**Appendix I**

**Witness Accounts**

## WITNESS ACCOUNTS

The location of witnesses that stayed in greater New Orleans during Hurricane Katrina and which provided deposition testimony that was incorporated in this report are shown in Figures I-1 through I-3.  The locations shown are where the witnesses stayed during the hurricane event and are placed in a location as accurate as can be determined from reviewing their testimony.



Figure I-1: Location of Lower Ninth Ward witnesses located north of N. Claiborne Ave. and west of Caffin Ave.



Figure I-2: Location of additional Lower Ninth Ward and St. Bernard Parish Witnesses.



Figure I-3: Location of Witnesses near the London Ave. and 17th Street Canals.

Testimony of Mr. Wilson Simmons:

Mr. Wilson Simmons lived at the corner of N. Roman St. and Reynes St. on the north east corner of the intersection.  He lived in a two-story home built on a slab.  The witness reported:

> In the neighborhood of 5:30, 5 o'clock, 5:30, there was this booming sound.  And the best way I can describe it to you is, I thought it was a transformer on one of the electrical poles probably just blowing out or something like that.

> P 35 Line 21 – P 36 Line 1

This noise was followed by the loss of electrical power.  Shortly after hearing this boom, the witness reported:

> …after hearing that booming sound, my home became inundated with water within 10 minutes or so.  My downstairs of my house flooded within 10 minutes.

> P 36 Line 3-7

He reports that within 10 minutes of the water entering his home, his first floor was flooded to the ceiling.  The witness went to an attic on the second floor and cut a hole in the roof of an attic above the first floor.  Sometime later, he climbed onto the roof above his first floor.  At this time, he reported "It was just at daybreak" (P 40 Line 12).  Once on the roof, he claimed that he saw the barge, and that "it was clearly in the residential area" (P 45 Line 1-2) in the vicinity of Jourdan Ave.  During the deposition, he opined that a catalyst was necessary for a levee failure, and speculated that the barge was that catalyst.

Analysis:

The timing of the first appearance of water (0500 to 0600) is similar to many other residents of the Lower Ninth Ward.  Times provided by witnesses are subject to considerable uncertainty, however.  Also, the term daybreak is open to much interpretation as the storm passing over would make it seem dark well into the day even though sunrise on the 29th of August 2005 technically occurred at 0636 (6:36) A.M.[1]  While standing on the roof, the area where the barge ended up was about 1000 feet away.  It is possible that the witness could see that far from his roof during the storm, although there is substantial proof and other accounts that the barge did not move once it hit the houses at Jourdan Ave. and N. Roman St.  The barge could not have been present at 0530 or 0600 (5:30 or 6:30 AM), in any event.

---

[1] Source: US Naval Observatory.

Concerning a catalyst, the events at other levee breaches (London Ave. Canal, 17th St. Canal) made it painfully clear that a levee or floodwall does not need a catalyst such as a barge to fail, and there were other failure mechanisms at work.

Testimony of Mr. Terry Adams:

Mr. Terry Adams lived on the corner of Deslonde St. and Law St.  The house was a single story with a crawlspace.  The witness woke at 0500 (5:00 AM) on the morning of August 29, 2005 and noticed "The carpet on the floor was wet" (P 18 Line 1).  He then climbed into the attic and onto the roof.  The witness estimates that he climbed onto the roof about 20 to 30 minutes after noticing the water.  At this time, Mr. Adams reported the water was ankle deep on his first floor.  While on the roof, he testifies:

> I'd say somewhere between 5:30 and 6:00 the levee right by my house, the water was kind of like coming under it.  I could see that. And a little over it.  But the levee was still there.  The levee was totally intact.

> (P 23 Line 24 – P 25 Line 4).

He claims that at 0600 (6:00 AM) he saw the barge hit the floodwall near the south breach site with a loud bang and he watched as the waters rapidly rose.  "I knew it had to be a barge because wouldn't nothing else be on the water" (P 24 Line 18-20).  After the barge entered the neighborhood, Mr. Adams reports:

> "The barge went in the neighborhood, and went toward Deslonde Street.  It was like going toward Deslonde and Tennessee Street"

> (P 27 Line 3-5).

The witness claims that his house started to float toward N. Claiborne Ave. Additionally, he stated that he could see the N. Claiborne Ave. liftbridge from his roof during the storm and that all of the trees in the way between his house, the N. Claiborne Ave. Bridge and the "most of the trees were stripped bare" (P 67 Line 16).  The witness claims that when the water from the south breach reached about Law St., the floodwall at the north breach gave way.  Mr. Adams states that his house was washed off of its foundation and moved toward N. Claiborne Ave.

Analysis:

The account of this witness concerning the timing and sequence of the breaches is not in accord with what others have said.  (For instance, the testimony is otherwise uniform that the north breach occurred first; and there is no doubt that this witness's house was displaced by water from the north breach, as it was pushed to the south).  The testimony also raises questions concerning timing,

visibility, and the witness's perception of events.  According to a line of sight survey by Gondalfo Kuhn, the witness was not at a vantage point where the south breach would have been visible.  Darkness, rain, wind, and distance all militate against this account.  The testimony does not overcome the objective wind, current and other evidence showing the sequence of levee breaches followed by the transit of the barge.

Testimony of Ms. Carolyn Berryhill:

Ms. Carolyn Berryhill lived on Deslonde St. between Roman and Prieur on the side closer to the IHNC.  The house was a two story four-plex built on a slab.  The witness claims that at about 0530 or 0545 (5:30 or 5:45 AM) "We all heard the grinding sound" (P 35 Line 4-5).  This grinding noise lasted about five minutes.  Sometime after this noise was heard water entered the first floor.  This caused the witness to go to the attic.  Once she was in the attic, the house collapsed and the roof floated away.  The witness also heard an explosion she thought was a power box.  (P 41).  The roof eventually got hung up on a tree on Deslonde St. to the south.  The witness then climbed into the tree to await rescue.  The witness claims that at 0800 (8:00 AM) the wind and rain started to pick up.  Elsewhere, she also stated that at 0800 conditions cleared up.  She stated that it was impossible to see in the darkness until the sun came out.  (P 47).  The witness did not see the barge come through the wall.  (P 113-14).  She did not see the barge until the eye of the hurricane had passed.  (P53-54).  She claimed that at 0800 she could see that barge, which was not moving.  The barge is the only reason she can think of as to how the levee failed.

Analysis:

The source of the "grinding noise" is unknown, but a wind-blown barge or other object could not have caused this noise because the wind was blowing from the east toward the west at that time (0530 to 0545).  The testimony regarding weather is not entirely consistent (clear at 0800, versus windy and rainy).  It would have been difficult for the witness to be precise about times, having been in the attic, then in a collapsed house, and then in a tree.  Even she recognized that visibility was impaired during the storm.

Testimony of Ms. D'Antionette Johnson:

Ms. D'Antionette Johnson lived on Deslonde St. between Tonti and Rocheblave on the side away from the IHNC.  The house was a one story duplex with a crawlspace.  Ms. Johnson lived in the front unit.  On the morning of the 29th of August 2005, the witness was woken up by friends staying with her saying that there was water in the house.  The witness says that she looked out the front door at about 0600 (6:00 AM) and saw water overtopping the floodwall along Jourdan Ave..  She described the overtopping as:

You have a cup of water, and just as the cup fills all the way to the top, if you drop an ice cube up in there, like some is going to come over the cup because it's too much water.

Page 34 Line 5-10

Alternatively, Ms. Johnson described the overtopping as like a bath tub overflowing after a person gets into it after being filled to the brim (P 35 Line 9-14).  As Ms. Johnson looked out of the front of her house, she claims that she saw:

…Like a big old wave.  I know it was tall.  I would say at least, and I am not over-exaggerating, at least 15 or 20 feet.

(Page 36 Line 1-5)

Ms. Johnson clarified the position the wave was traveling:

It was coming towards me.  It was coming, going towards St. Bernard Parish, Chalmette.

(Page 36 Line 12-14)

She climbed into the attic and onto the roof to escape the rising waters.  The witness believes it was approximately 0645 (6:45 AM) at this time.  About an hour after getting on the roof, the house broke in half and started to float away.  Ms. Johnson testifies "We floated more towards Florida Avenue" (P 47 Line 16-17). The house ended up on the corner of Rocheblave St.  The witness claims that she saw bubbles rising from the base of the floodwall, "Like as if the concrete fell and then it made bubbles come up" (P 49 Line 4-6).  She claims that once on her roof she could not see the floodwall to the north because her view was obstructed by trees.  She reports that she could see to about Prieur St. when looking south.  The witness states that she was not able to see the breaks in the floodwall while at the front door or while on the roof.  At no time did she see the barge (P 49-50).

Analysis:

The water initially entering the witness' home was likely the result of the north breach.  The surge of water that later demolished her house and washed it northward could have been the result of the south breach.  The timing of the first sighting of water is consistent with several other witnesses.  Concerning the large wave in the canal, there is no reason a 15 to 20 foot wave would be present in confined, relatively shallow waters; this was a torrent of water unleashed from the south breach, perceived as a wave in the canal.  Thus, possibly the witness saw the south breach occur, without participation by the barge.  The account of water

overtopping the wall at 0600 (6:00 AM) is plausible due to possible uneven subsidence of the floodwall and high water levels.

Testimony of Mr. Kendrick Pounds:

Mr. Kendrick Pounds lived in the same home as the previous witness, D'Antionette Johnson on Deslonde St. between Tonti and Rocheblave. The witness lived in the rear unit but was in the front unit with Ms. Johnson during the storm. The witness claims that he woke up at 0550 (5:50 AM) on the morning of the 29th of August and noticed that "…it looked like a lake outside" (P 23 Line 13). He also stated "The house was shaking real hard, like an earthquake was coming or something" (P 24 Line 16-17). He claims that he was able to see a large hole in the floodwall at the approximate location of the south breach (P 25). He gives the size of the breach relative to reference points in the conference room that the deposition is being taken in. He also claims that he saw a smaller breach to his right where the north breach would have been. The witness reports that overtopping began at 0558 (5:58 AM, P 29 Line 21) and that overtopping was not occurring when he first looked out of the front door. As the water rose, the witness climbed into the attic and onto the roof. He claimed that daylight occurred when he climbed onto the roof and that about 10 minutes after climbing onto the roof, the house broke in half and was washed north. The hurricane finally passed at about 1500 to 1600 (3:00 to 4:00 PM). The witness never saw the barge and claims that the levees were blown up. Prior to Katrina the witness reports that he saw water accumulating at the base of the levee near N. Prieur St. He thinks that this may have been caused by a broken pipe. He did not see a barge at any point. (P 36-37; 133-34).

Analysis:

There are inconsistencies in this account, including the size and timing of the breaches. It is unlikely that the witness would have seen water flowing through both breaches from his vantage point. Also, the time was prior to civil twilight. The testimony does not suggest any involvement by a barge, however.

Testimony of Mr. Arthur Murph:

Mr. Arthur Murph lived on Jourdan Ave. between N. Roman St. and N. Derbigny St. The house was a single story and built on a slab. The witness reports that rain started on the evening of the 28th. On the morning of August 29th the power went out. The witness went to his garage to start his generator. During this time he reported that there were strong winds and rain. While walking down his driveway he heard a "rubbing and banging" (P 44 Line 20) noise and then noticed water flowing down Jourdan Ave. from the north. According to Mr. Murph, "It was coming down the street" (P 49 Line 12) and "it was coming fast" (P 49 Line 22). The witness then went back inside his house and climbed into his attic. When he noticed the water rising very slowly he descended from his attic and returned to the first floor for a while until the water started to become too high. He then

returned to the attic where he waited for what he thinks might have been several hours (P 151 Line 2-12). The witness eventually broke through his roof and climbed on top. Once on the roof, he turned around to look in the direction of the floodwall and observed the barge resting "On the front of the house" (P 60 L 2). He then swam to a neighboring two story house. Mr. Murph testified that he never heard the barge hit his house (P 60 Line 12-14). At the time this happened he reported that it was dark. This witness has cut the grass on the levee across from his house for some time and never noticed water accumulating at its base. When standing on the roof, he reports that water was flowing from north to south.

Analysis:

The water the witness reports flowing down Jourdan Ave. while he was standing in his driveway likely came from the north breach based on the time it took for the water took to rise. The source of the scraping noise is not known but would not have been a wind-blown object at this time of the morning, as the wind was blowing from east to west. Although the witness reported that it was still dark when he saw the barge and swam to the next house, he also noted it was several hours after the water had risen and he was in his attic. If the witness went out to start the generator at 0600 (6:00 AM) and then stayed in his home and attic for several hours, this could easily put the barge sighting after 0900 (9:00 AM).

Testimony of Mr. William Villavasso:

Mr. William Villavasso was an employee of the New Orleans Sewerage and Water Board working at Pump Station 5 at the time of Hurricane Katrina. This station is located on Florida Ave. at the end of Jourdan Ave. and Deslonde St. The witness reports heavy rain at approximately 0300 (3:00 AM) but is not sure of what time it started. At some point, while looking out of the back door, the witness reported that he saw water splashing over the secondary levee behind the pump station. At about 0300 (3:00 AM) water was reported to be splashing over the IHNC floodwall. The witness looked out the switchgear room doors, which face west, and a strong wind ripped one of the doors off of its hinges. Shortly after looking out this door the witness heard a transformer pop and saw the IHNC floodwall toppled over near Florida Ave. The witness claims that he saw "what appear to be metal structure like a barge, only the tip of it. Couldn't tell you I seen a whole barge, because I didn't" (P 64 Line 21-24). He later claims "I seen the top part where it appears to be a piece of steel, what appeared to be a barge to me, and it was like from maybe a foot, foot and a half, two feet at the most" (P 202 Line 11-15). It was clarified that this one to two foot figure is what he could see of the object from top to bottom. Mr. Villavasso testified that the object never moved (P 97 Line 10-11).

After seeing the break the witness reports that water began to rise rapidly in the Lower Ninth Ward. The witness called central control on a radio and told them to

cut power to his pump station because of the flooding. It was reported that central control log received this request at 0610 (6:10 AM) but the witness did not so testify.

The witness reports that he saw a large wave "Coming from Southern Scrap towards the Florida Bridge, coming that way, going towards the Claiborne Bridge" (P 187, Lines 3-5). When this wave reportedly reached the floodwall in the vicinity of Florida Ave. the break occurred. The witness thinks he saw the object that he thought was the tip of a barge engulfed in this wave as it rushed toward the floodwall. However, the witness was nearsighted and was not wearing his glasses at that time. At the time the failure of the IHNC floodwall was observed the witness reported that the splashing over the wall had become more severe. The witness did not report seeing the sun until the next morning.

Analysis:

This witness testimony confirms that the north breach occurred before the south breach, and likely before 0600 (6:00 AM). The object that the witness reported to have seen could not have been the barge ING 4727 for several reasons, which are mentioned in the text of the report.

Testimony of Mr. Ronald McGill:

The witness lived on Reynes St. between N. Derbigny St. and N. Roman St. and the house faced away from the canal. The house was one story built on a crawlspace with a two story addition in the back built on a slab. The witness reports that he went outside at some point the night before Katrina and there was standing water from rain on the streets, but was shallow at that point. The witness reported that water first entered his house at about the time the power went off. He also heard a boom at this time (P 50) but did not know the cause (P 72 Line 19-22). Mr. McGill went into his attic when water entered his house, then climbed onto the roof a short time after entering the attic. At some point, the house broke in half. The witness was picked up by boat around dawn and taken to the N. Claiborne Ave. Bridge. The witness heard a boom while he was in his house at about the time that flooding began. The witness saw the barge when he arrived on the N. Claiborne Ave. Bridge (P 60 line 13-15). The barge was on Jourdan Ave. The witness said that visibility was poor. (P 45 Line 4-8).

