UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION |
| | NO. 05-418 |
| PERTAINS TO BARGE | |
| | SECTION "K" |

| | | |
|---|---|---|
| *Mumford* | C.A. NO. 05-5724 | as to plaintiffs Josephine Richardson and Holiday Jewelers, Inc. - ONLY |
| *Benoit* | C.A. NO. 06-7516 | as to claims of plaintiffs John Alford and Jerry Alford - ONLY |

## JOINT PRE-TRIAL ORDER

**NOW INTO COURT,** through undersigned counsel, come **Plaintiffs, JOHN AND JERRY ALFORD, JOSEPHINE RICHARDSON and HOLLIDAY JEWELERS, INC**., and **Defendant LAFARGE NORTH AMERICA, INC.,** who in accord with the provisions of Federal Rule of Civil Procedure 16, and pursuant to the Court's April 15, 2010 Order, submit their Pre-Trial Order.

1. A PRE-TRIAL CONFERENCE IS SCHEDULED FOR JUNE 10, 2010 AT 3:00 P.M.

2. ATTORNEYS

   <u>**For the Plaintiffs**</u>:

   1. Laurence E. Best, Best Koeppel Traylor;
   2. Peter S. Koeppel, Best Koeppel Traylor;
   3. Brian A. Gilbert, Best Koeppel Trayor and Law Office of Brian A. Gilbert;
   4. Lawrence D. Wiedemann, Wiedemann & Wiedemann;
   5. Karl Wiedemann, Wiedemann & Wiedemann;
   6. Shawn Khorrami, Khorrami, Pollard and Abir;
   7. Dylan F. Pollard, Khorrami, Pollard and Abir;

from the IHNC never reached that high. Plaintiff Holiday Jewelers Inc. seeks to recover its alleged lost profits, but it was not a profitable business before the storm and there is no reasonable certainty that it would have made a profit after the storm. It therefore cannot recover any alleged lost profits.

LNA will support these points with the testimony from two experts:

- *Dr. Wade R. Ragas* is the preeminent real estate appraiser in the New Orleans area. He will be providing testimony concerning the value of the Alford and Richardson properties both before and after the storm, and the increase in the value of their real estate holdings after the storm on account of payments they have already received for their property damages.

- *Dr. Kenneth J. Boudreaux* is a professor of economics and finance Tulane University. He will testify that Holiday Jewelers Inc. was not a profitable business before Hurricane Katrina and was not likely to be profitable after the storm.

For these reasons, and others that LNA detailed in its Pre-Trial brief, LNA will show at trial that the barge did not cause the IHNC floodwall to fail, and LNA is not liable for negligence.

### 7. UNCONTESTED MATERIAL FACTS
#### a. Plaintiffs:

1. The Inner Harbor Navigational Canal (IHNC)/Industrial Canal is a navigable waterway of the United States.

2. Lafarge North America operates the cement distribution facility on the INHC.

3. The barge, ING 4727, is a vessel more fully described as follows:

    Type:      Hopper
    Length:    200 feet
    Width:      35 feet
    Height:     12 feet (without covers)

4. At all pertinent times the ING 4727 was owned by Ingram Barge Company (notwithstanding any bailment, and/or interest acquired or held by Lafarge).

5. The ING 4727 and 4745 were loaded with cement by LNA at its facility in Joppa, IL.

37

6. ING 4727 was diverted from Westlake to New Orleans;

7. The Lafarge distribution facility on the IHNC was at the time of diversion of the barges undergoing a stock shortage of H-grade cement.

8. The ING 4727 and 4745 were delivered to the Zito Fleet on the Mississippi River.

9. After delivery to the Zito Fleet, the ING 4727 and 4745 were delivered to the LNA facility on the IHNC on August 26, 2005 at around 12:00 p.m.

10. Lafarge completed unloading operations of the ING 4727 at around 9:00 a.m. on Saturday, August 27, 2005.

11. At around 10:00 a.m. on Saturday, August 27, 2005, Lafarge assistant terminal manager, Ed Busch, telephoned Joe Domino, Inc./Unique Towing to have the ING 4727 and ING 4745 "topped around."

