LOUISIANA OFFICE

3501 HOLIDAY DRIVE, SUITE #314
NEW ORLEANS, LA  70114

CELL (24 HOURS): (504) 367-4072
FAX: (504) 367-3790

Email: Oceanoilpazos@cs.com
www.siterrific.com/pazos

# OCEAN-OIL

## EXPERT WITNESS, INC.

### NAVAL ARCHITECTS and MARINE ENGINEERS
### MARINE CONSULTANTS

FLORIDA OFFICE

P. O. BOX 47188
ST. PETERSBURG, FL  33743-7188

566 VILLA GRANDE AVE. S.
ST. PETERSBURG, FL  33707
PH: (727) 347-2556
FAX: (727) 343-9717
CELL (24 HRS): (727) 415-7192
Email: Hectorpazos75597@aol.com

June 29, 2009

Mr. Brian A. Gilbert          Mr. Patrick J. Sanders
821 Baronne Street            Attorney at Law
New Orleans, LA  70113        3316 Ridgelake Drive
                              Metairie, LA  70002

Mr. Lawrence Wiedemann        Mr. Shawn Khorrami / Mr. Dylan Pollard
821 Baronne St.               Khorrami, Pollard & Abir
New Orleans, LA  70113        444 South Flower St., 33rd Floor
                              Los Angeles, CA  90071

RE:  Katrina Levee Breaches
Civil Action No. 05-4419
OOEW Job No.1450

Dear Messrs. Gilbert, Wiedemann, Sanders, Khorrami & Pollard:

As per your request, I have reviewed the documents listed below, as well as other documents described under Additional Documents Considered, for the purpose of developing various conclusions and opinions regarding the case of reference.

I have also inspected the Ingram Barge ING 4727, the area of the Lower 9th Ward affected by flooding, multiple locations of the levees protecting New Orleans from floods, visited pumping stations and inspected the sections of the barge after the barge was removed from her post Katrina location.

The scope of this report is limited to the contribution of barge ING 4727 to the flooding of the Lower Ninth Ward, and St. Bernard Parish during hurricane Katrina on August 29, 2005.

INDEX:
A1.    DOCUMENTS RECEIVED
A2.    ADDITIONAL DOCUMENTS CONSIDERED
B.     BACKGROUND
C.     EXTRACTIONS FROM SOME OF THE DOCUMENTS REVIEWED
       C1a.   Extractions from the deposition of William Joseph Villavasso, Jr., taken December 18, 2007
              (Document #30)
       C1b.   Extractions from the Summary of Bill Vallavaso's Oral Statement of 10/09/07 (Doc. #54)

C1c.   Conclusions from the above testimony, which is also supported by and Mr. Villavasso's Oral Statements

C2a.   Extractions from excerpts of statement of Arthur Murph (Document #50)

C2b.   Conclusions from the excerpts of statement of Mr. Murph

C3a.   Extractions from the deposition of Terry Mark Adams taken November 13, 2006 (Doc. #27) Fact Witness

C3b.   Conclusions from the deposition of Mr. Adams

C4a.   Extractions from the deposition of Carolyn Berryhill taken December 13, 2007 (Doc. #28)

C5a.   Extractions from the deposition of Wilson Matthew Simmons, taken January 8, 2007 (Doc. #29)

C4b/

C5b:   Conclusions from the testimony Ms. Berryhill and Mr. Simmons:

C6.    Extractions from the deposition of Daniel Paul Mecklenborg taken Oct. 26, 2006 (Doc. #37) Ingram Corporate Representative/House Counsel

C7.    Extractions from the deposition of Raymond Grabert, Jr.  (Doc. #38) Captain of the tug REGINA H

C8.    Extractions from the deposition of Eric Thigpen taken Oct. 27, 2006 (Doc. #39) Deckhand on the tug Regina H

C9.    Extractions from the deposition of Gerald Thomas McNeill (Doc. #41)

C10.   Extractions from the statement of Earl J. Smith (Doc. #43)

C11.   Extractions from the statement of Ed Busch (Document #42)

C12a.  Extractions from the deposition of Stanley Vernon Cook

C12b.  Comments regarding the testimony of Mr. Cook

C13.   Extractions from the deposition of Mr. James R. Reed

C14.   Extractions from the deposition of James Louis Ruiz

C15a.  Extractions from the deposition of Andrew Sartin

C15b.  Conclusion from the testimony of Andrew Sartin

C16a.  Extractions from the deposition of Ernest Offray

C16b.  Conclusions from the deposition of Ernest Offray

C17a.  Extractions from the deposition of Sidney Williams

C17b.  Conclusions from the deposition of Sidney Williams

C18.   Extractions from the deposition of Ronald McGill (109 pages)

C19.   Extractions from the deposition of Dakeia Johnson (57 pages)

C20.   Extractions from the deposition of Earl Lackings (85 pages)

C21.   Extractions from the deposition of Damond Peters (43 pages)

C22.   Extractions from the deposition of Patrina Peters

C23.   Extractions from the deposition of Sally Susan Oster Jones (81 pages)

C24.   Extractions from the deposition of D'Antoinette Marie Johnson (155 pages)

C25:   Extractions from the deposition of Arthur Lee Murph, Jr. (Volume I – 153 pages)

C26.   Extractions from the deposition of Arthur Lee Murph (Vol. II – 291 pages)

C27.   Extractions from the deposition of Dolores St. Cyr-Butler (141 pages)

C28.   Extractions from the deposition of Hendrick Ray Pounds (143 pages)

D.   COMMENTS REGARDING MR. RAYMOND G. HELMER, JR.'S REPORT (DOC. #2)

E.   COMMENTS REGARDING MR. R. LEE WOOTEN'S REPORT (DOC. #14)

F.   COMMENTS REGARDING THE DECLARATION AND THE DVD OF DR. ROBERT GLENN BEA (DOC. #22)

G.   CONSIDERATIONS REGARDING PORT CONDITIONS WHISKEY, X-RAY, YANKEE & ZULU

H.   REVIEW OF VARIOUS ASPECTS REGARDING BARGE ING 4727 BREAKING LOOSE FROM ITS MOORINGS

I.   EXTRACTIONS FROM THE INDEPENDENT LEVEE INVESTIGATION TEAM – DRAFT

REPORT (ILIT) MADE AVAILABLE ABOUT MAY 22, 2006

J.     OBSERVATIONS REGARDING THE INSPECTION OF BARGE ING 4727 AT THE LOCATION WHERE IT RAN AGROUND, CLOSE TO THE LEVEE

K.     COMMENTS REGARDING THE INSPECTION OF THE SECTIONS OF THE BARGE ON APRIL 27, 2006

L.     DESCRIPTION OF THE DESIGN OF THE FLOODWALL IN THE AREA OF THE SOUTH BREACH

M.     REVIEW OF THE SIGNIFICANCE OF MRGO IN THE KATRINA FLOODING OF THE 9TH WARD OF NEW ORLEANS AND ST. BERNARD PARISH

N.     STATIC FORCES GENERATED BY WIND ON THE BARGE, TRANSFERRED TO THE FLOODWALL WHEN THE BARGE IS RESTING AGAINST THE FLOODWALL

O.     WAVE REFLECTION AND WAVE SUPERPOSITION

P.     SUMMARY OF THE TESTIMONY OF FACT WITNESSES REGARDING THE BARGE BEING THE CAUSE OF THE BREACHES

Q.     COMMENTS REGARDING SOME PHOTOGRAPHIC EVIDENCE PROVIDED BY LAFARGE NORTH AMERICA AND OTHERS

R.     COMMENTS REGARDING UNDERSEEPAGE OF THE IHNC LEVEE BEFORE KATRINA

S.     CONTRADICTIONS AMONG VARIOUS INVESTIGATORS

T.     COMMENTS REGARDING DROP IN WATER LEVEL AT THE IHNC WHEN THE NORTH BREACH WAS INITIATED

U.     COMMENTS REGARDING THE TIMING OF THE BREACHES ON THE EAST BANK OF THE IHNC

V.     COMMENTS REGARDING THE UNBREACHED PORTIONS OF THE FLOODWALL/LEVEE ON THE EAST BANK OF THE IHNC

W.     CONCLUSIONS REGARDING PROBABLE SEQUENCE OF EVENTS

X.     COMMENTS REGARDING THE REPORT AUTHORED BY D. F. RYAN, II, P.E., DATED JUNE 12, 2009

Y.     COMMENTS REGARDING THE REPORT AUTHORED BY D. PHILIP SKAER, II, DATED JUNE 12, 2009

Z.     COMMENTS EGARDING THE REPORT AUTHORED BY LARRY E. STROUSE DATED JUNE 12, 2009

AA.     CONSIDERATIONS REGARDING LAFARGE'S ACTIVITIES

BB.     CONCLUSIONS AND OPINIONS

A1.     <u>DOCUMENTS RECEIVED</u>

1.     Curriculum vitae of Ray G. Helmer (8 pages);
2.     Helmer Engineering, Inc's report of November 29, 2007 (14 pages);
3.     Helmer Engineer, Inc's company information (2 pages);
4.     Curriculum vitae of J. L. Arnold, Inc. (2 pages);
5.     Geological Investigation of the Mississippi River-Gulf Outlet Channel prepared by the U.S. Army Engineer Waterways Experiment Station, dated February 1958 (41 pages);
6.     Declaration of Jesse L. Arnold, P.E. (23 pages);
7.     DVD of WGI Excavation Photos and hard copies of various photographs/drawings of the Geological Investigation (21 sets) – NOTE:  Received approximately 340 pages of Geological Documents.
8.     Curriculum vitae of G. Paul Kemp, Ph.D. (11 pages);
9.     Declaration of Dr. G. Paul Kemp, dated September 16, 2007 (46 pages);

10.  Data and other Information Considered (Dr. Kemp) (2 pages);
11.  Science Magazine article:  Restoration of the Mississippi Delta:  Lessons from Hurricanes Katrina and Rita, by G. Paul Kemp, et al, dated March 23, 2007 (6 pages);
12.  Biographical Sketch of Arthur R. Theis, P.E., P.L.S. (8 pages);
13.  Declaration of Arthur R. Theis, P.E., P.L.S., dated September 17, 2007 (14 pages);
14.  GEI Consultants "Sources of Water in the St. Bernard and New Orleans East Basins During Hurricane Katrina" Expert Report of R. Lee Wooten, P.E., dated August 29, 2007 (88 pages);
15.  "Effects of the Mississippi River-Gulf Outlet on Coastal Wetlands in Southeastern Louisiana" submitted by John W. Day and Gary P. Schaffer, Dept. of Oceanography & Coastal Sciences, LSU, Baton Rouge, LA, dated September 15, 2007 (32 pages);
16.  Curriculum vitae of Chad Aaron Morris, P.L.S. (1 page);
17.  Survey and Spatial Data in the Vicinity of the Mississippi River Gulf Outlet prepared by Chad A. Morris, P.O.S., Cmor Consulting LLC, dated September 16, 2007 (18 pages);
18.  Supplemental Declaration of Chad A. Morris, dated September 27, 2007 (3 pages);
19.  Curriculum vitae of Patrick Shea Penland, Ph.D. (53 pages);
20.  Expert Report of P. Shea Penland, Ph.D., dated September 15, 2007 (with Appendix B & C attached - 21 pages; Appendix B:  10 pages; Appendix C:  6 pages);
21.  Curriculum vitae of Robert G. Bea, Ph.D. (36 pages);
22.  Declaration of Robert Glenn Bea, dated September 17, 2007 (with attached appendices A, B and C - 141 pages; plus Appendice A:  27 pages, Appendice B:  20 pages, Appendice C:  42 pages).
23.  Curriculum vitae of Donald J. Green (4 pages);
24.  Case List of Donald J. Green (4 pages);
25.  Report of Donald J. Green, USG (retired), Kdon Marine Consulting, dated September 10, 2007, with attachments used for the report (12 pages plus 4 pages of communications);
26.  U.S.C.G. Investigative Report dated November 2, 2007 – **Not Received**;
27.  Deposition of Terry Adams, taken November 13, 2006 (161 pages);
28.  Deposition of Carolyn Berryhill, taken December 13, 2007 (116 pages);
29.  Deposition of Wilson Matthew Simmons, taken January 8, 2007 (68 pages);
30.  Deposition of William Villavasso, taken December 18, 2007 (218 pages);
31.  Deposition of D'Antoinette Johnson, taken December 11, 2007 (155 pages);
32.  Deposition of Kendrick Ray Pounds, taken December 11, 2007 (145 pages);
33.  DVD of Vrjiling animation:  Received DVD;
34.  Bea video:  Received DVD;
35.  CD of Robinson expert depositions (these are in various formats) Received CD;
36.  Confidential Attorney work product (4 pages);
37.  Deposition of Daniel Paul Mecklenborg (164 pages);
38.  Deposition of Raymond Grabert, Jr. (87 pages);
39.  Deposition of Eric Thigpen (48 pages);
40.  Letter from Mr. Wiedemann to Mr. Greene with attachment (13 pages);
41.  Deposition of Gerald Thomas McNeill (120 pages plus approximately 211 pages of exhibits);
42.  Response of Lafarge North America, Inc., to Plaintiff Second Set of Interrogatories and Request for Production (32 pages), including statement of Ed Bush (2 pages);
43.  Statement of Earl J. Smith (3 pages);
44.  Responses to Request for Admissions (6 pages) – (Ingram);
45.  Responses of Lafarge North America, Inc. to Plaintiffs' Request for Admissions (10 pages plus 4 pages of attachments);
46.  USCG – Sector New Orleans – Hurricane Plan (156 pages);
47.  Letter from USCG dated 11/14/07, regarding Freedom of Information Act with attachments (77 pages);

4

48. Report of Investigation into the circumstances surrounding the incident involving Hurricane Katrina ING 4727/Breakaway-Grounding (82 pages);

49. Draft Final Report of IPET – Vol. I – June 2006 – Received only 9 pages (the report should be in excess of 220 pages);

50. Excerpts of statement of Arthur Murph, labeled: Top Secret – Confidential – Attorney Work Product (17 pages) - Photographs;

51. Deposition of R. Lee Wooten, taken on September 14, 2007 (181 pages);

52. Expert report of Robert A. Dalrymple, Ph.D., PE dated August 29, 2007 (37 pages);

53. Summary of Bill Villavasso's Oral Statement of 10/09/07 (1 Page);

54. Letter – Report dated 02/15/07, authored by Capt. John W. Klotz, requested by Mr. John Emmett, on behalf of Joseph D. Domino and Unique Towing;

55. C.V. of Elissa Benedeck - Exhibit F (47 pages);

56. C.V. of Ken Boudreaux - Exhibit I (8 pages)

57. C.V. of Joseph Suhayda - Exhibit E (23 pages)

58. LNA Expert Witness List (8 pages);

59. C.V. of Cheryl Wills - Exhibit G (12 pages);

60. C.V. of Larry Daggett - Exhibit A (13 pages);

61. C.V. of Wade Ragas - Exhibit H (22 pages);

62. C.V. of Austin Dooley - Exhibit B (6 pages);

63. C.V. of Daniel Ryan - Exhibit C (4 pages);

64. C.V. of Philip Skaer, II - Exhibit D (6 pages);

65. Section of IPET Report: Hydrodynamic Forces and Overtopping Analysis (27 pages);

66. Photo of South breach and many other photos

67. Copy of LNA photograph 001155;

68. Deposition of James Reed (68 pages);

69. Photos of the North and South breaches (CD);

70. Exhibit E of the IPET Report (7 pages);

71. Video of James Reed;

72. Photographs of James Reed (DVD);

73. Video of Tommy Duplessis/Guiterrez (DVD);

74. Photo and map of the Courthouse;

75. Deposition of Louis M. Ruiz (68 pages);

76. Appendix 17 of IPET Report (19 pages);

77. Document identified as Ingram Hurricane Plan: Maritime Hurricane Contingency Port Plan – IBCO –0080/0085/0083/0086 (4 pages);

78. J. C. Domino, Inc., Policies and Procedures Manual – Dom-00140/Dom-00141 (135 pages);

79. Service Agreement: Zito - Ingram - Defendant Exhibit 352 – IBCO-0716 and IBCO-0722 (2 pages);

80. Transportation Agreement between Ingram and Lafarge – Section 51 and 21 – IBCO-0001/0002/0003/0004 - Defendant Exhibit 300 (4 pages);

81. Speech by Dr. R. Bea (DVD);

82. Flood Model submitted by attorney, J. Bruno (DVD);

83. Declaration of Susan A. Steiner (6 pages);

84. Summary of the deposition of Stanley Vernon Cook (7 pages);

85. Deposition of Stanley Cook (142 pages);

86. Deposition summary of Edward Bush – November 14, 2006 (4 pages);

87. Notification of Ingram coming to Joppa Plant – LNA email dated 8/29/05 (1 page);

88. Summation of the deposition of Andrew Sartin;

89. Summation of the deposition of Victor Landry;

90. Summation of the deposition of Tanya Smith;

91. Deposition of Sidney Williams (104 pages);
92. Deposition of Sally Jones (81 pages);
93. Deposition of Ronald C. McGill (109 pages);
94. Depositions of Roland Johnson and Annette Gaskin (71 pages / 98 pages);
95. Deposition of Harley Stanford Winer, Ph.D. (128 pages);
96. Deposition of Gregory B. Miller (172 pages);
97. Deposition of Ernest J. Offray (95 pages);
98. Deposition of Dolores St. Cyr-Butler (141 pages);
99. Deposition of Damond Peters and Patrina Peters (43 pages / 120 pages);
100. Deposition of D'Antoinette Johnson and Kedrick Pounds (155 pages / 143 pages);
101. Deposition of Andrew Sartin (85 pages);
102. Deposition of Dakeia Johnson (57 pages);
103. Deposition of Earl Lackings (85 pages);
104. Deposition of Arthur Murph, Vol. I (291 pages);
105. Deposition of Arthur L. Murph, Vol. II;
106. Lafarge Exhibit #33: American Society of Civil Engineers External Review Panel – What Went Wrong and Why;
107. Lafarge Exhibit #35: Woolley, Douglas and Leonardo Shabman – "Decision Making Chronology for the Lake Ponchartrain and Vicinity" – Draft Final Report for the Headquarters, U. S. Army Corps of Engineers, June 2007;
108. Lafarge Exhibit #36: Final Report of the Select Bipartisan Committee A Failure of Initiative (February 15, 2006);
109. Lafarge Exhibit #37: Special Report of the Committee on Homeland Security of Governmental Affairs; U. S. Senate (2006);
110. Twenty-one (21) Photos made by Ethan Miller;
111. Disk containing video animation;
112. Sewerage and Water Board – Control Log 8/29/05 (1 page);
113. CD-R containing 144 photos taken by attorney, R. Evans;
114. CD-R – LNA May 2008 – Supplemental Response – Re: Breaches containing 17 PDF files attached;
115. Lafarge Sixth Exhibit list (84 Exhibits);
116. USACE Drawing – IHNC East Levee
117. Deposition of Nancy Powell Chief of N. O. District Hydraulics and Hydrologic (164 pages);
118. Deposition of Hubert Bob Schroeder Senior Engineer ACE Retired (123 pages);
119. Deposition of Rob Buisson (199 pages);
120. Deposition of Suzanne Hawess (52 pages);
121. Deposition of Keith O'Cain, Civil Engineer worked on 2007 Deep Draft – De-authorization study (148 pages);
122. Deposition of Melvin McElwee (2 Vols. – 364 pages);
123. Deposition of Leo Hubert (123 pages);
124. USACE Plan for De-authorization of MRGO;
125. Appendix E: Note on the Influence of the MRGO (22 pages);
126. LNA 001066 thru LNA 001087: Misc. USCG Bulletins; Weather Data; Maps and Seawall Drawing (21 pages);
127. 275 Photographs: LNA 001088 thru LNA 001360 (278 pages);
128. USCG Investigative Report (15 pages) LNA 001361 thru LNA 001375;
129. USCG Report of Investigation (13 pages) LNA 001378 thru LNA 001387;
130. Sun and Moon Date for One Day (1 page) LNA 001398;
131. Water Elevation (From IPET – 1 Page) LNA 001390;
132. Expert Report of Raymond G. Helmer (35 pages);

133.   Report of D. F. Ryan, II (34 pages);
134.   Report of D. Philip Skaer, II (10 pages);
135.   Report of Larry E. Strouse (25 pages);
136.   Report authored by D. J. Green, dated January 27, 2007 (12 pages);
137.   Report authored by D. J. Green, dated June 13, 2008 (9 pages);
138.   Report authored by D. J. Green, dated March 11, 2009 (10 pages);
139.   LNA 000113; and
140.   Deposition of Edward Busch.


A2.   ADDITIONAL DOCUMENTS CONSIDERED

1.   Performance Evaluation of the New Orleans and Southwest Louisiana Hurricane Protection System (Final Draft Reports by IPET. Interagency Performance Evaluation Team).
2.   The failure of the New Orleans Levee System during Katrina. By the Team Louisiana – Report to the Louisiana Department of Transportation and Development (2007).
3.   Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005 by ILIT – 2006 (Independent Levee Investigation Team).
4.   Report of ASCE: External Review panel: "The New Orleans Hurricane Protection System: What Went Wrong and Why.
5.   IPET: Hydrodynamic Forces and Overtopping Analysis (27 pages).
6.   Section 6.3 of ILIT report dated July 31, 2006.
7.   Numerous websites listed in Appendix I.


B.   BACKGROUND

On August 26, 2005, following Ingram's instructions, Zito Towing delivered barges ING 4745 and ING 4727 to the Lafarge North America, Inc. (LNA), cement facility located on a cut on the west side of the Inner Harbor Navigation Canal (IHNC), New Orleans, LA. Barge ING 4727 was discharged and the unloading operation was completed about 9:00 a.m. on August 27th.

Despite of the approaching hurricane and the U.S.C.G. setting condition WHISKEY on August 26th and condition X-ray on August 27th (see Section G below), no drastic action was taken by Zito or Lafarge regarding the Ingram barges, with the exception of LNA's personnel replacing one mooring line at one end, and adding one mooring line about midship of the barges.

Mr. G. T. McNeill, representing Joseph C. Domino, Inc., a Marine Towing Brokerage, testified that Mr. Scott Castaing, a dispatcher from Domino, on August 27th at 10:30 a.m., received a phone call from Mr. Ed Busch, Lafarge Assistant Terminal Manager, requesting to send a vessel to Lafarge to swap out or topping around barges ING 4745 and ING 4727. Mr. Castaing contacted Mr. Raymond Grabert, Captain of the push boat Regina H., owned by Unique Towing, Inc., and relayed the request of topping around the barges to Capt. Grabert.

When the Regina H arrived to the Lafarge facility, there was nobody from Lafarge and the crew of the Regina H proceeded to relocate the barges. After topping around the barges, they left the loaded barge (ING 4745) tied to the dock, and the empty barge (ING 4727) connected to the loaded barge with the same mooring lines as they found them when the Regina H arrived, but moored on the outside of barge ING 4745. The crew of the REGINA H tried to find additional mooring lines but found none. The Regina H departed Lafarge on August 27th at about 15:00.

