1

1          UNITED STATES DISTRICT COURT

2         EASTERN DISTRICT OF LOUISIANA

3

4   IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION

5                                  * NO. 05-4182

6   PERTAINS TO: BARGES            * Consolidated

7                                  * SECTION "K(2)"

8   Boutte v. Lafarge       05-5531 *

9   Mumford v. Ingram       05-5724 * JUDGE DUVAL

10  Lagarde v. Lafarge      06-5342 *

11  Perry v. Ingram         06-6299 * MAG. WILKINSON

12  Benoit v. Lafarge       06-7516 *

13  Parfait Family v. USA   07-3500 *

14  Lafarge v. USA          07-5178 *

15    *  *  *  *  *  *  *  *  *  *  *

16

17          (V O L U M E  I)

18       Deposition of HECTOR V. PAZOS, P.E.,

19  given at Chaffe McCall, LLP, 2300 Energy

20  Centre, 1100 Poydras Street, New Orleans,

21  Louisiana 70163-2300, on July 20th, 2009.

22

23  REPORTER BY:

24       JOSEPH A. FAIRBANKS, JR., CCR, RPR

25       CERTIFIED COURT REPORTER #75005

U.S. Dist. Ct. E.D. La.
No. 05-4182(K)(2) -- BARGE
DX 218

2

| | |
|---|---|
| 1 | APPEARANCES: |
| 2 | REPRESENTING THE BARGE PSLC: |
| 3 | BRIAN A. GILBERT, P.L.C. |
| 4 | (BY:  BRIAN A. GILBERT, ESQUIRE) |
| 5 | 821 Baronne Street |
| 6 | New Orleans, Louisiana 70113 |
| 7 | 504-885-7700 |
| 8 | |
| 9 | REPRESENTING LAFARGE NORTH AMERICA: |
| 10 | CHAFFE, MCCALL, L.L.P. |
| 11 | (BY:  DEREK WALKER, ESQUIRE) |
| 12 | (BY:  ROBERT FISHER, ESQUIRE) |
| 13 | 2300 ENERGY CENTRE |
| 14 | 1100 Poydras Street. |
| 15 | New Orleans, Louisiana 70163-2300 |
| 16 | 504-585-7000 |
| 17 | - AND - |
| 18 | GOODWIN PROCTOR, L.L.P. |
| 19 | (BY:  MARK S. RAFFMAN, ESQUIRE) |
| 20 | (BY:  JOHN ALDOCK, ESQUIRE) |
| 21 | (BY:  KIRSTEN ROBBINS, ESQUIRE) |
| 22 | 901 New York Avenue, NW |
| 23 | Washington, D.C. 20001 |
| 24 | 202-346-4000 |
| 25 | - AND - |

4

ALSO PRESENT:
   CHARLES CUSHING
   LARRY DAGGETT
   PETER KEELEY
   JOHN SHELONKO

3

| | |
|---|---|
| 1 | SUTTERFIELD & WEBB |
| 2 | (BY:  DANIEL A. WEBB, ESQUIRE) |
| 3 | 650 Poydras Street, Suite 2715 |
| 4 | New Orleans, Louisiana 70130 |
| 5 | 504-598-2715 |
| 6 | |
| 7 | REPRESENTING AMERICAN CLUB: |
| 8 | MONTGOMERY, BARNETT, BROWN, READ, |
| 9 | HAMMOND & MINTZ, L.L.P. |
| 10 | (BY:  RONALD J. KITTO, ESQUIRE) |
| 11 | 3200 Energy Centre |
| 12 | 1100 Poydras Street |
| 13 | New Orleans, Louisiana 70163 |
| 14 | 504-585-3200 |
| 15 | |
| 16 | REPRESENTING ZITO: |
| 17 | MOULEDOUX, BLAND, LEGRAND & BRACKETT, |
| 18 | L.L.C. |
| 19 | (BY:  WILLIAM C. EMORY, ESQUIRE) |
| 20 | 650 Poydras Street, Suite 2150 |
| 21 | New Orleans, Louisiana 70130 |
| 22 | 504-595-3000 |
| 23 | |
| 24 | VIDEOGRAPHER: |
| 25 | LORRI HART FABRE (HART VIDEO) |

5

E X A M I N A T I O N   I N D E X

EXAMINATION BY:                        PAGE

MR. RAFFMAN ...............................7

E X H I B I T   I N D E X

EXHIBIT NO.                        PAGE
Exhibit 1    ...............................25
Exhibit 2    ...............................26
Exhibit 3    ...............................53
Exhibit 4    ...............................59
Exhibit 5    ...............................61
Exhibit 6    ...............................72
Exhibit 7    ...............................93
Exhibit 8    ...............................94
Exhibit 9    ...............................165
Exhibit 10   ...............................167
Exhibit 11   ...............................167
Exhibit 12   ...............................177

6

STIPULATION

IT IS STIPULATED AND AGREED by and among counsel for the parties hereto that the deposition of the aforementioned witness may be taken for all purposes permitted within the Louisiana Code of Civil Procedure, in accordance with law, pursuant to notice;

That the formalities of reading, signing, filing, sealing and certification are hereby specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are reserved until such time as this deposition, or any part thereof, is used or sought to be used in evidence.

* * *

JOSEPH A. FAIRBANKS, JR., CCR, RPR, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

7

HECTOR V. PAZOS, P.E. 566 Villa Grande Avenue South, St. Petersburg, Florida 33707, a witness named in the above stipulation, having been first duly sworn, was examined and testified on his oath as follows:

THE REPORTER:

Usual stipulations?

MR. RAFFMAN:

Yeah, it's governed by Case Management Order Number 4 as far as depositions go, and the other case management orders in the case.

EXAMINATION BY MR. RAFFMAN:

Q.   Mr. Pazos, my name is Mark Raffman.  I represent Lafarge North America.

Am I correct that you have given depositions in the past?

A.   Yes.

Q.   On many occasions, right?

A.   In numerous occasions, yes.

Q.   So you understand that the court reporter will take down the words you speak and that in order for the court reporter to do that you and I need to take turns speaking.  You understand that.

8

A.   Yes.

Q.   If I ask a question you don't understand, will you ask me to clarify it?

A.   Yes.

Q.   If you remember something that pertains to an answer you gave before and that you'd like to include to make your answer complete, will you include that?

A.   Yes.

Q.   Have you taken any medicines, alcohol or drugs or anything else that would interfere with your ability to testify truthfully and accurately here today?

A.   I don't believe so.  I taking some medicine but I don't believe that it will interfere.

(Brief interruption.)

EXAMINATION BY MR. RAFFMAN:

Q.   Mr. Pazos, is there any reason why as you sit here today you are unable to give us your best testimony and recollection?

A.   No.

Q.   What did you do to prepare for the deposition today?

A.   Just read my report, and met with

9

Mr. Brian Gilbert yesterday, and last night I very briefly glance through two new documents I never seen before.

Q.   What were the two new documents you looked at last night?

A.   One was the report of expert Mr. Marino, and the other was the deposition of Mr. Green, but I only review it very briefly and not even finish reading the complete document.

Q.   Is there anything else that you looked at for the fires time last night?

A.   For the first time, just some information that were on the table, like some photograph and things like that.

MR. GILBERT:

And I believe what he's referring to is the photographs that were produced in connection with I think Mr. Skaer 's deposition, I believe it was, the ropes hanging from the, um -- barge.

EXAMINATION BY MR. RAFFMAN:

Q.   Did the photographs you looked at have barges and ropes hanging from them.  Is that

3  (Pages 6 to 9)

10

1  what you looked at?
2      A.  I remember -- yes, I remember a
3  photograph with some broken ropes.
4      Q.  Apart from your report and the report
5  of Mr. Marino and the deposition of Mr. Green
6  and the photos, did you look at any other
7  documents to prepare for your deposition?
8      A.  Um -- nothing in detail or
9  specifically.  Of course, in any meetings there
10  are many papers on the table and I may have
11  seen some other pieces of paper, but nothing
12  that I can specifically talk about.
13      Q.  Did you use or review any memoranda
14  prepared by counsel to prepare -- to assist in
15  preparing for the deposition?
16      A.  No, I don't recall of any specific
17  written document.
18      Q.  How long did you spend with
19  Mr. Gilbert yesterday?
20      A.  We met around 2:00 p.m., and I think I
21  left about 4:00 p.m., so roughly two hours.
22      Q.  Do you remember the date of the
23  deposition that was given by Don Green which
24  you reviewed last night for the first time?
25      A.  No.

11

1      Q.  Was Mr. Green 's deposition given this
2  year, do you know?
3      A.  I believe so.
4      Q.  Did anything you read in Mr. Marino 's
5  report cause you to change any of the
6  conclusions that you've drawn as reported to us
7  in the report you prepared in this case?
8      A.  No, but I like to repeat I received
9  this yesterday and I just glance it briefly, I
10  didn't read every word in any detail, so I
11  don't believe that there is anything
12  objectionable that I spot in this brief review.
13      Q.  Is there anything that you read in
14  Mr. Marino 's report that leaped out at you as
15  being wrong or erroneous, or in any way that
16  you disagree with, that leaps out at you?
17      A.  Yes, I spot a photograph that have a
18  little arrow to a position of a barge in an
19  aerial photograph that was wrong, and I
20  commented to my principal, I say, yes, we
21  realize that was an error that been corrected.
22      Q.  The photo you identified as wrong in
23  Mr. Marino 's report was a photograph of the
24  position of the barges that were at the Lafarge
25  terminal after the storm?  Correct?

12

1      A.  Yes, but there is pointing only at one
barge.
2      Q.  And the error in Marino 's report was
3  that he thought that the 4727, the break away
4  barge, had been moored outside of the five
5  barge tier instead of the one barge?
6      MR. GILBERT:
7          Object to form.
8  EXAMINATION BY MR. RAFFMAN:
9      Q.  Well, that's what was reflected in the
10  photo that you looked at.
11      A.  Well, I don't specifically recollect
12  if it's indicating where barge was, but I know
13  that there was an arrow to a barge at a
14  location that was -- in my recollection was not
15  right.
16      Q.  All right.  While I look for that
17  photo, apart from that one photo there was
18  nothing else in the report by Mr. Marino that
19  leaped out at you as incorrect.
20      A.  Again, my review of Marino 's report
21  was brief, I didn't read every word, but I
22  couldn't find anything else that called my
23  attention except what I just testified, a
24  photograph that caught my attention because it

13

1  have an arrow to a barge.  And I told my
2  principal I believe there's something wrong.
3  He said, okay, yes, we know that.
4      Q.  We're going to show you a figure
5  that's marked Figure 2.15, and I'll represent
6  to you that this is from the report of Genaro
7  Marino.
8      Mr. Pazos, do you recognize the photo
9  that I've handed you as the photo that you have
10  identified?
11      A.  Correct.  This is the only thing I
12  found that I had an objection.
13      Q.  Did you read the conclusions that
14  Mr. Marino drew?
15      A.  I briefly read few things, but I did
16  not have the time to read in detail anything.
17  I just glanced through the many pages, looked
18  at the photograph, so I didn't have enough time
19  to review to make a comment.
20      Q.  Right.  And the best you could do was
21  to read the general thrust of Mr. Marino 's
22  report and conclusions.  You got the basic
23  drift of what he was saying; is that right?
24      Do you want me to repeat the question?
25      A.  Yes, please.

14

1    Q.  In your brief review of Mr. Marino 's
2  report, the best you could do was to get the
3  overall thrust of his conclusions; right?
4    A.  Let me answer again, I review
5  briefly -- there were many pages.  I look at
6  photograph, I cannot find -- I didn't find
7  anything obviously that I found wrong,
8  otherwise I will have mentioned to my
9  principal.  But I did not analyze or try to
10  interpret the information contained in his
11  report.
12    Q.  Mr. Pazos, I want to make sure I got
13  the answer to this question:  Apart from
14  Marino 's report, Green 's deposition, your own
15  report and a few photos, was there anything
16  else that you reviewed to prepare for the
17  deposition?
18    MR. GILBERT:
19      Object.  Mischaracterizes his
20      testimony.  I think he's consistently
21      saying he didn't review Marino 's
22      report.
23    MR. RAFFMAN:
24      No, I think he said he did.
25  EXAMINATION BY MR. RAFFMAN:

15

1    Q.  But go ahead.  I mean, apart from
2  those four documents, is there anything else
3  you reviewed?
4    A.  Well, in the conference table where we
5  met yesterday were many papers.  I may have
6  looked at some papers, but I didn't recollect
7  any specific document to mention a name of a
8  document.
9    Q.  None of those other documents
10  refreshed your recollection about your
11  testimony here today; am I right about that?
12    A.  I didn't find anything that I should
13  make a comment.
14    Q.  All right.  What is Ocean Oil
15  International, Inc.?
16    A.  Um -- well, I'm a naval architect,
17  marine engineer, a registered professional
18  mechanical engineer, and I been in business for
19  many years operating under the name of two name
20  of Ocean Oil, Ocean Oil International
21  Corporation and Ocean Oil Expert Witness, Inc.
22  We used to design ship, barges, drilling rigs,
23  crew boats, um -- and I used to have a staff of
24  some thirty-four people at one time, but in
25  recent years I been downsizing and I just been

16

1  doing activities related to my profession, and
2  mostly the investigation of accidents.
3    Q.  What's the difference between Ocean
4  Oil International, Inc. and Ocean Oil Expert
5  Witness, Inc.?
6    A.  Well, Ocean Oil International, Inc.,
7  we need -- anything that is purely engineering
8  in the sense of design, inspections, salvage, a
9  lot of marine salvage, so anything that is
10  purely engineering from the point of view of a
11  professional engineer.  But, um -- and for this
12  I had a number of other engineers in the staff,
13  and draftmans, and other people, surveyors --
14  but then when I decide to downsize and, um --
15  enjoy life more, I reduce it to the
16  investigation of accidents.  That why I decide
17  few years ago to add the name Ocean Oil Expert
18  Witness, Inc.
19    Q.  How many employees does Ocean Oil
20  International, Inc. have today?
21    A.  Only one assistant, and then I retain
22  other professional as required.
23    Q.  Are you the sole owner of Ocean Oil
24  International, Inc.?
25    A.  Yes.

17

1    Q.  Are you the sole owner of Ocean Oil
2  Expert Witness, Inc.?
3    A.  With my wife.
4    Q.  Why did you choose to name the two
5  companies Ocean Oil?
6    A.  Because everything I been doing in my
7  life, my entire professional life, is related
8  to the ocean or water and rivers.  And since I
9  been in United States for more than fifty years
10  it related the oil.  I have done a lot of oil.
11  I used to be vice president of Petro Marine
12  Engineering, designing oil rigs, oil platforms
13  and doing substantial amount of work in the
14  oilfield.
15    Q.  For the past two years, can you give
16  me a breakdown of how much income you derive
17  percentage wise from Ocean Oil International,
18  Inc. as opposed to Ocean Oil Expert Witness,
19  Inc.?
20    A.  Yeah.  I will say 70 percent Ocean Oil
21  Expert Witness and 30 percent Ocean Oil
22  International corporation.
23    Q.  What percentage of your work -- well,
24  let me ask this question, first:  How many
25  employees does Ocean Oil Expert Witness, Inc.

18

1  have?
2      A.   I only have a full-time assistant in
3  New Orleans, and my wife is a full-time
4  assistant in Florida, and then I retain other
5  people as required.
6      Q.   Have you retained any other people to
7  carry out any of the work you've done in this
8  case, the barge case?
9      A.   No.
10     Q.   What percentage of the income of Ocean
11 Oil Expert Witness, Inc. is derived from work
12 carried out for lawyers?
13     A.   Um -- mostly for lawyers, although I
14 do work for insurance companies.  But generally
15 lawyers are involved, although in a number of
16 occasions owners have contacted me, like even
17 yesterday.  And I try to tell them to hire a
18 lawyer first, which most of the time is what's
19 happening.  But I'm being contacted by
20 insurance companies, owners and lawyers.
21     Q.   And what percentage of the income of
22 Ocean Oil Expert Witness, Inc. is derived from
23 work for lawyers?
24     A.   Almost all, because, as I indicated,
25 every time that an insurance or an owner

19

1  contact me I ask them to retain a lawyer first.
2  I being a source of referral for lawyers.
3      Q.   Lawyers also refer you work; correct?
4      A.   Repeat, please.
5      Q.   Lawyers refer work to you?
6      A.   Yes.
7      Q.   Lawyers hire you?
8      A.   Yes.
9      Q.   You've handled in the neighborhood of
10 1200 litigation cases over the course of your
11 career; is that right?
12     A.   About, yes.
13     Q.   In each one of those twelve hundred
14 litigation cases you were working for a lawyer,
15 right?
16     A.   Oh, yes.
17     Q.   And you ask lawyers to hire you, you
18 contact lawyers to be hired for litigation
19 cases?
20     A.   Well, off and on my assistants do very
21 light marketing, because also we, um -- our
22 name in several websites, so I get substantial
23 inquiries from replies to the website.
24     Q.   Do you ever send lawyers an e-mail
25 telling them that you're coming to town and

20

1  asking them whether they have any cases they
2  want to discuss with you?
3      A.   Yes.  My assistant does it all the
4  time.
5      Q.   And is it fair to say that when you're
6  retained by a lawyer that you'd like to help
7  that lawyer do that lawyer's job?
8      A.   No, I don't agree with what you are
9  asking.  I try to be as impartial as I can, I
10 try not to even pay attention if the attorney
11 is for the defendant or for the plaintiff.  I
12 avoid as much as I can even remembering the
13 name of the lawyer and remembering the law
14 firm.  I try to concentrate in the absolutely
15 technical side of the case.
16     Q.   How many times have you told a lawyer
17 that the lawyer had a bad case, you couldn't
18 help?
19     A.   Many, many times.  More than what
20 anybody will expected.  And they change the
21 direction of the case or I refuse to accept the
22 retainer.  It's happening right now in a case.
23     Q.   And once you accept a representation,
24 at that point you're going to try to help the
25 lawyer do what the lawyer wants to do -- is

21

1  trying to do.
2      A.   Absolutely no.  I still trying to stay
3  as impartial as I can in order to preserve the
4  future -- avoid anybody in the future
5  criticizing me for not being impartial.
6      Q.   Mr. Pazos, what percentage of your
7  expert witness work involves personal injury
8  claims?
9      A.   I will say off the top of my head,
10 maybe 30 percent.
11     Q.   All right.  And in those cases, what
12 percentage of your work is for plaintiffs?
13     A.   I have no idea.  I repeat, I try not
14 to pay attention if I work for plaintiff or
15 defendants.  It makes no difference to me, and
16 I try to say what I have in my mind regarding
17 the technicalities of the case.
18     Q.   You can't tell me as we sit here today
19 whether your personal injury work is
20 predominantly for plaintiffs or for defendants;
21 am I right?
22     A.   No.  I can answer this.  Um -- in the
23 early times that I start working for law firms
24 were all defense work.  And it's slowly been
25 changing to plaintiff work.  In recent years

22

1    probably was more plaintiff work than defense
2    work.
3            I used to do a lot of work for
4    insurance companies and these have declined
5    substantially.  I worked mostly defense, and
6    for some reason in recent times I believe it
7    mostly is plaintiff work, but I try not to pay
8    attention for what side I been retained to
9    prepare a report.
10       Q.   What about the other 70 percent of the
11   expert witness work you do, what kind of cases
12   are those?
13       A.   Um -- I'm sorry.  You are more
14   specific?  I don't understand your question.
15       Q.   All right.  You said that 30 percent
16   of your work in the expert witness area was in
17   personal-injury cases; right?
18       A.   Off the top my head help.  I don't
19   have a statistic to tell you, but I been
20   carrying many cases, that is, boat sinking,
21   colliding, oil rig -- so I just guessing maybe
22   it's 30 percent.  But I never analyze it to
23   develop a percentage, and this changes all the
24   time.
25       Q.   All right.  When you talked about

23

1    insurance company retentions declining, does
2    that apply generally to your expert witness
3    work?
4        A.   Yes, because from my memory, I
5    remember back in the eighties and nineties I
6    used to do a lot of work for many insurance
7    companies from New York, California, even from
8    Hawaii, and all this work for insurance company
9    have been declining.  I don't know why.
10       Q.   They don't hire you as much anymore,
11   do they?
12       A.   I don't receive requests from
13   insurance companies as much as I used to.
14       Q.   Right.  And the insurance companies,
15   would you say, generally are representing
16   defendants in casualty cases?
17       A.   I do not -- try not to pay attention
18   to what they represent.  I ask for the
19   technical information of the case and I provide
20   my preliminary opinion what I think has
21   happened.  If a pipeline to Hawaii breaks, I
22   don't care who they're representing or what
23   they're trying to do, I try to tell my opinion
24   of why the pipeline broke.
25       Q.   Mr. Pazos, in your experience --

24

1        A.   Yes.
2        Q.   -- do insurance companies usually get
3    involved in casualty cases, casualty litigation
4    on the side of the defendant, in your
5    experience?
6        A.   Not necessarily.  I do not pay
7    attention to what side they work for.  I pay
8    attention to the technical information that I
9    receive.  And if they ask me why I think that
10   this happens, I tell them my technical opinion
11   why something happens.
12       Q.   In this case, Mr. Pazos, do you know
13   if you're working for a plaintiff or a
14   defendant?
15       A.   I have to think about it.  Um -- oh, I
16   believe that in this case, yes, the people that
17   are my principal, um -- I don't know for sure.
18   You know, I have to read the complaint to see
19   who is doing what.  You know, I just have to
20   think -- I never read the complaint in detail.
21   Um -- so I couldn't answer this right now.
22       Q.   Well, I'll move on, then.
23           Mr. Pazos, I'm handing you what's been
24   marked as Exhibit 1 to your deposition.
25           Do you recognize Exhibit 1 to your

25

1    deposition as a copy of the report you have
2    tendered in this case to Mr. Gilbert,
3    Mr. Wiedemann, Mr. Sanders and Mr. Khorrami and
4    Pollard on behalf of whatever clients they
5    represent?
6            (Exhibit 1 was marked for
7    identification and is attached hereto.)
8        A.   Yes, the first page I recognize it as
9    being my report, yeah.
10   EXAMINATION BY MR. RAFFMAN:
11       Q.   All right.  I'm going to ask you to
12   turn to the Attachment Number 2 to your report
13   which I've tabbed with an orange tab for you.
14       A.   Okay.
15       Q.   And I'm going to ask you whether this
16   is a copy of your curriculum vitae.
17       A.   Looking at the first page, it appears
18   to be, yes.  I would like to expand my answer
19   saying that, of course, my CV changes often and
20   I will have to read it to make sure if this is
21   the last copy.  It don't appear that it is the
22   last copy of my CV.  So I update it -- or my
23   assistant update it every time I testify.  Like
24   I just testify about a week ago, probably my
25   assistant update it.  So this appears to be not

26

1   the latest, but it's just, um -- my CV.
2      Q.   And is this the copy of the CV that
3   was attached to your report dated June 29th,
4   2009?
5      A.   Um -- I apologize that it could be an
6   error.  Like I said, my problem is my CV is
7   updated almost every month, so I will have
8   to -- if you want me to provide you the last
9   copy of my CV I can provide you a copy.
10     Q.   Can you tell me -- well, I'll go a
11  different way.  Do you have a current copy of
12  your CV here today with you?
13     A.   Yes.
14     Q.   May I have it, please?
15     A.   I notice this because this CV is eight
16  pages and my current CV I believe is ten pages.
17  My current CV is ten pages and I hand you a
18  copy of my current CV.  And this change almost
19  every few weeks.
20     Q.   All right.  I'm handing you what's
21  been marked as Exhibit 2 to your deposition.
22          Do you see that?
23          (Exhibit 2 was marked for
24  identification and is attached hereto.)
25     A.   Yes.

27

1   EXAMINATION BY MR. RAFFMAN:
2      Q.   Is Exhibit 2 to your deposition a copy
3   of your current curriculum vitae?
4      A.   Yes.
5      Q.   May I have that back, please?
6      A.   Yes.  (Tendering.)
7      Q.   What degrees do you have?
8      A.   I have master degrees in naval
9   architecture and marine engineering, a master
10  degree in mechanical engineering, and I'm a
11  registered professional mechanical engineer in
12  Louisiana.
13     Q.   Have you ever taken any courses in the
14  area of law?
15     A.   I attended a number of seminars in a
16  number of opportunities in which attorneys made
17  speeches, so -- I didn't take any law courses.
18     Q.   Does Exhibit 2 list all the degrees
19  that you have?
20     A.   Yes.  It should be.  Yes.
21     Q.   Does Exhibit 2 list all of your
22  publications?
23     A.   No, I constantly writing stuff.  I
24  wrote three courses for professional engineers
25  which are being publicized and being sold.  And

28

1   I always working on these courses.  So I have a
2   list of publications I been working on which I
3   haven't published yet.  I've not been published
4   by actual -- I have a list on Page 5 of
5   published articles and books being developed.
6   I develop books in naval architecture and other
7   fields.
8      Q.   So the résumé that you just looked at
9   includes an entry that says unpublished
10  articles and books being developed, doesn't it?
11     A.   Yes.
12     Q.   Right?
13     A.   Yes.
14     Q.   Is there anything that you've
15  published that's not listed in your CV?
16     A.   Not that I recall.  Well, I'm sorry.
17  There are articles in magazines.  Not all are
18  listed here because I been in the business a
19  long time, and there are a few more articles,
20  probably.
21     Q.   How many articles have you published
22  over the course of your long career?
23     A.   Well, I not a publisher.  If a
24  newspaper like the Times-Picayune called me and
25  say, Mr. Pazos, we hear that you been doing

29

1   whatever, salvage in a certain case, can you
2   given us any information, they send a reporter
3   and they interview and they publish an article.
4   This happened in the past several times.
5      Q.   Those articles are just something you
6   gave an interview, right?
7      A.   Interviews, and then in other cases
8   they ask me for an article and I prepare an
9   article and send to them and they publish it.
10     Q.   And so my question, which you didn't
11  answer, is how many articles have you published
12  over the course of your long career?
13         MR. GILBERT:
14             Object.  He has answered.  He
15         says he's not a publisher.
16         MR. RAFFMAN:
17             All right.  Let's not quarrel
18         about the word published.
19  EXAMINATION BY MR. RAFFMAN:
20     Q.   How many articles have you written for
21  publication over the course of your long
22  career?
23     A.   I never counted so I couldn't give you
24  a number.  In the hundreds.
25     Q.   In the hundreds.  And have any of

30

1  those hundreds of articles ever been published
2  in a peer reviewed scholarly journal?
3      A.   Repeat your question, please.
4          MR. RAFFMAN:
5              Read it back.
6          (Whereupon the previous question was
7  read back.)
8      A.   No, I don't know what you are
9  referring to.
10 EXAMINATION BY MR. RAFFMAN:
11     Q.   All right.  Let me go on.
12         Have you ever published an article in
13 any journal about mooring of barges?
14     A.   I don't believe so.
15     Q.   Have you ever published an article or
16 written an article about hurricane preparation
17 at a barge facility?
18     A.   No, I don't believe so.
19     Q.   Have you ever published an article or
20 written an article about failure of a hurricane
21 protection structure?
22     A.   I don't remember.  I been involved in
23 several hurricanes, personally, even with my
24 own boat, and I wrote some about it, so I don't
25 remember exactly.  You may have to elaborate on

31

1  your question.
2          MR. RAFFMAN:
3              Read my question back, please.
4      A.   No, failure of a hurricane protection
5  structure, I don't believe so.
6  EXAMINATION BY MR. RAFFMAN:
7      Q.   Have you ever written or published an
8  article about the cause of failure or collapse
9  of a fixed structure anchored in soil?
10     A.   I been involved in actual engineering
11 cases in which failure of a fixed structure
12 attached to the soil occur, but I don't
13 remember if I wrote anything about it.
14 Probably I did.
15     Q.   What kind of structure?
16     A.   Well, I been involved in several
17 offshore platforms, I think was a jack up that
18 was attached to the ocean floor and collapse
19 during a storm.
20     Q.   Any others?
21     A.   Well, I cannot answer off the top of
22 my head.  You have to be more specific.
23     Q.   Okay.  The ones that you remember are
24 all offshore; right?
25     A.   Well, not necessarily.  Um -- you

32

1  know, I was in a hurricane at one time, and
2  this was in a canal out of Fort Lauderdale with
3  my boat, and a local newspaper ask me to write
4  something for them.  So this was a hurricane.
5  I was inside, was not offshore, you know, so.
6      Q.   And did that Fort Lauderdale involve a
7  failure of a fixed structure?
8      A.   Um --
9      Q.   That transcript is going to read
10 poorly.
11         Did your experience in Fort Lauderdale
12 involve failure of a fixed structure in a
13 hurricane?
14     A.   I don't believe you can call it fixed
15 structure to trees and parking lots and things
16 like that, because it didn't affect me or my
17 boat.  There were collapse of all kind of
18 things in the proximity.
19     Q.   Hurricane winds knocked things over;
20 right?
21     A.   Yes.  Flying things knocking things
22 over.
23     Q.   Hurricane winds caused things to fly
24 in the air and knock down trees and things like
25 that.

33

1      A.   Yes.  Flying Items.
2      Q.   What kind of items were flying?
3      A.   Pieces of houses, roofs, ladders,
4  cars.
5      Q.   Any flying barges?
6      A.   No.
7      Q.   Do you remember the publication in
8  which this Fort Lauderdale article appeared?
9      A.   I never seen it published.  I know a
10 reporter contacted me because I survived with
11 my boat while other boats in the proximity were
12 destroyed.  And I explain what I did, and they
13 were going to put something, but then I left
14 the area and I never contacted them again so I
15 don't know what happens.
16     Q.   Which hurricane?
17     A.   I don't remember right now off the top
18 of my head the name of the hurricane.  I been
19 through two hurricanes, and this was one that
20 destroyed a large area in south Florida.
21     Q.   What year?
22     A.   Again, I don't remember the year, but
23 must be around 1992 or '93 or '94, because I
24 was sailing often in the Caribbean and Florida.
25 And I was in the Bahamas when the hurricane

34

1  arrived, and I sail to Florida, and the way I
2  prepare my boat and anchor and moor it to the
3  docks made me survive while other boats in the
4  area did not survive.
5      Q.   How did you moor your boat to the dock
6  in a way that helped your boat survive while
7  others didn't?
8      A.   Yes.  I waited -- I contacted the
9  Coast Guard, I waited until they closed the
10  navigation in the canal where I was docking, I
11  moved the boat to the middle of the canal, I
12  put all my anchors on one side, the starboard
13  side, and as many lines as I could, and then I
14  put all the lines I have left to the dock,
15  tripled, quadrupled, quintupled lines to the
16  dock.  So my boat was in the middle of the
17  canal, anchored on the starboard side and
18  connected with half a dozen lines to the dock
19  on the port side.  While other boats stayed
20  close to the dock or in different arrangements
21  they sunk, or they broke, it was a disaster.
22      Q.   Did the water level in that canal rise
23  during the hurricane?
24      A.   Yes.
25      Q.   How did you rig your boat to

35

1  accommodate the rise in water level?
2      A.   My boat was floating, and I put as
3  many anchors -- I had at the time four anchors,
4  and of course four lines.  I put out the lines
5  on the starboard side, and I put a lot of lines
6  to the shore on the port side, and the boat was
7  floating although at one time the boat was
8  60 degrees touching trees with my mast.
9      Q.   Was there a sufficient amount of line
10  attached to the anchor to allow the boat to
11  rise without the anchor line actually dragging
12  the boat down with the surge?
13      A.   The lines were probably from 150 to
14  300 feet, so therefore they have enough ability
15  to withstand the seven to ten foot rise in the
16  water with no problem.  The boat was in the
17  center of the canal, the boat was up and down,
18  and going up, with plenty lines on both sides,
19  and my boat survived when many of the boats
20  around me did not survive.
21      Q.   Would you agree that in a hurricane
22  situation it's a good idea to take steps to
23  accommodate the expected rise in the level of
24  the water?
25      A.   Well, there are many aspects that you

36

1  have to observe in the local conditions to
2  decide what to do.
3      Q.   And accommodating the level of the
4  rise in the water is one of those conditions
5  that you ought to take into account, right?
6      A.   Well, it's one of many things.  It all
7  depends on the local circumstances.  Like I
8  say, in the case that I been explaining to you,
9  the raising of the water, even if it was twice,
10  will not affect the mooring arrangement that I
11  choose to do.  Because the boat was floating
12  free and the lines have enough length to
13  accommodate for any raising of the water.
14      Q.   Did you stay on the boat during that
15  hurricane?
16      A.   Absolutely.  In two hurricanes.  Even
17  a second one.
18      Q.   And what was the other hurricane that
19  you stayed on the boat for?
20      A.   I drifted 140 miles on my boat with
21  all the anchors out, drifting in the Bahamas,
22  through a hurricane.  The storm was called the
23  storm of the century.  95 miles an hour wind in
24  the location where I was close to Georgetown.
25      Q.   Which hurricane was that?

37

1      A.   I don't remember the name.  They call
2  it the storm of the century.  It had a name,
3  but I don't pay attention.
4      Q.   All right.  Mr. Pazos, for purposes of
5  this case, in what areas are you holding
6  yourself out as an expert to the Court?
7      A.   I have, um -- more than fifty years
8  experience in both barges, ship, waterfront, so
9  we have to be specific and I will be able to
10  tell you, if you ask me, if I feel like I have
11  expertise in a certain area.  My report -- I
12  only discuss in my report the year that I feel
13  like I have expertise, and I avoided and I
14  didn't write anything in the area that I don't
15  feel that my knowledge is sufficient to, um --
16  offer any opinion.
17      Q.   How would you describe the areas of
18  expertise to the Court?
19      A.   I have expertise in maritime
20  activities for all my life, since I was ten
21  years old being in boats, and the only thing I
22  been studying and taking courses and writing
23  reports and writing editorials and articles and
24  courses, it's all maritime.  So anything that
25  affect vessels, water and related to vessels

38

1  and water is the area that I been working,
2  studying and doing all my life.
3     Q.   And you've told me that you're a naval
4  architect, right?
5     A.   Naval architect and marine engineer,
6  yes.
7     Q.   What's the difference between a naval
8  architect and a marine engineer?
9     A.   Well, the university that I attended
10  for six years after a previous six years of
11  technical school is controlled by the local
12  Coast Guard in my country of origin Argentina.
13  And they have a board of registration for naval
14  architects and marine engineers, so it's --
15  this is the way that they describe the degree
16  and the acceptance.
17     Q.   So naval architect and marine
18  engineers is a single field of expertise and a
19  single course of study in your home country.
20  Am I right?
21     A.   When you say single, it's a field of
22  expertise related to ship and maritime affairs.
23     Q.   All right.  You've got a degree as a
24  naval architect and marine engineer --
25     A.   And also I have a degree in mechanical

39

1  engineering.
2     Q.   All right.  So the mechanical
3  engineering degree is separate from the degree
4  for a naval architect and marine engineer?
5     A.   In the university I attended they
6  offer these two degrees, and you have to go the
7  different courses to obtain the two degrees,
8  and I allowed to register in two different
9  boards of registration, yes.
10     Q.   All right.  So the first is naval
11  architect and marine engineer, correct?
12     A.   Yes.
13     Q.   And the second is mechanical engineer,
14  right?
15     A.   Yes.
16     Q.   All right.  What does a naval
17  architect and marine engineer do?
18     A.   It's an individual that deal with
19  ships and all kind of maritime affairs.
20     Q.   And is it fair to say that the primary
21  activity of the naval architect and marine
22  engineer is to design and build ships?
23     A.   It's a lot more than that.  It's a lot
24  more than that.  This is an over extreme
25  simplification.

40

1     Q.   So you deny that the primary activity
2  of a naval architect and marine engineer is to
3  design and build ships.
4     A.   It is a lot more than that.  What
5  you're saying is an oversimplification.
6  Launching of a ship, for instance, requires to
7  build lounging ways.  Launching ways apparently
8  more civil engineering, but I been working in
9  the design of launching ways.  So it's a lot
10  more than that.
11     Q.   So you deny -- you deny that the
12  primary activities of a naval architect are the
13  design and repair and construction of ships and
14  vessels.  That's not your experience.
15     A.   I do not deny, but I object the word
16  primary.
17     Q.   Between 1959 and 1969, you worked in
18  shipyards; am I right?
19     A.   Repeat the years, please.
20     Q.   1959 to 1969.  Use your résumé if you
21  need to refresh your recollection.
22     A.   Among other things, yes.  I worked in
23  shipyards amongst other things.
24     Q.   Well, taking a look at Page 6 of your
25  résumé, which of your jobs between 1959 and

41

1  1969 did not involve a shipyard?
2     A.   Well, I listed there employment, but
3  at the same time I was doing consulting for
4  many other people.  So this is part.
5     Q.   The ones you list are all shipyards,
6  right?
7     A.   Listed from full-time employment.  But
8  also if you read 1960 to '69, part-time
9  consulting service of many shipyard and ship
10  owners.  I missing to include insurance
11  companies, which I was doing also consulting
12  for insurance companies.
13     Q.   Other than the private consulting
14  you've listed, every single full-time
15  engagement you had for those ten years was with
16  a shipyard; am I right?
17     A.   I repeat again, there was a part-time
18  consulting services.  We will have to be more
19  specific if you want to discuss what consulting
20  services.
21     Q.   Well, we're going to get along a lot
22  better if you'll listen to the question that I
23  ask --
24     A.   Okay.
25     Q.   -- and answer the question that I ask.

42

1    A.   Okay.
2    Q.   I asked you, apart from the part-time
3 consulting --
4    A.   Okay.
5    Q.   -- all those jobs are for shipyards.
6 What's the answer to that question?
7    A.   Repeat your question.
8        (Whereupon the previous question was
9 read back.)
10   A.   Well, 1966 to 1968 I was a staff naval
11 architect and hydrodynamicist for FMC
12 corporation, which is not a shipyard.
13   Q.   And what business was FMC corporation?
14   A.   FMC corporation at the time was a
15 defense contractor, and I designed for them
16 many pieces of marine equipment, and I
17 supervised the construction of some equipment.
18   Q.   Have you ever designed a barge?
19   A.   Yes.
20   Q.   Describe your experience designing
21 barges.
22   A.   Well, I used to have a number of
23 engineers, naval architects and draftmans and
24 designers in my staff.  We designed several
25 barges for several companies.  I remember one

43

1 Hollywood Marine.  So we design several barges,
2 I don't remember whether it was five, six,
3 seven, and design also other floating equipment
4 that could be described as a barge.
5    Q.   What's a hopper barge?
6    A.   A hopper barge is a barge mostly to
7 carry bulk material.
8    Q.   Did you ever design a hopper barge?
9    A.   I believe so.  I believe for Hollywood
10 Marine, the one I remember, although we did
11 work for other company owning barges.
12   Q.   Did the barges that you designed for
13 Hollywood Marine ply the inland waterways?
14   A.   We designed both inland barges and
15 offshore barges.  This was years ago.  It would
16 be hard for me to tell you from memory, because
17 at the time we have a larger staff and many
18 projects were going on at the same time.
19   Q.   How many years ago was your experience
20 designing this hopper barge or barges for
21 Hollywood Marine?
22   A.   It probably was in the 1980 to 1995,
23 in this period of time when we were very active
24 in the design of equipment.  And also, I was
25 involved when I was vice president of Petro

44

Marine Engineering, I believe we designed some
barges, also.
    Q.   I'm referring you back to your
curriculum vitae.  It says you teach forensic
engineering courses.  Do you see that?
    A.   Yes.
    Q.   For which organization do you teach
forensic engineering courses?
    A.   Um -- the organization is called, I
believe -- I'm going by memory -- PDH
Engineering is a publisher of courses sold on
the Internet.  So I believe they contacted me
years ago because they saw some article that
were published in magazines, and the asked me
if I want to write for them courses.  And I
wrote three courses and they've been selling
for the last five, six years.  PDH Engineering.
I not too sure of the name.  I don't memorize
names.  I believe this is the name.
    Q.   When you write these courses, do they
include case studies?
    A.   The course are always based on case
studies, although I added technical information
related to legal cases.
    Q.   Does your résumé at Pages 2 and 3

45

include descriptions of the case studies that
you include in your forensic engineering
courses?
    A.   Yes.
    Q.   Did any of those cases that you teach
from involve the mooring of barges?
    A.   Off the top of my head, I don't
believe so, but I do not remember.  I mean,
writing so many things, it's hard for me to
tell you if I will not have sentences or
portion of things in which the mooring is
described.
    Q.   Did any of the cases that you teach
from involve mooring of barges in advance of a
hurricane?
    A.   I don't believe so.
    Q.   Did any of the cases that you teach
from involve the failure of a hurricane
protection structure?
    A.   Off the top of my head, I don't
believe so.
    Q.   Did any of the cases that you teach
from involve the cause of failure of a fixed
structure anchored in soil?
    A.   I couldn't answer, and I going to,

**46**

1   um -- I going to state that even my previous
2   answer also I shouldn't have answered because I
3   don't remember.  We have to go specific item by
4   item, refresh any memory, I tell you if there
5   is something there that may answer your
6   question better.  Off the top of my head, this
7   is for a period of many years, and every one of
8   these courses are eight to twenty pages.  It's
9   hard for me to remember every word I say in so
10  many pages.
11      Q.   You've described the contents of each
12  of the three courses at Page 2 and 3 of your
13  résumé, correct?
14      A.   No.  This is just the title of each
15  individual, um -- case.
16      Q.   Right.  And each title of each
17  individual case is listed at Pages 2 and 3 of
18  your résumé, right?
19      A.   Yes.
20      Q.   So take as long as you need to read
21  the twenty-five or so lines, bullet points, and
22  then tell me whether any of those twenty-five
23  of so bullet points that are listed at Pages 2
24  and 3 of your résumé involved the failure of a
25  fixed structure anchored in the soil.

**47**

1       A.   Okay.  We're going to take the time, I
2   will have to go line -- item by item.  I
3   looking at contents of Course 1, the very first
4   item Marine Disaster Involved Mooring of
5   Barges.
6       Q.   All right.  Describe for me how that
7   involved mooring of barges in the contents of
8   that first entry?
9       A.   Okay.
10      Q.   Actually, you know what?  I'll strike
11  that.
12          Did that first contact, that first
13  case involve mooring of barges in advance of a
14  hurricane?
15      A.   I apologize.  I looking at the wrong
16  thing.  No.  I don't believe any of these
17  involves a hurricane.
18      Q.   All right.  My question, just to be
19  clear, was whether or not any of these bullet
20  points involved the failure of a fixed
21  structure anchored in soil.
22      A.   Okay.  We have to go through the
23  titles to see if I can answer your question.
24      Q.   That will be fine.  There's
25  twenty-five of them.  Take all the time you

**48**

need.
    A.   Well, I notice in the contents of
Course No. 2, Offshore Drilling Rig Accident,
and I couldn't tell you right now off the top
of my head if this specific title include any
structure that fail due to a hurricane, because
I been involved in several that failed due to
hurricanes.
        Likewise, the item Predictable
Offshore Accidents, I don't remember exactly
what I listed were the items I have on this
case.
    Q.   As we sit here today and you reflect
on those two titles, do you have any specific
information to provide about the failure of a
fixed structure anchored in soil that forms a
part of those two cases?
    A.   Um -- not off the top of my head.  I
don't remember.  Every one of these are, you
know, five to twenty pages long, and are an
accumulation of the information of many cases.
        (Brief recess.)
EXAMINATION BY MR. RAFFMAN:
    Q.   Mr. Pazos, when were you first
retained to give an opinion as to whether the

**49**

barge had anything to do with the floodwall
failures on the eastern side of the Inner
Harbor Navigation Canal by anybody?
    A.   Within few weeks of the Hurricane
Katrina I was retained by attorney Ashton
O'Dwyer --
        (Brief interruption.)
        (Whereupon the previous question was
read back.)
    A.   Yes.  This is the first person that
retained my services.
EXAMINATION BY MR. RAFFMAN:
    Q.   Mr. O'Dwyer retained your services
sometime in the fall of 2005, maybe September
or October?
    A.   Correct.  A few weeks after the
Hurricane Katrina.
    Q.   When did you first come to be employed
for this purpose by Mr. Gilbert?
    A.   I think was early 2008.
    Q.   So from September or October of 2005
until early of 2008, whatever work you did on
this matter was for Mr. O'Dwyer?
    A.   No, I stop doing work for Mr. O'Dwyer
around November 2006.

50

1    Q.   All right.  For Mr. O'Dwyer you were
2  working from a few weeks after the hurricane
3  through November of 2006; correct?
4    A.   Yes.
5    Q.   Between November of 2006 and early
6  2008, were you working on the Katrina barge
7  matter for anybody?
8    A.   Not for anybody.  I keep receiving
9  information from different sources, but I was
10  not working for anybody.
11    Q.   You began to work for Mr. Gilbert in
12  early 2008.
13    A.   Correct.
14    Q.   Did you also do work for Mr. O'Dwyer
15  regarding the cause of the London Avenue Canal
16  breaches?
17    A.   To answer your question is I worked
18  for Mr. O'Dwyer in anything he ask me to do.
19  And to me was everything related to Hurricane
20  Katrina he give me the idea that he want me to
21  do something.
22    Q.   Did Mr. O'Dwyer ask you to work on the
23  question of what caused the London Avenue Canal
24  breaches?
25    A.   He never asked a specific question.

51

1  All he directed was, do that, go over there and
2  inspect something, go over there and take some
3  photographs, were all instructions, but I don't
4  recall a specific statement as you are phrasing
5  your question.
6    Q.   Did you ever do any expert witness
7  reports of any kind regarding the cause of the
8  London Avenue Canal breaches?
9    A.   I don't believe so.  Probably I wrote
10  many pieces of documents to respond to a
11  specific request from Mr. O'Dwyer, but I don't
12  recall writing what is called a report.
13    Q.   Did you ever write a document entitled
14  Comments Regarding the IPET report dated
15  December 5th, 2005, entitled, quote, Summary of
16  Field Observations Relevant to Flood Protection
17  in New Orleans, Louisiana?
18      MR. GILBERT:
19          Let me just object because
20      that -- I believe that that is
21      something other than a final report.
22      And I don't know how it came to your
23      possession, I don't know what it is,
24      but I just want to preserve my
25      objections for the record.

52

1    A.   In the period of time that I worked
2  for Mr. O'Dwyer I wrote many things upon his
3  request.  I not going to memorize if I wrote
4  forty, fifty or a hundred, let's call it,
5  memorandums.  I don't recall writing anything
6  that can be defined as a report.  So just from
7  memory I could not answer what I wrote in a
8  period of several years ago.
9      MR. RAFFMAN:
10          Counsel, I only have one copy of
11      this.  I apologize.
12  EXAMINATION BY MR. RAFFMAN:
13    Q.   I'm going to show you what has been
14  marked as Exhibit 3 to your deposition.  My
15  question is, do you recognize that as words you
16  wrote?
17      MR. GILBERT:
18          Let me just note an objection to
19      the use or attachment of this
20      document.  This is not something that
21      has been tendered by the plaintiffs in
22      this track of the Katrina litigation,
23      and although I recognize that it does
24      appear to be something that perhaps
25      Mr. O'Dwyer, um -- filed into the

53

1  record, as far as we're concerned this
2  is not a final report and it would
3  come under the privilege that attaches
4  according to the CMOs that have been
5  issued in connection with the barge
6  track of the litigation plus the
7  general privilege provisions in CMO 4.
8          Subject to the objection, you can
9      go ahead with the line of questioning.
10      (Exhibit 3 was marked for
11  identification and is attached hereto.)
12  EXAMINATION BY MR. RAFFMAN:
13    Q.   My question is, do you recognize this
14  document I've handed you as words that you
15  wrote?
16    A.   I going to answer in steps.  Step 1,
17  the first page, I don't recognize 95 percent of
18  the first page so I would have to look at the
19  second page to see if I recognize something.
20          Okay, my answer is yes, there is a
21  possibility that I may have written the pages
22  starting at the bottom of Page 1, but of course
23  this was probably in 2005 or early 2006.  So I
24  cannot say for sure.  But it sounds that it's
25  possible I wrote these pages.

54

1  Q.  All right.  When was the first time
2  that you reached a conclusion that the barge
3  caused the south breach of the Inner Harbor
4  Navigation Canal?
5  A.  You asking me for a date.
6  Q.  As close as you can give it, or
7  approximate if you can't.
8  A.  It's impossible for me to answer.
9  After many month of reading many documents and
10  many, um -- field investigation, I arrive at
11  the conclusion that the barge caused the
12  breaches somewhere in 2006.
13  Q.  All right.  Now, my question was about
14  the south breach in particular, so let me make
15  sure I understand your answer.  Your answer is
16  that at some point in 2006 you arrived at the
17  conclusion that barge caused the south breach.
18  Am I right?
19  A.  Well, my answer is right, but I don't
20  separate it two breaches because the area that
21  the barge was moving against or close to the
22  levee or against the levee is part of the same
23  subject.  So the answer is yes I arrived to the
24  conclusion that the barge created the breach in
25  the south breach of the Inner Harbor.

55

1  Q.  It's a simple question.  In 2006, you
2  arrived at the conclusion that the barge caused
3  the south breach; correct?
4  A.  Correct.
5  Q.  And in 2006 you arrived at the
6  conclusion that the barge caused the north
7  breach of the Inner Harbor Navigation Canal,
8  correct?
9  A.  I believe so.  Yes.
10  Q.  All right.  When you arrived at that
11  conclusion in 2006 -- I'm asking you about
12  2006.  Go back there.
13  A.  Right.
14  Q.  What were the important data points
15  that caused you to derive that conclusion in
16  2006?
17  A.  In order to answer what are the
18  important, I have to say a hundred and fifty to
19  five hundred documents that I read, um -- you
20  know, I will have a list of some hundred and
21  forty documents that I never, um -- could
22  specifically identify one single document.  So.
23  Q.  Well, let me ask you this question:
24  As you sit here today, what are the most
25  important data points in your mind that draw

56

you to the conclusion that the barge caused the
north breach?
A.  Repeat your question.  Let me see if I
can answer.
Q.  If you had to name the three most
important data points that support your
conclusion that the barge caused the north
breach, what are those three most important
data points?  I want the top three.
A.  Okay.  Um -- we're talking about the
north breach?
Q.  Yes.
A.  And you want three items that
primarily support my conclusion that the barge
cause the breach, the north breach.
Q.  Yes.  The top three.
A.  Okay.  Item Number 1, the sheet piling
in the north breach is composed of two sizes,
one is 23 feet deep and the other is 35 feet
deep.  This location is clearly a
discontinuity, a structural discontinuity, and
this is the location where the failure is
noticeable to the south of this location while
there was no failure to the north of the
location.  And in order to create a failure,

57

because the water at the time was relatively
low, it has to be an external force pushing in
the concrete pilings.  This is Item Number 1.
Item number 2 is that, um -- the
gentleman operating the pumping station just
across from the location hear the noise,
observe the concrete pilings tilting, observe a
piece of the barge visible between tilted
piles, the water start flowing after these
observation were made, and the pump was forced
to be shut half an hour later, approximately.
The third item is that as the barge
was contacting various concrete pilings and
creating gaps, it started a seepage that
eventually resulted in the complete failure of
a last portion about 250 feet of the seawall
and levee.
Q.  All right.  Thank you.  Thank you.
Those three.  So if I could, just Item 1 is the
discontinuity between the 23-foot and the
35-foot sheet pile, right?
A.  Yes.
Q.  Item 2 is the testimony or the account
of the pump station operator; right?
A.  Yes.

58

1    Q.   And his name is Villavaso, so we're
2    clear?
3    A.   Yes.
4    Q.   And Item 3 is the barge hitting panels
5    creating gaps and starting seepage that results
6    in the failure of the wall for 250 feet, right?
7    A.   Correct.
8    Q.   All right.  Were those three factors
9    also the factors that caused you to reach the
10   conclusion that the barge caused the north
11   breach in 2006?
12   A.   Okay.  You are asking me for
13   additional factors besides these three.
14   Q.   No, I want to know whether your top
15   three factors are the same now as they were
16   when you first concluded that the barge caused
17   the breach in 2006.
18   A.   Well, let me repeat again that after
19   review of hundreds of documents, of many pages,
20   several thousand pages some, it will be
21   impossible for me, and this is several years
22   ago, to be so specific at a specific document.
23         Is that what you're asking know?
24   Q.   Well, what I went to know is did you
25   know about the 23-foot sheet pile and the

59

1    35-foot sheet pile in 2006?
2    A.   Yes.
3    Q.   Did you know about the pump station
4    operator's account in 2006?
5    A.   Yes.
6    Q.   Did you know about the seepage in
7    2006?
8    A.   Yes.
9    Q.   All right.  Let me go back a second.
10   I want to mark Number 4.  I'm going to show you
11   what's been marked Exhibit 4, and I'm going to
12   ask you, with specific reference to the words
13   that appear on Pages 2 through 4 -- no, 2
14   through 5, do you recognize those as words you
15   wrote?
16         (Exhibit 4 was marked for
17   identification and is attached hereto.)
18   A.   I made a cursory review again of the
19   words, it appears that it may be the sum of
20   these words I wrote, some may be the type of
21   word I will be writing but there's no way for
22   me to recollect if I wrote these several years
23   ago, and I don't know if this is a composition
24   of other reports, or -- I couldn't answer
25   exactly whether I wrote this or not.

60

EXAMINATION BY MR. RAFFMAN:
Q.   Well, you can see that it says -- on
the first page, it says report or affidavit of
Hector V. Pazos, P.E., right?  You see that on
the very first page, Flip the first page over,
Mr. Pazos.
A.   I'm sorry.
Q.   And you can see there's a caption
here, it says United States District Court,
Eastern District of Louisiana, In re: Katrina
Canal Breaches Litigation.  Do you see there?
A.   Yeah.  I see the word report or
affidavit of Hector Pazos, P.E.  But my answer
is I do not recall -- recall these pages as
being written all by me, and I don't recall if
this is a composition of several other reports.
I don't see my signature anywhere, so if it
were an affidavit there should have been my
signature, and I don't recall writing reports.
Q.   If I showed you a copy with your
signature --
A.   Yes.  It would be different.
Q.   And you said that in looking it over
briefly some of the words you saw looked like
words you might use.

61

A.   Well, of course, there are millions of
words used in this case, and there are many
people, we're talking about fifty or a hundred
people using similar words.  So yes, I
recognize that I would have written words
similar somewhere in the last several years.
Q.   That may be the best we can do for the
moment.
     Did you submit a report to Mr. Gilbert
and his co-counsel in June of 2008?
A.   I believe so. yes.
Q.   I'm handing you what's been marked as
Exhibit 5 to your deposition and I'll ask you
to flip through it briefly and tell me whether
that looks like the report you submitted in
June of 2008.
     (Exhibit 5 was marked for
identification and is attached hereto.)
A.   I are going to answer as running to
items.  First item, today is June 25th.  From
memory I believe that a report I issue in June,
2008, was June 27th.  So it may be some
corrections or upgrading or updating or
whatever, but I'm going by memory.
EXAMINATION BY MR. RAFFMAN:

62

1      Q.   Without flipping through every single
2   page of the document, this Exhibit 5 looks like
3   a report you issued in June of 2008 toward the
4   end of the month.
5      A.   The answer is yes, looks like, but
6   also don't have attachments which were part of
7   the report.
8      MR. GILBERT:
9           Let me just -- so I can be clear,
10      is this something that we provided?
11      A.   Counsel just said yes.
12      MR. RAFFMAN:
13           Yes.  I'll go on the record.
14   EXAMINATION BY MR. RAFFMAN:
15      Q.   The document that I've shown you as
16   Exhibit 5 is a document that was provided to us
17   by Mr. Gilbert for the first time in March of
18   2009.  And because it bears a different date I
19   wanted to make sure I understood what the date
20   of that work was.  And I gather what you've
21   told me is this looks like your report but
22   there seems to be some attachments that are
23   missing.
24      A.   Correct.  Yes.
25      Q.   All right.  If I can get the complete

63

1   document with attachment I'll substitute, but
2   at least for the moment what we're looking at
3   as Exhibit 5 is something that you prepared.
4   Right?
5      A.   Yes.  Superficially, without going
6   page to page and questioning the date, appears
7   to be a report that I issued in June, 2008.
8      Q.   All right.  Between June of 2008 and
9   June of 2009, can you tell me what additional
10   work you did.
11      A.   I believe I didn't do anything for a
12   period of some nine month after issuing this
13   report.  But in recent time, some few month
14   ago, I started receiving some documents and I
15   start responding to these documents with
16   comments or upgrading my report every time I
17   receive a document.
18      Q.   As we sit here today, do you remember
19   any conclusions in your report regarding the
20   cause of the two floodwall breaches in the
21   Inner Harbor Navigation Canal that changed from
22   2008 to 2009?
23      A.   Off the top of my head, no, I don't
24   remember any changes in my findings regarding
25   what caused the northern and southern breach.

64

1      Q.   And is it fair to say, Mr. Pazos, that
2   most of the changes in your report from 2008
3   until 2009 concerned your comments about the
4   conduct of the Lafarge employees and Lafarge
5   respecting the mooring and the break away of
6   the barge?
7      A.   Correct.  I was asked to elaborated on
8   this subject which was touched very lightly
9   previously.
10      Q.   How much money does Mr. O'Dwyer owe
11   you for the work that you did from 2005 to
12   2006?
13      MR. GILBERT:
14           Object.  If you can rephrase that
15      question pertaining only to the
16      Industrial Canal part -- scope of his
17      work, then I think it might be an
18      appropriate question.
19      MR. RAFFMAN:
20           Are you going to instruct him not
21      to answer?
22      MR. GILBERT:
23           No, I'm just going to put the
24      objection on the record.
25      MR. RAFFMAN:

65

1           Well, I'll ask the second
2      question second.
3      A.   Repeat your question.
4   EXAMINATION BY MR. RAFFMAN:
5      Q.   How much money does Mr. O'Dwyer owe
6   you for the work you did for him in 2005 and
7   2006?
8      A.   I don't remember the exact number, but
9   it's somewhere in the ninety thousand dollar
10   range.
11      Q.   Of that ninety thousand dollars, how
12   much of it represents work that you did in
13   connection with the cause of the failures in
14   the Inner Harbor Navigation Canal?
15      A.   I don't believe I'm able to give you a
16   percentage because all the charges to
17   Mr. O'Dwyer's were in response to a specific
18   request from O'Dwyer.  And this covers the
19   entire activities regarding Katrina, so will be
20   difficult for me to arrive to percentages.
21   Also, because the same day every time that he
22   asked me to come to the field in New Orleans we
23   went through every aspect of Katrina without
24   separating the Industrial Canal from other
25   locations.

66

1   Q.   Have you billed Mr. Gilbert for any of
2   the work you did for Mr. O'Dwyer as it pertains
3   to Inner Harbor Navigation Canal?
4   A.   None whatsoever.
5   Q.   What's the total amount that you've
6   billed Mr. Gilbert for the work that has been
7   done in connection with the barge case?
8   A.   I don't know off the top of my head.
9   The invoices we issue are very specific and
10  listing every activity done as I respond to a
11  specific request.
12  Q.   Am I right that as of June 23rd, 2008,
13  you had billed approximately $108,000 for the
14  work that you did for Mr. Gilbert between
15  December 1, 2007, and June of 2008?
16  A.   I don't remember the number.  I
17  remember Mr. Gilbert asking me to provide a
18  number at a certain time, and my CPA gave me a
19  number and I present it to Mr. Gilbert, so I
20  assume the number you mentioning is the number
21  provided by Mr. Gilbert.
22  Q.   And after 2008, from then until now,
23  last year, can you approximate for me the
24  amount of your total charges to Mr. Gilbert for
25  the work you've done in this matter?

67

1   A.   No, I cannot.  I will have to go
2   invoice by invoice.
3   Q.   Do you know whether it's more than a
4   hundred thousand dollars?
5   A.   Um -- from what date to what date?
6   Q.   2008 until today.  June, 2008, until
7   today.
8   A.   Oh, no.  I don't believe so.  I
9   believe, um -- work done after June 2008 to
10  date may have been in the range -- I'm going to
11  guess -- in the range of twenty to forty
12  thousand.
13  Q.   All right.  I'm going to ask you to
14  turn back to Exhibit 1, which is your report.
15  A.   Okay.
16  Q.   Do you recognize Exhibit 1 as the
17  report you submitted in this case?
18  A.   Yes.
19  Q.   You draft this report?
20  A.   Yes.
21  Q.   The report is written in your words?
22  A.   Repeat.
23  Q.   The report is written in your words.
24  A.   Yes.  I wrote the report.  I didn't
25  type it, but I wrote it.  My assistant typed

68

1   it.
2   Q.   The first part of the report is a
3   72-page letter from you to the lawyers Gilbert,
4   Wiedemann, Sanders, Khorrami and Pollard.  Do
5   you see that?
6   A.   Yes.
7   Q.   At Page 72, at the top of the page, it
8   reads, this report is preliminary and will be
9   modified and/or expanded as more information
10  becomes available.  Do you see that?
11  A.   Yes.
12  Q.   Do you plan the modify or expand your
13  report?
14  A.   Yes.
15  Q.   When?
16  A.   As soon as my principle ask me to do
17  it.
18  Q.   What do you intend to do to modify or
19  expand your report?
20  A.   Well, just since yesterday I receive
21  two new documents, and I'm going to ask my
22  principal if he wants me to inject any
23  information that I learning from these two new
24  documents into my report.  And if he say yes, I
25  will do it.

69

1   Q.   And if you see something in these two
2   documents that causes you to -- well, let me go
3   back a second.  Unless Mr. Gilbert asks you to
4   do something, you don't plan to do anything; am
5   I right?
6   A.   Um -- not quite right.  Because every
7   time I receive a piece of information I do
8   something, which is reading it, taking notes.
9   And most of the time I learn something, because
10  I know that if I receive a document it's for me
11  to take some action.  But I not going to take
12  any drastic action without consulting with my
13  principal if he want me to do it.
14  Q.   Are you aware that the final deadline
15  for the plaintiffs' expert reports in this
16  matter was July 1, 2009?
17  A.   I heard these words, yes.
18  Q.   Now, what is it -- leaving aside
19  comments on other experts' reports -- put that
20  to the side, all right?  Is there anything else
21  you think you need to do to modify or expand
22  your report?
23  A.   Um -- not off the top of my head right
24  now, because you mention the word expert
25  report.  But yesterday I received a copy of a

70

1  deposition.  So whatever document I receive, if
2  I feel that it should influence anything I say
3  before, I will ask my principal if he want me
4  to take care of the situation.
5       Q.   Before July 1, 2009, were you aware of
6  the identity of any of the other experts who
7  had been retained by the plaintiffs in this
8  case?
9       A.   The identity of what expert, can you
10  be more specific?  And, you know, I see many
11  names, but I not too clear in who is doing what
12  and working for whom.  I not in -- connecting
13  or in relation to any other expert.
14       Q.   Did you speak with Genaro Marino
15  before July 1, 2009?
16       A.   He called me a few times, yes.
17       Q.   What did you talk about with
18  Mr. Marino?
19       A.   Primarily, he called me -- every time
20  he called me to ask me for a photograph, if I
21  have certain and specific photograph.  These
22  were the primary reason for his phone calls.
23       Q.   Did you ever look at any draft of his
24  report before July 1?
25       A.   The first time I saw anything from

72

1       Q.   Do you have another signature page,
2  Page 72?
3       A.   Well, this are 72.
4       Q.   All right.  If you would hand me one
5  copy of Page 72, we'll attach that as Exhibit 6
6  to the deposition.
7            Exhibit 6 to the deposition is your
8  signature on the report that we have marked as
9  Exhibit 1; correct?
10            (Exhibit 6 was marked for
11  identification and is attached hereto.)
12       A.   Yes.
13  EXAMINATION BY MR. RAFFMAN:
14       Q.   All right, sir.  Are all of the bases
15  for your information contained in your written
16  report?
17       A.   What was you question, please?
18       Q.   Your written report contains your
19  opinions, your statement of your opinions in
20  this case; right?
21       A.   Yes.
22       Q.   And are the bases of your opinions
23  contained in your written report?
24       A.   Yes.
25       Q.   And your written report contains all

71

1  Marino was last night.
2       Q.   And in your calls with Mr. Marino, did
3  he share with you any of his opinions?
4       A.   No, not as far as I remember.  Of
5  course, we talk general conversation, but the
6  primary cause of all his phone calls were to
7  request photographs.
8       Q.   Did you share your opinions with
9  Mr. Marino?
10       A.   We have general conversation but I
11  don't remember anything that could be defined
12  as sharing opinions.
13       Q.   Did you sign your report?
14       A.   Yes.
15       Q.   Do you have a signed copy of your
16  report?
17       A.   Yes.
18       Q.   You're holding it up.  May I see it,
19  please?
20       A.   (Tendering.)
21       Q.   All right.  The copy I have is not
22  signed.  Is this a copy that we can use to
23  attach to the deposition?
24       A.   Yes.  Well, I'm sorry.  Maybe it my
25  mistake, maybe I remove.

73

1  of the bases for the opinions you reach in that
2  report, right?
3       A.   Contain the basis that in my opinion
4  are sufficient to support my opinion.  Now,
5  everything can be expanded to the moon,
6  infinitely, if you -- because there are many,
7  many, many documents involving this case.
8  But in my personal opinion, I believe that the
9  basis that I describe are sufficient to support
10  my opinions.
11       Q.   Did you leave anything important out
12  of your report, Mr. Pazos?
13       A.   Not as far as I remember.
14       Q.   Did your report include the data and
15  information that you considered in reaching the
16  opinions described in your report?
17       A.   From the documents I received, yes.
18  It may be some other documents that will be
19  beneficial to improve the comments, but I work
20  only based on the material I was able to
21  review.
22       Q.   And those materials are listed in your
23  report, right?
24       A.   Yes.
25       Q.   Is there anything that you asked for

74

1  and didn't get by the way of materials to
2  review?
3      A.  Um -- I don't remember specifically,
4  but the answer is yes.  Ever time I read
5  something and I observe that I should have this
6  or the other, I try to call my principal and
7  say, I would like to receive so-and-so.  And
8  eventually I receive it, normally.  So by
9  memory I couldn't tell you exactly what I ask
10  for over a long period of time different
11  things.
12      Q.  When you refer to your principal
13  you're referring to Mr. Gilbert; am I right?
14      A.  Mr. Gilbert and his co-counsels.
15      Q.  All right.  Which of the lawyers on
16  that team did you principally work with?
17      A.  Initially, primarily with
18  Mr. Wiedemann, then with Mr. Gilbert, and only
19  yesterday I met Mr. Sanders personally.
20      Q.  All right.  Can you tell me anything
21  that you asked for from Mr. Gilbert or his team
22  and did not eventually receive?
23      A.  Not off the top of my head.  The
24  majority of things I asked generally I receive
25  it.  If I ask for something that my principal

75

1  feel, well, this is not necessary, he would
2  tell me, well, don't worry about this because
3  you don't need it.  But I cannot recollect any
4  specific situation.
5      Q.  You looked at photos in reaching your
6  conclusions; am I correct?
7      A.  Yes.
8      Q.  And are the most important photos
9  included in the attachments to your report?
10      A.  Of course if I include it, it because
11  I believe it's beneficial to the Court to see
12  these photos that support my opinions, but I
13  could add another several hundred photos if you
14  want any photo that support my opinion.
15      Q.  Well, did you include the most
16  important ones, Mr. Pazos?  That's my question.
17      A.  The answer is yes.
18      Q.  Have you been to the Lower Ninth Ward
19  yourself to inspect any of the physical
20  evidence there?
21      A.  Many times.
22      Q.  On how many occasions?
23      A.  Probably more than a dozen times.
24  Probably more than twenty times.
25      Q.  When was the first time you went to

76

1  the Lower Ninth Ward to investigate the causes
2  of the floodwall failure?
3      A.  From the first day I arrive to New
4  Orleans as a request by Mr. O'Dwyer, and every
5  time there after.
6      Q.  Do you remember whether your first
7  inspection of the Lower Ninth Ward was before
8  Hurricane Rita?
9      A.  No, I don't remember.
10      Q.  Did you take written observations or
11  field notes while you were doing your
12  inspections?
13      A.  At different times, yes.
14      Q.  Did you take pictures?  Photographs?
15      A.  I believe so, yes.
16      Q.  Have the photographs that you took
17  been included in the documentation produced
18  along with your report to us?
19      A.  Not all, just very few.
20      Q.  We'll possibly have occasion to
21  revisit that.
22          Did you take photographs on your first
23  visit to the area?
24      A.  I normally carry cameras and I take
25  photographs, and I'm sure I took photograph.

77

1      Q.  Did you take photos of the barge on
2  that first visit?
3      A.  I almost sure that -- yes.
4      Q.  Did you take photos of the failed
5  floodwall on that first visit?
6      A.  I almost sure, yes.  If I was allowed,
7  because there were police restrictions at
8  different times, so not all the time I was
9  allowed to reach every location.
10      Q.  Before you arrived on the scene to
11  take photographs of the barge and the failed
12  floodwall, had you discussed with Mr. O'Dwyer
13  what was Mr. O'Dwyer 's hypothesis about the
14  cause of those failures?
15      A.  I don't believe so, no.  All I
16  discussed with O'Dwyer is Mr. O'Dwyer gave me
17  instructions go to so-and-so place and we talk
18  later.
19      Q.  Before you arrived on the scene to
20  take photographs, you had no understanding from
21  Mr. O'Dwyer that one of the things he was
22  interested in is proving that the barge caused
23  the failure of the floodwall.
24      A.  I read newspapers and I listen to the
25  radio and TV, and I was extremely informed of

78

1  the situation, so there was no need -- it was
2  another accident for me to investigate in my
3  own, but we didn't have any detailed discussion
4  of what he was to do.
5      Q.   Did Mr. O'Dwyer tell you that he was
6  preparing a lawsuit on behalf of residents in
7  the Lower Ninth Ward before you inspected --
8      A.   Probably he say something, but again I
9  don't pay attention to this.  I trying to
10  concentrate in the technical side of any
11  activity, and I don't try to get involved in
12  the legalities of the case.
13     Q.   Did Mr. O'Dwyer tell you that he was
14  preparing a lawsuit against the owners or
15  operators of the barge, before you came to
16  visit New Orleans for the first time?
17     A.   I don't remember these words.  And I,
18  again, even if he had mentioned something, I
19  try not to pay attention.
20     Q.   Did Mr. O'Dwyer tell you he was
21  preparing a lawsuit against anybody before you
22  came to visit the area on his behalf?
23     A.   He may have talked several thousand
24  words, or a hundred thousand, but again I don't
25  pay attention to the legal side at all.  I have

79

1  to leave this up to the attorneys.
2      Q.   You keep saying that.  My question
3  actually was a yes or no.  You know --
4      A.   Oh, okay.
5      Q.   -- it doesn't move me any more that
6  you keep adding to the question.  I guess I'm
7  not going to be able to stop you from doing it,
8  but I'd like a yes or no answer to the
9  question.
10         Did Mr. O'Dwyer tell you, in speaking
11  with you about the work you were going to do
12  for him, that he was preparing a lawsuit on
13  behalf of the residents of New Orleans?
14     A.   Okay.  Let me answer.  I don't know
15  because I don't pay attention to the legalities
16  of the case.
17     Q.   Did you inspect the failed floodwall
18  at the north breach when you came back to New
19  Orleans?
20     A.   To some degree because, again, there
21  were police restrictions.
22     Q.   Same answer for the south breach?
23     A.   At different times things were more
24  free in the south breach than the north breach.
25     Q.   When is the first time you inspected

80

1  the Lafarge North America terminal?
2      A.   I never inspected the Lafarge
3  terminal.
4      Q.   You've never seen the Lafarge dock?
5      A.   Not from the water side.  I tried to
6  get through the land side and I was stopped by
7  police or somebody else I don't remember.  So I
8  only try to visit it from land but not from the
9  water.  I was not allowed to enter.
10     Q.   Who stopped you from entering?
11     A.   I don't quite remember if it was
12  police or private individuals, but at the time
13  I was trying there were restrictions
14  everywhere.
15     Q.   So you've never visited the Lafarge
16  terminal, am I right?
17     A.   Correct.  I never did.
18     Q.   Never seen the Lafarge dock
19  personally?
20     A.   Correct.  Well, I probably have seen
21  it because I been in the Industrial Canal a
22  thousand times, but not specifically to look at
23  the Lafarge facility.
24     Q.   You've never paid a visit to that
25  facility or that dock in connection with your

81

1  work on this case.
2      A.   Correct, no.
3      Q.   You testified earlier about two
4  sections of floodwall that came apart at the
5  north breach, a 35-foot section and a 23-foot
6  section.  You remember that testimony?
7      A.   The sheet pile, yes.
8      Q.   The sheet pile.  Yes, the sheet pile.
9  And have you ever physically inspected the two
10  sections of sheet pile that came apart?
11     A.   I was close to the location but there
12  were restrictions, so even if I believe I took
13  pictures from the distance at the time they
14  would not allow to be within feet of these
15  sheet pile.
16     Q.   All right.  Now, after the sheet pile
17  was extracted from the ground and the wall
18  repaired, do you know what happened to the
19  sheet pile?
20     A.   No.
21     Q.   And you have never looked at the sheet
22  pile that was extracted from the ground on
23  either side of that rip that took place at the
24  north breach, correct?
25     A.   Not at this location.  I been

82

1  observing many sheet pile at other location,
2  but not at this location.
3      Q.   So to be clear, the actual sheet pile
4  that ripped at the north breach -- I'm
5  referring to that sheet pile -- am I correct
6  that you have never physically inspected that
7  sheet pile?
8      A.   Correct.
9      Q.   During your work with Mr. O'Dwyer, did
10  you visit the 17th Street Canal breaches?
11      A.   Many times.
12      Q.   Did you visit the London Avenue Canal
13  breach?
14      A.   Many times.
15      Q.   Did you visit other breaches?
16      A.   Yes.
17      Q.   Which other breaches?
18      A.   Um -- I was, um -- instructed to drive
19  with another person that we visited many, many
20  locations of breaches.  So I will have to use
21  my memory to describe many area where we drove
22  and visited.
23      Q.   Did you see any other places where
24  barges had washed up against or had actually
25  landed on top of floodwalls during your

83

1  sojourns in the New Orleans area after Katrina?
2      A.   No, not that I remember.  No.
3      Q.   All right.  I want to turn you to
4  Page 69 of your report.
5          Are you with me on Page 69?
6      A.   Yes.
7      Q.   All right.  Referring you to the first
8  three paragraphs of Opinion Number 2 -- you see
9  that?
10      A.   Okay.  Yes.
11      Q.   Do these three paragraphs represent
12  the process by which you have concluded that
13  the north breach occurred?
14      A.   Okay.  Let me read it and I'll let you
15  know.
16          Yes, I read the three first paragraph
17  and I -- it where I go, yes.
18      Q.   All right.  So if you'd take me
19  through the process, you start the process by
20  the barge impacting and pushing sections of the
21  east floodwall across from pumping station
22  Number 5, initially tumbling over some panels
23  of floodwall.  Is that right?
24      A.   Yes.
25      Q.   And then next, the barge contacts and

84

1  pushes eight or nine additional panels before
2  moving away from the floodwall.  Is that right?
3      A.   Yes.
4      Q.   And then next, the impacting and
5  pushing of the floodwall creates gaps or
6  openings, allowing water to penetrate below the
7  ground surface between the sheet pile curtain
8  and the outboard side earthen embankment.
9  Right?
10      A.   Yes.
11      Q.   And that water is penetrating between
12  the sheet pile curtain and the canal side
13  earthen embankment.  Right?
14      A.   Yes.
15      Q.   All right.  And then the next thing
16  that happens is that this gapping develops and
17  extends to the base of the sheet piles
18  resulting in seepage of water through the
19  homogeneous saturated soil.  Right?
20      A.   Yes.
21      Q.   And next, as a result of the
22  underseepage of water, you have sliding that
23  starts to develop in the soil behind the sheet
24  pile on the land side.  Correct?
25      A.   Yes.

85

1      Q.   And once you have the underseepage and
2  the sliding that happens for a period of time,
3  suddenly the connection between the 23-foot
4  sheet pile and the 35-foot sheet pile at the
5  northern end breaks.  Right?
6      A.   Yes.
7      Q.   And that culminates in the rapid
8  relocation and overturning of 280 feet of
9  floodwall.  Right?
10      A.   Yes.
11      Q.   And that's the sequence of events that
12  you've concluded happened at the north breach.
13      A.   Yes.
14      Q.   Now, for the south breach, I would ask
15  you to read the bottom three paragraphs and
16  then the carryover onto Page 70, and I would
17  ask whether those paragraphs represent your
18  opinion regarding the cause of the south
19  breach.  Bottom three paragraphs of 69 and the
20  top two lines of 70.
21      A.   Okay.  I glance through the paragraph
22  that you mention, yes.
23      Q.   And these passages in your report
24  represent your opinion regarding the cause of
25  the south breach in the Inner Harbor Navigation

86

1  Canal, right?
2      A.  Yes.  It's a summary of sequence of
3  events.
4      Q.   This is a summary of your opinion.
5      A.  Yes.
6      Q.  Okay.  And so just to make sure I
7  understand the sequence here, after the barge
8  is finished at the north breach, it moves away
9  from the floodwall and leaves several hundred
10 feet of floodwall undisturbed.  Right?
11     A.  Yes.
12     Q.  And then it returns to the floodwall
13 1750 feet north of the Claiborne Avenue bridge,
14 impacting, scraping and pushing panels and
15 creating gaps on the water side of the sheet
16 piles.  Is that right?
17     A.  Yes.
18     Q.  And the barge travels about 900 feet
19 and then impacts on slightly leaning concrete
20 panels breaking the upper portion and causing
21 the water stop of the sheet pile at the joint
22 immediately south of the area of impact to
23 fail.  Is that right?
24     A.  Yes.
25     Q.  In addition to causing a water stop to

87

1  fail at the joint, it also causes an interlock
2  to fail close to the area of impact; is that
3  right?
4      A.  Yes.
5      Q.  Now, during -- and you go on, that in
6  the 900 feet that the barge has been scraping
7  and impacting and pushing, the floodwall is
8  compressed and the result is seepage flow that
9  increases.  Is that right?
10     A.  Yes.
11     Q.  And that seepage flow is flow similar
12 to what you've encountered at the north breach,
13 right?
14     A.  Yes.
15     Q.  The seepage is flowing in the gap
16 between the sheet pile curtain and the soil on
17 the protected -- on the canal side of the
18 levee.  I'm sorry.
19     A.  Yes.  And continue inland.
20     Q.  So the seepage flows through that gap
21 between --
22     A.  Yes.
23     Q.  -- the sheet pile and the canal side
24 soil.  It flows underneath the sheet pile
25 curtain and through onto the backside of the

88

1  levee.  Right?
2      A.  Correct.  Yes.
3      Q.  And once that seepage is on the
4  backside of the levee, it weakens the
5  resistance of the levee to the flow in the
6  canal, am I right?
7      A.  Once the seepage is started, weakens
8  the entire base of the levee, not only at the
9  end, but entire.  Create what is called piping.
10     Q.  So you have a piping that happens in
11 the soil --
12     A.  Yes.
13     Q.  -- on the protected side of the levee.
14     A.  Yes.
15     Q.  And the mechanism of failure on this
16 side, then, as we continue, um -- as the
17 water -- as the water gets onto the land
18 side -- let me start again.
19         MR. RAFFMAN:
20             Mr. Gilbert, make an objection so
21 I can start again.
22         MR. GILBERT:
23             Objection.  I don't understand
24 anything you're saying.  Please start
25 again.

89

1          MR. RAFFMAN:
2              Thank you.  Let me start again.
3  EXAMINATION BY MR. RAFFMAN:
4      Q.  Once the water has seeped under the
5  sheet pile --
6      A.  Yes.
7      Q.  -- the soil in the back loses the
8  support of the overburden on top; is that
9  right?
10     A.  Partially, yes.  And the water
11 pressure is carrying particles of soil farther
12 inland.
13     Q.  All right.  So again, the water acting
14 underneath the sheet pile curtain is having a
15 bad effects on the levee in back, right?
16     A.  Absolutely, yes.
17     Q.  And so the water acting underneath the
18 wall creates what you call a sudden shear,
19 rotational slip and/or major sliding at the toe
20 or bottom of the sheet pile.  Right?
21     A.  Yes.
22     Q.  That's right there in your report.
23     A.  Yes.
24     Q.  What you said is that the upper
25 portions of the floodwall move several inches

90

1    inland.
2        A.   Yes.
3        Q.   And then there was a slide at the
4    bottom of the sheet pile, right?
5        A.   Yes.
6        Q.   The upper portion of the floodwall
7    moves several inches inland because of what?
8        A.   Compression of the protected side of
9    the levee.
10       Q.   All right.  Now, let's -- moving on,
11   the seepage flow is weakening the soil on the
12   backside of the levee as the barge moves to the
13   south.  Am I right?
14       A.   Irregardless of the barge.  Whatever
15   the barge is doing, the piping is carrying
16   particles of soil away from the floodwall.
17       Q.   All right.  And the piping is
18   basically pushing soil away from the floodwall
19   toward the protected side, right?
20       A.   Yes.
21       Q.   It's pushing the soil inward on the
22   protected side toward the neighborhood.
23       A.   It's mobilizing particles of soil,
24   grains of ground, away because the pressure is
25   pushing these grains of ground farther away

91

1    from the hydrostatic pressure of the Inner
2    Harbor.
3        Q.   Right.  And basically, what you're
4    saying is that the hydrostatic pressure of the
5    building flood in the canal is being conveyed
6    through to the protected side through this
7    piping and seepage.  Am I right?
8        A.   Correct.  Yes.
9        Q.   All right.  And this is the result of
10   the creation of a gap on the flood side of the
11   wall that allows the water to penetrate, in
12   your opinion.
13       A.   Correct.  Yes.
14       Q.   And you say in the bottom, the
15   floodwall is in tension like a rubber band.
16   Seepage flow is active for a longer period of
17   time in the northern part of the south breach
18   area than -- I gather than the southern part.
19       A.   Yes.
20       Q.   All right.  And at some point an
21   interlock in the sheet pile near where the
22   barge impacts the floodwall fails.
23       A.   Yes.
24       Q.   And then the northern part of the
25   levee, it's weakened by underseepage and

92

1    displaced by compression, displaces laterally
2    more than the south portion of the levee, and
3    this is all washed away inland, the northern
4    part translated 170 to 180 feet.  Right?
5        A.   Yes.
6        Q.   And so -- and we'll look at a picture
7    later -- what you're saying is that the
8    northern part of the south breach had been
9    weakened more by the seepage under the wall and
10   that's why it went inland more.  Am I right?
11       A.   Because had more time.  You know, the
12   time is influential to the amount of seepage
13   because it's happening all the time.  See, in
14   the northern breach and pushing of the
15   floodwall occur first in time, had more time to
16   remove soil particles through seepage.
17       Q.   Oh, okay.  So your explanation for why
18   we have a big bow at the northern part of the
19   south breach and a smaller bow at the southern
20   part is that there was more seepage and more
21   time for seepage at the northern part.
22       A.   Correct.  Time.
23       Q.   More time.  More time.  And because
24   there was more time, the soil at the northern
25   part got weaker and pushed further.

93

1        A.   Correct.
2             By the way, I should make a
3    clarification.  Most of these words are coming
4    from the E-99 U.S. Corps of Engineer test.  I
5    repeating what they found.
6             (Brief interruption.)
7    EXAMINATION BY MR. RAFFMAN:
8        Q.   Mr. Pazos, you referred just a moment
9    ago to the E-99 sheet pile test.
10       A.   Yes.
11       Q.   I want to make sure that I understand
12   which document you're referring to.  I'm going
13   to hand you what's been marked as Exhibit 7 to
14   your deposition.  I'm going to ask you whether
15   this document represents the E-99 test that
16   you're referring to.  (Tendering.)
17            (Exhibit 7 was marked for
18   identification and is attached hereto.)
19       A.   The answer is yes, with the exception
20   that this is a small portion.  The E-99 report
21   is huge.  So I reviewed several times on the
22   Internet, and this is a small extraction.
23   EXAMINATION BY MR. RAFFMAN:
24       Q.   All right.  So Exhibit 7 is a small
25   part of a much bigger report on the E-99 test.

94

1  Am I correct?
2     A.  Yes.  It's very extensive.
3     Q.  And am I right that Exhibit 7 actually
4  came out of your files, it bears your
5  handwriting on it?
6     A.  Yeah.  I see my handwriting, yes.
7     Q.  I'm going to show you what's been
8  marked as Exhibit 8, Mr. Pazos.
9        Is Exhibit 8 another part of the E-99
10 report that you reviewed?
11       (Exhibit 8 was marked for
12 identification and is attached hereto.)
13    A.  Yes, I recognize what you hand me, but
14 it's only a partial -- you know, I believe all
15 these reports were so extensive that I
16 recognize these, but it's only a partial
17 portion.
18 EXAMINATION BY MR. RAFFMAN:
19    Q.  All right.  Tell me, do you know what
20 is the Electronic Journal of Geotechnical
21 Engineering?
22    A.  Well, I been looking at many documents
23 from the Electronic Journal in the Internet.
24    Q.  All right.  And is this journal a
25 reputable journal?  Does it have a good

95

1  reputation?
2     A.  Oh, absolutely.  Yes.
3     Q.  And do you know whether they publish
4  papers that have been subjected to peer review?
5     A.  I'm pretty sure that they print -- you
6  know, they have many technical papers.  This
7  is -- it's an engineering journal.
8     Q.  All right.  Tell me -- and then we'll
9  break -- why the E-99 test document is
10 important to the opinions you've reached in
11 this case.
12    A.  Because the E-99 was a solid proof
13 that seepage occurred and explain how seepage
14 occurred through gaps.  And this was something
15 that was theoretically known before the test,
16 or the E-99, but was proven during the test,
17 but regretfully was not, um -- paid enough
18 attention by the U.S. Army Corps of Engineers
19 when they decided what system to install as a
20 flood protection.
21    Q.  And in the E-99 test, am I right that
22 the seepage occurred because of the creation of
23 a gap between the sheet pile curtain and the
24 soil on the canal side of the wall?
25    A.  Correct.

96

1     Q.  In the E-99 test, what was the cause
2  of the creation of the gap?
3     A.  In the E-99 test, the cause of
4  creation of wall [sic] was the increase in
5  hydrostatic pressure and the characteristics of
6  the local soil.  Of course, there are many
7  other factors, like the depth of the sheet
8  pile.
9        MR. RAFFMAN:
10          Let's go off the record.
11       (Lunch break.)
12 EXAMINATION BY MR. RAFFMAN:
13    Q.  Good afternoon, Mr. Pazos.
14    A.  Yes, sir.
15    Q.  I've set up behind you an easel with a
16 post-storm overhead photograph of the IHNC
17 area, and I ask you to turn around, take the
18 red marker that's in front of you there, turn
19 around and please place an L at the location of
20 the Lafarge North America terminal, if you can
21 recognize it.
22    A.  (Witness complies.)
23    Q.  Mark an L right there.
24    A.  Okay.  Here it's darker so I'm going
25 to mark it here.

97

1     Q.  All right.
2     A.  L.
3     Q.  Very good.  Now, I'm going to ask you
4  to mark, if you can find, the Florida Avenue
5  bridge with an F.
6     A.  (Witness complies.)
7     Q.  All right.  That kind of comes
8  through.  Maybe we'll put some white tape on it
9  later.  But I see where you've marked.  Now,
10 I'm going to ask you to mark the Claiborne
11 Avenue bridge.  Put a C there.
12    A.  (Witness complies.)
13    Q.  Here's what we're going to do, because
14 I'm told it's not coming through very well.
15 We're going to use tape flags.  All right?
16 We'll use white tape flags.  I'll ask you to
17 put a white tape flag on the Florida Avenue
18 bridge, and put an F -- all right.
19       (Off the record.)
20 EXAMINATION BY MR. RAFFMAN:
21    Q.  All right.  I'm told that you can't
22 see the white either, so we're going to try
23 orange.  Is that all right?  So we'll put an F
24 on the orange, remove the white -- we'll get
25 there.  And we're going to have you mark the

98

1   board permanently and put a sticky on.  So
2   there's the Florida Avenue bridge.  Now let's
3   do the Claiborne Avenue bridge.  Put an orange
4   sticky on there and also write on the -- put a
5   stickie there.  We'll put a C on the stickie.
6   There's only a couple more of these.
7       All right.  The next thing I'm going
8   to ask you to do is take your red marker and
9   write NB at the site of the north breach.
10      A.  I'm going to put a sticker?
11      Q.  Well, put the red marker on first so
12  that it's a permanent note and then we'll put a
13  sticker.
14      A.  (Witness complies.)
15      Q.  All right.  And now let's put a
16  sticker so that the video can see where you've
17  marked the site of the north breach.
18      A.  (Witness complies.)
19      Q.  Now, where that sticker is, if I'm not
20  mistaken, it's actually in the canal rather
21  than over by the floodwall.  Am I right?
22      A.  Yes.  You want to move it?
23      Q.  Why don't you put the sticker over at
24  the end of the floodwall, at the end of the
25  breach so we'll really --

99

1       A.  (Witness complies.)
2       Q.  Now, let's do the same with the south
3   breach.  Why don't you take the red marker and
4   just draw up where the south breach is, and
5   take the red marker and draw the south breach.
6       A.  (Witness complies.)
7       Q.  Thank you very much.  Now, just so we
8   have it on the permanent record, please take
9   the red marker and write SB on the board
10  itself.  So we don't lose the stickies.
11      A.  (Witness complies.)
12      Q.  Thank you.  Now, that we're oriented I
13  want to ask you to narrate for us the sequence
14  of events as you understand them.  Let me start
15  by asking you a few questions about the barge.
16      Am I right that the barge is 200 feet
17  long and 35 feet wide?
18      A.  I believe so, yes.
19      Q.  The barge has no power source;
20  correct?
21      A.  Correct.
22      Q.  The barge cannot move on its own.
23      A.  Except for windy conditions.
24      Q.  Except for in wind conditions, right?
25      A.  Wind conditions or currents.

100

1       Q.  Wind or current.  So the barge is --
2   if the barge is going to move, it's going to
3   require an external force like wind or current
4   to move it, right?
5       A.  Correct.  Yes.
6       Q.  The barge was unloaded before the
7   storm hit; am I right?
8       A.  I not too sure it was totally unloaded
9   or have water in the voids, but there is
10  specific inspection indicates that it was
11  drawing a little bit more than a recently built
12  new barge draw.
13      Q.  All right.  How -- I understand what
14  you said.  My question was, the barge had been
15  unloaded before the storm, right?
16      A.  Yes.  Generally.
17      Q.  And the qualification you drew is that
18  it was riding a little lower in the water than
19  you would have expected it to ride if it was
20  completely unloaded, is that right?
21      A.  Yes.
22      Q.  What was the draft of the barge as you
23  understand it to have been?
24      A.  From the documents I reviewed, they
25  indicated 1'5" light draft.

101

1       Q.  All right.  How high is the barge?
2   How tall is the barge?
3       A.  I believe it's 12-foot depth.
4       Q.  12-foot depth.  And does that include
5   the height of the coaming?
6       A.  No.
7       Q.  So if you add the coaming, how tall is
8   the barge?
9       A.  I believe that the coaming was -- we
10  have to look to tell you exactly what they
11  claim that the coaming was, but the coaming and
12  combined covers were indicated by IPET to be
13  11 feet above deck.
14      Q.  All right.  So the combined coaming
15  and covers together is 11 feet above the deck
16  of the barge, is that right?
17      A.  The IPET report indicates that the
18  combined coaming and hatch covers was about
19  11 feet.
20      Q.  And is that in addition to the twelve
21  feet of barge depth?
22      A.  Yeah.  And the 12 feet is above the
23  line so you have to add the little bit more, an
24  inch or so.
25      Q.  All right.  So that from the very

102

1  bottom of the barge to the very tippy-top of
2  the hatch covers is how much?
3      A.   Okay.  From the molded line of the
4  bottom to the molded line of the deck is
5  12 feet.  If you added the thickness, an inch
6  and a half, approximately.  In addition to
7  that, add 11-foot of the covers and hatch
8  coaming.
9      Q.   So if we add all of that together, the
10  entire structure, if you like, is about
11  23 feet?
12     A.   23 feet, approximately, yes.
13     Q.   Approximately 23 feet.  Now, am I
14  right that the unloaded condition of the barge
15  is germane to the plaintiffs' theory of what
16  happened in this case?
17     A.   Of course, yes.
18     Q.   Explain for me why the unloaded
19  condition of the barge is relevant to this
20  case.
21     A.   Because the exposed surface to the
22  wind action.
23     Q.   And why is the exposed surface to the
24  wind action germane?
25     A.   Because the forces generated by the

103

1  wind on the barge asserting the translation of
2  the barge as related to the exposed surface to
3  the wind.
4      Q.   How much of the barge was exposed to
5  the wind?
6      A.   The entire portion of the barge above
7  the waterline.
8      Q.   All right.  So that would have been
9  somewhere in excess of twenty feet?
10     A.   Yes.
11     Q.   And it's your position that the wind
12  was acting on the barge with a sail area of
13  twenty feet above the waterline?
14     A.   The initial exposed area of the barge
15  to the wind was the difference between the top
16  of the barge alongside to the highest point of
17  the barge that break away.  So if a loaded
18  barge had a freeboard of two feet and the light
19  barge that break away had an exposed area of
20  twenty-two feet, it should be about twenty feet
21  exposed, initially, to the wind.  And I say
22  initially -- before any line broke.
23     Q.   And after it broke away, how much of
24  the barge was riding above the waterline and
25  exposed to the wind?

104

1      A.   It least 22-foot.
2      Q.   And as between wind and current, in a
3  hurricane condition, with a 22-foot sail area,
4  do you have a position about what is the
5  dominant force acting on the barge?
6      A.   Let me elaborate on your question,
7  because you mentioned wind and current.
8  Current is very insignificant because the
9  current needs to flow in order to exist.  And
10  the locks were closed, so the flow -- the flow
11  was very limited or local, so the wind is the
12  predominant item.
13     Q.   Do you have an opinion about how the
14  barge broke away from its mooring?
15     A.   Yes.
16     Q.   How did the barge break away -- well,
17  let me ask you a question first.  Well, tell me
18  how the barge broke away or slipped or however
19  it got away from its mooring.
20     A.   Okay.  The barge had three mooring
21  lines, one at one end, another at the other
22  end, and one about midship but rigged in a
23  spring line fashion on another.  Therefore,
24  when the wind start applying force on the side
25  of the barge, the two line, the fore and aft

105

1  lines, took about half of the force produced by
2  the wind at each end.  Therefore, one line that
3  was never changed and the strength was
4  estimated to have dropped from 55,000-pound
5  breaking strength indicated by an expert to the
6  range of 20 to 38,000, it broke first.  Once
7  this line broke, the barge will swing away from
8  the dock, hanging primarily on the line at the
9  other end, because the spring line which is
10  also on a vertical angle, a substantial
11  vertical angle, probably more than 45 degrees,
12  will actually not produce almost any resisting
13  force.  So the barge was hanging from a line at
14  one corner of the barge, allowing the barge to
15  heave, roll, pitch, surge, producing shocks in
16  the only line holding the barge.  This is
17  common sense, it's clear that the line will
18  part even if it were extraordinary much
19  stronger than what it was.
20     Q.   All right.  When that first line
21  broke, as you put it, under wind pressure, what
22  caused the barge to swing away from the dock?
23     A.   The wind on the expose area.  The
24  frontal area, of course, is much smaller than
25  the lateral area, so the wind is going to push

**106**

1   on the lateral area to minimize the force in
2   line with the wind.
3       Q.   So when the barge broke away from --
4   when the first line broke --
5       A.   Yes.
6       Q.   -- the wind was driving the barge away
7   from the dock.  Is that right?
8       A.   Well, for sure the barge will drive
9   away from the dock, because the winds are not
10  constant.  So the winds are constantly varying,
11  minute by minute.  So if the line -- if the
12  barge is only restrained at one point, it's
13  going to move -- at the other extreme it's
14  going to move away from the dock.
15      Q.   If the wind is pushing in the
16  direction of the dock, Mr. Pazos --
17      A.   Yes.
18      Q.   -- will the barge be drawn away from
19  the dock by the wind?
20      A.   No.
21      Q.   In order for the barge to move away
22  from the dock upon the breaking of that line --
23      A.   Yes.
24      Q.   -- the wind must be pushing the barge
25  away from the dock, right?

**107**

1       A.   Not exactly, because a wind is not in
2   a constant direction and is modified by the
3   surrounding buildings.  The turbulence is
4   constant, and besides the wind changing
5   direction minute by minute.
6       Q.   When you say changing direction minute
7   by minute --
8       A.   Yes.
9       Q.   -- do you mean that in a hurricane
10  there's no prevailing wind at any given
11  location?
12      A.   Yes.  For few seconds, yes.  A
13  fraction of a second.  But since the eye of the
14  hurricane is traveling, and the hurricane in
15  the Gulf of Mexico have a counterclockwise
16  rotation, the winds are changing all the time,
17  minute by minute.
18      Q.   And when you say the winds are
19  changing all the time, minute by minute, if I
20  understand you right -- and correct me if I'm
21  wrong, all right?
22      A.   Yes.
23      Q.   -- as the counterclockwise rotation of
24  the storm travels along the storm path, the
25  counterclockwise rotation will affect a given

**108**

1   location differently as the storm progresses.
2   Did I understand you right?
3           MR. GILBERT:
4               I am going object to the line of
5           questioning.  It's not part of his
6           report, he's not being proffered for
7           this reason.
8       A.   Do you want me to answer?
9   EXAMINATION BY MR. RAFFMAN:
10      Q.   Yes, please.
11      A.   Yeah.  As the eye of the hurricane
12  moves and the winds are in counterclock
13  rotation, the wind records at any specific
14  geographic location will change all the time.
15      Q.   And the changing that you're talking
16  about is based on the movement of the storm
17  along its path.  Right?
18          MR. GILBERT:
19              Same objection.
20      A.   The movement -- the movement of the
21  center of the storm and the effect of the
22  surrounding buildings, because the local wind
23  direction changes all the time.
24  EXAMINATION BY MR. RAFFMAN:
25      Q.   All right.  So let's go back to the

**109**

1   narrative where we left off.  We have a wind
2   breaking a line on the barge.  Right?
3       A.   Yes.  I will not say the word wind
4   alone.  The line broke -- the wind is
5   associated also with waves.  Okay?  So waves
6   are making the barge shake, and therefore
7   besides the wind force applied to the rope
8   there are wave force applied to the rope.
9           May I say something?
10      Q.   Of course.
11      A.   In regards to hurricanes, I guess to
12  make a minor correction in my previous
13  deposition, I've been involved in several
14  hurricanes and typhoons.  Not only in United
15  States, but overseas.  And I mean, after we
16  went to lunch I refreshed my memory, there have
17  only been two that the accident was the result
18  of mooring lines.  One in Central America, a
19  boat that went into a port of refuge during a
20  hurricane and the lines at the stern parted and
21  the boat move away from the dock leaving the
22  boat hanging from one end and capsized along
23  the dock with the loss of I don't remember how
24  many people.  Another in Singapore in which the
25  lines on the port side broke so the line on the

110

1 starboard side in that, having the vessel at an
2 angle to the storm and capsized with 99 people
3 dying.  These are two I remember.  Of course, I
4 been involved in other cases.
5     Q.  And what force was it that broke the
6 lines on the boat in Central America?
7     A.  The boat was about 140-foot diving
8 boat, and went to a port of refuge, and they
9 tied the bow very good but didn't tie the stern
10 line too good.  So when the heavy winds
11 arrived, the line broke, the boat swung and
12 went for the dock, and the boat capsized just
13 right there, killing several people.
14     Q.  And it was the force of the wind that
15 caused that line to break or part?
16     A.  Wind combined with waves.
17     Q.  Wind and waves.  How big were the
18 waves in the Inner Harbor Navigation Canal on
19 the morning of August 29th when the barge broke
20 away?
21     A.  Depending on the location, because the
22 wind by friction develop waves.  The waves
23 translate, and when the wave hit any side of
24 the canal or other structure reflects, so that
25 incoming waves, deflecting waves, and

111

1 combination of incoming and reflecting, which
2 generate higher, steeper waves.
3     Q.  Is there a formula that you can use to
4 derive the height of a wave, the height of
5 waves based on weather conditions and water
6 conditions in a location?
7 MR. GILBERT:
8         Object.  He's not being proffered
9     as a wave expert.  It's not in his
10     report.  You're going far beyond the
11     scope of what his opinions are in this
12     case and what his proffered areas of
13     expertise are, but I'll let you take
14     your time.
15 MR. RAFFMAN:
16         Well, I would be -- I'll cut out
17     a whole line of questions if you tell
18     me he's not going to tell the Court
19     anything about waves.
20 MR. GILBERT:
21         No, I can't say that.  But he's
22     not offered as a meteorological
23     expert, he's offered as maritime
24     expert.
25 MR. RAFFMAN:

112

1         All right.  Let me ask the
2     witness.
3 EXAMINATION BY MR. RAFFMAN:
4     Q.  Are you being offered as a expert in
5 meteorology, Mr. Pazos?
6     A.  My answer is I have no knowledge how
7 I'm being offered.  I can tell you of my
8 experience and knowledge, but I cannot talk for
9 attorneys saying how I --
10 MR. GILBERT:
11         Mark, go ahead and ask the
12     questions subject to my objection.
13 MR. RAFFMAN:
14         Sure.
15 EXAMINATION BY MR. RAFFMAN:
16     Q.  Do you know of a formula whereby a
17 scientist can derive the height of waves from
18 conditions at a given location on a body of
19 water?
20     A.  There is no such a simple thing that's
21 like a formula.  I'm a hydrodynamicist.  I work
22 as a hydrodynamicist for another corporation.
23 Yes, you can develop height of wave based on
24 wind by not just a little formula, it's a
25 sophisticated analysis.

113

1     Q.  Does the fetch have anything to do
2 with how high waves are?
3     A.  Can you repeat?
4     Q.  Fetch.  Does the fetch have anything
5 to do --
6     A.  Oh, absolutely.  Yes.
7     Q.  And am I right that a longer fetch
8 means higher waves?
9     A.  In an open waters of the ocean, yes.
10 In a little part of the world influenced by
11 surrounding buildings, no.  Not exactly.
12     Q.  All right.  Let me go back, because I
13 think I got off track.  Mr. Walker thinks I got
14 off track, too.
15         The barge has broken away from its
16 moorings, according to the process you've
17 described.  What time did that happen?
18     A.  I don't know.
19     Q.  Do you know what direction the wind
20 was blowing at the time?
21     A.  Not exactly because if I don't know
22 time, and the direction depending on the time,
23 how can I tell you direction if I don't know
24 the time?
25 MR. GILBERT:

114

1     And I want to go back and just
2   answer counsel's question.  That
3   answer was no, that I cannot assure
4   you that such and such testimony will
5   not be --
6   MR. RAFFMAN:
7     I didn't think so.
8   MR. GILBERT:
9     Right.
10  EXAMINATION BY MR. RAFFMAN:
11    Q.   Do you have a range of times for when
12  the barge broke away?
13    A.   Um -- yes, I have the end of the
14  range, which is probably around 4:00, 4:30 in
15  the morning.  I don't have the initial range.
16    Q.   All right.  Your testimony is the
17  barge must have broken away from its moorings
18  no later than 4:00 or 4:30.
19    A.   Correct.
20    Q.   So -- at 4:00 or 4:30, can you testify
21  about what the weather conditions were in the
22  Inner Harbor Navigation Canal?
23    A.   I could because I read many, um --
24  technical papers and other information, but I
25  did not memorize it so I could not answer right

116

1     Q.   In the United States, or even the
2   Caribbean, are there any authoritative sources
3   of meteorological data?
4     A.   Oh, yes.
5     Q.   What are the authoritative sources of
6   meteorological data in the United States?
7     A.   Um -- okay, I couldn't tell you off
8   the top of my head, but there are many.  Of
9   course NOAA, National Oceanic and Atmospheric
10  Administration is one.  And I used to subscribe
11  to several when I used to sail alone, myself.
12    Q.   What about the National Hurricane
13  Center?
14    A.   Yes.  Well, that what I say, there
15  are -- probably there are twenty to thirty
16  institutions developing reports of
17  meteorological, or more.
18    Q.   The National Hurricane Center is one
19  of those?
20    A.   Yes.
21    Q.   Do you know what the H*Wind data are?
22    A.   No, not off the top of my head.
23    Q.   Are you familiar with Buys Ballot's
24  law.
25    A.   Off the top of my head, no, I don't

115

1   now.
2     Q.   I see.  In your 1200 cases that you've
3   testified in, have you ever testified about
4   what the weather conditions were at the time of
5   an accident?
6     A.   Let me correct what you're saying.  I
7   been more probably over 1200 cases, but I
8   didn't testify in 1200 cases.  Most of my cases
9   they settle before me testifying.
10    Q.   All right.  In the 1200 cases that
11  you've been involved in, have you ever used
12  meteorological data to help you form your
13  opinions about weather conditions?
14    A.   Yes.
15    Q.   And what meteorological data have you
16  used?
17    A.   Well, of course each case is
18  different, but I mentioned just two cases, one
19  in Singapore, a drilling rig capsized during a
20  hurricane, and I investigated, read, analyzed,
21  discussed a lot of meteorological information.
22  The other is a case of a diving pleasure boat
23  in the Caribbean capsized alongside the dock.
24  I read a lot of information about the hurricane
25  that took this vessel down.

117

1   recall what you're talking about.
2     Q.   I just want to make sure, you've
3   written that hurricane winds swirl
4   counterclockwise along the storm eye, right?
5     A.   Yes.
6     Q.   And you've written that the yes of
7   Hurricane Katrina passed east of New Orleans
8   about 8:30 in the morning on August 29th?
9     A.   If I wrote this, it's because I
10  obtained it from other institutions like IPET.
11    Q.   All right.  Take a look at Page 37 of
12  your report --
13    A.   Yes.
14    Q.   -- the seventh paragraph down from the
15  top of the page.
16    A.   Yes.
17    Q.   What did you write there?
18    A.   I'm going to read it.  As the eye of
19  the hurricane moved to the northeast, the
20  counterclockwise rotation of the winds resulted
21  in an elevation of the water of Lake Borne.
22  Water was pushed against the earth berm - spoil
23  banks (EBSB), along the northeast frontage of
24  the south protected basin.
25    Q.   All right.  You can stop reading

118

1   there, and I'm going to ask you to read the
2   bullet point immediately above that, the 6th
3   bullet point.
4      A.  Hurricane Katrina 's eye passed to the
5   east of New Orleans about 8:30 a.m. central
6   daytime on 29 August 2005.
7      Q.  As you sit here today, do you have any
8   information to indicate that Hurricane
9   Katrina's eye passed to the east of New Orleans
10  at any time other than around 8:30 in the
11  morning Central Daylight Time on the 29th of
12  August, 2005?
13     A.  Well, this is a general statement
14  obtained from one of the documents reviewed,
15  but it's not a specific about the lat-long or
16  the location they're referring to.  So if
17  you're going to be specific we have to talk
18  about coordinates.
19     Q.  What are the coordinates of the Inner
20  Harbor Navigation Canal Lafarge facility or any
21  other place?
22     A.  You want me to memorize geographic
23  coordinates?
24     Q.  Do you know?
25     A.  No, I don't memorize those.

119

1      Q.  All right.  In writing your report --
2      A.  Yes.
3      Q.  -- you accepted as true the statement
4   that Hurricane Katrina's eye passed east of New
5   Orleans about 8:30 a.m. Central Daylight Time;
6   right?
7      A.  Well, of course, I obtained it from
8   one of the documents.  And when I read a dozen
9   documents and it all appears to coincide, I
10  accept it as probably correct.
11     Q.  So it may be that this information
12  appeared in more than one document.
13     A.  Oh.  I'm sure of that, yes.
14     Q.  Well, I guess I'm ready to have you
15  turn back to the diagram, Mr. Pazos, and tell
16  me, after the barge broke away way from its
17  mooring, where did it go?  And if would,
18  please, be some kind to take a red marker there
19  and just draw the path of the barge as you
20  understand it.
21        MR. GILBERT:
22            And I'm in fact withdrawing my
23         last two objections, the ones
24         concerning the line of questioning
25         about the waves.

120

1        MR. RAFFMAN:
2            I that you might do that.
3        MR. GILBERT:
4            I'm doing that.
5      A.  Okay.  Of course, I don't have a
6   single-line trajectory.  I going to scribe all
7   over the place.  Can I do it?
8   EXAMINATION BY MR. RAFFMAN:
9      Q.  You can -- why don't we get the start
10  point and the end point, first, and then see
11  how it gets there.
12     A.  Okay.  The start point I understand
13  was alongside the barge that I show in the
14  photograph, so this is the start point.  The
15  initial terminal point is over here.
16        You're going to mark it?
17     Q.  Yes.  You can mark that.  Put an X
18  there.
19     A.  Put an X here?
20     Q.  That's the place of the first impact.
21     A.  Well, I'm doing the best I can with
22  this photograph, because I don't recognize
23  clearly.  It's not clear enough.  But I assume
24  that is a continuation of the levee, but I
25  don't see what I remember seeing, that there is

121

1   some -- it's not a straight line.
2      Q.  All right.  I tell you what.  Let me
3   see if we have another board that will do
4   better for you.
5        MR. GILBERT:
6            Yeah.  I'm going to have to
7         object.  This is -- that's on the
8         video, isn't it?
9        MR. RAFFMAN:
10            That's being videotaped, yeah.
11         And the reason I didn't put that up
12         originally was because I understand
13         it's got some extra batture and some
14         extra structures, and so --
15     A.  Okay.  You want to --
16  EXAMINATION BY MR. RAFFMAN:
17     Q.  Are you able, looking at that, to tell
18  me the path of the barge from the terminal to
19  the location of the north breach?
20     A.  Let me make this comment first:  This
21  looks to me that is a photograph taken after
22  fixing the seawall.
23     Q.  Is it your testimony that looks to you
24  like a photo that was taken after the wall was
25  fixed?

122

1  A.  Yes.
2  Q.  And after Katrina?
3  A.  I believe so.
4  Q.  Are you sure?  Look at the
5 neighborhood.
6       MR. GILBERT:
7          Counsel, why don't you go ahead
8       and identify for him what he's looking
9       at.  I mean, I don't think it's fair
10      to make him guess.
11      MR. RAFFMAN:
12         No, of course not, but this is an
13      expert who interprets photographs, so
14      I guess --
15  A.  Well, the reason why I'm saying so is
16 because the location of the seawall in this
17 area, I don't recognize it when I remember
18 seeing it.  And I do not recognize the seawall
19 clearly over here.  If we want to locate a
20 specific point we need a drawing of the area.
21  Q.  Well, let's do this:  Let's take that
22 one down.
23  A.  Okay.
24  Q.  We'll put the other one back up.
25  A.  Okay.

123

1  Q.  Let's take the barge across the canal
2 to somewhere near the north breach and then
3 we'll give you another photo.
4  A.  Well, okay.  I'm going to repeat what
5 I say before.  If you want me to mark the
6 trajectory of the barge --
7  Q.  I do.
8  A.  Okay, I will have to make lines all
9 over the place.  Because the wind and the
10 reflection, incoming -- and the waves, the
11 impacting waves, the reflecting waves and the
12 winds are a combination, and the barge rotating
13 and change headings will allow me to scribe all
14 over the place and to get to this point.  You
15 want to do that?
16  Q.  Yes.
17  A.  Okay.  (Witness complies.)
18  Q.  All right.
19  A.  So all I'm saying is, I don't believe
20 the barge was here.  The barge was in this area
21 for the time before contacting the seawall in
22 the northern breach.
23  Q.  Do you know how long the barge took to
24 get across the canal?
25  A.  The barge could develop a speed of in

124

the range of 2 to 3-1/2 feet per second or go
backwards in the opposite direction for a few
seconds.  So it's impossible to predict without
making a very detailed analysis of the waves,
the reflecting waves, the location of the wind,
the direction of the wind -- so it's pure
guessing.
  Q.  How much did this barge weigh?
  A.  Repeat.
  Q.  How much did this barge weigh?
  A.  How much did it weigh?
  Q.  Yeah.  What was the weight of the
barge?
  A.  Um -- light, in the range of 300 tons.
Short tons.  The way I expected, with either
extra remaining cargo and/or floating on some
boys, about 400 to 450 short tons.
  Q.  All right.  So we have a 300 or
450-ton vessel.  And if the wind is driving
that vessel enough to give it a head of steam
of what did you say, 3 feet per second?  Did
you say 3 feet per second?
  A.  It would be the terminal velocity,
depending on the hydrodynamic resistance is in
the range of 2 to 4 second.  3-1/2 second.

125

  Q.  2 to 3-1/2 feet per second.
  A.  Feet per second, yes.
  Q.  If you have a barge that's traveling
2 feet per second in a given direction --
  A.  For a very short period of time.
Because changes all the time.  The reflecting
waves make it change.  It may go backwards.
  Q.  What's the formula for momentum,
Mr. Pazos?
  A.  Formula?
  Q.  Yeah.  Is there a formula for
momentum?
  A.  Momentum is a large chapter in physics
and mechanics.
  Q.  I guess what I'm trying to figure out
is this:  You've got a 300-ton vessel --
  A.  Yes.
  Q.  -- that's traveling in a given
direction at 2 feet per second.
  A.  Yes.
  Q.  And you're telling me that this vessel
can change bearing very quickly.  Is that what
you're telling me?
  A.  Absolutely.  The 300 tons is
completely reacted by flotation, so it's zero

126

1   weight.  300 tons down, 300 tons up, zero.
2   It's floating.  300 tons don't have nothing to
3   do.
4       Q.   So if a wind is driving that barge
5   across the wall and it picks up its terminal
6   velocity, driven by the wind in a given
7   direction, is it your testimony that a counter
8   wind can stop that vessel and push it in a
9   different direction almost instantaneously?  Is
10  that what you're saying?
11      A.   I'm using the words wind and waves.
12  And waves are very substantial part of the
13  equation because waves in this environment due
14  to reflecting waves can develop very high
15  pitch.
16      Q.   So once the barge is out in the canal,
17  is it your testimony that the waves are the
18  dominant factor that are moving it?
19      A.   No, I didn't use the word dominant
20  factor.  I say winds and waves.
21      Q.   Was there a predominant direction of
22  the waves in the Inner Harbor Navigation Canal
23  in the early morning hours of 4:00, 4:30 in the
24  morning?
25      A.   The incoming waves to a point and the

127

1   reflecting waves at this point changes all the
2   time because the wind is changing all the time,
3   and the surrounding structures, buildings,
4   bridges, and so on, creates turbulence that's
5   changing the waves because the wind changes.
6       Q.   How far is it from the Lafarge
7   terminal to the point of the north breach?
8       A.   I don't remember.  We can find it in
9   the records.
10      Q.   Do you know what the width of the
11  canal is?
12      A.   Not off the top of my head.
13      Q.   I'm just looking at the scale of the
14  map.  If you accept the scale of that map is
15  correct, do you want to estimate how far it is
16  from the Lafarge terminal to the north breach?
17      A.   Well, if I measure here 300 feet and I
18  start 300 feet, 600 feet, 900 feet, 1200 feet.
19           MR. GILBERT:
20               I'm going to object to this
21           exercise.
22           MR. RAFFMAN:
23               I understand.  Let him finish.
24      A.   In the range of 1500 feet.
25  EXAMINATION BY MR. RAFFMAN:

128

1       Q.   All right.  So that's no less than a
2   quarter of a mile?
3       A.   Correct.
4            MR. GILBERT:
5                Assuming that the Marks-a-Lot
6            exercise is what proves accurate,
7            which most assuredly it isn't.
8            MR. RAFFMAN:
9                Mr. Gilbert, if you don't like
10           his answer I guess you can object the
11           his answer, but my question is a good
12           question.
13  EXAMINATION BY MR. RAFFMAN:
14      Q.   And you've testified what the
15  direction of the waves is changing all the
16  time.  Is that your testimony?
17      A.   Well, if we want to talk about the
18  amount of change, it could be from 1 degree to
19  90 degrees.  So yes, it's changing all the
20  time, but we have to be specific about what
21  amount you're talking about.
22      Q.   Let me ask you this question:  Why did
23  the barge go from the Lafarge terminal to the
24  location of the north breach?  Why?
25      A.   Because the winds and wave propelled

129

1   the barge in that direction.
2       Q.   All right.  Now, when you say the wind
3   propelled the barge in that direction, I'll
4   leave the waves aside for a minute.
5       A.   Okay.
6       Q.   All right?  What if any meteorologic
7   data are you relying on for your conclusion
8   that the wind propelled the barge in that
9   direction?
10      A.   50 years of being a mariner and
11  sailing all my life and studying everything
12  related to wind, waves and marine stuff.
13      Q.   All right.  Apart from your fifty
14  years -- you didn't answer my question,
15  actually.  What data are you relying on --
16  leaving the fifty years of experience and all
17  that stuff out, do you have any meteorologic
18  data from any source?
19      A.   I review some meteorologic data, but I
20  didn't either memorize the source or cover it
21  recent to analyze it.
22      Q.   Have you ever seen meteorologic data
23  from the Lakefront Airport taken on the morning
24  of August 29th?
25      A.   Off the top of my head I don't

130

1  remember.  But probably I have seen it.
2      Q.   And did that data as you remember it
3  report any wind in the direction from -- in a
4  direction from the south to the north?
5      A.   I don't remember, but I'm pretty sure,
6  because the turbulence is different in the
7  airport than the turbulence close to a bridge.
8      Q.   What studying have you done of the
9  turbulence at this specific location; have you
10  done any?
11      A.   Not much except by reading documents.
12      Q.   You haven't tested the turbulence at
13  this location, have you?
14      A.   No.
15      Q.   You have no data to measure turbulence
16  at this location, do you?
17      A.   I don't have in front of me data, but
18  I'm sure I saw it and exists.
19      Q.   You haven't cited a single piece of
20  data about turbulence at this location in your
21  report, have you?
22      A.   Because I'm not interested.
23      Q.   Well, okay.  If you had any data
24  showing that the wind in Hurricane Katrina blew
25  from the south to the north at this Inner

131

1  Harbor Navigation Canal report, surely you
2  would have included the data in your report;
3  right?
4      A.   I disagree with you.  Why you say
5  surely?  I do what I feel is right for me to
6  express my opinions.  I don't depend on a
7  lawyer telling me what I should do.
8      Q.   Right.  And you don't depend on any
9  data to support the meteorologic conclusions
10  you've drawn.
11          MR. GILBERT:
12              Object.
13      A.   Because the physical record show that
14  a barge broke away from one place and end up in
15  another place, so this is physical, pure, clear
16  data.  Don't need any meteorologic data.
17  EXAMINATION BY MR. RAFFMAN:
18      Q.   No, you have no meteorologic
19  explanation based on data to explain how the
20  barge got from one place to the other.  You
21  just assume it's there because you have what
22  you call physical evidence that it was.  Right?
23      A.   I not assuming.  It's real life.
24  Reality.  It's not paperwork.
25      Q.   The National Hurricane Center has no

132

1  data showing that there was a south-to-north
2  wind blowing in the Inner Harbor Navigation
3  Canal --
4          MR. GILBERT:
5              Object.
6  EXAMINATION BY MR. RAFFMAN:
7      Q.   -- at any time on the morning of
8  August 29 th, right?
9      A.   This is your statement, not my
10  statement.
11      Q.   I'm asking you the question do you
12  know?
13      A.   I don't remember.
14      Q.   Did you ever look at the National
15  Hurricane Center 's weather data for the New
16  Orleans area ever, for August 29th, 2005?
17      A.   Most probably, yes, I reading document
18  and because I have no reason.
19      Q.   And in any of the documents you read,
20  did any of those documents show meteorologic
21  data from the National Hurricane Center or any
22  other meteorologic station showing a
23  south-to-north wind in the New Orleans area?
24      A.   I do not remember because I didn't
25  concentrate in this activity.

133

1      Q.   Because explaining how the wind could
2  have brought the barge to the north breach was
3  not an area that you cared very much about
4  since you already knew it was there.
5      A.   Correct.  There's physical evidence
6  show the barge there.  So why I will have to
7  explain my time for things that are physically
8  clear to everybody, like a child of five years
9  old.
10      Q.   Because even a child of five years old
11  would understand that the barge was present at
12  the north breach; that's your testimony.
13      A.   Yes.  Correct.
14      Q.   And did IPET understand that the barge
15  was present at the north breach?
16      A.   I'm sorry.
17      Q.   Did IPET conclude that the barge was
18  present at the north breach?
19      A.   Well, I don't remember the word, but
20  I'm sure that it is what they say.
21      Q.   Did ILIT conclude that barge was
22  present at the north breach?
23      A.   I don't memorize, but I'm sure they
24  all agree that the barge was there.
25      Q.   Did any of the scientists who

134

1   testified in the MRGO and Robinson litigation
2   conclude that barge was present at the north
3   breach?
4       A.   I don't recognize what you're talking
5   about.  What litigation?
6       Q.   Can you tell me the name of a single
7   expert in this case other than experts retained
8   by Mr. Gilbert and his group of plaintiffs who
9   concluded that the barge was present at the
10  north breach?
11      A.   I don't remember reading anything
12  except what is listed in my report.  So I don't
13  know what you're referring to.
14      Q.   You can't name a single person other
15  than -- a single expert other than the
16  plaintiffs' experts retained by Mr. Gilbert and
17  his group who have concluded after studying the
18  causes of the Inner Harbor Navigation Canal
19  failures that the barge was present at the
20  north breach; you can't name one, can you?
21          MR. GILBERT:
22              Object.  Asked and answered.  And
23          he did answer.  He just referred you
24          to his report which I believe mentions
25          Mr. Wooten.

135

1           MR. RAFFMAN:
2               Wooten didn't conclude that.
3           MR. GILBERT:
4               I guess it's in the eye of the
5           beholder.
6           MR. RAFFMAN:
7               He sure didn't.
8       A.   My understanding is I didn't memorize
9   any name because I got no reason to memorize.
10  EXAMINATION BY MR. RAFFMAN:
11      Q.   Well, I'm going to ask you to assume
12  with me --
13      A.   Yes.
14      Q.   -- that there is no expert, other than
15  the ones retained by the plaintiffs in this
16  case, who have studied the cause of the IHNC
17  failure and have concluded that the barge was
18  present at the north breach.  Will you make
19  that assumption with me?
20      A.   Okay.  It's your assumption.
21      Q.   It's my assumption, and I'm going to
22  ask you to share that assumption with me, and
23  I'm going to ask, is it your testimony that
24  none of those other experts has the
25  intelligence of a five-year-old, because any

136

1   five-year-old could conclude, as you do, that
2   the barge was present at the north breach?
3           MR. GILBERT:
4               I'm going to object to the
5           badgering nature of the question right
6           now.
7           MR. RAFFMAN:
8               If he will answer it I'll move
9           on.
10          MR. GILBERT:
11              Well, you can ask it.  You don't
12          have to badger.
13      A.   Yeah.  If you can ask to repeat your
14  question, I don't know what you ask me.  I
15  don't understand.  In order to answer I have to
16  understand what you ask.
17  EXAMINATION BY MR. RAFFMAN:
18      Q.   Well, I think it's clear enough, but I
19  guess I'll move on.
20          What's the physical evidence that
21  makes clear to a five-year-old that the barge
22  was present at the north breach?
23      A.   Um -- the barge was there.  The barge
24  end up in the east bank, so everybody, even a
25  five-year-old would realize that the barge was

137

1   there.
2       Q.   At the north breach.
3           MR. GILBERT:
4               Okay, look.  Let's get off the
5           five-year-old stuff.  Okay?  If you
6           want to talk about the physical
7           evidence at the north breach, let's
8           ask questions that actually provoke
9           discussion about that.
10          MR. RAFFMAN:
11              He used the words.  I didn't
12          bring it up.
13          MR. GILBERT:
14              I understand he used them, but
15          that doesn't mean that it's got to be
16          repeated through every question.  I
17          mean, we're bogging down over the
18          five-year-old comment.
19          MR. RAFFMAN:
20              It's your expert, Mr. Gilbert.
21          MR. GILBERT:
22              That's absolutely true.
23          MR. RAFFMAN:
24              You may wish the case were
25          otherwise, but I want to get an answer

138

1    to my question.
2    EXAMINATION BY MR. RAFFMAN:
3    Q.  What's the physical evidence?
4        MR. GILBERT:
5            Objection to counsel's
6            commentary.
7    A.  Okay.  You want me to the answer?
8        MR. GILBERT:
9            Yeah.  Answer his questions.
10           Give him an answer to his question.
11           He's asking what you physical evidence
12           is there placing the barge at the
13           north breach?
14   EXAMINATION BY MR. RAFFMAN:
15   Q.  Well, what's the physical evidence
16   that you're talking about that makes it clear
17   to anybody who looks at it?
18   A.  Okay.  Should I answer?
19   Q.  Yeah.
20       MR. GILBERT:
21           Yes.
22   A.  The pumping station was forced to shut
23   down their electrical system at 5:30 a.m.
24   because the station was getting flood.  If the
25   station was getting flood and the level of the

139

1    water in the canal was low, the only answer is
2    that something, like a barge, knocked down
3    openings in the seawall to flood the area.
4    EXAMINATION BY MR. RAFFMAN:
5    Q.  Anything else you want to add?
6    A.  Um -- also, the testimony of witness
7    indicates that the north breach start
8    developing flooding just a very, um -- in the
9    general timing area that the pump station start
10   getting flooded, while the level of the water
11   according to the records were relatively low at
12   the time.
13   Q.  Anything else you want to add in the
14   nature of physical evidence that makes it clear
15   to you that the barge caused the north breach?
16   A.  Um -- the necessity of developing gaps
17   in order to create the seepage that occurred to
18   move 250-foot of seawall so far inland is
19   another clear evidence that gaps were
20   developed.  And the gaps -- the most probably
21   cause of developing gaps to create the seepage
22   was the barge pushing on the panels.
23   Q.  Anything else that leaps to your mind
24   as physical evidence that proves that the barge
25   was present at the north breach to a

140

1    five-year-old?
2    A.  Well --
3        MR. GILBERT:
4            Counsel, I'm going to ask you to
5            drop the five-year-old stuff, really.
6    A.  The five-year-old was related to the
7    location of the barge, that the barge arrived
8    to the east bank.
9    EXAMINATION BY MR. RAFFMAN:
10   Q.  No.  No.  But go ahead.
11       MR. GILBERT:
12           Maybe he misunderstood your
13           question at the time.
14       MR. RAFFMAN:
15           No.  We'll pull the five-year-old
16           off.  I think it's made its point.
17       MR. GILBERT:
18           Thank you.  I think you have.
19           Thank you.
20   EXAMINATION BY MR. RAFFMAN:
21   Q.  What else?  Physical evidence.
22       MR. RAFFMAN:
23           Oh, Mr. Gilbert, you're so dying
24           to show him something why don't you
25           just put it in front of his face.  He

141

1    can't think of it on his own, but you
2    really want to show it to him so go
3    ahead, put it in front of him.
4        MR. GILBERT:
5            Well, he did think of it on his
6            own.  This is his report.
7    EXAMINATION BY MR. RAFFMAN:
8    Q.  Anything else you want to talk about
9    that's obvious physical evidence that the barge
10   was present at the north breach?
11   A.  Well, there's a gap.  We mention the
12   flooding of the pumping station.  We mention
13   witness that were domiciled very close to the
14   location.  We mentioned the operator of the
15   pumping station.  We mentioned the gaps and
16   seepage.  We mentioned the location of the
17   seawall farther inland at any other location.
18   You want me to --
19   Q.  If I understand right, the relocation
20   of seawall happens after the gaps and the
21   seepage cause the soil to be undermined and
22   allow the wall the move inland.  Am I right?
23   Do I remember that properly?
24   A.  Correct.  And this is explain the
25   time -- the distance is explained by the time

142

1  differential between the two, um -- breaches.
2      Q.   All right.  Well, I've asked the
3  question four times now.  Have I exhausted your
4  testimony about the physical evidence that
5  you're relying on at the north breach?  Is that
6  fair?
7      A.   Off the top of my head at this moment,
8  we haven't talk about witnesses, but we can
9  talk for hours about witnesses.
10     Q.   Well, let's talk about the witnesses.
11 Well, let's -- actually, we'll do that later.
12     What time was sunrise on the morning
13 of August 29th?
14     A.   I didn't memorize it.
15     Q.   Do you accept the United States Naval
16 Observatory as an authoritative source insofar
17 as time of civil twilight and sunrise?
18     A.   Oh, yes.
19     Q.   Do you know whether it was dark when
20 the barge arrived at the location of the north
21 breach?
22     A.   According to the operator of the
23 pumping station, I believe, yes.  It was not
24 daylight.
25     Q.   All right.  And what were the weather

143

1  conditions at the time of the impact you say
2  took place at the north breach?
3      A.   I don't have a detailed answer
4  because, like I told you before, I didn't
5  elaborate in the meteorologic conditions
6  locally that changed minute by minute.
7      Q.   So you don't know the answer.
8      A.   Well, the answer is I did not
9  elaborate.  If you asked me to do it and give
10 me a time, I can do it.
11     Q.   You can tell me what the weather
12 conditions were in the Inner Harbor Navigation
13 Canal at 4:30 in the morning on August 29th?
14     A.   The type of weather conditions
15 requires to elaborating wind force, direction
16 at different elevations and the turbulence
17 create by surrounding structures like the
18 bridge.  So I'm absolutely sure I can do it,
19 but not right now.
20     Q.   And you haven't studied it.
21     A.   I have not developed an investigation.
22     Q.   How high was the water from the top of
23 the wall when the barge first hit the north
24 breach area, as you put it?
25     A.   I don't remember off the top of my

144

1  head, but in order to talk about elevations we
2  make have to end up talking about how the
3  elevation was developed because there are many
4  errors and discrepancies in the records
5  regarding elevation.
6      Q.   What part of the barge struck the wall
7  at the location of the north breach?
8      A.   Um -- the word struck, in my opinion,
9  is not the absolutely the correct word.  The
10 word struck means impact.  And the barge could
11 have been resting against the wall and pushing
12 the wall without impact.
13     Q.   All right.  So you're not testifying,
14 as you sit here today, that the barge struck
15 the wall at the location of the north breach,
16 is that fair?  I just want to get your
17 testimony.
18     A.   Yeah.  My word is the barge contacted
19 the wall.  It's a matter of degree of what type
20 of contact.
21     Q.   All right.  What part of the barge
22 contacted the wall at the location of the north
23 breach?
24     A.   In my opinion, was the corner end of
25 the barge.  Whether it was aft, forward, port

145

1  or starboard, I don't know.
2      Q.   Did you observe any crushing damage to
3  the barge that you associated with the north
4  breach impact?
5      A.   Repeat your question.
6      Q.   Did you observe any crushing damage to
7  the barge that you would associate with the
8  north breach impact?
9      A.   You're talking about -- what word use,
10 crushing?  You're talking about the steel
11 crushing?
12     Q.   Yes.
13     A.   The barge is loaded with imperfections
14 and deficient surfaces from previous activity
15 and from new activity during the contact with
16 the seawall.
17     Q.   Were there any imperfections on the
18 barge that you uniquely associate with contact
19 at the location of the north breach?
20     A.   There are several unique deformations
21 of the surface of the steel, indentations and
22 deformations, both in the bottom, the bilges,
23 the bilge plate and sides of the barge all over
24 the place, several of which have been also
25 reported by other investigators.

146

1    Q.   Right.  And if I remember right,
2  Mr. Pazos, we've got a series of horizontal
3  scratches on the bottom of the barge that
4  you've observed, right?
5    A.   Well, this -- what I'm mentioning ten
6  seconds ago was more than scrapes.  I'm talking
7  about indentations from half inch to inch and a
8  half deep, from 4 feet in extension to ten feet
9  in extension.  And it's reported by me and
10  several other investigators.
11    Q.   All right.  The indentations that you
12  identify, which of those indentations are
13  uniquely associated with the features of the
14  north breach, and what features, if any, are
15  there that you put together like a puzzle?
16    A.   Okay.
17    Q.   I don't see it in your report.
18    A.   Because --
19    Q.   Maybe there is something in your
20  report.
21    A.   I repeat again, I don't expect the
22  contact of the barge and the seawall at the
23  north breach will have created any large
24  visible indentation on the barge because I
25  talking about contact, mostly pushing, not

147

1  impact or crushing, as the word you used.
2  Because the contact with the barge at the north
3  breach created the initial, um -- the initial
4  tilting of some concrete panels and initial
5  probably extension of cracks between the --
6  between the sheet piles and resulting in
7  initial flooding to the breaking of elastomeric
8  joints.
9    Q.   And if I understand your report
10  correctly, what you've said is -- and I'm
11  referring now to Page 47, and follow along --
12  that the concrete panels tilted but remained
13  very close to their pre-allision position.
14  This is in the second full paragraph at the end
15  of the paragraph.
16      Do you see that?
17    A.   Correct.
18    Q.   So if somebody were to suggest that
19  the barge rammed into the wall and blasted the
20  concrete, that's not what you're saying.
21    A.   Correct.  Yes.
22    Q.   What you're saying is that the barge
23  contacted the wall --
24    A.   Correct.
25    Q.   -- and that contact caused some

148

tilting of the top of the wall --
    A.   Correct.
    Q.   -- which then allowed water to
penetrate between the sheet pile and the soil
and seep underneath.
    A.   More than that.  Also, the contact
created a failure of the elastomeric joints
allowing flooding to the space between concrete
pilings to create initial flooding to the north
breach.  That flooded the pumping station a few
minutes later.
    Q.   All right.  Now, when you used the
word elasto --
    A.   Elastomeric?
    Q.   Elastomeric, is that the water stops?
    A.   Yes.
    Q.   So that the water stops came undone.
Right?
    A.   Broke.
    Q.   They broke.  The water stops broke,
and the water pushed through the wall through
those water stops.  Is that your testimony?
    A.   Yes.
    Q.   Do you know whether water stops came
undone at any other breaches in the New Orleans

149

area?
    A.   Oh, yes.
    Q.   They came undone at the London Avenue
breach; right?
    A.   Correct.
    Q.   Now, let me turn your attention now to
sketch Number 1.  Do you see that --
    A.   Yes.
    Q.   -- right behind you?
      This is a sketch you drew?
    A.   Yes.
    Q.   And do you see at the bottom you wrote
wind force, 156,500?  Do you write that?
    A.   Yes.
    Q.   And you drew an arrow.  Do you see
that?
    A.   Yes.
    Q.   And is that arrow the direction that
you concluded the wind was blowing when the
barge contacted the wall?
    A.   This is a very general instantaneous
information.  It don't means that all the time
the wind was in this direction.  This was to
say roughly what is the range of forces that
the wind can create when the wind is pushing on

150

1  the lateral side of the barge.
2      Q.   Well, let me ask the question.  There
3  is an arrow over there that says wave action.
4  Do you see that?
5      A.   Yes.
6      Q.   Is it your testimony that the wave
7  action -- that's the direction that wave action
8  is moving?
9      A.   This is an instantaneous possible
10  direction of the incoming wave, not indicating
11  the direction of the reflecting waves.  So
12  we're talking about instantaneous situation
13  that changed second by second.  So this is to
14  give the reader a general idea, very general
15  idea, of at a certain instant, a fraction of a
16  second, what could have been the situation.
17      Q.   Now I keep hearing you say from second
18  to second the weather condition and the wave
19  directions and wind forces can change.
20      A.   Yes.
21      Q.   So let me ask a question about
22  prevailing wind and prevailing wave direction.
23  All right?  Not instantaneous from second to
24  second.
25          Do you have a view about the

151

1  prevailing wind direction at the time the barge
2  hit -- contacted the wall at the site of the
3  north breach?
4      A.   Absolutely no.
5      Q.   Do you have an opinion about the
6  prevailing direction of the waves at the time
7  the barge contacted the wall at the site of the
8  north breach?
9      A.   Absolutely no.
10      Q.   All right.  Let me keep going then.
11          At Page 48 of your report you quote a
12  report that was done by a gentleman named
13  Wooten reporting on a discussion with a man
14  named Francisco Silva-Tulla.  Would you turn to
15  Page 48, please.
16      A.   Yes.
17      Q.   And you see that Dr. Silva described a
18  connection that was made with a field weld of
19  poor quality.  You see that as part of the
20  quotation, the indented quotation?
21      A.   Yes.
22      Q.   And this field weld is between two
23  different sections of sheet pile, am I right?
24      A.   Yes.
25      Q.   And what you have there, if you turn

152

1  around, you've got some deeper and longer sheet
2  piles of 35 feet.  Is that right?
3      A.   Yes.
4      Q.   And you've got shorter sheet piles at
5  23 feet.  Am I right there?
6      A.   Yes.
7      Q.   And you've got a discontinuity there?
8      A.   Yes.
9      Q.   So you've two different monoliths with
10  different strength capacities, capabilities?
11      A.   I don't know for sure.  I believe so,
12  but I don't know for sure.
13      Q.   All right.  You infer it from the fact
14  that the 35-foot is deeper and longer in the
15  soil; right?
16      A.   Yes.
17      Q.   And would you agree with me that this
18  weld would be the weakest point in the
19  floodwall?  Or one of the weakest points?
20      A.   Okay.  One of the weakest points is
21  generally better.  I don't have -- impossible
22  to have the entire physical information of
23  every inch of, um -- levee.
24      Q.   All right.  Now, if you've got a place
25  on the floodwall that's lacking structural

153

1  continuity, you wrote there discontinuity.
2      A.   Yes.
3      Q.   So if you're lacking structural
4  continuity it has a different strength
5  capacity, right?
6      A.   Yes.
7      Q.   And then you've got those conditions
8  on a wall, is it possible then to develop a
9  hinge between the monolith and the sheet piles?
10  Is that something that can happen?
11      A.   Yes.
12      Q.   And is it possible that the hinge can
13  develop between the monolith and the sheet
14  piles regardless of whether you have a barge do
15  that?
16      A.   It's a matter of magnitude.  If you're
17  talking about half of a degree or you're
18  talking about 5 degrees or you're talking about
19  20 degrees, the hinge develops an angle.  At
20  any time with even one very low force
21  conditions, the angle could be a quarter of a
22  degree.  At any time it could be 20 degrees.
23  So in order to be specific, you have to talk
24  about what the degree or hinge you're talking
25  about.

154

1  Q.  Right.  And have you done any
2  calculations about whether a hinge can develop
3  in this floodwall at any time, without a barge
4  impact?
5  A.  Um -- I didn't do any calculation
6  regarding how a hinge can develop in this
7  floodwall of any.  I read a lot of reports and
8  information about hinge that can be developed,
9  and I fully recognize why a hinge can develop.
10  Q.  Right.  And am I right that you
11  concluded a hinge developed between the
12  monolith and the sheet piles at the London
13  Avenue Canal?
14  A.  Yes.
15  Q.  In relation to the discontinuity
16  between the 23-foot sheet pile and the 35-foot
17  sheet pile, where was the barge impact?
18  A.  As I show in this sketch, the barge
19  must have contacted, "contacted," the first
20  panel close to the discontinuity.
21  Q.  So the barge, as you've drawn it, it's
22  within either a foot or a few -- some inches
23  away from the discontinuity.  Am I right that
24  that's about the distance?
25  A.  But when I use the word contact, it

155

1  don't means impact.  When you're talking about
2  two or three feet you're talking about impact,
3  pointing at a point.  I say no.  Anywhere here
4  in several feet the barge contacted the panel
5  and pushed the panel, and because of the
6  difference there is a heavy structural
7  discontinuity.
8  Q.  My question was how close to the
9  discontinuity was the barge contact?
10  A.  I will say anywhere between two feet
11  and fifteen feet.  Pushing the panel.
12  Q.  And is it your testimony that when the
13  barge pushed the panel that was when the weld
14  broke between the 23-foot and the 35-foot?  Or
15  did that happen later?
16  A.  No, the weld probably was already
17  have, um -- small cracks, corrosion, et cetera,
18  and was loaded because of the discontinuity,
19  and the pushing of the barge on the panel will
20  increase the stresses to either increase the
21  lengths of the cracks to a point that let's a
22  partial damage but not a separation of the
23  steel yet.
24  Q.  Have you done any calculations that
25  establish that the weld could not have come

156

undone based on the hydrostatic pressure in the
canal, without the barge?
A.  No.  I haven't done any calculation,
no.  I can do it.
Q.  All right.  Tell me how the barge
transmits to the panels the force created by
wind pressure.
A.  Okay.  The barge arrives to the
location, the barge moves and rotates, changing
headings, the barge rests against the panel,
and another gust of winds in combination with
waves pushing the panel, the barge still keeps
traveling because nothing is restraining the
barge from moving, and moving in and out in
contact with the panels, into the next panel,
breaking -- every time the contact, breaking
some elastomeric joints.
Q.  And the breaking of the joints that
happens allows water into the neighborhood, if
I understood you properly.
A.  Yes.
Q.  Now, looking at your diagram, what I'd
like you to do is to show me -- and use a
marker, if you can -- where on the height of
the floodwall the bottom of the barge is.

157

Where did the bottom of the barge hit?
A.  Where the barge contacted?
Q.  Yes.  Can you do that?
A.  Well, this is a not-to-scale sketch,
just to give a general idea.
Q.  All right.  We're going to show you
Sketch Number 2 which I think is drawn to
scale.
All right.  So Sketch Number 2, before
we -- well, all right.
MR. RAFFMAN:
Derek, let's leave that one up
there for a moment.
EXAMINATION BY MR. RAFFMAN:
Q.  And now we'll take a look at Sketch
Number 2.
Is sketch Number 2 a sketch you did --
MR. RAFFMAN:
Brian, I need another objection.
Object to my question.
MR. GILBERT:
You're doing all right, man.  Ask
your questions.
EXAMINATION BY MR. RAFFMAN:
Q.  All right.  We'll go back.

158

1      Before we levee Sketch Number 1,
2   Mr. Pazos, sketch number is a sketch you did
3   that's included in your report; correct?
4      A.   Yes.
5      Q.   All right.  Now let's see Sketch
6   Number 2.  Is Sketch Number 2 a sketch you did
7   for your report?
8      A.   Yes.
9      Q.   Sketch Number 2 has got a drawing of a
10  floodwall that is done to scale; right?
11     A.   It's not to scale.
12     Q.   The top part is not to scale?
13     A.   Oh, I'm sorry.  This part is
14  approximately to scale, yes.
15     Q.   All right.  My question for you,
16  Mr. Pazos, is, can you identify for me, in the
17  top part, what's the flood side?
18     A.   Can I identify what?
19     Q.   The flood side.  The canal side of the
20  floodwall.
21     A.   This is the canal side.  Flood side.
22     Q.   All right.  And the land side is
23  where?
24     A.   (Indicating.)
25     Q.   What I'd like you to do is I'd like

159

1   you to place an X on the part of the floodwall
2   where the bottom of the barge came into contact
3   at the site of the north breach.  How high up
4   the wall?
5      A.   The bottom of the barge did not came
6   in contact.  It's the side or the top part of
7   the bilge plate.
8      Q.   Fair enough.  I understand what you're
9   saying.  Please mark on the diagram where the
10  top part of the bilge plate came in contact
11  with the wall.
12     A.   Okay.  You want me to give a little
13  sketch, a single line of the profile of the
14  barge?
15     Q.   Sure.  That will be great.  Use the
16  red marker, please.  Use the red marker so that
17  it's clear.
18     A.   (Witness complies.)
19     Q.   Thank you.
20     A.   (Witness complies.)
21     Q.   All right.  So the barge is striking
22  the wall along the entire six foot surface of
23  the wall on the flood side.  That's what you've
24  drawn; right?
25     A.   Wrong.

160

Q.   No?
A.   I don't use the word striking.
Contacted the wall.
Q.   I'm sorry.  That's fine.  The barge is
contacting the wall along the entire six foot
surface of the flood side.
A.   Wrong.  A little area of a few inches
in depth.  No more than a few inches.  Look, I
inclined the line on purpose to show you that
only a few inches of the front plate will
contact the concrete wall.
Q.   All right.  Only a few inches of the
plate will contact the wall because the plate
is just --
A.   The bilge plate is round, cap
thickness, the next plate is half an inch to
tree quarter of an inch farther in, so only a
little piece of the top of the bilge plate will
contact the wall.
Q.   All right.  Now, the way the barge
goes -- you've stopped the barge there, but in
fact if you've got six feet of barge along the
surface of the wall there -- right?
A.   Okay.
Q.   You've got a couple of -- you've got a

161

foot or two feet below the waterline; right?
A.   Because the barge had a draft of about
one and a half to two and a half feet, and was
rolling, pitching, heaving and swaying every
minute.  Combination of six digress of freedom.
Q.   So what you've got, then, is -- but
the 23-foot barge, you'd want to extend that
red line up, right?
A.   (Witness complies.)  Over here.
Q.   All right.  You can't fit it on the
diagram because you've got -- if I understand
you right, you've got 14 feet or so of barge
sticking up above the top of the wall.  Am I
right?
A.   22 feet.
Q.   22 feet of barge sticking up on top of
the wall.
A.   On top of the water.
Q.   Higher than the wall.
A.   Okay.  Higher than the wall.  Yes.
Q.   The floodwall is 6-foot in your
diagram; right?  Am I right?
A.   Yes.  About.
Q.   Six foot of floodwall.  About.
A.   Yes.

162

1  Q.  So if the barge is level with the
2  bottom of the floodwall and it's 23 feet,
3  you're going to have about 17 feet of barge
4  visible on top of the floodwall.
5  A.  Except the water level does not apply.
6  Every fraction of a second it changing,
7  6 degrees of freedom.  Heave, role, pitch,
8  sway, tilt, you know, every second -- fraction
9  of a second.  One tenth of second you can take
10  picture, it's completely different.
11  Q.  Right.  It could be more than 14 feet
12  if it's pitching up?
13  A.  Yes.
14  Q.  It can't be a whole lot less than
15  14 feet or it's going to hit the levee; right?
16  A.  Well, it cannot fly, but what I'm
17  saying, the motions -- a point in the barge is
18  moving up and down, sideways and rotating
19  several feet.  Three, four, five feet.
20  Q.  So when this barge is contacting the
21  wall, there's some, according to your
22  testimony, a lot of motion associated with that
23  barge.
24  A.  At times.  At times.  Every second
25  things changes.  It could remain for a second

163

1  and a half almost steady in contact.  Like
2  glue.  A second, a fraction of a second later
3  may be moving two feet away.  We have big waves
4  here.
5  Q.  How big are the waves?
6  A.  Big waves.
7  Q.  How big?  Have you done any studies to
8  calculate the level of the waves?  How big?
9  A.  Not in this case, but in another case,
10  and I suggested that it could be waves in the
11  range of up to eight to ten feet at times
12  because of the composition of reflecting wave
13  and incoming wave reflecting from the seawall.
14  Q.  Have you done any calculations to
15  support the conclusion that you've got eight to
16  ten foot waves in the Inner Harbor Navigation
17  Canal?
18  A.  Not in this specific case, but I have
19  done it in other occasions.
20  Q.  Well, when you did it on other
21  occasions did you do it according to the
22  conditions present in the Inner Harbor
23  Navigation Canal in this case?
24  A.  No, I didn't try to do it in this
25  case.

164

1  Q.  All right.  Just before I go, I just
2  want to make sure I understand.  How much of
3  the barge would you expect to be above the top
4  of the floodwall -- if you've got the bottom of
5  the barge level with the top, the bottom of the
6  floodwall?  It's about 14 feet?
7  A.  Well, let's talk about what point of
8  the barge.  The top of the covers?
9  Q.  The top of the covers, yeah.
10  A.  The okay.  The top of the covers, like
11  we discussed before, is about 22 feet from the
12  baseline.  And the seawall was sticking above
13  the water about four, five, six feet.  So we're
14  talking that the top of the barge was above the
15  top of the seawall probably fifteen, sixteen,
16  seventeen feet.
17  Q.  Okay.
18  (Brief recess.)
19  EXAMINATION BY MR. RAFFMAN:
20  Q.  All right.  Thank you.
21  Mr. Pazos, I've handed you a series of
22  three photographs which together have been
23  marked as Exhibit 9 to your deposition.  I want
24  to ask you whether those three photographs are
25  the ones referenced at Page 42 of your report.

165

1  (Exhibit 9 was marked for
2  identification and is attached hereto.)
3  A.  Would you point me where I talk about
4  photographs?
5  EXAMINATION BY MR. RAFFMAN:
6  Q.  Sure.  Section Q says comments
7  regarding some --
8  A.  Yeah.
9  Q.  -- photographic evidence.
10  All right.  You see that now.
11  A.  Yes.
12  Q.  And you see that you've identified
13  photos number LNA 001142 --
14  A.  Yes.
15  Q.  -- LNA 001140 and LNA 001151 in your
16  report.
17  A.  Yes.
18  Q.  And are these three photographs,
19  Exhibit 9, the same photographs that you
20  reference in your report?
21  A.  I believe so.  Yes.
22  Q.  All right.  Now, you wrote in your
23  report that these photographs show the south
24  end of the north breach.
25  A.  Yes.

166

1    Q.   And you wrote that the photographs
2  appear to show cracks that you attribute to
3  contact by the barge.
4    A.   Yes.
5    Q.   Referring you to Page 1142, I'm going
6  to ask you to take a magic marker and circle
7  the places where you see cracks in the concrete
8  panels that you attribute to the barge.
9    MR. GILBERT:
10           I'm just going to object to the
11       extent that you have limited him to
12       one photo when he said that he sees
13       three photos that show that.  I would
14       ask, if possible, that we rephrase the
15       question to allow him to choose one of
16       these photos which -- that he wants to
17       mark.
18    MR. RAFFMAN:
19           If you can't find it in 1142,
20       then it's fine with me to use one of
21       the other photos.  I only used 1142
22       because it's one of the ones he, the
23       witness, cited.
24    A.   Okay, I can mark the three photos if
25  you want.

167

1  EXAMINATION BY MR. RAFFMAN:
2    Q.   Yeah.  I would like you to place a
3  mark, preferably on 1142, but you can use any
4  of the other photos if you need to -- but I
5  would like you to mark the places where you see
6  cracks that you attribute to contact by the
7  barge.
8    A.   Okay.  I put three marks in three
9  locations that appears to me these are a result
10  of contact with the barge.
11    Q.   May I see it for a moment?
12    A.   (Tendering.)
13    Q.   All right.  So that the record is
14  clear, let me mark 1142 as Exhibit 10, because
15  they've come apart, and I'll mark the last one
16  as Exhibit 11.
17    MR. RAFFMAN:
18           So let the record reflect that
19       the witness has looked at three
20       photographs, Exhibit 9 is LNA1140,
21       Exhibit 10 is LNA1142, and Exhibit 11
22       is LNA1151.
23           (Exhibit 10 was marked for
24  identification and is attached hereto.)
25           (Exhibit 11 was marked for

168

identification and is attached hereto.)
EXAMINATION BY MR. RAFFMAN:
    Q.   Mr. Pazos, why do you say that those
three areas that you've circled represent
contact by the barge as opposed to, say,
twisting and torsion brought on by hydrostatic
forces?
    A.   Because the sheet pile and the
concrete slab are sitting by gravity in a
yellow -- like front, very flexible material.
So the hydrostatic property -- the hydrostatic
forces can only push the front, using the front
as equivalent soft material, very gently
inland.  But if this concrete is going to have
cracks, you have to have some solid things
concentrating a contact load in the area of the
crack to create a crack.
    Q.   All right.  So twisting and torsion is
not a source of the cracks that you have
identified?
    A.   The twisting and torsion -- I don't
recognize the word twisting and torsion at the
time that the barge was there.
    Q.   Right.  Well, not necessarily right.
You said you don't believe that there was

169

twisting and torsion in the wall at the time
the barge was there; right?
    A.   Correct.  At the time that the barge
was there.
    Q.   Now, after the wall failed --
    A.   Yes.
    Q.   -- and after the sheet pile became
dislodged and tumbled into the neighborhood as
reflected in Sketch 2 behind you --
    A.   Yes.
    Q.   -- was there twisting and torsion on
the wall as the sheet pile was tumbling?
    A.   Um -- when the change from being
almost vertical wall to being a completely
twisted wall happens, which is a matter of a
couple of seconds or less, the cracks were
already there.  There is no reason for having
cracks like that in the joint I mark
specifically.  There is no reach.  Why will be
a crack in the edge of the elastomeric joint
unless there is a solid object that push over
there?
    Q.   I don't think you answered my
question.  Let me try it again.  Would you
agree with me that once the connection is

170

1    broken between the sheet pile that's anchored
2    in 35-foot soil and the sheet pile that's
3    anchored 23 feet, once that connection is
4    broken, at some point the wall translates
5    inland and -- it becomes separated and
6    translates inland.
7        A.   We're talking almost about the same
8    instantaneous time, within seconds or fraction
9    of seconds.  And the way you're expressing
10   appears to be two separate times.  To me, the
11   failure between the 35 and 23 occurred within a
12   second before the twisting that is described in
13   this sketch.
14       Q.   All right.  So within seconds the
15   connection comes apart and then we have the
16   twisting of the sheet pile described in the
17   sketch.
18       A.   Yes.
19       Q.   All right.  Now, at the end of the
20   sheet pile where you have --
21       A.   Which end?
22       Q.   The right-hand end, okay?  As you go
23   up that way, now, as you transition from the
24   area of the breach to the area where the sheet
25   pile remained intact --

171

1        A.   (Indicating.)
2        Q.   Yes.  The area in of the breach
3    described in 1142, that area.  And you've
4    circled three places on that --
5        A.   Yes.
6        Q.   -- photo.
7             Do you -- I don't know how to ask
8    this:  Is that part of the wall subject to any
9    twisting and torsion forces as a result of the
10   adjacent sheet pile tumbling into the
11   neighborhood, being pulled in?
12       A.   I don't recognize any situation in
13   where the word torsion and twisting can be
14   applied even, because the photograph shows that
15   the panel remains almost exactly as is except
16   for the crack is flat.  There is no spoiling.
17       Q.   All right.  Let me move away from the
18   north breach then.  We got to move along.  So
19   we're going to pull that board back up.  We're
20   going to see if you can describe for us the
21   movements of the barge.
22            After the barge comes into contact
23   with the wall at the north breach, Mr. Pazos,
24   describe for me, where does it go next?
25       A.   The barge moves in the direction of

172

the levee, off and on in contact with the
seawall for at least some 250 feet, creating
gaps and tilting panels and separated from the
seawall due to the waves that we discussed
before and variation of wind for a substantial
distance until becoming contact again in this
area I'm pointing.
    Q.   Would you take the green marker,
please, and draw for me on that diagram the
path of the barge from the time it moves away
from the north breach area until the time it
comes into contact with the wall at the south
breach.
    A.   Okay.  Do you want me to put it in
this cardboard a few little pictures of the
side with positions of the barge?
    Q.   Why don't you just do it the same way
you did it earlier with the path, except this
time use green instead of red.
    A.   (Witness complies.)
    Q.   Okay.  Thank you.  So that's -- how
long did the barge take to go from the north
breach to the initial point of the south
breach?
    A.   Well, that depends on the witness

173

that, um -- give differing ideas of time, and
it's clearly that the timing of every witness
don't coincide because some look at their watch
and some didn't.  So I will have to refer to
about fourteen witness saying whatever they
remember, but they didn't look at the same
watch all the time.
    Q.   Let me see if I can make it simpler.
         You testified that you think the barge
hit the north breach no later than 4:30; right?
    A.   I didn't say this.  About 4:30,
because they shut the pumps at 5:30.  So it
could be anywhere between around 4:30 to five
something.
    Q.   Did you not write in your report that
the barge initiated the southern breach around
six o'clock in the morning?
    A.   You have to point me where I say so,
because I been using the best information I
could from all the thousands of pages of
documents I reviewed, but many don't coincide
because nobody was writing the times.
    Q.   Well, didn't you write, at Page 37 of
your report, according to eye witnesses the
south breach of the IHNC occurred about 6:00

174

1  a.m. to 6:30 a.m.?
2      A.  The key word is about.
3      Q.  Okay.  But is that your testimony?
4      A.  Yes.  I summarizing the testimony of
5  fourteen witness saying about.
6      Q.  So, when I ask you how much time the
7  barge took to get from one place to the other,
8  would you answer that it was about ninety
9  minutes?
10      A.  The key word is about.  You want me to
11  give you -- from an earlier time to a later
12  time?  I can spreading a couple of hours.
13      Q.  Sure.  Well, okay.  It took somewhere
14  between an hour and two hours;  Is that fair?
15      A.  Well, this is better:  Between a
16  fraction of an hour and two hours.
17      Q.  A fraction of an hour and two hours.
18  How do we get that?
19      A.  Well, again, we have to decide what
20  time you want me -- you know, we don't have --
21  nobody have solid information.  Okay?  Except
22  for a few clocks that stopped due to the
23  floodings.  Otherwise, there is no solid
24  information.  It depends in recollection, after
25  the fact, several days, several weeks, several

175

1  month, of different witness.
2      Q.  Right.  So in the absence of solid
3  information, you've got to do the best you can.
4  Right?
5      A.  Yes.
6      Q.  And the best you can do is that it's
7  within an hour or a half an hour time frame,
8  those kind of blocks, right?  You wouldn't
9  pinpoint the timing of any of these events.
10      A.  Correct.
11      Q.  Have you done any modeling of waves or
12  wave heights in the Inner Harbor Navigation
13  Canal?
14      A.  No.
15      Q.  When you say eight to ten foot waves
16  in the canal, have you done any calculations to
17  support those numbers in this case?
18      A.  Not in this case.  I have done it in
19  other cases.
20      Q.  Okay.  I want you to describe for me
21  the formation of the south breach.
22      A.  Sorry.  Can you repeat what you want
23  me to do?
24      Q.  Yes.  Describe how the south breach
25  formed.

176

1      A.  How the south breach --
2      Q.  Formed.  What happened at the south
3  breach?  Tell me the story.
4      A.  Okay.  Well, it's in my report but let
5  me try to summarize saying, after the barge
6  float along several hundred feet, it become
7  free from contacting the wall.  All of a sudden
8  the barge contacted the wall again, which is
9  shown in some photograph -- you want me to look
10  at the photograph?
11      Q.  Let's see if I can make it easy for
12  you.  Attachment 4 --
13      A.  It's Photo Number 5 of Attachment 4
14  that I want to refer to.
15      Q.  Right.  That's the one I was going to
16  ask you about.
17      A.  (Indicating.)
18      Q.  Very good.  Let's see if I can take
19  that out.
20          So we're looking at Photo Number 5 of
21  Attachment Number 4?
22      A.  Yes.
23      Q.  Which has a Bates number on it, or
24  does it?
25      A.  Well, it's coming from website.

177

1      Q.  Right.  It bears a date March 22nd,
2  2008 on the bottom right.
3      A.  Yes.
4      Q.  Okay.  Let me ask you about that
5  photo.  What do you see in this photo that
6  tells you something about the involvement of
7  the barge in the south breach of the Lower
8  Ninth Ward?
9      A.  Okay.  Starting from the left bottom
10  corner, I see clearly scrape marks at an
11  elevation that correlates pretty good with the
12  level of the water that would be increasing at
13  this time, or the time according to the
14  documents available, including cracks visible
15  on a large broken piece, actually two large
16  broken pieces.
17      Q.  All right.  I'm going to hand you a
18  copy of this photograph so that we can have you
19  mark on it.  I'm going to mark it as Exhibit 12
20  to your deposition.  (Tendering.)
21          Is Exhibit 12 to your deposition the
22  same photo that you were just referring to?
23          (Exhibit 12 was marked for
24  identification and is attached hereto.)
25      A.  Yes.

178

1  EXAMINATION BY MR. RAFFMAN:
2      Q.   All right.  Would you take a pen and
3  write a notation for me about the scrape marks
4  that you described?
5          MR. GILBERT:
6              That's the question?  Make a
7          notation?
8          MR. RAFFMAN:
9              Yeah.  Circle those scrape marks.
10     A.   (Witness complies.)
11 EXAMINATION BY MR. RAFFMAN:
12     Q.   It's your contention that the scrape
13 marks you've just circled on Exhibit 12 were
14 created by the barge.
15     A.   Yes.
16     Q.   Do you know how far up the wall those
17 scrape marks extend?
18     A.   About halfway of the height of the
19 concrete slab.
20     Q.   All right.  You've described it in
21 terms of the height.  My question is, as
22 between this location near the south breach and
23 the location of the north breach --
24     A.   Yes.
25     Q.   -- do you know one way or the other

179

1  whether those scrape marks extend the entire
2  length of the floodwall?
3      A.   No.  As I discussed before, the barge
4  move away from the concrete wall for a while,
5  and I obtain from reports the location with
6  this initial contact occurred, where about
7  1,750 feet from the bridge.
8      Q.   Have you ever seen any photographs
9  that show that those scrape marks extend the
10 entire length of the floodwall without
11 interruption from the southern end of the north
12 breach all the way to the northern end of the
13 south breach?  Have you ever seen any
14 photograph like that?
15     A.   I don't remember seeing any photograph
16 like that, but what is more important is that
17 even if off and on the barge may have touched
18 the concrete slab, the touch was so light that
19 the seawall and the pile did not develop gaps,
20 that's why a large section of the seawall
21 remained unmovable.
22     Q.   So what you're testifying is that
23 there are lots of places on the wall where the
24 barge came in contact but didn't create a gap,
25 right?

180

1      A.   Correct.  It's a matter of the
2  strength of the contact and the time of the
3  contact.
4      Q.   So it would surprise you if there were
5  in fact a gap along the entire canal side of
6  the floodwall from the north breach to the
7  south breach.  That would surprise you if
8  anybody found that.
9          MR. GILBERT:
10             If you understand the question.
11     A.   No.  No.  Since the -- as the barge
12 start contacting the wall and pushing and
13 compressing the dry side of the levee, the
14 entire -- the entire seawall start stretching
15 like a rubber band, then you could have
16 differing amount of gap all through the entire
17 seawall, but the gap is only few inches at the
18 top, is different than a few feet in order for
19 the hydrostatic pressure to penetrate to the
20 bottom of the 23 feet sheet pile.
21     Q.   Did you inspect the canal side of the
22 floodwall between the north breach and the
23 south breach?
24     A.   Yes.  Well, I inspect what they allow
25 me after, during and during the event.  They

181

1  stopped me several times from walking in this
2  area.
3      Q.   I see.  And did you inspect the canal
4  side of the floodwall between the north breach
5  and the south breach?
6      A.   Yes, partially, depending on the
7  police and many people that stop me from doing
8  what I intend to do.  I did the best I can.
9      Q.   Do you know whether those scrapes that
10 you've identified extend the entire length of
11 the floodwall from the north breach to the
12 south breach without interruption?
13     A.   No, I don't know.
14     Q.   And it would surprise you if they did
15 since the barge contact with the wall was
16 intermittent, as you've describe it, right?
17     A.   Correct.  I believe so.  All depends
18 on the amount of contact.  So.
19     Q.   So if those scratches were in fact to
20 be found along the entire length of the
21 floodwall, then you would change your opinion,
22 you would conclude that barge scraped along the
23 entire length of the floodwall instead of
24 moving away and coming back, right?
25     A.   No.  No.  We have witness hearing

182

1   noises, bumping, which indicates that the barge
2   was in and out of the wall, or parts of the
3   barge.  So the barge is all the time traveling,
4   rotating, changing orientation, sometimes the
5   bow, sometimes the stern, sometimes the side.
6   So -- and also, the wall is not a perfectly
7   linear wall.  It's a wavy wall.  It goes in and
8   out a few inches.  It's impossible to do an
9   earth construction with piling driving and
10  concrete slap with elastomeric joint that you
11  can get an instrument and it's not like -- if
12  you take a picture of the entire seawall, it
13  will be a wavy wall.
14      Q.   All right.  So you wouldn't expect to
15  see horizontal scratches extending down the
16  length of the wall created by a barge, because
17  the wall is wavy, right?
18      A.   But the barge is moving all the time
19  with the wind and waves.  It's a flexible piece
20  of cake with a larger structure the size of
21  this table moving all the time in all
22  directions, in and out.  So it's nothing solid
23  here.
24      Q.   Did you ever see any pictures taken
25  before Hurricane Katrina in which these

183

1   horizontal scrapes appear?
2       A.   I don't remember seeing this, no.
3       Q.   And if I've showed you a picture taken
4   before Hurricane Katrina in which these
5   horizontal scrapes appear, would you conclude
6   from that that the barge didn't make those
7   scrapes?
8       A.   When you use the word these horizontal
9   scrapes, exactly these horizontal scrapes or
10  any kind of a scrape?
11      Q.   Well --
12      A.   All these seawalls have scrapes.
13  Because there is floating trash all the time.
14      Q.   All right.  Well, I guess we're going
15  to see.  Was there floating trash during
16  Hurricane Katrina?
17      A.   I'm sure there was.
18      Q.   Would you allow for the possibility
19  that a witness may have mistaken floating trash
20  for barge?
21      A.   Absolutely no.  A barge is huge
22  compared -- compared with the wall.  Huge.
23      Q.   Right.  It's sticking up 16 feet above
24  the wall, right?
25      A.   Yeah.

184

1       Q.   No way that a witness could mistake
2   the barge for something else.
3       A.   Correct.
4       Q.   Let me ask you, you say there's some
5   cracks in here that were made by the barge.
6   Would you circle the cracks in this Exhibit
7   Number 12.  Circle the cracks that were made by
8   the barge.
9       A.   I'm going to put in dashed lines.
10  One, two, three, four, five, six.  At least six
11  are clearly visible.
12      Q.   Why do you think those cracks were
13  made by the barge?
14      A.   Because this is reinforced concrete
15  designed by civil engineers specializing in
16  reinforced concrete.  These crack don't occur
17  by itself.  Something has to create a crack in
18  the concrete.  So and the something is
19  something that contact the concrete locally and
20  create a compressive force that makes the
21  crack.
22      Q.   So at each point that you drew, that
23  crack is the result of an actual contact been
24  the barge and the wall at that location.
25      A.   Yes.  As a matter of fact, here is a

185

1   low crack, the barge float up in a fraction of
2   a second, here is a higher crack, the barge
3   float again a fraction of a second, here's a
4   big crack, the barge float in a fraction of a
5   second, here is another.  This show clearly
6   that the barge is moving all the time.
7       Q.   Now, you testified earlier that the
8   part of the barge that's coming into contact
9   with the wall is the bilge plate.  Right?
10  That's what you expect to see?
11      A.   The barge is rolling, pitching,
12  heaving, and changing direction, changing
13  orientation.  Any area in the lower portion of
14  the barge can contact the seawall.
15      Q.   So you would expect the barge to have
16  all these contact points?
17      A.   Yes.
18      Q.   How high is the water level in the
19  canal when these events are taking place on --
20      A.   The water level in the canal.
21      Q.   -- Exhibit 12?
22      A.   The water level in the canal is a
23  certain elevation.  The instantaneous water
24  level at these locations is a completely
25  different thing, with variations of 5 to

186

1   10 feet because of the waves.
2       Q.   So at any given time the water level
3   of the canal could be five feet higher or ten
4   feet higher than the still water level?
5       A.   No, no.  This is not what I said.  The
6   still water level is pure theory.  There is no
7   such thing in real life of a still water level.
8   It's a function of the differing elevation of
9   waves averaging out to a still water level if
10  there were no waves.
11          So there is big waves all the time in
12  this area.  We are forgetting that there are
13  incoming waves from heavy winds reflecting
14  waves superposition on waves that can be twice
15  the size of incoming waves.
16      Q.   So from one moment to the other, there
17  could be a difference of from five to ten feet
18  as you've just said.
19      A.   The waves -- the crest of the wave?
20  Yes.  You take a film of the waves and you are
21  able to slower the film to take the elevation
22  of the crest of the waves, it's changing all
23  the time.
24      Q.   Now, have you done any calculations to
25  show what the pitch of the barge would be in a

187

1   five or a ten or an eight foot wave?
2       A.   Not in this case.
3       Q.   In these five to eight to ten foot
4   waves that you're testifying about, they were
5   present in the canal during the entire morning?
6       A.   You cannot use the word the canal.
7   The canal, as we talk about before, is like
8   1500 feet wide, and the waves are localized
9   waves instantaneous.  Because of wind, incoming
10  waves hitting the wall, reflecting waves
11  superposition of incoming and reflecting, in
12  each instant in each location the waves are
13  different.
14      Q.   All right.  I'm not going to ask you
15  about what it is at any instant in time.  I
16  want you to spend a couple of minutes thinking
17  about the entire morning.  All right?
18      A.   Okay.
19      Q.   And are you telling me that these
20  waves, up and down, five and ten feet, are part
21  of the conditions that existed in the canal
22  generally during the entire morning?
23      A.   Not the word entire.  It's changing
24  all the time.  As the eye is relocating, the
25  wind are changing, the distance from the eye to

188

the location is changing, the incoming tide is
changing.  So everything is changing
instantaneously in fraction of seconds that can
be recorded with instrument, but you would like
to use the word to entire morning.  This does
not apply.
    Q.   Between 4:00 and 6:00 in the morning,
during the time that you're telling me that the
barge was subject to these superposition waves,
is it your testimony that these waves existed
in the canal?
    A.   Existed at different locations in the
canal primarily in the proximity of both size
because of the reflecting waves.
    Q.   Is it mostly reflecting or incoming
waves?
    A.   The incoming waves is the waves
created by wind will occur in the middle of the
canal.  When these waves are traveling at a
certain speed, the crest hit the wall, this
wave is reflected at about 90 degrees.  And
this reflected wave is superimposed to another
portion of incoming waves and double up the
height in most cases.  This is in any book in
hydrodynamics.

189

    Q.   What are some authoritative sources of
knowledge in hydrodynamics?  Give me the name
of a textbook.
    A.   Saunders.  Saunders is the most
recognized book in the naval architecture
field.
    Q.   Saunders is the author?
    A.   Yes.
    Q.   And is it S-A-U-N-D-E-R-S?
    A.   I quote it also in my report.  I refer
to Saunders every time I talk about
hydrodynamics.
    Q.   Is that Principles of Naval
Architecture or is that something else?
    A.   Well, there are several books, but
Saunders is Hydrodynamics in Ship Design, I
believe.
    Q.   Saunders, Hydrodynamics and Ship
Design.  That's the authoritative source that I
need to look at.
    A.   Yes.  This is one.  There are probably
over a hundred books in this field.  I may have
about a dozen.
    Q.   All right.
        MR. GILBERT:

48  (Pages 186 to 189)

190

1    I don't want to break your
2 momentum, but I do want to call for
3 production of any photographs that
4 haven't been produced that fit the
5 description that you just gave to
6 Mr. Pazos as far as scrapes along the
7 entire length, unless that's just a
8 hypothetical scenario and not an
9 actual photo.
10    MR. RAFFMAN:
11        Well, I may tell you where to get
12 it on the Internet.  Or I may not.
13 EXAMINATION BY MR. RAFFMAN:
14    Q.   Any other evidence in Exhibit 12 of
15 contact by a barge?
16    A.   Not immediately, unless you have a
17 specific question.
18    Q.   No.  So after the barge hits the wall
19 at this location -- this is the northern end of
20 the south breach; right?
21    A.   Yeah.  But I disagree with your words.
22    Q.   You don't want to use the word hit,
23 you quantity to use the word contact.
24    A.   Correct.
25    Q.   All right.  I'll try to use the word

191

1 contact throughout here.  Because you don't
2 want to say that the barge was an impact, this
3 is a contact.  Right?
4    A.   It's a contact, yes.
5    Q.   Just so I'm clear, it's not your
6 testimony that this barge slammed into the wall
7 and drove the wall out of the soil and drove it
8 right back into the neighborhood.  Right?
9    A.   No.  This is not my testimony.  These
10 words are not my testimony.
11        (Off the record.)
12    MR. GILBERT:
13        Not thus far.  Strike my comment.
14    MR. RAFFMAN:
15        I think my friend's inferred
16 something that you didn't intend,
17 Mr. Gilbert.
18 EXAMINATION BY MR. RAFFMAN:
19    Q.   And in fact, if I understand
20 correctly, the wall is anchored by soil on the
21 backside.  Right?
22    A.   Repeat again, please, what is your
23 words again?
24    Q.   How does the flood -- well, no, I'll
25 stop.  Let me come back a second.

192

1    MR. GILBERT:
2        I think he's asking you to
3 clarify a question.
4    MR. RAFFMAN:
5        Well, all right, then I will.
6 It's my deposition, but, you know,
7 you're free to --
8    MR. GILBERT:
9        No, the witness is supposed to
10 ask you to clarify a question if he
11 doesn't understand it.
12    MR. RAFFMAN:
13        Right.  I'm just not sure I want
14 the go in that direction.
15    MR. GILBERT:
16        Okay.
17 EXAMINATION BY MR. RAFFMAN:
18    Q.   What did the barge do after it came
19 into contact with the wall at this northernmost
20 location of the south breach; what happened
21 next?
22    A.   The barge continue off and on
23 traveling off and on contacting the
24 seawall, most of the time resting for fraction
25 or a few seconds on the seawall, creating gaps

193

1 all the time, some gaps larger than others, to
2 creating a faster seepage, and continued
3 traveling south -- generally south.
4    Q.   And the gaps that we're talking about,
5 just to be clear, it's a gap between the sheet
6 pile and the canal side soil, right?
7    A.   Yes.
8    Q.   Allowing water to come in between the
9 sheet pile and the soil and ultimately seep
10 underneath the wall and weaken the soil on the
11 backside.
12    A.   Yes.
13    Q.   Did the barge scrape away the concrete
14 along the monolith as it traveled south?
15    A.   Absolutely.  As shown in this picture.
16    Q.   All right.  Well, that's my next
17 question.  So what we're going to do is we're
18 going to allow -- when you say this picture,
19 you're referring to Photo Number 6 in
20 Attachment 4, correct?
21    A.   Yes.
22    Q.   We'll let that be the backside of
23 Exhibit 12.  Exhibit 12 can be a two-picture
24 exhibit.
25        Mr. Pazos, how did the barge scrape

194

1  away the concrete in the manner that you've
2  suggested?
3      A.  I think it's very simple and obvious.
4  Again, the wind and the waves are changing all
5  the time, and in some areas the wind is
6  constant and the wave may relax because of the
7  wind action, and the barge is scraping for a
8  little longer distance and in contact with
9  enough force to remove an inch and a half to
10 two inches of facing concrete leaving the
11 rebars exposed.
12     Q.  Have you done any calculations to
13 establish how much energy the barge would need
14 to impart to the wall to scrape all the
15 concrete off the wall in the way that you've
16 suggested?
17     A.  No.  I can do it.
18     Q.  Is there any concrete remaining on
19 these sections of wall that the barge did not
20 scrape away in Photo Number 6?
21     A.  I'm sorry.  Can you repeat the
22 question?
23     Q.  Would you agree with me, Mr. Pazos,
24 that there are some portions of the concrete
25 cap that are not scraped off in Photo Number 6?

195

1      A.  Yes.  I agree with you.
2      Q.  Why didn't the barge scrape off those
3  portions of the concrete cap when it scraped
4  away the concrete underneath them?
5      A.  Because we discuss before that the
6  barge did not contact at the same time that
7  eight foot of concrete panel.  It contacts only
8  a small portion.
9      Q.  And I believe you said that the small
10 portion is represented by the bilge plate.
11     A.  At a certain time.  But I can show you
12 pictures that some areas are larger than that.
13     Q.  Now, this panel was scraped all the
14 way to the bottom of the concrete.  Do you
15 agree?  In Photo Number 6?
16     A.  I couldn't answer your question.  This
17 picture is not clear enough to -- you know, I
18 would have to look at the design drawings of
19 the seawall, look at the distance between
20 rebars, then scale the size of the seawall.  I
21 don't have -- I didn't spend the time with
22 doing that.
23     Q.  Is there any portion of the concrete
24 at the location of the bottom of the monolith
25 that's not scraped away by the barge in this

196

picture?
    A.  Yes.  Looks to me there is only three
or four feet that's scraped.
    Q.  The barge scraped three or four feet
of concrete from this monolith?  Is that your
testimony?
    A.  No, I tried to say the word -- I
should have used the word approximately or
about, but I say before that I need to scale
these, find the drawing with a distance between
rebars.  If you want exact numbers, I would
have to do more work.
    Q.  I want you to look at Group Number 5,
Photo Number 1.
    A.  Can you repeat, please?
    Q.  Group 5, Photo 1 to Attachment 1.
    A.  Attachment 1, Group 4?  Did you say
Group 4?
    MR. RAFFMAN:
        Hang on a second.  I'm just going
        to mark it separately.
EXAMINATION BY MR. RAFFMAN:
    Q.  Attachment 1, Group 5, Photo 1.  Let
me find it.
    MR. GILBERT:

197

    Mark, is it this?
    MR. RAFFMAN:
        Yes.  (Indicating.)
    MR. GILBERT:
        (Indicating.)
EXAMINATION BY MR. RAFFMAN:
    Q.  Do see where in your report you've got
a page that says Group 5, Page 1?
    A.  Yes.
    Q.  And you see at the bottom of the page
it says these photos show scrapes on the side
about halfway between the light and loaded
waterline and above the light waterline?  Do
you see that?
    A.  Yes.
    Q.  I'm going to hand you this portion of
Exhibit 1 so that you can mark on it.  I want
you to mark for me the locations of the scrapes
on the side about halfway between the light and
loaded waterline.
    A.  Okay.
    Q.  Draw a circle with your green pen.
    A.  Yeah.  I drew a circle with my pen.
    Q.  All right.  And is it your testimony
that those scrapes on the side of the barge

198

1  have something to do with this case?
2      A.  Something to do with this case?  Yes.
3      Q.  What do they have to do with this
4  case?
5      A.  That probably some were developed
6  during the scraping to the concrete slabs.
7      Q.  Did you do any tests on the side of
8  the barge to see whether there was any concrete
9  residue?
10     A.  No.
11     Q.  Do you know whether anyone else did?
12     A.  No.
13     Q.  Is it your testimony that these
14 portions of the barge would have been in
15 contact with the wall to create those scrapes?
16     A.  Could have been.
17     Q.  You don't know whether they were or
18 not.
19     A.  Not 100 percent sure.
20     Q.  What is it about a floodwall that
21 provides the force needed to resist the
22 accumulation of floodwaters and the pressure of
23 those floodwaters?
24     A.  Let me repeat your question to see if
25 I understand.  What is in a floodwall that

199

1  allows to receive the pressure of -- the
2  hydrostatic pressure of the water?
3      Q.  Why does a floodwall have sheet pile
4  that extends down into the soil?
5      A.  Okay.  The concrete slab that the U.S.
6  Army Corps of Engineers designed has to be
7  supported with some kind of foundation, whether
8  it is a horizontal or vertical foundation.  The
9  designers, when they decide this option, the
10 design apparently was to drive pile and sit the
11 concrete slab into vertical piles also with the
12 purpose to reduce the seepage of water from the
13 water side to the dry side.  So it was a
14 decision of somebody, in my opinion, with kind
15 of, um -- I would call it no, um -- background
16 at the time that decide to do this.  This have
17 been proven to be not the best solution.
18     Q.  Why is it not a good solution to drive
19 the sheet piling in this way?
20     MR. GILBERT:
21         Object.
22     A.  The Corps of Engineers --
23     MR. GILBERT:
24         Not the best solution?
25     A.  -- already decided, it's in many

200

1  reports, that the I-walls, which is an I-wall,
2  is not the best solution, and they're not doing
3  it again.
4  EXAMINATION BY MR. RAFFMAN:
5      Q.  Right.  And when you say not the best
6  solution, what you really mean is it's not a
7  very good solution.
8      A.  Okay.  Like I say, at the time that
9  whoever designed this didn't have enough
10 information or documentation and they adopted a
11 design that have not been working good.
12     Q.  And the I-walls failed at other
13 locations in the New Orleans area apart from
14 the Inner Harbor Navigation Canal, right?
15     A.  Repeat again.  I do not --
16     Q.  I-walls failed --
17     A.  Yes.
18     Q.  -- at other locations in the New
19 Orleans area during Katrina, apart from the
20 Inner Harbor Navigation Canal, right?
21     A.  Yes.  Completely different failure
22 than this failed.
23     Q.  Am I right that the wall derives
24 support from the soil on the protected side?
25     A.  Let me try to repeat your question to

201

1  see -- you're asking me if it's right that the
2  wall depends on the soil to support its weight?
3  This is what you're asking?  I don't understand
4  the question.
5      Q.  All right.  You've got an I-wall right
6  here that you've drawn in Sketch Number 3,
7  right?  What happens when you take away the
8  soil on the protected side of the wall?
9      A.  You say what happen when you take
10 the -- this portion of the dirt?
11     Q.  The soil support.  If something
12 happens.
13     A.  Oh.  The hydrostatic pressure will
14 push the seawall inland.
15     Q.  Right.  And so in order for the wall
16 to do its job, it needs to have support in the
17 soil on the protected side, right?
18     A.  Yes.
19     Q.  And your whole understanding of the
20 reason those breaches happened is that the
21 underseepage flow took away the support of that
22 protected side soil.
23     A.  Um -- actually, um -- developing of
24 the seawall being pushed inland is related to
25 the seepage.  But the seepage occurred because

202

1  the gaps were developed first.  And who
2  developed the gaps?  The barge.
3      Q.   All right.  Very good.  Just so I
4  understand it, then, the sequence of events is
5  not that the barge hits the wall and knocks it
6  over, that's not what happened.
7      A.   No.  I never say that in all my words.
8  These are not my words.  Not in this location.
9  There is one location where the barge actually
10 impacted the wall and broke a portion of the
11 wall.
12     Q.   That's at the very southern end of the
13 south breach, right?
14     A.   Correct.
15     Q.   All right.  Now we're going to come to
16 that.  We're going to come to that.  But just
17 so I'm clear, that's the only location on the
18 wall where the barge impacted the wall, as you
19 put it, right?
20     A.   Where I can use the word impacted.
21 Yes.
22     Q.   Only place where you can use the word
23 impact is at the southern end of the south
24 breach.
25     A.   Yeah.  The other locations are

203

1  differing level of contact.
2      Q.   Right.  And the contact at those other
3  locations is what creates the gaps, in your
4  view.
5      A.   Among other things.  Some cracks are
6  due to the heavy contact.  I already marked
7  some cracks.
8      Q.   You did mark some cracks.  But the
9  agent that caused the failure, in your view, is
10 the gaps and the seepage.  That's what I'm
11 trying to get at here is, the failure.
12     A.   Well, let's talk specifically what
13 failure.  There are failures due to impact at
14 the end of the south breach.  There are failure
15 due to the seepage throughout the two north and
16 south breach.
17     Q.   All right.
18     A.   We have to be specific.
19     Q.   Very good.  The impact at the end of
20 the south breach created some damage to the
21 rebar that you describe right here in this
22 sketch, right?
23     A.   To the -- damage to the reinforced
24 concrete.
25     Q.   To the reinforced concrete.  Very

204

good.
        Now, in back of the impact point, the
soil in back of the impact point did not
translate very deep into the neighborhood,
right?
    A.   At what time are you talking about?
    Q.   When the barge made impact at the very
south end of the south breach, the soil did not
move back in the same way, right?
    A.   Um -- no, not quite.  The entire levee
at the time -- at the time that the barge
impacted the southern end of the south breach,
the entire levee was elastically in compression
towards the dry side, stretching and allowing
the soil deformation.  So all the time the
inland side was trying to go inland as the
hydrostatic pressure increases.
    Q.   All right.  Before I get to the
southern -- I guess before I get to the
southern end of the south breach, at what time
did the underseepage flow begin to travel under
the wall at the south breach?
    A.   Okay.  The south breach is 900 feet
long.
    Q.   Right.

205

    A.   When the barge was at this location
where my hand is, seepage is started here.  And
when the barge was where my hand is, seepage
continue a little later.  And when the barge
was where my hand is, seepage continue a little
later, where seepage in the initial area
already was farther inland.  So the
distribution of the seepage changing constantly
with time.  That's why the deformation of the
seawall end up what it is.
    Q.   More time to seep at the north end of
the breach creates a bigger bow.
    A.   Yes.
    Q.   We talked about that.  How long did it
take the barge to get from the north end of the
south breach where your hand was first to the
south end of the south breach?
    A.   I would have to depend in the
testimony from fourteen witnesses, but they all
have differing ideas of time.
    Q.   I'm going to ask you to turn to
Page 23 of your report.
    A.   Yes.
    Q.   It says, Mr. Sartin heard two booms
five to fifteen minutes apart.  Do you see

206

1  that?
2      A.   I trying to find it.
3      Q.   Top of 23.
4      A.   Okay, I'm on Page 23.  Where are you?
5  Oh, at the top?
6      Q.   Yes, sir.
7      A.   Yes.  I reading what you read.
8      Q.   So you wrote, the first boom could
9  have been at the northernmost end of the south
10  breach.  The second boom could have been at
11  southernmost end of the south breach.  If the
12  booms were five minutes apart, the barge would
13  have to be moving at about 2.8 to 3 feet per
14  second.
15      A.   Yes.
16      Q.   If the booms were fifteen minutes
17  apart the barge would have to be moving at
18  about 0.94 feet per second.
19      A.   Yes.
20      Q.   Both situations are possible.
21      A.   Yes.
22      Q.   So based on what you wrote there in
23  your report, is it your testimony that the
24  barge traveled from the north end of the south
25  breach to the south end of the south breach

207

1  within five or 15 minutes?
2      A.   It's not my testimony.  I repeating
3  what a witness say in deposition.  But I don't
4  want to say my testimony because every witness
5  have different ideas of time.
6      Q.   Now, actually, if you look at the
7  bottom of Page 22, Mr. Pazos, I believe the
8  section you just read is under a caption that
9  says conclusions from the testimony of Andrew
10  Sartin.  Do you see that?
11      A.   Yes.  It's from it testimony.
12      Q.   So you've drawn the inference from
13  Mr. Sartin 's testimony that the barge could
14  have hit the north end of the south breach 5 to
15  15 minutes before it hit the south end of the
16  south breach, right?
17      A.   This is what he apparently say.
18      Q.   Do you --
19      A.   One witness.
20      Q.   Do you credit the testimony of that
21  witness our do you discredit the testimony of
22  that witness?
23      A.   I do not discredit any witness.  I
24  took the information from each deposition and I
25  try to analyze it and convert it in technical

208

wording.
    Q.   Right.  And your analysis of
Mr. Sartin 's testimony is that it supports the
conclusion that the barge may have traveled
from the north end to the south end of this
breach within 5 to 15 minutes.
    A.   It's possible, yes.
    Q.   All right.  Have you done any analysis
or computations to conclude or to figure out
how long it would take water to percolate
through soil once a gap is created in the sheet
pile?
    A.   No.
    Q.   Now, if a scientist calculated the
amount of time it would take for water to
percolate through the sheet pile --
    A.   I'm sorry.  Repeat again.
    Q.   If a scientist were to analyze how
much time it takes water to percolate through
the sheet pile, and if the scientist were to
conclude that seepage-induced instability was
not a factor in the breach, would you agree
with that conclusion?
    A.   No whatsoever.
    MR. GILBERT:

209

        Well, I didn't get a chance to
    object.  So.
    MR. RAFFMAN:
        I only want Mr. Gilbert to object
    when I tell him to object.
        (Recessed for the day.)

210

1          WITNESS' CERTIFICATE

2

3          I, HECTOR V. PAZOS, P.E., do hereby

4   certify that the foregoing testimony was given

5   by me, and that the transcription of said

6   testimony, with corrections and/or changes, if

7   any, is true and correct as given by me on the

8   aforementioned date.

9

10   _____   _____

11   DATE SIGNED          HECTOR V. PAZOS, P.E.

12

13   _____ Signed with corrections as noted.

14

15   _____ Signed with no corrections noted.

16

17

18

19

20

21

22

23

24

25   DATE TAKEN:  July 20th, 2009

211

1          REPORTER'S CERTIFICATE

2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,

3   Certified Court Reporter in and for the State

4   of Louisiana, do hereby certify that the

5   aforementioned witness, after having been first

6   duly sworn by me to testify to the truth, did

7   testify as hereinabove set forth;

8          That said deposition was taken by me

9   in computer shorthand and thereafter

10   transcribed under my supervision, and is a true

11   and correct transcription to the best of my

12   ability and understanding.

13          I further certify that I am not of

14   counsel, nor related to counsel or the parties

15   hereto, and am in no way interested in the

16   result of said cause.

17

18

19

20

21

22

23   _____

24   JOSEPH A. FAIRBANKS, JR., CCR, RPR

25   CERTIFIED COURT REPORTER #75005

HECTOR V. PAZOS, P.E.                                                    7/20/2009

Page 1

## A

**ability** 8:12 35:14 211:12
**able** 37:9 65:15 73:20
  79:7 121:17 186:21
**absence** 175:2
**absolutely** 20:14 21:2
  36:16 89:16 95:2 113:6
  125:24 137:22 143:18
  144:9 151:4,9 183:21
  193:15
**accept** 20:21,23 119:10
  127:14 142:15
**acceptance** 38:16
**accepted** 119:3
**accident** 48:3 78:2
  109:17 115:5
**accidents** 16:2,16 48:10
**accommodate** 35:1,23
  36:13
**accommodating** 36:3
**account** 36:5 57:23 59:4
**accumulation** 48:21
  198:22
**accurate** 128:6
**accurately** 8:13
**acting** 89:13,17 103:12
  104:5
**action** 1:4 69:11,12
  102:22,24 150:3,7,7
  194:7
**active** 43:23 91:16
**activities** 16:1 37:20
  40:12 65:19
**activity** 39:21 40:1 66:10
  78:11 132:25 145:14,15
**actual** 28:4 31:10 82:3
  184:23 190:9
**add** 16:17 75:13 101:7
  101:23 102:7,9 139:5
  139:13
**added** 44:23 102:5
**adding** 79:6
**addition** 86:25 101:20
  102:6
**additional** 58:13 63:9
  84:1

**adjacent** 171:10
**administering** 6:24
**Administration** 116:10
**adopted** 200:10
**advance** 45:14 47:13
**aerial** 11:19
**affairs** 38:22 39:19
**affect** 32:16 36:10 37:25
  107:25
**affidavit** 60:3,13,18
**aforementioned** 6:4
  210:8 211:5
**aft** 104:25 144:25
**afternoon** 96:13
**agent** 203:9
**ago** 16:17 25:24 43:15,19
  44:13 52:8 58:22 59:23
  63:14 93:9 146:6
**agree** 20:8 35:21 133:24
  152:17 169:25 194:23
  195:1,15 208:22
**AGREED** 6:2
**ahead** 15:1 53:9 112:11
  122:7 140:10 141:3
**air** 32:24
**airport** 129:23 130:7
**alcohol** 8:10
**ALDOCK** 2:20
**allow** 35:10 81:14 123:13
  141:22 166:15 180:24
  183:18 193:18
**allowed** 39:8 77:6,9 80:9
  148:3
**allowing** 84:6 105:14
  148:8 193:8 204:14
**allows** 91:11 156:19
  199:1
**alongside** 103:16 115:23
  120:13
**America** 2:9 7:15 80:1
  96:20 109:18 110:6
**AMERICAN** 3:7
**amount** 17:13 35:9 66:5
  66:24 92:12 128:18,21
  180:16 181:18 208:15
**analysis** 112:25 124:4

**208:2,8**
**analyze** 14:9 22:22
  129:21 207:25 208:18
**analyzed** 115:20
**anchor** 34:2 35:10,11
**anchored** 31:9 34:17
  45:24 46:25 47:21
  48:16 170:1,3 191:20
**anchors** 34:12 35:3,3
  36:21
**Andrew** 207:9
**and/or** 68:9 89:19
  124:16 210:6
**angle** 105:10,11 110:2
  153:19,21
**answer** 6:13 8:6,7 14:4
  14:13 21:22 24:21
  25:18 29:11 31:21
  41:25 42:6 45:25 46:2
  46:5 47:23 50:17 52:7
  53:16,20 54:8,15,15,19
  54:23 55:17 56:4 59:24
  60:13 61:19 62:5 64:21
  74:4 75:17 79:8,14,22
  93:19 108:8 112:6
  114:2,3,25 128:10,11
  129:14 134:23 136:8,15
  137:25 138:7,9,10,18
  139:1 143:3,7,8 174:8
  195:16
**answered** 29:14 46:2
  134:22 169:23
**anybody** 20:20 21:4 49:3
  50:7,8,10 78:21 138:17
  180:8
**anymore** 23:10
**apart** 10:4 12:18 14:13
  15:1 42:2 81:4,10
  129:13 167:15 170:15
  200:13,19 205:25
  206:12,17
**apologize** 26:5 47:15
  52:11
**apparently** 40:7 199:10
  207:17
**appear** 25:21 52:24

**59:13 166:2 183:1,5**
**APPEARANCES** 2:1
**appeared** 33:8 119:12
**appears** 25:17,25 59:19
  63:6 119:9 167:9
  170:10
**applied** 109:7,8 171:14
**apply** 23:2 162:5 188:6
**applying** 104:24
**appropriate** 64:18
**approximate** 54:7 66:23
**approximately** 57:11
  66:13 102:6,12,13
  158:14 196:8
**architect** 15:16 38:4,5,8
  38:17,24 39:4,11,17,21
  40:2,12 42:11
**architects** 38:14 42:23
**architecture** 27:9 28:6
  189:5,14
**area** 22:16 27:14 33:14
  33:20 34:4 37:11,14
  38:1 54:20 76:23 78:22
  82:21 83:1 86:22 87:2
  91:18 96:17 103:12,14
  103:19 104:3 105:23,24
  105:25 106:1 122:17,20
  123:20 132:16,23 133:3
  139:3,9 143:24 149:1
  160:7 168:16 170:24,24
  171:2,3 172:7,11 181:2
  185:13 186:12 200:13
  200:19 205:6
**areas** 37:5,17 111:12
  168:4 194:5 195:12
**Argentina** 38:12
**Army** 95:18 199:6
**arrangement** 36:10
**arrangements** 34:20
**arrive** 54:10 65:20 76:3
**arrived** 34:1 54:16,23
  55:2,5,10 77:10,19
  110:11 140:7 142:20
**arrives** 156:8
**arrow** 11:18 12:14 13:1
  149:15,18 150:3

HECTOR V. PAZOS, P.E.

7/20/2009

**article** 29:3,8,9 30:12,15
  30:16,19,20 31:8 33:8
  44:13
**articles** 28:5,10,17,19,21
  29:5,11,20 30:1 37:23
**Ashton** 49:5
**aside** 69:18 129:4
**asked** 42:2 44:14 50:25
  64:7 65:22 73:25 74:21
  74:24 134:22 142:2
  143:9
**asking** 20:1,9 54:5 55:11
  58:12,23 66:17 99:15
  132:11 138:11 192:2
  201:1,3
**asks** 69:3
**aspect** 65:23
**aspects** 35:25
**asserting** 103:1
**assist** 10:14
**assistant** 16:21 18:2,4
  20:3 25:23,25 67:25
**assistants** 19:20
**associate** 145:7,18
**associated** 109:5 145:3
  146:13 162:22
**assume** 66:20 120:23
  131:21 135:11
**assuming** 128:5 131:23
**assumption** 135:19,20
  135:21,22
**assure** 114:3
**assuredly** 128:7
**Atmospheric** 116:9
**attach** 71:23 72:5
**attached** 25:7 26:3,24
  31:12,18 35:10 53:11
  59:17 61:18 72:11
  93:18 94:12 165:2
  167:24 168:1 177:24
**attaches** 53:3
**attachment** 25:12 52:19
  63:1 176:12,13,21
  193:20 196:16,17,23
**attachments** 62:6,22
  75:9

**attended** 27:15 38:9 39:5
**attention** 12:24,25 20:10
  21:14 22:8 23:17 24:7
  24:8 37:3 78:9,19,25
  79:15 95:18 149:6
**attorney** 20:10 49:5
**attorneys** 27:16 79:1
  112:9
**attribute** 166:2,8 167:6
**August** 110:19 117:8
  118:6,12 129:24 132:8
  132:16 142:13 143:13
**author** 189:7
**authoritative** 116:2,5
  142:16 189:1,19
**available** 68:10 177:14
**Avenue** 2:22 7:2 50:15
  50:23 51:8 82:12 86:13
  97:4,11,17 98:2,3 149:3
  154:13
**averaging** 186:9
**avoid** 20:12 21:4
**avoided** 37:13
**aware** 69:14 70:5
**a.m** 118:5 119:5 138:23
  174:1,1

---

**B**

**B** 5:6
**back** 23:5 27:5 30:5,7
  31:3 42:9 44:3 49:9
  55:12 59:9 67:14 69:3
  79:18 89:7,15 108:25
  113:12 114:1 119:15
  122:24 157:25 171:19
  181:24 191:8,25 204:2
  204:3,9
**background** 199:15
**backside** 87:25 88:4
  90:12 191:21 193:11,22
**backwards** 124:2 125:7
**bad** 20:17 89:15
**badger** 136:12
**badgering** 136:5
**Bahamas** 33:25 36:21
**Ballot's** 116:23
**band** 91:15 180:15

**bank** 136:24 140:8
**banks** 117:23
**barge** 2:2 9:22 11:18
  12:2,5,6,6,13,14 13:1
  18:8 30:17 42:18 43:4
  43:5,6,6,8,20 49:1 50:6
  53:5 54:2,11,17,21,24
  55:2,6 56:1,7,14 57:8
  57:12 58:4,10,16 64:6
  66:7 77:1,11,22 78:15
  83:20,25 86:7,18 87:6
  90:12,14,15 91:22
  99:15,16,19,22 100:1,2
  100:6,12,14,22 101:1,2
  101:8,16,21 102:1,14
  102:19 103:1,2,4,6,12
  103:14,16,17,18,19,24
  104:5,14,16,18,20,25
  105:7,13,14,14,16,22
  106:3,6,8,12,18,21,24
  109:2,6 110:19 113:15
  114:12,17 119:16,19
  120:13 121:18 123:1,6
  123:12,20,20,23,25
  124:8,10,13 125:3
  126:4,16 128:23 129:1
  129:3,8 131:14,20
  133:2,6,11,14,17,21,24
  134:2,9,19 135:17
  136:2,21,23,23,25
  138:12 139:2,15,22,24
  140:7,7 141:9 142:20
  143:23 144:6,10,14,18
  144:21,25 145:3,7,13
  145:18,23 146:3,22,24
  147:2,19,22 149:20
  150:1 151:1,7 153:14
  154:3,17,18,21 155:4,9
  155:13,19 156:2,5,8,9
  156:10,12,14,25 157:1
  157:2 159:2,5,14,21
  160:4,20,21,22 161:2,7
  161:12,16 162:1,3,17
  162:20,23 164:3,5,8,14
  166:3,8 167:7,10 168:5
  168:23 169:2,3 171:21

  171:22,25 172:10,16,22
  173:9,16 174:7 176:5,8
  177:7 178:14 179:3,17
  179:24 180:11 181:15
  181:22 182:1,3,3,16,18
  183:6,20,21 184:2,5,8
  184:13,24 185:1,2,4,6,8
  185:11,14,15 186:25
  188:9 190:15,18 191:2
  191:6 192:18,22 193:13
  193:25 194:7,13,19
  195:2,6,25 196:4
  197:25 198:8,14 202:2
  202:5,9,18 204:7,11
  205:1,3,4,15 206:12,17
  206:24 207:13 208:4
**barges** 1:6 9:25 11:24
  15:22 30:13 33:5 37:8
  42:21,25 43:1,11,12,14
  43:15,20 44:2 45:6,14
  47:5,7,13 82:24
**BARNETT** 3:8
**Baronne** 2:5
**base** 84:17 88:8
**based** 44:22 73:20
  108:16 111:5 112:23
  131:19 156:1 206:22
**baseline** 164:12
**bases** 72:14,22 73:1
**basic** 13:22
**basically** 90:18 91:3
**basin** 117:24
**basis** 73:3,9
**Bates** 176:23
**batture** 121:13
**bearing** 125:22
**bears** 62:18 94:4 177:1
**becoming** 172:6
**began** 50:11
**behalf** 25:4 78:6,22
  79:13
**beholder** 135:5
**believe** 8:14,15 9:17,20
  11:3,11 13:2 22:6
  24:16 26:16 30:14,18
  31:5 32:14 43:9,9 44:1

HECTOR V. PAZOS, P.E.

44:10,12,19 45:8,16,21
47:16 51:9,20 55:9
61:11,21 63:11 65:15
67:8,9 73:8 75:11
76:15 77:15 81:12
94:14 99:18 101:3,9
122:3 123:19 134:24
142:23 152:11 165:21
168:25 181:17 189:17
195:9 207:7
**beneficial** 73:19 75:11
**Benoit** 1:12
**berm** 117:22
**best** 8:21 13:20 14:2 61:7
120:21 173:19 175:3,6
181:8 199:17,24 200:2
200:5 211:11
**better** 41:22 46:6 121:4
152:21 174:15
**beyond** 111:10
**big** 92:18 110:17 163:3,5
163:6,7,8 185:4 186:11
**bigger** 93:25 205:12
**bilge** 145:23 159:7,10
160:15,18 185:9 195:10
**bilges** 145:22
**billed** 66:1,6,13
**bit** 100:11 101:23
**BLAND** 3:17
**blasted** 147:19
**blew** 130:24
**blocks** 175:8
**blowing** 113:20 132:2
149:19
**board** 38:13 98:1 99:9
121:3 171:19
**boards** 39:9
**boat** 22:20 30:24 32:3,17
33:11 34:2,5,6,11,16,25
35:2,6,7,10,12,16,17,19
36:11,14,19,20 109:19
109:21,22 110:6,7,8,11
110:12 115:22
**boats** 15:23 33:11 34:3
34:19 35:19 37:21
**body** 112:18

**bogging** 137:17
**book** 188:24 189:5
**books** 28:5,6,10 189:15
189:22
**boom** 206:8,10
**booms** 205:24 206:12,16
**Borne** 117:21
**bottom** 53:22 85:15,19
89:20 90:4 91:14 102:1
102:4 145:22 146:3
149:12 156:25 157:1
159:2,5 162:2 164:4,5
177:2,9 180:20 195:14
195:24 197:10 207:7
**Boutte** 1:8
**bow** 92:18,19 110:9
182:5 205:12
**boys** 124:17
**BRACKETT** 3:17
**breach** 54:3,14,17,24,25
55:3,7 56:2,8,11,15,15
56:18 58:11,17 63:25
79:18,22,24,24 81:5,24
82:4,13 83:13 85:12,14
85:19,25 86:8 87:12
91:17 92:8,14,19 98:9
98:17,25 99:3,4,5
121:19 123:2,22 127:7
127:16 128:24 133:2,12
133:15,18,22 134:3,10
134:20 135:18 136:2,22
137:2,7 138:13 139:7
139:15,25 141:10 142:5
142:21 143:2,24 144:7
144:15,23 145:4,8,19
146:14,23 147:3 148:10
149:4 151:3,8 159:3
165:24 170:24 171:2,18
171:23 172:11,13,23,24
173:10,16,25 175:21,24
176:1,3 177:7 178:22
178:23 179:12,13 180:6
180:7,22,23 181:4,5,11
181:12 190:20 192:20
202:13,24 203:14,16,20
204:8,12,20,22,23

205:12,16,17 206:10,11
206:25,25 207:14,16
208:6,22
**breaches** 1:4 50:16,24
51:8 54:12,20 60:11
63:20 82:10,15,17,20
142:1 148:25 201:20
**break** 12:4 64:5 95:9
96:11 103:17,19 104:16
110:15 190:1
**breakdown** 17:16
**breaking** 86:20 105:5
106:22 109:2 147:7
156:16,16,18
**breaks** 23:21 85:5
**Brian** 2:3,4 9:1 157:19
**bridge** 86:13 97:5,11,18
98:2,3 130:7 143:18
179:7
**bridges** 127:4
**brief** 8:17 11:12 12:22
14:1 48:22 49:7 93:6
164:18
**briefly** 9:2,8 11:9 13:15
14:5 60:24 61:14
**bring** 137:12
**broke** 23:24 34:21
103:22,23 104:14,18
105:6,7,21 106:3,4
109:4,25 110:5,11,19
114:12 119:16 131:14
148:19,20,20 155:14
202:10
**broken** 10:3 113:15
114:17 170:1,4 177:15
177:16
**brought** 133:2 168:6
**BROWN** 3:8
**build** 39:22 40:3,7
**building** 91:5
**buildings** 107:3 108:22
113:11 127:3
**built** 100:11
**bulk** 43:7
**bullet** 46:21,23 47:19
118:2,3

**bumping** 182:1
**business** 15:18 28:18
42:13
**Buys** 116:23

---

**C**

**C** 3:19 97:11 98:5
**cake** 182:20
**calculate** 163:8
**calculated** 208:14
**calculation** 154:5 156:3
**calculations** 154:2
155:24 163:14 175:16
186:24 194:12
**California** 23:7
**call** 32:14 37:1 52:4 74:6
89:18 131:22 190:2
199:15
**called** 12:23 28:24 36:22
44:9 51:12 70:16,19,20
88:9
**calls** 70:22 71:2,6
**cameras** 76:24
**canal** 1:4 32:2 34:10,11
34:17,22 35:17 49:3
50:15,23 51:8 54:4
55:7 60:11 63:21 64:16
65:14,24 66:3 80:21
82:10,12 84:12 86:1
87:17,23 88:6 91:5
95:24 98:20 110:18,24
114:22 118:20 123:1,24
126:16,22 127:11 131:1
132:3 134:18 139:1
143:13 154:13 156:2
158:19,21 163:17,23
175:13,16 180:5,21
181:3 185:19,20,22
186:3 187:5,6,7,21
188:11,13,19 193:6
200:14,20
**cap** 160:15 194:25 195:3
**capabilities** 152:10
**capacities** 152:10
**capacity** 153:5
**capsized** 109:22 110:2
110:12 115:19,23

**caption** 60:8 207:8
**cardboard** 172:15
**care** 23:22 70:4
**cared** 133:3
**career** 19:11 28:22 29:12 29:22
**cargo** 124:16
**Caribbean** 33:24 115:23 116:2
**carried** 18:12
**carry** 18:7 43:7 76:24
**carrying** 22:20 89:11 90:15
**carryover** 85:16
**cars** 33:4
**case** 7:9,11,12 11:7 18:8 18:8 20:15,17,21,22 21:17 23:19 24:12,16 25:2 29:1 36:8 37:5 44:21,22 45:1 46:15,17 47:13 48:12 61:2 66:7 67:17 70:8 72:20 73:7 78:12 79:16 81:1 95:11 102:16,20 111:12 115:17,22 134:7 135:16 137:24 163:9,9,18,23 163:25 175:17,18 187:2 198:1,2,4
**cases** 19:10,14,19 20:1 21:11 22:11,17,20 23:16 24:3 29:7 31:11 44:24 45:5,13,17,22 48:17,21 110:4 115:2,7 115:8,8,10,18 175:19 188:24
**casualty** 23:16 24:3,3
**caught** 12:25
**cause** 11:5 31:8 45:23 50:15 51:7 56:15 63:20 65:13 71:6 77:14 85:18 85:24 96:1,3 135:16 139:21 141:21 211:16
**caused** 32:23 50:23 54:3 54:11,17 55:2,6,15 56:1 56:7 58:9,10,16 63:25 77:22 105:22 110:15

139:15 147:25 203:9
**causes** 69:2 76:1 87:1 134:18
**causing** 86:20,25
**CCR** 1:24 6:22 211:2,24
**center** 35:17 108:21 116:13,18 131:25 132:15,21
**central** 109:18 110:6 118:5,11 119:5
**Centre** 1:20 2:13 3:11
**century** 36:23 37:2
**certain** 29:1 37:11 66:18 70:21 150:15 185:23 188:20 195:11
**CERTIFICATE** 210:1 211:1
**certification** 6:9
**Certified** 1:25 6:23 211:3,25
**certify** 210:4 211:4,13
**cetera** 155:17
**Chaffe** 1:19 2:10
**chance** 209:1
**change** 11:5 20:20 26:18 108:14 123:13 125:7,22 128:18 150:19 169:13 181:21
**changed** 63:21 105:3 143:6 150:13
**changes** 22:23 25:19 63:24 64:2 108:23 125:6 127:1,5 162:25 210:6
**changing** 21:25 107:4,6 107:16,19 108:15 127:2 127:5 128:15,19 156:9 162:6 182:4 185:12,12 186:22 187:23,25 188:1 188:2,2 194:4 205:8
**chapter** 125:13
**characteristics** 96:5
**charges** 65:16 66:24
**CHARLES** 4:2
**child** 133:8,10
**choose** 17:4 36:11

166:15
**circle** 166:6 178:9 184:6 184:7 197:22,23
**circled** 168:4 171:4 178:13
**circumstances** 36:7
**cited** 130:19 166:23
**civil** 1:4 6:6 40:8 142:17 184:15
**Claiborne** 86:13 97:10 98:3
**claim** 101:11
**claims** 21:8
**clarification** 93:3
**clarify** 8:3 192:3,10
**clear** 47:19 58:2 62:9 70:11 82:3 105:17 120:23 131:15 133:8 136:18,21 138:16 139:14,19 159:17 167:14 191:5 193:5 195:17 202:17
**clearly** 56:20 120:23 122:19 173:2 177:10 184:11 185:5
**clients** 25:4
**clocks** 174:22
**close** 34:20 36:24 54:6,21 81:11 87:2 130:7 141:13 147:13 154:20 155:8
**closed** 34:9 104:10
**CLUB** 3:7
**CMO** 53:7
**CMOs** 53:4
**coaming** 101:5,7,9,11,11 101:14,18 102:8
**Coast** 34:9 38:12
**Code** 6:6
**coincide** 119:9 173:3,21
**collapse** 31:8,18 32:17
**colliding** 22:21
**combination** 111:1 123:12 156:11 161:5
**combined** 101:12,14,18 110:16

**come** 49:18 53:3 65:22 155:25 167:15 191:25 193:8 202:15,16
**comes** 97:7 170:15 171:22 172:12
**coming** 19:25 93:3 97:14 176:25 181:24 185:8
**comment** 13:19 15:13 121:20 137:18 191:13
**commentary** 138:6
**commented** 11:20
**comments** 51:14 63:16 64:3 69:19 73:19 165:6
**common** 105:17
**companies** 17:5 18:14,20 22:4 23:7,13,14 24:2 41:11,12 42:25
**company** 23:1,8 43:11
**compared** 183:22,22
**complaint** 24:18,20
**complete** 8:8 9:9 57:15 62:25
**completely** 100:20 125:25 162:10 169:14 185:24 200:21
**complies** 96:22 97:6,12 98:14,18 99:1,6,11 123:17 159:18,20 161:9 172:20 178:10
**composed** 56:18
**composition** 59:23 60:16 163:12
**compressed** 87:8
**compressing** 180:13
**compression** 90:8 92:1 204:13
**compressive** 184:20
**computations** 208:9
**computer** 211:9
**concentrate** 20:14 78:10 132:25
**concentrating** 168:16
**concerned** 53:1 64:3
**concerning** 119:24
**conclude** 133:17,21 134:2 135:2 136:1

181:22 183:5 208:9,21
**concluded** 58:16 83:12
85:12 134:9,17 135:17
149:19 154:11
**conclusion** 54:2,11,17,24
55:2,6,11,15 56:1,7,14
58:10 129:7 163:15
208:4,23
**conclusions** 11:6 13:13
13:22 14:3 63:19 75:6
131:9 207:9
**concrete** 57:3,7,13 86:19
147:4,12,20 148:8
160:11 166:7 168:9,14
178:19 179:4,18 182:10
184:14,16,18,19 193:13
194:1,10,15,18,24
195:3,4,7,14,23 196:5
198:6,8 199:5,11
203:24,25
**condition** 102:14,19
104:3 150:18
**conditions** 36:1,4 99:23
99:24,25 111:5,6
112:18 114:21 115:4,13
143:1,5,12,14 153:7,21
163:22 187:21
**conduct** 64:4
**conference** 15:4
**connected** 34:18
**connecting** 70:12
**connection** 9:19 53:5
65:13 66:7 80:25 85:3
151:18 169:25 170:3,15
**considered** 73:15
**consistently** 14:20
**Consolidated** 1:6
**constant** 106:10 107:2,4
194:6
**constantly** 27:23 106:10
205:8
**construction** 40:13 42:17
182:9
**consulting** 41:3,9,11,13
41:18,19 42:3 69:12
**contact** 19:1,18 47:12

144:20 145:15,18
146:22,25 147:2,25
148:6 154:25 155:9
156:15,16 159:2,6,10
160:11,13,19 163:1
166:3 167:6,10 168:5
168:16 171:22 172:1,6
172:12 179:6,24 180:2
180:3 181:15,18 184:19
184:23 185:8,14,16
190:15,23 191:1,3,4
192:19 194:8 195:6
198:15 203:1,2,6
**contacted** 18:16,19 33:10
33:14 34:8 44:12
144:18,22 147:23
149:20 151:2,7 154:19
154:19 155:4 157:2
160:3 176:8
**contacting** 57:13 123:21
160:5 162:20 176:7
180:12 192:23
**contacts** 83:25 195:7
**Contain** 73:3
**contained** 14:10 72:15
72:23
**contains** 72:18,25
**contention** 178:12
**contents** 46:11 47:3,7
48:2
**continuation** 120:24
**continue** 87:19 88:16
192:22 205:4,5
**continued** 193:2
**continuity** 153:1,4
**contractor** 42:15
**controlled** 38:11
**conversation** 71:5,10
**convert** 207:25
**conveyed** 91:5
**coordinates** 118:18,19
118:23
**copy** 25:1,16,21,22 26:2
26:9,9,11,18 27:2 52:10
60:20 69:25 71:15,21
71:22 72:5 177:18

**corner** 105:1 144:24
177:10
**corporation** 15:21 17:22
42:12,13,14 112:22
**Corps** 93:4 95:18 199:6
199:22
**correct** 7:16 11:25 13:11
19:3 39:11 46:13 49:16
50:3,13 55:3,4,8 58:7
62:24 64:7 72:9 75:6
80:17,20 81:2,24 82:5,8
84:24 88:2 91:8,13
92:22 93:1 94:1 95:25
99:20,21 100:5 107:20
114:19 115:6 119:10
127:15 128:3 133:5,13
141:24 144:9 147:17,21
147:24 148:2 149:5
158:3 169:3 175:10
180:1 181:17 184:3
190:24 193:20 202:14
210:7 211:11
**corrected** 11:21
**correction** 109:12
**corrections** 61:23 210:6
210:13,15
**correctly** 147:10 191:20
**correlates** 177:11
**corrosion** 155:17
**counsel** 6:3 10:14 52:10
62:11 122:7 140:4
211:14,14
**counsel's** 114:2 138:5
**counted** 29:23
**counter** 126:7
**counterclock** 108:12
**counterclockwise** 107:15
107:23,25 117:4,20
**country** 38:12,19
**couple** 98:6 160:25
169:16 174:12 187:16
**course** 10:9 19:10 25:19
28:22 29:12,21 35:4
38:19 44:22 47:3 48:3
53:22 61:1 71:5 75:10
96:6 102:17 105:24

109:10 110:3 115:17
116:9 119:7 120:5
122:12
**courses** 27:13,17,24 28:1
37:22,24 39:7 44:5,8,11
44:15,16,20 45:3 46:8
46:12
**court** 1:1,25 6:23 7:21,23
37:6,18 60:9 75:11
111:18 211:3,25
**cover** 129:20
**covers** 65:18 101:12,15
101:18 102:2,7 164:8,9
164:10
**co-counsel** 61:10
**co-counsels** 74:14
**CPA** 66:18
**crack** 168:17,17 169:20
171:16 184:16,17,21,23
185:1,2,4
**cracks** 147:5 155:17,21
166:2,7 167:6 168:15
168:19 169:16,18
177:14 184:5,6,7,12
203:5,7,8
**create** 56:25 88:9 139:17
139:21 143:17 148:9
149:25 168:17 179:24
184:17,20 198:15
**created** 54:24 146:23
147:3 148:7 156:6
178:14 182:16 188:18
203:20 208:11
**creates** 84:5 89:18 127:4
203:3 205:12
**creating** 57:14 58:5
86:15 172:2 192:25
193:2
**creation** 91:10 95:22
96:2,4
**credit** 207:20
**crest** 186:19,22 188:20
**crew** 15:23
**criticizing** 21:5
**crushing** 145:2,6,10,11
147:1

HECTOR V. PAZOS, P.E.

7/20/2009

**culminates** 85:7
**current** 26:11,16,17,18
27:3 100:1,3 104:2,7,8
104:9
**currents** 99:25
**curriculum** 25:16 27:3
44:4
**cursory** 59:18
**curtain** 84:7,12 87:16,25
89:14 95:23
**CUSHING** 4:2
**cut** 111:16
**CV** 25:19,22 26:1,2,6,9
26:12,15,16,17,18
28:15

**D**

**D** 5:1,6
**DAGGETT** 4:3
**damage** 145:2,6 155:22
203:20,23
**DANIEL** 3:2
**dark** 142:19
**darker** 96:24
**dashed** 184:9
**data** 55:14,25 56:6,9
73:14 115:12,15 116:3
116:6,21 129:7,15,18
129:19,22 130:2,15,17
130:20,23 131:2,9,16
131:16,19 132:1,15,21
**date** 10:22 54:5 62:18,19
63:6 67:5,5,10 177:1
210:8,11,25
**dated** 26:3 51:14
**day** 65:21 76:3 209:6
**daylight** 118:11 119:5
142:24
**days** 174:25
**daytime** 118:6
**deadline** 69:14
**deal** 39:18
**December** 51:15 66:15
**decide** 16:14,16 36:2
174:19 199:9,16
**decided** 95:19 199:25
**decision** 199:14

**deck** 101:13,15 102:4
**declined** 22:4
**declining** 23:1,9
**deep** 56:19,20 146:8
204:4
**deeper** 152:1,14
**defendant** 20:11 24:4,14
**defendants** 21:15,20
23:16
**defense** 21:24 22:1,5
42:15
**deficient** 145:14
**defined** 52:6 71:11
**deflecting** 110:25
**deformation** 204:15
205:9
**deformations** 145:20,22
**degree** 27:10 38:15,23,25
39:3,3 79:20 128:18
144:19 153:17,22,24
**degrees** 27:7,8,18 35:8
39:6,7 105:11 128:19
153:18,19,22 162:7
188:21
**deny** 40:1,11,11,15
**depend** 131:6,8 205:18
**depending** 110:21
113:22 124:24 181:6
**depends** 36:7 172:25
174:24 181:17 201:2
**deposition** 1:18 6:4,14
8:24 9:7,20 10:5,7,15
10:23 11:1 14:14,17
24:24 25:1 26:21 27:2
52:14 61:13 70:1 71:23
72:6,7 93:14 109:13
164:23 177:20,21 192:6
207:3,24 211:8
**depositions** 7:11,17
**depth** 96:7 101:3,4,21
160:8
**Derek** 2:11 157:12
**derive** 17:16 55:15 111:4
112:17
**derived** 18:11,22
**derives** 200:23

**describe** 37:17 38:15
42:20 47:6 73:9 82:21
171:20,24 175:20,24
181:16 203:21
**described** 43:4 45:12
46:11 73:16 113:17
151:17 170:12,16 171:3
178:4,20
**description** 190:5
**descriptions** 45:1
**design** 15:22 16:8 39:22
40:3,9,13 43:1,3,8,24
189:16,19 195:18
199:10 200:11
**designed** 42:15,18,24
43:12,14 44:1 184:15
199:6 200:9
**designers** 42:24 199:9
**designing** 17:12 42:20
43:20
**destroyed** 33:12,20
**detail** 10:8 11:10 13:16
24:20
**detailed** 78:3 124:4
143:3
**develop** 22:23 28:6 84:23
110:22 112:23 123:25
126:14 153:8,13 154:2
154:6,9 179:19
**developed** 28:5,10
139:20 143:21 144:3
154:8,11 198:5 202:1,2
**developing** 116:16 139:8
139:16,21 201:23
**develops** 84:16 153:19
**diagram** 119:15 156:22
159:9 161:11,22 172:9
**difference** 16:3 21:15
38:7 103:15 155:6
186:17
**different** 26:11 34:20
39:7,8 50:9 60:22
62:18 74:10 76:13 77:8
79:23 115:18 126:9
130:6 143:16 151:23
152:9,10 153:4 162:10

175:1 180:18 185:25
187:13 188:12 200:21
207:5
**differential** 142:1
**differently** 108:1
**differing** 173:1 180:16
186:8 203:1 205:20
**difficult** 65:20
**digress** 161:5
**directed** 51:1
**direction** 20:21 106:16
107:2,5,6 108:23
113:19,22,23 124:2,6
125:4,19 126:7,9,21
128:15 129:1,3,9 130:3
130:4 143:15 149:18,23
150:7,10,11,22 151:1,6
171:25 185:12 192:14
**directions** 150:19 182:22
**dirt** 201:10
**disagree** 11:16 131:4
190:21
**disaster** 34:21 47:4
**discontinuity** 56:21,21
57:20 152:7 153:1
154:15,20,23 155:7,9
155:18
**discredit** 207:21,23
**discrepancies** 144:4
**discuss** 20:2 37:12 41:19
195:5
**discussed** 77:12,16
115:21 164:11 172:4
179:3
**discussion** 78:3 137:9
151:13
**dislodged** 169:8
**displaced** 92:1
**displaces** 92:1
**distance** 81:13 141:25
154:24 172:6 187:25
194:8 195:19 196:10
**distribution** 205:8
**District** 1:1,2 60:9,10
**diving** 110:7 115:22
**dock** 34:5,14,16,18,20

HECTOR V. PAZOS, P.E.                                                          7/20/2009

80:4,18,25 105:8,22
106:7,9,14,16,19,22,25
109:21,23 110:12
115:23
**docking** 34:10
**docks** 34:3
**document** 9:10 10:17
15:7,8 51:13 52:20
53:14 55:22 58:22 62:2
62:15,16 63:1,17 69:10
70:1 93:12,15 95:9
119:12 132:17
**documentation** 76:17
200:10
**documents** 9:2,4 10:7
15:2,9 51:10 54:9
55:19,21 58:19 63:14
63:15 68:21,24 69:2
73:7,17,18 94:22
100:24 118:14 119:8,9
130:11 132:19,20
173:21 177:14
**doing** 16:1 17:6,13 24:19
28:25 38:2 41:3,11
49:24 70:11 76:11 79:7
90:15 120:4,21 157:22
181:7 195:22 200:2
**dollar** 65:9
**dollars** 65:11 67:4
**domiciled** 141:13
**dominant** 104:5 126:18
126:19
**Don** 10:23
**double** 188:23
**downsize** 16:14
**downsizing** 15:25
**dozen** 34:18 75:23 119:8
189:23
**Dr** 151:17
**draft** 67:19 70:23 100:22
100:25 161:2
**draftmans** 16:13 42:23
**dragging** 35:11
**drastic** 69:12
**draw** 55:25 99:4,5
100:12 119:19 172:9

197:22
**drawing** 100:11 122:20
158:9 196:10
**drawings** 195:18
**drawn** 11:6 106:18
131:10 154:21 157:7
159:24 201:6 207:12
**drew** 13:14 100:17
149:10,15 184:22
197:23
**drift** 13:23
**drifted** 36:20
**drifting** 36:21
**drilling** 15:22 48:3
115:19
**drive** 82:18 106:8 199:10
199:18
**driven** 126:6
**driving** 106:6 124:19
126:4 182:9
**drop** 140:5
**dropped** 105:4
**drove** 82:21 191:7,7
**drugs** 8:11
**dry** 180:13 199:13
204:14
**due** 48:6,7 126:13 172:4
174:22 203:6,13,15
**duly** 7:4 211:6
**DUVAL** 1:9
**dying** 110:3 140:23
**D.C** 2:23

──────────────

**E**

**E** 1:17 5:1,1,6,6
**earlier** 81:3 172:18
174:11 185:7
**early** 21:23 49:20,22
50:5,12 53:23 126:23
**earth** 117:22 182:9
**earthen** 84:8,13
**easel** 96:15
**east** 83:21 117:7 118:5,9
119:4 136:24 140:8
**eastern** 1:2 49:2 60:10
**easy** 176:11
**EBSB** 117:23

**edge** 169:20
**editorials** 37:23
**effect** 108:21
**effects** 89:15
**eight** 26:15 46:8 84:1
163:11,15 175:15 187:1
187:3 195:7
**eighties** 23:5
**either** 81:23 97:22
124:15 129:20 154:22
155:20
**elaborate** 30:25 104:6
143:5,9
**elaborated** 64:7
**elaborating** 143:15
**elastically** 204:13
**elasto** 148:13
**elastomeric** 147:7 148:7
148:14,15 156:17
169:20 182:10
**electrical** 138:23
**Electronic** 94:20,23
**elevation** 117:21 144:3,5
177:11 185:23 186:8,21
**elevations** 143:16 144:1
**embankment** 84:8,13
**EMORY** 3:19
**employed** 49:18
**employees** 16:19 17:25
64:4
**employment** 41:2,7
**encountered** 87:12
**energy** 1:19 2:13 3:11
194:13
**engagement** 41:15
**engineer** 15:17,18 16:11
27:11 38:5,8,24 39:4,11
39:13,17,22 40:2 93:4
**engineering** 16:7,10
17:12 27:9,10 31:10
39:1,3 40:8 44:1,5,8,11
44:17 45:2 94:21 95:7
**engineers** 16:12 27:24
38:14,18 42:23 95:18
184:15 199:6,22
**enjoy** 16:15

**enter** 80:9
**entering** 80:10
**entire** 17:7 65:19 88:8,9
102:10 103:6 152:22
159:22 160:5 179:1,10
180:5,14,14,16 181:10
181:20,23 182:12 187:5
187:17,22,23 188:5
190:7 204:10,13
**entitled** 51:13,15
**entry** 28:9 47:8
**environment** 126:13
**equation** 126:13
**equipment** 42:16,17 43:3
43:24
**equivalent** 168:13
**erroneous** 11:15
**error** 11:21 12:3 26:6
**errors** 144:4
**ESQUIRE** 2:4,11,12,19
2:20,21 3:2,10,19
**establish** 155:25 194:13
**estimate** 127:15
**estimated** 105:4
**et** 155:17
**event** 180:25
**events** 85:11 86:3 99:14
175:9 185:19 202:4
**eventually** 57:15 74:8,22
**everybody** 133:8 136:24
**evidence** 6:15 75:20
131:22 133:5 136:20
137:7 138:3,11,15
139:14,19,24 140:21
141:9 142:4 165:9
190:14
**exact** 65:8 196:11
**exactly** 30:25 48:10
59:25 74:9 101:10
107:1 113:11,21 171:15
183:9
**EXAMINATION** 5:3
7:13 8:18 9:23 12:9
14:25 25:10 27:1 29:19
30:10 31:6 48:23 49:12
52:12 53:12 60:1 61:25

──────────────────────────────────────────

JOHNS PENDLETON COURT REPORTERS                                     800 562-1285

62:14 65:4 72:13 89:3
93:7,23 94:18 96:12
97:20 108:9,24 112:3
112:15 114:10 120:8
121:16 127:25 128:13
131:17 132:6 135:10
136:17 138:2,14 139:4
140:9,20 141:7 157:14
157:24 164:19 165:5
167:1 168:2 178:1,11
190:13 191:18 192:17
196:22 197:6 200:4
**examined** 7:5
**exception** 93:19
**excess** 103:9
**exercise** 127:21 128:6
**exhausted** 142:3
**exhibit** 5:8,9,10,11,12,13
5:14,15,16,17,18,19,20
24:24,25 25:6 26:21,23
27:2,8,21 52:14 53:10
59:11,16 61:13,17 62:2
62:16 63:3 67:14,16
72:5,7,9,10 93:13,17,24
94:3,8,9,11 164:23
165:1,19 167:14,16,20
167:21,21,23,25 177:19
177:21,23 178:13 184:6
185:21 190:14 193:23
193:23,24 197:17
**exist** 104:9
**existed** 187:21 188:10,12
**exists** 130:18
**expand** 25:18 68:12,19
69:21
**expanded** 68:9 73:5
**expect** 146:21 164:3
182:14 185:10,15
**expected** 20:20 35:23
100:19 124:15
**experience** 23:25 24:5
32:11 37:8 40:14 42:20
43:19 112:8 129:16
**expert** 9:6 15:21 16:4,17
17:2,18,21,25 18:11,22
21:7 22:11,16 23:2

37:6 51:6 69:15,24
70:9,13 105:5 111:9,23
111:24 112:4 122:13
134:7,15 135:14 137:20
**expertise** 37:11,13,18,19
38:18,22 111:13
**experts** 69:19 70:6 134:7
134:16 135:24
**explain** 33:12 95:13
102:18 131:19 133:7
141:24
**explained** 141:25
**explaining** 36:8 133:1
**explanation** 92:17
131:19
**expose** 105:23
**exposed** 102:21,23 103:2
103:4,14,19,21,25
194:11
**express** 131:6
**expressing** 170:9
**extend** 161:7 178:17
179:1,9 181:10
**extending** 182:15
**extends** 84:17 199:4
**extension** 146:8,9 147:5
**extensive** 94:2,15
**extent** 166:11
**external** 57:2 100:3
**extra** 121:13,14 124:16
**extracted** 81:17,22
**extraction** 93:22
**extraordinary** 105:18
**extreme** 39:24 106:13
**extremely** 77:25
**eye** 107:13 108:11 117:4
117:18 118:4,9 119:4
135:4 173:24 187:24,25
**e-mail** 19:24
**E-99** 93:4,9,15,20,25
94:9 95:9,12,16,21 96:1
96:3

─────────────
**F**
**F** 97:5,18,23
**FABRE** 3:25
**face** 140:25

**facility** 30:17 80:23,25
118:20
**facing** 194:10
**fact** 119:22 152:13
160:22 174:25 180:5
181:19 184:25 191:19
**factor** 126:18,20 208:22
**factors** 58:8,9,13,15 96:7
**fail** 48:6 86:23 87:1,2
**failed** 48:7 77:4,11 79:17
169:5 200:12,16,22
**fails** 91:22
**failure** 30:20 31:4,8,11
32:7,12 45:18,23 46:24
47:20 48:15 56:22,24
56:25 57:15 58:6 76:2
77:23 88:15 135:17
148:7 170:11 200:21
203:9,11,13,14
**failures** 49:2 65:13 77:14
134:19 203:13
**fair** 20:5 39:20 64:1
122:9 142:6 144:16
159:8 174:14
**FAIRBANKS** 1:24 6:22
211:2,24
**fall** 49:14
**familiar** 116:23
**Family** 1:13
**far** 7:10 53:1 71:4 73:13
111:10 127:6,15 139:18
178:16 190:6 191:13
**farther** 89:11 90:25
141:17 160:17 205:7
**fashion** 104:23
**faster** 193:2
**features** 146:13,14
**feel** 37:10,12,15 70:2
75:1 131:5
**feet** 35:14 56:19,19 57:16
58:6 81:14 85:8 86:10
86:13,18 87:6 92:4
99:16,17 101:13,15,19
101:21,22 102:5,11,12
102:13 103:9,13,18,20
103:20 124:1,21,22

125:1,2,4,19 127:17,18
127:18,18,18,24 146:8
146:8 152:2,5 155:2,4
155:10,11 160:22 161:1
161:3,12,15,16 162:2,3
162:11,15,19,19 163:3
163:11 164:6,11,13,16
170:3 172:2 176:6
179:7 180:18,20 183:23
186:1,3,4,17 187:8,20
196:3,4 204:23 206:13
206:18
**fetch** 113:1,4,4,7
**field** 38:18,21 51:16
54:10 65:22 76:11
151:18,22 189:6,22
**fields** 28:7
**fifteen** 155:11 164:15
205:25 206:16
**fifty** 17:9 37:7 52:4 55:18
61:3 129:13,16
**figure** 13:4,5 125:15
208:9
**filed** 52:25
**files** 94:4
**filing** 6:9
**film** 186:20,21
**final** 51:21 53:2 69:14
**find** 12:23 14:6,6 15:12
97:4 127:8 166:19
196:10,24 206:2
**findings** 63:24
**fine** 47:24 160:4 166:20
**finish** 9:9 127:23
**finished** 86:8
**fires** 9:12
**firm** 20:14
**firms** 21:23
**first** 7:4 9:13 10:24 17:24
18:18 19:1 25:8,17
39:10 47:3,8,12,12
48:24 49:10,18 53:17
53:18 54:1 58:16 60:3
60:5,5 61:20 62:17
68:2 70:25 75:25 76:3
76:6,22 77:2,5 78:16

HECTOR V. PAZOS, P.E.

7/20/2009

79:25 83:7,16 92:15
98:11 104:17 105:6,20
106:4 120:10,20 121:20
143:23 154:19 202:1
205:16 206:8 211:5
**FISHER** 2:12
**fit** 161:10 190:4
**five** 12:5 43:2 44:11
48:20 55:19 133:8,10
162:19 164:13 173:13
184:10 186:3,17 187:1
187:3,20 205:25 206:12
207:1
**five-year-old** 135:25
136:1,21,25 137:5,18
140:1,5,6,15
**fixed** 31:9,11 32:7,12,14
45:23 46:25 47:20
48:16 121:25
**fixing** 121:22
**flag** 97:17
**flags** 97:15,16
**flat** 171:16
**flexible** 168:10 182:19
**flip** 60:5 61:14
**flipping** 62:1
**float** 176:6 185:1,3,4
**floating** 35:2,7 36:11
43:3 124:16 126:2
183:13,15,19
**flood** 51:16 91:5,10
95:20 138:24,25 139:3
158:17,19,21 159:23
160:6 191:24
**flooded** 139:10 148:10
**flooding** 139:8 141:12
147:7 148:8,9
**floodings** 174:23
**floodwall** 49:1 63:20
76:2 77:5,12,23 79:17
81:4 83:21,23 84:2,5
85:9 86:9,10,12 87:7
89:25 90:6,16,18 91:15
91:22 92:15 98:21,24
152:19,25 154:3,7
156:25 158:10,20 159:1

161:21,24 162:2,4
164:4,6 179:2,10 180:6
180:22 181:4,11,21,23
198:20,25 199:3
**floodwalls** 82:25
**floodwaters** 198:22,23
**floor** 31:18
**Florida** 7:3 18:4 33:20
33:24 34:1 97:4,17
98:2
**flotation** 125:25
**flow** 87:8,11,11 88:5
90:11 91:16 104:9,10
104:10 201:21 204:21
**flowing** 57:9 87:15
**flows** 87:20,24
**fly** 32:23 162:16
**flying** 32:21 33:1,2,5
**FMC** 42:11,13,14
**follow** 147:11
**follows** 7:5
**foot** 35:15 154:22 159:22
160:5 161:1,24 163:16
175:15 187:1,3 195:7
**force** 57:2 100:3 104:5
104:24 105:1,13 106:1
109:7,8 110:5,14
143:15 149:13 153:20
156:6 184:20 194:9
198:21
**forced** 57:10 138:22
**forces** 102:25 149:24
150:19 168:7,12 171:9
**fore** 104:25
**foregoing** 210:4
**forensic** 44:4,8 45:2
**forgetting** 186:12
**form** 6:12 12:8 115:12
**formalities** 6:8
**formation** 175:21
**formed** 175:25 176:2
**forms** 48:16
**formula** 111:3 112:16,21
112:24 125:8,10,11
**Fort** 32:2,6,11 33:8
**forth** 211:7

**forty** 52:4 55:21 67:11
**forward** 144:25
**found** 13:12 14:7 93:5
180:8 181:20
**foundation** 199:7,8
**four** 15:2 35:3,4 142:3
162:19 164:13 184:10
196:3,4
**fourteen** 173:5 174:5
205:19
**fraction** 107:13 150:15
162:6,8 163:2 170:8
174:16,17 185:1,3,4
188:3 192:24
**frame** 175:7
**Francisco** 151:14
**free** 36:12 79:24 176:7
192:7
**freeboard** 103:18
**freedom** 161:5 162:7
**friction** 110:22
**friend's** 191:15
**front** 96:18 130:17
140:25 141:3 160:10
168:10,12,12
**frontage** 117:23
**frontal** 105:24
**full** 147:14
**fully** 154:9
**full-time** 18:2,3 41:7,14
**function** 186:8
**further** 92:25 211:13
**future** 21:4,4

---

### G

**gap** 87:15,20 91:10 95:23
96:2 141:11 179:24
180:5,16,17 193:5
208:11
**gapping** 84:16
**gaps** 57:14 58:5 84:5
86:15 95:14 139:16,19
139:20,21 141:15,20
172:3 179:19 192:25
193:1,4 202:1,2 203:3
203:10
**gather** 62:20 91:18

**Genaro** 13:6 70:14
**general** 13:21 53:7 71:5
71:10 118:13 139:9
149:21 150:14,14 157:5
**generally** 18:14 23:2,15
74:24 100:16 152:21
187:22 193:3
**generate** 111:2
**generated** 102:25
**gentleman** 57:5 151:12
**gently** 168:13
**geographic** 108:14
118:22
**Georgetown** 36:24
**Geotechnical** 94:20
**germane** 102:15,24
**getting** 138:24,25 139:10
**Gilbert** 2:3,4 9:1,16
10:19 12:7 14:18 25:2
29:13 49:19 50:11
51:18 52:17 61:9 62:8
62:17 64:13,22 66:1,6
66:14,17,19,21,24 68:3
69:3 74:13,14,18,21
88:20,22 108:3,18
111:7,20 112:10 113:25
114:8 119:21 120:3
121:5 122:6 127:19
128:4,9 131:11 132:4
134:8,16,21 135:3
136:3,10 137:3,13,20
137:21 138:4,8,20
140:3,11,17,23 141:4
157:21 166:9 178:5
180:9 189:25 191:12,17
192:1,8,15 196:25
197:4 199:20,23 208:25
209:4
**give** 8:20 17:15 29:23
48:25 50:20 54:6 65:15
123:3 124:20 138:10
143:9 150:14 157:5
159:12 173:1 174:11
189:2
**given** 1:19 7:16 10:23
11:1 29:2 107:10,25

---

HECTOR V. PAZOS, P.E.                                                          7/20/2009

Page 10

112:18 125:4,18 126:6
186:2 210:4,7
**glance** 9:2 11:9 85:21
**glanced** 13:17
**glue** 163:2
**go** 7:11 15:1 26:10 30:11
39:6 46:3 47:2,22 51:1
51:2 53:9 55:12 59:9
62:13 67:1 69:2 77:17
83:17 87:5 96:10
108:25 112:11 113:12
114:1 119:17 122:7
124:1 125:7 128:23
140:10 141:2 157:25
164:1 170:22 171:24
172:22 192:14 204:16
**goes** 160:21 182:7
**going** 13:4 20:24 25:11
25:15 32:9 33:13 35:18
41:21 43:18 44:10
45:25 46:1 47:1 52:3
52:13 53:16 59:10,11
61:19,24 63:5 64:20,23
67:10,13 68:21 69:11
79:7,11 93:12,14 94:7
96:24 97:3,10,13,15,22
97:25 98:7,10 100:2,2
105:25 106:13,14 108:4
111:10,18 117:18 118:1
118:17 120:6,16 121:6
123:4 127:20 135:11,21
135:23 136:4 140:4
151:10 157:6 162:3,15
162:21 166:5,10 168:14
171:19,20 176:15
177:17,19 183:14 184:9
187:14 193:17,18
196:20 197:16 202:15
202:16 205:21
**good** 35:22 94:25 96:13
97:3 110:9,10 128:11
176:18 177:11 199:18
200:7,11 202:3 203:19
204:1
**GOODWIN** 2:18
**governed** 7:9

**grains** 90:24,25
**Grande** 7:2
**gravity** 168:9
**great** 159:15
**green** 9:8 10:5,23 11:1
14:14 172:8,19 197:22
**ground** 81:17,22 84:7
90:24,25
**group** 134:8,17 196:13
196:16,17,18,23 197:8
**Guard** 34:9 38:12
**guess** 67:11 79:6 109:11
119:14 122:10,14
125:15 128:10 135:4
136:19 183:14 204:19
**guessing** 22:21 124:7
**Gulf** 107:15
**gust** 156:11

## H

**H** 5:6
**half** 34:18 57:11 102:6
105:1 146:7,8 153:17
160:16 161:3,3 163:1
175:7 194:9
**halfway** 178:18 197:12
197:19
**HAMMOND** 3:9
**hand** 26:17 72:4 93:13
94:13 177:17 197:16
205:2,3,5,16
**handed** 13:9 53:14
164:21
**handing** 24:23 26:20
61:12
**handled** 19:9
**handwriting** 94:5,6
**Hang** 196:20
**hanging** 9:21,25 105:8
105:13 109:22
**happen** 113:17 153:10
155:15 201:9
**happened** 23:21 29:4
81:18 85:12 102:16
176:2 192:20 201:20
202:6
**happening** 18:19 20:22

92:13
**happens** 24:10,11 33:15
84:16 85:2 88:10
141:20 156:19 169:15
201:7,12
**Harbor** 49:3 54:3,25
55:7 63:21 65:14 66:3
85:25 91:2 110:18
114:22 118:20 126:22
131:1 132:2 134:18
143:12 163:16,22
175:12 200:14,20
**hard** 43:16 45:9 46:9
**HART** 3:25,25
**hatch** 101:18 102:2,7
**Hawaii** 23:8,21
**head** 21:9 22:18 31:22
33:18 45:7,20 46:6
48:5,18 63:23 66:8
69:23 74:23 116:8,22
116:25 124:20 127:12
129:25 142:7 144:1
**headings** 123:13 156:10
**hear** 28:25 57:6
**heard** 69:17 205:24
**hearing** 150:17 181:25
**heave** 105:15 162:7
**heaving** 161:4 185:12
**heavy** 110:10 155:6
186:13 203:6
**Hector** 1:18 7:1 60:4,13
210:3,11
**height** 101:5 111:4,4
112:17,23 156:24
178:18,21 188:24
**heights** 175:12
**help** 20:6,18,24 22:18
115:12
**helped** 34:6
**hereinabove** 211:7
**hereto** 6:3 25:7 26:24
53:11 59:17 61:18
72:11 93:18 94:12
165:2 167:24 168:1
177:24 211:15
**high** 101:1 113:2 126:14

143:22 159:3 185:18
**higher** 111:2 113:8
161:19,20 185:2 186:3
186:4
**highest** 103:16
**hinge** 153:9,12,19,24
154:2,6,8,9,11
**hire** 18:17 19:7,17 23:10
**hired** 19:18
**hit** 100:7 110:23 143:23
151:2 157:1 162:15
173:10 188:20 190:22
207:14,15
**hits** 190:18 202:5
**hitting** 58:4 187:10
**holding** 37:5 71:18
105:16
**Hollywood** 43:1,9,13,21
**home** 38:19
**homogeneous** 84:19
**hopper** 43:5,6,8,20
**horizontal** 146:2 182:15
183:1,5,8,9 199:8
**hour** 36:23 57:11 174:14
174:16,17 175:7,7
**hours** 10:21 126:23
142:9 174:12,14,16,17
**houses** 33:3
**huge** 93:21 183:21,22
**hundred** 19:13 52:4
55:18,19,20 61:3 67:4
75:13 78:24 86:9 176:6
189:22
**hundreds** 29:24,25 30:1
58:19
**hurricane** 30:16,20 31:4
32:1,4,13,19,23 33:16
33:18,25 34:23 35:21
36:15,18,22,25 45:15
45:18 47:14,17 48:6
49:4,17 50:2,19 76:8
104:3 107:9,14,14
108:11 109:20 115:20
115:24 116:12,18 117:3
117:7,19 118:4,8 119:4
130:24 131:25 132:15

HECTOR V. PAZOS, P.E.                                                                                                                7/20/2009

Page 11

132:21 182:25 183:4,16
**hurricanes** 30:23 33:19
    36:16 48:8 109:11,14
**hydrodynamic** 124:24
**hydrodynamicist** 42:11
    112:21,22
**hydrodynamics** 188:25
    189:2,12,16,18
**hydrostatic** 91:1,4 96:5
    156:1 168:6,11,11
    180:19 199:2 201:13
    204:17
**hypothesis** 77:13
**hypothetical** 190:8
**H*Wind** 116:21

### I

**idea** 21:13 35:22 50:20
    150:14,15 157:5
**ideas** 173:1 205:20 207:5
**identification** 25:7 26:24
    53:11 59:17 61:18
    72:11 93:18 94:12
    165:2 167:24 168:1
    177:24
**identified** 11:22 13:10
    165:12 168:20 181:10
**identify** 55:22 122:8
    146:12 158:16,18
**identity** 70:6,9
**IHNC** 96:16 135:16
    173:25
**ILIT** 133:21
**immediately** 86:22 118:2
    190:16
**impact** 86:22 87:2
    120:20 143:1 144:10,12
    145:4,8 147:1 154:4,17
    155:1,2 191:2 202:23
    203:13,19 204:2,3,7
**impacted** 202:10,18,20
    204:12
**impacting** 83:20 84:4
    86:14 87:7 123:11
**impacts** 86:19 91:22
**impart** 194:14
**impartial** 20:9 21:3,5

**imperfections** 145:13,17
**important** 55:14,18,25
    56:6,8 73:11 75:8,16
    95:10 179:16
**impossible** 54:8 58:21
    124:3 152:21 182:8
**improve** 73:19
**inch** 101:24 102:5 146:7
    146:7 152:23 160:16,17
    194:9
**inches** 89:25 90:7 154:22
    160:7,8,10,12 180:17
    182:8 194:10
**inclined** 160:9
**include** 8:7,8 41:10
    44:21 45:1,2 48:5
    73:14 75:10,15 101:4
**included** 75:9 76:17
    131:2 158:3
**includes** 28:9
**including** 177:14
**income** 17:16 18:10,21
**incoming** 110:25 111:1
    123:10 126:25 150:10
    163:13 186:13,15 187:9
    187:11 188:1,15,17,23
**incorrect** 12:20
**increase** 96:4 155:20,20
**increases** 87:9 204:17
**increasing** 177:12
**indentation** 146:24
**indentations** 145:21
    146:7,11,12
**indented** 151:20
**indicate** 118:8
**indicated** 18:24 100:25
    101:12 105:5
**indicates** 100:10 101:17
    139:7 182:1
**indicating** 12:13 150:10
    158:24 171:1 176:17
    197:3,5
**individual** 39:18 46:15
    46:17
**individuals** 80:12
**Industrial** 64:16 65:24

80:21
**infer** 152:13
**inference** 207:12
**inferred** 191:15
**infinitely** 73:6
**influence** 70:2
**influenced** 113:10
**influential** 92:12
**information** 9:14 14:10
    23:19 24:8 29:2 44:23
    48:15,21 50:9 68:9,23
    69:7 72:15 73:15
    114:24 115:21,24 118:8
    119:11 149:22 152:22
    154:8 173:19 174:21,24
    175:3 200:10 207:24
**informed** 77:25
**Ingram** 1:9,11
**initial** 103:14 114:15
    120:15 147:3,3,4,7
    148:9 172:23 179:6
    205:6
**initially** 74:17 83:22
    103:21,22
**initiated** 173:16
**inject** 68:22
**injury** 21:7,19
**inland** 43:13,14 87:19
    89:12 90:1,7 92:3,10
    139:18 141:17,22
    168:14 170:5,6 201:14
    201:24 204:16,16 205:7
**Inner** 49:2 54:3,25 55:7
    63:21 65:14 66:3 85:25
    91:1 110:18 114:22
    118:19 126:22 130:25
    132:2 134:18 143:12
    163:16,22 175:12
    200:14,20
**inquiries** 19:23
**inside** 32:5
**insignificant** 104:8
**insofar** 142:16
**inspect** 51:2 75:19 79:17
    180:21,24 181:3
**inspected** 78:7 79:25

80:2 81:9 82:6
**inspection** 76:7 100:10
**inspections** 16:8 76:12
**instability** 208:21
**install** 95:19
**instance** 40:6
**instant** 150:15 187:12,15
**instantaneous** 149:21
    150:9,12,23 170:8
    185:23 187:9
**instantaneously** 126:9
    188:3
**institutions** 116:16
    117:10
**instruct** 64:20
**instructed** 82:18
**instructions** 51:3 77:17
**instrument** 182:11 188:4
**insurance** 18:14,20,25
    22:4 23:1,6,8,13,14
    24:2 41:10,12
**intact** 170:25
**intelligence** 135:25
**intend** 68:18 181:8
    191:16
**interested** 77:22 130:22
    211:15
**interfere** 8:11,16
**interlock** 87:1 91:21
**intermittent** 181:16
**International** 15:15,20
    16:4,6,20,24 17:17,22
**Internet** 44:12 93:22
    94:23 190:12
**interpret** 14:10
**interprets** 122:13
**interruption** 8:17 49:7
    93:6 179:11 181:12
**interview** 29:3,6
**Interviews** 29:7
**investigate** 76:1 78:2
**investigated** 115:20
**investigation** 16:2,16
    54:10 143:21
**investigators** 145:25
    146:10

**invoice** 67:2,2
**invoices** 66:9
**involve** 32:6,12 41:1 45:6
  45:14,18,23 47:13
**involved** 18:15 24:3
  30:22 31:10,16 43:25
  46:24 47:4,7,20 48:7
  78:11 109:13 110:4
  115:11
**involvement** 177:6
**involves** 21:7 47:17
**involving** 73:7
**inward** 90:21
**IPET** 51:14 101:12,17
  117:10 133:14,17
**Irregardless** 90:14
**issue** 61:21 66:9
**issued** 53:5 62:3 63:7
**issuing** 63:12
**item** 46:3,4 47:2,2,4 48:9
  56:17 57:3,4,12,19,23
  58:4 61:20 104:12
**items** 33:1,2 48:11 56:13
  61:20
**I-wall** 200:1 201:5
**I-walls** 200:1,12,16

**J**

**J** 3:10
**jack** 31:17
**job** 20:7 201:16
**jobs** 40:25 42:5
**JOHN** 2:20 4:5
**joint** 86:21 87:1 169:18
  169:20 182:10
**joints** 147:8 148:7
  156:17,18
**JOSEPH** 1:24 6:22
  211:2,24
**journal** 30:2,13 94:20,23
  94:24,25 95:7
**JR** 1:24 6:22 211:2,24
**JUDGE** 1:9
**July** 1:21 69:16 70:5,15
  70:24 210:25
**June** 26:3 61:10,16,20,21
  61:22 62:3 63:7,8,9

66:12,15 67:6,9

**K**

**Katrina** 1:4 49:5,17 50:6
  50:20 52:22 60:10
  65:19,23 83:1 117:7
  118:4 122:2 130:24
  182:25 183:4,16 200:19
**Katrina's** 118:9 119:4
**KEELEY** 4:4
**keep** 50:8 79:2,6 150:17
  151:10
**keeps** 156:12
**key** 174:2,10
**Khorrami** 25:3 68:4
**killing** 110:13
**kind** 22:11 31:15 32:17
  33:2 39:19 51:7 97:7
  119:18 175:8 183:10
  199:7,14
**KIRSTEN** 2:21
**KITTO** 3:10
**knew** 133:4
**knock** 32:24
**knocked** 32:19 139:2
**knocking** 32:21
**knocks** 202:5
**know** 11:2 12:13 13:3
  23:9 24:12,17,18,19
  30:8 32:1,5 33:9,15
  47:10 48:20 51:22,23
  55:20 58:14,23,24,25
  59:3,6,23 66:8 67:3
  69:10 70:10 79:3,14
  81:18 83:15 92:11
  94:14,19 95:3,6 112:16
  113:18,19,21,23 116:21
  118:24 123:23 127:10
  132:12 134:13 136:14
  142:19 143:7 145:1
  148:24 152:11,12 162:8
  171:7 174:20 178:16,25
  181:9,13 192:6 195:17
  198:11,17
**knowledge** 37:15 112:6,8
  189:2
**known** 95:15

**K(2)** 1:7

**L**

**L** 1:17 6:1 96:19,23 97:2
**lacking** 152:25 153:3
**ladders** 33:3
**Lafarge** 1:8,10,12,14 2:9
  7:15 11:24 64:4,4 80:1
  80:2,4,15,18,23 96:20
  118:20 127:6,16 128:23
**Lagarde** 1:10
**Lake** 117:21
**Lakefront** 129:23
**land** 80:6,8 84:24 88:17
  158:22
**landed** 82:25
**large** 33:20 125:13
  146:23 177:15,15
  179:20
**larger** 43:17 182:20
  193:1 195:12
**LARRY** 4:3
**lateral** 105:25 106:1
  150:1
**laterally** 92:1
**latest** 26:1
**lat-long** 118:15
**Lauderdale** 32:2,6,11
  33:8
**launching** 40:6,7,9
**law** 6:7 20:13 21:23
  27:14,17 116:24
**lawsuit** 78:6,14,21 79:12
**lawyer** 18:18 19:1,14
  20:6,7,13,16,17,25,25
  131:7
**lawyers** 18:12,13,15,20
  18:23 19:2,3,5,7,17,18
  19:24 68:3 74:15
**lawyer's** 20:7
**leaning** 86:19
**leaped** 11:14 12:20
**leaps** 11:16 139:23
**learn** 69:9
**learning** 68:23
**leave** 73:11 79:1 129:4
  157:12

**leaves** 86:9
**leaving** 69:18 109:21
  129:16 194:10
**left** 10:21 33:13 34:14
  109:1 177:9
**legal** 44:24 78:25
**legalities** 78:12 79:15
**LEGRAND** 3:17
**length** 36:12 179:2,10
  181:10,20,23 182:16
  190:7
**lengths** 155:21
**letter** 68:3
**let's** 29:17 52:4 90:10
  96:10 98:2,15 99:2
  108:25 122:21,21 123:1
  137:4,7 142:10,11
  155:21 157:12 158:5
  164:7 176:11,18 203:12
**levee** 54:22,22 57:17
  87:18 88:1,4,5,8,13
  89:15 90:9,12 91:25
  92:2 120:24 152:23
  158:1 162:15 172:1
  180:13 204:10,13
**level** 34:22 35:1,23 36:3
  138:25 139:10 162:1,5
  163:8 164:5 177:12
  185:18,20,22,24 186:2
  186:4,6,7,9 203:1
**life** 16:15 17:7,7 37:20
  38:2 129:11 131:23
  186:7
**light** 19:21 100:25
  103:18 124:14 179:18
  197:12,13,19
**lightly** 64:8
**Likewise** 48:9
**limited** 104:11 166:11
**line** 35:9,11 47:2 53:9
  101:23 102:3,4 103:22
  104:23,25 105:2,7,8,9
  105:13,16,17,20 106:2
  106:4,11,22 108:4
  109:2,4,25 110:10,11
  110:15 111:17 119:24

HECTOR V. PAZOS, P.E.

7/20/2009

121:1 159:13 160:9
161:8
**linear** 182:7
**lines** 34:13,14,15,18 35:4
35:4,5,13,18 36:12
46:21 85:20 104:21
105:1 109:18,20,25
110:6 123:8 184:9
**list** 27:18,21 28:2,4 41:5
55:20
**listed** 28:15,18 41:2,7,14
46:17,23 48:11 73:22
134:12
**listen** 41:22 77:24
**listing** 66:10
**litigation** 19:10,14,18
24:3 52:22 53:6 60:11
134:1,5
**little** 11:18 100:11,18
101:23 112:24 113:10
159:12 160:7,18 172:15
194:8 205:4,5
**LLP** 1:19
**LNA** 165:13,15,15
**LNA1140** 167:20
**LNA1142** 167:21
**LNA1151** 167:22
**load** 168:16
**loaded** 103:17 145:13
155:18 197:12,20
**local** 32:3 36:1,7 38:11
96:6 104:11 108:22
**localized** 187:8
**locally** 143:6 184:19
**locate** 122:19
**location** 12:15 36:24
56:20,22,23,25 57:6
77:9 81:11,25 82:1,2
96:19 107:11 108:1,14
110:21 111:6 112:18
118:16 121:19 122:16
124:5 128:24 130:9,13
130:16,20 140:7 141:14
141:16,17 142:20 144:7
144:15,22 145:19 156:9
178:22,23 179:5 184:24

187:12 188:1 190:19
192:20 195:24 202:8,9
202:17 205:1
**locations** 65:25 82:20
167:9 185:24 188:12
197:18 200:13,18
202:25 203:3
**locks** 104:10
**London** 50:15,23 51:8
82:12 149:3 154:12
**long** 10:18 28:19,22
29:12,21 46:20 48:20
74:10 99:17 123:23
172:22 204:24 205:14
208:10
**longer** 91:16 113:7 152:1
152:14 194:8
**look** 10:6 12:17 14:5
40:24 53:18 70:23
80:22 92:6 101:10
117:11 122:4 132:14
137:4 157:15 160:8
173:3,6 176:9 189:20
195:18,19 196:13 207:6
**looked** 9:5,11,24 10:1
12:11 13:17 15:6 28:8
60:24 75:5 81:21
167:19
**looking** 25:17 47:3,15
60:23 63:2 94:22
121:17 122:8 127:13
156:22 176:20
**looks** 61:15 62:2,5,21
121:21,23 138:17 196:2
**LORRI** 3:25
**lose** 99:10
**loses** 89:7
**loss** 109:23
**lot** 16:9 17:10 22:3 23:6
35:5 39:23,23 40:4,9
41:21 115:21,24 154:7
162:14,22
**lots** 32:15 179:23
**Louisiana** 1:2,21 2:6,15
3:4,13,21 6:6,24 27:12
51:17 60:10 211:4

**lounging** 40:7
**low** 57:2 139:1,11 153:20
185:1
**lower** 75:18 76:1,7 78:7
100:18 177:7 185:13
**lunch** 96:11 109:16
**L.L.C** 3:18
**L.L.P** 2:10,18 3:9

--- M ---

**M** 1:17 5:1
**MAG** 1:11
**magazines** 28:17 44:14
**magic** 166:6
**magnitude** 153:16
**major** 89:19
**majority** 74:24
**making** 109:6 124:4
**man** 151:13 157:22
**management** 7:10,12
**manner** 194:1
**map** 127:14,14
**March** 62:17 177:1
**marine** 15:17 16:9 17:11
27:9 38:5,8,14,17,24
39:4,11,17,21 40:2
42:16 43:1,10,13,21
44:1 47:4 129:12
**mariner** 129:10
**Marino** 9:7 10:5 11:4,14
11:23 12:3,19,21 13:7
13:14,21 14:1,14,21
70:14,18 71:1,2,9
**maritime** 37:19,24 38:22
39:19 111:23
**mark** 2:19 7:14 59:10
96:23,25 97:4,10,25
112:11 120:16,17 123:5
159:9 166:17,24 167:3
167:5,14,15 169:18
177:19,19 196:21 197:1
197:17,18 203:8
**marked** 13:5 24:24 25:6
26:21,23 52:14 53:10
59:11,16 61:12,17 72:8
72:10 93:13,17 94:8,11
97:9 98:17 164:23

165:1 167:23,25 177:23
203:6
**marker** 96:18 98:8,11
99:3,5,9 119:18 156:24
159:16,16 166:6 172:8
**marketing** 19:21
**marks** 167:8 177:10
178:3,9,13,17 179:1,9
**Marks-a-Lot** 128:5
**mast** 35:8
**master** 27:8,9
**material** 43:7 73:20
168:10,13
**materials** 73:22 74:1
**matter** 49:23 50:7 66:25
69:16 144:19 153:16
169:15 180:1 184:25
**McCall** 1:19 2:10
**mean** 15:1 45:8 107:9
109:15 122:9 137:15,17
200:6
**means** 113:8 144:10
149:22 155:1
**measure** 127:17 130:15
**mechanical** 15:18 27:10
27:11 38:25 39:2,13
**mechanics** 125:14
**mechanism** 88:15
**medicine** 8:15
**medicines** 8:10
**meetings** 10:9
**memoranda** 10:13
**memorandums** 52:5
**memorize** 44:18 52:3
114:25 118:22,25
129:20 133:23 135:8,9
142:14
**memory** 23:4 43:16
44:10 46:4 52:7 61:21
61:24 74:9 82:21
109:16
**mention** 15:7 69:24
85:22 141:11,12
**mentioned** 14:8 78:18
104:7 115:18 141:14,15
141:16

**mentioning** 66:20 146:5
**mentions** 134:24
**met** 8:25 10:20 15:5
74:19
**meteorologic** 129:6,17
129:19,22 131:9,16,18
132:20,22 143:5
**meteorological** 111:22
115:12,15,21 116:3,6
116:17
**meteorology** 112:5
**Mexico** 107:15
**middle** 34:11,16 188:18
**midship** 104:22
**mile** 128:2
**miles** 36:20,23
**millions** 61:1
**mind** 21:16 55:25 139:23
**minimize** 106:1
**minor** 109:12
**MINTZ** 3:9
**minute** 106:11,11 107:5
107:5,6,7,17,17,19,19
129:4 143:6,6 161:5
**minutes** 148:11 174:9
187:16 205:25 206:12
206:16 207:1,15 208:6
**Mischaracterizes** 14:19
**missing** 41:10 62:23
**mistake** 71:25 184:1
**mistaken** 98:20 183:19
**misunderstood** 140:12
**mobilizing** 90:23
**modeling** 175:11
**modified** 68:9 107:2
**modify** 68:12,18 69:21
**molded** 102:3,4
**moment** 61:8 63:2 93:8
142:7 157:13 167:11
186:16
**momentum** 125:8,12,13
190:2
**money** 64:10 65:5
**monolith** 153:9,13
154:12 193:14 195:24
196:5

**monoliths** 152:9
**MONTGOMERY** 3:8
**month** 26:7 54:9 62:4
63:12,13 175:1
**moon** 73:5
**moor** 34:2,5
**moored** 12:5
**mooring** 30:13 36:10
45:6,11,14 47:4,7,13
64:5 104:14,19,20
109:18 119:17
**moorings** 113:16 114:17
**morning** 110:19 114:15
117:8 118:11 126:23,24
129:23 132:7 142:12
143:13 173:17 187:5,17
187:22 188:5,7
**motion** 162:22
**motions** 162:17
**MOULEDOUX** 3:17
**move** 24:22 79:5 89:25
98:22 99:22 100:2,4
106:13,14,21 109:21
136:8,19 139:18 141:22
171:17,18 179:4 204:9
**moved** 34:11 117:19
**movement** 108:16,20,20
**movements** 171:21
**moves** 86:8 90:7,12
108:12 156:9 171:25
172:10
**moving** 54:21 84:2 90:10
126:18 150:8 156:14,14
162:18 163:3 181:24
182:18,21 185:6 206:13
206:17
**MRGO** 134:1
**Mumford** 1:9

**N**

**N** 5:1,1,1,6 6:1
**name** 7:14 15:7,19,19
16:17 17:4 19:22 20:13
33:18 37:1,2 44:18,19
56:5 58:1 134:6,14,20
135:9 189:2
**named** 7:3 151:12,14

**names** 44:19 70:11
**narrate** 99:13
**narrative** 109:1
**National** 116:9,12,18
131:25 132:14,21
**nature** 136:5 139:14
**naval** 15:16 27:8 28:6
38:3,5,7,13,17,24 39:4
39:10,16,21 40:2,12
42:10,23 142:15 189:5
189:13
**navigation** 34:10 49:3
54:4 55:7 63:21 65:14
66:3 85:25 110:18
114:22 118:20 126:22
131:1 132:2 134:18
143:12 163:16,23
175:12 200:14,20
**NB** 98:9
**near** 91:21 123:2 178:22
**necessarily** 24:6 31:25
168:24
**necessary** 75:1
**necessity** 139:16
**need** 7:24 16:7 40:21
46:20 48:1 69:21 75:3
78:1 122:20 131:16
157:19 167:4 189:20
194:13 196:9
**needed** 198:21
**needs** 104:9 201:16
**neighborhood** 19:9
90:22 122:5 156:19
169:8 171:11 191:8
204:4
**never** 9:3 22:22 24:20
29:23 33:9,14 50:25
55:21 80:2,4,15,17,18
80:24 81:21 82:6 105:3
202:7
**new** 1:20 2:6,15,22 3:4
3:13,21 9:2,4 18:3 23:7
51:17 65:22 68:21,23
76:3 78:16 79:13,18
83:1 100:12 117:7
118:5,9 119:4 132:15

132:23 145:15 148:25
200:13,18
**newspaper** 28:24 32:3
**newspapers** 77:24
**night** 9:1,5,12 10:24 71:1
**nine** 63:12 84:1
**nineties** 23:5
**ninety** 65:9,11 174:8
**Ninth** 75:18 76:1,7 78:7
177:8
**NOAA** 116:9
**noise** 57:6
**noises** 182:1
**normally** 74:8 76:24
**north** 2:9 7:15 55:6 56:2
56:7,11,15,18,24 58:10
79:18,24 80:1 81:5,24
82:4 83:13 85:12 86:8
86:13 87:12 96:20 98:9
98:17 121:19 123:2
127:7,16 128:24 130:4
130:25 133:2,12,15,18
133:22 134:2,10,20
135:18 136:2,22 137:2
137:7 138:13 139:7,15
139:25 141:10 142:5,20
143:2,23 144:7,15,22
145:3,8,19 146:14,23
147:2 148:9 151:3,8
159:3 165:24 171:18,23
172:11,22 173:10
178:23 179:11 180:6,22
181:4,11 203:15 205:11
205:15 206:24 207:14
208:5
**northeast** 117:19,23
**northern** 63:25 85:5
91:17,24 92:3,8,14,18
92:21,24 123:22 179:12
190:19
**northernmost** 192:19
206:9
**notation** 178:3,7
**note** 52:18 98:12
**noted** 210:13,15
**notes** 69:8 76:11

HECTOR V. PAZOS, P.E.

**notice** 6:7 26:15 48:2
**noticeable** 56:23
**not-to-scale** 157:4
**November** 49:25 50:3,5
**number** 7:10 16:12
18:15 25:12 27:15,16
29:24 42:22 56:17 57:3
57:4 59:10 65:8 66:16
66:18,19,20,20 83:8,22
149:7 157:7,9,16,17
158:1,2,6,6,9 165:13
176:13,20,21,23 184:7
193:19 194:20,25
195:15 196:13,14 201:6
**numbers** 175:17 196:11
**numerous** 7:20
**NW** 2:22

**O**

**O** 1:17 5:1 6:1
**oath** 6:25 7:5
**object** 12:8 14:19 29:14
40:15 51:19 64:14
108:4 111:8 121:7
127:20 128:10 131:12
132:5 134:22 136:4
157:20 166:10 169:21
199:21 209:2,4,5
**objection** 13:12 52:18
53:8 64:24 88:20,23
108:19 112:12 138:5
157:19
**objectionable** 11:12
**objections** 6:11 51:25
119:23
**observation** 57:10
**observations** 51:16
76:10
**Observatory** 142:16
**observe** 36:1 57:7,7 74:5
145:2,6
**observed** 146:4
**observing** 82:1
**obtain** 39:7 179:5
**obtained** 117:10 118:14
119:7
**obvious** 141:9 194:3

**obviously** 14:7
**occasion** 76:20
**occasions** 7:19,20 18:16
75:22 163:19,21
**occur** 31:12 92:15
184:16 188:18
**occurred** 83:13 95:13,14
95:22 139:17 170:11
173:25 179:6 201:25
**ocean** 15:14,20,20,21
16:3,4,6,17,19,23 17:1
17:5,8,17,18,20,21,25
18:10,22 31:18 113:9
**Oceanic** 116:9
**October** 49:15,21
**offer** 37:16 39:6
**offered** 111:22,23 112:4
112:7
**officiated** 6:24
**offshore** 31:17,24 32:5
43:15 48:3,10
**oh** 19:16 24:15 67:8 79:4
92:17 95:2 113:6 116:4
119:13 140:23 142:18
149:2 158:13 201:13
206:5
**oil** 15:14,20,20,21 16:4,4
16:6,17,19,23 17:1,5,10
17:10,12,12,17,18,20
17:21,25 18:11,22
22:21
**oilfield** 17:14
**okay** 13:3 25:14 31:23
41:24 42:1,4 47:1,9,22
53:20 56:10,17 58:12
67:15 79:4,14 83:10,14
85:21 86:6 92:17 96:24
102:3 104:20 109:5
116:7 120:5,12 121:15
122:23,25 123:4,8,17
129:5 130:23 135:20
137:4,5 138:7,18
146:16 152:20 156:8
159:12 160:24 161:20
164:10,17 166:24 167:8
170:22 172:14,21 174:3

174:13,21 175:20 176:4
177:4,9 187:18 192:16
197:21 199:5 200:8
204:23 206:4
**old** 37:21 133:9,10
**once** 20:23 85:1 88:3,7
89:4 105:6 126:16
169:25 170:3 208:11
**ones** 31:23 41:5 75:16
119:23 135:15 164:25
166:22
**open** 113:9
**openings** 84:6 139:3
**operating** 15:19 57:5
**operator** 57:24 141:14
142:22
**operators** 78:15
**operator's** 59:4
**opinion** 23:20,23 24:10
37:16 48:25 73:3,4,8
75:14 83:8 85:18,24
86:4 91:12 104:13
144:8,24 151:5 181:21
199:14
**opinions** 71:3,8,12 72:19
72:19,22 73:1,10,16
75:12 95:10 111:11
115:13 131:6
**opportunities** 27:16
**opposed** 17:18 168:5
**opposite** 124:2
**option** 199:9
**orange** 25:13 97:23,24
98:3
**order** 7:10,23 21:3 55:17
56:25 104:9 106:21
136:15 139:17 144:1
153:23 180:18 201:15
**orders** 7:12
**organization** 44:7,9
**orientation** 182:4 185:13
**oriented** 99:12
**origin** 38:12
**originally** 121:12
**Orleans** 1:20 2:6,15 3:4
3:13,21 18:3 51:17

65:22 76:4 78:16 79:13
79:19 83:1 117:7 118:5
118:9 119:5 132:16,23
148:25 200:13,19
**ought** 36:5
**outboard** 84:8
**outside** 12:5
**overall** 14:3
**overburden** 89:8
**overhead** 96:16
**overseas** 109:15
**oversimplification** 40:5
**overturning** 85:8
**owe** 64:10 65:5
**owner** 16:23 17:1 18:25
**owners** 18:16,20 41:10
78:14
**owning** 43:11
**o'clock** 173:17
**O'Dwyer** 49:6,13,23,24
50:1,14,18,22 51:11
52:2,25 64:10 65:5,18
66:2 76:4 77:12,13,16
77:16,21 78:5,13,20
79:10 82:9
**O'Dwyer's** 65:17

**P**

**P** 6:1
**page** 5:3,8 25:8,17 28:4
40:24 46:12 53:17,18
53:19,22 60:3,5,5 62:2
63:6,6 68:7,7 72:1,2,5
83:4,5 85:16 117:11,15
147:11 151:11,15
164:25 166:5 173:23
197:8,8,10 205:22
206:4 207:7
**pages** 13:17 14:5 26:16
26:16,17 44:25 46:8,10
46:17,23 48:20 53:21
53:25 58:19,20 59:13
60:14 173:20
**paid** 80:24 95:17
**panel** 154:20 155:4,5,11
155:13,19 156:10,12,15
171:15 195:7,13

**panels** 58:4 83:22 84:1 86:14,20 139:22 147:4 147:12 156:6,15 166:8 172:3
**paper** 10:11
**papers** 10:10 15:5,6 95:4 95:6 114:24
**paperwork** 131:24
**paragraph** 83:16 85:21 117:14 147:14,15
**paragraphs** 83:8,11 85:15,17,19
**Parfait** 1:13
**parking** 32:15
**part** 6:14 41:4 48:17 54:22 62:6 64:16 68:2 91:17,18,24 92:4,8,18 92:20,21,25 93:25 94:9 105:18 108:5 110:15 113:10 126:12 144:6,21 151:19 158:12,13,17 159:1,6,10 171:8 185:8 187:20
**parted** 109:20
**partial** 94:14,16 155:22
**partially** 89:10 181:6
**particles** 89:11 90:16,23 92:16
**particular** 54:14
**parties** 6:3 211:14
**parts** 182:2
**part-time** 41:8,17 42:2
**passages** 85:23
**passed** 117:7 118:4,9 119:4
**path** 107:24 108:17 119:19 121:18 172:10 172:18
**pay** 20:10 21:14 22:7 23:17 24:6,7 37:3 78:9 78:19,25 79:15
**Pazos** 1:18 7:1,14 8:19 13:8 14:12 21:6 23:25 24:12,23 28:25 37:4 48:24 60:4,6,13 64:1 73:12 75:16 93:8 94:8

96:13 106:16 112:5 119:15 125:9 146:2 158:2,16 164:21 168:3 171:23 190:6 193:25 194:23 207:7 210:3,11
**PDH** 44:10,17
**peer** 30:2 95:4
**pen** 178:2 197:22,23
**penetrate** 84:6 91:11 148:4 180:19
**penetrating** 84:11
**people** 15:24 16:13 18:5 18:6 24:16 41:4 61:3,4 109:24 110:2,13 181:7
**percent** 17:20,21 21:10 22:10,15,22 53:17 198:19
**percentage** 17:17,23 18:10,21 21:6,12 22:23 65:16
**percentages** 65:20
**percolate** 208:10,16,19
**perfectly** 182:6
**period** 43:23 46:7 52:1,8 63:12 74:10 85:2 91:16 125:5
**permanent** 98:12 99:8
**permanently** 98:1
**permitted** 6:5
**Perry** 1:11
**person** 49:10 82:19 134:14
**personal** 21:7,19 73:8
**personally** 30:23 74:19 80:19
**personal-injury** 22:17
**pertaining** 64:15
**pertains** 1:6 8:6 66:2
**PETER** 4:4
**Petersburg** 7:2
**Petro** 17:11 43:25
**phone** 70:22 71:6
**photo** 11:22 12:11,18,18 13:8,9 75:14 121:24 123:3 166:12 171:6 176:13,20 177:5,5,22

190:9 193:19 194:20,25 195:15 196:14,16,23
**photograph** 9:15 10:3 11:17,19,23 12:25 13:18 14:6 70:20,21 76:25 96:16 120:14,22 121:21 171:14 176:9,10 177:18 179:14,15
**photographic** 165:9
**photographs** 9:18,24 51:3 71:7 76:14,16,22 76:25 77:11,20 122:13 164:22,24 165:4,18,19 165:23 166:1 167:20 179:8 190:3
**photos** 10:6 14:15 75:5,8 75:12,13 77:1,4 165:13 166:13,16,21,24 167:4 197:11
**phrasing** 51:4
**physical** 75:19 131:13,15 131:22 133:5 136:20 137:6 138:3,11,15 139:14,24 140:21 141:9 142:4 152:22
**physically** 81:9 82:6 133:7
**physics** 125:13
**picks** 126:5
**picture** 92:6 162:10 182:12 183:3 193:15,18 195:17 196:1
**pictures** 76:14 81:13 172:15 182:24 195:12
**piece** 57:8 69:7 130:19 160:18 177:15 182:19
**pieces** 10:11 33:3 42:16 51:10 177:16
**pile** 57:21 58:25 59:1 81:7,8,8,10,15,16,19,22 82:1,3,5,7 84:7,12,24 85:4,4 86:21 87:16,23 87:24 89:5,14,20 90:4 91:21 93:9 95:23 96:8 148:4 151:23 154:16,17 168:8 169:7,12 170:1,2

170:16,20,25 171:10 179:19 180:20 193:6,9 199:3,10 208:12,16,20
**piles** 57:9 84:17 86:16 147:6 152:2,4 153:9,14 154:12 199:11
**piling** 56:17 182:9 199:19
**pilings** 57:3,7,13 148:9
**pinpoint** 175:9
**pipeline** 23:21,24
**piping** 88:9,10 90:15,17 91:7
**pitch** 105:15 126:15 162:7 186:25
**pitching** 161:4 162:12 185:11
**place** 77:17 81:23 96:19 118:21 120:7,20 123:9 123:14 131:14,15,20 143:2 145:24 152:24 159:1 167:2 174:7 185:19 202:22
**places** 82:23 166:7 167:5 171:4 179:23
**placing** 138:12
**plaintiff** 20:11 21:14,25 22:1,7 24:13
**plaintiffs** 21:12,20 52:21 69:15 70:7 102:15 134:8,16 135:15
**plan** 68:12 69:4
**plate** 145:23 159:7,10 160:10,13,13,15,16,18 185:9 195:10
**platforms** 17:12 31:17
**please** 13:25 19:4 26:14 27:5 30:3 31:3 40:19 71:19 72:17 88:24 96:19 99:8 108:10 119:18 151:15 159:9,16 172:9 191:22 196:15
**pleasure** 115:22
**plenty** 35:18
**plus** 53:6
**ply** 43:13

HECTOR V. PAZOS, P.E.

**point** 16:10 20:24 54:16
91:20 103:16 106:12
118:2,3 120:10,10,12
120:14,15 122:20
123:14 126:25 127:1,7
140:16 152:18 155:3,21
162:17 164:7 165:3
170:4 172:23 173:18
184:22 204:2,3
**pointing** 12:1 155:3
172:7
**points** 46:21,23 47:20
55:14,25 56:6,9 152:19
152:20 185:16
**police** 77:7 79:21 80:7,12
181:7
**Pollard** 25:4 68:4
**poor** 151:19
**poorly** 32:10
**port** 34:19 35:6 109:19
109:25 110:8 144:25
**portion** 45:11 57:16
86:20 90:6 92:2 93:20
94:17 103:6 185:13
188:23 195:8,10,23
197:16 201:10 202:10
**portions** 89:25 194:24
195:3 198:14
**position** 11:18,24 103:11
104:4 147:13
**positions** 172:16
**possession** 51:23
**possibility** 53:21 183:18
**possible** 53:25 150:9
153:8,12 166:14 206:20
208:7
**possibly** 76:20
**post-storm** 96:16
**power** 99:19
**Poydras** 1:20 2:14 3:3,12
3:20
**predict** 124:3
**Predictable** 48:9
**predominant** 104:12
126:21
**predominantly** 21:20

**preferably** 167:3
**preliminary** 23:20 68:8
**preparation** 30:16
**prepare** 8:23 10:7,14
14:16 22:9 29:8 34:2
**prepared** 10:14 11:7
63:3
**preparing** 10:15 78:6,14
78:21 79:12
**present** 4:1 66:19 133:11
133:15,18,22 134:2,9
134:19 135:18 136:2,22
139:25 141:10 163:22
187:5
**preserve** 21:3 51:24
**president** 17:11 43:25
**pressure** 89:11 90:24
91:1,4 96:5 105:21
156:1,7 180:19 198:22
199:1,2 201:13 204:17
**pretty** 95:5 130:5 177:11
**prevailing** 107:10 150:22
150:22 151:1,6
**previous** 30:6 38:10 42:8
46:1 49:8 109:12
145:14
**previously** 64:9
**pre-allision** 147:13
**primarily** 56:14 70:19
74:17 105:8 188:13
**primary** 39:20 40:1,12
40:16 70:22 71:6
**principal** 11:20 13:2
14:9 24:17 68:22 69:13
70:3 74:6,12,25
**principally** 74:16
**principle** 68:16
**Principles** 189:13
**print** 95:5
**private** 41:13 80:12
**privilege** 53:3,7
**probably** 22:1 25:24
28:20 31:14 35:13
43:22 51:9 53:23 75:23
75:24 78:8 80:20
105:11 114:14 115:7

116:15 119:10 130:1
132:17 139:20 147:5
155:16 164:15 189:21
198:5
**problem** 26:6 35:16
**Procedure** 6:6
**process** 83:12,19,19
113:16
**PROCTOR** 2:18
**produce** 105:12
**produced** 9:19 76:17
105:1 190:4
**producing** 105:15
**production** 190:3
**profession** 16:1
**professional** 15:17 16:11
16:22 17:7 27:11,24
**proffered** 108:6 111:8,12
**profile** 159:13
**progresses** 108:1
**projects** 43:18
**proof** 95:12
**propelled** 128:25 129:3,8
**properly** 141:23 156:20
**property** 168:11
**protected** 87:17 88:13
90:8,19,22 91:6 117:24
200:24 201:8,17,22
**protection** 30:21 31:4
45:19 51:16 95:20
**proven** 95:16 199:17
**proves** 128:6 139:24
**provide** 23:19 26:8,9
48:15 66:17
**provided** 62:10,16 66:21
**provides** 198:21
**proving** 77:22
**provisions** 53:7
**provoke** 137:8
**proximity** 32:18 33:11
188:13
**PSLC** 2:2
**publication** 29:21 33:7
**publications** 27:22 28:2
**publicized** 27:25
**publish** 29:3,9 95:3

**published** 28:3,3,5,15,21
29:11,18 30:1,12,15,19
31:7 33:9 44:14
**publisher** 28:23 29:15
44:11
**pull** 140:15 171:19
**pulled** 171:11
**pump** 57:10,24 59:3
139:9
**pumping** 57:5 83:21
138:22 141:12,15
142:23 148:10
**pumps** 173:12
**pure** 124:6 131:15 186:6
**purely** 16:7,10
**purpose** 49:19 160:9
199:12
**purposes** 6:5 37:4
**pursuant** 6:7
**push** 105:25 126:8
168:12 169:21 201:14
**pushed** 92:25 117:22
148:21 155:5,13 201:24
**pushes** 84:1
**pushing** 57:2 83:20 84:5
86:14 87:7 90:18,21,25
92:14 106:15,24 139:22
144:11 146:25 149:25
155:11,19 156:12
180:12
**put** 33:13 34:12,14 35:2
35:4,5 64:23 69:19
97:8,11,17,18,23 98:1,3
98:4,5,10,11,12,15,23
105:21 120:17,19
121:11 122:24 140:25
141:3 143:24 146:15
167:8 172:14 184:9
202:19
**puzzle** 146:15
**P.E** 1:18 7:1 60:4,13
210:3,11
**P.L.C** 2:3
**p.m** 10:20,21

**Q**

**quadrupled** 34:15

HECTOR V. PAZOS, P.E.

7/20/2009

Page 18

**qualification** 100:17
**quality** 151:19
**quantity** 190:23
**quarrel** 29:17
**quarter** 128:2 153:21
  160:17
**question** 6:12 8:2 13:24
  14:13 17:24 22:14
  29:10 30:3,6 31:1,3
  41:22,25 42:6,7,8 46:6
  47:18,23 49:8 50:17,23
  50:25 51:5 52:15 53:13
  54:13 55:1,23 56:3
  64:15,18 65:2,3 72:17
  75:16 79:2,6,9 100:14
  104:6,17 114:2 128:11
  128:12,22 129:14
  132:11 136:5,14 137:16
  138:1,10 140:13 142:3
  145:5 150:2,21 155:8
  157:20 158:15 166:15
  169:24 178:6,21 180:10
  190:17 192:3,10 193:17
  194:22 195:16 198:24
  200:25 201:4
**questioning** 53:9 63:6
  108:5 119:24
**questions** 99:15 111:17
  112:12 137:8 138:9
  157:23
**quickly** 125:22
**quintupled** 34:15
**quite** 69:6 80:11 204:10
**quotation** 151:20,20
**quote** 51:15 151:11
  189:10

**R**
**radio** 77:25
**Raffman** 2:19 5:5 7:8,13
  7:14 8:18 9:23 12:9
  14:23,25 25:10 27:1
  29:16,19 30:4,10 31:2,6
  48:23 49:12 52:9,12
  53:12 60:1 61:25 62:12
  62:14 64:19,25 65:4
  72:13 88:19 89:1,3

93:7,23 94:18 96:9,12
97:20 108:9,24 111:15
111:25 112:3,13,15
114:6,10 120:1,8 121:9
121:16 122:11 127:22
127:25 128:8,13 131:17
132:6 135:1,6,10 136:7
136:17 137:10,19,23
138:2,14 139:4 140:9
140:14,20,22 141:7
157:11,14,18,24 164:19
165:5 166:18 167:1,17
168:2 178:1,8,11
190:10,13 191:14,18
192:4,12,17 196:19,22
197:2,6 200:4 209:3
**raising** 36:9,13
**rammed** 147:19
**range** 65:10 67:10,11
105:6 114:11,14,15
124:1,14,25 127:24
149:24 163:11
**rapid** 85:7
**reach** 58:9 73:1 77:9
169:19
**reached** 54:2 95:10
**reaching** 73:15 75:5
**reacted** 125:25
**read** 3:8 8:25 11:4,10,13
12:22 13:13,15,16,21
24:18,20 25:20 30:5,7
31:3 32:9 41:8 42:9
46:20 49:9 55:19 74:4
77:24 83:14,16 85:15
114:23 115:20,24
117:18 118:1 119:8
132:19 154:7 206:7
207:8
**reader** 150:14
**reading** 6:8 9:9 54:9 69:8
117:25 130:11 132:17
134:11 206:7
**reads** 68:8
**ready** 119:14
**real** 131:23 186:7
**Reality** 131:24

**realize** 11:21 136:25
**really** 98:25 140:5 141:2
200:6
**reason** 8:19 22:6 70:22
108:7 121:11 122:15
132:18 135:9 169:17
201:20
**rebar** 203:21
**rebars** 194:11 195:20
196:11
**recall** 10:16 28:16 51:4
51:12 52:5 60:14,14,15
60:19 117:1
**receive** 23:12 24:9 63:17
68:20 69:7,10 70:1
74:7,8,22,24 199:1
**received** 11:8 69:25
73:17
**receiving** 50:8 63:14
**recess** 48:22 164:18
**Recessed** 209:6
**recognize** 13:8 24:25
25:8 52:15,23 53:13,17
53:19 59:14 61:5 67:16
94:13,16 96:21 120:22
122:17,18 134:4 154:9
168:22 171:12
**recognized** 189:5
**recollect** 12:12 15:6
59:22 75:3
**recollection** 8:21 12:15
15:10 40:21 174:24
**record** 51:25 53:1 62:13
64:24 96:10 97:19 99:8
131:13 167:13,18
191:11
**recorded** 188:4
**records** 108:13 127:9
139:11 144:4
**red** 96:18 98:8,11 99:3,5
99:9 119:18 159:16,16
161:8 172:19
**reduce** 16:15 199:12
**refer** 19:3,5 74:12 173:4
176:14 189:10
**reference** 59:12 165:20

**referenced** 164:25
**referral** 19:2
**referred** 93:8 134:23
**referring** 9:17 30:9 44:3
74:13 82:5 83:7 93:12
93:16 118:16 134:13
147:11 166:5 177:22
193:19
**reflect** 48:13 167:18
**reflected** 12:10 169:9
188:21,22
**reflecting** 111:1 123:11
124:5 125:6 126:14
127:1 150:11 163:12,13
186:13 187:10,11
188:14,15
**reflection** 123:10
**reflects** 110:24
**refresh** 40:21 46:4
**refreshed** 15:10 109:16
**refuge** 109:19 110:8
**refuse** 20:21
**regarding** 21:16 50:15
51:7,14 63:19,24 65:19
85:18,24 144:5 154:6
165:7
**regardless** 153:14
**regards** 109:11
**register** 39:8
**registered** 15:17 27:11
**registration** 38:13 39:9
**regretfully** 95:17
**reinforced** 184:14,16
203:23,25
**related** 16:1 17:7,10
37:25 38:22 44:24
50:19 103:2 129:12
140:6 201:24 211:14
**relation** 70:13 154:15
**relatively** 57:1 139:11
**relax** 194:6
**relevant** 51:16 102:19
**relocating** 187:24
**relocation** 85:8 141:19
**relying** 129:7,15 142:5
**remain** 162:25

HECTOR V. PAZOS, P.E.

**remained** 147:12 170:25
179:21
**remaining** 124:16
194:18
**remains** 171:15
**remember** 8:5 10:2,2,22
23:5 30:22,25 31:13,23
33:7,17,22 37:1 42:25
43:2,10 45:8 46:3,9
48:10,19 63:18,24 65:8
66:16,17 71:4,11 73:13
74:3 76:6,9 78:17 80:7
80:11 81:6 83:2 109:23
110:3 120:25 122:17
127:8 130:1,2,5 132:13
132:24 133:19 134:11
141:23 143:25 146:1
173:6 179:15 183:2
**remembering** 20:12,13
**remove** 71:25 92:16
97:24 194:9
**repair** 40:13
**repaired** 81:18
**repeat** 11:8 13:24 19:4
21:13 30:3 40:19 41:17
42:7 56:3 58:18 65:3
67:22 113:3 123:4
124:9 136:13 145:5
146:21 175:22 191:22
194:21 196:15 198:24
200:15,25 208:17
**repeated** 137:16
**repeating** 95:3 207:2
**rephrase** 64:14 166:14
**replies** 19:23
**report** 8:25 9:6 10:4,4
11:5,7,14,23 12:3,19,21
13:6,22 14:2,11,14,15
14:22 22:9 25:1,9,12
26:3 37:11,12 51:12,14
51:21 52:6 53:2 60:3
60:12 61:9,15,21 62:3,7
62:21 63:7,13,16,19
64:2 67:14,17,19,21,23
67:24 68:2,8,13,19,24
69:22,25 70:24 71:13

71:16 72:8,16,18,23,25
73:2,12,14,16,23 75:9
76:18 83:4 85:23 89:22
93:20,25 94:10 101:17
108:6 111:10 117:12
119:1 130:3,21 131:1,2
134:12,24 141:6 146:17
146:20 147:9 151:11,12
158:3,7 164:25 165:16
165:20,23 173:15,24
176:4 189:10 197:7
205:22 206:23
**reported** 11:6 145:25
146:9
**reporter** 1:23,25 6:23
7:6,22,23 29:2 33:10
211:3,25
**REPORTER'S** 211:1
**reporting** 151:13
**reports** 37:23 51:7 59:24
60:16,19 69:15,19
94:15 116:16 154:7
179:5 200:1
**represent** 7:15 13:5
23:18 25:5 83:11 85:17
85:24 168:4
**representation** 20:23
**represented** 195:10
**representing** 2:2,9 3:7
3:16 23:15,22
**represents** 65:12 93:15
**reputable** 94:25
**reputation** 95:1
**request** 51:11 52:3 65:18
66:11 71:7 76:4
**requests** 23:12
**require** 100:3
**required** 16:22 18:5
**requires** 40:6 143:15
**reserved** 6:13
**residents** 78:6 79:13
**residue** 198:9
**resist** 198:21
**resistance** 88:5 124:24
**resisting** 105:12
**respecting** 64:5

**respond** 51:10 66:10
**responding** 63:15
**response** 65:17
**responsiveness** 6:12
**resting** 144:11 192:24
**restrained** 106:12
**restraining** 156:13
**restrictions** 77:7 79:21
80:13 81:12
**rests** 156:10
**result** 84:21 87:8 91:9
109:17 167:9 171:9
184:23 211:16
**resulted** 57:15 117:20
**resulting** 84:18 147:6
**results** 58:5
**retain** 16:21 18:4 19:1
**retained** 18:6 20:6 22:8
48:25 49:5,11,13 70:7
134:7,16 135:15
**retainer** 20:22
**retentions** 23:1
**returns** 86:12
**review** 9:8 10:13 11:12
12:21 13:19 14:1,4,21
58:19 59:18 73:21 74:2
95:4 129:19
**reviewed** 10:24 14:16
15:3 30:2 93:21 94:10
100:24 118:14 173:21
**revisit** 76:21
**ride** 100:19
**riding** 100:18 103:24
**rig** 22:21 34:25 48:3
115:19
**rigged** 104:22
**right** 7:19 12:16,17
13:20,23 14:3 15:11,14
19:11,15 20:22 21:11
21:21 22:15,17,25
23:14 24:21 25:11
26:20 28:12 29:6,17
30:11 31:24 32:20
33:17 36:5 37:4 38:4
38:20,23 39:2,10,14,16
40:18 41:6,16 46:16,18

47:6,18 48:4 50:1 54:1
54:13,18,21,24 55:10,13
57:18,21,24 58:6,8 59:9
60:4 62:25 63:4,8
66:12 67:13 69:5,6,20
69:23 71:21 72:4,14,20
73:2,23 74:13,15,20
80:16 81:16 83:3,7,18
83:23 84:2,9,13,15,19
85:5,9 86:1,10,16,23
87:3,9,13 88:1,6 89:9
89:13,15,20,22 90:4,10
90:13,17,19 91:3,7,9,20
92:4,10 93:24 94:3,19
94:24 95:8,21 96:23
97:1,7,15,18,21,23 98:7
98:15,21 99:16,24
100:4,7,13,15,20 101:1
101:14,16,25 102:14
103:8 105:20 106:7,25
107:20,21 108:2,17,25
109:2 110:13 112:1
113:7,12 114:9,16,25
115:10 117:4,11,25
119:1,6 121:2 123:18
124:18 128:1 129:2,6
129:13 131:3,5,8,22
132:8 136:5 141:19,22
142:2,25 143:19 144:13
144:21 146:1,1,4,11
148:12,18 149:4,9
150:23 151:10,23 152:2
152:5,13,15,24 153:5
154:1,10,10,23 156:5
157:6,9,10,22,25 158:5
158:10,15,22 159:21,24
160:12,20,23 161:1,8
161:10,12,14,22,22
162:11,15 164:1,20
165:10,22 167:13
168:18,24,24 169:2
170:14,19 171:17
173:10 175:2,4,8
176:15 177:1,2,17
178:2,20 179:25 181:16
181:24 182:14,17

HECTOR V. PAZOS, P.E.

183:14,23,24 185:9
187:14,17 189:24
190:20,25 191:3,8,8,21
192:5,13 193:6,16
197:24 200:5,14,20,23
201:1,5,5,7,15,17 202:3
202:13,15,19 203:2,17
203:21,22 204:5,9,18
204:25 207:16 208:2,8
**right-hand** 170:22
**rigs** 15:22 17:12
**rip** 81:23
**ripped** 82:4
**rise** 34:22 35:1,11,15,23
36:4
**Rita** 76:8
**rivers** 17:8
**ROBBINS** 2:21
**ROBERT** 2:12
**Robinson** 134:1
**role** 162:7
**roll** 105:15
**rolling** 161:4 185:11
**RONALD** 3:10
**roofs** 33:3
**rope** 109:7,8
**ropes** 9:21,25 10:3
**rotates** 156:9
**rotating** 123:12 162:18
182:4
**rotation** 107:16,23,25
108:13 117:20
**rotational** 89:19
**roughly** 10:21 149:24
**round** 160:15
**RPR** 1:24 6:22 211:2,24
**rubber** 91:15 180:15
**running** 61:19
**résumé** 28:8 40:20,25
44:25 46:13,18,24

---

**S**

**s** 2:19 6:1 9:20 11:1,4,14
11:23 12:3,21 13:21
14:1,14,14,21 77:13
118:4 132:15 207:13
208:3

**sail** 34:1 103:12 104:3
116:11
**sailing** 33:24 129:11
**salvage** 16:8,9 29:1
**Sanders** 25:3 68:4 74:19
**Sartin** 205:24 207:10,13
208:3
**saturated** 84:19
**Saunders** 189:4,4,7,11
189:16,18
**save** 6:11
**saw** 44:13 60:24 70:25
130:18
**saying** 13:23 14:21 25:19
40:5 79:2 88:24 91:4
92:7 112:9 115:6
122:15 123:19 126:10
147:20,22 159:9 162:17
173:5 174:5 176:5
**says** 28:9 29:15 44:4 60:2
60:3,9 150:3 165:6
197:8,11 205:24 207:9
**SB** 99:9
**scale** 127:13,14 157:8
158:10,11,12,14 195:20
196:9
**scenario** 190:8
**scene** 77:10,19
**scholarly** 30:2
**school** 38:11
**scientist** 112:17 208:14
208:18,20
**scientists** 133:25
**scope** 64:16 111:11
**scrape** 177:10 178:3,9,12
178:17 179:1,9 183:10
193:13,25 194:14,20
195:2
**scraped** 181:22 194:25
195:3,13,25 196:3,4
**scrapes** 146:6 181:9
183:1,5,7,9,9,12 190:6
197:11,18,25 198:15
**scraping** 86:14 87:6
194:7 198:6
**scratches** 146:3 181:19

182:15
**scribe** 120:6 123:13
**sealing** 6:9
**seawall** 57:16 121:22
122:16,18 123:21 139:3
139:18 141:17,20
145:16 146:22 163:13
164:12,15 172:2,4
179:19,20 180:14,17
182:12 185:14 192:24
192:25 195:19,20
201:14,24 205:10
**seawalls** 183:12
**second** 36:17 39:13
53:19 59:9 65:1,2 69:3
107:13 124:1,21,22,25
124:25 125:1,2,4,19
147:14 150:13,13,16,17
150:18,23,24 162:6,8,9
162:9,24,25 163:2,2
170:12 185:2,3,5
191:25 196:20 206:10
206:14,18
**seconds** 107:12 124:3
146:6 169:16 170:8,9
170:14 188:3 192:25
**section** 1:7 81:5,6 165:6
179:20 207:8
**sections** 81:4,10 83:20
151:23 194:19
**see** 24:18 26:22 44:5
47:23 53:19 56:3 60:2
60:4,8,11,12,17 68:5,10
69:1 70:10 71:18 75:11
82:23 83:8 92:13 94:6
97:9,22 98:16 115:2
120:10,25 121:3 146:17
147:16 149:7,12,15
150:4 151:17,19 158:5
165:10,12 166:7 167:5
167:11 171:20 173:8
176:11,18 177:5,10
181:3 182:15,24 183:15
185:10 197:7,10,14
198:8,24 201:1 205:25
207:10

**seeing** 120:25 122:18
179:15 183:2
**seen** 9:3 10:11 33:9 80:4
80:18,20 129:22 130:1
179:8,13
**seep** 148:5 193:9 205:11
**seepage** 57:14 58:5 59:6
84:18 87:8,11,15,20
88:3,7 90:11 91:7,16
92:9,12,16,20,21 95:13
95:13,22 139:17,21
141:16,21 193:2 199:12
201:25,25 203:10,15
205:2,3,5,6,8
**seepage-induced** 208:21
**seeped** 89:4
**sees** 166:12
**selling** 44:16
**seminars** 27:15
**send** 19:24 29:2,9
**sense** 16:8 105:17
**sentences** 45:10
**separate** 39:3 54:20
170:10
**separated** 170:5 172:3
**separately** 196:21
**separating** 65:24
**separation** 155:22
**September** 49:14,21
**sequence** 85:11 86:2,7
99:13 202:4
**series** 146:2 164:21
**service** 41:9
**services** 41:18,20 49:11
49:13
**set** 96:15 211:7
**settle** 115:9
**seven** 35:15 43:3
**seventeen** 164:16
**seventh** 117:14
**shake** 109:6
**share** 71:3,8 135:22
**sharing** 71:12
**shear** 89:18
**sheet** 56:17 57:21 58:25
59:1 81:7,8,8,10,15,16

HECTOR V. PAZOS, P.E.                                                                                                      7/20/2009

81:19,21 82:1,3,5,7
84:7,12,17,23 85:4,4
86:15,21 87:16,23,24
89:5,14,20 90:4 91:21
93:9 95:23 96:7 147:6
148:4 151:23 152:1,4
153:9,13 154:12,16,17
168:8 169:7,12 170:1,2
170:16,20,24 171:10
180:20 193:5,9 199:3
199:19 208:11,16,20
**SHELONKO** 4:5
**ship** 15:22 37:8 38:22
40:6 41:9 189:16,18
**ships** 39:19,22 40:3,13
**shipyard** 41:1,9,16 42:12
**shipyards** 40:18,23 41:5
42:5
**shocks** 105:15
**shore** 35:6
**short** 124:15,17 125:5
**shorter** 152:4
**shorthand** 211:9
**show** 13:4 52:13 59:10
94:7 120:13 131:13
132:20 133:6 140:24
141:2 154:18 156:23
157:6 160:9 165:23
166:2,13 179:9 185:5
186:25 195:11 197:11
**showed** 60:20 183:3
**showing** 130:24 132:1,22
**shown** 62:15 176:9
193:15
**shows** 171:14
**shut** 57:11 138:22
173:12
**sic** 96:4
**side** 20:15 22:8 24:4,7
34:12,13,17,19 35:5,6
49:2 69:20 78:10,25
80:5,6 81:23 84:8,12,24
86:15 87:17,23 88:13
88:16,18 90:8,19,22
91:6,10 95:24 104:24
109:25 110:1,23 150:1

158:17,19,19,21,21,22
159:6,23 160:6 172:16
180:5,13,21 181:4
182:5 193:6 197:11,19
197:25 198:7 199:13,13
200:24 201:8,17,22
204:14,16
**sides** 35:18 145:23
**sideways** 162:18
**sign** 71:13
**signature** 60:17,19,21
72:1,8
**signed** 71:15,22 210:11
210:13,15
**signing** 6:9
**Silva** 151:17
**Silva-Tulla** 151:14
**similar** 61:4,6 87:11
**simple** 55:1 112:20 194:3
**simpler** 173:8
**simplification** 39:25
**Singapore** 109:24 115:19
**single** 38:18,19,21 41:14
55:22 62:1 130:19
134:6,14,15 159:13
**single-line** 120:6
**sinking** 22:20
**sir** 72:14 96:14 206:6
**sit** 8:20 21:18 48:13
55:24 63:18 118:7
144:14 199:10
**site** 98:9,17 151:2,7
159:3
**sitting** 168:9
**situation** 35:22 70:4 75:4
78:1 150:12,16 171:12
**situations** 206:20
**six** 38:10,10 43:2 44:17
159:22 160:5,22 161:5
161:24 164:13 173:17
184:10,10
**sixteen** 164:15
**size** 182:20 186:15
188:13 195:20
**sizes** 56:18
**Skaer** 9:20

**sketch** 149:7,10 154:18
157:4,7,9,15,17,17
158:1,2,2,5,6,6,9
159:13 169:9 170:13,17
201:6 203:22
**slab** 168:9 178:19 179:18
199:5,11
**slabs** 198:6
**slammed** 191:6
**slap** 182:10
**slide** 90:3
**sliding** 84:22 85:2 89:19
**slightly** 86:19
**slip** 89:19
**slipped** 104:18
**slower** 186:21
**slowly** 21:24
**small** 93:20,22,24 155:17
195:8,9
**smaller** 92:19 105:24
**soft** 168:13
**soil** 31:9,12 45:24 46:25
47:21 48:16 84:19,23
87:16,24 88:11 89:7,11
90:11,16,18,21,23
92:16,24 95:24 96:6
141:21 148:4 152:15
170:2 191:7,20 193:6,9
193:10 199:4 200:24
201:2,8,11,17,22 204:3
204:8,15 208:11
**sojourns** 83:1
**sold** 27:25 44:11
**sole** 16:23 17:1
**solid** 95:12 168:15
169:21 174:21,23 175:2
182:22
**solution** 199:17,18,24
200:2,6,7
**somebody** 80:7 147:18
199:14
**soon** 68:16
**sophisticated** 112:25
**sorry** 22:13 28:16 60:7
71:24 87:18 133:16
158:13 160:4 175:22

194:21 208:17
**sought** 6:15
**sounds** 53:24
**source** 19:2 99:19 129:18
129:20 142:16 168:19
189:19
**sources** 50:9 116:2,5
189:1
**south** 7:2 33:20 54:3,14
54:17,25 55:3 56:23
79:22,24 85:14,18,25
86:22 90:13 91:17 92:2
92:8,19 99:2,4,5 117:24
130:4,25 165:23 172:12
172:23 173:25 175:21
175:24 176:1,2 177:7
178:22 179:13 180:7,23
181:5,12 190:20 192:20
193:3,3,14 202:13,23
203:14,16,20 204:8,8
204:12,20,22,23 205:16
205:17,17 206:9,11,24
206:25,25 207:14,15,16
208:5
**southern** 63:25 91:18
92:19 173:16 179:11
202:12,23 204:12,19,20
**southernmost** 206:11
**south-to-north** 132:1,23
**so-and-so** 74:7 77:17
**space** 148:8
**speak** 7:22 70:14
**speaking** 7:24 79:10
**specializing** 184:15
**specific** 10:16 15:7 22:14
31:22 37:9 41:19 46:3
48:5,14 50:25 51:4,11
58:22,22 59:12 65:17
66:9,11 70:10,21 75:4
100:10 108:13 118:15
118:17 122:20 128:20
130:9 153:23 163:18
190:17 203:18
**specifically** 6:10 10:9,12
12:12 55:22 74:3 80:22
169:19 203:12

JOHNS PENDLETON COURT REPORTERS                                              800 562-1285

HECTOR V. PAZOS, P.E.

7/20/2009

Page 22

**speeches** 27:17
**speed** 123:25 188:20
**spend** 10:18 187:16
 195:21
**spoil** 117:22
**spoiling** 171:16
**spot** 11:12,17
**spreading** 174:12
**spring** 104:23 105:9
**St** 7:2
**staff** 15:23 16:12 42:10
 42:24 43:17
**starboard** 34:12,17 35:5
 110:1 145:1
**start** 21:23 57:9 63:15
 83:19 88:18,21,24 89:2
 99:14 104:24 120:9,12
 120:14 127:18 139:7,9
 180:12,14
**started** 57:14 63:14 88:7
 205:2
**starting** 53:22 58:5
 177:9
**starts** 84:23
**state** 6:23 46:1 211:3
**statement** 51:4 72:19
 118:13 119:3 132:9,10
**States** 1:1 17:9 60:9
 109:15 116:1,6 142:15
**station** 57:5,24 59:3
 83:21 132:22 138:22,24
 138:25 139:9 141:12,15
 142:23 148:10
**statistic** 22:19
**stay** 21:2 36:14
**stayed** 34:19 36:19
**steady** 163:1
**steam** 124:20
**steel** 145:10,21 155:23
**steeper** 111:2
**Step** 53:16
**steps** 35:22 53:16
**stern** 109:20 110:9 182:5
**sticker** 98:10,13,16,19,23
**stickie** 98:5,5
**stickies** 99:10

**sticking** 161:13,16
 164:12 183:23
**sticky** 98:1,4
**STIPULATED** 6:2
**stipulation** 7:4
**stipulations** 7:7
**stop** 49:24 79:7 86:21,25
 117:25 126:8 181:7
 191:25
**stopped** 80:6,10 160:21
 174:22 181:1
**stops** 148:15,17,20,22,24
**storm** 11:25 31:19 36:22
 36:23 37:2 100:7,15
 107:24,24 108:1,16,21
 110:2 117:4
**story** 176:3
**straight** 121:1
**Street** 1:20 2:5,14 3:3,12
 3:20 82:10
**strength** 105:3,5 152:10
 153:4 180:2
**stresses** 155:20
**stretching** 180:14 204:14
**strike** 47:10 191:13
**striking** 159:21 160:2
**stronger** 105:19
**struck** 144:6,8,10,14
**structural** 56:21 152:25
 153:3 155:6
**structure** 30:21 31:5,9
 31:11,15 32:7,12,15
 45:19,24 46:25 47:21
 48:6,16 102:10 110:24
 182:20
**structures** 121:14 127:3
 143:17
**studied** 135:16 143:20
**studies** 44:21,23 45:1
 163:7
**study** 38:19
**studying** 37:22 38:2
 129:11 130:8 134:17
**stuff** 27:23 129:12,17
 137:5 140:5
**subject** 53:8 54:23 64:8

 112:12 171:8 188:9
**subjected** 95:4
**submit** 61:9
**submitted** 61:15 67:17
**subscribe** 116:10
**substantial** 17:13 19:22
 105:10 126:12 172:5
**substantially** 22:5
**substitute** 63:1
**sudden** 89:18 176:7
**suddenly** 85:3
**sufficient** 35:9 37:15
 73:4,9
**suggest** 147:18
**suggested** 163:10 194:2
 194:16
**Suite** 3:3,20
**sum** 59:19
**summarize** 176:5
**summarizing** 174:4
**summary** 51:15 86:2,4
**sunk** 34:21
**sunrise** 142:12,17
**Superficially** 63:5
**superimposed** 188:22
**superposition** 186:14
 187:11 188:9
**supervised** 42:17
**supervision** 211:10
**support** 56:6,14 73:4,9
 75:12,14 89:8 131:9
 163:15 175:17 200:24
 201:2,11,16,21
**supported** 199:7
**supports** 208:3
**supposed** 192:9
**sure** 14:12 24:17 25:20
 44:18 53:24 54:15
 62:19 76:25 77:3,6
 86:6 93:11 95:5 100:8
 106:8 112:14 117:2
 119:13 122:4 130:5,18
 133:20,23 135:7 143:18
 152:11,12 159:15 164:2
 165:6 174:13 183:17
 192:13 198:19

**surely** 131:1,5
**surface** 84:7 102:21,23
 103:2 145:21 159:22
 160:6,23
**surfaces** 145:14
**surge** 35:12 105:15
**surprise** 180:4,7 181:14
**surrounding** 107:3
 108:22 113:11 127:3
 143:17
**surveyors** 16:13
**survive** 34:3,4,6 35:20
**survived** 33:10 35:19
**SUTTERFIELD** 3:1
**sway** 162:8
**swaying** 161:4
**swing** 105:7,22
**swirl** 117:3
**sworn** 7:4 211:6
**swung** 110:11
**system** 95:19 138:23
**S-A-U-N-D-E-R-S** 189:9

---

**T**

**T** 5:1,6 6:1,1
**tab** 25:13
**tabbed** 25:13
**table** 9:14 10:10 15:4
 182:21
**take** 7:22,24 27:17 35:22
 36:5 46:20 47:1,25
 51:2 69:11,11 70:4
 76:10,14,22,24 77:1,4
 77:11,20 83:18 96:17
 98:8 99:3,5,8 111:13
 117:11 119:18 122:21
 123:1 157:15 162:9
 166:6 172:8,22 176:18
 178:2 182:12 186:20,21
 201:7,9 205:15 208:10
 208:15
**taken** 6:5 8:10 27:13
 121:21,24 129:23
 182:24 183:3 210:25
 211:8
**takes** 208:19
**talk** 10:12 70:17 71:5

HECTOR V. PAZOS, P.E.

77:17 112:8 118:17
128:17 137:6 141:8
142:8,9,10 144:1
153:23 164:7 165:3
187:7 189:11 203:12
**talked** 22:25 78:23
205:14
**talking** 56:10 61:3
108:15 117:1 128:21
134:4 138:16 144:2
145:9,10 146:6,25
150:12 153:17,18,18,24
155:1,2 164:14 170:7
193:4 204:6
**tall** 101:2,7
**tape** 97:8,15,16,17
**teach** 44:4,7 45:5,13,17
45:22
**team** 74:16,21
**technical** 20:15 23:19
24:8,10 38:11 44:23
78:10 95:6 114:24
207:25
**technicalities** 21:17
**tell** 18:17 21:18 22:19
23:23 24:10 26:10
37:10 43:16 45:10 46:4
46:22 48:4 61:14 63:9
74:9,20 75:2 78:5,13,20
79:10 94:19 95:8
101:10 104:17 111:17
111:18 112:7 113:23
116:7 119:15 121:2,17
134:6 143:11 156:5
176:3 190:11 209:5
**telling** 19:25 125:21,23
131:7 187:19 188:8
**tells** 177:6
**ten** 26:16,17 35:15 37:20
41:15 146:5,8 163:11
163:16 175:15 186:3,17
187:1,3,20
**tendered** 25:2 52:21
**Tendering** 27:6 71:20
93:16 167:12 177:20
**tension** 91:15

**tenth** 162:9
**terminal** 11:25 80:1,3,16
96:20 120:15 121:18
124:23 126:5 127:7,16
128:23
**terms** 178:21
**test** 93:4,9,15,25 95:9,15
95:16,21 96:1,3
**tested** 130:12
**testified** 7:5 12:24 81:3
115:3,3 128:14 134:1
173:9 185:7
**testify** 8:12 25:23,24
114:20 115:8 211:6,7
**testifying** 115:9 144:13
179:22 187:4
**testimony** 8:21 14:20
15:11 57:23 81:6 114:4
114:16 121:23 126:7,17
128:16 133:12 135:23
139:6 142:4 144:17
148:22 150:6 155:12
162:22 174:3,4 188:10
191:6,9,10 196:6
197:24 198:13 205:19
206:23 207:2,4,9,11,13
207:20,21 208:3 210:4
210:6
**tests** 198:7
**textbook** 189:3
**th** 132:8
**Thank** 57:18,18 89:2
99:7,12 140:18,19
159:19 164:20 172:21
**theoretically** 95:15
**theory** 102:15 186:6
**thereof** 6:14
**thickness** 102:5 160:16
**thing** 13:11 37:21 47:16
84:15 98:7 112:20
185:25 186:7
**things** 9:15 13:15 32:15
32:18,19,21,21,23,24
36:6 40:22,23 45:9,11
52:2 74:11,24 77:21
79:23 133:7 162:25

168:15 203:5
**think** 9:19 10:20 14:20
14:24 23:20 24:9,15,20
31:17 49:20 64:17
69:21 113:13 114:7
122:9 136:18 140:16,18
141:1,5 157:7 169:23
173:9 184:12 191:15
192:2 194:3
**thinking** 187:16
**thinks** 113:13
**third** 57:12
**thirty** 116:15
**thirty-four** 15:24
**thought** 12:4
**thousand** 58:20 65:9,11
67:4,12 78:23,24 80:22
**thousands** 173:20
**three** 27:24 44:16 46:12
56:5,8,9,13,16 57:19
58:8,13,15 83:8,11,16
85:15,19 104:20 155:2
162:19 164:22,24
165:18 166:13,24 167:8
167:8,19 168:4 171:4
184:10 196:2,4
**thrust** 13:21 14:3
**tide** 188:1
**tie** 110:9
**tied** 110:9
**tier** 12:6
**tilt** 162:8
**tilted** 57:8 147:12
**tilting** 57:7 147:4 148:1
172:3
**time** 6:13 9:12,13 10:24
13:16,18 15:24 18:18
18:25 20:4 22:24 25:23
28:19 32:1 35:3,7 41:3
42:14 43:17,18,23 47:1
47:25 52:1 54:1 57:1
62:17 63:13,16 65:21
66:18 69:7,9 70:19,25
74:4,10 75:25 76:5
77:8 78:16 79:25 80:12
81:13 85:2 91:17 92:11

92:12,13,15,15,21,22
92:23,23,24 107:16,19
108:14,23 111:14
113:17,20,22,22,24
115:4 118:10,11 119:5
123:21 125:5,6 127:2,2
128:16,20 132:7 133:7
139:12 140:13 141:25
141:25 142:12,17 143:1
143:10 149:22 151:1,6
153:20,22 154:3 156:16
168:23 169:1,3 170:8
172:10,11,19 173:1,7
174:6,11,12,20 175:7
177:13,13 180:2 182:3
182:18,21 183:13 185:6
186:2,11,23 187:15,24
188:8 189:11 192:24
193:1 194:5 195:6,11
195:21 199:16 200:8
204:6,11,11,15,20
205:9,11,20 207:5
208:15,19
**times** 20:16,19 21:23
22:6 29:4 70:16 75:21
75:23,24 76:13 77:8
79:23 80:22 82:11,14
93:21 114:11 142:3
162:24,24 163:11
170:10 173:22 181:1
**Times-Picayune** 28:24
**timing** 139:9 173:2 175:9
**tippy-top** 102:1
**title** 46:14,16 48:5
**titles** 47:23 48:14
**today** 8:13,20,24 15:11
16:20 21:18 26:12
48:13 55:24 61:20
63:18 67:6,7 118:7
144:14
**toe** 89:19
**told** 13:1 20:16 38:3
62:21 97:14,21 143:4
**tons** 124:14,15,17 125:24
126:1,1,2
**top** 21:9 22:18 31:21

HECTOR V. PAZOS, P.E.

33:17 45:7,20 46:6
48:4,18 56:9,16 58:14
63:23 66:8 68:7 69:23
74:23 82:25 85:20 89:8
103:15 116:8,22,25
117:15 127:12 129:25
142:7 143:22,25 148:1
158:12,17 159:6,10
160:18 161:13,16,18
162:4 164:3,5,8,9,10,14
164:15 180:18 206:3,5
**torsion** 168:6,18,21,22
169:1,11 171:9,13
**total** 66:5,24
**totally** 100:8
**touch** 179:18
**touched** 64:8 179:17
**touching** 35:8
**town** 19:25
**track** 52:22 53:6 113:13
113:14
**trajectory** 120:6 123:6
**transcribed** 211:10
**transcript** 32:9
**transcription** 210:5
211:11
**transition** 170:23
**translate** 110:23 204:4
**translated** 92:4
**translates** 170:4,6
**translation** 103:1
**transmits** 156:6
**trash** 183:13,15,19
**travel** 204:21
**traveled** 193:14 206:24
208:4
**traveling** 107:14 125:3
125:18 156:13 182:3
188:19 192:23 193:3
**travels** 86:18 107:24
**tree** 160:17
**trees** 32:15,24 35:8
**tried** 80:5 196:7
**tripled** 34:15
**true** 119:3 137:22 210:7
211:10

**truth** 211:6
**truthfully** 8:12
**try** 14:9 18:17 20:9,10,14
20:24 21:13,16 22:7
23:17,23 74:6 78:11,19
80:8 97:22 163:24
169:24 176:5 190:25
200:25 207:25
**trying** 21:1,2 23:23 78:9
80:13 125:15 203:11
204:16 206:2
**tumbled** 169:8
**tumbling** 83:22 169:12
171:10
**turbulence** 107:3 127:4
130:6,7,9,12,15,20
143:16
**turn** 25:12 67:14 83:3
96:17,18 119:15 149:6
151:14,25 205:21
**turns** 7:24
**TV** 77:25
**twelve** 19:13 101:20
**twenty** 46:8 48:20 67:11
75:24 103:9,13,20
116:15
**twenty-five** 46:21,22
47:25
**twenty-two** 103:20
**twice** 36:9 186:14
**twilight** 142:17
**twisted** 169:15
**twisting** 168:6,18,21,22
169:1,11 170:12,16
171:9,13
**two** 9:2,4 10:21 15:19
17:4,15 33:19 36:16
39:6,7,8 48:14,17 54:20
56:18 63:20 68:21,23
69:1 81:3,9 85:20
103:18 104:25 109:17
110:3 115:18 119:23
142:1 151:22 152:9
155:2,10 161:1,3 163:3
170:10 174:14,16,17
177:15 184:10 194:10

203:15 205:24
**two-picture** 193:23
**type** 59:20 67:25 143:14
144:19
**typed** 67:25
**typhoons** 109:14

### U

**U** 1:17 6:1
**ultimately** 193:9
**um** 9:21 10:8 15:16,23
16:11,14 18:13 19:21
21:22 22:13 24:15,17
24:21 26:1,5 31:25
32:8 37:7,15 44:9 46:1
46:15 48:18 52:25
54:10 55:19,21 56:10
57:4 67:5,9 69:6,23
74:3 82:18,18 88:16
95:17 114:13,23 116:7
124:14 136:23 139:6,8
139:16 142:1 144:8
147:3 152:23 154:5
155:17 169:13 173:1
199:15,15 201:23,23
204:10
**unable** 8:20
**undermined** 141:21
**underneath** 87:24 89:14
89:17 148:5 193:10
195:4
**underseepage** 84:22 85:1
91:25 201:21 204:21
**understand** 7:21,25 8:3
22:14 54:15 86:7 88:23
93:11 99:14 100:13,23
107:20 108:2 119:20
120:12 121:12 127:23
133:11,14 136:15,16
137:14 141:19 147:9
159:8 161:11 164:2
180:10 191:19 192:11
198:25 201:3 202:4
**understanding** 77:20
135:8 201:19 211:12
**understood** 62:19 156:20
**undisturbed** 86:10

**undone** 148:17,25 149:3
156:1
**unique** 145:20
**uniquely** 145:18 146:13
**United** 1:1 17:9 60:9
109:14 116:1,6 142:15
**university** 38:9 39:5
**unloaded** 100:6,8,15,20
102:14,18
**unmovable** 179:21
**unpublished** 28:9
**update** 25:22,23,25
**updated** 26:7
**updating** 61:23
**upgrading** 61:23 63:16
**upper** 86:20 89:24 90:6
**USA** 1:13,14
**use** 10:13 40:20 52:19
60:25 71:22 82:20
97:15,16 111:3 126:19
145:9 154:25 156:23
159:15,16 160:2 166:20
167:3 172:19 183:8
187:6 188:5 190:22,23
190:25 202:20,22
**Usual** 7:7
**usually** 24:2
**U.S** 93:4 95:18 199:5

### V

**v** 1:8,9,10,11,12,13,14,17
1:18 7:1 60:4 210:3,11
**variation** 172:5
**variations** 185:25
**various** 57:13
**varying** 106:10
**velocity** 124:23 126:6
**vertical** 105:10,11
169:14 199:8,11
**vessel** 110:1 115:25
124:19,20 125:16,21
126:8
**vessels** 37:25,25 40:14
**vice** 17:11 43:25
**video** 3:25 98:16 121:8
**VIDEOGRAPHER** 3:24
**videotaped** 121:10

HECTOR V. PAZOS, P.E.

7/20/2009

Page  25

**view** 16:10 150:25 203:4
203:9
**Villa** 7:2
**Villavaso** 58:1
**visible** 57:8 146:24 162:4
177:14 184:11
**visit** 76:23 77:2,5 78:16
78:22 80:8,24 82:10,12
82:15
**visited** 80:15 82:19,22
**vitae** 25:16 27:3 44:4
**voids** 100:9

**W**

**waited** 34:8,9
**waived** 6:10
**Walker** 2:11 113:13
**walking** 181:1
**wall** 58:6 81:17 89:18
91:11 92:9 95:24 96:4
121:24 126:5 141:22
143:23 144:6,11,12,15
144:19,22 147:19,23
148:1,21 149:20 151:2
151:7 153:8 159:4,11
159:22,23 160:3,5,11
160:13,19,23 161:13,17
161:19,20 162:21 169:1
169:5,12,14,15 170:4
171:8,23 172:12 176:7
176:8 178:16 179:4,23
180:12 181:15 182:2,6
182:7,7,13,16,17
183:22,24 184:24 185:9
187:10 188:20 190:18
191:6,7,20 192:19
193:10 194:14,15,19
198:15 200:23 201:2,8
201:15 202:5,10,11,18
202:18 204:22
**want** 13:24 14:12 20:2
26:8 41:19 44:15 50:20
51:24 56:9,13 58:14
59:10 69:13 70:3 75:14
83:3 93:11 98:22 99:13
108:8 114:1 117:2
118:22 121:15 122:19

123:5,15 127:15 128:17
137:6,25 138:7 139:5
139:13 141:2,8,18
144:16 159:12 161:7
164:2,23 166:25 172:14
174:10,20 175:20,22
176:9,14 187:16 190:1
190:2,22 191:2 192:13
196:11,13 197:17 207:4
209:4
**wanted** 62:19
**wants** 20:25 68:22
166:16
**Ward** 75:18 76:1,7 78:7
177:8
**washed** 82:24 92:3
**Washington** 2:23
**watch** 173:3,7
**water** 17:8 34:22 35:1,16
35:24 36:4,9,13 37:25
38:1 57:1,9 80:5,9 84:6
84:11,18,22 86:15,21
86:25 88:17,17 89:4,10
89:13,17 91:11 100:9
100:18 111:5 112:19
117:21,22 139:1,10
143:22 148:3,15,17,20
148:21,22,24 156:19
161:18 162:5 164:13
177:12 185:18,20,22,23
186:2,4,6,7,9 193:8
199:2,12,13 208:10,15
208:19
**waterfront** 37:8
**waterline** 103:7,13,24
161:1 197:13,13,20
**waters** 113:9
**waterways** 43:13
**wave** 109:8 110:23 111:4
111:9 112:23 128:25
150:3,6,7,10,18,22
163:12,13 175:12
186:19 187:1 188:21,22
194:6
**waves** 109:5,5 110:16,17
110:18,22,22,25,25

111:2,5,19 112:17
113:2,8 119:25 123:10
123:11,11 124:4,5
125:7 126:11,12,13,14
126:17,20,22,25 127:1
127:5 128:15 129:4,12
150:11 151:6 156:12
163:3,5,6,8,10,16 172:4
175:11,15 182:19 186:1
186:9,10,11,13,14,14
186:15,19,20,22 187:4
187:8,9,10,10,12,20
188:9,10,14,16,17,17
188:19,23 194:4
**wavy** 182:7,13,17
**way** 11:15 26:11 34:1,6
38:15 59:21 74:1 93:2
119:16 124:15 160:20
170:9,23 172:17 178:25
179:12 184:1 194:15
195:14 199:19 204:9
211:15
**ways** 40:7,7,9
**weaken** 193:10
**weakened** 91:25 92:9
**weakening** 90:11
**weakens** 88:4,7
**weaker** 92:25
**weakest** 152:18,19,20
**weather** 111:5 114:21
115:4,13 132:15 142:5
143:11,14 150:18
**WEBB** 3:1,2
**website** 19:23 176:25
**websites** 19:22
**week** 25:24
**weeks** 26:19 49:4,16 50:2
174:25
**weigh** 124:8,10,11
**weight** 124:12 126:1
201:2
**weld** 151:18,22 152:18
155:13,16,25
**went** 58:24 65:23 75:25
92:10 109:16,19 110:8
110:12

**we'll** 72:5 76:20 92:6
95:8 97:8,16,23,24 98:5
98:12,25 122:24 123:3
140:15 142:11 157:15
157:25 193:22
**we're** 13:4 41:21 47:1
53:1 56:10 58:1 61:3
63:2 97:13,15,22,25
99:12 137:17 150:12
157:6 164:13 170:7
171:19,19 176:20
183:14 193:4,17,17
202:15,16
**we've** 146:2
**whatsoever** 66:4 208:24
**white** 97:8,16,17,22,24
**wide** 99:17 187:8
**width** 127:10
**Wiedemann** 25:3 68:4
74:18
**wife** 17:3 18:3
**WILKINSON** 1:11
**WILLIAM** 3:19
**wind** 36:23 99:24,25
100:1,3 102:22,24
103:1,3,5,11,15,21,25
104:2,7,11,24 105:2,21
105:23,25 106:2,6,15
106:19,24 107:1,4,10
108:13,22 109:1,3,4,7
110:14,16,17,22 112:24
113:19 123:9 124:5,6
124:19 126:4,6,8,11
127:2,5 129:2,8,12
130:3,24 132:2,23
133:1 143:15 149:13,19
149:23,25,25 150:19,22
151:1 156:7 172:5
182:19 187:9,25 188:18
194:4,5,7
**winds** 32:19,23 106:9,10
107:16,18 108:12
110:10 117:3,20 123:12
126:20 128:25 156:11
186:13
**windy** 99:23

HECTOR V. PAZOS, P.E.

7/20/2009

Page 26

wise 17:17
wish 137:24
withdrawing 119:22
withstand 35:15
witness 6:4,25 7:3 15:21
  16:5,18 17:2,18,21,25
  18:11,22 21:7 22:11,16
  23:2 51:6 96:22 97:6
  97:12 98:14,18 99:1,6
  99:11 112:2 123:17
  139:6 141:13 159:18,20
  161:9 166:23 167:19
  172:20,25 173:2,5
  174:5 175:1 178:10
  181:25 183:19 184:1
  192:9 207:3,4,19,21,22
  207:23 210:1 211:5
witnesses 142:8,9,10
  173:24 205:19
Wooten 134:25 135:2
  151:13
word 11:10 12:22 29:18
  40:15 46:9 59:21 60:12
  69:24 109:3 126:19
  133:19 144:8,9,10,18
  145:9 147:1 148:13
  154:25 160:2 168:22
  171:13 174:2,10 183:8
  187:6,23 188:5 190:22
  190:23,25 196:7,8
  202:20,22
wording 208:1
words 7:22 52:15 53:14
  59:12,14,19,20 60:24
  60:25 61:2,4,5 67:21,23
  69:17 78:17,24 93:3
  126:11 137:11 190:21
  191:10,23 202:7,8
work 17:13,23 18:7,11
  18:14,23 19:3,5 21:7,12
  21:14,19,24,25 22:1,2,3
  22:7,11,16 23:3,6,8
  24:7 43:11 49:22,24
  50:11,14,22 62:20
  63:10 64:11,17 65:6,12
  66:2,6,14,25 67:9 73:19

74:16 79:11 81:1 82:9
  112:21 196:12
worked 22:5 40:17,22
  50:17 52:1
working 19:14 21:23
  24:13 28:1,2 38:1 40:8
  50:2,6,10 70:12 200:11
world 113:10
worry 75:2
wouldn't 175:8 182:14
write 32:3 37:14 44:15
  44:20 51:13 98:4,9
  99:9 117:17 149:13
  173:15,23 178:3
writing 27:23 37:22,23
  45:9 51:12 52:5 59:21
  60:19 119:1 173:22
written 10:17 29:20
  30:16,20 31:7 53:21
  60:15 61:5 67:21,23
  72:15,18,23,25 76:10
  117:3,6
wrong 11:15,19,22 13:2
  14:7 47:15 107:21
  159:25 160:7
wrote 27:24 30:24 31:13
  44:16 51:9 52:2,3,7,16
  53:15,25 59:15,20,22
  59:25 67:24,25 117:9
  149:12 153:1 165:22
  166:1 206:8,22

X

X 5:1,1,6,6 120:17,19
  159:1

Y

yeah 7:9 17:20 25:9
  60:12 94:6 101:22
  108:11 121:6,10 124:12
  125:11 136:13 138:9,19
  144:18 164:9 165:8
  167:2 178:9 183:25
  190:21 197:23 202:25
year 11:2 33:21,22 37:12
  66:23
years 15:19,25 16:17

17:9,15 21:25 37:7,21
  38:10,10 40:19 41:15
  43:15,19 44:13,17 46:7
  52:8 58:21 59:22 61:6
  129:10,14,16 133:8,10
yellow 168:10
yesterday 9:1 10:19 11:9
  15:5 18:17 68:20 69:25
  74:19
York 2:22 23:7

Z

zero 125:25 126:1
ZITO 3:16

$

$108,000 66:13

#

#75005 1:25 211:25

0

0.94 206:18
001140 165:15
001142 165:13
001151 165:15
05-4182 1:5
05-5531 1:8
05-5724 1:9
06-5342 1:10
06-6299 1:11
06-7516 1:12
07-3500 1:13
07-5178 1:14

1

1 5:9 24:24,25 25:6 47:3
  53:16,22 56:17 57:3,19
  66:15 67:14,16 69:16
  70:5,15,24 72:9 128:18
  149:7 158:1 196:14,16
  196:16,17,23,23 197:8
  197:17
1'5 100:25
1,750 179:7
10 5:18 167:14,21,23
  186:1

100 198:19
11 5:19 101:13,15,19
  167:16,21,25
11-foot 102:7
1100 1:20 2:14 3:12
1142 166:5,19,21 167:3
  167:14 171:3
12 5:20 101:22 102:5
  177:19,21,23 178:13
  184:7 185:21 190:14
  193:23,23
12-foot 101:3,4
1200 19:10 115:2,7,8,10
  127:18
14 161:12 162:11,15
  164:6
140 36:20
140-foot 110:7
15 207:1,15 208:6
150 35:13
1500 127:24 187:8
156,500 149:13
16 183:23
165 5:17
167 5:18,19
17 162:3
17th 82:10
170 92:4
1750 86:13
177 5:20
180 92:4
1959 40:17,20,25
1960 41:8
1966 42:10
1968 42:10
1969 40:17,20 41:1
1980 43:22
1992 33:23
1995 43:22

2

2 5:10 25:12 26:21,23
  27:2,18,21 44:25 46:12
  46:17,23 48:3 57:4,23
  59:13,13 83:8 124:1,25
  125:1,4,19 157:7,9,16
  157:17 158:6,6,9 169:9

HECTOR V. PAZOS, P.E.

**2.15** 13:5
**2.8** 206:13
**2:00** 10:20
**20** 105:6 153:19,22
**20th** 1:21 210:25
**200** 99:16
**20001** 2:23
**2005** 49:14,21 51:15
 53:23 64:11 65:6 118:6
 118:12 132:16
**2006** 49:25 50:3,5 53:23
 54:12,16 55:1,5,11,12
 55:16 58:11,17 59:1,4,7
 64:12 65:7
**2007** 66:15
**2008** 49:20,22 50:6,12
 61:10,16,22 62:3 63:7,8
 63:22 64:2 66:12,15,22
 67:6,6,9 177:2
**2009** 1:21 26:4 62:18
 63:9,22 64:3 69:16
 70:5,15 210:25
**202-346-4000** 2:24
**2150** 3:20
**22** 161:15,16 164:11
 207:7
**22nd** 177:1
**22-foot** 104:1,3
**23** 56:19 102:11,12,13
 152:5 162:2 170:3,11
 180:20 205:22 206:3,4
**23rd** 66:12
**23-foot** 57:20 58:25 81:5
 85:3 154:16 155:14
 161:7
**2300** 1:19 2:13
**25** 5:9
**25th** 61:20
**250** 57:16 58:6 172:2
**250-foot** 139:18
**26** 5:10
**27th** 61:22
**2715** 3:3
**280** 85:8
**29** 118:6 132:8
**29th** 26:3 110:19 117:8

118:11 129:24 132:16
 142:13 143:13

---

**3**

**3** 5:11 44:25 46:12,17,24
 52:14 53:10 58:4
 124:21,22 201:6 206:13
**3-1/2** 124:1,25 125:1
**30** 17:21 21:10 22:15,22
**300** 35:14 124:14,18
 125:24 126:1,1,2
 127:17,18
**300-ton** 125:16
**3200** 3:11
**33707** 7:3
**35** 56:19 99:17 152:2
 170:11
**35-foot** 57:21 59:1 81:5
 85:4 152:14 154:16
 155:14 170:2
**37** 117:11 173:23
**38,000** 105:6

---

**4**

**4** 5:12 7:10 53:7 59:10,11
 59:13,16 124:25 146:8
 176:12,13,21 193:20
 196:17,18
**4:00** 10:21 114:14,18,20
 126:23 188:7
**4:30** 114:14,18,20 126:23
 143:13 173:10,11,13
**400** 124:17
**42** 164:25
**45** 105:11
**450** 124:17
**450-ton** 124:19
**47** 147:11
**4727** 12:4
**48** 151:11,15

---

**5**

**5** 5:13 28:4 59:14 61:13
 61:17 62:2,16 63:3
 83:22 153:18 176:13,20
 185:25 196:13,16,23
 197:8 207:14 208:6

**5th** 51:15
**5:30** 138:23 173:12
**50** 129:10
**504-585-3200** 3:14
**504-585-7000** 2:16
**504-595-3000** 3:22
**504-598-2715** 3:5
**504-885-7700** 2:7
**53** 5:11
**55,000-pound** 105:4
**566** 7:2
**59** 5:12

---

**6**

**6** 5:14 40:24 72:5,7,10
 162:7 193:19 194:20,25
 195:15
**6th** 118:2
**6-foot** 161:21
**6:00** 173:25 188:7
**6:30** 174:1
**60** 35:8
**600** 127:18
**61** 5:13
**650** 3:3,20
**69** 41:8 83:4,5 85:19

---

**7**

**7** 5:5,15 93:13,17,24 94:3
**70** 17:20 22:10 85:16,20
**70113** 2:6
**70130** 3:4,21
**70163** 3:13
**70163-2300** 1:21 2:15
**72** 5:14 68:7 72:2,3,5
**72-page** 68:3

---

**8**

**8** 5:16 94:8,9,11
**8:30** 117:8 118:5,10
 119:5
**821** 2:5

---

**9**

**9** 5:17 164:23 165:1,19
 167:20
**90** 128:19 188:21

**900** 86:18 87:6 127:18
 204:23
**901** 2:22
**93** 5:15 33:23
**94** 5:16 33:23
**95** 36:23 53:17
**99** 110:2

212

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3

4    IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION

5                                    * NO. 05-4182

6    PERTAINS TO: BARGES             * Consolidated

7                                    * SECTION "K(2)"

8    Boutte v. Lafarge       05-5531 *

9    Mumford v. Ingram       05-5724 * JUDGE DUVAL

10   Lagarde v. Lafarge      06-5342 *

11   Perry v. Ingram         06-6299 * MAG. WILKINSON

12   Benoit v. Lafarge       06-7516 *

13   Parfait Family v. USA   07-3500 *

14   Lafarge v. USA          07-5178 *

15     *   *   *   *   *   *   *   *   *   *   *

16

17             (V O L U M E  II)

18         Deposition of HECTOR V. PAZOS, P.E.,

19   given at Chaffe McCall, LLP, 2300 Energy

20   Centre, 1100 Poydras Street, New Orleans,

21   Louisiana 70163-2300, on July 21st, 2009.

22

23   REPORTER BY:

24         JOSEPH A. FAIRBANKS, JR., CCR, RPR

25         CERTIFIED COURT REPORTER #75005

213

1  APPEARANCES:
2  REPRESENTING THE BARGE PSLC:
3      BRIAN A. GILBERT, P.L.C.
4      (BY:  BRIAN A. GILBERT, ESQUIRE)
5      821 Baronne Street
6      New Orleans, Louisiana 70113
7      504-885-7700
8
9  REPRESENTING LAFARGE NORTH AMERICA:
10     CHAFFE, MCCALL, L.L.P.
11     (BY:  DEREK WALKER, ESQUIRE)
12     (BY:  ROBERT FISHER, ESQUIRE)
13     2300 ENERGY CENTRE
14     1100 Poydras Street.
15     New Orleans, Louisiana 70163-2300
16     504-585-7000
17 - AND -
18     GOODWIN PROCTOR, L.L.P.
19     (BY:  MARK S. RAFFMAN, ESQUIRE)
20     (BY:  JOHN ALDOCK, ESQUIRE)
21     (BY:  KIRSTEN ROBBINS, ESQUIRE)
22     901 New York Avenue, NW
23     Washington, D.C. 20001
24     202-346-4000
25 - AND -

215

ALSO PRESENT:
    CHARLES CUSHING
    LARRY DAGGETT
    PETER KEELEY
    JOHN SHELONKO

214

1  SUTTERFIELD & WEBB
2      (BY:  DANIEL A. WEBB, ESQUIRE)
3      650 Poydras Street, Suite 2715
4      New Orleans, Louisiana 70130
5      504-598-2715
6
7  REPRESENTING AMERICAN CLUB:
8      MONTGOMERY, BARNETT, BROWN, READ,
9      HAMMOND & MINTZ, L.L.P.
10     (BY:  RONALD J. KITTO, ESQUIRE)
11     3200 Energy Centre
12     1100 Poydras Street
13     New Orleans, Louisiana 70163
14     504-585-3200
15
16 REPRESENTING ZITO:
17     MOULEDOUX, BLAND, LEGRAND & BRACKETT,
18     L.L.C.
19     (BY:  WILLIAM C. EMORY, ESQUIRE)
20     650 Poydras Street, Suite 2150
21     New Orleans, Louisiana 70130
22     504-595-3000
23
24 VIDEOGRAPHER:
25     LORRI HART FABRE (HART VIDEO)

216

E X A M I N A T I O N   I N D E X

EXAMINATION BY:                    PAGE

MR. RAFFMAN  ..............................218
MR. WALKER   ..............................253
MR. EMORY    ..............................323
MR. GILBERT  ..............................349
MR. RAFFMAN  ..............................361

E X H I B I T   I N D E X

EXHIBIT NO.                       PAGE
Exhibit 13  ..............................218
Exhibit 14  ..............................218
Exhibit 15  ..............................238
Exhibit 16  ..............................253
Exhibit 17  ..............................271
Exhibit 18  ..............................301
Exhibit 19  ..............................323

217

1        S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED by and
3    among counsel for the parties hereto that the
4    deposition of the aforementioned witness may be
5    taken for all purposes permitted within the
6    Louisiana Code of Civil Procedure, in
7    accordance with law, pursuant to notice;
8            That the formalities of reading,
9    signing, filing, sealing and certification are
10    hereby specifically waived;
11            That all objections, save those as to
12    the form of the question and the responsiveness
13    of the answer, are reserved until such time as
14    this deposition, or any part thereof, is used
15    or sought to be used in evidence.
16
17
18                    * * *
19
20
21
22        JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23    Certified Court Reporter in and for the State
24    of Louisiana, officiated in administering the
25    oath to the witness.

218

1        HECTOR V. PAZOS, P.E.
2    566 Villa Grande Avenue South, St. Petersburg,
3    Florida 33707, a witness named in the above
4    stipulation, having been previously sworn and
5    reminded of his oath, was examined and
6    testified on his oath as follows:
7    EXAMINATION BY MR. RAFFMAN:
8        Q.  Mr. Pazos, I've handed you what has
9    been marked as Exhibit 13 to your deposition.
10        Do you recognize Exhibit 13 as being
11    written on your letterhead?
12        (Exhibit 13 was marked for
13    identification and is attached hereto.)
14        A.  Yes, I recognize my letterhead.  Of
15    course, it been a long time.  I barely remember
16    the specific content.
17    EXAMINATION BY MR. RAFFMAN:
18        Q.  Mr. Pazos, if look behind you we've
19    marked Exhibit 14.  That is a trial board on
20    which you made some markings at your deposition
21    yesterday.
22        Do you recognize it as the trial board
23    on which you made markings yesterday?
24        (Exhibit 14 was marked for
25    identification and is attached hereto.)

219

1        A.  Yes.
2    EXAMINATION BY MR. RAFFMAN:
3        Q.  All right.  Mr. Pazos, in physics,
4    mass times velocity equals what?
5        A.  Momentum.
6        Q.  All right.  The diameter of a circle
7    times pi equals what?
8        A.  Perimeter.
9        Q.  Is another word for perimeter
10    circumference?
11        A.  Yes.  It's not the right technical
12    term, but it's okay.
13        Q.  Mr. Pazos, if you'll take a look at
14    the board behind you, Sketch Number 3, I want
15    to ask you some questions following up about
16    the south breach of the Inner Harbor
17    Navigational Canal.
18        You'll see that you've written
19    approximately 170-foot translation around a bow
20    of sheet pile.  Do you see that?
21        A.  Yes.
22        Q.  What was it that caused the sheet pile
23    to translate into the neighborhood and push
24    back and unfold like an accordion; what pushed
25    on the sheet pile to do that?

220

1        A.  Okay.  The entire levee is, um --
2    continuous elastic structure that's being
3    support at each end, that means that each end
4    is close to the Florida bridge and the other
5    end is close to the other bridge, so this
6    entire long structure is supported at each end,
7    and the entire levee is being compressed and
8    push by hydrostatic pressure.  So the entire
9    sheet pile system is a elastic, continuous
10    structure from one end to another that is
11    deflecting by hydrostatic pressure inland.  And
12    while it remains in one piece it's no problem.
13    It's just connected sheet pile to sheet pile.
14        Now, when the barge start opening gaps
15    and water start introducing in the soil
16    underneath and creating piping and transporting
17    particles of ground away from the location
18    where the water entered under the sheet pile is
19    creating a shear failure of the soil which
20    increase by time because the hydrostatic
21    pressure needs time to push the ground away.
22        This is exactly what happened here.
23    This area, we discuss it yesterday, was
24    compacted and pushed first, had more time for
25    the piping to proceed farther.  So this is the

221

1  worse area.
2        And closer where finally, the final
3  failure of the levee occurred due to collapse
4  of concrete panels, the seepage is much
5  smaller.
6        So the configuration of the final
7  resting place of the sheet pile is a clear,
8  very specific result of the theory in practice
9  behind seeping.
10     Q.   All right.  And thank you for that
11 narration.  Now, my question is simply, the
12 last part of what happens at northern bow is
13 that, if I understood you correctly, all right,
14 the northern bow moves further into the
15 neighborhood because the seepage has had more
16 time to act.  Correct?
17     A.   Correct.  The timing is a pretty
18 strong item.
19     Q.   All right.  And so the water pushes
20 the sheet pile and the panel and all the soil
21 into neighborhood deeper because there was more
22 seepage and more time for seepage at that part
23 of the breach.  Right?
24     A.   Yes.
25     Q.   Okay.  Good.  Thank you.  Now, I need

222

1  to complete the story of how the barge got into
2  the neighborhood.  And if I understood your
3  report and your sketch correctly, the top part
4  of sketch Number 3 is a representation of the
5  barge transit from the canal side to the
6  protected side.  Am I right?
7     A.   Yes.  Not to scale.
8     Q.   Not to scale.  Okay.  So describe for
9  me what happened at the far southern end of the
10 southern breach that resulted in the barge
11 transiting from the canal side to the land
12 side.
13    A.   Okay.  The level of the water -- the
14 still water level, pure theoretical level,
15 continue growing according to the
16 instrumentation at different places.  As the
17 barge was traveling south, closer to the south
18 end of the south breach, the water level
19 continue increasing, allowing the barge to
20 contact the floodwall at a higher elevation.
21 Also, the incoming and reflecting waves are not
22 exactly the same everywhere.  If you stand at a
23 location with a storm wasn't impacting at all,
24 you will see the biggest splash and so you will
25 see that it different one from another, they're

223

1  not exactly the same.  So the overlapping of
2  the incoming and reflecting waves can produce
3  waves of twice the size of incoming waves.
4  This has been proven in him, many experimental
5  stations, and it's in many books in the field.
6  So the barge could have been lifted in a
7  fraction of a second to contact the top of the
8  floodwall, both gravity wise and direct
9  horizontally directional wise, breaking -- I
10 mean pushing at the top of the concrete pile
11 creating a lever to the rebar attaching the
12 portion of the, um -- concrete slab.  So to me,
13 at this point this is what cause the breaking
14 of the concrete slab with a major deformation
15 or major, clear damage to the barge.  Although
16 there are indications that there are, um --
17 areas on the barge, at the end, where not only
18 myself but several other investigators agree
19 that this is deformation that is probably
20 related to the contact between the barge and
21 the seawall.
22    Q.   All right.  The deformations that
23 you're talking about, if I understand your
24 report correctly, the bent rebar on the wall
25 matches the scratches on the bottom of the

224

1  barge.  Is that right?
2     A.   The scratches on the bottom of the
3  barge were created by rebars that were push
4  down, bend down by the barge, because the barge
5  contacted the rebars at the -- about the
6  baseline of the barge in the bilge radius
7  plate.
8     Q.   All right.  And the angle of the
9  bending of the rebar, does that reflect the
10 angle of the barge as it -- or the attitude of
11 the barge as it went into the neighborhood?
12    A.   Absolutely.  Some was horizontal.
13    Q.   The barge orientation, as you've drown
14 it, it appears as though the barge is heading
15 into the neighborhood bow first and stern last,
16 if you like.  Is that --
17    A.   No.
18    Q.   Let me -- I'll withdraw the question
19 because it's --
20        MR. GILBERT:
21             I understand what you're trying
22        to -- yeah.
23 EXAMINATION BY MR. RAFFMAN:
24    Q.   What I'm trying to ask you is what is
25 the orientation of the barge vis-a-vis the

225

1  floodwall?
2       A.   Okay.  This sketch is a not-to-scale
3  sketch just to give the Court an idea of the
4  relative dimensions of the barge and the
5  dimension of the, um -- the sheet pile and the
6  concrete unit.  It not to scale, and this
7  doesn't mean that the barge was completely
8  perpendicular to the seawall.  The barge is all
9  the time 6 degrees of motion constantly, so
10 there's no way that the barge is going to go
11 perpendicular, off and on could be by waves
12 remote.  Most probably was a slight angle,
13 whatever is 1 degree, or 5 degrees or
14 15 degrees.  And this is reflected in the
15 scratches on the bottom of the barge.
16      Q.   The scratches in the bottom of the
17 barge are a good indicator of the angle at
18 which the barge transited from the canal into
19 the neighborhood; right?
20      A.   The general direction.
21      Q.   Very good.  Very good.  The wave that
22 you've discussed --
23      A.   Yes.
24      Q.   -- I don't want to misquote you, but I
25 guess -- because it's your testimony that this

226

1  wave could have pitched the barge up for a
2  period of 1 to 3 seconds above the top of the
3  floodwall?
4       A.   No.  Not exactly.  What I'm referring
5  to is this:  The waves are created by friction
6  between the wind and the surface of the water.
7  The wind is found on the average world-wide
8  normally have a 4 degree from the horizontal.
9  So the winds are not horizontal.  Okay?  They
10 are on a small angle with respect to the
11 horizontal.  Now, the winds force the surface
12 of the water to create waves, relation waves
13 which are developed what are called orbital
14 velocities of the particles of the wave.  This
15 orbital velocities that go from a large at the
16 top to almost zero at the bottom of the water
17 space, they -- when those waves hit the wall,
18 they -- the orbital velocity reflect back and
19 they overlap with the incoming waves and double
20 up in height.  And this can be observed --
21 anybody that walks into a waterfront with solid
22 stuff like cement front, you will see that this
23 what appears to be a 10-foot wave all of a
24 sudden becomes a 20-foot wave because of the
25 reflection.  Overlapping of the orbital

227

1  velocities of the waves.
2       So this could create a pitching and
3  heaving of the barge which raise the barge, or
4  raise at least one end of the barge -- of the
5  overall barge for a fraction of a second; two
6  or three seconds are the period of pitch of a
7  normal barge.  But I cannot tell you what
8  instant in the 2 to 3 seconds the contact
9  occurred.  It probably occurred at the end of
10 the pitching when the barge was coming down
11 after going up one second, it stay up half a
12 second, and come down in the next second, well
13 this is where the barge probably contacted the
14 top of the seawall.
15      Q.   Do you have any data about the period
16 or wavelength of the waves in the canal at this
17 time of the morning?
18      A.   No.
19      Q.   Does the pitch of a vessel in waves
20 have anything to do with the period or the
21 wavelength of the waves vis-a-vis the length of
22 the vessel?
23      A.   Well, are two independent technical
24 areas.  The barge have a 6 degrees of motion
25 and have different period for each one of the 6

228

1  degrees of motion.  The waves are depending on
2  the wind, so two different areas.  But if
3  you're lucky that they combine, if you have
4  waves of the same period for one of the motion
5  of the barge, then the motion of the barge will
6  multiplicate substantially.
7       Q.   Have you done any calculation about
8  how large a wave would be needed to pitch the
9  end of the barge up high enough to get it above
10 the floodwall at that time of morning?
11      A.   I didn't do any calculations, but I
12 can do it if you want me to.
13      Q.   Well, in my remaining 25 minutes I
14 think I'll move on.  You wrote in your report
15 that the scratches on the bottom of the barge
16 started at the bow and extended for about 80 to
17 100-foot.  I'm quoting from Page 34 of your
18 report, if you want to get it.  Actually, I'll
19 just give you my copy so that we can save some
20 time.
21      Do you see that I've highlighted that
22 in green, Mr. Pazos?
23      A.   Yes.
24      Q.   Starting at the bow and continuing for
25 80 to 100 feet.

229

1     A.  Yes.
2     Q.  May I have that back, please?  I'm
3  going to need it.
4        My question is --
5     MR. GILBERT:
6        Sorry, Mark.  What page?
7     MR. RAFFMAN:
8        Page 34, Brian.
9     MR. GILBERT:
10        Thank you.
11     MR. RAFFMAN:
12        And it's the penultimate
13  paragraph on the page.  Do you see it?
14     MR. GILBERT:
15        I will in a second.
16  EXAMINATION BY MR. RAFFMAN:
17     Q.  My question is, describe for me how
18  the barge came to have scratches over only 80
19  to 100 feet of its 200-foot length?
20     A.  Okay.  Number one, I should, um -- ask
21  you to, um -- correct your word when you say
22  the bow of the barge.  There were discrepancies
23  between several so-called experts or surveyors
24  which one was the bow, which one was the stern.
25  So there is not a clear agreement in what is

230

1  called the bow.
2        So the end that contacted the seawall,
3  okay, have definitely scratches in the bilge
4  radius of the peak, I call it peak, the end,
5  whether it's transom or the bow.  So we have
6  marks that started about a foot and a half from
7  the bottom line of the barge, that means the
8  rebars will have been almost straight, the
9  barge hit the rebars and bend the rebars to
10  create the scratches in the radius.  This is
11  number one.
12        Number two, the barge is falling from
13  Niagara Falls, so as it's progressing passing
14  the levee, the bow, or the end that went first
15  on the barge is pitching down because there is
16  almost no water on the dry side, so it's
17  falling from Niagara Falls, so the other end is
18  lifting, hinging in the supporting remains of
19  the seawall and levee.  So all of a sudden,
20  another wave comes or more water comes from the
21  canal, and the one end of the barge it lifted
22  just a few inches or fraction of inches from
23  the already bend rebars, so the scratches stop
24  and the barge start floating in the all dry
25  side of the levee.

231

1     Q.  Well, Mr. Pazos, if the barge has gone
2  over Niagara Falls --
3     A.  Yes.
4     Q.  -- at some point the front end of the
5  barge is going to have to hit dirt.  Right?
6     A.  No.  This don't happen in few seconds.
7  I'm pretty sure due to the friction this took a
8  while for the barge -- the barge is not
9  traveling fast.  And at the time also, flooding
10  are occurring between the tilted, um -- panels,
11  and we all know that there was also a lot of
12  scouring on the other side of the levee.  So we
13  don't know at the time that the one end of the
14  barge went actually on the dry side, we don't
15  know if it were four feet of water or six feet
16  of water or even more water.  But there was
17  some water.
18     Q.  So if I understand you right, the
19  barge is pitched by a wave and comes down on
20  the floodwall, the very front part of the barge
21  contacts the wall --
22     A.  The rebars are sticking up.
23     Q.  -- the rebars are sticking up, the
24  front of the barge comes into contact and is
25  scraped by rebar, then the barge travels across

232

1  the rebar, bending the rebar horizontally until
2  the barge is 80 --
3     A.  Not horizontally.  I didn't use the
4  word horizontally.  Look at this.  Look the
5  angle.  It's not horizontal.  Right?
6     Q.  Well, you used the word earlier, but
7  bend ing the rebar however it's bent.
8     A.  Okay.
9     Q.  All right?  The rebar is bent and the
10  barge stops at 80 to 100-foot in --
11     A.  It stop -- I never say stop.
12     Q.  Well, I'm tying to understand why the
13  scratches stop.  Are you saying that the
14  barge -- after 80 to 100 feet the barge somehow
15  pitches and the bottom of the barge ceases to
16  be in contact with the rebar?  Is that what
17  we're saying?  Just trying to understand it.
18     A.  Yeah.  The barge is moving all the
19  time in 6 directions, even when it's traveling
20  close to the top of the levee.  Even when it's
21  traveling it's pinching, it's rolling, it's
22  heaving, it's jerking.  All these motions, none
23  can be stop.  So with all these motions, just
24  for the last few seconds the one end of the
25  barge left the bend rebars and then travel to

233

1  the all dry side of the levee.
2      Q.  All right.  I think I'll move on.  You
3  wrote at Page 46 of your report, at the very
4  top, that there was a failure of an interlock
5  that abruptly eliminated the ability of the
6  floodwall to maintain longitudinal tension.
7  And you use the word, at the end of that
8  paragraph, the failure of the interlock is
9  equivalent to cut a rubber band in tension.
10 You see where you wrote that rubber band.
11     A.  Yes.
12     Q.  Explain to me what you meant by that
13 and how it relates to the barge transit to the
14 neighborhood.
15     A.  Okay.  Well, you understand what the
16 interlock of the sheet pile is.  I'm sure --
17     Q.  All right.  The sheet piles interlock
18 from panel to panel, right?
19     A.  From sheet pile to sheet pile.
20     Q.  Okay.
21     A.  They have an interlock, so they are
22 driven down through the interlock as a guide.
23     Q.  All the way down to the deepest part
24 of the sheet pile in the soil, right?
25     A.  Yes.

234

1      Q.  All right.  Go ahead.
2      A.  Every sheet pile is driven using the
3  interlock as a control means to go down.
4      Q.  And if the sheet pile is twenty feet,
5  the interlock in the sheet pile extends all the
6  way from the top of the twenty feet to the
7  bottom of the twenty feet, correct?
8      A.  Yes.  Except for fractures in the
9  interlock, which occur often.
10     Q.  Which occur without having a barge
11 around, just happens anyway?
12     A.  Well, the fact is that the -- not an
13 interlock was cracked and was noted by other
14 investigators.  So corrosion and tension will
15 create fractures, and the fractures normally
16 will occur at the top of the interlock.
17     Q.  All right.  But I'm just trying to get
18 an answer to this question:  And if the answer
19 is yes, you can say yes.  The interlock extends
20 from the top of the sheet pile all the way down
21 to the bottom of the sheet pile anchored in the
22 soil; correct?
23     A.  Not completely.  Because I notice that
24 the U.S. Army Corps of Engineers drove sheet
25 pile erroneously in many areas, having

235

1  differential penetration as much as three feet.
2  So some sheet piles are driven exactly the
3  same, some are deeper, some are shorter, from
4  inches to three feet, measured and
5  photographed.
6      Q.  All right, Mr. Pazos.  Is it at least
7  the normal -- the normal practice, the normal
8  practice, that if you have sheet pile
9  interlock, that interlock extends from the top
10 of the sheet pile to the bottom of the sheet
11 pile?
12     A.  It is the theoretical intention.
13     Q.  Okay.  So now tell me what happened at
14 this particular place in the sheet pile
15 interlock.
16     A.  After the barge damage the concrete
17 slab and bend the rebars and the bend is a
18 result of a force applied to thirty, forty or
19 fifty rebars, this force is transmitted to the
20 sheet pile through rebars creating additional
21 stresses in the interlock, so the interlock
22 broke.
23     Q.  When the interlock broke, Mr. Pazos,
24 is it your testimony that the sheet pile ceased
25 to be a continuous unit?

236

1      A.  Correct.  It's not instantaneous,
2  because we have 23 feet that have to be
3  fractured or deformed, so it may take a few
4  seconds or fraction of seconds while being in a
5  horizontal tension and it start cracking or
6  deforming for this elastic structure to split
7  and separate.
8      Q.  So when you say this elastic structure
9  splits and separates, what you're saying, if I
10 understand you correctly, is that the sheet
11 pile actually became separated, discontinuous.
12 Right?
13     A.  As shown in the photograph, yes.
14     Q.  And if I look at an overhead
15 photograph, I'm going to see -- well, let me
16 take it back.  The photograph you're referring
17 to, to be clear, is the Getty images photograph
18 cited in your report; right?
19     A.  I don't remember.  I know I've seen
20 photographs, I will have to dig through my file
21 to tell you what photo I'm referring to.
22     Q.  Well, here, let me just -- Page 45 of
23 your report, you wrote at the bottom of
24 Page 45, this condition can be observed in two
25 photographs published by gettyimages.com.

237

1  Image No. 55832357 and 55831691.  Correct?
2      A.  Okay.  Well, it's what is written.  I
3  would have to look at photograph to make sure
4  because I have seen over 2000 photographs, at
5  least.
6      Q.  Okay.  All right.  Well,
7  unfortunately, the photographs are not attached
8  to your report.  I've looked for them.  So --
9  and unless you want to go off the record, I
10  don't have the time to have you pull them out.
11      MR. GILBERT:
12          We can go off the record.
13      MR. RAFFMAN:
14          All right.  Let's go off the
15      record and see if he can pull them
16      out.
17      (Off the record.)
18  EXAMINATION BY MR. RAFFMAN:
19      Q.  Mr. Pazos, we broke to pull up two
20  photos which you've now reviewed on a computer.
21      A.  Yes.
22      Q.  Are those the two photos from Getty
23  images that you were referring to in your
24  report?
25      A.  Appears like, but of course from

238

1  memory I don't remember if these are the
2  specific photos or there are more photos.  If
3  the number correspond, it should be, yes.
4      Q.  If I represent to you that the number
5  corresponds, then are you prepared to say that
6  those two photos are the photos referenced in
7  your report?
8      A.  Yes.
9      Q.  All right.  I'm going to ask the court
10  reporter to take a quick screen grab -- or the
11  videographer to take a quick screen grab for
12  purposes of the video record.  And while the
13  videographer is working, I'll represent for the
14  record that we will attach a hard copy of those
15  two photos as Exhibit Number 15 to your
16  deposition.
17          If I understood you correctly earlier,
18  what you said is that the sheet pile sections
19  became completely separated at those locations
20  on the floodwall.
21      (Exhibit 15 was marked for
22  identification and is attached hereto.)
23      A.  Yes, at a certain location, yes.
24  EXAMINATION BY MR. RAFFMAN:
25      Q.  So one sheet pile was ripped apart

239

1  from the other sheet pile section, right?
2      A.  Yes.
3      Q.  And this happened all the way from the
4  top of the sheet pile to the bottom of the
5  sheet pile.
6      A.  I don't know all the way.  The
7  photographs show clearly that the top portion
8  of the 23-feet sheet pile is separated, but I
9  don't -- I have to have a crystal ball to know
10  what happened 23 feet down.
11      Q.  I see.  What you've told me is that
12  the -- when the sheet pile separated it snaps
13  like a rubber band and releases energy.  Is
14  that your testimony?
15      A.  Yes.
16      Q.  If the sheet pile remained connected
17  for any length of that 23 feet, would it have
18  the same reaction of an elastic band?
19      A.  The top part, yes.
20      Q.  Would the elastic band reaction
21  translate through the entire rest of the wall
22  if part of the sheet pile remained connected?
23      A.  There is one item of importance that
24  we have not mentioned in this last few minutes
25  of conversation, which is the strength of the

240

1  sheet pile zigzagging formation which is
2  perhaps more important than even the interlock.
3  The sheet pile is made by the steel that have a
4  depth, and if this is stretch, there is many,
5  many feet of stretch that can be compensated by
6  stretching this zigzagging shape of the sheet
7  pile.  It's not only the interlock.
8      Q.  So the zigzagging of the sheet pile
9  can stretch.  That's what you're saying?
10      A.  Yes.  Correct.
11      Q.  Did this disconnection you've talked
12  about -- let me ask, the zigzagging of the
13  sheet pile that you've describing is
14  independent of whether there was a break in the
15  sheet pile at the southern end; right?
16      A.  No.  It's the same force, horizontal
17  forces that are pushing and stretching the
18  zigzag and deforming the interlock, or cracking
19  the interlock.
20      Q.  Well, after the barge has passed and,
21  as you say, created gaps which result in
22  seepage which weaken the water -- weaken the
23  soil in the backside, you've described
24  hydrostatic pressure pushing on the wall.
25  Right?

241

1  A.  Before that, yes.
2  Q.  And the hydrostatic pressure is what
3  is causing the wall, at this point -- at this
4  point --
5  A.  Before the barge damage the concrete
6  panels.
7  Q.  All right.  Before the barge damaged
8  the concrete panels at the south end of the
9  south breach, hydrostatic pressure is pushing
10  on the wall and causing the zigzag to stretch.
11  Am I right?
12  A.  Yes.  But not to a measurable degree
13  yet.
14  Q.  The stretching that happens after the
15  barge traverses the wall is different from the
16  zigzagging that happens before the barge
17  traverses the wall, am I right?
18  A.  Um -- the stretching is not
19  substantial at any time because many
20  elastomeric joints remain intact.  If the
21  stretching is large, the elastomeric joints
22  will break.
23  Q.  I guess I don't have a description
24  from you that I understand of what you meant
25  when you said that, um -- "it broke like a

242

1  rubber band," at Page 46.
2  A.  Well, I trying to convey to the Court
3  that the entire levee is connected by a
4  structure which is the sheet pile, the
5  interlock, the concrete slab, and this
6  continuous structure is supported by earth
7  which is compressible, so due to hydrostatic
8  pressure before any failure, the whole system
9  is in tension.  If you put strain gauges on the
10  sheet pile, you can see they are -- have a
11  stress in the horizontal direction.  So without
12  any -- before any damage.
13  Q.  All right.  And if I understand you
14  right, when the barge traverses the south end
15  of the south breach, comes into contact with
16  the sheet pile and the rebar, it causes this
17  stretched structure to snap, to break.  Is that
18  your testimony?
19  A.  The snap occur when the barge hit the
20  top of the concrete slab, demolish part of the
21  cement, and at this time is when, to me, the
22  exact time when the rubber band broke.
23  Q.  All right.  So you wrote, at Page 53
24  of your report -- and thank you for that
25  answer, I appreciate you answering the

243

question.  At Page 53 of your report you wrote,
in the third paragraph down the, grounded
position and orientation of the barge after
Katrina and before Rita also indicates that the
initiation of the south breach occurred at the
southernmost end of the south breach.  You see
that you wrote that.
A.  Yes.
Q.  My first question is for you to
confirm for me that you believe the initiation
of the south breach occurred at the
southernmost end of the south breach.
A.  The definition of initiation must be
elaborated.  The initiation, to me, started
with the barge, it started contacting the
900 feet of damage of the south breach by
damaging concrete slab, pushing concrete slab,
creating gaps, starting -- you know, so you
have to define all this.
Q.  Well, I used your word on purpose.
A.  Yes.
Q.  I understand your theory of the
breach.  We've heard it several times.  The
barge contacts the wall --
A.  Yes.

244

Q.  -- at the upper part.
      Not impact; right?
A.  Specifically what location are you
talking about?
Q.  Until the barge reaches the very south
end of the south breach, the barge is in
contact but not impact; correct?
A.  Contact off and on, yes.
Q.  Off-and-on contact, and the contact
creates gaps and seepage and the seepage does
all its work.
A.  Yes.
Q.  We've heard that.
A.  Yes.
Q.  But you used the word initiation of
the south breach in a particular context.
A.  Yes.
Q.  And if I understand your use of that
word in that context correctly, what you're
saying is that the south end of the south
breach is where the wall snapped and the breach
occurred.
A.  Yes.  And I apologize for being not
too articulate.  I'm slow.
Q.  Whatever else you are, Dr. Pazos,

245

1   you're not slow.
2       Mr. Pazos.  See, I gave you a degree
3   you don't have.
4       If another expert said that the wall
5   at the north part of the south breach appears
6   to have been the first section that failed and
7   that the failure developed rapidly to the
8   south, would you agree with that
9   characterization?
10      MR. GILBERT:
11          Object.  Calls for speculation.
12          You can answer.
13      A.  You have to elaborate on the
14  definition of failure.  If in failure he's
15  calling to a few cracks like we show -- discuss
16  before in one of the exhibit, yes.  It's
17  failures, cracks.  Okay?  But if a failure
18  means that he think that the seawall were push
19  inland, I disagree.  So that you have to
20  elaborate on the definition of failure.
21  EXAMINATION BY MR. RAFFMAN:
22      Q.  If I understood this other opinion
23  correctly, what he's saying is that the seawall
24  was pushed inland.
25          (Brief interruption.)

246

1       A.  I apologize.
2   EXAMINATION BY MR. RAFFMAN:
3       Q.  But I understood your answer to the
4   question.
5       Mr. Pazos, why does the grounded
6   position and orientation of the barge indicate
7   that the south breach initiation occurred at
8   the southernmost end, as wrote in your report?
9       A.  Well, it's a confirmation that the
10  barge travel on top of the levee at the south
11  end of the south breach.  If the barge would
12  have traveled 900 feet to the north, the barge
13  will have been several blocks farther to the
14  north.  It's hard for me to believe that the
15  barge will be traveling on top of houses
16  several blocks.
17      Q.  And could you elaborate on the answer.
18  Why would the barge be traveling several blocks
19  on top of houses?
20      A.  Well, if you appear like --
21  somebody -- I don't remember the name --
22  claimed that perhaps the barge --
23      MR. GILBERT:
24          Let my just note an objection.
25          I'm sorry.  You framed your question

247

1   based on some wording that he didn't
2   use.  I think that you misunderstood
3   each other.
4   MR. RAFFMAN:
5       Let's see if he can answer it.
6       A.  Okay.  Can you repeat your question?
7   EXAMINATION BY MR. RAFFMAN:
8       Q.  Sure.  Why didn't the barge travel
9   deep into the neighborhood, Mr. Pazos?
10      A.  Why?
11      Q.  Why?
12      A.  Because the barge run aground with
13  houses, telephone poles, fire hydrants -- there
14  are many obstructions that accumulated, and
15  they slow the barge from floating free anywhere
16  the barge wants.
17      Q.  Mr. Pazos, do you have any opinion at
18  all about the force of water that went through
19  the breach in the northern part of the bow?
20      A.  Force of water?  I don't understand
21  your question what you define as force of
22  water.
23      Q.  Would you say, Mr. Pazos, that when
24  the water rushed into the neighborhood from the
25  Inner Harbor Navigational Canal it had enough

248

1   force behind it to wash houses off of their
2   foundations?
3       A.  Yes.
4       Q.  Would you say that the water was
5   rushing into the neighborhood through the
6   breach?
7       A.  Of course, yes.
8       Q.  And based on the configuration of the
9   breach, Mr. Pazos, is there any particular part
10  of the breach that suggests to you the water
11  was rushing at a higher velocity than any other
12  portion of the breach?
13      A.  You may have to talk about time.  And
14  I will say the main disaster, which is the
15  relocation of the floodwall inland, occurs in
16  fraction of seconds, 1, 2, 3 seconds and
17  fraction, depending on what location of the
18  900 feet.
19      Q.  So if you turn around and face the
20  board there, there was a very, very fast
21  release of a very large amount of water,
22  particularly at the point of the largest bow,
23  is that fair, based on what you've said?
24      A.  Not quite.  I will use different
25  words.  To me, the water were released through

249

1   the 900-foot land is a matter of why the
2   seawall end up farther inland at this location,
3   and we already discuss it, it because the
4   under -- the lower portion of the levee was
5   more damage in the area where the levee was
6   translated.
7       Q.   I have I think one more question, and
8   then I'm going to turn it over to Mr. Walker.
9           Would agree with me, Mr. Pazos, that
10  the barge did not travel deep into the
11  neighborhood and then travel back to its final
12  resting location?
13      A.   The barge travel into the neighborhood
14  and rest for a while at some location, and then
15  came another hurricane and the barge was
16  re floated or moved to a different location.
17      Q.   Would you please turn around, reach
18  behind you and grab Exhibit 14 and put it on
19  the easel for me.
20          Mr. Pazos, do you see the location of
21  the barge in Exhibit 14, the final resting
22  location?
23      A.   Yes.
24      Q.   Would you point to the final resting
25  location of the barge on Exhibit 14.

250

1       A.   (Witness complies.)
2       Q.   Would you please take the red magic
3   marker in front of you and draw for me the path
4   that the barge took once it crossed the wall
5   and went into the neighborhood.
6       A.   I do not know because there were
7   locations in between one hurricane to the
8   other, which I have to depend on few
9   photographs that -- very few exist in the
10  location of the barge, but I will say in this
11  general area the barge ended up in the first
12  motion, and then was moved to the final
13  location sometime later.
14      Q.   When you say the final location, you
15  mean the location after Hurricane Rita?
16      A.   The location in which we were able to
17  walk on the dry ground and observe the barge.
18      Q.   And when you walked on the ground and
19  observed the barge, was it sitting on top of
20  the school bus?
21      A.   Yes.
22      Q.   And would you agree with me that that
23  would have been after Hurricane Rita?
24      A.   Yes.
25      Q.   Can you look at the photo behind you

251

1   and identify the small school bus as part of
2   the photo?
3       A.   Well, definitely in this photograph I
4   don't see the school bus.  So unless there is a
5   little dot over here, but it don't look to me
6   because it was closer to that.  No, it don't
7   look like this photograph show the location
8   where the barge landed on top of the school
9   bus.
10      Q.   All right.  Let me, if I might, turn
11  the mike over to my colleague Mr. Walker who
12  has some questions for you about the events
13  that happened on the west side of the Inner
14  Harbor Navigational Canal.
15          MR. GILBERT:
16              Can I have a few seconds?
17          MR. RAFFMAN:
18              Yes.
19          MR. GILBERT:
20              Thank you.
21          (Off the record.)
22          THE WITNESS:
23              Okay, I would like to make a
24          minor correction to my previous
25          testimony.  I realized that the

252

1   photograph behind me is showing that
2   the barge about 30 to 35 feet from the
3   barge final location.  Just by looking
4   at the other photo I have on hand, it
5   seem like a little white dot in the
6   aerial photograph is the school bus,
7   just a different of 30, 35 feet from
8   initial location to final location.
9   EXAMINATION BY MR. RAFFMAN:
10      Q.   Just one quick follow-up:  As a quick
11  follow-up, the location of the barge as shown
12  in the photo is the location -- in the aerial
13  photo, the on behind you on Exhibit 14, that's
14  the location that the barge ended up after
15  Katrina but before Rita, am I right?
16      A.   It looks like from comparing with this
17  very detailed photograph.
18      Q.   All right.  Why don't we mark that as
19  Exhibit 16.
20          MR. WALKER:
21              Identified as the cover of the
22          Work Boat magazine.
23          MR. RAFFMAN:
24              Exhibit 16 is the cover of a Work
25          Boat magazine.

253

1    (Exhibit 16 was marked for
2 identification and is attached hereto.)
3 EXAMINATION BY MR. WALKER:
4    Q.  All right.  Good morning, Mr. Pazos.
5 My name is Derek Walker.  And I'm going to talk
6 about the other side of the canal with respect
7 to your report.  All right?
8    A.  Yes, sir.
9    Q.  I heard your testimony yesterday about
10 your engagement, and I apologize if I overlap a
11 bit with some of the questions but I'd like
12 some clarification.
13    When you were engaged by Mr. O'Dwyer,
14 exactly what was it that you were asked to
15 analyze and to do?
16    A.  It will be impossible to tell you
17 exactly because Mr. O'Dwyer was used to -- to
18 express, um -- instructions daily, hourly,
19 minute wise, and I been trying to accommodate
20 him by doing whatever his instructions were.
21 So one day he ask me go to this place and take
22 photographs, I go to the place, I take
23 photographs.  Go to this other place and watch
24 what people are doing, I going to the place and
25 I stay there and just watch for hours what

254

1 people are doing.
2    Q.  Okay.  Other than daily activities
3 that he may have instructed you about, when it
4 came to writing a report and distilling your
5 observations, your findings so as to reach
6 conclusions and opinions, what did he instruct
7 you to do?
8    MR. GILBERT:
9       Object to form.
10    A.  Again, I don't remember writing what I
11 call a report which normally is addressed to a
12 Court.  I remember several hundred, even
13 thousands instructions in reviewing documents
14 and making comments, which I did.  So I just
15 reply to each daily, hourly or minute
16 instruction the best I could.
17 EXAMINATION BY MR. WALKER:
18    Q.  All right.  Let's move away from
19 Mr. O'Dwyer, then.
20    When you were hired by Mr. Gilbert and
21 the team for which you produced the report
22 dated June 29, 2009, what were you instructed
23 to do with respect to the pipes and analyses
24 based on your observations?
25    MR. GILBERT:

255

1    Object to the extent the question
2    calls for information beyond the final
3    report.
4    A.  Okay.  Can you repeat your question,
5 please?
6 EXAMINATION BY MR. WALKER:
7    Q.  After you were hired by Mr. Gilbert
8 and his team --
9    A.  Yes.
10    Q.  -- what were you instructed to report
11 on and to opine on for your report of June 29,
12 2009?
13    A.  Um -- early in 2008 I was retained
14 initially, I was -- I started receiving
15 documents and I was asked to give my
16 impressions or comments in documents.  And
17 later on during the year, probably three, four,
18 five months later, I was asked to convert my
19 comments into a report.
20    Q.  I guess I'm being unclear.  You read
21 Mr. Green 's deposition or report just the
22 other day?
23    A.  Partially.  I haven't finished yet.
24    Q.  Okay.  Do you agree that he gives
25 opinions with respect to, um -- regulations,

256

1 recommendations, terminal operations, mooring,
2 ropes, that sort of thing?
3    A.  Well, I agree from what I read I guess
4 he provides opinions.  I couldn't tell you what
5 are they.  I didn't memorize.
6    Q.  Were you asked to give opinions on
7 those subjects?
8    A.  Not specifically.  I asked to write a
9 report of why this happens.
10    Q.  So you chose on your own to start from
11 the barge at the terminal through to its
12 resting place in the Ninth Ward.
13    A.  No.  I chose on my own to write
14 comments about every document that may be
15 influential to what actually happened, which is
16 flooding of a place where people live.  So --
17    Q.  I'm sorry.  Go ahead.
18    A.  So I just accumulated information
19 about depositions, or documents that to me were
20 of importance regarding my final conclusions.
21    Q.  Okay.  Do you understand or do you
22 have any knowledge today if you're going to be
23 offered as an expert on the break away?  And by
24 that I mean the preparations of Lafarge
25 pre-hurricane, the rigging, the tying up, the

257

1  ropes used, the type of configuration, the
2  strength of the ropes, and anything preceding
3  the break away?
4      A.  I not aware what my principals have in
5  mind.  I just been responding every time I
6  receive a document specifically in response to
7  what I receive.
8      Q.  Have you reviewed the qualifications
9  of Mr. Green?
10     A.  Probably I receive it, but I have no
11 reason to review qualifications of anybody
12 else.  Probably I received it, but I don't
13 remember reviewing any detail that will stay in
14 my memory.
15     Q.  Do you hold yourself out as an expert
16 being able to render expert testimony to assist
17 a Court with respect to U.S. Coast Guard
18 regulations or recommendations?
19     A.  Depending on what the specific area.
20 There are two areas I been trying to stay away
21 for the last fifty years, which is electrical
22 and chemicals.  Otherwise, I been testifying in
23 courts for and against the Coast Guard a number
24 of times in many cases.
25     Q.  And I'm asking you specifically as to

258

1  the applicability of recommendations or
2  regulations.
3      A.  Yeah.  I believe fully qualified.
4      Q.  Could you tell me, on what basis do
5  you make that belief -- you have that belief?
6      A.  I been dealing with maritime stuff --
7  Coast Guard from this country and other
8  countries for more than fifty years.  And I
9  been reading an enormous amount of material
10 regarding Coast Guard, and I work, like I say,
11 in many cases, many, which is several hundred,
12 involving the Coast Guard, both legal and non
13 legal.
14     Q.  You have never been employed by the
15 U.S. Coast Guard, have you?  And by that, I
16 mean within their official employment such as
17 in the marine safety division, the marine --
18     A.  No.
19     Q.  -- inspection office?
20     A.  Not as an employee.
21     Q.  You don't hold any ranks in the U.S.
22 Coast Guard, do you?
23     A.  No.
24     Q.  Would you agree that a person who was
25 a Commander in the U.S. Coast Guard or who had

259

1  been employed in the marine inspection office
2  or the marine safety office would have greater
3  knowledge of the recommendations and
4  regulations of the U.S. Coast Guard as they
5  apply to bodies of water in the U.S. than you
6  would?
7      A.  Greater knowledge compared with whom?
8          MR. GILBERT:
9              I just want to make an objection
10         to the question on the ground of
11         vagueness.
12 EXAMINATION BY MR. WALKER:
13     Q.  Greater knowledge compared to you
14 based on the experience that I just detailed of
15 such an individual.
16     A.  Depending specifically what area, I
17 may agree.  And in some areas I will not agree,
18 depending specifically what area you are
19 referring to.
20     Q.  Are you an expert in tugs and towing?
21     A.  I believe so.  I design tugboats and I
22 been involved in towing many hundred of times.
23     Q.  I'd like to differentiate in your
24 testimony, if you would, and your answers to my
25 questions, between your naval architecture and

260

1  engineering expertise which is in the design
2  and performance of vessels and aspects which
3  deal with the operations, if you could.
4      A.  Yes.
5      Q.  Okay?
6      A.  Yes.
7      Q.  Are you putting yourself out --
8          MR. GILBERT:
9              Let me just make sure I
10         understand.  You don't want him to
11         offer any testimony, when you question
12         him about his qualifications, that is
13         derived from his engineering and naval
14         architecture experience.
15         MR. WALKER:
16             Correct.
17         MR. GILBERT:
18             You don't want him to answer any
19         of that.
20         MR. WALKER:
21             Correct.
22         MR. GILBERT:
23             Okay.
24 EXAMINATION BY MR. WALKER:
25     Q.  Do you have any experience and

261

1  qualifications in operating a tug or tow or
2  fleeting facility?
3      A.  Absolutely yes.  I been directing
4  tugboat captains on what to do under many
5  conditions in the past, yes.
6      Q.  In what context have you done that?
7      A.  Primarily regarding marine salvage in
8  which I participate in probably around 400
9  marine salvage operations around the world.
10     Q.  Have you ever directed any tugboat
11 captains or towboat operators with respect to
12 their day-to-day commercial operations?
13     A.  Not terminal operators.  I only been
14 involved in cases of break away barges, but I
15 been directing tugboat captains in what to do.
16     Q.  It's fair to say that this expertise
17 that you are telling me about now has to do
18 with a post-casualty involvement of yours in
19 the salvage of break away or other incident
20 where you have directed people how to deal with
21 the post-accident event.
22     A.  Not necessarily.  I been telling
23 tugboat captains what to do to tow a drilling
24 rig and where to put lines or what to do, so in
25 every aspect that I been retained by somebody

262

1  to take action, I've been taking the action
2  where I believe I had the proper knowledge.
3      Q.  Have you ever confronted a situation
4  where you didn't believe you have sufficient
5  knowledge?
6      A.  Yes.  I told you before, anything
7  that's electrical or chemical, I will say
8  although I have knowledge I'd prefer to say not
9  my field of expertise.
10     Q.  Have you ever worked for a rope
11 manufacturer or a rope company?
12     A.  No.
13     Q.  Do you hold yourself out as an expert
14 in ropes?
15     A.  Yes.
16     Q.  And on what basis are you an expert in
17 ropes?
18     A.  I been investigating starting
19 selecting ropes for many years for many
20 different reasons.
21     Q.  So as a rope purchaser, you put
22 yourself out as an expert in ropes?  I'd like
23 you to give me a little more detail of your
24 answer.
25     MR. GILBERT:

263

1          Object.
2          You can answer.
3      A.  Okay.  No, I not a rope purchaser.  I
4  haven't purchased rope except for my boats.
5  But I have been involved in numerous occasions,
6  either in the design stage, in the construction
7  stage, operational stage, by deciding what
8  ropes should be used for whatever reason.
9  EXAMINATION BY MR. WALKER:
10     Q.  Well, could you give me some examples
11 of those reasons or contexts in which you have
12 given opinions regarding ropes?
13     A.  Not off the top of my head.  I will
14 have to think if we're talking about fifty
15 years of experience, fifty years of activities.
16     Q.  Have you ever given the opinion that
17 cables instead of ropes should have been used
18 in any context?
19     A.  Yes.
20     Q.  Other than this case.
21     A.  Oh, no.  For this specifically.  I do
22 not remember off the top of my head another
23 area in which there was a dispute between using
24 ropes or soft lines.  Off the top of my head.
25 I may remember it later.

264

1      Q.  Irrespective of a dispute, have you
2  ever given the opinion or the recommendation to
3  a principal that cables should have been used
4  in any context rather than soft lines?
5      A.  Most probably yes, but I cannot tell
6  you off the top of my head.  I would have to
7  think and review, you know, fifteen hundred
8  projects to remember which one have I specific
9  detail related to ropes.
10     Q.  Generally, as you sit here today, what
11 facts would normally compel you to give a
12 recommendation that cables instead of ropes
13 should be used?
14     A.  Well, for instance, let's say that I
15 was in charge of the scientific section of a
16 shipyard, which is the actual case, and we were
17 doing an inclining experiment of a 50000-ton
18 vessel.  I would have to question side what
19 anchors to use, what rope to use, how to tie,
20 and explain all this to an assistant of mine or
21 another engineer and write a request to
22 production to make the installation that I
23 request or propose.
24     Q.  Have you ever made calculations
25 regarding the tensile strength of a rope or

265

1  cable?
2      A.  Probably many times.
3      Q.  Probably many times.  Do you recall
4  any single time?
5      A.  I will have to work through my memory
6  to try to tell you a specific time, name a
7  company or whatever, but I been dealing with
8  rope like people deal with paper.  If you tell
9  me what paper is used in the past, I used
10  millions of pieces of paper.  So this is a
11  standard repeatable activity in my business.
12      Q.  And what activity is that?
13      A.  In the engineering business.
14      Q.  No, what is the standard repeatable
15  activity that you're telling me?
16      A.  Anything related to ropes, soft lines,
17  steel ropes.
18      Q.  Okay.  My question wasn't anything.
19  It was, have ever conducted tests of the
20  tensile strength of a rope, yes or no?
21      A.  No, I did not conduct it personally.
22  I don't have a laboratory.  I been involved in
23  testing of ropes on a number of occasions, but
24  I didn't have a laboratory to test a rope.
25      Q.  You didn't do the manual labor, but

266

1  you've been involved in the analysis of tensile
2  strength of ropes or cables; is that what
3  you're saying?
4      A.  Besides the analysis, I remember,
5  um -- maybe a couple of cases in which I
6  develop the instructions to the lab to what
7  kind of testing was needed.
8      Q.  And in your experience, or in your
9  opinion, can you calculate the breaking
10  strength of a rope and correlate it to a wind
11  speed?
12      A.  I can calculate the breaking strength
13  of any rope any time.  And correlate it to the
14  wind speed toward what?  The wind speed will
15  create forces in something.  In a building, a
16  crane, in a ship, in land, in a tree?  You have
17  to be more specific for me to be able to
18  answer.
19      Q.  Regardless of the factors that might
20  be involved that affect the ultimate analysis
21  or conclusion, is it your testimony that you
22  can correlate a wind speed with a breaking
23  strength of a rope?
24      A.  The word correlate is -- and the two
25  other word you use, wind speed and the strength

267

1  of a rope, I don't understand -- I apologize,
2  but I don't understand the relation.  Because a
3  wind speed has to be against something
4  producing a force in order to talk about force
5  or breaking of a wire.
6      Q.  I'm going to show you a document --
7          MR. GILBERT:
8              Let me -- let me just object to
9          the question, and to the next question
10          even though I haven't heard it if it
11          depends on the same line of
12          questioning.  He said that he needs to
13          know what object upon which the wind
14          is acting in order to answer your
15          question.
16  EXAMINATION BY MR. WALKER:
17      Q.  I'm going to show you a document that
18  at the top I believe says mooring arrangement.
19  The top line?
20      A.  Yes.
21      Q.  Okay.
22          MR. GILBERT:
23              It says Analysis of IHNC 4727
24          Mooring Arrangement.
25  EXAMINATION BY MR. WALKER:

268

1      Q.  Okay.  Would you agree with -- well,
2  I'll let you read that document.
3          MR. GILBERT:
4              Are we going to attach that?
5          MR. WALKER:
6              I might.
7          MR. GILBERT:
8              Well, let's call it something.
9          I'd like to attach it.
10          MR. WALKER:
11              We'll call it Mooring Arrangement
12          ING.
13          MR. GILBERT:
14              Okay.
15  EXAMINATION BY MR. WALKER:
16      Q.  Have you ever seen that document
17  before?
18      A.  No.
19      Q.  Do you understand it?
20      A.  I trying to, although it not too
21  clear.  3C, I don't know what is 3C.  Mooring
22  Arrangement 3C.  I don't have any information
23  supporting this piece of paper, so I have to
24  know what the guy that wrote this had in mind.
25  I don't know.

269

1   Q.   Okay.  That's fair.  Without knowing
2  the mooring arrangement, just let's look at the
3  analysis that this person has done where he's
4  gone through several different types of
5  potential configurations and reached
6  conclusions regarding breaking strength of the
7  mooring arrangements.  In your view, is that a
8  feasible exercise?
9       MR. GILBERT:
10           And I'm going to object to the
11      extent -- and I don't know this
12      either, but I'm going to object to the
13      extent that any of the opinions, if
14      that's what they are, in this document
15      on which you're asking Mr. Pazos to
16      comment may be dependent upon that
17      entire column of what apparently looks
18      to be some sort of key or code column
19      entitled mooring arrangement.
20           Go ahead, if you can answer.  If
21      you know what you're looking at, go
22      ahead.
23   A.   It would be impossible for me to make
24  any reasonable comment on something that I
25  don't even understand the details.  And you

270

1  call it configuration.  The word configuration
2  is not here.  You know, I need background on
3  this to be able to provide any reasonable
4  comment.
5   Q.   I'm not asking you to give me your
6  opinion or conclusion, I'm asking you to give
7  me an opinion on the methodology.
8       Can a person, and is it a reasonable
9  scientifically supportable, um -- process to
10  take a mooring configuration and apply a wind
11  speed or a percentage of rope strength and
12  derive a wind speed from it?
13       MR. GILBERT:
14           Wait.  I have to object because
15      we have not established any
16      methodology.
17  EXAMINATION BY MR. WALKER:
18   Q.   Can you answer the question?
19   A.   Let me repeat, it's impossible for me
20  to make any comments on something that I don't
21  even understand what I read.  3C, 4D -- I don't
22  know what those things are.
23   Q.   Let me ask you this:  In your opinion,
24  a 2-inch, new propylene rope subjected to a 36
25  mile-an-hour constant wind speed, would that

271

1  rope break?
2   A.   It would be impossible for me to
3  answer your question without more details.
4       MR. GILBERT:
5           I have to object.  We're talking
6      about a loose rope flapping in the
7      wind?  I mean, I know that you mean a
8      rope that is tied between two points,
9      but I think we need more information
10      in order for him to answer the
11      question.
12       MR. WALKER:
13           We'll attach the mooring
14      arrangement as 17.
15       (Exhibit 17 was marked for
16  identification and is attached hereto.)
17  EXAMINATION BY MR. WALKER:
18   Q.   But your report is broken down -- and
19  did you have a copy of it?
20   A.   Yes.
21   Q.   -- into various sections that you
22  describe in the index --
23   A.   Yes.
24   Q.   -- the end of which is BB, as I
25  recall, which is?

272

1       MR. GILBERT:
2           Sorry, Derek.  Which section are
3      you going to?
4       MR. WALKER:
5           BB.
6  EXAMINATION BY MR. WALKER:
7   Q.   And those are your opinions and final
8  conclusions, are they not?
9   A.   Yes.
10   Q.   And you break those down into various
11  violations of duty --
12   A.   Yes.
13   Q.   -- of some of the parties to this
14  litigation, right?
15   A.   Yes.
16   Q.   And I'd like to go through some of
17  those, if we could.  With respect to the
18  mooring configuration, you rely strictly on the
19  testimony of the individuals?  Or have you made
20  any inspection of ropes, photographs of ropes,
21  to determine what lines were tied at what
22  location?
23   A.   I relied on information provided to
24  me.  And just a few hours ago or a couple of
25  days ago is the first time I saw any pictures

16 (Pages 269 to 272)

273

1  of ropes that failed.
2      Q.  And have you made any attempt since
3  seeing those pictures, or at any time in the
4  past, to correlate any of the remnants of ropes
5  to locations on a barge, or to determine how
6  they failed?
7      A.  No.
8      Q.  You agree that that is an exercise
9  that can be done by an expert in ropes, to
10 determine how ropes fail.
11     A.  An expert in ropes can do many things
12 depending on what information he's provided.  I
13 have no problem with that.
14     Q.  Have you ever studied ropes and
15 determined whether they failed under a strain,
16 under a load, under shock load, by fire, by
17 wear, by tear?  Have you done that?
18     A.  I'm pretty sure so.
19        MR. GILBERT:
20           In what context?
21        MR. WALKER:
22           Any context.
23 EXAMINATION BY MR. WALKER:
24     Q.  So you agree that can be done.
25     A.  Yes.

274

1      Q.  Did you have an opinion in this case
2  as to whether the break away was caused by rope
3  slipping or breaking?  Because I'm a bit
4  confused on your testimony.
5      A.  I do not know.  I only saw one or two
6  pictures of broken ropes, but I don't even
7  remember what location they were installed.
8      Q.  You speak in your report regarding
9  various applicable CFRs as well as port
10 conditions.  Did you make any attempt to
11 determine the wind speeds, wind directions,
12 with respect to any port condition, whiskey,
13 zulu, x-ray, at any time when the barge was
14 still at the Lafarge terminal?
15     A.  I remember reading multiple documents
16 involving wind strength, direction, and
17 hurricane conditions, but I did not elaborate,
18 and I did not memorize any specifics, so I just
19 remember reading several different reports or
20 documents regarding wind direction, the
21 strengths, at different times, locations.
22     Q.  Is there a particular wind direction,
23 speed, other external condition that you use as
24 a criteria to give a recommendation that a
25 vessel should be ballasted or sunk?

275

1      A.  Let me see if I understand your
2  question.  Maybe you can repeat it for me, if
3  you please.
4      Q.  Well, in your report, I believe you
5  make the suggestion that the barge should have
6  been ballasted or sunk.  Am I correct?
7      A.  Yes.
8      Q.  Okay.
9      A.  Well, the key is ballasted.  The sunk
10 is an extreme measure.  I don't put both on the
11 same level.
12     Q.  Well, do you have the opinion in this
13 case that the barge should have been sunk?
14     A.  The barge should have been ballasted
15 first.  And if the ballasted do not serve the
16 purpose from a knowledgeable person, then an
17 alternate ultimate decision will be sinking the
18 barge.
19     Q.  And what is the purpose that you're
20 suggesting should have been severed by
21 ballasting or sinking?
22     A.  The ballasting will reduce the exposed
23 area to the wind and will reduce the forces --
24 and additional, which is very important, will
25 reduce the elevation of the deck of the barge

276

1  with respect to the elevation to the deck of
2  the barge to which it was tied.
3      Q.  And how do you propose that Lafarge
4  should have ballasted the barge?
5      A.  Just go and rent pumps or call vessels
6  in the area that have pumps capable of pumping,
7  and open the hatch covers of the barge and
8  ballast every void and double bottom.
9      Q.  What is your definition of a safe
10 harbor?
11     A.  I do not have a definition of safe
12 harbor.  I rely on, um -- professional in this
13 field that are dealing with the safety of
14 floating equipment for anchoring or mooring.
15 So I depend on this expert that have experience
16 to different storms to decide what they feel
17 that is a safe area.
18        I been selecting safe areas myself
19 during hurricanes, but for my own personal
20 equipment because of my boat.
21     Q.  Do you have an opinion regarding
22 whether or not the Lafarge terminal was a safe
23 area at the time of Hurricane Katrina?
24     A.  Um --
25        MR. GILBERT:

277

1      Object to form.
2      A.   According to the expert I rely on,
3  um -- this area where the barge was moored was
4  not a safe area.
5  EXAMINATION BY MR. WALKER:
6      Q.   What expert is that?
7      A.   Domino.
8      Q.   So you're relying on Domino -- on the
9  fact that Domino did not include this terminal
10 in their list of safe harbors for your opinion
11 that it was not a safe harbor, correct?
12     A.   Correct.  And I specifically said,
13 according to Domino, which in my opinion is an
14 expert with many years of experience and daily
15 activities deciding what area can be considered
16 safe harbor.
17     Q.   You don't know what factors or
18 criteria Domino used to include or exclude any
19 particular harbors or terminals from their
20 list, did you?
21     A.   Yes.
22     Q.   And what is that?
23     A.   Domino will go by experience, knowing
24 when in previous hundred years high winds, high
25 tide, high currents resulted in failure of

278

1  moorings or anchorings or piles or whatever, so
2  they look at history and they decide whether
3  certain locations are not safe in their
4  opinion, and I rely on their opinion.
5      Q.   How do you know they do this, did you
6  contact somebody there to determine how they
7  decide safe harbors or not?
8      A.   Not in this specific case, but yes in
9  the past.
10     Q.   So you relied on Domino.
11     A.   Yeah.  I believe it's a reputable
12 organization, very knowledgeable in deciding.
13     Q.   They hire good captains, good crew?
14     A.   I don't know about that.  An
15 individual can be hired and become a drunk
16 later on so he may not be a safe captain.  So I
17 don't know.
18     Q.   Well, do you think Domino -- it was
19 proper for Domino and Lafarge to rely on
20 Capt. Grabert and deckhand Thigpen with respect
21 to the rigging that they made of the barges?
22     A.   They did not ask this captain and his
23 deckhand to investigate the rigging, they asked
24 specifically to turn around two barges.
25     Q.   Well, you make the statement that in

279

1  their opinion the rigging was unsafe.  Do you
2  think that a Domino trained Captain, a company
3  that you apparently rely on for certain
4  opinions, shouldn't rely on their captain to
5  determine the safety of a rigging?
6      MR. GILBERT:
7          Wait.  Let me stop you.  Did you
8          say does he think that they should or
9          should not rely on their captain?
10     MR. WALKER:
11         Should.
12     MR. GILBERT:
13         Should.  Okay.
14     A.   Yes.  The captain observe, without
15 being asked, situation that in his opinion was
16 clearly obvious unsafe.  And without having
17 instructed to look for this, safety or
18 unsafety, they were so concerned they start
19 looking for lines, according to the, um --
20 statement, trying to solve this unsafe obvious
21 situation.
22 EXAMINATION BY MR. WALKER:
23     Q.   Is it your testimony that having read
24 the depositions of Capt. Grabert and
25 Mr. Thigpen that they make the statement and

280

1  testify anywhere that the rigging was unsafe
2  and that they were concerned?
3      A.   No, but I understand enough English to
4  realize that they, instead of doing the basic
5  instructions, they start looking for lines and
6  trying to find other lines.  It's clearly that
7  they concluded that were unsafe obvious
8  situation.
9      Q.   So the unsafe and obvious is your
10 conclusion based on their testimony.  Am I
11 right?
12     A.   Yes.
13     Q.   Okay.  Did they have rigging on the
14 tug?
15     A.   From what I read, no, they didn't
16 have.
17     Q.   Okay.  Looking at your Duty Number 1
18 on Page 65 -- you have violations of duty?
19     A.   Yes.
20     Q.   Is there any prohibition or
21 recommendation or regulation, order or mandate
22 which prevented Lafarge from completing the
23 unloading of the barge at the time that they
24 did?
25     A.   Not as far as I know.

281

1    Q.   Was there any recommendation,
2    regulation, mandate and order issued at any
3    time which compelled Lafarge to instruct that
4    the barge be taken out of the IHNC?
5        A.   I believe that there was an obligation
6    by being the owner of a facility that have a
7    barge that can create a dangerous condition,
8    they should have taken action and removed the
9    barge.
10       Q.   But you can't point to any specific
11   regulation, mandate, order or recommendation
12   that specifically instructs Lafarge to do that,
13   can you?
14           MR. GILBERT:
15               Let me just make an objection.
16           You're asking about mandate, order,
17           recommendation.  Are you asking him
18           about written documents, about written
19           mandates, orders, recommendations, or
20           are you asking just about the standard
21           of care?
22           MR. WALKER:
23               Written.
24           MR. GILBERT:
25               Okay.

282

1        A.   I didn't research in detail this area,
2    but if I would have been at the facility and I
3    was the person in charge, as I could have been,
4    I will remove the barge from this location.
5    EXAMINATION BY MR. WALKER:
6        Q.   That's not my question.
7        A.   Okay.  What is your question?
8        Q.   My question was, is there any written
9    mandate, order, regulation of any type that
10   compelled Lafarge to remove the barge in the
11   face of the incoming hurricane?
12       A.   I don't know.
13           MR. GILBERT:
14               And can we go back, with that
15           clarification, that it is a written
16           mandate, regulation, recommendation
17           you're asking about with respect to
18           halting the discharge or unloading
19           operations?  Can we go back to that
20           and just make sure that he can clarify
21           that that's still his answer?
22           MR. WALKER:
23               That's fine.
24   EXAMINATION BY MR. WALKER:
25       Q.   Is that still your answer, you don't

283

know?
1        A.   I don't know.
2        Q.   You criticize Mr. Busch -- who we
3    agree was the person in charge of the facility,
4    correct?
5        A.   Yes.
6        Q.   -- for not ballasting the barge, for
7    not instructing the barge to leave, and for
8    instructing that it be topped around; correct?
9        A.   Among other things.  There are much
10   more deficiencies.
11       Q.   Okay.  What information did Mr. Busch
12   have on August 27th that should have compelled
13   him to have the barge ballasted?
14       A.   The words is preparation for
15   hurricane.  So he was the person responsible
16   for doing whatever was necessary in preparation
17   for the coming hurricane.
18       Q.   And on August 27, what information did
19   he have that in your opinion should have
20   compelled him to either instruct the barge to
21   leave or to be ballasted?
22       A.   Um -- he's supposed to, as a facility
23   supervisor, to estimate the conditions that
24   were expected to possible develop and take

284

differing actions to prevent from damage
happening.  So he should have used his
knowledge, ability, experience, to take
actions, but they didn't take almost any
action.
    Q.   Can you point to what factors,
criteria, weather or anything else, Mr. Busch
should have considered that would have
indicated to him that he should ballast the
barge or instruct it to leave the canal?
    A.   Yes.  He knew that -- perhaps him
and/or other people, or people that Lafarge
retained or hired, clearly stated that in
preparation for hurricanes they should have
tied any floating equipment with cables to the
dock or to the ground.  And he knew that, and
he knew that -- he decided not to do it.  And
he also decided to leave the barge on the
outside of another barge.
    Q.   We know what he did --
    A.   Yes.
    Q.   -- but you're not answering my
question.
    A.   Okay.
    Q.   My question is, specifically, what

285

1  factors or criteria were available to Mr. Busch
2  that in your opinion he should have known or
3  acted upon to either ballast the barge or
4  instruct the barge to leave the canal?
5      A.  Okay --
6      Q.  Let's hold that question.
7          (Brief interruption.)
8      A.  Yes.  Mr. Busch was aware or should
9  have been aware of the progress of the
10  hurricane, Mr. Busch was aware that the barge
11  was light, high freeboard, um -- Mr. Busch was
12  aware that there were recommendations regarding
13  the doubling up of the fore and aft lines, so
14  he have plenty of information to make decisions
15  on what to do with this piece of equipment that
16  was representing an obvious danger.
17  EXAMINATION BY MR. WALKER:
18      Q.  So if I understand your answer
19  correctly, there was no particular specific
20  weather, wind or location of the hurricane that
21  in your opinion is the criteria that he should
22  have used to determine whether to ballast or
23  instruct the barge out of the canal.
24      MR. GILBERT:
25          Would you repeat that question,

286

1          please?
2  EXAMINATION BY MR. WALKER:
3      Q.  So if I understand your answer
4  correctly, there was no particular weather or
5  wind or location of the hurricane that he
6  should have used to determine whether the barge
7  should be ballasted or instructed out of the
8  canal.
9      MR. GILBERT:
10          Object to the form.
11          Mischaracterizes his testimony.  Not
12          intentionally, I'm sure.
13      A.  I don't expect that Mr. Busch or any
14  terminal manager to become suddenly a
15  meteorologic expert who predicts winds and
16  direction, but he should be a person with
17  enough experience to realize that if the
18  hurricane decide to develop high winds in his
19  area of interest, something has to be done with
20  equipment that he was responsible of
21  protecting.
22  EXAMINATION BY MR. WALKER:
23      Q.  Well, you agree that he took various
24  steps, you just disagree with the steps.
25  Correct?

287

1      A.  I disagree not only with he steps, but
2  I disagree with the number of steps.
3      Q.  Have you ever recommended or
4  instructed a principal to ballast a barge in
5  the face of incoming weather?
6      A.  I don't recall specifically ballasting
7  a barge.  I recall specifically ballasting
8  drilling rigs and other equipment.  I don't
9  remember specifically a barge.  And I did it
10  also with my own boat.
11      Q.  Do you recall Mr. Busch 's experience
12  and qualifications as a marine terminal
13  operator?
14      A.  I believe I received his CV or résumé,
15  but I do not recall reviewing it in detail
16  enough to memorize.
17      Q.  Do you have any opinion regarding at
18  what wind speed a two-inch poly rope will break
19  if directly across from each other on a level
20  deck?
21      A.  No.  I cannot answer your question
22  without developing and requesting more detail.
23      Q.  Assume you have two barges, two hopper
24  barges, and you have a two-inch line tied
25  between two kevels.

288

1      A.  Yes.
2      Q.  Do you have an opinion regarding the
3  wind speed required to break that rope?
4      A.  You have to talk about the elevation
5  of the deck, exposed area -- so the way you
6  presented the question it would be impossible
7  for me to answer.
8      Q.  Assume all the conditions that you are
9  familiar with at the Lafarge terminal at the
10  time or the range of times of the break away,
11  but that the barges are level instead of with a
12  differential in freeboard.  Do you have an
13  opinion regarding the wind strength that would
14  be required to break a two-inch line?
15      A.  If both decks are level, the ropes
16  between the two barges will receive very
17  insignificant force because one barge is
18  preventing the wind to act on the other barge.
19  But this is not the facts on this specific
20  case.
21      MR. GILBERT:
22          Let me just ask for
23          clarification.  You're asking a
24          question about one rope, one part of
25          rope?

289

1   MR. WALKER:
2       Uh-huh.
3   MR. GILBERT:
4       For the record --
5   MR. WALKER:
6       So your answer is --
7   MR. GILBERT:
8       Yes?
9   MR. WALKER:
10      Correct.
11  MR. GILBERT:
12      You're asking the question as to
13  one part of rope?
14  MR. WALKER:
15      Correct.
16  MR. GILBERT:
17      Because you're nodding your head
18  and you're not on video.
19  MR. WALKER:
20      Correct.
21  EXAMINATION BY MR. WALKER:
22      Q.  So your answer is you don't know?
23      A.  My answer is you mentioned the two
24  decks are the same level.  The amount of force
25  on the ropes will be very low because the winds

290

1   are acting on the barge that is attached to the
2   dock.
3       Q.  I understand.  So my question was, do
4   you have an opinion about the wind speed that
5   would be required to break that rope?
6       A.  But we have to define what are the
7   condition of the two barge that are connected
8   by the rope that you want me to answer.
9       Q.  I told you to assume all the
10  conditions at the Lafarge terminal between 4:00
11  and 6:00 a.m. on August 29th.
12      A.  No, I cannot give an answer right now.
13      Q.  Would it be 36 miles an hour?
14      A.  I have no idea.
15      Q.  Now, you seem critical also in your
16  report about Mr. Skaer 's measurement of the
17  ropes, two-inch versus four-and-a-half-inch
18  versus six-inch.  So could you explain to me
19  what your confusion is?
20      A.  Yes.  Number one, the
21  four-and-a-half-inch circumference, that means
22  perimeter of the outside of the rope.  He's
23  mentioning a six-and-a-half circumference,
24  which is the only place where I heard about
25  such a rope in his report.  Nobody else,

291

nobody, mentioned, ever, any other rope except
two-inch blue ropes.
    Q.  Okay.  The two-inch rope that we're
talking about, two-inch blue polypropylene
rope -- correct?
    A.  Yes.
    Q.  That's a fairly standard marine use
rope, isn't it?
    A.  Well, let me elaborate on this.  There
are many manufacturers of rope all over the
world.  Probably several hundred.  There are
several different formation of the strands for
ropes.  So two-inch poly is not enough.  I can
show you a catalog in which there are several
two inches with differing strength.
    So it has to be more specific in the
rope, and I never receive information
specifically on what rope and the strength.
The only place I have seen something is in the
report from this gentleman.
    Q.  Okay.  Try and listen to my questions
because they're much more -- they're much
narrower than your answers.  My question was
simply a two-inch polypropylene rope is
something you're familiar with, right?

292

    A.  Yeah.  I have -- I heard about it,
I've used it.
    Q.  And it's two-inch what; what does the
two-inch refer to?
    A.  Diameter.
    Q.  And a two-inch diameter is what
circumference?
    A.  About four and a half inches.
    MR. GILBERT:
        Can I just get -- how much more
    record time do we have?
    THE VIDEOGRAPHER:
        About an hour and twenty minutes.
    MR. GILBERT:
        Okay.
EXAMINATION BY MR. WALKER:
    Q.  And is it your understanding from
Mr. Skaer 's report that the six-inch rope that
he refers to is a rope different than the
two-inch rope?
    A.  Absolutely.  A four and a half is four
and a half, six inches is six inches.  Or six
and a half.  He's the only person mention six
and a half inches.
    Q.  Let's look at Violation of Duty No. 2

21 (Pages 289 to 292)

293

1  in your report.
2      A.  What page?
3      Q.  66.  You state that the replacing of
4  one mooring line and installation of another
5  amidship of the barge are violations of care
6  because they did not replace or double up the
7  existing mooring line at the other end of the
8  barge.  Right?
9      A.  Correct.
10     Q.  So it's your opinion that doubling up
11 can only be accomplished by putting an
12 additional part, or another line, at a
13 preexisting bow or end kevel.
14     A.  Not quite.
15     Q.  How not?
16     A.  You want me to elaborate?
17     Q.  Yes.
18     A.  Doubling up the lines, in my opinion,
19 is the -- a statement that refers that if a
20 certain piece of floating equipment, like a
21 barge, have reasonable, normal operation lines,
22 they should double up the stands of this
23 reasonable, normal operational lines at each
24 end.
25     Q.  Okay.  You say again at each end.

294

1      A.  Yes.
2      Q.  And you also said doubling the
3  strength.
4      A.  The strength, yes.
5      Q.  Can you double the strength by adding
6  lines other than at the two ends?
7      A.  Yes, but it's not the best solution,
8  and it may not result in the intended purpose,
9  because you want to keep the ends of the barge
10 close to the dock in order to avoid the barge
11 from moving any amount of distance from the
12 dock to avoid shock loads due to the 6 degrees
13 of motion of the barge.
14     Q.  All of that is your interpretation
15 based on your experience, but there's nothing
16 in the literature or in any of the
17 recommendations that speak about doubling up,
18 that either it should be restricted or limited
19 to or preferred to be done at bow or stern or
20 that the intention is that the, um -- well,
21 I'll stop there.
22     A.  No.  Very specifically, the
23 recommendation is at both ends, fore and aft.
24 And the reason is common sense.  You have to
25 keep the two extreme ends close to the dock as

295

1  possible, because if you put lines in between
2  you still may allow some deviation from being
3  very close to the dock, and this will result in
4  shock loads in the remaining close.  So the key
5  is doubling up the strength in both ends as
6  equally as possible.
7      Q.  What is a shock load?
8      A.  Shock is a dynamic effect that is
9  developed by the movement of a mass, and that
10 this movement of this mass has to be stop
11 suddenly then shock develops.
12     Q.  In this case, you don't have an
13 opinion whether the ropes were parted by shock
14 load or some other mechanism because you stated
15 previously that you didn't know if they broke
16 or they slipped off; correct?
17     A.  No, I disagree with you.  The only one
18 or two photographs that you observed a few
19 hours ago or yesterday indicate to me that the
20 rope I saw in the photograph was subject to
21 shock.  And I can explain why, also.
22     Q.  Shock would be a mechanism where the
23 rope is subject to a sudden strain as opposed
24 to a constant strain?
25     A.  Correct.  Yes.

296

1      MR. GILBERT:
2          For the record, I don't mean this
3      to be testimony but just for clarity,
4      he's referring to the photos that were
5      tendered to Pat Sanders in connection
6      with Mr. Skaer 's deposition.
7  EXAMINATION BY MR. WALKER:
8      Q.  So it's your opinion after having
9  looked at these photographs for the first time
10 in the last couple of days that the ropes that
11 you saw in the photographs were subject to
12 shock load.
13     A.  I remember one rope.  When you use
14 plural, I remember only one rope in one
15 location, and they were definitely broken by
16 shock, not by rubbing or abrasion or a cutting
17 mechanism.
18     Q.  I thought in your report that you
19 talked about the barge at the terminal being
20 subjected to pitching, heaving, rolling -- and
21 am I correct that those effects were felt on
22 the barge after the ropes parted?
23     A.  The two barges were floating were
24 subject to various relatively low-level motions
25 in every direction because they are free to

297

1  float although they are restricted for few
2  inches due to the ropes attached to the dock.
3  But when one of the ropes broke at one end and
4  the barge made that swing away from the dock,
5  now these motions become multiplied several
6  hundred times, mostly surge.  So the barge may
7  have two, three thousand pounds force on a rope
8  when was connected very close to the dock, and
9  then will have a hundred to two hundred
10  thousand pounds force when it's floating free
11  away from the dock due to surge and shock
12  resulting from surge.
13      Q.   That was my next question.  So the
14  shock load in your opinion is something that's
15  caused by movement of water, by surge, as
16  opposed to by wind?
17      A.   Both are interrelated.  Wind is one
18  that pushes on the barge, and waves which are
19  traveling give a result in trying to move the
20  barge in the direction other way.
21      Q.   Do you have an opinion in this case as
22  to whether the shock load which you opined was
23  the cause of the breakage of the rope that you
24  saw was due to wind or surge?
25      A.   Both.

298

1      Q.   I'm going to show you another diagram.
2           Have you ever seen that before?
3      A.   No.  First time I seeing this.
4      Q.   It looks like two barges, doesn't it,
5  side by side?
6      A.   Okay.
7      Q.   One barge has letters designating the
8  position of kevels and the other has numbers
9  designating the position of kevels; is that
10  fair?
11      A.   Well, there are two rectangular
12  sketches, and one show IHNC 4725 barge and the
13  other IHNC 4727 barge, and they have some A, B,
14  C and 3, 2, 1 at one end, and other letters and
15  other numbers at the other end, and then 3 dots
16  on the side with letters, also.
17      Q.   I represent to you that those are the
18  two barges.
19      A.   Yes.
20      Q.   One with letters, one with numbers.
21      A.   Yes.
22      Q.   Can you take this green pen and show
23  me where you understand the lines were tied at
24  the time prior to the break away between the
25  two barges.

299

1      A.   You want me to put a little green line
where the mooring lines were located?
2      Q.   Correct, between the kevels.
3           MR. GILBERT:
4               Let me just object, because I
5           don't -- I don't know that that is
6           necessarily scale in terms of the
7           distance between the barges, and at
8           what time -- I'm sorry.  Subject to
9           that, he can answer.
10          MR. WALKER:
11              I'm sorry.  I don't understand
12          the objection.
13      A.   This sketch is definitely not to
scale.
14  EXAMINATION BY MR. WALKER:
15      Q.   I understand.  I'm just asking you
16  based on that representation that those are the
17  two barges, as you've said --
18      A.   Okay.
19      Q.   -- they're labeled --
20      A.   Okay.
21      Q.   -- tell me where you understand the
22  lines were tied prior to the break away.
23      A.   Number one, I was not aware if they

300

1  tie the fore and aft lines to the immediate
2  cleats or to cleats that are a few feet away,
3  so I'm going to put a general --
4      Q.   Wait.  Wait.  Excuse me.  Before you
5  mark it, are you telling me that you reached
6  opinions and conclusions regarding the mooring,
7  the mooring configuration, the break away,
8  without knowing or having an opinion as to
9  where the lines were tied?
10          MR. GILBERT:
11              He hasn't said --
12          MR. WALKER:
13              Excuse me.
14  EXAMINATION BY MR. WALKER:
15      Q.   Is that correct?
16      A.   The answer is yes.  Never -- nobody
17  ever told me, and I have seen in any specific
18  report in words that the lines were connected
19  from, um -- a kevel at the corner, or the line
20  were connected at kevel a few away from the
21  corner.
22      Q.   So you have no real understanding as
23  we sit here today as to how the barges were
24  tied to each other.  Is that correct?
25      A.   I don't have a perfect understanding.

301

1  I don't have the understanding I would like to
2  have.
3      Q.   Okay.  What is your imperfect
4  understanding?
5      A.   My imperfect understanding is one line
6  at one end, another line at the other end, and
7  one line somewhere at an angle in the area of
8  midship.
9      Q.   Okay.  All right.  We'll mark that as
10  Exhibit 18.
11      (Exhibit 18 was marked for
12  identification and is attached hereto.)
13  EXAMINATION BY MR. WALKER:
14      Q.   Now, let's talk about this line that
15  you've drown at an angle sort of between what
16  is designated as a kevel D through kevel E to
17  kevel 6.  Okay?  Where did you obtain the
18  understanding that that -- that there was a
19  line at that kind of angle?
20      A.   The deckhand of the tugboat REGINA H
21  testified in several places that the line in
22  the midship area of the barge was at an angle.
23  Being since all the lines were at an angle with
24  respect to the horizontal, this was also an
25  angle in the fore and aft direction of the

302

1  barges.
2      Q.   He didn't say that, did he?  You infer
3  that.
4      A.   Oh, it's 100 percent sure because the
5  word angle here if it's in the vertical plane
6  applies to the three lines because they're
7  separate six or seven feet.  If it's in the
8  horizontal plane I can talking only about one
9  line, it's in a fore and aft angle of the
10  midship.
11      Q.   But his testimony was only that it was
12  at an angle, period.  Right?  The rest of it is
13  your inference or interpretation of his
14  testimony.
15      A.   Well, I believe it's more than
16  interpretation.  If he would have indicated
17  that the angle applies to the other lines, it
18  would be in the vertical plane.  But he's
19  talking about only one line at an angle, which
20  the only way that within line could be at an
21  angle, except for the vertical plane, is in the
22  for and aft direction or the midship
23  connection.
24      Q.   Which is your interpretation.  He
25  doesn't say anything about midship connection,

303

horizontal plane, vertical plane or anything.
All he said was angle; correct?
    A.   Because nobody ask him.  But this is
obvious.  I think, again, it's very elementary.
        And may I clarify one of my previous
answers?  Even it appears that this sketch is
wrong compared with this photograph.  Appears
to be that in this photo showing the barge with
differing amount of kevels than in this sketch.
    Q.   So you're saying that Sketch No. 18 is
inaccurate in terms of the kevels it shows?
    A.   Well, I will have to spend time and
look with a magnifying glass, but I counting
here four kevels, and those are showing 3, so I
have to spend the time, if you want me to give
you more, um -- details on this sketch.
    Q.   Well, let me ask you this:  You've
been involved in this case for several years,
and are you telling me that as you sit here
today you don't know how many kevels the ING
4727 had?
    A.   I don't have any reason to investigate
it.
    Q.   I'm not asking you for a reason.  Do
you know, yes or no, how many kevels the

304

4727 --
    A.   Not right now.
    Q.   You agree, don't you, that the Lafarge
hurricane checklist, based on the testimony
which is the only evidence you have on which to
form an opinion, had been changed --
        MR. GILBERT:
        Objection.
EXAMINATION BY MR. WALKER:
    Q.   -- such that --
        MR. GILBERT:
        Objection.
        MR. WALKER:
        I'm not finished.
EXAMINATION BY MR. WALKER:
    Q.   -- had been changed such that --
        MR. GILBERT:
        Well --
EXAMINATION BY MR. WALKER:
    Q.   -- the requirement was no longer to
use cables.
        MR. GILBERT:
        Object.
    A.   I don't remember what you're talking
about.  I don't remember if I heard about this

305

1  from conversation with my principals or I read
2  it somewhere, but I do not recall specifically
3  what you're saying reading clearly anywhere.
4  The only thing I remember seeing a document,
5  but I don't know exactly what you're talking
6  about.
7  EXAMINATION BY MR. WALKER:
8      Q.   Okay.  You remember the hurricane
9  checklist; right?
10     A.   I remember the hurricane checklist.
11     Q.   You remember Mr. Busch 's testimony?
12     A.   Well, I didn't memorize Mr. Busch
13  testimony.  You have to refer to --
14     Q.   Well, do you have any evidence to
15  contradict Mr. Busch 's testimony that at the
16  time of Hurricane Katrina the Lafarge hurricane
17  checklist did not require them to use cables?
18     A.   I don't remember what you're talking
19  about.
20     Q.   Well, if you look at Violation No. 5,
21  Page 68 -- I believe it's Number 5 -- you
22  summarize at the bottom that the barge was not
23  secured with wire ropes to the dock or shore.
24     A.   What page you are referring to?
25     Q.   68 at the bottom.

306

1      A.   I'm sorry?
2      Q.   68.
3      A.   68.  Can you tell me what --
4      Q.   The third -- the second bullet point.
5  (Indicating.)  It was not secured with wire
6  ropes to the dock or shore?
7      A.   Yes.  Okay.
8      Q.   Okay?  So is it your opinion that if
9  the barge had been secured with wires that
10  there would not have been a break away?
11     A.   Yes.
12     Q.   So it's your opinion that whatever
13  shock load or other forces acted on the
14  two-inch ropes that caused them to part would
15  not have caused a wire cable to part; is that
16  correct?
17     A.   If they used the proper wire cable.
18     Q.   And what cable would that be?
19     A.   At least one and a quarter plus inch
20  diameter of improved plow steel.
21     Q.   Plow is P-L-E-W?
22     A.   P-L-O-W.
23     Q.   P-L-O-W.  All right.  So just to make
24  sure I understand you, it's your testimony that
25  as long as they used a one and a quarter inch

307

1  diameter --
2      A.   One and a quarter inch diameter, which
3  is normal that we're using.
4      Q.   -- wire rope, or wire cable --
5      A.   Yes.
6      Q.   -- there would not have been a break
7  away.
8      A.   Most probably would not have been a
9  break away.
10     Q.   Well, now it's most probably.  Before
11  it was with certainty.
12          Is it most probably or are you
13  certain?
14     A.   Well, the reason why I not certain is
15  because depending on the rigging.  You know, it
16  has to be also rigged properly.
17     Q.   Assume it was rigged properly --
18     A.   Assuming that it was rigged properly,
19  experience indicate that wire -- that barges
20  secured at both ends with ropes improved plow
21  steel of one and a quarter plus diameter in
22  good shape never fail.
23     Q.   And would they have required doubling
24  up?
25     A.   Yes.

308

1      Q.   So the same recommendation would
2  apply.
3      A.   Well, the word doubling up is
4  referring to the mooring lines.  The ropes --
5  the steel ropes attached to the shore is in
6  addition to the connection of the lines
7  doubling up which are soft lines.
8      Q.   So you would agree that it would not
9  be proper or appropriate, or common, to tie the
10  two barges to each other with wire cables.
11     A.   It will be beneficial, it will be
12  additional resistance to separation of the
13  barges, yes.  Wire cable is appropriate in any
14  circumstance because it's much -- the strength
15  is much higher than the soft lines of larger
16  diameter.
17     Q.   So is it your testimony that it is
18  common practice to rig barges to each other
19  with wire cable?
20     A.   It is not exactly common practice.
21  It's done depending on the circumstances.
22     Q.   And is it your testimony that to
23  prevent this break away wire cable should have
24  been used between the barges as well as from
25  the barge to shore, or just from barge to

309

1   shore?
2       A.   Both will be beneficial.  The more
3   that you strengthen the connection to the
4   shore, the less possibility of the barges
5   moving away from shore.
6       Q.   Now, you talk about steel wire rope
7   and chains found on the 4727.  Do you recall?
8       A.   Yes.
9       Q.   Who found these, do you know?
10      A.   Well, I observe it myself when I
11  inspected the barge for the first time.
12      Q.   So when you went out on the barge
13  after Rita, they were still on the barge.
14      A.   I saw only one rope at one end, with
15  chain, and I took photograph.  I didn't see any
16  rope on the other end.
17          MR. GILBERT:
18              And I need to enter an objection
19          because it does mischaracterize his
20          testimony from yesterday.  He wasn't
21          sure whether he was out before or
22          after Rita the first time.
23          MR. WALKER:
24              But this morning he clarified it.
25          He said after Rita.

310

1           THE WITNESS:
2               It was at financial location of
3           the barge.
4           MR. GILBERT:
5               He's talking about the final
6           location of the barge.
7   EXAMINATION BY MR. WALKER:
8       Q.   I thought you said this morning that
9   the first time you went out to the Ninth Ward
10  to the barge was after Rita.
11      A.   Correct.  Final location of the barge.
12      Q.   Right.  Okay?  You just said ropes.
13  Did you mean wires or cables?
14      A.   Well, your question a few second ago
15  was regarding wire.  That means metal, not soft
16  line.
17      Q.   Right.
18      A.   I saw only one wire attached to chain
19  on the barge, nothing at the other three
20  corners.  One corner.
21      Q.   And if I understand your report
22  correctly, that wire rope was 20 to 22 feet
23  long.  Correct?
24      A.   Correct.  We can see in the
25  photograph.

311

1       Q.   And you would have required at least
2   40 feet to use that cable, correct?
3       A.   Yes.  To reach the shore.
4       Q.   So that cable that you found could not
5   have been used to moor the barge to the shore
6   because it was twenty feet too short, right?
7       A.   Correct.
8       Q.   Now, what does adjacent mean to you?
9       A.   What the word adjacent?
10      Q.   Yes.
11      A.   Close by.
12      Q.   Next to each other?
13      A.   Yes.
14      Q.   Do you recall reading Mr. Smith's
15  statement regarding where the lines were
16  placed, between the barges?
17      A.   Um -- well, I read his statement or --
18  I don't remember his statement of the position.
19  I read whatever he said.
20      Q.   Do you recall his statement to be that
21  the line that was placed between the barges in
22  the middle was placed on cleats adjacent to
23  each other?
24      A.   Yes.
25      Q.   That would not be at an angle, would

312

1   it?
2       A.   The word adjacent could mean five
3   feet, ten feet, twenty feet.  The key is that
4   they put it as a spring line not as a mooring
5   line.
6       Q.   I thought you just told me that
7   adjacent was next to each other.  Now you're
8   saying that adjacent is --
9           MR. GILBERT:
10              I'm going to object.
11      A.   The word next, it all depends how many
12  feet next.  Definitely the information I have,
13  it was a spring line not a mooring line.
14  EXAMINATION BY MR. WALKER:
15      Q.   You say that as a result of this
16  angled spring line --
17      A.   Yes.
18      Q.   -- that this prevented from absorbing
19  one third of the side force applied by the wind
20  to the barge.  Could you explain that to me?
21      A.   Yes.  If the main effect of the
22  wind -- not if, but the main effect of the wind
23  is reacting on the lateral side of the barge
24  and pushing the barge away from any restraint,
25  so it's perpendicular to the side, and if the

26  (Pages 309 to 312)

313

1  line is not perpendicular to the side it will
2  not take almost any load.  If the line is a
3  spring line, it's specifically to take forces
4  in fore and aft direction of the barge not in
5  the athwartship direction of the barge.
6      Q.   But you didn't calculate the forces,
7  you're just saying this generically, right?
8      A.   Yeah.  I can calculate the forces, of
9  course.
10     Q.   Okay.  Did you study the mooring of
11 the northern tier of barges, the five tier?
12     A.   No.
13     Q.   At all.
14     A.   No.
15     Q.   Do you have an opinion regarding
16 whether that tier of barges could have broken
17 loose and allided with the two tier barges?
18     A.   No.  I don't have any opinion.
19     Q.   Have you ever heard that as a theory?
20     A.   I think I briefly read it somewhere,
21 but I don't even remember where.
22     Q.   Do you have an opinion as to that
23 being a reasonable theory?
24     A.   I didn't pay much attention, so --
25 because I didn't have enough information, so

314

1  don't make any sense for me to waste time on
2  something that I don't have any documentation.
3      Q.   You didn't pursue that as a potential
4  cause of the break away.
5      A.   Correct, because I didn't receive any
6  information in this regard.
7      Q.   Do you know if the five tiers barges
8  were moored with cable or rope?
9      A.   I don't know for sure.
10         MR. GILBERT:
11             Object.  He's already said he
12         knows nothing about it.
13 EXAMINATION BY MR. WALKER:
14     Q.   But if I understand your prior
15 testimony --
16         MR. GILBERT:
17             He has no opinion about the five
18         barge tier.
19 EXAMINATION BY MR. WALKER:
20     Q.   If I understand your prior opinion,
21 you would expect that the five tier barges
22 would require cabling to shore to withstand the
23 hurricane forces.
24     A.   According to Lafarge and practical
25 experience, yes, in some fashion.

315

1          MR. GILBERT:
2              Object to the question.  Are the
3          five barges empty?  Are they the same
4          as 4727?  I think you're asking him to
5          make a comparison.  I'm trying to
6          clarify your question.
7  EXAMINATION BY MR. WALKER:
8      Q.   You earlier testified that in your
9  opinion the 4727 and the 4745 would have
10 required cabling to shore to withstand the
11 hurricane Hurricane Katrina, right?
12     A.   Yes, and if other details are also
13 considered.
14     Q.   And is it your opinion that a tier of
15 five barges in the same location some ten feet
16 to the north would also require wire cabling to
17 withstand the hurricane?
18         MR. GILBERT:
19             Object.
20     A.   Yes, will be beneficial.  You always
21 can replace cable by larger or multiple and
22 more strength line of soft, um -- material, but
23 the key is the strength.  Wire rope of much
24 smaller diameter than soft line have a much
25 more strength.  So the key is the strength.

316

1  EXAMINATION BY MR. WALKER:
2      Q.   And you would expect that if that five
3  tier of barges was made up with two-inch
4  polypropylene ropes they would break away, as
5  did the other two.
6      A.   Depending on the number --
7          MR. GILBERT:
8              Objection.
9      A.   -- of lines at each end and the
10 characteristic of the two inch wire rope -- the
11 two-inch soft line.
12 EXAMINATION BY MR. WALKER:
13     Q.   So are now testifying that in fact
14 using two-inch soft lines would be sufficient
15 to maintain barges at the Lafarge facility on
16 August 29, 2005?
17     A.   We didn't discuss what freeboard or
18 what kind or number of lines.  Your question is
19 too general.  You have to be more specific to
20 answer yes or no.
21     Q.   Well, let's go back to your prior
22 answer, then.  You said that in your opinion a
23 wire cable would have been necessary to
24 maintain the 4727 at the facility.  Am I right
25 or wrong?

317

1    A.  I don't believe -- wrong.  I don't
2  believe I used the word necessary.  I said
3  would be beneficial.  The key is increasing the
4  strength.
5    Q.  So you agree that the use of soft
6  lines was appropriate for the 4727, then.  You
7  just think they should have used more or added
8  some other type of lines.
9    A.  No, I didn't use the word appropriate.
10  I keep saying, the way that barge 4727 was with
11  high freeboard, should have been moored with a
12  steel wires to shore.
13    Q.  So your primary criticism, then, is
14  the freeboard, not the manner of rigging or the
15  type of ropes.
16    A.  Both.  I criticize definitely -- I
17  criticize both.
18    Q.  This green line that you've drawn on
19  Exhibit 11 between the two barges at an angle
20  is that a breast line, a spring line, what is
21  that?
22    A.  It's a spring line.
23    Q.  And what would be a breast line?
24    A.  A breast line will be perpendicular to
25  the side of the barge as much as possible.

318

1    Q.  Okay.  So between adjacent cleats
2  would be a breast line.
3    A.  Well, the word adjacent, we discussed
4  it before, could mean five feet, ten feet,
5  fifteen feet.  The word adjacent may be used,
6  but the key is that the line that was at an
7  angle was purely a spring line.
8    Q.  Okay.  I'm almost done.  I just have a
9  couple more questions.
10    What I'd like to have you show me is
11  where's the turn of the bilge.  And I have a
12  series of photographs.  If you have one that
13  you're familiar with that is handy --
14    A.  You want me to make a sketch?
15    Q.  Well, I have the photographs of the
16  barge.  If you can show us on the barge itself,
17  that would be -- I'll show you a couple, and
18  you tell me which one best depicts it.
19    A.  You want me to look in my files?
20    Q.  No.  I've got some.  You see the turn
21  of the bilge on that one?
22    A.  Yes.  It's far away, but I see the
23  turn of the bilge, yes.
24    Q.  Okay.  And let's see if we have a
25  better one.  That's a little closer.  Do you

319

see the turn of the bilge?
    A.  Vaguely, yes.  It's almost --
    Q.  (Turning the page.)
    A.  Yes.  But these are on the side.  Of
course, there's a turn of the bilge on both
ends also.
    Q.  So you would prefer one bow or stern.
    What is that arrow pointing to, do you
know?
    A.  Looks like some type of deformation of
the steel.
    Q.  Does that show the turn of the bilge?
    A.  Yes.
    Q.  Is that better than the others?
    A.  No, they're all very difficult to
discuss.  It's just shown but are not detailed
photograph.
    Q.  I'm going to show you one from your
report with the barge up on the, um -- on the
inflatable rollers.  Does that best depict the
turn of the bilge?
    A.  No, it still is very general photo.
The turn of the bilge is just a small location,
you know.  So it's part of the structure of the
barge, so they are in the pictures, but I don't

320

know what you would like to discuss about the
turn of the bilges.  I have better photo than
this in my report.
    Q.  Okay.  Why don't you find the
photograph that in your opinion best describes
or depicts the turn of the bilge.
    A.  Okay.  Okay, I found two photographs.
    Q.  Okay.
    A.  One is in Attachment No. 1, Group 6,
Page 4, in which I took a photograph with
measuring the barge to 90 degrees show clearly
that there is a radius at the turn of the
bilge.
    Q.  I'm sorry.  Group 6, Page 4.  Right.
Okay.  So what I'd like you to do, I have a
copy of that, and if you would, with the green
pen, on my copy, would you mark with a circle
or an arrow or a line, whichever is most
appropriate, the entire turn of the bilge that
you see in those photographs.
    A.  Well, the extent of the photograph is
on the turn of the bilge, with some pieces of
the bottom of the barge.
    Q.  So what does the arrow that you've
drawn mean?

321

1    A.   Well, the extent of the turn of the
2  bilge.  The whole photograph is the turn --
3  this is the turn of the bilge, here is the
4  bottom of the barge.  So two thirds of the
5  photograph are turn of the bilge, and a little
6  piece of the top is the bottom of the barge.
7    Q.   I'd still like -- I appreciate that.
8  I'd still like to find a photograph of the
9  barge, either on the inflatables or at another
10 point in time, where you can see the turn of
11 the bilge in a full view of the barge.
12         Do you have that?
13   A.   No.  The only way to give you a better
14 detail of what you're asking is a drawing of
15 the barge, which I can make you a sketch of the
16 turn of the bilges.
17   Q.   I'm going to show you another
18 photograph.  Doesn't that clearly depicted the
19 turn of the bilge?
20   A.   This photograph shows the entire barge
21 within the confines of the photograph, and part
22 of the barge is the bow and the stern, the
23 transom or the head log, and the steel or the
24 turn of the bilges at the bottom.
25   Q.   All right.

322

1    A.   They're a quarter of an inch.
2    Q.   So this photograph I'm showing you
3  does show the turn of the bilge which is this
4  bottom plate there, isn't it?
5    A.   No, sir.  All this is the turn of the
6  bilges. (Indicating.)
7    Q.   Well, okay, across the entire --
8    A.   Okay.
9    Q.   Okay.  So would you agree that the
10 turn of bilge is from here to here, as
11 shown in this photograph, the entire length?
12   A.   Yes.
13   Q.   Okay.  So roughly those green corners
14 that we've drawn and that entire length is the
15 turn of the bilge.
16   A.   Approximately, yes.
17   Q.   It's hard to see these, Mr. Pazos, so
18 with your agreement and approval I'll draw
19 arrows down from those corners and arrows up
20 from these.
21         These are the perimeters of the turn
22 of the bilge; right?
23   A.   Approximate, yes.
24   Q.   Approximate.
25   A.   Yes.

323

1    Q.   Okay.  We'll mark this photograph as
2  Exhibit 19 in connection with your deposition.
3         (Exhibit 19 was marked for
4  identification and is attached hereto.)
5    MR. WALKER:
6         That's all I have.  Thank you,
7  Mr. Pazos.
8    A.   You're welcome.
9  EXAMINATION BY MR. EMORY:
10   Q.   Mr. Pazos, my name is Bill Emory.  A
11 few questions:  I'm going to take you a little
12 further backwards on the timeline that we've
13 been discussing with you in your deposition.
14         I'm representing Zito.  Do you know --
15 first off, are you familiar with the company
16 Zito?
17   A.   Yes.
18   Q.   Your report does offer some opinions
19 concerning Zito which we're going to discuss a
20 little bit.
21         To kind of follow up on the same
22 question Mr. Walker just asked you, were you
23 specifically asked to render any opinions
24 concerning Zito?
25   A.   Not specifically.  I been asked to

324

1  describe what I think that happened.
2    Q.   Okay.  The report, this is your
3  June 29, 2009 report, if you refer back to I
4  believe it's Page 71, you offer two opinions,
5  actually Opinion No. 3 and Opinion No. 4,
6  relative to Zito 's involvement.  First off,
7  the Opinion No -- it's Opinion No. 3 in your
8  report, it's concerning the danger involved in
9  delivering the barges to the Lafarge facility.
10         Have you in any other cases issued
11 opinions concerning a boat company's ignoring
12 the danger in delivering a barge to a facility?
13   A.   Not specifically in the delivering a
14 barge to a facility.  I probably expressed
15 opinions in other cases in what the operator of
16 a vessel should have done to prevent an
17 accident that occurred later on.
18   Q.   But in terms -- and trying to narrow
19 the focus, in terms of an opinion concerning
20 whether a barge should or should not have been
21 delivered because of an approaching hurricane,
22 have you ever issued that type of opinion
23 before?
24   A.   I don't recall this specific case.
25   Q.   Okay.  And then also in Opinion No. 4

325

1  in your report, and that's dealing with the
2  removal of the barge, have you -- the same
3  question; have you in any other cases issued
4  opinions concerning a boat company's failure to
5  remove a barge or a vessel because of any type
6  of weather considerations?
7      A.  I don't recall any specific situation
8  exactly related to this.
9      Q.  The two opinions concerning Zito, is
10  it fair to say that those opinions are not the
11  typical opinions that you in the field of a
12  naval architect or a marine engineer would be
13  issuing?
14      A.  No, I been expressing through the
15  years many opinions regarding operations
16  because I'm involved in operations all the
17  time.  I deal with captains and salvage masters
18  and operators, so I been expressing many
19  opinions far and beyond regular engineering
20  because I been very active in the field for
21  many years, in many operations.
22      Q.  But just in your terms, you just don't
23  recall ever giving that type of opinion before
24  relative to Opinion 3 and Opinion 4.
25      A.  Not specifically, no.

326

1      Q.  Did you review -- first off, do you
2  know who Barry Boudreaux is?
3      A.  I may have seen the name.  I don't
4  recall right now.
5      Q.  I think you've already testified to
6  this.  Just to be clear, the documents that you
7  have identified in your report as the documents
8  that you received and reviewed, that would be
9  the full extent of the documents that you have
10  reviewed, unless we referred to something
11  additionally today.
12      A.  Well, of course, I look at many
13  websites and other information.  I listed in my
14  report whatever is specifically received from
15  my principal.
16      Q.  Okay.  If this listing in your report
17  makes no reference to any deposition testimony
18  or trial testimony from Mr. Boudreaux, would it
19  be safe or would it be a fair statement to say
20  that you have not received --
21      A.  Correct.
22      Q.  -- or reviewed those?
23      A.  Correct.
24      Q.  And this may be kind of a general,
25  self-evident question, but you've given a lot

327

of testimony and your report refers to some of
the mooring particulars relative to this barge
when it was empty at the Lafarge facility.
        Am I correct that you're aware of no
fact, sir, that Zito was involved in any of the
mooring activities of that barge when it was at
the Lafarge facility?
        A.  Um -- well, let me elaborate off the
top of the my head.  Zito delivered these
barges, and I don't recall specifically under
what configuration they delivered the barges,
but I expect they delivered the barges one
alongside the other and one was in contact with
the dock and this is the barge that was
unloaded.
        Q.  Okay.  Let's clarify a little bit.
        From the point that the barge was
brought to the facility by Zito, and from that
point when they left, after that point Zito had
no involvement with the mooring or the
configuration of those barges.
        A.  Correct, except apparently a phone
call to Zito from Lafarge people.
        Q.  And we'll discuss that in a little
bit.  But in terms of the actual mooring, they

328

had no one there and they were not involved in
that.
        A.  Correct.
        Q.  And the same question, in terms of the
decision to top around the barge, Zito was not
involved in that decision.
        A.  Correct.
        Q.  And to your knowledge, at least you're
aware of no facts that Zito was aware that
there was any type of discussion or any
contemplation that those barges would be topped
around prior to the storm?
        A.  Correct.  I not aware.
        Q.  Your report, sir, going back to
Page 71 where you're, um -- giving your
opinions, at least those relative to Zito, give
an opinion and then a basis below that opinion,
but there's no referencing violations or duties
that were violated.  Also, in reading your
report I did not see in your report at least
any references to any regulations or
recommendations or mandates or orders that Zito
had failed to comply with.  Is that a fair
statement?
        A.  Yes.

329

1  Q.  So as we sit here today, you're not
2  aware of any regulations that Zito failed to
3  comply with.
4  A.  Correct.
5  Q.  You're not aware of any
6  recommendations, mandates or orders that they
7  failed to comply with.
8  A.  Correct.
9  Q.  Now, in terms of your experience, sir,
10  you have never owned a barge fleeting facility.
11  A.  No.
12  Q.  You've never operated a barge fleeting
13  facility.
14  A.  Correct.
15  Q.  And you've never managed a barge
16  fleeting facility.
17  A.  Correct.
18  Q.  Flip back to Page 30 of your report,
19  if you don't mind.  Just about halfway down
20  there's a paragraph sentence which starts with
21  apparently Mr. Ed Busch, assistant terminal
22  manager -- do you see that one?
23  A.  Yes.
24  Q.  And that's what you just mentioned a
25  few moments ago about a claim that he had tried

330

1  to call someone at Zito.  I was looking back
2  through the material that you were provided
3  that you used to render your report and your
4  opinions.  Can you tell me what in this I guess
5  list of documents, what it was specifically
6  that you relied on to reach at least that
7  statement on Page 30 that apparently Mr. Ed
8  Busch had tried to telephone someone at Zito
9  Fleeting on the 27th?
10  A.  Well, I going by the top of my head,
11  but I mentioned Ed Busch, and it's most
12  probably I have seen it in Ed Busch's
13  deposition.
14  Q.  Okay.  I did not see in your list
15  here, um -- at least an identification of the
16  deposition from Mr. Busch.  I did see, I
17  believe, a reference to a statement from
18  Mr. Busch, but not his deposition.
19  A.  Well, what happened is I receive a
20  statement from Mr. Busch, and after requesting
21  to my principal to see the deposition, I
22  receive just few days ago, recently.
23  Q.  So you just recently --
24  A.  I'm sorry.
25  Q.  -- just recently got Mr. Busch 's

331

deposition?
A.  Okay.  On Page 7, I have as a final
document received, deposition of Edward Busch,
which I received recently.
Q.  I stand corrected.  I had previously
had an earlier edition, so I didn't see that.
My bad.  So basically, it was his testimony in
the deposition in Reference 140 on Page 70
where you reach the conclusion that he
apparently made the call.  Is that correct?
A.  Yes.
Q.  Prior to you receiving that
deposition, sir, did you have any knowledge as
to what if anything Mr. Busch had done in terms
of trying to contact anyone?
A.  Before receiving the deposition, like
I mention, I received some type of a statement
from Mr. Busch, and probably when I wrote the
word apparently, it was because I was basing on
this statement.
Q.  So it's your recollection that the
statement made reference to this apparent call?
A.  Well, of course, I didn't invent this
word, so I has to get it from a document.  If
at the time I wrote this word apparently I had

332

a document, this is what I referring to.  If I
will have had the deposition at the time which
say, I will put page and line for the
deposition.  So if I didn't put page and line,
probably I didn't have the deposition at the
time I wrote this statement.
Q.  Is it a fair statement, sir, that
other than your understanding of what Mr. Busch
apparently, to use your term, did, you have no
other basis to show that Zito knew that the
barge was going to be picked up prior to the
storm?  Do you?
A.  No, I believe there are other
documents that discuss this point, but off the
top of my head I don't have the names.  I think
people from Ingram probably -- I read somewhere
else, also.
Q.  So I want to make sure I'm clear on
this:  Is it your testimony that there are any
sources other than Mr. Busch, or are you saying
that you've seen other documents referencing
what Mr. Busch apparently did?
A.  I remember seeing in other documents
the subject that Busch or Lafarge trying to
contact Zito, besides Busch 's statement, but I

333

1  don't recall what documents I read this.
2      Q.  If I represent to you, sir, that the
3  testimony and the evidence will show that the
4  alleged contact between Lafarge and Zito was
5  through Mr. Busch, would you have any reason to
6  disagree with that?
7      A.  No, I have to go by the documents that
8  I receive.
9      Q.  And if that is in fact the only
10  contact, alleged contact between Lafarge and
11  Zito, you're aware of no other basis to show
12  that Zito would have been aware that the barge
13  was ready to be picked up prior to the storm.
14      A.  Correct.
15      Q.  Do you know, based on your review of
16  the deposition or any other documents, what
17  Mr. Busch allegedly -- what message he
18  allegedly gave to Zito?
19      A.  What method?
20      Q.  What message.
21      A.  Oh.  What message?  I don't recall the
22  exact words, I only recall that I read
23  somewhere that he called Zito, couldn't get an
24  answer, and left a message on the recorder.
25      Q.  But what that message was, you

334

1  don't -- you don't have an opinion as to what
2  that was.
3      A.  I don't recall any detailed
4  information.
5      Q.  Did you, in your review, review any of
6  the discovery responses from Lafarge concerning
7  phone calls or phone records from Lafarge?
8      A.  I don't recall something that I can
9  tell you some words you're talking about, I
10  don't recall.
11      Q.  If I represent to you, sir, that at
12  least based on the documents that Lafarge has
13  produced in response to discovery in
14  particular, phone records from Lafarge, if
15  those documents do not show any evidence of a
16  call from anyone at Lafarge on the morning of
17  the 27th to Zito, first off, you have no reason
18  to disagree with that fact.
19      A.  I don't recall seeing any document
20  that you're mentioning, so I do not have to
21  answer.  Because I do not recall any response
22  from Lafarge, so I don't recall seeing any
23  documents.
24      Q.  Well, I'm just representing to you
25  that that is what the discovery responses have

335

1  indicated.  And I'm just asking you, do you
2  have any other reason to disagree with that?
3      A.  No.  I don't.
4      Q.  And to continue on that same line,
5  assuming that those phone records, as I've
6  suggested, do not show a call from Lafarge to
7  Zito on the morning of the 27th, would you
8  agree, sir, that Zito would not have known that
9  the barge was empty prior to the storm?
10      A.  Correct, if nobody tells Zito, Zito
11  don't have any spies or anybody there.
12          (Brief recess.)
13  EXAMINATION BY MR. EMORY:
14      Q.  Mr. Pazos, in your review of the
15  records, including the statement from Mr. Busch
16  and Mr. Busch 's testimony, do you recall his
17  testimony that even though he claims to have
18  left a message for Zito he also testified that
19  he did not expect Zito to pick up the barge
20  prior to the storm?
21      A.  I don't remember what you just said.
22  I don't -- off the top of my head don't
23  remember.
24      Q.  If I represent to you, sir, that that
25  was the testimony of Mr. Busch, would you have

336

1  any reason to disagree with that?
2      A.  No, if you say so, I believe that you
3  are not lying.
4      Q.  Were you aware, sir, that Zito had
5  closed its fleet to incoming traffic on the
6  morning of August 27th?
7      A.  I read something similar to what you
8  are saying, but I don't remember the exact
9  things.
10      Q.  Well, you'll agree, once again, that
11  if the testimony in the records indicate that
12  Zito had closed their fleet on the morning of
13  August 27th, you have no reason to disagree
14  with that.
15      A.  Yes.  If they close it, if they have
16  documents say they closed it, they close it.
17  Yes.
18      Q.  Did you do anything, sir, to
19  investigate whether Zito had the means to pick
20  up the barge from the Lafarge facility on the
21  27th of August?
22      A.  I did not investigate.
23      Q.  If the testimony in fact indicates
24  that Zito did not have the means to pick up the
25  barge on the morning of the 27th, would you

337

1  disagree with that?
2      A.  If the records indicate that they
3  didn't have facilities to take any action, I
4  agree with the records.
5      Q.  Did you in your review see any
6  information as to what if any voicemail
7  capabilities Zito had at their office?
8      A.  I remember seeing something indicating
9  that they have communication problems, but I
10  don't remember any detail what communication
11  problems.
12      Q.  And just to be clear here, my question
13  was Zito.  I think you may have answered in
14  terms of Lafarge.
15      A.  Lafarge.  Lafarge, yes.
16      Q.  Just to be clear, I'll ask the
17  question again.  Are you aware of what if any
18  voicemail capabilities Zito had at their office
19  back on August 27, 2009?
20      A.  No, I don't have.
21      Q.  Not 2009, 2005.
22      A.  I don't have any idea.  No.
23      Q.  If I represent to you or suggest to
24  you, sir, that the evidence and the testimony
25  and the facts will show that Zito did not have

338

1  a means to receive voicemail on the morning of
2  August 27th, do you have any information to
3  disagree with that?
4      A.  No, I don't have any.
5      Q.  Do you have any information, sir, to
6  corroborate Mr. Busch 's claim that he left
7  message with Zito in the morning of
8  August 27th?
9      A.  No, I don't have any information.
10      Q.  And this may be self-evident, but
11  would you agree, sir, that if Zito did not
12  receive a voicemail message or a message from
13  Mr. Busch that morning that Zito would not have
14  known that the barge was ready to be picked up?
15      A.  The only information on this subject I
16  have is whatever I read from Busch.
17      Q.  So, and my question is, assuming that
18  they did not receive or do not have the means
19  to receive a voicemail message, you would agree
20  that they would not have know that the barge
21  was ready to be picked up.
22      A.  Correct.
23      Q.  Are you aware of any information that
24  Lafarge had a reputation in the industry that
25  it could not adequately secure or maintain

339

1  barges in advance of an approaching hurricane
2  or storm?
3      A.  I don't recall reading anything in
4  this regard.
5      Q.  Are you aware, sir, of any facts to
6  suggest that Zito had any reason to believe
7  that the barge would not be adequately cared
8  for or secured while at Lafarge 's facility
9  prior to and during the storm?
10          MR. GILBERT:
11              Objection to the extent it calls
12          for him to speculate.
13      A.  I don't recall reading anything in
14  this regard.
15  EXAMINATION BY MR. EMORY:
16      Q.  Did you undertake any investigation to
17  determine the length of delays that would be
18  expected for vessels trying to use the lock
19  between the canal and river?
20      A.  I remember reading somewhere or
21  hearing somebody say somewhere about the delays
22  regarding the locks.
23      Q.  So you're aware there were certainly
24  delays that day, or at that time.
25      A.  This is a normal everyday situation,

340

1  there are delays on the lock for whatever
2  reason.
3      Q.  Okay.
4      A.  But I don't recall the details of
5  delays of this case.
6      Q.  And you didn't look into the fact to
7  determine what the delays would have been
8  around the time period.
9      A.  No, I didn't investigate this.
10      Q.  Going back the Page 71, in particular
11  your Opinion No. 3 -- I'll let you go ahead and
12  get to that page -- that is the opinion where
13  you're referencing Zito ignoring the danger
14  involved in delivering the barges prior to the
15  storm.
16      A.  Yes.
17      Q.  Under the basis, you identify public
18  announcements regarding strength and direction
19  of the hurricane prior to the time Zito
20  delivered barges to Lafarge.  Can you tell me
21  specifically what public announcements Zito had
22  that in your opinion caused them to ignore the
23  danger involved with delivering barges?
24      A.  Yes.  Newspapers, television, radio,
25  um -- family communications.  Everyone was

341

1   scared and everybody was aware that something
2   was going wrong.  My family from New Orleans
3   called me many times.  So Zito, like anybody
4   else in the business related to the weather,
5   knew that something bad was about to happen or
6   appears that something bad could be happening.
7       Q.   Were you aware, sir, that -- first
8   off, that Lafarge called Zito on Wednesday,
9   August 24th, to request the delivery of two
10  barges, the IHNC 4727 and the 4745 on an
11  expedited basis once those barges arrived at
12  Zito's facility?
13      A.   I believe I read somewhere, yes.
14      Q.   Now, at that time, sir, in your
15  opinion was there any problem or concern in
16  delivering the barges at that time, on
17  August 24th?
18      A.   No, at that time evidently was okay.
19      Q.   Okay.  On August 25th, are you aware
20  that when Zito -- the CONNIE Z, the Zito boat,
21  departed Zito 's fleet with the barges on
22  Thursday, August 25th, the storm's center was
23  near the southern tip of Florida and had
24  maximum sustained winds of 75 miles per hour
25  and a projected path landfall east of

342

1   Pensacola?  Were you aware of that?
2       A.   Vaguely.  I didn't elaborating in the
3   meteorologic situation.
4       Q.   And would you agree, sir, that at
5   least at that point, based on that information,
6   there was no problem at least in your mind in
7   terms of delivering the barge based one that
8   information?
9       A.   Not quite.  If I will be at the time
10  the manager, I will have, um -- not really stop
11  the request, but I will have emphasized with
12  the opposing manager, that means Lafarge
13  manager, that are you sure you want to do that,
14  don't you want to wait another week or days or
15  whatever?
16         So in my opinion, Zito should have
17  done a little something to express concern
18  before delivering the barges.
19      Q.   And that's even based on the call that
20  they received right before that where they had
21  been specifically told by Lafarge, get it here
22  as soon as possible.
23      A.   It could have been during this call.
24  when they received this call saying deliver the
25  two loaded barges as soon as possible, I would

343

have said, Mr. So-and-so, are you sure you want
to receive these barges under the meteorologic
circumstances that may be difficult later on to
take care of those barges?
    Q.   So when the storm at that point is not
even projected to make landfall in the New
Orleans area, but is in fact maximum sustained
winds of 75 miles per hour with a landfall east
of Pensacola, it's your testimony that you
would expect an operator delivering a barge in
the New Orleans area to contact the person
requesting the barge and have a discussion or
dialogue with them concerning the prudence of
delivering that barge.
    A.   The key is a dialogue.  In the same
fashion that at the same time people were
buying generators to keep their electricity at
home.  It's the same type of concern.  So I
think Zito should have refreshed the memory of
the people that they were asking to do
something, well, are you sure you want to do
that?
    Q.   Are you aware of Zito having any
reason to believe that Lafarge's personnel were
not aware of the storm that at least at that

344

time was projected to make landfall east of
Pensacola?
    A.   No.  But Zito should have realized
that Lafarge people were not prudent.  It was
lack of prudency.
    Q.   Okay.  And I want to discuss that.
Because a minute ago, you were told me you were
not aware of anything that would lead you to
believe that Zito would have known that Lafarge
would not have properly cared for the barge
prior to the storm.  Now you just told me Zito
should have known that Lafarge was not prudent.
    A.   Well, should realize when they
received this call to deliver loaded barges
immediately, in my opinion Zito should have
discussed -- develop a exchange of ideas,
discussed and saying, are you sure that at this
time you want to deliver the barges?  Why don't
you wait until we know for sure what the
weather will do.
       (Off the record.)
       MR. GILBERT:
          Actually, I'll go on the record.
       Brian Gilbert, counsel for plaintiffs.
       We're not going to offer any opinion

345

1    testimony from Mr. Pazos that Zito was
2    negligent or at fault connected with
3    the delivery of the barge on the date
4    that it was delivered.
5  EXAMINATION BY MR. EMORY:
6    Q.   With that being said, we'll move on
7  from Opinion 3 and we'll now go to -- actually,
8  we've already discussed, at least in part,
9  Opinion 4.
10    Mr. Pazos, in response to some of the
11  questions from Mr. Walker a little bit earlier,
12  you were identifying the factors that were
13  available to Mr. Busch concerning what you
14  thought would have given him a reason to need
15  to consider either ballasting the barge or
16  removing the barge from the facility before the
17  storm's arrival.  And I wrote down the four
18  that you had identified.  One was the
19  approaching hurricane; number two was the fact
20  that the barge was empty; number three was the
21  fact that you had a high freeboard on the
22  barge; and number four was the mooring
23  configuration in general.
24    Do you recall that testimony?
25    A.   Yes.

346

1    Q.   With the exception of the fact that
2  the hurricane was approaching, Zito would not
3  have been aware of the fact that the barge was
4  empty; you've already told us that, correct?
5    A.   Yes.
6    Q.   Zito, therefore, would not have been
7  aware of the relative high freeboard; correct?
8    A.   Correct.
9    Q.   And also you've already told us Zito
10  would not have been aware of the mooring
11  configuration, at least after the barge was
12  brought from the facility and the Zito boat
13  left.
14    A.   Correct.
15    Q.   You've told us that you had a chance
16  to at least review portions of Mr. Green 's
17  recent deposition testimony.  Do you recall
18  reading any portions of his testimony
19  concerning Zito 's involvement?
20    A.   Not quite.  Like I say, I glanced
21  briefly and I still haven't finished, so.
22    Q.   Well, just based on what you reviewed,
23  did you see anything in his deposition, in his
24  testimony that he said relative to that you
25  disagree with?

347

1    A.   I don't recall off the top of my head.
2  It's just review many pages quickly.  But don't
3  recall.
4    Q.   And getting back just to -- this kind
5  of disjointed, but going backwards to your
6  overall experience, is it true, sir, that
7  you've never written or published any articles
8  regarding operating a barge fleeting facility?
9    A.   Correct.  I did not write any
10  articles.
11    Q.   And the same thing, you haven't
12  published or written any articles regarding the
13  management of a barge fleeting facility.
14    A.   Correct.
15    Q.   On Page 31 of your report, if you can
16  flip back to that for me --
17    A.   Yes.
18    Q.   -- just a quick question:  The first
19  non indented paragraph sentence on the top of
20  the page, you refer to Zito as an agent for
21  Ingram.  Is that your terminology, or is that
22  something that someone else suggested to you?
23    A.   You're talking about Paragraph No. 2.
24    Q.   Where it says Zito as agent for
25  Ingram.  You see that?

348

1    A.   Well, at the time I wrote this, it was
2  my understanding that Ingram had some type of
3  contractual agreement with Zito, and Zito being
4  an agent from Ingram barges.
5    Q.   You said that was at the time.  Is
6  that still your opinion or is that no longer
7  your opinion?
8    A.   I never research this specific item in
9  detail except when I wrote this because I read
10  it somewhere and I left it in.
11    Q.   Is it a fair statement, sir, that you
12  do not intend to provide any opinions that Zito
13  was an agent for Ingram?
14    A.   Yes.  I cannot provide an opinion
15  except if I ask to research where I obtained
16  this information.  But I know if I wrote it
17  it's because I got this impression from some
18  document.
19    MR. GILBERT:
20        The plaintiff is not going to
21      rely on any of their experts named to
22      date to render any legal conclusion or
23      opinion as to any agency relationship,
24      not in a legal sense.
25    MR. EMORY:

349

1      That's all that I have.
2      MR. GILBERT:
3          All right.  I've got just little
4   bit of rebuttal that I want to do.
5          Does anybody want to break before
6   we do this?
7      MR. WALKER:
8          What is a little bit?
9      (Off the record.)
10  EXAMINATION BY MR. GILBERT:
11     Q.  Okay.  Mr. Pazos, you know me.  I'm
12  Brian Gilbert.  I represent the plaintiffs in
13  this case.
14         You do know, don't you, who it is --
15  which party it is that you're hired by in this
16  case, correct?
17     A.  Yes.
18     Q.  Okay.  What party?
19     A.  Um -- I think the percent people that
20  have their houses flooded in the, um -- area
21  where there are two breaches in the levee.
22     Q.  Have you been asked by any of the
23  other attorneys that have examined you during
24  this deposition -- have you been asked in your
25  estimation to testify in any way that

350

1   contradicts what you reported?
2      MR. RAFFMAN:
3          Objection form.
4      A.  Um -- maybe you can repeat your
5   question, please?
6   EXAMINATION BY MR. GILBERT:
7      Q.  Repeat it or rephrase it?
8      A.  Either way.
9      Q.  Okay.
10     A.  I trying to figure out what you want
11  me --
12     Q.  Okay.  Have been asked during your
13  deposition -- before this point in time, have
14  you been asked -- as you understood the
15  questions, have you been asked any questions
16  that seek for you to alter any of the opinions
17  that you expressed in your report?
18     A.  Well, um -- you know, being many
19  questions, and some of the questions in my
20  opinion were not properly, um -- defined to
21  allow me to answer -- give a clear answer, a
22  yes or no, most of the questions required
23  further clarification, so I still not too clear
24  whether you refer to a specific question.
25     Q.  Okay.  That answer is sufficient.  I

351

understand your answer.
     What qualifies you to render any sort
of opinion about mooring barges?
     A.  Well, I been dealing with barges and
mooring practically all my entire professional
life, I been owning and operating commercial
boats, I been designing barges, I been
specifying anchoring and mooring systems, so I
believe I have just about the highest level of
expertise that any other professional in my
field will have regarding barges and mooring.
     Q.  In your experience as an owner and
principal of Ocean Oil Experts, Inc., do you
believe that it is significant to your
qualification that you have not published an
article about mooring of barges?
     A.  No.  I could start writing an article
today and publish it in the next two days,
because I have enough experience, but I only
been trying to write articles in the specific
field that is of interest to the general
professionals in my field, and I didn't have
any specific reason to write an editorial or an
article about barges and mooring as one of the
many parts of the professional field.

352

     Q.  What is the significance of having
soft mooring lines in a horizontal
configuration in terms of mooring?
     A.  The significance or the recommendation
of having soft mooring lines in the athwartship
direction of the vessel and as horizontal as
possible is to prevent the barge from swinging
away from the mooring dock.
     Q.  What is the significance of mooring
barges to one another with similar freeboard
height?
     A.  The important thing is to keep the
lines horizontal because most of the forces
that the barges are subject are fairly
horizontal forces, so you want the reaction or
the restraint to the motion to be taken by
horizontal restraining items which are the
mooring lines.
     (Brief interruption.)
EXAMINATION BY MR. GILBERT:
     Q.  Okay.  Mr. Pazos, you've conceded
several things in this case -- I mean in this
deposition so far, and that would include that
you had not been to the Lafarge terminal, that
you have not tested the tensile strength of the

36 (Pages 349 to 352)

353

1   ropes used, that you're not certain which ropes
2   were used other than the information that
3   you've read from various sources, Mr. Busch,
4   Mr. Smith, Lafarge 's experts.
5        All that aside, are you able with what
6   you do know to determine what mooring strength
7   would be needed to hold the 4727 in its berth
8   during the storm?
9        A.   Yes.
10       Q.   What do you need to know in order to
11   figure that out?
12       A.   You ask me if I should me able to tell
13   me what is needed need to, um -- develop a
14   proper mooring of the barge, and I say yes.
15       Is that the question?
16       Q.   Okay.  If you know the dimensions and
17   weight of 4727 and you know what it is, how
18   much freeboard height there is, can you from
19   that know how much tensile strength you need to
20   keep that barge against the dock?
21       A.   Yes.
22       Q.   Or keep it against whatever it's
23   moored to.
24       MR. WALKER:
25            Objection.  Insufficient

354

1            hypothetical.
2        A.   Yes.
3   EXAMINATION BY MR. GILBERT:
4        Q.   Was that a sufficient hypothetical
5   that I just asked you?
6        A.   Well, of course I have to decide the
7   conditions that I expect the barge to be
8   subject to.  But yes, this is a straight
9   engineering calculation to develop what the
10   strength of the mooring system will be required
11   to sustain in specific conditions.
12       Q.   So you don't need to know about the
13   dock, correct?  You don't need to know --
14   strike that.  I don't want to ask a compound
15   go.
16       MR. RAFFMAN:
17            I'll object.  Go ahead.
18       MR. GILBERT:
19            Thank you.
20   EXAMINATION BY MR. GILBERT:
21       Q.   So if you know the dimensions and
22   weight of the barge and --
23       Well, strike that.  You've already
24   answered the question.
25       Okay, you've offered some testimony

355

1   about the phrase doubling up line.  Imagine
2   that it is Saturday, August 27th, 2005, at the
3   Lafarge terminal, and the 4727 is there along
4   with all the other barges that are there, and
5   imagine that the only line available is
6   two-inch blue polypropylene braided line.
7        If you're going to double up, what
8   should you do?
9        A.   The key I think is double up both ends
10   with lines that were reasonable -- in
11   reasonable condition.  So you could have
12   doubled up two 2-inch lines to connect to the
13   other barge, but in addition you needed to
14   secure the barge to the dock by wire cable.
15       Q.   Let me ask the question again.  If all
16   you have is a spool of 2-inch blue
17   polypropylene line, if that's all you have to
18   work with, how do you double up?
19       A.   Number one, replace the old, worn out
20   lines.  Then you double or triple mostly at the
21   ends, and if the cleats are not of a size that
22   allow you to properly rig it, you use
23   additional cleats, primarily looking at the
24   lines to be in the athwartship direction.
25       Q.   So in that instance, what does

356

1   doubling up mean?
2        A.   It means doubling the strength of the
3   reasonable common lines at each end
4   approximately equally.
5        Q.   And how do you double the strength
6   when all you've got is two-inch line?  That's
7   all you've got.
8        A.   By replacing the old, worn out lines
9   and putting at least two lines at each end of
10   new line.
11       Q.   When you say two lines, would that be
12   the equivalent of saying two parts of line?
13       A.   Yes.
14       MR. RAFFMAN:
15            Objection.
16       A.   Correct.  Yes.
17       MR. RAFFMAN:
18            Object to the form of the
19            question.
20   EXAMINATION BY MR. GILBERT:
21       Q.   In your investigation, did you find
22   any evidence of any other objects -- besides
23   4727, any other objects between the Florida
24   bridge and the Claiborne bridge that could have
25   caused damage to the floodwall about which

357

1   you've rendered an opinion?
2        MR. RAFFMAN:
3            Objection.
4        A.   No, I haven't seen anything on this
5   specific subject.
6   EXAMINATION BY MR. GILBERT:
7        Q.   Do you have an opinion as to how much
8   force it would take to cause the effects that
9   you observed on the floodwall that you
10  attribute to the barge?
11       MR. RAFFMAN:
12           Objection.
13       A.   Yes.  And I already make calculations
14  and I'll attach to my report regarding forces
15  developed by wind on the barge that can be
16  transmitted to the seawall.
17  EXAMINATION BY MR. GILBERT:
18       Q.   Do you know of any other object in the
19  Industrial Canal between the Florida bridge and
20  the Claiborne bridge during Katrina that could
21  have transmitted that degree of force?
22       A.   No.  I haven't read any evidence in
23  the documentation I reviewed for a period of
24  three years.
25       Q.   Do you have in your possession, or do

358

1   you have anything that you can demonstrate --
2   any photographic evidence that demonstrates any
3   distinction between the failure mechanisms on
4   the Industrial Canal versus the London Avenue
5   Canal?
6        A.   Yes, absolutely.
7        Q.   Could you bring those out.
8        A.   It is partially part of my report
9   showing that hydrostatic pressure alone result
10  in a completely different type of failure of
11  the concrete panels.
12       Q.   Well, let's assume that the judge is
13  going to watch this video.  Would you
14  explain -- would you explain, using your photos
15  that you're looking for, would you explain how
16  you distinguish the failure mechanisms in these
17  two different locations.
18       A.   Yes.  The weakest portion of the U.S.
19  Army Corps of Engineers designed seawalls are
20  the elastomeric materials connecting two
21  concrete panels.  If the sheet pile was
22  properly installed, that means with the top
23  about the same level --
24       Q.   Let me just be clear.  What location
25  are you talking about right now?

359

1        A.   Any location that have the "I" seawall
2   design developed by the U.S. Army Corps of
3   Engineers, which is practically almost all the
4   locations of the breaches during Katrina.
5        Q.   All right.  I'm actually asking you a
6   much simpler question.  Let me try this a
7   different way.
8            Okay.  I'm going to show you photos on
9   the page of your report bearing Group 4, Page 4
10  in the upper right-hand corner where the
11  notation says, typical failure due to
12  hydrostatic pressure only.  What are the
13  distinguishing features in these two photos
14  that lead you to say that?
15       A.   Okay.  There are no cracks in the
16  overall concrete panel, and the main failure is
17  at the location of the joint between two
18  panels, which is a combination of the
19  elastomeric material and the lips grabbing the
20  material.
21       Q.   And I'm going to ask you the same as
22  to the photos on Page -- in the upper
23  right-hand corner called Group 4, Page 5.
24       A.   Exactly the same explanation, even
25  it's clear in the picture that even the panels

360

1   have barely tilted or are almost vertical,
2   still the elastomeric joint fail, and it's
3   clear in both pictures.  So that the weakest
4   point of the U.S. Army Corps of Engineers
5   design of the I-wall is the elastomeric system
6   regarding hydrostatic pressure when outside
7   object that's not contact or strike the
8   seawall.
9        Q.   Okay.  Let me refer you to a photo at
10  the top of the page called Group 2, Page 3.
11  Could you identify what that location is?
12       A.   Yes.  This location appears to be
13  about the southernmost end of the south breach.
14       Q.   Okay.  And to the layman's eye -- look
15  at this photo which is the top of Group 2,
16  Page 3, and compare it with any of the photos
17  on Group 4, Page 4, Group 4, Page 5, and see
18  that there is a difference in that the concrete
19  is all mashed up --
20       A.   Absolutely.
21       Q.   -- in this Group 2, Page 3 photo,
22  where the monoliths appear to be not mashed up
23  in Group 4, Page 5.
24            Is that a function of what you're
25  talking about in terms of the elastomeric

361

1  features.
2      A.  Yes.  Absolutely.  It very, very clear
3  that the concrete have been destroy, while in
4  the other canals with the elastomeric joint
5  fail only, and absolutely only the elastomeric
6  connection and the lips holding the elastomeric
7  connection is the only item that fail.
8      Q.  That's all the questions I have.
9          MR. RAFFMAN:
10             All right.  I have some follow-up
11         questions.
12  EXAMINATION BY MR. RAFFMAN:
13      Q.  Keeping your photo out, Group 2,
14  Page 3, it's right in front of you.
15      A.  It's attachment number --
16      Q.  Group 2, Page 3.
17      A.  Of what attachment?
18      Q.  What you were just looking at.
19         MR. GILBERT:
20             Hang on.  I'm getting it.  Okay.
21  EXAMINATION BY MR. RAFFMAN:
22      Q.  This is place where you say the
23  concrete is all mashed up.
24      A.  Yes.
25      Q.  Top photo.  And these are the bent

362

1  rebars there, that you see?
2      A.  Yeah.  I see the rebars.
3      Q.  And this is where the barge entered
4  the neighborhood, right?
5      A.  Approximately.
6      Q.  All right.  Next question:  You've
7  just described for Mr. Gilbert your opinions
8  about the differences in the floodwall failures
9  at the London Avenue versus the Inner Harbor
10  Navigation Canal, right?
11      A.  Yes.
12      Q.  And is this the first time in any of
13  the many cases that you've testified about that
14  you've been asked to diagnose the differences
15  in the causes of the failure of a floodwall
16  structure?
17      A.  This is the first time I did with
18  levees in respect to failures of levees and
19  floodwalls.
20      Q.  And you've testified that in your
21  opinion the floodwall is going to fail at the
22  weakest place, generally speaking.
23      A.  Depending on what is the force
24  originating the failure.
25      Q.  In the London Avenue Canal you've

363

1  testified that the floodwall failed at the
2  weakest place, right?
3      A.  Um -- it failed in several places.  So
4  the word weakest place is not specific enough.
5      Q.  No, but you used the words weakest
6  point is the elastomeric joint or the water
7  stop.  Didn't you use that?
8      A.  Oh.  All right.  The elastomeric joint
9  is the weakest spot for hydrostatic pressure of
10  the I-wall design, yes.
11      Q.  Right.  And in the London Avenue
12  Canal, the floodwall failed in the water stops
13  due to hydrostatic pressure, right?
14      A.  Yes.
15      Q.  And it failed at the weakest point
16  because the hydrostatic pressure caused it to
17  fail at the weakest point, right?
18      A.  Yes, but we have to -- there's more to
19  it.  We already discuss that there are improper
20  installation of sheet pile, which means that
21  there are some locations that not only the
22  elastomeric joint is the weakest but if the
23  sheet pile was improperly placed it may be
24  additionally weakest point developing a hinge
25  which may develop into cracks.

364

1      So we have several ideas of weakness;
2  one is weakness for design, which is the
3  elastomeric, and weakness due to installation
4  which was improper driving of the sheet pile.
5      Q.  And what you expect is that when the
6  failure happens in the London Avenue Canal it
7  happens at a place that is weakened because of
8  the water stops and also potentially because of
9  the improper construction.
10      A.  Okay.  Both, whatever is the weakest.
11  We have two differing ideas of weakness.  If
12  one is much weaker than the other, it will fail
13  due to the weakest reason.
14      Q.  Right.  Now, Mr. Gilbert better asked
15  you about whether there were any other objects
16  in the canal apart from the barge and whether
17  any other objects could have put force on the
18  wall.  My question to you, Mr. Pazos, is are
19  you aware of any scientists who have concluded
20  that the north and south breaches happened
21  without the force of an object contacting or
22  impacting the wall?
23      A.  Since I read many reports and many
24  documents, at certain times I read expressions
25  talking about the overtopping, and some people

365

1  elaborate on the overtopping more than others,
2  and some people make claim, I don't remember
3  the exact words, that the overtopping created,
4  um -- reduction in the dry side of the -- of
5  the seawall developing to failures.  So yes,
6  there are some other loose opinions, but I
7  don't remember the complete wording of these
8  opinions.
9     Q.  Now, when you say they're loose
10 opinions, what did you mean by using that word,
11 Mr. Pazos?
12    A.  By using this word is that there are
13 many reports, some by qualified and some not so
14 qualified people that desire to put things in
15 writing and publicize it.  So I don't call it
16 strong opinions unless I understand that the
17 person that wrote it is the proper person to
18 write that certain statement.
19    Q.  I see.  Have you read the IPET report
20 regarding the causes of the failures?
21    A.  Yes.
22    Q.  And do you classify the IPET authors
23 as a strong opinion with people with strong
24 credentials?
25       MR. GILBERT:

366

1          We're going beyond the scope now.
2       MR. RAFFMAN:
3          Give me a couple more and I'll
4  stop.
5     A.  The IPET report contains many, many
6  errors.  It's written by very qualified people
7  theoretically, but the interpretation of the
8  facts is different from other people.  So it's
9  very well known that contains many errors.
10 EXAMINATION BY MR. RAFFMAN:
11    Q.  Your view on IPET is good people wrote
12 it, but you don't agree with what it concludes.
13    A.  Well, I don't have anything against
14 the people that wrote it.  They probably are
15 good people.  But some of the opinions or
16 expression I read in sections of the IPET
17 report are totally erroneous, and not only as
18 indicated by me but many other investigators.
19    Q.  What about the ILIT team, do think
20 they were qualified to render the opinions they
21 wrote in their report?
22       MR. GILBERT:
23          Same objection.
24    A.  The same situation; very good people
25 in theory, but there are very different

367

1  expressions that are incorrect according the
2  many other investigators in some areas.
3  Nothing is totally perfect.
4  EXAMINATION BY MR. RAFFMAN:
5     Q.  All right.  Mr. Pazos, you were asked
6  about doubling and tripling, and you made the
7  statement that if the cleats at both ends do
8  not allow for adding more parts or more lines
9  then you should use additional cleats.  Do you
10 remember saying that?
11    A.  Yes.
12    Q.  Have you studied whether the cleats on
13 the ends of the barge ING 4727 would allow for
14 the addition of more lines?
15    A.  I do not have the dimensions of the
16 cleats, so I will not be able to say something
17 definitely without understanding the dimension
18 of the cleats.
19    Q.  All right.  Now Mr. Gilbert begun by
20 asking you about your expertise and
21 qualifications to render opinions on mooring
22 barges, so I have three questions.
23       Have you ever worked at an inland
24 waterway marine barge terminal as a deckhand or
25 a supervisor?

368

1     A.  No.
2     Q.  How many inland waterway barges have
3  you personally tied up?
4     A.  None.
5     Q.  How many times have you personally
6  directed hurricane preparation at an inland
7  marine barge terminal?
8     A.  Never.
9     Q.  That's it.  No more questions.
10       (Concluded.)

369

WITNESS' CERTIFICATE

I, HECTOR V. PAZOS, P.E., do hereby
certify that the foregoing testimony was given
by me, and that the transcription of said
testimony, with corrections and/or changes, if
any, is true and correct as given by me on the
aforementioned date.

_____    _____
DATE SIGNED        HECTOR V. PAZOS, P.E.

_____ Signed with corrections as noted.

_____ Signed with no corrections noted.

DATE TAKEN:  July 21st, 2009

370

REPORTER'S CERTIFICATE

I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
Certified Court Reporter in and for the State
of Louisiana, do hereby certify that the
aforementioned witness, after having been first
duly sworn by me to testify to the truth, did
testify as hereinabove set forth;

That said deposition was taken by me
in computer shorthand and thereafter
transcribed under my supervision, and is a true
and correct transcription to the best of my
ability and understanding.

I further certify that I am not of
counsel, nor related to counsel or the parties
hereto, and am in no way interested in the
result of said cause.

_____
JOSEPH A. FAIRBANKS, JR., CCR, RPR
CERTIFIED COURT REPORTER #75005

HECTOR PAZOS (VOL II)                                                    7/21/2009

Page 1

## A

**ability** 233:5 284:3
370:12
**able** 250:16 257:16
266:17 270:3 353:5,12
367:16
**abrasion** 296:16
**abruptly** 233:5
**absolutely** 224:12 261:3
292:21 358:6 360:20
361:2,5
**absorbing** 312:18
**accident** 324:17
**accommodate** 253:19
**accomplished** 293:11
**accordion** 219:24
**accumulated** 247:14
256:18
**act** 221:16 288:18
**acted** 285:3 306:13
**acting** 267:14 290:1
**action** 212:4 262:1,1
281:8 284:5 337:3
**actions** 284:1,4
**active** 325:20
**activities** 254:2 263:15
277:15 327:6
**activity** 265:11,12,15
**actual** 264:16 327:25
**added** 317:7
**adding** 294:5 367:8
**addition** 308:6 355:13
367:14
**additional** 235:20 275:24
293:12 308:12 355:23
367:9
**additionally** 326:11
363:24
**addressed** 254:11
**adequately** 338:25 339:7
**adjacent** 311:8,9,22
312:2,7,8 318:1,3,5
**administering** 217:24
**advance** 339:1
**aerial** 252:6,12
**affect** 266:20

**aforementioned** 217:4
369:8 370:5
**aft** 285:13 294:23 300:1
301:25 302:9,22 313:4
**agency** 348:23
**agent** 347:20,24 348:4,13
**ago** 272:24,25 295:19
310:14 329:25 330:22
344:7
**agree** 223:18 245:8 249:9
250:22 255:24 256:3
258:24 259:17,17 268:1
273:8,24 283:4 286:23
304:3 308:8 317:5
322:9 335:8 336:10
337:4 338:11,19 342:4
366:12
**AGREED** 217:2
**agreement** 229:25
322:18 348:3
**aground** 247:12
**ahead** 234:1 256:17
269:20,22 340:11
354:17
**ALDOCK** 213:20
**alleged** 333:4,10
**allegedly** 333:17,18
**allided** 313:17
**allow** 295:2 350:21
355:22 367:8,13
**allowing** 222:19
**alongside** 327:13
**alter** 350:16
**alternate** 275:17
**AMERICA** 213:9
**AMERICAN** 214:7
**amidship** 293:5
**amount** 248:21 258:9
289:24 294:11 303:9
**analyses** 254:23
**analysis** 266:1,4,20
267:23 269:3
**analyze** 253:15
**anchored** 234:21
**anchoring** 276:14 351:8
**anchorings** 278:1

**anchors** 264:19
**and/or** 284:12 369:6
**angle** 224:8,10 225:12,17
226:10 232:5 301:7,15
301:19,22,23,25 302:5
302:9,12,17,19,21
303:2 311:25 317:19
318:7
**angled** 312:16
**announcements** 340:18
340:21
**answer** 217:13 234:18,18
242:25 245:12 246:3,17
247:5 260:18 262:24
263:2 266:18 267:14
269:20 270:18 271:3,10
282:21,25 285:18 286:3
287:21 288:7 289:6,22
289:23 290:8,12 299:10
300:16 316:20,22
333:24 334:21 350:21
350:21,25 351:1
**answered** 337:13 354:24
**answering** 242:25
284:22
**answers** 259:24 291:23
303:6
**anybody** 226:21 257:11
335:11 341:3 349:5
**anyway** 234:11
**apart** 238:25 364:16
**apologize** 244:23 246:1
253:10 267:1
**apparent** 331:22
**apparently** 269:17 279:3
327:22 329:21 330:7
331:10,19,25 332:9,22
**appear** 246:20 360:22
**APPEARANCES** 213:1
**appears** 224:14 226:23
237:25 245:5 303:6,7
341:6 360:12
**applicability** 258:1
**applicable** 274:9
**applied** 235:18 312:19
**applies** 302:6,17

**apply** 259:5 270:10
308:2
**appreciate** 242:25 321:7
**approaching** 322:21
339:1 345:19 346:2
**appropriate** 308:9,13
317:6,9 320:19
**approval** 322:18
**Approximate** 322:23,24
**approximately** 219:19
322:16 356:4 362:5
**architect** 325:12
**architecture** 259:25
260:14
**area** 220:23 221:1 249:5
250:11 257:19 259:16
259:18 263:23 275:23
276:6,17,23 277:3,4,15
282:1 286:19 288:5
301:7,22 343:7,11
349:20
**areas** 223:17 227:24
228:2 234:25 257:20
259:17 276:18 367:2
**Army** 234:24 358:19
359:2 360:4
**arrangement** 267:18,24
268:11,22 269:2,19
271:14
**arrangements** 269:7
**arrival** 345:17
**arrived** 341:11
**arrow** 319:8 320:18,24
**arrows** 322:19,19
**article** 351:16,17,24
**articles** 347:7,10,12
351:20
**articulate** 244:24
**aside** 353:5
**asked** 253:14 255:15,18
256:6,8 278:23 279:15
323:22,23,25 349:22,24
350:12,14,15 354:5
362:14 364:14 367:5
**asking** 257:25 269:15
270:5,6 281:16,17,20

282:17 288:23 289:12
299:17 303:24 315:4
321:14 335:1 343:20
359:5 367:20
**aspect** 261:25
**aspects** 260:2
**assist** 257:16
**assistant** 264:20 329:21
**assume** 287:23 288:8
290:9 307:17 358:12
**assuming** 307:18 335:5
338:17
**athwartship** 313:5 352:5
355:24
**attach** 238:14 268:4,9
271:13 357:14
**attached** 218:13,25
237:7 238:22 253:2
271:16 290:1 297:2
301:12 308:5 310:18
323:4
**attaching** 223:11
**attachment** 320:9 361:15
361:17
**attempt** 273:2 274:10
**attention** 313:24
**attitude** 224:10
**attorneys** 349:23
**attribute** 357:10
**August** 283:13,19 290:11
316:16 336:6,13,21
337:19 338:2,8 341:9
341:17,19,22 355:2
**authors** 365:22
**available** 285:1 345:13
355:5
**Avenue** 213:22 218:2
358:4 362:9,25 363:11
364:6
**average** 226:7
**avoid** 294:10,12
**aware** 257:4 285:8,9,10
285:12 299:25 327:4
328:9,9,13 329:2,5
333:11,12 336:4 337:17
338:23 339:5,23 341:1

341:7,19 342:1 343:23
343:25 344:8 346:3,7
346:10 364:19
**a.m** 290:11

---
## B
**B** 216:10 298:13
**back** 219:24 226:18
229:2 236:16 249:11
282:14,19 316:21 324:3
328:14 329:18 330:1
337:19 340:10 347:4,16
**background** 270:2
**backside** 240:23
**backwards** 323:12 347:5
**bad** 317:7 341:5,6
**ball** 239:9
**ballast** 276:8 284:9
285:3,22 287:4
**ballasted** 274:25 275:6,9
275:14,15 276:4 283:14
283:22 286:7
**ballasting** 275:21,22
283:7 287:6,7 345:15
**band** 233:9,10 239:13,18
239:20 242:1,22
**barely** 218:15 360:1
**barge** 213:2 220:14
222:1,5,10,17,19 223:6
223:15,17,20 224:1,3,4
224:4,6,10,11,13,14,25
225:4,7,8,10,15,17,18
226:1 227:3,3,4,5,7,10
227:13,24 228:5,5,9,15
229:18,22 230:7,9,12
230:15,21,24 231:1,5,8
231:8,14,19,20,24,25
232:2,10,14,14,15,18
232:25 233:13 234:10
235:16 240:20 241:5,7
241:15,16 242:14,19
243:3,15,24 244:5,6
246:6,10,11,12,15,18
246:22 247:8,12,15,16
249:10,13,15,21,25
250:4,10,11,17,19
251:8 252:2,3,11,14

256:11 273:5 274:13
275:5,13,14,18,25
276:2,4,7 277:3 280:23
281:4,7,9 282:4,10
283:7,8,14,21 284:10
284:18,19 285:3,4,10
285:23 286:6 287:4,7,9
288:17,18 290:1,7
293:5,8,21 294:9,10,13
296:19,22 297:4,6,18
297:20 298:7,12,13
301:22 303:8 305:22
306:9 308:25,25 309:11
309:12,13 310:3,6,10
310:11,19 311:5 312:20
312:23,24 313:4,5
314:18 317:10,25
318:16,16 319:19,25
320:11,23 321:4,6,9,11
321:15,20,22 324:12,14
324:20 325:2,5 327:2,6
327:14,17 328:5 329:10
329:12,15 332:11
333:12 335:9,19 336:20
336:25 338:14,20 339:7
342:7 343:10,12,14
344:10 345:3,15,16,20
345:22 346:3,11 347:8
347:13 352:7 353:14,20
354:7,22 355:13,14
357:10,15 362:3 364:16
367:13,24 368:7
**barges** 212:6 261:14
278:21,24 287:23,24
288:11,16 296:23 298:4
298:18,25 299:8,19
300:23 302:1 307:19
308:10,13,18,24 309:4
311:16,21 313:11,16,17
314:7,21 315:3,15
316:3,15 317:19 324:9
327:10,11,12,21 328:11
339:1 340:14,20,23
341:10,11,16,21 342:18
342:25 343:2,4 344:14
344:18 348:4 351:3,4,7

351:11,16,24 352:10,14
355:4 367:22 368:2
**BARNETT** 214:8
**Baronne** 213:5
**Barry** 326:2
**based** 247:1 248:8,23
254:24 259:14 280:10
294:15 299:18 304:4
333:15 334:12 342:5,7
342:19 346:22
**baseline** 224:6
**basic** 280:4
**basically** 331:7
**basing** 331:19
**basis** 258:4 262:16
328:17 332:10 333:11
340:17 341:11
**BB** 271:24 272:5
**bearing** 359:9
**begun** 367:19
**belief** 258:5,5
**believe** 243:10 246:14
258:3 259:21 262:2,4
267:18 275:4 278:11
281:5 287:14 302:15
305:21 317:1,2 324:4
330:17 332:13 336:2
339:6 341:13 343:24
344:9 351:9,14
**bend** 224:4 230:9,23
232:7,25 235:17,17
**bending** 224:9 232:1
**beneficial** 308:11 309:2
315:20 317:3
**Benoit** 212:12
**bent** 223:24 232:7,9
361:25
**berth** 353:7
**best** 254:16 294:7 318:18
319:20 320:5 370:11
**better** 318:25 319:14
320:2 321:13 364:14
**beyond** 255:2 325:19
366:1
**biggest** 222:24
**bilge** 224:6 230:3 318:11

318:21,23 319:1,5,12
319:21,23 320:6,13,19
320:22 321:2,3,5,11,19
322:3,10,15,22
**bilges** 320:2 321:16,24
322:6
**Bill** 323:10
**bit** 253:11 274:3 323:20
327:16,25 345:11 349:4
349:8
**BLAND** 214:17
**blocks** 246:13,16,18
**blue** 291:2,4 355:6,16
**board** 218:19,22 219:14
248:20
**boat** 252:22,25 276:20
287:10 324:11 325:4
341:20 346:12
**boats** 263:4 351:7
**bodies** 259:5
**books** 223:5
**bottom** 223:25 224:2
225:15,16 226:16
228:15 230:7 232:15
234:7,21 235:10 236:23
239:4 276:8 305:22,25
320:23 321:4,6,24
322:4
**Boudreaux** 326:2,18
**Boutte** 212:8
**bow** 219:19 221:12,14
224:15 228:16,24
229:22,24 230:1,5,14
247:19 248:22 293:13
294:19 319:7 321:22
**BRACKETT** 214:17
**braided** 355:6
**breach** 219:16 221:23
222:10,18 241:9 242:15
243:5,6,11,12,16,23
244:6,16,21,21 245:5
246:7,11 247:19 248:6
248:9,10,12 360:13
**breaches** 212:4 349:21
359:4 364:20
**break** 240:14 241:22

242:17 256:23 257:3
261:14,19 271:1 272:10
274:2 287:18 288:3,10
288:14 290:5 298:24
299:24 300:7 306:10
307:6,9 308:23 314:4
316:4 349:5
**breakage** 297:23
**breaking** 223:9,13 266:9
266:12,22 267:5 269:6
274:3
**breast** 317:20,23,24
318:2
**Brian** 213:3,4 229:8
344:24 349:12
**bridge** 220:4,5 356:24,24
357:19,20
**Brief** 245:25 285:7
335:12 352:19
**briefly** 313:20 346:21
**bring** 358:7
**broke** 235:22,23 237:19
241:25 242:22 295:15
297:3
**broken** 271:18 274:6
296:15 313:16
**brought** 327:18 346:12
**BROWN** 214:8
**building** 266:15
**bullet** 306:4
**bus** 250:20 251:1,4,9
252:6
**Busch** 283:3,12 284:7
285:1,8,10,11 286:13
287:11 305:11,12,15
329:21 330:8,11,16,18
330:20,25 331:3,14,18
332:8,20,22,24,25
333:5,17 335:15,16,25
338:6,13,16 345:13
353:3
**Busch's** 330:12
**business** 265:11,13 341:4
**buying** 343:17

---
**C**
---
**C** 214:19 298:14

**cable** 265:1 306:15,17,18
307:4 308:13,19,23
311:2,4 314:8 315:21
316:23 355:14
**cables** 263:17 264:3,12
266:2 284:15 304:21
305:17 308:10 310:13
**cabling** 314:22 315:10
315:16
**calculate** 266:9,12 313:6
313:8
**calculation** 228:7 354:9
**calculations** 228:11
264:24 357:13
**call** 230:4 254:11 268:8
268:11 270:1 276:5
327:23 330:1 331:10,22
334:16 335:6 342:19,23
342:24 344:14 365:15
**called** 226:13 230:1
333:23 341:3,8 359:23
360:10
**calling** 245:15
**calls** 245:11 255:2 334:7
339:11
**canal** 212:4 219:17 222:5
222:11 225:18 227:16
230:21 247:25 251:14
253:6 284:10 285:4,23
286:8 339:19 357:19
358:4,5 362:10,25
363:12 364:6,16
**canals** 361:4
**capabilities** 337:7,18
**capable** 276:6
**Capt** 278:20 279:24
**captain** 278:16,22 279:2
279:4,9,14
**captains** 261:4,11,15,23
278:13 325:17
**care** 281:21 293:5 343:4
**cared** 339:7 344:10
**case** 263:20 264:16 274:1
275:13 278:8 288:20
295:12 297:21 303:18
324:24 340:5 349:13,16

352:22
**cases** 257:24 258:11
261:14 266:5 324:10,15
325:3 362:13
**catalog** 291:14
**cause** 223:13 297:23
314:4 357:8 370:16
**caused** 219:22 274:2
297:15 306:14,15
340:22 356:25 363:16
**causes** 242:16 362:15
365:20
**causing** 241:3,10
**CCR** 212:24 217:22
370:2,24
**ceased** 235:24
**ceases** 232:15
**cement** 226:22 242:21
**center** 341:22
**Centre** 212:20 213:13
214:11
**certain** 238:23 278:3
279:3 293:20 307:13,14
353:1 364:24 365:18
**certainly** 339:23
**certainty** 307:11
**CERTIFICATE** 369:1
370:1
**certification** 217:9
**Certified** 212:25 217:23
370:3,25
**certify** 369:4 370:4,13
**CFRs** 274:9
**Chaffe** 212:19 213:10
**chain** 309:15 310:18
**chains** 309:7
**chance** 346:15
**changed** 304:6,16
**changes** 369:6
**characteristic** 316:10
**characterization** 245:9
**charge** 264:15 282:3
283:4
**CHARLES** 215:2
**checklist** 304:4 305:9,10
305:17

HECTOR PAZOS (VOL II)                                                          7/21/2009

Page 4

chemical 262:7
chemicals 257:22
chose 256:10,13
circle 219:6 320:17
circumference 219:10
  290:21,23 292:7
circumstance 308:14
circumstances 308:21
  343:3
cited 236:18
Civil 212:4 217:6
Claiborne 356:24 357:20
claim 329:25 338:6 365:2
claimed 246:22
claims 335:17
clarification 253:12
  282:15 288:23 350:23
clarified 309:24
clarify 282:20 303:5
  315:6 327:16
clarity 296:3
classify 365:22
clear 221:7 223:15
  229:25 236:17 268:21
  326:6 332:18 337:12,16
  350:21,23 358:24
  359:25 360:3 361:2
clearly 239:7 279:16
  280:6 284:13 305:3
  320:11 321:18
cleats 300:2,2 311:22
  318:1 355:21,23 367:7
  367:9,12,16,18
close 220:4,5 232:20
  294:10,25 295:3,4
  297:8 311:11 336:15,16
closed 336:5,12,16
closer 221:2 222:17
  251:6 318:25
CLUB 214:7
Coast 257:17,23 258:7
  258:10,12,15,22,25
  259:4
code 217:6 269:18
collapse 221:3
colleague 251:11

column 269:17,18
combination 359:18
combine 228:3
come 227:12
comes 230:20,20 231:19
  231:24 242:15
coming 227:10 283:18
Commander 258:25
comment 269:16,24
  270:4
comments 254:14 255:16
  255:19 256:14 270:20
commercial 261:12
  351:6
common 294:24 308:9
  308:18,20 356:3
communication 337:9,10
communications 340:25
compacted 220:24
company 262:11 265:7
  279:2 323:15
company's 324:11 325:4
compare 360:16
compared 259:7,13
  303:7
comparing 252:16
comparison 315:5
compel 264:11
compelled 281:3 282:10
  283:13,21
compensated 240:5
complete 222:1 365:7
completely 225:7 234:23
  238:19 358:10
completing 280:22
complies 250:1
comply 328:23 329:3,7
compound 354:14
compressed 220:7
compressible 242:7
computer 237:20 370:9
conceded 352:21
concern 341:15 342:17
  343:18
concerned 279:18 280:2
concerning 323:19,24

324:8,11,19 325:4,9
  334:6 343:13 345:13
  346:19
concluded 280:7 364:19
  368:10
concludes 366:12
conclusion 266:21 270:6
  280:10 331:9 348:22
conclusions 254:6
  256:20 269:6 272:8
  300:6
concrete 221:4 223:10,12
  223:14 225:6 235:16
  241:5,8 242:5,20
  243:17,17 358:11,21
  359:16 360:18 361:3,23
condition 236:24 274:12
  274:23 281:7 290:7
  355:11
conditions 261:5 274:10
  274:17 283:24 288:8
  290:10 354:7,11
conduct 265:21
conducted 265:19
configuration 221:6
  248:8 257:1 270:1,1,10
  272:18 300:7 327:11,21
  345:23 346:11 352:3
configurations 269:5
confines 321:21
confirm 243:10
confirmation 246:9
confronted 262:3
confused 274:4
confusion 290:19
connect 355:12
connected 220:13 239:16
  239:22 242:3 290:7
  297:8 300:18,20 345:2
connecting 358:20
connection 296:5 302:23
  302:25 308:6 309:3
  323:2 361:6,7
CONNIE 341:20
consider 345:15
considerations 325:6

considered 277:15 284:8
  315:13
Consolidated 212:6
constant 270:25 295:24
constantly 225:9
construction 263:6 364:9
contact 222:20 223:7,20
  227:8 231:24 232:16
  242:15 244:7,8,9,9
  278:6 327:13 331:15
  332:25 333:4,10,10
  343:11 360:7
contacted 224:5 227:13
  230:2
contacting 243:15
  364:21
contacts 231:21 243:24
contains 366:5,9
contemplation 328:11
content 218:16
context 244:16,19 261:6
  263:18 264:4 273:20,22
contexts 263:11
continue 222:15,19
  335:4
continuing 228:24
continuous 220:2,9
  235:25 242:6
contractual 348:3
contradict 305:15
contradicts 350:1
control 234:3
conversation 239:25
  305:1
convert 255:18
convey 242:2
copy 228:19 238:14
  271:19 320:16,17
corner 300:19,21 310:20
  359:10,23
corners 310:20 322:13
  322:19
Corps 234:24 358:19
  359:2 360:4
correct 221:16,17 229:21
  234:7,22 236:1 237:1

240:10 244:7 260:16,21
275:6 277:11,12 283:5
283:9 286:25 289:10,15
289:20 291:5 293:9
295:16,25 296:21 299:3
300:15,24 303:2 306:16
310:11,23,24 311:2,7
314:5 326:21,23 327:4
327:22 328:3,7,13
329:4,8,14,17 331:10
333:14 335:10 338:22
346:4,7,8,14 347:9,14
349:16 354:13 356:16
369:7 370:11
**corrected** 331:5
**correction** 251:24
**corrections** 369:6,13,15
**correctly** 221:13 222:3
223:24 236:10 238:17
244:19 245:23 285:19
286:4 310:22
**correlate** 266:10,13,22
266:24 273:4
**correspond** 238:3
**corresponds** 238:5
**corroborate** 338:6
**corrosion** 234:14
**counsel** 217:3 344:24
370:14,14
**counting** 303:13
**countries** 258:8
**country** 258:7
**couple** 266:5 272:24
296:10 318:9,17 366:3
**course** 218:15 237:25
248:7 313:9 319:5
326:12 331:23 354:6
**court** 212:1,25 217:23
225:3 238:9 242:2
254:12 257:17 370:3,25
**courts** 257:23
**cover** 252:21,24
**covers** 276:7
**cracked** 234:13
**cracking** 236:5 240:18
**cracks** 245:15,17 359:15

363:25
**crane** 266:16
**create** 226:12 227:2
230:10 234:15 266:15
281:7
**created** 224:3 226:5
240:21 365:3
**creates** 244:10
**creating** 220:16,19
223:11 235:20 243:18
**credentials** 365:24
**crew** 278:13
**criteria** 274:24 277:18
284:7 285:1,21
**critical** 290:15
**criticism** 317:13
**criticize** 283:3 317:16,17
**crossed** 250:4
**crystal** 239:9
**currents** 277:25
**CUSHING** 215:2
**cut** 233:9
**cutting** 296:16
**CV** 287:14

**D**

**D** 216:1,10 301:16
**DAGGETT** 215:3
**daily** 253:18 254:2,15
277:14
**damage** 223:15 235:16
241:5 242:12 243:16
249:5 284:1 356:25
**damaged** 241:7
**damaging** 243:17
**danger** 285:16 324:8,12
340:13,23
**dangerous** 281:7
**DANIEL** 214:2
**data** 227:15
**date** 345:3 348:22 369:8
369:11,25
**dated** 254:22
**day** 253:21 255:22
339:24
**days** 272:25 296:10
330:22 342:14 351:18

**day-to-day** 261:12
**deal** 260:3 261:20 265:8
325:17
**dealing** 258:6 265:7
276:13 325:1 351:4
**decide** 276:16 278:2,7
286:18 354:6
**decided** 284:17,18
**deciding** 263:7 277:15
278:12
**decision** 275:17 328:5,6
**decisions** 285:14
**deck** 275:25 276:1
287:20 288:5
**deckhand** 278:20,23
301:20 367:24
**decks** 288:15 289:24
**deep** 247:9 249:10
**deeper** 221:21 235:3
**deepest** 233:23
**deficiencies** 283:11
**define** 243:19 247:21
290:6
**defined** 350:20
**definitely** 230:3 251:3
296:15 299:14 312:12
317:16 367:17
**definition** 243:13 245:14
245:20 276:9,11
**deflecting** 220:11
**deformation** 223:14,19
319:10
**deformations** 223:22
**deformed** 236:3
**deforming** 236:6 240:18
**degree** 225:13 226:8
241:12 245:2 357:21
**degrees** 225:9,13,14
227:24 228:1 294:12
320:11
**delays** 339:17,21,24
340:1,5,7
**deliver** 342:24 344:14,18
**delivered** 324:21 327:9
327:11,12 340:20 345:4
**delivering** 324:9,12,13

340:14,23 341:16 342:7
342:18 343:10,14
**delivery** 341:9 345:3
**demolish** 242:20
**demonstrate** 358:1
**demonstrates** 358:2
**departed** 341:21
**depend** 250:8 276:15
**dependent** 269:16
**depending** 228:1 248:17
257:19 259:16,18
273:12 307:15 308:21
316:6 362:23
**depends** 267:11 312:11
**depict** 319:20
**depicted** 321:18
**depicts** 318:18 320:6
**deposition** 212:18 217:4
217:14 218:9,20 238:16
255:21 296:6 323:2,13
326:17 330:13,16,18,21
331:1,3,8,13,16 332:2,4
332:5 333:16 346:17,23
349:24 350:13 352:23
370:8
**depositions** 256:19
279:24
**depth** 240:4
**Derek** 213:11 253:5
272:2
**derive** 270:12
**derived** 260:13
**describe** 222:8 229:17
271:22 324:1
**described** 240:23 362:7
**describes** 320:5
**describing** 240:13
**description** 241:23
**design** 259:21 260:1
263:6 359:2 360:5
363:10 364:2
**designated** 301:16
**designating** 298:7,9
**designed** 358:19
**designing** 351:7
**desire** 365:14

**destroy** 361:3
**detail** 257:13 262:23
  264:9 282:1 287:15,22
  321:14 337:10 348:9
**detailed** 252:17 259:14
  319:16 334:3
**details** 269:25 271:3
  303:16 315:12 340:4
**determine** 272:21 273:5
  273:10 274:11 278:6
  279:5 285:22 286:6
  339:17 340:7 353:6
**determined** 273:15
**develop** 266:6 283:25
  286:18 344:16 353:13
  354:9 363:25
**developed** 226:13 245:7
  295:9 357:15 359:2
**developing** 287:22
  363:24 365:5
**develops** 295:11
**deviation** 295:2
**diagnose** 362:14
**diagram** 298:1
**dialogue** 343:13,15
**diameter** 219:6 292:5,6
  306:20 307:1,2,21
  308:16 315:24
**difference** 360:18
**differences** 362:8,14
**different** 222:16,25
  227:25 228:2 241:15
  248:24 249:16 252:7
  262:20 269:4 274:19,21
  276:16 291:12 292:19
  358:10,17 359:7 366:8
  366:25
**differential** 235:1 288:12
**differentiate** 259:23
**differing** 284:1 291:15
  303:9 364:11
**difficult** 319:15 343:3
**dig** 236:20
**dimension** 225:5 367:17
**dimensions** 225:4 353:16
  354:21 367:15

**direct** 223:8
**directed** 261:10,20 368:6
**directing** 261:3,15
**direction** 225:20 242:11
  274:16,20,22 286:16
  296:25 297:20 301:25
  302:22 313:4,5 340:18
  352:6 355:24
**directional** 223:9
**directions** 232:19 274:11
**directly** 287:19
**dirt** 231:5
**disagree** 245:19 286:24
  287:1,2 295:17 333:6
  334:18 335:2 336:1,13
  337:1 338:3 346:25
**disaster** 248:14
**discharge** 282:18
**disconnection** 240:11
**discontinuous** 236:11
**discovery** 334:6,13,25
**discrepancies** 229:22
**discuss** 220:23 245:15
  249:3 316:17 319:16
  320:1 323:19 327:24
  332:14 344:6 363:19
**discussed** 225:22 318:3
  344:16,17 345:8
**discussing** 323:13
**discussion** 328:10 343:12
**disjointed** 347:5
**dispute** 263:23 264:1
**distance** 294:11 299:8
**distilling** 254:4
**distinction** 358:3
**distinguish** 358:16
**distinguishing** 359:13
**DISTRICT** 212:1,2
**division** 258:17
**dock** 284:16 290:2
  294:10,12,25 295:3
  297:2,4,8,11 305:23
  306:6 327:14 352:8
  353:20 354:13 355:14
**document** 256:14 257:6
  267:6,17 268:2,16

269:14 305:4 331:3,24
  332:1 334:19 348:18
**documentation** 314:2
  357:23
**documents** 254:13
  255:15,16 256:19
  274:15,20 281:18 326:6
  326:7,9 330:5 332:14
  332:21,23 333:1,7,16
  334:12,15,23 336:16
  364:24
**doing** 253:20,24 254:1
  264:17 280:4 283:17
**Domino** 277:7,8,9,13,18
  277:23 278:10,18,19
  279:2
**dot** 251:5 252:5
**dots** 298:15
**double** 226:19 276:8
  293:6,22 294:5 355:7,9
  355:18,20 356:5
**doubled** 355:12
**doubling** 285:13 293:10
  293:18 294:2,17 295:5
  307:23 308:3,7 355:1
  356:1,2 367:6
**Dr** 244:25
**draw** 250:3 322:18
**drawing** 321:14
**drawn** 317:18 320:25
  322:14
**drilling** 261:23 287:8
**driven** 233:22 234:2
  235:2
**driving** 364:4
**drove** 234:24
**drown** 224:13 301:15
**drunk** 278:15
**dry** 230:16,24 231:14
  233:1 250:17 365:4
**due** 221:3 231:7 242:7
  294:12 297:2,11,24
  359:11 363:13 364:3,13
**duly** 370:6
**duties** 328:18
**duty** 272:11 280:17,18

292:25
**DUVAL** 212:9
**dynamic** 295:8
**D.C** 213:23

---

**E**

**E** 212:17 216:1,1,10,10
  301:16
**earlier** 232:6 238:17
  315:8 331:6 345:11
**early** 255:13
**earth** 242:6
**easel** 249:19
**east** 341:25 343:8 344:1
**EASTERN** 212:2
**Ed** 329:21 330:7,11,12
**edition** 331:6
**editorial** 351:23
**Edward** 331:3
**effect** 295:8 312:21,22
**effects** 296:21 357:8
**either** 263:6 269:12
  283:21 285:3 294:18
  321:9 345:15 350:8
**elaborate** 245:13,20
  246:17 274:17 291:9
  293:16 327:8 365:1
**elaborated** 243:14
**elaborating** 342:2
**elastic** 220:2,9 236:6,8
  239:18,20
**elastomeric** 241:20,21
  358:20 359:19 360:2,5
  360:25 361:4,5,6 363:6
  363:8,22 364:3
**electrical** 257:21 262:7
**electricity** 343:17
**elementary** 303:4
**elevation** 222:20 275:25
  276:1 288:4
**eliminated** 233:5
**Emory** 214:19 216:7
  323:9,10 335:13 339:15
  345:5 348:25
**emphasized** 342:11
**employed** 258:14 259:1
**employee** 258:20

employment 258:16
empty 315:3 327:3 335:9
  345:20 346:4
ended 250:11 252:14
ends 294:6,9,23,25 295:5
  307:20 319:6 355:9,21
  367:7,13
energy 212:19 213:13
  214:11 239:13
engaged 253:13
engagement 253:10
engineer 264:21 325:12
engineering 260:1,13
  265:13 325:19 354:9
Engineers 234:24 358:19
  359:3 360:4
English 280:3
enormous 258:9
enter 309:18
entered 220:18 362:3
entire 220:1,6,7,8 239:21
  242:3 269:17 320:19
  321:20 322:7,11,14
  351:5
entitled 269:19
equally 295:6 356:4
equals 219:4,7
equipment 276:14,20
  284:15 285:15 286:20
  287:8 293:20
equivalent 233:9 356:12
erroneous 366:17
erroneously 234:25
errors 366:6,9
ESQUIRE 213:4,11,12
  213:19,20,21 214:2,10
  214:19
established 270:15
estimate 283:24
estimation 349:25
event 261:21
events 251:12
everybody 341:1
everyday 339:25
evidence 217:15 304:5
  305:14 333:3 334:15

337:24 356:22 357:22
  358:2
evidently 341:18
exact 242:22 333:22
  336:8 365:3
exactly 220:22 222:22
  223:1 226:4 235:2
  253:14,17 305:5 308:20
  325:8 359:24
EXAMINATION 216:3
  218:7,17 219:2 224:23
  229:16 237:18 238:24
  245:21 246:2 247:7
  252:9 253:3 254:17
  255:6 259:12 260:24
  263:9 267:16,25 268:15
  270:17 271:17 272:6
  273:23 277:5 279:22
  282:5,24 285:17 286:2
  286:22 289:21 292:16
  296:7 299:16 300:14
  301:13 304:9,15,19
  305:7 310:7 312:14
  314:13,19 315:7 316:1
  316:12 323:9 335:13
  339:15 345:5 349:10
  350:6 352:20 354:3,20
  356:20 357:6,17 361:12
  361:21 366:10 367:4
examined 218:5 349:23
examples 263:10
exception 346:1
exchange 344:16
exclude 277:18
Excuse 300:4,13
exercise 269:8 273:8
exhibit 216:12,13,14,15
  216:16,17,18,19 218:9
  218:10,12,19,24 238:15
  238:21 245:16 249:18
  249:21,25 252:13,19,24
  253:1 271:15 301:10,11
  317:19 323:2,3
exist 250:9
existing 293:7
expect 286:13 314:21

316:2 327:12 335:19
  343:10 354:7 364:5
expected 283:25 339:18
expedited 341:11
experience 259:14
  260:14,25 263:15 266:8
  276:15 277:14,23 284:3
  286:17 287:11 294:15
  307:19 314:25 329:9
  347:6 351:12,19
experiment 264:17
experimental 223:4
expert 245:4 256:23
  257:15,16 259:20
  262:13,16,22 273:9,11
  276:15 277:2,6,14
  286:15
expertise 260:1 261:16
  262:9 351:10 367:20
experts 229:23 348:21
  351:13 353:4
explain 233:12 264:20
  290:18 295:21 312:20
  358:14,14,15
explanation 359:24
exposed 275:22 288:5
express 253:18 342:17
expressed 324:14 350:17
expressing 325:14,18
expression 366:16
expressions 364:24
  367:1
extended 228:16
extends 234:5,19 235:9
extent 255:1 269:11,13
  320:21 321:1 326:9
  339:11
external 274:23
extreme 275:10 294:25
eye 360:14

───────────────
F
FABRE 214:25
face 248:19 282:11 287:5
facilities 337:3
facility 261:2 281:6
  282:2 283:4,23 316:15

316:24 324:9,12,14
  327:3,7,18 329:10,13
  329:16 336:20 339:8
  341:12 345:16 346:12
  347:8,13
fact 234:12 277:9 316:13
  327:5 333:9 334:18
  336:23 340:6 343:7
  345:19,21 346:1,3
factors 266:19 277:17
  284:6 285:1 345:12
facts 264:11 288:19
  328:9 337:25 339:5
  366:8
fail 273:10 307:22 360:2
  361:5,7 362:21 363:17
  364:12
failed 245:6 273:1,6,15
  328:23 329:2,7 363:1,3
  363:12,15
failure 220:19 221:3
  233:4,8 242:8 245:7,14
  245:14,17,20 277:25
  325:4 358:3,10,16
  359:11,16 362:15,24
  364:6
failures 245:17 362:8,18
  365:5,20
fair 248:23 261:16 269:1
  298:10 325:10 326:19
  328:23 332:7 348:11
FAIRBANKS 212:24
  217:22 370:2,24
fairly 291:7 352:14
falling 230:12,17
Falls 230:13,17 231:2
familiar 288:9 291:25
  318:13 323:15
family 212:13 340:25
  341:2
far 222:9 280:25 318:22
  325:19 352:23
farther 220:25 246:13
  249:2
fashion 314:25 343:16
fast 231:9 248:20

HECTOR PAZOS (VOL II)                                                                7/21/2009

**fault** 345:2
**feasible** 269:8
**features** 359:13 361:1
**feel** 276:16
**feet** 228:25 229:19
    231:15,15 232:14 234:4
    234:6,7 235:1,4 236:2
    239:10,17 240:5 243:16
    246:12 248:18 252:2,7
    300:2 302:7 310:22
    311:2,6 312:3,3,3,12
    315:15 318:4,4,5
**felt** 296:21
**field** 223:5 262:9 276:13
    325:11,20 351:11,21,22
    351:25
**fifteen** 264:7 318:5
**fifty** 235:19 257:21 258:8
    263:14,15
**figure** 350:10 353:11
**file** 236:20
**files** 318:19
**filing** 217:9
**final** 221:2,6 249:11,21
    249:24 250:12,14 252:3
    252:8 255:2 256:20
    272:7 310:5,11 331:2
**finally** 221:2
**financial** 310:2
**find** 280:6 320:4 321:8
    356:21
**findings** 254:5
**fine** 282:23
**finished** 255:23 304:14
    346:21
**fire** 247:13 273:16
**first** 220:24 224:15
    230:14 243:9 245:6
    250:11 272:25 275:15
    296:9 298:3 309:11,22
    310:9 323:15 324:6
    326:1 334:17 341:7
    347:18 362:12,17 370:5
**FISHER** 213:12
**five** 255:18 312:2 313:11
    314:7,17,21 315:3,15

316:2 318:4
**flapping** 271:6
**fleet** 336:5,12 341:21
**fleeting** 261:2 329:10,12
    329:16 330:9 347:8,13
**flip** 329:18 347:16
**float** 297:1
**floated** 249:16
**floating** 230:24 247:15
    276:14 284:15 293:20
    296:23 297:10
**flooded** 349:20
**flooding** 231:9 256:16
**floodwall** 222:20 223:8
    225:1 226:3 228:10
    231:20 233:6 238:20
    248:15 356:25 357:9
    362:8,15,21 363:1,12
**floodwalls** 362:19
**Florida** 218:3 220:4
    341:23 356:23 357:19
**focus** 324:19
**follow** 323:21
**following** 219:15
**follows** 218:6
**follow-up** 252:10,11
    361:10
**foot** 230:6
**force** 226:11 235:18,19
    240:16 247:18,20,21
    248:1 267:4,4 288:17
    289:24 297:7,10 312:19
    357:8,21 362:23 364:17
    364:21
**forces** 240:17 266:15
    275:23 306:13 313:3,6
    313:8 314:23 352:13,15
    357:14
**fore** 285:13 294:23 300:1
    301:25 302:9 313:4
**foregoing** 369:4
**form** 217:12 254:9 277:1
    286:10 304:6 350:3
    356:18
**formalities** 217:8
**formation** 240:1 291:12

**forth** 370:7
**forty** 235:18
**found** 226:7 309:7,9
    311:4 320:7
**foundations** 248:2
**four** 231:15 255:17
    292:8,21,21 303:14
    345:17,22
**four-and-a-half-inch**
    290:17,21
**fraction** 223:7 227:5
    230:22 236:4 248:16,17
**fractured** 236:3
**fractures** 234:8,15,15
**framed** 246:25
**free** 247:15 296:25
    297:10
**freeboard** 285:11 288:12
    316:17 317:11,14
    345:21 346:7 352:10
    353:18
**friction** 226:5 231:7
**front** 226:22 231:4,20,24
    250:3 361:14
**full** 321:11 326:9
**fully** 258:3
**function** 360:24
**further** 221:14 323:12
    350:23 370:13

────────

### G

**gaps** 220:14 240:21
    243:18 244:10
**gauges** 242:9
**general** 225:20 250:11
    300:3 316:19 319:22
    326:24 345:23 351:21
**generally** 264:10 362:22
**generators** 343:17
**generically** 313:7
**gentleman** 291:20
**getting** 347:4 361:20
**Getty** 236:17 237:22
**gettyimages.com** 236:25
**Gilbert** 213:3,4 216:8
    224:20 229:5,9,14
    237:11 245:10 246:23

251:15,19 254:8,20,25
    255:7 259:8 260:8,17
    260:22 262:25 267:7,22
    268:3,7,13 269:9
    270:13 271:4 272:1
    273:19 276:25 279:6,12
    281:14,24 282:13
    285:24 286:9 288:21
    289:3,7,11,16 292:9,14
    296:1 299:4 300:10
    304:7,11,17,22 309:17
    310:4 312:9 314:10,16
    315:1,18 316:7 339:10
    344:22,24 348:19 349:2
    349:10,12 350:6 352:20
    354:3,18,20 356:20
    357:6,17 361:19 362:7
    364:14 365:25 366:22
    367:19
**give** 225:3 228:19 255:15
    256:6 262:23 263:10
    264:11 270:5,6 274:24
    290:12 297:19 303:15
    321:13 328:16 350:21
    366:3
**given** 212:19 263:12,16
    264:2 326:25 345:14
    369:4,7
**gives** 255:24
**giving** 325:23 328:15
**glanced** 346:20
**glass** 303:13
**go** 225:10 226:15 234:1,3
    237:9,12,14 253:21,22
    253:23 256:17 269:20
    269:21 272:16 276:5
    277:23 282:14,19
    316:21 333:7 340:11
    344:23 345:7 354:15,17
**going** 225:10 227:11
    229:3 231:5 236:15
    238:9 249:8 253:5,24
    256:22 267:6,17 268:4
    269:10,12 272:3 298:1
    300:3 312:10 319:18
    321:17 323:11,19

HECTOR PAZOS (VOL II)                                                    7/21/2009

328:14 330:10 332:11
340:10 341:2 344:25
347:5 348:20 355:7
358:13 359:8,21 362:21
366:1
**good** 221:25 225:17,21
225:21 253:4 278:13,13
307:22 366:11,15,24
**GOODWIN** 213:18
**grab** 238:10,11 249:18
**grabbing** 359:19
**Grabert** 278:20 279:24
**Grande** 218:2
**gravity** 223:8
**greater** 259:2,7,13
**green** 228:22 255:21
257:9 298:22 299:1
317:18 320:16 322:13
346:16
**ground** 220:17,21
250:17,18 259:10
284:16
**grounded** 243:2 246:5
**Group** 320:9,14 359:9,23
360:10,15,17,17,21,23
361:13,16
**growing** 222:15
**Guard** 257:17,23 258:7
258:10,12,15,22,25
259:4
**guess** 225:25 241:23
255:20 256:3 330:4
**guide** 233:22
**guy** 268:24

---

**H**

**H** 216:10 301:20
**half** 227:11 230:6 292:8
292:21,22,23,24
**halfway** 329:19
**halting** 282:18
**HAMMOND** 214:9
**hand** 252:4
**handed** 218:8
**handy** 318:13
**Hang** 361:20
**happen** 231:6 341:5

**happened** 220:22 222:9
235:13 239:3,10 251:13
256:15 324:1 330:19
364:20
**happening** 284:2 341:6
**happens** 221:12 234:11
241:14,16 256:9 364:6
364:7
**harbor** 219:16 247:25
251:14 276:10,12
277:11,16 362:9
**harbors** 277:10,19 278:7
**hard** 238:14 246:14
322:17
**HART** 214:25,25
**hatch** 276:7
**head** 263:13,22,24 264:6
289:17 321:23 327:9
330:10 332:15 335:22
347:1
**heading** 224:14
**heard** 243:23 244:13
253:9 267:10 290:24
292:1 304:25 313:19
**hearing** 339:21
**heaving** 227:3 232:22
296:20
**HECTOR** 212:18 218:1
369:3,11
**height** 226:20 352:11
353:18
**hereinabove** 370:7
**hereto** 217:3 218:13,25
238:22 253:2 271:16
301:12 323:3 370:15
**high** 228:9 277:24,24,25
285:11 286:18 317:11
345:21 346:7
**higher** 222:20 248:11
308:15
**highest** 351:9
**highlighted** 228:21
**hinge** 363:24
**hinging** 230:18
**hire** 278:13
**hired** 254:20 255:7

278:15 284:13 349:15
**history** 278:2
**hit** 226:17 230:9 231:5
242:19
**hold** 257:15 258:21
262:13 285:6 353:7
**holding** 361:6
**home** 343:18
**hopper** 287:23
**horizontal** 224:12 226:8
226:9,11 232:5 236:5
240:16 242:11 301:24
302:8 303:1 352:2,6,13
352:15,17
**horizontally** 223:9 232:1
232:3,4
**hour** 290:13 292:13
341:24 343:8
**hourly** 253:18 254:15
**hours** 253:25 272:24
295:19
**houses** 246:15,19 247:13
248:1 349:20
**hundred** 254:12 258:11
259:22 264:7 277:24
291:11 297:6,9,9
**hurricane** 249:15 250:7
250:15,23 274:17
276:23 282:11 283:16
283:18 285:10,20 286:5
286:18 304:4 305:8,10
305:16,16 314:23
315:11,11,17 324:21
339:1 340:19 345:19
346:2 368:6
**hurricanes** 276:19
284:14
**hydrants** 247:13
**hydrostatic** 220:8,11,20
240:24 241:2,9 242:7
358:9 359:12 360:6
363:9,13,16
**hypothetical** 354:1,4

---

**I**

**idea** 225:3 290:14 337:22
**ideas** 344:16 364:1,11

**identification** 218:13,25
238:22 253:2 271:16
301:12 323:4 330:15
**identified** 252:21 326:7
345:18
**identify** 251:1 340:17
360:11
**identifying** 345:12
**ignore** 340:22
**ignoring** 324:11 340:13
**IHNC** 267:23 281:4
298:12,13 341:10
**II** 212:17
**ILIT** 366:19
**Image** 237:1
**images** 236:17 237:23
**imagine** 355:1,5
**immediate** 300:1
**immediately** 344:15
**impact** 244:2,7
**impacting** 222:23 364:22
**imperfect** 301:3,5
**importance** 239:23
256:20
**important** 240:2 275:24
352:12
**impossible** 253:16
269:23 270:19 271:2
288:6
**impression** 348:17
**impressions** 255:16
**improper** 363:19 364:4,9
**improperly** 363:23
**improved** 306:20 307:20
**inaccurate** 303:11
**inch** 306:19,25 307:2
316:10 322:1
**inches** 230:22,22 235:4
291:15 292:8,22,22,24
297:2
**incident** 261:19
**inclining** 264:17
**include** 277:9,18 352:23
**including** 335:15
**incoming** 222:21 223:2,3
226:19 282:11 287:5

336:5
incorrect 367:1
increase 220:20
increasing 222:19 317:3
indented 347:19
independent 227:23
    240:14
index 271:22
indicate 246:6 295:19
    307:19 336:11 337:2
indicated 284:9 302:16
    335:1 366:18
indicates 243:4 336:23
indicating 306:5 322:6
    337:8
indications 223:16
indicator 225:17
individual 259:15
    278:15
individuals 272:19
Industrial 357:19 358:4
industry 338:24
infer 302:2
inference 302:13
inflatable 319:20
inflatables 321:9
influential 256:15
information 255:2
    256:18 268:22 271:9
    272:23 273:12 283:12
    283:19 285:14 291:17
    312:12 313:25 314:6
    326:13 334:4 337:6
    338:2,5,9,15,23 342:5,8
    348:16 353:2
ing 232:7 268:12 303:20
    367:13
Ingram 212:9,11 332:16
    347:21,25 348:2,4,13
initial 252:8
initially 255:14
initiation 243:5,10,13,14
    244:15 246:7
inland 220:11 245:19,24
    248:15 249:2 367:23
    368:2,6

Inner 219:16 247:25
    251:13 362:9
insignificant 288:17
inspected 309:11
inspection 258:19 259:1
    272:20
installation 264:22 293:4
    363:20 364:3
installed 274:7 358:22
instance 264:14 355:25
instant 227:8
instantaneous 236:1
instruct 254:6 281:3
    283:21 284:10 285:4,23
instructed 254:3,22
    255:10 279:17 286:7
    287:4
instructing 283:8,9
instruction 254:16
instructions 253:18,20
    254:13 266:6 280:5
instructs 281:12
instrumentation 222:16
Insufficient 353:25
intact 241:20
intend 348:12
intended 294:8
intention 235:12 294:20
intentionally 286:12
interest 286:19 351:21
interested 370:15
interlock 233:4,8,16,17
    233:21,22 234:3,5,9,13
    234:16,19 235:9,9,15
    235:21,21,23 240:2,7
    240:18,19 242:5
interpretation 294:14
    302:13,16,24 366:7
interrelated 297:17
interruption 245:25
    285:7 352:19
introducing 220:15
invent 331:23
investigate 278:23
    303:22 336:19,22 340:9
investigating 262:18

investigation 339:16
    356:21
investigators 223:18
    234:14 366:18 367:2
involved 259:22 261:14
    263:5 265:22 266:1,20
    303:18 324:8 325:16
    327:5 328:1,6 340:14
    340:23
involvement 261:18
    324:6 327:20 346:19
involving 258:12 274:16
IPET 365:19,22 366:5,11
    366:16
Irrespective 264:1
issued 281:2 324:10,22
    325:3
issuing 325:13
item 221:18 239:23
    348:8 361:7
items 352:17
I-wall 360:5 363:10

_____

**J**

J 214:10
jerking 232:22
JOHN 213:20 215:5
joint 359:17 360:2 361:4
    363:6,8,22
joints 241:20,21
JOSEPH 212:24 217:22
    370:2,24
JR 212:24 217:22 370:2
    370:24
judge 212:9 358:12
July 212:21 369:25
June 254:22 255:11
    324:3

_____

**K**

Katrina 212:4 243:4
    252:15 276:23 305:16
    315:11 357:20 359:4
KEELEY 215:4
keep 294:9,25 317:10
    343:17 352:12 353:20
    353:22

Keeping 361:13
kevel 293:13 300:19,20
    301:16,16,17
kevels 287:25 298:8,9
    299:3 303:9,11,14,20
    303:25
key 269:18 275:9 295:4
    312:3 315:23,25 317:3
    318:6 343:15 355:9
kind 266:7 301:19
    316:18 323:21 326:24
    347:4
KIRSTEN 213:21
KITTO 214:10
knew 284:11,16,17
    332:10 341:5
know 231:11,13,15
    236:19 239:6,9 243:18
    250:6 264:7 267:13
    268:21,24,25 269:11,21
    270:2,22 271:7 274:5
    277:17 278:5,14,17
    280:25 282:12 283:1,2
    284:20 289:22 295:15
    299:6 303:20,25 305:5
    307:15 309:9 314:7,9
    319:9,24 320:1 323:14
    326:2 333:15 338:20
    344:19 348:16 349:11
    349:14 350:18 353:6,10
    353:16,17,19 354:12,13
    354:21 357:18
knowing 269:1 277:23
    300:8
knowledge 256:22 259:3
    259:7,13 262:2,5,8
    284:3 328:8 331:13
knowledgeable 275:16
    278:12
known 285:2 335:8
    338:14 344:9,12 366:9
knows 314:12
K(2) 212:7

_____

**L**

L 212:17 217:1
lab 266:6

HECTOR PAZOS (VOL II)                                                                                         7/21/2009

**labeled** 299:21
**labor** 265:25
**laboratory** 265:22,24
**lack** 344:5
**Lafarge** 212:8,10,12,14
　213:9 256:24 274:14
　276:3,22 278:19 280:22
　281:3,12 282:10 284:12
　288:9 290:10 304:3
　305:16 314:24 316:15
　324:9 327:3,7,23
　332:24 333:4,10 334:6
　334:7,12,14,16,22
　335:6 336:20 337:14,15
　337:15 338:24 339:8
　340:20 341:8 342:12,21
　344:4,9,12 352:24
　353:4 355:3
**Lafarge's** 343:24
**Lagarde** 212:10
**land** 222:11 249:1
　266:16
**landed** 251:8
**landfall** 341:25 343:6,8
　344:1
**large** 226:15 228:8
　241:21 248:21
**larger** 308:15 315:21
**largest** 248:22
**LARRY** 215:3
**lateral** 312:23
**law** 217:7
**layman's** 360:14
**lead** 344:8 359:14
**leave** 283:8,22 284:10,18
　285:4
**left** 232:25 327:19
　333:24 335:18 338:6
　346:13 348:10
**legal** 258:12,13 348:22
　348:24
**LEGRAND** 214:17
**length** 227:21 229:19
　239:17 322:11,14
　339:17
**letterhead** 218:11,14

**letters** 298:7,14,16,20
**let's** 237:14 247:5 254:18
　264:14 268:8 269:2
　285:6 292:25 301:14
　316:21 318:24 327:16
　358:12
**levee** 220:1,7 221:3
　230:14,19,25 231:12
　232:20 233:1 242:3
　246:10 249:4,5 349:21
**levees** 362:18,18
**level** 222:13,14,14,18
　275:11 287:19 288:11
　288:15 289:24 351:9
　358:23
**lever** 223:11
**life** 351:6
**lifted** 223:6 230:21
**lifting** 230:18
**light** 285:11
**limited** 294:18
**line** 230:7 267:11,19
　287:24 288:14 293:4,7
　293:12 299:1 300:19
　301:5,6,7,14,19,21
　302:9,19,20 310:16
　311:21 312:4,5,13,13
　312:16 313:1,2,3
　315:22,24 316:11
　317:18,20,20,22,23,24
　318:2,6,7 320:18 332:3
　332:4 335:4 355:1,5,6
　355:17 356:6,10,12
**lines** 261:24 263:24
　264:4 265:16 272:21
　279:19 280:5,6 285:13
　293:18,21,23 294:6
　295:1 298:23 299:2,24
　300:1,9,18 301:23
　302:6,17 308:4,6,7,15
　311:15 316:9,14,18
　317:6,8 352:2,5,13,18
　355:10,12,20,24 356:3
　356:8,9,11 367:8,14
**lips** 359:19 361:6
**list** 277:10,20 330:5,14

**listed** 326:13
**listen** 291:21
**listing** 326:16
**literature** 294:16
**litigation** 272:14
**little** 251:5 252:5 262:23
　299:1 318:25 321:5
　323:11,20 327:16,24
　342:17 345:11 349:3,8
**live** 256:16
**LLP** 212:19
**load** 273:16,16 295:7,14
　296:12 297:14,22
　306:13 313:2
**loaded** 342:25 344:14
**loads** 294:12 295:4
**located** 299:2
**location** 220:17 222:23
　238:23 244:3 248:17
　249:2,12,14,16,20,22
　249:25 250:10,13,14,15
　250:16 251:7 252:3,8,8
　252:11,12,14 272:22
　274:7 282:4 285:20
　286:5 296:15 310:2,6
　310:11 315:15 319:23
　358:24 359:1,17 360:11
　360:12
**locations** 238:19 250:7
　273:5 274:21 278:3
　358:17 359:4 363:21
**lock** 339:18 340:1
**locks** 339:22
**log** 321:23
**London** 358:4 362:9,25
　363:11 364:6
**long** 218:15 220:6
　306:25 310:23
**longer** 304:20 348:6
**longitudinal** 233:6
**look** 218:18 219:13
　232:4,4 236:14 237:3
　250:25 251:5,7 269:2
　278:2 279:17 292:25
　303:13 305:20 318:19
　326:12 340:6 360:14

**looked** 237:8 296:9
**looking** 252:3 269:21
　279:19 280:5,17 330:1
　355:23 358:15 361:18
**looks** 252:16 269:17
　298:4 319:10
**loose** 271:6 313:17 365:6
　365:9
**LORRI** 214:25
**lot** 231:11 326:25
**Louisiana** 212:2,21
　213:6,15 214:4,13,21
　217:6,24 370:4
**low** 289:25
**lower** 249:4
**low-level** 296:24
**lucky** 228:3
**lying** 336:3
**L.L.C** 214:18
**L.L.P** 213:10,18 214:9

**M**

**M** 212:17 216:1
**MAG** 212:11
**magazine** 252:22,25
**magic** 250:2
**magnifying** 303:13
**main** 248:14 312:21,22
　359:16
**maintain** 233:6 316:15
　316:24 338:25
**major** 223:14,15
**making** 254:14
**managed** 329:15
**management** 347:13
**manager** 286:14 329:22
　342:10,12,13
**mandate** 280:21 281:2
　281:11,16 282:9,16
**mandates** 281:19 328:22
　329:6
**manner** 317:14
**manual** 265:25
**manufacturer** 262:11
**manufacturers** 291:10
**marine** 258:17,17 259:1
　259:2 261:7,9 287:12

291:7 325:12 367:24
368:7
**maritime** 258:6
**mark** 213:19 229:6
252:18 300:5 301:9
320:17 323:1
**marked** 218:9,12,19,24
238:21 253:1 271:15
301:11 323:3
**marker** 250:3
**markings** 218:20,23
**marks** 230:6
**mashed** 360:19,22
361:23
**mass** 219:4 295:9,10
**masters** 325:17
**matches** 223:25
**material** 258:9 315:22
330:2 359:19,20
**materials** 358:20
**matter** 249:1
**maximum** 341:24 343:7
**McCall** 212:19 213:10
**mean** 223:10 225:7
250:15 256:24 258:16
271:7,7 296:2 310:13
311:8 312:2 318:4
320:25 352:22 356:1
365:10
**means** 220:3 230:7 234:3
245:18 290:21 310:15
336:19,24 338:1,18
342:12 356:2 358:22
363:20
**meant** 233:12 241:24
**measurable** 241:12
**measure** 275:10
**measured** 235:4
**measurement** 290:16
**measuring** 320:11
**mechanism** 295:14,22
296:17
**mechanisms** 358:3,16
**memorize** 256:5 274:18
287:16 305:12
**memory** 238:1 257:14

265:5 343:19
**mention** 292:23 331:17
**mentioned** 239:24
289:23 291:1 329:24
330:11
**mentioning** 290:23
334:20
**message** 333:17,20,21,24
333:25 335:18 338:7,12
338:12,19
**metal** 310:15
**meteorologic** 286:15
342:3 343:2
**method** 333:19
**methodology** 270:7,16
**middle** 311:22
**midship** 301:8,22 302:10
302:22,25
**mike** 251:11
**miles** 290:13 341:24
343:8
**mile-an-hour** 270:25
**millions** 265:10
**mind** 257:5 268:24
329:19 342:6
**mine** 264:20
**minor** 251:24
**MINTZ** 214:9
**minute** 253:19 254:15
344:7
**minutes** 228:13 239:24
292:13
**mischaracterize** 309:19
**Mischaracterizes** 286:11
**misquote** 225:24
**misunderstood** 247:2
**moments** 329:25
**Momentum** 219:5
**monoliths** 360:22
**MONTGOMERY** 214:8
**months** 255:18
**moor** 311:5
**moored** 277:3 314:8
317:11 353:23
**mooring** 256:1 267:18,24
268:11,21 269:2,7,19

270:10 271:13 272:18
276:14 293:4,7 299:2
300:6,7 308:4 312:4,13
313:10 327:2,6,20,25
345:22 346:10 351:3,5
351:8,11,16,24 352:2,3
352:5,8,9,18 353:6,14
354:10 367:21
**moorings** 278:1
**morning** 227:17 228:10
253:4 309:24 310:8
334:16 335:7 336:6,12
336:25 338:1,7,13
**motion** 225:9 227:24
228:1,4,5 250:12
294:13 352:16
**motions** 232:22,23
296:24 297:5
**MOULEDOUX** 214:17
**move** 228:14 233:2
254:18 297:19 345:6
**moved** 249:16 250:12
**movement** 295:9,10
297:15
**moves** 221:14
**moving** 232:18 294:11
309:5
**multiple** 274:15 315:21
**multiplicate** 228:6
**multiplied** 297:5
**Mumford** 212:9

**N**

**N** 216:1,1,1,10 217:1
**name** 246:21 253:5 265:6
323:10 326:3
**named** 218:3 348:21
**names** 332:15
**narration** 221:11
**narrow** 324:18
**narrower** 291:23
**naval** 259:25 260:13
325:12
**Navigation** 362:10
**Navigational** 219:17
247:25 251:14
**near** 341:23

**necessarily** 261:22 299:7
**necessary** 283:17 316:23
317:2
**need** 221:25 229:3 270:2
271:9 309:18 345:14
353:10,13,19 354:12,13
**needed** 228:8 266:7
353:7,13 355:13
**needs** 220:21 267:12
**negligent** 345:2
**neighborhood** 219:23
221:15,21 222:2 224:11
224:15 225:19 233:14
247:9,24 248:5 249:11
249:13 250:5 362:4
**never** 232:11 258:14
291:17 300:16 307:22
329:10,12,15 347:7
348:8 368:8
**new** 212:20 213:6,15,22
214:4,13,21 270:24
341:2 343:6,11 356:10
**Newspapers** 340:24
**Niagara** 230:13,17 231:2
**Ninth** 256:12 310:9
**nodding** 289:17
**non** 258:12 347:19
**normal** 227:7 235:7,7,7
293:21,23 307:3 339:25
**normally** 226:8 234:15
254:11 264:11
**north** 213:9 245:5
246:12,14 315:16
364:20
**northern** 221:12,14
247:19 313:11
**notation** 359:11
**note** 246:24
**noted** 234:13 369:13,15
**notice** 217:7 234:23
**not-to-scale** 225:2
**number** 219:14 222:4
229:20 230:11,12 238:3
238:4,15 257:23 265:23
280:17 287:2 290:20
299:25 305:21 316:6,18

HECTOR PAZOS (VOL II)

345:19,20,22 355:19
361:15
**numbers** 298:8,15,20
**numerous** 263:5
**NW** 213:22

**O**

**O** 212:17 216:1 217:1
**oath** 217:25 218:5,6
**object** 245:11 254:9
255:1 263:1 267:8,13
269:10,12 270:14 271:5
277:1 286:10 299:5
304:23 312:10 314:11
315:2,19 354:17 356:18
357:18 360:7 364:21
**objection** 246:24 259:9
281:15 299:13 304:8,12
309:18 316:8 339:11
350:3 353:25 356:15
357:3,12 366:23
**objections** 217:11
**objects** 356:22,23 364:15
364:17
**obligation** 281:5
**observations** 254:5,24
**observe** 250:17 279:14
309:10
**observed** 226:20 236:24
250:19 295:18 357:9
**obstructions** 247:14
**obtain** 301:17
**obtained** 348:15
**obvious** 279:16,20 280:7
280:9 285:16 303:4
**occasions** 263:5 265:23
**occur** 234:9,10,16
242:19
**occurred** 221:3 227:9,9
243:5,11 244:22 246:7
324:17
**occurring** 231:10
**occurs** 248:15
**Ocean** 351:13
**offer** 260:11 323:18
324:4 344:25
**offered** 256:23 354:25

**office** 258:19 259:1,2
337:7,18
**official** 258:16
**officiated** 217:24
**Off-and-on** 244:9
**Oh** 263:21 302:4 333:21
363:8
**Oil** 351:13
**okay** 219:12 220:1
221:25 222:8,13 225:2
226:9 229:20 230:3
232:8 233:15,20 235:13
237:2,6 245:17 247:6
251:23 254:2 255:4,24
256:21 260:5,23 263:3
265:18 267:21 268:1,14
269:1 275:8 279:13
280:13,17 281:25 282:7
283:12 284:24 285:5
291:3,21 292:15 293:25
298:6 299:20,22 301:3
301:9,17 305:8 306:7,8
310:12 313:10 318:1,8
318:24 320:4,7,7,8,15
322:7,8,9,13 323:1
324:2,25 326:16 327:16
330:14 331:2 340:3
341:18,19 344:6 349:11
349:18 350:9,12,25
352:21 353:16 354:25
359:8,15 360:9,14
361:20 364:10
**old** 355:19 356:8
**once** 250:4 336:10
341:11
**open** 276:7
**opening** 220:14
**operated** 329:12
**operating** 261:1 347:8
351:6
**operation** 293:21
**operational** 263:7
293:23
**operations** 256:1 260:3
261:9,12 282:19 325:15
325:16,21

**operator** 287:13 324:15
343:10
**operators** 261:11,13
325:18
**opine** 255:11
**opined** 297:22
**opinion** 245:22 247:17
263:16 264:2 266:9
270:6,7,23 274:1
275:12 276:21 277:10
277:13 278:4,4 279:1
279:15 283:20 285:2,21
287:17 288:2,13 290:4
293:10,18 295:13 296:8
297:14,21 300:8 304:6
306:8,12 313:15,18,22
314:17,20 315:9,14
316:22 320:5 324:5,5,7
324:7,19,22,25 325:23
325:24,24 328:17,17
334:1 340:11,12,22
341:15 342:16 344:15
344:25 345:7,9 348:6,7
348:14,23 350:20 351:3
357:1,7 362:21 365:23
**opinions** 254:6 255:25
256:4,6 263:12 269:13
272:7 279:4 300:6
323:18,23 324:4,11,15
325:4,9,10,11,15,19
328:16 330:4 348:12
350:16 362:7 365:6,8
365:10,16 366:15,20
367:21
**opposed** 295:23 297:16
**opposing** 342:12
**orbital** 226:13,15,18,25
**order** 267:4,14 271:10
280:21 281:2,11,16
282:9 294:10 353:10
**orders** 281:19 328:22
329:6
**organization** 278:12
**orientation** 224:13,25
243:3 246:6
**originating** 362:24

**Orleans** 212:20 213:6,15
214:4,13,21 341:2
343:7,11
**outside** 284:19 290:22
360:6
**overall** 227:5 347:6
359:16
**overhead** 236:14
**overlap** 226:19 253:10
**overlapping** 223:1
226:25
**overtopping** 364:25
365:1,3
**owned** 329:10
**owner** 281:6 351:12
**owning** 351:6
**O'Dwyer** 253:13,17
254:19

**P**

**P** 217:1
**page** 216:3,12 228:17
229:6,8,13 233:3
236:22,24 242:1,23
243:1 280:18 293:2
305:21,24 319:3 320:10
320:14 324:4 328:15
329:18 330:7 331:2,8
332:3,4 340:10,12
347:15,20 359:9,9,22
359:23 360:10,10,16,17
360:17,21,23 361:14,16
**pages** 347:2
**panel** 221:20 233:18,18
359:16
**panels** 221:4 231:10
241:6,8 358:11,21
359:18,25
**paper** 265:8,9,10 268:23
**paragraph** 229:13 233:8
243:2 329:20 347:19,23
**Parfait** 212:13
**part** 217:14 221:12,22
222:3 231:20 233:23
239:19,22 242:20 244:1
245:5 247:19 248:9
251:1 288:24 289:13

293:12 306:14,15
319:24 321:21 345:8
358:8
**parted** 295:13 296:22
**partially** 255:23 358:8
**participate** 261:8
**particles** 220:17 226:14
**particular** 235:14 244:16
248:9 274:22 277:19
285:19 286:4 334:14
340:10
**particularly** 248:22
**particulars** 327:2
**parties** 217:3 272:13
370:14
**parts** 351:25 356:12
367:8
**party** 349:15,18
**passed** 240:20
**passing** 230:13
**Pat** 296:5
**path** 250:3 341:25
**pay** 313:24
**Pazos** 212:18 218:1,8,18
219:3,13 228:22 231:1
235:6,23 237:19 244:25
245:2 246:5 247:9,17
247:23 248:9 249:9,20
253:4 269:15 322:17
323:7,10 335:14 345:1
345:10 349:11 352:21
364:18 365:11 367:5
369:3,11
**peak** 230:4,4
**pen** 298:22 320:17
**penetration** 235:1
**Pensacola** 342:1 343:9
344:2
**penultimate** 229:12
**people** 253:24 254:1
256:16 261:20 265:8
284:12,12 327:23
332:16 343:16,20 344:4
349:19 364:25 365:2,14
365:23 366:6,8,11,14
366:15,24

**percent** 302:4 349:19
**percentage** 270:11
**perfect** 300:25 367:3
**performance** 260:2
**perimeter** 219:8,9
290:22
**perimeters** 322:21
**period** 226:2 227:6,15,20
227:25 228:4 302:12
340:8 357:23
**permitted** 217:5
**perpendicular** 225:8,11
312:25 313:1 317:24
**Perry** 212:11
**person** 258:24 269:3
270:8 275:16 282:3
283:4,16 286:16 292:23
343:11 365:17,17
**personal** 276:19
**personally** 265:21 368:3
368:5
**personnel** 343:24
**PERTAINS** 212:6
**PETER** 215:4
**Petersburg** 218:2
**phone** 327:22 334:7,7,14
335:5
**photo** 236:21 250:25
251:2 252:4,12,13
303:8 319:22 320:2
360:9,15,21 361:13,25
**photograph** 236:13,15
236:16,17 237:3 251:3
251:7 252:1,6,17
295:20 303:7 309:15
310:25 319:17 320:5,10
320:21 321:2,5,8,18,20
321:21 322:2,11 323:1
**photographed** 235:5
**photographic** 358:2
**photographs** 236:20,25
237:4,7 239:7 250:9
253:22,23 272:20
295:18 296:9,11 318:12
318:15 320:7,20
**photos** 237:20,22 238:2,2

238:6,6,15 296:4
358:14 359:8,13,22
360:16
**phrase** 355:1
**physics** 219:3
**pi** 219:7
**pick** 335:19 336:19,24
**picked** 311:1 333:13
338:14,21
**picture** 359:25
**pictures** 272:25 273:3
274:6 319:25 360:3
**piece** 220:12 268:23
285:15 293:20 321:6
**pieces** 265:10 320:22
**pile** 219:20,22,25 220:9
220:13,13,18 221:7,20
223:10 225:5 233:16,19
233:19,24 234:2,4,5,20
234:21,25 235:8,10,11
235:14,20,24 236:11
238:18,25 239:1,4,5,8
239:12,16,22 240:1,3,7
240:8,13,15 242:4,10
242:16 358:21 363:20
363:23 364:4
**piles** 233:17 235:2 278:1
**pinching** 232:21
**pipes** 254:23
**piping** 220:16,25
**pitch** 227:6,19 228:8
**pitched** 226:1 231:19
**pitches** 232:15
**pitching** 227:2,10 230:15
296:20
**place** 221:7 235:14
253:21,22,23,24 256:12
256:16 290:24 291:19
361:22 362:22 363:2,4
364:7
**placed** 311:16,21,22
363:23
**places** 222:16 301:21
363:3
**plaintiff** 348:20
**plaintiffs** 344:24 349:12

**plane** 302:5,8,18,21
303:1,1
**plate** 224:7 322:4
**please** 229:2 249:17
250:2 255:5 275:3
286:1 350:5
**plenty** 285:14
**plow** 306:20,21 307:20
**plural** 296:14
**plus** 306:19 307:21
**point** 223:13 231:4 241:3
241:4 248:22 249:24
281:10 284:6 306:4
321:10 327:17,19,19
332:14 342:5 343:5
350:13 360:4 363:6,15
363:17,24
**pointing** 319:8
**points** 271:8
**poles** 247:13
**poly** 287:18 291:13
**polypropylene** 291:4,24
316:4 355:6,17
**port** 274:9,12
**portion** 223:12 239:7
248:12 249:4 358:18
**portions** 346:16,18
**position** 243:3 246:6
298:8,9 311:18
**possession** 357:25
**possibility** 309:4
**possible** 283:25 295:1,6
317:25 342:22,25 352:7
**post-accident** 261:21
**post-casualty** 261:18
**potential** 269:5 314:3
**potentially** 364:8
**pounds** 297:7,10
**Poydras** 212:20 213:14
214:3,12,20
**practical** 314:24
**practically** 351:5 359:3
**practice** 221:8 235:7,8
308:18,20
**preceding** 257:2
**predicts** 286:15

preexisting 293:13
prefer 262:8 319:7
preferred 294:19
preparation 283:15,17
  284:14 368:6
preparations 256:24
prepared 238:5
PRESENT 215:1
presented 288:6
pressure 220:8,11,21
  240:24 241:2,9 242:8
  358:9 359:12 360:6
  363:9,13,16
pretty 221:17 231:7
  273:18
prevent 284:1 308:23
  324:16 352:7
prevented 280:22 312:18
preventing 288:18
previous 251:24 277:24
  303:5
previously 218:4 295:15
  331:5
pre-hurricane 256:25
primarily 261:7 355:23
primary 317:13
principal 264:3 287:4
  326:15 330:21 351:13
principals 257:4 305:1
prior 298:24 299:24
  314:14,20 316:21
  328:12 331:12 332:11
  333:13 335:9,20 339:9
  340:14,19 344:11
probably 223:19 225:12
  227:9,13 255:17 257:10
  257:12 261:8 264:5
  265:2,3 291:11 307:8
  307:10,12 324:14
  330:12 331:18 332:5,16
  366:14
problem 220:12 273:13
  341:15 342:6
problems 337:9,11
Procedure 217:6
proceed 220:25

process 270:9
PROCTOR 213:18
produce 223:2
produced 254:21 334:13
producing 267:4
production 264:22
professional 276:12
  351:5,10,25
professionals 351:22
progress 285:9
progressing 230:13
prohibition 280:20
projected 341:25 343:6
  344:1
projects 264:8
proper 262:2 278:19
  306:17 308:9 353:14
  365:17
properly 307:16,17,18
  344:10 350:20 355:22
  358:22
propose 264:23 276:3
propylene 270:24
protected 222:6
protecting 286:21
proven 223:4
provide 270:3 348:12,14
provided 272:23 273:12
  330:2
provides 256:4
prudence 343:13
prudency 344:5
prudent 344:4,12
PSLC 213:2
public 340:17,21
publicize 365:15
publish 351:18
published 236:25 347:7
  347:12 351:15
pull 237:10,15,19
pumping 276:6
pumps 276:5,6
purchased 263:4
purchaser 262:21 263:3
pure 222:14
purely 318:7

purpose 243:20 275:16
  275:19 294:8
purposes 217:5 238:12
pursuant 217:7
pursue 314:3
push 219:23 220:8,21
  224:3 245:18
pushed 219:24 220:24
  245:24
pushes 221:19 297:18
pushing 223:10 240:17
  240:24 241:9 243:17
  312:24
put 242:9 249:18 261:24
  262:21 275:10 295:1
  299:1 300:3 312:4
  332:3,4 364:17 365:14
putting 260:7 293:11
  356:9
P-L-E-W 306:21
P-L-O-W 306:22,23
P.E 212:18 218:1 369:3
  369:11
P.L.C 213:3

## Q

qualification 351:15
qualifications 257:8,11
  260:12 261:1 287:12
  367:21
qualified 258:3 365:13
  365:14 366:6,20
qualifies 351:2
quarter 306:19,25 307:2
  307:21 322:1
question 217:12 221:11
  224:18 229:4,17 234:18
  243:1,9 246:4,25 247:6
  247:21 249:7 255:1,4
  259:10 260:11 264:18
  265:18 267:9,9,15
  270:18 271:3,11 275:2
  282:6,7,8 284:23,25
  285:6,25 287:21 288:6
  288:24 289:12 290:3
  291:23 297:13 310:14
  315:2,6 316:18 323:22

325:3 326:25 328:4
  337:12,17 338:17
  347:18 350:5,24 353:15
  354:24 355:15 356:19
  359:6 362:6 364:18
questioning 267:12
questions 219:15 251:12
  253:11 259:25 291:21
  318:9 323:11 345:11
  350:15,15,19,19,22
  361:8,11 367:22 368:9
quick 238:10,11 252:10
  252:10 347:18
quickly 347:2
quite 248:24 293:14
  342:9 346:20
quoting 228:17

## R

radio 340:24
radius 224:6 230:4,10
  320:12
RAFFMAN 213:19
  216:5,9 218:7,17 219:2
  224:23 229:7,11,16
  237:13,18 238:24
  245:21 246:2 247:4,7
  251:17 252:9,23 350:2
  354:16 356:14,17 357:2
  357:11 361:9,12,21
  366:2,10 367:4
raise 227:3,4
range 288:10
ranks 258:21
rapidly 245:7
reach 249:17 254:5
  311:3 330:6 331:9
reached 269:5 300:5
reaches 244:5
reacting 312:23
reaction 239:18,20
  352:15
read 214:8 255:20 256:3
  268:2 270:21 279:23
  280:15 305:1 311:17,19
  313:20 332:16 333:1,22
  336:7 338:16 341:13

348:9 353:3 357:22
364:23,24 365:19
366:16
**reading** 217:8 258:9
274:15,19 305:3 311:14
328:19 339:3,13,20
346:18
**ready** 333:13 338:14,21
**real** 300:22
**realize** 280:4 286:17
344:13
**realized** 251:25 344:3
**really** 342:10
**reason** 257:11 263:8
294:24 303:22,24
307:14 333:5 334:17
335:2 336:1,13 339:6
340:2 343:24 345:14
351:23 364:13
**reasonable** 269:24 270:3
270:8 293:21,23 313:23
355:10,11 356:3
**reasons** 262:20 263:11
**rebar** 223:11,24 224:9
231:25 232:1,1,7,9,16
242:16
**rebars** 224:3,5 230:8,9,9
230:23 231:22,23
232:25 235:17,19,20
362:1,2
**rebuttal** 349:4
**recall** 265:3 271:25
287:6,7,11,15 305:2
309:7 311:14,20 324:24
325:7,23 326:4 327:10
333:1,21,22 334:3,8,10
334:19,21,22 335:16
339:3,13 340:4 345:24
346:17 347:1,3
**receive** 257:6,7,10
288:16 291:17 314:5
330:19,22 333:8 338:1
338:12,18,19 343:2
**received** 257:12 287:14
326:8,14,20 331:3,4,17
342:20,24 344:14

**receiving** 255:14 331:12
331:16
**recess** 335:12
**recognize** 218:10,14,22
**recollection** 331:21
**recommendation** 264:2
264:12 274:24 280:21
281:1,11,17 282:16
294:23 308:1 352:4
**recommendations** 256:1
257:18 258:1 259:3
281:19 285:12 294:17
328:22 329:6
**recommended** 287:3
**record** 237:9,12,15,17
238:12,14 251:21 289:4
292:11 296:2 344:21,23
349:9
**recorder** 333:24
**records** 334:7,14 335:5
335:15 336:11 337:2,4
**rectangular** 298:11
**red** 250:2
**reduce** 275:22,23,25
**reduction** 365:4
**refer** 292:4 305:13 324:3
347:20 350:24 360:9
**reference** 326:17 330:17
331:8,22
**referenced** 238:6
**references** 328:21
**referencing** 328:18
332:21 340:13
**referred** 326:10
**referring** 226:4 236:16
236:21 237:23 259:19
296:4 305:24 308:4
332:1
**refers** 292:19 293:19
327:1
**reflect** 224:9 226:18
**reflected** 225:14
**reflecting** 222:21 223:2
**reflection** 226:25
**refreshed** 343:19
**regard** 314:6 339:4,14

**regarding** 256:20 258:10
261:7 263:12 264:25
269:6 274:8,20 276:21
285:12 287:17 288:2,13
300:6 310:15 311:15
313:15 325:15 339:22
340:18 347:8,12 351:11
357:14 360:6 365:20
**Regardless** 266:19
**REGINA** 301:20
**regular** 325:19
**regulation** 280:21 281:2
281:11 282:9,16
**regulations** 255:25
257:18 258:2 259:4
328:21 329:2
**related** 223:20 264:9
265:16 325:8 341:4
370:14
**relates** 233:13
**relation** 226:12 267:2
**relationship** 348:23
**relative** 225:4 324:6
325:24 327:2 328:16
346:7,24
**relatively** 296:24
**release** 248:21
**released** 248:25
**releases** 239:13
**relied** 272:23 278:10
330:6
**relocation** 248:15
**rely** 272:18 276:12 277:2
278:4,19 279:3,4,9
348:21
**relying** 277:8
**remain** 241:20
**remained** 239:16,22
**remaining** 228:13 295:4
**remains** 220:12 230:18
**remember** 218:15
236:19 238:1 246:21
254:10,12 257:13
263:22,25 264:8 266:4
274:7,15,19 287:9
296:13,14 304:24,25

305:4,8,10,11,18
311:18 313:21 332:23
335:21,23 336:8 337:8
337:10 339:20 365:2,7
367:10
**reminded** 218:5
**remnants** 273:4
**remote** 225:12
**removal** 325:2
**remove** 282:4,10 325:5
**removed** 281:8
**removing** 345:16
**render** 257:16 323:23
330:3 348:22 351:2
366:20 367:21
**rendered** 357:1
**rent** 276:5
**repeat** 247:6 255:4
270:19 275:2 285:25
350:4,7
**repeatable** 265:11,14
**rephrase** 350:7
**replace** 293:6 315:21
355:19
**replacing** 293:3 356:8
**reply** 254:15
**report** 222:3 223:24
228:14,18 233:3 236:18
236:23 237:8,24 238:7
242:24 243:1 246:8
253:7 254:4,11,21
255:3,10,11,19,21
256:9 271:18 274:8
275:4 290:16,25 291:20
292:18 293:1 296:18
300:18 310:21 319:19
320:3 323:18 324:2,3,8
325:1 326:7,14,16
327:1 328:14,20,20
329:18 330:3 347:15
350:17 357:14 358:8
359:9 365:19 366:5,17
366:21
**reported** 350:1
**reporter** 212:23,25
217:23 238:10 370:3,25

HECTOR PAZOS (VOL II)

7/21/2009

Page 17

**REPORTER'S** 370:1
**reports** 274:19 364:23
   365:13
**represent** 238:4,13
   298:17 333:2 334:11
   335:24 337:23 349:12
**representation** 222:4
   299:18
**representing** 213:2,9
   214:7,16 285:16 323:14
   334:24
**reputable** 278:11
**reputation** 338:24
**request** 264:21,23 341:9
   342:11
**requesting** 287:22
   330:20 343:12
**require** 305:17 314:22
   315:16
**required** 288:3,14 290:5
   307:23 311:1 315:10
   350:22 354:10
**requirement** 304:20
**research** 282:1 348:8,15
**reserved** 217:13
**resistance** 308:12
**respect** 226:10 253:6
   254:23 255:25 257:17
   261:11 272:17 274:12
   276:1 278:20 282:17
   301:24 362:18
**responding** 257:5
**response** 257:6 334:13
   334:21 345:10
**responses** 334:6,25
**responsible** 283:16
   286:20
**responsiveness** 217:12
**rest** 239:21 249:14
   302:12
**resting** 221:7 249:12,21
   249:24 256:12
**restraining** 352:17
**restraint** 312:24 352:16
**restricted** 294:18 297:1
**result** 221:8 235:18

240:21 294:8 295:3
   297:19 312:15 358:9
   370:16
**resulted** 222:10 277:25
**resulting** 297:12
**retained** 255:13 261:25
   284:13
**review** 257:11 264:7
   326:1 333:15 334:5,5
   335:14 337:5 346:16
   347:2
**reviewed** 237:20 257:8
   326:8,10,22 346:22
   357:23
**reviewing** 254:13 257:13
   287:15
**rig** 261:24 308:18 355:22
**rigged** 307:16,17,18
**rigging** 256:25 278:21,23
   279:1,5 280:1,13
   307:15 317:14
**right** 219:3,6,11 221:10
   221:13,19,23 222:6
   223:22 224:1,8 225:19
   231:5,18 232:5,9 233:2
   233:17,18,24 234:1,17
   235:6 236:12,18 237:6
   237:14 238:9 239:1
   240:15,25 241:7,11,17
   242:13,14,23 244:2
   251:10 252:15,18 253:4
   253:7 254:18 272:14
   280:11 290:12 291:25
   293:8 301:9 302:12
   304:2 305:9 306:23
   310:12,17 311:6 313:7
   315:11 316:24 320:14
   321:25 322:22 326:4
   342:20 349:3 358:25
   359:5 361:10,14 362:4
   362:6,10 363:2,8,11,13
   363:17 364:14 367:5,19
**right-hand** 359:10,23
**rigs** 287:8
**ripped** 238:25
**Rita** 243:4 250:15,23

252:15 309:13,22,25
   310:10
**river** 339:19
**ROBBINS** 213:21
**ROBERT** 213:12
**rollers** 319:20
**rolling** 232:21 296:20
**RONALD** 214:10
**rope** 262:10,11,21 263:3
   263:4 264:19,25 265:8
   265:20,24 266:10,13,23
   267:1 270:11,24 271:1
   271:6,8 274:2 287:18
   288:3,24,25 289:13
   290:5,8,22,25 291:1,3,5
   291:8,10,17,18,24
   292:18,19,20 295:20,23
   296:13,14 297:7,23
   307:4 309:6,14,16
   310:22 314:8 315:23
   316:10
**ropes** 256:2 257:1,2
   262:14,17,19,22 263:8
   263:12,17,24 264:9,12
   265:16,17,23 266:2
   272:20,20 273:1,4,9,10
   273:11,14 274:6 288:15
   289:25 290:17 291:2,13
   295:13 296:10,22 297:2
   297:3 305:23 306:6,14
   307:20 308:4,5 310:12
   316:4 317:15 353:1,1
**roughly** 322:13
**RPR** 212:24 217:22
   370:2,24
**rubber** 233:9,10 239:13
   242:1,22
**rubbing** 296:16
**run** 247:12
**rushed** 247:24
**rushing** 248:5,11
**résumé** 287:14

| S |
| --- |

**s** 213:19 217:1 255:21
   287:11 290:16 292:18
   296:6 305:11,15 324:6

330:25 332:25 335:16
   338:6 339:8 341:21
   346:16,19 353:4
**safe** 276:9,11,17,18,22
   277:4,10,11,16 278:3,7
   278:16 326:19
**safety** 258:17 259:2
   276:13 279:5,17
**salvage** 261:7,9,19
   325:17
**Sanders** 296:5
**Saturday** 355:2
**save** 217:11 228:19
**saw** 272:25 274:5 295:20
   296:11 297:24 309:14
   310:18
**saying** 232:13,17 236:9
   240:9 244:20 245:23
   266:3 303:10 305:3
   312:8 313:7 317:10
   332:20 336:8 342:24
   344:17 356:12 367:10
**says** 267:18,23 347:24
   359:11
**scale** 222:7,8 225:6 299:7
   299:15
**scared** 341:1
**school** 250:20 251:1,4,8
   252:6
**scientific** 264:15
**scientifically** 270:9
**scientists** 364:19
**scope** 366:1
**scouring** 231:12
**scraped** 231:25
**scratches** 223:25 224:2
   225:15,16 228:15
   229:18 230:3,10,23
   232:13
**screen** 238:10,11
**sealing** 217:9
**seawall** 223:21 225:8
   227:14 230:2,19 245:18
   245:23 249:2 357:16
   359:1 360:8 365:5
**seawalls** 358:19

**second** 223:7 227:5,11
  227:12,12 229:15 306:4
  310:14
**seconds** 226:2 227:6,8
  231:6 232:24 236:4,4
  248:16,16 251:16
**section** 212:7 239:1
  245:6 264:15 272:2
**sections** 238:18 271:21
  366:16
**secure** 338:25 355:14
**secured** 305:23 306:5,9
  307:20 339:8
**see** 219:18,20 222:24,25
  226:22 228:21 229:13
  233:10 236:15 237:15
  239:11 242:10 243:6
  245:2 247:5 249:20
  251:4 275:1 309:15
  310:24 318:20,22,24
  319:1 320:20 321:10
  322:17 328:20 329:22
  330:14,16,21 331:6
  337:5 346:23 347:25
  360:17 362:1,2 365:19
**seeing** 273:3 298:3 305:4
  332:23 334:19,22 337:8
**seek** 350:16
**seen** 236:19 237:4
  268:16 291:19 298:2
  300:17 326:3 330:12
  332:21 357:4
**seepage** 221:4,15,22,22
  240:22 244:10,10
**seeping** 221:9
**selecting** 262:19 276:18
**self-evident** 326:25
  338:10
**sense** 294:24 314:1
  348:24
**sentence** 329:20 347:19
**separate** 236:7 302:7
**separated** 236:11 238:19
  239:8,12
**separates** 236:9
**separation** 308:12

**series** 318:12
**serve** 275:15
**set** 370:7
**seven** 302:7
**severed** 275:20
**shape** 240:6 307:22
**shear** 220:19
**sheet** 219:20,22,25 220:9
  220:13,13,18 221:7,20
  225:5 233:16,17,19,19
  233:24 234:2,4,5,20,21
  234:24 235:2,8,10,10
  235:14,20,24 236:10
  238:18,25 239:1,4,5,8
  239:12,16,22 240:1,3,6
  240:8,13,15 242:4,10
  242:16 358:21 363:20
  363:23 364:4
**SHELONKO** 215:5
**ship** 266:16
**shipyard** 264:16
**shock** 273:16 294:12
  295:4,7,8,11,13,21,22
  296:12,16 297:11,14,22
  306:13
**shore** 305:23 306:6
  308:5,25 309:1,4,5
  311:3,5 314:22 315:10
  317:12
**short** 311:6
**shorter** 235:3
**shorthand** 370:9
**show** 239:7 245:15 251:7
  267:6,17 291:14 298:1
  298:12,22 318:10,16,17
  319:12,18 320:11
  321:17 322:3 332:10
  333:3,11 334:15 335:6
  337:25 359:8
**showing** 252:1 303:8,14
  322:2 358:9
**shown** 236:13 252:11
  319:16 322:11
**shows** 303:11 321:20
**side** 222:5,6,11,12
  230:16,25 231:12,14

  233:1 251:13 253:6
  264:18 298:5,5,16
  312:19,23,25 313:1
  317:25 319:4 365:4
**Signed** 369:11,13,15
**significance** 352:1,4,9
**significant** 351:14
**signing** 217:9
**similar** 336:7 352:10
**simpler** 359:6
**simply** 221:11 291:24
**single** 265:4
**sinking** 275:17,21
**sir** 253:8 322:5 327:5
  328:14 329:9 331:13
  332:7 333:2 334:11
  335:8,24 336:4,18
  337:24 338:5,11 339:5
  341:7,14 342:4 347:6
  348:11
**sit** 264:10 300:23 303:19
  329:1
**sitting** 250:19
**situation** 262:3 279:15
  279:21 280:8 325:7
  339:25 342:3 366:24
**six** 231:15 292:22,22,22
  292:23 302:7
**six-and-a-half** 290:23
**six-inch** 290:18 292:18
**size** 223:3 355:21
**Skaer** 290:16 292:18
  296:6
**sketch** 219:14 222:3,4
  225:2,3 299:14 303:6,9
  303:10,16 318:14
  321:15
**sketches** 298:12
**slab** 223:12,14 235:17
  242:5,20 243:17,17
**slight** 225:12
**slipped** 295:16
**slipping** 274:3
**slow** 244:24 245:1
  247:15
**small** 226:10 251:1

  319:23
**smaller** 221:5 315:24
**Smith** 353:4
**Smith's** 311:14
**snap** 242:17,19
**snapped** 244:21
**snaps** 239:12
**soft** 263:24 264:4 265:16
  308:7,15 310:15 315:22
  315:24 316:11,14 317:5
  352:2,5
**soil** 220:15,19 221:20
  233:24 234:22 240:23
**solid** 226:21
**solution** 294:7
**solve** 279:20
**somebody** 246:21 261:25
  278:6 339:21
**soon** 342:22,25
**sorry** 229:6 246:25
  256:17 272:2 299:9,12
  306:1 320:14 330:24
**sort** 256:2 269:18 301:15
  351:2
**sought** 217:15
**sources** 332:20 353:3
**south** 218:2 219:16
  222:17,17,18 241:8,9
  242:14,15 243:5,6,11
  243:12,16 244:5,6,16
  244:20,20 245:5,8
  246:7,10,11 360:13
  364:20
**southern** 222:9,10
  240:15 341:23
**southernmost** 243:6,12
  246:8 360:13
**So-and-so** 343:1
**so-called** 229:23
**space** 226:17
**speak** 274:8 294:17
**speaking** 362:22
**specific** 218:16 221:8
  238:2 257:19 264:8
  265:6 266:17 278:8
  281:10 285:19 288:19

HECTOR PAZOS (VOL II)                                                                                   7/21/2009

291:16 300:17 316:19
324:24 325:7 348:8
350:24 351:20,23
354:11 357:5 363:4
**specifically** 217:10 244:3
256:8 257:6,25 259:16
259:18 263:21 277:12
278:24 281:12 284:25
287:6,7,9 291:18
294:22 305:2 313:3
323:23,25 324:13
325:25 326:14 327:10
330:5 340:21 342:21
**specifics** 274:18
**specifying** 351:8
**speculate** 339:12
**speculation** 245:11
**speed** 266:11,14,14,22
266:25 267:3 270:11,12
270:25 274:23 287:18
288:3 290:4
**speeds** 274:11
**spend** 303:12,15
**spies** 335:11
**splash** 222:24
**split** 236:6
**splits** 236:9
**spool** 355:16
**spot** 363:9
**spring** 312:4,13,16 313:3
317:20,22 318:7
**St** 218:2
**stage** 263:6,7,7
**stand** 222:22 331:5
**standard** 265:11,14
281:20 291:7
**stands** 293:22
**start** 220:14,15 230:24
236:5 256:10 279:18
280:5 351:17
**started** 228:16 230:6
243:14,15 255:14
**starting** 228:24 243:18
262:18
**starts** 329:20
**state** 217:23 293:3 370:3

**stated** 284:13 295:14
**statement** 278:25 279:20
279:25 293:19 311:15
311:17,18,20 326:19
328:24 330:7,17,20
331:17,20,22 332:6,7
332:25 335:15 348:11
365:18 367:7
**STATES** 212:1
**stations** 223:5
**stay** 227:11 253:25
257:13,20
**steel** 240:3 265:17
306:20 307:21 308:5
309:6 317:12 319:11
321:23
**steps** 286:24,24 287:1,2
**stern** 224:15 229:24
294:19 319:7 321:22
**sticking** 231:22,23
**STIPULATED** 217:2
**stipulation** 218:4
**stop** 230:23 232:11,11,13
232:23 279:7 294:21
295:10 342:10 363:7
366:4
**stops** 232:10 363:12
364:8
**storm** 222:23 328:12
332:12 333:13 335:9,20
339:2,9 340:15 343:5
343:25 344:11 353:8
**storms** 276:16
**storm's** 341:22 345:17
**story** 222:1
**straight** 230:8 354:8
**strain** 242:9 273:15
295:23,24
**strands** 291:12
**Street** 212:20 213:5,14
214:3,12,20
**strength** 239:25 257:2
264:25 265:20 266:2,10
266:12,23,25 269:6
270:11 274:16 288:13
291:15,18 294:3,4,5

295:5 308:14 315:22,23
315:25,25 317:4 340:18
352:25 353:6,19 354:10
356:2,5
**strengthen** 309:3
**strengths** 274:21
**stress** 242:11
**stresses** 235:21
**stretch** 240:4,5,9 241:10
**stretched** 242:17
**stretching** 240:6,17
241:14,18,21
**strictly** 272:18
**strike** 354:14,23 360:7
**strong** 221:18 365:16,23
365:23
**structure** 220:2,6,10
236:6,8 242:4,6,17
319:24 362:16
**studied** 273:14 367:12
**study** 313:10
**stuff** 226:22 258:6
**subject** 295:20,23 296:11
296:24 299:9 332:24
338:15 352:14 354:8
357:5
**subjected** 270:24 296:20
**subjects** 256:7
**substantial** 241:19
**substantially** 228:6
**sudden** 226:24 230:19
295:23
**suddenly** 286:14 295:11
**sufficient** 262:4 316:14
350:25 354:4
**suggest** 337:23 339:6
**suggested** 335:6 347:22
**suggesting** 275:20
**suggestion** 275:5
**suggests** 248:10
**Suite** 214:3,20
**summarize** 305:22
**sunk** 274:25 275:6,9,13
**supervision** 370:10
**supervisor** 283:24
367:25

**support** 220:3
**supportable** 270:9
**supported** 220:6 242:6
**supporting** 230:18
268:23
**supposed** 283:23
**sure** 231:7 233:16 237:3
247:8 260:9 273:18
282:20 286:12 302:4
306:24 309:21 314:9
332:18 342:13 343:1,21
344:17,19
**surface** 226:6,11
**surge** 297:6,11,12,15,24
**surveyors** 229:23
**sustain** 354:11
**sustained** 341:24 343:7
**SUTTERFIELD** 214:1
**swing** 297:4
**swinging** 352:7
**sworn** 218:4 370:6
**system** 220:9 242:8
354:10 360:5
**systems** 351:8

---

**T**

**T** 216:1,10 217:1,1
**take** 219:13 236:3,16
238:10,11 250:2 253:21
253:22 262:1 270:10
283:25 284:3,4 298:22
313:2,3 323:11 337:3
343:4 357:8
**taken** 217:5 281:4,8
352:16 369:25 370:8
**talk** 248:13 253:5 267:4
288:4 301:14 309:6
**talked** 240:11 296:19
**talking** 223:23 244:4
263:14 271:5 291:4
302:8,19 304:24 305:5
305:18 310:5 334:9
347:23 358:25 360:25
364:25
**team** 254:21 255:8
366:19
**tear** 273:17

technical 219:11 227:23
telephone 247:13 330:8
television 340:24
tell 227:7 235:13 236:21
  253:16 256:4 258:4
  264:5 265:6,8 299:23
  306:3 318:18 330:4
  334:9 340:20 353:12
telling 261:17,22 265:15
  300:5 303:19
tells 335:10
ten 312:3 315:15 318:4
tendered 296:5
tensile 264:25 265:20
  266:1 352:25 353:19
tension 233:6,9 234:14
  236:5 242:9
term 219:12 332:9
terminal 256:1,11
  261:13 274:14 276:22
  277:9 286:14 287:12
  288:9 290:10 296:19
  329:21 352:24 355:3
  367:24 368:7
terminals 277:19
terminology 347:21
terms 299:7 303:11
  324:18,19 325:22
  327:25 328:4 329:9
  331:14 337:14 342:7
  352:3 360:25
test 265:24
tested 352:25
testified 218:6 301:21
  315:8 326:5 335:18
  362:13,20 363:1
testify 280:1 349:25
  370:6,7
testifying 257:22 316:13
testimony 225:25 235:24
  239:14 242:18 251:25
  253:9 257:16 259:24
  260:11 266:21 272:19
  274:4 279:23 280:10
  286:11 296:3 302:11,14
  304:4 305:11,13,15

306:24 308:17,22
  309:20 314:15 326:17
  326:18 327:1 331:7
  332:19 333:3 335:16,17
  335:25 336:11,23
  337:24 343:9 345:1,24
  346:17,18,24 354:25
  369:4,6
testing 265:23 266:7
tests 265:19
thank 221:10,25 229:10
  242:24 251:20 323:6
  354:19
theoretical 222:14
  235:12
theoretically 366:7
theory 221:8 243:22
  313:19,23 366:25
thereof 217:14
Thigpen 278:20 279:25
thing 256:2 305:4 347:11
  352:12
things 270:22 273:11
  283:10 336:9 352:22
  365:14
think 228:14 233:2
  245:18 247:2 249:7
  263:14 264:7 271:9
  278:18 279:2,8 303:4
  313:20 315:4 317:7
  324:1 326:5 332:15
  337:13 343:19 349:19
  355:9 366:19
third 243:2 306:4 312:19
thirds 321:4
thirty 235:18
thought 296:18 310:8
  312:6 345:14
thousand 297:7,10
thousands 254:13
three 227:6 235:1,4
  255:17 297:7 302:6
  310:19 345:20 357:24
  367:22
Thursday 341:22
tide 277:25

tie 264:19 300:1 308:9
tied 271:8 272:21 276:2
  284:15 287:24 298:23
  299:24 300:9,24 368:3
tier 313:11,11,16,17
  314:18,21 315:14 316:3
tiers 314:7
tilted 231:10 360:1
time 217:13 218:15
  220:20,21,24 221:16,22
  225:9 227:17 228:10,20
  231:9,13 232:19 237:10
  241:19 242:21,22
  248:13 257:5 265:4,6
  266:13 272:25 273:3
  274:13 276:23 280:23
  281:3 288:10 292:11
  296:9 298:3,24 299:9
  303:12,15 305:16
  309:11,22 310:9 314:1
  321:10 325:17 331:25
  332:2,6 339:24 340:8
  340:19 341:14,16,18
  342:9 343:16 344:1,18
  348:1,5 350:13 362:12
  362:17
timeline 323:12
times 219:4,7 243:23
  257:24 259:22 265:2,3
  274:21 288:10 297:6
  341:3 364:24 368:5
timing 221:17
tip 341:23
today 256:22 264:10
  300:23 303:20 326:11
  329:1 351:18
told 239:11 262:6 290:9
  300:17 312:6 342:21
  344:7,11 346:4,9,15
top 222:3 223:7,10 226:2
  226:16 227:14 232:20
  233:4 234:6,16,20
  235:9 239:4,7,19
  242:20 246:10,15,19
  250:19 251:8 263:13,22
  263:24 264:6 267:18,19

321:6 327:9 328:5
  330:10 332:15 335:22
  347:1,19 358:22 360:10
  360:15 361:25
topped 283:9 328:11
totally 366:17 367:3
tow 261:1,23
towboat 261:11
towing 259:20,22
traffic 336:5
trained 279:2
transcribed 370:10
transcription 369:5
  370:11
transit 222:5 233:13
transited 225:18
transiting 222:11
translate 219:23 239:21
translated 249:6
translation 219:19
transmitted 235:19
  357:16,21
transom 230:5 321:23
transporting 220:16
travel 232:25 246:10
  247:8 249:10,11,13
traveled 246:12
traveling 222:17 231:9
  232:19,21 246:15,18
  297:19
travels 231:25
traverses 241:15,17
  242:14
tree 266:16
trial 218:19,22 326:18
tried 329:25 330:8
triple 355:20
tripling 367:6
true 347:6 369:7 370:10
truth 370:6
try 265:6 291:21 359:6
trying 224:21,24 232:17
  234:17 242:2 253:19
  257:20 268:20 279:20
  280:6 297:19 315:5
  324:18 331:15 332:24

HECTOR PAZOS (VOL II)

339:18 350:10 351:20
**tug** 261:1 280:14
**tugboat** 261:4,10,15,23
301:20
**tugboats** 259:21
**tugs** 259:20
**turn** 248:19 249:8,17
251:10 278:24 318:11
318:20,23 319:1,5,12
319:21,23 320:2,6,12
320:19,22 321:1,2,3,5
321:10,16,19,24 322:3
322:5,10,15,21
**Turning** 319:3
**twenty** 234:4,6,7 292:13
311:6 312:3
**twice** 223:3
**two** 227:5,23 228:2
230:12 236:24 237:19
237:22 238:6,15 257:20
266:24 271:8 274:5
278:24 287:23,23,25
288:16 289:23 290:7
291:15 294:6,25 295:18
296:23 297:7,9 298:4
298:11,18,25 299:19
308:10 313:17 316:5,10
317:19 320:7 321:4
324:4 325:9 341:9
342:25 345:19 349:21
351:18 355:12 356:9,11
356:12 358:17,20
359:13,17 364:11
**two-inch** 287:18,24
288:14 290:17 291:2,3
291:4,13,24 292:3,4,6
292:20 306:14 316:3,11
316:14 355:6 356:6
**tying** 232:12 256:25
**type** 257:1 282:9 317:8
317:15 319:10 324:22
325:5,23 328:10 331:17
343:18 348:2 358:10
**types** 269:4
**typical** 325:11 359:11

**U**

**U** 212:17 217:1
**Uh-huh** 289:2
**ultimate** 266:20 275:17
**um** 220:1 223:12,16
225:5 229:20,21 231:10
241:18,25 253:18
255:13,25 266:5 270:9
276:12,24 277:3 279:19
283:23 285:11 294:20
300:19 303:16 311:17
315:22 319:19 327:8
328:15 330:15 340:25
342:10 349:19,20 350:4
350:18,20 353:13 363:3
365:4
**unclear** 255:20
**underneath** 220:16
**understand** 223:23
224:21 231:18 232:12
232:17 233:15 236:10
241:24 242:13 243:22
244:18 247:20 256:21
260:10 267:1,2 268:19
269:25 270:21 275:1
280:3 285:18 286:3
290:3 298:23 299:12,17
299:23 306:24 310:21
314:14,20 351:1 365:16
**understanding** 292:17
300:22,25 301:1,4,5,18
332:8 348:2 367:17
370:12
**understood** 221:13 222:2
238:17 245:22 246:3
350:14
**undertake** 339:16
**unfold** 219:24
**unfortunately** 237:7
**unit** 225:6 235:25
**UNITED** 212:1
**unloaded** 327:15
**unloading** 280:23 282:18
**unsafe** 279:1,16,20 280:1
280:7,9
**unsafety** 279:18
**upper** 244:1 359:10,22

**USA** 212:13,14
**use** 232:3 233:7 244:18
247:2 248:24 264:19,19
266:25 274:23 291:7
296:13 304:21 305:17
311:2 317:5,9 332:9
339:18 355:22 363:7
367:9
**U.S** 234:24 257:17
258:15,21,25 259:4,5
358:18 359:2 360:4

**V**

**v** 212:8,9,10,11,12,13,14
212:17,18 218:1 369:3
369:11
**Vaguely** 319:2 342:2
**vagueness** 259:11
**various** 271:21 272:10
274:9 286:23 296:24
353:3
**velocities** 226:14,15
227:1
**velocity** 219:4 226:18
248:11
**versus** 290:17,18 358:4
362:9
**vertical** 302:5,18,21
303:1 360:1
**vessel** 227:19,22 264:18
274:25 324:16 325:5
352:6
**vessels** 260:2 276:5
339:18
**video** 214:25 238:12
289:18 358:13
**videographer** 214:24
238:11,13 292:12
**view** 269:7 321:11
366:11
**Villa** 218:2
**violated** 328:19
**Violation** 292:25 305:20
**violations** 272:11 280:18
293:5 328:18
**vis-a-vis** 224:25 227:21
**voicemail** 337:6,18 338:1

338:12,19
**void** 276:8

**W**

**wait** 270:14 279:7 300:4
300:4 342:14 344:19
**waived** 217:10
**walk** 250:17
**walked** 250:18
**Walker** 213:11 216:6
249:8 251:11 252:20
253:3,5 254:17 255:6
259:12 260:15,20,24
263:9 267:16,25 268:5
268:10,15 270:17
271:12,17 272:4,6
273:21,23 277:5 279:10
279:22 281:22 282:5,22
282:24 285:17 286:2,22
289:1,5,9,14,19,21
292:16 296:7 299:11,16
300:12,14 301:13 304:9
304:13,15,19 305:7
309:23 310:7 312:14
314:13,19 315:7 316:1
316:12 323:5,22 345:11
349:7 353:24
**walks** 226:21
**wall** 223:24 226:17
231:21 239:21 240:24
241:3,10,15,17 243:24
244:21 245:4 250:4
364:18,22
**want** 219:14 225:24
228:12,18 237:9 259:9
260:10,18 290:8 293:16
294:9 299:1 303:15
318:14,19 332:18
342:13,14 343:1,21
344:6,18 349:4,5
350:10 352:15 354:14
**wants** 247:16
**Ward** 256:12 310:9
**wash** 248:1
**Washington** 213:23
**wasn't** 222:23 265:18
309:20

HECTOR PAZOS (VOL II)                                                                7/21/2009

**waste** 314:1
**watch** 253:23,25 358:13
**water** 220:15,18 221:19
222:13,14,18 226:6,12
226:16 230:16,20
231:15,16,16,17 240:22
247:18,20,22,24 248:4
248:10,21,25 259:5
297:15 363:6,12 364:8
**waterfront** 226:21
**waterway** 367:24 368:2
**wave** 225:21 226:1,14,23
226:24 228:8 230:20
231:19
**wavelength** 227:16,21
**waves** 222:21 223:2,3,3
225:11 226:5,12,12,17
226:19 227:1,16,19,21
228:1,4 297:18
**way** 225:10 233:23 234:6
234:20 239:3,6 288:5
297:20 302:20 317:10
321:13 349:25 350:8
359:7 370:15
**weaken** 240:22,22
**weakened** 364:7
**weaker** 364:12
**weakest** 358:18 360:3
362:22 363:2,4,5,9,15
363:17,22,24 364:10,13
**weakness** 364:1,2,3,11
**wear** 273:17
**weather** 284:7 285:20
286:4 287:5 325:6
341:4 344:20
**WEBB** 214:1,2
**websites** 326:13
**Wednesday** 341:8
**week** 342:14
**weight** 353:17 354:22
**welcome** 323:8
**went** 224:11 230:14
231:14 247:18 250:5
309:12 310:9
**west** 251:13
**we'll** 268:11 271:13

301:9 323:1 327:24
345:6,7
**we're** 232:17 263:14
271:5 291:3 307:3
323:19 344:25 366:1
**we've** 218:18 243:23
244:13 322:14 323:12
345:8
**whichever** 320:18
**whiskey** 274:12
**white** 252:5
**WILKINSON** 212:11
**WILLIAM** 214:19
**wind** 226:6,7 228:2
266:10,14,14,22,25
267:3,13 270:10,12,25
271:7 274:11,11,16,20
274:22 275:23 285:20
286:5 287:18 288:3,13
288:18 290:4 297:16,17
297:24 312:19,22,22
357:15
**winds** 226:9,11 277:24
286:15,18 289:25
341:24 343:8
**wire** 267:5 305:23 306:5
306:15,17 307:4,4,19
308:10,13,19,23 309:6
310:15,18,22 315:16,23
316:10,23 355:14
**wires** 306:9 310:13
317:12
**wise** 223:8,9 253:19
**withdraw** 224:18
**withstand** 314:22 315:10
315:17
**witness** 217:4,25 218:3
250:1 251:22 310:1
369:1 370:5
**word** 219:9 229:21 232:4
232:6 233:7 243:20
244:15,19 266:24,25
270:1 302:5 308:3
311:9 312:2,11 317:2,9
318:3,5 331:19,24,25
363:4 365:10,12

**wording** 247:1 365:7
**words** 248:25 283:15
300:18 333:22 334:9
363:5 365:3
**work** 244:11 252:22,24
258:10 265:5 355:18
**worked** 262:10 367:23
**working** 238:13
**world** 261:9 291:11
**world-wide** 226:7
**worn** 355:19 356:8
**worse** 221:1
**write** 256:8,13 264:21
347:9 351:20,23 365:18
**writing** 254:4,10 351:17
365:15
**written** 218:11 219:18
237:2 281:18,18,23
282:8,15 347:7,12
366:6
**wrong** 303:7 316:25
317:1 341:2
**wrote** 228:14 233:3,10
236:23 242:23 243:1,7
246:8 268:24 331:18,25
332:6 345:17 348:1,9
348:16 365:17 366:11
366:14,21

___

**X**

**X** 216:1,1,10,10
**x-ray** 274:13

___

**Y**

**yeah** 224:22 232:18
258:3 278:11 292:1
313:8 362:2
**year** 255:17
**years** 257:21 258:8
262:19 263:15,15
277:14,24 303:18
325:15,21 357:24
**yesterday** 218:21,23
220:23 253:9 295:19
309:20
**York** 213:22

___

**Z**

**Z** 341:20
**zero** 226:16
**zigzag** 240:18 241:10
**zigzagging** 240:1,6,8,12
241:16
**Zito** 214:16 323:14,16,19
323:24 324:6 325:9
327:5,9,18,19,23 328:5
328:9,16,22 329:2
330:1,8 332:10,25
333:4,11,12,18,23
334:17 335:7,8,10,10
335:18,19 336:4,12,19
336:24 337:7,13,18,25
338:7,11,13 339:6
340:13,19,21 341:3,8
341:20,20,21 342:16
343:19,23 344:3,9,11
344:15 345:1 346:2,6,9
346:12,19 347:20,24
348:3,3,12
**Zito's** 341:12
**zulu** 274:13

___

**#**

**#75005** 212:25 370:25

___

**0**

**05-4182** 212:5
**05-5531** 212:8
**05-5724** 212:9
**06-5342** 212:10
**06-6299** 212:11
**06-7516** 212:12
**07-3500** 212:13
**07-5178** 212:14

___

**1**

**1** 225:13 226:2 248:16
280:17 298:14 320:9
**10-foot** 226:23
**100** 228:25 229:19
232:14 302:4
**100-foot** 228:17 232:10
**11** 317:19
**1100** 212:20 213:14

HECTOR PAZOS (VOL II)

214:12
**13** 216:13 218:9,10,12
**14** 216:14 218:19,24
  249:18,21,25 252:13
**140** 331:8
**15** 216:15 225:14 238:15
  238:21
**16** 216:16 252:19,24
  253:1
**17** 216:17 271:14,15
**170-foot** 219:19
**18** 216:18 301:10,11
  303:10
**19** 216:19 323:2,3

---

**2**

**2** 227:8 248:16 292:25
  298:14 347:23 360:10
  360:15,21 361:13,16
**2-inch** 270:24 355:12,16
**20** 310:22
**20-foot** 226:24
**200-foot** 229:19
**2000** 237:4
**20001** 213:23
**2005** 316:16 337:21
  355:2
**2008** 255:13
**2009** 212:21 254:22
  255:12 324:3 337:19,21
  369:25
**202-346-4000** 213:24
**21st** 212:21 369:25
**2150** 214:20
**218** 216:5,13,14
**22** 310:22
**23** 236:2 239:10,17
**23-feet** 239:8
**2300** 212:19 213:13
**238** 216:15
**24th** 341:9,17
**25** 228:13
**25th** 341:19,22
**253** 216:6,16
**27** 283:19 337:19
**27th** 283:13 330:9
  334:17 335:7 336:6,13

336:21,25 338:2,8
  355:2
**271** 216:17
**2715** 214:3
**29** 254:22 255:11 316:16
  324:3
**29th** 290:11

---

**3**

**3** 219:14 222:4 226:2
  227:8 248:16 298:14,15
  303:14 324:5,7 325:24
  340:11 345:7 360:10,16
  360:21 361:14,16
**3C** 268:21,21,22 270:21
**30** 252:2,7 329:18 330:7
**301** 216:18
**31** 347:15
**3200** 214:11
**323** 216:7,19
**33707** 218:3
**34** 228:17 229:8
**349** 216:8
**35** 252:2,7
**36** 270:24 290:13
**361** 216:9

---

**4**

**4** 226:8 320:10,14 324:5
  324:25 325:24 345:9
  359:9,9,23 360:17,17
  360:17,23
**4D** 270:21
**4:00** 290:10
**40** 311:2
**400** 261:8
**45** 236:22,24
**46** 233:3 242:1
**4725** 298:12
**4727** 267:23 298:13
  303:21 304:1 309:7
  315:4,9 316:24 317:6
  317:10 341:10 353:7,17
  355:3 356:23 367:13
**4745** 315:9 341:10

---

**5**

**5** 225:13 305:20,21
  359:23 360:17,23
**50000-ton** 264:17
**504-585-3200** 214:14
**504-585-7000** 213:16
**504-595-3000** 214:22
**504-598-2715** 214:5
**504-885-7700** 213:7
**53** 242:23 243:1
**55831691** 237:1
**55832357** 237:1
**566** 218:2

---

**6**

**6** 225:9 227:24,25 232:19
  294:12 301:17 320:9,14
**6:00** 290:11
**65** 280:18
**650** 214:3,20
**66** 293:3
**68** 305:21,25 306:2,3

---

**7**

**7** 331:2
**70** 331:8
**70113** 213:6
**70130** 214:4,21
**70163** 214:13
**70163-2300** 212:21
  213:15
**71** 324:4 328:15 340:10
**75** 341:24 343:8

---

**8**

**80** 228:16,25 229:18
  232:2,10,14
**821** 213:5

---

**9**

**90** 320:11
**900** 243:16 246:12
  248:18
**900-foot** 249:1
**901** 213:22