1

<pre>
 1                  UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF LOUISIANA

 3      ...............................................

 4      IN RE: KATRINA CANAL BREACHES:CIVIL ACTION

 5      CONSOLIDATED LITIGATION      :

 6                                   :NO. 05-4182

 7                                   :and consolidated cases

 8        PERTAINS TO BARGE          :

 9                                   :SECTION "K" (2)

10      Boutte v. Lafarge      05-5531:

11      Mumford v. Ingram      05-5724:

12      Lagarde v. Lafarge     06-5342:JUDGE

13      Perry v. Ingram        06-6299:STANWOOD R. DUVAL, JR.

14      Benoit v. Lafarge      06-7516:

15      Parfait Family v. USA  07-3500:MAG.

16      Lafarge v. USA         07-5178:JOSEPH C. WILKINSON,JR.

17      Weber v. Lafarge       08-4459:

18      ...............................................

19             ORAL DEPOSITION OF DONALD GREEN

20                    JUNE 25, 2009

21      ...............................................

22

23

24

25
</pre>

U.S. Dist. Ct. E.D. La.
No. 05-4182(K)(2) -- BARGE
DX 216

**2**

Oral deposition of DONALD GREEN, produced as a witness at the instance of the Defendant Lafarge North America, Inc., and duly sworn, was taken in the above-styled and numbered cause on the 25th day of June, 2009, from 11:13 a.m. until 4:44 p.m., before Denise Ganz Byers, RMR, CRR, CSR, in and for the State of Texas, reported by machine shorthand, at the offices of Chaffe McCall, LLP, 815 Walker St., Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**4**

INDEX
DEPOSITION OF DONALD GREEN
JUNE 25, 2009
PAGE

Examination by Mr. Walker          5
Examination by Mr. Mouledoux       187
Examination by Mr. Sanders         207
Further Examination by Walker      230
Further Examination by Sanders     236

Appearances                        3
Witness Signature Page/Corrections 238
Reporter's Certificate             241

GREEN EXHIBITS

NO.   DESCRIPTION                       PAGE

A    3/11/09 opinion letter to         20
     Lawrence Wiedemann from
     Donald Green

B    History for New Orleans           25
     Lakefront, Louisiana on
     Monday, August 29, 2005
     LNA 001071-1078
C    Flory Analysis of ING 4727        28
     Mooring Arrangement

D    Page 69 and cover of             216
     NAVAL SHIPHANDLING
E    Page 80 and cover of             216
     A DICTIONARY OF OLD
     SEA TERMS
F    Pages 6, 12 and cover            216
     of BARGE FLEETING
     STANDARD OF CARE &
     STREAMLINED INSPECTION
     PROGRAM GUIDE BOOK
G    Various photographs              231
H    Visual prepared for              236
     trial for Don Green

**3**

A P P E A R A N C E S
FOR THE PLAINTIFFS:
     Patrick Sanders
     ATTORNEY AT LAW
     3123 Ridgelake Dr., Suite B
     Metairie, Louisiana 70002
     504.834.0646

FOR THE DEFENDANT LAFARGE
NORTH AMERICA, INC.:
     Derek A. Walker
     CHAFFE McCALL, L.L.P.
     2300 Energy Centre
     1100 Poydras St.
     New Orleans, Louisiana 70163
     504.585.7000
     walker@chaffe.com

FOR THE ZITO FLEETING LLC:
     André J. Mouledoux
     MOULEDOUX, BLAND,
     LEGRAND & BRACKETT
     4250 One Shell Square
     701 Poydras St.
     New Orleans, Louisiana 70139
     504.595.3000
     amouledoux@mblb.com

**5**

DONALD GREEN
was called as a witness by the Defendant Lafarge North America, Inc., and, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. WALKER:
Q.  Good morning, Mr. Green.
A.  Good morning.
Q.  Thank you for accommodating us, and I thank Mr. Sanders as well for starting a bit early.  We know you had something else to do.  We appreciate it.
    You recall that I took your deposition on November 21st, 2008?
A.  Yes, sir.
Q.  And you understand we're here basically on the same case, although at the time of the last deposition I believe you told me the report that you had prepared had to do with the class certification; correct?
A.  That's correct, yes.
Q.  You've since issued another report dated March 11, 2009?
A.  That's correct, yes.
Q.  All right, sir.  And what's your understanding of the reason why that report was

6

1  necessary?
2      A.  My understanding is that this would be the
3  final report before the end of discovery, so to
4  review any material that I've received since the last
5  deposition and to render opinions in that regard as
6  well as wrap it up as my final report.
7      Q.  Were you instructed to prepare a new report?
8      A.  Yes.  I was given additional opinions --
9  additional material, rather, that allowed me to form
10 additional opinions and I've memorialized that in
11 that report of March 11, 2009.
12     Q.  Okay.  Were you asked to prepare a new report
13 because you were given additional materials or were
14 you given additional materials and did you then
15 inform that, based on those materials, you needed to
16 modify your opinions?
17     A.  Based on the material I received, I felt it
18 necessary to modify and/or supplement my declaration
19 of -- I can't remember the date, but this has ended
20 up being the final report.
21     Q.  Okay.  So my question was:  Were you asked to
22 prepare an additional report after your declaration
23 of September '08?
24     A.  I don't remember how the conversation was,
25 but I don't think I was directed to prepare a new

7

1  report.
2          They simply said, "The final reports are
3  due at a certain time and we have additional material
4  for you and if you see it necessary to form another
5  report beyond the declaration, then do it."
6      Q.  Okay.  What's the additional material that
7  you've obtained?
8      A.  Let's see -- I received photographs.  I
9  discussed the Coast Guard report.  Let's see what
10 other materials.
11     Q.  Let's go to Page 3 of your report of --
12     A.  Okay.
13     Q.  -- March 11, 2009.
14     A.  All right.  Yeah.
15     Q.  Okay.  Those five bullet points are your new
16 materials, aren't they?
17     A.  Yes, sir.  Yes.
18         MR. SANDERS:  In addition, we got your
19 expert reports which you asked him to review.
20         MR. WALKER:  Right.
21         THE WITNESS:  Yes.
22         MR. SANDERS:  About a week ago.
23         MR. WALKER:  Right.
24     A.  But I didn't have those expert reports when I
25 prepared this.

8

1      Q.  (By Mr. Walker)  I understand.  Having gone
2  through your reports, as far as I can tell making a
3  comparison of your materials reviewed, these five
4  bullet points are the only new materials since your
5  last report; am I correct?
6      A.  That's correct.  As well as the further
7  review of rules and regulations and all this other
8  stuff and those photographs.  Yeah, you're correct.
9  Exactly.
10     Q.  So the deposition of Louis Robin, what
11 information did you glean from that deposition that
12 you felt was necessary to include in the new report?
13         MR. SANDERS:  Object to the form.  It's
14 overly broad.
15     A.  Well, I'd have to go back and look at his
16 deposition again, but I know that I took it into
17 consideration.
18     Q.  (By Mr. Walker)  Okay.  So you can't refer me
19 to any specific testimony from Mr. Robin that you
20 considered relevant to your opinions to point to your
21 report and show me where you used that?
22     A.  That's correct, yeah.
23     Q.  Okay.  Same question for Mr. Johnson, can you
24 tell me what passage, what portion of his deposition
25 you considered relevant to use as new material for

9

1  your March 11, 2009 report?
2      A.  If I recall, both of those witnesses, one was
3  at the power station, and I can't remember his name
4  now, but -- I just took those into consideration, but
5  I don't have a specific passage in his deposition --
6  in the depositions, other than his description of
7  seeing the corner of a barge hitting the levee and
8  then beginning to run, and then he didn't look back,
9  he just heard all this crashing stuff.
10     Q.  I've read your report of March 11, 2009 --
11     A.  Yes, sir.
12     Q.  -- which I assume you've read also?
13     A.  Yes, sir.
14     Q.  There's not a single reference to any
15 testimony of either Robin or Johnson.
16     A.  Well, I'll take your word for it.  I'd have
17 to read it again.  I've read it four times since
18 yesterday.
19     Q.  Okay.  But my questions go back to your
20 initial answers in this deposition, that the reason
21 you prepared this report is because you had no
22 information that you felt was necessary to include in
23 a new report.
24     A.  Yes.
25     Q.  I don't see any information from the

10

1  depositions of either Robin or Johnson that modify
2  your opinions or that are included in this report.
3  A.  They just supplemented my report.  They were
4  certainly considered, but the new information that
5  was most germane to me is the expert report that I
6  depended on for calculations.
7  Q.  We'll get to all of the others.
8  A.  All right.  Sure.
9  Q.  I'm trying to make sure that I'm clear.
10  MR. SANDERS:  We'll agree that he
11  doesn't mention those names.
12  THE WITNESS:  Right.
13  Q.  (By Mr. Walker)  Nor any information
14  contained in those depositions?
15  MR. SANDERS:  Object to the form.
16  A.  Yes.
17  Q.  (By Mr. Walker)  There are photographs as
18  your third point.  What new photographs did you
19  obtain?
20  A.  These photographs were supplied to me,
21  provided to me by the Wiedemann firm.
22  Q.  These were not attached to your report,
23  however?
24  A.  That's correct.
25  Q.  Is this a copy I can have, or is this your

11

1  original copy?
2  A.  That's all I have.
3  Q.  Okay.  So you've handed me a packet of one,
4  two, three, four, five, six, seven -- 13 photographs?
5  A.  Yes, sir.
6  Q.  And these are the additional photographs that
7  you referred to as "various photographs" on Page 3,
8  Bullet Point 3 of your March 11 report?
9  A.  That's correct, yes.
10  Q.  Because earlier in the report you also refer
11  to -- on Page 1, the first thing you state is
12  "various photographs."
13  A.  Yes.
14  Q.  So we have two "various photographs," the
15  original set and this supplemental set?
16  A.  That's correct.
17  Q.  Is this your only copy?
18  A.  Yes, sir.
19  MR. WALKER:  Pat, do you have a set of
20  what you sent him?
21  MR. SANDERS:  I've got three to attach.
22  MR. WALKER:  I'm sorry?
23  MR. SANDERS:  I have three to attach.
24  MR. WALKER:  In addition to these?
25  MR. SANDERS:  No.

12

1  MR. WALKER:  Three sets?
2  MR. SANDERS:  I copied three of those to
3  attach.
4  MR. WALKER:  So do you have a set that
5  we can use?
6  MR. SANDERS:  I can send you one later
7  or you can xerox those here.
8  MR. WALKER:  Let's do that.
9  MR. MOULEDOUX:  Off the record.
10  (Recess from 11:21 until 11:22.)
11  Q.  (By Mr. Walker)  The next bullet point is "New
12  Orleans Lakefront Airport weather data" --
13  A.  Yes.
14  Q.  -- "Pages Numbers LNA 1071 through 1078."
15  I have a set of those.  I just want you
16  to double check and make sure that is what you're
17  referring to.
18  A.  Yes, sir.
19  Q.  Okay.  And where did you receive this data
20  from?  Was that from Mr. Wiedemann?
21  A.  Yes, sir.
22  Q.  Okay.  And then your last new bullet point is
23  the John Flory" -- that's F-L-O-R-Y -- "mooring
24  arrangement"?
25  A.  Yes.

13

1  Q.  And I have that as well.  I just want to
2  confirm that it's the same thing.  At least I had it
3  on the flight.
4  A.  You want my copy?
5  Q.  Yes.  Just hold it up for me and let's
6  confirm that.
7  A.  It's two pages.
8  Q.  Right, yes.  I need to find it anyway so we
9  can use it.  We'll get to it.
10  And you received that from Mr. Wiedemann
11  as well?
12  A.  Yes, sir.
13  Q.  Not listed but mentioned in your testimony is
14  something you said about the Coast Guard.
15  A.  Oh, I just went back and looked at the
16  regulations.  I reviewed -- I was also supplied the
17  Coast Guard investigation report and I did additional
18  research based on that and --
19  Q.  So the Coast Guard investigation report you
20  had not seen prior to preparing this report?
21  A.  That's correct.
22  Q.  Okay.  So you did not use that report for
23  your three prior reports and declaration?
24  A.  That's correct.
25  Q.  Again, it's not listed as material reviewed

4 (Pages 10 to 13)

14

1  nor is it mentioned in the body of your report.
2      A.  That's correct.
3      Q.  So was there no information contained in that
4  investigative report that you deemed relevant?
5          MR. SANDERS:  He got it after, he said.
6      A.  I reviewed -- it's my understanding that
7  we're not allowed to use the Coast Guard reports as
8  evidence in a case such as this.  If that's
9  incorrect, then I'd certainly want to use that
10 report.
11     Q.  (By Mr. Walker)  What --
12     A.  But I do have the report.
13     Q.  Okay.  Did you review the report prior to
14 writing your report of March 11, 2009?
15     A.  Yes.
16     Q.  And you simply didn't list it or use its
17 contents because you understood that you weren't
18 allowed to use it in evidence?
19     A.  That's my understanding, yes.
20     Q.  Okay.  What portion, what content would you
21 have used or do you consider relevant?
22     A.  Some of the investigation, and I looked at
23 their executive summary, and then some other parts of
24 it, particularly about people that had inspected the
25 barge, the barge inspectors that inspected it when it

15

1  was down in the Ninth Ward.
2      Q.  Your opinions as set forth in your prior
3  testimony have to do with mooring arrangements, the
4  adequacy of the mooring arrangements of the barges
5  prior to the hurricane and the applicability of
6  regulations or recommendations.
7          Is that still a fair summary of the
8  reason why you're going to testify in this case?
9      A.  Yes.
10     Q.  What in what you've just described are the
11 contents of the investigative report have any bearing
12 on your opinions regarding mooring or applicable
13 recommendations or regulations?
14     A.  It doesn't.
15     Q.  That's what I thought.
16     A.  The Coast Guard report, that is.
17     Q.  Right.  The investigative report?
18     A.  That's correct.
19     Q.  You said you did some additional research.
20 Into what?
21     A.  Well, after I received your expert's report,
22 I went back in and looked at the regulations again
23 and came to the conclusion I think I'm right.
24     Q.  Okay.  Is that basically what you did to
25 prepare your report?  And by that, I mean these new

16

1  materials and subsequent to the report, reviewing the
2  expert reports that we submitted to you?
3      A.  Yes, sir.
4      Q.  Okay.  So between November 2008 when I took
5  your deposition and the preparation of this report of
6  March 2009, you didn't do any other preparation or
7  review, other than what you've told me?
8      A.  That's correct.
9      Q.  Okay.  And since your report, what you've
10 done is review the three expert reports that I
11 submitted to you and have done some research into
12 those reports?
13     A.  That's correct, yes.
14     Q.  Okay.  I believe you're missing at least
15 something that I infer from your report, and that's
16 conversations with Mr. Flory?
17     A.  Oh, okay.  Yeah, I did have a conversation
18 with Mr. Flory.
19     Q.  How many conversations?
20     A.  I think it was only one.
21     Q.  By phone or in person?
22     A.  By phone.
23     Q.  And you were in Houston and where was he?
24     A.  I would assume -- I have his phone number,
25 wherever that is.  I didn't ask him that.

17

1      Q.  Okay.  What phone number is that?
2      A.  973-267-0871.
3      Q.  And you initiated the call?
4      A.  Yes.
5      Q.  Did you have his two sheets of calculations
6  or whatever they are --
7      A.  Yes.
8      Q.  -- before you called him?
9      A.  Yes, sir.
10     Q.  Okay.  Did you have any e-mail or any other
11 contact of any sort with him after that phone call?
12     A.  No, sir.
13     Q.  And how long was that phone call?
14     A.  I'd say 45 minutes, or not that long, 30
15 minutes, 30 to 45 minutes.
16     Q.  All right.  Did you re-read your deposition
17 of November 2008?
18     A.  No, I did not.  I was not supplied it.  I
19 think I said I wasn't going to sign, I didn't sign or
20 whichever, but I never got a copy of that deposition.
21     Q.  So as we sit here today since it was taken
22 you've never reread it?
23     A.  No, sir.
24     Q.  You were never given the opportunity to
25 conduct an errata review or anything like that?

18

1    A.  No, sir.
2    Q.  Do you generally remember your testimony?
3    A.  I try to but, you know, it depends on how
4    long it is.  It's hard to remember.  Even if I read
5    it last night, it's still hard to remember.
6    Q.  Is there anything that you remember
7    testifying to that you would like to modify or
8    correct at this time?
9        MR. SANDERS:  Object to the form; overly
10   broad.
11   A.  Well, if you want to be specific about
12   anything that I've testified to and if I still feel
13   the same way, I can certainly comment on that.
14   Q.  (By Mr. Walker)  Okay.
15   A.  But I can't remember -- I can't remember the
16   entire deposition.  I think it was a three-hour
17   deposition.
18   Q.  Have you changed your opinions in any way
19   since that deposition?
20       MR. SANDERS:  Object to the form; overly
21   broad.
22   A.  At this time, I don't think so.
23   Q.  (By Mr. Walker)  Well, have you modified your
24   opinions --
25       MR. SANDERS:  Same objection.

19

1    Q.  (By Mr. Walker)  -- since your deposition?
2    A.  In what regard?
3    Q.  In any regard.
4    A.  Well, I rewrote this.  This is my final
5    report.  And if there's any difference between what
6    my testimony is, I guess that would be a difference.
7        But I don't -- I don't recall all of my
8    testimony, I just recall the gist of my testimony,
9    and if there's specific areas that you'd like to go
10   over with me, that would be great.
11   Q.  You don't recall any testimony of yours that
12   as you sit here today was incorrect or you wish to
13   modify?
14       MR. SANDERS:  Object to the form.
15   A.  Again, if you could point out something that
16   you think I either misrepresented and/or you would
17   think that I would want to change -- I don't --
18   Q.  (By Mr. Walker)  We don't have enough time
19   for that.
20   A.  I understand.  And the reason for that is
21   usually I say I don't want to read and sign because
22   there's nothing I can do about it any way, it's
23   already memorialized.
24   Q.  Let's mark as Exhibit 1 your report of March
25   2009.  Actually, let's mark it as Exhibit A so we can

20

1    differentiate from Exhibit 1 of your prior
2    deposition.  Okay?
3    A.  Okay.  Sure.
4        (Green Exb. A was marked
5        for identification.)
6    Q.  (By Mr. Walker)  In preparing Exhibit A, did
7    you already have a template in the computer, which
8    was either your declaration of June 13th, 2008 or any
9    of your prior reports of December 2007 or January
10   2007?
11   A.  Yes.
12   Q.  Okay.  So the changes that you would have
13   made would have been made in the body of a
14   preexisting report and would have been fairly simple
15   to make on your computer; correct?
16   A.  That's correct, yeah.
17   Q.  I've compared your reports, and the changes
18   are minimal.  Would you agree?
19   A.  I'd agree with that.
20   Q.  Okay.  We'll go through them in greater
21   detail, but basically what are the changes in your
22   opinions as reflected in your March 11, 2009 report
23   as differentiated from your prior reports?
24       MR. SANDERS:  Object to the form.
25       Do you want him to read the difference,

21

1    the four or five paragraphs?
2        MR. WALKER:  No.  I want him to
3    enunciate them.
4    A.  Well, the way I do that is I make a copy of
5    the last report, then I go in and modify the report
6    and either strike or replace or modify or reword or
7    add additional opinions, and that's the method I use
8    and that's probably what I did with this March 11
9    report.
10       So I did not, after it was all over
11   with, compare the two to see what the major
12   differences are.
13   Q.  (By Mr. Walker)  Well, in your opinion as you
14   sit here today, what were the significant changes
15   that you made in your report that reflect changes in
16   your opinion, if any?
17   A.  Okay.  Let's see.  I have to go back here.
18       MR. SANDERS:  For ease, do you want to
19   direct him to the different articles or do you want
20   him to compare both reports?
21   Q.  (By Mr. Walker)  We can all read your report.
22   I'm trying to get your thought process.  You're the
23   expert.
24       Do you know, as you sit here today, what
25   opinions you changed without reading them?

22

1   A.   No, I don't.
2   Q.   You don't?
3   A.   I have 30 active cases going on.
4   Q.   What's this case about?
5   A.   This case is about a breakaway and voluminous
6   information is here, and I did this report in March
7   and today is June.
8          And so I read my report.  I did not
9   compare it recently to the June 13th report to see
10  what the major differences are, but I added comments
11  and so we'd have to go through these bullet by
12  bullet.
13  Q.   Do you remember why you excluded or omitted
14  any opinions that you held previously in this report?
15  A.   No, sir.
16  Q.   Do you remember if -- and, if so, how -- any
17  of the new information affected your opinions?
18         MR. SANDERS:  Object to the form; overly
19  broad.
20  A.   Yes.
21  Q.   (By Mr. Walker)  How?
22  A.   Well, the mooring arrangement that existed at
23  the time of the breakaway, I have issues with that,
24  and that was based on this new information I
25  received, plus --

23

1   Q.   What new information?
2   A.   Well, that's the photographs.
3   Q.   Okay.  So the new photographs --
4   A.   The new photographs.
5   Q.   -- influenced your opinion regarding the
6   mooring?
7   A.   Yes.
8   Q.   In what respect?
9   A.   The photographs clearly show that there were
10  cables, ratchets, chains and other hardware on the
11  4727 that I was unaware of prior to rendering this
12  report.
13  Q.   What's the relevance of the cables, ratchets,
14  chains and other hardware?
15  A.   Well, in my opinion that Lafarge had the
16  opportunity to utilize that hardware to -- it's
17  always been my opinion that it was improperly moored
18  for the conditions that they were expecting at the
19  time of the hurricane, and certainly if they would --
20  it's my opinion that had they utilized this equipment
21  that was on the barge then the chances of it breaking
22  away could have been minimized.
23  Q.   And you derive that opinion from the
24  photographs?
25  A.   Yes.

24

1   Q.   Is there any other data or information of any
2   sort that relates to this hardware and your opinion?
3   A.   To that opinion?
4   Q.   Uh-huh.
5   A.   No.  I think that the hardware should have
6   been utilized.
7   Q.   I understand.
8   A.   And I did not realize or I was not provided
9   photographs showing the wires that were on the barge
10  as it sat in the Ninth Ward.
11  Q.   Okay.  I'm trying not to be confusing with my
12  questions and I apologize if they are, but try and
13  answer the questions that I ask you.
14         My question was:  Is there any other
15  source of data or information that mentions this
16  hardware that you've listed such that it has any
17  bearing on your opinion?
18  A.   No.  The photographs tell it all.
19  Q.   Is there anything other than the photographs
20  that relates to this hardware?
21  A.   No.
22  Q.   So, to be clear, you haven't read any report,
23  you haven't read any survey, you haven't read any
24  deposition, heard of any testimony or seen reference
25  to this hardware in any other form other than in

25

1   these photographs?
2   A.   That's correct.
3   Q.   Okay.  All right.  I think my original
4   question was:  How did the new material affect your
5   opinions?  And you said the photographs --
6   A.   Yes.
7   Q.   -- as they relate to this hardware.
8   A.   Yes.
9   Q.   What else?
10  A.   Well, I think I just testified that had I
11  known that the --
12  Q.   Not how.  What else?
13  A.   What else?  Nothing.  The photographs in my
14  opinion tell it all.
15  Q.   So the weather information that I've marked
16  as Exhibit B --
17         (Green Exb. B was marked
18          for identification.)
19  Q.   (By Mr. Walker)  -- LNA 1071 through 1078
20  have no bearing on your opinions?
21  A.   No.  Other than to confirm what the wind
22  conditions were.  I think maximum speed, if I recall
23  correctly, was 68 miles an hour and somewhere there's
24  a storm surge record that outlines different areas
25  that the storm surge was recorded.

**26**

1   Q.  Okay.  If I understand your testimony
2   correctly, the new information received in Exhibit B
3   didn't change or modify any opinions, it simply
4   supplied you additional information as a factual
5   recitation of your report?
6   A.  Yes.
7   Q.  Exhibit C will be the Flory two-page notes.
8   Did those affect your opinion in any way?
9   A.  Yes, it did.
10   Q.  And could you tell me how?
11   A.  Well, the Flory report helped me, along with
12   Mr. Flory talking me through his diagram.
13       It looked to be that the mooring as it
14   existed, which has all been testified to, that it
15   would have failed at somewhere around 36 miles an
16   hour, and I put that in Opinion 5.12.
17   Q.  So the conversations with Flory and the
18   interpretation of his two sheets reached the
19   conclusion or corroborated your conclusion and
20   opinion that the moorings would have failed at
21   36 miles an hour?
22   A.  Yes.
23   Q.  Is that it in a nutshell?
24   A.  Yes.
25   Q.  Okay.  Anything else derived from the Flory

**27**

1   conversations or calculations?
2   A.  Yes.  He also gave scenarios, various
3   scenarios that I had suggested in my earlier
4   testimony as well as in trial, that had the moorings,
5   existing moorings been doubled up and had the
6   arrangement been different between the 4727 and 4745,
7   there's a possibility that with the wind conditions
8   as such it wouldn't have broken away.
9   Q.  All right.  So you're saying that there are
10   two scenarios that you suggested, which were:  Had
11   the moorings been doubled up or had the arrangement
12   been different between the two barges that possibly
13   they wouldn't have broken away?
14   A.  That's correct, yes.
15   Q.  You suggested those to Flory?
16   A.  No.  I suggested that in prior testimony and
17   in other reports.  I've always been consistent in my
18   opinion that three single line mooring lines were
19   insufficient and improper and it was overcome by
20   hurricane wind forces.
21   Q.  Of 36 miles an hour?
22   A.  Well, Flory gave me -- his analysis provided
23   that number of 36 miles an hour.
24   Q.  Let's go back to these two scenarios.  You
25   used the word "suggested."

**28**

1   A.  Well, testified.
2   Q.  How did they get to Flory?
3   A.  I'm sure -- I don't know.  I don't know how
4   it got to Flory.
5   Q.  Well, did you discuss these two scenarios
6   with him?
7   A.  Yes.  Not at the time I talked to him.  He
8   already had -- I don't know what he had.  He might
9   have had my report.  He might have had my testimony.
10   I'm not sure.
11       But he was hired by the Wiedemann firm
12   to do an analysis, and I was given his phone number
13   and called him and talked to him after I received
14   this.
15       (Green Exb. C was marked
16       for identification.)
17   Q.  (By Mr. Walker)  We'll mark that as C now
18   that I've found them.  We'll go through these in more
19   detail in a little bit.
20       I believe you stated this earlier, but
21   the March 11 report, Exhibit A, is the sum total and
22   present position of Don Green regarding opinions and
23   conclusions in this case; correct?
24   A.  Yes.
25   Q.  And I realize that you prepared the report

**29**

1   before you read the reports of Skaer, S-K-A-E-R, Ryan
2   and Strouse.
3   A.  Yes.
4   Q.  Since having read those reports, do you
5   still stand by your report, Exhibit A?
6   A.  Yes.
7   Q.  Anything that you read in those three reports
8   of the experts I just mentioned -- is there anything
9   in those three reports that causes you to modify,
10   change or delete any opinion?
11       MR. SANDERS:  Let me object to the form.
12   A.  At this point, no, sir.
13       MR. SANDERS:  Except he's going to
14   disagree with them.
15       THE WITNESS:  I think I said that.
16       MR. SANDERS:  Okay.  He's asking very
17   long, convoluted questions, so listen.
18       THE WITNESS:  Yes, sir.
19   Q.  (By Mr. Walker)  Did you meet with anybody in
20   preparation for today's deposition?
21   A.  Yes, sir.
22   Q.  With Mr. Sanders?
23   A.  Yes.
24   Q.  And when did you-all meet?
25   A.  He came to my office -- he came into Houston

30

1  yesterday afternoon and he came to my office and we
2  went through my box of stuff here, went through my
3  file and went through my report.
4           He asked me if I had anything to add
5  since I read the three experts, and I said other than
6  disagreeing with them, no, sir.
7      Q.  Did you review anything other than this box
8  of file contents that you have?
9      A.  Yes.  I looked up the definition of "vessel,"
10 because Mr. Captain Ryan differs with the use of the
11 word "vessel" throughout the hurricane -- Coast Guard
12 hurricane preparedness document, as well as his
13 interpretation of various regulations regarding
14 mooring of vessels, and so I disagree with Captain
15 Ryan and his interpretation of those regulations.
16     Q.  And the rest of your review was the contents
17 of your file?
18     A.  Yes.  Yes, sir.
19     Q.  Is the contents of that file the listing of
20 the materials you've reviewed as set forth in your
21 report?
22     A.  Except some items are missing and have been
23 since my first deposition taken in the case in the
24 Wiedemann office.
25           The file was reviewed by several

31

1  attorneys at that time.  And I had a girl, my
2  assistant that works for me, inventory the file box
3  and there were several items that are not there
4  anymore.
5      Q.  Are there any items in addition to what's
6  listed?
7      A.  I don't think so.
8      Q.  Okay.  Subsequent to having read the three
9  expert reports, have you been asked to prepare any
10 rebuttal or supplemental reports?
11     A.  No, sir, but I haven't -- I went through them
12 and I tried to find areas that Captain Ryan disagreed
13 with me and to see if it warranted issuing a
14 supplemental report and I haven't decided yet whether
15 I should do that or not.
16     MR. SANDERS:  And you had asked us for
17 him to review it prior to this deposition.
18     MR. WALKER:  Right.
19     MR. SANDERS:  So we hadn't intended to
20 issue a supplemental report.  I mean, if we issue a
21 supplemental report, we've got to come back for
22 another deposition?
23     MR. WALKER:  That might be a
24 possibility.
25     MR. SANDERS:  My point is we rushed to

32

1  have him -- in compliance with your request, he
2  rushed to look at the reports for today.
3      Q.  (By Mr. Walker)  Okay.  Let's look at your
4  report, Exhibit A, Page 3 -- I'm sorry -- the first
5  page, "Introduction."
6      A.  Let me get to it if I can find it.  Excuse
7  me.  Okay.
8      Q.  That "Introduction" remains basically
9  unchanged through the history of your reports, and
10 it's opinions regarding the circumstances surrounding
11 the breakaway of the barge ING 4727.  That's what
12 your report is about; right?
13     A.  Yes, sir.
14     Q.  And breaking that down as we did earlier it
15 pertains to mooring arrangements and regulations or
16 recommendation applicable to the mooring of that
17 barge?
18     A.  That's right, and the actions of Lafarge.
19     Q.  As pertains to mooring?
20     A.  Yes.  Or managing their facility.
21     Q.  Now, you previously told me that in your
22 opinion the breakaway occurred as a result of lines
23 breaking at 36 miles per hour wind speed?
24     A.  Well, that's what I concluded after talking
25 to Mr. Flory.

33

1      Q.  Right.  Going to your opinions starting with
2  5.1, 5.1 through 5.9 are unchanged from prior
3  reports; am I correct?
4      A.  Well, I'm not sure, because after rereading
5  things I go through and I have a grammar girl that
6  works for me, some sentences might have been
7  unintelligible and she would have straightened it out
8  for me.
9           So some of this stuff might have
10 changed, but I think the crux of the opinions haven't
11 changed.  But word for word, I'd have to go back and
12 do a complete check.
13     Q.  Well, would you agree that you've added
14 Opinions 5.10 through 5.15 to this report that did
15 not exist in prior reports?
16     A.  Yes, I would agree with that.
17     MR. SANDERS:  5.15 was there in prior
18 reports.  Okay.  Let's see --
19     Q.  (By Mr. Walker)  5.9 of your prior reports
20 became 5.15?
21     A.  Oh, okay.  Thank you.
22     Q.  All right.  Let's talk about the breaking of
23 the lines at 36 miles per hour.
24           Your previous testimony and your reports
25 reflect your opinion that some time between 4 a.m.

34

1  and 6 a.m. the barge breakaway occurred; correct?
2      MR. SANDERS:  Object to the form.
3  That's not correct.  That's when Mr. Villavaso saw it
4  break the wall.
5      Q.  (By Mr. Walker)  Do you want to correct your
6  prior testimony?
7          Your testimony -- and I can read you the
8  page and line of your deposition -- is that based on
9  the testimony of Villavaso and Adams, it's your
10 opinion that the breakaway occurred sometime the
11 morning of the 29th of August, 2005 and to the best
12 of your estimate between 4 and 6 a.m.?
13     MR. SANDERS:  Let me object.  This was
14 corrected in the prior deposition, Derek.
15     Q.  (By Mr. Walker)  Is there anything that you
16 want to change?
17     A.  If it's true and if there's anything
18 different, if you two guys exchanging comments about
19 what I said and what I didn't say, I'd have to look
20 at my deposition on that.
21     Q.  I want your opinion.
22     A.  My opinion is that it happened sometime
23 between 4 and 6, or in that time frame, yes.  I don't
24 know exactly when it broke loose.  I don't think
25 anyone does.

35

1      Q.  And the basis of your opinion is Villavaso
2  and Adams' testimony; correct?
3      A.  Yes.
4      Q.  Do you know what the wind direction was
5  between 4 and 6 a.m.?
6      A.  Only from the report of the weather from the
7  Lakefront that put the wind at, if I recall correctly
8  with it not being in front of me, somewhere from the
9  northeast -- north, northeast, or from that general
10 direction.  And sometime the report just goes blank.
11 Is that it right there?
12     Q.  (Indicating.)
13     A.  Yes.  I reviewed this.
14     Q.  Okay.  So it's your opinion relying on this
15 weather data that at some time between 4 and 6 a.m.
16 with wind blowing from the northeast the barge broke
17 away?
18     MR. SANDERS:  Object to the form.
19 Derek, you're misleading him.
20     MR. WALKER:  Just object.  You're not --
21     MR. SANDERS:  No.  It's misleading.
22     MR. WALKER:  You're not going to lecture
23 me.
24     MR. SANDERS:  Mr. Villavaso saw it break
25 the wall.

36

1      MR. WALKER:  It doesn't matter what he
2  saw.  I'm asking him to answer a question.
3      MR. SANDERS:  It's all going to be
4  worthless.
5      MR. WALKER:  Fine.
6      Q.  (By Mr. Walker)  Is that your opinion and
7  conclusion?
8      A.  My opinion is that those are the observations
9  made at the Lakefront Airport.  At the Lakefront
10 Airport, it could have been blowing there, but it
11 could have been blowing a different direction down at
12 the Lafarge dock or there could have been tornadoes
13 going through or wind shifting through buildings.
14         So to say I would put everything on the
15 observations at Lakefront Airport that the wind at
16 Lafarge was in fact 68 miles an hour coming from the
17 northeast, I couldn't say that with certainty.
18         I would say that the observation
19 and it speaks for itself, but it's 5-1/2, 6 miles
20 away.  And depending on the position of the
21 hurricane, whether the wind was packing or whether it
22 was veering at the facility, no one knows.
23         So I can't say with certainty that at
24 the Lafarge facility the wind was blowing from the
25 northeast at 68 miles an hour as reflected in the

37

1  Lakefront weather observations.
2      Q.  According to your Opinion 5.12 and as you
3  previously stated, it's your opinion that the
4  moorings would have failed when sustained winds
5  reached 36 miles an hour, which would have preceded
6  the landfall of Hurricane Katrina by several hours.
7      A.  5.12, yes.
8      Q.  In your opinion, when did Hurricane Katrina
9  make landfall?
10     A.  Down at Buras, I don't recall.  It was 8:00,
11 9:00, I think.
12     Q.  8 or 9 a.m. on August 29th?
13     A.  I don't recall.
14     Q.  Well, what did you use to make this statement
15 that --
16     A.  Which statement?
17     Q.  5.12.
18     A.  Okay.
19     Q.  -- that sustained winds of 36 miles an hour
20 would have failed the moorings several hours before
21 landfall of Katrina?
22     A.  Does it say that?  5.12 says, "It is my
23 opinion while the exact time of the barge breakaway
24 is unknown, given the temporary/inadequate mooring
25 status of the ING 4727, it is estimated that moorings

38

1  would have failed when sustained wind reached
2  approximately 36 miles an hour, which would have
3  preceded the landfall of Hurricane Katrina by several
4  hours," and I stand by that.
5     Q.  Okay.  So you don't know when Katrina made
6  landfall?
7     A.  Well, I don't at this point.  I'd have to go
8  back and research again through all of this
9  voluminous information of weather data and the rest
10 of it to see.
11        But when I wrote this I had taken all of
12 that into consideration in order to draft that
13 sentence that, according to the witnesses, the thing
14 broke away sometime before it made landfall down in
15 Buras.
16    Q.  It's your opinion --
17    A.  Yes.
18    Q.  -- that 36 mile-an-hour winds were sustained
19 at the Lafarge terminal several hours before landfall
20 of Hurricane Katrina?  Yes or no?
21    A.  I can't -- that's not a yes-or-no answer.  I
22 can't give you a yes-or-no answer based on all of the
23 information that's available.
24        No one knows when the lines failed.  My
25 opinion is that it failed -- it could have failed,

39

1  according to Mr. Flory's expert analysis, sometime
2  prior to the storm arriving at land.
3        36 miles an hour, I'd have to go back
4  and look at the weather deal to actually nail down in
5  a reasonable period when it might have happened.
6     Q.  Why don't you do that?
7     A.  But his analysis is that the lines as they
8  were -- as they were deployed could have and would
9  have failed at 36 miles an hour.
10    Q.  And it's your opinion that that's what broke
11 the lines, the sustained wind at 36 miles an hour;
12 correct?
13    A.  One of the other things that I also
14 previously testified, if the surge came up, this
15 long-lining occurred, the upper tier could have
16 drifted down into it and that could have quickened or
17 contributed to the lines breaking.  No one knows.
18    Q.  Mr. Green, you equivocate so much that it's
19 very difficult to take your deposition and get a
20 straight answer, but I'm sure the Judge will make you
21 give us a straight answer.
22        MR. SANDERS:  Let me object to --
23        MR. WALKER:  Excuse me.
24    Q.  (By Mr. Walker) I thought you previously
25 stated in answering my questions today and in the

40

1  prior deposition that it's your opinion that the
2  reason the barge broke away was because the lines
3  broke --
4        MR. SANDERS:  Objection.
5     Q.  (By Mr. Walker) -- and that the lines broke
6  because they had sustained winds of 36 miles an hour.
7  Now is that correct or not?
8        MR. SANDERS:  Object to the form in that
9  you are misstating his testimony.  He said it was a
10 combination of wind --
11        MR. WALKER:  He said no such thing.  If
12 you keep making statements, I'm going to call the
13 Magistrate, because you're entitled to make an
14 objection, not lead him.
15        MR. SANDERS:  Object to the form.
16        MR. WALKER:  Very well.
17    Q.  (By Mr. Walker)  Is that a correct statement
18 of your opinion?  Yes or no?
19    A.  Yes.  I stand by my opinion that it is
20 estimated, I estimated based on my conference call
21 with -- and my analysis of his analysis is that it's
22 estimated the mooring lines would have failed when
23 sustained winds reached approximately 36 miles an
24 hour.
25    Q.  And the failing of those lines in your

41

1  opinion is what allowed the barge to break away?
2     A.  Yes.
3     Q.  And the reasons the lines failed was because
4  they were exposed to 36 mile-an-hour winds?
5        MR. SANDERS:  Object to the form.
6     A.  I said estimated.
7     Q.  (By Mr. Walker)  Estimated 36 mile-an-hour
8  winds; right?
9     A.  Yes.
10    Q.  Now, would every line have broken at 36 miles
11 an hour?
12    A.  No, not necessarily.  We don't know.  But it
13 could have been one line failed and then that would
14 have allowed the other two lines to become overcome.
15    Q.  Did you conduct any tests on any 2-inch
16 polypropylene new lines?
17    A.  No, sir.
18    Q.  Do you know if Mr. Flory conducted any tests
19 on 2-inch new polypropylene lines to determine their
20 tensile strength and their breaking point?
21    A.  I'm not sure.  I didn't ask him that
22 question.
23    Q.  You didn't think that was relevant for him to
24 make a statement that you used in your opinion that
25 that at 36 mile-an-hour wind ropes would have broken,

**42**

1  how he made that determination?
2      A.  Well, it was a 45-minute conversation and I
3  didn't take notes.  These are the only notes I have
4  of my conversation with him.
5      Q.  Right.  My question is:  You didn't think
6  that was relevant?
7              MR. SANDERS:  I think you should allow
8  the witness to answer.
9      A.  I think it's relevant for him to make an
10  analysis that he would have taken into consideration
11  the size of the lines and how they were configured.
12          In fact, looking at his analysis -- and
13  I missed a point somewhere in someone's deposition, I
14  think it was -- later on I found it in -- I think in
15  Mr. Smith's deposition.  The deployment of the line
16  that was in the middle as opposed to two lines on the
17  end and I have opinions about that.
18      Q.  (By Mr. Walker)  So you relied wholly on
19  Mr. Flory telling you that the lines would have
20  broken at 36 miles an hour --
21      A.  No.
22      Q.  -- without determining how he reached that
23  conclusion?
24      A.  Well, he --
25      Q.  Yes or no, and then you can explain all you

**43**

1  want.
2      A.  No, I didn't depend on him saying that it
3  would fail at 36 miles an hour.
4          It's my interpretation of his analysis
5  that the way it was configured at the time of the
6  breakaway, it would have reached 100 percent strength
7  limit at 36 miles an hour, which at that time, given
8  whatever, that's when it could have estimated the
9  moorings would have failed.  That's my opinion.
10      Q.  When you say "configured," what does that
11  mean?
12      A.  Well, the lines -- the 4-1/2 lines -- not
13  4-1/2 -- the breast lines were at each end of the
14  barge as I understand.  And the line in the middle, a
15  third line, was from one cavel and it was arranged
16  much as a spring line.  And that would have been a
17  much weaker line than would have been the other two
18  lines.
19      Q.  "Configured" means the manner in which they
20  were --
21      A.  Deployed.
22      Q.  -- deployed or tied up or arranged?
23      A.  Yes.
24      Q.  "Configured" does not refer to the individual
25  strength of a line?

**44**

1      A.  That's correct.  But it does play and it
2  should be considered as the strength of the line and
3  how it's deployed, and it's my opinion that the
4  middle line was not deployed, in my opinion,
5  properly.
6      Q.  How should it have been deployed in your
7  opinion?
8      A.  As straight across as a breast line that it
9  could have been accomplished.
10      Q.  And in your opinion does that affect whether
11  or not that line breaks at 36 miles an hour?
12      A.  It could, yes.  It could influence when that
13  line is going to break or when it's not going to
14  break.
15      Q.  How?
16      A.  Well, number one, it depends on what line
17  went first.
18          Then as the barge swings out, it could
19  overcome the middle line, and that line was arranged
20  much as a spring line would be arranged, and one of
21  the lines at the other end could have been the last
22  line to fail.
23      Q.  If I understand your theory or your
24  conclusions, the wind acting upon the barge was
25  pushing the barge such that the lines were stretched,

**45**

1  and when they reached 36 miles-an-hour wind velocity
2  they failed?
3      A.  They could have failed, yes.  But we don't
4  know -- no one knows what the direction of the wind
5  was coming from when the first line failed, or they
6  didn't -- I don't think based on my experience of
7  having lines fail, they don't fail uniformly.  They
8  fail -- the first one becomes overcome and then it
9  becomes a domino effect from that point on.
10      Q.  Would you agree that this barge had a sail, a
11  large sail area?
12      A.  Yes.
13      Q.  And the greater the sail area, the more
14  susceptible to wind?
15      A.  Yes.
16      Q.  Would you agree that if the wind was pushing
17  from the outboard side, in other words, the water
18  side, toward the dock that the lines would be --
19  Well, strike that.
20          In your opinion, if the wind was pushing
21  the barge from the outboard side, from the water
22  side, would the lines be more or less susceptible to
23  breaking?
24      A.  It would be less.
25      Q.  Have you done any research, reviewed any

**12 (Pages 42 to 45)**

46

1    documents, weather data or any other information,
2    indicating to you when and if the wind was coming
3    from the west, in other words, pushing towards the
4    water?
5        A.   The Lakefront Airport didn't have that.  I
6    think there's a document someplace of a wind
7    analysis, and somewhere along that line, that morning
8    as the hurricane skirted New Orleans, that it would
9    have had a westerly direction.  I know I've seen it
10   someplace in here.
11       Q.   And a westerly direction would have pushed
12   the barges away from the dock and towards the water;
13   right?
14       A.   Yes.  But the barge I think in my opinion
15   broke away in those early morning hours and the New
16   Orleans area, anyway, had a northeast wind.
17            That would mean -- it all depends on
18   where the position of the hurricane was.
19       Q.   A northeast wind would have been pushing the
20   barge against the wharf; right?
21       A.   No, not necessarily.  And I told you before,
22   and I'll repeat it again, this is at the New Orleans
23   Airport.  No one knows what the wind direction was or
24   whether a tornado had come through or --
25       Q.   No.  My question was:  A northeast wind would

47

1    have pushed the barge against the wharf, wouldn't it?
2        A.   Not necessarily, no.  The orientation of the
3    canal at that area is in a northeast -- is in a
4    northeast orientation and it would have been pushing
5    from the other way and it could have come whipping
6    around the other way.
7        Q.   That's not my question.  The wind is blowing
8    from the northeast.  What would the effect be at the
9    Lafarge terminal on the barge?
10       A.   It would be separating the two barges.  I
11   brought a map to get the orientation of the canal and
12   it shows where the turning basin is, where the barge
13   was tied up, is on a northeast orientation axis, and
14   so it would not have been pushing it against the dock
15   in my opinion, if we only assume that that's what the
16   wind conditions were at the dock.
17            You can look at that if you want
18   (indicating).
19       Q.   So if there's a northeast wind, what effect
20   would that be having on the barge?
21            MR. SANDERS:  Asked and answered.
22       A.   It would be pushing the bow or the stern,
23   whichever way it's oriented, away from the dock or
24   down the dock.
25       Q.   (By Mr. Walker)  In a southerly direction

48

1    towards the facility that's --
2        A.   No, it wouldn't.
3        Q.   -- towards the facility that is downchannel?
4        A.   Oh, yes, yes.
5        Q.   Toward the southern end of the slip from
6    Florida Avenue -- yeah -- from Florida Avenue to
7    Claiborne Avenue?
8        A.   Yes.
9        Q.   During this time frame when you estimate that
10   the wind was 36 miles an hour and the barge broke
11   away, do you know what the surge would have been?
12       A.   No, sir.
13       Q.   Do you know if there would have been any
14   surge?
15       A.   I understand that looking at the -- there's a
16   graph someplace I've reviewed about the height of the
17   surge and when the surge occurred.
18       Q.   Well, in your opinion, at the time frame when
19   you estimated the breakaway, did the surge have any
20   effect on the barges and the breakaway?
21       A.   It could have.
22            MR. SANDERS:  Object to the form.
23       Q.   (By Mr. Walker)  Do you have an opinion?  And
24   if so, on what do you base that opinion?
25       A.   It would be my opinion that a surge would

49

1    affect the movement of the barges within that turning
2    basin.
3        Q.   In a hypothetical, you're saying?
4        A.   Yes.
5        Q.   Do you know the surge between 4 and 6 a.m. on
6    August 29th, 2005 at the Lafarge terminal?
7        A.   No, I do not.
8        Q.   Do you know the surge as per your Opinion
9    5.12 several hours before landfall of Hurricane
10   Katrina?
11       A.   Again, it would be speculation on my part
12   because no one was there at the facility.  I can only
13   go on what the graph of the observations were at
14   various points when the surge occurred.
15       Q.   At 36 miles an hour I believe you told me you
16   don't know what rope would have failed or what line
17   would have failed?
18       A.   That's correct.
19       Q.   I'm just trying to understand your opinion.
20   At 5.1 of your opinion you also state that the
21   northern tier of five barges' lines parted or
22   slipped; correct?
23       A.   Yes.
24       Q.   Did those lines part or slip?  Do you have an
25   opinion?

50

1   A.  They slipped.
2   Q.  Okay.  So they did not part?
3   A.  You're correct, didn't.
4   Q.  Okay.
5   A.  I don't have any evidence.  There's an aerial
6   photograph taken post-Katrina that showed the upper
7   tier in an askanced position.  And I've zoomed in on
8   it and I think I saw a line going from the
9   northernmost end of that upper tier to the dock.
10   Q.  Were those five barges exposed to the same
11   wind and other elements as the two barges directly
12   south of them?
13          MR. SANDERS:  Object to the form.
14   A.  No, they weren't.
15   Q.  (By Mr. Walker)  They weren't?
16   A.  No.
17   Q.  So different wind was blowing 50 feet north?
18          MR. SANDERS:  That wasn't the question.
19   A.  You just talked to me about, and I agreed
20   with you, that it had a substantial sail area, 4727,
21   so it wouldn't have been exposed to the same extent
22   as the five other barges.
23   Q.  (By Mr. Walker)  You misunderstood my
24   question.  I didn't ask you about the effects of any
25   elements.  I asked you, would they have been exposed

51

1   to the same wind?
2          MR. SANDERS:  Objection to form.
3   A.  Yes.
4   Q.  (By Mr. Walker)  Would that have been exposed
5   to the same surge and other climatic elements?
6   A.  Yes.
7   Q.  But it's your opinion that because of the
8   increased sail effect of the empty barge that barge
9   is affected differently?
10   A.  That's correct.
11   Q.  Is it your opinion that the sail effect of a
12   barge impacts Mr. Flory's conclusions as to when a
13   rope breaks at 36 miles-an-hour wind?
14   A.  Yes.
15   Q.  So 36 mile-an-hour wind on a barge or in a
16   lab is different than 36 mile-an-hour wind somewhere
17   else?  I don't understand.
18          MR. SANDERS:  Object to the form.
19   Q.  (By Mr. Walker)  Let me strike that question.
20          Isn't 36 miles an hour 36 miles an hour?
21   A.  Yes.  And I qualify that, approximately
22   36 miles an hour.
23          I'm not saying it broke exactly at --
24   and that's not my opinion.
25   Q.  Let's not get hung up on "approximately" or

52

1   "estimated."  I understand it's plus or minus 36.
2   A.  Yes.
3   Q.  We're going to use 36 conceding that it's
4   plus or minus?
5   A.  So this is a hypothetical?
6   Q.  It could be 35 or 39.
7   A.  Okay.
8   Q.  Your opinions are, based on Mr. Flory, that
9   at 36 miles an hour the ropes broke; right?
10   A.  Yes.
11   Q.  Isn't it your opinion that the northern tier
12   of barges was exposed to 36 mile-an-hour winds?
13          MR. SANDERS:  Object to form.
14   A.  Yes.  To the extent that they were -- their
15   freeboard was.
16   Q.  (By Mr. Walker)  What does the freeboard have
17   to do with it?
18          Were they exposed to 36 miles an hour?
19   Yes or no?
20   A.  Yes.
21   Q.  Did any lines break?
22   A.  No.  That I'm aware of.
23   Q.  Right.  You previously expressed the opinion
24   that the northern tier of barges collided with the
25   4727 and 4745.  Is that still your opinion?

53

1   A.  It's certainly a possibility, and I hold that
2   opinion today, that with the combination of surge and
3   combination of wind, that the mooring at the northern
4   end of the northern tier, long-lined allowing the
5   five barges to possibly come in contact, and that was
6   my opinion and still is my opinion.
7   Q.  And it's still just a possibility?  You don't
8   have any objective evidence of any allision, do you?
9   A.  No, sir, I don't.
10   Q.  Okay.  And you just threw in three things:
11   Breaking of the lines because of the wind, the surge
12   and the allision.
13          I thought you just told me you had no
14   idea what the surge was at the Lafarge terminal that
15   morning.
16   A.  Well --
17   Q.  Am I correct, is that what you told me?
18   A.  Well, no, I didn't say that exactly.
19          I said that I looked at surge data
20   and -- now I'd have to find it -- surge data of
21   readings at various places, including the locks, I
22   think the Lakefront -- not the Lakefront, but over
23   there at the Paris Road and another place, and it
24   fits in that area, that there was a surge or the tide
25   was up and so there was a possibility that --

54

1  Q.  Mr. Green, if you have an opinion, I assume
2  that you're going to be able to support it with some
3  sort of objective --
4  A.  Yes.
5  Q.  -- basis that the Judge will assume that
6  you're somewhat credible.
7  A.  Yes.
8  Q.  Okay.  So I'd like to help you along that
9  line so we can all be on the same page when we go to
10  trial.
11  A.  Sure.
12  Q.  Do you have any basis, objective or
13  otherwise, from all of these sources that you say you
14  looked at, to say that between 4 and 6 a.m. there was
15  a surge at the Lafarge terminal that in your opinion
16  caused or contributed to the breakaway?
17  A.  I'd have to say yes.
18  Q.  Okay.  Where is that data?
19  A.  It's in here someplace.
20  Q.  And it's not in your report?
21  A.  Well, I said -- didn't I say -- where is it?
22      Here I say, "Subject to receiving
23  additional information or records, it is my opinion
24  that the cause of the breakaway from its mooring on
25  the Lafarge facility during Hurricane Katrina was

55

1  most likely the combination of hurricane force winds
2  and rising water levels in advance of Hurricane
3  Katrina."
4  Q.  Uh-huh.
5  A.  So that's speaking to the surge.
6  Q.  If you give an opinion, I assume that you
7  base it on some objective criteria.
8  A.  Yes.
9  Q.  What rising water criteria, or surge, do you
10  have to support that statement, if any?
11  A.  The graph that I was talking about.
12  Q.  I'd like to see it.
13      MR. SANDERS:  It's the IPET report;
14  correct?
15      THE WITNESS:  Where is that IPET report?
16  Q.  (By Mr. Walker)  So is it your testimony
17  based on the refreshed recollection that your
18  attorney gives you that the information that you're
19  relying on to make the statement that a surge could
20  have had an effect on the barge comes from IPET?
21      MR. SANDERS:  It's IPET or one of those.
22  A.  I don't know.  The piece of information I
23  reviewed gave the -- gives, rather, the heights of
24  the rising water, and in order for my opinion for the
25  mooring line at the northern end of the northern tier

56

1  to long-line, then that would have been as a result
2  of that rising water.
3  Q.  (By Mr. Walker)  Okay.  But that's different
4  than what we're talking about.
5      What you're saying is at some point the
6  water level rose at the terminal sufficient to allow
7  the long-lining to do exactly what it's designed to
8  do, which is release --
9  A.  Yes.
10  Q.  -- at the top of the cavel or bollard?
11  A.  That's correct.
12  Q.  Okay.  So that's not surge causing a line to
13  break?
14      MR. SANDERS:  Object to the form.  Is
15  that a question?
16  A.  That's correct.  That's correct, yes.  I
17  agree with that.
18  Q.  (By Mr. Walker)  All right.  So let's go back
19  to your opinions then.
20      Am I correct that it's your opinion that
21  the surge did not have an effect on the breakaway of
22  Barge 4727 to the extent that it's not what caused
23  the line to break?
24  A.  That's correct.
25  Q.  What caused the line to break was the wind

57

1  velocity that you and Mr. Flory discussed?
2  A.  Yes.
3  Q.  Okay.  Now, the third thing you keep talking
4  about was the allision of this northern tier.
5  A.  Yes.
6  Q.  But you have no evidence, objective, of any
7  physical striking or damage between the barges or
8  anything like that, do you?
9  A.  That's correct, except the aerial photograph
10  I talked about.
11  Q.  That photograph doesn't show an allision, it
12  shows the long-lining or the loosening of one end;
13  right?
14  A.  Yes, and a missing 4727.  And where the barge
15  is from, the northern tier are in a position where
16  the 4727 was.
17  Q.  Are you sure of that?
18  A.  Yes, sir.
19  Q.  So in your opinion explain to me, how is it
20  that the allision would have caused the breakaway?
21  A.  My opinion would be that the combination of
22  wind and -- Well, okay.  The allision caused the
23  breakaway.
24      Again, based on that photograph, is that
25  when the five barges were allowed to drift down --

**58**

1  and it's my opinion that it struck the outer barge
2  being the 4727, and that could very well have either
3  broke the line or hastened the line being broke.
4      Q.  Was this before or after 36 mile-an-hour
5  winds?
6      A.  I have no idea.
7      Q.  And how would the allision have hastened
8  something to do with the 4727?
9      A.  It's always been my opinion that those barges
10 coming down -- and no one knows for sure -- but the
11 photograph shows that tier of barges had come down.
12 And if it did come down and strike the barge, that
13 could very well have overcome the line.
14     Q.  Did you discuss this with Mr. Flory?
15     A.  No, I did not.
16     Q.  So which of the two in your opinion was more
17 likely the cause of the breakaway, the 36
18 mile-an-hour wind or the allision?
19     A.  I think it could have been a combination of
20 the two.  But, again --
21     Q.  I know.  But my question was which of the
22 two?
23     A.  The wind would have been the most.
24     Q.  Okay.  Before we go to another area, could
25 you explain this Exhibit C, Mr. Flory's calculations

**59**

1  or whatever they are, analysis of mooring
2  arrangement?
3      A.  Yes.  Mr. Flory had a computer-rendered
4  diagram of the two vessels and the position of
5  pilings attached presumably to the dock.
6      Q.  Okay.  So the Page 2 is a diagram of the two
7  barges and the two cylindrical things are bollards on
8  the dock?
9      A.  Yes.
10     Q.  Would you call those bollards or something
11 else?
12     A.  No.  I would call those -- they use them for
13 mooring, but it's not designed for that.  I took
14 pictures of it, I went and looked at it, and I think
15 it's pilings, cement pilings.
16     Q.  What's the difference between a cavil and a
17 bollard?
18     A.  A cavel is shaped in a certain way where you
19 can Figure 8 it, and a bollard is simple and round
20 with a reduced diameter in the middle and increased
21 diameter at the top and it's used on a dock to moor
22 vessels.
23     Q.  So a bollard looks like a mushroom with a big
24 head and a cavel has wings?
25     A.  Horns, yes.

**60**

1      Q.  Okay.
2      A.  Okay.  Now, explaining --
3      Q.  So he's got a configuration, a computer model
of the two barges?
4      A.  Yes.
5      Q.  Right?
6      A.  Yes, sir.  And the first line there --
7      Q.  Go ahead.  I'm listening.
8      A.  -- shows -- and he's numbered the points of
attachment on the 4727 in numerals and the points of
attachment on the 4725 with letters.
12            And so the first one, 3, would be on the
4727 on the southern end of the barge.
14     Q.  All right.  So let me stop you so I
understand.  So we're looking at the first line of
the exhibit --
17     A.  Uh-huh.
18     Q.  -- where it says "Mooring Arrangement," and
it says "3->C+7->G+4->F"?
20     A.  Yes, sir.
21     Q.  And each of those numbers and letters refers
to a mooring point on one of two barges?
23     A.  That's correct, yes.
24     Q.  Okay.  So the hypotheticals are, in every
instance, the barge is light?

**61**

1      A.  Yes.
2      Q.  And in every instance the typed lines are
polypropylene except in the one, two, three, four --
fifth example, which is wire?
5      A.  Yes.
6      Q.  And then there are different mooring
arrangements, and then the conclusions are the
maximum tolerable wind speeds?
9      A.  Yes.
10     Q.  That's a fair reading?  That's what the
conclusion is of the --
12     A.  That's my understanding, yes.
13     Q.  All right.  Which of these is the way that
the barges were made up?
15     A.  The first one.
16     Q.  Okay.  And all of the rest are hypotheticals?
17     A.  That is correct.
18     Q.  So in the way that the barge was made up
according to Mr. Flory's analysis, you had a line
from Point 3 to Point C?
21     A.  Yes, sir.
22     Q.  Okay.  And then you had a different line from
Point 7 to Point G?
24     A.  Yes, sir.
25     Q.  And a different line from Point 4 to Point F?

62

1    A.  That's correct.
2    Q.  Okay.  So you had three separate 2-inch poly
3  lines; correct?
4    A.  That's my understanding, yes.
5    Q.  What does he mean by "Strength Limit," the
6  100 percent versus 75?
7    A.  He told me that he took into consideration
8  the size of the line and the product and that's what
9  his analysis -- computer analysis come up with.
10   Q.  I don't understand the answer.
11       Why did he use 100 and why did he use 75
12  and where did he get those conclusions from?
13   A.  That was a brand new and the other would be
14  75 strength, like a used line.
15   Q.  Okay.  Were these lines new or used?
16   A.  Two of them were new and one was used.
17   Q.  Okay.  Which ones were new?  Do you know to
18  which attachment points?
19   A.  No, sir.
20   Q.  He didn't differentiate between two new and
21  one used, he just either considered all three
22  100 percent or all three 75 percent; right?
23   A.  That's what it looks like, yes.
24   Q.  Okay.  So considering all three as new, his
25  conclusion on the mooring arrangements as on the date

63

1  of the hurricane, that at 36 miles an hour that's the
2  maximum tolerable wind speed?
3    A.  That's right.
4    Q.  And stated differently as per your opinions,
5  that means that anything over 36 that line breaks?
6    A.  No.  Has a possibility of breaking.  I said
7  that it would have broke at approximately 36 miles an
8  hour.
9        MR. SANDERS:  Plus or minus.
10   A.  Plus or minus.
11   Q.  (By Mr. Walker)  If the number is 25, it's
12  not going to break?
13   A.  The number is 25?
14   Q.  If the number of miles per hour is 25, then
15  it hasn't reached the maximum tolerable wind speed;
16  correct?
17   A.  That's correct.
18   Q.  It's 36 or over?
19   A.  Yes.
20   Q.  Okay.  How did he come up with these other
21  six scenarios?  Was there any rhyme or reason?
22   A.  I didn't ask him that.
23   Q.  Do you see any rhyme or reason on these?
24  Have you analyzed what each of these looks like as a
25  tying configuration?

64

1    A.  Yes.  I went through all of them and looked
2  at the different configurations.
3    Q.  Okay.
4    A.  But this is what we had, 3-C, 7-G and 4-F.
5    Q.  Right.
6    A.  And I went down to pull all of them and to
7  see what it would look like.  I did that.
8    Q.  My question is, though --
9        Well, when you say you went through all
10  of them to see what it would look like --
11   A.  Yes.
12   Q.  -- do you mean to see what wind would be the
13  maximum tolerable?
14   A.  That, number one; and number two, where was
15  the point they were affixed.
16   Q.  How was it configured?
17   A.  Yes, sir.
18   Q.  Is any of these a configuration that you,
19  prior to seeing Mr. Flory's report, opined was a
20  configuration that you would have recommended or that
21  you suggest or that you believe they should have had?
22   A.  Yes.
23   Q.  Which one?
24   A.  Number one -- well, no, I didn't do that with
25  these.  My conclusion is that the lines should have

65

1  been deployed as breast lines, and the way the
2  testimony is, is that Line 4 to F was not a breast
3  line.
4    Q.  So how would you make 4 to F a breast line?
5    A.  You'd go from 4 to D or 5 to E.
6    Q.  And had they done that, you would have been
7  satisfied with the arrangement?
8    A.  No, sir.  It was still -- it was still only
9  single lines.
10   Q.  Okay.
11   A.  But the next scenario, 2 to B and 8 -- 3 --
12  let's see -- 2 to B -- 2 to B and 3 to A and 7 to I
13  and 8 to H doubled, Mr. Flory explained to me, which
14  I agree, is that the difference in height between the
15  barges and the lines going straight down to the barge
16  is a weaker deployment than would be if they go from
17  2 to B which would have a greater slope to it and
18  would be perpendicular to the barges.
19   Q.  And what does "doubled" there?
20   A.  "Doubled" would be double down.  It would be
21  duplicate the mooring lines.
22   Q.  What does that mean?
23   A.  In other words, double the lines.  If it's
24  one line from Point 2 to B, you have two lines.
25   Q.  Well, it doesn't say "two lines."  It says

66

1  "doubled."
2      A.  Well, that's the accepted criteria.  And
3  based on your expert's report, I thought it would be
4  obvious to everyone what "doubled" means, but
5  obviously it isn't.
6      Q.  Well, it says "doubled."
7      A.  "Double" means to double -- to duplicate the
8  lines.  If it has one, you put two.  If it has two,
9  you put four.
10     Q.  Doesn't "double" also mean if it has one you
11 put two or if you have one you'd tie it around twice?
12     A.  Yes, sir.
13     Q.  So doubling means either --
14     A.  Two parts.
15     Q.  -- one more line --
16     A.  Yes.
17     Q.  -- or the same line twice?
18     A.  Yes.
19     Q.  You agree with that, don't you?
20     A.  I agree with that, yes.
21     Q.  Okay.
22     A.  We went over that during that last
23 deposition.
24     Q.  Okay.  And that's why Mr. Flory uses the term
25 "doubled"?  He doesn't say "two lines"?

67

1      A.  No, he does not.
2      Q.  Because "doubling" can be accomplished by
3  either of those methods?
4      A.  That's correct, yes.
5      Q.  All right.  It's your opinion that the
6  mooring arrangement used by Lafarge, which is the
7  first one in this Exhibit C, was inadequate.
8      A.  Yes.
9      Q.  Why?
10     A.  Number one, it doesn't comply -- well, number
11 one, it's just for the expected forces that were
12 predicted in the New Orleans area -- for the
13 predicted forces them expected in the New
14 Orleans area, three single mooring lines were in my
15 opinion inadequate.
16          Further, it doesn't comply with the
17 recommendations of the hurricane plan to double up
18 and also I have heartburn with the line going from
19 4 to F.  It is arranged as a spring line as opposed
20 to in a perpendicular fashion.
21     Q.  Okay.  You're aware that prior to topping
22 around, the barges were tied in a certain fashion;
23 right?
24     A.  I understand, yes, they were.  Yes.
25     Q.  And that the eventual tying of the barges as

68

1  they were at the time that the hurricane struck was
2  different than it had been previously; correct?
3          MR. SANDERS:  Object to the form.
4      A.  Before I answer, let me answer it this way
5  and I hope to answer your question.
6      Q.  (By Mr. Walker)  Uh-huh.
7      A.  The barges were -- the laden barges were
8  against the dock and the 4727 in a light condition
9  was on the outside -- was against the dock and they
10 called --
11     Q.  Why don't you just start over to be clear?
12     A.  Thank you.
13          The empty barge, the 4727, was against
14 the dock and the laden barge, 4725, was on the
15 outboard side, and they were moored to the dock.
16          They call a tugboat in and he tops it
17 around and he puts the laden barge against the dock
18 and the empty barge outboard of that.
19          Did I answer your question?
20     Q.  No, not really.
21          And he used additional lines, more lines
22 than had been previously between the barges, didn't
23 he?
24          MR. SANDERS:  Object to the form.
25     A.  No, sir.  He added a line to the dock to the

69

1  laden barge.
2      Q.  (By Mr. Walker)  He added a line from the
3  dock to the laden barge?
4      A.  Yes.
5      Q.  Okay.  How many lines were between the two
6  barges?
7      A.  Three.
8      Q.  Again, your opinion is that the -- and I'm
9  looking at 5.2 -- the mooring arrangement is totally
10 inadequate; right?
11     A.  Yes.
12     Q.  What is inadequate about that mooring
13 arrangement?
14     A.  Number one, it's not prepared for a hurricane
15 in my opinion.
16     Q.  So it's not that it's inadequate --
17     A.  It's inadequate for the conditions that were
18 expected to exist in a short period of time.
19     Q.  Okay.  And the conditions being, what, over
20 36 miles an hour?
21     A.  Yes.
22     Q.  So in your opinion --
23     A.  Or hurricane force winds.
24     Q.  Well, is 36 miles an hour hurricane force?
25     A.  No, it's not.

70

1    Q.   Is it your opinion that any mooring
2  configuration that ties barges together or barges to
3  a wharf that uses three 2-inch poly lines in
4  anticipation of 36 mile an hour --
5              Which is just about gale force; correct?
6    A.   Yes.
7    Q.   -- is inadequate?
8    A.   No.
9    Q.   But it is your opinion that at 36 miles an
10 hour those lines may break, according to Mr. Flory
11 whose opinion you've adopted?
12   A.   I've considered.
13   Q.   You're relying on it?
14   A.   I'm relying on his analysis.
15   Q.   Is there any Coast Guard or any other
16 entities' regulations, recommendations that you can
17 direct us to that state that in anticipation of gale
18 force winds, which I believe are 39, moorings should
19 not be done with single 2-inch poly lines?
20   A.   No.  The regulation doesn't speak to
21 specifics.  It says that vessels shall be moored in a
22 manner to -- existing -- for anticipated
23 environmental conditions, passing vessels, being
24 sucked away from the dock, et cetera, et cetera.
25              It's folly to try to tie it down to

71

1  specific knots.  It's left up to the seamen and/or
2  the people that are taking care of vessels to
3  anticipate what the configuration should be based on
4  what they expect to happen.
5    Q.   In your opinion, if the expectation was no
6  greater than 36 mile-an-hour winds, would this
7  configuration have been appropriate?
8    A.   No.  I still think that they would have -- it
9  would be my opinion to double up, yes.
10   Q.   If the expectation was no greater than 36-39
11 miles an hour; is that your opinion?
12   A.   I would double up, yes.
13   Q.   That's your opinion?
14   A.   Yeah.  In fact, all of the publications and
15 text that I've referred to all speak to mooring a
16 vessel.
17              If you're going to be there for a while
18 that is the custom and practice, to double up the
19 lines.  There's nowhere does it say if you're going
20 to leave a vessel that you use single lines, nowhere.
21   Q.   What's the purpose of doubling up?
22   A.   To double the -- to put additional lines out
23 to secure the vessel.
24   Q.   "Doubling" means twice as much; right?
25              MR. SANDERS:  Object to the form.

72

1    A.   "Doubling" mean -- "doubling up" means
2  duplicating the mooring lines.
3    Q.   "Tripling" means times as much?
4    A.   Yes.
5    Q.   Is 150,000 more than double 60,000?
6              MR. SANDERS:  Object to form.
7    A.   Say that again.  160,000 more than double how
8  much?
9    Q.   (By Mr. Walker)  Is 150,000 more than double
10 60,000?
11   A.   Yes.
12   Q.   So if you increase the tensile strength or,
13 as Mr. Flory says, the maximum tolerable wind
14 speedability of an object from 50,000 to 150,000, as
15 an example, you've more than doubled it, haven't you?
16   A.   In theory, yes.
17              THE WITNESS:  Could we take a break?
18              MR. WALKER:  Sure.
19              (Recess from 12:46 until 1:00.)
20   Q.   (By Mr. Walker)  You've personally inspected
21 the ropes; right?
22   A.   Yes, sir.
23   Q.   Do you have any criticism of the condition or
24 the size or quality of those ropes?
25   A.   No, sir.  I think one looked like it was more

73

1  used than the other two.
2    Q.   Your criticism is the number of ropes, you
3  would have liked to have seen more, and the breast
4  line/spring line configuration?
5    A.   Yes, sir.
6              MR. SANDERS:  Object to the form.
7    Q.   (By Mr. Walker)  All right.  Let's talk about
8  your new opinion 5.2 -- I'm sorry -- 5.10.
9  Basically, it's a failure to properly monitor the
10 storm?
11   A.   Yes.
12   Q.   You did not have this opinion prior to this
13 report in your three previous reports; right?
14   A.   That's correct, yeah.
15   Q.   Where did you come up with this opinion?
16   A.   Well, looking back over everything and all of
17 the information in total, the fact that Lafarge had
18 no real hurricane plan, it only had a checklist and
19 they had nothing -- there was no indication anywhere
20 that they --
21   Q.   Let me stop you.  I'm not asking you for the
22 basis of the opinion now.
23   A.   Okay.
24   Q.   I'm asking you why.
25   A.   Why I did that?

74

1    Q.   Why you came up with it now and not for the
2    prior four years that you've been involved with this
3    case.
4    A.   Well, the more and more I think about things,
5    I come up with new opinions and then I weigh them to
6    see if it would be appropriate.
7        This opinion, in my opinion, is
8    appropriate, and I added it.
9    Q.   And there's no new information that you
10   obtained for this opinion that you didn't have for
11   your prior reports, is there?
12   A.   No, sir.
13   Q.   Okay.  All right.  So let's talk about the
14   opinion, failure to properly monitor the storm.  How
15   did they fail to properly monitor the storm?
16   A.   Well, all of the deposition and testimony is
17   that they knew there was a hurricane, they were
18   informed by cell calls on the morning of the 27th,
19   but they had virtually no communications due to
20   renovation or construction at Lafarge.
21       They testified that there was no e-mail
22   communications, fax communications, and the telephone
23   system was down and they were dependent on Nextel
24   phones only.  And so it's my opinion that they
25   couldn't have monitored the progress of the storm as

75

1    they should have.
2        They could have easily gotten a marine
3    radio.  They might have had one onboard, but there
4    was no testimony that they had a marine radio on the
5    facility.
6    Q.   The core of your opinions, you testified,
7    were with respect to recommendations or regulations
8    that you felt should apply?
9    A.   Yes.
10   Q.   And with the mooring arrangement?
11   A.   Yes.
12   Q.   What does this have to do with either of
13   those?
14   A.   Well, it talks to -- points to the lack of
15   planning, the lack of monitoring the hurricane, the
16   lack of being aware of what was the impending danger
17   of the hurricane approaching the New Orleans area.
18   Q.   Right.  And what does that have to do with
19   either of your core opinions?
20   A.   Well, if they would have monitored all --
21   well, number one, the Governor declared an emergency
22   I think on Friday, Friday, sometime on Friday, and
23   they should have known that.  That should have
24   alerted them to begin preplanning and seeing how they
25   were going to do things, but there's no evidence that

76

they did anything.
    They took a barge in, they began
offloading it, and I think that they should have --
number one, they should have not taken it in; and
certainly if they did take it in, they should not
have begun discharging it.
    The Governor had already declared an
emergency.
Q.   Are you sure of that?
A.   I think it was on --
    MR. SANDERS:  Friday.
A.   -- Friday.
Q.   (By Mr. Walker)  And where was the hurricane
at that time?
A.   It was in the Gulf and heading toward the
panhandle of Florida.
Q.   There was no indication at that time that it
was headed to New Orleans, was there?
A.   No.
    MR. SANDERS:  Object to the form.
A.   I'd have to go back and read it, but there is
language that it looked to be a westward movement.
    And then later that day, at 11:00 that
night, there was a clear shift and the weather
reports indicated there was a drift to the west.

77

Q.   (By Mr. Walker)  All right.  During the day
Friday, there was no indication that the hurricane
was coming to New Orleans, was there?
    MR. SANDERS:  Object to the form.
A.   It was certainly within the cone of
uncertainty.
Q.   (By Mr. Walker)  There was no indication that
there was any direct hit expected in New Orleans on
Friday; isn't that correct?
A.   I'd have to agree with that, yes.
Q.   So exactly what is it that in your opinion
they should have done differently to monitor the
storm?
A.   Well, they certainly could have listened to
or gotten information from marine broadcasts that
were being disseminated by the Coast Guard, news
reports, the Governor declaring an emergency.  All of
those certainly should have been enough information
to give them a wakeup call that they have the
possibility of a hurricane striking the New Orleans
area and taking steps to begin battering down the
facility and making it less vulnerable to hurricane
damage, and I don't think they did that.
Q.   How did they not do that?
A.   They didn't do anything.  They found out and

78

1  then they put out -- Well, I take that back.  They
2  did do something.
3          They had rope, new line available at the
4  facility.  They replaced a line on the -- between the
5  two barges.  They put new lines and they left an
6  existing line, and they prepared the mooring to the
7  dock with this long-line method.
8      Q.  They prepared for a hurricane, they made the
9  calls that they thought necessary?
10     A.  Yes.
11     Q.  They had the barge topped around.  You just
12  disagree with their mooring configuration and
13  arrangements; right?
14         MR. SANDERS:  Object to the form.
15     A.  That and the lack of using available
16  equipment that was there on the barge as well as on
17  the dock concerning --
18     Q.  (By Mr. Walker)  But let's not get into
19  other -- I understand you've said that.
20         MR. SANDERS:  He's entitled to answer
21  the question.  You're trying to nail him down to
22  particular things you say.
23         MR. WALKER:  Exactly.
24         MR. SANDERS:  All of his opinions are in
25  his report, not just what you say.

79

1      Q.  (By Mr. Walker)  My question is -- if we keep
2  on track, we'll get to everything that you want to
3  say.
4      A.  Okay.
5      Q.  We're talking only about 5.10 --
6      A.  Right.
7      Q.  -- and your criticism of their failure to
8  monitor; okay?
9      A.  Yes.
10     Q.  Now, you've told me what you wished they
11 would had done in terms of marine broadcasts and
12 others.
13     A.  Yeah.
14     Q.  But the fact remains that they did everything
15 that they wanted to do to prepare for the hurricane,
16 you just disagree with what they did; right?
17     A.  Yes, yes.  I consider that to be poor
18 planning --
19     Q.  And it's your opinion --
20     A.  -- or no planning at all.
21     Q.  And it's your opinion -- or is it your
22 opinion that they would have done something
23 differently if they had monitored marine broadcasts?
24     A.  Yes.
25     Q.  And why is that?  What information came at

80

1  some point Friday from marine broadcasts or elsewhere
2  that they didn't already have or that they didn't
3  take into account in preparing for a hurricane?
4      A.  The fact that the Governor announced an
5  emergency, and had they been listening to the Coast
6  Guard broadcast they would have been alerted to begin
7  reviewing their hurricane preparedness plan, to
8  double up lines, to do all the things that are
9  outlined in the -- in those broadcasts.
10     Q.  They doubled the lines, you just disagree
11 with what they did?
12     A.  Oh, no, they did not double the lines.
13     Q.  We disagree, don't we?
14     A.  Yes, major.
15     Q.  But that's just a disagreement on what
16 "doubling" is?
17     A.  Yes.
18     Q.  They doubled the lines.  Didn't they do,
19 whether you agree or disagree with what they did,
20 everything that they sought to do in preparation for
21 a hurricane?
22     A.  No, they didn't everything they could have
23 done.
24     Q.  Sought to do.
25     A.  Sought to do.

81

1      Q.  What did they attempt to do or what plans
2  were out there for them to do on Friday --
3      A.  They could have --
4      Q.  -- that they didn't do?
5      A.  One thing, they unloaded the barge.  And it's
6  my opinion that based on all the information that was
7  out there at the time they should not have emptied
8  that barge prior to the onslaught of the hurricane.
9      Q.  I understand you disagree with what they did.
10     A.  Yes.
11     Q.  But the information gathering is all that
12 this pertains to.
13     A.  Yes.
14     Q.  And they had information that they took into
15 account and they made the decision that based on that
16 information they were going to unload the barge?
17     A.  They did.  Yes, they did it -- they --
18 whatever information they had, they did not heed that
19 information and went ahead and emptied the barge
20 anyway.
21     Q.  Right.  But they had the information?
22     A.  No, they didn't.  The testimony is that they
23 didn't monitor anything.  They didn't have any
24 communications.  All they had was Nextel phones and
25 that was it.

82

1    They had no fax, no e-mail and they
2 didn't subscribe to any of these broadcasts, so they
3 weren't privy -- they weren't -- had not received any
4 of those.  I don't know if they had a marine radio or
5 not, but they should have had.
6    Q.  Why did they call Zito?
7    A.  To top it around because they anticipated a
8 hurricane.
9       MR. MOULEDOUX:  Object to the response.
10       MR. SANDERS:  Zito.
11    A.  Zito.  Oh, because the barge was finished
12 being unloaded and they purportedly made a call to
13 Zito and said the barge was ready to be picked up.
14    Q.  (By Mr. Walker)  Why did they want the barge
15 potentially picked up?
16       MR. MOULEDOUX:  Objection to the form;
17 speculation.
18    A.  All of the testimony is they were through
19 with the barge and it was ready to be picked up.
20       I don't think -- I can't recall whether
21 the testimony was "We wanted Zito to come pick up the
22 barge because the hurricane was coming."
23       They said the barge -- I think his
24 words, not exactly, but in essence he testified that
25 "We emptied the barge and we called Zito at some time

83

1 on Saturday morning and said the barge is ready to be
2 picked up," and that was it.
3    Q.  (By Mr. Walker)  Why did they have the barge
4 topped around?
5    A.  Because he -- Mr. Busch was concerned about
6 the overtopping of the dock and he wanted the empty
7 barge outboard.
8    Q.  Because of what, because they were aware a
9 hurricane might be coming?
10    A.  Yes.
11    Q.  Why did they put additional lines out?
12    A.  Because they were anticipating a hurricane
13 coming.
14    Q.  So what they did they did with information
15 that they had that there might be a hurricane coming;
16 right?
17    A.  Yes, but --
18    Q.  So listening to Governor Blanco's emergency
19 or monitoring the radio would not have given them any
20 additional information that there might be a
21 hurricane coming and this is what they did?
22       MR. SANDERS:  Object to the form.
23    A.  Yes, but if they had access to the Coast
24 Guard recommendations about doubling up, Coast Guard
25 recommendations about ballasting vessels, they could

84

1 have taken all of those things into consideration and
2 did those -- taken those actions.
3    Q.  (By Mr. Walker)  That's not monitoring, is
4 it?
5    A.  Well, it's monitoring and gathering
6 information.  It's planning.
7    Q.  But 5.10 doesn't talk about gathering
8 information.  It says they failed to properly monitor
9 the storm.
10    A.  Yes, yes.
11    Q.  Reading or knowledge of recommendations or
12 regulations is not monitoring, is it?
13    A.  No.  You're right.
14    Q.  You said the barge should not have been
15 loaded -- should not have been unloaded.  Sorry.  Why
16 is that?
17    A.  Because an unloaded barge is more susceptible
18 to storm action than an empty barge.
19    Q.  And when was the barge unloaded?
20    A.  Wait a minute.  An unloaded barge is more
21 susceptible to storm action than a loaded barge.
22    Q.  What do you mean, "storm action"?
23    A.  Wind, particularly.
24    Q.  When was the barge completely unloaded?
25    A.  Somewhere around 9:00 on Saturday.

85

1    Q.  Is there any regulation, recommendation or
2 practice or policy with respect to whether the barge
3 should be loaded or unloaded?
4    A.  Yes.  I mentioned it before in my diatribe
5 that it's the recommendations and it should be common
6 sense to facility owners, facility operators, that an
7 empty barge with a storm coming is more susceptible
8 to the actions of a hurricane or storm or gale than
9 would be a loaded barge, and they progressed anyway
10 against a common-sense policy to offload the barge.
11    Q.  What recommendation?
12    A.  To ballast the barge.  The recommendation
13 would be to -- and it says in the marine safety
14 broadcast, which is common sense among mariners,
15 that --
16    Q.  Forget the common sense.  What regulation or
17 recommendation can you point me to that says that a
18 barge should not be unloaded in the face of incoming
19 weather?
20    A.  It doesn't say specifically barges.  It says
21 they should ballast vessels, and this is a vessel.  A
22 barge is a vessel, a ship is a vessel, a yacht is a
23 vessel.
24    Q.  Does it say that the barge or vessel should
25 not be unloaded?

86

1 A. No, it does not.
2 Q. Still on 5.10, you talk about the failure to
3 monitor would have allowed for proper movement of the
4 barge, proper mooring, ballasting or sinking of the
5 barge.
6    What do you mean by "movement of the
7 barge"?
8 A. They could have called an operator to come
9 get it.
10 Q. Did they do that?
11 A. They said they called Zito and said it was
12 ready to be picked up.
13 Q. Did they not do that?
14 A. They did call for that, but they didn't
15 follow through to make sure that it was going to
16 actually happen.
17 Q. Right.  But we're talking about your opinion
18 there, proper planning would have allowed for
19 movement of the barge.
20 A. That's right.
21 Q. Your testimony is to come get the barge, call
22 someone?
23 A. It was a phone call that's being contested
24 whether it actually took place or not.
25 Q. I understand.

87

1 A. But assuming that it did go forward, then
2 certainly they made a call somewhere around 9:00 that
3 the barge was ready to be picked up.
4 Q. So they did what you would have expected them
5 to do?
6 A. Correct, except they didn't leave -- not all
7 of them -- but they left between 12:00 and 1:00, and
8 they should have followed up on that to ensure that
9 that message had gotten through and find out just
10 exactly when they were going to come pick up the
11 barge.
12 Q. Right.  That has nothing to do monitoring,
13 does it?
14 A. Yes, it does.  You monitor the whole thing.
15 Q. Properly monitor the storm?
16 A. Yes.  That would lead them to plan to have
17 the facility ready for the storm and it was not
18 ready.
19 Q. Okay.  Listen to my question.
20 A. Monitor.
21 Q. You say "properly monitor the storm."
22 A. That's right.
23 Q. And had they done that --
24 A. Yes.
25 Q. -- this would have allowed them to plan for

88

1 movement of the barge?
2 A. That's right.
3 Q. And your testimony is that what you mean by
4 that is that they should have called someone to come
5 get the barge?
6 A. Yes, yes.
7 Q. So they did that?
8 A. But they didn't follow through on it.
9 Q. That's fine.  But at least in that respect,
10 they properly monitored the storm because they did
11 what you would have expected of them?
12 A. I don't agree with that.
13 Q. You said they didn't follow through, but that
14 doesn't mean they didn't monitor.
15 A. They made a supposed call to Zito to come get
16 the barge, and that was it.
17 Q. Right.  Based on their monitoring of the
18 storm; right?
19 A. No.  I don't know if it was based on their
20 monitoring the storm.  They knew a storm was coming
21 and so --
22    No.  The call to Zito was not because of
23 the storm coming.  They called Zito to come pick up
24 the barge.  I think that was the testimony.
25 Q. And your testimony is that that's what you

89

1 mean for "movement of the barge"?
2 A. Yes.
3 Q. Okay.  And then your next words are "proper
4 planning would have allowed for proper mooring"?
5 A. Yes.
6 Q. And by that you mean --
7 A. Doubling up.
8 Q. -- more than the three lines?
9 A. Yes.  Doubling up, right.
10 Q. Ballasting or sinking of the barge?
11 A. Yes.
12 Q. So it's your testimony that if they had heard
13 Governor Blanco's emergency state or monitored the
14 marine broadcasts that they should have ballasted or
15 sunk the barge?
16 A. No.  Yes, number one.  But first off they
17 should have never offloaded it in light of the
18 broadcast and the state of emergency.
19    There was no exigent situation existing
20 where they had to unload it.  They had five other
21 barges tied up and had been there for some time.  But
22 for some reason or another they elected to offload
23 this thing even though an emergency had been set and
24 with continual broadcasts, weather broadcasts saying
25 the storm is moving more and more to the west toward

90

1   New Orleans.
2       Q.   Let's talk about ballasting.
3       A.   Okay.
4       Q.   We already talked about unloading.  It's your
5   opinion that the barge should have been ballasted?
6       A.   Yes.
7       Q.   And how would you expect them to do that?
8       A.   Well, in the discovery, I noticed that
9   there's a report submitted by Lafarge to all of the
10  parties indicating that the barge void spaces were
11  checked prior to unloading.
12           And so it's my opinion if somebody
13  checks the voids to see if there's water in there,
14  and if there is water in there then they would take
15  steps to dewater the barge.  And so that would
16  indicate to me that they have pumps on the facility
17  to dewater barges as necessary.
18           They could have turned right around and,
19  once they discharged the barge, they could have
20  filled the void spaces with canal water and that
21  would have reduced the sail area and made it less
22  vulnerable to wind conditions.
23       Q.   So the answer to my question is, they would
24  have pumped water in it?
25       A.   Yes.

91

1       Q.   And for that they needed to have pumps?
2       A.   Yes.  Or they could have called a contractor.
3   If it was 9:00 in the morning on Saturday, they could
4   have --
5       Q.   So in the face of the emergency that you just
6   said they were monitoring, they could have just
7   called somebody to come and pump the barge; is that
8   what you're saying?
9       A.   I'd say there were services that could do
10  that.
11      Q.   On a Saturday morning?
12      A.   On Saturday morning.  Those services in
13  rivers and in canals are on a 24/7 basis.  They don't
14  quit on a Friday morning or Saturday morning much
15  like people do ashore.
16      Q.   But you expected Lafarge to be monitoring the
17  storm on Friday?
18      A.   Yes.
19      Q.   But these other service contractors, to be
20  available Saturday morning?
21      A.   If they didn't have pumps.  But if they would
22  not have unloaded it, they wouldn't have to worry
23  about ballasting.
24      Q.   We already talked about that.
25      A.   If they have discharged it and it's in a

92

1   light condition, they know that if a hurricane hits
2   it's going to play, in my opinion, havoc with this
3   light barge.
4            And so they had the opportunity, if they
5   had -- and I don't know this to be a fact -- if they
6   had pumps on the facility, they should have used
7   those pumps to ballast the void spaces.
8            Your expert opines about this would make
9   the barge unstable.  I disagree with that totally.
10  He is assuming that you would fill the hopper with
11  water.  I would not do that.  I would fill the voids.
12  They have rakes at each end and they have void
13  compartments on both sides of the barge which would
14  have lowered the freeboard of the vessel.
15      Q.   And how long would that take?
16      A.   Well, a 3-inch pump pumps pretty fast because
17  those pumps are designed to get ahead of a hole in a
18  barge with a lot of water.  And I don't have the
19  exact gallons per minute that it would discharge, but
20  if they began discharging on --
21      Q.   My question is real simple:  How long would
22  it take?
23      A.   I have no idea.
24      Q.   Two hours, ten hours?
25      A.   It could be.

93

1       Q.   Either of those?
2       A.   We're talking about 42 hours before the
3   hurricane got there.
4       Q.   You're the expert.  Two hours, ten hours,
5   24 hours?
6       A.   It could be anywhere from two to four to six
7   hours.  It depends on how many pumps they have.
8       Q.   To bring it down how far?
9       A.   Well, again, that would be rank speculation
10  on my part, but I can say unequivocally that the use
11  of pumps -- and if they would have multiple pumps,
12  with the use of pumps they could have ballasted that
13  vessel down and reduced the freeboard area -- yes,
14  the freeboard area and made it less vulnerable to
15  wind action.
16      Q.   Down to what?
17      A.   I'd say level with the other barge.  But I'm
18  not sure whether those voids being full would bring
19  it down to that level.  That would be another
20  calculation.  I think your expert could do it.
21      Q.   Is there any recommendation or regulation or
22  policy that would require ballasting of the barge?
23      A.   No.  All of the recommended practices and
24  statements issued by the Coast Guard and seamen all
25  universal is that a ballasted vessel is more

94

1   stable --
2       Q.   That's not my question.  Is there a
3   recommendation or a policy --
4       A.   I'm trying to tell you there is.
5       Q.   Just tell me what that is.
6       A.   Well, it's in the -- in the -- what you call
7   it?  There it is, the Marine Safety Bulletins.
8       Q.   Okay.  Anything else?
9       A.   And common sense, seamanship.
10      Q.   Is that Marine Safety Bulletin a
11  recommendation or a regulation?
12      A.   It's a recommendation.
13      Q.   Does it apply to unmanned barges?
14      A.   Sure, it does.  It says "vessels," yes.
15      Q.   So in your opinion "vessels" generically
16  would encompass these barges?
17      A.   Yes.
18      Q.   And you also say they could have sunk the
19  barge.  How would they have done that?
20      A.   Well, they could have -- what they would do
21  is blow holes with a blow torch along the waterline
22  and then they would use -- they had a crane there,
23  some other device to lean it over so it could start
24  taking on water or blow a hole right straight through
25  the bottom.

95

1       Q.   And do you really think that's a practical,
2   realistic possibility or recommendation that you
3   would provide one of your customers if they called
4   you under this scenario?
5       A.   Yes.  It's buttressed by the fact that the
6   Coast Guard now requires with the approach of a storm
7   everyone get out of the canal, and they point to Ike
8   where 40 to 60 vessels broke loose from Southern
9   Scrap and the Coast Guard Captain stood up and said,
10  "Well, one of the reasons I feel a little comfortable
11  with their condition is that they have put holes in
12  the barges so that they will take on water and they
13  won't float away."
14           So the Coast Guard considered that and I
15  certainly considered that.  The fact is if that
16  vessel would have been, at the least, what I first
17  recommended and, at the most, if they had blown a
18  hole in it with a blow torch and sunk the thing, then
19  it would --
20      Q.   And how long would that have taken?
21      A.   Well, again, it's depends on many holes you
22  put in it.
23      Q.   Well, if you make a 2-inch hole, how long is
24  it going to take to sink?
25      A.   I can't calculate that right now.

96

1       Q.   But you think this is a realistic --
2       A.   Yes.
3       Q.   -- possibility?
4       A.   Yes, I think so.
5       Q.   Under the circumstances of that day,
6   Friday --
7       A.   Compared --
8       Q.   -- or Saturday?
9       A.   Compared to what the end result of --
10      Q.   I'm not asking to compare anything.  Is this
11  a realistic scenario that you're willing to testify
12  about in court --
13      A.   Yes.
14      Q.   -- that would have been done Saturday before
15  the hurricane --
16      A.   Yes.
17      Q.   -- right?
18      A.   They would have had no other alternative.
19  They would have had no other alternative.  They
20  couldn't move it.  They discharged it anyway.  They
21  couldn't get it out of there and they knew it was an
22  empty vessel.
23           They're concerned about it being empty
24  in the first place.  And if they could have ballasted
25  it, number one, or stopped offloading it at a certain

97

1   point.  It took from 12:00 until 9:00 the next
2   morning.  That's almost 24 hours they're offloading.
3            All of these broadcasts, all of these
4   weather reports had been disseminated to the public,
5   marine public and everyone else, and they continued
6   to discharge.
7            If they had stopped at some point, maybe
8   at 6:00 in the morning, then it might still have had
9   enough freeboard -- I mean, a minimal freeboard to
10  not have so much sail area as would happen when the
11  hurricane comes.
12      Q.   Do you know how many barges broke away during
13  Hurricane Katrina?
14      A.   I heard that before.  There was a whole bunch
15  of them.
16      Q.   1,500 or more?
17      A.   Yeah.  That was on the river, that was
18  everywhere.
19      Q.   Do you know how many of those were in ballast
20  as opposed to fully laden?
21      A.   No, but I know none of them went through the
22  Industrial Canal levee.
23           MR. MOULEDOUX:  Object to the
24  responsiveness.
25      Q.   (By Mr. Walker)  You don't know that this one

98

1   did either, do you?
2       A.  Well, it ended up in the Ninth Ward.
3       Q.  You don't know it went through the levee, do
4   you?
5       A.  It went through the levee.
6       Q.  You don't know it went through the levee, do
7   you?
8           MR. SANDERS:  I think you mean broke the
9   flood wall.
10          MR. WALKER:  I don't know what that
11  means.
12          MR. SANDERS:  Go ahead.
13      A.  The witnesses that --
14      Q.  (By Mr. Walker)  If you're going to make
15  inane statements, I'm going to make inane questions.
16      A.  Okay.
17      Q.  You weren't there and you don't know to make
18  that statement and that's certainly outside the
19  purview of your expertise and testimony, isn't it?
20      A.  That's correct.
21      Q.  Okay.  What we don't know is how many of the
22  barges that broke away during the hurricane, 1,500 or
23  more, were fully laden; right?
24          MR. SANDERS:  Object to the form.
25      A.  That's correct.

99

1       Q.  (By Mr. Walker)  Do you know of any barge
2   that was sunk in anticipation of Hurricane Katrina
3   purposely?
4       A.  No.
5       Q.  Do you know of any barge that was ballasted
6   in anticipation of Hurricane Katrina?
7       A.  No.
8       Q.  Do you know of any barge -- Strike that.
9           You don't know of any barge which was
10  ballasted and/or fully or partially laden that broke
11  away in spite of that draft condition?
12      A.  No.
13      Q.  Have you ever sunk a barge?
14      A.  No.
15      Q.  Have you ever recommended sinking a barge in
16  anticipation of incoming weather?
17      A.  No, I have not.
18      Q.  Opinion 5.11 is a new one also.  It says that
19  using three single-part lines was a temporary
20  mooring.
21      A.  Yes.
22      Q.  Where did you get that?  How was it
23  temporary?  Where does that opinion come from?
24      A.  Well, because I testified before, if they
25  were going to leave the barge at a place, it's

100

1   customary to double up.  And certainly in light of a
2   hurricane coming, they would double up anyway.
3           But a single part line is in my opinion
4   a temporary mooring.
5       Q.  Okay.  So it's not that you heard or somebody
6   concluded or gives you an opinion that it was meant
7   to be a temporary mooring?
8       A.  No.
9       Q.  It's based on your opinion that it was
10  insufficient and, therefore, you conclude it's also
11  temporary?
12      A.  Yes.
13      Q.  And then you say "insufficient for hurricane
14  conditions."
15          Again, that goes back to the
16  disagreement we have regarding what constitutes
17  doubling; right?
18      A.  Yes.
19      Q.  Now, you say that three single-part lines in
20  your opinion was insufficient?
21      A.  Yes, especially the way they were arranged.
22      Q.  Would four be sufficient?
23      A.  Well, it depends on how they would be
24  arranged.
25      Q.  Well, could you arrange four to be

101

1   sufficient?
2       A.  Doubled up, yes.
3       Q.  Well, I don't know what that means.  We're
4   talking four lines.  Could you arrange them to be
5   sufficient?
6       A.  No.
7       Q.  I thought you said you could arrange three to
8   be sufficient as long as there was --
9       A.  Double up.
10      Q.  -- as long as it was a breast rather than a
11  spring line configuration in the center.
12      A.  If I said that, I'm incorrect and I want to
13  change my testimony right now to say that if it was
14  three lines that were out and they were breast lines
15  that were out and they were doubled up, I would feel
16  much better about that.
17      Q.  Three single part lines in your opinion, no
18  matter how they're tied up, would be insufficient?
19      A.  Yes.
20      Q.  Four single part lines would be insufficient?
21      A.  Yes.
22      Q.  Five single part lines would be insufficient?
23      A.  If they used five-part lines and they were
24  doubled up, then I would buy that.
25      Q.  I'm talking five single lines.

102

1   A.   My opinion has always been that the lines be
2   doubled up, and that means doubling the mooring
3   lines.  If they had three out, they would put six
4   out.
5   Q.   Okay.  I'm talking five single lines.
6   A.   Five single lines could very well have been
7   enough.
8   Q.   So four, no, but five maybe; is that what
9   you're saying?  Is that your testimony?
10  A.   I'd say a line on every cavel, and they had
11  five cavels, all five points would have been single
12  lines and tightly moored, then I think that might
13  have been sufficient.
14  Q.   Okay.  Your previous testimony was, based on
15  Mr. Flory's calculations at 36 miles-an-hour wind or
16  more, 2-inch poly lines would have broken; correct?
17  A.   That's what he -- I'm depending on his
18  analysis.
19  Q.   And that would be whether you have one line
20  out or five lines out; right?
21  A.   No.  His calculation was done on three lines.
22  Q.   So it's based on the number of lines, not on
23  the effect of the wind on a single line?
24  A.   That's correct.  That's what I understand his
25  analysis to be.

103

1   Q.   You said that the barge was not moored for
2   hurricane conditions.  For what conditions was it
3   moored?
4   A.   I'd say it was moored for temporary
5   conditions.
6   Q.   Well, 40 mile-an-hour winds?
7   A.   No.  No, it wasn't.
8   Q.   25 mile-an-hour winds?
9   A.   Just for -- certainly not even -- in my
10  opinion, it was based -- that opinion is single-part
11  lines is a temporary mooring.
12  Q.   I'm not asking you about the temporary.  I'm
13  asking you conditions.
14  A.   Okay.
15  Q.   Because that's your word.  You said it was
16  not moored for hurricane conditions?
17  A.   That's correct.
18  Q.   I'm asking what conditions was it moored for,
19  in your opinion?
20          MR. SANDERS:  If you know.
21  A.   If I know?
22  Q.   (By Mr. Walker)  Yes.
23  A.   I don't know.
24  Q.   Well, in your opinion, do three-part lines --
25  Strike that.

104

Based on Mr. Flory's calculations, three
part lines do not withstand 36 mile-an-hour winds;
correct?
1   A.   Three one-part lines, as it was arranged, did
2   not.
3   Q.   And you don't know what three part lines
4   would withstand, whether it's 25 or 20 or 15
5   mile-an-hour winds?
6   A.   No, I do not.
7   Q.   Looking at Opinion 5.12, you say that "The
8   exact time of the barge breakaway is unknown."
9   A.   Yes, sir.
10  Q.   I assume you're talking about exact time.
11  It's still your testimony that it was between 4 and
12  6 a.m.?
13  A.   Well, we went over that and I looked it up
14  here in my report that Mr. Bosch -- excuse me --
15  what's his name?  Villavaso, an eye witness,
16  testified on the morning of the 29th between the
17  hours of 4 and 6 he witnessed the barge strike the
18  flood wall.
19          So that means it had to break away
20  before 4:00 or before that time period in order to be
21  able to strike the wall at 4:00, between 4 and 6.  So
22  I don't know when the exact time it broke loose.  No

105

1   one else does.
2   Q.   Your prior testimony was that it was between
3   4 and 6.  Are you saying it was before 4 now?
4           MR. SANDERS:  Yes.  That's what he was
5   explaining to you.
6   A.   That's what I'm explaining to you, yes, that
7   Villavaso said he saw it hit the wall between 4 and
8   6.  So it had to break away before then, if that's
9   true.
10  Q.   (By Mr. Walker)  And your time frame relies
11  entirely on his testimony?  You have no other basis
12  for opining as to the time of the breakaway; correct?
13  A.   That's correct, yes.
14  Q.   In 5.13 you say that Lafarge violated their
15  Hurricane Preparation Checklist?
16  A.   Yes.
17  Q.   Okay.  You have read testimony and you're
18  aware that that published checklist had been
19  superseded; correct?
20  A.   Yes.
21          MR. SANDERS:  Object to the form.
22  Q.   (By Mr. Walker)  And you're also aware that
23  the wire use that that prior check suggested was
24  because of an older dock facility and the manner in
25  which barges were moved at the facility; correct?

106

1      MR. SANDERS:  Object to the form.
2      A.  That was their testimony, yes.
3      Q.  (By Mr. Walker)  So you understand, based on
4  the testimony, that the Hurricane Preparation
5  Checklist that you're referring to was in fact not in
6  effect at the time?
7      MR. SANDERS:  Object to the form.
8      A.  That's what they testified to, but that was
9  their last published checklist, and then they went
10 off of some verbal thing.
11     Q.  (By Mr. Walker)  Now, is it your opinion that
12 the only manner in which this barge would have
13 been prevented from breaking away is to have used
14 cabling?
15     MR. SANDERS:  Object to the form.
16     Are we going to start the deposition all
17 over again?
18     A.  I think I put in here a combination of soft
19 line and cables, which were available, then it would
20 have had a much better chance of not breaking loose.
21 And they had cables.  The cables were available.
22     Q.  (By Mr. Walker)  Is that your opinion, that
23 cables plus lines would have been required, or could
24 lines alone have been sufficient?
25     A.  No.  I think that the preparation should have

107

1  used all means available.
2      Q.  That's not my question.  Are cables and lines
3  in your opinion necessary to have withstood the
4  forces of this hurricane or would lines alone have
5  been sufficient?
6      MR. SANDERS:  Object to the form.
7      A.  Lines could have been sufficient, but with
8  the availability of lines and wire they should have
9  used both.  More is better.
10     Q.  (By Mr. Walker)  My question is:  What's your
11 opinion?
12     A.  My opinion is more is better.
13     Q.  My question is:  What's your opinion as to
14 whether or not lines alone could have -- would have
15 been sufficient?
16     MR. SANDERS:  Object to the form.
17     A.  It would be speculation on my part, but I
18 think that if they had sufficient lines doubled up
19 with the minimum recommendations, then it could very
20 well have withstood.
21     But with the presence of wire, I can't
22 understand why they didn't use them.
23     Q.  (By Mr. Walker)  Now, if I understand your
24 opinion here correctly, you talk about "the U.S.
25 Coast Guard recommendation of doubling up lines

108

(which includes cable and wire rope.)"
1      Is it your opinion that if cabling had
2  been used it had to be doubled up as well?
3      A.  Yes.
4      Q.  So whether it's cabling or lines, in your
5  opinion either one would have to be doubled?
6      A.  Yes.  I think more is better.  It's as simple
7  as that.
8      Also, the Coast Guard recommendations
9  for doubling up is the bare minimum.  The Coast Guard
10 recommendations are just that, recommendations, as
11 you pointed out to me, only recommendations.  They're
12 not law.  They're not statute.  They're
13 recommendations, but those recommendations are the
14 bare minimum.
15     Q.  And "doubling up" means doubling the breaking
16 strength of either the cable or the lines that you're
17 using?
18     MR. SANDERS:  Object to the form.
19     A.  Certainly the strength of lines play a part,
20 but the doubling up adds additional strength to the
21 arrangement, and that is not necessarily it doubles
22 the strength, but it doubles the amount of elasticity
23 in the lines, it adds all sorts of qualities that go
24 beyond the strength of the line.

109

1      Q.  (By Mr. Walker)  In Section 5.15 you refer to
2  good seamanship and marine standards of care.
3      A.  Yes.
4      Q.  What are you referring to and who are you
5  talking about here?
6      A.  Lafarge.
7      Q.  What is good seamanship or what -- in what
8  respect would good seamanship play a part in this?
9      MR. SANDERS:  Object to the form.  He's
10 testified in three depositions about all of that.
11     A.  By default, they're put in a position to
12 secure barges, vessels, and you have to use good
13 marlinspike seamanship to do that.
14     Their landsmen, certainly, but they're
15 in the care and custody of barges and they've been
16 doing it for years and years.
17     Q.  (By Mr. Walker)  So you're talking about
18 mooring?
19     A.  Mooring, yes.
20     Q.  And you're just using the term "seamanship"
21 to apply to the Lafarge --
22     A.  Yes.
23     Q.  -- individuals?
24     A.  Right.
25     Q.  Anybody else?

110

1    A.  No.
2    Q.  And the marine standards of care that you're
3  talking about --
4    A.  Yes.
5    Q.  -- apply again to the mooring?
6    A.  Yes.
7       MR. SANDERS:  Object to the form.
8    Q.  (By Mr. Walker)  Now, in 5.2 you or your able
9  assistant added a sentence that was not included in
10  your prior opinions --
11    A.  Uh-huh.
12    Q.  -- I believe.  It says that "Rigging or
13  mooring lines could have been added if requested."
14       MR. SANDERS:  Don't assume what he's
15  saying is true.
16       THE WITNESS:  I'm looking for it.
17    Q.  (By Mr. Walker)  Let me double-check if
18  that's correct.  I may have that wrong.
19       You don't find that, do you?
20    A.  No, sir.
21    Q.  Let me come back to that.
22    A.  Okay.  I'm going to go get the key again.
23       (Recess from 1:44 until 1:50.)
24    Q.  (By Mr. Walker)  You state that a fleet could
25  have accepted the barge or the barge could have been

111

1  called to fleet or taken to a fleet.
2       What fleet would that have been?
3    A.  Zito's fleet.
4    Q.  You've researched that and have determined
5  that that fleet was available?
6    A.  No.  I asked Mr. Sanders about that and he
7  said that the testimony of Mr. Boudreaux, who was --
8  Boudreaux or Bourgeois, one or the other -- was the
9  person on watch at the Zito Fleet and I understand
10  his testimony to be that, if asked, they could have
11  taken her in.
12       MR. MOULEDOUX:  Object to the form and
13  responsiveness.
14    Q.  (By Mr. Walker)  Did you make any independent
15  determination of how and when this barge would have
16  been picked up relative to the closing of the access
17  in and out of the IHNC?
18    A.  No, I did not, other than look at the lock
19  logs and the fact that they dispatched the boat to
20  turn the two barges around.  What was that?  I can't
21  remember the name of the vessel.
22       MR. SANDERS:  REGINA H.
23    A.  REGINA H to turn around.  She could have
24  taken it out.  That was at 4:00 on Saturday, I think,
25  that she left out of there.

112

1       I think the locks closed sometime around
2  4:00 in the morning I think on Sunday and the lock
3  logs show, I think, four or five vessels that were
4  going through -- light going through there, and one
5  of those -- one of those boats could have been
6  engaged to pick up the barge.
7    Q.  (By Mr. Walker)  Are you aware of any
8  testimony or documentation indicating that fleets
9  were not accepting barges?
10    A.  I understand, yes, that's correct, but I also
11  understand that Zito reserves something like
12  40 percent or 60 percent of their spaces to Ingram,
13  who was their largest customer, and my understanding
14  of that man's testimony is that, yes, they would have
15  taken it.
16       MR. MOULEDOUX:  Object to the
17  responsiveness.
18    Q.  (By Mr. Walker)  Have you omitted or deleted
19  applicable CFR standards from your March 11 report
20  that you included in prior reports?
21    A.  I could very well have, but I don't know
22  which ones I deleted.
23    Q.  Well, did you?
24    A.  Yes, I did.
25    Q.  Okay.

113

1    A.  I don't know which ones specifically.
2    Q.  Well, in respect to why were they applicable
3  and that you consider them no longer applicable?  Why
4  did you delete them?
5    A.  Well, I didn't think they were any longer
6  applicable.
7    Q.  In what respect?  Because they didn't apply
8  to an unmanned dumb barge, because they didn't apply
9  to the Inner Harbor Navigation Canal, because they
10  weren't recommendations or regulations?
11       On what basis did you withdraw your
12  opinion that these were applicable?
13       MR. SANDERS:  I object to the form.
14    A.  No longer applicable.
15       I'd have to go back and analyze my last
16  report, what regulations I dropped out, and then I'd
17  have to reflect in my own mind why I did that, but I
18  did that.
19    Q.  (By Mr. Walker)  You don't --
20    A.  I don't --
21    Q.  -- remember now which ones nor why?
22    A.  No.  That's correct.
23    Q.  Well, let's start with 33 CFR 162.75?
24    A.  162.75, what does that say?
25    Q.  You can either look at your prior reports or

114

1  elsewhere.
2      A.   162.75?
3          MR. SANDERS:  Why don't you give him the
4  gist of it?  Maybe it will jog his memory.
5      Q.   (By Mr. Walker) If you compare your March 11
6  report with your declaration of September 10, your
7  section "Applicable Standards and Regulations" --
8      A.   Uh-huh.
9      Q.   -- your prior declaration starts with 162.75
10 and your present declaration does not.
11     A.   Well, the present report does cite in
12 Opinion 5.6 "violated the provisions of 33 CFR
13 162.75."
14         I might have just dropped it out of the
15 other thing, but that could have been a mistake on my
16 part.
17     Q.   So it's your opinion that it is applicable?
18     A.   Yes, I have an opinion about it.
19     Q.   Well, you omitted it from the section of
20 "Applicable Standards and Regulations," so that's why
21 I'm asking.
22     A.   Oh, okay.  I messed up.  I should put it back
23 in.  But my opinion in 5.7 clearly points it out.
24     Q.   Well, have you done a comparison of these
25 charts that you made?

115

1      A.   Which charts?  No, I have not.
2          That was for use at the trial which has
3  been over two years ago and I have not reviewed them
4  again since then.
5      Q.   Well, did you do a chart like this for this
6  report of March 11?
7      A.   No, sir.
8      Q.   You did attach these to a prior report,
9  didn't you?
10     A.   I don't think I did.  I brought those to
11 court in a big blowup.
12     Q.   And you haven't reviewed these since to
13 determine whether they're any longer accurate and all
14 of the regulations or recommendations on the chart in
15 your opinion still apply?
16     A.   No, sir, I have not.
17     Q.   All right.  So is it your testimony that
18 although you didn't include 162.75 in your
19 "Applicable Standards" section that you believe it's
20 still applicable?
21     A.   Yes.
22     Q.   Is it correct then that the standards which
23 are contained in your Section 5, which is your
24 opinions, are those standards that you believe apply,
25 whether or not they're in the "Applicable Standards"

116

1  section?
2      A.   Yes.  My opinion in 5.6 cites the
3  33 CFR 162.75 and I think it's applicable.
4      Q.   One thing in looking at my notes, and I
5  apologize if I asked it, but I'm unclear, using just
6  one cable as opposed to poly lines in your opinion
7  would not have been sufficient, right, to prevent a
8  breakaway?
9          MR. SANDERS:  Object to the form.
10     A.   One cable?
11     Q.   (By Mr. Walker)  Right.
12     A.   It could very well be.  I don't know what the
13 breaking strength of the cable is.  I didn't
14 investigate that.
15     Q.   I thought you just told me breaking strength
16 was irrelevant, that you were concerned about
17 doubling up?
18     A.   Well, I'm concerned about the fact that the
19 barge was not securely moored against this other
20 barge and one cable would be in my opinion
21 insufficient.  It would give the vessel too much
22 ability to move and drift away, bang into and all
23 that sort of thing.
24         So when I say "properly moored," that's
25 the deployment of lines in the doubled-up condition.

117

1      Q.   Irrespective of moving around and everything
2  else you said that one line would allow, is it your
3  opinion that using one cable would be sufficient to
4  prevent a breakaway?  In other words, would one cable
5  break under the conditions as you have analyzed them
6  in Hurricane Katrina?
7          MR. SANDERS:  Object to the form.
8      A.   It would be speculation, but in my opinion
9  one line -- I don't think I said one line would be
10 sufficient, one wire rope would be sufficient.  If I
11 did say that, then I withdraw it.
12     Q.   (By Mr. Walker)  How do you deploy cables?
13     A.   You use straps or you can use cable and clips
14 to form eyes.
15         And in the case of this barge, they had
16 cable on the dock.  They could have formed an eye
17 using clips and put it on the outboard vessel and
18 made it fast with chains and shackles to moor on the
19 dock.  That would have been one way.
20     Q.   How do you double up a cable?
21     A.   You simply -- well, you wrap it around and
22 then you use a ratchet as a counterweight to jerk the
23 slack out of it and then you attach the ratchet to a
24 short piece of chain to an anchoring spot and then
25 you draw it tight.

118

1    Q.   And is that a common procedure, to attach a
2    barge to barge in your experience?
3    A.   Yes, it is.
4    Q.   Using cables?
5    A.   Yes, sir.
6    Q.   And how about barge to dock?
7    A.   No, not necessarily.  They use soft lines or
8    they use cable -- a prefabricated cable to go from a
9    barge to a dock.
10   Q.   Now, one of the other things that you omitted
11   from this report that you had elsewhere is that the
12   authorities were predicting the levees would be
13   overtopped.
14   A.   Yes.
15   Q.   Why did you omit that now?
16       MR. SANDERS:  Don't assume he's telling
17   you the truth.
18   A.   Well, I don't know.  Now I've got to go back
19   and look at that.  If I put that in there, I must
20   have got it from somewhere that the authorities
21   predicted the levees would overtop.
22   Q.   (By Mr. Walker)  Well, is it your opinion
23   today that the authorities were predicting the levees
24   would be overtopped?
25   A.   It could very well be.  I'd have to go

119

1    back --
2    Q.   You don't know what your opinion is?
3        MR. SANDERS:  He doesn't know about that
4    fact.
5    A.   I don't know about that particular fact.  My
6    opinions are based on taking into consideration all
7    of the mooring.
8        And if I said in a prior report that the
9    officials predicted that the levees would overtop,
10   then if that's a fact I put in, then that was in a
11   prior report and it's not in this report because I
12   didn't consider it in my final opinions.
13   Q.   (By Mr. Walker)  Why did you omit that fact?
14   Did you find it to be false, incorrect, unsupported
15   or did it not buttress your opinions and you omitted
16   it?
17       MR. SANDERS:  Object to the form.  It's
18   not been proved that it was omitted.
19   A.   If I did omit it, it's because I thought it
20   was not relevant to my opinions.
21   Q.   (By Mr. Walker)  Do you agree -- and I
22   believe it's contained in your report -- that as of
23   6:00, Monday, August 29th, the National Hurricane
24   Center advised that the storm was 70 miles
25   south-southeast of New Orleans and hurricane winds

120

extended outward up to 120 miles from the center?
    A.   Where do you see that?
    Q.   I believe it's in your fact presentation.
    A.   Oh, okay.  That was probably taken verbatim
out of a weather report.  I should be citing the
weather report.
    Q.   Look at Page 4, first full paragraph.
    A.   Oh, yeah.  There it is.  Advisory Number 26A.
    Q.   Right.  As far as you know, that information
of that paragraph lifted from Advisory 26A is
accurate?
    A.   I hope it is, yes.
    Q.   And you've relied on that?
    A.   Yes, as part of my narrative.
    Q.   In Opinion 5.6 you talk about 33 CFR 162.75,
Anchoring and Mooring.  You've included this, so
obviously it's your opinion that it applies to
Lafarge and this barge; right?
    A.   Yes.
    Q.   And similarly 33 CFR 6.19 you believe
applies?
    A.   Yes.
    Q.   Now, with respect to opinion 5.9 which we
talked about earlier, the alleged failure to monitor
the progress of the storm, you had all of the

121

information necessary to make this opinion for all of
your prior reports.
        Why did you include it now and not
previously?
            MR. SANDERS:  What number did you say?
            MR. WALKER:  5.9.
    A.   Well, clearly if I didn't put it in my other
reports, after digesting all of this information
for -- let's see -- one, two, three -- for the fourth
time, it was obvious to me that I should address
that.
    Q.   (By Mr. Walker)  It didn't arise as a result
of discussions with anybody, attorneys or other
experts --
    A.   No.
    Q.   -- or anything in particular you read?
    A.   No, sir.  These are my opinions, drafted and
typed by me.
    Q.   After the barge broke away, it had a sail
area of, what, some 14, 16 feet?
    A.   I think the depth of the barge someone said
was 12 feet, maybe a foot and a half of draft, so
10 foot of hull and another 4 foot of hopper.
    Q.   So about 14 feet?
    A.   Yes.  Thank you.

122

1   Q.   And that would have been susceptible to the
2   winds?
3   A.   And currents.
4   Q.   Are you aware of any currents?
5   A.   Well, certainly the surge came in.  That's
6   current.
7        If it broke away after the surge was in
8   there and with the water rushing different places, we
9   don't know which way the current was running, but
10  it's safe to say that it came in into -- through the
11  Mississippi Gulf outlet, and I read somewhere that
12  the majority of it went toward the water, but
13  certainly it went up into the reaches of the
14  Industrial Canal, and that's going to cause all kinds
15  of eddies, counter currents and the rest of it.  So
16  no one knows where all the current was going, but it
17  would be as you say susceptible to current, yes.
18  Q.   As you state in the report, the barge drifted
19  in the Industrial Canal and eventually ended up in
20  the neighborhood?
21  A.   Yes, sir.
22  Q.   And it ended up in the neighborhood close to
23  Claiborne Avenue Bridge, correct, which is the
24  southern part of the Industrial Canal?
25  A.   That's correct, yeah.

123

1   Q.   So it drifted south from the terminal towards
2   the Claiborne Avenue Bridge?
3        MR. SANDERS:  Object to the form.
4   A.   Well, we don't know that.  We have a
5   witness -- what's his name -- at the power station
6   saying it hit up at the northern end and then it
7   eventually ended -- if that's the same barge, that it
8   drifted back and forth or whichever, but it was at
9   the mercy of winds and current for some time.
10  Whether it made two hits or one hit, but it ended up,
11  and you're correct, in the lower end of the Ninth
12  Ward.
13  Q.   (By Mr. Walker)  You're not contradicting
14  your prior testimony, are you, that the barge, after
15  it broke away, drifted in a southerly direction?
16       And you drew arrows on photographs
17  showing the direction of the wind and the drift of
18  the barge.
19       MR. SANDERS:  Object to the form in that
20  Mr. Villavaso became aware --
21       MR. WALKER:  It doesn't matter what
22  you --
23       MR. SANDERS:  I'm not going to let you
24  mislead him.
25       MR. WALKER:  What's your objection?

124

1        MR. SANDERS:  The objection is what he
2   says is in his report after reviewing all of the
3   testimony of Mr. Villavaso and Adams and his own
4   investigation.
5   Q.   (By Mr. Walker)  Are you contradicting your
6   prior testimony and the photograph that you -- on
7   which you drew arrows and your testimony that the
8   barge drifted south after it broke away?
9   A.   Yes.
10  Q.   You are contradicting it?
11  A.   Yes, based on this new information.
12  Q.   What new information?
13  A.   Villavaso.
14  Q.   Didn't you have that before?
15  A.   I don't think I did.
16       MR. SANDERS:  Don't agree to that.
17  Q.   (By Mr. Walker)  Yes, you did.
18       MR. SANDERS:  Don't agree to that.
19  A.   Anyway, the --
20  Q.   (By Mr. Walker)  Excuse me.  Yes, you did.
21  So what new information?
22  A.   Well, the fact that --
23  Q.   (By Mr. Walker)  The fact that it's
24  impossible to go north?
25  A.   No.  I don't say it's impossible to go north.

125

1   We don't know.  We don't know which direction this
2   barge went.
3        Again, I just finished testifying, it
4   was at the mercy of the winds and the current, and
5   the current could have carried it that way, the water
6   piled up and drove it that way, no one knows.
7        I would say even drawing it on was rank
8   speculation.  All we know is the testimony of those
9   two witnesses, is that one guy saw it hit at the
10  northern end and the other guy saw it come through
11  the other southern end.
12  Q.   What new information do you have since your
13  deposition and since your prior reports?
14  A.   Well, in all my reflection on all of this
15  stuff all combined together, after testifying in
16  court and three depositions and rereading this stuff
17  for the 15th time, no one can tell me -- and
18  regardless if I put a dotted line saying it went
19  right straight south, if I did that, then I reject
20  that, I take it back.
21  Q.   So you reject that?
22  A.   Yes.
23  Q.   But you have no new information on which to
24  base that?
25  A.   Well, I certainly reflected on it again.  I

126

1  certainly reanalyzed the information.
2      Q.  You did?  When did you do that?
3      A.  When I prepared this report.
4      Q.  There's nothing in this report that changes
5  your report on that basis?
6      A.  Well --
7          MR. SANDERS:  It is a different report.
8      A.  It is a different report, one, and I'm
9  testifying -- you just asked me if I rejected -- if I
10  was rejecting what I put down in my prior deposition.
11         And if I put down a straight line going
12  south from the facility, then I say that I didn't
13  really consider the current and the winds and the
14  other things that could have caused it to go in
15  different directions.
16     Q.  (By Mr. Walker)  Well, your testimony talks
17  about eddies and current and Villavaso.
18     A.  Well, then --
19     Q.  You don't remember that?
20     A.  No, I don't.  I haven't read my deposition.
21     Q.  You didn't consider all of those things?
22     A.  Well, I considered them, but my analysis
23  reached a different level by the time I've rethought
24  all of this stuff and tried to make this as
25  comprehensive as I could and keeping in mind what we

127

1  know and what we don't know.
2      Q.  Your testimony is consistent that with a sail
3  area of the type that the barge had, the wind affects
4  the movement of that barge; right?
5      A.  Yes, sir.
6      Q.  And you also agree that the barge has no mode
7  of power?
8      A.  That's correct.  It's a dumb vessel.
9      Q.  Do you know Captain Ryan?
10     A.  No, sir.
11     Q.  Have you reviewed his credentials?
12     A.  Yes, sir.
13     Q.  Do you have any information critical of
14  Mr. Ryan and his expertise?
15     A.  No.  I'd say that I disagree with his
16  interpretation of the regulations and I disagree with
17  his criticism of my report and my testimony,
18  certainly.
19     Q.  All right.  But you don't have any
20  information or basis to state that he's not qualified
21  to give the opinions that he's giving, do you?
22     A.  No, sir.  He's a Coast Guard Academy
23  graduate, he's a Naval architect by training, he was
24  in marine safety forever, so, I don't know, that's
25  going to be up to the Judge to decide whether he's

128

1  competent to testify or not, not me.
2      Q.  You don't have any basis to criticize his
3  competence or ability to give the opinions that he
4  gives?
5      A.  Well, I disagree with his interpretation.
6      Q.  I understand you disagree.  You don't have
7  any basis to criticize his competence or ability to
8  give those opinions, whether you disagree with them
9  or not?
10     A.  I'd say no.
11     Q.  He was in the Marine Safety, Security &
12  Environmental Protection Department.  Are you
13  familiar with that department?
14     A.  Yes.
15     Q.  Did you ever serve in that department?
16     A.  Yes.
17     Q.  Were you ever chief of that department?
18     A.  No.  I was assistant chief.
19     Q.  What would you expect the chief to know and
20  be knowledgeable about in that department?
21     A.  He would have to make decisions regarding
22  interpretation of violations of law and policy within
23  the marine safety area that he was responsible for.
24     Q.  So overseeing commercial vessel safety,
25  waterways management, port security and environmental

129

1  protection throughout the district?
2      A.  Yes.
3      Q.  And would that person be knowledgeable of
4  methods of tying up barges and the safety of mooring?
5      A.  Not necessarily.  As I understand, looking at
6  his credentials, he does not have a marine license.
7      Q.  I didn't ask you about any person in specific
8  to talk about credentials.  I said the head of the
9  Marine Safety Office.
10     A.  Would he have knowledge of the proper mooring
11  between barges?
12     Q.  Uh-huh.
13     A.  He could or could not.  He's a seaman,
14  certainly.
15     Q.  Well, you were assistant to that position,
16  weren't you?
17     A.  Yeah, but --
18     Q.  You wouldn't expect your superior to have as
19  much knowledge as you did regarding mooring?
20     A.  No.  I think my chief depended on me to draft
21  letters, comment on violations, but be as it may --
22     Q.  What was the name of that chief?
23     A.  Captain Welsh.
24     Q.  Is he still alive?
25     A.  I don't know if he is or not.  I've been

130

1  retired.
2      Q.   And it's your testimony --
3      A.   Wait.  Let me finish.  I do not cast any
4  aspersions on the qualifications of Captain Ryan.
5  He's a qualified captain.  He's got tons of
6  experience and certainly he's got training that I do
7  not have.
8          Likewise, I have training and experience
9  that he does not have.
10     Q.   And he would be qualified to testify and give
11 an opinion regarding mooring, wouldn't he?
12     A.   I think that's going to be up to the
13 trier-of-facts.
14     Q.   In your opinion, he would be qualified based
15 on somewhat overlapping and parallel careers and the
16 qualifications that you know a person in his position
17 would have to testify and give opinions regarding
18 mooring; right?
19     A.   Well, I don't -- let me put it this way, my
20 experience and training is different from Captain
21 Ryan's experience and training.
22         I did not see anything in his
23 credentials or his resume saying that he served with
24 the American Waterways, he served as a deckhand on
25 towboats doing that training.  I see nothing at all

131

1  in that regard.
2          I think in his seagoing career he was
3  a -- if I recall, I think he was an onboard engineer,
4  so he wasn't in the deck department.
5          MR. SANDERS:  If you don't know, just
6  say.
7      A.   I just don't know.
8      Q.   (By Mr. Walker)  So you don't have an opinion
9  regarding whether or not he's competent to testify
10 regarding mooring?
11     A.   No, I do not.
12     Q.   Do you know what MSO stands for?
13     A.   Yes.  Marine Safety Office.
14     Q.   Do you think that somebody that served in the
15 Marine Safety Office would be competent to opine on
16 mooring?
17     A.   Not necessarily, no.  There's inspectors and
18 there's inspectors.  Some inspectors have different
19 disciplines and experience that they bring to bear
20 and other ones don't.
21     Q.   Have you ever been in a position where you
22 had to apply U.S. Coast Guard regulations and
23 recommendations concerning maritime procedures and
24 waterways management?
25     A.   Yes.

132

1      Q.   Where was that?
2      A.   I was Deputy Captain of the Port in
3  Cincinnati and I was also acting Captain of the Port
4  in Cincinnati for -- well, I served three years in
5  Cincinnati as a deputy and six months as the acting
6  Captain of the Port.
7      Q.   Why is the net tonnage and gross tonnage of
8  Barge 4727 the same?
9      A.   Because there's no exclusions for a barge as
10 opposed to a ship.
11     Q.   Where did you get that information?
12     A.   I was the Coast Guard inspector that measured
13 vessels.
14     Q.   That's not information you've gained since
15 the last deposition where you didn't know how to
16 answer that question?
17     A.   Did I say that in my last deposition?
18     Q.   Uh-huh.
19     A.   If I did, I was incorrect, because the
20 difference between gross tonnage and net tonnage is
21 exclusions, and it goes back to the measurement of a
22 gross ton is 100 cubic feet and it's the
23 cargo-carrying capacity of a vessel and it comes back
24 from the old sailing days.  But that's the
25 measurement that they used for determining taxes, all

133

1  kinds of stuff, but it's different than displacement
2  tonnage.
3          And the only thing I agree with
4  Captain Ryan is that I didn't know -- my research
5  didn't show that this was a documented vessel,
6  because I had looked for it and I couldn't find it,
7  but up pops a documented number.
8      Q.   All right.  Do you have his report in front
9  of you, Captain Ryan's report?
10     A.   I can get it.  Let's see -- okay.  I've got
11 it.
12     Q.   If you go to Page 5, "Findings," Paragraphs A
13 through H are fact recitations basically.
14         You said you read this report; right?
15     A.   Yes, sir.
16     Q.   Is there anything in the fact recitations
17 Paragraphs A through H that you disagree with?
18     A.   Let me see.  Let me read it.
19         (Reviewing document.)
20         Paragraph F, the last sentence.
21     Q.   Let's leave that one out for now.  I know
22 that's not per se a fact, that's an opinion, so let's
23 set that one aside.  I understand.  We'll talk about
24 that one.
25     A.   Okay.

134

1  Q.  Go ahead and read G and H.
2  A.  (Reviewing document.)
3      Okay.
4  Q.  All right.  So you agree with those facts as
5  he's set them forth?
6  A.  Yes.  Well --
7  Q.  And you have the comment on this last
8  sentence of F?
9  A.  Yes.
10  Q.  Do you agree that the Barge 4727 is not
11  self-propelled; right?
12  A.  Yes.
13  Q.  Is it over or under 500 gross tons?
14  A.  It's over 500 gross tons.
15  Q.  What is it that you disagree with in that
16  statement?
17  A.  That the -- he makes -- it says, "However,
18  the specific recommended actions of the Hurricane
19  Protection Plan in regards to Port Condition WHISKEY
20  are applicable to self-propelled oceangoing vessels
21  over 500 tons."
22      That's not true.  It also includes
23  barges.  Particularly Appendix 2 of the plan talks
24  about barges.  It differentiates.  It says "vessels"
25  and then it goes on to say "vessels and barges," if I

135

1  recall correctly.
2      So I don't agree that the entire set of
3  recommendations exclude barges in its entirety.
4  Q.  So it's your opinion that this part of the
5  Hurricane Protection Plan applies to the 4727 as a
6  nonoceangoing, not self-propelled vessel or barge?
7  A.  It is a nonself-propelled nonoceangoing
8  barge, yes.
9  Q.  And it's your opinion that this part of the
10  Hurricane Plan applies to that nonself-propelled,
11  nonoceangoing barge?
12  A.  It says -- if I read this correctly, he's
13  encompassing the entire recommended actions
14  applicable only to self-propelled vessels over
15  500 gross tons.  That is true in some respects, but
16  not entirely true.
17  Q.  Well, talking about Port Condition WHISKEY.
18  A.  Well, I'd have to go back and go study the
19  thing again, but it's my opinion that the Hurricane
20  Protection Plan includes -- has specific
21  recommendations about self-propelled vessels over
22  500 gross tons and seagoing vessels, but it also
23  includes barges.
24  Q.  Such as the 4727?
25  A.  Yes.

136

1  Q.  If you go to the next page, Paragraph I,
2  again with respect to the hurricane plans and now
3  specifically New Orleans Marine Safety Bulletin
4  Volume 5 issued with regard to Port Condition X-RAY,
5  Captain Ryan states that the specific recommended
6  actions are for self-propelled oceangoing vessels
7  over 500 gross tons and all oceangoing barges and
8  their support tugs and not applicable to the 4727.
9      On what basis do you state that they're
10  applicable to the 4727?
11  A.  I'd have to look at that Port Condition
12  X-RAY, when it was set and what it had to say.
13      (Reviewing document.)
14      It doesn't speak to Marine Safety
15  Bulletin Volume 5, that issue.  I don't see where
16  it -- it talks about current port and waterway
17  status.  It discusses "All deep draft vessels are
18  prohibited from entering the safety zone without
19  specific permission from the Captain of the Port.
20  The closure is necessary to reduce the risk posed to
21  life and property by tropical storm force winds that
22  are expected within the next 48 hours."
23      So it doesn't speak to vessels over
24  500 gross tons, but certainly it talks about deep
25  draft vessels.

137

1  Q.  This is not a deep draft vessel, is it --
2  A.  No.
3  Q.  -- 4727?
4  A.  No.  And neither would a 500-gross-ton vessel
5  be a deep draft vessel.
6  Q.  And so do you agree that this particular
7  Hurricane Plan, either Conditions X-RAY or YANKEE are
8  not applicable to the 4727?
9  A.  No, I don't agree with that.
10      I agree with Port Condition WHISKEY.  It
11  says "all vessels and facilities," and that includes
12  dumb barges, deep draft ships, tugs and towboats,
13  everything.  Port Condition WHISKEY includes all of
14  those vessels.
15  Q.  That's not qualified elsewhere to
16  self-propelled oceangoing vessels over 500 gross
17  tons?
18  A.  No.  In the Hurricane Plan itself they speak
19  to vessels 500 tons and above, but it also
20  speaks to -- they have a particular section that is
21  applicable to barges.  And in another area in the
22  plan, it takes into consideration all vessels.
23      So to categorically exclude everything
24  beyond 500-gross-ton seagoing vessels, I don't agree
25  with Captain Ryan.

138

1   Q.   Looking at Paragraph K, do you recall and do
2  you agree as to when Port Condition ZULU was set on
3  August 28th?
4       A.   ZULU?  Let's see.
5            MR. SANDERS:  You talking about the date
6  and time?
7            MR. WALKER:  Right.
8            MR. SANDERS:  If you know.
9       A.   I don't know.
10           (Reviewing document.)
11           Yes.  It says, "As of 12 p.m. on 28
12 August, 2005 the Captain of the Port will establish a
13 temporary safety zone closing all waterways in the
14 New Orleans and Morgan City area of responsibility to
15 include the Gulf Intracoastal Waterway from Long
16 Beach, Mississippi to Fresh Water Bayou, the lower
17 Mississippi River from the sea buoy to Natchez,
18 Mississippi and all coastal ports along Louisiana and
19 Mississippi."
20           So I'd have to agree with him, 12:00.
21      Q.   (By Mr. Walker)  And on the next page, second
22 line, he says "One recommendation was mooring lines
23 doubled up with due consideration given to the
24 effects of predicted storm surge.  Doubling up lines
25 is a common marine industry term that in general

139

1  means to double the strength of the mooring
2  connections, as by doubling up the number of lines
3  being used to moor the vessel.  Doubling up is
4  usually accomplished by running additional lines or
5  using the excess length of the original mooring
6  line."
7            Do you agree with all of that?
8       A.   I agree with everything except where he says
9  "to double the strength of all of the mooring lines."
10           The definition doesn't speak to
11 strength, and I've looked up six different
12 definitions of "doubling up" and none of them speak
13 about strength.  They talk about the deployment of
14 lines, doubling them up, taking into consideration
15 how they're deployed.
16      Q.   And then he ends by stating "The ING 4727 was
17 moored with extra lines of double strength."
18           Do you agree or disagree with that?
19      A.   I disagree with that.  The line that they
20 bought wasn't specifically purchased keeping in mind
21 that it was double strength.  They just had new line,
22 and I don't see anything or any testimony from
23 Lafarge, and I'm not familiar if this is double the
24 strength of the regular lines that the vessel came in
25 with.  I don't see anything --

140

1       Q.   So you don't have an opinion, you just have
2  lack of knowledge on that?
3       A.   No.  I have an opinion that there is a lack
4  of information, rather that the lines he says are
5  double the strength of the mooring connections --
6       Q.   Let's go over it again.  Here's the sentence:
7  "The ING 4727 was moored with extra lines of double
8  strength."
9            Do you agree or disagree?
10      A.   I disagree.
11           MR. SANDERS:  Object to the form.
12      A.   Right.
13      Q.   (By Mr. Walker)  On what basis?
14      A.   I disagree because he doesn't give a
15 definition or expound on what does he mean by "double
16 the strength."
17      Q.   (By Mr. Walker)  Okay.  So you don't have
18 enough information?
19      A.   And he didn't give enough information.
20      Q.   I understand.
21      A.   Right.
22      Q.   So you don't have enough information to agree
23 or disagree?
24      A.   Okay.  You could say that, yes.
25      Q.   One of the recommendations for Port Condition

141

1  ZULU is "marine lines doubled up with due
2  consideration given to the effects of the predicted
3  storm surge."
4            It's your opinion that Lafarge did not
5  comply with that?
6       A.   That's correct, yes, sir.
7       Q.   Now, Paragraph L talks about the last
8  section, Enclosure 11, "Sector" --
9       A.   Wait.  Paragraph L.
10      Q.   Page 8.
11      A.   Page 11?
12      Q.   8.
13      A.   Oh, Page 8?
14      Q.   Page 8.
15      A.   L, okay.
16      Q.   It talks about "The last section of
17 Enclosure 11, "Sector New Orleans Maritime Hurricane
18 Contingency Port Plan."'
19           "One of the recommendations is that only
20 barges and ships incapable of operating under their
21 own power should remain moored to wharves."
22      A.   Yes, I saw that.  I agree with that.
23      Q.   So you agree that Lafarge was in compliance
24 with that recommendation because it was maintaining
25 at its facility barges incapable of operating under

142

1    their own power?
2        A.   Yes.  And I would add to that that what they
3    were -- they certainly didn't violate that, but they
4    didn't comply that it was properly moored.
5        Q.   All right.  The next section 6 is his
6    comments on your reports of June 2008 and March 2009.
7        A.   Yes.
8        Q.   You've read this?
9        A.   Yes, sir.
10       Q.   Are there any of these points that you agree
11   or concede to Captain Ryan as him being right and you
12   being wrong?
13           MR. SANDERS:  Object to the form; overly
14   broad.
15       A.   Well, reading them, I certainly agree I don't
16   have the -- I did not include the documentation
17   number.  But other than that, let me see.
18           Let me read B.  (Reviewing document.)
19           Well, I think it's his interpretation
20   and my interpretation of those two regulations, and I
21   disagree with him.  6.14-2 talks about those
22   conditions of a vessel creating any danger and then
23   6.19-1 talks about whose ultimate responsibility and
24   duty that is.
25           And it's my opinion that the condition

143

1    that the vessel was moored in would have invoked
2    6.14-2 and, therefore, I consider those two cites to
3    be correct.  He disagrees with that.
4        Q.   Well, does 6.19-1 only discuss the primary
5    responsibility for the protection and security of
6    vessels in waterfront facilities?
7        A.   Yes, it does.
8        Q.   All right.  Paragraph C talks about GNOBFA,
9    the Greater New Orleans Barge Fleeting Association?
10       A.   Yes.
11       Q.   Do you agree that those standards and
12   regulations are not applicable to the mooring of
13   4727?
14       A.   Yes, I do.  I think in prior testimony, and
15   it's still my opinion today, that it is a good
16   general standard that had Lafarge adhered to that
17   that could have prevented the barge breakaway.
18       Q.   Do you agree that 33 CFR 165.803 is
19   applicable only to waters in the Mississippi River
20   between Miles 8 and 240 above Head of Passes?
21           MR. SANDERS:  Object to the form.
22   Which one?
23       Q.   (By Mr. Walker)  33 CFR 165.803.
24       A.   Yes, I agree with that.
25       Q.   So you agree that it's not applicable to the

144

1    Inner Harbor Navigation Canal?
2        A.   No.  Those rules are applicable to the river,
3    not the ICW -- or not the Industrial Canal.
4            But in my report I state that they are
5    not applicable, but they are standards that should
6    have been adhered to.
7            Those are, again, the minimum standards
8    for ensuring that barge fleets don't break away in
9    the river in high water conditions.
10       Q.   So you're saying that this is knowledge that
11   Lafarge should have applied or known, although
12   they're not regulations or recommendations applicable
13   to them?
14       A.   That's true, yes.
15       Q.   Now, with respect to the lines, do you have
16   an opinion one way or the other as to whether the
17   three lines that were used actually doubled the
18   strength of the prior lines?
19       A.   I do have an opinion.
20       Q.   Okay.
21       A.   And the opinion is, no, they do not.
22           The additional line, if we take Captain
23   Ryan's opinion that they doubled the strength of the
24   mooring, the typical mooring is a line on the bow and
25   a line on the stern, two points, and if you -- in

145

1    order to double it, that would have had to employ
2    four lines or double the two points.
3            I think my interpretation of his
4    writings are that based on the deployment of mooring
5    line is that the mooring line going from -- as I
6    described, the spring line, would not double the
7    strength of the other two lines.
8        Q.   Did you conduct any tests or analysis of the
9    lines to determine whether they were in fact double
10   in strength to the prior lines?
11       A.   No.
12       Q.   Or to the prior configuration?
13       A.   No.  They were of the same type of line that
14   we use in the industry and I don't know where he got
15   the "double the strength" from, but two lines and add
16   a third line in my opinion does not mean double the
17   strength.
18       Q.   The 4727 was not under tow; correct?
19       A.   It was not under tow.
20       Q.   So any regulations that apply to a barge as a
21   tow or in a tow or under tow are not applicable;
22   correct?
23       A.   I disagree with that totally.  It came in as
24   a tow, it left as a tow and it is a vessel.
25       Q.   My question was --

146

1    A.   And your question specifically was trying to
2  get me to say that because it was a dumb barge tied
3  to the dock that it was not a tow and it was not a
4  vessel.
5    Q.   I didn't mention the word "vessel," I don't
6  think.
7        MR. SANDERS:  He disagrees.
8    A.   Anyway, I disagree.
9    Q.   (By Mr. Walker)  Disagree with that?
10   A.   I disagree --
11       MR. SANDERS:  The statement.
12   Q.   (By Mr. Walker)  Excuse me.  What is it you
13  think you're disagreeing with?
14   A.   I think I'm disagreeing with the fact that
15  the Barge 4727 was a tow or a vessel.  It was a
16  vessel tied to the dock.
17   Q.   The 4727, was it a barge?
18   A.   Yes, it was.
19   Q.   Was it under tow?
20   A.   It was a vessel.
21   Q.   Was it a barge?
22   A.   Yes, it was a barge.
23   Q.   Was it under tow?
24       MR. SANDERS:  Object to the form.
25   A.   It was not under tow at the time it happened.

147

1    Q.   (By Mr. Walker)  Excuse me.  Was it part of a
2  tow?
3    A.   It was a part of a tow.
4    Q.   When?
5    A.   When they brought it in.
6    Q.   At the time of the hurricane, was it part of
7  a tow?
8    A.   No, it was not.
9    Q.   At the time it was moored alongside the
10  facility, was it part of a tow?
11   A.   Yes, it had been part of a tow when it was
12  brought in.
13   Q.   Was it part of a tow at the time it was
14  moored at the facility?
15   A.   After it was moored to the dock, then it was
16  no longer part of the tow.
17   Q.   So at the time of the hurricane and time of
18  the breakaway, it was not part of the tow?
19   A.   That's correct.
20   Q.   At the time it was secured and topped around,
21  it was not part of a tow?
22   A.   It was part of a two-barge nest.
23   Q.   Right.  It was not part of a tow?
24   A.   That's correct.
25   Q.   So any recommendations, regulations or other

148

norms applicable to a barge as part of a tow or in a
tow would not be applicable to the 4727 at the time
of the breakaway; correct?
        MR. SANDERS:  Object to the form.
    A.   I disagree.
    Q.   (By Mr. Walker)  What do you disagree with?
    A.   I disagree with that because it was a part of
a tow and it was delivered to the dock as part of a
tow.  But regardless of my interpretation, I think
I'm correct that the vessel arrived as a tow.
        But any regulations that talk about
vessels and tows and mooring against the dock to
prevent them from being -- because of passing vessels
or whatever to draw them away from their moored
facility applies to the 4727.
    Q.   So are you saying that although at the time
of the hurricane and breakaway the 4727 was not in a
tow or part of a tow that norms and regulations and
recommendations applicable to barges in tow would
apply?
    A.   Yes.  The regulation 162.75 applied to the
4727 at the dock at Lafarge.
    Q.   Even though she's not in a tow or part of a
tow?
    A.   That's correct.

149

    Q.   And you say that because she came in as a
tow?
    A.   She came in as a tow.  She's a vessel.  She's
a dumb barge, but she's tied to the dock.  And those
regulations are designed -- if we want to be worried
about semantics on this language, the language is --
let me get the language.
    Q.   While you look for the language, is it your
testimony there that once in a tow, always in a tow?
    A.   Well, it was part of a tow, yeah.
    Q.   Right.  So is that your testimony that --
    A.   Yes.  Here's what it says.
    Q.   Hold on.  Listen to my question.  Is it your
testimony, therefore, that once a tow -- once a barge
has been in a tow, even though it's been delivered to
a fleet or to a facility, all of the norms,
practices, recommendations, regulations that apply to
that barge as a tow or in a tow still continue to
apply?
    A.   Yes, and my rationale for this, it says,
33 CFR 162.75, Paragraph 3.2, "When tied up
individually, all vessels and tows shall be moored by
bow and stern line."
        And the barge was certainly a vessel,
and my interpretation is it came in as a tow.  But be

150

1   as it may, it says "all vessels."  It does not
2   differentiate between motor vessels, yachts, barges
3   or anything.  It says "all vessels."
4       Q.   And you don't think that applies to vessels
5   in tow or under tow?
6       A.   It applies to vessels under tow, but it says
7   "When tied up individually, all vessels and tows
8   shall be moored by bow and stern lines."
9       Q.   You don't think that "vessels and tows"
10  refers to vessels under tow?
11      A.   It says "When tied up individually, all
12  vessels and tows shall be moored by bow and stern
13  lines."
14          Again, that's going to be up to the
15  Judge to decide the language, whether that means that
16  a vessel, a barge with a tow tied up, it only applies
17  to that.  I don't agree with that.
18      Q.   Does it state anywhere there -- in 162.75,
19  does it address mooring of vessels or tows in
20  anticipation of weather or hurricanes?
21      A.   No.
22      Q.   What does it say there?
23      A.   It says -- it clearly says that "When tied up
24  individually, all vessels and tows shall be moored by
25  bow and stern line.  Tows shall be secured at

151

1   sufficiently frequent intervals to ensure they are
2   not being drawn away from the bank by winds, currents
3   and the suction of passing vessels.  Lines shall be
4   shortened so that the various barges in the tow will
5   be as close together as possible."
6       Q.   And my question is, did 162.75 specifically
7   apply or was it written or promulgated with respect
8   to anticipated severe weather or hurricanes?
9       A.   Certainly, it speaks --
10      Q.   Yes or no?
11      A.   Wait a minute.  It's not a yes-or-no answer.
12      Q.   It's yes or no and then you can explain it.
13      A.   Let's see, the question -- I'd say yes,
14  because the words in there say "to ensure they are
15  not being drawn away from the bank by winds, currents
16  or the suction of passing vessels."
17          So winds and currents are certainly --
18  whatever the legislative history is of this
19  particular cite, I don't know what it is off the top
20  of my head, but it would be ludicrous to suggest that
21  a barge tied up against the dock out in a bayou
22  someplace or in a harbor at Lafarge dock would not be
23  considered to be -- that these regulations would not
24  apply to it.
25      Q.   So it's your testimony that 162.75 addresses

152

1   mooring of vessels in anticipation of a hurricane?
2       A.   I didn't say "hurricane."  I said it speaks
3   to winds and currents.
4       Q.   My question is hurricane.
5       A.   No, it does not say "hurricanes."
6       Q.   I didn't say whether it said or not.  Does it
7   apply?
8       A.   Yes, it would apply.
9       Q.   So 162.75 in your opinion addresses mooring
10  of vessels or tows in anticipation of a hurricane?
11      A.   Along with --
12      Q.   Yes or no?  In anticipation of a hurricane is
13  the question?
14      A.   It's improper for me to give you an opinion
15  that would later say that it doesn't say anything
16  about a hurricane in here because it certainly does
17  not articulate hurricanes, but it certainly says
18  currents and winds.
19      Q.   Right.
20      A.   So certainly something that's associated with
21  a hurricane, gales, whatever.  So it has to be moored
22  sufficiently to withstand those expected winds and
23  currents and passing vessels.
24          So is hurricanes considered?  Certainly
25  hurricanes is considered, but it doesn't say

153

1   hurricanes.  It doesn't say gales.  It doesn't say
2   small crafts.
3       Q.   In your opinion 162.75 applies to mooring of
4   vessels in anticipation of a hurricane?
5       A.   Along with other --
6       Q.   In anticipation of a hurricane?
7       A.   In anticipation -- I'm not going to say
8   hurricanes alone --
9       Q.   I didn't say "alone."
10      A.   -- Mr. Walker.
11      Q.   I said, does it apply to hurricanes?
12      A.   It would apply to hurricanes, it would apply
13  to gales, it would apply to any winds and currents
14  that would affect the stability of the vessel to
15  remain moored.
16      Q.   How many lines are required by
17  162.75(b)(3)(ii)?
18      A.   Two.  Two spots.
19      Q.   So you agree that the 4727 was moored with
20  more lines than required by that?
21      A.   No, because I would say that if the --
22      Q.   Is three more than two?
23      A.   Yes.
24      Q.   Okay.
25      A.   But the third one in my opinion was

154

1  ineffective.  It was a line, yes.  So three is more
2  than two, or you could say that the insufficient
3  strength of Number 3.
4      Q.  Is three more than two?
5      A.  Yes.
6      Q.  And you've testified that 162.75(b)(3)(ii)
7  requires two?
8      A.  No.  It says "fore and aft."  It doesn't say
9  "double up."  It doesn't say "single."  I will tell
10  you that the custom and practice is to double up
11  lines.
12      Q.  Your testimony was "yes" to the prior
13  question?
14      A.  Yes, two.
15      Q.  Two?
16      A.  Two points.  What does it say specifically?
17  The bow and stern lines.
18      Q.  Two lines?
19      A.  No, sir.  Bow and stern positions.
20          MR. SANDERS:  Did you read it?
21      Q.  (By Mr. Walker)  Did you answer the question?
22  You said two.
23          MR. SANDERS:  It's minimum.
24      A.  It's the minimum for that vessel to be tied
25  up, and it says "the bow and stern positions."

155

1      Q.  (By Mr. Walker)  Got it.  Two lines is the
2  minimum; right?
3      A.  Yes.
4      Q.  And the 4727 had three lines, whether you
5  like where they were or not; correct?
6      A.  They had -- but they were not -- they were
7  not doubled up.  They had two lines.
8      Q.  Does 162.75(b)(3)(ii) say anything about
9  doubling up?
10      A.  No, but it says --
11      Q.  Okay.
12      A.  Wait a minute.  That's not it at all.
13          It says, "Sufficient frequent intervals
14  to ensure they are not being drawn away from the bank
15  by winds and currents or the suction of passing
16  vessels."
17          MR. SANDERS:  There you go.
18      Q.  (By Mr. Walker)  Does it say "doubling up"
19  anywhere?
20      A.  No.
21      Q.  Do you agree that the Lafarge terminal is a
22  protected slip?
23      A.  No, sir, I do not agree.
24      Q.  What in your opinion is a protected slip?
25      A.  A protected slip would be a narrow slip where

156

1  two vessels could moor side by side.
2          But this area is a turning basin and
3  it's -- I don't know the exact dimensions.  I think
4  I've got it someplace here.
5          MR. SANDERS:  We don't need it.
6      A.  Anyway, in my opinion it's an open area used
7  as a turning basin and its use is published in the
8  COAST PILOT and also in the charts.
9      Q.  (By Mr. Walker)  Do you know when was the
10  last time that facility or that area was used as a
11  turning basin?
12      A.  No, but I know -- I would suspect that small
13  ships going to the docks closest to the locks could
14  very well use it as a turning basin.
15          I don't know when the last time it was
16  used as a turning basin, but that's what its purpose
17  was, or purpose is.
18      Q.  So is it your opinion that barges moored
19  alongside that facility would be exposed to the same
20  elements as barges moored directly along the outside
21  of the wharf downriver on the Industrial Canal?
22      A.  It could very well be, yes.
23      Q.  So the slip provides no protection in your
24  opinion?
25      A.  It is not -- it does not fit the definition

157

1  of a slip.
2      Q.  Talking about Enclosure 11 of the Coastal
3  Severe Weather Hurricane Plan, do you agree that it's
4  only a recommended guidance and not applicable to the
5  4727?
6      A.  Yes, sir.  It's a guidance and woe be unto
7  those that disregard it.
8      Q.  Is there anything in the "Sector New Orleans
9  Hurricane Plan" that requires or recommends using all
10  available mooring points?
11      A.  No, sir, I haven't seen anything.
12      Q.  Have you read Mr. Strouse's report?
13      A.  Yes, sir.
14      Q.  Is there anything that you've read about him
15  that causes you to question his competence or ability
16  to render opinions in this case?
17      A.  I'd have to -- to answer that question, I'd
18  have to go back and look at his credentials again.
19          I read his report and I looked at his
20  credentials and he said he was a towboat captain and
21  he certainly should have enough -- I might have the
22  wrong guy.  Let's see.
23          MR. SANDERS:  Ferry boat captain, pilot.
24      A.  Pilot, all kind of stuff.  So I'd say he's
25  got plenty -- he should have sufficient experience.

158

1   Q.  (By Mr. Walker)  To opine on those subjects
2  that he opines in his report; right?
3   A.  Yes.
4   Q.  Do you have an Unlimited Masters License of
5  Inland Waterways with any endorsement?
6   A.  Yes, I do.  No.  I have an Unlimited Master
7  of Towing Vessels for Inland, Oceans and Western
8  Rivers.
9   Q.  Do you have a First Class Pilot License?
10   A.  No, sir, I don't.
11   Q.  Are you marine surveyor?
12   A.  No, sir.  I was a marine surveyor when I was
13  in Coast Guard.
14   Q.  In your practice, have you reviewed mooring
15  locations and procedures and given recommendations to
16  owners or operators of barges?
17   A.  No, I have not.
18   Q.  Have you ever done surveys or inspections of
19  mooring procedures?
20   A.  I'm sure I have.  I teach marlinspike
21  seamanship and I teach and train licensed tow and
22  vessel operators.  And in the course of that
23  curriculum we teach mooring, towing and other fine
24  points of seamanship.
25       But I have not, if I can recall, made

159

1  recommendations for particular mooring.
2   Q.  Have you ever done any surveys or inspections
3  of mooring procedures?
4   A.  Yes.  I've reviewed mooring procedures for
5  ships and also I operated a mooring facility in the
6  Sabine River from 1984 to '85.
7   Q.  Have you ever been involved in any case other
8  than this one involving mooring or mooring
9  configuration of a barge?
10   A.  I'm sure I have.  I've done -- I've had over
11  700 cases and I think I have.
12   Q.  You don't remember any at this point?
13   A.  No, sir.
14   Q.  Have you ever been involved in any matter
15  where you provided an opinion regarding the strength
16  of a mooring rope or the strength of a mooring
17  configuration?
18   A.  I'm sure I have, but I -- I'm not an expert
19  on mooring ropes -- or mooring lines, rather, in
20  terms of tensile strength, breaking strength, and I
21  depend on other people for that.
22   Q.  All right.  Looking at Mr. Strouse's report,
23  Opinions 1 through 14, have you reviewed these?
24   A.  Wait.  Let me see if I've got the right guy.
25   Q.  You do.

160

1   A.  Okay.  Let's see -- yes, I did review his
2  opinions.
3   Q.  Is there any --
4   A.  Which one -- again, I've got to go through
5  them.
6   Q.  Are there any particular that you recall that
7  you disagree with?
8   A.  Let me see.  I have to read it.
9       (Reviewing document.)
10       Well, I disagree with his Number 1.  He
11  says "The Lafarge North America facility" -- this is
12  quibbling really -- "located in the Inner Harbor
13  Navigation Canal on the west side is adjacent to a
14  turning basin" -- that's true -- "which measures
15  1320 feet by 990 feet wide, not inclusive of the
16  navigational channel."
17       It's adjacent to and part of the
18  navigational channel if it's used as a turning basin,
19  so that -- he's just trying to make a distinction,
20  trying to opine that it's not a navigational area,
21  and I differ with his opinion there.
22       We have a difference on Opinion
23  Number 2.  Near the bottom he says, "There was an old
24  practice noted in the written hurricane checklist
25  that suggested cables should be utilized for mooring,

161

1  but this older practice was based on an older dock
2  design where chafe across the dock edge would cause a
3  problem with the use of soft lines.  Cables do not
4  possess the same flexibility and elasticity as the
5  2-inch polypropylene" -- I agree with that -- "nor do
6  they possess the same breaking strength."
7       I would have to look at the different
8  breaking strengths of the line versus the wire rope
9  to confirm that.
10       "Therefore, the long-lining method using
11  the high quality polypropylene lines would provide
12  more strength to the mooring arrangement than
13  cables."  I disagree with that.
14   Q.  On what basis?
15   A.  Well, unless --
16   Q.  On the basis of the information that you
17  don't have?
18   A.  Yes.
19   Q.  So you don't have a basis to disagree?
20   A.  Well, I don't know what the breaking strength
21  of the cable is and I don't know what the breaking
22  strength of that particular mooring line is.
23   Q.  So you have no basis to disagree?
24   A.  But if they had used --
25   Q.  Before you go there --

162

1   A.  Yes.
2   Q.  -- you have no basis to disagree?
3   A.  Right.
4   Q.  Why don't you read these and we'll take a
5   quick break and then we'll come back go through them.
6   A.  Okay.
7       (Recess from 3:05 until 3:17.)
8   Q.  (By Mr. Walker)  Okay.  You went through
9   Numbers 1 and 2.
10  A.  Yes.  Now we're on Number 3.
11  Q.  Number 3?
12  A.  I disagree with Number 3 when he says "4727
13  and 4745 and northern tier of barges were properly
14  and adequately moored in accordance with hurricane
15  preparations."
16      The northern tier barges, I think
17  there's testimony how they were moored, but they were
18  certainly -- they didn't break loose, so I would have
19  to agree partially that they were properly moored and
20  they didn't break away.
21      But to categorically state that ING 4727
22  and 4745 were properly moored, I disagree with that.
23  Q.  All right.  Let's talk about the northern
24  tier.  It's in there where you agree they were
25  properly moored.

163

1   A.  Uh-huh.
2       MR. SANDERS:  Is that a question?
3   Q.  (By Mr. Walker)  They were not doubled up,
4   were they?
5   A.  I don't know that to be a fact, but I do
6   remember testimony by a witness saying that they had
7   wires between the barges, but I don't know -- he
8   never gave a description of whether they were
9   doubled-up wires or not.
10      But if they were wires, they should have
11  been doubled up.  I have no information to opine
12  whether they were properly moored or not.
13  Q.  I thought you just said they were properly
14  moored.
15  A.  Okay.  Well, I withdraw that and say they
16  didn't break loose.
17  Q.  Okay.  But you said they were properly moored
18  and now you're changing your mind?  Based on my
19  questioning, you're changing your mind?
20  A.  Based on your questioning whether they were
21  doubled up or how they were moored, I have no
22  opinion.
23  Q.  They were successfully moored because they
24  didn't break away; correct?
25  A.  There you go.

164

1   Q.  All right.  And you don't know if they were
2   doubled up, you don't know if they had wires or
3   cables or ropes or how many between them; right?
4   A.  Correct.
5   Q.  If they were successfully moored and were
6   not -- Strike that.
7       What else?  Number 4?
8   A.  Number 4.
9   Q.  Let me ask you a question and maybe we can
10  make it shorter.  This talks about tying a loaded
11  barge alongside a barge that has more freeboard.
12  A.  Yes.
13  Q.  And you disagree with that methodology?
14  A.  Yes, sir.
15  Q.  And you think the barges should be of equal
16  draft?
17  A.  Yes.  You should strive for that.
18  Q.  And you've never tied barges together that
19  are of unequal draft?
20  A.  I could very well have when I was riding as a
21  deckhand for a towing company.
22  Q.  So you've seen it done?
23  A.  I've seen tows with high and low barges, yes.
24  Q.  And you've done it yourself?
25  A.  Possibly participated in it, yes.  But the

165

danger is that -- of high and low is that it reduces
the strength of the lines between them and also you
have the danger of lines slipping off of the lower
tow.
Q.  How does it reduce the strength of the lines
between them?
A.  Well, it creates chafing points between the
high barge and the low barge and could weaken the
line as well.
Q.  And you agree that it's a fairly common
mooring arrangement?
    MR. SANDERS:  Object to the form.
A.  No, I don't agree.  It's to be avoided if
possible.
Q.  (By Mr. Walker)  I didn't ask you that.
A.  This man says that he's done it plenty of
times, but the recommended and preferred arrangement
is to have loaded to loaded and empties to empties.
Q.  Recommended where?
A.  I think it's in the -- well, I know one
thing, it's in different publications talking about
tows as well as the --
Q.  There's no Coast Guard recommendation to that
effect?
A.  No, there's no Coast Guard.

166

1   Q.   And there's no regulation that says that
2   barges tied together must be of equal draft?
3   A.   No, there is none.
4   Q.   So there was no violation of any
5   recommendation or regulation on the part of Lafarge
6   by mooring this way, it's just something that you
7   would have preferred to have avoided?
8   A.   And other similar licensed people would do
9   the same, yes.
10  Q.   Number 5, any objection there?
11  A.   Yes.  In Number 5 he says that there was no
12  requirement to call the Captain of the Port to tell
13  him about this.  I disagree.
14          Given the condition of the barge being
15  an empty barge in a cluster of five -- six loaded
16  barges that they could and should have notified the
17  Captain of the Port that they had an empty barge in
18  that condition, in that facility, and just to at
19  least put the Coast Guard on notice that they had an
20  empty barge in there that it could be -- it could
21  potentially break away.
22  Q.   Is there any regulation that puts that
23  requirement on them?
24  A.   Yeah.  That's the 6.14-2, I think, where it
25  says it could pose a danger to the port and also --

167

1   Q.   And what is it that it requires then?
2   A.   It requires -- it implies that the Captain of
3   the Port be notified and/or the Captain of the Port
4   would do an independent survey of the port to see if
5   everyone was moored properly.
6   Q.   It implies that.  Does it put any
7   recommendation -- is there any recommendation or
8   regulation that placed on Lafarge any duty or
9   suggestion that they call the Captain of the Port?
10          MR. SANDERS:  Object to the form.
11          Listen to his question.
12  A.   Yes.
13  Q.   (By Mr. Walker)  And where is that found?
14  A.   The recommendation is if -- they should have
15  recognized that they had a potential for a breakaway
16  and they should have notified -- followed that
17  recommendation and notified the Captain of the Port
18  of that condition.
19  Q.   Okay.  So to follow that recommendation they
20  first would have to have identified that they had a
21  potential for a breakaway?
22  A.   Yes.
23  Q.   Okay.  All right.  Number 7?  I'm sorry.
24  Number 6.
25  A.   I'm on Number 5.  Let's see -- oh, we already

168

did Number 5.
Q.   Right.
A.   Number 6, here it says -- he said, "LNA had a
written hurricane checklist prior to Hurricane
Katrina, but did not have a detailed written plan, as
it was not common practice industry-wide for
companies that did not operate powered or towing
vessels to have written hurricane plans.  Although
LNA had no" --
Q.   Can you just tell us what you disagree with?
A.   I disagree with --
Q.   We're trying to make our flight.
A.   Okay.  I'm sorry.
Q.   That's all right.
A.   I disagree because I think they should have
had a written plan.  And by not having a written
plan, just like Ingram didn't have a written plan,
that they should have a written plan to be able to
make their preparations and such, as monitoring goes
hand and glove with my other opinions regarding their
lack of monitoring and lack of planning.
Q.   So in your opinion, the hurricane checklist
is not sufficient?
A.   That's correct.
Q.   What's Number 7?

169

A.   I disagree with that.  He says there was
nothing to stop them from discharging it.
        I think in hindsight that they would
agree that they should not have discharged it, but
that's still --
Q.   That's not the question here.
        They stopped loading by 12 p.m. August
28, which was what Port Condition X-RAY required;
right?
A.   Yes.
Q.   And, in fact, they had stopped loading on
August 27th, 24 hours in advance of that deadline?
        MR. SANDERS:  He's entitled to answer.
It says, "Lafarge did not act
unreasonably."
A.   I'm saying that it was unreasonable.
Q.   (By Mr. Walker)  What was unreasonable?
A.   It was unreasonable for them to start
unloading the barge in the face of -- in anticipation
of a hurricane striking the New Orleans or close to
New Orleans area.
Q.   So your opinion is that on Thursday, August
26th, it was unreasonable for them to start
discharging this barge?
A.   No.  They started --  Wait a minute.  They

170

1  started discharging on Friday.
2    Q.  I'm sorry.  On Friday, August 26th, it was
3  unreasonable?
4    A.  Yes, it was unreasonable.
5    Q.  Although they complied with Port Condition
6  X-RAY which allowed cargo operations up through
7  12 p.m. on August 28th; correct?
8    A.  Yes.
9    Q.  All right.  Number 8?  This is with respect
10  to placing the barge outboard.  You disagree that
11  they should have done that?
12    A.  Yes.
13    Q.  Okay.  Although you would agree that that
14  would have facilitated anybody coming to pick up the
15  barge, right, to have it on the outside?
16    A.  Well, they could have still -- it doesn't
17  bother a towboat coming in to flip it around just
18  like they did.  It took less than 20 minutes to flip
19  it around and get the empty barge had they done that.
20    Q.  Do you agree that having the empty barge next
21  to the wharf would have made the wharf more
22  susceptible to damage from that barge?
23    A.  Well, yeah, it would have ridden -- it could
24  have ridden on top of the pilings and impaled itself
25  right there and then we wouldn't have it in the Ninth

171

1  Ward.  So I would rather --
2    Q.  So if you were now a person hired by the
3  owner of the dock --
4    A.  Uh-huh.
5    Q.  -- and we had left the barge alongside the
6  dock, you'd be critical of the fact that the barge
7  wasn't placed on the outside because the dock was
8  damaged?
9    A.  No.  I think that if -- it would have
10  afforded more protection if it had been against the
11  dock.  A loaded barge would have given it much more
12  stability and prevented it from breaking away.
13        Certainly it should have been taken into
14  consideration about the barge going up, but I would
15  much rather it go up and impale itself on a piling
16  than I would have it break away and go careening
17  around the Industrial Canal.
18    Q.  The danger that Lafarge was addressing was
19  the potential damage to the dock and barge by keeping
20  it alongside; correct?
21    A.  Yes, that's what he said.
22    Q.  Number 9 basically talks about the strength
23  of lines --
24    A.  Yeah.
25    Q.  -- as demonstrated by the turning around,

172

1  topping around; right?
2    A.  Yeah.  I don't agree with that.  That topping
3  around, you're using the momentum of a moving barge
4  to dampen the strain put on a line while you're doing
5  a toparound.  Once they get the barge moving, there's
6  minimal strain against the lines until that's
7  accomplished.
8    Q.  So you disagree --
9    A.  I disagree.
10    Q.  -- that the topping and mooring arrangements
11  and maneuvering is a test of the rope strength?
12    A.  I disagree with that, yes.
13    Q.  How about Number 10?
14    A.  Oh, you've got more.
15    Q.  Yes.
16    A.  Oh, wow.  Okay.  I disagree with his analysis
17  of a single versus a double-line.
18    Q.  Which you have explained before?
19    A.  Yes.
20    Q.  Same thing?
21    A.  Yes.
22    Q.  Okay.  Number 11?
23    A.  Number 11, I disagree.  There was plenty of
24  traffic moving through the canal that could have
25  picked up the barge and taken it out of there if

173

1  someone from Lafarge had hung around.
2        They were there something like 42 hours
3  before the hurricane hit and they all abandoned ship
4  at right around 12:00 on Saturday.
5        They had Saturday, Sunday, that's 24
6  hours; and then Sunday into 12:00, that's another 12
7  hours, that's 36; and hurricane force winds didn't
8  come up until early Monday morning, so that would
9  have been another four or five hours.  24, 36,
10  possibly 40 hours.
11    Q.  So it's your opinion that the barge should
12  have been removed from the canal and they had plenty
13  of time to do it?
14    A.  Yes, sir.
15    Q.  And should they have had the five tier barge
16  removed also?
17    A.  I didn't consider that, but those were laden
18  barges and they were successfully moored.
19    Q.  So is there a difference in your opinion as
20  to whether or not they should have or one should in
21  anticipation of a hurricane remove barges, whether
22  laden or unladen?
23    A.  Well, the remedial action by the Coast Guard
24  makes it clear that they want all barges, all vessels
25  out of the Industrial Canal with the approach of the

174

1 hurricane.
2 Q. I'm asking for your opinion. In your
3 opinion, would it be necessary to remove the five
4 tier --
5 MR. MOULEDOUX: Before you answer, let
6 me just note an objection to the question and to the
7 previous answer to the extent that it's a
8 post-accident remedial measure.
9 But subject to the objection, go ahead.
10 THE WITNESS: Whether that's true or
11 not, whether the Court can consider it is up to the
12 Judge certainly.
13 MR. MOULEDOUX: Right.
14 A. But I can say that my focus is on an empty
15 barge as opposed to loaded barges.
16 Q. (By Mr. Walker) And Number 12?
17 A. I disagree because he says in essence that it
18 was a safe harbor. It was not a safe harbor. It was
19 not on a list of anyone's area as a safe harbor.
20 Joe Domino or one of those people had a
21 list of safe harbors, and the Industrial Canal was
22 not listed.
23 To add insult to injury, it was between
24 two bridges, and he is opining that it's "a protected
25 area and a safe haven for mooring barges as hurricane

175

1 protection."
2 The recommendations clearly state that
3 extra precaution is to be taken for vessels that are
4 moored in between -- in close proximity to bridges.
5 In this case, they were between two
6 major bridges that -- if this barge would have hit
7 the bridge and damaged it, then that could have
8 impeded evacuation of the lower Ninth Ward
9 completely.
10 Q. I'm sorry. What are you talking about? You
11 lost me.
12 MR. SANDERS: Number 12.
13 A. Number 12.
14 Q. (By Mr. Walker) I have no idea what your
15 answer has to do with Number 12.
16 A. Well, he says --
17 MR. SANDERS: Answer it again for him.
18 A. He opines that it was a safe haven and a
19 protected area. It was not a protected area, in my
20 opinion.
21 Q. (By Mr. Walker) So that's having to do with
22 the protected slip issue we talked about earlier?
23 A. Yes, sir.
24 Number 13 I disagree with.
25 Q. You don't think scuttling is ridiculous?

176

1 A. No.
2 Q. Or imprudent?
3 A. No.
4 Q. And potentially unlawful?
5 A. No. Only if you have pollution. But I think
6 in the face of an oncoming --
7 There's nothing to pollute. The dumb
8 barge had no dangerous cargo, didn't have any oil in
9 it that we know of. It was carrying cement, so there
10 was nothing that -- the only thing that would have
11 polluted anything would have been cement dust, but --
12 Q. You're assuming it's --
13 A. I did not propose to flood the harbor. I
14 proposed to flood the void spaces and/or cut holes in
15 the void spaces to sink the vessel.
16 Q. Number 14?
17 A. Okay. I disagree -- let's see -- I disagree
18 with that. They left 42 hours before the hurricane
19 hit. They had plenty of time to do other things to
20 make the facility safe and they chose instead to,
21 upon being notified by their wives via cell phone, to
22 get out of Dodge.
23 Q. So in your opinion the Lafarge personnel
24 should have stayed at the terminal?
25 A. They should have stayed at the terminal

177

1 longer to complete adequate and proper preparations
2 and to follow up with Zito to make sure Zito was
3 going to be coming to pick the barge up; and if that
4 wasn't possible, then to contact another towing
5 vessel to come and get it.
6 Q. All right. You're familiar with Mr. Skaer's
7 report?
8 A. He's the rope guy?
9 Q. Uh-huh. You're not an expert, are you?
10 A. No.
11 Q. I'm sorry. You're not a rope expert?
12 A. No, I'm not, and I don't purport to be.
13 Q. And so you relied on Flory with respect to --
14 A. With respect to --
15 Q. -- with respect to your opinions on the rope;
16 right?
17 A. Yes, sir.
18 Q. Did you discuss this report with Flory?
19 A. No. I just got this, like, two days ago and
20 I was in trial in another state.
21 Q. Now, according to Mr. Skaer and the evidence,
22 prior to the hurricane, 4727 was tied with two
23 4-1/2-inch circumference 8-strand braided high
24 tenacity copolymer poly lines.
25 Are you aware of that?

178

1    A.   No.
2    Q.   You are aware that those lines were then
3  replaced with three new 2-inch poly lines?
4    A.   No.  Two lines.  They left one -- there was
5  an original one that stayed there and they only
6  replaced two lines.
7    Q.   Which was the original that stayed?
8    A.   I don't know.
9         MR. SANDERS:  He says to be a 20,000 to
10  30,000-pound strength.
11    Q.   (By Mr. Walker)  You don't know which
12  position, which line?
13    A.   No, sir.
14    Q.   You don't have any basis to disagree with
15  Mr. Skaer that the tensile strength of those original
16  lines was 50,000 pounds each?
17    A.   No, sir, I don't.
18    Q.   And you can't disagree with him either that
19  the replaced new lines had a capacity for sustaining
20  178,500 pounds?
21    A.   No, I can't.  I can't agree or disagree.
22    Q.   Okay.  So you have no basis to disagree?
23    A.   I have no basis to disagree or agree.
24    Q.   So Mr. Skaer, based on his calculations and
25  opinions, calculates the pre-Katrina tie-up strength

179

1  to be 58,500 pounds and the tie-up strength at the
2  time of the hurricane to be 178,500 pounds.
3         You would agree that 58,500 -- I'm
4  sorry -- that 178,500 is more than three times
5  58,500?
6         MR. SANDERS:  Do the math.
7    A.   How much was the other one?
8    Q.   (By Mr. Walker)  178 and 58.  Approximately
9  three times?
10    A.   Okay.  Give or take, two to three times.
11    Q.   Certainly it's more than double?
12    A.   Yes.
13    Q.   Okay.  So you would not agree that the
14  strength of the mooring configuration was more than
15  doubled and was actually nearly tripled?
16    A.   No, I wouldn't agree with that.
17    Q.   And why not?
18    A.   Because we don't know what the breaking
19  strength of the other lines that they replaced, we
20  don't know what their condition was.  I mean, they
21  might have been -- they might have just nilly-willy
22  changed those lines out.  I don't know why they
23  changed them out.
24         But I have no factual basis to agree
25  that the mooring arrangement was more than doubled

180

1  than it was previously.  We only know one line that
2  was existing and the other two were new.
3    Q.   You say that because you don't know the
4  strength of the pre-Katrina mooring arrangement?
5    A.   That's right.
6    Q.   Assuming that it was correctly calculated to
7  be 58,500 pounds and that it was adjusted to 178,500
8  pounds, the configuration would have been more than
9  doubled; correct?
10         MR. SANDERS:  Object to the form.
11    A.   Mathematically, it would be more than
12  doubled.  But had they doubled up the lines, that
13  would also have doubled the strength of the existing
14  lines.
15    Q.   (By Mr. Walker)  But what they did, based on
16  these numbers that we've gone through, more than
17  doubled strength?
18    A.   We don't know that.  There's one line he's
19  comparing --
20    Q.   Listen to my question.  Assuming that his
21  calculations are correct --
22    A.   Uh-huh.
23    Q.   Okay?  I'm asking you to assume that, that
24  the pre-Katrina strength was 58,500 and the strength
25  at the time of the hurricane was 178,500.  Then the

181

1  strength was more than doubled?
2    A.   Yes.
3    Q.   Now, do you know if the lines were
4  Figure 8'ed?
5    A.   Typically, they are.
6    Q.   Do you know any basis to disagree that
7  Figure 8'ing is an efficient way of doubling?
8    A.   No, I do not.  That's strictly to secure to a
9  cleat, or in this case they call them cavels.
10    Q.   Do you know whether the lines parted from
11  tension or shock overload?
12    A.   I think somebody opined that it was under
13  tension, but I don't know that to be a fact.
14    Q.   One way or the other?
15    A.   One way or the other.
16    Q.   Do you have any basis to agree or disagree
17  with Mr. Skaer that even if additional lines or
18  additional parts of the same lines had been used, the
19  force of the wind would have parted them anyway?
20    A.   No.  That's contrary to what Mr. --
21         MR. SANDERS:  Flory.
22    A.   -- Mr. Flory says.
23    Q.   (By Mr. Walker)  So you don't have any basis,
24  but based on Flory, you conclude that?
25    A.   Yes.  I conclude what?

182

1   Q.   That even with additional lines or additional
2   parts, the force of the wind would have parted them?
3   A.   No.
4   Q.   "No" what?
5   A.   No, I don't agree with that.  I don't have
6   enough information.  I'd have to take that hypothet
7   to Mr. --
8   Q.   Flory?
9   A.   -- Flory.  Thank you.
10   Q.   Do you agree that the strain on the lines
11   would have been the greatest when the winds were
12   blowing from the west?
13   A.   Yes.
14   Q.   Do you agree that poly rope is more flexible
15   than wire rope?
16   A.   Yes.
17   Q.   Easier to handle and less recoil?
18   A.   Yes.
19   Q.   And do you agree that synthetic ropes have
20   greater stretch characteristics than wire ropes?
21   A.   Well, some do, but I don't know.  Nylon would
22   be the most forgiving line and some lines have no
23   give whatsoever.
24        So I haven't looked into the
25   characteristics of this polypropylene line, whether

183

1   it has -- how much elasticity it has.
2   Q.   Do you have any basis to disagree that if the
3   wire rope had been used in tying up the barge it
4   would have broken before the poly ropes?
5   A.   No, I don't think so.  I think the wire rope
6   is stronger than a 1-inch-wide rope or a 2-inch-wide
7   rope.  Compared to a 2-inch line, the wire rope wins
8   every time.
9   Q.   But you're not a rope expert, is the first
10   thing you said?
11   A.   That's true.
12   Q.   So you don't have a basis to disagree with
13   Mr. Skaer who is a wire and rope expert that in fact
14   in his opinion a cable would have broken prior to a
15   poly rope?
16        MR. SANDERS:  Object to the form.
17   A.   I don't have any opinion on what his opinion
18   is.
19   Q.   (By Mr. Walker)  Do you currently hold a
20   license?
21   A.   Yes.
22   Q.   And what is it?
23   A.   I have a Master 1600 tons Oceans, I have a
24   Second Mate Unlimited Oceans, I have a Master
25   Oceans -- a Master of Towing Vessels Oceans and Lands

184

1   and Western Rivers.
2   Q.   Are those separate licenses?
3   A.   The Master has three endorsements, the Master
4   of Towing has three endorsements.  Master of Towing
5   Oceans and Master -- well, Inland is included in the
6   Oceans, and then Master of Western Rivers.
7   Q.   Okay.  So you have one license with three
8   endorsements?
9   A.   Yes.  Master 1600 Ton, Second Mate and Master
10   of Towing, yes.
11   Q.   When did you apply for the license?
12   A.   1989.
13   Q.   And that's not more than 1600-gross-ton
14   vessels?
15   A.   That's my Master's license, but the Master's
16   Towing is unlimited for inland vessels.
17   Q.   Did you ever sail under that license?
18   A.   No.
19   Q.   So you've never served on a vessel of not
20   more than 1600 gross tons, oceans or near coastal
21   areas --
22   A.   That's correct.
23   Q.   -- as Master?
24   A.   That's correct.
25   Q.   And why is that?

185

1   A.   Because I was already retired from the Coast
2   Guard.
3   Q.   So you actually got your license after you
4   retired?
5   A.   Yes, based on seagoing experience and
6   examination by the Coast Guard.
7   Q.   When you applied and sat for the license,
8   what were the service requirements?
9   A.   I had to have six years at sea and
10   appropriate tonnage.
11   Q.   Didn't you have to have a minimum of three
12   months of qualifying service on vessels of
13   appropriate tonnage?
14   A.   Yeah, I did that.
15   Q.   And within the three years immediately
16   preceding the date of application?
17   A.   Oh, the rules were -- I got in before they
18   changed the rules.  The rules had been changed in
19   1989, right after I sat for my license.
20   Q.   So today somebody in your position wouldn't
21   get a license; right?
22   A.   No.  They'd have to go back to sea for
23   90 days.
24   Q.   And it was decided to change that because
25   people were getting licenses that didn't really have

186

1  the oceangoing and appropriate experience to obtain
2  licenses?
3       MR. SANDERS:  If you know.
4       A.  If I know, I don't know.  But I disagree with
5  that premise.
6       Q.  (By Mr. Walker)  Shortly after you got your
7  license, the criteria which allowed you to get your
8  license would no longer have allowed you to get one;
9  right?
10      A.  That's correct.
11      Q.  What documenting evidence did you provide the
12  licensing officer with respect to your qualifying
13  service?
14      A.  Service aboard Coast Guard cutters.
15      Q.  And when was the last time you'd served
16  aboard a Coast Guard cutter?
17      A.  1970.
18      Q.  When were you --
19      A.  Wait, wait, wait.  Let's see -- I'd have to
20  look at my CV to find out.
21      MR. SANDERS:  If you don't know, Don,
22  just say you don't remember.
23      A.  I don't remember.
24      Q.  (By Mr. Walker)  When did you sit for this
25  license?

187

1       A.  1989.
2       Q.  So your last seagoing service had been at
3  least ten years before you sat for your license?
4       A.  Yes, yes.
5       Q.  Do you have copies of the application form
6  with the licensing officer's initials or comments on
7  your application?
8       A.  No.  If it still exists, the Coast Guard has
9  it.
10      Q.  And today the requirement to show recent
11  service is in fact an integral requirement of the
12  licensing qualifications; right?
13      A.  Yes.
14      MR. WALKER:  I tender the witness
15  subject to some areas I want to review and those
16  photographs, if you can hand me those.  To expedite,
17  I'm going to let André go next.
18           EXAMINATION
19  BY MR. MOULEDOUX:
20      Q.  Mr. Green, I'm André Mouledoux, I represent
21  Zito and I have a number of questions for you.
22      I have your resume and it says that
23  you've been employed as a consultant from 1989 to the
24  present time and that your company is KDON Marine
25  Consulting.

188

1            Would you tell us, what is the business
2  of KDON Marine?
3       A.  Litigation support, expert witness, analysis
4  of material, rendering of opinions regarding
5  liability.
6       Q.  Is essentially all of your work
7  litigation-driven?
8       A.  Yes.
9       Q.  All right.  At the same time, you are also
10  the owner and I assume the manager of the Houston
11  Exam Prep Training Center?
12      A.  That's correct, yes.
13      Q.  And its business is to train people to obtain
14  their Coast Guard licenses?
15      A.  That's correct, yes.
16      Q.  How long have you been an instructor with
17  that company?
18      A.  Since 1985.
19      Q.  And you obtained your Master's license four
20  years after you began teaching?
21      A.  Yes.
22      Q.  All right.  You were a little critical of the
23  Lafarge folks for having closed down and evacuated
24  from Lafarge 40 hours before the storm.
25      A.  Yes.

189

1       Q.  Did you evacuate Houston when Ike came here a
2  year or so ago?
3       A.  Yes.
4       Q.  When did you evacuate?
5       A.  A couple of days before the hurricane.
6       Q.  48 hours?
7       A.  Oh, yeah.
8       Q.  And was Ike as severe as Katrina?
9       A.  No.  Ike was not as severe as Katrina, but it
10  certainly caused enough damage in Galveston.
11      Q.  I don't mean to underestimate what happened
12  with Ike, but you've had a taste of what happens when
13  a hurricane comes ashore; correct?
14      A.  After Katrina.  Katrina was, in my opinion, a
15  post-accident remedial action.
16      Q.  It was a wakeup call for a lot of people;
17  correct?
18      A.  After we watched New Orleans, we all decided
19  to get out of Dodge.
20      Q.  Would you agree that Katrina is the most
21  severe hurricane to hit the United States in the
22  history that hurricanes have been recorded?
23      A.  I don't know that, but I wouldn't disagree.
24      Q.  The worst in your lifetime?
25      A.  Yes.

190

1   Q.   Have you completed all of the research and
2   gotten all of the information you need for purposes
3   of the opinions you're rendering in this case?
4   A.   Well, now that I've been asked all of these
5   additional questions during this deposition I'm going
6   to go back and research some more and look for any
7   information that would either debunk my opinions or
8   buttress them.
9   Q.   Okay.  But before your deposition today, were
10  you waiting on any information for purposes of the
11  opinions that you've rendered today?
12  A.   No, sir.
13  Q.   Okay.  You were questioned by
14  Mr. Walker about your activities since you obtained
15  the Master license and that you've not been employed
16  as a Master since you got the license; correct?
17  A.   That's correct.
18  Q.   Have you ever owned or managed a barge
19  fleeting facility?
20  A.   No.  I was a manager of an offshore supply
21  boat company after I retired.
22  Q.   I take it then your answer is, no, you have
23  not owned or managed a barge fleeting facility; is
24  that correct?
25  A.   No.  I established and managed a vessel

191

1   fleeting facility in Orange, Texas.
2   Q.   Mr. Green, I don't mean to wrestle with you.
3   A.   Okay.  No barges.
4   Q.   Okay.  Thank you.
5        Are you familiar with the concept of
6   downtime and demurrage on vessels?
7   A.   Only -- No.
8   Q.   Have you ever heard of vessels at docks
9   incurring downtime or demurrage -- I should say lay
10  time or demurrage?
11  A.   Yeah, I am familiar with the terms, but I
12  don't know them legally, what they really entail,
13  except if a vessel fails to discharge cargo or other
14  things that contractually they're obligated to do,
15  there could be monetary penalties.
16  Q.   If a dock doesn't unload a barge in a timely
17  fashion, the dock owner may owe the barge owner
18  demurrage for keeping the barge; correct?
19  A.   Yes.  I think so.  I'm not sure.
20  Q.   Okay.  Or if the barge owner delays
21  delivering the vessel, then he may be subject to
22  penalties to the dock owner if he's delayed the dock;
23  correct?
24  A.   Could be, yes.
25  Q.   You attended the trial that was with

192

Judge Berrigan?
A.   Yes.
Q.   And you saw the testimony of Mr. Ed Busch?
A.   Yes.
Q.   And you saw the testimony of Mr. Barry
Boudreaux of Zito?
A.   Yes.
Q.   And you heard Mr. Busch's testimony that
although he testified that he left a message with
Zito that he did not expect Zito to come and pick up
the barge?
A.   Yes.
Q.   Okay.  And isn't it fair to conclude that the
call he made to Zito to report the barge was empty
was for purposes of downtime and demurrage?
     MR. SANDERS:  Object to the form.
You're asking what was in his brain?
Q.   (By Mr. Mouledoux)  No.  I'm asking did you
rule that out, that that was the purpose of the phone
call, was just to advise the barge was empty for
purposes of demurrage or lay time?
A.   It could very well be.  I have no knowledge
one way or the other.
Q.   Okay.  In some questions from Mr. Walker you
mentioned that Lafarge should have listened to the

193

marine broadcast to monitor the weather and your
words were "as a wakeup call about the possibility of
a hurricane so they could begin taking steps to
batten down the facility to protect against the
hurricane"; do you remember that?
A.   Yes.
Q.   You would, likewise, expect that Zito would
be preparing for a hurricane at the same time?
A.   Yes.
Q.   Did you investigate as to what steps Zito
took in preparation for the hurricane on that
Saturday morning?
A.   No.  Only what they testified to in court.
Q.   And what did you understand those facts to
be?
A.   They were closing their -- getting everything
ready and closing their fleet.
Q.   And they sent a warning to various barge
owners; correct?
A.   Yes.  That's what I understand.
Q.   You heard the testimony of Mr. Boudreaux, but
Mr. Boudreaux didn't testify that he was in a
position to send a tug that morning to pick up the
barge, did he?
A.   I don't think he did.

194

1    Q.   Did you investigate whether Mr. Busch
2  actually made a phone call to Zito?
3    A.   No.  I'm only going on his sworn testimony
4  that was presented in court.
5    Q.   Did you find any evidence to corroborate
6  Mr. Busch's testimony?
7    A.   Nothing at all.
8    Q.   And you heard Mr. Boudreaux testify that Zito
9  does not have the means to receive voice mail;
10  correct?
11    A.   Right now, I don't remember that, but it
12  could very well be.
13    Q.   All right.  Well, if Mr. Busch testified that
14  he left a voice mail message, you don't know whether
15  that is true or not, do you?
16    A.   Yeah.  I can't testify about the veracity or
17  truthfulness of these two witnesses, but one says he
18  left a message and the other says we don't have a way
19  to receive a message and we never got a call, so
20  somebody is not telling the truth.
21    Q.   And you will admit that even if the message
22  was delivered, according to Mr. Busch's testimony, he
23  still did not have the expectation that Zito would
24  pick up the barge; correct?
25    A.   That's what Mr. Busch's testimony was.

195

1    Q.   And you would expect with that understanding
2  on the part of Mr. Busch that Lafarge would make the
3  necessary arrangements to secure the barge to
4  withstand the hurricane; correct?
5    A.   Yes.
6    Q.   In Section 5.14 of your March 11, 2009 expert
7  report, there is a statement, the concluding
8  sentence, that says, "I am of the opinion that the
9  failure of Zito, had it received the call to retrieve
10  the barge, knowing that it was empty, released and
11  ready for pickup, constituted negligence."
12    A.   Yes.
13    Q.   Would you agree that if Zito had not received
14  the call that your opinion regarding its negligence
15  would be reversed?
16    A.   Yes.
17    Q.   Now, did I understand that your opinion with
18  respect to the breakaway is based upon a series of
19  events, one is the five-barge tier that was adjacent
20  to the location of the Barge 4727 drifted into the
21  4727?
22    A.   Yes.
23        MR. SANDERS:  He said "possible."
24    A.   Possible.
25    Q.   (By Mr. Mouledoux)  And you attribute that to

196

slippage of a mooring line because they did not use
steel cable to secure the five-barge tier?
   A.   Yes.
   Q.   And then you indicated that Barge ING 4727
separated from its adjoining loaded barge 4745
because proper mooring lines were not used by
Lafarge?
   A.   Yes.  I said it was possible as the result
of forces in all of these instances.
   Q.   If Lafarge had used proper mooring lines to
secure the barge, is it your opinion that it is more
probable than not that the barge would not have
broken away on August 29th?
        MR. WALKER:  Objection.
   A.   Say that -- I'm sorry.
   Q.   (By Mr. Mouledoux)  In other words, assume
that Lafarge had used the mooring lines that you have
suggested should have been used.
   A.   Yes.
   Q.   If Lafarge had followed your recommendation,
is it more probable than not the barge would not have
broken away on August 29th, 2005?
   A.   Yes.
        MR. WALKER:  Same objection.
   Q.   (By Mr. Mouledoux)  Would you agree that Zito

197

had no responsibility for the securing or mooring of
the five-barge tier?
   A.   Correct.
   Q.   And would you agree that Zito had no
responsibility with respect to the mooring of the
Barges 4727 around 4745 as they were shifted on that
Saturday preceding the storm?
   A.   I agree.
   Q.   And is it your understanding and appreciation
that Lafarge had the necessary means and equipment to
secure the barges in the manner that you have
recommended in your deposition today?
   A.   Yes.
   Q.   Now in your report, going back to
Section 5.14, in the middle of that section you
state, "Had there been a phone call, there clearly
was enough time to move the ING 4727 from the Lafarge
facility to the Zito Fleeting facility on the
Mississippi River."
        Would you explain what you mean by
"there clearly was enough time"?
   A.   Well, they notified them at 9:00 on Saturday
morning purportedly, and so they had from 9:00 that
morning until they closed the port of further
movement some 36 hours later, whatever.  It's a lot

198

1  of hours, more than a day.
2      Q.   Did you investigate whether Zito had the
3  means to go pick up the barge?
4      A.   No, I did not.
5      Q.   Are you proposing here that Lafarge could
6  have found another tower available to move it to
7  Zito?
8      A.   Yes, and also Zito.  If they wanted to get it
9  out of there, they had plenty of light boats going
10  through there.
11     Q.   Is there any Coast Guard -- was there a Coast
12  Guard regulation in effect on August 29th, 2005 that
13  precluded the presence of secured empty barges in the
14  Industrial Canal that day?
15     A.   No, sir.
16     Q.   Okay.  To your knowledge, had there been any
17  previous barge breakaways at Lafarge before August
18  29, 2005?
19     A.   Not that I'm aware of.
20     Q.   Okay.  Do you have any information that
21  suggests that Lafarge had a reputation in the
22  industry that it could not adequately maintain and
23  secure the barges in advance of Hurricane Katrina?
24     A.   No.
25              MR. SANDERS:  Other than the facts

199

1  presented in this case?
2      Q.   (By Mr. Mouledoux)  I'm obviously speaking in
3  advance of this hurricane.
4      A.   Yeah.
5      Q.   Do you have any information or knowledge that
6  Lafarge had a reputation that it was incompetent or
7  did not have the means to secure this barge prior to
8  the hurricane?
9      A.   No.
10              MR. WALKER:  Objection.
11     Q.   (By Mr. Mouledoux)  Likewise, you have no
12  indication that Zito had any reason to believe that
13  the barge would not be cared for and secured by
14  Lafarge; correct?
15     A.   I agree.
16     Q.   There was a discussion in the questioning by
17  Mr. Walker about the direction of the wind relative
18  to the barge position on the Industrial Canal.
19              Are you familiar with the location of
20  Zito's Fleet?
21     A.   No.
22     Q.   Well, I want to show you a document that you
23  have previously produced in this case.
24     A.   Uh-huh.
25     Q.   Do you recognize that?

200

1      A.   Oh, yeah.
2      Q.   The document.
3      A.   Yeah.
4      Q.   What is the document that you're holding?
5      A.   Yeah.  This is a document that was prepared
6  for me by a graphics person and it shows where Zito's
7  Algiers fleet is.
8      Q.   So this is a document that you
9  hand-prepared --
10     A.   Yes.
11     Q.   -- for purposes of your analysis and
12  opinions; correct?
13     A.   Well, it was to aid the Court in a visual --
14              MR. SANDERS:  In the Ingram case.
15     A.   -- in the Ingram case.
16     Q.   (By Mr. Mouledoux)  okay.  As a part of that,
17  you've shown on there in a section of that visual the
18  relative locations of Lafarge and the Zito Fleet;
19  correct?
20     A.   Yes.
21     Q.   Okay.  Would you agree with me, assuming that
22  the position of the Zito Fleet is correctly depicted,
23  that a wind from the northwest -- excuse me -- a wind
24  from the northeast would tend to push barges away
25  from Zito Fleet and out into the Mississippi River?

201

1      A.   I couldn't agree with that because we don't
2  know what the -- they would be in alee of Algiers
3  Point, which means that they would be lower than the
4  surrounding terrain and buildings and that sort of
5  thing.
6              So that could very well play a part in
7  it, but it would be my opinion that they would be in
8  alee of Algiers Point.
9      Q.   Have you ever been to Zito's fleet?
10     A.   Sure.  I've been there.  Looking at where it
11  is, I've been there many, many times as a Coast Guard
12  inspector.
13     Q.   What is across the levee from Zito Fleet?
14     A.   Well, the levee is 20-something feet,
15  30-something feet high and then they've got houses
16  and other things on the other side, but right now I
17  can't recall if there are any major buildings across.
18     Q.   If I were to suggest there are no major
19  buildings --
20     A.   I couldn't dispute that.
21     Q.   Okay.  If the wind was blowing in the
22  hurricane from the northeast in the manner that it's
23  been suggested on those Lakefront Airport weather
24  readings --
25     A.   Uh-huh.

202

1   Q.   -- is it your opinion that the wind would be
2   at a different direction at the point where Zito
3   Fleet is located?
4   A.   Well, Zito Fleet, according to my depiction
5   of it, is oriented on a north-south basis
6   orientation, and if it was northeast winds -- but we
7   don't know where the wind was.  I was arguing with
8   Mr. Walker concerning the direction of the wind and
9   all of the other factors.
10          Because it says so at the Lakefront
11  Airport doesn't necessarily mean so at Algiers Point.
12  I'm not trying to argue with you, but I think that
13  the orientation is north and south and northeast wind
14  would have -- they would have been in a lee.
15  Q.   I think you acknowledged previously in your
16  testimony that there were approximately 1500 barge
17  breakaways as a result of Hurricane Katrina?
18      MR. SANDERS:  He has no personal
19  knowledge of that.
20  A.   I didn't agree with that.  I only said that I
21  didn't know how many barges.  Mr. Walker suggested it
22  was 1500 barges.
23  Q.   (By Mr. Mouledoux)  I think you acknowledged
24  that you didn't dispute that, that could be correct?
25  A.   That's correct.  I didn't do an independent

203

1   investigation of total barge breakaways.
2   Q.   Assuming that to be correct, you would also
3   assume that most of the breakaways occurred on the
4   Mississippi River and not in the Industrial Canal?
5       MR. SANDERS:  No.
6   A.   No.  In fact, the last deposition told me
7   about a whole bunch of barges that broke loose on the
8   upper reaches of the Industrial Canal toward the
9   Lakefront.
10  Q.   (By Mr. Mouledoux)  Okay.  So there were
11  other barge breakaways in the Industrial Canal?
12  A.   That's what I've been told, yes.
13  Q.   When you say the "upper reaches," are you
14  talking about --
15  A.   Toward the lake.
16  Q.   -- toward Lake Pontchartrain?
17  A.   Toward Lake Pontchartrain.
18  Q.   And this is not in the area where you
19  describe Southern Scrap having barges that broke
20  away, which was actually closer to the river than
21  Lafarge; correct?
22  A.   No.  Southern Scrap is over here on the
23  other --
24      MR. SANDERS:  On the other side.
25  A.   -- the other side.

204

1       MR. WALKER:  Off the record a second.
2       (Discussion off the record.)
3   Q.   (By Mr. Mouledoux)  So are those the barges
4   that you're talking about, the Southern Scrap barges
5   that broke away?
6   A.   Yes, sir.
7   Q.   Didn't we say that was four or five barges?
8   A.   No.  The Coast Guard -- I didn't say
9   anything.  Talking about remedial action and the
10  Coast Guard cites Southern Scrap during Hurricane
11  Ike, it was something like 40 barges broke loose.
12  Q.   I think that was Hurricane Gustav.
13  A.   Oh, Gustav.  That's right.
14  Q.   I'm talking about in connection with
15  Hurricane Katrina.
16  A.   No.  I don't have any information about
17  barges breaking away from other facilities.
18  Q.   Do you know whether the Mississippi River
19  flow reversed so that it was flowing upriver during
20  Katrina?
21  A.   That's my understanding, yes.
22  Q.   Is there a tidal flow in the Industrial Canal
23  when there's no hurricane?
24  A.   In this case, there was.
25  Q.   When there's no hurricane.

205

1   A.   When there is no hurricane, there is a tidal
2   flow, yes.
3   Q.   Which way does the tide flow?
4   A.   It goes in and out.  It empties through the
5   MR-GO.  It comes up the MR-GO and through the
6   Rigolets and it goes into Lake Pontchartrain and it
7   goes into the Industrial Canal.  The Industrial Canal
8   is open to the sea.
9   Q.   Do you know whether there were any breakaways
10  on the Mississippi River as a result of Katrina in
11  the New Orleans area?
12  A.   Yes.  I was just on a case in Kentucky about
13  that very thing.
14  Q.   Did you investigate whether there were any
15  backups, waiting towboats to get through the lock at
16  the Industrial Canal at the river that Saturday and
17  Sunday?
18  A.   No.  I looked at the lock logs.  That's all I
19  looked at.
20  Q.   Do you know what the average wait time was
21  for a vessel in line to get through the line?
22  A.   No.
23  Q.   Looking at your visual that we spoke of
24  earlier, you have a timeline for August 25th through
25  the 29th, and on Friday the 26th you make reference

206

1  to the movement of Barge ING 2747 [sic].
2         Do you see the notation at 6:00 in the
3  morning?
4     A.  Yes, sir.
5     Q.  If I were to suggest to you that the shift
6  boat that delivered the ING 2747 [sic] to Lafarge
7  that day had to wait from 6:00 in the morning as
8  indicated on your visual until approximately the 9:50
9  time or 9:20 time, that it had to wait that long in
10 order to gain entrance through the lock, would you
11 disagree with that or do you have any knowledge that
12 contradicts that?
13    A.  No, sir.
14    Q.  Do you know whether that's a routine delay to
15 get through the industrial locks?
16    A.  No, I don't.
17    Q.  And it indicates it took 40 minutes to go
18 through the lock, if the timing is correct on the
19 entry that you have on the visual; correct?
20    A.  Yes.
21    Q.  So if the tug was ready to depart with the
22 barge at 6:00 in the morning, how much time passed
23 until it actually delivered the barge to Lafarge?
24    A.  I can't remember when they delivered it to
25 Lafarge.

207

1     Q.  It's shown on your timeline?
2     A.  Oh, it is?  Oh, here it is.  11:30, 11:25.
3     Q.  So we're talking about 5 hours and
4  25 minutes --
5     A.  Yes.
6     Q.  -- from the time the tug would have been
7  ready to leave with the barge until it got cleared
8  through the lock and delivered the barge?
9     A.  Yeah.
10    Q.  Do you know how much time it would have taken
11 if the REGINA H which turned the tow around had
12 agreed or had been asked to take the barge and agreed
13 to do so, how much time it would have taken for that
14 barge to be taken from Lafarge on the afternoon of
15 that Saturday to get through the lock?
16    A.  On the reverse way?
17    Q.  Yes, sir.
18    A.  No, I don't.
19         MR. MOULEDOUX:  That's all I have.
20 Thank you.
21         EXAMINATION
22 BY MR. SANDERS:
23    Q.  Mr. Green, regarding your most recent report,
24 in your last deposition wasn't it made clear that
25 that was not your final report?

208

1     A.  Yes.
2     Q.  And wasn't it made clear that there would be
3  additional work done in preparation for the final
4  report?
5     A.  Yes.
6     Q.  Okay.  Now, about the issue of time in your
7  report --  Well, it came up in your last deposition
8  about the time of Villavaso witnessing the barge
9  break the wall; is that correct?
10    A.  Yes.
11    Q.  And that was resolved back then, if I may
12 read, that the barge must have broken loose sometime
13 prior to the 4 to 6 a.m. time frame; is that correct?
14    A.  Yeah.  I think we finally straightened it out
15 near the end of depo, the end of my examination by
16 Mr. Walker.
17    Q.  Right.
18         MR. WALKER:  Are you trying to
19 rehabilitate him or something?
20         MR. SANDERS:  No.  I'm trying to
21 illustrate how you keep bringing up issues, and we
22 could go a lot farther.  If you knew he was mistaken,
23 just point it out.
24    Q.  (By Mr. Sanders)  Now, with regard to your
25 report, you indicated that the barge -- you have no

209

1  idea when the barge broke loose; is that correct?
2     A.  That's correct.
3     Q.  And if the barge would have broken loose at
4  or about when winds reached 36 miles per hour, you
5  don't know when that was; is that correct?
6     A.  That's correct.
7     Q.  But the weather records from the Lakefront
8  Airport start when winds were in excess of, I want to
9  say, 40 miles per hour.  Am I correct?  Have you got
10 the weather records?
11         MR. WALKER:  Can I have those, because
12 that's an exhibit?
13         THE WITNESS:  I think this is mine.  Is
14 that yours right there?
15         MR. WALKER:  No.  That's mine.  You
16 didn't have them.  Remember?
17         THE WITNESS:  Oh, I had them, but I --
18    Q.  (By Mr. Sanders)  Referring to LNA 001073 at
19 12:01 a.m., what was the wind speed?
20    A.  46 miles an hour.  45.
21    Q.  46?
22    A.  46 miles an hour.
23    Q.  So, in retrospect, at 12:01 a.m., the barge
24 could have broken loose prior to that time?
25    A.  Yes.

210

1  Q.  So if Mr. Villavaso saw it sometime between
2  4 and 6, it could have broken loose sometime the day
3  before?
4      A.  It could have -- you're right.  I don't know
5  when it broke away.
6      Q.  Exactly.  Now, with regard to wind direction,
7  from your experience, your lake experience as well as
8  your experience as a captain and your training with
9  regard to hurricanes, does the wind direction always
10  stay the same?
11     A.  No, it does not.
12     Q.  Okay.  What else would affect the movement of
13  a barge in a confined area like the Industrial Canal
14  between the Florida Avenue Bridge and the Claiborne
15  Bridge?  Would wind shifting?
16     A.  Yes.
17     Q.  Would tornadoes?
18     A.  Yes.
19     Q.  Would waves?
20     A.  Yes.
21     Q.  Would deflection and reflection of waves?
22     A.  Yes.
23     Q.  All of that would cause -- have an effect
24  upon the movements of a floating vessel?
25     A.  Yes.

211

1      Q.  All right.  Now, you were asked about the
2  tier of five barges being exposed to the same wind as
3  the tier of two barges, that being of 36 miles per
4  hour.
5          You will agree that they were exposed to
6  the same wind at that speed; is that correct?
7      A.  Yes.
8      Q.  But won't you also agree that the quality of
9  the winds was different in that the ING 4727 had more
10  freeboard; is that correct?
11     A.  More sail area, yes.
12     Q.  More sail area.  So with regard to sail area,
13  the wind had a greater impact upon that barge?
14     A.  That's correct, yes.
15     Q.  Okay.
16     A.  I think I testified to that.
17     Q.  Okay.  Now, the north tier, the five tier of
18  barges, that tier swung out; is that correct?
19     A.  It's my opinion, yes, I think so.
20     Q.  Again, we don't know when that occurred; is
21  that correct?
22     A.  That's correct.
23     Q.  But isn't it a regulation in the United
24  States COAST PILOT 5 that "Barges shall be made fast
25  securely at both ends to prevent swinging out or

212

1  breaking loose"?
2      A.  Yes.
3      Q.  Okay.  This long-lining technique --
4      A.  Can I see that?
5      Q.  (Indicating.)
6              -- that allowed the barge to slip its
7  mooring and swing out; is that correct?
8      A.  Yes.  In my opinion, yes.
9      Q.  So that mooring deployment on the north tier
10  would be in violation of COAST PILOT 5 with regard to
11  the Inner Harbor Navigation Canal?
12     A.  Yes.
13          MR. WALKER:  He's an expert and you can
14  lead to him, but it would be nice to hear his
15  testimony.
16     Q.  (By Mr. Sanders)  Okay.  Now, with regard to
17  Hurricane Katrina, it was expected to be a Category 5
18  hurricane with surges between 15 and 25 feet?
19     A.  18 to 22 feet or whatever it was.
20          MR. MOULEDOUX:  Objection to form.
21          MR. WALKER:  Objection.
22     Q.  (By Mr. Sanders)  Is it fair to say that with
23  regard to extraordinary danger one must take
24  extraordinary precaution?
25          MR. MOULEDOUX:  Object to the form.

213

1          MR. WALKER:  Objection; form.
2      A.  I agree.
3      Q.  (By Mr. Sanders)  I'm sorry.  Extraordinary
4  danger requires extraordinary care; is that correct?
5      A.  Yes, that's correct.
6          MR. WALKER:  Same objection.
7          MR. MOULEDOUX:  Same objection.
8      Q.  (By Mr. Sanders)  But in fact, after it made
9  landfall, the storm that hit New Orleans was not
10  Category 5 but rather Category 3; is that correct?
11     A.  That's correct, yes.
12     Q.  Okay.  Overall, did Lafarge take any
13  extraordinary care to protect the ING 4727 from
14  breaking away?
15     A.  Not in my opinion.
16     Q.  Okay.  You were asked about a possible
17  allision between the north tier of five barges and
18  the two-tier -- the south tier barges.
19          Would an allision -- could it result in
20  added strain to mooring lines?
21     A.  Yes, it would, and it could very well have
22  overcome a mooring line at that time.
23     Q.  This long-lining technique, had you ever
24  heard of that before this case?
25     A.  No.

214

1    Q.   And that technique is in direct contravention
2    to the COAST PILOT 5?
3    A.   For the Industrial Canal, yes.
4    Q.   Let me ask you about "doubling up."
5         I came to your office yesterday; is that
6    correct?
7    A.   Yes.
8    Q.   And you have a library of books which you
9    rely upon in the performance of your duties and job;
10   is that correct?
11   A.   Yes.
12   Q.   I'm going to refer you to one entitled NAVAL
13   SHIPHANDLING.  This is authored by the U.S. Navy; is
14   that correct?
15   A.   Yes.
16   Q.   On Page 69 -- and I'm going to put a little
17   check for you -- how do they define "mooring lines
18   doubled up"?
19   A.   "When the ship is secured, the mooring lines
20   are normally doubled up, which means that an extra
21   bight of line is passed to the pier or other ship,
22   giving three parts of line instead of only one part."
23   Q.   Okay.  I'm going to refer you to another book
24   called A DICTIONARY OF OLD SEA TERMS.  Is this a book
25   customarily relied upon by you and others in your

215

1    occupation with regard to your duties?
2         MR. MOULEDOUX:  Object to the form.
3    A.   Yes.
4    Q.   (By Mr. Sanders)  I have also checked off the
5    definition of "double up."  Would you read into the
6    record what it says?
7    A.   Okay.  "Double up" means "to duplicate
8    mooring lines."
9    Q.   Okay.  Now, the opinions or interpretations
10   to double the line strength, that does not coincide
11   or that is in conflict with these two definitions; is
12   that correct?
13   A.   I feel so.
14        MR. WALKER:  Objection.
15   Q.   (By Mr. Sanders)  Okay.  I'm going to also
16   refer you to the BARGE FLEETING STANDARD OF CARE.
17        We've already established that it's not
18   a required document or regulation for Lafarge; is
19   that correct?
20   A.   That's correct.
21   Q.   But it does provide a standard of care for
22   good and practical seamanship; is that correct?
23   A.   Yes.
24   Q.   And this document is prepared in partnership
25   between industry and the U.S. Coast Guard; is that

216

1    correct?
2    A.   That's correct.
3    Q.   And, sir, how does it define "double-up"?
4    A.   Same thing.  It says:  "Double-up:  Placement
5    of additional barge-to-barge mooring as defined in
6    33 CFR 165.803, over the existing barge-to-barge
7    mooring, during high water."
8    Q.   Does it depict a photograph of cables doubled
9    up?
10   A.   Yes.
11   Q.   And does it explain in detail its definition
12   of "double-up mooring" on Figure 3?
13   A.   Yes.
14   Q.   Okay.  What exhibit are we on?
15        MR. WALKER:  C.
16        MR. SANDERS:  I'm going to make the
17   NAVAL SHIPHANDLING Exhibit D, the DICTIONARY OF SEA
18   TERMS E and the pages referred to from the BARGE
19   FLEETING STANDARD OF CARE as F.
20        (Green Exbs. D-F were
21        marked for identification.)
22        MR. WALKER:  Can I have the weather
23   deal?  I have it.
24   Q.   (By Mr. Sanders)  Mr. Green, are operators of
25   vessels on inland waters and operators of marine

217

1    terminals bound by the rules and regulations of the
2    inland rules?
3    A.   Yes.
4    Q.   Okay.  Referring back to your report
5    Section 5.0.  We've talked about Lafarge's failure to
6    monitor the storm.
7         Is it fair to say -- is it appropriate
8    to say that appropriate monitoring would allow
9    appropriate planning and time to implement?
10   A.   Yes.
11   Q.   Okay.  Now, is it fair to say that if Lafarge
12   was aware or had appropriately monitored weather
13   conditions as set forth by the New Orleans Hurricane
14   Center, let's say, or had subscribed to a weather
15   service or had a working VHF radio wherein weather
16   advisories are communicated --
17   A.   Yes.
18   Q.   -- that it would have had more time to plan
19   because it would have been aware of the approach of
20   the storm?
21   A.   I agree with that.  I think I, in essence,
22   testified to that.
23   Q.   So if anyone would make an argument that we
24   didn't have time to ballast -- first of all, about
25   ballasting, just stopping unloading operations would

218

1   decrease the ability of the vessel to float higher;
2   is that correct?
3       A.   Yes.  I testified to that.
4       Q.   So to ballast, all they had to do was stop
5   unloading?
6       A.   Right.  If they had stopped unloading, then
7   she would have had less freeboard.
8       Q.   Okay.  Even if they had completely unloaded,
9   they could have ballast by pumping back in; is that
10  correct?
11      A.   That's correct, into the void spaces.
12      Q.   Again, with regard to adding water to the
13  void -- I mean, they could have pumped cement back
14  in -- is that correct -- to weight it down?
15      A.   I guess so, but I think it would have been --
16  I don't know.  I hadn't even considered pumping
17  cement back in, but I did consider pumping water from
18  the canal.
19      Q.   Okay.  If they needed pumps to be brought in
20  or if they needed an independent contractor to come
21  in and cut a hole, any argument that there was no
22  time for it would be alleviated by proper planning;
23  is that correct?
24      A.   Yes.
25      Q.   With regard to any argument that a barge did

219

1   not have enough time to get through the locks would
2   be alleviated by proper planning; is that correct?
3       A.   That's correct as well.
4       Q.   Let's assume there was not enough time.  Does
5   Lafarge as a marine terminal facility have in terms
6   of good seamanship the obligation to notify the
7   Captain of the Port?
8       A.   Yes.
9               MR. WALKER:  Objection.
10      Q.   (By Mr. Sanders)  And that is set forth by
11  the recommendations of the "Sector New Orleans
12  Hurricane Plan"; is that correct?
13      A.   Yes.
14      Q.   In addition, that's set for the by notions of
15  good seamanship; is that correct?
16      A.   Yes.
17      Q.   What are the powers of the Captain of the
18  Port?
19      A.   The power of the Captain of the Port is
20  almost unlimited when it talks about the protection
21  of the port, and that's all outlined in 33 CFR
22  Part 6.  They call them the super 6.
23      Q.   Does the Captain of the Port have the ability
24  to take control of a vessel?
25      A.   Yes, he does.

220

   Q.   Does the Captain of the Port have the power
to dispatch U.S. Coast Guard personnel to a facility?
   A.   Yes.
   Q.   Does the Captain of the Port have the ability
to dispatch U.S. Coast Guard personnel to secure a
vessel?
   A.   Under extraordinary circumstances, but they
wouldn't normally get involved in actually hands-on,
but the Captain of the Port could make that happen.
   Q.   Does the Captain of the Port have the power,
along with the Corps of Engineers, to order that a
vessel be allowed through the locks?
   A.   Yes.
   Q.   All right.  Is it any excuse for a maritime
facility to say that "We were under construction and
did not have communication abilities"?
   A.   No.
       MR. WALKER:  Objection.
   A.   There's no excuse for that.
   Q.   (By Mr. Sanders)  Any facility could set up
temporary communication facilities; is that correct?
   A.   That's correct, yes.
   Q.   Any facility could set up a VHF radio,
subscribe to weather advisories?
   A.   Yes.

221

   Q.   Is that correct?
   A.   Yes.
   Q.   And to receive, what are they, maritime
advisories from the U.S. Coast Guard --
   A.   Yeah.  Maritime Information Bulletins.
   Q.   Those are sent to the maritime community to
advise in this situation of the approaching storm and
precautions that are strongly urged to be taken; is
that correct?
   A.   That's correct.
   Q.   The issue of sinking the vessel, that would
be a last resort; is that correct?
   A.   That's a last resort, yes.
   Q.   When you made the comment about three
single-part lines being temporary mooring, is it fair
to say that that's mooring you would see in an
everyday situation?
   A.   You see temporary moorings moving barges
between fleets, taking a barge in, taking it out of a
deal, they just use one-part lines and tie it up and
move it.
       But if they're going to leave the barge,
it's customary and prudent to double up.
   Q.   You were asked about Lafarge's checklist
being superseded.  There was no written document

222

1  published to the employees of Lafarge other than that
2  checklist; is that correct?
3      A.  That's correct, yes.
4      Q.  So any new policy or procedure is something
5  that obviously was not communicated to employees in
6  hard copy or paper; is that correct?
7      A.  Yeah.  It wasn't, as you guys say,
8  memorialized.
9      Q.  Now, you were asked about the only reason for
10 the barge breaking away was the failure to have
11 cabling, as I recall.
12         Is it true that this barge broke away
13 for various reasons, including its mooring lines?
14     A.  Yes.
15     Q.  Including the deployment of its mooring
16 lines?
17     A.  Yes.
18     Q.  Including the fact that we had a moored empty
19 to a full barge creating a sail effect?
20     A.  Yes.
21     Q.  Including the fact that it was not moved out
22 of there?
23     A.  That's correct.
24     Q.  Okay.
25         MR. WALKER:  Objection.  I would have

223

1  objected to the entire question, but you did it
2  piecemeal.  It mischaracterizes his testimony.
3         MR. MOULEDOUX:  I join in the objection.
4      Q.  (By Mr. Sanders)  Well, just to maybe remedy
5  that, all of those factors played a part in either
6  causing the breakaway or preventing it; is that
7  correct?
8      A.  Yes.
9         MR. SANDERS:  Objection;
10 mischaracterizes testimony.
11     Q.  (By Mr. Sanders)  Marine Standards of Care,
12 they apply not only to mooring, but to also other
13 areas of practice; is that correct?
14         MR. MOULEDOUX:  Object to the form.
15     A.  Yes.
16     Q.  (By Mr. Sanders)  Under some of those marine
17 advisories from the U.S. Coast Guard there is
18 recommendation to move empty barges out of fleets
19 upriver if possible; is that correct?
20     A.  I don't know.  I didn't see that.
21         MR. MOULEDOUX:  Object to form.
22     Q.  (By Mr. Sanders)  I'll find it for you.
23         MR. MOULEDOUX:  This is all off the
24 record.
25         (Discussion off the record.)

224

1      Q.  (By Mr. Sanders)  Operators of a marine
2  facility are bound by U.S. Coast Guard laws and
3  regulations; is that correct?
4      A.  Waterfront facilities?
5      Q.  Yes.
6      A.  Yes.
7      Q.  They also should be guided by the
8  recommendations of the U.S. Coast Guard; is that
9  correct?
10     A.  That's correct, yes.
11     Q.  As well as notions of good seamanship?
12     A.  Yes.
13     Q.  As far as closing the river or the tributary
14 to barge traffic as of midnight, that didn't exactly
15 happen; is that correct?
16     A.  Midnight when?
17     Q.  Sunday.  Because barges were continuing to go
18 through the lock as of 4 a.m.; is that correct?
19     A.  4 a.m. on Monday?
20     Q.  Sunday.
21     A.  On Sunday, yes, that's true.
22         MR. MOULEDOUX:  Just for clarification.
23 You asked midnight --
24         MR. SANDERS:  When did they close it?
25         MR. MOULEDOUX:  I don't know.

225

1      A.  Somewhere in the lock log there's a notation
2  or -- I know there's a timeline somewhere and it said
3  4:00.
4      Q.  (By Mr. Sanders)  If I misspoke, it's
5  irrelevant.
6      A.  I don't know what the answer is.
7      Q.  With regard to the three lines and two being
8  replaced, is it fair to say that that mooring system
9  is only as strong as its weakest link?
10     A.  That's correct, yes.
11     Q.  So it was moored with one rope that had a
12 strength of roughly half of its new conditioned
13 strength?
14     A.  That's what the testimony is, yes.  I mean,
15 it was -- it was an older line, it was a used line.
16     Q.  And if that line would part, wouldn't you
17 think it would be done on tension or shock?
18     A.  Yes.
19     Q.  And wouldn't that tension or shock continue
20 down the length of the vessel?
21     A.  Yes.
22     Q.  And by that time it would be less strength
23 than the original three lines; is that correct?
24         MR. WALKER:  Objection.
25     A.  That's correct, yes.  Domino effect, I call

226

1  it.
2      Q.   (By Mr. Sanders)  All things being equal,
3  2-inch poly rope and 2-inch cable, what's stronger?
4          MR. WALKER:  Objection.
5      A.   I'm not an expert, but I would say that cable
6  is.
7      Q.   (By Mr. Sanders)  From your experience, cable
8  is?
9      A.   From my experience, cable is.
10      Q.   You were asked by Mr. Strouse, commenting on
11  Paragraph 4, that a high-low mooring is something
12  that's common?
13      A.   No.  By Mr. Walker.
14      Q.   It was about Mr. Strouse's report.  I'm
15  sorry.
16          It does happen and it is common, if you
17  want to use those words, but not for hurricane
18  situations; is that correct?
19          MR. WALKER:  Objection.
20      A.   I would say that's true, but I -- certainly
21  they do on occasion put highs against lows, but they
22  strive to get lows to lows and highs to highs.
23      Q.   (By Mr. Sanders)  Under this Barge Fleeting
24  Standard of Care, which again is not a regulation
25  that Lafarge has to comply with, it does set forth a

227

1  standard of care that says high-low mooring
2  configurations should be avoided; is that correct?
3          MR. MOULEDOUX:  Object to the form.
4          MR. WALKER:  Same objection.
5      A.   That's correct.
6      Q.   (By Mr. Sanders)  Mr. Strouse said that the
7  facility had no -- it was not recommended that it
8  contact the Captain of the Port.
9          That's not true under the "Sector
10  Hurricane Plan"; is that correct?
11      A.   That's correct.
12      Q.   Under that plan, it is recommended that the
13  facility notify the Captain of the Port?
14      A.   Yes.
15          MR. MOULEDOUX:  Object to the form.
16          MR. WALKER:  Can you just put a
17  continuing objection to the leading questions for me?
18          MR. SANDERS:  He's an expert.
19          MR. WALKER:  I know.
20          MR. SANDERS:  For the last 20 years I've
21  been leading experts all of the time.
22          MR. WALKER:  I'm not saying you can't.
23          MR. SANDERS:  Oh.
24      Q.   (By Mr. Sanders)  Okay.  With regard to
25  Paragraph 11 of Mr. Strouse, that there was no time

228

1  to do something, all of that could be resolved,
2  number one, with proper planning and/or consultation
3  with the Captain of the Port; is that correct?
4      A.   That's correct, yes.
5      Q.   Now to Mr. Skaer.  Each rope was not of
6  50,000-pound capacity; is that correct?
7      A.   Wait.  Say that again.
8      Q.   Each of the three ropes was not of
9  50,000-pound strength?
10      A.   Yes.
11      Q.   Now, Mr. Mouledoux asked you about when you
12  evacuated for Hurricane Ike or Gustav, and you said
13  about 40, 48 hours.
14          MR. MOULEDOUX:  Objection.  That's a
15  misstatement of his testimony.
16      Q.   (By Mr. Sanders)  When did you evacuate?
17      A.   I think it was a couple days.  As soon as it
18  got in the Gulf and they said it was heading for
19  Galveston I got out of town.
20      Q.   And Lafarge left about how many hours, the
21  same thing?
22      A.   About 40 hours, yes.
23      Q.   Let me ask you this:  Did you have in your
24  care an empty barge?
25      A.   No.

229

1      Q.   Did you have in your care a barge moored with
2  three single-part lines?
3      A.   No.
4      Q.   Did you have in your care a barge that should
5  have been moved out?
6      A.   No.
7      Q.   Okay.  All right.  Again, Mr. Mouledoux asked
8  you about slippage of the mooring line on the five
9  tier.
10          That slippage was due to this
11  long-lining technique; is that correct?
12      A.   It's my opinion that's what happened.
13      Q.   But that may or may not have been involved
14  with hitting the two tier; is that correct?
15      A.   That's right.  It was -- I think I qualified
16  that in my opinion.
17      Q.   And as for any indications that you had that
18  the barge could have been moved out, Mr. Grabert
19  testified that he could have brought it out if he had
20  been requested; is that correct?
21      A.   That's correct, he did say that.
22      Q.   Again, proper planning and calls to the
23  Captain of the Port; is that correct?
24      A.   Yes.
25      Q.   You were asked about the fleet of Zito.  The

230

1  implication was that the fleet was possibly not as
2  safe or something to that effect.
3          Let me ask you this:  Isn't it true that
4  Zito had no breakaways during Hurricane Katrina but
5  only had two barges sink in place?
6      A.  I don't know that.
7          MR. MOULEDOUX:  Object to the form.
8          MR. SANDERS:  Okay.  All right.  That's
9  all I have.
10         MR. WALKER:  I have a couple.
11             FURTHER EXAMINATION
12  BY MR. WALKER:
13     Q.  Do you remember earlier in your deposition
14  you talked about this hardware that was found from
15  the barge that you weren't aware of before this last
16  report?
17     A.  Yes, sir.
18     Q.  Chains?
19     A.  Ratchets.
20     Q.  Shackles, ratchets.  You don't know when
21  those were placed there, do you?
22     A.  No.
23     Q.  You don't know if it was before or after the
24  hurricane?
25     A.  That's correct.

231

1      Q.  You don't know if it was subsequent to the
2  hurricane during Coast Guard or other people's
3  inspections; correct?
4      A.  I don't know, except that the Coast Guard
5  investigation sent two inspectors there and they
6  commented that the wires and associated equipment was
7  there.
8      Q.  You don't know the original use of those
9  cables, ratchets, chains or other hardware?
10     A.  No.  They're used to make barges, tie them
11  together.
12     Q.  Your answer was no, but they were used?
13     A.  I don't know --
14     Q.  You don't know?
15     A.  I don't know specifically, but the purpose of
16  those wires, ratchets is to make up tow.
17         (Green Exb. G was marked
18          for identification.)
19     Q.  (By Mr. Walker)  I marked as Exhibit G in
20  globo the photographs that you designate as "various
21  photographs."
22         It's from these photographs that you got
23  the information about this hardware?
24     A.  Yes, sir.
25     Q.  Okay.  I'll show you one that has a tape

232

1  measure and a piece of chain on the ground?
2      A.  Yes, sir.
3      Q.  You don't know where that chain came from, do
4  you?
5      A.  No, sir, except --
6          Can I see the other photograph?
7      Q.  (Indicating.)
8      A.  This photograph is of the chain and wire
9  together.  But to answer your question specifically,
10  I don't know where that photograph is.
11     Q.  And you don't know what that chain was
12  attached to or if it was attached to anything prior
13  to the hurricane?
14     A.  I do not know.
15     Q.  And there's a photograph of a tape measure
16  and a -- what is that, a wire rope?
17     A.  Yes, sir.
18     Q.  A cable?
19     A.  Uh-huh.  Yes, sir.
20     Q.  This is what you have been calling a cable
21  during your testimony?
22     A.  Yes, sir.
23     Q.  So attached to the Barge 4727 are some
24  cables?
25     A.  Yes, sir.  They call them -- they're commonly

233

1  called straps.
2      Q.  I'll show you a photograph that shows the
3  4727, and is that -- what is this that I'm pointing
4  to on the barge?
5      A.  Can I see?
6      Q.  Yes.
7      A.  That's a cavel.
8      Q.  That's a cavel on the barge?
9      A.  Yes, sir, or a cleat.
10     Q.  And it has a wire strapped to it; is that
11  what you're saying?
12     A.  That's what it looks like, yes.
13     Q.  And in Photograph 7892 in the yellow area,
14  what is that?
15     A.  This is commonly called a ratchet and that's
16  to take the slack out of wires.
17     Q.  And that would be material that would be
18  placed and remain on the barge in its regular course
19  of operations --
20     A.  That's correct.
21     Q.  -- for use at any line?
22     A.  Yes.
23     Q.  And so would the other equipment that you
24  found on there -- ratchet, wires, et cetera -- those
25  would be on most barges in the event that they're

234

1  required?
2      A.  They're required to make up barges to one
3  another.
4      Q.  I want to show you Exhibit 5 from your prior
5  deposition which is where you placed arrows showing
6  the wind direction and where the barge was moored.
7  Do you recall this exhibit?
8          MR. SANDERS:  Don't assume that's what
9  you testified to.
10     A.  Yes, sir.
11     Q.  (By Mr. Walker)  Don't assume it.  It is
12  true.
13         MR. SANDERS:  We don't know what the
14  arrows mean.  If you remember, tell him.  If you
15  don't remember --
16     Q.  (By Mr. Walker)  Do you recall that
17  photograph?
18     A.  Vaguely, yes.  This is the third deposition
19  and --
20         MR. SANDERS:  Exactly.
21     Q.  (By Mr. Walker)  Okay.  According to the
22  photograph, it says "Wind direction at breakaway,"
23  okay, and there were three red arrows.
24         Are you testifying now that those arrows
25  are incorrect?

235

1      A.  It could very well be incorrect.  We went
2  over in great detail about the prevailing winds that
3  were at the Lakefront, and I said that what's at the
4  Lakefront would not necessarily be at Lafarge.
5          But this direction is -- the orientation
6  of the canal is to the northeast and that looks like
7  wind coming from the north, so it could very well
8  have been that.
9      Q.  It could very well be what?
10     A.  It could be accurate, but we don't know what
11  the wind was at the time of breakaway.  No one knows.
12     Q.  Do you have any evidence of any tornadoes in
13  that area at the time of the hurricane?
14     A.  No, but it's possible they had tornadoes.
15     Q.  But you don't have any evidence?
16     A.  I don't have any evidence.
17     Q.  Okay.  Do you have any evidence of waves or
18  deflection or reflection?
19     A.  No.  Only from the standpoint that it would be
20  possible with the surge coming in.
21     Q.  Anything is possible?
22     A.  No.
23     Q.  Do you have any evidence of any waves,
24  deflection or reflection?
25         MR. SANDERS:  The deposition of Terry

236

1  Adams.  The depositions that you reviewed.
2      Q.  (By Mr. Walker)  Do you have any evidence?
3      A.  Right now, I do not recall.
4      Q.  And you don't have any recollection of any
5  evidence and the direction of any such waves or
6  currents or anything of that nature, do you?
7      A.  No, other than what the witness has said.
8      Q.  Which you don't recall at this point in time?
9      A.  I don't recall.
10         MR. WALKER:  That's all I have.
11         MR. MOULEDOUX:  Just for completeness of
12  the record, at my request you viewed what we called
13  the visual that was prepared for trial.  Just for the
14  record, I have a black-and-white reduced size that
15  I'd like to identify for the record as Exhibit H.
16         (Green Exb. H was marked
17          for identification.)
18         FURTHER EXAMINATION
19  BY MR. SANDERS:
20     Q.  Mr. Green, you were asked about the
21  ratcheting in the photos.  Would the 4745 also have
22  such ratcheting?
23     A.  They should have, yes.
24     Q.  And would it also have such cable?
25     A.  It could very well have.

237

1      Q.  That being the case, in the face an
2  extraordinary storm such as Hurricane Katrina, should
3  Lafarge have utilized all available means to moor
4  this vessel?
5      A.  Yes.
6      Q.  At all available points?
7      A.  Yes.
8      Q.  And that would include cable from the 4745
9  and the 4727; is that correct?
10     A.  That's correct.
11         MR. SANDERS:  All right.  Thank you.
12         (Deposition concluded at 4:44 p.m.)

**238**

CHANGES AND SIGNATURE

PAGE LINE CHANGE          REASON

1
2
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

**240**

THE STATE OF                :

COUNTY OF               :

BEFORE ME, _____, on this day personally appeared DONALD GREEN, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ____ day of _____, 20____.

_____
Notary Public in and for
     County,
My Commission Expires:

**239**

1  _____
2  _____
3  _____
4  _____
5  _____
6  _____
7
8  I, DONALD GREEN, have read the foregoing deposition
9  and hereby affix my signature that same is true and
10 correct, except as noted above.
11
12
13 _____
14 DONALD GREEN

**241**

THE STATE OF TEXAS:
COUNTY OF HARRIS:

     I, Denise Ganz Byers, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the facts stated by me in the caption hereto are true; that the foregoing deposition of DONALD GREEN, the witness hereinbefore named, was taken by me in machine shorthand, the said witness having been by me first duly cautioned and sworn to tell the truth, the whole truth and nothing but the truth, and later transcribed from machine shorthand to typewritten form by me.

     I further certify that the above and foregoing deposition, as set forth in typewriting, is a full, true and correct transcript of the proceedings had at the time of taking said deposition.

     I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

242

```
 1          I further certify that charges for the
 2   preparation of the foregoing completed deposition
 3   were $_____ for the original thereof, charged to
 4   Attorney(s) for the Defendant Lafarge North America,
 5   Inc.
 6          GIVEN under my hand and seal of office
 7   on this, the 28th day of June, 2009.
 8
 9
10          _____
11          Denise Ganz Byers, CSR/RPR/RMR/CRR
            C.S.R. No. 2037, Expires 12/31/2010
12          Notary Public, State of Texas
            Commission expires 6/03/2010
13
            Allied Advanced Reporting, Inc.
14          CRCB Firm No. 252
            1647 Colquitt Street
15          Houston, Texas 77006
            Phone:  (713) 524 - 6777
16          Fax:    (713) 524 - 6888
17
18
19
20
21
22
23
24
25
```

DONALD GREEN

6/25/2009

Page 1

**A**

**abandoned** 173:3
**abilities** 220:16
**ability** 116:22 128:3,7
    157:15 218:1 219:23
    220:4
**able** 54:2 104:24 110:8
    168:18
**aboard** 186:14,16
**above-styled** 2:4
**Academy** 127:22
**accepted** 66:2 110:25
**accepting** 112:9
**access** 83:23 111:16
**accommodating** 5:9
**accomplished** 44:9 67:2
    139:4 172:7
**account** 80:3 81:15
**accurate** 115:13 120:11
    235:10
**acknowledged** 202:15,23
    240:10
**act** 169:14
**acting** 44:24 132:3,5
**action** 1:4 84:18,21,22
    93:15 173:23 189:15
    204:9 241:21,25
**actions** 32:18 84:2 85:8
    134:18 135:13 136:6
**active** 22:3
**activities** 190:14
**Adams** 34:9 35:2 124:3
    236:1
**add** 21:7 29:10 30:4
    142:2 145:15 174:23
**added** 22:10 33:13 68:25
    69:2 74:8 110:9,13
    213:20
**adding** 218:12
**addition** 7:18 11:24 31:5
    219:14
**additional** 6:8,9,10,13,14
    6:22 7:3,6 11:6 13:17
    15:19 21:7 26:4 54:23
    68:21 71:22 83:11,20
    108:21 139:4 144:22

181:17,18 182:1,1
    190:5 208:3 216:5
**address** 121:10 150:19
**addresses** 151:25 152:9
**addressing** 171:18
**adds** 108:21,24
**adequacy** 15:4
**adequate** 177:1
**adequately** 162:14
    198:22
**adhered** 143:16 144:6
**adjacent** 160:13,17
    195:19
**adjoining** 196:5
**adjusted** 180:7
**admit** 194:21
**adopted** 70:11
**advance** 55:2 169:12
    198:23 199:3
**Advanced** 242:13
**advise** 192:20 221:7
**advised** 119:24
**advisories** 217:16 220:24
    221:4 223:17
**Advisory** 120:8,10
**aerial** 50:5 57:9
**affect** 25:4 26:8 44:10
    49:1 153:14 210:12
**affix** 239:9
**affixed** 64:15
**afforded** 171:10
**aft** 154:8
**afternoon** 30:1 207:14
**ago** 7:22 115:3 177:19
    189:2
**agree** 10:10 20:18,19
    33:13,16 45:10,16
    56:17 65:14 66:19,20
    77:10 80:19 88:12
    119:21 124:16,18 127:6
    133:3 134:4,10 135:2
    137:6,9,10,24 138:2,20
    139:7,8,18 140:9,22
    141:22,23 142:10,15
    143:11,18,24,25 150:17
    153:19 155:21,23 157:3

161:5 162:19,24 165:10
    165:13 169:4 170:13,20
    172:2 178:21,23 179:3
    179:13,16,24 181:16
    182:5,10,14,19 189:20
    195:13 196:25 197:4,8
    199:15 200:21 201:1
    202:20 211:5,8 213:2
    217:21
**agreed** 50:19 207:12,12
**ahead** 60:8 81:19 92:17
    98:12 134:1 174:9
**aid** 200:13
**Airport** 12:12 36:9,10,15
    46:5,23 201:23 202:11
    209:8
**alee** 201:2,8 202:14
**alerted** 75:24 80:6
**Algiers** 200:7 201:2,8
    202:11
**alive** 129:24
**alleged** 120:24
**alleviated** 218:22 219:2
**Allied** 242:13
**allision** 53:8,12 57:4,11
    57:20,22 58:7,18
    213:17,19
**allow** 42:7 56:6 117:2
    217:8
**allowed** 6:9 14:7,18 41:1
    41:14 57:25 86:3,18
    87:25 89:4 170:6 186:7
    186:8 212:6 220:12
**allowing** 53:4
**alongside** 147:9 156:19
    164:11 171:5,20
**alternative** 96:18,19
**America** 2:3 3:6 5:3
    160:11 242:4
**American** 130:24
**amouledoux@mblb.co...**
    3:15
**amount** 108:23
**analysis** 4:15 27:22
    28:12 39:1,7 40:21,21
    42:10,12 43:4 46:7

59:1 61:19 62:9,9
    70:14 102:18,25 126:22
    145:8 172:16 188:3
    200:11
**analyze** 113:15
**analyzed** 63:24 117:5
**anchoring** 117:24 120:16
**André** 3:12 187:17,20
**and/or** 6:18 19:16 71:1
    99:10 167:3 176:14
    228:2
**announced** 80:4
**answer** 24:13 36:2 38:21
    38:22 39:20,21 42:8
    62:10 68:4,4,5,19 78:20
    90:23 132:16 151:11
    154:21 157:17 169:13
    174:5,7 175:15,17
    190:22 225:6 231:12
    232:9
**answered** 47:21
**answering** 39:25
**answers** 9:20
**anticipate** 71:3
**anticipated** 70:22 82:7
    151:8
**anticipating** 83:12
**anticipation** 70:4,17
    99:2,6,16 150:20 152:1
    152:10,12 153:4,6,7
    169:19 173:21
**anybody** 29:19 109:25
    121:13 170:14
**anymore** 31:4
**anyone's** 174:19
**anyway** 13:8 46:16 81:20
    85:9 96:20 100:2
    124:19 146:8 156:6
    181:19
**apologize** 24:12 116:5
**Appearances** 4:6
**appeared** 240:5
**Appendix** 134:23
**applicability** 15:5
**applicable** 15:12 32:16
    112:19 113:2,3,6,12,14

DONALD GREEN

6/25/2009

Page 2

114:7,17,20 115:19,20
115:25 116:3 134:20
135:14 136:8,10 137:8
137:21 143:12,19,25
144:2,5,12 145:21
148:1,2,19 157:4
**application** 185:16 187:5
187:7
**applied** 144:11 148:21
185:7
**applies** 120:17,21 135:5
135:10 148:15 150:4,6
150:16 153:3
**apply** 75:8 94:13 109:21
110:5 113:7,8 115:15
115:24 131:22 145:20
148:20 149:17,19 151:7
151:24 152:7,8 153:11
153:12,12,13 184:11
223:12
**appreciate** 5:11
**appreciation** 197:9
**approach** 95:6 173:25
217:19
**approaching** 75:17
221:7
**appropriate** 71:7 74:6,8
185:10,13 186:1 217:7
217:8,9
**appropriately** 217:12
**approximately** 38:2
40:23 51:21,25 63:7
179:8 202:16 206:8
**architect** 127:23
**area** 45:11,13 46:16 47:3
50:20 53:24 58:24
67:12,14 75:17 77:21
90:21 93:13,14 97:10
121:20 127:3 128:23
137:21 138:14 156:2,6
156:10 160:20 169:21
174:19,25 175:19,19
203:18 205:11 210:13
211:11,12,12 233:13
235:13
**areas** 19:9 25:24 31:12

184:21 187:15 223:13
**argue** 202:12
**arguing** 202:7
**argument** 217:23 218:21
218:25
**arrange** 100:25 101:4,7
**arranged** 43:15,22 44:19
44:20 67:19 100:21,24
104:4
**arrangement** 4:15 12:24
22:22 27:6,11 59:2
60:18 65:7 67:6 69:9
69:13 75:10 108:22
161:12 165:11,17
179:25 180:4
**arrangements** 15:3,4
32:15 61:7 62:25 78:13
172:10 195:3
**arrived** 148:10
**arriving** 39:2
**arrows** 123:16 124:7
234:5,14,23,24
**articles** 21:19
**articulate** 152:17
**ashore** 91:15 189:13
**aside** 133:23
**askanced** 50:7
**asked** 6:12,21 7:19 30:4
31:9,16 47:21 50:25
111:6,10 116:5 126:9
190:4 207:12 211:1
213:16 221:24 222:9
224:23 226:10 228:11
229:7,25 236:20
**asking** 29:16 36:2 73:21
73:24 96:10 103:12,13
103:18 114:21 174:2
180:23 192:17,18
**aspersions** 130:4
**assistant** 31:2 110:9
128:18 129:15
**associated** 152:20 231:6
**Association** 143:9
**assume** 9:12 16:24 47:15
54:1,5 55:6 104:13
110:14 118:16 180:23

188:10 196:16 203:3
219:4 234:8,11
**assuming** 87:1 92:10
176:12 180:6,20 200:21
203:2
**attach** 11:21,23 12:3
115:8 117:23 118:1
**attached** 2:11 10:22 59:5
232:12,12,23
**attachment** 60:10,11
62:18
**attempt** 81:1
**attended** 191:25
**attorney** 3:3 55:18
241:20,23
**attorneys** 31:1 121:13
**Attorney(s)** 242:4
**attribute** 195:25
**August** 4:13 34:11 37:12
49:6 119:23 138:3,12
169:7,12,22 170:2,7
196:13,22 198:12,17
205:24
**authored** 214:13
**authorities** 118:12,20,23
**availability** 107:8
**available** 38:23 78:3,15
91:20 106:19,21 107:1
111:5 157:10 198:6
237:3,6
**Avenue** 48:6,6,7 122:23
123:2 210:14
**average** 205:20
**avoided** 165:13 166:7
227:2
**aware** 52:22 67:21 75:16
83:8 105:18,22 112:7
122:4 123:20 177:25
178:2 198:19 217:12,19
230:15
**axis** 47:13
**a.m** 2:5 33:25 34:1,12
35:5,15 37:12 49:5
54:14 104:15 208:13
209:19,23 224:18,19

---

**B**

**B** 3:3 4:12 25:16,17 26:2
65:11,12,12,17,24
142:18
**back** 8:15 9:8,19 13:15
15:22 21:17 27:24
31:21 33:11 38:8 39:3
56:18 73:16 76:21 78:1
100:15 110:21 113:15
114:22 118:18 119:1
123:8 125:20 132:21,23
135:18 157:18 162:5
185:22 190:6 197:14
208:11 217:4 218:9,13
218:17
**backups** 205:15
**ballast** 85:12,21 92:7
97:19 217:24 218:4,9
**ballasted** 89:14 90:5
93:12,25 96:24 99:5,10
**ballasting** 83:25 86:4
89:10 90:2 91:23 93:22
217:25
**bang** 116:22
**bank** 151:2,15 155:14
**bare** 108:10,15
**barge** 1:8 4:20 9:7 14:25
14:25 23:21 24:9 32:11
32:17 34:1 35:16 37:23
40:2 41:1 43:14 44:18
44:24,25 45:10,21
46:14,20 47:1,9,12,20
48:10 51:8,8,12,15
55:20 56:22 57:14 58:1
58:12 60:13,25 61:18
65:15 68:13,14,17,18
69:1,3 76:2 78:11,16
81:5,8,16,19 82:11,13
82:14,19,22,23,25 83:1
83:3,7 84:14,17,18,19
84:20,21,24 85:2,7,9,10
85:12,18,22,24 86:4,5,7
86:19,21 87:3,11 88:1,5
88:16,24 89:1,10,15
90:5,10,15,19 91:7 92:3
92:9,13,18 93:17,22
94:19 99:1,5,8,9,13,15

DONALD GREEN

99:25 103:1 104:11,20
106:12 110:25,25
111:15 112:6 113:8
116:19,20 117:15 118:2
118:2,6,9 120:18
121:19,21 122:18 123:7
123:14,18 124:8 125:2
127:3,4,6 132:8,9
134:10 135:6,8,11
143:9,17 144:8 145:20
146:2,15,17,21,22
148:1 149:4,14,18,24
150:16 151:21 159:9
164:11,11 165:8,8
166:14,15,17,20 169:19
169:24 170:10,15,19,20
170:22 171:5,6,11,14
171:19 172:3,5,25
173:11,15 174:15 175:6
176:8 177:3 183:3
190:18,23 191:16,17,18
191:20 192:11,14,20
193:18,24 194:24 195:3
195:10,20 196:4,5,11
196:12,21 198:3,17
199:7,13,18 202:16
203:1,11 206:1,22,23
207:7,8,12,14 208:8,12
208:25 209:1,3,23
210:13 211:13 212:6
215:16 216:18 218:25
221:19,22 222:10,12,19
224:14 226:23 228:24
229:1,4,18 230:15
232:23 233:4,8,18
234:6
**barges** 15:4 27:12 46:12
47:10 48:20 49:1,21
50:10,11,22 52:12,24
53:5 57:7,25 58:9,11
59:7 60:4,22 61:14
65:15,18 67:22,25 68:7
68:7,22 69:6 70:2,2
78:5 85:20 89:21 90:17
94:13,16 95:12 97:12
98:22 105:25 109:12,15

111:20 112:9 129:4,11
134:23,24,25 135:3,23
136:7 137:12,21 141:20
141:25 148:19 150:2
151:4 156:18,20 158:16
162:13,16 163:7 164:15
164:18,23 166:2,16
173:18,21,24 174:15,25
191:3 197:6,11 198:13
198:23 200:24 202:21
202:22 203:7,19 204:3
204:4,7,11,17 211:2,3
211:18,24 213:17,18
221:18 223:18 224:17
230:5 231:10 233:25
234:2
**barge-to-barge** 216:5,6
**Barry** 192:5
**base** 48:24 55:7 125:24
**based** 6:15,17 13:18
22:24 34:8 38:22 40:20
45:6 52:8 55:17 57:24
66:3 71:3 81:6,15
88:17,19 100:9 102:14
102:22 103:10 104:1
106:3 119:6 124:11
130:14 145:4 161:1
163:18,20 178:24
180:15 181:24 185:5
195:18
**basically** 5:15 15:24
20:21 32:8 73:9 133:13
171:22
**basin** 47:12 49:2 156:2,7
156:11,14,16 160:14,18
**basis** 35:1 54:5,12 73:22
91:13 105:11 113:11
126:5 127:20 128:2,7
136:9 140:13 161:14,16
161:19,23 162:2 178:14
178:22,23 179:24 181:6
181:16,23 183:2,12
202:5
**batten** 193:4
**battering** 77:21
**bayou** 138:16 151:21

**Beach** 138:16
**bear** 131:19
**bearing** 15:11 24:17
25:20
**began** 76:2 92:20 188:20
**beginning** 9:8
**begun** 76:6
**believe** 5:17 16:14 28:20
49:15 64:21 70:18
110:12 115:19,24
119:22 120:3,20 199:12
**Benoit** 1:14
**Berrigan** 192:1
**best** 34:11
**better** 101:16 106:20
107:9,12 108:7
**beyond** 7:5 108:25
137:24
**big** 59:23 115:11
**bight** 214:21
**bit** 5:10 28:19
**black-and-white** 236:14
**Blanco's** 83:18 89:13
**BLAND** 3:12
**blank** 35:10
**blow** 94:21,21,24 95:18
**blowing** 35:16 36:10,11
36:24 47:7 50:17
182:12 201:21
**blown** 95:17
**blowup** 115:11
**boat** 111:19 157:23
190:21 206:6
**boats** 112:5 198:9
**body** 14:1 20:13
**bollard** 56:10 59:17,19
59:23
**bollards** 59:7,10
**book** 4:22 214:23,24
**books** 214:8
**Bosch** 104:17
**bother** 170:17
**bottom** 94:25 160:23
**Boudreaux** 111:7,8
192:6 193:21,22 194:8
**bought** 139:20

**bound** 217:1 224:2
**Bourgeois** 111:8
**Boutte** 1:10
**bow** 47:22 144:24 149:23
150:8,12,25 154:17,19
154:25
**box** 30:2,7 31:2
**BRACKETT** 3:13
**braided** 177:23
**brain** 192:17
**brand** 62:13
**BREACHES:CIVIL** 1:4
**break** 34:4 35:24 41:1
44:13,14 52:21 56:13
56:23,25 63:12 70:10
72:17 104:22 105:8
117:5 144:8 162:5,18
162:20 163:16,24
166:21 171:16 208:9
**breakaway** 22:5,23
32:11,22 34:1,10 37:23
43:6 48:19,20 54:16,24
56:21 57:20,23 58:17
104:11 105:12 116:8
117:4 143:17 147:18
148:3,17 167:15,21
195:18 223:6 234:22
235:11
**breakaways** 198:17
202:17 203:1,3,11
205:9 230:4
**breaking** 23:21 32:14,23
33:22 39:17 41:20
45:23 53:11 63:6
106:13,20 108:16
116:13,15 159:20 161:6
161:8,20,21 171:12
179:18 204:17 212:1
213:14 222:10
**breaks** 44:11 51:13 63:5
**breast** 43:13 44:8 65:1,2
65:4 73:3 101:10,14
**bridge** 122:23 123:2
175:7 210:14,15
**bridges** 174:24 175:4,6
**bring** 93:8,18 131:19

DONALD GREEN                                                                6/25/2009

**bringing** 208:21
**broad** 8:14 18:10,21
   22:19 142:14
**broadcast** 80:6 85:14
   89:18 193:1
**broadcasts** 77:15 79:11
   79:23 80:1,9 82:2
   89:14,24,24 97:3
**broke** 34:24 35:16 38:14
   39:10 40:2,3,5 46:15
   48:10 51:23 52:9 58:3
   58:3 63:7 95:8 97:12
   98:8,22 99:10 104:25
   121:19 122:7 123:15
   124:8 203:7,19 204:5
   204:11 209:1 210:5
   222:12
**broken** 27:8,13 41:10,25
   42:20 102:16 183:4,14
   196:13,22 208:12 209:3
   209:24 210:2
**brought** 47:11 115:10
   147:5,12 218:19 229:19
**buildings** 36:13 201:4,17
   201:19
**bullet** 7:15 8:4 11:8
   12:11,22 22:11,12
**Bulletin** 94:10 136:3,15
**Bulletins** 94:7 221:5
**bunch** 97:14 203:7
**buoy** 138:17
**Buras** 37:10 38:15
**Busch** 83:5 192:3 194:1
   194:13 195:2
**Busch's** 192:8 194:6,22
   194:25
**business** 188:1,13
**buttress** 119:15 190:8
**buttressed** 95:5
**buy** 101:24
**Byers** 2:6 241:4 242:11

---

**C**

**C** 1:16 3:1 4:15 26:7
   28:15,17 58:25 61:20
   67:7 143:8 216:15
**cable** 108:1,17 116:6,10

116:13,20 117:3,4,13
   117:16,20 118:8,8
   161:21 183:14 196:2
   226:3,5,7,9 232:18,20
   236:24 237:8
**cables** 23:10,13 106:19
   106:21,21,23 107:2
   117:12 118:4 160:25
   161:3,13 164:3 216:8
   231:9 232:24
**cabling** 106:14 108:2,5
   222:11
**calculate** 95:25
**calculated** 180:6
**calculates** 178:25
**calculation** 93:20 102:21
**calculations** 10:6 17:5
   27:1 58:25 102:15
   104:1 178:24 180:21
**call** 17:3,11,13 40:12,20
   59:10,12 68:16 77:19
   82:6,12 86:14,21,23
   87:2 88:15,22 94:6
   166:12 167:9 181:9
   189:16 192:14,20 193:2
   194:2,19 195:9,14
   197:16 219:22 225:25
   232:25
**called** 5:2 17:8 28:13
   68:10 82:25 86:8,11
   88:4,23 91:2,7 95:3
   111:1 214:24 233:1,15
   236:12
**calling** 232:20
**calls** 74:18 78:9 229:22
**canal** 1:4 47:3,11 90:20
   95:7 97:22 113:9
   122:14,19,24 144:1,3
   156:21 160:13 171:17
   172:24 173:12,25
   174:21 198:14 199:18
   203:4,8,11 204:22
   205:7,7,16 210:13
   212:11 214:3 218:18
   235:6
**canals** 91:13

**capacity** 132:23 178:19
   228:6
**captain** 30:10,14 31:12
   95:9 127:9 129:23
   130:4,5,20 132:2,3,6
   133:4,9 136:5,19
   137:25 138:12 142:11
   144:22 157:20,23
   166:12,17 167:2,3,9,17
   210:8 219:7,17,19,23
   220:1,4,9,10 227:8,13
   228:3 229:23
**caption** 241:6
**card** 240:7
**care** 4:21 71:2 109:2,15
   110:2 213:4,13 215:16
   215:21 216:19 223:11
   226:24 227:1 228:24
   229:1,4
**cared** 199:13
**careening** 171:16
**career** 131:2
**careers** 130:15
**cargo** 170:6 176:8
   191:13
**cargo-carrying** 132:23
**carried** 125:5
**carrying** 176:9
**case** 5:16 14:8 15:8 22:4
   22:5 28:23 30:23 74:3
   117:15 157:16 159:7
   175:5 181:9 190:3
   199:1,23 200:14,15
   204:24 205:12 213:24
   237:1
**cases** 1:7 22:3 159:11
**cast** 130:3
**categorically** 137:23
   162:21
**Category** 212:17 213:10
   213:10
**cause** 2:4 54:24 58:17
   122:14 161:2 210:23
**caused** 54:16 56:22,25
   57:20,22 126:14 189:10
**causes** 29:9 157:15

**causing** 56:12 223:6
**cautioned** 241:10
**cavel** 43:15 56:10 59:18
   59:24 102:10 233:7,8
**cavels** 102:11 181:9
**cavil** 59:16
**cell** 74:18 176:21
**cement** 59:15 176:9,11
   218:13,17
**center** 101:11 119:24
   120:1 188:11 217:14
**Centre** 3:8
**certain** 7:3 59:18 67:22
   96:25
**certainly** 10:4 14:9 18:13
   23:19 53:1 76:5 77:5
   77:14,18 87:2 95:15
   98:18 100:1 103:9
   108:20 109:14 122:5,13
   125:25 126:1 127:18
   129:14 130:6 136:24
   142:3,15 149:24 151:9
   151:17 152:16,17,20,24
   157:21 162:18 171:13
   174:12 179:11 189:10
   226:20
**certainty** 36:17,23
**Certificate** 4:7
**certification** 5:18
**Certified** 241:4
**certify** 241:6,14,19 242:1
**cetera** 70:24,24 233:24
**CFR** 112:19 113:23
   114:12 116:3 120:15,20
   143:18,23 149:21 216:6
   219:21
**chafe** 161:2
**Chaffe** 2:8 3:7
**chafing** 165:7
**chain** 117:24 232:1,3,8
   232:11
**chains** 23:10,14 117:18
   230:18 231:9
**chance** 106:20
**chances** 23:21
**change** 19:17 26:3 29:10

DONALD GREEN                                                                              6/25/2009

34:16 101:13 185:24
238:2
**changed** 18:18 21:25
33:10,11 179:22,23
185:18,18
**changes** 20:12,17,21
21:14,15 126:4 238:1
**changing** 163:18,19
**channel** 160:16,18
**characteristics** 182:20
182:25
**charged** 242:3
**charges** 242:1
**chart** 115:5,14
**charts** 114:25 115:1
156:8
**check** 12:16 33:12
105:23 214:17
**checked** 90:11 215:4
**checklist** 73:18 105:15
105:18 106:5,9 160:24
168:4,22 221:24 222:2
**checks** 90:13
**chief** 128:17,18,19
129:20,22
**chose** 176:20
**Cincinnati** 132:3,4,5
**circumference** 177:23
**circumstances** 32:10
96:5 220:7
**cite** 114:11 151:19
**cites** 116:2 143:2 204:10
**citing** 120:5
**City** 138:14
**Civil** 2:10
**Claiborne** 48:7 122:23
123:2 210:14
**clarification** 224:22
**class** 5:18 158:9
**clear** 10:9 24:22 68:11
76:24 173:24 207:24
208:2
**cleared** 207:7
**clearly** 23:9 114:23
121:7 150:23 175:2
197:16,21

**cleat** 181:9 233:9
**climatic** 51:5
**clips** 117:13,17
**close** 122:22 151:5
169:20 175:4 224:24
**closed** 112:1 188:23
197:24
**closer** 203:20
**closest** 156:13
**closing** 111:16 138:13
193:16,17 224:13
**closure** 136:20
**cluster** 166:15
**Coast** 7:9 13:14,17,19
14:7 15:16 30:11 70:15
77:16 80:5 83:23,24
93:24 95:6,9,14 107:25
108:9,10 127:22 131:22
132:12 156:8 158:13
165:23,25 166:19
173:23 185:1,6 186:14
186:16 187:8 188:14
198:11,11 201:11 204:8
204:10 211:24 212:10
214:2 215:25 220:2,5
221:4 223:17 224:2,8
231:2,4
**coastal** 138:18 157:2
184:20
**coincide** 215:10
**collided** 52:24
**Colquitt** 242:14
**combination** 40:10 53:2
53:3 55:1 57:21 58:19
106:18
**combined** 125:15
**come** 31:21 46:24 47:5
53:5 58:11,12 62:9
63:20 73:15 74:5 82:21
86:8,21 87:10 88:4,15
88:23 91:7 99:23
110:21 125:10 162:5
173:8 177:5 192:10
218:20
**comes** 55:20 97:11
132:23 189:13 205:5

**comfortable** 95:10
**coming** 36:16 45:5 46:2
58:10 77:3 82:22 83:9
83:13,15,21 85:7 88:20
88:23 100:2 170:14,17
177:3 235:7,20
**comment** 18:13 129:21
134:7 221:14
**commented** 231:6
**commenting** 226:10
**comments** 22:10 34:18
142:6 187:6
**commercial** 128:24
**Commission** 240:21
242:12
**common** 85:5,14,16 94:9
118:1 138:25 165:10
168:6 226:12,16
**commonly** 232:25
233:15
**common-sense** 85:10
**communicated** 217:16
222:5
**communication** 220:16
220:21
**communications** 74:19
74:22,22 81:24
**community** 221:6
**companies** 168:7
**company** 164:21 187:24
188:17 190:21
**compare** 21:11,20 22:9
96:10 114:5
**compared** 20:17 96:7,9
183:7
**comparing** 180:19
**comparison** 8:3 114:24
**compartments** 92:13
**competence** 128:3,7
157:15
**competent** 128:1 131:9
131:15
**complete** 33:12 177:1
**completed** 190:1 242:2
**completely** 84:24 175:9
218:8

**completeness** 236:11
**compliance** 32:1 141:23
**complied** 170:5
**comply** 67:10,16 141:5
142:4 226:25
**comprehensive** 126:25
**computer** 20:7,15 60:3
62:9
**computer-rendered** 59:3
**concede** 142:11
**conceding** 52:3
**concept** 191:5
**concerned** 83:5 96:23
116:16,18
**concerning** 78:17 131:23
202:8
**conclude** 100:10 181:24
181:25 192:13
**concluded** 32:24 100:6
237:12
**concluding** 195:7
**conclusion** 15:23 26:19
26:19 36:7 42:23 61:11
62:25 64:25
**conclusions** 28:23 44:24
51:12 61:7 62:12
**condition** 68:8 72:23
92:1 95:11 99:11
116:25 134:19 135:17
136:4,11 137:10,13
138:2 140:25 142:25
166:14,18 167:18 169:8
170:5 179:20
**conditioned** 225:12
**conditions** 23:18 25:22
27:7 47:16 69:17,19
70:23 90:22 100:14
103:2,2,5,13,16,18
117:5 137:7 142:22
144:9 217:13
**conduct** 17:25 41:15
145:8
**conducted** 41:18
**cone** 77:5
**conference** 40:20
**configuration** 60:3 63:25

DONALD GREEN                                                                6/25/2009

64:18,20 70:2 71:3,7
73:4 78:12 101:11
145:12 159:9,17 179:14
180:8
**configurations** 64:2
227:2
**configured** 42:11 43:5
43:10,19,24 64:16
**confined** 210:13
**confirm** 13:2,6 25:21
161:9
**conflict** 215:11
**confusing** 24:11
**connection** 204:14
**connections** 139:2 140:5
**consider** 14:21 79:17
113:3 119:12 126:13,21
143:2 173:17 174:11
218:17
**consideration** 8:17 9:4
38:12 42:10 62:7 84:1
119:6 137:22 138:23
139:14 141:2 171:14
240:11
**considered** 8:20,25 10:4
44:2 62:21 70:12 95:14
95:15 126:22 151:23
152:24,25 218:16
**considering** 62:24
**consistent** 27:17 127:2
**consolidated** 1:5,7
**constituted** 195:11
**constitutes** 100:16
**construction** 74:20
220:15
**consultant** 187:23
**consultation** 228:2
**Consulting** 187:25
**contact** 17:11 53:5 177:4
227:8
**contained** 10:14 14:3
115:23 119:22
**content** 14:20
**contents** 14:17 15:11
30:8,16,19
**contested** 86:23

**Contingency** 141:18
**continual** 89:24
**continue** 149:18 225:19
**continued** 97:5
**continuing** 224:17
227:17
**contractor** 91:2 218:20
**contractors** 91:19
**contractually** 191:14
**contradicting** 123:13
124:5,10
**contradicts** 206:12
**contrary** 181:20
**contravention** 214:1
**contributed** 39:17 54:16
**control** 219:24
**conversation** 6:24 16:17
42:2,4
**conversations** 16:16,19
26:17 27:1
**convoluted** 29:17
**copied** 12:2
**copies** 187:5
**copolymer** 177:24
**copy** 10:25 11:1,17 13:4
17:20 21:4 222:6
**core** 75:6,19
**corner** 9:7
**Corps** 220:11
**correct** 5:19,20,23 8:5,6
8:8,22 10:24 11:9,16
13:21,24 14:2 15:18
16:8,13 18:8 20:15,16
25:2 27:14 28:23 33:3
34:1,3,5 35:2 39:12
40:7,17 44:1 49:18,22
50:3 51:10 53:17 55:14
56:11,16,16,20,24 57:9
60:23 61:17 62:1,3
63:16,17 67:4 68:2
70:5 73:14 77:9 87:6
98:20,25 102:16,24
103:17 104:3 105:12,13
105:19,25 110:18
112:10 113:22 115:22
122:23,25 123:11 127:8

141:6 143:3 145:18,22
147:19,24 148:3,10,25
155:5 163:24 164:4
168:24 170:7 171:20
180:9,21 184:22,24
186:10 188:12,15
189:13,17 190:16,17,24
191:18,23 193:19
194:10,24 195:4 197:3
199:14 200:12,19
202:24,25 203:2,21
206:18,19 208:9,13
209:1,2,5,6,9 211:6,10
211:14,18,21,22 212:7
213:4,5,10,11 214:6,10
214:14 215:12,19,20,22
216:1,2 218:2,10,11,14
218:23 219:2,3,12,15
220:21,22 221:1,9,10
221:12 222:2,3,6,23
223:7,13,19 224:3,9,10
224:15,18 225:10,23,25
226:18 227:2,5,10,11
228:3,4,6 229:11,14,20
229:21,23 230:25 231:3
233:20 237:9,10 239:10
241:16
**corrected** 34:14
**correctly** 25:23 26:2 35:7
107:24 135:1,12 180:6
200:22
**corroborate** 194:5
**corroborated** 26:19
**counsel** 241:20,23
**counter** 122:15
**counterweight** 117:22
**County** 240:2,20 241:2
**couple** 189:5 228:17
230:10
**course** 158:22 233:18
**court** 1:1 96:12 115:11
125:16 174:11 193:13
194:4 200:13
**cover** 4:16,18,20
**crafts** 153:2
**crane** 94:22

**crashing** 9:9
**CRCB** 242:14
**creates** 165:7
**creating** 142:22 222:19
**credentials** 127:11 129:6
129:8 130:23 157:18,20
**credible** 54:6
**criteria** 55:7,9 66:2
186:7
**critical** 127:13 171:6
188:22
**criticism** 72:23 73:2 79:7
127:17
**criticize** 128:2,7
**CRR** 2:6
**crux** 33:10
**CSR** 2:6
**CSR/RPR/RMR/CRR**
242:11
**cubic** 132:22
**current** 122:6,9,16,17
123:9 125:4,5 126:13
126:17 136:16
**currently** 183:19
**currents** 122:3,4,15
151:2,15,17 152:3,18
152:23 153:13 155:15
236:6
**curriculum** 158:23
**custody** 109:15
**custom** 71:18 154:10
**customarily** 214:25
**customary** 100:1 221:23
**customer** 112:13
**customers** 95:3
**cut** 176:14 218:21
**cutter** 186:16
**cutters** 186:14
**CV** 186:20
**cylindrical** 59:7
**C+7** 60:19
**C.S.R** 242:11

---

**D**

**D** 4:16 65:5 216:17
**damage** 57:7 77:23
170:22 171:19 189:10

DONALD GREEN

6/25/2009

Page 7

**damaged** 171:8 175:7
**dampen** 172:4
**danger** 75:16 142:22
   165:1,3 166:25 171:18
   212:23 213:4
**dangerous** 176:8
**data** 12:12,19 24:1,15
   35:15 38:9 46:1 53:19
   53:20 54:18
**date** 6:19 62:25 138:5
   185:16
**dated** 5:21
**day** 2:4 76:23 77:1 96:5
   198:1,14 206:7 210:2
   240:5,14 242:7
**days** 132:24 177:19
   185:23 189:5 228:17
**deadline** 169:12
**deal** 39:4 216:23 221:20
**debunk** 190:7
**December** 20:9
**decide** 127:25 150:15
**decided** 31:14 185:24
   189:18
**decision** 81:15
**decisions** 128:21
**deck** 131:4
**deckhand** 130:24 164:21
**declaration** 6:18,22 7:5
   13:23 20:8 114:6,9,10
**declared** 75:21 76:7
**declaring** 77:17
**decrease** 218:1
**deemed** 14:4
**deep** 136:17,24 137:1,5
   137:12
**default** 109:11
**Defendant** 2:2 3:6 5:2
   242:4
**define** 214:17 216:3
**defined** 216:5
**definition** 30:9 139:10
   140:15 156:25 215:5
   216:11
**definitions** 139:12
   215:11

**deflection** 210:21 235:18
   235:24
**delay** 206:14
**delayed** 191:22
**delays** 191:20
**delete** 29:10 113:4
**deleted** 112:18,22
**delivered** 148:8 149:15
   194:22 206:6,23,24
   207:8
**delivering** 191:21
**demonstrated** 171:25
**demurrage** 191:6,9,10
   191:18 192:15,21
**Denise** 2:6 241:4 242:11
**depart** 206:21
**department** 128:12,13
   128:15,17,20 131:4
**depend** 43:2 159:21
**depended** 10:6 129:20
**dependent** 74:23
**depending** 36:20 102:17
**depends** 18:3 44:16
   46:17 93:7 95:21
   100:23
**depict** 216:8
**depicted** 200:22
**depiction** 202:4
**deploy** 117:12
**deployed** 39:8 43:21,22
   44:3,4,6 65:1 139:15
**deployment** 42:15 65:16
   116:25 139:13 145:4
   212:9 222:15
**depo** 208:15
**deposition** 1:19 2:1 4:1
   5:12,17 6:5 8:10,11,16
   8:24 9:5,20 16:5 17:16
   17:20 18:16,17,19 19:1
   20:2 24:24 29:20 30:23
   31:17,22 34:8,14,20
   39:19 40:1 42:13,15
   66:23 74:16 106:16
   125:13 126:10,20
   132:15,17 190:5,9
   197:12 203:6 207:24

208:7 230:13 234:5,18
   235:25 237:12 239:8
   241:7,15,18,22 242:2
**depositions** 9:6 10:1,14
   109:10 125:16 236:1
**depth** 121:21
**deputy** 132:2,5
**Derek** 3:7 34:14 35:19
**derive** 23:23
**derived** 26:25
**describe** 203:19
**described** 15:10 145:6
**description** 4:9 9:6 163:8
   240:7
**design** 161:2
**designate** 231:20
**designed** 56:7 59:13
   92:17 149:5
**detail** 20:21 28:19
   216:11 235:2
**detailed** 168:5
**determination** 42:1
   111:15
**determine** 41:19 115:13
   145:9
**determined** 111:4
**determining** 42:22
   132:25
**device** 94:23
**dewater** 90:15,17
**diagram** 26:12 59:4,6
**diameter** 59:20,21
**diatribe** 85:4
**DICTIONARY** 4:18
   214:24 216:17
**differ** 160:21
**difference** 19:5,6 20:25
   59:16 65:14 132:20
   160:22 173:19
**differences** 21:12 22:10
**different** 21:19 25:24
   27:6,12 34:18 36:11
   50:17 51:16 56:3 61:6
   61:22,25 64:2 68:2
   122:8 126:7,8,15,23
   130:20 131:18 133:1

139:11 161:7 165:21
   202:2 211:9
**differentiate** 20:1 62:20
   150:2
**differentiated** 20:23
**differentiates** 134:24
**differently** 51:9 63:4
   77:12 79:23
**differs** 30:10
**difficult** 39:19
**digesting** 121:8
**dimensions** 156:3
**direct** 21:19 70:17 77:8
   214:1
**directed** 6:25
**direction** 35:4,10 36:11
   45:4 46:9,11,23 47:25
   123:15,17 125:1 199:17
   202:2,8 210:6,9 234:6
   234:22 235:5 236:5
**directions** 126:15
**directly** 50:11 156:20
**disagree** 29:14 30:14
   78:12 79:16 80:10,13
   80:19 81:9 82:9 92:9 127:15
   127:16 128:5,6,8
   133:17 134:15 139:18
   139:19 140:9,10,12,14
   140:23 142:21 145:23
   146:8,9,10 148:5,6,7
   160:7,10 161:13,19,23
   162:2,12,22 164:13
   166:13 168:10,11,15
   169:1 170:10 172:8,9
   172:12,16,23 174:17
   175:24 176:17,17
   178:14,18,21,22,23
   181:6,16 183:2,12
   186:4 189:23 206:11
**disagreed** 31:12
**disagreeing** 30:6 146:13
   146:14
**disagreement** 80:15
   100:16
**disagrees** 143:3 146:7
**discharge** 92:19 97:6

DONALD GREEN

6/25/2009

Page 8

191:13
**discharged** 90:19 91:25
96:20 169:4
**discharging** 76:6 92:20
169:2,24 170:1
**disciplines** 131:19
**discovery** 6:3 90:8
**discuss** 28:5 58:14 143:4
177:18
**discussed** 7:9 57:1
**discusses** 136:17
**discussion** 199:16 204:2
223:25
**discussions** 121:13
**dispatch** 220:2,5
**dispatched** 111:19
**displacement** 133:1
**dispute** 201:20 202:24
**disregard** 157:7
**disseminated** 77:16 97:4
**distinction** 160:19
**district** 1:1,2 129:1
**dock** 36:12 45:18 46:12
47:14,16,23,24 50:9
59:5,8,21 68:8,9,14,15
68:17,25 69:3 70:24
78:7,17 83:6 105:24
117:16,19 118:6,9
146:3,16 147:15 148:8
148:12,22 149:4 151:21
151:22 161:1,2 171:3,6
171:7,11,19 191:16,17
191:22,22
**docks** 156:13 191:8
**document** 30:12 46:6
133:19 134:2 136:13
138:10 142:18 160:9
199:22 200:2,4,5,8
215:18,24 221:25 240:8
**documentation** 112:8
142:16
**documented** 133:5,7
**documenting** 186:11
**documents** 46:1
**Dodge** 176:22 189:19
**doing** 109:16 130:25

172:4
**domino** 45:9 174:20
225:25
**Don** 4:24 28:22 186:21
**Donald** 1:19 2:1 4:1,11
5:1 239:8,14 240:5
241:8
**dotted** 125:18
**double** 12:16 65:20,23
66:7,7,10 67:17 71:9,12
71:18,22 72:5,7,9 80:8
80:12 100:1,2 101:9
117:20 139:1,9,17,21
139:23 140:5,7,15
145:1,2,6,9,15,16 154:9
154:10 179:11 215:5,7
215:10 221:23
**doubled** 27:5,11 65:13
65:19,20 66:1,4,6,25
72:15 80:10,18 101:2
101:15,24 102:2 107:18
108:3,6 138:23 141:1
144:17,23 155:7 163:3
163:11,21 164:2 179:15
179:25 180:9,12,12,13
180:17 181:1 214:18,20
216:8
**doubled-up** 116:25
163:9
**doubles** 108:22,23
**double-check** 110:17
**double-line** 172:17
**double-up** 216:3,4,12
**doubling** 66:13 67:2
71:21,24 72:1,1 80:16
83:24 89:7,9 100:17
102:2 107:25 108:10,16
108:16,21 116:17
138:24 139:2,3,12,14
155:9,18 181:7 214:4
**downchannel** 48:3
**downriver** 156:21
**downtime** 191:6,9
192:15
**Dr** 3:3
**draft** 38:12 99:11 121:22

129:20 136:17,25 137:1
137:5,12 164:16,19
166:2
**drafted** 121:17
**draw** 117:25 148:14
**drawing** 125:7
**drawn** 151:2,15 155:14
**drew** 123:16 124:7
**drift** 57:25 76:25 116:22
123:17
**drifted** 39:16 122:18
123:1,8,15 124:8
195:20
**dropped** 113:16 114:14
**drove** 125:6
**due** 7:3 74:19 138:23
141:1 229:10
**duly** 2:3 5:3 241:10
**dumb** 113:8 127:8
137:12 146:2 149:4
176:7
**duplicate** 65:21 66:7
215:7
**duplicating** 72:2
**dust** 176:11
**duties** 214:9 215:1
**duty** 142:24 167:8
**DUVAL** 1:13
**D-F** 216:20

---

**E**

**E** 3:1,1 4:18 65:5 216:18
**earlier** 11:10 27:3 28:20
32:14 120:24 175:22
205:24 230:13
**early** 5:10 46:15 173:8
**ease** 21:18
**Easier** 182:17
**easily** 75:2
**EASTERN** 1:2
**Ed** 192:3
**eddies** 122:15 126:17
**edge** 161:2
**effect** 45:9 47:8,19 48:20
51:8,11 55:20 56:21
102:23 106:6 165:24
198:12 210:23 222:19

225:25 230:2
**effects** 50:24 138:24
141:2
**efficient** 181:7
**either** 9:15 10:1 19:16
20:8 21:6 58:2 62:21
66:13 67:3 75:12,19
93:1 98:1 108:6,17
113:25 137:7 178:18
190:7 223:5
**elasticity** 108:23 161:4
183:1
**elected** 89:22
**elements** 50:11,25 51:5
156:20
**emergency** 75:21 76:8
77:17 80:5 83:18 89:13
89:18,23 91:5
**employ** 145:1
**employed** 187:23 190:15
241:20,24
**employee** 241:23
**employees** 222:1,5
**emptied** 81:7,19 82:25
**empties** 165:18,18 205:4
**empty** 51:8 68:13,18
83:6 84:18 85:7 96:22
96:23 166:15,17,20
170:19,20 174:14
192:14,20 195:10
198:13 222:18 223:18
228:24
**Enclosure** 141:8,17
157:2
**encompass** 94:16
**encompassing** 135:13
**ended** 6:19 98:2 122:19
122:22 123:7,10
**endorsement** 158:5
**endorsements** 184:3,4,8
**ends** 139:16 211:25
**Energy** 3:8
**engaged** 112:6
**engineer** 131:3
**Engineers** 220:11
**ensure** 87:8 151:1,14

DONALD GREEN

6/25/2009

Page 9

155:14
**ensuring** 144:8
**entail** 191:12
**entering** 136:18
**entire** 18:16 135:2,13
223:1
**entirely** 105:11 135:16
**entirety** 135:3
**entities** 70:16
**entitled** 40:13 78:20
169:13 214:12
**entrance** 206:10
**entry** 206:19
**enunciate** 21:3
**environmental** 70:23
128:12,25
**equal** 164:15 166:2
226:2
**equipment** 23:20 78:16
197:10 231:6 233:23
**equivocate** 39:18
**errata** 17:25
**especially** 100:21
**essence** 82:24 174:17
217:21
**essentially** 188:6
**establish** 138:12
**established** 190:25
215:17
**estimate** 34:12 48:9
**estimated** 37:25 40:20,20
40:22 41:6,7 43:8
48:19 52:1
**et** 70:24,24 233:24
**evacuate** 189:1,4 228:16
**evacuated** 188:23 228:12
**evacuation** 175:8
**event** 233:25
**events** 195:19
**eventual** 67:25
**eventually** 122:19 123:7
**everyday** 221:17
**evidence** 14:8,18 50:5
53:8 57:6 75:25 177:21
186:11 194:5 235:12,15
235:16,17,23 236:2,5

**exact** 37:23 92:19 104:11
104:13,25 156:3
**exactly** 8:9 34:24 51:23
53:18 56:7 77:11 78:23
82:24 87:10 210:6
224:14 234:20
**Exam** 188:11
**examination** 4:3,4,4,5,5
5:5 185:6 187:18
207:21 208:15 230:11
236:18
**examined** 5:4
**example** 61:4 72:15
**Exb** 20:4 25:17 28:15
231:17 236:16
**Exbs** 216:20
**excess** 139:5 209:8
**exchanging** 34:18
**exclude** 135:3 137:23
**excluded** 22:13
**exclusions** 132:9,21
**excuse** 32:6 39:23 104:17
124:20 146:12 147:1
200:23 220:14,19
**executed** 240:10
**executive** 14:23
**exhibit** 19:24,25 20:1,6
25:16 26:2,7 28:21
29:5 32:4 58:25 60:16
67:7 209:12 216:14,17
231:19 234:4,7 236:15
**EXHIBITS** 4:8
**exigent** 89:19
**exist** 33:15 69:18
**existed** 22:22 26:14
**existing** 27:5 70:22 78:6
89:19 180:2,13 216:6
**exists** 187:8
**expect** 71:4 90:7 128:19
129:18 192:10 193:7
195:1
**expectation** 71:5,10
194:23
**expected** 67:11,13 69:18
77:8 87:4 88:11 91:16
136:22 152:22 212:17

**expecting** 23:18
**expedite** 187:16
**experience** 45:6 118:2
130:6,8,20,21 131:19
157:25 185:5 186:1
210:7,7,8 226:7,9
**expert** 7:19,24 10:5 16:2
16:10 21:23 31:9 39:1
92:8 93:4,20 159:18
177:9,11 183:9,13
188:3 195:6 212:13
226:5 227:18
**expertise** 98:19 127:14
**experts** 29:8 30:5 121:14
227:21
**expert's** 15:21 66:3
**expires** 240:21 242:11,12
**explain** 42:25 57:19
58:25 151:12 197:20
216:11
**explained** 65:13 172:18
**explaining** 60:2 105:5,6
**exposed** 41:4 50:10,21
50:25 51:4 52:12,18
156:19 211:2,5
**expound** 140:15
**expressed** 52:23 240:11
**extended** 120:1
**extent** 50:21 52:14 56:22
174:7
**extra** 139:17 140:7 175:3
214:20
**extraordinary** 212:23,24
213:3,4,13 220:7 237:2
**eye** 104:18 117:16
**eyes** 117:14
**e-mail** 17:10 74:21 82:1

**F**

**F** 4:20 60:19 61:25 65:2
65:4 67:19 133:20
134:8 216:19
**face** 85:18 91:5 169:19
176:6 237:1
**facilitated** 170:14
**facilities** 137:11 143:6
204:17 220:21 224:4

**facility** 32:20 36:22,24
48:1,3 49:12 54:25
75:5 77:22 78:4 85:6,6
87:17 90:16 92:6
105:24,25 126:12
141:25 147:10,14
148:15 149:16 156:10
156:19 159:5 160:11
166:18 176:20 190:19
190:23 191:1 193:4
197:18,18 219:5 220:2
220:15,20,23 224:2
227:7,13
**fact** 36:16 42:12 71:14
73:17 79:14 80:4 92:5
95:5,15 106:5 111:19
116:18 119:4,5,10,13
120:3 124:22,23 133:13
133:16,22 145:9 146:14
163:5 169:11 171:6
181:13 183:13 187:11
203:6 213:8 222:18,21
**factors** 202:9 223:5
**facts** 134:4 193:14
198:25 241:6
**factual** 26:4 179:24
**fail** 43:3 44:22 45:7,7,8
74:15
**failed** 26:15,20 37:4,20
38:1,24,25,25 39:9
40:22 41:3,13 43:9
45:2,3,5 49:16,17 84:8
**failing** 40:25
**fails** 191:13
**failure** 73:9 74:14 79:7
86:2 120:24 195:9
217:5 222:10
**fair** 15:7 61:10 192:13
212:22 217:7,11 221:15
225:8
**fairly** 20:14 165:10
**false** 119:14
**familiar** 128:13 139:23
177:6 191:5,11 199:19
**Family** 1:15
**far** 8:2 93:8 120:9 224:13

DONALD GREEN                                                                    6/25/2009

Page 10

**farther** 208:22
**fashion** 67:20,22 191:17
**fast** 92:16 117:18 211:24
**fax** 74:22 82:1 242:16
**Federal** 2:9
**feel** 18:12 95:10 101:15
  215:13
**feet** 50:17 121:20,22,24
  132:22 160:15,15
  201:14,15 212:18,19
**felt** 6:17 8:12 9:22 75:8
**Ferry** 157:23
**fifth** 61:4
**Figure** 59:19 181:4,7
  216:12
**file** 30:3,8,17,19,25 31:2
**fill** 92:10,11
**filled** 90:20
**final** 6:3,6,20 7:2 19:4
  119:12 207:25 208:3
**finally** 208:14
**financially** 241:24
**find** 13:8 31:12 32:6
  53:20 87:9 110:19
  119:14 133:6 186:20
  194:5 223:22
**Findings** 133:12
**fine** 36:5 88:9 158:23
**finish** 130:3
**finished** 82:11 125:3
**firm** 10:21 28:11 242:14
**first** 5:3 11:11 30:23 32:4
  44:17 45:5,8 60:7,12,15
  61:15 67:7 89:16 95:16
  96:24 120:7 158:9
  167:20 183:9 217:24
  241:10
**fit** 156:25
**fits** 53:24
**five** 7:15 8:3 11:4 21:1
  49:21 50:10,22 53:5
  57:25 89:20 101:22,25
  102:5,6,8,11,11,20
  112:3 166:15 173:9,15
  174:3 204:7 211:2,17
  213:17 229:8

**five-barge** 195:19 196:2
  197:2
**five-part** 101:23
**fleet** 110:24 111:1,1,2,3,5
  111:9 149:16 193:17
  199:20 200:7,18,22,25
  201:9,13 202:3,4
  229:25 230:1
**fleeting** 3:11 4:20 143:9
  190:19,23 191:1 197:18
  215:16 216:19 226:23
**fleets** 112:8 144:8 221:19
  223:18
**flexibility** 161:4
**flexible** 182:14
**flight** 13:3 168:12
**flip** 170:17,18
**float** 95:13 218:1
**floating** 210:24
**flood** 98:9 104:21 176:13
  176:14
**Florida** 48:6,6 76:16
  210:14
**Flory** 4:15 12:23 16:16
  16:18 26:7,11,12,17,25
  27:15,22 28:2,4 32:25
  41:18 42:19 52:8 57:1
  58:14 59:3 65:13 66:24
  70:10 72:13 177:13,18
  181:21,22,24 182:8,9
**Flory's** 39:1 51:12 58:25
  61:19 64:19 102:15
  104:1
**flow** 204:19,22 205:2,3
**flowing** 204:19
**focus** 174:14
**folks** 188:23
**follow** 86:15 88:8,13
  167:19 177:2
**followed** 87:8 167:16
  196:20
**follows** 5:4
**folly** 70:25
**foot** 121:22,23,23
**force** 55:1 69:23,24 70:5
  70:18 136:21 173:7

  181:19 182:2
**forces** 27:20 67:11,13
  107:4 196:9
**fore** 154:8
**foregoing** 239:8 240:9
  241:7,15 242:2
**forever** 127:24
**Forget** 85:16
**forgiving** 182:22
**form** 6:9 7:4 8:13 10:15
  18:9,20 19:14 20:24
  22:18 24:25 29:11 34:2
  35:18 40:8,15 41:5
  48:22 50:13 51:2,18
  52:13 56:14 68:3,24
  71:25 72:6 73:6 76:20
  77:4 78:14 82:16 83:22
  98:24 105:21 106:1,7
  106:15 107:6,16 108:19
  109:9 110:7 111:12
  113:13 116:9 117:7,14
  119:17 123:3,19 140:11
  142:13 143:21 146:24
  148:4 165:12 167:10
  180:10 183:16 187:5
  192:16 212:20,25 213:1
  215:2 223:14,21 227:3
  227:15 230:7 241:13
**formed** 117:16
**forth** 15:2 30:20 123:8
  134:5 217:13 219:10
  226:25 241:15
**forward** 87:1
**found** 28:18 42:14 77:25
  167:13 198:6 230:14
  233:24
**four** 9:17 11:4 21:1 61:3
  66:9 74:2 93:6 100:22
  100:25 101:4,20 102:8
  112:3 145:2 173:9
  188:19 204:7
**fourth** 121:9
**frame** 34:23 48:9,18
  105:10 208:13
**freeboard** 52:15,16
  92:14 93:13,14 97:9,9

  164:11 211:10 218:7
**frequent** 151:1 155:13
**Fresh** 138:16
**Friday** 75:22,22,22
  76:11,12 77:2,9 80:1
  81:2 91:14,17 96:6
  170:1,2 205:25
**front** 35:8 133:8
**full** 93:18 120:7 222:19
  241:16
**fully** 97:20 98:23 99:10
**further** 4:5,5 8:6 67:16
  197:24 230:11 236:18
  241:14,19,22 242:1
**F-L-O-R-Y** 12:23

---

## G

**G** 4:23 61:23 134:1
  231:17,19
**gain** 206:10
**gained** 132:14
**gale** 70:5,17 85:8
**gales** 152:21 153:1,13
**gallons** 92:19
**Galveston** 189:10 228:19
**Ganz** 2:6 241:4 242:11
**gathering** 81:11 84:5,7
**general** 35:9 138:25
  143:16
**generally** 18:2
**generically** 94:15
**germane** 10:5
**getting** 185:25 193:16
**girl** 31:1 33:5
**gist** 19:8 114:4
**give** 38:22 39:21 55:6
  77:19 114:3 116:21
  127:21 128:3,8 130:10
  130:17 140:14,19
  152:14 179:10 182:23
**given** 6:8,13,14 17:24
  28:12 37:24 43:7 83:19
  138:23 141:2 158:15
  166:14 171:11 240:14
  242:6
**gives** 55:18,23 100:6
  128:4

DONALD GREEN                                                                    6/25/2009

**giving** 127:21 214:22
**glean** 8:11
**globo** 231:20
**glove** 168:20
**GNOBFA** 143:8
**go** 7:11 8:15 9:19 19:9
  20:20 21:5,17 22:11
  27:24 28:18 33:5,11
  38:7 39:3 49:13 54:9
  56:18 58:24 60:8 65:5
  65:16 76:21 87:1 98:12
  108:24 110:22 113:15
  118:8,18,25 124:24,25
  126:14 133:12 134:1
  135:18,18 136:1 140:6
  155:17 157:18 160:4
  161:25 162:5 163:25
  171:15,16 174:9 185:22
  187:17 190:6 198:3
  206:17 208:22 224:17
**goes** 35:10 100:15
  132:21 134:25 168:19
  205:4,6,7
**going** 15:8 17:19 22:3
  29:13 33:1 35:22 36:3
  36:13 40:12 44:13,13
  50:8 52:3 54:2 63:12
  65:15 67:18 71:17,19
  75:25 81:16 86:15
  87:10 92:2 95:24 98:14
  98:15 99:25 106:16
  110:22 112:4,4 122:14
  122:16 123:23 126:11
  127:25 130:12 145:5
  150:14 153:7 156:13
  171:14 177:3 187:17
  190:5 194:3 197:14
  198:9 214:12,16,23
  215:15 216:16 221:22
**good** 5:7,8 109:2,7,8,12
  143:15 215:22 219:6,15
  224:11
**gotten** 75:2 77:15 87:9
  190:2
**Governor** 75:21 76:7
  77:17 80:4 83:18 89:13

**Grabert** 229:18
**graduate** 127:23
**grammar** 33:5
**graph** 48:16 49:13 55:11
**graphics** 200:6
**great** 19:10 235:2
**greater** 20:20 45:13
  65:17 71:6,10 143:9
  182:20 211:13
**greatest** 182:11
**Green** 1:19 2:1 4:1,8,11
  4:24 5:1,7 20:4 25:17
  28:15,22 39:18 54:1
  187:20 191:2 207:23
  216:20,24 231:17
  236:16,20 239:8,14
  240:5 241:8
**gross** 132:7,20,22 134:13
  134:14 135:15,22 136:7
  136:24 137:16,19
  184:20
**ground** 232:1
**Guard** 7:9 13:14,17,19
  14:7 15:16 30:11 70:15
  77:16 80:6 83:24,24
  93:24 95:6,9,14 107:25
  108:9,10 127:22 131:22
  132:12 158:13 165:23
  165:25 166:19 173:23
  185:2,6 186:14,16
  187:8 188:14 198:11,12
  201:11 204:8,10 215:25
  220:2,5 221:4 223:17
  224:2,8 231:2,4
**guess** 19:6 218:15
**guidance** 157:4,6
**GUIDE** 4:22
**guided** 224:7
**Gulf** 76:15 122:11
  138:15 228:18
**Gustav** 204:12,13 228:12
**guy** 125:9,10 157:22
  159:24 177:8
**guys** 34:18 222:7
**G+4** 60:19

**— H —**

**H** 4:24 65:13 111:22,23
  133:13,17 134:1 207:11
  236:15,16
**half** 121:22 225:12
**hand** 168:20 187:16
  240:14 242:6
**handed** 11:3
**handle** 182:17
**hands-on** 220:8
**hand-prepared** 200:9
**happen** 71:4 86:16 97:10
  220:9 224:15 226:16
**happened** 34:22 39:5
  146:25 189:11 229:12
**happens** 189:12
**harbor** 113:9 144:1
  151:22 160:12 174:18
  174:18,19 176:13
  212:11
**harbors** 174:21
**hard** 18:4,5 222:6
**hardware** 23:10,14,16
  24:2,5,16,20,25 25:7
  230:14 231:9,23
**HARRIS** 241:2
**hastened** 58:3,7
**haven** 174:25 175:18
**havoc** 92:2
**head** 59:24 129:8 143:20
  151:20
**headed** 76:18
**heading** 76:15 228:18
**hear** 212:14
**heard** 9:9 24:24 89:12
  97:14 100:5 191:8
  192:8 193:21 194:8
  213:24
**heartburn** 67:18
**heed** 81:18
**height** 48:16 65:14
**heights** 55:23
**held** 22:14
**help** 54:8
**helped** 26:11
**hereinbefore** 241:8
**hereto** 2:11 241:7,24

**high** 144:9 161:11
  164:23 165:1,8 177:23
  201:15 216:7
**higher** 218:1
**highs** 226:21,22,22
**high-low** 226:11 227:1
**hindsight** 169:3
**hired** 28:11 171:2
**history** 4:12 32:9 151:18
  189:22
**hit** 77:8 105:7 123:6,10
  125:9 173:3 175:6
  176:19 189:21 213:9
**hits** 92:1 123:10
**hitting** 9:7 229:14
**hold** 13:5 53:1 149:13
  183:19
**holding** 200:4
**hole** 92:17 94:24 95:18
  95:23 218:21
**holes** 94:21 95:11,21
  176:14
**hope** 68:5 120:12
**hopper** 92:10 121:23
**Horns** 59:25
**hour** 25:23 26:16,21
  27:21,23 32:23 33:23
  36:16,25 37:5,19 38:2
  39:3,9,11 40:6,24 41:11
  42:20 43:3,7 44:11
  48:10 49:15 51:20,20
  51:22 52:9,18 63:1,8,14
  69:20,24 70:4,10 71:11
  209:4,9,20,22 211:4
**hours** 37:6,20 38:4,19
  46:15 49:9 92:24,24
  93:2,4,4,5,7 97:2
  104:20 136:22 169:12
  173:2,6,7,9,10 176:18
  188:24 189:6 197:25
  198:1 207:3 228:13,20
  228:22
**houses** 201:15
**Houston** 2:9 16:23 29:25
  188:10 189:1 242:15
**hull** 121:23

DONALD GREEN

6/25/2009

Page 12

**hung** 51:25 173:1
**hurricane** 15:5 23:19
27:20 30:11,12 36:21
37:6,8 38:3,20 46:8,18
49:9 54:25 55:1,2 63:1
67:17 68:1 69:14,23,24
73:18 74:17 75:15,17
76:13 77:2,20,22 78:8
79:15 80:3,7,21 81:8
82:8,22 83:9,12,15,21
85:8 92:1 93:3 96:15
97:11,13 98:22 99:2,6
100:2,13 103:2,16
105:15 106:4 107:4
117:6 119:23,25 134:18
135:5,10,19 136:2
137:7,18 141:17 147:6
147:17 148:17 152:1,2
152:4,10,12,16,21
153:4,6 157:3,9 160:24
162:14 168:4,4,8,22
169:20 173:3,7,21
174:1,25 176:18 177:22
179:2 180:25 189:5,13
189:21 193:3,5,8,11
195:4 198:23 199:3,8
201:22 202:17 204:10
204:12,15,23,25 205:1
212:17,18 217:13
219:12 226:17 227:10
228:12 230:4,24 231:2
232:13 235:13 237:2
**hurricanes** 150:20 151:8
152:5,17,24,25 153:1,8
153:11,12 189:22 210:9
**hypothet** 182:6
**hypothetical** 49:3 52:5
**hypotheticals** 60:24
61:16

**I**

**ICW** 144:3
**idea** 53:14 58:6 92:23
175:14 209:1
**identification** 20:5 25:18
28:16 216:21 231:18
236:17

**identified** 167:20
**identify** 236:15
**identity** 240:7
**IHNC** 111:17
**Ike** 95:7 189:1,8,9,12
204:11 228:12
**illustrate** 208:21
**immediately** 185:15
**impact** 211:13
**impacts** 51:12
**impale** 171:15
**impaled** 170:24
**impeded** 175:8
**impending** 75:16
**implement** 217:9
**implication** 230:1
**implies** 167:2,6
**impossible** 124:24,25
**improper** 27:19 152:14
**improperly** 23:17
**imprudent** 176:2
**inadequate** 67:7,15
69:10,12,16,17 70:7
**inane** 98:15,15
**incapable** 141:20,25
**include** 8:12 9:22 115:18
121:3 138:15 142:16
237:8
**included** 10:2 110:9
112:20 120:16 184:5
**includes** 108:1 134:22
135:20,23 137:11,13
**including** 53:21 222:13
222:15,18,21
**inclusive** 160:15
**incoming** 85:18 99:16
**incompetent** 199:6
**incorrect** 14:9 19:12
101:12 119:14 132:19
234:25 235:1
**increase** 72:12
**increased** 51:8 59:20
**incurring** 191:9
**independent** 111:14
167:4 202:25 218:20
**INDEX** 4:1

**indicate** 90:16
**indicated** 76:25 196:4
206:8 208:25
**indicates** 206:17
**indicating** 35:12 46:2
47:18 90:10 112:8
212:5 232:7
**indication** 73:19 76:17
77:2,7 199:12
**indications** 229:17
**individual** 43:24
**individually** 149:22
150:7,11,24
**individuals** 109:23
**industrial** 97:22 122:14
122:19,24 144:3 156:21
171:17 173:25 174:21
198:14 199:18 203:4,8
203:11 204:22 205:7,7
205:16 206:15 210:13
214:3
**industry** 138:25 145:14
198:22 215:25
**industry-wide** 168:6
**ineffective** 154:1
**infer** 16:15
**influence** 44:12
**influenced** 23:5
**inform** 6:15
**information** 8:11 9:22
9:25 10:4,13 14:3 22:6
22:17,24 23:1 24:1,15
25:15 26:2,4 38:9,23
46:1 54:23 55:18,22
73:17 74:9 77:15,18
79:25 81:6,11,14,16,18
81:19,21 83:14,20 84:6
84:8 120:9 121:1,8
124:11,12,21 125:12,23
126:1 127:13,20 132:11
132:14 140:4,18,19,22
161:16 163:11 182:6
190:2,7,10 198:20
199:5 204:16 221:5
231:23
**informed** 74:18

**ING** 4:15 32:11 37:25
139:16 140:7 162:21
196:4 197:17 206:1,6
211:9 213:13
**Ingram** 1:11,13 112:12
168:17 200:14,15
**initial** 9:20
**initials** 187:6
**initiated** 17:3
**injury** 174:23
**inland** 158:5,7 184:5,16
216:25 217:2
**Inner** 113:9 144:1
160:12 212:11
**inspected** 14:24,25 72:20
**INSPECTION** 4:21
**inspections** 158:18 159:2
231:3
**inspector** 132:12 201:12
**inspectors** 14:25 131:17
131:18,18 231:5
**instance** 2:2 60:25 61:2
**instances** 196:9
**instructed** 6:7
**instructor** 188:16
**instrument** 240:9
**insufficient** 27:19 100:10
100:13,20 101:18,20,22
116:21 154:2
**insult** 174:23
**integral** 187:11
**intended** 31:19
**interested** 241:25
**interpretation** 26:18
30:13,15 43:4 127:16
128:5,22 142:19,20
145:3 148:9 149:25
**interpretations** 215:9
**intervals** 151:1 155:13
**Intracoastal** 138:15
**Introduction** 32:5,8
**inventory** 31:2
**investigate** 116:14
193:10 194:1 198:2
205:14
**investigation** 13:17,19

DONALD GREEN                                                                    6/25/2009

14:22 124:4 203:1 231:5
**investigative** 14:4 15:11 15:17
**invoked** 143:1
**involved** 74:2 159:7,14 220:8 229:13
**involving** 159:8
**IPET** 55:13,15,20,21
**irrelevant** 116:16 225:5
**Irrespective** 117:1
**issue** 31:20,20 136:15 175:22 208:6 221:11
**issued** 5:21 93:24 136:4
**issues** 22:23 208:21
**issuing** 31:13
**items** 30:22 31:3,5

### J

**J** 3:12
**January** 20:9
**jerk** 117:22
**job** 214:9
**Joe** 174:20
**jog** 114:4
**John** 12:23
**Johnson** 8:23 9:15 10:1
**join** 223:3
**JR** 1:13
**Judge** 39:20 54:5 127:25 150:15 174:12 192:1
**June** 1:20 2:5 4:2 20:8 22:7,9 142:6 242:7

### K

**K** 1:9 138:1
**Katrina** 1:4 37:6,8,21 38:3,5,20 49:10 54:25 55:3 97:13 99:2,6 117:6 168:5 189:8,9,14 189:14,20 198:23 202:17 204:15,20 205:10 212:17 230:4 237:2
**KDON** 187:24 188:2
**keep** 40:12 57:3 79:1 208:21

**keeping** 126:25 139:20 171:19 191:18
**Kentucky** 205:12
**key** 110:22
**kind** 157:24
**kinds** 122:14 133:1
**knew** 74:17 88:20 96:21 208:22
**knots** 71:1
**know** 5:11 8:16 18:3 21:24 28:3,3,8 34:24 35:4 38:5 41:12,18 45:4 46:9 48:11,13 49:5,8,16 55:22 58:21 62:17 82:4 88:19 92:1 92:5 97:12,19,21,25 98:3,6,10,17,21 99:1,5 99:8,9 101:3 103:20,21 103:23 104:6,25 112:21 113:1 116:12 118:18 119:2,3,5 120:9 122:9 123:4 125:1,1,8 127:1,1 127:9,24 128:19 129:25 130:16 131:5,7,12 132:15 133:4,21 138:8 138:9 145:14 151:19 156:3,9,12,15 161:20 161:21 163:5,7 164:1,2 165:20 176:9 178:8,11 179:18,20,22 180:1,3 180:18 181:3,6,10,13 182:21 186:3,4,4,21 189:23 191:12 194:14 201:2 202:7,21 204:18 205:9,20 206:14 207:10 209:5 210:4 211:20 218:16 223:20 224:25 225:2,6 227:19 230:6 230:20,23 231:1,4,8,13 231:14,15 232:3,10,11 232:14 234:13 235:10
**knowing** 195:10
**knowledge** 84:11 129:10 129:19 140:2 144:10 192:22 198:16 199:5 202:19 206:11

**knowledgeable** 128:20 129:3
**known** 25:11 75:23 144:11 240:5
**knows** 36:22 38:24 39:17 45:4 46:23 58:10 122:16 125:6 235:11

### L

**L** 141:7,9,15
**lab** 51:16
**lack** 75:14,15,16 78:15 140:2,3 168:21,21
**laden** 68:7,14,17 69:1,3 97:20 98:23 99:10 173:17,22
**Lafarge** 1:10,12,14,16 1:17 2:2 3:6 5:2 23:15 32:18 36:12,16,24 38:19 47:9 49:6 53:14 54:15,25 67:6 73:17 74:20 90:9 91:16 105:14 109:6,21 120:18 139:23 141:4,23 143:16 144:11 148:22 151:22 155:21 160:11 166:5 167:8 169:14 171:18 173:1 176:23 188:23,24 192:25 195:2 196:7,10 196:17,20 197:10,17 198:5,17,21 199:6,14 200:18 203:21 206:6,23 206:25 207:14 213:12 215:18 217:11 219:5 222:1 226:25 228:20 235:4 237:3 242:4
**Lafarge's** 217:5 221:24
**Lagarde** 1:12
**lake** 122:12 203:15,16,17 205:6 210:7
**Lakefront** 4:13 12:12 35:7 36:9,9,15 37:1 46:5 53:22,22 201:23 202:10 203:9 209:7 235:3,4
**land** 39:2
**landfall** 37:6,9,21 38:3,6

38:14,19 49:9 213:9
**Lands** 183:25
**landsmen** 109:14
**language** 76:22 149:6,6,7 149:8 150:15
**large** 45:11
**largest** 112:13
**law** 3:3 108:13 128:22
**Lawrence** 4:11
**laws** 224:2
**lay** 191:9 192:21
**lead** 40:14 87:16 212:14
**leading** 227:17,21
**lean** 94:23
**leave** 71:20 87:6 99:25 133:21 207:7 221:22
**lecture** 35:22
**left** 71:1 78:5 87:7 111:25 145:24 171:5 176:18 178:4 192:9 194:14,18 228:20
**legally** 191:12
**legislative** 151:18
**LEGRAND** 3:13
**length** 139:5 225:20
**letter** 4:10
**letters** 60:11,21 129:21
**let's** 7:8,9,11 12:8 13:5 19:24,25 21:17 27:24 32:3 33:18,22 51:25 56:18 65:12 73:7 74:13 78:18 90:2 113:23 121:9 133:10,21,22 138:4 140:6 151:13 157:22 160:1 162:23 167:25 176:17 186:19 217:14 219:4
**levee** 9:7 97:22 98:3,5,6 201:13,14
**levees** 118:12,21,23 119:9
**level** 56:6 93:17,19 126:23
**levels** 55:2
**liability** 188:5
**library** 214:8

DONALD GREEN

6/25/2009

Page 14

**license** 129:6 158:4,9
183:20 184:7,11,15,17
185:3,7,19,21 186:7,8
186:25 187:3 188:19
190:15,16
**licensed** 158:21 166:8
**licenses** 184:2 185:25
186:2 188:14
**licensing** 186:12 187:6
187:12
**life** 136:21
**lifetime** 189:24
**lifted** 120:10
**light** 60:25 68:8 89:17
92:1,3 100:1 112:4
198:9
**liked** 73:3
**likewise** 130:8 193:7
199:11
**limit** 43:7 62:5
**line** 27:18 34:8 41:10,13
42:15 43:14,15,16,17
43:25 44:2,4,8,11,13,16
44:19,19,20,22 45:5
46:7 49:16 50:8 54:9
55:25 56:12,23,25 58:3
58:3,13 60:7,15 61:19
61:22,25 62:8,14 63:5
65:2,3,4,24 66:15,17
67:18,19 68:25 69:2
73:4 78:3,4,6 100:3
101:11 102:10,19,23
106:19 108:25 117:2,9
117:9 125:18 126:11
138:22 139:6,19,21
144:22,24,25 145:5,5,6
145:13,16 149:23
150:25 154:1 161:8,22
165:9 172:4 178:12
180:1,18 182:22,25
183:7 196:1 205:21,21
213:22 214:21,22
215:10 225:15,15,16
229:8 233:21 238:2
**lines** 27:18 32:22 33:23
38:24 39:7,11,17 40:2,5

40:22,25 41:3,14,16,19
42:11,16,19 43:12,12
43:13,18 44:21,25 45:7
45:18,22 49:21,24
52:21 53:11 61:2 62:3
62:15 64:25 65:1,9,15
65:21,23,24,25 66:8,25
67:14 68:21,21 69:5
70:3,10,19 71:19,20,22
72:2 78:5 80:8,10,12,18
83:11 89:8 99:19
100:19 101:4,14,14,17
101:20,22,23,25 102:1
102:3,5,6,12,16,20,21
102:22 103:11,24 104:2
104:4,6 106:23,24
107:2,4,7,8,14,18,25
108:5,17,20,24 110:13
116:6,25 118:7 138:22
138:24 139:2,4,9,14,17
139:24 140:4,7 141:1
144:15,17,18 145:2,7,9
145:10,15 150:8,13
151:3 153:16,20 154:11
154:17,18 155:1,4,7
159:19 161:3,11 165:2
165:3,5 171:23 172:6
177:24 178:2,3,4,6,16
178:19 179:19,22
180:12,14 181:3,10,17
181:18 182:1,10,22
196:6,10,17 213:20
214:17,19 215:8 221:15
221:20 222:13,16 225:7
225:23 229:2
**line/spring** 73:4
**link** 225:9
**list** 14:16 174:19,21
**listed** 13:13,25 24:16
31:6 174:22
**listen** 29:17 87:19 149:13
167:11 180:20
**listened** 77:14 192:25
**listening** 60:8 80:5 83:18
**listing** 30:19
**Litigation** 1:5 188:3

**litigation-driven** 188:7
**little** 28:19 95:10 188:22
214:16
**LLC** 3:11
**LLP** 2:8
**LNA** 4:14 12:14 25:19
168:3,9 209:18
**loaded** 84:15,21 85:3,9
164:10 165:18,18
166:15 171:11 174:15
196:5
**loading** 169:7,11
**located** 160:12 202:3
**location** 195:20 199:19
**locations** 158:15 200:18
**lock** 111:18 112:2 205:15
205:18 206:10,18 207:8
207:15 224:18 225:1
**locks** 53:21 112:1 156:13
206:15 219:1 220:12
**log** 225:1
**logs** 111:19 112:3 205:18
**long** 17:13,14 18:4 29:17
92:15,21 95:20,23
101:8,10 138:15 188:16
206:9
**longer** 113:3,5,14 115:13
147:16 177:1 186:8
**long-line** 56:1 78:7
**long-lined** 53:4
**long-lining** 39:15 56:7
57:12 161:10 212:3
213:23 229:11
**look** 8:15 9:8 32:2,3
34:19 39:4 47:17 64:7
64:10 111:18 113:25
118:19 120:7 136:11
149:8 157:18 161:7
186:20 190:6
**looked** 13:15 14:22
15:22 26:13 30:9 53:19
54:14 59:14 64:1 72:25
76:22 104:16 133:6
139:11 157:19 182:24
205:18,19
**looking** 42:12 48:15

60:15 69:9 73:16
104:10 110:16 116:4
129:5 138:1 159:22
201:10 205:23
**looks** 59:23 62:23 63:24
233:12 235:6
**loose** 34:24 95:8 104:25
106:20 162:18 163:16
203:7 204:11 208:12
209:1,3,24 210:2 212:1
**loosening** 57:12
**lost** 175:11
**lot** 92:18 189:16 197:25
208:22
**Louis** 8:10
**Louisiana** 1:2 3:4,9,14
4:13 138:18
**low** 164:23 165:1,8
**lower** 123:11 138:16
165:3 175:8 201:3
**lowered** 92:14
**lows** 226:21,22,22
**ludicrous** 151:20
**L.L.P** 3:7

**M**

**machine** 2:7 241:9,12
**Magistrate** 40:13
**mail** 194:9,14
**maintain** 198:22
**maintaining** 141:24
**major** 21:11 22:10 80:14
175:6 201:17,18
**majority** 122:12
**making** 8:2 40:12 77:22
**man** 165:16
**managed** 190:18,23,25
**management** 128:25
131:24
**manager** 188:10 190:20
**managing** 32:20
**maneuvering** 172:11
**manner** 43:19 70:22
105:24 106:12 197:11
201:22
**man's** 112:14
**map** 47:11

DONALD GREEN

6/25/2009

**March** 5:22 6:11 7:13
9:1,10 11:8 14:14 16:6
19:24 20:22 21:8 22:6
28:21 112:19 114:5
115:6 142:6 195:6
**marine** 75:2,4 77:15
79:11,23 80:1 82:4
85:13 89:14 94:7,10
97:5 109:2 110:2
127:24 128:11,23 129:6
129:9 131:13,15 136:3
136:14 138:25 141:1
158:11,12 187:24 188:2
193:1 216:25 219:5
223:11,16 224:1
**mariners** 85:14
**maritime** 131:23 141:17
220:14 221:3,5,6
**mark** 19:24,25 28:17
**marked** 20:4 25:15,17
28:15 216:21 231:17,19
236:16
**marlinspike** 109:13
158:20
**Master** 158:6 183:23,24
183:25 184:3,3,4,5,6,9
184:9,23 190:15,16
**Masters** 158:4
**Master's** 184:15,15
188:19
**Mate** 183:24 184:9
**material** 6:4,9,17 7:3,6
8:25 13:25 25:4 188:4
233:17
**materials** 6:13,14,15
7:10,16 8:3,4 16:1
30:20
**math** 179:6
**Mathematically** 180:11
**matter** 36:1 101:18
123:21 159:14
**maximum** 25:22 61:8
63:2,15 64:13 72:13
**McCall** 2:8 3:7
**mean** 15:25 31:20 43:11
46:17 62:5 64:12 65:22

66:10 72:1 84:22 86:6
88:3,14 89:1,6 97:9
98:8 140:15 145:16
179:20 189:11 191:2
197:20 202:11 218:13
225:14 234:14
**means** 43:19 63:5 66:4,7
66:13 71:24 72:1,3
98:11 101:3 102:2
104:22 107:1 108:16
139:1 150:15 194:9
197:10 198:3 199:7
201:3 214:20 215:7
237:3
**meant** 100:6
**measure** 174:8 232:1,15
**measured** 132:12
**measurement** 132:21,25
**measures** 160:14
**meet** 29:19,24
**memorialized** 6:10 19:23
222:8
**memory** 114:4
**mention** 10:11 146:5
**mentioned** 13:13 14:1
29:8 85:4 192:25
**mentions** 24:15
**mercy** 123:9 125:4
**message** 87:9 192:9
194:14,18,19,21
**messed** 114:22
**Metairie** 3:4
**method** 21:7 78:7 161:10
**methodology** 164:13
**methods** 67:3 129:4
**middle** 42:16 43:14 44:4
44:19 59:20 197:15
**midnight** 224:14,16,23
**mile** 70:4
**miles** 25:23 26:15,21
27:21,23 32:23 33:23
36:16,19,25 37:5,19
38:2 39:3,9,11 40:6,23
41:10 42:20 43:3,7
44:11 48:10 49:15
51:20,22,22 52:9,18

63:1,7,14 69:20,24 70:9
71:11 119:24 120:1
143:20 209:4,9,20,22
211:3
**miles-an-hour** 45:1
51:13 102:15
**mile-an-hour** 38:18 41:4
41:7,25 51:15,16 52:12
58:4,18 71:6 103:6,8
104:2,8
**mind** 113:17 126:25
139:20 163:18,19
**mine** 209:13,15
**minimal** 20:18 97:9
172:6
**minimized** 23:22
**minimum** 107:19 108:10
108:15 144:7 154:23,24
155:2 185:11
**minus** 52:1,4 63:9,10
**minute** 84:20 92:19
151:11 155:12 169:25
**minutes** 17:14,15,15
170:18 206:17 207:4
**mischaracterizes** 223:2
223:10
**mislead** 123:24
**misleading** 35:19,21
**misrepresented** 19:16
**missed** 42:13
**missing** 16:14 30:22
57:14
**Mississippi** 122:11
138:16,17,18,19 143:19
197:19 200:25 203:4
204:18 205:10
**misspoke** 225:4
**misstatement** 228:15
**misstating** 40:9
**mistake** 114:15
**mistaken** 208:22
**misunderstood** 50:23
**mode** 127:6
**model** 60:3
**modified** 18:23
**modify** 6:16,18 10:1 18:7

19:13 21:5,6 26:3 29:9
**momentum** 172:3
**Monday** 4:13 119:23
173:8 224:19
**monetary** 191:15
**monitor** 73:9 74:14,15
77:12 79:8 81:23 84:8
86:3 87:14,15,20,21
88:14 120:24 193:1
217:6
**monitored** 74:25 75:20
79:23 88:10 89:13
217:12
**monitoring** 75:15 83:19
84:3,5,12 87:12 88:17
88:20 91:6,16 168:19
168:21 217:8
**months** 132:5 185:12
**moor** 59:21 117:18 139:3
156:1 237:3
**moored** 23:17 68:15
70:21 102:12 103:1,3,4
103:16,18 116:19,24
139:17 140:7 141:21
142:4 143:1 147:9,14
147:15 148:14 149:22
150:8,12,24 152:21
153:15,19 156:18,20
162:14,17,19,22,25
163:12,14,17,21,23
164:5 167:5 173:18
175:4 222:18 225:11
229:1 234:6
**mooring** 4:15 12:23 15:3
15:4,12 22:22 23:6
26:13 27:18 30:14
32:15,16,19 37:24
40:22 53:3 54:24 55:25
59:1,13 60:18,22 61:6
62:25 65:21 67:6,14
69:9,12 70:1 71:15
72:2 75:10 78:6,12
86:4 89:4 99:20 100:4
100:7 102:2 103:11
109:18,19 110:5,13
119:7 120:16 129:4,10

JOHNS PENDLETON COURT REPORTERS

800 562-1285

DONALD GREEN                                                         6/25/2009

129:19 130:11,18
131:10,16 138:22 139:1
139:5,9 140:5 143:12
144:24,24 145:4,5
148:12 150:19 152:1,9
153:3 157:10 158:14,19
158:23 159:1,3,4,5,8,8
159:16,16,19,19 160:25
161:12,22 165:11 166:6
172:10 174:25 179:14
179:25 180:4 196:1,6
196:10,17 197:1,5
212:7,9 213:20,22
214:17,19 215:8 216:5
216:7,12 221:15,16
222:13,15 223:12 225:8
226:11 227:1 229:8
**moorings** 26:20 27:4,5
27:11 37:4,20,25 43:9
70:18 221:18
**Morgan** 138:14
**morning** 5:7,8 34:11
46:7,15 53:15 74:18
83:1 91:3,11,12,14,14
91:20 97:2,8 104:19
112:2 173:8 193:12,23
197:23,24 206:3,7,22
**motor** 150:2
**Mouledoux** 3:12,12 4:4
12:9 82:9,16 97:23
111:12 112:16 174:5,13
187:19,20 192:18
195:25 196:16,25 199:2
199:11 200:16 202:23
203:10 204:3 207:19
212:20,25 213:7 215:2
223:3,14,21,23 224:22
224:25 227:3,15 228:11
228:14 229:7 230:7
236:11
**move** 96:20 116:22
197:17 198:6 221:21
223:18
**moved** 105:25 222:21
229:5,18
**movement** 49:1 76:22

86:3,6,19 88:1 89:1
127:4 197:25 206:1
210:12
**movements** 210:24
**moving** 89:25 117:1
172:3,5,24 221:18
**MR-GO** 205:5,5
**MSO** 131:12
**multiple** 93:11
**Mumford** 1:11
**mushroom** 59:23

**N**

**N** 3:1
**nail** 39:4 78:21
**name** 9:3 104:18 111:21
123:5 129:22 240:8
**named** 241:8
**names** 10:11
**narrative** 120:14
**narrow** 155:25
**Natchez** 138:17
**National** 119:23
**nature** 236:6
**Naval** 4:17 127:25
214:12 216:17
**Navigation** 113:9 144:1
160:13 212:11
**navigational** 160:16,18
160:20
**Navy** 214:13
**near** 160:23 184:20
208:15
**nearly** 179:15
**necessarily** 41:12 46:21
47:2 108:22 118:7
129:5 131:17 202:11
235:4
**necessary** 6:1,18 7:4
8:12 9:22 78:9 90:17
107:3 121:1 136:20
174:3 195:3 197:10
**need** 13:8 156:5 190:2
**needed** 6:15 91:1 218:19
218:20
**negligence** 195:11,14
**neighborhood** 122:20,22

**neither** 137:4 241:19
**nest** 147:22
**net** 132:7,20
**never** 17:20,22,24 89:17
163:8 164:18 184:19
194:19
**new** 3:9,14 4:12 6:7,12
6:25 7:15 8:4,12,25
9:23 10:4,18 12:11,22
15:25 22:17,24 23:1,3,4
25:4 26:2 41:16,19
46:8,15,22 62:13,15,16
62:17,20,24 67:12,13
73:8 74:5,9 75:17
76:18 77:3,8,20 78:3,5
90:1 99:18 119:25
124:11,12,21 125:12,23
136:3 138:14 139:21
141:17 143:9 157:8
169:20,21 178:3,19
180:2 189:18 205:11
213:9 217:13 219:11
222:4 225:12
**news** 77:16
**Nextel** 74:23 81:24
**nice** 212:14
**night** 18:5 76:24
**nilly-willy** 179:21
**Ninth** 15:1 24:10 98:2
123:11 170:25 175:8
**nonoceangoing** 135:6,7
135:11
**nonself-propelled** 135:7
135:10
**normally** 214:20 220:8
**norms** 148:1,18 149:16
**north** 2:3 3:6 5:3 35:9
50:17 124:24,25 160:11
202:13 211:17 212:9
213:17 235:7 242:4
**northeast** 35:9,9,16
36:17,25 46:16,19,25
47:3,4,8,13,19 200:24
201:22 202:6,13 235:6
**northern** 49:21 52:11,24
53:3,4 55:25,25 57:4,15

123:6 125:10 162:13,16
162:23
**northernmost** 50:9
**northwest** 200:23
**north-south** 202:5
**Notary** 240:19 242:12
**notation** 206:2 225:1
**note** 174:6
**noted** 160:24 239:10
**notes** 26:7 42:3,3 116:4
**notice** 166:19
**noticed** 90:8
**notified** 166:16 167:3,16
167:17 176:21 197:22
**notify** 219:6 227:13
**notions** 219:14 224:11
**November** 5:13 16:4
17:17
**number** 16:24 17:1
27:23 28:12 44:16
63:11,13,14 64:14,14
64:24 67:10,10 69:14
73:2 75:21 76:4 89:16
96:25 102:22 120:8
121:5 133:7 139:2
142:17 154:3 160:10,23
162:10,11,12 164:7,8
166:10,11 167:23,24,25
168:1,3,25 170:9
171:22 172:13,22,23
174:16 175:12,13,15,24
176:16 187:21 228:2
**numbered** 2:4 60:9
**numbers** 12:14 60:21
162:9 180:16
**numerals** 60:10
**nutshell** 26:23
**Nylon** 182:21

**O**

**oath** 240:6
**object** 8:13 10:15 18:9
18:20 19:14 20:24
22:18 29:11 34:2,13
35:18,20 39:22 40:8,15
41:5 48:22 50:13 51:18
52:13 56:14 68:3,24

DONALD GREEN                                                                                          6/25/2009

Page 17

71:25 72:6,14 73:6
76:20 77:4 78:14 82:9
83:22 97:23 98:24
105:21 106:1,7,15
107:6,16 108:19 109:9
110:7 111:12 112:16
113:13 116:9 117:7
119:17 123:3,19 140:11
142:13 143:21 146:24
148:4 165:12 167:10
180:10 183:16 192:16
212:25 215:2 223:14,21
227:3,15 230:7
**objected** 223:1
**objection** 18:25 40:4,14
51:2 82:16 123:25
124:1 166:10 174:6,9
196:14,24 199:10
212:20,21 213:1,6,7
215:14 219:9 220:18
222:25 223:3,9 225:24
226:4,19 227:4,17
228:14
**objective** 53:8 54:3,12
55:7 57:6
**obligated** 191:14
**obligation** 219:6
**observation** 36:18
**observations** 36:8,15
37:1 49:13
**obtain** 10:19 186:1
188:13
**obtained** 7:7 74:10
188:19 190:14
**obvious** 66:4 121:10
**obviously** 66:5 120:17
199:2 222:5
**occasion** 226:21
**occupation** 215:1
**occurred** 32:22 34:1,10
39:15 48:17 49:14
203:3 211:20
**oceangoing** 134:20 136:6
136:7 137:16 186:1
**oceans** 158:7 183:23,24
183:25,25 184:5,6,20

**office** 29:25 30:1,24
129:9 131:13,15 214:5
240:14 242:6
**officer** 186:12
**officer's** 187:6
**offices** 2:8
**officials** 119:9
**offload** 85:10 89:22
**offloaded** 89:17
**offloading** 76:3 96:25
97:2
**offshore** 190:20
**oh** 13:15 16:17 33:21
48:4 80:12 82:11
114:22 120:4,8 141:13
167:25 172:14,16
185:17 189:7 200:1
204:13 207:2,2 209:17
227:23
**oil** 176:8
**okay** 6:12,21 7:6,12,15
8:18,23 9:19 11:3
12:19,22 13:22 14:13
14:20 15:24 16:4,9,14
16:17 17:1,10 18:14
20:2,3,12,20 21:17 23:3
24:11 25:3 26:1,25
29:16 31:8 32:3,7
33:18,21 35:14 37:18
38:5 50:2,4 52:7 53:10
54:8,18 56:3,12 57:3,22
58:24 59:6 60:1,2,24
61:16,22 62:2,15,17,24
63:20 64:3 65:10 66:21
66:24 67:21 69:5,19
73:23 74:13 79:4,8
87:19 89:3 90:3 94:8
98:16,21 100:5 102:5
102:14 103:14 105:17
110:22 112:25 114:22
120:4 133:10,25 134:3
140:17,24 141:15
144:20 153:24 155:11
160:1 162:6,8 163:15
163:17 167:19,23
168:13 170:13 172:16

172:22 176:17 178:22
179:10,13 180:23 184:7
190:9,13 191:3,4,20
192:13,24 198:16,20
200:16,21 201:21
203:10 208:6 210:12
211:15,17 212:3,16
213:12,16 214:23 215:7
215:9,15 216:14 217:4
217:11 218:8,19 222:24
227:24 229:7 230:8
231:25 234:21,23
235:17
**old** 4:18 132:24 160:23
214:24
**older** 105:24 161:1,1
225:15
**omit** 118:15 119:13,19
**omitted** 22:13 112:18
114:19 118:10 119:15
119:18
**onboard** 75:3 131:3
**once** 90:19 149:9,14,14
172:5
**oncoming** 176:6
**ones** 62:17 112:22 113:1
113:21 131:20
**one-part** 104:4 221:20
**onslaught** 81:8
**open** 156:6 205:8
**operate** 168:7
**operated** 159:5
**operating** 141:20,25
**operations** 170:6 217:25
233:19
**operator** 86:8
**operators** 85:6 158:16,22
216:24,25 224:1
**opine** 131:15 158:1
160:20 163:11
**opined** 64:19 181:12
**opines** 92:8 158:2 175:18
**opining** 105:12 174:24
**opinion** 4:10 21:13,16
23:5,15,17,20,23 24:2,3
24:17 25:14 26:8,16,20

27:18 29:10 32:22
33:25 34:10,21,22 35:1
35:14 36:6,8 37:2,3,8
37:23 38:16,25 39:10
40:1,18,19 41:1,24 43:9
44:3,4,7,10 45:20 46:14
47:15 48:18,23,24,25
49:8,19,20,25 51:7,11
51:24 52:11,23,25 53:2
53:6,6 54:1,15,23 55:6
55:24 56:20 57:19,21
58:1,9,16 67:5,15 69:8
69:15,22 70:1,9,11 71:5
71:9,11,13 73:8,12,15
73:22 74:7,7,10,14,24
77:11 79:19,21,22 81:6
86:17 90:5,12 92:2
94:15 99:18,23 100:3,6
100:9,20 101:17 102:1
103:10,10,19,24 104:10
106:11,22 107:3,11,12
107:13,24 108:2,6
113:12 114:12,17,18,23
115:15 116:2,6,20
117:3,8 118:22 119:2
120:15,17,23 121:1
130:11,14 131:8 133:22
135:4,9,19 140:1,3
141:4 142:25 143:15
144:16,19,21,23 145:16
152:9,14 153:3,25
155:24 156:6,18,24
159:15 160:21,22
163:22 168:22 169:22
173:11,19 174:2,3
175:20 176:23 183:14
183:17,17 189:14 195:8
195:14,17 196:11 201:7
202:1 211:19 212:8
213:15 229:12,16
**opinions** 6:5,8,10,16
8:20 10:2 15:2,12
18:18,24 20:22 21:7,25
22:14,17 25:5,20 26:3
28:22 32:10 33:1,10,14
42:17 52:8 56:19 63:4

DONALD GREEN                                                                6/25/2009

74:5 75:6,19 78:24
110:10 115:24 119:6,12
119:15,20 121:17
127:21 128:3,8 130:17
157:16 159:23 160:2
168:20 177:15 178:25
188:4 190:3,7,11
200:12 215:9
**opportunity** 17:24 23:16
92:4
**opposed** 42:16 67:19
97:20 116:6 132:10
174:15
**Oral** 1:19 2:1
**Orange** 191:1
**order** 38:12 55:24
104:23 145:1 206:10
220:11
**orientation** 47:2,4,11,13
202:6,13 235:5
**oriented** 47:23 202:5
**original** 11:1,15 25:3
139:5 178:5,7,15
225:23 231:8 242:3
**Orleans** 3:9,14 4:12
12:12 46:8,16,22 67:12
67:14 75:17 76:18 77:3
77:8,20 90:1 119:25
136:3 138:14 141:17
143:9 157:8 169:20,21
189:18 205:11 213:9
217:13 219:11
**outboard** 45:17,21 68:15
68:18 83:7 117:17
170:10
**outer** 58:1
**outlet** 122:11
**outlined** 80:9 219:21
**outlines** 25:24
**outside** 68:9 98:18
156:20 170:15 171:7
**outward** 120:1
**Overall** 213:12
**overcome** 27:19 41:14
44:19 45:8 58:13
213:22

**overlapping** 130:15
**overload** 181:11
**overly** 8:14 18:9,20
22:18 142:13
**overseeing** 128:24
**overtop** 118:21 119:9
**overtopped** 118:13,24
**overtopping** 83:6
**owe** 191:17
**owned** 190:18,23
**owner** 171:3 188:10
191:17,17,20,22
**owners** 85:6 158:16
193:19

### P

**P** 3:1,1
**packet** 11:3
**packing** 36:21
**page** 4:2,9,16,18 7:11
11:7,11 32:4,5 34:8
54:9 59:6 120:7 133:12
136:1 138:21 141:10,11
141:13,14 214:16 238:2
**pages** 4:20 12:14 13:7
216:18
**Page/Corrections** 4:7
**panhandle** 76:16
**paper** 222:6
**paragraph** 120:7,10
133:20 136:1 138:1
141:7,9 143:8 149:21
226:11 227:25
**paragraphs** 21:1 133:12
133:17
**parallel** 130:15
**Parfait** 1:15
**Paris** 53:23
**part** 49:11,24 50:2 93:10
100:3 101:17,20,22
104:2,6 107:17 108:20
109:8 114:16 120:14
122:24 135:4,9 147:1,3
147:6,10,11,13,16,18
147:21,22,23 148:1,7,8
148:18,23 149:10
160:17 166:5 195:2

200:16 201:6 214:22
219:22 223:5 225:16
**parted** 49:21 181:10,19
182:2
**partially** 99:10 162:19
**participated** 164:25
**particular** 78:22 119:5
121:16 137:6,20 151:19
159:1 160:6 161:22
**particularly** 14:24 84:23
134:23
**parties** 90:10 241:21,24
**partnership** 215:24
**parts** 14:23 66:14 181:18
182:2 214:22
**passage** 8:24 9:5
**passed** 206:22 214:21
**Passes** 143:20
**passing** 70:23 148:13
151:3,16 152:23 155:15
**Pat** 11:19
**Patrick** 3:2
**penalties** 191:15,22
**people** 14:24 71:2 91:15
159:21 166:8 174:20
185:25 188:13 189:16
**people's** 231:2
**percent** 43:6 62:6,22,22
112:12,12
**performance** 214:9
**period** 39:5 69:18 104:23
**permission** 136:19
**perpendicular** 65:18
67:20
**Perry** 1:13
**person** 16:21 111:9
129:3,7 130:16 171:2
200:6 240:8
**personal** 202:18
**personally** 72:20 240:5
**personnel** 176:23 220:2
220:5
**pertains** 1:8 32:15,19
81:12
**phone** 16:21,22,24 17:1
17:11,13 28:12 86:23

176:21 192:19 194:2
197:16 242:15
**phones** 74:24 81:24
**photograph** 50:6 57:9,11
57:24 58:11 124:6
216:8 232:6,8,10,15
233:2,13 234:17,22
**photographs** 4:23 7:8
8:8 10:17,18,20 11:4,6
11:7,12,14 23:2,3,4,9
23:24 24:9,18,19 25:1,5
25:13 123:16 187:16
231:20,21,22
**photos** 236:21
**physical** 57:7
**pick** 82:21 87:10 88:23
112:6 170:14 177:3
192:10 193:23 194:24
198:3
**picked** 82:13,15,19 83:2
86:12 87:3 111:16
172:25
**pickup** 195:11
**pictures** 59:14
**piece** 55:22 117:24 232:1
**piecemeal** 223:2
**pier** 214:21
**piled** 125:6
**piling** 171:15
**pilings** 59:5,15,15 170:24
**pilot** 156:8 157:23,24
158:9 211:24 212:10
214:2
**place** 53:23 86:24 96:24
99:25 230:5
**placed** 167:8 171:7
230:21 233:18 234:5
**Placement** 216:4
**places** 53:21 122:8
**placing** 170:10
**PLAINTIFFS** 3:2
**plan** 67:17 73:18 80:7
87:16,25 134:19,23
135:5,10,20 137:7,18
137:22 141:18 157:3,9
168:5,16,17,17,18

JOHNS PENDLETON COURT REPORTERS                              800 562-1285

DONALD GREEN                                                              6/25/2009

Page 19

217:18 219:12 227:10
227:12
**planning** 75:15 79:18,20
84:6 86:18 89:4 168:21
217:9 218:22 219:2
228:2 229:22
**plans** 81:1 136:2 168:8
**play** 44:1 92:2 108:20
109:8 201:6
**played** 223:5
**plenty** 157:25 165:16
172:23 173:12 176:19
198:9
**plus** 22:25 52:1,4 63:9,10
106:23
**point** 8:20 10:18 11:8
12:11,22 19:15 29:12
31:25 38:7 41:20 42:13
45:9 56:5 60:22 61:20
61:20,23,23,25,25
64:15 65:24 80:1 85:17
95:7 97:1,7 159:12
201:3,8 202:2,11
208:23 236:8
**pointed** 108:12
**pointing** 233:3
**points** 7:15 8:4 49:14
60:9,10 62:18 75:14
102:11 114:23 142:10
144:25 145:2 154:16
157:10 158:24 165:7
237:6
**policy** 85:2,10 93:22 94:3
128:22 222:4
**pollute** 176:7
**polluted** 176:11
**pollution** 176:5
**poly** 62:2 70:3,19 102:16
116:6 177:24 178:3
182:14 183:4,15 226:3
**polypropylene** 41:16,19
61:3 161:5,11 182:25
**Pontchartrain** 203:16,17
205:6
**poor** 79:17
**pops** 133:7

**port** 128:25 132:2,3,6
134:19 135:17 136:4,11
136:16,19 137:10,13
138:2,12 140:25 141:18
166:12,17,25 167:3,3,4
167:9,17 169:8 170:5
197:24 219:7,18,19,21
219:23 220:1,4,9,10
227:8,13 228:3 229:23
**portion** 8:24 14:20
**ports** 138:18
**pose** 166:25
**posed** 136:20
**position** 28:22 36:20
46:18 50:7 57:15 59:4
109:11 129:15 130:16
131:21 178:12 185:20
193:23 199:18 200:22
**positions** 154:19,25
**possess** 161:4,6
**possibility** 27:7 31:24
53:1,7,25 63:6 77:20
95:2 96:3 193:2
**possible** 151:5 165:14
177:4 195:23,24 196:8
213:16 223:19 235:14
235:20,21
**possibly** 27:12 53:5
164:25 173:10 230:1
**post-accident** 174:8
189:15
**post-Katrina** 50:6
**potential** 167:15,21
171:19
**potentially** 82:15 166:21
176:4
**pounds** 178:16,20 179:1
179:2 180:7,8
**power** 9:3 123:5 127:7
141:21 142:1 219:19
220:1,10
**powered** 168:7
**powers** 219:17
**Poydras** 3:8,14
**practical** 95:1 215:22
**practice** 71:18 85:2

154:10 158:14 160:24
161:1 168:6 223:13
**practices** 93:23 149:17
**precaution** 175:3 212:24
**precautions** 221:8
**preceded** 37:5 38:3
**preceding** 185:16 197:7
**precluded** 198:13
**predicted** 67:12,13
118:21 119:9 138:24
141:2
**predicting** 118:12,23
**preexisting** 20:14
**prefabricated** 118:8
**preferred** 165:17 166:7
**premise** 186:5
**Prep** 188:11
**preparation** 16:5,6
29:20 80:20 105:15
106:4,25 193:11 208:3
242:2
**preparations** 162:15
168:19 177:1
**prepare** 6:7,12,22,25
15:25 31:9 79:15
**prepared** 4:24 5:18 7:25
9:21 28:25 69:14 78:6
78:8 126:3 200:5
215:24 236:13
**preparedness** 30:12 80:7
**preparing** 13:20 20:6
80:3 193:8
**preplanning** 75:24
**presence** 107:21 198:13
**present** 28:22 114:10,11
187:24
**presentation** 120:3
**presented** 194:4 199:1
**presumably** 59:5
**pretty** 92:16
**prevailing** 235:2
**prevent** 116:7 117:4
148:13 211:25
**prevented** 106:13 143:17
171:12
**preventing** 223:6

**previous** 33:24 73:13
102:14 174:7 198:17
**previously** 22:14 32:21
37:3 39:14,24 52:23
68:2,22 121:4 180:1
199:23 202:15
**pre-Katrina** 178:25
180:4,24
**primary** 143:4
**prior** 13:20,23 14:13
15:2,5 20:1,9,23 23:11
27:16 31:17 33:2,15,17
33:19 34:6,14 39:2
40:1 64:19 67:21 73:12
74:2,11 81:8 90:11
105:2,23 110:10 112:20
113:25 114:9 115:8
119:8,11 121:2 123:14
124:6 125:13 126:10
143:14 144:18 145:10
145:12 154:12 168:4
177:22 183:14 199:7
208:13 209:24 232:12
234:4
**privy** 82:3
**probable** 196:12,21
**probably** 21:8 120:4
**problem** 161:3
**procedure** 2:10 118:1
222:4
**procedures** 131:23
158:15,19 159:3,4
**proceedings** 241:17
**process** 21:22
**produced** 2:1 199:23
**product** 62:8
**PROGRAM** 4:22
**progress** 74:25 120:25
**progressed** 85:9
**prohibited** 136:18
**promulgated** 151:7
**proper** 86:3,4,18 89:3,4
129:10 177:1 196:6,10
218:22 219:2 228:2
229:22
**properly** 44:5 73:9 74:14

DONALD GREEN                                                                          6/25/2009

Page  20

74:15 84:8 87:15,21
88:10 116:24 142:4
162:13,19,22,25 163:12
163:13,17 167:5
**property** 136:21
**propose** 176:13
**proposed** 176:14
**proposing** 198:5
**protect** 193:4 213:13
**protected** 155:22,24,25
174:24 175:19,19,22
**protection** 128:12 129:1
134:19 135:5,20 143:5
156:23 171:10 175:1
219:20
**proved** 119:18 240:6
**provide** 95:3 161:11
186:11 215:21
**provided** 10:21 24:8
27:22 159:15
**provides** 156:23
**provisions** 2:10 114:12
**proximity** 175:4
**prudent** 221:23
**public** 97:4,5 240:19
242:17
**publications** 71:14
165:21
**published** 105:18 106:9
156:7 222:1
**pull** 64:6
**pump** 91:7 92:16
**pumped** 90:24 218:13
**pumping** 218:9,16,17
**pumps** 90:16 91:1,21
92:6,7,16,17 93:7,11,11
93:12 218:19
**purchased** 139:20
**purport** 177:12
**purportedly** 82:12
197:23
**purpose** 71:21 156:16,17
192:19 231:15
**purposely** 99:3
**purposes** 190:2,10
192:15,21 200:11

240:11
**pursuant** 2:9
**purview** 98:19
**push** 200:24
**pushed** 46:11 47:1
**pushing** 44:25 45:16,20
46:3,19 47:4,14,22
**put** 26:16 35:7 36:14
66:8,9,11 71:22 78:1,5
83:11 95:11,22 102:3
106:18 109:11 114:22
117:17 118:19 119:10
121:7 125:18 126:10,11
130:19 166:19 167:6
172:4 214:16 226:21
227:16
**puts** 68:17 166:22
**p.m** 2:5 138:11 169:7
170:7 237:12

## Q

**qualifications** 130:4,16
187:12
**qualified** 127:20 130:5
130:10,14 137:15
229:15
**qualify** 51:21
**qualifying** 185:12
186:12
**qualities** 108:24
**quality** 72:24 161:11
211:8
**question** 6:21 8:23 24:14
25:4 36:2 41:22 42:5
46:25 47:7 50:18,24
51:19 56:15 58:21 64:8
68:5,19 78:21 79:1
87:19 90:23 92:21 94:2
107:2,10,13 132:16
145:25 146:1 149:13
151:6,13 152:4,13
154:13,21 157:15,17
163:2 164:9 167:11
169:6 174:6 180:20
223:1 232:9
**questioned** 190:13
**questioning** 163:19,20

199:16
**questions** 9:19 24:12,13
29:17 39:25 98:15
187:21 190:5 192:24
227:17
**quibbling** 160:12
**quick** 162:5
**quickened** 39:16
**quit** 91:14

## R

**R** 1:13 3:1
**radio** 75:3,4 82:4 83:19
217:15 220:23
**rakes** 92:12
**rank** 93:9 125:7
**ratchet** 117:22,23 233:15
233:24
**ratcheting** 236:21,22
**ratchets** 23:10,13 230:19
230:20 231:9,16
**rationale** 149:20
**reached** 26:18 37:5 38:1
40:23 42:22 43:6 45:1
63:15 126:23 209:4
**reaches** 122:13 203:8,13
**read** 9:10,12,17,17 18:4
19:21 20:25 21:21 22:8
24:22,23,23 29:1,4,7
30:5 31:8 34:7 76:21
105:17 121:16 122:11
126:20 133:14,18 134:1
135:12 142:8,18 154:20
157:12,14,19 160:8
162:4 208:12 215:5
239:8
**reading** 21:25 61:10
84:11 142:15
**readings** 53:21 201:24
**ready** 82:13,19 83:1
86:12 87:3,17,18
193:17 195:11 206:21
207:7
**real** 73:18 92:21
**realistic** 95:2 96:1,11
**realize** 24:8 28:25
**really** 68:20 95:1 126:13

160:12 185:25 191:12
**reanalyzed** 126:1
**reason** 5:25 9:20 15:8
19:20 40:2 63:21,23
89:22 199:12 222:9
238:2
**reasonable** 39:5
**reasons** 41:3 95:10
222:13
**rebuttal** 31:10
**recall** 5:12 9:2 19:7,8,11
25:22 35:7 37:10,13
82:20 131:3 135:1
138:1 158:25 160:6
201:17 222:11 234:7,16
236:3,8,9
**receive** 12:19 194:9,19
221:3
**received** 6:4,17 7:8 13:10
15:21 22:25 26:2 28:13
82:3 195:9,13
**receiving** 54:22
**Recess** 12:10 72:19
110:23 162:7
**recitation** 26:5
**recitations** 133:13,16
**recognize** 199:25
**recognized** 167:15
**recoil** 182:17
**recollection** 55:17 236:4
**recommendation** 32:16
85:1,11,12,17 93:21
94:3,11,12 95:2 107:25
138:22 141:24 165:23
166:5 167:7,7,14,17,19
196:20 223:18
**recommendations** 15:6
15:13 67:17 70:16 75:7
83:24,25 84:11 85:5
107:19 108:9,11,11,12
108:14,14 113:10
115:14 131:23 135:3,21
140:25 141:19 144:12
147:25 148:19 149:17
158:15 159:1 175:2
219:11 224:8

DONALD GREEN                                                                6/25/2009

recommended 64:20
  93:23 95:17 99:15
  134:18 135:13 136:5
  157:4 165:17,19 197:12
  227:7,12
recommends 157:9
record 2:11 12:9 25:24
  204:1,2 215:6 223:24
  223:25 236:12,14,15
recorded 25:25 189:22
records 54:23 209:7,10
red 234:23
reduce 136:20 165:5
reduced 59:20 90:21
  93:13 236:14
reduces 165:1
refer 8:18 11:10 43:24
  109:1 214:12,23 215:16
reference 9:14 24:24
  205:25
referred 11:7 71:15
  216:18
referring 12:17 106:5
  109:4 209:18 217:4
refers 60:21 150:10
reflect 21:15 33:25
  113:17
reflected 20:22 36:25
  125:25
reflection 125:14 210:21
  235:18,24
refreshed 55:17
regard 6:5 19:2,3 131:1
  136:4 208:24 210:6,9
  211:12 212:10,16,23
  215:1 218:12,25 225:7
  227:24
regarding 15:12 23:5
  28:22 30:13 32:10
  100:16 128:21 129:19
  130:11,17 131:9,10
  159:15 168:20 188:4
  195:14 207:23
regardless 125:18 148:9
regards 134:19
REGINA 111:22,23

207:11
regular 139:24 233:18
regulation 70:20 85:1,16
  93:21 94:11 148:21
  166:1,5,22 167:8
  198:12 211:23 215:18
  226:24
regulations 8:7 13:16
  15:6,13,22 30:13,15
  32:15 70:16 75:7 84:12
  113:10,16 114:7,20
  115:14 127:16 131:22
  142:20 143:12 144:12
  145:20 147:25 148:11
  148:18 149:5,17 151:23
  217:1 224:3
rehabilitate 208:19
reject 125:19,21
rejected 126:9
rejecting 126:10
relate 25:7
related 241:20
relates 24:2,20
relative 111:16 199:17
  200:18 241:23
release 56:8
released 195:10
relevance 23:13
relevant 8:20,25 14:4,21
  41:23 42:6,9 119:20
relied 42:18 120:13
  177:13 214:25
relies 105:10
rely 214:9
relying 35:14 55:19
  70:13,14
remain 141:21 153:15
  233:18
remains 32:8 79:14
remedial 173:23 174:8
  189:15 204:9
remedy 223:4
remember 6:19,24 9:3
  18:2,4,5,6,15,15 22:13
  22:16 111:21 113:21
  126:19 159:12 163:6

186:22,23 193:5 194:11
  206:24 209:16 230:13
  234:14,15
remove 173:21 174:3
removed 173:12,16
render 6:5 157:16
rendered 190:11
rendering 23:11 188:4
  190:3
renovation 74:20
repeat 46:22
replace 21:6
replaced 78:4 178:3,6,19
  179:19 225:8
report 5:17,21,25 6:3,6,7
  6:11,12,20,22 7:1,5,9
  7:11 8:5,12,21 9:1,10
  9:21,23 10:2,3,5,22
  11:8,10 13:17,19,20,22
  14:1,4,10,12,13,14
  15:11,16,17,21,25 16:1
  16:5,9,15 19:5,24 20:14
  20:22 21:5,5,9,15,21
  22:6,8,9,14 23:12 24:22
  26:5,11 28:9,21,25 29:5
  30:3,21 31:14,20,21
  32:4,12 33:14 35:6,10
  54:20 55:13,15 64:19
  66:3 73:13 78:25 90:9
  104:17 112:19 113:16
  114:6,11 115:6,8
  118:11 119:8,11,11,22
  120:5,6 122:18 124:2
  126:3,4,5,7,8 127:17
  133:8,9,14 144:4
  157:12,19 158:2 159:22
  177:7,18 192:14 195:7
  197:14 207:23,25 208:4
  208:7,25 217:4 226:14
  230:16
reported 2:7
Reporter 241:5
Reporter's 4:7
Reporting 242:13
reports 7:2,19,24 8:2
  13:23 14:7 16:2,10,12

20:9,17,23 21:20 27:17
  29:1,4,7,9 31:9,10 32:2
  32:9 33:3,15,18,19,24
  73:13 74:11 76:25
  77:17 97:4 112:20
  113:25 121:2,8 125:13
  142:6
represent 187:20
reputation 198:21 199:6
request 32:1 236:12
requested 110:13 229:20
require 93:22
required 106:23 153:16
  153:20 169:8 215:18
  234:1,2
requirement 166:12,23
  187:10,11
requirements 185:8
requires 95:6 154:7
  157:9 167:1,2 213:4
reread 17:22
rereading 33:4 125:16
research 13:18 15:19
  16:11 38:8 45:25 133:4
  190:1,6
researched 111:4
reserves 112:11
resolved 208:11 228:1
resort 221:12,13
respect 23:8 75:7 85:2
  88:9 109:8 113:2,7
  120:23 136:2 144:15
  151:7 170:9 177:13,14
  177:15 186:12 195:18
  197:5
respects 135:15
response 82:9
responsibility 138:14
  142:23 143:5 197:1,5
responsible 128:23
responsiveness 97:24
  111:13 112:17
rest 30:16 38:9 61:16
  122:15
result 32:22 56:1 96:9
  121:12 196:8 202:17

JOHNS PENDLETON COURT REPORTERS                              800 562-1285

DONALD GREEN                                                          6/25/2009

Page  22

205:10 213:19
**resume** 130:23 187:22
**rethought** 126:23
**retired** 130:1 185:1,4
  190:21
**retrieve** 195:9
**retrospect** 209:23
**reverse** 207:16
**reversed** 195:15 204:19
**review** 6:4 7:19 8:7
  14:13 16:7,10 17:25
  30:7,16 31:17 160:1
  187:15
**reviewed** 8:3 13:16,25
  14:6 30:20,25 35:13
  45:25 48:16 55:23
  115:3,12 127:11 158:14
  159:4,23 236:1
**reviewing** 16:1 80:7
  124:2 133:19 134:2
  136:13 138:10 142:18
  160:9
**reword** 21:6
**rewrote** 19:4
**re-read** 17:16
**rhyme** 63:21,23
**ridden** 170:23,24
**Ridgelake** 3:3
**ridiculous** 175:25
**riding** 164:20
**Rigging** 110:12
**right** 5:24 7:14,20,23
  10:8,12 13:8 15:17,23
  17:16 25:3 27:9 31:18
  32:12,18 33:1,22 35:11
  41:8 42:5 46:13,20
  52:9,23 56:18 57:13
  60:6,14 61:13 62:22
  63:3 64:5 67:5,23
  69:10 71:24 72:21 73:7
  73:13 74:13 75:18 77:1
  78:13 79:6,16 81:21
  83:16 84:13 86:17,20
  87:12,22 88:2,17,18
  89:9 90:18 94:24 95:25
  96:17 98:23 100:17

101:13 102:20 109:24
115:17 116:7,11 120:9
120:18 125:19 127:4,19
130:18 133:8,14 134:4
134:11 138:7 140:21
142:5,11 143:8 147:23
149:11 152:19 155:2
158:2 159:22,24 162:3
162:23 164:1,3 167:23
168:2,14 169:9 170:9
170:15,25 172:1 173:4
174:13 177:6,16 180:5
185:19,21 186:9 187:12
188:9,22 194:11,13
201:16 204:13 208:17
209:14 210:4 211:1
218:6 220:14 229:7,15
230:8 236:3 237:11
**Rigolets** 205:6
**rising** 55:2,9,24 56:2
**risk** 136:20
**river** 97:17 138:17
  143:19 144:2,9 159:6
  197:19 200:25 203:4,20
  204:18 205:10,16
  224:13
**rivers** 91:13 158:8 184:1
  184:6
**RMR** 2:6
**Road** 53:23
**Robin** 8:10,19 9:15 10:1
**rope** 49:16 51:13 78:3
  108:1 117:10 159:16
  161:8 172:11 177:8,11
  177:15 182:14,15 183:3
  183:5,6,7,7,9,13,15
  225:11 226:3 228:5
  232:16
**ropes** 41:25 52:9 72:21
  72:24 73:2 159:19
  164:3 182:19,20 183:4
  228:8
**rose** 56:6
**roughly** 225:12
**round** 59:19
**routine** 206:14

**rule** 192:19
**rules** 2:9 8:7 144:2
  185:17,18,18 217:1,2
**run** 9:8
**running** 122:9 139:4
**rushed** 31:25 32:2
**rushing** 122:8
**Ryan** 29:1 30:10,15
  31:12 127:9,14 130:4
  133:4 136:5 137:25
  142:11
**Ryan's** 130:21 133:9
  144:23

## S

**S** 3:1
**Sabine** 159:6
**safe** 122:10 174:18,18,19
  174:21,25 175:18
  176:20 230:2
**safety** 85:13 94:7,10
  127:24 128:11,23,24
  129:4,9 131:13,15
  136:3,14,18 138:13
**sail** 45:10,11,13 50:20
  51:8,11 90:21 97:10
  121:19 127:2 184:17
  211:11,12,12 222:19
**sailing** 132:24
**Sanders** 3:2 4:4,5 5:10
  7:18,22 8:13 10:10,15
  11:21,23,25 12:2,6 14:5
  18:9,20,25 19:14 20:24
  21:18 22:18 29:11,13
  29:16,22 31:16,19,25
  33:17 34:2,13 35:18,21
  35:24 36:3 39:22 40:4
  40:8,15 41:5 42:7
  47:21 48:22 50:13,18
  51:2,18 52:13 55:13,21
  56:14 63:9 68:3,24
  71:25 72:6 73:6 76:11
  76:20 77:4 78:14,20,24
  82:10 83:22 98:8,12,24
  103:20 105:4,21 106:1
  106:7,15 107:6,16
  108:19 109:9 110:7,14

111:6,22 113:13 114:3
116:9 117:7 118:16
119:3,17 121:5 123:3
123:19,23 124:1,16,18
126:7 131:5 138:5,8
140:11 142:13 143:21
146:7,11,24 148:4
154:20,23 155:17 156:5
157:23 163:2 165:12
167:10 169:13 175:12
175:17 178:9 179:6
180:10 181:21 183:16
186:3,21 192:16 195:23
198:25 200:14 202:18
203:5,24 207:22 208:20
208:24 209:18 212:16
212:22 213:3,8 215:4
215:15 216:16,24
219:10 220:20 223:4,9
223:11,16,22 224:1,24
225:4 226:2,7,23 227:6
227:18,20,23,24 228:16
230:8 234:8,13,20
235:25 236:19 237:11
**sat** 24:10 185:7,19 187:3
**satisfied** 65:7
**Saturday** 83:1 84:25
  91:3,11,12,14,20 96:8
  96:14 111:24 173:4,5
  193:12 197:7,22 205:16
  207:15
**saw** 34:3 35:24 36:2 50:8
  105:7 125:9,10 141:22
  192:3,5 210:1
**saying** 27:9 43:2 49:3
  51:23 56:5 89:24 91:8
  102:9 105:3 110:15
  123:6 125:18 130:23
  144:10 148:16 163:6
  169:16 227:22 233:11
**says** 37:22 60:18,19
  65:25 66:6 70:21 72:13
  84:8 85:13,17,20 94:14
  99:18 110:12 124:2
  134:17,24 135:12
  137:11 138:11,22 139:8

DONALD GREEN

6/25/2009

Page 23

140:4 149:12,20 150:1 150:3,6,11,23,23 152:17 154:8,25 155:10 155:13 160:11,23 162:12 165:16 166:1,11 166:25 168:3 169:1,14 174:17 175:16 178:9 181:22 187:22 194:17 194:18 195:8 202:10 215:6 216:4 227:1 234:22

**scenario** 65:11 95:4 96:11

**scenarios** 27:2,3,10,24 28:5 63:21

**Scrap** 95:9 203:19,22 204:4,10

**scuttling** 175:25

**se** 133:22

**sea** 4:19 138:17 185:9,22 205:8 214:24 216:17

**seagoing** 131:2 135:22 137:24 185:5 187:2

**seal** 240:14 242:6

**seaman** 129:13

**seamanship** 94:9 109:2,7 109:8,13,20 158:21,24 215:22 219:6,15 224:11

**seamen** 71:1 93:24

**second** 138:21 183:24 184:9 204:1

**section** 1:9 109:1 114:7 114:19 115:19,23 116:1 137:20 141:8,16 142:5 195:6 197:15,15 200:17 217:5

**Sector** 141:8,17 157:8 219:11 227:9

**secure** 71:23 109:12 181:8 195:3 196:2,11 197:11 198:23 199:7 220:5

**secured** 147:20 150:25 198:13 199:13 214:19

**securely** 116:19 211:25

**securing** 197:1

**security** 128:11,25 143:5

**see** 7:4,8,9 9:25 21:11,17 22:9 31:13 33:18 38:10 55:12 63:23 64:7,10,12 65:12 74:6 90:13 120:2 121:9 130:22,25 133:10 133:18 136:15 138:4 139:22,25 142:17 151:13 157:22 159:24 160:1,8 167:4,25 176:17 186:19 206:2 212:4 221:16,18 223:20 232:6 233:5

**seeing** 9:7 64:19 75:24

**seen** 13:20 24:24 46:9 73:3 157:11 164:22,23

**self-propelled** 134:11,20 135:6,14,21 136:6 137:16

**semantics** 149:6

**send** 12:6 193:23

**sense** 85:6,14,16 94:9

**sent** 11:20 193:18 221:6 231:5

**sentence** 38:13 110:9 133:20 134:8 140:6 195:8

**sentences** 33:6

**separate** 62:2 184:2

**separated** 196:5

**separating** 47:10

**September** 6:23 114:6

**series** 195:18

**serve** 128:15

**served** 130:23,24 131:14 132:4 184:19 186:15

**service** 91:19 185:8,12 186:13,14 187:2,11 217:15

**services** 91:9,12

**set** 11:15,15,19 12:4,15 15:2 30:20 89:23 133:23 134:5 135:2 136:12 138:2 217:13 219:10,14 220:20,23 226:25 241:15

**sets** 12:1

**seven** 11:4

**severe** 151:8 157:3 189:8 189:9,21

**shackles** 117:18 230:20

**shaped** 59:18

**sheets** 17:5 26:18

**Shell** 3:13

**shift** 76:24 206:5

**shifted** 197:6

**shifting** 36:13 210:15

**ship** 85:22 132:10 173:3 214:19,21

**SHIPHANDLING** 4:17 214:13 216:17

**ships** 137:12 141:20 156:13 159:5

**shock** 181:11 225:17,19

**short** 69:18 117:24

**shortened** 151:4

**shorter** 164:10

**shorthand** 2:7 241:4,9 241:12

**Shortly** 186:6

**show** 8:21 23:9 57:11 112:3 133:5 187:10 199:22 231:25 233:2 234:4

**showed** 50:6

**showing** 24:9 123:17 234:5

**shown** 200:17 207:1

**shows** 47:12 57:12 58:11 60:9 200:6 233:2

**sic** 206:1,6

**side** 45:17,18,21,22 68:15 156:1,1 160:13 201:16 203:24,25

**sides** 92:13

**sign** 17:19,19 19:21

**signature** 4:7 238:1 239:9

**significant** 21:14

**similar** 166:8

**similarly** 120:20

**simple** 20:14 59:19 92:21

108:7

**simply** 7:2 14:16 26:3 117:21

**single** 9:14 27:18 65:9 67:14 70:19 71:20 100:3 101:17,20,22,25 102:5,6,11,23 154:9 172:17

**single-part** 99:19 100:19 103:10 221:15 229:2

**sink** 95:24 176:15 230:5

**sinking** 86:4 89:10 99:15 221:11

**sir** 5:14,24 7:17 9:11,13 11:5,18 12:18,21 13:12 16:3 17:9,12,23 18:1 22:15 29:12,18,21 30:6 30:18 31:11 32:13 41:17 48:12 53:9 57:18 60:7,20 61:21,24 62:19 64:17 65:8 66:12 68:25 72:22,25 73:5 74:12 104:12 110:20 115:7,16 118:5 121:17 122:21 127:5,10,12,22 133:15 141:6 142:9 154:19 155:23 157:6,11,13 158:10,12 159:13 164:14 173:14 175:23 177:17 178:13,17 190:12 198:15 204:6 206:4,13 207:17 216:3 230:17 231:24 232:2,5 232:17,19,22,25 233:9 234:10

**sit** 17:21 19:12 21:14,24 186:24

**situation** 89:19 221:7,17

**situations** 226:18

**six** 11:4 63:21 93:6 102:3 132:5 139:11 166:15 185:9

**size** 42:11 62:8 72:24 236:14

**Skaer** 29:1 177:21 178:15,24 181:17

DONALD GREEN                                                                6/25/2009

Page 24

183:13 228:5
**Skaer's** 177:6
**skirted** 46:8
**slack** 117:23 233:16
**slip** 48:5 49:24 155:22,24
   155:25,25 156:23 157:1
   175:22 212:6
**slippage** 196:1 229:8,10
**slipped** 49:22 50:1
**slipping** 165:3
**slope** 65:17
**small** 153:2 156:12
**Smith's** 42:15
**soft** 106:18 118:7 161:3
**somebody** 90:12 91:7
   100:5 131:14 181:12
   185:20 194:20
**someone's** 42:13
**someplace** 46:6,10 48:16
   54:19 151:22 156:4
**somewhat** 54:6 130:15
**soon** 228:17
**sorry** 11:22 32:4 73:8
   84:15 167:23 168:13
   170:2 175:10 177:11
   179:4 196:15 213:3
   226:15
**sort** 17:11 24:2 54:3
   116:23 201:4
**sorts** 108:24
**sought** 80:20,24,25
**source** 24:15
**sources** 54:13
**south** 50:12 123:1 124:8
   125:19 126:12 202:13
   213:18
**southerly** 47:25 123:15
**southern** 48:5 60:13 95:8
   122:24 125:11 203:19
   203:22 204:4,10
**south-southeast** 119:25
**spaces** 90:10,20 92:7
   112:12 176:14,15
   218:11
**speak** 70:20 71:15
   136:14,23 137:18

139:10,12
**speaking** 55:5 199:2
**speaks** 36:19 137:20
   151:9 152:2
**specific** 8:19 9:5 18:11
   19:9 71:1 129:7 134:18
   135:20 136:5,19
**specifically** 85:20 113:1
   136:3 139:20 146:1
   151:6 154:16 231:15
   232:9
**specifics** 70:21
**speculation** 49:11 82:17
   93:9 107:17 117:8
   125:8
**speed** 25:22 32:23 63:2
   63:15 209:19 211:6
**speedability** 72:14
**speeds** 61:8
**spite** 99:11
**spoke** 205:23
**spot** 117:24
**spots** 153:18
**spring** 43:16 44:20 67:19
   101:11 145:6
**Square** 3:13
**St** 2:8 3:8,14
**stability** 153:14 171:12
**stable** 94:1
**stand** 29:5 38:4 40:19
**standard** 4:21 143:16
   215:16,21 216:19
   226:24 227:1
**standards** 109:2 110:2
   112:19 114:7,20 115:19
   115:22,24,25 143:11
   144:5,7 223:11
**standpoint** 235:19
**stands** 131:12
**start** 68:11 94:23 106:16
   113:23 169:18,23 209:8
**started** 169:25 170:1
**starting** 5:10 33:1
**starts** 114:9
**state** 2:7 11:11 49:20
   70:17 89:13,18 110:24

122:18 127:20 136:9
   144:4 150:18 162:21
   175:2 177:20 197:16
   240:1 241:1,5 242:12
**stated** 2:10 28:20 37:3
   39:25 63:4 241:6
**statement** 37:14,16
   40:17 41:24 55:10,19
   98:18 134:16 146:11
   195:7
**statements** 40:12 93:24
   98:15
**states** 1:1 136:5 189:21
   211:24
**stating** 139:16
**station** 9:3 123:5
**status** 37:25 136:17
**statute** 108:13
**stay** 210:10
**stayed** 176:24,25 178:5,7
**steel** 196:2
**steps** 77:21 90:15 193:3
   193:10
**stern** 47:22 144:25
   149:23 150:8,12,25
   154:17,19,25
**stood** 95:9
**stop** 60:14 73:21 169:2
   218:4
**stopped** 96:25 97:7
   169:7,11 218:6
**stopping** 217:25
**storm** 25:24,25 39:2
   73:10 74:14,15,25
   77:13 84:9,18,21,22
   85:7,8 87:15,17,21
   88:10,18,20,20,23
   89:25 91:17 95:6
   119:24 120:25 136:21
   138:24 141:3 188:24
   197:7 213:9 217:6,20
   221:7 237:2
**straight** 39:20,21 44:8
   65:15 94:24 125:19
   126:11
**straightened** 33:7 208:14

**strain** 172:4,6 182:10
   213:20
**strapped** 233:10
**straps** 117:13 233:1
**STREAMLINED** 4:21
**Street** 242:14
**strength** 41:20 43:6,25
   44:2 62:5,14 72:12
   108:17,20,21,23,25
   116:13,15 139:1,9,11
   139:13,17,21,24 140:5
   140:8,16 144:18,23
   145:7,10,15,17 154:3
   159:15,16,20,20 161:6
   161:12,20,22 165:2,5
   171:22 172:11 178:10
   178:15,25 179:1,14,19
   180:4,13,17,24,24
   181:1 215:10 225:12,13
   225:22 228:9
**strengths** 161:8
**stretch** 182:20
**stretched** 44:25
**strictly** 181:8
**strike** 21:6 45:19 51:19
   58:12 99:8 103:25
   104:20,24 164:6
**striking** 57:7 77:20
   169:20
**strive** 164:17 226:22
**strong** 225:9
**stronger** 183:6 226:3
**strongly** 221:8
**Strouse** 29:2 226:10
   227:6,25
**Strouse's** 157:12 159:22
   226:14
**struck** 58:1 68:1
**study** 135:18
**stuff** 8:8 9:9 30:2 33:9
   125:15,16 126:24 133:1
   157:24
**subject** 54:22 174:9
   187:15 191:21
**subjects** 158:1
**submitted** 16:2,11 90:9

JOHNS PENDLETON COURT REPORTERS                              800 562-1285

DONALD GREEN

6/25/2009

Page 25

subscribe 82:2 220:24
subscribed 217:14 240:9
subsequent 16:1 31:8
    231:1
substantial 50:20
successfully 163:23
    164:5 173:18
sucked 70:24
suction 151:3,16 155:15
sufficient 56:6 100:22
    101:1,5,8 102:13
    106:24 107:5,7,15,18
    116:7 117:3,10,10
    155:13 157:25 168:23
sufficiently 151:1 152:22
suggest 64:21 151:20
    201:18 206:5
suggested 27:3,10,15,16
    27:25 105:23 160:25
    196:18 201:23 202:21
suggestion 167:9
suggests 198:21
Suite 3:3
sum 28:21
summary 14:23 15:7
Sunday 112:2 173:5,6
    205:17 224:17,20,21
sunk 89:15 94:18 95:18
    99:2,13
super 219:22
superior 129:18
superseded 105:19
    221:25
supplement 6:18
supplemental 11:15
    31:10,14,20,21
supplemented 10:3
supplied 10:20 13:16
    17:18 26:4
supply 190:20
support 54:2 55:10
    136:8 188:3
supposed 88:15
sure 10:8,9 12:16 20:3
    28:3,10 33:4 39:20
    41:21 54:11 57:17

58:10 72:18 76:9 86:15
    93:18 94:14 158:20
    159:10,18 177:2 191:19
    201:10
surge 25:24,25 39:14
    48:11,14,17,17,19,25
    49:5,8,14 51:5 53:2,11
    53:14,19,20,24 54:15
    55:5,9,19 56:12,21
    122:5,7 138:24 141:3
    235:20
surges 212:18
surrounding 32:10 201:4
survey 24:23 167:4
surveyor 158:11,12
surveys 158:18 159:2
susceptible 45:14,22
    84:17,21 85:7 122:1,17
    170:22
suspect 156:12
sustained 37:4,19 38:1
    38:18 39:11 40:6,23
sustaining 178:19
swing 212:7
swinging 211:25
swings 44:18
sworn 2:3 5:4 194:3
    241:10
swung 211:18
synthetic 182:19
system 74:23 225:8
S-K-A-E-R 29:1

_____

**T**

take 9:16 39:19 42:3
    72:17 76:5 78:1 80:3
    90:14 92:15,22 95:12
    95:24 125:20 144:22
    162:4 179:10 182:6
    190:22 207:12 212:23
    213:12 219:24 233:16
taken 2:3 17:21 30:23
    38:11 42:10 50:6 76:4
    84:1,2 95:20 111:1,11
    111:24 112:15 120:4
    171:13 172:25 175:3
    207:10,13,14 221:8

241:9,22
takes 137:22
talk 33:22 73:7 74:13
    84:7 86:2 90:2 107:24
    120:15 129:8 133:23
    139:13 148:11 162:23
talked 28:7,13 50:19
    57:10 90:4 91:24
    120:24 175:22 217:5
    230:14
talking 26:12 32:24
    55:11 56:4 57:3 79:5
    86:17 93:2 101:4,25
    102:5 104:13 109:5,17
    110:3 135:17 138:5
    157:2 165:21 175:10
    203:14 204:4,9,14
    207:3
talks 75:14 126:16
    134:23 136:16,24 141:7
    141:16 142:21,23 143:8
    164:10 171:22 219:20
tape 231:25 232:15
taste 189:12
taxes 132:25
teach 158:20,21,23
teaching 188:20
technique 212:3 213:23
    214:1 229:11
telephone 74:22
tell 8:2,24 24:18 25:14
    26:10 94:4,5 125:17
    154:9 166:12 168:10
    188:1 234:14 241:11
telling 42:19 118:16
    194:20
template 20:7
temporary 99:19,23
    100:4,7,11 103:4,11,12
    138:13 220:21 221:15
    221:18
temporary/inadequate
    37:24
ten 92:24 93:4 187:3
tenacity 177:24
tend 200:24

tender 187:14
tensile 41:20 72:12
    159:20 178:15
tension 181:11,13 225:17
    225:19
term 66:24 109:20
    138:25
terminal 38:19 47:9 49:6
    53:14 54:15 56:6 123:1
    155:21 176:24,25 219:5
terminals 217:1
terms 4:19 79:11 159:20
    191:11 214:24 216:18
    219:5
terrain 201:4
Terry 235:25
test 172:11
testified 5:4 18:12 25:10
    26:14 28:1 39:14 74:21
    75:6 82:24 99:24
    104:19 106:8 109:10
    154:6 192:9 193:13
    194:13 211:16 217:22
    218:3 229:19 234:9
testify 15:8 96:11 128:1
    130:10,17 131:9 193:22
    194:8,16
testifying 18:7 125:3,15
    126:9 234:24
testimony 8:19 9:15
    13:13 15:3 18:2 19:6,8
    19:8,11 24:24 26:1
    27:4,16 28:9 33:24
    34:6,7,9 35:2 40:9
    55:16 65:2 74:16 75:4
    81:22 82:18,21 86:21
    88:3,24,25 89:12 98:19
    101:13 102:9,14 104:14
    105:2,11,17 106:2,4
    111:7,10 112:8,14
    115:17 123:14 124:3,6
    124:7 125:8 126:16
    127:2,17 130:2 139:22
    143:14 149:9,11,14
    151:25 154:12 162:17
    163:6 192:3,5,8 193:21

DONALD GREEN                                                                6/25/2009

194:3,6,22,25 202:16
212:15 223:2,10 225:14
228:15 232:21
**tests** 41:15,18 145:8
**Texas** 2:7,9 191:1 241:1
241:5 242:12,15
**text** 71:15
**thank** 5:9,9 33:21 68:12
121:25 182:9 191:4
207:20 237:11
**theory** 44:23 72:16
**thereof** 242:3
**They'd** 185:22
**thing** 11:11 13:2 38:13
40:11 57:3 81:5 87:14
89:23 95:18 106:10
114:15 116:4,23 133:3
135:19 165:21 172:20
176:10 183:10 201:5
205:13 216:4 228:21
**things** 33:5 39:13 53:10
59:7 74:4 75:25 78:22
80:8 84:1 118:10
126:14,21 176:19
191:14 201:16 226:2
**think** 6:25 15:23 16:20
17:19 18:16,22 19:16
19:17 24:5 25:3,10,22
29:15 31:7 33:10 34:24
37:11 41:23 42:5,7,9,14
42:14 45:6 46:6,14
50:8 53:22 58:19 59:14
71:8 72:25 74:4 75:22
76:3,10 77:23 82:20,23
88:24 93:20 95:1 96:1
96:4 98:8 102:12
106:18,25 107:18 108:7
111:24 112:1,2,3 113:5
115:10 116:3 117:9
121:21 124:15 129:20
130:12 131:2,3,14
142:19 143:14 145:3
146:6,13,14 148:9
150:4,9 156:3 159:11
162:16 164:15 165:20
166:24 168:15 169:3

171:9 175:25 176:5
181:12 183:5,5 191:19
193:25 202:12,15,23
204:12 208:14 209:13
211:16,19 217:21
218:15 225:17 228:17
229:15
**third** 10:18 43:15 57:3
145:16 153:25 234:18
**thought** 15:15 21:22
39:24 53:13 66:3 78:9
101:7 116:15 119:19
163:13
**three** 11:4,21,23 12:1,2
13:23 16:10 27:18 29:7
29:9 30:5 31:8 53:10
61:3 62:2,21,22,24
67:14 69:7 70:3 72:3
73:13 89:8 99:19
100:19 101:7,14,17
102:3,21 104:1,4,6
109:10 121:9 125:16
132:4 144:17 153:22
154:1,4 155:4 178:3
179:4,9,10 184:3,4,7
185:11,15 214:22
221:14 225:7,23 228:8
229:2 234:23
**three-hour** 18:16
**three-part** 103:24
**threw** 53:10
**Thursday** 169:22
**tidal** 204:22 205:1
**tide** 53:24 205:3
**tie** 66:11 70:25 221:20
231:10
**tied** 43:22 47:13 67:22
89:21 101:18 146:2,16
149:4,21 150:7,11,16
150:23 151:21 154:24
164:18 166:2 177:22
**tier** 39:15 49:21 50:7,9
52:11,24 53:4 55:25
57:4,15 58:11 162:13
162:16,24 173:15 174:4
195:19 196:2 197:2

211:2,3,17,17,18 212:9
213:17,18 229:9,14
**ties** 70:2
**tie-up** 178:25 179:1
**tight** 117:25
**tightly** 102:12
**time** 5:16 7:3 18:8,22
19:18 22:23 23:19 28:7
31:1 33:25 34:23 35:15
37:23 43:5,7 48:9,18
68:1 69:18 76:14,17
81:7 82:25 89:21
104:11,13,23,25 105:10
105:12 106:6 121:10
123:9 125:17 126:23
138:6 146:25 147:6,9
147:13,17,20 148:2
148:16 156:10,15
173:13 176:19 179:2
180:25 183:8 186:15
187:24 188:9 191:10
192:21 193:8 197:17,21
205:20 206:9,9,22
207:6,10,13 208:6,8,13
209:24 213:22 217:9,18
217:24 218:22 219:1,4
225:22 227:21,25
235:11,13 236:8 241:17
**timeline** 205:24 207:1
225:2
**timely** 191:16
**times** 9:17 72:3 165:17
179:4,9,10 201:11
**timing** 206:18
**today** 17:21 19:12 21:14
21:24 22:7 32:2 39:25
53:2 118:23 143:15
185:20 187:10 190:9,11
197:12
**today's** 29:20
**told** 5:17 16:7 32:21
46:21 49:15 53:13,17
62:7 79:10 116:15
203:6,12
**tolerable** 61:8 63:2,15
64:13 72:13

**ton** 132:22 184:9
**tonnage** 132:7,7,20,20
133:2 185:10,13
**tons** 130:5 134:13,14,21
135:15,22 136:7,24
137:17,19 183:23
184:20
**top** 56:10 59:21 82:7
151:19 170:24
**toparound** 172:5
**topped** 78:11 83:4
147:20
**topping** 67:21 172:1,2,10
**tops** 68:16
**torch** 94:21 95:18
**tornado** 46:24
**tornadoes** 36:12 210:17
235:12,14
**total** 28:21 73:17 203:1
**totally** 69:9 92:9 145:23
**tow** 145:18,19,21,21,21
145:24,24 146:3,15,19
146:23,25 147:2,3,7,10
147:11,13,16,18,21,23
148:1,2,8,9,10,18,18,19
148:23,24 149:2,3,9,9
149:10,14,15,18,18,25
150:5,5,6,10,16 151:4
158:21 165:4 207:11
231:16
**towboat** 157:20 170:17
**towboats** 130:25 137:12
205:15
**tower** 198:6
**towing** 158:7,23 164:21
168:7 177:4 183:25
184:4,4,10,16
**town** 228:19
**tows** 148:12 149:22
150:7,9,12,19,24,25
152:10 164:23 165:22
**track** 79:2
**traffic** 172:24 224:14
**train** 158:21 188:13
**training** 127:23 130:6,8
130:20,21,25 188:11

DONALD GREEN

6/25/2009

210:8
**transcribed** 241:12
**transcript** 241:16
**trial** 4:24 27:4 54:10
  115:2 177:20 191:25
  236:13
**tributary** 224:13
**tried** 31:12 126:24
**trier-of-facts** 130:13
**tripled** 179:15
**Tripling** 72:3
**tropical** 136:21
**true** 34:17 105:9 110:15
  134:22 135:15,16
  144:14 160:14 174:10
  183:11 194:15 222:12
  224:21 226:20 227:9
  230:3 234:12 239:9
  241:7,16
**truth** 118:17 194:20
  241:11,11,12
**truthfulness** 194:17
**try** 18:3 24:12 70:25
**trying** 10:9 21:22 24:11
  49:19 78:21 94:4 146:1
  160:19,20 168:12
  202:12 208:18,20
**tug** 193:23 206:21 207:6
**tugboat** 68:16
**tugs** 136:8 137:12
**turn** 111:20,23
**turned** 90:18 207:11
**turning** 47:12 49:1 156:2
  156:7,11,14,16 160:14
  160:18 171:25
**twice** 66:11,17 71:24
**two** 11:4,14 13:7 17:5
  21:11 26:18 27:10,12
  27:24 28:5 34:18 41:14
  42:16 43:17 47:10
  50:11 58:16,20,22 59:4
  59:6,7 60:4,22 61:3
  62:16,20 64:14 65:24
  65:25 66:8,8,11,14,25
  69:5 73:1 78:5 92:24
  93:4,6 111:20 115:3

121:9 123:10 125:9
142:20 143:2 144:25
145:2,7,15 153:18,18
153:22 154:2,4,7,14,15
154:16,18,22 155:1,7
156:1 174:24 175:5
177:19,22 178:4,6
179:10 180:2 194:17
211:3 215:11 225:7
229:14 230:5 231:5
**two-barge** 147:22
**two-page** 26:7
**two-tier** 213:18
**tying** 63:25 67:25 129:4
  164:10 183:3
**type** 127:3 145:13
**typed** 61:2 121:18
**typewriting** 241:15
**typewritten** 241:13
**typical** 144:24
**Typically** 181:5

## U

**Uh-huh** 24:4 55:4 60:17
  68:6 110:11 114:8
  129:12 132:18 163:1
  171:4 177:9 180:22
  199:24 201:25 232:19
**ultimate** 142:23
**unaware** 23:11
**uncertainty** 77:6
**unchanged** 32:9 33:2
**unclear** 116:5
**underestimate** 189:11
**understand** 5:15 8:1
  19:20 24:7 26:1 43:14
  44:23 48:15 49:19
  51:17 52:1 60:15 62:10
  67:24 78:19 81:9 86:25
  102:24 106:3 107:22,23
  111:9 112:10,11 128:6
  129:5 133:23 140:20
  193:14,20 195:17
**understanding** 5:25 6:2
  14:6,19 61:12 62:4
  112:13 195:1 197:9
  204:21

**understood** 14:17
**unequal** 164:19
**unequivocally** 93:10
**uniformly** 45:7
**unintelligible** 33:7
**United** 1:1 189:21
  211:23
**universal** 93:25
**unknown** 37:24 104:11
**unladen** 173:22
**unlawful** 176:4
**unlimited** 158:4,6
  183:24 184:16 219:20
**unload** 81:16 89:20
  191:16
**unloaded** 81:5 82:12
  84:15,17,19,20,24 85:3
  85:18,25 91:22 218:8
**unloading** 90:4,11
  169:19 217:25 218:5,6
**unmanned** 94:13 113:8
**unreasonable** 169:16,17
  169:18,23 170:3,4
**unreasonably** 169:15
**unstable** 92:9
**unsupported** 119:14
**upper** 39:15 50:6,9 203:8
  203:13
**upriver** 204:19 223:19
**urged** 221:8
**USA** 1:15,16
**use** 8:25 12:5 13:9,22
  14:7,9,16,18 21:7 30:10
  37:14 52:3 59:12 62:11
  62:11 71:20 93:10,12
  94:22 105:23 107:22
  109:12 115:2 117:13,13
  117:22 118:7,8 145:14
  156:7,14 161:3 196:1
  221:20 226:17 231:8
  233:21
**uses** 66:24 70:3
**usually** 19:21 139:4
**utilize** 23:16
**utilized** 23:20 24:6
  160:25 237:3

**U.S** 107:24 131:22
  214:13 215:25 220:2,5
  221:4 223:17 224:2,8

## V

**v** 1:10,11,12,13,14,15,16
  1:17
**Vaguely** 234:18
**various** 4:23 11:7,12,14
  27:2 30:13 49:14 53:21
  151:4 193:18 222:13
  231:20
**veering** 36:22
**velocity** 45:1 57:1
**veracity** 194:16
**verbal** 106:10
**verbatim** 120:4
**versus** 62:6 161:8 172:17
**vessel** 30:9,11 71:16,20
  71:23 85:21,22,22,23
  85:24 92:14 93:13,25
  95:16 96:22 111:21
  116:21 117:17 127:8
  128:24 132:23 133:5
  135:6 137:1,4,5 139:3
  139:24 142:22 143:1
  145:24 146:4,5,15,16
  146:20 148:10 149:3,24
  150:16 153:14 154:24
  158:22 176:15 177:5
  184:19 190:25 191:13
  191:21 205:21 210:24
  218:1 219:24 220:6,12
  221:11 225:20 237:4
**vessels** 30:14 59:4,22
  70:21,23 71:2 83:25
  85:21 94:14,15 95:8
  109:12 112:3 132:13
  134:20,24,25 135:14,21
  135:22 136:6,17,23,25
  137:11,14,16,19,22,24
  143:6 148:12,13 149:22
  150:1,2,3,4,6,7,9,10,12
  150:19,24 151:3,16
  152:1,10,23 153:4
  155:16 156:1 158:7
  168:8 173:24 175:3

DONALD GREEN

6/25/2009

183:25 184:14,16 185:12 191:6,8 216:25
**VHF** 217:15 220:23
**viewed** 236:12
**Villavaso** 34:3,9 35:1,24 104:18 105:7 123:20 124:3,13 126:17 208:8 210:1
**violate** 142:3
**violated** 105:14 114:12
**violation** 166:4 212:10
**violations** 128:22 129:21
**virtually** 74:19
**visual** 4:24 200:13,17 205:23 206:8,19 236:13
**voice** 194:9,14
**void** 90:10,20 92:7,12 176:14,15 218:11,13
**voids** 90:13 92:11 93:18
**Volume** 136:4,15
**voluminous** 22:5 38:9
**vulnerable** 77:22 90:22 93:14

---

**W**

**wait** 84:20 130:3 141:9 151:11 155:12 159:24 169:25 186:19,19,19 205:20 206:7,9 228:7
**waiting** 190:10 205:15
**wakeup** 77:19 189:16 193:2
**Walker** 2:8 3:7 4:3,5 5:6 7:20,23 8:1,18 10:13,17 11:19,22,24 12:1,4,8,11 14:11 18:14,23 19:1,18 20:6 21:2,13,21 22:21 25:19 28:17 29:19 31:18,23 32:3 33:19 34:5,15 35:20,22 36:1,5 36:6 39:23,24 40:5,11 40:16,17 41:7 42:18 47:25 48:23 50:15,23 51:4,19 52:16 55:16 56:3,18 63:11 68:6 69:2 72:9,18,20 73:7 76:13 77:1,7 78:18,23

79:1 82:14 83:3 84:3 97:25 98:10,14 99:1 103:22 105:10,22 106:3 106:11,22 107:10,23 109:1,17 110:8,17,24 111:14 112:7,18 113:19 114:5 116:11 117:12 118:22 119:13,21 121:6 121:12 123:13,21,25 124:5,17,20,23 126:16 131:8 138:7,21 140:13 140:17 143:23 146:9,12 147:1 148:6 153:10 154:21 155:1,18 156:9 158:1 162:8 163:3 165:15 167:13 169:17 174:16 175:14,21 178:11 179:8 180:15 181:23 183:19 186:6,24 187:14 190:14 192:24 196:14,24 199:10,17 202:8,21 204:1 208:16 208:18 209:11,15 212:13,21 213:1,6 215:14 216:15,22 219:9 220:18 222:25 225:24 226:4,13,19 227:4,16 227:19,22 230:10,12 231:19 234:11,16,21 236:2,10
**walker@chaffe.com** 3:10
**wall** 34:4 35:25 98:9 104:21,24 105:7 208:9
**want** 12:15 13:1,4 14:9 18:11 19:17,21 20:25 21:2,18,19 34:5,16,21 43:1 47:17 79:2 82:14 101:12 149:5 173:24 187:15 199:22 209:8 226:17 234:4
**wanted** 79:15 82:21 83:6 198:8
**Ward** 15:1 24:10 98:2 123:12 171:1 175:8
**warning** 193:18

**warranted** 31:13
**wasn't** 17:19 50:18 103:7 131:4 139:20 171:7 177:4 207:24 208:2 222:7
**watch** 111:9
**watched** 189:18
**water** 45:17,21 46:4,12 55:2,9,24 56:2,6 90:13 90:14,20,24 92:11,18 94:24 95:12 122:8 125:5 138:16 144:9 216:7 218:12,17
**waterfront** 143:6 224:4
**waterline** 94:21
**waters** 143:19 216:25
**waterway** 136:16 138:15
**waterways** 128:25 130:24 131:24 138:13 158:5
**waves** 210:19,21 235:17 235:23 236:5
**way** 18:13,18 19:22 21:4 26:8 43:5 47:5,6,23 59:18 61:13,18 65:1 68:4 100:21 117:19 122:9 125:5,6 130:19 144:16 166:6 181:7,14 181:15 192:23 194:18 205:3 207:16
**weaken** 165:8
**weaker** 43:17 65:16
**weakest** 225:9
**weather** 12:12 25:15 35:6,15 37:1 38:9 39:4 46:1 76:24 85:19 89:24 97:4 99:16 120:5,6 150:20 151:8 157:3 193:1 201:23 209:7,10 216:22 217:12,14,15 220:24
**Weber** 1:17
**week** 7:22
**weigh** 74:5
**weight** 218:14
**Welsh** 129:23

**went** 13:15 15:22 30:2,2 30:3 31:11 44:17 59:14 64:1,6,9 66:22 81:19 97:21 98:3,5,6 104:16 106:9 122:12,13 125:2 125:18 162:8 235:1
**weren't** 14:17 50:14,15 82:3,3 98:17 113:10 129:16 230:15
**west** 46:3 76:25 89:25 160:13 182:12
**westerly** 46:9,11
**Western** 158:7 184:1,6
**westward** 76:22
**we'll** 10:7,10 13:9 20:20 28:17,18 79:2 133:23 162:4,5
**we're** 5:15 14:7 52:3 56:4 60:15 79:5 86:17 93:2 101:3 162:10 168:12 207:3
**we've** 31:21 180:16 215:17 217:5
**wharf** 46:20 47:1 70:3 156:21 170:21,21
**wharves** 141:21
**whatsoever** 182:23
**whichever** 17:20 47:23 123:8
**whipping** 47:5
**WHISKEY** 134:19 135:17 137:10,13
**wholly** 42:18
**wide** 160:15
**Wiedemann** 4:11 10:21 12:20 13:10 28:11 30:24
**WILKINSON,JR** 1:16
**willing** 96:11
**wind** 25:21 27:7,20 32:23 35:4,7,16 36:13 36:15,21,24 38:1 39:11 40:10 41:25 44:24 45:1 45:4,14,16,20 46:2,6,16 46:19,23,25 47:7,16,19 48:10 50:11,17 51:1,13

DONALD GREEN

6/25/2009

51:15,16 53:3,11 56:25
57:22 58:18,23 61:8
63:2,15 64:12 72:13
84:23 90:22 93:15
102:15,23 123:17 127:3
181:19 182:2 199:17
200:23,23 201:21 202:1
202:7,8,13 209:19
210:6,9,15 211:2,6,13
234:6,22 235:7,11
**winds** 37:4,19 38:18 40:6
40:23 41:4,8 52:12
55:1 58:5 69:23 70:18
71:6 103:6,8 104:2,8
119:25 122:2 123:9
125:4 126:13 136:21
151:2,15,17 152:3,18
152:22 153:13 155:15
173:7 182:11 202:6
209:4,8 211:9 235:2
**wings** 59:24
**wins** 183:7
**wire** 61:4 105:23 107:8
107:21 108:1 117:10
161:8 182:15,20 183:3
183:5,7,13 232:8,16
233:10
**wires** 24:9 163:7,9,10
164:2 231:6,16 233:16
233:24
**wish** 19:12
**wished** 79:10
**withdraw** 113:11 117:11
163:15
**withstand** 104:2,7
152:22 195:4
**withstood** 107:3,20
**witness** 2:2 4:7 5:2 7:21
10:12 29:15,18 42:8
55:15 72:17 104:18
110:16 123:5 163:6
174:10 187:14 188:3
209:13,17 236:7 241:8
241:9
**witnessed** 104:20
**witnesses** 9:2 38:13

98:13 125:9 194:17
**witnessing** 208:8
**wives** 176:21
**woe** 157:6
**word** 9:16 27:25 30:11
33:11,11 103:15 146:5
**words** 45:17 46:3 65:23
82:24 89:3 117:4
151:14 193:2 196:16
226:17
**work** 188:6 208:3
**working** 217:15
**works** 31:2 33:6
**worried** 149:5
**worry** 91:22
**worst** 189:24
**worthless** 36:4
**wouldn't** 27:8,13 47:1
48:2 50:21 91:22
129:18 130:11 170:25
179:16 185:20 189:23
220:8 225:16,19
**wow** 172:16
**wrap** 6:6 117:21
**wrestle** 191:2
**writing** 14:14
**writings** 145:4
**written** 151:7 160:24
168:4,5,8,16,16,17,18
221:25
**wrong** 110:18 142:12
157:22
**wrote** 38:11

## X

**xerox** 12:7
**X-RAY** 136:4,12 137:7
169:8 170:6

## Y

**yacht** 85:22
**yachts** 150:2
**YANKEE** 137:7
**yeah** 7:14 8:8,22 16:17
20:16 48:6 71:14 73:14
79:13 97:17 120:8
122:25 129:17 149:10

166:24 170:23 171:24
172:2 185:14 189:7
191:11 194:16 199:4
200:1,3,5 207:9 208:14
221:5 222:7
**year** 189:2
**years** 74:2 109:16,16
115:3 132:4 185:9,15
187:3 188:20 227:20
**yellow** 233:13
**yesterday** 9:18 30:1
214:5
**yes-or-no** 38:21,22
151:11
**you-all** 29:24

## Z

**Zito** 3:11 82:6,10,11,13
82:21,25 86:11 88:15
88:22,23 111:9 112:11
177:2,2 187:21 192:6
192:10,10,14 193:7,10
194:2,8,23 195:9,13
196:25 197:4,18 198:2
198:7,8 199:12 200:18
200:22,25 201:13 202:2
202:4 229:25 230:4
**Zito's** 111:3 199:20
200:6 201:9
**zone** 136:18 138:13
**zoomed** 50:7
**ZULU** 138:2,4 141:1

## 0

**001071-1078** 4:14
**001073** 209:18
**05-4182** 1:6
**05-5531** 1:10
**05-5724** 1:11
**06-5342:JUDGE** 1:12
**06-6299:STANWOOD**
1:13
**06-7516** 1:14
**07-3500:MAG** 1:15
**07-5178:JOSEPH** 1:16
**08** 6:23
**08-4459** 1:17

## 1

**1** 11:11 19:24 20:1
159:23 160:10 162:9
**1,500** 97:16 98:22
**1-inch-wide** 183:6
**1:00** 72:19 87:7
**1:44** 110:23
**1:50** 110:23
**10** 114:6 121:23 172:13
**100** 43:6 62:6,11,22
132:22
**1071** 12:14 25:19
**1078** 12:14 25:19
**11** 5:22 6:11 7:13 9:1,10
11:8 14:14 20:22 21:8
28:21 112:19 114:5
115:6 141:8,11,17
157:2 172:22,23 195:6
227:25
**11:00** 76:23
**11:13** 2:5
**11:21** 12:10
**11:22** 12:10
**11:25** 207:2
**11:30** 207:2
**1100** 3:8
**12** 4:20 121:22 138:11
169:7 170:7 173:6
174:16 175:12,13,15
**12/31/2010** 242:11
**12:00** 87:7 97:1 138:20
173:4,6
**12:01** 209:19,23
**12:46** 72:19
**120** 120:1
**13** 11:4 175:24
**13th** 20:8 22:9
**1320** 160:15
**14** 121:20,24 159:23
176:16
**15** 104:7 212:18
**15th** 125:17
**150,000** 72:5,9,14
**1500** 202:16,22
**16** 121:20
**160,000** 72:7

DONALD GREEN                                                      6/25/2009

Page  30

**1600** 183:23 184:9,20
**1600-gross-ton** 184:13
**162.75** 113:23,24 114:2,9
   114:13 115:18 116:3
   120:15 148:21 149:21
   150:18 151:6,25 152:9
   153:3
**162.75(b)(3)(ii)** 153:17
   154:6 155:8
**1647** 242:14
**165.803** 143:18,23 216:6
**178** 179:8
**178,500** 178:20 179:2,4
   180:7,25
**18** 212:19
**187** 4:4
**1970** 186:17
**1984** 159:6
**1985** 188:18
**1989** 184:12 185:19
   187:1,23

**2**

**2** 1:9 59:6 65:11,12,17
   65:24 134:23 160:23
   162:9
**2-inch** 41:15,19 62:2
   70:3,19 95:23 102:16
   161:5 178:3 183:7
   226:3,3
**2-inch-wide** 183:6
**20** 4:10 104:7 170:18
   227:20 240:15
**20,000** 178:9
**20-something** 201:14
**2005** 4:13 34:11 49:6
   138:12 196:22 198:12
   198:18
**2007** 20:9,10
**2008** 5:13 16:4 17:17
   20:8 142:6
**2009** 1:20 2:5 4:2 5:22
   6:11 7:13 9:1,10 14:14
   16:6 19:25 20:22 142:6
   195:6 242:7
**2037** 242:11
**207** 4:4

**21st** 5:13
**216** 4:16,18,20
**22** 212:19
**230** 4:5
**2300** 3:8
**231** 4:23
**236** 4:5,24
**238** 4:7
**24** 93:5 97:2 169:12
   173:5,9
**24/7** 91:13
**240** 143:20
**241** 4:7
**25** 1:20 4:2,12 63:11,13
   63:14 103:8 104:7
   207:4 212:18
**25th** 2:4 205:24
**252** 242:14
**26A** 120:8,10
**26th** 169:23 170:2
   205:25
**27th** 74:18 169:12
**2747** 206:1,6
**28** 4:15 138:11 169:8
**28th** 138:3 170:7 242:7
**29** 4:13 198:18
**29th** 34:11 37:12 49:6
   104:19 119:23 196:13
   196:22 198:12 205:25

**3**

**3** 4:6 7:11 11:7,8 32:4
   60:12,19 61:20 65:11
   65:12 154:3 162:10,11
   162:12 213:10 216:12
**3-C** 64:4
**3-inch** 92:16
**3.2** 149:21
**3/11/09** 4:10
**3:05** 162:7
**3:17** 162:7
**30** 17:14,15 22:3
**30,000-pound** 178:10
**30-something** 201:15
**3123** 3:3
**33** 113:23 114:12 116:3
   120:15,20 143:18,23

   149:21 216:6 219:21
**35** 52:6
**36** 26:15,21 27:21,23
   32:23 33:23 37:5,19
   38:2,18 39:3,9,11 40:6
   40:23 41:4,7,10,25
   42:20 43:3,7 44:11
   45:1 48:10 49:15 51:13
   51:15,16,20,20,22 52:1
   52:3,9,12,18 58:4,17
   63:1,5,7,18 69:20,24
   70:4,9 71:6 102:15
   104:2 173:7,9 197:25
   209:4 211:3
**36-39** 71:10
**39** 52:6 70:18

**4**

**4** 33:25 34:12,23 35:5,15
   49:5 54:14 61:25 65:2
   65:4,5 67:19 104:14,20
   104:24 105:3,3,7 120:7
   121:23 164:7,8 208:13
   210:2 224:18,19 226:11
**4-F** 64:4
**4-1/2** 43:12,13
**4-1/2-inch** 177:23
**4:00** 104:23,24 111:24
   112:2 225:3
**4:44** 2:5 237:12
**40** 95:8 103:6 112:12
   173:10 188:24 204:11
   206:17 209:9 228:13,22
**42** 93:2 173:2 176:18
**4250** 3:13
**45** 17:14,15 209:20
**45-minute** 42:2
**46** 209:20,21,22
**4725** 60:11 68:14
**4727** 4:15 23:11 27:6
   32:11 37:25 50:20
   52:25 56:22 57:14,16
   58:2,8 60:10,13 68:8,13
   132:8 134:10 135:5,24
   136:8,10 137:3,8
   139:16 140:7 143:13
   145:18 146:15,17 148:2

   148:15,17,22 153:19
   155:4 157:5 162:12,21
   177:22 195:20,21 196:4
   197:6,17 211:9 213:13
   232:23 233:3 237:9
**4745** 27:6 52:25 162:13
   162:22 196:5 197:6
   236:21 237:8
**48** 136:22 189:6 228:13

**5**

**5** 4:3 65:5 115:23 133:12
   136:4,15 166:10,11
   167:25 168:1 207:3
   211:24 212:10,17
   213:10 214:2 234:4
**5-1/2** 36:19
**5.0** 217:5
**5.1** 33:2,2 49:20
**5.10** 33:14 73:8 79:5 84:7
   86:2
**5.11** 99:18
**5.12** 26:16 37:2,7,17,22
   49:9 104:10
**5.13** 105:14
**5.14** 195:6 197:15
**5.15** 33:14,17,20 109:1
**5.2** 69:9 73:8 110:8
**5.6** 114:12 116:2 120:15
**5.7** 114:23
**5.9** 33:2,19 120:23 121:6
**50** 50:17
**50,000** 72:14 178:16
**50,000-pound** 228:6,9
**500** 134:13,14,21 135:15
   135:22 136:7,24 137:16
   137:19
**500-gross-ton** 137:4,24
**504.585.7000** 3:9
**504.595.3000** 3:15
**504.834.0646** 3:4
**524** 242:15,16
**58** 179:8
**58,500** 179:1,3,5 180:7
   180:24

**6**

DONALD GREEN                                                                 6/25/2009

**6** 4:20 34:1,12,23 35:5,15
  36:19 49:5 54:14
  104:15,20,24 105:3,8
  142:5 167:24 168:3
  208:13 210:2 219:22,22
**6.14-2** 142:21 143:2
  166:24
**6.19** 120:20
**6.19-1** 142:23 143:4
**6/03/2010** 242:12
**6:00** 97:8 119:23 206:2,7
  206:22
**60** 95:8 112:12
**60,000** 72:5,10
**6777** 242:15
**68** 25:23 36:16,25
**6888** 242:16
**69** 4:16 214:16

---
**7**

**7** 61:23 65:12 167:23
  168:25
**7-G** 64:4
**70** 119:24
**700** 159:11
**70002** 3:4
**701** 3:14
**70139** 3:14
**70163** 3:9
**713** 242:15,16
**75** 62:6,11,14,22
**77006** 242:15
**7892** 233:13

---
**8**

**8** 37:12 59:19 65:11,13
  141:10,12,13,14 143:20
  170:9
**8'ed** 181:4
**8'ing** 181:7
**8-strand** 177:23
**8:00** 37:10
**80** 4:18
**815** 2:8
**85** 159:6

---
**9**

**9** 37:12 171:22
**9:00** 37:11 84:25 87:2
  91:3 97:1 197:22,23
**9:20** 206:9
**9:50** 206:8
**90** 185:23
**973-267-0871** 17:2
**990** 160:15

EXHIBIT

B

ONEIDA 003-109-6969

New Orleans Lakefront Airport weather data 050829

# History for New Orleans Lakefront, Louisiana
## on Monday, August 29, 2005

Jump to data by:

Date: August   29   2005   [Go]   Airport Code: [  ]   Bottom of Form

Latest visited Airport Codes: KNEW | KNBG | KFLL

« Previous Day   Daily | Weekly | Monthly | Custom | Trip Planner   Next Day »

| | Daily Summary | | |
| --- | --- | --- | --- |
| | Actual | Average | Record |
| **Temperature** | | | |
| Mean Temperature | 85 °F / 29 °C | 82 °F / 27 °C | |
| Max Temperature | 91 °F / 32 °C | 90 °F / 32 °C | 99 °F / 37 °C (1998) |
| Min Temperature | 79 °F / 26 °C | 74 °F / 23 °C | 67 °F / 19 °C (1971) |
| **Degree Days** | | | |
| Heating Degree Days | 0 | 0 | |
| Month to date heating degree days | 0 | 0 | |
| Since 1 July heating degree days | 0 | 0 | |
| Cooling Degree Days | 20 | 17 | |
| Month to date cooling degree days | 558 | 485 | |
| Year to date cooling degree days | 2200 | 2038 | |
| Growing Degree Days | 28 (Base 50) | | |
| **Moisture** | | | |
| Dew Point | 75 °F / 23 °C | | |
| Average Humidity | 75 | | |
| Maximum Humidity | 91 | | |
| Minimum Humidity | 59 | | |

LNA001071

1

| Precipitation | | | |
|---|---|---|---|
| Precipitation | 0.65 in / 1.65 cm | 0.21 in / 0.53 cm | 2.72 in / 6.91 cm (1996) |
| Month to date precipitation | 3.77 | | |
| Year to date precipitation | 40.18 | 44.77 | |
| **Snow** | | | |
| Snow | 0.00 in / 0.00 cm | 0 | |
| Month to date snowfall | 0.0 | | |
| Since 1 July snowfall | 0.0 | | |
| Snow Depth | 0.00 in / 0.00 cm | | |
| **Sea Level Pressure** | | | |
| Sea Level Pressure | 29.10 in / 985 hPa | | |
| **Wind** | | | |
| Wind Speed | 17 mph / 27 km/h (NE) | | |
| Max Wind Speed | 33 mph / 53 km/h | | |
| Max Gust Speed | 47 mph / 76 km/h | | |
| Visibility | 1 miles / 2 kilometers | | |
| Events | Fog, Rain | | |

Key: T is trace of precipitation, MM is missing value

Source: NWS Daily Summary

LNA001072

| Time(CDT) | Temperature | Dew Point | Humidity | Sea Level Pressure | Visibility | Wind Direction | Wind Speed | Gust Speed | Precipitation | Events | Conditions |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12:01 AM | 80.6 °F / 27.0 °C | 75.2 °F / 24.0 °C | 84% | 29.43 in / 996.5 hPa | 2.0 miles / 3.2 Kilometers | NE | 46.0 mph / 74.1 km/h | 57.5 mph / 92.6 km/h | 0.02 in / 0.1 cm | Rain | Heavy Rain |
| | | | | | | | | | | | |
| 12:19 AM | 80.6 °F / 27.0 °C | 75.2 °F / 24.0 °C | 84% | 29.43 in / 996.5 hPa | 4.0 miles / 6.4 Kilometers | NE | 44.9 mph / 72.2 km/h | 63.3 mph / 101.9 km/h | 0.05 in / 0.1 cm | Rain | Light Rain |

Temperature Dew Point Normal High/Low

Barometric Pressure

Wind Speed

Show full METARS (help) - Comma Delimited File

LNA001073

| Time | Temp | Dew Point | Humidity | Pressure | Visibility | Wind Dir | Wind Speed | Gust Speed | Precip | Conditions |
|---|---|---|---|---|---|---|---|---|---|---|
| 2:15 AM | 78.8 °F / 26.0 °C | 75.2 °F / 24.0 °C | 89% | | | | | | | Rain / Heavy Rain |
| 2:07 AM | 78.8 °F / 26.0 °C | 75.2 °F / 24.0 °C | 89% | 29.30 in / 992.1 hPa | 1.0 miles / 1.6 kilometers | NE | 52.9 mph / 85.2 km/h | 66.7 mph / 107.4 km/h | 0.13 in / 0.3 cm | Rain |
| 2:00 AM | | | 89% | | | | | | | Rain / Heavy Rain |
| 1:53 AM | 78.1 °F / 25.6 °C | 75.0 °F / 23.9 °C | 90% | 29.32 in / 992.9 hPa | 1.0 miles / 1.6 kilometers | NE | 51.8 mph / 83.3 km/h | 67.9 mph / 109.3 km/h | 0.55 in / 1.4 cm | Heavy Rain |
| 1:39 AM | | | 89% | | 1.2 miles / 2.0 kilometers | | | | 0.41 cm | Rain |
| 1:23 AM | 78.8 °F / 26.0 °C | 75.2 °F / 24.0 °C | 89% | 29.35 in / 993.8 hPa | 0.8 miles / 1.2 kilometers | NE | 47.2 mph / 75.9 km/h | 58.7 mph / 94.5 km/h | 0.31 in / 0.8 cm | Heavy Rain |
| 1:12 AM | | | 89% | | 1.8 miles / 2.8 kilometers | | | | 0.4 cm | Rain |
| 1:00 AM | 78.8 °F / 26.0 °C | 75.2 °F / 24.0 °C | 89% | 29.38 in / 994.8 hPa | 0.8 miles / 1.2 kilometers | NE | 44.9 mph / 72.2 km/h | 56.4 mph / 90.7 km/h | 0.10 in / 0.3 cm | Heavy Rain |
| 12:53 AM | | | 85% | | 2.0 miles / 3.2 kilometers | | | | 0.4 cm | Rain |
| 12:37 AM | 80.6 °F / 27.0 °C | 75.2 °F / 24.0 °C | 84% | 29.40 in / 995.5 hPa | 3.0 miles / 4.8 kilometers | NE | 44.9 mph / 72.2 km/h | 58.7 mph / 94.5 km/h | 0.10 in / 0.3 cm | Light Rain |
| 12:25 AM | | 24.0 °C | | | 1.8 miles / 2.8 kilometers | | 47.2 mph / | 63.0 mph / | 0.08 in / 0.2 cm | Heavy Rain |

LNA001074

4

| Time | Temp | Dew Point | Humidity | Pressure | Visibility | Wind Dir | Wind Speed | Gust Speed | Precip | Conditions |
|---|---|---|---|---|---|---|---|---|---|---|
| 2:27 AM | 78.8 °F / 26.0 °C | 75.2 °F / 24.0 °C | 89% | 29.28 in / 991.4 hPa | 1.0 miles / 1.6 kilometers | NNE | 40.3 mph / 64.8 km/h | 54.1 mph / 87.0 km/h | 0.28 in / 0.7 cm | Light Rain |
| 2:44 AM | 78.8 °F / 26.0 °C | 75.2 °F / 24.0 °C | 89% | 29.25 in / 990.4 hPa | 0.5 miles / 0.8 kilometers | NE | 43.7 mph / 70.4 km/h | 71.4 mph / 114.8 km/h | 0.70 in / 1.8 cm | Heavy Rain |
| 3:03 AM | 78.8 °F / 26.0 °C | 75.2 °F / 24.0 °C | 89% | 29.20 in / 988.7 hPa | 2.5 miles / 4.0 kilometers | NNE | 42.6 mph / 68.5 km/h | 64.4 mph / 103.7 km/h | 0.01 in / 0.0 cm | Rain |
| 3:16 AM | 78.8 °F / 26.0 °C | 75.2 °F / 24.0 °C | 89% | 29.18 in / 988.0 hPa | 0.5 miles / 0.8 kilometers | NNE | 42.6 mph / 68.5 km/h | 57.5 mph / 92.6 km/h | 0.32 in / 0.8 cm | Fog |
| 3:28 AM | 78.8 °F / 26.0 °C | 75.2 °F / 24.0 °C | 89% | 29.17 in / 987.7 hPa | 0.2 miles / 0.4 kilometers | NNE | 43.7 mph / 70.4 km/h | 58.7 mph / 94.5 km/h | 0.93 in / 2.4 cm | Fog |
| 3:43 AM | 78.8 °F / 26.0 °C | 75.2 °F / 24.0 °C | 89% | 29.08 in / 984.6 hPa | 0.5 miles / 0.8 kilometers | NNE | 50.6 mph / 81.5 km/h | 59.8 mph / 96.3 km/h | 1.66 in / 4.2 cm | Fog, Heavy Rain |

5

| Time | Temp | Dew/Heat | Humidity | Pressure | Visibility | Wind Dir | Wind Speed | Gust | Precip | Conditions |
|---|---|---|---|---|---|---|---|---|---|---|
| 3:46 AM | 78.8 °F / 26.0 °C | 24.0 °C / 75.2 °F | 89% | 29.11 in / 987.6 hPa | 0.5 miles / 0.8 kilometers | NNE | 61.8 mph / 83.3 km/h | 70.2 mph / 113.0 km/h | 1.73 in / 4.4 cm | Fog, Heavy Rain |
| 3:53 AM | 78.1 °F / 25.6 °C | 75.9 °F / 24.4 °C | 93% | 29.12 in / 986.1 hPa | 0.5 miles / 0.8 Kilometers | NE | 54.1 mph / 87.0 km/h | 85.2 mph / 137.0 km/h | 1.80 in / 4.6 cm | Fog |
| 4:00 AM | 78.8 °F / 26.0 °C | 24.0 °C / 75.2 °F | 89% | 29.11 in / 985.7 hPa | 1.0 miles / 1.6 kilometers | NNE | 77.8 mph / 77.8 km/h | 0.1 in / | Overcast |
| 4:29 AM | 78.8 °F / 26.0 °C | 24.0 °C / 75.2 °F | 89% | 29.05 in / 983.6 hPa | 0.8 miles / 1.2 Kilometers | NNE | 48.3 mph / 77.8 km/h | 61.0 mph / 98.2 km/h | 0.21 in / 0.5 cm | Overcast |
| 4:37 AM | 78.8 °F / 26.0 °C | 24.0 °C / 75.2 °F | 89% | 29.02 in / 982.6 hPa | 0.5 miles / 0.8 kilometers | NNE | 52.9 mph / 85.2 km/h | 64.4 mph / 103.7 km/h | 0.34 in / 0.9 cm | Fog, Fog |
| | 78.8 °F | | 75.2 °F / 24.0 °C | 89% | 28.96 in / 980.5 hPa | 0.5 miles / 0.8 kilometers | NNE | 55.2 mph / 88.9 km/h | 69.0 mph / 111.1 km/h | 0.46 in / 1.2 cm | Fog |

| Time | Temp | Dew/Heat | Humidity | Pressure | Visibility | Wind Dir | Wind Speed | Gust | Precip | Conditions |
|---|---|---|---|---|---|---|---|---|---|---|
| 6:05 AM | 78.8 °F / 26.0 °C | 24.0 °C / 75.2 °F | 89% | 28.76 in / 973.8 hPa | 0.2 miles / 0.4 Kilometers | NNE | 59.8 mph / 96.3 km/h | 80.6 mph / 129.6 km/h | 0.25 in / 0.6 cm | Fog |
| 6:19 AM | 78.8 °F / 26.0 °C | 24.0 °C / 75.2 °F | N/A% | 28.70 in / | 0.2 miles / 0.4 kilometers | North | | | | Fog |
| 6:53 AM | 79.0 °F / 26.1 °C | - | N/A% | 28.59 in / 967.9 hPa | 0.2 miles / 0.4 kilometers | NE | 69.0 mph / 111.1 km/h | 86.3 mph / 138.9 km/h | 1.23 in / 3.1 cm | Fog |
| 7:16 AM | 78.8 °F / 26.0 °C | - | N/A% | 28.49 in / 965.7 hPa | - | North | - | - | 0.34 in / 0.9 cm | Unknown, Fog |
| 7:53 AM | - | 24.0 °C / 75.2 °C | N/A% | 28.30 in / 958.4 hPa | - | North | - | - | 0.37 in / 0.9 cm | Unknown |

Astronomy
August 29, 2005

7

| Time | Temp | | Humidity | Pressure | Wind Dir | Wind Speed | Visibility | Precip | Events |
|---|---|---|---|---|---|---|---|---|---|
| 6:05 AM | 78.8 °F / 26.0 °C | 75.2 °F / 24.0 °C | 89% | 28.76 in / 973.8 hPa | NNE | 59.8 mph / 96.3 km/h | 0.2 miles / 0.4 kilometers | 0.25 in / 0.6 cm | Fog |
| 6:19 AM | | | N/A% | | North | 80.6 mph / 129.6 km/h | 0.49 in / | Fog |
| 6:53 AM | 79.0 °F / 26.1 °C | - | N/A% | 28.59 in / 967.9 hPa | NE | 69.0 mph / 111.1 km/h | 0.2 miles / 0.4 kilometers | 1.23 in / 3.1 cm | Fog |
| 7:16 AM | 78.8 °F / 26.0 °C | | N/A% | | North | 86.3 mph / 138.9 km/h | | | Fog |
| 7:53 AM | - | - | N/A% | 28.30 in / 958.4 hPa | North | - | - | 0.37 in / 0.9 cm | Unknown |

## Astronomy

| | |
|---|---|
| Actual Time | 11:35 AM UTC / 12:25 AM UTC |
| Civil Twilight | 11:11 AM UTC / 12:50 AM UTC |
| Nautical Twilight | 10:42 AM UTC / 1:19 AM UTC |
| Astronomical Twilight | 10:12 AM UTC / 1:48 AM UTC |
| Moon | 6:44 AM UTC (8/29) 9:38 PM UTC (8/29) |
| Length Of Visible Light: | 13h 39m |
| Length of Day | 12h 50m |

Normal View  Extended View

| 8/29 | 9/3 New | 9/11 First Quarter | 9/18 Full | 9/25 Last Quarter |
|---|---|---|---|---|

LNA001077

For more information about the solar system,
– View the Full Star Chart!

* * *

Δ

Downloaded at 1225, Friday, October 28, 2005 from:
http://www.wunderground.com/history/airport/KNEW/2005/8/29/DailyHistory.html?req_city=NA&req_state=NA&req_statename=N

8

LNA001078