1

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF LOUISIANA

3

4   IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION

5                                  * NO. 05-4182

6   PERTAINS TO: BARGES            * Consolidated

7                                  * SECTION "K(2)"

8   Boutte v. Lafarge       05-5531 *

9   Mumford v. Ingram       05-5724 * JUDGE DUVAL

10  Lagarde v. Lafarge      06-5342 *

11  Perry v. Ingram         06-6299 * MAG. WILKINSON

12  Benoit v. Lafarge       06-7516 *

13  Parfait Family v. USA   07-3500 *

14  Lafarge v. USA          07-5178 *

15    *  *  *  *  *  *  *  *  *  *  *

16

17        Deposition of DONALD J. GREEN, given

18  at Chaffe McCall, L.L.P., 815 Walker Street,

19  Suite 953, Houston, Texas 77002, on November

20  21st, 2008.

21

22

23  REPORTER BY:

24        JOSEPH A. FAIRBANKS, JR., CCR, RPR

25        CERTIFIED COURT REPORTER #75005

U.S. Dist. Ct. E.D. La.
No. 05-4182(K)(2) -- BARGE
DX 224

**2**

1  APPEARANCES:
2  REPRESENTING THE BARGE PSLC:
3      LAW OFFICE OF PATRICK J. SANDERS
4      (BY:  PATRICK J. SANDERS, ESQUIRE)
5      3123 Ridgelake Drive, Suite B
6      Metairie, Louisiana 70002
7      504-834-0646
8
9  REPRESENTING LAFARGE NORTH AMERICA:
10     CHAFFE, MCCALL, L.L.P.
11     (BY:  ROBERT FISHER, ESQUIRE)
12     (BY:  DEREK WALKER, ESQUIRE)
13     2300 Energy Centre
14     1100 Poydras Street
15     New Orleans, Louisiana 70163-2300
16     504-585-7000
17  - AND -
18     SUTTERFIELD & WEBB
19     (BY:  DANIEL A. WEBB, ESQUIRE)
20     650 Poydras Street, Suite 2715
21     New Orleans, Louisiana 70130
22     504-598-2715
23
24
25

**3**

1  ALSO PRESENT:
2      WILLIAM EMORY, ESQ.
3      PHILIP WATSON, ESQ.  (VIA TELE)
4      TAHEERAH K. EL-AMIN, ESQ.  (VIA TELE)
5      CONOR KELLS, ESQ.  (VIA TELE)
6      MARK HANNA, ESQ.  (VIA TELE)
7      RONALD J. KITTO, ESQ.  (VIA TELE)
8      BEN RODGERS, ESQ.  (VIA TELE)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

EXAMINATION INDEX

EXAMINATION BY:                    PAGE

MR. WALKER  ...............................8
MR. EMORY  .............................133
MR. WALKER  ...........................141
MR. EMORY  .............................147
MR. WALKER  ...........................151
MR. SANDERS ...........................155

EXHIBIT INDEX

EXHIBIT NO.                        PAGE
Exhibit Green 1 .............................12
Exhibit Green 2 .............................14
Exhibit Green 3 and 4 ......................14
Exhibit Green 5 .............................23
Exhibit Green 6 .............................74

**5**

STIPULATION

        IT IS STIPULATED AND AGREED by and
among counsel for the parties hereto that the
deposition of the aforementioned witness may be
taken for all purposes permitted within the
Louisiana Code of Civil Procedure, in
accordance with law, pursuant to notice;
        That all formalities, save reading
and signing of the original transcript by the
deponent, are hereby specifically waived;
        That all objections, save those as to
the form of the question and the responsiveness
of the answer, are reserved until such time as
this deposition, or any part thereof, is used
or sought to be used in evidence.


                    *  *  *


        JOSEPH A. FAIRBANKS, JR., CCR, RPR,
Certified Court Reporter in and for the State
of Louisiana, officiated in administering the
oath to the witness.

6

1          DONALD J. GREEN
2    8876 Gulf Freeway, Suite 120,  Houston, Texas
3    77017, a witness named in the above
4    stipulation, having been first duly sworn, was
5    examined and testified on his oath as follows:
6    MR. WALKER:
7          Derek Walker for Lafarge North
8    America.  Present in the Houston
9    conference room with Mr. Green are
10   Bill Emory representing Zito and
11   Patrick Sanders representing the barge
12   plaintiffs, along the court reporter
13   and the witness Mr. Green.  It's just
14   the five of us here.
15         Prior to the deposition,
16   Mr. Sanders and I and Mr. Emory
17   discussed the scope of the deposition,
18   and we're just going to make a
19   statement on the record in that
20   regard.  This deposition was
21   originally scheduled prior to
22   submission of the class cert papers,
23   and the purpose was to examine
24   Mr. Green with respect to his report
25   or reports insofar as they related to

7

1    his designation as an expert on the
2    class cert issues.  And that is the
3    purpose of this deposition.  So
4    Lafarge and Zito and probably other
5    parties will want to join in reserving
6    their rights to retake -- or take
7    Mr. Green 's deposition again if and
8    when he's offered as an expert on
9    liability aspects.  With that proviso,
10   Mr. Sanders and I and also Mr. Emory
11   concede that due to the nature of
12   Mr. Green 's expertise and his reports
13   that this deposition may in fact
14   overlap and get into areas that are
15   not, per se, class related, but that
16   will be something that will be
17   difficult to avoid.  But we're going
18   to try and restrict it as much as
19   possible, reserving those rights.
20   MR. SANDERS:
21         My name the Pat Sanders.  In
22   addition to what was said by
23   Mr. Walker, barge plaintiffs will
24   reserve the right to have Mr. Green
25   issue reports in conjunction with

8

1    future scheduling orders of the Court
2    on the issues of liability.  In
3    addition to that, Mr. Green may or may
4    not do additional work and/or research
5    to that end after today.
6    MR. WALKER:
7          Okay.
8    THE WITNESS:
9          Before you start, who is on the
10   other end of those lines?
11   MR. WALKER:
12         The court reporter is going to
13   read them out for you.
14         (The reporter identified for the
15   witness all counsel participating via
16   teleconferencing.)
17   EXAMINATION BY MR. WALKER:
18   Q.  All right.  Mr. Green, good morning.
19   Thank you for finally meeting with us.  I
20   apologize for the various times we've had to
21   reschedule your deposition.
22         First thing is you're back in your
23   home and office after the hurricane and
24   everything is good?
25   A.  Yes, sir.  Thank you, so much for

9

1    asking.
2    Q.  Thank you.  You and I have met before,
3    haven't we?
4    A.  Yes, we have.
5    Q.  Just to put it out on the table, in
6    fact you've worked for me once as an expert on
7    behalf of one of my clients, correct?
8    A.  That's correct, yes.
9    Q.  And that was the MINI SAKURA, is that
10   right?  Was that the name of the ship?
11   A.  Yes, sir.
12   Q.  And that was in relation to the death
13   of three individuals in the hold of a ship?  Or
14   two individuals?
15   A.  That's correct, yes.
16   Q.  Okay.  All right.  You heard the
17   preliminaries, so we are going to try and
18   shortcut a lot of this because we'll probably
19   meet again.  But I did want to ask you a series
20   of questions.
21         First of all, what is your
22   understanding as to the expertise that you are
23   lending to the class certification process?
24   A.  My expertise with Coast Guard rules
25   and regulations, my expertise in seamanship,

10

1  and mooring of vessels, and my expertise and
2  experience with regard to shoreside facilities.
3      Q.  Do you have any understanding how any
4  of those areas relate to the class
5  certification hearing?
6      A.  No, I do not.
7      Q.  Prior to meeting with me this morning
8  here, have you met with any counsel for the
9  barge plaintiffs in preparation for this
10  deposition?
11      A.  Yes.
12      Q.  And that's Mr. Sanders?
13      A.  That's Mr. Sanders, yes.
14      Q.  And you met with him earlier today or
15  yesterday?
16      A.  Yesterday afternoon.
17      Q.  Okay.  Did you discuss in any greater
18  detail or specificity your role in the class
19  cert process?
20      A.  No, sir, we did not.
21      Q.  Did you review any documents that have
22  not been previously produced?
23      A.  No, sir, I have not.
24      Q.  And you have with you today your
25  entire file.

11

1      A.  Yes.  I have -- it's one legal storage
2  box full.
3      Q.  Okay.  And it contains all the
4  documents that you referred to in your report
5  of June 13th, 2008?
6      A.  Yes.  There are a few exceptions.
7  Um -- before the deposition I related that I
8  have an assistant that inventoried all of the
9  documents that I referred to in my report, and
10  there is a barge unloading report, New Orleans
11  terminal report, a fleet picture, Lafarge truck
12  and rail report, and the statement of Busch and
13  the statement of Earl Smith.
14      Q.  Those things are missing?
15      A.  Yes.
16      Q.  Okay.  Is it your recollection that
17  those were produced in the deposition taken
18  with respect to the limitation case, and that's
19  where they are?
20      A.  Yes, sir.
21      Q.  Mr. Sanders is pointing out that those
22  were all attachments to Lafarge's Response to
23  Requests for Admissions?
24      A.  Yes, sir, that's correct.
25      Q.  Okay.  Well, let's mark as Green

12

1  Number 1 the report of June 13, 2008.
2          (Exhibit Green 1 was marked for
3  identification and is attached hereto.)
4      A.  Yes, sir.
5  EXAMINATION BY MR. WALKER:
6      Q.  That is your last and latest version?
7      A.  That's correct, yes.
8      Q.  Are you working on any other version?
9      A.  No, sir, I'm not.
10      Q.  Okay.  Have you been requested to
11  create any different version?
12      A.  No, sir.
13      Q.  Have any of your opinions changed
14  since your report of June 13, 2008?
15      A.  No, sir.
16      Q.  Have you reviewed any materials since
17  preparing your report of June 13, 2008?
18      A.  No, I have not.
19      Q.  So is it your testimony that based on
20  these materials that you reviewed for
21  preparation of your June 13, 2008 report none
22  of your opinions have changed?
23      A.  That's correct.
24      Q.  But you've reviewed nothing since then
25  which would cause you to change your opinions.

13

1      A.  That's correct.
2      Q.  So you've been provided no
3  depositions, no exhibits, no testimony or no
4  additional information of any type by counsel
5  or based on your own research since June 13,
6  2008.
7      A.  That's correct.
8          MR. SANDERS:
9          For the record, Derek, does that
10  report contain his résumé and list of
11  testimony, the one you're attaching?
12          MR. WALKER:
13          We can do that.
14          MR. SANDERS:
15          Okay.
16          MR. WALKER:
17          Let's see.
18          MR. SANDERS:
19          I have it handy, if you need it.
20          MR. WALKER:
21          Is that the same?  Oh, and his
22  résumé.  Right?  Why don't we attach
23  them as separate ones.
24          MR. SANDERS:
25          Okay.

14

```
 1    MR. WALKER:
 2        We're going to attach as Green
 3    Number 2 the résumé which has along
 4    with it a four-page list of cases.
 5        (Exhibit Green 2 was marked for
 6    identification and is attached hereto.)
 7    THE WITNESS:
 8        Yes.
 9    MR. WALKER:
10        I'd like to attach as Green 3 and
11    4 your reports of September 10 and
12    January 17, 2007.
13    THE WITNESS:
14        Yes, sir.
15    MR. WALKER:
16        The September 10 would be
17    Number 3 and the January 17 would be
18    Number 4.
19        (Exhibit Green 3 and 4 were marked for
20    identification and are attached hereto.)
21    MR. SANDERS:
22        Again, for the record, those two
23    prior reports were issued in
24    conjunction with the Ingram litigation
25    and involved therein -- it was in
```

16

```
 1    Q.   Okay.  Let's look at that 2.2,
 2   Additional Considerations.  You say you've
 3   reviewed safety procedures.  What safety
 4   procedures that are not otherwise listed in
 5   your information reviewed Section 2.1 did you
 6   review?
 7    A.   Um -- I reviewed both online as well
 8   as publications, um -- the safety procedures of
 9   mooring, ballasting vessels, heavy weather
10   issues, um -- but these safety procedures I
11   reviewed were pretty well duplicated in the
12   material that was provided to me.
13    Q.   Will, is there anything that you
14   either took notes from, memorialized in any way
15   or copied, that would tell us what safety
16   procedures you looked at that are not listed in
17   2.1?
18    A.   No, I didn't.  I did not memorialize
19   those reviews, I used those safety procedures
20   to confirm what my initial opinions were based
21   on the fact -- based on the information I had
22   to review.
23    Q.   Okay.  What I don't want to have
24   happen, Mr. Green, is that you pull out
25   something that we call -- or that you call a
```

15

```
 1    phases, a Phase I privity and
 2    knowledge, and Phase II liability
 3    which dealt only with Ingram.
 4   EXAMINATION BY MR. WALKER:
 5    Q.   Well, that's part of what you'll
 6   explain to us.
 7        All right, looking at Exhibit 1, your
 8   report of June 13, 2008, could you tell me,
 9   what are your opinions?
10    A.   Um -- this document reflects the
11   research that I conducted, the material I
12   reviewed and a narrative of my understanding of
13   the events that took place during the morning
14   and prior to the morning of August 29th, 2005.
15        Then, in Section 4 -- excuse me,
16   Section 5 are my opinions, which are outlined
17   5.1 through 5.9.
18    Q.   All right.  And these opinions are
19   based on the list of documents that you list in
20   Section 2 of your report which is information
21   reviewed; is that right?
22    A.   Yes, sir.  In addition to that, those
23   items that I've listed in 2.2, those -- 2.1 is
24   what was furnished to me, and 2.2 is additional
25   considerations.
```

17

```
 1   safety procedure that we haven't had the
 2   benefit of examining you on today with respect
 3   to your opinions.  So I want to make sure that
 4   whatever that safety procedures encompasses I'm
 5   aware of it.
 6    A.   Yes.  I agree with you totally.
 7   Again, these are -- and my methodology in
 8   approaching a case is to take all of the
 9   information that is provided to me.  And in
10   addition to that, based on my experience and
11   training, I review several publications that
12   confirm and reacquaint myself with procedures
13   that I've been trained to use over the last
14   fifty years.  So to put it in, um -- in a
15   context that I'm not going to produce anything
16   from this point on, unless I'm asked to review
17   or to research for additional safety
18   procedures.  This is a very broad term that I
19   use routinely in my reports, and the
20   methodology I use, as I just testified, was to
21   review as much information as I possibly can to
22   ensure that I feel I'm in the right direction.
23    Q.   All right.  So there is no safety
24   procedure that you can identify for me that you
25   looked at under this section Additional
```

18

1  Considerations that is not otherwise listed in
2  your Section 2 --
3       A.  Yes.
4       Q.  -- is that right?
5       A.  Yes.  That's right.
6       Q.  Okay.  You also state Federal Rules
7  and regulations.  I'll ask you the same
8  questions:  Is there any federal rule or
9  regulation that you reviewed that is not
10 otherwise listed in your Section 2?
11      A.  Um -- I guess so, and my opinions --
12 no, Section -- I apologize, but Section 3.1.2
13 and -- oh, excuse me, Section 4, rather,
14 Applicable Standards and regulations, those are
15 the regulations that I reviewed in drafting
16 this report.
17      Q.  Okay.  And those are the regulations
18 to which you refer in 2.2.
19      A.  Yes.
20      Q.  No others.
21      A.  No others, right, with regard to this
22 report.  Now, my previous reports I have cited
23 other regulations that are not in this report.
24      Q.  Are there any regulations, federal
25 rules or regulations that you're aware of that

19

1  are applicable to this casualty that you have
2  not cited in any of your three reports?
3       A.  No, I think I've pretty well covered
4  everything.
5       Q.  You also mentioned Coast Guard online
6  database.  Could you tell me what it is that
7  you referred to and what you reviewed?
8       A.  Um -- the, um -- online database is I
9  downloaded, um -- notice to mariners and
10 bulletins that were in the public domain.
11      Q.  Do you have copies of what you
12 downloaded?
13      A.  Yes.  They're listed in the
14 information I listed here.
15      Q.  So everything that you downloaded from
16 the Coast Guard online database is listed in
17 2.1, Information Reviewed.
18      A.  Yes, sir.
19      Q.  Okay.  Have you gone back to that
20 online database since preparing your June 13,
21 2008 report?
22      A.  No, sir, I have not.
23      Q.  You also say you reviewed online
24 research for information regarding Hurricane
25 Katrina.

20

1       A.  Yes.
2       Q.  Is all of that information that you
3  reviewed listed in 2.1?
4       A.  Yes, sir.
5       Q.  It says you reviewed Coast Guard
6  marine safety bulletins.  Are those all listed
7  in 2.1?
8       A.  They should be listed in 2.1.  And
9  they certainly are in my file and/or I refer to
10 them in my report.
11      Q.  Okay.  And you've provided us copies
12 of those, or your counsel has, of all those
13 Coast Guard marine safety bulletins that you
14 reviewed?
15      A.  Yes, sir.  Yes.
16      Q.  And then lastly, you say also various
17 news reports regarding Hurricane Katrina.  Are
18 those listed in 2.1?
19      A.  Yes.
20      Q.  All of the ones you referred to.
21      A.  Yes.
22      Q.  Okay.  2.2, Additional Considerations,
23 and 2.1, Information Reviewed, gathers every
24 piece of information that you have reviewed
25 with which you prepared the report of June 13,

21

1  2008; is that correct?
2       A.  Yes.  All the information that is
3  listed in 2.1 and 2.2 are that information that
4  I relied upon.  Now, I've looked at other
5  things, but I didn't keep a copy of it, or I
6  didn't -- it didn't, um -- it wasn't germane to
7  what my opinions were.
8       Q.  Okay.  Did you review, prior to this
9  report or since then, any document or
10 information which caused you to form a
11 different opinion or opinions than those of
12 June 13, 2008?
13      A.  No, sir.
14      Q.  Okay.  You haven't discarded, ignored
15 or omitted some piece of information or
16 document that would contradict your opinions.
17      A.  No, sir.
18      Q.  Has any such piece of information,
19 testimony, document, photograph, inspection,
20 Coast Guard document, hearing, any information
21 at any time come to your attention that would
22 caution you to alter any of your opinions?
23      A.  No, sir.
24      Q.  You also say in 2.2 you visited and
25 inspected the remnants of the mooring lines

22

1  used to moor the ING 4727 and the ING 4745.
2  What conclusion, if any, did you reach with
3  regard to the mooring lines that you considered
4  for your opinions?
5      A.  My inspection of the lines, it
6  appeared to me -- and of course the lines were
7  in the possession of scientists here in Houston
8  doing tests -- laboratory tests on them, but it
9  was my opinion that they parted under tension.
10      Q.  You're not a rope expert.
11      A.  No, sir.
12      Q.  And you were asked a series of
13  questions, I believe, by Mr. Haycraft at your
14  last deposition with respect to your knowledge
15  of tensile strength and breaking point and
16  things like that.  You don't profess to have
17  any knowledge which you could lend to this
18  Court with respect to ropes, rope condition or
19  tensile strength or anything like that, right?
20      A.  No, only from the standpoint of a
21  seaman, not from a scientific standpoint.  I
22  mean, appropriate lines, appropriate mooring
23  systems, line used.  And seamen are required to
24  know the tensile strength of various ropes and
25  lines and wires.  That's the extent of my

23

1  expertise in that regard.
2      Q.  Okay.  You also visited the Lafarge
3  waterfront facility.  Have you been there
4  since?
5      A.  No, sir.
6      Q.  What observations did you make with
7  respect to that facility that are relevant to
8  your opinions?
9      A.  I visited the -- well, relevant to my
10  opinions?  Um -- it gave me a, um -- certainly
11  a sense of the facility, how it's laid out,
12  where the barges were tied up, and based on all
13  the testimony it gave me a much better idea of
14  the facility, certainly, and the events that
15  took place.
16      Q.  I show you a photograph that I've
17  marked as Number 5.  And before we mark it up
18  with a pen, can you tell me where the facility
19  is that you visited?
20          (Exhibit Green 5 was marked for
21  identification and is attached hereto.)
22      A.  Yes, sir.  It's this area right here.
23  EXAMINATION BY MR. WALKER:
24      Q.  Okay.  Now, you're pointing to the
25  area in front of the silos.

24

1      A.  That's correct.  Yes.
2      Q.  Okay.  Just to the left, as you face
3  the photograph, of the orange warehouse space?
4      A.  That's correct.  Yes.
5      Q.  Do you know what this blue bridge is
6  called?
7      A.  I can't remember -- the Florida Avenue
8  bridge I think.
9      Q.  So we're looking at the Florida Avenue
10  bridge.  I'll represent to you that this is the
11  Sewerage and Water Pump Station Number 5.
12      A.  Yes.
13      Q.  Okay?
14      A.  Yes.
15      Q.  Do you recall where the barge was
16  moored prior to the hurricane?
17      A.  It was moored right in the vicinity of
18  the, um -- I'm not sure what it was called, the
19  unloader or the loader.  Right in this area.
20      Q.  Can you mark that with an X with your
21  pen there?
22      A.  Yeah.  It should be right in here.
23      Q.  You marked it with a black circle;
24  right?
25      A.  Yes.

25

1      Q.  Okay.
2      MR. SANDERS:
3          Derek, may I ask, do you know the
4  date of this photograph?
5      MR. WALKER:
6          I don't.
7      MR. SANDERS:
8          Okay.
9      MR. WALKER:
10          I'm not sure which group that
11  comes from, but it's one we've used in
12  many of the depositions.
13      MR. SANDERS:
14          I just notice a lot of the
15  barges that -- there's been repairs
16  done to the breaches and there was a
17  barge over here by this bridge, all
18  that's been removed.  So it was
19  sometime after the boat in Rita, I
20  presume.
21      MR. WALKER:
22          Probably.  Could be November --
23  there's a series that were taken
24  November 15th, 2005.  It could be
25  around then.

26

1  EXAMINATION BY MR. WALKER:
2      Q.   All right.  Could you tell me in a
3  general sense what your instructions were from
4  counsel for the barge plaintiffs as to the
5  purpose of the June 13, 2008 report?
6      A.   First, I was asked to prepare a
7  declaration as opposed to my typical report.
8  It was -- in fact, the title of it is
9  Declaration of Donald J. Green, Commander, U.S.
10  Coast Guard Retired, Marine Consultant.
11     Q.   Yeah.
12     A.   And I was to review all the
13  information that I had previously reviewed and
14  address the liability of Lafarge.
15     Q.   Do your opinions change as to what
16  occurred based on whose liability you're asked
17  to analyze?
18     A.   No, I think my opinions are consistent
19  from the very beginning.  The report of
20  January 17th, the report of September 10th, and
21  finally this report, is -- there might be -- I
22  might have changed the text around, but the
23  essence of the opinions remain the same.
24     Q.   And what is that essence, how would
25  you distill that?

27

1      A.   Well, it's my opinion that there were
2  two parties involved in this, and that was
3  Ingram Barge as well as Lafarge.  And in my
4  first report I addressed both of those parties,
5  what I felt to be their liability and in my
6  opinion acts of negligence.
7      Q.   And how are those opinions and those
8  acts of negligence related to the flooding in
9  the class -- the potential class area?
10     A.   I have no idea.  I'm not an attorney,
11  and I'm not familiar with the class action or
12  this class certification.  I simply -- again,
13  my methodology and the way I conduct my
14  investigations and issue reports are not so
15  much based on the legal entities, or the legal
16  niceties of what this is, a class action versus
17  privity of knowledge.  If I'm asked to address
18  privity of knowledge, I will do that.  In this
19  case I was asked to render a declaration based
20  on what I -- what my opinions are with regard
21  to liability.
22     Q.   And you don't have an opinion on wall
23  failure, do you?
24     A.   No, I do not.
25     Q.   And you have no opinion regarding what

28

caused the wall to fail.
    A.   Only from the standpoint that there's
witnesses that indicate that the wall was
struck by Barge 4727.
    Q.   That's testimony that the judge will
determine whether it's credible or not.
    A.   That's correct, yes.
    Q.   You don't have an opinion as to what
caused the wall to fail.
    A.   No, I do not.
    Q.   You don't have an opinion as to
whether the barge hit the wall or not, do you?
    A.   Well, I didn't -- I'm not sure if I
address that issue; however, I was
concentrating on the mooring of the barge and
the responsibility of Lafarge in this
particular report.
    Q.   Right.  And that's your area of
expertise.
    A.   Yes.  I have no opinion -- only from
the standpoint of the testimony I reviewed
regarding two gentlemen, Mr. Adams and a
Mr. Dennis --
    Q.   Villavaso.
    A.   Thank you -- Villavaso.

29

    Q.   So in a geographical sense, your
expertise is limited to the occurrences on the
west side of the Inner Harbor Navigation Canal
and at the Lafarge terminal.
        MR. SANDERS:
            May I object to the form.
    A.   Yes.
EXAMINATION BY MR. WALKER:
    Q.   And specifically, as I read and
understand your report, your expertise and
opinions are limited to whether or not the
mooring configuration was correct and whether
or not recommendations or regulations with
respect to mooring in the face of an incoming
hurricane were followed.
        MR. SANDERS:
            Let me object to the form.
    A.   Yes.
EXAMINATION BY MR. WALKER:
    Q.   Is there anything in what I just said
that you disagree with?
    A.   No, sir.
    Q.   Now, we were talking about your three
reports, and you said that the -- I believe you
said that the difference was the last one was

30

1  for class cert, I think the middle one was for
2  limitation, and the first one, if I have them
3  right --
4       MR. SANDERS:
5            Privity of knowledge.
6  EXAMINATION BY MR. WALKER:
7       Q.   -- was privity of knowledge.  Is that
8  correct?
9       A.   Yes.
10      Q.   But the core of your opinions are the
11 same throughout the three.  Is that your
12 testimony?
13      A.   That's right.  Yes.
14      Q.   All right.  You have no training as a
15 marine engineering; right?
16      A.   No, sir, I do not.
17      Q.   You didn't attend any Coast Guard
18 academy?
19      A.   No, I did not.
20      Q.   You're not a naval architect?
21      A.   No, I'm not.
22      Q.   You're not a licensed marine surveyor?
23      A.   There are no such thing as a licensed
24 marine surveyor, but I have conducted surveys.
25      Q.   Are you a member of the Association of

31

1  Marine Surveyors, I believe it's called or
2  something along those lines?
3       A.   No, I'm not.
4       Q.   Okay.  You're not a civil engineer?
5       A.   No, I'm not.
6       Q.   I believe your résumé reflects that
7  your degrees are in business and personnel
8  management?
9       A.   Yes.  And I'm also a Licensed Coast
10 Guard Officer -- a Coast Guard Licensed
11 Merchant Officer.
12      Q.   Well, explain to me -- I believe you
13 said that the areas that you considered you
14 were rendering expert testimony in, or
15 expertise, are seamanship, mooring and terminal
16 facilities?
17      A.   Yes.
18      Q.   Okay.  Based on that education I've
19 just gone through, what special knowledge do
20 you have which the judge himself couldn't glean
21 that causes you to be able to render an expert
22 opinion in these areas?
23      A.   I think what I should be able to bring
24 to the Court is my experience, training and
25 expertise in the use of mooring lines, the

32

1  mooring of vessels, the inspection, and duties
2  and responsibilities of a facility owner with
3  regard to ensuring that the facility is safe
4  and vessels moored to it are safe, as well as
5  my experience in dealing with Coast Guard rules
6  and regulations, as well as during my time in
7  the Coast Guard I assisted in the drafting of
8  Coast Guard rules and regulations that were
9  promulgated and published in the Federal
10 Register and became part of the CFRs.
11      Q.   All right.  Well, let's see if I can
12 remember them.  I didn't write as quickly as
13 you spoke.  Your first was the use of mooring
14 lines.
15      A.   Yes.
16      Q.   What expertise, specialized knowledge,
17 do you have in the use of mooring lines?
18      A.   Um -- eight years at sea and fifteen
19 years as a marine inspector, investigator,
20 investigating numerous barge breakaway cases,
21 notably in New Orleans and surrounding area.  I
22 think I mentioned service at sea already.  And
23 for the last twenty years I've been teaching
24 seamanship as a Coast Guard certified
25 instructor of navigation, seamanship, vessel

33

1  operations.  And, um -- and I think I mentioned
2  before that I'm a licensed officer.
3       Q.   What was the highest rank you
4  obtained?
5       A.   In the Coast Guard?  I retired as a
6  Commander, that's an 05.
7       Q.   When you say licensed officer, is that
8  what you mean?
9       A.   No, I'm a Licensed Merchant Marine
10 Officer.  I have a Limited Master 's License,
11 1600-ton oceans.  I'm a second mate unlimited,
12 as well as a Master of Towing Vessels on Oceans
13 and Western Rivers.
14      Q.   So your expertise in the use of
15 mooring lines, and I'm repeating your word, is
16 basically your practical experience in your
17 career as a seaman and in the Coast Guard.
18      MR. SANDERS:
19           Object to the form.
20      A.   Yes.
21 EXAMINATION BY MR. WALKER:
22      Q.   So when you said use of mooring lines,
23 what do you mean by use?
24      A.   Well, there are, over the millennium,
25 vessels have been tied up using mooring lines

34

1  both in the rivers as well as, um -- other, you
2  know, foreign ports, and there's a, um --
3  there's established use of mooring lines, and
4  what mooring lines are intended to do.  And so
5  I guess my experience is being intimately
6  familiar with use of mooring lines, securing a
7  vessel to a dock or a quay and the procedures
8  to be used in that regard.
9      Q.   All right.  I guess I'm stuck on the
10  word use.  When you say use of mooring lines,
11  we know that a mooring line is used to tie a
12  vessel of some type to a facility or another
13  vessel.  Right?
14      A.   Yes, sir.
15      Q.   So is that what you mean when you say
16  the use of mooring lines, you're talking about
17  their function as a device to hold, in this
18  case, a barge to a facility or another barge?
19      A.   Yes.  And the degree of -- or the,
20  um -- the methodology used to moor, in this
21  case, a barge to another barge.
22      Q.   Your second thing you said was mooring
23  of vessels.  I think that's what you've just
24  talked about.
25      A.   Yeah.  All encompassing.

35

1      Q.   And duties and responsibilities of
2  facility owner.  What gives you expertise to
3  render testimony in that regard?
4      A.   Well, that was the enforcement of
5  Coast Guard statutes with regard to facilities
6  in harbors and vessels in harbors.
7      Q.   You've never served as a captain of
8  the port or officer in charge of a marine
9  inspection, have you?
10      A.   Yes, I have.
11      Q.   And where was that?
12      A.   In Cincinnati, I was the alternate
13  captain of port, and the commanding officer was
14  transferred and I was the acting captain of
15  port for approximately six months until a new
16  commander was brought in.
17      Q.   And that was captain of the port of
18  Cincinnati?
19      A.   Yes.
20      Q.   You were an alternate or executive
21  officer, right?
22      A.   That's correct, yes.
23      Q.   Is it correct that the last time
24  you've actually moored a barge was in 1975?
25      A.   That could be correct, yes.

36

1      Q.   And that was done as a training
2  program for Coast Guard inspectors, not in a,
3  quote, real live context.
4      A.   Well, I disagree with that last
5  statement.
6      Q.   Let me strike the question and
7  rephrase it.
8          That mooring that you did in 1975 was
9  as part of a training program for Coast Guard
10  inspectors; right?
11      A.   Yes.  It was -- I was assigned to
12  American Waterways as -- to, um -- learn the
13  operations of a barge company and that sort of
14  thing.  And during that time I chose to
15  participate in all departments on line haul
16  boats on the Mississippi River and the upper
17  Mississippi, and as such I participated in
18  mooring of barges, of fastening barges
19  together, and also during my career in the
20  Coast Guard in New Orleans inspected many
21  fleets of barges on the Mississippi River
22  regarding mooring, and -- but I think you're
23  correct, I think 1975 might be the last time I
24  actually moored a barge, per se.
25      Q.   And you've never served as a master of

37

1  an inland towing vessel or as a member of a
2  crew of an inland towing vessel, have you?
3      A.   That's correct.  Yes.
4      Q.   And you've never managed a terminal or
5  loading facility, have you?
6      A.   No.  My extent in that regard is the
7  inspection of terminals and vessels at those
8  terminals, inspection of their operations
9  manual in compliance with Coast Guard rules and
10  regulations.
11      Q.   All right.  I think this area of
12  questioning began with my asking you about
13  Exhibit 1, your June 13, 2008 report as to, you
14  know, what instructions you had received, and I
15  think you told me that you had been asked to do
16  a declaration.  Did you ever do the
17  declaration?
18      A.   Yeah.  This is it.
19      Q.   Okay.  This is your declaration.
20      A.   Yes, sir.
21      Q.   But this is not sworn.  This is just a
22  report in your normal format that you'd title
23  declaration.
24      A.   That's correct.  Yes.
25      Q.   I mean, is that what you consider

38

1   this, an expert report?
2       A.   I consider it a declaration.  And it's
3   my understanding, and again I'm not an
4   attorney, but I don't think that declarations
5   are required to be sworn.
6       Q.   Is there any difference between
7   Exhibit 1 and your other two reports in terms
8   of their format, structure and what they state,
9   one being a declaration and the other being
10  just letters to counsel?
11      A.   There's absolutely no difference.
12      Q.   Okay.  All right.  Did you submit any
13  drafts of Exhibit 1 prior to this final
14  issuance?
15      A.   I could very well have.  It's my
16  practice to E-mail a draft and ask the other
17  side -- or my clients whether there are any
18  errors and/or omissions that they would want me
19  to address.  And, um -- if there is any changes
20  it was -- it would have been grammatical as
21  opposed to factual changes.
22      Q.   Okay.  Did you omit or delete any
23  opinions in this final report that you had
24  contained in prior drafts?
25      A.   No, sir.  I don't think so.

