1

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4    IN RE: KATRINA CANAL BREACHES
     CONSOLIDATED LITIGATION

5

     PERTAINS TO:  BARGE          : CIVIL ACTION
6                                 : No. 05-4182
                                  : and consolidated
7    Boutte v Lafarge      05-5531 : Cases
     Mumford v Ingram      05-5724 :
8    Lagarde v Lafarge     06-5342 : SECTION "K" (2)
     Perry v Ingram        06-6299 :
9    Benoit v Lafarge      06-7516 : JUDGE STANWOOD R.
     Parfait Family v USA  07-3500 : DUVAL, JR.
10   Lafarge v USA         07-5178 :
     Weber v Lafarge       08-4459 : MAGISTRATE JOSEPH C.
11                                 : WILKINSON, JR.
     ------------------------------X
12

13        VIDEOTAPED DEPOSITION OF REED MOSHER

14               Washington, D.C.

15            Wednesday, July 22, 2009

16

17

18

19

20

21

22

23

Reported By:  Kathy Savich, RPR, CLR

U.S. Dist. Ct. E.D. La.
No. 05-4182(K)(2) -- BARGE
**DX 283**

2

1                         Wednesday, July 22, 2009

                                    9:33 a.m.

2

3

4            Videotaped Deposition of REED MOSHER, held

5     at the offices of:

6

7                   GOODWIN PROCTER LLP

8               901 New York Avenue, N.W.

9                   Washington, D.C.

10

11

12            Pursuant to Notice of Deposition, before

13    Kathy Savich, Registered Professional Reporter and

14    Notary Public in and for the District of Columbia.

15

16

17

18

19

20

21

22

23

24

25

3

```
1    APPEARANCES:

2

3    On Behalf of the Barge Plaintiffs:

4

5             LAW OFFICE OF RICHARD T. SEYMOUR, PLLC

6             1150 Connecticut Avenue, N.W.

7             Suite 900

8             Washington DC  20036-4129

9             (202) 862-4320

10            rick@rickseymourlaw.net

11            BY:  RICHARD T. SEYMOUR, ESQUIRE

12

13   On Behalf of the United States:

14

15            U.S. DEPARTMENT OF JUSTICE

16            FTCA Section

17            Post Office Box 888

18            Ben Franklin Station

19            Washington, DC  20044

20            (202) 616-4270

21            taheerah-el-amin@usdoj.gov

22            plevine1@gmail.com

23            BY:  TAHEERAH K. EL-AMIN, ESQUIRE

24                 PAUL LEVINE, ESQUIRE

25
```

4

1    APPEARANCES CONTINUED:

2

3    On Behalf of Lafarge North America, Inc.:

4

5          GOODWIN PROCTER

6          901 New York Avenue, N.W.

7          Washington, DC 20001

8          (202) 346-4444

9          mraffman@goodwinprocter.com

10         egoldberg@goodwinprocter.com

11         jaldock@goodwinprocter.com

12         BY:  MARK S. RAFFMAN, ESQUIRE

13              ERIC I. GOLDBERG, ESQUIRE

14              JOHN ALDOCK, ESQUIRE

15

16   ALSO PRESENT:  CARMINE GIULIANO, videographer

17

18

19

20

21

22

23

24

25

5

1                          I N D E X

2      EXAMINATION OF REED MOSHER BY               PAGE

3      Mr. Raffman                                   8

4      Mr. Seymour                                  90

5      Mr. Raffman                                 263

6

7      MOSHER DEPOSITION EXHIBITS:                 PAGE

8      Exhibit 1  Expert Report of Reed Mosher      15

9      Exhibit 2  Vol. V, Final                     41

10     Exhibit 3  Appendix 11                       43

11     Exhibit 4  Vol. I Executive Summary & Overview 52

12     Exhibit 5  Performance Evaluation Status &

13                Interim Results Report 2 of a Series

14                10 Mar 06, Final Draft (subject to

15                revision)                         146

16     Exhibit 6  Expert Report of Bruce Ebersole   156

17     Exhibit 7  Expert Report Steven Fitzgerald   175

18     Exhibit 8  New Orleans Hurricane Protection

19                System – Assessing Pre-Katrina

20                Vulnerability and Improving

21                Mitigation & Preparedness         217

22     Exhibit 9  Lateral Weir Evaluation 12/13/08  243

23     Exhibit 10 Evaluation NAVD882004.65          246

24     Exhibit 11 H1ax1.5 Model                     248

25     Exhibit 12 Map                               249

6

1    MOSHER DEPOSITION EXHIBITS:                    PAGE

2    Exhibit 13 Contribution From Each Source       253

3    Exhibit 14 New Orleans Hurricane Projection

4              Projects Data LNA001172 through

5              LNA001179                            266

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

REED MOSHER

1          REED MOSHER

2       P R O C E E D I N G S

3          THE VIDEOGRAPHER:  My name is

4   Carmine Giuliano of Veritext New York.

5   The date today is July 22nd, 2009, and

6   the time is approximately 9:33 a.m.

7          This deposition is being held in

8   the office of Goodwin Procter, located

9   at 901 New York Avenue, Northwest,

10  Washington, DC.

11         The caption of this case is in

12  re Katrina Canal Breaches Consolidated

13  Litigation, Pertains to Barge, Civil

14  Action Number 05-4182 and consolidated

15  cases.

16         The name of the witness is Reed

17  L. Smith, Ph.D. [sic].

18         MR. LEVINE:  No.

19         THE WITNESS:  Reed L. Mosher,

20  Ph.D.

21         THE VIDEOGRAPHER:  I'm sorry.

22  Reed L. Mosher.  I'm sorry.

23         At this time the attorneys will

24  identify themselves and the parties

25  they represent, after which our court

8

REED MOSHER

1

2     reporter, Kathy Savich, will swear in

3     the witness and we can proceed.

4          MR. RAFFMAN:  My name is Mark

5     Raffman with the firm of Goodwin

6     Procter appearing today on behalf of

7     Lafarge North America.  With me are

8     Eric Goldberg and John Aldock also of

9     my firm.

10          MR. SEYMOUR:  I'm Richard

11     Seymour of the law office of Richard

12     Seymour, representing the barge

13     plaintiffs in this action.

14          MR. LEVINE:  Paul Levine and

15     Taheerah El-Amin for the United States

16     of America.

17         REED L. MOSHER,

18 called as a witness, after having been first

19 duly sworn testified as follows:

20            EXAMINATION

21 BY MR. RAFFMAN:

22     Q.    Dr. Mosher, my name is Mark

23 Raffman.  I represent Lafarge North America

24 which is a defendant in the barge track of the

25 Katrina litigation?

1          **REED MOSHER**

2          I know you have given depositions

3     before because I have sat in some of those

4     depositions.  Before I start asking my

5     questions, I want to just refresh you a little

6     about some of the rules of the road that, if

7     we follow them, will make the deposition a

8     better record for the court and factfinder.

9          A.     Okay.

10         Q.     The court reporter -- the court

11    reporter will be taking down the words that

12    you speak and that I speak, so it's important

13    that both of us speak clearly so we can make

14    ourselves understood.

15              Do you understand that?

16         A.     Yes.

17         Q.     And the court reporter can only

18    take down one person's words at a time, so we

19    need to try not to interrupt each other or

20    speak over each other.

21              Do you understand that?

22         A.     Yes.

23         Q.     If you don't understand one of

24    my questions, will you ask for clarification?

25         A.     I will.

10

                    REED MOSHER

1

2        Q.      I need to ask this question.

3  The answer is usually the same.  Are you able

4  to testify truth -- are you able to testify

5  today truthfully and to the best of your

6  ability?

7        A.      Yes, I am.

8        Q.      There is no medication or other

9  reasons why you cannot testify truthfully to

10  the best of your ability?

11        A.      No, there's no other reason.

12        Q.      Thank you.

13          You have appeared as an expert

14  witness in the In Re Canal -- In Re Katrina

15  Canal Breaches litigation; am I right?

16        A.      That's correct.

17        Q.      And you have appeared on behalf

18  of the United States?

19        A.      That's correct.

20        Q.      You have appeared as the

21  government's expert on the levee and floodwall

22  failures and the causes of those failures?

23        A.      That's correct.

24        Q.      You have served as the United

25  States government's Rule 30(b)(6) witness on

11

1                    REED MOSHER

2    the subject of the wall failures at the Inner

3    Harbor Navigation Canal?

4         A.    Yes, that's correct.

5         Q.    And you've given a couple of

6    depositions in the Katrina litigation, right?

7         A.    That's correct.

8         Q.    Now, are you familiar with -- at

9    all familiar with the barge track of the

10   Katrina litigation?

11        A.    In general terms I am familiar

12   with it, but not a lot of the details.  I

13   haven't been involved in that case.

14        Q.    Right.  So if I can, briefly,

15   the barge plaintiffs are alleging that the

16   barge ING 4727 caused each of the two

17   floodwall failures on the eastern side of the

18   Inner Harbor Navigation Canal, both the north

19   breach and the south breach.  Do you

20   understand what the north breach is?

21        A.    Yes, I do.

22        Q.    And you understand what the

23   south breach is?

24        A.    Yes.

25        Q.    And you've seen the barge ING

12

1                    REED MOSHER

2    4727?

3         A.      Yes, uh-huh, I've seen the

4    barge.

5         Q.      Now, in earlier deposition in

6    the case, you testified briefly about the

7    involvement of the barge in response to a

8    question asked by Mr. Bruno.

9              Do you remember that testimony?

10        A.      I do remember.  I can't remember

11   exactly what the question was, but I do

12   remember he asked some question about the

13   barge.

14        Q.      What was the thrust of your

15   testimony?

16        A.      The thrust was that I didn't

17   consider -- when we did the IPET

18   investigation, we didn't feel that the barge

19   was the cause of the breach.

20              We did see where -- a location

21   where the barge may have hit the wall on the

22   south breach, but we didn't believe it was the

23   principal cause of the breaching of those two

24   areas.

25        Q.      And when you say "we," who are

13

1                      REED MOSHER

2    you referring to?

3           A.     It's really the IPET team, which

4    I was -- for the levees and floodwalls, I was

5    the lead for that, along with -- co-lead,

6    actually, along with myself and Dr. Michael

7    Duncan of Virginia Tech.

8           Q.     All right.   Now, I am going to

9    ask you some questions about IPET in a few

10   minutes, but before I do, as you sit here

11   today, do you have a view about whether the

12   barge was the cause of the failure of either

13   of the two floodwall failures?

14                 MR. SEYMOUR:   Objection.   Are

15           you asking him to speak as an expert or

16           as a lay witness?

17                 MR. RAFFMAN:   I think it will be

18           informed lay opinion.

19                 MR. SEYMOUR:   So you're not

20           tendering him as an expert?

21                 MR. RAFFMAN:   We're not

22           tendering Dr. Mosher as an expert,

23           certainly not at this time.

24                 MR. SEYMOUR:   Then objection

25           that this would be without -- beyond

14

REED MOSHER

1  the scope of lay opinion.

2        But please answer.

3            THE WITNESS:  Okay.  At least

4  our -- after the investigation and

5  everything I've seen since then has not

6  changed my opinion from when we did the

7  IPET report; that the barge was

8  striking the wall, if it did or didn't

9  strike the wall, was not the principal

10  cause of the breaches, both the north

11  and south breach.

12 BY MR. RAFFMAN:

13      Q.    And I will ask you what -- when

14 you say "not the principal cause," do you mean

15 to suggest that the breaches would have

16 happened -- or would not have happened had the

17 barge not been involved?

18            MR. SEYMOUR:  Objection.

19        Leading.

20            THE WITNESS:  Okay.

21 BY MR. RAFFMAN:

22      Q.    You can answer.

23      A.    What I mean by the principal,

24 that the walls would have failed even if the

15

                        REED MOSHER

1

2    barge hadn't hit the walls.

3           MR. RAFFMAN:  Okay.  Let me start

4    with your curriculum vitae then.  Let me mark

5    as Exhibit 1 to your deposition.

6                (Busch Exhibit No. 1 was marked

7           for identification.)

8    BY MR. RAFFMAN:

9           Q.    You have been handed --

10               MR. SEYMOUR:  Before you begin,

11          plaintiff -- plaintiffs object to the

12          use of an expert report from the person

13          who is not being tendered as an expert.

14               Please begin.

15   BY MR. RAFFMAN:

16          Q.    I'm going to ask you to turn to

17   page 189 of the Mosher expert -- well, first

18   of all, let me ask, do you recognize the

19   document that's been marked as Exhibit 1 to

20   your deposition?

21          A.    Yes.

22          Q.    What is it?

23          A.    It was the expert report that I

24   provided for the Robinson versus U.S. case.

25          Q.    All right.  If we turn to page

16

REED MOSHER

1

2    189, do you recognize the pages that appear as

3    189 --

4         A.    Yes.

5         Q.    -- and after?

6         A.    Uh-huh.

7         Q.    And what are those pages?

8         A.    It's essentially the CV that I

9    provided, attached to the expert report, that

10   gives my background.

11        Q.    What is your profession,

12   Dr. Mosher?

13        A.    I'm a -- I am a researcher by --

14   initially, when I first started working at the

15   -- what was the U.S. Army Waterways Experiment

16   Station.

17             So my background is in civil

18   engineering, and my Ph.D. is in civil

19   engineering, with emphasis on geotechnical and

20   soil-structure interaction problems.

21        Q.    What is geotechnical engineering

22   or geotechnical work?

23        A.    It's -- it's the field -- or the

24   subfield of civil engineering that's focused

25   on the behavior of soils and their response to

1                      REED MOSHER

2    loading by either water, other structures, or

3    in cases I have worked in, it's also with

4    other types of loading such as explosive

5    loadings and other things.

6              But it's mainly dealing with soils

7    and their response for engineering purposes.

8         Q.      What bearing does geotechnical

9    engineering have on the question of why the

10   Inner Harbor Navigation Canal floodwall

11   failed?

12        A.      The wall was founded in a levee,

13   which is made up of soil, and the principal

14   resisting forces to any loads that are applied

15   to the wall were resisted by the soils that

16   the wall was setting in, and so that it's a

17   classical soil-structure interaction problem.

18        Q.      Would you describe your

19   educational background, please.

20        A.      I have a BS in civil engineering

21   from Worcester Polytechnic Institute in

22   Worcester, Mass.  I graduated in 1977.  And

23   then I -- while working for the Corps of

24   Engineers in Vicksburg, I received a master's

25   degree from Mississippi State.

18

1          REED MOSHER

2          And then I was sponsored by the

3     Corps of Engineers to go to Virginia Tech to

4     get a Ph.D.  And I finished the coursework

5     there and returned and did the dissertation

6     while I was working.  And I think the

7     graduation date is 1991, I believe, for my

8     Ph.D.

9          Q.     Have you ever taught

10    engineering?

11         A.     I've taught courses in

12    engineering, soil-structure interaction and

13    fine element courses.  And then I have taught

14    a -- numerous courses on what we call prospect

15    courses.  They're five-day type courses to

16    practicing engineers on how you design and use

17    some of the software to do that design.

18         Q.     What is soil structure

19    engineering, the phrase you use?

20         A.     It's how a structure responds in

21    soil, and how it will behave due to

22    displacement stresses, those types of things.

23    So it's the interface -- really, if you want

24    to look at it, it's the interface between a

25    structure and soil, and how those reactions --

19

1                    REED MOSHER

2    how they react to each other.

3         Q.      Does soil-structure interaction

4    have anything to do with the question of the

5    failure of the Inner Harbor Navigation Canal

6    floodwall?

7         A.      Yes.   It would -- the wall is a

8    structure and it's founded in soil, so that

9    it's -- the resistance that the wall receives

10   from the soil is that soil-structure

11   interaction problem.

12        Q.      You said earlier you have done

13   work with the Army Corps of Engineers.   Could

14   you describe your work for the Army Corps,

15   please.

16        A.      I've actually worked for them

17   for 31 years after I had a brief employment by

18   Raymond International.   After I got out of

19   school, I went to work.   And most of my work

20   has been in -- dealing with geotechnical and

21   structural and soil-structure interaction

22   problems from developing -- initially

23   developing some software codes to do design

24   and analysis.

25             We examined walls, slip stability,

20

1                       REED MOSHER

2    levees, pile foundations, a series of

3    problems.  And a lot of that involved

4    assessing actual structures that had been --

5    the performance of actual structures, and

6    comparing our computer analysis to the

7    performance instrumentation and other things

8    of those structures.

9              So up until 1994, I did mostly what

10   would be considered civil works type problems

11   which deal with our infrastructure,

12   navigation, flood control, those types of

13   problems.  And they included T-walls, levees,

14   natural slopes, cellular cofferdams, pile

15   foundations for locks and dams, those types of

16   problems.

17             And then in 1994 I became the chief

18   of the structural mechanics division.  And

19   there we still did some of the things on

20   dealing with structures, navigation structures

21   and flood control structures, but it also

22   changed to doing more work with the effects of

23   explosives on the behavior of structures both

24   above and below ground.

25             They are -- it is a similar type

21

1                    REED MOSHER

2    work in that it's a highly computational type

3    of area.  The difference is the forces are

4    much faster and durations are short periods of

5    time, but very high stresses.  So it's

6    actually a little bit more of a challenging

7    type of problem.

8              And I did that until 2000, and in

9    19 -- in 2000 I became the technical director

10   for military engineering, which covered the

11   whole area of both the explosive effects, but

12   also airfields and pavements done for the

13   military, as well as mobility.  I was in

14   charge of running that program.

15             Then in 2000 -- 2008, January 2008,

16   I became the director of the information

17   technology level where I became a member of

18   the senior executive service.

19        Q.    And you have been -- well, let

20   me go back a sec.

21             Which organiz -- well, let me go

22   back.

23             What is the Army Corps of

24   Engineers' role with respect to flood control

25   and levee systems and floodwalls in the New

22

1                          REED MOSHER

2     Orleans area?

3          A.     For that, they are the

4     responsible party for overseeing the

5     construction and design of those and the --

6     for flood control and navigation along the

7     Mississippi River and its contributaries [sic]

8     in a nav -- I guess, actually, in a navigable

9     river, they would have the overall

10    responsibility for the regulation of and the

11    design and construction of, at least

12    overseeing it and certifying it.  I think

13    there was --

14         Q.     What relationship was there

15    between the work you did in connection with

16    levees and floodwalls and the Army Corps'

17    oversight of the --

18         A.     The Army --

19         Q.     -- levee and floodwall?

20         A.     The Army Corps of Engineers is

21    broken into a series of districts that have

22    responsibility.  I work at -- it's called the

23    Army Engineer Research and Development Center.

24    We are the principal research arm for the

25    Corps of Engineers.

23

REED MOSHER

2      So we're involved in doing research

3   and development to support those districts

4   that do the design and construction.

5      Q.      Are the floodwalls at the Inner

6   Harbor Navigation Canal that breached during

7   Hurricane Katrina a part of the floodwall

8   system for which the U.S. Army Corps of

9   Engineers had responsibility and as to which

10  your job pertained?

11     A.      They are -- they are part of the

12  federal levee and floodwall -- flood control

13  system for the New Orleans area.

14          I guess, to be complete, a little

15  bit on my background, too.  But, after the

16  hurricane, there was a team formed which was

17  called the interagency performance evaluation

18  task force.  And for the next year-and-a-half

19  or so I was principally detailed to do -- to

20  work on that, with a first report coming out

21  in June 2006, and then the final report coming

22  out in the summer of 2007.

23          And I was responsible for a team

24  that did the co-lead -- I was the co-lead with

25  Professor Mike Duncan for the team for doing

24

1              REED MOSHER

2    levee and floodwall performance evaluation,

3    which included the assessment of what took

4    place at the Inner Harbor Canal.

5         Q.      When you -- well, okay, you --

6              When you were working on the IPET

7    project, by whom were you employed?

8         A.      By -- I was employed by the

9    Corps of Engineers.

10        Q.      Your work on the IPET project

11   was a part of your employment?

12        A.      Yes.  But it was, we were, I

13   guess, the secretary of defense, then it went

14   to the secretary of the army, and eventually

15   to the assistant secretary of the army for

16   civil works.

17              There was a request by them to set

18   up a separate task force to do an evaluation

19   of what took place in New Orleans.  And our --

20   our commanding general took this task and set

21   us up as a team to do this.  It's made up of

22   both government and outside folks to do that.

23   I think it was 350, more or less, people

24   involved in doing that assessment.

25        Q.      What was the purpose of IPET?

1                    REED MOSHER

2           A.      The purpose was to do an

3    unbiased assessment of what, from a scientific

4    and engineering standpoint, took place in New

5    Orleans during Hurricane Katrina, from an

6    engineering and science standpoint.

7           Q.      By whom was the IPET project

8    established?

9           A.      Well, it was started -- as I

10   said before, eventually -- it was passed down

11   from the secretary of defense to the secretary

12   of the army to do this.   The establishment of

13   it was by General Stroth who was the

14   commanding general of the Corps of Engineers.

15          Q.      All right.

16          A.      And he was the one who tasked us

17   to do the investigation.

18          Q.      Forgive me if I am plowing old

19   ground.   What was your role in IPET?

20          A.      I was the co-lead for the

21   investigation of the performance of the levees

22   and floodwalls and which common -- which ended

23   up being the Volume V part of the report.

24          Q.      Did you receive any awards for

25   your work with IPET?

REED MOSHER

1

2          A.      Yes.   I received a meritorious

3    service award.   I think that's what it was

4    for.

5          Q.      From whom did you receive it?

6          A.      From the Corps of Engineers.

7          Q.      In your course of work with the

8    Corps of Engineers, have you received any

9    other awards?

10          A.      Yes.   After that, I also

11   received the Defense Distinguished Civilian

12   Award and other -- I received a Commander

13   Achievement Award and some others.

14          Q.      And those are listed in your C

15   -- your curriculum vitae?

16          A.      Right.   Right.

17          Q.      Does your curriculum vitae list

18   your publications?

19          A.      It lists some of my

20   publications, yes.

21          Q.      There are publications you have

22   done that are not listed in your curriculum

23   vitae?

24          A.      Yeah.   I think there's some that

25   aren't related to my -- for this work that I

27

                        REED MOSHER

1

2   didn't really.

3        Q.    And just to be clear, the work

4   you're talking about in your curriculum vitae

5   is the geotechnical side --

6        A.    Side.

7        Q.    -- of the work you've done?

8        A.    Right.

9        Q.    So the curriculum vitae that's

10  included in Exhibit 1 is focused on your

11  geotechnical work; is that fair?

12       A.    Uh-huh, yes.

13       Q.    Have any of your geotechnical

14  work been peer-reviewed?

15       A.    Yes, some of the journal papers.

16  And then there was a series of design

17  documents -- design engineering manuals that

18  ASCE reviewed and actually published them as

19  their -- as a document for them as a design

20  guidance for folks.

21       Q.    And who is ASCE?

22       A.    It's the American Society of

23  Civil Engineers.

24       Q.    What is the American Society of

25  Civil Engineers?

28

REED MOSHER

A.     It is an association of the engineering community.  It's an independently run group, like a professional society, a professional organization, and -- to promote civil engineering and to -- as a professional organization to deal with -- essentially dealing with both the business of civil engineering, but also the professionalism and the design and -- criteria, and it's also a review organization of things that take place in civil engineering.

Q.     What was the subject of the design document that you wrote and that the ASCE published as its own?

A.     Okay.  One of the them was the design of sheet pile walls.  There was also one on the design of pile foundations.

Q.     When you say sheet pile walls, let me ask, what structure was used at the Inner Harbor Navigation Canal to provide flood protection?

A.     It was a -- what we called an I-wall, which is essentially a sheet pile wall with a concrete header section sticking above

29

1                        REED MOSHER

2    the ground.

3            Q.        Did you participate in a project

4    known as the E-99 project?

5            A.        Yes.

6            Q.        And did you -- well, what was

7    the subject of the E-99 test?

8            A.        The E-99 test was a test of a

9    sheet pile section, full scale, to investigate

10   the performance of those walls with actual

11   water loading on the -- it was located along

12   the Chafalia basin.  It was on a section of

13   levee on the land wood side of it, and they

14   used the crest of the levee and the slope

15   to -- as a place to impound the water.

16               They built a, I think it was

17   eight-foot high sheet pile wall design using

18   the design methods at the current time.  I

19   would have to go back and look, but something

20   that was like a 25 to 30 foot deep sheet pile

21   driven below the ground.

22           Q.        Now, when was the test

23   conducted?

24           A.        The test -- I would have to go

25   back and look to make sure, but it was roughly

30

1                           REED MOSHER

2       1986, '87, something like that.  It might be

3       '85.  It was in that time period, mid '80s.

4              I don't remember right off.

5            Q.     Can you compare the depth of the

6       sheet pile wall that you tested in the E-99

7       test with the approximate depth of the sheet

8       pile wall that was used in the Inner Harbor

9       Navigation Canal?

10           A.     I would have to look at those,

11      but I believe that -- you know, that probably

12      the -- they were probably fairly similar in

13      depth.  The E-99 might have been even a little

14      -- a little deeper, but I can't remember.  But

15      they were probably comparable.

16           Q.     Did you publish or coauthor any

17      papers involving the E-99 test?

18           A.     Yeah.  We -- there is one paper,

19      I think it's in my CV, that we published

20      related to that where we -- we were trying to

21      do -- we were working on a new analysis

22      procedure and we used the E-99 as a basis to

23      compare our results to.

24              And so the first paper -- there is

25      two of them in a series.  The first one was

31

REED MOSHER

2    the assessment of the E-99 wall where we did

3    some finite element analysis to do that

4    assessment.

5          Q.     All right.  Do you know whether

6    there was a peer review process before you

7    published your E-99 paper?

8          A.     I believe there was a peer

9    review process for that, but they -- but even

10   in that case, it was mainly an assessment of

11   what had taken place at the time of that.  It

12   wasn't particularly a controversial subject at

13   the time.

14         Q.     I understand.  And since that

15   time, there has been some -- well, I'll leave

16   that by.

17         Have you written any books?

18         A.     Well, there is a -- in my CV,

19   there is a couple of those.  The engineering

20   manuals ended up being books, or classified as

21   books.  And there is another one, a

22   theoretical manual for cellular cofferdams,

23   which is published as a book by Pile Buck,

24   Incorporated.

25         Q.     One of the books you wrote, as

1                REED MOSHER

2    listed in your CV --

3          A.      Right.

4          Q.      -- is about design of sheet pile

5    walls.

6          A.      Right.

7          Q.      Do you participate in

8    engineering conferences?

9          A.      Yes, over the years, various

10   engineering conferences.  And, actually, we

11   sponsor an engineering conference every year.

12   As -- you know, as the director, I'm -- the

13   conference actually falls underneath me.  It's

14   in the shock and vibrations area.

15         Q.      Have any of the conferences in

16   which you have participated involved the

17   design or the failure of sheet pile I-walls?

18         A.      I would have to go back and see.

19   I mean we have talked, I don't know if it was

20   so much about the failure of them, but of the

21   design and of retaining walls, and those

22   issues have been covered in some of those.

23         Q.      All right.  What is your

24   understanding of why you were chosen to serve

25   as the co-lead of the IPET investigation of

33

REED MOSHER

1   the causes of the floodwall and levee failures

2   during Katrina?

3             MR. SEYMOUR:   Objection.

4       Foundation.

5   BY MR. RAFFMAN:

6       Q.      Do you have an understanding of

7   why you were chosen as the co-lead?

8       A.      Uh-huh.

9             MR. LEVINE:   You have to say yes

10      or no.

11            THE WITNESS:   Yes.

12  BY MR. RAFFMAN:

13      Q.      And what is that understanding?

14      A.      There was actually -- with my

15  background that I had worked in this area and

16  my, kind of, I guess, also reputation of being

17  able to do the numerical model and relate that

18  back to practical results, so I was actually

19  asked, personally asked to do this.

20          Because it was outside of what my

21  current job was doing.   So I was asked by

22  headquarters, the Corps of Engineers

23  headquarters, to do this.

24      Q.      Who at headquarters asked you

1                    REED MOSHER

2    personally to serve as the co-lead for the

3    IPET Test V project?

4         A.    It was actually their chief of

5    engineering at the time, Dwight Burnick.  I'll

6    have to look that name up for some of them.

7    But the person who asked and talked to me

8    about it was Donald Driscoll who was in the

9    headquarters office.

10         Q.    Okay.  You said earlier that a

11   purpose of IPET was to provide an unbiased

12   assessment of scientific and engineering

13   issues related to the performance of the

14   hurricane protection system.

15         Have I captured the thrust of your

16   earlier testimony?

17         A.    Yeah, that's, in essence, what

18   it was, you know.

19         Q.    And what I want to know is, what

20   measures did IPET take, or the people who

21   established IPET take, to make sure that IPET

22   would be an unbiased assessment?

23         A.    I -- it actually formed in

24   really three ways.  The first being the

25   formation of a team being both from outside

REED MOSHER

the government, outside the Corps of
Engineers, different agencies, that each of
the leads for the different tasks under the
task force had a co-lead that was from outside
of government, or outside of the Corps of
Engineers.

And then, the whole process, they
had an outside evaluation team formed by the
American Society of Civil Engineers where they
chose people, you know, that were familiar
with each of the areas as a -- part of the
review.

And then, on top of that, there was
another review process set up by the National
Academy of Science, or National Academy of
Engineers, that also did review.  The
difference in those two reviews was, the ASCE
actually reviewed our process as we went
along, and so they actually reviewed the scope
of work and each piece of the work as we went
along, to get immediate feedback on that.

And then the NRC had point --
periods of time, at about a quarter -- about a
quarter of the way through each of our

36

1                        REED MOSHER

2    efforts, to review where we stood.

3           Q.      You said "NRC," and I want to

4    make sure that we understand --

5           A.      Yeah.  National Research

6    Council, and that's, well...

7           Q.      What is the National Research

8    Council?

9           A.      It's Council.  It's a -- it's

10   made up of -- the National Academy of Science.

