

# Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005

## Volume I: Main Text and Executive Summary

by

R. B. Seed, R. G. Bea, R. I. Abdelmalak, A. G. Athanasopoulos, G. P. Boutwell, J. D. Bray,
J.-L. Briaud, C. Cheung, D. Cobos-Roa, J. Cohen-Waeber, B. D. Collins, L. Ehrensing, D. Farber,
M. Hanemann, L. F. Harder, K. S. Inkabi, A. M. Kammerer, D. Karadeniz, R.E. Kayen, R. E. S. Moss, J. Nicks,
S. Nimmala, J. M. Pestana, J. Porter, K. Rhee, M. F. Riemer, K. Roberts, J. D. Rogers, R. Storesund,
A. V. Govindasamy, X. Vera-Grunauer, J. E. Wartman, C. M. Watkins, E. Wenk Jr., and S. C. Yim

**Final Report**
**July 31, 2006**

U.S. Dist. Ct. E.D. La.
No. 05-4182(K)(2) -- BARGE
**DX 141**







Case 2:05-cv-04182-SRD-JCW   Document 20405-80   Filed 08/30/11   Page 2 of 5

Independent Levee
Investigation Team

New Orleans Levee Systems
Hurricane Katrina
July 31, 2006

surge to flow virtually unimpeded across the open swampland before the storm surge had begun to subside significantly.

The Forty Arpent levee was only a "secondary" levee, with crest heights on the order of Elev. + 7.5 to + 10 feet (MSL), and it was not intended to have to face the full brunt of a largely undiminished rising storm surge.  As a result, the storm surge passed easily over this secondary levee, and pushed rapidly into the populated areas of St. Bernard Parish, as described previously in Chapter 2.  As is arrived rapidly, and prior to significant abatement of the storm surge, the floodwaters ponded to an unexpectedly high elevation of approximately +12 feet above mean sea level.  Homes and businesses on "high ground" (at elevations several feet and more above sea level) were thus unexpectedly flooded, and the depth of flooding in lower-lying areas was especially severe.  The massive inrushing floodwaters also had large lateral force, and pushed homes aside from their foundations (as shown previously in Figure 2.19), tossed cars like toys (see Figure 6.15), deposited large fishing boats in residential neighborhoods (Figure 6.16), and left large branches of trees on the roofs of numerous homes (e.g.: Figure 6.17).

Interestingly, the smaller (secondary) Forty Arpent levee was severely overtopped along much of its length, but it suffered relatively little erosional damage as a result.  This appears to be because it was constructed of significantly better materials than the outer (MRGO frontage) levees; the Forty Arpent levee appears to have been constructed primarily of clay, with good intrinsic resistance to erosion.  Figure 6.14 shows a section of the Forty Arpent levee that was apparently significantly overtopped, but which suffered only slight "cosmetic" erosional damage as a result.

The use of highly erodeable sand and shell sand fill was unfortunate along the exposed MRGO frontage levee section, and the consequences were severe.  Damage to the populated areas of St. Bernard Parish was catastrophic, and the floodwaters from this populous area next began to make their way westwards towards what was now the already doomed Lower Ninth Ward.

**6.3   The Two large Breaches on the East Bank of the IHNC at the Lower Ninth Ward**

As the storm surge from Lake Borgne pushed westward along the east-west trending channel of the GIWW/MRGO that separates the St. Bernard and New Orleans East protected basins, it raised the water levels in the IHNC and produced two massive breaches on the east bank of the IHNC (at the western edge of the Lower Ninth Ward).  These two breaches occurred at approximately 7:30 to 7:45 a.m., at an IHNC water level of approximately Elev. + 14 to +14.5 feet (MSL), as shown in Figure 6.18 (which shows a hydrograph of measured water levels vs. time in the IHNC channel.)


6.3.1  The IHNC East Bank (South) Breach at the Lower Ninth Ward

The larger of these two breaches was the south breach, and this is shown in Figure 6.19 (which is a repeat of Figure 2.13).  This was a very long breach, nearly 900 feet in length, and the inrushing waters entered the adjacent community with great force.  As shown

in Figure 6.17, homes for several blocks were ripped from their foundations and scattered, usually in splinters, eastward across the inboard neighborhood.

