"Eco-LOGIC: Waste Minimization at Louisiana Crude Oil & Gas Exploration and Production Sites," Louisiana Department of Environmental Quality (LDEQ), Feb 1995.

"Lag-Time of Thermal Distribution in a HDPE Liner," WEF Specialty Conf., Sewers of the Future, Houston, TX, Sep 10-13, 1995.

"Use of Red Mud as a Landfill Cover," ASCE/ACI Annual Fall Conference & Show, Pontchartrain Center, Kenner, LA, Sep 21, 1995.

"Eco-LOGIC: Waste Minimization at Louisiana Crude Oil & Gas Exploration and Production Sites," U.S. Environmental Protection Agency, Region VI, Dallas, TX, Oct 1995.

"Applicability of a New Efficiency Formula for Pile Groups," 11th African Conf. on Soil Mech. & Found. Eng., 11th ARC 95', Cairo, Egypt, Dec 11-15, 1995.

"A New Efficiency Formula for Pile Groups," ASCE Louisiana Section, Annual Spring Meeting, Lafayette, LA, Mar 29, 1996.

"Field and Numerical Evaluation of a Full-scale Geotextile Reinforced Embankment," 7th International Colloquium on Structural & Geotechnical Eng., Cairo, Egypt, Dec 17-19, 1996.

"Use of Municipal and Industrial Wastes as Artificial Soils," 7th International Colloquium on Structural & Geotechnical Eng., Cairo, Egypt, Dec 17-19, 1996.

"Use of Municipal and Industrial Wastes as Artificial Soils," Dept. of Civil Eng., Faculty of Engineering and Petroleum, Kuwait University, Feb 18, 1997.

"Field Performance of Pile Supported Approach Slabs," ASCE Mississippi Section Annual Spring Conference, University of Mississippi, Oxford, MS, May 13, 1999.

"Downdrag on Pile Supported Approach Slabs," ASCE/ACI Annual Fall Conference & Show, Pontchartrain Center, Kenner, LA, Sep 21, 1999.

"Downdrag Load on Piles," Louisiana Engineering Society, Acadiana Branch, Houma, LA, Feb 21, 2000.

"Mitigating Embankment Settlement with Pile Supported Approach Slabs," Louisiana Department of Transportation and Development, Baton Rouge, LA, Nov 2000.

"Settlement of Pile Supported Approach Slabs," ASCE/ACI Annual Fall Conference and Show, Pontchartrain Center, Kenner, LA, Sep 13-14, 2001.

"Buckling of HDPE Liners," Trenchless Technology Workshop, ASCE/SESTT, Landmark Hotel, Metairie, LA, Dec 6-7, 2001.

"An Expert System Decision Support System for Crisis Management," First International Conference on Intelligent Computing and Information Systems (ICICIS 2002), Cairo, Egypt, Jun 23-25, 2002.

"Evaluation of DOTD Semi-Integral Bridge and Abutment System," Transportation Research Conference, DOTD/LTRC, Baton Rouge, LA, Feb 19-20, 2004.

"Post-Katrina Geotechnical Engineering Education," Tri-State (LA, MS & AL) Engineering Society Meeting, Point Clear, AL June 1-4, 2008.

## WORKSHOPS ORGANIZED/TAUGHT:

"Introduction to Micro-Computers," Mini-Courses for Professional Development in Computer-Assisted Design for Micro and Mainframe Computers, Department of Civil and Environmental Engineering, Tulane University, New Orleans, LA, Oct 10-11, 1986.

"Structural Analysis - Micro," Mini-Courses for Professional Development in Computer-Assisted Design for Micro and Mainframe Computers, Department of Civil and Environmental Engineering, Tulane University, New Orleans, LA, Nov 7-8, 1986.

"Geotechnical Engineering," Mini-Courses for Professional Development in Computer-Assisted Design for Micro and Mainframe Computers, Department of Civil and Environmental Engineering, Tulane University, New Orleans, LA, Feb 13-14, 1987.

"Finite Element Modeling of Geotextile Reinforced Earth Embankments," Workshop for the US Army Corps of Engineers, Department of Civil and Environmental Engineering, Tulane University, New Orleans, LA, Mar 14-15, 1991.

"Liability Potential in Using Computer Software in Design," Organized and Moderated a Panel Discussion, Sponsored by the Geotechnical Activity Technical Committee, New Orleans Branch, ASCE, Tulane University, New Orleans, LA, Apr 4, 1991.

"An Expert System for Dredging Projects," Workshop for the U.S. Army Corps of Engineers, Department of Civil and Environmental Engineering, Tulane University, New Orleans, LA, Nov 20-22, 1991.

"GEODREDG - An Expert System for Geotechnical Aspects of Dredging," Workshop for the U.S. Army Corps of Engineers, Seattle District, Seattle, WA, Aug 22-24, 1992.

"GEODREDG - An Expert System for Geotechnical Aspects of Dredging," Workshop for the U.S. Army Corps of Engineers, Department of Civil and Environmental Engineering, Tulane University, New Orleans, LA, Sep 3-4, 1992.

Reimers, R.S., Bakeer, R.M., Abdelghani, A.A., Akers, T.G., Kiyombo, M.K., "Innovations in Landfill Operations and Design," Short Course for Louisiana LDEQ, *Sanitary Landfill Design and Management*, LSU, Baton Rouge, LA, Mar 1993.

Reimers, R.S. and Bakeer, R.M., "Innovative Approaches to Biosolids Management in Louisiana," LDEQ Environmental Education Seminar, Baton Rouge, LA, Jan 1994.

## RESEARCH ACTIVITIES:

**Funded Research:**

PI/PD, "A Simplified Approach for the Design of Gravity Walls in Seismic Zones," Syracuse University Senate Research Committee 1985, $900.

PI/PD, "Color Graphics Workstation," Tulane University Senate Subcommittee on Educational Computing Projects, 1987, $4,990.

PI/PD, "Stability of a Spread Footing on a Void in Clay," Tulane University Committee on Research Summer Fellowship (COR), 1987, $3,000.

PI/PD, "Software for Development of Expert Systems in Civil Engineering," Tulane University Senate Subcommittee on Educational Computing Projects, 1988, (Co-PI Dr. T. Hadj Hamou), $2,250.

PI/PD, "Analysis of Pile Test Data at the Ascalmore-Tippo Control Structure," Waterways Experiment Station (WES), U.S. Army Corps of Engineers, DACW39-88-P-1130, Tulane University No. 5-33509, 1988, (with Dr. T. Hadj-Hamou), $19,760.

PI/PD, "A Computer Program for Finite Element Analysis of Earth Embankments," New Orleans District (LMNED), U.S. Army Corps of Eng., DACW29-89-C-0071, Tulane University No. 5-32139, 1989, $47,275.

Co-PI, "Tulane Geotechnical Engineering Research Center (TUGERC)," Tulane University Committee on Research Summer Fellowship (COR), 1989, (Co-PI Dr. T. Hadj-Hamou), $3,000.

PI/PD, "Multimedia Library for Geotechnical Education," Apple Computers/TCS, 1990, $12,000 (Equipment).

PI/PD, "Physical Properties of Fluff Residues to be Used as Interim Landfill Cover," ENTEC, Inc./Southern Scrap, Inc., Tulane University No. 5-33815, 1991, $12,000.

Co-PI, "Treating Sand Blasting and other Residues for Reuse as an Interim Landfill Cover," Avondale Industries, Inc, Shipyard, Division, New Orleans, LA, Tulane University No. 5-34016, 1991(Co-PI Drs. R. Reimers and A. Abdelghani), $60,000.

