1

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3

4    IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION

5                                   * NO. 05-4182

6    PERTAINS TO: BARGES            * Consolidated

7                                   * SECTION "K(2)"

8    Boutte v. Lafarge       05-5531 *

9    Mumford v. Ingram       05-5724 * JUDGE DUVAL

10   Lagarde v. Lafarge      06-5342 *

11   Perry v. Ingram         06-6299 * MAG. WILKINSON

12   Benoit v. Lafarge       06-7516 *

13   Parfait Family v. USA   07-3500 *

14   Lafarge v. USA          07-5178 *

15    *  *  *  *  *  *  *  *  *  *  *

16

17            Deposition of GENNARO G. MARINO,

18   PH.D., P.E., given at Chaffe McCall, L.L.P.,

19   2300 Energy Centre, 1100 Poydras Street, New

20   Orleans, Louisiana 70163-2300, on September

21   12th, 2008.

22

23   REPORTER BY:

24           JOSEPH A. FAIRBANKS, JR., CCR, RPR

25           CERTIFIED COURT REPORTER #75005

U.S. Dist. Ct. E.D. La.
No. 05-4182(K)(2) -- BARGE
DX 225

**2**

1  APPEARANCES:
2  REPRESENTING THE BARGE PSLC:
3      WIEDEMANN & WIEDEMANN
4      (BY:  LAWRENCE D. WIEDEMANN, ESQUIRE)
5      821 Baronne Street
6      New Orleans, Louisiana 70113
7      504-581-6180
8  - and -
9      BRIAN A. GILBERT, P.L.C.
10     (BY:  BRIAN A. GILBERT, ESQUIRE)
11     821 Baronne Street
12     New Orleans, Louisiana 70113
13     504-885-7700
14
15 REPRESENTING LAFARGE NORTH AMERICA:
16     GOODWIN PROCTOR, L.L.P.
17     (BY:  MARK S. RAFFMAN, ESQUIRE)
18     901 New York Avenue, NW
19     Washington, D.C. 20001
20     202-346-4000
21 - and -
22
23
24
25

**3**

1      LAFARGE NORTH AMERICA, INC. LEGAL
2      DEPARTMENT
3      (BY:  PETER L. KEELEY, ESQUIRE)
4      12950 Worldgate Drive, Suite 500
5      Herndon, Virginia 20170
6      703-956-3437
7  - and -
8      CHAFFE, MCCALL, L.L.P.
9      (BY:  DEREK WALKER, ESQUIRE)
10     2300 Energy Centre
11     1100 Poydras Street
12     New Orleans, Louisiana 70163-2300
13     504-585-7000
14
15 ALSO PRESENT:
16     MARK HANNA, ESQ.
17     HEATHER LONIAN, ESQ.
18     WILLIAM J. GUSTE, IV, ESQ.
19     RICHARD PAVLICK, ESQ.
20     CONOR KELLS, ESQ.
21     RONALD J. KITTO, ESQ.
22
23 VIDEOGRAPHER:
24     GILLEY DELORIMIER (DEPO-VUE)
25

**4**

E X A M I N A T I O N   I N D E X

EXAMINATION BY:                        PAGE

MR. RAFFMAN ..................................8

E X H I B I T   I N D E X

EXHIBIT NO.                        PAGE
Marino Exhibit 1 ...........................12
Marino Exhibit 2 ...........................68
Marino Exhibit 3 ...........................115
Marino Exhibit 4 ...........................166

**5**

S T I P U L A T I O N
        IT IS STIPULATED AND AGREED by and
among counsel for the parties hereto that the
deposition of the aforementioned witness may be
taken for all purposes permitted within the
Louisiana Code of Civil Procedure, in
accordance with law, pursuant to notice;
        That all formalities, save reading
and signing of the original transcript by the
deponent, are hereby specifically waived;
        That all objections, save those as to
the form of the question and the responsiveness
of the answer, are reserved until such time as
this deposition, or any part thereof, is used
or sought to be used in evidence.

                    *  *  *

        JOSEPH A. FAIRBANKS, JR., CCR, RPR,
Certified Court Reporter in and for the State
of Louisiana, officiated in administering the
oath to the witness.

**6**

1    GENNARO G. MARINO, PH.D., P.E.
2  1905 Maynard Drive, Champaign, Illinois 61822,
3  a witness named in the above stipulation,
4  having been first duly sworn, was examined and
5  testified on his oath as follows:
6  MR. RAFFMAN:
7        Case Management Orders 4, 5 and 7
8    will govern the deposition today.
9  MR. WIEDEMANN:
10        Let the record reflect that
11    Mr. Marino is appearing here today in
12    reference to the certification aspect
13    of the case.  His final report on the
14    liability aspect is not due until
15    March of 2009 and he will reserve the
16    right and will have the right to file
17    the additional report and he has an
18    ongoing investigation.
19  MR. WALKER:
20        Could I get a clarification on
21    that?  Is it the position of the
22    plaintiffs that this report that has
23    been submitted is not Mr. Marino 's
24    final report?
25  MR. WIEDEMANN:

**7**

1        We don't take a position on that.
2    That's a report that he prepared in
3    connection -- at our request to
4    determine causality.  And he has
5    not -- he has an ongoing investigation
6    of which he can tell you, but I'm not
7    particularly cognizant -- but he is
8    going to be prepared to render an
9    additional report as the Court has
10    ordered, in March of 2009, which will
11    include any additional investigation,
12    tests, whatever he does from this
13    point on.
14  MR. WALKER:
15        So this report is submitted for
16    class certification purposes and this
17    deposition is taken for class
18    certification purposes.
19  MR. WIEDEMANN:
20        It was submitted because the
21    Court required the submission of five
22    reports in the class certification
23    aspect.  And that's what it was
24    submitted under.
25  MR. WALKER:

**8**

1        Okay.
2  MR. WIEDEMANN:
3        And that's the stage of the case.
4  EXAMINATION BY MR. RAFFMAN:
5    Q.  Mr. Marino -- your counsel
6  Mr. Wiedemann referred to you as Mr. Marino.
7  Is that acceptable?
8    A.  You can call me Ger if you want.
9  Jerry, Gennaro -- you know, when I was at the
10  University of Illinois I would be introduced as
11  Dr. Marino, I'd tell my guys that are working
12  under me you can just call me Ger if you want.
13  So that's -- I'm not really stuck on names.
14    Q.  Okay.  Well, Mr. Marino is what comes
15  most naturally to my tongue, so if that's
16  accept to you that's what I'm going to use.
17    A.  That's fine.
18    Q.  My name is Mark Raffman.  I represent
19  Lafarge North America, one of the defendants in
20  the barge litigation.  And I'll be asking you
21  questions today in your capacity as an expert
22  retained by the plaintiff's in this matter.
23        You have been retained by the
24  plaintiffs in this case; right?
25    A.  Yes.

**9**

1    Q.  You've given depositions in the past;
2  am I right?
3    A.  Yes.
4    Q.  How many have you done?
5    A.  The first number that comes to mind is
6  ten, maybe up to fifteen.  Ten to fifteen, in
7  that range.
8    Q.  Have you ever been a party to a
9  lawsuit?
10    A.  I'm not sure.  What do you mean by
11  that?
12    Q.  Well, have you ever been plaintiff in
13  a lawsuit.  Did you ever sue anybody?
14    A.  Not that I know of.
15    Q.  Did you ever get sued by somebody?
16    A.  Well, there was -- it never went to
17  court.  There was an instance of where we were
18  drilling holes in a parking lot, and there was
19  a gas line that was hit and, um -- Cosco, um --
20  said it was our responsibility and the
21  driller's responsibility.
22    Q.  Did you give a deposition in that
23  case?
24    A.  No.  No, like I said, it didn't get
25  very far.

**10**

1   Q.   On the basis of the ten to fifteen
2 depositions that you've given in the past, are
3 you familiar with procedure for giving a
4 deposition?
5   A.   In general.
6   Q.   Okay.  Well, maybe a little refresher
7 is in order.  The court reporter will take down
8 the words that you and I say.  You understand
9 that.
10   A.   Uh-huh.  Yes.
11   Q.   Right.  And in order for him to do his
12 job, we each need to speak rather than use
13 gestures such as head nods or shaking our
14 heads.  You understand that?
15   A.   Yeah.  But you can remind me.
16   Q.   Okay.  We need to take turns talking.
17 We can't both talk at the same time.  You
18 understand that.
19   A.   Well, that's hard for Italians, we
20 like to use our hands and we talk all the time.
21 You know, in my family, you know, it's always
22 going back and forth -- yeah, I understand.
23 I'm just joking.
24   Q.   Okay.  You understand you're under
25 oath today as if you were testifying in a court

**11**

1 of law.
2   A.   Yes.
3   Q.   And if you don't understand a question
4 that I ask, will you seek clarification?
5   A.   Yes.
6   Q.   If you remember something that's
7 responsive to a question I asked earlier,
8 you're welcome to interject that you've
9 remembered something else.  You understand
10 that.
11   A.   Yes.
12   Q.   Have you taken any medications,
13 alcohol, drugs or anything else that would
14 interfere with your ability to testify
15 truthfully and accurately today?
16   A.   No.  I'm sorry, I forgot.  What was
17 your name?
18   Q.   My name is Mark Raffman.
19   A.   Mark Raffman.
20   Q.   What if anything did you do to prepare
21 for this deposition today?
22   A.   Um -- I reviewed my report, notes that
23 I had, um -- talked to some of my engineers.
24 Um --
25   Q.   I'm going to ask the court reporter

**12**

1 the mark this document as Exhibit 1.
2      Mr. Marino, I'm handing you what the
3 court reporter has marked as Marino Exhibit 1.
4 Do you recognize Exhibit 1 as a copy of the
5 report that you submitted in connection with
6 the class certification phase of this case?
7      (Marino Exhibit 1 was marked for
8 identification and is attached hereto.)
9   A.   All except it looks like Photo 13
10 didn't come out right.  Unless Hurricane
11 Katrina was going on when the picture was
12 taken.
13 EXAMINATION BY MR. RAFFMAN:
14   Q.   Now, apart from Figure 13, the
15 photograph 13, is this the report that you've
16 submitted?
17   A.   Looks like it, yeah.
18   Q.   Okay.  And I'll represent for the
19 record that Photo 13 is the report as we
20 received it.
21   A.   Oh, really.  Well, it's not the way
22 it's supposed to be.
23   Q.   Can you tell us how it's supposed to
24 be?
25   A.   It's, um -- it's a close-up of Figure

**13**

1 12, looking at the north or south end,
2 depending on your viewpoint, of the upper
3 portion of the wall where it sheared off.
4   Q.   This is the part of the wall where the
5 rebar is bent in the direction of the Lower
6 Ninth Ward?
7   A.   Yes.
8   Q.   Okay.
9   A.   It's the vertical fracture surface
10 right beyond the construction joint.
11   Q.   At the south breach, correct?
12   A.   Right.
13   Q.   Okay.  You said you reviewed some
14 notes that you have.  What was the nature of
15 those notes?
16   A.   Um -- I had some notes on some of the
17 witnesses that I looked at.  I didn't get
18 through them all.  I got through a couple
19 witnesses.  Didn't have time to look at all of
20 them.
21   Q.   Do you have those notes with you
22 today?
23   A.   Not with me.
24   Q.   Apart from notes about what some of
25 the witnesses said, did you have any other

14

1   notes that you reviewed the prepare for the
2   deposition today?
3       A.   I made some notes on just some of the
4   work that I have done in the past.
5       Q.   And when you say work done in the
6   past, you mean work done in connection with
7   this project?
8       A.   No.  Just sometimes I -- normally, in
9   these kinds of depositions, people ask me --
10  not almost every time, every time, you know,
11  work that you've done in the past.  And I have
12  difficulty since I've got, you know, so much
13  experience, you know, over thirty years or more
14  experience, it's hard to remember specific -- a
15  number of specific projects.  So I try to
16  recall some of the work that I've done.
17      Q.   So the notes recalling some of the
18  work that you've done and that you reviewed to
19  prepare for the deposition are where?
20      A.   They're back in the hotel.  But
21  they're just like little -- they're not like
22  detailed or anything, Mark, it's just like a
23  phrase.  You know, it's not -- I don't even
24  think anybody would understand them.
25      Q.   Apart from the notes on the witnesses

15

1   and the notes on the prior projects, did you
2   review any other notes to prepare for today's
3   deposition?
4       A.   Not that I can recall.
5       Q.   Mr. Marino, when were you retained to
6   assist the plaintiffs in this lawsuit?
7       A.   I want to say in April of this year.
8       Q.   That would be April of 2008?
9       A.   Yes.  It might have been in March.
10  March-April, I'm not positive.
11      Q.   How did you come to be involved in the
12  lawsuit?
13      A.   I was referred to -- by, um -- Ray
14  Helmer to Larry Wiedemann.
15      Q.   You worked with Mr. Helmer on prior
16  projects?
17      A.   No.
18      Q.   How do you know Mr. Helmer?
19      A.   We've had some correspondence in the
20  past.  He has done newsletters that our company
21  have put out, and we thought those projects
22  were interesting.
23      Q.   What is Mr. Helmer's area of
24  expertise?
25      A.   As far as I know, he's a civil

16

1   engineer.  I'm not sure what his specific area
2   of expertise within civil engineering is, what
3   his background is.
4       Q.   Who made the first call or the first
5   contact between you and Mr. Wiedemann?
6       A.   Don't remember.
7       Q.   When you first spoke with
8   Mr. Wiedemann, was it on the phone or in person
9   or some other way?
10      A.   On the phone.
11      Q.   And in that first phone call, were you
12  asked to do anything?
13      A.   Yes.
14      Q.   What were you asked to do?
15      A.   Um -- to evaluate the failure of the
16  floodwalls, the north and south breach.
17      Q.   After you were asked to evaluate the
18  failure of the floodwalls at the north and
19  south breaches, did you accept that assignment?
20      A.   Yes.
21      Q.   When you accepted that assignment,
22  what was the first thing you did to begin
23  carrying it out?
24      A.   The first thing I remember was looking
25  at the information online.

17

1       Q.   What information did you look at
2   online?
3       A.   Um -- information related to the ILIT
4   and IPET websites and the Team Louisiana
5   website.
6       Q.   What else did you do?
7       A.   I went through those websites and
8   started printing out what I thought at the
9   beginning would be the most relevant stuff for
10  me to understand the problem.
11      Q.   Apart from ILIT, IPET and Team
12  Louisiana, what else did you review in the
13  course of your work evaluating failure of the
14  floodwalls at the north and south breaches?
15          MR. WIEDEMANN:
16              You talking about at the
17          beginning?
18          MR. RAFFMAN:
19              I'm going to move forward a bit.
20          MR. WIEDEMANN:
21              Okay.  Go ahead.
22      A.   Um -- photographs, witness
23  depositions, pretty much what I've said, Mark,
24  in my report is the substance of what I
25  reviewed.  And I think it said here our

18

1    investigation included review and evaluation of
2    previous public investigative reports to date
3    on the subject, floodwall failures, a number of
4    earwitness depositions, relevant technical
5    publications, and project photos, and
6    performance of certain engineering
7    calculations.  That's what we did.
8    EXAMINATION BY MR. RAFFMAN:
9         Q.   All right.  So making reference now to
10   Paragraph 1.1 of your report, Exhibit 1, your
11   testimony today is that that accurately
12   characterizes what you've done in the course of
13   your project evaluating the failure of the
14   floodwalls at the north and south breaches as
15   of now.
16        A.   I mean, yeah, I would say that that's
17   substantially correct, yes.  Well, not of now.
18   I mean, because this was written, um -- I think
19   it was due on June 30th.  It says here,
20   concurrent with this work we are collecting and
21   reducing relevant data and performing various
22   stability and seepage analyses, among other
23   tasks.  It says, consequently, the findings
24   given below are based on only the work which
25   had been accomplished to date.  So it says

20

1         Q.   What have you done since the
2    production of this report?
3         A.   Um -- primarily what we've done is
4    data collection and some reduction work.
5         Q.   What data has been collected?
6         A.   We have got a number of CDs and DVDs
7    and a hard drive from Brian Gilbert that we've
8    been going through a lot of information and
9    taking -- gleaning from that anything that
10   might be somewhat relevant.
11        Q.   What information is on the CDs and
12   hard drives that you received and that you've
13   looked at since the production of this report?
14        A.   You know, I'm not doing it personally,
15   I have another engineer doing that, so I can't
16   answer that in totality.  You know, I'm -- I've
17   talked to him about it and I know that he's got
18   ten photos from it, I think there's some video
19   footage on there, um -- and I think, but I'm
20   not positive, but he's gotten some, um --
21   design memo, um -- drawings, maybe some
22   calculations.  I think there is also boring and
23   laboratory data within those files.
24        Q.   Has your firm Marino Engineering
25   Associates collected soil boring data?

19

1    right there that, you know, we are doing other
2    work.
3         Q.   All right.  As of June 30, when this
4    report was submitted, the statement in 1.1
5    about the work that was done accurately
6    describes the work as of that date.  Correct?
7         A.   Yes.
8         Q.   Since that date, you've continued to
9    do work?
10        A.   Yes.
11        Q.   Do you expect to testify in connection
12   with the class certification hearing about work
13   that you did after this report was due but
14   that's not included in this report?
15        A.   Not that I'm aware of.
16        Q.   Any testimony you give at the class
17   certification stage of this case would be based
18   on what the conclusions are reached in this
19   report; correct?
20        A.   Mark, I'm not aware of going to any
21   hearing.
22        Q.   All right.
23        A.   Okay?  All I know is that I was
24   requested to produce a report by June 30th on
25   what our findings were.

21

1         A.   You have to tell me exactly what you
2    mean by that.
3         Q.   Have you taken soil samples?
4         A.   No.
5         Q.   Anything else you can recall about the
6    information on the CDs and DVD hard drives from
7    Mr. Gilbert that's been collected and reduced
8    since the report was issued?
9              MR. WIEDEMANN:
10                 Let me just make a general
11             objection.  The report is submitted
12             with regard to the class
13             certification.  There is an ongoing
14             analysis that's going to result in a
15             report in March of 2009.  And --
16             MR. RAFFMAN:
17                 Finished?
18             MR. WIEDEMANN:
19                 Yeah.
20             MR. RAFFMAN:
21                 If you want to tell me on the
22             record here today that whatever you
23             submit in connection with class cert
24             is based on the conclusions in this
25             report, then I'll stop asking

**22**

1   questions.
2   MR. WIEDEMANN:
3       The report was June of 2008.
4   Right?
5   MR. RAFFMAN:
6       That's correct.  That's when your
7   expert reports on class certification
8   were due.
9   MR. WIEDEMANN:
10      Right.  Right.
11  MR. RAFFMAN:
12      So if you want me to stop asking
13  questions, you can make that
14  representation; otherwise, I'm going
15  to keep asking questions.
16  MR. WIEDEMANN:
17      You can make that decision.
18  That's the report we submitted.
19  MR. RAFFMAN:
20      All right.
21  EXAMINATION BY MR. RAFFMAN:
22  Q.   Apart from the receipt, collection,
23  reduction of data, are there other things that
24  you and your firm have done since the June 30
25  report was issued?

**23**

1   A.   Other than some casual conversations,
2   we really haven't done anything.  Oh, I've
3   looked at some of the photos that were
4   produced.  I'm not sure where the engineer got
5   the photos, actually.  He might have got some
6   of the photos from, um -- this information that
7   was sent by Brian Gilbert, but there might have
8   been some from websites as well.
9   Q.   Okay.  So you've described, as you say
10  in the report, that you are collecting and
11  reducing relevant data you see that in the
12  report, right?
13  A.   Yeah.  Uh-huh.
14  Q.   It also says you're performing various
15  stability and seepage analyses.  Do you see
16  that?
17  A.   Yes.
18  Q.   Can you describe those analyses for
19  us, please?
20  A.   They would be very similar to those
21  that have been done by the Corps and by the
22  ILIT group.  Um -- we haven't gotten to do much
23  of that since before this report here was
24  published, the one in June.
25  Q.   The report, Section 1 point -- before

**24**

1   I ask that question, have you reviewed any of
2   the other expert reports that have been issued
3   in this case?
4   A.   Um -- the only ones that I'm aware of
5   were ones that were sent to me last week, and
6   they weren't really that relevant to my area,
7   so I just kind of cruised through them, I
8   didn't really study them in detail.
9   Q.   Do you remember the names of any of
10  the experts whose reports you cruised through?
11  A.   I can tell you one was a hydrology
12  report and I don't know if I can pronounce the
13  doctor 's name.  Um -- it started with an S, I
14  think.
15  Q.   Dr. Suhayda?
16  A.   Suhayda.  That's not too hard.  And I
17  looked at -- like I said, just kind of browsed
18  through a report by Infinity Engineering
19  Consultants.  Is that right?
20  Q.   These would have been the reports that
21  were submitted by the defendants' experts;
22  right?
23  A.   Yes.
24  Q.   Apart from ILIT, IPET and Team
25  Louisiana, have you reviewed any other reports

**25**

1   or findings regarding the causes of the
2   breaches on the eastern side of the Inner
3   Harbor Navigational Canal?
4   A.   I would say our focus has been those
5   reports, um -- I know and am aware of other
6   reports, but really haven't had a chance to
7   look at them.
8   Q.   What other reports are you aware of
9   that you have not had the chance to look at?
10  A.   I know there's professional papers
11  that have been written.
12  Q.   Do you know the authors of any of
13  those professional papers?
14  A.   Not offhand.  I would assume they're
15  the authors in general of, um -- the people
16  that were involved in the ILIT investigation,
17  primarily.
18  Q.   Now, Exhibit 1 to your deposition,
19  this is, as you've described it, your report,
20  correct?
21  A.   Yes.
22  Q.   And it bears your signature, right?
23  A.   Yes.
24  Q.   Did you write it?
25  A.   Yes.

26

1    Q.   These are your words?
2    A.   Um -- let me back up a minute.  There
3  are sections in here that were written by
4  Dr. Gamal.
5    Q.   Dr. Gamal is someone that works with
6  you?
7    A.   Yes.
8    Q.   He's an employee of Marino Engineering
9  Associates?
10    A.   He was at the time.  Now he's a
11  consultant.
12    Q.   Can you identify for me which sections
13  Dr. Gamal wrote?
14    A.   Well, they're kind of he wrote and
15  then I went over them and we modified it a
16  little bit and then that was the final thing.
17  Section 3.1, 3.2, 3.3, 3.5, 4.2A he contributed
18  some to.  And he also reviewed the entire
19  report.  And there might be some sentences here
20  and there or some qualifications to some other
21  sections.  That's it.
22    Q.   Okay.  Thank you.
23    A.   You're welcome.
24    Q.   Referring to Section 1.1 of the
25  report, it's titled Preliminary Failure

27

1  Investigation, right?
2    A.   Right.
3    Q.   What else do you plan to do to
4  complete the failure investigation?
5    A.   Mark, like I said here, concurrent
6  work -- concurrent with this work, we are
7  collecting and reducing relevant data and
8  performing various stability and seepage
9  analysis, among other tasks.  I mean, the among
10  other tasks is probably what you're asking me
11  about, and I put among other tasks because
12  these are the primary things.  There may be
13  some corollary tasks that we do that are, um --
14  to assist or augment these analyses.
15    Q.   Can you think of any as you sit here
16  today that you plan to undertake, these
17  corollary tasks?
18    A.   Um -- I would say if the defendants
19  decide to drill and sample, you know, we'd be
20  interested in being there while it happens, or
21  possibly doing our own drilling.  Um - more
22  work on the impact of the barge would be
23  another area that we might do additional
24  analysis.  I'm sure we will do additional
25  analysis on.  How much I'm not sure.  Or what.

28

1    Q.   Is there anything else that you can
2  think of that would fit into these corollary
3  tasks that you plan to undertake?
4    A.   No.
5    Q.   As of the time of this report, the
6  efforts -- the significant efforts that were
7  made are detailed in Paragraph 1.1; right?
8    A.   Right.
9    Q.   Okay.  As of the time of this report,
10  how many hours had you and your staff spent
11  working on this matter?
12    A.   I don't know.
13    Q.   What amount of money did you bill or
14  charge for up through the time this report was
15  prepared?
16    A.   It's over a hundred thousand, but I'm
17  not sure where -- what the total was.
18    Q.   Paragraph 1.1 says that your
19  investigation has included review and
20  evaluation of previous public investigative
21  reports.  By that, do you mean to refer to the
22  IPET, ILIT and Team Louisiana reports?
23    A.   Yes.
24    Q.   Any other reports?
25    A.   No.

29

1    Q.   You also reviewed and evaluated a
2  number of eyewitness depositions; correct?
3    A.   Yes.
4    Q.   What depositions did you review?
5    A.   I don't know if I could remember all
6  those.  It was some time ago when I did review
7  them, so -- um --
8    Q.   Did somebody create or provide you
9  with summaries of the depositions?
10    A.   I think there were some summaries that
11  were provided.
12    Q.   Who provided them?
13    A.   Wiedemann.  But I looked at the
14  depositions myself.  I didn't really use those.
15    Q.   Do you remember any of the names of
16  the people whose deposition testimony you
17  reviewed?
18    A.   Yeah.  Some of them.
19    Q.   What names do you remember?
20    A.   And I may have these wrong.  Okay?
21  Patrina Peters, I think there was a Williams,
22  there was a Murph, Johnson -- those are ones I
23  can remember offhand.
24    Q.   Your report says you reviewed --
25    A.   Oh, Villavaso.  Sorry.

30

1    Q.  I'll go back and re-ask the question.
2        I know you remembered Mr.Villavaso as
3    one of the depositions you reviewed.
4    A.  Yes.
5    Q.  And why did that one stand out in your
6    mind as you remembered it?
7    A.  Because it's very relevant to the
8    north breach.
9    Q.  What did you do to evaluate the
10   depositions when you reviewed them?
11   A.  I basically, um -- like I said before,
12   prepared notes on the depositions.
13   Q.  Did you form any views as you reviewed
14   the depositions as to the reliability or fit of
15   the witnesses' testimony with other evidence
16   you were considering?
17   A.  Yeah.  I think -- and that's covered
18   in the report.  Um -- if we went to
19   Section 2.1, um -- since the ILIT and I --
20   Mark, you want me to just read it or --
21   Q.  Well, you can go ahead and read it if
22   it helps you.
23   A.  Okay.  Since the ILIT, IPET and Team
24   Louisiana reports, there have been a
25   significant amount of eyewitness information

31

1    which has become available which was not, which
2    did not exist in those reports.
3    Q.  And then it goes on from there.  I
4    don't need you to read all of the things the
5    eyewitnesses said.
6    A.  Right.
7    Q.  And my question was, you more or less
8    took the eyewitnesses as they came, right?
9    A.  No, I -- you know, there are some
10   conflicting statements, of course, between the
11   eyewitnesses.  And what I gleaned from it was
12   things that seemed to be consistent in general
13   with, um -- the witnesses or -- in terms of
14   other factors related to the mechanisms of
15   failure.
16   Q.  Give me an example of an eyewitness
17   testimony that you looked at and you concluded
18   was inconsistent and, therefore, disregarded.
19   A.  Um -- for example, um -- like I said,
20   I don't remember them all.  Okay?  But I
21   remember ones where the transcript and -- like
22   a phone transcript and then the deposition,
23   there were conflicting information.  So where
24   there was conflicting information I disregarded
25   that.  I tend to think the phone transcript is

32

1    probably more valid because it was done, um --
2    in more of a -- it was the initial interview.
3    Q.  Do you remember which witness you drew
4    that conclusion about?
5    A.  I think there were two that stand out
6    that I can remember.  One is a guy named
7    Williams.  I'm not sure what his name was --
8    Q.  Sidney Williams?
9    A.  Sidney Williams, where he was
10   saying -- he was saying about the barge hitting
11   the wall in his deposition, and before the
12   deposition he didn't say anything about that.
13       And then there was I think it's Murph,
14   where he said in his phone conversation prior
15   to his deposition that he saw it the wall.
16   And then in his deposition later he kind of
17   moved away from that.
18   Q.  So in forming the opinions that led to
19   the preparation of this report, you tended to
20   credit the transcript of the interview with
21   Sidney Williams more than you credited the
22   deposition testimony.
23   A.  Right.
24   Q.  And in forming the opinions that went
25   into this report you tended to credit those

33

1    portions of the Arthur Murph recorded
2    transcript that you found to be in conflict
3    with the deposition testimony.
4    A.  Correct.
5    Q.  Can you think of any other
6    inconsistencies that caused you to discount or
7    disregard deposition testimony that you read?
8    A.  I can't think of any others.
9    Q.  You referred to technical publications
10   in Paragraph 1.1.  Do you see that?
11   A.  Uh-huh.
12   Q.  Relevant technical publications.  Are
13   those the technical publications that are
14   listed in the appendix to your report?
15   A.  Yes, primarily, yes.
16   Q.  Can you think of any other technical
17   publications that you found relevant but that
18   you didn't list in the appendix?
19   A.  No, not that I can think of.
20   Q.  You referenced the performance of
21   certain engineering calculations in
22   Paragraph 1.1.  Do you see that?
23   A.  Yes.
24   Q.  Can you describe those calculations
25   for me?

34

1    A.   They would be some limit equilibrium
2  analysis that we did.  We did some seepage
3  analysis and also some hydrodynamic load impact
4  analysis which are discussed in this report.
5    Q.   Which of the engineering calculations
6  discussed in your report are limit
7  equilibrium -- which of the engineering
8  calculations in your report are limit
9  equilibrium analyses?
10    A.   Um -- the limit equilibrium analyses
11  are related to basically our focus at the time,
12  because we hadn't finished our data collection
13  phase, was basically to reproduce the results
14  that other investigators had obtained.  So the
15  limit equilibrium analyses were basically a
16  duplication of others' work to see if we could
17  come up with the same numbers, basically.
18    Q.   What is a limit equilibrium analysis?
19  Describe that for me as if I'm a reasonably
20  smart high school senior.
21    A.   These days or ten years ago?
22    Q.   Describe it for me so that my son
23  could understand.
24    A.   It's basically a method by which you
25  determine a failure surface which gives you the

35

1  greatest driving force versus the, um -- in
2  ratio, it gives you the greatest -- it gives
3  the greater ratio of driving force to resisting
4  force.  And it's a trial and error procedural.
5    Q.   Is that the kind of analysis that
6  results in a factor of safety lower than 1?
7    A.   Or it could be greater than 1.  It
8  could be 2, it could be 3, you know, it just
9  depends on the circumstances that you're
10  modeling.
11    Q.   The output of a limit equilibrium
12  analysis is a factor of safety number; correct?
13    A.   That's one of the result, yes.
14    Q.   The limit equilibrium analyses that
15  you did reflected in this report were to
16  reproduce the results of other investigations,
17  or at least see if you could, right?
18    A.   Right.
19    Q.   Did you do any limit equilibrium
20  analyses of your own independent from what
21  others had done?
22    A.   No.  That's -- we didn't have enough
23  time to get that far.  So we, um -- we plan to
24  do that.  That's part of this, um -- stability
25  analysis, various stability analysis and steep

36

seepage analysis discussed earlier in
Paragraph 1.1.
    Q.   Something you plan to do but have not
yet done.
    A.   Right.
    Q.   All right.  The engineering
calculations that were done for this report
included not only limited equilibrium analysis
but also seepage analysis; right?
    A.   Yes.
    Q.   Describe the seepage analysis done for
this report.
    A.   That was done using a numerical
modeling, essentially duplicating -- we were
able to duplicate the ILIT results.  And then
what we did is, we did one thing that was
different than what they had to see the effect
of it; we changed the permeability of one layer
to see what effect it would have.
    Q.   If I remember redding it right, you
made the layer less permeable than ILIT.
Right?
    A.   Yes.
    Q.   When you made the layer less
permeable, the water didn't get through in the

37

way ILIT said?
    A.   Yes.
    Q.   And that's why you concluded ILIT was
wrong.
    A.   That was one -- no.  It has to go
back -- you have to go back to the material
properties of -- the reported material
properties of that clay layer that's assumed to
be of the permeability of really, basically a
sand and gravel.  And it's a fat clay.  And
it's a modeling clay.
    Q.   The conclusion you drew that the layer
is in fact a modeling clay instead of a sand
and gravel --
    A.   Right.
    Q.   -- is what drove you to select a
different permeability coefficient; correct?
    A.   Yes.
    Q.   And having selected that different
permeability coefficient, you then concluded
that the ILIT results were incorrect.
    A.   Right.
    Q.   All right.  We may come back to that a
little later but that's a helpful summary.
    A.   I'm glad I could help.

10  (Pages 34 to 37)

38

1      Q.   Hopefully you can help us more as we
2   go forward.
3      A.   Good.
4      Q.   Were there other seepage analyses that
5   you did in connection with this report?
6      A.   No.
7      Q.   The last type of analysis you referred
8   in the engineering calculations is a
9   hydrodynamic load analysis.  What's that?
10     A.   That's -- it's pretty much discussed
11   in the stuff that Dr. Gamal wrote.  He did
12   that -- he did those calculations.  And I
13   referred to those paragraphs.  That is his
14   numbers that he came up with.
15     Q.   At the moment I'm not asking you about
16   numbers, I just want you to describe for me as
17   if I'm a reasonably smart high school senior
18   what is hydrodynamic load analysis.
19     A.   Okay.  Basically, what he did was
20   looked at wind speeds and wave heights and the
21   barge physical characteristics and came up with
22   a range of forces that -- a potential force
23   range that would impact the wall.
24     Q.   All right.  So hydrodynamic load -- if
25   I understand the word hydrodynamic, it has

39

1   something so do with water.  Right?
2      A.   Right.
3      Q.   And a hydrodynamic load is a load
4   that's made by water that is exerting a force
5   upon a retaining wall structure, right?
6      A.   Um -- I guess there is not really a
7   word for what we did, a specific word.  I mean,
8   you could say hydrodynamic/barge, um --
9   interaction of forces.
10     Q.   So the type of analysis you referred
11   the as a hydrodynamic load analysis, in
12   actuality it's an analysis that compares water
13   loads with calculated barge loads that you
14   derived.
15     A.   Right.  Ultimately, right.
16     Q.   You are a geotechnical engineer; am I
17   right?
18     A.   I would say that that's the emphasis
19   of my work.  I've done other things, as well.
20     Q.   What is a geotechnical engineer?
21     A.   It's basically the behavior of soil
22   and rock to manmade structures, or the
23   interaction of structures with soil and rock.
24     Q.   One of the things you study would be
25   the structural integrity of structures that are

40

1   anchored in the soil?
2      A.   When it has to do with sheet piling,
3   floodwalls, that sort of thing.  If you look at
4   these ILIT and IPET reports, you know, all the
5   professional work related to the performance is
6   really geotechnical.  They're all geotechnical
7   guys.
8      Q.   Am I right that the reason that
9   geotechnical science has nothing to offer to
10   this question is because the floodwalls were
11   anchored in the soil?
12     A.   Yes.
13     Q.   And in order to fail the floodwall,
14   you have to have some failure of the soil.
15     A.   Yes.
16     Q.   Have you ever -- before this case,
17   have you studied the failure of a levee or a
18   retaining wall?
19     A.   Yes.
20     Q.   Tell me about your experience studying
21   the failure of a levee or retaining wall before
22   this case.
23     A.   I worked you know a case in, um --
24   this is where I'm racking my mind here that I
25   was telling you about.  I worked on a case in

41

1   Tennessee.  It was Hurricane Creek where their
2   Gabion retaining wall was installed, and it
3   failed.
4           I looked at, um -- a retaining wall in
5   Texas, I-35, that also yielded.  It didn't
6   completely fail, there was a lot of remediation
7   work that needed to be done to it.
8           I worked on one in Virginia where the
9   retaining walls -- they were for the abutment
10   for a bridge, which had settled, moved out.
11          Those are the ones I can think of
12   right now.
13     Q.   All right.  In the case of the
14   Tennessee retaining wall that failed, what
15   caused that failure?
16     A.   It was a slope stability bearing
17   failure.
18          Oh.  I'm sorry.  I've got some
19   others -- another one that I just thought of.
20   I worked on Suburban Canal down here in New
21   Orleans that had problems with retaining soil.
22     Q.   All right.  In the Tennessee case you
23   said the slope stability bearing failure.  That
24   meant that the soil that had been providing
25   passive resistance became unstable and stopped

**42**

1  providing passive resistance? Did I understand
2  that right?
3      A.   There's passive resistance, but there
4  was also -- I mean, it's not just passive
5  resistance.
6      Q.   All right.  So what else happened
7  besides the loss of passive resistance?
8      A.   You have a global stability failure.
9      Q.   Involving both the active and the
10  passive forces?
11      A.   Right.
12      Q.   What caused the stability failure, if
13  you know?
14      A.   Um -- it was underdesigned.  There
15  were soft soils.  The soils were too soft.
16      Q.   In the case of the Texas wall that
17  yielded but did not fail, what was nature of
18  that failure?
19      A.   It was deteriorating backfill that
20  became soft.
21      Q.   If the soil on the backside of a wall
22  becomes soft, that soil provides less
23  resistance to failure, correct?
24      A.   Really, actually, Mark, what it does,
25  it provides a greater active force.

**43**

1      Q.   Okay.
2      A.   I mean, there's some resistance there,
3  but that's where you're getting your driving
4  force from.
5      Q.   The soil that became soft was in the
6  area that retaining wall was holding back?
7      A.   Right.
8      Q.   And as that soil became softer it
9  exerted more force on the wall, asking it the
10  lean back and hold it.
11      A.   Right.
12      Q.   The failure of the wall in Virginia
13  that you described, what was the nature of that
14  failure?
15      A.   Um -- it primarily dealt with karst
16  deposits that were below the embankment.
17      Q.   What is a karst deposit?
18      A.   Okay.  Karst is an area where there
19  has been significant limestone solutioning
20  that's caused sink holes in the ground surface
21  that now in those sink holes you have very soft
22  soils which are collapse features.
23      Q.   The karst deposits that you've just
24  described, were they on the side of the wall
25  that was providing the passive pressure or on

**44**

1  the side of the wall providing the active
2  pressure, or both?
3      A.   I would say they were -- that they
4  were both.  It was a complex structure.
5      Q.   All right.  And as the soils lost
6  their ability to provide support, did that have
7  something to do with the failure of that wall?
8      A.   Yes.
9           I did think of another one.
10      Q.   Well, let's recap.  We had the case in
11  Tennessee that you've described, in Texas, and
12  in Virginia.  Those are the three we've just
13  gone through.  Now there is another one in New
14  Orleans.
15      A.   Right.
16      Q.   And then you've just thought of a
17  fifth one.
18      A.   Right.
19      Q.   Tell me what the fifth one is.
20      A.   That was in Queens, New York, and it
21  was a temporary retaining wall that, um --
22  didn't have sufficient capacity to retain the
23  embankment of a Amtrak rail that was sitting
24  above it.
25      Q.   What was it about that temporary

**45**

1  retaining wall that deprived it of the capacity
2  to retain the track?
3      A.   As I remember, it wasn't high enough.
4  The wall wasn't high enough.
5      Q.   There was too much active pressure on
6  the wall for it to resist.
7      A.   No, it was actually a slope stability
8  problem above the wall.
9      Q.   If the wall had been higher it might
10  have been able to resist the failure?
11      A.   Yes.  You probably would have had to
12  have a bigger wall.  I mean, it would have had
13  to have more structure capacity, the wall.
14      Q.   If you build that wall higher on top,
15  then you need to have more anchoring
16  underneath, right?
17      A.   Right.  You know, you have your
18  bending stresses that are increased and, you
19  know -- there are extra loads, so you have to
20  design the walls to be stronger.
21      Q.   Right.  And the strength from a
22  retaining wall derives at least in part from
23  the ability of the wall below the soil to
24  resist the active pressure coming from above,
25  right?

