UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION<br><br>NO. 05-4182<br><br>SECTION "K" |

PERTAINS TO BARGE

### MEMORANDUM IN PARTIAL OPPOSITION TO "THE AMERICAN CLUB'S" MOTION FOR SUMMARY JUDGMENT AS LIMITED BY THE COURT

MAY IT PLEASE THE COURT:

    The Court has ordered that the Plaintiffs, rather than briefing the full breadth of their opposition to the American Steamship Owners Mutual Protection and Indemnification Association's bid to impose summary judgment on the issue of coverage, address only whether application of New York law as opposed to Louisiana law, coupled with the Plaintiffs' need for discovery, overcomes principles of judicial comity.  In short, the Plaintiffs answer resoundingly in the affirmative.  This inquiry encompasses a number of considerations dictating against wedding the Louisiana Plaintiffs to the outcome of a first-party coverage dispute between insurer and assured brought before Courts sitting in New York, applying New York law.  Louisiana law governs this dispute, the extreme local impact of which overshadows a merely marginal and tenuous connection with New York.

    First, while Plaintiffs' action against The Club was stayed by this Court, the Plaintiffs have been afforded no discovery whatsoever as to any of the areas of factual inquiry indicated by in The Club's coverage defense.  Such discovery, though unavailable at this point, would greatly

1

aid Plaintiffs in the comparative law analysis that the Court has ordered as a prerequisite to discovery.

Second, the decisions of the Southern District of New York or the United States Second Circuit Court of Appeals are not preclusive as to the Plaintiffs. In short, no preclusion doctrine allows The Club or Court to extend these decisions to the detriment of the Plaintiffs, who are Plaintiffs are also entitled to the rights and protections afforded by Louisiana's Direct Action Statute, La. Rev. Stat. 22:1269. Indeed, the prohibition against virtual representation only reinforces the inappropriateness of wedding the Plaintiffs to a decision involving entirely separate parties, whose rights as to one another are in stark contrast with those between the Plaintiffs and The Club, in a proceeding to which they were not privy.[1] Such substantive due process considerations far outweigh principles of judicial deference, reciprocity or comity.

## BACKGROUND

The American Steamship Owners Mutual Protection and Indemnity Association, Inc. issued and delivered to Lafarge North America, Inc. a policy of marine insurance containing P&I provisions whose effective period covers those dates and times in August 2005 pertinent to the claims, defenses and damages in this suit. The policy is presumed by Plaintiffs to have been written and delivered in New York.[2] But see *Grubbs v. Gulf Intern. Marine, Inc.*, 625 So.2d 495 (La. 1993).

---

[1] Although the absence of a Judgment affects Lafarge's rights under the American Club's indemnity policy, the Plaintiffs are not The Club's assureds, and not party to any provisions conditioning suit upon a judgment of liability.

[2] As stated, Plaintiffs have been afforded no opportunity to conduct discovery and accordingly, do not possess proof of delivery. Delivery and issuance are of no moment, however. *Grubbs v. Gulf Intern. Marine, Inc.*, 625 So.2d 495 (La. 1993) (on certification by United States Fifth Circuit of question whether marine insurance policy issued by American Steamship Owners Mutual Protection and Indemnification Association - "The American Club" - was amenable to suit under Louisiana Direct Action Statute regardless of policy having been delivered in New York, where both The Club and tortfeasor's offices are located ) ("In sum, the text, purpose, and legislative history of the Louisiana Direct Action Statute and the Louisiana Insurance Code lead us to conclude that within its terms the statute permits *all* injured persons to maintain direct actions against *all* liability insurers, including P & I insurers.")

Lafarge's Certificate of Entry, **Exhibit A**, contains the following pertinent language:

If Lafarge Corporation et al acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease or otherwise, such insurance as is afforded hereunder to any similar vessel effective from the date and time the Assured acquires an insurable interest in such additional vessel. With respect to a chartered, leased, or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured hereunder.

The Assured agrees to report the name and gross tonnage of any vessel in which they acquire an insurable interest at the expiration of this policy and pay any additional premium as may be required annually, at expiry at daily pro-rate the annual rates agreed.

Please see **Exhibit A**, pp. 5-6, "Member Specific Clauses." This policy was not to lapse until February 2006. It is understood by Plaintiffs that Lafarge, in full compliance with The Club's terms, provided written notification to The Club of Lafarge's acquisition of an insurable interest in ING 4727 and sought to pay the premium nearly six months before expiry of the policy.

