UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE: KATRINA CANAL BREACHES** | * | |
| **CONSOLIDATED LITIGATION** | * | **CIVIL ACTION** |
| | * | |
| | * | **NO. 05-4182** |
| **PERTAINS TO: BARGE** | * | **and consolidated cases** |
| | * | |
| | * | **SECTION "K" (2)** |
| *Weisler v. Seymour, et al.* **09-2737** | * | |
| | * | **JUDGE** |
| | * | **STANWOOD R. DUVAL, JR.** |
| | * | |
| | * | **MAGISTRATE JUDGE** |
| | * | **JOSEPH C. WILKINSON, JR.** |

### MEMORANDUM ON BEHALF OF PLAINTIFF, DR. RICHARD H. WEISLER IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

### INTRODUCTION

This matter is essentially an "open account" or "collection case" in which a psychiatrist, Dr. Richard Weisler, seeks to recover professional expert witness fees owed to him by a group of attorneys representing certain plaintiffs and/or putative class members in the "Katrina Barge Litigation." The Defendants are all individual attorneys as well as the firms for which they

1

work, who refer to themselves on their "Barge Case" website as the "Barge Plaintiffs Subgroup Litigation Committee" (BPSLC"). These attorneys had developed the concept of an "emotional injury" subclass and had attempted to find one or more experts who could help them establish that subclass, albeit belatedly, as they waited until less than thirty days before the deadline for expert reports to pursue the concept.

After contacting Dr. Weisler, retaining him, agreeing to his $600.00 hourly rate, directing Dr. Weisler's efforts, as well as those of several other mental health professionals, and accepting and praising Dr. Weisler's expert report generated under incredible time constraints, the Defendants ran into funding issues and claimed they could not pay him or the other providers. Meanwhile, they had contacted yet another law firm to fund the litigation whose lawyers convinced the Defendants that their proposed "emotional injury subclass" was an unworkable concept from the outset, and so it was abandoned.

The Defendants then attempted to negotiate a lesser payment for Dr. Weisler's services to which they were not entitled since Dr. Weisler had done everything he was told to do. Thereafter, the Defendants refused to pay Dr. Weisler and several of the other mental healthcare providers a dime. At the same time, the Defendants *did* pay two of the mental health care providers. The first was psychologist, Dr. Jill Hayes, who refused to turn over her contributory

report until such time as she had been paid early on. The second was Dr. Mark Townsend, who was paid at the same agreed $600.00 rate as Dr. Weisler, but not until 2009, and only because the Defendants concluded they needed Dr. Townsend as an expert witness at trial.

The Defendants' arbitrary refusal to pay the mental healthcare providers would have been insult enough, but the Defendants have now compounded their collective wrong by filing a bogus counter-claim based on specious reasons created well after the fact as a way of dodging payment. These reasons constitute blatant examples of groundless theories made in bad faith which should warrant Rule 11 relief which Dr. Weisler now seeks as well.

In sum, Dr. Weisler seeks partial summary judgment on three issues which will greatly simplify the issues for the jury trial set for December 5, 2011. The first issue is the Defendants' contractual liability to Dr. Weisler since the elements of a contract for services are easily established. Next, Dr. Weisler also seeks partial summary judgment dismissed or establishing that an "open account" existed. Finally, he seeks the Defendants' specious counter-claim, as well as Rule 11 relief. The only issue remaining for trial should be the amount of Dr. Weisler's damages, if that is even at issue, as his detailed invoices clearly support his claim.

## FACTS

### I. The Project

In early 2008, with the deadline for expert reports rapidly approaching, the BPSLC decided to retain medical experts in the fields of psychology and psychiatry in order to establish

an "emotional injury subclass" within the larger class-action which was and is the subject of the Katrina Barge litigation.   On May 15, 2008, with less than 30 days until the expert report deadline of June 12, 2008, attorney Alan Fuchsberg, then a member of the BPSLC, sent out an e-mail to various experts in those fields in an effort to find someone who could undertake the task of providing sufficient medical support for an "emotional injury subclass."

