# Exhibit 2

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2009 FEB 11  AM 9: 51

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| RICHARD H. WEISLER, M.D. | * | CIVIL ACTION NO.: |
| | * | |
| VS. | * | DIVISION " **09-2737** |
| | * | |
| RICHARD T. SEYMOUR, ESQ., RICHARD | * | JUDGE |
| T. SEYMOUR, P.L.L.C., ALAN L. FUCHSBERG, | * | |
| ESQ., THE JACOB D. FUCSHBERG LAW | * | MAGISTRA **SECT. K MAG 2** |
| FIRM, BRIAN A. GILBERT, ESQ., LAW OFFICE | * | |
| OF BRIAN A. GILBERT, P.L.C.,  WIEDEMANN | * | |
| & WIEDEMANN, P.L.C.,  LAWRENCE | * | |
| LAWRENCE WILSON, ESQ.,  AND WILSON, | * | |
| GROCHOW, DRUKER, & NOLET | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## **COMPLAINT**

Richard H. Weisler, M.D., for his Complaint against Richard T. Seymour, Esq., Richard T.

Seymour, P.L.L.C., Alan L. Fuchsberg, Esq., The Jacob D. Fuchsberg Law Firm, L.L.P., Brian A.

Gilbert, Esq., Law Office of Brian A. Gilbert, P.L.C., Wiedemann & Wiedemann, P.L.C.,  Lawrence

Wilson, Esq., and Wilson, Grochow, Druker & Nolet (collectively referred to as  ("Defendants")

setting forth causes of action for Breach of Contract and Open Account under the Louisiana Open

Account Statute La. R.S. 9:2781 et seq . and , avers, based upon information and belief, as follows:

Fee $350.
✓ Process _____
X  Dktd _____
___ CtRmDep _____
___ Doc. No. _____

1

## PARTIES

1.

Plaintiff, Richard H. Weisler, M.D., ("Dr. Weisler"), is a citizen of the State of North Carolina and a practicing psychiatrist who retains an office d/b/a Richard H. Weisler, P.A., the principal place of business for which is located in Raleigh, North Carolina. Dr. Weisler maintains an active private practice, serves as psychiatric professional at Duke University and the University of North Carolina at Chapel Hill, lectures nationally and internationally, is frequently published, and will at times consult, advise and/or serve as an expert witness.

2.

Made Defendants herein are:

a.    **Richard T. Seymour, Esq. ("Mr. Seymour")**, is an attorney licensed to practice law in Washington, the District of Columbia and elsewhere and is a citizen of Washington, the District of Columbia;

b.    **Richard T. Seymour, P.L.L.C. ("Seymour PLLC"),** is a Professional Limited Liability Corporation organized and existing pursuant to the laws of the District of Columbia, solely owned and operated by Defendant, Richard T. Seymour, Esq., with its principal place of business located at 1150 Connecticut Avenue, N.W., Suite 900, Washington, D.C. 20036-4129;

2

c.   **Alan L. Fuchsberg, Esq., ("Mr. Fuchsberg")** is an attorney licensed to practice law in the State of New York, a citizen of the State of New York and at all times pertinent, was and is the managing partner of the Jacob D. Fuchsberg Law Firm, LLP;

d.   **The Jacob D. Fuchsberg Law Firm, LLP, ("Fuchsberg Firm")** is a Limited Liability Partnership organized and existing pursuant to the laws of the State of New York with its principal place of business located at 500 Fifth Avenue, New York, New York 10110-0393;

e.   **Brian A. Gilbert, Esq. ("Mr. Gilbert"),** is an attorney licensed to practice law in the State of Louisiana and is a citizen of the State of Louisiana;

f.   **The Law Office of Brian A. Gilbert, P.L.C. ("Gilbert Office"),** is a Professional Limited Liability Corporation organized and existing pursuant to the laws of the State of Louisiana, with its principal place of business located at 810 Baronne Street, New Orleans, Louisiana 70113;

g.   **Wiedemann & Wiedemann, P.L.C., ("Wiedemann Firm")** is a Professional Limited Liability Corporation organized and existing pursuant to the laws of the State of Louisiana, with its principal place of business located at 821 Baronne

3

Street, New Orleans, Louisiana 70113, and, whose senior partner is Lawrence D.

