DEPOSITION OF RICHARD H. WEISLER, M.D.
CONDUCTED ON SUNDAY, OCTOBER 9, 2011

1 (Pages 1 to 4)

## Page 1

```
 1        UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF LOUISIANA
 3   --------------------------------x
 4   IN RE: KATRINA CANAL BREACHES   :
 5   CONSOLIDATED LITIGATION         : CIVIL ACTION NO.:
 6   RICHARD H. WEISLER, M.D.        : 05-4182 (09-2737)
 7        v.                         :
 8   RICHARD T. SEYMOUR, ESQ.,       : SECTION "K" (2)
 9   RICHARD T. SEYMOUR, P.L.L.C.,   :
10   ALAN L. FUCHSBERG, ESQ., THE    : JUDGE STANWOOD R.
11   JACOB D. FUCHSBERG LAW FIRM,    : DUVAL, JR.
12   BRIAN A. GILBERT, P.L.C.,       :
13   WIEDEMANN & WIEDEMANN, P.L.C.,  : MAGISTRATE JUDGE
14   LAWRENCE WILSON, ESQ., AND      : JOSEPH C.
15   WILSON, GROCHOW, DRUKER & NOLET : WILKINSON, JR.
16   --------------------------------x
17         Deposition of RICHARD H. WEISLER, M.D.
18              Raleigh, North Carolina
19              Sunday, October 9, 2011
20                   10:30 a.m.
21   Pages: 1 - 260
22   Reported by: Marian E. Cummings, LSR
```

## Page 2

```
 1        Deposition of RICHARD H. WEISLER, M.D., held at
 2   the offices of:
 3
 4
 5        CaseWorks, Inc.
 6        8601 Six Forks Road
 7        Suite 460
 8        Raleigh, North Carolina 27615
 9        (919) 676-5300
10
11
12
13
14        Pursuant to Notice, before Marian E. Cummings,
15   Notary Public in and for the State of North Carolina.
```

## Page 3

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF:
 3        ANDREW C. WILSON, ESQUIRE
 4        Simon, Peragine, Smith
 5        & Redfearn, LLP
 6        1100 Poydras Street
 7        30th Floor
 8        New Orleans, Louisiana 70163
 9        (504) 569-2030
10
11
12   ON BEHALF OF THE DEFENDANTS:
13        RICHARD T. SEYMOUR, ESQUIRE
14        PRO SE
15        Law Office of Richard T. Seymour, PLLC
16        Suite 900
17        888 17th Street, NW
18        Washington, DC 20006
19        (202) 785-2145
```

## Page 4

```
 1      A P P E A R A N C E S   C O N T I N U E D
 2   ON BEHALF OF THE DEFENDANTS:
 3        LAWRENCE A. WILSON, ESQUIRE
 4        PRO SE
 5        Wilson Grochow Druker & Nolet
 6        233 Broadway
 7        5th Floor
 8        New York, New York 10279
 9        (212) 608-4400
10
11
12   ON BEHALF OF THE DEFENDANTS:
13        BRIAN A. GILBERT, ESQUIRE
14        PRO SE
15        Law Offices of Brian A. Gilbert, PLC
16        2030 St. Charles Avenue
17        New Orleans, Louisiana 70130
18        (504) 598-1000
19        (Present via telephone)
```

21

1   Q.   Okay.  Now, can we agree, sir, then as of
2   May 16, 2008 in your mind you had an oral contract
3   with Alan Fuchsberg to perform certain work?
4   A.   I did, and also Dr. Townsend had a
5   contract.
6   Q.   Okay.  And at that time is it true that
7   Mr. Fuchsberg represented that he was acting on behalf
8   of a small group of attorneys?
9   A.   That's very true.
10  Q.   And I'd like to read something to you.
11     MR. WILSON:  What are you reading from?
12  BY MR. L. WILSON:
13  Q.   I'm reading from the Opposition to
14  Defendant's Motion to Dismiss.  "At no time did
15  Mr. Fuchsberg ever indicate that the parties to the
16  agreement he had reached with these experts included
17  any law firms, even his own."  Is that true, sir?
18  A.   I'm not sure I understand what you're
19  saying.
20  Q.   Okay.  I'll reread it.  "At no time did
21  Mr. Fuchsberg ever indicate that the parties to the
22  agreement he had reached with these experts included

22

1   any law firms, even his own."
2   A.   What he noted was this was a group of
3   attorneys who were working together on this project.
4   Q.   Right.
5   A.   And actually repeated that and kept
6   emphasizing it was the attorneys.
7   Q.   Okay.
8   A.   And actually, if I may --
9   Q.   Well, let me ask the question.
10     MR. WILSON:  He needs to finish his answer.
11  A.   If I may, one of the things he referenced
12  as well, if I remember correctly, was something which
13  said on the thing it says "We are New Orleans class
14  action attorneys suing Ingram Barge Company and the
15  towing fleet for the negligence.  And we've been
16  appointed by the United States District Court" and
17  it --
18  Q.   What are you reading from?
19  A.   It just lists the names.
20  Q.   May I see that?
21  A.   Sure.
22  Q.   This is --

23

1     MR. SEYMOUR:  Let me see.
2   BY MR. L. WILSON:
3   Q.   This is dated June 19th, 2008?
4   A.   That is.  That is from the web site.
5   Q.   This is from the web site.  This is not an
6   email?
7   A.   No.
8   Q.   And this is not a conversation that you
9   had with --
10  A.   That is a conversation I had, but that had
11  information because he told me about it.
12  Q.   Okay.  You had a conversation, but let's
13  be clear, okay?  May 15th you had a conversation with
14  Alan Fuchsberg that he wanted to enter into an
15  agreement with you, correct?
16  A.   Yes.
17  Q.   On behalf of a small -- himself and on
18  behalf of a small group of attorneys?
19  A.   Small group of attorneys.
20  Q.   And at that time he didn't list the names
21  of the attorneys, correct?
