# SUMMARY OF ACTIVITY

*In Re: Katrina Canal Breaches Litigation*, CA No. 05-04182 (SRD/JCW)/
c/w *Mumford v. Ingram Barge Company, et al*, CA No. 05-05724
**Barge Plaintiffs' Litigation Steering Committee: Outstanding Expert Fees**

The following is a summary of my involvement as an expert witness in the emotional injury subclass project associated with the captioned litigation. Included is a history of the project including a summary of my activity, as well as a description of the present billing impasse. Although this project was eventually abandoned, the summary will make it clear that at no time did the numbers of the expert team gathered for this project, nor I, guarantee the results of the project. Further, we never agreed to perform our services for the project contingent on the outcome as this would be unethical if not illegal.

### *Initial Contact*

I was first contacted in the Barge Case in an email on May 14, 2008, from New York attorney, Alan Fuchsberg, titled "**FW: Katrina emotional injuries--seeking consultant expert**". Mr. Fuchsberg wrote that he wanted to talk to me about serving as an expert witness regarding a proposed "emotional subclass" which a group of attorneys was seeking to certify. More specifically, he stated that:

> "There are certain generic across the board emotional injuries that can be fairly stated to have occurred on a class basis. We need an expert like you to examine this issue and prepare a report. From seeing your paper[1], I believe you have considerable experience with victims of that day, their injuries and needs, or can point us to the right person."

Shortly after exchanging additional brief emails and phone messages we first spoke on May 16, 2008. In the call Mr. Fuchsberg was profusely apologetic about the fact that he and his co-counsel had waited until the very last possible minute to look for an expert witness for his proposed emotional subclass. He described his group of attorneys as the Barge Plaintiffs' Litigation Steering Committee ("BPLSC"). Mr. Fuchsberg in that same telephone call described to me the barge incident and the fact that there were potentially many *thousands* of members of the proposed emotional subclass, among a much larger class described in his original email of persons having "some property loss and personal injuries occurring to some 60,000 residents in the 9th Ward, St Bernard's Parish, New Orleans, due to the uniquely swift and traumatic nature of flood damage to their neighborhood." Mr. Fuchsberg said, as he had written in his initial email, that he was concerned that many thousands of the potential emotional injury subclass from the "60,000 residents" may have been impacted and thus be or have been emotionally

---

[1] 8/2006 JAMA Commentary article on "Mental Health and Recovery in the Gulf Coast after Hurricanes Katrina and Rita".

Richard H. Weisler, M.D. Deposition
Oct. 9, 2011    Exhibit 8





distressed and in need of mental health treatment because of barge related flooding in the Lower Ninth Ward and St Bernard Parish following Hurricane Katrina.

Mr. Fuchsberg next related in the same phone call that he and his co-counsel had just filed a Motion to certify the proposed class and subclasses on May 15, 2008, which I would later receive from the BPLSC to review. Mr. Fuchsberg then gave me general information on the status of the case with regard to the Barge PLSC's critical need for a very comprehensive expert witness report on the emotional subclass issues which report had to be exchanged with opposing counsel in less than thirty days per the existing order of presiding federal Judge Stanwood R. Duval, Jr. Mr. Fuchsberg also indicated that the BPLSC also wanted psychiatric evaluations of some of their claimants in connection with the proposed report.

In response, in that same initial phone call, I told Mr. Fuchsberg that I was frankly stunned by the lateness of his and the BPLSC's request for the emotional subclass expert report. Mr. Fuchsberg answered that he and the other members of the BPLSC had somehow overlooked or neglected the need for the emotional subclass expert witness and report for a long time. Mr. Fuchsberg then explained that failing to have arranged for the proposed emotional subclass expert was perhaps because of what was going on with other larger class issues, such as those related to property damage and other unrelated class matters.

As to the details of the proposed project, Mr. Fuchsberg said that he wanted a psychiatric expert to thoroughly evaluate a representative sample of members of the proposed emotional subclass, which the BPLSC attorneys would themselves select. He also indicated that he wished for me to complete an expert witness report on my findings for exchange with opposing counsel by June 12, 2008.

