what to do, even though I insisted and we all agreed that, in no way, could Dr. Townsend or I be involved in their actual treatment given our role in the litigation. I then called two of the BPLSC's potential subclass clients on multiple occasions and also spoke with one of their family members (with permission) as well as with one claimant's prior mental health provider, and, a potential new mental health provider for one all in attempts to help connect them to clinically needed alternative mental health care. Some of these calls occurred shortly after the evaluations, on June 27, and eventually much later on July 27, 2008, as instructed once again by Mr. Gilbert and Mr. Seymour.

Most importantly, during that same June 2, 2008 conference both Mr. Seymour and Mr. Gilbert instructed me to continue to work intensely on my preparation of the required comprehensive report for the entire project, as I had previously been designated by the BPLSC as the expert witness for the court required report. They also told Dr. Townsend to continue to assist me as needed. Mr. Seymour and Mr. Gilbert repeatedly emphasized, as did Mr. Fuchsberg at other times, that as the potentially testifying Expert witness I would have to be prepared to vigorously defend our client evaluations, including the methodologies that we used to collect the clinical information. I was also told that I would have to scientifically and clinically defend the opinions and conclusions that my team and I had reached.

More specifically, I was told repeatedly in other conference calls and in that meeting that since only one medical expert was allowed to testify, that I would also have to write and testify about multiple areas of medicine and psychiatry including areas of clinical study that I had informed them from the start were not in my area of expertise. Those areas included, in part, child and adolescent psychiatry, and large scale mental health screening, diagnosis, and treatment. Other areas in which I told Mr. Fuchsberg, Mr. Seymour, and Mr. Gilbert that I did not believe I had sufficient expertise among others, included the areas of medical (not mental health related) consequences of disasters, substance abuse disorders, violence, and of course knowledge about local mental health resources that were or would be available for future screening and treatment in the New Orleans area or elsewhere for potential claimants who had moved away before or after the flooding.

Having been advised of these limitations, the BPLSC still instructed me that I had to be prepared to describe how our findings from the clinical evaluations we conducted might impact and guide future screening efforts for members of the entire proposed emotional subclass who might come forward if it were ever certified by the court. Mr. Fuchsberg had estimated for us in his May 29, 2008 e-mail that there may be a need "to evaluate anyone who comes forward from the 9th Ward (up to Parish Road) in response to a class notice, potentially 5,000 (more or less?) of the 40,000 or so residents for screening and then need possible referral for treatment" if the subclass were certified.

Thus, I was instructed on many occasions to always think about and prepare for not only the eleven clients we evaluated, but in addition about how to both organize and provide services in the community for any representatives of the proposed subclass and other potential members of the proposed subclass who were emotionally distressed if the

13

subclass were certified by the court. We were also told that I needed to begin exploring how to identify members of the proposed emotional subclass who had moved away from the New Orleans area after the flooding and then how to identify general ways to find potential treatment options for them as well.

### *Resource Materials*

Mr. Seymour at one point had sent Dr. Townsend and me a copy of Federal Rule 26 and informed me that as primary expert I would have to comply with that Rule as it related to experts. Mr. Fuchsberg had told me the same thing about Rule 26 previously. This meant to me, and Dr. Townsend concurred, that as the author of the expert report and all attachments thereto, that I should be the one of us to try to review and provide references to as many clinically relevant materials that I could identify so that I and the other members of the team could rely upon them during our clinical evaluations and data/scale analysis. The peer reviewed articles and material that I chose to review were selected by me. However, many of these articles and other materials were also selected after consultations with other experts including Drs. Richard Dalton, Howard Osofsky, Joy Osofsky, Jill Hayes, Fran Norris, Alex Crosby, Jonathan Davidson, Ashwin Patkar, James Diaz, David Sheehan, and others in order to help me better understand and support the observations and conclusions that I would later express for myself and the team in the expert report.

In addition to reading all these or parts of materials, I also followed Mr. Fuchsberg's repeated instructions to me to create an extensive annotated bibliography of key related medical literature and materials. Mr. Fuchsberg instructed me to include any materials necessary under Rule 26 (a) (2) which I thought would possibly assist presiding Judge Duval in becoming more knowledgeable about the screening, diagnostic, and treatment needs of emotionally distressed members of the proposed subclass including all problems caused or exacerbated by the flooding associated with Katrina.

