minute on behalf of the BPLSC just before the court deadline for exchanging the report on June 30, 2008. Despite these odds, I was able to complete our clinical evaluation, do the necessary management, research, and reading to be able to write the expert report covering an extensively broad area of mental health, violence and safety issues, and medical health outcomes for those with emotional distress by the deadline for exchanging the report with the defendants. Significantly, my having to reformat what I had written as well as answer new questions and issues which Mr. Seymour and Mr. Gilbert had sent to me on behalf of the BPLSC at the last possible minute made my task considerably harder and necessitated my working many additional hours over what would have been required if I and the other members of the team had been given the attorney questions early in the course of the project, as would be expected in a case, as here, where the attorneys had over two years to plan.

Despite all this, in July 2008, after the timely submission of the comprehensive expert report, I received the following email from Mr. Fuchsberg thanking me and the team for our efforts:

> "Thank you Rick W.
> Your work, and that of the team, for this report is important
> and reminds us how people are still suffering from the
> inside and need help.
> Alan L. Fuchsberg"

Consequently, by that point in time, there were no complaints about the content of the report or the cost of the report, including all fees incurred by the BPLSC, which was set out in detail in the report: an estimated $158,500.00 by me and $91,600.00 on behalf of all other experts. To the contrary, I was specifically told to proceed as they instructed.

### *Additional Efforts*

Following the submission of the report, I received a request from the BPLSC for all of the materials underlying the comprehensive report. The BPLSC advised at that time that the Defendants' attorneys apparently wished to review these materials which were not sent with the report originally due to their volume and because of the nature of the clinical material that the BPLSC attorneys previously instructed us they believed were covered under a "master protective order". This clinical information and data which they requested was sent separately because of the volume and the nature of the information, but the email below confirms the Defendants' request for that information I had created with the other members of the team which was provided to the BPLSC for exchange:

> "The defendant has requested copies of all documents not
> yet produced, that were considered or relied upon. I've
> attached their letter pointing out some particular records
> referenced in the report but not produced.

26

Please gather these records and any other records that you
considered or relied upon, and send them to Brian Gilbert
as soon as possible.

Please do NOT include copies of e-mails or
communications with any of the attorneys.

Brian's e-mail address, if these documents are scanned or
electronic files, is bgilbert@briangilberlaw.com.  If the
volume is too great for e-mail but it can be put on a DVD
or CD, please put it on a CD or DVD and send it to Brian.
If the documents are hard-copy, please end them to Brian.

Brian's address for a FedEx overnight delivery is:

    Brian A. Gilbert, Esq.
    LAW OFFICE OF BRIAN A. GILBERT, P.L.C.
    821 Baronne Street
    New Orleans, Louisiana 70113
    Telephone:  (504) 885-7700

Please let me know when we can expect the complete
batch. If we can get some part of it earlier than the
complete batch, please let me know. We need to get back to
the other side, and give them an idea of the date when they
will receive or start to receive the documents.

Thanks,
                    Rick"


During and immediately after the full submission of the report and attachments to Mr.
Gilbert for exchange with the Defendants he also instructed me to continue preparing for
my deposition that was ultimately scheduled for August 14, 2008. Mr. Gilbert also noted
in his June 28, 2008 4:03 PM email that I would be deposed. Mr. Seymour gave me
similar instructions by phone in July and August, 2008. Mr. Fuchsberg had likewise
previously instructed me orally and in writing to be prepared to defend our evaluations
and conclusions by" examination and discussion of peer review articles and peer accepted
methodologies".

Of course, since the entire concept of an "emotional injury class" was an entirely new
legal theory, and the responsibility for presenting same was placed on me, the situation
required that I read and/or reread the highly technical scientific articles, manuals, and
books that would support the findings and conclusions in my upcoming deposition.
Obviously, if I did not do so there would be a likelihood that my opinion would not be
accepted and the subclass would not be certified. Consistent with the overall situation,

27

Mr. Gilbert and Seymour repeatedly instructed me to keep reading such materials (until my deposition would eventually be canceled on August 12, 2008) if I felt that they were necessary to prepare for the deposition. I had also been so advised by the BPLSC to thoroughly prepare for the deposition in the email below from Mr. Seymour requesting to schedule my deposition.

