# LAW OFFICE OF RICHARD T. SEYMOUR, P.L.L.C.

1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
E-Mail: rick@rickseymourlaw.net

Voice:  202-862-4320             Fax:  800-805-1065             Cell:  202-549-1454

February 8, 2009

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
30th Floor - Energy Centre
1l00 Poydras Street
New Orleans, LA 70163-3000

Re: ***Mumford v. Ingram Barge Company, et al.,***
(E.D. La., C.A. No. 05-5724): Dr. Weisler's Bills

Dear Mr. Wilson:

It was good to meet with you and Dr. Townsend on January 2, and I think I speak for everyone on the Barge P.S.L.C. at the time[1] in saying that we are glad that that matter has been resolved.

I think I also speak for everyone on the Barge P.S.L.C. at the time in saying that we hope the matter of Dr. Weisler's statements can be resolved amicably.  That would, of course, require very substantial modifications of Dr. Weisler's position.

It would help to have a common understanding of the facts.

## A.     The Task Dr. Weisler and the Medical Team Were Given, and What They Did Instead

The task Dr. Weisler and the rest of the medical team were given was to come up with a means of inexpensively evaluating the mental health of a large number of people after a disaster, so that we could present a plan to the Court showing how, if a class were certified, we could set up prospective relief so that those who needed treatment because of the disaster could be identified inexpensively, and so that the defendant could be ordered to pay for their treatment in the event that we won.  For those who had mental problems at the time they were evaluated, we needed to be able to show that the flooding caused their problems or an escalation of any pre-existing problems.  We also needed to

_____

[1] As you have been separately informed, orally and in writing, the firm of Khorrami, Pollard & Abir was not on the Barge P.S.L.C. at the time Dr. Weisler was retained and did any compensable work, and is not responsible for any of his bills.  Any claim against that firm would be frivolous for that reason, in addition to the reasons set forth in this letter.

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 2 of 26 —

be able to show that there was a means of identifying any faking of symptoms.  We
needed to test such instruments on a small number of plaintiffs and class members we
would find from among the plaintiffs and from our database: those who were present for
the flooding and those who had evacuated, those who had lost a relative in the flooding
and those who had not, those who were old and those who were young, etc.

There were thus three parts to the task: identifying the instruments, field-testing
them on a small selection of plaintiffs and class members with varying experiences, and
writing the report.

The part of the task involving the identification of the instruments ought to have
involved a very small amount of time and expense for someone representing that he was
worth $600 an hour.  As shown in Part B of this letter, there were already existing scales,
developed by the Centers for Disease Control and others, for the mass evaluations of
large numbers of people, and of victims of disasters.

The part of the task involving field-testing of the instruments on a small number
of persons should have involved no more expense than it would have taken to perform
forensic psychiatric or psychological examinations of a plaintiff in a personal-injury or
sexual harassment case.  The ordinary charge in many parts of the country is between
$5,000 and $10,000.  The instruments used showed that five of the eleven persons the
medical team evaluated had no mental health problems; they would have taken less time
and expense.  A $2,500 figure for five persons seems reasonable; that would be $15,000.
Even if an average figure of $7,500 is used, the ordinary and reasonable charge for six
persons would be $45,000.  This part of the task had a reasonable price tag of $60,000,
and the payments to Dr. Townsend and Dr. Hayes take care of that.  Dr. Weisler was
present through two and a half days while the team members were meeting with the
eleven persons being evaluated.

The writing of the report was primarily Dr. Weisler's responsibility, although he
inserted large sections written by others.  He largely dropped the ball, as described in
Part C of this letter.  The litigation team went to a different approach and decided not to
use any of the medical testimony, in large part because of the poor quality of the report
and Dr. Weisler's tardiness in getting a draft to us so that there was far too little time to
get it put into a more professional shape.

**B.     The Identification of the Instruments: Dr. Weisler's Failure to
         Inform the Barge P.S.L.C. that Others Had Already Developed and
         Field-Tested the Types of Scale Dr. Weisler Was Trying to Develop
         from Scratch**

After a mass torts firm joined as co-counsel, the Barge P.S.L.C. was astonished
to discover that others had already developed, tested, and validated sets of tests to
determine the emotional anguish caused by the trauma of events like massive flooding,

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 3 of 26 —

and that these were widely accepted devices.

In our January 2 meeting, you asked for specifics and I promised to get them to you.  The Centers for Disease Control and Prevention have developed a "Mental Health Survey Instrument" that is available on-line, that has explanatory notes, and that the government is prepared to help professionals implement.  The CDC summary says:

> This data instrument provides health departments and other decision-makers with core data useful for investigating the psychological symptoms associated with a mass casualty event. Specifically, the instrument assesses symptoms of anxiety, depression, acute and posttraumatic stress disorders, and problematic drinking. The instrument was adapted from several tools. Its contents or format can be modified to accommodate the circumstances of a particular mass casualty event. Each data element is defined in the Explanatory Notes, so that local or state health departments can quickly train and dispatch workers to collect comparable mental health data. The tool may be administered during phone interviews, face-to-face interviews, or paper-and-pencil assessments. These data can then be provided to decision-makers to help guide public health responses to the mass casualty event or provide the basis for more in-depth investigations. For further guidance about implementing the data instrument or assistance with data analysis, send an e-mail to CDC's Injury Center at OHCINFO@cdc.gov.

See the discussion and links at http://www.bt.cdc.gov/masscasualties/mhsurvey.asp.

I had never dreamed that any expert retained at so high a rate would either have failed to know, or known and decided not to mention, the availability of such an instrument, its government backing satisfying our need to show legitimacy, or the fact that free guidance was available on its implementation.

Now that I know such a thing is possible, I did an experimental Google search this morning, using the search terms "Instruments for mass evaluation of mental health," and it took only a few seconds to discover this information.

In addition, there have been a lot of scholarly articles already in existence supporting the use of the Clinician Administered PTSD Scale for DSM IV ("CAPS") and the Structured Clinical Interview for DSM IV Axis I Disorders ("SCID").  In 45 minutes last night I learned that there were more than 500 articles supporting the use of CAPS and came across a large number of articles supporting SCID.  There was no need for extensive research in the field of psychiatry at large to show the legitimacy of these scales; a couple of days reading abstracts would have taken care of everything needed.

In our January 2 meeting, you stated that we as counsel were incompetent to have trusted a retained expert not to do unnecessary work and not to cheat us, and that

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 4 of 26 —

Dr. Weisler had the right to do whatever he wanted, and to charge us for as much time as much as he wanted, because we had not put an explicit constraint on him.  This is astounding.  See Part E of this letter, discussing the implied covenant of good faith and fair dealing.  See also Parts L(4) and L(5) of this letter, discussing the requirement of Louisiana law that expert fees be reasonable, and the approach the Federal courts take with respect to the award of attorneys' fees.

Dr. Weisler's representation that his rate was $600 an hour carried with it the representation that he knew the field and also carried with it an obligation to be candid and inform the Barge P.S.L.C. about the availability of this scale that would have made most of the work of identification unnecessary.

To the extent that Dr. Weisler performed work that was unnecessary because he knew or should have know of the existence of this scale and failed to inform the Barge P.S.L.C., his work was only make-work and is not compensable.

