**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| | * | |
| IN RE: KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO: BARGE | * | and consolidated cases |
| | * | |
| | * | SECTION "K" (2) |
| | * | |
| | * | |
| *Weisler v. Seymour, et al.*    **09-2737** | * | JUDGE |
| | * | STANWOOD R. DUVAL, |
| | * | JR. |
| | * | |
| | * | MAG. JUDGE |
| | * | JOSEPH C. WILKINSON, JR. |
| | * | |

# DECLARATION OF RICHARD T. SEYMOUR IN SUPPORT OF SEYMOUR DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## Table of Contents

A. Introduction ........................................................................................... 1
B. Standing ................................................................................................ 1
C. The Physical and Emotional Injury Subclass ........................................ 2
D. The Task Assigned to the Medical Team .............................................. 5
E. Personal Liability .................................................................................. 6
F. Discussions with the Medical Team About Keeping Costs Down .......... 7
G. Plaintiff's Hourly Rate and Total Bill ................................................... 10
H. Plaintiff's Bills ...................................................................................... 12
I. Plaintiff's Billing Practices .................................................................... 15
   1. Charging a Quarter Hour for Touching the File ................................. 15
   2. Failure to Keep Starting and Ending Times, and Failure to Record Interruptions ....... 16
   3. Unadmitted Reconstructed Time ...................................................... 17
   4. Reconstructed Statements of Activities ............................................ 17
   5. Claiming Time Unsupported Even by Scraps of Paper or Post-It Notes ........ 17
J. Churning the File .................................................................................. 18
   1. Familiarity with Other Experts' Work ................................................ 18

i

2. Chatting with the World at Large ............................................................... 19
3. Literature Review .................................................................................... 21
K. The Poor Quality of the Report.................................................................... 24
L. The Consequences of the Poor Quality of Plaintiff's Report ........................................... 26

CITY OF WASHINGTON   )
                            )  ss:
DISTRICT OF COLUMBIA  )

I declare that the following statements are true, subject to the penalties for perjury:

**A.** **Introduction**

1. I am an adult, over the age of 21.

2. I was formerly one of the counsel for plaintiffs in the Barge litigation (hereinafter "Barge counsel"), and was a member of Barge counsel from the Order appointing me on March 4, 2008 (Doc. # 11527), through the Order granting my withdrawal on August 23, 2011 (Doc. # 20400). Since then, I have no longer been one of the Barge counsel.

**B.** **Standing**

3. On October 9, 2011, I took the deposition of plaintiff in Raleigh, North Carolina. During the deposition, I learned from the first time that the contracting party for the contract he believed he had formed was not himself individually, but Richard H. Weisler, M.D., P.A. 10/09/2011 Dep. Tr. 242, lines 4-9.[1]

4. On October 25, 2011, I went on the web site of the North Carolina Department of State to obtain information on the status of Richard H. Weisler M.D., P.A. I downloaded the report stating that it is a corporation, as opposed to an unincorporated trade name, and its status is currently "Suspended."[2]

---

[1] Excerpts of the 10/09/2011 deposition of plaintiff are attached to the accompanying Memorandum as Exhibit 3.
[2] A copy of the North Carolina Department of State report on the status of Richard H. Weisler M.D., P.A. is attached to the accompanying Memorandum as Exhibit 4.

C.    <u>The Physical and Emotional Injury Subclass</u>

5.    On May 15, 2008, the Barge plaintiffs moved to certify a class (Doc. # 13166), which included a physical and emotional injury subclass.[3]

6.    I have had substantial experience representing plaintiffs in employment discrimination class actions since 1969.[4]

7.    At all times throughout Barge counsel's dealings with the medical team, I was well aware of the difficulties of obtaining certification of a class seeking damages for emotional distress, in light of the requirement of Rule 23(b)(3), Fed. R. Civ. Pro., that common issues predominate over individual issues.

8.    Barge counsel were aware of the zone-of-danger limitation under Louisiana law for recovery of emotional-distress damages for injuries to property, and the limitations on recovery of emotional-distress damages for injuries to third persons.  Given our belief that most class members had evacuated the area, these limitations would have had the effect of making the emotional-damage subclass small, compared to the property-damage subclass.  However, the Barge co-counsel was also concerned that the failure to seek certification on a claim for emotional-distress damages might have the effect of waiving the claim.  The May 15, 2008, motion to certify a class (Doc. # 13166) therefore sought damages for a physical or emotional-distress subclass.  See ¶¶ 24-33 at pp. 25-27.

9.    No medical experts were necessary with respect to the question whether a small physical or emotional-distress subclass could be certified; that was a legal question on which medical input was not relevant.

---

[3] A copy of the Barge Plaintiffs' May 15, 2008 Motion to Certify the Class (Doc. # 13166) is attached to the accompanying Memorandum as Exhibit 5.

[4] A detailed statement of my experience, prepared in January 2008, is attached to the accompanying Memorandum as Exhibit 6.

10. My recommendation to the other Barge counsel was that in light of the difficulties described above we seek an additional means of addressing this issue by obtaining an injunction requiring the Barge defendants to establish and fund a program to screen and treat class members for emotional distress stemming from the flooding caused by the barge, if we succeeded on liability.  Such relief would have been available under Rule 23(b)(2), which is not subject to the predominance test of Rule 23(b)(3).

