UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   *
CONSOLIDATED LITIGATION     *   CIVIL ACTION
            *
            *   NO. 05-4182
PERTAINS TO: BARGE     *   and consolidated cases
            *
            *   SECTION "K" (2)
*Weisler v. Seymour, et al. 09-2737*   *
            *   JUDGE
            *   STANWOOD R. DUVAL, JR.
            *   MAGISTRATE JUDGE
            *   JOSEPH C. WILKINSON, JR.

******************** *** **** *** ***********************

**REPLY MEMORANDUM OF PLAINTIFF, DR. RICHARD H. WEISLER,
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

**MAY IT PLEASE THE COURT:**

**INTRODUCTION**

  This matter presents a most unusual situation. A Washington D.C. attorney, Richard T. Seymour, was admitted *pro hac vice* as a member of the Barge Subgroup Plaintiffs' Litigation Committee ("BSPLC")" after he falsely represented to the Court that he had the financial wherewithal to effectively serve the putative class members.[1] Less then

---

   [1]   *See*, Motions to Certify Class and Subclasses, May 19, 2008 and September 29, 2008.

1

thirty days before the BSPLC's expert deadline, he then convinced the BSPLC to pursue an "emotional injury subclass," relying on Mr. Seymour's self-professed class action "expertise". Oddly, after all the work was done, the BSPLC eventually decided to abandon the project because of Mr. Seymour's flawed legal analysis, a decision which left behind a trail of unpaid invoices of experts and support staff who helped in the project. Not surprisingly, in an effort to explain away his failures, Seymour volunteered to begin a campaign of personal attacks on the unpaid experts and to create specious reasons for not paying the outstanding invoices.

This is to address the Defendants' most egregious false representations. Plaintiff, Dr. Richard H. Weisler ("Dr. Weisler") will show in his Reply Memorandum in further support of his Motion for Partial Summary Judgment, through the Defendants' own e-mails that: (1) Dr. Weisler's report contains everything the Defendants asked for and thus the Defendants' refusal to pay him constitutes a deliberate breach of contract; (2) the billing issues raised by the Defendants were specious and are only raised after the fact to avoid payment; and, (3) the content of Defendants' response is deliberately false and misleading, warranting sanctions under FRCP Rule 11.

## I. SEYMOUR'S "BABY"

The BSPLC's contemporaneous e-mails show that from the start, the "emotional injury sub-class" was conceived, nurtured and brought to maturity by Richard T. Seymour

2

and Richard T. Seymour, PLLC (collectively, "Seymour"), however poorly.   More specifically, with a deadline of June 12, 2008 for the BPSLC to furnish expert reports,  the BPSLC inexplicably began to belatedly consider pursuing "Class Mental Health Assessment and Monitoring Claims."  As late as May 11, 2008, Seymour, who claims to have "43 years of class action expertise", generated an untimely legal  "Memorandum" on this topic[2] including a discussion of the limitation on recovering for "monitoring" under LCC art. 2315. Shortly after sending that Memorandum, Seymour issued a characteristically tentative disclaimer:  "This is not at all a sure shot, because a number of courts have rejected medical-monitoring claims in the context of toxic exposures.  It seems to me a shot worth taking."[3]

Despite Seymour's self-protective and equivocal disclaimer, the BPSLC still agreed with him and quickly began contacting various mental healthcare providers to act as experts. Among these efforts,  BSPLC members/Defendants, Alan Fuchsberg/The Jacob Fuchsberg Law Firm, PLC (collectively "Fuchsberg") contacted and retained psychiatrists, Dr. Mark Townsend and Plaintiff, Dr. Richard H. Weisler, and on May 16, 2008,

---

[2]      Exhibit No. 31 (the Exhibit numbers resume from the last exhibit attached to Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment).

