LAW OFFICE OF RICHARD T. SEYMOUR, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C. 20036-4129
E-Mail: rick@rickseymourlaw.net

Voice: 202-862-4320        Fax: 800-805-1065        Cell: 202-549-1454

May 11, 2008

# CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT

# MEMORANDUM

To:     Katrina Barge Team

From:   Rick Seymour

Re:     **Barge Cases: Class Mental-Health Assessment and Monitoring Claims**

**Table of Contents**

A.  Summary of the Question .................................................................................. 1
B.  Lousiana Civil Code Art. 2315 ........................................................................... 2
C.  Federal Appellate Classes Approving Class Certification for Medical Monitoring Claims ................................................................................................................. 2
D.  Federal Appellate Classes Approving or Speaking Favorably of Class Certification .... 3
E.  Federal Appellate Cases Rejecting Class Certification ...................................... 9
F.  Federal Appellate Cases Referring to Medical-Monitoring Class Settlements ............ 17
G.  ALR 5th Article from 1994 ................................................................................ 17

A.  **Summary of the Question**

A number of the resources NOLA Larry sent to the team suggested medical / psychological / psychiatric support for the proposition that emotional distress is common after a mass disaster. They generally recommend that mental health assessments be made and treatment be made available. The cynic may say that a lot of such recommendations are merely special-interest pleas for funding, but the scope and scale of what Katrina did should put us above that.

The Sixth Corrected Amended and Supplemental Complaint includes in the Prayer:

A. Past and future mental pain, suffering and anguish;

B. Past and future mental health care expense;

PRIVILEGED AND CONFIDENTIAL        BargePSLCWeisSeym000054

**Exhibit 31**

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 2 of 18 —

*     *     *

We have not asked for a current assessment, but need to do so because of the 1999 amendment to Louisiana Civil Code Article 2315, discussed below.

B.   <u>Lousiana Civil Code Art. 2315</u>

The Civil Code limits recovery for monitoring unless it is "directly related to a manifest physical or mental injury or disease." The Article says:

> A. Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
>
> B. Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person. Damages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease. Damages shall include any sales taxes paid by the owner on the repair or replacement of the property damaged.

The limitation bars such a future recovery without an individual showing, but does not seem to bar an order requiring a losing defendant to pay for a screening to establish present evaluations that may lay such a basis, where the nature of the wrong is that present problems are probable. As NOLA Larry said, this is a stretch, but so was Katrina.

The limitation was enacted in 1999. Its existence implies that there is a cause of action on Louisiana for monitoring and future mental-health treatment where the condition of the limitation is met.

The mental-health expert has to address the issues raised by the limitation.

C.   <u>Federal Appellate Classes Approving Class Certification for Medical Monitoring Claims</u>

I did a WestLaw search for "medical monitoring" in connection with class, and a Locate search for "class /s certif.!" over the past decade.

1. *Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004), *cert. denied*, 545 U.S. 1152 (2005), held that the lower court did not abuse its discretion in certifying a class that sought medical monitoring in addition to other relief. The court described the prayer at 498: "The plaintiffs seek compensatory damages for physical and mental illnesses caused by the pollution and for the purchase of equipment to clean and remove emitted substances from their property. The plaintiffs also seek exemplary and punitive damages, as well as an injunction requiring

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 3 of 18 —

Lafarge to: (a) fund a medical monitoring program (Count I); (b) repair any damage to the plaintiffs' property; (c) improve the operation of the plant to eliminate emissions; and (d) refrain from allowing emitted substances to be deposited on the plaintiffs' property." The court did not focus on the claim in its discussion of class certification, other than to say at 510:

> Similarly, we find *Reilly v. Gould Incorporated*, 965 F.Supp. 588 (M.D.Pa.1997) to be distinguishable. In that case, the defendant's plant had been closed for more than ten years before the plaintiffs brought suit. *Id.* at 593-94. Therefore, the plaintiffs were not seeking any common injunctive relief (other than a constructive trust for medical monitoring which, at best, is quasi-equitable in nature).[FN7] *Id.* In contrast, in the present case, the defendant's plant is still operating and the plaintiffs are asking the court to enter a permanent injunction enjoining the defendant from polluting-a conflict particularly suitable for class action adjudication.
>
> FN7. A number of courts have treated requests for medical monitoring as a form of damage relief. *See, e.g., Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir.2001); *Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520 (N.D.Ill.1998); *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473 (D.C.Colo.1998); *O'Connor v. Boeing North American, Inc.*, 180 F.R.D. 359 (C.D.Cal.1997); *Arch v. Am. Tobacco Co.*, 175 F.R.D. 469 (E.D.Pa.1997); *Harding v. Tambrands, Inc.*, 165 F.R.D. 623 (D.Kan.1996); *Thomas v. FAG Bearings Corp.*, 846 F.Supp. 1400 (W.D.Mo.1994).

