UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: KATRINA CANAL BREACHES<br>CONSOLIDATED LITIGATION | CIVIL ACTION<br>NUMBER: 05-4182 "K"(2)<br>JUDGE Duval<br>MAG. Wilkinson |
| PERTAINS TO:   MRGO<br>            *Armstrong*, No. 10-866 | |

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO AMEND SCHEDULING ORDER REGARDING EXPERT DEADLINES

Plaintiffs respectfully request an additional six weeks to complete additional testing in the vicinity of the IHNC breach locations and to complete Dr. Bea's expert report.

With respect to completing additional testing, Plaintiffs contend that Defendants' pump tests at their selected locations near the IHNC were improper because they violated the parties' agreed upon standard operating procedure and would produce unreliable results.  Plaintiffs requested from Defendants a joint extension of the testing deadline in order for Plaintiffs to complete additional pump tests at these locations after the test wells had been properly developed pursuant to the joint testing protocol, but Defendants declined.  This additional round of pump tests will yield information that is crucial to the rebuttal of Defendants' expert opinions.

In addition to the dispute regarding pump tests, the parties have also reached an impasse regarding Plaintiffs' request to excavate certain wells that were installed at a site that is in the vicinity of the EBIA referred to as the School site.  The School site excavation will create a trench that will permit Plaintiffs' experts to (1) visually inspect the soil stratigraphy that surrounds the excavated well, (2) supplement the information that the parties obtained from the

1

soil borings that were performed at the School site over the summer, and (3) aid in rebutting criticisms that defense experts may offer with respect to the School site data. While Defendant's representative indicated initially that they wished to participate in the excavation, they have since reversed course and opposed the excavation.

With respect to additional time to complete Dr. Bea's expert report, there have been several unforeseen events involving the sampling program that resulted in weeks of delay. Despite the significant delays encountered during the sampling program, Plaintiffs' experts can still complete their reports under the current schedule, with the exception of Dr. Bea. Because Dr. Bea bases his opinions in part on the work of Plaintiffs' other experts, his report may not be completed until after the reports of the other experts are finalized and he has had time to analyze and incorporate their findings into his final report.

Granting the extension will not require any delay in the trial of this matter. Rather, the only substantive change to the scheduling order is that the briefing and hearing on any Daubert motions will be postponed, but will still occur well in advance of the trial setting.

**A. Legal Standard**

Rule 16(b) of the Federal Rules of Civil Procedure provides that "[a] schedule shall not be modified except upon a showing of good cause…." Fed. R. Civ. Proc. 16(b). The "good cause" standard focuses on the diligence of the party seeking a modification of the scheduling order. *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003). The movant must show that "despite his diligence, he could not have reasonably met the scheduling deadline." 6A C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1522.1 at 231 (2d ed. 1990). If the moving party can show good cause to modify the scheduling order, then the district court should apply a liberal standard and amend the order

2

when justice so requires.  *Adams Family Trust v. John Hancock Life Ins. Co., U.S.A.*, 424 Fed. Appx. 377, 381 (5th Cir. 2011).

    **B. An Extension Is Required To Permit Plaintiffs To Conduct Additional Testing, The Need For Which Was Unforeseen And Only Arose In The Last Few Weeks**

        **1.    Summary**

The Court's Scheduling Order commanded the parties to work together to develop a joint sampling plan prior to the start of any sample collection or testing.  The merits of a joint approach are numerous.  First and foremost, compelling the parties to agree, at the outset, on a uniform sampling and testing program eliminates many of the disputes that typically arise between experts at trial.  By requiring the parties' experts to identify and resolve their differences regarding methodology, the Court was easing the burden that would otherwise be placed on it if those methodological disputes were left for resolution at trial.  Of course, the experts will still have many issues on which they disagree, but the intent of the joint sampling plan was to narrow those disputes as much as possible.

An additional anticipated benefit of the joint sampling program was that it would reduce the amount of time required to complete the field work.  Since the parties were to agree on test methodologies at the start of the work, there would no longer be a need for "dueling" tests, with each party seeking to complete its own test based on the party's experts' preferred methodology.

