much time.

From the receipt of plaintiff's invoice, all counsel objected to it, as the invoice was much more than expected, and was much more than could be afforded. The Fuchsberg defendants never told Dr. Weisler that his first invoice should be presented at the time of his report. The timing of Dr. Weisler's invoicing was not discussed. Dr. Weisler never advised as to how large of a bill he was running up. Also, the Fuchsberg defendants did not tell Dr. Weisler that his report would serve as an interim invoice. Dr. Weisler did not advise that he was not a forensic psychiatrist. Dr. Weisler was not "open and honest" about his limited experience.

The Fuchsberg defendants never had a discussion with Dr. Weisler about assembling a large volume of reading materials, or his reading a large volume of materials. The Fuchsberg defendants never told Dr. Weisler to expand his bibliography. Also, the Fuchsberg defendants never told Dr. Weisler that anyone was prepared to spend substantial sums of money. To the contrary, Dr. Weisler was consistently advised from the outset that very limited resources were available. Dr. Weisler was not asked to be an expert in multiple fields.

No writing was ever drafted or executed agreeing to retain plaintiff as an expert in the Barge P.L.S.C. No agreement was made, either in writing, orally, or otherwise, to formally retain the services of plaintiff, Richard Weisler as an expert in the Barge P.L.S.C. Similarly, no agreement was made, either in writing, orally,

or otherwise regarding the billing rate that plaintiff, Richard Weisler would charge for his services as an expert in the Barge P.L.S.C. Also, no agreement was made, either in writing, orally, or otherwise, regarding the scope of services that plaintiff, Richard Weisler, would conduct as an expert in the Barge P.L.S.C.

There is no contract between the plaintiff and the defendants. No meeting of the minds occurred. Therefore, plaintiff's suit is without merit.

### VII.  UNCONTESTED MATERIAL FACTS:

1. On May 15, 2008, the Fuchsberg Defendants sent an e-mail to Dr. Weisler and Dr. Townsend seeking their participation in an effort to establish an "emotional injury subclass."

2. On May 16, 2008, the Fuchsberg Defendants e-mailed the other Defendants advising of the "good news" that the Fuchsberg Defendants had spoken with psychiatrists, Dr. Mark Townsend and Dr. Richard Weisler, with a view to their acting as experts to establish an emotional injury subclass.

3. Dr. Mark Townsend was paid the full amount owed to him of $52,662.25.

4. Dr. Jill Hayes was paid the full amount owed to her.

5. Defendants have not paid Dr. Phillip Griffin, Dr. Joy Osovosky and Dr. Howard Osovosky anything. [Uncontested fact, but defendants dispute materiality and relevance.]

6. Defendants have not paid anything to Ronnie Montgomery. [Uncontested

fact, but defendants dispute materiality and relevance.]

## VIII. CONTESTED ISSUES OF FACT:

1. Whether, in the e-mail to Dr. Weisler and Dr. Townsend, the Fuchsberg Defendants indicated they were acting on behalf of a "group of attorneys."

2. Whether Plaintiff and defendants ever entered into a written contract specifying the work to be performed, or the hourly rates to be paid for Plaintiff's work, or the persons or entities responsible for paying for Plaintiff's work.

3. Whether Plaintiff informed the Fuchsberg defendants that he charged $600 an hour because that was the standard rate charged by the faculty of Duke University Medical School for faculty members involved with its Clnic.

4. Whether Plaintiff was a faculty member of Duke University Medical School, and was not involved with its Clinic.

5. Whether Plaintiff informed any other defendant of his hourly rate, or of his basis for using that rate, until he submitted Attachment 16 to his report in this case, shortly before the date the report was due,

6. Whether the Fuchsberg Defendants agreed that Dr. Townsend and Dr. Weisler would be paid at a rate of $600.00 per hour.

7. Whether the Defendants have ever paid Dr. Richard Weisler anything.

8. Whether Dr. Jill Hayes was paid over $21,000.00 at a rate of $350.00 per hour as a treating psychologist for primarily administering tests to just one plaintiff.

9. Whether Plaintiff ever informed any defendants, until he submitted a bill so

18

stating on July 7, 2008, that he rounded even an additional minute of time after a quarter-hour mark to the next higher quarter-hour.

10. Whether Plaintiff never informed any defendants that he would bill for time without keeping contemporaneous time records.

11. Whether Plaintiff never informed any defendants that he would bill for large amounts of time based on rough estimates of his daily time.

12. Whether Plaintiff charged for two days of expert time at $600 a day for his canceled deposition.

13. Whether Plaintiff did not inform any defendants of the amount of time he was spending or charging until he submitted billing information as part of his report.

