**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES | § | CIVIL ACTION NO. 05-4182 "K"(2) |
| CONSOLIDATED LITIGATION | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| | § | |
| | § | |
| PERTAINS TO: | § | |
| | § | |
| MRGO | § | |
| *Armstrong*, No. 10-866 | § | |
| | § | |
| | § | |

**DEFENDANT WASHINGTON GROUP INTERNATIONAL, INC.'S**
**OPPOSITION TO PLAINTIFFS' MOTION TO AMEND**
**SCHEDULING ORDER REGARDING EXPERT DEADLINES**

Defendant Washington Group International, Inc. ("WGII") respectfully submits this brief in opposition to Plaintiffs' Motion to Amend the Scheduling Order Regarding Expert Deadlines (the "Motion").

The parties' geotechnical investigation and testing of the area adjacent to the Inner Harbor Navigation Canal ("IHNC") and nearby sites was conducted over a period of 19 weeks. That schedule, the product of extensive negotiations, represented a joint effort by the parties to establish a timetable that would permit each party to conduct, within the pretrial schedule set by the Court, all of the geotechnical work it believed was necessary to allow its respective experts to evaluate Plaintiffs' claims or Defendants' defenses. Under this Court's Orders, the parties were required to complete that field and laboratory investigation and testing on November 3, 2012.

Now that the November 3 deadline has passed, however, Plaintiffs claim that another six-week extension of the geotechnical testing deadline is necessary in order for them to conduct additional pumping tests at two IHNC sites selected by defendants, and to perform grid trenching operations at the so-called School Site. But Plaintiffs cannot perform their proposed pumping

tests within this six-week timeframe, and the improvised well development methodology—which purports to avoid certain essential delays associated with those tests—lacks any scientific foundation.  What is more, the trenching Plaintiffs propose to conduct at the School Site will destroy the site itself, along with the ability to replicate the tests already performed at that location.  Put simply, Plaintiffs' request will further delay the proposed trial, to the great prejudice and expense of the Defendants.

For these reasons, and for the reasons set out in more detail below, Plaintiffs' Motion—filed on the Court-ordered testing deadline—should be denied.

## BACKGROUND

Pursuant to this Court's March 17, 2011 Scheduling Order, all parties and their experts met and conferred throughout the spring and early summer of 2011 to create a joint sampling and testing program for investigation of the soils at the East Bank Industrial Area ("EBIA").  This joint program was intended to ensure that the soils investigation and testing necessary to support the parties' geotechnical expert reports proceeded efficiently, to minimize any disputes regarding the methodologies employed for testing, and to enable all parties to share jointly in the results (and the costs) of the final program.  The March 17 Order provided that all soils investigation and testing must be completed no later than September 6, 2011.

After a brief negotiation the parties jointly settled on Fugro Consulting, Inc. ("Fugro") to perform the soils investigation and the corresponding laboratory testing.  Each party then identified the field and laboratory work that it believed was necessary to provide its experts with sufficient data to reach their opinions, and the parties prepared a joint soils investigation proposal for Fugro to provide line item estimates of the costs.  The proposal included a wide variety of soils sampling, laboratory tests, and other geotechnical field work to be performed, including soil

1076614v.1

borings, Geoprobe soundings, installation of standpipe and vibrating wire piezometers, slug tests in standpipe piezometers, field vane testing, cone penetration tests ("CPTs"), and pumping tests. Defendants proposed conducting field work in the area adjacent to the levee and floodwall.  The Plaintiffs proposed to test the soils at a site just south of the EBIA and at two remote sites.  One of the sites was nearly a half a mile from the EBIA at the former Alfred Lawless Elementary School, bounded by North Rocheblave Avenue to the north, Andry Street to the east, North Miro Street to the South, and Lizardi Street to the west (the "School Site"); the other remote site was in the vicinity of the railroad line north of Florida Avenue.[1]

On May 16, 2011, after expending significant time and effort to jointly develop the sampling and testing program, the parties presented the completed proposal to Fugro, which then provided a line-by-line estimate for the cost of each test sought.  After Fugro presented this estimate, however, Plaintiffs informed the parties that they no longer intended to proceed with—and would not pay for any portion of—any field work other than the Geoprobe soundings and work at the various wells associated with the pumping tests.

