UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: KATRINA CANAL BREACHES         § | CIVIL ACTION |
|              CONSOLIDATED LITIGATION  § | NO. 05-4182 "K" (2) |
|                                                                   § | |
| _____ § | |
|                                                                   § | JUDGE DUVAL |
| PERTAINS TO: MRGO                                § | MAG. J. WILKINSON |
|              *Armstrong,* No. 10-866              § | |
| _____ § | |

**DEFENDANT UNITED STATES' OPPOSITION
TO PLAINTIFFS' MOTION TO MODIFY
SCHEDULING ORDER**

The plaintiffs seek an order allowing them to conduct soils testing and exploration during a six-week period, but they have not shown good cause for modifying the scheduling order. They seek more time to perform tests at two sites where tests were performed at the defendants' direction and to dig a large pit that will destroy a site where tests were performed at the plaintiffs' direction. Having failed to show good cause for the lengthy delay that these tests will necessitate, their motion should be denied.

-1-

## ARGUMENT

**I.   PLAINTIFFS DO NOT SEEK DATA TO PROVE THEIR CASE BUT TO BOLSTER THEIR OPPOSITION TO THE ANTICIPATED OPINIONS OF THE DEFENDANTS' EXPERTS.**

The absence of good cause becomes obvious by noting what the plaintiffs are *not* requesting.  They are *not* requesting time to perform tests that they need to prove their case.  They are *not* requesting time for tests and explorations that they proposed or that were originally proposed by any party as part of the court-ordered "joint sampling and boring protocol."[1]  They are *not even* requesting time for tests that they need to rebut the defendants' experts.

Instead, the plaintiffs want to delay the case so that they can run *tests that they never proposed,* in the hope that doing so will give them *more* grounds for opposing opinions that they speculate will be put forward by the defendants' experts.  Plaintiffs assert that the wells at the defendants' sites were not adequately prepared ("developed") before the pumping tests were

---

[1] R.D. 20200, at 6 (emphasis omitted).

performed.[2] They acknowledge, however, that the parties' experts disagreed about whether the wells were adequately prepared.[3] This sort of disagreement among experts is the stuff of which trials are made. The plaintiffs can attempt to make their case that the wells were inadequately prepared, and if their testimony is persuasive then the Court will be able to discount the tests at those sites. This disagreement among experts does not amount to good cause for a schedule modification.

    Plaintiffs misleadingly assert that a danger of confusion may arise unless "all of the pump tests conducted during the course of the field work . . . adhere to the SOP that was agreed to by all of the parties."[4] This is misleading because their own experts have proposed relaxing the SOP requirement that "the calculated hydraulic conductivity value of the control well from the second test [be] within 30% of the first test" in order to consider the well "adequately developed."[5] To shorten the time required for development, the

---

[2] *See* R.D. 20550-1 (Plt. Mem.) at 4.

[3] *See id.* at 5.

[4] *Id.* at 7.

[5] Exh. A (Pumping Test SOP) at 5. This requirement also applies to observation wells. *See id.*

plaintiffs propose to consider a site "adequately developed" even if as many a quarter of the wells do not meet the 30% repeatability standard. Although the plaintiffs say all the pumping tests should be performed identically in order to keep from comparing apples to oranges, no two pumping tests have been performed identically. Numerous variances from the SOP occurred at the plaintiffs' sites. Whether those variances were justified and how they affected the data from the testing at those sites are subjects to be addressed by the experts. Modifying the schedule to allow the plaintiffs to undertake more "noncomplying" tests will not aid the Court.

The plaintiffs candidly admit that they want time for an excavation that they *first proposed on October 22*—twelve days before the already twice-delayed deadline for completion of geotechnical sampling and testing.[6] This excavation—digging a huge pit that will destroy a pumping-test site—is not even claimed to be necessary to prove their case but is proposed to "supplement the information that the parties obtained from the soil borings"

---

[6]*Compare id..* (March 17 Order, directing that "[a]ll geotechnical testing shall be completed no later than September 6, 2011 . . . .") (emphasis omitted) *with* R.D. 20272 (June 9 Order, extending deadline from September 6, 2011 to October 24, 2011) *and* R.D. 20424 (Sept. 12 Order, extending deadline from October 24 to November 3).

in the "belie[f] that the excavations will aid Plaintiffs in rebutting criticisms that defense experts may offer."[7]  This speculative belief—hope, if you will—does not constitute good cause for modifying the scheduling order: the defendants' experts have not yet expressed their opinions.

