UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: KATRINA CANAL BREACHES<br>CONSOLIDATED LITIGATION | CIVIL ACTION<br>NUMBER: 05-4182 "K"(2)<br>JUDGE Duval<br>MAG. Wilkinson |
| PERTAINS TO: MRGO<br>　　　　　　　*Armstrong*, No. 10-866 | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO AMEND SCHEDULING ORDER REGARDING EXPERT DEADLINES**

**I.   SUMMARY**

The sands have shifted since Defendants filed their opposition to Plaintiffs' Motion to Amend the Scheduling Order. In particular, the Court granted Plaintiffs' Motion with respect to the request for an extension of the deadline for Dr. Bea's expert report. Dr. Bea's report is now due February 3, 2012, and more importantly, the trial of this matter has been continued to September 10, 2012. As a result, much of Defendants' opposition—which is premised on the perceived prejudice that would result if the trial setting were delayed—is moot. Granting Plaintiffs' request for additional testing will not cause any further delay of the trial of this matter nor will it impact any of the deadlines for Defendants' expert reports. The *only* change Plaintiffs now seek in the current scheduling order is to postpone the deadlines for completion of geotechnical testing and submission of Plaintiffs' remaining geotechnical expert reports so that they fall on the same day that Dr. Bea's report is due. This corollary delay will not necessitate any other changes in the scheduling order, nor will it cause prejudice to Defendants or their

1

experts. Under these circumstances, the only remaining questions are whether the tests sought by Plaintiffs are "necessary" and "can actually be accomplished" prior to February 3, 2012.[1]

Turning first to Plaintiffs' request to excavate certain wells at the School Site, Defendants do not contest that this work may be completed in less than six weeks. Rather, the only point of contention is whether these tests should be permitted given that they would destroy some of the existing wells. When properly examined, Defendants' invocation of the "destructive" testing label is a red herring. It was Plaintiffs, not Defendants, who sought to perform pump tests at the School Site. Defendants have never asked to conduct tests at this location, and it strains credulity for Defendants to now argue that they might want to conduct such testing in the future. Indeed, the November 3rd deadline for geotechnical testing has now passed, and Defendants still have not asked to conduct any tests (rebuttal or otherwise) at the School Site. Any need for such additional testing would have been well known to Defendants experts by November 3rd, since by that date they had received the preliminary results of the three pump tests conducted at the School Site in September and October.

The second set of tests sought by Plaintiffs concerns pump tests at two sites that were selected by Defendants. Defendants oppose these additional pump tests by incorrectly asserting that Plaintiffs are relying on a "novel" test methodology that relies on the addition of outside water to the wells. In fact, this allegedly novel methodology was utilized by Fugro Consulting, Inc. (the independent testing contractor jointly retained by the parties) to develop wells at both the School and South EBIA sites, is fully consistent with the parties' joint standard operating protocol, and is expressly approved by the relevant ASTM standards. Defendants' experts did not voice any concerns regarding this method until *after* Defendants received the results of the

---

[1] R.D. 20592 at 2.

2

initial pump tests, no doubt because Defendants only then realized that the results were unfavorable to their position. Moreover, whether Defendants agree with Plaintiffs' proposed methodology is not dispositive of whether the tests are necessary. Rather, the inquiry is whether Plaintiffs in fairness should be afforded the same opportunity as Defendants, which is the right to conduct pump tests at the EBIA-SB and EBIA-N sites using a methodology that is believed to be the most reliable. In the final analysis, this after-the-fact challenge to methodology is at best an issue to be explored when examining the comparative reliability of opposing pump test data.

## II.   ARGUMENT

### A.   The fact that Plaintiffs seek "rebuttal" tests does not negate their necessity, especially where such tests directly address criticisms voiced by Defendants.

