Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
                                 JUDGE DUVAL
PERTAINS TO MRGO                 MAG. WILKINSON

FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
         05-6314, 05-6324, 05-6327, 05-6359,
         06-0225, 06-0886, 06-1885, 06-2152,
         06-2278, 06-2287, 06-2824, 06-4024,
         06-4065, 06-4066, 06-4389, 06-4634,
         06-4931, 06-5032, 06-5155, 06-5159,
         06-5156, 06-5162, 06-5260, 06-5771,
         06-5786, 06-5937, 07-0206, 07-0621,
         07-1073, 07-1271, 07-1285

* * *

VIDEOTAPED DEPOSITION OF
FRED NELSON HOLMES, JR.,
30231 Glenboro Drive, Spring, Texas 77386,
given at The Woodlands Waterway Marriott Hotel
and Convention Center, 1601 Lake Robbins
Drive, The Woodlands, Texas on Saturday,
September 24, 2011.

Page 2

1  APPEARANCES:
2
   REPRESENTING THE PLAINTIFFS:
3       LAW OFFICE OF GERALD N. ANDRY, JR.
        (BY:  GERALD N. ANDRY, JR., ESQUIRE)
4       710 Carondelet Street
        New Orleans, Louisiana 70130
5       504-581-4334 (NOT PRESENT)
   - AND-
6       DEGRAVELLES, PALMINTIER, HOLTHAUS &
        FRUGE, L.L.P.
7       (BY:  JOSHUA M. PALMINTIER, ESQUIRE)
        618 Main Street
8       Baton Rouge, Louisiana 70801-1910
        225-344-3735
9  - AND-
        THE ANDRY LAW GROUP, LLC
10      (BY:  JONATHAN B. ANDRY, ESQUIRE)
        610 Baronne Street
11      New Orleans, Louisiana 70113-1004
        504-525-5535 (NOT PRESENT)
12
13
14 REPRESENTING THE UNITED STATES OF AMERICA:
        U.S. DEPARTMENT OF JUSTICE
15      (BY:  CONOR KELLS, ESQUIRE)
        Torts Branch, Civil Division
16      P.O. Box 888
        Benjamin Franklin Station
17      Washington, D.C. 20044
        202-616-4289
18
19 REPRESENTING WASHINGTON GROUP INTERNATIONAL,
        INC.:
20      JONES DAY
        (BY:  CHRISTOPHER THATCH, ESQUIRE)
21      51 Louisiana Avenue, N.W.
        Washington, D.C. 20001-2113
22      202-879-4645
23
   ALSO PRESENT:
24      JENEEN MARIE BAUDOIN-HOLMES
25

Page 3

1  APPEARANCES CONTINUED:
2
3
4
5
6  VIDEOGRAPHER:  KEN HART (HART VIDEO)
7
8
9
10 REPORTED BY:
11     ROGER D. JOHNS, CCR
12     CERTIFIED COURT REPORTER
13     STATE OF LOUISIANA
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

      S T I P U L A T I O N

   It is stipulated and agreed by and between
counsel for the parties hereto
that the deposition of the aforementioned
witness is hereby being taken under the
Federal Rules of Civil Procedure, for all
purposes, in accordance with law;
   That the formalities of certification and
filing are specifically waived;
   That the formality of reading and signing
of the transcript is specifically not waived;
   That all objections, save those as to the
form of the question and the responsiveness of
the answer, are hereby reserved until such
time as this deposition, or any part thereof,
may be used or sought to be used in evidence.

      * * * *

   ROGER D. JOHNS, RDR, CRR, Certified Court
Reporter, for the State of Louisiana,
officiated in administering the oath to the
witness.

00025
1    Q.  -- did you do anything else for the
2  University of New Orleans aside from working
3  in the Registrar's Office?
4    A.  Yes, sir.  I worked -- Actually, I
5  went -- I worked in the Parking Department.
6    Q.  What did you do for the Parking
7  Department?
8    A.  I was a ticket writer/event
9  planner.
10   Q.  "Ticket writer" sounds like an
11 exciting job with a college campus.
12   A.  It's not.  It is not.
13   Q.  Okay.  So you worked as a ticket
14 writer and an events planner in the Parking
15 Department.
16   A.  That's correct.
17   Q.  Did you have any other employment
18 during your time at the University of New
19 Orleans?
20   A.  Yes.  From -- I worked there for
21 three years and then I went, I was a -- Let me
22 see.  I went, I went -- I worked next in
23 Property Control.  I worked Property Control
24 for five years, and then most recently I was
25 office supply manager.  That was my last job

Page 25

00026
1  leading up to Katrina.
2    Q.  Now, when you were working in
3  Property Control, was that after you
4  graduated?
5    A.  Yes, it was.
6    Q.  So has the University of New Orleans
7  been your only employer since you graduated
8  from college?
9    A.  Since I graduated from college?
10   Q.  Aside from your most recent
11 employment in Texas.
12   A.  Yes.  I mean, I was working at
13 Wal-Mart in conjunction at the same time for a
14 little while, but then I just became -- you
15 know, working at Property Control after that.
16   Q.  So after you graduated from college,
17 in between the time that you stopped working
18 for the University of New Orleans, the
19 University of New Orleans was your only
20 employer?
21   A.  Yes, sir.
22   Q.  And when Katrina hit in August of
23 '05, you were working for the University of
24 New Orleans; correct?
25   A.  That is correct.

Page 26

00027
1    Q.  I would like to get into the time
2  line and some before and after questions with
3  respect to Hurricane Katrina and those
4  events.  And I appreciate that these are
5  difficult memories and that you all have been
6  through quite a bit with respect to this whole
7  ordeal.  So let me know, please, if at any
8  point during these questions you need a
9  break.  We're more than happy to accommodate
10 you.
11   A.  I understand.
12   Q.  Now, before the storm touched down
13 in New Orleans -- And throughout the
14 deposition, when I refer to "storm" or
15 "hurricane", we can just understand that that
16 --
17       MR. PALMINTIER:
18       We know.
19 EXAMINATION BY MR. THATCH:
20   Q.  -- refers to Katrina unless we, you
21 know, suggest otherwise.
22   A.  Okay.
23   Q.  But before the storm touched down in
24 New Orleans, you were living at 1205 Perrin
25 Drive in Arabi, Louisiana?

