**JENEEN MARIE BAUDOIN-HOLMES**                                         **September 25, 2011**

---

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
                                 JUDGE DUVAL
PERTAINS TO MRGO                 MAG. WILKINSON

FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
          05-6314, 05-6324, 05-6327, 05-6359,
          06-0225, 06-0886, 06-1885, 06-2152,
          06-2278, 06-2287, 06-2824, 06-4024,
          06-4065, 06-4066, 06-4389, 06-4634,
          06-4931, 06-5032, 06-5155, 06-5159,
          06-5156, 06-5162, 06-5260, 06-5771,
          06-5786, 06-5937, 07-0206, 07-0621,
          07-1073, 07-1271, 07-1285

                    * * *

VIDEOTAPED DEPOSITION OF
JENEEN MARIE BAUDOIN-HOLMES,
30231 Glenboro Drive, Spring, Texas 77386,
given at The Woodlands Waterway Marriott Hotel
and Convention Center, 1601 Lake Robbins
Drive, The Woodlands, Texas on Sunday,
September 25, 2011.

---

Page 2

 1  APPEARANCES:
 2
    REPRESENTING THE PLAINTIFFS:
 3      LAW OFFICE OF GERALD N. ANDRY, JR.
        (BY:  GERALD N. ANDRY, JR., ESQUIRE)
 4      710 Carondelet Street
        New Orleans, Louisiana 70130
 5      504-581-4334 (NOT PRESENT)
    - AND-
 6      DEGRAVELLES, PALMINTIER, HOLTHAUS &
        FRUGE, L.L.P.
 7      (BY:  JOSHUA M. PALMINTIER, ESQUIRE)
        618 Main Street
 8      Baton Rouge, Louisiana 70801-1910
        225-344-3735
 9  - AND-
        THE ANDRY LAW GROUP, LLC
10      (BY:  JONATHAN B. ANDRY, ESQUIRE)
        610 Baronne Street
11      New Orleans, Louisiana 70113-1004
        504-525-5535 (NOT PRESENT)
12
13
14  REPRESENTING THE UNITED STATES OF AMERICA:
        U.S. DEPARTMENT OF JUSTICE
15      (BY:  CONOR KELLS, ESQUIRE)
        Torts Branch, Civil Division
16      P.O. Box 888
        Benjamin Franklin Station
17      Washington, D.C. 20044
        202-616-4289
18
19  REPRESENTING WASHINGTON GROUP INTERNATIONAL,
        INC.:
20      JONES DAY
        (BY:  CHRISTOPHER THATCH, ESQUIRE)
21      51 Louisiana Avenue, N.W.
        Washington, D.C. 20001-2113
22      202-879-4645
23
    ALSO PRESENT:
24      FRED N. HOLMES, JR.
25

---

Page 3

 1  APPEARANCES CONTINUED:
 2
 3
 4
 5
 6  VIDEOGRAPHER:  KEN HART (HART VIDEO)
 7
 8
 9
10  REPORTED BY:
11      ROGER D. JOHNS, CCR
12      CERTIFIED COURT REPORTER
13      STATE OF LOUISIANA
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

 1        S T I P U L A T I O N
 2
 3      It is stipulated and agreed by and between
 4  counsel for the parties hereto
 5  that the deposition of the aforementioned
 6  witness is hereby being taken under the
 7  Federal Rules of Civil Procedure, for all
 8  purposes, in accordance with law;
 9      That the formalities of certification and
10  filing are specifically waived;
11      That the formality of reading and signing
12  of the transcript is specifically not waived;
13      That all objections, save those as to the
14  form of the question and the responsiveness of
15  the answer, are hereby reserved until such
16  time as this deposition, or any part thereof,
17  may be used or sought to be used in evidence.
18
19          * * * *
20
21      ROGER D. JOHNS, RDR, CRR, Certified Court
22  Reporter, for the State of Louisiana,
23  officiated in administering the oath to the
24  witness.
25

---

Page 17

1   Q.  And how long were you a high school
2   teacher?
3   A.  Only one month.
4   Q.  Why only one month?
5   A.  It wasn't for me.
6   Q.  So after you left the high school
7   where did you begin working?
8   A.  Delgado Community College.
9   Q.  And do you remember approximately
10  when you began working for Delgado Community
11  College?
12  A.  I believe it may have been in 1998,
13  early '98.  I don't recall the specific
14  month.
15  Q.  And when you began your employment
16  with Delgado Community College, what were you
17  doing?  What was your job title?
18  A.  Financial aid counselor.
19  Q.  And you worked for Delgado Community
20  College from 1998 until 2005 when Hurricane
21  Katrina hit?
22  A.  That is correct.
23  Q.  Did your job title change at any
24  point during that time period between 1998 and
25  2005?

