**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In Re: KATRINA CANAL BREACHES** | | **CIVIL ACTION** |
| **CONSOLIDATED LITIGATION (2)** | | **NO. 05-4182 "K"** |
| _____ | § | |
| **PERTAINS TO: MRGO** | § | **JUDGE DUVAL** |
| | § | **MAG. J.** |
| | | **WILKINSON** |
| ***Armstrong,* No. 10-866** | § | |
| _____ | § | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT WASHINGTON GROUPS
INTERNATIONAL, INC.'S  MOTION TO EXCLUDE EVIDENCE
REGARDING ECONOMIC LOSS CLAIMS**

**INTRODUCTION**

Plaintiffs filed suit under Louisiana Civil Code Article 2315 against defendant, WGII, alleging that defendant was negligent in the performance of engineering and excavation work conducted as part of a lock expansion project along the Inner Harbor Navigational Canal and the East Bank Industrial Area. They claim that the defendant's negligence was a substantial factor in causing extreme flooding in the Lower 9th Ward and areas adjacent to the IHNC, which  not only damaged their homes beyond repair but forced them to relocate and seek alternative employment.

Plaintiffs' claims include damages to their immovable and movable property, as well as, reasonably foreseeable economic damages for lost wages and reduction of earning capacity.  Plaintiffs seek to recover the full measure of the economic damages sustained as a direct consequence of the devastation of their homes.  The ultimate value of these claims will require this court to assess and valuate their pre- and post-Katrina comparative earnings.

Defendant, the Washington Group International, Inc. (hereinafter WGII), seeks to have this Court exclude all evidence regarding economic losses suffered by the Armstrong and Holmes plaintiffs.  It does so through a *Motion In Limine* which it styles as a Motion to Exclude Evidence.  As set forth herein below, this motion should be denied as a procedurally inappropriate and substantively unsupported Motion to Dismiss under Rule 12(b)(6) or a Motion for Summary Judgment under Rule 56(a).

**W**GII's arguments can be summarized as follows:

> *Plaintiffs' economic loss claims do not arise directly from damage to their property or persons and are therefore precluded from recovery. Thus, any evidence in support of those specific elements of damage is irrelevant and inadmissible.*

The relief sought by WGII would deny these plaintiffs the opportunity to prove at trial substantial economic damages which are in fact recoverable under Louisiana law. This self-styled "Motion to Exclude" is the kind of *in limine* motion which rarely

has a place in a bench trial. The primary justification for these "preliminary" evidentiary rulings – prevention of prejudice or confusion of the jury – simply does not exist here.

A motion *in limine* should not be allowed to substitute for a thorough factual development by the parties and a proper evaluation of facts by the trier of fact (in the context of a mandated duty-risk analysis). Though such motions are generally found to be within the court's authority to manage the order and efficiency of the trial, as set out in the Federal Rules,[1] this authority is most often exercised as a way of regulating the quality and quantity of evidence allowed to be presented to a jury[2] and are <u>not</u> appropriate when the judge is the trier of fact.[3]

---

[1] Rule 16 of the Federal Rules of Civil Procedure implicitly recognizes *in limine* motions in federal courts. The rule provides the judge with pre-trail procedures for considering matters that will aid in the disposition of the action. See "TO ARGUE IS HUMAN, TO EXCLUDE, DIVINE: THE ROLE OF MOTIONS IN LIMINE AND THE IMPORTANCE OF PRESERVING THE RECORD ON APPEAL", (Jennifer M. Miller, 32 Am. J. Trial Advoc. 541, 543.).

[2] The rules of evidence are also a foundation for the *in limine* motion. Federal Rule of Evidence 403, which provides that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." has been referenced as such a foundational pronouncement. See "TO ARGUE IS HUMAN, TO EXCLUDE, DIVINE: THE ROLE OF MOTIONS IN LIMINE AND THE IMPORTANCE OF PRESERVING THE RECORD ON APPEAL", (Jennifer M. Miller, 32 Am. J. Trial Advoc. 541, 544.).