Analysis:

This witness did not provide much relevant information. The witness remembered no approximate times that the events in question took place. Other than the fact that it was the south breach that ultimately broke his house in half, and that visibility was poor, there are no other observations that can be made from this witness's testimony.

<u>Testimony of Mr. Donald McCrosky</u>:

Mr. McCrosky was the plant manager of the Entergy Michoud power plant located along the combined MRGO / GIWW canal in New Orleans East. The witness had arrived at the plant the Sunday before Katrina made landfall and was tasked with preparing the facility for the coming hurricane. Throughout the time the witness was at the Entergy Michoud facility he took video and still photos of the hurricane event. The photos and videos provide a log of the storm surge in the MRGO / GIWW canal, wind, rain and general visibility during the storm. The witness states that at 0615 (6:15 AM) the wind was blowing from east to west (P 42 Line 21-22). The wind direction later backed and took on a more west-east component. The photos and video taken by the witness show that it was not possible to see the south bank of the MRGO from the Entergy plant during the storm (P 44 Line 17-21).

Analysis:

The witness' statements about the wind direction concur with data that was taken during the storm. This further shows that the winds could not have blown barge ING 4727 into the IHNC floodwall early in the storm. The south bank of the MRGO was approximately one quarter mile from the location where Mr. McCrosky took his photos and video. The fact that the south bank was not visible shows how poor the visibility was during the peak of the storm. The Entergy Michoud facility is approximately 5 ½ miles from the location of the Lower Ninth Ward breaches, meaning that it was close enough that the prevailing conditions such as wind and visibility would have been similar at both sites. Mr. McCrosky's video and photos show that some witness' claims that they could see events occurring a long distance away are unreasonable.

<u>Testimony of Mr. Earl Lackings</u>:

The witness lived on N. Miro St. between Reynes and Forstall. The witness was sitting in a car in front of his house with his brother when "We heard a big boom" (P 55 Line 19). The witness got out of the car and walked to the corner of Reynes and N. Miro (P 60 Line 2-4). The witness did not know the time of the booms. (P59 Line 9-23). After standing in that location for several minutes, the witness returned to the car. After returning to the car, the witness reported "…about five, ten minutes later, you know, water was coming all in the car" (P 61 Line 15-17). The witness stated that "The water was coming down Reynes Street" (P 63 Line 3-4). Mr. Lackings reports that the water was flowing from the direction of Tonti St., which was located 1 block north of N. Miro (P 66). Upon seeing water, the witness went to his neighbor's 2 story house where he gathered necessary items and immediately went to the attic. Eventually the witness broke through the roof. Mr. Lackings reported it to be daylight when he broke through the roof, and repeatedly stated that not a lot of time had passed between first seeing the water and breaking through the roof.

Analysis:

The witness did not know what time any of the events he described occurred. Like many other witnesses, Mr. Lackings heard a loud boom. The water that was observed after hearing the boom would had to have come from the north breach, as it flowed south down a N-S oriented street. N. Miro St. was located north of the south breach, so water from the south breach would not have reached N. Miro St. by coming from the north. More time may have passed between entering the neighbor's house and breaking through the roof than the witness had stated.

Testimony of Ms. Dakeia Johnson:

The witness lived on Lamanche St. between N. Miro St. and N. Galvez St. The house was located on the east side of Lamanche St. The witness "was thrown out of the bed" (P 35 Line 15-16) and heard "A big boom" (P 35 Line 21). Ms Johnson states that she heard one boom before being thrown from her bed, but that boom did not wake her up (P 36). Shortly after, at about 0600 to 0630 (6:00 to 6:30 AM), the witness looked out of the kitchen window and observed water rising (P 45 Line 3-10). The water was observed to have been flowing from the direction of the canal (p 45 Line 18). The witness eventually climbed on the roof of a neighboring house that had floated off its foundation. The witness reported that it was sunny at the time she climbed on the roof of the neighboring house, which she thinks was 0700 to 0730 (7:00 to 7:30 AM). She said the weather worsened in the 0830 to 0900 (8:30 to 9:00 AM) timeframe.

Analysis:

The witness' describes the boom as being more severe than other witnesses had reported. This witness lived approximately 2/3rd of a mile from the IHNC breaches, further than any of the other of the Lower Ninth Ward witnesses. Because of the witness's statement that the boom felt more powerful than it felt to many people that lived closer to the breach, it is possible that the boom came from a source other than the breaches or that the witnesses in this house overstated the severity of the boom.

Testimony of Ms. Patrina Peters:

The witness was the mother of Dakeia Johnson and lived in the same house. Ms. Peters states that her home was built on a crawlspace. The witness woke at about 0500 (5:00 AM) on August 29th and watched television and started a pot of coffee. As Ms. Peters was about to return to the kitchen to get the coffee, she heard a loud boom which shook the house (P 61 Line 6). She reported that her daughter Dakeia was still asleep at this time. The witness goes on to testify:

> And then like within about 10 minutes or so within that time, I heard the boom again.  I heard the boom again.  And at this time this boom, it shook everything, like the house was shaking.  It was like an earthquake.

> P 61 Line 16-22

This shaking was reported to have lasted about five minutes.  Shortly after hearing the booms, Ms. Peter's daughter noticed water outside.  Ms. Peters fled to the roof of a neighboring house along with her daughter.  She stated that she believes the levees were dynamited.  (P43 Line 3 – P 44 Line 14).  The witness did not see a barge at any time.  (P 78).

Analysis:

Ms. Peters, like her daughter Dakeia who was present in the same house, states that the booms were very loud and violent, with severe and pronounced shaking.  This description is not consistent with that of other witnesses.  In any event, it is known that booms were heard at other breaches (17th Street and London Ave. Canals) where no barges were present.

Testimony of Mr. Damond Peters:

The witness had lived at the same house as his mother Patrina Peters and his sister Dakeia Johnson, but had evacuated the day before Katrina made landfall.  The witness states that at 0530 (5:30 AM) on 29 August he received a call from his mother that she had heard a loud boom.  He states that about a half hour after that call, he had received a second call from his mother where he was told she heard a second boom.

Analysis:

Mr. Peters' testimony closely matches that of his mother's experiences.

Testimony of Mr. Andrew Sartin:

The witness lived on N. Roman St. between Andry St. and Flood St.  The house was on the south side of N. Roman.  He says that he went to the N. Claiborne Ave. Bridge on Sunday evening and saw water "lapping right at the top" of the wall.  (P 53 Line 3 – P 54 Line 4).  The witness woke up on Monday the 29th of August at daybreak.  He reported "It was raining.  Wind blowing hard" (P 39 Line 23) at that time.  Mr. Sartin stood on his front porch "…they had a loud crash back, you know, back there by (Southern) scrap I heard" (P 44 Line 25 - P 45 Line 2).  He estimates the time of this noise as 0600 to 0630 (6:00 to 6:30 AM).  But he says it was "already daylight."  P 45 Line 15-16).  After hearing this noise, he saw "…a big 'ole tidal wave coming down the street" (P 50 L 3-4).  About 10 to

15 minutes (P 51 Line 17-20) after this, he heard a second noise from the direction of the Claiborne Ave. Bridge, which was louder than the first noise (P 50 Line 22-23).  After hearing this noise, the witness reports that the water rose to the ceiling in 30 minutes (P 57 Line 1).  The witness said the winds were blowing from the direction of St. Bernard parish toward the IHNC on the morning of 29 August.  (P 41-42).

Analysis:

It is doubtful that water from the north breach would have arrived at Mr. Sartin's house as quickly as his testimony would suggest.  This water likely came from the south breach.  If Mr. Sartin's accounts are reliable, this would put the timing of the south breach at right around daybreak (~0630 to 0700).  This is somewhat earlier than IPET and ILIT, but consistent with the testimony of Ernest Edwards, who said overtopping was taking place before then.  The wind was blowing from east to west at that time as Mr. Sartin's testimony states, and hence the barge could not have been involved.

Testimony of Dr. Reed Mosher:

Dr. Mosher is an employee of the US Army Corp of Engineers.  The purpose of this deposition was to gain the Corp's official opinion on what caused the failure of the floodwalls during Hurricane Katrina (as opposed to IPET, which was an independent investigation sponsored by the Corps.  The witness attributes the south breach to overtopping and the north breach to an inadequate landside embankment.  He states that the Corp concluded that the barge did not cause the breach.  The witness also states that underseepage is unlikely to have been a cause of the south breach because of the results of their transient seepage analysis.

Analysis:

Dr. Mosher's testimony closely matches the causes given in the IPET Report.

Testimony of Mr. Ernest Edwards:

The witness lived on Deslonde St. between Johnson and Galvez on the side of the street nearer the canal.  The house was one story built on a slab.  The witness went to the ramp over the floodwall to Surekote Road several times the night before the storm, the last time at about 0130 (1:30 AM) on the 29th.  At this time the witness observed the water to be about 1-2 feet from overtopping the floodwall.  He states that he saw a barge tied up across the canal at this time.  The witness then drove his trailered boat to the Claiborne Ave. Bridge.  At the time the witness arrived at the bridge, about 0145 (1:45 AM) (P 77 Line 10), the floodwalls "Hadn't started topping" (P 77 Line 23).   The witness reports

overtopping as starting at about 0245 (2:45 AM) (P 78 Line 4).  Initially, Mr. Edwards reported that he could see the floodwall, but eventually

> …because it was raining so – It turned snow white.  Couldn't see out the truck anymore"

(P 78 Line 17-19).

While on the bridge, the witness observed water "inching up and inching up" (P 82 Line 9) on the Lower Ninth Ward side ramp, which forced him to move his truck up the bridge further.  Mr. Edwards states "The first person I rescued was 7 o'clock that morning" (P 84 Line 7-8).  This person was rescued directly from the bridge; the witness had not launched his boat yet.  He launched his boat at about 0900 (9:00 AM) (P 86 Line 6).  At some point during the night, two loud booms were heard (P 87 Line 17-18).  The witness suggests he believes he saw the barge at about 0700 (7:00 AM) in the Lower Ninth Ward (P 89 Line 2).

Analysis:

The witness reports overtopping earlier than other sources, but for several reasons it is plausible that the floodwall was subject to considerable overtopping before the still water level reached the reported wall top height.  The sighting of the barge at 0700 (7:00 AM) is too early as there was no way the barge could have been carried away from the Lafarge Terminal based on conditions at this hour – but based on the sequence as reported by this witness, regardless of the time of sighting it would have been well after the breaches occurred.

Testimony of Mr. Wallace Rainey:

The witness was a pump operator at pump station 5 in the Lower Ninth Ward. The witness reported strong winds throughout the day of the 28th and reported rain started sometime in the night.  At some point, water entered the pump station and began to flood the motor pits, so a call was sent out the central control to cut power to the station.  This was slightly before daybreak.  The water was reported to have been coming from over the railroad tracks (Forty Arpent Levee) and down the pump station driveway (P 30).  Mr. Rainey reported that the water flowing down the driveway looked "…just like, um – a fast river or something" (P37 Line 3-4).  The witness never reported seeing water coming over the IHNC floodwall or witnessed the floodwall failure.  Mr. Rainey testifies that no one had ever told him that they saw the floodwall collapse or that they had seen a barge hit the floodwall (P39 Line 20-25).  The witness first saw the collapsed floodwall on Tuesday morning (P 41 Line 20).

Analysis:

The witness's account matches that of Mr. Villavasso concerning the approximate timing of the power cut off (about daybreak).  The witness never

saw anything resembling a barge and never heard Mr. Villavasso talk about his description of the floodwall failure.

Testimony of Mr. Stephen Lentz:

During Katrina the witness lived at 326 Tacoma Ave near the 17th Street Canal floodwall.  The witness woke slightly before 0700 (7:00 AM) on 29 August and noticed that there was water in the streets that halfway submerged the wheels of his pickup truck.  The witness was getting ready for work at some time between 0730 and 0815 (7:30 and 8:15 AM) when he heard a loud boom.  After hearing the boom, the water began to rise rapidly and the witness was driven into his attic.  The witness reports that the boom noise came from the north.  While in the attic, the witness used a hatchet to chop a hole in the roof.  After two hours on the roof, the witness was rescued by a boat and taken to a higher commercial building.  From the roof of this building the breach in the floodwall was visible.  A strong current was reported as coming through the breach.

Analysis:

The witness heard a loud boom sound near a floodwall failure that no one attributes to a barge impact.  The boom was likely the sound of the floodwall overturning and releasing a large torrent of water into a neighborhood.  The booms heard in the Lower Ninth Ward were likely also caused by a failing floodwall.

Testimony of Mr. Aaron Lee:

The witness was returning to his home in Gentilly from a relatives home in St. Bernard.  When the witness was driving on Mirabeau Ave. in the vicinity of the London Ave. Canal, he heard a loud boom.  Immediately water started rising at a rapid rate.

Analysis:

The witness was immediately adjacent to the London Ave. Canal breach when the breach occurred.  The failure of the floodwall is what caused the loud bang.  This shows that loud booms were typical of all floodwall failures during Hurricane Katrina.

Testimony of Mr. Gregory Campbell:

The witness lived on Mirabeau Ave. in Gentilly during Katrina.  At about 0900 (9:00 AM) on the 29th, the witness heard a boom and saw water rushing down Mirabeau St..  The sound came from the London Ave. Canal.

Analysis:

The boom heard by the witness was from the London Ave. Canal floodwall failure.

Testimony of Ms. Jackie Campbell:

The witness lived at the same Mirabeau Ave. home as Gregory Campbell.  From the inside of her home, she heard a loud sound that sounded like an explosion.  She then ran to a window and saw water flowing from the direction of the canal.  About 20 to 30 minutes later, the water level had reached the first level of the house.

Analysis:

The boom heard by the witness was from the London Ave. Canal floodwall failure.

Testimony of Ms. Marenthia Lagarde:

The witness lived at 1815 Jourdan Ave. between N. Roman St. and N. Prieur St.  She evacuated the day before Katrina.  While watching TV at the hotel she was staying in, she claims to have seen video shot from a helicopter of the Lower Ninth Ward levee breaches, including the area where her house was located and where the barge ended up.  She did not see the barge in the video, and believes the video was taken before the barge entered the Lower Ninth Ward.

Analysis:

If Ms. Lagarde had seen video footage taken on Monday morning prior to the barge arriving in the neighborhood, that would establish the breach occurred without the barge.  Clearly, that is what she reported seeing.  By the same token, Ms. Lagarde would have seen the video of the Lower Ninth Ward on late Monday or Tuesday.  At that time, the barge would have been in the neighborhood.  Either Ms. Lagarde is correct, in which case her testimony establishes that the breach occurred without the barge or she is mistaken, in which case her testimony reflects that eyewitness testimony is not definitive with respect to the event.

Testimony of Mr. Robert Green:

The witness lived on the west side of Tennessee St. between N. Roman St. and N. Prieur St.  He was woken by his brother who noticed water in the house (P 88 Line 3-4).  At that time he did not know what time it was, but after the storm he spoke with a neighbor who was listening to the radio when she noticed the water.  The radio indicated that it was about 0400 (4:00 AM) at that time, so Mr. Green

accepts this as the time the water was noticed.  The water was about shin deep in Mr. Green's bedroom when he was woken up (P 92 Line 16).  After trying unsuccessfully to reach a 2 story house across the street, everyone in the house went to the attic and ultimately onto the roof.  While on the roof, the witness believes he could see as far as Egania St. because of the conditions.  The house floated off of the foundation and moved toward Claiborne Ave..