12. At the request of Joe Domino, Inc., the M/V Regina H was dispatched to the IHNC facility to top the barges around.

13. The M/V Regina H completed this task at around 14:25 (2:25 p.m.).

14. At around noon, Lafarge evacuated its facility on the IHNC.

15. At all pertinent times, the following were employees of Lafarge North America, acting within the course and scope of the employment:

    Ed Busch
    Earl Smith
    Roland Johnson
    Louis Robin
    Annette Gaskin
    Rachel Burnett-Mays

16. At all pertinent times, the following were employed by Unique Towing, Inc. as crew of the M/V Regina H, acting within the course and scope of the employment.

    Captain – Raymond Grabert
    Deckhand – Eric Thigpen

17. Lafarge did not ask Joseph C. Domino, Inc. or Unique Towing to add any mooring lines between ING 4727 and ING 4725;

18. Mr. and Mrs. John and Jerry Alford were married, and owned community property bearing municipal address 2423 Deslonde, New Orleans, LA at the time of the storm.

38

19. Josephine Richardson owned the property bearing municipal address 1321 Egania, New Orleans, LA at the time of the storm.

20. Holliday Jewelers, Inc. had its place of business at municipal address 8400 West Judge Perez, Chalmette, LA at the time of the storm.

21. The testimony of Plaintiff's trial witness Tommy Duplessis is as follows:

> Tommy Duplessis is an adult and of sound mind;
>
> Tommy Duplessis was at the time of Katrina a St. Bernard Parish Sheriff's Deputy;
>
> Tommy Duplessis was present at the St. Bernard Parish Courthouse on the morning of August 29, 2005;
>
> Tommy Duplessis filmed the video footage referred to previously in this litigation as the "Gutierrez video," and described by Sal Gutierrez in his February 28, 2008 deposition in this litigation as having been filmed by Tommy Duplessis;

22. The Tommy Duplessis St. Bernard Courthouse video is authentic.

   b. **LNA:**

1. The plaintiffs in this case are three individuals, John and Jerry Alford and Josephine Long Richardson, and a corporation, Holiday Jewelers, Inc.

2. The IHNC provides a connection between the Mississippi River at its southern end and Lake Ponchartrain 5.8 miles to the north. The southern half of the IHNC, approximately between the Florida Avenue Bridge and the Mississippi River, separates the city to the west from the Lower Ninth Ward to the east. The IHNC is oriented in a roughly north-south direction.

3. The IHNC is bisected by Reach 1 of the Mississippi River – Gulf Outlet ("MRGO"), which enters the IHNC at a point just above the Florida Avenue Bridge.

4. The Lafarge North America cement terminal ("LNA Terminal") is located on the west side of the IHNC, between the Florida Avenue Bridge and the Claiborne Avenue Bridge.

5. The LNA Terminal serves as a distribution point for the company's cement products. Cement products arrive at the terminal by barge and are unloaded into silos for distribution by truck to LNA customers in the region.

6. To be delivered to the LNA Terminal for unloading, barges must pass through the IHNC lock from the Mississippi River. LNA does not have its own tugs at the terminal, and thus it relies on fleeting services to deliver full barges and to remove empty barges after they have been unloaded. Once the barges are unloaded, they must again pass through the IHNC lock to the Mississippi River upon retrieval by the fleeting service.

7. Upon unloading a barge, LNA terminal personnel call the relevant fleeting service to "release" the barge for pickup.

8. During the period in question, LNA had a Transportation Agreement with Ingram Barge Company ("Ingram") to deliver LNA's cement products to the LNA terminal via barge from its production facility in Joppa, Illinois. Ingram employed Zito Fleeting Company to receive barges at its fleet in the Mississippi River, deliver them to the LNA Terminal, and then retrieve empty barges from the LNA Terminal and return them to the fleet, where they would be held before moving on to their next destination. Zito was the only designated fleeting service for delivering Ingram barges to the LNA Terminal and for retrieving them after unloading and fleeting them pending their next assignment by Ingram.

9. The Barge ING 4727 arrived at the LNA Terminal, laden with cement, at approximately 12:20 p.m. CDT on August 26, 2005, together with another loaded barge, the ING 4745. The two barges were delivered by Zito on behalf of Ingram, which owned both barges.

10. At the time the two barges arrived at the LNA Terminal, there were five loaded barges moored in a tier at the dock immediately to the north of the unloading apparatus where the ING 4727 and ING 4745 were docked.