In summary, from review of various documents, it was determined that the following took place:

> Before the hurricane force winds arrived, the ING 4727 was in light condition, i.e. unloaded, moored alongside the dock, alongside of the loaded ING 4745 at the Lafarge facility. There was about a 6 foot draft and freeboard differential between the loaded and unloaded barges. In the afternoon of Saturday, 27 Aug., the M/V REGINA H acting on a request from Lafarge, turned the two barges so that the loaded ING 4745 was against the dock and the unloaded ING 4727 barge was outboard of the ING 4745 barge.

In the early hours on August 29, 2005, barge ING 4727 broke loose from its moorings.

The Lower ninth Ward and the most populated areas of St. Bernard Parish are surrounded by floodwalls and/or levees. A floodwall/levee is located along the Inner Harbor Navigation Canal (IHNC) on the west, the levee of the Mississippi River Gulf Outlet (MRGO) and Lake Borgne on the northeast, Violet Canal on the southeast, and the Mississippi River on the southwest. There are also inner levees called back levees, such as the levee of the Forty Arpent Canal.

The documents reviewed indicates that early on August 29, 2005, a barge (the only barge known to be in this area early August 29, 2005 was ING 4727) contacted the floodwall located in the proximity of pump station No. 5, which initiated a breach of the levee (North breach) and forced shutting off pumping at pump station No. 5 at 5:30 a.m. Later, the barge continued contacting the floodwall until about 6:00 a.m. when it impacted and broke two or more concrete panels initiating the South breach as the sheet piles at this location became separated and some 850 feet of floodwall previously disturbed by the barge were relocated inland some 170 feet. These breaches created a catastrophic inundation of the lower Ninth Ward and the most populated areas of St. Bernard Parish.

The Concrete I-wall and supporting levee failed at the above-mentioned locations during the approximate time frame of 4:30 to 6:30 a.m. on Monday, August 29, 2005. One location (North breach), approximately 250-foot long failure was near to Florida Avenue. The other approximate 900 foot long failure was near to Claiborne Avenue. Some of the remaining section of concrete I-wall experienced some tilt and severe scour at its landward side, but did not fail (IPET* III-439). (It should be noted that other documents reporting on Hurricane Katrina may report somewhat different times or lengths for the concrete I-wall failures).

The impact of the barge contacting the floodwall at the North end of the North breach was heard and observed by Mr. Villavasso, Jr., Pump Station No. 5, Chief operator. Prior to and at the time of the initiation of the development of the South breach, several witnesses heard and/or observed that barge ING 4727 was in contact with the concrete panels of the floodwall. When the concrete I-wall collapsed, a wall of water rushed into the Lower Ninth Ward.

Floodwaters unleashed by the uncontrolled maneuvers of the barge covered a very specific geographic area in the following boundaries:

> From the Industrial Canal floodwall on the West to Parish Road on the East, including the populated areas of the 9th Ward of New Orleans and the St. Bernard Parish.

*IPET: Interagency Performance Evaluation Team

The water spread eastward across Lower Ninth Ward toward St. Bernard Parish. It reached Jackson Barracks on the Orleans/St. Bernard Parish Line at 0800 a.m. (IPET IV-196) and Paris Road in Chalmette mid-morning on Monday, August 29, 2005. (IPET IV-99)

Ground surface in the Lower Ninth Ward is at approximate Elevation –1.0 to –2.0 feet (Sea Level). Water in the IHNC was at Elevation 10.0 to 10.5 feet at 0500 a.m. on Monday, August 29, 2005 and 12.5 feet at 0700 a.m. Water level in the IHNC continued to rise to Peak Elevation 14.3 feet at 0900 a.m. Water level in the IHNC subsided gradually to Elevation 4.0 feet at 0400 a.m. on Tuesday, August 30, 2005. (IPET IV-223).

The dimensions of Barge ING 4727 are:    Length:   200'
                                                                       Beam:     35'
                                                                       Depth:    12'


Although the light draft of the barge empty may have been approximately 1 – 5", visual inspection indicates that the average draft may have been close to 2.5', probably due to water in the voids.


C.    **EXTRACTIONS FROM SOME OF THE DOCUMENTS REVIEWED**

   C1a.    Extractions from the deposition of William Joseph Villavasso, Jr., taken December 18, 2007 (Document #30)

      P. 24, l. 18:  Pumping plant operator.

      P. 25, L. 12:  Station 5 is located on Florida Ave. and right off the Industrial Canal between the railroad tracks and Florida Ave.

      P. 32, L. 14:  A. "I was the chief operator".

      P. 36:  Was called to work on Sunday the day before the hurricane and arrived about 12:00 noon on 8/28/05.

      P. 53, L. 17:  the levee wall was from 200 to 300 feet from the porch. He could see the levee (P. 54, L. 19).

      P. 64, L. 4:  " … when I looked over to my left, I am watching the water, it's getting more intense splashing over the wall. Then I heard like an explosion. Boom. And I heard the explosion, I said what - - what could that be? I am still looking in that direction. And then I seen the levee wall partially - - sections, it's - - The levee walls are like in sections. I saw it tumble over (indicating). A couple of sections looked like they tumbled over. And I am looking real good, I am squinting my eyes because it's raining, too. Imagine it was still dark, but I could see that. Because it looked like a mouth with a tooth out. That's what went through my mind. And then I seen what appear to be metal structure like a barge, only the tip of it. Couldn't tell you I seen a whole barge, because I didn't. I - - That's what I seen".

      P. 66, L. 3:  " … it looked that appeared to be the tip of a barge".

      P. 70, L. 12:  " … when I heard the boom, the walls tumble and that was it".

P. 71, L. 1:  Mr. Villavasso saw the barge seconds or about 1 minute after the wall fell.

P. 71, L. 4: " ... A.  Seconds.  Minutes.  Maybe a minute.  I don't know.  When it fell down, it splashed and I seen massive amounts of water and I seen something that appeared to be a barge protruding, the tip protruding through the wall."

P. 74, L. 2:  "It appeared to be a barge to me."

P. 81, L. 17: "A.  It was a tip of what appeared to be a barge sticking - - protruding from the wall."

P. 85, L. 5: " ... All I could see was the top part of the tip of it protruding like may be it was on an angle.  What appeared to be a barge."

P. 97, L. 13: " ... I seen the tip - - I seen the wall fall, I seen the tip of it ...".

P. 118, L. 19: " ... But the sound that I heard when I heard the wall break was like an explosion.  It was a deeper boom."

P. 119, L. 5: " ... I heard the boom and seen the wall tumble ...".

P. 119, L. 14: " ... it was almost instantaneously."

P. 128, L. 21: " ... the wall start tumbling down and I seen what appeared to be a barge tip, ..."

P. 202, L. 13: " ... what appeared to be a barge to me ...".


**C1b.**   <u>Extractions from the Summary of Bill Vallavaso's Oral Statement of 10/09/07 (Doc. #53)</u>

"Hears "explosion".  Looks.  Sees levee wall tumble like a domino, and the tip of the barge poking through floodwall.  This is the north breach.  Sees the tip of the barge at the beginning of the break.  Sees it sticking through the wall.  Break about 100 ft south of FL Ave. Bridge. North beach.  Water started rushing, wall falling.  Ran back inside to cut elect power.  Can't tell amount of time between "explosion" and water rushing".

**C1c.**   <u>Conclusions from the above testimony, which is also supported by and Mr. Villavasso's Oral Statements</u>

Mr. Villavasso is a reliable professional with 23 years with the Sewerage and Water Board.  He heard like an explosion then he saw sections of the concrete panels of the floodwall tumbling, and he saw a portion of a barge protruding thru the concrete panels and massive amounts of water pouring thru the concrete panels.  It is a very likely scenario that barge ING 4727 made contact with the floodwall and initiated the failure of the levee, which resulted in the North breach.


**C2a.**   <u>Extractions from excerpts of statement of Arthur Murph (Document #50)</u>

- Living at 1739 Jordan Ave. – two blocks off Claiborne

- Brought wife and daughter to the Hyatt Hotel on Sunday, August 28, 2005

- Went back to his house to get his dog

- Was about 6:30 or 7:00 a.m. or a little later than that

- Walked across the street to check the levee

- It was 2 feet from the top

- The lights weren't out

- The lights went out

- I heard a big "boom" sound

- - two – foot wave of water

- climbed to my attic

- chopped a hole in the roof . . . and then I saw the barge

- The water was not overrunning the levee – the barge came from the other side and broke through the wall

C2b.   <u>Conclusions from the excerpts of statement of Mr. Murph</u>

Mr. Murph heard a big :boom":, observed a large amount of water a short time after hearing the "boom", and saw the barge.

C3a.   <u>Extractions from the deposition of Terry Mark Adams taken November 13, 2006 (Doc. #27)</u> Fact Witness

P. 14, L. 16:  On August 29, 2005, was living at 2604 Deslonde (within a half a block of the IHNN east levee).

P. 15, L. 12:  Was in the house since 8:00 p.m. on August 28, 2005.

P. 17, L. 24:  On August 29, 2005, got up at 5:00 a.m.

P. 20, L. 4:  Got on the roof between 5:30 to 6:00 a.m.

P. 21, L. 7:  Could look and see the levee.  It was still there.

P. 22, L. 23:  The House (2604 Deslonde) was less than half a block from the Industrial Canal.

P. 24, L. 3: " ... Somewhere between 5:30 and 6:00 the levee right by my house, the water was kind of like coming under it. I could see that. And a little over it. But the levee was still there. The rest of the levee was totally intact."

P. 24, L. 21: Saw water coming over the wall and some coming under, but there was no breach in the wall.

P. 25, L. 2: It was straight up.

P. 25, L. 6: "A. When I looked towards the Claiborne Bridge I could see something coming towards the levee, towards the wall. I couldn't exactly see what it was. And kept watching it. Then I heard something that sounded like a bang. When I heard the bang I seen the barge come floating through. After the barge came through the water came through, like the water must have rose about 12 feet in seconds".

P. 26, L. 18: "A. After I heard that (the boom), the water came through. It was like a tidal wave or the tsunami. Cars were getting rolled, houses were getting pushed apart".

P. 26, L. 25: The wall disappeared.

P. 28, l. 4: The water that moved his house came "from down the street where the barge came through at".

P. 36, L. 13: "A. That barge had to come through somewhere around Prieur or Johnson. Prieur or Johnson, or Roman. Somewhere in that – in that block radius".

P. 37, L. 16: " ... Because the water came through like it was a tidal wave or tsunami".

P. 38, L. 1: "A. When the barge hit the wall, that part of the wall just disappeared.

C3b.   Conclusions from the deposition of Mr. Adams

Mr. Adams heard a "bang", saw the barge come floating thru the floodwall and the water rose about 12 feet in seconds.

C4a.   Extractions from the deposition of Carolyn Berryhill taken December 13, 2007 (Doc. #28)

P. 14, L. 3: Was living at 1838 Deslonde in the Ninth Ward.

P. 33, L. 12: About quarter to six heard a grinding sound.

P. 105, L. 19: About five minutes after that grinding sound, started getting water.

P. 106, L. 23: The water was rushing real fast.

C5a.   Extractions from the deposition of Wilson Matthew Simmons, taken January 8, 2007 (Doc. #29)

P. 7, L. 7:  Was living at 5007 North Roman Street, New Orleans, LA 70117.

P. 35, L. 14:  Went outside between 1:30 a.m. to 2 o'clock.  "There was just the water up to the curb".

P. 35, L. 21:  " ... in the neighborhood of 5:30 a.m., 5 o'clock, 5:30, there was this booming sound ...".

P. 36, L. 3:  " ... after hearing that booming sound, my home became inundated with water within ten minutes or so.  My downstairs of my home flooded within ten minutes".

P. 36, L. 9:  "A.  To the ceiling ...".

C4b/5b:  Conclusions from the testimony Ms. Berryhill and Mr. Simmons:

Ms Berryhill and Mr. Simmons heard noises most probably created by the barge contacting the floodwall, just a few seconds before a major flood inundated the lower Ninth Ward and Mr. Murph heard a big "boom".  The testimony of the above fact witnesses' leave no doubt that barge ING 4727 caused the South breach.


C6.   Extractions from the deposition of Daniel Paul Mecklenborg taken Oct. 26, 2006 (Doc. #37)
Ingram Corporate Representative/House Counsel

P. 7, L. 4:  Executive with Ingram Barge Company.

P. 12, L. 23:  "A. Ingram's primary fleet location is a fleet owned and operated by Zito at mile 95 called Algiers Fleet.  There are several other fleets in the area that Ingram barges are located at periodically.  That's the primary fleet.  Then we also have a facility at Reserve, LA, which is an Ingram owned and operated called Triangle Fleet."

P. 13, L. 11:  "A. After a barge is unloaded by Lafarge at its France Road Facility it would at some point be picked up by Ingram or its independent contractor and moved to a fleet in the New Orleans vicinity.  And ordinarily that would be the Algiers Fleet, which is owned and operated by Zito".

P. 13, L. 34:  "A. Ingram has a contract with Zito for fleeting barges at Zito's facility, and associate shifting."

P. 20, L. 24:  Zito, as an independent contractor, would take the barges from its facility into the Lafarge Facility.

P. 21, L. 6:  "A. A Zito boat would ordinarily pick up a barge some time following unloading from the Lafarge Facility and then move it back to the Zito Algiers Fleet".

P. 27, L. 16:  "A. Zito will received communications regarding arriving barges from Ingram's barge dispatch customer service group located at Triangle Fleet".

P. 27, L. 22 thru 25:  Triangle is owned and operated by Capital Marine Supply, Inc. (an Ingram affiliate).

P. 35, L. 2 thru L. 16:  The contract between Ingram and Lafarge requires a written notice when a barge is unloaded.

P. 39, L. 21:  " … line boats generally move longer distances whereas shuttle boats in – as Ingram uses them, Ingram has two or three boats that are the same size as line-haul boats that operate as shuttle boats in the Baton Rouge thru IMT corridor".

P. 75, L. 5:  " … Zito shifted the 4727 from the – from its Algiers fleet to the Lafarge facility at France Road on the 26th'th of August …".

P. 75, L. 13:  Zito's boat Connie-Z shifted barge ING 4227 from Zito Algiers fleet to the Lafarge Facility on August 26th.  But, on P. 132, L. 12 is indicated that an unnamed vessel picked up this barge at 8:31 on 8/25 at the Zito Algiers Fleet and then it moved to the Lafarge facility on 8/26.

P. 76, L. 11:  " … it was moved at the request of Lafarge".

P. 93, L. 9:  Regarding to Lafarge's Answer to Interrogatories, Number 20: "According to LNA employee, Ed Bush, a call was made on August 27, 2005 to release the barge over voice mail to one of Ingram's representatives in New Orleans".

P. 95, L. 18:  Mr. Mecklenborg disagrees that Ed Bush talked to anyone at Ingram.

P. 98, L. 3:  "Zito has a contract with Ingram to provide the shifting.  And so Lafarge will call Zito when it wants a shift of the – of an unloaded barge from its facility out".

P. 103, L. 25:  Document LNA 00278 dated 8/29/05, related to Ingram barges in Joppa, Illinois, was provided to Mr. Mecklenborg to read.

P. 104, L. 18:  Document LNA 00278 was read, indicating that Ingram inspected their barges in Joppa.

P. 108, L. 16:  Zito closed the fleeting facility on the morning of the 27th.

P. 108, L. 17:  " … Zito closed the fleeting facility on the morning of the 27th, and was not accepting any incoming barges".

P. 121, L. 21:  " … the barge in fact was delivered to Lafarge's France Road facility in the morning of the 26th, I believe around 11:00 o'clock – 11:30".

P. 143, L. 17:  New Orleans Barge Fleeting Association Standard of Care Book indicates: "moorings from high to low fittings should be avoided if the low fitting in the lower barge may allow the line to slip off."

P. 147, L. 24:  At least one barge was brought to the Lafarge facility at the same time as the ING 4727.

P. 160, L. 3:  Ingram did not make any inquiry to Lafarge relative to Hurricane preparation in regards to barge 4727, because Ingram had no obligation to do so under the contract.

P. 162, L. 18:  Ingram purchased the assets of Riverway in April 2005.

C7.   Extractions from the deposition of Raymond Grabert, Jr. (Doc. #38)
      Captain of the tug REGINA H

P. 8, L. 11:  Master in towing – OUTV – Operator of uninspected towing vessel license.

P. 8, L. 21:  Employed by Boulage Marine Towing.

P. 9, L. 4:  Before employed by Unique.

P. 9, L. 21:  Was the captain of the Regina H in August 2005.

P. 14, L. 22:  The Regina H is an 800 horsepower push boat.

P. 22, L. 18:  Capt. Grabert received his assignment from the dispatcher (either Scott Castaigne or Morris Lasanne, who are employees of Joseph C. Domino, over the cell phone).

P. 43, L. 21:  The dispatcher specifically told Mr. Grabert:  " … He gave me the barge numbers and told me there was a empty on the dock with a load on the outside.  I would go there and flip the two around, and tie the load back to the dock."

P. 46, L. 11:  Arrived to Lafarge at 14:25 but " … there wasn't a soul around".

P. 47, L. 14:  "A. When I got there, there was three one-part lines holding the load to the empty".

P. 47, L. 21:  "A. Single line, three places".

P. 47, L. 23 and P. 48, L. 2:  It was blue line, two inch.

P. 48, L. 12:  "One on each end and one in the middle.

P. 50, L. 4:  There were roughly four cleats or cavils* in which the lines could have been placed.

P. 52, L. 24:  Apparently there were 2 cavils* that were not being used (Also, P. 53, L. 22).

P. 70, L. 25:  Regarding taking the light barge out of the canal and bring it to a fleeting operation:  "If they have requested me to do it so, I'd have done it".

*Note:  The correct spelling is:  Kevel

C8.    <u>Extractions from the deposition of Eric Thigpen taken Oct. 27, 2006 (Doc. #39)</u>
Deckhand on the tug Regina H

P. 7, L. 24:  Back on August 27, 2004 was working for Unique Towing.

P. 12, L. 6:  " … You got one part lines in between it …".  (Also, P. 17, L. 1)

P. 14, L. 24:  "A. There was nobody in-on the premises.  I walked all over, looked for ropes.  There were no ropes …".

P. 15, L. 25:  A. Well, I found one rope …".

P. 23 thru P. 26:  Had three one part ropes connecting the 2 barges – blue color – two-inch diameter.  The middle rope was at an angle. (Also, P. 23, L. 9 and L. 25).

P. 37, L. 7:  Did not do anything with relation to the lines between the loaded barge and the empty barge (Also, P. 39, L. 17 and P. 44, L. 10).

Regarding the question:  "Q. And would you put four parts between two barges?"  (P. 44, L. 14), Mr. Thigpen answered on P. 44, L. 16:  "A. Common sense, most of the time in all fleets anywhere, you just don't put loads and empties together.  That's why, because it's too hard to put parts between them".

P. 45, L. 1:  Mr. Thigpen testified that he wouldn't put an empty barge close to a full barge.


C9.    <u>Extractions from the deposition of Gerald Thomas McNeill (Doc. #41)</u>

P. 9, L. 16 thru 23:  Employed by Joseph C. Domino as part time dispatcher.  Was president of the corporation until January 30, 2006, for 21 years.

P. 53, L. 8:  "A. "topping around" means swapping around the barge positions".

P. 54, L. 24:  The task of taking the barges apart, is up to the vessel captain directing the deckhands.

P. 58, L. 11:  "A. It is the facility's responsibility to have ropes, lines to tie up with …".

P. 59, L. 16:  The call to swap out the barges came from Ed Bush (Lafarge).

P. 59, L. 20:  The dispatcher was Scott Castaing.

P. 63, L. 9:  Lafarge dictates what to do with the barges.

P. 63, L. 20:  If Lafarge were given orders to take barge ING 4727 to a fleeting operation on the river, there is no reason why they couldn't have moved it.

P. 64, L. 12:  The captain and the deckhand handle the mooring operations.

P. 65, L. 11: Mr. Castaing, the dispatcher, received a call on the 27th at 10:30 from Mr. Bush of Lafarge.

P. 66, L. 24: Swap out and topping around is the same thing.

P. 98, L. 15: Ingram did not ask Domino to do anything with barge 4727 during the period August 26th to August 29th.

P. 107, L. 18: Unique and Domino are not related, except by being brokered. Unique is a boat owner.

C10.   <u>Extractions from the statement of Earl J. Smith (Doc. #43)</u>

Mr. Smith is a maintenance supervisor at the Lafarge North America, Inc. His statement indicates:

> "On the morning of Saturday, August 27, 2005, there were seven barges at the terminal. In the northern row were five loaded barges, and in the southern row were the empty barge ING 4727 and, outboard of it, a loaded barge, the ING 4745. Along with other Lafarge employees, I began preparing the terminal for the approach of the storm.
>
> We secured barges in the northern row to the dock and to each other in preparation for the storm. We added extra mooring ropes between the barges, using new, two-inch braided polypropylene line. We also replaced old mooring ropes with the new rope, and, for each of the barges, we added extra ropes between adjacent cleats. We used the same procedure for the southern row of barges, replacing at least one line between the ING 4727 and ING 4745 with a new line, and adding a new line between the cleats near the middle of the barges. In securing the barges to the dock, we allowed for the expected rise in the water level by making several turns of the mooring ropes around the dock pilings, after making the ropes fast to the dock bollard cleats and cleating the other end to the barges. This was to allow the turns to release gradually as the water rose, so the lines would not become too tight and break. We had a boat shift around the two barges in the southern row so that the loaded barge (ING 4745) would be next to the dock and made fast to the dock in the same way as the northern row of barges. This was done to give a better lead angle to the dock lines and to assure that the light barge (ING 4727) would not ride up over the dock during the surge of the storm.
>
> We prepare for heavy weather several times a year, and this was the normal procedure that we have used to secure the plant and barges for storms."

It is evident that the rigging between the two barges was improper since barge ING 4727 broke loose and had no wires connecting the barge to the dock.

C11.   <u>Extractions from the statement of Ed Busch (Document #42)</u>

Mr. Busch is the Assistant Terminal Manager for the New Orleans Lafarge North America, Inc.

The "long lining" technique described by Mr. Busch, which consists of arranging mooring lines between the dock and the barge, was not applied to barge ING 4727 because after Lafarge prepared the barges for heavy weather, Mr. Busch "arranged for a tug to shift the light barge ING 4727 to the outside of the southern row of barges and to place the loaded ING 4745 on the inside, against the dock"; … Mr. Busch continued his statement indicating: " … this way, the light barge ING 4227 would be away from the dock and would not risk riding up onto the dock and causing a breakaway".

It is obvious that the "long lining technique was never attempted with the ING 4727 because Mr. Busch and Mr. Smith left the facility before barge ING 4727 was relocated.  Also, Mr. Busch stated that he "arranged to have barge ING 4727 to the outside of the southern row of barges".

## C12a.   Extractions from the deposition of Stanley Vernon Cook (Document #85)

P. 10, L. 16:  Worked for Ingram for 15 years.

P. 10, L. 23:  Works at triangle fleet.

P. 12, L. 15:  Area Maintenance Manager.

P. 14, L. 2:  From Florida to Texas.

P. 15, L. 4:  Assistant:  George Williams (only inspector working under Cook – P. 21, L. 23).

P. 15, L. 6:  Tank barge inspector.

P. 16, L. 6:  Cook reports to Rick Harnack.

P. 17 thru P. 21:  Names of barge inspectors:  George Williams (Reserve); Jimmy Goodott (Reserve); Terry Fontenot (Baton Rouge); David Williams (Paducah); Gary Homan (Paducah); Gerald Jarell (West Virginia); Paul Ward, Odom Vaughn, Peter Tassin, all barge inspectors who reported to Harnack in Nashville.