39

1       Q.   Did you add any opinions to this final
2   report that were not contained in any prior
3   draft?
4       A.   I'd have to sit here and compare all
5   three, but --
6       Q.   I'm sorry.  By drafts I don't mean
7   your two prior reports, I mean drafts of the
8   report Exhibit 1 which is your June 13, 2008
9   report.
10      A.   No, sir.
11      Q.   Okay.  Have you read the class
12  certification motion or any opposition to it?
13      A.   No, sir.
14      Q.   Have you read any depositions since
15  the deposition of Mr. Villavaso?
16      A.   No, sir.
17      Q.   Are there any particular facts that
18  you're relying on for your opinion -- and I'm
19  sorry if that's sort of a self-evident question
20  from reading your report, but we've established
21  that, you know, your opinion pertains to how
22  the barge was moored and the regulations that
23  might or might not have applied to that
24  mooring.  Correct?
25      A.   Yes.

40

1       Q.   In a very simplistic sense.
2            Other than the facts of how the barge
3   was tied up, the topping around that occurred,
4   are there any other facts that are relevant to
5   your opinion?
6            MR. SANDERS:
7                Object to the form.  It's overly
8            broad.
9       A.   Well, I agree that it's overly broad,
10  but I think that in addressing my opinions I
11  took into consideration all the things that we
12  talked about.  But in a general sense is, those
13  opinions are my interpretation of the evidence
14  that I've reviewed.
15           And I'm not sure whether I'm answering
16  your question.
17  EXAMINATION BY MR. WALKER:
18      Q.   Let me ask you this way:  You have a
19  bunch of depositions that you've listed.
20      A.   Yes, sir.
21      Q.   And they primarily are depositions of
22  either people at Ingram or people at Lafarge
23  who were in potential decision making position
24  regarding what to do or not to do in the face
25  of the hurricane.  You have the deposition of

41

1   various crew members of tugs who might have
2   been involved with coming out, doing something,
3   and the Lafarge employees who were there prior
4   to the hurricane, all of that being events on
5   the west side of the canal at the terminal,
6   correct?
7       A.   That's correct, yes.
8       Q.   Nothing that is contained in any of
9   your reports and nothing that is relevant to
10  your opinion occurred on the east side of the
11  canal after the hurricane, did it?
12           MR. SANDERS:
13               Let me object to form.  Derek,
14           it's clear in his report he mentions
15           Adams and Villavaso 's testimony.
16           MR. WALKER:
17               Do you have an objection?
18           MR. SANDERS:
19               Yeah.  The question is misleading
20           and mischaracterizes Mr. Green 's
21           reports as to its content.  And I was
22           just trying to facilitate justice and
23           a clear understanding of his opinion.
24           MR. WALKER:
25               All right.

42

EXAMINATION BY MR. SANDERS:
1 Q. I'll re-ask the question.
2 A. Okay.
3 Q. All of those depositions and other
4 items that I mentioned relate to the barge
5 pre-hurricane and at the time of the breaking
6 away or the event leading to the breaking away
7 and/or regulations that may or may not apply to
8 it, right?
9 A. Yes.
10 Q. Okay. What is the relevance to your
11 opinions, if any, of the testimony of Mr. Adams
12 or Mr. Villavaso, as a for instance?
13 A. Well, it -- in my opinion, that
14 testimony helped me determine the, um -- the
15 end result of what happened as a result of
16 those acts -- in my opinion those acts of
17 negligence which allowed this vessel to become
18 adrift, and the testimony is that it hit the
19 wall and certainly the physical evidence is
20 that it ended up in the Ninth Ward in a
21 neighborhood.
22 Q. Yeah. But we've already established
23 that you have no opinion and no expertise on
24 whether or not the barge broke the wall, could
25

43

1 have broken the wall, hit the wall, right?
2 MR. SANDERS:
3 Objection. That flies in the
4 face of his report.
5 A. I think I also testified that I read
6 those depositions, and you correctly pointed
7 out the judge is going to decide whether that
8 testimony is credible. But my understanding of
9 the testimony is that two witnesses witnessed
10 the barge -- a barge striking the levee wall.
11 And if this barge would have --
12 EXAMINATION BY MR. WALKER:
13 Q. Let me interrupt you. What is --
14 MR. SANDERS:
15 No. Let him -- he's entitled --
16 Derek, he is entitled to finish his
17 answer.
18 EXAMINATION BY MR. WALKER:
19 Q. Let me interrupt you and you can go
20 back and finish your answer. That proves what,
21 that the barge broke away, right?
22 MR. SANDERS:
23 Don't answer that. Finish your
24 answer first from the prior question.
25 A. Anyway, the, um -- had the barge ended

44

up on the bank someplace, I don't think any of
us would be here today. And, but I take into
consideration those acts that I pointed out in
my report that allowed this vessel to break
free of its moorings and cause the devastation
that it did. Now, when you say what relevance
is that to my report, I think, um -- when you
look at my complete report it's -- that
evidence is, um -- is all germane in my
opinions.
EXAMINATION BY MR. WALKER:
Q. Okay. Well, tell me how the
devastation is germane to a barge breakaway is?
A. Is that the barge was the cause, um --
according to the witness testimony, of the
breach in the wall and a sudden and, um --
devastating tidal wave that went through the
wall.
Q. Well, that's what I want to know. Are
you going to testify in front of Judge Duval
that the barge was the cause of the break of
the wall? Yes or no?
MR. SANDERS:
Object to the form of the
question. And it's impossible for him

45

to know what questions will be asked
of him. But his report indicates a
fair understanding.
A. Certainly I'm going to testify to
whatever I have in my report, and certainly on
cross-examination I'm going to be subjected to
inquiry into that, but this is my understanding
of the facts and certainly if I'm asked a
question then I'm going to give an answer
similar to what I just gave.
EXAMINATION BY MR. WALKER:
Q. Yeah. Well, part of this whole
process is, as you know, discovery so that we
know what you're going to say. Right?
A. Yes, sir. Yes.
Q. And I thought it was pretty clear what
your expertise is in, and I thought it was
pretty clear by reading your report that your
opinions, and I'll read your introduction which
is identical to all three reports are regarding
the circumstances surrounding the break away of
the barge. Okay?
A. Yes.
Q. That's what your opinion is all about,
right?

12 (Pages 42 to 45)

46

1     A.   Yes.
2     Q.   Mr. Adams has nothing to add to the
3  circumstances surrounding the breakaway of the
4  barge, does he?
5     A.   Only from the --
6     Q.   Yes or no?
7        MR. SANDERS:
8           No.
9        MR. WALKER:
10          Do you have an objection?
11       MR. SANDERS:
12          I'm objecting that you're
13       unfairly limiting the witness to his
14       answer.  He clearly mentioned
15       Mr. Villavaso --
16       MR. WALKER:
17          You don't have to testify.
18       What's your objection?
19       MR. SANDERS:
20          Object to the form in that the
21       question is unfairly limiting.
22       Go.
23  EXAMINATION BY MR. WALKER:
24     Q.   Okay.
25     A.   Okay.  Now, would you restate the

47

1  question, please, or have the court reporter --
2     Q.   Your opinions regarding the
3  circumstances surrounding the breakaway of the
4  barge.
5     A.   That's correct.  Yes, sir.
6     Q.   And in your opinion, how and why did
7  the barge break away?
8     A.   I outlined it in my Opinion Number 1
9  through, um -- 5.1 through, um -- 5.9.
10     Q.   Well, simply, it broke away because in
11  your opinion the mooring line broke under
12  stress, right?
13       MR. SANDERS:
14          Object to the form.
15     A.   No, I don't -- the mooring line broke
16  for other reasons -- well, it broke under
17  tension, as far as I can tell.
18  EXAMINATION BY MR. WALKER:
19     Q.   Okay.
20     A.   But what caused that tension to cause
21  it to break, um -- certainly is part of my
22  opinions.
23     Q.   Right.
24     A.   And it's my opinion that, as I state
25  in here, that a combination of hurricane winds,

48

1  rising water levels in advance of Hurricane
2  Katrina and the acts and omissions of the
3  parties discussed herein.
4     Q.   I agree 100 percent with what you're
5  saying.
6     A.   Yes.
7     Q.   And those are the circumstances that
8  form your opinions regarding the breakaway of
9  the barge, right?
10     A.   That's correct, yes.
11     Q.   Any observations of Mr. Adams or
12  Mr. Villavaso on the west side of the canal
13  have nothing to do with your opinions regarding
14  the breakaway of the barge, do they?  As you've
15  just set forth.
16     A.   I disagree with that only from the
17  standpoint that they confirm that the barge
18  broke away.
19     Q.   But is there any dispute that the
20  barge broke away?
21     A.   No.
22     Q.   Okay.  So do they add anything to your
23  expertise and upon which you rely for the
24  circumstances surrounding the breakaway of the
25  barge?

49

1     A.   Well, yes.  They confirm that the
2  combination of hurricane winds and forces, the,
3  um -- the way the barge was moored, all those
4  instances that contribute to this barge
5  becoming adrift, and the result of that.
6     Q.   So are you telling me that if the
7  judge finds that neither of those individuals
8  are credible that your opinions, therefore,
9  will change?
10     A.   No, I don't think so.
11     Q.   Okay.
12     A.   I think that if they had no witnesses
13  as all, we know that the barge ended up in the
14  neighborhood, and whether there's going to be
15  other people who are going to testify that the
16  condition of the wall was either struck or
17  breached or whichever.  But the facts are that
18  the barge ended up in the Ninth Ward.
19     Q.   All right.  Let's go through your
20  opinions starting with 5.1.  According to 5.1,
21  in your opinion the most likely cause of the
22  breakaway is a combination of hurricane force
23  winds and rising water levels.  Right?
24     A.   And, um -- known to all parties, and
25  the acts and omissions of the parties discussed

50

1  herein.
2      Q.  Well, I'd like to take them piece by
3  piece.
4      A.  Sure.
5      Q.  Hurricane force winds and rising water
6  levels.
7      A.  Yes.
8      Q.  Okay.  How did they cause or
9  contribute to this breakaway?
10      A.  Well, the methodology that Lafarge
11  used to moor the vessel, um -- the northern
12  tier of the vessels that were at the facility,
13  in my opinion the rising waters caused the
14  mooring lines to slip or part and allowed that
15  tier of barges to set down and allide with the
16  southern tier of barges, namely 4727 and 4745.
17      Q.  All right.  I just want to make sure I
18  understand your opinion, because I want to be
19  fair to you.
20      A.  Yes, sir.
21      Q.  But I don't want you to tell me in six
22  months at trial that you have a different
23  opinion.
24      A.  Oh, I understand perfectly.
25      Q.  You've studied this for three years or

51

1  so, haven't you?
2      MR. SANDERS:
3          Let me object, Derek, in that we
4      have put on the record that he's
5      entitled to change his opinions for
6      the issues of liability.  That was
7      made clear that he may or may not
8      continue to do more work on this case,
9      and that when the issue of liability
10      comes up he will issue a new report
11      and there will be depositions on that
12      issue.
13      MR. WALKER:
14          Well, let's talk about the facts
15      upon which you rely for the opinions
16      on liability that you've now issued
17      three times.  And if you change them
18      we'll have to discuss that.
19      MR. SANDERS:
20          Again, that's
21      mischaracterization.  The first two
22      reports dealt with Ingram only.  And
23      Lafarge though was a party in the
24      Ingram litigation, the parties were
25      precluded from discussing liability of

52

1  Ingram throughout that litigation.
2          Will you agree with that?
3  EXAMINATION BY MR. WALKER:
4      Q.  We've already established that the
5  party that you address in the reports does not
6  change your opinion.  Isn't that your
7  testimony?
8      A.  That's correct.  Yes.
9      Q.  And you've now formed your opinions
10  three times with respect to one core issue,
11  which is circumstances regarding the breakaway
12  of the barge; correct?
13      A.  That's correct.  Yes.
14      Q.  So I'd like to understand the facts
15  upon which you rely and the bases of your
16  opinions, and then your opinions.  Okay?
17      A.  Yes, sir.
18      Q.  All right.  So you stated that a rope
19  or ropes slipped or parted.
20      A.  That's correct.
21      Q.  All right.  Which rope or ropes are
22  you talking about?
23      A.  The northern end of the five-barge
24  tier, which is above the, um -- the 27 and the
25  45.  They were all moored, tied together, and

53

1  the five barges, um -- post-Katrina aerial
2  photographs that show that the five barges
3  shifted, and it looks like the line on the
4  northern tier of the five-barge tier either
5  slipped off or parted, um -- and that tier
6  allided with the 27 and the 45.
7      Q.  Okay.  All right.  And then what is
8  the basis of your opinion; so that the
9  five-tier allided with the 47 and the 45, and
10  then what?
11      A.  And it was a combination of
12  everything; it was the hurricane winds, the
13  storm surge, um -- the, um -- the five-barge
14  tier becoming loose, all of that, um -- nobody
15  can say for sure what exactly happened.
16      Q.  Okay.  But what I'm not getting from
17  you is all of that caused what?
18      A.  Caused the barge to break away.
19      Q.  And how did the barge break away, in
20  your opinion?
21      A.  Well, then the combination of all
22  those things I just talked about caused the
23  lines to part under tension, and the vessel
24  became adrift.
25      Q.  What lines?

54

1    A.   The mooring lines between the 4745 and
2  the 4727.
3    Q.   Okay.  So backing up then, you had
4  lines between the two barges 4727 and 4725, and
5  that line parted under tension.
6    A.   Three lines parted under tension.
7    Q.   Three lines parted under tension
8  allowing the 4727 to drift away.
9    A.   That's correct.
10    Q.   That's your testimony; right?
11    A.   Yes.  Yeah.
12    Q.   Okay.  Do you know when that occurred?
13    A.   No, sir.  Somewhere between -- well,
14  trying to tie it down, um -- it had to occur
15  sometime before five o'clock.
16    Q.   5:00 a.m. on the morning of --
17    A.   The 29th.
18    Q.   Okay.  And why do you say it had to
19  occur sometime before 5:00 a.m.?
20    A.   I think that the testimony of, um --
21  of the pump person Mr --
22    Q.   Villavaso?
23    A.   Thank you -- and Mr. Adams, Mr. Adams
24  said he woke up at five o'clock and he had
25  water on the floor and that sort of thing, and

55

1  he stuck his head out through his fan vent, and
2  he saw a dark object going toward the levee.
3  Then Mr. Villavaso said it happened somewhere
4  between 4:00 and 6:00, if I recall his
5  testimony correctly.  But it was in that same
6  time frame, so --
7    Q.   Okay.  So you're relying on Adams and
8  Villavaso for the basis of the opinion that the
9  breakaway occurred sometime before five a.m.
10    A.   Yes, sir.  Yes.
11    Q.   Now, you had said a contributing
12  factor was the wind.  Could you explain that?
13    A.   Well, the weather reports indicated
14  that just about that time the hurricane was
15  about 70 miles away and had winds of --
16  expected winds of 145 miles an hour, hurricane
17  winds.  And I think the hurricane was something
18  like 250 -- not the eye, but the extent of
19  hurricane force winds were 250 miles, if I
20  recall correctly.  So they had hurricane winds,
21  and, um -- and of course the storm surge, um --
22  was occurring just in that same time frame.
23    Q.   That was my question.  You said at
24  that time there were winds.  At what time are
25  we taking about?

56

1    A.   We're talking about between 4:00 and
2  6:00 a.m.
3    Q.   Okay.  Well, you said before it had to
4  happen prior to 5:00 a.m., and now you're
5  saying 4:00 to 6:00 a.m.
6    A.   Well, I'm looking in my report, and
7  Mr. Villavaso says between 4:00 and 6:10 he
8  witnessed a barge strike the floodwall.
9  Mr. Adams talked about 5:30 to 6:00.  So in
10  general terms it's in that area, in that time
11  area.
12    Q.   Okay.  Did you check the direction of
13  the wind?
14    A.   Yes, I did.  And, um -- the direction
15  of the wind at that time should have been
16  coming from either the northeast or due from
17  the north.
18        MR. WEBB:
19             What time again?
20    A.   Between 4:00 and 6:00.
21  EXAMINATION BY MR. WALKER:
22    Q.   So on this photograph, the wind
23  direction would have been like this or like
24  this?  (Indicating.)
25    A.   It would have been -- this doesn't

57

1  show the direction, but the orientation of the
2  canal is this is north.
3    Q.   This is north here.
4    A.   Right.  North.  And so it was coming
5  from either from this area, from the north,
6  northeast or slightly from the northwest.
7    Q.   So could you draw an arrow in this
8  area which way the wind is actually blowing?
9        MR. SANDERS:
10             At what time?
11  EXAMINATION BY MR. WALKER:
12    Q.   At the time you're talking about.
13        MR. SANDERS:
14             4:00 to 6:00 a.m.
15  EXAMINATION BY MR. WALKER:
16    Q.   4:00 to 6:00 a.m.
17    A.   Yeah.  Again, I didn't see any
18  information that, um -- it would be coming from
19  this area or this area.
20        MR. EMORY:
21             Here, use this.  (Tendering.)
22    A.   (Witness complies.)
23  EXAMINATION BY MR. WALKER:
24    Q.   Now, we have marked it in three red
25  arrows.  And I'll say wind direction at the

15 (Pages 54 to 57)

58

1  time of the break away?
2      A.  Yes.  In that general time frame.  We
3  don't know the exact time, and no one knows the
4  exact time of when the barge broke loose.
5      Q.  All right.  And you also mentioned
6  surge.
7      A.  Yes.
8      Q.  Could you explain that to me, how
9  that's related?
10     A.  Well, the surge, they predicted a
11 surge of in the neighborhood of eighteen feet.
12 Eighteen to twenty-eight feet I think it was.
13 And the surge certainly, um -- played a part in
14 disturbing the two tiers.  The tier with the
15 five barges, the testimony is that they, um --
16 secured the mooring lines with, um -- um --
17 lines going from the barge against the dock
18 to -- no, excuse me, from a bollard on the
19 dock, and wrapped three times around a piling
20 on the dock and then led to the barge.  I think
21 that's -- if I recall correctly, that's the way
22 he, um -- in fact, in my report I summarize and
23 I say Mr. Busch described the arrangement as
24 follows:  The mooring linings were secured to a
25 mooring bollard affixed to the dock, then

59

1  looped around a cement piling with three loops,
2  thence to the cleats or bitts on the barge.
3      Q.  All right.  Do you have any objection
4  to that method of securing?
5      A.  Yes.
6      Q.  Okay.  What's your objection to that?
7      A.  My objection is that, um -- it
8  allows -- and their purpose in putting those
9  loops the way they did, as Mr. Busch testified,
10 that he theorized that this method would allow
11 a payout of the mooring lines as the water
12 level rose in the canal.  And my opinion is
13 that if he would have -- if they would have
14 moored in a traditional sense, if the water
15 level went over the dock then the barges could
16 have very well -- the loaded barges could very
17 well have still stayed against the dock.  Um --
18 his theory was to put the empty barge that was
19 against the dock, put it outboard of the loaded
20 barge; hence, the procedure of having the
21 barges topped around.  He was concerned about
22 the empty barge going up on the dock.
23     Q.  All right.  I'll get back to that, but
24 I want to understand the storm surge.
25     A.  Well, the storm surge is, um -- is a

60

1  well known phenomenon that hurricanes produce
2  from the forces of wind that builds up a surge
3  of water principally on the right quadrant
4  of -- the right side quadrant of the
5  approaching storm.
6      Q.  So the surge would have been coming
7  from the same direction as the arrows that
8  you've marked here as the wind?
9      A.  Yes.  It would have come up the MRGO.
10 The Mississippi River Gulf Outlet.
11     Q.  So in the same direction generally as
12 those arrows, or any different?
13     A.  No, pretty much as those arrows.
14     Q.  So the surge is pushing from north to
15 south, basically, at least in the canal.
16     A.  Not the whole canal.  This is the
17 turning basin where the facility is located.
18 There's another turning basin to the north of
19 there.  And the Mississippi gulf outlet comes
20 in a direction -- I think the orientation is
21 something like either due east or in that
22 direction, or southeast.  But anyway, the surge
23 comes up through the MRGO and would come this
24 way.  The water would rise in the canal.
25     Q.  And the direction of the surge in the

61

1  canal would be north to south.
2      A.  In that particular area, yes.
3      Q.  Okay.
4      A.  But again, as that surge builds up,
5  and I'm not a hydrologist, but I would expect
6  that it would cause -- as it comes up and it
7  was coming in, and I don't know what the speed
8  of the current was at that time, however this
9  water is going to come up with the surge and
10 it's going to cause all kind of eddies and
11 counter-currents, and particularly in this
12 turning basin.  But to answer your question
13 directly, the surge would have come through the
14 Florida Avenue bridge.
15     Q.  Down through -- north of the bridge to
16 the other side is what you're saying, when you
17 say through the bridge.
18     A.  Yes, sir, it would have been going in
19 a southerly direction.
20     Q.  Okay.  And the importance of the surge
21 for your opinion is that it did what to the
22 barges to contribute to the breakaway?
23     A.  It allowed the, um -- the lines
24 attached to the upper tier, five barge, which
25 were all loaded barges, it allowed one of those

62

1   lines -- and the photograph that I've reviewed
2   indicates that the five-barge tier, um --
3   northernmost end came away from the dock.  And
4   for that to happen, one of two things had to
5   occur; one, the line that Mr. Busch described
6   as being looped around the cement pilings
7   actually came loose and allowed the vessel,
8   that tier to, um -- to be, um -- to drift down
9   or to hit the two barges, the 4727 and the
10  4745, which is right adjacent to them.
11      Q.   Right.  We're still on 5.1, and I'm
12  trying to understand the basis of your opinion.
13  Is it your opinion that the five tier of
14  barges, as a result of storm surge and winds
15  upon that five tier came loose and allided with
16  the 4727 and the 4745 causing the mooring lines
17  holding those two barges together to part?
18          MR. SANDERS:
19              Let me object to the form.  It
20          misstates all his prior testimony.
21              I suggest you read 5.1 into the
22          record.
23  EXAMINATION BY MR. WALKER:
24      Q.   No, this is my deposition.  I don't
25  want you to do that.  But do you understand my

63

1   question?
2       A.   Yes.
3       Q.   Okay.  Is that correct?
4       A.   That's not correct.
5       Q.   What's incorrect about that?
6       A.   Well, what's incorrect is you have
7   failed to include the fact that it was a
8   combination of hurricane force winds and the
9   combination that it's my opinion that the,
10  um -- the 427 and the 445 were inadequately
11  moored together.
12      Q.   No, I didn't fail to consider that, I
13  haven't gotten there.
14      A.   Oh.
15      Q.   Is it your opinion that the five tiers
16  allided with the 4727 and/or 4745; yes or no?
17      A.   Yes.
18      Q.   Okay.  And is it your opinion that as
19  a result of that allision the lines between
20  4727 and 4745 parted?
21      A.   Not totally, no.
22      Q.   Well, partially?
23      A.   Well, I think that the barges came
24  loose, the five-barge tier came loose, or
25  parted, came loose, and allided with the 4727,

64

1   and the 4727, which was empty at the time and
2   would have been exposed mere to hurricane winds
3   than would be the five-barge tier.  They were
4   all loaded, and as such, um -- it's common
5   knowledge, and it's been pointed out in Coast
6   Guard procedures that loaded barges are much
7   safer in hurricane force winds and in hurricane
8   conditions than are light barges.  And they
9   even recommend that barges be ballasted -- or
10  not barges, but vessels be ballasted to reduce
11  their sail area and, as such, not be as
12  influenced by the wind as an empty barge or an
13  empty vessel could be.
14          And so it was a combination of
15  hurricane force winds, storm surge and the fact
16  that the five-barge tier came loose.  And I
17  think that, um -- based on that aerial
18  photograph, um --
19      Q.   Okay.  Let me interrupt you.  I'm not
20  understanding you.  The five tier barges hit
21  the other two; correct?
22      A.   That's my opinion, yes.
23      Q.   Right.  Is that what caused the other
24  two -- the lines between 4727 and 4745 to
25  break?

65

1       A.   That, um -- was part of the cause.
2       Q.   What else was the cause?
3       A.   The other cause was the, um -- was the
4   inadequate lines, number one.
5       Q.   Okay.  Inadequate lines in what sense?
6       A.   They were -- the lines were not
7   doubled up as they should have been.
8       Q.   Did that cause them the part?  That's
9   just a condition.  I'm asking you the cause.
10      A.   The cause --
11      Q.   What caused the lines the part, the
12  force of the allision of the five tier barge?
13      A.   And the combination of hurricane force
14  winds.
15      Q.   Okay.  Hurricane force winds upon
16  what?
17      A.   Upon the sail area of the exposed
18  empty barge.
19      Q.   Okay.  So in your opinion what caused
20  the lines between the 4727 and the 4745 to part
21  was the combination of the five tier barge
22  alliding with those barges and the wind upon
23  the 4727.
24      A.   And the surge.
25      Q.   Okay.  The surge upon what?

66

1    A.  Well, as I -- you provided Exhibit
2   Number 5, and we talked about the storm surge
3   coming into the Industrial Canal.  And it's my
4   opinion that that surge happening within just a
5   very short period of time of anywhere from
6   eighteen to twenty-eight feet would have caused
7   a tremendous amount of current,
8   counter-currents and other hydraulic actions on
9   vessels within this area.  And it's my opinion
10  that all three of those conditions in
11  combination caused that.
12      Q.  Okay.  I don't understand the surge.
13  What effect did the surge have on the barge to
14  cause or contribute to the breaking of the
15  lines?
16      A.  I think I just testified to that but
17  I'll say it again.
18      Q.  Well, you're not a hydrologist, right?
19      A.  I'm not a hydrologist but I'm a
20  seaman, an experienced seaman of riding through
21  hurricanes and preparing vessels to withstand
22  the effects of oncoming hurricanes.  And the
23  fact that it was in my opinion inadequately
24  moored --
25      MR. SANDERS:

67

1       Let him finish, please.
2   EXAMINATION BY MR. WALKER:
3       Q.  No, I want to restrict you so I
4   understand your answer.  Surge is all I want to
5   know about.  How did the surge affect the barge
6   to cause or contribute to the parting of lines?
7       MR. SANDERS:
8           Derek, you have no right to cut
9       him off without him finishing.  He was
10      going to say -- talk about the
11      inadequate mooring in combination to
12      the surge.
13      MR. WALKER:
14          How do you know he was going to
15      say that?
16      MR. SANDERS:
17          I was listening to him.
18      MR. WALKER:
19          He didn't get there.  I
20      interrupted him.
21      MR. SANDERS:
22          Why don't you let him answer the
23      question.
24      MR. WALKER:
25          Because he said it three times.

68

EXAMINATION BY MR. WALKER:
    Q.  Is my question unclear?
    A.  I think I want to they how did the
surge contribute to the parting of the lines.
And I think I was on my way to answering that
question, and that is that the surge
contributed to the breakaway, overcome the
existing mooring lines, um --
    Q.  How?
    A.  How?  Well --
    Q.  Did it raise the barge higher?  Did it
push it?
    A.  Yes, it did.  It raised it.  It
caused --
    Q.  Tell me what it did.
    A.  It caused, and I'm sure a, um -- a
hydrologist would be more equipped to be able
to describe the phenomenon, but from a
seaman 's standpoint, from an everyday
seamanship standpoint, that you are to moor a
barge to withstand the expected forces of wind,
current and other vessels passing and that sort
of thing.  And so in this case, the surge, in
my opinion, caused forces within that turning
basin that assisted in overcoming the mooring

69

lines.
    Q.  Assisted in overcoming --
    A.  Maybe I'm using the wrong word.  It
was a combination of those forces.
    Q.  Okay.  Maybe I'm not being clear in my
question.  Tell me what the surge did to the
five tier barges or to the 4727 to cause or
contribute to the breaking of the lines between
the 4727 and the 4745?
    A.  The, um -- the surge and combination
of the surge and the wind, um -- caused the
northern end of the five tier loaded barges,
um -- to, um -- slip its mooring or broke the
line that was mooring it.  The five tier barges
then allided with the two barges the 4727 and
the 4745, um -- and the combination of the
wind, the surge and that allision, um -- in my
opinion caused the mooring lines to break.
    (Brief recess.)
EXAMINATION BY MR. WALKER:
    Q.  What do you understand to be the
distance between the 4727 and 4745 and the five
tier barges?
    A.  I can only -- I understand that they
were adjacent to each other, but the actual

70

1  distance I don't have any data in that regard
2  other than the, um -- post-Katrina aerial
3  photographs that show the 4745 is right
4  adjacent to that tier. Looks in close
5  proximity.
6      Q.  So normal practice would be, what, a
7  couple of feet?
8      A.  Could be as much as five feet. It
9  could be maybe more. I just can't tell the
10 distance between those two tiers.
11     Q.  None of these barges are
12 self-propelled; right?
13     A.  No, sir, they're not.
14     Q.  So any barge of these adrift or
15 loosened from their moorings is going to float
16 where the wind or current will take it.
17     A.  That's correct, yes.
18     Q.  Your report at Section 3,
19 circumstances, gives a description of the
20 barge. What does uninspected and undocumented
21 mean?
22     A.  Um -- it's -- it is uninspected by the
23 Coast Guard, and it is not documented by the
24 United States government.
25     Q.  Does that mean it's subject to -- or

71

1  not subject to certain regulations?
2      A.  Yes. That's correct. They're not
3  subject to the inspection laws other than,
4  um -- as a dumb barge with regard to, um --
5      Q.  And dumb, for the landlubbers reading
6  this, means that it's not self-propelled.
7      A.  Yes. That's correct. Yes. I'm
8  sorry.
9      Q.  Go ahead. I'm sorry.
10     A.  And undocumented means that it's not,
11 um -- it hadn't been registered with the United
12 States government and issued an official
13 number.
14     Q.  Are there other regulations that an
15 undocumented, uninspected barge is not subject
16 to?
17     A.  Yes. It's not subject to the
18 inspection laws of a -- in this case, it's not
19 a seagoing barge, it's an inland barge, and
20 there's no regulations that cover inland barges
21 other than basic uninspected vessel safety
22 rules regarding fire extinguishers and that
23 sort of thing. But for a non self-propelled,
24 undocumented, uninspected barge, there's very,
25 very few applicable regulations.