11   And the National Academy of Engineering is the

12   overall group.  And that's a, essentially,

13   independent group that was originally, I

14   guess, set up by Abraham Lincoln to look at

15   the review of the Department of War during the

16   Civil War, and make sure that they were

17   getting what they were being contracted to

18   get, essentially, independent scientists and

19   engineers to do that.

20           And that has continued on.  And

21   that's -- the government often -- often uses

22   the National Academy to do that review of

23   various things.  And that's what took place

24   here.

25           Now, they actually donate the time

37

1                    REED MOSHER

2  free, people involved in it, to do that

3  review.

4        Q.     So the IPET work was overseen by

5  two different nongovernmental organizations.

6           Have I got it right?

7        A.     Yes.   It was reviewed by two

8  different nongovernment reviews.   And the

9  people involved were people of national status

10  in the various community -- engineering

11  communities in their fields.

12        Q.     What was the -- and I think you

13  may have said this already -- what was the

14  oversight role of the American Society of

15  Civil Engineers?

16        A.     Theirs was a, what I would call

17  a more in-depth role where they actually

18  reviewed as we went along and gave us feedback

19  immediately.   So they reviewed our scopes of

20  work.   They reviewed our intermediate results

21  that we had, gave us feedback, and we could

22  make changes and answer those questions and

23  make changes to what we were doing to satisfy

24  them.

25           So they had a very in-depth

1                    REED MOSHER

2    evaluation.   It was an external evaluation --

3    we call it an external evaluation, but they

4    were very involved in reviewing everything

5    that we did.

6          Q.        What was the role of the

7    National Research Council and National Academy

8    of Science in reviewing the work that IPET

9    did?

10         A.        Theirs was a little more of an

11   assessment of -- well, we gathered the facts,

12   the various facts.   The ASCE, if you want to

13   look at it, they kind of reviewed the facts

14   and that part.   And then the NRC did a little

15   more of, okay, you have these facts.   What are

16   the implications as to where should -- you

17   know, where -- why did we go -- why did things

18   go wrong; where should we go from there.

19            So it's more of an assessment of

20   the evolved results.

21         Q.        Did both organizations provide

22   comments on IPET's work?

23         A.        Uh-huh.   Yes.

24            NRC, all their meetings are public

25   meetings and public feedback to that.   ASCE,

39

1                    REED MOSHER

2    some of their, you know, interactions with us

3    weren't made public, but every review process

4    they provided a document that went to the

5    public.  And those were independent from our

6    review.

7              And they gave feedback to the

8    commanding general.

9         Q.    Do you know what the level of

10   funding was for the IPET project?

11        A.    Yeah.  It was roughly around $22

12   million, $23 million.

13        Q.    How many people worked on IPET

14   in total?

15        A.    Around 350 plus.

16        Q.    Can you characterize the level

17   of priority accorded by the Army Corps of

18   Engineers to the IPET project?

19        A.    Yes.  You know, it was -- as far

20   as the commanding general, it was -- he was

21   given the highest priority to do things, and

22   he made it quite clear that we were to be

23   looked on as being independent from review of

24   the rest of the Corps of Engineers; that our

25   opinions and what we decided we informed them

40

1                    REED MOSHER

2    of, but they were not subject to review --

3         Q.      You --

4         A.      -- and changes.  And changes.

5         Q.      Okay.  I understand.

6              You did not expect your bosses at

7    the Army Corps of Engineers to make changes to

8    what your independent --

9         A.      Yeah.

10        Q.      -- team found?

11        A.      Right.  We weren't -- I mean

12   they could question what our findings were,

13   but we weren't subject to be asked to make

14   changes or things like that.  Our opinions

15   were our opinions, and the facts that we found

16   in support of those.

17        Q.      All right.  Now you had said

18   that you were the co-leader of Task V with

19   Mike Duncan; is that right?

20        A.      Right.  Correct.

21        Q.      And who is Mike Duncan?

22        A.      He is a chaired professor at

23   Virginia Polytechnic Institute.

24        Q.      Commonly known as Virginia Tech?

25        A.      Yeah, that's right.

REED MOSHER

1

2        MR. RAFFMAN:  Why don't I pull

3   Volume V out, and we'll mark that as

4   the next exhibit.

5        MR. LEVINE:  You're talking

6   about the main body of Volume V, not

7   the -- not all the appendices?

8        MR. RAFFMAN:  I am.  And I'm

9   going to make clear what we're looking

10  at.

11        (Mosher Exhibit No. 2 was marked

12  for identification.)

13        THE WITNESS:  And I -- I don't

14  want to downplay -- you know, Mike

15  Duncan is a -- you know, a nationally

16  known geotechnical engineer that is

17  well-respected and has been a -- and

18  given numerous awards by engineering

19  professor -- professional.

20  BY MR. RAFFMAN:

21     Q.     Maybe I should have followed up

22  and asked more about Professor Duncan.

23     A.     Yeah.

24     Q.     I just wanted to...

25        But Professor Duncan, can you

42

1                    REED MOSHER

2    describe his background in the subject of

3    geotechnical engineering?

4         A.    Yeah.  I mean, he's -- as I

5    said, he's nationally known.  He was a --

6    previously to coming to Virginia Tech, he was

7    at the University of California Berkeley.  And

8    he is -- in today's era, he is probably one of

9    the top ten geotechnical engineers in the

10   country, you know, and looked upon in a...

11        Q.    Now, I handed you Exhibit 2.

12   It's a -- it's a document about 128 pages long

13   entitled, "Volume V - The Performance --

14   Levees and Floodwalls," written in connection

15   with "Performance Evaluation of the New

16   Orleans and Southeast Louisiana Hurricane

17   Protection System," and dated June 2007.

18        A.    Uh-huh.

19        Q.    And it's marked "Final."

20             Can you identify Exhibit 2?

21        A.    Yes.  It is the report that we

22   provided for the IPET as the final report for

23   Volume V.  And I was -- actually, I was the

24   principal writer of it, did the first draft of

25   it, and then with Mike -- with Mike Duncan and

43

REED MOSHER

2    Tom Brandon completed it.

3              Q.      Were there appendices to IPET

4    Volume V?

5              A.      Yeah.   There's a number of

6    appendices.   There were 23 altogether.   The

7    whole thing stacks up about that high, about a

8    foot high.

9              (Mosher Exhibit No. 3 was marked

10         for identification.)

11             MR. RAFFMAN:   Okay.   We've got

12         3.

13   BY MR. RAFFMAN:

14             Q.      Can you identify the document

15   that's been marked as Exhibit 3 to your

16   deposition?

17             A.      Yes.   This is the appendices of

18   Volume V that deals with the analysis of the

19   performance of the Inner Harbor Navigation

20   Canal.

21             Q.      And it's marked Appendix 11?

22             A.      11, correct.

23             Q.      This -- Exhibit 3 was one of --

24   well --

25             A.      23.

44

                    REED MOSHER

1

2          Q.      -- one of 20 -- one of 23

3    appendices, and this ones is marked Appendix

4    11?

5          A.      That's correct.

6          Q.      And this appendix deals, in

7    particular, with the performance of the two

8    breaches at the Inner Harbor Navigation Canal?

9          A.      Correct.

10         Q.      How did you go about -- and you

11   and -- well, before I do that, let me ask you

12   about your team.

13         Describe the team that worked under

14   you to carry out Task V of the IPET project.

15         A.      Well, we had a group of folks,

16   it was actually kind of two -- two tasks -- or

17   subtasks underneath this one.  One of them

18   dealt with the physical modeling that was done

19   on the centrifuge.  Mike Sharp and Scott

20   Steedman oversaw that and reported to me on

21   that work.

22         And then we had a -- actually, we

23   took two groups of folks to do analysis of

24   each of the breaches, and we had them work

25   independent of each other.  And then -- and

45

1              REED MOSHER

2    one of them was at Virginia Tech and one of

3    them was in Vicksburg.  And we had them do the

4    -- roughly the same analysis using some

5    different tools to do the -- what we call the

6    classical analysis, stability analysis.

7              Then we had another team, actually

8    another two teams, doing finite element

9    analysis of those same performance -- same

10   failures.

11             And we did that in order to help in

12   getting these done, really, quicker, because

13   they would actually be independent checks as

14   we went along to -- to understand what took

15   place.

16             So we were altogether broken up

17   into about six different teams of folks doing

18   the assessment.

19        Q.    All right.  And --

20        A.    And I coordinated the effort

21   between all of those in...

22        Q.    Referring you now to pages V-2

23   through V-4 --

24        A.    Uh-huh.

25        Q.    -- of Exhibit 2 --

46

                         REED MOSHER

1

2       A.      Yup.

3       Q.      -- are all these people working

4   on your team?

5       A.      Yes.

6       Q.      You use two words that -- or two

7   phrases that bear a little more description.

8   You use the phrase "stability analysis."  What

9   is stability analysis?

10      A.       In this, they were looking --

11  this is dealing with the slope stability,

12  which is -- essentially, in the process of

13  geotechnical engineering, one of the tools to

14  do assessments is to determine the factor of

15  safety against sliding or stability.

16           And it's a rough way to -- or easy

17  way, layman's way, it is essentially the

18  driving forces versus the -- a comparison of

19  ratio of the driving forces to the resisting

20  forces.  And if you have a factor of safety

21  greater than one, your resisting forces are

22  greater than your driving forces.

23      Q.      All right.  And I'm going to

24  come back to that, but in a couple of minutes.

25      A.      Okay.

47

1                     REED MOSHER

2        Q.     What is a finite element

3    analysis?

4        A.     Okay.  A finite element analysis

5    is -- essentially, you are breaking the whole

6    area up into a number of finite areas.  Okay,

7    they either could be 2-D or 3-D, and within

8    that area you can actually just write the

9    equations of motion for those.  So you can

10   determine what the displacements are in that

11   area.

12            So you -- with that you can

13   assemble a whole set of -- this is quite

14   technical -- but a whole set of differential

15   equations, okay.  And you can assemble that

16   whole set of equations, apply the boundary

17   conditions to it, such as the loads, the

18   fixations, and the locations, and then you can

19   solve for those loads and it will determine

20   the displacements and the stresses.

21            So if you look at a stability

22   analysis, we call those limit, or equilibrium,

23   okay, they only assess the conditions what

24   take place at the point of failure; where, a

25   finite element analysis does a description of

48

REED MOSHER

1    a loading all the way from its initial loading

2    and construction all the way up to failure.

3            So you have a complete assessment

4    from the initial loading construction all the

5    way up to the ultimate load; whereas, the

6    stability analysis is just going to tell you

7    what takes -- what is -- the condition's rate

8    at failure would be.

9        Q.      All right.  A few more questions

10   about your work on Task V before I get into

11   the actual dirt work you did and the results.

12   How long did your project team take to work on

13   Project V from the time it began until the

14   time of the final report?

15       A.      We worked right up until -- we

16   got the draft -- I mean we worked full tilt

17   until we finished the draft in, I guess it was

18   the 1st of June.  We were right to that last,

19   almost like he was talking about with the

20   filing of the brief.

21            Right at midnight, we were

22   finishing things up and making sure things

23   were done, because we had to have a draft by

24   the 1st of June because that was the first of

49

1                          REED MOSHER

2     hurricane season.

3            Q.      All right.

4            A.      And then we continued on after

5     that to finalize it for another -- so it was

6     roughly, the team worked -- the whole team

7     worked together pretty much for about a

8     year-and-a-half full-time on this.

9            Q.      How soon after Hurricane Katrina

10    did your team mobilize?

11           A.      We tried -- we got people on the

12    ground, I think it was like -- we were trying

13    to get folks to go to New Orleans, I think, by

14    the second week in September or something like

15    that.

16           Q.      Of 2005?

17           A.      Of 2005.

18                   Because the biggest concern -- this

19    was even before we even got the teams -- we

20    got things started actually before they formed

21    the IPET team, because we were concerned that

22    as the reconstruction and repairs were taking

23    place that we were going to lose information

24    that we needed to do the assessment, so we

25    wanted to get people there very early.

50

1                    REED MOSHER

2              Along with us going there, there

3    was an ASCE team and I think also what was

4    considered a Berkeley NSF team that went about

5    the same time to collect data.   And we

6    actually helped them get around and visit the

7    different sites.

8         Q.    Did you actually visit the north

9    breach site?

10        A.    Yes, several times.

11        Q.    And when was the first time you

12   visited the north breach site?

13        A.    I think it was right after the

14   Rita hurricane took place.   I can't remember

15   exact date, I'd have to look it up, but

16   shortly --

17        Q.    Sometime in -- does September of

18   '05 ring a bell?

19        A.    Right.   It might have been the

20   1st of October of '05, something like that.

21        Q.    Okay.  Did you visit the south

22   breach site?

23        A.    Yes.

24        Q.    How many times?

25        A.    Probably -- during the times,

1                    REED MOSHER

2    probably three or four times I've been to the

3    sites.

4         Q.    Did others who did work on IPET

5    Volume V also visit the site and examine the

6    breaches?

7         A.    Uh-huh, yes.

8         Q.    Did people on your team take

9    photographs?

10        A.    We took photographs and we

11   actually sent a boring crew to take borings at

12   the site and to do field testing for the soil

13   conditions.

14        Q.    This is at both the north and

15   south breach sites?

16        A.    Yes.

17        Q.    Did the Volume V report include

18   some of that information?

19        A.    Uh-huh, yes.

20        Q.    Did your team also see the barge

21   ING 4727 in the neighborhood?

22        A.    Yes.

23        Q.    And did the IPET team also visit

24   other breaches such as the London Avenue canal

25   breach?

52

                    REED MOSHER

1

2        A.      We -- all the breaches that took

3   place that -- especially the wall breaches, we

4   spent a good bit of time assessing those.

5              MR. RAFFMAN:  I've got one more

6         document that I want to mark as an

7         exhibit.  This will be 4.

8              (Mosher Exhibit No. 4 was marked

9         for identification.)

10  BY MR. RAFFMAN:

11       Q.      We've handed you what's been

12  marked as Exhibit 4 to your deposition.

13       A.      Uh-huh.  Yup.  Yes.

14       Q.      Sorry.  That's okay.

15              I think maybe the highlighting is

16  in the original.

17              Do you recognize Exhibit 4,

18  Dr. Mosher?

19       A.      Yes.

20       Q.      Is Exhibit 4 an Executive

21  Summary and Overview, Volume I?  This says

22  "Draft Final" IPET.

23       A.      Yes.  Why -- it is draft final,

24  and it may actually be out now as final

25  because -- it was draft final because I think

53

REED MOSHER

1

2     only they were still waiting to do the final

3     publication on the risk analysis, which I

4     believe was posted about a week ago or two

5     weeks ago.

6          Q.     I see.   So Exhibit 4 to your

7     deposition is a draft final executive summary,

8     but the final has changed only in respect to

9     risk analysis?

10         A.     Correct.

11         Q.     All right.   We'll put that aside

12    for just a moment.

13         Did you feel that your team had

14    enough resources to conduct the kind of

15    analysis that you wanted to conduct on the

16    IPET project?

17         A.     From a resource standpoint, yes,

18    I think we did.   Our, probably, biggest

19    challenge was the time probably; whereas,

20    these things, you would like to have more time

21    to look at -- look at different things to get

22    more details of.

23         But as far as the time and whether

24    it would have changed if we had had more time,

25    would it have substantially changed our

54

REED MOSHER

opinions, no, but it would have -- we would

have been able to provide some more details

related to those opinions if we had had more

time.

     Q.    And, in fact, since the IPET

published its final reports in June of 2007,

is that -- that's when the final report was --

     A.    Right.

     Q.    -- published, right?

     A.    Right.

     Q.    And since then you have had

occasion to continue your analyses of the two

-- of the failures, right?

     A.    Yes, uh-huh, that's correct.

     Q.    From June of 2007 to the

present, has -- has there been any material

change in your analysis of the cause of the

failures at the Inner Harbor Navigation Canal

north or south breach?

     A.    No.   And a matter of fact, the

reassessments that I have been involved in, in

working with the court case and other things,

have just continued to confirm those opinions.

     Q.    When you say confirm the

55

1                    REED MOSHER

2    opinions, just to be clear it's the opinions

3    expressed in the IPET Task 5 report and the

4    appendices?

5         A.     Correct.

6         Q.     Let me then move to the

7    conclusions that the IPET team drew about the

8    failures.  What did the IPET team conclude was

9    the cause of the north breach of the Inner

10   Harbor Navigation Canal?

11        A.     That it was a stability problem;

12   that the wall failed prior to water reaching

13   the top of the wall.  The details are --

14   highlights of it are that a crack formed when

15   the water got up against the wall, a crack

16   formed on the canal side allowing full

17   hydrostatic pressure down the full length of

18   the wall, and that led to the instability of

19   the wall.

20             Part of the reason for that

21   relative to the design that was done --

22             MR. SEYMOUR:  Objection to

23        discussion of cause since he's not an

24        expert.

25             Why don't I just have a running

56

REED MOSHER

1

2  objection to these questions so I don't

3  have to keep interrupting.  Is that

4  satisfactory?

5      If the witness is going to

6  testify to cause and effect, we've got

7  an objection that he's not being

8  tendered as an expert.

9      MR. RAFFMAN:  Well, the question

10  I asked -- the question -- the question

11  I asked -- all right.  We'll have --

12  we'll have a running -- you can have a

13  running objection.  I don't -- I don't

14  think I want the interruptions.

15      Of course, the question I asked

16  was, I think, a valid question, but go

17  ahead, you can have your --

18      MR. SEYMOUR:  I will agree.  The

19  witness was expanding upon your

20  question, though.

21      MR. RAFFMAN:  You can have your

22  objection.

23      MR. LEVINE:  Continue your

24  answer.

25      THE WITNESS:  Okay.  You know,

REED MOSHER

1

2    the cause part of it, as -- as we cited

3    in the IPET report, was due to -- that

4    was different than the design was the

5    fact that they didn't account for the

6    -- the surface elevation on the

7    protected side was approximately three

8    feet lower than what they had for the

9    design, so it had less resisting forces

10   at that location on the north wall.

11        And that hadn't been considered

12   at the design, and that's sufficient to

13   have a factor of safety of less than

14   one for the water to the top of the

15   wall, actually, less than one at about

16        eleven feet of water; elevation eleven.

17   BY MR. RAFFMAN:

18        Q.   When you say elevation eleven

19   feet, what data were you referring to?

20        A.   That is the NVAA88-2 [sic]

21   whatever, 2008.  It's cited in the report.

22        Q.    Right.  Okay.  Very good.

23          Well, let's break this down a

24   little bit so that it becomes clearer.

25        Describe the crack that IPET

58

1                     REED MOSHER

2    concluded had formed on the canal side.  What

3    created it and what did it look like?

4         A.    What happens is when the water

5    rises up against the wall, it moves laterally

6    towards the protected -- protected side.  The

7    soil doesn't move, and that pushing causes a

8    separation between the wall and the canal side

9    soil.

10            And it doesn't have to be a lot of

11   movement, a lot of distance, for you to get

12   fully hydrostatic pressure down the back of

13   the wall.

14        Q.    Now, you use the term

15   hydrostatic pressure --

16        A.    Right.

17        Q.    -- and just so that whoever may

18   watch this video understands, what is

19   hydrostatic pressure?

20        A.    It is, the pressure in all

21   directions at a location is equal to the

22   weight of the water times the distance down

23   from the surface to that location.  And that

24   is the pressure that is in three dimensions at

25   that time pushing out, or if you have

59

REED MOSHER

2  something near a surface, that's how much

3  pressure is going to be pushing on it.

4       Q.     All right.  So as you --

5       A.     Hydro meaning, okay, water, and

6  static meaning just the actual static

7  distance, as opposed to, you could have

8  hydrodynamic pressures which are ones that you

9  have water flowing and hitting something.  And

10  then you actually have the velocity of the

11  water plus the distance of the water.

12       Q.     What -- what you're describing

13  is, what you found is that as the wall

14  deflects inward to the protected side, and the

15  canal side soil stays steady, water

16  infiltrates further down the wall?

17       A.     That's correct.  That's where

18  the surface -- whatever the water surface is

19  down to the -- wherever it would crack and

20  opens up to.

21       Q.     When the water infiltrates

22  deeper along the surface of the sheet pile

23  wall, what does that do?

24       A.     Two things happen.  One is, you

25  have essentially split the levee in half, and

1                    REED MOSHER

2   so you have lost all of the soil resistance

3   that is on the canal side to your stability.

4   And then -- and then you've increased that

5   with -- replaced that with the lateral

6   pressure from the hydrostatic water pressure

7   pushing on the wall.

8           So you have not only lost some

9   resistance that you have there, but you have

10  also increased the loading, so you have two

11  factors affecting it.

12      Q.    What is it that creates the gap

13  between the canal side soil and the sheet pile

14  wall?

15      A.    Well, it is the water pressure

16  pushing on the wall just from the raising in

17  the canal.  And why it hadn't showed up

18  probably before is they hadn't had that high

19  of water in the canal to have that show up.

20          And it is a -- pretty dramatic, and

21  the sense is because it goes from having no

22  pressure in that location to a very high

23  pressure.  And when the crack opens, that

24  water goes down, and it leads to actually

25  deepening it.  So it's kind of a sudden or

61

                    REED MOSHER

1

2    what we call a brittle failure, if you want to

3    put it in those terms.

4         Q.     And what I -- what I want to

5    make sure I understand -- and, again, all of

6    my questions are now referring to IPET's --

7    IPET's findings.

8         A.     Uh-huh.

9         Q.     And as co-lead investigator, I'm

10   asking you to focus on that.

11            In the first instance, the crack

12   forms because of what?

13         A.     Oh, I mean what leads to it is

14   the fact that the wall moved.  The water along

15   the wall above the soil surface pushes the

16   wall laterally to its protective side.

17            The soil doesn't move.  The wall

18   does move and allows a dis -- a crack to open.

19   There's a displacement between the two.

20         Q.     Did IPET have any information or

21   data to support the phenomenon of water that

22   presses on a wall and creates this gap?

23         A.     Well, we had other locations

24   where we found this, okay.  Probably, I mean

25   the two -- and we actually saw other places

62

1                    REED MOSHER

2   along the wall on the IHNC where that gap

3   opened up.

4            Probably the most pronounced -- two

5   most pronounced ones that you can see as

6   evidence of this is the 17th Street failure

7   where you -- the bottom survey that was done,

8   the bathymetric survey after the failure,

9   shows that the levee was split in two; that

10  part of the levee on the canal side was

11  actually left in place, and the -- during the

12  failure, the rest of the levee was moved

13  horizontally as much as 40 or 50 feet.

14            And then on London Avenue just

15  south of the north breach near Robert E. Lee

16  bridge, we actually -- you can actually see

17  the crack of a gap in the wall where it hadn't

18  failed and it lost it, but you can actually

19  see a four or five-inch gap.  There's pictures

20  of that in the report, I believe, in Volume V.

21      Q.    All right.  It's been suggested

22  -- I'm going to represent to you, it's been

23  suggested in this case that the gap between

24  the sheet pile and the canal side soil was

25  created by contact from a barge.

1              REED MOSHER

2          Did IPET conclude that a barge had

3    anything to do with the creation of a gap

4    between the sheet pile and the canal side

5    soil?

6          A.    We didn't come to that

7    conclusion, and it -- based on what we've

8    seen, that's not very likely because of the

9    places that we found the gap to occur in other

10   locations and the fact that the gap was on --

11   in so many locations along the wall.

12          There isn't a need for the

13   additional load that you would get from the

14   barge to cause that to happen.

15       Q.    And you testified that IPET

16   found a gap at the 17th Street failure.

17       A.    Uh-huh.

18       Q.    Was any barge found in the

19   vicinity of the 17th Street failure --

20       A.    No, there wasn't.

21       Q.    -- by IPET?

22       A.    There wasn't.

23       Q.    And you testified that IPET

24   found a similar gap at the London Avenue Canal

25   bridge, right?

1                    REED MOSHER

2          A.      That's correct.

3          Q.      Was any barge found in the

4    vicinity of the 17th -- the London Avenue

5    Canal bridge?

6          A.      No, there wasn't.

7          Q.      What analyses did IPET perform

8    to support or to derive its conclusion that

9    the north breach was the result of a

10   foundation instability?

11         A.      Principally that we use the soil

12   stability analysis for that, but the -- it's

13   not just on the analysis.  It's also looking

14   at the physical evidence, both doing the

15   examination out there and also looking at the

16   -- the -- what we did was a clock survey of

17   when the flooding took place.  And the timing

18   of that helped us also to put into perspective

19   when the instability took place, and did the

20   instability that we're calculating match the

21   physical events that took place.  And so that

22   was -- that's an important part of doing the

23   assessment.

24         Q.      What other -- well, let me go

25   back.

65

REED MOSHER

Why is it that the surface
elevation -- you said earlier that the surface
elevation on the protected side was three feet
lower than you expected.

Did I get that right?

A.      On the protective, yes.

Q.      And this is at the north breach?

A.      At the north breach.

Q.      And why is that germane to your
conclusion about the failure due to foundation
instability?

A.      Well, it means that you have
three feet less of soil to resist the lateral
movement.  And that's significant in the
stability calculation.  That's sufficient to
cause it to go from something that would be
stable to something that would fail.

Q.      What was the physical evidence
that you were referring to at the north
breach?

A.      One of the -- one of the things
that became important to know was when we
looked -- when we first went out there we saw
a lot of evidence of overtopping as -- as the

1                    REED MOSHER

2    mechanism of failures, particularly on the

3    west side and then on the south.

4            And, which, you know, the north

5    breach, you know, initial impressions was that

6    was probably the cause because you saw erosion

7    of the wall right up to where the breach took

8    place.

9            But when we started doing our

10   calculations, we found that we were getting

11   factors of safety less than one before the

12   wall reached -- water reached the top of the

13   wall.

14           And so we had -- there's another

15   group that was doing the hydraulics part of it

16   and looking at the flooding.  We had a meeting

17   with them, and they had discovered that there

18   was water in the neighborhood before -- around

19   5:00 in the morning or before in that part of

20   the neighborhood.

21           While -- okay.  That makes sense if

22   we had failure of the wall before the wall

23   [sic] took place.  And it was actually in that

24   part of the -- near Florida Avenue where they

25   saw the flood had taken place.

67

REED MOSHER

2      They had gone in and done clocked

3   surveys where they actually found clocks that

4   had stopped when water got to them.  And so

5   at -- early in the morning, maybe 5:00 to 6:00

6   in the morning, there may have been as much as

7   six to eight feet of water in that part of the

8   neighborhood already at that point, and that

9   only could occur if the wall failed before

10  water got to the top of it.

11          Q.    All right.  The --

12          A.    So -- so our calculations that

13  we -- we were doubting whether we're having --

14  maybe the calculations were right, but were

15  reaffirmed by the fact that, hey, we did

16  actually have water in the neighborhood and

17  that explains it.

18          Q.    All right.  Did you express the

19  same conclusion in the Robinson matter when

20  you testified there?

21          A.    Yes.

22              MR. LEVINE:  You're talking

23      about his conclusion in the expert

24      report.  I don't think he testified to

25      that at trial.

68

                              REED MOSHER

1

2                       MR. RAFFMAN:   I'm sorry.   That

3              was a bad question.   I meant to say in

4              the Robinson expert report.

5                       THE WITNESS:   Correct.

6    BY MR. RAFFMAN:

7              Q.      Did IPET conclude that the

8    conditions in the Inner Harbor Navigation

9    Canal were sufficient to cause the wall to

10   fail without involvement by a barge?

11             A.      Yes.

12             Q.      Let me ask you about the south

13   breach then.   What did IPET conclude was the

14   cause of the south breach of the Inner Harbor

15   Navigation Canal?

16             A.      Overtopping and erosion of the

17   material on the protective side.

18             Q.      What analysis did IPET do to

19   arrive at that conclusion?

20             A.      Well, there were several that we

21   did, and actually even on the north wall.

22   There was some question that seepage may have

23   been a problem at both of those locations, and

24   we did a series of fine element analysis

25   looking at seepage as a potential cause

REED MOSHER

because it had been raised by the NSF group at California at Berkeley.

And we did an assessment of that for both the north and south breach and found that that was not a cause of the breach. We did slope stability analysis of the walls and found that on the south breach that you would have to have water above the top of the wall to get a factor of safety of less than one for stability.

And then the clocks are raised again. We can see in the hydrograph that we produced for the inner part of the wall that somewhere around 7:00 in the morning there was an influx of water into the neighborhood at that -- and a rate of increase in the water in the neighborhood significantly peaked at that time or jumped up how fast it was coming into the neighborhood, and that was attributed to that south breach. And, at that time, there was water sufficient to be over the top of the wall based on the hydrographs.

Q.    Why would overtopping and erosion -- let me ask it this way.

70

```
1              REED MOSHER

2         Why did IPET --

3              MR. RAFFMAN:  None of these

4    questions are very good.  Paul, make an

5    objection.  I'll start again.

6              MR. LEVINE:  Start again.

7              Do you just want to -- are we

8    almost close to the 80-minute mark?  Do

9    you guys just want to take a break?

10   He's almost done, done with his first

11   tape.

12             MR. RAFFMAN:  Is that right?

13             MR. LEVINE:  Yeah.

14             MR. RAFFMAN:  Okay.  Then why

15   don't we stop -- stop here for a few

16   minutes.

17             THE VIDEOGRAPHER:  One moment.

18             We're going off the record.

19   This is the end of videotape number 1.

20   The time is now 10:51.

21             (Brief recess.)

22             THE VIDEOGRAPHER:  We are back

23   on the record.  This is the beginning

24   of videotape number 2.  The time is now

25   11:03.
```

71

1                     REED MOSHER

2        BY MR. RAFFMAN:

3              Q.      I'm asking you now about the

4        south breach of the Inner Harbor Navigation

5        Canal.  You have that in mind, right?

6              A.      Correct, uh-huh.

7              Q.      And you had said that

8        overtopping and erosion of soil was the causes

9        found by IPET of that breach?

10             A.      Correct.

11             Q.      Did IPET find that overtopping

12       and erosion of soil was responsible for any

13       other breaches in the New Orleans area?