Figure 6.19 also shows the sheetpile curtain that had supported the floodwall at the crest of the earthen levee at this section. It is interesting to note that the sheetpiles (which were cold-rolled steel sections) remained interlocked throughout the cataclysmic failure and the ensuing hydrodynamic loading of the massive inrushing floodwaters. The concrete floodwall is largely absent from the tops of these sheetpiles, as the sheetpiles have been stretched out (like an accordion), flattening their bent flanges in order to accommodate the extension imposed on them by the inrushing flow.

Figure 6.19 also shows a large steel barge that passed inward through this section, and came to rest near the southern end of the breach. This raised the question as to which came first; the barge or the breach?

Figure 6.20 shows the large barge, in its final resting position (prior to being cut apart with torches to remove it) atop a small yellow bus. This was not the initial resting location of this barge immediately after hurricane Katrina, however. Initially, after Katrina, the barge had come to rest a bit farther to the east. It was then re-floated several weeks later when the temporary breach repair failed during the second hurricane surge produced by hurricane Rita on September 24, 2005 (see Chapter 11), and came to rest at its current position at that time. The small yellow school bus also arrived between hurricanes Katrina and Rita, having been appropriated and used for interim transport and then abandoned in its location as shown.

There is a single large dent low on the side of the barge just around the left side of the bow (not quite visible in Figure 6.20), and a pronounced scrape on the bottom of the barge at that same location. Most of the concrete floodwall was failed in extension and flexure, with its reinforcing steel (rebar) fairly extended. There was one single section of wall which clearly evinced a major impact, however, and that was at the extreme southern end of the breach. Figure 6.21 shows a close-up view of the floodwall at this location. The rebar is compressed and bent, and the concrete crushed at this location. It was the consensus view of our investigation team that the barge had scraped along the wall and then impacted the end of the wall at this location.

As this was the extreme southern end of the very long breach; this impact was not the cause of the breach and failure. Instead, the barge was apparently traveling southwards along the IHNC (driven by the prevailing storm winds at that time) and was drawn into the breach by the inflowing waters. The barge did not enter cleanly into the breach, but struck at the south end before passing in.

That does not mean that the barge might not have struck the floodwall twice (or more times) before finally impacting the southern end of the breach, but our investigation's view is that there are other modes of failure that would have been <u>expected</u> to fail this section without any need for help from the barge, so that the likelihood is that the barge slipped its moorings and was eventually drawn in through a breach that was already well developed.

Case 2:05-cv-04182-SRD-JCW   Document 20405-80   Filed 08/30/11   Page 4 of 5

Independent Levee
Investigation Team

New Orleans Levee Systems
Hurricane Katrina
July 31, 2006

Figure 6.22 shows the trench that was eroded by water that passed over the top of the concrete floodwall at the south end of the large breach. (The barge can be seen at the right in this photo.) Overtopping and scour occurred at both ends of this breach feature, and the resulting scoured trenches reached depths of up to 5.5 feet in sections that did not subsequently fail. It is, of course, not possible to determine whether deeper scouring/trenching might have occurred at the actual breach inception location, as the embankment and foundation soils at the center of the breach were deeply scoured out by the massive flows in through the breach. One of the potential failure modes evaluated by our (ILIT) studies was the possibility that this scour had sufficiently laterally unbraced the concrete floodwall (and its supporting sheetpile curtain) that the lateral force of the elevated canal water was able to displace it laterals and foment a resulting breach.

Figure 6.23 shows our ILIT re-interpretation of the original boring data along this section of the east bank of the IHNC, with the locations of the two large breaches indicated. The boring data was far too sparse along this section for the importance of the design (the inboard population and properties being protected) and for the complexity of the local geology. In addition, widely spaced borings along the approximate levee centerline do not provide an adequate basis for development of appropriate cross-sections for analysis and design. An effort was made to perform pairs of borings (one roughly at the crest and another at the inboard toe) at selected locations so that cross-sections could at least be attempted, but this was still an inadequately sparse investigation. The foundation investigation for the design of these levees and floodwalls was inadequate for a project of this scope and importance, and the minor savings in drilling, sampling and testing are now dwarfed by the massive costs of the failures that resulted; both property damages and loss of life.

Figure 6.24 shows the cross-section used for our analyses of this south breach. The two pre-Katrina ("initial design") borings, Borings B-4 and B-4T, were supplemented by three additional CPT probes performed by the IPET investigation (IHBR-6.05C, 5.05C and 16.05C), and two additional borings and a CPTU probe that were performed by our ILIT investigation (Borings IHNC-S-BOR-1 and CON-1, and CPTU IHNC-S-CPT-1). The cross-section of Figure 6.24 shows the tragic failure to extend the sheetpile curtain to sufficient depth as to cut off underseepage flow through the laterally pervious "marsh" deposits at this site.