PI/PD, "Analysis of Pile Test Data at the Ascalmore-Tippo Control Structure," Waterways Experiment Station, U.S. Army Corps of Engineers, DACW39-92-M-0669, Tulane University No. 5-33509, 1988, $2,000.

Co-PI, "Development of the Pori Process to Meet Approval as Landfill Cover," Pori International, Inc., Baltimore, MD, Tulane University No. 6-25625, 1992, (Co-PI Drs. R. Reimers, T. Akers and D. Little), $22,791.

Co-PI, "Evaluation of Proposed Hazardous Waste Injection at Geismar, Louisiana," Louisiana Department of Environmental Quality (LDEQ), Baton Rouge, LA, Tulane University No. 5-32001, 1993, (Co-PI's Drs. M. Barber, G. Flowers and R. Reimers), $50,000.

PI/PD (Uptown Component), "Expert Geographical Information System for Assessing Hazardous Wastes in Aquatic Environments," U.S. Department of Energy (DOE), Washington D.C., DE-FG01-93EW53023, Tulane University No. 5-33958, Year-1, 1993, (Co-PI's Dr. M. Barber, Dr. Belkhouche, Tulane CBR, and Tulane School of Public Health), $377,554.

Co-PI, "Development of a Red Mud Mix for Landfill Cover, Laboratory Study," Kaiser Aluminum and Chemical Corp., Tulane University No. 6-25181, 1993, (Co-PI Dr. R. Reimers), $50,000.

Co-PI/PD, "Evaluation of U-Liner Technology for Trenchless Sewer Rehabilitation," Louisiana Education Quality Support Fund (LEQSF), Subprogram B (Industrial Ties), Baton Rouge, LA, Tulane Univ. No. 5-32023, 1993, (Co-PI Dr. M. Barber), $377,500.

PI/PD, "An Expert System for Dredging," SJS Corp., Coos Bay, OR, and U.S. Army Corps of Engineers, Waterways Experiment Station (WES), Vicksburg, MS, Tulane University No. 5-32052, 1993, $6,250.

PI/PD, "Direct Shear and Pull-Out Tests," GCI, Inc., Winter Park, FL, 1993, Tulane University No. 5-33049, $1,650 and $10,000 (Equipment from U.S. Army Corps of Engineers WES).

Co-PI, "Pore Pressure Response for Shallow Marine Sediments," Naval Research Laboratory, MS, Tulane University No. 5-33989, 1993, (Co-Pi's Drs. G. Andersen and M. Barber), $100,160.

PI/PD (Uptown component) "Expert Geographical Information System for Assessing Hazardous Wastes in Aquatic Environments, (Year-2)," U.S. Department of Energy (DOE), Washington D.C., DE-FG01-93EW53023, Tulane University No. 5-33958, 1994, (Co-PI's Dr. M. Barber, Dr. Belkhouche, Tulane CBR, and Tulane School of Public Health), $378,000.

Co-PI, "Waste Minimization Development in Louisiana Crude Oil and Gas Exploration/Production Facilities," Louisiana Department of Environmental Quality (LDEQ), Baton Rouge, LA, Tulane University No. 5-334796, 1994, (Co-PI Dr. R. Reimers), $50,000.

Co-PI, "Market Feasibility Study on the Applications of Topsoil Produced by Blending Compost from Entergy and Spent Bauxite from Kaiser," Kaiser Aluminum and Chemical Corp. and Entergy, 1994, (Co-PI Drs. J. Elstrott and R. Reimers).

Co-PI, "Development of Red Mud/New Orleans Incinerator Ash Mix for a Landfill Cover," Kaiser Aluminum and Chemical Corp. and New Orleans S&WB, 1994, (Co-PI Dr. R. Reimers), Tulane University No. 6-25181, $15,000.

Co-PI, "Field Demonstration of Stabilized Red Mud as Landfill Cover, Field Demonstration at Kaiser, Phase I," Kaiser Aluminum and Chemical Corp., 1994, (Co-PI Dr. R. Reimers), Tulane University No. 6-27612, $127,000.

PI/PD (Uptown Component) "Expert Geographical Information System for Assessing Hazardous Wastes in Aquatic Environments, (Year-3)," U.S. Department of Energy (DOE), Washington

D.C., DE-FG01-93EW53023, Tulane University No. 5-33143, 1995, (with Dr. Belkhouche, Tulane CBR, and Tulane School of Public Health), $267,000.

Co-PI "Evaluation of Statistical Procedures for Interpretation of Groundwater Monitoring Data Proposed by Chemical Waste Management, Inc. and Uniroyal Chemicals," Louisiana Department of Environmental Quality (LDEQ), Baton Rouge, LA, Tulane Univ. No. 5-34895, 1995, (Co-PI's Drs. A. Rene, J. Lefonte, and R. Reimers), $32,000.

Co-PI, "Waste Minimization Development in Louisiana Crude Oil and Gas Exploration/Production Facilities (Phase II)," Louisiana Department of Environmental Quality (LDEQ), Baton Rouge, LA, Tulane University No. 5-334796, 1995, (Co-PI Dr. R. Reimers), $25,000.

Co-PI, "Assessment of Synthetic Red Mud Landfill Cover/Liner, Field Monitoring/Testing and Pertinent Laboratory Investigations, In-Situ Demonstration at BFI's Colonial Landfill, Phase II," Kaiser Aluminum and Chemical Corp., 1995, (Co-PI Dr. R. Reimers), Tulane University No. 5-34935, $124,821.

PI/PD (Uptown Component), "Water Quality in the Mississippi River," Freeport McMoran Corp., New Orleans, 1995, (Co-PI's Drs. Belkhouche, Luna, and Steinberg Tulane CBR, and Tulane School of Public Health), $750,000.

Co-PI, "Assessment of Synthetic Red Mud Soil as Daily, Interim and Final Cover-Field Monitoring/Testing and Pertinent Laboratory Investigation, Phase III," Kaiser Aluminum and Chemical Corp., 1996, (Co-PI Dr. R. Reimers), Tulane Univ. No. 5-34008, $245,000.

PI/PD, "Applicability of Microwave Technology to Recovery and Treatment of DNAPL," Department of Defense (DoD), 1996, (Co-PI Dr. R. Reimers), Tulane University No. 5-33223, $35,000.

PI/PD, "Test for Fluid Migration Between Host Pipe and Pipe Liners," City of Baton Rouge, Wastewater Rehabilitation Program, Dept of Public Works, Baton Rouge, LA, $6500, 1996.

Co-PI, "Development of Terreborn Parish Biosolids in Class A Disinfection Biosolids for Artificial Wetland Soils," Coastal Engineering and Environmental Consultants, Inc. and Kaiser Aluminum and Chemical Corp., 1997, (Co-PI Dr. R. Reimers), $32,845.

Co-PI, "Trace Element Partition and Risk Assessment for Red Mud Products," Kaiser Aluminum and Chemical Corp., 1997-1999 (Co-PI Mr. Goldstein and Dr. R. Reimers), $45,000.

Co-PI, "Assessment of Spent Bauxite as an Ingredient to Produce Class A Disinfected Biosolids," Kaiser Aluminum and Chemical Corp., 1997-1999, (Co-PI Dr. R. Reimers), $35,000.