46

1    A.   Can you say that again?
2    Q.   Sure.  A retaining wall is built to
3  resist pressure from earth or water or
4  something that's pressing on the wall, right?
5    A.   Right.  I mean, unless you have
6  surface -- like in this case, you also had a
7  train, so you had live loads from a train that
8  you needed to consider.
9    Q.   Whatever it is that's above the
10  surface that's pressing on your wall --
11    A.   You need to consider it.
12    Q.   And you need to consider that --
13    A.   That's not an active pressure.  That's
14  not considered an active pressure.  That's
15  considered a pressure from surface loads.
16    Q.   All right.  And I don't want to get
17  caught up in terminology because I may be
18  misunderstanding some of your terms, but the
19  fundamental principle is that in order for a
20  wall to resist a load it needs to have some
21  sort of anchor somewhere so that when the load
22  is exerted the wall can push back.
23    A.   Right.  I mean, there's different ways
24  to do that.  One way is embedment depth.
25    Q.   Right.  And one way is to put sheet

47

1  pile in the ground below a floodwall, right?
2    A.   Right.
3    Q.   Tell me about that fourth example in
4  New Orleans where you had a problem with the
5  Suburban Canal.
6    A.   Um -- that was a very interesting
7  problem.  It was a number of -- it actually
8  involved hundreds of stability analyses,
9  because there were numerous cofferdams that
10  were constructed along the canal in order to
11  make the improvement, and each -- many of
12  these, I wouldn't say each one, but many of
13  these, I'd say 80 percent of the cofferdams
14  that were temporarily constructed moved and
15  caused some safety concerns.
16    Q.   What is a cofferdam?
17    A.   It's basically a retaining structure
18  that keeps water -- typically keeps water from
19  an enclosed area where you're working.  Like
20  you commonly see cofferdams that are used for
21  bridge piers.
22    Q.   What caused the cofferdams to move?
23    A.   I just thought of another one, too.
24  They just come to me.
25    Um -- basically, my evaluation was

48

that the design was not compatible with the
specifications, and you had very soft soils, as
we have in this case, very similar to this, and
the loads that were allowed on the embankment
were too big and caused the stability problems.
It caused a change in the means and methods by
the contractor.
    Q.   What was it about the soft soils that
caused the problem with the cofferdam?
    A.   The drawdown of the water and also
construction loads.
    Q.   The soft soils were not able to resist
the loads that were being forced on them?
    A.   Yes.  As well as the, um --
dewatering.
    Q.   What was it about the dewatering that
created a problem?
    A.   Well, you're going from a bouyant
condition to a dead weight condition.
    Q.   You say a bouyant condition to a dead
weight condition?
    A.   So basically, what you're doing is --
here's an example.  Okay?  You get a pail with
gravel in it.  Right?  And you put it in water.
It's easy to lift up, right?  But you take it

49

out of the water, what happens?  It gets awful
heavy, right?  Okay.  It's in a bouyant
condition when it's in the water.
    Q.   All right.  So if I understand you
right, when there's water present in the soil
under a surface, that water creates a buoyancy.
Right?
    A.   Um -- in this situation, yes.
    Q.   In the situation that you're
describing at New Orleans.
    A.   Right.
    Q.   And I don't mean to generalize
unfairly but I want to understand what the
problem was here was that when the water was in
the soil there was a buoyancy that did what to
make it more stable?
    A.   It made it weigh less.  It made the
slope weigh less.  The soil effectively becomes
heavier when you dewater it.
    Q.   So dewatering that soil --
    A.   Dewatering -- you can imagine that the
canal is underwater.  Right?
    Q.   All right.
    A.   Now, what you're doing is you're
putting a cofferdam in and you're dewatering

50

1   that section in order to make the canal
2   improvement.  Right?  So that water is no
3   longer against the slope, so you don't have the
4   bouyant condition anymore, the slope now is
5   dead weight.  Okay?  So it adds to the -- if
6   you want to use the word active forces.
7       Q.   Okay.  All right.
8           Did you want to talk about a sixth
9   example?
10      A.   The sixth example was for a bridge
11  pier in, um -- where was it?  It was across the
12  Missouri River.  And the contractor was putting
13  in sheet pile, and the sands were too loose and
14  they were saturated and it resulted in
15  localized liquefaction causing the sheet pile
16  to move inward.
17      Q.   This was a situation, then, in which
18  water in the soil caused it to be weaker.
19      A.   Yes.  With the vibration of installing
20  the sheet pile.
21      Q.   All right.  So the water in the soil
22  combined with the action of the sheet pile
23  caused the weakness.
24      A.   Yes.
25      Q.   All right.  If you remember a seventh

51

1   example you're welcome to volunteer it.
2       A.   It may come after the deposition but
3   I'm sure I will remember a seventh.
4       Q.   Okay.
5           (Brief recess.)
6   EXAMINATION BY MR. RAFFMAN:
7       Q.   Mr. Marino, I'm going to direct your
8   attention to Section 2 of your report.
9   Section 2.1, in a portion you've read, it says,
10  since the ILIT, IPET and Team Louisiana
11  reports, there has been a significant amount of
12  eyewitness information which has become
13  available which did not exist in those reports.
14          You see that?
15      A.   Yes.
16      Q.   What eyewitness information are you
17  referring to in that sentence?
18      A.   The eyewitness reports that I had
19  reviewed.  I haven't seen any evidence that
20  those -- that information was available at the
21  time these reports were written.  Or that they
22  were considered.
23      Q.   Well, let me make sure I understand
24  which eyewitness reports that you reviewed.
25  Those are the depositions that are listed in

52

Appendix A to your report?
    A.   Yeah.  Yes.
    Q.   Are there any other depositions?
    A.   That should be a complete list.  I had
my secretary put them together.  I would assume
that that's a complete list.
    Q.   As you look at that list of names, are
there any that you can remember that are not on
that list or that are obviously missing from
it?
        MR. WIEDEMANN:
            As of June of 2008.
        MR. RAFFMAN:
            Well, that's fine, I'll ask that
        question that way first.
EXAMINATION BY MR. RAFFMAN:
    Q.   As of June of '08.
    A.   Not that I can recall.
    Q.   Okay.  And since June of 2008, have
you looked at other depositions that are
germane to your conclusions about barge impact
or wall failure?
    A.   No.
    Q.   Referring to the list of depositions
at Page 15, which of those depositions do you

53

find particularly significant?
    A.   As I mentioned before, Villavaso's
copy.
    Q.   Now, Villavaso's deposition is
relevant to the north breach I believe you
said.
    A.   Yes.
    Q.   And Villavaso was the one who --
describe for me what Villavaso -- what's the
significance of his deposition?
    A.   His description of what he saw during
the collapse of the wall.
    Q.   What's your recollection of what he
described having seen?
    A.   Um -- basically, um -- he heard a
boom-like sound, the wall started tumbling,
section by section, and he saw something that
appeared to be a barge protrude through a
section of the wall that had collapsed, and
then a gush of water came over the top -- or
came coincidentally with it.
        That's, I guess, a summary of what I
take from it.
    Q.   All right.  Of the eyewitnesses that
are listed on your list here, did any other

54

1    eyewitnesses on this list profess to have seen
2    a barge at the site of the north breach?
3        A.   I don't believe I remember seeing
4    anything like that.
5        Q.   Apart from Mr.Villavaso, which other
6    eyewitnesses on this list did you find
7    particularly significant?
8        A.   Um -- well, as a whole, I can say what
9    I thought was particularly significant was, you
10   know, the -- the what's been described as a
11   boom sound -- multiple boom sounds in the
12   direction of the Industrial Canal, um --
13   shaking of the ground, um -- and then I think
14   there's one or two witnesses that said -- which
15   I put some credence in that said that they saw
16   the barge going through the wall.  And one of
17   them I believe is Arthur Murph.  And I think
18   there's another one, but I can't remember at
19   this moment.
20       Q.   All right.  Arthur Murph gave --
21       A.   We talked about that one.  Sorry.
22       Q.   We talked about Murph earlier.  He
23   gave -- there was a recording of a phone
24   conversation with Murph; right?
25       A.   Yes.

55

1        Q.   And do you remember -- well, there was
2    also a deposition of Arthur Murph.  Right?
3        A.   Right.
4        Q.   All right.  And when you refer to
5    Murph 's recorded conversation or his
6    deposition as having seen the barge go through
7    the wall, as you said, at which breach did
8    Arthur Murph profess to have seen the barge go
9    through the wall?
10       A.   South breach.
11       Q.   Murph didn't profess to have seen the
12   barge at the north breach, did he?
13       A.   No.
14       Q.   And Villavaso didn't profess to have
15   seen the barge at the south breach, did he?
16       A.   No.
17       Q.   And apart from Murph, you can't
18   remember the name of another eyewitness who
19   professed to see the barge go through?
20       A.   No.
21       Q.   All right.  Turning your attention
22   back to -- well, let me rewind a bit.  The
23   testimony of Villavaso about what he saw at the
24   north breach is germane to your conclusions
25   about the cause of the north breach; right?

56

1        A.   It's not the only thing, but it is
2    germane, yes.
3        Q.   And the testimony of Murph, or the
4    recorded conversation of Murph, whatever Murph
5    said, is germane to your conclusions about the
6    south breach, right?
7        A.   Yes.  Same answer.  As well as the
8    other things I -- I mean, I think I've stated
9    in here what I thought was germane.
10       Q.   I don't mean to exclude anything else,
11   Mr. Marino, just to be clear.
12       A.   Oh.  All right.
13       Q.   I understand that you'll tell me that
14   even if Mr. Villavaso had never testified, you
15   would conclude the barge impacted the north
16   breach.  Isn't that correct?
17       A.   Right.
18       Q.   And even if Mr. Murph had never
19   testified, you would conclude that the barge
20   impacted the south breach, isn't that right?
21       A.   Yes.
22       Q.   But Mr. Villavaso's testimony doesn't
23   relate to your conclusions bout the south
24   breach, does it?
25       A.   No.

57

1        Q.   And Mr. Murph 's testimony doesn't
2    relate to your conclusions about the north
3    breach.
4        A.   As far as I remember his testimony,
5    no.
6        Q.   So to the extent that these
7    eyewitness' testimony is germane to your
8    conclusions as one of your inputs, your
9    conclusions about the north breach and about
10   the south breach are using the testimony of
11   different witnesses to support what you're
12   saying in that respect, isn't that right?
13       A.   I think they're consistent with my
14   overall conclusions.
15       Q.   Okay.  The witnesses are consistent
16   with your conclusions.
17       A.   Right.
18       Q.   But I guess what I'm trying to ask you
19   is, if one wants to test your conclusions for
20   consistency with the eyewitness accounts that
21   you find germane --
22       A.   Yes.
23       Q.   -- one would be looking at different
24   testimony at the north breach than at the south
25   breach.  Right?

58

1    A.  If I understand the question, yes.  I
2  don't remember, Mark, any witness that has
3  talked about both breaches.
4    Q.  Okay.  Let me turn now to the
5  paragraph at the top of 2 which says, no
6  observations of seepage at any time along the
7  subject floodwall or relevant areas of the
8  neighborhood prior to floodwall failure.
9       You see that?
10    A.  Yes.
11    Q.  That is an observation you made about
12  what these fifteen deponents observed or failed
13  to observe; right?
14    A.  Right.
15    Q.  And it's based on your review of
16  fifteen depositions, right?
17    A.  Correct.
18    Q.  And do you take the testimony of those
19  fifteen witnesses to allow you to conclude that
20  there was in fact no seepage prior to the
21  floodwall failure?
22    A.  I would say it's an indication that's
23  consistent with the information that I've
24  reviewed about the ground conditions.  Given
25  the ground conditions and the reported

59

1  engineering properties of those soils, I
2  wouldn't expect to see seepage.
3    Q.  If a witness were to testify at some
4  future time in this case that they observed
5  seepage in the area near the north breach,
6  would that affect your opinions?
7       MR. WIEDEMANN:
8          Object to the form of the
9          question.  Speculation.
10    A.  I would -- it would just depend.  I
11  would have to hear what that person has to say.
12  EXAMINATION BY MR. RAFFMAN:
13    Q.  The next section of your report says
14  that witnesses heard one to three booms, which
15  some say was a hollow sound, coming from the
16  direction of breaches within the approximate
17  time span of north and south breaches.
18       You see that?
19    A.  Yes.
20    Q.  That's an observation that you say
21  emerged from the eyewitness information that
22  became available but did not exist in the ILIT,
23  IPET or Team Louisiana reports.  Is that what
24  you wrote?
25    A.  Right.  These witness accounts were

60

not available until their depositions were
taken, as far as I'm --
    Q.  All right.  The witness accounts
regarding booms, were they the first witness
accounts regarding booms that you became aware
of?
    A.  I think there was one or two instances
in the IPET report where they talked about
eyewitness accounts of booms.
    Q.  Do you equate the boom or booms with
the impact from a barge?
    A.  Yes.
    Q.  Does each boom represent a barge
impact with the wall?
    A.  Yes.
    Q.  Can you think of anything else that
might have happened that morning other than a
barge hitting the wall that might have caused a
sound that people heard as a boom or booms?
    A.  No.
    Q.  Have you ever personally heard a barge
make impact with a floodwall or a lock wall or
any other structure?
    A.  No.
    Q.  In your report you say that -- you

61

observed that some of the witnesses say the
sound was a hollow sound, and then later on you
say many say the boom was an explosion or a
collision type noise.  Do you see that?
    A.  Yes.
    Q.  Do you equate the hollow sound with
the sound of an explosion or a collision?
    A.  Um -- I think it's just different
witnesses' description of the same thing.  Some
people are more able to describe something than
others.
    Q.  Was there a boom or booms at the north
breach?
    A.  Yes.
    Q.  Was there a boom or booms at the south
breach?
    A.  Yes.
    Q.  Was there a boom or booms at any other
breaches, to your knowledge?
    A.  No.
    Q.  You used the word hollow.  What's the
significance of the word hollow?
    A.  That was just a word that was used by
one of the witnesses, one or two of the
witnesses.  They used that to say, well, that

62

1   the hollow sound was caused by the barge
2   because the barge, you know, was empty.
3       Q.   Do you, as you review this testimony,
4   find it plausible to draw the connection that
5   the hollow sound was a result of the barge
6   being empty?
7       A.   I think it's a plausible description.
8       Q.   You said that, in the last part of
9   this section, some witnesses residing in homes
10  closest to the subject floodwall or on the
11  second floor felt significant coincident
12  shaking of the structure.  Do you see that?
13      A.   Yes.
14      Q.   Is it your opinion that the barge
15  impact on the wall caused the homes to shake?
16      A.   Yes.
17      Q.   Did the barge impact on the wall cause
18  the homes to shake at both the north and south
19  breach?
20      A.   Um -- I'm not sure about the north.
21      Q.   Your testimony then is that the barge
22  caused the, barge impact on the wall caused
23  homes the shake at the south breach?
24      A.   Yes.
25      Q.   Are you aware of any published studies

63

1   in which a barge collision with any structure
2   has caused homes nearby to shake?
3       A.   I don't think there is any case
4   histories like this, Mark.  But I mean,
5   engineering-wise, you just think about it, if
6   something hits -- impacts a wall that's
7   connected to soil, there's going to be
8   compression waves that are going to be
9   generated from it.  And those waves, like an
10  earthquake, can cause the ground to shake and
11  cause then a structure to shake.
12      Q.   That is your engineering explanation
13  for your conclusion that the barge impact in
14  fact caused homes in the nearby neighborhood to
15  shake.
16      A.   It's consistent, yeah.
17      Q.   Apart from what you've just said, do
18  you have any other basis to conclude that the
19  impact of the barge on the floodwall caused
20  homes to shake?
21          MR. WIEDEMANN:
22              Except for the witness'
23          statement?  That's not something he
24          understands.  Object to the form of
25          the question.

64

1       A.   Nothing that I know of.
    EXAMINATION BY MR. RAFFMAN:
2       Q.   You wrote, eyewitnesses indicate no
3   knowledge of leaning walls at the north or
4   south breach before failure.  You see that?
5       A.   Yes.
6       Q.   This again is the fifteen depositions
7   that you referred to; correct?
8       A.   Yes.
9       Q.   Are you relying on anything else other
10  than those fifteen depositions for that
11  conclusion?
12      A.   Well, in the context of this, this is
13  all based on eyewitness accounts.  So I'm not
14  sure how to answer that.
15      Q.   All right.  I guess I -- your
16  observation is that these witness statements
17  are salient.
18      A.   Right.
19      Q.   The salient statement is that they
20  have no knowledge of leaning walls at the north
21  or south breach before failure; right?
22      A.   Right.
23      Q.   This is based on fifteen depositions;
24  right?

65

1       A.   Right.
2       Q.   And from those you conclude that there
3   was in fact no leaning walls at the north or
4   south breach?
5       A.   I'm saying that there's no knowledge
6   of it that I know of.
7       Q.   Have you drawn an expert conclusion
8   that the walls were not leaning before the
9   failure?
10      A.   Yes.  I mean -- okay.  I guess we have
11  to determine here what we mean by leaning.  I
12  mean, are we talking about yielded walls or are
13  we talking about -- you know, I look at it in
14  terms of an engineer.  Right?  If you have a
15  beam with a load, it's deflected.  Okay?  If
16  you have a cantilevered retaining wall and
17  there's load on it, it's deflected.  Is that
18  considered leaning?  I mean --
19      Q.   That's one question I'd like to ask
20  you.
21      A.   Yeah.  When I refer to knowledge of
22  leaning walls here, I'm talking about very
23  noticeable leaning.  I mean tilted.  Obviously
24  tilted, from a distance.
25      Q.   All right.  So the conclusion you've

66

1   drawn here --
2       A.   I'm not saying that they're not
3   deflected at all, no.
4       Q.   And in fact, as the water rises in the
5   canal the wall will deflect, won't it?
6       A.   Yeah.  Yeah.
7       Q.   What you're saying is that before
8   Hurricane Katrina those walls were standing up
9   straight.  Right?
10      A.   No.  I'm saying that before the
11  failure ensued, where -- when I say failure, I
12  mean the inrush of water.  Right?  That there
13  was no observations -- I have no knowledge of
14  any observations that a witness said, well, I
15  saw the wall, it was very tilted, you know,
16  from a distance.
17      Q.   All right.  As far as you know, the
18  walls were not leaning or, um -- tilted or
19  anything other than upright before Hurricane
20  Katrina.
21      A.   That's not what my statement says, but
22  what you're asking me, I don't know of the
23  walls having any tilt in them before Hurricane
24  Katrina.
25      Q.   You next said that according to the

67

1   salient statements, water was not observed to
2   be continuously cascading over the floodwalls
3   before the time of the breaches.  Do you see
4   that?
5       A.   Yes.
6       Q.   This again is based on the fifteen
7   depositions?
8       A.   Yes.
9       Q.   Based on those fifteen depositions, do
10  you conclude that in fact there was no water
11  cascading over the wall before the breaches at
12  either location?
13      A.   Now, you have to notice I said
14  continuously cascading, okay?  Like a water
15  fall.  I'm not saying that there wasn't some
16  water going over the walls.
17      Q.   All right.  I omitted a word.  Just so
18  I understand your testimony, you are not saying
19  that the water stayed on the canal side and
20  didn't cascade to some degree over the walls.
21      A.   I'm not saying that, no.
22      Q.   In fact, before the failures the water
23  may have cascaded over the walls, but not
24  continuously.
25      A.   I think it had cascaded over the

68

1   walls.
2       Q.   All right.  So prior to the failure,
3   water had cascaded over the walls, you've
4   concluded that.
5       A.   That's my -- that's -- that's
6   consistent with my understanding.
7       Q.   All right.  But your testimony in your
8   expert opinion is that there was no water
9   continuously cascading over the wall before the
10  time of the breaches.
11      A.   Yes.
12      Q.   That conclusion is based -- well,
13  apart from the eyewitnesses, what is the basis
14  for that conclusion, if there are others?
15      A.   Um -- the hydrograph information.
16      Q.   The court reporter has handed you
17  what's been marked as Exhibit 2, and I will
18  represent this is a page that's taken out of
19  the report by CivilTech Engineering which is a
20  report by the plaintiffs' hydrology expert.
21           When you referenced hydrograph
22  earlier, does this looks like the hydrograph
23  that you're relying on?
24           (Marino Exhibit 2 was marked for
25  identification and is attached hereto.)

69

1       A.   The one I was relying on doesn't have
2   this, um -- New Orleans levee gage -- there are
3   two different gauges on here.  I don't have any
4   information on this one that's red -- in red.
5   Now, the information I have is between -- I
6   have information on the USGS gage.
7   EXAMINATION BY MR. RAFFMAN:
8       Q.   All right.  The particular hydrographs
9   that you -- do you see on Exhibit 2 a
10  particular line that represents the hydrograph
11  you're relying on?
12      A.   The two lines that I was looking at,
13  one is the USGS, INC at I-10, and then the one
14  at the lock which is called the INC lock.  I
15  can't read what it says here, the next word.
16      Q.   Staff gage?
17      A.   Staff gage, right.
18      Q.   So the record is clear, the USGS gage,
19  IHNC at I-10, is a gray or black line with Xs,
20  right?
21      A.   Right.
22      Q.   And the IHNC lock staff gage is a pink
23  or orange line with triangles, right?
24      A.   Right.
25      Q.   Okay.  And that's the hydrograph that

**70**

1  you mentioned in your testimony that supports
2  your conclusion that the water was not
3  continuously cascading over the floodwalls
4  before the time of the breaches.
5       MR. WIEDEMANN:
6            Object to the form of the
7            question.
8  EXAMINATION BY MR. RAFFMAN:
9       Q.  Am I right to say that?
10      A.  That's one of the things, right.
11      Q.  All right.  Aside from the hydrographs
12  and the eyewitnesses, what other bases do you
13  have for your opinion that the water was not
14  continuously cascading over the floodwalls
15  before the time of the breaches?
16      A.  Um -- the shearing of the wall on the
17  south end.  Or the south breach.
18      Q.  Why does the shearing of the wall on
19  the south end of the south breach support your
20  conclusion that the water wasn't continuously
21  cascading over the wall at the time of the
22  failure?
23      A.  Because the wall broke three feet down
24  from the top.
25      Q.  And so you've concluded that because

**71**

1  the wall broke three feet down from the top,
2  the break must have happened at a time when the
3  water level was certainly no higher than the
4  top of the wall.  Right?
5       A.  Right.
6       Q.  Because otherwise, had the wall been
7  higher than the top when that part broke, then
8  the barge would have floated over.  Is that
9  your testimony?  Do I have that right?
10      A.  I would say that's approximately
11  right.
12      Q.  Any other basis for your conclusion
13  that water was not continuously cascading over
14  the walls before the time of the breach?
15      MR. WIEDEMANN:
16           Of the north breach?
17      MR. RAFFMAN:
18           I'm talking about the south
19           breach now.
20      MR. WIEDEMANN:
21           Okay.
22      A.  I would say at this point in time,
23  those are the three factors.
24  EXAMINATION BY MR. RAFFMAN:
25      Q.  Let me see if I understand.  Just to

**72**

1  clarify, the shearing that you testified about,
2  the wall broke three feet down from the top.
3  Is that what you said?
4       A.  Yes.
5       Q.  That break that you've testified
6  about, that's a break you attribute to the
7  barge, right?
8       A.  Most definitely.  I think it's
9  ludicrous for anybody to think that that wasn't
10  caused by the barge.
11      Q.  All right.  I just want to understand
12  your testimony.  And the part you're
13  specifically referring to, so we understand it,
14  what break you're talking about is the part
15  that's shown in Photo 12.  Right?
16      A.  Yes.
17      Q.  And you say it's ludicrous for anyone
18  to believe that damage was not caused by the
19  barge.
20      A.  Right.
21      Q.  All right.  Is it ludicrous for anyone
22  to believe that the damage that's shown in
23  Photograph 1 and 2 was not caused by the barge?
24  Is that also ludicrous?
25      A.  Well, I mean it's not ludicrous.  I

**73**

1  mean, obviously there are opinions otherwise.
2  We all know that.  So -- but it's not
3  ludicrous.
4       Q.  And is it ludicrous for anyone to
5  conclude that the damage shown in Photo 5 is
6  not caused by the barge?
7       A.  Photo 5.  This is still the north
8  breach -- yes.  This is still the north breach.
9       Q.  Right.  Your answer is the same for
10  Photo 5.
11      A.  Right.
12      Q.  And now turning to the photos that
13  evidence the major part of the south breach, we
14  can look at Photo 9, is it ludicrous for anyone
15  to conclude that that damage is not caused by
16  the barge?
17      A.  Same answer.
18      Q.  Same answer.  It's not ludicrous to
19  conclude that.
20      A.  No.
21      Q.  And your testimony about ludicrous to
22  conclude is reserved for that part of the
23  damage that's reflected in Photo 12.
24      A.  Yes.
25      Q.  So I'm clear.  And so your testimony

74

1   is that the barge knocked the top three feet of
2   the wall off at the part of the wall shown in
3   Photo 12.
4       A.   Right.
5       Q.   And therefore, a reasonably smart high
6   school student might infer that you've
7   concluded the barge struck the wall about three
8   feet from the top.  Right?
9           MR. WIEDEMANN:
10              Object to the form of the
11          question.
12          MR. RAFFMAN:
13              That's a bad question.
14          MR. WIEDEMANN:
15              Yes, it is.
16          MR. RAFFMAN:
17              Than you, counsel.
18   EXAMINATION BY MR. RAFFMAN:
19       Q.   Have you concluded that the barge
20   struck the wall at that location three feet
21   from the top?
22       A.   Well, somewhere in that range.  More
23   towards the bottom of that three feet.
24       Q.   Okay.  Somewhere between three feet
25   and the top of the wall is where the barge hit.

75

1       A.   Right.  Or it could have been a little
2   bit lower because there is also scrapes up on
3   the front part of the barge.
4       Q.   So making some allowance, it's in the
5   neighborhood of three feet from the top of the
6   wall is where the barge hit at that location,
7   right?
8       A.   Um -- I guess -- you could say three
9   feet -- I would say three feet kind of as a
10   ballpark number.  I mean the bottom part, you
11   know, of the barge.
12       Q.   You wrote in your report, turning back
13   to Page 2, it says, some eyewitnesses claimed
14   to have seen the barge going through the
15   floodwall at the north and south breaches.  And
16   forgive me if I've asked you this, but the
17   eyewitness you mentioned at the north breach Is
18   Villavaso, right?
19       A.   Yes.
20       Q.   The eyewitness you mentioned at the
21   south breach was Murph.
22       A.   Yes.
23       Q.   And there is no witness who purports
24   to have seen the thing go through both
25   breaches?

76

1       A.   Right.
2       Q.   Would the wall have failed without
3   involvement by a barge?
4           MR. WIEDEMANN:
5               Object to the form of the
6           question.
7       A.   That's not my opinion.  My opinion is
8   that the barge caused the failure.
9   EXAMINATION BY MR. RAFFMAN:
10       Q.   You don't have an opinion one way or
11   the other about whether the wall could have
12   failed without involvement by the barge.
13          MR. WIEDEMANN:
14              Object to form.
15       A.   I don't believe it would have, no.
16   EXAMINATION BY MR. RAFFMAN:
17       Q.   All right.  Let's go through some of
18   the photographs.  It's the next section of your
19   report.
20          (Lunch break.)
21   EXAMINATION BY MR. RAFFMAN:
22       Q.   Mr. Marino, I want to ask you some
23   questions about the section of your report that
24   discusses the photographs, starting at
25   Section 2.2.  If you would turn to Page 2 of

77

1   your report, and it may make sense to mark the
2   photographs so you can flip back and forth.  I
3   hand you a Post-it for that purpose.  Your
4   report writes --
5       A.   Thank you, Mark.
6       Q.   You're welcome -- Photos 1 and 2 show
7   a very abrupt failure at the construction joint
8   at the north end of the north breach.  This
9   wall break is a result of failure in shear from
10   clockwise twist.
11          What does a clockwise twist mean?
12       A.   (Gesturing.)  You know how a clock
13   goes around, the rotation of a clock?
14       Q.   Okay, yes.
15       A.   That's clockwise.
16       Q.   All right.
17       A.   Counterclockwise would be in the
18   opposite rotation.
19       Q.   All right.  In the context of this
20   breach, does clockwise mean that the top of the
21   wall moved away from the canal?
22       A.   Yes.  Looking north.
23       Q.   Okay.  And in Photo 1, you see it says
24   the sheet pile tore.
25       A.   Yes.

78

1    Q.   Right?  What caused the sheet pile to
2  tear?
3    A.   The impact of the barge.
4    Q.   How high on the wall was the barge
5  when it made impact?
6    A.   Um -- just above the levee.
7    Q.   The sheet pile tear that you observe
8  here in the footnote in Photo 2 was only
9  apparent at the north breach; correct?
10    A.   Yes.
11    Q.   There was no tear of the sheet pile at
12  the south breach; correct?
13    A.   Right.
14    Q.   Did you inspect the floodwall
15  personally?
16    A.   No.
17    Q.   Is the anything in these photos that
18  leads you to conclude that the barge caused the
19  failure that's reflected there?
20    A.   Just basically the characteristics of
21  the failure, it being a very abrupt failure.
22  If you look at other floodwall failures that
23  occurred during Hurricane Katrina you don't
24  find these abrupt failures without back scour.
25  The tearing of the sheet pile also indicates a

79

1  concentrated force condition, impact force.
2    Q.   So the concentrated impact force of
3  the barge, as you describe it, was made right
4  there at the point reflected in Footnote -- in
5  Photo Number 2.
6    A.   I don't know -- no, it could be, it's
7  probably a portion of the monolith to the
8  south.
9    Q.   So the barge struck the wall somewhere
10  else and ripped the sheet pile there in the
11  place reflected in Photo 2?
12    A.   Yes.
13    Q.   Why would the sheet pile rip at that
14  place rather than at the place the barge hit?
15    A.   Because this wall has a joint,
16  construction joint.  It's at a construction
17  joint.
18    Q.   Was there a construction joint there
19  that included the sheet pile?  Describe the
20  construction joint for me, please.
21    A.   Basically, it's the vertical joint
22  between the monolith, so there's no shear
23  capacity there.
24    Q.   Was there also a construction joint
25  between the sheet pile lengths in each of the

80

two monoliths?
   A.   I'm confused by the question.
   Q.   As you understand the construction of
the wall -- you've described a construction
joint that relates to the concrete monoliths;
right?
   A.   Yes.
   Q.   And those concrete monoliths --
describe for me how the sheet pile inside the
concrete monoliths was connected from monolith
to monolith.
   A.   It was interlocked.
   Q.   Was there a construction joint between
the interlocked sheet pile at the location of
the construction joint between the two concrete
monoliths?
   A.   That seemed like a double thing.  I
didn't understand that.
   Q.   All right.  Describe for me the
connection between the sheet pile in the one
monolith and the second monolith at the point
of this breach.
   A.   Describe to you the sheet pile between
the monolith -- the sheet pile is not between a
monolith.  The monolith is on top of the sheet

81

pile.
   Q.   Okay.  I understand.  So the sheet
pile is embedded within the monolith.
   A.   Yes.
   Q.   The monolith to the north that's still
standing in Photo 2 has sheet pile embedded
within it; right?
   A.   Yes, to a certain depth.
   Q.   Was there a construction joint between
the sheet pile that's embedded in the monolith
that's still standing and the sheet pile that
was embedded in the monolith that collapsed?
   A.   Yeah.  I mean, you can see part of the
joint.  It's right there.  That is the joint.
   Q.   All right.  Photos 3 and 4 -- your
Section 2.3 says Photos 3 and 4 depict the wall
that came completing out of the ground and
twisted longitudinally 270 degrees and
displaced eastward at the north end.
       Referring you now to Photos 3 and 4,
describe how the wall came completely out of
the ground.
   A.   Well, if you look in the foreground of
3, you can see -- wait a minute.  No, that's
gravel.  Maybe that's not a good picture.

82

1    Well, you can see, if you look at the
2 top of the wall, as shown in Figure 3, it's
3 actually the bottom of the wall.  It's
4 completely out of the ground.  It's not just
5 been displaced like the other floodwalls where
6 it's just been moved because of passive
7 resistance, it's completely out of the ground.
8    Q.   And how did that happen?
9    A.   Impact of the barge initiated it.
10    Q.   Well, describe how the impact of the
11 barge on one side of the wall initiated an
12 event which caused the sheet pile to come
13 completely out of the ground.
14    A.   When the barge hit, the wall tumbled
15 and teared, and as it teared the rush of the
16 water caused the sheet pile to get pulled out
17 of the ground and twist.
18    Q.   The result of the barge hitting the
19 wall is shown, then, in Figure -- in Photo
20 Number 3?
21    A.   Yes.
22    Q.   And Photo Number 4.
23    A.   Yes.
24    Q.   Did you have an opinion about how long
25 passed between the time the barge hit the wall

83

1 and the time that the sheet pile was pulled
2 completely out of the ground?
3    A.   Um -- I would say on a matter of -- I
4 don't have an exact time, no.
5    Q.   Can you give me a ballpark?
6    A.   Well, I mean, if we go by Villavaso 's
7 description, it was a progression that occurred
8 fairly rapidly.
9    Now, I think there's some secondary
10 effects in here that occurred from the water
11 that then caused additional failure of the
12 wall.
13    Q.   The water caused additional failure of
14 the wall where?
15    A.   Well, you got scouring that's
16 occurring along the side which is causing the
17 embedment depth to be less, in effect.
18    Q.   When you say scouring that's occurring
19 along the side, you mean to say that the water
20 that poured into the neighborhood scoured the
21 water on the back side of the wall to the south
22 of where the initial breach was?
23    A.   Yes.  As the water is pouring in it's
24 pouring in from the side.
25    Q.   Is it your testimony that the water

84

1 that poured into the neighborhood then secured
2 out behind the wall just to the south of the
3 initial breach?
4    A.   Yes.
5    Q.   Turning to the south breach on Pages 3
6 and 4, Paragraph 2.5, this is dealing with the
7 northern end of the southern breach.
8    A.   I'm tagging it.
9    Q.   Okay.  Now, if you turn to Photo
10 Number 6, photo Number 6 depicts the scour
11 trench to the north of the south breach.  What
12 is the relevance of this photograph to your
13 conclusions?
14    A.   What I'm trying to do in these series
15 of photographs is pretty much describe the
16 conditions that exist in terms of like the
17 failure characteristics.  So when I mention or
18 describe something, I'm trying to describe what
19 I think is the more relevant features.
20    Q.   What is the relevance of the scour
21 trench to your conclusion?
22    A.   Because the scour trench is erosion
23 that occurred behind the channel.  And there's
24 been analysis about the scour trench related to
25 failure of the wall.

85

1    Q.   Does the scour trench enter into your
2 conclusions regarding barge causation?
3    A.   Um -- in that I don't believe it
4 was -- played a critical role in the failure,
5 yes.
6    Q.   Is there any other respect in which
7 the scour trench enters into your conclusions?
8    A.   Other than that it was there.
9    Q.   That's it, right?
10    A.   Yeah.
11    Q.   Your description of Photo Number 6
12 refers to concentrated deformation at the
13 construction joint.  Do you see that?
14    A.   Yes.
15    Q.   What is the relevance of concentrated
16 deformation?
17    A.   Basically, again just trying to
18 describe how the deformations are concentrated
19 or occurring along the, um -- construction
20 joints, which are, you know, more the weaker
21 link in shear, as we discussed in the north
22 broach.
23    Q.   Let me turn your attention to
24 Paragraph 2.6.  It says, as can be seen in
25 Photo 10, the maximum floodwall displacement is

86

1  along the northern half of the breach with the
2  fragmentation of the concrete so great that
3  much of it is missing.
4      Do you see here you wrote that in
5  Paragraph 2.6?
6      A.  Yes.
7      Q.  All right.  And then referring you to
8  Photo 10, which is an aerial view of the south
9  breach, in your opinion where did the south
10  breach fail first?
11     A.  It would be in the convex portion of
12  the alignment of the wall.
13     Q.  Let me ask you to put a Number 1 --
14  I'll pass you a pen -- mark with a Number 1 the
15  part of the south breach that failed first.
16  Maybe even write on the white part and draw a
17  little line or something.
18     A.  Here?
19     Q.  Yeah.  Somehow indicating.
20     A.  (Witness complies.)
21     Q.  And then draw a line through to the
22  part of the breach that you say failed first.
23     A.  (Witness complies.)
24     Q.  All right.  The line that you've drawn
25  is to a part of the breach that is north of

87

1  the -- it's to the north part of this breach;
2  right?
3      A.  Yes.
4      Q.  And it's at the center of maximum
5  displacement.
6      A.  In that area, yes.
7      Q.  In that area.  Sure.  In your opinion,
8  where did the barge first hit the wall at the
9  site of the south breach?
10     A.  The first major impact I would say is
11  where I put the Number 1.
12     Q.  All right.  So the point of major
13  impact is also the point that corresponds to
14  the center of that bow-shaped portion of the
15  breach.
16     A.  Yes.
17     Q.  And the point of barge impact at the
18  south breach would then be, again, at the
19  center of the center point of the maximum
20  displacement.
21     A.  I'm sorry.  I kind of lost track.
22  What did you say?
23     Q.  Yeah.  The place where the barge first
24  hit the wall is at that point which shows
25  maximum displacement in your diagram.

88

1      A.  Right.  That's about right.
2      Q.  Your report on Photo Number 10
3  observes that the concrete has broken apart at
4  the northern half of the breach but that the
5  concrete wall remained over the sheet piling in
6  the southern half of the breach.  Do you see
7  that?
8      A.  Yeah.  Let me see.
9      Q.  It's in your description of Photo 10.
10  So you need to be on that photo.
11     As you render Photo 10 in your report,
12  it says, as can be seen in the photo, most of
13  the concrete floodwall segment has broken off
14  the sheet piling in the northern half, whereas
15  the southern half, the concrete wall has
16  remained over the sheet piling.  Do you see
17  that?
18     A.  Yes.
19     Q.  And this refers to the southern breach
20  right?
21     A.  It all refers to the southern breach.
22     Q.  All is the southern breach.
23     Why do you think that the concrete
24  floodwall segment broke off the sheet piling in
25  the northern half?