The presence of ING 4727 at the Lafarge Terminal at times pertinent to the Plaintiffs suit was pursuant to, and governed by, a Transportation Agreement between Lafarge and Ingram Barge Company. **Exhibit B**. As Judge Berrigan found in Ingram Barge Company's limitation action, LAED Civil Action 05-4416, R. Doc. 928 at p. 10, the Transportation Agreement created a bailment.[3] The Transportation Agreement, arguably and despite any language to the contrary, in fact establishes a charter arrangement.[4] The Transportation Agreement also provides at

---

[3] "In addition, the Court finds that a bailment analogous to that in *Barge UM-23B* was present, such that the wharfinger, LNA, was solely responsible for the duty of reasonable care relating to the ING4727 when Hurricane Katrina made landfall." C.A. 05-4419, R. Doc. 928, "Opinion" at p. 10; See also fn. 14, at R. Doc. 928, Id.: "The Court draws support for its position that LNA was essentially a "bailee for hire" as in *Barge UM-23B* from the testimony of Daniel Mecklenborg. Rec. Doc. 768, p. 12-14. Mecklenborg testified that the LNA-Ingram contract was negotiated, in part, such that LNA would bear the costs for maintaining the barge.

[4] "A `charter' is an arrangement whereby one person (the `charterer') becomes entitled to the use of the whole of a vessel belonging to another (the `owner')." *Walker v. Braus*, 995 F.2d 77, 80 (5th Cir. 1993). See *Forrester v. Ocean*

3

Section 34, in pertinent part, that the "Shipper shall assume the duty and responsibility for the safety of each barge in its possession," and that "Shipper shall be responsible for the safekeeping of Carrier's barge…" In Section 35, Lafarge, the Shipper, warrants that the barge shall have a safe berth. Such are insurable interests according to explicit language in The Club's policy.

However, at the time Plaintiffs commenced their action against The Club, there was, unbeknownst to Plaintiffs, a Declaratory Action pending between Lafarge and The Club in the United States District Court for the Southern District of New York whose subject matter included whether or not whether The Club policy afforded Lafarge with cover as to ING 4727. Plaintiffs were not provided formal or informal contemporaneous notice of the pendency of this Declaratory Action, and learned of it through sheer happenstance only after it was well underway. The action was brought by The Club in the Southern District of New York pursuant to a venue provision in The Club Rules, ***Exhibit C***, at Class I, Protection and Indemnity Insurance, Rule 1, Introductory: Interpretation: Membership: General Provisions, pp. 36 – 37, Paragraphs 43, 44 and 45. These provisions concerning "Disputes" and "Applicable Law" provide that any disputes between The Club and its assured shall be litigated, at The Club's discretion, via suit commenced in the United States District Court for the Southern District of New York, and that the insurance contract shall be governed and construed according to the laws of the State of New York. This provision concerns only first-party claims between Insurer and Insured, and has nothing whatsoever do to with, and no binding or even guiding effect upon, injured or otherwise damaged third parties bringing an action for negligence against the Insured,

---

*Marine Indem. Co.*, 11 F.3d 1213, 1215 (5th Cir. 1993); 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 11-1 (4th ed. Westlaw 2010).   Under a time charter, the owner retains possession and control of the vessel. A voyage charter is similar to a time charter but exists only when the charterer rents the vessel for a single voyage. 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 11-1 (4th ed. Westlaw 2010).

4

Lafarge North America, Inc. R. Docs. 13821, 14719.[5] Please also see R. Docs. 7731, 13821 with all attachments and exhibits, incorporated by reference to the extent consistent with this Opposition.

## **CHOICE OF LAW and COMITY - MARITIME INSURANCE POLICIES**

The subject insurance policy issued by The Club to LNA is properly considered a "maritime insurance contract" because such "specifically insures against certain maritime risks, injuries, and losses." (*Transco Exploration Co. v. Pacific Employers Ins. Co.*, 869 F.2d 862, 863 [5th Cir. 1989].) Critically, the United States Supreme Court has made clear that the interpretation of maritime insurance contracts is properly left to the states. (*Wilburn Boat Co. v. Fireman's Fund Ins. Co*, 348 US 310 [1955].) As noted by the Fifth Circuit, "[S]tates are far better equipped to balance the risks that each party to an insurance contract endures." (*Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 887 [5th Cir. 1991].)