Two of the experts with whom he communicated were Plaintiff, Dr. Richard H. Weisler, a psychiatrist who practices in Raleigh, North Carolina, who is also an adjunct faculty member at both Duke University Medical Center and the University of North Carolina and lectures nationally and internationally; and, Dr. Mark H. Townsend, a professor of psychiatry and a psychiatrist affiliated with the LSU Health Services Center here in New Orleans.  Both of these psychiatrists had published and spoken on the adverse psychological effects of Katrina on flooded residents of the New Orleans area.

In his e-mail to Dr. Weisler[1], Mr. Fuchsberg specifically indicated that he was one of "a small group of attorneys" seeking an expert to provide a comprehensive expert report to help establish an emotional injury subclass. In a conference call the next day with Dr. Weisler and Dr. Townsend, Mr. Fuchsberg suggested that the subclass might  consist of about 5,000 people of the

---

[1]      Exhibit 1.

total of approximately 60,000 people which made up the larger class-action or Barge case.[2]  As

his e-mail to the other members of the BPSLC reflects, Mr. Fuchsberg retained both experts:[3]

> I just got off a conference call with two psychiatrists professors
> (from LSU School of mental health and Duke University) who
> together have worked with Katrina victims, and are populist
> psychiatrists.  They have agreed to coauthor a report by June 12.
> They want to interview the class reps in New Orleans next
> Saturday.  Their names are Dr. Mark Townsend and Dr. Richard
> Weisler.  They will send a plan summary after the weekend for our
> review.  Alan.

He would also later agree to their hourly rate of $600.[4]  No limit was ever placed on what

the project would cost, nor did the Defendants, all attorneys or law firms, ever prepare a formal

agreement or contract.    Months later one of the Defendants stated that the absence of such

written agreement made the Defendants look like "hicks"[5]  Shortly after retaining Dr. Weisler

and Dr. Townsend, the Defendants, particularly Mr. Fuchsberg and Richard Seymour, began to

define the project in greater detail.  First, Mr. Fuchsberg sent a copy of a Motion the Defendants

had filed related to the certification of the proposed emotional injury subclass as well as other

---

[2]      Exhibit 2.

[3]      Exhibit 3.

[4]      Exhibit 4.

[5]      Exhibit 5.

matters.[6]  The Defendants had just filed the Motion on May 15, 2008, just one day before

contacting Dr. Weisler.  In that Motion the Defendants indicated that the "emotional injury

subclass" would be composed of "randomly" chosen individuals who had sustained emotional

injuries as a result of flooding caused by "the Barge".  Yet, just days after filing this Motion, the

Defendants indicated they would **select** twelve "representative" Plaintiffs to represent the

proposed "emotional injury subclass."[7]  In any event, Dr. Weisler immediately advised the

Defendants in response that since the Defendants were selecting these "representatives," he

could not predict what symptoms, if any, these individuals would have.   Mr. Seymour also,

early on, provided the scope and purpose of the project as follows:

> An admissible diagnosis will have to be differential, to exclude
> other causes, even if this is a tentative or 'starter' diagnosis.  That
> means psychological testing by a psychologist.  The psychiatrist
> can rely on this testing without the psychologist having to testify.
> This will need to be lined up and explained to them in advance by
> counsel.[8]

As the directives from Defendant Richard Seymour made clear, Dr. Townsend and Dr.

Weisler would be charged not only with "screening" potential class members for post-traumatic

stress disorder ("PTSD"), but also with screening for a variety of other adverse psychological

---

[6]     DI 15549

[7]     Exhibit 6.

[8]     Exhibit 7.