Wiedemann;

h.    **Lawrence Wilson, Esq. ("Mr. Wilson")**, is an attorney licensed to practice law

in the State of New York and is a citizen of the State of New York; and

i.    **Wilson, Grochow, Druker & Nolet ("Wilson Firm")**, is a partnership organized

and existing pursuant to the laws of the State of New York with its principal place

of business located in the Woolworth Building, 233 Broadway, 5th Floor, New

York, New York 10279 and is a citizen of the State of New York.

## JURISDICTION AND VENUE

3.

There is complete diversity of citizenship between Plaintiff and Defendants and the

amount of controversy exceeds $75,000.00, exclusive of interest and cost.  Accordingly, this

Trial Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332.

4.

Venue is proper herein pursuant to 28 U.S.C. §1391(a)(2) as four of the Defendants are

domiciled within the Eastern District of Louisiana, the facts and circumstances giving rise to the

causes of action at issue herein occurred for the most part in New Orleans and/or the Eastern

District of Louisiana, and, the *Katrina Breaches Litigation*, which forms the basis for the

services, fees and expenses which are the subject of this controversy, is presently pending before

this Trial Court in the Eastern District of Louisiana.

## FACTS

5.

On August 29, 2005, Hurricane Katrina struck the New Orleans area triggering

circumstances which, in turn, led to widespread flooding. As a result, various lawsuits and class

actions were filed in the United States District Court for the Eastern District of Louisiana, all of

which have been consolidated as the "*Katrina Breaches Litigation*". One of those cases is

referred to as the "Barge Case".

6.

In connection with the Barge Case, the Defendants sought to be appointed as the Barge

Plaintiffs' Litigation Steering Committee and/or the Barge Plaintiffs' Subgroup Litigation

Committee ("BPLSC"), and continued to represent that they have been so appointed by the

Court.

7.

As the BPLSC, the Defendants have posted a website, www.bargecase.com, on which

the Defendants state the following:

5

> "We have been appointed by the United States District Court for
> the Eastern District of Louisiana to the Barge Plaintiffs' Subgroup
> Litigation Committee – the committee leading the litigation of all
> cases involving the breach allegedly caused by Barge ING 4727.
> This means that the Court has appointed us to conduct and lead all
> aspects of the litigation for the benefit of the proposed class. We
> have asked the court to certify a class covering in excess of 40,000
> persons who lived in the class area, and the persons who had
> property or a business there."

The website also lists all of the Defendants as members of the BPLSC by name and by their firm

names, issues frequent updates concerning the litigation, provides access to relevant court filings,

and provides information to the public about how to join the Barge Case as a claimant.

8.

Defendants, acting collectively as the BPLSC, also maintain a checking account, the

checks for which are labeled "BPLSC". From this account, the Defendants have issued numerous

payments related to their collective role as the BPLSC in the litigation.

9.

The Defendants in representing themselves collectively as the BPLSC to the public at

large, in essence, are doing business as the BPLSC, and are therefore collectively bound by the

actions of any one of the Defendants acting on behalf of the BPLSC in the confection of contracts

or obligations.

6

10.

On May 14, 2008, Defendant, Mr. Fuchsberg, sent an e-mail to the Plaintiff, Dr. Weisler, seeking his services as an expert witness in order to establish a proposed "emotional subclass" which the BPLSC was seeking to certify. Thereafter, on May 16, 2008, Mr. Fuchsberg and Dr. Weisler spoke by telephone at which time Mr. Fuchsberg described the "barge incident" and the fact that he was concerned that there may be many thousands of potential emotional injury subclass members from the "60,000 residents" who might have been impacted, and that these people might be in need of mental health treatment. Mr. Fuchsberg also indicated that he and the BPLSC had already filed a motion to certify a proposed subclass of emotionally injured persons from the larger class which the BPLSC hoped to certify and that expert witness assistance would support those efforts. Specifically, he indicated that he wanted a psychiatric expert to evaluate a representative sample of members of the proposed emotional subclass, the BPLSC would themselves select. He also indicated that he would need a comprehensive expert report of the findings related to those evaluations to be exchanged with opposing counsel by June 12, 2008, leaving less than 27 days for these efforts. He apologized for the "last-minute" nature of his request.

7

11.

Dr. Weisler indicated it would be impossible for him to do so individually but that if he were permitted to assemble a team of mental health professionals from the LSU health sciences Center in the Psychiatry Department including New Orleans colleagues, Dr. Mark Townsend, Dr. Howard Osofsky, the Chairman of Psychiatry at LSU Health Sciences Center, Joy Osofsky, a psychologist who is a Professor of Psychiatry and Pediatrics at the LSU Health Sciences Center, Dr. Jill Hayes, as well as Dr. Philip Griffin, he thought he would be able to complete the project as outlined. Dr. Weisler indicated that his fees as well as those of all of the other psychiatrists retained for the project would be based upon the standard Duke University rate of $600 per hour plus, in Dr. Weisler's case, travel expenses from North Carolina when necessary. Mr. Fuchsberg indicated that both the rate and the travel expenses were acceptable.