22  A.   He listed some of the attorneys, I'm

24

1   trying to remember that, I cannot remember quite
2   honestly, but he said it was a small group of
3   attorneys.
4   Q.   He didn't list the name of certain law
5   firms, did he?
6   A.   He didn't mention law firms.
7   Q.   And he didn't mention the names of the
8   specific attorneys at that time, correct?
9   A.   No, he -- I don't remember exactly how he
10  did that.  He sent something, I've got to find the
11  date here if you give me a second.  On the 16th at the
12  same time he sent the Katrina class certification
13  motion that had been filed the day before that listed
14  attorneys' names and that was before we agreed to
15  things.
16  Q.   That was before you agreed, I'm sorry?
17  A.   This thing was done on the 16th as we were
18  having our discussions.
19  Q.   Okay.
20     MR. WILSON:  For those not present it might
21  be a little confusing because we're saying "this" and
22  "that."

DEPOSITION OF RICHARD H. WEISLER, M.D.
CONDUCTED ON SUNDAY, OCTOBER 9, 2011

9 (Pages 33 to 36)

Page 33

1  Deposition Exhibit 2 so --
2      MR. L. WILSON: Yes, it's deposition Exhibit
3  2.
4    BY MR. L. WILSON:
5    Q.  And I'll read to you from page four of
6  Deposition Exhibit 2.
7    A.  Is this the same thing?
8      MR. WILSON: No.
9  BY MR. WILSON:
10    Q.  Right here it says "Significantly, the
11  mention of Barge PSLC only came about when the experts
12  were told to direct their invoices to the Barge PSLC
13  over a month after they were retained."
14    A.  He mentioned that y'all were a group
15  together.
16    Q.  Okay, but that was a month after May 16,
17  2008 that you first learned of the Barge PSLC, isn't
18  that true, sir?
19    A.  That I'm not certain about.
20    Q.  Well, isn't that what it says in your
21  opposition to dismiss your claim?
22    A.  I was told it was a group of attorneys

Page 34

1  working together.
2    Q.  Okay.
3    A.  And that's what -- when I agreed that's
4  what this is about.
5    Q.  When you agreed with Alan Fuchsberg he
6  told you it was a group of attorneys working together,
7  correct?
8    A.  That's correct.
9    Q.  He didn't mention the barge PSLC at that
10  time, correct?
11    A.  He told me it was a group of attorneys
12  working on a co-counseling was the term he used in
13  litigation.
14    Q.  And at that time on May 16th, 2008 he
15  never said the Barge PSLC, correct?
16    A.  That I don't remember, I can't be certain.
17    Q.  Okay.
18    A.  I don't think so, but I can't be certain.
19    Q.  You don't think he said it at that time is
20  what you're saying, correct?
21    A.  I can't be certain.
22    Q.  Well, sir, is this true, "Significantly,

Page 35

1  the mention of the Barge PSLC only came about when the
2  experts were told to direct to their invoices to the
3  Barge PSLC over one month after they were retained?
4    A.  That part is true in terms of where to
5  send the invoices to, that is correct.
6    Q.  So until that time a month later you never
7  thought the Barge PSLC was going to pay your bill, you
8  thought it was a small group of attorneys?
9    A.  A small group of attorneys working,
10  co-counseling in the litigation just like he said.
11    Q.  And he never mentioned the names of those
12  firms, correct?
13    A.  They were on the certification.
14    Q.  When you entered into that oral contract
15  with Mr. Fuchsberg he never mentioned the names of the
16  firms, correct?
17    A.  Well, he had sent --
18    Q.  It's a yes or a no.
19    A.  I'm trying to answer, sir.
20      MR. GILBERT: Object to responsiveness.
21    A.  He had sent an email which --
22    Q.  Sir, we already established you had an

Page 36

1  oral agreement with Alan Fuchsberg, correct?
2    A.  That's correct.
3    Q.  There was no written agreement with Alan
4  Fuchsberg?
5    A.  There was absolutely no written agreement.
6      MR. WILSON: Aside from the emails, right?
7  BY MR. WILSON:
8    Q.  Okay. Any writings are irrelevant to the
9  agreement you had with Mr. Fuchsberg, correct?
10      MR. WILSON: Objection, that's a legal
11  conclusion.
12    A.  No, I had -- I considered these emails
13  agreements.
14    Q.  Okay. And did I ever send you an email,
15  sir?
16    A.  You did not.
17    Q.  And did you ever send me an email, sir?
18    A.  I did not, not to my knowledge.
19    Q.  And since we had never spoken prior to
20  today we can agree that you and I, I being Lawrence
21  Wilson, never entered into an oral contract, correct?
22    A.  Directly, no. Mr. Fuchsberg though was

Page 37

1 speaking on your behalf.
2   Q.  Well, we just -- I just asked you at the
3 time that he entered into the contract with you did he
4 ever say anybody's name and you said that he only said
5 a small group of attorneys and he didn't say anybody's
6 name, isn't that true, sir?
7   A.  Well, that's not it exactly because he
8 also sent me at that time the Katrina class
9 certification motion prior to that.
10   Q.  Okay, but he didn't say to you --
11       MR. WILSON:  Let him finish his answer.
12   A.  Let me finish.  And in the class
13 certification motion your name was listed.
14   Q.  My law firm is listed, correct?
15   A.  Your name was listed.
16   Q.  And my law firm, right?
17   A.  Your law firm, your name was listed and he
18 said I was dealing with attorneys, not law firms.
19       MR. GILBERT:  Can I get a response to that
20 answer (sic).  Mr. Wilson asked whether the name of
21 the law firm was listed.
22       MR. WILSON:  And he answered that.

Page 38

1   A.  I answered it and it was on the class
2 certification motion that y'all had filed the day
3 before.
4   Q.  The law firms were listed, correct?
5   A.  Yes, they are listed, but your name was
6 listed also.