Under the circumstances, I told Mr. Fuchsberg that it would be impossible for me, or for that matter, I believed anyone else individually, to perform the task he was requesting in such a short period of time. In fact, I specifically told Mr. Fuchsberg that it would certainly be impossible for me to undertake a task of this magnitude in just a little over three weeks.

Accordingly, having advised him of this, and as a possible solution to the problem, I mentioned that if I were to be involved I could probably associate other psychiatrists including Mark Townsend, MD and/or James Barbee, MD, with whom I had worked on Katrina related mental health issues. I also indicated that Drs. Barbee and Townsend were local experts who worked at LSU Health Sciences Center in the Psychiatry Department who would not have the additional time burden of traveling to and from New Orleans from Durham, NC as I would. Mr. Fuchsberg stated that my travel time and costs would be covered by the BPLSC and thus my travel would not be an issue for the BPLSC.

But the timing constraints of the report remained an issue for me and so I again advised Mr. Fuchsberg that if I were to even consider being involved in any fashion at such a late date that it would have to be as part of a team of experts, not just the two I had mentioned

2

previously, due to the then impending June 12, 2008 court deadline that Mr. Fuchsberg thought was unchangeable.[2] Mr. Fuchsberg asked what my hourly rate was and I informed him that I followed the Duke University Medical Center faculty suggested rate of $600/hour, though I would be paid directly because of my non-salaried Adjunct Faculty status. Mr. Fuchsberg immediately agreed to my hourly rate and instructed me and later Dr. Townsend to just note the number of hours that we worked on the Barge case project.

Mr. Fuchsberg also sought to immediately take up my suggestion that we should also reach out to Dr. Townsend and/or Dr. Barbee. He then informed me that he had already written to them as well. Consistent with his e-mail to me, he told me that he had written to all of us about being an expert witness because of our co-authored 8/2006 JAMA Commentary article. He also indicated he had contacted me because of my background in psychiatry and mental health, particularly post-traumatic stress disorder ("PTSD") and other trauma related symptoms. Additionally, although I rarely testify in Court, he felt I would be qualified as an expert for purposes of this litigation under the existing law because I wrote extensively for peer journals, I am a psychiatric professional at Duke University and the University of North Carolina at Chapel Hill and I lecture nationally and internationally.

On that same day Mr. Fuchsberg attempted to arrange a conference call with me and with Dr. Townsend and Barbee. He did not reach Dr. Barbee at that time, but he did interact at length with Dr. Townsend in a conference call in which I participated after I gave him his number. At that time, Mr. Fuchsberg then repeated to Dr. Townsend much of the information that he had previously shared with me about the BPLSC's needs and those of the Barge Class. More specifically, Mr. Fuchsberg spoke in detail about the expert witness needs of the proposed emotional subclass, which included extensive psychiatric evaluations of the BPLSC's chosen sampling of some of the potential members of the proposed emotional damage subclass in their case.

Based on these discussions, Mr. Fuchsberg concluded the BPLSC would need a consensus of psychiatric expert opinions on the clients that we were going to examine with regard to diagnosis and differential diagnosis.[3] In fact, per the instructions of Mr. Fuchsberg and in the near future by another member of the BPLSC, Washington, D.C. attorney, Richard Seymour, our intensive psychiatric evaluations were also to be paired with formal forensic psychological evaluations to be performed separately on the proposed class representatives or clients we were evaluating, so as to allow us to determine whether these individuals were still experiencing significant mental health problems related to the flooding, which would, in turn, allow us to determine the

---

[2] The deadline would eventually be extended to June 30, 2008 due to the growing scope of the project which would have been impossible to complete in the limited time frame resulting from the BPLSC's request.

[3] These initial discussions made it quite clear that the likely results would include a significant variance in the symptomatology of those examined based upon the variance in their own personal Katrina experiences, prior mental health functioning, and genetic vulnerability for emotional and psychological disorders.

3

spectrum of variance in symptoms and treatment needs among the BPLSC's chosen sampling.