Having received this assignment, unlike Dr. Townsend and the other member of the team, as the project leader, I had to spend a considerable amount of my time working throughout the project both searching for and reviewing medical and/or disaster related literature which I thought would help us accomplish the goals that my team and I had been instructed by the BPLSC to try and accomplish. Many of these articles, books, and other materials that I identified and reviewed are included in the attachments to the comprehensive report we eventually produced on June 30, 2008. For efficiency sake, I only shared some of the articles that I reviewed with the other members of the team and counsel, as Dr. Townsend and the others were not likely to be deposed or expected to testify. The documents in the attachments to my expert report reflected only the key materials that I relied upon, but the attachments did *not* include all of the materials I reviewed for the Barge PLSC proposed emotional subclass work prior to my reducing these materials down to the critically "relied upon" peer reviewed literature that I submitted.

14

Consistent with these efforts, I also told the BPLSC in mid and late June that the reference and other educational documents that I was organizing were so extensive that it was not possible for me to transfer them by email in a standard fashion. For that reason, I began exploring on my own, and with Mr. Seymour and Mr. Gilbert, multiple, potential options for ultimately sending the approximately two thousand pages of attachments reviewed or to be reviewed for eventual Court submission. I read most of these articles and materials that I had organized but in some cases I had actually helped write them.

At several points, in an effort to structure our efforts, Dr. Townsend proposed and I supported the use of the legal research and support firm, Firm Logic, to organize these materials on the tight deadline given to me. Firm Logic is routinely used by Dr. Paul Balson and other medical experts and was recommended to the BPLSC on May 19, 2008, but the team received no response. As Dr. Townsend wrote on June 28, 2008:

> "Rick S.,
> I don't recall whether you all said you were amenable to using a third-party to assist us in gathering and assembling documents, e.g. FirmLogic? Although Rick, Jill and I have no reason not to believe we cannot complete the work report by COB tomorrow, FirmLogic would work with us (under separate contract with you) to re-sort and re-compile the information.
> Thanks,
> Mark"

Unfortunately, Mr. Seymour denied this request, as Mr. Seymour wrote:

> "I do not understand what but complication and chance for error would arise from injecting a new person or persons at this stage. You know what you considered and relied upon, and would have to spend time teaching someone else who knows nothing of the case or your work so far. What is needed is from one to "X" paragraphs addressing each of the questions, saying what you did, and what you have so far concluded. Sending a paralegal to North Carolina or hiring a company at this stage sounds unworkable. Misstatements might creep in inadvertently.
>
> You have the substance, and just need to organize it to address the questions.
> Rick
>
> We represent the dispossessed of the Earth, and executives recently shown the door."

15

This lack of assistance, which had been requested by us at the outset of our work, is confirmed in the email for the May 19, 2008 teleconference that we had with the BPLSC attorneys and Paul Balson for Firm Logic. The BPLSC attorneys' refusal to provide assistance through either a third party or paralegal assistance further complicated the situation and caused me to expend much more medical/professional time on organizational and editing needs of the project which might otherwise have been avoided.

Meanwhile, the BPLSC realized the need for assistance in gathering and delivering certain medical records related to the claimants who were to be evaluated for my review. The BPLSC retained investigator, Ronnie Montgomery, who was previously used for such purposes by one or more members of the team. Mr. Montgomery 's invoice for approximately $1,656.00, also remains unpaid.

### _Consultations_

During our claimant evaluations, Dr. Townsend and I had also both immediately realized the critical need for an expert to evaluate a child or adolescent for the team's efforts since those affected obviously included younger persons. Unfortunately, apparently because this project was being done at the last minute, the BPLSC had been unable to identify or select an adolescent or child in time for our claimant evaluations. For that reason, I reached out to Richard Dalton, MD, a recognized expert in that area at Tulane University, who shortly thereafter was named the Medical Director of the Louisiana Department of Mental Health. Dr. Dalton provided me with excellent reference articles for review as well as verbal and written input with regard to disaster related treatment needs for children and adolescents, which I incorporated, in part, in my report to address this issue.

I along with Dr. Townsend also sought out and received specific permission from Mr. Fuchsberg on behalf of the BPLSC to involve Howard Osofsky, MD, the Chairman of Psychiatry at LSU Health Sciences Center, and Joy Osofsky, PhD, a psychologist who is a Professor of Psychiatry and Pediatrics at the LSU Health Sciences Center. I wanted to take advantage of their expertise in the area of Child and Adolescent Psychiatry and in particular the knowledge they gained from their own outstanding post-Katrina clinical work with the youth of New Orleans as well as their parents and teachers. My interactions with the Osofskys related to the BPLSC were extensive and involved numerous conference calls, emails, and the exchange of significant amounts of written material and references for all of us to consider.