As Rick Seymour advised me:

> "The defendants would like to take your deposition on
> August 7. It would take a full day, and we would have to
> spend some time with you in preparation for the deposition
> first.
>
> There is not much leeway on the timing, because the other
> side's experts have to have a chance to review what you say
> in order to prepare their own expert reports.
>
> Is August 7 agreeable?
>
> We then have to take up the question whether your
> deposition should be in North Carolina or in New Orleans.
> It could be either. Do you have a very strong preference?
>                     Rick
>
> We represent the dispossessed of the Earth, and executives
> recently shown the door."

Based on this e-mail, I continued to prepare for the deposition. In addition, I received repeated phone calls and e-mails from the BPLSC advising me to keep preparing for the depositions. It would not be until August 12, 2008, that I was abruptly advised to cease all work on the project. In the meantime, during our August 10, 2008 group telephone conference prior to that date with the BPLSC it became apparent to the BPLSC that the mental health claims might be worth more if they were pursued individually. This realization among the members of the BPLSC coincided with the involvement of a new BPLSC member, Shawn Khorami, and the departure of an old member, Alan Fuchsberg.

Regardless of this evolving realization, which would obviate the entire subclass project, Mr. Seymour still said that it was best for me to come to New Orleans for the deposition to limit their travel costs due to the number of attorneys who would be involved. My deposition was scheduled for August 15, 2008, and the BPLSC advised that I had to make myself available all day on August 14, 2008 to prepare as late as the evening of our August 12, 2008 scheduled teleconference with them in New Orleans for that deposition.

Moreover, as I and Dr. Townsend had informed the Barge PLSC attorneys verbally and in writing in the early days and during the course of the project, my disaster work had

28

always been on a volunteer basis rather than a daily or even yearly part of my job description. As such, while I have expertise in the area, I, like the vast majority of psychiatrists, including Drs. Townsend, Barbee, Osofskys, and even the other recognized experts I consulted with in the US with disaster work experience, do such work most often only as part-time work during times of great community, national, or even international need. With only rare exceptions disaster mental health psychiatrists, like me, work in the field sporadically on a part-time basis, and Mr. Fuchsberg and the Barge PLSC were fully aware that there would have been only a small number of US Government or possibly state government employees and Red Cross like employees fully current on the medical literature and scientific methodology for the entire disaster mental health field at a level necessary to provide information to help educate a Federal Judge looking out for the welfare of many thousands of New Orleans residents in the impacted areas ranging in age from young children to the elderly. For all of these reasons, comprehensive preparation for the deposition remained critical.

## *Fees, Invoicing and Non-Payment*

In our initial discussion, Mr. Fuchsberg had agreed that I would be paid at the standard Duke University Faculty Expert Witness rate of $600/hour. It was the same rate Mr. Fuchsberg approved with my other MD project collaborators, Drs. Townsend and the Osofskys as well in separate conversations. It is also the same hourly rate that I provided as directed by Mr. Seymour, Gilbert, and Fuchsberg in my Expert Witness report Attachment 16, which lists per Rule 26 (a) (2) estimates of compensation paid and owed for me and the other members of the team up to the date of submission of the Expert Witness report. Significantly, this same Expert Witness report, attachments, and all collected clinical information that I produced with the help of the team would later be used by the BPLSC attorneys after our court ordered submission for exchange with the defendant's attorneys and experts. Thus our work product was both accepted and used by the BPLSC in exchange for which we should have been paid in full.

From late June 2008, forward, members of the team and I made repeated efforts to no avail to get the BPLSC to honor their prior financial commitments to pay me as well as Drs. Townsend, Howard and Joy Osofsky, and Griffin for the work that we had done. When I asked Mr. Fuchsberg again in late June 2008, Mr. Fuchsberg told me that everyone including me would be compensated for our work, and that the BPLSC was at that time negotiating with other law firms to provide the necessary financial resources for the Barge case class legal and expert report efforts. Additionally, prior to tendering the expert witness report and attachments, Dr. Fuchsberg kept encouraging me and the other members of the team to continue to be patient about invoices being paid. Moreover, Mr. Fuchsberg also personally guaranteed on behalf of the BPLSC that we would each be paid after discussing with me rough estimates of how much time each member of the team had committed to date.