### C.    The Deficiencies in Dr. Weisler's Report

In our January 2 meeting, I laid out a number of problems with the 54-page report provided to us at the last minute, including the facts that:

> ➢ Nine pages were a list of references, leaving only 45 pages for Dr. Weisler's discussion of substance;

> ➢ Thirteen pages were provided by Drs. Jill and Howard Oshofsky, leaving only 32 pages for Dr. Weisler's discussion of substance;

> ➢ Seven pages were simply descriptions of independent studies, leaving only 25 pages for Dr. Weisler's discussion of substance;

> ➢ Four pages were simply a list of collaborators and their qualifications, leaving only 22 pages for Dr. Weisler's discussion of substance; and

> ➢ The remaining 22 pages are more like a stream of consciousness dictation, bear no resemblance to the kind of rigor on which courts insist in finding that an expert report is sufficiently useful to warrant its admission into evidence, and do not intrinsically indicate that any substantial amount of time was spent in their preparation.

There is a serious question whether the 22 pages of Dr. Weisler's substantive discussion would have been stricken under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The work product does not support the time Dr. Weisler claims.  Indeed, it does not support more than a small fraction of the time claimed.

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 5 of 26 —

      **D.**     **Dr. Weisler Knew in Advance of the Need to be Frugal and
Reasonable in Incurring Expert Time and Fees**

At the outset of their involvement in the case, Drs. Weisler and Townsend were
informed by the Barge P.S.L.C. of the fact that plaintiffs were representing a putative
class of residents of the Lower Ninth Ward and the part of St. Bernard Parish West of
Paris Road, that many members of the putative class had low or no incomes, that there
were other experts in the case whose fees also had to be paid, that payment of their fees
was not contingent on plaintiffs' winning the case, and that plaintiffs would ask the
Court to reimburse the fees from the judgment for the class or for plaintiffs if the case
did not proceed as a class action.

The Barge P.S.L.C. made it clear to Drs. Weisler and Townsend at the outset that
their fees would need to be reviewed by the Court in the event that plaintiffs won, in
order to support an award of fees from the judgment for plaintiffs and/or their class.

The Barge P.S.L.C. made it clear to Drs. Weisler and Townsend at the outset that
the Barge P.S.L.C. did not want to incur any fees that could not reasonably be included
in a request for reimbursement from the class award.

It was thus clear to Dr. Weisler at all relevant times that his fees may ultimately
come from the plaintiffs and/or their class.  Dr. Weisler had actual knowledge that
submitting false, inflated, or unjustified time statements could, in the event that plaintiffs
won the case, cheat plaintiffs and class members out of part of their recoveries.

Dr. Weisler was well aware that the funds of the Barge P.S.L.C. were limited.  I
communicated this directly to Drs. Weisler and Townsend on May 25, 2008, in
connection with their request for authorization to use a medical or private investigator to
obtain medical records. Dr. Weisler as well as Dr. Townsend were well aware—because
I told them—that the Barge P.S.L.C. was unwilling or unable to commit the few
thousand dollars to pay for this reasonable endeavor, and that there was an
overwhelming need to be as frugal as possible. Drs. Weisler and Townsend knew that
the project went ahead only because I ultimately personally committed to pay the fees of
the medical investigator.

The Barge P.S.L.C. never authorized Dr. Weisler to spend time unreasonably, or
to spend unlimited amounts of time.  Dr. Weisler never sought authorization to spend
time unreasonably, or to spend unlimited amounts of time.  He was authorized only to
perform specific tasks, and that authorization did not imply that he was free to act
unreasonably.

As I am sure you are aware, no attorney representing a party in litigation can
agree to pay an unreasonable expert fee, or can pay an unreasonable bill, because this
would create an implication that the expert has been retained as a mere hired gun, and

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 6 of 26 —

the credibility of the expert would be destroyed.

### E.    The Covenant of Good Faith and Fair Dealing

As stated in *Bensco One, LLC v. Volkswagen of America, Inc.*, 2008 WL 907521 (E.D.La. March 31, 2008) (No. CIV.A. 06-1591) at p. *8:

> Louisiana recognizes an implied covenant of good faith and fair dealing in every contract. *Brill v. Catfish Shales of America,* 727 F.Supp. 1035, 1039 (E.D.La.1989); *Bonanza Int'l, Inc. v. Restaurant Management Consultants, Inc.,* 625 F.Supp. 1431, 1445 (E.D.La.1986).

This doctrine is important to bear in mind in evaluating Dr. Weisler's claims.

### F.    Dr. Weisler's Misrepresentations of His Communications with Mr. Fuchsberg

In a telephone conversation with Dr. Weisler, Mr. Gilbert, and Karen Wiedemann on August 1, 2008, Dr. Weisler represented to us that, during the expert study:

> ➢ Drs. Weisler and Townsend had repeatedly offered to provide interim statements so that the Barge P.S.L.C. could see the extent of the expert fees piling up and make any changes it wanted in its requests to the medical experts;

> ➢ Mr. Fuchsberg had explicitly told Drs. Weisler and Townsend that "money was no object";

> ➢ Mr. Fuchsberg had explicitly told Drs. Weisler and Townsend that "the size of the bill did not matter";

> ➢ Mr. Fuchsberg had explicitly told Drs. Weisler and Townsend that "there would be no problem paying any statement";

> ➢ Mr. Fuchsberg told them that the Barge P.S.L.C. was completely tied up litigating some major things; and

> ➢ Mr. Fuchsberg told them they should not distract the Barge P.S.L.C. by sending it an interim statement.

To say that Mr. Gilbert, Ms. Wiedemann and I were shocked by his representations would be putting it mildly.

I have since had an opportunity to think about and to investigate these assertions.

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 7 of 26 —

*First*, these representations conflict with the information described in Part D above, which I know was communicated to Dr. Weisler and Dr. Townsend at the outset of the expert study.  *Second*, Dr. Townsend did in fact provide an interim statement in early June, as you know.  *Third*, Dr. Hayes submitted more than one interim statement, as you know.  *Fourth*, I sent Drs. Hayes, Townsend and Weisler instructions for submitting interim statements.  *Fifth*, Dr. Townsend stated that he would submit an interim statement, and cc'd Dr. Weisler.  *Sixth*, Dr. Weisler thanked me for the information.

In our January 2 meeting, you repeatedly referred to e-mails you had received from Dr. Weisler, so I assume that Dr. Weisler provided you with these messages.  If he provided you only with the types of message "headers" you provided to us February 4 in your Exhibit 4, that should heighten your concern about Dr. Weisler's representations.

*Seventh*, Mr. Fuchsberg categorically denies that Dr. Weisler even once offered to submit interim statements, let alone repeatedly.

During our January 2 meeting, you stated several times that you had e-mail documentation of some or all of the above-described six representations made by Dr. Weisler.  On behalf of the Barge P.S.L.C., we requested copies of them.  You refused to provide them, stating that you were not going to turn them over until much farther down the road.  We infer that you were referring to discovery in some legal proceeding you would initiate.

The Barge P.S.L.C. has raised very serious and completely legitimate questions about the bills submitted by Dr. Weisler.  <u>To the extent that you refuse reasonable requests for information backing up Dr. Weisler's bills, you are waiving in whole or in part any right to compensation Dr. Weisler might otherwise have had.</u>

The refusal to produce the claimed e-mails also leads us to believe that Dr. Weisler may have represented to you that such e-mails exist, but that you have not taken custody of them and that—without your knowledge— they do not exist and Dr. Weisler's representation that they do is simply part of a cover-up.  In the absence of the described evidence, it is difficult to avoid the tentative conclusion that each of Dr. Weisler's six representations described above were deliberate misrepresentations to support bills that he knew to be unjustified.  If there is such evidence, of course, none of these tentative conclusions may be appropriate.