11. For this reason, ¶ 10 on p. 19 of the May 15, 2008 Motion to certify a class (Doc. # 13166, exhibit 5 to the accompanying Memorandum) outlined the requested injunctive relief as follows:

> 10. The class meets the requirements of Rule 23(b)(2), Fed. R. Civ. Pro., because defendants acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  Plaintiffs will shortly seek to amend and supplement their Complaint to seek injunctive and declaratory relief against defendants.  Injunctive relief is important to ensure that defendants do not again endanger the class members by taking similarly negligent action in the future.  Declaratory relief is also important to class members, to affix responsibility for the August 29, 2005, flood in the class area, which may also help to restrain defendants' conduct in the future.  <u>Finally, plaintiffs will seek an order requiring defendants to establish a clinical program to evaluate and treat ongoing emotional distress caused by their actions, without charge to the class members, or in the alternative the creation of a fund to accomplish these goals.</u>

(Emphasis supplied.)

12. The other Barge counsel accepted this recommendation and decided to retain a medical expert to provide a report on the ability to screen class members inexpensively for emotional distress caused by flooding for which the barge was responsible, to show the feasibility of such relief for purposes of class certification.

13. To demonstrate the feasibility of a screening device, I did not intend that we use a statistical random sample, but simply examples of persons in different situations.  A statistical random sample would have been appropriate if we were trying to estimate the percentage of

3

class members who did or did not have this or that kind of specific mental disorder. The latter inquiry was no part of the goal for the injunctive relief for which we needed evidence of a suitable screening device, because it was unnecessary.

14. By contrast, data on the percentage of class members who did or did not have this or that kind of specific mental disorder would have been relevant to a Rule 23(b)(3) class for damages. See, for example, the May 15, 2008 Motion to Certify the Class (Doc. # 13166, exhibit 5 to the accompanying Memorandum), ¶ 30 at p. 26, referring to a statistical random sample for a damages claim for those persons "who suffered physical injury or emotional distress as a result of the August 29, 2005 flood and its aftermath, whether (1) as a result of the wrongful death of a family member; (2) personally experiencing the flooding and its aftermath; (3) physical injuries suffered during the flood and its aftermath; (4) the loss of a home whether owned or rented; (5) the loss of income; (6) resulting from evacuation and/or displacement from home, family, friends, community, culture and lifestyle; and/or (7) the loss of a business or injury to a business." *Id.*, ¶ 24(b) at p. 25.

15. This random-sample had no bearing on the issue of the screening device, however, but would have been a random sample of those who responded to a class notice. *Id.*, ¶ 24(a) at p. 25.

16. To demonstrate the feasibility of a screening device, we intended to have a medical expert examine a small number of persons who had had different experiences during Hurricane Katrina, such as being present or having evacuated, being old or young, having property damage or not, and whether or not a family member was harmed or died. We intended to combine that with existing professional studies establishing that there was a pool of persons in the class area or the metropolitan area with enough distress of whatever cause that they could

4

benefit from the inexpensive screening we envisioned and from treatment at the Barge defendants' expense if the flooding caused by the barge turned out to be the source of their difficulties.

17. It was never part of Barge co-counsel's plan to prepare a complete diagnosis of the persons with whom the medical expert or experts met, or to use the exercise to arrange for treatment of those interviewed.  Our intent was simply to find a reliable method by which class members could be inexpensively screened, so that we could advocate its use in connection with class certification.  See, for example, the June 6, 2008 e-mail thread in which the third e-mail sent at 4:10 PM Eastern from me to plaintiff and others asks for a draft report in a few days and states in part: "Remember, this is not a report to diagnose anyone with anything; it's a report on range and commonality and what makes sense going forward, informed by what you have seen and studied but without needing to pin everything down."[5]

### D.   The Task Assigned to the Medical Team

18. My first call with anyone on the medical team was on May 19, 2008.  My billing records show that Paul Balson, Richard Weisler, and Mark Townsend were on the line from the medical team, and Alan Fuchsberg and Lawrence Wiedemann were also on the line.

19. On this call, I explained to Drs. Balson, Weisler, and Townsend the task of finding an inexpensive screening instrument for the purpose of supporting the claim for injunctive relief, as described above.

20. During this call, neither Dr. Balson, nor Dr. Weisler, nor Dr. Townsend informed me or the other attorneys that the Centers for Disease Control had already developed such a device.

---

[5] A copy of the June 6, 2008 e-mail thread is attached to the accompanying Memorandum as Exhibit 8.

21. During this call, Drs. Weisler and Townsend did mention that there were one or more devices that had been used successfully in the immediate aftermath of a disaster to screen large numbers of people, but said there was a need to determine if that device or those devices were valid after a lapse of time.  This indicated to me that the tasks were smaller and less difficult than had been envisioned.

22. My next involvement with the medical team involved scheduling interviews with potential class members, attempting to arrange space for the interviews, and sorting out logistical problems with the interviews.  See Plaintiffs' Exhibit 6 (Doc. 20499-6).

23. During the scheduling, the question whether there was a need to have a random sample, as opposed to selected exemplars, arose.  I informed them that random selection was not important to the purpose of the study they were to perform.

24. To the extent that any attorney ever suggested otherwise, plaintiff and the rest of the medical team were informed that the instructions they received from me were to govern. See, *e.g.*, Mr. Gilbert's June 28, 2008 e-mail to plaintiff, Dr. Townsend, and others, Plaintiffs' Exhibit 19 (Doc. 20508-8); .[6]

25. The medical team nevertheless went its own way in violation of these instructions.  See the discussion in Parts K and L below, ¶¶ 130-148 as to the poor quality of the report submitted.

### E.    **Personal Liability**

26. I did not ever agree to become personally liable for any debt contracted in my law practice.

---

[6] This exhibit was attached to plaintiff's October 19, 2011 Ex Parte Motion and Order to Supplement Record on Behalf of Dr. Richard Weisler, and to Add Plaintiff's Exhibits (Doc. 20508).

27. I did not ever inform any member of the medical team, including plaintiff, that I was agreeing to become personally liable for any debt contracted in my law practice.