[3]      Exhibit No. 32

3

immediately reported to other members of the BPSLC this "good news".[4]   Months later, Fuchsberg, whose website prominently displays millions of dollars in successful verdicts, and who apparently was supposed to provide funding for the project,  would sheepishly admit to the members of the BPSLC that he had agreed from the outset to a $600.00 hourly rate for both Dr. Townsend and Dr. Weisler, but failed to provide any written guidance or a written agreement/retainer  for the project.[5]   In fact, the BPSLC would reluctantly pay Dr. Townsend his full ($52,440.00) at that rate for his limited involvement, but only close to one year later after litigation was threatened.[6]

Once Fuchsberg made the agreement with the psychiatrists on behalf of his "group of attorneys", Seymour began to immediately "micro-manage" all aspects of the project. He first vetted the credentials of the experts.[7]   Next, he hand-picked the initial representative plaintiffs,[8]   who were supposed to be "randomly" chosen according to the BPSLC

---

[4]      Exhibit No. 33.

[5]      Exhibit No. 34.

[6]      Exhibit No. 1, Affidavit of Dr. Mark Townsend, attached to Plaintiff's prior Opposition Memorandum in Response to Seymour's Motion for Summary Judgment.

[7]      Exhibit No. 35.

[8]      Exhibit No. 36.

4

pleadings. He also arranged for the initial screening/interviews[9], coordinated other mental healthcare providers[10] and arranged for the delivery of medical records through an investigator/courier, the fees for which he "personally guaranteed"[11] but never paid.   In fact, he handled all decision making associated with each major issue as they arose and took great pride in addressing each "crisis du jour."[12]

Most importantly, Seymour also directed every aspect of the drafting of the expert report.  He sent the experts instructions on following the Federal Rules of Civil Procedure[13] as well as collecting literature to support the report[14], and also sent other experts' reports as forms[15].  He made lengthy recommendations, sometimes in the middle of the night[16], often even on style and format[17].  Significantly, Seymour also requested that Dr. Weisler

---

[9]      Exhibit No. 37.

[10]     Exhibit No. 38.

[11]     Exhibit No. 39.

[12]     Exhibit No. 40.

[13]     Exhibit No. 41.

[14]     Exhibit No. 42.

[15]     Exhibit No. 43.

[16]     Exhibit No. 44

[17]     Exhibit No. 45.

post the report on an internet website so that all members of the BPSLC could provide any necessary comments and/or changes to the report before it actually issued.[18] Consequently, if there was any problem with the content of the report, it was the Defendants' own fault, particularly that of Seymour. And once the report was delivered to opposing counsel, Seymour indicated that Dr. Weisler needed to prepare for a deposition to defend the report, and that the defense had to be "bullet proof."[19]

Despite the ridiculous time constraints placed on the project by the lack of foresight, planning and communication on the part of Seymour and the other BSPLC members, Dr. Weisler and a team of multiple healthcare professionals were miraculously able to generate the report, which contained everything Seymour asked for, including diagnostic "information" which he had requested as early as May 16, 2008.[20] Significantly, Dr. Weisler had specifically advised Seymour and the other members of the BPSLC early on of the likelihood of a differential diagnoses among Seymour's chosen representatives, but the BSPLC had felt this would only enhance the validity of the report and methodology.[21] Yet only two months later in a recorded telephone conference call with Dr. Weisler, BSPLC

---

[18]     Exhibit No. 46.

[19]     Exhibit No. 47.

[20]     Exhibit No. 48.

[21]     Exhibit No. 49.

member, Karen Wiedemann, indicated on behalf of the group that they were reluctant to

pay for the report because, "It doesn't work because it leaves too many individual issues

left for the courts to decide afterwards . . . . which then defeats class certification . . . .

PTSD is, is only, ya' know, an individualized diagnosis. . . . Individualized diagnoses don't

win themselves class certification."[22]

Oddly, just days before that conference call, Seymour was still trying to defend his

"baby" as well as Dr. Weisler with the newly involved Khorammi firm which had agreed to

bank-roll the litigation, but had ignored Seymour's legal analysis and 43 years of expertise.