### D. Federal Appellate Classes Approving or Speaking Favorably of Class Certification

2. *Sutton v. St. Jude Medical S.C., Inc.*, 419 F.3d 568 (6th Cir. 2005), reversed the lower court's Rule 12(b)(6) decision dismissing the case for lack of standing, so the class certification issues had not been reached yet. As to standing, the court said:

**B. Standing under Article III**

[2] Sutton brings suit on behalf of a class of as-of-yet uninjured device implantees. In order to satisfy the standing requirements of Article III of the Constitution, Sutton must meet three requirements. Failure to establish any one of them deprives a federal court of jurisdiction to hear the suit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, Sutton must demonstrate he has suffered "an 'injury in fact' that is both concrete and particularized and actual or imminent." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Lujan*, 504 U.S. at 560-61, 112 S.Ct. 2130). Second, the injury must be fairly traceable to the challenged action of St. Jude. *Id.* Finally, Sutton must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 4 of 18 —

[3] [4] The Article III standing requirements apply equally to class actions. The class representative must allege an individual, personal injury in order to seek relief on behalf of himself or any other member of the class. *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Sutton's general factual allegations may be sufficient to show standing when assessing the issue on a motion to dismiss. *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. The court must accept as true all such allegations contained in the complaint and must construe the complaint in favor of Sutton. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Greater Cincinnati Coalition for the Homeless v. City of Cincinnati,* 56 F.3d 710, 716 (6th Cir.1995) (citing *Gladstone, Realtors v. Vill. of Bellwood,* 441 U.S. 91, 109, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)).

**C. Standing Based Upon Increased Risk of Future Harm**

Sutton makes three main factual allegations in his complaint: (1) the device is defective and unreasonably dangerous; (2) implantation of the device puts Sutton and class members at a substantially greater risk for developing restenosis and occlusion of the bypass graft; and (3) this increased risk necessitates both current and future medical testing and monitoring. *571 The district court found Sutton's alleged injury "purely hypothetical" because he did "not provide[ ] the Court with any information from which to assess his allegedly increased risk of harm from implantation of the aortic connector." *Sutton v. St. Jude Med., Inc.,* 292 F.Supp.2d 1005, 1008-09 (W.D.Tenn.2003). The thrust of the district court's decision was that Sutton failed to establish a sufficient risk of harm associated with the device to survive dismissal for lack of standing. We find the district court incorrectly attempted to evaluate the merits of Sutton's contention that he is entitled to medical monitoring costs. During the threshold standing inquiry, the district court should have accepted Sutton's allegations as true and construed the complaint in Sutton's favor. *See Greater Cincinnati Coalition for the Homeless,* 56 F.3d at 716.

[5] Sutton argues that exposure to an increased risk of disease has been recognized by federal courts as an injury in fact sufficient to confer Article III standing. He likens exposure to the device to exposure to toxins such as nuclear emissions and asbestos. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 73-74, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (finding standing where plaintiffs had not yet manifested any physical injury as a result of exposure to nuclear emission); *Carlough v. Amchem Prod., Inc.* 834 F.Supp. 1437, 1454 (E.D.Pa.1993) (conferring standing from mere exposure to asbestos). The district court correctly stated that the device presently at issue differs from toxic substances in that the device provides a medical benefit to individuals "exposed" to it. The district court also properly noted that medical devices can be beneficial for some users while causing complications in others. For purposes of standing however, we hold the differences between exposure to toxic substances and allegedly defective products are immaterial.

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 5 of 18 —

In recent years, tort plaintiffs have increasingly sought, and have regularly been awarded, medical monitoring costs in both toxic tort and product liability cases. *See* Arvin Maskin, *et al., Medical Monitoring: A Viable Remedy for Deserving Plaintiffs or Tort Law's Most Expensive Consolation Prize?*, 27 Wm. Mitchell L.Rev. 521, 522 (2000) (citing *Day v. NLO*, 851 F.Supp. 869, 876 (S.D.Ohio 1994); *Bower v. Westinghouse Elec. Co.*, 206 W.Va. 133, 522 S.E.2d 424, 427 (1999)). A medical monitoring award aids presently healthy plaintiffs who have been exposed to an increased risk of future harm to detect and treat any resultant harm at an early stage. *Ayers v. Jackson Township*, 106 N.J. 557, 525 A.2d 287, 308 (1987).

The question of whether an increased risk of harm requiring current medical monitoring is a sufficient injury in fact to confer standing is one of first impression in this Circuit. The main basis found in the case law for allowing such claims to proceed is *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816 (D.C.Cir.1984). *Friends for All Children* concerned a tort action on behalf of Vietnamese orphans for injuries suffered in an aviation accident in Vietnam in 1975. The court found a sufficient injury in fact for "approximately forty adopted Vietnamese children living in France fac[ing] irreparable injury unless they promptly obtained diagnostic examinations ...." 746 F.2d at 816. After finding the plaintiffs had standing to pursue their claim, the *Friends for All Children* court upheld the district court's decision ordering Lockheed to establish a fund to pay for medical monitoring of the children placed at risk by the incident. The court then went on to address whether the tort law of the District of Columbia encompassed a cause of action *572 for diagnostic examinations in the absence of proof of actual injury.[FN3] *Id.*

FN3. A district court case from this Circuit has extensively discussed the issue of which states' laws allow for such actions. *See In re Telectronics Pacing Sys., Inc.*, 168 F.R.D. 203 (S.D.Ohio 1996) (noting that plaintiffs in a cause of action for medical monitoring costs do not have to prove a present, physical injury in Colorado, the District of Columbia, Kansas, Kentucky, New York, Pennsylvania, Utah, Washington, and Guam. Physical injury must be shown in Delaware, Virginia, West Virginia, and the Virgin Islands). *In re Telectronics,* and all of the cases cited therein, found a sufficient injury in fact.

A distinguishing feature of *Friends for All Children,* 746 F.2d 816, is that an irreparable injury immediately confronted the plaintiffs as a result of the airplane accident. While this same immediacy cannot be imputed to Sutton's proposed class of plaintiffs, we see no reason to require it to confer standing. Nor do we see fit to deny standing to Sutton and other class members because of any differences between exposure to toxins and implantation of purportedly beneficial medical devices. A defective medical device embedded in an individual's body can pose just as serious a threat as exposure to toxic substances. Indeed, such devices may be even more dangerous given the fact that an individual with such an implant will continuously be exposed to its increased risks.