Now that the field work is nearing completion, Plaintiffs can report that the parties have indeed realized many of the benefits of a joint approach to the field work.  For the past six months the parties' experts have worked tirelessly to coordinate on various issues.  When disputes have arisen, the experts worked in good faith to resolve them.

Unfortunately, one area of disagreement among the parties that has eluded an easy resolution concerns two "pump tests" at the EBIA site.  In particular, Plaintiffs and Defendants

3

were not able to agree on exactly when—and under what conditions—these two remaining pump tests should proceed. Approximately one week ago, Defendants' experts determined that the tests were ready to begin, but Plaintiffs' experts disagreed and felt that further preparatory work of the pump wells was required. In an effort to resolve the dispute, Plaintiffs requested that Defendants agree to seek a joint extension so that further preparatory work could be completed, but Defendants declined. Facing the imminent deadline for completion of the field work, and after noting their objections about proceeding with the pump tests at this stage, Plaintiffs agreed that the tests may proceed because otherwise there was a risk that the tests would not be completed at all.

Plaintiffs now come before the Court to seek an extension so that the pump tests may be performed after the requisite well preparation is completed. Plaintiffs estimate that an extension of six weeks will be sufficient. Granting the extension will not require a delay in the trial of this matter; rather, the only substantive change to the scheduling order is that the briefing and hearing on any Daubert motions will be postponed (but will still occur well in advance of the trial setting).

## 2. Factual Background

### i. Pump Tests

The EBIA field program generally consists of three components: (1) soil borings; (2) laboratory analysis of soil samples, and (3) field conductivity tests. The present dispute between the parties' experts concerns a specific type of field conductivity test known as a pump test. At the outset of the field program, Plaintiffs requested a total of nine pump tests (three tests at each of three discrete locations). Defendants requested two pump tests (one test at each of two discrete locations referred to as EBIA-SB and EBIA-N). Following further discussions among the parties, Defendants elected to request four more pump tests (two additional tests each at

4

EBIA-SB and EBIA-N).  Thus, at one point the parties intended to conduct a total of 15 pump tests.

As a result of scheduling decisions made by the independent contractor, the pump tests were scheduled to begin until after all of the soil borings were completed.  Due to various delays with the completion of the soil borings, the first pump tests were not scheduled to begin until August.  However, due to weather and equipment delays, the first test did not actually begin until September.  During September and October a total of seven pump tests were completed, or less than half of the number that were originally envisioned by the parties.

Prior to the initiation of the pump tests, the parties' experts worked together to develop a single, joint methodology for conducting the tests.  This process took several weeks, but ultimately culminated in a test methodology that was accepted by all of the experts.  For ease of reference, this methodology will be referred to as the standard operating procedure, or SOP.

The SOP addresses a number of different topics related to the pump tests.  One topic addressed in the SOP that is relevant to the present dispute concerns the criteria that will be used to identify when the wells are ready for the pump test.  A pump test may not begin until the wells have been properly "developed."  The SOP sets forth two criteria that must be satisfied before a well will be considered developed.[1]  The SOP notes that these criteria may be modified in the field "in order to meet schedule requirement" but only with the consensus of all of the experts.

When the subject of completing the pump tests at the EBIA-SB and EBIA-N sites was discussed among the experts last month, a disagreement arose regarding whether the SOP criteria was met.  Plaintiffs' experts believed that the criteria had not been satisfied and further

---

[1] The first criterion is that the calculated hydraulic conductivity values of two successive slug tests must be within 30% of one another.  The second criterion is that the head of the well following a slug test must recover to within 90% of the displaced static level measure prior to the first slug test.

5

preparation (or development) of the wells was required.  Defendants disagreed and requested authorization to proceed with the pump tests on October 19.  In an effort to reach a compromise, Plaintiffs asked Defendants to agree to a joint extension of the testing deadline, but Defendants declined.  As a result, and despite their belief that the wells required further development, Plaintiffs agreed that the pump tests could proceed; the alternative was to deny Defendants the right to conduct any tests prior to the deadline for completion of the field work.  However, Plaintiffs determined at that point that an extension of the testing deadline would be sought so as to permit Plaintiffs to conduct a second round of pump tests at the EBIA-SB and EBIA-N sites.  This additional round of pump tests will yield information that is crucial to the rebuttal of Defendants' expert opinions.