14. Whether the Seymour Defendants "personally guaranteed" the fees of investigative/courier, Ronnie Montgomery.

15. Whether Ronnie Montgomery was simply a messenger who was supposed to pick up copies of medical records and deliver the, to Plaintiff.

16. Whether the Seymour defendants guaranteed the fees of Ronnie Montgomery only up to a limit of $300.

17. Whether Ronnie Montgomery ultimately submitted an invoice more than five times the amount agreed.

18. Whether Plaintiff assembled much of his report by cutting and pasting from submissions made by others.

19. Whether Plaintiff's report addressed the questions he had been asked to

19

address.

20. Whether Plaintiff's report was never used for any purpose in the Barge litigation.

21. Whether the plaintiffs in the Barge litigation withdrew their tender of Plaintiff as an expert after receiving his report.

22. Whether the plaintiffs in the Barge litigation withdrew their tender of Plaintiff as an expert after Shawn Khorrami rejected the analysis of the Seymour defendants and the basis for the proposed emotional injury subclass.

23. Whether, if Plaintiff had informed defendants about his billing practices, he would have been used in the project.

24. Whether Plaintiff was instructed that he should assemble his reliance materials as he went along, to make it inexpensive to produce them to the defendant in the Barge litigation.

25. Whether Plaintiff failed to follow this instruction, and spent unnecessary time in gathering his reliance materials.

26. Whether Plaintiff was instructed that he should keep informed on what the other psychiatric and psychological researchers were doing, so that he could fairly describe their activities in his report.

27. Whether Plaintiff failed to follow this instruction, and instead tried to teach himself the fields of the other psychiatric and psychological researchers, and spent unnecessary time in doing so.

28. Whether Plaintiff's report could be used for the purpose of answering the questions he had been asked to address.

29. Whether Plaintiff continued to charge for large amounts of time after submission of his report.

30. Whether, to the extent Plaintiff suffered any damages, Plaintiff made any effort to mitigate his damages.

31. Whether Plaintiff could have worked in his office on the same kinds of tasks on which he ordinarily worked in his office, on the days that had previously been set aside for his deposition preparation and deposition.

32. Whether Plaintiff has provided information on the income he would ordinarily have made from seeing patients at the time of his scheduled deposition.

33. Whether, at the time of the discussion as to the use of Ronnie Montgomery as a runner to pick up medical records, the Seymour defendants cautioned Plaintiff and the other medical researchers that funds were very tight and they needed to be as efficient and inexpensive as possible.

34. Whether Plaintiff ignored that instruction.

35. .Whether the Fuchsberg defendants cautioned Plaintiff and the other medical researchers that funds were very tight and they needed to be as efficient and inexpensive as possible.

36. Whether Plaintiff ignored that instruction.

37. Whether the Gilbert Defendants were asked to, or agree to, fund amounts

21

for emotional damages subclass experts.

38.   Whether the Gilbert Defendants retained Dr. Weisler.

39.   Whether the Gilbert Defendants asked Dr. Weisler to enter into a contract.

40.   Whether the Gilbert Defendants asked anyone to act as agent in entering a contract with Dr. Weisler.

41.   Whether the Gilbert Defendants participated in asking Dr. Weisler to enter into a contract.

42.   Whether the Gilbert Defendants participated in negotiating any contract terms with Dr. Weisler.

43.   Whether the Gilbert Defendants, the Seymour defendants, or the defendant Wiedemann & Wiedemann P.L.C., were identified when Dr. Weisler assertedly entered into a contract.

44.   Whether the Gilbert Defendants, the Seymour defendants, or the defendant Wiedemann & Wiedemann P.L.C., knew Dr. Weisler's rate until he produced Attachment 16 to his report.

45.   Whether the Gilbert Defendants, the Seymour defendants, or the defendant Wiedemann & Wiedemann P.L.C., agreed at any time to Dr. Weisler's rate.

46.   Whether the Gilbert Defendants, the Seymour defendants, or the defendant Wiedemann & Wiedemann P.L.C., agreed at any time to be directly responsible for Dr. Weisler's bill.

47.   Whether the individual Defendants Brian A. Gilbert or Richard T. Seymour

agreed at any time to be directly responsible for Dr. Weisler's bill.

48. Whether, other than to critique his report, and to cease work, the Gilbert Defendants gave any instruction to Dr. Weisler.

49. Whether the Gilbert Defendants retained any emotional damages expert.

50. Whether the Law Office of Brian A. Gilbert, P.L.C. is a professional law corporation at all times pertinent authorized to do and doing business, in good standing, and duly registered with the Louisiana Secretary of State. Whether the Law Office of Richard T. Seymour, P.L.L.C., is a professional limited liability corporation at all times pertinent authorized to do and doing business, in good standing, and duly registered with the District of Columbia.

51. Whether the Gilbert Defendants told Dr. Weisler that Brian A. Gilbert, an individual, was party to any contract with him.