Plaintiffs' unilateral withdrawal from a significant portion of the parties' joint sampling and testing program gave rise to a dispute between the parties regarding (1) the particular field work and testing that Fugro would perform at the parties' direction; and (2) how Fugro would be compensated for that work.  Resolution of this disagreement ultimately required the assistance of the Court on Thursday, June 9, 2011, which suggested that if any party did not intend to pay for certain field work and/or testing proposed by another party, the objecting party would not be entitled to receive the results of that testing unless and until it was produced, as reliance material, in connection with the report of the testing party's expert.  As a practical matter, this meant that

---

[1] Ultimately, Plaintiffs' proposed tests at the railroad site were never completed.

Plaintiffs, since they expressed no interest in any field permeability tests proposed by WGII and the United States other than the work associated with pumping tests, would not be entitled to receive the results of that testing unless and until that data was produced in connection with the reports of Defendants' experts.  In light of the delay caused by Plaintiffs' refusal to pay for certain field work, the Court also granted the parties' joint request for an extension of the deadline to complete all geotechnical testing from September 6 to October 24.[2]

With these preliminary matters finally resolved, actual field work began at the EBIA Site and the School Site on or about June 21.  Per the agreement of all parties, including Fugro, the initial field work consisted of the soil borings, standpipe piezometer permeability tests, field vane testing, and CPTs at the EBIA that were requested by Defendants, and the Geoprobe soundings requested by the Plaintiffs.[3]  With the exception of the Geoprobe soundings, those tests proceeded largely on schedule, with minimal delays associated with weather and assorted scheduling conflicts.  The Plaintiffs' proposed Geoprobe soundings had to be abandoned after a few trials since they proved unsuitable for the conditions found at the EBIA.  The pumping  tests were scheduled to begin after the other field work since they had a later deadline.  Plaintiffs had elected to cause Fugro to perform pumping tests at the School Site and at a site just south of the EBIA, identified as "South EBIA."  Defendants proposed to conduct pumping tests at two locations within the EBIA, identified in the joint proposal as EBIA-South Breach ("EBIA-SB") and EBIA-North ("EBIA-N").

---

[2] In a subsequent Order, the Court again extended this deadline to November 3.

[3] In their Motion, Plaintiffs unfairly attempt to blame Fugro for the fact that the pumping tests did not begin until after the soil borings had been completed.  (Pls. Br. at 5.)  In reality, the parties' joint sampling protocol had always anticipated that soil borings would be completed prior to the initiation of any pumping tests.

1076614v.1

Prior to proceeding with the pumping tests, however, the parties had to agree on a methodology governing the installation and development of the control and observation wells[4] for those tests.  After about three additional weeks of negotiations among the parties' experts, and in consultation with Fugro, the parties' experts agreed upon a standard operating procedure ("SOP") for the pumping tests on August 18, 2011.  The SOP provided a scientifically defensible protocol, applicable to the parties' selected pumping test sites, for installing and developing the wells required for the pumping tests in accordance with recognized standards set by the American Society for Testing and Materials ("ASTM").

Importantly, the SOP also acknowledged that the well-development procedures "may need to be modified in the field," and provided that such modifications could be made only "with the consensus of the experts in order to meet schedule requirements."  SOP at 5  This provision

---

[4] The fundamental soil property involved in fluid flow is permeability (also referred to as hydraulic conductivity).  Engineers and hydrologists determine permeability using one or more of the following methods:

1. Field tests – including Pumping Tests and Slug Tests (fall/rising head)

2. Laboratory tests – including Constant, Falling, or Variable Head Permeameter Tests, Permeability Triaxial Tests, and Oedometer Tests

3. Empirical correlations – including correlations with grain size, pore pressure dissipation during Cone Penetration Tests (CPT), and others

A Pumping Test requires the installation of a Control Well to remove water from the aquifer and Piezometers or Observation Wells to observe drawdown water levels at different distances on radial lines from the control well.  For the Joint Exploration and Testing Program at the EBIA, the control wells consisted of:

"2-inch diameter by 60-inch long PVC casing and 3-foot screen Section with a slot size of 0.010-inches.  In general, there will be 6 inches of sand below the screen and 6 inches of sand above the screen… A six-inch diameter rotary boring will be drilled to install the 2 inch diameter control well." **[SOP at 3].**

The observation wells consisted of:

"2.4-inch O.D. pre-pack well screen 24-inches in length. The pre-pack well screen is constructed of 1.5-inch Schedule 40 PVC with a 0.010-inch slot size… The outer component of the screen is stainless steel wire mesh with a pore size of 0.011-inch and is packed with 20/40 environmental grade sand.  In general, there will be six inches of sand above the screen resulting in a collection zone of 30-inches... pre-pack well screens will be placed using direct push in accordance with ASTM Method D6724-04" **[SOP at 4]**.

Each pumping test location had one control well and 12 observation wells.

1076614v.1

proved to be critical once the pumping tests began.  As will be addressed in more detail below—and as WGII's experts will explain at the hearing before this Court on November 30—during the process of developing the various wells at both the EBIA and the School Site, it became clear that most of the wells could not be fully developed in keeping with the requirements of the SOP because the soils at those locations are too impermeable to allow for development in accordance with the SOP within the parties' agreed-upon schedule.

Fugro commenced development of the Plaintiffs' wells at the School Site on August 30. Understanding that attempting to develop the Plaintiffs' wells in accordance with the SOP would take several months, and in order to ensure that the pumping tests would be completed within the schedule set by the Court, Defendants did not force Fugro to develop Plaintiffs' wells strictly within the scope of the SOP before performing the pumping tests.  Plaintiffs' wells at the School Site were never fully developed in accordance with the agreed SOP.  A similar scenario occurred in connection with the second site selected by the Plaintiffs for pumping tests, South EBIA.

After Plaintiffs' pumping tests had begun at South EBIA, Fugro began the work of developing the wells at the two EBIA sites selected by Defendants.  Even though Defendants were satisfied with the development of their own designated pumping test wells, Plaintiffs objected to the initiation of pumping tests at Defendants' sites.  In so doing, Plaintiffs cited the SOP development requirements, and then proposed a joint extension of the field investigation testing deadline.  Because well development in accordance with the agreed SOP was not achievable in the time proposed by Plaintiffs, and considering that Plaintiffs' request was made just days before the field investigation was scheduled to end, Defendants declined Plaintiffs'

offer and proceeded with the pumping tests at EBIA-SB and EBIA-N on October 26, with the reluctant permission of Plaintiffs' experts.[5]

On November 3—the Court-imposed deadline for the completion of all geotechnical testing—Plaintiffs filed the instant Motion, seeking yet another extension of the testing period. Specifically, Plaintiffs now claim that they need additional time in order to conduct their own pumping tests at EBIA-SB and EBIA-N—sites selected by Defendants, and sites that Plaintiffs' experts had urged were not as relevant as the sites Plaintiffs had selected.  Plaintiffs also propose to use a makeshift method of well development directly contrary the SOP, and to which the Defendants objected when discussed amongst the parties at the time Plaintiffs' School site well development was taking place.  This makeshift procedure is in fact also contrary to generally accepted well development practices in the engineering and hydrogeology professions.  Finally, Plaintiffs propose to excavate and ultimately destroy certain pumping test locations at the School Site.  (Pls. Br. at 5-6.)  Because these activities will yield no appreciable benefit, and will only prejudice the Defendants and further delay the proposed trial, Plaintiffs' Motion should be denied.

## **ARGUMENT**

Rule 16 provides that a scheduling order "may be modified *only* for good cause"  Fed. R. Civ. P. 16(b)(4) (emphasis added).  To make this determination, courts consider (i) the moving party's explanation for the failure to meet the existing deadline; (ii) the importance of the amendment sought; (iii) the potential prejudice to the nonmoving party in allowing the requested amendment; and (iv) the availability of a continuance to cure such prejudice.  *S&W Enterprises,*

---

[5] As Plaintiffs acknowledge in their motion, their experts ultimately did consent to Defendants' pumping tests.  (Pls. Br. at 6.)