## II. PLAINTIFFS' PROPOSED TESTING WILL RESULT IN AT LEAST A THREE-MONTH DELAY—FOR TESTS THAT PROBABLY CANNOT BE COMPLETED IN SIX WEEKS.

What the plaintiffs fail to reveal—perhaps because it puts the exclamation point on the absence of good cause—is that their proposed six-week testing-and-excavation plan would require at least a *three-month extension* of the current deadlines.  By the time the Court rules on the plaintiffs' motion, nearly a month will have elapsed since the termination of testing.  At that point, a two-week additional delay will be required for the contractor to estimate the cost of the proposed work, issue a contract modification, and mobilize equipment and personnel.  After the six-week testing period ends, the contractor will need another two weeks to process the data and post it in draft form for quality-assurance review by the parties' experts.  Only at that point can the plaintiffs' experts begin to form opinions

---

[7]R.D. 20550-1 (Plt. Mem.) at 6.

based on the new data and then incorporate those opinions into their reports. If the plaintiffs' motion is granted on December 1, the day after the motion is heard, then the current cessation of testing date, November 3, will have to be extended to at least February 1, 2012. Plaintiffs' expert reports, now due December 15, will almost certainly be delayed until March 15.

If the weather- and equipment-related delays cited by the plaintiffs constitute good cause for modifying the scheduling order to allow the proposed testing and exploration, then it can be assumed that any modification now will not be the last. The same sorts of delays that twice necessitated schedule modifications and are now cited as the basis for a third enlargement can be expected to occur again, and there will be no basis for denying yet another schedule-modification motion if the work that the plaintiffs' now request is not completed within the enlargement that they now request. Good cause for these lengthy delays cannot be shown.

### III. PLAINTIFFS PLAN TO USE A NEWLY PROPOSED AND UNPROVEN METHOD OF WELL DEVELOPMENT THAT IS AT VARIANCE WITH THE SOP, DIVERGES FROM ACCEPTED INDUSTRY STANDARDS, AND HAS NOT BEEN SHOWN TO BE RELIABLE.

Absence of good cause also is shown by the nature of the specific tests that the plaintiffs propose. They propose pumping tests that do not comply with the Standard Operating Procedures (SOP) that the parties experts drew up to govern the pumping tests.[8] Ironically, the plaintiffs argue that they need time for these tests because the timely pumping tests at the defendants' two sites did not comply with the SOP. Noncompliance with the SOP is not, in and of itself, a basis for determining whether pumping tests were properly conducted. For that reason, the SOP specifically provides for variance from the specified procedures.[9]

At the plaintiffs' sites, the defendants' experts deferred to the plaintiffs' experts when they proposed SOP variances. This deference was anticipated by the SOP, which provides that "Plaintiff's experts will have primary

---

[8]The SOP is attached as Exhibit A.

[9]*See* Exh. A (SOP) at 5 ("The well development procedures may need to be modified in the field with the consensus of the experts in order to meet schedule requirements."); *cf. id.* at 1-2 ("Any modifications to this SOP or field changes regarding the construction of wells, duration of testing, or determination or alteration of pumping rate will be made only after joint consultation among the experts for plaintiffs, DOJ and WGI.").

responsibility for design of field activities at sites 1 through 3 but in consultation and agreement with Defense experts, while Defense experts will have primary responsibility for design of field activities at sites 4 and 5 but in consultation and agreement with Plaintiff's experts.[10] At the defendants' sites, the plaintiffs' experts refused to defer but did allow the pumping tests to proceed over their objections. Plaintiffs now propose to use a novel and unproven procedure that is at variance from the SOP in order to speed up the testing that they desire to direct at the defendants' sites:

> [Plaintiffs' expert] Rogers suggested that Fugro use well water (brines) from their pump well to replenish the water pumped out of the adjacent observation wells during development (maybe 5 gallons of water). This technique is loosely referred to as "borrow bailing" of water. In this way the salinity of the well water would be maintained and the required recovery time optimized.[11]

Rogers's reference to "the required recovery time" is an allusion to the SOP requirement that "[w]ells will be developed and then allowed to recover such that head in the well recovers to within 90% of the displaced static level measured prior to the first slug test."[12] Well preparation ("development")

---

[10] *Id.* at 1.

[11] Exh. B (Rogers' memo) at 1.