The United States suggests that Plaintiffs' tests are not necessary because they are merely rebuttal tests that are responding to "speculative" criticisms. United States' Opposition ("Opp.") at 11. But the criticisms made by Defendants' experts are far from speculative. Indeed, Defendants have already asserted on multiple occasions in their prior briefs that the permeability of the marsh layer at the EBIA site is exceedingly low. *See*, *e.g.*, WGI Opp. at 6 (EBIA soils are impermeable); United States Opp. to Plaintiffs' Motion to Expedite at 2. Defendants will attempt to prove this point by relying on the results of the pump tests they initiated over the objections of Plaintiffs' experts, and it is these tests that Plaintiffs now seek to rebut. Whether Defendants' assertion regarding the marsh layer's permeability is correct will ultimately be decided at trial. But the fact that Defendants have made these assertions is not speculative, as Defendants' own briefing established. The trier of fact should be allowed to receive and weigh these competing data in its quest for the truth.

Similarly, as will be explained at the November 30 hearing by Plaintiffs' geotechnical expert Dr. David Rogers, WGI's expert has stated that he believes there are alternative and/or

3

confounding sources that explain why the pump tests at the School Site demonstrated a highly permeable marsh layer. In particular, WGI's experts have stated that the School Site pump test results can be "explained away" by the existence of a nearby storm drain that Defendants allege may contribute to the water levels at the School Site. In order to refute this criticism and confirm the reliability of the School Site pump tests, Plaintiffs request that the School Site wells be excavated to rule out any contribution from the adjacent storm drain.

Plaintiffs are not speculating on potential criticisms; rather, they are addressing actual critiques that have been expressed by Defendants or their experts. The rebuttal testing that Plaintiffs seek is therefore necessary to permit the fact finder to make a fully informed decision regarding the experts' scientific disagreement.[2] Defendants' argument is manifestly unfair. In essence, Defendants argue that they should be permitted to conduct tests and produce data while simultaneously denying Plaintiffs the right to establish the unreliability of Defendants' tests. Incredibly, Defendants argue that Plaintiffs can only refute the reliability of Defendants' pump test results by criticizing the methodology, all the while knowing that a repeat of these pump tests using a more reliable method could provide the most damning evidence of their deficiencies.

### B. The standard operating protocol consists of the written standards *as well as* any revisions made in the field based on the agreement of <u>all</u> of the parties' experts.

The United States and WGI correctly note that the parties' experts, after weeks of negotiations, agreed upon a written Standard Operating Protocol ("SOP") that establishes the standards and guidelines for the development of the pump wells. Defendants also rightly

---

[2] Defendants try to seize on the fact that Plaintiffs waited until the eleventh hour before requesting permission to conduct the additional tests. But this fact should come as no surprise given that these are *rebuttal* tests, and thus the need for them only arose after Defendants voiced their criticisms of the prior testing work.

observe that the SOP contains an express provision that permits ad hoc revisions based on actual field conditions and scheduling requirements, but *only if such revisions are consented to by all of the parties*.  *See* SOP, attached as Exhibit A to United States' Opp., at 5 ("The well development procedures may need to be modified in the field with the consensus of the experts in order to meet schedule requirements.").  Despite acknowledging this provision, Defendants ignore its importance.

In particular, Defendants fail to admit that the "borrow bailing" method that they now criticize—which entails the introduction of a small amount of water during the development phase—was in fact agreed to by their own experts during the course of the development work at the School and South EBIA sites.  Indeed, by definition and by design, the parties must agree to *all* modifications of or additions to the written SOP standards.  In the absence of any such agreement, then the written standards must be followed.  This process was implemented for the purpose of ensuring a truly "joint" sampling program, as opposed to competing sampling programs that would ultimately require the Court to act as arbiter of the dueling methodologies.

Defendants now contend that the addition of water during the development process constitutes an impermissible deviation from the SOP.  But Defendants cannot offer any evidence to support this contention.  Instead, Defendants reference a provision in the SOP requiring that the wells be allowed to recover before the next stage of development may proceed.  But this provision does not prohibit the addition of water; indeed, nowhere in the SOP does such a prohibition occur.  Rather, the "allowed to recover" language is intended to ensure that the water level in the wells has reached equilibrium before any additional development may occur.  The language does not preclude the use of added water during the development process, but it does

5

preclude beginning any further development work before the water levels have recovered to equilibrium.[3]

Notably, the very ASTM standards that are referenced and adopted in the SOP approve the addition of water during the development phase:

> Of the various methods available for use in developing wells in general, mechanical surging, overpumping and **backwashing**, and high-velocity hydraulic jetting with pumping (or combinations of two or more of these methods) are best suited for use in developing groundwater monitoring wells. . . . Backwashing is the term applied to **the method of well development in which water is added to the well** to create a flow reversal.