Page 27

00028
1    A.  Yes.
2    Q.  That's correct?
3    A.  (Witness nods head affirmatively.)
4    Q.  Did anyone live at that address at
5  Perrin Drive at the time that the storm hit
6  besides you and your wife?
7    A.  No.
8    Q.  And you purchased the house at
9  Perrin Drive in 2003?
10   A.  I believe so.  That's correct.
11   Q.  Do you recall that you purchased the
12 Perrin Drive house for $107,000?
13   A.  Roughly, yes, sir.
14   Q.  And you had a mortgage with Standard
15 Mortgage Corporation?
16   A.  That is correct.
17   Q.  Do you recall how much money you put
18 down to purchase the house at Perrin Drive?
19   A.  Not right offhand, no, sir.
20   Q.  Do you remember what the balance on
21 your mortgage was when Katrina hit?
22   A.  No.
23   Q.  Did you refinance that mortgage
24 between the time that you purchased the house
25 and the time that Katrina hit?

Page 28

Page 29

1   A.  No, never did.
2   Q.  Was Perrin Drive the first house
3   that you owned?
4   A.  Yes, it was.
5   Q.  Before Perrin Drive, before you
6   purchased that house in 2003, where else did
7   you live?
8   A.  Before Perrin?  We -- My wife and I
9   lived on Seal Drive for quite a few years
10  beforehand.  We -- It was a rental.
11  Q.  Do you recall the address of that
12  residence?
13  A.  133 Seal Drive.  It's also in Arabi.
14  It's about three blocks from the home that we
15  purchased.
16  Q.  And how long did you all live there?
17  A.  Quite a few years.  Quite a few
18  years.  I don't recall exactly how many, but
19  it was quite a few years.
20  Q.  And before you lived at Seal Drive,
21  where did you live?
22  A.  Before Seal?  I think we lived on
23  Chalona.  It was -- It was another rental.
24  Q.  Do you remember the address?
25  A.  No, I do not.

Page 30

1   Q.  What was the street name again?
2   A.  Chalona.
3   Q.  Was that also in Arabi?
4   A.  No, sir, that was in Chalmette.
5   Q.  Chalmette?
6   A.  Yes, sir.
7   Q.  Is there anywhere else where you and
8   your wife lived together aside from the house
9   at Perrin Drive, the house on Seal Drive, and
10  the house you just mentioned in Chalmette?
11  A.  There was a couple, but -- Yes, sir.
12  Q.  And do you remember those
13  addresses?
14  A.  We lived -- You know, we lived
15  shortly after we got married with her mother
16  on Veronica Drive.  And then we lived --
17  purchased -- I mean, not purchased, we rented
18  a place on Victor Drive.  I don't know the
19  exact address.  And then after that we lived
20  on campus for a short time.
21  Q.  Do you recall how many years you
22  lived at the Veronica Drive address?
23  A.  The Veronica Drive?  It wasn't very
24  long.
25  Q.  More or less than a year?

Page 31

1   A.  Roughly.
2   Q.  And the same question with respect
3   to the house at Victor Drive.
4   A.  Probably about the same time frame.
5   It wasn't that long.
6   Q.  And did you live on campus the
7   entire time you were at the University of New
8   Orleans?
9   A.  No, indeed not.  It was a short time
10  that we -- that we lived on campus.  Two
11  semesters, I believe.
12  Q.  And how long were you a student at
13  the University of New Orleans?
14  A.  How long was I a student?
15  Q.  Yes.
16  A.  So I think I started in '91 and
17  graduated in '98.
18  Q.  Let's talk about your living
19  expenses at the time of the storm.  And I
20  appreciate that some of these questions may be
21  better answered by your wife, but we can deal
22  with that as we go.
23  A.  What's the question again?  I'm
24  sorry.
25  Q.  How much was your mortgage payment

Page 32

1   per month when the storm hit in 2005?
2   A.  Roughly $800.  I'm not sure.
3   Q.  And do you recall how much you paid
4   for gas, utilities at Perrin Drive when the
5   storm hit?
6   A.  No, I do not.  Not at this time, no.
7   Q.  Did you have an electric bill?
8   A.  Yes, we did.
9   Q.  Do you recall how much you paid for
10  your electric bill?
11  A.  No, I don't.
12  Q.  The same question with respect to a
13  water bill.  Do you recall how much you paid
14  for a water bill at the time that Katrina
15  hit?
16  A.  I'm not 100 percent sure.  I would
17  say close to $25, but I really don't recall.
18  Q.  Did you all have a land line
19  telephone at Perrin Drive?
20  A.  Yes, we did.
21  Q.  Do you remember how much you paid
22  for that service?
23  A.  Not offhand, no, sir.
24  Q.  Did you have a cell phone?
25  A.  Yes, I did.

Page 33

1    Q.  Did you have a BlackBerry or any
2    other mobile communications device?
3    A.  No, sir.  Just a standard phone.
4    Q.  No iPhone?
5    A.  No.
6    Q.  I don't know if the iPhones were out
7    at that time actually.  Did you all have
8    Internet service at Perrin Drive?
9    A.  No.
10   Q.  Cable TV service?
11   A.  Cable TV, yes, sir.
12   Q.  Do you recall how much you paid for
13   monthly when Katrina hit for any of those
14   services?
15   A.  Not right offhand, no, sir.
16   Q.  You owned two cars at the time that
17   the storm hit.  Is that correct?
18   A.  Yes, that is correct.
19   Q.  Can you tell me what those cars
20   were?
21   A.  A 2002 Camry and a 1998 Carolla.
22   Q.  Did you have car payments on those
23   cars?
24   A.  No, sir.  I believe -- I believe
25   they were paid off at that time.

Page 34

1    Q.  And do you recall how much you paid
2    for car insurance?
3    A.  No, not -- not then.
4    Q.  I'm going to take a stab here.  Can
5    you estimate for me roughly how much you would
6    have paid for food per month at the Perrin
7    Drive home when Katrina hit?
8    A.  No, I couldn't.
9    Q.  So a grocery bill per month, you're
10   not sure how much you all would have spent in
11   groceries --
12   A.  No, sir.
13   Q.  -- each month?
14   A.  No, sir.
15   Q.  Did you eat out regularly at that
16   time?
17   A.  No, sir, we didn't.
18   Q.  How often would you say you ate out?
19   A.  I don't know, -- I don't know, at
20   most twice a week at, you know -- maybe twice
21   a month.  It really depended what was going
22   on.
23   Q.  Did you take your lunch to work or
24   did you eat out for lunch?
25   A.  We -- We took our lunch to work.