Page 18

1   A.  No, sir.
2   Q.  Yesterday we talked with your
3   husband a bit about living expenses at the
4   residence that you all held, 1205 Perrin Drive
5   in Arabi, Louisiana.
6   A.  Yes.
7   Q.  And he was able to give me some
8   detail, but not much detail.  So I'll just ask
9   you.  Are you able to give me any more detail
10  with respect to your living expenses at Perrin
11  Drive before Katrina?
12  A.  My husband's information was the
13  more accurate of the information.  I don't --
14  He handles that affair for me.
15  Q.  Let me ask you this, just generally
16  speaking.  Since you were sitting here
17  yesterday during your husband's deposition, is
18  there anything that you recall from
19  yesterday's testimony that you disagree with?
20  A.  No, sir.
21  Q.  Mrs. Holmes, did you have any
22  student loans from your time at the University
23  of New Orleans?
24  A.  Yes, I did.
25  Q.  Can you tell me, are you still

Page 19

1   paying those loans off?
2   A.  No, sir, they're finally paid off.
3   Q.  That's fantastic.  I cannot say the
4   same, unfortunately.
5   Can you tell me approximately when
6   you were able to pay them off?
7   A.  Just within the last year or two.
8   It's fairly recent.
9   Q.  Let me show you a couple of
10  documents here.
11  (Document marked as Exhibit J.
12  Holmes 1 attached to transcript.)
13  Mrs. Holmes, do you recognize this
14  document?
15  A.  I'm taking a look over it.  Give me
16  one minute, please.
17  Q.  Please take your time.
18  A.  Okay.  No, sir, I have not seen this
19  document, but my husband had informed me of
20  such, of seeing it.  I was aware of it, but
21  no, this is the first time I am laying my eyes
22  on it.
23  Q.  Well, just for the record, this is
24  the September 19, 2001 expert report from Dr.
25  Randolph Rice.

Page 20

1   MR. PALMINTIER:
2   2011.
3   EXAMINATION BY MR. THATCH:
4   Q.  2011.  I apologize.
5   MR. THATCH:
6   Thank you, Counsel.
7   EXAMINATION BY MR. THATCH:
8   Q.  And we looked at this document
9   yesterday with your husband.  Let me just ask
10  you a couple of questions.  I realize you're
11  not familiar with it.  Have you ever met with
12  Dr. Randolph Rice?
13  A.  No, sir.
14  Q.  Have you ever spoken with him?
15  A.  No, sir.
16  Q.  Have you ever exchanged any
17  correspondence with him, whether it be email
18  or letter correspondence?
19  A.  Directly, not through me.  Any
20  correlation would have been through my
21  husband.
22  Q.  So just so I am clear, you may have
23  prepared an email or a letter that you
24  provided to your husband and then your husband
25  sent to Dr. Rice?

JENEEN MARIE BAUDOIN-HOLMES                                September 25, 2011

Page 29

    Okay. If you look at that
document, in the first paragraph you see --
I'm sorry, not the first paragraph. You see
the third paragraph on that page that starts
with "Mr. Holmes was not vested"? And if you
move over to the second page, you see the
following paragraph reads "Miss Holmes is
vested in the Teachers Retirement System of
Louisiana." Do you see that?
    A. Yes, sir.
    Q. Did you have an understanding as to
what being vested in this retirement plan
meant?
    A. "Vested" means when you become of
retirement age, I believe, that you can draw
down the allocation or percentage that the
system calculates.
    Q. And if you look at this paragraph
here that Dr. Rice has written, it says "Miss
Holmes is vested in the Teachers Retirement
System of Louisiana. She will receive $435
per month at age 60." Is that a correct
understanding of how your pension plan worked?
    A. Yes, sir, I believe so.
    Q. It also says "Had she maintained her