[3] "Further, the Court notes that the purpose of Daubert motion is 'to ensure that only reliable and relevant expert testimony is presented to the jury.'" *Thompson v. Rowan Cos., Inc.*, 2007 WL 724646(E.D. La. 3/6/07), 06-3218 citing *Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496, 506 (5th Cir.1999) (superseded by rule on other grounds), citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

### Standard of Review

When a defendant attacks a complaint on grounds that it fails to state a legally cognizable claim, Rule 12(b)(6) provides the appropriate challenge. The test for determining the sufficiency of a complaint under Rule 12(b)(6) is that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Subsumed within the rigorous standard of the *Conley* test is the requirement that the plaintiff's complaint be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged. *Elliott v. Foufas*, 867 F.2d 877, 880 (5th Cir.1989). Further, the plaintiff's complaint is to be construed in a light most favorable to plaintiff, the allegations contained therein are to be taken as true and the court must draw all reasonable inferences from those allegations in the plaintiff's favor. *Oppenheimer v. Prudential Securities, Inc.* 94 F.3d 189, 194 (5th Cir.1996).

This is consistent with the well-established policy that the plaintiff be given every opportunity to state a claim. *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977).  In other words, a motion to dismiss an action for failure to state a claim "admits the facts alleged in the complaint, but challenges plaintiff's right to

4

relief based upon those facts." *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1137 (5th Cir.1992). Finally, when considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the district court must examine the complaint to determine whether the allegations provide relief on any possible theory. *Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir.1994).

> "Thus, to survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570; *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir.2007) (recognizing a change in the standard of review). Plausible grounds "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Bell Atlantic Corp.*, 550 U.S. at 556. "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely. (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002))."

The allegations of the Armstrong and Holmes plaintiffs contain "facially plausible" allegations which (when accepted as true) raise a reasonable expectation that the injuries, damages and economic losses they sustained were the result of Defendants' "legal fault". Thus, Plaintiffs adequately state claims upon which the relief sought—economic damages—may be granted.[4] And even assuming, for purposes of argument, that this matter is properly before the court, plaintiffs show that the attempt to exclude evidence of their economic loss is not substantively well-founded and should be denied. In the final analysis, if these

---

[4] Armstrong: 10-cv-00866, (Rec. Doc. 1), Class Action Complaint at ¶ 60, 66(a) (03/12/10); Holmes: 05-cv-04182 (Rec. Doc. 20242-2) Complaint in Intervention at ¶ 62, 64, 66 and 68 (05/11/11).

plaintiffs prove at trial what they allege, they are entitled to recover for all damages recoverable under La. C.C. art. 667, 2315, 2316, 2317 and/or 2322.

## FACTS

Fred and Jeneen Holmes and Kenneth and Jeannine Armstrong were part of a massive evacuation of the New Orleans area as Hurricane Katrina approached its August 29, 2005, landfall. As this court knows all too well, much of the city was inundated with flood-waters which completely destroyed significant portions of its infrastructure and rendered many areas of the region uninhabitable for months and even years after the storm. The Holmes and the Armstrongs were among the many that lost their homes to flooding. In the aftermath, the New Orleans area struggled to recover from the devastation; but, to this date its population and infrastructure in many areas remain well below pre-Katrina levels.

These damages are directly traceable to the destruction of her home and personal property damage as a foreseeable result of WGII's negligence. Plaintiffs have alleged and will prove at trial that WGII's negligent acts/omissions led to the devastating and lingering flood waters into the neighborhood where plaintiffs lived thereby causing the near complete loss of all of their worldly possessions.

The question becomes, whether or not Defendants' conduct caused or contributed to foreseeable economic damages (i.e. lost wages, impairment of earning capacity,

lost retirement benefits) to plaintiffs?   Any question or dispute about whether Plaintiffs did all they could to try to find a new residence in the greater New Orleans area are not germaine to the issue now before the court.

## HOLMES

Fred and Jeneen Holmes' only residence in the area was inundated with floodwaters during Hurricane Katrina. The home was rendered completely uninhabitable, and would eventually be demolished.[5] Prior to Hurricane Katrina, Fred Holmes worked for the University of New Orleans[6] and Jeneen Holmes worked for Delgado Community College.[7] As a result of the destruction of their home, neither of the Holmes were able to return to New Orleans immediately after the storm.  Although their employers allowed them to continue their employment from their temporary residence in Houston[8], the Holmes soon realized that they would not be able to find housing which would allow them to return home.[9] Despite the fact that they applied for a FEMA trailer and made multiple reservations, their efforts  failed to generate a solution to their living situation.[10]  As Mrs. Holmes testified, finding housing was