Analysis:

Mr. Green's experiences are consistent with those of witnesses who lived close by.  The initial water may have come from the north breach, while the flow of water that displaced the house from its foundation may have been the result of the south breach.

Testimony of Mr. Kevin McFarland:

The witness lived on Forstall between Claiborne Ave. and Derbigny St.  The front of the house faced away from the canal.  The witness woke at about 0600 (6:00 AM) and noticed strong wind and heavy rain, but observed no water (P 45 Line 25).  He then laid back down in when he heard a loud boom (P 48 Line 18-20).  The witness went to investigate the boom, but saw nothing so he laid back down again.  Shortly later he noticed water entering his home.  The witness then went to the attic and roof of a neighboring 2 story house.

Analysis:

The witness reports flooding later than many others, reflecting the overall uncertainty inherent in witness accounts, especially relating to timing.  The witness never claims to have seen the barge before being brought to the N. Claiborne Ave. Bridge.

Testimony of Mr. Alfred McRoyal:

The witness lived on Wickfield Ave. in Gentilly, 1 block east of the London Ave. Canal near Prentiss Ave.  On Monday morning, the witness was outside his house when he heard a boom from the south.  Shortly after, he saw cars being pushed down the street sideways by water.  The witness thinks the levee was blown up.  The witness states that the cars were being pushed toward the lake.  A second explosion was heard from the north, with the second one being louder than the first.

Analysis:

The witness lived well north of the London Ave. east floodwall failure.  The first boom would have been the east failure.  Water from the east breach would have reached Mr. McRoyal by traveling north.  The London Ave. west breach was

much closer to Mr. McRoyal's home.  That explains the second boom being louder.  Since Mr. McRoyal lived on the east side of the canal, water from the west breach did not affect Mr. McRoyal to a large degree, as he was already flooded from the east breach.

Testimony of Mr. Richard Riess:

The witness was a pump operator at the OP-5 pump station on Florida Ave..  Mr. Riess states that the floodwall was visible from the pump station when the wind and rain were not strong.  At about 0600 to 0615 (6:00 to 6:15 AM) Mr. Riess was alerted by Mr. Villavasso about water rushing down the pump station driveway (P 53 Line 15-20).  Eventually, Mr. Riess noticed that water was coming from the direction of the IHNC (P 56 Line 25).  The witness reports that water started to enter the pump station about 35 to 40 minutes after first noticing the water flowing from Southern Scrap (P 57 Line 19).  Power was believed to be lost at about 0300 to 0400 (3:00 to 4:00 AM), but not the 25Hz power for running the pumps (P 49 Line 3-7).  Mr. Riess states that William Villavasso never told him anything about a barge hitting the floodwall or seeing the wall fail (P 52).  Villavasso is the one that alerted Mr. Riess that there was flooding outside, and that was about 35-40 minutes before water flooded the pump station at 0615 (6:15 AM) (P 53).  Mr. Riess did not see a wall of water in the canal (P 54 Line 15-16).
Analysis:

As was shown in William Villavasso's deposition, the request for switching off 25 cycle power to station OP-5 was received at 0610.  Given this, Mr. Riess' account of water entering the pump station about 35 to 40 minutes after noticing the water flowing from Southern Scrap puts the sighting of that water about a half hour before he stated in his deposition.  On many issues, Mr. Riess' testimony closely matches that of William Villavasso, with the exception of claiming to have seen a barge wedged in the floodwall break.  This testimony puts the occurrence of the north breach at about 0530.

Testimony of Ms. Arcola Sutton:

The witness lived on Jourdan Ave. between Law St and Dorgenois.  Ms. Sutton was watching TV early Monday morning when she heard a loud boom that shook the house.  She believes this occurred at about 0505 (5:05 AM) (P 74 Line 9).  Shortly after hearing the boom, water started to enter the witnesses house (P 76 Line 1), which was built over a crawlspace.  Ms. Sutton let her friend who was staying with her out the front door.  The friend then climbed on top of the roof.  Ms. Sutton says that it was not dark at this time (P 83 Line 19).  She then went into the attic and onto the roof.  At that time, it was raining very hard and Ms. Sutton "Couldn't see nothing" (P 94 Line 14).  She never saw the levee break (P 100 Line 7), and never saw the barge (P 108 Line 5).

Analysis:

There is a conflict when Ms. Sutton says that she heard the boom at 0505 (5:05 AM) and when a few minutes later she said it was getting to be daylight when she let her friend out the front door. Daylight would have been more than an hour after the boom was reported. Ms. Sutton however never saw a barge until returning to the neighborhood after it was dried out.

Testimony of Ms. Joy Davis:

The witness lived on Allen St. about 4 blocks south of Mirabeau Ave. Allen St. runs parallel to the London Ave. Canal about 3 blocks east of the canal. Water started to enter the house sometime after daylight. The water was coming from the north (Mirabeau Ave. direction). Just before the water came, a loud boom was heard. Within 30 minutes of hearing the boom, the first floor of the house had flooded.

Analysis:

Miss Davis' testimony closely matches that of other witnesses near the London Ave. Canal, where a boom was heard despite no barge being involved.

Testimony of Ms. Debra Blackwell:

The witness lived on Wickfield Ave. between Prentiss and Burbank. While talking on the phone, a loud boom was heard. 20 minutes later, water entered the house.

Analysis:

Ms. Blackwell's testimony closely matches that of other witnesses near the London Ave. Canal, where a boom was heard despite no barge being involved.

Testimony of Mr. Glenn Cross:

The witness lived on Carnot St. between St. Anthony and Annette. At 1000 – 1030 (10:00 to 10:30 AM), the witness went outside to check damage. The witness went inside, then into the back yard some time later when he heard a boom. After hearing the boom, the witness and his friend started to walk toward Mirabeau to investigate the boom. Immediately, they were faced with water coming down Annette St. from the north. The witness ran back to his house and watched the water gradually rise. The water took several hours to begin to flood the house, which was raised off of the ground.

Analysis:

The witness reports water rising slower than other witnesses at the London Ave. breach.  This may be because he lived to the south on slightly higher ground than to the north, where most of the water flowed.  The boom noise is consistent with the other witnesses at the same breach site.

Testimony of Mr. Arthur Foley, Sr.:

The witness lived on Van Ave., on the west side of the London Ave. Canal and several blocks south of Mirabeau Ave.  The witness was woken on Monday the 29th by a boom sound.  He reported that it was daylight at this time.  About 1/2 hour passed between hearing the boom and having water enter the house.

Analysis:

It is not clear what floodwall failure was associated with the boom heard by Mr. Foley, but the water probably came from the London Ave. west breach.  Mr. Foley is consistent with the other witnesses when he heard the boom.

Testimony of Ms. Lula Watson:

The witness lived in the same house on Van Ave. as Arthur Foley.  Ms. Watson was woken up at 1330 or 1400 (1:30 to 2:00 PM) by Arthur Foley, and at that time there was water in the house.  The witness reports having heard a boom at about 0200 or 0300 (2:00 to 3:00 AM), at the same time that a tree fell on the house.  The witness went to the attic after water entered the house.

Analysis:

It is not likely that Ms. Watson heard the boom associated with the floodwall failure at 0200 to 0300 (2:00 to 3:00 AM), as that was far too early for the breach to occur.  But the hearing of a boom at a breach with no barge present is consistent with others' testimony.

Testimony of Ms. Helen McNeal:

The witness lived on Van Ave. immediately to the west of the London Ave. Canal. On the morning of the 29th, the occupants of the house went outside to inspect for any possible damage.  They noted that there was water accumulated in the street at that time.  After inspecting the house, a boom was heard.  Water than started to rise much faster, and the witness made her way to the attic.

Analysis:

Ms. McNeil's testimony closely matches that of other witnesses near the London Ave. Canal.

Testimony of Mr. Raymond McNeal:

The witness lived on Van Ave. in the same house as Helen McNeal.  Mr. McNeal was outside inspecting damage in the morning of the 29th when he heard a boom, described as like a sonic boom.  After hearing the boom, the witness went back inside the house.  Water then entered the house.  The witness observed the water to be flowing from the north.

Analysis:

Water coming from the north would have originated at the London Ave. west breach, which was at the far north end of the canal.  The west breach was about 1.3 miles from Mr. McNeal's home, while the east breach was one-half mile away.  If any breach was heard, it was more likely the east breach.  Other details closely match those of other witnesses.

Testimony of Mr. Darion Hunter:

The witness lived on Wallace Drive, south of Mirabeau Ave. on the east side of the London Ave. Canal.  He was inspecting damage on the 29th of August, when he heard what he describes as four consecutive explosions.  The witness was walking up Annette St. near Brutus when he heard the booms.  Before hearing the booms, Mr. Hunter observed that there was water in the streets.  Once the booms were heard, the water rose very quickly.
Analysis:

Mr. Hunter's testimony closely matches that of other witnesses near the London Ave. Canal.

Testimony of Mr. Jerome Aguillard:

The witness lived on Brutus St. in Gentilly one block south of Mirabeau Ave. and one block east of the London Ave. Canal.  The witness went outside the morning after the hurricane when he heard a muffled boom.  Water entered the house about 30-40 minutes after the boom was heard.  Mr. Aguillard reports that the water was coming from the north.

Analysis:

Mr. Aguillard's testimony closely matches that of other witnesses living near the London Ave. Canal.

Testimony of Ms. Sarah Price:

The witness lived on Chatham Drive on the west side of the London Ave. Canal. On the morning of the 29th, the witness heard a boom, and shortly after water started to flood the ground outside.

Analysis:

Ms. Price's testimony closely matches that of other witnesses living near the London Ave. Canal.

Testimony of Mr. Kenneth Henderson:

The witness was a St. Bernard Parish Council member and was at the St. Bernard Government Complex at the time of Katrina.  The weekend before the hurricane made landfall, Mr. Henderson and others traveled to the MRGO to monitor the conditions and water levels.  As the hurricane approached, an access road on the water side of the MRGO levee was observed to be flooded. At about 0900 or 1000 (9:00 or 10:00 AM) Monday morning, the Sheriff substation in Arabi called the St. Bernard Government Complex and informed that the substation was taking water.  Shortly thereafter, water was noticed on the streets outside of the government complex.  By about 1100 (11:00 AM), the water in the first floor of the building was 4-5 feet deep.

Analysis:

The witness describes flooding that occurred without the strong flow that occurred near the breaches.

Testimony of Ms. Polly Boudreaux:

The witness was at the St. Bernard Parish Government complex during Katrina. Ms. Boudreaux observed water rise outside of the building before entering the first floor.  Ultimately, she was forced to the second floor.

Analysis:

The witness describes flooding that occurred without the strong flow that occurred near the breaches.

Testimony of Ms. Marie Benoit:

The witness lived on Deslonde St. at Rocheblave St.  The house was on the canal side of Deslonde.  Ms. Benoit evacuated the Sunday before Katrina, and as such did not witness anything.

Analysis:

Ms. Benoit was not present during the storm, and had no relevant information to add with respect to this investigation.

Testimony of Mr. James Ruiz:

The witness lived on Lebeau St. in Arabi.  The house was one story and raised about three feet off of the ground.  At 0915 (9:15 AM), Mr. Ruiz received a call on his cell phone telling him to look outside (P 18 Line 7), and there was water on the street and in his yard about 2 feet deep (P 19 Line 2).  Within about 35 minutes, water came into his house and rose 6 to 7 feet deep (P 19 Line 9).  At the time the flooding started, the witness reported strong winds coming from the north-west (P 53 Line 6).  The witness thinks the water was flowing from the west.

Analysis:

Mr. Ruiz's statements concerning the wind seem to be quite accurate for that time, which was well after the IHNC breaches occurred.  Because he lived a distance away from the breaches, he experienced only rising water and not the effects of rushing water.

Testimony of Ms. Sally Ann Jones:

The witness lived on Mehle St. in Arabi.  The house was a raised one story.  At about 0630 (6:30 AM), the witness observed a few inches of water in her driveway.  At 0810 (8:10 AM), the witness reported looking out the front window and seeing a "tidal wave" (P 29 Line 21) heading for the house.  Shortly thereafter, the water entered the house and rose rapidly.

Analysis:

It is not expected that a witness living so far from the breaches would see a large wave moving down the street.  A large wave would have created more damage than was present in the southwest corner of St. Bernard Parish.

Testimony of Mr. Christopher Weaver:

The witness was living on Jourdan Ave. between Florida Ave. and Law St.  He woke up about 0500 to 0530 (5:00 to 5:30 AM) on the morning of the 29th.  At this time, Mr. Weaver testifies:

> …when I stepped out of bed, they had – the floor was wet.  They has a little water in the house and first thing came to my mind the toilet or something was running over.  I opened the bedroom door, I

could see the water in the house and I went looked out the window.
I saw the water topping over the levee.

Page 82 Line 12-18

Mr. Weaver repeatedly affirmed that water was overtopping the floodwall at 0500 – 0530 9 (P 85). After escaping from his house through a window and climbing onto the roof, Mr. Weaver noticed "the levee got a big hole in it" (P 88 Line 8-9). After escaping from the house, a large rush of water came (P 89). The witness never saw the barge at either breach site (P 132 Line 1-5). He also admits that he would not have been able to see the south breach location from his house (P 142 Line 6-11). Mr. Weaver stated that in the past, he had seen water accumulating near the levee (P 158 Line 18-21).

Analysis:

Mr. Weaver's testimony closely matches that of Terry Adams in certain respects but not others. Both witnesses describe flooding before their houses were washed away. This supports the theory that the north breach failed in stages, rather than letting go all at once. Mr. Weaver never saw a barge, despite looking at the floodwall in the vicinity of the north breach. Mr. Weaver's statements about visibility and viewing the south breach site do not match Terry Adams' claim that he saw the barge strike the floodwall at the south breach site.

Testimony of Ms. Dolores St. Cyr-Butler:

The witness lived on N. Johnson St. on the corner of Choctaw St. The house appears to be a raised one-story home with a 2-story addition built on a slab in the back. At some point on the morning of the 29th, an upstairs window was blown out of Mrs. Butler's house. When this happened, she went to the garage to get a sheet of plywood to cover the window. She testifies:

> When I got down in the garage, I heard boom, boom, boom, and then the water came in. And when the water came in, it came up so fast that by the time I ran upstairs, I was looking for my husband, and he was pulling himself up behind me, and he said – I told him, I said, baby, that water is coming in. He said, yeah. He said I almost couldn't make it up the steps.

Page 32 Line 8-16

The witness states the water rose very fast after first arriving. After the water rose above the second floor, the witness went to the roof, and was rescued two days later and brought to the St. Claude Ave. Bridge. She never saw the barge during this time.

I-24

Analysis:

Mrs. Butler's home was likely flooded by water coming from the south breach, judging by the location and how fast it flooded. Her testimony is similar to Wilson Simmons in how fast the flooding occurred. Mrs. Butler does not remember what time the flooding occurred.