11. Upon its delivery to LNA, the ING 4727 was tied up with two strands of 4.5-inch circumference (1.5-inch diameter) polypropylene line, both of which had previously been in use.

12. LNA personnel began to unload the ING 4727 upon its arrival at the LNA Terminal. Unloading continued throughout the afternoon of August 26, and into the next morning.

13. LNA's Terminal personnel completed the unloading of ING 4727 on Saturday morning, August 27.

14. At the southern end of the protected slip where the LNA Terminal is located, there is a gantry shed that projects over the water.

15. ING 4727 was a hopper barge with no motor or other means of self-propulsion.

40

16. ING 4727 required an external force to propel it from the west side to the east side of the IHNC.

17. ING 4727 was over twenty feet high from top to bottom (including hatch covers).

18. In the northern hemisphere, the counterclockwise cyclonic motion of a hurricane means that the area of low-pressure (the eye of the storm) is to the left of a person standing with his back to the wind.

19. The eye of Hurricane Katrina did not pass through the latitude of New Orleans and the IHNC until after 8:00 a.m. CDT on the morning of August 29, 2005.

20. The IHNC below the Florida Avenue Bridge was a "closed system" in the sense that the lock at its southern end prevented the flow of water to or from the Mississippi River.

21. The levee and floodwall structure protecting the Lower Ninth Ward extends along the eastern shore of the southern section of the IHNC and is part of the 320 miles of levees and floodwalls protecting the New Orleans and surrounding areas. The IHNC levee and floodwall extends from the Florida Avenue Bridge in the north to the Claiborne Avenue Bridge and the lock system to the south. It runs parallel to Jourdan Avenue in the Lower Ninth Ward.

22. The levee system along the IHNC consisted of an earth embankment with a crest of approximately 7.5 feet according to the North American Vertical Datum of 1988 (NAVD-88) and side slopes of 2.4:1 and 2.8:1 on the land and water side, respectively. The elevation of the levee toe decreased toward Florida Avenue.

23. On the morning of August 29, 2005, two breaches occurred in the floodwall on the east side of the IHNC.

24. The IHNC "North Breach" occurred just south of the Florida Avenue Bridge, at a location to the north and east of the Lafarge Terminal and on the opposite side of the IHNC from the terminal.

25. The North Breach occurred at a location of structural discontinuity between deeper and longer I-wall sheet piles on the north side of the breach and shorter I-wall sheet piles within the displaced section of the breach.

26. The IHNC "South Breach" occurred closer to the Claiborne Avenue Bridge, at a location to the south and east of the Lafarge Terminal and on the opposite side of the IHNC from the terminal.

27. The barge passed through the floodwall at the extreme southern end of the South Breach, at a location where bent rebar was found which matched scratches found in the bottom of the barge.

28. The North Breach was approximately 215 feet in length.

29. The South Breach was more than 800 feet in length.

30. The distance from 2604 Deslonde Street to the location of the South Breach is over 2950 feet.

31. Civil twilight was at 6:11 a.m. CDT and sunrise was at 6:36 a.m. CDT on the morning of August 29, 2005.

32. The earthen levees along MRGO Reach 2 protect the same area ("polder") as the floodwalls on the east side of the IHNC.

33. After Hurricane Katrina, the Alfords received a wind damage insurance payment in the amount of $27,796.

34. After Hurricane Katrina, the Alfords received funds from the Road Home program in the amount of $120,000 for flood damage.

35. After Hurricane Katrina, Mrs. Richardson received a wind damage insurance payment of $10,489.71.

36. After Hurricane Katrina, Mrs. Richardson received funds from the Road Home program in the amount of $119,010 for flood damage.

8. **CONTESTED ISSUES OF FACT**

   a. **Plaintiffs**

   1. Organizational structure and ownership of Lafarge North America, Inc.;

   2. Whether, and at what point in time, LNA knew or should have known of Hurricane Katrina's projected path and forecasted strength;

   3. Whether LNA knew or should have known of Hurricane Katrina's potential for storm surge, wind, or other water and weather effects;

   4. Whether LNA knew or should have known that a Hurricane Katrina's effects could cause a vessel to breakaway;

   5. Whether LNA knew or should have known that a breakaway vessel could cause damages to persons and property;

42