P. 23, L. 17:  Above Harnack is Scott Noble.

P. 28, L. 10 and L. 13:  Ingram's Liquid Department:  responsible for moving barges.

P. 30, L. 3:  Harnack's department:  Maintenance and Repair.

P. 30, L. 16:  On call 24 hours a day.

P. 45, L. 5 thru L. 20:  Cook testified that does not remember who directed him to go to Lafarge on August 27.

P. 48, L. 9:  Instructions from Nashville.

P. 50 thru P. 56:  Cook testified that he "don't know" or the "don't recall" to multiple questions.

P. 54, L. 5:  Cook went to Lafarge to examine the covers.

P. 60, L. 23:  Barge ropes' inspections was part of the questions.

P. 61, L. 15:  Other inspectors went out to inspect Ingram barges on the 26th and 27th.

P. 61, L. 23 and P. 62:  Fontenot from Baton Rouge went out to inspect Ingram barges, as well as:  Paul Tassin, Gary Holman, Greg Jarrell.

P. 64, L. 1:  There was a directive from Nashville to go and check Ingram barges throughout the area.

P. 64, 65 and 66:  Cook does not remember the answer to several questions

P. 66, L. 16:  Cook took coils of 3/8" polypropylene line.

P. 68, L. 14:  Cook wasn't going to inspect barges.

P. 68, L. 16:  He was going to see if covers were being tied down.

P. 71, l. 25:  Before August 27, 2005, was instructed to inspect barges in the hand of third parties in inclement weather.

P. 73, L. 12:  Instructions would be given as to what should be done regarding Ingram barges in the hands of third parties.

P. 74, L. 3:  They do it for all hurricanes.

P. 74, L. 23:  Covers on barges.

P. 93, L. 3:  Cook:  "I did not get on the empty barge".

P. 93, L. 15:  the empty barge was against the dock.

P. 93, L. 20:  the full barges were against the dock.

P. 94, L. 5:  a loaded Ingram Barge was at the dock.

P. 94, L. 8:  They were moored to the dock.

P. 94, L. 10:  Both barges were moored to the dock.

P. 96, L. 5:  The empty barge was against the dock.

P. 97, L. 7:  The covers were on top of the barge, but they were not ready to be tied down.

P. 97, L. 10:  They just completed discharging the barge.

P. 100, L. 2:  There was another loaded Ingram barge in these tier of barges.

P. 100, L. 18:  Went on the Ingram barge that Cook said was in the tier.

P. 101, L. 14:  Cook didn't do anything regarding either barge.

P. 101, L. 23:  Cook didn't go aboard the empty.

P. 105, L. 4:  Cook does not recall another Ingram barge outboard the empty.

P. 105, L. 8:  Cook recalls an Ingram loaded barge being in the tier of barges marked "Loads" in Exhibit No. 4.

P. 114, L. 3:  There was a general directive to go out and check Ingram barges at this time around the 27th.

C12b.  <u>Comments regarding the testimony of Mr. Cook</u>

    1).    On page 93, Mr. Cook testified that an empty barge was against the dock and a full barge was also against the dock.  This testimony contradicts the testimony of the captain of the Regina H (R. Grabert, Jr.), the deckhand of the Regina H (E. Thigpen), and the statement of Mr. Earl Smith.

    2).    It does not appear realistic that a supervisor from Nashville, Tennessee, would have requested a tank barge inspector, such as Mr. Cook, to travel from Reserve, LA, to the IHNC, just to verify that the covers of the barge were secured, to ensure that the covers will not be affected by the hurricane winds; and during this inspection the barge inspector found that the covers were not ready to be tied down, and the inspector left the area without being able to confirm that the covers were tied down.

C13.  <u>Extractions from the deposition of Mr. James R. Reed (Document #68)</u>

P. 9, L. 18:  Address:  4025 Kings Dr., Chalmette, LA  70043.

P. 18, L. 9:  On Monday, August 29, woke up about 4:00, 4:30.

P. 19, L. 1:  At about 4:00 to 4:30 there was no water in the street.

P. 20, L. 16:  The back of his property, had:  … back to the canal was a wooden fence, and the chain link ran across the canal, the Derringer Canal all the way to the Forty Arpent Canal in back of my garage.

P. 21, L. 16:  On the right, the vinyl fence runs North and South.

P. 22, L. 3:  The garage is on the left side of the house.

P. 23, L. 20:  The Derringer Canal connects with the Forty Arpent Canal.

P. 26, L. 6:  Between 7:00 and 8:00 water in the Derringer Canal overcome its banks.

P. 28, L. 19:  The Forty Arpent Canal also overflowed its bank.

P. 29, L. 12:  There is a levee on the opposite side of the Forty Arpent Canal and at 7:00 to 8:00 did not see any water coming over the levee into the Forty Arpent Canal.

P. 30:  Water was continuously raising in the street, until got over the hood of a jeep parked on the street.

P. 32, L. 11:  Water got into his home at approximately 10 o'clock a.m.

P. 37, L. 15:  His garage floated to the east side of the Derringer Canal.

P. 39, L. 10:  The water rose up in the attic until two o'clock.

P. 40, L. 1:  Was a steady rise.

P. 52, L. 6:  Mr. Reed never seen any water come over the 40 Arpent levee into the 40 Arpent Canal.

P. 57, L. 18:  All items outside the house moved in an easterly, southeasterly direction.

P. 58, L. 14:  In the morning the wind was coming from the Parish roadside and blowing towards New Orleans area.

P. 59, L. 1:  At three o'clock was coming from the North side towards Paris Road.


C14.  Extractions from the deposition of James Louis Ruiz (Document #75)

P. 9, L. 10:  Address 923 Lebeau St., Arabi, LA  70032 (Approximately 2 miles West of the St. Bernard Parish Courthouse).

P. 9, L. 18:  5 blocks below Jackson Barracks.

P. 16, L. 16:  On Monday morning August 29, 2005, did wake up at 2:30 in the morning.

P. 18, L. 1:  There was no water in the streets at that time.

P. 18, L. 7:  The first time that saw water in the street was 9:15 a.m.

P. 19, L. 2:  At that time the water was about 2 feet in his backyard.

P. 20, L. 15:  By about quarter to 10:00 the water was 6 ½ to 7 feet in his house.

P. 32, L. 3:  The St. Bernard Jail is on Parish Road and St. Bernard Highway.  It is the highest point in Chalmette.  It only got about six inches of water.

P. 50, L. 6:  2 feet of water in the front yard.

P. 50, L. 16:  6 ½ feet inside the house in 35 minutes.

P. 52, L. 13:  Was looking directly out my front door towards New Orleans.

P. 52, L. 21:  The water was flowing towards my house.

P. 53, L. 7:  The wind was coming from the Northwest.

P. 55, L. 3:  The only part that was dry was about two or three blocks of Arabi.  Once you got into New Orleans, there was no dry area.

P. 57, L. 21:  He knew that the water was coming from the West (West to East).

P. 58, L. 14:  the water was coming from the Industrial Canal.


C15a.  Extractions from the deposition of Andrew Sartin (Document #101):

P. 17, L. 17:   At the time of the hurricane he lived at 5428 North Roman, 9th Ward.

P. 19, L. 6:   Between Andry and Flood.

P. 45, L. 14:   Heard a noise up by Southern Scrap, Florida Ave.

P. 45, L. 20:   It was "about 6:00".

P. 45, L. 25:   " … like a big crash …".

P. 46, L. 1-2:   " … like something hit something.  Like boom …".

P. 47, L. 5:   Heard the noise:  "From the floodwall".

P. 50, L. 8:   " … heard the second noise …" (Also, P. 50, L. 21).

P. 50, L. 23:   The second noise was louder.

P. 51, L. 1:   It came from the Claiborne Ave. side.

P. 51, L. 18:   Five, ten minutes apart, fifteen minutes.

P. 54, L. 21:   Water came straight down Roman Street.

P. 55, L. 3:   Water was dragging cars.


C15b:  Conclusion from the testimony of Andrew Sartin:

22

Mr. Sartin heard 2 booms 5 to 15 minutes apart. The 1st boom could have been at the northernmost end of the South Breach. The 2nd boom could have been at the southernmost end of the South Breach. If the booms were 5 minutes apart, the barge would have to be moving at about 2.83 ft/sec. If the booms were 15 minutes apart, the barge would have to be moving at about 0.94 ft/sec. Both situations are possible. Hence, the testimony of hearing 2 booms supports the "conclusions Regarding Probable Sequence of Events' Section P of this report.

C16a. <u>Extractions from the deposition of Ernest Offray (Document #97)</u>

P. 18, L. 12:   Live in 2025 Deslonde Street at the time of the Hurricane.

P. 35, l. 21:   " … The water didn't start coming over the walls until maybe almost daylight time. Because first it was like a big old explosion that I heard.

P. 36, L. 3:   "… Because we heard a big old boom, boom …".

P. 36, L. 21:   "… we just heard the sound …".

P. 48, L. 21:   " … it wasn't around daybreak when we pulled the people off, it was just before daybreak. The sky was - - - it was showing light but it wasn't daylight …".

P. 50, L. 19:   " … I only saw the water coming into the neighborhood when we got out and rescued the people".

P. 50, L. 24:   "A. That was after the sound".

P. 51, L. 1:   "Bang, Bang …".

P. 51, L. 4:   "A. It was two".

P. 92, L. 16:   "A. It sounded like an explosion …".

C16b. <u>Conclusions from the deposition of Ernest Offray</u>:

Just before daybreak he heard two sounds, bang, bang, that sounded like an explosion, before water came in the neighborhood.

C17a: <u>Extractions from the deposition of Sidney Williams (Document #91)</u>:

P. 18, L. 20:   At the time of the hurricane was living at 1720 Tennessee St. – Ninth Ward.

P. 40, L. 20:   He made it to the attic after 3:00 (Also, P. 41, L. 2).

P. 40, L. 24:   It could have been 3:30.

P. 41:   Question: Okay. And what did you see, what did you hear, during the time

you were in the attic?

Answer:  Well, when we was making the hole, I heard a bang, a big old loud sound, you know.  I mean, we had done got a hole in there, Calving went up, he pulled me up, and me and him both was helping to pull the other two when I heard two more bangs.  But I was looking over – when I heard the first bang we got on the roof.  I looked around.  That's when I seen the barge hit the wall, bounced off – the water was real rough – and it hit the wall again.

P. 47, L. 22:   " … I seen it the second two booms.  I seen the barge slamming into the wall".

49, L. 7: "A.  When I got on the roof and I'm looking around and I heard the second boom, I'm looking into the water.  I am watching this barge slam into the wall".

P. 50, L. 22:   "I seen the barge hit the wall".

P. 70, L. 21:   "Four o'clock, five o'clock".


C17b:  <u>Conclusions from the deposition of Sidney Williams</u>:

Mr. Williams saw the barge slamming into the floodwall several times early in the morning.


C18:   <u>Extractions from the deposition of Ronald McGill (109 pages) – (Document #93)</u>:

P. 13, L. 21:   At the time of Katrina, residence:  1648 Reynes Street.

P. 49, L. 24:   " … I was in my house and I heard the boom.

P. 50, L. 21 and P. 51:   He was on the phone talking to his girlfriend and both heard the boom.  " … she heard it and I heard it …".

P. 59, L. 11:   "A.  It was "boom".

P. 59, L. 20:   It came from the barge.

P. 60, L. 7:   "A.  He hit the wall and came through.


C19:   <u>Extractions from the deposition of Dakeia Johnson (57 pages) (Document #102)</u>:

P. 23, L. 1:   Was living at 2139 Lamanche at the time of the Hurricane.

P. 35, L. 9:   Water started rising around 6:00, 6:30 a.m.

P. 35, L. 21:   Was thrown out of bed because " … it was a big boom".

P. 36, L. 16:   " … I heard two, …".

P. 39, L. 15:   Believe that the first boom was around 6:00 or 6:30.

P. 45, L. 21:   "A.  From the current in the water and the --- the way the debris was floating. Everything was floating from the Industrial Canal towards Chalmette".

C20.   <u>Extractions from the deposition of Earl Lackings (85 pages) (Document #103)</u>:

P. 26, L. 17:   At the time of the hurricane was living on 5017 North Miro St.

P. 44, L. 23,
P. 55, L. 19,
And
P. 81, L. 12:   " ... all I heard was a big boom ...".

P. 60, L. 12:   Walk to the corner and 5 minutes later, the streets started getting flooded.

P. 71, L. 19:   When we heard the boom wasn't daylight.

C21.   <u>Extractions from the deposition of Damond Peters (43 pages) – (Document #99)</u>:

P. 15, L. 3:    At the time of the hurricane was living on 2139 Lamanche Street.

P. 29, L. 16:   He received 2 phone calls from family members telling him that they heard 2 booms, like an explosion, about 5:30 a.m.

C22.   <u>Extractions from the deposition of Patrina Peters (Document #99)</u>:

P. 27, L. 1:    Was living at 2139 Lamanche.

P. 61, L. 6:    She heard the 1st boom.

P. 61, L. 18:   She heard the boom again.

P. 67, L. 20:   "A.  Between say quarter to six, 5:30, ...".

C23.   <u>Extractions from the deposition of Sally Susan Oster Jones (81 pages) – (Document #92)</u>;

P. 8, L. __:    Was living at 645 Mehle Ave., Arabi, LA  70032.

P. 27, L. 24:   Water did get in her house between 8:00 to 8:10.

P. 29, L. 21:   "A.  I saw a tidal wave . . . quite tall".

C24.   Extractions from the deposition of D'Antoniette Marie Johnson (155 pages)-(Document #100):

    P. 12, L. 12:   Was living at 2317 Deslonde Street, New Orleans, LA 70117.

    P. 25, L. 8:   Went to bed about 3:30 to 4:00 Monday morning.

    P. 26, L. 2:   Sleep for about 45 minutes.

    P. 26, L. 17:   When she woke up, water was in the house, about 6:00 o'clock.


C25:   Extractions from the deposition of Arthur Lee Murph, Jr. (Vol. I-153 pages)-(Document #104):

The extractions below are in addition to the extractions from his statement (See C2a).

    P. 42, L. 1:   In the period of 7 or 8 years before Katrina never had any flooding in the street.

    P. 43, L. 24:   Heard scrapping noises (Also, P. 44, L. 1).

    P. 46, L. 15:   "A. Just scraping and banging".

    P. 48, L. 21:   "Water started to come down the street".

    P. 59, L. 18:   " … I saw a barge on the front of the house".

    P. 61, l. 10:   It was dark – no daylight.

    P. 143, L. 14:   Did not notice any puddling of water in the levee side of the floodwall.

    P. 144, L. 19:   Did not notice any puddling or pooling of water.


C26.   Extractions from the deposition of Arthur Lee Murph (Vol. II – 291 pages)-(Document #105):

    P. 190, L. 3 and L. 8:   "A. I heard a big boom scraping sound …".

    P. 192, L. 10:   "A. It just was a boom …".

    P. 192, L. 17:   "A. I was just a noise, a loud noise outside".

    P. 282, L. 5:   Water started coming three to four minutes after the scraping sound.


C27.   Extractions from the deposition of Dolores St. Cyr-Butler (141 pages) – (Document #98):

    P. 17, L. 11:   Resident on August 2005: 5434 N. Johnson St.

P. 31, L. 8:   " … I heard boom, boom and the water came in …".

P. 34, L. 5:   The boom noise was not a transformer sound when it blows (Also, P. 34, L. 7, L. 9 and L. 12).

P. 37, L. 10:   Water came in a matter of seconds.

P. 116, L. 8:   Never saw any water gathering along Jourdan Ave. and the floodwall.

P. 116, L. 16:   Never saw any water collecting alongside the floodwall associated with the floodwall.

P. 118, L. 10:   " … the initial water come from after I heard the three booms …".

P. 12, L. 19:   Was no power on in the house when she heard the booms.  It was dark (P. 121, L. 16).

C28.   Extractions from the deposition of Hendrick Ray Pounds (143 pages) – (Document #100):

P. 7, L. 23:   Resident on August 29, 2005:  2317 and ½ Deslonde Street.

P. 23, L. 8 & L. 16:   Was awaken by his niece at 5:50 because was water in the house.

P. 24, L. 22:   It was nighttime.  " … I seen cars floating …".

P. 24, L. 25:   the weather was nice-pretty-beautiful.

P. 25, L. 14:   " … But when I looked to my left, I saw a big-ass hole in that wall" (floodwall) – (Also, P. 45, L. 25 and P. 124, L. 21).

P. 25, L. 18:   " … And then I looked to my right and they had another hole in the wall, and that was by the black bridge".

P. 25, L. 23:   The hole to his left was the biggest.

P. 26, L. 9:   " … I say about 80 …" (feet).

P. 48, L. 6:   the opening to his right was like ten feet.

P. 59, L. 4:   The level of the water at the left opening was halfway up on the floodwall.

P. 74, L. 7:   Did not see any water gathering along Jourdan Street when was not raining (Also, P. 75, L. 7).

P. 82, L. 8:   The hole to his left was a little more than a block.

P. 82, L. 15:   The hole to his right was less than half a block.

P. 129, L. 21:   Angelica said she heard a boom.

P. 129, L. 10:  D'Antoniette Johnson heard a boom.

P. 129, L. 12:  Before the water started coming.

P. 132, L. 6:   Dwight heard a boom.

D.   **COMMENTS REGARDING MR. RAYMOND G. HELMER, JR.'S REPORT (DOC. #2)**

The report authored by Mr. Helmer, Jr., dated November 29, 2007, analyzed the sources of water that flooded the New Orleans Lower Ninth Ward and the St. Bernard Parish during Katrina on August 29, 2005.

Mr. Helmer, Jr., summarizes his opinions as follows:

> "1.  The Lower Ninth Ward, and areas of St. Bernard Parish west of Paris Road, **were** flooded by flows from IHNC floodwall breaches.
> 2.  The Lower Ninth Ward, and areas of St. Bernard Parish west of Parish Road, **were not** flooded by flows from overtopping of MRGO levees."

E.   **COMMENTS REGARDING MR. R. LEE WOOTEN'S REPORT (DOC. #14)**

The report authored by Mr. Wooten dated August 27, 2007, contains the following statement:

> "Causes and possible causes for sources of water varied also in the complexity from source to source. For instance, the cause of rainfall is relatively straightforward as resulting from the Katrina storm; whereas, the causes and contributing circumstances for the breaches in the Lower Ninth Ward are complex to the point that investigation teams have significant disagreements about these causes and may have actually underestimated a potential factor such as a barge impact."

F.   **COMMENTS REGARDING THE DECLARATION AND THE DVD OF DR. ROBERT GLENN BEA (DOC. #22)**

On page 49 of his declaration, Dr. Bea's questions … "what came first; the barge or the breach?" but, later on, in a speech recorded on video (DVD) Dr. Bea blames the barge for breaking the INHC East floodwall and flooding the Ninth Ward. The DVD was apparently made in the field during Dr. Bea's visit to the site where the barge was aground. In his recorded speech, he uses the following words:

> "Barges broke loose from its moorings and run into levees, unfolding the levee under excessive forces from the colliding barge".

Dr. Bea also indicated that he observed that levees located at the boundary of wetlands performed extremely admirably. His remarks are probably in reference to the Forty Arpent Canal that protected St. Bernard parish from the surge overtopping the levee alongside the MRGO.

On page 50 of his declaration, Dr. Bea included the following observation:

28

"64.    There is a single large dent low on the side of the barge just around the left side of the bow and a pronounced scrape on the bottom of the barge at that same location. Most of the concrete floodwall was failed in extension and flexure, with its reinforcing steel (rebar) fairly extended. There was one single section of wall which clearly evinced a major impact, however, and that was at the extreme southern end of the breach. Figure 31 shows a close-up view of the floodwall at this location. The rebar is compressed and bent, and the concrete crushed at this location. It was the consensus view of our investigation team that the barge had scraped along the wall and then impacted the end of the wall at this location."

G.    CONSIDERATIONS REGARDING PORT CONDITIONS WHISKEY, X-RAY, YANKEE & ZULU

Title 33, CFR, Parts 160 and 165 describe the authority that U.S.C.G. Captains of the Port (COTP) can use to ensure the safety of their ports. Port conditions are set by COTP in advance of an arriving hurricane.

The four Port Conditions are:

- **WHISKEY**: Gale force winds are predicted to arrive at the Southwest Pass Entrance Sea Buoy within 72 hours (72 hours before anticipated landfall).
- **X-RAY**: Gale force winds are predicted to arrive at the Southwest Pass Entrance Sea Buoy within 48 hours.
- **YANKEE**: Gale force winds are predicted to arrive at the Southwest Pass Entrance Sea Buoy within 24 hours. This condition is also used after the storm passes, because vessel traffic control measures will still be in effect.
- **ZULU**: Gale force winds are predicted to arrive at the Southwest Pass Entrance Sea Buoy within 12 hours.

The Port Conditions are based on when gale force winds associated with the hurricane are predicted to arrive at Southwest Pass (marked by the Southwest Pass Entrance Sea Buoy). Gale force winds are defined as sustained winds at 34 knots (39 mph).

Among other recommendations, the Section New Orleans, Maritime Hurricane Contingency Port Plan, emphasized the following:

Port Condition Whiskey: Develop plans to shift to an alternate location or berth.

It should be noted that an experienced operator such as J. C. Domino does not include the IHNC as a safe harbor in their list of locations that have been deemed safe harbor for Joseph C. Domino, Inc. vessels during the threat of a hurricane.

And particularly for barges: Mooring lines doubled up with due consideration given to the effects of predicted storm surge. Special consideration should be paid to barges moored in the proximity of bridges.

On 26 August 2005 at 2031 the New Orleans COTP set Port Condition Whiskey.

Barge ING 4727 had been delivered to the Lafarge facility on the morning of August 26, 2005, by Zito Towing.

On 27 August 2005 at 1650 the New Orleans COTP set Port Condition X-Ray, which provides: "(a) Vessels intending to remain at their moorings during the hurricane should obtain the permission of the owner, operator, or person-in-charge of the waterfront facility and determine the conditions the facility will require."

Also, the Maritime Hurricane Contingency Port Plan, under Waterfront Facilities states: "The owner operator and/or person in charge of a facility and the masters, owners, operators, and/or agents of a vessel are primarily responsible for the safety of their facilities and vessels."

Lafarge completed unloading of barge ING 4727 in the morning of August 27th.

Ingram has a Service Agreement with Zito Towing, LLC, by which Zito agrees to provide towing and fleeting services to barges owned, chartered or managed by Ingram.

Apparently, Mr. Ed Bush, assistant terminal manager at Lafarge, telephone Zito Fleeting on August 27th at 0900, but was unable to reach anyone, and Zito did not return his message.

The following are extractions of the Service Agreement between Ingram and Zito by which Zito agrees to provide towing and fleeting services with.