72

1      Q.  Gross tons you say 960, net tons 960.
2  That's not correct, is it?
3      A.  Yes. It is.
4          MR. SANDERS:
5              He says estimated.
6  EXAMINATION BY MR. WALKER:
7      Q.  Gross tons and net tons you estimate
8  to be the same?
9      A.  Yes. On an uninspected barge like
10 this, the net tonnage would be those spaces
11 that would be exempt from the measurement, and
12 on a dumb barge or an uninspected barge that
13 carries cement or grain or whichever, it's --
14 the net ton and gross ton are typically the
15 same.
16     Q.  Okay. And what do you mean by depth?
17     A.  Depth is the depth from the bottom of
18 the barge -- inside of the bottom of the barge
19 to the main deck.
20     Q.  So that's an interior space
21 measurement?
22     A.  Yes, it is. And it has, this barge
23 has coaming, but that is not included in the
24 depth.
25     Q.  I'm going to show you a picture

73

1  previously marked as Villavaso Number 4.
2      A.  Yes.
3      Q.  And you see that that is indeed the
4  Barge 4727?
5      A.  Yes, sir.
6      Q.  And you see the numbers on it?
7      A.  Yes.
8      Q.  All right. There are sort of two
9  sections, the large orange section that's sort
10 of more forward, and then the top section. Can
11 you describe those to me in more technical
12 terms?
13     A.  Yeah. This is the -- this is the, the
14 first section which is, um -- in my
15 measurements I got as 12-foot, that would be
16 this section from the bottom of the barge to
17 the main deck.
18     Q.  All right. Let's mark those with Xs,
19 if you would.
20     A.  Uh-huh.
21     Q.  Or actually, Bill, can we use your red
22 pen?
23     A.  I'm going to put it to the side where
24 it's contrasting colors.
25     Q.  Oh. Okay.

74

1   A.   From there to there.  That's the
2   document.
3   Q.   Okay.  Why don't you join those
4   somehow, like with a parentheses or something.
5        Yeah.  All right.  So you've marked on
6   the photograph which we've now marked as Green
7   Number 6, on the left-hand side of the barge,
8   with brackets, an area that's the depth.
9        (Exhibit Green 6 was marked for
10  identification and is attached hereto.)
11  A.   Yes.
12  EXAMINATION BY MR. WALKER:
13  Q.   So that's 12 feet, according to the
14  documentation.
15  A.   Yes.
16  Q.   And when the barge is in the water
17  that entire twelve feet is below water?
18  A.   No.
19  Q.   Okay.  When the vessel -- when the
20  barge is loaded, how much of that twelve feet
21  is below water?
22  A.   Well, you can see there's -- this line
23  would be as a result of being submerged, and
24  this would be the typical, um -- freeboard as
25  such that the vessel would have when it's

75

1   loaded.
2   Q.   Okay.  Freeboard being the area above
3   the water 's surface when the barge is loaded.
4   A.   Yes, sir.
5   Q.   Okay.  And do you have a freeboard
6   calculation there?
7   A.   No.
8   Q.   Okay.  You say a light draft 1 foot
9   4-1/2 inches.
10  A.   Yes.
11  Q.   What does that mean?
12  A.   That means when she's empty she should
13  be sitting -- well, she should have no more
14  than a foot and 4-1/2 inches submerged.
15  Q.   Below the water.
16  A.   Yes.
17  Q.   So when she's empty, most of this
18  twelve foot depth, except for a foot 4.5, would
19  be above water.
20  A.   That's correct, yes.
21  Q.   Okay.  What your understanding as to
22  the condition of the barge at the time of the
23  hurricane?
24  A.   I understand it was empty.
25  Q.   So approximately, um -- ten and a half

76

feet of this depth area would have been above
water.
    A.   That's correct.
    Q.   As well as all of this red area which
is what, the cover?
    A.   That's the -- well, it's the coaming,
which is a peripheral of the interior space,
the box.  And that's where cargo is loaded.
And then of course the covers.
    Q.   Okay.  You want to just put a little
arrow over here and say coaming and cover?
    A.   Okay.
    Q.   And would you say that that's about --
the coaming and cover are about four to five
feet above deck level?
    A.   Yes.
    Q.   So you'd have sixteen or so feet
looming above the water when this barge was
light.
    A.   That's correct, yes.
    Q.   Okay.  What material are the covers
made out of?
    A.   Fiberglass.
    Q.   How heavy are they?
    A.   Um -- I have no idea, but I would

77

expect, um -- that, um -- I don't want to
speculate what the weight is.
    Q.   Okay.  Is it one cover or is it
several covers?
    A.   No, it's several covers.  They usually
have six or eight covers.
    Q.   All right.  Let's go back to your
opinions, then.  Your Opinion 5.2 says that
Lafarge failed to properly moor the 4727 to the
4745.
    A.   Yes, sir.
    Q.   Then you state that the mooring
arrangement was totally inadequate.
    A.   That's correct.
    Q.   Okay.  How and why was it inadequate?
    A.   Well, it was inadequate from the
standpoint of being able to withstand hurricane
force winds.
    Q.   We know the results.  But how was it
inadequate?
    A.   It was not -- the lines were -- they
were not doubled up, as a minimum.  And the,
um --
    Q.   Okay.  Was the mooring inadequate in
any other way?

20  (Pages 74 to 77)

78

1    A.   No, it was -- had it been doubled up,
2 or maybe tripled up, more than likely we
3 wouldn't have broke its moorings.
4    Q.   Okay.  So just to be clear, your
5 opinion is that the inadequacy of the mooring
6 between the ING 4727 and the 4745 were that the
7 lines were not doubled up.
8    A.   That's correct.
9    Q.   Now, according to your description
10 they were moored together with three 1-part,
11 2-inch lines.
12    A.   That's correct, yes.
13    Q.   That, to you, is not doubled up?
14    A.   That's not doubled up.
15    Q.   Okay.  What would have been doubled
16 up?
17    A.   They would have, um -- they'd have
18 been, um -- four parts of line going between
19 the two barges.
20    Q.   And here we had three parts of line?
21    A.   No.  The way they described it, it was
22 only 1-part line.
23    Q.   When you say 1-part, we're talking
24 about one strand?
25    A.   Yes, sir.

79

1    Q.   Okay.  And in your opinion, at each
2 location where there was one strand they should
3 have had at least two, is that what you're
4 saying?
5    A.   Yes.
6    Q.   And is it your opinion that the effect
7 of only was one part, as you describe, that
8 that part -- that single strand was
9 insufficient to withstand the surge and the
10 wind and the allision that you've talked about?
11    A.   Yes, sir.
12    Q.   And it's your opinion that had there
13 been two strands at each of those locations the
14 allision would not have caused the rope to
15 break under strain.
16    A.   It may not have.  It's rank
17 speculation to -- there's, um -- we don't know
18 really what happened, but based on all the
19 information that I've reviewed it's my opinion
20 that had the mooring lines been doubled up as
21 recommended by all sorts of people, including
22 my experience and training for expected storm
23 surge, wind, hurricane winds, then it's more
24 likely than not it would not have broken away.
25    Q.   Okay.  You also state that it's

80

further your opinion that the decision to top
around the barges placing the light barge on
the outboard side was imprudent, unseamanlike
and exposed the empty barge to breaking away
from its moorings.  In what respect was topping
around imprudent, unseamanlike?
   A.   Well, first off, it was -- it's my
opinion -- well, let me answer your question.
Is that, um -- by having the empty barge in on
the outside exposed it to, um -- hurricane
force winds, um -- and, um -- and surge
conditions, and in this case it was my opinion
that it was struck by the upper tier.  Had it
been against the pier, then it would have been
less exposed in that condition.
   Q.   So it's your testimony that the surge
was less against the pier.
   A.   Well --
   Q.   And the wind was less, and the current
was less --
   A.   No, the --
   Q.   -- and the force of the allision was
less?
   A.   The exposure of the barge, um --
because of its -- of its high freeboard, and

81

moored to a full barge, is not recommended,
number one.  In my opinion, it should have been
ballasted and/or they should not have
discharged it prior to the onset of a
hurricane.  And it's not recommended and it's
not good practice to have empty barges moored
to loaded barges in the face of a hurricane.
And especially -- the likelihood of moorings
slipping off of a set -- of a cleat or a
mooring bitt from a high to a low barge is,
um -- more likely to happen than not.
     If the barges are level and they're
both empty or they're both full, then the
moorings are much more effective.  In this
case, one barge was at least six to eight feet
higher than the other barge, and in my opinion
in the face of an oncoming hurricane the
recommendations are -- and it's good
seamanship, to ballast vessels before the
arrival of a hurricane.
   Q.   Okay.  So let's go back to my
question.  I'd like to know in what respect is
it that you're critical of the decision to top
around?
   A.   It exposed the empty barge to the,

21 (Pages 78 to 81)

82

1  um -- the full force of the hurricane and the
2  surge and of course in this case the allision
3  between the upper tier of barges.
4      Q.  Okay.  Any other way?
5      A.  Had it been against the dock it would
6  have had the protection of the dock and it
7  would have had the protection of the loaded
8  barge on the outside.
9      Q.  Okay.  Any other reason why topping
10  around was not prudent?
11     A.  I think that's all my opinion there.
12  Let me see.  Let me make sure.
13     Q.  You said imprudent, unseamanlike and
14  exposed the barge.
15     A.  Yep.  That pretty well does it.
16     Q.  All right.  You talked about
17  recommendations twice, I believe, in answering
18  those questions.  Whose recommendations and
19  what recommendations are you referring to about
20  barges should be, A, not topped around and, B,
21  ballasted?
22     A.  There's no recommendation saying not
23  to top around, but the, um -- but the, um --
24  the barge -- what is it, the Barge Fleeting
25  Association is a document that was prepared as

83

1  a result of a casualty some years ago, and they
2  recommend about not putting loaded barges next
3  to empty barges due to the possibility of
4  moorings slipping off.
5      Q.  Those are not regulations.
6      A.  No, they are not regulations, but they
7  explain the procedures that, um -- barge
8  fleeting operators should take to comply with
9  the set of regulations 33 CFR 165.803.
10     Q.  Is there any regulation that you found
11  that Lafarge was not in compliance with?
12     A.  With regard to --
13     Q.  Anything.
14     A.  -- what we just talked about?
15     Q.  Uh-huh.
16     A.  Um -- as I think -- in, let's see 5.6
17  and 5.7.
18     Q.  Okay, we'll talk about those.  But
19  with respect to topping around or ballasting
20  the barge.
21     A.  Well, there's no regulation that
22  speaks to that other than --
23     Q.  To either of those.
24     A.  Either of those.
25     Q.  Okay.

84

1      A.  It's just what my experience and
2  training as well as the recommendations of
3  other parties recommend.
4      Q.  You understand -- you've read the
5  testimony of the reasons behind the topping
6  around?
7      A.  Yes.
8      Q.  Do you not think those were valid
9  reasons?
10     A.  No, I do not.  In fact, as we sit here
11  today, had they let the empty barge on the
12  inside -- he was afraid of the barge topp ing
13  the dock -- it would have much -- if in fact
14  the barge struck the wall and all this other
15  consequences that happened, had it been set up
16  on top of the dock it would have been much safer
17  than drifting uncontrolled in the canal.
18     Q.  Other than the fact that the barge
19  ended up down by Claiborne Avenue bridge in the
20  neighborhood, you don't know where it went
21  after it broke away, do you?
22     A.  No, sir.
23     Q.  All right.  Looking at 5.3, you state
24  that it's your opinion that Lafarge violated
25  their hurricane preparation checklist by not

85

1  cabling the barges to shore.
2          You're aware of the testimony that
3  there was no such, um -- published hurricane
4  preparation checklist in effect at the time.
5          MR. SANDERS:
6              May I object to the form.  That's
7  a mischaracterization.
8      A.  It's my understanding that, um --
9  based on the testimony of Mr. Busch as well as
10  another gentleman, the, um -- Lafarge, um --
11     Q.  Vandermeulen?
12     A.  Yes, sir.  Vandermeulen.  Both
13  testified that the last formal procedure was
14  the one I referred to.  They, um -- they
15  meaning Mr. Busch, with agreement from
16  Mr. Vandermeulen, decided that -- well, the way
17  they described it in recent time, that they
18  would use this, um -- going from the bollard to
19  wraps around the cement piling and then to the
20  barge, and their rationale for what that would
21  do for them.  And I think that --
22     Q.  So it's correct that the testimony is
23  that at the time of Hurricane Katrina the
24  practice of Lafarge had been changed from
25  cabling to soft lines.

86

1    MR. SANDERS:
2        Let me object to the form.
3    A.  Yes.  They testified that, um -- that
4  the last formal, um -- procedure was to cable.
5  Had they employed that procedure, again --
6  EXAMINATION BY MR. WALKER:
7    Q.  To cable you said?
8    A.  Yeah.  No --
9    Q.  To soft line.
10    MR. SANDERS:
11        To cable.  The last formal
12    procedure.
13    A.  The last formal procedure was cabling,
14  and they --
15  EXAMINATION BY MR. WALKER:
16    Q.  That's not my question.  Listen to my
17  question.  It's correct that their testimony is
18  that several years prior to Katrina the
19  practice had been changed from cabling to soft
20  lines.
21    A.  That's correct.
22    Q.  Okay.
23    A.  Yes.
24    Q.  And it's your opinion had they cabled
25  the five tier barges to the dock that those

87

1  barges wouldn't have loosened and allided with
2  the two tiers.  Correct?
3    A.  Correct.  And they should have cabled
4  the 4727 and the 4745 to the dock.
5    Q.  Now, would cabling allow for surge?
6    A.  Probably not, no.
7    Q.  Well, let's make sure we understand
8  each other.  There's some slack that was left
9  in lines, which is common practice to account
10  for rising water, right?
11    A.  Well, that's what they did.  And I
12  don't agree with that.
13    Q.  Okay.  Would cabling allow you to have
14  a similar slack?  Whether you agree with it or
15  not?
16    A.  Well, yes.  It depends on how they
17  arrange the cabling.  If the cabling goes
18  straight or, say, very close to the dock, to
19  the barge, then it's not going to have much
20  leeway.  But it's still my opinion that cabling
21  those vessels together would have been a much
22  more effective mooring arrangement than having
23  soft line wrapped three times around the
24  piling.
25    Q.  Okay.  And when you say cabling, what

88

do you mean by cabling?  It's a different
material of rope that's being used?
    A.  Yeah.  It's wire rope.
    Q.  Okay.  And does it have any stretch,
any tensile, um --
    A.  Yes, it does.
    Q.  Elasticity?
    A.  Yes.  And also it depends on how they
would deploy it.  If they affix it to -- some
distance off of the -- away from the face of
the dock could have allowed for surge.  It
depends on what arrangements they had used.
But it's my opinion that the cabling material
would have been a much more substantial
material than the soft line.
    Q.  What is your understanding of the
amount of slack that was left in the line?
    A.  Well, he described it as, um -- if the
loaded barges were -- the northern tier was all
loaded barges, which means they had like maybe
four or five foot of, um -- freeboard, and the
top of the dock when I visited was something
like six and a half feet, I think, or seven and
half feet from the top of the cement area down
to the water.  And so it depends, it might add

89

maybe a two or three feet difference between
the loaded barges and the top of the dock, in
that --
    Q.  So two or three feet of slack is what
you're saying?
    A.  Yes, sir.
    Q.  And that's between the 4727 and the
4745, And to the dock, was there slack in those
lines?  Was it the same?
    A.  Again, it would -- somewhere -- it
would be in the name neighborhood.
    Q.  Two to three feet.
    A.  Yes, sir.
    Q.  And it's your opinion --
    A.  But two to three feet, the difference
going, you know, you would be going down to the
loaded barge, up to the dock.
    Q.  All right.
    A.  So, yeah.  You say that was a
difference from the barge to the dock.  And
when you say slack, that would be in addition
to the line deployed.
    Q.  So is it more than two or three feet?
    A.  Um -- again, it's speculation on my
part, but he, Mr. Busch, testified that he had

90

1  purposely looped -- in fact, the way he
2  described it was three loops.
3      Q.   How much slack would that allow?
4      A.   Well, the diameter of the cement post
5  was, um -- I haven't done the math, and it
6  would take me -- but anyway, it was three loops
7  around the cement post.
8      Q.   Is that three feet, ten feet, five
9  feet?
10     A.   That would have to be speculation on
11 my part.  I don't know.
12     Q.   Is it your opinion that the cable --
13 if they'd used cable they could have arranged
14 the same way and left the same slack?
15     A.   You mean wrapped around the --
16     Q.   Uh-huh.
17     A.   Um --
18     Q.   In other words, could they simply have
19 substituted cable for rope and done everything
20 exactly the same?
21     A.   No.  No.  I don't think so.  Because
22 they purposely put extra slack in the line for
23 the purpose of, um -- the expected surge in the
24 canal.
25     Q.   Okay.  And you previously said that

91

1  your recollection is that the surge was
2  somewhere around 16 feet, 18 feet?
3      A.   Well, that was the expected.  I don't
4  know what the actual surge ended up there at
5  the facility.
6      Q.   Is it your testimony that cabling the
7  barges to shore and to each other without slack
8  would have withstood the forces of the
9  allision, the surge and the wind?
10     A.   Could very well have, yes.
11     Q.   So you're speculating.
12     A.   Well, certainly.  I don't think you
13 can get anyone that's going to be definitive,
14 engineers or whoever --
15     Q.   So your testimony is --
16          MR. SANDERS:
17              Let him finish, please.
18 EXAMINATION BY MR. WALKER:
19     Q.   I'm sorry.
20     A.   So it's my opinion, and certainly,
21 um -- everyone in the marine industry would
22 agree with me, that soft line is not as strong
23 and substantial as wire rope.  And all the
24 regulations that now speak to barge fleeting
25 are using cable as opposed to soft line.

92

1      Q.   Is it your testimony, and I understand
2  you're not a rope or cable expert --
3      A.   I'm only a user of these items.
4      Q.   Is it your testimony that the cabling
5  would have withstood a surge of 16 feet?
6      A.   Could very well have, yes.
7      Q.   All right.  Let's go to Opinion 5.4.
8  You said that Lafarge failed to order Domino to
9  provide additional rigging.
10     A.   Yes.
11     Q.   What was the additional rigging to do?
12     A.   It was to make fast the two barges,
13 4727 and the 4745.
14     Q.   So this is basically to double up or
15 add to the single lines?
16     A.   Yes.
17     Q.   Okay.  And why is it your opinion that
18 it was Lafarge 's obligation to request
19 additional rigging?
20     A.   Well, number one, they made the 4727
21 and the 4745 -- they made that mooring
22 arrangement themselves.  They should have --
23 they could have and should have known that
24 single line between the two barges was
25 inadequate, and it was not what is recommended

93

1  in preparing for onslaught of a hurricane.
2      Q.   Okay.  But my question goes to why do
3  you opine that it's Lafarge's failure or
4  obligation to request Joseph Domino to do
5  anything?
6      A.   Well, it's their facility.  The barges
7  are at their facility.  They, as professional
8  facility managers in having barges there should
9  have realized that the barges were inadequately
10 moored and requested that Joe Domino provide
11 this additional rigging.
12     Q.   Okay.  You're missing my question.  Is
13 there anything written in any regulation,
14 recommendation, policy, practice of any type
15 that states that it's up to a terminal operator
16 or owner to advise a tug company whether or not
17 to provide additional rigging?
18          MR. SANDERS:
19              Object to form.
20              But you can answer.
21     A.   I don't know if I can find the exact
22 language, but certainly the Coast Guard
23 hurricane plan suggests that vessels' mooring
24 lines be doubled up.
25 EXAMINATION BY MR. WALKER:

94

1    Q.   That's not my question.
2    A.   Well, I think it is.
3    Q.   No, it's not.  We know how you feel
4   about the lines.  You've already given us your
5   opinion.  You've now stated a different
6   opinion.  Your opinion is that Lafarge's
7   failure --
8    A.   Yes.
9    Q.   -- to order something --
10    A.   Yes.
11    Q.   Where does it say that Lafarge has
12   such an obligation, practice, procedure or
13   policy?
14    A.   Well, they had the barge, it was
15   there, they should have known or they should
16   have recognized that it was inadequately
17   moored, and if they didn't have the equipment,
18   it is my opinion they could have asked Joe
19   Domino in there to come and top around the
20   barges and to put out additional rigging.
21    Q.   So I guess your answer is there's
22   nothing written that you're aware of.
23    A.   You're correct.  Yes.
24    Q.   Okay.
25    A.   But it's not true that is not written

95

1   anywhere.  It's written that barges shall be --
2   vessels' mooring lines shall be doubled up.
3    Q.   But we're not asking about doubling
4   up.
5    A.   Well, you asked about --
6    Q.   I'm asking about Lafarge's failure.  I
7   think you've answered my question.
8    A.   Lafarge's failure is not ordering --
9   they should have known that it was inadequately
10   moored and should have asked for additional --
11   it's my opinion, asked for additional moorings.
12    Q.   Your second clause there says and it's
13   your opinion that Lafarge's failure to order
14   Domino to remove the 4727 and tow it to a fleet
15   rather than top.  Right?
16    A.   Yes.
17    Q.   You've already told us why you
18   criticized the topping; right?  Because it put
19   the loaded barge on the inside rather than the
20   outside.
21    A.   Yes.
22    Q.   Is there any regulation, any written
23   policy, any recommendation that you can point
24   to which would have prescribed that Lafarge
25   order Domino to remove the ING 4727 from the

96

1   facility?
2    A.   No.
3    Q.   Let's go to 5.5.  Your opinion is that
4   Lafarge failed to ensure that the barges had
5   sufficient rigging and mooring lines.  Are you
6   talking again about the single-part?
7    A.   Yes.
8    Q.   And in this clause 5.5, you say that
9   they should have doubled up the lines.  In your
10   opinion doubling up would have withstood the
11   effects of the hurricane; is that right?
12    A.   It could very well have, yes.
13    Q.   Well, I want to know what your opinion
14   is, because I think in your earlier testimony
15   you said two or three.  In your report you say
16   doubling up, which to me means two.  Now is it
17   two or is it three that you would have
18   recommended?
19    A.   It would have been double up.  It
20   would have been two lines.
21    Q.   Two lines at each location.
22    A.   Yes.  It's my opinion that it's more
23   likely than not that would have prevented it
24   from breaking away.
25    Q.   It's your opinion that Lafarge should

97

1   have doubled up the lines at the three
2   locations where they had a single-part; right?
3    A.   Yes.
4    Q.   And had they done so then Lafarge
5   would have been in compliance with your
6   practices and policies and recommendations with
7   respect to the mooring, right?
8    A.   As well as Coast Guard
9   recommendations, as well as good seamanship, as
10   well as, um -- anticipating high winds and
11   storm surge.
12    Q.   Right.  By doubling up.
13    A.   Yes.
14    Q.   Okay.
15    A.   And also not having an empty next to a
16   full.
17    Q.   Well, but I didn't ask you that.  I
18   asked you about doubling up.
19    A.   Okay.
20    Q.   Is it your opinion that they would
21   have been in compliance with those practices
22   and recommendations if they had doubled up?
23    A.   Yes.
24    Q.   So if testimony indicates or expert
25   review indicates that doubling up would in fact

25  (Pages 94 to 97)

98

1 not have prevented the breakaway, not have
2 withstood the, um -- the effects of the wind,
3 surge and the allision, then you would agree
4 that the failure to have double parts instead
5 of single parts would be irrelevant.
6     A.  No, I don't agree to that.  I
7 certainly don't agree to that.  I mean, I can't
8 imagine an expert in marine operations and
9 vessels and moorings that would say that.
10     Q.  You didn't listen to my question.
11         MR. SANDERS:
12             Let him finish, please, Derek.
13 EXAMINATION BY MR. WALKER:
14     Q.  You misunderstood.
15         MR. SANDERS:
16             Let him finish the answer.
17     A.  That, um -- that would fly in the face
18 of accepted maritime practice, recommendations,
19 um -- that the Coast Guard has put out.
20 EXAMINATION BY MR. WALKER:
21     Q.  That has nothing to do with my
22 question.
23         MR. SANDERS:
24             Derek, please.  We'll adjourn
25         this deposition if you don't let this

99

1 man answer his questions.
2         MR. WALKER:
3             You can do anything you want.
4         MR. SANDERS:
5             Are you going to let him answer
6         the question?
7         MR. WALKER:
8             His answer has nothing to do with
9         my question.
10         MR. SANDERS:
11             Then make your objection at the
12         end.
13         MR. WALKER:
14             It's not an objection.  I don't
15         object to my own questions.
16         MR. SANDERS:
17             May I ask that you please quit
18         interrupting?
19         MR. WALKER:
20             I'm going to interrupt if he's
21         not answering the question.
22         MR. SANDERS:
23             Let's go.
24             For the record, Mr. Walker has
25         indicated that he will continue to

100

1 interrupt the witness.  I've asked him
2 not to, to allow the witness to finish
3 his questions.  I'm again going to
4 implore Mr. Walker again to please
5 stop interrupting the witness.  May I
6 ask Mr. Walker, will you stop,
7 please -- please stop interrupting the
8 witness?
9         MR. WALKER:
10             I will stop interrupting as long
11         as the witness is answering the
12         question and not giving me a
13         dissertation on something that's
14         irrelevant, since we're all trying to
15         make a flight.  Now, I'll try the
16         question again.
17         MR. SANDERS:
18             Look.  But I surmise that
19         Mr. Walker does not like the man 's
20         answer and is proceeding to interrupt
21         him in order to stop him from putting
22         on the record what he wants to say.
23         MR. WALKER:
24             Well, you're incorrect about
25         that.  I'd be happy to let Mr. Green

101

1 continue.
2         MR. WEBB:
3             That's a problem Mr. Green had
4         when he was testifying before Judge
5         Berrigan, and she stopped him several
6         times.  Please ask him to answer the
7         question and not ramble on.
8 EXAMINATION BY MR. WALKER:
9     Q.  I'll try again.
10     A.  I apologize.
11     Q.  Here's my question.  My question is
12 very simply about the lines --
13     A.  Yes, sir.
14     Q.  -- okay?
15     A.  Yes, sir.
16     Q.  Your testimony is that double lines
17 would be in accordance with your policies,
18 practices, recommendations.  So I posed a
19 hypothetical, which I'm entitled to do, as an
20 expert -- since you're an expert.
21     A.  Yes.
22     Q.  And I said, in that case, if there's
23 testimony that demonstrates that even with
24 double lines they would have broken in light of
25 the surge and the wind and allision conditions

102

1  which you made the basis of your opinion, then
2  you would agree, wouldn't you, that whether
3  there was one line or double line would be
4  irrelevant.
5       MR. SANDERS:
6            I object to the form.
7       A.  I disagree with that.
8       MR. SANDERS:
9            Okay.
10  EXAMINATION BY MR. WALKER:
11      Q.  Okay.  On what basis do you disagree
12  with your own prior testimony?
13      MR. SANDERS:
14            May I object to the form in that
15  he never gave prior testimony.
16      A.  Did I testify that a single line would
17  be adequate?
18  EXAMINATION BY MR. WALKER:
19      Q.  That's not what I said.  That wasn't
20  my question.  Did you understand my question to
21  be that a single line would be adequate?
22      A.  No, you said that other expert opinion
23  would be that a single line -- if I understand
24  your question, if other expert opinion would
25  say that a single line --

103

1       Q.  I never said such a thing.
2       A.  Okay.  Well, then --
3       Q.  My question --
4       A.  I'm having difficulty understanding
5  your question.
6       Q.  You are.
7       A.  Obviously.
8       Q.  Okay.  I'll try again.
9            If there's expert opinion which
10  indicates that the double lines which you
11  recommend would have in fact broken in
12  Hurricane Katrina, then don't you agree whether
13  there was one line or two would be an
14  irrelevant fact?
15      MR. SANDERS:
16            Object to the form.
17      A.  No, and it's my opinion that, um -- if
18  they had one line or three lines, um -- and it
19  broke, um -- then I think that the mooring was
20  inadequate.
21  EXAMINATION BY MR. WALKER:
22      Q.  The number of lines would be
23  irrelevant.
24      A.  In what regard?
25      Q.  In your opinion 's regard, which is

104

1  that two would be sufficient.  If the evidence
2  shows that two would not have been sufficient,
3  then the difference between one and two is
4  irrelevant.
5       A.  Well, I don't -- if they had two lines
6  and it still broke, then it's still my opinion
7  that two lines are better than one line.
8            Does that make sense?  I'm trying to
9  answer -- I really am trying to answer your
10  question.  But my opinion is is that --
11      Q.  Your opinion is that two lines would
12  have been sufficient.
13      A.  Yes.  That's correct.
14      Q.  And if the evidence through expert
15  testimony indicates that two lines would have
16  broken anyway, then isn't it correct that your
17  opinions with respect to the number of lines
18  are irrelevant?
19      MR. SANDERS:
20            Object to the form.
21      A.  Well, I would disagree with those
22  opinions.
23  EXAMINATION BY MR. WALKER:
24      Q.  That's not my question.  You may
25  disagree all you want.  But you don't have the

105

1  expertise to disagree with someone who can make
2  a test and examination and come to a
3  conclusion, in this hypothetical that I'm
4  giving you, that two lines would have broken
5  anyway.
6       MR. SANDERS:
7            Is that a statement or a
8  question?
9       A.  I think that's a statement.  Is that a
10  statement?
11  EXAMINATION BY MR. WALKER:
12      Q.  Question mark at the end.  Now it's a
13  question.
14      A.  Okay.
15      MR. SANDERS:
16            May I object to the form of the
17  question.
18      MR. WALKER:
19            We'll move on.
20  EXAMINATION BY MR. WALKER:
21      Q.  Let's look at 5.6.  It's your opinion
22  that Lafarge violated 33 CFR 162.75 for their
23  failure to ensure that the barge was adequately
24  moored to withstand hurricane winds.  Right?
25      A.  Yes, sir.

106

1   Q.   Is it your opinion that 33 CFR 162.75
2   applies to this situation?
3   A.   Yes, it does.
4   Q.   And in what regard did Lafarge violate
5   those provisions?
6   A.   They, um -- they only had three 1-part
7   mooring lanes between the two barges.
8   Q.   And what does the provision state
9   otherwise?
10   A.   The provision, and I pretty well
11   summarize it there, Anchoring and mooring:  For
12   their failure to ensure that it was adequately
13   moored to withstand the anticipated hurricane
14   wind forces -- force winds of Hurricane
15   Katrina.  The regulation actually says, they
16   shall be moored in a manner to withstand
17   expected, um -- forces of wind, current and
18   passing vessels or some sort.
19   Q.   It doesn't say anything about the
20   lines, the number of lines or how many parts,
21   does it?
22   A.   No, it does not.  But all the
23   recommendations are that the, um -- the
24   published recommendations are that you have
25   doubled up lines.  And they didn't do that.

107

1   Q.   And those are recommendations, not
2   regulations.
3   A.   That's correct.  Yes.
4   Q.   All right.  So in the opinion of the
5   Lafarge individuals who were conducting the
6   mooring and others who subsequently came and
7   viewed or inspected or remoored, um -- the
8   mooring was conformed to 33 CFR 162.75,
9   correct?
10   A.   No, sir.
11   Q.   In your opinion they didn't.
12   A.   Well, factually they didn't.  I mean,
13   the facts are that the captain -- the deckhand
14   Thigpen testified that they only had three
15   1-part lines.  And I think there was somebody
16   else that, um -- that confirmed that testimony.
17   Q.   Right, but there's --  go ahead.
18   A.   He testified that they only had three
19   1-part lines, and he knew that -- he testified
20   to Judge Berrigan that that was not correct,
21   and he scrounged around and found a line to put
22   between the loaded barge and the dock, but he
23   had no other lines available to, um -- to
24   buttress the lines between the 4727 and 4745.
25   Q.   But once again, the number of lines

108

and the manner of mooring is not set forth in
33 CFR 162.75, correct?
   A.   No, it's -- correct, it does not
address the number of lines.  However, all
the -- the regulation says, and I said it
before, moored in such a manner to withstand
the expected winds, currents and passing
vessels.  In my opinion that was a violation of
that particular statute.
   Q.   All right.  5.7, your opinion is that
there was a violation of 33 CFR 6.19.
   A.   Yes.
   Q.   In what respect?
   A.   Is that the, um -- in my opinion that
Lafarge had primary responsibility for their
failure to ensure that the 4727 was secure and
safe, which they didn't do.
   Q.   That doesn't state the number of lines
or the manner of mooring either, does it?
   A.   No, it doesn't.
   Q.   So basically, these two CFRs that you
say were violated, um -- you say were violated
simply because the barge broke away.
      MR. SANDERS:
         Object to the form.  That's a

109

mischaracterization.
   A.   No, they were violated because they
failed to comply with the procedures of the --
that were recommended by the Coast Guard to
double up all lines.  And also recommended
that, um --
EXAMINATION BY MR. WALKER:
   Q.   Excuse me.  You don't have to comply
with a recommendation, do you?
   A.   Well, if you don't comply with a
recommendation from a recognized authority that
has expertise in seamanship and port security,
then I think they're way out on a limb by
themselves.  So --
   Q.   As a Commander --
   A.   -- as a Commander, I'm telling you
that --
   Q.   My question:  As a Commander, are you
saying that if someone doesn't comply with a
recommendation they've violated a regulation?
   A.   No.  They've violated a recommendation
that is -- that is --
   Q.   How do you violate a recommendation?
You may not follow it, but you don't violate
it.