14             A.      Yes.  There -- there were a

15       number of other locations.  Probably the most

16       overtopping and the subsequent erosion, there

17       was -- probably the most dramatic one is --

18       that you can see the progression of it is

19       along the inner harbor coastal waterway at the

20       offloading location.  And it's -- I guess it's

21       called actually the Citrus Back Levee

22       location.  It's New Orleans east, and I

23       believe in -- I think somewhere around, I

24       think it's figure -- on 76 in the Volume V,

25       Exhibit 2.

72

1                    REED MOSHER

2              MR. LEVINE:   What's your page

3        number?

4              THE WITNESS:   V-96.

5              MR. SEYMOUR:   What page?

6              THE WITNESS:   V-96.

7    BY MR. RAFFMAN:

8         Q.      It has been suggested,

9    Dr. Mosher, that the overtopping induced

10   deflection that's shown in V-96 is not similar

11   to the deflection that was found at the south

12   breach of the Inner Harbor Navigation Canal.

13            Did IPET find that there was some

14   important distinction in the way those two

15   breaches appeared that made one more likely or

16   less likely to be subject to overtopping and

17   erosion?

18        A.      No.

19              MR. SEYMOUR:   I need a

20        clarification.   If the witness is

21        testifying to what he understands IPET

22        did as distinct from what's in the IPET

23        report, that tells us something that

24        the written report doesn't.

25              But if he's just testifying to

73

REED MOSHER

1

2      what's in the written report, I think

3      the report speaks for itself, and I'm

4      going to object on that basis.

5              MR. RAFFMAN:  Well, I gave you a

6      continuing objection.  You can --

7              MR. SEYMOUR:  -- continue on

8      this one as well?

9              MR. RAFFMAN:  Well --

10             MR. SEYMOUR:  That will be fine.

11             MR. RAFFMAN:  -- if your test --

12     if your position, Mr. Seymour, is that

13     I am not entitled to have a witness to

14     explain the process that went in the

15     IPET report, which your experts have

16     roundly criticized and sought to take

17     apart, we'll have that taken up with

18     the judge.

19             But I'm asking -- the witness

20     has pointed to a picture in the IPET

21     report, and I'll ask the question again

22     because I'm sure it's not in mind.

23  BY MR. RAFFMAN:

24         Q.    Dr. Mosher, it's been suggested

25  that the physical appearance of the Citrus

74

1                    REED MOSHER

2  Back Levee wall failure somehow shows a

3  difference in the etiology of the breach from

4  the south breach of the Inner Harbor

5  Navigation Canal.  And I'm asking, did IPET

6  find that to be so or not?

7        A.    Just looking at the pictures,

8  and also the -- we actually think that this is

9  a -- kind of an imminent stage that you would

10  have seen during the process of the south

11  breach where the wall had started to tip over,

12  in this case, it didn't go all the way to

13  complete failure, but -- the south breach did,

14  but you can see the type of erosion that you

15  would have -- that you would see.

16             As a matter of fact, I think it's

17  on 76, this trench that we see, on the erosion

18  trench, in 77 it looks very similar to the

19  erosion trench that is found down on the south

20  breach, which is on page 83.

21        Q.    All right.  So you have referred

22  to the trench that appears at figure 77 of

23  IPET Volume V?

24        A.    Right.

25        Q.    And the second reference was to

REED MOSHER

a trench that appears in figure 83?

 A. 83, right.

 Q. Figure 83 reflects what breach?

 A. That is the south breach on the IHNC adjacent to The Ninth Ward.

   THE COURT REPORTER:  I'm sorry. Can you speak up.  South breach at...

   THE WITNESS:  The south breach on the Inner Harbor Coastal adjacent to The Ninth Ward.

BY MR. RAFFMAN:

 Q. All right.  So --

 A. The physical evidence there is pretty similar to that -- that type of erosion taking place.

 Q. What is it about the scour and erosion that IPET concluded leads to failure of the wall?

 A. When the water goes over the top of the wall and erodes the soil behind the wall, that soil is what is supporting the wall, keeping it from failing or moving, okay. Once that is eroded, that wall can move, it has no support, so it leads to its failure and

76

1                          REED MOSHER

2      collapse.

3              Q.      All right.

4              A.      The only thing I would say is

5      there are some other differences in these two

6      locations.   The -- if you will look at the

7      south breach, it sets [sic] up higher and has

8      a bigger drop-off to the protective side.

9      Okay.   So as the wall failed and moved out

10     after it had the initial erosion take place,

11     it would be somewhat more dramatic because it

12     would drop a greater distance.

13              This levee here at the Citrus Back

14     Levee didn't -- on the protective side wasn't

15     as far off the ground, so you didn't see as

16     big of an opening up of the area.

17              Q.      When you say an opening up and

18     dramatic failure, I would direct your

19     attention to figure 81 at page --

20              A.      Uh-huh.

21              Q.      -- V-101.

22              A.      Right.

23              Q.      What -- what is depicted in

24     figure 81?

25              A.      You can see in 81 the location

77

1                    REED MOSHER

2  of the wall after the failure -- it's kind of

3  a circular area pushed out into the

4  neighborhood -- and that was from the

5  tremendous amount of water that dropped.

6              Distance-wise, I mean, there's a

7  big differential between what the canal water

8  height was and what was actually the height of

9  the ground surface on -- in The Ninth Ward,

10  and that pushed that wall out.  And

11  essentially what happened was the sheet piling

12  stretched and flexed out.

13              So they're Z-shaped, so those --

14  that Z was lengthened and stretched out to

15  allow the wall to expand out in that

16  direction.  So it's -- it flattened the V

17  section -- the Z shape on the sheet piles.

18       Q.     Did IPET conclude that a barge

19  impact or a barge contact was necessary to

20  cause the south breach of the Inner Harbor

21  Navigation Canal?

22       A.     We concluded that it wasn't

23  necessary for a barge impact to -- in order to

24  have that breach take place.

25       Q.     And just to be clear, did

78

1                    REED MOSHER

2      IPET -- did IPET conclude that the barge

3      caused the wall to fail?

4           A.     No, we didn't -- we didn't

5      conclude that the barge was the cause of the

6      failure of the wall.

7           Q.     And that -- if I understood you

8      right, IPET at least briefly considered

9      whether the barge was a cause of the failure?

10          A.     Right, that's correct.

11          Q.     And rejected that conclusion?

12          A.     Correct.

13          Q.     I want to just ask a few

14     questions about Appendix 11.   And, in

15     particular, I'd like to direct you to figure

16     11-8 at page V-11-23.

17               Dr. Mosher, what is shown in figure

18     11-8?

19          A.     This is the location -- this one

20     here we're talking about, right?

21          Q.     Yes.   Yes.

22          A.     This is the location where there

23     had been borings taken at the site of soil

24     investigations at the site.   It has the red

25     ones which were taken by ERDC for the IPET

1                    REED MOSHER

2       investigation.

3                 The blue ones are the ones that

4       were done for the general design memorandum,

5       the GDM, as it's abbreviated there.

6                 And then there was also a series

7       that Eustis Engineering took along there.

8                 And then there's a line marking

9       where the centerline or the cross-section of

10      where -- the cross-sections and the centerline

11      of the levee, and where we had cross-sections

12      taken.

13           Q.    You used the word ERDC.  Tell me

14      what ERDC is.

15           A.    It's the Engineering Research

16      and Development Center.  It's part of the

17      Corps of Engineers.  It is where I work.

18                 And why it's phased that way, we

19      were the ones that sent the money to the

20      Vicksburg district to do the borings, and we

21      oversaw the borings with our -- where our

22      folks, their overseeing the boring taking

23      place.

24           Q.    What is a CPT?

25           A.    It's a cone penetrometer test.

80

1                     REED MOSHER

2    It's where a cone is pushed into the ground

3    and you measure the resistance of the tip of

4    the cone and the sleeve along the side of the

5    cone.  It can give you the -- it's a way to

6    determine the strength of the soil

7    characteristics.

8         Q.    What did the IPET Task V team do

9    with the -- well, what did the IPET Task V

10   team do with the data that is generated by

11   these boring and CPT results?

12        A.    We use this data here to

13   determine what the stratification of the soils

14   were versus depth at these locations and

15   determine the soil strengths and properties at

16   these locations.

17        Q.    Did your team, did the Task V

18   team, use not only the boring but also the CPT

19   to do that analysis?

20        A.    Yeah.  We actually relied more

21   on the CPT data.  But borings in this area and

22   the previous borings we felt were faulty from

23   previous work that we have looked at 17th

24   Street.

25             And we were concerned that they

1                    REED MOSHER

2    didn't provide the correct shear strength, and

3    we felt the CPT, because of its institute of

4    measurement, where the other borings and soil

5    strengths had been determined by laboratory

6    tests where they had to extract -- extract the

7    soil and take it to the laboratory and then

8    push the soil out to do the sampling had given

9    some false readings, and we felt that the CPT

10   data was better.

11            And also our review folks from ASCE

12   and the National Research Council --

13   particularly Andrew Little and John Christian

14   were the two geotechnical folks for the

15   National Research Council -- were --

16   particularly wanted us to do CPT testing and

17   vane shear testing at those locations because

18   they were concerned with the soil testing,

19   apparently, so that was one of the requests

20   that we got from the National Research

21   Council.

22        Q.     Let me turn your attention to

23   figure 11-12 of the same report.   It's at page

24   26.

25        A.     Yeah.

82

1                    REED MOSHER

2          Q.      What does this -- what does this

3    graph represent?

4          A.      It's a graph that shows the --

5                  MR. SEYMOUR:  I'm sorry.  Page

6    26 of the expert report?

7                  MR. RAFFMAN:  No.  I'm sorry.

8    It's Appendix 11.

9                  MR. SEYMOUR:  V-11-26?

10                 MR. RAFFMAN:  Yes, that's

11   correct.

12                 MR. LEVINE:  Exhibit 3.

13                 THE WITNESS:  Exhibit 3.

14                 It is -- it's a plot of the

15   shear strength versus depth for the

16   location.  And this one is East bank

17   centerline of the levee.

18                 And it shows the shear strength

19   and also roughly where the soil layers

20   are, first being the levee soil at the

21   top, marsh layer one, marsh layer two,

22   and then the interdistributory clay

23   layer below that.

24   BY MR. RAFFMAN:

25         Q.      What does the red line

83

1                    REED MOSHER

2      represent?

3           A.      The red line represents the

4      shear strength that we determined for the IPET

5      study.

6           Q.      What shear strength did you

7      determine -- well, let's take an example.  The

8      levee fill and marsh one layers, what shear

9      strength did you get there?

10          A.      Well, the first -- somewhere --

11     it's -- from this graph, it's around 500

12     pounds per square foot.

13          Q.      All right.  And for marsh two --

14          A.      It's --

15          Q.      -- the shear strength is?

16          A.      -- 300.  I think there's

17     actually a table in here that has all that.

18              It's -- I believe it's table 11-10

19     on page 17, V-11-17.

20          Q.      All right.  I see -- I see

21     that --

22          A.      That's the west bank.  Sorry.

23     We need the east bank.  Sorry.  Yeah.  11-5.

24          Q.      All right.  Table 11-5 in

25     Appendix 3 sets forth the --

84

REED MOSHER

1          MR. LEVINE:  Appendix 11.

2  BY MR. RAFFMAN:

3      Q.    Oh, Table 11-5 in Appendix 11,

4  Exhibit 3, sets forth the shear strengths

5  that, again, are reflected --

6      A.    On that graph.

7      Q.    -- reflected in figure 11-12?

8      A.    Yes.

9      Q.    And are the IPET strength

10  represented by the red line, is that -- is

11  that based in the data that's shown in figure

12  11-8?

13      A.    Correct.

14          MR. RAFFMAN:  Okay.

15          MR. LEVINE:  You mean figure --

16          MR. RAFFMAN:  Figure -- the

17  overhead slide where all the CPT --

18          MR. LEVINE:  Oh, got you.

19          MR. SEYMOUR:  Is this one that

20  -- I've got the page number.

21          THE WITNESS:  Yeah, in --

22  actually it talks about here a little

23  bit about the original design and the

24  comparisons between them.

1        REED MOSHER

2            We actually have several

3        different -- it shows you what -- it

4        talks about those strengths.  There's a

5        whole description of the process going

6        through deciding what the soil

7        strengths were.

8            And there was a -- we did a

9        parameter study to understand what the

10       results would be if those varied from

11       one location to the -- varied the

12       strengths in those locations so we

13       could see what the effects of those

14       strengths would be.

15   BY MR. RAFFMAN:

16       Q.    What's the --

17       A.    The -- you know, the red line

18   here is the --

19       Q.    Yes.

20       A.    -- is the strengths that -- the

21   strength profile that we used for the -- the

22   analysis of what we determined.

23            And then we looked above and below

24   that to see what the effect would be of change

25   in those strengths.

86

1                       REED MOSHER

2          Q.      All right.   And when you did

3   that, that second analysis, what did you find?

4          A.      Well, basically, we're -- what

5   we're looking at is what was the probability

6   of failure for that.

7          Q.      Right.

8          A.      And because we had a -- at this

9   location, for an elevation of around eleven

10  feet, that we had a factor of -- factor of

11  safety one, the probability of failure is near

12  one, it's close to one, so...

13         Q.      What happens to a wall when a

14  factor of safety gets close to one?

15         A.      It will start to move a lot.

16  And basically what we've seen from the finite

17  element analysis where you have -- you can

18  actually look at the movements of the wall,

19  you find that once you get a factor of safety

20  below 1.2 that you start to have large

21  deformations of the wall.

22             And, finally, because it is an

23  analysis that's looked at of failure, when you

24  get to one, you're talking about that it will

25  have moved considerably an amount, and maybe

87

1                    REED MOSHER

2    two or three feet even at that point before it

3    goes to final failure.

4                So you can get some very large

5    displacements before you get to one before you

6    get total failure.

7        Q.     Did IPET or the IPET team reach

8    any conclusions about what was happening at

9    the south breach?

10               MR. RAFFMAN:  You know what,

11          I'll strike that.  I'll strike that

12          question.

13               I think I may be done, but may I

14          confer with my colleagues?

15               MR. LEVINE:  You want to go off

16          the record?

17               MR. RAFFMAN:  Yeah, let's go off

18          the record.

19               THE VIDEOGRAPHER:  We're going

20          off the record.  The time is now 11:23.

21               (Brief recess.)

22               THE VIDEOGRAPHER:  One moment.

23          We are back on the record.  The time is

24          now 11:23.

25               MR. RAFFMAN:  All right.  Very

88

REED MOSHER

1  good.   Thank you.

3  BY MR. RAFFMAN:

4      Q.     You referred to Vicksburg a

5  couple of times.  When you say Vicksburg, what

6  were you referring to?

7      A.     Vicksburg, Mississippi.  That's

8  where we're located, where the U.S. Army

9  Engineer Research and Development Center is

10  located.

11      Q.     All right.  Now, subject to

12  Mr. Seymour's objection, which we may -- we

13  may sustain or may not sustain, since the time

14  that IPET issued its report, have your

15  conclusions about the cause of the south

16  breach changed?

17      A.     No, they haven't.

18      Q.     Since the time that IPET issued

19  its report, have your conclusions about the

20  cause of the north breach changed?

21      A.     No, they haven't and -- and I --

22  I think that what substantiates that, the two

23  reviews from the exterior folks and from the

24  National Research Council, they have all

25  supported that also and haven't questioned

89

REED MOSHER

1

2      that part of it.

3             So I feel pretty certain in my

4      conclusions, you know, of the conclusions in

5      the IPET report that we've...

6             Q.      Okay.  And just because -- now

7      I'm going to ask another question that may not

8      be subject to the objection Mr. Seymour would

9      make to the last question.

10            A.      Yeah.

11            Q.      Describe for me the results of

12      the review by the two reviewing organizations.

13            A.      At different -- there were

14      different stages of it, and they had some

15      questions, but the final review that was done

16      here in Washington -- and I can't remember the

17      exact date, but they have issued it -- there

18      they had no objections to the scientific and

19      engineering work that we had done for the

20      report, particularly in the chapters of the

21      Volume V we had answered to the satisfaction

22      of what -- their questions, and they had

23      accepted what our results were for that

24      analysis and supported that.

25             MR. RAFFMAN:  All right.  I have

90

REED MOSHER

1    no other questions.   Thank you,

2    Dr. Mosher.

3              EXAMINATION

4    BY MR. SEYMOUR:

5        Q.      You stated towards the beginning

6    of your deposition, Dr. Mosher, that the barge

7    was not the principal cause of the breaches.

8        A.      Uh-huh.

9        Q.      Please tell me everything that

10   you did to investigate any effect of the barge

11   on the north breach.

12       A.    Okay.   Mainly --

13              MR. RAFFMAN:  I'll object to the

14   question as mischaracterizing prior

15   testimony.

16              I'm sorry for the interruption.

17   Please continue.

18              THE WITNESS:  We look for the

19   physical evidence of the barge hitting

20   the -- if it had hit the wall and

21   things like that.

22              We found one location near the

23   southern part of the breach, south

24   breach, where it looked like there was

1              REED MOSHER

2    a -- something had struck the barge.

3    And we did look on the barge to see if

4    we could see any indications of

5    scrapings or anything like that, and

6    thought there might have been.

7              We -- actually, another part of

8    the IPET study that was done, I think

9    it's in Volume IV on the storm, there

10   -- we did an investigation to see what

11   kind of -- what kind of velocity would

12   the winds cause to -- for the barge to

13   potentially hit it.

14             And then we looked at all the

15   other physical evidence.  And the barge

16   being the cause of the failure is

17   eventually yet to be ruled out as the

18   cause because of the other strong

19   evidence of the other causes of the

20   failure.

21             Other places where we saw barges

22   hit walls, the -- particularly along

23   the Mississippi Buckingham Parish area

24   or in the -- in the coast of MRGO,

25   barges do make -- can cause damage to

92

1                    REED MOSHER

2         the walls, but it's usually very local

3         damage to the wall.

4              Where you saw this large scale

5         erosion taking place and the movement

6         of it, it led to the conclusion that

7         the barge wasn't the principal cause.

8              It is other things would have

9         caused the -- caused the failure even

10         if the barge hadn't been there.

11    BY MR. SEYMOUR:

12         Q.    Now isn't it correct that the

13    other examples that you had of barges that did

14    not cause walls to topple, although there were

15    impacts between barges and walls, involved

16    barges hitting embankments in front of walls?

17         A.    They also had hit -- they may

18    have hit embankments and the wall itself.

19    That's a possibility, yes.

20         Q.    So the embankment would absorb

21    some of the force and the wall would absorb

22    some of the force?

23         A.    It depends on the water heights

24    of those.  I would have to go back and look.

25    But one of them you can see that the barge is

93

1                    REED MOSHER

2    above the embankment and actually cut through

3    the wall and is setting [sic] on the wall.

4              So obviously if the barge is

5    through the wall, it is above the embankment.

6         Q.      You mean the barge knocked the

7    wall down there?

8         A.      No.   It actually -- it actually

9    cut through the wall and made a hole in the

10   wall.

11        Q.      It punched through it?

12        A.      Punched through it.

13        Q.      And where did the barge punch

14   through the wall?

15        A.      This was a wall on the MRGO.

16        Q.      Do you know which location that

17   was?

18        A.      I believe it is -- it's at one

19   of the control structures.   I think it's the

20   one on Bienvenue.

21              MR. RAFFMAN:   B-i-e-n-v-e-n-u-e.

22   BY MR. SEYMOUR:

23        Q.      What was the width of the punch

24   that the barge caused through the wall?

25        A.      I don't have an exact

94

REED MOSHER

measurement of -- because I mainly looked at

the picture, it wasn't -- I didn't make a

measurement of it, so I...

     Q.     Barges are a lot longer than

they are wide.  Do you remember whether --

     A.     It was --

     Q.     -- it was the --

     A.     It was --

     Q.     -- the width or the length?

     A.     It was the -- it was a funnel.

It was the width of it that was punching

through through a corner of it.

     Q.     Did you make any detailed

examination of the physical evidence at that

location?

     A.     No.  No.

     Q.     Did you, for example, look to

see whether a gap had been created between the

canal side soil and the wall when the barge

punched through?

     A.     We didn't on that case, but that

wall was a little bit different because it was

a T-wall.

     Q.     Were T-walls generally stronger

95

                         REED MOSHER

1
2      than I-walls?

3           A.      Generally they were stronger

4      than I-walls, yes.

5           Q.      And is it generally true that

6      T-walls did not fail but I-walls did in

7      Katrina?

8           A.      That is true, uh-huh.

9           Q.      So was this stronger T-wall

10     deformed on the sides of where the barge had

11     punched a hole through?

12          A.      Not significantly.  It was

13     actually mainly it punched through the wall.

14     There wasn't significant bowing of the wall at

15     the other sections.

16          Q.      It was like a bullet going

17     through.  There's no --

18              Let me understand.  You mentioned

19     something about a funnel effect at this

20     location, if I remember correctly.  Could you

21     describe exactly what it looked like to you

22     when you examined the site?

23          A.      I'm not clear of what you're

24     saying.

25          Q.      Well, you said it was about the

96

REED MOSHER

1

2    width of the barge but you did not take

3    measurements.

4            A.      Right.

5            Q.      So I don't know if the barge

6    carried through parts of the wall to the side

7    or not.

8            A.      Yeah.  It is actually a picture

9    of -- there is a picture of it.  And actually

10   the barge is in place in the wall.

11           Q.      Stuck like a cork?

12           A.      Yeah.

13           Q.      And where is the picture?

14           A.      I am not sure if it's in our

15   report or not, but it is one that I've seen in

16   other reports.  I think it is actually in -- I

17   believe it is in Dr. Bea's expert witness

18   report.

19           Q.      Do you know whether anyone

20   examined the area underneath -- right

21   underneath the impact of the barge to see

22   whether the force of the barge had created a

23   gap between the canal side soil and the

24   T-wall?

25           A.      I don't know if anyone did.

                        REED MOSHER

1

2          Q.      Would you expect that it would?

3          A.      With a -- right below it, I

4    would expect there might be some, because

5    there -- I mean, it deformed the wall enough,

6    in cutting through it, there would be some

7    movement.  It probably wouldn't be very deep,

8    but it would be some immediately...

9          Q.      Okay.  Why do you say it would

10   not have been very deep, or is it just that it

11   possibly might not have been very deep?

12         A.      Possibly might not have been

13   very deep.

14         Q.      Again, do you know of anybody

15   who -- I gather, since you don't know if

16   anybody looked at it, you don't know if

17   anybody measured its depth?

18         A.      No, I don't.

19         Q.      What is the amount of a gap?

20   What's the minimum size of a gap that is going

21   to cause the problem you described as

22   splitting the levee in two, creating

23   hydrostatic pressure on the wall, and making

24   it easier to lean over and fall?

25         A.      I can't necessarily give you a

REED MOSHER

minimum gap, but it can be very small.  I

mean, even an inch of displacement at the top

of the wall with a gap between would lead to

that, the beginning of hydrostatic cracking

down the wall.

    Q.    Now, were there any other barges

in the Katrina event in the New Orleans area

that hit walls as opposed to hitting

embankments?

    A.    Not that I know of.  I'm trying

to think.  The one that -- on the MRGO was the

most prominent one that I remember.  Other

ones may have hit but gone by or whatever, but

we didn't see much damage to walls due to

something striking them.

    Q.    In your IPET report, is it

generally correct to say that you only found

one example of a wall that failed or a breach

that was made prior to overtopping?

        MR. LEVINE:  Objection.  Are you

       talking about just Volume V or the

       whole IPET report?

        MR. SEYMOUR:  Volume V is fine.

        MR. LEVINE:  All right.  Go

99

REED MOSHER

1    ahead.

2          THE WITNESS:  Would you clarify

3    that a little bit?

4    BY MR. SEYMOUR:

5         Q.    Do you know today of any breach

6    in any of the walls in the New Orleans area as

7    a result of Katrina that occurred prior to

8    overtopping, except for the north breach that

9    you have already testified about?

10         A.    Prior to the overtopping?  Yes.

11    I believe that -- well, 17th Street occurred

12    prior to overtopping.  London Avenue, two

13    breaches along London Avenue occurred prior to

14    overtopping.

15         Q.    Are there any others?

16         A.    Those, I believe, are the -- the

17    ones that we -- that we stated in the IPET

18    report happened prior to overtopping.

19         Q.    Do you remember asserting in the

20    IPET report that the north breach on the east

21    side of the Inner Harbor Navigation Canal was

22    the only breach that occurred prior to

23    overtopping?

24         A.    No.

100

**REED MOSHER**

1

2       Q.     Do you remember testifying to

3  that in your depositions?

4       A.     No.

5       Q.     Do you remember --

6       A.     But that could have been because

7  I wasn't asked about those because it may have

8  been in that deposition selective to just the

9  MRGO litigation.

10      Q.     Well, the deposition will speak

11 for itself, but do you remember testifying to

12 that effect during the Robinson trial, that

13 except for the north breach, all breaches were

14 preceded by overtopping?

15      A.     I don't remember testifying to

16 that.  It is a -- it is a condition.

17           MR. SEYMOUR:  I am sorry.  I

18      couldn't hear the last part of your

19      statement.

20           MR. LEVINE:  I'm going to object

21      generally because he didn't testify

22      regarding the IHNC breaches at the

23      Robinson trial.

24           THE WITNESS:  And I think it's

25      clear in our report that we cite that

REED MOSHER

there were four breaches that occurred

prior to water reaching the top of the

wall.

BY MR. SEYMOUR:

Q.      You mentioned that there were

three foundation breaches, and one that was

caused -- the one that was the north breach.

A.      Uh-huh.

Q.      Where were those foundation

breaches?

A.      The ones that are -- the ones

were 17th Street, two on London Avenue, and

the north breach.  That's four.

Q.      And the 17th Street and London

Avenue Canals are both breaches where you

testified that barges also hit?

A.      The barges hit, no?  The barges

didn't hit those.

Q.      Okay.  Let me -- let me go back

in my notes because I may have taken something

down wrongly.

A.      I mean, those -- that's very

contradictory to what's in the report.  All of

those breaches occurred due to foundation

1                      REED MOSHER

2      failures prior to water reaching the top of

3      the walls.   And they all --

4           Q.     Your recollection is correct,

5      and mine is wrong.

6           A.     And they all --

7           Q.     It was a gap in --

8           A.     And they all show where a crack

9      formed behind the walls without any barge

10     hitting it.

11          Q.     A crack formed, you mean on the

12     protected side?

13          A.     No.   A crack formed on the canal

14     side of the wall.

15          Q.     But the wall did not fail?

16          A.     No, the walls did fail at those

17     locations, but there are also examples where

18     they didn't fail.

19          Q.     So the existence of a gap does

20     not necessarily doom the wall.   Something more

21     might be needed?

22          A.     Yes, uh-huh.   It's a piece.

23          Q.     Did you ever have occasion to

24     review the deposition testimony of a gentleman

25     by the name of William Villabezo?

REED MOSHER

1

2       A.      No.

3       Q.      I represent to you that he said

4  that he saw a large object in the canal, and

5  that he turned away for a moment and he heard

6  a large crack -- or a large sound -- I won't

7  -- I don't want to characterize the sound --

8  and he turned back and the barge was right

9  there and he saw the breach.

10              MR. RAFFMAN:  Objection to the

11          characterization or mischaracterization

12          of Mr. Villabezo's testimony.  You may

13          continue.

14  BY MR. SEYMOUR:

15      Q.      Do you remember ever hearing

16  anything about that?

17      A.      No.

18      Q.      If you had learned of anything

19  like that, would you have considered that

20  important to your investigation?

21              MR. LEVINE:  Objection.  Calls

22          for a hypothetical.

23              MR. RAFFMAN:  Same objection.

24              MR. LEVINE:  You may answer.

25              THE WITNESS:  It would have been

                         REED MOSHER

1

2          some of the things that we were

3          invest -- would have investigated and

4          looked at, but it has to stand up

5          against the other evidence.

6                   We had other eyewitnesses, a lot

7          in some of the other locations, and

8          saying that they saw water and waves

9          coming over the 17th Street wall and

10         things like that.   It was difficult to

11         substantiate their -- what they had

12         seen based on the other evidence that

13         was in the -- that was provided with

14         the actual physical evidence there.

15    BY MR. SEYMOUR:

16         Q.      Were you aware of eyewitnesses

17    within The Lower Ninth Ward that said that

18    there was no water coming over the wall of the

19    south breach before the wall failed?

20              MR. RAFFMAN:   Same objection.

21              THE WITNESS:   I'm not aware of

22         that.   I do believe that probably there

23         was water in the neighborhood and was

24         getting close to that area prior to

25         that breaching coming from the north

105

                        REED MOSHER

2          breach because...

3    BY MR. SEYMOUR:

4          Q.      If you had heard of eyewitnesses

5    who did not see the overtopping before the

6    failure of the south breach, would you have

7    considered that important to your

8    investigation?

9                  MR. LEVINE:  Objection.  Calls

10        for a hypothetical.

11               You can answer.

12               THE WITNESS:  Okay.

13               It would have been important,

14        but our -- in our assessment of it, it

15        only took about fifteen minutes of

16        water flowing over the top of the wall

17        to cause it to occur.  So there --

18   BY MR. SEYMOUR:

19        Q.      The south breach?

20        A.      The south breach.

21               And so, during that short period of

22   time, people may have seen water coming over

23   the -- not coming over the wall until it got

24   almost -- you know, it would have been a very

25   short period of time of water flowing over it

1                        REED MOSHER

2    before it would have looked like it was

3    failing.

4              And once it starts to fail, the

5    wall leans and it shoots water out, so it

6    would -- it would be very hard to distinguish

7    that you had a wall there as it was breaching.

8              And I don't think too many people

9    were around at that time because water was

10   going -- was rising four or five feet an hour

11   -- or four or five feet in an hour's time at

12   that location.  I mean, it flooded it and --

13   and just washed those houses out in a very

14   short period of time.  It may have been a half

15   an hour max for -- before you got complete

16   failure.

17        Q.    Do I understand you rightly to

18   say that the south breach may have occurred

19   before any overtopping?  That the overtopping

20   occurred after the wall was already leaning?