The upper embankment fill is a moderately compacted imported clay, which is underlain by an older "fat clay" (CH) fill apparently comprised of locally available lacustrine clays. The upper foundation soils are then dominated by thick deposits of high plasticity clays (CH), punctuated by two layers of marsh deposits, and there is a relatively thin but continuous stratum of low plasticity silt (ML) underlying the lower marsh unit.

Subsequent to the completion of the levee embankment and floodwall, additional sandy fill was placed on the outboard (water) side of the levee to raise the ground surface slightly above mean canal water level. Some buildings and facilities had been constructed on this made ground, but these had been removed prior to hurricane Katrina.

Figure 6.25 shows plots of data regarding strength properties vs. depth for the soils from the silt layer down (from Elevations -19 to -50 feet, MSL) beneath (a) the levee crest,

Case 2:05-cv-04182-SRD-JCW   Document 20405-80   Filed 08/30/11   Page 5 of 5

Independent Levee
Investigation Team

New Orleans Levee Systems
Hurricane Katrina
July 31, 2006

and (b) at the inboard toe of the levee (under far lesser embankment overburden). The detailed procedures and relationships used to process the CPTU data, and then to overlay the additional UUTX data to develop these plots, are presented and discussed in detail in Chapter 8, and this will not be repeated here. The lower unit of lacustrine clay clearly shows two overconsolidation "crusts" as a result of surface desiccation during early "stands" in the accretion of these deposits, and they are more normally consolidated at greater depth. These clays, in the end, do not appear to have participated in the failure that occurred.

Similarly, the relatively thin silt stratum (ML) also shows evidence of overconsolidation, and this gives it sufficient strength that it too is uninvolved the failure.

Figure 6.26 shows similar plots regarding strength properties of the far more critical upper foundation soil strata between elevations of approximately +0 to -20 feet (MSL). These deposits, consisting of interlayered marsh and clay units, are the critical soils at this site.

As described in detail in Chapter 8, a number of different approaches were taken to the processing of the available field and laboratory test data in order to evaluate and characterize these soils. Based on the CPTU measurements within the marsh deposits (both at this site, and at the 17th Street canal breach site) values of $B_q$ were developed, and then based on the relationships of Lunne et al. (1994) and Karlsrud et al. (1996), a value of $N_{kt} = 15$ was selected for transposing the CPTU tip resistance values to the estimates of undrained shear strength that are plotted in Figure 6.26. The resulting values were then converted to values of Su/P as shown in the far right figure of Figure 6.26, and these appear to infer three desiccation-induced overconsolidation profiles corresponding to surface exposure at three times during the evolution of these deposits. The relationship of Mayne and Mitchell (1988) was then used, again as described in Chapter 8, to cross-check the resulting relationship between Su/P vs. OCR as a function of Plasticity Index (PI, %) for these deposits using the available UUTX laboratory test data. These were found to be consistent. Finally, the limited available in situ vane shear test data, and the UUTX laboratory test data, was co-plotted with the CPTU-based strengths, and these too were judged to be consistent (with allowances for sample disturbance and vane insertion disturbance in these soils of variable fibrous organic content).

Similar processing resulted in selection of a value of $N_{kt} = 15$ for processing of the CPTU data for the silty clay (CH/CL) stratum lying between the two "marsh" deposits. This differs from the value of $N_{kt} = 12$ that was used to process the CPTU data for the deeper layer of gray lacustrine clay of high plasticity, and it reflects the lower plasticity of this upper clay unit. Once again, the limited available in situ vane shear test data and UUTX laboratory test data were then co-plotted with the strengths as interpreted by the CPTU, and were found to be consistent (as shown).

Figure 6.27 shows the geometry and principal input parameters used to model and analyze this section using the finite element analysis program PLAXIS (2004). The "soft soil" constitutive model within PLAXIS was used to model all of the uppermost soil strata, so that both undrained and partially drained conditions could be studied within an effective stress framework. Shear strengths from Figures 6.25 and 6.26 were reduced by 15% in the marsh strata, and by 20% in the clay strata, to account for differences between the field (in situ) test