Co-PI, "Addendum on Assessment of Spent Bauxite as an Ingredient to Produce Class A Disinfected Biosolids," Kaiser Aluminum and Chemical Corp., 1997-1999 (Co-PI Dr. R. Reimers), $15,000.

Co-PI, "Assessment of Mitigating Embankment Settlement with Pile Supported Approach Slabs," Louisiana Transportation Research Center (LTRC), Baton Rouge, LA, 1997, (Co-PI Dr. S. Das), State Project No. 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, LTRC No. 97-4GT, Tulane University No. 5-34008, $170,000.

PI/PD, "A new Construction Material for Low Cost Housing," Lion InvestBanc Research Foundation, Baton Rouge, LA, 1999, Tulane University No. 5-32620, $12,000.

PI/PD, "Collaborative Efforts between the Department of Civil and Environmental Engineering and the Department of Environmental Health Sciences," Strategic Research Initiatives 2000, Wall Foundation, 2000, (Co-PI's Dr. R. Reimers, A. J. Englande and L. A. White), $474,000.

PI/PD, "The Evaluation of DOTD Integral Bridge and Abutment System," Louisiana Transportation Research Center (LTRC), Baton Rouge, LA, 2002, (Co-PI Dr. N.J. Mattei UNO), State Project No. 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, LTRC No. 02-4GT, Tulane University No. 5-34008, $99,530.

PI/PD, "MRGO Channel Operations and Maintenance Improvement Plan," New Orleans District (LMNED), U.S. Army Corps of Eng., DACW29-02-P-0233, Tulane University No. 5-42118, 2002, $24,911.

## EXTERNAL REVIEWER/EDITOR:

**Reviewer of Proposals:**

- National Science Foundation (NSF)

- U.S. State Department

- U.S. Environmental Protection Agency (EPA), National Center for Environmental Research and Quality Assurance, Office of Research and Development

- U.S. Environmental Protection Agency (EPA), STAR Graduate Fellowship Program

- U.S. Department of Education, Fund for the Improvement of Post-secondary Education FIPSE Program

- Fulbright International Program

**Reviewer of Technical Papers:**

- ASCE Journal of the Geotechnical Engineering Division

- ASCE Journal of Computing in Civil Engineering

- ASCE Journal of the Structural Engineering Division

- Transportation Research Record (TRB)

- Evaluation of Geotechnical Computer Programs, American Concrete Institute, ACI

- The XIII International Conf. on Soil Mech. and Foundation Eng., ICSMFE, New Delhi, India, 1994

- Second International Conf. on Artificial Intelligence Applications, Cairo, Egypt, Jan 22-24, 1994

- "Recent Advances in Instrumentation Data Acquisition and Testing in Soil Dynamics," S.K. Bhatia and G.W. Blaney editors, Geotechnical Special Publ. No. 29, ASCE, Nov 1992

- The 4th International Conf. of Industrial and Eng. Applications of Artificial Intelligence and Expert Systems, IEA; AEI, 1990

- International Journal of Solids and Structures

- Journal of Hazardous Materials

**Member Organizing Committee:**

- Trenchless Technology Workshop, ASCE/SESTT, Landmark Hotel, Metairie, LA, Dec 6-7, 2001

- ASCE New Orleans Branch Annual Fall Conference and Show, 1998-2002

- Co-Chair, ASCE/ACI 2001 Annual Fall Conference and Show, Pontchartrain Center, Kenner, LA, Sep 13-14, 2001

- The 2nd International Conference on Artificial Intelligence Applications, Cairo, Egypt, Jan 22-24, 1994

- The 1st International Conference on Artificial Intelligence Applications, Cairo, Egypt, Jun 6-8, 1992

## EXPERT WITNESS:

"CPM Schedule, Ames Pump Station, Jefferson Parish, LA," Construction Arbitration, River Road Construction, Inc., 1987.

"Accident Linked to Soil Settlement at Audubon Park, New Orleans, LA," Civil Litigation, T. Foutz, Attorney, Civil District Court, New Orleans, LA, 1988.

"Effect of Construction Induced Vibration on a Historic Building in New Orleans French Quarter, New Orleans, LA," F. D'Amico, Attorney, Civil District Court, New Orleans, LA, 1993.

"Accident Linked to Soil Settlement at a New Orleans Gas Station, New Orleans, LA," R. Ward Attorney, Sessions and Fishman, Civil District Court, New Orleans, LA, 1993.

"Failure of a Marine Loading Dock, St. James Parish, LA" Civil Litigation, D. Plunkett, Attorney, 1994.

"A Trenchless Technology Product Patent Infringement," Neutral Expert Appointed by District Court, Los Angeles, CA, 1996.

"Existing Residence, 20204 River Park South, Covington, LA," GEI J6817, P & L Contracting, Inc., 1998.

"Accident Related to Settlement of a Sidewalk, New Orleans, LA," Donavon & Lawler - A Professional Law Corporation, Civil District Court, New Orleans, LA, 2001.

"Existing Residence, 124 Cherry Laurel Drive, St. Tammany Parish, LA," GEI J7770, Quick and Associates, Inc., 2001.

"Existing Residence, 620 Woodridge Boulevard, Mandeville, LA," GEI J7371, Gilbert Engineering, LLC, 2000.

"Existing Residence, 423 River Oaks Drive, Covington, LA," GEI J7375, U.S. Inspect, 2000.

"Existing Residence, 107 Blackburn Place, Covington, LA," GEI J7380, Anderson Engineering, Inc., 2000.

"Metallurgical Investigation of Upper Bearing Casting from Buhler Boom Loading Tower # 3, ADM-Growmark," Chaffe, McCall, Phillips, Toler & Sarpy, LLP, Civil District Court, New Orleans, LA, 2001.

"Existing Residence, 628 North Park Boulevard, Covington, LA," GEI J7911, Gilbert Engineering, LLC, 2001.

"Existing Residence, 1819 LA Hwy 22 West, Madisonville, LA," GEI J7932, Anthony J. Stains, Counsel, Civil District Court, St. Tammany Parish, 2002.

"Existing Residence, 1217 Bluewater Drive, Covington, LA," GEI J7986, Clement & Gates Counselors at Large, Civil District Court, St. Tammany Parish, 2002.

"Existing Residence, 628 Northpark Boulevard, Covington, LA," GEI J8294, Gilbert Engineering, LLC, 2003.

"Settlement of an Existing Residence, 102 Fairway Drive, New Orleans, LA," Klein-Daigle, LLC, Renaudin, et al. vs. Sewerage & Water Board, No. 00-02452, Civil District Court, New Orleans, LA, 2003.

"Existing Residence, 465 Rutherford Drive, Covington, LA," GEI J8398, Quick and Associates, Inc., 2003.

"Existing Residence, 58 Rutherford Drive, Covington, LA," GEI J8511, Rykert O. Toledano, Jr. of Toledano and Herrin, Attorneys at Law, Civil District Court, St. Tammany Parish, 2004.

"Distressed Floor Slab, 2117 East Gause Boulevard, Slidell, LA, "GEI J8608a, Dammon Engineering, Inc., 2004.

"Existing Residence, 17 Ibis Lane, Mandeville, LA," GEI J8687, John C. Bose Consulting Engineer, LLC, 2004.

"Existing Residence, 22 Woodstone Drive, Mandeville, LA," GEI J8708, James A. Oswald of Shields, Mott, Lund, L.L.P., Attorneys and Counselors at Law, Civil District Court, St. Tammany Parish, 2004.