89

1      A.  From the impact of the barge on an
2  angle.
3      Q.  So is it your testimony that the barge
4  knocked all that concrete off the sheet
5  piling?
6      A.  I would say the majority of it.
7  Because of the out-of-plane bending stresses.
8      Q.  And why did the concrete at the
9  northern end of the breach fall apart while the
10  concrete at the southern end stayed relatively
11  intact?
12     A.  Because as the barge rotated and
13  pinned from this location, it would impact the
14  wall flush, side to side.
15     Q.  Do you associate the concrete breaking
16  apart with the explosive noise you testified
17  about earlier?
18     A.  Yes.  The concrete -- the impact
19  itself.
20     Q.  And an explosive impact on a wall
21  would have the effect of breaking concrete?
22     A.  It could, yes.
23     Q.  You would expect it to.
24     A.  Yeah.
25     Q.  Anyplace where there was an explosive

90

1  impact of a barge, you would expect to see the
2  kind of rubbling and obliteration of concrete
3  that you see here in the southern breach in
4  that maximum displaced zone.
5      A.  Yes.
6      Q.  The next set of photographs is Photos
7  11 through 14, um -- which depicts the southern
8  end of the south breach.  Right?
9      A.  Yes.
10     Q.  And you wrote that one 30-foot panel
11  was sheared off, and that this was clearly
12  caused by --
13     A.  A little more than one.
14     Q.  All right.  Let's see.  A little
15  more -- at the southern end of the south
16  breach, a little more than one 30-foot panel
17  has been sheared off.  And this is shown in
18  Photos 11 through 14, right?
19     A.  Yes.
20     Q.  Okay.  And by shearing off, do you
21  mean that the top three feet has been taken off
22  of the top of the wall?
23     A.  Yes.
24     Q.  This is the place where the rebar was
25  bent?

91

1      A.  Yes.
2      Q.  And this is the place where you
3  thought clearly the barge had passed from the
4  canal into the Lower Ninth Ward at this
5  location.
6      A.  Yes.
7      Q.  Did you see any similar feature at the
8  north breach where the top was sheared off and
9  the rebar bent?
10     A.  No.
11     Q.  This feature is unique to the south
12  breach.
13     A.  Yes.
14     Q.  Did this shearing off of the top three
15  feet at this location occur before or after the
16  failure at the center point of maximum
17  displacement in Photo 10?
18     A.  It occurred after.
19     Q.  Why do you conclude that?
20     A.  Basically, it's stated in here.  Maybe
21  it wasn't stated correctly -- I mean not
22  understood.  Let's see.  I'll just read that
23  section.  Okay.  It says, on Page 6, which is
24  basically two paragraphs that cover this, based
25  on available data, however, it is highly

92

probable that the barge initially impacted the
wall on an angle, hitting the floodwall at an
angle would have caused an impact force to be
more concentrated along a limited or shorter
portion of the wall, shattering the concrete
panels in a blast-like manner in a very short
duration.  This is consistent with the boom
sounds heard and the house shaking felt by a
number of Hurricane Katrina survivors and
disintegrated concrete floodwalls.  It appears
that after the barge -- after the first barge
impact and failure of the north -- northern
part of the southern breach, that the barge
became pinned at this location and rotated
counterclockwise around the pin point, hitting
the wall along the full length of the barge.
This secondary primary collision had better
distribution of the impact force along the full
length of the barge with possibly slightly
higher impact time that it still probably
less -- let me read that again.  This secondary
primary collision had better distribution of
the impact force along the full length of the
barge with possibly slightly higher impact
time, that is, still probably less than a

93

second.  This is consistent with the existence
of concrete floodwall sections along the
southern part of the southern breach remaining
relatively whole compared to the northern part
of the southern breach.
        And then it says, the ING 4727 barge
appears to have exited into the Ninth Ward
along the southern portion of the south breach.
This is evident by the damage in this section
indicating the top three feet of the wall was
literally sheared off as the barge broke
through.
    Q.   If I understand your testimony
correctly, then, the impacts on the southern
breach happened in three stages.  Am I right?
    A.   Yes.
    Q.   And the first stage is an explosive
impact at the point of maximum displacement
which shattered concrete.  Right?
    A.   Yes.
    Q.   The second is a collision which
happened lengthwise but that did not shatter
concrete?
    A.   Well, I wouldn't say -- it depends on
your definition of shatter.  The concrete is

94

1   broken up, but it's not -- it's not -- most of
2   it has remained on the wall, the sheet pile
3   wall itself.
4       Q.   The concrete in this southern section
5   of the wall did not come away from the wall.
6       A.   Yes.
7       Q.   And it's in the second part of your
8   analysis.
9       A.   Yes.
10      Q.   And then the third analysis, the
11  barge, um -- passed through the neighborhood --
12  passed through the wall and shattered three
13  feet of concrete on the top as it passed
14  through.
15      A.   Yes.
16      Q.   Why did the barge shatter the concrete
17  in the third part but not the second part?
18      A.   It was basically the angle at which
19  the barge was hitting the wall on the last
20  collision, in that it was more aligned to
21  the -- more aligned to the direction of the
22  wall, the north-south direction of the wall.
23      Q.   Describe what happened when the barge
24  passed from the canal into the neighborhood at
25  this location that's shown in Photo Number 12.

95

1       A.   Basically, the barge came through this
2   section, and after a portion of the barge had
3   passed through the wall it then lifted up over
4   and then rotated in this direction in the
5   clockwise direction.
6       Q.   And what happened then?
7       A.   It knocked down the remaining wall to
8   the north and moved into the neighborhood.
9       Q.   Did the barge move in a direction from
10  the south to the north at any time during this
11  transit?  At the south breach?
12      A.   It moved slightly to the north.  As
13  the water was going over it, it took the barge
14  and instead of it completely going through this
15  way, it rotated it out this way into the
16  neighborhood. (Indicating.)
17      Q.   This was at a time after the south
18  bleach had failed at the point of maximum
19  displacement to the north as shown in Photo 10?
20      A.   Yes.
21      Q.   And this was at a time after the water
22  was rushing into the neighborhood through the
23  breach that was created as shown in Photo 10.
24      A.   Can you restate that question?
25      Q.   I'll withdraw it.  I don't think it

96

was very clear.
        Do you have any opinions about what
happened to the barge once it went into the
neighborhood?
    A.   Other than what I just told you?
    Q.   Yeah.
    A.   No.
    Q.   Let me turn your attention to
Section 4 of your report entitled failure
analysis.
        Actually, sorry, I want to turn your
attention to Page 4 of your report entitled
Potential Barge Impact Load.  You're not
getting away without discussing that part of
your report.
        All right.  You wrote that it is a
well-established fact that vessel impact is one
of the most significant design considerations
for the design of bridge piers that span
navigable waterways.
        You wrote that, right?
    A.   No.
    Q.   No, this was --
    A.   Dr. Gamal.
    Q.   Your colleague.

97

    A.   Right.
    Q.   You reviewed that.
    A.   Yes.
    Q.   You're able to opine on that section
of the report; right?
    A.   I can rely on his analysis.  I
understand what he did and it makes sense to
me.
    Q.   All right.  Tell me, what is the basis
on which you think it's proper to equate bridge
piers with floodwalls?
    A.   It was actually my idea to look into
that.  It's basically the same kind of analysis
where you're looking at the momentum of a
vessel and designing for the momentum of a
vessel so that bridge piers which are
susceptible to collisions with various types of
vessels can sustain such impacts.
    Q.   Can you think of any differences
between bridge piers and floodwalls that might
impact how they're affected in a collision?
    A.   Oh, yeah.
    Q.   What would those be?
    A.   Well, a bridge pier is much more stout
and stiff, so it could handle a barge much

98

1  better than a floodwall which has no design
2  capacity for impact loads.
3      Q.  When you say it's more stiff, is that
4  another way of saying its more rigid?
5      A.  I guess you could say that.  Sturdy,
6  um -- would be probably another word.
7  Stronger.  Much stronger.
8      Q.  What relevance do bridge pier design
9  standards have to this case?
10     A.  It just gives you some idea of what
11 the loads that a vessel would have on an
12 impact.
13     Q.  Have you ever seen any studies that
14 discuss barge collisions with lock walls?
15     A.  Not that I've seen, no.
16     Q.  Have you ever seen any studies that
17 discuss whether barge collisions with lock
18 walls correlate to collisions with bridge
19 piers?
20     A.  Not that I know of.
21     Q.  Is soil compressible?
22     A.  Is it compressible?
23     Q.  Yes.
24     A.  In what way?  I mean, everything is
25 compressible.

99

1      Q.  Okay.  Does a structure that's
2  anchored in soil occasionally act like a spring
3  when impact is made with it?
4      A.  Say that again.
5      Q.  When impact is made with a structure
6  that's anchored in soil --
7      A.  What kind of structure?
8      Q.  Well, let's call it a floodwall or a
9  bridge pier, either one.
10     A.  Okay.
11     Q.  Is there any kind of reaction on
12 impact of the soil acting like a spring to
13 absorb and push back an impact?
14     A.  It depends on how great the magnitude
15 of the impact is and its time duration.
16     Q.  Does the compressibility of the soil
17 have anything to do with its capacity to act in
18 a spring-like manner?
19     A.  Yes.
20     Q.  Can you determine the compressibility
21 of soil?
22     A.  Yes.
23     Q.  Have you determined the
24 compressibility of the soil in the area of the
25 Inner Harbor Navigational Canal?

100

1      A.  On a certain level.  You know, like I
2  said, our study at this point was basically
3  taking the information given in the reports and
4  trying to duplicate those analyses and drawing
5  our independent conclusions from what we could
6  glean from that.
7      Q.  Do any of your calculations reflect
8  the compressibility of the soil in the area of
9  the Inner Harbor Navigational Canal floodwall?
10     A.  We would have used the compressibility
11 values that were used by other investigators.
12     Q.  Do you know what those investigators
13 did?  What values they used?
14     A.  No.
15     Q.  Did you evaluate as part of your
16 analysis how far the floodwall would deflect
17 when hit by the barge?
18     A.  No.
19     Q.  Do you know what force at the top of
20 the wall would be required the deflect the wall
21 by one inch?
22     A.  We might have some of that
23 information.  Um -- I didn't -- Dr. Gamal was
24 more directly involved in it, although I saw
25 the results and had input on the work.  Um --

101

1  I'm not sure we -- I know that the one analysis
2  that would have given us deflection we were
3  having trouble with at the time, um -- getting
4  the model to converge.
5      Q.  What do you mean by that?
6      A.  Um -- when you run a numerical
7  analysis, um -- there is an iteration process
8  that's done where it's sort of like -- in high
9  school terms, it's like okay, let's grossly
10 look at this and see what number we get.
11 Right?  And they say, oh, okay, looks like it's
12 more in this direction so let's now refine it
13 in that direction and then see how close we're
14 getting to a looped solution.  You know how you
15 come back to the same number.  And you keep
16 doing that and refine it until everything is
17 copesetic.  And we weren't able to get to that
18 point.
19     Q.  Since the production of this report
20 have you been able to get to that point?
21     A.  We decided to go back and finish our
22 data reduction and -- collection and reduction.
23     Q.  The answer is no, you haven't at this
24 point.
25     A.  No.  (Nods affirmatively.)  Plan to.

102

1  Q.  All right.  Only because there's a
2  written transcript as well, let me make sure
3  that I have your answer right.
4  A.  Okay.
5  Q.  When you read it you'll so why I'm
6  asking that.
7  A.  Okay.
8  Q.  Am I correct that you have not
9  resolved that issue at this point?
10  A.  That's correct.
11  Q.  You wrote in Paragraph 3.1 that the
12  forces that can be imparted by a moving barge
13  to any stationary structure can easily cause
14  the failure of that structure.  What is the
15  basis for that statement?
16  A.  Basically, it was based on looking at
17  actual tests on barges that were -- barge or
18  barges that were done, that were, um -- made to
19  impact a wall, and the measurements of stresses
20  and strains were taken and the damage to the
21  barge was also measured.  And some damage
22  criteria and force -- empirical force
23  relationships were developed based on that
24  research.
25  Q.  The tests of barges that were done are

103

1  reflected in which references cited in your
2  report?
3  A.  Like for example you have -- the first
4  sentence in Number 2, if you went back and
5  looked at Number 2 -- okay, barge impact
6  testing of the St. George Island causeway
7  bridge.
8  Q.  So to be clear, the test of barges
9  that were done that you're referencing in this
10  report are those reflected in your reference
11  Number 2, correct?
12  A.  Well, there's other references in
13  there, too.  Most of these are, if not all
14  these, are barge references.
15  Q.  All right.  So --
16  A.  I think these are all barge
17  references.
18  Q.  You testified earlier, just a moment
19  ago, that to support this statement regarding a
20  moving barge that can easily cause the failure
21  of the structure you were relying on tests of
22  barges that were done.  Did I understand you
23  right?
24  A.  That, and -- I mean, the collection
25  of, um -- I didn't read this reference, this

104

1  was Dr. Gamal 's reference, and apparently
2  maybe in that particular reference they
3  actually talk about or specifically make
4  mention of that note.  Um --
5  Q.  If I want to look at the support for
6  that statement, I would need to go back and try
7  to find these sources.
8  A.  Right.
9  Q.  Is that right?
10  A.  Right.
11  Q.  And the sources I would need to look
12  at would be the first reference by Consolazio
13  and others?
14  A.  My cousin.  No, he's not.
15  Q.  That would be one of them I would need
16  to read?
17  A.  He's a paisan.
18  Q.  Okay.  But please answer my question.
19  A.  Yes.
20  Q.  That would be one of the ones I would
21  need to read.
22  A.  Yes.
23  Q.  And another one would be the second
24  one by the same gentleman.
25  A.  Yes.

105

1  Q.  And I guess the third one by the same
2  gentleman, as well.
3  A.  Yes.
4  Q.  Possibly the fourth one by P.T.
5  Pedersen?
6  A.  Yes.
7  Q.  Are there any others besides those
8  four?
9  A.  Yes.  I mean, it's all eight of these
10  references are related to the potential barge
11  impact loads.
12  Q.  All right.  And that's what I would
13  need to read just to find the basis for your
14  statement that the forces that can be imparted
15  by a moving barge can easily cause the failure
16  of the structure.
17  A.  Yes.
18  Q.  Are you aware of any instance in which
19  a barge caused the failure of a floodwall
20  before this incident?
21  A.  I haven't really done a study of that,
22  so no.
23  Q.  While we're on this, are you aware of
24  any other barge impacts with floodwalls that
25  happened during Hurricane Katrina?

106

1    A.   I remember one photograph of a wall --
2    of a barge sitting on top of a wall.  And
3    that's the only occasion that I've had to date
4    to see anything.
5        Q.   Do have an opinion as to why that
6    barge sat on top of the wall without failing
7    it, whereas that barge caused two failures in
8    the wall as you opine?
9        A.   Um -- it appears to me that it's
10   laying on top of the wall.  Actually, the water
11   receded.  It doesn't appear to me that it
12   actually had a lot of movement behind it --
13   velocity.
14       Q.   So what distinguishes this impact from
15   other impacts is the velocity that the barge
16   had when it came into contact with the wall.
17       A.   Yeah.  And its location relative to
18   the wall.
19           (Brief recess.)
20   EXAMINATION BY MR. RAFFMAN:
21       Q.   You wrote, at Page 4, at the bottom of
22   Page 4, given the structural capability to
23   which bridge piers are designed, it is clear --
24       A.   Mark, you keep saying you wrote.  And
25   this is -- I mean, this section was originally

107

1    written by Dr. Gamal, and I went over it and we
2    came to -- you know, we modified it a little
3    bit.  But -- so I'll just assume when you say
4    that, that you have that understanding.
5        Q.   Well, I understand that somebody else
6    initially drafted it.  But you did sign this
7    report.
8        A.   Yes.
9        Q.   And when I say you wrote, I'm trying
10   to get at this is your report.
11       A.   Okay.  Okay.
12       Q.   So you've adopted the views in this
13   report.
14       A.   Yes.
15       Q.   So if I use you wrote as a shorthand
16   for you've adopted, you'll understand me,
17   right?
18       A.   Yeah.  Now I do.
19       Q.   And what's written here is that given
20   the structural capability to which bridge piers
21   are designed it is clear that floodwalls have
22   little chance of resisting any significant
23   collision from a barge of such size.
24          What is a significant collision?
25       A.   I'm sorry.  Where are we now?

108

1        Q.   At the bottom of Page 4.
2            MR. WIEDEMANN:
3            He read the last sentence.
4        A.   Okay.  This is basically going -- when
5    you're locking at the structural capability of
6    a pier -- right? -- and what types of loads
7    that a pier can resist, the way they're
8    designed for impact loads, that, compared to --
9    you take that impact load and then you look at
10   what kind of impact load the floodwall will
11   take, there's no comparison.
12       Q.   What is your basis for that statement?
13       A.   Um -- I think we'll get to that as we
14   go through this.
15       Q.   Can I find the basis for that
16   statement in the report?
17       A.   Yes.
18       Q.   There's nothing outside the report
19   that supplies a basis for your statement that
20   floodwalls have little chance of resisting any
21   significant collision from a barge of such a
22   size.
23       A.   And the references are the backup for
24   it.  That would be it.
25       Q.   All right.  Nothing outside the report

109

1    and the references that supports that
2    statement.  Did I just -- yeah.  That's what I
3    wanted to say.
4        A.   I mean, the results of our analysis
5    are given in the report.  And the references
6    are given that we used for the basis for
7    determining these results.
8        Q.   If I wanted to understand the basis
9    for your conclusion that floodwalls have little
10   chance of resisting any significant collision
11   from a barge, I need look only at your report
12   and at the references that you cite, correct?
13       A.   I don't know what you mean by
14   understand.  If you want to understand the
15   result, you'd look in here.  Those are --
16       Q.   Sorry to interrupt.
17       A.   The results are given in the report.
18       Q.   I want to understand why you think
19   that floodwalls have little chance of resisting
20   a significant collision.
21       A.   Okay.  That's given in this report.
22       Q.   When you use the word significant
23   collision, what do you mean by that?
24       A.   Well, I just explained to you,
25   significance in terms of the relative amount of

110

1 impact that a bridge pier can sustain compared
2 to a floodwall. In other words, the load
3 from -- on a pier that would cause failure is
4 way too significant for a floodwall.
5     Q.   So if a barge -- if I understand
6 significant in this context, then, what you're
7 saying is significant means any collision that
8 would cause a bridge pier to fail.
9     A.   It would mean a collision that a
10 normally designed bridge pier, that load,
11 that's the load we're talking about. And if
12 you took that load and put it up against a
13 floodwall, you have no chance in hell.
14     Q.   So the impacts that you testified
15 about earlier, the one impact where the barge
16 was sitting on the floodwall, that in your view
17 was not a significant collision.
18     A.   No.
19     Q.   And you know it wasn't a significant
20 collision because if it had been the wall would
21 have failed.
22     A.   Right. And it was above the wall. It
23 wasn't -- it's not the same kind of impact load
24 that we're talking about here where you're
25 broadsiding the side of a floodwall. I mean,

111

1 maybe you don't understand that. It's like
2 when you're hitting a bridge pier, you're
3 broadsiding it. Okay? When we're hitting the
4 floodwall in breach 1 and 2, we're broadsiding
5 it.
6     Q.   So the distinction between this barge
7 impact and any other barge impact that doesn't
8 cause failure is the broadside nature of the
9 impact, in your view?
10        MR. WIEDEMANN:
11            I object to the form of the
12        question. I don't know what other
13        barge he's talking about.
14     A.   Obviously, the size of the vessel
15 would have something to do with it. The
16 momentum that the vessel has would have
17 something to do with the impact load. The wave
18 action would have something to do with the
19 impact load. We're talking about a similar
20 instance to what -- it's just like a bridge
21 pier. Okay? Let's just take the bridge pier.
22 Maybe this will make you understand.
23            If you have a barge that just skims by
24 the bridge, just kind of slivers off it, right?
25 That's not what we're talking about. We're

112

1 talking about a broadside.
2     Q.   To be clear --
3     A.   Yes.
4     Q.   -- and to be fair --
5     A.   Yes.
6     Q.   -- you're not saying that anytime a
7 barge hits a floodwall that floodwall is going
8 the fall over, are you?
9     A.   Right.
10     Q.   And what you're saying is that in
11 order for the barge to make the floodwall fall
12 over you've got to have some sort of force
13 that's driving the barge into the floodwall.
14 Right?
15     A.   Right. It's got to be a broadside
16 action.
17     Q.   And when you say a broadside action,
18 you're referring to some force that gives the
19 barge some velocity when it's hitting that
20 wall, right?
21     A.   Right.
22     Q.   And then the barge has to strike the
23 wall in a way that causes the barge to clearly
24 impact and transfer its energy to the wall
25 instead of some sort of a glancing blow, right?

113

1     A.   Right.
2     Q.   You need both of those conditions to
3 make the barge fail the wall.
4     A.   Makes sense, doesn't it?
5     Q.   This is what I'm asking.
6     A.   Yes.
7     Q.   So your answer is yes?
8     A.   Yes.
9     Q.   You need both of those conditions.
10     A.   Yeah. I mean, if the barge is flying
11 in the air and it's not hitting the wall, even
12 if its got velocity it's not going to do
13 anything.
14     Q.   You'd have to launch it with some
15 velocity and you have to make it hit in a way
16 that causes the energy to transfer. Right?
17     A.   Yeah. You have to be able to transfer
18 the energy, yep.
19     Q.   Okay. Let's turn to Page 5 of your
20 report. For the south breach, an analysis was
21 done by MEA using the same approach presented
22 in IPET report Appendix 17 applying drag
23 coefficients identified in Reference 6 but a
24 more realistic impact time was used.
25        That's part of your report; right?

29 (Pages 110 to 113)

114

1  A.  Yes.
2  Q.  An MEA is your firm, right?
3  A.  Yes.
4  Q.  And this was an analysis you did for
5  the south breach only?  When I say this --
6  A.  Yes.
7  Q.  Okay.  You didn't do this same
8  analysis for the north breach.
9  A.  No, this was for the south breach.
10  Q.  Why did you do it for the south breach
11  only?
12  A.  Because that -- the barge would be
13  going in the direction of the wind for the
14  south breach.
15  Q.  At the north breach was the barge also
16  going in the direction of the wind?
17  A.  No.
18  Q.  But at the north breach the barge was
19  going in a direction other than the direction
20  of the wind.
21  A.  Yes.
22  Q.  Is the analysis that was done by MEA
23  written down somewhere?
24  A.  Yes.
25  Q.  Who did the analysis?

115

1  A.  Dr. Gamal.
2  Q.  Did you check it?
3  A.  Yes.
4  Q.  Do you have a copy of the analysis
5  with you today?
6  A.  No.  If you look at the methodology
7  used by -- in the IPET report, it's the same
8  thing.  I mean, any adjustment that we made, I
9  think there was only one adjustment that we
10  made and it was related to the impact time.
11  Q.  Do you have an opinion as to how the
12  barge arrived at the north breach in a manner
13  other than wind-aided?
14  A.  Yes.  Wave action.
15  Q.  You referenced IPET Appendix 17, so
16  let's mark Exhibit 3.  I've handed you what the
17  court reporter has marked as Marino Exhibit 3.
18  Do you recognize this as the IPET
19  appendix 17 referenced in your earlier
20  testimony?
21  (Marino Exhibit 3 was marked for
22  identification and is attached hereto.)
23  A.  Um -- I know there's two versions.
24  I'm not sure if this is the -- is this the
25  final report version?

116

EXAMINATION BY MR. RAFFMAN:
Q.  I will represent for the record that I
believe it is.
A.  Okay.  This would be the one that
we're referencing.
Q.  And if you look at figure 17-1, which
is the definition sketch of the Inner Harbor
Navigational Canal of the wind blowing on the
barge, is this the approach that you used to do
the analysis referenced in 3.2 of your report?
A.  Yes.  Like I said, we followed the
same analysis done in this appendix.
Q.  One of the things you wrote is that
you used drag coefficients identified in
Reference 6, right?
A.  Yes.
Q.  And reference 6 is called Boundary
Layer Theory by H. Schlichting?
A.  Yes.
Q.  Is that a textbook?
A.  Yes.
Q.  And do you happen to know where in
that textbook I could find the drag
coefficients that you reference?
A.  Not offhand.

117

Q.  Did you actually personally look at
that textbook to find those drag coefficients?
A.  I think we used the same drag
coefficients that were in -- it's the same
reference that's used in this appendix.  And I
believe we used the same drag coefficients.
Q.  So when you wrote that you used the
same approach presented in IPET Appendix 17,
applying drag coefficients identified in
reference 6, what you're telling us is that
IPET Appendix 17 referred to the Boundary Layer
Theory text and you just used those drag
coefficients.
A.  Yes.  If you look on References, on
the document that you just handed me, you'll
see the same reference.
Q.  You didn't go to the textbook and
independently pull that --
A.  Yes, we did.
Q.  You did independently pull it out.
A.  Yes.
Q.  Did you do that personally or did
someone in your office --
A.  I pulled them out.
Q.  If I went to the library and pulled a

30  (Pages 114 to 117)

118

1  copy of this textbook Boundary Layer Theory, do
2  you think you could find the drag coefficient
3  for me?
4      A.   After some time.  I wouldn't be able
5  to find it like in five minutes, you know.
6      Q.   Right.  So -- maybe I won't -- maybe
7  it wouldn't be such a good idea to go to the
8  library and find that text book, would it?
9      A.   I'm sure your own consultant could
10 find it.  I don't think there would be any
11 problem with that.
12     Q.   But in order -- if I handed you the
13 textbook today, it would take you quite a bit
14 of time to find the drag coefficient.
15     A.   I would need a couple of hours.
16     Q.   All right.  Which is a couple of hours
17 we don't have.
18         Describe the analysis and calibration
19 procedure in detail.
20     A.   I'm not sure I'm following where
21 you're -- can you tell me where you're
22 referring to?
23     Q.   Well, the analysis that was done by
24 MEA.
25     A.   Right.

119

1      Q.   Um --
2      A.   What calibration?
3      Q.   Well, I thought that the report
4  referenced a calibration procedure.  Maybe not.
5  So let me go back.  Describe the analysis.
6      A.   In 3.2?
7      Q.   Yes.
8      A.   Okay.  Basically, we followed the
9  procedure given in Appendix 17.  I mean, it's
10 pretty clear to figure it out.  You know, it's
11 almost like -- if gives you a step-by-step
12 procedure of how they did it.
13     Q.   The Appendix 17 is the recipe that you
14 used to do the calculation of impact force.
15     A.   Yes.  For 3.2, correct.
16     Q.   For 3.2.  But you -- which of the --
17 well, let me ask you to describe it for me as
18 you would to a reasonably intelligent high
19 school senior.
20     A.   Okay.  You have a wind.  Right?  You
21 have the drag force on the wind.  Okay?  That
22 drag force from the wind imparted on the barge
23 causes the barge to develop a velocity.  Okay?
24 With the velocity and the mass of the barge,
25 you can determine the impact force based on the

120

1  duration of the time of impact.  The greater
2  the impact time the lower the force imparted on
3  whatever structure you're talking about.  So,
4  in other words, if you have a certain wind
5  velocity, it will impart a certain velocity on
6  to the barge based on the drag coefficient.  It
7  will reach -- after a certain period of time,
8  it will reach what is called the terminal
9  velocity.  Okay?  And that terminal velocity
10 is -- it's basically -- I was going to say
11 steady state but you wouldn't know that.
12 Constant velocity.  The constant velocity.  And
13 that velocity, with the mass of the barge
14 itself, creates a momentum.  And the
15 momentum -- the magnitude of the momentum and
16 the time of impact determine the impact on the
17 wall.
18     Q.   All right.  Can you tell me what input
19 you used for the area of the barge above the
20 waterline that was exposed to wind?
21     A.   Oh, we used -- I think we used a draft
22 of 1 to -- it says -- if you look in 3.3 it
23 will tell you that.  At the bottom of the page,
24 it says -- tells you the range of speeds, the
25 wind speeds we used, and it tells you also the

121

1  drafts that we looked at, barge drafts of 1-1/2
2  to 2-1/2 feet.
3      Q.   So what input did you use for the area
4  above the waterline exposed to the wind?  If
5  you know?
6      A.   If you go -- 21 feet, 19-1/2 to
7  18-1/2.  I'm sorry.  At 23 feet.  So it would
8  be 21-1/2 and 20-1/2.  That would be the height
9  of the barge that was exposed to the wind.
10     Q.   And that's how high the barge was
11 sticking up out of the water at any given time,
12 right?
13     A.   Right.
14     Q.   That height of 20-1/2 feet or 21-1/2
15 feet sticking up out of the water, that didn't
16 change at any point during the storm; right?
17     A.   It was about the same, yeah.
18     Q.   It was an empty barge when it broke
19 away from the dock; right?
20     A.   Right.
21     Q.   And it was an empty barge all the rest
22 of the way, right?
23     A.   Right.
24     Q.   So at any point during the storm that
25 you're doing any analysis, you're going to have

122

1    a barge that's sticking up out of the water
2    somewhere between 20 feet and 21 feet.
3        A.   Did you say 20?  What did you say?
4        Q.   20.5 to 21.5.
5        A.   Right.
6        Q.   The input you used for area below the
7    waterline normal to the direction of movement,
8    what input did you use for that?
9        A.   Say that again, Mark.
10       Q.   The area below the waterline that was
11   normal to the direction of movement, the area
12   below -- the relevant -- sorry.
13       A.   So that would be the 1-1/2 to 2-1/2
14   feet.
15       Q.   The drag coefficient of the barge
16   above the waterline was what?
17       A.   We used whatever was in here.  We'll
18   have to find it.  I mean, we can just say, if
19   you want to, the drag coefficient given in the
20   document.  Anything we changed would have been
21   in our report.  Everything else was -- here's
22   the drag coefficient right here, CDa=0.52.
23       Q.   And that's as which page of the IPET
24   report?
25       A.   That's on Page 17-5.

123

1        Q.   All right.  The drag coefficient below
2    the waterline is also shown in the IPET report?
3        A.   Yes.
4        Q.   The surface waterline is shown in
5    IPET?
6        A.   Yes.  All the information that you
7    need to make a calculation is given.
8        Q.   You used the width of the barge given
9    in IPET?
10       A.   Yes.
11       Q.   You used the density of air and water
12   given in IPET?
13       A.   Yes.
14       Q.   You used the viscosity of water given
15   in IPET.
16       A.   Yes.
17       Q.   The attitude of the barge vis-a-vis
18   the wind, what did you use to represent that?
19       A.   Attitude of the what?
20       Q.   Of the barge vis-a-vis the wind.
21       A.   The same that was used in IPET.
22       Q.   All right.  Can you show me where in
23   IPET the IPET people represented the barge as
24   it interacted with the wind?
25       A.   You'll have to give me a minute.  It

124

1    says here the barge was considered broadside to
2    the wind.
3        Q.   And the attitude of the barge to the
4    wall, what did you use for that?
5        A.   We considered it broadside.
6        Q.   For the weight of the barge, what
7    input did you use?
8        A.   Whatever is given in IPET.
9        Q.   Can you find the weight of the barge
10   in IPET?
11       A.   Sure.
12       Q.   Maybe I can shorten it up.  If I turn
13   your attention to Case 2, barge lightly
14   loaded -- do you see that?
15       A.   What page are you on?
16       Q.   On Page 12.
17       A.   I thought it was in the beginning of
18   the report.  Yes.
19       Q.   Do you see it there?
20       A.   Yes.
21       Q.   Where do you see it?
22       A.   Well, at first I thought it was the
23   total -- oh, okay.  Yeah.  It's the total mass.
24       Q.   So you used total mass from IPET.  And
25   is total mass measured in long ton, metric ton,

125

1    short ton or some other ton?
2        A.   Slugs.
3        Q.   Slugs.  What did you use for wind
4    speed and direction?
5        A.   Um -- wind speed, we used a range of
6    80 to 125 miles per hour.  That's given in our
7    report.
8        Q.   All right.  And in what direction did
9    you blow the barge when you blew it into the
10   wall in your analysis?
11       A.   We looked at the case of where it was
12   broadsided into the wall to get some potential
13   values for load, impact force.
14       Q.   So if the wall is oriented in a
15   north-south direction, your wind for your
16   analysis was blowing directly west to east.
17       A.   No, it was moving in the direction --
18   if, say, the barge is east-west, then the
19   direction of wind would be north-south.  If it
20   was -- if the barge was north-south, the
21   direction -- then the wind would be east-west
22   in terms of getting this, um -- broadsiding of
23   the wind on the barge.
24       Q.   All right.  Let's do this:  Let's take
25   a look here at the Figure 17-1 in the IPET

126

1   report.
2       A.  Right.
3       Q.  You see that.  It's in Exhibit 3.
4           So you see this is a representation of
5   the Inner Harbor Navigational Canal?
6       A.  Correct.
7       Q.  Can you take a pen and draw and
8   superimpose on here the wind direction that you
9   used when you did your analysis of this issue?
10      A.  You want to do it on here?
11      Q.  Yes.  That would be fine, thank you.
12  Would you write next to that, MEA analysis.
13      A.  (Witness complies.)
14      Q.  Wind direction.  Something that will
15  reflect for the record what you just did.
16      A.  Okay.
17      Q.  Okay.  Did you include any input for
18  fetch in your analysis?
19      A.  I don't know if there was anything in
20  here for that.  At this stage, Mark, what we
21  were interested in is finding out what the
22  potential range of forces were.  This is not
23  our final report, um -- so, I mean, we expect
24  to do more work on this.
25      Q.  The analysis you've done on this was

127

1   sufficient for you to opine that the barge
2   caused the south breach of the wall.
3       A.  Yes.  That it had the potential to
4   make an impact to the degree of the damage that
5   was realized.
6       Q.  But am I right that this impact
7   calculation really is one of the centerpieces
8   of your report concluding that the barge caused
9   the south breach?
10      A.  It's one of the aspects of the report
11  that indicates that there's a significant
12  potential force from the barge, not only as it
13  relates to wind but as it relates to wave
14  velocity -- I'm sorry, wave height.
15      Q.  The wave height we're going to talk
16  about in the north breach; right?
17      A.  Well, I mean, it also applies to this.
18      Q.  Tell me about wave height that applies
19  here.
20      A.  Well, I mean, you have a barge that is
21  adjacent to -- after it makes its first impact,
22  you have a barge that's adjacent to the wall.
23  And waves impacting that barge are then going
24  to impact the wall.  The barge is going to
25  impact the wall with the force of that wave.

128

1       Q.  Is there a wave impact analysis that
2   you did for the south breach?
3       A.  We did it.  We did a wave impact
4   analysis, just a general one, which would apply
5   for either case.
6       Q.  Could you find that analysis, please?
7       A.  Yes.  It's at 3.5.
8       Q.  Now your testimony is 3.5 applies to
9   both the north and the south breach.
10      A.  Yes.
11      Q.  All right.  Is there any other
12  analysis in your report apart from your impact
13  analysis based on IPET Appendix 17 --
14      A.  Is there any other what?
15      Q.  Let me finish the question.  Anything
16  other than this IPET Appendix 17 type analysis
17  that you did that has brought you to the
18  conclusion that the barge impact on the wall
19  was enough force to cause the wall to fail?
20      A.  Yes.
21      Q.  And what is that?
22      A.  Well, we haven't gotten it to yet.
23  Um -- that would be in 3.5.
24      Q.  You wrote, at 3.2, that a ten second
25  impact time does not appear to be realistic and

129

1   is unheard of based on reported case studies.
2   I see you wrote that.
3       A.  Yes.
4       Q.  That's based on the case studies that
5   are include in the reference section of your
6   report?
7       A.  Yes.
8       Q.  You wrote that for comparable barge
9   sizes in the 600 to 700-ton range, the reported
10  impact time ranged from 0.9 to 1.5 seconds.
11  You see that.
12      A.  Yes.
13      Q.  That's based on the references in your
14  report?
15      A.  Yes.
16      Q.  What was the tonnage of ING 4727?
17      A.  I don't remember.  I would assume it's
18  in the 600 to 700-ton range.  It's been a while
19  since I've looked at this stuff, to tell you
20  the truth.
21      Q.  Do you know what your source is for
22  600 to 700 tons?
23      A.  It says here in 3.3, on Page 5, for
24  comparable barge sizes in the 600 to 700-ton
25  range.

130

1  Q.  Is that the gross tonnage of the
2  barge?
3  A.  I would assume that that's the tonnage
4  of the barge empty.
5  Q.  Which is equivalent to gross tonnage,
6  net tonnage or some other measure?
7  A.  I'm not, um -- like I said, I don't
8  remember the number, so I couldn't tell you.
9  Q.  You wrote -- would it make a
10  difference in your calculations if it's gross
11  or net?
12  A.  I don't remember -- well, yeah.  I
13  mean, one value would have a more significant
14  value than the other -- magnitude than the
15  other.
16  Q.  Which one would have more significant
17  value?
18  A.  Well, the gross tonnage would have a
19  more significant value.
20  Q.  You wrote, or you adopted a statement
21  that inspection of the hull of the Ingram barge
22  showed no significant crushing depth,
23  indicating an impact time that is even less
24  than 0.9 seconds.  You see that?
25  A.  Yes.

131

1  Q.  And you wrote immediately above there
2  that barge damage is typically called crushing
3  depth.  You see that?
4  A.  Yes.
5  Q.  Did anyone from your group inspect the
6  hull of the barge?
7  A.  No.
8  Q.  Who inspected the hull?
9  (Brief interruption.)
10  EXAMINATION BY MR. RAFFMAN:
11  Q.  Who inspected the hull?
12  A.  Um -- Mr. Hector Pezos.  And it may
13  have been another individual, another
14  consultant from Bartlett Engineering, maybe.
15  Q.  Is there a report of the inspection?
16  A.  I know there's photographs, and there
17  is -- I don't know of a specific report.
18  Q.  And would you agree based on what you
19  saw that there was no significant crushing
20  depths on the Ingram barge?
21  A.  Yes.
22  Q.  And by crushing depth, you mean barge
23  damage.
24  A.  Yes.
25  Q.  So there was no significant barge

132

1  damage on this barge, right?
2  A.  Yes.
3  Q.  Why does the absence of barge damage
4  indicate that the impact time is less than 0.9
5  seconds?
6  A.  Because what was found empirically is
7  that with greater impact time there is
8  greater -- it's an empirical correlation.  It's
9  based on tests that were actually run with
10  barge impacting pier -- or a pier protection
11  system.
12  Q.  So if I understand you right, you have
13  tests that show that when a barge has a head-on
14  impact with a pier that lasts longer than 0.9
15  seconds you would expect to see crushing depth
16  damage on the barge.  Right?
17  A.  Yes.
18  Q.  And you would infer from that that the
19  absence of crushing depth damage on this barge
20  meant that a head-on collision occurred which
21  was less than .9 second, right?
22  A.  Yes.
23  Q.  The report says, data from full scale
24  tests on barges colliding with bridge piers
25  showed that the tested barges did not endure

133

1  significant body damage if the impact time is
2  0.5 to 0.6 seconds or less.  Right?
3  A.  Right.
4  Q.  And does that refer to the full-scale
5  tests on barges reported in the references
6  listed on Page 14 of your report?
7  A.  Yes.
8  Q.  And it assumes, does it not, that the
9  absence of impact or absence of crushing damage
10  on a barge from a collision with a bridge pier
11  would equate to a similar collision with a
12  floodwall.
13  A.  Yes.  That they can be correlated.
14  Q.  Am I correct that if you reduce the
15  impact time you will increase the impact force
16  generated by the calculation?
17  A.  Yes.
18  Q.  In fact, you've already testified to
19  that effect.
20  A.  Yes.
21  Q.  So when you reduce the impact time
22  from ten seconds as reported in IPET to 0.5
23  seconds, then it will have a dramatic increase
24  in the force that you derive from your
25  calculation.