Therefore, it has become axiomatic that State law governs the interpretation of marine insurance policies unless an available federal maritime rule controls the disputed issue. (*see Ingersoll-Rand Financial Corp v. Employers Ins. of Wausau*, 771 F.2d 910 [5th Cir. 1985].) In this regard, the Fifth Circuit has identified three (3) factors that a court should consider in determining if a federal maritime rule controls the interpretation of a marine insurance policy, or whether state law governs such interpretation:

> (1) Whether there is a relevant federal maritime rule that constitutes "entrenched federal precedent";
>
> (2) Whether the state has a substantial and legitimate interest in the application of its law; and

---

[5] This Court stated in R. Doc. 14719: "In the event that Judge Haight finds that the American Club must provide coverage to Lafarge for the alleged damages caused by the Ingram barge, then it will be bound by that decision in this case. *If not, plaintiffs will not necessarily be precluded from adjudicating the issue before the Court at a later time*." Emphasis added.

>> (3) Whether the state's rule is materially different from the federal maritime rule.

(*see Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 [5th Cir. 1991].)

Concerning the first factor, the issue herein, as discussed *infra*, is simply whether Plaintiff can maintain an action against the The Club under The Club's policy of marine insurance covering LNA. Critically, The Club does not argue, nor could it, that there is any relevant federal maritime rule, let alone any "entrenched federal precedent," governing this issue.

Concerning the second factor, as discussed *infra*, it is beyond cavil that Louisiana has a "substantial and legitimate interest in the application of its law" concerning this dispute.

Finally, concerning the third factor, while it is well-settled that state law should not be applied if it differs materially from federal maritime law (*Id.*), again, The Club does not argue that there is any relevant federal maritime law.

Therefore, upon concluding that federal maritime law does not apply – a conclusion not argued against by any party herein – the court must determine whether New York or Louisiana law applies. (*Id.*) In this regard, although a federal court customarily applies the choice of law rules of the forum in which the Court is located (see generally *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 US 487 [1941]), the court in maritime insurance disputes must apply general federal maritime choice of law rules." (*Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 [5th Cir. 1991]; *see also Bordelon Marine, Inc. v. F/V Kenny Boy*, 780 F.Supp.2d 497 [E.D. La. 2011][applying Louisiana law to interpretation of maritime insurance contract because no different applicable federal maritime rule].)

General federal maritime choice of law rules require the application of the law of the state having the "greatest interest in the litigation" (*Transco Exploration Co. v. Pacific*

*Employers Ins. Co.*, 869 F.2d 862, 863 [5th Cir. 1989]; *see also St. Paul Fire & Marine Ins. Co. v. Pham*, 2007 WL 1466747 [E.D. La. 2007].)

Factors considered in determining which state has the greatest interest in the litigation include where the accident occurred and the principal place of business of the insured. (*see St. Paul Fire & Marine Ins. Co. v. Pham* (2007 WL 1466747 [E.D. La. 2007]); *Transco Exploration Co. v. Pacific Employers Ins. Co.* (869 F.2d 862 [5th Cir. 1989]); *Truehart v. Blandon*, 884 F.2d 223 [5th Cir. 1989].) Critically, these factors outweigh the location of the principal place of business of the insurer and/or where the insurer was incorporated. Moreover, it is axiomatic (and if otherwise, counter to common sense business practice) that The Club cannot and would not bind its Members or parties injured thereby to subject their claims solely to New York law when a Member such as Lafarge conducts operations in widespread locations, leading to a casualty of massive proportions and local effect.[6] There is no valid reason that a coverage dispute should be conducted *in absentia* of tens of thousands of the parties in interest most affected by the outcome.

Indeed, as noted in *St. Paul Fire & Marine Ins. Co. v. Pham* (2007 WL 1466747 [E.D. La. 2007]):

> "The Court holds that Louisiana has the greatest interest in the litigation. St. Paul is incorporated and has its principal place of business in New York and the owner of the F/V DREAM COME TRUE is a resident of Texas, but the insurance contract was issued in Louisiana, the accident took place off the coast of Louisiana,

---

[6] See *American Home Assurance Co. v. Liberty Mutual Insurance Company*, Civil Action 02-3842 SECTION "S" (4) (EDLA 2-12-08) (discussing of the role of Louisiana Civil Code Articles 3515 and 3537, esp. La. Civ. Code art. 3537 Revision Comments, stating in part: "Article 3537 adds specificity to the description of this process by: providing an illustrative list of the factual contacts that are usually pertinent in contract conflicts; by adding to the list of "policies mentioned in Article 3515" certain sets of policies that are *ex hypothesi* pertinent in contract conflicts; and by providing that the evaluation of the strength and pertinence of the involved policies is to be made "in the light of . . . the nature, type, and purpose of the contract."