6

effects.  They were also to provide "differential" diagnoses as needed for the representative plaintiffs of the subclass.  He also indicated they should review and reference numerous publications.[9]

## II.  The Project Expands

To start, Dr. Weisler forwarded examples of various screening forms to Mr. Fuchsberg and the other Defendants as part of the initial phase of their development of the proposed methodology.[10]  It quickly became apparent that under the time constraints, Dr. Weisler and Dr. Townsend would also need to eventually perform detailed interviews of the twelve "representatives" chosen by the Defendants on the following weekend.  These efforts would be supported by psychological testing and evaluation to be performed by psychologists, including Dr. Jill Hayes and Dr. Phillip Griffin.[11]  Eventually, since the Defendants had overlooked the fact that many of those adversely effected were adolescents and teenagers, it would be necessary to bring in other resources and authorities for such individuals.  Consequently, with the approval of the Defendants, Dr. Howard Osofsky, a psychiatrist, and Dr. Joy Osofsky, a psychologist, both experts in adolescent mental healthcare, were brought in.  In addition, Dr. Weisler asked for and

---

[9]       *Id.* Exhibit 8.

[10]      Exhibit 9.

[11]      Exhibit 10.

received permission to contact various other specialists in various fields who would provide additional authoritative information for the project.[12]

As the project began to grow both in scope and participating mental health professionals, all with the Defendants' authorization, the Defendants felt that there should be a "single point of entry" or one spokesperson communicating for and on behalf of the expert team.  Defendant, Alan Fuchsberg described this role:

> [M]y understanding is that there will need to be a principal psychiatrist/report author for the class action expert opinion report due June 12th.  This person will need to sign the report and be willing to testify as to the nature of the study what the report is about: as to efforts that were taken by the group to evaluate class representatives, methodology that was filed for these evaluations, the findings as to each class reps condition - - ranging from those who continued to be ill to those who are not injured to any diagnosable degree, and what other psychiatric disorders found and then associated with Katrina are found in houses included.  Then we need a workable supportable defensible plan to evaluate anyone who comes forward from the ninth ward (up to Parish Road) in a response to a class notice, potentially 5,000 (more or less?) Of the 40,000 or so residents; abridge the evaluations consistent with recognized psychiatric principles, describing what methodology could be used to screen and then shortly identify individuals who suffered or continue to suffer an emotional injury as recognized under a standard diagnostic criteria(s).  Of course it would be best to have a psychiatric consensus on the approach (among the psychiatrists involved) gained from this investigation of class rep injuries, as well as examination and discuss of peer review articles and peer accepted methodologies.  Whoever can

---

[12]         Exhibit 11.

8

best share this because of credential and experience - - and willingness of course - - should be this point of entry person. What do others think?[13]

The Defendants suggested Dr. Weisler should fulfill this and write the report.[14] This inevitably meant that Dr. Weisler would have to perform much more work than any of the other mental health professionals involved in the project. His task was made all the more complicated by the time constraints created by the Defendants' belated decision to pursue this project. This also greatly increased the workload and therefore both Dr. Weisler and Dr. Townsend informed the Defendants that they would have to work days, nights and weekends in order to complete the project within weeks. With this understanding, Dr. Weisler cleared his calendar of his usual work activities, and he made immediate plans to travel to New Orleans on May 23, 2008 to begin conducting formal psychiatric evaluations that weekend with Dr. Townsend. They would interview the potential proposed class representatives and others whom the Defendants had hand picked. These individuals were referred by Defendants, Rick Seymour, Alan Fuchsberg, Brian Gilbert, as well as Larry Wiedemann of the Wiedemann & Wiedemann firm, another Defendant herein.[15]

---

[13]     Exhibit 12.

[14]     Exhibit 13.

[15]     Mr. Wiedemann was in bankruptcy at the time this lawsuit was filed and was thus not named individually.