12.

Later on the same day, on a telephone conference call with Dr. Townsend and Dr. Weisler, Defendant, Mr. Fuchsberg, outlined the project in greater detail. He indicated that this was the first emotional class certification effort that he was aware of any where in the United States. Further, he indicated that the expert services the BPLSC would even require that the team would be required to be retained to: (1) perform intensive psychiatric evaluations of the large number of their claimant; (2) conduct psychological testing; (3) write a comprehensive expert

8

witness report describing the valuations, which would of necessity, include an extensive review

and discussion of the applicable medical literature; (4) identify defensible methodologies for

large-scale mental health screenings; and (5) describe or recommend defensible and optimal,

potential treatment modalities for many thousands of those presumably still in need.

13.

In response, Dr. Townsend and Dr. Weisler indicated it would be very expensive for the

two to perform all these tasks, particularly at a rate of $600 per hour. Mr. Fuchsberg replied that

the BPLSC "were prepared to spend substantial amounts" to pursue their proposed emotional

subclass. On those terms, Dr. Townsend and Dr. Weisler agreed to serve as expert witnesses.

Later on the same day, Mr. Fuchsberg wrote an e-mail to the other members of the BPLSC as

follows:

> "I just got off a conference call with two psychiatrists professors
> (from LSU School of mental health and Duke University) together
> have worked with Katrina victims, and our populist psychiatrists.
> They have agreed to co-author a report by June 12. They want to
> interview the class wraps in New Orleans next Saturday. Their
> names are Dr. Mark Townsend and Dr. Richard Weisler. They will
> send the plan summary after the weekend for our review.
> Alan"

14.

These communications among the BPLSC evidenced their binding oral contract and

obligation with Dr. Townsend and Dr. Weisler. The BPLSC thereafter listed Dr. Weisler and Dr.

9

Townsend as "will call" expert witnesses on their Preliminary Witness List filed on May 20, 2008.

15.

Dr. Weisler and Dr. Townsend communicated regularly with members of the BPLSC concerning the progress of their efforts. In addition, they regularly received specific instructions and comments via e-mail and telephone from Defendants, Mr. Fuchsberg, Mr. Seymour and Mr. Gilbert. Finally, they would periodically meet in person with Mr. Gilbert and members of the Wiedemann firm to discuss their findings.

16.

During the course of their efforts, Dr. Weisler and Dr. Townsend were instructed to keep track of the numerous reference materials they were expected to review in connection with the proposed report they were to prepare, all as required by the Federal Rules of Civil Procedure for experts in litigation. Eventually, the BPLSC decided to have just one expert testify on behalf of the entire mental health professional/emotional subclass effort. This was Dr. Weisler. As a result, Dr. Weisler was required to provide references to as many clinically relevant materials he could identify so that he and the other members of the team could rely upon them during the course of the clinical valuations and analysis. In addition, he was to a select those materials that would assist the Court related to screening, diagnostic and treatment needs of emotionally distressed

members of the proposed subclass including all problems caused or exacerbated by the flooding associated with Katrina. Consequently, from early on in the project, the BPLSC had determined that Dr. Weisler would have a much greater role in the project than any other mental health professionals including Dr. Townsend.

17.

The project was at times hindered by conflicting instructions from members of the BPLSC. In fact, although the deadline for producing a comprehensive expert report was extended from June 12, 2008 to June 30, 2008, some members of the BPLSC continue to attempt to reformat the structure of the proposed expert report by submitting a series of new questions to be answered or criteria to be addressed as late as 1 to 2 days before the report was due.

18.

Still, the report was delivered in timely fashion. The full report with attachments consisted of over 2000 pages of materials, not counting some 1500 pages of evaluation and related clinical materials. Further, as required by Rule 26 which had been forwarded by the BPLSC, the report also contained description of the fee schedule and fees incurred by all professionals as of the date of the report. These were as follows:

Dr. Mark Townsend -- $48,000

Dr. Howard Osofsky -- $13,200

11

Dr. Joy Osofsky -$7000

Dr. Jill Hayes -- $21,000

Dr. Philip Griffin -- $2400

Dr. Richard Weisler -- $156,000 (as supervisor, coordinator, testifying expert witness, and

author of the comprehensive expert report)

19.