7   Q.  But Mr. Fuchsberg didn't say the people
8 listed on the class certification are going to pay
9 your bill, correct?  He entered into an oral agreement
10 with you on behalf of himself and what he represented
11 was a small group of attorneys, correct?
12   A.  He did say a small group of attorneys,
13 yes.
14   Q.  So I'm correct in what I'm saying, right?
15   A.  I'm not a hundred percent certain on all
16 the attorneys that were involved at that time.
17   Q.  Okay.  And in fact, not only have we never
18 spoken, sir, you and I have never had any dealings,
19 correct, before this barge litigation or during this
20 barge litigation, correct?
21   A.  Other than be copied on the same emails.
22   Q.  Other than being cc'd on an email,

Page 39

1 correct?
2   A.  Yeah, multiple emails, yes.
3   Q.  Cc'd, correct?
4   A.  Yes, carbon copied to the same emails.
5   Q.  Now --
6   A.  And I --
7   Q.  Sir, I don't have a question for you, but
8 I'm formulating one.
9   A.  Okay.
10   Q.  I'm going to ask you this, this is on page
11 four, sir.
12       MR. WILSON:  Page four of --
13       BY MR. L. WILSON:
14   Q.  Page four of your opposition of
15 defendant's motion to dismiss.  "At no time did
16 Mr. Fuchsberg ever indicate that the parties to the
17 agreement he had reached with these experts included
18 any law firms, even his own."
19   A.  He spoke about it as individuals.
20   Q.  Okay.  So that's true that the law firms
21 were absolutely not party to the agreement that you
22 reached with Alan Fuchsberg, correct?

Page 40

1       MR. WILSON:  Objection, that's a legal
2 conclusion.
3       BY MR. L. WILSON:
4   Q.  No, I want to know what his state of mind
5 is.  Sir, there's a statement in this affidavit to --
6 to defendant's motion to dismiss, I want to know if
7 it's true.
8       MR. WILSON:  My objection is that that's a
9 principle of agency, principle meaning with a P-L-E of
10 the concept of agents in principle and whether the
11 particular individual attorneys can bind the firm is a
12 legal conclusion and I don't think Dr. Weisler is
13 competent to make that conclusion.
14       MR. SEYMOUR:  Let me clarify.  I'm not sure
15 what document we're talking about.  Are we talking
16 about the attorney signed opposition to the motion to
17 dismiss or are we talking about Dr. Weisler's
18 affidavit which is Exhibit 1 to the deposition?
19       MR. WILSON:  We're talking about Exhibit 2
20 to the deposition.
21       MR. SEYMOUR:  Which is the defendant's
22 opposition.

**41**

BY MR. L. WILSON:
Q. Correct. So the statement that Mr. Fuchsberg never indicated that the parties to the agreement included any law firms or even his own, is that a true statement when you entered into the oral agreement with Mr. Fuchsberg that he never mentioned any law firms, even his own?
A. He mentioned I was dealing with attorneys.
Q. Okay, but he didn't say who those attorneys were, correct?
A. A group of attorneys.
Q. Is it correct that he didn't say who they were, he just said a group of attorneys?
A. He didn't know.
Q. And that would be Alan Fuchsberg didn't know, correct?
A. No, I didn't say Alan Fuchsberg didn't know, what I'm trying to say is that --
Q. Is you didn't know?
A. He told us it was a group of attorneys.
Q. Right, nothing more, nothing less, correct? Correct?

**42**

A. That's correct.
Q. Okay. And that's on May 16, 2008 when you entered into the oral contract with Alan Fuchsberg, correct?
A. That was on May 16th, yes.
Q. Now, did you eventually come to work with the small group of attorneys on this barge litigation project?
A. Yes, I did. In fact, on the 16th at 8:07 p.m. you were copied on an email where he said "Good news on the emotional health class issue and need to set up psyche evaluations next Saturday for class representatives."
Q. Who sent me that?
A. This is one from Mr. Fuchsberg, but it was attached to Mr. Seymour's note as well.
Q. So my name is on the Seymour aspect of it?
A. It is.
Q. Not on the Fuchsberg aspect of it, correct?
A. Right, but it's on the same page and your

**43**

name is --
Q. Which one came first, the Fuchsberg?
A. They're combined.
Q. Well --
A. Timewise the other one came first.
Q. Timewise which one came first?
   MR. SEYMOUR: Can I see?
A. It's one email.
Q. Sir, it's to Rick Weisler, Mark Townsend and Richard Seymour. It's from Alan Fuchsberg dated 5-16, 2008 at 8:07 p.m., correct?
A. Yeah, 8:07 p.m. and then nine minutes later it looks like Mr. Seymour sent this out to the other members working on this with you which included --
Q. I object to your term your phrase working with me, okay, because you have no knowledge of that, do you, sir?
A. I'm just reading the list here who he sent it to which includes you in the exact same email "Good news on the emotional health class, need to set up psyche evaluations for class reps." And then y'all

**44**

went on to list the names of some of the class reps and who they were and talking importantly about admissible diagnosis.
Q. You said you-all listed names, but I didn't list names, right?
A. Mr. Seymour listed names.
Q. Mr. Seymour did, I was just cc'd on that, correct?
A. That's correct.
Q. Sir, if you were cc'd on an email and then I put in 300 hours' worth of work that I billed at $600 an hour, okay, and then I sent you a bill, would you think that you and I had a contract because you were cc'd on an email?
A. Well, you were also listed, as I said, on the class certification and I'm not a lawyer.
Q. Okay, but we never had a meeting of minds, correct?
A. No, we didn't, but as you were pointing out earlier in the middle of the month of June all the correspondence from Mr. Gilbert and actually Mr. Seymour was to send all the bills to the barge

Page 45

1  **plaintiffs steering committee.**
2      Q.   I never sent you an email that said that,
3  did I, sir?
4      A.   **You did not.**
5      Q.   And that was and I'll read from page four
6  of the opposition to defendant's motion to dismiss.