Significantly, Mr. Fuchsberg also told Dr. Townsend and me on May 16, 2008 that this was the first emotional class certification effort that he was aware of in the United States, something Mr. Seymour would also tell us later. It should also be kept in mind that this emotional injury subclass concept was entirely created by the BPLSC and they had apparently filed their pleadings seeking to certify that subclass before the BPLSC ever spoke with me, or any other members of the proposed subclass expert team assembled for this project. In fact, it was unclear if they ever spoke to *any* mental health provider other than briefly with epidemiologist, Ronald Kessler, PhD., who Dr. Fuchsberg later told me had declined to work with the BPLSC, before the BPLSC prepared their pleadings or contacted me. Also significant is the fact that the BPLSC alone selected the eleven representative Plaintiffs/claimants to be evaluated. Consequently, neither I nor any of the other experts could in any way guarantee the outcome of the project, or the content of the report, or, give an accurate estimate of the size of the report or the necessary scope of the project to satisfy their goal of subclass certification.

But in that first teleconference I did tell Mr. Fuchsberg, as did Dr. Townsend, that it was going to be *very expensive* for the BPLSC to: (1) perform intensive psychiatric evaluations on a large number of their claimants; (2) conduct psychological testing; (3) write an expert witness report describing the evaluations which would, of necessity, include an *extensive review and discussion* of the applicable medical literature; (4) identify defensible methodologies for large scale mental health screenings; and (5) describe or recommend defensible and optimal potential treatment modalities for many thousands of those presumably still in need - all at medical expert witness rates of $600 per hour. Mr. Fuchsberg informed Dr. Townsend and me in that same conference call that he and the members of the BPLSC "*were prepared to spend substantial amounts*" to pursue their proposed emotional subclass, which had been described in their May 15, 2008 court pleadings the BPLSC had already filed. Following the phone call, Mr. Fuchsberg then sent Dr. Townsend and me the entire BPLSC May 15, 2008 pleadings and another file containing excerpts related to their proposed emotional subclass.

On May 16, 2008 at 5:22 PM after he concluded the conference call with me and Dr. Townsend, Mr. Fuchsberg wrote an e-mail to members of the BPLSC titled "**good news on the emotional health class issue and need to set up psych evaluations next Saturday for class reps**". This e-mail, on which I was copied, stated in pertinent part that:

> "I just got off a conference call with two psychiatrists professors (from LSU School of mental health and Duke University) who together have worked with Katrina victims, and are populist psychiatrists. They have agreed to coauthor a report by June 12. They want to interview the class reps in New Orleans next Saturday. Their names are

4

>Dr. Mark Townsend and Dr. Richard Weisler. They will
>send a plan summary after the weekend for our review.
>Alan.

Consequently, at that point in time, Mr. Fuchsberg had fully advised the BPLSC of the retention of a psychiatric team who were to proceed with evaluations of claimants on an immediate basis. The project had begun.

### *Commencement of the Project*

As the initial e-mails reflect, Mr. Fuchsberg had advised that we needed to immediately interview the class representatives in New Orleans the following Saturday, May 24, 2008. Over the next few days and then weeks I sent Mr. Fuchsberg and other BPLSC attorneys information, articles, and slides that clearly indicated the need for individual screening prior to determining who had been, or still was, adversely impacted by the flooding. On May 17, 2008 I sent Mr. Fuchsberg the 2007 World Psychiatric Association workshop slides that I had previously used, specifically highlighting slides 52-56 in the set. Slide 56 notes that only about 42% of people may have severe emotional problems after a natural disaster and that 34% may have severe emotional problems in technological disasters. Our telephonic and written comments and the slides highlighted the need for the BPLSC to plan on individual screenings of their proposed subclass, representatives and the full subclass if the court ever certified their proposed emotional subclass, in order to determine who had been adversely impacted emotionally.

As Mr. Fuchsberg had instructed me, I began hastily working on developing and sending a preliminary draft of a pilot evaluations/methods plan to him on May 19, 2008 for my client evaluations with Dr. Townsend in New Orleans so that Mr. Fuchsberg could share it with his BPLSC co-counsel prior to our scheduled teleconference with Washington, D.C. attorney, and BPLSC member Richard Seymour, as well as New Orleans attorneys, Larry Wiedemann, Brian Gilbert and Karen Weidemann, and of course New York attorney and BPLSC member, Mr. Fuchsberg, that same day. My May 19, 2008 email to Mr. Fuchsberg and Dr. Townsend also spelled out some of the options under consideration for our use as validated, structured diagnostic interview scales and validated rating assessment scales for depression, mania, anxiety, and PTSD, capturing information on both frequency and severity of key symptoms. Additional validated scales rating general and work functioning and overall disease severity suggestions for the upcoming client evaluations that we were considering using were also included.