Mr. Seymour also concurred with my involving Child and Adolescent experts because I had repeatedly told him and Mr. Fuchsberg and other members of the Barge PLSC at the beginning and throughout my work that I was _not_ an expert in Child and Adolescent Psychiatry, but would still have to testify in these fields. This was because, as Mr. Seymour instructed me, there could only be _one_ testifying medical expert witness. Mr. Seymour also told me that I would also have to read any necessary material, and be totally familiar with same, for me to be able to speak knowledgably on the topic of child and adolescent mental health assessment and treatment needs or any other area for which

16

I had indicated or felt that I was *not* an expert in relation to the proposed emotional subclass.

Similarly, I spoke with David Post, MD, with whom I had previously worked because he ran the Capital Area Mental Health clinical effort after Hurricane Katrina. From Dr. Post I learned about and then spoke with James Diaz, MD, MHA, MPH &TM, Dr PH of the LSU Health Sciences Center. Dr. Diaz's expertise is in both Family and Preventive Medicine and Public Health. After Dr. Diaz and I spoke we exchanged emails, which included reference articles, materials, and links that he thought could be useful. I later reviewed references and links that Dr. Diaz provided me as well as others materials I identified in order to assist me in trying to become more knowledgeable about disaster related medical needs in the New Orleans area for the proposed emotional subclass.

Once again, Mr. Seymour and Mr. Fuchsberg had clearly instructed me early on that I would need to become as knowledgeable as I could in the short time frame available about disaster related impacts on general medical health because the BPLSC was only allowed one medical expert. Of course this assignment that they gave me also required additional reading, as I had informed them previously that while I was qualified in the mental health field, I was also certainly *not* an expert in the area of *medical* health problems following disasters (as opposed to *mental* health problems) much less what had occurred and was *medically* needed for *physical* symptoms after the flooding in the impacted area.

Both before and especially *after* I was instructed by Mr. Fuchsberg, Gilbert, and Seymour to be the expert witness and project lead, I had to initiate significant telephone or in-person interactions with members of our team as well as the aforementioned outside consultants regarding our team's efforts and needs. I made the effort because of the team's collective need to obtain guidance from outside experts about legally defensible screening or treatment related articles and needs as well as options to assist in selecting and scoring our clinical ratings and evaluations that we had conducted. This was consistent with the ongoing direct instructions of Mr. Fuchsberg primarily, as well as, Mr. Seymour and Mr. Gilbert, who had advised that we should think of how to plan *for future mass class screenings and treatment efforts if the emotional subclass was approved for an expected 5,000 people or more who may still be in need.* In order to meet this additional challenge, I needed additional input not only from the members of our team, but from other experts to plan for that assignment as well.

For the reasons noted above and consistent with the existing and ongoing instructions by Barge PLSC attorneys, I also felt it necessary to arrange for and then interact with Jonathan Davidson, MD, Wei Zhang, MD, Ashwin Patkar, MD, and Allan Chrisman, MD at Duke University Medical Center, Fran Norris PhD and Jessica Hamblen PhD at the National Centers for PTSD and Dartmouth, Alex Crosby, MD with the Centers for Disease Control and Prevention Division of Violence Prevent, David Abramson, PhD at Columbia University Medical Center (initially at the suggestion of Larry Wiedemann), Mark VanLandingham at Tulane University (initially at the suggestion of Mr. Gilbert),

17

Narayan Sastry, PhD at the University of Michigan, and David Sheehan, MD, M.B.A. and Juris Janus, MD at the University of South Florida.

Moreover, it is obvious from even a cursory review of the volume of emails and voluminous attachments exchanged between and among the members of the team as well as these consults, as well as the volume of phone calls, and discussions with the other team members that the clinical evaluations, expert report, and the planning for potential large scale emotional distress class screenings and treatment options (present and future), all required me to spend a considerable amount of my time managing all aspects of this effort for the BPLSC.