Meanwhile, in June 2008 Karen Wiedemann had written Dr. Townsend in an email exchange saying that she and the BPLSC had his invoice and that it was their customary policy to pay within 30 days of getting an invoice. It would not be until February 2, 2009

29

that Dr. Townsend would be paid, but only half of what he is owed. Dr. Townsend's fee, like mine and that of the Osofskys, in that invoice was $ 600/hour.

> "Dear Karen,
> I left my first interim invoice with your office yesterday, with the amount to be paid to LSUHSC via our business manger Stan Tefft. My portion is then distributed with my monthly salary.
>
> I understand from Dr. Hayes that your office couriered a check to her. Security at LSUHSC is such that it would be difficult for you to be so kind with me.
>
> Money I receive in the next five business days can be placed in my June salary. I would be happy to pick up the check from your assistant at your Baronne Street office. Otherwise, if you prefer, mailing it to our 2020 Gravier Street address at your earliest convenience would be similarly helpful to me.
>
> Many thanks,
> Mark"


> "Mark,
> I have received your invoice. It is our policy to pay within 30 days of receipt of the invoice. I hope that is not a problem for you. I have placed you in line for payment. When I have the check ready, I will mail it or call you to pick it up if you would like. Please let me know your preference.
> Thanks,
> Karen Wiedemann"

Still no payments were forthcoming that entire summer to most of the professionals. The only exception was Dr. Jill Hayes, who was the only professional associated with the team whose invoice was paid in its entirety during 2008. Unlike the rest of us, Dr. Hayes often testifies in court and deals with lawyers on a regular basis. Consequently, when her evaluations were completed and her report written she had advised the BPLSC that she would not release her report until she was paid. Once she was paid in full she advised she would then release her report. It should be noted that for comparison purposes, although her fee rate was just $350 per hour ( a little more than one-half the hourly rate for Dr. Townsend and myself), she was paid about $21,000.00 for performing a psychological evaluation (not a full psychiatric evaluation), on just one claimant, and some consultation. No one from the BPLSC objected to this fee. Dr. Townsend and I on the other hand, prepared psychiatric evaluations on *eleven* claimants. In addition to those

evaluations, I also performed countless hours of organizational tasks and research all at the request of the BPLSC.

Although Dr. Hayes was promptly paid, once we released our report we eventually received a different reaction to our invoices, particularly mine, but only one month after we had already tendered the report and had kept preparing for the deposition.  As Mr. Fuchsbert wrote on July 30, 2008:

> "Dear Rick W,
>
> We are in receipt of your invoice.
> It's much more than we expected or can afford.
> For example. Mark Townsend's invoice is about one-fifth
> of yours; also, his billing rate is one-half.
> We are operating on a shoe string budget and if you could
> bring this down to Mark's area, it would be much
> appreciated.
> Sincerely
> Alan"

Aside from the obvious mathematical errors, this communication does confirm the fact that Mr. Fuchsberg as well as the other members of the BPLSC refused to recognize that the significant difference between my invoice and Dr. Townsend's invoice was because of the dramatic difference in the length and amount of required time for each of our respective contributions on the proposed emotional subclass project due to our very different, though sometimes shared, responsibilities. While we both did the clinical evaluations of claimants, I was also responsible for managing the entire proposed emotional distress subclass expert witness project.  I was also the individual in charge of developing a schedule for the evaluation process and obtaining the different diagnostic and rating instruments and their scoring information. Moreover, Mr. Fuchsberg's earlier May 29, 2008 email Re: a psychologist and a suggestion", directly conflicts with Mr. Fuchsberg's July 30, 2008 refusal to acknowledge the very significant differences in my other and separate responsibilities for the BPLSC versus those of Dr. Townsend. Again, those occurred primarily because of my being the lead author of the expert report, the primary researcher and reader of the peer reviewed literature, the manager of the entire project, and the person whom the attorneys instructed to prepare to testify for an August 2008 deposition and possible future court testimony.