Of course, you are well aware of your duty under Rule 11, Fed. R. Civ. Pro., to conduct your own investigation prior to initiating any legal proceeding.  "Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and 'not interposed for any improper purpose.'"  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990).  This rule requires you to look behind your client's statements to you, particularly where there are well-supported disputes about your

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 8 of 26 —

client's representations and bills, as shown herein.

If you file baseless claims, our January 2 meeting and this letter are sufficient to place you and Dr. Weisler on notice that we have available to us the sanction of seeking an award of our fees and expenses under Rule 11, and under the bad-faith litigation exception to the American rule that each side bears its own attorneys' fees. See *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259-60, 275 (1975). Dr. Weisler and you both need to understand that each of you could stand to lose a great deal by unreasonable and baseless litigation.

### G.    The "Time Records" Submitted to Us

Dr. Weisler stated on the telephone during our January 2 meeting that he had contemporaneous records of his activities, but I do not recall his stating that he had such contemporaneous records of activities for each day's statement of time, and that these records included the amount of time spent. In fairness, we did not have an opportunity to put these specific questions because of your stated desire that we not cross-examine Dr. Weisler.

In any event, we requested at the meeting to see all of the original records, whether on calendars, on paper, or in electronic form. Thank you for submitting Exhibit 5 to us on Wednesday, February 4, consisting of copies of internal e-mails and what appear to be notes on scraps of paper or prescription-pad forms the "time records" on which Dr. Weisler relies to support his bill.

Your statement that you would file suit by the "end of the week"—Friday, February 6—if we did not capitulate to Dr. Weisler's demands, grudgingly extended to Monday, February 9 after we protested the lack of time, indicates that you do not want to give us much time to look at the exhibits you gave to us.

In the very limited time you have allowed us to examine the documents you sent, however, we have noted that there are not even scraps of paper or internal e-mails or prescription-pad blanks showing any time after July 28, 2008.

We have also noted that the scraps of paper or internal e-mails or prescription-pad blanks stating numbers of hours contain no descriptions of activities for any time other than the five time entries from May 22 to 26, 2008. Those account for only $25,220 of the $269,250 Dr. Weisler is claiming.

Exhibit 1 of the February 4 attachments has an explanation of activities that has to have been written since January 2. Dr. Weisler has not informed us what it is based upon. The explanations are not the same as the explanations on Dr. Weisler's December 12, 2008 statement that you provided to us, but has been amplified greatly.

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 9 of 26 —

However, Exhibit 1 tells us some of the problems with Dr. Weisler's billing practices. On May 23, we learned for the first time from Exhibit 1, Dr. Weisler was billing us for his travel time from Grand Rapids, Michigan, to New Orleans, as well as travel time from New Orleans to Raleigh. We have no idea why he was in Grand Rapids, but that was none of our doing. On May 29, Dr. Weisler informed us in Exhibit 1 with underscored emphasis that he was not charging for travel time from Raleigh to Phoenix, but on May 30 Exhibit 1 states that he billed us for travel time from Phoenix to New Orleans.

Exhibit 1 also evidences some of the over-billing that infests Dr. Weisler's statements. On May 19, he billed for three solid hours of e-mails during the noon to 6:00 PM period, on top of four hours for other parts of the day when he says he reviewed literature and did even more e-mailing.

### H.     The Problems with E-Mails in Your February 4, 2009 Exhibit 4

Exhibit 4 is a strange justification for Dr. Weisler's time. The subject lines are truncated and the message body has been cut out in every e-mail listed.[2] Dr. Weisler has not distinguished between e-mails on which he spent any noticeable time—which would have been reasonable to include—and e-mails on which he spent no or virtually no time—which were not reasonable to include if the exhibit was intended to show that he spent significant time on this case. Indeed, Dr. Weisler has not included enough information for anyone to know whether he spent any time at all on properly compensable e-mails.

Dr. Weisler seems to have listed, but dumped into the message-content shredder, every e-mail he sent or received during the period of time in which he is claiming time, if anyone on the message was involved with the case and sometimes if no one we knew about was the recipient or sender of the message. See the following illustrative examples I pulled from these 73 pages:

➢ the three messages on page 6[3] with some unidentified person named Alex Crosby, one with a subject on a New York Times article on suicide, and one with a subject of "Violence prev in communities";

➢ the 15 messages on pp. 11 and 12 with some unidentified person named Fran H. Norris in which Dr. Weisler seems from the subject lines to have been passing on information about this case. See, for example, a June 4, 2008 message on "Some background Industrial Canal Breach Litigation, Barge Case"; a June 10, 2008

---

[2] One cannot help but wonder about e-mails such as the September 15, 2008, e-mail on p. 20 that Dr. Jill Hayes sent to Dr. Weisler with the subject line: "How Dare You?"

[3] The exhibit has no page numbers, so I had to add them.

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 10 of 26 —

message on "Request for a section on diagnostic and clinical treatment needs for class"; and a June 11 message from someone to whom the earlier message had been forwarded.

> the 165 e-mails, spanning <u>nineteen pages</u> from p. 23 through p. 42, of messages with some unidentified person named Kara Koehrn with an "@duke.edu" e-mail address.  Many of them have a subject line beginning "Check out" this or that, and the net effect of these subject lines is that they create the impression that this person unknown tom and unapproved by, the counsel retaining Dr. Weisler may have been the person doing the work for which he is billing time.  Some of these have no conceivable relation to compensable work, such as "Check out Katrina images Tulane Project," "Check out MSN video," "Check Out Photo: lower Ninth EWard," etc., "Check Out Effects of Hurricane Katrina . . . Wikipedia," "Check out USA Today.com – Barge a contentious symbol of Hurricane," and even two messages saying "a few articles from Dr. Richard Weisler.  These examples are all from a single page, p. 35.

Dr. Weisler included the many e-mails I sent, trying to get Dr. Weisler to respond as to the schedule of interviews and the physical arrangements, so that we could line up space.  I can verify that little or no time was spent on these, or I would not have had to repeat the request or similar requests so often.

Dr. Weisler seems from Exhibit 4 to have breached confidentiality by passing on information about this case to outsiders without the knowledge or approval of counsel retaining him, and depriving counsel retaining him of any meaningful opportunity to find out whether the person receiving confidential information had a conflict of interest. See, for example, the following:

> Page 11 shows a June 4, 2008 message on "Some background Industrial Canal Breach Litigation, Barge Case" that Dr. Weisler sent to the following persons over and above the LSU addressees unknown to counsel for plaintiffs:

  o Fran H. Norris, with a Dartmouth address;[4]

  o An "rdalton" with a Tulane address;

  o A "david011@notes.duke.edu";

  o A dsheehan@health.usf.edu; and

_____

[4] An e-mail address with a university name does not mean that the individual is a faculty member of the university; the person may simply be using a student or employee e-mail, or a university forwarding address available to alumni.

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 11 of 26 —

      o   A chris014@mc.duke.edu.

- ➢ Page 11 also shows a June 10, 2008, e-mail on "Request for a section on diagnostic and clinical treatment needs for class" that Dr. Weisler sent to the same unknown, unauthorized, and unapproved persons.