28. No member of the medical team ever requested that I assume personal liability for the debts of my law firm.

29. Prior to the filing of this lawsuit, neither plaintiff nor any member of the medical team ever expressed to me any doubt or misgiving that he or she was dealing with law firms and with lawyers plainly acting on behalf of their law firms.

30. Each of the many e-mails I sent in this case to the medical team specified my law firm's name, my law firm's address, my law firm's telephone number, and my law firm's fax number.

31. No e-mail I sent in this case contained my home address, my home telephone numbers, or my home fax number.

32. In almost 43 years of practice, I have never before had any expert or other vendor confuse a retainer by a lawyer acting on behalf of his or her law firm with a personal contractual relationship with a lawyer.

**F.**     **Discussions with the Medical Team About Keeping Costs Down**

33. In one of my first few telephone conference calls with the medical team, I had made the point that the resources of plaintiffs' counsel were limited.  I told them that we had a large number of experts performing a variety of projects, and could not afford to spend a lot of money on this project.  To the best of my recollection, this took place on my second call with plaintiff and Dr. Townsend, on May 21, 2008, with Mr. Fuchsberg also on the line.

34. On May 18, 2008, Dr. Townsend, with the expressed support of plaintiff, suggested that a company called Firm Logic should be brought into the project to "marshall

facts."  I believe that that is a core expert function in writing a report, and well within the expected range of competence for anyone charging $600 an hour.

35. I questioned the value of bringing in such a firm, and to the best of my recollection told them that the expense and duplication of effort could not be justified in light of our limited resources.  This would have been on the May 21, 2008 conference call described above.

36. My rejection of the use of the FirmLogic company should have made it reasonably clear to plaintiff and the medical team that resources for the work on the medical project were very limited.

37. Another example quickly surfaced.  Dr. Jill Hayes suggested using a runner named Ronnie Montgomery to pick up copies of physician's records so that the medial team would have them by the time of the interview.  Plaintiff and Dr. Townsend supported the idea.  I recall that the amount they estimated for the cost would be about $300.00.  I told Plaintiff and Dr. Townsend that I could not authorize a three-hundred-dollar expense but would have to talk to co-counsel about it, because our resources were tight.  Based on my billing records, I believe that this conversation with plaintiff and Dr. Townsend took place on May 25, 2008, with Mr. Gilbert also on the line.  See the e-mails dated May 27, 2008[7] referring to Mr. Montgomery as the investigator named by Dr. Hayes and stating that both Dr. Townsend and I had spoken with him that day.

38. The May 25, 2008, conference call was the second time I made clear that resources for the work on the medical project were very limited.

---

[7] The May 27, 2008 e-mail thread discussing Ronnie Montgomery is attached to the accompanying Memorandum as Exhibit 9.

39. In a May 28, 2008, conference call with plaintiff, Dr. Balson, and Mr. Fuchsberg, I told them that there was still no authorization to pay Mr. Montgomery the expected $300 fee, but that I would pay the $300 if the other Barge counsel did not.  My June 2, 2008 e-mail to other Barge counsel confirms this arrangement.  See Plaintiff's exhibit 21 (Doc. 20499-14).

40. I never received a statement from Mr. Montgomery, and have never seen a statement from him.

41. The May 28, 2008, conference call was a third instance in which I made clear to plaintiff and the medical team that resources for the work on the medical project were very limited.

42. I tried to arrange inexpensive but suitable office or hotel space for the interviews with the potential class members who were to be used as exemplars of different types of situations in the medical interviews and validation of an inexpensive screening instrument.  Hotel space was too expensive, and I so informed the medical team.

43. My emphasis on cost in the selection of suitable office or hotel space for the medical team's interviews was a fifth instance in which I made clear to plaintiff and the medical team that resources for the work on the medical project were very limited.

44. I received a copy of Mr. Fuchsberg's June 12, 2008 e-mail to Dr. Howard Osofsky, with copies to plaintiff and Dr. Townsend as well as some Barge counsel, stating in part: "Please keep your work to what is needed at this stage as we need to watch our costs."[8]

45. Mr. Fuchsberg's June 12, 2008 e-mail to Dr. Howard Osofsky, with copies to plaintiff and Dr. Townsend, was a sixth instance in which Barge counsel made clear to plaintiff

---

[8] A copy of Mr. Fuchsberg's June 12, 2008 e-mail to Dr. Howard Osofsky on holding costs down is attached to the accompanying Memorandum as Exhibit 10.

Weisler and the medical team that resources for the work on the medical project were very limited.

46. Plaintiff and Dr. Townsend were aware of Barge counsel's difficulty in finding the money to pay the statements of Dr. Jill Hayes.  They brought it up in telephone calls with me and other counsel.

47. Plaintiff's and Dr. Townsend's awareness of Barge counsel's difficulty in finding the money to pay the statements of Dr. Jill Hayes was a seventh instance in which it was made clear to plaintiff Weisler and the medical team that resources for the work on the medical project were very limited.

48. During the May 19, 2008 call, neither Dr. Balson, nor Dr. Weisler, nor Dr. Townsend informed me or include me in an oral or written discussion to the effect this project would involve anything like the types of expenses ultimately reflected in their statements, particularly plaintiff's statement.

49. At no time until their bills arrived did Dr. Weisler or Dr. Townsend inform me or include me in an oral or written discussion to the effect this project would involve anything like the types of expenses ultimately reflected in their statements, particularly plaintiff's statement.

G. **Plaintiff's Hourly Rate and Total Bill**

50. I was not involved in the initial discussions Mr. Fuchsberg had with the medical team.

51. In my experience, it normally costs somewhere between $5,000 and $10,000 a person to have a full diagnostic report, excluding deposition preparation and attendance, and trial preparation and attendance.