Nevertheless, Seymour was still adamant that the chances of establishing that "sub-class"

were good.[23]  Seymour also defended Dr. Weisler and the report:

> There is no question in any of our minds that Dr. Weisler
> needs good preparation for his testimony.  The timing allowed
> virtually no time to refine and reshape the report, ***but it is still***
> ***useful for us***. . . .  Dr. Weisler and his team spent their time
> and effort building and field-testing on 11 persons a model for
> the evaluation of large numbers of people, using scales that
> can be administered to these persons and that enable them to
> sort class members into groups that seem to have suffered no
> injury, suffered injury but have already wholly or largely
> recovered from it, or suffered injury and have ongoing
> problems of PTSD or other mental distress.  The latter would
> be the larger-value claims, and can be tried individually as part

---

[22]     Exhibit No. 50, Transcript of recorded telephone conversation (9/15/08), p. 16.

[23]     Exhibit No. 51.

of the overall class structure.[24]

But the BSPLC had to accede to the Khorammi firm, as the BSPLC lacked independent funding.  Oddly, the Khorammi firm was still going to use Dr. Weisler's report, but refused to pay for it.  In fact, as Khorammi stated, "if we are not relying on the report, we are going to have trouble because of that."[25]  Equally odd is the fact that the BPSLC continued to list Dr. Weisler as an expert witness as late as November 2008[26] and offered to produce Dr. Weisler for a deposition while still refusing to pay him.[27]

Once the Khorammi firm abandoned the project, the BSPLC did not need the report, only a psychiatrist who would be able to testify for individual claimants.  They eventually chose Dr. Townsend to whom they owed much less, but he likewise demanded full payment, although the BSPLC had no money. The following year, in February 2009 the BSPLC found the money to pay Dr. Townsend in full, and then Seymour volunteered to come up with bogus reasons for not paying Dr. Weisler or any of the other mental healthcare providers who worked around the clock generating the report.

---

[24]     Exhibit No. 52 (emphasis added).

[25]     Exhibit No. 53.

[26]     Exhibit No. 54.

[27]     *See* Plaintiff's Witness & Exhibit List on Barge Case (11/20/08).

8

## II.  <u>FABRICATED BILLING ISSUES</u>

Over three years have passed since Dr. Weisler delivered his comprehensive report on July 1, 2008, after which Dr. Weisler was told to continue working until August 12, 2008. At present, Seymour continues to create specious billing issues as a way of avoiding payment for Dr. Weisler's invoices.  Seymour's improper actions began as early as August, 2008, when Fuchsberg sheepishly revealed he had agreed to the $600.00 rate and Seymour replied, "Blast! There goes a good argument."[28]

Seymour's rationale for non-payment constantly evolves.  A good example is his rationale for not paying the investigator/courier, Ronnie Montgomery. On May 28, 2008, Seymour had e-mailed Mr. Montgomery directly, stating:

> Ronnie, this is to confirm the statement I just gave you on the phone.  I've asked for approval to hire you to get the medical records at $55.00 an hour and .50 cents a mile and actual charges for the records.
>
> To enable you to start, ***I will personally guarantee your fees and expenses*** until then unless I hear otherwise from co-counsel.  My contact information is below.
>
> Please contact Jill Hayes, Mark Townsend (on his way to Phoenix right now) and their staff so you can get started.

---

[28]      Exhibit No. 55.

Rick Seymour.[29]  (Emphasis added)

There is no question that Seymour "personally guaranteed" his payment and there was no requirement for BSPLC approval or any dollar limit.  In fact, in September, 2008, Seymour again acknowledged he had personally guaranteed Mr. Montgomery's fees.[30]  But when Mr. Montgomery sent his invoice for $1,656.00[31] addressed to Seymour on September 8, 2008, Seymour ignored it.