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 6 of 18 —

The Third Circuit considered medical monitoring in *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829 (3d Cir.1990). *Paoli* held that a cause of action for medical monitoring is cognizable in Pennsylvania in order to cover the cost of periodic medical examinations. These examinations were needed to protect against exacerbation of latent diseases brought about by exposure to hazardous substances. The *Paoli* court delineated the difference between medical monitoring claims and damages claims involving an increased risk of harm without a present physical injury. *Id.* at 849-51. *Paoli* couches the discussion by considering medical monitoring a tort in and of itself, as opposed to a remedy for the underlying tort of exposure to an increased risk of future harm. The court noted that "[m]edical monitoring is one of a growing number of non-traditional torts that have developed in the common law ...." *Id.* at 849. Comparing a claim for medical monitoring to a claim for damages based on the enhanced risk, the court stated, "an action for medical monitoring seeks to recover only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm, whereas an enhanced risk claim seeks compensation for the anticipated harm itself, proportionately reduced to reflect the chance that it will not occur." *Id.* at 850.

While we consider the distinction set forth in *Paoli* helpful, we note that medical monitoring is more properly considered one of a number of possible remedies to an underlying tort, rather than a separately actionable tort. *See* Andrew R. Klein, *Rethinking Medical Monitoring*, 64 Brook. L.Rev. 1, 10-11 (1998) (challenging the propriety of construing the cases as creating a unique cause of action and arguing in favor of the notion that medical monitoring "simply describes a potential remedy in established tort actions."). Instead of "[t]he injury in an enhanced risk claim [being] the anticipated harm itself" and "[t]he injury in a medical monitoring claim [being] the cost of the medical care that will, one hopes, detect that injury", *Paoli*, 916 F.2d at 850, we think it more accurate to find the increased risk of future harm is the injury in both types of cases. The difference lies in the remedy sought by the plaintiff. Based on the particular remedy a plaintiff chooses to seek, her burden of proof will vary. *See id.* (noting that proving*573 monetary damages "is inherently speculative because courts are forced to anticipate the probability of future injury" while proving the need for medical monitoring "is much less speculative because the issue for the jury is the less conjectural question of whether the plaintiff needs medical surveillance.").

In *Metro-North Commuter Railroad v. Buckley* considered a medical monitoring claim in the context of exposure to asbestos. 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997). The Court held that the plaintiff could not recover medical monitoring costs in a Federal Employers' Liability Act case, finding a lack of "sufficient support in the common law." *Id.* at 444, 117 S.Ct. 2113. Importantly, *Metro-North* does not address standing, which by implication strongly suggests that the plaintiff, in fact, had standing to pursue medical monitoring costs.[FN4]

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 7 of 18 —

> FN4. *Metro-North* also supports our framing of medical monitoring as a remedy rather than a separate tort. 521 U.S. at 443, 117 S.Ct. 2113 ("we are ... troubled ... by the potential systemic effects of creating a new, full-blown, tort law cause of action ....").

    Two district courts in other Circuits have considered the issue of standing in increased risk of future harm cases, and have answered the inquiry in the affirmative. *See In re St. Jude Med., Inc.,* No. MDL 01-1396 JRT FLN, 2003 WL 1589527 (D.Minn. Mar.27, 2003) (" *In re St. Jude* "); *In re Propulsid Prod. Liab. Litig.,* 208 F.R.D. 133, 139 (E.D.La.2002) (" *In re Propulsid* "). *In re St. Jude Medical, Inc.* presented a plaintiff requesting medical monitoring for side effects from implanted heart valves manufactured by St. Jude. St. Jude recalled all of the un-implanted heart valves at issue. Scientific findings revealed that these valves caused a two percent occurrence of paravalvular leak, as compared to a 0.25 percent occurrence in conventional heart valves. 2003 WL 1589527 at *1. In addition to the voluntary recall, St. Jude "immediately notified hospitals and physicians, instructing them not to use [the] products. [Defendant] also sent letters regarding the care and management of patients with implanted ... valves, and established a reimbursement program to pay for uninsured medical costs associated with the detection, diagnosis and treatment of paravalvular leak." *Id.* The plaintiff sought certification of a class of individuals who had received the valve implants, but who had not suffered any injurious side effects. *Id.* at *2. The relief requested was the establishment of a medical monitoring program that would watch for side effects associated with defective heart valves. *Id.* In support of the requested relief, the plaintiff provided ample medical evidence documenting the potential complications caused by the valve and its possible long-term consequences. *Id.* at *11. Though the court in *In re St. Jude* did not specifically address whether the plaintiff had standing, by reaching the merits of the plaintiff's claims it clearly found a sufficient injury in fact to confer Article III standing.[FN5]

> FN5. While we have included the particular factual findings of the district court in our discussion of the *In re St. Jude* decision, we again note that specific evidence of the alleged increased risk of harm is not a requirement to confer standing.