### ii. *Excavation Trenches*

In addition to the dispute regarding pump tests, the parties have also reached an impasse regarding Plaintiffs' request to excavate certain wells that were installed at a site that is in the vicinity of the EBIA site and that the parties refer to as the School site.  The purpose of the excavation is to create a trench that will permit Plaintiffs' expert to visually inspect the soil stratigraphy that surrounds the excavated well.  The visual inspection will supplement the information that the parties obtained from the soil borings that were performed at the School site over the summer.  Plaintiffs also believe that the excavations will aid Plaintiffs in rebutting criticisms that defense experts may offer with respect to the School site data.

Plaintiffs' experts proposed the excavations on October 22, 2011 in a conference call with Defendants' experts.  On October 27, Defendant's representative indicated that they wished to participate in the excavation.  However, the following day Plaintiffs received notice that Defendants were opposed to the excavation and would object to Plaintiffs proceeding uniformly.

Defendants explained that their opposition was based on their desire to preserve the well installations "until all issues related to these tests have been resolved."

In light of Defendants' refusal to consent to the trench excavations, Plaintiffs are left with no choice but to seek the Court's input. Plaintiffs estimate that the time to dig the trenches, conduct the visual inspection, and fill the trenches will take three days. Plaintiffs acknowledge that the excavation of the School site wells will prevent any further data collection, which is why Plaintiffs do not intend to perform any excavation activity until the final week of the testing period.

### 3. Argument

Plaintiffs seek an extension so that they may conduct two pump tests at the EBIA-SB and EBIA-N locations. The parties worked in September and October to prepare the wells at these two locations for the requested pump tests, but for a variety of reasons, the development process took longer than anticipated. In the end, the parties did not agree on whether the wells had been sufficiently developed. Despite this disagreement, Defendants proceeded with the pump tests last week. Plaintiffs request an extension so that they may have the opportunity to conduct pump tests after the wells have been properly developed.

The extension sought by Plaintiffs is necessitated by the disagreement that arose over the past two weeks among the parties' experts. Plaintiffs believe that all of the pump tests conducted during the course of the field work should adhere to the SOP that was agreed to by all of the parties. Otherwise, there is a substantial risk that the experts will no longer be comparing "apples to apples"; that is to say, the utility of comparing the results of pump tests at various locations is a function of whether those tests were conducted using similar methods. If the methods are substantially different, then a party could argue that any differences in the test

results are based not on underlying soil properties but rather on the difference in test methodology.

Good cause exists to amend the scheduling order to permit Plaintiffs additional time to complete the field work at the EBIA site.  Plaintffs have acted diligently to perform all field work prior to the November 3rd deadline in the current scheduling order.  However, as a result of the disagreement that arose in the past two weeks among the parties' experts, Plaintiffs were not able to complete all of the work that they believe is necessary to support their experts' opinions and/or to rebut the opinions of Defendants' experts.  Plaintiffs did not—and indeed could not—foresee that the pump test SOP that was agreed to by experts for Plaintiffs and Defendants would ultimately provide to be a source of disagreement in the closing days of the sampling program.

Moreover, granting Plaintiffs' extension request is consistent with the Court's desire to permit a *joint* sampling program.  Although the dispute regarding the pump tests at the EBIA-SB and EBIA-N sites has prevented this particular field work from being jointly undertaken, the Court should still permit the parties to conduct those tests that each respective party believes will support the parties' expert evidence.  In this particular instance, Defendants were able to conduct pump tests pursuant to their preferred methodology, and Plaintiffs merely ask that they be afforded the same opportunity.

### C.  Even If An Extension Of The Sampling Period Is Not Permitted, Plaintiffs Still Request An Extension Of The Expert Report Deadline For Dr. Bea

Even if the Court does not wish to extend the deadline for geotechnical testing, Plaintiffs still request additional time for the expert report of Dr. Robert Bea.  There have been several unexpected delays during the months-long testing protocol that have severely compressed the time in which Plaintiffs' experts may complete their reports.  While Plaintiffs expected delays

and other contingencies when creating a master schedule, certain events (and the delay that resulted) could not have been foreseen.