52. Whether the Seymour Defendants told Dr. Weisler that Richard T. Seymour, an individual, was party to any contract with him.

53. Whether all Barge papers filed by the Barge plaintiffs in In Re Katrina Canal Breaches Consolidated Litigation bear the words "Law Office of Brian A. Gilbert, P.L.C." in the signature block.

54. At all times relevant hereto, whether all Barge papers filed by the Barge plaintiffs in In Re Katrina Canal Breaches Consolidated Litigation bear the words "Law Office of Richard T. Seymour, P.L.L.C." in the signature block.

55. Whether, at all times pertinent, the Law Office of Brian A. Gilbert, P.L.C.

23

was included in the Membership directory of the Louisiana State Bar Association website, www.lsba.org.

56. At all times relevant hereto, whether all or virtually e-mails sent by Richard Seymour to Plaintiff from his office Outlook account had the name and address of his law firm, "Law Office of Richard T. Seymour, P.L.L.C." in a name and address block.

57. At all times relevant hereto, whether the Seymour defendants used any e-mail address with Plaintiff that did not incorporate his law firm domain names "rickseymourlaw.net" or "rickseymourlaw.com."

58. Whether the defendants collectively decided to obtain an expert.

59. Whether Alan Fuchsberg made the initial contact with Dr. Weisler acting as a member of the Barge P.S.L.C.

60. Whether the defendants conducted an interview of Dr. Weisler to determine whether Dr. Weisler would perform services including a psychological evaluation of anecdotal clients, which would enable Dr. Weisler and Dr. Townsend to configure an abridged efficient methodology to examine other Katrina victims potentially in the class

61. Whether the defendants agreed to Dr. Weisler's alleged hourly rate.

62. The reason(s) the Defendants refused to pay the mental healthcare providers who acted as their experts in this matter.

63. The amount owed Dr. Weisler, if any.

64. Whether any additional damages were sustained by Dr. Weisler.

24

65. Whether the Defendants' funding issues were a factor in the Defendants' failure to pay Dr. Weisler.

66. Whether the delayed timing of the Defendants' request for the report less than thirty (30) days before the expert report deadline, affected the quality and content of the emotional injury subclass expert report.

67. Whether the quality of the Defendants' legal analysis affected the Defendants' choice to pursue the emotional injury subclass, as well as the eventual content of the eventual expert report and/or the Defendants' decision to abandon the emotional injury subclass.

68. Whether Defendants made personal attacks on Dr. Weisler.

69. If so, whether such attacks were made in bad faith.

70. Whether Plaintiff demonstrated billing judgment in his charges

71. Whether Plaintiff breached his agreement to provide a professionally acceptable expert report;

72. Whether there was any useful value in plaintiff's report;

73. Whether Plaintiff breached his covenant of good faith and fair dealing;

74. Whether Plaintiff actually performed the work for which he seeks compensation;

75. Whether Plaintiff should be compensated for time he did not record;

76. Whether Plaintff should be compensated for useless activity;

77. Whether any amount is owed to Plaintiff and, if so, how much;

25

78. Whether Richard T. Seymour is a proper defendant in this action;

79. Whether the Seymour defendants ever agreed to Plaintiff's hourly rate;

80. Whether the Seymour defendants cautioned Plaintiff and the other medical researchers that funds were very tight and they needed to be as efficient and inexpensive as possible;

81. Whether the Seymour defendants ever participated in any acceptance of Dr. Weisler's hourly rate;

82. Whether the Seymour defendants ever told Plaintiff not to make contemporaneous time records;

83. Whether the Seymour defendants ever told Plaintiff to perform the extent of activities for which he claims compensation;

84. Whether the Seymour defendants ever told Plaintiff to contact the large numbers of persons he contacted;

85. Whether the Seymour defendants ever told Plaintiff to read the large number of sources he claims to have read,

86. Whether the Seymour defendants ever told Plaintiff to delay his submission of invoices;

87. Whether the Seymour defendants ever told Plaintiff anything that could reasonably be construed as meaning that charges or activity on the scale of his charges were acceptable;

88. Whether the Seymour defendants ever told Plaintiff anything that could

reasonably be construed as meaning that charges or activity on the scale of his charges would be paid;

89. Whether the Seymour defendants ever told Plaintiff anything that could reasonably be construed as meaning that charges or activity on the scale of his charges could reasonably have been paid from any funds awarded to the class or to the clients.

90. Meeting of the minds/intent.

91. Whether Gilbert Defendants were identified as alleged principals at the time of contract formation.

92. Whether any mandate existed, and if so, what was its scope, and whether it was exceeded or breached.

93. Whether anyone was authorized to say that Brian Gilbert or his law office were entering into a contract with or financially responsible to Dr. Weisler.