1076614v.1

*L.L.C. v. SouthTrust Bank of Alabama, NA*, 315 F.3d 533, 536 (5th Cir. 2003).  Courts routinely deny motions for extensions of time where the moving party has already sought and received previous extensions, or where the nonmoving party would suffer prejudice if the requested extension were granted.  *See id.; accord* 6A C. Wright and A. Miller, Federal Practice & Procedure § 1522.2 (3d ed. 2010).

Here, Plaintiffs' proposed six-week extension an insufficient amount of time in which to complete the pumping tests that they propose.  This is true even if Plaintiffs direct Fugro to utilize the makeshift well-development plan proposed in their Motion--a plan contrary to the SOP and accepted practice.  Plaintiffs' trenching proposal, by contrast, will ultimately result in the total obliteration of the test site itself.  Moreover, granting Plaintiffs yet another extension to perform this new round of testing and investigation will directly prejudice Defendants.  In light of these facts, the costs associated with the additional tests Plaintiffs seek—both financial and otherwise—far outweigh any alleged benefits that Plaintiffs claim these tests will provide.  Accordingly, Plaintiffs' Motion should be denied.

**I.  Plaintiffs Cannot Complete Their Proposed Testing Within The Six Weeks They Request.**

Despite the assurances to the contrary in their Motion, Plaintiffs cannot possibly complete their proposed tests in six weeks, no matter whether they perform their tests in compliance with the parties' agreed-upon SOP or in accordance with their makeshift plan.  This fact alone demonstrates that Plaintiffs cannot show good cause for the extension they seek.

As WGII's experts will explain at the November 30 hearing, if Plaintiffs conducted their proposed tests in accordance with the existing SOP—as they originally claimed they would do in their Motion (*see* Pls. Br. at 7)—those tests would require at least four months to complete, and

that assumes that the tests would not fall victim to any weather-related delays.[6]  No doubt recognizing this fact, Plaintiffs' experts have recently crafted—apparently out of whole cloth—a different method for developing the wells used in the performance of these tests.  (*See* J. Rogers, "Follow Up on EBIA Joint Experts Call of November 9, 2011" at 1.)  This improvised and unproved plan, which involves pouring water into the test wells during development in order to force the head (water level) to remain within 90% of the displaced static level (as opposed to allowing the wells to recover to that level as required under the SOP) is not an acceptable practice and does not appear in any of the peer-reviewed guidelines or standards commonly used to ensure proper conduct of pumping tests.

Even if Plaintiffs were permitted to shortcut the existing approved and agreed SOP by following their makeshift well-development plan, the six-week extension Plaintiffs seek still would not provide enough time to complete the tests and provide any data from the proposed "pump testing."  Plaintiffs' experts have informed Defendants' experts that under Plaintiffs' makeshift plan, the new pumping tests would start a mere ten days before the expiration of the six-week extension they seek in their Motion.  The test itself would take at least 72 hours (three days) and recovery would take another six or seven days.  (*See* J. Rogers, "Follow Up on EBIA Joint Experts Call of November 9, 2011" at 1.)  Thus Plaintiffs' experts' estimate omits several key steps that must be completed **before** commencing any new round of testing, and omits the time required for delivery of data to the parties' experts **after** the six weeks contemplated for completion of this unorthodox planned testing.  For example, **before** any new tests can be conducted, and in accordance with the SOP, the parties would have to discuss and come to

---

[6] Of course, the likelihood that these or any subsequent tests will entirely avoid any delays due to weather is exceedingly slim.  Plaintiffs' own motion observes that the just-completed tests "experienced significant weather delays" in the form of rainstorms, which "delayed [the tests] by approximately two weeks."  (Pls. Br. at 9-10.)

agreement with Fugro on the test procedures, equipment, and other preliminary matters.  Based on prior experience, this process would likely take at least two weeks.  Once the parties reached an agreement regarding the tests, Fugro would need 4-5 days to obtain delivery of the necessary test equipment from the rental company, In-Situ, Inc.[7]  Fugro would then require additional days to set up the equipment once it had been received.  Similarly, **after** completion of the tests, Fugro would require a minimum of two weeks to process and post the results of the new tests.  Once again, these estimates do not include any time that might be lost due to inclement weather.