[12] Exh. A. (SOP) at 4.

entails surging water within the well so that water is forced through a screen that lines the well adjacent to the subterranean formation ("unit") that is being investigated. One of the purposes of this surging is to dislodge small soil particles that may have been displaced when the well was installed. These small particles ("fines") are placed in suspension by the surging and are removed from the well by pumping out the water in which they are suspended. As a result of removing this water from the well, a differential is created between the water level ("head") in the well and the water level in the adjacent formation. Standard practice is to wait for the water level in the well to return to (or nearly to) the level in the adjacent formation before proceeding. Gravity is the force that causes the water in the formation to flow out of the formation, through the screen, and into the well. What Dr. Rogers euphemistically describes as "optimization" of recovery time is in reality a manipulation of water levels to avoid the lengthy times that can be expected if the wells are "allowed to recover" naturally. The well operator pours water into the well as the fines are being pumped out, minimizing the head differential.

The SOP phraseology ("allowed to recover") denotes the textbook and industry-standard practice of waiting for water to move through the subterranean stratum into the well as a result of gravity. The flow of water out of the formation (or "unit") being investigated accomplishes three important functions. First it demonstrates that the well is in communication with the adjacent soil stratum. Second the flow through the screen removes small soil particles ("fines") that could impede flow during the pumping test and distort the hydraulic-conductivity data gleaned from the test. A third function, of perhaps lesser importance, is that the rate of well recovery provides a preliminary indication of the permeability of the soil stratum being investigated. This preliminary indication can be used to set the pumping rate at a level that will not dewater the well and cause the pumping test to be aborted when the surface of the water in the well falls below the top of the screen. (After the plaintiffs forced recovery by this illicit "borrow bailing" technique at one of their sites, they specified a pumping rate that was too high to allow the test to be completed.)

The well-development technique proposed for use at the defendants' sites will compromise whatever data is obtained. The so-called "borrow

bailing" technique is inconsistent with industry standards and practices and has not been shown to produce accurate and reliable data.[13] The schedule should not be modified to allow these tests to be performed.

### IV. PLAINTIFFS' PROPOSED "TRENCH" WILL DESTROY A PUMPING-TEST SITE IN THE SPECULATIVE HOPE OF GETTING "SUPPLEMENTAL" DATA.

Plaintiffs propose to "create a trench that will permit Plaintiffs' experts to (1) visually inspect the soil stratigraphy that surrounds the excavated well, (2) supplement the information that the parties obtained from the soil borings that were performed at the School site over the summer, and (3) aid in rebutting criticisms that defense experts may offer with respect to the School site data."[14] What the plaintiffs' brief describes as a trench is actually a large (up to 513 cubic feet) pit that will destroy several wells at one of the plaintiffs' pumping-test sites.[15] This attempt to gather supplemental information would permanently prevent the parties (and the Court) from revisiting this site in

---

[13]Dr. Thomas G. Naymik, a licensed and certified professional geologist, will testify concerning the industry-standard and accepted practices for determining hydraulic conductivity of geologic formations. Dr. Naymik's curriculum vitae is attached as Exhibit C.

[14]R.D. 20550-1 (Plt. Mem.) at 1-2.

[15]Exh. B (Plaintiffs' expert Rogers memo dated Nov. 11, 2011) at 4.

-11-

the future, should litigative developments give rise to a need for additional investigation.  The plaintiffs already have information on the "soil stratigraphy" from the soil borings.  The scheduling order should not be modified to allow the proposed destructive exploration.

## CONCLUSION

The plaintiffs' motion should be denied because they have not shown good cause for modifying the scheduling order.

                Respectfully Submitted,

                TONY WEST
                Assistant Attorney General
                PHYLLIS J. PYLES
                Director, Torts Branch
                JAMES G. TOUHEY, JR.
                Assistant Director, Torts Branch

                 s/ Robin Doyle Smith
                ROBIN DOYLE SMITH
                Senior Trial Counsel, Torts Branch
                Civil Division
                U.S. Department of Justice
                Benjamin Franklin Station,
                P.O. Box 888
                Washington, D.C.  20044
                (202) 616-4400/616-5200 (fax)
                [robin.doyle.smith@usdoj.gov](mailto:robin.doyle.smith@usdoj.gov)
                Attorneys for the United States

## **CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing was served upon all counsel of record by ECF on November 22, 2011.

/s  Robin Doyle Smith
ROBIN DOYLE SMITH