American Society for Testing and Materials (ASTM), 2005. ASTM D 5521-05 Standard Practice for Development of Ground Water Monitoring Wells in Granular Aquifers at 6, 10 (attached as Exhibit A) (emphasis supplied); *see also* SOP at 6 (listing ASTM D 5521 as a reference). The addition of water to aid the development process is a far cry from the "novel" and "make shift" method that Defendants describe.

Even assuming *arguendo* that the introduction of an outside water source was not permitted by the written SOP standards or the incorporated ASTM guidelines, this technique was still agreed to by the parties and thus by definition compliant with the SOP. The SOP states that the standards set forth in the SOP are not set in stone, and the parties may agree to modifications out of a concern for scheduling requirements. Thus, of critical importance is the fact that the borrow bailing method was employed by Fugro during the development of the wells at both of the test sites selected by Plaintiffs. WGI (but not the United States) now asserts that this technique was utilized over its objections. WGI Opp. at 6. But by acknowledging the terms of

---

[3] Plaintiffs have always maintained that the wells should be allowed to recover to the equilibrium point. In fact, one of the reasons that Plaintiffs seek to conduct additional pump tests at the defense sites is that Defendants failed to wait until the wells recovered before beginning their pump tests.

the parties' SOP, WGI has already conceded that this method could never have been utilized over its objections, thus refuting WGI's claim that it timely objected.

The only exception to the SOP's "consensus" requirement occurred at the close of the testing period when Plaintiffs and Defendants were not able to reach agreement on whether the wells at the two defense sites had been adequately developed.  Rather than refusing to let the pump tests proceed—which would have effectively prevented the tests from occurring at all given the impending deadline for completion of the testing—Plaintiffs permitted the tests to proceed over their objections.  This situation is the polar opposite from what occurred with regard to the five pump tests that were conducted at Plaintiffs' chosen sites, none of which elicited objections from Defendants' experts until *after* the development work was completed and initial pump test results were reported.

### C. Defendants' attorneys may not nullify agreements made by Defendants' experts in an effort to contest the necessity and feasibility of Plaintiffs' requested tests.

Defense counsel is attempting to rewrite history by suggesting that the pump test SOP permitted the party that requested the pump test to have the final say regarding the test methodology, and thus the objections of the non-requesting party or parties could be ignored. *See*, *e.g.*, United States Opp. at 7; WGI Opp. at 6.  Yet the text of the SOP plainly refutes this suggestion—the written SOP standards govern, and these may only be altered in the event that all of the parties' experts agree to the alteration.

Defendants are intimately familiar with the requirement that changes to the written SOP may only be done by consensus of the parties, since on at least four prior occasions Defendants invoked this requirement to stop Plaintiffs from instituting changes to the written SOP standard.

7

Dr. Rogers will discuss these instances in detail at the November 30 hearing, and therefore Plaintiffs will highlight only one of them here as an example.

The example concerns Plaintiffs' request to modify the methodology of the third pump test at the School Site. After the completion of the first two pump tests at the School Site, Defendants' experts requested permission to utilize the "constant head" pump test method instead of the "constant rate" pump test. After discussions among the parties, Plaintiffs accepted Defendants' proposed modification. Because Defendants were now planning on employing the constant rate methodology at their two test sites, Plaintiffs sought approval to employ this method at the School Site for the third pump test so that an "apples-to-apples" comparison could be made between the two sites. However, Defendants objected and refused to permit Plaintiffs the opportunity to switch from a constant rate test to a constant head test. As a result, the constant rate test was utilized during the third and final pump test at the School Site.