Page 35

1    Q.  Did you have any dry cleaning
2    expenses?
3    A.  No, sir.
4    Q.  Did you have student loans at the
5    time that Katrina hit?
6    A.  Yes, I did.
7    Q.  Do you recall how much your student
8    loan payment was at that time?
9    A.  No, sir, not at that time, no, sir.
10   Q.  Did you have any life insurance at
11   the time that Katrina hit in 2005?
12   A.  Not that I am aware of.
13   Q.  Aside from the various monthly
14   expenses, living expenses that we just
15   described, is there any other expense that you
16   can think of that you and your wife paid per
17   month at the time that Katrina hit?
18   A.  Not that I think of.  Not that I can
19   think of, no, sir.
20   Q.  And do you have any documentation
21   that would show us what these expenses were at
22   the time that Katrina hit?
23   A.  No, sir, unfortunately.
24   Q.  Now, you mentioned that you worked
25   for the University of New Orleans when Katrina

Page 36

1    touched down.  Is that correct?
2    A.  Yes, sir.
3    Q.  And you were an office supply
4    manager at that point in time at University of
5    New Orleans?
6    A.  Yes, sir.
7    Q.  What were your other job titles at
8    the University of New Orleans, aside from the
9    ones that we have already discussed while you
10   were in college?
11   A.  So in Property Control, I started as
12   a coordinator and became assistant manager.
13   Q.  And then after you were working in
14   Property Control, is that when you became
15   office supply manager?
16   A.  That is correct.
17   Q.  And how long did you work as the
18   office supply manager at University of New
19   Orleans?
20   A.  Unfortunately, not as long as it
21   should have been.  I had -- It was roughly a
22   year that I was in the position.
23   Q.  Let me hand you another document
24   here.  Hopefully sort some of this out.
25       (Document marked as F. Holmes

Page 37

1      Exhibit 3 and attached to transcript.)
2      Mr. Holmes, do you recognize this
3  document?
4      A.  Yes, sir.
5      Q.  Can you describe it for me?
6      A.  It looks to be my salaries before
7  and after Hurricane Katrina.
8      Q.  Did you create this document?
9      A.  I had provided information for it.
10     Q.  But did you -- did you actually
11 write this document?
12     A.  No, sir.
13     Q.  Do you know who did write this
14 document?
15     A.  I believe it was Mr. Rice.
16     Q.  You say Mr. Rice, you're referring
17 to Randolph Rice?
18     A.  Yes, sir.
19     Q.  Dr. Randolph Rice?
20     A.  Yes, sir.
21     Q.  Now, did you discuss this document
22 with Dr. Rice?
23     A.  No, not really.
24     Q.  Did he ask you any questions about
25 the document?

Page 38

1      A.  I was just asked to provide
2  information.  That was pretty much it.
3      Q.  So you provided information to Dr.
4  Rice and you believe that Dr. Rice then
5  created this document?
6      A.  Yes, sir.
7      Q.  Now, according to this document,
8  your income was $29,867.11 in 2005 when
9  Katrina hit.  Is that correct?
10     A.  Yes, sir.
11     Q.  And was that your salary at the
12 University of New Orleans?
13     A.  Yes, sir.
14     Q.  So this is the total amount of money
15 that you made that year?
16     A.  For that year, yes, sir.
17     Q.  You didn't have any other source of
18 income in 2005?
19     A.  Not for myself, no, sir.
20     Q.  And then in 2006, according to this
21 document, you made $2,694.45.  Is that
22 correct?
23     A.  Yes, sir.
24     Q.  And where did that income come from?
25     A.  I believe it came from

Page 39

1  unemployment.
2      Q.  So was there any portion of that
3  $2,694.45 amount that came from the University
4  of New Orleans?
5      A.  It -- If so, it may have been one
6  month.  It wasn't much.  I think -- I think
7  January is when I actually got the furlough.
8      Q.  When did you apply for
9  unemployment?
10     A.  I don't recall.
11     Q.  Do you have any records or documents
12 that pertain to your unemployment filing?
13     A.  No, sir.
14     Q.  Now, this document also said that
15 you would have made $32,500 in 2006 if you
16 remained at the University of New Orleans.  Do
17 you see that?
18     A.  Yes, sir.  That would have been my
19 salary.
20     Q.  And how do you know that that would
21 have been your salary?
22     A.  That's what they hired me for the
23 position at.
24     Q.  And they communicated to you that
25 you would be making that salary?

Page 40

1      A.  Yes, sir.
2      Q.  Did you have any benefits at the
3  University of New Orleans?
4      A.  Yes, sir, we did.
5      Q.  Can you tell me what those benefits
6  were?
7      A.  I -- I was enrolled in the LASERS
8  program, Louisiana State Employee Retirement
9  plan.
10     Q.  What about medical insurance?
11     A.  Medical insurance, yes, sir.
12 Through Ochsner I believe it was.
13     Q.  Did the University of New Orleans
14 provide you with any life insurance coverage?
15     A.  Not that I can recall.
16     Q.  Did you have any disability coverage
17 with the University of New Orleans, long-term
18 or short-term?
19     A.  I don't recall.
20     Q.  Are there any other benefits that
21 you received from the University of New
22 Orleans that we didn't just mention?
23     A.  Not that I can think of, no, sir.
24     Q.  And do you have any documents
25 reflecting the medical insurance coverage that

Page 41

1   you received from the University of New
2   Orleans?
3       A.  No, sir.
4       Q.  Now, you mentioned that you had a
5   retirement plan through the Louisiana State
6   Employees Retirement System, or LASERS.  Is
7   that correct?
8       A.  Yes, sir, that's correct.
9       Q.  Do you recall what the terms of that
10  retirement plan were?
11      A.  In terms of --
12      Q.  Well, was it a traditional pension
13  plan?  In other words, you worked for a
14  certain amount of time and the money that you
15  have accrued is paid to you at a certain point
16  when you retire?
17      A.  Yes, sir.
18      Q.  Do you have any documents -- We
19  received some documents from Dr. Rice, but do
20  you recall -- Well, let me just break out the
21  LASERS account issue right here.
22          Now, do you recognize this
23  document, Mr. Holmes?
24          (Document marked as F. Holmes
25      Exhibit 4 attached to transcript.)