Page 30

employment with Delgado College for this time
period, her estimated retirement income would
have been approximately $4,500 per month." Is
that a correct understanding of how your
retirement plan worked at Delgado?
    A. I believe so.
    Q. Mrs. Holmes, if you can go back to
the first page of this document, in the first
paragraph it says "We have looked at the loss
of earnings experienced by Mr. Holmes as he
transitioned jobs from the University of New
Orleans in 2006 to his current employment at
Rice University. It is unclear whether a
similar type calculation is appropriate for
Miss Holmes inasmuch as her actual W-2s for
2006 and 2007 with User Friendly Phone Book
LLC are not available." Do you see that?
    A. Yes, sir.
    Q. And User Friendly Phone Book is the
same User Friendly that we spoke about earlier
today?
    A. Yes, sir.
    Q. Now, it says here it's unclear
whether a similar type calculation is
appropriate because the actual W-2s for 2006

Page 31

through 2007 with User Friendly are not
available. Do you have those W-2s?
    A. I had them and I'm sure I have
them. I just don't have my hands on them.
    Q. But you didn't produce these W-2s to
Dr. Rice?
    A. They weren't available at the time.
    Q. Now, when you say you think you have
them, you think you have them at your house
now or you think you could obtain them?
    A. I would need to probably request the
IRS to send out duplicates or to contact the
company in question.
    MR. THATCH:
        Well, Josh, just for the record,
    yesterday we requested documents
    pertaining to Mr. Holmes' retirement
    account at the University of New
    Orleans. We would like to make the
    same request with respect to documents
    pertaining to Mrs. Holmes' retirement
    account at Delgado Community College.
    MR. PALMINTIER:
        Yes, to the extent that Miss
    Holmes is able to get those documents

Page 32

    and give them to us, we will
    definitely provide them for you.
    MR. THATCH:
        And then also with respect to
    W-2s for 2006 and 2007 with User
    Friendly Phone Book, to the extent
    that Mrs. Holmes has them or you are
    able to request those from the IRS, we
    talked off the record earlier today
    about making a similar request to the
    IRS for a full -- full set of the tax
    forms for both Mr. and Mrs. Holmes and
    so maybe we can lump that request for
    the User Friendly tax forms in with
    that request.
    MR. PALMINTIER:
        Sure.
EXAMINATION BY MR. THATCH:
    Q. All right, Mrs. Holmes. Let's go
back to talk a little bit more about your
employment with Delgado Community College.
When did you -- When did you stop working for
Delgado?
    A. I stopped working in 2006, January.
    Q. So that was a few months after

8 (Pages 29 to 32)

JOHNS, PENDLETON COURT REPORTERS                                    504 219-1993

Page 33

1  Hurricane Katrina touched down in New Orleans;
2  correct?
3      A.  Yes.
4      Q.  Did you work full time for Delgado
5  Community College during the period between
6  the time that Hurricane Katrina hit and the
7  time when your employment ended in January of
8  2006?
9      A.  Yes.
10     Q.  And can you tell me what your salary
11 was at Delgado Community during that time
12 period?
13     A.  The same as it was the day of
14 Katrina.
15     Q.  And that would have been $33,766.43?
16     A.  That was a partial year.  They had
17 -- I am not sure if that included cafeteria
18 plan or not.  Roughly, yes.
19     Q.  Roughly --
20     A.  That's -- That's an approximate.
21 Without having the document in front of me,
22 I'd have to go from this, yes.
23     Q.  Now, when you say you're not sure if
24 that salary amount included an amount for a
25 cafeteria plan, what exactly do you mean?

Page 34

1      A.  If there were anything that was
2  taken out that was covered, sheltered benefits
3  such as the retirement, I -- I believe my
4  salary may have been a little bit higher than
5  that at that time.
6      Q.  So you believe --
7      A.  I believe my salary may have been
8  more around 36,000.  I think this is the
9  difference from the shelter of the retirement
10 benefits.
11         MR. THATCH:
12            Well, Josh, we'll take a look at
13       the records that we receive from both
14       retirement plans and the W-2s and we
15       can sort them out.  Again, if we have
16       any questions, we may need to reopen.
17        MR. PALMINTIER:
18            I understand.
19 EXAMINATION BY MR. THATCH:
20     Q.  Now, Mrs. Holmes, during the time
21 period between when Katrina touched down in
22 New Orleans and the end of your employment
23 with Delgado Community, did you hold the same
24 job?
25     A.  Yes, sir.