---

[5]See, Deposition of Fred Holmes, "Exhibit A" at 80:2-5.
[6]See, Exhibit A at 35:24-36:2.
[7] See, Deposition of Jeneen Holmes, "Exhibit B" at 17:19-21.
[8]See, Exhibit A at 45:4-16.
[9]See, Exhibit A 49:21-23.
[10]Exhibit A, at 60:22-61:5 and 60:5-19.
Q.   And one other thing I wanted to ask you.  I know that during -- during the time immediately after the storm hit that there were several people who applied for temporary housing through FEMA in New Orleans.
A.   Yes, sir.
Q.   Did you all at any time apply for such housing?
A.   We had -- We were -- Actually, what we had applied for was for the FEMA trailer...

7

"impossible".[11]   In either event, this information would go to "mitigation" not "availability" of economic damages.

Although frustrating, their bleak housing prospects did not affect the Holmes situation with greatest significance until January of 2006 when their employers made demands that the Holmes either return to New Orleans or lose their jobs.  Unable to find suitable housing to allow for their return to New Orleans, and despite their best efforts, Mr. and Mrs. Holmes were furloughed by their employers and, as a matter of fact, suffered substantial lost wages and diminished earning capacity.[12]

Movants  mis-characterize the testimony given by the Holmes.  Neither Fred nor Jeneen ever stated that they did not attempt to return home.  In fact every indication was that they wanted to return to the community they had lived in all their lives.  The Holmes simply stated that they did not meet with anyone regarding housing on the initial two to three trips back to the devastated area. To the contrary, the Holmes stated that they were unable to find adequate housing in the devastated area.  The Holmes attempted to return to New Orleans after Hurricane Katrina, but were unable to because of a lack of adequate housing.[13]  Mr. and Mrs. Holmes applied

---

[11]*Id.*
[12] See, Exhibit A at 44:25-45:3; Exhibit B 23:15-21.
[13]  See, Exhibit A at 60:5-61:6.

for temporary housing through FEMA, but were denied for reasons beyond their control.[14]

The reason for their relocation to Texas was directly related to the inundation of water into their community devastating the region and destroying their home and all of their personal property.  In fact, the Holmes were allowed to continue to work remotely by their respective employers until January 6, 2006 at which point they were furloughed.[15]  It was at this time that the Holmes were each told that to continue working for their respective employers they would have to return to the devastated area.  Both Mr. Holmes and Mrs. Holmes stated that the reason they were furloughed was due to the fact that they were not able to move back home. All of which are issues which go toward an assessment of the value of their claims, not whether or not such damages are recoverable as a matter of law.

### ARMSTRONG

Much like the Holmes, Jeannine and Kenneth Armstrong fled the New Orleans area prior to Hurricane Katrina making landfall.  Fortunately they were able to find a hotel room in the Baton Rouge area at the Lod Cook Conference Center and Hotel on the campus of Louisiana State University.[16]  After about a month in this hotel, the Armstrongs were able to move in with Jeannine's sister in Prairieville, where they

---

[14] *Id.*
[15] See, Exhibit A at 44:25-46:14 and Exhibit B at 32:19-33:14; 34:20-35:8.
[16] See, Deposition of Jeannine Armstrong, "Exhibit C" at 64-65.

remained for two months before moving into an apartment in nearby Gonzales.[17] The apartment in Gonzales was their home for approximately six months, until June of 2006, when they were able to move to Covington to enroll their daughter in school.[18]

With their living situation in constant flux, the Armstrongs were unsure when, if ever, they would be able to return home to Chalmette.[19] Mr. Armstrong managed to maintain his job by making the long and arduous daily commute from Prairieville (near Baton Rouge) to his job in Metairie so he makes no claim for lost wages or diminished earning capacity (only Mrs. Armstrong asserts such a claim herein). With all of the uncertainty surrounding their displacement, Mrs. Armstrong was reluctant to obtain employment, as she knew her living situation was temporary and had no idea where she would be in another six months.[20]  Janeen Armstrong actually described her situation after the loss of their home as being "lost".[21] After an illness kept her from returning to employment in early 2007,[22] Mrs. Armstrong finally secured a job in Houma which she began in August of 2007 in a part-time capacity.[23] According to Mrs. Armstrong, there simply were no full-time positions available.[24]

---

[17] See, Exhibit C at 67, 73-75.
[18] See, Exhibit C at 72:18-73:3, 76:2-9.
[19] See, Exhibit C at 75:14-20; Exhibit A at 45:10-14.
[20] See, Exhibit C at 74:12-19; Exhibit A at 48:12-19.
[21] See, Exhibit C at 51:2-11.
[22] Defendant has alleged, in part, that Mrs. Armstrong cannot support a claim for economic loss because at least a portion of her damages can be attributed to her illness.  However, this is a question of valuation, not relevance, and does not support exclusion of all economic damage evidence.
[23] See, Exhibit C at 80:13-16.
[24] See, Exhibit C at 50:24-51:1.