Testimony of Mr. Sidney Williams:

The witness lived on Tennessee St. between Derbigny and N. Roman St. The house was on the west side of Tennessee St. The witness states that he woke up at about 0230 (2:30 AM) Monday morning when his generator stopped running because "the water had done got to it" (P 34 Line 20-21). He estimates that when he looked out of the door at this time, the water was about 2 feet deep (P 36 Line 22-23). The witness went to the attic, then heard three booms a few seconds apart (P 45-46). He looked out of a hole in the rood and claims to have seen the barge hitting the floodwall (P 45 Line 18-21). A rush of water washed Mr. Williams' house away, and he eventually climbed onto the roof of another house.

In a second deposition, it is pointed out that Mr. Williams gave a previous statement to investigators that he did not see the barge until later in the morning, and he did not see the barge hit the wall. The witness, in the second deposition, stood by his first deposition testimony that he saw the barge hit the floodwall, even though he admitted having given the prior recorded statement saying the opposite was true. Other people living in the same house as Mr. Williams did not see the barge hitting the floodwall when interviewed by the investigators. Mr. Williams also says that the only part of the barge that was sticking above the floodwall was the covers. The witness also admits that his times may not be accurate.

Analysis:

Mr. William's account of water at 0230 (2:30 AM) is too early and does not match with other witnesses. It is likely that this happened several hours later. In light of the previous interview, Mr. Williams statement that he saw the barge hit the floodwall does not seem to be credible. In addition, Mr. Williams' account of having seen the barge is contrary to the laws of science for the reasons state in this report. Further, if the barge was on the canal side of the wall, and only the hatch covers were protruding above the wall crest, the barge would not have been able to strike the floodwall, as its depth would had to have extended below ground level when it was adjacent to the wall.

Testimony of Mr. George Cavignac:

The witness was a St. Bernard Parish Council member and a railroad police officer.  He evacuated during the storm, and returned later the same week to perform duties for his employer.  At this time, he saw the barge stranded in the Lower Ninth Ward.

Analysis:

Because Mr. Cavignac evacuated, he did not have any experiences with the storm itself.

Testimony of Mr. Frank Auderer:

The witness was a St. Bernard Parish council member and was at a shelter at St. Bernard High School during Katrina.  Sometime early Monday morning, a call was received that water was present in the surrounding areas, and that they should move to the second floor of the school.  After daylight, water started to enter the school.

Analysis:

Mr. Auderer's experiences are typical of those in St. Bernard Parish and do not provide an insight into timing or causation of the breaches.

Testimony of Mr. Paul Best:

The witness lived on Colbert St. between Walker St. and Mouton St.  The house was on the east side of Colbert St., Facing the 17th Street Canal.  At daybreak on 29 August, the witness reported squall conditions, with heavy rain and strong winds.  At 0830 to 0900 (8:30 to 9:00 AM), The witness observed water starting to accumulate in the streets, and he believes that this was rain water.  Sometime after 0900 or approximately at 0930 (9:00-9:30 AM), the witness heard a boom that he thought sounded like dynamite.  About 15 to 30 minutes after hearing the boom, the witness looked out his front window and saw a small wave of black water coming toward his house.  After the wave came, the witness reports that the water rose about a foot every half hour, and continued rising until the entire first floor of his house was submerged.

Analysis:

Mr. Best's testimony is consistent with that of Stephen Lentz in that water was observed covering the streets earlier in the morning followed by booms and then more severe flooding.  Mr. Best reports that the booms happened later than reported by Mr. Lentz, but the times given by witnesses should be taken as approximate.

Testimony of Mr. George Brooks

The witness lived on St. Claude Ave. on the corner of Charbonnet St. in the Lower Ninth Ward.  The house was on the north side of St. Claude.  The witness states that he woke sometime after daylight and went downstairs and outside for a moment.  At this time he reported that there was strong wind and heavy rain (P 55 Line 11), but no water accumulation yet.  He then returned to the second floor of his home.  Sometime later in the morning Mr. Brooks went back downstairs and noticed that the streets outside were flooded (P 64 Line 7-9).  Within two or three minutes of seeing the water outside, the water had entered the first floor of his house (P 69 Line 12).  The witness heard what he described as a screeching sound or an explosion (P 75), but does not remember at what time that occurred.

Analysis:

Mr. Brooks lived well south and inland of either of the IHNC east floodwall breaches, and on somewhat higher ground.  This can explain his testimony that the water did not arrive until well after daylight, while witnesses north of N. Claiborne Ave. observed flooding much earlier.  It is possible that the sound heard by Mr. Brooks was an electrical transformer explosion; from his testimony it appears to have happened too late to have been associated with a floodwall breach.

Testimony of Mr. Mark Madary:

The witness was a St. Bernard parish Council member and was at the St. Bernard Government Complex during Katrina.  During the storm, at about 0730 to 0800 (7:30 to 8:00 AM), he left the complex with a National Guard member to conduct a rescue, but the truck drove into water that was too deep and the two men had to seek refuge on the roof of a nearby commercial building.  He reports that the water that they ran into was coming from west to east.  The truck became inundated on Judge Perez Dr. between Rowley Blvd. and Perrin Dr, which is approximately 0.8 miles east of the St. Bernard Government complex.  Several days after Katrina, the witness took a helicopter tour of the flooded areas and noticed the barge in the Lower Ninth Ward.

Analysis:

Like other witnesses at the St. Bernard Government Complex, Mr. Madary reports that there was no water at daybreak.  By that time, the Lower Ninth Ward near the breaches had been completely flooded.  The water that the truck ran into when going west on Judge Perez Dr. would have come from the IHNC breaches.

Testimony of Ms. Towonda Schexnayder:

The witness lived on Jourdan Ave. between N. Villere St. and Urquhart St.  The house was on the west side of Jourdan Ave.  The house was one story raised a few feet off of the ground.  At about 0300 (3:00 AM) Monday morning, the witness reports hearing:

> A screeching noise.  It was like a knocking.

P 45 Line 6-7

At this time she states that the wind and rain were heavy. The witness looked outside frequently throughout the night (P 45 Line 25), and at one point noticed that there was water in the streets and it appeared to be rising (P 45 Line 2).  The water entered the house a short time later (P 46 Line 7).  The witness surmised that the screeching sound was the barge rubbing against the floodwall (P 50 Line 17-20), but admitted that she did not see the barge (P 51 Line 14).  After the water entered their house, the occupants climbed onto the roof through a hole in the attic.  She thinks that she climbed on the roof by 0400 or 0430 (4:00 or 4:30 AM).  At this time she reported that it was relatively calm, with a light drizzle and light winds.  While on the roof the witness stated that she could barely see the N. Claiborne Ave. Bridge because of the weather conditions (P 61 Line 13), but she reports seeing the barge on Jourdan Ave from her roof at approximately sunrise.

Analysis:

The witness lived approximately 0.35 miles from the south breach / barge site, and approximately 1 mile from the north breach site.   Because Ms. Schexnayder's home was closer to the river, the ground elevation was a few feet higher than near the south breach.   Ms. Schexnayder's testimony that the flooding began in the 0300 to 0330 time frame is early and precedes the flooding observed by witnesses at both the north breach and south breach site by several hours.  In all likelihood, the flooding occurred several hours after reported by the witness.  The screeching noise could have been something to do with the wind, but the witnesses conclusion that it was the barge scraping against the floodwall is unfounded; there is simply no way that the barge could be in the vicinity of the floodwall that early.  The barge could not have been on Jourdan Ave. at sunrise.  However, it could have been there three hours after the flooding started, as Ms. Shexneyder reported, if one adjusts for the errouneous breach time she reported.

Testimony of Mr. Arthur M. Anderson, Jr.:

The witness lived on Jourdan Ave. between N. Villere St. and Urquhart St.  The house was on the west side of Jourdan Ave.  The house was one story and raised about three feet off of the ground.  In the early morning, the witness reported:

> Well, after the wind picked up, and by it being real silent around there, I could hear like a clashing sound every now and then, which I didn't pay no attention to it.

Page 69 Line 1-5

The witness reported that this noise was intermittent over several minutes (P 69 Line 17) and believes that it was coming from the north (P 70 Line 5).  After daylight, by which time the witnesses had climbed on top of his roof, he claims to have seen the barge sitting on Jourdan Ave. to the north (P 74 Line 2).  At some point in the morning, the witness' car alarm went off (P 84 Line 3).  This caused the witness to look outside and notice that there was water in the streets and the car's trunk had opened.  Mr. Anderson went outside to close the trunk.  The witness estimates that 25 minutes (P 95 Line 14) after hearing the car alarm, he fled to his attic where he stayed for about three hours (P 96 Line 5) before breaking out onto his roof.  At this time, it was daylight and the witness reported seeing the barge on Jourdan Ave (P 103 Line 22).

Analysis:

Mr. Anderson lived next door to his daughter, Towonda Schexnayder, so they would have experienced similar incidents at the same time.  The earliest that the barge could have been in the Lower Ninth Ward is about 0900 (9:00 AM).  According to Mr. Anderson, he first noticed water approximately 3 and one half hours before climbing on his roof and seeing the barge.  This would place the arrival of the water at 0530 (5:30 AM) at the earliest.  This timeframe is reasonable considering other Lower Ninth Ward witnesses, not withstanding Ms. Schexnayder who reported water at about 0300 (3:00 AM), which is far too early, especially for the area in which she lived.  The three and one half hour time lag between the flooding and the barge sighting is reasonable.

Testimony of Mr. Arthur Anderson III:

The witness was living in the same house as his father, Arthur Anderson, Jr.  Mr. Anderson was alerted by his father that there was water outside, but does not recall at what time this was.  He seems to think that it was around the transition between night and daylight (P 44 Line 17).  When the water was first brought to the attention of the witness, it was approximately one step below the front porch (P 46 Line 9).  Shortly thereafter, the water entered the house.  After the water entered the house, the occupants broke their way into the attic, where they stayed for some time.  The witness states that he broke through the gable with a wrench, a process he estimates took three to four hours.  Mr. Anderson states that he did hear a long booming noise at some point before noticing the water (P 61 Line 6), but he does not know exactly when.  After climbing on the roof, the

witness testifies that he could see the barge on Jourdan Ave. to the north (P 58 Line 17).

Analysis:

Dawn on 29 August occurred at 0636 (6:36 AM). If the water was first noticed slightly before this time, and it took three to four hours between climbing in the attic and breaking through the gable, it would have been between approximately 0930 and 1030 (9:30 to 10:30 AM). At this time, it is likely that the barge could have been in the Lower Ninth Ward, so it is possible that it could have been seen from the roof of Mr. Anderson's home. Like many other witnesses that lived near floodwall failures, Mr. Anderson heard a boom.

<u>Testimony of Mr. Michael Anthony Bickham:</u>

The witness lived on Deslonde St. between N. Roman and N. Prieur St. The house was a two-story fourplex (the same building where Carolyn Berryhill lived). Mr. Bickham lived on the second floor. Sometime early in the morning, the witness tool a walk a block down Deslonde St. and noticed:

> The water coming over the levee. The wind had already got the water where it was high on the levee – on the Industrial Canal.

(P 56 Line 10).

Mr. Bickham then returned to his residence. A few minutes later Mr. Bickham heard what he thought was a transformer blowing and a noise that he thought sounded like something dragging, then he heard a car's horn going off outside his house. When he investigated this sound, the witness noticed that the streets were flooded (P 57 Line 14). Mr. Bickham reported that the water was rising rapidly, and within a few minutes the water was almost to the second floor of the house. All occupants of the house then climbed into the attic. Shortly after entering the attic the house moved off of its foundation and collapsed. All the occupants of the house then climbed into a tree and awaited rescue. The witness testifies that he never saw the barge during the storm (P 78 Line 10), only seeing it later on TV (P 81 Line 10).

Analysis:

It is possible that the noises heard before the car's horn went off were the floodwall failing. The house was located directly in front of the south breach, and this breach is what would have caused the house to have been destroyed. It is not known if any of the initial water came from the north breach. Mr. Bickham was stranded in the same tree as Carolyn Berryhill, but unlike Ms. Berryhill Mr. Bickham did not see the barge.

Testimony of Ms. Chantell Lynn Doss:

The witness lived on N. Miro St. between Jourdan Ave. and Deslonde St.  The house was located on the north side of N. Miro St. and was a raised one story. During the hurricane, the witness evacuated to an assisted living facility on St. Maurice Ave. near the river levee.  The witness was staying on the third floor of the building.  At sometime in the late morning Ms. Doss heard a loud explosion-like boom and felt the building shake (P 34 Line 6).  The witness thinks that the explosion came from the direction of Claiborne Ave (P 35 Line 21).  Within a few minutes of hearing the boom water started to flood the streets (P 34 Line 8).  The water came from the north (P 38 Line 11).

Analysis:

Ms. Doss' accounts are similar to others living to the south of Claiborne Ave. Being located relatively far south and on higher ground, the flood waters reached that area at a later time than the area between N. Claiborne Ave. and Florida Ave.

Testimony of Ernest Joseph Offray

The witness lived on Deslonde St. between N. Johnson and Galvez St.  The house faced away from the IHNC.  At about 0430 (4:30 AM), the witness traveled with his father to Surekote Rd. to see how far the water in the canal had risen. Mr. Offray reported that the water had reached Surekote Road itself (P 33 Line 2).  After observing the water on Surekote Road, Mr. Offray and his father, Ernest Edwards, towed Mr. Edward's boat to the Claiborne Ave. Bridge.  Mr. Offray reports "The water didn't start coming over the walls until almost daylight time" (P 35 Line 21).  While on the Claiborne Bridge, the witness reports hearing "like a big old explosion" (P 35 Line 23), which he attributes to the barge impacting the floodwall, even though he admits that he did not see the barge until the next day (P 36 Line 17).  The truck the witness was staying in had to be moved up the bridge because water was rising on the bridge approach after hearing the explosion. (P 40 Line 23).  While on the bridge near Deslonde St., Mr. Offray testifies that the conditions prevented him from seeing his house (P 47 Line 20). He also testifies that while helping rescued people onto the bridge, he first noticed overtopping (P48 Line 8).  He only saw the barge later in the morning when it was on Jourdan Ave. (P 49 Line 9).

Analysis:

Mr. Offray delivers somewhat different testimony than his father, Ernest Edwards. Unlike his father, Mr. Offray testifies that overtopping was not occurring when the men were on the Claiborne Ave. Bridge (although he still reports it occurring before daylight), and when going to Surekote Rd, the water was not quite up to

the base of the floodwall.  Like his father, Mr. Offray did not see the barge until later in the morning while performing rescues.

# Appendix J

# Glossary

**GLOSSARY**

ADCIRC – Advanced Circulation Computer Model

ACI – American Concrete Institute

Aggregate – a component of a composite material used to resist compressive stress

AHP – Above Head of Passes

Airdraft – The distance from the water line to the highest point on a vessel

Apron – Pavement placed on the land side of a levee or floodwall to protect from erosion during overtopping

ASCE – American Society of Civil Engineers

ASL – Above Sea Level

Athwartship – Across a ship from side to side, at right angles to the fore-aft line of a vessel,

Bascule Bridge – A moveable bridge with a counterweight that balances the span throughout the entire upward swing in providing clearance for boat traffic

Benchmark – A point of reference for a measurement

Berm – A mound of soil.  A levee is a type of berm.

Bollard – A cylindrical mooring fitting usually located on a dock

Batture – A strip of land located on the flood side of a levee

Button – A cylindrical mooring fitting usually placed on a vessel

Buy-Ballot's Law – A method for determining the location of the center of a hurricane based on the wind direction

CDT – Central Daylight Savings Time

Centroid – The geometric center of the object's shape

Circular Failure Arc – Semicircular shear plane

Clay – A cohesive soil material with grains smaller than 0.002 millimeters in diameter.