2.  Services:  During the Term of this Agreement, or any renewal period, Zito agrees to provide barge fleeting, shifting, cover handling and cleaning services in the New Orleans area corridor (LMR mile 119.5 to LMR mile 81) as requested by IBCO (the "Services") ZITO shall provide the Services in a prompt, efficient and workmanlike manner and in accordance with all IBCO instructions.  ZITO will have all barges in the clear for IBCO's towboats to pick up, without delay, upon receiving reasonable prior notice from IBCO, and will promptly receive all barges dropped off for services without delay,.

    (a)  ZITO shall provide daily fleeting space at no charge to IBCO for a minimum of forty (40) barges owned, chartered, operated or managed by IBCO (or one or more of its affiliates), between LMR mile 105 and LMR mile 95.  Without limiting the foregoing, if requested by IBCO, and if available, some portion of these spaces may be allocated to other fleets operated by ZITO.  Such allocation shall only be upon request by IBCO and shall be at the sole discretion of ZITO.

    (b)  ZITO shall perform all shifting to or from docks to load or unload IBCO barges moored in their fleets except for transit barges.  Transit barges are defined as any barge that is temporarily dropped into one of the fleets but such fleet is not the final destination for loading or unloading and the term "Services" shall not include the shifting of transit barges.

13. Priority Service: ZITO will provide the Services to IBCO on priority basis in regard to switching and fleeting, designation and guaranteeing the availability of whatever assets are necessary for the fulfillment of this Agreement.  In fleet service time for linehaul vessels is expected to be less than one (1) hour per pick-up or per drop, including delay time, in reliance on and furtherance of the foregoing, IBCO agrees that ZITO shall exclusively provide all of the Services to be performed hereunder during the Term of this Agreement,

> or any renewal period, so long as ZITO is performing the Services in accordance with this Section 13 and the other terms and conditions of this Agreement and is not otherwise in breach of this Agreement; provided that, nothing in this Agreement shall limit the right of IBCO to perform any of the Services on its own behalf, so long as such Services are performed by IBCO personnel (or the personnel of one or more of its affiliates), using equipment owned, operated or bareboat chartered by IBCO or one or more of its affiliates.

Zito, as agent for Ingram, should have monitored the status of the barges delivered to Lafarge, in view of the approaching hurricane, in addition to responding promptly to the phone request from Mr. Bush of Lafarge. Zito should have monitored the status of the two Ingram barges delivered to Lafarge because Zito knew that at least one barge would be empty within a few hours of being delivered and it was unsafe to leave it at Lafarge while the hurricane was moving closer.


## H.   REVIEW OF VARIOUS ASPECTS REGARDING BARGE ING 4727 BREAKING LOOSE FROM ITS MOORINGS

Lafarge North America, Inc., by accepting the delivery of barge ING 4727 to its facility on August 26, 2005, assumed control of these barges and responsibility for the security, mooring, movements and/or actions involving the barge.

Mr. Earl J. Smith, a maintenance supervisor for Lafarge, stated (Doc. #43) that on the morning of August 27, 2005, he and other employees began preparing the terminal for the approach of the storm. He stated that they added a new line between ING 4727 and ING 4745 and appears to indicate that the ropes were two inch, braided polypropylene line, and that this new line was placed between the cleats near the middle of the barges.

The above statements are supported by the testimony of the deckhand of the tugboat REGINA H, Mr. Thigpen, who observed 3 one part ropes (although the midship ropes was at an angle), and by the captain of the REGINA H, Mr. Grabert, Jr., who observed three single lines, blue lines, two inch.

Some photographs taken by the USCG investigators of barge ING 4727, soon after August 29, 2005 (probably October 12, 2005) shows one apparently undamaged wire rope and chain rigging, which the USCG report (Doc. #48) erroneously claims that there were "mooring lines around the four corner bollards on the barge".
The USCG report does not mention the existence of any "soft" mooring lines, a portion of which would have remained on barge ING 4727 if the lines parted. The only "soft" lines mentioned in the USCG report are the lines that have been used to secure the barge covers.

Furthermore, the author of this report did not observe any soft lines during several visits to the site where the ING 4727 was aground, as well as no soft lines are shown in various photographs taken by other parties.

A document identified as LNA 000113 titled "New Orleans Terminal – Hurricane Preparation List", which is part of the documents submitted by Lafarge, contains the following requirement:

> "Cable All Barges To Shore"

It is evident that Lafarge did not apply their own guidelines, since barge ING 4727 was not moored with cables to shore.

The following conclusions can be arrived from the above comments:

Conclusion #1:  Since barge ING 4727 was apparently secured to the ING 4745 with 3 soft lines and no sections of soft lines were found on barge ING 4727 after Katrina, it could be concluded that the 3 lines slipped off the cleats, kevels or bitts of the barge.  Although Mr. D. Philip Skaer, II, claims in his report that he examined parted lines.

Conclusion #2:  Since steel wire rope and chains were found on barge ING 4727, apparently undamaged, it can be concluded that these wires and chains were not used to secure barge ING 4727 to barge ING 4745 and/or to the dock.  Also, the wire rope is too short to reach the dock.

One of the wires shown appears to be about 20 to 22 feet long.  To be used to secured barge ING 4727 to the dock, while alongside of barge ING 4745, the wire needs to be about 40 feet long, since the barges are 35 feet wide.

Other comments:

1.    The author of this report disagrees with item #9 of Section F. Investigation – ING 4727 of the U.S.C.G. Report of Investigation into the circumstances surrounding the incident involving Hurricane Katrina ING 4727/Breakaway/Grounding, dated 08/29/05 (Doc. 48, which states:

"9.  After inspecting the barge and its mooring wires, Petty Officers (names withheld) determined that there was evidence the barge had been moored in accordance with good marine practice."

It appears that the U.S.C.G. investigation was extremely superficial.

It is common sense that good marine practice is to avoid securing a barge with high freeboard (empty barge) to a barge with a low freeboard (loaded barge), and to install mooring wires secured to the dock, rather than to another floating barge.

It should be noted that a document identified as LNA 000113 (produced by Lafarge) titled: "New Orleans Terminal Hurricane Preparation Checklist", contains this requirement: "Cable All Barges To Shore".

Another well-recognized procedure when a storm is approaching, is to double the mooring lines.  This activity was not executed by Lafarge personnel, although Mr. Earl J. Smith stated that they prepared the terminal for the approach of the storm.

2.    The author of this report also disagrees with the U.S.C.G. report dated 08/29/05 (Doc. #48), which in Section I – Incident Brief and in Section III. Conclusions, indicates that the floodwall was breached prior to the arrival of the barge ING 4727.  This apparent conclusion of the U.S.C.G. report totally disregards the statement and testimony of several witnesses, as well as other evidence that indicates that barge ING 4727 created the breaches.

I.     <u>EXTRACTIONS FROM THE INDEPENDENT LEVEE INVESTIGATION TEAM – DRAFT REPORT (ILIT) MADE AVAILABLE ABOUT MAY 22, 2006</u>

From Chapter 6:

"6.3.1  The IHNC East Bank (South) Breach of the Lower Ninth Ward"

"The larger of these two breaches was the south breach, and this is shown in Figure 6.17 (which is a repeat of Figure 2.13).  This was a very long breach, nearly 900 feet in length, and the inrushing waters entered the adjacent community with great force. ..."

"Figure 6.17 also shows the sheetpile curtain that had supported the floodwall at the crest of the earthen levee at this section.  It is interesting to note that the sheetpiles (which were cold-rolled steel sections) remained interlocked throughout the cataclysmic failure and the ensuing hydrodynamic loading of the massive inrushing floodwaters.  The concrete floodwall is largely absent from the tops of these sheetpiles, as the sheetpiles have been stretched out (like an accordion), flattening their bent flanges in order to accommodate the extension imported on them by the inrushing flow."

Regarding barge ING 4727:

"There is a single large dent on the side of the barge just around the left side of the bow (not quite visible in Figure 6.18), and a pronounced scrape on the bottom of the barge at that same location.  Most of the concrete floodwall was failed in extension and flexure, with its reinforcing steel (rebar) fairly extended.  There was one single section of wall which clearly evinced a major impact, however, and that was at the extreme southern end of the breach.  Figure 6.19 shows a closeup view of the floodwall at this location.  The rebar is compressed and bent, and the concrete crushed at this location.  It was the consensus view of our investigation team that the barge had scraped along the wall and then impacted the end of the wall at this location."

The author of this report agrees that the barge scraped along the wall and impacted the wall (these facts are supported by several witnesses).

Since the breach is about 900 feet long, if the breach would have occurred before the arrival of the barge to the northern most portion of the breach, witness Carolyn Berrihill would not have been able to hear "a grounding sound" and getting "water rushing real fast" "five minutes after" that "grounding sound", since Ms. Berrihill's home was located about one and a half blocks from the southernmost end of the breach (1838 Deslonde).

Likewise, Mr. Wilson Matthew Simmons, who was living about 3 ½ blocks from the southernmost end of the breach (5007 N. Roman St.), could not have had his "home flooded neither ten minutes of hearing a "booming sound".

Additionally, Mr. Terry Mark Adams observed "water coming over the wall and some coming under, but there was no breach in the wall", until he saw "something coming towards the levee, towards the wall".  Then he heard a bang and saw the barge come floating through, like the water must have rose about 12 feet in seconds."

J.   **OBSERVATIONS REGARDING THE INSPECTION OF BARGE ING 4727 AT THE LOCATION WHERE IT RAN AGROUND, CLOSE TO THE LEVEE**

1.   Orientation of the barge:

The stern of the barge (ING 4727) was identified (presumably by Ingram's representatives), by painting the word "stern" on the transom, which was facing northeast. Hence, the starboard side was the side closer to the levee and the port side was the side closer to the houses destroyed.

2.   Indentations and marks observed on the sides of the barge, within 2 to 3 feet of the bottom and at the bottom of the barge:

There were a number of indentations, scrapes and marks on the side bilge, and bottom plates of the barge, two of which appear to be directly related to the failure of the floodwall. One was an indentation of the bilge plate at one end of the barge, approximately 10 feet from the side. The other are a group of about 34 scrapes on the bottom plate, most starting a few feet aft of midship and extending all the way to the end of the barge. These scrapes are running almost fore and aft except for a smooth (large radius) curvature at the aft end of the scrapes. The following approximate distances were measured (at one location in the proximity of midship), between adjacent scrapes, as they were found moving inboard:  5", 8", 15" (2 scrapes very close), 11", 7", 11", 7", 12", 16", 9", 12", 4 ½", 11", 12 ½", 11", 12", 6 ½", 11", 7 ½", 5". These measurements should be considered approximate and not complete because a full survey was very difficult to perform due to interference with the kevlar bags used to lift the barge 4 to 6' above the ground, and is presented above just to give the reader an idea of the spacing between scrapes.

K.   **COMMENTS REGARDING THE INSPECTION OF THE SECTIONS OF THE BARGE ON APRIL 27, 2006**

The bottom of the barge was cut in 19 sections and they were preserved in a warehouse. The bow was indicated to be at the far end of the warehouse and was identified as section #1.

There were a number of depressions and indents varying between 12" in diameter and ½" deep to 4' or 5' in diameter and 1" deep besides a large indentation in the bilge plate at one end of the barge. There was one fracture area about 34" long, as part of a 50" long, 7" indent on the starboard side of piece #7.

Starting at the bow and extending for about 80' to 100', there were 34 highly visible scrapes that were deep enough to remove most of the marine growth and some of the corrosion scale. The scrapes are from about ¼" to about 5/8" wide.

The marks on the bottom are fairly parallel to the centerline of the barge, and have a slight angle to port in the bow section, a slight curvature starting on the 2nd section, bringing the marks more parallel to centerline and thereafter are almost parallel to centerline with a small angle to the port side close to the bow. The distance of the marks from the port side are as follows:

| | | | |
|---|---|---|---|
| Mark: #1: 1' – 3" | Mark #10: 9' – 11" | Mark #18: 15' – 1"/ | Mark #26: 21' – 2" |
| Mark #2: 2' – 6" | Mark #11: 10' – 10" | 15' – 3"** | Mark #27: 21' – 8" |
| Mark #3: 3' – 8" | Mark #12: 11' – 5" | Mark #19: 16' – 3" | Mark #28: 22' – 2" |
| Mark #4: 4' – 1"* | Mark #13: 12' – 2" | Mark #20: 16' – 6" | Mark #29: 22' – 10" |
| Mark #5: 4' – 11" | Mark #14: 12' – 11" | Mark #21: 17' – 5" | Mark #30: 23' – 9" |
| Mark #6: 6' – 4" | Mark #15: 12' – 13" | Mark #22: 18' – 1" | Mark #31: 24' – 8" |
| Mark #7: 7' – 1" | Mark #16: 13' – 8" | Mark #23: 18' – 6" | Mark #32: 25' – 9" |
| Mark #8: 8' – 6" | Mark #17: 14' – 3"/ | Mark #24: 19' – 5" | Mark #33: 26' – 8" |
| Mark #9: 9' – 1" | 14' - 4"** | Mark #25: 20' – 3" | |

*There are multiple lighter scrapes between Mark #4 and Mark #6 and between Mark #7 and Mark #8, extending a short distance.

**There are 2 marks almost overlapping or crisscrossing.

There are a substantial number of (about 14) indents and depressions at the bilge plate and the bottom plates, as well as the port and starboard edges of the headlog and transom, located in sections 1, 2, 7, 9, 12, 14, 15, 16 and 17.

There is a very noticeable depression at the turn of the bilges on one end of the barge.  This depression is ¾" deep, 19" in the athwartship direction and 36" in the fore and aft direction.

Most of the bottom scrapes start about 12" to 20" on the vertical side of the bilge plate on the end of the barge, and, after scraping the bilge plate, the scrapes continue on the bottom almost parallel to the centerline of the barge.

L.   DESCRIPTION OF THE DESIGN OF THE FLOODWALL IN THE AREA OF THE SOUTH BREACH

The floodwall is not immovable, it is a flexible cantilever (I type) structure embedded in a soil mass of soft saturated clay and other soil materials composing the levee, which is still more flexible.

As the hydrostatic pressure created by the level of the water in the canal side increases, the materials of the levee are being compressed fairly uniform, including the soil materials supporting the floodwall.  According to IPET (III – 439) approximately 3,000 feet of levee in the proximity of the breaches experience some tilt and severe scour but did not fail.  Hence, it can be concluded that the development of the two breaches in the locations where the barge contacted the floodwall was a result of the forces imposed to the floodwall by barge ING 4727.

Page 4-2 of the ASCE/NSF Report titled:  Preliminary Report on the Performance of the New Orleans Levee System in Hurricane Katrina on August 29, 2005, describes the floodwall/levee as follows:

"The flood protection system located north of the Claiborne Avenue Bridge in the Lower Ninth Ward consists of I-walls embedded in the earthen levees.  The I-walls

at this location consist of approximately 20 feet of sheet pile topped by an 8-foot high concrete floodwall section. The sheet pile extends about 5 feet into the floodwall with a concrete sheet pile connection. Subsurface conditions in the vicinity generally consist of approximately 10 feet of very soft clay over 5 feet of soft peats underlain by about 25 feet of soft clay. Dense sands are encountered at a depth of approximately 40 feet."

Page 14 of Appendix C of Dr. Bea's Declaration dated 09/17/07, indicates that the top of the levee for the IHNC was at elevation +9.0 feet, and the top of the concrete panels were at elevation +15.0 feet.

The above information may not be totally correct, because it appears that there were some areas of the floodwall where the construction of the concrete panels and/or the penetration of the sheet pile into the concrete may have been different than the above description.

The concrete panels are connected by water stops, generally made of polyvinylchloride (PVC).

As per LNA 001086, there are 2 types of I-walls for the East IHNC: In one version, the concrete is 10 feet high and the other version: 8 feet high.

In both cases, the sheet pile is indicated to be embedded in the concrete 3' – 0".


M.    REVIEW OF THE SIGNIFICANCE OF MRGO IN THE KATRINA FLOODING OF THE 9TH WARD OF NEW ORLEANS AND ST. BERNARD PARISH

The role of the Mississippi River Gulf Outlet (MRGO) in the flooding of the (9the Ward of New Orleans and vicinity has been reviewed by various investigators, reaching conclusions that significantly diminish the influence of the MRGO in the flooding of the 9th Ward and vicinity.

The IHNC extends from Lake Pontchartrain, to the North, to the Mississippi River to the South. The IHNC is connected to the Mississippi River by a navigation lock, located at the Southern end of the IHNC. The IHNC is connected to the Gulf Intercoastal Waterways (GIWW) and about 6 miles from this point starts the Mississippi River Gulf Outlet Canal (MRGO). The point where the MRGO and the GIWW merge is just East of the Paris Road Bridge. The section between the intersection of the MRGO and the GIWW, and the navigation lock at the South end of the IHNC is referred to Reach 1. The rest of the MRGO is referred as Reach 2.

The MRGO is a manmade waterway completed in 1968, having Lake Borgne in the Northeast and a floodwall/levee composed of a 4,000 foot wide Earthen Berm/Spoil Bank and sheet piles as a Southwest boundary.

On August 29, 2005, about 5:00 a.m., the storm surge was well below the top of the levee on the West side of MRGO, but 5 to 7 feet waves driven by Katrina's winds started having an effect on the Earthen Berm and sections of the slopes facing Lake Borgne started to crumble resulting in rapid erosion and damaging the sheet piles.

In the marshes across the MRGO, friction from grasses and shrubs reduced the speed of advance of the surge lessening the wave energy by 90%, as researchers from LSU indicated. LSU researcher Paul Kemp said: "the waves are breaking against trees instead of against levees". Dr. Robert Bea,

in a speech recorded a DVD emphasizing that the levees located in the boundary of the wetlands performed extremely admirably.

The storm-dampening effect of wetlands is fully recognized during a fast moving storm, like Katrina, because the surge has less time to build.

Besides the MRGO levee and marshes across the MRGO, the populated areas of St. Bernard Parish are protected by the levee of the Forty Arpent Canal.

The levee of the Forty Arpent Canal runs from Arabi through Chalmette, Meraux and Violet to Verret, and it is also called the inner levee or back levee.

The inner levee is 10 feet or higher on the Western side of Paris Road in Arabi and Chalmette, but drops to an average of 8 feet to the East from Paris Road to Violet. The levee averages 7 feet from Violet to Verret. There were no breaks in the Forty Arpent Levee during Katrina.

Hurricane Katrina's eye passed to the East of New Orleans about 8:30 a.m., CDT, on 29 August 2005.

As the eye of the hurricane moved to the Northeast, the counterclockwise rotation of the winds resulted in an elevation of the waters of Lake Borgne, water was pushed against the Earthen Berm/Spoil Banks (EBSB) along the Northeast frontage of the St. Bernard protected basin. This resulted in major erosion and breaching of the EBSB along Reach 2 on the Southwest of the MRGO, with the water reaching the back protection levee of the Forty Arpent Canal.

In the area where the MRGO intersects the GIWW, a superposition of the gush of water associated with the storm surge advancing in the MRGO and the GIWW drives water heights higher and results in channeling the storm surge into the IHNC. Some researchers have described this scenario as the development of a "funnel". Nevertheless, as Volume IV of the IPET Report indicates "these waves decay rapidly, and within less than a mile have been reduced to about 1.2 feet".


Timeline for the flooding:

As per the testimony of Mr. Villavasso, Pumping Plant Operator of Pump Station #5, the initiation of the North breach on the East side of the IHNC started at about 4:30 a.m. to 5:00 a.m., and at 5:30 a.m. the power to the pump was shut off due to high flooding water levels reaching Pump Station #5.

According to eyewitnesses, the South breach of the IHNC occurred about 6:00 a.m. to 6:30 a.m.

Flooding water arrived to Mr. James R. Reed's backyard between 7:00 and 8:00 a.m. (Reed's deposition, P. 26, L. 6). His home is located in Chalmette at the intersection of the Forty Arpent Canal and the Derringer Canal. Mr. Reed also testified that he never saw any water come over the Forty Aprent Canal Levee (Reed's Depo. P. 52, L. 6), but water inundated his home at approximately 10:00 a.m. on August 29, 2005, and rose up into the attic until two o'clock.

By 2:00 p.m., the water rose to about 1½ feet inside the attic, about 12 feet from the ground.

In summary, water from the IHNC (water moving in the Southeasterly direction) arrived to Mr. Reed's home about 7:00 a.m. to 8:00 a.m., when the water level rose up to the bumper of a jeep parked in front of his house, and by 10:00 a.m. the water got into his home, which was built on a 4 foot cement slab, while Mr. Reed never saw any water coming over the Forty Arpent Canal Levee.

Mr. James Louis Ruiz, who has his home in Arabi, 5 blocks below Jackson Barracks, testified that he observed water in the street (2 feet) about 9:15 a.m., but by 10:00 a.m., the water was 6 ½ to 7 feet in the house. He also testified that the water was flowing from New Orleans towards his house.

In other words, water from the IHNC (water flowing from New Orleans towards his house) arrived to Mr. Ruiz's house about 9:15 a.m. (Mr. Ruiz's house is located at a higher elevation than Mr. Reed's, closer to the Mississippi Rive Bank), and by 10:00 a.m. was 6 ½ to 7 feet inside his house.

Therefore, floodwaters did not enter the St. Bernard area West of Paris Road, from wetland areas to the North by flowing over the Forty Arpent Levee, and floodwaters did not enter the St. Bernard area West of Paris Road, crossing Paris Road from the East. Floodwaters coming from the IHNC reached Paris Road before floodwaters overtopping the MRGO levees reached this area.

Additional confirmation that flooding of the 9th Ward and St. Bernard Parish up to Paris Road, was due to the IHNC's breaches is stated in the Volume IV of the IEPT Report (IV-197) which contains the following summary:

> "In summary for the Lower Ninth Ward, it appears that flooding began early on Monday morning. Eyewitness accounts, and stopped clock data indicate that floodwaters began entering the Lower Ninth Ward prior to 0530 and possibly as early as 0430. These early times suggest that the water entered through one or both of the breaches in the IHNC Floodwall".

The IPET Report dated June 1, 2006, in Volume I, page I-6, states: "During Katrina, MRGO was far from the "hurricane highway" moniker with which it has been branded".

Appendix E to the IPET Report titled: "Note on the Influence of the Mississippi River Gulf Outlet on Hurricane Induced Storm Surge in New Orleans", indicates that three previous studies have been developed to examine the influence of MRGO/Reach 2 on flooding of New Orleans and vicinity.

The first of these studies, Bretschneider and Collins (1996) investigated Hurricane Betsy and Six Synthetic storms, arrived to the conclusion that "Betsy would have produced essentially the same elevation with or without the MRGO".

The second study, commissioned by the USACE-MVN concluded: "For nearly all situations that were examined, the presence of the MRGO/Reach 2 either did not cause a significant change or the increase was less than 0.3 feet".

The third study, commissioned by the State of Louisiana, Department of Natural Resources concluded: "Reach 2 of the MRGO had a very limited impact on increasing storm surge for large storms, including Hurricane Betsy and Katrina".

Furthermore, the IPET report indicates: "In the case of Hurricane Katrina, the surge propagated in a northeasterly direction perpendicular to the MRGO towards Gulfport, Mississippi".