110

1    MR. SANDERS:
2         Pleas, Mr. Walker, let him
3    finish.
4    A.   Well, I guess --
5    Q.   Am I right?
6    A.   I guess you can say that if they don't
7    follow a recommendation and the recommendation
8    would have prevented or is, um -- designed to
9    comply with a regulation, um -- I don't know, I
10   guess it's a matter of interpretation, but I
11   think it's a violation of a regulation.
12   Q.   Well, tell me where these
13   recommendations you're referring to are
14   confected to the 33 CFR regulations.  You're
15   saying that those recommendations are part of
16   the regulations?
17   A.   Well --
18   Q.   Is that what you're saying?  If you
19   answer my questions we'll have less
20   disagreement.
21   A.   Yes.
22   Q.   So you're saying they're part and
23   parcel, contained in the body of the
24   regulations.
25   A.   They're not contained in the body of

111

1    the regulations.
2    Q.   So tell me where there is any enabling
3    language that says that those recommendations
4    are to be part or followed by virtue of the
5    regulations.
6    A.   I can't point to it.
7    Q.   Okay.  Now, your Opinion 5.8 is that
8    Lafarge failed to adhere to the recommendations
9    of the Coast Guard sector New Orleans hurricane
10   plan, particularly Appendix 2 requiring mooring
11   lines doubling up and barges moored in
12   proximity of bridges.
13        Again, it's a recommendation, not a
14   regulation; correct?
15   A.   That's correct, yes.
16   Q.   And then you say that in addition,
17   Lafarge failed to adhere to the recommendations
18   of Annex C by failing to determine special
19   needs and intentions.  Can you tell me how
20   Lafarge failed in that regard?
21   A.   I'd have to go back and review Annex
22   C, but I think it's to do with mooring lines
23   and also the fact that special needs because
24   the vessel was moored between two bridges -- in
25   the proximity of bridges.

112

1    Q.   Well, I think it has to deal with
2    notification.  Does the refresh your memory?
3    A.   Yes.  I think so, yeah.  Because it
4    goes on a little further and says, had they
5    notified.  So that means it was a notification
6    requirement.
7    Q.   Okay.  And so in what respect did the
8    notification requirement contribute to the
9    breakaway?
10   A.   Well, had they -- if they called the
11   Coast Guard and notified them that the vessel
12   had been allegedly called in to be picked up
13   and that it was only moored with single part
14   lines, I think the Coast Guard would have
15   ordered them to follow the recommendations to
16   double up those lines.
17   Q.   Have you had any discussions with the
18   Coast Guard in that regard, whether in fact
19   they would have followed up?
20   A.   No, I think based on my own experience
21   as a Coast Guard officer, if someone would call
22   me and say -- there's a hurricane coming and I
23   have a barge over here and all I have is enough
24   lines to put one part between the two barges, I
25   would have suggested -- strongly suggested to

113

1    them, or maybe I would have issued an order for
2    them to comply with the recommendations that
3    leaving a barge with only single-part lines
4    would have been a violation.
5    Q.   How can you tell someone that they
6    were violating something if there's no
7    regulation in force?
8    A.   Well, Part 6, which is the Coast Guard
9    calls it the Super 6, gives the Coast Guard
10   broad authority to issue orders if they
11   discover a condition in a port that could be
12   considered to be dangerous, by the Coast Guard,
13   not by the individual company, but the decision
14   of whether a condition is unsafe would be
15   totally under the purview of the Coast Guard
16   and they would issue legal orders to take
17   action.
18   Q.   So if I understand you correctly, 5.8,
19   in that section what you're saying Lafarge
20   failed to do was notify the Coast Guard of
21   what?
22   A.   That number one, that they have an
23   empty barge, that they have a barge that's
24   empty and ready to be picked up --
25   Q.   So let me stop you.  Slowly.  So in

114

1  your opinion, a terminal operator has the
2  obligation or should have the practice to
3  contact the Coast Guard to tell them they have
4  an empty barge ready to be picked up.
5      A.  But that's not all of it.
6      Q.  But is the right?
7      A.  No.  No.
8      Q.  That's your opinion.
9      A.  That's not true.
10     Q.  Okay.
11     A.  Again, you're interrupting me.
12  Because my response, um -- was supposed -- was
13  going to be that, um -- had they notified the
14  Coast Guard that they have an empty barge
15  that's moored to a full barge with a
16  single-part line, then the Coast Guard would
17  have clearly, in pay opinion, have required
18  them to double up those lines.  And if they had
19  notified the barge ready to be picked up and
20  gotten out of there, then they would have
21  advised them to have that taken care of.
22     Q.  Okay.  So I want to know what is the
23  information that in your opinion Lafarge failed
24  to provide the Coast Guard.
25     A.  The fact that --

115

1      Q.  Just give me one, two, three.
2      A.  One is that the barge was empty and
3  ready to be picked up --
4      Q.  So empty -- we have an empty barge,
5  right?
6      A.  Right.  Next to a full barge --
7      Q.  We want it to break picked up?
8      A.  Well, an empty barge next to a full
9  barge, in between two major evacuation routes,
10  the Florida Avenue bridge and the St. Claude
11  bridge, whatever it's named, and the fact that
12  they would notify the Coast Guard that they
13  only have 1-part lines between the barges,
14  um -- and that's what I consider to be their
15  failure.
16     Q.  And is it your opinion that every
17  fleet operator and terminal operator in New
18  Orleans should follow that?
19     A.  Yes.  Yes.
20     Q.  Do you know how many barges broke away
21  in Hurricane Katrina?
22     A.  I understand there was numerous barges
23  that broke away.
24     Q.  Would the number about 1500 jog your
25  memory?

116

1      A.  I don't remember that number, but I
2  wouldn't be surprised.
3      Q.  Uh-huh.  And have you made any
4  determination, any study, any inquiry into the
5  condition of any of those barges prior to their
6  breaking away?
7      A.  No, I haven't.
8      Q.  Okay.
9      A.  No, I have not.
10     Q.  Go ahead.  Do you have an explanation?
11     A.  However, if those barges broke away as
12  a result of inadequate mooring, then I would
13  criticize those facility operators for not
14  taking positive action to secure the vessels in
15  anticipation of an approaching hurricane.
16          And they should have also notified the
17  Coast Guard.  If they have conditions that they
18  can't correct and or ameliorate before the
19  advance of the hurricane, then the Coast Guard
20  would be on notice that they have potential
21  danger spots, potential barges that may break
22  away and could anticipate or at least make
23  plans to, um -- to somehow make plans or take
24  some action to protect the port as well as the
25  public at large.

117

1      Q.  Do you know how many of the barges
2  that broke away during Hurricane Katrina were
3  cabled rather than had soft lines?
4      A.  No, I do not.
5      Q.  Do you know how many of the barges
6  that broke away were doubled or tripled rather
7  than single line?
8      A.  No, I do not.
9      Q.  Do you know how many calls the Coast
10  Guard received from terminal operators or fleet
11  operators or tug operators that they had empty
12  barges next to full barges and were ready to be
13  picked up?
14     A.  Nope.  No, I do not.
15         (Brief recess.)
16  EXAMINATION BY MR. WALKER:
17     Q.  Something obvious but just for the
18  record, that is your signature on your report
19  Exhibit 1?
20     A.  Yes, sir.
21     Q.  Have you ever given any opinions,
22  prepared any reports, other than in this case,
23  regarding the mooring of a barge?
24     A.  I can't think of one right off the top
25  of my head, but I've done over almost 700 cases

118

1  during my career as a marine consultant and,
2  um -- I know I've, um -- worked on cases with
3  barge breakaways, vessel breakaways and, um --
4  so I'm sure they're out there.  I'd have to go
5  and research to find out if I opined about
6  barge breakaway about inadequate moorings.
7      Q.  Do you remember any case off the top
8  of your head where you've given the opinion
9  that a mooring arrangement or mooring
10  configuration was adequate?
11      A.  Again, I probably did.  There might be
12  some out there that I said a mooring was
13  adequate.
14      Q.  Have you ever given the opinion that
15  single as opposed to doubling up lines was
16  adequate?
17      A.  No, I don't think so, no.
18      Q.  With respect to the breakaway cases
19  that you've given opinions in, have you ever
20  given an opinion in these cases that a
21  breakaway was not due to the inadequacy of
22  mooring arrangements?
23      A.  No.
24      Q.  Have you ever been involved with wave
25  wash or surge cases?

119

1      A.  Yes, sir.
2      Q.  Have you ever been involved defending
3  the ship that was alongside as opposed to the
4  passing ship which caused the wave wash?
5      A.  Yes.  That's a good question.  I think
6  I've been on both sides.
7      Q.  Right.  And do you recall giving an
8  opinion on behalf of the vessel moored
9  alongside a terminal or facility that it was
10  adequately moored?
11      A.  Well, I recall cases where maybe I was
12  working for a ship pilot and they were accused
13  of passing a facility too fast, and I think my
14  opinion was that the moored vessel failed to
15  maintain -- take up the lines as the vessel was
16  discharged, or adjusted the lines while it was
17  being loaded or discharged, whichever, that put
18  sufficient slack in the mooring lines that the
19  mooring lines were overcome with the suction of
20  a passing vessel.
21      Q.  So you recall giving an opinion that
22  slack should be maintained in lines sufficient
23  to allow for different levels in water.
24      A.  No.  No.  I said that slack -- the
25  mooring lines should be monitored to take out

120

1  slack, to prevent vessel passing from sucking
2  okay it away from the dock and overcoming the
3  mooring lines.
4      Q.  Keeping the lines tight.
5      A.  Yes.  Yes.
6          And I had particularly one case, um --
7  a ship was hit by -- here in Houston, a storm
8  came through and it broke loose and caused all
9  kind of havoc.
10      Q.  But my question actually originally
11  was the opposite.  Do you recall testifying or
12  issuing reports on behalf of the vessel moored
13  at the facility, defending its mooring
14  arrangements?
15      A.  I can only recall one case of a -- I
16  was working for a barge company out of New
17  Orleans, and a ship passed and broke, um --
18  fuel lines or discharge lines, and I can't
19  recall what I said, but either the vessel was
20  passing too fast, it was a red flag barge and
21  in my opinion he should have slowed down or
22  whichever.  But I have testified on both sides
23  of the issue.
24      Q.  Have you ever testified in any
25  hurricane cases before?

121

1      A.  No, sir.  I don't think so.
2      Q.  So this is the first time you've
3  testified regarding the effect of surge, wind,
4  um -- and hurricane weather on a barge.
5      A.  I think so, yes.
6      Q.  Are you the sole owner of KDON Marine?
7      A.  My wife and I are.
8      Q.  You would be the only person who would
9  testify for KDON Marine.
10      A.  That's correct, yes.
11      Q.  Have you ever been tendered as an
12  expert in any area and not been qualified?
13      A.  If I have -- if I've been limited in
14  my testimony I'm not aware of it.  I've never
15  been disqualified.
16      Q.  Now, according to your website your
17  areas of expertise are marine personal injury
18  claims, marine vessel operations, Coast Guard
19  safety rules and regulations and various
20  others.  Which areas of expertise are you
21  holding yourself out in this case?
22          MR. SANDERS:
23              And if you know.
24      A.  If I know?  It would be vessel
25  operations and care of those vessels.  And

122

1  certainly in my opinion mooring of the vessels
2  would certainly be within my expertise.
3  EXAMINATION BY MR. WALKER:
4      Q.   That comes under marine vessel
5  operations?
6      A.   Yes.  I mean, I tried to be as general
7  as possible to cover all the, um -- aspects of
8  a vessel and its operation.
9      Q.   Have you consulted any other experts
10  or individuals to assist you in your opinions?
11      A.   No, sir.
12      Q.   Have you talked to any of the other
13  experts hired by the barge plaintiffs?
14      A.   I don't even know who they are.  No,
15  sir, I have not.
16      Q.   Have you reviewed ILIT, IPET or Team
17  Louisiana reports?
18      A.   I think I have.  That rings a bell
19  because I think Mr. Haycraft had questioned me
20  about that before and after the deposition I
21  think I went looking for it.
22      Q.   And you found them?
23      A.   I'm pretty sure I did.
24      Q.   There's nothing in these reports that
25  changes your opinions.

123

1      A.   No, sir.
2      Q.   You mentioned the turning basin when
3  you talked about Exhibit 5, a turning basin
4  north of the Florida Avenue bridge.  And I
5  believe you also said that the area in front of
6  the Lafarge facility is a turning basin, as
7  well?
8      A.   Yes, sir.
9      Q.   You agree -- or I assume you know that
10  that area has not been used as a turning basin
11  in several decades.
12      A.   I don't know that.  But the coast
13  pilot describes it as a turning basin, with
14  controlling depth of 31 feet I think it is.
15      Q.   That's its physical description.
16      A.   Yes.
17      Q.   You're not aware that its use as a
18  turning basin has not been -- it has not been
19  used as a turning basin in many decades?
20          MR. SANDERS:
21              Object to the form.
22  EXAMINATION BY MR. WALKER:
23      Q.   Yes or no?  Do you know that or not?
24      A.   I do not, no.
25      Q.   Okay.  You are familiar with the Coast

124

1  Guard hurricane plan?
2      A.   Yes, sir.
3      Q.   And are you aware that the language
4  all vessels operating below Huey P. Long Bridge
5  applies to the Mississippi River and does not
6  include the facilities in the Industrial Canal?
7      A.   I would disagree with that.  I think
8  it means what it says, that everything
9  operating below the Huey P. Long Bridge, it
10  would be the ICW and in this case the
11  Intracoastal waterway.  It doesn't exclude --
12      Q.   It includes the MRGO?
13      A.   I would say so, yes.  Yeah.
14      Q.   And on what do you base that expansive
15  opinion?
16      A.   On the fact that it's a waterway, it's
17  below the Huey P. Long Bridge, that, um -- that
18  it's within the Port of New Orleans, um -- all
19  those things.  I think that clearly -- unless
20  someone can show me something that would
21  exclude those areas, um -- I think -- anyway,
22  it's my opinion that those waters are included
23  in that recommendation.
24      Q.   You have no objective basis for that,
25  no written information, nobody you have talked

125

1  to, nothing to assist that interpretation, it's
2  just your interpretation of those words.
3      A.   My interpretation of those words
4  means -- includes all the waters below -- and I
5  think if I recall the testimony, or the -- it
6  includes tributaries, too.
7      Q.   Well, that was my next question.  Is
8  it your testimony that barge mooring
9  regulations which apply to fleets in the
10  Mississippi River apply to tributaries
11  including the Industrial Canal?
12      A.   No.  It does not.  In fact, I said in
13  my report, I -- the recommendations that are
14  included in the barge fleeting manual are not
15  applicable.
16      Q.   Do not apply.
17      A.   Do not apply.
18      Q.   I thought you said they did apply.
19      A.   No.  No.
20      Q.   So we're in agreement that the barge
21  mooring regulations which apply to Mississippi
22  River fleets do not apply to the Industrial
23  Canal.
24      A.   Yes.  That's correct.
25      Q.   Okay.  Where did you get your

126

1   interpretation of what doubling up is?
2       A.  It's a standard phrase in seamanship,
3   doubling up.
4       Q.  Is it in some seaman 's book that
5   doubling up means two lines rather than one?
6       A.  Yes.  I think I should be able to find
7   that.
8       Q.  It's not contained in your report;
9   right?
10      A.  Well, no, I did not describe my
11  interpretation of that definition.
12      Q.  Is doubling up two lines?
13      A.  It could be doubling up with two
14  lines, it could be four lines.  Doubling up is
15  a broad term, it means more than one.
16      Q.  I'm sorry.  My question is, is
17  doubling up putting two lines out?
18      A.  It can be two lines out, it can be
19  four lines out.
20      Q.  Okay.  Is doubling up putting two
21  lines?
22      A.  It's more than one.
23      Q.  Okay.  Is it putting two separate
24  lines, or can it also be wrapping one line
25  twice?

127

1       A.  It could be exactly what you said.
2       Q.  So both of those are doubling up.
3       A.  Well, no.  I would say doubling up
4   would be wrapping.
5       Q.  Okay.  So all this time that we've
6   been talking about putting another line, that's
7   not doubling up.
8       A.  No.
9       Q.  Doubling up -- we've been misusing the
10  term, and in your opinion and the way you
11  intended it in your report, doubling up means
12  taking the same line and making it go around
13  twice.
14      A.  Yes.
15      Q.  And that's what you think should have
16  been done.
17      A.  Yes.
18      Q.  Not taking extra lines.
19      A.  It could be --
20      Q.  Well, you just --
21      A.  No, I just -- you could have
22  additional lines.  Additional lines are not
23  doubling up.
24      Q.  Okay.  I'm talking about doubling up.
25      A.  Doubling up is using the same line in

128

1   a double fashion.
2       Q.  Okay.  Doubling up is not putting on
3   in additional line.
4       A.  That's correct.  In my opinion.
5       Q.  Uh-huh.  So anytime we've used, in a
6   question or an answer, the term doubling up, it
7   applies to looping or using the same line.
8       A.  That's my interpretation.
9       Q.  Well, that was what you intended.
10      A.  That's what I intended, yes.  That's
11  correct.
12      Q.  So any requirement, recommendation,
13  policy, practice, that you've testified about
14  which stated doubling up, that meant using the
15  same line twice.
16      A.  Yes.
17      Q.  And doubling up in those contexts
18  specifically did not mean obtaining an extra
19  line.
20      A.  That's correct.  The interpretation of
21  that, in my opinion, would be adding additional
22  lines.
23      Q.  Right.  Which is a different --
24      A.  Different deal.
25      Q.  -- thing than doubling up.

129

1       A.  Yes.
2       Q.  All right.  And you said this is in
3   some seaman 's book somewhere.
4       A.  The definition of that?  I think I
5   could go back to the office and find it.  Or
6   you can do it.  Just do a Google search.
7       Q.  Can doubling up, or have you ever
8   heard of doubling up to include using one line
9   but of double the strength?
10      A.  No.
11      Q.  That's not doubling up in your
12  opinion.
13      A.  No.
14      Q.  But that would be doubling the
15  strength of the line, right?
16      A.  Well, you can interpret it that way,
17  but you wouldn't describe it as doubling up.
18      Q.  All right.  This location that you've
19  marked on Exhibit 5, by the way, which we
20  haven't -- this was where you had the barge
21  moored; right?
22      A.  Yes.
23      Q.  So we'll put the ING 4727?
24      A.  Yes, sir.
25      Q.  Okay.  This location in front of the

130

1  facility, do you call that a slip?  Is that a
2  correct nautical term for this?
3      A.  No, it wouldn't be, no.
4      Q.  What would it be?
5      A.  It would be a quay or a wharf.  It's a
6  linear thing as opposed to.
7      Q.  The key or the wharf is the land-based
8  structure.  I'm talking about the water in
9  front of the terminal.  Is that a slip?
10     A.  No, I wouldn't call it a slip.  I'd
11 call it what the coast pilot calls it.
12     Q.  What is it called?
13     A.  A turning basin.
14     Q.  Are you aware of any vessels, barges
15 or other floating structures which were in the
16 Industrial Canal between Florida Avenue and the
17 Seabrook bridge which broke away during the
18 hurricane?
19     A.  I think during my last deposition
20 Mr. Haycraft -- in fact, he gave me pictures to
21 look at of barges in various aspects and
22 condition that he told me also broke away.
23     Q.  So your only awareness is from
24 Mr. Haycraft showing them to you.
25     A.  That's correct.  Yes.  I did not do

131

1  any independent investigation of other
2  breakaways.
3      Q.  Your opinion earlier was that the five
4  tier barges loosened or unmoored; right?
5  Because those ropes did not break.  Am I right?
6      A.  Um -- well, I said I didn't know if it
7  slipped or it failed or it parted.  But I know
8  looking at the photographs that I have
9  indicated that the north end of the tier is
10 away from the dock.
11     Q.  So that based on the one photograph or
12 set of photographs that show a cockeyed
13 northern edge to that five tier, right?
14     A.  Yes.
15     Q.  So do you have any physical evidence
16 that there was any allision between any barge
17 on that five tier in either of the two 4727 or
18 4745?
19     A.  No, sir.
20     Q.  Other than that photograph, do you
21 have any basis for your opinion that there was
22 a potential allision?
23     A.  That photograph made me, um -- or --
24     Q.  Right.  Other than the photograph was
25 my question.

132

1      A.  No.
2      Q.  Okay.  All right.  Let's look at your
3  report Page 5, 31.3.  It says Breakaway Event.
4      A.  Yes, sir.
5      Q.  What do you mean by Breakaway Event?
6      A.  The barge breaking away.
7      Q.  So the breakaway event is the barge,
8  um -- parting its lines or somehow moving away
9  or separating itself from its moorings --
10     A.  Yes.
11     Q.  -- right?
12     A.  Yes, sir.
13     Q.  Okay.  So am I correct -- I'm
14 confused.  Under Breakaway Event you put
15 Villavaso and Adams.  They have nothing to do
16 with the breakaway event.
17     A.  Well, the breakaway event --
18     Q.  Am I right, they have nothing to do
19 with the breakaway event.  I think we've been
20 over it, but I'm confused as to why you have it
21 here.
22     A.  Well, I have it there because they
23 witnessed the barge -- their testimony is they
24 witnessed a barge.
25     Q.  Right.  So as far as the objective

133

1  evidence in your opinion, they have nothing to
2  do with the breakaway event, do they?
3      A.  That is correct.  Yes.  They just
4  witnessed the barge -- whatever.
5      Q.  All right.
6         (Brief recess.)
7         MR. WALKER:
8             We're back on, and rather than
9         delay, since we're all trying to get
10        back, I'm going to reserve some of my
11        questions and review my notes while
12        Bill continues.
13 EXAMINATION BY MR. EMORY:
14     Q.  Mr. Green, we've already met.  As you
15 know, I'm representing Zito in connection with
16 this litigation.  And I'm going be asking
17 questions subject to the same reservation that
18 Mr. Walker made at the beginning of the
19 deposition.
20        All that being said, you understand in
21 general Zito 's involvement, at least how they
22 ultimately end up in this litigation, is that
23 correct?
24     A.  Yes, sir.
25     Q.  And just to I guess simplify and

134

1 summarize, Zito is the company that
2 initially -- or that brought the barge out to
3 the Lafarge location on the Friday before the
4 storm.
5     A.  That's correct.
6     Q.  And then there's testimony where
7 allegedly a call was made and a message was
8 left with Zito to indicate that the barge was
9 released and ready for pick up.
10    A.  Yes, sir.
11    Q.  All that being said, I've had a chance
12 to go through the three reports that you've
13 issued thus far in connection with this
14 incident, and in these reports you were
15 certainly aware of Zito's involvement as you
16 were issuing those reports, correct?
17    A.  Yes.
18    Q.  In those reports I did not see any
19 indication where at least in your opinions in
20 those reports where you have found any fault
21 concerning Zito or Zito 's involvement.
22    MR. SANDERS:
23        Wait a minute.  For the record,
24    he was never asked to consider Zito 's
25    involvement.  The first report

135

1     regarded privity and knowledge in
2     Judge Berrigan 's court.  And the
3     second report dealt with liability of
4     Ingram.  Now we're here on issues of
5     class certification, and I'll
6     stipulate that he's not going to give
7     any opinion on Zito 's negligence or
8     lack thereof with regard to the class
9     certification matter.  We have
10    liability trials and deadlines coming
11    up beginning of next year.
12    MR. EMORY:
13        And that's fair, Pat.  I just
14    wanted to make sure in my reading I
15    didn't miss something.
16 EXAMINATION BY MR. EMORY:
17    Q.  There's nothing in those reports;
18 correct?
19    A.  I'd have to go back and review every
20 one of them, but I think --
21    MR. WEBB:
22        We've got a stipulation.
23    MR. SANDERS:
24        Yeah.  There's nothing in those
25    reports.

136

THE WITNESS:
    Thank you, sir, whoever you are.
MR. EMORY:
    I think that was Dan coming to
    your rescue.
EXAMINATION BY MR. EMORY:
    Q.  You've been asked several questions
today about the mooring and the types of
moorings and your opinions on the types of
moorings that should have been used with
respect to that barge.  Are you aware of any
facts to indicate that Zito had any involvement
with how that barge was moored at the Lafarge
facility prior to the storm?
    A.  No, sir.
    Q.  Are you aware of any facts to indicate
that Zito was in any way involved in the
decision to top around the barge, to use your
term, in the Lafarge facility?
    A.  I'm not aware of anything.
    Q.  Based on your review of Zito 's
involvement and the facts that you understand
surrounding Zito's involvement, are you aware
of any regulations that Zito failed to comply
with?

137

MR. SANDERS:
    Let me object in that he said
    he's not performed any review
    regarding Zito.  You threw in, in that
    question, based upon your review.  I
    just want to be fair.
MR. EMORY:
    Okay.  That's fair.  And I'll
    change it.
EXAMINATION BY MR. EMORY:
    Q.  Based on your understanding of Zito 's
involvement, are you aware of any regulations
that they have failed to comply with?
    A.  At this point, no.
    Q.  Is there any additional information
that you have requested or intend to receive
regarding Zito's involvement?
    A.  No.
    Q.  Is it a fair statement, at least based
on your understanding, other than the testimony
from Mr. Busch I believe it was that he
allegedly left a voicemail with Zito on the
morning of Saturday before the accident, you
have no other basis to show that Zito knew that
the barge was ready to be picked up that

138

1   morning.
2           MR. SANDERS:
3               I'm going to allow that, but come
4   on.  This is class cert.
5       A.  I have nothing else.
6   EXAMINATION BY MR. EMORY:
7       Q.  Okay.  Do you intend to issue a report
8   with respect to Zito's involvement?
9       A.  It depends on what information is
10  given to me.  The information I have right now
11  is that Mr. Busch testified that he left a
12  message, you know, for the barge to be picked
13  up.  And that's -- as far as I know, that's all
14  I have.
15  EXAMINATION BY MR. WALKER:
16      Q.  Now, you were also -- you sat through
17  the trial, um -- I think it was either Phase I
18  or Phase II, and you heard the testimony of
19  Mr. Barry Boudreaux who was the President of
20  Zito.  And you've heard him testify that
21  Zito 's telephone system would not allow for
22  someone to leave a voicemail message without
23  first speaking to an actual person.
24      A.  I don't remember that.
25      Q.  You don't recall testifying to that

139

1   effect at the trial?
2       A.  Did I testify to that?
3       Q.  Yes, sir.
4       A.  That, um -- I knew that Zito 's phone
5   system wouldn't let -- allow for a message to
6   be left?
7       Q.  That you were at trial and you heard
8   Mr. Boudreaux testify to that effect.
9       A.  Well, I could have been in the
10  courtroom but I don't recall that testimony.
11          MR. SANDERS:
12              Bill, again he's not testifying
13  in December about anything concerning
14  Zito.  This deposition is for class
15  cert purposes.  I'm asking you to --
16          MR. EMORY:
17              Well, and I appreciate that, Pat.
18  Allow me some leeway, because I need
19  to, to the extent I can --
20          MR. SANDERS:
21              I want you to know he has not
22  been given anything on Zito, he's been
23  not asked by us to give an opinion on
24  Zito.  He's performed no work
25  regarding Zito, and he's not --

140

1           MR. WEBB:
2               Question:  I said you have a
3   stipulation that he's not going to
4   call him to testify about Zito in the
5   class cert.  What more do you need?
6           MR. EMORY:
7               Well, Dan, I mean, the point is I
8   may be trying to get out of this case
9   sooner rather than later, and I want
10  to find out if this witness is going
11  to be offering opinion that I need to
12  be aware of for my motion.
13          MR. WEBB:
14              I know, but you're not there yet.
15          MR. SANDERS:
16              The deadlines for those reports
17  are probably in March 2009.  And the
18  depositions.
19          MR. EMORY:
20              No, Dan, I appreciate that.  I'd
21  love to stay in the dance but I'd like
22  to get out as soon as possible, and
23  that's what I'm trying to, to the
24  extent that I can, cut to the chase
25  here.

141

1           MR. SANDERS:
2               We've got about ten other people,
3   I have questions, and we're all trying
4   to get out of here for three o'clock.
5           MR. EMORY:
6               I don't have many questions, Pat.
7           MR. SANDERS:
8               But I think you're abusing it.
9   I'm not saying that in a bad way.
10          MR. EMORY:
11              No, I know what you mean, and I'm
12  not taking that in a bad way.
13          MR. SANDERS:
14              Okay.  Come on.
15          MR. EMORY:
16              Derek, if you have some questions
17  I'm going to try to cull down my
18  questions to accommodate Pat here.  So
19  if you want to jump forward.
20  EXAMINATION BY MR. WALKER:
21      Q.  All right.  Yeah.  I'll come back.
22  Again, Exhibit 1 that we've been talking
23  about --
24      A.  Is my report?
25      Q.  Your report, right.  Section 3.1.2.  A

142

1    couple of questions there:  Your first sentence
2    says, during the early morning hours of
3    August 29 the barge broke free.
4        A.  Yes.
5        Q.  Okay.  I assume that's what we've
6    previously talked about when you said -- first
7    I think you said between 4:00 and 5:00 a.m.,
8    later you said 4:00 to 6:00 a.m.?
9        MR. SANDERS:
10               No.  That's a
11           mischaracterization.
12   EXAMINATION BY MR. WALKER:
13       Q.  Is that correct?
14       A.  It's correct that I mentioned times,
15   but I mentioned the times that Mr. Adams
16   testified to and also Mr. Villavaso.
17       Q.  Right.  So you're saying -- and I
18   think I asked you, and the record will reflect,
19   when did the barge break away?  And I thought
20   your testimony was 4:00 to 5:00, 4:00 to 6:00.
21       MR. SANDERS:
22               Unh-unh.
23       A.  Yes.  Sometime -- well, that's when
24   the witnesses said they saw it.  And so it had
25   to break loose sometime before that.  I don't

143

1    know, it could have meandered around there for
2    a while before it supposedly --
3    EXAMINATION BY MR. WALKER:
4        Q.  Okay.  Well, that's not your prior
5    testimony.
6        MR. SANDERS:
7                I say it is.
8        MR. WALKER:
9                Excuse me.
10   EXAMINATION BY MR. WALKER:
11       Q.  That's not your prior testimony.  So
12   let's be clear what we're saying.
13       A.  Okay, I'll correct my testimony.
14       Q.  When do you think the barge broke
15   away?
16       A.  Sometime before the witnesses saw it.
17       MR. SANDERS:
18               Okay.
19   EXAMINATION BY MR. WALKER:
20       Q.  Okay.  Based on the surge, the wind
21   and the allision which would have been caused
22   by the wind and the surge in your opinion, do
23   you have an opinion as to whether the barge
24   would have broken away?
25       A.  No, I do not.

144

1        Q.  You then state that it drifted south
2    in the IHNC.  South would be in the direction
3    of the Claiborne Avenue bridge?
4        A.  Yes.
5        Q.  And then you state that it passed
6    through the levee.  And that would be into the
7    neighborhood down by the, um -- Claiborne
8    Avenue bridge through that breach which we call
9    the southern breach?
10       A.  It could very well have.
11       Q.  I mean, that's what you say, it passed
12   through the levee.
13       A.  Well, the levee, as you know, is
14   breached in two places.  Whether it went in and
15   came out, I don't know what -- no one knows,
16   except these two witnesses.  One guy says he
17   saw the nose of the barge through it, the other
18   guy said he saw a black thing approaching the
19   levee wall.  But it did go through the levee.
20       Q.  It passed through the levee are your
21   words.?
22       A.  Yes, sir.
23       Q.  And ended up in the location in the
24   southern portion of the Ninth Ward.
25       A.  Yes, sir.