21        A.    No.   What I would have said,

22   that it would have taken just a little bit of

23   overtopping to start the wall to -- you know,

24   a very -- little bit in terms of time, but a

25   tremendous amount of water would have gone

107

REED MOSHER

1

2   over to cause that.  But it didn't take very

3   long for it to take place before the wall

4   would start leaning and more water would start

5   rushing over it.

6       Q.      Now, you testified that the --

7   you did calculations with respect to the north

8   breach and found that the factor of safety

9   went below one at about the eleven feet level;

10  is that correct?

11      A.      Approximately, yes.

12      Q.      And did you do similar

13  calculations with respect to the south breach?

14      A.      Yes.

15      Q.      And what was the water elevation

16  that would cause that particular problem?

17      A.      To go close to one, it had to be

18  above the top of the wall.

19      Q.      Above the top of the wall?

20      A.      Right.

21      Q.      And what was the elevation at

22  the top of the wall?

23      A.      Around twelve-and-a-half feet.

24      Q.      So an extra -- so at eleven

25  feet, that wall would have been safe?

REED MOSHER

1

2      A.      Uh-huh.   And that water to the

3  top of the wall would have been safe.

4      Q.      Now, what was the factor of

5  safety -- do you have anything in this

6  Appendix 11 or Report V that tells what the

7  factor of safety was for the wall at the north

8  breach at nine feet?

9      A.      I believe we did look at several

10  different elevations along there, what the

11  factor of safety was.   I would have to look at

12  it in a little more detail to pick that out.

13  I don't -- I can't pick it out right now, but

14  we did look at several different locations.

15      Q.      You spent a --

16      A.      A lot of them.

17      Q.      You spent a fair amount of time

18  looking at the chart on page V-11-26.   It's

19  called figure 11-12.   Does that give you the

20  answer?

21      A.      This one here?   No.   It doesn't

22  have -- that just gives you the soil

23  stratification.

24      Q.      Okay.   At what point in the

25  Inner Harbor Navigation Canal is this data

109

REED MOSHER

1

2    for?

3          A.      This is for the centerline along

4    the toe of the structure and...

5          Q.      The centerline of the toe and

6    not the levee?

7          A.      Excuse me.  The center -- I'm

8    sorry.  The centerline of the levee.  The next

9    one, 13, gives you the toe, the shear strength

10   of the toe.  You need to have both of those.

11         Q.      And which -- go ahead.

12         A.      And this is the composite

13   strength that we have that we used along that

14   area.  What we would do is, these elevations

15   for the different layers may change a little

16   bit, but the strengths that we have for each

17   of those layers would -- we would use the

18   same.

19             And for the clay layer, that one --

20   the strength of that one for the

21   interdiscipline is something that depends on

22   what is the weight above the soil.  So you

23   find that the shear strength of -- depending

24   on how much weight is above it, you calculate

25   what the shear strength would be, so, you

110

REED MOSHER

1   know, depending on how thick the levee was in

2   the marsh layers at each of these locations,

3   the one at the south breach.

4

5          So you have some different profiles

6   of the soil here.  Let me look at these.  If

7   you look at page 19.  Excuse me.  Figure 19,

8   page V-11-13.  Oh, V-11-31.  Sorry.  Figure 9

9   -- Figure 11-19, and that gives the two

10  profiles that we use for the soil stability

11  analysis for the north breach and the south

12  breach; 18 being the north breach, 19 being

13  the south breach.

14      Q.     I have to confess that I have

15  never studied geotechnical engineering, so I

16  am not even sure, looking at the top figure

17  for the north breach or the bottom figure for

18  the south breach, where the top of the

19  floodwall is.  Is it shown on here?

20      A.     Yes.

21      Q.     Because there seems to be an

22  elevation of zero feet.  And right above that

23  there is a line, but that's --

24      A.     There -- you can actually see

25  it's marked.  There is a top of the floodwall

REED MOSHER

at elevation 12.5.  And that's in the figure

18.  And then you -- also 19 you see that it

also has a line drawn to it that says top of

-- top of wall elevation 12.5.

     Q.    Is this related to the factor of

safety at different water heights?

     A.    This -- no.  What this --

     Q.    I understand it's loosely

related, but is there something that I can --

     A.    Yeah.  Yeah.  I mean, all of the

-- beyond this, you'll see there is a series

of calculation -- results of calculations of

factors of safety.  That's -- and these

profiles come from that area, from these

profiles here, to do those calculations.

     Q.    Are the types of information

that I've been asking about in the little hard

to read grid boxes in the -- towards the upper

right of each of these tables?

     A.    Uh-huh.  It has the different

strength of the soils, unit weights, shear

strength.

     Q.    Okay.  So --

     A.    And provided in -- in there is

112

REED MOSHER

1  kind of a summary of those.

2       Q.      Okay.  I see on page V-11-32,

3  figure 11-20, which seems to be the first of

4  this set, calculations for canal water level

5  equals ten feet with a crack.

6       A.      Uh-huh.

7       Q.      Could you say yes or no.

8       A.      Yes.  That's -- that's what I

9  think is...uh-huh.

10      Q.      And then on the next page it

11 goes to ten-and-a-half feet with a crack, and

12 then at the bottom ten-and-a-half feet without

13 a crack.

14      A.      Uh-huh.

15      Q.      Then 11.2 feet with a crack, and

16 twelve-and-a-half feet with a crack.  Is there

17 anywhere that has got the starting stage, nine

18 feet, no crack?

19      A.      I don't see one of those in

20 here.  We didn't present one of those.

21      Q.      Isn't it a fact that your team

22 concluded, at least by the time of the expert

23 reports, your team and then the Corps of

24 Engineers concluded that the breach occurred

113

REED MOSHER

2    at the ninth water level for the north breach?

3             MR. LEVINE:  Objection.  By

4         expert reports, are you talking about

5         IPET?

6             MR. SEYMOUR:  The December 2008

7         expert reports --

8             MR. LEVINE:  Okay.

9             MR. SEYMOUR:  -- that were

10        turned in at the same time as

11        Dr. Mosher's report.

12            THE WITNESS:  I can't speak to

13        that.  There was -- I think even in

14        here we state that the -- as 11. -- we

15        say 11.1 or something like that.  That

16        may change some due to any wave action.

17            If you have seen the -- the

18        video that CNN and others have done due

19        to Gustav in the canal area, it's easy

20        to see that there would be -- there's a

21        possibility of having a couple feet of

22        waves taking place.

23            That additional wave on top of

24        nine feet could be -- get us at close

25        to eleven and could be the -- enough to

114

REED MOSHER

2      cause that to occur.

3              So we were looking at the

4      static.  We didn't consider the wave

5      part of it.  The waves could be the

6      difference between what we have and

7      what the nine foot would be.

8  BY MR. SEYMOUR:

9      Q.    Dr. Mosher, didn't you

10  previously conclude that the waves were not a

11  big factor?

12              MR. RAFFMAN:  Objection.

13              THE WITNESS:  Well, a factor as

14      far as the dynamic load on the

15      structure, but it could be in the

16      static water -- water pressure.

17  BY MR. SEYMOUR:

18      Q.    Please explain.

19      A.    The part of the -- that we

20  didn't conclude was that we had large enough

21  waves breaking against the structure that add

22  additional hydrodynamic loads to the

23  structure.

24              But what waves can do is they

25      can actually increase the static, the

115

                    REED MOSHER

2        hydrostatic water pressure, because

3        they are like in a bathtub shaking back

4        and forth, the waves will rise -- will

5        actually lift the water, the static

6        level of the water.

7   BY MR. SEYMOUR:

8        Q.      So the waves could cause a crack

9   even if the water level doesn't cause a crack,

10  would that be right?

11       A.      If the waves would be enough to

12  cause the water to go up above that level to

13  cause a crack, they could actually initiate

14  the crack, uh-huh.

15       Q.      Did you estimate the weight of

16  the waves that would cause a crack at the

17  north breach?

18       A.      I don't think we have to

19  estimate the weight of it.  You can just look

20  at the height that would take place.  I mean,

21  we --

22       Q.      No, no, but did you -- did you

23  calculate the amount of force on the wall

24  created by a wave?

25       A.      Calculate?  No, we didn't, not

116

REED MOSHER

2  from a -- either from a static standpoint, or

3  hydrostatic, or from a hydrodynamic

4  standpoint?

5       Q.    Either, either way.

6       A.    We did look at what the

7  hydrodynamic parts of it was, and concluded

8  that they were not substantially different

9  than what would be caused by the static --

10  static change in the water height.

11       Q.    So a three foot wave would be

12  the same as a three foot raise in surge?

13       A.    Yeah, or there wasn't a dramatic

14  difference between that, in that they -- I

15  mean, what -- what happens is, if you have a

16  wave that's breaking and it's slapping against

17  the wall, you get a -- you get a higher force

18  higher than the wall.

19            When you have a wave that's just

20  sloshing up and down, you get more of a --

21  just an increase in the hydrostatic pressure.

22       Q.    Well, a wave that's sloshing

23  presents a push on the wall, doesn't it?

24       A.    But it's equivalent -- roughly

25  equivalent to its static increase in height.

1                    REED MOSHER

2    So what -- you have a two-foot increase, and

3    it ends up as being, two times the unit weight

4    of water is the increased push on the wall.

5            Q.      What was the height of the waves

6    when the water was at nine feet in the canal?

7            A.      I really don't know, but we

8    could see from Gustav it could be a couple

9    feet.

10           Q.      Did you ever do a comparison of

11   the momentum of the barge pressing against the

12   wall versus a wave pressing against the wall?

13           A.      No.

14                   MR. RAFFMAN:   Objection.

15           Well --

16   BY MR. SEYMOUR:

17           Q.      Why?

18           A.      Because at that point we had

19   concluded that -- that there were other causes

20   to the failure of the walls other than the

21   barge, and didn't feel that that was a

22   potential cause for the failure of the walls.

23   They would have failed otherwise.

24           Q.      Isn't it true that when a wall

25   fails, it fails as a result of the cumulative

1                    REED MOSHER

2    forces of all the pressures that are brought

3    to bear upon it at that time?

4          A.    I would, in general terms, say

5    that a failure of the wall is due to the fact

6    that the resistance forces cannot withstand

7    the driving forces at that -- at that time.

8             Now, there can be times when the

9    loads are of such short duration that they

10   don't show up as being a major driving force,

11   they're so short that the soil of the wall

12   cannot respond to them.

13         Q.    What are the dimensions of the

14   barge?

15         A.    I think these are -- I don't

16   know exactly what the dimensions of that barge

17   was.

18         Q.    Did you ever calculate or become

19   aware of the calculation of the weight of the

20   barge?

21         A.    At one time I -- I did, and I

22   was aware of the calculation of what the

23   potential velocity was, and due to the wind

24   driving it with a certain amount of weight --

25   of distance out of the wall, but I can't

119

REED MOSHER

1

2    remember what that -- what those were.

3         Q.     If the barge did hit the wall at

4    the north breach, with all of its mass and

5    momentum, would that have been part of any

6    force against the wall?

7         A.     Uh-huh.

8              MR. LEVINE:  Objection.  Calls

9         for a hypothetical.

10             MR. RAFFMAN:  I'll make an

11        objection, too.  If you now changed

12        your mind and you want Mr. Mosher --

13        Dr. Mosher's expert testimony, you

14        know, I guess, fair is fair.

15             MR. SEYMOUR:  I have to respond

16        to the -- well, let me -- let me ask

17        the question first, because we can

18        shorten this a great deal if Dr. Mosher

19        would be testifying live at trial.

20             Do you intend to use this

21        deposition as a trial deposition?

22             MR. RAFFMAN:  That may very well

23        be.

24             MR. SEYMOUR:  Then subject to my

25        objection, and equally subject to it

120

1          REED MOSHER

2     being stricken by the Court in light of

3     that objection, I'd ask you to answer

4     my question.

5          THE WITNESS:  Okay.  Would you

6     please repeat it since we've had

7     some...

8          MR. SEYMOUR:  Reporter, please

9     read the question back.

10         (Above-requested testimony was

11    read back by reporter.)

12         THE WITNESS:  Yes, I would say

13    it would have been.  And we do see

14    evidence of something striking the wall

15    in the southern part of it.  It's quite

16    high up and it did do some damage to

17    the wall.  I mean we saw pictures of

18    that.  So it did -- you know, if it

19    struck it, it would do some damage to

20    the wall.

21         MR. RAFFMAN:  I just want to

22    make sure that the question was clear

23    that he's talking about the north

24    breach and not the south breach.

25         THE WITNESS:  Are you talking

121

1                    REED MOSHER

2          about the north breach?

3                    MR. SEYMOUR:  North breach.

4                    THE WITNESS:  Oh.  Oh, okay.

5          Sorry.

6                    MR. SEYMOUR:  These are all

7          north breach questions.

8                    THE WITNESS:  Well, then, I

9          don't believe the barge had any impact

10         on what took place at the north breach.

11    BY MR. SEYMOUR:

12         Q.     My question was, if the barge

13    hit the wall at the point of the north breach,

14    would it -- would it have exerted force

15    against the wall?

16                   MR. LEVINE:  Objection.

17         Incomplete hypothetical.

18                   MR. RAFFMAN:  Same objection.

19                   THE WITNESS:  If it did hit it,

20         it would depart some force on the wall.

21         Yeah, I mean, you hit it -- if the

22         barge hits it, it applies some load to

23         the wall.

24    BY MR. SEYMOUR:

25         Q.     And if the barge hits the wall

122

REED MOSHER

1   other than straight on, if it hits at an

2   angle, wouldn't all the force be concentrated

3   at the point of impact?

4            MR. RAFFMAN:  Same objection.

5            THE WITNESS:  Okay.  There is a

6       piece of that.  I have actually studied

7       some of this, so -- barges running into

8       walls, okay.

9            It's a -- it's a part of a load,

10      but it -- when it hits it at an angle,

11      it only receives part of a load.  It's

12      a scraping along there.  And you have

13      to measure the duration it takes.

14           Usually when they hit a wall,

15      like a barge like that, it hits,

16      impact, and bounces off.  And so the

17      load?  The force has to be the pressure

18      versus the time.

19           So it isn't actually the whole

20      weight of the barge striking the wall.

21      It's actually a striking blow that

22      scratches across it and imparts during

23      that period of time.

24           It may only be a few seconds

123

1            REED MOSHER

2         that it actually strikes the wall, and

3         that may not be sufficient to cause a

4         crack or a failure of the wall.

5    BY MR. SEYMOUR:

6         Q.      Doctor, I want to be clear.  I

7    am talking about not the barge coming up

8    against the wall the way that a boat eases up

9    to a dock.

10        A.      No, no, I would say the corner

11   of a barge striking the wall.

12        Q.      The corner of a barge striking

13   the wall dead on.

14        A.      Well, you said at an angle.

15        Q.      At an angle, but that angle

16   strikes the wall dead on.  It doesn't just

17   scrape gently along, but striking the wall

18   dead on but with --

19        A.      Yeah, but you're doing dead

20   on --

21        Q.      -- the corner.  The corner of

22   the barge --

23        A.      Fine.  Then that's --

24        Q.      -- is hitting the wall.

25        A.      Uh-huh.

124

REED MOSHER

1    Q.    The corner is coming at the wall

2    perpendicular to the wall.

3

4    A.    Uh-huh.

5    Q.    Is it going to impart all of its

6    force at the point of impact?  That's basic

7    engineering, isn't it?

8    A.    No, actually, because you

9    have -- it's a -- the force applied is due to

10   the velocity.  I would say part of the

11   velocity is going along the edge of the wall

12   and part of it is going perpendicular to the

13   wall.

14        So you don't get the full -- it

15   isn't the same as having the barge hit dead

16   center of the wall where you have the whole

17   front of the wall striking it.  There is a

18   reduction because it's hit at an angle.  And

19   whatever that angle is, you have to look at

20   that part of it.

21   Q.    My question did not assume that

22   there was any north-south movement of the

23   barge.  We can get into that in a moment.

24        But I would like you to answer my

25   question directly.  If the barge is coming

125

REED MOSHER

1   straight at the wall and hits the wall with an

2   angle, isn't it true that the entire impact of

3   the barge, the entire momentum of the barge is

4   expended upon that one small piece of the

5   wall?

6           MR. RAFFMAN:  I'll -- objection

7       to the hypothetical.

8           MR. LEVINE:  I am going to

9       object to the form, because you just

10      said that the barge hits the wall

11      straight in the wall and then at some

12      angle.  That's --

13          THE WITNESS:  That's

14      contradictory.  The question doesn't --

15          MR. SEYMOUR:  The corner of the

16      barge hits the wall straight on.  I'm

17      trying to make it as clear as I

18      possibly can, and I appreciate anything

19      that you can do to help make it

20      clearer.  But I have a clear question

21      in my mind, and I may need your help to

22      express it clearly, but I need to have

23      a clear answer to...

24          THE WITNESS:  The part -- I

126

                    REED MOSHER

1

2          would say the problem that we have with

3          the question is first you say hit it

4          straight on and then you say at an

5          angle.

6                Okay.  If it is coming in

7          perpendicular to the wall where you

8          would have the -- I mean the only way

9          that can actually happen is if the full

10         front of the wall -- the full front of

11         the barge hits the wall, unless it has

12         some protrusions out in front of it.

13    BY MR. SEYMOUR:

14         Q.     Let me try another time.

15         A.     Okay.

16         Q.     We're talking about -- forget

17    about angles.  We're talking about the corner

18    of the barge.  So the barge is not at a right

19    angle to the wall, but the corner of the

20    barge, the path that that corner takes going

21    across the canal and hitting the wall is at

22    right angles to the wall.  Is that -- is that

23    a clear concept?

24         A.     Okay.  If the motion of the

25    barge is perpendicular to the wall, then that

1                    REED MOSHER

2    could be the case, and then it would impart --

3    whatever the weight of the barge plus its

4    velocity at the time would be the force, but

5    it would have to be traveling perpendicular to

6    the wall.

7         Q.     And that would be a large force

8    in relationship to the water, wouldn't it?

9              MR. LEVINE:  Objection to this

10        hypothetical.

11             MR. RAFFMAN:  Object to the

12        hypothetical.  Again, it's absolutely

13        inconsistent with what the plaintiffs'

14        own experts testified.  I guess you can

15        ask away.

16             MR. SEYMOUR:  I would like the

17        opportunity, yes, without commentary.

18   BY MR. SEYMOUR:

19        Q.     Please.

20        A.     Okay.  You would have to compare

21   that width, okay, with the weight across the

22   section of the wall, whatever the monolith

23   distance is, because what would be resisting

24   that would be -- what you're looking at is a

25   point load applied to the structure versus a

REED MOSHER

2   surface load and across whatever distance the

3   monoliths say.

4            And what would be -- it could be

5   greater than the water load or it could be

6   somewhere close to what the water load would

7   be.  At that particular point, it's going to

8   be much higher than any water load at that

9   point.  That's why we don't see water punching

10  through a wall where you might see the

11  structure punching through the wall.

12           But to provide what resistance

13  would be developed by the wall, you would have

14  to go and look at all the -- you would have to

15  look at it in a three-D nature, not just a

16  cross-section.

17      Q.     Is it correct that the final

18  IPET study stated that if the barge had hit

19  the wall at either point, it would have had a

20  considerable -- it would have added

21  considerably to the impact of the water?

22      A.     Could be.  I can't answer to

23  that.  That was not my statement, if it was

24  made.

25      Q.     Now --

129

REED MOSHER

A.      In -- in general terms, I would
think that, you know, the wall would not do a
very good job of resisting the barge.

Q.      And the barge could then open up
a crack and cause the hydrostatic pressure and
the division of the strength of the levee in
two, as you described?

A.      I wouldn't think it would be the
cause of the -- what we're talking about -- a
crack, the length that we're talking about we
saw on the south breach or the north breach.

Q.      Going back to the tail of the
little touch boy who put his finger in the
dike and prevented more erosion and a widening
of the dike, isn't it true that when you have
a small hole, it tends to become a large hole
in these situations?

A.      Even generally, if you have a
concentration area where water is flowing,
like at a transition or something like that,
it would cause more erosion at that one
location.

Q.      That's right.   And that's what
the phenomenon of -- in a different context --

REED MOSHER

2  piping is all about, isn't it?  You have some

3  water that's coming through the foundation and

4  it erodes away the foundation and it goes up

5  into the levee and erodes away the fill

6  inside?

7       A.     Generally what would happen with

8  piping, to clarify it a little bit so I can

9  answer it, is that you will have on the

10  protected side water causing the soil to move

11  and it will start actually transmitting that

12  soil out to the protective side and then keep

13  eroding back through the levee to cause loss

14  of that material in the levee.

15       Q.      Now, if the barge did knock a

16  hole in the north breach, would you be able to

17  see anything different in terms of the

18  physical evidence other than what you did see?

19            MR. LEVINE:  Objection.

20       Hypothetical.  Vague.  Go ahead and

21       answer.

22            THE WITNESS:  Possibly.  You

23       know, some of the things that we saw,

24       the large movement of a wall, the

25       cracks that extended below where the

131

REED MOSHER

2    actual failure was, I would have

3    thought if the barge had hit at that

4    location, we wouldn't have seen that.

5 BY MR. SEYMOUR:

6    Q.    Are you aware of eyewitness

7 testimony saying that -- we're talking about

8 the south breach again now.  My question was

9 the north breach, but --

10    A.    I know.

11    Q.    -- could you...

12         Was your answer as to the north

13 breach or was it --

14    A.    My answer was to the north

15 breach.

16    Q.    Okay.

17    A.    Yeah.

18    Q.    Going over to the south

19 breach -- let me stay -- I withdraw that.  Let

20 me stay on the north breach for just a second.

21         If I recall your testimony

22 correctly at the beginning of the deposition,

23 you said that there was three feet less of

24 supporting soil on the protected side than had

25 been called for in the design.

132

REED MOSHER

2      A.      Uh-huh, that's correct.

3      Q.      What happened to it?

4      A.      Well, I don't know, okay.  It

5  could be -- I mean, some of the possibilities

6  of it is that they didn't account for that and

7  actually make measurements at that time in

8  that area or there has been -- well, that's

9  the only thing I can think of because it --

10  it's consistent for the whole area.

11         That whole part of the

12  neighborhood, including that, slopes down from

13  what would be the barracks back towards

14  Florida Avenue.  So I believe it was an

15  oversight in the design.

16      Q.      And isn't it also true that the

17  height of the levee walls on the east bank of

18  the Inner Harbor Navigation Canal were not

19  their design height?  At the time of Katrina,

20  they were not their design height?

21      A.      Yeah, they were not.  They were

22  not what was specified as the design height.

23      Q.      You testified very near the

24  beginning of your deposition that part of the

25  Corps of Engineers' responsibility was to

133

1                    REED MOSHER

2    regulate and certify levees that are built by

3    others; is that correct?

4         A.    I believe that is part of that,

5    yes, if they're part of the federal.

6         Q.    And does part of that involve

7    inspection?

8         A.    Yes.

9         Q.    Does the Corps inspect its own

10   levees?

11        A.    I can't answer that.  I believe

12   they do, but I'm not involved in that.

13        Q.    Did you look at any inspection

14   reports for the Inner Harbor Navigation Canal

15   at the points of either the north or the south

16   breaches?

17        A.    I believe we did look at them.

18   I didn't -- I -- I don't remember the details

19   of that.  We do have the copy of a -- what

20   inspection reports were done for the New

21   Orleans district.  Early on, people had --

22   that looked at those reports felt that they

23   were less than satisfactory --

24        Q.    How so?

25        A.    -- as far as --

134

1                     **REED MOSHER**

2          Well, they didn't have as much

3  detail of what the inspections were.  They

4  looked like they were a field trip and not...

5      Q.    I couldn't hear.

6      A.    That they were a field trip and

7  not a detailed inspection.

8      Q.    Did these inspection reports

9  include the actual height of the levee?

10     A.    No, they didn't.

11     Q.    Did they include an examination

12  of whether the designed soil level on the

13  protected side was present?

14     A.    No, they didn't.  They used what

15  was in the documentation, but they didn't

16  include a separate survey.  They didn't

17  include a new survey of this.

18     Q.    Prior to Katrina, what is the

19  last most recent ground level survey that was

20  done of the east wall of the Inner Harbor

21  Navigation Canal?

22     A.    I can't -- I don't remember that

23  offhand.

24     Q.    Do you remember if one was done

25  after its construction?

REED MOSHER

2      A.      There were surveys that -- that

3   have been done.  And one of the problems with

4   those surveys was the benchmarks were off due

5   to subsidence.  And so one of the problems

6   that we had during the IPET study was that the

7   surveys, even if they are done, they were

8   inaccurate -- inaccurate because of problems

9   with the benchmarks, meaning that -- that the

10  data was incorrect.

11      Q.      How long has subsidence been

12  known to be a problem with respect to levees?

13      A.      I would say there was a letter,

14  it's called the Chattery letter, identifying

15  that there was -- he was the chief of

16  engineering for the New Orleans district, and

17  he sent a letter saying that there is a

18  problem with the survey.

19      Q.      Do you know about when?

20      A.      It was either the late -- late

21  '70s or early '80s when that was -- that

22  statement was made, that letter was sent.  It

23  is in the IPET report, and there is a whole

24  section in the IPET report on the geodetic

25  surveys and the benchmarking.

136

                    REED MOSHER

1

2      Q.    Is that one of the appendices to

3   Volume V?

4      A.    No.  It's a separate volume.  I

5   think it's Volume II.  I would have to look to

6   make sure.

7          I can tell you right off.  I

8   believe it's Volume II, but...

9          Yes, it's Volume II.  It's called

10  the "Geodetic Vertical and Water Level

11  Datums."

12     Q.    Is there a date on that

13  reference?

14     A.    Well, this is -- you'll see

15  this, it's -- this is in Deposition Exhibit 4.

16  It has each of the volumes for the IPET report

17  in there and it actually has that information.

18     Q.    If you tell me what page you're

19  looking on, then I can --

20     A.    1-15.

21     Q.    Okay.  That's a general

22  description of Volume II there.

23     A.    Yes.

24     Q.    Okay.  I do not have a copy of

25  it, but I have on my screen Volume II of the

137

1                    REED MOSHER

2    report.  And if you would like to look at it,

3    you're certainly welcome to.  I can blow it up

4    to make it easier to read.  But I thought I

5    would just read it out loud and if counsel

6    wants to come around and make sure that I'm

7    reading it accurately, you're welcome to.

8              MR. RAFFMAN:  I think I might.

9              MR. LEVINE:  You're asking him

10        about Volume II of the IPET report?

11             MR. SEYMOUR:  That's right.

12             MR. LEVINE:  Okay.

13   BY MR. SEYMOUR:

14        Q.    This is on V-104, again, it's

15   right below figure V-80, status of efforts

16   remaining.

17             MR. LEVINE:  Wait.  You are

18        talking about V?

19             MR. SEYMOUR:  I'm talking about

20        Volume II, and they've numbered the

21        page V-104, which is -- Part V is this

22        whole --

23             MR. LEVINE:  Should it have been

24        a number to 104?

25             MR. RAFFMAN:  Come over here.

138

1               REED MOSHER

2          MR. LEVINE:  Yeah, I got it.

3     Sorry.

4          MR. RAFFMAN:  I think this may

5     be a preliminary report.  At the bottom

6     it says, "this is a preliminary report

7     subject to revision.  It does not

8     contain final conclusions of the United

9     States Army Corps of Engineers."

10          MR. LEVINE:  Can you see what

11     draft version we're looking at because

12     there are multiple versions?

13          MR. SEYMOUR:  It does not state

14     "Draft Version" at the top of it.

15          MR. LEVINE:  All the way at the

16     first page.

17          MR. SEYMOUR:  Okay.  Just one

18     moment.

19          MR. LEVINE:  This is the

20     March --

21          MR. SEYMOUR:  10 March 2006.

22          MR. LEVINE:  Right.  It goes --

23          THE WITNESS:  March 2006.

24          MR. SEYMOUR:  But it says,

25     "Final Draft, Subject to Revisions,"

**REED MOSHER**

1

2     so...

3          THE WITNESS:  Yeah, but it's --

4     but it wasn't even the volume -- it

5     wasn't even January -- excuse me --

6     June 1, 2006, so it's back in March.

7     That's a pretty old one.

8          MR. SEYMOUR:  Okay.

9          MR. LEVINE:  Just so the record

10    is clear, I mean there has been

11    multiple iterations of the IPET report

12    and that, to my knowledge, is not the

13    final version of it.

14  BY MR. SEYMOUR:

15     Q.    I mean, the language, however,

16  says, "Although it has been demonstrated" -- I

17  quote, "Although it has been demonstrated that

18  the barge terminal momentum and energy could

19  have been considerable and thus possible

20  contributors to the levee failure at the Lower

21  Ninth Ward, this is not evidence that the

22  barge did contribute to the failure," with the

23  word did underscored, "thus, it is recommended

24  that other types of forensic evidence be

25  sought, including indications of whether

140

REED MOSHER

1   evidence of substantial impact of the

2   floodwalls was present on the barge and as

3   much as possible about the mooring arrangement

4   and conditions of the mooring lines after

5   levee failure.  Other types of forensic

6   evidence may also be available."

7            Were you aware that that paragraph

8   was in Volume II?

9              MR. LEVINE:  Wait a minute.  I

10        just want to make an objection that

11        that might not be from Volume II.

12        That's listed from page V-104 of a

13        March 2006 draft of the IPET report, so

14        I don't know what that document --

15              MR. SEYMOUR.  I'll also modify

16        the question.

17              MR. LEVINE:  Yeah.

18              THE WITNESS:  Okay.

19   BY MR. SEYMOUR:

20        Q.   Were you aware that that was in

21   Volume II of the March 10th, 2006 draft?

22              MR. LEVINE:  I'm going to

23        object, I don't even know if that's

24        Volume II.

REED MOSHER

1

2          THE WITNESS:  It's not in Volume

3       II.  It would be in Volume -- I am

4       pretty sure it's in Volume IV, the

5       storm.

6          That was a preliminary report

7       and I believe those were -- yes, after

8       that time -- after March 2006, right?