"IHNC levee Failures During Hurricane Katrina, LNA –Barge ING 4727," Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., Civil District Court, New Orleans, LA, 2006.

"Existing Residence, 701 River Oaks Drive, Covington, LA," GEI J9179, Gilbert Engineering, LLC, 2006.

## COURSES TAUGHT:

**Undergraduate Courses:**

| | |
|---|---|
| ENGR 101 | Freshman Seminar |
| CVEN 209 | Numerical Analysis and Computer Methods |
| CVEN 245 | Statics |
| CVEN 344 | Geotechnical Engineering and Laboratory |
| CVEN 348 | Geo-environmental Engineering and Laboratory |
| CVEN 414 | Professional Development Seminar |
| CVEN 447 | Foundation Engineering |
| CVEN 462 | Construction Management |

**Graduate Courses:**

| | |
|---|---|
| CVEN 613 | Advanced Soil Mechanics |
| CVEN 614 | Advanced Foundations |
| CVEN 615 | Soil Improvement |
| CVEN 619 | Advanced Geotechnical Laboratory |
| CVEN 630 | Engineering Use of Geosynthetics |
| CVEN 673 | Design of Civil Engineering Systems |
| CVEN 674 | Management of Engineering Projects |

## THESIS/DISERTATION SUPERVISION:

**Master Theses:**

Dussom, K., "An Expert System for the Selection of Site Specific Earthquake Design Accelerograms," M.S., May, 1988.

Mikulak, D. "Wave Equation Analysis of the Ascalmore-Tippo Pile Load Tests," M.E., 1990.

Morse, M., "CLASS - An Expert System for Soil Classification," M.S., 1990.

Rau, D., "TUPILTST - A Computer Package for Determining Pile Failure Loads from Load Tests," M.S., May 1990.

Subramanian, R. "A Computer Program for the Analysis of Static Pile Load Tests," M.S.E., May 1995.

Flowers, G., "Assessment of the Subsurface Geology of Hazardous Waste Injection Sands near Geismar, Louisiana," M.S.E., May1995.

Jin Cui, "Geographical Information System for Devil's Swamp and Bayou Trepagnier," M.S.E., May 1995.

Andrede, F., "A Remediation Technologies Selection Program," M.S.E., May1995.

Yang, G., "Effect of Heat on the Behavior of Polyethylene Pipes," M.S.E., May 1995.

Pechon, S., "Effects of Installation Procedure on the behavior of High Density Polyethylene Liner Pipe," M.S.E., May 1996.

Taylor, J., "Material Performance of High Density Polyethylene Deformed/Reformed Liner Systems," M.S.E., May 1996.

Graf, P., "Finite Element Analysis of a Levee Enlargement project on Soft Ground," M.S.E., May 1996.

Kanger, D., "DUKPC - A Computer Software for Wave Equation Analysis of Piles," M.S.E., May 1996.

Koob, T., "A Decision Support System for Constructed Wetlands for Runoff Treatment," M.S.E., May 1996.

Aalders, A., "Deformation of a HDPE Liner under Uniform Radial Pressure," M.S.E., May 1997.

Burks, R., "Field Demonstration of Red Mud Landfill Cover Material," M.S.E., May 1998.

Schutt, M. "Settlement of Pile Supported Bridge Approach Slabs," M.S.E., May 1999.

Cantrel, D., "Settlement Analysis of Mississippi River Bridges Using Abductive Modeling," M.S.E., May 1999.

Cody, B., "Effectiveness of Microwaves in Remediation of Soils Contaminated with DNAPLs," M.S.E., May 1999.

Miao, X., "Effect of Chemicals on Various Plastic Pipe Liners," M.S., May 2004.

Janowsky, W., "Analyses of Pile Load Tests in Soft Clay," M.S.E., May 2004.

Stachowiak, K., "Estimation of Cut-to-Fill Ratio for Confined Renourishment of Louisiana's Barrier Islands," M.S., May 2005.

Elbe, L. "Hydraulic Analyses of Paved Slopes," M.S.E., May 2007.

**Doctorate Dissertations:**

Tavasolli, M., "Finite Element Modeling of Reinforced Earth Embankments," Ph.D., May 1991.

Suryanaryana, C., "Finite Element Modeling of HDPE Liners," Ph.D., May 1996.

Abdel-Rahman, A., "Modeling of Geotextile Reinforcement of Soft Soils," Ph.D., May 1997.

Abu Elinen, G., "A GIS Erosion Model for the Nile River," (from Suez Canal University), Ph.D., May 1997.

Liu, S., "Treatment of Landfill Leachate with Spent Bauxite," (Co-Chair, SPHTM student), D.Sc., May1997.

Bankston, W.S., "Assessment of Innovative Applications of Applied Field Technologies for Microbiological Disinfection," (Co-Chair, SPHTM student), D.Sc., May 1998.

Goldstien, G., "Trace Element Partitioning, Mobility, and Bioavailability in Red Mud Synthetic Wetland Sediment," (Co-Chair, SPHTM student), D.Sc., May 1999.

Al-Saleh, S., "A Prototype Decision Support System for Crisis Response," D.Sc., May 1999.

Zhong, J., "A Numerical Model for the Analyses of Downdrag on Piles," Ph.D., May 2004.

Foust, C.H., Real Time Control in Water Resource Operations, Ph.D., Dec 2004.

**Sever, V**. F., "Method for Evaluating Performance of Polymeric Liners for Environmental Applications," (Co-Chair with Dr. G. Boyd), Ph.D., May 2006.

Al-Malik, B., "Geotechnical Considerations of the Headwall/Approach Slab Detail in Semi-Integral Bridges," Ph.D., Dec 2006.

**APPENDIX D**


**EXCERPTS FROM USACE I-WALL GDM**

c.  Design floodwall height and freeboard.

(1)  Insufficient open water areas exist for the generation of waves, therefore, no data on wave characteristics is furnished in this tidal hydraulics portion of the hydrology and hydraulics appendix.

(2)  Occurrence of a design hurricane would produce a maximum storm surge level of 13.0[1] along the Florida Avenue Complex and wave runup would be practically nonexistent.  In accordance with criteria previously approved by higher authority, the freeboard selected is 1 foot above stillwater level.  Consequently, the final net grade design for the Florida Avenue Complex floodwall is 14.0 feet.

3.  Climatology.

a.  Climate.  The project is located in a subtropical latitude having mild winters and hot, humid summers.  During the summer, prevailing southerly winds produce conditions favorable for convective thundershowers.  In the colder seasons, the area experiences frontal passages which produce squalls and sudden temperature drops.  River fogs are prevalent in the winter and spring when the temperature of the Mississippi River is somewhat colder than the air temperature.  Climatological data for the area are contained in monthly and annual publications by the U.S. Department of Commerce, National Oceanic and Atmospheric Administration (NOAA), titled, "Climatological Data for Louisiana," and "Local Climatological Data, New Orleans, La."

---

[1]Elevations shown herein are in feet referred to National Geodetic vertical datum unless otherwise noted.