134

1    A.   Right.
2    Q.   You said you used a wind speed range
3  of 80 to 125 miles an hour, right?
4    A.   Yes.
5    Q.   What was your basis for choosing that
6  wind speed range?
7    A.   I believe it was the wind speed range
8  at the time -- in the time range of when the
9  barge would have hit the wall.
10   Q.   Based on what data?
11   A.   I don't know.  There's charts that are
12 given in the IPET report that give wind speed.
13   Q.   What time did the barge hit the wall?
14   A.   Um -- our best estimate is it could
15 have been at 7:00 or earlier.
16   Q.   It wouldn't have been after 7:00, in
17 your analysis; correct?
18   A.   No.
19   Q.   Is that incorrect?
20   A.   No.  I think it's probably around
21 7:00.  It could have been 7:30, something like
22 that.  I don't think there's a lot of good
23 information on the time of when the barge
24 impacted.  I mean, no one was there with a
25 secondhand clock to tell you, you know, when it

135

1  really happened.  It's all, from what I can
2  tell, um -- narrative information.
3    Q.   So the input that you're using is the
4  wind data that exists in the 7:00 a.m. to
5  7:30 a.m. time frame.
6    A.   In that range, yeah.
7    Q.   And the 7:00 a.m. to 7:30 time frame
8  is your best sense of what time the barge
9  struck at the south breach based on the
10 information that you reviewed.
11   A.   Yes.
12   Q.   My next question is related to what
13 you say on Page 6.  Based on available data,
14 however, it is highly probable that the barge
15 initially impacted the wall at an angle.
16   A.   (Witness nods head affirmatively.)
17   Q.   What available data are you referring
18 to there?
19   A.   The direction of the wind being close
20 to north-south, the, um -- way of the initial
21 impact, what I mean way, the configuration of
22 the initial impact on the wall, it gives the
23 impression that it was more of a corner or
24 end-to-end impact -- end-to-wall impact.
25   Q.   Why would the orientation of the wind

136

close to north-south cause the corner of the
barge to hit the wall?
    A.   Because it would be moving in an
incline direction to the south.
    Q.   And based on the information you've
reviewed, the direction of the wind in the
7:00 a.m. to 7:30 time frame had a significant
north-south component to it?
    A.   Yes.
    Q.   Now we're still talking about the
south breach with all of these questions and
answers, right?
    A.   Yes.
    Q.   Hitting the wall on an angle would
deliver a more concentrated impact according to
your statement?
    A.   Yes.
    Q.   And the concentrated impact is
delivered by the corner of the barge?
    A.   Yes.
    Q.   Can you explain, again treating me as
you would a reasonably intelligent high school
senior, why the corner of the barge hitting the
wall would have a bigger impact than some other
configuration?

137

    A.   Okay.  This is a hard one to explain
that way.  The barge has a certain momentum.
Right?  The area -- that momentum doesn't
change.  It doesn't matter how the barge hits,
if it hits this way or if it hits on an angle.
Okay?  It's just like a weight.  Okay?  And if
you imagine a pressure and you're hitting
broadsided with a pressure, and that -- and the
weight that's causing that pressure is the same
as if it's on an angle, so now you have this
concentrated force over a much smaller area so
the impact force is concentrated.
    Q.   Your report says that this would
result in the shattering of the concrete panels
in a blast-like manner over very short
duration.  In fact, you read that part of your
report earlier this morning; right?
    A.   Right.
    Q.   The significant impact from a barge
would be expected to shatter the concrete at
the point of impact?
    A.   Yes.
    Q.   And referring your attention to
Photograph 10, what portion of the shattered
concrete panels in Photo 10 were caused by

138

1   impact from the barge?
2       A.   Well, you know, like I was mentioning
3   earlier, there's -- most of the material is
4   missing.  Even though it was shattered to such
5   a degree it's missing, even though that there
6   was interlocking with the rebar and the
7   concrete in the pour.  Rebar, concrete, and
8   the, um -- sheet pile were interlocked
9   together.
10      Q.   So that if I understand you right,
11  what you're saying is that the barge impact
12  shattered concrete across a fairly wide section
13  of the failed floodwall.
14      A.   Right.  Right.  And if you look at --
15  I mean, it's the same thing as what occurred on
16  the south end of the south breach.  If you look
17  at Figure 14, you can see how this concrete is
18  all shattered.  That's not caused by hydraulic
19  pressure.
20      Q.   So --
21      A.   If you look at the other flood walls
22  you'll see a rotational failure where it stays
23  embedded in the ground and then moves out.
24          These are completely out of the
25  ground.  They've moved 180 feet.

139

1       Q.   And the movement of the 180 feet is a
2   result -- if I understand your testimony right,
3   that dramatic movement of that bow 180 feet
4   into the neighborhood is a result of a very
5   high impact barge being launched by the wind
6   into the wall at high velocity.
7       A.   Right.  That's -- yes.
8       Q.   The result of that high impact wind
9   launched the barge into the wall --
10      A.   In addition to the wave action.
11      Q.   -- combined with the wave action --
12      A.   Combined with the wave action.
13      Q.   The wind launched barge striking the
14  wall combined with the wave action has caused
15  the concrete to shatter across virtually the
16  entire length of this long bow shown in Photo
17  10.
18      A.   Right.
19      Q.   And it has driven the wall 180 feet
20  deep into the neighborhood.
21      A.   Well, I mean eventually.  It's
22  exacerbated afterwards with the flow of water
23  and the impact of the barge coming -- finally
24  coming -- overtopping the wall.  You have to
25  realize, when you're shattering that wall

140

1   you're causing excessive bending stresses,
2   out-of-plane bending stresses in the concrete
3   which cause it to pop off or debond from the
4   sheet pile.
5       Q.   But it's barge impact -- if I
6   understand you right, it's barge impact that
7   explains why there's no concrete along this
8   length of wall where it's bowed.
9       A.   Yeah, primarily.
10      Q.   And you wrote that after the first
11  barge impact and failure at the northern part
12  of the southern breach the barge became pinned
13  and rotated counterclockwise.  Do you see that?
14      A.   Uh-huh.
15      Q.   This is at Page 6.
16      A.   Yes.
17      Q.   Can you describe for me how that
18  happened?
19      A.   Yeah.  I mean, we talked about it
20  earlier.
21      Q.   At the south breach?
22      A.   Yeah.  We talked about it rotating
23  around and that's why the concrete remained on
24  the wall.  Remember?  When -- in the southern
25  part?

141

1       Q.   So the barge knocks the wall over --
2   and again referring you to Photo 10, if I
3   understand you right, the barge knocks the wall
4   over and shatters the concrete in the northern
5   part of that bow.
6       A.   Significantly displaces the wall.
7       Q.   Displaces the wall.
8       A.   Significantly displaces the wall.
9       Q.   All right.  And then it rotates and
10  travels along the length of the --
11      A.   Slams against the wall.
12      Q.   It rotates and slams against the wall.
13  Why don't you narrate it.
14      A.   Okay.  The wall -- the barge impacts
15  the wall, and then with the wind and wave
16  action it comes back around and slams against
17  the wall, and then it exits through the south
18  end and rotates back over taking the wall with
19  it.
20      Q.   How high on the wall was the barge
21  when it hit at the first impact at the south
22  breach?
23      A.   I would imagine not much different
24  than when it exited.
25      Q.   And that was about in the three-foot

142

1   range, if I remember your testimony right,
2   below the top.
3       A.   The barge?
4       Q.   Yes.
5       A.   Yeah, the barge was I'd say in the
6   foot, three foot range. Maybe slightly higher.
7   Maybe possibly lower. A little lower maybe.
8       Q.   In the bottom paragraph of Footnote --
9   excuse me. Of Footnote -- what's the basis of
10  the your testimony that the barge was at that
11  three-foot, give or take, level when it first
12  hit the wall?
13      A.   That's the shearing depth.
14      Q.   Now I'm going to refer you to Page 6,
15  second paragraph -- last paragraph, talking
16  about a second primary collision. If I
17  understand you right, this is the collision
18  that happens after the barge rotates. Right?
19      A.   Yes.
20      Q.   You said that this second primary
21  collision was along the full length of the
22  barge?
23      A.   Yes.
24      Q.   So the barge is essentially parallel
25  to the wall?

143

1       A.   Yes.
2           (Brief recess.)
3   EXAMINATION BY MR. RAFFMAN:
4       Q.   The analysis that we've just been
5   going through, this impact analysis, was
6   something you did only for the south breach;
7   right?
8       A.   Yes.
9       Q.   There's a separate analysis that you
10  did for the north breach.
11      A.   Yes.
12      Q.   The analysis for the north breach --
13      A.   The analysis for the north breach also
14  applies for the south breach, but it's the wave
15  action analysis.
16      Q.   Well, now, the north breach wave
17  action analysis, if you look here at Page 7, it
18  says from the pump station manager 's
19  description of the incident it appears that the
20  impact force generated by ING 4727 barge was
21  cussed by exceptional wave action.
22      A.   Right.
23      Q.   Now, is it your testimony that there
24  was exceptional wave action at both the north
25  and the south breach?

144

1       A.   Yeah. I believe that there was also
2   wave action, I think I mentioned that earlier,
3   wave action during the south breach, as well.
4       Q.   So your analysis is that the north
5   breach doesn't include the wind dated velocity,
6   right?
7       A.   Right.
8       Q.   So the north breach has to happen
9   without the aid of wind velocity. Right?
10      A.   Yes.
11      Q.   So in that sense your conclusions
12  about the north breach and the south breach are
13  different conclusions.
14      A.   Yes.
15      Q.   Let's go to the north breach and let
16  me ask you some questions about Paragraph 3.4
17  on Page 7.
18      A.   Okay.
19      Q.   It says, the north breach had a
20  shorter stretch of damaged wall when compared
21  to the south breach. It says, the barge
22  impacted the middle to lower half of the wall,
23  and the sheet pile was literally torn off at
24  the construction joint from the impact.
25      A.   Yes.

145

1       Q.   Right? The barge impact cause the
2   sheet pile to rip in two?
3       A.   Yes.
4       Q.   That only happened at the north
5   breach.
6       A.   Yes.
7       Q.   The wall reacted differently there
8   than it did at the south breach.
9       A.   Yes.
10      Q.   There was no crushing depth or barge
11  damage on the barge from this impact; right?
12      A.   Well, there were apparently not,
13  because we didn't see any crushing depth on
14  the -- we have no knowledge of any crushing
15  depth on the barge as it stood in the Ninth
16  Ward.
17      Q.   So based on the review that Hector
18  Pezos and Mr. Bartlett did, there was no
19  crushing depth or barge damage on the barge
20  that would have reflected the barge 's presence
21  at this location at this impact.
22          MR. WIEDEMANN:
23              I object. I don't understand the
24  question.
25  EXAMINATION BY MR. RAFFMAN:

146

1   Q.  Do you understand the question?
2   A.  Your asking whether or not there was a
3   distinctive barge impact -- a distinctive
4   impact on the barge or dent on the barge that
5   said, aha, that's from the first breach.
6   Right?
7   Q.  That's one question, yes.
8   A.  No.
9   Q.  All right.  In fact, one of the
10   conclusions you drew in connection with the
11   south breach is that the impact time must have
12   been shorter because we didn't see any crushing
13   depth or barge damage.  Right?
14   A.  Yes.
15   Q.  You wrote that from the pump station
16   manager 's description of the incident it
17   appears the impact force was caused by
18   exceptional wave action.
19   A.  Yes.
20   Q.  So the description here about
21   exceptional wave action is tied to the pump
22   station manager's description, right?
23   A.  Yes.
24   Q.  And that's Mr. Villavaso?
25   A.  Yes.

147

1   Q.  What was it about the pump station
2   manager 's testimony that gave rise to the
3   conclusion that exceptional wave action was
4   involved?
5   A.  Well, he talked about a large -- he
6   thought from where he was standing, a 20-foot
7   wave that went down the canal, cascading over,
8   and after that wave passed the barge impacted
9   the wall.
10   Q.  Apart from the pump station manager 's
11   description, do you have any evidence that a
12   20-foot wave of water went down the canal?
13   A.  That's the only evidence that I know
14   of.  Currently.
15   Q.  And when you refer to exceptional wave
16   action in the report, is the 20-foot wave
17   described by the pump station manager what
18   you're referring to?
19   A.  Right.  It's sort of a general
20   condition that's going on at the time, yes.
21   Q.  Are you aware of any description of a
22   20-foot wave of water taking place at the time
23   of the south breach?
24   A.  Not at the time.
25   Q.  You didn't consider wind in connection

148

with the north breach because the wind wasn't
blowing in the direction of the wall at that
time, right?
    A.  Right.
    Q.  Narrate for me your understanding of
how the wave brought the barge to the wall.
    A.  There's wave action behind the barge
that caused it to reach the location of the
breach and impose a force on the barge that
then caused that force from the barge to be --
to be impacted onto the barge.  I'm sorry, onto
the wall.
    Q.  And apart from the pump station
manager 's description of the wave action, is
there any other basis for your conclusion that
the wave action caused the barge to impact the
wall in this manner?
        MR. WIEDEMANN:
            Already answered.  Objection.
    A.  That's what I think.
EXAMINATION BY MR. RAFFMAN:
    Q.  The pump station manager 's
description of the wave action is really the
beginning and the end of your opinion on the
subject, right, as to how the barge got to the

149

wall?
        MR. WIEDEMANN:
            Object.  Repetition.  The third
    time.
    A.  At this time, yes.
EXAMINATION BY MR. RAFFMAN:
    Q.  You wrote in Paragraph 3.5, in
addition to the wind effect on the barge a
separate analysis was done to evaluate imposed
vessel force from periodic wave action.
        Are there papers reflecting this
separate analysis?
    A.  Yes.  Um -- Number 5.
    Q.  Number 5 is a reference that you used,
right?
    A.  Right.  I'm sorry.  I thought Number 5
was related to the barge impact, but it
apparently is -- it is related to the wave
action.
    Q.  I just wanted -- I want to understand
the separate analysis that was done to evaluate
imposed vessel force from periodic wave action.
    A.  Right.
    Q.  Somebody in your office sat down and
did a calculation.

150

1   A.   Yes.
2   Q.   Who did that?
3   A.   Dr. Gamal.
4   Q.   And you reviewed it?
5   A.   Yes.
6   Q.   Can you describe for me, again
7   treating me as a reasonably intelligent high
8   school student, how this calculation was done
9   and what it represents?
10   A.   Periodic wave is like a water wave
11   that occurs at a certain frequency.  And you
12   can take this wave to have a different speed,
13   and you can have this wave take a different
14   height.  And basically, what this analysis does
15   is it determines as this wave impacts the barge
16   how much force it would impose on the barge.
17   Q.   So you are taking as your inputs what?
18   A.   Wave force is a function of -- at the
19   bottom of the page, Page 7 -- wave force is a
20   function of several factors including wave
21   period, water depth, barge dimension and
22   distance from the floodwall.  For simplicity,
23   the barge was assumed to be momentarily fixed
24   in a mean position at a given time.  So what
25   that means is, in lieu of considering that the

151

1   barge is moving, it was considered let's see
2   what the force of that wave on the barge is
3   stationary.  Obviously the barge is moving, so
4   it actually has more force.  But for this
5   calculation it was assumed that the barge was
6   just sitting in the water and it wasn't near a
7   wall, and the force imposed on the barge was
8   determined based on the wave and the barge
9   dimensions.
10   Q.   The idea is that the wave activates
11   the barge.
12   A.   Yes.
13   Q.   What assumptions did you make about --
14   well, go back.  What input did you use for wave
15   period?
16   A.   I don't remember.
17   Q.   What input did you use for water
18   depth?
19   A.   We have here assuming only a water
20   height of one foot.
21   Q.   It says assume a wave height of one
22   foot.
23   A.   That's the same thing.
24   Q.   Water depth is the same as wave
25   height?

152

1   A.   Yes, for the wave.
2   Q.   Okay.  What did you use for barge
3   dimension?
4   A.   Um -- I don't remember, Mark.  It's
5   been like -- when I looked at these
6   calculations it was probably two, three months
7   ago.
8   Q.   What did you use for distance to the
9   floodwall?
10   A.   I think this calculation was done
11   considering that it wasn't next to the
12   floodwall.  So it would be a greater impact if
13   it was, but for this calculation it was just
14   assumed to be what the impact would be out in
15   standing water.
16   Q.   What is potential flow theory?
17   A.   Um -- basically, it is the periodic --
18   the, um -- the wave, the periodic wave that
19   you're considering has a time displacement
20   characteristic of a sawtooth in that there's no
21   irritational velocity.
22   Q.   But the input data that we talked
23   about, wave period, water depth, barge
24   dimension and distance, even if you don't
25   remember what it was do you know where you got

153

1   it, where it came from?
2   A.   Yes.  We got it -- it was based on the
3   reference that we've got mentioned here,
4   Number 5.
5   Q.   All of those inputs came from your
6   reference Number 5?
7   A.   Other than the inputs that are given
8   in that paragraph, yes.
9   Q.   When you say the inputs given in the
10   paragraph, you're talking about the assumption
11   that the barge is momentarily fixed and the
12   wave height of one foot.
13   A.   Yes.  I actually think in the paper
14   itself it assumes a momentarily fixed condition
15   for the barge in order to derive a solution.
16   Q.   So if I want to know where you got
17   wave period and water depth, I would go to
18   reference 5.
19   A.   Right.
20   Q.   Barge dimension, would that come from
21   Reference 5, as well?
22   A.   You know, the water depth, maybe
23   you're right, maybe that's the depth of the
24   barge, um -- depth of the water -- the draft of
25   the barge.  That could be, now that I look at

154

1   it again.
2          What was your question?
3      Q.   I'm trying to figure out -- because
4   you don't remember these inputs I want to know
5   where I might go to figure out what they are
6   and try to --
7      A.   Yeah.  I mean, our analysis was based
8   on this reference file, which gives you means
9   to get this, um -- force.
10     Q.   You wrote that wave force can yield an
11  additional force of at least 100 percent of the
12  preexisting hydrostatic force.
13     A.   Yes.
14     Q.   That's based on this analysis that
15  you've been describing?
16     A.   Yes.
17     Q.   Who conducted the analysis?
18     A.   Dr. Gamal.
19     Q.   And you have work papers for this
20  analysis at your office.
21     A.   Yes.
22     Q.   You don't have those work papers here
23  today.
24     A.   No.
25     Q.   What is the preexisting hydrostatic

155

1   force?
2      A.   That would be the force that would be
3   imposed on the wall if it was -- the water was
4   up to the top of the wall.
5      Q.   Is that the force with or without
6   waves?
7      A.   That would be the force -- a level
8   surface of water at the top of the wall.
9      Q.   So that preexisting hydrostatic force
10  does not include any force that a wave would
11  exert if the wave hit the wall directly.
12     A.   Right.
13     Q.   Turning the Page 8, the failure
14  analysis of your report, is it fair to say that
15  Section 4 of your report includes the
16  criticisms that you and your colleagues at MEA
17  made against the conclusions stated in IPET and
18  ILIT?
19     A.   Yes.
20     Q.   As you sit here today, have you
21  developed any criticism of IPET and ILIT other
22  than those stated here in the report?
23     A.   No.
24     Q.   Let me ask you some questions about
25  those criticisms.  You wrote in 4.1A, there was

156

no analysis done by IPET that indicates that
scour would have caused the failure.  You see
that?
    A.   Yes.
    Q.   This relates to the south breach;
right?
    A.   Yes.
    Q.   The south breach is the only breach
that IPET concluded was caused by scour.
Right?
    A.   Of the two breaches.
    Q.   Of the two breaches on the IHNC,
right?
    A.   Yes.
    Q.   And what did you mean to say when you
said that there was no analysis done by IPET
that indicates scour would have caused the
failure?
    A.   Because their limit equilibrium
analysis cannot include the effect of scour
and, um -- I didn't see any numerical analysis
which would be required to assess that effect.
    Q.   There is, somewhere in IPET, a factor
of safety analysis related to the south breach,
right?

157

    A.   Yes.
    Q.   And you've seen and reviewed that
factor of safety analysis.
    A.   Yes.
    Q.   They call that a stability analysis,
didn't they?
    A.   Yes.
    Q.   So tell me, what was it about that
analysis that was deficient with regard to the
question of scour?
    A.   Um -- it had a safety factor of -- I
believe a lowest safety factor was 1.1, so it
wasn't failure, and but it didn't include any
scour effects.  From my review of the
documents, basically IPET said, well, it failed
because of scour.  The remaining amount of
resistance was the result of scour.  The
remaining amount of resistance left because --
because their limit equilibrium method didn't
have 1 or 0, 1 or less, they said, okay, well,
we get to less than 1 by the scour.  But I
didn't see any analysis where that was derived.
    Q.   With respect to this IPET factor of
safety analysis, do you disagree with the
methodology they used or with the inputs they

158

1   put into the methodology or both or neither?
2       A.   Um -- I have a little problem with the
3   strengths of the lower clay layer, as ILIT did.
4   Um -- you know, that's parts of the -- part of
5   the question that you're asking is something
6   that we haven't done yet, where we look at what
7   we think these strengths should be and what we
8   think, um -- the conditions are that need to be
9   modeled.  Like I said, we're still in the data
10  collection and reduction stage.
11          But what we did, for the limit
12  equilibrium, for IPET, we were able to
13  duplicate their results, so we were able to see
14  how they -- the assumptions and everything they
15  used.  We were able to get the same numbers.
16      Q.   Well, you've rejected the IPET
17  conclusion that back scour was a cause of the
18  ultimate failure of the wall, right?
19      A.   Yes.
20      Q.   Are the reasons for your rejection of
21  scour as a cause of the wall set forth in
22  section 4.1 of your report?
23      A.   I believe so.  Yes.
24      Q.   Are there any other reasons that you
25  reject scour as a cause of the failure?  At the

159

1   south breach, now.
2       A.   Other than what's in 4.1?
3       Q.   Other than what's set forth here,
4   right.
5       A.   Not that I can think of, no.
6       Q.   Have you done a separate analysis to
7   see whether back scour would cause the failure
8   or not, independent of what IPET did?
9       A.   We -- you mean ILIT did?
10      Q.   Well --
11      A.   I didn't see one that IPET did.
12      Q.   Okay.
13      A.   You're talking about the ILIT?
14      Q.   Let me ask the question without the
15  qualifier.  Have you done a separate analysis
16  to see whether back scour would cause the
17  failure?
18      A.   We were doing -- trying to duplicate
19  the ILIT results.  And I think I talked to you
20  about this, that we were to a point where we
21  had a couple -- we were able to identify -- we
22  were able to do -- duplicate their results for
23  seepage conditions, but when we tried to couple
24  the model with that of a stress field we were
25  having troubles getting it to converge.

160

1       Q.   So when you wrote here at the bottom
2   of Page 8, MEA has confirmed the ILIT analysis
3   and obtained similar results, parens,
4   pending --
5       A.   Pending because I was hoping that we
6   would have had that done.  We never got it
7   done.  I probably should have taken that out.
8       Q.   So the sentence at the back end here,
9   MEA has confirmed the ILIT analysis and
10  obtained similar results pending relates to
11  that --
12      A.   Difficulty we were having to converge.
13      Q.   Okay.  All right.  Got it.  Got it.  I
14  think the record will be clear.
15          One of the reasons you gave for
16  rejecting scour is that current evidence exists
17  that indicated at the time of failure the surge
18  elevation was below the top of the floodwall,
19  therefore a scour trench was not present at the
20  time of failure.  You see that?
21      A.   Yes.
22      Q.   And the time of failure you're talking
23  about here is the 7:00 to 7:30 time frame that
24  you talked about earlier.
25      A.   Right.

161

1       Q.   What are you relying on for your
2   conclusion that the surge elevation was below
3   the top of the floodwall at that time?
4       A.   I think we talked about that.  Um --
5   witness accounts, um -- the impact of the
6   barge, you know, the shearing of the wall,
7   hydrograph information -- I mean, even if you
8   consider -- okay, let's even take it a little
9   further.  A later time.  You're not talking
10  about a lot of cascading.
11      Q.   Have you done any calculations about
12  what overtopping would do to soil underneath a
13  floodwall that's not armored by concrete or
14  other protection?
15      A.   That's the calculation I was just
16  telling you about, the one that we haven't been
17  able to complete yet.  I mean, basically,
18  that's what ILIT did.  Okay?  The exact
19  question you asked is what ILIT did and found
20  that the scour did not play a critical role.
21      Q.   That calculation I've just described
22  is one that you haven't been able to duplicate
23  ILIT's work yet.
24      A.   Right.
25      Q.   But you're working on it.

162

1   A.   Well, not currently, but we will be
2   doing that.
3   Q.   All right.  When did the scour trench
4   develop on the back side of the wall as shown
5   in photo Number 5?
6   A.   Primarily it developed over time after
7   the wall was more, um -- more like continuously
8   cascading over the wall.  I don't believe
9   splashes over the wall are going to cause that
10  kind of erosion.
11  Q.   So because the wall failed before the
12  water was flowing over the top, it's your
13  testimony that the entire scour trench
14  developed after the wall had already failed.
15  A.   Yes.  Or it was minor.  You know, it
16  was a minor scour trench at that time.
17  Q.   Any scour trench that existed before
18  the failure was a minor scour trench; right?
19  A.   Yes.
20  Q.   And this -- it wasn't until after the
21  failure that the water rose to a level in the
22  canal that overtopped the wall and caused the
23  scour trench to the multiple feet that you see
24  in Photo 5, right?
25  A.   Yes.

163

1   Q.   And I meant to say Photo 6.
2   A.   But I knew what you meant.
3   Q.   All right.  So the record is clear.
4   The next section of your report talks
5   about the ILIT failure analysis.  This is at
6   4.2.  And it discusses the ILIT conclusion that
7   both the north and south breaches resulted from
8   extremely high permeability marsh layers
9   underlying the floodwall.  You see that.
10  A.   Yes.
11  Q.   You've concluded at Pages 9 and 10
12  that there are several factors that are
13  inconsistent with ILIT 's underseepage theory;
14  correct?
15  A.   Yes.
16  Q.   Do you equate underseepage with
17  uplift?
18  A.   Yeah.  The underseepage word is taken
19  right out of ILIT.  It's a word that they use.
20  Q.   And you've concluded that ILIT has
21  assumed a marsh permeability which is too high?
22  A.   Yes.
23  Q.   What is that conclusion based on?
24  A.   Based on the descriptions of the
25  material in the boring logs and based on

164

permeability values that have been reported by
IPET of this clayey marsh, and their
disagreement with the assumption made by ILIT
of their permeability values.  It's also based
on some cone penetrometer values which
indicate, um -- higher -- lower permeability.
   Q.   IPET used lower permeabilities and you
agreed with their use of the lower
permeabilities, is that right?
   A.   Yes.  For this region.
   Q.   For this region meaning the region
underneath the Industrial Canal.
   A.   Yes.  At least on the east side.
   Q.   Does permeability equate or reflect
water pressure.
   A.   That's such a general question it's
hard to answer.
   Q.   Well, does lack of permeability
eliminate uplift as a cause of the failure?
   A.   Yes.
   Q.   Did you do any testing to confirm your
agreement with the IPET report insofar as it
disputed the ILIT permeability quotient?
   A.   You mean in-place testing?
   Q.   Any sort of testing apart from just

165

reviewing the IPET report.
   A.   We didn't do any testing.
   Q.   You wrote that the -- at Page 10, now,
the bore holes that were drilled by the Army
Corps of Engineers near the south and north
breaches showed that the marsh is very soft to
medium stiff organic fat clay with roots and
wood and lenses of silt at those locations.
The marsh layer was assigned a USCS -- that's
Unified Soil Classification System -- of CH,
indicating that the marsh is in fact a fat
clay.  Do you see where you wrote that?
   A.   Yes.
   Q.   What was your source for that
statement?
   A.   The CH.  CH is a designation for fat
clay.  In fact, it indicates that organics are
not of a great quantity.
      If the organics were very high, it
would have been classified as an OH.  O stands
for organic.
   Q.   Is there a document that I can look at
that will show that the marsh layer was
assigned a value of CH?
   A.   Oh, yeah.

166

1   Q.   What document is that?
2   A.   Those are boring logs.  Some of them
3   were back in the 1960s.
4   Q.   Are the boring logs part of the IPET
5   record?
6   A.   Um -- yeah, on their website I think
7   you can find some of their boring logs.
8   Q.   Let me see if I can understand this.
9   MR. RAFFMAN:
10          Mark this document a Exhibit 4,
11       please.
12      (Marino Exhibit 4 was marked for
13   identification and is attached hereto.)
14   A.   No, this wouldn't show you.
15   EXAMINATION BY MR. RAFFMAN:
16   Q.   Well, I have handed you what's been
17   marked as Exhibit Marino 4.  This document does
18   not show the boring logs you've just referred
19   to in your prior testimony.
20   A.   Well, it shows the boring logs but it
21   doesn't give -- no, it doesn't show the borings
22   logs, it shows boring locations.  These are
23   more like stick logs -- rudimentary stick logs.
24   Q.   Do you disagree with the IPET
25   characterization of the soil layers as

167

1   reflected in Exhibit 4?
2   A.   Um -- like I said, we haven't really
3   quantified this information other than
4   basically we tried -- we duplicated the
5   information they used for our model analysis.
6   What we did in terms of classifying -- or
7   looking at these soft clay layers was we look
8   at the actual borings where the Army Corps of
9   Engineers describes what those soils consist
10   of.
11   Q.   As you sit here today and look at this
12   Marino 4, does this at least represent IPET 's
13   characterization of the soils underneath the
14   north and south breach?
15   A.   This -- yeah.  This is just kind of a
16   general geologic -- it's more of geologic
17   profile than a geotechnical profile.
18   Q.   All right.  And as you sit here
19   today --
20   A.   It really doesn't give me really a
21   good idea of what permeabilities are by looking
22   at this.
23   Q.   I guess my question was going to be
24   the location of the swamp and marsh layers
25   reflected in Marino 4 is not something you can

168

1   either affirm or negate as you sit here today.
2   Is that right?
3   A.   Right.
4   Q.   You don't have a view one way or the
5   other about whether this accurately describes
6   the soil underneath the wall at the north
7   breach or south broach?
8   MR. WIEDEMANN:
9          Objection to the form of the
10       question.  You already asked him.  He
11       said that's shown by the borings.
12   A.   Yeah.  We looked at the borings to
13   see --
14   MR. WIEDEMANN:
15          That's exactly what he --
16   EXAMINATION BY MR. RAFFMAN:
17   Q.   How deep was the sheet pile at the
18   north breach?
19   A.   I want to say -8 elevation.
20   Q.   How deep was the sheet pile at the
21   south breach?
22   A.   Same.
23   Q.   What soil layer was present at the
24   bottom of the sheet pile at the north breach?
25   A.   Um -- same unit as at the south

169

1   breach.
2   Q.   Was that marsh, clay or something
3   else?
4   A.   It's some kind of soft clay.
5   Q.   Where was the marsh layer located --
6   A.   Now, I'm doing all this on memory.
7   Okay?  Because I haven't looked at this in a
8   while.  I just want to qualify that.
9   Q.   As you sit here today, do you have an
10   opinion as to where the marsh layer was located
11   vis-a-vis the bottom of the sheet pile wall at
12   the north breach?
13   A.   Don't remember.
14   Q.   Same question:  South breach?
15   A.   Don't remember.
16   Q.   You chose a lower permeability value
17   than ILIT used; correct?
18   A.   Yes.
19   Q.   Did you do a sensitivity analysis
20   based on the choices of different permeability
21   value?
22   A.   Somewhat, yes.
23   Q.   What did you find?
24   A.   That even if we assumed the value of
25   10 to the -4, which is more like a fine sand

170

1 permeability value, that you don't get the
2 transfer of seepage pressures from the flood
3 side to the protected side. Um -- and that's
4 assuming a steady state analysis.
5     Q.   What do you mean by assuming a steady
6 state analysis?
7     A.   Well, steady state means that you're
8 not in a transient mode, everything is in
9 equilibrium. So the water has sat there long
10 enough that everything is now -- the flows are
11 constant. Just imagine if you wished the water
12 behind the wall. Right? And you're sitting on
13 the toe of the protected side. Well, you're
14 waiting a while, and you're waiting a while,
15 and then you're not seeing anything. Right?
16 And then after a while let's say there is some
17 seepage. Okay? You see this seepage. Right?
18 And then that seepage, with that level staying
19 the same, eventually gets constant -- to a
20 constant value. Right? That's -- now, you're
21 in a steady state condition. So it takes some
22 time -- even if you had a certain level of
23 permeability, it takes some time for that water
24 to move through all those strata to make it to
25 the toe.

171

1     Q.   Your analysis assumes that the water
2 has already permeated to the toe of the levee?
3     A.   No. Our analysis was a steady state
4 condition. When you use the permeability like
5 this, the value that we're talking about, the
6 steady state condition doesn't give you any
7 significant pressures on the protected side of
8 the slope.
9     Q.   What you're saying is that the steady
10 state condition with a permeability value of 10
11 to the -4 will never give you underseepage at
12 the levee toe. Correct?
13     A.   Like ILIT is talking about, correct,
14 that would cause stability problems. And
15 that's consistent with what the Corps of
16 Engineers is saying.
17     Q.   Insofar as IPET rejects ILIT 's
18 underseepage analysis, you agree with IPET.
19     A.   Yes.
20     Q.   You wrote that less than twelve hours
21 of surge meant that transient seepage
22 conditions and not steady state seepage apply.
23 That was at Page 11, I think.
24     A.   Mark, say that again.
25     Q.   Look at Paragraph D on Page 11.

172

1     A.   Okay. Where are we on there?
2     Q.   It's at the top of the page.
3     A.   You talking about with significant
4 water surge?
5     Q.   It says, with significant water surge
6 in the Industrial Canal occurring over less
7 than twelve hours, transient seepage conditions
8 exist under the floodwall structure. Do you
9 see that?
10     A.   Yes.
11     Q.   What do you mean by that?
12     A.   That's the steady state. That's what
13 I'm talking about, it takes a while -- you
14 know, it's only there for twelve hours or less.
15 Right? And it takes some time for that
16 pressure to develop on the protection side. In
17 addition to that, you have that the water
18 pressure is not at its maximum the entire time.
19 It's only at its maximum for a fraction of this
20 twelve hours.
21     Q.   One of the bases for your conclusion
22 that ILIT got it wrong is that it would have
23 taken time for the water to squeeze under the
24 wall and through that layer and to permeate,
25 right?

173

1     A.   Well, that's not the seepage they're
2 talking about. They're not talking about
3 seepage around the sheet pile.
4     Q.   No?
5     A.   They're talking about a layer much
6 lower, this clay marsh layer which is below the
7 levee -- the earth levee itself, and that water
8 is coming all the way from back here and
9 getting all the way you under and coming up the
10 other side.
11     Q.   All right. All right. So I misspoke
12 when I described it as coming under the sheet
13 pile. But I think the point still holds. Let
14 me understand it.
15         Part of your -- an important part of
16 your reasons for rejecting ILIT 's analysis is
17 that it would have taken time for water from
18 the storm surge to transmit through that soil
19 layer to the levee toe. Correct?
20     A.   Yes. That's one aspect, correct.
21     Q.   No, if I heard you correctly, you've
22 also concluded that even independent of that
23 time factor, the low permeability coefficient
24 of the soil means that the water was n't going
25 to reach the levee toe regardless. Am I right?

174

1    A.   That the water pressures would not
2    reach a point where they would be significant
3    in terms of stability.  Very good, Mark.  Very
4    good.
5        Q.   Apart from the reference that you
6    stated here in your report, are there any other
7    reasons why you reject the ILIT explanation for
8    the south breach?
9        A.   Not I can think of.
10       Q.   And your analysis and criticism of
11   ILIT and its conclusions about the south breach
12   is the same today as it was when you prepared
13   the June 30 report, correct?
14       A.   Correct.
15       Q.   All right.  Let me ask you about the
16   failure analysis for the north breach.  IPET --
17   and I'm referring now to 4.3 of your report.
18   Okay?
19       A.   Right.  Right.
20       Q.   IPET determined that the north breach
21   was the result of weak soils which could not
22   withstand surge levels at the 11-foot
23   elevation.  You see that.
24       A.   Yes.
25       Q.   That's your characterization of IPET.