7

>and the additional insured, Business Loan Center, has its principal place of business in Louisiana."

(*Id.* at *2)

Similarly, in *Transco Exploration Co. v. Pacific Employers Ins. Co.* (869 F.2d 862 [5th Cir. 1989]) the court held:

>"We hold that, in this case, Texas has the greatest interest in the litigation. Although Pacific is incorporated and has its principal place of business in California, the insurance contract was delivered to the corporate headquarters of Salen, a Texas general partnership, in Houston, Texas. Transco, a general partner of Salen, has its principal place of business in Texas. The accident giving rise to the lawsuit and settlement took place on the outer continental shelf offshore Louisiana, not in Louisiana territorial waters; Louisiana's only connection with the suit is that the settlement of the injured worker's Jones Act claim took place in Louisiana."

(*Id.* at 863.)

Likewise, in *Truehart v. Blandon* (884 F.2d 223 [5th Cir. 1989]) the Fifth Circuit held:

>"We believe that the district court correctly applied Louisiana law since, as noted by the court, the vessel owner was a Louisiana resident, the vessel was moored in Louisiana, and the accident occurred in Louisiana."

(*Id.* at 226; *see also U.S. Fidelity & Guar. Co. v. Williams,* 676 F.Supp 123 [E.D. La. 1987].)[7]

In the instant matter, every factor considered in the aforementioned cases militates towards Louisiana having the greatest interest in this litigation. By way of example:

a. Plaintiffs are residents of the State of Louisiana.

---

[7] *Cf. Dunlap v. Hartford Insurance Company,* 907 So. 2d 122 (1st Cir. App. 2005) ("Under these circumstances, the policy itself demonstrates that Zurich and Iafrate anticipated that Iafrate would be conducting business in many states other than Michigan**;** that the policy would cover Iafrate-owned vehicles, licensed, used and garaged in other states; that residents of many other states would be employed by Iafrate, would be using its vehicles, and would be insured under the policy and that the laws of other states might be applied to modify the terms of the policy. We believe this knowledge on the part of both Iafrate and Zurich must have informed and influenced their negotiations and decisions concerning policy premiums and coverage limits.")

8

    b.  LNA has been licensed/authorized to do business in the State of Louisiana since 1988 and operates over 20 land based distribution facilities in Louisiana and at least 3 maritime terminals.

    c.  The barge was moored in Louisiana.

    d.  The incident occurred in Louisiana.

    e.  The incident caused hundreds of millions of dollars in damage to tens of thousands of Louisiana residents and their property.

    f.  The incident caused hundreds of millions of dollars to Louisiana local and state governments.

Conversely, while The Club has offices in New York (as well as London, Piraeus, and Shanghai), there is no other relevant connection to New York herein. Respectfully, any contrary argument is pure sophistry. As such, pursuant to federal maritime choice of law rules, Louisiana law should be applied herein.

Moreover, considerations of comity do not lead to a different result. Indeed, while the doctrine of comity is advanced where courts of coordinate rank are respectful of each other's orders,[8] critically, "Comity does not require deference to a state with fewer significant contacts." (*Lee v. Ford Motor Co.*, 457 So.2d 193, 195 [2nd Cir.1984] *writ denied* 461 So.2d 319 [La.1984]; *see also Brown v. DSI Transports, Inc.*, 496 So.2d 478 [La.App. 1st Cir. 1986] *writ denied* 498 So.2d 18 [La.1986].) Indeed, as held by that court, "Louisiana, as the forum state chosen by the plaintiff, has the right to favor its own policies over the policies of a state with a less significant relationship to the issue." (*Id.* at 195.) Neither does comity wed the Plaintiffs or this Court to a decision that excludes consideration of this same District's finding of a bailment, that is, an insurable interest to which the American Club policy affords cover.

---

[8] (*see Schauss v. Metals Depository Corp.*, 757 F.2d 649 [5th Cir. 1985].)

Perhaps most importantly, deference to the New York decision, either through comity or otherwise, would seriously run afoul of long-held constitutional considerations of due process. Indeed, this Court correctly observed in R. Doc. 14719: "In the event that Judge Haight finds that the American Club must provide coverage to Lafarge for the alleged damages caused by the Ingram barge, then it will be bound by that decision in this case. *If not, plaintiffs will not necessarily be precluded from adjudicating the issue before the Court at a later time*." Emphasis added.