### III.   Initial Findings

Shortly after the first round of evaluations, Dr. Weisler and Dr. Townsend informed Larry Wiedemann and Brian Gilbert that two of the five individuals who were listed as their potential proposed class representatives were found not to have ever experienced any diagnosable mental health disorders as a consequence of the flooding which occurred during the Barge incident.   Additionally, one of the five potential proposed class representatives was determined to have no diagnosable current mental health symptoms, even though she had previously been impacted.   In response, Mr. Fuchsberg, Mr. Seymour and Mr. Gilbert were neither surprised nor dissatisfied with these findings as they thought the court would look favorably on a medical approach and methodology that could relatively quickly rule out those who were not, or who were less significantly, adversely impacted mentally by the aftermath of Hurricane Katrina.[16]   Despite these findings of no symptoms in some of the representatives, Dr. Weisler and Dr. Townsend also informed the Defendants that two of the individuals they had evaluated for them reported that they had been suicidal, and that one had also a period of feeling homicidal after the extensive flooding in their neighborhoods, and suggested that they be referred for more individual professional care.[17]   Based upon these initial findings, Dr. Weisler

---

[16]     Exhibit 14.

[17]     Exhibit 15.

and Dr. Townsend were told by the Defendants to continue to evaluate the remaining representatives. Meanwhile, Dr. Jill Hayes evaluated one of the representative Plaintiffs through a battery of psychological testing.

When the psychological interview and testing had been concluded, Dr. Weisler pulled together all of the screening information, interview notes, academic articles from other specialists and authorities, and other related information and began to put together the report. This was no simple task as, according to Mr. Fuchsberg, such a report had never been done before and certainly Dr. Weisler made it clear that certainly he had never put together such a report before. The time constraints on the project caused solely by the untimely nature of the Defendants' request did not make the project any easier. Fortunately, the Defendants were able to obtain a two week extension until July 1, 2008 from the Court.

Meanwhile, in an effort to make the project come together more quickly, more efficiently and more economically, Dr. Weisler and Dr. Townsend suggested that the Defendants retain FirmLogic, a company that organizes documentation and provides assistance in gathering an ongoing documents, for the preparation of the expert report. The Defendants refused to permit involvement of FirmLogic, preferring instead for the healthcare providers and their respective staffs to do all of the "leg-work" themselves.[18]   As the Defendants would later admit, this

---

[18]       Exhibit 15.

increased the workload and, in turn, the fees charged by the healthcare providers.[19]  Meanwhile, the Defendants did retain an individual, Ronnie Montgomery, to gather individual records. Although, Defendant, Richard Seymour, personally guaranteed his fees[20], the Defendants have refused to pay him as well.

Under these round the clock adverse circumstances, Dr. Weisler and the other members of the project team continued to work increasingly toward completing the report on time.  With the deadline of July 1, 2008, fast approaching, and the report nearly complete, Defendant, Richard Seymour, decided to completely change the report.  Mr. Seymour sent an e-mail shortly after midnight on Sunday, June 29, 2008 to Dr. Weisler, copying many of the Defendants and mental health professionals suggesting multiple pages of "questions I expect the judge would like to see information about in the medical report, whether or not complete answers are in."[21] These "questions" covered some five pages.  Mr. Seymour gave no explanation for why he waited until less than two days before the expert report deadline to have Dr. Weisler address pages and pages of questions which would necessarily require the complete revision of the massive report.  This untimely request on top of the general untimeliness of the entire project, all caused by the Defendants' actions, greatly increased Dr. Weisler's workload requiring him to

---

[19]     Exhibit 16.

[20]     Exhibit 17.

[21]     Exhibit 18.

work around the clock to meet the Court's deadline. He did so.

Dr. Weisler's comprehensive expert report was received with glowing acclaim by the Defendants. For instance, Mr. Gilbert wrote to Dr. Weisler that he would "breeze through any challenge to your ability to render expert scientific opinions in this case," and "that your methods are more than sufficiently peer reviewed and your data founded upon clear and accepted scientific principles."[22] He also stated that he believed that, "your findings as to any of the individuals you tested will withstand challenge." Likewise, Mr. Fuchsberg wrote to Dr. Weisler: " Thank you Rick W. Your work and that of the team, for this report is important and reminds us how people are still suffering from the inside and need help."[23] The next step of he project was for Dr. Weisler to prepare for an expert deposition to defend the report. Unfortunately, the Defendants ran into money problems.