The comprehensive expert report was received with glowing acclaim by the BPLSC. For instance, Mr. Gilbert wrote to Dr. Weisler that he would "breeze through any challenge to your ability to render expert scientific opinions in this case," and "that your methods are more than sufficiently peer reviewed and your data founded upon clear and accepted scientific principles." He also stated that he believed that, "your findings as to any of the individuals you tested will withstand challenge." Likewise, Mr. Fuchsberg wrote to Dr. Weisler: " Thank you Rick W. Your work and that of the team, for this report is important and reminds us how people are still suffering from the inside and need help.

Alan L. Fuchsberg"

20.

At that point in time on June 30, 2008, Dr. Weisler had received only praise for the report and the efforts of his team. Further, although as of that point in time, despite the fact that his

12

expert report clearly indicated that the BPLSC had incurred an estimated $158,500 in fees owed

to Dr. Weisler and $91,600 owed to the other members of the team, there were no complaints

from any members of the BPLSC.

21.

Instead, the BPLSC began to instruct Dr. Weisler to take on even more duties and

responsibilities. First, the BPLSC asked Dr. Weisler to gather and reproduce copies of any and all

documents he had reviewed or relied upon in connection with the generation of his

comprehensive report. Next, the BPLSC instructed him to begin to prepare for a deposition by

opposing counsel which eventually would be scheduled for August 12, 2008. In connection with

the preparations, Dr. Weisler was instructed to read all materials necessary for him to be able to

respond to the likely questions he would face at the deposition. Finally, the BPLSC instructed

him to make preparations to appear for that deposition and to plan to appear in New Orleans one

day ahead of time in order to prepare for the deposition in a meeting with members of the

BPLSC. In accordance with their instructions, Dr. Weisler commenced preparations for the

deposition. He also participated in numerous telephone conferences with members of the BPLSC

including telephone conference calls, and also received numerous e-mails telling him continue in

his preparations.

13

22.

On the afternoon of August 12, 2008, Dr. Weisler received an e-mail from the BPLSC abruptly instructing him to cease all efforts related to the proposed emotional injury subclass with little or no explanation.

23.

Throughout the period of time compassing July of 2008 through the present, Dr. Weisler had also attempted to obtain payment of outstanding fees owed not only to him but to the entire team associated with the emotional injury subclass. While Mr. Fuchsberg had originally indicated when he had confected the agreement between the BPLSC and Dr. Weisler and Dr. Townsend that funding was not an issue, he had suddenly indicated on July 30, 2008, one month after Dr. Weisler had released the comprehensive report, requested that Dr. Weisler unilaterally reduce its fees indicating that, "We are operating on a shoestring budget and if you could bring this down to Mark's area it would be much appreciated." In making this request, Mr. Fuchsberg was attempting to sidestep the fact that Dr. Townsend had had limited involvement in the project other than evaluating patients and ended his involvement on June 30, 2008. In addition, Mr. Fuchsberg was attempting to sidestep the fact that Dr. Weisler had performed most of the efforts associated with the project and was the designated witness to testify on the behalf of all of the mental health care professionals' efforts.

14

24.

As a point in fact, although all of the mental health professionals associated with this matter had been instructed to tender their invoices to the BPLSC through the Wiedemann law firm, and had done so, only one of the mental health care professionals, Dr. Jill Hayes, had been paid to date, despite her limited involvement in the project. She was the only one of the group who had had significant previous experience working with attorneys in connection with litigation, and had therefore withheld her contributing report until such time as she had been paid, which in fact occurred. The other mental healthcare professionals had all released their information, documentation and reports, if not the comprehensive report, before receiving payment and were not paid.

25.

Accordingly, as of August 12, 2008, based solely on the specific instructions of the BPLSC, the emotional injury subclass efforts were discontinued. Further, as of that date, no further payments were made to any of the mental healthcare professionals involved in the project throughout the calendar year 2008. For the period of time encompassing May 16, 2008 through August 15, 2008, the date set aside for his deposition, Dr. Weisler expended a total of 448.75 hours at $600 per hour for a total of $269,250. When combined with travel expenses of $2,799.56, the total amount owed by the BPLSC to Dr. Weisler is $272,049.56.

15

## COUNT I

### BREACH OF CONTRACT

26.