7  It says "Significantly, the mention of the Barge PSLC
8  only came about when the experts were told to direct
9  their invoices to the Barge PSLC over a month after
10 they were retained," correct?
11     A.   **That part about where to send the bills**
12 **was indeed correct.**
13     Q.   So at the time you entered into the
14 contract, oral agreement, with Alan Fuchsberg the only
15 words used at that time was he wanted to retain you
16 and a small group of attorneys, correct?
17         MR. WILSON:  I don't understand the
18 question.
19         MR. L. WILSON:  That's all right.
20     BY MR. L. WILSON:
21     Q.   Do you, Doctor?
22     A.   **I also don't understand the question.**

Page 46

1      Q.   Do you want to have it read back, please?
2          (Whereupon, the court reporter read back the
3  previous question.)
4      BY MR. L. WILSON:
5      Q.   Also wanted to retain, correct?
6      A.   **Can you rephrase it one more time?**
7      Q.   On May 16, 2008 when you entered into the
8  oral agreement with Alan Fuchsberg, at that time he
9  represented that he, Alan Fuchsberg, wanted to enter
10 into an agreement with you on behalf of himself and a
11 small group of attorneys, correct?
12     A.   **Yes, who were co-counseling in the**
13 **litigation from his original thing which is what he**
14 **told me.**
15     Q.   You're reading from a May 14th email,
16 correct?
17     A.   **That's correct.**
18     Q.   But we're talking about the words he used
19 on May 16th.
20     A.   **And that's basically what he said again.**
21 **He said --**
22     Q.   But sir, you've signed an affidavit in

Page 47

1  this case, correct?
2      A.   **I have.**
3      Q.   Okay.  And you have it in front of you.
4  I'd like to mark it Defendant's One to the deposition
5  and you say in paragraph 3, oh, no, let's start
6  paragraph 2, paragraph 3, "Thereafter I entered into a
7  binding agreement with Mr. Fuchsberg who was acting on
8  behalf of the "small group of attorneys," correct?
9      A.   **That is correct.**
10     Q.   And if he would have said something else
11 you would have put it in your affidavit, correct, sir?
12     A.   **I can't say that.**
13     Q.   You can't say that?
14     A.   **I'm not certain.**
15     Q.   Well, if he would have said I'm acting on
16 behalf of myself and David Druker you would have said
17 that, correct?
18         MR. WILSON:  I think that's calling for
19 speculation.
20         MR. L. WILSON:  Well, I'm asking him.
21         MR. WILSON:  Well, the affidavit is only
22 intended to address the issues that were raised in the

Page 48

1  motion.
2          MR. L. WILSON:  The motion, not anything
3  else.
4      BY MR. L. WILSON:
5      Q.   And in that motion the individual
6  attorneys wanted the cases dismissed against them,
7  correct?
8      A.   **Yeah, I'm not an attorney obviously so --**
9      Q.   You don't know?
10     A.   **Yeah, I'm not an attorney.**
11     Q.   Did you tape record the conversation that
12 you had with Alan Fuchsberg on May 16th, 2008?
13     A.   **I did not.**
14     Q.   Were there any witnesses to that
15 conversation?
16         MR. WILSON:  On?
17     BY MR. L. WILSON:
18     Q.   May 16th, 2008 when he entered into the
19 oral agreement with Alan Fuchsberg.
20     A.   **Part of the conversation Dr. Townsend may**
21 **have been part of.**
22     Q.   May have, but you don't know?

---

Page 49

A. Well, certain parts I had separately and parts I had with him directly with Dr. Townsend involved.

Q. Well, when Alan Fuchsberg entered into the oral agreement with you to have you perform work on the barge litigation was Dr. Townsend on the phone with you at that time?

A. He was on the phone for part of that time, yes, he was.

Q. What part?

A. I cannot tell you exactly the entire conversation at this point many years later, but what I can tell you is that he told Dr. Townsend he wanted to retain him and to retain me to work on the project for this small group of attorneys.

Q. Okay, so Dr. Townsend also submitted an affidavit, correct? When you say "he told me" you're talking about Alan Fuchsberg, right?

A. Yes.

Q. That he wanted to retain you on behalf of himself and this small group of attorneys, correct? Correct?

---

Page 50

A. Yes, he did say that.

Q. Sir, prior to retaining counsel did you ever send me a bill?

A. No.

Q. Did you ever call me up?

A. Are you talking about personally? I sent it to --

Q. Yeah, personally, did you ever send me a bill?

MR. WILSON: Finish your answer.

A. Let me finish. I did send a bill to the barge plaintiffs steering committee group.

Q. And where did you send that?

A. Care of Karen Wiedemann's office.

Q. And you didn't send it to Lawrence Wilson, correct?

A. I did not.

Q. And you didn't send it to Wilson, Grochow, Druker & Nolet, correct?

A. No, I did not.

Q. When was the first time you sent a bill related to the work that you performed on the barge

---

Page 51

case?

A. Well, as I was preparing the expert witness report I was told that one of the sections, in fact, I believe it was Section 16 was my expert compensation section both for me and for the other people.

MR. SEYMOUR: You said Section 16 was that? I'm confused.

A. It was Attachment 16 in my expert witness report, I believe that's the number. I can look it up to be certain.

Q. You don't have to, sir. You don't have to. It's not necessary right now.

A. And in that section I put down the number of hours that I had estimated that I had worked because what Mr. Fuchsberg told me was that no matter -- I had hoped to get it in before the expert witness report was actually turned over, but he wrote, in fact, Karen Wiedemann wrote to Dr. Townsend that it was your customary policy to pay in 30 days after the invoices were submitted and it was not 30 days -- there were not 30 days between when I had this

---

Page 52

information and was getting ready to turn in the expert witness report.

MR. WILSON: Just answer his question.

BY MR. L. WILSON:

Q. Yeah, my question was when did you first send an invoice related to the work that you performed --

A. The first invoice in my mind which is -

THE COURT REPORTER: Excuse me one second. I'm going to need you to wait until he completely finishes his question.