Later on May 19, 2008, I sent Mr. Fuchsberg another email detailing and giving him access to the very comprehensive MINI Plus Diagnostic Interview schedule that we ultimately elected to use for the psychiatric evaluations.

Had any of the BPLSC members wished us to consider any other scales or approach at that time, we would have gladly considered such a request, but there was none. Moreover, the SPRINT-E psychiatric screening questionnaire that we elected to use in

addition to other methods was very effective at determining treatment needs of the claimants we evaluated supporting the possible use of the SPRINT-E in abridged future class screening efforts if the subclass were ever certified. The SPRINT-E was chosen after discussions with Mr. Fuchsberg in large part because the Centers for Disease Control and Prevention had elected to used the exact same SPRINT-E scale in their Louisiana Department of Mental Health requested Rapid Needs Assessment in October 2005 soon after Hurricane Katrina struck New Orleans. The results from the SPRINT-E scale used in that assessment had already been published in the Journal of the American Medical Association CDC section called Medical and Morbidity Weekly Report on January 20, 2006. What had been less certain initially was how useful the SPRINT-E scale would be in screenings almost 3 years after a disaster, which is why we wanted to pair it with our initial clinical and psychological evaluations of the 11 BPLSC claimants.

In the end, however, Dr. Townsend and I also chose to use the much longer MINI Plus Diagnostic Interview or schedule because the instructions from Mr. Fuchsberg and Mr. Seymour were for us to perform very comprehensive psychiatric evaluations of these initial representative clients as these evaluations would be more defensible under the anticipated cross-examination of whomever would be the designated expert witness insofar as subclass certification was concerned. Such a comprehensive clinical approach, we felt, could also better survive any type of intensive review of our proposed class representative evaluations by opposing Defense experts.

Throughout these efforts, the Barge PLSC attorneys had reminded us on many occasions that there had never been an emotional subclass like this in a class action before. Because of this, Mr. Seymour, Mr. Fuchsberg, and Mr. Gilbert indicated that they could offer us minimal guidance on what would be acceptable with regard to such a proposed subclass in what could be a potentially precedent-setting case. Under these circumstances, they told us to be very comprehensive in our clinical assessment of the selected emotional subclass representatives and any other claimants we would be asked to examine, as well as in preparing the report and attachments.

Early on in these efforts, Mr. Seymour began to take a more active role in the project, often advising us as to what should be included in the report we were to generate. For example on May 20, 2008, at 7:29 AM Mr. Seymour forwarded substantial materials for the case for us to review and provided specific instructions to me in an e-mail entitled **"Barge Cases Medical: Dr. Kilpatrick's Affidavit, and Judge Duval's Daubert Ruling"**, in which he attached a copy of the provisions of Rule 26(a)(2) of the Federal Rules of Civil Procedure. He also advised that our June 12 report would need to comply with all of those requirements, and that insofar as reference materials I might rely upon, "It is always a good idea to start compiling early the lists required by the rule, so that things can be added to it as they are consulted. Doing it at the end is far less pleasant."

Later that same day, at 4:16 PM, Mr. Rick Seymour sent another email to attorneys Alan Fuchsberg, Brian Gilbert, and Larry Wiedemann, as well as Dr. Townsend, Dr. Paul Balson (another LSUHSC Psychiatry Professor), and me indicating that his paralegal,

Jullion, has reached all class reps named in the motion for the case as a whole or for any subclass." Mr. Seymour then noted that Brian Gilbert separately had reached three other "class reps" for the psychiatric evaluations. Thus, the BPLSC member attorneys, Messrs. Fuchsberg, Seymour, Wiedemann, and Gilbert, alone were responsible for determining both, which of their clients, and, the total number of potential proposed subclass members whom Dr. Townsend and I were to evaluate in New Orleans on May 24 and May 25, 2008 as well as on June 1, 2008.