Eventually, we as a team completed psychiatric evaluations on eleven claimants and psychological testing of five emotionally impacted claimants who were currently symptomatic. Only because I worked nights, weekends, and holidays as well as during most other available free times prior to the time deadline was this project completed, despite the BPLSC's failure to allow us adequate preparation time. Fortunately, the Court would eventually grant the Barge PLSC a brief extension until June 30, 2008, which helped immensely, but the final Expert Witness Report and our work product could have been significantly improved were it not for the lack of available time because of the late start of the project. For example, it was not until the afternoon of June 29, 2008, just one day prior to the final court deadline for exchanging the emotional injury subclass expert witness report, that I even received my first organized set of questions to be addressed in the expert report from the BPLSC attorneys. As Mr. Seymour wrote:

> " Here are the questions I expect the judge would like to
> see information about in the medical report, whether or not
> complete answers are in:
>
> A. The Major Question: Does the class action device
> provide advantages or disadvantages in addressing any
> past, current, or ongoing physical or emotional distress
> arising from the flooding of the Lower Ninth Ward of New
> Orleans and the part of St. Bernard Parish within the Class
> Area?
>
> B. Have independent studies been made of any patterns
> of physical or mental health problems caused by Katrina?
> What did they say?
>
> C. Have you performed any studies that would, at least
> at this stage, either tend to reject or corroborate or confirm
> these independent studies?
>
> D. Who are the people who worked with you, and their
> qualifications?

18

E. What did you do, in general?

F. What instruments or rating scales were used?

G. What are your broad conclusions as to the studies you performed?

H. Is there evidence of past physical or emotional distress arising from the flooding of the Lower Ninth Ward of New Orleans and the part of St. Bernard Parish within the Class Area?

    1. Can pre-Katrina physical or emotional distress be separated out, so that we are dealing with only the physical or emotional distress, or with the aggravation of past physical or mental conditions, caused by the destruction of life and property by the flooding?

    2. Is there a reliable means of determining that the person in question suffered some past physical or emotional distress, given that none is now manifest?

    3. Is there a reliable means of determining the degree or intensity of the person's past physical or emotional distress, given that none is now manifest?

    4. Is there a reliable means of determining the duration of the person's past physical or emotional distress, given that none is now manifest?

I. Is there evidence of current physical or emotional distress arising from the flooding of the Lower Ninth Ward of New Orleans and the part of St. Bernard Parish within the Class Area?

    1. Can pre-Katrina physical or emotional distress be separated out, so that we are dealing with only the physical or emotional distress, or with the aggravation of past physical or mental conditions, caused by the destruction of life and property by the flooding?

    2. Is there a reliable means of determining that the person in question suffered some past physical or emotional distress, given that it may have been reduced as time went by?

    3. Is there a reliable means of determining the degree or intensity of the person's physical or emotional distress, given that it may have been reduced as time went by?

    4. Is there a reliable means of determining the duration of the person's physical or emotional distress, given that it may have been reduced as time went by?

19

J. Is there evidence of ongoing physical or emotional distress arising from the flooding of the Lower Ninth Ward of New Orleans and the part of St. Bernard Parish within the Class Area?

1. Can pre-Katrina physical or emotional distress be separated out, so that we        are dealing with only the physical or emotional distress, or with the aggravation of past physical or mental conditions, caused by the destruction of life and property        by the flooding?

2. Is there a reliable means of determining that the person in question suffered some past physical or emotional distress, given that it may have been reduced as time went by?

3. Is there a reliable means of determining the degree or intensity of the person's physical or emotional distress, given that it may have been reduced as time went by?

4. Is there a reliable means of determining the past and future duration of the person's physical or emotional distress, given that it may have been reduced as time went by?

K. Is there evidence that some people did not suffer ongoing physical or emotional distress arising from the flooding of the Lower Ninth Ward of New Orleans and the part of St. Bernard Parish within the Class Area?

1. Explain.

2. Can malingerers and dishonest people, claiming injury where there was none, be identified?  How?

L. Did you find any patterns among the people you have evaluated to date, or was it all individual?

M. Do persons in the Class Area need to be screened for past, current, or ongoing physical or emotional distress arising from the flooding of the Lower Ninth Ward of New Orleans and the part of St. Bernard Parish within the Class Area?

1. Why?

2. Hasn't everyone who needs to be screened already been screened?

3. Is it more effective to leave this to individuals who feel injured and whomever they consult, or to develop a system for screening large numbers of people under a common procedure and with common rating scales?

20

4. Is it more cost-effective to leave this to individuals who feel injured and whomever they consult, or to develop a system for screening large numbers of people under a common procedure and with common rating scales?