In contrast, Dr. Townsend, as he wrote in an email to Mr. Khorrami on August 15, 2008, and as is reflected in his invoices, stopped all of his work for the BPLSC on June 30, 2008, about six weeks before I was told to stop working by the BPLSC.  Moreover, Dr. Townsend helped me write only a small section of the expert witness report and attachments, and he did not perform any real literature searches or reading except for some of the articles that I sent to him.  Dr. Townsend never prepared for a deposition

31

because he was instructed early on by the Barge BPLSC that I would be the one to have to prepare to testify not him.

In early August 2008 I had pushed for a teleconference related to our fees that occurred on August 4, 2008, wherein I was told by Mr. Seymour and Mr. Gilbert that I would be paid and that all of my fees and those of the other experts would now be paid by Mr. Khorrami's office now instead of the Wiedemanns' office. They both instructed me to have all unpaid invoices sent to Mr. Khorrami's office for payment. I was also informed around that time, that Karolina Ball, an accountant, associated with Mr. Khorrami's office, was the person in charge of this function in his office. Mr. Seymour and Gilbert also told me in that call that Mr. Fuchsberg was no longer part of the BPLSC because of problems similar to what had occurred with the emotional subclass project, whatever that meant.

On the morning of August 4, 20/08 Mr. Seymour and Mr. Fuchsberg as representatives of the BPLSC also told me that while they had "some reservations" about my charges, that I would be paid. They instructed me for the first time in my interactions with them to try in the future to limit my future deposition preparation time to what I felt was absolutely critical, which in fact is what I told them I had been doing all along. They further asked me to try to limit my additional deposition preparation to about twenty to thirty hours plus or minus, if it was going to be sufficient for me to be adequately prepared for my deposition on August 15, 2008. I told them that I would do my best, but that I had to be able to fully prepare for my deposition by reviewing the mountains of clinical information and medical and disaster literature on which I had relied, or would rely upon in the deposition, which they agreed with.

Eventually, I reached Karolina Ball, the Khorrami, Pollard, and Abir accountant, who told me in a telephone call I made to her on August 8, 2008 that she thought in general that Khorrami, Pollard, and Abir were looking to pay me and the other team members in several installments beginning later that month or in early September. I requested that she also assist us in arranging a teleconference with Mr. Khorrami as soon as possible because of the necessity of getting the payment issue resolved before my deposition the following Friday.

### *End of the Project*

The BPLSC attorneys eventually and ultimately made a decision to completely abandon the emotional subclass.   This decision, of which our team was belatedly informed, followed a somewhat heated discussion between Mr. Seymour and Mr. Khorrami, in a Sunday night teleconference on August 10, 2008, in which Mr. Khorrami and other attorneys in his office, as well as Mr. Seymour, Mr. Gilbert, and Drs. Howard Osofsky, Joy Osofsky, and Mark Townsend and I all participated. After I along with Drs. Townsend, Howard Osofsky, and Joy Osofsky presented our clinical findings and concerns for the proposed emotional subclass, Mr. Seymour and Mr. Khorrami during the August 10, 2008 teleconference suddenly began vigorously debating the legal pros and

cons of the BPLSC's trying individual cases instead of their continuing to pursue their proposed emotional subclass. Mr. Khorrami also made a comment to the group saying something to the effect that these cases may be worth more as individual cases than as a class after hearing the expert collective discussions of all the mental health experts on the line related to our clinical findings and the needs of the community including those of its children and adolescents.

Mr. Khorrami and the others mentioned that we would all probably still be needed as medical experts if they elected to pursue individual cases instead of a class approach. Then the attorneys told us that Mr. Khorrami and Mr. Seymour would have a separate discussion about the merits of a class on August 11, 2008. Nevertheless, I was still told by the BPLSC attorneys participating in the conference, to make any necessary arrangements including freeing my work schedule to be away from work and travel to New Orleans for my deposition preparation and deposition that week by the attorneys. I tried to reconfirm with Mr. Seymour on August 11, 2008 as to whether the deposition was still scheduled, but I couldn't reach him. Therefore, I freed my work schedule and booked my flights and my hotel for my trip to New Orleans on August 13, 2008.  As with all my other experiences, I paid for these personally as Mr. Fuchsberg had specifically instructed.