- ➢ Dr. Weisler sent a similar e-mail with the same subject line on June 11, 208, as shown on p. 49, with all of the above unapproved addressees except for "rdalton."

- ➢ The e-mail referenced immediately above was in turn forwarded by someone to others unknown to the counsel retaining Dr. Weisler, because someone with the address Jessica.hamblen@dartmouth.edu responded on June 11, according to two of her e-mails on p. 12. Her third e-mail referred to a call, so the extent of unauthorized disclosures would be unknown even if plaintiffs had the text of these e-mails.

The e-mail subject lines show many topics that may have satisfied Dr. Weisler's or others' idle curiosity about the case or news accounts of Hurricane Katrina or the medicines used to treat depression or blood platelet studies or Wikipedia articles or the like, but these are not compensable activities. The inclusion of these e-mails demonstrates that Dr. Weisler saw fit to spend significant time on noncompensable activities totally unnecessary to the project.

### I.    Discrepancies Between Dr. Weisler's July 7 and December 12 Statements

Given the firmness of your and your client's belief demonstrated in our January 2 meeting, in the accuracy of Dr. Weisler's time statements and descriptions of his activities, I want to make sure you are aware that Dr. Weisler altered his statements of time and activities between his July 7, 2008 bill and his bill enclosed with your December 12 letter. While the latter refers to "Hours through 7/28/08 Updated," nothing in that subtitle clearly communicates that the underlying data were changed.

### 1.    Inserted Time

For example, the July 7 statement has no entry of time for June 2, 2008. The December 12 statement inserted an entry for June 2 of ten hours for "Data review, analysis, and meeting with B. Gilbert." There was a meeting with Mr. Gilbert on that date for no more than an hour. We accept the hour, but there is no explanation for why the remainder of the time was not included in the July 7 statement. Indeed, there was nothing at all directing attention to this particular $6,000 alteration. I would think that adding $6,000 to the claim is worth at least a couple of sentences of explanation.

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 12 of 26 —

## 2.      Inserted Descriptions of Activities

There are no descriptions of activities for the majority of entries in the July 7 bill. The December 12 bill has inserted descriptions of activities for most of the gaps.  Where did these come from?

For example, the July 7 bill has no description of activities for 2.0 hours on May 21.  The December 12 bill says "Review."  Where did the description of the activity come from?

For another example, the July 7 bill has an entry of 6.5 hours for June 4, with no description of activities.  The December 12 bill shows the activity of "Writing, analyzing, reading & calling".  Where did the description of the activity come from? Was it just borrowed from the following entries, or is it independently supported?

The July 7 bill had no description of activities for the 41 hours and $26,400 claimed for the period from June 11 through June 17.  The December 12 bill has inserted descriptions of activities.  Where did these come from?

The July 7 bill had no description of activities for the 94.5 hours and $56,700 claimed for the period from June 24 through July 2.  The December 12 bill has inserted descriptions of activities.  Where did these come from?

The July 7 bill had no description of activities for the 5.0 hours and $3,000 claimed for the period from July 4 through July 6.  The December 12 bill has inserted descriptions of activities.  Where did these come from?

The July 7 bill had no description of activities for the 60.5 hours and $36,300 claimed for the period from July 9 through July 28.  The December 12 bill has inserted descriptions of activities.  Where did these come from?

All told, the inserted descriptions of time in the December 12 bill where the July 7 bill was blank amounted to claims of 209.5 hours and $ in the time claims mentioned in just this subsection of this letter, to the exclusion of the entries mentioned in other sections.  To say that these alterations are a major cause of concern would be an understatement.

## 3.      Disagreements on Dates of Work and/or Statements of Time and Activities

The July 7 bill has an entry of 8.5 hours for "Review" on May 28, and the December 12 bill has no entry for that date.

The July 7 bill has an entry of 7.0 hours for May 29, with no description of activities.  The December 12 bill has an entry of 8.5 hours for May 29, with the activity

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 13 of 26 —

of "Review and meeting with Drs. Townsend and Hay[es]".  Where did the time and activity come from?

The July 7 bill has an entry of 7.5 hours for May 30, with no description of activities.  The December 12 bill has an entry of 7.0 hours for May 30, with the activity of "Review and meeting with Dr. Sheehan."  Where did the time and activity come from?

The July 7 bill has an entry of 13.15 hours for May 31, with no description of activities.  The December 12 bill has an entry of 7.5 hours for May 31, with the activity of "Review and planning".  Where did the time and activity come from?

The July 7 bill has no entry for June 1.  The December 12 bill has an entry of 13.15 hours for June 1, with the activity of "Client interviews and data collection and analysis".  Where did the time and activity come from?

The July 7 bill has no entry for June 2, as stated above.  The December 12 bill has an entry of 10 hours for June 2, with the activity of "Data review, analysis, and meeting with B. Gilbert", as stated above.  Where did the time and activity come from?

### 4.        Arithmetic Errors

Incidentally, the July 7 statement has an incorrect subtotal of 300.25 hours for the time Dr. Weisler claims he spent from May 16, 2008, through July 6, 2008.  The correct arithmetic total for the hours claimed is 300.15.  In the December 12 statement, the total for the identical statements of daily hours is 310.25.[5]

### J.        Comparison of Dr. Weisler's and Dr. Townsend's Time Records for the Same Activities

During our meeting, I gave you a half dozen examples of days in which Dr. Weisler and Dr. Townsend were engaged in the identical activities, and in which Dr. Weisler was not engaged in travel.  In each instance, Dr. Weisler billed for a number of hours' more time than Dr. Townsend, and over the whole set of examples Dr. Weisler billed almost twice the number of hours for which Dr. Townsend billed.  While you stated at the meeting that there was no comparison between their activities, I think you will understand our disinclination to accept this representation and our concern that there

---

[5] Oddly, the dollar figure stated in the July 7 subtotal is $180,090, which is arithmetically incorrect for the claimed subtotal of 300.25 hours, but arithmetically correct if the hours claimed were 300.15.  This oddity is carried over to the December 12 statement, where the stated subtotal of $186,090 is arithmetically incorrect for the claimed subtotal of 310.25 hours but arithmetically correct if the hours claimed were 310.15.

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 14 of 26 —

was no similarity in the accounts of time spent.  As we see it, Dr. Weisler's overstatement of his time on these occasions when we have a strict comparison indicates that there was at least as much, if not a larger, amount of overstatement of his time when he was by himself.

>    **K.    Indicators That Dr. Weisler's Time "Records" Were Created Long After the Work**

During our meeting, I also mentioned that my experience of close to forty years in making and reviewing fee submissions had given me a clear appreciation of the distinction between time statements supported by contemporaneous records of both the activity and the time spent, and those put together long after the work was done.

Since then, we have been given Exhibit 1 to your February 4 letter, which expands greatly on the prior descriptions of activities but is completely unsupported in the "time records" provided in your Exhibit 5.