10

52. Since we neither asked for nor needed a full diagnostic report, I did not expect charges in excess of the usual range.  Since we did not expect every interviewee to have emotional distress, I expected charges lower than the usual range.

53. I did not see the May 14, 2008 e-mail from Alan Fuchsberg to Richard Weisler (Plaintiff's Exhibit 1, Doc. 20499-3) or become aware of its substance,  until after this lawsuit was filed.

54. Plaintiff never informed me orally or in writing that he was charging $600 an hour for his time prior to the receipt of his June 29, 2008 invoice.

55. Plaintiff never informed me orally or in writing that he was planning to charge more than $50,000 or $75,000 for his work, or anything other than the ordinary charges one would expect from such a project.  He would never have been used as an expert if he had communicated that intention.

56. Plaintiff never informed me orally or in writing that he was ultimately going to charge more than a quarter of a million dollars for his own personal work.  He would never have been used as an expert if he had communicated that intention.

57. Attachment 16 to plaintiff's expert report stated that Dr. Weisler was charging $600 an hour, and that he estimated he had worked 260 hours to date.  The product of these figures is $156,000.  Plaintiff did not e-mail, fax, or mail this attachment to me.  Plaintiff loaded three of the Attachments to his report on a file server I made available to him, but Attachment 16 was not one of them.  Plaintiff provided the attachments on a CD to Mr. Gilbert for transmission to the Barge defendants, but I did not receive a copy.

58. I did not know from any other source that plaintiff was charging $600 an hour for his time until he submitted his invoice on July 29, 2008, a month after his expert report had been

served on the Barge defendant.  See Plaintiff's Exhibit 26 (Doc. # 20499-20), in which I say "it's

fair to say the amount is a shock" and in which I ask Mr. Fuchsberg whether he had discussions

about plaintiff's hourly rate or budget.  At that point, there was nothing that could be done about

the rate since the report and Attachment 16 had already been served on the Barge defendant in

order to meet the Court's deadline.

59. At the time, I was under the impression that Dr. Townsend was billing $300 an

hour.  See Plaintiff's Exhibit 26 (Doc. # 20499-20).  I learned differently later.  See the July 30,

2008 e-mail from Karen Wiedemann to me, Plaintiff's Exhibit 29 (Doc. 20508-11).[9]

**H.   Plaintiff's Bills**

60. Plaintiff's first bill in this case was dated July 7, 2008, but contained statements of

time through July 28, 2008.  One of his employees, Sherry Cofield, submitted the bill by e-mail

on July 29, 2008.[10]

61. This July 29, 2008 bill had no statements of activity for most days on which time

was claimed.  Where statements of activity appeared, they were usually copies of standardized

statements such as "Review" or "Writing, analyzing, reading & calling."  *Id.*

62. Plaintiff's July 29, 2008 first bill claimed 83.0 hours, amounting to $49,800 at

$600 an hour, for time spent *after* he submitted his expert report

63. On July 30, 2008, one day after the submission of plaintiff's July 29, 2008 first

bill, Mr. Fuchsberg sent an e-mail to plaintiff protesting the amount as excessive.  See Plaintiff's

Exhibit 25, Doc. 20499-19.

---

[9] This exhibit was attached to plaintiff's October 19, 2011 Ex Parte Motion and Order to Supplement
Record on Behalf of Dr. Richard Weisler, and to Add Plaintiff's Exhibits (Doc. 20508).

[10] The July 29, 2008 e-mail from Sherry Cofield and attached first bill from Dr. Weisler are Exhibit 11 to
the accompanying Memorandum.

64. On or about August 1, 2008, plaintiff participated in a telephone conversation with Barge counsel about his billing.  During this call, Barge counsel informed him that his fees were excessive.

65. Plaintiff's second bill in this case was submitted as an attachment to a December 12, 2008 letter from his counsel, Mr. Andrew Wilson.[11]

66. Plaintiff's second bill in this case was an updated version of his first bill, filling in time entries with repetitive statements correcting some dates, and adding $6,000 to the total, bringing the total to $222,390.[12]

67. Plaintiff's third bill in this case was also submitted as an attachment to a December 12, 2008 letter from his counsel, Mr. Andrew Wilson.

68. Plaintiff's third bill is dated December 2, 2008[13] and claimed 73 additional hours from August 1, 2008 through August 15, 2008, for a total of $43,800 at $600 an hour, for his time.  This time included two days—August 14 and 15, 2008—in which he charged 16 hours at $600 an hour for the cancellation of his deposition and "missed work opportunity" because of cancellation of patients.

69. I have repeatedly requested plaintiff to document the claimed loss for these two days, to provide information on what else he did or could have done on August 14 and 15, 2008, to provide information on his fees received from patients, and similar information, and plaintiff has failed and refused to do so.

---

[11] A copy of Mr. Andrew Wilson's December 12, 2008 letter submitting additional bills for plaintiff and Dr. Townsend is attached to the accompanying Memorandum as Exhibit 12.  I refer to him throughout this Declaration as Andrew Wilson in order  to distinguish him from defendant Lawrence Wilson.

[12] A copy of plaintiff's December 12, 2008 second bill is attached to the accompanying Memorandum as Exhibit 13.

[13] A copy of plaintiff's December 2, 2008 third bill, provided to defendants on December 12, 2008, is attached to the accompanying Memorandum as Exhibit 14.

70. Plaintiff's third bill, like his first and second bills, contains repetitive descriptions of time.

71. Mr. Andrew Wilson's December 12, 2008 letter also attached two bills from Dr. Townsend.[14]

72. Shortly after the receipt of Mr. Andrew Wilson's December 12, 2008 letter, defendants arranged a meeting on January 2, 2009 with Mr. Andrew Wilson and Dr. Townsend in New Orleans.  Plaintiff participated by speaker telephone.  I flew down from Washington, D.C., and attended the meeting in person.