More recently, at the time of Dr. Weisler's deposition, Seymour claimed that Mr. Montgomery's expenses were only $200.00[32], which Seymour claims was not approved by the BSPLC.[33]  Now, in his "Declaration", Seymour suggests that the amount was $300.00,[34] and Seymour's excuse for not paying this invoice is that it was not approved or that he supposedly never received it.[35]  He gives no explanation for why he never communicated

---

[29]     Exhibit No. 56.

[30]     Exhibit No.57.

[31]     Exhibit No. 58.

[32]     Exhibit No. 59 Deposition of Dr. Richard H. Weisler, p. 183.

[33]     Deposition of Dr. Richard H. Weisler, p. 184-185.

[34]     Declaration, p. 8, No. 37.

[35]     *Id.*

with Mr. Montgomery to pay the guaranteed bill whatever it was.  It is most curious that the invoice is addressed to Seymour's office, and Seymour confirms he absolutely guaranteed payment on the invoice yet with the invoice in hand now, Seymour has still not paid it. Similarly, Seymour still has no explanation for why the BSPLC refuses to pay the $37,000.00 owed to Dr. Phillip Griffin, Dr. Howard Osofsky, and Dr. Joy Osofsky, whose invoices the BSPLC has had for some time, as Seymour acknowledged in July and September, 2008.[36]

Significantly, while all the while encouraging the project team to move forward, the BSPLC never revealed to the mental healthcare providers that the BSPLC had no money. As Seymour told the BSPLC internally in June 2008:

> I keep hearing from the medical experts that they need Jill Hayes to get paid, so they can get her input, and I get the sense they are worried that they won't have her input.
>
> How much was her first interim statement for?  Can that be paid right away?
>
> If the account is flat, is there someway to funnel some more money in?  I personally guaranteed Ronnie Montgomery's fees, so he could get the medical records to the doctors in time for their report, and never heard from anyone NOLA that it would be covered by the Barge PSLC.  It had to be done, so I did it. When I get his bill, absent some NOLA acceptance of it, I'll send the bill with a check to the Barge PSLC and it can

---

[36]     Exhibit No. 60.

be paid from the check I send.

Can someone take care of Hayes?  Is the situation is that we can't pay her from the account?

Rick.[37]

The BSPLC never revealed their lack of funds to any of the mental healthcare providers.  As BSPLC 's member, Karen Wiedemann, e-mailed Seymour:

Rick, I trust that you received the statement from Jill.  Her bill is around $6,600.00.  ***I would love to tell you I have the money . . . but I don't.***  What I'm spending now is remaining amount of funds that Wilson & Druker advanced two weeks ago.  I have been using that money to pay salaries (Mark, Carrie and Edward), postage, transportation costs and incidentals (like the hard drive we had to buy to send stuff to Marino).  I wish I had an answer, but I am afraid all I have is a stack of bills.

Karen.[38] (Emphasis added)

In Seymour's recent Opposition Memorandum and accompanying "Declaration", Seymour attempts to falsely suggest that he repeatedly reminded the mental healthcare that funding was an issue.[39]  If that were true, which it isn't, Seymour would have been able

---

[37]      Exhibit No. 61.

[38]      Exhibit No. 62.

[39]      *See*, "Declaration" at pp. 7-10.

12

to show at least one e-mail he had sent telling the mental healthcare providers that funding was an issue. Had he done so, no doubt the project would have come to a screeching halt. Instead, the members of the BSPLC, particularly Seymour and Fuchsberg, deliberately concealed the BSPLC's lack of funds and continued to encourage Dr. Weisler, Dr. Townsend and the other mental healthcare providers to continue working on the project. The only e-mail Seymour has been able to produce to date related to cost controls, was one e-mail from Fuchsberg, when Fuchsberg retained the *fifth* and *sixth* mental health professionals for the project team, and mentions as an aside to "watch our costs," although at the same time he told the new members of the project team to do "what is needed."[40]

The reality was, neither Seymour nor Fuchsberg made any attempt to control costs. They simply waited for the delivery of Seymour's "baby" on the extended due date of July 1, 2008. This would be revealed months later and toward the beginning of August, 2008 in what was a "Who's on first?" moment when Seymour confirmed to the BSPLC that neither Seymour nor Fuchsberg executed any type of written contract or budget for the project:

> Alan, Dr. Weisler submitted his invoice today for $216,390.00 at $600.00 an hour, and it is fair to say that the amount is a shock. It is about five times what Mark Townsend charged, and twice his rate. When you were discussing the case with

---

[40]     Exhibit No. 63.