    *In re Propulsid* found that a plaintiff who had previously used a heartburn drug causing irregular heartbeats in some users, but who had not herself developed any such injury, had alleged a sufficient injury in fact based on the increased risk of harm. The court stated a broad standard for demonstrating injury in fact: "plaintiff has satisfied her burden of establishing this element [injury in fact] because the courts have long recognized that an *574 increased risk of harm, which the plaintiff alleges, is an injury-in-fact." *In re Propulsid,* 208 F.R.D. at 139 (citing *Friends for All Children,* 746 F.2d 816; *Paoli,* 916 F.2d 829; *In re Orthopedic Bone Screw Prods. Liab. Litig.,* Nos. Civ. A. 98-4643, MDL 1014, 1999 WL 455667 (E.D.Pa. July 2, 1999)). *In re Propulsid* sets a relatively low bar for satisfying the injury in fact doctrine in exposure to prescription drugs and, by analogy, medical device cases. *Id.* at 133; *see also, In re Orthopedic Bone Screw Prods. Liab.*

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 8 of 18 —

Litig., Nos. Civ. A. 98-4643, MDL 1014, 1999 WL 455667 (E.D.Pa. July 2, 1999) (finding standing to challenge federal agency action when plaintiffs argued their injury was exposure to a potentially dangerous medical device whose safety has not been demonstrated in accordance with the Food, Drug and Cosmetic Act and the Medical Device Amendments).

In *Taylor v. Medtronics, Inc.*, 861 F.2d 980 (6th Cir.1988), this Circuit affirmed judgment as a matter of law for defendant on a products liability claim. We found the evidence showed that the plaintiff's particular pacemaker was not defective, even though there was a high incidence of defects in that model of pacemaker. *Id.* In our view, *Taylor* is distinguishable from the instant case, and the district court erroneously relied upon it to find that Sutton lacks standing. In *Taylor,* the plaintiff sought compensatory and punitive damages for an allegedly defective pacemaker. This Court granted summary judgment to the defendant manufacturer, because plaintiff failed to show that her actual pacemaker was defective. *Id.* at 988. *Taylor* does not suggest that the plaintiff lacked standing because her pacemaker was not defective. On the contrary, because this Court decided the case on the merits at the summary judgment stage, it necessarily follows that the plaintiff did satisfy the requirements of Article III standing; she simply did not have a meritorious claim. *Id.*; *cf. Baur v. Veneman*, 352 F.3d 625, 634 (2d Cir.2003) (enhanced risk of contracting food-borne illness due to consumption of downed livestock sufficient injury in fact to confer standing); *Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094 (5th Cir.1991) (no discussion of standing where plaintiffs sought damages for fear that allegedly defective, but currently functioning, heart valves would cause future injury); *Harris v. Purdue Pharma, L.P.*, 218 F.R.D. 590, 595 (S.D.Ohio 2003) (presuming that plaintiffs have standing based on increased risk of drug dependency through use of prescription pain medication).

Other courts have indicated they would not find standing to pursue medical monitoring costs in increased risk of future harm situations. One such case supporting the denial of standing to uninjured plaintiffs, relied upon by the district court in the instant case, is *Martin v. American Medical Systems, Inc.*, No. IP 94-2067-C-H/G, 1995 WL 680630 (S.D.Ind. Oct.25, 1995). There the district court denied class certification to a group of plaintiffs who had received penile implants. Some of the implants had malfunctioned, though not any of those implanted in the plaintiffs. The *Martin* court expressed doubt as to whether the plaintiffs, who were satisfied with their particular implants and had derived some benefit therefrom, could point to an injury in fact. *Id.* at *6.

Analyzing Sutton's present action in light of the above precedent, we disagree with the result reached by the district court below. Sutton has alleged sufficient facts, when accepted as true, to suggest an increased risk of future harm resulting from being implanted with St. Jude's device. Whether Sutton is likely to prevail on the merits is not a proper consideration at this time. We decline to preclude the *575 possibility of a

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 9 of 18 —

> plaintiff or class of plaintiffs bringing suit under an increased risk of future harm theory due to the implantation of a medical device.
>
> Though the plaintiffs in *In re St. Jude Medical, Inc.* were able to demonstrate a 700-percent increase in risk associated with using the heart valves there at issue, we hold it unnecessary for a plaintiff to make such a showing as a matter of course. Such a vast increase in the risk of injury clearly establishes an injury in fact, but to require a plaintiff to so clearly demonstrate her injury in order to confer standing is to prematurely evaluate the merits of her claims. Here Sutton alleges an increased risk of harm when comparing those individuals implanted with the device to those undergoing traditional surgery. Accepting Sutton's allegations as true, the standing requirements have been met. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130; *Greater Cincinnati Coalition for the Homeless*, 56 F.3d at 716. We also note that there is something to be said for disease *prevention*, as opposed to disease *treatment*. Waiting for a plaintiff to suffer physical injury before allowing any redress whatsoever is both overly harsh and economically inefficient.
>
> The last two requirements for standing are easily met in this instance. The increased risk of future harm must be "fairly traceable" to St. Jude's actions. *Friends of the Earth, Inc.*, 528 U.S. at 180-81, 120 S.Ct. 693. St. Jude is the undisputed designer, manufacturer, and distributor of the device. There is no question that any increased risk of harm arising from implantation of the device is fairly traceable to St. Jude. Finally, Sutton must demonstrate his injury is redressable by a favorable decision. *Id.* Assuming Sutton is capable of proving the device puts implantees at a substantially greater risk for developing restenosis and occlusion of the bypass graft-as he asserts in his complaint-medical monitoring will undoubtedly help to remedy the situation.
>
> The court below improperly concluded Sutton lacks standing to seek medical testing and monitoring allegedly made necessary by the implantation of a medical device that has not yet malfunctioned or caused Sutton any physical injuries, but presents an increased risk of future harm. We accordingly reverse and remand Sutton's action.