In particular, the following events impacted the time available to Plaintiffs' experts' for field exploration, testing, analysis, and drafting their expert reports:

1) Fugro's (the third party contractor retained by the parties) unexpected transition from utilizing Geoprobes to Soil Borings and Cone Penetration Tests ("CPT"). Contrary to Plaintiffs' understanding at the outset of the field program, Fugro opted to not run multiple rigs at the same time, so Plaintiffs had to wait until the first Defense sampling campaign was completed before exploration began at Plaintiffs' designated sites. This transition and protocol introduced approximately four weeks of delay to implementing Plaintiffs' testing.

2) Drilling obstacles were encountered at the Railroad Site and Fugro did not have available drillers/rigs to address these obstacles. As a result, Plaintiffs' experts had to wait for Fugro to find drillers/rigs to drill the site and it took them several days to get past the buried obstructions. Plaintiffs' experts requested that pot-holes be excavated to get past the fill identified during the CPT probes, but Defense experts objected, which propagated further unexpected delay of approximately two weeks.

3) The duration for which the parties' experts were to generate a Joint Pump Test Standard Operating Procedure (including materials, equipment, and methods) introduced approximately four weeks of unexpected delay.

4) Finally, all parties have experienced significant weather delays that have exceeded the range of delays predicted during the testing period. There have been significant rain storms that saturated the ground and the parties' testing could not be resumed until the water

levels at the testing locations returned to normal. As a result of these weather events during the summer months, the testing process was delayed approximately two additional weeks.

The parties' various testing and sampling efforts will generate a tremendous amount of data that must be scrupulously analyzed and verified. It is not until this process is complete that Plaintiffs' experts can discuss this data in their reports. While Plaintiffs' experts have been working diligently for the last several months to complete their testing in a timely fashion, the delays detailed above have created an unexpectedly compressed schedule that leaves Plaintiffs' experts with little time to complete their reports.

Despite the significant delays encountered during the sampling program, Plaintiffs' experts can still complete their reports under the current schedule, with the exception of Dr. Bea. Because Dr. Bea bases his opinions in part on the work of other Plaintiffs' experts, his report may not be completed until after the reports of the other experts are finalized. Plaintiffs anticipate that the reports of experts other than Dr. Bea will not be finalized until shortly before the December 15 expert report deadline. Therefore, and in the interest of presenting the Court with comprehensive expert reports that analyze, study and report on the causes of the catastrophic failure of the IHNC floodwall during Hurricane Katrina, Plaintiffs respectfully request an additional six weeks to submit Dr. Bea's expert report to Defendants.

### D. Granting Either Extension Will Not Impact The Trial Setting

For the convenience of the Court and Defendants, Plaintiffs attach as Exhibit "A" a chart that identifies the changes in the Court's scheduling order that Plaintiffs believe would be required if the Court grants either of Plaintiffs' extension requests. Notably, under no scenario do Plaintiffs believe that a postponement of the trial setting is required. Rather, the only significant change to the current scheduling order is that the hearing (and associated briefing) on Daubert challenges will be moved from late spring to early summer.

E.  Conclusion

Accordingly, for the reasons stated above, Plaintiffs respectfully request the Court grant their motion requesting six additional weeks to perform additional testing and for Dr. Bea to complete his expert report.

Dated:  November 3, 2011

**Respectfully Submitted,**
**PLAINTIFFS LIAISON COUNSEL**

       /s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
Bruno & Bruno, LLP
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

**MR-GO PLAINTIFFS SUB-GROUP LITIGATION**
**COMMITTEE**

       /s/ James Parkerson Roy
JAMES PARKERSON ROY
MR-GO PSLC Liaison Counsel
LA. Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
P.O.Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

**MR-GO PLAINTIFFS SUB GROUP LITIGATION**
**COMMITTEE**

Jonathan Andry (The Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

**CERTIFICATE OF SERVICE**

11

I certify that a true and correct copy of the foregoing was served upon all counsel of record by ECF on November 3, 2011.

/s/ Joseph M. Bruno