94. Whether acts or omissions respecting retainer of Dr. Weisler were reasonable.

95. Nature and extent of any acts or statements by Gilbert Defendants bearing upon alleged ratification of any contract with Dr. Weisler, indicated by clear, absolute and unequivocal intent.

96. Whether Gilbert Defendants had full knowledge of the material facts.

97. Whether Gilbert Defendants maintained corporate formalities.

98. Whether Dr. Weisler was reasonable in reliance upon Mr. Fuchsberg's alleged representations.

27

99. Whether there were other business transactions between the parties;

100. Whether a line of credit was extended by one party to the other;

101. Whether there are running or current dealings;

102. Whether there are expectations of other dealings.

103. Whether Dr. Weisler's bill is a litigation expense.

104. Whether Dr. Weisler's bill is accurate.

105. Whether any "meeting of the minds" existed necessary to form a contract between plaintiff and defendants.

106. Whether Dr. Weisler's billing rate was agreed-to.

107. Whether Dr. Weisler's scope of services performed was beyond the scope discussed with the defendants.

108. Whether, in contacting Dr. Weisler, the Fuchsberg defendants were acting in their individual capacities.

109. Whether the Defendants misunderstood the law related to class action and reimbursement of expert witness fees.

110. Whether the Defendants acted in bad faith in creating new reasons not to pay the mental health care providers involved in emotional injury subclass project.

111. The amounts the Defendants paid their other experts.

## IX.   CONTESTED ISSUES OF LAW:

1. Whether Defendants breached their agreement with Dr. Weisler.

2. Whether Dr. Weisler breached his agreement with Defendants.

3. Whether Dr. Weisler's arrangement/agreement with the Defendants constituted an "Open Account" under La. R.S. 9:2781 and other applicable Louisiana law;

4. The amount Dr. Weisler is owed for fees and/or damages, if any.

5. Did Plaintiff materially breach his contract?

6. Did Plaintiff's work contribute anything of value to the barge litigation?

7. May Plaintiff recover for his statements of time spent when he kept few or no contemporaneous billing records?

8. May Plaintiff recover for his statements of time spent when he estimated so much of his time?

9. May Plaintiff recover for his statements of time spent when he charged for 106.25 hours for which he did not even have an estimated time slip?

10. May Plaintiff recover for his statements of time spent when he rounded his time to the next quarter hour, half hour, or hour when he spent as little as a minute past the quarter-hour mark?

11. Did Plaintiff exercise billing judgment?

12. Did Plaintiff breach the covenant of good faith and fair dealing? [The Plaintiff objects to this issue as it was never raised as an affirmative defense.]

13. Is Richard T. Seymour or Brian A. Gilbert a proper defendant?

29

14. Issues of Contract;

15. Issues of Agency/mandate;

16. Issues of Ratification;

17. Personal Liability/Disregard of corporate status;

18. Whether any "meeting of the minds" existed necessary to form a contract between plaintiff and defendants.

19. Whether the named defendants are solidary obligors.

20. Whether the release of Larry Wilson compromised plaintiff's suit against defendants, as a settlement with a potentially solidary obligor.

21. Whether Dr. Weisler has forfeited any right to compensation by seeking an exorbitant fee.

22. Whether Plaintiff or the Defendants should be subject to Rule 11 sanctions.

23. Whether Plaintiff or the Defendants acted in bad faith.

24. Plaintiff or the Defendants' negligence and incompetence in failing to properly direct their own subclass project.

25. Whether Plaintiff is entitled to prejudgment interest under Louisiana law.

26. Whether Plaintiff is liable for attorneys' fees and costs in bringing a claim without a reasonable basis.

X.	**EXHIBITS:**

The parties are working to identify common exhibits, including exhibits from among the hundreds of email exhibits exchanged during discovery, so as to make one list of stipulated exhibits that can go directly into evidence, and remove them from individual exhibit lists. This Joint List is attached as Appendix "A". Also attached as Appendix "B" is a separate list of those exhibits to which objections have been raised. The original listing of Exhibits by the parties with the revisions required by the Court, is as set out below.

    A.	**On behalf of Plaintiff:**

1. Invoices and work description prepared by Dr. Weisler.

2. CD of e-mails provided by Dr. Weisler in discovery.

3. Transcript of recorded conversation of September 15, 2008.

4. E-mails provided by Defendants.

5. Invoices for the following:

    a.	Dr. Mark Townsend;
    b.	Dr. Jill Hayes;
    c.	Dr. Howard Osofsky;
    d.	Dr. Joy Osofsky;
    e.	Dr. Phillip Griffin; and
    f.	Dr. Ronnie Montgomery.

6. Expert report of Dr. Weisler with attachments.

7. Emails exchanged with Astra Zeneca on or about July 3-13, 2008.