Assuming the absolute best case scenario, then, Plaintiffs' proposed testing would take at least ten weeks to complete, concluding—if the process began the day after the hearing on this Motion—on February 2, 2012.  That is one week ***after*** the extended deadline that the Plaintiffs have already requested for Dr. Robert Bea's expert report, a report that either cannot be completed without the benefit of these very test results, or which is not required by the expert designated to use those results.  Plaintiffs' proposal is simply untenable, and no justification they may offer can establish that good cause exists for a further modification of the Scheduling Order.[8]

---

[7] As WGII informed the Court in its Opposition to Plaintiffs' Motion for Expedited Hearing and Incorporated Memorandum on Their Motion to Amend Scheduling Order Regarding Expert Deadlines, after they filed the instant Motion, Plaintiffs instructed Fugro to return the test equipment to the rental company.

[8] Plaintiffs also request additional time to excavate pumping wells at the School Site by "creat[ing] a trench that will permit Plaintiffs' expert to visually inspect the soil stratigraphy that surrounds the excavated well."  (Pls. Br. at 6.)  After filing their Motion, Plaintiffs suggested to the Defendants that the School Site excavation can be completed in one or two days, which WGII maintains is impossible if the task is to be performed with the care and level of detail required to obtain meaningful results.  Although it is possible that the excavation could be completed in the six weeks that Plaintiffs request, doing so would destroy the test site and make it impossible for the prior tests conducted at the site to be redone.  *See* Section II.B, *infra*.

1076614v.1

**II.**  **Even If There Was Sufficient Time For Plaintiffs' Proposed Testing, The Pump Well Testing Is Unscientific And The Trenching Activities Would Obliterate One Of The Testing Sites.**

Even assuming, counterfactually, that the six-week extension plaintiffs seek provided sufficient time for them to complete the testing they propose, this Court should nevertheless deny their request. Not only does Plaintiffs' proposal for a new round of pumping tests at the two sites selected by Defendants materially deviate from the parties' agreed-upon SOP and lack any scientific foundation, their request to perform "excavation trenching" at the School Site has as its only result the complete destruction of that test site. Permitting Plaintiffs additional time to conduct these tests would materially prejudice Defendants because of Plaintiffs' makeshift pumping test proposal would introduce uncertainty in the results of the very pumping tests they propose to perform. Allowing the trenching proposal to take place would prejudice Defendants because these trenching activities would obliterate the School Site. For these reasons, as well, the Court should deny Plaintiffs' request for an extension of time in which to perform those tests.

**A.**  **Plaintiffs' Makeshift Pumping Test Well Development Plan Would Render Any New Pumping Tests Indefensible.**

The parties' original SOP provided an agreed, and scientifically defensible protocol for developing pumping test wells in accordance with recognized standards set by the ASTM. In particular, the agreed SOP set forth the following steps to properly develop the control wells at the parties' testing sites:

- First, a slug test[9] would be performed "on each well following installation in accordance with either ASTM D4044-96 "Standard Test Method for (Field Procedure) for Instantaneous Change in Head (Slug) Tests for Determining

---

[9] A "slug test" is described as a falling head or rising head permeability test performed in a standpipe piezometer or well in which the standpipe water level is quickly increased or decreased by the insertion or removal of a slug (a capped pipe or rod with a predetermined volume and sufficiently heavy to sink in the groundwater). Following the insertion or removal of the slug, the standpipe water level is monitored over time, and the results are used to calculate a field permeability.

Hydraulic Properties of Aquifers" or ASTM D7242-06 "Standard Practice for Field Pneumatic Slug (Instantaneous Change in Head) Tests to Determine Hydraulic Properties of Aquifers with Direct Push Ground Water Samplers";

- Following this initial slug test, "the Control Well and Observation Wells will be developed ***and then allowed to recover*** such that the head in the well recovers to 90% of the displaced static level measured prior to the first slug test"; and

- After the well had been ***allowed*** to recover, a second slug test would be performed.

SOP at 4-5 (emphasis added).  If the calculated hydraulic conductivity of the control well in the second slug test is within 30% of the first test ("30% repeatability"), the well would be considered "adequately developed." *Id*. at 5.  The original SOP required all pumping test control wells and observation wells to meet this standard.