If Defendants were correct and the party requesting the pump test had the final word on methodology, then Plaintiffs would have been able to utilize the constant head methodology. The fact that this did not occur confirms what the pump test SOP makes explicit—any variance of the written SOP standards may not occur absent agreement of all the parties. Thus, WGI's recent claim that its experts objected to the use of "borrow bailing" technique during the pump tests at the School and South EBIA sites is simply not credible. If WGI or the United States had objected, then the technique could not have been utilized; critically, that did not occur here.

### D. The additional pump tests may be accomplished in the time allotted by the Court.

Defendants assert that the pump tests sought by Plaintiffs will not be completed by February 3, 2012, which is the proposed deadline for Plaintiffs' expert reports and the completion of the rebuttal tests. But Plaintiffs have already produced a proposed schedule for

8

the work in which the tests are completed in 36 days. *See* Exhibit B. Even assuming Fugro requires a full ten days to re-mobilize equipment and staff and another week to finalize the results, the tests will still be completed by the middle of January (assuming a favorable ruling on Plaintiffs' motion is issued on or shortly after the November 30 hearing). This leaves ample time to address unanticipated delays and still satisfy the February 3rd deadline.

### E. Concerns regarding destructive testing at the School Site are misplaced because the wells are already scheduled for destruction.

Unable to contest the necessity or timing of Plaintiffs' request to excavate the School Site wells, WGI and the Government are left to arguing that the trenching operations will destroy the well site. This criticism, although true, is misleading because the wells were scheduled to be destroyed long before Plaintiffs sought leave to perform these "rebuttal" well excavations.

The respective land use permits that granted the parties the right to conduct geophysical testing at the School site requires that the site be returned in the same condition as existed prior to the commencement of drilling. In other words, the parties are required to deliver the property with the wells properly closed, sealed and all installations removed. Moreover, even if this were not the case, the State of Louisiana requires closure by plugging of these wells.[4]

The work at the School Site is completed save only the excavation trenching requested by Plaintiffs. For months, Defendants have had the opportunity to conduct further testing at the School Site but refused to do so. It is thus disingenuous for these Defendants to suggest that there is a need to preserve the well sites intact. There is no demonstrable need to preserve the School Site well installations.

---

[4] *See* Louisiana Department of Environmental Quality et al., "Construction of Geotechnical Boreholes and Groundwater Monitoring Systems Handbook," December 2000, at 18 (available at http://dnr.louisiana.gov/assets/OC/env_div/gw_res/200010_GREENBOOK.pdf) ("All boreholes shall be plugged as soon as possible or within 30 calendar days after cessation of the sampling program.").

What the Defendants seek to preserve is a tactical advantage, an opportunity to challenge the School Site conductivity test results based on purely hypothetical confounding factors. In evaluating the accuracy of the results at the School Site, one or more of Defendants' experts have advanced the view that underground structures or utility lines <u>may</u> be present that interfere with the subsurface water flow, thus they theorize artificially driving the conductivity results higher. There is no reason to believe that the Defendants will waive this potential attack on conductivity results at the School Site. The present circumstances more than justify Plaintiffs' request for additional testing, will substantially aide the trier of fact and cause no prejudice to any party.

**WHEREFORE**, Plaintiffs pray that their Motion to Amend Scheduling Order Regarding Expert Deadlines be granted.

Dated:  November 28, 2011

**Respectfully Submitted,**
**PLAINTIFFS LIAISON COUNSEL**

      /s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
Bruno & Bruno, LLP
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

**MR-GO PLAINTIFFS SUB-GROUP LITIGATION COMMITTEE**

      /s/ James Parkerson Roy
JAMES PARKERSON ROY
MR-GO PSLC Liaison Counsel
LA. Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
P.O.Box 3668
Lafayette, LA. 70502

Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

**MR-GO PLAINTIFFS SUB GROUP LITIGATION COMMITTEE**

Jonathan Andry (The Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served upon all counsel of record by ECF on November 28, 2011.

/s/ Joseph M. Bruno