Page 42

1       A.  Yes, sir.
2       Q.  Can you tell me what it is?
3       A.  That's a LASERS report in regards to
4   my account.
5       Q.  And did you provide this document to
6   Dr. Rice?
7       A.  Yes, sir, I did.
8       Q.  And did you simply pull it off the
9   Internet?
10      A.  Yes, sir.
11      Q.  And did you discuss this document at
12  any time with Dr. Rice?
13      A.  Not at length, no, sir.  Just that I
14  had sent it.  That was all.
15      Q.  So you told him you sent it, but you
16  haven't had any discussions --
17      A.  Correct.
18      Q.  -- since sending it with him?
19      A.  Correct.
20      Q.  He hasn't asked you any questions
21  about it?
22      A.  No, sir.
23      Q.  Now, according to this document, you
24  would have accrued $13,491.35 in total
25  contributions as of 2006.  Is that correct?

Page 43

1       A.  That's correct.
2       Q.  Under the "Total contributions"
3   column there?
4       A.  That is correct.
5       Q.  Now, when you ended your employment
6   with the University of New Orleans, do you
7   understand what happened to that money?
8       A.  From what I understand, I wasn't
9   what they would deem as being vested.  You
10  have to have ten years to be deemed as
11  vested.  I have 9.2 years.  That was eight --
12  eight months short.
13      Q.  Now, you said you were -- you had
14  9.2 months --
15      A.  9.2 years.
16      Q.  I'm sorry, 9.2 years.  Excuse me.
17  So then you were not enrolled in the LASERS
18  program from your beginning of -- from the
19  beginning of your employment with the
20  University of New Orleans.  Is that correct?
21      A.  That is correct.  Not as a student
22  worker, no.  That's correct.  You're not
23  eligible for those benefits.
24      Q.  Do you recall when you signed up for
25  the benefits?

Page 44

1       A.  That would have been in '99.  Is
2   that -- No, I'm sorry.
3       Q.  It says 1996 here.
4       A.  '96, yes, sir.  '99 is when I
5   started in Property.  I'm sorry.
6       Q.  Just so I understand, the total
7   contributions here, $13,491.35, because you
8   were not vested in this program, it's your
9   understanding that you could not have access
10  to that money?
11      A.  I am not sure exactly how it's going
12  to work out.  I know I don't get full benefit
13  as I would have.  If I am able to recover any
14  of it, I'm not certain.
15      Q.  But this account still exists?
16      A.  Yes, sir, it does exist.
17      Q.  Have you received any documentation
18  from LASERS since Katrina, explaining to you
19  what will ultimately happen to the
20  contribution that you made to this plan?
21      A.  No, sir, not yet.
22      Q.  Have you had any discussions with
23  them?
24      A.  Not yet.
25      Q.  Mr. Holmes, when did you stop

Page 45

1  working for the University of New Orleans?
2      A.  January of 2006 was when they
3  furloughed me.
4      Q.  So then you worked -- you continued
5  to work for the University of New Orleans
6  after Katrina.  Is that correct?
7      A.  That is correct.  I had benefit
8  time.
9      Q.  And were you working -- You were
10 working remotely from Texas?
11     A.  Yes, sir.
12     Q.  And what exactly were you doing
13 during that time?
14     A.  They had allowed me to order,
15 requisitions, you know, for office supplies,
16 and everything was handled via fax.
17     Q.  And how many hours per week did you
18 work during the time period between when
19 Katrina hit and when you stopped working for
20 the University of New Orleans in January in
21 '06?
22     A.  It wasn't quite -- it didn't quite
23 work out that way.  It was just whatever work
24 needed to be done they asked me to do.  It
25 wasn't predicated to a number of hours.

Page 46

1      Q.  So you were still being paid your
2  base salary --
3      A.  Correct.
4      Q.  -- for that period of time?
5      A.  Correct.
6      Q.  And did you receive that base salary
7  for that entire period until you quit or until
8  you left in January of '06?
9      A.  Right.  It was a layoff.  The
10 furlough is a layoff.  I'm sorry.
11     Q.  Now, did you continue to receive
12 your benefits through January of 2006 from the
13 University of New Orleans?
14     A.  Yes.
15     Q.  Now, you mentioned the furlough.
16 Can you explain to me the circumstances
17 surrounding your departure from the University
18 of New Orleans?
19     A.  I mean, they -- it was -- I was
20 pretty much given the ultimatum that either I
21 show up for work that morning or they were
22 going to lay me off, and unfortunately I
23 didn't have housing to be able to go back.
24     Q.  And they communicated that to you
25 during that January, 2006 time frame?

Page 47

1      A.  Yes, sir.
2      Q.  Now, when they -- Did you have an
3  idea before that conversation in January of
4  2006 that you may lose your job if you weren't
5  able to report to work?
6      A.  There was -- There was never up to
7  that point, there was never any indication.
8  There were promises that, you know, "We're
9  going to work with you.  We understand your
10 circumstance", and then one day just given the
11 ultimatum.
12     Q.  What promises or assurances did they
13 make to you?
14     A.  Just that they would allow me to
15 have the ability to work remotely.  They
16 didn't say for what kind of time frame or
17 anything like that.  They just said that they
18 would be able to give the ability to work
19 remotely.
20     Q.  Did you understand then that that
21 ability to work remotely would be indefinite?
22     A.  No, of course not.
23     Q.  And they didn't give you any time
24 frame --
25     A.  No.

Page 48

1      Q.  -- aside from that conversation in
2  January of 2006 when they told you to report
3  to work or your job is lost?
4      A.  Right.
5      Q.  They didn't communicate to you at
6  any point before then how long you could work
7  remotely?
8      A.  No.  No, it wasn't determined yet.
9      Q.  Do you recall who you spoke to at
10 the University of New Orleans with respect to
11 whether or not you would be allowed to work
12 remotely?
13     A.  That would have been my boss's boss,
14 Harriet Reynolds.
15     Q.  I'm sorry, you said Harriet
16 Reynolds?
17     A.  Correct.
18     Q.  And is Miss Reynolds still with the
19 University of New Orleans?
20     A.  I'm not sure.  I don't think so.  I
21 think she retired.  I'm not sure.
22     Q.  And you mentioned that Harriet
23 Reynolds was your boss's boss.
24     A.  Correct.
25     Q.  Who was your boss at that time?