Page 35

1      Q.  So you had the same job
2  responsibilities and same job title?
3      A.  Yes, sir.
4      Q.  And you continued to receive the
5  benefits that you were receiving before
6  Katrina from Delgado during the time period
7  after the storm?
8      A.  Yes, sir.
9      Q.  Can you tell me approximately when
10 you ended employment with Delgado Community?
11 I know you mentioned January, 2006.  Do you
12 have a more approximate date in mind?
13     A.  I officially worked through the end
14 of January.  However, I believe I was only
15 paid for the first part of January.
16     Q.  When you say only paid for the first
17 part of January, can you tell me what the
18 first part would have amounted to?  A week,
19 two weeks?
20     A.  It would have been on a W-2 for that
21 year.
22     Q.  And can you tell me why you only
23 received income payment from Delgado for part
24 of January, although working all the way
25 through the end of the month?

Page 36

1      A.  Furlough.  The furlough letter time
2  frame.
3      Q.  And what were the circumstances of
4  you ending your employment with Delgado
5  Community?
6          MR. PALMINTIER:
7             I object to form.
8          THE WITNESS:
9             I didn't officially end my
10        employment.  It was that I had to
11        obtain living and return back on a
12        certain date, which was impossible to
13        find for us, to locate housing.
14 EXAMINATION BY MR. THATCH:
15     Q.  Can you tell me what you were told?
16 You mentioned receiving a letter from Delgado
17 Community.  Can you tell me what that letter
18 said?
19     A.  It entailed that we had to -- I had
20 to return by a certain date or my job would be
21 eliminated.
22     Q.  And prior to receiving that letter
23 from Delgado had you had any other
24 communications with Delgado about the furlough
25 or your continuing employment beyond January,

Page 37

1  2006?
2      A.  My recollection was just receiving
3  duties of jobs to take care of while I was
4  abroad.
5      Q.  Duties of jobs to take care of while
6  you were abroad.
7      A.  Processing work duties.
8      Q.  When you say "abroad", are you
9  referring to Texas?
10     A.  Yes, sir.
11     Q.  Do you have copies of both the
12 furlough letter and the documents that you
13 received from Delgado Community regarding your
14 employment toward the end?
15     A.  Not -- Not -- I no longer have that
16 information.
17     Q.  During -- I'm sorry.
18     A.  I would think that -- I would
19 believe that the Human Resources Department
20 would be able to provide that information to
21 you.
22     Q.  Can you tell me who your supervisor
23 was at Delgado Community in January of 2006?
24     A.  Germaine Edwards.  Spelled G E R M A
25 I N E.  Edwards, E D W A R D S.

Page 38

1      Q.  And do you know if Germaine Edwards
2  is still with Delgado Community College?
3      A.  I am not aware.  I don't know.
4      Q.  Mrs. Holmes, do you understand that
5  if you had returned to New Orleans after
6  Katrina to live that you would have been able
7  to continue to work for Delgado Community
8  College?
9      A.  I believe so.
10     Q.  And do you have an understanding of
11 whether Delgado Community shut down during the
12 storm?
13     A.  It was inundated with flood waters,
14 so yes, it was shut down for a period of
15 time.  I don't recall exactly how long.
16     Q.  Do you recall the extent of the
17 damage that the community college sustained as
18 a result of Katrina?
19     A.  Substantial.
20     Q.  Now, yesterday we talked with your
21 husband a bit about the trips that he and you,
22 I believe, made back to New Orleans after you
23 evacuated in August of 2005.  And he mentioned
24 two trips back to New Orleans.  One around
25 October, November of 2005 time frame and

Page 39

1  another at some point in the beginning of
2  2006.  And I believe he said that you had gone
3  back with him on one of those trips.  Is that
4  correct?
5      A.  I was not with him on the first
6  occasion.
7      Q.  So you went back to visit New
8  Orleans with your husband during that second
9  trip that he mentioned yesterday?
10     A.  I believe it was the second time
11 that he had gone back.  I know I went back
12 with him to view the remains.
13     Q.  Now, that trip with your husband the
14 second time that he recalled, was that the
15 only trip that you made back to New Orleans
16 after the evacuation?
17     A.  I've had to go back on several
18 occasions since.
19     Q.  Can you tell me when, when those
20 occasions were that you went back to New
21 Orleans?
22     A.  I don't recall specific dates, but I
23 know I had to go back on occasion for two
24 funerals.
25     Q.  And would those have been recent