10

These diasporic migrations caused her to miss out on income she would have earned had she been able to stay in her home.

The proposed evidence would also include the expert reports/testimony of Dr. G. Randolph Rice, an expert forensic economist, who has calculated in his report the present value of both the Holmes and Armstrong plaintiffs' economic losses and diminished earning capacity.   Although discovery in the case is still ongoing, these facts present a synopsis of the record developed thus far.   Defendant, WGII, has filed this Motion to Dismiss (or alternatively for Summary Judgment) guised as a Motion In Limine to Exclude Evidence seeking to prevent plaintiffs from offering any evidence of lost wages and/or diminished earnings capacity. Plaintiffs' are entitled to have this Court evaluate that evidence in the context of a full trial on the merits.

## LAW & ARGUMENT

As expressed more fully below, plaintiffs are not barred by the applicable law of Louisiana from recovering economic losses and they should be allowed to present their testimony and evidence on this issue. This court can then determine whether those losses were "reasonably foreseeable" or "easily associated" with Defendants' conduct and if so, determine whether the actions/inactions of Defendants, WGII and/or the USACE were substantial contributing factors in causing same.

In support of its motion, WGII relies upon an inapposite and "anachronistic" maritime law concept referred to as the "economic loss rule" (hereinafter ELR).[25] The bold assertion in WGII's memorandum that the ELR is "well settled" Louisiana law is not only misleading but contrary to over twenty-five (25) years of controlling jurisprudence of the Louisiana Supreme Court.[26] Both Federal and State courts have ruled that Louisiana does not recognize the exclusionary ELR, nor does it recognize a doctrine sufficiently similar to enable the Courts to adopt a blanket rejection of pure economic damages in all tort claims under Louisiana law.

In *PPG*, the Louisiana Supreme Court considered whether a tortfeasor could be held liable for the indirect economic loss incurred by a party who had a contractual relationship with the owner of property negligently damaged by the tortfeasor. 447 So.2d at 1059. The Louisiana Supreme Court specifically acknowledged that the plaintiffs' damages were relevant, stating "[w]e conclude that while the situation giving rise to the question in this case falls literally within the expansive terms of La.C.C.Art. 2315, in that the dredging contractor's 'act ... cause[d] damage to another'..." *Id*. The court's later denial of the recovery sought

---

[25] See *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 308 (1927); *Forcum-James Co. v. Duke Transportation Co.*, 231 La. 953, 93 So.2d 228 (1957).

[26] *E.g. Entrevia v Hood*, 427 So.2d 1146 (La. 1983); *PPG Industries, Inc. v Bean Dredging*, 447 So.2d 1058 (La. 1984); *Forrest v La. DOTD*, 493 So.2d 563 (La. 1986); *Pitre v Opelousas General Hospital, et al*, 530 So.2d 1151 (La.1988); *9 to 5 Fashions, Inc. v Spurney*, 538 So.2d 228 (La. 1989); *Roberts v Benoit*, 605 So.2d 1032 (La. 1991); *Barrie v V.P. Exterminators, Inc.* 625 So.2d 1007 (La. 1993); *Jefferson v Lead Industries Association, Inc., 106 F.3d 1245 (5C, 1997); Perkins v Entergy Corporation, et al, 782 So.2d 606 (La. 2001); Cleco Corp. v Johnson, 795 So.2d 302 (La. 2001); Marks v OHMEDA, Inc., 871 So.2d 1148 (3C, 2004); and Rando v ANCO Insulations, Inc., 16 So.3d 1065 (La. 2009); Phillips v G&H Seed Co. 66 So.3d 507 (3C, 2011)(Phillips II).*

was based on "policy reasons hereinafter stated in a duty-risk analysis" <u>not</u> upon any jurisprudential or statutory prohibition against such damages. *Id*. Plaintiff suffered no direct property damage or personal injury, which is clearly different than the situation here where plaintiffs sustained total losses of their most important property: their homes and their partimony.