Cleat – A long, low-profile mooring fitting found on both docks and vessels.

Coaming – A raised rim or border around an opening

Coefficient of Friction – A dimensionless scalar value which describes the ratio of the force of friction to the normal force between two bodies.

Cohesion – The intermolecular attraction by which the elements of a body are held together

Coriolis Effect – The apparent effect of fluids moving northward in the northern hemisphere to curve to the east, caused by the rotation of the earth, and conversely, southward flow in southern latitudes to curve to the east

Cyclonic – A characteristic of the atmosphere around a low pressure center

Diurnal – A tide having a period of approximately one day

Dock Board – Board of commissioners of the port of New Orleans

Eyewall – The boundary of the eye of a hurricane

Faubourg – Suburb

Fender System – A device to minimize rubbing between a boat and the dock

Fill – Soil added to an area

Floodwall – A wall constructed to serve the same purpose as a levee but requires less right of way.

Floodwall Gap – A narrow crevasse created between a floodwall and the water side soil embankment caused by hydrostatic pressure pushing on the floodwall.

FPS – Feet per second

Gapping Theory – The creation of a narrow void between the floodwall and the water side levee embankment

Geostrophic Wind – A theoretical wind that is directed exactly parallel to isobars

GIWW – Gulf Intracoastal Waterway

GPS – Global Positioning System

Heel – The tilt of a boat to one side caused by the pressure of wind or unevenly distributed weight

High Plasticity Clay – A cohesive soil that behaves plastically over a wide range of moisture contents

Hopper barge – An unpowered vessel that carries bulk, non-liquid cargoes

HPS – Hurricane Protection System

Hurricane – A strong tropical or subtropical storm with sustained winds greater than 64 miles per hour.

HWM – High Water Mark

Hydrology – A science to study of the movement, distribution, and quality of water throughout the Earth.

IHNC – Inner Harbor Navigation Canal

ILIT – Independent Levee Investigation Team

IPET – Interagency Performance Evaluation Taskforce

Isobar – a line on a weather map connecting areas of equal barometric pressure

IWS – Intracoastal Waterway System

K – Spring constant – A force constant, which relates the force exerted by a spring to the distance which it is stretched or compressed.

Ke – Kinetic Energy – Energy possesses by an object due to its motion

Kinematic Viscosity – The ratio of viscous force in a liquid to the inertial force

Kip – Kilo pound, 1000 lbs

Knot (kt) – One nautical mile per hour, approximately 1.15 miles per hour

Leeward – Opposite of windward, sheltered from the wind

Levee – An embankment intended to keep floodwaters out of a developed area

LMSL – Local Mean Sea Level

LNA – Lafarge North America, Inc.

LNW – Lower Ninth Ward

Lockmaster – A the person in charge of operating a navigation lock

LSU – Louisiana State University

Marsh – Soil containing a large percentage of organic matter

Mbar – Millibar, a unit for measuring atmospheric pressure, 1/1000th of a bar.

Meter (m) – Approximately 3.28 feet.

MLLW – Mean Lower Low Water

MLW – Mean Low Water

Moment Arm – The distance a force acts from a point of rotation

Moment of Inertia – A measure of an object's resistance to changes in its rotation rate

MRGO – Mississippi River Gulf Outlet

MSL – Mean Sea Level

NAE – National Academy of Engineering

NAS – National Academy of Science

Nautical Mile – 6080 feet or 1.15 statute miles

NAVD – North American Vertical Datum

Newton – The unit of force derived in the SI system

NGS – National Geodectic Survey

NGVD – National Geodectic Vertical Datum

NHC – National Hurricane Center

NOAA – National Oceanic and Atmospheric Administration

NOS – National Ocean Service

NRC – National Research Council

NSF – National Science Foundation

NTDE – National Tidal Datum Epoch

OWI – Ocean Weather, Inc.

Parish – Louisiana term for county

Percolating Water – Water that passes through rocks or soil under the force of gravity

Percolation – The slow seepage of water into and through porous media

Pervious – Able to be penetrated; permeable

Piping Erosion – A subsurface form of erosion which involves the removal of subsurface soils in pipe-like erosional channels to a free or escape exit

Polder – An area of land with depressed elevations surrounded by levees

PSF – A pressure unit, pounds per square foot

Rebar – Steel bars embedded in concrete to give it strength in tension and bending

Riprap – Rubble consisting of large stones or broken concrete used to protect a slope or channel against erosion

Scour – Erosion caused by fast flowing water

Scour Pad – A pad of non-erosive material designed to prevent scour holes

Silt – A fine non-cohesive soil with grain size smaller than sand but larger than clay

Slug – A unit of mass associated with Imperial units

Shear – Parallel internal surfaces sliding past one another

Sheetpile – A type of retaining wall consisting of steel sheets or concrete planks driven into the soil

SNAME – Society of Naval Architects and Marine Engineering

SPH – Standard Project Hurricane

Stringer – A thin strip of wood or metal for strengthening the surface that is attached

Subsidence – Motion of a surface as it shifts downward

Surge – The piling up of water caused by a hurricane or other storm.

Transom – Flat portion of the end of a ship or barge

Turn of the bilge – The point where the bottom and the sides of a ship join

Underseepage – Seepage beneath a levee

USACE – United States Army Corp of Engineers

USGS – United States Geological Survey

UTC – Universal Coordinated Time, formerly known as Greenwich Mean Time (GMT)

WST – Waterway Simulation Technology

$\Delta$ – Greek letter delta, used to denote change

$\sigma$ – Greek letter sigma, used to denote stress

# Appendix K

# Additional Photographs

| Document No. |
| --- |
| LNA000739 |
| LNA000740 |
| LNA000741 |
| LNA000742 |
| LNA000743 |
| LNA000744 |
| LNA000745 |
| LNA000746 |
| LNA000748 |
| LNA000750 |
| LNA000751 |
| LNA000752 |
| LNA000754 |
| LNA000755 |
| LNA000756 |
| LNA000757 |
| LNA000758 |
| LNA000759 |
| LNA000760 |
| LNA000761 |
| LNA000762 |
| LNA000763 |
| LNA000765 |
| LNA000766 |
| LNA000767 |
| LNA000768 |
| LNA000774 |
| LNA000775 |
| LNA000776 |
| LNA000777 |
| LNA000779 |
| LNA000780 |
| LNA000781 |
| LNA000782 |
| LNA000783 |
| LNA000784 |
| LNA000785 |
| LNA000786 |
| LNA000787 |
| LNA000788 |
| LNA000789 |
| LNA000790 |
| LNA000797 |
| LNA000803 |
| LNA000804 |
| LNA000807 |
| LNA001070 |
| LNA001088 |
| LNA001089 |
| LNA001090 |
| LNA001091 |

| Document  No. |
|---|
| LNA001092 |
| LNA001093 |
| LNA001094 |
| LNA001098 |
| LNA001099 |
| LNA001103 |
| LNA001109 |
| LNA001110 |
| LNA001112 |
| LNA001119 |
| LNA001121 |
| LNA001124 |
| LNA001130 |
| LNA001134 |
| LNA001136 |
| LNA001137 |
| LNA001138 |
| LNA001146 |
| LNA001149 |
| LNA001150 |
| LNA001153 |
| LNA001154 |
| LNA001155 |
| LNA001159 |
| LNA001162 |
| LNA001164 |
| LNA001171 |
| LNA001172 |
| LNA001173 |
| LNA001174 |
| LNA001175 |
| LNA001177 |
| LNA001178 |
| LNA001344 |
| LNA001347 |
| LNA001354 |
| LNA001355 |
| LNA001361 |
| LNA001364 |
| LNA001366 |
| LNA001367 |
| LNA001373 |
| LNA001389 |
| LNA005500 |
| LNA007489 |
| LNA007529 |
| LNA007530 |
| LNA007778 |
| LNA007780 |
| LNA007783 |
| LNA007784 |

| Document No. |
| --- |
| LNA007785 |
| LNA007786 |
| LNA007787 |
| LNA007789 |
| LNA007791 |
| LNA007794 |
| LNA007795 |
| LNA007796 |
| LNA007799 |
| LNA007804 |
| LNA007805 |
| LNA007808 |
| LNA007809 |
| LNA007811 |
| LNA007812 |
| LNA007813 |
| LNA007814 |
| LNA007815 |
| LNA007819 |
| LNA007883 |
| LNA007886 |
| LNA009509 |
| LNA009510 |
| LNA009511 |
| LNA009512 |
| LNA009513 |
| LNA009514 |
| LNA009517 |
| LNA009519 |
| LNA009521 |
| LNA009524 |
| LNA009528 |
| LNA009531 |
| LNA009533 |
| LNA009534 |
| LNA009535 |
| LNA009537 |
| LNA009546 |
| LNA009548 |
| LNA009556 |
| LNA009565 |
| LNA009566 |
| LNA009568 |
| LNA009569 |
| LNA009570 |
| LNA009571 |
| LNA009573 |
| LNA009582 |
| LNA009594 |
| LNA009612 |
| LNA009613 |

| Document No. |
| --- |
| LNA009615 |
| LNA009623 |
| LNA009633 |
| LNA009641 |
| LNA009646 |
| LNA009647 |
| LNA009648 |
| LNA009650 |
| LNA009654 |
| LNA009655 |
| LNA009675 |
| LNA009687 |
| LNA009690 |
| LNA009693 |
| LNA009703 |
| LNA009741 |
| LNA009744 |
| LNA009745 |
| LNA009746 |
| LNA009751 |
| LNA009752 |
| LNA009760 |
| LNA009768 |
| LNA009769 |
| LNA009784 |
| LNA009785 |
| LNA009786 |
| LNA009801 |
| LNA009802 |
| LNA009803 |
| LNA009807 |
| LNA009808 |
| LNA009811 |
| LNA009812 |
| LNA009813 |
| LNA009896 |
| LNA009904 |
| LNA009905 |
| LNA009914 |
| LNA009916 |
| LNA010124 |
| LNA010125 |
| LNA010128 |
| LNA010134 |
| LNA010139 |
| LNA010140 |
| LNA010141 |
| LNA010145 |
| LNA010150 |
| LNA010153 |
| LNA010154 |

| Document  No. |
| --- |
| LNA010160 |
| LNA010163 |
| LNA010168 |
| LNA010169 |
| LNA010170 |
| LNA010171 |
| LNA010173 |
| LNA010187 |
| LNA010201 |
| LNA010202 |
| LNA010204 |
| LNA010205 |
| LNA010206 |
| LNA010207 |
| LNA010208 |
| LNA010209 |
| LNA010210 |
| LNA010211 |
| LNA010212 |
| LNA010213 |
| LNA010249 |
| LNA010261 |
| LNA010262 |
| LNA010263 |
| WGI082930 |
| WGI082931 |
| WGI082932 |
| WGI082934 |
| WGI082936 |
| WGI082941 |
| WGI082945 |
| WGI082990 |
| WGI082991 |
| WGI082993 |
| WGI082995 |
| ILIT-2-15 |
| ILIT-2-16 |
| ILIT-8-65 |
| ILIT-8-70 |
| IPET-IV-166 |
| IPET-V-69 |
| Katrina Graphics Frame No. 11 |
| Katrina Graphics Frame No. 12 |
| Katrina Graphics Frame No. 13 |
| Katrina Graphics Frame No. 14 |
| Katrina Graphics Frame No. 15 |
| Katrina Graphics Frame No. 16 |

**Appendix L**

**C.R. Cushing C.V. and Corporate Resume**

## CHARLES R. CUSHING, Ph.D., P.E.

**Employer**:     C. R. Cushing & Co., Inc.
Naval Architects, Marine Engineers & Transportation Consultants
30 Vesey Street, 7th Floor
New York, New York 10007

**Position**:     President

**Education**:     U. S. Merchant Marine Academy, B.S. (Marine Transportation) 1956
Massachusetts Institute of Technology, B.S. (Naval Architecture and Marine
Engineering) 1960
State University of New York, M.S., (Ocean Transportation) 1972
University of Wales, Cardiff University, Ph.D. (Maritime Studies), 1997

**Experience:**

From its formation in 1968, Dr. Cushing has been President of C. R. Cushing & Co., Inc., a firm of naval architects, marine engineers and transportation consultants with offices in New York.  He has been responsible for the design, construction and/or conversion of over 250 ocean-going vessels in most major shipyards in the U.S., Europe and the Far East.  He has personally carried out and/or directed the concept, preliminary and contract design, strategic planning, plan approval and supervision of construction of tankers, tank barges, containerships, LNG ships, tugs, bulk carriers, roll-on/roll-off vessels, offshore pipe laying vessels, jacket delivery barges, passenger ships, and other types of vessels.  His work has included new construction, conversion, repair and refurbishment of vessels.  Dr. Cushing has been directly responsible for risk analyses, safety audits, energy audits and the preparation of the U.S.C.G. Tankerman's Manual, studies on corrosion, vessel maintenance, manning, safety, collision avoidance, pollution prevention, navigation, coatings, automation, pumping, noise, vibration, hydrodynamics, air quality, and similar, and has been responsible for port and terminal projects, economic analyses, material handling studies, marine operation and maintenance studies, automation studies, planned maintenance and repair systems, and numerous other projects in the marine field.  He has been responsible for the design of numerous types of intermodal shipping containers and purchase, inspection, and testing of containers, container refrigeration equipment, container chassis, and container handling equipment.

From 1961 to 1968, Dr. Cushing was the Chief Naval Architect at Sea-Land Service, Inc. and was responsible for the development of cranes, cargo handling systems, and the design and conversion of some 45 containerships.

Dr. Cushing holds a number of patents in maritime and intermodal technology.

Prior to his graduation from MIT, he sailed as a cadet and a licensed deck officer on a number of U.S.-flag general cargo and passenger vessels, and has been involved in cargo handling operations in the United States, South America, Southeast Asia, Australia, New Zealand, the Far East, Middle East, Africa, and Europe.