In summary, the IEPT Report arrives to the following conclusions (From Appendix 6 – Note on the influence of the Mississippi River Gulf Outlet on the Hurricane Induced Storm Surge in New Orleans and Vicinity):

> "The reasons for the very limited influence of the MRGO/Reach 2 in the vicinity of New Orleans for strong storm events are clear. First, the MRGO does not influence the important preliminary east-west movement of water that drives the significant build up of surge in the early parts of the storm. Second, the northerly propagation of surge during the later stages of the storm are only minimally influenced by the MRGO because the increased hydraulic conveyance associated with the channel is very limited for large storms due to the large surge magnitude and especially due to the very large lateral extend of the high waters on the Mississippi-Alabama shelf that build up early on from the east. In addition, the propagation direction of this surge wave does not typically align with the MRGO and furthermore the southeasterly winds which align with the MRGO occur only very briefly."

From the Preliminary Report from the USACE, Chapter V – The Storm, the following is extracted:

> "An analysis was performed to examine the influence of the MRGO channel on storm surge propagation into the New Orleans vicinity. The section of waterway where the GIWW and MRGO occupy the same channel allows Lake Pontchartrain and Lake Borgne to be hydraulically connected to each other via the IHNC. Storm surge experienced in the IHNC and the GIWW/MRGO section of waterway is dictated by storm surge conditions in both Lakes due to this hydraulic connection. The long northwest/southeast-oriented section of the MRGO channel to the east of Paris Road Bridge, which seems to be the one that has raised the most concern, only influences the storm surge in the IHNC and GIWW/MRGO canals by a few tenths of a foot for high storm surge events (storms like Hurricanes Betsy and Katrina). It has a more important role for low surges, less than 4 ft. in amplitude, but still only creates changes of less than 0.6 ft in some cases and less than 0.3 ft in most cases. The MRGO role in propagation of law amplitude astronomical tide and influx of higher saline water into Lake Pontchartrain has been established: the low-amplitude tide propagates primarily through channels, of which the MRGO is one. However, during high storm surge conditions, when the wetlands become inundated, this reach of the MRGO becomes much less important in storm surge propagation into the IHNC and GIWW/MRGO section."

From the IPET Report, Volume IV. The Storm, page IV-227, the following was extracted:

> "The largest waves entering the IHNC from Lake Pontchartrain boundary lag the large waves entering from the MRGO/GIWW by about 4 hr, with peak conditions occurring around 1430 UTC (9:30 a.m. CDT). Similar to waves entering the MRGO/GIWW, these waves decay rapidly and within less than a mile have been reduced to about 1.2 ft. As was the case in the MRGO/GIWW, local wave generation contributes significantly to the evolution of the wave field propagating down the canal from the north. In this case the maximum winds for generation

down this portion of the canal occur at about 1430 UTC (9:30 a.m. CDT) on the 29th and are about 61 knots out of the north."

The statement continues as follows:

" . . . waves at the confluence of the IHNC and MRGO/GIWW entering from the north and east can be treated independently for a number of reasons.  First, about a 4-hr phase difference exists in the peak of the wave time histories at the two boundaries.  Second, due to the rapid decay of waves entering from the boundaries, waves from the boundaries are less than 0.5 ft at the MRGO/GIWW – IHNC confluence for all time modeled.  Third, the local winds align with the MRGO/GIWW axis about 4 hr earlier than with the northern IHNC axis."


N.   STATIC FORCES GENERATED BY WIND ON THE BARGE, TRANSFERRED TO THE FLOODWALL WHEN THE BARGE IS RESTING AGAINST THE FLOODWALL

The projected lateral area of the barge above the waterline when the draft is 2.5 feet was estimated to be:  4,077.5 S.F.

The projected frontal area of the barge above the waterline when the draft is 2.5 feet was estimated to be:  585.5 S.F.

Using an average wind velocity of 100 MPH = 146.7 Ft./Sec., it was estimated that the forces transferred to the floodwall are:
            For side winds:  156,576 lbs.
            For frontal winds:  24,548 lbs.

The above does not include any dynamic effect due to:
a).      Waves (oncoming and reflected)
b).      Water run-up
c).      Translation velocity and/or terminal velocity.
d).      Gusts of winds


Ref.: Hydrodynamics in Ship Design by H. Saunders, V. III, Page 188.


O.   WAVE REFLECTION AND WAVE SUPERPOSITION

The reflection of wind waves from barriers such as the floodwall can produce waves of incredible steepness (steepness ratios as high as 1.2).

These composite waves, also called cross-waves can develop crests normal to the obstruction, at right angles to the oncoming crests.

Ref.: Hydrodynamic in Ship Design, Volume III, Page 189.

This superposition can result in gigantic waves that rise suddenly, in an area or region that was relatively smooth only a few seconds before.

Ref.: Hydrodynamic in Ship Design, Volume I, Page 165.

The above has been demonstrated in experimental testing tanks by numerous researches and by observations on seawalls and it was found that a crest angle of 90 degrees can occur, as compared with minimum of 120 degrees for the progressive irrotational stokes wave described on page 157 of Volume I - Hydrodynamics in Ship Design.

In summary, it is quite possible that barge ING 4727 was forced to heave, coming down on the upper portions of concrete panels that have been tilted, creating the very notable depression found in the bilge plate of one end of the barge and knocking down the concrete panel that the barge contacted.


P.  <u>SUMMARY OF THE TESTIMONY OF FACT WITNESSES REGARDING THE BARGE BEING THE CAUSE OF THE BREACHES</u>

The following fact witnesses provided testimony supporting the allegation that barge ING 4727 initiated the North and South breach of the IHNC.

1.  <u>William J. Villavasso, Jr.</u>:   Heard and observed the barge creating the initial failure of the North breach.  See Section C1a, C1b and C1c of this report.

2.  <u>Arthur Murph</u>:   Heard the sound of scrapping and banging noises and the barge colliding with the floodwall.  Had water coming three or four minutes after scrapping and banging sound 6:30 to 7:00 a.m.  See Section C2a, C2b, C25 and C26.

3.  <u>Terry Mark Adams</u>:   Heard the sound of the barge colliding with the floodwall and saw the barge come floating through.  Water rose in seconds 5:30 to 6:00 a.m.  See Section C3a, C3b.

4.  <u>Carolyn Berryhill</u>:   Heard grinding sound.  Five minutes after grinding sound started getting water.  5:45 a.m.  See Section C4a and C4b/5b.

5.  <u>Wilson Matthew Simmons</u>:   Heard a booming sound.  Become inundated within ten minutes.  5:30 a.m.  See Section C5a and C4b/5b.

6.  <u>Andrew Sartin</u>:   Heard sounds of the barge colliding with the floodwall.  Two times 5 to 15 minutes apart.  Shortly thereafter: floodwaters.  About 6:00a.m.  See Section C15a and C15b.

7.  <u>Ernest Offray</u>:   Heard sounds of the barge colliding with the floodwall before daybreak.  See Section C16a and C16b.

8.  <u>Sidney Williams</u>:  Heard sounds and saw the barge slamming into the wall.  Four or five o'clock.  See Section C17a and C17b.

9.  <u>Ronald McGill</u>:   Heard the sounds of the barge colliding with the floodwall.  See Section C18.

10. <u>Dakeia Johnson</u>:   Heard the sound of the barge colliding with the floodwall.  6:00, 6:30 a.m.  See Section C19.

11. <u>Earl Lackings</u>:   Heard the sound of the barge colliding with the floodwall.  Five minutes later, saw streets getting flooded.  See Section C20.

12. <u>Danmond Peters</u>:  Heard the sounds of the barge colliding with the floodwall.  5:30 a.m.  See Section C21.

13. <u>Patrina Peters</u>:   Heard the sounds of the barrage colliding with the floodwall.  5:30 to 5:45. See Section C22.

14. <u>Dolores St. Cyr-Butler</u>:   Heard the sound of the barge colliding with the floodwall. Floodwater came in a matter of seconds.  Was dark.  See Section C27.

15. <u>Hendrick Ray Pounds</u>:   About 5:50 a.m. observed two holes in the floodwall.  Testified that 3 other people heard the sound of the barge colliding with the floodwall.  See Section C28.


<u>Summary</u>:  Above are the summaries of the depositions of fifteen (15) witnesses whose testimonies are very much supportive of the contention that the barge contacted the floodwall initially at about 4:30 to 5:00 a.m. and again about 5:45 to 6:30 a.m.

The testimony of fourteen (14) of these witnesses is very consistent regarding the estimated times of the barge scraping and impacting the floodwall in the area of the South breach, and the high volume of water that inundated streets and houses a few minutes after the sound of impacts were heard.


Q.   <u>COMMENTS REGARDING SOME PHOTOGRAPHIC EVIDENCE PROVIDED BY LAFARGE NORTH AMERICA AND OTHERS</u>

1.   Lafarge Photos:

Lafarge North America provided some 278 photographs.  From these, photographs LNA 001142, LNA 001140 and LNA 001151 shows the South end of the North breach.  In these three photographs, the first visible concrete panel, just above the water appears to show several cracks, two of these cracks close to the top and the others in the area where the sheet pile becomes visible.

The next clearly visible panel, tilted at angles approximately 15 to 45 degrees from vertical, shows a large crack about mid-length, starting at the top of the floodwall and apparently terminating at (what appears to be), a horizontal scrape that continues in the adjacent panels.

The very clear crack starting at the top is one more item that supports the theory of the barge hitting the floodwall, since concrete panels that were disturbed purely by hydrostatic pressure, such as the 17th Street Canal and other locations, did not end up cracking at the top.

The apparent horizontal scrape on the flat side of the floodwall can also be attributed to the barge moving south at 1 to 2 feet/second, while "pushing" and scraping the concrete panels (See photos #1, #2  and #3 – Attachment #4).

2.    Other photographic evidence:

A 50-page report dated 9/20/06, titled:

> Hurricane Katrina – What Happened?
>      A Field Trip,
> by Stephen A. Nelson of Tulane University (snelson@tulane.edu), has a photograph
> on page 13, titled:

> > Fig. 12.  Floodwall and sheet piling strewn into Lower 9th Ward at
> > the southern (larger) breach on the Industrial Canal.

The photo is from the U. S. Army Corps of Engineers IPET website, which was taken on
October 4, 2005.

This photo shows the previously horizontal and vertical re-bars that were 3" inside a concrete
panel, close to the waterside surface of the concrete panel and are now exposed and visible,
indicating that the layer of concrete previously covering these re-bars has been scrapped
apparently thru the entire panel.  This configuration is not just one or several localized cracks
on the concrete panel; it is the result of a large frictional force scraping the surface of the
panel while pushing it into the surface of the concrete while moving on a continuous
displacement in horizontal travel.  This resulting damage to the previously vertical surface of
the panel could only be developed by the barge "pushing" the panel while moving
horizontally, like if a big machine tool (planer) was removing a layer of concrete 3" thick
(See photos #6 and #8 – "Scraped Concrete Panels" – Attachment #4).

R.    COMMENTS REGARDING UNDERSEEPAGE OF THE IHNC LEVEE BEFORE KATRINA

It is important to emphasize that several of the fact witnesses that had their residence in the
proximity of the levee of the IHNC, were asked during their depositions if they noticed prior to
Katrina, any accumulation (puddling or pooling) of water on the protected side of the levee when it
was not raining.

Every person that was deposed answered that they never saw any accumulation of water collecting
on the levee side of the floodwall.

The testimony of these witnesses support the conclusion that hydraulic piping/seepage under pre-
Katrina conditions was not predominant in the levee of IHNC before Katrina.

The failure of the levees at the North and South breach of the IHNC, resulting in the relocation of the
floodwall inland (translation stability failure) and the total erosion of the entire levee in these two
breaches, was due to very large increase of the "underground channels" or underseepage induced
instability created by the development of gaps (separation) as a result of the barge "pushing" and
colliding with the floodwall along the length of the two breaches.  These "underground channels"
did not exist before the barge reached the area of the breaches.

These gaps are created when the floodwall deflects laterally slightly, which allows water to apply
additional lateral pressure against the sheet pile and promote underseepage flows.

The progressive development of water-filled gap between the floodwall/sheet pile curtain and the outboard section of the levee embankment takes some time. After the barge initiated the gap formation, it progressed fairly rapidly to the base of the sheet piles (See also Section W of this report: Conclusions Regarding Probable Sequence Of Events).

Flow of water seeping thru the bottom of the levee, thru the material, is picking up particles of soil and moving the earth to areas of lesser hydrostatic pressure. When this happens, it can being to destabilize the entire levee/floodwall structure at its strongest point: the base where the sheet pile is anchored to the soil.

The destructive result of seepage erosion and piping are discussed in detail in Section 6.3 of the Independent Levee Investigation Team Report dated July 31, 2006, titled: "6.3. The Two Large Breaches on the East Bank of the IHNC at the Lower Ninth Ward".

On pages 6-6 thru 6-16, the report emphasizes the importance of the formation of gaps, but concentrate on the discussion in gaps created by hydrostatic pressure, while the same type of gaps can be created and were created by the barge pushing on the floodwall.

The reports of underseepage and ponding of waters along the IHNC on the proximity of the breaches, and contractor's problems with dewatering of excavations in these areas are post-Katrina events, and support the conclusion that substantial modification of the strata took place due to erosion and piping resulting from the formation of the gaps developed by the barge.

The following statement was extracted from the IPET study:

> "Piping and erosion from under seepage is unlikely because the I-walls were founded in a clay levee fill, a marsh layer made up of organics, clay and silt, and a clay layer. Because of the thickness, the low permeability of these materials, and the relatively short duration of the storm, this failure mode was considered not likely and was eliminated as a possible mode of failure" (IPET, 2006).

The above statement is based primarily on the "short duration of the storm", but it did not consider the creation of gaps by the actions of the barge.

S.   CONTRADICTIONS AMONG VARIOUS INVESTIGATORS

The Independent Levee Investigation Team report, dated July 31, 2006, supports the theory that the translational stability failure was due to underseepage created by gaps.

This contradicts the initial conclusions of the Draft Final Report by the IPET investigation, dated June 1, 2006, and the hypothesis of the American Society of Civil Engineers and National Science Foundation – sponsored field investigation teams, all of which favored the hypothesis that the failure and breach at the IHNC breaches resulted from overtopping flow over the floodwall, which eroded a trench along the protected side of the floodwall.

T.   **COMMENTS REGARDING DROP IN WATER LEVEL AT THE IHNC WHEN THE NORTH BREACH WAS INITIATED**

Early the morning of 29 August 2005, the water level in the IHNC began to rise as a result of the effect of the hurricane Katrina surge developed in Lake Borgne and its hydraulic connectivity with the ICWW and the Mississippi River Gulf Outlet (MRGO).

Nevertheless, according to Katrina hydrograph for IHNC (IPET Draft Final Report, Appendix 1, 2006 – See Attachment #4:  Evidence LNA 001390), an unusual drop in the water level at about 5 a.m. is believed to have been associated with breaches at the intersection of the CSX railroad at the I-10 overpass and a major levee breach into the Desire area of Orleans Metro on the west bank of the IHNC near France Road.  According to IPET, this is the time the north breach developed and water started flooding the Lower 9th Ward, close to Pump Station #5.  The ILIT and Team Louisiana data and analysis indicate that this breach developed (probably was intended to say "Fully Developed") several hours later.

It is the opinion of the author of this report that ILIT and Team Louisiana were not totally clear regarding this item, since there are fact witnesses like Mr. Villavasso testifying that the breach was initiated earlier than 5:00 a.m.  The conclusion that can be derived from the above is that hydrostatic pressure was not a factor in the initiation of the North breach, since it was initiated by the barge when the hydrostatic pressure was low.


U.   **COMMENTS REGARDING THE TIMING OF THE BREACHES ON THE EAST BANK OF THE IHNC**

There is no doubt that some flooding thru disturbed concrete panels of the floodwall close to Pump Station #5, started about 5:00 a.m., since Pump Station #5 was forced to shut down at 5:30 a.m.  But, because the ground elevation increases between Florida Ave. towards the Mississippi River levee area, the initial flooding was not noticed immediately by the fact witnesses that were deposed and the depositions that were reviewed by the author of this report.

Based on the testimony of 14 fact witnesses, it is undisputable that the flooding waters going thru the South breach started inundating the 9th Ward at approximately 6:00 a.m., time period, within minutes of the barge breaking the concrete panels at the South end of the South breach.  Therefore, there is no doubt that this large volume of floodwater caused immediate erosion of portions of the protected side of the levee that was already weakened by the barge initiating a catastrophic failure of some 850 feet of floodwall/levee.  Thereafter, although water in the IHNN continued to rise, to a peak of about 14 feet at 9:00 a.m., the unbreached portions of the levee remained almost undisturbed although having an elevation of about 12.5 were overtopped by the surge between 9:00 to 10:00 a.m.  It is not known at what time the floodwall/levee at the North breach was suddenly translated inland, but it should have been between 6:00 a.m. to 9:00 a.m.

Another factor supporting the above statements is that the impact of the barge not only resulted in broken concrete panels, but also in the failure of the interlock between the damaged panels with the bent re-bars and the immediate adjacent panel North of the panel with bent re-bars.

This condition can be observed in two photographs published by Getty Images.com:  Image #55832357 and #55831691.

45

The failure of this interlock had the effect of abruptly eliminating the ability of the floodwall to maintain the longitudinal tension that was holding the floodwall as a continuous structure, despite of the weakening of the protected side of the levee due to the gaps created by the barge. The failure of the interlock shown in the photos from Getty Images is equivalent to cutting a rubber band in tension.

An additional factor supporting the above views is the after-failure configuration of the floodwall, which after being translated inland, ended up in an arc having a distance of 170 to 180 feet from its pre-failure position close to the Northern end of the South breach. This indicates that the underseepage caused by the gaps created by the barge had more time at the Northern end of the South breach than at the Southern end of the South breach to weaken the levee on the protected side.

From the IEPT Report, Volume IV. The Storm, page IV-193, the following was extracted:

> "Two sets of stopped clock data were also obtained in this area to provide more insight into the time of flooding. In the area around site C1, which is immediately east of the northern breach on the IHNC, nine stopped clocks were obtained (Figure 135). Further east around site C2, eight additional clocks were obtained. The elevation of these clocks was surveyed relative to observed high water marks, which for this area were about 10.5 ft. A stage of hydrograph was developed from these data and is shown in Figure 136. This hydrograph reveals the rapid water level rise that occurred early on Monday morning. At site C1, two of the clocks indicate a time of about 0515, while two other clocks at the same elevation indicate a time of about 0630. Four other clocks at higher elevations at site C1 also indicate a time of about 0630. Also plotted in Figure 136, is the floor elevation of Pump Station 5, which was shut down at 0530. This point agrees with the two 0515 clocks, which further supports the earlier flood times. The ground elevation in this area is about –6 ft, which would indicate that at +2 ft, the water level had to have risen about 8 ft, before the clocks became inundated. Therefore, the actual breach time would have had to have been sometime prior to the recorded times on the clocks, which would be in agreement with the eyewitness accounts of about 0430. At site C2, which is on slightly higher ground and further to the east, the hydrograph in Figure 136 indicates that significant flooding began by 0730. This hydrograph seems to be compatible with the hydrograph developed at the Jackson Barracks (site 1 in Figure 135), which is also shown in Figure 136. A time stamped photograph taken at site 1 reveals that at 0746, the floodwaters had not yet reached this location. However, by about 0800, the floodwaters were reported to be coming down the street from the north in front of the HQ building and at 0813 the water was already up to the wheels on a truck cab (Figure 137). Using the time stamped photographs at the Jackson Barracks, the hydrograph in Figure 136 was developed by surveying the observed water levels. This hydrograph shows that the water rose rapidly starting about 0800, and peaked at elevation 10.5 ft at about 1445. Ground elevation in this area is about +4 ft. Another eyewitness at site 2 reported water shooting up through her floor furnace at about 0730 on Monday morning and that within about 15 minutes the water was about nine feet deep in her house. Site 2 is slightly east of site 1 and appears to be at a lower elevation.
>
> Based on the eyewitness accounts and stopped clock data, it appear that waters began entering the Lower Ninth Ward prior to 0530 and possibly as early as 0430."

46

V.   **COMMENTS REGARDING THE UNBREACHED PORTIONS OF THE FLOODWALL/LEVEE ON THE EAST BANK OF THE IHNC**

The most reasonable explanation of why areas of the levee/floodwall like the North and South breach, had a catastrophic lateral translation (pushed inland 70 to 80 feet at the North breach and translated 170 to 180 feet at the South breach), while these adjacent areas (unbreached portion) did not fail and remained almost undisturbed, it is the action of the barge weakening the embankment where the 2 breaches occurred, by pushing and impacting concrete panels, developing the creation of gaps, which after a period of time of increasing underseepage (seepage flow increases with time) reduced the capacity of the levee to resist the increasing hydrostatic pressure of the raising water level of the IHNC.

In the North breach, after a period of time of underseepage, the floodwall was overturned and dragged inland, and the levee was completely washed away.  For this to take place, it is the opinion of the author of this report that the concrete panels impacted or pushed by the barge in the area of the North breach (when Mr. Villavaso heard the sound of impact and observed a portion of the barge between tilted panels), tilted substantially (at least 2 panels), and disturbed 8 or 9 more panels, breaking several water stops, but the panels remained very close to their pre-allision position.

The above conclusion is also based on the fact that the level of the water in the IHNC was relatively low at about 4:30 to 5:00 a.m. when the barge initially contacted the floodwall, therefore, the hydrostatic pressure was low.

Furthermore, in order for the floodwall to be overturned and pushed 70 to 80 feet inland later on, the floodwall, although was allowing substantial amounts of water to flow between panels due to broken water stops, was resisting the increasing hydrostatic pressure until the protected side of the levee failed suddenly due to underseepage as a result of gaps.

In other words, without the weakening of portions of the levee by the pushing/impacting of the barge, the floodwall/levee on the East bank of the IHNC will not have failed.

It is clear that the overtopping and scour was not the cause of the failure at the North and South breaches since the scour on the protected side was substantial in the unbreached portions, without affecting the floodwall in the unbreached portions.


W.   **CONCLUSIONS REGARDING PROBABLE SEQUENCE OF EVENTS**

After the barge became free from her moorings, drifted across the IHNC probably changing a few degrees of heading several times and also, at times, developing speeds up to 5 or 6 fps. Due to wave reflection, the velocity of the barge could have been less than the terminal velocity in the proximity of the floodwall.

The North Breach:

The barge contacted a concrete panel of the floodwall across from Pump Station No. 5, about 4:30 a.m. to 5:00 a.m., probably at an angle of 45 degrees or smaller, pivoting about the floodwall panel and pushing one or two concrete panels inland, breaking the northern side water stop of the concrete panel and stretching and rupturing the sheet pile located close to the vertical plane of the damaged water stop*.

The concrete panel just north of the damaged water stop and the sheet pile, to which the disturbed concrete panel was connected, remained almost undisturbed, as can be observed in photo LNA 001155 (See Attachment #4 - Photos #1, #2 and #3).

Hence, this photograph supports the conclusion that the north breach was not initiated by hydrostatic pressure (which at that time was low (+4), when one or two concrete panels were pushed inland), but rather by application of the force transferred by the barge to the panel immediately south of the damaged water stop, that is, South of the panel left standing to the North side of the breach.