145

1        Q.  Have you read any of the reports
2    submitted by the experts in the MRGO or
3    Robinson litigations?
4        A.  No, sir.
5        Q.  Have you ever meet with Joe Bruno or
6    any of the attorneys in that case?
7        A.  No, sir.
8        Q.  Are you aware of any of their theories
9    of how the wall collapsed?
10       A.  No, sir.
11       MR. HANNA:
12               Object to the form.
13   EXAMINATION BY MR. WALKER:
14       Q.  Amongst the papers that you say you
15   reviewed are Lafarge pleadings,
16   interrogatories, requests for admissions and
17   requests for production.  Are there any facts
18   contained in those pleadings that you disagree
19   with?
20       A.  Gee, I'd have to --
21       MR. EMORY:
22               Object to the form.
23       A.  I'd have to go back and look at all of
24   them again and see, based on all the questions
25   you have proposed to me or propounded to me.

146

1    I'd have to look again and see.
2    EXAMINATION BY MR. WALKER:
3        Q.  Well, no, not on that basis, but in
4    preparing your report I assume if there was a
5    fact with which you disagreed for your opinions
6    you would have noted it in your report.
7        A.  Yeah.  That's a safe assumption.  So
8    based on that, this is all I have.
9        (Brief recess.)
10   EXAMINATION BY MR. WALKER:
11       Q.  As far as the testimony that you've
12   reviewed, even though I know you criticized the
13   particular mooring arrangement, you do agree
14   that at the time the Lafarge personnel left the
15   facility the barges were moored and were
16   alongside the facility.
17       A.  Yes.
18       Q.  And based on the testimony, you also
19   understand that they were later -- that 4727
20   and 4745 was switched and topped around putting
21   the light barge outboard.
22       A.  That's correct.
23       Q.  And they were moored to the facility.
24       A.  Yes.
25       Q.  Earlier we talked about the Coast

147

1    Guard New Orleans Hurricane Plan, Annex C I
2    believe that you referred to.
3        A.  Yes.
4        Q.  And I think there were some things
5    that you said Lafarge failed to do.  Among them
6    was determine the special needs and attention
7    of vessels at the facility.  Can you
8    explain better to me what that means?
9        A.  In there, it says, special attention
10   should be paid to barges moored in the vicinity
11   of bridges.
12       Q.  Okay.  So the special attention and
13   needs that Lafarge failed to take into account
14   was that there were bridges close to its
15   facility?
16       A.  Yes.
17       Q.  That's it?
18       A.  Yes, sir.
19       Q.  Okay.  I think that's all I have.
20   EXAMINATION BY MR. EMORY:
21       Q.  Mr. Green, going back to your
22   June 2008 report, on Page 6, top of Page 6,
23   there was a sentence in there which I did not
24   see in your previous two reports where you're
25   referring to the conversation or at least the

148

1    alleged, I guess, phone call from Mr. Busch to
2    Zito.  And you say, called Zito Towing
3    ostensibly to have them remove the empty barge.
4        Why did you include this sentence in
5    this report and not in the other ones?
6        A.  I don't know.  I just reviewed
7    everything and thought it was appropriate.
8        Q.  Okay.  What is the significance to you
9    when you refer to the call as being a call made
10   ostensibly to have them remove the empty barge?
11       A.  Well, there's different testimony.
12   One says that, no, I just called them and said
13   it was empty.  I think it was Mr. Busch.  Then
14   I think Mr., um -- the other person there at
15   the facility said there was a call that it was
16   empty and ready to be picked up.
17       Q.  What is your understanding of what was
18   the communication or at least the message?
19       A.  Well, the message was that the barge
20   was empty.  We know that.  I think they -- both
21   witnesses agree to that.  It's just there's a
22   difference in the way one described the
23   conversation or what the message was to the
24   alleged Zito answering machine.
25       Q.  In the records that you've reviewed,

149

1    did you review the discovery responses from
2    Lafarge where they had produced some of their
3    phone records?
4        A.  No.
5        Q.  Okay.  I want you just to assume for
6    the purpose of my question that the phone
7    records from Lafarge do not show any evidence
8    of a call being made that morning from Lafarge
9    to Zito.  If you assume that to be correct,
10   would you agree that Zito would have had no
11   reason to know that the barge was empty, number
12   one?
13       A.  That's true.  If there's no record
14   that the phone call -- a phone call was made to
15   Zito, I guess the -- that begs the question,
16   then, why would Mr. Busch say that?  He could
17   be using somebody else's phone, um -- anyway, I
18   think that's what it is.
19       Q.  Simply for the purpose of my question
20   I want you to assume that the records from
21   Lafarge show no evidence of that call.  And you
22   agree, number one, that Zito would not have
23   known that the barge was empty.
24       MR. SANDERS:
25       Wait.  Come on.  We're getting

150

1    into all kind of issues, what phone
2    was used, is there only one phone
3    record, are there more than one phone
4    line at Zito?  This has nothing to do
5    with class certification.  He hasn't
6    reviewed any facts, and you're not
7    feeding him all the facts for this
8    question.
9    EXAMINATION BY MR. EMORY:
10       Q.   I thought I saw in one of the
11   reports -- look on Page 4 of your report,
12   Mr. Green.  On Page 4 of your report you talk
13   about Mr. Busch testifying that the -- it's
14   about halfway down -- that there was limited
15   communication, and that the communications --
16   that they were limited to Nextel cellphone
17   service.  I want you to assume that the records
18   from Lafarge show that their Nextel phones,
19   there's no evidence of a call on a Nextel -- or
20   a Lafarge Nextel phone being made to Zito that
21   morning.
22          Based on that assumption, you'd agree
23   that Zito would not have known that the barge
24   was empty.
25       A.   If that's true, well then that's true.

151

1        Q.   That's all I'm asking.  That's all I
2    have.
3           MR. WALKER:
4               I have a couple more.
5           MR. SANDERS:
6               Go ahead.
7    EXAMINATION BY MR. WALKER:
8        Q.   Okay.  Again, looking at your three
9    reports, I know you're trying to be as accurate
10   as you can be with the information that you
11   receive as you evolve in this case.  Your first
12   report which we have marked as Number 4 dated
13   January 17th, 2007.
14       A.   Okay.
15       Q.   Okay?
16       A.   Okay.
17       Q.   And your second we have marked as
18   Green Number 2 was dated, um -- or Green
19   Number 3.  It's lost in my papers somewhere, b
20   ut it is dated --
21          MR. SANDERS:
22              Sometime after.
23       A.   September 10th.
24          MR. WALKER:
25              I just had it.

152

1           MR. SANDERS:
2               September 10th.
3    EXAMINATION BY MR. WALKER:
4        Q.   September 10th.
5           If we look at the one we've been
6    referring to, Number 1 --
7        A.   Which one is Number 1?
8        Q.   June 13th, right.  It says, during the
9    early morning hours -- I'm referring to 3.1
10   again -- during the early morning hours of
11   August 29, the ING 4727 broke free of its
12   mooring during Hurricane Katrina and drifted
13   south.  You see that?
14       A.   Yes.
15       Q.   Okay.  If you look at your prior two
16   reports, what you say in both of them is during
17   the early morning hours of August 29, at about
18   05:30-06:00 it broke free.
19          So you've changed your mind, haven't
20   you?
21       A.   No, not really.  That was based on I
22   think Mr. Adams' testimony, then we had this --
23   since then we had the testimony of Villavaso,
24   and he put a different time limit on it.
25       Q.   Uh-huh.

153

1        A.   And so rather than have a conflict I
2    just put during -- that's why I reworded that.
3    I'm pretty sure that's why I reworded that.
4        Q.   Well, is it relevant to your opinion
5    when the barge broke away?
6        A.   Um -- only from the standpoint of when
7    the surge got there, when the wind shifted.  So
8    those, all those forces that came to be.
9        Q.   No.  Is it relevant to your opinion
10   when the barge broke away, yes or no?
11       A.   No.  No.
12       Q.   No.
13       A.   Thank you for that.
14       Q.   Okay.  And you have some other
15   changes.  In your original two reports you said
16   drifted south and allied with the east side
17   levee of the canal causing a breach in the
18   levee which precipitated catastrophic
19   inundation of the area.  You've removed all
20   that because that's way outside the scope of
21   your expertise and knowledge, isn't it?
22       A.   Well, not only because of that, is
23   that I tried to limit it, um --
24       Q.   To what you know.
25       A.   What I know.

154

1    Q.   Right.  And you don't know whether it
2   allided with the east side of the levee, do
3   you?
4    A.   I only have the testimony of the two
5   witnesses.
6    Q.   Right.  And you don't know whether it
7   caused the breach in the levee or not, do you?
8    A.   Only the testimony of the two
9   witnesses said after the explosion then there
10  was a tidal wave.  And one guy described it as
11  a tooth was missing and --
12   Q.   And neither of those, as you've
13  testified earlier, have anything to do with
14  your expertise and opinions regarding the
15  breakaway of the barge, right?
16   A.   I was providing narrative as I
17  understood the facts to be.
18   Q.   So the answer to my question is
19  correct, neither of those have anything to do
20  with your opinions with respect to the
21  circumstances surrounding the breakaway of the
22  barge.
23       MR. SANDERS:
24           Object to the form.
25   A.   Correct.

155

1   EXAMINATION BY MR. WALKER:
2    Q.   All right.  That's all the questions I
3   have for now.  Thank you, Mr. Green.
4        MR. SANDERS:
5            Any questions from New Orleans?
6        MR. WEBB:
7            They're shaking their heads no.
8   EXAMINATION BY MR. SANDERS:
9    Q.   Mr. Green, again, Pat Sanders talking
10  for the people in New Orleans.  With regard to
11  your credentials, you testified in the Ingram
12  case before Judge Berrigan, is that correct?
13   A.   That's correct, yeah.
14   Q.   And in connection with that testimony
15  there were various motions to exclude your
16  testimony, is that correct?
17   A.   Yes.
18   Q.   And Judge Berrigan elected to -- she
19  denied those motions, allowing you to testify.
20   A.   That's correct.  Yes.
21   Q.   Okay.  Now, as per the time of the
22  breach, the times you cite as indicated by
23  Mr. Adams and Villavaso are the times that they
24  saw the barge break the wall, is that correct?
25   A.   Correct.

156

        MR. WALKER:
            Objection.  They don't say any
        such thing.
EXAMINATION BY MR. SANDERS:
     Q.   Well, assume that that's what they
say, that they saw the barge break the wall.
But those are the times that you put in your
report.
     A.   That's correct.  Yes.
     Q.   And wouldn't it be so that the barge
had to break away sometime prior to that?
     A.   That's correct.  Yes.
     Q.   Now, you had testified that I thought
Katrina was some 200 miles in diameter.  Is
that correct?
     A.   I think it was 200 or 250 miles, yeah.
     Q.   That being the case, if it made
landfall somewhere around 5:00 or 6:00 a.m. in
Buras --
        MR. WEBB:
            Are you trying to qualify him as
        a meteorologist now?
        MR. SANDERS:
            No.
EXAMINATION BY MR. SANDERS:

157

     Q.   But if it made landfall five or six
hours prior in Buras, would we have hurricane
winds for some time prior to its having made
landfall?
     A.   Yes.
        MR. WALKER:
            Objection.  Outside of his
        expertise.
EXAMINATION BY MR. SANDERS:
     Q.   Now, as the storm would approach,
given your experience in maritime matters,
would you agree that there were varying waves,
wave directions and wave heights?
     A.   Yes.
        MR. WALKER:
            Objection.  Outside his
        expertise.
        MR. SANDERS:
            I thought we were reserving all
        objections except those to form.
        MR. WALKER:
            Okay.  I just note them so I
        don't forget them.
EXAMINATION BY MR. SANDERS:
     Q.   So is it fair to say you don't know

158

1  when the barge actually broke away?
2      A.  No, I do not.
3      Q.  Okay.  And do you know whether the
4  barge broke away because of winds that were 70
5  miles per hour, 100 miles per hour or 140 miles
6  per hour?
7      A.  No, I do not.
8      Q.  Do you know whether the barge broke
9  away because -- we mentioned a storm surge --
10  isn't a storm surge -- can it be a gradual
11  increase in wave height?
12      A.  Yes.  Prior to a surge, there is a
13  rise in water level before the surge arrives.
14      Q.  Okay.  So when you talked about a
15  storm surge, you didn't mean like a tidal wave,
16  it could have been any number of wave actions.
17      A.  That's correct.  Yes.
18      Q.  Okay.  Now, just to confirm, regarding
19  the tier of five barges that went cockeyed,
20  using Mr. Walker 's words, your opinion that it
21  hit the 4727 was based solely on that aerial
22  photograph.
23      A.  That's correct.  Yes.
24      Q.  Would you agree that you're not sure
25  that that is what happened?

159

1      A.  Well, I think I testified to that.
2      Q.  Okay.  I'm sorry.  You were questioned
3  regarding your opinions in your report numbered
4  5.1 to 5.9.  Would you agree that what was
5  written in your report is a more complete
6  recitation of your opinions than the questions
7  asked of you by Mr. Walker?
8      A.  Yes.
9      Q.  When asked about whether any rules or
10  regulations required Joe Domino -- or required
11  Lafarge to ask Joe Domino for additional
12  rigging, you indicated that there was no
13  specific rules or regulations requiring that,
14  is that correct?
15      A.  That's correct.
16      Q.  But would you agree that notions of
17  good common sense and good seamanship would
18  require Lafarge to ask Joe Domino for
19  additional rigging?
20          MR. WALKER:
21              Objection.
22          MR. WEBB:
23              Form.
24      A.  Yes.  And I think my opinions suggest
25  that, it was seamanship and professional, um --

160

1  maritime practice that it would, my opinion, be
2  incumbent upon them to ask for that.
3  EXAMINATION BY MR. SANDERS:
4      Q.  And in addition regarding your opinion
5  5.5 about mooring lines and whether any
6  regulations specifically mention the number or
7  type of mooring lines, you said that they do
8  not, is that correct?
9      A.  That's correct.
10      Q.  But then again, doesn't their
11  obligations under the CFRs require that they
12  adequately moor the vessel?
13      A.  That's what I've been trying to say,
14  yes.
15      Q.  And your opinion that adequate mooring
16  would involve doubling up of lines is based
17  upon -- let me count these off -- common sense
18  and good seamanship.
19      A.  Yes.
20      Q.  The standard --
21          MR. WALKER:
22              Continuing objection since I
23          didn't know you were going to break
24          them down.
25          MR. SANDERS:

161

1              Okay.
2  EXAMINATION BY MR. SANDERS:
3      Q.  The standard of care as set forth by
4  the Greater New Orleans Barge Fleeting
5  Association.
6      A.  Yes.
7      Q.  Okay.  The Sector New orleans
8  Hurricane Plan.
9      A.  Yes.
10      Q.  Okay.  And also your opinion and some
11  25 years experience in the industry.
12      A.  Fifty years.
13      Q.  Fifty years.  I'm sorry.
14              Regarding the hurricane sector plan,
15  you indicated that Lafarge failed to adhere to
16  the recommendations of Annex C by failing to
17  determine the special needs and intentions of
18  vessels moored at the facility, the commander
19  of the port has the power to order that vessels
20  be properly secured.  Is that correct?
21      A.  Yes.
22      Q.  He has the power to order that vessels
23  bow moved from problem areas which may involve
24  bridges and floodwalls, is that correct?
25      A.  Yes.

162

1     MR. WALKER:
2       Objection.
3   A.  Yes.
4     MR. WALKER:
5       You're leading, Pat.
6     MR. SANDERS:
7       I'm sorry.  I thought he was an
8   expert.
9     MR. WEBB:
10      He's testifying.  There's a
11   difference.
12 EXAMINATION BY MR. SANDERS:
13   Q.  Well, given the fact that this vessel
14 upon the exit of the Lafarge employees from the
15 facility was moored an empty to a full, with
16 three single-part lines, in close proximity to
17 bridges and floodwalls, would you agree that
18 this vessel was a vessel with special needs and
19 from which the Commander of the Port would have
20 wanted to know about?
21   A.  Yes.
22   Q.  Mr. Walker asked you about the certain
23 information that you felt Lafarge should have
24 conveyed to the Commander of the Port.  When
25 such notification occurs to the Commander of

163

1 the Port, doesn't the Commander of the Port
2 inquire as to the status of vessels?
3   A.  Typically, yes.
4   Q.  Okay.  So when you were asked by
5 Mr. Walker that, are you saying that other
6 people, all these other barges that broke away,
7 they should have called the Commander of the
8 Part and said, it's moored like this, it's,
9 um -- it's empty or full, or it's ready to pick
10 up or whatever?  In actuality, that's not how
11 it occurs, the Commander of the Port questions
12 the facilities as to the needs of the vessel
13 and it's intentions, is that correct?
14     MR. WALKER:
15       Objection.
16   A.  Yes.
17 EXAMINATION BY MR. SANDERS:
18   Q.  Is it fair to say that there was not
19 just one act of negligence which caused this
20 breakaway?
21   A.  No.  There was a series of omissions
22 and acts of negligence, in my opinion.
23   Q.  And that would -- some of those would
24 be the failure to double up -- well, let's say
25 the failure to ballast.

164

1   A.  Yes.
2   Q.  And the failure to move the vessel out
3 of this location.
4   A.  Yes.
5   Q.  The failure -- or the mooring of an
6 empty to a full barge.
7   A.  Yes.
8   Q.  And that causes, number one, an
9 inability to put as much lines between
10 cavels --
11   A.  Yes.
12   Q.  -- due to the extended distance.
13   A.  Yes.
14   Q.  And that also creates a sail effect
15 with regard to the empty barge, is that
16 correct?
17   A.  Yes.
18     MR. WALKER:
19       Objection.
20   A.  That's correct.
21 EXAMINATION BY MR. SANDERS:
22   Q.  What is does a sail effect mean?
23   A.  It means that there's more line out
24 than in -- excuse me -- more vessel is exposed
25 to wind than otherwise.

165

1   Q.  Okay.  In your opinion, had the 4727
2 been moored to the 4745 in the same way the
3 4745 was moored to the dock, would it have
4 broken free?
5   A.  I don't know.  It would be speculation
6 on my part.  I think Mr. Thigpen testified that
7 he scrounged around the dock and found an
8 additional line to put between the dock and the
9 full barge against the dock.  But that's -- the
10 fact that the 4727 and 4745 were something like
11 six or eight feet difference in height, um --
12 created a situation that in my opinion was
13 unsafe.
14   Q.  Okay.  That's all I have.
15     MR. SANDERS:
16       Anybody else?
17     MR. WALKER:
18       Nope.
19     MR. SANDERS:
20       Done.

166

WITNESS' CERTIFICATE

I, DONALD J. GREEN, do hereby
certify that the foregoing testimony was given
by me, and that the transcription of said
testimony, with corrections and/or changes, if
any, is true and correct as given by me on the
aforementioned date.

_____   _____
DATE SIGNED        DONALD J. GREEN

_____ Signed with corrections as noted.

_____ Signed with no corrections noted.

DATE TAKEN: November 21st, 2008

167

REPORTER'S CERTIFICATE
I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
Certified Court Reporter in and for the State
of Louisiana, do hereby certify that the
aforementioned witness, after having been first
duly sworn by me to testify to the truth, did
testify as hereinabove set forth;
That said deposition was taken by me
in computer shorthand and thereafter
transcribed under my supervision, and is a true
and correct transcription to the best of my
ability and understanding.
I further certify that I am not of
counsel, nor related to counsel or the parties
hereto, and am in no way interested in the
result of said cause.

_____
JOSEPH A. FAIRBANKS, JR., CCR, RPR
CERTIFIED COURT REPORTER #75005

43 (Pages 166 to 167)

GREEN, DONALD

11/21/2008

Page 1

**A**

**ability** 167:12
**able** 31:21,23 68:17
  77:17 126:6
**absolutely** 38:11
**abusing** 141:8
**academy** 30:18
**accepted** 98:18
**accident** 137:23
**accommodate** 141:18
**account** 87:9 147:13
**accurate** 151:9
**accused** 119:12
**act** 163:19
**acting** 35:14
**action** 1:4 27:11,16
  113:17 116:14,24
**actions** 66:8 158:16
**acts** 27:6,8 42:17,17 44:3
  48:2 49:25 163:22
**actual** 69:25 91:4 138:23
**actuality** 163:10
**Adams** 28:22 41:15
  42:12 46:2 48:11 54:23
  54:23 55:7 56:9 132:15
  142:15 152:22 155:23
**add** 39:1 46:2 48:22
  88:25 92:15
**adding** 128:21
**addition** 7:22 8:3 15:22
  17:10 89:21 111:16
  160:4
**additional** 8:4 13:4
  15:24 16:2 17:17,25
  20:22 92:9,11,19 93:11
  93:17 94:20 95:10,11
  127:22,22 128:3,21
  137:15 159:11,19 165:8
**address** 26:14 27:17
  28:14 38:19 52:5 108:4
**addressed** 27:4
**addressing** 40:10
**adequate** 102:17,21
  118:10,13,16 160:15
**adequately** 105:23

106:12 119:10 160:12
**adhere** 111:8,17 161:15
**adjacent** 62:10 69:25
  70:4
**adjourn** 98:24
**adjusted** 119:16
**administering** 5:24
**admissions** 11:23 145:16
**adrift** 42:19 49:5 53:24
  70:14
**advance** 48:1 116:19
**advise** 93:16
**advised** 114:21
**aerial** 53:1 64:17 70:2
  158:21
**affect** 67:5
**affix** 88:9
**affixed** 58:25
**aforementioned** 5:4
  166:8 167:5
**afraid** 84:12
**afternoon** 10:16
**ago** 83:1
**agree** 17:6 40:9 48:4
  52:2 87:12,14 91:22
  98:3,6,7 102:2 103:12
  123:9 146:13 148:21
  149:10,22 150:22
  157:12 158:24 159:4,16
  162:17
**AGREED** 5:2
**agreement** 85:15 125:20
**ahead** 71:9 107:17
  116:10 151:6
**alleged** 148:1,24
**allegedly** 112:12 134:7
  137:22
**allide** 50:15
**allided** 53:6,9 62:15
  63:16,25 69:15 87:1
  153:16 154:2
**alliding** 65:22
**allision** 63:19 65:12
  69:17 79:10,14 80:22
  82:2 91:9 98:3 101:25
  131:16,22 143:21

**allow** 59:10 87:5,13 90:3
  100:2 119:23 138:3,21
  139:5,18
**allowed** 42:18 44:4 50:14
  61:23,25 62:7 88:11
**allowing** 54:8 155:19
**allows** 59:8
**alongside** 119:3,9 146:16
**alter** 21:22
**alternate** 35:12,20
**ameliorate** 116:18
**America** 2:9 6:8
**American** 36:12
**amount** 66:7 88:17
**analyze** 26:17
**Anchoring** 106:11
**and/or** 8:4 20:9 38:18
  42:8 63:16 81:3 166:6
**Annex** 111:18,21 147:1
  161:16
**answer** 5:13 43:17,20,23
  43:24 45:9 46:14 61:12
  67:4,22 80:8 93:20
  94:21 98:16 99:1,5,8
  100:20 101:6 104:9,9
  110:19 128:6 154:18
**answered** 95:7
**answering** 40:15 68:5
  82:17 99:21 100:11
  148:24
**anticipate** 116:22
**anticipated** 106:13
**anticipating** 97:10
**anticipation** 116:15
**Anybody** 165:16
**anytime** 128:5
**anyway** 43:25 60:22 90:6
  104:16 105:5 124:21
  149:17
**apologize** 8:20 18:12
  101:10
**APPEARANCES** 2:1
**appeared** 22:6
**Appendix** 111:10
**applicable** 18:14 19:1
  71:25 125:15

**applied** 39:23
**applies** 106:2 124:5
  128:7
**apply** 42:8 125:9,10,16
  125:17,18,21,22
**appreciate** 139:17
  140:20
**approach** 157:10
**approaching** 17:8 60:5
  116:15 144:18
**appropriate** 22:22,22
  148:7
**approximately** 35:15
  75:25
**architect** 30:20
**area** 23:22,25 24:19 27:9
  28:18 32:21 37:11
  56:10,11 57:5,8,19,19
  61:2 64:11 65:17 66:9
  74:8 75:2 76:1,4 88:24
  121:12 123:5,10 153:19
**areas** 7:14 10:4 31:13,22
  121:17,20 124:21
  161:23
**arrange** 87:17
**arranged** 90:13
**arrangement** 58:23
  77:13 87:22 92:22
  118:9 146:13
**arrangements** 88:12
  118:22 120:14
**arrival** 81:20
**arrives** 158:13
**arrow** 57:7 76:11
**arrows** 57:25 60:7,12,13
**asked** 17:16 22:12 26:6
  26:16 27:17,19 37:15
  45:1,8 94:18 95:5,10,11
  97:18 100:1 134:24
  136:7 139:23 142:18
  159:7,9 162:22 163:4
**asking** 9:1 37:12 65:9
  95:3,6 133:16 139:15
  151:1
**aspects** 7:9 122:7 130:21
**assigned** 36:11

GREEN, DONALD

11/21/2008

Page 2

**assist** 122:10 125:1
**assistant** 11:8
**assisted** 32:7 68:25 69:2
**Association** 30:25 82:25
  161:5
**assume** 123:9 142:5
  146:4 149:5,9,20
  150:17 156:5
**assumption** 146:7
  150:22
**attach** 13:22 14:2,10
**attached** 12:3 14:6,20
  23:21 61:24 74:10
**attaching** 13:11
**attachments** 11:22
**attend** 30:17
**attention** 21:21 147:6,9
  147:12
**attorney** 27:10 38:4
**attorneys** 145:6
**August** 15:14 142:3
  152:11,17
**authority** 109:11 113:10
**available** 107:23
**Avenue** 24:7,9 61:14
  84:19 115:10 123:4
  130:16 144:3,8
**avoid** 7:17
**aware** 17:5 18:25 85:2
  94:22 121:14 123:17
  124:3 130:14 134:15
  136:11,16,20,23 137:12
  140:12 145:8
**awareness** 130:23
**a.m** 54:16,19 55:9 56:2,4
  56:5 57:14,16 142:7,8
  156:18

_____

**B**

**b** 2:5 4:11 82:20 151:19
**back** 8:22 19:19 43:20
  59:23 77:7 81:21
  111:21 129:5 133:8,10
  135:19 141:21 145:23
  147:21
**backing** 54:3

**bad** 141:9,12
**ballast** 81:19 163:25
**ballasted** 64:9,10 81:3
  82:21
**ballasting** 16:9 83:19
**bank** 44:1
**barge** 2:2 6:11 7:23 10:9
  11:10 24:15 25:17 26:4
  27:3 28:4,12,15 32:20
  34:18,18,21,21 35:24
  36:13,24 39:22 40:2
  42:5,25 43:10,10,11,21
  43:25 44:13,14,21
  45:22 46:4 47:4,7 48:9
  48:14,17,20,25 49:3,4
  49:13,18 52:12 53:18
  53:19 56:8 58:4,17,20
  59:2,18,20,22 61:24
  64:12 65:12,18,21
  66:13 67:5 68:11,21
  70:14,20 71:4,15,19,19
  71:24 72:9,12,12,18,18
  72:22 73:4,16 74:7,16
  74:20 75:3,22 76:18
  80:2,4,9,24 81:1,10,15
  81:16,25 82:8,14,24,24
  83:7,20 84:11,12,14,18
  85:20 87:19 89:17,20
  91:24 94:14 95:19
  105:23 107:22 108:23
  112:23 113:3,23,23
  114:4,14,15,19 115:2,4
  115:6,8,9 117:23 118:3
  118:6 120:16,20 121:4
  122:13 125:8,14,20
  129:20 131:16 132:6,7
  132:23,24 133:4 134:2
  134:8 136:11,13,18
  137:25 138:12 142:3,19
  143:14,23 144:17
  146:21 148:3,10,19
  149:11,23 150:23 153:5
  153:10 154:15,22
  155:24 156:6,10 158:1
  158:4,8 161:4 164:6,15
  165:9

**barges** 1:6 23:12 25:15
  36:18,18,21 50:15,16
  53:1,2 54:4 58:15
  59:15,16,21 61:22,25
  62:9,14,17 63:23 64:6,8
  64:9,10,20 65:22 69:7
  69:12,14,15,23 70:11
  71:20 78:19 80:2 81:6
  81:7,12 82:3,20 83:2,3
  85:1 86:25 87:1 88:19
  88:20 89:2 91:7 92:12
  92:24 93:6,8,9 94:20
  95:1 96:4 106:7 111:11
  112:24 115:13,20,22
  116:5,11,21 117:1,5,12
  117:12 130:14,21 131:4
  146:15 147:10 158:19
  163:6
**Barry** 138:19
**base** 124:14
**based** 12:19 13:5 15:19
  16:20,21 17:10 23:12
  26:16 27:15,19 31:18
  64:17 79:18 85:9
  112:20 131:11 136:21
  137:5,11,19 143:20
  145:24 146:8,18 150:22
  152:21 158:21 160:16
**bases** 52:15
**basic** 71:21
**basically** 33:16 60:15
  92:14 108:21
**basin** 60:17,18 61:12
  68:25 123:2,3,6,10,13
  123:18,19 130:13
**basis** 53:8 55:8 62:12
  102:1,11 124:24 131:21
  137:24 146:3
**becoming** 49:5 53:14
**began** 37:12
**beginning** 26:19 133:18
  135:11
**begs** 149:15
**behalf** 9:7 119:8 120:12
**believe** 22:13 29:24 31:1
  31:6,12 82:17 123:5

  137:21 147:2
**bell** 122:18
**BEN** 3:8
**benefit** 17:2
**Benoit** 1:12
**Berrigan** 101:5 107:20
  135:2 155:12,18
**best** 167:11
**better** 23:13 104:7 147:8
**Bill** 6:10 73:21 133:12
  139:12
**bitt** 81:10
**bitts** 59:2
**black** 24:23 144:18
**blowing** 57:8
**blue** 24:5
**boat** 25:19
**boats** 36:16
**body** 110:23,25
**bollard** 58:18,25 85:18
**book** 126:4 129:3
**bottom** 72:17,18 73:16
**Boudreaux** 138:19 139:8
**Boutte** 1:8
**bow** 161:23
**box** 11:2 76:8
**brackets** 74:8
**breach** 44:16 144:8,9
  153:17 154:7 155:22
**breached** 49:17 144:14
**breaches** 1:4 25:16
**break** 44:4,21 45:21 47:7
  47:21 53:18,19 58:1
  64:25 69:18 79:15
  115:7 116:21 131:5
  142:19,25 155:24 156:6
  156:11 160:23
**breakaway** 32:20 44:13
  46:3 47:3 48:8,14,24
  49:22 50:9 52:11 55:9
  61:22 68:7 98:1 112:9
  118:6,18,21 132:3,5,7
  132:14,16,17,19 133:2
  154:15,21 163:20
**breakaways** 118:3,3
  131:2

GREEN, DONALD

11/21/2008

Page 3

**breaking** 22:15 42:6,7 66:14 69:8 80:4 96:24 116:6 132:6
**bridge** 24:5,8,10 25:17 61:14,15,17 84:19 115:10,11 123:4 124:4 124:9,17 130:17 144:3 144:8
**bridges** 111:12,24,25 147:11,14 161:24 162:17
**Brief** 69:19 117:15 133:6 146:9
**bring** 31:23
**broad** 17:18 40:8,9 113:10 126:15
**broke** 42:25 43:21 47:10 47:11,15,16 48:18,20 58:4 69:13 78:3 84:21 103:19 104:6 108:23 115:20,23 116:11 117:2 117:6 120:8,17 130:17 130:22 142:3 143:14 152:11,18 153:5,10 158:1,4,8 163:6
**broken** 43:1 79:24 101:24 103:11 104:16 105:4 143:24 165:4
**brought** 35:16 134:2
**Bruno** 145:5
**builds** 60:2 61:4
**bulletins** 19:10 20:6,13
**bunch** 40:19
**Buras** 156:19 157:2
**Busch** 11:12 58:23 59:9 62:5 85:9,15 89:25 137:21 138:11 148:1,13 149:16 150:13
**business** 31:7
**buttress** 107:24