9       Is that what that date was?

10   BY MR. SEYMOUR:

11       Q.    March 10th, 2006.

12       A.    Yes.

13          MR. LEVINE:  Right.

14          THE WITNESS:  After that time

15       was when we discovered the -- some of

16       the clock data and the additional

17       flooding that took place down in that

18       area that -- which led us to the reason

19       why the Ninth -- why the north ward --

20       the north breach occurred.  So, I mean,

21       at that time, we hadn't even had all of

22       the clock survey.

23          That probably was a report that

24       was issued on -- as part of our review

25       with the ASCE, talking and answering

142

REED MOSHER

1

2          some of those questions.  So it is by

3          no means a final report.  And -- and

4          there was sufficient -- there was

5          sufficient other data being gathered at

6          that time.

7     BY MR. SEYMOUR:

8          Q.     Well, let me clarify what I said

9     about Volume II.  On the front page it says,

10    "Report II of a series."  So that doesn't make

11    it Volume II.

12         A.     Right.

13         Q.     But, with that clarification,

14    were you aware of that at the time?

15         A.     At the time, probably, yes.  I

16    mean, we had discussions about the barges and

17    things like that, and trying to find out, you

18    know, information about it.

19              That was primarily done by the

20    group that was doing the clock surveys and the

21    other part, trying to find the heights of the

22    water and things like that, and the timing of

23    what took place.

24              MR. LEVINE:  Sorry.

25              THE WITNESS:  So that would have

143

1            REED MOSHER

2       been Bruce Ebersole's and Brian Resio's

3       volume.

4            MR. LEVINE:  Is there a way to

5       get that -- a copy of that so we can

6       attach it to the record?

7            MR. SEYMOUR:  Sure.

8            MR. LEVINE:  Okay.

9            MR. SEYMOUR:  Actually, I can

10      email the front page and that page

11      right now or email the entire document

12      right now, assuming I can get on -- or

13      we can just do it at the lunch break.

14           MR. LEVINE:  Yeah.  Lunch?

15           MR. RAFFMAN:  Whatever is your

16      pleasure.  I'd just assume have you

17      continue your examination and get as

18      far as you can.

19  BY MR. SEYMOUR:

20      Q.    We were talking about the

21  physical evidence at the north breach would

22  have been different if the barge hit, and you

23  had said possibly, and then have you finished

24  talking about what the possible differences

25  might be in physical evidence?  I said not

144

REED MOSHER

1    necessarily it would be there, but possibly it

2

3    would be there.

4        A.      I believe I have.

5        Q.      Then let me ask you the same

6    question with respect to the south breach.

7            Is there any physical evidence that

8    would necessarily be different than what you

9    observed if the barge had hit the south

10   breach?

11       A.      Well --

12       Q.      Let me clarify that question.

13           Would there be any difference in

14   what you had observed if the barge had been a

15   contributing factor to the collapse of the

16   floodwall at the south breach?

17           MR. LEVINE:   Objection.   Calls

18       for a hypothetical.

19           THE WITNESS:   Okay.   I -- yeah,

20       I think there would have been some

21       differences if it had been the primary

22       cause because it would have been a more

23       focused erosion and not -- not as long

24       a trench as we saw.   And based on what

25       I saw as evidence of the -- where the

1                    REED MOSHER

2         barge -- where they believe the barge

3         hit at the southern part of it, that

4         wall wasn't actually -- where it hit

5         wasn't actually pushed out into the

6         neighborhood like it was farther up

7         on the south breach.

8              And so it's -- you know, it

9         doesn't seem to match up to where the

10        primary damage is versus where the

11        location of where we saw potential

12        damage from a barge hitting it.

13   BY MR. SEYMOUR:

14        Q.     Where were you saying the barge

15   was pushed out in the neighborhood?

16             MR. RAFFMAN:  Objection.  He

17        said the floodwall was pushed in the

18        neighborhood, not the barge.

19             THE WITNESS:  Yeah, I did say

20        the floodwall.

21             MR. SEYMOUR:  I apologize.

22             We have just five minutes left

23        on the tape, so why don't we take a

24        break right now.

25             MR. RAFFMAN:  All right.

146

1                    REED MOSHER

2              THE VIDEOGRAPHER:   One moment.

3        We're going off the record.   This is

4        the end of videotape number 2.   The

5        time is now 12:22.

6                   (Lunch recess.)

7                   (Mosher Exhibit No. 5 was marked

8        for identification.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

147

```
 1              REED MOSHER

 2            AFTERNOON SESSION

 3            THE VIDEOGRAPHER:  We are back

 4      on the record.  This is the beginning

 5      of videotape number 3.  The time is now

 6      1:37.

 7  BY MR. SEYMOUR:

 8       Q.    Dr. Mosher, when we broke, we

 9  were talking about the physical evidence of

10  the south breach.  And you had said that a

11  floodwall was pushed into the neighborhood --

12       A.    Uh-huh.

13       Q.    -- which had not occurred like

14  that for the north breach.

15            Are you aware of eyewitness

16  testimony that people heard a scraping sound,

17  loud scraping sounds, prior to the south

18  breach but after the north breach?

19       A.    I'm aware that they heard

20  sounds.  There are also people who reported

21  things like almost like a popping or shotgun

22  shells going off, things like that, noises

23  coming from the wall, which is not surprising

24  seeing as that the wall, as it was deformed,

25  it was being flexed and the concrete popping
```

148

REED MOSHER

2    off the wall as it's being flexed would have

3    been very loud sounds occurring during that

4    time.

5          Q.      I am specifically asking about

6    scraping sounds and objects scraping against

7    the wall.  Did you hear of such eyewitness

8    testimony?

9          A.      No, I did not.

10         Q.      If you had heard of such

11   eyewitness testimony --

12               MS. EL-AMIN:  Objection.

13         Hypothetical.

14               MR. SEYMOUR:  If you would let

15         me get my question out first, I'd

16         appreciate it.

17   BY MR. SEYMOUR:

18         Q.      If you had heard of such

19   eyewitness testimony, would you have

20   considered it important?

21               MS. EL-AMIN:  Objection.

22         Hypothetical.

23               MR. RAFFMAN:  I'll join.

24               THE WITNESS:  Possibly, but, you

25         know, I'm not sure what they -- what

149

                    REED MOSHER

1
2          was -- when it was.  You know, it would
3          have helped to have a lot more detail
4          to have it be useful.
5   BY MR. SEYMOUR:
6          Q.      Would it be fair to state that
7   the wall of the Inner Harbor Navigation Canal
8   on the east side at the location of the south
9   breach was weakened before Katrina?
10         A.      Weakened before Katrina.  That's
11  -- I would have to know more what you mean by
12  that.
13         Q.      Was it at its design elevation?
14         A.      It was not at its design
15  elevation so it provided less protection than
16  what it was intended in the design.
17         Q.      How much did it fall short of
18  its design elevation at the point of the
19  breach?
20         A.      The top of the wall was at 12.5,
21  thereabouts, and it could vary along there,
22  but around 12.5, and it should have been
23  around 14 foot.
24         Q.      And was it lower than 12.5 at
25  any points along that south breach area?

150

REED MOSHER

1

2      A.      Yeah.  From the surveys and

3  information, it could vary along there, but I

4  mean, the wall wasn't perfectly leveled across

5  in there.  It could vary as much as maybe six

6  inches along the wall.

7      Q.      Is there -- was all the soil

8  behind the wall that was supposed to be there?

9      A.      Are we talking about the --

10      Q.      At the location of the breach.

11      A.      -- south breach?

12      Q.      Yes.

13      A.      The south breach was probably

14  pretty close to what the design was.  And

15  when -- when you say behind, do you mean the

16  protected side?

17      Q.      On the protected side.

18      A.      Yeah.  It was close to the

19  design height at the south breach, you know,

20  but in the New Orleans area there is a lot of

21  settlement that goes on, subsidence taking

22  place, so it may have an effect, but I'd say

23  it was close to what was the intended design.

24      Q.      What do you mean by close?

25      A.      You know, within -- let me see

151

REED MOSHER

1

2 if I can find it.  I want to go back and look

3 at the document.

4        Q.     Which document?

5        A.     Number 3, Deposition Exhibit

6 Number 3, the Appendix 11.  And I'm looking at

7 -- I'm looking at page V-11-28.

8        Q.     Which of the two figures on the

9 page are you referring?

10        A.     I'm actually looking at both of

11 them, okay, and I have to do a little bit of

12 converting here because the design one is

13 based on the elevations at the design where

14 the top one is based on NAV -- NAVD88.

15        The design called for, if you look

16 at the bottom figure right at the bottom slope

17 before it goes into the ditch area, a minus

18 three.  That's really -- it should be about a

19 foot-and-a-half lower than that, so that would

20 be about four-and-a-half feet.

21        If you look in the sec -- minus

22 four-and-a-half feet.  If you look in the top

23 picture, there the elevation close to where

24 three -- where the south breach is, it's --

25 four-and-a-half feet would have been that one,

152

REED MOSHER

2  and this one was a little lower.  So it was

3  about almost minus five-and-a-half, so it was

4  about a foot different than the design.

5          Q.      I mean, just for the record --

6          A.      I mean just trying to take a

7  quick look at it based on what that said.

8          Q.      Just for the record, in looking

9  at charts like the one of figure 11-14, what

10  do the minus figures signify?

11          A.      That is the -- that is the toe

12  profile running along the toe of the levee.

13          Q.      But what does a −2 mean?

14          A.      Elevation −2.

15          Q.      What is 0.?

16          A.      That is sea level.  So it's four

17  feet below, five feet below sea level.

18          Q.      And what is the distance in

19  feet?

20          A.      That is the distance running

21  from the south to the north.  So --

22          Q.      And --

23          A.      -- so up here at roughly 3,000,

24  land it's almost 4 -- almost 3,400 would be

25  where the north breach is.

153

REED MOSHER

1

2      Q.      And where would the south breach

3  be?

4      A.      I believe the south breach, I

5  would have to look a little bit, but I think

6  it's somewhere around 1,000, in that area.  I

7  would have to go back and measure it to make

8  sure, but it's in that.

9      Q.      Given that the soil behind the

10  wall was about a foot less than it should have

11  been and that the height of the wall was about

12  a foot-and-a-half less than it should have

13  been --

14      A.      Uh-huh.

15      Q.      -- is it fair to call this wall

16  weakened?

17      A.      I won't call it weakened because

18  that implies something else, but I would call

19  it not able to provide the protection it was

20  expected to provide.

21      Q.      Have you ever heard of the term

22  an eggshell skull?

23      A.      Excuse me?

24      Q.      An eggshell skull.

25      A.      Skull?

154

1                    REED MOSHER

2          Q.      Yes.

3          A.      No.

4          Q.      Have you heard the term egg

5     shell levee in this case?

6          A.      Egg-shelled levee?

7          Q.      Yes.

8          A.      No.

9          Q.      Is it correct that if you have a

10    weaker levee than was designed, it takes less

11    force to breach it?

12         A.      Well, if you have a shorter

13    levee than originally designed, you have less

14    protection.  If you have weaker soils than

15    what was designed, you have a weaker levee.

16    The driving forces, whatever they may be,

17    would have a bigger effect or get you closer

18    to a factor of safety of one or less if you

19    have weaker soils in the levee.

20             And that's what I mean -- that's

21    what I would mean by weaker or -- or if you

22    have a smaller profile and less soil, it would

23    reduce your resisting forces, and you would

24    have less resisting forces to the driving

25    forces.

155

1                        REED MOSHER

2          Q.     If you turn to Exhibit 2, which

3    is Volume V of the IPET report, and turn to

4    page V-102.

5          A.     Yup.

6          Q.     You will see figure 82.

7          A.     Correct.

8          Q.     Is this from an area -- is this

9    photograph from an area just north of the

10   south breach?

11         A.     It is in an area between the

12   north and south breach.  I would say it's not

13   just about, but it's maybe closer to a third

14   of the way up or so.

15         Q.     By "a third of the way," how

16   many feet would you estimate?

17         A.     Just looking at the figure, I

18   haven't got it measured here, but it looks

19   like it's more than 500, maybe close to 1,000

20   feet above it.

21         Q.     I'd like to pass you -- pass the

22   court reporter first -- a document that is

23   being marked as Plaintiff's Exhibit -- excuse

24   me, Deposition Exhibit 6.

25              Deposition Exhibit 5 will be the

156

REED MOSHER

1

2      one that was printed out.  But deposition

3      Exhibit 6.  And it's only page 156 that's

4      included in the proffer.  The rest is there

5      just for context.

6                  (Mosher Exhibit No. 6 was marked

7           for identification.)

8                  THE WITNESS:  This is expert

9           report in Robinson and U.S., versus

10          Robinson U.S. and it's Bruce Ebersole's

11          report.

12     BY MR. SEYMOUR:

13          Q.    And that's dated about the same

14     time as your report, isn't it?

15          A.    The expert report, yes, uh-huh.

16          Q.    Just one day apart?

17          A.    Yeah.

18          Q.    Could you say yes?

19          A.    Yes.

20          Q.    Thank you.

21              On figure 105 of his report, is

22     that the same photograph that you have in --

23          A.    Uh-huh.

24          Q.    -- the IPET report on page

25     V-102?

157

REED MOSHER

1

2       A.      I believe it is the same report.

3       Q.      Do you see that he locates this

4   photograph as being just north of the site of

5   the southern breach?

6       A.      Uh-huh.

7       Q.      Could you say yes?

8       A.      Correct.  He's -- that's what it

9   says in his report.

10      Q.      Does that refresh your

11  recollection as to whether this is just north

12  of the southern breach?

13      A.      Well, I do not believe that what

14  I said was any different than what I would say

15  by looking at this.  He has no distance here,

16  does he?  No, that's not the breach.

17          And by viewing this, I see a pipe

18  crossing down here farther down the wall.  You

19  can see it actually in the picture.  I believe

20  that's well over a couple hundred feet down.

21  And that pipe -- and it still looks like there

22  a wall is still standing for some distance

23  beyond that.

24          So I still think that this is 500

25  to 1,000 feet above the breach.

158

REED MOSHER

Q.     Do you have any record or notes that shows where the various photographs were taken?

A.     I really -- I don't on these, other than knowing where they were located, you know, in general terms, but there was a continuous scour along this wall between the two -- two sites.  And this was actually put into the report to just give an example of what that scour looked like as opposed to a documented case that we needed to have a distance to.

Q.     I looked through your reliance materials that the government was kind enough to provide to us, and I did not find there or anywhere in Volume V of the IPET report or anywhere in your expert report, Exhibit 1 to this deposition, any information comparing the soil characteristics of the area that breached with the immediately adjacent area that did not breach.

A.     Okay.

Q.     Is there such a thing?  Is there such a comparison?

159

REED MOSHER

1

2      A.      There would be -- I believe

3   there is borings -- and let me just refresh my

4   memory here in looking at the...

5            Well, first of all on page V-11-24

6   in the Deposition Exhibit 3, there is a

7   profile figure 11-9 that runs along the

8   centerline of the levee going from north to

9   south which shows the soil conditions

10  comparing those as far as elevations and

11  locations.

12            MS. EL-AMIN:   What page is that?

13            THE WITNESS:   That's V-11-24.

14  BY MR. SEYMOUR:

15      Q.      Yes, I have the page.

16      A.      And if you look at the previous

17  page of V-11-23, in figure 11-28 there's a

18  series of borings that were taken, the ones in

19  red that were along there, and those are -- I

20  believe they're provided in the document, in

21  the IPET report, that have different borings

22  along those locations.

23            And the overall results that we

24  have here at V-11-26 and V-11-27 is the

25  composite of those results showing the soil

1                    REED MOSHER

2     conditions.

3          Q.     Can you -- can you explain to me

4     on pages V-11-26 and V-11-27 in Deposition

5     Exhibit 3 how I could find information about

6     the adjacent areas, one which failed and one

7     which did not, with respect to the south

8     breach or the north breach?

9          A.     Okay.   And what you would have

10    to do is use these soil conditions with these

11    different profiles that you see here at 11-25

12    to construct cross-sections for each one of

13    those.

14          So could you take the measure --

15    the information from figure 11-13, 11-15 and

16    the cross-sections at this location and the

17    information we showed where we have the

18    different profiles for the toe, and you could

19    use those -- that information to construct

20    different profiles of all those locations.

21          We chose the ones that we did at

22    that location because they were representative

23    of the conditions at those two sites to do the

24    comparisons of the factors of safety.

25          As you can see from the -- from

REED MOSHER

1

2   these diagrams, there's not a significant

3   amount -- there's not a lot of difference in

4   the strength of the soils that run along here

5   from the composites, and there's only mainly

6   differences in some of the heights of the

7   levee fill which would be the crown positions,

8   and then information about the toe side in

9   those slopes.  And that -- that information is

10  out there in the LIDAR data if you want to go

11  find it.

12       Q.    Looking at just page 11-12, how

13  do I know which of these symbols refer to the

14  area that -- of the south breach that is

15  closest to that picture that we just showed

16  with a large scour in the wall that did not

17  collapse and the closest boring for a part of

18  the wall north of that breach that did not

19  collapse?

20       A.    And basically what you're going

21  to have to do is, because the interdiscipline

22  -- interdistributary clay layer was the main

23  controlling factor, okay, in that.  And the

24  shear strength of that is a -- is controlled

25  by or is equal to .23 times the other -- times

162

REED MOSHER

1    the overburden pressure for that shear

2

3    strength.

4         And so that's how you interpolate

5    from one location to the other, by looking at

6    how much soil is above that to determine what

7    that soil strength is.  So what we are showing

8    here is a plot showing that, yes, this matches

9    the -- the CPT data at this location where

10   this boring was taken, but you can transport

11   this to any other location just by using that

12   formula.

13        And it's a well-known method called

14   SHANSEP established by Chuck Ladd at MIT.  And

15   he actually reviewed our test data as we were

16   doing this to make sure we were in the

17   right -- right realm.

18        Q.    I assure you, it may be

19   well-known to you but it is Greek to me.

20        A.    Yeah.  But it is -- it is a

21   standard practice now of representing shear

22   strength based on the ratio between the

23   underlying shear strength divided by the

24   overbearing pressure.

25        Q.    Among those with expert in the

163

REED MOSHER

1     field?

2         A.     Uh-huh.

3         Q.     Now -- could you answer yes or

4     no?

5         A.     That is true, uh-huh.

6         Q.     Okay.  But looking on page

7     V-11-26, is there any symbol that you can

8     identify that refers specifically to the

9     boring that -- for an unbreached part of the

10    wall; that is, the closest boring that was

11    taken to the south breach?

12        A.    I can't right now based on this

13    data.  I would have to go back and look at the

14    other -- other pieces of data.

15        Q.    And would your answer be the

16    same with respect to the next page, V-11-27,

17    with figure 11-13?

18        A.    Correct.  In terms of, though,

19    this variation in shear strength at both

20    locations, we believe are the same for the --

21    for the clay layer, whether it's -- it's the

22    same soil and same behavior, it has the same

23    characteristics of what -- how it was placed,

24    deposition, and we believe that at the south

164

REED MOSHER

2  breach and at the north breach, it still has

3  the same shear strength versus depth.

4      Q.    And is that true also, the same

5  shear strength for the part of the wall that

6  did not collapse between the north and south

7  breaches?

8      A.    Yes, uh-huh.

9      Q.    So what was different about the

10  area of the south breach that collapsed?

11      A.    Okay.   The south breach was that

12  it had water flowing over the top of it,

13  caused it to erode.   It may have a lower

14  profile at that location.   You know, there may

15  be a slight difference in the elevation of the

16  wall at that location, but it had erosion,

17  effectively, so its shear strength didn't

18  control that.   It was the water flowing over

19  the top of --

20      Q.    You say there --

21      A.    South breach.

22      Q.    You say there may have been a

23  difference in elevation.

24      A.    Right.

25      Q.    Do you have anything to add to

165

REED MOSHER

2    your testimony before that there was not much

3    difference of elevation?

4         A.    Right.   But it doesn't take a

5    lot of difference when water is flowing

6    because it will go to the lowest area to flow

7    over.

8         And this is one of the challenges

9    of doing an after action, after the wall is

10   actually gone, to knowing exactly what that

11   elevation would have been.   We know that it

12   varied.   The part that's left, it does vary

13   some along there.

14        But in that location where the wall

15   is no longer there, we can't really say

16   because we don't have survey data to specify

17   that.

18        Q.    Would it be fair to say that

19   your testimony as to the south breach is a

20   hypothesis?

21             MR. RAFFMAN:   Objection.

22             THE WITNESS:   No.   I am saying,

23   knowing the elevation, we don't -- we

24   don't have clear information there, but

25   we have clear evidence that erosion was

166

                    REED MOSHER

1

2       the cause of the failure.

3  BY MR. SEYMOUR:

4           Q.      Okay.  Do you have any clear

5  evidence that the barge did not contribute to

6  the failure of the wall?

7           A.      We have clear evidence that it

8  wasn't a primary cause of -- cause of it,

9  because the erosion was.

10          Q.      If the barge makes the wall lean

11  by scraping against it and weakening it,

12  doesn't that increase erosion?

13               MR. RAFFMAN:  Objection.

14          Hypothetical.

15               MS. EL-AMIN:  Same objection.

16               THE WITNESS:  If the barge is

17          scraping along the wall, I would be

18          surprised if -- if it was scraping and

19          moving along the wall, it would have

20          enough force to cause the wall to lean

21          relative to how much water was on

22          there.

23  BY MR. SEYMOUR:

24          Q.      Did you calculate the amount of

25  force that a barge scraping along that wall

167

REED MOSHER

2    could have exerted upon the wall?

3        A.      I didn't actually do the

4    calculations, but I know if it's scraping

5    along the wall, it can't be -- it's -- it's --

6    at an angle I have an idea of how much that

7    would be.

8        Q.      You testified earlier that the

9    wave action put additional pressure on the

10   wall and could have been enough to open up a

11   gap.

12       A.      Uh-huh.

13       Q.      Do you have any scientific basis

14   for concluding that the barge would not have

15   had at least that much effect?

16       A.      I have not done those

17   calculations.

18       Q.      Going back to the wave action,

19   is the height of the wave in the center of a

20   body of water like the canal the same as the

21   height of the wave at the edge of the canal?

22           MR. RAFFMAN:  Objection.

23       Foundation.

24           THE WITNESS:  The other part,

25       I'm not an expert in -- in wave effects

168

REED MOSHER

2          and things likes that, but just general

3          knowledge would be that I would expect

4          that they could be different.

5     BY MR. SEYMOUR:

6          Q.     They'd be damp down the sides,

7     wouldn't they?

8          A.     Well, it actually could peak at

9     the sides because they're pushing up against

10    the wall and then running up and so they have

11    a boundary condition that would stop them and

12    they would have to make a high wave at the

13    wall.

14          They can't be continuous.

15          Q.     Okay.

16          A.     So the energy has to go

17    somewhere and it goes in raising the height of

18    the -- height of the water.

19          Q.     I just want to make clear that I

20    have -- that my memory is accurate for your

21    earlier testimony.  Sometimes you speak with

22    low voice and it's hard for me to hear and I

23    may make the wrong judgment about what you

24    just said.

25          A.     Right.

                        REED MOSHER

1

2       Q.      So I make mistakes, too.

3               But if I recall correctly, you said

4       that -- in your earlier testimony that there

5       were waves that were coming over the wall and

6       producing water on the other side that can

7       start erosion; is that correct?

8       A.      I did not say that here.

9       Q.      Okay.  Well --

10      A.      No, no.

11      Q.      -- is it true?

12      A.      Well, in this case, where I know

13      that it -- that it could have happened, it's

14      on the levee systems and things like that.

15      And at certain times in -- I didn't talk about

16      it in this previous deposition, or in this

17      deposition, but it is likely that as the water

18      got close to the top of the wall and there was

19      waves in there, that those waves would raise

20      above from what is the surge level, and you

21      would have some water going over the walls due

22      to that wave action.

23      Q.      I thought I had recalled your

24      talking about waves being a couple of feet

25      high, maybe two to three-and-a-half feet high.

170

                    REED MOSHER

1

2          A.      I said a couple feet high, I

3    believe.

4          Q.      And --

5          A.      Could be, I said.

6          Q.      And is the wind one of these

7    pressures against the east wall of the levee

8    also?

9                  MR. RAFFMAN:  Objection.

10        Incomplete.

11                 MS. EL-AMIN:  Same.  Foundation.

12   BY MR. SEYMOUR:

13        Q.      If you don't know, you can say

14   you don't know.

15        A.      I would expect that there would

16   be some, but I don't know what the value would

17   be, and it would be -- going back and forth,

18   it would be on both sides at times.

19        Q.      Okay.  And is the wind also

20   pushing the water against the levee?

21        A.      Against the walls?

22        Q.      Against -- I'm merely talking

23   about the east wall right now.

24        A.      Yeah, yeah.

25                 MR. RAFFMAN:  Objection.  Again,

171

REED MOSHER

1

2      incomplete hypothetical.

3             THE WITNESS:   The wind is what

4      generates the waves.   To an extent,

5      that would be, yes, sir.

6  BY MR. SEYMOUR:

7      Q.      So if the waves are there, the

8  wind is pushing the waves?

9      A.      There's some of that and there's

10  also some sloshing back and forth.   There's

11  actually energy in the water.

12      Q.      Are you aware that one end of

13  the Industrial Canal was closed off at the

14  time of Katrina, that the lock gates were

15  closed?

16      A.      Yes.

17      Q.      You mentioned a couple of times

18  that -- I withdraw that.

19             Who did you rely on for

20  hydrological information in your report?

21      A.      It was actually the folks that

22  -- for the IPET report.   It was Bruce Ebersole

23  and Don Resio were the leads for that and it

24  was Volume IV of the report.

25      Q.      And for your expert report, who

172

REED MOSHER

1
2   did you rely on for hydrological information?

3       A.    Well, I would actually like to

4   use the terms of a hurricane surge and wave

5   action.  That's what -- what we're talking

6   about.  And those would also be primarily

7   Bruce Ebersole is the -- his expert report

8   here.  But we also Joannes Westerink at Notre

9   Dame has also made a contribution to that.

10      Q.    Is Dr. Ebersole an employee of

11  the Corps?

12      A.    It's Mr. Ebersole, and he is an

13  employee of the Corps.

14      Q.    Is he a professional engineer?

15      A.    I don't know.  I'd have to look

16  what he says.

17      Q.    And do you know if Dr. Westerink

18  is an engineer?

19      A.    I don't know.  I know that he is

20  an expert in hurricane modeling.

21      Q.    Do you know what training

22  Mr. Ebersole had for his information of the

23  effects of, well, waves and water, as you

24  described it?

25      A.    In general terms, I don't think

173

1                          REED MOSHER

2      it probably would be good for me to be

3      testifying to his expertise, other than I know

4      that he's had over 30 years experience working

5      in the coastal regions in ocean engineering

6      type work.

7              He has a C -- CV.  It was in this

8      report that you provided.  You can probably

9      find that information there.  And it was

10     covered at the trial.

11         Q.    For your expert report, which is

12     Exhibit 1 to this deposition, did you rely on

13     anyone besides Dr. Ebersole and Dr. Westerink

14     for hydrological information?

15         A.    Yes.  Don Resio on some wave

16     information dealing with -- particularly with

17     the MRGO levees.

18         Q.    Did you do anything to check

19     their calculations?

20         A.    No.  I relied upon their expert

21     work.  That is not a field that I am an expert

22     in, so...

23         Q.    Did you rely to any extent on

24     the work of an engineer by the name of Steven

25     Fitzgerald?

174

1              REED MOSHER

2        A.     I didn't.  I was interested in

3    getting some information from him, but it kind

4    of came through Bruce, on looking at how much

5    water from the MRGO would go into that area

6    and how much would go into that.

7              Yes, I did get some information.  I

8    forgot about that.  But I didn't use that in

9    my export report.  I was merely doing that as

10   a check to see what would have been the

11   difference of a flooding had it been -- if the

12   walls hadn't failed at the IHNC.

13        Q.     Hypotheticals?

14        A.     Hypotheticals, yeah.

15        Q.     Well, it's clear that nobody

16   wants you to talk about hypotheticals.  So did

17   you ever read Mr. Fitzgerald's report?

18        A.     Expert report, no.

19        Q.     Have you ever had any

20   conclusions form Mr. Fitzgerald's either work

21   or report called to your attention?

22        A.     During the trial, I believe I

23   was asked some questions about elevations,

24   elevations of the levees that were based on

25   Mr. Fitzgerald's work.  And I think that was

175

1                    REED MOSHER

2    primarily all that was asked about his -- his

3    work.

4         Q.    Do you know whether Dr. Ebersole

5    -- well, I forget.  Is it Dr. or Mr. Ebersole?

6         A.    Mr.

7         Q.    Mr.  Do you know whether

8    Mr. Ebersole approved Dr. Fitz -- or

9    Mr. Fitzgerald's work?

10        A.    To -- as for the expert report?

11        Q.    That's right.

12        A.    I do not know whether that --

13   whether he did or he didn't.

14             MR. SEYMOUR:  I ask the court

15        reporter to mark as Exhibit 6 to the

16        deposition, and hand copies to counsel,

17        excerpts.

18             THE COURT REPORTER:  5?

19             MR. RAFFMAN:  It would be 7.  5

20        is the excerpt that you...

21             MR. SEYMOUR:  That's right.  It

22        would be 7.  It would be 7.

23        (Mosher Exhibit No. 7 was marked

24        for identification.)

25   BY MR. SEYMOUR:

176

REED MOSHER

1

2          Q.      And, again, I provide it more

3     for context, but the only part that I'm really

4     making part of this proffer is the chart that

5     is at the top of page 17 showing the location

6     of various hydrographs.

7          A.      Uh-huh.

8          Q.      And then the charts themselves

9     on pages 22 and 23.

10              Let me ask you first about figure 7

11     on page 17.  Have you seen that chart showing

12     the location of hydrographs before?

13          A.      I haven't seen this, no.  This

14     would be my first look at that.

15          Q.      Does this correspond with other

16     information that you had, or does it strike

17     you as being incorrect in some way?