5.)  **I-Wall Configurations.**  Further review of the potential lateral deflections associated with proposed I-wall designs in conjunction with embankments at El. 15.0 and lower indicated that the design criteria for this type of design should be changed. The effect of differential embankment elevations on either side of the wall increases adverse deflection potential. In addition, where I-walls have been utilized in the past, embankment elevations were set near the design flood elevation. The design criteria for I-wall designs was changed to require El. 18.0 as the minimum embankment crown elevation on both sides of the wall.

a. Cantilever I-type floodwall. The stability and required penetration of the steel sheet pile below ground surface were determined by the method of planes for both the (Q) and (S) shear strength cases. A factor of safety of 1.50 was applied to the design shear strengths as follows:

$$\phi' = \phi \text{ developed} = \tan^{-1} \frac{(\tan \phi \text{ available})}{(\text{factor of safety})}$$

$$C' = C \text{ developed} = \frac{(C \text{ available})}{(\text{factor of safety})}$$

The required depths of penetration were determined for hurricane water level 6 inches below the top of the floodside, and water level equal to the water table on the protected side. Factors of safety were also determined for the headwater level at the top of the walls. These are shown by note on stability plates 8, 9, and 10. Stability analyses of the levee, with the I-wall, were made for the (Q) condition. Results of these analyses are given on plates 11 and 12. From station 210+75.00 to station 219+06.29, the sheet pile penetrates to elevation -10.5[1] with the top of the levee at elevation 9.0. The sheet pile I-wall along the drainage canal, station 223+73.08 to 237+42.51, penetrates to elevation -20.0 in order to cut off the organic clay layer between elevations -5.0 and -17.0. This protection is equivalent to that provided on the opposite side of the drainage canal (Florida Avenue to IHNC Lock). With the sheet pile penetration at -20.0, the levee elevation of 8.0 is adequate to maintain the stability of the I-wall. See plate 9.

e.   Design of T-type wall for west levee.   The T-type floodwalls for the west levee were designed for the following conditions:

Case 1 – Water at elevation 14.0 on the floodside and elevation zero on the protected side. Steel sheet pile cutoff impervious. Uplift with full head on floodside of cutoff and tailwater on the protected side. Earth fill to elevation 5.0.

Case 2 - Same as Case 1 except steel sheet pile cutoff pervious. Uplift varies uniformly from full head on floodside to tail-water on the protected side.

Case 3 – Water at elevation 11.0 on floodside and water at elevation zero on protected side. Impervious cutoff. Uplift as in Case 1.

Case 4 – Same as Case 3 except cutoff pervious and up-lift as in Case 2.

Case 5 – Water at elevation 10.0 on floodside and at elevation zero on protected side. Impervious cutoff. Uplift as in Case 1.

Case 6 – Same as Case 5 except cutoff pervious and up-lift as in Case 2.

In all cases, the at rest earth pressure was assumed to be 75% of the submerged unit weight of earth (55#/cu.ft.) on the floodside and cracked section assumed on protected side.


8.   Selection of wall type.   The type of wall to be constructed will depend on the height of wall required which, inturn, will depend on the elevation of the ground surface. A cantilever I-type wall will be constructed where floodwall heights above ground are not in excess of 10 feet and deflection of the wall will not be a problem.

10.  I-type floodwall.  Most of the floodwall will be an I-type
wall constructed in an existing levee, which will be reshaped, and to a
lesser extent in a new levee.  Bending moments and deflections for structural
design of sheet pile are based on a factor of safety of 1.5 applied to
the soils.  It should be noted that the sheet pile penetrations shown on
the design analysis sheets are design penetrations and not necessarily
the final penetration which are shown on the plan and profile plates.
The plan and profiles of the wall and levees are shown on plates IV-1
through IV-31 and design sections on plates IV-35 through IV-38.  The
strength of the wall was checked for the case with water at the top
of the wall, as initially constructed, and found to be adequate as
shown on figures 4-1 through 4-19.  Where possible, expansion joints
in I-type walls will be spaced 30 feet apart.  Where I-type walls join
T-type walls, a special seal located in a notch in the I-type wall
will prevent water from passing through the expansion joints when the
wall is deflected.  The seal detail is shown on plate IV-40.

19.  Stability.

a.  Cantilever I-type floodwall.  The stability and required
penetration of the steel sheet pile below the earth surface were deter-
mined by the method of planes using the (S) shear strengths shown on
the stability plates.  A factor of safety of 1.5 was applied to the
design shear strengths as follows:  (C = 0); $\emptyset$ developed = tan $^{-1}$
(tan $\emptyset$ available )
(factor of safety). Using the resulting shear strengths, net lateral
water and earth pressure diagrams were determined for movement toward
each side of the sheet pile. Using these distributions of pressure,
the summation of horizontal forces was equated to zero for various tip
penetrations.  At these penetrations, summations of overturning moments
about the bottom of the sheet pile were determined.  The required
depths of penetration to satisfy the stability criteria were determined
as those where the summation of moments was equal to zero.  The
stability of I-type floodwalls on both sides of the IHNC was determined
for a hurricane water level 6-inches below the top of the wall on the
floodside; and on the protected side, for a water level equal to the
water table assuming the water table at the average ground surface
where the ground surface is below elevation zero and for a water level
at elevation zero where the ground surface is above zero, except along
the swampy area on the east side of the IHNC where el. zero was used
for the landside water level even though the ground surface is below
zero.  Factors of safety (F.O.S.) were also determined for the headwater
level at the top of the walls, and for high tail water conditions in the
sandy fill along the buried beach sand reach.  These F.O.S. are shown
on the stability plates.  The I-wall analyses are shown on plates III-12
through III-19 and III-29 through III-36.  Where I-walls serve as flood-
walls and earth retaining bulkheads  the stability condition that governed
for design penetration is presented on the plate III-16.

24. <u>Erosion protection</u>. Due to the short duration of hurricane floods, the resistant nature of the clayey soils, and the limited conditions for wave generation; no erosion protection is considered necessary along the major portion of the line of protection. However, where the levees and walls are near the canal proper in the vicinity of U. S. Highway 90 and Florida Avenue, erosion protection will be provided where required. A concrete strip will be provided around the relief wells, on the west side, and extend into the sodded discharge collection ditch, as shown on the drawings.

**Reda M. Bakeer, Ph.D., P.E.**
Consulting Engineer
4624 Pike Drive
Metairie, Louisiana 70003
Telephone: (504) 237-1062
Fax: (504) 888-4806
Email: rbakeer@hotmail.com

August 1, 2009

Chaffe McCall LLP
2300 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2300

Attention: Robert B. Fisher, Jr.

Re: LNA-Barge ING 4727 - Levee Failures during Hurricane Katrina, New Orleans

Dear Mr. Fisher:

This letter contains a review of a furnished report by Marino Engineering Associates, Inc. (MEA) of Urbana, Illinois entitled "*Failure Investigation of the North and South Breaches along the IHNC during Hurricane Katrina, St. Bernard Parish, New Orleans, LA.*" The report dated July 1, 2009 was prepared by Gennaro G. Marino, Ph.D. P.E. for Mr. Larry Wiedmann of Wiedmann and Wiedmann, 8221 Baronne St., New Orleans, Louisiana. The letter also addresses the allegations made in the MEA report concerning Barge ING 4727 (Barge) as being a cause or contributor to the two breaches that occurred in the floodwall along the east bank of the Inner Harbor Navigation Canal (IHNC) during Hurricane Katrina on August 29, 2005.

The letter includes general comments made relative to some fundamental engineering concepts discussed in the MEA report. The remainder of the letter focuses on the geotechnical engineering aspects of the report, which is my area of expertise and practice for over 33 years. I also included herewith this letter a set of figures, sketches and tables obtained from the MEA

1

report and other references as Pages F-1 through F-34.   I added some remarks and comments on this set of figures, sketches and tables to clarify some of my discussion.