175

1        A.   Right.
2        Q.   You rejected IPET's explanation for
3    the north break, right?
4        A.   Yes.
5        Q.   Why did you reject IPET's explanation
6    of the north break?
7        A.   Primarily because of the -- if you
8    look at all the laboratory data of the strength
9    of the soft layer that we're talking about,
10   we're talking about that has the
11   permeability -- low permeability, the value
12   that they used, to me, is almost inexplicable
13   why they chose such a low value for strength.
14       In fact, that same criticism was
15   pointed out by the ILIT report, and they redid
16   the IPET 's analysis with a more reasonable
17   value for strength and came up with like a 1.9
18   safety factor, which is pretty decent for a
19   safety factor.  And that was without a 3D
20   analysis being done.
21       Q.   What you've just described for me is
22   recounted there at Page 12, right?  On the top?
23       A.   Yes.  That's -- I've pretty much gone
24   over all that.
25       Q.   So your testimony is that the soil

176

1    behind the wall should have held.  Right?
2        A.   Yes.
3        Q.   Does your analysis take into account
4    the water-filled gap that formed a part of
5    IPET 's conclusions?
6        A.   Yes.
7        Q.   Please explain what you mean when you
8    say both ILIT and IPET assumed a 2-dimensional
9    failure.
10       A.   Um -- this point was actually brought
11   up by ILIT, as well, that the safety factor
12   would be higher because a 2-dimensional
13   analysis is done.  If you look at the failure,
14   because the initial failure was so narrow --
15   right?  I'm trying to explain this to you.
16   Okay?  A 2-dimensional analysis is like a slice
17   of the ground.  Okay?  It assumes that the
18   conditions and the failures are uniform for an
19   infinite depth -- an infinite length.  Okay?
20   That's not necessarily true.  When you get long
21   failures, the end effects aren't significant.
22   You're going to get resistance along the end
23   effects.  But if you've got a long failure --
24   or even slides, it works the same way in
25   landslides -- you're not going to get much

177

1    contribution for resistance from the ends.
2        Now, if you take your failure and you
3    kind of condense it and now your sides are much
4    closer, the ends, those sides can have a
5    significant amount of resistance to the failure
6    of the soil itself.
7        I hope -- I tried to explain that as
8    best I could.
9        Q.   Let me see if I understood it.  Your
10   testimony is that IPET and ILIT failed to take
11   into account resistance at the ends of the
12   failure that would have given the wall extra
13   strength based on the narrowness of the
14   failure.
15       A.   The passive resistance, if you will.
16   (Nods affirmatively.)
17       Q.   But of course at least one end of that
18   failure was ripped away.  Right?
19       A.   Yes.  But we're talking about -- what
20   we're talking about here is the safety factor
21   of the soil with just a hydrostatic load.
22       Q.   Do you reject the ILIT conclusion
23   regarding the cause of failure of the north
24   broach?
25       A.   Yes.  I mean, it's the same conclusion

178

1   they've reached pretty much throughout the
2   Greater New Orleans area that, you know,
3   there's going to be a bunch of underseepage and
4   there's going to be a bunch of failures.
5       Q.   Are the reasons why you reject the
6   ILIT conclusion about the north breach those
7   stated in your report?
8       A.   Um -- yes.
9       Q.   New, are the reasons why you reject
10  the IPET approach with regard to the north
11  breach those that are stated in your report?
12      A.   Yes.
13      Q.   There is none that you've come up with
14  since you did the report.
15      A.   No.
16      Q.   Looking at Pages 12 and 13 of your
17  report, do those set forth the conclusions that
18  you've drawn in this report?
19      A.   Yes.
20      Q.   Your first conclusion is that the only
21  loose vessel in the opined area between the
22  IHNC lock and the Florida Avenue bridge is the
23  hopper barge ING 4727.  Do you see that?
24      A.   Yes.
25      Q.   Do you know whether there was any

179

1   other floating debris in that area?
2       A.   Debris?
3       Q.   Yes.
4       A.   No.
5       Q.   Can you rule out that the pump station
6   employees saw something other than a barge?
7       A.   He seemed, in my mind, to say it over
8   and over, that in his mind that's what he
9   thought he saw.  When I reviewed my notes,
10  there were a number of places where he said the
11  same thing.
12      Q.   Based on your testimony, you've taken
13  that what he saw was a barge.
14      A.   It would be hard not to distinguish
15  what that is.
16      Q.   When you say that, do you mean to say
17  it would be hard to think a barge was something
18  else?
19          MR. WIEDEMANN:
20              Object to the form of the
21          question as calling for speculation.
22          He's told you what he said.
23      A.   I'm not understanding the question.
24  EXAMINATION BY MR. RAFFMAN:
25      Q.   Well, I'm not sure I understood you

180

1   then.
2       A.   Okay.  I mean, I think -- to me, I
3   personally think the barge has a certain
4   configuration that would be hard to duplicate
5   by debris.
6       Q.   And am I right in inferr ing that
7   that's because the barge is really big?
8       A.   Yes.  That and its configuration.
9       Q.   You wrote at Paragraph 5.2, analyses
10  to date clearly indicate that the impact of the
11  ING 4727 would play a critical role in the
12  failure of the floodwall at the north and south
13  breaches.  Are these the analyses that you've
14  included in this report?
15      A.   Yes.
16      Q.   Are there any other analyses?
17      A.   No.
18      Q.   Why did you use the word would play
19  and not the words did ply?
20      A.   Because we're -- you know, analyses to
21  date.  Okay?  You know, as in any expert
22  report, I'm sure you've read numbers of them,
23  where, you know, as additional information
24  comes available you have to look at it
25  objectively.

181

1       Q.   What more do you need to do to
2   complete these analyses to the point where you
3   can say did play a critical role instead of
4   would play a critical relevant?
5       A.   That would occur with the final
6   report.  I mean, that's -- you know, we have
7   additional analyses to do, and data reduction
8   and collection to do, and so, you know, in my
9   mind that's our final report that's due in
10  March.  I think it's March of the coming year.
11      Q.   What do you plan to do between now and
12  March?
13      A.   Work.
14      Q.   What work do you plan to do?
15      A.   Um -- you know, I think I've said it
16  before, but, you know, basically I want to make
17  sure we have all the available data that we can
18  gather.  We have to independently go through
19  that information, we have models that need to
20  be calibrated and set up and then run.  Um --
21  you know, overall, that's basically what we're
22  talking about.
23      Q.   What models do you need to calibrate
24  set up and run?
25      A.   Um -- the ones I was talking about is

182

1  like one of the numerical models, you can't
2  just -- I don't know, you probably never had
3  this experience in running numerical models,
4  but when you set up a model system it's almost
5  unheard of that you can run it and it behaves
6  like it's supposed to behave.  And you have to
7  play with it to make sure it's giving you
8  realistic numbers and realistic results.  Any
9  engineer that works with numerical methods will
10  know that -- will tell you that.
11       I had one job where we were running
12  six computers -- we burnt out a few computers
13  because we had to make so many runs before we
14  really got it to make sense.
15       Q.   Did the models you're talking about
16  have names?
17       A.   Well, there's a number of -- well,
18  finite element methods.  Okay?  There could be
19  some close form solution methods or empirical
20  methods that we use.  Limit equilibrium
21  methods.  Um -- I would say that covers the
22  general types.
23       Q.   Okay.  You wrote that it appears the
24  barge came loose at or before 4:30 a.m. and
25  struck the floodwall just south of the Florida

183

1  Avenue bridge and then the wall between the
2  streets N. Galvez and N. Prieur.  That's parts
3  of your report; right?
4       A.   Yes.
5       Q.   And have we fully -- I'm going to try
6  to save a little time.  Apart from what you
7  testified earlier today, is there anything that
8  comes to mind that forms the basis for that
9  conclusion?
10       A.   No.
11       Q.   Because we have gone through it all
12  already, right?
13       A.   Pretty much, yeah.  Some things
14  several times.  I'm not trying to -- I
15  understand, you know, you got to do that
16  sometimes to get it all out.
17       Q.   I just want to make sure there's
18  nothing I've missed.
19       A.   Right.
20       Q.   And in candor, I don't want to go
21  through it all again.  If I think I've
22  exhausted it, that's all I'm going to ask.  But
23  the next item in your conclusion is that Lower
24  Ninth Ward survivor accounts of events and
25  damage associated with the floodwall breaches

184

1  are reasonably consistent with the collision of
2  the barge with the floodwall.  You wrote that,
3  right?
4       A.   Yes.
5       Q.   And have we now exhausted the bases
6  for that conclusion based on the testimony here
7  today?
8       A.   Yes.
9       Q.   The next conclusion is that present
10  analyses and evidentiary data indicate that the
11  impact force of the ING 4727 barge likely
12  reduced the safety factor below 1 and caused
13  failure of the wall at the north and south
14  breach locations.  That's another conclusion
15  you've reached.
16       A.   Yes.
17       Q.   Have you done a safety factor analysis
18  of your own to show that the barge impact
19  reduced the factor of safety below 1?
20       A.   Not a safety factor, per se, other
21  than that if you have loads that we have
22  given -- I mean, it's kind of simple.  I mean,
23  if you've got loads that are two, three times
24  greater than what the wall hydrostatic pressure
25  is, I mean, there's no safety factor you need

185

1  it calculate.  These designs are not at a
2  safety factor of 2 or 3.
3       Q.   Well, the analysis you're talking
4  about, then, largely incorporates the finite
5  element with a limit equilibrium analysis.
6       A.   Right.
7       Q.   And the limit equilibrium analysis
8  really is the same thing as the barge impact
9  calculations that are described in your report
10  for wind or for waves that you've testified
11  about earlier.
12       A.   Can you say that again?  Because I'm
13  not sure I understood that.
14       Q.   Well, what I'm really trying to get at
15  is that the analyses that we've just described,
16  that give you two or three times higher load --
17       A.   Right.
18       Q.   -- those are the analyses that are
19  reflected in Section 3 of your report --
20       A.   Yes.
21       Q.   -- right?
22       A.   Yes.
23       Q.   There's no analyses apart from those
24  reflected in Section 3 of your report that give
25  you impact loads.

186

1    A.   No.
2    Q.   Have you concluded with a reasonable
3  degree of engineering certainty that the barge
4  caused the north breach?
5    A.   Yes.
6    Q.   Have you concluded with a reasonable
7  degree of engineering certainty that the barge
8  was the only cause of the north breach?
9    A.   Well, I mean, you had hydrostatic
10  water against it.  I mean, you know, there's
11  active forces and there's resisting forces.  I
12  mean, to say that the water didn't have an
13  active force is not accurate.  So I mean, there
14  are other causes.  I mean, in terms of causes
15  there's the water and there's, um -- the barge.
16    Q.   All right.  So the water and the barge
17  combined together to cause the north breach.
18    A.   Right.  But if it was just the water
19  there, it wouldn't have caused the breach.
20    Q.   And if it was just the barge there it
21  wouldn't have caused the breach either, right?
22    A.   That's the same thing.  Except the
23  water -- it's the same thing.  Yes.  Right.
24    Q.   You need both of them, right?
25    A.   Yes.  The barge couldn't get there if

187

1  the water wasn't there also.  Unless it was an
2  air-filled one.
3    Q.   So you really need both the barge and
4  the water to cause the breach.
5    A.   Yes.
6    Q.   All right.  Is the same condition true
7  for the south breach, you need both the barge
8  and the water?
9    A.   Yes.
10    Q.   Do you conclude to a reasonable degree
11  of engineering certainty that the Inner Harbor
12  Navigational Canal east wall would not have
13  failed at any time on August 29th if the barge
14  had not broken away from its mooring?
15    A.   Yes.
16    Q.   What analysis have you done to support
17  that conclusion?
18    A.   I think this is what the report is all
19  about.
20    Q.   The report says, at Paragraph 5.6,
21  that there's other postulated failure
22  mechanisms by other investigators, to
23  paraphrase, they appear to be significantly
24  flawed.  Do you see that?
25    A.   Yes.

188

1    Q.   Did the mechanisms postulated by the
2  other investigators play any role in the IHNC
3  floodwall breaches?
4    A.   Mechanisms.  I'm having a hard time
5  answering that.  If I don't believe -- I guess
6  no.
7    Q.   When you started this project did you
8  understand that you'd have to do a separate
9  analysis for the north breach and for the south
10  breach?
11    A.   Yes.
12    Q.   And as you went through this project,
13  did you a separate analysis for the north
14  breach and the south breach, right?
15    A.   Yes.
16    Q.   The north breach and the south breach
17  are separate events, right?
18    A.   Yes.
19    Q.   And at the north breach you had a
20  ripped sheet pile at one end of the breach,
21  right?
22    A.   Yes.
23    Q.   Didn't have that sheet pile rip at the
24  south breach, right?
25    A.   No.

189

1    Q.   At the north breach you had the
2  testimony of the pump station operator
3  Villavaso which is particularly germane to what
4  happened up there, right?
5    A.   Yes.
6    Q.   And at the south breach you have other
7  witnesses such as Mr. Murph whose testimony is
8  particularly germane to what happened there,
9  right?
10    A.   Yes.
11    Q.   The north breach happened at a
12  different time from the south breach, right?
13    A.   Yes.
14    Q.   The north breach happened in your
15  report sometime around 4:30, let's say?
16    A.   Yes.
17    Q.   And the south breach happened, as
18  you've said today, sometime in the 7:00 to 7:30
19  time frame, right?
20    A.   Yes.
21    Q.   At the north breach there was a
22  different water level from the south breach,
23  right?
24    A.   Yes.
25    Q.   And in fact, the water level was lower

190

1  at the time of the north breach, right?
2      A.  Yes.
3      Q.  Higher at the time of the south
4  breach.
5      A.  Yes.
6      Q.  And so the barge ended up just inside
7  the south breach, right?
8      A.  Yes.
9      Q.  And so you've testified the barge
10 sheared the concrete cap and bent the rebar
11 that marked it passage into the neighborhood at
12 the south breach, right?
13     A.  Yes.  At the north branch, however,
14 the barge did not end up anywhere that would
15 provide visual evidence it had been there,
16 right?
17         MR. WIEDEMANN:
18             Object to the form of the
19         question.
20 EXAMINATION BY MR. RAFFMAN:
21     Q.  Can you answer?
22         MR. WIEDEMANN:
23             As what is visual evidence.
24     A.  I thought he was talking about ended
25 up in the neighborhood.

191

1  EXAMINATION BY MR. RAFFMAN:
2      Q.  You can't see anything about the north
3  breach that tells you, aha, the barge was here,
4  right?
5      A.  No.
6      Q.  Is that incorrect?
7      A.  No.  That's right.
8      Q.  Okay.  And your analysis of the north
9  breach included analysis of exceptional wave
10 action, right?
11     A.  Yes.
12     Q.  You didn't analyze exceptional wave
13 action like a 20-foot wave when you did the
14 south breach, right?
15     A.  No.
16     Q.  Is that incorrect?
17     A.  No.  I didn't.
18     Q.  You didn't.  Okay.
19         When you analyzed the south breach you
20 used IPET Appendix 17 based on wind, right?
21     A.  Yes.
22     Q.  So these are two separate analyses
23 that you did for each of these two separate
24 breaches, correct?
25     A.  Well, like I said, I mean, the wind

192

1  action -- I mean, sorry, the wave action also
2  applies to the south breach.  But the wind
3  action does not apply to the north.
4      Q.  Wind action is only south breach,
5  right?
6      A.  Yes.
7      Q.  Wave action applies in part to both
8  breaches.  Right?
9      A.  Yes.
10     Q.  But at the north breach we have
11 exceptional wave action that you've used there
12 and not used to the same degree at the south
13 breach, correct?
14     A.  Yes.
15     Q.  So if a judge or a jury analyzes these
16 two breaches, they're going to have to be
17 analyzed separately, correct?
18         MR. WIEDEMANN:
19             Object to the form of the
20         question.
21     A.  Yes.
22 EXAMINATION BY MR. RAFFMAN:
23     Q.  And earlier there was a discussion
24 about whether it was ludicrous to conclude one
25 thing or another, and maybe it will bring that

193

1  to mind.  It is possible that a judge or a jury
2  could find that the barge caused the south
3  breach but not the north breach, right?
4          MR. WIEDEMANN:
5              Object to the form of the
6          question.  A judge and jury can do
7          whatever they want.
8      A.  I guess -- I don't know.  I mean, I
9  guess.
10 EXAMINATION BY MR. RAFFMAN:
11     Q.  When you started this project it was
12 possible that you could find that the barge
13 caused the south breach but not the north
14 breach, right?
15         MR. WIEDEMANN:
16             Object to the form of the
17         question.
18     A.  Right.
19 EXAMINATION BY MR. RAFFMAN:
20     Q.  You didn't come to the project with
21 any preconceived ideas about what the barge
22 did, right?
23     A.  No.
24     Q.  And so when you started, as far as you
25 were aware you could conclude the barge caused

194

1   he north breach but not the south breach,
2   right?
3        MR. WIEDEMANN:
4            Object to the form of the
5        question.
6        A.   I guess so.
7   EXAMINATION BY MR. RAFFMAN:
8        Q.   And it could have been vice versa, you
9   might have concluded the barge caused the south
10  but not the north.
11       MR. WIEDEMANN:
12           Object to the form of the
13       question.
14       A.   You never know what a jury is going to
15  think, especially if you've got a low IQ jury.
16  EXAMINATION BY MR. RAFFMAN:
17       Q.   Well, they're independent events in
18  any case, right?
19       A.   I mean juries are -- it's a crapshoot
20  with juries sometimes.
21       Q.   But they -- but anybody who analyzes
22  this will analyze them as independent events,
23  the one doesn't follow the other.  Am I right?
24       MR. WIEDEMANN:
25           Object to the from of the

195

1        question.
2        A.   Right.
3   EXAMINATION BY MR. RAFFMAN:
4        Q.   IPET analyzed the north breach
5   separately from the south breach, didn't they?
6        MR. WIEDEMANN:
7            Objection to the form of the
8        question.
9        A.   Yes.
10       MR. RAFFMAN:
11           Let's take a break.  All right?
12           (Brief recess.)
13  EXAMINATION BY MR. RAFFMAN:
14       Q.   The documents that you reviewed are
15  those listed in Appendix A to your report;
16  correct?
17       A.   Yes.
18       Q.   Was there anything that you asked for
19  and did not receive in the way of documents to
20  review?
21       A.   Um -- that weren't available.  I mean,
22  the only thing I can think of is Villavaso 's,
23  um -- video.  I asked for that.  I didn't get
24  that.  Um -- other than that, I asked for other
25  things but, you know, we're going through a

196

1   bunch of CDs and stuff, like I said, trying to
2   find this other information.  Um -- so -- I
3   mean, I've asked for it but I don't think it
4   was available.
5        Q.   Let me ask you a question about
6   References 7 and 8 to your report.  Those are
7   two publications by a principal author named
8   Wuttrich.
9        A.   Uh-huh.
10       Q.   Is it possible you've got a
11  typographic error in your citations to these
12  two references?
13       A.   That is always possible.  Why do you
14  say that?
15       Q.   Um -- the reason is that both of them
16  are cited as being present in Performance of
17  Constructed Facilities, ASCE Volume 15 at Pages
18  17 to 23.
19       A.   It looks like there's something wrong
20  with that.  I can get you a correction on that.
21       Q.   Do you know which of these references
22  correct?
23       A.   No.  Not by just looking at it.
24       Q.   You did not inspect the barge;
25  correct?

197

1        A.   The only thing I looked at are the
2   photographs.
3        Q.   Did you inspect the floodwall?
4        A.   Just photographs.
5        Q.   Did you inspect the failed sheet pile?
6        A.   No.
7        Q.   If I remember right you have not
8   analyzed any soil samples on your own.
9   Correct?
10       A.   No.
11       Q.   That's incorrect?
12       A.   I have not.
13       Q.   You testified you've given ten to
14  fifteen depositions over the course of your
15  career, if I remember right.  Have you every
16  testified in Court?
17       A.   Yes.
18       Q.   In which cases have you given court
19  testimony?
20       A.   I've given -- would you consider,
21  um -- I forget what it's called, the Corps --
22  the Army Corps of Engineers Court.  Um -- Court
23  of Appeals?  Court of appeals I think it is.
24       Q.   Army Corps Appeal Board?
25       A.   Yes.

198

1    Q.   Okay.
2    A.   And, um -- a project in Minnesota.
3    Minneapolis.
4    Q.   That was -- the Minneapolis project
5    was the Army Corps Appeal Board?
6    A.   No.
7    Q.   Different one.
8    A.   Different one.
9    Q.   All right.  So was your Minneapolis
10   project a court appearance?
11   A.   Yes.
12   Q.   Which Court?
13   A.   Federal Court.
14   Q.   What was nature of the litigation?
15   A.   It had to do with, um -- the thawing
16   of frozen soils and damage to a grocery store.
17   Q.   Did you testify on behalf of one of
18   the parties to that case?
19   A.   Yes.
20   Q.   Which party?
21   A.   The owner.
22   Q.   The owner of the grocery store?
23   A.   Yes.
24   Q.   Was your testimony accepted by the
25   Court?

199

1    A.   Yes.
2    Q.   In what field were you qualified as an
3    expert by that Court?
4    A.   Same as what I'm doing here.
5    Q.   Has any Court ever excluded your
6    opinion as an expert?
7    A.   Not that I know of.
8    Q.   What was the name of the grocery store
9    owner?
10   A.   It was Cub Foods.  Super Value.  Super
11   Value owns Cub Foods.  You've heard of Super
12   Value, right?  I guess it's a local store.
13   Q.   I have no further questions.
14
15
16
17
18
19
20
21
22
23
24
25

200

WITNESS' CERTIFICATE

I, GENNARO G. MARINO, Ph.D., P.E.,
do hereby certify that the foregoing testimony
was given by me, and that the transcription of
said testimony, with corrections and/or
changes, if any, is true and correct as given
by me on the aforementioned date.

_____   _____
DATE SIGNED    GENNARO G. MARINO, Ph.D., P.E.

_____ Signed with corrections as noted.

_____ Signed with no corrections noted.

DATE TAKEN:  September 12th, 2008

201

REPORTER'S CERTIFICATE
I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
Certified Court Reporter in and for the State
of Louisiana, do hereby certify that the
aforementioned witness, after having been first
duly sworn by me to testify to the truth, did
testify as hereinabove set forth;
That said deposition was taken by me
in computer shorthand and thereafter
transcribed under my supervision, and is a true
and correct transcription to the best of my
ability and understanding.
I further certify that I am not of
counsel, nor related to counsel or the parties
hereto, and am in no way interested in the
result of said cause.

_____
JOSEPH A. FAIRBANKS, JR., CCR, RPR
CERTIFIED COURT REPORTER #75005

MARINO, PH.D., GENNARO

9/12/2008

Page 1

## A

**ability** 11:14 44:6 45:23 201:12
**able** 36:15 45:10 48:12 61:10 97:4 101:17,20 113:17 118:4 158:12,13 158:15 159:21,22 161:17,22
**abrupt** 77:7 78:21,24
**absence** 132:3,19 133:9,9
**absorb** 99:13
**abutment** 41:9
**accept** 8:16 16:19
**acceptable** 8:7
**accepted** 16:21 198:24
**accomplished** 18:25
**account** 176:3 177:11
**accounts** 57:20 59:25 60:3,5,9 64:14 161:5 183:24
**accurate** 186:13
**accurately** 11:15 18:11 19:5 168:5
**act** 99:2,17
**acting** 99:12
**action** 1:4 50:22 111:18 112:16,17 115:14 139:10,11,12,14 141:16 143:15,17,21,24 144:2 144:3 146:18,21 147:3 147:16 148:7,14,16,23 149:10,19,22 191:10,13 192:1,1,3,4,7,11
**activates** 151:10
**active** 42:9,25 44:1 45:5 45:24 46:13,14 50:6 186:11,13
**actual** 102:17 167:8
**actuality** 39:12
**addition** 139:10 149:8 172:17
**additional** 6:17 7:9,11 27:23,24 83:11,13 154:11 180:23 181:7
**adds** 50:5

**adjacent** 127:21,22
**adjustment** 115:8,9
**administering** 5:24
**adopted** 107:12,16 130:20
**aerial** 86:8
**affect** 59:6
**affirm** 168:1
**affirmatively** 101:25 135:16 177:16
**aforementioned** 5:4 200:8 201:5
**ago** 29:6 34:21 103:19 152:7
**agree** 131:18 171:18
**agreed** 5:2 164:8
**agreement** 164:22
**aha** 146:5 191:3
**ahead** 17:21 30:21
**aid** 144:9
**air** 113:11 123:11
**air-filled** 187:2
**alcohol** 11:13
**aligned** 94:20,21
**alignment** 86:12
**allow** 58:19
**allowance** 75:4
**allowed** 48:4
**America** 2:15 3:1 8:19
**amount** 28:13 30:25 51:11 109:25 157:16,18 177:5
**Amtrak** 44:23
**analyses** 18:22 23:15,18 27:14 34:9,10,15 35:14 35:20 38:4 47:8 100:4 180:9,13,16,20 181:2,7 184:10 185:15,18,23 191:22
**analysis** 21:14 27:9,24 27:25 34:2,3,4,18 35:5 35:12,25,25 36:1,8,9,11 38:7,9,18 39:10,11,12 84:24 94:8,10 96:10 97:6,13 100:16 101:1,7 109:4 113:20 114:4,8

114:22,25 115:4 116:10 116:12 118:18,23 119:5 121:25 125:10,16 126:9 126:12,18,25 128:1,4,6 128:12,13,16 134:17 143:4,5,9,12,13,15,17 144:4 149:9,12,21 150:14 154:7,14,17,20 155:14 156:1,16,20,21 156:24 157:3,5,9,22,24 159:6,15 160:2,9 163:5 167:5 169:19 170:4,6 171:1,3,18 173:16 174:10,16 175:16,20 176:3,13,16 184:17 185:3,5,7 187:16 188:9 188:13 191:8,9
**analyze** 191:12 194:22
**analyzed** 191:19 192:17 195:4 197:8
**analyzes** 192:15 194:21
**anchor** 46:21
**anchored** 40:1,11 99:2,6
**anchoring** 45:15
**and/or** 200:6
**angle** 89:2 92:2,3 94:18 135:15 136:14 137:5,10
**answer** 5:13 20:16 56:7 64:15 73:9,17,18 101:23 102:3 104:18 113:7 164:17 190:21
**answered** 148:19
**answering** 188:5
**answers** 136:12
**anybody** 9:13 14:24 72:9 194:21
**anymore** 50:4
**Anyplace** 89:25
**anytime** 112:6
**apart** 12:14 13:24 14:25 17:11 22:22 24:24 54:5 55:17 63:17 68:13 88:3 89:9,16 128:12 147:10 148:13 164:25 174:5 183:6 185:23
**apparent** 78:9

**apparently** 104:1 145:12 149:18
**Appeal** 197:24 198:5
**appeals** 197:23,23
**appear** 106:11 128:25 187:23
**appearance** 198:10
**APPEARANCES** 2:1
**appeared** 53:18
**appearing** 6:11
**appears** 92:10 93:7 106:9 143:19 146:17 182:23
**appendix** 33:14,18 52:1 113:22 115:15,19 116:12 117:5,8,11 119:9,13 128:13,16 191:20 195:15
**applies** 127:17,18 128:8 143:14 192:2,7
**apply** 128:4 171:22 192:3
**applying** 113:22 117:9
**approach** 113:21 116:9 117:8 178:10
**approximate** 59:16
**approximately** 71:10
**April** 15:7,8
**area** 15:23 16:1 24:6 27:23 43:6,18 47:19 59:5 87:6,7 99:24 100:8 120:19 121:3 122:6,10,11 137:3,11 178:2,21 179:1
**areas** 58:7
**armored** 161:13
**Army** 165:4 167:8 197:22,24 198:5
**arrived** 115:12
**Arthur** 33:1 54:17,20 55:2,8
**ASCE** 196:17
**Aside** 70:11
**asked** 11:7 16:12,14,17 75:16 161:19 168:10 195:18,23,24 196:3

MARINO, PH.D., GENNARO

9/12/2008

Page 2

**asking** 8:20 21:25 22:12
  22:15 27:10 38:15 43:9
  66:22 102:6 113:5
  146:2 158:5
**aspect** 6:12,14 7:23
  173:20
**aspects** 127:10
**assess** 156:22
**assigned** 165:9,24
**assignment** 16:19,21
**assist** 15:6 27:14
**associate** 89:15
**associated** 183:25
**Associates** 20:25 26:9
**assume** 25:14 52:5 107:3
  129:17 130:3 151:21
**assumed** 37:8 150:23
  151:5 152:14 163:21
  169:24 176:8
**assumes** 133:8 153:14
  171:1 176:17
**assuming** 151:19 170:4,5
**assumption** 153:10
  164:3
**assumptions** 151:13
  158:14
**attached** 12:8 68:25
  115:22 166:13
**attention** 51:8 55:21
  85:23 96:8,12 124:13
  137:23
**attitude** 123:17,19 124:3
**attribute** 72:6
**augment** 27:14
**August** 187:13
**author** 196:7
**authors** 25:12,15
**available** 31:1 51:13,20
  59:22 60:1 91:25
  135:13,17 180:24
  181:17 195:21 196:4
**Avenue** 2:18 178:22
  183:1
**aware** 19:15,20 24:4
  25:5,8 60:5 62:25
  105:18,23 147:21

193:25
**awful** 49:1
**a.m** 135:4,5,7 136:7
  182:24

---
**B**

**B** 4:6
**back** 10:22 14:20 26:2
  30:1 37:6,6,23 43:6,10
  46:22 55:22 75:12 77:2
  78:24 83:21 99:13
  101:15,21 103:4 104:6
  119:5 141:16,18 151:14
  158:17 159:7,16 160:8
  162:4 166:3 173:8
**backfill** 42:19
**background** 16:3
**backside** 42:21
**backup** 108:23
**bad** 74:13
**ballpark** 75:10 83:5
**barge** 2:2 8:20 27:22
  32:10 38:21 39:13
  52:21 53:18 54:2,16
  55:6,8,12,15,19 56:15
  56:19 60:11,13,18,21
  62:1,2,5,14,17,21,22
  63:1,13,19 71:8 72:7,10
  72:19,23 73:6,16 74:1,7
  74:19,25 75:3,6,11,14
  76:3,8,12 78:3,4,18
  79:3,9,14 82:9,11,14,18
  82:25 85:2 87:8,17,23
  89:1,3,12 90:1 91:3
  92:1,11,11,13,16,19,24
  93:6,11 94:11,16,19,23
  95:1,2,9,13 96:3,13
  97:25 98:14,17 100:17
  102:12,17,21 103:5,14
  103:16,20 105:10,15,19
  105:24 106:2,6,7,15
  107:23 108:21 109:11
  110:5,15 111:6,7,13,23
  112:7,11,13,19,22,23
  113:3,10 114:12,15,18
  115:12 116:9 119:22,23

119:24 120:6,13,19
  121:1,9,10,18,21 122:1
  122:15 123:8,17,20,23
  124:1,3,6,9,13 125:9,18
  125:20,23 127:1,8,12
  127:20,22,23,24 128:18
  129:8,24 130:2,4,21
  131:2,6,20,22,25 132:1
  132:3,10,13,16,19
  133:10 134:9,13,23
  135:8,14 136:2,19,23
  137:2,4,19 138:1,11
  139:5,9,13,23 140:5,6
  140:11,12 141:1,3,14
  141:20 142:3,5,10,18
  142:22,24 143:20
  144:21 145:1,10,11,15
  145:19,19,20 146:3,4,4
  146:13 147:8 148:6,7,9
  148:10,11,16,25 149:8
  149:17 150:15,16,21,23
  151:1,2,3,5,7,8,11
  152:2,23 153:11,15,20
  153:24,25 161:6 178:23
  179:6,13,17 180:3,7
  182:24 184:2,11,18
  185:8 186:3,7,15,16,20
  186:25 187:3,7,13
  190:6,9,14 191:3 193:2
  193:12,21,25 194:9
  196:24
**barges** 1:6 102:17,18,25
  103:8,22 132:24,25
  133:5
**Baronne** 2:5,11
**Bartlett** 131:14 145:18
**based** 18:24 19:17 21:24
  58:15 64:14,24 67:6,9
  68:12 91:24 102:16,23
  119:25 120:6 128:13
  129:1,4,13 131:18
  132:9 134:10 135:9,13
  136:5 145:17 151:8
  153:2 154:7,14 163:23
  163:24,25 164:4 169:20
  177:13 179:12 184:6

191:20
**bases** 70:12 172:21 184:5
**basically** 30:11 34:11,13
  34:15,17,24 37:9 38:19
  39:21 47:17,25 48:22
  53:15 78:20 79:21
  85:17 91:20,24 94:18
  95:1 97:13 100:2
  102:16 108:4 119:8
  120:10 150:14 152:17
  157:15 161:17 167:4
  181:16,21
**basis** 10:1 63:18 68:13
  71:12 97:9 102:15
  105:13 108:12,15,19
  109:6,8 134:5 142:9
  148:15 183:8
**beam** 65:15
**bearing** 41:16,23
**bears** 25:22
**beginning** 17:9,17
  124:17 148:24
**behalf** 198:17
**behave** 182:6
**behaves** 182:5
**behavior** 39:21
**believe** 53:5 54:3,17
  72:18,22 76:15 85:3
  116:3 117:6 134:7
  144:1 157:12 158:23
  162:8 188:5
**bending** 45:18 89:7
  140:1,2
**Benoit** 1:12
**bent** 13:5 90:25 91:9
  190:10
**best** 134:14 135:8 177:8
  201:11
**better** 92:17,22 98:1
**beyond** 13:10
**big** 48:5 180:7
**bigger** 45:12 136:24
**bill** 28:13
**bit** 17:19 26:16 55:22
  75:2 107:3 118:13
**black** 69:19

MARINO, PH.D., GENNARO

**blast-like** 92:6 137:15
**bleach** 95:18
**blew** 125:9
**blow** 112:25 125:9
**blowing** 116:8 125:16
148:2
**Board** 197:24 198:5
**body** 133:1
**book** 118:8
**boom** 54:11,11 60:10,13
60:19 61:3,12,15,18
92:7
**booms** 59:14 60:4,5,9,10
60:19 61:12,15,18
**boom-like** 53:16
**bore** 165:4
**boring** 20:22,25 163:25
166:2,4,7,18,20,22
**borings** 166:21 167:8
168:11,12
**bottom** 74:23 75:10 82:3
106:21 108:1 120:23
142:8 150:19 160:1
168:24 169:11
**Boundary** 116:17 117:11
118:1
**bout** 56:23
**Boutte** 1:8
**bouyant** 48:18,20 49:2
50:4
**bow** 139:3,16 141:5
**bowed** 140:8
**bow-shaped** 87:14
**branch** 190:13
**breach** 13:11 16:16 30:8
53:5 54:2 55:7,10,12,15
55:24,25 56:16,20,24
57:3,9,10,24,25 59:5
61:13,16 62:19,23 64:5
64:22 65:4 70:17,19
71:14,16,19 73:8,8,13
75:17,21 77:8,20 78:9
78:12 80:22 83:22 84:3
84:5,7,11 86:1,9,10,15
86:22,25 87:1,9,15,18
88:4,6,19,21,22 89:9

90:3,8,16 91:8,12 92:13
93:3,5,8,15 95:11,23
111:4 113:20 114:5,8,9
114:10,14,15,18 115:12
127:2,9,16 128:2,9
135:9 136:11 138:16
140:12,21 141:22 143:6
143:10,12,13,14,16,25
144:3,5,8,12,12,15,19
144:21 145:5,8 146:5
146:11 147:23 148:1,9
156:5,8,8,24 159:1
167:14 168:7,18,21,24
169:1,12,14 174:8,11
174:16,20 178:6,11
184:14 186:4,8,17,19
186:21 187:4,7 188:9
188:10,14,14,16,16,19
188:20,24 189:1,6,11
189:12,14,17,21,22
190:1,4,7,12 191:3,9,14
191:19 192:2,4,10,13
193:3,3,13,14 194:1,1
195:4,5
**breaches** 1:4 16:19 17:14
18:14 25:2 58:3 59:16
59:17 61:19 67:3,11
68:10 70:4,15 75:15,25
156:11,12 163:7 165:6
180:13 183:25 188:3
191:24 192:8,16
**break** 71:2 72:5,6,14
76:20 77:9 175:3,6
195:11
**breaking** 89:15,21
**Brian** 2:9,10 20:7 23:7
**bridge** 41:10 47:21 50:10
96:19 97:10,16,20,24
98:8,18 99:9 103:7
106:23 107:20 110:1,8
110:10 111:2,20,21,24
132:24 133:10 178:22
183:1
**Brief** 51:5 106:19 131:9
143:2 195:12
**bring** 192:25

**broach** 56:6 85:22 168:7
177:24
**broadside** 111:8 112:1
112:15,17 124:1,5
**broadsided** 125:12 137:8
**broadsiding** 110:25
111:3,4 125:22
**broke** 70:23 71:1,7 72:2
88:24 93:11 121:18
**broken** 88:3,13 94:1
187:14
**brought** 128:17 148:6
176:10
**browsed** 24:17
**build** 45:14
**built** 46:2
**bunch** 178:3,4 196:1
**buoyancy** 49:6,15
**burnt** 182:12

## C

**calculate** 185:1
**calculated** 39:13
**calculation** 119:14 123:7
127:7 133:16,25 149:25
150:8 151:5 152:10,13
161:15,21
**calculations** 18:7 20:22
33:21,24 34:5,8 36:7
38:8,12 100:7 130:10
152:6 161:11 185:9
**calibrate** 181:23
**calibrated** 181:20
**calibration** 118:18 119:2
119:4
**call** 8:8,12 16:4,11 99:8
157:5
**called** 69:14 116:17
120:8 131:7 197:21
**calling** 179:21
**canal** 1:4 25:3 41:20 47:5
47:10 49:22 50:1 54:12
66:5 67:19 77:21 91:4
94:24 99:25 100:9
116:8 126:5 147:7,12
162:22 164:12 172:6

187:12
**candor** 183:20
**cantilevered** 65:16
**cap** 190:10
**capability** 106:22 107:20
108:5
**capacity** 8:21 44:22 45:1
45:13 79:23 98:2 99:17
**career** 197:15
**carrying** 16:23
**cascade** 67:20
**cascaded** 67:23,25 68:3
**cascading** 67:2,11,14
68:9 70:3,14,21 71:13
147:7 161:10 162:8
**case** 6:7,13 8:3,24 9:23
12:6 19:17 24:3 40:16
40:22,23,25 41:13,22
42:16 44:10 46:6 48:3
59:4 63:3 98:9 124:13
125:11 128:5 129:1,4
194:18 198:18
**cases** 197:18
**casual** 23:1
**caught** 46:17
**causality** 7:4
**causation** 85:2
**cause** 55:25 62:17 63:10
63:11 102:13 103:20
105:15 110:3,8 111:8
128:19 136:1 140:3
145:1 158:17,21,25
159:7,16 162:9 164:19
171:14 177:23 186:8,17
187:4 201:16
**caused** 33:6 41:15 42:12
43:20 47:15,22 48:5,6,9
50:18,23 60:18 62:1,15
62:22,22 63:2,14,19
72:10,18,23 73:6,6,15
76:8 78:1,18 82:12,16
83:11,13 90:12 92:3
105:19 106:7 127:2,8
137:25 138:18 139:14
146:17 148:8,10,16
156:2,9,17 162:22

MARINO, PH.D., GENNARO

184:12 186:4,19,21
193:2,13,25 194:9
**causes** 25:1 112:23
113:16 119:23 186:14
186:14
**causeway** 103:6
**causing** 50:15 83:16
137:9 140:1
**CCR** 1:24 5:22 201:2,24
**CDa=0.52** 122:22
**CDs** 20:6,11 21:6 196:1
**center** 87:4,14,19,19
91:16
**centerpieces** 127:7
**Centre** 1:19 3:10
**cert** 21:23
**certain** 18:6 33:21 81:8
100:1 120:4,5,7 137:2
150:11 170:22 180:3
**certainly** 71:3
**certainty** 186:3,7 187:11
**CERTIFICATE** 200:1
201:1
**certification** 6:12 7:16
7:18,22 12:6 19:12,17
21:13 22:7
**Certified** 1:25 5:23
201:3,25
**certify** 200:4 201:4,13
**CH** 165:10,16,16,24
**Chaffe** 1:18 3:8
**Champaign** 6:2
**chance** 25:6,9 107:22
108:20 109:10,19
110:13
**change** 48:6 121:16
137:4
**changed** 36:18 122:20
**changes** 200:7
**channel** 84:23
**characteristic** 152:20
**characteristics** 38:21
78:20 84:17
**characterization** 166:25
167:13 174:25
**characterizes** 18:12