Indeed, in order for *res judicata* to apply, *all* of the following four requirements must be met:

- First, the parties in the instant action must be the same as or in privity with the parties in the prior action in question. (*see United States v. Shanbaum*, 10 F.3d 305, 310 [5th Cir.1994].) (emphasis added).

- Second, the court that rendered the prior judgment must have been a court of competent jurisdiction. *Id*.

- Third, the prior action must have terminated with a final judgment on the merits. *Id*.

- Fourth, the same claim or cause of action must be involved in both suits. *Id.*; *see* also *Gulf Island-IV, Inc. v. Blue Streak-Gulf Is Ops*, 24 F.3d 743, 746 (5th Cir. 1994).

Here, Plaintiffs are not in privity with the previous plaintiffs and therefore, *res judicata* does not apply. (*see Gulf-Island-IV, Inc. v. Blue Streak-Gulf Is Ops*, *supra*, at 747 [finding "[b]ecause [plaintiff] does not meet the first requirement of *res judicata*, it is unnecessary to review the arguments presented by the parties as to the other requirements of *res judicata*."])

In order for collateral estoppel to bar a particular issue, the following four conditions must be met:

- First, the issue under consideration is identical to that litigated in the prior action;

- Second, the issue was fully and vigorously litigated in the prior action;

- Third, the issue was necessary to support the judgment in the prior case; and

- Fourth , *there is no special circumstance that would make it unfair to apply the doctrine.*

(*see Black v. Arceneaux,* 1998 U.S. Dist. LEXIS 450, 10-11 [1998]; *see also Enlund v. British Petroleum Oil Co*., 1993 U.S. Dist. LEXIS 5541 *4 [1993].)

The failure to meet any one of the four conditions precludes the application of collateral estoppel. *See id.*

"Due process requires that the rule of collateral estoppel operate only against persons who have had their day in court either as a party to the prior suit or as a privy…" (*see Bernhard v. Bank of America National Trust & Savings Ass'n*, 19 Cal.2d 807 [1942]; *see also Benson v.Wanda Petroleum Co*., 468 S.W.2d 361, 362-364 [1971]; *see also Parklane Hosiery v. Shore., 439* U.S. 322, 327 [1979] ["[a]n underlying principle is that it is a violation of due process for a judgment [in a prior suit] to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard."])   A finding that a party stands in privity with a party or parties to a prior action, "requires more than a showing of parallel interests or, even, a use of the same attorney in both suits." (*see id.*; *see also Hardy v. Johns-Manville Sales Corp*., 681 F.2d 334, 340 [5th Cir. 1982]["…privity is not established by the mere fact that persons may happen to be interested in the same question or in proving the same state of facts.")]

This Circuit has consistently held that finding privity between parties requires more than

a shared interest in the issues or facts of the case. For example, in *Pollard v. Cockrell* (578 F.2d 1002 [5th Cir. 1978]), the defendant sought to preclude the plaintiffs from litigating their claims, arguing that the plaintiffs in a prior case had identical interests and thus "virtually represented" the latter plaintiffs, collaterally estopping the latter plaintiffs from re-raising the issue of whether a particular ordinance was constitutional. Despite the fact that both sets of plaintiffs were massage parlor owners and masseuses who were represented by the same attorneys, filed virtually identical complaints, and had identical interests in a determination of the constitutionality of an ordinance, the court rejected the defendant's "virtual representation" argument.  In so holding, the court found that "[v]irtual representation demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to nonparties who file a subsequent suit raising identical issues." (*Id.* at 1008-1009.) The court noted that in reviewing cases where a "virtual representation" relationship was found, the types of relationships included "estate beneficiaries bound by administrators, presidents and sole stockholders by their companies, parent corporations by their subsidiaries, and a trust beneficiary by the trustee."(*Id.*)

Unlike these "virtual representation" scenarios, the plaintiffs in the prior case had no legal accountability to the plaintiffs in the subsequent case, and thus a "virtual representation" relationship was not established. As such, the plaintiffs in the two suits were not in privity and precluding Plaintiffs from litigating their claims would violate their right to due process. (*see id.*)