## IV.  Invoicing

At various points in time during the project, Dr. Weisler and the other members of the project team invoiced the BPSCL per the members' instructions.  First off, Dr. Jill Hayes sent her invoice, but would not release her report until such time as she was paid.[24]  Next up, on or

---

[22]     Exhibit 19.

[23]     Exhibit 20.

[24]     Exhibit 21.

about June 10, 2008, Dr. Mark Townsend issued his first invoice for professional services.[25]  Dr. Townsend would not be compensated until early 2009, after he threatened litigation and it was apparent the Defendants needed expert witness testimony from him.  Significantly, he charged the same $600 hourly rate Dr. Weisler charged.  In addition, Dr. Phillip Griffin, Dr. Joy Osofsky and Dr. Howard Osofsky all issued their invoices to the BPSLC, but they were never paid, nor were the medical records investigator, Ronnie Montgomery.

Dr. Weisler gave his first indication of the fees owed him with an attachment to the expert report.[26]  He subsequently sent an invoice indicating additional hours on or about June 28, 2008 as well as later invoices.[27]  In response to Dr. Weisler's June 28th invoice, Defendant, Alan Fuchburg wrote:

> Dear Rick W,
>
> We are in receipt of your invoice.
> It is much more than we expected or can afford.  For example, Mark Townsend's invoice is about one-fifth of yours; also his billing rate is one-half.
> We are operating on a shoe string budget and if you could, bring this down to Mark's area, it would be much appreciated.
> Sincerely,
> Alan[28]

---

[25]  Exhibit 22.

[26]  Exhibit 23.

[27]  Exhibit 24.

[28]  Exhibit 25.

14

Similarly, on July 29, 2008, Defendant Richard Seymour e-mailed the members of the

BSPLC as follows:

> Alan, Dr. Weisler submitted his invoice today for $216,390.00 at $600 an hour, and it is fair to stay that the amount is a shock. It's about five times what Mark Townsend charged and twice his rate.
>
> When you were discussing the case with him or e-mailing with him, was their a retainer or a budget, if so, please send it to us.
>
> Did you ever have a discussion with him about his rate or about the need to keep expenses low? If that was memorialized in an e-mail or letter, please send it to us.
>
> This is a huge problem, and we need to make sure we are on top of the facts before the NOLA people and/or I talk to Dr. Weisler about a major adjustment.[29]

Significantly, both of these Defendants completely misunderstood the situation. First,

Alan Fuchsberg never indicated that money was an issue. Second, Dr. Townsend was billing at

the same $600 hourly rate. Third, Dr. Weisler, as the group's spokesperson and author of the

report spent five time the number of hours Dr. Townsend spent on the project. As Dr. Townsend

billed in excess of $54,000.00, Dr. Weisler's fees were certainly reasonable. Curiously, the

Defendants raised no issue as regards Dr. Hayes' billings of over $21,000 for testing ***just one*** of

the representative plaintiffs. Dr. Weisler evaluated all eleven (one of the defendants' chosen

representative was a "no-show") and then evaluated all of the psychological testing submitted by

the psychologists.

---

[29]     Exhibit 26.

Despite this situation, the Defendants instructed Dr. Weisler that he should continue to prepare for his deposition which was scheduled for August 15, 2008 in New Orleans. Dr. Weisler did so. On August 12, 2008, Defendant, Brian Gilbert e-mailed some of the other members of the groups advising them to "cease all efforts" due to "legal questions" which had to be resolved.[30] In actuality, what this meant was that a new law firm had entered the BSPLC which agreed to fund the litigation, but was against the proposed "emotional injury subclass".