Plaintiff reavers and realleges all of the allegations set forth in paragraphs 1 through 24, above, which are incorporated herein as if set forth *in extenso*.

27.

The Plaintiff, Dr. Richard Weisler, entered into a binding oral contract with the BPLSC on May 16, 2008 to perform expert witness services in accordance with the Duke University faculty terms and conditions including an hourly rate of $600.

28.

Dr. Weisler performed services in accordance with those terms and conditions, and has invoiced the Defendants/BPLSC $272,049.56.

29.

The Defendants/BPLSC have refused to pay any amount whatsoever for Dr. Weisler's services under the aforementioned contract, and have also refused to pay any of the other mental healthcare professionals involved in this project, other than Dr. Jill Hayes, who had withheld a report until she was paid in full, and Dr. Mark Townsend, whom the BPLSC elected to pay in two installments of $26,000, as an inducement to him to continue to work for the BPLSC. Only

16

one such installment has been paid to date.

30.

The Defendants are therefore in breach of contract and Dr. Weisler is therefore entitled to recover all amounts due under the outstanding invoices he has previously forwarded to them, as well as all related damages and expenses, as well as pre-judgment interest, costs and attorney's fees.

## COUNT II

## OPEN ACCOUNT

31.

Plaintiff reavers and realleges all of the allegations set forth in paragraphs 1 through 29, above, which are incorporated herein as if set forth *in extenso.*

32.

Plaintiff , Dr. Weisler, has invoiced the Defendants/BPLSC on several occasions. 30 days have passed since those invoices were sent. Further, pursuant to their request, Dr. Weisler also provided the Defendants/BPLSC an invoice with even greater detail. Still, the Defendants/BPLSC not only have failed to pay those invoices, but have refused to pay those invoices in whole or in part.

33.

Accordingly, the amounts owed by the Defendants/BPLSC constitute an "open account" under the Louisiana open account statute, La. R.S. 9:2781 et seq., and Dr. Weisler is entitled to recover not only the amounts due under the invoices, but also interest, costs, and attorney's fees.

WHEREFORE, Plaintiff, Dr. Richard Weisler, prayed, that after due proceedings had, there be judgment in his favor and against the Defendants severally and *in solido,* in the amount of TWO HUNDRED SEVENTY TWO THOUSAND FORTY NINE AND 56/100 ($272,049.56) DOLLARS, as well as all related damages, consequential damages, expenses, pre-judgment interest from date of judicial demand, and costs, as well as all other general and equitable relief.

Respectfully submitted,

Daniel J. Caruso (3941)
Andrew C. Wilson (01162)
Charles E. Riley, IV (28200)
Christopher B. Conley (31674)
30th Floor– Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone (504) 569-2030
Facsimile (504) 569-2999
Attorneys for Plaintiff, Richard H. Weisler, M.D.

**PLEASE SEE NEXT PAGE FOR SERVICE INSTRUCTIONS**

18

**PLEASE SERVE:**

**RICHARD T. SYEMOUR, ESQ., personally**
**1150 Connecticut Avenue NW**
**Wahington, DC 20036-4105**

**RICHARD T. SEYMOUR, P.L.L.C.**
**Through its registered agent for service of process**
**1150 Connecticut Avenue NW**
**Wahington, DC 20036-4105**

**ALAN L. FUCHSBERG, ESQ.,**
**16 Linden Avenue**
**Larchmont, New York 10538-4139**

**THE JACOB D. FUCSHBERG LAW FIRM, L.L.P.**
**Through its DOS Process**
**500 Fifth Avenue**
**New York, New York  10110-0393**

**BRIAN A. GILBERT, ESQ., personally**
**821 Baronne Street**
**New Orleans, Louisiana 70113**

**LAW OFFICE OF BRIAN A. GILBERT, P.L.C.**
**Through its registered agent for service of process**
**Brian A. Gilbert**
**821 Baronne Street**
**New Orleans, Louisiana 70113**

**WIEDEMANN & WIEDEMANN, P.L.C.,**
**Through its registered agent for service of process**
**L.D. Wiedemann, 249 Citrus Road**
**River Ridge, LA.  70123**

And

**LAWRENCE A. WILSON, ESQ., personally**
**111 3RD Avenue, Apt. 16E**
**New York, New York 10003-5523**

**WILSON, GROCHOW, DRUKER, & NOLET,**
**Through its DOS process**
**Lawrence A. Wilson, II**
**233 Broadway, 5th Floor**
**New York, New York  10279**

20