BY MR. WILSON:

Q. Withdrawn. Relating to the oral agreement that you had with Alan Fuchsberg, when did you send an invoice for the first time for that work?

A. What Mr. Fuchsberg told me was that my first invoice would actually be represented in part by the attachment in the expert witness report which would list how many hours I had put in.

MR. WILSON: He's asking you the date, when did you send that?

A. That would have been on 7-1.

**Page 57**

1  that what you mean?  You said rather than the
2  individual attorneys.
3       BY MR. L. WILSON:
4       Q.  It talked about a small group of attorneys
5  rather than the law firm.  He talked about the small
6  group of attorneys -- rather than the individual
7  attorneys you said, not law firm.
8       A.  I said rather than the individual law
9  firm. I'm sorry, what did you say?
10       MR. SEYMOUR:  Why don't you re-put the
11  question.
12       MR. WILSON:  You had said individual
13  attorneys twice.
14       (Whereupon, the court reporter read back the
15  previous question.)
16       A.  Will you rephrase the question.
17       Q.  Yeah, let me try and ask it again because
18  I'm not sure what we got on the record.
19       Page five, first sentence, "Consequently, this
20  small group of attorneys who presumably would have
21  knowledge of the law, including the fact that any
22  principle for whom they purportedly are acting must be

**Page 58**

1  specifically identified never identified their law
2  firms as parties to the agreement with Dr. Weisler and
3  Dr. Townsend at all."  Is that true, sir?
4       A.  Yes.
5       Q.  Now, you say this small group of attorneys
6  never identified their law firms as parties to the
7  agreement with Dr. Weisler and Dr. Townsend, correct?
8       A.  I would say that's correct.
9       Q.  Okay.  Now, but the truth is you spoke
10  with Alan Fuchsberg when you entered into that oral
11  agreement, correct?
12       A.  On behalf of your group.
13       Q.  The small group of attorneys?
14       A.  On behalf -- he said he was speaking on
15  behalf of the group.
16       Q.  A small group of attorneys, correct?
17       A.  Correct.
18       Q.  So Alan never identified the law firms,
19  correct?
20       MR. WILSON:  At that time?
21       BY MR. L. WILSON:
22       Q.  At that time.

**Page 59**

1       A.  As I said, the only thing that Alan sent
2  around that time was --
3       Q.  Sir, did Alan identify the law firms at
4  that time, yes or no?
5       A.  He did not identify the law firms except
6  the certification.
7       Q.  And it was an earlier statement that you
8  didn't know about the Barge PSLC until a month after
9  you entered into the oral agreement with Alan,
10  correct?
11       A.  Where to send the bills.
12       Q.  Right.  That was the first time you heard
13  that the barge PSLC may be paying your bills, correct?
14       A.  That was the first time I was told that
15  that's where all the bills should be addressed to.
16       Q.  Okay.  It says here "Significantly," page
17  four, "the mention of the Barge PSLC only came about
18  when the experts were told to direct their invoices to
19  the Barge PSLC over a month after they were
20  retained."  "Significantly," right there.
21       "Significantly, the mention of the Barge PSLC
22  only came about when the experts were told to direct

**Page 60**

1  their invoices to the Barge PSLC over one month after
2  they were retained."
3       A.  I'll need to look.
4       Q.  Sir, I'm talking about the oral
5  conversation you had.
6       A.  You're talking about different dates, sir.
7       Q.  Sir, I'm only asking you about May 16,
8  2008, okay?
9       MR. WILSON:  Just answer his question.
10       A.  May 16th, okay.
11       Q.  On that day Alan Fuchsberg didn't tell you
12  that the Barge PSLC was going to pay your bill,
13  correct?
14       A.  No, he said the small group of attorneys.
15       Q.  Okay, so the answer is correct, he didn't
16  tell me the Barge PSLC, he told me that the small
17  group of attorneys was going to pay my bill?
18       A.  That's correct.
19       MR. WILSON:  On May 16th.
20       A.  On May 16th.
21       Q.  And that's when you came to a meeting of
22  the minds with Alan Fuchsberg about the work you were

**61**

 1  going to perform, correct?
 2    A.  That date is the correct date, yes. And
 3  again I do have a hearing problem.
 4    (Exhibit 2 was marked for identification.)
 5    Q.  Okay. I'm going to read to you something
 6  from page nine of the memorandum submitted in support
 7  of your -- I'm going to show you page 9 of Exhibit 2
 8  of the deposition today, okay. It's bolded. It says
 9  "The defendants are personally liable due to their
10  failure to disclose the existence of an agency
11  relationship with the Barge PSLC at the time the
12  contract was confected, that statement true, sir?
13    MR. WILSON:  I'm going to object. That's a
14  legal conclusion.
15    BY MR. L. WILSON:
16    Q.  I would like to know, is that your
17  thought, sir?
18    MR. WILSON:  Objection, that's a legal
19  conclusion.
20    A.  I'm not a lawyer.
21    Q.  Well, it is true that the defense or at
22  least Alan Fuchsberg failed to disclose the existence

**62**

 1  of an agency relationship with the Barge PSLC at the
 2  time that you entered into the oral agreement with him
 3  on May 16th, 2008?
 4    MR. WILSON:  Objection. I think it's been
 5  asked and answered. He specifically identified the
 6  group of attorneys.
 7    BY MR. L. WILSON:
 8    Q.  Okay, thank you, fine. Page 11 it says
 9  "There is no question that the individual attorneys
10  did not disclose the existence of an agency
11  relationship with their respective firms or even with
12  the Barge PSLC at the point of the contractual
13  agreement with Dr. Weisler." Is that true, sir?