Obviously, having selected the claimants themselves, we could not guarantee the nature of our findings, including whether there would be any variance in their symptomatology. In fact, much later on June 28, 2008, as I was in the process of trying to finalize the expert witness report, Mr. Seymour set forth in an e-mail dated June 28, 2008 the rationale that was utilized by the attorneys in their selection of which of their claimants they wanted us to evaluate in our diagnostic clinical interviews. In the e-mail Mr. Seymour also wrote that, "We expected that some (claimants) would have no ongoing emotional distress and that some would." This comment clearly confirms that the BPLSC knew from what the other experts and I had told them, or should have known early on that there would likely be a variance in the symptoms among the claimants they had selected. Indeed, as. Mr. Seymour also eventually stated:

> "As we discussed in calls at the time, we tried to line up people for interviews based on different exposures to the events, and based on different ages.
>
> Evacuated and did NOT lose family members or close friends - Old
>
> Evacuated and did NOT lose family members or close friends - Younger
>
> Evacuated and DID lose family members or close friends - Old
>
> Evacuated and DID lose family members or close friends - Younger
>
> Did not evacuate and did NOT lose family members or close friends - Old
>
> Did not evacuate and did NOT lose family members or close friends - Younger
> Did not evacuate and DID lose family members or close friends - Old
>
> Did not evacuate and DID lose family members or close friends - Younger

7

> Our mutual goal was to get as full a range as possible of the experiences of the potential class members, without any preconceived idea of who had past emotional distress and who did not, who had current emotional distress and who did not. We expected that some would have no ongoing emotional distress and some would.
>
> While this was not a statistical random sample, it was at least a range of exposures and experiences.
>
> Rick"

This e-mail is significant for two reasons. First, the BPLSC would eventually and belatedly decide in August 2008, nearly two months after our "team" had generated the urgently needed comprehensive report, that the report would not be needed at all. This was solely because the BPLSC had unilaterally decided to completely abandon the emotional injury subclass and pursue any such claims individually, as the claims might be "worth more" individually. Second, Mr. Seymour's comments when contrasted with those of another member of the BPLSC, Brian Gilbert, illustrate an ongoing dissonance among the members of the BPLSC as well as the conflicting nature of the instructions we received from the BPLSC, which complicated our efforts. For example, on the same day Mr. Seymour sent the e-mail above, Mr. Gilbert had written an email to me at 4:03 PM, which states in pertinent part:

> "Also, I do not believe that you should report that the persons evaluated were selected by attorneys. It tends to erode the needed randomness of the sample. You will be asked in *deposition* how the persons were selected, and unless you can describe in your report how the persons evaluated are an accurate representation of the whole of the putative class, we will need to refine the question later.
>
> Again, Rick Seymour has the final word on these matters, but time is going by, and I have not been able to speak with him. I would suggest that you call me with any questions, but I'll probably be unable to answer them because what I have written pretty much reflects the extent of my understanding of what needs attention. HOWEVER, IF YOU DECIDE TO START MAKING CHANGES, DO NOT DELETE YOUR ORIGINAL REPORT, IN CASE RICK SEYMOUR DISAGREES WITH MY COMMENTS MADE HERE.

Despite these types of untimely conflicting and confusing instructions, compounded by the time constraints and scheduling created by the Barge PLSC, we had nevertheless proceeded with the evaluations and later the expert witness report and attachments. Dr.

8

Townsend and I, as well as our psychologists Drs. Jill Hayes and Phil Griffin, were forced to evaluate Barge PLSC clients and work on Saturdays and Sundays from early in the morning well into the evening because of the then rapidly approaching June 12, 2008 court imposed deadline for exchanging my expert witness report. During and after our initial weekend evaluations Dr. Townsend and I called Mr. Fuchsberg and Mr. Seymour on multiple occasions to report on our clinical findings, including the fact that two out of five of their proposed emotional subclass representatives did *not* meet criteria for either past or current diagnosable mental disorders that could be related by us to the flooding. In other words, these people had no symptoms that required treatment. We received no indications from the BPLSC that this was a problem and in fact, were told that this would be helpful because it would allow for a determination as to who had become adversely impacted so that they might continue treatment for a clinical diagnosis.