5. Without the structure of a class, for communications with class members and to obtain funding from one or more defendants if plaintiffs win the case, do you think unscreened people will get screened?

N. Do persons in the Class Area need to be treated for past, current, or ongoing physical or emotional distress arising from the flooding of the Lower Ninth Ward of New Orleans and the part of St. Bernard Parish within the Class Area?

1. Why?

2. Hasn't everyone who needs to be treated already been treated?

3. Is it more effective to leave this to individuals who feel injured and whomever they consult, or to develop a system for screening large numbers of people under a common procedure and with common rating scales?

4. Is it more cost-effective to leave this to individuals who feel injured and whomever they consult, or to develop a system for screening large numbers of people under a common procedure and with common rating scales?

6. Without the structure of a class, for communications with class members and to obtain funding from one or more defendants if plaintiffs win the case, do you think untreated people will get treated?

O. List of all documents and materials reviewed or considered.

P. Compensation for you and for the team.

Rick

We represent the dispossessed of the Earth, and executives recently shown the door."

These extensive questions, which could and should have been provided much earlier, caused me to expend additional hours in reformatting the report. Our efforts were further hampered and slowed by the ongoing dissonance between and among the BPLSC mentioned above. More specifically, these time constraints and the necessity to work nearly round the clock, resulted not only from the untimeliness of the project overall but also from untimely and inconsistent instructions. For example, on June 28, 2008, just one

day after Mr. Seymour's list of questions were received, Mr. Fuchsberg sent an e-mail which reads in pertinent part:

> "Mark, Rick W., Brian and Rick S.:
> Perhaps this suggestion is helpful.
> The most important thing to exchange by tomorrow will be Rick W's report and the focus should be to see it is in the best shape possible. Then comes contributing reports. If Rick W's report and the contributing reports can be e-mailed by tomorrow, I feel the supporting evaluations as well as references to prior studies and articles could be circulated a day later without it being an issue as to the timeliness of the exchange.
> Do we agree?
>                   -   Alan"

Mr. Gilbert then curtly responded in an e-mail on which I was copied as follows:

> "No, Alan,  WE DO NOT AGREE.  The suggestion is absolutely inappropriate and contrary to law, and as Barge Plaintiffs' Master Committee Counsel, I mean to clarify by this message that all direction  and communication to Drs. Townsend or Weisler concerning their reports and the requirements thereof are to come from Rick Seymour only. DRS. WEISLER AND TOWNSEND ARE TO PROCEED AS PER RICK SEYMOUR'S GUIDANCE, TO THE EXCLUSION OF ALL OTHER REMARKS OR SUGGESTIONS.
>
>                   -  Brian"

Still, we were able to complete the comprehensive report.

### The Report

On June 28, 2008, I distributed a draft report to members of the BPLSC.  As I had informed the BPLSC previously, this was the first time I had ever generated a report in litigation.  Eventually our final report would issue timely on June 30, 2008.  The full report with attachments consisted of over 2,000 pages of materials not counting some 1,500 pages of evaluation and related clinical materials.  Further, as required by Rule 26 which had been forwarded to me by the BLPSC, the report also contained a description of my fee schedule and a listing of my fees incurred as of the date of the report.  Not one

22

member of the BPLSC objected to my fees or those of anyone else at that time.  The report's attachment indicated fees as follows:

       **Attachment16**       **Expert Compensation**

1) Mark H. Townsend, MD is being reimbursed at a rate of $600/hour. He estimates that he has worked over 80 hours to date. ($48,000.00)
2) Howard J, Osofsky, MD is being reimbursed at a rate of $600/hour. He has billed $13,200 to date.
3) Joy D. Osofsky, PhD is being reimbursed at a rate of $400/hour. She has billed $7,000 to date.
4) Jill S. Hayes, PhD is being reimbursed at a rate of $350/hour. She has billed about $21,000 to date.
5) Philip Griffin, PhD has billed $2400 to date.
6) Richard H. Weisler, MD is being reimbursed at a rate of $600/hour. I estimate that I have worked over 260 hours to date ($156,000.00). My work included designing, implementing, and seeing potential class representatives in the pilot evaluation study. I also reviewed the medical literature, talked to consultants and collaborators, and wrote the expert opinion report. I will also be reimbursed about $2500 for travel related costs that I have already paid. The travel was related to my going to New Orleans on 2 occasions to evaluate potential class representatives, see impacted neighborhoods, and work on writing up the evaluations.