It was only on the afternoon of August 12, 2008 in Mr. Gilbert's email of that date that I and the others learned abruptly for the first time that the BPLSC had decided to abandon their pursuit of their proposed certification for the emotional injury subclass. I was told later by Mr. Gilbert that there were just too many individual variables and "that individual screening would be required" which is something we had told Mr. Fuchsberg, Mr. Seymour, Mr. Wiedemann, and Mr. Gilbert repeatedly throughout our work for the BPLSC.  As Mr. Gilbert wrote:

> "Gentlemen:
>
> For the time being, we request that you suspend all work on the Barge Case. We must take stock of the legal backdrop underlying our emotional distress claims, and until we have a clearer picture, we do not want to engage in any effort that might actually hinder compensation.  Dr. Weisler's deposition will not take place this week, and no preparation for the deposition would be appropriate at this time.  We will advise once we have conferred and reached consensus as to the legal questions that concern us.  Thank you for your understanding.

On September 15, 2008 in yet another scheduled teleconference as part of our efforts to try to get paid by the BPLSC, I spoke with Mr. Seymour, Mr.Gilbert, and Ms. Karen Wiedemann. Both Ms. Wiedemann and Mr. Seymour advised at that time that Mr. Fuchsberg had been somewhat involved in the loss of their funding for the BPLSC case.

33

The same attorneys told me that Mr. Fuchsberg had "misled" them too and that they had no doubt that he had "misled" me too. Mr. Gilbert also asked me to "negotiate some sort of break" for them by reducing my charges and by giving the BPLSC extra time to pay the invoice. In essence they no longer thought that the Court would view the work performed by our team and I as beneficial to the class, and that our fees and expenses would not constitute a reimbursable expense for the class. But neither I nor any member of the team would have ever even considered agreeing to a "contingency" arrangement, whereby we would be paid only if the class were certified and/or if the Court approved our fees. Such an arrangement would be unethical if not illegal.

Although I had continued to push for another group teleconference about payments for our services for some time both before and during that September 15, 2008 teleconference, this payment issue was never resolved.

It is instructive to read an early email to Dr. Hayes from Mr. Seymour pasted below which highlights the fact that the BPLSC members knew from the outset that the courts would reimburse them only if they won.

> Jill, I'm not involved in the accounting end, but I do know it's important to send all statements to Karen Wiedemann in New Orleans, the attorney delegated to this task, and it's important that they be made to the Barge P.S.L.C. because everyone receives statements from a lot of people in the rest of their practice and the payor line is important in getting it paid out of the right account, *as well as being important to a court reimbursement order if we win the case.*
>
> So if you already have sent someone a statement with "Barge P.S.L.C." as payor, please send it directly to Karen Wiedemann. I've cc'd her to make sure you have her address, since she was not an addressee as to the original message.
>
> Rick"

### *Amicable Demand*

After we failed to hear anything further from the BPLSC attorneys after the e-mail from Brian Gilbert on October 13, 2008, Dr. Townsend and I officially retained counsel in yet another effort to try to obtain payment of our outstanding invoices by the BPLSC's attorneys. After an initial demand letter and another teleconference held in an effort to resolve the issue, we still have not been paid. This summary should explain my position in full and would be my last effort toward amicable resolution. If unsuccessful, it appears we will have to proceed with litigation.

34

## *Conclusion*

At this point, it appears that the main reason we have not been compensated are these:

(1)     We released the comprehensive report before being compensated;

(2)     The BPLSC realized in mid-August 2008, well after the report was released, they did not wish to attempt to certify the purposed subclass since it would be more lucrative to pursue individual mental health claims and thus the cost of the report would not be reimbursable in Court; and/or

(3)     The BPLSC funding arrangements collapsed.

But these developments should in no way prevent me or any of the other mental health professionals from being compensated.