>    **1.    Confusion in the Time Statements**

Your Exhibit 1 does not clear up existing confusions, but adds more:

| Date | According to Dr. Weisler's July 7, 2008 Bill | According to Dr. Weisler's Dec. 12, 2008 Bill | According to Dr. Weisler's Feb. 4, 2009 Bill | According to Dr. Weisler's "Time Records" |
|---|---|---|---|---|
| May 26, 2008 | 2.50 | 2.50 | 2.50 | 2.5 |
| May 27, 2008 | 0 | 0 | 0 | 0 |
| May 28, 2008 | 8.50 | 0 | 0 | 7.0 |
| May 29, 2008 | 7.00 | 8.50 | 8.50 | 8.5 |
| May 30, 2008 | 7.50 | 7.00 | 7.00 | 7.5 |
| May 31, 2008 | 13.15 | 7.50 | 7.50 | 13.00 (twice); 13.15 (once) |
| June 1, 2008 | 0 | 13.15 | 13.25 | 0 |
| June 2, 2008 | 0 | 10.00 | 10.00 | 0 |

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 15 of 26 —

This does not inspire confidence.

### 2.       Disproportionate Numbers of Entries in Whole Hours or Half-Hours

The proportion of Dr. Weisler's time entries that reflect whole numbers of hours (e.g., 15.0 hours, 14.0 hours, 10.0 hours, and the like) or numbers of hours ending in half hours (e.g., 13.5 hours, 11.5 hours, and the like) strongly suggest time statements put together long after the fact.

Since our meeting, I have taken the occasion to make a count of the time records to make our concerns quite specific.

In a contemporaneous set of time records, the first digit after the decimal point should occur 10% of the time at random.

➢ Instead, of the 69 entries there is a zero after the decimal point (i.e., the number of hours claimed is a whole number) 24 times, amounting to 34.8% of the time entries instead of the expected 10%.

➢ Of the 69 entries, there is a "5" after the decimal point (i.e., the number of hours claimed has a final half-hour) in 42 entries, amount to 60.9% of the time entries instead of the expected 10%.

➢ Of the 69 entries, there is a number after the decimal point other than zero or "5" in only 3 entries. One entry ended in .15 hours, and two ended in .25 hours. This amounts to 4.3% of the entries instead of the expected 80%.

By contrast, Dr. Townsend's 78 time entries were significantly closer to the expected random distribution. A full 39 had numbers after the decimal point other than zero or "5". They amounted to 50.0% of the total compared to Dr. Weisler's 4.3%. There was a half-hour after the decimal point in 15 entries, amounting to 19.2% of the entries compared to Dr. Weisler's 60.9%. While there were still 23 whole-number entries, amounting to 29.5% of the total, this still compares favorably with Dr. Weisler's 34.8%.

A large proportion of time entries in whole numbers of hours and half-hours are a hallmark of a construction or reconstruction of time without contemporaneous time records. A full 95.7% of Dr. Weisler's time entries were in whole numbers of hours and half-hours, compared with Dr. Townsend's 48.7%.[6]

---

[6] One of Dr. Townsend's entries was "Not Charged" and had no time stated, so the percentages of his time stated herein do not add up to 100%.

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 16 of 26 —

   **3.**  **Dr. Weisler's Evident Failure to Follow His Own Stated Time Inflation Practice, Which Is Itself Unreasonable**

   Dr. Weisler's statement represents that he follows the practice of adding a quarter-hour of time if the time spent is any part of a quarter hour. Thus, he represents that he charges an additional $150 for a single additional minute over the last quarter-hour. This is an unreasonable padding of time, to which we object.

   Putting that aside for the moment, he only has two time entries ending in ".25" and none ending in ".75." His time records suggest to us that he ordinarily added an hour or half-hour if he thought he spent a minute more than the last unit recorded. That would be an even more objectionable padding of time. Putting even that aside for the moment, a fair reading of his representation is that he keeps time records to the minute. As you can understand, we are very interested in that representation.

   **4.**  **Dr. Weisler's Frequent Copying of Time Descriptions for Day After Day, in the December 12 Bill**

   Another frequent indicator of time statements put together long after the fact is a very general statement of activities repeated without change for day after day after day. As I mentioned at the meeting, this is a characteristic of Dr. Weisler's time statements.

   Since our meeting, I have taken the occasion to make a count of the time records with respect to this issue as well, to make our concerns quite specific.

> ➢ Dr. Weisler used the time description "Writing, analyzing, reading & calling" as his only descriptions of activities for June 5, June 6, June 7, and June 8, 2008. He claims 28.5 hours on those four days, and is seeking payment for $17,700 based on these vague copycat descriptions.

> ➢ Dr. Weisler's time records contain the description "Review, research, and writing" for 23 consecutive entries, and are the only description of his activities from June 9 through July 3, 2008. Those 23 entries are a third of his 69 time entries. He seeks payment of $95,100 for this time.

   Dr. Weisler then had three consecutive entries stating "Review", and the next 13 consecutive entries stated: "Data and literature review for deposition preparatio," which presumably has an "n" at the end. This is the only description of his activities from July 8 through July 28, 2008.

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 17 of 26 —

     **L.**    **The Reasonableness of the Bills**

       **1.**    **The Argument that Dr. Weisler Could Bill Whatever He Chose to Bill**

In our January 2 meeting, I was particularly bothered by your assertion that Dr. Weisler was entitled to work as much time as he wanted, and bill as much as he wanted for that work, because no one had told him not to do so. He was, of course, told that funds were limited, that his time had to be reasonable, that his charges would be subject to a request for reimbursement of the Barge P.S.L.C. from awards to plaintiffs and hteir class if we were successful, and must inevitably have realized that his charges would reduce the compensation received by the victims of defendants' negligence.

Putting all that aside for the purpose of this part of the discussion however, I must say that I am astonished by this "anything goes" argument. While it may be a fair reflection of Dr. Weisler's approach to his time—he told us that he wanted part of his fee to fund a trust for a family member—his retainer in this case was not a license to print money by reading the stacks of the local library. It reminds me of nothing so much as the "D.C. Pants Case" in which a D.C. Administrative Judge claimed $54 million for a dry cleaner's alleged loss of his pants, basing his claim on the notion that a "Satisfaction Guaranteed" sign entitled him to claim as much as he wanted.

Your argument failed to recognize the covenant of good faith and fair dealing that is imported into every contract in Louisiana. See Part B of this letter above.

Your argument also failed to recognize that Dr. Weisler, like an attorney seeking a fee award, is obligated to use and demonstrate billing judgment. As the Fifth Circuit has put it:

       In addition, plaintiffs seeking attorney's fees are charged with the burden of showing the reasonableness of the hours billed and, therefore, are also charged with proving that they exercised billing judgment. [FN14] Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant. [FN15] The proper remedy for omitting evidence of billing judgment does not include a denial of fees but, rather, a reduction of the award by a percentage intended to substitute for the exercise of billing judgment. [FN16]

       FN14. *Walker v. City of Mesquite,* 313 F.3d 246, 251 (5th Cir.2002).

       FN15. *Id.; Green v. Adm'rs of Tulane Educ. Fund,* 284 F.3d 642, 662 (5th Cir.2002).

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 18 of 26 —

FN16. *Walker,* 313 F.3d at 251 (citing *Walker v. HUD,* 99 F.3d 761, 770 (5th Cir.1996)).

*Saizan v. Delta Concrete Products Co., Inc.*, 448 F.3d 795, 799 (5th Cir. 2006).  As shown below, there is an intra-Circuit split on the court's ability to deny all fees when, as here, a bill is so high as to shock the judicial conscience.