73. During the January 2, 2009 meeting, I explained to Mr. Andrew Wilson and plaintiff the problems with his bills and charges and requested copies of his time records, a clearer explanation of time, and a review of these bills for billing judgment.

74. On February 4, 2009, Mr. Andrew Wilson sent a letter to defendants,[15] enclosing a fourth and final revised bill from plaintiff, a narrative summary of what plaintiff had been doing, a reading list of documents plaintiff had assertedly reviewed, a "Subject Line Index/Table of Contents" consisting of chopped-off e-mail headers for the many persons with whom plaintiff was in contact during this project, "Contemporaneous time entry activity," and travel vouchers and expense forms.  Most of the attachments are discussed below.

75. Plaintiff's February 4, 2009, fourth and final revised bill is Plaintiff's Exhibit 24 (Doc. 20499-16).  The fourth revised bill states that it contains "enhanced explanations" as well as the enhanced amount of $269,250 for plaintiff's time, exclusive of expenses.  This is larger than the sum of the updated second bill and the third bill, although no time had been spent since the end of the time covered by the third bill.

---

[14] Copies of Dr, Townsend's bills are attached to the accompanying Memorandum as Exhibits 15 and 16.
[15] A copy of Mr. Andrew Wilson's February 4, 2009 letter is attached to the accompanying Memorandum as Exhibit 17.

76. On February 8, 2009, I sent a detailed 26-page letter to Andrew Wilson, explaining the problems with plaintiff's bills.[16]  I received no response other than this lawsuit.

I.   **Plaintiff's Billing Practices**

1.   **Charging a Quarter Hour for Touching the File**

77. Plaintiff's invoices state that he charges for another quarter hour each time he spends any part of a quarter hour.  His wording is "Charge for Additional 15 Min or Part Thereof."  Plaintiff does not round his time to the nearest quarter hour, he just charges another quarter hour.  (Plaintiff's Exhibit 24, Doc. # 20499-16, p. 8.)  Thus, plaintiff adds 15 minutes to the size of his bill every time he spends a single minute.

78. As lead counsel in a number of successful class actions in cases subject to statutory fee-shifting or percentage recoveries, I have sometimes had to review the proposed fee submissions of co-counsel before they have been submitted to the court.

79. In my experience reviewing draft fee petitions, the practice of charging for another quarter hour every time one spends even a minute of time can have a substantial inflationary effect on a bill.

80. Where I have been given the responsibility of approving fee petitions, I have never allowed co-counsel to follow a practice like plaintiff's billing practice.

81. In nearly 43 years at the bar, I have never seen an expert follow this practice.

82. I would never have agreed to retain plaintiff as an expert if he had disclosed this billing practice of charging an extra quarter hour for any time he spends that exceeds the last quarter hour, which I consider aggressive.

---

[16] A copy of Richard Seymour's February 8, 2009 letter to Andrew Wilson, explaining the problems with plaintiff's bills, is attached to the accompanying Memorandum as Exhibit 18.

83. I do not believe any member of the Barge counsel would have agreed to retain plaintiff as an expert if he or she had been aware of this practice.

84. Dr. Townsend's bills contrast sharply with plaintiff's bills, in that they have actual contemporaneous descriptions of time and have a mix of time strongly indicating that time was recorded contemporaneously with attention paid to starting and ending times, without a "touch the file" minimum quarter-hour charge.[17]

## 2. Failure to Keep Starting and Ending Times, and Failure to Record Interruptions

85. Plaintiff also did not keep starting and ending times for work, with recorded breaks for meals and interruptions, but simply wrote numbers of hours per day on scraps of paper and Post-It notes, with several days sometimes appearing on one note.[18]

86. There is thus no way to check the arithmetic in plaintiff's statements of time.

87. There is also thus no way to check how much plaintiff increased his time statements by his admitted practice of rounding his time up.

88. The seriousness of the failure to keep accurate records is magnified at a claimed rate of $600 an hour.

89. I would never have agreed to retain plaintiff as an expert if he had disclosed that he would not keep accurate time records that could be checked for accuracy of arithmetic if need be.

90. I do not believe any member of the Barge counsel would have agreed to retain plaintiff as an expert if he had disclosed that he would not keep accurate time records that could be checked for accuracy of arithmetic if need be.

---

[17] See Exhibits 15 and 16 to the accompanying Memorandum.
[18] Plaintiff's complete time "records" are Exhibit 19 to the accompanying Memorandum.

### 3.      Unadmitted Reconstructed Time

91. Plaintiff has an unusually high number of time entries that reflect a whole number of hours, and an unusually high number of time entries ending in a half hour.[19]

92. In my experience reviewing draft fee petitions, unusually high numbers of time entries for whole numbers of hours, and unusually high numbers of instances of time entries ending in a half hour, are hallmarks of reconstructed or guessed time.

93. The seriousness of not bothering to keep accurate time records as one proceeds is magnified at a claimed rate of $600 an hour.

94. I would never have agreed to retain plaintiff as an expert if he had disclosed that he would not keep accurate time records but would periodically reconstruct or guess his time.

95. I do not believe any member of the Barge counsel would have agreed to retain plaintiff as an expert if he had disclosed that he would not keep accurate time records but would periodically reconstruct or guess his time.

### 4.      Reconstructed Statements of Activities

96. In addition, plaintiff's time "records" do not contain any descriptions of activities.

97. Plaintiff's statements of activities must all have been added after the fact.  This makes them all reconstructed.

### 5.      Claiming Time Unsupported Even by Scraps of Paper or Post-It Notes

98. Plaintiff is also charging for 106.25 hours for which he has no time records at all.[20]

99. Plaintiff is charging $ 63,750.00 for these 106.25 hours.  That is 23.7% of all the time for which he is charging in this case.