13

him or e-mailing with him, was there a retainer or a budget?  If so, please send it is us.

Did you ever have a discussion with him about the rate or about the need to keep expenses low?   If that was memorialized in an e-mail or letter, please send it to us. This is a huge problem, and we need to make sure we are on top of the facts before the NOLA people and/or I talk to Dr. Weisler about a major adjustment.

Rick.[41]

Shortly thereafter, Fuchsberg responded indicating, "we did not cap his time or the cost of the project."[42]   Fuchsberg further clarified by indicating that, "there was no agreement except that he indicated that his hourly rate was $600.00,"[43] which was the same rate Dr. Townsend charged.   Eventually, Defendant, Brian Gilbert, would confirm that Dr. Weisler had done everything he was supposed to do and that the dispute was simply about his fees which after Fuchsberg "bailed" on the project they couldn't afford:

It is entirely unrealistic and fundamentally wrong to suggest or believe that we can simply tell Weisler 'P_ _ _ off, you get nothing.'   *Whether we are satisfied with the result or not, he did what we considered to be the proper approach to emotional damages*. We don't agree with his fees, but we

---

[41]     Exhibit No. 64.

[42]     Exhibit No. 34.

[43]     *Id.*

14

> assume risk anytime we engage an expert, that the expert will reach conclusions we don't like, or that we later second - guess.[44]  (Emphasis added)

Consequently, there is no question that Dr. Weisler did what he was supposed to do.  It is apparent by the Defendants' own admissions, that their failure to pay him **anything** constitutes a breach of their contract with him.  The Defendants also admit the $600.00 hourly rate.  Consequently, there is absolutely no factual or legal basis whatsoever for any "counter-claim".  The analysis of the Defendants' continuing wrongful conduct turns on what the Defendants **did** pay and **didn't** pay, and why.

First, the Defendants paid psychologist, Dr. Jill Hayes, $21,108.97 in fees based upon a $350.00 hourly rate.  Dr. Hayes only provided psychological testing for **just one representative plaintiff**!  She presented three invoices with little detail, no contemporaneous backup, and no beginning or end time for time entries and no reference to "interruptions".  Seymour claims that Dr. Weisler's invoices should have met all three of these requirements based upon his 43 years of experience.[45]  But the BSPLC did not blink an eye and **immediately** paid her three invoices, just to get her report.

In the case of Dr. Townsend, neither of his invoices have any backup or

---

[44]   Exhibit No. 65.

[45]   *See* Declaration, pp. 15-17.

15

contemporaneous time documentation nor do they have any beginning or end time or indications of "interruptions." Yet, the BSPLC paid Dr. Townsend in full, i.e. $52,440.00 at a rate of $600.00 per hour, for his limited involvement. But this was only in February 2009, after he threatened litigation and the Defendants needed an expert witness to testify for some of the individual claimants. Coupling Seymour's false billing issues with the fact that Dr. Weisler provided exactly what Seymour asked for establishes the Defendants' breach of contract and the lack of merit behind their counter-claim. Dr. Weisler is therefore entitled to partial summary judgment on these bases.