E.   **Federal Appellate Cases Rejecting Class Certification**

3.   *In re St. Jude Medical, Inc.*, __ F.3d __, 2008 WL 942274 (8th Cir. April 9, 2008) (No. 06-3860). Keynote 1 says it all:

> Common issues would not predominate over individual issues that needed to be litigated to resolve product liability claims of patients implanted with medical company's recalled prosthetic heart valve, and therefore district court improperly certified class of patients; whether information on which treating physicians based their actions ultimately could be traced to a representation by medical company undoubtedly would vary by individual physician, thus any trial would require physician-by-physician inquiries into each doctor's sources of information about the valve, and patients' effort to recover damages, which was based, among other things, on past and future medical expenses, past wage loss, and

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 10 of 18 —

loss of future earning capacity, also required individual determinations concerning the extent to which particular patients had suffered injuries caused by the heart valve. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.App.(2000).

4. *In re St. Jude Medical, Inc.*, 425 F.3d 1116, 1121-23 (8th Cir. 2005), held that medical-monitoring claims were not suitable for class treatment because of the existence of multiple individual causes of class members' medical conditions:

**B. Medical Monitoring Class**

[6] SJM also asserts the district court erred in certifying the medical monitoring class. SJM argues this class defies *Erie* 's command that federal courts refrain from altering or creating new state law. SJM further argues certification of this class as one seeking injunctive relief under Rule 23(b)(2) violates the Due Process Clause. Finally, SJM argues certification of this class is improper due to diverse legal and factual issues that would make a classwide trial inefficient and unmanageable. We conclude the diverse legal and factual issues preclude class certification, and we reverse on this ground. As this ground again is dispositive, we do not address the *Erie* and due process arguments.

[7] [8] [9] Class certification under Rule 23(b)(2) is proper only when the primary relief sought is declaratory or injunctive. Although Rule 23(b)(2) contains no predominance or superiority requirements, class claims thereunder still must be cohesive. *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir.1998). Because "unnamed members are bound by the action without the opportunity to opt out" of a Rule 23(b)(2) class, even greater cohesiveness generally is required than in a Rule 23(b)(3) class. *Id.* at 142-43. A "suit could become unmanageable and little value would be gained in proceeding as a class action ... if significant individual issues were to arise consistently." *Id.* (citation and quotation omitted); *see also *1122 Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577, 580 (7th Cir.2000) (same). "At base, the (b)(2) class is distinguished from the (b)(3) class by class cohesiveness .... Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries. The members of a (b)(2) class are generally bound together through 'preexisting or continuing legal relationships' or by some significant common trait such as race or gender." *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155 n. 8 (11th Cir.1983) (citation and quotation omitted).

Proposed medical monitoring classes suffer from cohesion difficulties, and numerous courts across the country have denied certification of such classes. *See, e.g., Ball v. Union Carbide Corp.*, 385 F.3d 713, 727-28 (6th Cir.2004); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1195-96, *amended*, 273 F.3d 1266 (9th Cir.2001); *Barnes*, 161 F.3d at 143-46; *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir.1995). Quoting the Third Circuit, the Supreme Court in *Windsor* listed some of the individual variations

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 11 of 18 —

precluding class certification: "[Exposure-only plaintiffs] will also incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories." 521 U.S. at 624, 117 S.Ct. 2231 (quoting *Georgine,* 83 F.3d at 626). Differences in state laws on medical monitoring further compound these disparities. *See id.*

In this case, like in *Windsor,* each plaintiff's need (or lack of need) for medical monitoring is highly individualized. Every patient in the 17-state class who has ever been implanted with a mechanical heart valve already requires future medical monitoring as an ordinary part of his or her follow-up care. A patient who has been implanted with the Silzone valve may or may not require additional monitoring, and whether he or she does is an individualized inquiry depending on that patient's medical history, the condition of the patient's heart valves at the time of implantation, the patient's risk factors for heart valve complications, the patient's general health, the patient's personal choice, and other factors. The plaintiffs concede the states recognizing medical monitoring claims as a separate cause of action have different elements triggering culpability. Simply put, the medical monitoring class presents a myriad of individual issues making class certification improper. For the same reasons the district court decertified the personal injury tort class, the medical monitoring class was certified incorrectly.

[10] Bolstering our conclusion is the fact the plaintiffs never demonstrated to the district court they "would sue for the medical monitoring program sought here even in the absence of a claim for damages." *In re Rezulin Prods. Liab. Litig.,* 210 F.R.D. 61, 73 (S.D.N.Y.2002). As the Southern District of New York ruled, a district court certifying a medical monitoring class must be satisfied

> that a reasonable plaintiff, based on a medical and economic calculus, would have sued solely for a medical monitoring program, not merely that a lawyer could have been found who would have located a plaintiff and brought a class action in the hope of a fee, else the test would be meaningless.
>
> Plaintiffs have not persuaded the Court that this criterion has been satisfied here. Neither the American Diabetes Association nor the American Association of Clinical Endocrinologists, which promulgate guidelines for the care and treatment of diabetics, nor any public health agency or professional medical society or institution, has recommended special monitoring for patients who formerly took Rezulin.

*Id.* While every mechanical heart valve patient will require follow-up care in connection*1123 with the implant, the question of additional monitoring above that required for normal mechanical heart valve implantation is not clear.

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 12 of 18 —

    For the above reasons, we conclude class certification of the medical monitoring class was an abuse of discretion. We reverse the district court's certification of this class.