As WGII's experts will explain in more detail at the November 30 hearing, requiring that the wells be left untouched ("***allowed*** to recover") following development until the water level reaches 90% of the level measured prior to the first slug test is critically important.  Pumping the well to induce flow thorough the collection zone is an integral part of the well development process.  Pumping water *into* the well, as the Plaintiffs propose, bypasses this essential aspect of well development.  After pumping the well to induce flow thorough the collection zone, the well must be "***allowed*** to recover such that head in the well recovers to within 90% of the displaced static level measured prior to the first slug test" as required by the agreed SOP.  Pumping water into the well at this stage, instead of *allowing* it to recover, would  introduce uncertainty in the test conditions that would make accurate interpretation of the data collected nearly impossible.  Furthermore, pumping foreign water into the well, as the Plaintiffs have previously done at their two pumping test sites, can alter the results obtained from the tests due to differences in chemical composition of the fluids.

To be sure, not all of the wells developed by either party have satisfied the 30% repeatability requirement.  However, WGII's experts believe—and will testify on November 30—that this is because these pumping tests were not appropriate for the soils at the sites selected by either party.  Preliminary findings indicate that the soils at the locations designated for pumping tests are too impermeable to allow for development in accordance with the SOP and within the parties' agreed-upon schedule.  As a result, the control or observation wells may never be fully developed under the SOP, and certainly not within the time frame proposed by Plaintiffs. This is precisely why WGII decided to proceed with its own pumping tests at EBIA-SB and EBIA-N sites as opposed to wasting the remaining time before the deadline on further, unnecessary development of the observation wells which would not have permitted the performance of a single pumping test at either site.  Moreover, it is why WGII conducted several other types of field permeability tests—*e.g.*, slug tests on standpipe piezometers—in order to determine if the pumping tests were appropriate for the EBIA conditions and, if so, to help design the test details.[10]  In essence, the parties' inability to properly develop the pumping test wells is itself evidence that the tests were not meant to be performed on soils like those at the EBIA and the School Site.

### B.   Plaintiffs' Proposed Trenching At The School Site Would Destroy The Test Area, As Well As The Imbedded Instruments Themselves.

Plaintiffs also request additional time to excavate the School Site in order to investigate the stratigraphy surrounding the wells already in place there.  Specifically, Plaintiffs propose to dig four trenches, each twelve feet deep, make observations therein, and then backfill the trenches with compacted soil—all in less than 72 hours.  (*See* IHNC-EBIA School Site Trench

---

[10] During the negotiations that ultimately produced the current SOP and testing schedule, Plaintiffs were afforded the opportunity to perform their own standpipe piezometer tests, but they declined to do so.

1076614v.1

SOP, October 2011 at 3.)  WGII's experts will testify that this is not sufficient time to perform any meaningful investigation of the stratigraphy in the trenches other than performing cursory visual observations.

Even if the Plaintiffs took the full six weeks to perform the trenching, however, Plaintiffs themselves admit that the trenching would destroy the placement of the underground instrumentation imbedded in the pump wells and obliterate the existing properties of the surrounding soils.  When a proposed test will alter the original state of an object, the court must balance the costs of the alteration of the object and the benefits of learning the truth in the case. *Nugent v. Hercules Offshore Corp.*, 1999 WL 1277536, *1 (E.D. La. Dec. 28, 1999) (citing *Hawthorne v. Michelin Tire Corp.*, 1996 WL 640481, at *4 (9th Cir. Nov. 5, 1996) and *Cameron v. District Court in and for First Judicial Dist.*, 565 P.2d 925, 929 (Colo. 1977)).  Evidence sought through destructive testing must be "integral to proving the movant's case and do more than strengthen an already established claim or defense."  *Mirchandani v. Home Depot, U.S.A., Inc.*, 235 F.R.D. 611, 615 (D. Md. 2006).