Page 49

1   A.  My boss at that time was Roy
2   Robertson.
3   Q.  And do you know if Mr. Robertson is
4   still employed by the University of New
5   Orleans?
6   A.  Yes, he is, to my knowledge.
7   Q.  Did you ever have any conversations
8   with Mr. Robertson about whether or not you
9   would be allowed to continue to work with the
10  University of New Orleans?
11  A.  Yes.  I mean, we -- that was -- that
12  was the ultimate plan.
13  Q.  So you when say that was the
14  ultimate plan, he had communicated to you that
15  you expected to be able to work for them for a
16  certain period of time?
17  A.  Yes, that's correct.
18  Q.  And did that period of time extend
19  beyond January, 2006?
20  A.  No, it did not.
21  Q.  You said you were unable to find
22  housing.
23  A.  That's correct.
24  Q.  During that period of time when
25  Katrina hit and January of 2006 --

Page 50

1   A.  Uh-huh (affirmatively).
2   Q.  -- did you make any trips back to
3   New Orleans to visit the area?
4   A.  We did.  Yes.
5   Q.  Do you recall how many times you
6   came back to New Orleans?
7   A.  Twice, maybe three times.
8   Q.  And do you remember when you made
9   those trips?  Let's take the first one.
10  A.  The first one, the first time I went
11  back, it would have been early November.
12  Q.  Early November of 2005?
13  A.  Correct.
14  Q.  And how long did you stay in New
15  Orleans when you made that trip back?
16  A.  Not long at all.  I can't recall if
17  it was a day or two days, but it wasn't long.
18  Q.  So no more than two days?
19  A.  Exactly.
20  Q.  And what did you do in New Orleans
21  during those two days?
22  A.  We went back, looked at the
23  property, looked at other relatives's
24  property.  That was it.
25  Q.  Did you spend any time looking for

Page 51

1   housing in New Orleans during that trip back?
2   A.  At that time?  No.  It was just to
3   go back and see our property.
4   Q.  Now, tell me about the second time
5   that you went back to New Orleans.  You
6   mentioned that you might have been back three
7   times, maybe two.  When was the second time
8   that you went back?
9   A.  The second time?  I really don't
10  recall.  It was a few months after that, but
11  I'm not sure.
12  Q.  So would it have been a few months
13  after November, at the beginning of 2006, do
14  you think?
15  A.  I can't recall.
16  Q.  And do you recall how long you
17  stayed in New Orleans during that trip?
18  A.  Roughly a day.  It wasn't long at
19  all.
20  Q.  So no more than a day?
21  A.  That I can recall, yes, sir.
22  Q.  And what did you do during that trip
23  back to New Orleans?
24  A.  Again, it was just seeing -- just
25  seeing everything there with my property.

Page 52

1   Q.  Did you spend any time during that
2   trip looking for any housing in New Orleans?
3   A.  No, sir.
4   Q.  Did you speak to any realtors during
5   that time?
6   A.  Not there, no.  Not when I went
7   back.
8   Q.  Now, you said you might have been
9   back a third time to New Orleans.  Do you
10  recall when that was?
11  A.  After us talking, I believe it was
12  just twice.
13  Q.  All right.  So there was no third
14  trip back; is that correct?
15  A.  At that time, no, sir.
16  Q.  And when you made these two trips
17  back to New Orleans, did you travel back by
18  yourself or did you travel with other people?
19  Did anybody come with you?
20  A.  My wife's grandfather.
21  Q.  And did he make the trip with you
22  both times that you went back?
23  A.  Yes, sir.
24  Q.  What's your wife's grandfather's
25  name?

Page 53

1   A.  Huh?  Francis Hallal.
2       Excuse me.  I need to get a sip of
3   water.  Okay.
4   Q.  Now, when you had these
5   communications with the University of New
6   Orleans about continuing with your employment
7   there after Katrina, was it your understanding
8   that if you had returned to New Orleans and
9   you had a place to live in New Orleans that
10  you would have been able to continue to work
11  there?
12  A.  Yes, sir.
13  Q.  Do you recall if the University of
14  New Orleans shut down during the storm?
15  A.  I know they had initially, but I
16  don't recall for how long.  I know they
17  suspended operations.  It had to be at least a
18  month, but I am not sure.
19  Q.  So you believe they may have
20  suspended operations for a month.  Is that
21  correct?
22  A.  Correct, that I can think of.
23  Q.  Do you recall if the University of
24  New Orleans was damaged and what the extent of
25  the damage was during the storm?

Page 54

1   A.  I knew that there was damage.  I
2   never did find out how much.
3   Q.  During the time that -- After you
4   had left New Orleans, between that time and
5   the time that you ceased your employment with
6   the university, did you keep --
7       MR. PALMINTIER:
8         I object to form.  Go ahead.  I'm
9       sorry.  Go ahead.
10  EXAMINATION BY MR. THATCH:
11  Q.  -- did you keep in touch with any
12  co-workers from the University of New
13  Orleans?
14  A.  Yes.
15  Q.  Aside from your supervisor and your
16  supervisor's supervisor?
17  A.  Those were my main contacts that I
18  spoke with.
19  Q.  And do you recall how long those two
20  people -- I'm sorry.  Let me rephrase.
21      Did your supervisor and your
22  supervisor's supervisor, do you recall how
23  long they were unable to go back to work at
24  the University of New Orleans after the storm?
25  A.  No, I'm not.

Page 55

1   Q.  Did you have conversations about
2   other people's experiences, other employees at
3   the University of New Orleans's experiences
4   working -- working there after the storm
5   during that time period?
6   A.  No, sir, unfortunately.
7   Q.  Now, before Katrina hit, we were
8   talking earlier about income and salary and
9   expenses.  Before Katrina hit, did your family
10  have any other source of income besides your
11  job with the University of New Orleans?
12  A.  My wife was employed.
13  Q.  Did you have any other income at
14  that time when Katrina hit besides your income
15  and your wife's income?
16  A.  No, sir.
17  Q.  No investments, no investment
18  accounts?
19  A.  No, sir.
20  Q.  No second jobs?
21  A.  No, sir.
22  Q.  Now, when did you first learn that
23  Katrina would hit New Orleans?
24  A.  I mean, they -- just watching on the
25  news what they were forecasting, but didn't