Page 40

1  trips back to New Orleans?
2      A.  2008.
3      Q.  So from the time that you all
4  evacuated New Orleans as a result of Katrina,
5  between that date and 2008, you made one trip
6  back to New Orleans?
7      A.  Several.  I just don't recall the
8  specific dates.
9      Q.  Would those several other trips back
10 to New Orleans have been in 2006?
11     A.  Perhaps.
12     Q.  But you don't recall when those
13 trips occurred?
14     A.  Proceedings with the cases and --
15 that were part of Katrina.
16     Q.  Aside from the trip that you took
17 with your husband back in early 2006, on any
18 of those other trips that you recall making,
19 did you go back to your house at Perrin Drive?
20     A.  Yes, sir.
21     Q.  Do you recall how many times you
22 went back?
23     A.  Nearly every time we went back.
24     Q.  And on the trips that you made back
25 -- Let's just take the year 2006.  And I am

Page 101

1  yesterday that your husband made one trip back
2  in '05 that you did not attend and he also
3  made a trip in 2006, early 2006 that you did
4  attend.  And then you had mentioned earlier
5  today, and I am just asking this again because
6  I want to make sure I can try to get the
7  record clear here, you had mentioned that you
8  might have made other trips in 2006 down to
9  New Orleans in addition to that trip with your
10 husband.  Do you recall that?
11    A.  Yes, I do recall that.
12    Q.  Do you remember approximately how
13 many trips you would have made in 2006 in
14 addition to the trip with your husband?
15    A.  As indicated before, I don't
16 remember.
17    Q.  And what were -- what was the
18 purpose of those trips that you made in 2006?
19    A.  Whenever we went back it was to view
20 the home, try to find out the next way to go
21 through any course work of trying to get
22 resolved, family.
23    Q.  Now, let's move to 2007.  Did you
24 make any trips back to New Orleans in 2007?
25    A.  Perhaps.

Page 102

1     Q.  Do you remember approximately,
2  ballpark, how many trips you would have made
3  in 2007?
4     A.  I don't remember.
5     Q.  And when you went back in 2007, did
6  you return to New Orleans for the same reason
7  that you just described having returned during
8  those trips in 2006?
9     A.  It was -- It was always to deal with
10 Katrina.  I -- I don't remember anything else.
11    Q.  I think that's it for -- I'm sorry.
12       (Discussion off the record.)
13 EXAMINATION BY MR. THATCH:
14    Q.  Mrs. Holmes, during the trips that
15 you took back to New Orleans in 2006 and in
16 2007, did you ever meet with any realtors
17 during those trips?
18    A.  No, sir.
19    Q.  No?  Did you meet with anyone else
20 with respect to housing in New Orleans?  Aside
21 from Road Home and any of the other groups
22 that you may have sought assistance from.
23    A.  I don't remember.  I don't think
24 so.
25       MR. THATCH:

Page 103

1        That's it for us.
2        MR. PALMINTIER:
3        Okay.
4        MR. THATCH:
5        Actually, let me just say before
6    we're done that we had talked earlier
7    today about filling out the IRS forms.
8        MR. PALMINTIER:
9        Yes.
10       MR. THATCH:
11       And, you know, we'll just talk
12   about that off the record.  Deal with
13   those details.
14       MR. PALMINTIER:
15       Sounds good.
16 EXAMINATION BY MR. KELLS:
17    Q.  Okay.  And, Ms. Holmes, I introduced
18 myself earlier, but I'm Conor Kells.  I
19 represent the United States in this case.  And
20 the same general rules that Chris went over at
21 the beginning.  I only have a few short
22 questions to ask you about.
23       Yesterday I presented the same
24 claim form that was submitted by your husband
25 to the Army Corps of Engineers, and if I

Page 104

1  could, I would like to ask you one or two
2  questions about the same document and have
3  that marked as an exhibit for the deposition.
4        (Document marked as Exhibit J.
5    Holmes 8 attached to transcript.)
6        MR. KELLS:
7        What number are we on, anyway?
8        COURT REPORTER:
9        8.
10 EXAMINATION BY MR. KELLS:
11    Q.  8.  Okay.
12    A.  Yes, sir.
13    Q.  Have you seen this form before?
14    A.  Yes, sir.
15    Q.  Did you assist your husband in
16 filling it out?
17    A.  Yes.  I believe so.
18    Q.  I noticed down at the bottom in box
19 13-A there are two signatures there.  Is one
20 of them yours?
21    A.  Yes, sir.
22    Q.  On this form I noticed that for date
23 of birth there's only one date of birth
24 listed.  Is that your date of birth or your
25 husband's date of birth?