Likewise, on this point, Judge Catherine Perry made the following observation in the *Genetically Modified Rice Litigation* pending in Missouri federal court:

> "Bayer also argues that Louisiana Courts, as a rule, prohibit claims for indirect economic losses, [sustained without damage to property] but Louisiana law does not make such a categorical distinction… Even if the rule of *Robins Dry Dock* did apply to this case, Louisiana courts do not apply it without reference to the individual facts of the case. See, *Cleco Corp. v. Johnson*, 795 So. 2d 302 (La. 2001)". [8]2

## DUTY/RISK ANALYSIS MANDATED BY CONTROLLING CASE LAW

As the clear and controlling jurisprudence of Louisiana mandates, the duty-risk analysis is the proper framework within which to determine whether plaintiff's may recover the losses they seek.[29] Specifically in regards to tortiously-caused economic loss, the Louisiana Supreme Court – first in *PPG* and consistently for the next 25 years – has abrogated the mechanical application of any bright-line, no-duty

---

[28] *In re: Genetically Modified Rice Litigation,* 2010 WL 2326036, at p.9, fn. 6 (E.D. Mo., 2010).
[29] *Berg v. Zummo,* 200-1699 (La. 2001), 786 So.2d 708, 716 citing *Roberts v. Benoit*, 605 So.2d 1032, 1051 (La.1991) (on rehearing).

litmus test to determine the scope of tort duties. Instead, the law of this state has consistently favored a more reasoned, nuanced, circumstance-specific, policy-based duty/risk analysis. A long and distinguished line of controlling Louisiana jurisprudence over the past three decades has confirmed the availability of purely economic damages in this state. When a duty/risk analysis is properly performed and the social, moral and economic factors involved, with a view toward the ideal of justice, make it fair and reasonable to associate a general class of plaintiffs' damages with a particular type of damage caused by a defendants' conduct recovery of pure economic losses are permitted, as a matter of law.

Under the duty/risk analysis, the plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's  injuries (the cause-in-fact element); (4) **the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element)**; and, (5) actual damages (the damages element). *Id*. (Emphasis Supplied).

Ultimately, the proper question is: "How easily does one associate the plaintiffs' complained-of harm with the defendant's conduct?" (*Roberts*, supra, at

14

p.1045). Once cause-in-fact is established, as here, a full assessment of the moral, social and economic factors involved is mandated and the question becomes: As a matter of policy is it fair to conclude that the unreasonable risk of harm created by defendants should be extended to include these particularly foreseeable economic losses to these totally innocent victims?

> "A judge, when determining whether the interest of the party seeking recovery of damages is one that falls within the intended protection of the rule of law whose violation gave rise to the damages, should consider the particular case in terms of the moral, social and economic values involved, as well as a view toward the ideal of justice."
> *PPG Industries, Inc. v. Bean Dredging*, 447 So.2d 1058, 1061 (La.1984).

> "There is no 'rule' for determining the scope of the duty. ... The task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises. How appropriate is the rule to the facts of this controversy? This is the question that the court cannot escape."
> *Roberts v. Benoit*, 605 So.2d 1032, 1044 (La. 1991).

> "Regardless if stated in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty." *Roberts v. Benoit,* 605 So.2d 1032, 1044 (La.1991). "The scope of protection inquiry asks 'whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner.'" *Faucheaux v. Terrebonne Consol. Gov't,* 615 So.2d 289, 293 (La.1993). Although we have unequivocally stated "the determination of legal cause involves a purely legal question,"*Todd v. State, Dept. of Social Services,* 96-3090 (La.9/9/97), 699 So.2d 35, 39, this legal determination depends on factual determinations of foreseeability and ease of association. *See Perkins v. Entergy Corp.,* 98-

2081 (La.App. 1 Cir. 12/28/99), 756 So.2d 388, 410,*affirmed,* 00-1372
(La.3/23/01), 782 So.2d 606.
*Rando v Anco Insulations, Inc.,et al, 16 So.3d 1065, 1088 (La. 2009).*

The evidence sought to be introduced by plaintiffs detail losses they
suffered as a result of being displaced from their homes. Plaintiffs have alleged
that this displacement and the losses they sustained were causally connected to
WGII's negligence (cause-in-fact).  Therefore, under the most simplistic analysis,
this evidence is relevant to the damages element of the duty-risk analysis. The
primary issue before this court is whether this relevant evidence pertains to
damages that are fairly encompassed within the scope of the risk of defendants'
negligent conduct and that question can only be answered after a full review of
the evidence and the application of a full and proper duty/risk analysis.