**Professional Associations:**

American Bureau of Shipping, Naval Architecture Committee, Past Member,
American Bureau of Shipping, Committee on Cargo Containers, Past Member
American National Standards Institute MH5 Committee, Member
American Society of Heating, Ventilation and Air Conditioning Engineers, Member, No. 3031973
American Society of Mechanical Engineers, Fellow, No. 261040
American Society of Naval Engineers, Naval Member, No. 00549
Charter Engineer, U.K., Engineering Council No. 152957
Chemical Transportation Advisory Board, Past Member
Chemical Trans. Advisory Board Subcommittee on Bulk Terminals/Tank Vessels, Past Member
EuroEngineer, European Union
Global Maritime and Transportation School (GMATS), Member, Board of Directors
Institute of Marine Engineering Science and Technology, Fellow
Instituto Pan Americano de Ingenieria Naval, Member IM-605
International Cargo Handling and Coordination Association, Member
International Standards Organization, TC-104, Past U.S. Delegate
Japan Society of Naval Architects and Ocean Engineers, Member
Korean Society of Naval Architects, Member
Professional Engineer, State of Mississippi, Reg. No. 03537
Lloyds Register of Shipping, U.S. Committee Past Chairman; Technical Committee, Past Chairman
Marine Board, Member, 2004 to date
Maritime Resource Center, Past Chairman
MIT Club of New York, Member
National Academy of Engineering – Elected 2004
National Academy of Sciences - NRC, Ship Structures Committee, Past Member
National Fire Protection Association, Member No. 105205
National Shipbuilding Research Program, Blue Ribbon Panel Member
National Safety Council, Member
New York City Port Council, Past Member
New York Yacht Club, Member
North East Coast Institution of Engineers and Shipbuilders, Past Member
Nautical Institute, Member No. 98 12550
Royal Institute of Naval Architects, Fellow
Royal Institute of Navigation, Member
Society of Maritime Arbitrators, Member
Society of Naval Architects and Marine Engineers, Life Member, Fellow, No. 1080010
SNAME Fellows Committee, past Chairman
SNAME Finance Committee, Member
SNAME Ship Technical Operating Committee, Member
Sperry Board of Awards, Chairman 1991/1992
State University of New York (Maritime College), Engineering Advisory Committee, Member
U.S.C.G., SOLAS Working Group on Container Safety - Member and past U.S. Delegate
U.S. Merchant Marine Academy, Trustee 2005 to date
U.S. Merchant Marine Academy Alumni Assn., President, 1986-1990
U.S. Merchant Marine Academy, Engineering Advisory Board, Member
U.S. Merchant Marine Academy Foundation, Chairman, 1982-1986
Webb Institute (Naval Architecture), Board Member; Fellow; Executive Committee; Finance Committee; Chairman; Audit Committee; Planning Committee

**Awards:**

The Admiral E.S. Land Medal for Excellence in Naval Architecture, USMMA, 1956
The Marine Man-of-the-Year, 1970, USMMA/SNAME
The Alumnus-of-the-Year, 1991, USMMA
The International Maritime Hall of Fame, 2000
The Admiral E.S. Land Medal for Outstanding Contributions in the Marine Field, SNAME, 2000

**Other Professional Activities:**

- Authored numerous publications for professional societies, trade publications and industry conferences.  Chapters in SNAME's <u>Ship Design</u> and <u>1993 Historical Transactions</u>.

- Visiting Professor at World Maritime University in Malmo, Sweden and Dalian, China in The Ship Acquisition Process and Maritime Accident Investigation, 1987 to date.

- Lecturer at Massachusetts Institute of Technology, Webb Institute, University of Michigan, USMMA, Industrial College of the Armed Forces, MEBA, GMATS, and elsewhere.

- Serves as a director, officer or committee member of numerous educational, professional and industry organizations.

- Chairman, founder and principal shareholder in Oiltest, Inc.

- U.S. Naval Reserve, 30 years, retired 1982.

- Member National Academy of Engineering, elected 2004.

# *CORPORATE RESUME*

## C. R. CUSHING & CO., INC.
### Naval Architects, Marine Engineers & Transportation Consultants

**30 Vesey Street, 7th floor**
**New York, New York  10007**
**Tel. – 212-964-1180     Fax. – 212-285-1334**

October 2002

C. R. CUSHING & CO., INC.

# *TABLE OF CONTENTS*

INTRODUCTION                                                                          3

CORPORATE FACILITIES                                                                 4

TYPICAL PROJECTS -- Dry Cargo Vessels                                               5

TYPICAL PROJECTS -- Product, Crude, and Chemical Carriers                          7

TYPICAL PROJECTS -- Ferries and Passenger Vessels                                  9

TYPICAL PROJECTS -- Hull Form, Stability, Seakeeping & Maneuvering Studies        10

TYPICAL PROJECTS -- Ports and Terminals                                           11

TYPICAL PROJECTS -- Environment and Safety                                        12

TYPICAL PROJECTS -- Containers                                                    13

TYPICAL PROJECTS -- Accident Investigations                                       14

TYPICAL PROJECTS -- Related Work                                                  15

REPRESENTATIVE LIST OF CLIENTS, NYC OFFICE                                        16

PROFESSIONAL DEVELOPMENT                                                          19

C. R. CUSHING & CO., INC.

# <u>INTRODUCTION</u>

- C.R. Cushing & Co. is a firm of naval architects, marine engineers and transportation consultants, founded in New York in 1968. Over intervening years, the company has had branch offices in the U.S. (New Jersey), overseas subsidiary companies (Hamburg; Madrid, Piraeus), and field offices (Korea; Spain, Japan).

- C.R. Cushing & Co. has designed over 150 vessels that have been built in the U.S. and abroad. These vessels and other vessels designed have main propulsion plants amounting to over 2,000,000 horsepower. Construction projects have been carried out in more than 200 shipyards, worldwide and ship construction, conversion and repair negotiations have been carried out with many of these. Many of these projects involved analyses of shipbuilding methods, design for shipyards, manufacture of sub-assemblies, repairs, conversions, etc. In addition, C.R. Cushing & Co. has carried out analyses of shipyards and shipbuilding industries throughout the world to identify their strengths and weaknesses and to recommend changes.

- The company has designed, built, converted and/or worked on passenger ships, cruise ships, motor yachts, containerships, roll-on/roll-off vessels, container feeder ships, car carriers, crude and product tankers, gas carriers, OBOs, offshore oil production vessels, pipe lay barges and vessels, tank barges, bulk carriers, chemical carriers, refrigerated cargo ships, heavy-lift ships, etc. The work has involved all phases of ship design, ranging from concept and preliminary design and transport analysis to plan approval, construction supervision and contract management. Specific areas of involvement include the development of vessel arrangements, structural design, ship motions and loading, cargo handling arrangements and equipment, propeller design, propulsion analyses, heat balances, piping studies, electrical design, fire protection, navigation and communications systems, vibration calculations and surveys, HVAC design, structural and damage surveys, preparation of planned maintenance systems, design and implementation of condition monitoring, loading manuals, operating manuals and other shipboard support studies.

- Conversion design work has included lengthening, widening and deepening hulls, adding sponsons, widening hatch openings, relocating bulkheads, removing and adding decks, re-engining, reflagging, relocating and rebuilding superstructures, strapping and strengthening ships.

- In addition to traditional ship design work, CRC&Co. has performed economic analyses, transport studies, stability studies, propulsion studies, ship valuations and cost estimating, safety audits, energy conservation studies, risk analyses, environmental impact assessments, port and terminal design and development, intermodal studies, container design and operations studies. The company has carried out over 3,000 projects of varying size and type for both the private and public sector. Private sector work has included clients such as ship operators, leasing companies, major shippers, oil companies, shipping and railroad companies, and utilities. Among public sector clients have been many agencies of the US government, including the U.S. Coast Guard, the Environmental Protection Agency, the U.S. Navy, the U.S. Army, the Department of the Interior, etc., port authorities, municipal and state governments, foreign governments, as well as standards and safety organizations with international jurisdiction. While the work CRC&Co. has performed has been extensive, our commitment to client satisfaction is paramount and is pursued on all projects.

- C. R. Cushing & Co., Inc. has been delegated authority by the Commandant (G-MSO), U.S. Coast Guard, to approve containers as complying with the International Safe Container Act in accordance with Title 49, U.S. Code of Federal Regulations, Part 450, since 8 Sept. 1981.

C. R. CUSHING & CO., INC.

## CORPORATE FACILITIES

C. R. Cushing & Co., Inc. is conveniently located in downtown Manhattan, in the heart of the New York area shipping community. Classification societies, shipowners, shipyard sales offices, marine equipment salespeople and various marine services are often within walking distance, or located nearby in New Jersey or Connecticut. Three major local airports allow easy transportation anywhere in the world at short notice. Telefax, e-mail, telephone, and various overnight mail services insure rapid communication on a worldwide basis.

Within the office C. R. Cushing & Co., Inc. also has extensive computer capabilities to support and enhance all the naval architectural, engineering and consulting services it offers. State-of-the-art computers and different modern naval architectural computer software allow quick and detailed analysis of hull volumes, weights and moments, measures of stability, speed and power prediction, etc. Also modern, industry standard computer aided design packages, are used for drawing development. These programs enable draftsmen, naval architects and engineers to render drawings with a computer, either in two or three dimensions. For projects requiring many drawings, or many revisions, computer aided drafting is very valuable and cost effective. Every naval architect and engineer has a desktop personal computer for report and letter writing, spreadsheets, and engineering analyses. Lap-top computers are used by engineers in the field at shipyards, surveying aboard ships, or when travelling. The accounting department uses contemporary accounting and bookkeeping software to ensure rapid and accurate cost accounting.

The company has available computer software for finite element analysis for structural design and analysis, pipe network analysis for pipe flow problems, container and trailer restraint system design and analysis, vibrations, ship speed and propulsion analysis, project management for PERT/CPM analysis and other requirements. Access to various computer databases for research into vessel characteristics and populations is on-line.

In addition to computer hardware and software, C. R. Cushing & Co., Inc. maintains a well furnished and equipped drafting room for conventional drafting purposes. The company also has a production center with capabilities for photocopying, blueprinting and report binding.

In the course of thirty years of business, C. R. Cushing & Co., Inc. has compiled an excellent library of books, annuals and other references on ship design and construction, containerization, intermodalism, general shipping subjects, port operations and terminal design, oceanography, ship's systems, naval subjects, general engineering practice and much more. The library also receives an abundance of international periodicals dealing with marine and marine related subjects. Useful information is also available from the thousands of files of past projects, research conducted for previous proposals, and the extensive collection of subject files and product literature. The Company extensively uses computerized databases such as Internet, American-on-Line, Lexis/Nexus, etc.

**C. R. CUSHING & CO., INC.**

## <u>TYPICAL PROJECTS</u> -- Dry Cargo Vessels

- The design and construction supervision of the world's largest dry cargo containerships (12 vessels) in South Korea for U.S. Lines.
- The jumboizing of twelve large containerships, which included a coarse and fine mesh FEA analysis of entire ship in Japan for Sea-Land Service.
- Design for the reconstruction of a fleet of tankers into containerships.
- Conversion of Lighter Aboard Ship (LASH) ships into containerships.
- The design and construction supervision of a fleet of ro/ros, with the first diesel PTO-driven generator;
- Conversion of a fleet (eight ships) of the world's fastest merchant ships to naval auxiliary vessels.
- Develop conversion of a large containership of a Pre-positioned Logistics Support Vessel for the U.S. Marine Corps.
- Provided technical assistance, plan approval, and yard construction supervision of three new vessels for trans-Atlantic service, including the supervision of loading and container handling in all ports on the maiden voyage;
- Design and calculations, including preparation of specifications and contract plans, and solicitation of shipyard bids, for a mass-produced standard containership with numerous unique and patentable features, for a European steamship company;
- Provided design, plan approval, and construction of two classes of nine reefer ships built in Spain for an international fruit company;
- Prepared specifications and contract plans, gave general technical assistance, supervised yard construction, and inspected a fleet of high speed containerships, constructed in Germany for German owners;
- Provided preliminary design, contract design and specifications, and supervised the construction of a 150,000 DWT bulk carrier built in Japan for Spanish owners;
- Prepared design and specifications, and supervised the construction of four large containerships, built in Korean yards for Korean owners;
- Supervised the construction of a high-tech combination reefer shipyard/automobile carrier in Japan. Provided considerable after-delivery support to insure proper operations of sophisticated refrigeration system and hydraulic car platforms and ramps;
- Developed contract design for large catamaran ro-ro barges.
- Developed preliminary steel weight and cost estimates for the conversion of four tankers to containerships.
- Evaluated new construction and conversion alternatives of self-propelled vessels, integrated tug-barges, and deck barges for a rail car ferry operation.
- Perform preliminary designs of rail car ITB and self-propelled vessel for short sea service.
- Prepared preliminary design studies for a post-Panamax containership for a U.S. container operator.
- Studied trim and stability on refrigerated cargo/container ships to analyze possible enhancements to container capacity.
- Analyzed and developed solutions to bottom shell cracking problems on a class of eight containerships.

**C. R. CUSHING & CO., INC.**

## TYPICAL PROJECTS -- Dry Cargo Vessels (Continued)

- Plan review, calculation verification, structural design, and other aspects of detail design review to support Quincy Shipbuilding in converting the SL-7 class containerships to meet Military Sealift requirements as a TAKRX.
- Plan review, calculation verification, and specification review in support of American President Lines' offer for the conversion of C5 cargo ships to meet Military Sealift Command requirements as TAKRX pre-positioned ships.
- Conducted design, specifications, plans, and engineering of the Roll on/Roll off vessel the *M/V Cape Edmont* for sale to the U.S. Federal Government.
- Plan review, design, and specification for the modification of LASH-type vessels to meet U.S. military requirements.
- Studied the conversion and reflagging of foreign-flag Roll on/Roll off vessels to U.S. flag specifications for the U.S. Maritime Administration.
- Conducted design, specifications, plans, and engineering for the reflagging of The *M/V American Eagle* to U.S. Coast Guard and American Bureau of Shipping standards for Military Sealift Command charter.
- Developed concept design for vessel to serve as a container crane transfer facility in conjunction with non-sustaining containerships to meet proposed requirements for the U.S. military.
- Conducted design, specifications, plans, and engineering for the reflagging and deck modification of the *M/V American Cormorant* to U.S. Coast Guard and American Bureau of Shipping standards for use as a Military Sealift Command chartered semi-submersible, heavy lift vessel.
- Performed analyses of ro-ro decks to determine compliance with vessel charter requirements.
- Developed steel weight and cost estimates for ro-ro barge modification options to increase cargo capacity.
- Carried out rudder force and torque calculations to confirm suitability of rudder pintle dimensions.
- Developed a lashing system for two containerships chartered by the Military Sealift Command.
- Guided procurement of 3,500HP harbor tugboats for a Port Authority.
- The design (and patents) for a unique reel pipe laying vessel;
- The design of an oil spill recovery vessel;
- Carried out numerous modifications of hatch covers and container restraint systems to suit new combinations of container stowage.

**C. R. CUSHING & CO., INC.**

**<u>TYPICAL PROJECTS</u> -- Product, Crude, and Chemical Carriers**

- Carried out major conversion and upgrading of a product/chemical tanker to new vessel standards of the U.S. Coast Guard, including the joining of a tanker stern to an ITB forebody.
- Prepared conversion designs for several classes of tankers.
- Carried out reconstruction design of 120,000 ton deadweight tankers from single to double hull configuration.
- Prepared concept design of a forebody for a class of 125,000 ton deadweight tankers.
- Carried out design of 20,000 ton deadweight tankers for U.S. flag operation.
- Developed design of double hull VLCC's.
- Evaluated several existing single hull tankers for operation in U.S. jurisdiction, including determining options for modification to carry desired products.
- Designed a 225,000 ton deadweight double hull oil tanker.
- Carried out the design and construction supervision of a fleet of OBOs.
- Designed and supervised the construction of an 80,000 DWT OBO, with the first Sulzer RTA diesel.
- Prepared plans and specifications, and carried out technical, safety and environmental studies for the construction of three 125,000 cubic meter LNG vessels.
- Carried out preliminary design for lengthening of a U.S. flag oil tanker.
- Performed preliminary design of a 30,000 DWT clean product tanker for a U.S. owner.
- Developed conversion designs for tankers to meet requirements of IOPP and MARPOL, including implementation of inert gas systems, segregated ballast systems, spill detection systems, crude oil washing and crew training procedures.
- Carried out plan approval for a 40,000 barrel double hull tank barge.
- Determined suitability of various noxious liquid substances (NLS) with the features of existing product or chemical carriers and advised about the modifications which would be necessary to carry the desired product.
- Prepared a design for the conversion of a petroleum tanker to a sulfur tanker.
- Developed preliminary and contract design for a 24,000 ton deadweight, U.S. flag sulfur carrier; carried out shipyard bid analysis, and negotiated specification with shipyard.
- Carried out numerous on line/off line, damage and condition surveys on tankers.
- Analyzed the circumstances concerning the sinking of several tankers.
- Prepared re-engining studies on several tankers.
- Investigated the conversion of a tanker for the transport of tallow.
- Developed a fendering system for a class of OBOs.
- Performed preliminary concept design for conversion of a product carrier to an asphalt carrier.
- Evaluated a class of new tankers for a major ship financing institution.
- Investigation and repair of a major structural failure in a double bottom hull of an ITB tank barge.
- Prepared tank barge cargo oil heating retrofit with thermal fluid system.
- Redesign the rudder on a VLCC.
- Designed a floating storage tanker.
- Carried out a survey of floating storage tankers.
- Studied the corrosion rates in tankers.