Mr. R. Lee Wooten, P.E., issued a report dated August 29, 2007, titled: "Sources of Water in the St. Bernard and New Orleans East Basin during Hurricane Katrina". On page 44 of this report, Mr. Wooten provides the following information regarding the North breach of the IHNC.

> "I also discussed features of this breach that may be relevant to evaluation of causation with Francisco Silva-Tulla, Sc.D.,P.E., another member of the initial ASCE Levee Assessment Team (Silva, 2006). On June 2, 2006, during a field visit to the east bank of the Industrial Canal on behalf of Washington Group International, Inc., Dr. Silva observed the structural members that formed the connection between the deeper and longer (35 feet) I-wall sheet piles on the north side of the breach with the shorter (23 foot) I-wall sheet piles within the displaced section of the breach. Dr. Silva observed that a length of about 2 feet at the top of this connection was made with a field weld of poor quality. A tear had occurred through this field weld and had continued below the weld for about 12 feet of the length of the sheet pile, presumably at a time immediately preceding, during, or soon after the breach. He also noted that this connection would have been a likely point of stress concentration during the flood loading because the deeper sheet pile would have been relatively stiff compared to the adjacent shorter pile."

The above supports the conclusion that at the location of the initiation of the north breach there was a condition of structural discontinuity, therefore, requiring somewhat lesser impact force to result in a separation of the sheet piles at this location.

After the impact with the concrete panel (Mr. Villavasso heard like an explosion), the barge pivoted in a yawing motion while drifting south, partially and intermittent resting on or impacting several of the adjacent panels, which Mr. Villavasso saw tumbling over.

As the barge contacted (or impacted) several concrete panels of the floodwall across from Pump Station #5 (Villavasso heard the sound: "Boom"), the panels tilted. The contacts or impacts were in the horizontal direction, substantially below the top of the concrete panels. Because at that time, about 4:30 a.m. to 5:00 a.m., the still water level (SWL) in the IHNC was low.

*Water stops are elastomeric parts making the joint between concrete panels watertight.

The horizontal contacts or impacts were not sufficiently strong to break the concrete panel to pieces, but was sufficiently strong enough to crack the concrete panels and the panels were disturbed (tilting and breaking the water stops), although the panels remained, for a short period of time close to the pre-Katrina location.

Photos LNA 001142, LNA 001115 and PNA 001140 provided by Lafarge, shows the South end of the North breach. The first visible concrete panel, just above the water appears to show several cracks.

The next clearly visible panel, tilted at angles approximately 15 to 45 degrees from vertical, shows a large crack about mid-length, starting at the top of the floodwall and apparently terminating at a horizontal scrape that continues in the adjacent panels.

The crack starting at the top of this panel is one more item that supports the theory of the barge hitting the floodwall, since concrete panels that were disturbed purely by hydrostatic pressure, such as the 17th Street Canal and other locations, did not end up cracking at the top.

The apparent horizontal scrape on the flat side of the floodwall can also be attributed to the barge moving south while "pushing" the concrete panels.
At this location (North breach), although the barge could have acquired, at times, a velocity close to its terminal velocity before reaching the floodwall, the horizontal impact was not sufficient to shatter the concrete panels, but was sufficient to created cracks.

If, upon hitting the first concrete panel, breaking the water stop (made of PVC), and probably developing a tear at the connection of 35 foot and 23 foot sheet piles, and/or forcing the interlock of the sheet pile to become separated, the top of the panel was pushed inland between 5 to 10 feet, the force applied by the barge to the panel was estimated to be in excess of 50,000 lbs. (25 S.T.), which is reasonable, considering that the wind drag force for an average wind velocity of 100 miles per hour, wind applied to the side of the barge when the barge was not moving was estimated to be in the range of 150,000 lbs.

The tilting of the floodwall effectively reduces its top elevation, which allows additional overtopping, causing localized erosion, which eventually results in scour and loss of passive soil resistance of the levee, although the overtopping and scour did not result in failure and breach.

Once the panel "pushed" by the barge is leaning towards inland, the water stop connecting the leaning panel to the adjacent concrete panel to the South will also break, and the barge keeps moving South the next panel will also be pushed toward inland and left in tilted position.

<u>The Gap</u>:

The barge "resting" or "pushing" on the concrete panels, transmitting to the panels the force created by wind pressure, results in the developing of a gap (separation) between the soil of the levee on the waterside, and the sheet pile, allowing water to flow between the sheet pile and the remains of the waterside portion of the levee.

The gap mentioned above is the same type of gap found by the U.S.A.C.E. to take place by increasing the hydrostatic pressure on the full-scale field test of a "test section" of a levee and sheet pile-supported floodwall in 1985, just South of Morgan City in the Atchafalaya Basin (E99 Sheet Pile Wall Field Test Report, Technical Report 1, Lower Mississippi Valley Division, June 1988).

Similarly, according to IPET Report, Volume I, Page 1-12: "Late in the 1990's, Research Published in part by the Waterways Experiment Station (Soil Structure Interaction Effects in Floodwalls, Electronic Journal of Geotechnical Engineering, Vol, 2, 1997) discussed the need to include hydrostatic water pressures with regard to a gap forming between the pool side soil and wall in the numerical modeling of sheet pile floodwalls".

Intrusion of free water into the tension crack (gap) produces additional hydrostatic pressures on the wall side of the crack and equal and opposite pressures on the soil side of the crack, and the maximum hydrostatic pressure occurs at the bottom of the crack, which eventually will reach the toe of the sheet pile.

If the material comprising the levee is porous, water can flow under the sheet pile thru the protected side of the levee, and these "underground channels" can grow until a major separation occurs.

Professor Raymond B. Seed of the University of California, Berkeley in a letter to the U.S.A.C.E. dated 03/08/06, described this condition as:

> "cut the cake in half and slide it sideways"

The separation or gap (lateral movement) resulted in hydraulic piping and erosion from underseepage beneath the sheet pilings, which undermined the levee and caused it (and the floodwall) to be pushed outward away from the IHNC. This is the exact failure mechanism found by the U.S.A.C.E. in the experimental levees in the Atchafalaya basin in 1985.

The failure of water stops and the tilting of panels was repeated with several concrete panels, leaving these concrete panels standing, but at a leaning angle, with a gap between the sheet pile and the waterside of the levee, and with water flowing between concrete panels, where the water stops no longer were able to maintain water tightness.

Probably, as many as 10 to 12 floodwall panels (after the initiation of the North breach), were affected by the barge moving South and remained tilted at an angle, with broken water stops, allowing water rushing between panels to erode the protected side of the levee and creating a flooding condition in the proximity of Pump Station No. 5.

This condition of the panel of the North breach continued deteriorating between the time that the barge hit the first concrete panel, until some time later, at which time the portion of the floodwall/levee weakened by the barge by tilting and creating gaps, was completely pushed inland and portions of the floodwall were overturned and fanned out in a continuous arc.
In the area of the North breach, the actions of the barge did not initially result in broken concrete panels (just cracks in some panels), but rather tilted panels, creating gaps, and breaking water stops.

The gaps allowed additional water to penetrate the layer of weak soil under the sheet piles, softening the levee by increasing the "underground channels", enhancing the erosion at the toe of the levee.

Eventually, after a period of time of underground erosion, the earthen portion of the levee was removed and shifted (translational stability failure), taking the I-wall with it, which was overturned and dragged inland about 70 feet, with the sheet pile interlocked.

The toe of the sheet pile was pushed inland first, and the I-wall came to rest upside down, with the concrete panels at the bottom and the pile sheet pointing upwards.

After contacting 10 to 12 concrete panels, the barge moved away from the floodwall due to wave run-up, wave reflection and wind turbulence, probably because of the proximity of the Florida Avenue Bridge.

The South Breach:

Thereafter, the barge contacted the floodwall again at about 1,750 feet North of the Claiborne Ave. Bridge. At this location, a concrete panel that remained standing on the North end of the South breach (after the South breach was created), shows a localized damage on the waterside of the concrete panel, which appears to be the result of being contacted by the barge. This concrete panel is shown in a photo from the National Science Foundation.

The photograph shows a hole, pieces of concrete had spalled away (surface failure), on the waterside of the concrete panels, about 1½ feet x 2 feet and cracks in the concrete. Also, this photograph shows multiple scrapes, probably created by the barge.

The photograph was published by the National Science Foundation as part of Press Release 06-88 titled "Researchers Release Draft Final Report On New Orleans Levees", which shows a portion of floodwall still standing up at the north end of the south breach with a localized damage on the water side of the concrete panel. This photograph can be seen at:

http://www.nsf.gov/news/mmg/media/images/level1_h1.jpg

This location is where the barge started maintaining intermittent contact scraping and colliding with the floodwall for about 850 feet, moving away from the floodwall and closer to the floodwall as forced by wave run-up, winds, multi-direction oncoming waves, wave reflection and currents.

As the barge was moving south contacting off and on the upper portions of some of the concrete panels, it is almost certain that the floodwall panels being pushed by the barge, started leaning inland, as theorized on page 67 of "Team Louisiana's Report" dated 02/12/07, but there is no doubt that the floodwall remained approximately in place, somewhat upright until the barge reached a location close to the south most end of the south breach.

In other words, by transferring the forces created by wind drag on the barge to several concrete panels of the 850-foot portion of the floodwall that later on collapsed, the ability of the levee/floodwall to resist the hydrostatic forces being applied was reduced substantially in this 850 foot of length of floodwall due to gaps and corresponding seepage.

The forces applied by the barge varied in intensity because of the changes in yawing angles, water run-up, changes in wind velocity and other factors such as surge, heave and pitch, until a major impact took place, probably due to the effect of oncoming waves and wave reflection resulting in a very large wave due to wave superposition, combined with wind action, all the above happening at a constant increasing level of the water of the IHNC (when witnesses heard the sounds of "booms"), knocking down two concrete panels, breaking the water stop and the sheet pile interlock of the southern most panel contacted.

By the time the barge reached the area of the Southern end of the South breach, the still water level of the IHNC had increased by approximately 2 feet or more (from the time of initiating the North breach), and the barge was most probably subject to a superposition of oncoming and reflecting waves, which forced the barge to develop a substantial heave and pitch, resulting in the end of the barge being raised above the top of the floodwall for 1 to 3 seconds (the full period of pitch may have been 2.5 to 4 seconds) and falling on top of the floodwall, applying a large portion of the barge weight (probably over 200 S.T.*), to the top of the floodwall, besides the dynamic effect of the downward motion of the gravity force of the end of the barge.

The above downward (vertical) motion and the advancing (horizontal) motion resulted in breaking the concrete panels.  Due to the hydrostatic pressure and the drift of the barge towards the floodwall due to the wind, the broken concrete pieces of the panels were pushed inland falling on the protected side of the levee.

The water stop between the southernmost broken concrete panel and the concrete panel that remained standing at the South end of the South breach was broken and the interlock between the piles at this location became separated.

The location described approximately 40 feet in length, is the only place where, after the collapse of portions of the concrete panels, the reinforcing bars of the broken panels were bent at an angle towards inland, and were found at an elevation to be contacted by the bilge plate of the end of the barge and the bottom plate of the barge as the barge was moving towards inland (as if it were on the edge of a waterfall), on top of the levee, as the levee was being eroded by flooding waters.

After the barge contacted the floodwall with enough force to knock down the concrete panels close to the south most end of the south breach, and sections of concrete with re-bars fell in the almost undisturbed portion of the levee, the barge continued moving towards inland as the portion of the levee previously disturbed by gaps and underseepage was being eroded by the large stream of water originated at the location of the initiation of the breach.

In other words, the barge was contacting and impacting the floodwall intermittently for approximately 800 to 900 feet, which resulted in leaning of the floodwall, creating gaps and weakening the levee, until, almost at the end of the 900 feet, the barge was subject to a superposition of oncoming and reflected waves and wave run-up and impacted the floodwall with a combined vertical and horizontal force "booms" heard by witnesses), knocking down sections of at least two concrete panels, which crumbled, allowing large volumes of water to start flowing thru a forty foot opening on the floodwall, dragging the barge inland by water friction and wind pressure (which was added to the linear momentum remaining after the collision), in a similar fashion as if the barge was at the edge of a waterfall.

Under the above-described circumstances, the barge developed a trim attitude riding downwards on the reinforcing bars, while pivoting above the remains of the floodwall and levee, which was being eroded and translated inland by the massive volume of water flowing thru the space where two of the panels were knocked down.

*The weight of the barge was estimated to be about 518 S.T. (assuming a draft of 2.5 feet).

The erosion and mass translation of the levee due to gaps (see previous comments about gaps discussed under the previous subsection titled: The North Breach) extending from 1,750 feet North of the Claiborne Ave. Bridge for several hundred feet, adjacent to the area immediately North of the portion where the barge impacted and crumbled two of the concrete panels, resulted in progressive erosion and translation of the levee, which was washed away, taking the I-wall with it.

The above scenario represents the only circumstances in which the scrapes noticed on the bottom of the barge, could have been created by the re-bars.

The grounded position and orientation of the barge, after Katrina and before Rita, also indicates that the initiation of the south breach occurred at the southernmost end of the south breach.

If, in contradiction to the testimony of some 20 fact witnesses, the south breach would have occurred before the arrival of the barge to the southern portion of the breach, as alleged in some published documents, the developments that occurred after the breach started, supports the contention that the barge could not have scrapes in the bottom unless the barge crossed the levee within a few seconds of the initial collapse of the concrete panels.

The elevation of the water in the IHNC was increasing during the morning hours of August 29th, and the level of the flooding water (after the South breach was developed) on the protected side was also going up fast to match the IHNC water level. Hence, the distance from the level of the water to the collapsed concrete panels and re-bars, would have become larger than the draft of the barge very fast, precluding the possibility of developing scrapes starting at the bilge plate of the barge and continuing at the bottom of the barge.

In summary, as the barge impacted the concrete panels and the concrete panels partially crumbled and fell downhill on the levee, the only way for the bottom of the barge to contact the re-bars and create the 34 scrapes was the development of a waterfall configuration in which the barge acquired a large trim, tilted (or "hinged" about the centerline of the levee) while moving downhill from the IHNC water level to the relatively dry side (lower water elevation) of the previously protected side of the levee.

X.   COMMENTS REGARDING THE REPORT AUTHORED BY D. F. RYAN, II, P.E., DATED JUNE 12, 2009

  I.   GENERAL COMMENTS:

As it is described under Detailed Comments below, there are two requirements or recommendations for the mooring of barges that are not independent of each other, on the contrary, they are absolutely related.

One requirement is:

In accordance with 33 CFR 162.75 (b) (1) and 33 CFR 162.75 (b) (3) (i), the ING 4727 was required to be moored by bow and stern lines.

Additional requirement, "Port Condition Zulu" was set on Sunday, August 28, 2005, by the USCG COTP New Orleans in accordance with MHCPP: "Sector New Orleans Maritime

Hurricane Contingency Port Plan", of CGSECTORNOLAINST 3006, dated 01 June 2005.  This document recommends:
"Mooring lines doubled up with due consideration given to the effects of predicted storm surge"

The above recommendation is intended to double up equally the capacity of the mooring lines at each end, to resist forces applied by the wind without breaking either the bow or the stern lines. The reasons to double up the mooring lines at both ends is to maintain the side of the vessel parallel and close to the dock, or in the case of the ING 4727, parallel to the ING 4745, in order to avoid the expected shock loads due to motions of the barge (surge, pitch, sway and heave) if the barge swings away from the dock when the mooring line at one end fails.

In other words, the intention of the two recommendations is to have approximately equal mooring strength capacity at both ends of the barge.

## II.  DETAILED COMMENTS:

Section 5 Mr. Ryan's Report:  FINDINGS:

Item 1 of Section 5:  On page 6 of his report (Item f), Mr. Ryan states that the recommended actions of the MHCPP (Maritime Hurricane Contingency Port Plan), such as condition Whiskey are not applicable to the barge 4727.

   Comment:  See comment of Item 3 below.

Item 2 of Section 5:  On page 6 of his report (Item g), Mr. Ryan States:  "During the morning of 27 August 2005, LNA employees added and replaced mooring connections between the ING 4727 and the ING 4745".

   Comments:

   It is assumed that the above sentence is based on the statement of Earl J. Smith dated 10/31/05 (Doc. #43 of H. Pazos' report), which indicates that they replaced ... "one line between the ING 4727 and ING 4745 with a new line, and added a new line between the cleats near the middle of the barges".
   In summary, according to Mr. Smith, only one line was added at midship between the barges and only one line was replaced at one end.

   That is, the recommendation to double the lines was not executed, and there were no mooring cables connecting Barge ING 4727 to the dock, after ING 4745 was top around, as required by Lafarge's Guidelines "New Orleans Terminal – Hurricane Preparation List".

   The Captain of the tug Regina H (Raymond Grabert, Jr.) testified that, as requested by the dispatcher from Joe Domino (Scott Casting), he proceeded to execute the request by Ed Bush (Assistant Terminal Manager for Lafarge), to flip the barges around.  He testified that there was three one-part lines holding the loaded to the empty:  "Single Line, three places" (P. 47, L. 21).  Therefore, Capt. Grabert's testimony agrees with the statement of Earl Smith, but, the testimony of the deckhand of the Regina H (Eric Thigpen) also states:  "The middle rope was at an angle".

Because one of the 3 ropes was at an angle, the wind force created against the side of the barge must be resisted basically only by the 2 mooring ropes (bow and stern lines) located at the ends of the barge, one of which was neither replaced or doubled-up and therefore had a reduced capacity to withstand the wind loads, when compared with the opposite end of the barge.

Conclusion: Mr. Ryan's statement under item g. used the words "replaced mooring connections", appear to indicate that various ropes were replaced, while only one rope was apparently replaced. Also, the word "added" refers to one line that was added but wrongly rigged about midship at an angle, seriously limiting the ability of this rope to resist side wind loading when either the bow or stern lines are overstressed. Therefore, barge ING 4727 was basically secured to the ING 4745 by one new single line rope at one end and one single line old rope, probably of low strength capacity at the other end.


NOTE: Mr. Skaer, II, a rope expert retained by LNA estimates that the synthetic lines connecting barge ING 4727 to ING 4745, may have had a strength of 55,000 lbs. when they were new, and between 38,500 to 20,000 pre-Katrina.


Item 3 of Section 5: On page 7 Mr. Ryan states (Item i & Item j) that the recommended actions of the MHCPP in regards to the port condition X- RAY and YANKEE are not applicable to the ING 4727.

   Comments:

   If, according to Mr. Ryan, Port Condition WHISKEY, Port Condition X-RAY and Port Condition YANKEE were not applicable to barge ING 4727.

   In the opinion of the undersigned, Port Condition WHISKEY, X-RAY and YANKEE are applicable to ING 4727.

Item 4 of Section 5: On page 7 and 8 (Item k), Mr. Ryan discusses Port Condition ZULU, which recommends that:
"mooring lines doubled up with due consideration given to the effects of predicted storm surge". Mr. Ryan's report also states: "The ING 4727 was in compliance with the Marine Safety Bulletin for Port Condition ZULU".

Also, Mr. Ryan's report states the following: "The ING 4727 was moored with extra lines of double strength".

   Comments:

   The "extra lines" mentioned by Mr. Ryan are actually only one line (no lines: plural) which was rigged improperly. The words "double strength" are incorrect. The strength of the mooring system cannot be double by replacing a used single line by a newer single line and not doubling up the line at the other end of the barge.

   Furthermore, since the single line added in the middle of the barge was observed to be wrongly rigged at an angle, it is suspected that the person that installed this line was

inexperienced and also could have improperly secured the line to the cleats, since he was forced to climb up and down 6 to 7 feet between the decks of the barges.

The reason why 33 CFR 162.75 require barges to be moored by bow and stern lines is to keep the side of the barge parallel to the mooring dock, to avoid one end of the barge from swinging away from the dock.

The recommendation of MHCPP to double-up applies to both the bow and stern lines. Increasing the strength capacity of the mooring line at one end of the barge, and <u>not</u> equally increasing the strength capacity at the other end of the barge constitutes a failure to comply with the "double-up" recommendation.

The reason for the above is that the force developed by the winds blowing against the side of the barge will be equally distributed (when the winds are at 90° to the side) to both ends, that is, half of the total force will be applied at one end and half of the total force will be applied to the other end. If the lines at one end cannot resist 50% of the total force they will break, then, the end of the barge where the mooring line parted, will swing away from the dock and the remaining line at the other end will have to resist almost 100% of the load, even if the new line at midship is capable of some contribution.

In summary double-up must apply to both ends, the bow and the stern lines.

Mr. Ryan's report expresses the argument in items f, i and j, that Port Condition <u>WHISKEY</u>, <u>X-RAY</u> and <u>YANKEE</u> do not apply to the ING 4727, while in item k he agrees that Condition <u>ZULU</u> applies to the ING 4727.


## Section 6: <u>COMMENTS CONCERNING KDON MARINE CONSULTING DECLARATION DATED 13 JUNE 2008 AND LETTER DATED 11 MARCH 2009</u>

<u>ITEM a.</u>: No comments.

<u>ITEM b.</u>: No comments.

<u>ITEM c.</u>: Under this item, Mr. Ryan's report appears to imply that the "Standard of Care" recommended by the "Barge Fleeting Standard Of Care & Streamlined Program Guide Book", advising that "moorings from high to low fittings should be avoided", as emphasized by the Greater New Orleans Barge Fleeting Association (GNOBFA), applies only to waters of the Mississippi River between miles 88 and 240 AHP, and are not applicable to the IHNC.

<u>Comments</u>:

The recommendation to "avoid moorings from high to low fittings" is just Common Good Marine Practice, irregardless of the location of the barges. Hence, the undersigned disagrees with Mr. Ryan who implies that Good Marine Practice applicable to the Mississippi River on barges may be different for the IHNC. The Standard of Care applies to any location.

<u>ITEM d.</u>: Mr. Ryan's report states: "The three one-part lines actually used by LNA to moor the ING 4727 to the ING 4745 in preparation for hurricane Katrina had more than doubled the

strength of the normal mooring, which had been rigged using two lines as called for by 33 CFR 162.75 (b)(3)(ii)".

Comments:

The above statement is erroneous:  Only one line was added, but was installed at an angle which prevented this line from absorbing 1/3 of the side force applied by the wind to the barge.  Hence, the force applied by the wind was needed to be resisted from only 2 lines, one of which was old (was not replaced).  Therefore, the words: "more than double the strength of the normal mooring" is incorrect.  The bow and stern lines were no doubled-up.

ITEM e.:  Mr. Ryan states: "By using three one-part lines of greater strength to moor the ING 4727 to the ING 4745, LNA had doubled the strength of the mooring".

Comment:  The above statement is incorrect.

ITEM f.:  The undersigned disagrees with Mr. Ryan's opinion.

ITEM g.:  The undersigned disagrees with Mr. Ryan's opinion.

ITEM h.:  The undersigned disagrees with Mr. Ryan's opinion.

ITEM i.:  The undersigned disagrees with Mr. Ryan's opinion.

ITEM j.:  The undersigned disagrees with Mr. Ryan's opinion.

ITEM k.:  The undersigned disagrees with Mr. Ryan's opinion.

ITEM l:    The undersigned disagrees with Mr. Ryan's opinion.