**C**

**C** 111:18,22 147:1 161:16
**cable** 86:4,7,11 90:12,13 90:19 91:25 92:2

**cabled** 86:24 87:3 117:3
**cabling** 85:1,25 86:13,19 87:5,13,17,17,20,25 88:1,13 91:6 92:4
**calculation** 75:6
**call** 16:25,25 112:21 130:1,10,11 134:7 140:4 144:8 148:1,9,9 148:15 149:8,14,14,21 150:19
**called** 24:6,18 31:1 112:10,12 130:12 148:2 148:12 163:7
**calls** 113:9 117:9 130:11
**canal** 1:4 29:3 41:5,11 48:12 57:2 59:12 60:15 60:16,24 61:1 66:3 84:17 90:24 124:6 125:11,23 130:16 153:17
**captain** 35:7,13,14,17 107:13
**care** 114:21 121:25 161:3
**career** 33:17 36:19 118:1
**cargo** 76:8
**carries** 72:13
**case** 11:18 17:8 27:19 34:18,21 51:8 68:23 71:18 80:12 81:15 82:2 101:22 117:22 118:7 120:6,15 121:21 124:10 140:8 145:6 151:11 155:12 156:17
**cases** 14:4 32:20 117:25 118:2,18,20,25 119:11 120:25
**casualty** 19:1 83:1
**catastrophic** 153:18
**cause** 12:25 44:5,14,21 47:20 49:21 50:8 61:6 61:10 65:1,2,3,8,9,10 66:14 67:6 69:7 167:16
**caused** 21:10 28:1,9 47:20 50:13 53:17,18 53:22 64:23 65:11,19 66:6,11 68:14,16,24

69:11,18 79:14 119:4 120:8 143:21 154:7 163:19
**causes** 31:21 164:8
**causing** 62:16 153:17
**caution** 21:22
**cavels** 164:10
**CCR** 1:24 5:22 167:2,24
**cellphone** 150:16
**cement** 59:1 62:6 72:13 85:19 88:24 90:4,7
**Centre** 2:13
**cert** 6:22 7:2 10:19 30:1 138:4 139:15 140:5
**certain** 71:1 162:22
**certainly** 20:9 23:10,14 42:20 45:4,5,8 47:21 58:13 91:12,20 93:22 98:7 122:1,2 134:15
**CERTIFICATE** 166:1 167:1
**certification** 9:23 10:5 27:12 39:12 135:5,9 150:5
**certified** 1:25 5:23 32:24 167:3,25
**certify** 166:4 167:4,13
**CFR** 83:9 105:22 106:1 107:8 108:2,11 110:14
**CFRs** 32:10 108:21 160:11
**Chaffe** 1:18 2:10
**chance** 134:11
**change** 12:25 26:15 49:9 51:5,17 52:6 137:9
**changed** 12:13,22 26:22 85:24 86:19 152:19
**changes** 38:19,21 122:25 153:15 166:6
**charge** 35:8
**chase** 140:24
**check** 56:12
**checklist** 84:25 85:4
**chose** 36:14
**Cincinnati** 35:12,18
**circle** 24:23

**circumstances** 45:21 46:3 47:3 48:7,24 52:11 70:19 154:21
**cite** 155:22
**cited** 18:22 19:2
**civil** 1:4 5:6 31:4
**Claiborne** 84:19 144:3,7
**claims** 121:18
**class** 6:22 7:2,15 9:23 10:4,18 27:9,9,11,12,16 30:1 39:11 135:5,8 138:4 139:14 140:5 150:5
**Claude** 115:10
**clause** 95:12 96:8
**clear** 41:14,23 45:16,18 51:7 69:5 78:4 143:12
**clearly** 46:14 114:17 124:19
**cleat** 81:9
**cleats** 59:2
**clients** 9:7 38:17
**close** 70:4 87:18 147:14 162:16
**coaming** 72:23 76:6,11 76:14
**coast** 9:24 19:5,16 20:5 20:13 21:20 26:10 30:17 31:9,10 32:5,7,8 32:24 33:5,17 35:5 36:2,9,20 37:9 64:5 70:23 93:22 97:8 98:19 109:4 111:9 112:11,14 112:18,21 113:8,9,12 113:15,20 114:3,14,16 114:24 115:12 116:17 116:19 117:9 121:18 123:12,25 130:11 146:25
**cockeyed** 131:12 158:19
**Code** 5:6
**collapsed** 145:9
**colors** 73:24
**combination** 47:25 49:2 49:22 53:11,21 63:8,9 64:14 65:13,21 66:11

GREEN, DONALD

11/21/2008

Page 4

67:11 69:4,10,16
**come** 21:21 60:9,23 61:9
    61:13 94:19 105:2
    138:3 141:14,21 149:25
**comes** 25:11 51:10 60:19
    60:23 61:6 122:4
**coming** 41:2 56:16 57:4
    57:18 60:6 61:7 66:3
    112:22 135:10 136:4
**commander** 26:9 33:6
    35:16 109:15,16,18
    161:18 162:19,24,25
    163:1,7,11
**commanding** 35:13
**common** 64:4 87:9
    159:17 160:17
**communication** 148:18
    150:15
**communications** 150:15
**company** 36:13 93:16
    113:13 120:16 134:1
**compare** 39:4
**complete** 44:8 159:5
**compliance** 37:9 83:11
    97:5,21
**complies** 57:22
**comply** 83:8 109:3,8,10
    109:19 110:9 113:2
    136:24 137:13
**computer** 167:9
**concede** 7:11
**concentrating** 28:15
**concerned** 59:21
**concerning** 134:21
    139:13
**conclusion** 22:2 105:3
**condition** 22:18 49:16
    65:9 75:22 80:15
    113:11,14 116:5 130:22
**conditions** 64:8 66:10
    80:12 101:25 116:17
**conduct** 27:13
**conducted** 15:11 30:24
**conducting** 107:5
**confected** 110:14
**conference** 6:9

**configuration** 29:12
    118:10
**confirm** 16:20 17:12
    48:17 49:1 158:18
**confirmed** 107:16
**conflict** 153:1
**conformed** 107:8
**confused** 132:14,20
**conjunction** 7:25 14:24
**connection** 133:15
    134:13 155:14
**CONOR** 3:5
**consequences** 84:15
**consider** 37:25 38:2
    63:12 115:14 134:24
**consideration** 40:11 44:3
**considerations** 15:25
    16:2 18:1 20:22
**considered** 22:3 31:13
    113:12
**consistent** 26:18
**Consolidated** 1:6
**consultant** 26:10 118:1
**consulted** 122:9
**contact** 114:3
**contain** 13:10
**contained** 38:24 39:2
    41:8 110:23,25 126:8
    145:18
**contains** 11:3
**content** 41:21
**context** 17:15 36:3
**contexts** 128:17
**continue** 51:8 99:25
    101:1
**continues** 133:12
**Continuing** 160:22
**contradict** 21:16
**contrasting** 73:24
**contribute** 49:4 50:9
    61:22 66:14 67:6 68:4
    69:8 112:8
**contributed** 68:7
**contributing** 55:11
**controlling** 123:14
**conversation** 147:25

148:23
**conveyed** 162:24
**copied** 16:15
**copies** 19:11 20:11
**copy** 21:5
**core** 30:10 52:10
**correct** 9:7,8,15 11:24
    12:7,23 13:1,7 21:1
    24:1,4 28:7 29:12 30:8
    35:22,23,25 36:23 37:3
    37:24 39:24 41:6,7
    47:5 48:10 52:8,12,13
    52:20 54:9 63:3,4
    64:21 70:17 71:2,7
    72:2 75:20 76:3,20
    77:14 78:8,12 85:22
    86:17,21 87:2,3 94:23
    104:13,16 107:3,9,20
    108:2,3 111:14,15
    116:18 121:10 125:24
    128:4,11,20 130:2,25
    132:13 133:3,23 134:5
    134:16 135:18 142:13
    142:14 143:13 146:22
    149:9 154:19,25 155:12
    155:13,16,20,24,25
    156:9,12,15 158:17,23
    159:14,15 160:8,9
    161:20,24 163:13
    164:16,20 166:7 167:11
**corrections** 166:6,13,15
**correctly** 43:6 55:5,20
    58:21 113:18
**counsel** 5:3 8:15 10:8
    13:4 20:12 26:4 38:10
    167:14,14
**count** 160:17
**counter-currents** 61:11
    66:8
**couple** 70:7 142:1 151:4
**course** 22:6 55:21 76:9
    82:2
**court** 1:1,25 5:23 6:12
    8:1,12 22:18 31:24
    47:1 135:2 167:3,25
**courtroom** 139:10

**cover** 71:20 76:5,11,14
    77:3 122:7
**covered** 19:3
**covers** 76:9,21 77:4,5,6
**create** 12:11
**created** 165:12
**creates** 164:14
**credentials** 155:11
**credible** 28:6 43:8 49:8
**crew** 37:2 41:1
**critical** 81:23
**criticize** 116:13
**criticized** 95:18 146:12
**cross-examination** 45:6
**cull** 141:17
**current** 61:8 66:7 68:22
    70:16 80:19 106:17
**currents** 108:7
**cut** 67:8 140:24

---

### D

**D** 4:1,11
**Dan** 136:4 140:7,20
**dance** 140:21
**danger** 116:21
**dangerous** 113:12
**DANIEL** 2:19
**dark** 55:2
**data** 70:1
**database** 19:6,8,16,20
**date** 25:4 166:8,11,25
**dated** 151:12,18,20
**deadlines** 135:10 140:16
**deal** 112:1 128:24
**dealing** 32:5
**dealt** 15:3 51:22 135:3
**death** 9:12
**decades** 123:11,19
**December** 139:13
**decide** 43:7
**decided** 85:16
**decision** 40:23 80:1
    81:23 113:13 136:18
**deck** 72:19 73:17 76:15
**deckhand** 107:13
**declaration** 26:7,9 27:19

GREEN, DONALD

11/21/2008

Page 5

declarations 38:4
defending 119:2 120:13
definition 126:11 129:4
definitive 91:13
degree 34:19
degrees 31:7
delay 133:9
delete 38:22
demonstrates 101:23
denied 155:19
Dennis 28:23
departments 36:15
depends 87:16 88:8,12
 88:25 138:9
deploy 88:9
deployed 89:22
deponent 5:10
deposition 1:17 5:4,14
 6:15,17,20 7:3,7,13
 8:21 10:10 11:7,17
 22:14 39:15 40:25
 62:24 98:25 122:20
 130:19 133:19 139:14
 167:8
depositions 13:3 25:12
 39:14 40:19,21 42:4
 43:6 51:11 140:18
depth 72:16,17,17,24
 74:8 75:18 76:1 123:14
Derek 2:12 6:7 13:9 25:3
 41:13 43:16 51:3 67:8
 98:12,24 141:16
describe 68:18 73:11
 79:7 126:10 129:17
described 58:23 62:5
 78:21 85:17 88:18 90:2
 148:22 154:10
describes 123:13
description 70:19 78:9
 123:15
designation 7:1
designed 110:8
detail 10:18
determination 116:4
determine 28:6 42:15

111:18 147:6 161:17
devastating 44:17
devastation 44:5,13
device 34:17
diameter 90:4 156:14
difference 29:25 38:6,11
 89:1,15,20 104:3
 148:22 162:11 165:11
different 12:11 21:11
 50:22 60:12 88:1 94:5
 119:23 128:23,24
 148:11 152:24
difficult 7:17
difficulty 103:4
direction 17:22 56:12,14
 56:23 57:1,25 60:7,11
 60:20,22,25 61:19
 144:2
directions 157:13
directly 61:13
disagree 29:21 36:4
 48:16 102:7,11 104:21
 104:25 105:1 124:7
 145:18
disagreed 146:5
disagreement 110:20
discarded 21:14
discharge 120:18
discharged 81:4 119:16
 119:17
discover 113:11
discovery 45:13 149:1
discuss 10:17 51:18
discussed 6:17 48:3
 49:25
discussing 51:25
discussions 112:17
dispute 48:19
disqualified 121:15
dissertation 100:13
distance 69:22 70:1,10
 88:10 164:12
distill 26:25
DISTRICT 1:1,2
disturbing 58:14
dock 34:7 58:17,19,20,25

59:15,17,19,22 62:3
 82:5,6 84:13,16 86:25
 87:4,18 88:11,22 89:2,8
 89:17,20 107:22 120:2
 131:10 165:3,7,8,9
document 15:10 21:9,16
 21:19,20 74:2 82:25
documentation 74:14
documented 70:23
documents 10:21 11:4,9
 15:19
doing 22:8 41:2
domain 19:10
Domino 92:8 93:4,10
 94:19 95:14,25 159:10
 159:11,18
Donald 1:17 6:1 26:9
 166:3,11
double 92:14 96:19 98:4
 101:16,24 102:3 103:10
 109:5 112:16 114:18
 128:1 129:9 163:24
doubled 65:7 77:22 78:1
 78:7,13,14,15 79:20
 93:24 95:2 96:9 97:1
 97:22 106:25 117:6
doubling 95:3 96:10,16
 97:12,18,25 111:11
 118:15 126:1,3,5,12,13
 126:14,17,20 127:2,3,7
 127:9,11,23,24,25
 128:2,6,14,17,25 129:7
 129:8,11,14,17 160:16
downloaded 19:9,12,15
draft 38:16 39:3 75:8
drafting 18:15 32:7
drafts 38:13,24 39:6,7
draw 57:7
drift 54:8 62:8
drifted 144:1 152:12
 153:16
drifting 84:17
Drive 2:5
due 71:1 56:16 60:21
 83:3 118:21 164:12
duly 6:4 167:6

dumb 71:4,5 72:12
duplicated 16:11
duties 32:1 35:1
Duval 1:9 44:20

**E**

E 4:1,1,11,11
Earl 11:13
earlier 10:14 96:14 131:3
 146:25 154:13
early 142:2 152:9,10,17
east 41:10 60:21 153:16
 154:2
EASTERN 1:2
eddies 61:10
edge 131:13
education 31:18
effect 66:13 79:6 85:4
 121:3 139:1,8 164:14
 164:22
effective 81:14 87:22
effects 66:22 96:11 98:2
eight 32:18 77:6 81:15
 165:11
eighteen 58:11,12 66:6
either 16:14 40:22 49:16
 53:4 56:16 57:5 60:21
 83:23,24 108:19 120:19
 131:17 138:17
Elasticity 88:7
elected 155:18
else's 149:17
EL-AMIN 3:4
Emory 3:2 4:6,8 6:10,16
 7:10 57:20 133:13
 135:12,16 136:3,6
 137:7,10 138:6 139:16
 140:6,19 141:5,10,15
 145:21 147:20 150:9
employed 86:5
employees 41:3 162:14
empty 59:18,22 64:1,12
 64:13 65:18 75:12,17
 75:24 80:4,9 81:6,13,25
 83:3 84:11 97:15
 113:23,24 114:4,14

115:2,4,4,8 117:11
148:3,10,13,16,20
149:11,23 150:24
162:15 163:9 164:6,15
**enabling** 111:2
**encompasses** 17:4
**encompassing** 34:25
**ended** 42:21 43:25 49:13
49:18 84:19 91:4
144:23
**Energy** 2:13
**enforcement** 35:4
**engineer** 31:4
**engineering** 30:15
**engineers** 91:14
**ensure** 17:22 96:4
105:23 106:12 108:16
**ensuring** 32:3
**entire** 10:25 74:17
**entities** 27:15
**entitled** 43:15,16 51:5
101:19
**equipment** 94:17
**equipped** 68:17
**errors** 38:18
**especially** 81:8
**ESQ** 3:2,3,4,5,6,7,8
**ESQUIRE** 2:4,11,12,19
**essence** 26:23,24
**established** 34:3 39:20
42:23 52:4
**estimate** 72:7
**estimated** 72:5
**evacuation** 115:9
**event** 42:7 132:3,5,7,14
132:16,17,19 133:2
**events** 15:13 23:14 41:4
**everyday** 68:19
**evidence** 5:15 40:13
42:20 44:9 104:1,14
131:15 133:1 149:7,21
150:19
**evolve** 151:11
**exact** 58:3,4 93:21
**exactly** 53:15 90:20
127:1

**examination** 4:3 8:17
12:5 15:4 23:23 26:1
29:8,19 30:6 33:21
40:17 42:1 43:12,18
44:11 45:11 46:23
47:18 52:3 56:21 57:11
57:15,23 62:23 67:2
68:1 69:20 72:6 74:12
86:6,15 91:18 93:25
98:13,20 101:8 102:10
102:18 103:21 104:23
105:2,11,20 109:7
117:16 122:3 123:22
133:13 135:16 136:6
137:10 138:6,15 141:20
142:12 143:3,10,19
145:13 146:2,10 147:20
150:9 151:7 152:3
155:1,8 156:4,25 157:9
157:24 160:3 161:2
162:12 163:17 164:21
**examine** 6:23
**examined** 6:5
**examining** 17:2
**exceptions** 11:6
**exclude** 124:11,21
155:15
**excuse** 15:15 18:13 58:18
109:8 143:9 164:24
**executive** 35:20
**exempt** 72:11
**Exhibit** 4:13,14,15,16,17
4:18 12:2 14:5,19 15:7
23:20 37:13 38:7,13
39:8 66:1 74:9 117:19
123:3 129:19 141:22
**exhibits** 13:3
**existing** 68:8
**exit** 162:14
**expansive** 124:14
**expect** 61:5 77:1
**expected** 55:16 68:21
79:22 90:23 91:3
106:17 108:7
**experience** 10:2 17:10
31:24 32:5 33:16 34:5

79:22 84:1 112:20
157:11 161:11
**experienced** 66:20
**expert** 7:1,8 9:6 22:10
31:14,21 38:1 92:2
97:24 98:8 101:20,20
102:22,24 103:9 104:14
121:12 162:8
**expertise** 7:12 9:22,24,25
10:1 23:1 28:19 29:2
29:10 31:15,25 32:16
33:14 35:2 42:24 45:17
48:23 105:1 109:12
121:17,20 122:2 153:21
154:14 157:8,17
**experts** 122:9,13 145:2
**explain** 15:6 31:12 55:12
58:8 83:7 147:8
**explanation** 116:10
**explosion** 154:9
**exposed** 64:2 65:17 80:4
80:10,15 81:25 82:14
164:24
**exposure** 80:24
**extended** 164:12
**extent** 22:25 37:6 55:18
139:19 140:24
**extinguishers** 71:22
**extra** 90:22 127:18
128:18
**eye** 55:18
**E-mail** 38:16

### F
**face** 24:2 29:14 40:24
43:4 81:7,17 88:10
98:17
**facilitate** 41:22
**facilities** 10:2 31:16 35:5
124:6 163:12
**facility** 23:3,7,11,14,18
32:2,3 34:12,18 35:2
37:5 50:12 60:17 91:5
93:6,7,8 96:1 116:13
119:9,13 120:13 123:6
130:1 136:14,19 146:15

146:16,23 147:7,15
148:15 161:18 162:15
**fact** 7:13 9:6 16:21 26:8
58:22 63:7 64:15 66:23
84:10,13,18 90:1 97:25
103:11,14 111:23
112:18 114:25 115:11
124:16 125:12 130:20
146:5 162:13 165:10
**factor** 55:12
**facts** 39:17 40:2,4 45:8
49:17 51:14 52:14
107:13 136:12,16,22
145:17 150:6,7 154:17
**factual** 38:21
**factually** 107:12
**fail** 28:1,9 63:12
**failed** 63:7 77:9 92:8
96:4 109:3 111:8,17,20
113:20 114:23 119:14
131:7 136:24 137:13
147:5,13 161:15
**failing** 111:18 161:16
**failure** 27:23 93:3 94:7
95:6,8,13 98:4 105:23
106:12 108:16 115:15
163:24,25 164:2,5
**fair** 45:3 50:19 135:13
137:6,8,19 157:25
163:18
**FAIRBANKS** 1:24 5:22
167:2,24
**familiar** 27:11 34:6
123:25
**Family** 1:13
**fan** 55:1
**far** 47:17 132:25 134:13
138:13 146:11
**fashion** 128:1
**fast** 92:12 119:13 120:20
**fastening** 36:18
**fault** 134:20
**federal** 18:6,8,24 32:9
**feeding** 150:7
**feel** 17:22 94:3
**feet** 58:11,12 66:6 70:7,8

74:13,17,20 76:1,15,17
81:15 88:23,24 89:1,4
89:12,15,23 90:8,8,9
91:2,2 92:5 123:14
165:11
**felt** 27:5 162:23
**Fiberglass** 76:23
**fifteen** 32:18
**fifty** 17:14 161:12,13
**file** 10:25 20:9
**final** 38:13,23 39:1
**finally** 8:19 26:21
**find** 93:21 118:5 126:6
129:5 140:10
**finds** 49:7
**finish** 43:16,20,23 67:1
91:17 98:12,16 100:2
110:3
**finishing** 67:9
**fire** 71:22
**first** 6:4 8:22 9:21 26:6
27:4 30:2 32:13 43:24
51:21 73:14 80:7 121:2
134:25 138:23 142:1,6
151:11 167:5
**FISHER** 2:11
**five** 6:14 53:1,2 54:15,24
55:9 58:15 61:24 62:13
62:15 63:15 64:20
65:12,21 69:7,12,14,22
70:8 76:14 86:25 88:21
90:8 131:3,13,17 157:1
158:19
**five-barge** 52:23 53:4,13
62:2 63:24 64:3,16
**five-tier** 53:9
**flag** 120:20
**fleet** 11:11 95:14 115:17
117:10
**fleeting** 82:24 83:8 91:24
125:14 161:4
**fleets** 36:21 125:9,22
**flies** 43:3
**flight** 100:15
**float** 70:15
**floating** 130:15

**flooding** 27:8
**floodwall** 56:8
**floodwalls** 161:24
162:17
**floor** 54:25
**Florida** 24:7,9 61:14
115:10 123:4 130:16
**fly** 98:17
**follow** 109:24 110:7
112:15 115:18
**followed** 29:15 111:4
112:19
**follows** 6:5 58:24
**foot** 75:8,14,18,18 88:21
**force** 49:22 50:5 55:19
63:8 64:7,15 65:12,13
65:15 77:18 80:11,22
82:1 106:14 113:7
**forces** 49:2 60:2 68:21,24
69:4 91:8 106:14,17
153:8
**foregoing** 166:4
**foreign** 34:2
**forget** 157:23
**form** 5:12 21:10 29:6,17
33:19 40:7 41:13 44:24
46:20 47:14 48:8 62:19
85:6 86:2 93:19 102:6
102:14 103:16 104:20
105:16 108:25 123:21
145:12,22 154:24
157:20 159:23
**formal** 85:13 86:4,11,13
**formalities** 5:8
**format** 37:22 38:8
**formed** 52:9
**forth** 48:15 108:1 161:3
167:7
**forward** 73:10 141:19
**found** 83:10 107:21
122:22 134:20 165:7
**four** 76:14 78:18 88:21
126:14,19
**four-page** 14:4
**frame** 55:6,22 58:2
**free** 44:5 142:3 152:11

152:18 165:4
**freeboard** 74:24 75:2,5
80:25 88:21
**Freeway** 6:2
**Friday** 134:3
**front** 23:25 44:20 123:5
129:25 130:9
**fuel** 120:18
**full** 11:2 81:1,13 82:1
97:16 114:15 115:6,8
117:12 162:15 163:9
164:6 165:9
**function** 34:17
**furnished** 15:24
**further** 80:1 112:4
167:13
**future** 8:1

**G**

**gathers** 20:23
**Gee** 145:20
**general** 26:3 40:12 56:10
58:2 122:6 133:21
**generally** 60:11
**gentleman** 85:10
**gentlemen** 28:22
**geographical** 29:1
**germane** 21:6 44:9,13
**getting** 53:16 149:25
**give** 45:9 115:1 135:6
139:23
**given** 1:17 94:4 117:21
118:8,14,19,20 138:10
139:22 157:11 162:13
166:4,7
**gives** 35:2 70:19 113:9
**giving** 100:12 105:4
119:7,21
**glean** 31:20
**go** 43:19 46:22 49:19
71:9 77:7 81:21 92:7
96:3 99:23 107:17
111:21 116:10 118:4
127:12 129:5 134:12
135:19 144:19 145:23
151:6

**goes** 87:17 93:2 112:4
**going** 6:18 7:17 8:12
9:17 14:2 17:15 43:7
44:20 45:4,6,9,14 49:14
49:15 55:2 58:17 59:22
61:9,10,18 67:10,14
70:15 72:25 73:23
78:18 85:18 87:19
89:16,16 91:13 99:5,20
100:3 114:13 133:10,16
135:6 138:3 140:3,10
141:17 147:21 160:23
**good** 8:18,24 81:6,18
97:9 119:5 159:17,17
160:18
**Google** 129:6
**gotten** 63:13 114:20
**government** 70:24 71:12
**gradual** 158:10
**grain** 72:13
**grammatical** 38:20
**greater** 10:17 161:4
**Green** 1:17 4:14,15,16
4:17,18 6:1,9,13,24 7:7
7:12,24 8:3,18 11:25
12:2 14:2,5,10,19 16:24
23:20 26:9 41:20 74:6
74:9 100:25 101:3
133:14 147:21 150:12
151:18,18 155:3,9
166:3,11
**gross** 72:1,7,14
**group** 25:10
**Guard** 9:24 19:5,16 20:5
20:13 21:20 26:10
30:17 31:10,10 32:5,7,8
32:24 33:5,17 35:5
36:2,9,20 37:9 64:6
70:23 93:22 97:8 98:19
109:4 111:9 112:11,14
112:18,21 113:8,9,12
113:15,20 114:3,14,16
114:24 115:12 116:17
116:19 117:10 121:18
124:1 147:1
**guess** 18:11 34:5,9 94:21

GREEN, DONALD

11/21/2008

Page 8

110:4,6,10 133:25
148:1 149:15
**gulf** 6:2 60:10,19
**guy** 144:16,18 154:10

## H

**H** 4:11
**half** 75:25 88:23,24
**halfway** 150:14
**handy** 13:19
**HANNA** 3:6 145:11
**happen** 16:24 56:4 62:4
81:11
**happened** 42:16 53:15
55:3 79:18 84:15
158:25
**happening** 66:4
**happy** 100:25
**Harbor** 29:3
**harbors** 35:6,6
**haul** 36:15
**havoc** 120:9
**Haycraft** 22:13 122:19
130:20,24
**head** 55:1 117:25 118:8
**heads** 155:7
**heard** 9:16 129:8 138:18
138:20 139:7
**hearing** 10:5 21:20
**heavy** 16:9 76:24
**height** 158:11 165:11
**heights** 157:13
**helped** 42:15
**hereinabove** 167:7
**hereto** 5:3 12:3 14:6,20
23:21 74:10 167:15
**high** 80:25 81:10 97:10
**higher** 68:11 81:16
**highest** 33:3
**hired** 122:13
**hit** 28:12 42:19 43:1 62:9
64:20 120:7 158:21
**hold** 9:13 34:17
**holding** 62:17 121:21
**home** 8:23
**hour** 55:16 158:5,5,6

**hours** 142:2 152:9,10,17
157:2
**Houston** 1:19 6:2,8 22:7
120:7
**Huey** 124:4,9,17
**hurricane** 8:23 19:24
20:17 24:16 29:15
40:25 41:4,11 47:25
48:1 49:2,22 50:5
53:12 55:14,16,17,19
55:20 63:8 64:2,7,7,15
65:13,15 75:23 77:17
79:23 80:10 81:5,7,17
81:20 82:1 84:25 85:3
85:23 93:1,23 96:11
103:12 105:24 106:13
106:14 111:9 112:22
115:21 116:15,19 117:2
120:25 121:4 124:1
130:18 147:1 152:12
157:2 161:8,14
**hurricanes** 60:1 66:21
66:22
**hydraulic** 66:8
**hydrologist** 61:5 66:18
66:19 68:17
**hypothetical** 101:19
105:3

## I

**ICW** 124:10
**idea** 23:13 27:10 76:25
**identical** 45:20
**identification** 12:3 14:6
14:20 23:21 74:10
**identified** 8:14
**identify** 17:24
**ignored** 21:14
**IHNC** 144:2
**II** 15:2 138:18
**ILIT** 122:16
**imagine** 98:8
**implore** 100:4
**importance** 61:20
**impossible** 44:25
**imprudent** 80:3,6 82:13

**inability** 164:9
**inadequacy** 78:5 118:21
**inadequate** 65:4,5 67:11
77:13,15,16,20,24
92:25 103:20 116:12
118:6
**inadequately** 63:10
66:23 93:9 94:16 95:9
**inches** 75:9,14
**incident** 134:14
**include** 63:7 124:6 129:8
148:4
**included** 72:23 124:22
125:14
**includes** 124:12 125:4,6
**including** 79:21 125:11
**incoming** 29:14
**incorrect** 63:5,6 100:24
**increase** 158:11
**incumbent** 160:2
**independent** 131:1
**indicate** 28:3 134:8
136:12,16
**indicated** 55:13 99:25
131:9 155:22 159:12
161:15
**indicates** 45:2 62:2 97:24
97:25 103:10 104:15
**Indicating** 56:24
**indication** 134:19
**individual** 113:10
**individuals** 9:13,14 49:7
107:5 122:10
**Industrial** 66:3 124:6
125:11,22 130:16
**industry** 91:21 161:11
**influenced** 64:12
**information** 13:4 15:20
16:5,21 17:9,21 19:14
19:17,24 20:2,23,24
21:2,3,10,15,18,20
26:13 57:18 79:19
114:23 124:25 137:15
138:9,10 151:10 162:23
**ing** 22:1,1 78:6 84:12
95:25 129:23 152:11

**Ingram** 1:9,11 14:24
15:3 27:3 40:22 51:22
51:24 52:1 135:4
155:11
**initial** 16:20
**initially** 134:2
**injury** 121:17
**inland** 37:1,2 71:19,20
**Inner** 29:3
**inquire** 163:2
**inquiry** 45:7 116:4
**inside** 72:18 84:12 95:19
**insofar** 6:25
**inspected** 21:25 36:20
107:7
**inspection** 21:19 22:5
32:1 35:9 37:7,8 71:3
71:18
**inspector** 32:19
**inspectors** 36:2,10
**instance** 42:13
**instances** 49:4
**instructions** 26:3 37:14
**instructor** 32:25
**insufficient** 79:9
**intend** 137:16 138:7
**intended** 34:4 127:11
128:9,10
**intentions** 111:19 161:17
163:13
**interested** 167:15
**interior** 72:20 76:7
**interpret** 129:16
**interpretation** 40:13
110:10 125:1,2,3 126:1
126:11 128:8,20
**interrogatories** 145:16
**interrupt** 43:13,19 64:19
99:20 100:1,20
**interrupted** 67:20
**interrupting** 99:18 100:5
100:7,10 114:11
**intimately** 34:5
**Intracoastal** 124:11
**introduction** 45:19
**inundation** 153:19

GREEN, DONALD

11/21/2008

Page 9

**inventoried** 11:8
**investigating** 32:20
**investigation** 131:1
**investigations** 27:14
**investigator** 32:19
**involve** 160:16 161:23
**involved** 14:25 27:2 41:2
    118:24 119:2 136:17
**involvement** 133:21
    134:15,21,25 136:12,22
    136:23 137:12,17 138:8
**IPET** 122:16
**irrelevant** 98:5 100:14
    102:4 103:14,23 104:4
    104:18
**issuance** 38:14
**issue** 7:25 27:14 28:14
    51:9,10,12 52:10
    113:10,16 120:23 138:7
**issued** 14:23 51:16 71:12
    113:1 134:13
**issues** 7:2 8:2 16:10 51:6
    135:4 150:1
**issuing** 120:12 134:16
**items** 15:23 42:5 92:3

---

**J**

**J** 1:17 2:3,4 3:7 6:1 26:9
    166:3,11
**January** 14:12,17 26:20
    151:13
**Joe** 93:10 94:18 145:5
    159:10,11,18
**jog** 115:24
**join** 7:5 74:3
**Joseph** 1:24 5:22 93:4
    167:2,24
**JR** 1:24 5:22 167:2,24
**judge** 1:9 28:5 31:20
    43:7 44:20 49:7 101:4
    107:20 135:2 155:12,18
**jump** 141:19
**June** 11:5 12:1,14,17,21
    13:5 15:8 19:20 20:25
    21:12 26:5 37:13 39:8
    147:22 152:8