18                  MR. RAFFMAN:  Objection.  Form.

19                  THE WITNESS:  Yeah.  I wouldn't

20          like to make a statement about this

21          just in general terms because I haven't

22          really studied it, so...

23     BY MR. SEYMOUR:

24          Q.      Well, I am just talking about

25     figure 7 on page 17.

177

REED MOSHER

A.    Oh.  I mean I understand where
it is, right.

Q.    And I'm asking about, you
referred to hydrographs in your report, and I
want to find out if your general sense of the
location of hydrographs corresponds with
what's on figure 7 or whether it differs from
what's on figure 7.

MR. RAFFMAN:  Objection.

THE WITNESS:  What you asked is
unclear.  Could you -- could you try to
clear that up?

BY MR. SEYMOUR:

Q.    Do you know of any hydrographs
that you relied upon in your report that are
not indicated in figure 7?

A.    I didn't use any of these
hydrographs in my expert report because these
are all interior.

Q.    These are all land side,
protected side, correct?

A.    Yeah.

Q.    You do refer in your report to
water levels that existed within The Lower

178

**REED MOSHER**

1

2    Ninth Ward at various times.

3          A.     Yes.

4          Q.     Did you rely upon any

5    hydrographic information for that?

6          A.     Hydrographic in terms of the

7    work that was done for IPET and Volume IV.

8    This is the clock survey information and other

9    levels, and they reconstructed a hydrograph

10   based on that, and it's in -- it's in Appendix

11   11.

12         Q.     Do you -- I believe you had in

13   your report, either in your report or in

14   Volume V of the final IPET report, a location

15   as to where the reports of depth were that you

16   relied upon.

17             Do I remember that correctly or am

18   I confusing two different reports?

19         A.     Hang on.  I think it's in both

20   of them.  Let's just...

21         Q.     And while we're looking for

22   that, let me just state for the record that

23   hydrograph is the word that's used here, but I

24   cannot say whether what that means is a

25   stopped clock or an eyewitness report.

179

REED MOSHER

1

2      A.      Uh-huh.

3              MR. RAFFMAN:  Or something else.

4              MR. SEYMOUR:  Or something else.

5      I think two people have hydrographs in

6      their backyards.

7              THE WITNESS:  The one that I

8      used --

9  BY MR. SEYMOUR:

10     Q.      Could you tell us what document

11  you're in?

12     A.      I am getting to that.

13          -- is in exhibit Deposition Exhibit

14  3, it's Appendix 11, and it's on page V-11-19.

15  There's actually two of them on that page.

16  And the top one is the hydrograph that was

17  used to determine water inside the canal and

18  the bottom one is the hydrograph, what's

19  called provisional hydrograph, showing the

20  water levels in time in the Lower Ninth Ward.

21          And it has the locations of where

22  these different measurements were made of the

23  stopped clock.  And you have to go back to

24  Volume -- the -- you would have to go back to

25  Volume IV to get the details of the exact

180

1                    REED MOSHER

2   ones, but, roughly, Site 1, SC1, is down near

3   Florida Avenue.

4        Q.      And that's at the north end,

5   north of the north breach, right?

6        A.      That's at the north end, close

7   to the north breach.

8        Q.      Would that correspond roughly to

9   the site of figure number 1 -- excuse me, site

10  number 1 on figure 7 of Mr. Fitzgerald's

11  report?

12       A.      It would be close to that, I

13  think, in the general -- general area, yes.

14       Q.      And site C2?

15       A.      I have to go back and see C2.  I

16  think it's closer to, in this case, site 2 on

17  Fitzgerald's, I believe.

18       Q.      And do the Jackson Barracks show

19  up in Mr. Fitzgerald's figure 7?

20       A.      I'd have to look.  I don't know

21  if that's what that XA is.  It may be.  I

22  don't know.  I haven't...

23       Q.      And the green rectangle in your

24  report, or on page V-11-19, figure 11-3, says

25  Chalmette?

181

                        REED MOSHER

1

2       A.      Right.  I -- right.

3       Q.      I'm sorry?

4       A.      That's what it says is

5    Chalmette.

6       Q.      Okay.  Do you know -- can you

7    link that up to any site on figure 7?

8       A.      I can't right offhand.  I would

9    have to go back and do some comparisons

10   between that because I don't remember that one

11   as well.

12      Q.      And the final one is called

13   OP54.

14      A.      Right.

15      Q.      What is that?

16      A.      I believe that was an eyewitness

17   report of a guy living in a house there, and

18   that was the location -- for a location where

19   he said the water was at a certain time.

20      Q.      Do you remember where his

21   location was?

22      A.      I believe that one is also in

23   the -- near the Florida Avenue.

24      Q.      Now, turning to the next part of

25   the proffer after figure 7, on page 22, figure

182

1                    **REED MOSHER**

2    9A at the top and --

3         A.    22, 9A?

4         Q.    That's right.

5         A.    Yeah.

6         Q.    And this has an arrow pointing

7    to it that the north IHNC breach occurs, and I

8    believe they used a figure of 3:50 a.m.,

9    shortly before 4:00 a.m. for that breach.

10             Are you familiar with that?

11        A.    Uh-huh.

12        Q.    Say --

13        A.    Yes, in general terms, you know.

14   I haven't studied it.

15        Q.    Do you agree that the breach was

16   around 3:50 a.m. on August the 29th?

17             MR. RAFFMAN:  Objection.  You

18        can answer it.

19             THE WITNESS:  Okay.

20             MR. RAFFMAN:  Object to the

21        question.

22             THE WITNESS:  I believe it was

23        before 5:00 in the morning and it could

24        have been that early.

25   BY MR. SEYMOUR:

REED MOSHER

1

2      Q.      Do you recall what you said is

3  the likely time of the breach in your IPET

4  report?

5      A.      I don't remember right offhand,

6  but it could be as early as 4:00 in the

7  morning.

8      Q.      At the time of the north IHNC

9  breach, the water level is at the -- just

10  below the -8 mark.  Do you see that?

11      A.      Yup.

12      Q.      Is that a piece of information

13  that you had come across before seeing this

14  chart here today?

15      A.      Yes.

16      Q.      When did you first learn of that

17  being the water level at the time of the north

18  IHNC breach?

19      A.      Well --

20          MR. RAFFMAN:  I object to these

21      questions.

22          THE WITNESS:  Yeah.

23          MR. RAFFMAN:  It's completely

24      unclear what -- what water level is

25      being referred to.  I don't want the

184

REED MOSHER

1

2      testimony to be misused.

3             And I would again say that he's

4      looking at the document for the first

5      time, but...

6             THE WITNESS:  Yeah.  I'm less

7      comfortable talking about these.  I

8      really -- the ones that I am most

9      familiar is -- with is the one in our

10     -- our IPET report in 11.

11            And I would have to do some

12     studying to understand.  Because he has

13     stages.  It doesn't have -- I don't

14     know if these are elevations and

15     what -- his reference that he's making

16     for these.

17            But I do know that, you know --

18 BY MR. SEYMOUR:

19     Q.     When you say "stage," are you

20 referring to the number of feet in the Y axis?

21     A.     Right.

22            And I know in the cases that I was

23 working on, I was looking at elevations.  And

24 these elevations of +2 mean that there is

25 possibly eight to ten feet of water in the

185

                            REED MOSHER

1
2      neighborhood at that -- at that time because
3      the --
4           Q.     I'm sorry.   +2?
5           A.     +2 over here on my documents,
6      okay, on this.  And that's roughly 5:00 in the
7      morning.  There was -- +2, it would be close
8      to eight to ten feet of water in the
9      neighborhood at that time, at the -- and
10     that's down in -- near Florida Avenue.
11          Q.     How many feet below sea level is
12     the ground level of the Lower Ninth Ward at
13     the point of the north breach?
14          A.     Let me give you a little more
15     specifics on that here.
16               Where the north breach was, it
17     could be -8 feet, so +2 would be ten feet
18     above -- ten feet of water.
19          Q.     Now you said you had become
20     aware of this piece of data prior to seeing
21     this chart here today.  When did you become
22     aware of it?
23               MS. EL-AMIN:  Objection.  Vague.
24          What piece of data?
25               MR. SEYMOUR:  The piece of data

186

REED MOSHER

2      that at the time of the north breach

3      the water level was at the −8 feet

4      meaning eight feet below sea level.

5              THE WITNESS:  Okay.

6              MR. RAFFMAN:  That's not what he

7      testified.  I object.

8              THE WITNESS:  Yeah, that is not

9      what I testified.

10              What I was getting at is that

11      this type of profile is what I have

12      seen before, not the details of the

13      profile, because I haven't looked at

14      this enough to get the detail

15      information about the profile.

16              But I know that -- I know that

17      this data here that I am familiar

18      with --

19  BY MR. SEYMOUR:

20      Q.      When you say "this data here,"

21  you're referring to page V-11-19 --

22      A.      Yes.

23      Q.      -- in Appendix 11, Deposition

24  Exhibit 3?

25      A.      That's correct.

187

REED MOSHER

1

2      Q.     Now, that information itself

3  says provisional in red letters.

4      A.     Uh-huh.

5      Q.     In your expert report, is that

6  also listed as provisional?  I'm referring to

7  Deposition Exhibit 1.  I believe you'll find

8  it on page 62.

9      A.     Yes, it says provisional also.

10             THE COURT REPORTER:  I'm sorry?

11             THE WITNESS:  Yes, it says

12      provisional also.

13  BY MR. SEYMOUR:

14      Q.     Did you do anything between the

15  June 1st, 2007 -- actually, I take that back.

16             Was Appendix 11 submitted at the

17  same time as Volume V, the final report?

18      A.     Yes.  The final one, yes.

19      Q.     So this also has a date of

20  June 1st, 2007?

21      A.     Yes.

22      Q.     Okay.  And your expert report is

23  a little more than a year-and-a-half later,

24  December 18, 2008; is that correct?

25      A.     That's correct.

188

REED MOSHER

2      Q.      Did you do anything between

3  June 1st, 2007 and December 18th, 2008 to get

4  more information with respect to this

5  provisional stage hydrograph?

6      A.      No, I did not.

7      Q.      Do you presently intend to do

8  anything more?

9      A.      No.

10     Q.      So the provisional is final as

11 far as you're concerned?

12     A.      Yes, as far as I -- as far as

13 the leads that I had for it.

14     Q.      Now, you said you have seen this

15 type of chart before, referring to Deposition

16 Exhibit 7, page 22, figure 9A.

17     A.      Uh-huh.

18     Q.      Where have you seen those types

19 of charts before?

20     A.      I believe some of these types of

21 charts I seen from the court case.  It was --

22 at various times when I was in court or going

23 in and out of court.  I believe the Dutch had

24 something similar to this of stages of water

25 also in the different areas.

189

1                       REED MOSHER

2          Q.     I'm sorry.  The Dutch?

3          A.     Dutch, the plaintiffs' experts

4      from -- from the Netherlands.

5          Q.     Dr. -- I'm not sure how you

6      pronounce it -- Vrijling?

7          A.     Yeah.  Vrijling.

8          Q.     I believe that's

9      V-r-i-j-l-i-n-g, but I cannot vouch for the

10     pronunciation.

11         A.     I think they had similar types

12     of charts and...

13         Q.     And were you there for

14     discussions of these types of charts?

15         A.     Not for the full discussions of

16     them.  I was in and out of the -- out of the

17     courtroom.

18         Q.     Okay.  The --

19         A.     And particularly because I don't

20     have a background in this area.  I am not an

21     expert in this area so I don't feel

22     comfortable testifying to the validity of

23     these or what they mean.

24         Q.     Do you see in figure 9A that --

25     there is an arrow marking the point of the

190

                    REED MOSHER

1

2    south IHNC breach.

3         A.      Correct.

4         Q.      And that is at the four-foot

5    level.

6         A.      I do see that, uh-huh.

7         Q.      Prior to seeing this today, had

8    you come across any information indicating

9    that the south breach occurred when the water

10   was at the four-foot level?

11              MR. RAFFMAN:  Objection.  The

12         water -- the water where?

13              MR. SEYMOUR:  In the Inner

14         Harbor Navigational Canal.

15              MR. RAFFMAN:  That's not what

16         this document says, but you can answer

17         the question.

18              THE WITNESS:  In the canal?

19   BY MR. SEYMOUR:

20        Q.      The -- I take your point.  I

21   take your point.  This does not show a canal.

22   It shows the Ninth Ward.

23              So had you previously heard before

24   today or seen any data indicating that at the

25   time of the south Inner Harbor Navigational

191

REED MOSHER

1

2   Canal breach the water was at four feet above

3   sea level, which would make it a twelve-foot

4   depth at that point?

5          MR. RAFFMAN:  Same objection.

6          THE WITNESS:  Okay.  I -- going

7      back to this figure here in --

8   BY MR. SEYMOUR:

9      Q.     Referring to page V-11-19?

10     A.     Right.

11     Q.     And page 62 of your report?

12     A.     Right.  That would be very close

13  to where we see the elevation of the water at

14  the Jackson Barracks.

15     Q.     And going back to figure 9A, you

16  see that there's an arrow pointing to the

17  surge from MRGO arriving, and that in time

18  looks as if it's -- well, it looks to mine

19  that it's 10:00 or 11:00.

20     A.     Right.

21     Q.     Have you, before seeing this

22  chart today, seen any information indicating

23  that the water from the MRGO breaches reached

24  The Lower Ninth Ward at about that time?

25          MR. RAFFMAN:  Same objection.

192

1              REED MOSHER

2              MS. EL-AMIN:  Objection.

3              THE WITNESS:  Okay.  I don't

4         have information about that, but I do

5         have -- do know something about the

6         surge level or what the water level was

7         in the Industrial Canal and its peak

8         occurring somewhere around 11:00 or

9         12:00.

10   BY MR. SEYMOUR:

11        Q.     So that would be consistent with

12   this?

13              MR. RAFFMAN:  Objection.

14              THE WITNESS:  It looks to be

15         consistent, but I can't -- I would have

16         to know more about this.

17   BY MR. SEYMOUR:

18        Q.     And have you -- prior to today,

19   have you come across any information

20   suggesting to you that that peak level was

21   reached when the water from the MRGO breaches

22   reached the Inner Harbor Navigational Canal in

23   the Lower Ninth Ward?

24        A.     The part that I don't know from

25   this report is, is this a measure from the

1                     REED MOSHER

2    water coming in from St. Bernard Parish,

3    coming into The Ninth Ward from the

4    St. Bernard Parish, or is this the peak surge

5    due -- coming out the -- the MRGO and then

6    coming into the canal at that level.

7              I don't know.  From what I

8    have information here, I can't tell that, so I

9    can't answer that question.

10        Q.     I just want to make sure that I

11   understand what you just said.  As I

12   understand it, the MRGO actually is at two

13   ends, and you're not sure which end the water

14   might be coming in from?

15        A.     Well, what I'm concerned -- what

16   I am not sure is, is this saying that this is

17   the water that came in from the flooding that

18   was taking place in St. Bernard Parish, came

19   over the area and filled up The Ninth Ward, or

20   is it water that came out the Industrial --

21   came into the Industrial Canal from the

22   Intracoastal Highway and then filled up the

23   canal and came in.  I can't tell from this

24   what he's -- what he's showing here.

25        Q.     Does that come down to whether

194

REED MOSHER

1    it's -- you can't tell whether it's breach one

2    water or breach two water?

3         A.      Essentially, yeah.

4         Q.      Dr. Mosher, did you rely upon

5    your specialized education and training in

6    order to perform the analyses that are in

7    Volume V of the IPET report, Deposition

8    Exhibit 2, and in your expert report in the

9    Robinson case, Deposition Exhibit 1?

10        A.      Yes.

11        Q.      Would you be able to understand

12   your own report if you had not had that

13   specialized education?

14        A.      I would believe that, in general

15   terms, a geotechnical engineer that was

16   familiar would be able to understand the

17   details so would be able to understand what we

18   did in that report.  They may not be able to

19   talk about it in -- or actually discuss --

20   have opinions about it without having some

21   specialized knowledge of it.

22            The overview that's in Volume VII

23   was written to provide somebody that had a

24   general knowledge of civil engineering, a

1              REED MOSHER

2    general knowledge of floodwalls and I-walls,

3    to have an understanding of what took place

4    during Hurricane Katrina.

5         Q.     Would it be fair to say that it

6    requires at least the level of education and

7    training of a geotechnical engineer to be able

8    to appreciate this report fully?

9         A.     Volume V in totality, yes.

10        Q.     And the same with your expert

11   report in the Robinson case?

12        A.     Yes, because some of it is

13   detail.

14        Q.     And the same for Appendix 11

15   which is Exhibit 4 to the deposition --

16   Exhibit 3 to the deposition?

17        A.     Yes.  It's not something you

18   pick up for the -- as a casual reader.

19        Q.     Did the Corps of Engineers have

20   more than one purpose in performing this

21   analysis of the Katrina system?

22        A.     There was -- as it turned out,

23   there was more than one purpose.  And if you

24   look in Volume I, I think, that was provided,

25   there is a statement --

196

1                    REED MOSHER

2          Q.      I'm sorry.   Volume I of the IPET

3     report?

4          A.      Yeah.   I had a -- it was one of

5     the depositions.   Yes, it is.   Deposition 4.

6     Excuse me.   Yeah, Deposition Exhibit 4, page

7     I9.   And the highlighted yellow is the -- kind

8     of the tasking that we had that General Strock

9     wanted us to do in the IPET.

10             But also with it was we wanted to

11    feed what we learned back to the people doing

12    the design for the rebuild so that they

13    wouldn't make the same mistakes twice and they

14    would understand what took place.   And as they

15    were doing rehab and replacement and bringing

16    the system back, we could provide them

17    information that would make it so they could

18    do a better job in the future and understand

19    what --

20          Q.      Isn't it --

21          A.      -- and understand what took

22    place.

23          Q.      Isn't it fair to say,

24    Dr. Mosher, that when the Corps of Engineers

25    looks at any failures anywhere, including

197

REED MOSHER

2  these, but not limited to these, that a major

3  purpose of looking at them is to try to build

4  better levees elsewhere so that these problems

5  don't occur again?

6       A.    Yes.   I mean, that's a general

7  -- I think that's a general statement that you

8  would make for the civil engineering

9  profession, that we would want to do that,

10  learn that, and pass that on.

11       Q.    Was it also part of the purpose

12  of the Corps of Engineers to provide

13  information to be used in the defense of the

14  lawsuits against the United States?

15       A.    No, it wasn't.

16       Q.    I'm sorry?

17       A.    No, it wasn't.

18       Q.    When did you first learn that

19  there were lawsuits filed against the United

20  States?

21       A.    I believe the first time I --

22       Q.    Let me -- because of the failure

23  of the levees?

24       A.    I can't remember if it was

25  during that first year.  Mainly newspaper

198

REED MOSHER

1

2  reports that there was going to be -- mainly

3  that I heard that there was newspaper reports

4  that there was a lawsuit.

5        I was never approached or people on

6  our team were never approached until after we

7  finished the report about participating in

8  the -- in the lawsuit.

9      Q.    When were you first approached

10  about participating in the lawsuit?

11      A.    I -- I can't really -- I can't

12  really remember.  It was after -- I want to

13  say, it may have been November or October of

14  2007, something like that.

15        Personally, I tried to avoid being

16  involved in it.  And I had no desire to be

17  involved in it.  Sorry.  I have got other

18  things in my career I would like to do other

19  than to be involved in a lawsuit.

20      Q.    When you performed the report

21  for IPET, did you have a general understanding

22  that this could be a factor in the lawsuits

23  against the United States for the failures of

24  the levees?

25      A.    Actually, one of the things that

1                    REED MOSHER

2    we actually discussed is that there may be

3    lawsuits from this, and that that is not what

4    our purpose was.   And we made it quite clear

5    in discussions, and it was from the chief

6    standpoint that we were to pursue this no

7    matter where it led and who was found at

8    fault.

9              The whole idea of our study was to

10   find out what took place, what were the

11   reasons, and we were careful in terms of not

12   actually trying to put blame on individuals,

13   but to actually give the facts of what took

14   place, and what was the difference from what

15   was designed, what was built, and what the

16   performance was for each of those, regardless

17   of who ends up being at fault.

18        Q.      Is it fair to say that during

19   the period of time before you became involved

20   in the lawsuit or were ever thinking about

21   that while you were -- in other words, while

22   you were working on the IPET report, your

23   primary interest was in problems with the

24   levee design itself as opposed to onetime

25   factors such as a barge being loose?

200

REED MOSHER

2   A.      Uh-huh.   Our primary focus was

3   on the performance of the levees during the

4   storm, and not the design, necessarily, and

5   what was actually there, how did it perform

6   due to the conditions that they saw.

7   Q.      Would it be accurate to say that

8   investigation of the role of the barge and

9   bringing about a collapse of even a weakened

10  levee would not give you much useful

11  information about the design of levees in the

12  future?

13  A.      I don't think that was a

14  consideration.   Actually, there were many

15  people who thought that it was, oh, great, if

16  the barge did it, then it's not the Corps'

17  fault.   And you have to fight back jumping to

18  those conclusions.   You need to look at all

19  the data and decide on what was the real

20  cause.

21  Q.      When did you first hear someone

22  in the corps say that if the barge did it,

23  it's not on the Corps' fault?

24  A.      I think early on when we were

25  out in the -- initially gathering the data

1                REED MOSHER

2    early in the October-November time frame and

3    we would visit the site, and the people may

4    have talked about it at that time.  I think

5    even some of the people that were with the

6    ASCE also, you know, were concerned that,

7    well, maybe the barge did it and not a problem

8    with the levee system.

9         Q.     Does the fact of these

10   conversations about whether it was the Corps'

11   fault or not refresh your memory about when

12   you first heard that there were claims being

13   made against the United States because of the

14   failure of the levees?

15        A.     Not -- not in terms of -- we --

16   we made sure that we tried to isolate

17   ourselves from having to deal -- or be

18   involved in the lawsuit and think of it in

19   terms of a lawsuit.

20             We were very focused on finding out

21   what was the actual cause of the -- what was

22   the performance of these levees throughout the

23   whole time.

24             And we -- actually, if you look at

25   the news coverage, the IPET team made very few

202

REED MOSHER

2  statements of speculations of what happened

3  until they actually had gathered facts about

4  it and could actually put forward a -- a

5  fact-based, review-based cause of one of the

6  failures.

7      Q.      Is it a fair description of the

8  way in which you approached the work for IPET,

9  that you looked for a plausible explanation,

10 and that once you found a plausible

11 explanation, you did not look very much for

12 alternative explanations?

13     A.    No.   We really focused on where

14 the physical evidence took us and then tried

15 to back the physical evidence up by vigorous

16 analysis of looking at different alternatives.

17         We didn't chase every -- every

18 possible thing that someone dreamed up as a

19 reason.   It had to have -- be a fact-based,

20 physical-based evidence in order to pursue it.

21     Q.      Okay.   I want to draw your

22 attention to the transcript of your

23 February 20th, 2009 deposition.

24     A.      Uh-huh.

25     Q.      And I'm referring to page 396.

203

```
1              REED MOSHER
2    I don't know if counsel all have a copy.
3         A.    I'd like to see it.
4              MS. EL-AMIN:  Do you have
5         copies?
6              MR. SEYMOUR:  Pardon me?
7              MS. EL-AMIN:  Do you have copies
8         for us to look at?
9              MR. SEYMOUR:  I don't, but I am
10        happy to direct you.  It's page 396
11        beginning at page -- line 13.
12              THE WITNESS:  I'd like to see
13        it.
14              MS. EL-AMIN:  Can you repeat
15        that, please.  I'm sorry.
16              MR. SEYMOUR:  Page 396.
17              MS. EL-AMIN:  February 19th?
18        Okay.
19              MR. SEYMOUR:  Line 13.
20   BY MR. SEYMOUR:
21        Q.    And going over to page 397, line
22        8.
23        A.    Okay.
24        Q.    Let me read into the record the
25   questions and answers.  And please correct me
```

204

1                    REED MOSHER

2    if I get anything wrong.

3              On line 13 Mr. Bruno asked,

4        "Okay.  So once -- it's that same sort

5        of deductive reasoning that you have

6        applied really throughout, and that is

7        you found a plausible explanation which

8        allowed you to exclude other potential

9        mechanisms, right?"

10             Mr. Levine, "Objection."

11             Answer, "use the available

12       information to, um -- provide the

13       opinion that I have of what took

14       place."

15         And Mr. Bruno, on line 24, "Well,

16       again, isn't that consistent with what

17       I just said.  You found a plausible

18       explanation for what occurred, and once

19       you found that plausible explanation

20       you said to yourself, there's no need

21       to do any further investigation?"

22             Answer, "And the plausible

23       explanation of why it failed at that

24       point."

25             Question, "yes?"

REED MOSHER

Answer, "Yes."

Did I read that correctly?

A.      You did read that correctly, but
I need to look at the context of what this
was -- was about.

Q.      If it was --

A.      I think it's not inconsistent
with what I'm saying, is that you have to have
the physical evidence of why the failure took
place, and that physical evidence has to be
drawn to -- and you can't have a plausible
failure mechanism unless you have that
physical evidence there.

I think this had to deal with some
of the -- I'll have to read through this.  But
there are -- there were people providing lots
of opinions of why the failures took place,
and they were plausible but they didn't have
any physical evidence to them, so they weren't
things that you would pursue.

If you don't have the physical
evidence, or the possibility of a failure
mechanism, the mechanics of it, or whatever,
then it is not a plausible failure mechanism.

REED MOSHER

1

2          You just don't go after and say,

3    every possible reason was a failure or was a

4    possible cause of the failure.  You actually

5    have to nail down what really were the causes,

6    and does the physical evidence support that.

7    And that's what we did in the IPET report.

8          Q.     On February 20th, just five

9    months ago, you said at the top of Page 397,

10   you agreed with the statement that once you

11   found a plausible explanation, you said to

12   yourself there is no need to do any other

13   investigation.  Do you see that?

14         A.     And what I am saying -- what I

15   mean by a plausible explanation means it's

16   my -- what I mean by that is it has to have

17   the physical evidence to prove that it was a

18   plausible explanation of failure.

19         Q.     Do you agree or disagree with

20   the statement you made on February the 20th of

21   this year, that once you found a plausible

22   explanation, however you define it, you stop

23   looking for other explanations?

24              MS. EL-AMIN:  Objection.

25         Mischaracterization of prior testimony.

1          REED MOSHER

2          THE WITNESS:  I would say that

3     you have to have the physical evidence

4     to do it and the plausible information,

5     unless there is other physical

6     information or other analysis that

7     would lead me to believe that there was

8     another plausible failure mechanism,

9     because otherwise you'd be constantly

10    spending the rest of your life

11    searching for that failure mechanism,

12    and you wouldn't make any progress of

13    trying to actually settle on what

14    actually took place.

15        So I would say that you wouldn't.

16    And once you have physical evidence,

17    the plausible explanation analysis,

18    then, especially in IPET, we had to

19    come to a conclusion because we had to

20    present those results on June 1st, 2006

21    and state our opinions and have those

22    reviewed.

23          And those opinions have been

24    reviewed and substantiated by the two

25    different review groups.  So I would

1        REED MOSHER

2        say that we were well -- well within

3        what we were tasked to do and presented

4        and it stood the test of time with our

5        review groups.

6    BY MR. SEYMOUR:

7        Q.    As you testified here today, do

8    you agree or do you disagree with the

9    statement that once you found a plausible

10   explanation, you stopped looking for

11   alternatives?

12              MS. EL-AMIN:  Same objection.

13              THE WITNESS:  Okay.

14              And I would -- no, I disagree

15       with the way that you have stated that.

16   BY MR. SEYMOUR:

17       Q.    Explain the disagreement.

18       A.    You say "a plausible."  Okay.  I

19   say that this has to do with the physical

20   evidence that you provide.

21       Q.    If you take a look --

22       A.    And you have to take a look at

23   the whole -- examine all the evidence and

24   provide it and that has to be reviewed.  And

25   that's the process that we went through.

REED MOSHER

Q.     If you take a look on page 396,
at lines 15 and 16 you were asked about "a
plausible explanation."

Have you changed your mind since
February 20th with respect to this subject?

MR. RAFFMAN:  Objection.  Asked
and answered.

THE WITNESS:  I think my answer
to that was plausible; do you use the
available information to reach that
explanation.

BY MR. SEYMOUR:

Q.     Do you have anything else to
say?

A.     No.  In terms of you have to use
the available information to come up with that
plausible explanation.

Q.     And once you find a plausible
explanation, would that available information,
as you describe it, and plausible, as you have
described it, did you then stop looking for
alternatives?

A.     In this case we -- at the IPET
part of it, we probably did come to the end of

REED MOSHER

1

2   it and had to produce our report.

3          And my addition that I would say to

4   that, if there is more physical evidence, if

5   something else comes along that could change

6   that plausible information, we would pursue

7   that.

8          Q.     Did you pursue any other

9   explanations for the failure of the north

10  breach and the south breach between June 1st,

11  2007 when the IPET report was issued and

12  December 18th, 2008 when you submitted your

13  expert report in the Robinson case?

14         A.     We did go back over all of the

15  other -- some of the other plausible

16  explanations of it, particularly the seepage

17  information, and we had more time to look at

18  that and also to look at what were the

19  plaintiffs' reasons for the cause of the

20  failures.

21         Q.     The Robinson plaintiffs?

22         A.     In the Robinson case.

23          And they also looked at the IHNC

24  and, to my knowledge, they pretty much agreed

25  with our -- especially the north breach, that

211

1                    REED MOSHER

2    our -- our opinion is supported by what they

3    have said in their briefs or their expert

4    reports and testimony.

5         Q.      As you testified here today, are

6    you aware of any alternatives for the breaches

7    of the levee system where there is an

8    alternative that you have not investigated?

9         A.      There --

10         Q.      When I talk about alternatives,

11    I don't mean a crazy theory.   I mean something

12    that looks as if it might have some substance

13    to it.

14              MS. EL-AMIN:   Levee system in

15         New Orleans?

16              THE WITNESS:   Any part of the

17         system?