The discussions given herein are based on my review of the MEA report as well as several other documents prepared by various agencies and experts pertaining to the performance of the New Orleans Flood/Hurricane Protection System (FPS/HPS) during Hurricane Katrina and the results of my own geotechnical analyses made in this regard.   My findings, opinions and conclusions relative to the causes of the two breaches (North Breach and South Breach) and why the Barge was not involved in causing either of them are discussed in my report dated August 1, 2009.   A list of the documents prepared by national experts and agencies pertaining to the performance of the New Orleans FPS/HPS which I reviewed during the course of this litigation is included in my report.

The following general comments are offered with regard to some fundamental engineering concepts discussed in the MEA report.   A more detailed discussion will follow relative to the geotechnical contents, particularly Chapter 5, of the MEA report.   Reference is also made to the attached set of figures, sketches and tables (F-1 through F-34) included in this report for further clarification of the discussion.   My general comments are as follows:

- Analyses, design, construction and performance as well as failure analyses of FPS/HPS structures, including floodwalls, are mainly governed by geotechnical considerations.   The analyses, design and construction of these structures are also based on specific procedures and design guidelines established by the US Army Corps of Engineers (USACE).   These procedures include Engineering Manuals (EMs) and Technical Memoranda (TMs) which are used by the USACE and many other agencies nationwide.   Furthermore, the analyses, design and construction of New Orleans FPS/HPS are governed by local criteria established by the US Army Engineer District, New Orleans (NOD) and by US Army Engineer Division, Lower Mississippi Valley (LMVD).   After Hurricane Katrina, the NOD developed a comprehensive document entitled "*Hurricane and Storm Damage Risk Reduction System Design Guidelines*" (HSDRRS-DG, 2007/08) that specifically addresses the deficiencies in the New Orleans FPS/HPS experienced during Katrina.   It also

establishes the design procedures for future FPS/HPS structures as well as methodologies to be used in the evaluation of existing structures. These USACE, NOD and LMVD criteria are specific to FPS/HPS structures and account for the local subsoil conditions encountered in the New Orleans area.  Accordingly, they may deviate from standard academic and professional geotechnical practices used elsewhere.  While the lead author of the MEA report, Dr. Gennaro G. Marino, is a geotechnical engineer, it does not appear that he is quite familiar with the USACE analyses, design and construction methodologies particularly those used locally by the NOD and LMVD.

▪ The allegation made in the MEA report that Barge ING 4727 caused or was a contributor to both breaches along the east side of the IHNC (North Breach and South Breach) during Hurricane Katrina contradicts the findings of all credible investigations published to date including those by ILIT, IPET, Team Louisiana, NSF and ASCE.  While some of the investigating teams disagreed on the exact mechanism or geotechnical cause of failure (seepage, tension crack, scour, overtopping, global stability, etc.), they have all reached the same conclusion that both failures are geotechnical in nature and that there is no evidence that indicates that the Barge was a cause or contributor to either of the IHNC east bank breaches. The findings of the renowned national scientists who participated in these investigations were subsequently published in numerous peer-reviewed scientific journals and presented in national and international conferences.

▪ The MEA report claims that the Barge caused the North Breach "*as it became pinned or penetrated through the North Breach.*"  None of the investigating teams who examined the IHNC breaches even considered this argument, which defies the fundamental laws of physics and hydraulics for many reasons, including the prevailing current, wind direction and water level on the flood side of the floodwall according to Cushing (2009).  In addition, if this were to have happened, the Barge should have then entered into the Lower Ninth Ward through the North Breach along with the inrushing and rising floodwater or remained pinned at that location.  The evidence shows that two sheet piles separated at that exact location where two I-walls

of different age, height and tip penetration adjoined. The MEA report concurs that the failure initiated at that "*construction*" joint, but it claims that the Barge impacted the floodwall at that exact location. The report fails to recognize that this joint (construction or connection between two adjoining walls) constitutes the weakest link in a continuous structure which will fail first when the entire floodwall is subjected to a uniform hydrostatic pressure without the presence of a barge. The "*tooth out* (and) *metal tip*" analogy used by an eyewitness to illustrate the conditions at that joint describes how the shorter and deteriorated steel sheet pile bent landward (*metal structure like a barge, only the tip of it*) allowing for an opening (*tooth out*) to develop. The metal protrusion could not be Barge ING 4727, but may well have been the bent steel sheet piles. Subsequently, inflow of water through the separation gap eroded the levee and soils directly landward of the gap causing that wall segment to dislodge from the ground and to tumble under the water pressure (*The levee walls are like in sections. I saw it tumble over*, as described by the same eyewitness).

- According to the MEA report, witnesses heard several "booms", "grinding", "explosion" or "collision" type noise or "hollow" sounds coming from the direction of the breaches within the approximate time spans of the North Breach and South Breach. However, "boom, hollow, explosion, grinding or collision" sounds can develop when a massive concrete and steel structure, such as the floodwall, collapses. These sounds resulted from dislodging and spreading of the steel sheet piles I-wall and crushing of the concrete cap in tension and compression. More noise emitted from other displaced objects (utility lines, residences, vehicles, etc.) along the path of inrushing floodwater and the failed segment itself as it spread landward into the neighborhood, without the need for a barge. Some eyewitnesses testified that they heard similar sounds in the vicinity of the North Breach, which could not have been caused by the Barge considering the fundamental laws of physics and hydraulics. Similarly, witnesses at other distant breach locations, such as at the London Avenue and 17th Street Canal, heard similar "boom" sounds, even though there was no barge even arguably present at either of these sites.

4

- Section 4.0 of the MEA report states that scour in adjacent IHNC floodwall sections due to overtopping did not cause failures in those areas as was also the case in other floodwalls that did not fail during Hurricane Katrina.  Though there may have been scoured areas that did not fail, it should be noted that all of these floodwalls failed only at their weakest locations (links), including the North Breach and South Breach at the IHNC, where the available soil support was insufficient or compromised due to factors other than the Barge, as discussed in detail in my report, as well as in IPET and ILIT.  The presence of a scour trench behind still standing or tilted segments of the floodwalls means that only partial soil support was lost in those areas.  This may have reduced the available factor of safety against failure but provided sufficient resistance and a factor of safety against failure above 1.0.  This was the case in areas with high landside grade, areas with sheet piles tips embedded deeper or into stronger soils, areas of high floodwall top which reduced the overtopping period, areas with stronger soils, etc.  For example, failure at the 17th Street Canal and London Avenue Canal developed only at the "weakest" segments of the floodwalls in terms of the existing soil type and support.   However, several segments of these FPS/HPS floodwalls experienced different degrees of tilting outside the breached areas indicating some in partial or incipient failure condition.  These floodwall conditions and analogy are well illustrated in the numerous photographs of I-walls included in Section 4.0 of the MEA report itself.