**charge** 28:14
**charts** 134:11
**check** 115:2
**choices** 169:20
**choosing** 134:5
**chose** 169:16 175:13
**circumstances** 35:9
**citations** 196:11
**cite** 109:12
**cited** 103:1 196:16
**civil** 1:4 5:6 15:25 16:2
**CivilTech** 68:19
**claimed** 75:13
**clarification** 6:20 11:4
**clarify** 72:1
**class** 7:16,17,22 12:6
19:12,16 21:12,23 22:7
**Classification** 165:10
**classified** 165:20
**classifying** 167:6
**clay** 37:8,10,11,13 158:3
165:7,12,17 167:7
169:2,4 173:6
**clayey** 164:2
**clear** 56:11 69:18 73:25
96:1 103:8 106:23
107:21 112:2 119:10
160:14 163:3
**clearly** 90:11 91:3
112:23 180:10
**clock** 77:12,13 134:25
**clockwise** 77:10,11,15,20
95:5
**close** 101:13 135:19
136:1 182:19
**closer** 177:4
**closest** 62:10
**close-up** 12:25
**Code** 5:6
**coefficient** 37:17,20
118:2,14 120:6 122:15
122:19,22 123:1 173:23
**coefficients** 113:23
116:14,24 117:2,4,6,9
117:13
**cofferdam** 47:16 48:9

49:25
**cofferdams** 47:9,13,20
47:22
**cognizant** 7:7
**coincident** 62:11
**coincidentally** 53:21
**collapse** 43:22 53:12
**collapsed** 53:19 81:12
**colleague** 96:25
**colleagues** 155:16
**collected** 20:5,25 21:7
**collecting** 18:20 23:10
27:7
**collection** 20:4 22:22
34:12 101:22 103:24
158:10 181:8
**colliding** 132:24
**collision** 61:4,7 63:1
92:17,22 93:21 94:20
97:21 107:23,24 108:21
109:10,20,23 110:7,9
110:17,20 132:20
133:10,11 142:16,17,21
184:1
**collisions** 97:17 98:14,17
98:18
**combined** 50:22 139:11
139:12,14 186:17
**come** 12:10 15:11 34:17
37:23 47:24 51:2 82:12
94:5 101:15 153:20
178:13 193:20
**comes** 8:14 9:5 141:16
180:24 183:8
**coming** 45:24 59:15
139:23,24 173:8,9,12
181:10
**commonly** 47:20
**company** 15:20
**comparable** 129:8,24
**compared** 93:4 108:8
110:1 144:20
**compares** 39:12
**comparison** 108:11
**compatible** 48:1
**complete** 27:4 52:4,6

161:17 181:2
**completely** 41:6 81:21
82:4,7,13 83:2 95:14
138:24
**completing** 81:17
**complex** 44:4
**complies** 86:20,23
126:13
**component** 136:8
**compressibility** 99:16,20
99:24 100:8,10
**compressible** 98:21,22
98:25
**compression** 63:8
**computer** 201:9
**computers** 182:12,12
**concentrated** 79:1,2
85:12,15,18 92:4
136:15,18 137:11,12
**concerns** 47:15
**conclude** 56:15,19 58:19
63:18 65:2 67:10 73:5
73:15,19,22 78:18
91:19 187:10 192:24
193:25
**concluded** 31:17 37:3,20
68:4 70:25 74:7,19
156:9 163:11,20 173:22
186:2,6 194:9
**concluding** 127:8
**conclusion** 32:4 37:12
63:13 64:12 65:7,25
68:12,14 70:2,20 71:12
84:21 109:9 128:18
147:3 148:15 158:17
161:2 163:6,23 172:21
177:22,25 178:6,20
183:9,23 184:6,9,14
187:17
**conclusions** 19:18 21:24
52:21 55:24 56:5,23
57:2,8,9,14,16,19 84:13
85:2,7 100:5 144:11,13
146:10 155:17 174:11
176:5 178:17
**concrete** 80:5,8,10,15

MARINO, PH.D., GENNARO

9/12/2008

Page 5

86:2 88:3,5,13,15,23
89:4,8,10,15,18,21 90:2
92:5,10 93:2,19,23,25
94:4,13,16 137:14,20
137:25 138:7,7,12,17
139:15 140:2,7,23
141:4 161:13 190:10
**concurrent** 18:20 27:5,6
**condense** 177:3
**condition** 48:19,19,20,21
49:3 50:4 79:1 147:20
153:14 170:21 171:4,6
171:10 187:6
**conditions** 58:24,25
84:16 113:2,9 158:8
159:23 171:22 172:7
176:18
**conducted** 154:17
**cone** 164:5
**configuration** 135:21
136:25 180:4,8
**confirm** 164:21
**confirmed** 160:2,9
**conflict** 33:2
**conflicting** 31:10,23,24
**confused** 80:2
**connected** 63:7 80:10
**connection** 7:3 12:5 14:6
19:11 21:23 38:5 62:4
80:20 146:10 147:25
**CONOR** 3:20
**consequently** 18:23
**consider** 46:8,11,12
147:25 161:8 197:20
**considerations** 96:18
**considered** 46:14,15
51:22 65:18 124:1,5
151:1
**considering** 30:16
150:25 152:11,19
**consist** 167:9
**consistency** 57:20
**consistent** 31:12 57:13
57:15 58:23 63:16 68:6
92:7 93:1 171:15 184:1
**Consolazio** 104:12

**Consolidated** 1:6
**constant** 120:12,12
170:11,19,20
**constructed** 47:10,14
196:17
**construction** 13:10 48:11
77:7 79:16,16,18,20,24
80:3,4,13,15 81:9 85:13
85:19 144:24
**consultant** 26:11 118:9
131:14
**Consultants** 24:19
**contact** 16:5 106:16
**context** 64:13 77:19
110:6
**continued** 19:8
**continuously** 67:2,14,24
68:9 70:3,14,20 71:13
162:7
**contractor** 48:7 50:12
**contributed** 26:17
**contribution** 177:1
**converge** 101:4 159:25
160:12
**conversation** 32:14
54:24 55:5 56:4
**conversations** 23:1
**convex** 86:11
**copesetic** 101:17
**copy** 12:4 53:3 115:4
118:1
**corner** 135:23 136:1,19
136:23
**corollary** 27:13,17 28:2
**Corps** 23:21 165:5 167:8
171:15 197:21,22,24
198:5
**correct** 13:11 18:17 19:6
19:19 22:6 25:20 29:2
33:4 35:12 37:17 42:23
56:16 58:17 64:8 78:9
78:12 102:8,10 103:11
109:12 119:15 126:6
133:14 134:17 163:14
169:17 171:12,13
173:19,20 174:13,14

191:24 192:13,17
195:16 196:22,25 197:9
200:7 201:11
**correction** 196:20
**corrections** 200:6,13,15
**correctly** 91:21 93:14
173:21
**correlate** 98:18
**correlated** 133:13
**correlation** 132:8
**correspondence** 15:19
**corresponds** 87:13
**Cosco** 9:19
**counsel** 5:3 8:5 74:17
201:14,14
**counterclockwise** 77:17
92:15 140:13
**couple** 13:18 118:15,16
159:21,23
**course** 17:13 18:12 31:10
177:17 197:14
**court** 1:1,25 5:23 7:9,21
9:17 10:7,25 11:25
12:3 68:16 115:17
197:16,18,22,22,23
198:10,12,13,25 199:3
199:5 201:3,25
**cousin** 104:14
**cover** 91:24
**covered** 30:17
**covers** 182:21
**crapshoot** 194:19
**create** 29:8
**created** 48:17 95:23
**creates** 49:6 120:14
**credence** 54:15
**credit** 32:20,25
**credited** 32:21
**Creek** 41:1
**criteria** 102:22
**critical** 85:4 161:20
180:11 181:3,4
**criticism** 155:21 174:10
175:14
**criticisms** 155:16,25
**cruised** 24:7,10

**crushing** 130:22 131:2
131:19,22 132:15,19
133:9 145:10,13,14,19
146:12
**Cub** 199:10,11
**current** 160:16
**currently** 147:14 162:1
**cussed** 143:21

---

**D**

**D** 2:4 4:1,6 171:25
**damage** 72:18,22 73:5,15
73:23 93:9 102:20,21
127:4 131:2,23 132:1,3
132:16,19 133:1,9
145:11,19 146:13
183:25 198:16
**damaged** 144:20
**data** 18:21 20:4,5,23,25
22:23 23:11 27:7 34:12
91:25 101:22 132:23
134:10 135:4,13,17
152:22 158:9 175:8
181:7,17 184:10
**date** 18:2,25 19:6,8
106:3 180:10,21 200:8
200:11,25
**dated** 144:5
**days** 34:21
**dead** 48:19,20 50:5
**dealing** 84:6
**dealt** 43:15
**debond** 140:3
**debris** 179:1,2 180:5
**decent** 175:18
**decide** 27:19
**decided** 101:21
**decision** 22:17
**deep** 139:20 168:17,20
**defendants** 8:19 24:21
27:18
**deficient** 157:9
**definitely** 72:8
**definition** 93:25 116:7
**deflect** 66:5 100:16,20
**deflected** 65:15,17 66:3

MARINO, PH.D., GENNARO

9/12/2008

Page 6

**deflection** 101:2
**deformation** 85:12,16
**deformations** 85:18
**degree** 67:20 127:4 138:5
  186:3,7 187:10 192:12
**degrees** 81:18
**deliver** 136:15
**delivered** 136:19
**DELORIMIER** 3:24
**density** 123:11
**dent** 146:4
**DEPARTMENT** 3:2
**depend** 59:10
**depending** 13:2
**depends** 35:9 93:24
  99:14
**depict** 81:16
**depicts** 84:10 90:7
**deponent** 5:10
**deponents** 58:12
**deposit** 43:17
**deposition** 1:17 5:4,14
  6:8 7:17 9:22 10:4
  11:21 14:2,19 15:3
  25:18 29:16 31:22
  32:11,12,15,16,22 33:3
  33:7 51:2 53:4,10 55:2
  55:6 201:8
**depositions** 9:1 10:2 14:9
  17:23 18:4 29:2,4,9,14
  30:3,10,12,14 51:25
  52:3,20,24,25 58:16
  60:1 64:7,11,24 67:7,9
  197:14
**deposits** 43:16,23
**DEPO-VUE** 3:24
**deprived** 45:1
**depth** 46:24 81:8 83:17
  130:22 131:3,22 132:15
  132:19 142:13 145:10
  145:13,15,19 146:13
  150:21 151:18,24
  152:23 153:17,22,23,24
  176:19
**depths** 131:20
**DEREK** 3:9

**derive** 133:24 153:15
**derived** 39:14 157:22
**derives** 45:22
**describe** 23:18 33:24
  34:19,22 36:11 38:16
  53:9 61:10 79:3,19
  80:9,19,23 81:21 82:10
  84:15,18,18 85:18
  94:23 118:18 119:5,17
  140:17 150:6
**described** 23:9 25:19
  43:13,24 44:11 53:14
  54:10 80:4 147:17
  161:21 173:12 175:21
  185:9,15
**describes** 19:6 167:9
  168:5
**describing** 49:10 154:15
**description** 53:11 61:9
  62:7 83:7 85:11 88:9
  143:19 146:16,20,22
  147:11,21 148:14,23
**descriptions** 163:24
**design** 20:21 45:20 48:1
  96:18,19 98:1,8
**designation** 165:16
**designed** 106:23 107:21
  108:8 110:10
**designing** 97:15
**designs** 185:1
**detail** 24:8 118:19
**detailed** 14:22 28:7
**deteriorating** 42:19
**determine** 7:4 34:25
  65:11 99:20 119:25
  120:16
**determined** 99:23 151:8
  174:20
**determines** 150:15
**determining** 109:7
**develop** 119:23 162:4
  172:16
**developed** 102:23 155:21
  162:6,14
**dewater** 49:19
**dewatering** 48:15,16

49:20,21,25
**diagram** 87:25
**difference** 130:10
**differences** 97:19
**different** 36:17 37:17,19
  46:23 57:11,23 61:8
  69:3 141:23 144:13
  150:12,13 169:20
  189:12,22 198:7,8
**differently** 145:7
**difficulty** 14:12 160:12
**dimension** 150:21 152:3
  152:24 153:20
**dimensions** 151:9
**direct** 51:7
**direction** 13:5 54:12
  59:16 94:21,22 95:4,5,9
  101:12,13 114:13,16,19
  114:19 122:7,11 125:4
  125:8,15,17,19,21
  126:8,14 135:19 136:4
  136:6 148:2
**directly** 100:24 125:16
  155:11
**disagree** 157:24 166:24
**disagreement** 164:3
**discount** 33:6
**discuss** 98:14,17
**discussed** 34:4,6 36:1
  38:10 85:21
**discusses** 76:24 163:6
**discussing** 96:14
**discussion** 192:23
**disintegrated** 92:10
**displaced** 81:19 82:5
  90:4
**displacement** 85:25 87:5
  87:20,25 91:17 93:18
  95:19 152:19
**displaces** 141:6,7,8
**disputed** 164:23
**disregard** 33:7
**disregarded** 31:18,24
**distance** 65:24 66:16
  150:22 152:8,24
**distinction** 111:6

**distinctive** 146:3,3
**distinguish** 179:14
**distinguishes** 106:14
**distribution** 92:18,22
**DISTRICT** 1:1,2
**dock** 121:19
**doctor** 24:13
**document** 12:1 117:15
  122:20 165:22 166:1,10
  166:17
**documents** 157:15
  195:14,19
**doing** 19:1 20:14,15
  27:21 48:22 49:24
  101:16 121:25 159:18
  162:2 169:6 199:4
**double** 80:17
**Dr** 8:11 24:15 26:4,5,13
  38:11 96:24 100:23
  104:1 107:1 115:1
  150:3 154:18
**draft** 120:21 153:24
**drafted** 107:6
**drafts** 121:1,1
**drag** 113:22 116:14,23
  117:2,3,6,9,12 118:2,14
  119:21,22 120:6 122:15
  122:19,22 123:1
**dramatic** 133:23 139:3
**draw** 62:4 86:16,21
  126:7
**drawdown** 48:10
**drawing** 100:4
**drawings** 20:21
**drawn** 65:7 66:1 86:24
  178:18
**drew** 32:3 37:12 146:10
**drill** 27:19
**drilled** 165:4
**driller's** 9:21
**drilling** 9:18 27:21
**drive** 3:4 6:2 20:7
**driven** 139:19
**drives** 20:12 21:6
**driving** 35:1,3 43:3
  112:13

MARINO, PH.D., GENNARO

9/12/2008

**drove** 37:16
**drugs** 11:13
**due** 6:14 18:19 19:13
  22:8 181:9
**duly** 6:4 201:6
**duplicate** 36:15 100:4
  158:13 159:18,22
  161:22 180:4
**duplicated** 167:4
**duplicating** 36:14
**duplication** 34:16
**duration** 92:7 99:15
  120:1 137:16
**DUVAL** 1:9
**DVD** 21:6
**DVDs** 20:6
**D.C** 2:19

**E**

**E** 4:1,1,6,6
**earlier** 11:7 36:1 54:22
  68:22 89:17 103:18
  110:15 115:19 134:15
  137:17 138:3 140:20
  144:2 160:24 183:7
  185:11 192:23
**earth** 46:3 173:7
**earthquake** 63:10
**earwitness** 18:4
**easily** 102:13 103:20
  105:15
**east** 125:16 164:13
  187:12
**eastern** 1:2 25:2
**eastward** 81:19
**east-west** 125:18,21
**easy** 48:25
**effect** 36:17,19 83:17
  89:21 133:19 149:8
  156:20,22
**effectively** 49:18
**effects** 83:10 157:14
  176:21,23
**efforts** 28:6,6
**eight** 105:9
**either** 67:12 99:9 128:5

168:1 186:21
**element** 182:18 185:5
**elevation** 160:18 161:2
  168:19 174:23
**eliminate** 164:19
**embankment** 43:16
  44:23 48:4
**embedded** 81:3,6,10,12
  138:23
**embedment** 46:24 83:17
**emerged** 59:21
**emphasis** 39:18
**empirical** 102:22 132:8
  182:19
**empirically** 132:6
**employee** 26:8
**employees** 179:6
**empty** 62:2,6 121:18,21
  130:4
**enclosed** 47:19
**ended** 190:6,24
**ends** 177:1,4,11
**endure** 132:25
**end-to-end** 135:24
**end-to-wall** 135:24
**energy** 1:19 3:10 112:24
  113:16,18
**engineer** 16:1 20:15 23:4
  39:16,20 65:14 182:9
**engineering** 16:2 18:6
  20:24 24:18 26:8 33:21
  34:5,7 36:6 38:8 59:1
  63:12 68:19 131:14
  186:3,7 187:11
**engineering-wise** 63:5
**engineers** 11:23 165:5
  167:9 171:16 197:22
**ensued** 66:11
**enter** 85:1
**enters** 85:7
**entire** 26:18 139:16
  162:13 172:18
**entitled** 96:9,12
**equate** 60:10 61:6 97:10
  133:11 163:16 164:14
**equilibrium** 34:1,7,9,10

34:15,18 35:11,14,19
  36:8 156:19 157:19
  158:12 170:9 182:20
  185:5,7
**equivalent** 130:5
**erosion** 84:22 162:10
**error** 35:4 196:11
**especially** 194:15
**ESQ** 3:16,17,18,19,20,21
**ESQUIRE** 2:4,10,17 3:3
  3:9
**essentially** 36:14 142:24
**estimate** 134:14
**evaluate** 16:15,17 30:9
  100:15 149:9,21
**evaluated** 29:1
**evaluating** 17:13 18:13
**evaluation** 18:1 28:20
  47:25
**event** 82:12
**events** 183:24 188:17
  194:17,22
**eventually** 139:21
  170:19
**evidence** 5:15 30:15
  51:19 73:13 147:11,13
  160:16 190:15,23
**evident** 93:9
**evidentiary** 184:10
**exacerbated** 139:22
**exact** 83:4 161:18
**exactly** 21:1 168:15
**EXAMINATION** 4:3
  8:4 12:13 18:8 22:21
  51:6 52:16 59:12 64:2
  69:7 70:8 71:24 74:18
  76:9,16,21 106:20
  116:1 131:10 143:3
  145:25 148:21 149:6
  166:15 168:16 179:24
  190:20 191:1 192:22
  193:10,19 194:7,16
  195:3,13
**examined** 6:4
**example** 31:16,19 47:3
  48:23 50:9,10 51:1

103:3
**exceptional** 143:21,24
  146:18,21 147:3,15
  191:9,12 192:11
**excessive** 140:1
**exclude** 56:10
**excluded** 199:5
**excuse** 142:9
**exert** 155:11
**exerted** 43:9 46:22
**exerting** 39:4
**exhausted** 183:22 184:5
**Exhibit** 4:8,9,10,11,12
  12:1,3,4,7 18:10 25:18
  68:17,24 69:9 115:16
  115:17,21 126:3 166:10
  166:12,17 167:1
**exist** 31:2 51:13 59:22
  84:16 172:8
**existed** 162:17
**existence** 93:1
**exists** 135:4 160:16
**exited** 93:7 141:24
**exits** 141:17
**expect** 19:11 59:2 89:23
  90:1 126:23 132:15
**expected** 137:20
**experience** 14:13,14
  40:20 182:3
**expert** 8:21 22:7 24:2
  65:7 68:8,20 180:21
  199:3,6
**expertise** 15:24 16:2
**experts** 24:10,21
**explain** 136:21 137:1
  176:7,15 177:7
**explained** 109:24
**explains** 140:7
**explanation** 63:12 174:7
  175:2,5
**explosion** 61:3,7
**explosive** 89:16,20,25
  93:17
**exposed** 120:20 121:4,9
**extent** 57:6
**extra** 45:19 177:12

MARINO, PH.D., GENNARO

9/12/2008

Page 8

**extremely** 163:8
**eyewitness** 29:2 30:25
  31:16 51:12,16,18,24
  55:18 57:7,20 59:21
  60:9 64:14 75:17,20
**eyewitnesses** 31:5,8,11
  53:24 54:1,6 64:3
  68:13 70:12 75:13

**F**
**Facilities** 196:17
**fact** 37:13 58:20 63:14
  65:3 66:4 67:10,22
  96:17 133:18 137:16
  146:9 165:11,17 175:14
  189:25
**factor** 35:6,12 156:23
  157:3,11,12,23 173:23
  175:18,19 176:11
  177:20 184:12,17,19,20
  184:25 185:2
**factors** 31:14 71:23
  150:20 163:12
**fail** 40:13 41:6 42:17
  86:10 110:8 113:3
  128:19
**failed** 41:3,14 58:12 76:2
  76:12 86:15,22 95:18
  110:21 138:13 157:15
  162:11,14 177:10
  187:13 197:5
**failing** 106:6
**failure** 16:15,18 17:13
  18:13 26:25 27:4 31:15
  34:25 40:14,17,21
  41:15,17,23 42:8,12,18
  42:23 43:12,14 44:7
  45:10 52:22 58:8,21
  64:5,22 65:9 66:11,11
  68:2 70:22 76:8 77:7,9
  78:19,21,21 83:11,13
  84:17,25 85:4 91:16
  92:12 96:9 102:14
  103:20 105:15,19 110:3
  111:8 138:22 140:11
  155:13 156:2,18 157:13

158:18,25 159:7,17
  160:17,20,22 162:18,21
  163:5 164:19 174:16
  176:9,13,14,23 177:2,5
  177:12,14,18,23 180:12
  184:13 187:21
**failures** 18:3 67:22 78:22
  78:24 106:7 176:18,21
  178:4
**fair** 112:4 155:14
**FAIRBANKS** 1:24 5:22
  201:2,24
**fairly** 83:8 138:12
**fall** 67:15 89:9 112:8,11
**familiar** 10:3
**family** 1:13 10:21
**far** 9:25 15:25 35:23 57:4
  60:2 66:17 100:16
  193:24
**fat** 37:10 165:7,11,16
**feature** 91:7,11
**features** 43:22 84:19
**Federal** 198:13
**feet** 70:23 71:1 72:2 74:1
  74:8,20,23,24 75:5,9,9
  90:21 91:15 93:10
  94:13 121:2,6,7,14,15
  122:2,2,14 138:25
  139:1,3,19 162:23
**felt** 62:11 92:8
**fetch** 126:18
**field** 159:24 199:2
**fifteen** 9:6,6 10:1 58:12
  58:16,19 64:7,11,24
  67:6,9 197:14
**fifth** 44:17,19
**figure** 12:14,25 82:2,19
  116:6 119:10 125:25
  138:17 154:3,5
**file** 6:16 154:8
**files** 20:23
**final** 6:13,24 26:16
  115:25 126:23 181:5,9
**finally** 139:23
**find** 53:1 54:6 57:21 62:4
  78:24 104:7 105:13

108:15 116:23 117:2
  118:2,5,8,10,14 122:18
  124:9 128:6 166:7
  169:23 193:2,12 196:2
**finding** 126:21
**findings** 18:23 19:25
  25:1
**fine** 8:17 52:14 126:11
  169:25
**finish** 101:21 128:15
**finished** 21:17 34:12
**finite** 182:18 185:4
**firm** 20:24 22:24 114:2
**first** 6:4 9:5 16:4,4,7,11
  16:22,24 52:15 60:4
  86:10,15,22 87:8,10,23
  92:11 93:17 103:3
  104:12 124:22 127:21
  140:10 141:21 142:11
  146:5 178:20 201:5
**fit** 28:2 30:14
**five** 7:21 118:5
**fixed** 150:23 153:11,14
**flawed** 187:24
**flip** 77:2
**floated** 71:8
**floating** 179:1
**flood** 138:21 170:2
**floodwall** 18:3 40:13
  47:1 58:7,8,21 60:22
  62:10 63:19 75:15
  78:14,22 85:25 88:13
  88:24 92:2 93:2 98:1
  99:8 100:9,16 105:19
  108:10 110:2,4,13,16
  110:25 111:4 112:7,7
  112:11,13 133:12
  138:13 150:22 152:9,12
  160:18 161:3,13 163:9
  172:8 180:12 182:25
  183:25 184:2 188:3
  197:3
**floodwalls** 16:16,18
  17:14 18:14 40:3,10
  67:2 70:3,14 82:5
  92:10 97:11,20 105:24

107:21 108:20 109:9,19
**floor** 62:11
**Florida** 178:22 182:25
**flow** 139:22 152:16
**flowing** 162:12
**flows** 170:10
**flush** 89:14
**flying** 113:10
**focus** 25:4 34:11
**follow** 194:23
**followed** 116:11 119:8
**following** 118:20
**follows** 6:5
**Foods** 199:10,11
**foot** 142:6,6 151:20,22
  153:12
**footage** 20:19
**footnote** 78:8 79:4 142:8
  142:9
**force** 35:1,3,4 38:22 39:4
  42:25 43:4,9 79:1,1,2
  92:3,18,23 100:19
  102:22,22 112:12,18
  119:14,21,22,25 120:2
  125:13 127:12,25
  128:19 133:15,24
  137:11,12 143:20
  146:17 148:9,10 149:10
  149:22 150:16,18,19
  151:2,4,7 154:9,10,11
  154:12 155:1,2,5,7,9,10
  184:11 186:13
**forced** 48:13
**forces** 38:22 39:9 42:10
  50:6 102:12 105:14
  126:22 186:11,11
**foregoing** 200:4
**foreground** 81:23
**forget** 197:21
**forgive** 75:16
**forgot** 11:16
**form** 5:12 30:13 59:8
  63:24 70:6 74:10 76:5
  76:14 111:11 168:9
  179:20 182:19 190:18
  192:19 193:5,16 194:4

Johns Pendleton Court Reporters

800 562-1285

MARINO, PH.D., GENNARO

9/12/2008

Page 9

194:12 195:7
**formalities** 5:8
**formed** 176:4
**forming** 32:18,24
**forms** 183:8
**forth** 10:22 77:2 158:21
  159:3 178:17 201:7
**forward** 17:19 38:2
**found** 33:2,17 132:6
  161:19
**four** 105:8
**fourth** 47:3 105:4
**fraction** 172:19
**fracture** 13:9
**fragmentation** 86:2
**frame** 135:5,7 136:7
  160:23 189:19
**frequency** 150:11
**front** 75:3
**frozen** 198:16
**full** 92:16,18,23 132:23
  142:21
**fully** 183:5
**full-scale** 133:4
**function** 150:18,20
**fundamental** 46:19
**further** 161:9 199:13
  201:13
**future** 59:4

## G

**G** 1:17 6:1 200:3,11
**Gabion** 41:2
**gage** 69:2,6,16,17,18,22
**Galvez** 183:2
**Gamal** 26:4,5,13 38:11
  96:24 100:23 104:1
  107:1 115:1 150:3
  154:18
**gap** 176:4
**gas** 9:19
**gather** 181:18
**gauges** 69:3
**general** 10:5 21:10 25:15
  31:12 128:4 147:19
  164:16 167:16 182:22

**generalize** 49:12
**generated** 63:9 133:16
  143:20
**Gennaro** 1:17 6:1 8:9
  200:3,11
**gentleman** 104:24 105:2
**geologic** 167:16,16
**George** 103:6
**geotechnical** 39:16,20
  40:6,6,9 167:17
**Ger** 8:8,12
**germane** 52:21 55:24
  56:2,5,9 57:7,21 189:3
  189:8
**gestures** 10:13
**Gesturing** 77:12
**getting** 43:3 96:14 101:3
  101:14 125:22 159:25
  173:9
**Gilbert** 2:9,10 20:7 21:7
  23:7
**GILLEY** 3:24
**give** 9:22 19:16 31:16
  83:5 123:25 134:12
  142:11 166:21 167:20
  171:6,11 185:16,24
**given** 18:9 1 10:2 18:24
  58:24 100:3 101:2
  106:22 107:19 109:5,6
  109:17,21 119:9 121:11
  122:19 123:7,8,12,14
  124:8 125:6 134:12
  150:24 153:7,9 177:12
  184:22 197:13,18,20
  200:5,7
**gives** 34:25 35:2,2 98:10
  112:18 119:11 135:22
  154:8
**giving** 10:3 182:7
**glad** 37:25
**glancing** 112:25
**glean** 100:6
**gleaned** 31:11
**gleaning** 20:9
**global** 42:8
**go** 17:21 30:1,21 37:5,6

38:2 55:6,8,19 75:24
  76:17 83:6 101:21
  104:6 108:14 117:17
  118:7 119:5 121:6
  144:15 151:14 153:17
  154:5 181:18 183:20
**goes** 31:3 77:13
**going** 7:8 8:16 10:22
  11:25 12:11 17:19
  19:20 20:8 21:14 22:14
  48:18 51:7 54:16 63:7
  63:8 67:16 75:14 95:13
  95:14 108:4 112:7
  113:12 114:13,16,19
  120:10 121:25 127:15
  127:23,24 142:14 143:5
  147:20 162:9 167:23
  173:24 176:22,25 178:3
  178:4 183:5,22 192:16
  194:14 195:25
**good** 38:3 81:25 118:7
  134:22 167:21 174:3,4
**GOODWIN** 2:16
**gotten** 20:20 23:22
  128:22
**govern** 6:8
**gravel** 37:10,14 48:24
  81:25
**gray** 69:19
**great** 86:2 99:14 165:18
**greater** 35:3,7 42:25
  120:1 132:7,8 152:12
  178:2 184:24
**greatest** 35:1,2
**grocery** 198:16,22 199:8
**gross** 130:1,5,10,18
**grossly** 101:9
**ground** 43:20 47:1 54:13
  58:24,25 63:10 81:17
  81:22 82:4,7,13,17 83:2
  138:23,25 176:17
**group** 23:22 131:5
**guess** 39:6 53:22 57:18
  64:16 65:10 75:8 98:5
  105:1 167:23 188:5
  193:8,9 194:6 199:12

**gush** 53:20
**GUSTE** 3:18
**guy** 32:6
**guys** 8:11 40:7

## H

**H** 4:6 116:18
**half** 86:1 88:4,6,14,15,25
  144:22
**hand** 77:3
**handed** 68:16 115:16
  117:15 118:12 166:16
**handing** 12:2
**handle** 97:25
**hands** 10:20
**HANNA** 3:16
**happen** 82:8 116:22
  144:8
**happened** 42:6 60:17
  71:2 93:15,22 94:23
  95:6 96:3 105:25 135:1
  140:18 145:4 189:4,8
  189:11,14,17
**happens** 27:20 49:1
  142:18
**Harbor** 25:3 99:25 100:9
  116:7 126:5 187:11
**hard** 10:19 14:14 20:7,12
  21:6 24:16 137:1
  164:17 179:14,17 180:4
  188:4
**head** 10:13 135:16
**heads** 10:14
**head-on** 132:13,20
**hear** 59:11
**heard** 53:15 59:14 60:19
  60:21 92:8 173:21
  199:11
**hearing** 19:12,21
**HEATHER** 3:17
**heavier** 49:19
**heavy** 49:2
**Hector** 131:12 145:17
**height** 121:8,14 127:14
  127:15,18 150:14
  151:20,21,25 153:12

MARINO, PH.D., GENNARO

9/12/2008

Page 10

**heights** 38:20
**held** 176:1
**hell** 110:13
**Helmer** 15:14,15,18
**Helmer's** 15:23
**help** 37:25 38:1
**helpful** 37:24
**helps** 30:22
**hereinabove** 201:7
**hereto** 5:3 12:8 68:25
  115:22 166:13 201:15
**Herndon** 3:5
**high** 34:20 38:17 45:3,4
  74:5 78:4 101:8 119:18
  121:10 136:22 139:5,6
  139:8 141:20 150:7
  163:8,21 165:19
**higher** 45:9,14 71:3,7
  92:20,24 142:6 164:6
  176:12 185:16 190:3
**highly** 91:25 135:14
**histories** 63:4
**hit** 9:19 32:15 74:25 75:6
  79:14 82:14,25 87:8,24
  100:17 113:15 134:9,13
  136:2 141:21 142:12
  155:11
**hits** 63:6 112:7 137:4,5,5
**hitting** 32:10 60:18
  82:18 92:2,15 94:19
  111:2,3 112:19 113:11
  136:14,23 137:7
**hold** 43:10
**holding** 43:6
**holds** 173:13
**holes** 9:18 43:20,21
  165:4
**hollow** 59:15 61:2,6,21
  61:22 62:1,5
**homes** 62:9,15,18,23
  63:2,14,20
**hope** 177:7
**Hopefully** 38:1
**hoping** 160:5
**hopper** 178:23
**hotel** 14:20

**hour** 125:6 134:3
**hours** 28:10 118:15,16
  171:20 172:7,14,20
**house** 92:8
**hull** 130:21 131:6,8,11
**hundred** 28:16
**hundreds** 47:8
**Hurricane** 12:10 41:1
  66:8,19,23 78:23 92:9
  105:25
**hydraulic** 138:18
**hydrodynamic** 34:3 38:9
  38:18,24,25 39:3,11
**hydrodynamic/barge**
  39:8
**hydrograph** 68:15,21,22
  69:10,25 161:7
**hydrographs** 69:8 70:11
**hydrology** 24:11 68:20
**hydrostatic** 154:12,25
  155:9 177:21 184:24
  186:9

**I**

**idea** 97:12 98:10 118:7
  151:10 167:21
**ideas** 193:21
**identification** 12:8 68:25
  115:22 166:13
**identified** 113:23 116:14
  117:9
**identify** 26:12 159:21
**IHNC** 69:19,22 156:12
  178:22 188:2
**ILIT** 17:3,11 23:22
  24:24 25:16 28:22
  30:19,23 36:15,21 37:1
  37:3,21 40:4 51:10
  59:22 155:18,21 158:3
  159:9,13,19 160:2,9
  161:18,19 163:5,6,13
  163:19,20 164:3,23
  169:17 171:13,17
  172:22 173:16 174:7,11
  175:15 176:8,11 177:10
  177:22 178:6

**ILIT's** 161:23
**Illinois** 6:2 8:10
**imagine** 49:21 137:7
  141:23 170:11
**immediately** 131:1
**impact** 27:22 34:3 38:23
  52:21 60:11,14,22
  62:15,17,22 63:13,19
  78:3,5 79:1,2 82:9,10
  87:10,13,17 89:1,13,18
  89:20 90:1 92:3,12,18
  92:20,23,24 93:18
  96:13,17 97:21 98:2,12
  99:3,5,12,13,15 102:19
  103:5 105:11 106:14
  108:8,9,10 110:1,15,23
  111:7,7,9,17,19 112:24
  113:24 115:10 119:14
  119:25 120:1,2,16,16
  125:13 127:4,6,21,24
  127:25 128:1,3,12,18
  128:25 129:10 130:23
  132:4,7,14 133:1,9,15
  133:15,21 135:21,22,24
  135:24 136:15,18,24
  137:12,19,21 138:1,11
  139:5,8,23 140:5,6,11
  141:21 143:5,20 144:24
  145:1,11,21 146:3,4,11
  146:17 148:16 149:17
  152:12,14 161:5 180:10
  184:11,18 185:8,25
**impacted** 56:15,20 92:1
  134:24 135:15 144:22
  147:8 148:11
**impacting** 127:23 132:10
**impacts** 63:6 93:14 97:18
  105:24 106:15 110:14
  141:14 150:15
**impart** 120:5
**imparted** 102:12 105:14
  119:22 120:2
**important** 173:15
**impose** 148:9 150:16
**imposed** 149:9,22 151:7
  155:3

**impression** 135:23
**improvement** 47:11 50:2
**inch** 100:21
**incident** 105:20 143:19
  146:16
**incline** 136:4
**include** 7:11 126:17
  129:5 144:5 155:10
  156:20 157:13
**included** 18:1 19:14
  28:19 36:8 79:19
  180:14 191:9
**includes** 155:15
**including** 150:20
**inconsistencies** 33:6
**inconsistent** 31:18
  163:13
**incorporates** 185:4
**incorrect** 37:21 134:19
  191:6,16 197:11
**increase** 133:15,23
**increased** 45:18
**independent** 35:20 100:5
  159:8 173:22 194:17,22
**independently** 117:18,20
  181:18
**indicate** 64:3 132:4
  164:6 180:10 184:10
**indicated** 160:17
**indicates** 78:25 127:11
  156:1,17 165:17
**indicating** 86:19 93:10
  95:16 130:23 165:11
**indication** 58:22
**individual** 131:13
**Industrial** 54:12 164:12
  172:6
**inexplicable** 175:12
**infer** 74:6 132:18
**inferr** 180:6
**infinite** 176:19,19
**Infinity** 24:18
**information** 16:25 17:1
  17:3 20:8,11 21:6 23:6
  30:25 31:23,24 51:12
  51:16,20 58:23 59:21

MARINO, PH.D., GENNARO

9/12/2008

Page 11

68:15 69:4,5,6 100:3,23
123:6 134:23 135:2,10
136:5 161:7 167:3,5
180:23 181:19 196:2
**ing** 93:6 129:16 143:20
178:23 180:6,11 184:11
**Ingram** 1:9,11 130:21
131:20
**initial** 32:2 83:22 84:3
135:20,22 176:14
**initially** 92:1 107:6
135:15
**initiated** 82:9,11
**Inner** 25:2 99:25 100:9
116:7 126:5 187:11
**input** 100:25 120:18
121:3 122:6,8 124:7
126:17 135:3 151:14,17
152:22
**inputs** 57:8 150:17 153:5
153:7,9 154:4 157:25
**inrush** 66:12
**inside** 80:9 190:6
**insofar** 164:22 171:17
**inspect** 78:14 131:5
196:24 197:3,5
**inspected** 131:8,11
**inspection** 130:21 131:15
**installed** 41:2
**installing** 50:19
**instance** 9:17 105:18
111:20
**instances** 60:7
**intact** 89:11
**integrity** 39:25
**intelligent** 119:18 136:22
150:7
**interacted** 123:24
**interaction** 39:9,23
**interested** 27:20 126:21
201:15
**interesting** 15:22 47:6
**interfere** 11:14
**interject** 11:8
**interlocked** 80:12,14
138:8

**interlocking** 138:6
**interrupt** 109:16
**interruption** 131:9
**interview** 32:2,20
**introduced** 8:10
**investigation** 6:18 7:5,11
18:1 25:16 27:1,4
28:19
**investigations** 35:16
**investigative** 18:2 28:20
**investigators** 34:14
100:11,12 187:22 188:2
**involved** 15:11 25:16
47:8 100:24 147:4
**involvement** 76:3,12
**Involving** 42:9
**inward** 50:16
**in-place** 164:24
**IPET** 17:4,11 24:24
28:22 30:23 40:4 51:10
59:23 60:8 113:22
115:7,15,18 117:8,11
122:23 123:2,5,9,12,15
123:21,23,23 124:8,10
124:24 125:25 128:13
128:16 133:22 134:12
155:17,21 156:1,9,16
156:23 157:15,23
158:12,16 159:8,11
164:2,7,22 165:1 166:4
166:24 167:12 171:17
171:18 174:16,20,25
175:16 176:5,8 177:10
178:10 191:20 195:4
**IPET's** 175:2,5
**IQ** 194:15
**irritational** 152:21
**Island** 103:6
**issue** 102:9 126:9
**issued** 21:8 22:25 24:2
**Italians** 10:19
**item** 183:23
**iteration** 101:7
**IV** 3:18
**I-10** 69:13,19
**I-35** 41:5