Similarly, in *Freeman v. Lester Coggins Trucking Co.* (771 F.2d 860 [5th Cir. 1985]), the plaintiff appealed the dismissal of his wrongful death claim and those of four other wrongful death claimants for the death of his infant daughter. The dismissal was based upon collateral

estoppel as the plaintiff had already brought suit against the defendants for his own personal injuries and the court dismissed the suit pursuant to a jury verdict exculpating the defendants of negligence. Relying on the court's holding in *Pollard*, the court found that the wrongful death claimants, other than Freeman himself whose personal injury claim was tried, were *not* estopped from litigating their claims because they had no control over the prior litigation, the claimants in the prior litigation had no legal accountability to them and thus the parties were not in privity. (*see Id*.) As such, "they [had] never had a chance to present their evidence and arguments on the claim" and precluding them from so doing would violate their due process rights. (*Id*. at 866.) In so holding, the *Freeman* court emphasized the paramount importance of preserving due process rights noting that "[t]he price of due process… may include the possibility of conflicting adjudications in order to assure each litigant his or her day in court." (*Id.*)

The United States Supreme Court, in *Taylor v. Sturgell* (128 S.Ct. 880 [2008]), wholeheartedly rejected the suggestion of virtual representation as a preclusive defense to a separate action involving different litigants. In effect, The Club seeks to reverse the Supreme Court. In rejecting the position espoused by The Club, the Court wrote:

> "We reject this argument for three reasons. First, our decisions emphasize the fundamental nature of the general rule that a litigant is not bound by a judgment to which she was not a party. See, *e.g.,* Richards, 517 U.S., at 798-799, 116 S.Ct. 1761; *Martin,* 490 U.S., at 761-762, 109 S.Ct. 2180. Accordingly, we have endeavored to delineate discrete exceptions that apply in "limited circumstances." *Id.,* at 762, n. 2, 109 S.Ct. 2180. Respondents' amorphous balancing test is at odds with the constrained approach to nonparty preclusion our decisions advance.
>
> "Our second reason for rejecting a broad doctrine of virtual representation rests on the limitations attending nonparty preclusion based on adequate representation. A party's representation of a nonparty is "adequate" for preclusion purposes only if, at a minimum: (1) the interests of the nonparty and her representative are aligned, see *Hansberry,* 311 U.S., at 43, 61 S.Ct.

13

> 115; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty, see *Richards,* 517 U.S., at 801-802, 116 S.Ct. 1761; *supra,* at 2173-2174. In addition, adequate representation sometimes requires (3) notice of the original suit to the persons alleged to have been represented, see *Richards,* 517 U.S., at 801, 116 S.Ct. 1761.[11] In the class-action context, these limitations are implemented by the procedural safeguards contained in Federal Rule of Civil Procedure 23.
>
> "An expansive doctrine of virtual representation, however, would "recogniz[e], in effect, a common-law kind of class action." *Tice,* 162 F.3d, at 972 (internal quotation marks omitted). That is, virtual representation would authorize preclusion based on identity of interests and some kind of relationship between parties and nonparties, shorn of the procedural protections prescribed in *Hansberry, Richards,* and Rule 23. These protections, grounded in due process, could be circumvented were we to approve a virtual representation doctrine that allowed courts to "create *de facto* class actions at will." *Tice,* 162 F.3d, at 973.
>
> "Third, a diffuse balancing approach to nonparty preclusion would likely create more headaches than it relieves. Most obviously, it could significantly complicate the task of district courts faced in the first instance with preclusion questions. An all-things-considered balancing approach might spark wide-ranging, time-consuming, and expensive discovery tracking factors potentially relevant under seven- or five-prong tests. And after the relevant facts are established, district judges would be called upon to evaluate them under a standard that provides no firm guidance. See *Tyus,* 93 F.3d, at 455 (conceding that "there is no clear test for determining the applicability of" the virtual representation doctrine announced in that case). Preclusion doctrine, it should be recalled, is intended 2177*2177 to reduce the burden of litigation on courts and parties. Cf. *Montana,* 440 U.S., at 153-154, 99 S.Ct. 970. "In this area of the law," we agree, "`crisp rules with sharp corners' are preferable to a round-about doctrine of opaque standards." *Bittinger v. Tecumseh Products Co.,* 123 F.3d 877, 881 (C.A.6 1997)."

(*Taylor v. Sturgell*, 128 S.Ct. 2161 [2008].)

The Court also described exceptions to the prohibition against non-party preclusion, none of which are satisfied here.

14

> "First, "[a] person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement." 1 Restatement (Second) of Judgments § 40, p. 390 (1980)."