### V.  Dodging the Bill

On September 5, 2008, after repeated efforts to get the BSPLC to pay his bills, as well as the other members of the project team, Dr. Weisler e-mailed members of the group, as well as the Defendants, advising that he had just spoken with Defendant, Richard Seymour, who was "very surprised when he told me that he was under the impression that many, if not all of you had already been paid in the Barge case".[31] Dr. Weisler then received indications from the other members of the project team indicating that they had not yet been paid and forwarded these replies to the Defendant. While refusing to pay the outstanding invoices, the Defendants, internally, were admitting they owed Dr. Weisler. In fact, Defendant, Richard Seymour, admitted Dr. Weisler's entire case in a rather revealing e-mail which Dr. Weisler obtained during

---

[30]     Exhibit 27.

[31]     Exhibit 28.

the discovery process.[32]   While redacted pursuant to the Magistrate's ruling, the e-mail still reveals that the Defendants knew they owed Dr. Weisler for his services.

This did not stop them from attempting to come up with false reasons for not paying him or the other members of the team.   One of the first was that the $600 rate was too high.   When apprised that the BSPLC had already agreed to pay Dr. Townsend the same $600 hourly rate, Defendant, Richard Seymour replied "Oh blast!"[33].   Next, the Defendants began to accept the theories of the new law firm headed by Shawn Khorammi, who incorrectly thought that Dr. Weisler's efforts had solely involved the creation of a new screening form for PTSD, while such forms were already available.   This is despite the fact that the Defendants had outlined the project in detail in e-mails which Mr. Khorammi either ignored or was not provided.   Next, the Defendants began to accept Mr. Khorammi's theory that the "emotional injury subclass" could not succeed since Dr. Weisler's evaluation of the Defendants' handpicked representatives showed that some of them had no symptoms.   While the Defendants had previously thought that this would actually enhance the prospects for the class, again because Mr. Khorammi was bank rolling the litigation, the Defendants acceded to his flawed rationale.   Finally, the Defendants began to question the amount of time Dr. Weisler spent on the project.   This was despite the fact that he was told to generate the report in less than thirty days, defend their proposed "emotional injury subclass" of some 5,000 people in a deposition and review all of the necessary literature

---

[32]      Exhibit 29.

[33]      Exhibit 30.

and medical records to do so.   Somehow the Defendants forgot that they had specifically instructed him repeatedly from May through mid-August 2008 to do so.   These same specious reasons would form the basis for the Defendant's counter-claim filed in this litigation.

## ARGUMENT

### I.   Summary Judgment Standard

Summary judgment is proper when there is "no genuine dispute as to any material fact" and "the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*[34]. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non- moving party, there is no genuine issue for trial."[35]   Once the moving party has identified those portions of the record which it believes show the absence of a genuine issue of material fact, the non-moving party must proffer sufficient evidence to show that a reasonable jury could find in its favor — that is, that "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." Anderson, 477 U.S. at 249-50, 252.2 The existence of "some evidence" favoring the

---

[34]      477 U.S. 317, 323-24 (1986).

[35]      *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

18

non-moving party will not prevent summary judgment unless the evidence is "of such a character that it would warrant the jury in finding a verdict in favor of that party."[36]

## II.  Breach of Contract

Dr. Weisler and the Defendants entered into a valid enforceable contract.  As the Court in *Gipson v. Fortune*[37], summarized Louisiana law on contracts:

> A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. C.C.P. art. 1906.  The four elements required for confection of a valid contract are: (1) the capacity to contract (La. C.C.P. art. 1918); (2) mutual consent (La. C.C.P. art. 1927); (3) a certain object (La. C.C.P. art. 1971); and (4) a lawful cause (La. C.C.P. art. 1966).

The Defendants have raised no issues regarding the capacity of the parties to contract, a lawful cause, or a certain object, i.e., Dr. Weisler's report, or even mutual consent as is evidenced by their respective e-mails.  Indeed Art. 1927 clearly establishes that consent was present without further formality.  As that article reads:

> **Art. 1927.   Consent**
> A contract is formed by the consent of the parties established to offer an acceptance.
>
> Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent.