14    A.  There is no question. Agency relationship
15  I might need help with understanding.
16    MR. WILSON:  I think these are legal terms.
17    A.  These are legal terms, I'm not a lawyer.
18    Q.  I'll take the word agency out, okay?
19  "There is no question that the individual attorneys
20  did not disclose the existence of their respective
21  firms or even the Barge PSLC at the point of
22  contractual agreement with Dr. Weisler." Is that

**63**

 1  statement true or false, sir?
 2    A.  May I look at the document again?
 3    Q.  Sure.
 4    MR. WILSON:  You're referring to May 16,
 5  correct?
 6    MR. L. WILSON:  Correct.
 7    A.  May 16th at that point I was not aware of
 8  that part of it.
 9    Q.  What does that mean, sir? Can you answer
10  the question? Can you read back the question to him,
11  please?
12    (Whereupon, the court reporter read back the
13  previous question.)
14    A.  When we agreed that's my understanding, is
15  that it was -- he was representing a small group of
16  attorneys at that point when I made the decision.
17    Q.  Okay. And he didn't disclose the law
18  firms and he didn't disclose the Barge PSLC?
19    A.  No. At that point when we were talking on
20  the phone --
21    Q.  It's yes, he did not disclose them?
22    A.  He did not disclose them.

**64**

 1    Q.  And that would be the Barge PSLC or the
 2  law firms, correct?
 3    A.  Yes, that would be correct.
 4    Q.  Thank you. Thank you. "I was also
 5  instructed by Mr. Fuchsberg and some other attorneys
 6  to perform a comprehensive review of the disaster
 7  related medical and psychiatric literature." This is
 8  from your affidavit. It's paragraph five. It's been
 9  marked today as Defendant's Exhibit One deposition. I
10  think it's the second sentence of paragraph "I was
11  also instructed --"
12    A.  Uh-huh.
13    Q.  You were instructed by Mr. Fuchsberg and
14  it says and some other attorneys to perform a
15  comprehensive review, correct?
16    A.  That's correct.
17    Q.  Wait for my question. My question is I
18  wasn't one of those attorneys, correct?
19    A.  No.
20    Q.  Meaning -- you mean yes?
21    A.  You were not one of those attorneys.
22    Q.  Thank you, sir. Just so we're clear, at

DEPOSITION OF RICHARD H. WEISLER, M.D.
CONDUCTED ON SUNDAY, OCTOBER 9, 2011

205

1  Q.  After you were informed of the
2  cancellation of the depositions, did you do anything
3  to try to reduce the amount of any out-of-pocket loss
4  for August 14th and 15th?
5  A.  Well, I tried.  As you see I had a
6  cancellation fee for my USAir flight which was
7  supposed to take me down to New Orleans to meet with
8  you and so instead of flying to New Orleans I flew
9  back to Raleigh.
10  And if I remember correctly I tried to see if the
11  last minute, and this was just a few hours before
12  because I didn't learn about it until basically the
13  late afternoon or late evening, I can't remember, of
14  the 12th, so I had the 13th basically to try to
15  identify people, but I was actually teaching in
16  Charlotte if I remember correctly on the 13th.  That's
17  why I was flying out of Charlotte to go down to New
18  Orleans so I did my best to try to arrange, but I'm
19  not sure I could arrange anything at the last minute
20  on the last day.
21  Q.  Did you ask for staff to see if any
22  patients could be brought in on those days?

206

1  A.  I did.
2  MR. WILSON:  Off the record.
3  (A brief recess was taken.)
4  (Exhibit 34 was marked for identification.)
5  BY MR. SEYMOUR:
6  Q.  I've marked as Exhibit 34 for the
7  deposition an August 12, 2008 time 12:29 p.m. from
8  Brian Gilbert to Dr. Townsend, Dr. Weisler talking
9  about the cancellation of the depositions, did you
10  receive that?
11  A.  This one as I said was a --
12  Q.  Did you receive that?
13  A.  I did receive it so this would have been
14  basically 1:29 our time, Eastern time.
15  Q.  On my machine that is 12:29 Eastern.
16  A.  Oh, it is?
17  Q.  Yes.
18  A.  But this is Brian Gilbert sent it.
19  Q.  Brian Gilbert sent it and I received it
20  and it corrects automatically.
21  A.  All right then I accept that.
22  (Discussion off the record.)

207

1  CROSS-EXAMINATION
2  BY MR. L. WILSON:
3  Q.  In your questioning by Mr. Seymour you
4  gave answers such as you-all asked, the group asked,
5  you guys asked, considering that you and I have never
6  had any communication before, when you say that you're
7  not talking about Lawrence Wilson, right?
8  A.  I was not talking about you specifically,
9  I was talking about the group, on the group's behalf,
10  that's what I was asked, but never directly with you.
11  Q.  Okay.  And in the group of people that you
12  dealt with was it Alan Fuchsberg, Rick Seymour, Larry
13  Wiedemann and Brian Gilbert?
14  A.  They were primarily the people I dealt
15  with, sometimes Karen Wiedemann as well.
16  Q.  Did you also deal with Shawn Khorrami?
17  A.  I did, we had a teleconference on I
18  believe it was August 10th if my memory serves me
19  correctly and Mr. Seymour was part of that conference
20  call, so was Mr. Gilbert and also in that same call
21  Dr. Howard Osofsky, Dr. Joy Osofsky and Dr. Townsend
22  were also party to it because I was trying to get

208

1  everything finalized and make certain that everything
2  was set and I was paid or at least it was all set up
3  or everybody was prior to having to do my deposition
4  which was scheduled for the 14th, for the 1th and for
5  which I was getting prepared.
6  Q.  And did Mr. Khorrami tell you that he was
7  going to pay your bill?
8  A.  That was my memory of it was in essence
9  like win, lose or draw, basically we were going to get
10  paid.  And I would say Mr. Seymour and Gilbert were
11  part of that conversation too, that whatever happened
12  we were going to get paid is what our -- my
13  recollection was.
14  Q.  My other question is, Doctor, can people
15  suffer an emotional injury from a tragedy such as a
16  hurricane without having a clinically diagnosable
17  injury?