### *Communication Issues*

Given the number of psychiatrists and psychologists involved in the Barge PLSC's emotional injury subclass project, it became clear that one member of the team should be tasked to coordinate the efforts of all involved and to eventually write the final comprehensive report. These efforts were also complicated by the separate and often conflicting instructions we were receiving from various members of the BPLSC, some of whom were located outside of New Orleans where the evaluations were taking place. As a result, Dr. Townsend had written on May 29, 2008 regarding the need to clarify a single point of contact or primary expert:

> "Dear all,
>
> Dr. Griffin is available to perform psychological testing on Saturday afternoon at 12:30, and again on Sunday afternoon at 12:30, both at our clinic at 3450 Chestnut Street in New Orleans. A suggestion: in the psychiatric world we have a concept of Single Point of Entry, where one professional is the contact for all. It would be essential to have a similar template with this case, in the spirit of helpful communication in the face of the complexity of the situation. Please let me know who that person should be.
> Thanks,
> Mark"

Mr. Fuchsberg then confirmed in an e-mail on May 29, 2008 titled "Re: a psychologist and a suggestion", which describes in general what Dr. Townsend and I had been and were specifically instructed to do by the Barge PLSC both in writing and then separately in multiple telephone calls:

> "Mark,
>
> As for a single point of entry, do you mean among the

9

> psychiatrists as opposed to between the lawyers?
>
> If so, my understanding is that there *will need to be a principal psychiatrist/report author for the class action expert opinion report* due June 12. **This person will need to sign the report and be willing to testify** as to the nature of the study that the report is about: as to efforts that were taken by the group to evaluate class representatives, methodology that was followed for these evaluations, the findings as to each class reps condition--ranging from those who continue to be ill to those who were not injured to any diagnosable degree, and what are the psychiatric disorders found in them associated with Katrina are found and how is this concluded.
>
> Then we need a *workable supportable defensible plan* to evaluate anyone who comes forward from the 9th Ward (up to Parish Road) in response to a class notice, potentially 5,000 (more or less?) of the 40,000 or so residents; abridged evaluations consistent with recognized psychiatric principles, describing what methodology could be used to screen and then shortly identify individuals who suffered or continue to suffer an emotional injury as recognized under a standard diagnostic criteria(s). Of course it would be best to have a psychiatric consensus on the approach (among the psychiatrists involved) gained from this investigation of class rep injuries as well as *examination and discussion of peer review articles and peer accepted methodologies*. Whoever can best chair this because of credentials and experience--and willingness of course-- should be this point of entry person.
> What do others think?
> Alan L. Fuchsberg" (emphasis added)

Throughout the project, the members of the BPLSC were consistent on this one concept that there could be only one testifying expert. Indeed, Mr. Fuchsberg, and subsequently Mr. Seymour and Mr. Gilbert, informed Dr. Townsend and me that only one person could serve as the Expert witness for the proposed emotional distress subclass, though other experts could assist the testifying expert. Consistent with this plan, I was the individual selected by Mr. Fuchsberg and the BPLSC to be the primary and testifying expert witness for the proposed emotional subclass. My designation as the expert witness was better clarified during the time of the clinical evaluations in New Orleans.

Mr. Fuchsberg had previously instructed me as he wrote above to coordinate and manage the clinical evaluation process of their claimants, conduct the data analysis, complete an examination and discussion of the peer reviewed medical literature research and peer

10

accepted methodologies, and to write the expert report. He instructed me to comprehensively prepare throughout the effort so that I could then successfully defend clinical work and the opinions of all involved during my anticipated deposition or court testimony.

As a result, my efforts, per the specific instructions of Mr. Fuchsberg and/or the BPLSC, were to greatly exceed the efforts of the other workers of the team because of their more limited roles and responsibilities. Despite this clear differentiation of roles in the project, the BPLSC would eventually begin on July 30, 2008 to contest indicate they or "had some reservations" about any variances between the amounts of my fees as opposed to those of Dr. Townsend.

On June 2, 2008, during the second of my two hastily scheduled visits to New Orleans within two weeks for proposed class representative evaluations, I spent the morning at LSUHSC continuing to review and organize the ultimately 1500 or more plus pages of interviews, as well as psychologists findings, clinical scales, medical histories, and other material that I ultimately collected with Dr. Townsend, Dr. Hayes, and Dr. Griffin. These documents were generated solely in connection with the project and are separate and apart from the peer journals and literature I was also instructed to review and then select and organize for my expert witness report for the court's exchange deadline. On June 2, 2008, I also performed my preliminary data review, initial proofing, and organizational work during a time when Dr. Townsend was still caring for patients elsewhere at LSUHSC *not* related to the BPLSC project.