In general, our overall effort, including the comprehensive report, was well received by the BPLSC as is confirmed by their e-mails, which issued even before the final report would issue on June 30, 2008. On June 28, 2008, Mr. Gilbert wrote that I will "breeze through any challenge to (my) ability to render expert scientific opinions in this case," and "that our methods are more than sufficiently peer reviewed and your data founded upon clear and accepted scientific principles."  He also stated that he believed that , "(our) findings as to any of the individuals (we) tested will withstand challenge.

But Mr. Gilbert's June 28, 2008 e-mail is also significant for a number of other reasons. It highlights the confirmation among the attorneys as to what should go in the project, the problems that were caused by the time constraints resulting from the late request for the report, and the fact that I was specifically to continue to prepare for a deposition to defend the report.

As Mr. Gilbert states:

"However, because this report is for class certification purposes, there are certain areas that need attention.  Some

problems are merely formal, while some are substantive.
***Were it that we had more time, we could meet to discuss
and hone the report, but unfortunately our rigid deadline
is roughly forty-eight hours away.*** I believe it imperative
that you speak with Rick Seymour concerning reporting
requirements for class certification, as this is his area of
expertise - not mine.  Nonetheless, I note the following:

Your report paints you in various respects as advocates for
the victims.  This is not appropriate, and must be remedied.
You must remain purely objective, scientifically detached.
You must absolutely refrain from arguing to the Court that
the victims should be given class treatment.  You are not
advocates for the class, not their attorneys, and the decision
to afford class status remains solely with the Judge, based
upon the arguments of the attorneys.  You are to provide
expert  PSYCHIATRIC conclusions, not legal conclusions.
Your expertise is psychiatry, and your conclusions must be
limited accordingly.

If you advocate, you lose credibility and objectivity, which
could seriously jeopardize your being accepted as experts
because of the potential for bias.

While we do seek to define a group in need of treatment,
you should not cite to this as a reason for class treatment.
Rather, your report must limit itself to findings that support
the attorneys' arguments for class treatment.

Class treatment is appropriate where the damages are
common, typical and predominant among a group of
plaintiffs.  The conclusions needed to fuel these arguments
are either unclear in your report, or are not included.

If the following statement is true, then it - with appropriate
adjustments for inclusiveness and accuracy - is the very
heart of the report and must be given priority treatment:

"Given XYZ experience in the field of post-mass disaster
research, given that populations exposed to mass disasters
are known to typically experience symptoms of
_____ requiring treatment consisting of
_____, given that _____ of
the 11 random subjects I evaluated demonstrated symptoms
of _____ whose onset coincided with the
flooding of _____, it is my opinion

24

to a reasonable medical and psychiatric certainty that
_____ of persons from the Lower Ninth Ward and western
portion of St. Bernard Parish to Paris Road have suffered,
are suffering, and/or will continue to suffer to a common
degree from symptoms of _____ caused
by _____. It is also my opinion to a
reasonable medical and psychiatric certainty that this
condition predominates among a percentage of the persons
from this area at a percentage of at least _____
among all persons affected by the events precipitated
during Katrina."

*Also, I do not believe that you should report that the
persons evaluated were selected by attorneys. It tends to
erode the needed randomness of the sample. You will be
asked in deposition how the persons were selected, and
unless you can describe in your report how the persons
evaluated are an accurate representation of the whole of
the putative class, we will need to discuss and refine this
question later.*

Again, Rick Seymour has the final word on these matters,
but time is going by, and I have not been able to speak with
him. I would suggest that you call me with any questions,
but I'll probably be unable to answer them because what I
have written pretty much reflects the extent of my
understanding of what needs attention. HOWEVER, IF
YOU DECIDE TO START MAKING CHANGES, DO
NOT DELETE YOUR ORIGINAL REPORT, IN CASE
RICK SEYMOUR DISAGREES WITH MY COMMENTS
MADE HERE.

Thanks for the continuing effort. Call if you think that
there is any way that I can be of help, or if you need me to
explain what I've written here.
        -   Brian A. Gilbert" (bold/italics added/all caps
original)

So even by June 28, 2008, two days before the comprehensive report was due, the
BPLSC was still instructing me to undertake major revisions in the project and the related
comprehensive report.

Once again, it was only possible by my working almost non-stop, often when no other
clerical or other assistance was available, for me to reformat my expert witness report and
answer the new questions Mr. Seymour and Mr. Gilbert sent me at the last possible