For my Barge portion of this project, I had to expend my own personal funds to cover all of my costs of travel to and from New Orleans for client evaluations in May and June 2008 at the instruction of the BPLSC. Mr. Fuchsberg told me that my making the purchases directly on my credit card would be more practical given the time constraints of our last minute notification and my need to make changes to previously existing flights in order to even hope to meet the court deadline for exchanging the report with the defendants. As of February 3, 2009 the BPLSC has yet to even reimburse me for my travel costs. In point of fact, to date, I have not been paid one cent for any of my work by the BPLSC members. This is despite repeated reassurances and verbal guarantees made by Mr. Fuchsberg, Mr. Gilbert, and Mr. Seymour that I and the other team members would be paid as agreed upon.

Indeed, it was only after the vast majority of my work was completed on July 30, 2008 that I received the first adverse comment about my fees or charges despite the evidence of the "lion's share" of charges incurred as of June 30, 2008, which I provided to the court in the Expert report in the form of Attachment 16 a month earlier.

Significantly, despite the fact that several of the other health care providers and I have been paid for our work by the Barge PLSC, Mr. Khorrami, writing on behalf of the other BPLSC members still listed as exhibits the curricula vitae for both of us and also listed "mental health professionals" as potential expert witnesses in amended, witness and exhibit lists filed in November 2008. Ironically, despite the claims of a lack of funding, each of the members of the BPLSC also represented to the Court in Affidavits that each filed in September 2008, in order to be appointed "class counsel," that they have the wherewithal to prosecute the subject class action.

As of February 3, 2009 Drs. Howard and Joy Osofsky and Dr. Philip Griffin who also worked at the instruction of the BPLSC still have never received any payment for their

services even though services were rendered in June 2008 by the Osofskys and in June and August 2008 by Dr. Griffin. Again, Dr Jill Hayes was paid about $21,000 for her work in June 2008 for completing psychological testing of *just one* proposed class representative and then helping with facilitating client evaluations one day in New Orleans as well as other periodic assistance such as providing forensic psychological insights and some edits of draft reports.

Shortly after Hurricane Gustav during one of my many unpaid payment related conversations and emails with BPLSC attorneys, Mr. Gilbert bragged to me that he was very excited about his and the BPLSC's prospects in their "$700 million dollar case". Mr. Gilbert sounded very excited, and when I asked why he said it was because other barges and vessels had broken loose during Gustav and that some came close to damaging the Industrial Canal again as had happened in Hurricane Katrina. He stated that he felt that these events significantly strengthened the BPLSC's case. But still no payment arrived.

In October 2008 Dr. Townsend and Mr. Gilbert exchanged emails in which Mr. Gilbert attempted again to negotiate a reduction in Dr. Townsend's fees. I had refused to do so as I felt it was unethical and inappropriate, as it would convert the arrangement into a contingency fee agreement, which I believe is unlawful and unethical. More specifically, Mr. Gilbert wrote on October 13, 2008 on behalf of the BPLSC that they were waiting to hear about their "proposal for a reduction and workout."

At that point, it became patently obvious that the BPLSC was attempting to negotiate such a reduction of fees and charges because of three reasons: (1) the Barge PLSC venture partner problems, (2) BPLSC's previously expressed court reimbursement concerns beause of their flawed legal rationale for for the proposed emotional distress subclass; and/or (3) the Barge PLSC decision to pursue individual cases, rather than their proposed emotional distress subclass certification case. To "negotiate" fees after the fact would raise serious ethical concerns for the entire group. Dr. Townsend , Drs. Howard and Joy Oshofsky and I had previously told Mr. Gilbert, Mr. Khorrami, and Mr. Seymour and in my case also Mr. Fuchsberg that our agreeing to such reductions in our fees and charges would be against medical ethics because of the attorney's efforts to make our payment contingent on the case outcome. The BPLSC should have known that even now medical experts who are retained in connection with litigation couldn't provide their services, reports, or testimony contingent on the outcome of a particular case. Yet the following e-mail from Brian Gilbert to Dr. Townsend reflects the BPLSC's instance that we accept such a contingency arrangement:

> "I haven't heard from anyone either. I was expecting to hear from you or Rick W. after our request that he approach the rest of your group with our proposal for a reduction and workout. We are still unresolved (with) our former venture partners, and hope to get a commitment from them to contribute to the outstanding expenses. Nonetheless, we hope to further engage in negotiations with your group."

These negotiations have been categorically rejected for all the reasons set forth above.

36