### 2.    Dr. Weisler's Hourly Rate Promised Efficiency

Dr. Weisler represented that his customary rate was $600 an hour.  For that extremely top-level rate, as I mentioned at the meeting, the Barge P.S.L.C. was entitled to expect a high degree of efficiency in the time spent.

### 3.    Dr. Weisler Was, At Best, Horribly Inefficient

If Dr. Weisler's claimed time was actually spent, it could not have been efficiently spent.  For example, on August 1, 2008 Mr. Gilbert and I authorized no more than 15-20 hours of deposition preparation for Dr. Weisler so that he could clear up any questions he had on his own report.  Dr. Weisler then billed 73 hours, an additional $43,800.  Even if one were to strike the 16.0 hours claimed for cancelation of patients—a claim as to which we also have the most serious questions—that is still 57 hours, almost three times the amount authorized.

Even worse, 28.5 hours and $17,500 were for proofing and correcting the scales in the report.  Dr. Weisler has staff; Sherry Cofield, for example, is his Practice/Research Manager.  No efficient expert would charge $600 an hour for clerical tasks that could be performed by his staff.

All told, Dr. Weisler billed 60.5 hours and $36,300 from July 8 through July 28 for "Data and literature review for deposition preparati[on]," using the same description for every single day in this period of time, and then added 57 hours and $34,200 in August for review and proofing and correction of his own report and more literature reviews.  That is 117.5 hours and $100,500 for claimed self-directed deposition preparation without spending a single minute with a lawyer.

It is also useful to focus on the 163.50 hours and $98,100 from June 9 through July 6, 2008, claimed for "Review, research and writing" or for "Review."  One can add the 60.5 hours and $36,300 claimed for "Data and literature review for deposition preparati[on]" from July 8 to July 28, 2008, and the 28.5 hours and $17,100 claimed for "Disaster and Medical Literature Review for deposition preparation" and similar entries from August 8 through August 11, 2008, that is a claim of 252.5 hours and $151,500 basically for reviewing literature.  Even if the report took three eight-hour days to write—which would be a stretch, given its content—that would result in a claim of 228.5 hours or $137,100 for reading literature with which he would already have had to be

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 19 of 26 —

<u>familiar in order to justify his extremely high rate</u>.

We do not think Dr. Weisler's bills are remotely reasonable.

Moreover, Dr. Weisler's misrepresentations as to his instructions and interactions with Mr. Fuchsberg cast a pall over all of his statements of time and activities.

## 4.      Louisiana Law on Awards of Expert Witness Fees

Some Louisiana cases involving the award of expert witness fees are instructive. *City of Shreveport v. Noel Estate, Inc.*, 941 So.2d 66, 85-86 (La. App. 2d Cir. 2006), *writ denied*, 948 So.2d 171 (La. 2007), stated:

> Specifically as to expert witness fees, witnesses called to testify as expert witnesses shall be compensated for their services, with the amount to be determined by the court and taxed as costs to be paid by the party cast in judgment. La. R.S. 13:3666. An expert witness is entitled to reasonable compensation for his court appearance and for his preparatory work. The trial judge is not required to set an expert fee at the amount charged by the expert witness. *Allstate, supra; City of Shreveport v. Chanse Gas Corp.,* 34,958, 34,959 (La.App.2d Cir.08/22/01), 794 So.2d 962, *writs denied,* 2001-2657, 805 So.2d 209, 2001-2660 (La.01/04/02), 805 So.2d 209; *Hammock v. Louisiana State Univ. Medical Ctr. in Shreveport,* 34,086 (La.App.2d Cir.11/01/00), 772 So.2d 306.  Relevant factors in fixing the fee include the time spent testifying, time spent in preparation for trial, time spent away from regular duties while waiting to testify, extent and nature of the work performed, and the knowledge, attainments of the expert. *City of Shreveport, supra.* The court may also consider the helpfulness of the expert's report and testimony. *Id.* Here as to the expert witness fees, the trial court ordered the payment of a substantial portion of the fees, almost 70% of the total. We see no abuse of discretion in the amount of this award.

The court is not bound by the expert's bill, and will not award time for unreasonable charges.  *Wampold v. Fisher*, 837 So.2d 638, 640-41 (La. App. 1st Cir. 2002), stated:

> It has been the law for almost a century that the assertion of an attorney and the bill of an expert do not support an award for the total time of an expert. The expert must testify at the trial of the rule and be subject to cross-examination, unless there is some stipulation between the parties. *Northwest,* 501 So.2d at p. 1065 and cases cited therein. *Also see, Davis v. Husqvarna Motor,* 561 So.2d 847, 855 (La.App. 2 Cir.1990). Although testimony as to the time rendered and the costs of services is required, the trial court is not bound by agreements between a party and the expert witness. Expert witnesses are only entitled to reasonable compensation. *Smith v. Roussel,* 2000-1672, p. 6 (La.App.

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 20 of 26 —

> 1 Cir 6/22/01), 808 So.2d 726, 731. The fees of an expert may be reduced if expenses were needlessly or excessively incurred. *In re Medical Review Panel on Behalf of Laurent,* 94-1661, pp. 16-17 (La.App. 1 Cir. 6/23/95), 657 So.2d 713, 723-724. The factors which the trial court may consider in setting a fee are set out in detail in *Albin v. Illinois Cent. Gulf R. Co.,* 607 So.2d 844, 845 (La.App. 1 Cir.1992).

Flawed and unpersuasive work may be compensated at a rate less than 10% of the amount claimed. *McDaniel v. Carencro Lions Club*, 934 So.2d 945, 980 (La .App. 3d Cir.), *writ denied*, 940 So.2d 671 (2006), stated:

> McDaniel next argues that the trial court erred in awarding Patin only $250 for trial and pre-trial work when his trial and pre-trial fees totaled $35,253.10. The trial court has great discretion in awarding costs including expert witness fees, which will not be reversed on appeal in the absence of an abuse of discretion. *Olsen v. Johnson,* 99-783 (La.App. 3 Cir. 11/3/99), 746 So.2d 740. Further, the trial court is not required to set the expert witness fee at the amount charged by the expert witness. *Trahan v. Savage Indus., Inc.,* 96-1239 (La.App. 3 Cir. 3/5/97), 692 So.2d 490, *writs denied,* 97-1636, 97-1652 (La.10/3/97), 701 So.2d 207, 209.

> Having reviewed the record, we find it was an abuse of discretion for the trial court to award Patin only $250. Although we found most of Patin's testimony flawed and unpersuasive, he did survey the property, conduct lighting tests, and review various literature along with conducting the survey, and agreed to testify regarding these issues. We think a more reasonable fee for his services would be $3,000. Accordingly, the trial court's award for Patin's fees is increased from $250 to $3,000.