_____

[19] See the Declaration of Matthew M. Seymour, ¶¶ 7-11, attached to the accompanying Memorandum as Exhibit 20.

[20] See the Declaration of Matthew M. Seymour, ¶¶ 4-6, attached to the accompanying Memorandum as Exhibit 20.

100.     I would never have agreed to retain any expert who would charge so much money without any supporting time records.

101.     I do not believe any member of the Barge counsel would have agreed to retain plaintiff as an expert if he had disclosed that he would charge so much money without any supporting time records.

**J.     Churning the File**

**1.     Familiarity with Other Experts' Work**

102.     I informed plaintiff that, as the testifying expert, he needed to be generally familiar with what the other persons working on the project were doing.

103.     This required plaintiff to do some research in other fields, so that he would be familiar with what they were doing and fairly include their work in his report.  However, these were allied fields, such as psychiatry and child psychiatry, psychiatry and psychological administration of tests, not distantly related fields.

104.     I have given such instructions to experts many times, both when they were working as head of a team including their own staff members, and when they were working on a team that included persons from outside their offices.

105.     In my nearly 43 years of practice, such instructions to an expert have never led to the expenditure of very substantial amounts of additional time.  They have always previously been reasonably and responsibly carried out.

106.     These instructions should have been simply carried out, given that the task of validating an inexpensive screening instrument to distinguish between people who were suffering from Barge-caused emotional distress and therefore needed to see a therapist and people who did not need to see a therapist, and given the similarity of psychological and psychiatric disciplines involved.

107.     Plaintiff's curriculum vitae, provided to Barge counsel before the start of his work, led me to believe him capable of carrying out this instruction without expending substantial time and effort.[21]  It states in pertinent part that even thirty years ago he was responsible for coordination across disciplines, and with psychologists as well as psychiatrists:

> I coordinated the services of more than thirty residents and thirty psychologists, social workers, and medical students.   Co-chaired the multi-disciplinary treatment conference where all referrals and new patients were reviewed and matched for optimal treatment modality and therapist.  I co-taught with Roger Spencer, M.D. the year-long course for second year psychiatry residents on diagnostic and treatment interviewing. I helped supervise all medical students and many of the residents in the outpatient clinic on case management.

108.     I would never have agreed to retain plaintiff, or to use plaintiff as the testifying expert, if I had known that plaintiff would charge extraordinary expenditures of time, and thus of money, on the basis that he needed to study the disciplines of each of the other professionals on the medical team.

109.     I do not believe any member of the Barge counsel would have agreed to retain plaintiff as an expert retain plaintiff, or to use plaintiff as the testifying expert, if he or she had known that plaintiff would charge extraordinary expenditures of time time, and thus of money, on the basis that he needed to study the disciplines of each of the other professionals on the medical team.

## 2.     <u>Chatting with the World at Large</u>

110.     Plaintiff sent large numbers of e-mails about the project to persons who were not previously involved in the project, and brought them in to some aspect of the project, often without the agreement or even knowledge of Barge counsel  His Report[22] lists as "consultants" Dr. Richard Dalton from Tulane, Dr. Jonathan Davidson from Duke, Dr. David

---

[21] A copy of plaintiff's April 21, 2008 curriculum vitae is attached to the accompanying Memorandum as Exhibit 21.

[22] A copy of plaintiff's June 30, 2008 Report in this case is attached as Exhibit 22 to the accompanying Memorandum.

Sheehan (described as "internationally renowned"), Dr. Allan Chrisman at Duke, Dr. Fran Norris at Dartmouth, Dr. Jessica Hamblen at Dartmouth, Dr. Narayan Sastry at the University of Michigan, and Kara Koehrn, a Masters of Environmental Management candidate. *Id.* pp. 15-16. This is in addition to the medical team known to Barge counsel of himself, Dr. Townsend, Dr. Howard Osofsky, Dr. Joy Osofsky, Dr. Jill Hayes, and Dr. Philip Griffin. *Id.* at pp. 12-14.

111.    As a partial explanation for his time, plaintiff provided Barge counsel with a 72-page document showing only the chopped-off headers for e-mails showing subject, date, from and to, but excluding the body of each message.[23]

112.    These e-mails are organized into the following sets: To and From Mr. Fuchsberg; To and From Alex Crosby, whoever he is; To and From Mr. Gilbert; To and From F. Norris; To and From Dr. Howard Osofsky; To and From Jill Hayes Vol. 1; To and From Jill Hayes Vol. 2; To and From Dr. Joy Osofsky; To and From Kara Koehrn Vol. 1; To and From Kara Koehrn Vol. 2; To and From Kara Koehrn Vol. 3; To and From Kara Koehrn Vol. 4; Karen Wiedemann; LD Wiedemann; Dr. Townsend Vol. 1; Dr. Townsend Vol. 1; Dr. Townsend Vol. 2; Dr. Townsend Vol. 3; Dr. Townsend Vol. 4; Miscellaneous Emails; Dr. Peter Griffin; To and From R. Dalton; and S. Khorrami.

113.    Plaintiff did not produce the text of these e-mails in his Initial Disclosures or in discovery.   Plaintiff refused to provide the text of these e-mails in his responses to discovery.[24]

114.    Without the text of the e-mails, it is impossible for defendants to determining whether all or any of the time spent in communications with the medical team, or

---

[23] A copy of plaintiff's "Subject Line Index/Table of Contents" set of chopped-off e-mail headers is attached as Exhibit 23 to the accompanying Memorandum.