It should also be noted that Seymour's *legal* analysis on billing issues is also fundamentally flawed. It appears that Seymour somehow conflates the concepts of damages due for breach of contract with the assessment or taxing of court costs. Seymour cites numerous cases related to standards various courts have used to "fix costs" for experts when those costs are sought from Defendants in class actions. This is not such a case; this matter involves the Defendants' breach of contract for professional services where Seymour and Fuchsberg provided no budget, but did agree to a $600.00 hourly rate. In Louisiana, different tests are used for fixing or taxing costs as opposed to what might be due by attorneys who retain experts and breach that contract for professional services.[46]

---

[46]     *See,* e.g., *Penton v. Healy*, 2003-0614 (La. App. 4 Cir. 12/17/03), 883 So.2d 684, 690; *Smith v. Roussel*, 2000-1672 (La. App. 1 Cir. 6/22/03) 808, So2d 726, 730.

Seymour apparently misunderstood the law and suggested in the recorded telephone conversation on September 19, 2008 that unless the experts' costs are ruled reimbursable in the class action, the BSPLC would not pay them.[47]   In any event, Seymour misunderstood the law and all of the jurisprudence cited by Seymour is inapplicable.

## III.   THE SEYMOUR "DECLARATION"

Seymour has now submitted yet another "Declaration", much like the Declaration of the younger Seymour, his son, the "paralegal", whose analysis was limited to noting that Dr. Weisler did not attach small "Post-It-notes" for each and every time entry he had in his invoice.  The younger Seymour also failed to note that none of the other mental health professionals provided *any* "Post-Its" or contemporaneous time support.  He also ignored Dr. Weisler's detailed entries and narrative describing what he did.

This aside, it appears that Seymour's newest "Declaration" is simply a reiteration of the "hatchet- job" correspondence he sent on February 8, 2009, months after the BSPLC had accepted Dr. Weisler's report, praised it, gave it to counsel for the Barge Defendants and then told Dr. Weisler to prepare for a "bullet proof" defense of the report in a deposition they were to schedule, initially on August 14, 2008.  In any event, Seymour's latest "Declaration" ignores his own contemporaneous e-mails which actually belie nearly all of

---

[47]        Exhibit No. 50, pp. 5, 12.

what he asserts.  In fact, Seymour principally relies on Seymour's own "beliefs" as to what he might have said as created three years after the fact to exculpate himself.  These "beliefs" as well as his factual assertions are false.

For instance, under Section E. Personal Liability he states: "26.  I did not ever agree to become personally liable for any debt contracted in my law practice."  Yet on May 28, 2008, he informed Ronnie Montgomery that, "To enable you to start, I will personally guaranty your fees and expenses . . .."[48]  Similarly, in an e-mail addressed to Fuchsberg entitled **"Includes Personal Guarantee Info, Financing Interest Rate in Bullet 9, and Info on My Bill",** Seymour states:

> I also want to respond further to a question you asked last week about the new arrangements.  The NOLA firms and I have all signed agreements under ***which we are personally liable, alongside our firms, to repay all funds advanced for case expense.***[49]  (Emphasis added)

Next, under the heading, "F.  Discussions With The Medical Team About Keeping Cost Down.", Seymour falsely asserts that he told the project team to be mindful of costs. If this were evenly remotely true, it conflicts with the fact that the BSPLC then retained three psychiatrists and three psychologists who were told to work around the clock

---

[48]     Exhibit No. 56.

[49]     Exhibit No. 66.

18

because of the report deadline the BSPLC failed to anticipate. Seymour then states that to save costs   Dr. Townsend suggested on May 18, 2008 that a company called "FirmLogic" should be brought into the project, to reduce clerical costs, Seymour attempts to falsely suggest that this "could not be justified in light of our limited resources."[50]  The reality is that Seymour simply failed to respond to Dr. Townsend's inquiry on FirmLogic which was raised once again on June 28, 2008, since Dr. Townsend had never received a reply from Seymour. Moreover, when Seymour finally replied, he made absolutely no mention of finances, stating only:

> I do not understand what but complication and chance for error would arise from injecting a new person or persons at this state.  Do you know what you considered and relied upon, and would have tp spend time teaching someone else who knows nothing of the case or your work so far.  What is needed is from "1 to X" paragraphs addressing each of the questions, saying what you did, and what you have so far concluded. Sending a paralegal to North Carolina or hiring a company at this stage sounds unworkable.  Misstatements might creep inadvertently.