    5.  *Ball v. Union Carbide Corp.*, 385 F.3d 713, 727-28 (6th Cir. 2004), affirmed the denial of class certification, in part because of a medical-monitoring claim:

> Even though liability issues may have been common*728 to the putative class, by seeking medical monitoring and environmental cleanup of property, Plaintiffs have raised individualized issues. Each individual's claim was for that reason necessarily proportional to his or her exposure to toxic emissions or waste. Similarly, the *Heiser* Plaintiffs' claims depended on their period of residency in Oak Ridge and levels of exposure. Also, the "named plaintiffs who *already* have thyroid cancer have fundamentally different interests than those named and unnamed plaintiffs who do not." *Con-Defs.' Heiser Br.* at 47 (emphasis in the original). Indeed, the *Heiser* Plaintiffs who had thyroid cancer were not even members of the proposed class, which was defined as consisting of individuals who were at risk of developing the cancer.

    6.  *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1192 n.8 (9th Cir. 2001), *amended in other respects on denial of rehearing*, 273 F.3d 1266 (9th Cir. 2001), rejected a medical-monitoring class of persons implanted with defective Pacemaker leads and highly individualized questions of causation. The court stated:

> The dissent also urges that the proposed medical monitoring subclass merits certification under Rule 23(b)(3). Again the dissent contends that *if* Zinser were to propose two sub-subclasses, any manageability problems due to variations in state law could be resolved. As an initial matter, variations in state law cannot be so simply resolved. For example, some states recognize medical monitoring as a separate cause of action. *Compare Friends For All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 824-25 (D.C.Cir.1984)* (holding District of Columbia recognizes a cause of action for medical monitoring without manifestation of physical injury) *with Burton v. R.J. Reynolds Tobacco Co., 884 F.Supp. 1515, 1523 n. 6 (D.Kan.1995)* (stating that a claim is recognized in Kansas only if the plaintiff has not yet suffered injuries; otherwise, medical monitoring is merely a component of damages). Others, however, recognize medical monitoring only as an element of damages when liability is established under traditional tort theories of recovery. *See Telectronics, 168 F.R.D. at 215-17* (discussing state variations regarding treatment of medical monitoring claim). But variations of state law aside, the question we must answer is whether the district court abused its discretion in refusing to certify the proposed medical monitoring subclass. Rule 23(c)(4), in a proper case, may enable the district court to *recognize* subclasses that have proper representatives and otherwise comply with Rule 23's requirements. This does not mean, however, that the district court abused its discretion by refusing to certify a subclass that does not comply with Rule 23.

The court then went on to disapprove certification of a medical-monitoring class under Rules 23(b)(1)(A) and 23(b)(2):

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 13 of 18 —

[17] Zinser next argues that certification of the proposed medical monitoring subclass is appropriate pursuant to Rule 23(b)(1)(A) because separate actions create a risk that ARI will be subject to incompatible standards for monitoring class members' leads. Because we conclude that the medical monitoring claim primarily seeks monetary damages, we affirm the district court's denial of certification of the medical monitoring subclass.

[18] [19] A class action is maintainable under Rule 23(b)(1)(A) if "prosecution of separate actions ... would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class...." Fed.R.Civ.P. 23(b)(1)(A). The phrase "incompatible standards of conduct" refers to the situation where "different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct." 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Federal Practice and Procedure § 1773 at 431 (2d ed.1986) (footnote omitted). Rule 23(b)(1)(A) certification requires more, however, "than a risk that separate judgments would oblige the opposing party to pay damages to some class members but not to others or to pay them different amounts...." Id. at 429. Certification under Rule 23(b)(1)(A) is therefore not appropriate in an action for damages. See, e.g., Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1340 (9th Cir.1976); McDonnell Douglas Corp. v. U.S. Dist. Court, 523 F.2d 1083, 1086 (9th Cir.1975).[FN9]

FN9. COURTS HAVE HELD THAT CLASS CERTIFICATION PURSUANT TO RULE 23(B)(1)(A) IS APPROPRIATE IN A VARIETY OF SITUATIONS. THESE INCLUDE A SUIT TO ENJOIN STATE OFFICERS FROM TERMINATING UNEMPLOYMENT COMPENSATION WITHOUT A HEARING, AN ACTION FOR A DECLARATORY JUDGMENT WITH RESPECT TO PLAINTIFF'S INSURANCE LIABILITY ON AN ILLEGALLY DECLARED DIVIDEND, AND AN ACTION SEEKING A DECLARATION OF ELIGIBILITY FOR DEFERMENTS UNDER THE SELECTIVE SERVICE ACT. A CLASS ACTION SEEKING RESCISSION OF PURCHASES OF SECURITIES THAT ALLEGEDLY WERE MADE ON THE BASIS OF FRAUDULENT MISREPRESENTATIONS ALSO HAS BEEN ALLOWED UNDER CLAUSE (1)(A).7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Federal Practice and Procedure § 1773 at 435 (2d ed.1986) (citing Crow v. California Dep't of Human Resources, 325 F.Supp. 1314 (N.D.Cal.1970); Federal Sav. & Loan Ins. Corp. v. Huttner, 265 F.Supp. 40 (N.D.Ill.1967); Gregory v. Hershey, 51 F.R.D. 188 (E.D.Mich.1970); Sultan v. Bessemer-Birmingham Motel Assocs., 322 F.Supp. 86 (S.D.N.Y.1970)).