Plaintiffs simply cannot argue that the extensive trenching they now propose is a necessary fact-finding endeavor, let alone integral to their case.  Plaintiffs propose to destroy the site despite the existence of other less-damaging avenues they can pursue to investigate the stratigraphy.  *See Mirchandani*, 235 F.R.D. at 614 (considering whether there are any less prejudicial alternative methods of obtaining the evidence sought).  For example, Plaintiffs have already taken soil borings at the School Site.  Those borings are more than sufficient to identify the stratigraphy surrounding the wells.  Additionally, if (as Plaintiffs appear to believe) the remote School Site is representative of the subsurface geometry in the EBIA, they should be able to perform their proposed trenching at a nearby location and still obtain an accurate

-14-

representation of the stratigraphy without destroying their existing pump and observation well sites.

More importantly, because Plaintiffs' proposed trenching will result in obliteration of the wells and the soil properties around those wells, the trenching will make it impossible to verify any results obtained at those sites.  *See Mirchandani*, 235 F.R.D. at 614 (considering whether the non-movant's ability to present evidence at trial will be hindered, or whether the non-movant will be prejudiced in some other way).  Even where this Court has allowed destructive testing, that testing has been limited and did not completely destroy the evidence in question.  *See, e.g., Nugent*, 1999 WL 1277536, *1 (holding that party was entitled to conduct limited destructive testing by making only one cut in the curvature of a failed lanyard).  The trenching that Plaintiffs propose, by contrast, will forever alter the test sites, remove the imbedded instrumentation, and eliminate the potential for Defendants to challenge Plaintiffs' results in any meaningful way.

In short, the benefit of preserving the School Site to resolve future disputes far outweighs any data Plaintiffs may obtain by obliterating the site to gather stratigraphy information that is already available from other sources.

### III.    The Costs of Plaintiffs' Proposed Tests Far Outweigh Any Claimed Benefits .

In addition to the loss of valuable trial preparation time and—in one case—the destruction of an entire testing site, the financial costs associated with conducting Plaintiffs' testing are too great, particularly in light of the fact that the testing serves no real purpose.  WGII should not be made to bear the costs—both financial and otherwise—associated with tests that are at best wholly unnecessary and at worst actively destructive.

To accomplish the tests proposed by Plaintiffs for the six (6) week extension, assuming their makeshift plan of two development cycles and one pumping test the total cost has been estimated by WGII's experts as $350,752.  To accomplish an additional pumping test at each of

the Defendants' sites (EBIA-SB and EBIA-N) pursuant to the agreed SOP (which would take 3 to 4 months) WGII's experts estimate the total cost would be $766,356.

Finally, to perform the destructive trenching exercise proposed by Plaintiffs at the School site is estimated to cost about $50,000, assuming it is performed based on the latest SOP prepared by Plaintiffs' experts and sent via e-mail to WGII's experts on October 29, 2011, an SOP that has not been fully agreed to by Defendants' experts.  Although not specified in the SOP, the estimate uses a duration of 5 days for the trenching and inspection work.

All of the costs estimated above, for both the proposed pumping tests and the proposed trenching exercise, do not include the charges for the time and travel expense for all of the parties' experts that would necessarily be involved in observation and utilization of any information developed.

1076614v.1

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion to Amend the Scheduling Order Regarding Expert Deadlines should be denied.

Dated: November 22, 2011                 Respectfully submitted,


                                _/s/ *William D. Treeby*_____
                               William D. Treeby, Bar No. 12901
                               James C. Gulotta, Jr., Bar No. 6590
                               Heather S. Lonian, Bar No. 29956
                               STONE PIGMAN WALTHER WITTMANN LLC
                               546 Carondelet Street
                               New Orleans, LA 70130
                               Phone:  504-581-3200
                               Fax:  504-581-3361

                               Adrian Wager-Zito
                               Debra S. Clayman
                               Christopher R. Farrell
                               Christopher N. Thatch
                               JONES DAY
                               51 Louisiana Avenue, N.W.
                               Washington, D.C. 20001-2113
                               Phone:  1-202-879-3939
                               Fax: 1-202-626-1700

                               *Attorneys for Defendant*
                               *Washington Group International, Inc.*

1076614v.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing Opposition to Plaintiff's Motion to Amend Scheduling Order Regarding Expert Deadlines has been served upon all counsel of record through the Court's CM/ECF electronic filing system or by placing same in the United States mail, postage prepaid and properly addressed, this 22nd day of November, 2011.


_____/s/ _____