Page 56

1   know exactly when.
2   Q.  And did you make any preparations to
3   protect your house or personal property before
4   the storm?
5   A.  We had tried -- We didn't know
6   exactly what would happen.  We tried to put
7   things up high and we taped -- you know, we
8   put duct tape on windows.
9   Q.  So you put duct tape on windows.
10  Did you do anything else to protect your house
11  at Perrin Drive?
12  A.  I think we shut off the pilots, the
13  gas.  Unplugged electrical components.
14  Q.  What about your personal property;
15  did you do anything to protect your personal
16  property?
17  A.  We made sure the house was secure.
18  Q.  Did you move any property to
19  different locations to --
20  A.  We tried to elevate things as much
21  as possible.
22  Q.  Now, you evacuated Perrin Drive on
23  August 28th of 2005.  Is that correct?
24  A.  Yes.
25  Q.  And that was the day before Katrina

Page 57

1  made landfall in New Orleans?
2     A.  Yes, sir.
3     Q.  Do you recall what time you left New
4  Orleans on August 28?
5     A.  I don't recall.  It was early
6  morning.
7     Q.  And you evacuated by car; correct?
8     A.  Yes, sir.
9     Q.  Who did you evacuate with?
10    A.  It was four of us.  Myself and my
11 wife in one car, and my mother-in-law and her
12 father in the secondary car.
13    Q.  And what is your mother-in-law's
14 name?
15    A.  Kathy Baudoin.
16    Q.  And her father is, we spoke of
17 earlier, Francis Hallal?
18    A.  Hallal, that's correct.
19    Q.  Where did your mother-in-law live at
20 the time of the storm?
21    A.  3316 Veronica Drive.
22    Q.  That was the same house where you
23 all lived with her prior?
24    A.  Correct.  Yes, sir.
25    Q.  And Mr. Hallal lived where?

Page 58

1     A.  On Corinne Drive.  That's in
2  Chalmette.
3     Q.  Now, when you left New Orleans when
4  you evacuated, did you intend to evacuate to a
5  particular area?
6     A.  We had -- We finally were able to
7  make reservations at a hotel here in Houston
8  area.  That was the closest place that we
9  could find that would accept pets.
10    Q.  So you made those reservations
11 before you left?
12    A.  Correct.  It was just a couple of
13 days before.
14    Q.  And I meant to ask you about your
15 pets before, but --
16    A.  That's okay.
17    Q.  -- I neglected to.  Tell me what
18 pets did you own at the time Katrina hit?
19    A.  At that time, I had two dogs and a
20 cat.
21    Q.  And did all -- Did they evacuate
22 with you?
23    A.  Yes.
24        MR. THATCH:
25          Why don't we take a quick break.

Page 59

1        MR. PALMINTIER:
2          Sure.
3        MR. THATCH:
4          Because I could use some water as
5  well.
6        VIDEO OPERATOR:
7          Off the record.
8        (Recess.)
9        VIDEO OPERATOR:
10         We're now back on the record.
11 EXAMINATION BY MR. THATCH:
12    Q.  All right.  Mr. Holmes, -- I'm
13 sorry.
14    A.  That's okay.
15    Q.  Take your time.
16    A.  Okay.
17    Q.  Just a couple of follow-up questions
18 from some of the things we were talking about
19 before we broke.  You mentioned that you had
20 medical insurance through the University of
21 New Orleans.
22    A.  Yes, sir.
23    Q.  Do you recall if and how much you
24 paid yourself for that insurance?
25    A.  No, sir, I don't.

Page 60

1     Q.  Do you remember if you paid
2  anything, or was that insurance provided
3  entirely by the university?
4     A.  No, it -- I paid my percentage.
5     Q.  And one other thing I wanted to ask
6  you.  I know that during -- during the time
7  immediately after the storm hit that there
8  were several people who applied for temporary
9  housing through FEMA in New Orleans.
10    A.  Yes, sir.
11    Q.  Did you all at any time apply for
12 such housing?
13    A.  We had -- We were -- Actually, what
14 we had applied for was for the FEMA trailer.
15 We actually had three reservations.  One for
16 St. Bernard community; one through my wife's
17 employer; and one through my employer.
18 Unfortunately, none of those came through for
19 us.
20    Q.  Do you recall why they didn't come
21 through?
22    A.  For whatever reason, it either
23 booked up before -- beforehand or they didn't
24 even do the trailer there.  They couldn't get
25 the site built.

**FRED NELSON HOLMES JR.**                                     September 24, 2011

Page 105

1  no longer alleging the damage of
2  business interruption.
3  EXAMINATION BY MR. THATCH:
4  Q.  Mr. Holmes, can you explain the
5  basis of your claim for loss of business
6  opportunities?
7  A.  I don't know that we actually did
8  that on our behalf.  I am not sure.
9  Q.  Okay.  When you say that you don't
10 think you did that on your behalf, do you mean
11 specifically your behalf, Fred Holmes' behalf?
12 A.  Correct.  We don't own a business or
13 anything like that.
14 Q.  So then you don't understand this
15 claim that is listed here for loss of business
16 opportunities?
17 A.  Correct.
18 Q.  Can you identify any opportunities
19 for business that you might have lost as a
20 result of Katrina?
21 A.  No, sir, not unless we're talking
22 about job-related.  That's it.
23 Q.  So aside from your employment with,
24 say, the University of New Orleans, you can't
25 identify any other opportunities for loss of

Page 106

1  business that are connected to Hurricane
2  Katrina?
3  A.  That's correct.
4  Q.  The next thing on my list is damages
5  for personal injury.
6      MR. PALMINTIER:
7         We'll stipulate.
8      MR. THATCH:
9         All right.
10 EXAMINATION BY MR. THATCH:
11 Q.  And then the next is --
12     MR. PALMINTIER:
13        Stipulated.
14     MR. THATCH:
15        -- wrongful death.  Would you
16 stipulate it?
17     MR. PALMINTIER:
18        We will stipulate.
19     MR. THATCH:
20        As well as survival damages?
21     MR. PALMINTIER:
22        Yes.  Correct.
23 EXAMINATION BY MR. THATCH:
24 Q.  We also have a claim for fear --
25 well, several claims.  I have sort of lumped

Page 107

1  these all together.  Fear, fright, emotional
2  distress, grief, and mental anguish.
3      MR. PALMINTIER:
4         Stipulate.
5      MR. THATCH:
6         And I believe, based on the
7  August 24th, 2011 letter from Counsel,
8  that inconvenience has not been
9  stipulated.
10     MR. PALMINTIER:
11        Correct.
12     MR. THATCH:
13        And that August 24th letter
14 actually reads "All Plaintiffs allege
15 damages for all injuries recoverable
16 by law, including, but not limited to,
17 injury due to inconvenience".
18 EXAMINATION BY MR. THATCH:
19 Q.  Mr. Holmes, can you explain to me
20 the basis for this claim for inconvenience?
21 A.  My whole life after Hurricane
22 Katrina has been nothing but inconvenience.
23 Life as I knew it beforehand was, you know,
24 every -- everything is changed about my life
25 since Hurricane Katrina.  You know, we've lost