## PURELY  ECONOMIC  DAMAGES ARE  RECOVERABLE UNDER LOUISIANA TORT LAW

Louisiana courts in a multitude of "tort" cases have recognized the recovery
of pure economic losses without physical injury to property of the victim: *e.g.*,
*Milton J. Womack, Inc. v House of Representatives*, 509 So.2d 62 (La. App. 1 Cir.,
1987), *writ denied*, 513 So.2d 1208 (La. 1987) (architect's liability for bonus due
contractor for early completion where flaw in architect's plans caused delay past the
deadline for early completion); *Colbert v B.F. Carvin Constr. Co.*, 600 So.2d 719
(La. App. 5 Cir., 1992), writ denied, 604 So.2d 1309 (holding that a third party not

16

in privity could recover economic damages for a negligent professional undertaking by a surveyor/appraiser); *Barrie v V.P. Exterminators, Inc. 625 So.2d 1007 (La. 1993)*(termite inspector liable to third party not in privity and to whom he made no direct communications/misrepresentations)*; Smith v Walker*, 708 So.2d 797 (La. App. 1 Cir., 2/20/98), *writ denied*, 718 So.2d 418 (La. 1998)(medical malpractice); *Anderson, et al v Collins, et al*, 26,124 (La. App. 2 Cir., 2/23/95), 648 So.2d 1371(succession attorney liable to non-client for malpractice); *Lifecare Hospitals, Inc. v B&W Quality Growers, Inc.,* 39,065 (La. App. 2 Cir., 2004), 887 So.2d 624 writ denied, 893 So.2d 872 (La. 2005)(defendant's breach of duty to provide complete and accurate information through agent caused pure economic damage to hospital). Each of these cases allowed plaintiffs/claimants to recover damages under Louisiana tort law (La. C.C. art. 2315 "fault") for purely economic harm (without direct damage to their person or property).

The *Wiltz* decision, relied upon by Defendants herein, is contrary to controlling Louisiana Supreme Court authority including: *PPG v. Bean Dredging, Pitre v. Opelousas General Hospital,* 530 So.2d 1151, 1155 (La.1988); *9 to 5 Fashions Inc v. Spurney,* 538 So.2d 228 (La. 1989); *Roberts v. Benoit, supra, Barrie v. VP Exterminators,* 625 So.2d 1007 (La. 1993); *Perkins v. Entergy,*2010-1902 (La., 2010), 51 So.3d 1; *Cleco v. Johnson,* 2001–0175, p. 3 (La.9/18/01), 795 So.2d 302,

304; *Rando v. Anco Insulations, Inc.,* 2008-1163 and 2008-1169 (La., 2009),16 So.3d 1065 *writ denied,*18 So.3d 77 (La., 2009); *Forrest v. DOTD*; and *Carter v. City Parish Govt. of East Baton Rouge,* 423 So.2d 1080, 1084 (La.1982), as well as, other decisions of the U.S. Fifth Circuit. See for example: *In re: Taira Lynn Marine,* 444 F.3d 371 (2006), *Consolidated Aluminum Corp. v. C.F. Bean Corp.* (aka: *Consolidated II*), 833 F.2d 65 (1987) and *Matthews v Remington Arms Company, Inc.,* Case No. 09-31217 (Doc: # 00511482312) (May 18, 2011).