**C. R. CUSHING & CO., INC.**

**<u>TYPICAL PROJECTS</u> -- Product, Crude, and Chemical Carriers (Continued)**

- Studied and surveyed a VLCC for causes of contamination of product cargoes.
- Designed a series of oil spill recovery vessels, oil spill pick-up equipment, and oily water separators.
- Provided inspection and owner's representation for re-activation of LNG carriers.
- Concept design development of a 20,000 - 30,000 DWT clean product tanker to meet the requirements of the U.S. Navy's Replacement Program.
- Obtained U.S.C.G. approval of vapor recovery system installed on a tanker.
- Prepared tanker freeboard calculation.
- Prepared damage stability response system for a fleet of LNG tank vessels.
- Provided technical assistance on the first series of Double Eagle Tankers.

C. R. CUSHING & CO., INC.

## TYPICAL PROJECTS -- Ferries and Passenger Vessels

- Prepared a preliminary design for a 2,200 passenger cruise ship for an American company.
- Performed surveys, ship evaluations, and modification designs of the U.S. flag passenger ships *S.S. Constitution* and *Independence*.
- Carried out survey and conversion design of the *S.S. America.*
- Provided technical services relating to the preliminary design of a 300 passenger ferry.
- Prepared preliminary design, specifications, working drawings and yard supervision in the conversion of the *Theodore Herzog* to the cruise vessel *Mardi Gras.*
- Prepared plans and specifications for the conversion of a cargo vessel for the Eastern Mediterranean.
- Carried out design and specification negotiation, plan approval, and construction supervision of a 35 meter luxury motor yacht.
- Conducted technical and safety assessments aboard *SSC Radisson Diamond*, the world's first SWATH cruise ship.
- Conducted condition surveys and feasibility studies for the sale of passenger vessels for use in the Mediterranean Sea as a foreign flag vessel.
- Carried out on-hire survey of *Vera Cruz I* and condition survey of *T.S.S. Santa Rosa* for Bermuda Star Line.
- Review design and approve plans for Hong Kong high speed ferries.
- Condition survey of the *M/V Independence*, 138 passenger commuter ferry converted from a crew boat, to determine the suitability of ferry operation in New York harbor.
- Surveyed numerous passenger ferries as candidates for conversion for a ferry in the Port of New York.
- Conducted safety and technical assessments aboard various cruise ships for Commodore Cruise Line.
- Conducted both safety and technical assessments aboard the cruise ship *M/V Future Seas.*
- Developed and approved design of sponsons and modifications to a 40 year old passenger vessel to meet statutory requirements.
- Analyzed intact and damage stability aspects and provided technical support in arbitration concerning a major modification of a passenger ship.
- Supervised stability test, prepared sea trial agenda, supervised sea trial, and prepared sea trial report and maneuvering diagrams and information for navigation of a modern cruise ship.
- Evaluated the stability and supervised the stability test of a 63 ft. passenger ferry for U.S. Coast Guard approval.
- Measure and evaluate stern and shaft vibrations on the *S.S. Caribe.*
- Surveyed existing and analyzed proposed ferry services between Yucatan and Cozumel.
- Obtained U.S. Coast Guard approvals for ferry *Oliver Twist.*
- Accomplished contract design for modernization of steering system of the U.S. Coast Guard Governor's Island ferry *M/V Tide.*
- Surveyed and prepared valuations of U.S. ferries for a major U.S. bank.
- Performed preliminary conversion design of a crew boat to a ferry.
- Studied feasibility of a high speed steel U.S. flag car ferry.
- Provided contract design, general arrangement, and specifications to the National Park Service for an all-weather ferry in New York Harbor.
- Provided design services for modification of prison ferries at Riker's Island for the New York City Department of Corrections.
- Provided engineering services to RCCL for cruise vessels *Sovereign of the Seas* and *Monarch of the Seas.*

**C. R. CUSHING & CO., INC.**

<u>**TYPICAL PROJECTS**</u> -- Hull Form, Stability, Sea keeping, & Maneuvering Studies

- Developed alternative hull forms for comparative evaluation of resistance, propulsion, seakeeping, ship motions, and maneuvering characteristics for numerous ship design projects.
- Carried out seakeeping studies on a large, oceangoing catamaran.
- Supervised parametric tests on optimum bulbous bow forms for a variety of ships.
- Developed different stern form designs, including conventional waterline flow and buttock flow (Pram) type sterns.
- Carried out systematic studies and model tests to develop optimum trim.
- Carried out designs, investigations and model tests on a series of broad beamed, large containerships with pram-type sterns.
- Designed vessels for various grades of ice class.
- Prepared model test agenda for each phase of hull form design for many projects.
- Evaluated model test facilities for conduct of model testing on several occasions based upon the model test agenda contemplated.
- Evaluated model test quotations and carried out selection of model test facility on many different projects.
- Worked with major model test facilities of the world, including MARIN (Wageningen), HSVA (Hamburg), SSPA (Gothenburg), IHI (Yokohama), MHI (Nagasaki), the University of Michigan (Ann Arbor), and Davidson Laboratory (Hoboken).
- Evaluated model test results and prepared corresponding performance predictions.
- Carried out study of different thruster arrangements for evaluation of necessary ship maneuvering capability.
- Carried out numerous evaluations of maneuvering capability based on principal particulars and rudder type and area.
- Evaluated and selected thruster type and size based on vessel mission requirements and life cycle cost analysis.
- Performed calculations to reconstruct the tracks of vessels in shoal waters.
- Developed data on a number of vessels, including tankers and passenger ships on squat.
- Analyzed vessel performance, including power, speed, and vessel motions in varying ocean weather systems.
- Performed a systematic series of designs of breakwaters and bow forms for low freeboard vessels operating in waves.
- Analyzed the ship motions of containerships and compared with computer program predictions.
- Carried out wave refraction and diffraction calculations to assess wave height and period in marina.

**C. R. CUSHING & CO., INC.**

## <u>TYPICAL PROJECTS</u> -- Ports and Terminals

- Carried out a comprehensive review of the all facets of a tanker and bulk carrier company for an investment group, including all owned port and cargo handling facilities, all vessels, evaluation of the company management, and determination of the competitiveness of the company in future operations.

- Prepared a time and motion study relating to the loading and discharge of containers, using both shipboard and shore cranes for a large container operator.

- Carried out a survey of ports and terminal facilities for a new container operation, including an analysis of port charges, labor costs, new facilities costs, and transportation and distribution systems serving the ports.

- Prepared preliminary design of a container handling facility in Haifa.

- Developed the port development and expansion plans for Tin Can Island in Lagos, Nigeria.

- Performed the design of a marine terminal expansion including analysis of warehousing facilities, railroad spur access, traffic flow patterns, maintenance and repair facilities and cargo handling rates and throughput.

- Investigated and analyzed the loading and discharge operation of paper newsprint for the New York Daily News, at a consolidated plant, including the preparation of the design for equipment for discharging the ships, moving the paper into the warehouse, stacking the rolls, and automatically withdrawing the rolls from storage for automatic feed to the press rooms.

- Planned the development of a major oil terminal in the Virgin Islands.

- Studied the interface options between a rail car ferry and shore ramp.

- Carried out a study and design of specialized mechanical equipment to efficiently unload grain in bulk.

- Develop several alternatives for a trailer ramp for interface with a large ro-ro barge.

- Provided technical assistance in the conceptual design and layout of a marine container terminal for a terminal operating company.

- Performed research project for the U.S. Government for improving the efficiency of container terminals, including a detailed cost analysis of all costs in the containerization system external to direct marine costs.

- The design of crude discharge and product loading facilities for a 200,000 barrel per day refinery;

- Performed a marine facility feasibility study for a major U.S. energy supplier including analyses of meteorological, climatogical and oceanographic data, geographic studies, ocean wave and current measurement surveys and marine environmental impact assessments for several proposed sites.

- Developed plans for the expansion of the port of San Juan, Puerto Rico.

- Provided consultation on the expansion of a floating tennis facility at the 79th Street boat basin and marina on the Hudson River in New York.

- Engineering oversight of an automated grain loading facility in Galveston including the design & manufacturing of spiral loaders, conveyers, bagging equipment, palletizers, etc.

- Engineering services in connection with the concept and contract design of a limestone port in Mexico handling 10,000,000 tons of stone per year.

- Development of a floating automatic bucket discharge facility for handling coal.

- Technical, safety, operational and economic audit of bulk bauxite and alumina terminal.

C. R. CUSHING & CO., INC.

## TYPICAL PROJECTS -- Environment and Safety

- Prepared the Tankerman's Manual for the U.S. Coast Guard.
- Prepared oil spill response manuals.
- Studied the collision resistance of tankers.
- Developed a oil pipeline inspection procedures for U.S. Coast Guard including identification of oil spill risk components.
- Investigation of maneuvering deficiency for a 225,000 DWT tanker.
- Prepared of a tanker operations manual for a U.S. owner and operator.
- Carried out a study of the technical, environmental, safety and operations aspects of an offshore platform in 130 feet of water to receive tank vessels up to 500,000 DWT.
- Studied deep water port mooring (CALMS and SALMS) and crude oil transfer systems for the U.S. Department of Transportation.
- Development of an operating manual for a tanker company, including safety procedures, pollution control, regulatory requirements, spill containment and collection.
- Development of environmental criteria and guidelines to assess the environmental impact plan submitted as part of the oil purchase/transport contract for U.S. Department of Energy, Strategic Petroleum Office.
- Compared the damage stability characteristics of double hull and mid-deck/hydrostatically balanced concept tankers.
- Analyzed stability aspects of trunk deck double hull tankers.
- Design of trolley, wave maker and trolley towing winch system for the EPA's Oil and Hazardous Materials Test Tank facilities (OHMSETT) in New Jersey.
- Studied the operational intact stability difficulties of double hull tankers.
- Technical, environmental, safety, and operational aspects of single point mooring facilities for tankers up to 500,000 ton DWT at an offshore platform in 130 feet of water for the U.S. Coast Guard in 1979.
- Prepared a prevention and control program for oil pollution in the San Francisco Bay area for the California Water Control Board.
- Performed studies on existing ships to assess new IMO damage stability regulations for cargo ships.
- Conducted a container safety study for the U.S. Coast Guard, examining a variety of containers and rating their overall safety features, entitled "A Study of Intermodal Container Safety."
- Studied the reported on the relative resistance of FRP containers to sustain side and top panel damage and the suitability of FRP containers to carry hazardous materials.
- Conducted a dry cargo vessel subdivision study to International Maritime Organization safety regulations for the U.S. Coast Guard.
- Studied the problems related to tanker navigation in ice.
- Conducted a Roll on/Roll off vessel dry cargo subdivision safety study for the U.S. Department of Transportation/ Transportation Systems Center.
- Development of acoustic emission hose failure detection system for deepwater port including effects of environmental factors on system reliability and maintainability.
- Developed a computer simulation technique for risk evaluation to augment existing experimental simulation.
- Safety analysis for LNG terminal and marine facilities for the State of New Jersey.
- Performed analysis of LNG cargo handling to assess problem of product spills.
- Measurement of airborne asbestos on vessels in port and at sea.
- Measurement of toxic gases and indoor air pollution on vessel.

C. R. CUSHING & CO., INC.

## <u>TYPICAL PROJECTS</u> – Containers

- C. R. Cushing has been a member of the American Standards Committee continuously since 1960.  This is the committee that developed the strength and dimensional standards for the ISO containers.
- C. R. Cushing has been a U.S. delegate to the International Standards Organization TC104 meetings over the last 38 years.
- C. R. Cushing & Co. has carried out the design and structural analysis on numerous types of containers, including dry cargo, tank, refrigerated, open top, folding, etc.
- C. R. Cushing & Co. has prepared purchase specifications, negotiated and/or acted as owner representative and inspectors for the procurement of thousands of containers for such companies as Sea-Land, Seatrain, Delta Lines, U.S. Lines, Columbus Lines, Fabre Lines, Meri Shipping, Maersk Lines, and many others.
- C. R. Cushing & Co. has inspected, type approved, load tested and damage surveyed, thousands of containers over the last 32 years.
- C. R. Cushing & Co. has developed container cranes, container straddle carriers, container spreaders, container power boxes, container dehumidification and refrigeration systems, stores containers, containerized test labs, containerized gas turbine transport system, container securing and restraint systems.
- C. R. Cushing & Co. has designed container factories in Ireland, India and Yugoslavia, and analyzed/evaluated such facilities in the U.S., China, Japan and elsewhere.
- C. R. Cushing & Co. has designed containers in aluminum, stainless steel, flat and corrugated steel, filament wound plastic, honey combed sandwich panel, and other materials.
- C. R. Cushing & Co. was the first to apply finite element analysis techniques to the structural analysis of containers.
- C. R. Cushing has been a member of the American Bureau of Shipping container committee since its inception 18 years ago.
- C. R. Cushing & Co. has been delegated authority by the Commandant (G-MSO), U.S. Coast Guard, to approve containers as complying with the International Safe Container Act in accordance with Title 49, U.S. Code of Federal Regulations, Part 450, since 8 Sept. 1981.
- C. R. Cushing & Co. is recognized throughout the world as a leading authority on containers.