Comments:

The undersigned disagrees with the statements made by Mr. Ryan in this item.  Regarding kevels, Capt. Grabert (Regina H's Master), testified on page 50, line 4 of his deposition: "There were roughly four cleats or kevels in which the lines could have been placed".  And on page 14, line 24 of the deposition of the deckhand of the Regina H (Mr. Thigpen), he testified: "I walked all over, looked for ropes.  There were no ropes".  In other words, the crew of the Regina H realized that the mooring of the ING 4727 was not safe, but they did not have extra ropes and could not find ropes at the LNA facility that they realized that were needed.

Additionally, Mr. Ryan states:  "the ING 4727 was moored in a protected slip".  This statement is erroneous as was proven during Katrina.  Also, J. C. Domino, who is a very experienced operator, does not include the IHNC as a Safe Harbor in their list of locations that have been deemed Safe Harbor by Joseph C. Domino's vessels during the threat of a hurricane.

III. **APPENDIX A TO MR. RYAN'S REPORT TITLED:**

**COMMENTS/OPINIONS CONCERNING DEPOSITION OF DONALD J. GREEN, KDON MARINE CONSULTING, TAKEN 21 NOVEMBER 2008**

**Item a.:** Mr. Ryan criticizes Mr. Green for asserting that the barge 4727 should have been ballasted.

**Comments:**

It is common sense to realize that the barge will have had substantially reduced the area exposed to the wind if it was ballasted.  Stability will not be a problem if only the voids were ballasted.

Ballasting of the barge ING 4727 would have resulted in minimizing the mooring condition "from high to low fittings' and therefore, improving the compliance with the "Standard of Care" of the "Greater New Orleans Barge Fleeting Association (GNOBFA).

**Item b.:** The undersigned disagrees with Mr. Ryan's opinion.

**Comments:**

The undersigned disagrees with Mr. Ryan's definition of doubling up lines.  The undersigned agrees that doubling up in general means to double the strength of each of the forward and aft mooring connections.  Nevertheless, Mr. Ryan is wrong stating:  "The ING 4727 was moored with extra lines of at least double strength …".  This statement is wrong because only one line was replaced and only one line (improperly rigged) was added, without doubling up the mooring line at the end of the barge where an old mooring line was neither replaced nor doubled-up.

**Item c.:** No comment.

**Item d.:** No comment.

**Item e.:** The undersigned disagrees with Mr. Ryan's opinion.

**Comments:**

Regarding the Recommendation of Greater New Orleans Barge Fleeting Association, the undersigned disagrees with Mr. Ryan because Good Marine Practice should prevail over any limited procedures or regulations.

**Item f.:** The undersigned disagrees with Mr. Ryan's opinion.

**Comments:**

Mr. Ryan's report continues erroneously stating that the three one-part line replaced, doubled up the strength of the moorings.

Because only one of the old lines was replaced by a newer line and another new line that was improperly rigged at midship was added, there is no support whatsoever in Mr. Ryan's statement, and Mr. Ryan apparently missed the concept of requiring doubling the lines at both ends of the barge, to provide equal mooring capacity at both ends of the barge.

Item g.: The undersigned disagrees with Mr. Ryan's opinion.

Item h.: The undersigned disagrees with Mr. Ryan's opinion.

Item i.: The undersigned disagrees with Mr. Ryan's opinion.

Item j.: The undersigned disagrees with Mr. Ryan's opinion.

Item k.: The undersigned disagrees with Mr. Ryan's opinion.

Comments:

The fact is that the moorings of ING 4727 failed during hurricane Katrina, despite Mr. Ryan's opinion that the mooring was appropriate.

Y.   COMMENTS REGARDING THE REPORT AUTHORED BY D. PHILIP SKAER, II, DATED JUNE 12, 2009

Basic comment: Mr. Philip Skaer, II's opinion regarding use of wire ropes for the mooring of barges is erroneous and it is in contradiction to Lafarge's guidelines on this subject, as discussed below. Also, Mr. Philip Skaer, II, appears to disregard the reasons for the requirement of having mooring lines at both ends. He apparently believes that increasing the strength of the mooring line at one end could solve the barge mooring problem.

On page 1 of his report, Mr. Philip Skaer, II, states that barge ING 4727 was tied up with "two 4 ½" circumference 8 strand braided high tenacity copolymer polypropylene lines". Mr. Philip Skaer, II, states that when new, these lines have a tensile strength (ultimate) of approximately 55,000 pounds each.

Mr. Skaer, II's assumed (the undersigned does not know the basis for these assumptions) that because both lines had been in use, their tensile strength would have been "about 38.500 lbs. for one of the ropes" and "possibly 20,000 lbs. for the other rope".

Comment: There is not indication of how Mr. Philip Skaer, II, arrived to the above values, since he does not mention testing the remains of the lines. The undersigned is not aware of how he was able to arrive to two substantially different residual strength (38,500 lbs. and 20,000 lbs.) for the same type of lines that had similar use thru the life of the lines.

The undersigned is not aware of the source and/or correctness of the information presented by Mr. Skaer, II, in his report, which it is described as being obtained from a catalog.

It should be noted that catalogs from different manufacturers may indicate different values of tensile strength than the 55,000 lbs. mentioned in Mr. Skaer, II's report.

For instance:
- 2" diameter twisted nylon is cataloged by Byrne, Rice and Turner (New Orleans) at 84,600 lbs. minimum tensile strength
- 2" polyester/blend is cataloged also by Byrne, Rice and Turner (MAGNOS) at 62,000 lbs. minimum tensile strength

The importance of this observation is that, if the pre-Katrina mooring lines of barge ING 4727 had a tensile strength of 84,600 lbs., it would have been required that mooring lines be at each end of the barge having a total strength of 169,200 lbs., while, according to Mr. Skaer, II, the new line that was installed at one end replacing an old one was rated at 102,000 lbs. (The undersigned cannot verify this number), and, at the other end of the barge, it would have had, according to Mr. Skaer, II, either 20,000 lbs. capacity or 38,500 lbs.

Mr. Philip Skaer, II, indicates that Lafarge replaced one of the existing lines (he uses plural: lines, while it should be singular: line) with a "new 6 inch circumference Hi-tenacity 8 strand GARFIL MAXIFEX rope rated at 102,000 lbs.". Lafarge also added a line at about midship, but this line was improperly rigged.

Comments:

The undersigned is not aware of the existence of a 6" circumference line reported by Mr. Skaer, II, except as indicated in his report.

It should be noted that the crew of the tug REGINA H noticed only 2" diameter lines (4 ½" circumference), as well as Mr. Smith's statement and Mr. Busch's deposition only mention 2" diameter lines (4 ½" circumference) , rather than a 6" circumference line as reported by Mr. Skaer, II.

Because the new line installed by LNA about midship was improperly rigged at an angle, it was not effective as a mooring line, in relation to the philosophy of doubling the mooring lines at both ends. To get an appreciation of the insufficient total strength of the mooring system rigged by Lafarge, by using the values indicated by Mr. Skaer, II, the ING 4727 had, at the strong end of 102,000 lbs. capacity and 38,500 at the weak end, while it could have been 169,200 lbs. at each end of the barge. Therefore, the claims of compliance with the USCG COTP in accordance with MHCPP regarding doubling up the mooring lines are wrong.

On page 2 of his report, Mr. Philip Skaer, II, presents an analysis for a vessel exposed to wind conditions.

Comments:

The recommendation to double-up the forward and aft lines cannot be satisfied by increasing the strength capacity at one end of the barge. Mr. Philip Skaer, II, uses the words "overall strength" and total strength disregarding the requirement of using mooring lines of approximately equal strength at both ends.

Mr. Philip Skaer, II, stated that he examined the "new 6 inch cir. lines and concluded that the lines parted from "great tensions and/or shock overload".

<u>Comments</u>:  The above supports the following sequence of events:
The old line at one end of the barge (that was not doubled-up) must have failed early, allowing one end of the barge to swing away from the dock.  This forced new configuration of the barge, resulting in pitch, surge, heave and sway motions, which applied shock loading to the overloaded 2 remaining lines at midship and at the end of the barge, resulting in parting of the midship line, and finally parting the last line at the end.

After reviewing the general characteristics of synthetic lines, Mr. Skaer, II, discusses wire ropes, stating that wire ropes "must be of predetermined length.

<u>Comments</u>:

Mr. Skaer, II, apparently totally disregarding the existence and common use of steel wire clips. Using wire rope in conjunction with wire clips, the mooring wires can be installed with the desired length at any time at any location.

The justifications for not mooring the ING 4727 with cables to shore, submitted by Mr. Skaer, II, are not valid in the opinion of the undersigned.  Mr. Skaer, II, attempted to justify the avoidance of installing cables by claiming that:
a).     Cables could result in lifting injuries;
b),     Cables are difficult to handle;
c),     Cables recoil on break;
d).     Wire ropes tend to break:
e).     Wires can cut the hands of men handling them; and
f).     Wire ropes must be a predetermined length.

It is the opinion of the undersigned that each of the justifications for not using cables submitted by Mr. Skaer, II, are improper.

Wire ropes are used every minute of every day in many ways in the marine industry without the slight consideration to the claims stated by Mr. Skaer, II.

Furthermore, it is not clear that Mr. Skaer, II would reject the requirement of LNA, while acting on behalf of LNA.

Conclusion, Lafarge failed on its obligation by not mooring the ING 4727 with cables to shore.

Furthermore, Mr. Skaer, II, expresses his opinion that wire ropes "would have broken before the synthetic rope that was used", without indicating what size/strength of wire rope he is talking about.

<u>Comments</u>:

The nominal strength of improved plow steel wire rope (6 x 19) with fiber core is as follows:
    For ¾" diameter:  23.8T = 47,600 lbs.
    For 1" diameter:  41.8T = 83,600 lbs.
    For 1 ¼" diameter:"  64.6T = 129,200 lbs.

While the 6" cir. synthetic line used is indicated by Mr. Skaer, II, to have a 102,000 lb. capacity.

61

Additionally, Mr. Skaer, II's opinion regarding use of wire ropes, is in contradiction to the guidelines for mooring barges developed by Lafarge, since a documents identified as LNA 000113 titled: "New Orleans Terminal – Hurricane Preparation Checklist", the following requirement is included: "CABLE ALL BARGES TO SHORE".

In other words, Lafarges' management request to Lafarge's employees to use wire rope, while Mr. Skaer, II's opinion is in contradiction to Lafarge's own requirements.

Regarding Mr. Skaer, II's conclusions:

Conclusion 1: The undersigned disagrees
Conclusion 2: The undersigned disagrees
Conclusion 3: Both, the undersigned and Lafarge's management totally disagrees with Mr. Skaer, II.
Conclusion 4: The undersigned disagrees with Mr. Skaer, II's opinion that it is not possible to secure a barge. If this were true, Lafarge should have removed the barge from the facility.


Z.    COMMENTS REGARDING THE REPORT AUTHORED BY MR. LARRY E. STROUSE DATED JUNE 12, 2009

- In the section titled COMMENTS/OPINIONS, under item 3, Mr. Strouse states: "The ING 4727, ING 4745 and northern tier of barges were properly and adequately moored in accordance to hurricane preparations".

  Comments: This statement is erroneous since the ING 4727 broke away and the mooring was not in compliance with various requirements and recommendations, such as doubling up the moorings at each end and having moorings from high to low. Also, contrary to Lafarge guidelines, barge ING 4727 was not moored with cables to shore.

- Under item 4, Mr. Strouse discusses high-low mooring arrangements. The "Standard of Care" of the "Greater New Orleans Barge Fleeting Association" (GNOBFA) recommends to minimize any mooring condition from high to low fittings, Mr. Strouse concluded that this standard, in his opinion "it is not considered substandard practice". In other words, he disagrees with the GNOBFA.

- Under item 5, Mr. Strouse discusses Title 33 CFR, Part 3-40-15, without offering any specific opinion.

- Under item 6, Mr. Strouse mentioned LNA written hurricane checklist without offering any specific opinion, and does not mention that the checklist requires to "CABLE ALL BARGES TO SHORE".

- Under item 7, Mr. Strouse discusses the discharging the ING 4727 without offering any specific opinion.

- Under item 8, Mr. Strouse discusses the decision by Ed Busch to ask Joe Domino to turn the loaded barge ING 4745 and the empty barge ING 4727 around.

- Under <u>item 9</u>, Mr. Strouse discusses the topping of the barges and states that: "the maneuver would have exerted sufficient force to demonstrate that the mooring of these barges was capable of sustaining considerable force". And also: "Thus the performance of the mooring lines during the topping around maneuver confirm the adequacy of the mooring lines".

  <u>Comments</u>: In the opinion of the undersigned the lines were adequate for topping around, but were <u>totally</u> inadequate for mooring during hurricane conditions. The deficient mooring found by Captain Grabert, Jr., and deckhand, Eric Thigpen o the tug REGINA H, was so obvious that they, without any instructions from Joe Domino or Lafarge, " - - - walked all over, looked for ropes. There were no ropes" (Thipgen's deposition, Page 14, Line 24). Also, Capt. Grabert testified on page 70, line 25 of his deposition: Regarding taking the light barge out of the canal and brining it to a fleeting operation: "If they have requested me to do so, I'd have done it". Hence, Mr. Strouse's opinion: "There was no reason for Ed Busch to have asked Joe Domino to alter the mooring arrangement or add to it, nor any reason to believe that anything Joe Domino might have done in that regard would have prevented the eventual breakaway". Hence, it is the opinion of the undersigned that Mr. Strouse's opinion under item 9 is erroneous.

- Under <u>item 10</u>, Mr. Strouse states in regards to USCG New Orleans Marine Safety Bulletin Vol. V, Issued XXXV "Set Port Condition Whiskey, and in regarding to Mooring Lines doubled up: "The quality and arrangement of the high-quality stronger lines were adequate and satisfied the bulletin's recommendation".

  <u>Comment</u>: In the opinion of the undersigned this statement is incorrect.

- Under <u>item 11</u>, Mr. Strouse disagrees with Captain Grabert.

- Under <u>item 12</u>, Mr. Strouse states: "The LNA facility and the mooring arrangements in the IHNC at Florida Avenue has long been known in the industry to be a protected area and a safe haven for mooring barges as hurricane protection".

  <u>Comments</u>:

  The above statement contradicts the opinion of an experienced operator such as J. C. Domino who does not include the IHNC as a safe harbor in their list of locations that have been deemed safe harbor by Joseph C. Domino, Inc.'s vessels during the threat of a hurricane. Also, Mr. Strouse states: "There was nothing wrong with mooring barges abreast at the LNA facility". In the opinion of the undersigned, there is nothing wrong with mooring barges abreast if the appropriate mooring system, including doubling up the fore and aft lines and installing cables to shore would have been applied, and if the difference of deck elevations was small.

- Under <u>item 13</u> Mr. Strouse characterizes the opinions of Mr. D. J. Green regarding scuttling or ballasting as ridiculous.

  <u>Comments</u>:

  In hindsight, ballasting or even scuttling would have been excellent solutions when compared with the flooding of the Lower Ninth Ward and the St. Bernard Parish. Additionally, Mr.

Strouse's opinion that to get pump to the dock would have been impossible is totally erroneous since there are in New Orleans at any time, numerous vessels capable of pumping water on short notice. And, regarding the vessel to be unstable, the undersigned as a Naval Architect with many years of experience in stability matters is the opinion that ballasting would have been feasible without having stability problems.

- Under item 14, the comments about mandatory evacuation are correct.

- COMMENTS REGARDING MR. STROUSE'S CONCLUSIONS

  In the introduction to his conclusions, Mr. Strouse appears to intend to justify the failure of mooring ING 4727 by stating that other vessels also broke their moorings. The undersigned disagrees with this attempted justification. Furthermore, he expresses the opinion that: "Lafarge NA adequately and properly, by means of sufficient quantity and strength mooring lines, secured the barge ING 4727 at the LNA facility in the IHNC on August 27, 2005".

  The above opinion is erroneous and contrary to the facts because:

  1. The mooring lines were not adequate. Only one of the fore or aft lines may have been doubled-up in capacity.
  2. The mooring lines were not properly installed. The line installed about midship was at an angle.
  3. The lines were not sufficient in quantity and/or strength.
  4. No mooring cables to the dock recommended by Lafarge were installed.
  5. The Standard of Care promulgated by the Greater New Orleans Barge Fleeting Association regarding high-low mooring arrangements was not applied.
  6. There were no extra mooring lines available at LNA facility.

AA.   **CONSIDERATIONS REGARDING LAFARGE'S ACTIVITIES**

The USCG Sector New Orleans, Maritime Hurricane Contingency Port Plan (MHCPP) under Waterfront Facilities states: "The owner operator and/or the person in charge of the facility . . . are primarily responsible for the safety of their facility and vessels".

Also, Annex B, Appendix 2 – Recommended Precautionary Measures for Barges, states:

  "Mooring lines doubled-up with due consideration given to the effects of predicted storm surge. Special attention should be paid to barges moored in the proximity of bridges".

  Additionally, "Spare mooring lines and/or wires should be readily available".

Lafarge accepted delivery of the ING 4727 on August 26, 2005, and the unloading operation of the ING 4727 was completed about 9:00 a.m. on August 27, 2005.

On the same date, August 27, 2005, Earl J. Smith, maintenance supervisor for Lafarge, and other employees, replaced one used-soft mooring line at one end of the ING 4727 by a new 2" mooring line, and installed a new-soft line at about midship. They did not replace the used-soft mooring line at the other end of the ING 4727 and did not double up the mooring lines or install mooring cables to

64

the dock, as required in Lafarge's Guidelines: "New Orleans Terminal – Hurricane Preparation Checklist".

At about 10:30 in the morning, Ed Busch, Assistant Terminal Manager for the New Orleans Lafarge North America, called Joseph C. Domino, Inc. and requested the dispatcher, Scott Casting to send a tugboat to top around (swap out) the two barges.

About noon, all Lafarge personnel left the LNA facility.

On the afternoon of August 27, 2005, at about 1425, the tug REGINA H arrived and the ING 4727 with the ING 4745 moored to it was topped around, such that the ING 4745 was moored to the wharf at the LNA dock and the ING 4727 was outboard of the ING 4745.

The captain (Mr. Grabert, Jr.) and deckhand (Mr. McNeil) of the REGINA H considered the three single line moorings between the ING 4745 and the ING 4727 inadequate and walked around the LNA facility trying to find additional lines, but could not find any suitable lines, except one rope, which he used in securing the barge ING 4745 to the dock.

The deckhand also noticed that the mooring line at midship of the barges was at an angle, but they did not re-rig the line. Also, they noticed that there were 2 kevels that were not being used. They did not do anything to the lines between the loaded barge and the empty barge.

The deckhand stated that because the difference in freeboard between the empty barge and the loaded barge (about 6 to 7 feet) is too hard to put parts between them.


BB.    CONCLUSIONS AND OPINIONS

OPINION #1:  LAFARGE NORTH AMERICA, INC., HAD AN OBLIGATION REGARDING HANDLING VARIOUS ACTIVITIES INVOLVING THE ING 4727 BARGE, ACTIONS THAT RESULTED IN THE ING 4727 BREAKING LOOSE FROM HER MOORINGS AND CREATING TWO MAJOR BREAKS IN THE FLOODWALL/LEVEE OF THE INNER HARBOR NAVIGATION CANAL (IHNC), BREACHES THAT RESULTED IN THE FLOODING OF THE LOWER NINTH WARD AND AREAS OF ST. BERNARD PARISH.

Lafarge North America's violation of duties include the following activities:


VIOLATION OF DUTY I:  On Friday, August 26, 2005, shortly after the ING 4727 and ING 4745 were moored at the LNA Terminal (at approximately 1220), unloading the ING 4727 cargo had commenced, and, on Saturday morning, August 27th, at approximately 0980, the down loading of the ING 4727 was completed.

It appears that LNA started unloading the ING 4727 as soon as it arrived because LNA needed to ship H-Cement to the Oil Well Industry as soon as possible.

Because on August 26th, at approximately 2005, the USCG COPT New Orleans issued Port Condition WHISKEY.  On August 27th, LNA should have halted the discharge of the ING 4727 or taken action to remove the empty barge from its facility.  Instead, on August 27th at 1030, Ed Busch,

Assistant Terminal Manager for the New Orleans LNA, requested Joseph C. Domino, Inc., to send a tugboat to top around the two barges.

The request by LNA to top around the barges without taking other action was improper, among other reasons because the differential freeboard between the ING 4727 and ING 4745 was in excess of 6 feet. The Greater New Orleans Barge Fleeting Association's "Standard of Care and Stream Lined Inspection Program Guide Book", on page 17 recommends that moorings from high to low fittings should be avoided.

As a minimum, LNA could have ballasted the voids on the ING 4727 without any stability problem, reducing substantially the difference in elevation of the decks of the ING 4727 and the ING 4745, but also LNA should have realized that the mooring lines needed to be stronger than if the deck of the two barges were at the same level.

VIOLATION OF DUTY II: In the morning of Saturday, August 27th, Earl J. Smith, Maintenance Supervisor at LNA and other Lafarge personnel replaced one mooring line at one end of the ING 4727 and installed a line about midship of the barge.

The above actions were a violation of care because of the following:

They did not replace and/or double-up the existing mooring line at the other end of the barge, which had lost substantial strength, probably due to wear and tear.

Mr. Skaer, II, an expert assisting Lafarge, estimated that strength of the lines of he ING 4727 has been reduced from approximately 55,000 lbs. to about 38,500 lbs. or 20,000 lbs.

They replaced one line at one end of the barge with a single line, which according to Mr. Skaer, II, was rated at 102,000 lbs.

They installed a new line about midship on the barge, which, according to the deckhand of the REGINA H was improperly rigged at an angle. This configuration, combined with the 6 to 7 feet of difference in elevation of the decks of the ING 4727 and the ING 4745 made the new line at midship substantially ineffective.

Lafarge breached its obligation by not properly mooring the ING 4727 to the ING 4745 as required by USCG COTP in accordance with MHCPP regarding doubling-up the mooring lines at both ends.

VIOLATION OF DUTY III: Lafarge North America developed a Hurricane Preparation Checklist for the New Orleans Terminal (Document #139), which specifically requires: "Cable All Barges To Shore".

The fact is that the ING 4727 was moored without any cable to shore in violation of LNA's own requirement for preparation for hurricane.

The justification for not mooring the ING 4727 with cables to shore, submitted by Mr. Skaer, II, acting on behalf of LNA is unacceptable. Mr. Skaer, II, justified the avoidance of installing cables by claiming that:

a).   Cables could result in lifting injuries;
b),   Cables are difficult to handle;
c),   Cables recoil on break;
d).   Wire ropes tend to break:
e).   Wires can cut the hands of men handling them; and
f).   Wire ropes must be a predetermined length.

It is the opinion of the undersigned that each of the justifications for not using cables submitted by Mr. Skaer, II, are improper.

Wire ropes are used every minute of every day in many ways in the marine industry without the slight consideration to the claims stated by Mr. Skaer, II.

Furthermore, it is unclear why Mr. Skaer, II, would reject the requirement of LNA.

Conclusion, Lafarge breached its duties by not mooring the ING 4727 with cables to shore.


VIOLATION OF DUTY IV:  Lafarge North America acted improperly because the mooring of the ING 4727 and ING 4745 was not supervised or inspected by a person knowledgeable and qualified for this activity.