**justice** 41:22

---

**K**

**K** 3:4
**Katrina** 1:4 19:25 20:17
    48:2 85:23 86:18
    103:12 106:15 115:21
    117:2 152:12 156:14
**KDON** 121:6,9
**keep** 21:5
**Keeping** 120:4
**KELLS** 3:5
**key** 130:7
**kind** 61:10 120:9 150:1
**KITTO** 3:7
**knew** 107:19 137:24
    139:4
**know** 22:24 24:5 25:3
    34:2,11 37:14 39:21
    44:19 45:1,13,14 49:13
    54:12 58:3 61:7 67:5
    67:14 77:19 79:17
    81:22 84:20 89:16
    90:11 91:4 93:21 94:3
    96:13 110:9 114:22
    115:20 117:1,5,9 118:2
    121:23,24 122:14 123:9
    123:12,23 131:6,7
    133:15 138:12,13
    139:21 140:14 141:11
    143:1 144:13,15 146:12
    148:6,20 149:11 151:9
    153:24,25 154:1,6
    157:25 158:3,8 160:23
    162:20 165:5
**knowledge** 15:2 22:14,17
    27:17,18 30:5,7 31:19
    32:16 64:5 135:1
    153:21
**known** 49:24 60:1 92:23
    94:15 95:9 149:23
    150:23
**knows** 58:3 144:15
**K(2)** 1:7

---

**L**

**L** 5:1
**laboratory** 22:8
**lack** 135:8
**Lafarge** 1:8,10,12,14 2:9
    6:7 7:4 11:11 23:2
    26:14 27:3 28:16 29:4
    40:22 41:3 50:10 51:23
    77:9 83:11 84:24 85:10
    85:24 92:8,18 94:11
    95:24 96:4,25 97:4
    105:22 106:4 107:5
    108:15 111:8,17,20
    113:19 114:23 123:6
    134:3 136:13,19 145:15
    146:14 147:5,13 149:2
    149:7,8,21 150:18,20
    159:11,18 161:15
    162:14,23
**Lafarge's** 11:22 93:3
    94:6 95:6,8,13
**Lagarde** 1:10
**laid** 23:11
**landfall** 156:18 157:1,4
**landlubbers** 71:5
**land-based** 130:7
**lanes** 106:7
**language** 93:22 111:3
    124:3
**large** 73:9 116:25
**lastly** 20:16
**latest** 12:6
**law** 2:3 5:7
**laws** 71:3,18
**leading** 42:7 162:5
**learn** 36:12
**leave** 138:22
**leaving** 113:3
**led** 58:20
**leeway** 87:20 139:18
**left** 24:2 87:8 88:17
    90:14 134:8 137:22
    138:11 139:6 146:14
**left-hand** 74:7
**legal** 11:1 27:15,15
    113:16
**lend** 22:17

**lending** 9:23
**letters** 38:10
**let's** 11:25 13:17 16:1
    32:11 49:19 51:14
    73:18 77:7 81:21 83:16
    87:7 92:7 96:3 99:23
    105:21 132:2 143:12
    163:24
**levee** 43:10 55:2 144:6
    144:12,13,19,19,20
    153:17,18 154:2,7
**level** 59:12,15 76:15
    81:12 158:13
**levels** 48:1 49:23 50:6
    119:23
**liability** 7:9 8:2 15:2
    26:14,16 27:5,21 51:6,9
    51:16,25 135:3,10
**License** 33:10
**licensed** 30:22,23 31:9
    31:10 33:2,7,9
**light** 64:8 75:8 76:19
    80:2 101:24 146:21
**likelihood** 81:8
**limb** 109:13
**limit** 152:24 153:23
**limitation** 11:18 30:2
**limited** 29:2,11 33:10
    121:13 150:14,16
**limiting** 46:13,21
**line** 22:23 34:11 36:15
    47:11,15 53:3 54:5
    62:5 69:14 74:22 78:18
    78:20,22 86:9 87:23
    88:15,17 89:22 90:22
    91:22,25 92:24 102:3,3
    102:16,21,23,25 103:13
    103:18 104:7 107:21
    114:16 117:7 126:24
    127:6,12,25 128:3,7,15
    128:19 129:8,15 150:4
    164:23 165:8
**linear** 130:6
**lines** 8:10 21:25 22:3,5,6
    22:22,25 31:2,25 32:14
    32:17 33:15,22,25 34:3

34:4,6,10,16 50:14
53:23,25 54:1,4,6,7
58:16,17 59:11 61:23
62:1,16 63:19 64:24
65:4,5,6,11,20 66:15
67:6 68:4,8 69:1,8,18
77:21 78:7,11 79:20
85:25 86:20 87:9 89:9
92:15 93:24 94:4 95:2
96:5,9,20,21 97:1
101:12,16,24 103:10,18
103:22 104:5,7,11,15
104:17 105:4 106:20,20
106:25 107:15,19,23,24
107:25 108:4,18 109:5
111:11,22 112:14,16,24
113:3 114:18 115:13
117:3 118:15 119:15,16
119:18,19,22,25 120:3
120:4,18,18 126:5,12
126:14,14,17,18,19,21
126:24 127:18,22,22
128:22 132:8 160:5,7
160:16 162:16 164:9
**linings** 58:24
**list** 13:10 14:4 15:19,19
**listed** 15:23 16:4,16 18:1
18:10 19:13,14,16 20:3
20:6,8,18 21:3 40:19
**listen** 86:16 98:10
**listening** 67:17
**litigation** 14:24 51:24
52:1 133:16,22
**litigations** 145:3
**little** 76:10 112:4
**live** 36:3
**loaded** 59:16,19 61:25
64:4,6 69:12 74:20
75:1,3 76:8 81:7 82:7
83:2 88:19,20 89:2,17
95:19 107:22 119:17
**loader** 24:19
**loading** 37:5
**located** 60:17
**location** 79:2 96:21
129:18,25 134:3 144:23

164:3
**locations** 79:13 97:2
**long** 100:10 124:4,9,17
**look** 16:1 44:8 100:18
105:21 130:21 132:2
145:23 146:1 150:11
152:5,15
**looked** 16:16 17:25 21:4
**looking** 15:7 24:9 56:6
84:23 122:21 131:8
151:8
**looks** 53:3 70:4
**looming** 76:18
**looped** 59:1 62:6 90:1
**looping** 128:7
**loops** 59:1,9 90:2,6
**loose** 53:14 58:4 62:7,15
63:24,24,25 64:16
120:8 142:25
**loosened** 70:15 87:1
131:4
**lost** 151:19
**lot** 9:18 25:14
**Louisiana** 1:2 2:6,15,21
5:6,24 122:17 167:4
**love** 140:21
**low** 81:10
**L.L.P** 1:18 2:10

___

**M**

**M** 4:1
**machine** 148:24
**MAG** 1:11
**main** 72:19 73:17
**maintain** 119:15
**maintained** 119:22
**major** 115:9
**making** 40:23 127:12
**man** 99:1 100:19
**managed** 37:4
**management** 31:8
**managers** 93:8
**manner** 106:16 108:1,6
108:19
**manual** 37:9 125:14
**March** 140:17

**marine** 20:6,13 26:10
30:15,22,24 31:1 32:19
33:9 35:8 91:21 98:8
118:1 121:6,9,17,18
122:4
**mariners** 19:9
**maritime** 98:18 157:11
160:1
**mark** 3:6 11:25 23:17
24:20 73:18 105:12
**marked** 12:2 14:5,19
23:17,20 24:23 57:24
60:8 73:1 74:5,6,9
129:19 151:12,17
**master** 33:10,12 36:25
**mate** 33:11
**material** 15:11 16:12
76:21 88:2,13,15
**materials** 12:16,20
**math** 90:5
**matter** 110:10 135:9
**matters** 157:11
**McCall** 1:18 2:10
**mean** 22:22 33:8,23
34:15 37:25 39:6,7
70:21,25 72:16 75:11
88:1 90:15 98:7 107:12
122:6 128:18 132:5
140:7 141:11 144:11
158:15 164:22
**meandered** 143:1
**meaning** 85:15
**means** 71:6,10 75:12
88:20 96:16 112:5
124:8 125:4 126:5,15
127:11 147:8 164:23
**meant** 128:14
**measurement** 72:11,21
**measurements** 73:15
**meet** 9:19 145:5
**meeting** 8:19 10:7
**member** 30:25 37:1
**members** 41:1
**memorialize** 16:18
**memorialized** 16:14
**memory** 112:2 115:25

**mention** 160:6
**mentioned** 19:5 32:22
33:1 42:5 46:14 58:5
123:2 142:14,15 158:9
**mentions** 41:14
**Merchant** 31:11 33:9
**mere** 64:2
**message** 134:7 138:12,22
139:5 148:18,19,23
**met** 9:2 10:8,14 133:14
**Metairie** 2:6
**meteorologist** 156:22
**method** 59:4,10
**methodology** 17:7,20
27:13 34:20 50:10
**middle** 30:1
**miles** 55:15,16,19 156:14
156:16 158:5,5,5
**millennium** 33:24
**mind** 152:19
**MINI** 9:9
**minimum** 77:22
**minute** 134:23
**mischaracterization**
51:21 85:7 109:1
142:11
**mischaracterizes** 41:20
**misleading** 41:19
**missing** 11:14 93:12
154:11
**Mississippi** 36:16,17,21
60:10,19 124:5 125:10
125:21
**misstates** 62:20
**misunderstood** 98:14
**misusing** 127:9
**monitored** 119:25
**months** 35:15 50:22
**moor** 22:1 34:20 50:11
68:20 77:9 160:12
**moored** 24:16,17 32:4
35:24 36:24 39:22 49:3
52:25 59:14 63:11
66:24 78:10 81:1,6
93:10 94:17 95:10
105:24 106:13,16 108:6

111:11,24 112:13
114:15 119:8,10,14
120:12 129:21 136:13
146:15,23 147:7,10
161:18 162:15 163:8
165:2,3
**mooring** 10:1 16:9 21:25
22:3,22 28:15 29:12,14
31:15,25 32:1,13,17
33:15,22,25 34:3,4,6,10
34:11,16,22 36:8,18,22
39:24 47:11,15 50:14
54:1 58:16,24,25 59:11
62:16 67:11 68:8,25
69:13,14,18 77:12,24
78:5 79:20 81:10 87:22
92:21 93:23 95:2 96:5
97:7 103:19 106:7,11
107:6,8 108:1,19
111:10,22 116:12
117:23 118:9,9,12,22
119:18,19,25 120:3,13
122:1 125:8,21 136:8
146:13 152:12 160:5,7
160:15 164:5
**moorings** 44:5 70:15
78:3 80:5 81:8,14 83:4
95:11 98:9 118:6 132:9
136:9,10
**morning** 8:18 10:7 15:13
15:14 54:16 137:23
138:1 142:2 149:8
150:21 152:9,10,17
**motion** 39:12 140:12
**motions** 155:15,19
**move** 105:19 164:2
**moved** 161:23
**moving** 132:8
**MRGO** 60:9,23 124:12
145:2
**Mumford** 1:9

### N

**N** 4:1,1,1,11 5:1
**name** 7:21 9:10 89:11
**named** 6:3 115:11

**narrative** 15:12 154:16
**nature** 7:11
**nautical** 130:2
**naval** 30:20
**navigation** 29:3 32:25
need 13:19 139:18 140:5
140:11
**needs** 111:19,23 147:6
147:13 161:17 162:18
163:12
**negligence** 27:6,8 42:18
135:7 163:19,22
**neighborhood** 42:22
49:14 58:11 84:20
89:11 144:7
**neither** 49:7 154:12,19
**net** 72:1,7,10,14
**never** 35:7 36:25 37:4
102:15 103:1 121:14
134:24
**new** 2:15,21 11:10 32:21
35:15 36:20 51:10
111:9 115:17 120:16
124:18 147:1 155:5,10
161:4,7
**news** 20:17
**Nextel** 150:16,18,19,20
**niceties** 27:16
**Ninth** 42:21 49:18
144:24
**non** 71:23
**Nope** 117:14 165:18
**normal** 37:22 70:6
**north** 2:9 6:7 56:17 57:2
57:3,4,5 60:14,18 61:1
61:15 123:4 131:9
**northeast** 56:16 57:6
**northern** 50:11 52:23
53:4 69:12 88:19
131:13
**northernmost** 62:3
**northwest** 57:6
**nose** 144:17
**notably** 32:21
**note** 157:22
**noted** 146:6 166:13,15

**notes** 16:14 133:11
**notice** 5:7 19:9 25:14
116:20
**notification** 112:2,5,8
162:25
**notified** 112:5,11 114:13
114:19 116:16
**notify** 113:20 115:12
**notions** 159:16
**November** 1:19 25:22,24
166:25
**number** 12:1 14:3,17,18
23:17 24:11 47:8 65:4
66:2 71:13 73:1 74:7
81:2 92:20 103:22
104:17 106:20 107:25
108:4,18 113:22 115:24
116:1 149:11,22 151:12
151:18,19 152:6,7
158:16 160:6 164:8
**numbered** 159:3
**numbers** 73:6
**numerous** 32:20 115:22

### O

**O** 4:1 5:1
**oath** 5:25 6:5
**object** 29:6,17 33:19
40:7 41:13 44:24 46:20
47:14 51:3 55:2 62:19
85:6 86:2 93:19 99:15
102:6,14 103:16 104:20
105:16 108:25 123:21
137:2 145:12,22 154:24
**objecting** 46:12
**objection** 41:17 43:3
46:10,18 59:3,6,7 99:11
99:14 156:2 157:7,16
159:21 160:22 162:2
163:15 164:19
**objections** 5:11 157:20
**objective** 124:24 132:25
**obligation** 92:18 93:4
94:12 114:2
**obligations** 160:11
**observations** 23:6 48:11

**obtained** 33:4
**obtaining** 128:18
**obvious** 117:17
**Obviously** 103:7
**occur** 54:14,19 62:5
**occurred** 26:16 40:3
41:10 54:12 55:9
**occurrences** 29:2
**occurring** 55:22
**occurs** 162:25 163:11
**oceans** 33:11,12
**offered** 7:8
**offering** 140:11
**office** 2:3 8:23 129:5
**officer** 31:10,11 33:2,7
33:10 35:8,13,21
112:21
**official** 71:12
**officiated** 5:24
**oh** 13:21 18:13 50:24
63:14 73:25
**okay** 8:7 9:16 10:17 11:3
11:16,25 12:10 13:15
13:25 16:1,23 18:6,17
19:19 20:11,22 21:8,14
23:2,24 24:2,13 25:1,8
31:4,18 37:19 38:12,22
39:11 42:3,11 44:12
45:22 46:24,25 47:19
48:22 49:11 50:8 52:16
53:7,16 54:3,12,18 55:7
56:3,12 59:6 61:3,20
63:3,18 64:19 65:5,15
65:19,25 66:12 69:5
72:16 73:25 74:3,19
75:2,5,8,21 76:10,12,21
77:3,15,24 78:4,15 79:1
79:25 81:21 82:4,9
83:18,25 86:22 87:13
87:25 88:4 90:25 92:17
93:2,12 94:24 97:14,19
101:14 102:9,11 103:2
103:8 105:14 111:7
112:7 114:10,22 116:8
120:2 123:25 125:25
126:20,23 127:5,24

GREEN, DONALD

11/21/2008

Page 12

128:2 129:25 132:2,13
137:8 138:7 141:14
142:5 143:4,13,18,20
147:12,19 148:8 149:5
151:8,14,15,16 152:15
153:14 155:21 157:22
158:3,14,18 159:2
161:1,7,10 163:4 165:1
165:14
**omissions** 38:18 48:2
49:25 163:21
**omit** 38:22
**omitted** 21:15
**once** 9:6 107:25
**oncoming** 66:22 81:17
**ones** 13:23 20:20 148:5
**online** 16:7 19:5,8,16,20
19:23
**onset** 81:4
**onslaught** 93:1
**operating** 124:4,9
**operation** 122:8
**operations** 33:1 36:13
37:8 98:8 121:18,25
122:5
**operator** 93:15 114:1
115:17,17
**operators** 83:8 116:13
117:10,11,11
**opine** 93:3
**opined** 118:5
**opinion** 21:11 22:9 27:1
27:6,22,25 28:8,11,20
31:22 39:18,21 40:5
41:10,23 42:14,17,24
45:24 47:6,8,11,24
49:21 50:13,18,23 52:6
53:8,20 55:8 59:12
61:21 62:12,13 63:9,15
63:18 64:22 65:19 66:4
66:9,23 68:24 69:18
77:8 78:5 79:1,6,12,19
80:1,8,12 81:2,16 82:11
84:24 86:24 87:20
88:13 89:14 90:12
91:20 92:7,17 94:5,6,6

94:18 95:11,13 96:3,10
96:13,22,25 97:20
102:1,22,24 103:9,17
103:25 104:6,10,11
105:21 106:1 107:4,11
108:8,10,14 111:7
114:1,8,17,23 115:16
118:8,14,20 119:8,14
119:21 120:21 122:1
124:15,22 127:10 128:4
128:21 129:12 131:3,21
133:1 135:7 139:23
140:11 143:22,23 153:4
153:9 158:20 160:1,4
160:15 161:10 163:22
165:1,12
**opinions** 12:13,22,25
15:9,16,18 16:20 17:3
18:11 21:7,11,16,22
22:4 23:8,10 26:15,18
26:23 27:7,20 29:11
30:10 38:23 39:1 40:10
40:13 42:12 44:10
45:19 47:2,22 48:8,13
49:8,20 51:5,15 52:9,16
52:16 77:8 104:17,22
117:21 118:19 122:10
122:25 134:19 136:9
146:5 154:14,20 159:3
159:6,24
**opposed** 26:7 38:21
91:25 118:15 119:3
130:6
**opposite** 120:11
**opposition** 39:12
**orange** 24:3 73:9
**order** 92:8 94:9 95:13,25
100:21 113:1 161:19,22
**ordered** 112:15
**ordering** 95:8
**orders** 8:1 113:10,16
**orientation** 57:1 60:20
**original** 5:9 153:15
**originally** 6:21 120:10
**orleans** 2:15,21 11:10
32:21 36:20 111:9

115:18 120:17 124:18
147:1 155:5,10 161:4,7
**ostensibly** 148:3,10
**outboard** 59:19 80:3
146:21
**outlet** 60:10,19
**outlined** 15:16 47:8
**outside** 80:10 82:8 95:20
153:20 157:7,16
**overcome** 68:7 119:19
**overcoming** 68:25 69:2
120:2
**overlap** 7:14
**overly** 40:7,9
**owner** 32:2 35:2 93:16
121:6
**o'clock** 54:15,24 141:4

**P**

**P** 5:1 124:4,9,17
**Page** 4:3,13 132:3 147:22
147:22 150:11,12
**paid** 147:10
**papers** 6:22 145:14
151:19
**parcel** 110:23
**parentheses** 74:4
**Parfait** 1:13
**part** 5:14 15:5 32:10
36:9 45:12 47:21 50:14
53:23 58:13 62:17 65:1
65:8,11,20 79:7,8 89:25
90:11 110:15,22 111:4
112:13,24 113:8 163:8
165:6
**parted** 22:9 52:19 53:5
54:5,6,7 63:20,25 131:7
**partially** 63:22
**participate** 36:15
**participated** 36:17
**participating** 8:15
**particular** 28:17 39:17
61:2 108:9 146:13
**particularly** 61:11
111:10 120:6
**parties** 5:3 7:5 27:2,4

48:3 49:24,25 51:24
84:3 167:14
**parting** 67:6 68:4 132:8
**parts** 78:18,20 98:4,5
106:20
**party** 51:23 52:5
**passed** 120:17 144:5,11
144:20
**passing** 68:22 106:18
108:7 119:4,13,20
120:1,20
**Pat** 7:21 135:13 139:17
141:6,18 155:9 162:5
**Patrick** 2:3,4 6:11
**pay** 114:17
**payout** 59:11
**pen** 23:18 24:21 73:22
**people** 40:22,22 49:15
79:21 141:2 155:10
163:6
**percent** 48:4
**perfectly** 50:24
**performed** 137:3 139:24
**period** 66:5
**peripheral** 76:7
**permitted** 5:5
**Perry** 1:11
**person** 54:21 121:8
138:23 148:14
**personal** 121:17
**personnel** 31:7 146:14
**pertains** 1:6 39:21
**Phase** 15:1,2 138:17,18
**phases** 15:1
**phenomenon** 60:1 68:8
**PHILIP** 3:3
**phone** 139:4 148:1 149:3
149:6,14,17 150:1,2
150:3,20
**phones** 150:18
**photograph** 21:19 23:16
24:3 25:4 56:22 62:1
64:18 74:6 131:11,20
131:23,24 158:22
**photographs** 53:2 70:3
131:8,12

GREEN, DONALD

phrase 126:2
physical 42:20 123:15
131:15
pick 134:9 163:9
picked 112:12 113:24
114:4,19 115:3,7
117:13 137:25 138:12
148:16
picture 11:11 72:25
pictures 130:20
piece 20:24 21:15,18
50:2,3
pier 80:14,17
piling 58:19 59:1 85:19
87:24
pilings 62:6
pilot 119:12 123:13
130:11
place 15:13 23:15
places 144:14
placing 80:2
plaintiffs 6:12 7:23 10:9
26:4 122:13
plan 93:23 111:10 124:1
147:1 161:8,14
plans 116:23,23
played 58:13
pleadings 145:15,18
Pleas 110:2
please 47:1 67:1 91:17
98:12,24 99:17 100:4,7
100:7 101:6
point 17:16 22:15 95:23
111:6 137:14 140:7
pointed 43:6 44:3 64:5
pointing 11:21 23:24
policies 97:6 101:17
policy 93:14 94:13 95:23
128:13
port 35:8,13,15,17
109:12 113:11 116:24
124:18 161:19 162:19
162:24 163:1,1,11
portion 144:24
ports 34:2
posed 101:18

position 40:23
positive 116:14
possession 22:7
possibility 83:3
possible 7:19 122:7
140:22
possibly 17:21
post 90:4,7
post-Katrina 53:1 70:2
potential 27:9 40:23
116:20,21 131:22
power 161:19,22
Poydras 2:14,20
practical 33:16
practice 38:16 70:6 81:6
85:24 86:19 87:9 93:14
94:12 98:18 114:2
128:13 160:1
practices 97:6,21 101:18
precipitated 153:18
precluded 51:25
predicted 58:10
preliminaries 9:17
preparation 10:9 12:21
84:25 85:4
prepare 26:6
prepared 20:25 82:25
117:22
preparing 12:17 19:20
66:21 93:1 146:4
prescribed 95:24
Present 3:1 6:8
President 138:19
presume 25:20
pretty 16:11 19:3 45:16
45:18 60:13 82:15
106:10 122:23 153:3
prevent 120:1
prevented 96:23 98:1
110:8
previous 18:22 147:24
previously 10:22 26:13
73:1 90:25 142:6
pre-hurricane 42:6
primarily 40:21
primary 108:15

principally 60:3
prior 6:15,21 10:7 14:23
15:14 21:8 24:16 38:13
38:24 39:2,7 41:3
43:24 56:4 62:20 81:4
86:18 102:12,15 116:5
136:14 143:4,11 152:15
156:11 157:2,3 158:12
privity 15:1 27:17,18
30:5,7 135:1
probably 7:4 9:18 25:22
87:6 118:11 140:17
problem 101:3 161:23
procedure 5:6 17:1,24
59:20 85:13 86:4,5,12
86:13 94:12
procedures 16:3,4,8,10
16:16,19 17:4,12,18
34:7 64:6 83:7 109:3
proceeding 100:20
process 9:23 10:19 45:13
produce 17:15 60:1
produced 10:22 11:17
149:2
production 145:17
profess 22:16
professional 93:7 159:25
program 36:2,9
promulgated 32:9
properly 77:9 161:20
proposed 145:25
propounded 145:25
protect 116:24
protection 82:6,7
proves 43:20
provide 92:9 93:10,17
114:24
provided 13:2 16:12
17:9 20:11 66:1
providing 154:16
provision 106:8,10
provisions 106:5
proviso 7:9
proximity 70:5 111:12
111:25 162:16
prudent 82:10

PSLC 2:2
public 19:10 116:25
publications 16:8 17:11
published 32:9 85:3
106:24
pull 16:24
pump 24:11 54:21
purpose 6:23 7:3 26:5
59:8 90:23 149:6,19
purposely 90:1,22
purposes 5:5 139:15
pursuant 5:7
purview 113:15
push 68:12
pushing 60:14
put 9:5 17:14 51:4 59:18
59:19 73:23 76:10
90:22 94:20 95:18
98:19 107:21 112:24
119:17 129:23 132:14
152:24 153:2 156:7
164:9 165:8
putting 59:8 83:2 100:21
126:17,20,23 127:6
128:2 146:20

## Q
quadrant 60:3,4
qualified 121:12
qualify 156:21
quay 34:7 130:5
question 5:12 36:6 39:19
40:16 41:19 42:2 43:24
44:25 45:9 46:21 47:1
55:23 61:12 63:1 67:23
68:2,6 69:6 80:8 81:22
86:16,17 93:2,12 94:1
95:7 98:10,22 99:6,9,21
100:12,16 101:7,11,11
102:20,20,24 103:3,5
104:10,24 105:8,12,13
105:17 109:18 119:5
120:10 125:7 126:16
128:6 131:25 137:5
140:2 149:6,15,19
150:8 154:18

GREEN, DONALD

11/21/2008

Page 14

**questioned** 122:19 159:2
**questioning** 37:12
**questions** 9:20 18:8
  22:13 45:1 82:18 99:1
  99:15 100:3 110:19
  133:11,17 136:7 141:3
  141:6,16,18 142:1
  145:24 155:2,5 159:6
  163:11
**quickly** 32:12
**quit** 99:17
**quote** 36:3

**R**

**rail** 11:12
**raise** 68:11
**raised** 68:13
**ramble** 101:7
**rank** 33:3 79:16
**rationale** 85:20
**reach** 22:2
**reacquaint** 17:12
**read** 8:13 29:9 39:11,14
  43:5 45:19 62:21 84:4
  145:1
**reading** 5:8 39:20 45:18
  71:5 135:14
**ready** 113:24 114:4,19
  115:3 117:12 134:9
  137:25 148:16 163:9
**real** 36:3
**realized** 93:9
**really** 79:18 104:9
  152:21
**reason** 82:9 149:11
**reasons** 47:16 84:5,9
**recall** 24:15 55:4,20
  58:21 119:7,11,21
  120:11,15,19 125:5
  138:25 139:10
**receive** 137:16 151:11
**received** 37:14 117:10
**recess** 69:19 117:15
  133:6 146:9
**recitation** 159:6
**recognized** 94:16 109:11

**recollection** 11:16 91:1
**recommend** 64:9 83:2
  84:3 103:11
**recommendation** 82:22
  93:14 95:23 109:9,11
  109:20,21,23 110:7,7
  111:13 124:23 128:12
**recommendations** 29:13
  81:18 82:17,18,19 84:2
  97:6,9,22 98:18 101:18
  106:23,24 107:1 110:13
  110:15 111:3,8,17
  112:15 113:2 125:13
  161:16
**recommended** 79:21
  81:1,5 92:25 96:18
  109:4,5
**record** 6:19 13:9 14:22
  51:4 62:22 99:24
  100:22 117:18 134:23
  142:18 149:13 150:3
**records** 148:25 149:3,7
  149:20 150:17
**red** 57:24 73:21 76:4
  120:20
**reduce** 64:10
**refer** 18:18 20:9 148:9
**referred** 11:4,9 19:7
  20:20 85:14 147:2
**referring** 82:19 110:13
  147:25 152:6,9
**reflect** 142:18
**reflects** 15:10 31:6
**refresh** 112:2
**regard** 6:20 10:2 18:21
  22:3 23:1 27:20 32:3
  34:8 35:3,5 37:6 70:1
  71:4 83:12 103:24,25
  106:4 111:20 112:18
  135:8 155:10 164:15
**regarded** 135:1
**regarding** 19:24 20:17
  27:25 28:22 36:22
  40:24 45:20 47:2 48:8
  48:13 52:11 71:22
  117:23 121:3 137:4,17

139:25 154:14 158:18
  159:3 160:4 161:14
**Register** 32:10
**registered** 71:11
**regulation** 18:9 83:10,21
  93:13 95:22 106:15
  108:5 109:20 110:9,11
  111:14 113:7
**regulations** 9:25 18:7,14
  18:15,17,23,24,25
  29:13 32:6,8 37:10
  39:22 42:8 71:1,14,20
  71:25 83:5,6,9 91:24
  107:2 110:14,16,24
  111:1,5 121:19 125:9
  125:21 136:24 137:12
  159:10,13 160:6
**relate** 10:4 42:5
**related** 6:25 7:15 11:7
  27:8 58:9 167:14
**relation** 9:12
**released** 134:9
**relevance** 42:11 44:6
**relevant** 23:7,9 40:4 41:9
  153:4,9
**relied** 21:4
**rely** 48:23 51:15 52:15
**relying** 39:18 55:7
**remain** 26:23
**remember** 24:7 32:12
  116:1 118:7 138:24
**remnants** 21:25
**remoored** 107:7
**remove** 95:14,25 148:3
  148:10
**removed** 25:18 153:19
**render** 27:19 31:21 35:3
**rendering** 31:14
**repairs** 25:15
**repeating** 33:15
**rephrase** 36:7
**report** 6:24 11:4,9,10,11
  11:12 12:1,14,17,21
  13:10 15:8,20 18:16,22
  18:23 19:21 20:10,25
  21:9 26:5,7,19,20,21

27:4 28:17 29:10 37:13
  37:22 38:1,23 39:2,8,9
  39:20 41:14 43:4 44:4
  44:7,8 45:2,5,18 51:10
  56:6 58:22 70:18 96:15
  117:18 125:13 126:8
  127:11 132:3 134:25
  135:3 138:7 141:24,25
  146:4,6 147:22 148:5
  150:11,12 151:12 156:8
  159:3,5
**reporter** 1:23,25 5:23
  6:12 8:12,14 47:1
  167:3,25
**REPORTER'S** 167:1
**reports** 6:25 7:12,25
  14:11,23 17:19 18:22
  19:2 20:17 27:14 29:24
  38:7 39:7 41:9,21
  45:20 51:22 52:5 55:13
  117:22 120:12 122:17
  122:24 134:12,14,16,18
  134:20 135:17,25
  140:16 145:1 147:24
  150:11 151:9 152:16
  153:15
**represent** 24:10
**representing** 2:2,9 6:10
  6:11 133:15
**request** 92:18 93:4
**requested** 12:10 93:10
  137:16
**requests** 11:23 145:16,17
**require** 159:18 160:11
**required** 22:23 38:5
  114:17 159:10,10
**requirement** 112:6,8
  128:12
**requiring** 111:10 159:13
**reschedule** 8:21
**rescue** 136:5
**research** 8:4 13:5 15:11
  17:17 19:24 118:5
**reservation** 133:17
**reserve** 7:24 133:10
**reserved** 5:13

GREEN, DONALD

11/21/2008

**reserving** 7:5,19 157:19
**respect** 6:24 11:18 17:2
  22:14,18 23:7 29:14
  52:10 80:5 81:22 83:19
  97:7 104:17 108:13
  112:7 118:18 136:11
  138:8 154:20
**response** 11:22 114:12
**responses** 149:1
**responsibilities** 32:2
  35:1
**responsibility** 28:16
  108:15
**responsiveness** 5:12
**restate** 46:25
**restrict** 7:18 67:3
**result** 42:16,16 49:5
  62:14 63:19 74:23 83:1
  116:12 167:16
**results** 77:19
**retake** 7:6
**retired** 26:10 33:5
**review** 10:21 16:6,22
  17:11,16,21 21:8 26:12
  97:25 111:21 133:11
  135:19 136:21 137:3,5
  149:1
**reviewed** 12:16,20,24
  15:12,21 16:3,5,7,11
  18:9,15 19:7,17,23 20:3
  20:5,14,23,24 26:13
  28:21 40:14 62:1 79:19
  122:16 145:15 146:12
  148:6,25 150:6
**reviews** 16:19
**reworded** 153:2,3
**re-ask** 42:2
**Ridgelake** 2:5
**riding** 66:20
**rigging** 92:9,11,19 93:11
  93:17 94:20 96:5
  159:12,19
**right** 7:24 8:18 9:10,16
  13:22 15:7,18,21 17:22
  17:23 18:4,5,21 22:19
  23:22 24:17,19,22,24