18    BY MR. SEYMOUR:

19         Q.      Yes.

20         A.      We have looked at several since

21    IPET, particularly on the H -- the IHNC, there

22    has been some concern about seepage and people

23    reporting that there was water coming through

24    the levees.   And there were some additional

25    investigations into where that water came

212

1                    REED MOSHER

2    from.

3          Q.      You're speaking additional

4    eyewitness information?

5          A.      This was actually water flowing

6    under the levee system as it currently stands

7    and concerns about that.

8          Q.      You mean after Rita and after

9    Gustav?

10         A.      Right.  Actually, really after

11   Rita.

12         Q.      I'm sorry?

13         A.      After Rita, before Gustav.

14         Q.      By the way, were the soil

15   borings that were taken pursuant to the IPET

16   investigation taken before or after Rita?

17         A.      After Rita.

18         Q.      And between Katrina and Rita,

19   didn't the Corps try to make some patches in

20   these holes?

21         A.      Yes, they tried to stop the

22   water from flowing in, and particularly were

23   concerned about during Rita, to try to reduce

24   the continued flooding.

25         Q.      And what kind of additional

213

                    REED MOSHER

1  material did the Corps put in to try to patch

2  these holes between Katrina and Rita?

3          A.      They put a graded limestone, I

4  think it was, material to try to patch that.

5          Q.      It was not hydraulic fill?

6          A.      It was not hydraulic fill.

7          Q.      By the way, do you know whether

8  hydraulic fill was used in the part of the

9  levee north or just north, depending on which

10 picture caption you look at, of the south

11 breach the one where you saw the big scour

12 behind and we spent a fair amount of time

13 talking about that photo.

14              MR. RAFFMAN:  Objection.

15              THE WITNESS:  Yeah.  I -- right

16          offhand, I don't know exactly.  I

17          believe -- well, there was various

18          stages of fill.  I would have to go

19          back and look at that.  I can't

20          remember it offhand.

21 BY MR. SEYMOUR:

22         Q.      As we sit here today, is it

23 possible that the fill was the same for the

24 failed portion of the south breach and for the

214

REED MOSHER

1    portion north of that that did not fail?

2              MS. EL-AMIN:  Objection.

3         Hypothetical.

4              MR. RAFFMAN:  And it's vague as

5         to time.  You're talking about after

6         the storm?

7              MR. SEYMOUR:  No.  I'm talking

8         about here, July 22nd, 2009.

9              THE WITNESS:  If the material --

10   BY MR. SEYMOUR:

11        Q.     Do you have knowledge of that?

12   If you don't know, you don't know.

13        A.     If the materials are different

14   than they are now?

15        Q.     That's right.

16        A.     Well, the whole wall is

17   different.  It's now -- it's a T-wall built on

18   pile foundations and some or all of that --

19        Q.     No, I'm sorry.  I'm not talking

20   about the current wall.  I'm talking about the

21   wall as it existed in Katrina, do you know as

22   of today, with all the information that you

23   have gathered since the storm, whether there

24   was any difference in the fill for the failed

REED MOSHER

2  portion that was at the south breach and the

3  portion immediately -- portions immediately

4  adjacent on both sides that did not fail?

5      A.      Okay.  And I'm going to ask, you

6  have to be a little more specific.  I believe

7  the interdisciplinary clay material was the

8  same.  Okay, that's basically the same.

9          The levees may -- the levee

10  material may be different because there were

11  construction work that was done to remove some

12  buildings and tanks and things like that, and

13  that did make the backfill area on the flood

14  side somewhat different, vary along the length

15  of that wall.

16      Q.      When was this construction,

17  removing the tanks and so on?

18      A.      That was prior to the -- I can't

19  remember exactly the dates, but it was -- it

20  was prior to the hurricane, but I think it was

21  in the '90s or in the early 2000s, something

22  like that, and that's -- that's on line.  I

23  can't remember exactly the dates.

24      Q.      Did you analyze the fill, the

25  records of what was used to fill the portion

216

REED MOSHER

1

2    of the wall that failed in the south breach

3    versus the portions that did not fail --

4          A.     Yeah, I mean --

5          Q.      -- that were adjacent to the

6    failure?

7          A.      -- we did in terms of the

8    important parts that caused the failure, yes,

9    we looked at those.

10         Q.      Hydraulic fill, was that used in

11   the part that failed?

12         A.      The levee materials, the

13   strengths of the materials, were very close

14   as -- up and down there, of the fill of the

15   levee, okay, but, you know, the majority --

16   the levee fill had very little impact on the

17   behavior of the walls at the global stability.

18   It was mainly the interdisciplinary clays that

19   were important.

20         Q.      Are you aware that the National

21   Research Council and National Academy of

22   Engineering has criticized the IPET report for

23   failure to consider alternatives adequately?

24         A.      Out of what?

25         Q.      Has criticized the IPET report

217

1                        REED MOSHER

2    for failure to consider alternative

3    explanations adequately.

4         A.      Please give the date when that

5    was done, when that criticism was given.

6         Q.      I believe it was April of this

7    year.

8         A.      And what is the context of that?

9              MS. EL-AMIN:  Are we caught for

10        time?  Why don't we just take a break

11        and you can --

12              MR. SEYMOUR:  Oh, certainly,

13        because we're going to run out of tape.

14        That's fine.

15              THE VIDEOGRAPHER:  We're going

16        off the record.  This is the end of

17        videotape number 3.  The time is now

18        3:00.

19              (Brief recess.)

20              (Mosher Exhibit No. 8 was marked

21        for identification.)

22              THE VIDEOGRAPHER:  We are back

23        on the record.  This is the beginning

24        of videotape number 4.  The time is now

25        3:13.

218

1                     REED MOSHER

2      BY MR. SEYMOUR:

3           Q.      Dr. Mosher, over the recess I

4      handed you -- handed your counsel, then handed

5      you, a copy of the report from the National

6      Academy of Sciences.   Could you read the title

7      of the report from the first page, please.

8           A.      It is, "New Orleans Hurricane

9      Protection System, assessing Pre-Katrina

10     Vulnerability and Improving Mitigation and

11     Preparedness.   Committee on the New Orleans

12     Regional Hurricane Protection Project.   Water

13     and Science Technology Board.   Division of

14     Earth and Life Sciences.   Board on

15     Infrastructure and Construction Environment.

16     Division of Engineering and Physical Systems,

17     National Academy of Science and -- excuse me,

18     National Academy of Engineering and National

19     Research Council."

20          Q.      And then if you turn to the last

21     page, you see a date of 2009 on the download

22     sheet for that document?

23          A.      Correct, I do see a 2009.   I

24     believe that is their committee report.   It's

25     a pdf.

219

REED MOSHER

1

2      Q.      Then please turn to page 15 of

3  the report.

4      A.      Uh-huh.

5      Q.      This is in a section entitled,

6  "Performance of the Hurricane Protection

7  System During and After Katrina."

8      A.      Correct.

9      Q.      And in the second paragraph,

10  third sentence, do you see where it says, "The

11  IPET team concluded that a singular driving

12  mechanism is a key factor affecting each of

13  the failures; however, alternative factors

14  contributing to failure were proposed by

15  others, notably by a research team that was

16  working through a grant from the National

17  Science Foundation (NSF)."

18          Do you see that?

19      A.      Yes.

20      Q.      Then -- then the next sentence

21  reads, "An earlier report from this NAE/NRC

22  committee drew attention to the complex soil

23  conditions and the number of unknowns still

24  associated with these sites despite the

25  extensive work conducted (NRC, 2006b).   In the

REED MOSHER

2   end, that report advised the IPET to 'be aware

3   of alternative failure mechanism system and

4   assess the potential for instability at other

5   locations along the level system."

6           And then it goes on to discuss the

7   17th Street Canal breach and says, "The

8   explanation of the failure mechanism for the

9   17th Canal Street breach, while plausible, is

10  not fully convincing, and alternative failure

11  mechanisms should be more rigorously

12  assessed." (NRC 2006b).

13           Do you see that?

14       A.     Uh-huh.   And that was their

15  interim report to us, and when we did that,

16  that's why you see a final report in 2007.

17  And we worked to try to answer and look at

18  some of these alternatives and to explain some

19  of the alternatives that the folks from the --

20  from the National Science Foundation study,

21  particularly the Berkeley folks was the ones

22  who had done that, led that, and to address

23  those issues, and the June 2007 report

24  addresses those.

25       Q.     Did the June 2007 report have a

221

                    REED MOSHER

1  scientific investigation of the barge?

2       A.    No, because that was not one of

3  the ones that was in question.

4       Q.    That would have been an

5  alternative explanation; would it not?

6       A.    That would have been an

7  alternative, but not one that the NRC had

8  actually asked questions about, and not one

9  that the National Science folks -- the

10 National Foundation group were looking at.

11      They try -- they were saying that

12 the failure was due to seepage, and we did an

13 extensive study to show that even if you

14 change the seepage properties of the soil by

15 increasing their permeability by a factor of

16 1,000, you still would not end up with seepage

17 as a problem.

18      Q.    Have you seen this report of the

19 National Research Council/National Academy of

20 Engineering before today?

21      A.    I hadn't seen all of it, but

22 I -- I was at the meetings and I was aware of

23 these other two reports because I had to

24 address these, the 2006 one.

222

REED MOSHER

1

2          So this is —— this isn't any

3   different than what I had heard from them.

4          Q.     And do you recall discussion

5   from the National Research Council and

6   National Academy of Engineering that they

7   still felt that alternatives needed more

8   attention?

9          A.     I think they believe ——

10  actually, what they were —— if you read down

11  farther, they actually say that "this will

12  still probably be a debate in —— in the

13  profession for awhile."

14          There is actually an ASCE

15  Geotechnical Journal that's on the 17th Street

16  failure presenting all the different

17  possibilities that has been put out, referee

18  papers on it to try to clear some of that up.

19          There was a conference in Denver, I

20  think that was in 2007, March of 2007, which

21  led to discussions about the failure mechanism

22  for these, and we participated in that.

23          Q.     And from June 1st, 2007 to the

24  present, is it correct to say that you have

25  not done a scientific investigation of the

223

1                          REED MOSHER

2    role of the barge?

3           A.      No, we haven't.

4           Q.      So the statement is correct?

5           A.      Yes.

6           Q.      Did the Corps do its own

7    investigation separate from the IPET?

8           A.      Of?

9           Q.      Did the Corps of Engineers do

10   its own investigation of the levee failures

11   separate from the IPET investigation?

12          A.      There were -- at the time of

13   the -- immediately after the hurricane and

14   when they were doing some -- preparing for the

15   repair, they were doing analysis of the

16   failures, or doing some investigations of what

17   was the causes of some of it, and then they

18   were designing alternatives to replace what --

19   the damage.

20                  So they were doing some assessment

21   of it.

22          Q.      This is after June 1st, 2007

23   or...

24          A.      No, this is actually starting

25   probably in October 2005, they were gathering

1            REED MOSHER

2    information, what -- what was the cause, what

3    were the -- what did the failures look like,

4    different types of assessments along that

5    line.  And then also, you know, what needs to

6    be done to raise it to a higher level of

7    protection.

8        Q.    Was that additional work with

9    the Corps of Engineers in the fall of 2005

10   reflected in the June 1st, 2007 final report?

11       A.    Well, we used some of the same

12   data as they were using, borings, things like

13   that, like the Eustis borings, things like

14   that.  We -- we tried to take advantage of

15   that in our IPET report.

16       Q.    You mentioned several times that

17   the goal of IPET was to do an unbiased report,

18   and you said that there was a person by the

19   name of Duncan that was your co-lead.

20       A.    Right.

21       Q.    Do you know how much -- is it

22   Mr. or Dr. Duncan?

23       A.    Dr. Duncan.

24       Q.    Do you know how much Dr. Duncan

25   was paid by the Corps?

225

REED MOSHER

1

2      A.      I don't know exactly.  I would

3   have to look it up, but I know he was paid

4   from the Corps for his time.  And -- and the

5   only reason I don't know is I just haven't

6   added it up, but I know that he was paid by

7   the Corps for his time.

8      Q.      Was he paid -- do you know

9   whether he was paid an amount that reached the

10  six figures?

11     A.      He probably was paid close to

12  $100,000 there on some of it and -- because he

13  worked a good bit of time.

14     Q.      Now I am not sure if my notes

15  were correct, but --

16     A.      Just like I would be paid,

17  working on it for full-time, I would be paid

18  over $100,000 too.

19     Q.      My understanding is you received

20  no additional compensation from the Corps; is

21  that right?

22     A.      Right.

23     Q.      We were just talking about

24  salary and the way everybody with a job feels.

25          Okay.  I thought you said something

226

REED MOSHER

1

2      about the finalization of the report and the

3      involvement of somebody else in the

4      finalization, but I'm not sure that I heard

5      you correctly.

6          A.     Oh, in the -- in the Volume V,

7      the main text of that, I did the first draft

8      and Mike Duncan and Tom Brandon helped and

9      edited to get it to the final stage in 2000,

10     in June 2006, when we were finishing it up.

11             And then as we finished up the

12     2007, they reviewed that.  And Mike Brandon --

13     excuse me.  Tom Brandon is a professor at

14     Virginia Tech that was sort of --

15         Q.     Is he a Mr. or a Dr.?

16         A.     Dr.  He works with Professor

17     Duncan.

18         Q.     Are you aware of a meeting that

19     was held among the experts for the government

20     in the Robinson case to decide on what the

21     Corps' position would be on common approached

22     issues?  Are you aware of any meeting like

23     that?

24         A.     Not that I'm aware of, no.

25         Q.     Appendix 11 makes some

227

REED MOSHER

2  references to barges in general and to barges

3  crashing into banks and crashing into control

4  structures and damaging them but does not

5  mention the barge in the Inner Harbor

6  Navigation Canal.

7          Do you know why that is?

8      A.      Principally because we would --

9  we didn't have any good physical evidence of

10  knowing the full extent of what the damage

11  would be of what the barge did.  We saw where

12  it hit, but, again, we don't believe -- we

13  didn't believe it was the principal cause of

14  the failures of that so we didn't address it

15  in terms of trying to explain what the

16  performance was of the levees and floodwalls

17  in the Inner Harbor Canal.

18      Q.      A couple of times you referred

19  to the barge as not being the principal cause.

20  Did you believe it was a contributing cause?

21      A.      Well, we can't say because we

22  don't have any evidence.  We know that it hit

23  the -- hit -- we believe that it hit the wall

24  because it looks like there is damage there,

25  but where it struck and where we see that is

228

REED MOSHER

2  at the far south end of the wall, and that is

3  not where the principal damage of the wall is

4  located.

5      Q.      Did you do a study of which way

6  -- well, I will withdraw that.

7          The south breach is a fairly large

8  one; is it not?

9          A.      That's correct.

10         Q.      Do you know whether all parts of

11  the south breach wall failed at the same time?

12         A.      No, we don't know that, and I

13  would suspect, just by -- if you look at

14  figure, I think it's 81.

15         Q.      We're on Exhibit 2?

16         A.      Yeah.   Exhibit 2, the -- Volume

17  V of the IPET report.

18         Q.      And what page number?

19         A.      Page V-101.

20         Q.      I think we're on the same page.

21         A.      Okay.   If you -- you can see the

22  wall is kind of a snake-like figure in the

23  kind of middle two-thirds of the -- or middle

24  third of the page there.   Have you located

25  that?   And you can see that down here near the

1                           REED MOSHER

2     southern part that it hasn't moved very far

3     from the levee.   Here it has moved quite a

4     ways from the levee.

5               And I would suspect that this is

6     where it is.   Because of all the damage of the

7     houses in this area was the blunt force of

8     where the water -- the majority of the water

9     and initiated to cause this to happen and had

10    the most erosion and tipped the wall the

11    farthest way.

12              The barge where we see the impact

13    is way down here.

14         Q.    When you say "way down here,"

15    can you describe it so the court reporter

16    can --

17         A.    It's beyond the, actually, edge

18    of the picture here.

19         Q.    Beyond the edge of the picture,

20    you find the barge?

21         A.    On the southern part, yeah.   And

22    you don't even see the barge in this.

23              MR. RAFFMAN:   So the record is

24         clear with Mr. Seymour's position, the

25         witness was gesturing toward the bowed

230

1                  REED MOSHER

2         area of the wall on the middle to left

3         portion of the picture when indicating

4         where the main part of the failure

5         occurred.

6              THE WITNESS:   Failures or

7         where --

8              MR. RAFFMAN:   Where the water --

9         well, I don't want to use --

10             THE WITNESS:   I was going to say

11        where the -- where we see the most

12        damage to the houses is where the

13        highest water flow would be and where

14        the wall was pushed out to the greatest

15        extent.

16   BY MR. SEYMOUR:

17        Q.    And when you referred to the

18   south side of the thing, is the right-hand

19   side towards the south?

20        A.    South, yes.

21        Q.    Did you do a scientific analysis

22   of the edges of the barge to see if they had

23   concrete residue from the wall?

24        A.    No, we did not do -- no.

25        Q.    Did you do an examination of the

231

REED MOSHER

1

2   underside of the barge to see whether there

3   were striations on it that were consistent

4   with the marks that would have been left by

5   the bent rebar of the collapsed wall?

6       A.   I remember at the time of

7   examining the barge to try to see if we could

8   find where that it was struck, I can't

9   remember exactly the results of that, sorry, I

10  just don't remember.

11      Q.   When you saw the barge, was it

12  on the ground?

13      A.   It was on the ground.

14      Q.   And was it intact?

15      A.   It was intact.

16      Q.   Did you see -- did you look at

17  any photographs of the bottom of the barge?

18      A.   Afterwards, no, I didn't.  No.

19  But at that time it would be kind of hard to

20  know because it could have gone across the

21  wall after it was laying down and all those

22  things.  It would be very hard to tell whether

23  the bottom of the barge was damaged from

24  hitting the wall or moving across the wall as

25  it was laying on the ground.

232

REED MOSHER

1
2    Q.      Would you agree that the

3    concrete residue and examination right

4    afterwards would have been the best

5    indication?

6    A.      It would have -- well, it may

7    have -- I think what I would have liked to

8    have seen is some damage where it hit the wall

9    and so you saw some indentation of it.  Just

10   concrete residue, you know, because the wall

11   flexed and popped, there was a lot of concrete

12   dust and things like that in the area.  So

13   concrete residue could have come from a number

14   of different places.

15   Q.      Well, this is not my field

16   because I'm not one of your type of engineers,

17   but when an object strikes a concrete wall,

18   aren't you going to have a pattern of residue

19   that's different from dust settling?

20   A.      It could be.  If -- I would like

21   to see the pattern and pictures of the pattern

22   of the damage to the -- or in the dragging of

23   the barge in order to make that determination,

24   but just concrete residue on its own we don't

25   think is a full indication that -- of what

233

REED MOSHER

1

2    kind of contact was made with the wall.

3         Q.    Now, I believe I also heard you

4    speaking about the IPET executive summary,

5    Exhibit 4 to the deposition, and that

6    something was changed a couple of weeks ago,

7    perhaps the risk analysis.  Do you recall

8    that?

9         A.    Yes, uh-huh.

10        Q.    Can you point me to what was

11   changed?

12        A.    Actually, I -- I don't know

13   exactly what the change was because I wasn't

14   involved in that part of it, but I know they

15   finalized -- you know, this says final draft.

16            I know that they posted the results

17   of the risk analysis for public release, and I

18   imagine they made the corrections to --

19   changes to this document for that.  I

20   personally have been so busy, I haven't been

21   able to look at that.

22        Q.    This -- this is labeled a draft

23   final, and it's a full year after your Final

24   Report V was put in.

25        A.    Right.

234

REED MOSHER

1

2      Q.      Can you explain that?

3      A.      Yeah.  It's because the risk

4  analysis hadn't been completed.

5      Q.      What is being looked at in the

6  risk analysis?

7      A.      They're -- the assessments they

8  are looking at, what was the risk, potential

9  risk, and the damages and consequences

10  associated with that, as designed, as built,

11  looking at the 100-year, and looking at the

12  2010 --

13              MR. RAFFMAN:  Keep going.

14              THE WITNESS:  -- the 2010 level

15          of protection in June 2010.  So they

16          looked at a number of different

17          sequences, and then developing a series

18          of risk maps that could be used by the

19          public to assess where they're located

20          and what risk that they take at

21          different times.

22  BY MR. SEYMOUR:

23      Q.      Did any part of this change in

24  risk assessment involve the performance of the

25  levees?

235

REED MOSHER

1

2        A.      It didn't -- it didn't change

3   the assessment of the performance of the

4   levees during Katrina, but it does have an

5   effect on what kind of protection you would --

6   they did look at what kind of protection the

7   improvements to the levee system would

8   provide, and how that would affect the risk of

9   flooding.

10       Q.      Were you asked to contribute to

11  this executive summary dated June 1st, 2008?

12       A.      The original one, I did, and I

13  reviewed some of it before it was released,

14  but mainly it's attributing to the part that I

15  was involved in, which is the Volume V

16  portion.

17       Q.      You mentioned something called

18  NAVD88 which I believe is an acronym for

19  NAVD88.

20       A.      Right.

21       Q.      Would you please explain the

22  term.

23       A.      I'd have to look up exactly what

24  it means, but it is NAVD -- NAVD88, and then I

25  think it's 2006.4, is the survey that -- that

236

REED MOSHER

1

2    set the benchmarks for measuring elevations in

3    the New Orleans area that we used during

4    Katrina.  It had the Katrina or IPET study,

5    and what is being used now, and that had --

6    gives us -- it is a survey data.

7            It isn't actually the elevation

8    above sea level.  It is an -- it is an

9    elevation that is related to what sea level

10   is.  So sea level changes some.  This point is

11   a more mixed point.  And they can measure what

12   sea level is relative to this elevation.

13       Q.    Is this like a LIDAR examination

14   of the --

15       A.    No.  This is -- this is a hard

16   survey done by National Oceanographic and

17   whatever.

18       Q.    National Oceanographic &

19   Atmospheric Administration?

20       A.    Yeah, exactly, it's certified by

21   them.

22       Q.    Does that mean that they did the

23   survey with satellites or with people standing

24   on the ground?

25       A.    Both, actually.  They use a

237

REED MOSHER

1

2   certain geodetic capability that they have,

3   but they also did hard surveys, too, of the

4   locations.  But they're trying to make

5   corrections for subsidence to the benchmarks.

6         Q.    Can a satellite observation of a

7   floodwall pick up the narrow I-walls on top?

8         A.    Okay.  I know that there are

9   satellites that can do that, but we don't have

10  access to them.

11        Q.    Fair enough.

12              When a LIDAR examination is done --

13  is it LIDAR or LIDAR?

14        A.    LIDAR.  And that is actually

15  done from a plane and not from a satellite.

16  It's an air breather.

17        Q.    Can that pick up an object like

18  an I-wall, sheet metal -- or sheet pile I-wall

19  that's less than six inches in diameter?

20        A.    It can be -- it can be done if

21  it's done with enough resolution and you have

22  the software available to extract that.  It is

23  not an easy thing to do, but it can be done.

24  And the accuracy, you may have a problem with

25  accuracy if you do it, kind of like the --

238

REED MOSHER

some of the surveys that were done where there

was only like a one-meter accuracy of the

LIDAR sampling, then you probably couldn't

pick it up.  But if you get down to six IHNC

or less accuracy, then you can pick them up.

Q.     Were these perhaps the LIDAR

surveys --

A.     But, again, I am not an expert

in this area, but I know that you can pick up

some.

Q.     In IPET Report Volume V and --

Exhibit 2 to the deposition, and your expert

report for the Robinson case, which is Exhibit

1, you refer to the LIDAR surveys.

A.     Right.

Q.     Were those with this degree of

resolution that could pick up narrow I-walls

or without that kind of resolution?

A.     We did not use the LIDAR data to

get the elevations of the walls.  We used the

hard survey data that was done.

The LIDAR data was used to get

profiles on the embankments out to the side.

Q.     You mentioned a test that was

239

REED MOSHER

1

2    done called E-99 or something like that --

3         A.    Uh-huh.

4         Q.    -- in which you developed

5    information about the formation of a crack on

6    the water side of a sheet pile wall.  Did you

7    obtain any calculations of the amount of force

8    on the wall that is sufficient to form, say, a

9    one-inch crack?

10        A.    We -- we don't have a direct

11   correlation of -- it's more on the

12   displacement of the wall and a crack

13   occurring.  No, we don't have a direct

14   calculation of that.

15              Oh, when I say that, the experiment

16   that was done in the '80s wasn't done to

17   determine that the crack occurred.  As a

18   matter of fact, you couldn't see the crack

19   because it was draped with a black plastic to

20   prevent water from seeping through the wall.

21              Only since then, since the failure

22   in New Orleans, had people felt that there was

23   a -- the crack occurred.  So there was no

24   actual measurement of the crack during those

25   tests.

240

1                       REED MOSHER

2              And those tests were not used to

3     assess the global stability.   They were

4     principally used to look at deflections and

5     how long of -- how deep of tip elevation did

6     you need to control the deflections that you

7     were seeing at the wall, the top of the wall.

8          Q.     After Katrina, did you see a lot

9     of cracks in areas where the walls did not

10    fail?

11         A.     We saw in locations, yes, where

12    there was water on the walls, yes.

13         Q.     Did you see cracks at any of the

14    areas in the Inner Harbor Navigation Canal

15    where the walls did not fail?

16         A.     Yes.

17         Q.     Where -- where were those

18    locations?

19         A.     There was actually some between

20    the south and north breach.   There was

21    actually some on the east side above the --

22    it's hard to say where it is -- it's above the

23    Florida Street bridge, and some on the west

24    side also above the Florida Street bridge.

25              There were cracks on the walls,

241

1                      REED MOSHER

2   I-walls that were in the line of Mississippi

3   levees and Plaquemines Parish where some

4   failed and some didn't fail.   London Avenue,

5   we couldn't see the ones on 17th Street,

6   mainly because they're under water that's side

7   of the wall.

8        Q.      In the cracks -- and just in the

9   Inner Harbor Navigational Canal on the east

10  side, did the cracks that you observed run up

11  to the area where you had the south breach?

12       A.      There is some movement there.

13  The wall was less -- where we saw the wall,

14  there was less -- less movement than there was

15  at the north side in the north breach.

16       Q.      Okay.   And did you see the --

17  the crack that you observed for the part of

18  the wall that did not fail between the north

19  and south breaches, did the crack run all the

20  way to the north breach?

21       A.      The crack was immediate below

22  the north breach and ran south for a ways and

23  it was quite a large crack.

24       Q.      Do you remember the width of

25  that crack?

242

REED MOSHER

2      A.      In some places we had actually

3   soil that had settled behind it so there was a

4   gap of settled soil behind the wall of, like,

5   three feet in some of the locations.

6      Q.      And on the water side?

7      A.      This was on the water side.

8      Q.      Okay.

9      A.      And, I mean, this has also been

10  seen in an experiment on a -- or a full-scale

11  test that was done on London Avenue here

12  recently where they closed in the back of one

13  of the walls and brought water up to different

14  elevations, seven, seven-and-a-half, and it

15  was -- they were able to measure that the wall

16  did move and there was an opening, a crack

17  forming.

18      Q.      What was the size of that crack?

19      A.      I believe it was pretty small.

20  It was in the range of an IHNC, an IHNC and a

21  half or something like that.  It was quite

22  small.

23      Q.      The government was good enough

24  to give us a CD or a DVD of the materials on

25  which you relied which do not appear in your

243

                    REED MOSHER

1
2    report.  And there are several of these

3    documents that I may or may not have questions

4    about if I understood them, but I need to

5    borrow your expertise in order to understand

6    what it is they are.

7                    MR. SEYMOUR:  I ask the reporter

8              to mark as Exhibit 9 a document dated

9              December 13th, 2008 at the top.  And

10             its title is, Lateral Weir evaluation.

11                    (Mosher Exhibit No. 9 was marked

12             for identification.)

13                    THE WITNESS:  I can't actually

14             speak to that to any great degree.

15             That was something that was provided to

16             me by Steve Fitzgerald, okay.  And

17             while it was included in an email that

18             was sent to me, I did not use -- I

19             didn't use this part of the information

20             in what I needed.  So you would have to

21             talk to Steve Fitzgerald to explain

22             what this is.

23   BY MR. SEYMOUR:

24             Q.    There is -- on the right-hand

25   side of the chart, there is a -- the word

244

1          REED MOSHER

2    "overtopping" and then there are several

3    columns of data below that.  And there are two

4    columns that are headed by PQ.  Do you know

5    what PQ is?

6              MS. EL-AMIN:  Objection.  He

7         just said he can't speak to it.

8              THE WITNESS:  I can't speak to

9         this.

10             MR. SEYMOUR:  Counsel, he may

11        know.

12             MS. EL-AMIN:  He can answer the

13        question.

14             MR. SEYMOUR:  I am asking him

15        what he knows.

16             THE WITNESS:  From looking at --

17        from the symbol here -- I'm just

18        looking at the symbol -- it says cubic

19        feet per second.  I believe that would

20        be the measurement.

21   BY MR. SEYMOUR:

22        Q.    Is it common in the field of

23   geotechnical engineering to use the symbol Q

24   for cubic feet per second?

25        A.    No, not really.  But, I mean,

245

1                    REED MOSHER

2    it's not a...

3         Q.    Then the columns immediately to

4    the right say peak TW.  Do you know what TW

5    is?

6         A.    I do not know what that is.

7         Q.    And then there are columns to

8    the right of that saying peak WL outside Weir.

9    Does that look like water level?

10             MR. RAFFMAN:  Objection.

11        Foundation.

12             MS. EL-AMIN:  Same objection.

13   BY MR. SEYMOUR:

14        Q.    Do you know?

15        A.    It could be water level.

16        Q.    Do you know?

17        A.    I don't know for sure.  But by

18   looking at this, just purely looking at the

19   information here, based on what you said, I'd

20   say it could be.

21             MR. SEYMOUR:  I ask the court

22        reporter to mark as Exhibit 10 to the

23        deposition another document that was on

24        the CD for your reliance materials.  It

25        is labeled IHNC at the top.