- The reference elevations used in the different sections of the MEA report are inconsistent, confusing and occasionally wrong.  As per the USACE GDM and IPET Vo. II Page II-105, the earthen levee crown and the top of the IHNC floodwall were at Elev. +9.0 and +15.0 ft. MSL, respectively.  Figures 2.8 and 2.14 of the MEA report show the earthen levee crown and top of the IHNC floodwall at Elev. +9.0 and +15.0 ft. NGVD29, respectively.  The MEA report is also inconsistent in converting elevations from one reference datum to another (i.e.; from NGVD to NAVD or MSL or the reverse).  In some cases, their conversions indicate that MSL is higher than NGVD or NAVD and sometimes it shows the opposite.  For example, Page 6-7 of the MEA report states that "*the water elevation is 4.9 ft NAVD88, (which is equivalent to 2.9 ft MSL-ILIT).  The water elevation at 9:00 a.m. on August 29 is 14.2 ft NAVD88*

*(or 12.2 MSL-ILIT)."*   The USACE IPET study concluded that the model domain is the 1985 epoch of NGVD29.  The conversion of NGVD29 1985 epoch to NAVD88 2004.65 varies across the New Orleans area.  For the Lake Pontchartrain and Vicinity and West Bank and Vicinity project areas, the average conversion factor is about -0.5 ft. (NAVD88 2004.65 = NGVD29 1985 – about 0.5 ft.).  Meanwhile, NGVD29 elevations are generally lower than MSL elevations by about 2 ft. (NGVD29 1985 = MSL – about 2 ft.).  Using incorrect reference datum or conversion actors casts doubt on all of the models and analytical results particularly when comparisons are given relative to the findings of IPET and ILIT.

- The limits (start and end) and locations of the North Breach and South Breach shown on Figures 2.1 through 2.7, Figure 4.4 and Figure 5.1 in the MEA report are inconsistent and/or incorrect.  Most of these diagrams show the North Breach occurring at the 90 degree turn in the 1980 I-wall, where in fact Photographs 4.6 through 4.8 in the MEA report indicate that the North Breach developed at a joint connecting the 1966-68 I-wall with the end of a concrete monolith of the 1980 I-wall that parallels the IHNC.

- The schematic illustration of the North Breach failure sequence depicted on Figure 4.1 of the MEA report is speculative and illogical.  Figure 4.1 shows the I-wall tilting landward in a clockwise motion (from Position 1 to 2 then 3) under a horizontal impact load applied on the concrete monolith.  Next, the I-wall dislodged from the ground as illustrated in Position 4.  While dislodging, it is believed that the sketch implies that the I-wall removed soil blocks II, III and possibly IV.  The dislodged floodwall then begins to tumble in a clockwise motion to Positions 5, 6 and 8 over the intact slope of the levee.  Several remarks are made relative to this figure:

    - There is no explanation of how or why soil block I bounded by two dashed lines on the sketch was removed, if this was the case.

    - There is no explanation of how or when the I-wall will reach Position 7.

o The sketch is misleading as it is not plotted to a consistent scale. If properly plotted to scale, the floodwall top should be at Elev. +15.0 ft. MSL and its tip at Elev. -8.0 ft. MSL, as shown by my comments on the figure.

o Figure 4.1 shows that the horizontal load continued to act on the floodwall at the same level after the wall has moved to Position 2. If it is as argued in the MEA report that this load is due to the Barge impacting the wall then the Barge will either get pinned on the intact levee slope at Elev. +9 ft. MSL or it will continue to drift with the floodwater into the Lower Ninth Ward depending on the water level.

o If the wall did start to rotate from Position 3 to Position 4 in a clockwise rotation under the impact load as shown in Figure 4.1, then the dislodged tip of the sheet pile and displaced soil blocks (II and possibly I, III and IV) will impact the bottom of the Barge which according to the sketch should be over the levee crown at that time. Examination of the bottom of the Barge by Cushing (2009) did not reveal any evidence of an impact of this type. If it is argued that the I-wall rotated to Position 4 under water pressure when the Barge went suddenly into a "reverse" motion back into the IHNC (for no apparent reason considering the direction and force of floodwater flow through the breach compounded by wind and waves), then the global stability analyses with a tension crack discussed in Sections 5.0 and 6.0 in the MEA report should have indicated a condition of failure (a factor of safety below 1.0). However and surprisingly, the MEA analyses indicated a safe wall under water pressure with a tension rack filled with water. As can be seen, neither scenario could be substantiated through fundamental engineering principles.

o According to Figure 4.1, the water level in the IHNC should have been at least at about Elev. +9.5 to +11.0 ft. MSL or higher at the time of the impact load application assuming that the wall top was at Elev. +15.0 ft.

MSL.  The evidence shows that the wall top in the area of the north breach was at a much lower elevation in 2005 (LiDAR 2000 data).  Storm waves will even raise the location of the point of impact (centroid) above the shown water level.  Based on this high water level and point of impact, the Barge should have sheared the concrete monolith as was the case at its only point of entry into the landside at the southern end of the South Breach.  The numerous photographs included in Section 4.0 of the MEA report do not show such evidence.

- The schematic illustration of the South Breach failure sequence depicted on Figure 4.2 of the MEA report is also speculative, illogical and incorrect.  Figure 4.2 shows the floodwall experiencing two individual breaches (I & VI segments) which MEA claims to be the results of two consecutive Barge impacts at the center (apex) of each segment.  These two individual segments essentially adjoined (V), as shown in Figure 4.2.  The lengths of the large spread northern segment illustrated in Figure 4.2 before (IV) and after (V) adjoining with the southern segment is essentially impossible unless the floodwall was made of a "rubber band".  It is impossible for a floodwall made of concrete and steel could stretch to more than 2.34 and 2.8 times its original length after dislodging from the soil while spreading backward and remaining interlocked as illustrated in Figure 4.2.   The pattern of failure of the southern segment (VI) is wrong as it should deflect like a beam with two fixed ends due to the relatively infinite extension of the floodwall at both ends.  The pattern shown on the sketch is for a beam with hinged ends, as shown in my remarks on Figure 4.2.  Furthermore, if the floodwall was impacted at its apex by an impact (point) load, as per the argument made in the MEA report, then the failed wall should have a sharp or pointed apex at the impact location.  This was not the case as illustrated by the numerous photographs of the breach provided in the MEA report, including Figure 4.2 itself.

- The schematic illustration of the South Breach failure sequence depicted on Figure 4.3 of the MEA report is speculative and illogical.  As discussed in the MEA report, the sketch is intended to illustrate the failure sequence at the apex of the northern

8

segment (large bow) of the South Breach and not the point of entry of the Barge at the southern end of the South Breach (small bow). Figure 4.3 shows the I-wall tilting in a clockwise rotation from Position 1 to Position 2 under a horizontal impact load. Next, it displaced landward to Position 3 while rotating counterclockwise until it returns back to an almost vertical upright position (Position 4). This reversal in the direction of rotation is illogical considering the steady nature of the applied load (either a horizontal impact load as illustrated in the figure or/and uniform water pressure). There is no explanation of how soil blocks I through VI were removed or even what the shown dashed boundary lines mean. Again, if it is as argued in the MEA report that this horizontal load is due to the Barge impact then it will either become pinned on the still standing levee top or will continue to drift into the Lower Ninth Ward with the floodwater. Reference is made to my earlier comments relative to Figure 4.1 of the MEA report (schematic of the North Breach) and on my attached sketches.

The following comments are offered relative to the geotechnical discussions contained in the MEA report particularly in Chapter 5. Reference is also made to the attached set of figures, sketches and tables included in this report for further clarification of the discussion on pages F-1 through F-34.

1. Figure 5.12 in the MEA report shows an east-west cross section at the North Breach and Figures 5.13 and 5.14 show east-west cross sections at the South Breach. These profiles indicate very irregular and complex geometry (soil stratification, continuities and discontinuities) that cannot be substantiated or justified based on the limited information available to date about the landside and the EBIA. It appears that the selected stratification does not account for the time, ground surface elevation and reference datum of the different soil borings and excavations used to construct these profiles. Constructing these complex profiles from few scattered soil borings made at different times and at locations outside the breach areas is at best speculative and unrepresentative. These complex profiles were used in the subsequent MEA geotechnical analyses which significantly affected the results. Also, it is not valid to use very complex profiles only to apply a very crude soil model, based on simple mathematical averages as will be discussed.