**J**

**J** 3:18,21
**Jerry** 8:9
**job** 10:12 182:11
**Johnson** 29:22
**joint** 13:10 77:7 79:15,16
79:17,18,20,21,24 80:5
80:13,15 81:9,14,14
85:13 144:24
**joints** 85:20
**joking** 10:23
**JOSEPH** 1:24 5:22
201:2,24
**JR** 1:24 5:22 201:2,24
**judge** 1:9 192:15 193:1,6
**June** 18:19 19:3,24 22:3
22:24 23:24 52:12,17
52:19 174:13
**juries** 194:19,20
**jury** 192:15 193:1,6
194:14,15

**K**

**karst** 43:15,17,18,23
**Katrina** 1:4 12:11 66:8
66:20,24 78:23 92:9
105:25
**KEELEY** 3:3
**keep** 22:15 101:15
106:24
**keeps** 47:18,18
**KELLS** 3:20
**kind** 24:7,17 26:14 32:16
35:5 75:9 87:21 90:2
97:13 99:7,11 108:10
110:23 111:24 162:10
167:15 169:4 177:3
184:22
**kinds** 14:9
**KITTO** 3:21
**knew** 163:2
**knocked** 74:1 89:4 95:7
**knocks** 141:1,3
**know** 8:9 9:14 10:21,21
14:10,12,13,23 15:18
15:25 19:1,23 20:14,16

20:17 24:12 25:5,10,12
27:19 28:12 29:5 30:2
31:9 35:8 40:4,23
42:13 45:17,19 54:10
62:2 64:1 65:6,13
66:15,17,22 73:2 75:11
77:12 79:6 85:20 98:20
100:1,12,19 101:1,14
107:2 109:13 110:19
111:12 115:23 116:22
118:5 119:10 120:11
121:5 126:19 129:21
131:16,17 134:11,25
138:2 147:13 152:25
153:16,22 154:4 158:4
161:6 162:15 172:14
178:2,25 180:20,21,23
181:6,8,15,16,21 182:2
182:10 183:15 186:10
193:8 194:14 195:25
196:21 199:7
**knowledge** 61:19 64:4,21
65:5,21 66:13 145:14
**K(2)** 1:7

**L**

**L** 3:3 5:1
**laboratory** 20:23 175:8
**lack** 164:18
**Lafarge** 1:8,10,12,14
2:15 3:1 8:19
**Lagarde** 1:10
**landslides** 176:25
**large** 147:5
**largely** 185:4
**Larry** 15:14
**lasts** 132:14
**launch** 113:14
**launched** 139:5,9,13
**law** 5:7 11:1
**LAWRENCE** 2:4
**lawsuit** 9:9,13 15:6,12
**layer** 36:18,21,24 37:8
37:12 116:18 117:11
118:1 158:3 165:9,23
168:23 169:5,10 172:24

MARINO, PH.D., GENNARO

9/12/2008

173:5,6,19 175:9
**layers** 163:8 166:25
    167:7,24
**laying** 106:10
**leads** 78:18
**lean** 43:10
**leaning** 64:4,21 65:3,8
    65:11,18,22,23 66:18
**led** 32:18
**left** 157:18
**LEGAL** 3:1
**length** 92:16,19,23
    139:16 140:8 141:10
    142:21 176:19
**lengths** 79:25
**lengthwise** 93:22
**lenses** 165:8
**let's** 44:10 76:17 90:14
    91:22 99:8 101:9,12
    111:21 113:19 115:16
    125:24,24 144:15 151:1
    161:8 170:16 189:15
    195:11
**levee** 40:17,21 69:2 78:6
    171:2,12 173:7,7,19,25
**level** 71:3 100:1 142:11
    155:7 162:21 170:18,22
    189:22,25
**levels** 174:22
**liability** 6:14
**library** 117:25 118:8
**lieu** 150:25
**lift** 48:25
**lifted** 95:3
**lightly** 124:13
**limestone** 43:19
**limit** 34:1,6,8,10,15,18
    35:11,14,19 156:19
    157:19 158:11 182:20
    185:5,7
**limited** 36:8 92:4
**line** 9:19 69:10,19,23
    86:17,21,24
**lines** 69:12
**link** 85:21
**liquefaction** 50:15

**list** 33:18 52:4,6,7,9,24
    53:25 54:1,6
**listed** 33:14 51:25 53:25
    133:6 195:15
**literally** 93:11 144:23
**litigation** 8:20 198:14
**little** 10:6 14:21 26:16
    37:24 75:1 86:17 90:13
    90:14,16 107:2,22
    108:20 109:9,19 142:7
    158:2 161:8 183:6
**live** 46:7
**load** 34:3 38:9,18,24
    39:3,3,11 46:20,21
    65:15,17 96:13 108:9
    108:10 110:2,10,11,12
    110:23 111:17,19
    125:13 177:21 185:16
**loaded** 124:14
**loads** 39:13,13 45:19
    46:7,15 48:4,11,13 98:2
    98:11 105:11 108:6,8
    184:21,23 185:25
**local** 199:12
**localized** 50:15
**located** 169:5,10
**location** 67:12 74:20
    75:6 80:14 89:13 91:5
    91:15 92:14 94:25
    106:17 145:21 148:8
    167:24
**locations** 165:8 166:22
    184:14
**lock** 60:22 69:14,14,22
    98:14,17 178:22
**locking** 108:5
**logs** 163:25 166:2,4,7,18
    166:20,22,23,23
**long** 82:24 124:25
    139:16 170:9 176:20,23
**longer** 50:3 132:14
**longitudinally** 81:18
**LONIAN** 3:17
**look** 13:19 17:1 25:7,9
    40:3 52:7 65:13 73:14
    78:22 81:23 82:1 97:12

101:10 104:5,11 108:9
    109:11,15 115:6 116:6
    117:1,14 120:22 125:25
    138:14,16,21 143:17
    153:25 158:6 165:22
    167:7,11 171:25 175:8
    176:13 180:24
**looked** 13:17 20:13 23:3
    24:17 29:13 31:17
    38:20 41:4 52:20 103:5
    121:1 125:11 129:19
    152:5 168:12 169:7
    197:1
**looking** 13:1 16:24 57:23
    69:12 77:22 97:14
    102:16 167:7,21 178:16
    196:23
**looks** 12:9,17 68:22
    101:11 196:19
**looped** 101:14
**loose** 50:13 178:21
    182:24
**loss** 42:7
**lost** 44:5 87:21
**lot** 9:18 20:8 41:6 106:12
    134:22 161:10
**Louisiana** 1:2,20 2:6,12
    3:12 5:6,24 17:4,12
    24:25 28:22 30:24
    51:10 59:23 201:4
**low** 173:23 175:11,13
    194:15
**lower** 13:5 35:6 75:2
    91:4 120:2 142:7,7
    144:22 158:3 164:6,7,8
    169:16 173:6 183:23
    189:25
**lowest** 157:12
**ludicrous** 72:9,17,21,24
    72:25 73:3,4,14,18,21
    192:24
**Lunch** 76:20
**L.L.P** 1:18 2:16 3:8

_____

**M**

**M** 4:1

**MAG** 1:11
**magnitude** 99:14 120:15
    130:14
**major** 73:13 87:10,12
**majority** 89:6
**making** 18:9 75:4
**Management** 6:7
**manager** 143:18 146:16
    147:2,10,17 148:14,22
**manager's** 146:22
**manmade** 39:22
**manner** 92:6 99:18
    115:12 137:15 148:17
**March** 6:15 7:10 15:9
    21:15 181:10,10,12
**March-April** 15:10
**Marino** 1:17 4:9,10,11
    4:12 6:1,11,23 8:5,6,11
    8:14 12:2,3,7 15:5
    20:24 26:8 51:7 56:11
    68:24 76:22 115:17,21
    166:12,17 167:12,25
    200:3,11
**mark** 2:17 3:16 8:18
    11:18,19 12:1 14:22
    17:23 19:20 27:5 30:20
    42:24 58:2 63:4 77:1,5
    86:14 106:24 115:16
    122:9 126:20 152:4
    166:10 171:24 174:3
**marked** 12:3,7 68:17,24
    115:17,21 166:12,17
    190:11
**marsh** 163:8,21 164:2
    165:6,9,11,23 167:24
    169:2,5,10 173:6
**mass** 119:24 120:13
    124:23,24,25
**material** 37:6,7 138:3
    163:25
**matter** 8:22 28:11 83:3
    137:4
**maximum** 85:25 87:4,19
    87:25 90:4 91:16 93:18
    95:18 172:18,19
**Maynard** 6:2

MARINO, PH.D., GENNARO

**McCall** 1:18 3:8
**MEA** 113:21 114:2,22
  118:24 126:12 155:16
  160:2,9
**mean** 9:10 14:6 18:16,18
  21:2 27:9 28:21 39:7
  42:4 43:2 45:12 46:5
  46:23 49:12 56:8,10
  63:4 65:10,11,12,18,23
  66:12 72:25 73:1 75:10
  77:11,20 81:13 83:6,19
  90:21 91:21 98:24
  101:5 103:24 105:9
  106:25 109:4,13,23
  110:9,25 113:10 115:8
  119:9 122:18 126:23
  127:17,20 130:13
  131:22 134:24 135:21
  138:15 139:21 140:19
  150:24 154:7 156:15
  159:9 161:7,17 164:24
  170:5 172:11 176:7
  177:25 179:16 180:2
  181:6 184:22,22,25
  186:9,10,12,13,14
  191:25 192:1 193:8
  194:19 195:21 196:3
**meaning** 164:11
**means** 48:6 110:7 150:25
  154:8 170:7 173:24
**meant** 41:24 132:20
  163:1,2 171:21
**measure** 130:6
**measured** 102:21 124:25
**measurements** 102:19
**mechanisms** 31:14
  187:22 188:1,4
**medications** 11:12
**medium** 165:7
**memo** 20:21
**memory** 169:6
**mention** 84:17 104:4
**mentioned** 53:2 70:1
  75:17,20 144:2 153:3
**mentioning** 138:2
**method** 34:24 157:19

**methodology** 115:6
  157:25 158:1
**methods** 48:6 182:9,18
  182:19,20,21
**metric** 124:25
**middle** 144:22
**miles** 125:6 134:3
**mind** 9:5 30:6 40:24
  179:7,8 181:9 183:8
  193:1
**Minneapolis** 198:3,4,9
**Minnesota** 198:2
**minor** 162:15,16,18
**minute** 26:2 81:24
  123:25
**minutes** 118:5
**missed** 183:18
**missing** 52:9 86:3 138:4
  138:5
**Missouri** 50:12
**misspoke** 173:11
**misunderstanding** 46:18
**mode** 170:8
**model** 101:4 159:24
  167:5 182:4
**modeled** 158:9
**modeling** 35:10 36:14
  37:11,13
**models** 181:19,23 182:1
  182:3,15
**modified** 26:15 107:2
**moment** 38:15 54:19
  103:18
**momentarily** 150:23
  153:11,14
**momentum** 97:14,15
  111:16 120:14,15,15
  137:2,3
**money** 28:13
**monolith** 79:7,22 80:10
  80:11,21,21,24,25,25
  81:3,5,10,12
**monoliths** 80:1,5,8,10,16
**months** 152:6
**mooring** 187:14
**morning** 60:17 137:17

**move** 17:19 47:22 50:16
  95:9 170:24
**moved** 32:17 41:10 47:14
  77:21 82:6 95:8,12
  138:25
**movement** 106:12 122:7
  122:11 139:1,3
**moves** 138:23
**moving** 102:12 103:20
  105:15 125:17 136:3
  151:1,3
**Mr.Villavaso** 30:2 54:5
**multiple** 54:11 162:23
**Mumford** 1:9
**Murph** 29:22 32:13 33:1
  54:17,20,22,24 55:2,5,8
  55:11,17 56:3,4,4,18
  57:1 75:21 189:7

---

## N

**N** 4:1,1,1,6 5:1 183:2,2
**name** 8:18 11:17,18
  24:13 32:7 55:18 199:8
**named** 6:3 32:6 196:7
**names** 8:13 24:9 29:15
  29:19 52:7 182:16
**narrate** 141:13 148:5
**narrative** 135:2
**narrow** 176:14
**narrowness** 177:13
**naturally** 8:15
**nature** 13:14 42:17
  43:13 111:8 198:14
**navigable** 96:20
**Navigational** 25:3 99:25
  100:9 116:8 126:5
  187:12
**near** 59:5 151:6 165:5
**nearby** 63:2,14
**necessarily** 176:20
**need** 10:12,16 31:4 45:15
  46:11,12 88:10 104:6
  104:11,15,21 105:13
  109:11 113:2,9 118:15
  123:7 158:8 181:1,19
  181:23 184:25 186:24

187:3,7
**needed** 41:7 46:8
**needs** 46:20
**negate** 168:1
**neighborhood** 58:8
  63:14 75:5 83:20 84:1
  94:11,24 95:8,16,22
  96:4 139:4,20 190:11
  190:25
**neither** 158:1
**net** 130:6,11
**never** 9:16 56:14,18
  160:6 171:11 182:2
  194:14
**New** 1:19 2:6,12,18 3:12
  41:20 44:13,20 47:4
  49:10 69:2 178:2,9
**newsletters** 15:20
**Ninth** 13:6 91:4 93:7
  145:15 183:24
**nods** 10:13 101:25
  135:16 177:16
**noise** 61:4 89:16
**normal** 122:7,11
**normally** 14:8 110:10
**north** 2:15 3:1 8:19 13:1
  16:16,18 17:14 18:14
  30:8 53:5 54:2 55:12
  55:24,25 56:15 57:2,9
  57:24 59:5,17 61:12
  62:18,20 64:4,21 65:3
  71:16 73:7,8 75:15,17
  77:8,8,22 78:9 81:5,19
  84:11 85:21 86:25 87:1
  91:8 92:12 95:8,10,12
  95:19 114:8,15,18
  115:12 127:16 128:9
  143:10,12,13,16,24
  144:4,8,12,15,19 145:4
  148:1 163:7 165:5
  167:14 168:6,18,24
  169:12 174:16,20 175:3
  175:6 177:23 178:6,10
  180:12 184:13 186:4,8
  186:17 188:9,13,16,19
  189:1,11,14,21 190:1

MARINO, PH.D., GENNARO

9/12/2008

Page 14

190:13 191:2,8 192:3
192:10 193:3,13 194:1
194:10 195:4
**northern** 84:7 86:1 88:4
88:14,25 89:9 92:12
93:4 140:11 141:4
**north-south** 94:22
125:15,19,20 135:20
136:1,8
**note** 104:4
**noted** 200:13,15
**notes** 11:22 13:14,15,16
13:21,24 14:1,3,17,25
15:1,2 30:12 179:9
**notice** 5:7 67:13
**noticeable** 65:23
**number** 9:5 14:15 18:3
20:6 29:2 35:12 47:7
75:10 79:5 82:20,22
84:10,10 85:11 86:13
86:14 87:11 88:2 92:9
94:25 101:10,15 103:4
103:5,11 130:8 149:13
149:14,16 153:4,6
162:5 179:10 182:17
**numbers** 34:17 38:14,16
158:15 180:22 182:8
**numerical** 36:13 101:6
156:21 182:1,3,9
**numerous** 47:9
**NW** 2:18
**n't** 173:24

**O**

**O** 4:1 5:1 165:20
**oath** 5:25 6:5 10:25
**object** 59:8 63:24 70:6
74:10 76:5,14 111:11
145:23 149:3 179:20
190:18 192:19 193:5,16
194:4,12,25
**objection** 21:11 148:19
168:9 195:7
**objections** 5:11
**objectively** 180:25
**obliteration** 90:2

**observation** 58:11 59:20
64:17
**observations** 58:6 66:13
66:14
**observe** 58:13 78:7
**observed** 58:12 59:4
61:1 67:1
**observes** 88:3
**obtained** 34:14 160:3,10
**obviously** 52:9 65:23
73:1 111:14 151:3
**occasion** 106:3
**occasionally** 99:2
**occur** 91:15 181:5
**occurred** 78:23 83:7,10
84:23 91:18 132:20
138:15
**occurring** 83:16,18
85:19 172:6
**occurs** 150:11
**offer** 40:9
**offhand** 25:14 29:23
116:25
**office** 117:23 149:24
154:20
**officiated** 5:24
**oh** 12:21 23:2 29:25
41:14 56:12 97:22
101:11 120:21 124:23
165:20,25
**okay** 8:1,14 10:6,16,24
12:18 13:8,13 17:21
19:23 23:9 26:22 28:9
29:20 30:23 31:20
38:19 43:1,18 48:23
49:2 50:5,7 51:4 52:19
57:15 58:4 65:10,15
67:14 69:25 71:21
74:24 77:14,23 81:2
84:9 90:20 91:23 99:1
99:10 101:9,11 102:4,7
103:5 104:18 107:11,11
108:4 109:21 111:3,21
113:19 114:7 116:4
119:8,20,21,23 120:9
124:23 126:16,17 137:1

137:6,6 141:14 144:18
152:2 157:20 159:12
160:13 161:8,18 169:7
170:17 172:1 174:18
176:16,17,19 180:2,21
182:18,23 191:8,18
198:1
**omitted** 67:17
**once** 96:3
**ones** 24:4,5 29:22 31:21
41:11 104:20 181:25
**ongoing** 6:18 7:5 21:13
**online** 16:25 17:2
**operator** 189:2
**opine** 97:4 106:8 127:1
**opined** 178:21
**opinion** 62:14 68:8 70:13
76:7,7,10 82:24 86:9
87:7 106:5 115:11
148:24 169:10 199:6
**opinions** 32:18,24 59:6
73:1 96:2
**opposite** 77:18
**orange** 69:23
**order** 10:7,11 40:13
46:19 47:10 50:1
112:11 118:12 153:15
**ordered** 7:10
**Orders** 6:7
**organic** 165:7,21
**organics** 165:17,19
**orientation** 135:25
**oriented** 125:14
**original** 5:9
**originally** 106:25
**Orleans** 1:20 2:6,12 3:12
41:21 44:14 47:4 49:10
69:2 178:2
**output** 35:11
**outside** 108:18,25
**out-of-plane** 89:7 140:2
**overall** 57:14 181:21
**overtopped** 162:22
**overtopping** 139:24
161:12
**owner** 198:21,22 199:9

**owns** 199:11

**P**

**P** 5:1
**page** 4:3,8 52:25 68:18
75:13 76:25 91:23
96:12 106:21,22 108:1
113:19 120:23 122:23
122:25 124:15,16
129:23 133:6 135:13
140:15 142:14 143:17
144:17 150:19,19
155:13 160:2 165:3
171:23,25 172:2 175:22
**Pages** 84:5 163:11
178:16 196:17
**pail** 48:23
**paisan** 104:17
**panel** 90:10,16
**panels** 92:6 137:14,25
**paper** 153:13
**papers** 25:10,13 149:11
154:19,22
**paragraph** 18:10 28:7,18
33:10,22 36:2 58:5
84:6 85:24 86:5 102:11
142:8,15,15 144:16
149:7 153:8,10 171:25
180:9 187:20
**paragraphs** 38:13 91:24
**parallel** 142:24
**paraphrase** 187:23
**parens** 160:3
**Parfait** 1:13
**parking** 9:18
**part** 5:14 13:4 35:24
45:22 62:8 71:7 72:12
72:14 73:13,22 74:2
75:3,10 81:13 86:15,16
86:22,25 87:1 92:13
93:3,4 94:7,17,17 96:14
100:15 113:25 137:16
140:11,25 141:5 158:4
166:4 173:15,15 176:4
192:7
**particular** 69:8,10 104:2

MARINO, PH.D., GENNARO

**particularly** 7:7 53:1 54:7,9 189:3,8
**parties** 5:3 198:18 201:14
**parts** 158:4 183:2
**party** 9:8 198:20
**pass** 86:14
**passage** 190:11
**passed** 82:25 91:3 94:11 94:12,13,24 95:3 147:8
**passive** 41:25 42:1,3,4,7 42:10 43:25 82:6 177:15
**Patrina** 29:21
**PAVLICK** 3:19
**Pedersen** 105:5
**pen** 86:14 126:7
**pending** 160:4,5,10
**penetrometer** 164:5
**people** 14:9 25:15 29:16 60:19 61:10 123:23
**percent** 47:13 154:11
**performance** 18:6 33:20 40:5 196:16
**performing** 18:21 23:14 27:8
**period** 120:7 150:21 151:15 152:23 153:17
**periodic** 149:10,22 150:10 152:17,18
**permeabilities** 164:7,9 167:21
**permeability** 36:18 37:9 37:17,20 163:8,21 164:1,4,6,14,18,23 169:16,20 170:1,23 171:4,10 173:23 175:11 175:11
**permeable** 36:21,25
**permeate** 172:24
**permeated** 171:2
**permitted** 5:5
**Perry** 1:11
**person** 16:8 59:11
**personally** 20:14 60:21 78:15 117:1,22 180:3

**PERTAINS** 1:6
**PETER** 3:3
**Peters** 29:21
**Pezos** 131:12 145:18
**phase** 12:6 34:13
**phone** 16:8,10,11 31:22 31:25 32:14 54:23
**photo** 12:9,19 72:15 73:5 73:7,10,14,23 74:3 77:23 78:8 79:5,11 81:6 82:19,22 84:9,10 85:11,25 86:8 88:2,9,10 88:11,12 91:17 94:25 95:19,23 137:25 139:16 141:2 162:5,24 163:1
**photograph** 12:15 72:23 84:12 106:1 137:24
**photographs** 17:22 76:18,24 77:2 84:15 90:6 131:16 197:2,4
**photos** 18:5 20:18 23:3,5 23:6 73:12 77:6 78:17 81:15,16,20 90:6,18
**phrase** 14:23
**physical** 38:21
**Ph.D** 1:18 6:1 200:3,11
**picture** 12:11 81:25
**pier** 50:11 97:24 98:8 99:9 108:6,7 110:1,3,8 110:10 111:2,21,21 132:10,10,14 133:10
**piers** 47:21 96:19 97:11 97:16,20 98:19 106:23 107:20 132:24
**pile** 47:1 50:13,15,20,22 77:24 78:1,7,11,25 79:10,13,19,25 80:9,14 80:20,23,24 81:1,3,6,10 81:11 82:12,16 83:1 94:2 138:8 140:4 144:23 145:2 168:17,20 168:24 169:11 173:3,13 188:20,23 197:5
**piling** 40:2 88:5,14,16,24 89:5
**pin** 92:15

**pink** 69:22
**pinned** 89:13 92:14 140:12
**place** 79:11,14,14 87:23 90:24 91:2 147:22
**places** 179:10
**plaintiff** 9:12
**plaintiffs** 6:22 8:24 15:6 68:20
**plaintiff's** 8:22
**plan** 27:3,16 28:3 35:23 36:3 101:25 181:11,14
**plausible** 62:4,7
**play** 161:20 180:11,18 181:3,4 182:7 188:2
**played** 85:4
**please** 23:19 79:20 104:18 128:6 166:11 176:7
**ply** 180:19
**point** 7:13 23:25 71:22 79:4 80:21 87:12,13,17 87:19,24 91:16 92:15 93:18 95:18 100:2 101:18,20,24 102:9 121:16,24 137:21 159:20 173:13 174:2 176:10 181:2
**pointed** 175:15
**pop** 140:3
**portion** 13:3 51:9 79:7 86:11 87:14 92:5 93:8 95:2 137:24
**portions** 33:1
**position** 6:21 7:1 150:24
**positive** 15:10 20:20
**possible** 193:1,12 196:10 196:13
**possibly** 27:21 92:19,24 105:4 142:7
**postulated** 187:21 188:1
**Post-it** 77:3
**potential** 38:22 96:13 105:10 125:12 126:22 127:3,12 152:16
**pour** 138:7

**poured** 83:20 84:1
**pouring** 83:23,24
**Poydras** 1:19 3:11
**preconceived** 193:21
**preexisting** 154:12,25 155:9
**Preliminary** 26:25
**preparation** 32:19
**prepare** 11:20 14:1,19 15:2
**prepared** 7:2,8 28:15 30:12 174:12
**presence** 145:20
**present** 3:15 49:5 160:19 168:23 184:9 196:16
**presented** 113:21 117:8
**pressing** 46:4,10
**pressure** 43:25 44:2 45:5 45:24 46:3,13,14,15 137:7,8,9 138:19 164:15 172:16,18 184:24
**pressures** 170:2 171:7 174:1
**pretty** 17:23 38:10 84:15 119:10 175:18,23 178:1 183:13
**previous** 18:2 28:20
**Prieur** 183:2
**primarily** 20:3 25:17 33:15 43:15 140:9 162:6 175:7
**primary** 27:12 92:17,22 142:16,20
**principal** 196:7
**principle** 46:19
**printing** 17:8
**prior** 15:1,15 32:14 58:8 58:20 68:2 166:19
**probable** 92:1 135:14
**probably** 27:10 32:1 45:11 79:7 92:20,25 98:6 134:20 152:6 160:7 182:2
**problem** 17:10 45:8 47:4 47:7 48:9,17 49:14

MARINO, PH.D., GENNARO

118:11 158:2
**problems** 41:21 48:5
  171:14
**procedural** 35:4
**procedure** 5:6 10:3
  118:19 119:4,9,12
**process** 101:7
**PROCTOR** 2:16
**produce** 19:24
**produced** 23:4
**production** 20:2,13
  101:19
**profess** 54:1 55:8,11,14
**professed** 55:19
**professional** 25:10,13
  40:5
**profile** 167:17,17
**progression** 83:7
**project** 14:7 18:5,13
  188:7,12 193:11,20
  198:2,4,10
**projects** 14:15 15:1,16
  15:21
**pronounce** 24:12
**proper** 97:10
**properties** 37:7,8 59:1
**protected** 170:3,13 171:7
**protection** 132:10
  161:14 172:16
**protrude** 53:18
**provide** 29:8 44:6 190:15
**provided** 29:11,12
**provides** 42:22,25
**providing** 41:24 42:1
  43:25 44:1
**PSLC** 2:2
**public** 18:2 28:20
**publications** 18:5 33:9
  33:12,13,17 196:7
**published** 23:24 62:25
**pull** 117:18,20
**pulled** 82:16 83:1 117:24
  117:25
**pump** 143:18 146:15,21
  147:1,10,17 148:13,22
  179:5 189:2

**purports** 75:23
**purpose** 77:3
**purposes** 5:5 7:16,18
**pursuant** 5:7
**push** 46:22 99:13
**put** 15:21 27:11 46:25
  48:24 52:5 54:15 86:13
  87:11 110:12 158:1
**putting** 49:25 50:12
**P.E** 1:18 6:1 200:3,11
**P.L.C** 2:9
**P.T** 105:4

### Q

**qualifications** 26:20
**qualified** 199:2
**qualifier** 159:15
**qualify** 169:8
**quantified** 167:3
**quantity** 165:18
**Queens** 44:20
**question** 5:12 11:3,7
  24:1 30:1 31:7 40:10
  52:15 58:1 59:9 63:25
  65:19 70:7 74:11,13
  76:6 80:2 95:24 104:18
  111:12 128:15 135:12
  145:24 146:1,7 154:2
  157:10 158:5 159:14
  161:19 164:16 167:23
  168:10 169:14 179:21
  179:23 190:19 192:20
  193:6,17 194:5,13
  195:1,8 196:5
**questions** 8:21 22:1,13
  22:15 76:23 136:11
  144:16 155:24 199:13
**quite** 118:13
**quotient** 164:23

### R

**racking** 40:24
**Raffman** 2:17 4:5 6:6 8:4
  8:18 11:18,19 12:13
  17:18 18:8 21:16,20
  22:5,11,19,21 51:6

52:13,16 59:12 64:2
69:7 70:8 71:17,24
74:12,16,18 76:9,16,21
106:20 116:1 131:10
143:3 145:25 148:21
149:6 166:9,15 168:16
179:24 190:20 191:1
192:22 193:10,19 194:7
194:16 195:3,10,13
**rail** 44:23
**range** 9:7 38:22,23 74:22
  120:24 125:5 126:22
  129:9,18,25 134:2,6,7,8
  135:6 142:1,6
**ranged** 129:10
**rapidly** 83:8
**ratio** 35:2,3
**Ray** 15:13
**reach** 120:7,8 148:8
  173:25 174:2
**reached** 19:18 178:1
  184:15
**reacted** 145:7
**reaction** 99:11
**read** 30:20,21 31:4 33:7
  51:9 69:15 91:22 92:21
  102:5 103:25 104:16,21
  105:13 108:3 137:16
  180:22
**reading** 5:8
**realistic** 113:24 128:25
  182:8,8
**realize** 139:25
**realized** 127:5
**really** 8:13 12:21 23:2
  24:6,8 25:6 29:14 37:9
  39:6 40:6 42:24 105:21
  127:7 135:1 148:23
  167:2,20,20 180:7
  182:14 185:8,14 187:3
**reason** 40:8 196:15
**reasonable** 175:16 186:2
  186:6 187:10
**reasonably** 34:19 38:17
  74:5 119:18 136:22
  150:7 184:1

**reasons** 158:20,24
  160:15 173:16 174:7
  178:5,9
**rebar** 13:5 90:24 91:9
  138:6,7 190:10
**recall** 14:16 15:4 21:5
  52:18
**recalling** 14:17
**recap** 44:10
**receded** 106:11
**receipt** 22:22
**receive** 195:19
**received** 12:20 20:12
**recess** 51:5 106:19 143:2
  195:12
**recipe** 119:13
**recognize** 12:4 115:18
**recollection** 53:13
**record** 6:10 12:19 21:22
  69:18 116:2 126:15
  160:14 163:3 166:5
**recorded** 33:1 55:5 56:4
**recording** 54:23
**recounted** 175:22
**red** 69:4,4
**redding** 36:20
**redid** 175:15
**reduce** 133:14,21
**reduced** 21:7 184:12,19
**reducing** 18:21 23:11
  27:7
**reduction** 20:4 22:23
  101:22,22 158:10 181:7
**refer** 28:21 55:4 65:21
  133:4 142:14 147:15
**reference** 6:12 18:9
  103:10,25 104:1,2,2
  113:23 116:15,17,24
  117:5,10,16 129:5
  149:14 153:3,6,18,21
  154:8 174:5
**referenced** 33:20 68:21
  115:15,19 116:10 119:4
**references** 103:1,12,14
  103:17 105:10 108:23
  109:1,5,12 117:14

MARINO, PH.D., GENNARO

129:13 133:5 196:6,12
196:21
**referencing** 103:9 116:5
**referred** 8:6 15:13 33:9
38:7,13 39:10 64:8
117:11 166:18
**referring** 26:24 51:17
52:24 72:13 81:20 86:7
112:18 118:22 135:17
137:23 141:2 147:18
174:17
**refers** 85:12 88:19,21
**refine** 101:12,16
**reflect** 6:10 100:7 126:15
164:14
**reflected** 35:15 73:23
78:19 79:4,11 103:1,10
145:20 167:1,25 185:19
185:24
**reflecting** 149:11
**refresher** 10:6
**regard** 21:12 157:9
178:10
**regarding** 25:1 60:4,5
85:2 103:19 177:23
**regardless** 173:25
**region** 164:10,11,11
**reject** 158:25 174:7
175:5 177:22 178:5,9
**rejected** 158:16 175:2
**rejecting** 160:16 173:16
**rejection** 158:20
**rejects** 171:17
**relate** 56:23 57:2
**related** 17:3 31:14 34:11
40:5 84:24 105:10
115:10 135:12 149:17
149:18 156:24 201:14
**relates** 80:5 127:13,13
156:5 160:10
**relationships** 102:23
**relative** 106:17 109:25
**relatively** 89:10 93:4
**relevance** 84:12,20 85:15
98:8
**relevant** 17:9 18:4,21

20:10 23:11 24:6 27:7
30:7 33:12,17 53:5
58:7 84:19 122:12
181:4
**reliability** 30:14
**rely** 97:6
**relying** 64:10 68:23 69:1
69:11 103:21 161:1
**remained** 88:5,16 94:2
140:23
**remaining** 93:3 95:7
157:16,18
**remediation** 41:6
**remember** 11:6 14:14
16:6,24 24:9 29:5,15,19
29:23 31:20,21 32:3,6
36:20 45:3 50:25 51:3
52:8 54:3,18 55:1,18
57:4 58:2 106:1 129:17
130:8,12 140:24 142:1
151:16 152:4,25 154:4
169:13,15 197:7,15
**remembered** 11:9 30:2,6
**remind** 10:15
**render** 7:8 88:11
**Repetition** 149:3
**report** 6:13,17,22,24 7:2
7:9,15 11:22 12:5,15,19
17:24 18:10 19:4,13,14
19:19,24 20:2,13 21:8
21:11,15,25 22:3,18,25
23:10,12,23,25 24:12
24:18 25:19 26:19,25
28:5,9,14 29:24 30:18
32:19,25 33:14 34:4,6,8
35:15 36:7,12 38:5
51:8 52:1 59:13 60:8
60:25 68:19,20 75:12
76:19,23 77:1,4 88:2,11
96:9,12,15 97:5 101:19
103:2,10 107:7,10,13
108:16,18,25 109:5,11
109:17,21 113:20,22,25
115:7,25 116:10 119:3
122:21,24 123:2 124:18
125:7 126:1,23 127:8

127:10 128:12 129:6,14
131:15,17 132:23 133:6
134:12 137:13,17
147:16 155:14,15,22
158:22 163:4 164:22
165:1 174:6,13,17
175:15 178:7,11,14,17
178:18 180:14,22 181:6
181:9 183:3 185:9,19
185:24 187:18,20
189:15 195:15 196:6
**reported** 37:7 58:25
129:1,9 133:5,22 164:1
**reporter** 1:23,25 5:23
10:7 11:25 12:3 68:16
115:17 201:3,25
**REPORTER'S** 201:1
**reports** 7:22 18:2 22:7
24:2,10,20,25 25:5,6,8
28:21,22,24 30:24 31:2
40:4 51:11,13,18,21,24
59:23 100:3
**represent** 8:18 12:18
60:13 68:18 116:2
123:18 167:12
**representation** 22:14
126:4
**represented** 123:23
**REPRESENTING** 2:2
2:15
**represents** 69:10 150:9
**reproduce** 34:13 35:16
**request** 7:3
**requested** 19:24
**required** 7:21 100:20
156:22
**research** 102:24
**reserve** 6:15
**reserved** 5:13 73:22
**residing** 62:9
**resist** 45:6,10,24 46:3,20
48:12 108:7
**resistance** 41:25 42:1,3,5
42:7,23 43:2 82:7
157:17,18 176:22 177:1
177:5,11,15

**resisting** 35:3 107:22
108:20 109:10,19
186:11
**resolved** 102:9
**respect** 57:12 85:6
157:23
**responsibility** 9:20,21
**responsive** 11:7
**responsiveness** 5:12
**rest** 121:21
**restate** 95:24
**result** 21:14 35:13 62:5
77:9 82:18 109:15
137:14 139:2,4,8
157:17 174:21 201:16
**resulted** 50:14 163:7
**results** 34:13 35:6,16
36:15 37:21 100:25
109:4,7,17 158:13
159:19,22 160:3,10
182:8
**retain** 44:22 45:2
**retained** 8:22,23 15:5
**retaining** 39:5 40:18,21
41:2,4,9,14,21 43:6
44:21 45:1,22 46:2
47:17 65:16
**review** 15:2 17:12 18:1
28:19 29:4,6 58:15
62:3 145:17 157:14
195:20
**reviewed** 11:22 13:13
14:1,18 17:25 24:1,25
26:18 29:1,17,24 30:3
30:10,13 51:19,24
58:24 97:2 135:10
136:6 150:4 157:2
179:9 195:14
**reviewing** 165:1
**rewind** 55:22
**re-ask** 30:1
**RICHARD** 3:19
**right** 6:16,16 8:24 9:2
10:11 12:10 13:10,12
18:9 19:1,3,22 22:4,10
22:10,20 23:12 24:19

MARINO, PH.D., GENNARO

9/12/2008

Page 18

24:22 25:22 27:1,2
28:7,8 31:6,8 32:23
35:17,18 36:5,6,9,20,22
37:15,22,23 38:24 39:1
39:2,5,15,15,17 40:8
41:12,13,22 42:2,6,11
43:7,11 44:5,15,18
45:16,17,21,25 46:4,5
46:16,23,25 47:1,2
48:24,25 49:2,4,5,7,11
49:22,23 50:2,7,21,25
53:24 54:20,24 55:2,3,4
55:21,25 56:6,12,17,20
57:12,17,25 58:13,14
58:16 59:25 60:3 64:16
64:19,22,23,25 65:1,14
65:25 66:9,12,17 67:17
68:2,7 69:8,17,20,21,23
69:24 70:9,10,11 71:4,5
71:9,11 72:7,11,15,20
72:21 73:9,11 74:4,8
75:1,7,18 76:1,17 77:16
77:19 78:1,13 79:3
80:6,19 81:7,14,15 85:9
86:7,24 87:2,12 88:1,1
88:20 90:8,14,18 93:15
93:19 96:16,21 97:1,5,9
101:11 102:1,3 103:15
103:23 104:8,9,10
105:12 107:17 108:6,25
110:22 111:24 112:9,14
112:15,20,21,25 113:1
113:16,25 114:2 116:15
118:6,16,25 119:20
120:18 121:12,13,16,19
121:20,22,23 122:5,22
123:1,22 125:8,24
126:2 127:6,16 128:11
132:1,12,16,21 133:2,3
134:1,3 136:12 137:3
137:17,18 138:10,14,14
139:2,7,18 140:6 141:3
141:9 142:1,17,18
143:7,22 144:6,7,9
145:1,11 146:6,9,13,22
147:19 148:3,4,25

149:15,16,23 153:19,23
155:12 156:6,10,13,25
158:18 159:4 160:13,25
161:24 162:3,18,24
163:3,19 164:9 167:18
168:2,3 170:12,15,17
170:20 172:15,25
173:11,11,25 174:15,19
174:19 175:1,3,22
176:1,15 177:18 180:6
183:3,12,19 184:3
185:6,17,21 186:16,18
186:21,23,24 187:6
188:14,17,21,24 189:4
189:9,12,19,23 190:1,7
190:12,16 191:4,7,10
191:14,20 192:5,8
193:3,14,18,22 194:2
194:18,23 195:2,11
197:7,15 198:9 199:12
**rigid** 98:4
**rip** 79:13 145:2 188:23
**ripped** 79:10 177:18
188:20
**rise** 147:2
**rises** 66:4
**River** 50:12
**rock** 39:22,23
**role** 85:4 161:20 180:11
181:3 188:2
**RONALD** 3:21
**roots** 165:7
**rose** 162:21
**rotated** 89:12 92:14 95:4
95:15 140:13
**rotates** 141:9,12,18
142:18
**rotating** 140:22
**rotation** 77:13,18
**rotational** 138:22
**RPR** 1:24 5:22 201:2,24
**rubbling** 90:2
**rudimentary** 166:23
**rule** 179:5
**run** 101:6 132:9 181:20
181:24 182:5