In light of Plaintiffs' pleadings and their earlier efforts to have the coverage dispute resolved here, there is no question that the Plaintiffs did not agree to be bound by the decisions of the Southern District of New York or the Second Circuit. This Court also observed that such decisions need not be binding.

> "Second, non-party preclusion may be justified based on a variety of pre-existing "substantive legal relationship[s]" between the person to be bound and a party to the judgment. Shapiro 78. See also *Richards*, 517 U. S., at 798. Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor. See 2 Restatement §§ 43-44, 52, 55."

There is no preexisting legal relationship between the Plaintiffs and The Club.

> "Third, we have confirmed that, "in certain limited circumstances," a non-party may be bound by a judgment because she was "adequately represented by someone with the same interests who [wa]s a party" to the suit. *Richards*, 517 U. S., at 798 (internal quotation marks omitted). Representative suits with preclusive effect on non-parties include properly conducted class actions, see *Martin*, 490 U. S., at 762, n. 2 (citing Fed. Rule Civ. Proc. 23), and suits brought by trustees, guardians, and other fiduciaries, see *Sea-Land Services, Inc.* v. *Gaudet*, 414 U. S. 573, 593 (1974). See also 1 Restatement § 41."

Here, class status was denied, and there is definitely not a trusteeship, guardianship, or fiduciary relationship between the Plaintiffs and Lafarge North America. Likewise, Lafarge and the Plaintiffs do not share the same interests where Lafarge is contractually bound to litigate disputes with its insurer in New York according to New York law.

> "Fourth, a non-party is bound by a judgment if she "assume[d] control" over the litigation in which that judgment was rendered. *Montana*, 440 U. S., at 154. See also *Schnell* v. *Peter Eckrich & Sons, Inc.*, 365 U. S. 260, 262, n. 4 (1961); 1 Restatement § 39.

> Because such a person has had "the opportunity to present proofs and argument," he has already "had his day in court" even though he was not a formal party to the litigation. *Id.*, Comment *a*, p. 382."

Plaintiffs had no formal notice of the Declaratory Action, were not noticed of or parties to any discovery or motions in that action, and were afforded no viable opportunity to affect its outcome. This Court declined Plaintiffs' efforts to bring the dispute before it, and Plaintiffs were conscious not to waive any rights such as those asserted in this Opposition or R. Docs. 7731, 13821 incorporated herein or arguments otherwise advanced to this Court for the proposition that the Plaintiffs have the right to bring the coverage dispute before this Court.

> "Fifth, a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy."

This criterion is not implicated by any of the party relationships in the Plaintiffs' action pending here.

> "Sixth, in certain circumstances a special statutory scheme may "expressly foreclos[e] successive litigation by non-litigants . . . if the scheme is otherwise consistent with due process." *Martin*, 490 U. S., at 762, n. 2. Examples of such schemes include bankruptcy and probate proceedings, see *ibid.*, and *quo warranto* actions or other suits that, "under [the governing] law, [may] be brought only on behalf of the public at large," *Richards*, 517 U. S., at 804."

There is no statutory scheme which binds Plaintiffs to the decisions of the Southern District of New York and the Second Circuit respecting the Plaintiffs' suit against The Club.

### **INTERPRETION OF THE POLICY REQUIRES DISCOVERY**

Although Rule 56 permits the parties to move for summary judgment before discovery is completed, summary judgment motions usually are not appropriate at the very outset of litigation. In fact, "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v.*

16

*UnitedStates Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir. 2000); *see also Deere & Co. v. Ohio Gear,* 462 F.3d 701, 706-708 (7th Cir. 2006) (in light of pending discovery motions, district court abused its discretion by granting summary judgment). If the motion seems premature, Fed.R.Civ.P. 56(d) allows the court to deny the motion, or defer ruling on it. *Fed. R. Civ. P. 56(d).* In fact, requests for additional time for discovery "are broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot oppose." *Raby v. Livingston,* 600 F.3d 552, 561-562 (5th Cir. 2010). Please see **Exhibit D**, Plaintiffs' Fed. R. Civ. P. 56(d) Declaration pertinent to the American Club coverage dispute.