---

[36]     *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872)).

[37]     45 021 (La. App. 2 Cir. 1/27/10), 30 So.3d. 1076.

> Unless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made and the manner in which acceptance is made.

In this matter, Dr. Weisler was contacted by Defendant, Alan Fuchsberg; the project was outlined in numerous e-mails from the Defendants; Alan Fuchsberg agreed to the $600 hourly rate; and, Dr. Weisler generated his expert report, which he was prepared to defend in the deposition.   All of this is confirmed by e-mails between and among Dr. Weisler and the Defendants.   And no writing or signature was necessary. Absent a signature or a signing of an agreement by one or both parties, the effect or validity of the agreement may be shown by the actions and conduct of the party.[38]   Under this rule, courts have long held that it is possible that the agreement between the parties is in writing even though the parties have not signed the writing.[39]   Further, courts have long recognized that an agreement may be written and the consent thereto given may be orally or by the action or inaction by the parties, and thus there is no signing requirement.[40]   Finally, a contract may be implied from facts and circumstances showing mutual intention to contract; and when one avails himself of the services of another in performance of a task, he is obligated to compensate that person[41].

---

[38]   *Hurley v. Fox*, 520 So.3d (La. App. 4th Cir. 1988).

[39]   *Id.* at 469.

[40]    *Id.*

[41]   *Morphy, Makofsky, & Masson, Inc. v. Canal Place 2000*, 538 So.2d 569 (La. 1989). *See also*, *Dumas and Associates, Inc. v. Lewis Enterprises, Inc.*, 704 So.2d 433 (La. App. 2d Cir.

In sum, plainly and simply, the Defendants breached their contract with Dr. Weisler in failing to compensate him for services rendered pursuant to the agreement.  He provided his report under difficult time constraints and prepared to defend the report in a deposition. Accordingly, partial summary judgment is appropriate on this issue.

**III.  Open Account**.

While it is not uncommon for attorneys to retain experts and refuse to pay them[42], the practice has apparently carried over to this litigation.[43]  This is another example.  Fortunately, in addition to the remedies to which Dr. Weisler is entitled for the Defendants' breach of contract, his arrangement with the Defendants also constitutes an "open account" under La. R.S. 9:2781.

In this matter, Dr. Weisler invoiced the Defendants on several occasions and continued to work as directed by the Defendants after issuing the invoices.  In addition, the Defendants listed Dr. Weisler as an expert witness in their repeated filings, even after the Defendants began their efforts to negotiate for lesser fees.  Consequently, there is no question that there are multiple

---

1997); *Tallulah Constr., Inc. v. Northeast Louisiana Delta Community Development Corp.*, 982 So.2d (La. App. 4th Cir. 2008); *Fogelman v. Cajun Bag & Supply Co.*,  638 So.2d 706 (La. App. 3rd Cir. 6/15/1994), *writ denied*, 644 So.2d 375.

[42]      *See,* e.g. *In Re: Johnson*, 2009-2742 (La. App. 3/12/10), 29 So.2d 3 502; *In Re: Carr,* 2003-3138 (La. App. 5/25/04), 874 So.2d 823.

[43]      *Ocean-Oil Expert Witness, Inc. v. O'Dwyer*, 2008 WL 1884047 (E.D. La. 4/28/08).

21

invoices with contemplation of future services.  As that statute states:

> **Section 2781.   Open accounts; attorney's fees; professional fees; open account owed to the State.**
>
> A.   When any person fails to pay an open account within thirty days after the claimant sends written demand therefore, correctly setting forth the amount owed, that person shall be liable to the claimant for reasonable attorney's fees for the prosecution and collection of such claim when judgment of the claim is rendered in favor of the claimant.  Citation and service of a petition shall be deemed written demand for the purpose of this Section.  If a claimant and his attorney have expressly agreed that the debtor shall be liable for the claimant's attorney's fees in a fixed or determinable amount, the claimant is entitled to that amount when judgment on the claim is rendered in favor of the claimant.  Receipt of written demand by the person is not required.
>
> B.   If the demand is forwarded to the person by first class mail to his last known address, a copy of that demand shall be introduced as evidenced for written demand on the debtor.
>
> C.   If the demand is made by citation and service of a petition, the person shall be entitled to pay the account without attorney's fees by delivery to the claimant or the claimant's attorney within ten days after service of the petition in city courts and fifteen days after the service of the petition in all other courts.
>
> D.   For the purposes of this Section and Code of Civil Procedure articles 1702 and 4916 'open account' includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions. 'Open account' shall include debts incurred for professional services, including but not limited to legal and medical services.  For the purposes of this Section only, attorney's fees shall be paid on open accounts owed to the State.

Dr. Weisler's arrangement with the Defendants clearly meets all of the criteria for an "open account". Indeed, it is not uncommon for expert witnesses to use the vehicle of the "open account" statute to recover their fees, as well as attorney's fees.[44] Professional fees for services rendered on a one-time basis fit within the definition "open account" and expert consultations clearly fit within the definition of professional services.[45] Accordingly, partial summary judgment should be granted on this issue as well.

## IV. The Counter-Claim was made in Bad Faith.

As a way of dodging payment, the Defendants have filed a counter-claim based upon specious reasons made in bad faith. They claim that there was a "material breach of contract," a "failure of consideration in the contract"; and, that Dr. Weisler failed to "diligently engage in the work he was contracted to do," was "grossly negligent", "improperly conveyed information and caused confusion as to the scope of his professional experience," "generated bills inconsistent with the quality and kind of work actually performed", and then contested his billing practices. The Defendants also demanded a setoff or credit for any payments made of which there were none. This last claim more or less colors the quality of the Defendants' other theories.

As set forth above, Dr. Weisler did everything he was directed to do. They also claimed they lacked the funding to pay him, although they had represented to the Court on numerous

---

[44]     See, e.g., *D.H. Blanchard RRPT v. Cors & Bassett, Saks, Western, Smolinsky, Albert & Luber*, 2009-2236 (La. App. 1 Cir. 9/8/10) 2010 WL 3496263; *Brooks-Harbouor & Associates, Inc. v. Mustakas*, 562 So.2d 1089 (La. App. 4th Cir. 1990).

[45]     *Brooks v. Harbor*, 562 So.2d at 1091.

occasions through their own respective affidavits that they had the where-with-all to represent the claims.  It should also be noted that at the time Dr. Weisler was performing his services for the Defendants, the Defendants had already incurred over $800,000.00 in expert witness fees, including one for nearly $400,000.00 for one expert alone.[46]  As the Defendants' actions reflect, the Defendants would only pay those experts they needed.  When they belatedly were informed by the new law firm bank-rolling the litigation, that the emotional injury subclass would not work and that Dr. Weisler was not needed, it was only then that they choose not to pay him.  Accordingly, Dr. Weisler is entitled to partial summary judgment on this issue, as well as sanctions and attorney's fees under Rule 11 of the Federal Rules of Civil Procedure.

## CONCLUSION

Based on the foregoing, Plaintiff, Dr. Richard Weisler, submits that he is entitled to partial summary judgment on the Defendants' breach of contract, on the existence of an open account, and the dismissal of the Defendant's specious counter-claim.

Respectfully submitted,

/s/ Andrew C. Wilson
Daniel J. Caruso (3941)
Andrew C. Wilson (01162)
Charles E. Riley, IV (28200)
Christopher B. Conley (31674)
30th Floor– Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone (504) 569-2030
Facsimile (504) 569-2999
Attorneys for Plaintiff, Richard H. Weisler, M.D.

---

[46]        Exhibit 30.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 18, 2011, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>/s/ Andrew C. Wilson</u>

N:\DATA\N\50182001\Pleadings\Memo in Support of Motion for Partial Summary Judgment.wpd