18  A.  Yes.
19  Q.  And my last question is did anybody
20  receive a benefit from your report?
21  A.  Well, you used the report, okay.  And so
22  the barge group submitted the report and y'all also

217

1  A.  No.
2  Q.  So this is your final one?
3  A.  If this was February 2009 I don't think
4  there's been any.
5  Q.  Now, if you take a look, if you will, at
6  the document.  There are a lot of entries that are for
7  whole numbers of hours and a few that are quarter
8  hours and a few that are half hours.  How do you
9  record your time?
10  A.  Well, I try as best possible to be as
11  accurate as I can in capturing the time spent so
12  sometimes I do it in between patient evaluations,
13  sometimes I might do it -- for example, this one here
14  talks about going to New Orleans and flying so I would
15  include while I was traveling, but also I try to
16  read.
17      That was where I did part of my reading as well
18  in some cases, tried to make the most of this time,
19  and then the way I would do it is I would keep track
20  during the day of roughly how many hours it was to try
21  to make notes to myself.
22  Q.  Where you do not have a note for a

218

1  particular time does that mean that you estimated the
2  time?
3  A.  Well, there's some things that actually --
4  for example, if it's just mostly reading and
5  particularly some materials sometimes what I would do
6  to be fair is I would time myself reading certain
7  things and see how long it would take so I would then
8  know if I read this many pages roughly how much time I
9  spent.  Most of the time I tried to do it by the time,
10  if at all possible.
11  Q.  Well, for example, you have five hours
12  down for the second time entry on May 17th, 2008,
13  that's the second item on this chart?
14  A.  That's correct.
15  Q.  And the description is research and
16  literature review for planning for claimant
17  evaluations, where did you get the five hours from?
18  A.  Well, I was working on that document, I
19  can't remember which number it was, but we were
20  talking about trying to come up -- you were asking me
21  to plan for what would my methods be, if I remember
22  correctly, for doing evaluations of your clients and

219

1  how would we propose to do that.  So to do that I
2  would have to figure out what scales, I would have to
3  get how do you do the scale and scoring instruments to
4  make sure they were right, and that we were using the
5  same approach in scoring, and also talk to other
6  people.
7      For example here there's electronic
8  correspondence with Dr. Townsend, you, Mr. Seymour,
9  Larry Wiedemann and there are individual table of
10  contents with these descriptions.
11  Q.  Is the figure of five hours estimated?
12  A.  No, that was a pretty good -- that was the
13  best I could do keeping track of when I spent the
14  time.  It would depend on when I finished.  For
15  example, I don't know what day the 17th was, but if I
16  were seeing patients, maybe it was during the day, I
17  was between things I would keep track and have an
18  estimate as best I could and in terms of trying to be
19  as accurate as I could be how much time I spent.
20  Q.  Let me be clear, one way of keeping time
21  is to say that you started working at 8:06 a.m. on a
22  project and at 11:23 you had to stop because you had a

220

1  patient, then you have the time to spend between 12:35
2  and one o'clock and then you add up that element --
3  then you add that up and then you have an actual count
4  to minutes or tenths of an hour or whatever for the
5  end of the day, that's one thing.
6      Another is to look at the end of the day and try
7  to figure out how much time was spent in the
8  aggregate.  Is it fair to say that you routinely
9  looked at the end of day or subsequently to figure out
10  how much time was spent in the aggregate?
11  A.  Actually, I tried to do a little bit of
12  both.  For example today, how do you say how much time
13  was spent in the deposition were Marian not keeping
14  track of it because we have a lunch break and we go to
15  the bathroom or you get a phone call or whatever it
16  might be and I tried to make allowances for that and
17  be conservative, believe it or not, on how much time I
18  spent in putting down the times.
19  Q.  So a lot of these involve estimates at the
20  end of the day; is that right?
21  A.  Well, I would try to factor out if I knew
22  that I had taken a break for lunch or if I had to see

DEPOSITION OF RICHARD H. WEISLER, M.D.
CONDUCTED ON SUNDAY, OCTOBER 9, 2011

56 (Pages 221 to 224)

221

1  a particular patient during the period of time, then I
2  would try to subtract that out, yes.
3     Q.   Let me make my question as specific as I
4  can.  If you have starting and ending times within a
5  day then you can just add it up, there's no estimation
6  involved?
7     A.   And if you have nothing else to do, but
8  even then, like today --
9     Q.   No, but whether starting at any time it
10 doesn't matter whether you've got the starting and
11 ending times, I'm just trying to find out whether for
12 your time entries in Deposition Exhibit 37, those are
13 time entries that are generally estimates as you've
14 described it at the end of the day as opposed to
15 recording the starting and ending times?
16    A.   Well, I could frequently tell by the work
17 product when I started things because I could look and
18 see sometimes when I was reading an article or wrote
19 an email, made a phone call in some cases, so I would
20 have -- and that's what I tried to use when possible
21 and also when I might have made phone calls to people
22 or when I actually remember saying I've had enough

222

1  work on this, I've already worked during the day and
2  that was all I could do and I went to bed.
3     Q.   Where your time for a particular day
4  differs from what was stated in an earlier statement
5  of time either in draft form or provided to us is it
6  fair to say that you were making an estimation perhaps
7  a month later?
8         MR. WILSON:  Let him finish his question,
9  but I'm going to object to any speculation as to what
10 might have happened.
11    A.   What I would tell you is the one that I
12 made an error on was this last day, if I remember
13 correctly, in New Orleans where I had a dating error.
14    Q.   What page are you referring to?
15    A.   It doesn't have a page number.
16    Q.   What date?
17    A.   It would be, I think, the 6-1 time period.
18    Q.   There was a 13.25 hours for June 1st?
19    A.   If you pull up -- what is the exhibit that
20 had the very first one I sent, that 7-7 date, if you
21 give me that date.  So for example here, this is the
22 original one, so in the original one here.

223

1     Q.   If you had an exhibit number would you
2  tell us.