Meanwhile during these evaluations, while most of the team had other commitments and obligations locally, because I was visiting from out of town specifically to participate in and oversee the evaluations, my hours would generally be greater than all other members of the team. Again, this was completely in line with the BPLSC's original, express intentions and specific instructions. Certainly, my travel time from Michigan to New Orleans and then back toNorth Carolina during the first set of evaluations and from Phoenix to New Orleans and then back to North Carolina after the second set of evaluations was also a significant factor in my greater hours during the evaluation periods as can be seen in the plane ticket invoices that the BPLSC has been provided previously.

Nevertheless, after the BPLSC would eventually abandon the subclass project, the BPLSC then chose to contest any differential between the hours I spent and the related fees I charged and those of any other local New Orleans psychiatrist or psychologist involved in this project during the clinical evaluation time frame and later.

### *Initial Findings*

When Dr. Townsend returned to his office on June 2, 2008, we both reviewed some of the key findings of what we thought we had learned from the BPLSC's chosen subclass representatives as well as from other evaluations. We then arranged to meet in person with Mr. Gilbert at his New Orleans law office he shares with the attorneys of Wiedemann & Wiedemann, to cover our clinical findings and impressions, prior to my flying back to North Carolina after 5 PM the same day. Dr. Townsend and I then also met

11

Larry Wiedemann for the first time in person when we arrived at their New Orleans office and very briefly shared with him some of our initial findings. A few minutes later, Mr. Gilbert, Dr. Townsend, and I met together just prior to our beginning a lengthy teleconference, in which Mr. Seymour participated remotely. At that time, Dr. Townsend and I reviewed our clinical findings from the client evaluations.

In the meeting, I along with Dr. Townsend, clearly reiterated to Mr. Gilbert and Mr. Seymour at that time that three out of five of the BPLSC proposed emotional distress subclass did *not* have current psychiatric disorders related to the aftermath of Hurricane Katrina; however, one of the three potential proposed subclass representatives without any current flooding related psychiatric diagnosis previously met criteria for Major Depressive Disorder ("MDD") after the flooding before he recovered spontaneously shortly thereafter through the possibility of recurrence of his MD was still named secondary to his having been symptomatic after the flooding. For that one claimant, his recovery indicated findings of a temporary nature as opposed to those with permanent symptoms. Again, this was further evidence of the likely variance in symptoms among the members of the BPLSC's proposed subclass that we had predicted prior to our even conducting the clinical treatment.

Mr. Seymour told us during that June 2, 2008 meeting, as he had in our earlier progress reports related to our evaluations and in updating phone calls, that he was very pleased with our efforts and the clinical findings. Mr. Seymour said that he thought the Court would also be pleased because our group's evaluation and screening methods were able to distinguish between those who had experienced significant emotional distress after the flooding and those who had not, just as we had been instructed to design psychiatric evaluation process methods to do so. Mr. Gilbert likewise shared Mr. Seymour's positive view about our psychiatric evaluation methodology and findings. Moreover, both Mr. Gilbert and Mr. Seymour were very impressed that our evaluations also identified those proposed and potential class representatives who still clearly required or could benefit from psychiatric treatment or psychological therapy. Along these lines, Dr. Townsend and I both stressed at this meeting (as we had from Day 1 of our interactions with the BPLSC attorneys) the obvious need for individual screening of the proposed class members, if the emotional subclass were ever certified, to identify those who had experienced emotional distress that was caused or exacerbated by the flooding and those still in need of treatment.

Consistent with our recommendations in that same June 2, 2008 conference at Mr. Gilbert's office, both Dr. Townsend and I reiterated our previously voiced concerns about significant past suicidality in two of their clients, past homicidal thoughts in one out of their five clients, and current alcohol dependence in a third individual among their five currently impacted clients. Mr. Gilbert and Mr. Seymour said they had been totally unaware of these emotional problems and risks in their clients.

Mr. Seymour and Mr. Gilbert and later Mr. Fuchsberg agreed that I should work along with Dr. Townsend to help identify treatment options and facilitate involvement in care for two of their more severely, clinically at risk clients because they said they had no idea

12