*Wingfield v. State ex rel. Dept. of Transp. and Development*, 879 So.2d 766, 770 (La. App. 1st Cir. 2004), agreed that the mere submission of a bill at an agreed rate is not binding on the court and that the claimed fee must be reasonable:

> Experts are only entitled to reasonable fees and related costs. Neither the agreement between the hiring party and the expert, nor the bill submitted to the court, binds the court's decision. *Wampold v. Fisher,* 01-0808, p. 3 (La.App. 1 Cir. 6/26/02), 837 So.2d 638, 640. Factors to be considered by the trial court in setting expert fees and related costs include: the time spent testifying at trial, time spent in preparatory work for trial, time spent away from regular duties while waiting to testify, the extent and nature of work performed, and the knowledge, attainments, and skill of the expert. Additional considerations include the helpfulness of the expert's testimony to the court, the amount in controversy, the complexity of the problem addressed by the expert, and awards to experts in

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 21 of 26 —

similar cases. *Samuel v. Baton Rouge General Medical Center,* 99-1148, p. 8 (La.App. 1 Cir 10/2/00), 798 So.2d 126, 132. While an expert may receive fees for preparatory work, this is limited to the work done in preparation for trial, not consultations that only assist the attorney in his preparation for trial. *Smith v. Roussel,* 00-1672, p. 6 (La.App. 1 Cir. 6/22/01), 808 So.2d 726, 731. Experts who testify by deposition may also have their fees taxed as costs, provided that their depositions have been introduced as evidence. *Smith*, 00-1672 at p. 6, 808 So.2d at 730-31.

In setting expert fees and related costs for in-court time, such as testimony and depositions submitted at trial, the trial court may rely upon its own in-court observations and experiences, without further proof. *Wampold*, 01-0808 at pp. 2-3, 837 So.2d at 640. However, for work done or expenses incurred outside the courtroom, such as time spent gathering facts in preparation for trial testimony and time spent away from regular duties, the plaintiff in rule must submit competent and admissible evidence. Unless the parties stipulate to the specifics and costs of the out-of-court work, the expert must testify at the trial, or a subsequent hearing on the rule to tax costs, and be subject to cross-examination. *Wampold*, 01-0808 at p. 3, 837 So.2d at 640; *see Allen v. Roadway Express, Inc.,* 31,628, pp. 3-8 (La.App. 2 Cir. 2/24/99), 728 So.2d 1015, 1017-19. Thus, pursuant to *Wampold v. Fisher,* the mere assertions of an attorney and the expert via the submitted bill, even in conjunction with an expert's affidavit attesting to the correctness and truth of the billing statement, are not sufficient. *Id.* This is especially true for complex, protracted litigation that has produced high expert fees and related costs.

*Illinois Central R. Co. v. 16.032 Acres of Land in Jefferson Parish*, 2000 WL 278096

(E.D.La. March 14, 2000) (No. CIV. A. 98-3337), also sheds light on the subject at p.

\*7, identifying factors that courts can use to determine expert witness fees:

Louisiana law provides that the award of expert witness fees and costs is highly discretionary and each case turns on its own facts. *See Heard,* 629 So.2d at 505; *Nicholson,* 460 So.2d at 628. "[A]n agreement entered into by a party as to the fee which an expert is to receive, or the statement of the expert as to his charges or even the actual payment of such a fee to the expert, [is] not binding on the court and [is] not ... to be used by the court in fixing the expert fees which are to be assessed as costs in the suit." *Mathis v. City of DeRidder,* 599 So.2d 378, 392 (La.App. 3rd Cir.1992). Louisiana courts have identified a number of factors that courts can use in determining expert witness fees, including (1) the amount of time consumed by the expert in compiling his report; (2) the amount charged the landowner; (3) the amount of time spent preparing for trial; (4) the amount of

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 22 of 26 —

time actually spent in court; (5) the witnesses' expertise; (6) the extent to which his testimony and expert report aided the factfinder in its decision; (7) the amount in controversy and the complexity of the problem addressed by the expert; and (8) awards to experts in similar cases. *See Heard,* 629 So.2d at 505; *Nicholson,* 460 So.2d at 628, *citing* LA. REV. STAT. § 13:3666; *State, Through Dept. of Highways v. Bougere,* 363 So.2d 228 (La.App. 4th Cir.1978); *State Dept. of Highways v. Miltenberger,* 344 So.2d 705 (La.App. 1st Cir.1977).

The most important factor in determining an expert witness fee is that the award be reasonable. *See Nicholson,* 460 So.2d at 628, *citing Town of Krotz Springs v. Weinstein,* 401 So.2d 664 (La.App. 3rd Cir.1981). An expert appraiser may also recover fees for his reasonably necessary preparatory work, after considering whether that work actually tended to show the value of the property, whether it was useful in determining the award made, and the value of the land at issue. *See id.*

Further, vague and ambiguous entries must be explained before they can be considered reasonable. *Estate of Manship v. United States*, 2008 WL 695242 (M.D. La. March 12, 2008) (No. CIV. A. 04-91-C-M2).

## 5.     Federal Law on Fee Awards Provides a Useful Analogy

The standards for judicial approval of claimed expert fees are remarkably similar to the judicial standards for approval of attorneys' fee submissions, particularly when the implied duty of good faith and fair dealing is taken into account.

Under a January 5, 2009 decision of the Second Circuit, Dr. Weisler could properly be denied any fee if he were an attorney, on the grounds that submission of an excessive fee request and the unhelpfulness of part of the underlying work can justify denial of any fee whatsoever even though the attorney recovered $2.4 million for the client:

New York courts have consistently held that "an attorney who engages in misconduct by violating the Disciplinary Rules is not entitled to legal fees for any services rendered." *Shelton v. Shelton,* 151 A.D.2d 659, 542 N.Y.S.2d 719, 720 (N.Y.App. Div.2d Dep't 1989); *see also Schwartz v. Jones,* 58 Misc.2d 998, 297 N.Y.S.2d 275, 276 (N.Y.Sup.Ct.1969) ("When an attorney is denied a fee the authorities speak of it as a penalty visited upon him for misconduct .") (citation omitted). New York's Disciplinary Rules provide that "[a] lawyer shall not enter into an agreement for, charge or collect an illegal or excessive fee." 22 N.Y. ADC 1200.11(a). Accordingly, if the district court's conclusion that Goldman purposely requested an excessive fee was not clearly erroneous, then the court did not abuse its discretion in denying Goldman's fee application in its entirety.

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 23 of 26 —

*Chen v. Chen Qualified Settlement Fund*, __ F.3d __, 2009 WL 18726 (2d Cir. Jan. 5, 2009) (Nos. 06-1302-CV(L), 06-3810-CV(CON)) at p. *5. Turning to the inadequacy of counsel's work in seeking judicial approval of the settlement of a minor's claims, the Second Circuit stated at p. *7:

> The record also amply supports the district court's determination that Goldman had provided inadequate assistance to his client in terms of doing what was necessary to obtain court approval of the settlement. In his proposed Stipulation of Settlement and Infant's Compromise Order, Goldman offered none of the documentation and reports necessary for the court to determine whether the settlement proposed by the parties was reasonable. After Goldman failed to respond sufficiently to repeated requests for the information from the Special Master, the district court took it upon itself to obtain the information needed to ascertain whether the settlement was reasonable. Goldman provided no real assistance to the court in gathering the required information. Equally disturbing, the record suggests that Goldman himself had made only limited inquiries into David's condition and the nature and extent of David's future medical needs. Given the importance of this information in the district court's consideration of the settlement, it was not an abuse of discretion for the district court to determine that Goldman had inadequately represented his client.

> Goldman argues that the district court's conclusion regarding the effectiveness of his representation disregards the "enormously successful result" of securing a settlement in the case. This argument might have merit if Goldman had himself made the effort to obtain the documentation and information necessary to ascertain whether the settlement agreed to between the parties was sufficient to address David's on-going and extensive medical needs. He did not. However appropriate the settlement might have been, Goldman failed to engage in the work required to secure the district court's approval of the settlement.