[24] Plaintiff's response to the Seymour Defendants' Request for Production 4, 10, and 13 are attached to the accompanying Memorandum as Exhibit 24.

with the "consultants," or with persons unknown like Alex Crosby, were reasonably within the scope of the tasks assigned or were instead plaintiff's frolic and not properly chargeable to the case.

115.    E-mails like those partially shown in Exhibit 12 to the accompanying Memorandum are of particular concern when plaintiff charges a quarter hour for touching the file.

116.    Plaintiff's associated telephone conversations raise the same concern.

117.    I would never have agreed to retain plaintiff if I had known that plaintiff would charge extraordinary expenditures of time, and thus of money, on the basis that he needed to engage in all the communications evidenced in Exhibit 12 to the accompanying Memorandum and similar telephone conversations, or that he would refuse to provide the texts of the communications when asked so that his billing for these activities could be checked.

118.    I do not believe any member of the Barge counsel would have agreed to retain plaintiff as an expert retain plaintiff, or to use plaintiff as the testifying expert, if he or she had known that plaintiff would charge extraordinary expenditures of time, and thus of money, on the basis that he needed to engage in all the communications evidenced in Exhibit 12 to the accompanying Memorandum and similar telephone conversations, or that he would refuse to provide the texts of the communications when asked so that his billing for these activities could be checked.

### 3.    **Literature Review**

119.    Mr. Fuchsberg and I both asked plaintiff to perform a literature review.

120.    On numerous occasions in my nearly 43 years of practice, I have made similar requests to experts I have retained in class litigation, to make sure they are aware of

recent scholarship affecting their reports and testimony.  Carrying out such requests has never

previously involved any substantial amount of time or money.

121.      Plaintiff took this request as an occasion to read an enormous number of

publications at the expense of Barge counsel

122.      As a partial explanation for his time, plaintiff provided Barge counsel with

a 25-page document listing the publications he read.[25]

123.      Plaintiff's document contains the title, author, date published, and number

of pages.  Not all of the articles have dates.

124.      Plaintiff's document lists 225 articles he read (including two he wrote

himself, on p. 17), consisting of 3,769 pages.  Sixteen of these articles have no number of pages

listed, so treating each as a page long that would be 3,785 pages.  The earliest articles go back to

the 1990s.  This count excludes twenty-one listed documents in the "Other Documents" section

at pp. 23-25, which I assume were sent to him by me or by other Barge counsel.

125.      The titles of the articles themselves raise questions about the value and

legitimacy of this activity.  On the second page of the document alone, the titles include subjects

such as "Psychological factors after traumatic amputation in landmine survivors: the bridge

between physical healing and full recovery," "KidsCount," "Barge a contentious symbol of

Hurricane Katrina," "Risk Charts Show Smokers Should Be Aware," and "APA Practice

Guidelines for PTSD," a topic one would have thought a $600 an hour expert with plaintiff's

background would already have known about.  Some titles read like titles of newspaper articles;

the smoker article is credited to the Associated Press, but others like "2006 murder rate tops in

---

[25] A copy of the "Barge case Expert Witness Reading List" plaintiff provided to defendants is attached to
the accompanying Memorandum as Exhibit 25.

the nation" on p. 3 and "Judge Rules Army Corps of Engineers can be sued over Katrina flooding" on p. 4 are credited to persons.

126.     Plaintiff's document does not contain the name of the newspaper, journal, or other publication in which the article appeared.  Without that information, it is difficult or impossible for anyone to locate the document and see if this is a legitimate article to be reviewed, or a personal frolic of plaintiff.

127.     Plaintiff did not produce copies of these articles in his Initial Disclosures or in discovery.  Plaintiff refused to provide copies of these articles in his responses to discovery, did not state affirmatively that he had any such documents or how many he might have, and simply stated: "To the extent copies of such documents are still in the Plaintiff's possession, these can be copied at Plaintiff's office."[26]

128.     I would never have agreed to retain plaintiff if I had known that plaintiff would charge extraordinary expenditures of time, and thus of money, on the basis that he needed to engage in the extensive reading referenced in his reading list, including news articles and APA Guidelines, or that he would refuse to provide the texts of the articles when asked so that his billing for these activities could be checked.

129.     I do not believe any member of Barge counsel would have agreed to retain plaintiff as an expert retain plaintiff, or to use plaintiff as the testifying expert, if he or she had known that plaintiff would charge extraordinary expenditures of time, and thus of money, on the basis that he needed to engage in the extensive reading referenced in his reading list, including news articles and APA Guidelines, or that he would refuse to provide the texts of the articles when asked so that his billing for these activities could be checked.

---

[26] Plaintiff's responses to the Seymour Defendants' Requests for Production 14 and 15 are attached to the accompanying Memorandum as Exhibit 25.

K.   <u>The Poor Quality of the Report</u>

130.     I provided plaintiff and Dr. Townsend with a copy of the provisions of Rule 26(a)2(B), Fed. R. Civ. Pro., setting forth the required contents of expert reports.

131.     I provided plaintiff and Dr. Townsend with an example of an expert report meeting the requirements of Rule 26(a)2(B), Fed. R. Civ. Pro.

132.     Early in the project, I informed plaintiff and Dr. Townsend that they would need to produce the materials on which they rely, and that they should save time by gathering such materials for production as they proceeded.

133.     Plaintiff must have ignored this instruction, because he later complained about the time required to gather these materials after he submitted his report.

134.     Plaintiff was not the lead person on the project before it was decided that he would be the drafter of the report, based largely on Dr. Townsend's lack of comfort with that role.

135.     On June 29, 2008, at 2:17 P.M., one day before the report was due, the medical team once again asked that Barge counsel retain Firm Logic to write the report.  See Plaintiff's Exhibit 15, Doc. 20499-12, cut-off e-mail thread at the bottom of the page.