> You have the substance, and just need to organize it to address the questions.[51]

Consequently, Seymour's costs assertion is completely false.  Seymour would later

---

[50]     Declaration, pp. 7-8, No. 34-36.

[51]     Exhibit No. 67.

admit that "it would have probably reduced the overall cost of the project."[52]   Moreover, FirmLogic had nothing to do with "ghost writing" as Seymour attempts to improperly suggest which is yet another false statement.

Next, Seymour asserts in Statement No. 37, that as regards the amount of Montgomery's fees, the amount they estimated for the cost would be about $300.00." This is false.   As Seymour's contemporaneous e-mails to Mr. Montgomery reflect, he "personally guaranteed" Mr. Montgomery's billing rates of $50.00 per hour and .50 cent per mile with and open-ended e-mail on May 28, 2008.[53]   There is absolutely no mention in any e-mail to any of the expert team for the project that there was a limitation on deliveries and/or Mr. Montgomery's expenses.   This, like the rest of the project, was open-ended with no budget, and Seymour's statements to the contrary are simply false.

Seymour then states:

> No. 51.   In my experience, it normally costs somewhere between $5,000.00 and $10,000.00 a person to have a full ***diagnostic*** report, excluding deposition preparation and attendance, and trial preparation and attendance.   (emphasis added).

Oddly, Seymour forgets that he stated earlier in the same "Declaration" that:

---

[52]   Exhibit No. 68.

[53]   Exhibit No. 56.

20

> 17.   It was never part of Barge co-counsel's plan to prepare a complete ***diagnosis*** of the persons with whom the medical expert or experts met . . ..   (Emphasis added)

Instead, Dr. Weisler and the other members of the project team were told to simply do what Seymour directed, and create the massive report Seymour wanted.  They did.

Equally inconsistent is the fact that Seymour's estimate of "$5,000.00 and $10,000.00 a person" is totally inconsistent with the $21,108.97 the BSPLC paid to Dr. Jill Hayes for a limited psychological evaluation (not a full fledged diagnostic report) for ***just one claimant***.  Simply stated, Seymour's fictional estimates are fabricated after the fact.

Seymour then compounds the impropriety of the situation by attempting to suggest in Item No. 57 that "plaintiff did not e-mail, fax or mail" the Attachment 16 to his report which set forth his billings at that time.  In reality, because of its enormous size, this was sent on a CD to BSPLC member/Defendant, Brian Gilbert, as confirmed in an e-mail on which Seymour was copied.[54]   Presumably, Gilbert  would have provided or made available the CD to other members of the BSPLC since they had to provide same to opposing counsel for the Barge Defendants.  Once again, Seymour attempts to distance himself from all of the outstanding invoices, claiming he never received them, even though

---

[54]        Exhibit No. 69.

notice of same went directly to him.

Seymour then boldly attempts to suggest that Dr. Weisler was at fault for his alleged "failure to keep starting and ending times, and failure to record interruptions." This assertion improperly suggests that there was any requirement for Dr. Weisler to follow such procedures. Not one of the other mental health professionals, paid or unpaid, followed such a practice. This is a deliberate effort on the part of Seymour to improperly divert the Court's attention away from the fact that both Fuchsberg and Seymour were inept in their failure to obtain a written agreement, a budget, a retainer agreement or provide any type of documented guidelines for what the project team was supposed to do.

In addition, Dr. Weisler provided multiple detailed invoices and a narrative summary to explain each and every one of his efforts. This is completely contrary to Seymour's unsubstantiated statements such as: "101. I do not believe any member of the Barge counsel would have agreed to retain Plaintiff as an expert if he had disclosed that he would charge so much money without any support time records." This is a false statement, as Seymour wanted his report, no matter what it cost, despite the fact that the BSPLC had no funds to pay for the report.