*1194 As support for her Rule 23(b)(1)(A) medical monitoring subclass argument, Zinser relies on Telectronics. There, the district court noted that although ARI was

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 14 of 18 —

conducting a research program to investigate and detect the cause of the lead fractures, "[p]laintiffs seek the establishment of a medical monitoring program which would include diagnostic testing and research." *Telectronics,* 172 F.R.D. at 285. The court thus reasoned that any judicially imposed modification of the research program-a uniform benefit to the class of lead implantees-logically would affect the entire class. *Id.*

The salient facts here, however, are quite different. Here, Zinser's amended complaint does not seek the establishment of a medical monitoring program-presumably because such a program already exists-but rather seeks "the creation of a medical monitoring *fund.*" Specifically, Zinser's amended complaint requests that the court order:

> (1) [the defendants to] pay the cost of notifying all class members of the unreasonably dangerous and defective nature of its Leads and other pertinent related information; (2) that defendants create a medical monitoring fund ... for the purpose of monitoring in the future the health and well being of plaintiff and the other class members; (3) that defendants be required to pay all future medical expenses in any way related to its defective product; and (4) that defendants be ordered to conduct full and proper research into alternative methodologies for remedying the condition of each patient/class member....

From this, it is apparent that the requested "medical monitoring fund" is in essence a request for monetary relief. Moreover, the complaint also seeks past and future compensatory damages plus punitive damages. We conclude that Zinser primarily seeks money damages.[FN10]

FN10. For further treatment of this issue, see part V, *infra.*

Zinser contends that the issue is not whether ARI must pay for the monitoring, but instead what type of monitoring must be performed. Zinser does not, however, demonstrate how ARI's current patient management guidelines and screening program are inadequate. More importantly, Zinser does not demonstrate how separate adjudications will force ARI to comply with inconsistent standards of conduct that it cannot legally pursue.

Even if multiple courts were to formulate separate medical monitoring programs as Zinser urges may occur, Rule 23(b)(1)(A) certification is still not appropriate. As we explained in *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461 (9th Cir.1973):

> Rule 23(b)(1)(A) authorizes class actions to eliminate the possibility of adjudications in which the defendant will be required to follow inconsistent courses of continuing conduct. This danger exists in those situations in which the defendant by reason of the legal relations involved can not as a practical matter pursue two different courses of conduct. The Advisory Committee's Note makes this clear in discussing Rule 23(b)(1)(A) by its reference to actions to declare bond issues invalid, to fix the rights and duties of a

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 15 of 18 —

> riparian owner, and to determine*1195 a landowner's rights and duties respecting a claimed nuisance.

*Id.* at 466 (footnotes omitted). Any administrative difficulty ARI potentially might face from slightly different medical monitoring programs required by different courts for differently situated potential claimants does not rise to the level of requiring of ARI *inconsistent* courses of conduct.

We therefore hold that the district court did not abuse its discretion by refusing to certify the proposed medical monitoring subclass pursuant to Rule 23(b)(1)(A).[FN11]

FN11. Favoring the reasoning of the district court in *Telectronics,* the dissent disagrees. While conceding that there are some "minor factual differences" between the medical monitoring class certified in *Telectronics* and that proposed here, the dissent would overlook these differences and hold that the district court abused its discretion by denying certification under Rule 23(b)(1)(A). We respectfully disagree. Zinser has not demonstrated that Accufix "by reason of the legal relations involved can not as a practical matter pursue two different courses of conduct." *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 466 (9th Cir.1973). As such, the district court properly denied certification under Rule 23(b)(1)(A).

### V

[20] Zinser also contends that the district court abused its discretion by refusing to certify the proposed medical monitoring subclass pursuant to Rule 23(b)(2).

[21] [22] Rule 23(b)(2) provides that a class action is appropriate if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive. *Nelsen v. King County,* 895 F.2d 1248, 1254-55 (9th Cir.1990); *O'Connor v. Boeing N. Am., Inc.,* 180 F.R.D. 359, 377 (C.D.Cal.1997); *Haley,* 169 F.R.D. at 657. A class seeking monetary damages may be certified pursuant to Rule 23(b)(2) where such relief is "merely incidental to [the] primary claim for injunctive relief." *Probe v. State Teachers' Retirement Sys.,* 780 F.2d 776, 780 (9th Cir.1986).

Zinser contends that a medical monitoring claim is primarily equitable or injunctive. A request for medical monitoring cannot be categorized as primarily equitable or injunctive *per se.* Many courts, including California state courts, have recognized that medical monitoring relief is appropriate only as an element of damages after independent proof of liability. See *Potter v. Firestone Tire and Rubber Co.,* 6 Cal.4th 965, 25 Cal.Rptr.2d 550,

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 16 of 18 —

863 P.2d 795, 823 (1993); *see also* *Telectronics*, 168 F.R.D. at 215-17 (discussing state variations regarding treatment of medical monitoring claim).

Because Rule 23(b)(2) certification is inappropriate where the primary relief sought is monetary, *Nelsen*, 895 F.2d at 1254, the dispositive question is: What type of relief does Zinser primarily seek? We find the following discussion helpful and strikingly persuasive by analogy here:

> Plaintiffs do not seek a court-established medical monitoring program solely for the purposes of diagnosing disease and sharing information with class members. Rather Plaintiffs seek the establishment of a "reserve fund to pay for the cost of the medical monitoring program," which includes medical examinations of class members, as well as treatment of disease detected in class members. Plaintiffs additionally seek punitive and compensatory damages for the Class. Thus, the medical monitoring program Plaintiffs*1196 seek does not resemble that held in *Day* as appropriate injunctive relief. In fact, Plaintiffs' proposed program does not resemble any programs certified under Rule 23(b)(2).

*O'Connor*, 180 F.R.D. at 377 n. 23 (citation omitted).