Page 108

1  communities, we've -- family and friends.  You
2  know, all of that is gone.  You know, we had
3  -- I had to walk away from 14 years, you
4  know, experiences at the University of New
5  Orleans.  That's gone.  I've -- You know, the
6  communities, you know, where -- the church
7  that we got married in, that is gone.  They're
8  not going to reopen that church.  You know,
9  how -- how do you measure that, you know?
10 It's major.  It's nothing but inconvenience.
11 Q.  Do you want to take a minute, Mr.
12 Holmes?
13 A.  Yes, please.
14 Q.  All right.  Let's do that.
15     VIDEO OPERATOR:
16        Off the record.
17        (Whereupon a discussion was held
18 off the record.)
19     VIDEO OPERATOR:
20        We're now back on the record.
21     MR. THATCH:
22        And now that -- The next two I
23 have are pain and suffering and loss
24 of capacity to enjoy life, and I
25 assume the answer to those questions

27 (Pages 105 to 108)

Page 257

1    Q.  Okay.  Let's talk about the
2  insurance claims that you made under your
3  homeowner's policy to Auto Club.
4    A.  Uh-huh (affirmatively).
5    Q.  You made claims under your policy
6  with Auto Club for damage to the Perrin Drive
7  house and its contents in connection with wind
8  and wind-driven rain.  Is that correct?
9    A.  That's what the attorney -- Yes,
10 sir.
11   Q.  And those claims that you made for
12 damages to the Perrin Drive house and the
13 contents of the house were denied by Auto Club
14 Family?  Is that correct?
15   A.  I am not sure.  I don't know.
16   Q.  Let me show you a letter here.
17   A.  I'm not sure how -- unless I'm
18 misunderstanding the question.
19      MR. PALMINTIER:
20        Are we talking about the initial
21      homeowner's?
22 EXAMINATION BY MR. THATCH:
23   Q.  The initial claims made under the
24 home insurance policy for insurance coverage.
25   A.  Yes, sir.  Yes, sir.  I'm sorry.  I

Page 258

1  misunderstood.
2    Q.  No, that's all right.  Just wanted
3  to make sure we're clear.
4       Let me show you a document here.
5  This is just to inform me more than anything
6  else.  Do you recognize this document, Mr.
7  Holmes?
8       (Document marked as F. Holmes
9       Exhibit 15 attached to transcript.)
10   A.  It looks familiar, yes, sir.  Yes,
11 sir, I have seen this one.
12   Q.  Now, down at the bottom -- Well, can
13 you describe the document for me?
14   A.  It's an agreement for -- to take out
15 the insurance signed by myself and my wife.
16   Q.  Down at the bottom of the page it
17 says here, "According to ACFIC's records, thus
18 far ACFIC has made the following payments to
19 you on account of the claim you have made
20 against ACFIC arising out of Hurricane
21 Katrina."  And then there's a total listed
22 there under coverage C and D for $2,750.  Do
23 you see that?
24   A.  Yes, sir.
25   Q.  Can you explain to me what that

Page 259

1  payment was for?
2    A.  I don't recall right offhand.
3    Q.  Do you recall receiving that payment
4  from Auto Club Family?
5    A.  Yes, sir, I do.
6    Q.  Okay.  Let's talk for a minute about
7  the lawsuit that you filed against Auto Club
8  Family Insurance in connection with Hurricane
9  Katrina.
10   A.  Yes, sir.
11   Q.  Can you tell me why you filed that
12 lawsuit?
13   A.  In regards to the homeowner's --
14   Q.  Correct?
15   A.  -- insurance?
16   Q.  Correct.
17   A.  Okay.  I mean, they -- it was -- it
18 was something that we had filed.  We didn't
19 know exactly to what extent, what damages.
20   Q.  Can you explain then the claims that
21 you made in that lawsuit against Auto Club?
22   A.  I mean, it's what -- whenever my
23 attorney, that's how it was filed.
24   Q.  So you claimed that -- and this was
25 your homeowner's insurance.  You claimed that

Page 260

1  a portion of your house and several of your
2  personal property items were damaged by wind
3  or wind-driven rain.  Is that correct?
4    A.  That's what was filed, yes, sir.
5    Q.  And you also sought additional
6  living expenses in connection with the wind
7  and wind-driven rain damage to Perrin Drive
8  and its contents?
9    A.  I'm sorry, what are you referring
10 to?  I'm sorry.
11   Q.  I'll rephrase.  You also sought
12 additional living expenses in connection with
13 Hurricane Katrina on your home insurance
14 policy.
15   A.  Yes, sir.  I'm sorry.
16   Q.  I'll show you a couple of documents
17 here.
18      (Document marked as F. Holmes
19      Exhibit 16 attached to transcript.)
20      Do you recognize this document,
21 Mr. Holmes?
22   A.  I believe so.
23   Q.  Can you tell me what it is?
24   A.  It's the Petition For Damages
25 against Club Insurance.

65 (Pages 257 to 260)

Page 261

1  Q.  So you understand this to be the
2  Petition For Damages filed in your lawsuit
3  against Auto Club Family?
4      A.  Yes, sir, that's correct.
5      Q.  If you look on that first page at
6  the bottom, under what's labeled as paragraph
7  Roman numeral IV, do you see that?
8      A.  Yes, sir.
9      Q.  It says "That on August 29, 2005,
10 the immovable property located at 1205 Perrin
11 Drive, Arabi, Louisiana, in the Parish of St.
12 Bernard, suffered extensive wind damage as a
13 result of Hurricane Katrina".  Do you see
14 that?
15     A.  Yes, sir.
16     Q.  It says "More particularly, damages
17 include, but are not limited to, the
18 following: roof damage, wind damage to the
19 front door, wind-blown rain, mold, and
20 additional living expenses."  Do you see that?
21     A.  Yes, sir.
22     Q.  And those were claims that you made
23 in this lawsuit in connection with your
24 insurance claims -- I'm sorry, rephrase.
25 These were claims that you made at the time

Page 262

1  against Fidelity under your homeowner's
2  insurance policy with respect to the house at
3  Perrin Drive?
4          MR. PALMINTIER:
5             I object to form.
6          THE WITNESS:
7             No.  Against Fidelity?
8  EXAMINATION BY MR. THATCH:
9      Q.  I'm sorry.  It's getting late.
10     A.  Okay.  I'm sorry.  I thought I
11 misheard.
12     Q.  No, no, no, I'm glad you corrected.
13 These were claims for wind damage and
14 wind-driven rain damage to your house at
15 Perrin Drive and its contents against your
16 homeowner's insurance policy, Auto Club
17 Family?
18     A.  It's what I filed with my attorney,
19 yes, sir.
20     Q.  Let's look at another document
21 here.
22         (Document marked as F. Holmes
23      Exhibit 17 attached to transcript.)
24     A.  Thank you.
25     Q.  Do you have it, Mr. Holmes?