This line of well-established authority requires a court-- in deciding a tort case seeking recovery of economic loss- to engage in a full duty/risk analysis and consider the ease of association between the defendants' actions and the plaintiff's injuries. That analysis must consider all relevant moral, social, and economic factors in the context of the relevant facts and the court may not merely rely upon a bright line litmus test regarding whether the plaintiff had a proprietary interest in any damaged property. While the *Wiltz* court accurately stated that existence of any proprietary interest and the level/degree thereof should be factors for consideration as part of the requisite duty/risk analysis, these considerations are not explicitly legislated nor considered controlling in the jurisprudence.[30] At most, the existence,

---

[30] **Note:** *Phillips v G&H Seed Co. (Phillips II)* by order of the Louisiana Supreme Court dated November 18, 2011, was argued to the *En Banc* Louisiana Third Circuit on January 25, 2012 and a ruling which should resolve the conflict between *Phillips I,* (proprietary interest),10 So.3d 339 (La. 3C, 2009) and *Phillips II,* (no proprietary interest), 66 So.3d 507 (La. 3C, 2011) is expected within the next few weeks. The Louisiana Supreme Court will then be presented with an opportunity to address and at long last resolve this important issue of state law and policy. The accuracy of the "*Erie* guess" by the U.S.C.A. 5 in *Wiltz* is seriously called in to question not only by prior

*vel non*, of a proprietary interest and the level/degree thereof should simply be additional factors for consideration as part of the requisite duty/risk analysis. (see: Chief Judge Thibodeaux's concurring opinion in *Phillips II*).

While the Armstrong and Holmes Plaintiffs continue to assert that they need not establish damage to their person or property in order to recover purely economic losses under Louisiana law, the facts of the *Anderson* case relied upon by movants are clearly distinguishable.[31] The plaintiffs' claims in *Anderson*, as in *PPG* derived from loss, injury, or damage sustained by another – not from reasonably foreseeable economic consequences of personal property damage as is the case with the Holmes and Armstrongs.  The cases cited within the *Anderson* opinion also suffer from this factual dissimilarity.  When concluding its opinion in *Anderson*, this very Court stated, "defendant had no duty to avoid economic loss to **uninjured** employees of the person to whom that duty was owed." [Emphasis Added] *Id*. at *3.  This Court also cited *PPG*, which provided that damage someone else's property does not encompass the risk that a third party who has **contracted with the owner of the injured property** will thereby suffer an economic loss. [Emphasis Added] *Id*. citing *PPG*, 447 So.2d at 1061.

This Court itself supported the application of the duty-risk analysis in *Anderson*, citing *PPG* which recognized that, as a policy matter, the "court sought

---

[31] *Anderson v. T&D Machine Handling, Inc.*, Not Reported in Fed. Supp, 1996 WL 684449 (E.D. La. 11/12/96).

to avoid the mechanical rejection of these claims by applying a duty-risk analysis on a case by case basis. *Id*. at *1. This analysis is the proper approach in determining the scope of recoverable damages is a duty-risk analysis. *Anderson* contained no prohibition against nor did it even consider losses sustained as a result of damage to personal property. Therefore its denial of economic damages cannot be said to apply here.

Here, the connection between WGII's duty and plaintiffs' damages is even more direct than the situation considered in *Wiltz*, et al, supra. Plaintiffs here do not attempt to string together complex business customs and long term relationships in order to plead a source of their damages. They rely, quite simply, on the property damage they directly sustained when their homes were destroyed, they were forced to evacuate and unable to return. None of the policy considerations cited in *Wiltz* or *PPG* would be advanced by limiting plaintiffs' claimed damages and the facts here do not warrant invoking any "pragmatic limitations" imposed by that line of cases.

In this case, neither the purpose for 'economic loss rule' (preventing double recovery) nor the policy considerations of *PPG* (social, moral and economic factors) are advanced by Defendants' proffered interpretation of Louisiana law. Further, neither *Wiltz* nor *Anderson* support the existence of a bright-line economic loss rule in Louisiana. *Wiltz*, by its own language, is limited to the facts of the case:

"[a]lthough there may be some cases in which the Louisiana Supreme Court would authorize recovery in tort for purely economic loss, we do not think this commercial dispute is one of those cases."  645 F.3d at 703.

Therefore, facts and evidence regarding these relevant damages must be fully explored so that the court can weigh and apply the appropriate policy considerations in deciding whether, as a matter of policy, there is an "ease of association" between the Defendants' conduct and the economic losses sustained by this general class of plaintiffs.  This determination is to be undertaken at the trial on the merits.