**C. R. CUSHING & CO., INC.**

<u>**TYPICAL PROJECTS**</u> **-- Accident Investigations**

- Study of the structural failure and sinking of a tanker for the Liberian government.
- Investigation, analysis and solution to bottom shell cracking problems on a class of eight containerships
- Study and repair design of a major structural failure in a double bottom of an ITB tank barge.
- Study of the sinking of the tanker *Spartan Lady*.
- Investigation into the structural failure of a tanker which grounded in the Houston Ship Channel.
- Study of the grounding and damage to the tanker *Sea Saint*.
- Investigation of the corrosion rates of ULCCs and VLCCs.
- Investigation of the capsizing and subsequent sinking of containerships, including the *Munchen*, the *Poet*, and the *Tuxpan*.
- Studied the alleged grounding and total collapse of the hull girder of a tanker.
- Investigation of buckling and subsequent break up of a bulk carrier.
- Studied the alleged break up and disappearance of a four year old containership.
- Investigated the cause of the capsizing of a cruise ship subsequent to a grounding.
- Carried out several investigations of capsizings and sinkings of ocean barges while under tow.
- Investigated numerous cargo losses, cargo damages and personal injuries.
- Analyzed the arrangement of mooring lines and mooring line strength for containership on which mooring lines broke.
- Sinking of the Ukrainian Bulkcarrier *Salvadore Allende*
- Loss of Containers containing highly toxic chemicals from the *Santa Clara*
- *Exxon Valdez* grounding and track analyses, causes for grounding, double hull analysis, testimony cases held in Anchorage and in Houston.
- *Sundancer* sinking analysis
- The sinking of the *M/V Golden Chariot*
- The loss of the tanker *Hawaiian Patriot*
- Seaworthiness of the tanker *Alsterstern*
- Risk analysis and testimony in asbestos and benzene cases
- Causes for the grounding of the *M/V Mantinia*
- Causes for the loss of the deck cargo from the *M/V Captain Panos*
- A study of the fire on the passenger ship *Rotterdam*
- Technical assistance concerning the charter party dispute on the *M/V Dan Xia Shan*

**C. R. CUSHING & CO., INC.**

## <u>TYPICAL PROJECTS</u> -- Related Work

- Carried out numerous valuations of vessels of all types.
- Planned, scheduled, and conducted sea trials for numerous vessels of all types, including passenger ships, containerships, ro-ro ships, tankers, bulk carriers, tugs, tug-barge combinations, private yachts, etc.
- Instrumented vessels with accelerometers, pressure transducers, strain gauges, velocity flow meters, torque meters, revolution counters, etc. and reduced data for use in finite element and longitudinal stress programs.
- Performed wind tunnel tests on shore gantry cranes to obtain information about forces on tie-down forces, stability information and performance of equipment in high winds.
- Designed, built, and positioned buoys in selected locations near the coast of St. Croix to set up and record wave patterns and amplitudes over a three month period.  This information was used to assess the most appropriate site for an oil refinery.
- Carried out numerous analyses of model tests using scale models of ship designs in developmental stages, including resistance, self-propulsion, open water propeller, propeller cavitation, seakeeping, and maneuvering.
- Developed data for and produced trim, stability, and loading manuals for vessels of all types, including computer programs.
- Performed an analysis of the shipyards of China and recommendations concerning modifications to individual yards and the Chinese commercial industry.
- Analyzed the shipbuilding industry of Argentina for a major bank.
- Surveyed and analyzed the shipbuilding industry of Turkey for a major bulk carrier owner.
- Obtained and reviewed proposals for the privatization of the Curacao Shipyard.
- A review of the plans, layout, work flow, production methods and shipbuilding equipment selection for a major South Korean shipyard.
- Completed a study of the Turkish shipbuilding industry.
- Carried out a detailed transportation study for the transportation of aggregate commodities between Central America and the U.S.
- Prepared transportation network model for comparing the economics of various transportation techniques and modes of different bulk commodities for development of an ITB operation.
- Designed and supervised the construction of a container manufacturing factory in Poona, India.
- Planning and analysis of a petroleum transshipment terminal in the Caribbean;
- Prepared conceptual design booklets describing various conversions of vessels for use as U.S. military transports (RRMS and RAPS).
- Conducted a lashing study for the U.S. Maritime Administration in 1983.
- Conducted a bulk handling study for the MARAD 1981, entitled "A Guide to Selecting Shipboard Container and Trailer Restraint Systems."
- Conducted a container optimization study to develop an equipment stowage scheme in aircraft for the U.S. Air Force, including the examination of container equipment, handling techniques, and logistical support.
- Conducted an engineering study for flat rack containers for the U.S. Army.
- Completed NAVFAC drawing corrections and participated in the plan review of marine control console drawings for causeway sections.  Completed research, analyses, and text in association with a number of marine engineering firms for the U.S. MARAD's "Ship of the Future" study.

**C. R. CUSHING & CO., INC.**

### Representative List of Clients, NYC Office

| | |
|---|---|
| A.P. Moller | Continental Oil |
| Admiral Cruise Lines | Coordinated Container Transport |
| Aimcor | Crowley Marine Transport |
| Alabama Shipyards | CSAV |
| Alcoa | Cushman & Wakefield |
| Alfa Laval, Inc. | Del Monte Fresh Fruit Co. |
| Ambassador Cruises | Delta Steamship Lines |
| American Automar, Inc. | DeOrchis, Walker & Corsa |
| American Bulk Carriers | Derby, Cook, Quinby and Tweed |
| American Bureau of Shipping | Diamond Radisson |
| American Cruise Lines | Dixie Carriers |
| American Hawaii Cruises | Dock Express Contractors |
| American Heavy Lift | Dole Fresh Fruit International Ltd. |
| American President Lines | Don Jon Marine |
| Anchor Marine | Donovan Maloof, Walsh & Kennedy |
| ARCO Marine | Dyer, Ellis |
| Argent Marine | E.K. Traders Pty., Ltd. |
| Association of Danish Shipbuilders | Eastham, Watson |
| Atlantic Container Line | Effjohn International |
| Bank of America | Egyptian Refrigerated Transport |
| Bath Iron Works | Eletson Tankers |
| Belcher Towing | European Container Terminals, E.C.T. |
| Bermuda Star Lines | Exxon Corporation |
| Bethlehem Steel Corp. | Fabre Lines |
| Bigham, Englar, Jones & Houston | Farrell Lines |
| C I T | Federation Navigation |
| C T I | First National Bank of Minneapolis |
| Cabot LNG Corporation | Freehill, Hogan |
| Cardillo & Corbett | Freehill, Hogan, Mahar |
| Carnival Cruise Lines | Freeport Cruise Lines |
| Central Gulf Lines | GE Capital |
| Century Shipping | Gelco CTI Container Services |
| Chalos, English & Brown | Global Container Lines |
| Chandris Cruise Lines | Global Terminal & Container Services |
| Chargeurs Renunis | Graham & James |
| Chase Manhattan Bank | Great American Lines |
| City of Alameda | Great Lakes Transport |
| City of Philadelphia | Greyhound Leasing |
| Coastal Ship | Haight, Gardner, Holland & Knight |
| Colonial Marine Industries | Halley, Calkins & Avallone |
| Columbus Line | Hamburg-Sud |
| Commodore Cruise Line | Hanjin Transportation Co. |
| Connell, Foley | Healy & Bailey |
| Consolidated Edison | Hill, Betts and Nash |
| Continental Bank | Hughes Bros. |
| Continental Illinois | Hvide Shipping |

**C. R. CUSHING & CO., INC.**

Ingalls Shipbuilding
Ingenieros Civiles Associados (ICA)
Integrated Container Services
International Terminal Operating Co.
Interocean
ITEL Container International Corp.
Johnstone, Adams
Kadampanattu Corp.
Keystone Shipping
Kirk Line
Lamont, Doherty Geological Observatory
LNG Ltd.
Lockeed Corporation
Maersk Container Line
Marine Transport Lines
Maritime Capital Corporation
Massport
Mattioni, Mattioni & Mattioni, Ltd.
May Ship
McAllister Towing & Transportation
McArdle, McMaster, Meighen
McDonald, Douglas
Mexican Line
Meyerwerft
Minneapolis Honeywell
Mitsubishi Heavy Industries
Moore-McCormack Bulk Transport
Moran Towing & Transportation
Morgan Guaranty Trust
NASSCO
National Maritime Research Center
Navierias de Puerto Rico (PRMMI)
Network Shipping
New York City Dept. of Corrections
New York City Fire Department
New York City Police Department
New York Daily News
Novoship
Odense Shipyard
Oilmorphic
Oiltest Inc.
Orient Overseas Container Service
Osprey-Acomarit
Overseas Shipholding Group
Pacific Alaska LNG Company
Pacific Indonesia Company

Pacific Lighting and Electric
Peck & Hale, Inc.
Penn Tankers
Pepsico
Polish Ocean Lines
Port Authority of Jamaica
Port Authority of Jebal Ali
Pratt and Whitney
Prince Rupert Port Corporation
Prudential Lines
Raytheon
Red River Shipping
Reefer Express Lines
Royal Caribbean Cruise Line
Royster, Razor, Vickery,  Williams
San Francisco Drycock
Sante Fe International Corporation
Sea River Maritime
Sea-Land Services
Sedgwick, Detert
Skagit Corporation
Soros and Associates
Southern Cross Overseas
Southern Ship Management, Inc.
Southwest Marine
Stolt Nielsen
Sulphur Carriers
Sumitomo Corp. of America
Texaco
TMT
Trailer Bridge
Trans Oceanic Cableship
Transporta Mexicana
U.S. Air Force
U.S. Army
U.S. Army Corps of Engineers
U.S. Coast Guard
U.S. Department of Interior
U.S. Environmental Protection Agency
U.S. Federal Energy Administration
U.S. Gypsum
U.S. Maritime Administration
U.S. Merchant Marine Academy
U.S. National Park Service
U.S. Navy
Union Carbide

**C. R. CUSHING & CO., INC.**

United Fruit Company
United Nations
Virgin Island Refinery Corporation
Vulcan Materials Company
Waesche, Scheinbaum, O'Regan

Walker and Corsa
Waterman Lines
Watson, Farley
Xtra Inc.

**C. R. CUSHING & CO., INC.**

## PROFESSIONAL DEVELOPMENT

- To encourage personnel development and education, C.R. Cushing & Co. supports a graduate education tuition reimbursement plan. Company personnel do participate, or have participated, in professional and governmental technical activities, including:
- International Maritime Organization (IMO) - U.S. Delegation to Subcommittee on Stability, Load Lines, and Fishing Vessels Safety
- International Maritime Organization (IMO) - U.S. Delegation to Subcommittee on Bulk and Hazardous Cargoes;
- National Academy of Science - Ship Structures Committee
- American Bureau of Shipping - Member and Technical Committees
- Lloyds Register of Shipping - North American Committee member
- Society of Naval Architects and Marine Engineers - Member and Technical Committees
- International Cargo Handling Coordination Association - Governing Board
- American National Standards Institute - Technical  Advisory Group
- International Standards Organization - U.S. Delegation
- U.S. Coast Guard - Advisory Group on Petroleum Terminals;  Advisory Group on Hazardous Cargo

Other organizations in which C.R. Cushing & Co. personnel participate in are:

- The Royal Institution of Naval Architects
- The Institute of Marine Engineering, Science & Technology
- American Boat and Yacht Council
- Japan Society of Naval Architects
- Korean Society of Naval Architects
- American Society of Mechanical Engineers
- American Society of Naval Engineers
- American Society of Heat, Refrigeration, Air Conditioning Engineers
- National Fire Protection Association
- National Safety Council
- Refrigerated Transportation Foundation
- Truck Trailer Manufacturers Association
- International Standards Organization (ISO) TC-104 Committee on Containers
- World Maritime University (Faculty)
- Royal Institute of Navigation
- Alumni associations of MIT, Michigan, Webb, Kings Point, Fort Schuyler, and other universities.

**Appendix M**

**C.R. Cushing Testimony in the Last 4 Years**

# Testimony Given Last Four Years
## By Charles R. Cushing Ph.D., P.E.

PROJECT No. 2988
Name of Project:  Walsworth, Franklin – Westbrook Asbestos
Date:  July 6, 2009
Client:  Walsworth, Franklin - Deposition

PROJECT No. 2964
Name of Project:  Sedgwick, Detert – Niebauer Asbestos
Date: June 11, 2009
Client: Sedgwick, Detert - Deposition

PROJECT No. 2640
Name of Project:  Gardner Bond – Lenz Asbestos
Date:  31 March 2009
Client:  Gardner, Bond, Trabolsi, St. Louis & Clement – Deposition Testimony

PROJECT No. 2895
Name of Project:  Wilcox & Savage – Leigh Asbestos
Date:  5 March 2009
Client:  Wilcox & Savage – Deposition Testimony

PROJECT No. 2918
Name of Project: - Gordon & Rees – Crull Asbestos
Date:  3 March 2009
Client:  Gordon & Rees – Deposition Testimony

PROJECT No. 2681
Name of Project: - Mound, Cotton – Fortier Asbestos
Date:  12 February 2009
Client:  Mound, Cotton, Wollan & Greengrass – Deposition Testimony

PROJECT No. 2737
Name of Project: - DeHay & Elliston – Garcia Asbestos
Date:  14 October 2008
Client:  DeHay & Ellison – Deposition Testimony

PROJECT No. 2755
Name of Project:  Wilcox & Savage – Morton Asbestos
Date:  25 September 2008
Client:  Wilcox & Savage – Deposition Testimony

PROJECT No. 2842
Name of Project:  Sidley Austin – Cohen Asbestos
Date:  15 August 2008
Client:  Sidley Austin LLP – Deposition

PROJECT No. 2692
Name of Project:  Thompson Hine – Jackson Asbestos
Date:  25 June 2008
Client:  Thompson, Hine & Flory LLP – Deposition and Testimony

PROJECT No. 2609
Name of Project:  Freehill, Hogan – Rofail P.I.
Date:  23 June 2008
Client:  Freehill, Hogan & Mahar LLP – Deposition and Testimony

PROJECT No. 2735
Name of Project:  Filice Brown – Weber Asbestos
Date:  8 April 2008
Client:  Filice Brown Essa & McLeod LLP - Deposition

PROJECT No. 2669
Name of Project:  Holland & Knight – Crane Barge OVUS 1
Date:  28 March 2008 – Deposition - 24 April 2008 – Testimony
Client:  Holland & Knight – Deposition Testimony

PROJECT No. 2411
Name of Project:  Holland & Knight – M/T PRESTIGE
Date:  26 - 27 November 2007
Client:  Holland & Knight – Deposition Testimony

PROJECT No. 2692
Name of Project – Jackson Hine - Jackson Asbestos
Date:  30 August 2007
Client: Jackson Hine LLP – Deposition Testimony

PROJECT No. 2674
Name of Project – Migliori - Ochs Asbestos
Date:  5 January 2007
Client: Donald Migliori, Esq. – Deposition Testimony

PROJECT No. 2655
Name of Project – Foley & Mansfield – Bridges Asbestos
Date:  7 November 2006
Client: Foley & Mansfield P.L.L.P. – Deposition Testimony

PROJECT No. 2611
Name of Project – Foley & Mansfield – McNamara Asbestos
Date:  13 June 2006
Client: Foley & Mansfield P.L.L.P. – Deposition Testimony

PROJECT No. 2592
Name of Project – Armstrong & Associates - Stroker Asbestos
Date:  30 January 2006
Client: Armstrong & Associates – Deposition Testimony

PROJECT No. 2585
Name of Project – Bailey Crowe - Riggle Asbestos
Date:  13 December 2005
Client: Bailey Crowe & Kruger, LLP – Deposition Testimony

PROJECT No. 2593
Name of Project – Mound, Cotton - Rowan Asbestos
Date:  2 December 2005
Client: Mound, Cotton, Wollan & Greengrass – Deposition Testimony

PROJECT No. 2568
Name of Project – Armstrong & Associates - Goias Asbestos
Date:  31 August 2005
Client:  Armstrong & Associates – Deposition Testimony

**Appendix N**

**C.R. Cushing Publications in the Last 10 Years**

### Publications by C.R. Cushing in Past Ten Years

1.   Cushing, C.R.,  *The Ship Acquisition Process,* Chapter 3, Ship Design, Volume 1, SNAME, 2003.

2.   Cushing, C.R.,  *Globalization – Fair Winds or Storm Warnings*, a presentation to the Maritime and Transportation Groups of Holland and Knight, Atlanta, September 22, 2000.

3.   Cushing, C.R.,  *Containerization, The Next 30 Years*, Port Days Conference, Halifax, September 1999.

**Appendix O**

**C.R. Cushing & Co., Inc. Compensation**

# C.R. CUSHING & CO., INC.
**Naval Architects, Marine Engineers & Transportation Consultants**

## BILLING RATES

Dr. Cushing is compensated $290 per hour for his time.