Furthermore, Mr. Edward Busch testified on page 67, line 3, that, when Mr. Smith and 2 hourly employees:  Mr. Lewis and Mr. Johnson, were tying down the tops of the barges (hatch covers) and making sure that everything else was ship-shape (P. 63, L. 18), while he was on the dock cutting the rope (P. 66, L. 12), stating:
   "A.  We have a spool of rope.  Because we handle so many barges, we buy 600-foot spools of rope".
   And on:  page 67, line 10:  " … it was a new roll of rope".
              page 67, line 17:  "A.  It was blue".
              Page 68, line 5:  The rope was a 2-inch rope.

Additionally, the statement of Earl J. Smith (Document #43) also states that they were using new, two-inch braided polypropylene line.

The above records appear to disagree with Mr. Skaer, II's report, which indicates that Lafarge replaced one of the lines by a 6-inch circumference rope.

Mr. Busch and Mr. Smith testified that only 2-inch ropes were used (4 ½ inch circumference).

The undersigned has found no evidence that a 6-inch circumference rope was used, except the information found in Mr. Skaer, II's, report.

The crew of the REGINA H, testified they observed only 2-inch diameter ropes, blue color.

Mr. Busch testified on page 57, line 35, that Lafarge's Safety Director, Jennifer Arnold, have no experience with barges.

Mr. Busch did not inspect the mooring lines securing the ING 4727 to the ING 4745.

He testified on page 66, line 12, that, before he left the Lafarge facility, " ... I did not climb out onto the barge. I was doing other things. I was cutting ropes and dragging them off the dock, but I did look at the rigging ...".

Mr. Busch could not have inspected the mooring between the ING 4727 and the ING 4745 from the dock because the rigging was about 40-feet away from the dock (Barge beam = 35 feet), the deck of the ING 4727 was 6 to 7 feet higher than the deck of the ING 4745, and furthermore, the ING 4745 is 8 feet shorter (L = 192 feet), than the ING 4727 (L = 200 feet).

Therefore, the mooring lines at the end of the barges could not be observed from the dock even if binoculars were available.

Of course, the midship mooring line was totally hidden from view.

Mr. Busch left the Lafarge facility leaving it up to Mr. Smith, the responsibility of properly mooring the ING 4727 to the ING 4745, without leaving any instructions for securing the barges after the topping maneuver was executed.

In summary, Lafarge did not provide appropriate supervision by qualified people for the mooring of the barges.

VIOLATION OF DUTY V:  Lafarge did not request Joseph C. Domino, Inc., to provide additional rigging to secure the ING 4727 to the ING 4745 or to secure the ING 4727 to the dock.

Furthermore, Lafarge did not leave any ropes or wires at the dock of the Lafarge facility for the crew of the REGINA H to improve the rigging if they find it necessary.

The USCG Sector New Orleans, Maritime Hurricane Contingency Port Plan (MHCPP) states "spare mooring lines and/or wires should be readily available".

The crew of the REGINA H found the rigging between the 2 barges, unsafe, but could not find any ropes to improve the rigging.  Hence, Lafarge breached its duties by leaving the facility without any personnel to assist and/or any material to improve the rigging.

In summary, on August 29, 2005, Barge ING 4727 broke loose from its mooring because it was not in a safe harbor and because it was improperly secured by Lafarge North America, Inc.:
- It was not moored directly to the dock or shore.
- It was not secured with wire ropes to the dock or shore.
- The mooring lines were not doubled up.
- It was moored alongside another barge that had a lower freeboard.

Basis:  a).  Inspection of the barge.
         b).  Testimony of witnesses:
- Deposition of Mr. Grabert, Jr. (Section C 7 of this report)
- Deposition of Mr. Thigpen (Section C 8 of this report)
- Statement of Mr. Smith (Section C 10 of this report)
- Deposition of Mr. Edward Busch
- Deposition of Mr. McNeil (Section C9 of this report)

OPINION #2: On August 29, 2005, Barge ING 4727 impacted and pushed sections of the east floodwall of the Inner Harbor Navigation Canal (IHNC) across from pump station No. 5, initially tumbling over several panels of floodwall, which started some flooding forcing to shut down Pump station #5 at 5:30 a.m.

Then the barge contacted and pushed 8 or 9 additional panels before moving away from the floodwall for a short period of time. The impacting and pushing of the floodwall created gaps or openings (allowing water to penetrate below the ground surface), between the sheet pile curtain and the outboard side earthen embankment and then water penetrated into this gap. This effectively cut the supporting embankment in half, and the water pressures applied against the lower sheet pile sections helped to push the inboard half of the embankment as well as the floodwall towards the protected side. Once this gapping began, it then developed rapidly and the gap was extended to the base of the sheet piles. Seepage or flow of water through homogenous saturated soil increased with time (hydrostatic time lag) and with the increase of water level of the IHNC.

As the protected side of the levee is compressed (horizontal compactation) and sliding starts to develop due to underseepage, the whole moving mass (inboard embankment section and floodwall), is displaced laterally together, a substantial tension is developed in the sheet pile curtain. After a period of time of increasing seepage flow and increasing tension on the sheet pile curtain, suddenly, the connection between the 23 foot sheet piles and the 35 foot sheet piles at the Northern end of the breach was broken, resulting in a very rapid relocation and overturning of 280 feet of floodwall and total destruction of the protected levee in this area some time about 6:00 a.m. or 7:00 a.m.

After initiating the failure of the floodwall, which would later become an approximately 280 foot breach, and, after moving away from the floodwall leaving several hundred feet of floodwall undisturbed, the barge struck the floodwall again 1,750 feet North of the Claiborne Ave. Bridge, impacting, scraping, and pushing the floodwall panels and levee, creating gaps on the waterside of the sheet piles, while moving South, for approximately 900 feet, until it impacted on slightly leaning concrete panels, breaking the upper portion of the panels and causing the water stop of the sheet pile at the joint immediately south of the area of impact, to fail, as well as the failure of an interlock close to the area of the impact. Because the floodwall and the protected embankment in the 900 fee that the barge as been scraping, impacting and pushing was compressed and the seepage flow was increasing resulting in the protected side of the levee being displaced laterally, the 900 feet of sheet pile was in tension, tension that was exacerbated due to the constant increase of hydrostatic pressure developed by raise of the level of the water in the IHNC.

As the water level increases and therefore the hydrostatic pressure increases, the lateral force being applied to the floodwall increases, and the soil on the land side of the floodwall (which is compressible like a sponge) will experience a "volumetric compression" (horizontal compactation) before a sudden shear, rotational slip and/or major sliding at the toe or bottom of the sheet pile takes place. In other words, the upper portions of the floodwall will move several inches inland, before any substantial slide of the bottom of the sheet pile occurs. Initially should be some elastic or permanent settlement of the upper portions of the embankment creating an elongation of the sheet pile curtain.

The floodwall was in tension like a rubber band, and the seepage flow had been active for a longer period of time in the Northern part of the South breach than the area where the barge broke the concrete panels. Therefore, when the interlock of the sheet pile in the proximity of the location where the barge impacted the floodwall failed, the Northern portion of the levee of the South breach, which was weakened by underseepage and was displaced (by compression) laterally substantially

more than the South portion of the levee, suddenly, was washed away and translated inland 170 to 180 feet.

The unbreached sections of the floodwall/levee remained practically undisturbed in spite of large scour trenches developed at the toe of the protected side of the floodwall, along the entire length of the unbreached sections.

In summary, the events developed by the movements of the barge were the cause of the North and South breaches of the levee/floodwall of the East side of the IHNC.

The North and South breaches of the East IHNC levee resulted in a catastrophic inundation of the Ninth Ward of New Orleans and most populated areas of St. Bernard Parish, West of Parish Road.

Basis:
a).    Analysis of the level of the water of the IHNC at various times.
b).    Field inspection of the levees (Scouring/trenching), and the inspection of the barge.
c).    Field observations of the disturbed and undisturbed floodwalls.
d).    Comparison of the failure of the IHNC's levee with levees at various other locations.
e).    Analysis of multiple photographs.
f).    Testimony of witnesses:
      Section C1a of this report:  Deposition of Mr. Villavasso.
      Section C1b of this report:  Oral Statement of Mr. Villavasso.
      Section C1c of this report:  Conclusions from the testimony of Mr. Villavasso.
      Section C2a of this report:  Statement of Mr. Murph.
      Section C2b of this report:  Conclusions from Mr. Murph's Statement.
      Section C3a of this report:  Deposition of Mr. Adams.
      Section C3b of this report:  Conclusion from the testimony of Mr. Adams.
      Section C4a and 5a of this report:  Testimony of Ms. Berryhill & Ms. Simmons.
      Section C4b / 5b of this report:  Conclusions from Ms. Berryhill & Ms. Simmons testimony.
      Section C13 of this report:  Deposition of Mr. Reed.
      Section C14 of this report:  Deposition of Mr. Ruiz.
      Section C15a of this report:  Deposition of Andrew Sartin
      Section C15b of this report:  Conclusion from the testimony of Andrew Sartin
      Section C16a of this report:  Deposition of Ernest Offray
      Section C16b of this report:  Conclusions from the deposition of Ernest Offray
      Section C17a of this report:  Deposition of Sidney Williams
      Section C17b of this report:  Conclusions from the deposition of Sidney Williams
      Section C18 of this report:  Deposition of Ronald McGill
      Section C19 of this report:  Deposition of Dakeia Johnson
      Section C20 of this report:  Deposition of Earl Lackings
      Section C21 of this report:  Deposition of Damond Peters
      Section C22 of this report:  Deposition of Patrina Peters
      Section C23 of this report:  Deposition of Sally Susan Oster Jones
      Section C24 of this report:  Deposition of D'Antoniette Marie Johnson
      Section C25 of this report:  Deposition of Arthur Lee Murph, Jr. (Vol. I)
      Section C26 of this report:  Deposition of Arthur Lee Murph (Vol. II)
      Section C27 of this report:  Deposition of Dolores St. Cyr-Butler
      Section C28 of this report:  Deposition of Hendrick Ray Pounds

g).  Section D:  COMMENTS REGARDING MR. RAYMOND G. HELMER, JR.'S REPORT (DOC. #2)

h).  Section F:  COMMENTS REGARDING THE DECLARATION AND THE DVD OF DR. ROBERT GLENN BEA (DOC. #22)

i).  Section M:  REVIEW OF THE SIGNIFICANCE OF MRGO IN THE KATRINA FLOODING OF THE 9TH WARD OF NEW ORLEANS AND ST. BERNARD PARISH

j).  Section N:  STATIC FORCES GENERATED BY WIND ON THE BARGE, TRANSFERRED TO THE FLOODWALL WHEN THE BARGE IS RESTING AGAINST THE FLOODWALL

k).  Section O:  WAVE REFLECTION AND WAVE SUPERPOSITION

l).  Section P:  SUMMARY OF THE TESTIMONY OF FACT WITNESSES REGARDING THE BARGE BEING THE CAUSE OF THE BREACHES

m).  Section Q:  COMMENTS REGARDING SOME PHOTOGRAPHIC EVIDENCE PROVIDED BY LAFARGE NORTH AMERICA AND OTHERS

n).  Section R:  COMMENTS REGARDING UNDERSEEPAGE OF THE IHNC LEVEE BEFORE KATRINA

o).  Section T:  COMMENTS REGARDING DROP IN WATER LEVEL AT THE IHNC WHEN THE NORTH BREACH WAS INITIATED

p).  Section V.  COMMENTS REGARDING THE UNBREACHED PORTIONS OF THE FLOODWALL/LEVEE OF THE EAST BANK OF THE IHNC

q).  Section W.  CONCLUSIONS REGARDING PROBABLY SEQUENCE OF EVENTS


OPINION #3:  Zito Fleeting ignored the danger involved in delivering barges to the Lafarge facility on August 26, 2005, in view of the proximity of the hurricane.

Basis:  Public announcements regarding the strength and direction of the hurricane prior to the time that Zito delivered barges to Lafarge.


OPINION #4:  Zito failed to remove and/or fleet barge ING 4727 from the Lafarge facility when requested by Lafarge at approximately 9:00 a.m. on August 27, 2005.

Basis:  Deposition of Mr. Daniel Mecklenbourg (Section C 6)


OPINION #5:  The existence of the MRGO had very minimum influence in the flooding of the 9th Ward and the adjacent area of St. Bernard Parish up to Paris Road.

Basis:  Section M of this report:  Review of the Significance of MRGO in the Katrina Flooding of the 9th Ward of New Orleans and St. Bernard Parish.

71

This report is preliminary and will be modified and/or expanded as more information becomes available.

Sincerely,

_Hector V. Pazos_

Hector V. Pazos, P.E.
Naval Architect and Marine Engineer
Registered Mechanical Engineer
Marine Consultant – Expert Witness

HVP/pmv

Attachments:

Attachment #1:  Sixty-four (64) Photographs depicting 7 groups of interest (32 pages)
Attachment #2:  Compliance with Rule 26 (2) (B) of the Federal Rules of Civil Procedures:
Curriculum Vitae of Hector V. Pazos, P. E., including

- Qualifications
- List of Publications
- Technical Presentations
- Partial List of Cases

Attachment #3:  Schedule of Rates
Attachment #4:  Additional photographic and other evidence supporting the conclusions and opinions presented in this report
Attachment #5:  Estimate of the Forces Acting on the Floodwall Due to the Barge Contacting the Floodwall.

Appendix I:  List of websites researched

**Appendix I**

LOUISIANA OFFICE

3501 HOLIDAY DRIVE, SUITE #314
NEW ORLEANS, LA 70114

CELL (24 HOURS): (504) 367-4072
FAX: (504) 367-3790

Email: Oceanoilpazos@cs.com
www.siterrific.com/pazos

# OCEAN-OIL

## EXPERT WITNESS, INC.

NAVAL ARCHITECTS and MARINE ENGINEERS
MARINE CONSULTANTS

FLORIDA OFFICE

P. O. BOX 47188
ST. PETERSBURG, FL 33743-7188

566 VILLA GRANDE AVE. S.
ST. PETERSBURG, FL 33707
PH: (727) 347-2556
FAX: (727) 343-9717
CELL (24 HRS): (727) 415-7192
Email: Hectorpazos75597@aol.com

RE: Barge Case - Katrina
Civil Action No. 05-4419
OOEW Job No.1450

## PARTIAL LIST OF SOME OF THE WEBSITES RESEARCHED

- rgb@ce.berkeley.edu

- http://katrina.house.gov/full_katrina_report.htm

- http://www.ejge.com/1997/Ppr9707/Ppr707.htm

- www.ntis.gov/search/product.asp?ABBR

- http://www.nola.com/weblogs/print.ssf?/mtlogs/nola_tporleans/archives/print083003.html

- http://www.tulane.edu/~sanelson/Katrina/

- https://ipet.wes.army.mil/

- http://www.asce.org/files/pdf/erpletterformat.pdf

- http://www.msnbc.msn.com/id9419053/

- http://www.ce.berkeley.edu/~new_orleans/

- http://www.nola.com/katrina/graphics.continuous.swf

- http://www.usatoday.com/news/nation/2006-02-17-barge-katrina_x.htm

- http://www.nola.com/katrina/pages/110305/1103A01.pdf

- http://www.nola.com/katrina/pages/110505/1105A01.pdf

- http://www.nola.com/katrina/pages/110905/1109A01.pdf

- http://www.nola.com/printer/printer.ssf?/base/news-4/1129960640235820.xml

- http:www.nola.com/hurricane/katrina/pdf/102205/1022A01.pdf

- http://www.nola.com/katrina/pages/102505/1025A01.pdf

- http://www.nola.com/hurricane/?/washingaway/index.html

- http://www.pbs.org/wgbh/nova/orleans/

- http://www.ejge.com/1997/Ppr9707/Ppr9707/htm

- http://www.nola.com/t-p/archive.ssf?/mtlogs/nola_tporleans/archives/2005_09_06.html#077196

- http://www.nola.com/newslogs/tporleans/index.ssf?/mtlogs/nola_tporleans/archives/2005_09_27.html#083003

- http://www.nola.com/t-p/archive.ssf?/mtlogs/nola_tporleans/archives/2005_10_04.html#084767

- http://www.nola.com/hurricane/katrina/pdf/10135/1013A01.pdf

- http://www.nola.com/newslogs/breakingtp/index.ssf?/mtlogs/nola_Times-Picayune/archives/2005_10_14.html#087413

- http://www.nola.com/printer.ssf?/base/news-4/1129359337274730.xml

- http://www.nola.com/hurricane/katrina/pdf/101505/1015A01/pdf

- http://www.nola.com/newslogs/tpupdates/index.ssf?/mtlogs/nola_tpupdates/archives/2005_11.html#095519

- http://hsgac.senate.gov/index.cfm?FuseAction=Hearings.Detail&HearingID=290

- http://hsgac.senate.gov/_files/110205vanHeerden.pdf

- http://hsgac.senate.gov/_files/Katrina/Preliminary_Report.pdf

- http://www.asce.org/static/hurricane/whitehouse.cfm

- http://iwr.usace.army.mil/inside/products/pub/hpdc/hpdc.cfm

- http://katrina.house.gov/full_katrina_report.htm

- http://www.gpoaccess.gov/serialset/creports/katrination.html

- hurricane.lsu.edu/floodprediction

- http://lagic.lsu.edu/hurricanes.htm

- http://www.asce.org/files/pdf/ERPreport.pdf

- www.nola.com

- www.2theavocate.com

- www.cbs.com

- http://alternet.org

- usatoday.printhis.clickability.com

- www.washingtonpost.com

- www.wired.com/news/hurricane

- www.nationalreview.com

- http://boe.cabe.k12.wv.us/habitat/levees

- www.npr.org

- www.cbc.ca/story

- www.4.army.mil/

- www.cns-newswire.com

- www,rense.com/general67/nolevee.jpg

- http://news.nationalgeographic.com

- http://xymphora.blogspot.com

- www.blackelectorate.com

- http://historyishere.joeuser.com

- http://nl.newsbank.com

- www.ap.org

- tantongazette.com

- www.thcage.com

- www.frontpagemag.com

- snelson@tulane.edu

- http://www.nsf.gov/news/mmg/media/images/level_hl.jpg

LOUISIANA OFFICE

3501 HOLIDAY DRIVE, SUITE #314
NEW ORLEANS, LA 70114
CELL (24 HOURS): (504) 367-4072
FAX: (504) 367-3790

Email: Oceanoilpazos@cs.com
www.siterrific.com/pazos

# OCEAN-OIL

## EXPERT WITNESS, INC.

NAVAL ARCHITECTS and MARINE ENGINEERS
MARINE CONSULTANTS

FLORIDA OFFICE

P. O. BOX 47188
ST. PETERSBURG, FL 33743-7188

566 VILLA GRANDE AVE. S.
ST. PETERSBURG, FL 33707
PH: (727) 347-2556
FAX: (727) 343-9717
CELL (24 HRS): (727) 415-7192
Email: Hectorpazos75597@aol.com

## SEVEN (7) GROUPS OF PHOTOGRAPHS DEPICTING THE FOLLOWING AREAS OF INTEREST

<u>Group 1</u>:  3 Pages / 6 Photos
Photos depicting the scour of the levee on the landside of the floodwall immediately South of the location where the barge impacted the floodwall, clearly indicating that the floodwall/levee had sufficient strength to withstand the hydrostatic pressure, despite of the scour in the area not contacted by the barge.   (IHNC)

<u>Group 2</u>:  4 Pages / 8 Photos
Photos depicting the collapse of the floodwall due to the barge impact, and the area of the concrete panels where the re-bars are uniformly bent pointing inland, indicating that they were bent by the barge in the direction of the travel of the barge after the collapse of the floodwall.  Also, the last 2 photos show that the North breach was originated by impact damage.

<u>Group 3</u>:  2 Pages / 4 Photos
Photos showing the undisturbed portion of the floodwall (despite of the scour) just South of the location where the barge impacted the floodwall, during repairs after Katrina.   (IHNC)

<u>Group 4</u>:  6 Pages / 12 Photos
These photos depict typical failures of floodwalls/levees due to <u>hydrostatic pressure only</u> (London and 17th Street Canals), to use as comparison with the floodwalls that collapsed due to the barge contacting the floodwall.  Note that the concrete panels remained almost intact.

<u>Group 5</u>:  6 Pages / 12 Photos
General photos of the barge showing scrape marks on the side.

<u>Group 6</u>:  7 Pages / 14 Photos
The first photo on the first page of this group is an overall view of the warehouse where the bottom sections of the barge were stored for inspection.  The other photos of this group show scrapes starting at the bilge plate at the end of the barge.  The scrapes made by the re-bars to the bilge plate on the end of the barge, indicates that the re-bars that caused these scrapes were pointing generally upwards before being contacted by the bilge plate at the end of the barge, and were bent pointing inland as the barge bent the re-bars, by riding on top of the re-bars.

<u>Group 7</u>:  4 Pages / 8 Photos
Photos showing continuation of scrapes in other sections of the bottom of the barge.

## <u>CONFIRMATION OF THE CONCLUSIONS REGARDING PROBABLE SEQUENCE OF EVENTS FROM THE REVIEW OF THE PHOTOGRAPHS</u>

The barge was pitching and heaving while drifting due to wind and impacted the floodwall, initiating the North breach.  Then continued contacting the floodwall off and on (surging), as being forced by the superposition of the oncoming waves and waves reflected by the floodwall, in the area where the North breach developed.  Thereafter, after moving away from the floodwall, the barge impacted the floodwall again and continued contacting the floodwall off and on, for approximately 850 feet, until, due to the combination of heave, pitch and surge of the barge, motions forced by large wave action, that occurred when the barge was at the South end of what becomes the South breach, two concrete panels were impacted and broken by the barge, and pushed by the barge and the large flow of water, that immediately developed, to the top of the protected side of the levee, leaving at least 34 re-bars exposed in an almost vertical orientation.

As the barge was being dragged towards the landside of the levee by the waterfall created at the opening left on the floodwall after the concrete panels were broken and pushed inland and downward, the buoyancy of the portion of the barge that was no longer on the IHNC, it was lost, and the barge was forced to acquire a large downward trim attitude resulting in the upper portion of the bilge plate of the end of the barge contacting the re-bars that were in an almost vertical orientation, and bending them, allowing the barge to ride downwards to the almost dry landside area of the 9th Ward on top of the bent re-bars.

Hence, the scrapes on the upper portion of the bilge plate at the end of the barge, are a solid proof that the landside area of the 9th Ward was almost dry when the barge impacted the floodwall and was driven across the levee, in order for the barge to be forced to develop a large downward trim angle, which is the only way that the upper portions of the bilge plate could have contacted the almost vertical re-bars.

If the 9th Ward would have been flooded before the time the barge arrived to the area of the South breach where the bent re-bars were found, the barge could not have obtained the larger trim angle required to create scrapes on the upper portion of the bilge plate, and furthermore, the barge would have been floating high above the broken pieces of concrete panels and re-bars.

2





Severe scour in the landward side (protective side) of the levee, immediately South of the South breach. The orientation of the portion of the floodwall shown in these photos is in the North-South direction.

Note that the floodwall remained almost undisturbed, which clearly indicates that the floodwall/levee was sufficiently strong to withstand the hydrostatic pressure created by the high water level in the IHNC and the surge.   (IHNC).