26:2 28:18 30:3,13,14
  30:15 32:11 34:9,13
  35:21 36:10 37:11
  38:12 41:25 42:9 43:1
  43:21 45:14,25 47:12
  47:23 48:9 49:19,23
  50:17 52:18,21 53:7
  54:10 57:4 58:5 59:3
  59:23 60:3,4 62:10,11
  64:23 66:18 67:8 70:3
  70:12 73:8,18 74:5
  77:7 82:16 84:23 87:10
  89:18 92:7 95:15,18
  96:11 97:2,7,12 105:24
  107:4,17 108:10 110:5
  114:6 115:5,6 117:24
  119:7 126:9 128:23
  129:2,15,18,21 131:4,5
  131:13,24 132:2,11,18
  132:25 133:5 138:10
  141:21,25 142:17 152:8
  154:1,6,15 155:2
**rights** 7:6,19
**rings** 122:18
**rise** 60:24 158:13
**rising** 48:1 49:23 50:5,13
  87:10
**Rita** 25:19
**River** 36:16,21 60:10
  124:5 125:10,22
**rivers** 33:13 34:1
**ROBERT** 2:11
**Robinson** 145:3
**RODGERS** 3:8
**role** 10:18
**RONALD** 3:7
**room** 6:9
**rope** 22:10,18 52:18,21
  79:14 88:2,3 90:19
  91:23 92:2
**ropes** 22:18,24 52:19,21
  131:5
**rose** 59:12
**routes** 115:9
**routinely** 17:19
**RPR** 1:24 5:22 167:2,24

**rule** 18:8
**rules** 9:24 18:6,25 32:5,8
  37:9 71:22 121:19
  159:9,13
**résumé** 13:10,22 14:3
  31:6

---

## S

**s** 5:1 7:7,12 33:10 41:15
  41:20 68:19 75:3 92:18
  100:19 103:25 126:4
  129:3 133:21 134:21,24
  135:2,7 136:21 137:11
  138:21 139:4 158:20
**safe** 32:3,4 108:17 146:7
**safer** 64:7 84:16
**safety** 16:3,3,8,10,15,19
  17:1,4,17,23 20:6,13
  71:21 121:19
**sail** 64:11 65:17 164:14
  164:22
**SAKURA** 9:9
**Sanders** 2:3,4 4:10 6:11
  6:16 7:10,20,21 10:12
  10:13 11:21 13:8,14,18
  13:24 14:21 25:2,7,13
  29:5,16 30:4 33:18
  40:6 41:12,18 42:1
  43:2,14,22 44:23 46:7
  46:11,19 47:13 51:2,19
  57:9,13 62:18 66:25
  67:7,16,21 72:4 85:5
  86:1,10 91:16 93:18
  98:11,15,23 99:4,10,16
  99:22 100:17 102:5,8
  102:13 103:15 104:19
  105:6,15 108:24 110:1
  121:22 123:20 134:22
  135:23 137:1 138:2
  139:11,20 140:15 141:1
  141:7,13 142:9,21
  143:6,17 149:24 151:5
  151:21 152:1 154:23
  155:4,8,9 156:4,23,25
  157:9,18,24 160:3,25
  161:2 162:6,12 163:17

164:21 165:15,19
**sat** 138:16
**Saturday** 137:23
**save** 5:8,11
**saw** 55:2 142:24 143:16
  144:17,18 150:10
  155:24 156:6
**saying** 48:5 56:5 61:16
  79:4 82:22 89:5 109:19
  110:15,18,22 113:19
  141:9 142:17 143:12
  163:5
**says** 20:5 56:7 72:5 77:8
  95:12 106:15 108:5
  111:3 112:4 124:8
  132:3 142:2 144:16
  147:9 148:12 152:8
**scheduled** 6:21
**scheduling** 8:1
**scientific** 22:21
**scientists** 22:7
**scope** 6:17 153:20
**scrounged** 107:21 165:7
**se** 7:15 36:24
**sea** 32:18,22
**Seabrook** 130:17
**seagoing** 71:19
**seaman** 22:21 33:17
  66:20,20 68:19 126:4
  129:3
**seamanship** 9:25 31:15
  32:24,25 68:20 81:19
  97:9 109:12 126:2
  159:17,25 160:18
**seamen** 22:23
**search** 129:6
**second** 33:11 34:22
  95:12 135:3 151:17
**section** 1:7 15:15,16,20
  16:5 17:25 18:2,10,12
  18:12,13 70:18 73:9,10
  73:14,16 113:19 141:25
**sections** 73:9
**sector** 111:9 161:7,14
**secure** 108:16 116:14
**secured** 58:16,24 161:20

GREEN, DONALD

11/21/2008

Page 16

securing 34:6 59:4
security 109:12
see 13:17 32:11 57:17
    73:3,6 74:22 82:12
    83:16 134:18 145:24
    146:1 147:24 152:13
self-evident 39:19
self-propelled 70:12 71:6
    71:23
sense 23:11 26:3 29:1
    40:1,12 59:14 65:5
    104:8 159:17 160:17
sentence 142:1 147:23
    148:4
separate 13:23 126:23
separating 132:9
September 14:11,16
    26:20 151:23 152:2,4
series 9:19 22:12 25:23
    163:21
served 35:7 36:25
service 32:22 150:17
set 48:15 50:15 81:9 83:9
    84:15 108:1 131:12
    161:3 167:7
seven 88:23
Sewerage 24:11
shaking 155:7
shifted 53:3 153:7
ship 9:10,13 119:3,4,12
    120:7,17
shore 85:1 91:7
shoreside 10:2
short 66:5
shortcut 9:18
shorthand 167:9
show 23:16 53:2 57:1
    70:3 72:25 124:20
    131:12 137:24 149:7,21
    150:18
showing 130:24
shows 104:2
side 29:3 38:17 41:5,10
    48:12 60:4 61:16 73:23
    74:7 80:3 153:16 154:2
sides 119:6 120:22

signature 117:18
Signed 166:11,13,15
significance 148:8
signing 5:9
silos 23:25
similar 45:10 87:14
simplify 133:25
simplistic 40:1
simply 27:12 47:10
    90:18 101:12 108:23
    149:19
single 79:8 92:15,24 98:5
    102:16,21,23,25 112:13
    117:7 118:15
single-part 96:6 97:2
    113:3 114:16 162:16
sir 8:25 9:11 10:20,23
    11:20,24 12:4,9,12,15
    14:14 15:22 19:18,22
    20:4,15 21:13,17,23
    22:11 23:5,22 29:22
    30:16 34:14 37:20
    38:25 39:10,13,16
    40:20 45:15 47:5 50:20
    52:17 54:13 55:10
    61:18 70:13 73:5 75:4
    77:11 78:25 79:11
    84:22 85:12 89:6,13
    101:13,15 105:25
    107:10 117:20 119:1
    121:1 122:11,15 123:1
    123:8 124:2 129:24
    131:19 132:4,12 133:24
    134:10 136:2,15 139:3
    144:22,25 145:4,7,10
    147:18
sit 39:4 84:10
sitting 75:13
situation 106:2 165:12
six 35:15 50:21 77:6
    81:15 88:23 157:1
    165:11
sixteen 76:17
slack 87:8,14 88:17 89:4
    89:8,21 90:3,14,22 91:7
    119:18,22,24 120:1

slightly 57:6
slip 50:14 69:13 130:1,9
    130:10
slipped 52:19 53:5 131:7
slipping 81:9 83:4
slowed 120:21
Slowly 113:25
Smith 11:13
soft 85:25 86:9,19 87:23
    88:15 91:22,25 117:3
sole 121:6
solely 158:21
somebody 107:15 149:17
someplace 44:1
soon 140:22
sooner 140:9
sorry 39:6,19 71:8,9
    91:19 126:16 159:2
    161:13 162:7
sort 36:13 39:19 54:25
    68:22 71:23 73:8,9
    106:18
sorts 79:21
sought 5:15
south 60:15 61:1 144:1,2
    152:13 153:16
southeast 60:22
southerly 61:19
southern 50:16 144:9,24
space 24:3 72:20 76:7
spaces 72:10
speak 91:24
speaking 138:23
speaks 83:22
special 31:19 111:18,23
    147:6,9,12 161:17
    162:18
specialized 32:16
specific 159:13
specifically 5:10 29:9
    128:18 160:6
specificity 10:18
speculate 77:2
speculating 91:11
speculation 79:17 89:24
    90:10 165:5

speed 61:7
spoke 32:13
spots 116:21
St 115:10
standard 126:2 160:20
    161:3
Standards 18:14
standpoint 22:20,21 28:2
    28:21 48:17 68:19,20
    77:17 153:6
start 8:9
starting 49:20
state 5:23 18:6 38:8
    47:24 77:12 79:25
    84:23 106:8 108:18
    144:1,5 167:3
stated 52:18 94:5 128:14
statement 6:19 11:12,13
    36:5 105:7,9,10 137:19
states 1:1 70:24 71:12
    93:15
Station 24:11
status 163:2
statute 108:9
statutes 35:5
stay 140:21
stayed 59:17
stipulate 135:6
STIPULATED 5:2
stipulation 6:4 135:22
    140:3
stop 100:5,6,7,10,21
    113:25
stopped 101:5
storage 11:1
storm 53:13 55:21 59:24
    59:25 60:5 62:14 64:15
    66:2 79:22 97:11 120:7
    134:4 136:14 157:10
    158:9,10,15
straight 87:18
strain 79:15
strand 78:24 79:2,8
strands 79:13
Street 1:18 2:14,20
strength 22:15,19,24

GREEN, DONALD

11/21/2008

Page 17

stress 47:12
stretch 88:4
strike 36:6 56:8
striking 43:10
strong 91:22
strongly 112:25
struck 28:4 49:16 80:13
   84:14
structure 38:8 130:8
structures 130:15
stuck 34:9 55:1
studied 50:25
study 116:4
subject 70:25 71:1,3,15
   71:17 133:17
subjected 45:6
submerged 74:23 75:14
submission 6:22
submit 38:12
submitted 145:2
subsequently 107:6
substantial 88:14 91:23
substituted 90:19
sucking 120:1
suction 119:19
sudden 44:16
sufficient 96:5 104:1,2
   104:12 119:18,22
suggest 62:21 159:24
suggested 112:25,25
suggests 93:23
Suite 1:19 2:5,20 6:2
summarize 58:22 106:11
   134:1
Super 113:9
supervision 167:10
supposed 114:12
supposedly 143:2
sure 17:3 24:18 25:10
   28:13 40:15 50:4,17
   53:15 68:16 82:12 87:7
   118:4 122:23 135:14
   153:3 158:24
surface 75:3
surge 53:13 55:21 58:6

129:9,15
58:10,11,13 59:24,25
60:2,6,14,22,25 61:4,9
61:13,20 62:14 64:15
65:24,25 66:2,4,12,13
67:4,5,12 68:4,6,23
69:6,10,11,17 79:9,23
80:11,16 82:2 87:5
88:11 90:23 91:1,4,9
92:5 97:11 98:3 101:25
118:25 121:3 143:20,22
153:7 158:9,10,12,13
158:15
surmise 100:18
surprised 116:2
surrounding 32:21 45:21
   46:3 47:3 48:24 136:23
   154:21
surveyor 30:22,24
Surveyors 31:1
surveys 30:24
SUTTERFIELD 2:18
switched 146:20
sworn 6:4 37:21 38:5
   167:6
system 138:21 139:5
systems 22:23

## T

T 4:1,11 5:1,1
table 9:5
TAHEERAH 3:4
take 7:6 17:8 44:2 50:2
   70:16 83:8 90:6 113:16
   116:23 119:15,25
   147:13
taken 5:5 11:17 25:23
   114:21 166:25 167:8
talk 51:14 67:10 83:18
   150:12
talked 34:24 40:12 53:22
   56:9 66:2 79:10 82:16
   83:14 122:12 123:3
   124:25 142:6 146:25
   158:14
talking 29:23 34:16
   52:22 56:1 57:12 78:23

96:6 127:6,24 130:8
141:22 155:9
teaching 32:23
Team 122:16
technical 73:11
TELE 3:3,4,5,6,7,8
teleconferencing 8:16
telephone 138:21
tell 15:8 16:15 19:6
   23:18 26:2 44:12 47:17
   50:21 68:15 69:6 70:9
   110:12 111:2,19 113:5
   114:3
telling 49:6 109:16
ten 75:25 90:8 141:2
tendered 121:11
Tendering 57:21
tensile 22:15,19,24 88:5
tension 22:9 47:17,20
   53:23 54:5,6,7
term 17:18 126:15
   127:10 128:6 130:2
   136:19
terminal 11:11 29:4
   31:15 37:4 41:5 93:15
   114:1 115:17 117:10
   119:9 130:9
terminals 37:7,8
terms 38:7 56:10 73:12
test 105:2
testified 6:5 17:20 43:5
   59:9 66:16 85:13 86:3
   89:25 107:14,18,19
   120:22,24 121:3 128:13
   138:11 142:16 154:13
   155:11 156:13 159:1
   165:6
testify 44:20 45:4 46:17
   49:15 102:16 121:9
   138:20 139:2,8 140:4
   155:19 167:6,7
testifying 101:4 120:11
   138:25 139:12 150:13
   162:10
testimony 12:19 13:3,11
   21:19 23:13 28:5,21

30:12 31:14 35:3 41:15
42:12,15,19 43:8,9
44:15 52:7 54:10,20
55:5 58:15 62:20 80:16
84:5 85:2,9,22 86:17
91:6,15 92:1,4 96:14
97:24 101:16,23 102:12
102:15 104:15 107:16
121:14 125:5,8 132:23
134:6 137:20 138:18
139:10 142:20 143:5,11
143:13 146:11,18
148:11 152:22,23 154:4
154:8 155:14,16 166:4
166:6
tests 22:8,8
Texas 1:19 6:2
text 26:22
Thank 8:19,25 9:2 28:25
54:23 136:2 153:13
155:3
theories 145:8
theorized 59:10
theory 59:18
thereof 5:14 135:8
they'd 78:17 90:13
Thigpen 107:14 165:6
thing 8:22 30:23 34:22
36:14 54:25 68:23
71:23 103:1 128:25
130:6 144:18 156:3
things 11:14 21:5 22:16
40:11 53:22 62:4
124:19 147:4
think 19:3 24:8 26:18
30:1 31:23 32:22 33:1
34:23 36:22,23 37:11
37:15 38:4,25 40:10
43:5 44:1,7 49:10,12
54:20 55:17 58:12,20
60:20 63:23 64:17
66:16 68:3,5 82:11
83:16 84:8 85:21 88:23
90:21 91:12 94:2 95:7
96:14 103:19 105:9
107:15 109:13 110:11

GREEN, DONALD

11/21/2008

Page 18

111:22 112:1,3,14,20
117:24 118:17 119:5,13
121:1,5 122:18,19,21
123:14 124:7,19,21
125:5 126:6 127:15
129:4 130:19 132:19
135:20 136:4 138:17
141:8 142:7,18 143:14
147:4,19 148:13,14,20
149:18 152:22 156:16
159:1,24 165:6
**thought** 45:16,17 125:18
142:19 148:7 150:10
156:13 157:19 162:7
**three** 9:13 19:2 29:23
30:11 39:5 45:20 50:25
51:17 52:10 54:6,7
57:24 58:19 59:1 66:10
67:25 78:10,20 87:23
89:1,4,12,15,23 90:2,6
90:8 96:15,17 97:1
103:18 106:6 107:14,18
115:1 134:12 141:4
151:8 162:16
**threw** 137:4
**tidal** 44:17 154:10
158:15
**tie** 34:11 54:14
**tied** 23:12 33:25 40:3
52:25
**tier** 50:12,15,16 52:24
53:4,4,5,14 58:14 61:24
62:2,8,13,15 63:24 64:3
64:16,20 65:12,21 69:7
69:12,14,23 70:4 80:13
82:3 86:25 88:19 131:4
131:9,13,17 158:19
**tiers** 58:14 63:15 70:10
87:2
**tight** 120:4
**time** 5:13 21:21 32:6
35:23 36:14,23 42:6
55:6,14,22,24,24 56:10
56:15,19 57:10,12 58:1
58:2,3,4 61:8 64:1 66:5
75:22 85:4,17,23 121:2

127:5 146:14 152:24
155:21 157:3
**times** 8:20 51:17 52:10
58:19 67:25 87:23
101:6 142:14,15 155:22
155:23 156:7
**title** 26:8 37:22
**today** 8:5 10:14,24 17:2
44:2 84:11 136:8
**told** 37:15 95:17 130:22
**ton** 72:14,14
**tonnage** 72:10
**tons** 72:1,1,7,7
**tooth** 154:11
**top** 73:10 80:1 81:23
82:23 84:16 88:22,24
89:2 94:19 95:15
117:24 118:7 136:18
147:22
**topp** 84:12
**topped** 59:21 82:20
146:20
**topping** 40:3 80:5 82:9
83:19 84:5 95:18
**totally** 17:6 63:21 77:13
113:15
**tow** 95:14
**towing** 33:12 37:1,2
148:2
**traditional** 59:14
**trained** 17:13
**training** 17:11 30:14
31:24 36:1,9 79:22
84:2
**transcribed** 167:10
**transcript** 5:9
**transcription** 166:5
167:11
**transferred** 35:14
**tremendous** 66:7
**trial** 50:22 138:17 139:1
139:7
**trials** 135:10
**tributaries** 125:6,10
**tried** 122:6 153:23
**tripled** 78:2 117:6

**truck** 11:11
**true** 94:25 114:9 149:13
150:25,25 166:7 167:10
**truth** 167:6
**try** 7:18 9:17 100:15
101:9 103:8 141:17
**trying** 41:22 54:14 62:12
100:14 104:8,9 133:9
140:8,23 141:3 151:9
156:21 160:13
**tug** 93:16 117:11
**tugs** 41:1
**turning** 60:17,18 61:12
68:24 123:2,3,6,10,13
123:18,19 130:13
**twelve** 74:17,20 75:18
**twenty** 32:23
**twenty-eight** 58:12 66:6
**twice** 82:17 126:25
127:13 128:15
**two** 9:14 14:22 27:2
28:22 38:7 39:7 43:9
51:21 54:4 58:14 62:4
62:9,17 64:21,24 69:15
70:10 73:8 78:19 79:3
79:13 87:2 89:1,4,12,15
89:23 92:12,24 96:15
96:16,17,20,21 103:13
104:1,2,3,5,7,11,15
105:4 106:7 108:21
111:24 112:24 115:1,9
126:5,12,13,17,18,20
126:23 131:17 144:14
144:16 147:24 152:15
153:15 154:4,8
**type** 13:4 34:12 93:14
160:7
**types** 136:8,9
**typical** 26:7 74:24
**typically** 72:14 163:3

---

**U**

**U** 5:1
**Uh-huh** 73:20 83:15
90:16 116:3 128:5
152:25

**ultimately** 133:22
**um** 11:7 15:10 16:7,8,10
17:14 18:11 19:8,8,9
21:6 23:10,10 24:18
32:18 33:1 34:1,2,20
36:12 38:19 42:15
43:25 44:7,9,14,16 47:9
47:9,21 49:3,24 50:11
52:24 53:1,5,13,13,14
54:14,20 55:21,21
56:14 57:18 58:13,15
58:16,16,22 59:7,17,25
61:23 62:2,8,8 63:10
64:4,17,18 65:1,3 68:8
68:16 69:10,11,13,13
69:16,17 70:2,22 71:4,4
71:11 73:14 74:24
75:25 76:25 77:1,1,23
78:17,18 79:17 80:9,10
80:11,11,24 81:11 82:1
82:23,23 83:7,16 85:3,8
85:10,10,14,18 86:3,4
88:5,18,21 89:24 90:5
90:17,23 91:21 97:10
98:2,17,19 103:17,18
103:19 106:6,17,23
107:7,16,23 108:14,22
109:6 110:8,9 114:12
114:13 115:14 116:23
118:2,2,3 120:6,17
121:4 122:7 124:17,18
124:21 131:6,23 132:8
138:17 139:4 144:7
148:14 149:17 151:18
153:6,23 159:25 163:9
165:11
**unclear** 68:2
**uncontrolled** 84:17
**understand** 29:10 50:18
50:24 52:14 59:24
62:12,25 66:12 67:4
69:21,24 75:24 84:4
87:7 92:1 102:20,23
113:18 115:22 133:20
136:22 146:19
**understanding** 9:22 10:3

GREEN, DONALD

11/21/2008

Page 19

15:12 38:3 41:23 43:8
45:3,7 64:20 75:21
85:8 88:16 103:4
137:11,20 148:17
167:12
**understood** 154:17
**undocumented** 70:20
71:10,15,24
**unfairly** 46:13,21
**Unh-unh** 142:22
**uninspected** 70:20,22
71:15,21,24 72:9,12
**United** 1:1 70:24 71:11
**unlimited** 33:11
**unloader** 24:19
**unloading** 11:10
**unmoored** 131:4
**unsafe** 113:14 165:13
**unseamanlike** 80:3,6
82:13
**upper** 36:16 61:24 80:13
82:3
**USA** 1:13,14
**use** 17:13,19,20 31:25
32:13,17 33:14,22,23
34:3,6,10,10,16 57:21
73:21 85:18 123:17
136:18
**user** 92:3
**usually** 77:5
**ut** 151:20
**U.S** 26:9

**V**

**v** 1:8,9,10,11,12,13,14
**valid** 84:8
**Vandermeulen** 85:11,12
85:16
**various** 8:20 20:16 22:24
41:1 121:19 130:21
155:15
**varying** 157:12
**vent** 55:1
**version** 12:6,8,11
**versus** 27:16
**vessel** 32:25 34:7,12,13

37:1,2 42:18 44:4
50:11 53:23 62:7 64:13
71:21 74:19,25 111:24
112:11 118:3 119:8,14
119:15,20 120:1,12,19
121:18,24 122:4,8
160:12 162:13,18,18
163:12 164:2,24
**vessels** 10:1 16:9 32:1,4
33:12,25 34:23 35:6
37:7 50:12 64:10 66:9
66:21 68:22 81:19
87:21 93:23 95:2 98:9
106:18 108:8 116:14
121:25 122:1 124:4
130:14 147:7 161:18,19
161:22 163:2
**vicinity** 24:17 147:10
**viewed** 107:7
**Villavaso** 28:24,25 39:15
41:15 42:13 46:15
48:12 54:22 55:3,8
56:7 73:1 132:15
142:16 152:23 155:23
**violate** 106:4 109:23,24
**violated** 84:24 105:22
108:22,22 109:2,20,21
**violating** 113:6
**violation** 108:8,11
110:11 113:4
**virtue** 111:4
**visited** 21:24 23:2,9,19
88:22
**voicemail** 137:22 138:22

**W**

**Wait** 134:23 149:25
**waived** 5:10
**Walker** 1:18 2:12 4:5,7,9
6:6,7 7:23 8:6,11,17
12:5 13:12,16,20 14:1,9
14:15 15:4 23:23 25:5
25:9,21 26:1 29:8,19
30:6 33:21 40:17 41:16
41:24 43:12,18 44:11
45:11 46:9,16,23 47:18

51:13 52:3 56:21 57:11
57:15,23 62:23 67:2,13
67:18,24 68:1 69:20
72:6 74:12 86:6,15
91:18 93:25 98:13,20
99:2,7,13,19,24 100:4,6
100:9,19,23 101:8
102:10,18 103:21
104:23 105:11,18,20
109:7 110:2 117:16
122:3 122:23 133:7,18
138:15 141:20 142:12
143:3,8,10,19 145:13
146:2,10 151:3,7,24
152:3 155:1 156:1
157:6,15,21 158:20
159:7,20 160:21 162:1
162:4,22 163:5,14
164:18 165:17
**wall** 27:22 28:1,3,9,12
42:20,25 43:1,1,10
44:16,18,22 49:16
84:14 144:19 145:9
155:24 156:6
**want** 7:5 9:19 16:23 17:3
38:18 44:19 50:17,18
50:21 59:24 62:25 67:3
67:4 68:3 76:10 77:1
96:13 99:3 104:25
114:22 115:7 137:6
139:21 140:9 141:19
149:5,20 150:17
**wanted** 135:14 162:20
**wants** 100:22
**Ward** 42:21 49:18
144:24
**warehouse** 24:3
**wash** 118:25 119:4
**wasn't** 21:6 102:19
**water** 24:11 48:1 49:23
50:5 54:25 59:11,14
60:3,24 61:9 74:16,17
74:21 75:3,15,19 76:2
76:18 87:10 88:25
119:23 130:8 158:13
**waterfront** 23:3

**waters** 50:13 124:22
125:4
**waterway** 124:11,16
**Waterways** 36:12
**WATSON** 3:3
**wave** 44:17 118:24 119:4
154:10 157:13,13
158:11,15,16
**waves** 157:12
**way** 16:14 27:13 40:18
49:3 57:8 58:21 59:9
60:24 68:5 77:25 78:21
82:4 85:16 90:1,14
109:13 127:10 129:16
129:19 136:17 141:9,12
148:22 153:20 165:2
167:15
**weather** 16:9 55:13
121:4
**WEBB** 2:18,19 56:18
101:2 135:21 140:1,13
155:6 156:20 159:22
162:9
**website** 121:16
**weight** 77:2
**went** 44:17 59:15 84:20
122:21 144:14 158:19
**west** 29:3 41:5 48:12
**Western** 33:13
**we'll** 9:18 51:18 83:18
98:24 105:19 110:19
129:23
**we're** 6:18 7:17 14:2
24:9 56:1 62:11 78:23
95:3 100:14 125:20
133:8,9 135:4 141:3
143:12 149:25
**we've** 8:20 25:11 39:20
42:23 52:4 74:6 127:5
127:9 128:5 132:19
133:14 135:22 141:2,22
142:5 152:5
**wharf** 130:5,7
**whichever** 49:17 72:13
119:17 120:22
**wife** 121:7

GREEN, DONALD

**WILKINSON** 1:11
**WILLIAM** 3:2
**wind** 55:12 56:13,15,22
    57:8,25 60:2,8 64:12
    65:22 68:21 69:11,17
    70:16 79:10,23 80:19
    91:9 98:2 101:25
    106:14,17 121:3 143:20
    143:22 153:7 164:25
**winds** 47:25 49:2,23 50:5
    53:12 55:15,16,17,19
    55:20,24 62:14 63:8
    64:2,7,15 65:14,15
    77:18 79:23 80:11
    97:10 105:24 106:14
    108:7 157:3 158:4
**wire** 88:3 91:23
**wires** 22:25
**withstand** 66:21 68:21
    77:17 79:9 105:24
    106:13,16 108:6
**withstood** 91:8 92:5
    96:10 98:2
**witness** 5:4,25 6:3,13 8:8
    8:15 14:7,13 44:15
    46:13 57:22 100:1,2,5,8
    100:11 136:1 140:10
    166:1 167:5
**witnessed** 43:9 56:8
    132:23,24 133:4
**witnesses** 28:3 43:9
    49:12 142:24 143:16
    144:16 148:21 154:5,9
**woke** 54:24
**word** 33:15 34:10 69:3
**words** 90:18 125:2,3
    144:21 158:20
**work** 8:4 51:8 139:24
**worked** 9:6 118:2
**working** 12:8 119:12
    120:16
**wouldn't** 78:3 87:1 102:2
    116:2 129:17 130:3,10
    139:5 156:10
**wrapped** 58:19 87:23
    90:15

**wrapping** 126:24 127:4
**wraps** 85:19
**write** 32:12
**written** 93:13 94:22,25
    95:1,22 124:25 159:5
**wrong** 69:3

## X

**X** 4:1,1,11,11 24:20
**Xs** 73:18

## Y

**yeah** 24:22 26:11 34:25
    37:18 41:19 42:23
    45:12 54:11 57:17
    73:13 74:5 86:8 88:3
    89:19 112:3 124:13
    135:24 141:21 146:7
    155:13 156:16
**year** 135:11
**years** 17:14 32:18,19,23
    50:25 83:1 86:18
    161:11,12,13
**Yep** 82:15
**yesterday** 10:15,16

## Z

**Zito** 6:10 7:4 133:15,21
    134:1,8,21,21,24 135:7
    136:12,17,21,24 137:4
    137:11,22,24 138:20,21
    139:4,14,22,24,25
    140:4 148:2,2,24 149:9
    149:10,15,22 150:4,20
    150:23
**Zito's** 134:15 136:23
    137:17 138:8

## #

**#75005** 1:25 167:25

## 0

**05** 33:6
**05-4182** 1:5
**05-5531** 1:8
**05-5724** 1:9
**05:30-06:00** 152:18

**06-5342** 1:10
**06-6299** 1:11
**06-7516** 1:12
**07-3500** 1:13
**07-5178** 1:14

## 1

**1** 4:14 12:1,2 15:7 37:13
    38:7,13 39:8 47:8 75:8
    117:19 141:22 152:6,7
**1-part** 78:10,22,23 106:6
    107:15,19 115:13
**10** 14:11,16
**10th** 26:20 151:23 152:2
    152:4
**100** 48:4 158:5
**1100** 2:14
**12** 4:14 74:13
**12-foot** 73:15
**120** 6:2
**13** 12:1,14,17,21 13:5
    15:8 19:20 20:25 21:12
    26:5 37:13 39:8
**13th** 11:5 152:8
**133** 4:6
**14** 4:15,16
**140** 158:5
**141** 4:7
**145** 55:16
**147** 4:8
**15th** 25:24
**1500** 115:24
**151** 4:9
**155** 4:10
**16** 91:2 92:5
**1600-ton** 33:11
**162.75** 105:22 106:1
    107:8 108:2
**165.803** 83:9
**17** 14:12,17
**17th** 26:20 151:13
**18** 91:2
**1975** 35:24 36:8,23

## 2

**2** 4:15 14:3,5 15:20 18:2

    18:10 111:10 151:18
**2-inch** 78:11
**2.1** 15:23 16:5,17 19:17
    20:3,7,8,18,23 21:3
**2.2** 15:23,24 16:1 18:18
    20:22 21:3,24
**200** 156:14,16
**2005** 15:14 25:24
**2007** 14:12 151:13
**2008** 1:20 11:5 12:1,14
    12:17,21 13:6 15:8
    19:21 21:1,12 26:5
    37:13 39:8 147:22
    166:25
**2009** 140:17
**21st** 1:20 166:25
**23** 4:17
**2300** 2:13
**25** 161:11
**250** 55:18,19 156:16
**27** 52:24 53:6
**2715** 2:20
**29** 142:3 152:11,17
**29th** 15:14 54:17

## 3

**3** 4:16 14:10,17,19 70:18
    151:19
**3.1** 152:9
**3.1.2** 18:12 141:25
**31** 123:14
**31.3** 132:3
**3123** 2:5
**33** 83:9 105:22 106:1
    107:8 108:2,11 110:14

## 4

**4** 4:16 14:11,18,19 15:15
    18:13 73:1 150:11,12
    151:12
**4-1/2** 75:9,14
**4.5** 75:18
**4:00** 55:4 56:1,5,7,20
    57:14,16 142:7,8,20,20
**427** 63:10
**445** 63:10

GREEN, DONALD

11/21/2008

Page 21

**45** 52:25 53:6,9
**47** 53:9
**4725** 54:4
**4727** 22:1 28:4 50:16
54:2,4,8 62:9,16 63:16
63:20,25 64:1,24 65:20
65:23 69:7,9,15,22 73:4
77:9 78:6 87:4 89:7
92:13,20 95:14,25
107:24 108:16 129:23
131:17 146:19 152:11
158:21 165:1,10
**4745** 22:1 50:16 54:1
62:10,16 63:16,20
64:24 65:20 69:9,16,22
70:3 77:10 78:6 87:4
89:8 92:13,21 107:24
131:18 146:20 165:2,3
165:10

**5**

**5** 4:17 15:16 23:17,20
24:11 66:2 123:3
129:19 132:3
**5.1** 15:17 47:9 49:20,20
62:11,21 159:4
**5.2** 77:8
**5.3** 84:23
**5.4** 92:7
**5.5** 96:3,8 160:5
**5.6** 83:16 105:21
**5.7** 83:17 108:10
**5.8** 111:7 113:18
**5.9** 15:17 47:9 159:4
**5:00** 54:16,19 56:4 142:7
142:20 156:18
**5:30** 56:9
**504-585-7000** 2:16
**504-598-2715** 2:22
**504-834-0646** 2:7

**6**

**6** 4:18 74:7,9 113:8,9
147:22,22
**6.19** 108:11
**6:00** 55:4 56:2,5,9,20

57:14,16 142:8,20
156:18
**6:10** 56:7
**650** 2:20

**7**

**70** 55:15 158:4
**700** 117:25
**70002** 2:6
**70130** 2:21
**70163-2300** 2:15
**74** 4:18
**77002** 1:19
**77017** 6:3

**8**

**8** 4:5
**815** 1:18
**8876** 6:2

**9**

**953** 1:19
**960** 72:1,1