246

1            REED MOSHER

2            (Mosher Exhibit No. 10 was

3        marked for identification.)

4    BY MR. SEYMOUR:

5        Q.    Are you familiar with this

6    chart?

7        A.    I am not really familiar with

8    it, but I have seen something similar to this.

9    I was asked questions about this in the

10   Robinson.  And I at the time told them that,

11   as I am telling you, that I did not produce

12   this, I really don't know what the explanation

13   of it is other than in general terms that this

14   is part of the assessment that Steve used to

15   look at how much water was flowing through the

16   failure -- through the breaches, and that's

17   it.

18       Q.    Was this generated by

19   Mr. Fitzgerald for --

20       A.    Yes.  It was included in an

21   email that he sent me with some other

22   information.

23       Q.    There are two areas that are

24   marked by -- well, red partial rectangles.  Do

25   you know whether those correspond to the

247

1               REED MOSHER

2    locations of the breaches?

3        A.    I believe they are, but -- but

4    that's only, you know, based on what I know

5    here and what I saw with the other ones on the

6    MRGO previous ones I was asked about in court.

7        Q.    There is a black line with sort

8    of diamonds on it.  And the legend says that

9    that is IPET HEC-RAS.  And I believe you use

10   that phrase in your report.

11            What does that mean?

12            MR. RAFFMAN:  Objection.

13            THE WITNESS:  Yeah.  I don't

14       know.  Other than like -- I know it --

15       well, I know what HEC-RAS is.  That's

16       the analysis called HEC-RAS.  But I

17       don't --

18   BY MR. SEYMOUR:

19       Q.    What's that?

20       A.    Well, it's a program called by

21   the Hydrographic Engineering Center, which is

22   part of the Corps review out in Sacramento.

23   And it's a program that they call RAS, but I

24   know very little about it other than its name.

25       Q.    Over on the right-hand side

248

1                    REED MOSHER

2      there is a reference to Kemp crest elev. with

3      the FINEL model, in parentheses, below that.

4      Do you know what that means?

5          A.    Only from -- I know that there's

6      something called the FINEL model, and that was

7      something the Dutch used.  And that's the

8      extent of my knowledge of that.

9                    (Mosher Exhibit No. 11 was

10          marked for identification.)

11     BY MR. SEYMOUR:

12         Q.    I asked the court reporter to

13     mark as Exhibit 11 another document from your

14     reliance materials which says at the top

15     H1ax1.5 model, volume from perimeter lateral

16     weirs (acre feet).

17             Do you know what this is?

18         A.    I do know a little bit about

19     this one because this is one I was asking him

20     about.  Here was looking at the amount of

21     flooding that took place relative to the

22     different breaches in different locations.

23     And with breaches and no breaches.

24         Q.    The amount of flooding that

25     would have taken place without any breaches

249

REED MOSHER

1

2    versus what took place with breaches?

3         A.    Yeah, it's basically, for each

4    of the breaches, how much water entered into

5    the area.

6         Q.    Do you know whether these

7    numbers were generated accurately?

8         A.    No, I don't.  This is what

9    Steve -- you would have to ask Steve

10   Fitzgerald.  He is the one that did that.

11             (Mosher Exhibit No. 12 was

12        marked for identification.)

13   BY MR. SEYMOUR:

14        Q.    I asked the court reporter to

15   mark as Exhibit 12 to the deposition a

16   map-type chart.  Are you familiar with this

17   document?

18        A.    Uh-huh.

19        Q.    You have to say yes or no.

20        A.    Yes.  Yes.

21        Q.    Please explain it.

22        A.    It is a document that shows

23   locations along the MRGO, and they coordinate

24   with a series of LIDAR data in pictures,

25   vertical pictures, taken at these locations.

250

REED MOSHER

1

2          And there is a series of continuing

3     LIDAR datums for between 3,000, 6,000 --

4     there's just a whole series of them that go

5     along with that.

6          Q.    Okay.  I don't see numbers like

7     3,000 or 6,000.  Can you direct me to the part

8     that you're thinking of?

9          A.    If you look at the document

10    here, it starts out at zero here, goes to

11    3,000, 6,000, 9,000, 12,000.  And that's a

12    distance along the -- from the starting point,

13    zero.

14          Q.    Along the MRGO?

15          A.    MRGO.  Yeah.

16          Q.    Does this provide any

17    information to you with respect to the Inner

18    Harbor Navigational Canal?

19          A.    (Shakes head.)

20          Q.    No?

21          A.    (Shakes head.)

22               No.

23          Q.    Is it -- withdraw that.

24               On the right-hand side you see the

25    72,000 mark for the MRGO.  And then you see

251

1                          REED MOSHER

2      turning -- what looks like close to a right

3      turn, the numbers go on, 75,000, down to

4      82,825.  Do you see that?

5              A.     Yes, I do.

6              Q.     Is that also a breach of the

7      MRGO?

8              A.     Yes.  It's the levee that comes

9      back and goes into -- goes back to make a

10     connection for the levee that goes back --

11     what do they call -- Verret to Chalmette

12     levee.

13             Q.     And does a -- I don't see a blue

14     line indicating water after the 82,825-foot

15     marker, unless it's the one right next to that

16     roughly horizontal orange line.  Is that a

17     body of water?

18             A.     No.  The MRGO stops -- this

19     chart, on the levee, turns at the MRGO at

20     72,000 and comes back to make a connection

21     with the Mississippi River.

22             Q.     Is the connection with the

23     Mississippi River off the chart?

24             A.     No.  It's there.

25             Q.     Could you describe where it goes

252

REED MOSHER

1    from the last point on the MRGO towards the
2
3    Mississippi?

4         A.    Okay.

5         Q.    If you hold the chart up so the
6    videographer can see what you're pointing to,
7    it will help.

8         A.    Okay.  Right here is the MRGO.
9    Okay?

10         Q.    Uh-huh.

11         A.    The levee comes back along here,
12    hits this straighter part of the levee, and
13    this comes back to the Mississippi River over
14    here on the left.

15         Q.    So it is along the roughly
16    horizontal orange line on the bottom?

17         A.    Right.

18         Q.    Okay.

19         A.    But that's not a body of water.
20    That's actually a swamp marsh area.

21              Are we going to go through all of
22    these?

23         Q.    No.  Just the ones that I
24    printed out.

25         A.    Okay.  So am I here to help you

253

REED MOSHER

1

understand what those are?

3     Q.    So that I can know whether I

4 need to ask you questions about it.  That's

5 right.

6              (Mosher Exhibit No. 13 was

7        marked for identification.)

8 BY MR. SEYMOUR:

9     Q.    I ask the reporter to mark as

10 Exhibit 13 a document entitled, Contribution

11 from each source.

12              Have you seen this document before?

13     A.    I don't remember this one.  I

14 don't remember using this one.  It may have

15 been in with Fitzgerald's information.  So I

16 can't help you, really, with that.

17     Q.    Please turn to your report for

18 IPET, Deposition Exhibit 2, at page 70.  There

19 is one item that's -- well --

20     A.    Go ahead.

21     Q.    It's the IPET report, not the --

22 I think you've got the same thing in your...

23     A.    Yeah.  I just wanted to make

24 sure.  Yes.  Uh-huh.

25     Q.    Okay.  What's the page where the

254

REED MOSHER

2    corresponding chart appears in your expert

3    report?

4           A.     61.

5           Q.     There is one set of

6    measurements -- actually two -- that seem a

7    little bit different than the others.  The one

8    marked by an X called USGS gauge IHNC at I-10.

9           A.     Yes.

10          Q.     Do you know why those

11   measurements seem to be out of step with the

12   others?

13          A.     The ones at 10 with the others?

14   Yes.  It is believed that that gauge stuck

15   during the time of the hurricane.  It actually

16   has a little slider, and that got stuck and

17   caused it actually to go down, and then it

18   popped back up.  And the belief is that the

19   readings were erroneous.

20          It's detailed about that in Volume

21   IV.  You will find it there.

22          Q.     Then the Orleans levee gauge,

23   IHNC at I-10, looks as if it takes a turn

24   that's away from the rest of the data for a

25   little bit.

255

REED MOSHER

1

2      A.     I think that's the one I was

3  talking about.  Okay.  Maybe that's -- oh,

4  which one -- it's the Orleans levee gauge 10?

5      Q.     It's got a purple line, and it's

6  got --

7      A.     Boxes on it?

8      Q.     -- sort of a blue rectangle on

9  top of it.

10      A.     Yeah.  Those are the -- I think

11  those are gauges that are simultaneous -- that

12  are located in the same area.  And they seem

13  to be somewhat erroneous at that location.

14          I think those are also very close

15  to where the railroad crossing blew open when

16  they were sandbagging it.

17      Q.     We spoke about the scour trench

18  on the protected side of the floodwall, again,

19  at the Inner Harbor Navigational Canal on the

20  east side.  Does that trench go as far -- the

21  picture of the trench we had was behind a wall

22  that had not failed.  Did that trench go as

23  far as the failure of the south breach?

24      A.     Yes.

25      Q.     Did it extend beyond that into

256

1                    REED MOSHER

2    the area of the failure?

3         A.     Well, it was hard to -- yes, it

4    is into the area of failure.  You can

5    actually -- there's photographs in the report

6    that shows that.

7         Q.     And did it extend all the way to

8    the north breach?

9         A.     Yes.

10        Q.     What is your understanding of

11   the word "overtopping" as you use it in your

12   reports?

13        A.     Water flowing over the crest of

14   the wall of the levee.

15        Q.     Does overtopping mean waves

16   splashing over or is that something different?

17        A.     In general terms, I think we've

18   used the overtopping being that the surge

19   level would be above the top.

20        Q.     We have talked a little bit

21   about the subsidence of the ground under the

22   east wall of the Inner Harbor Navigational

23   Canal.  Was the subsidence uniform across the

24   area or did it differ?

25        A.     Well, it varied some in surface

1                    REED MOSHER

2    location, especially the marsh material in the

3    levee in the backfill.   From -- from a general

4    layman's term, when you go out there and look

5    at it, it looked fairly consistent, but there

6    are some variations among -- in the heights of

7    it on both -- both sides.

8         Q.     Is it possible to characterize

9    the size of the variations?

10        A.     I could, but I don't have that

11   immediately.  We would have to do some --

12        Q.     Is it more or less than an IHNC?

13        A.     Oh, it's more than an IHNC.

14        Q.     Do you know if it's more or less

15   than a foot?

16        A.     I would say that it's close --

17   it may vary as much as two feet.   And Novato

18   (phonetic) varied from -- as much as four or

19   five feet.

20        Q.     How often -- or how far apart in

21   time were these inspections that we've talked

22   about?

23        A.     I don't know -- I actually don't

24   know the exact length, but I think they have a

25   requirement of every five years to do an

258

1                    REED MOSHER

2    inspection of the levees.  And I believe that

3    is actually done -- the responsibility of the

4    inspection is by the levee board, the local

5    levee board.

6          Q.    You've referred to relying on

7    stopped clock data.  How many stopped clocks

8    did you use?

9          A.    We would have to look at a group

10   of -- I didn't actually do the survey of that;

11   other folks did.  I would have to go and look

12   at what they had for that.  I don't know right

13   offhand.  But it is -- all of that is

14   explained in Volume IV of our report in quite

15   a lot of detail.

16         Q.    Okay.  Did you obtain any

17   information about the time that electric power

18   was cut to the Lower Ninth Ward?

19         A.    No.  We did do some interviews

20   with the people that were at the pump station

21   at Florida Avenue and talked to them about --

22   and I think they mentioned in there the time

23   that they lost the -- lost the power.

24         Q.    Do you recall the time they told

25   you?

REED MOSHER

A.      They didn't tell me, but I
think, reading it -- and this is
recollections -- it was somewhere before 5:00
in the morning or something like that.

Q.      And in looking at the stopped
clocks that you relied on for the IPET report
and your expert report, were any of those
electric clocks?

A.      No.  Those weren't -- electric
clocks weren't part of the stopped clock
survey because we know that does go out in the
power.  So those were not part of that survey.

Q.      Wouldn't the electric clocks
show you what time the power went out?

A.      It would, but it doesn't tell
you how high the water is.  And we were
interested in knowing how high the water is,
not when the electricity went out.

Q.      As you can see from the speed
with which I'm going through my notes, we've
already covered an awful lot of things that I
had down here.

We talked a moment ago about the
differences in the degree of subsidence within

260

REED MOSHER

2  the Lower Ninth Ward where the floodwall is in

3  the Lower Ninth Ward.

4       Was there greater subsidence in the

5  areas that breached?

6       A.    Okay.   There are -- we actually

7  separate it into two pieces, okay.   And

8  subsidence is -- there is a regional

9  subsidence that's taking place in the New

10  Orleans area, which is a large soil -- large

11  subsidence due to the soil and the geology in

12  that area.   And then there is local settlement

13  that takes place.

14       When the levees are built along

15  there, there is settlement due to the fact

16  that the levees are built on a soft material.

17  And that continues on for a number of years.

18  It may take 30 to 40 years for that to take

19  place.

20       Variations in how much of that

21  would vary along there, depend on the soil

22  thicknesses.   And you see from our -- the

23  profiles that we have there, we have different

24  amounts of soils, so that would vary along the

25  length of wall.   And we would have to do a

261

REED MOSHER

2   detailed study of each location to determine

3   how much that might vary.  But it wouldn't be

4   unusual to have a difference of a foot of

5   settlement, or six inches of settlement, in

6   the levee fill from one location to another.

7       Q.    I just wanted to know if there

8   was a substantial enough degree of settlement

9   in areas that failed that distinguishes them

10   from the areas that did not fail?

11       A.    One of the problems that we have

12   is we don't have as good information about the

13   profiles from one location to another to

14   distinguish that.

15       Q.    Okay.  When you were performing

16   your analysis of the Inner Harbor Navigation

17   Canal, did you learn whether or not the

18   Florida Avenue Bridge was lowered to close off

19   that end of the canal as well as the Claiborne

20   Avenue side?

21       A.    I don't remember, but I think --

22   I don't remember exactly.

23       Q.    In your investigation of the

24   Inner Harbor Navigation Canal in connection

25   with the IPET report and your expert report,

262

REED MOSHER

1

2   did you ever become aware of any other vessel

3   or object that was in the water at the time of

4   Katrina?

5              MR. RAFFMAN:  Objection.  Form.

6              THE WITNESS:  No.

7   BY MR. SEYMOUR:

8        Q.    By "in the water," I mean inside

9   the canal.

10       A.    No, I don't remember, no.

11       Q.    If there had been another vessel

12   or a large object, would you have been likely

13   to learn of it during the investigation?

14       A.    If it was another large object

15   and if it was in that region where the

16   failures were, I would probably have been told

17   about that.  But I don't remember any -- I

18   don't know of any notification that there was

19   another thing floating around out there.

20             MR. SEYMOUR:  No further

21        questions.

22             MR. RAFFMAN:  Bear with me.  I

23        have a few minutes.

24             THE WITNESS:  Okay.

25

**REED MOSHER**

**EXAMINATION**

BY MR. RAFFMAN:

1  
2  
3  
4  Q.    You mentioned earlier -- you  
5  used the term "refereed paper."  What is a  
6  refereed paper?  
7  A.    It's a paper that is reviewed by  
8  members of the engineering community before  
9  something is published.  They ask questions  
10  about it or if they don't believe something  
11  that's in the paper is correct or they would  
12  like to see something explained more, they'll  
13  get back to you, and you have to correct those  
14  before those can be published.  
15  Q.    And have you seen any refereed  
16  papers concerning the causes of the Inner  
17  Harbor Navigation Canal breaches?  
18  A.    I have not.  
19  Q.    What's the purpose of a --  
20  having a paper be refereed?  
21  A.    It's similar to like a peer  
22  review, essentially your peers get a chance to  
23  review what you've written.  It doesn't  
24  necessarily mean that what you have there is  
25  correct, but it does mean it has a certain

264

REED MOSHER

2  amount of merit that they believe that the

3  community ought to see.

4        Q.     Have you seen peer-reviewed

5  papers regarding the causes of the Katrina

6  breaches?

7        A.     Yes, on some.  17th Street

8  there's been some peer-reviewed papers.

9  There's a whole specialty journal on that.

10        Q.     All right.  During the course of

11  your work on the Katrina breaches, you've seen

12  a number of different scientific opinions

13  regarding the causes of the Inner Harbor

14  Navigation Canal breaches; is that fair?

15        A.     Yes, uh-huh.

16        Q.     Dr. Mosher, have you seen any

17  report by any scientist -- and for present

18  purposes, I'll exclude scientists who are

19  working for the plaintiffs in the barge

20  case -- any report by any scientist that has

21  concluded that the barge caused the failures

22  of the Inner Harbor Navigational Canal?

23        A.     I have not seen any.

24        Q.     I am going to ask you to take a

25  look at Exhibit 50 -- figure 50 in Exhibit

265

REED MOSHER

1

2    Number 1 to your deposition.

3              MR. SEYMOUR:  On page?

4              MR. RAFFMAN:  I believe it's on

5        page 52.

6              THE WITNESS:  Yes.

7    BY MR. RAFFMAN:

8        Q.    Can you describe what is shown

9    in figure 50?

10       A.    This is a barge that struck the

11   wall that I was talking about on the control

12   structure Bayou Bienvenue.

13       Q.    We're going to mark -- and the

14   barge is sitting on top of the floodwall

15   there?

16       A.    Yes.

17       Q.    We're going to mark another

18   exhibit.  This may be our last.  I will

19   represent that the cover page is the cover

20   page that is printed from -- well, let me ask

21   the question.  Do you recognize the cover

22   page?

23       A.    It looks like something from our

24   website.

25              (Mosher Exhibit No. 14 was

266

REED MOSHER

1

2          marked for identification.)

3    BY MR. RAFFMAN:

4          Q.     Right.   And I'll represent that

5    the photos were printed from the website, but

6    I'll ask the question.   And I will represent

7    further that the Bates control numbers on the

8    photos were added by our law firm.

9          A.     Okay.

10         Q.     The question, Dr. Mosher, is, do

11   you recognize the pictures in Exhibit 14 as

12   having come from the IPET website?

13         A.     Yes.   Uh-huh.

14         Q.     And are these pictures that you

15   viewed in connection with your work on the

16   IPET project?

17         A.     They have been some that you

18   looked at --

19         Q.     All right.

20         A.     -- but this is fairly early on,

21   yeah.

22         Q.     What is shown in these pictures?

23         A.     It is a barge that was actually

24   on top of the wall on the control structure.

25   And it shows that -- you know, the damage that

REED MOSHER

2   that barge did when it ran into it and landed

3   on a structure.

4       Q.    Is it fair to say, Dr. Mosher,

5   that whatever damage the barge did is in the

6   nature of punching through rather than causing

7   the collapse?

8       A.    Yes.  And it's basically what I

9   described earlier today in my deposition.

10      Q.    And to make it clear for the

11   record, Dr. Mosher, is this barge a different

12   barge from the ING 4727 that ended up in the

13   Lower Ninth Ward?

14      A.    It looks similar to that.  It is

15   a different barge, but I don't -- but it looks

16   similar to that type of barge.

17      Q.    That's fair enough.  Of a

18   similar type, but not the same barge?

19      A.    Right.

20      Q.    Thank you.  All right.

21      The next place I wanted to direct

22   your attention, Dr. Mosher, is page -- it's

23   going to be Exhibit 2 to your deposition, the

24   IPET report.  It's going to be figure 82.  And

25   the page number is V-102.

268

1                    REED MOSHER

2         A.      Okay.

3         Q.      Do you see that?  This is a

4   picture that my colleague, Mr. Seymour showed

5   you earlier.  Do you see that?

6         A.      That's correct.  Uh-huh.

7         Q.      And what's written in the

8   caption here is stage A erosion along the

9   eastern side --

10        A.      Right.

11        Q.      -- of the IHNC adjacent to the

12  Lower Ninth Ward.

13             What is stage A erosion?

14        A.      We have a description of the

15  different types of erosion that would --

16  actually, it's shown in one of the figures

17  back here.  Page V-94, figure 74.

18        Q.      I see.

19        A.      And it has a description of the

20  different stages of erosion that take place

21  when you have water flowing over an I-wall and

22  a levee.  Just to give -- a way to represent

23  the different stages, a different way to

24  characterize the -- what we saw in the field

25  of different stages of erosion.

269

1                    REED MOSHER

2        Q.      All right.   Did your team

3    conclude that, insofar as floodwalls are

4    concerned, erosion can progress from this sort

5    of stage A into something that might be more

6    dramatic in the area of failure?

7        A.      Yes, uh-huh.

8        Q.      So the fact that the levee

9    survived here at figure 82 -- see at figure 82

10   the levee is not -- the floodwall is not

11   pushed back and bowed out in the neighborhood.

12       A.      Right.

13       Q.      Did your organization conclude,

14   nevertheless, that as erosion progress at

15   other stages, erosion can, in fact, cause the

16   floodwall to fail and bow back into the

17   neighborhood?

18       A.      Yes.

19       Q.      And that's what --

20       A.      You know, you can see it kind of

21   progressing from what we saw on photograph 76

22   all the way up to photograph 83.

23       Q.      You refer to photographs 76 and

24   83.   Those are the figure 76 and figure 83 in

25   the IPET Volume V report?

270

1                 REED MOSHER

2        A.     That's correct.

3        Q.     I am going to ask you to turn to
4  figure 53 at page V72.

5        A.     Okay.

6        Q.     You see this is a picture
7  looking -- tell me what's described in this
8  picture.

9        A.     This is the south breach,
10  looking south.   You can see on the left the
11  I-wall as it's been displaced.   And it's
12  relatively close to the south end of it.   You
13  can see a scour area running from the right
14  corner to the middle third of the wall, a
15  deeper area where the scour took place --

16        Q.     All right.

17        A.     -- right here.   And then you see
18  the wall that hasn't been displaced out into
19  the neighborhood at the very end of the south
20  breach.

21        Q.     All right.   Now, you've pointed
22  to the wall that hasn't been displaced into
23  the neighborhood at the very end of the south
24  breach.

25        A.     Right.

271

1                    REED MOSHER

2          Q.      Did your team observe something

3    at that location?

4          A.      Yeah.  That was where we found

5    what looked to be an impact by the barge or by

6    something where it actually had scraped off

7    the concrete at that area and exposed some

8    rebar.

9          Q.      Apart from that standing-up, or

10   nearly standing-up panel, did your team find

11   any other physical evidence of barge impact

12   with the wall?

13         A.      No, we didn't.

14         Q.      Dr. Mosher, you mentioned just a

15   few moments ago interviews of people at a pump

16   station.

17         A.      Right.

18         Q.      Where is that pump station

19   located?

20         A.      It is near Florida Avenue Bridge

21   and the north breach in that area.

22         Q.      And with whom were those

23   interviews conducted?

24         A.      There was a team of folks that

25   went out to do that.  Their names are in the

```
 1              REED MOSHER
 2    Volume IV.
 3         Q.     All right.   And those interviews
 4    that were conducted, were they with employees
 5    of the pump station who remained behind during
 6    the storm?
 7         A.     Yes.
 8         Q.     And did those interviews
 9    generate any information from any of those
10    employees to the effect that a barge had been
11    observed impacting the floodwall at the
12    location of the north breach?
13         A.     That was not -- that wasn't
14    reported by them when they did the interviews.
15         Q.     Just to be clear, it was not
16    reported by them?
17         A.     It was not reported by them.
18         Q.     All right.  You were asked
19    questions earlier about the strength of the
20    levee fill.  Let me just turn your attention
21    to appendix 11, item 3 -- Exhibit 3 to your
22    report.
23              And you reported in -- I'm sorry.
24    I am totally screwing up -- these questions up
25    because I want to finish.  Let me go back.  I
```

273

1                    REED MOSHER

2    only have a couple more.

3         A.    Sure.  Take your time.

4              MR. SEYMOUR:  You can finish now

5    if you want.

6              MR. RAFFMAN:  Just a couple

7    more.

8    BY MR. RAFFMAN:

9         Q.    I'm referring you to figure

10   11-12 in Exhibit 3 to your deposition.  All

11   right.  The strength of the levee fill.  You

12   reported here that the strength of the levee

13   fill is about 500 pounds per square feet,

14   right?

15        A.    I think it's actually about 550,

16   something like that.

17        Q.    550.  And is that the

18   neighborhood of the strength that the Corps

19   uses when it would put soil on levee fill?

20        A.    Well, in general, that is the

21   available fill, and they compact it --

22   semi-compact it to a degree.  And, yes, that's

23   a value that's reasonable.

24              They would like to have better, but

25   you don't always have that available.  The

1                    REED MOSHER

2    stronger the better, so...

3          Q.      And this is what the value was

4    found by the CPT testing as well?

5          A.      Right.   But the real, I mean,

6    controlling part of it was this

7    interdisciplinary -- boy, I hate this word,

8    interdistributary clay layer.

9          Q.      Just to be clear, the

10   interdistributary clay layer was the part that

11   you found controlled the strength?

12         A.      Controlled the stability of the

13   levee.

14         Q.      All right.

15         A.      And this is very consistent with

16   other published data, people that have done

17   studies on it, and the CP -- we typically did

18   the CPTU data because it gave the best -- you

19   know, was the best indicator of the soil

20   strength.   It's an institute measurement.   And

21   then we backed it up with these vane shear

22   tests which you will see in the DST 1 through

23   3.

24         Q.      Now, you talked about -- or

25   Mr. Seymour asked you about subsidence.   And

275

REED MOSHER

2   did I understand you correctly that when you

3   put more levee material and add that material

4   to a given place, then you would expect to see

5   more subsidence in the place --

6        A.    Or more settlement in that

7   location.  And that really is talked about as

8   being settlement.  Subsidence is a kind of

9   regional type --

10       Q.    All right.  Then let me use the

11  right term.  You expect to see more settlement

12  in a place where more levee fill is added?

13       A.    Right.  More weight is applied

14  to it, so more squeezing of the water out of

15  the soil that takes place.  And you get

16  greater settlement.

17            MR. RAFFMAN:  All right.  That

18       concludes my examination except I

19       wanted to say one thing for the record.

20            We noted Mr. Seymour's objection to

21       Dr. Mosher's testimony being admitted

22       as lay opinion testimony.  And I

23       believe that we have the right to

24       introduce his testimony on that basis.

25       But to the extent there is an

276

1          REED MOSHER

2     objection, we're going to reserve the

3     right to designate this deposition as

4     expert testimony.  And we can fight

5     with the plaintiffs about that later,

6     but I don't want the record to be

7     unclear.

8          We believe the Court should hear

9     this testimony, and that we will do

10    what is needed to perfect its

11    admissibility.  I have no more

12    questions.

13         MR. SEYMOUR:  This is Richard

14    Seymour with the final sign-off on

15    this.  We would object to the tendering

16    of Dr. Mosher as an expert in this

17    case.  There is not a report that has

18    been tendered to us in this case, and

19    the deadline has passed for designating

20    an additional expert.

21         MR. RAFFMAN:  Your position is

22    noted.

23         MR. SEYMOUR:  Dr. Mosher, thank

24    you very much.

25         THE WITNESS:  Okay.  Thank you.

277

1           REED MOSHER

2           THE VIDEOGRAPHER:  One moment.

3       We're going off the record.  This is

4       end of videotape number 4.  The time is

5       now 4:29.

6

7           (Whereupon, at 4:29 p.m. signature

8       not having been waived, the deposition

9       was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

278

1

2                    **ACKNOWLEDGMENT OF DEPONENT**

3

4                    I, REED MOSHER, do hereby

5        acknowledge I have read and examined the

6        foregoing pages of testimony, and the same is

7        a true, correct and complete transcription of

8        the testimony given by me, and any changes

9        and/or corrections, if any, appear in the

10       attached errata sheet signed by me.

11

12       _____        _____

13       Date                         Signature

14

15

16

17

18

19

20

21

22

23

24

25

279

1

2                  REPORTER'S CERTIFICATE

3                       I, Kathy Savich, the undersigned

4          Registered Professional Reporter and

5          Notary Public in and for the District

6          of Columbia, do hereby certify that the

7          above-named witness, after having been

8          first duly sworn to testify to the

9          truth, did testify as set forth in the

10         foregoing pages, that the testimony was

11         reported by me in stenotype and

12         transcribed under my personal direction

13         and supervision, and is a true and

14         correct transcript.

15                     I further certify that I am not

16         of counsel, not related to counsel or

17         the parties hereto, and not in any way

18         interested in the outcome of this

19         matter.

20                       SUBSCRIBED AND SWORN TO under my

21         hand.

22    My Commission Expires:  1/1/2012

23

      _____

24    Kathy Savich, RPR

      Notary Public in and for the

25    District of Columbia

280

1

2                      **ERRATA SHEET**

3           **Veritext Reporting Company**
                      **1-800-727-6396**

4     **200 Old Country Road 1350 Broadway**

      **Mineola, N.Y. 11501  New York, N.Y. 11018**

5

      **Name of Case:  IN RE: KATRINA CANAL BREACHES**

6     **Date of Deposition: 7/22/09**

      **Name of Deponent: Reed Mosher**

7

      **Page       Line      Change                     Reason**

8     _____     _____     _____     _____

      _____     _____     _____     _____

9     _____     _____     _____     _____

      _____     _____     _____     _____

10    _____     _____     _____     _____

      _____     _____     _____     _____

11    _____     _____     _____     _____

      _____     _____     _____     _____

12    _____     _____     _____     _____

      _____     _____     _____     _____

13    _____     _____     _____     _____

      _____     _____     _____     _____

14    _____     _____     _____     _____

      _____     _____     _____     _____

15    _____     _____     _____     _____

      _____     _____     _____     _____

16    _____     _____     _____     _____

      _____     _____     _____     _____

17    _____     _____     _____     _____

      _____     _____     _____     _____

18    _____     _____     _____     _____

19

20                         _____

                              **REED MOSHER**

21

      **SUBSCRIBED AND SWORN TO BEFORE ME**

22    **THIS _____DAY OF _____, 20__.**

23

      _____        _____

24     **NOTARY PUBLIC           COMMISSION EXPIRES**

25