2. Soil strength, unit weight (wet density), stratification and continuity, etc. of the subsoil under a levee and beyond its toes are to be established for short-term and long-term global stability analyses and water flow (seepage) analyses based on the results of field exploration and laboratory testing. The following excerpts are taken from the USACE NOD "*Hurricane and Storm Damage Risk Reduction System Design Guidelines*" (HSDRRS-DG, 2007/08) which summarize the procedures used in this regard:

"*3.1.2 Field Investigations*

*For levee design, centerline and toe borings should be taken every 500 feet (OC), with borings alternating between 5" undisturbed and general type soil borings or CPTs.*

*3.1.2.1 Strengthlines*

*The guidance outlined herein assumes test results are from 5" diameter undisturbed samples; unconsolidated-undrained triaxial (Q) tests are the predominant tests and are supplemented by unconfined compression (UCT) tests. The methods of analysis should be both Spencer Method and Method of Planes using the factors of safety outlined in Table 3.1. Strengthlines should be drawn such that approximately one-third of the tests fall below the strengthline and two-thirds plot above the strengthline. A line indicating the ratio of cohesion to effective overburden pressure (c/p) of 0.22 should be superimposed on the plot. The c/p line may be used to assist in determining the trend of the strengthline. A plot of centerline strengths under an existing embankment and another plot under natural ground to be used for toe strengths should be drawn.*

*3.1.3 Levee Embankment Design*

*A. Using centerline borings, toe borings, CPTs, and applicable test results, determine stratification, shear strength, and unit weights of materials and separate alignment into soils and hydraulic reaches. Soil parameters and stratification to be used for design must be reviewed for approval by senior engineer.*"

3. The soil data plotted on Figures 5.15 through 5.31 of the MEA report were used to develop the wet density ($\gamma$) and undrained shear strength ($S_u$ or undrained cohesion $C_u$) used in their analyses of the two IHNC reaches. MEA used selectively simple mathematical averages of

some or all of the data points plotted on each individual diagram, and then applied some subjective judgment to select the soil parameters used in their global stability and seepage analyses. It should be noted that results of these analyses are highly dependent on the selected soil parameters as well as the modeled geometry (discussed in Item 1 above). The MEA data is not representative of the subsoil conditions at the breach areas for many reasons including:

a. The soil data plotted in Figures 5.15 through 5.31 contain results from a number of soil borings as shown in Figure 5.11. These borings were made by different agencies, at different times, at different locations and for different reasons to form a "fruit basket" containing "apples, oranges, lemons, grapes, etc." Therefore, applying a simple mathematical average to this data set of points is over-simplistic and inaccurate due to:

   i. Some of these borings were made at different times prior to Hurricane Katrina while others were made after the storm. It is an indisputable scientific fact that properties of subsoils, particularly clays, vary with time (time dependent) due to many factors including stress history, added fill, excavations, lowering of groundwater table (pumping), construction, etc. This is extremely important considering the numerous activities that took place over the years on both sides of the IHNC floodwall. Therefore, the results of laboratory tests performed on samples obtained from this wide collection of borings cannot be represented by a simple mathematical average or even plotted on one diagram without applying some scientific adjustments.

   ii. Most of the borings shown on Figure 5.11 were made hundreds of feet away (a football field is about 300 ft. long) from the breach areas, and at locations where the subsoil conditions are expected to be better. It is indisputable that a breach will develop at a location where the subsoils are generally weaker than the remaining areas outside the limits of the breach. Otherwise, a breach should have developed along the entire length of the floodwall at the 17th Street Canal, London Avenue Canal and the IHNC. Again, the results of the laboratory tests performed on samples obtained from this widely spaced (on the landside) and

distant (in the EBIA) borings cannot be grouped and averaged without applying some scientific and objective judgment.  MEA does not explicitly discuss how this data was averaged.

iii.  Some of the soil borings used by MEA were made by different contractors as part of their construction activities (demolition, excavation, monitoring wells, etc.).  Some of these borings may be only 10 ft. deep or were exploration pits. Some of these borings (3 inch in diameter) may not be of the same quality as those made for the purposes for new construction or failure analyses. Therefore, their results should not be relied on or they should at least be adjusted or assigned lower weights in the mathematical averages.

iv.  Two types of borings are performed by the USACE NOD for their FPS/HPS projects.  These are the 5 inch diameter undisturbed (U) soil borings and the 3 inch diameter general (G) borings.  The U borings provide higher quality soil samples with minimum disturbance and, therefore, more weight is given in the FPS/HPS designs to their laboratory test results.  Section 2-8 on Page 2-4 of the USACE EM 1110-2-1913 *Design and Construction of Levees* (2000) states that "*Samples for determining consolidation and shear strength characteristics and values of density and permeability should be obtained using undisturbed borings in which 127-mm- (5-in.-) diameter samples are taken in cohesive materials and 76.2-mm- (3-in.-) diameter samples are taken in cohesionless materials.*"  As per the NOD, soils are continuously sampled in the U borings using a piston sampler to minimize disturbance in the recovered soil cores.  The G borings are also used by the industry (contractors, consultants, etc.) since they are more cost effective but not of the same quality as the U borings.  Therefore, results of the G borings are only used by the NOD for non critical structures (borrow pits, excavations, inspections, instrumentation installation, etc.) or to confirm the continuity of the soil strata between widely spaced U borings. However, a smaller weight is assigned by the USACE in their designs to the laboratory test performed on samples obtained from the G borings due to their lower quality (smear and disturbance) and the small diameter of the recovered

cores.  MEA failed to recognize this well known practice when they assigned equal weights of 1.0 in their mathematical averages to the test results obtained from the U, G borings and even unknown borings (refer to the legends on Figures 5.15 through 5.31) possibly made by contractors for purposes other than formal designs.

For all of the above reasons, IPET, ILIT and my own analyses relied on the results of high quality borings which were made after Hurricane Katrina and within the specific areas of the breaches.  Based on the defects in MEA analyses, there is no surprise that MEA reached different conclusions in their analyses of the IHNC North Breach and South Breach.

b.  The data plotted in Figures 5.15 through 5.31 include results from laboratory and field tests performed on samples obtained from different borings U's, G's and unknowns (refer to the legends of the figures) made on both sides of the floodwall. Again, these field and laboratory tests were performed by different agencies, at different times and for different purposes.  More specifically:

   i.  The post-Katrina USACE FPS/HPS projects and analyses incorporate the results of field (in-situ) tests.  The Cone Penetrometer Test (CPT) was selected as their present standard field test.   CPT yields continuous profiles with depth showing subsoil stratification and variations in the soil's undrained shear strength ($S_u$ or $C_u$) and pore water pressure, but it does not produce soil samples for laboratory testing. CPT soundings have been used since the 1980s by the Louisiana Department of Transportation and Development (La DOTD) which oversees the Louisiana Levee Boards and it became a required standard test in all of their projects in the 1990s.  CPT soundings were performed at the IHNC site after Hurricane Katrina (see attached IPET Figures 11-12 and 11-13 and ILIT Figures 6.25 and 6.26).  These CPT soundings were made specifically within the breached areas (a CPT truck is shown in the area of the North Breach in Figure 4.13 of the