**running** 182:3,11
**runs** 182:13
**rush** 82:15
**rushing** 95:22

## S

**s** 2:17 5:1 6:23 24:13,13
55:5 57:1 83:6 104:1
143:18 145:20 146:16
147:2,10 148:14,22
163:13 167:12 171:17
173:16 175:16 176:5
195:22
**safety** 35:6,12 47:15
156:24 157:3,11,12,24
175:18,19 176:11
177:20 184:12,17,19,20
184:25 185:2
**salient** 64:18,20 67:1
**sample** 27:19
**samples** 21:3 197:8
**sand** 37:10,13 169:25
**sands** 50:13
**sat** 106:6 149:24 170:9
**saturated** 50:14
**save** 5:8,11 183:6
**saw** 32:15 53:11,17
54:15 55:23 66:15
100:24 131:19 179:6,9
179:13
**sawtooth** 152:20
**saying** 32:10,10 57:12
65:5 66:2,7,10 67:15,18
67:21 98:4 106:24
110:7 112:6,10 138:11
171:9,16
**says** 18:19,23,25 23:14
28:18 29:24 51:9 58:5
59:13 66:21 69:15
75:13 77:23 81:16
85:24 88:12 91:23 93:6
120:22,24 124:1 129:23
132:23 137:13 143:18
144:19,21 151:21 172:5
187:20
**scale** 132:23

**Schlichting** 116:18
**school** 34:20 38:17 74:6
101:9 119:19 136:22
150:8
**science** 40:9
**scour** 78:24 84:10,20,22
84:24 85:1,7 156:2,9,17
156:20 157:10,14,16,17
157:21 158:17,21,25
159:7,16 160:16,19
161:20 162:3,13,16,17
162:18,23
**scoured** 83:20
**scouring** 83:15,18
**scrapes** 75:2
**se** 184:20
**second** 62:11 80:21 93:1
93:21 94:7,17 104:23
128:24 132:21 142:15
142:16,20
**secondary** 83:9 92:17,21
**secondhand** 134:25
**seconds** 129:10 130:24
132:5,15 133:2,22,23
**secretary** 52:5
**section** 1:7 23:25 26:17
26:24 30:19 50:1 51:8
51:9 53:17,17,19 59:13
62:9 76:18,23,25 81:16
91:23 93:9 94:4 95:2
96:9 97:4 106:25 129:5
138:12 155:15 158:22
163:4 185:19,24
**sections** 26:3,12,21 93:2
**secured** 84:1
**see** 23:11,15 33:10,22
34:16 35:17 36:17,19
47:20 51:14 55:19 58:9
59:2,18 61:4 62:12
64:5 67:3 69:9 71:25
77:23 81:13,24 82:1
85:13 86:4 88:6,8,16
90:1,3,14 91:7,22
101:10,13 106:4 117:16
124:14,19,21 126:3,4
129:2,11 130:24 131:3

MARINO, PH.D., GENNARO

9/12/2008

Page 19

132:15 138:17,22
140:13 145:13 146:12
151:1 156:2,21 157:22
158:13 159:7,11,16
160:20 162:23 163:9
165:12 166:8 168:13
170:17 172:9 174:23
177:9 178:23 187:24
191:2
**seeing** 54:3 170:15
**seek** 11:4
**seen** 51:19 53:14 54:1
55:6,8,11,15 75:14,24
85:24 88:12 98:13,15
98:16 157:2
**seepage** 18:22 23:15 27:8
34:2 36:1,9,11 38:4
58:6,20 59:2,5 159:23
170:2,17,17,18 171:21
171:22 172:7 173:1,3
**segment** 88:13,24
**select** 37:16
**selected** 37:19
**senior** 34:20 38:17
119:19 136:23
**sense** 77:1 97:7 113:4
135:8 144:11 182:14
**sensitivity** 169:19
**sent** 23:7 24:5
**sentence** 51:17 103:4
108:3 160:8
**sentences** 26:19
**separate** 143:9 149:9,12
149:21 159:6,15 188:8
188:13,17 191:22,23
**separately** 192:17 195:5
**September** 1:20 200:25
**series** 84:14
**set** 90:6 158:21 159:3
178:17 181:20,24 182:4
201:7
**settled** 41:10
**seventh** 50:25 51:3
**shake** 62:15,18,23 63:2
63:10,11,15,20
**shaking** 10:13 54:13

62:12 92:8
**shatter** 93:22,25 94:16
137:20 139:15
**shattered** 93:19 94:12
137:24 138:4,12,18
**shattering** 92:5 137:14
139:25
**shatters** 141:4
**shear** 77:9 79:22 85:21
**sheared** 13:3 90:11,17
91:8 93:11 190:10
**shearing** 70:16,18 72:1
90:20 91:14 142:13
161:6
**sheet** 40:2 46:25 50:13
50:15,20,22 77:24 78:1
78:7,11,25 79:10,13,19
79:25 80:9,14,20,23,24
80:25 81:2,6,10,11
82:12,16 83:1 88:5,14
88:16,24 89:4 94:2
138:8 140:4 144:23
145:2 168:17,20,24
169:11 173:3,12 188:20
188:23 197:5
**short** 92:6 125:1 137:15
**shorten** 124:12
**shorter** 92:4 144:20
146:12
**shorthand** 107:15 201:9
**show** 77:6 123:22 132:13
165:23 166:14,18,21
184:18
**showed** 130:22 132:25
165:6
**shown** 72:15,22 73:5
74:2 82:2,19 90:17
94:25 95:19,23 123:2,4
139:16 162:4 168:11
**shows** 87:24 166:20,22
**side** 25:2 43:24 44:1
67:19 82:11 83:16,19
83:21,24 89:14,14
110:25 162:4 164:13
170:3,3,13 171:7
172:16 173:10

**sides** 177:3,4
**Sidney** 32:8,9,21
**sign** 107:6
**signature** 25:22
**Signed** 200:11,13,15
**significance** 53:10 61:22
109:25
**significant** 28:6 30:25
43:19 51:11 53:1 54:7
54:9 62:11 96:18
107:22,24 108:21
109:10,20,22 110:4,6,7
110:17,19 127:11
130:13,16,19,22 131:19
131:25 133:1 136:7
137:19 171:7 172:3,5
174:2 176:21 177:5
**significantly** 141:6,8
187:23
**signing** 5:9
**silt** 165:8
**similar** 23:20 48:3 91:7
111:19 133:11 160:3,10
**simple** 184:22
**simplicity** 150:22
**sink** 43:20,21
**sit** 27:15 155:20 167:11
167:18 168:1 169:9
**site** 54:2 87:9
**sitting** 44:23 106:2
110:16 151:6 170:12
**situation** 49:8,9 50:17
**six** 182:12
**sixth** 50:8,10
**size** 107:23 108:22
111:14
**sizes** 129:9,24
**sketch** 116:7
**skims** 111:23
**slams** 141:11,12,16
**slice** 176:16
**slides** 176:24
**slightly** 92:19,24 95:12
142:6
**slivers** 111:24
**slope** 41:16,23 45:7

49:18 50:3,4 171:8
**Slugs** 125:2,3
**smaller** 137:11
**smart** 34:20 38:17 74:5
**soft** 42:15,15,20,22 43:5
43:21 48:2,8,12 165:6
167:7 169:4 175:9
**softer** 43:8
**soil** 20:25 21:3 39:21,23
40:1,11,14 41:21,24
42:21,22 43:5,8 45:23
49:5,15,18,20 50:18,21
63:7 98:21 99:2,6,12,16
99:21,24 100:8 161:12
165:10 166:25 168:6,23
173:18,24 175:25 177:6
177:21 197:8
**soils** 42:15,15 43:22 44:5
48:2,8,12 59:1 167:9,13
174:21 198:16
**solution** 101:14 153:15
182:19
**solutioning** 43:19
**somebody** 9:15 29:8
107:5 149:24
**somewhat** 20:10 169:22
**son** 34:22
**sorry** 11:16 29:25 41:18
54:21 87:21 96:11
107:25 109:16 121:7
122:12 127:14 148:11
149:16 192:1
**sort** 40:3 46:21 101:8
112:12,25 147:19
164:25
**sought** 5:15
**sound** 53:16 54:11 59:15
60:19 61:2,2,6,7 62:1,5
**sounds** 54:11 92:8
**source** 129:21 165:14
**sources** 104:7,11
**south** 13:1,11 16:16,19
17:14 18:14 55:10,15
56:6,20,23 57:10,24
59:17 61:15 62:18,23
64:5,22 65:4 70:17,17

MARINO, PH.D., GENNARO

70:19,19 71:18 73:13
75:15,21 78:12 79:8
83:21 84:2,5,11 86:8,9
86:15 87:9,18 90:8,15
91:11 93:8 95:10,11,17
113:20 114:5,9,10,14
127:2,9 128:2,9 135:9
136:4,11 138:16,16
140:21 141:17,21 143:6
143:14,25 144:3,12,21
145:8 146:11 147:23
156:5,8,24 159:1 163:7
165:5 167:14 168:7,21
168:25 169:14 174:8,11
180:12 182:25 184:13
187:7 188:9,14,16,24
189:6,12,17,22 190:3,7
190:12 191:14,19 192:2
192:4,12 193:2,13
194:1,9 195:5
**southern** 84:7 88:6,15,19
88:21,22 89:10 90:3,7
90:15 92:13 93:3,3,5,8
93:14 94:4 140:12,24
**span** 59:17 96:19
**speak** 10:12
**specific** 14:14,15 16:1
39:7 131:17
**specifically** 5:10 72:13
104:3
**specifications** 48:2
**speculation** 59:9 179:21
**speed** 125:4,5 134:2,6,7
134:12 150:12
**speeds** 38:20 120:24,25
**spent** 28:10
**splashes** 162:9
**spoke** 16:7
**spring** 99:2,12
**spring-like** 99:18
**squeeze** 172:23
**St** 103:6
**stability** 18:22 23:15
27:8 35:24,25 41:16,23
42:8,12 45:7 47:8 48:5
157:5 171:14 174:3

**stable** 49:16
**staff** 28:10 69:16,17,22
**stage** 8:3 19:17 93:17
126:20 158:10
**stages** 93:15
**stand** 30:5 32:5
**standards** 98:9
**standing** 66:8 81:6,11
147:6 152:15
**stands** 165:20
**started** 17:8 24:13 53:16
188:7 193:11,24
**starting** 76:24
**state** 5:23 120:11 170:4,6
170:7,21 171:3,6,10,22
172:12 201:3
**stated** 56:8 91:20,21
155:17,22 174:6 178:7
178:11
**statement** 19:4 63:23
64:20 66:21 102:15
103:19 104:6 105:14
108:12,16,19 109:2
130:20 136:16 165:15
**statements** 31:10 64:17
67:1
**STATES** 1:1
**station** 143:18 146:15,22
147:1,10,17 148:13,22
179:5 189:2
**stationary** 102:13 151:3
**stayed** 67:19 89:10
**staying** 170:18
**stays** 138:22
**steady** 120:11 170:4,5,7
170:21 171:3,6,9,22
172:12
**steep** 35:25
**step-by-step** 119:11
**stick** 166:23,23
**sticking** 121:11,15 122:1
**stiff** 97:25 98:3 165:7
**STIPULATED** 5:2
**stipulation** 6:3
**stood** 145:15
**stop** 21:25 22:12

**stopped** 41:25
**store** 198:16,22 199:8,12
**storm** 121:16,24 173:18
**stout** 97:24
**straight** 66:9
**strains** 102:20
**strata** 170:24
**Street** 1:19 2:5,11 3:11
**streets** 183:2
**strength** 45:21 175:8,13
175:17 177:13
**strengths** 158:3,7
**stress** 159:24
**stresses** 45:18 89:7
102:19 140:1,2
**stretch** 144:20
**strike** 112:22
**striking** 139:13
**stronger** 45:20 98:7,7
**struck** 74:7,20 79:9
135:9 182:25
**structural** 39:25 106:22
107:20 108:5
**structure** 39:5 44:4
45:13 47:17 60:23
62:12 63:1,11 99:1,5,7
102:13,14 103:21
105:16 120:3 172:8
**structures** 39:22,23,25
**stuck** 8:13
**student** 74:6 150:8
**studied** 40:17
**studies** 62:25 98:13,16
129:1,4
**study** 24:8 39:24 100:2
105:21
**studying** 40:20
**stuff** 17:9 38:11 129:19
196:1
**Sturdy** 98:5
**subject** 18:3 58:7 62:10
148:25
**submission** 7:21
**submit** 21:23
**submitted** 6:23 7:15,20
7:24 12:5,16 19:4

21:11 22:18 24:21
**substance** 17:24
**substantially** 18:17
**Suburban** 41:20 47:5
**sue** 9:13
**sued** 9:15
**sufficient** 44:22 127:1
**Suhayda** 24:15,16
**Suite** 3:4
**summaries** 29:9,10
**summary** 37:24 53:22
**Super** 199:10,10,11
**superimpose** 126:8
**supervision** 201:10
**supplies** 108:19
**support** 44:6 57:11
70:19 103:19 104:5
187:16
**supports** 70:1 109:1
**supposed** 12:22,23 182:6
**sure** 9:10 16:1 23:4
27:24,25 28:17 32:7
46:2 51:3,23 62:20
64:15 87:7 101:1 102:2
115:24 118:9,20 124:11
179:25 180:22 181:17
182:7 183:17 185:13
**surface** 13:9 34:25 43:20
46:6,10,15 49:6 123:4
155:8
**surge** 160:17 161:2
171:21 172:4,5 173:18
174:22
**survivor** 183:24
**survivors** 92:9
**susceptible** 97:17
**sustain** 97:18 110:1
**swamp** 167:24
**sworn** 6:4 201:6
**system** 132:11 165:10
182:4

**T**
**T** 4:1,6 5:1,1
**tagging** 84:8
**take** 7:1 10:7,16 48:25

MARINO, PH.D., GENNARO

9/12/2008

Page 21

53:23 58:18 108:9,11
111:21 118:13 125:24
126:7 142:11 150:12,13
161:8 176:3 177:2,10
195:11
**taken** 5:5 7:17 11:12
12:12 21:3 60:2 68:18
90:21 102:20 160:7
163:18 172:23 173:17
179:12 200:25 201:8
**takes** 170:21,23 172:13
172:15
**talk** 10:17,20 50:8 104:3
127:15
**talked** 11:23 20:17 54:21
54:22 58:3 60:8 140:19
140:22 147:5 152:22
159:19 160:24 161:4
**talking** 10:16 17:16
65:12,13,22 71:18
72:14 110:11,24 111:13
111:19,25 112:1 120:3
136:10 142:15 153:10
159:13 160:22 161:9
171:5,13 172:3,13
173:2,2,5 175:9,10
177:19,20 181:22,25
182:15 185:3 190:24
**talks** 163:4
**tasks** 18:23 27:9,10,11
27:13,17 28:3
**Team** 17:4,11 24:24
28:22 30:23 51:10
59:23
**tear** 78:2,7,11
**teared** 82:15,15
**tearing** 78:25
**technical** 18:4 33:9,12,13
33:16
**tell** 7:6 8:11 12:23 21:1
21:21 24:11 40:20
44:19 47:3 56:13 97:9
118:21 120:18,23
127:18 129:19 130:8
134:25 135:2 157:8
182:10

**telling** 40:25 117:10
161:16
**tells** 120:24,25 191:3
**temporarily** 47:14
**temporary** 44:21,25
**ten** 9:6,6 10:1 20:18
34:21 128:24 133:22
197:13
**tend** 31:25
**tended** 32:19,25
**Tennessee** 41:1,14,22
44:11
**terminal** 120:8,9
**terminology** 46:17
**terms** 31:13 46:18 65:14
84:16 101:9 109:25
125:22 167:6 174:3
186:14
**test** 57:19 103:8
**tested** 132:25
**testified** 6:5 56:14,19
72:1,5 89:16 103:18
110:14 133:18 183:7
185:10 190:9 197:13,16
**testify** 11:14 19:11 59:3
198:17 201:6,7
**testifying** 10:25
**testimony** 18:11 19:16
29:16 30:15 31:17
32:22 33:3,7 55:23
56:3,22 57:1,4,7,10,24
58:18 62:3,21 67:18
68:7 70:1 71:9 72:12
73:21,25 83:25 89:3
93:13 115:20 128:8
139:2 142:1,10 143:23
147:2 162:13 166:19
175:25 177:10 179:12
184:6 189:2,7 197:19
198:24 200:4,6
**testing** 103:6 164:21,24
164:25 165:2
**tests** 7:12 102:17,25
103:21 132:9,13,24
133:5
**Texas** 41:5 42:16 44:11

**text** 117:12 118:8
**textbook** 116:20,23
117:2,17 118:1,13
**thank** 26:22 77:5 126:11
**thawing** 198:15
**theory** 116:18 117:12
118:1 152:16 163:13
**thereof** 5:14
**thing** 16:22,24 26:16
36:16 40:3 56:1 61:9
75:24 80:17 115:8
138:15 151:23 179:11
185:8 186:22,23 192:25
195:22 197:1
**things** 22:23 27:12 31:4
31:12 39:19,24 56:8
70:10 116:13 183:13
195:25
**think** 14:24 17:25 18:18
20:18,19,22 24:14
27:15 28:2 29:10,21
30:17 31:25 32:5,13
33:5,8,16,19 41:11 44:9
54:13,17 56:8 57:13
60:7,16 61:8 62:7 63:3
63:5 67:25 72:8,9 83:9
84:19 88:23 95:25
97:10,19 103:16 108:13
109:18 115:9 117:3
118:2,10 120:21 134:20
134:22 144:2 148:20
152:10 153:13 158:7,8
159:5,19 160:14 161:4
166:6 171:23 173:13
174:9 179:17 180:2,3
181:10,15 183:21
187:18 194:15 195:22
196:3 197:23
**third** 94:10,17 105:1
149:3
**thirty** 14:13
**thought** 15:21 17:8
41:19 44:16 47:23 54:9
56:9 91:3 119:3 124:17
124:22 147:6 149:16
179:9 190:24

**thousand** 28:16
**three** 44:12 59:14 70:23
71:1,23 72:2 74:1,7,20
74:23,24 75:5,8,9 90:21
91:14 93:10,15 94:12
142:6 152:6 184:23
185:16
**three-foot** 141:25 142:11
**tied** 146:21
**tilt** 66:23
**tilted** 65:23,24 66:15,18
**time** 5:13 10:17,20 13:19
14:10,10 26:10 28:5,9
28:14 29:6 34:11 35:23
51:21 58:6 59:4,17
67:3 68:10 70:4,15,21
71:2,14,22 82:25 83:1,4
92:20,25 95:10,17,21
99:15 101:3 113:24
115:10 118:4,14 120:1
120:2,7,16 121:11
128:25 129:10 130:23
132:4,7 133:1,15,21
134:8,8,13,23 135:5,7,8
136:7 146:11 147:20,22
147:24 148:3 149:4,5
150:24 152:19 160:17
160:20,22,23 161:3,9
162:6,16 170:22,23
172:15,18,23 173:17,23
183:6 187:13 188:4
189:12,19 190:1,3
**times** 183:14 184:23
185:16
**titled** 26:25
**today** 6:8,11 8:21 10:25
11:15,21 13:22 14:2
18:11 21:22 27:16
115:5 118:13 154:23
155:20 167:11,19 168:1
169:9 174:12 183:7
184:7 189:18
**today's** 15:2
**toe** 170:13,25 171:2,12
173:19,25
**told** 96:5 179:22

MARINO, PH.D., GENNARO

9/12/2008

Page  22

**ton** 124:25,25 125:1,1
**tongue** 8:15
**tonnage** 129:16 130:1,3
  130:5,6,18
**tons** 129:22
**top** 45:14 53:20 58:5
  70:24 71:1,4,7 72:2
  74:1,8,21,25 75:5 77:20
  80:25 82:2 90:21,22
  91:8,14 93:10 94:13
  100:19 106:2,6,10
  142:2 155:4,8 160:18
  161:3 162:12 172:2
  175:22
**tore** 77:24
**torn** 144:23
**total** 28:17 124:23,23,24
  124:25
**totality** 20:16
**track** 45:2 87:21
**train** 46:7,7
**transcribed** 201:10
**transcript** 5:9 31:21,22
  31:25 32:20 33:2 102:2
**transcription** 200:5
  201:11
**transfer** 112:24 113:16
  113:17 170:2
**transient** 170:8 171:21
  172:7
**transit** 95:11
**transmit** 173:18
**travels** 141:10
**treating** 136:21 150:7
**trench** 84:11,21,22,24
  85:1,7 160:19 162:3,13
  162:16,17,18,23
**trial** 35:4
**triangles** 69:23
**tried** 159:23 167:4 177:7
**trouble** 101:3
**troubles** 159:25
**true** 176:20 187:6 200:7
  201:10
**truth** 129:20 201:6
**truthfully** 11:15

**try** 14:15 104:6 154:6
  183:5
**trying** 57:18 84:14,18
  85:17 100:4 107:9
  154:3 159:18 176:15
  183:14 185:14 196:1
**tumbled** 82:14
**tumbling** 53:16
**turn** 58:4 76:25 84:9
  85:23 96:8,11 113:19
  124:12
**turning** 55:21 73:12
  75:12 84:5 155:13
**turns** 10:16
**twelve** 171:20 172:7,14
  172:20
**twist** 77:10,11 82:17
**twisted** 81:18
**two** 32:5 54:14 60:7
  61:24 69:3,12 80:1,15
  91:24 106:7 115:23
  145:2 152:6 156:11,12
  184:23 185:16 191:22
  191:23 192:16 196:7,12
**type** 38:7 39:10 61:4
  128:16
**types** 97:17 108:6 182:22
**typically** 47:18 131:2
**typographic** 196:11

---

**U**

**U** 5:1
**Uh-huh** 10:10 23:13
  33:11 140:14 196:9
**ultimate** 158:18
**Ultimately** 39:15
**um** 9:19,19 11:22,23,24
  12:25 13:16 15:13
  16:15 17:3,22 18:18
  20:3,19,20,21 23:6,22
  24:4,13 25:5,15 26:2
  27:13,18,21 29:7 30:11
  30:18,19 31:13,19,19
  32:1 34:10 35:1,23,24
  39:6,8 40:23 41:4
  42:14 43:15 44:21 47:6

47:25 48:14 49:8 50:11
  53:15,15 54:8,12,13
  61:8 62:20 66:18 68:15
  69:2 70:16 75:8 78:6
  83:3 85:3,19 90:7
  94:11 98:6 100:23,25
  101:3,6,7 102:18
  103:25 104:4 106:9
  108:13 115:23 119:1
  125:5,22 126:23 128:23
  130:7 131:12 134:14
  135:2,20 138:8 149:13
  152:4,17,18 153:24
  154:9 156:21 157:11
  158:2,4,8 161:4,5 162:7
  164:6 166:6 167:2
  168:25 170:3 176:10
  178:8 181:15,20,25
  182:21 186:15 195:21
  195:23,24 196:2,15
  197:21,22 198:2,15
**underdesigned** 42:14
**underlying** 163:9
**underneath** 45:16
  161:12 164:12 167:13
  168:6
**underseepage** 163:13,16
  163:18 171:11,18 178:3
**understand** 10:8,14,18
  10:22,24 11:3,9 14:24
  17:10 34:23 38:25 42:1
  49:4,13 51:23 56:13
  58:1 67:18 71:25 72:11
  72:13 80:3,18 81:2
  93:13 97:7 103:22
  107:5,16 109:8,14,14
  109:18 110:5 111:1,22
  132:12 138:10 139:2
  140:6 141:3 142:17
  145:23 146:1 149:20
  166:8 173:14 183:15
  188:8
**understanding** 68:6
  107:4 148:5 179:23
  201:12
**understands** 63:24

**understood** 91:22 177:9
  179:25 185:13
**undertake** 27:16 28:3
**underwater** 49:22
**unfairly** 49:13
**unheard** 129:1 182:5
**Unified** 165:10
**uniform** 176:18
**unique** 91:11
**unit** 168:25
**UNITED** 1:1
**University** 8:10
**unstable** 41:25
**uplift** 163:17 164:19
**upper** 13:2
**upright** 66:19
**USA** 1:13,14
**USCS** 165:9
**use** 8:16 10:12,20 29:14
  50:6 107:15 109:22
  121:3 122:8 123:18
  124:4,7 125:3 151:14
  151:17 152:2,8 163:19
  164:8 171:4 180:18
  182:20
**USGS** 69:6,13,18

---

**V**

**v** 1:8,9,10,11,12,13,14
**valid** 32:1
**value** 130:13,14,17,19
  165:24 169:16,21,24
  170:1,20 171:5,10
  175:11,13,17 199:10,11
  199:12
**values** 100:11,13 125:13
  164:1,4,5
**various** 18:21 23:14 27:8
  35:25 97:17
**velocity** 106:13,15
  112:19 113:12,15
  119:23,24 120:5,5,9,9
  120:12,12,13 127:14
  139:6 144:5,9 152:21
**versa** 194:8
**version** 115:25

---

MARINO, PH.D., GENNARO

9/12/2008

Page  23

versions 115:23
versus 35:1
vertical 13:9 79:21
vessel 96:17 97:15,16
    98:11 111:14,16 149:10
    149:22 178:21
vessels 97:18
vibration 50:19
vice 194:8
video 20:18 195:23
VIDEOGRAPHER 3:23
view 86:8 110:16 111:9
    168:4
viewpoint 13:2
views 30:13 107:12
Villavaso 29:25 53:8,9
    55:14,23 56:14 75:18
    83:6 146:24 189:3
    195:22
Villavaso's 53:2,4 56:22
Virginia 3:5 41:8 43:12
    44:12
virtually 139:15
viscosity 123:14
visual 190:15,23
vis-a-vis 123:17,20
    169:11
Volume 196:17
volunteer 51:1

W

wait 81:24
waiting 170:14,14
waived 5:10
WALKER 3:9 6:19 7:14
    7:25
wall 13:3,4 32:11,15
    38:23 39:5 40:18,21
    41:2,4,14 42:16,21 43:6
    43:9,12,24 44:1,7,21
    45:1,4,6,8,9,12,13,14
    45:22,23 46:2,4,10,20
    46:22 52:22 53:12,16
    53:19 54:16 55:7,9
    60:14,18,22 62:15,17
    62:22 63:6 65:16 66:5

66:15 67:11 68:9 70:16
70:18,21,23 71:1,4,6
72:2 74:2,2,7,20,25
75:6 76:2,11 77:9,21
78:4 79:9,15 80:4
81:16,21 82:2,3,11,14
82:19,25 83:12,14,21
84:2,25 86:12 87:8,24
88:5,15 89:14,20 90:22
92:2,5,16 93:10 94:2,3
94:5,5,12,19,22,22 95:3
95:7 100:20,20 102:19
106:1,2,6,8,10,16,18
110:20,22 112:20,23,24
113:3,11 120:17 124:4
125:10,12,14 127:2,22
127:24,25 128:18,19
134:9,13 135:15,22
136:2,14,24 139:6,9,14
139:19,24,25 140:8,24
141:1,3,6,7,8,11,12,14
141:15,17,18,20 142:12
142:25 144:20,22 145:7
147:9 148:2,6,12,17
149:1 151:7 155:3,4,8
155:11 158:18,21 161:6
162:4,7,8,9,11,14,22
168:6 169:11 170:12
172:24 176:1 177:12
183:1 184:13,24 187:12
walls 41:9 45:20 64:4,21
65:3,8,12,22 66:8,18,23
67:16,20,23 68:1,3
71:14 98:14,18 138:21
want 8:8,12 15:7 21:21
22:12 30:20 38:16
46:16 49:13 50:6,8
72:11 76:22 96:11
104:5 109:14,18 122:19
126:10 149:20 153:16
154:4 168:19 169:8
181:16 183:17,20 193:7
wanted 109:3,8 149:20
wants 57:19
Ward 13:6 91:4 93:7
145:16 183:24

Washington 2:19
wasn't 45:3,4 67:15
70:20 72:9 91:21
110:19,23 148:1 151:6
152:11 157:13 162:20
187:1
water 36:25 39:1,4,12
46:3 47:18,18 48:10,24
49:1,3,5,6,14 50:2,18
50:21 53:20 66:4,12
67:1,10,14,16,19,22
68:3,8 70:2,13,20 71:3
71:13 82:16 83:10,13
83:19,21,23,25 95:13
95:21 106:10 121:11,15
122:1 123:11,14 139:22
147:12,22 150:10,21
151:6,17,19,24 152:15
152:23 153:17,22,24
155:3,8 162:12,21
164:15 170:9,11,23
171:1 172:4,5,17,23
173:7,17,24 174:1
186:10,12,15,16,18,23
187:1,4,8 189:22,25
waterline 120:20 121:4
122:7,10,16 123:2,4
waterways 96:20
water-filled 176:4
wave 38:20 111:17
115:14 127:13,14,15,18
127:25 128:1,3 139:10
139:11,12,14 141:15
143:14,16,21,24 144:2
144:3 146:18,21 147:3
147:7,8,12,15,16,22
148:6,7,14,16,23
149:10,18,22 150:10,10
150:12,13,15,18,19,20
151:2,8,10,14,21,24
152:1,18,18,23 153:12
153:17 154:10 155:10
155:11 191:9,12,13
192:1,7,11
waves 63:8,9 127:23
155:6 185:10

way 12:21 16:9 37:1
46:24,25 52:15 76:10
95:15,15 98:4,24 108:7
110:4 112:23 113:15
121:22 135:20,21 137:2
137:5 168:4 173:8,9
176:24 195:19 201:15
ways 46:23
weak 174:21
weaker 50:18 85:20
weakness 50:23
website 17:5 166:6
websites 17:4,7 23:8
week 24:5
weigh 49:17,18
weight 48:19,21 50:5
124:6,9 137:6,9
welcome 11:8 26:23 51:1
77:6
well-established 96:17
went 9:16 17:7 26:15
30:18 32:24 96:3 103:4
107:1 117:25 147:7,12
188:12
weren't 24:6 101:17
195:21
west 125:16
we'll 108:13 122:17
we're 101:13 105:23
110:11,24 111:3,4,19
111:25,25 116:5 127:15
136:10 158:9 171:5
175:9,10 177:19,20
180:20 181:21 195:25
we've 15:19 20:3,7 44:12
143:4 153:3 185:15
white 86:16
wide 138:12
width 123:8
Wiedemann 2:3,3,4 6:9
6:25 7:19 8:2,6 15:14
16:5,8 17:15,20 21:9,18
22:2,9,16 29:13 52:11
59:7 63:21 70:5 71:15
71:20 74:9,14 76:4,13
108:2 111:10 145:22

MARINO, PH.D., GENNARO

9/12/2008

Page 24

148:18 149:2 168:8,14
179:19 190:17,22
192:18 193:4,15 194:3
194:11,24 195:6
**WILKINSON** 1:11
**WILLIAM** 3:18
**Williams** 29:21 32:7,8,9
32:21
**wind** 38:20 114:13,16,20
116:8 119:20,21,22
120:4,20,25 121:4,9
123:18,20,24 124:2
125:3,5,15,19,21,23
126:8,14 127:13 134:2
134:6,7,12 135:4,19,25
136:6 139:5,8,13
141:15 144:5,9 147:25
148:1 149:8 185:10
191:20,25 192:2,4
**wind-aided** 115:13
**wished** 170:11
**withdraw** 95:25
**withstand** 174:22
**witness** 5:4,25 6:3 17:22
32:3 58:2 59:3,25 60:3
60:4 63:22 64:17 66:14
75:23 86:20,23 126:13
135:16 161:5 200:1
201:5
**witnesses** 13:17,19,25
14:25 30:15 31:13
54:14 57:11,15 58:19
59:14 61:1,9,24,25 62:9
189:7
**wood** 165:8
**word** 38:25 39:7,7 50:6
61:21,22,23 67:17
69:15 98:6 109:22
163:18,19 180:18
**words** 10:8 26:1 110:2
120:4 180:19
**work** 14:4,5,6,11,16,18
17:13 18:20,24 19:2,5,6
19:9,12 20:4 27:6,6,22
34:16 39:19 40:5 41:7
100:25 126:24 154:19

154:22 161:23 181:13
181:14
**worked** 15:15 40:23,25
41:8,20
**working** 8:11 28:11
47:19 161:25
**works** 26:5 176:24 182:9
**Worldgate** 3:4
**wouldn't** 47:12 59:2
93:24 118:4,7 120:11
134:16 166:14 186:19
186:21
**write** 25:24 86:16 126:12
**writes** 77:4
**written** 18:18 25:11 26:3
51:21 102:2 107:1,19
114:23
**wrong** 29:20 37:4 172:22
196:19
**wrote** 26:13,14 38:11
59:24 64:3 75:12 86:4
90:10 96:16,21 102:11
106:21,24 107:9,15
116:13 117:7 128:24
129:2,8 130:9,20 131:1
140:10 146:15 149:7
154:10 155:25 160:1
165:3,12 171:20 180:9
182:23 184:2
**Wuttrich** 196:8

## X

**X** 4:1,1,6,6
**Xs** 69:19

## Y

**yeah** 10:15,22 12:17
18:16 21:19 23:13
29:18 30:17 52:2 63:16
65:21 66:6,6 81:13
85:10 86:19 87:23 88:8
89:24 96:6 97:22
106:17 107:18 109:2
113:10,17 121:17
124:23 130:12 135:6
140:9,19,22 142:5

144:1 154:7 163:18
165:25 166:6 167:15
168:12 183:13
**year** 15:7 181:10
**years** 14:13 34:21
**yep** 113:18
**yield** 154:10
**yielded** 41:5 42:17 65:12
**York** 2:18 44:20

## Z

**zone** 90:4

## #

**#75005** 1:25 201:25

## 0

**0** 157:20
**0.5** 133:2,22
**0.6** 133:2
**0.9** 129:10 130:24 132:4
132:14
**05-4182** 1:5
**05-5531** 1:8
**05-5724** 1:9
**06-5342** 1:10
**06-6299** 1:11
**06-7516** 1:12
**07-3500** 1:13
**07-5178** 1:14
**08** 52:17

## 1

**1** 4:9 12:1,3,4,7 18:10
23:25 25:18 35:6,7
72:23 77:6,23 86:13,14
87:11 111:4 120:22
157:20,20,21 184:12,19
**1-1/2** 121:1 122:13
**1.1** 18:10 19:4 26:24 28:7
28:18 33:10,22 36:2
157:12
**1.5** 129:10
**1.9** 175:17
**10** 85:25 86:8 88:2,9,11
91:17 95:19,23 137:24

137:25 139:17 141:2
163:11 165:3 169:25
171:10
**100** 154:11
**11** 90:7,18 171:23,25
**11-foot** 174:22
**1100** 1:19 3:11
**115** 4:11
**12** 4:9 13:1 72:15 73:23
74:3 94:25 124:16
175:22 178:16
**12th** 1:21 200:25
**125** 125:6 134:3
**12950** 3:4
**13** 12:9,14,15,19 178:16
**14** 90:7,18 133:6 138:17
**15** 52:25 196:17
**166** 4:12
**17** 113:22 115:15,19
117:8,11 119:9,13
128:13,16 191:20
196:18
**17-1** 116:6 125:25
**17-5** 122:25
**18-1/2** 121:7
**180** 138:25 139:1,3,19
**19-1/2** 121:6
**1905** 6:2
**1960s** 166:3

## 2

**2** 4:10 35:8 51:8 58:5
68:17,24 69:9 72:23
75:13 76:25 77:6 78:8
79:5,11 81:6 103:4,5,11
111:4 124:13 185:2
**2-dimensional** 176:8,12
176:16
**2-1/2** 121:2 122:13
**2.1** 30:19 51:9
**2.2** 76:25
**2.3** 81:16
**2.5** 84:6
**2.6** 85:24 86:5
**20** 122:2,3
**20-foot** 147:6,12,16,22

MARINO, PH.D., GENNARO

191:13
**20-1/2** 121:8,14
**20.5** 122:4
**20001** 2:19
**2008** 1:21 15:8 22:3
52:12,19 200:25
**2009** 6:15 7:10 21:15
**20170** 3:5
**202-346-4000** 2:20
**21** 121:6 122:2
**21-1/2** 121:8,14
**21.5** 122:4
**23** 121:7 196:18
**2300** 1:19 3:10
**270** 81:18
**29th** 187:13

---
### 3
**3** 4:11 35:8 81:15,16,20
81:24 82:2,20 84:5
115:16,17,21 126:3
185:2,19,24
**3D** 175:19
**3.1** 26:17 102:11
**3.2** 26:17 116:10 119:6
119:15,16 128:24
**3.3** 26:17 120:22 129:23
**3.4** 144:16
**3.5** 26:17 128:7,8,23
149:7
**30** 19:3 22:24 174:13
**30th** 18:19 19:24
**30-foot** 90:10,16

---
### 4
**4** 4:12 6:7 81:15,16,20
82:22 84:6 96:9,12
106:21,22 108:1 155:15
166:10,12,17 167:1,12
167:25 169:25 171:11
**4.1** 158:22 159:2
**4.1A** 155:25
**4.2** 163:6
**4.2A** 26:17
**4.3** 174:17
**4:30** 182:24 189:15

**4727** 93:6 129:16 143:20
178:23 180:11 184:11

---
### 5
**5** 6:7 73:5,7,10 113:19
129:23 149:13,14,16
153:4,6,18,21 162:5,24
**5.2** 180:9
**5.6** 187:20
**500** 3:4
**504-581-6180** 2:7
**504-585-7000** 3:13
**504-885-7700** 2:13

---
### 6
**6** 84:10,10 85:11 91:23
113:23 116:15,17
117:10 135:13 140:15
142:14 163:1
**600** 129:9,18,22,24
**61822** 6:2
**68** 4:10

---
### 7
**7** 6:7 143:17 144:17
150:19 196:6
**7:00** 134:15,16,21 135:4
135:7 136:7 160:23
189:18
**7:30** 134:21 135:5,7
136:7 160:23 189:18
**700** 129:22
**700-ton** 129:9,18,24
**70113** 2:6,12
**70163-2300** 1:20 3:12
**703-956-3437** 3:6

---
### 8
**8** 4:5 155:13 160:2
168:19 196:6
**80** 47:13 125:6 134:3
**821** 2:5,11

---
### 9
**9** 73:14 132:21 163:11
**901** 2:18