Discovery in this matter should take the following into account. An insurance policy is a contract and must be construed using the general rules of interpretation of contracts set forth in the Louisiana Civil Code. (s*ee Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577 [2003].) As relevant here, the Louisiana Civil Code provides, "Interpretation of a contract is the determination of the common intent of the parties." The language of the policy is the starting point for determining that common intent. (*see Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948 [5th Cir. 2009].) "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." (LA Civ. Code Art. 2046). Moreover, "The words of a contract must be given their generally prevailing meaning." (LA Civ. Code Art. 2047). However, "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." (LA Civ. Code Art. 2048) Likewise, "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." (LA Civ. Code Art. 2049). Critically, "A contract executed in a standard

17

form of one party must be interpreted, in case of doubt, in favor of the other party." (LA Civ. Code Art. 2056).

A provision in an insurance contract is ambiguous if it is susceptible to two or more reasonable interpretations, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed. (*see generally Campbell v. Melton*, 817 So.2d 69 [2002].) Under Louisiana law, any ambiguous contract provision must be interpreted in favor of coverage (*see Garcia v. St. Bernard Parish School Bd.*, 576 So.2d 975 [1991]), and the insurer bears the burden of proving a policy exclusion. (*see Tunstall v. Stierwald*, 809 So.2d 916 [2002].) Finally, equivocal provisions seeking to narrow the insurer's obligation are strictly construed against the insurer. (*see Garcia v. St. Bernard Parish School Bd.*, 576 So.2d 975 [1991].)

When an ambiguity is present, the court may look to parol and/or extrinsic evidence to determine the intent of the parties. (*see Doerr v. Mobile Oil Corp.*, 774 So.2d 119 [2000]; *see also Campbell v. Melton*, 817 So.2d 69 [2002].) Critically, in the context of insurance policy ambiguities, "[A] continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course" if it is determined that such discovery may be "helpful" in resolving the ambiguity. (*Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 963 [5th Cir. 2009] *quoting Int'l Shortstop, Inc. v. Rally, Inc.*, 939 F.2d 1257, 1267 [5th Cir. 1991].)

Here, there can be no doubt that resort to discovery, to examine and discover parol and extrinsic evidence, may be "helpful" to determine the intent of the parties to The Club's contract. This is especially true in light of the fact that plaintiff herein was not a party to the New York

action, was not noticed – either formally or informally – of the New York action, nor participated at all in the New York proceedings or any discovery that may have taken place therein.

## **CONCLUSION**

The Plaintiffs' substantive due process rights as tort victims outweigh comity principles. Given the magnitude of the casualty at issue, any interest The Club might claim New York has cannot compare with the demographic, economic and policy impact upon the State of Louisiana. Given an opportunity to conduct discovery, the Plaintiffs can prove, particularly given Judge Berrigan's ruling as to existence of a bailment, that Lafarge held an insurable interest in ING 4727, one encompassed within the terms of the policy. The American Club's Motion for Summary Judgment should be denied.

October 17, 2011

Respectfully submitted,

*/s/Brian A. Gilbert*
Brian A. Gilbert (21297)
**LAW OFFICE OF BRIAN A. GILBERT, P.L.C.**
2030 St. Charles Avenue
New Orleans, Louisiana 70130
Telephone: (504) 598-1000
Facsimile: (504) 524-1024
E-mail:
bgilbert@briangilbertlaw.com

Shawn Khorrami (CA SBN #14011)
**KHORRAMI, POLLARD & ABIR, LLP**
444 S. Flower Street, 33rd Floor
Los Angeles, California 90071
Telephone: (213) 596-6000

19

Facsimile: (213) 596-6010
e-mail: Skhorrami@kpalawyers.com

Lawrence A. Wilson (N.Y.S.B.A. #2487908)
**WILSON, GROCHOW, DRUKER**
233 Broadway, 5th Floor
New York, NY 10279
Telephone: (212) 608-4400
Facsimile: (212) 608-0746
e-mail: lwilson@wgdnlaw1.com

Lawrence D. Wiedemann (#13457)
Karl Wiedemann (18502)
**WIEDEMANN ANDWIEDEMANN**
100 Veterans Memorial Blvd., Ste.
Metairie, Louisiana 70005
Telephone: 504-581-6180
e-mail: ldwiedemann@gmail.com
karlwiedemannlaw@gmail.com

Patrick J. Sanders (18741)
**PATRICK J. SANDERS, LLC**
3316 Ridgelake Drive, Suite 100
Metairie, Louisiana 70002
Telephone: (504) 834-0646
e-mail: pistols42@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document has been served upon counsel of record, by United States Mail, postage prepaid and properly addressed, facsimile and/or ECF upload, this 17th day of October, 2011.

*/s/ Brian A. Gilbert*