3     A.   Exhibit 4.
4     Q.   Exhibit 4, okay.
5     A.   So when you asked me to look at it again
6  and track it I had all these dates wrong.  When I was
7  flying I was traveling.
8     Q.   You're pointing with your thumb, but tell
9  the reporter what dates you're referring to, first
10 page.
11    A.   It looks like I've got to match it up here
12 so hold on a second.  So this is when I was on the
13 plane and had gone to New Orleans to do evaluations so
14 on the -- I showed work originally on the 28th, 29th,
15 30th, 31st and 1st and then here in the original one
16 you notice there's no June 1st.
17        I had a dating error for all of those dates so
18 the 28th became the 29th, the 30th became the 31st,
19 and the 31st became June 1st, but the hours basically
20 were there and they were the same hours but just a
21 different date and I was doing this while I was on the
22 plane and obviously flown enough like you guys do and

224

1  made a mistake and there were contemporaneous notes
2  from those days that I wrote down how many hours.
3     Q.   So in those instances you were going back
4  and estimating days after the work was done?
5     A.   No, no, I'm not saying that.  If I can
6  find it I actually did it at the time.  I was writing
7  on a little stickie how many hours I put in each of
8  those days.  That was the day I was in New Orleans and
9  after going through all the records at LSU in the
10 morning, meeting with Dr. Townsend, I met with
11 Mr. Gordon, met Mr. Wiedemann and also got you on a
12 teleconference that day and I had to go to the
13 airport, fly back to Raleigh and do a lot of reading
14 as well, and that's what the 13-and-a-half hours
15 represents.
16    Q.   Is it your practice when you keep time to
17 generally bill -- round to the nearest hour or half
18 hour?
19    A.   I try to do as best I can.  If I hear, for
20 example, this date here on the 31st I put 13, 15, I'm
21 not sure if the 15 is right, but anyway then I have
22 the number ones here a half an hour, if I can time it

DEPOSITION OF RICHARD H. WEISLER, M.D.
CONDUCTED ON SUNDAY, OCTOBER 9, 2011

57 (Pages 225 to 228)

225

1  within 15 minutes I do, but most of the time I try to
2  take a break periodically and I figure that's how I'm
3  going to take up with the time.  I need bathroom
4  breaks periodically and other things --
5           MR. L. WILSON:  I have defendant's
6  Exhibit 2.
7           MR. WILSON:  The affirmation.
8           MR. L. WILSON:  And the affidavit to
9  Dr. Weisler attached to defense counsel's memorandum.
10 It's the memorandum on behalf of the plaintiff in
11 opposition to defendant's motion and it has attached
12 to it Dr. Weisler's affidavit and Dr. Townsend's
13 affidavit and we marked it previously as Deposition
14 Defendant's 2.
15          MR. SEYMOUR:  It's the opposition was 2.
16          MR. WILSON:  The whole attachment.  I know
17 that there's an affidavit that's already attached but
18 I'd like the whole thing.  You want to take out your
19 Post-Its and so on.  What I'm saying is should I leave
20 it with the court reporter?
21          MR. SEYMOUR:  Yes, but you need to strip all
22 of the notes and so on.

226

1           (A brief recess was taken)
2           RE-REDIRECT EXAMINATION
3  BY MR. SEYMOUR:
4       Q.   Let's go on the record.
5       A.   And you were asking earlier about what did
6  I try to do and in terms of when everything was
7  canceled and one of the things that happened by doing
8  all this work obviously is I turned down a lot of
9  work.
10      I turned down private patients, I turned down
11 research study patients, I turned down research
12 studies, for that matter, so I had to try to begin to
13 examine the impact of having spent all this time
14 working for the barge plaintiff's group during the
15 prior months and what I was going to do going forward.
16      Q.   And you presumably turned down unpaid
17 writing as well?
18      A.   Unpaid writing, I don't get paid to write
19 typically so I do that all the time, but that's not
20 what I was doing.
21      Q.   Have you ever done any articles with any
22 of the persons who are listed in the expert report as

227

1  persons who worked with you or contributed?
2       A.   Yes.
3       Q.   Which ones?
4       A.   Well, Dr. Davidson and I have written a
5  number of articles together.  Dr. Sheehan and I have
6  been coauthors, I know we've done posters together on
7  that.  Dr. Townsend and I have done research work
8  together.  Obviously y'all picked me up because
9  Dr. Townsend and I wrote the JAMA article before about
10 mental health and recovery after Hurricane Katrina.
11 Mark Townsend and I had also done other work together
12 in relation to the Medscape piece we did on Hurricane
13 Katrina.
14      Q.   Let me ask you specifically about work
15 done after you commenced work on this project.  Did
16 you coauthor any articles with any of those persons
17 listed in the expert report?
18      A.   In relation to the work we did with this
19 or other topics?
20      Q.   In relation to other any of the questions
21 involved in the expert report.
22      A.   Not to my knowledge.  I did not use it to

228

1  write a report.
2           (Exhibit 38 was marked for identification.)
3  BY MR. SEYMOUR:
4       Q.   Exhibit 38 is a statement of hours through
5  7-28-08 updated and I've marked it as Exhibit 38 to
6  the deposition.  We have -- this is the fourth
7  document with that date?
8       A.   Yes, that's -- the way they the title in
9  my office could have probably been better.  This did
10 have updated time, but it only went through 7-28 which
11 would be correct in this invoice.  Again I have to
12 verify that if we sent it to you, I had sent it to you
13 previously so I'm assuming it came to my office.  And
14 this one has that 6-1 date, the dating correction.
15 That was the main change in that one.
16      Q.   Okay.
17          (Exhibit 39 was marked for identification.)
18 BY MR. SEYMOUR:
19      Q.   I've marked as Exhibit 39 what was Exhibit
20 3 to Andrew Wilson's February 2009 letter.  Is that a
21 reading list that you compiled?
22      A.   Yeah, it's a reading list I compiled.