The Fourth Circuit has also held that all fees may be denied to a partially successful attorney where the time records are "woefully inadequate," no effort had been made to demonstrate billing judgment by weeding out hours spent on unsuccessful claims, and where the total claimed was so high as to shock the conscience. *Fair Housing Council of Greater Washington v. Landow*, 999 F.2d 92 (4th Cir. 1993).

The Fifth Circuit cited *Fair Housing Council* with approval in *Scham v. District Courts Trying Criminal Cases*, 148 F.3d 554, 559 (5th Cir. 1998),[7] which affirmed the denial of all fees to a prevailing plaintiff because the fee request was so excessive that it shocked the conscience of the court. Citing *Landow*, the Fifth Circuit stated:

---

[7] *Scham* is still good law, although an intervening Supreme Court decision led to the abrogation of its holding on an unrelated point. *Bailey v. Mississippi*, 407 F.3d 684, 686-87 (5th Cir. 2005).

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 24 of 26 —

        We realize that the district court's remedy here is extreme, but we are reluctant to reverse inasmuch as doing so would serve to condone and encourage such outrageous petitions.  As the Fourth Circuit has reasoned, appellants in this case intended to submit an outrageously excessive fee petition in the hope that the district court would at least award some, preferably high, percentage of the requested fees. We believe Congress did not intend to foster such gamesmanship when it enacted the Civil Rights Attorney's Fees Act of 1976. Rather, the clear intent of Congress was to provide reasonable fees to prevailing parties. Our decision today seeks to further that purpose by encouraging attorneys at the outset to request only reasonable fees and to provide the necessary assistance to the district court for determining a reasonable fee. [FN20]

        FN20. *Landow, 999 F.2d at 98*.

        The Fifth Circuit has also affirmed drastic reductions in an excessive fee claim. *Hopwood v. State of Texas*, 236 F.3d 256 (5th Cir. 2000), *cert. denied*, 533 U.S. 929 (2001).  The Court of Appeals affirmed an overall 25% reduction in the compensable hours "based on the inadequacy of the time entries, duplicative work product, and lack of billing judgment of their counsels' submitted hourly totals."  *Id.* at 279-80.  The Fifth Circuit approved a further 15% reduction for lack of success.  *Id.*  That added up to a 40% reduction.  The court then disapproved specific categories of time claimed.  *Id.* at 280-81.  The court then cut hourly rates significantly, discussing the reduction of one attorney's claimed rate by half.  *Id.* at 281.  For that attorney, the overall reduction was at least 70% (the 25% reduction left 75%, the further 15% reduction left only 60% of the claimed time, and halving the rate left the attorney with a maximum of 30% of the original claim, and perhaps less if the attorney had spent time in the categories for which the court denied compensation.

**M.**       **Preservation of Documents**

        There is clearly a dispute over Dr. Weisler's bills, and has been since at least Dr. Weisler's six representations on August 1, 2008.  This triggered the duty of preservation in anticipation of litigation, which supplements the pre-existing duty of Dr. Weisler to retain all records bearing on his bills.

        We request that you take immediate custody of, and preserve, all of Dr. Weisler's hard-copy and electronic records of his involvement in this case, his daily activities from May 16, 2008 through August 15, 2008, his daily time records if any, his daily time descriptions if any, and all of his e-mails to or from anyone involved with this project.

        Our request also includes all hard-copy and electronic records of all of Dr. Weisler's personal and professional activities from May 16, 2008 through August 15, 2008.  Since the enormity of his time claims would have made most other activities impossible, it is extremely important that you take custody of, and preserve, all of Dr.

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 25 of 26 —

Weisler's hard-copy and electronic records of his activities during this period.

In addition, you stated at the meeting that Dr. Weisler's bills include the value of time lost because his claimed work in this case made him unavailable to see fee-paying patients. His December 12, 2008, time statement explicitly claimed such time only for August 14 and 15, 2008, but the tenor of your comments on January 2 indicated to us that such time was included throughout the time covered by his bills. In any event, to evaluate this contention, we will need to analyze the patient appointments, cancellations, and financial aspects of Dr. Weisler's practice for the period from May 16, 2006, through August 15, 2008, so that we can estimate the value of the claimed loss of professional income from this source. The 27-month period requested for these records ought to be sufficient. We request that you take immediate custody of these records and preserve them.

To the extent that Dr. Weisler earned income from his time in any other activity from May 16, 2006, through August 15, 2008, we will need comparable information as to each such activity. The 27-month period requested for these records ought to be sufficient. We request that you take immediate custody of these records and preserve them.

We request that you take immediate custody of, and preserve, all of Dr. Weisler's hard-copy and electronic records of his hourly rate in the period from May 16, 2005, through August 15, 2008, to support his hourly rate.

Because the statements of time and activities in the December 12, 2008 statement were altered from those in the July 7, 2008 statement, we think it is important to eliminate future disputes by your taking custody of the records immediately.

## N.      The February 4, 2009, Summary of Activity

Because of your artificially short deadline, there has not been time to analyze Exhibit 2 to your letter, the "Statement of Activity." Indeed, there has not even been time to scan it properly. However, one glaring statement leapt out at me: Dr. Weisler's statement on p. 17 that he had been asked to become generally knowledgeable about disaster related impacts on general medical health because we were only allowed one expert.

This may explain the extraordinary reading list in Exhibit 3, the vast bulk of which had nothing to do with this case.

The truth of the matter is that Dr. Weisler was instructed that he had to be aware of what the other experts were doing because only one expert was allowed to testify. We had no interest and no need in his becoming knowledgeable about any broader topics. Had he ever told us that that was how he was construing his mandate, we would

Andrew C. Wilson, Esq.
Simon, Peragine, Smith & Redfearn, L.L.P.
February 8, 2009
Page 26 of 26 —

have immediately told him to confine himself to what he had been asked to do.  That could not have been more explicit; I personally went over this with him on more than one occasion.  Dr. Weisler's decision to go far beyond his instructions, particularly in the face of direct warnings about the need to hold down costs, was what the law has rightly termed "a frolic and a detour."  It was not compensable time.

Dr. Weisler's next paragraph states that he contacted outside experts about legally defensible screening or treatment related articles.  He was not asked or allowed to do anything of the sort, but simply took it upon himself to jeopardize confidentiality, run the risk of unknown conflicts, and rely on unauthorized sources.

The oddest thing about these misstatements on p. 17 is that they cannot be reconciled with the extremely poor quality and thin substance of his work product.  One cannot get from the "there" he describes to the "here" of that low-grade paper.

This only scratches the surface of Exhibit 2.  You have not allowed us time to do more.

O.      **Suggested Way to Proceed**

The Barge P.S.L.C. is not now taking the position that it will not pay anything to Dr. Weisler, although it holds that option open in the event of litigation, or in the event that we are not able to reach an amicable resolution quickly.

Dr. Weisler agreed on January 2 to re-examine his time and ensure that no time spent on anything else wound up by mistake on his bills.  He has not done so.  Instead, he has constructed additional descriptions of activities that are unsupported by his contemporaneous "records," and created more conflicts with his prior bills.

We suggest that Dr. Weisler also consider the points made above, and exercise billing judgment.

We will respond as quickly as possible to any substantially revised bills.

I hope we can work this out amicably.

With best wishes,

Very truly yours,

Richard T. Seymour