136.     On June 29, 2008, at 2:34 P.M., seventeen minutes after the request was made, I rejected the request that Barge counsel retain Firm Logic to write the report.  See Plaintiff's Exhibit 15, Doc. 20499-12, e-mail at the top of the page responding to the cut-off message.  The reasons were stated in the e-mail.

137.     In almost 43 years of practice, I have never had a retained expert suggest at the last minute that his or her report be written or ghost-written by any person or corporation not involved with the expert analysis and retained for the purpose of writing or ghost-writing the

report.  I have always understood that it is a basic element of an expert's competence that he or she be able to write a legally acceptable and clear report.  I considered this request bizarre.

138.     Plaintiff first provided a draft of his June 30, 2008 report to Barge counsel on June 27, 2008.[27]  It had numerous holes to be filled in, it rambled, it did not directly address the one large question or several subtopics the medical team had been asked to answer, and it did not include a list of the materials on which plaintiff and the medical team relied.

139.     The June 27, 2008 draft report did not contain any mention of plaintiff's compensation or billing rate.  This draft also largely ignored the basic questions the medical team had been asked to answer.

140.     On June 28, 2008, at 6:01 P.M. Eastern time, Mr. Gilbert sent an e-mail to plaintiff and Dr. Townsend, pointing out numerous deficiencies in the draft, instructing them not to argue as advocates for class treatment, and to address the psychiatric questions for which they were retained and which would be used by the attorneys as a basis to argue for class certification. Its critical sentence stated: "The conclusions needed to fuel these arguments are either unclear in your report, or are not included."  The e-mail also stated: "I believe it imperative that you speak with Rick Seymour concerning reporting requirements for class certification, as this is his area of expertise – not mine."  See Plaintiff's Exhibit 19, Doc. 20508-8.[28]

141.     On June 29, 2008, I sent an e-mail to plaintiff and Dr. Townsend suggesting what I thought was a more sensible, and easier-to-follow, organization of the report, and tried to steer them back towards the fundamental questions they had been asked to address

---

[27] A copy of plaintiff's June 27, 2008 draft report is attached to the accompanying Memorandum as Exhibit 26.

[28] This exhibit was attached to plaintiff's October 19, 2011 Ex Parte Motion and Order to Supplement Record on Behalf of Dr. Richard Weisler, and to Add Plaintiff's Exhibits.

and the required elements of expert reports under Rule 26(a)2(B), Fed. R. Civ. Pro.  See Plaintiff's exhibit 18, Doc. 20499-13.

142.    On June 30, 2008, at 11:49 A.M. Eastern time, I clarified to plaintiff and Dr. Townsend that the report had to be their report, not mine, that they had to be comfortable with it, that they needed to rely on their own judgment as to all parts of the report, and emphasizing what I thought the matters in which the Court would be most interested.  See Plaintiff's Exhibit 12 (Doc. 20499-11).

143.    Plaintiff's second draft of the report was provided to Barge counsel on June 29, 2008,[29] the day before it was due to be served on the Barge defendant.  It still contained holes and gaps.  The second draft also contains commentary by Dr. Jill Hayes.

144.    The quality of plaintiff's final report was poor.  It lacked organization, did not squarely address the questions the medical team had been directed to enter, did not follow many of the suggestions I had offered to make a cohesive report responsive to the tasks given to the medical team, and was not very persuasive.

145.    Plaintiff's final report seemed full of filler material, as opposed to substance.

**L.    The Consequences of the Poor Quality of Plaintiff's Report**

146.    Plaintiff's failure to provide a draft of his report sufficiently in advance of the deadline for service of the report on the Barge defendant made it impossible for Barge counsel to get the depth and range of changes necessary to turn it into a report useful to the purpose: advancing a claim for injunctive relief under which class members could be screened inexpensively at defendant's expense for any need for therapy and to cover the costs of therapy.

---

[29] A copy of plaintiff's June 29, 2008 second draft report is attached to the accompanying Memorandum as Exhibit 27.

147.     Plaintiff's deposition was canceled after Barge counsel conferred and decided that there was no plausible scenario on which the testimony of plaintiff and his report could be used to advance to the Court a subclass for emotional distress.

148.     On September 29, 2008 Barge plaintiffs filed a class certification motion (Doc. 15549) that dropped the claim for injunctive relief, in large part because of the unacceptably poor quality of plaintiff's work and report.

149.     Plaintiff's report and work were served on the Barge defendant because there was no alternative, but were useless in this litigation.  Barge counsel did not "accept" this report and work.

/s/ Richard T. Seymour
Richard T. Seymour
Law Office of Richard T. Seymour, P.L.L.C.
Suite 900, Brawner Building
888 17th Street, N.W.
Washington, D.C.  20006-3307
       rick@rickseymourlaw.net
       (202) 785-2145 – Telephone
       (202) 549-1454 – Cell
       (800) 805-1065 – Facsimile

Dated: October 25, 2011

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of October, 2011, I served a copy of the Declaration of Richard T. Seymour in Support of the Seymour Defendants' Opposition to Plaintiff's Motion for Summary Judgment on counsel of record for Plaintiff, as shown below, and on all other counsel and parties through the Court's ECF system and, where the party served is not on the ECF system, by e-mail:

> Andrew C. Wilson, Esq.
> Simon, Peragine, Smith & Redfearn, L.L.P.
> 30th Floor - Energy Centre
> 1l00 Poydras Street
> New Orleans, LA 70163-3000

> /s/ Richard T. Seymour
> Richard T. Seymour
> *Attorney for Defendants Richard T. Seymour and [misnamed]"Richard T. Seymour P.L.L.C."*