Seymour then says: "102. I informed Plaintiff, that, as the testifying expert, he needed to be generally familiar with what the other persons working on the project were doing." This is false. As Seymour made clear to the other members of the BSPLC, Dr.

Weisler had to be able to provide a "bullet-proof" defense of the report at a deposition and had to prepare accordingly.[55]  In addition, as Dr. Townsend made clear in his Affidavit, it was necessary for Dr. Weisler to read all of the articles which were referenced and/or attached to the report. In addition, Dr. Weisler and Dr. Townsend were both encouraged to contact other colleagues repeatedly throughout the project, as their e-mails seeking authorization reflect.[56]  Seymour's statements to the contrary are completely false.

Seymour then states:

> 113.  Plaintiff did not produce the text of these e-mails in his initial disclosures or in discovery.  Plaintiff refused to provide the text of these e-mails at 114.  Without the text of the e-mails, it is impossible for Defendants determining(sic) whether all or any of the time spent in communications with the medical team or with the "consultants" or with persons unknown like Alex Crosby, more reasonably within the scope of the task assigned or instead, Plaintiff's frolic and not probably chargeable to the case."

This is completely false.  Dr. Weisler provided all of his e-mails which he had carefully preserved in his initial disclosures in a CD to opposing counsel representing the BPSLC, Robert Rainey.  Consequently, this statement is not only false, it is Seymour's own fault and neglect that kept him from properly analyzing Dr. Weisler's e-mails.  Likewise,

---

[55]     Exhibit No. 47.

[56]     *See*, e.g. Exhibit No. 70.

Seymour attempts to criticize Dr. Weisler's charging for reviewing tens of thousands of pages of articles he needed to prepare for his deposition, all of which were listed in his report and provided under separate CD. Seymour attempts to falsely accuse Dr. Weisler of not providing these documents when they *were* provided if he simply looked at them or requested them from the BSPLC.  Dr. Weisler also made them available at his office.

Lastly, Seymour suggests the supposed "Poor Quality of the Report" and states: "147.  Plaintiff's deposition was cancelled after Barge counsel conferred and decided that there was no plausible scenario on which the testimony of Plaintiff and his report could be used to advance to the Court a sub-class for emotional distress."  He also falsely suggests that the report was, "useless in this litigation.  Barge counsel did not 'accept' this report and work."

This is also completely false.  Defendants, Seymour, Fuchsberg and Gilbert all have issued e-mails confirming the usefulness of the report.[57]  The reality is that Dr. Weisler was not used because the Khorammi firm found Seymour's legal analysis to be flawed and thus, chose not to go forward with the emotional injury sub-class.

In sum, Dr. Weisler submits that Seymour should be sanctioned under Rule 11 of the Federal Rules of Civil Procedure for making these false and misleading "Declarations."

---

[57]        Exhibit No. 52, 69 and 71.

24

## **CONCLUSION**

Based on the foregoing, Dr. Weisler submits that his Motion for Partial Summary Judgment should be granted on the issues of (1) the Defendants' breach of contract; (2) the dismissal of the Defendants' Counter-Claim; and, (3) on the issue of the existence of an "Open Account" addressed in the original Memorandum in Support of this Motion.

Respectfully submitted,

    /s/ Andrew C. Wilson
Daniel J. Caruso (3941)
Andrew C. Wilson (01162)
Susan F. Clade (1033)
Christopher B. Conley (31674)
SIMON, PERAGINE, SMITH & REDFEARN, L.L.P.
30th Floor - Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone (504) 569-2030
Facsimile (504) 569-2999
Attorneys for Plaintiff, Richard H. Weisler, M.D.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 1, 2011, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

    /s/ Andrew C. Wilson

N:\DATA\N\50182001\Pleadings\Memo in Support of Reply Memorandum.wpd