Courts have split on whether medical monitoring relief is primarily compensatory or injunctive. Depending on the nature of the precise relief sought and the circumstances of the particular case, many courts have declined to certify medical monitoring classes when joined with requests for funding and compensation. *See* *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir.1995) (although certification of medical monitoring class under Rule 23(b)(2) is legally permissible, district court did not abuse its discretion in refusing to certify such a class where the relief sought was primarily money damages); *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 479-80 (D.Colo.1998) (even where relief sought was diagnostic testing and medical screening necessary to facilitate early detection and treatment of disease, rather than damages for past, present, or future injury, such relief was primarily a suit for damages); *Arch v. Am. Tobacco Co.*, 175 F.R.D. 469, 483-85 (E.D.Pa.1997) (Rule 23(b)(2) certification inappropriate where plaintiffs' medical monitoring program included not only periodic examinations but also a fund for treatment because the "request for treatment drastically alters the nature of the relief requested by plaintiffs ... [making it] identical to a traditional damage claim for personal injury"); *Haley*, 169 F.R.D. at 657 (Rule 23(b)(2) certification improper for class seeking medical monitoring program and damages because medical monitoring, while not incidental to action for monetary damages, was not primary goal). *Compare* *Yslava v. Hughes Aircraft Co.*, 845 F.Supp. 705, 708, 712 (D.Ariz.1993) (certifying class for court-supervised medical monitoring program to detect disease when damages sought were for medical monitoring costs incurred, rather than other compensatory and punitive damages); *Craft v. Vanderbilt Univ.*, 174 F.R.D. 396, 406 (M.D.Tenn.1996) (noting

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 17 of 18 —

authority supporting proposition that "medical monitoring, if properly framed, can be a form of injunctive relief.").

We conclude that Zinser's proposed medical monitoring subclass is not appropriate for certification pursuant to Rule 23(b)(2). The amended class action complaint here seeks the establishment of a reserve fund for past and future damages, compensation for future medical treatment, plus other compensatory and punitive damages. Although the complaint also seeks "full and proper research into alternative methodologies for remedying the condition of each patient/class member," this injunctive relief is merely incidental to the primary claim for money damages.

We hold that the district court did not abuse its discretion by refusing to certify the proposed medical monitoring subclass pursuant to Rule 23(b)(2).

F.  **Federal Appellate Cases Referring to Medical-Monitoring Class Settlements**

1. *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenflurammine) Products Liability Litigation*, 401 F.3d 143 (3d Cir. 2005) (litigation involved fee allocation and different treatment of Illinois residents).

G.  **ALR 5th Article from 1994**

Allen L. Schwartz, *Recovery of damages for expense of medical monitoring to detect or prevent future disease or condition*, 17 A.L.R.5th 327 (1994, with some updates), has the following un-updated statement:

**§ 8. Class action certification**

In the following cases, the courts have recognized or upheld class action certification as appropriate for those seeking future medical monitoring costs.

In Re Three Mile Island Litigation (1980, MD Pa) 87 FRD 433, 14 Envt Rep Cas 1834, 30 FR Serv 2d 708, later proceeding (MD Pa) 557 F Supp 96, later proceeding (MD Pa) 596 F Supp 1274, a Federal District Court granted class action certification under Federal Rule of Civil Procedure 23(a, b) as a "superior method" of deciding whether there was any basis of granting damages for medical detection services to monitor for future manifestations of injury caused by exposure to radioactive emissions. The court gave the following reasons for upholding the class action certification request: joinder of potentially tens of thousands of plaintiffs was impracticable; numerous common factual issues including the kinds and amounts of substances emitted; the likely pattern of emissions under prevailing meteorological conditions, and what future physical effect the exposed population might expect; and the same legal issues concerning liability based on exposure to these emissions and whether such exposure warranted an award of damages for medical monitoring.

**CONFIDENTIAL AND PRIVILEGED ATTORNEY WORK PRODUCT**
Memorandum to the Katrina Barge Team
May 11, 2008
Page 18 of 18 —

    In <u>Boggs v Divested Atomic Corp. (1991, SD Ohio) 141 FRD 58</u>, a Federal District Court granted class action certification to residents who lived within 6 miles of a radioactive–emitting plant, so that such residents could present, on a class–wide basis, various claims, including a claim for future medical monitoring for early <u>cancer</u> detection (the other claims presented were for emotional stress, diminution in value of real property, and injunctive relief against further unlawful emission of hazardous substances from the plant). More specifically, the court held that each of the prerequisites for class action certification under <u>Federal Rule of Civil Procedure 23(a)</u> (that is, numerosity, commonality, typicality, and adequacy of representation) had been met, and that class certification under <u>Federal Rule of Civil Procedure 23(b)(1)</u> was "appropriate."

    In the following case, class action certification was denied to those seeking future medical monitoring costs.

    In <u>Askey v Occidental Chemical Corp. (1984, 4th Dept) 102 App Div 2d 130, 477 NYS2d 242</u>, an intermediate New York appellate court held that class action certification was properly denied to persons alleging a need for future medical monitoring, because those persons had not satisfied their burden of showing a factual basis for identifying a genuine class under New York Civ Prac L & R §§ 901 and 902 (Consol) which requires that class action claimants must show factually that the purported class exists and can be described with certainty. The court explained that a map showing the geographical area impacted or affected by the landfill in question was relevant to indicate those persons who may have been exposed to airborne particles emanating from the landfill, but that the map did not identify with any degree of specificity those persons within that area whose bodies had been invaded by a toxic substance and who as a result needed medical monitoring. Further, explained the court, the affidavit of the class action claimants' medical doctor conceded that it was "hard to say with precision" who were members of the proposed class and admitted that identification of the class was dependent not only on geographic considerations but also on other factors which he acknowledged were "not fully known" at the present time but which included invisible genetic damage which could lead to a variety of adverse health effects at future times, possibly as late as 20 years later.