Page 263

1      A.  Yes, sir.
2      Q.  Do you recognize this document?
3      A.  I'm not sure.  I believe so.
4      Q.  And can you describe it for me?
5      A.  It would be a response to
6  interrogatories with Club Insurance.
7      Q.  So these were responses that you
8  made to Auto Club Family's interrogatories in
9  connection with the case against Auto Club
10 Family?
11     A.  Correct.
12     Q.  Now, do you recall reviewing these
13 responses before they were filed in this
14 case?
15     A.  I believe so, but I really don't
16 recall.  It's been a little while.
17     Q.  If you go to the page that's marked
18 ACFIC-000156, and then if you see at the
19 middle it says "Answer to Interrogatory number
20 4"?  Do you see that?
21     A.  Yes, sir.
22     Q.  It says "We contend that there was
23 extensive wind damage to the exterior of the
24 house as well as a majority of the contents of
25 the household."  Do you recall as we sit here

Page 264

1  today what portions of the exterior of the
2  house you claimed were damaged by wind as part
3  of this lawsuit?
4          MR. PALMINTIER:
5             I object to form.
6          THE WITNESS:
7             No, sir, I don't know.
8  EXAMINATION BY MR. THATCH:
9      Q.  Do you recall what contents within
10 the house were damaged by wind?
11         MR. PALMINTIER:
12            I object to form.
13         THE WITNESS:
14            Again, I don't recall.
15 EXAMINATION BY MR. THATCH:
16     Q.  Do you understand these discovery
17 responses to have been true and correct when
18 filed?
19         MR. PALMINTIER:
20            I object to form.
21         THE WITNESS:
22            I believe so, yes, sir.
23 EXAMINATION BY MR. THATCH:
24     Q.  And the same question with respect
25 to the Petition For Damages that we looked at

FRED NELSON HOLMES JR.                                                September 24, 2011

Page 269

1  an Excel spreadsheet and then some of these
2  pages, the columns bled into additional
3  pages.
4      A.  Okay.
5      Q.  But on pages 188 through 190 you
6  have listed throughout all three of those
7  pages wind-driven rain and mold.  Is that
8  correct?
9          MR. PALMINTIER:
10             I object to form.
11         THE WITNESS:
12             That's what's written, yes, sir.
13 EXAMINATION BY MR. THATCH:
14     Q.  Now, do you recall -- First of all,
15 you recall creating this list?
16     A.  I recall providing information.  I
17 don't recall exact, but I remember providing.
18     Q.  Well, my question is did you create
19 the list?
20     A.  Yes, I believe so.
21     Q.  And did you create it on your own or
22 did you create it with other -- with your
23 wife's help, for instance?
24     A.  I'm sure I would have had my wife's
25 help.

Page 270

1      Q.  And at the time that you created
2  this list and provided it to V. J. in your
3  case against Auto Club Financial, you
4  understood that the contents listed here in
5  this document were damaged by wind-driven
6  rain?
7          MR. PALMINTIER:
8             Object to form.
9  EXAMINATION BY MR. THATCH:
10     Q.  And/or wind?
11         MR. PALMINTIER:
12            I object to form.
13         THE WITNESS:
14            I don't know.
15 EXAMINATION BY MR. THATCH:
16     Q.  Now, your lawsuit against Auto Club
17 Financial was ultimately settled.  Is that
18 correct?
19     A.  Correct.
20     Q.  Do you recall the settlement
21 amount?
22     A.  Not right offhand, no, sir.
23     Q.  Let me see if this helps.
24         (Document marked as F. Holmes
25      Exhibit 19 attached to transcript.)

Page 271

1      Q.  Do you recognize this document,
2  Mr. Holmes?
3      A.  I believe so, yes, sir.
4      Q.  If you go to the last page, which is
5  ACFIC-000010, that's your signature on that
6  page?
7      A.  Yes, sir.
8      Q.  Correct?
9      A.  On the last page, yes, sir.
10     Q.  If you go back to the first page, at
11 the top it says "Amount of payment".
12     A.  Yes, sir.
13     Q.  "$20,000".  Do you see that?
14     A.  Yes, sir.  Okay.
15     Q.  Do you understand that to have been
16 the amount that you settled with Auto Club
17 for?
18     A.  Yes, sir.
19     Q.  Okay.  Let's talk for a minute about
20 your Road Home claim.  We talked about a
21 little bit earlier that following Katrina you
22 applied for assistance to the Road Home
23 Program.  Is that correct?
24     A.  That's correct.
25     Q.  And am I correct that Road Home

Page 272

1  offered you four different options as part of
2  its recovery program in connection with that
3  assistance?
4      A.  I don't recall a fourth.  I remember
5  three.  I don't remember four.
6      Q.  Well, it may just be that I am being
7  particular and specific when I include the
8  fourth option, which was decline assistance
9  from Road Home.
10     A.  Oh, very good.
11     Q.  Do you remember the first three
12 options?
13     A.  I believe so.
14     Q.  Okay.  I'll show you a couple of
15 documents just to clarify.
16         (Document marked as F. Holmes
17      Exhibit 20 attached to transcript.)
18     Q.  Do you recognize this document,
19 Mr. Holmes?
20     A.  I believe I have seen this before,
21 yes, sir.
22     Q.  Can you tell me what it is?
23     A.  It looks like the Road Home
24 information.
25     Q.  On the page that's numbered at the

68 (Pages 269 to 272)

JOHNS, PENDLETON COURT REPORTERS                                         504 219-1993