## ECONOMIC LOSSES OF THIS TYPE WERE A FORESEEABLE CONSEQUENCE OF DAMAGE TO PLAINTIFFS' PROPERTY AND INABILITY TO RETURN

"*PPG* clearly shows the supreme court did not intend to close the door to recovery for all claims of economic harm arising out of damage to what is technically a third person's property, i.e., proprietary interest.". It made such recovery available in certain circumstances for limited groups of people with a special interest in or relationship with the damaged property, whose damages were a particularly foreseeable result of the tortious conduct of the defendant."
*Phillips II, supra, at p. 516.*

"Although the reasoning and result in <u>PPG</u> flow from the standard economic-loss rule, certain language in the decision left the door open for case-by-case adjustments. <u>PPG</u> emphasized that policy considerations determine the "reach" of the rule, and instructed courts to consider whether there is an "ease of association" between "the rule of conduct, the risk of injury, and the loss sought to be recovered." <u>Id.;</u> see also <u>Roberts, 605 So.2d at 1054</u> ("The critical test in Louisiana, however, is phrased in terms of 'the ease of association' which melds policy and foreseeability into one inquiry: Is the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant?"). <u>PPG</u> also instructed courts to "consider the particular

case in the terms of the moral, social and economic values involved, as well as with a view toward the ideal of justice."
*Wiltz v. Bayer CropScience, LP*, 645 F.3d 690, 698-9 (5C, 2011).

The Fifth Circuit describes those consequences of negligence which are "reasonably foreseeable" as follows:

> "We perceive a harm to be the foreseeable consequence of an act or omission if <u>harm of a general sort to persons of a general class</u> might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention". [32] (Emphasis Supplied).

It should also be noted that, specific damage to a particular plaintiff is not required as a matter of law. *In Forest v* DOTD, 493 So.2d 563, 569-70 (La. 1986) the Louisiana Supreme Court held that a risk need not be "distinctly foreseeable" or "individually foreseeable".  See also: *Carter v City Parish Gov't of East Baton Rouge,* 423 So.2d 1080 (La. 1982) (A particular unforeseeable risk may be included if the injury is easily associated with the rule relied upon-or-with other risks of the same type that are foreseeable and clearly within the ambit of protection).

## CONCLUSION

Under the Louisiana duty/risk analysis, plaintiffs are entitled to recover any "tort" damages they prove by a preponderance of the evidence were caused or substantially contributed to by defendant's negligence.

---

[32] In re: *Taira Lynn Marine* 444 F.3d 371, 380-1 (5C 2006), this court quotes *Consolidated Aluminum Corp. v. C.F. Bean Corp. (Consolidated II)*, 833 F.2d 65, 68 (5th Cir.1987).

Because recovery for this "sort of harm" is not foreclosed by applicable law, plaintiffs must be allowed to submit evidence tending to prove the nature and extent of their economic damages. Likewise, defendants are free at trial to contest the value and cause of these damages with any "relevant" evidence they chose to submit in response.    Defendant's conclusory remarks that plaintiffs economic losses have no connexity to their property damage is a determination that has not been made by this court and should not be made until all facts and evidence are presented at a full blown trial or at the very least after the completion of discovery.

While other jurisdictions may apply a bright-line economic loss rule, the overwhelming and controlling jurisprudence of this state demonstrates that this antiquated litmus test is clearly not the law of Louisiana. Indeed, the essence of Louisiana's "duty/risk" analysis in tort cases stems from judicial flexibility and consideration of policy factors to determine the scope of the duty "legal cause" inquiry. In the final analysis, considering the moral, social and economic factors involved, with a view toward the ideal of justice, these plaintiffs are fairly included within the scope of Defendants' duty.

Wherefore, for the foregoing reasons and based on the foregoing authority Defendant's "Motion to Exclude Evidence" should be denied.

Respectfully submitted,

PLAINTIFFS' LIAISON COUNSEL

*s/ Joseph M. Bruno*
JOSEPH M. BRUNO (La. Bar No. 3604)
BRUNO & BRUNO, L.L.P.
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

MR-GO   PLAINTIFFS   SUB-GROUP   LITIGATION
COMMITTEE

*s/ James Parkerson Roy*
JAMES PARKERSON ROY (La. Bar No. 11511)
MR-GO PSLC Liaison Counsel
Domengeaux Wright Roy & Edwards LLC
P.O. Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

for

**MRGO   PLAINTIFFS   SUBGROUP   LITIGATION
COMMITTEE**

Jonathan Andry (The Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette,
LA)

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above referenced pleading upon all known counsel for all parties by filing the foregoing with the Clerk of Court by using the CM/ECF system, this 14th day of February, 2012.

_s/ Joseph M. Bruno_
JOSEPH M. BRUNO