JENEEN MARIE BAUDOIN-HOLMES                                    September 25, 2011

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES       CIVIL ACTION
CONSOLIDATED LITIGATION               NO. 05-4182 K2
                                      JUDGE DUVAL
PERTAINS TO MRGO           MAG. WILKINSON

FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885, 06-2152,
06-2278, 06-2287, 06-2824, 06-4024,
06-4065, 06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155, 06-5159,
06-5156, 06-5162, 06-5260, 06-5771,
06-5786, 06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

* * *

VIDEOTAPED DEPOSITION OF
JENEEN MARIE BAUDOIN-HOLMES,
30231 Glenboro Drive, Spring, Texas 77386,
given at The Woodlands Waterway Marriott Hotel
and Convention Center, 1601 Lake Robbins
Drive, The Woodlands, Texas on Sunday,
September 25, 2011.

## Page 2

APPEARANCES:

REPRESENTING THE PLAINTIFFS:
LAW OFFICE OF GERALD N. ANDRY, JR.
(BY: GERALD N. ANDRY, JR., ESQUIRE)
710 Carondelet Street
New Orleans, Louisiana 70130
504-581-4334 (NOT PRESENT)
-AND-
DEGRAVELLES, PALMINTIER, HOLTHAUS &
FRUGE, L.L.P.
(BY: JOSHUA M. PALMINTIER, ESQUIRE)
618 Main Street
Baton Rouge, Louisiana 70801-1910
225-344-3735
-AND-
THE ANDRY LAW GROUP, LLC
(BY: JONATHAN B. ANDRY, ESQUIRE)
610 Baronne Street
New Orleans, Louisiana 70113-1004
504-525-5535 (NOT PRESENT)

REPRESENTING THE UNITED STATES OF AMERICA:
U.S. DEPARTMENT OF JUSTICE
(BY: CONOR KELLS, ESQUIRE)
Torts Branch, Civil Division
P.O. Box 888
Benjamin Franklin Station
Washington, D.C. 20044
202-616-4289

REPRESENTING WASHINGTON GROUP INTERNATIONAL,
INC.:
JONES DAY
(BY: CHRISTOPHER THATCH, ESQUIRE)
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
202-879-4645

ALSO PRESENT:
FRED N. HOLMES, JR.

## Page 3

APPEARANCES CONTINUED:

VIDEOGRAPHER: KEN HART (HART VIDEO)

REPORTED BY:
ROGER D. JOHNS, CCR
CERTIFIED COURT REPORTER
STATE OF LOUISIANA

## Page 4

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;

That the formalities of certification and filing are specifically waived;

That the formality of reading and signing of the transcript is specifically not waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

ROGER D. JOHNS, RDR, CRR, Certified Court Reporter, for the State of Louisiana, officiated in administering the oath to the witness.

PLAINTIFF'S EXHIBIT B

Page 17

1  Q. And how long were you a high school
2  teacher?
3  A. Only one month.
4  Q. Why only one month?
5  A. It wasn't for me.
6  Q. So after you left the high school
7  where did you begin working?
8  A. Delgado Community College.
9  Q. And do you remember approximately
10 when you began working for Delgado Community
11 College?
12 A. I believe it may have been in 1998,
13 early '98. I don't recall the specific
14 month.
15 Q. And when you began your employment
16 with Delgado Community College, what were you
17 doing? What was your job title?
18 A. Financial aid counselor.
19 Q. And you worked for Delgado Community
20 College from 1998 until 2005 when Hurricane
21 Katrina hit?
22 A. That is correct.
23 Q. Did your job title change at any
24 point during that time period between 1998 and
25 2005?

Page 18

1  A. No, sir.
2  Q. Yesterday we talked with your
3  husband a bit about living expenses at the
4  residence that you all held, 1205 Perrin Drive
5  in Arabi, Louisiana.
6  A. Yes.
7  Q. And he was able to give me some
8  detail, but not much detail. So I'll just ask
9  you. Are you able to give me any more detail
10 with respect to your living expenses at Perrin
11 Drive before Katrina?
12 A. My husband's information was the
13 more accurate of the information. I don't --
14 He handles that affair for me.
15 Q. Let me ask you this, just generally
16 speaking. Since you were sitting here
17 yesterday during your husband's deposition, is
18 there anything that you recall from
19 yesterday's testimony that you disagree with?
20 A. No, sir.
21 Q. Mrs. Holmes, did you have any
22 student loans from your time at the University
23 of New Orleans?
24 A. Yes, I did.
25 Q. Can you tell me, are you still

Page 19

1  paying those loans off?
2  A. No, sir, they're finally paid off.
3  Q. That's fantastic. I cannot say the
4  same, unfortunately.
5      Can you tell me approximately when
6  you were able to pay them off?
7  A. Just within the last year or two.
8  It's fairly recent.
9  Q. Let me show you a couple of
10 documents here.
11     (Document marked as Exhibit J.
12 Holmes 1 attached to transcript.)
13     Mrs. Holmes, do you recognize this
14 document?
15 A. I'm taking a look over it. Give me
16 one minute, please.
17 Q. Please take your time.
18 A. Okay. No, sir, I have not seen this
19 document, but my husband had informed me of
20 such, of seeing it. I was aware of it, but
21 no, this is the first time I am laying my eyes
22 on it.
23 Q. Well, just for the record, this is
24 the September 19, 2001 expert report from Dr.
25 Randolph Rice.

Page 20

1      MR. PALMINTIER:
2      2011.
3  EXAMINATION BY MR. THATCH:
4  Q. 2011. I apologize.
5      MR. THATCH:
6      Thank you, Counsel.
7  EXAMINATION BY MR. THATCH:
8  Q. And we looked at this document
9  yesterday with your husband. Let me just ask
10 you a couple of questions. I realize you're
11 not familiar with it. Have you ever met with
12 Dr. Randolph Rice?
13 A. No, sir.
14 Q. Have you ever spoken with him?
15 A. No, sir.
16 Q. Have you ever exchanged any
17 correspondence with him, whether it be email
18 or letter correspondence?
19 A. Directly, not through me. Any
20 correlation would have been through my
21 husband.
22 Q. So just so I am clear, you may have
23 prepared an email or a letter that you
24 provided to your husband and then your husband
25 sent to Dr. Rice?

JENEEN MARIE BAUDOIN-HOLMES September 25, 2011

Page 21

1  A. Any figures that my husband may have
2  needed I would have gotten to him to give to
3  Mr. Rice -- to Dr. Rice.
4  Q. And so then Dr. Rice never contacted
5  you directly to ask you questions about those
6  figures?
7  A. No, sir.
8  Q. I'm going to hand you another
9  document here.
10         (Document marked as Exhibit J.
11         Holmes 2 attached to transcript.)
12         Tell me when you've had an
13  opportunity to look over it, Mrs. Holmes.
14  A. I have. Yes.
15  Q. Do you recognize this document?
16  A. I don't recall seeing this document,
17  but I have seen many documents. So I don't
18  recall it specifically.
19  Q. Well, just for the record, this is
20  the income summary that was provided as part
21  of Dr. Randy Rice's reliance materials to his
22  expert report on lost income and benefits
23  loss. We talked about this document yesterday
24  in your husband's deposition. Do you
25  recognize the -- If you look at the document

Page 22

1  here on the top, it says "Mr. Holmes" at the
2  top and then it says "Miss Holmes". Do you
3  see that?
4  A. Yes, sir.
5  Q. And then down the list there are
6  figures, numbers identified for the years 2003
7  through 2010. Do you see that?
8  A. Yes, sir.
9  Q. These figures that are listed for
10  years 2003 to 2010, do you recognize these
11  figures?
12  A. They seem to correspond with my
13  recollection of wages for me and my husband.
14  Q. If you look on the document under
15  your name, Miss Holmes, for 2005, you see the
16  number $33,766.23?
17  A. Yes, sir.
18  Q. Was that your salary at Delgado
19  Community College during the year 2005?
20  A. I believe it was.
21  Q. And was that the only income you
22  earned in 2005?
23  A. I'm not sure when unemployment went
24  into effect after Hurricane Katrina. There
25  was no other job employment other than

Page 23

1  University -- Delgado Community College for
2  me; and the same for my husband, a different
3  school.
4  Q. Do you recall if you received any
5  other type of income aside from employment,
6  investment benefits or anything like that?
7  A. No, sir. I don't recall.
8  Q. Now, if you look down one notch
9  lower on this document, your name again for
10  2006. You see the figure $18,714.16?
11  A. Yes, sir.
12  Q. That was your income for 2006?
13  A. I'm not sure. I don't have the W-2s
14  in front of me. I'm sorry. I don't recall.
15  Q. Do you remember when you filed for
16  unemployment?
17  A. After Katrina. I don't recall exact
18  dates. It was after Katrina. It wasn't until
19  after the furlough from Delgado Community
20  College. So that may have included the
21  unemployment and the wages from Delgado.
22  Q. Did you have any other employment
23  income during the year 2006 besides what you
24  might have received from Delgado --
25  A. No.

Page 24

1  Q. -- toward the end of your employment
2  and unemployment?
3  A. Not to my knowledge.
4         One quick thing. I did work at
5  User Friendly, and I don't recall when I had
6  started so I am not -- I'm -- that's blurred
7  between 2006 and 2007. I don't recall when I
8  had began employment there.
9  Q. What is User Friendly?
10  A. It was a phone book company, or is a
11  phone book company.
12  Q. And what did you do for User
13  Friendly?
14  A. Worked in contracts.
15  Q. What were your job responsibilities?
16  A. Entering contracts, assisting
17  clients on the phone at the front desk,
18  getting account checks passed over to the
19  accounting office.
20  Q. And approximately how long did you
21  work for User Friendly?
22  A. Approximately a year, if I can
23  recall.
24  Q. And you believe that was sometime in
25  2006 and 2007?

Page 29

1  Okay. If you look at that
2  document, in the first paragraph you see --
3  I'm sorry, not the first paragraph. You see
4  the third paragraph on that page that starts
5  with "Mr. Holmes was not vested"? And if you
6  move over to the second page, you see the
7  following paragraph reads "Miss Holmes is
8  vested in the Teachers Retirement System of
9  Louisiana." Do you see that?
10     A. Yes, sir.
11     Q. Did you have an understanding as to
12  what being vested in this retirement plan
13  meant?
14     A. "Vested" means when you become of
15  retirement age, I believe, that you can draw
16  down the allocation or percentage that the
17  system calculates.
18     Q. And if you look at this paragraph
19  here that Dr. Rice has written, it says "Miss
20  Holmes is vested in the Teachers Retirement
21  System of Louisiana. She will receive $435
22  per month at age 60." Is that a correct
23  understanding of how your pension plan worked?
24     A. Yes, sir, I believe so.
25     Q. It also says "Had she maintained her

Page 30

1  employment with Delgado College for this time
2  period, her estimated retirement income would
3  have been approximately $4,500 per month." Is
4  that a correct understanding of how your
5  retirement plan worked at Delgado?
6     A. I believe so.
7     Q. Mrs. Holmes, if you can go back to
8  the first page of this document, in the first
9  paragraph it says "We have looked at the loss
10  of earnings experienced by Mr. Holmes as he
11  transitioned jobs from the University of New
12  Orleans in 2006 to his current employment at
13  Rice University. It is unclear whether a
14  similar type calculation is appropriate for
15  Miss Holmes inasmuch as her actual W-2s for
16  2006 and 2007 with User Friendly Phone Book
17  LLC are not available." Do you see that?
18     A. Yes, sir.
19     Q. And User Friendly Phone Book is the
20  same User Friendly that we spoke about earlier
21  today?
22     A. Yes, sir.
23     Q. Now, it says here it's unclear
24  whether a similar type calculation is
25  appropriate because the actual W-2s for 2006

Page 31

1  through 2007 with User Friendly are not
2  available. Do you have those W-2s?
3     A. I had them and I'm sure I have
4  them. I just don't have my hands on them.
5     Q. But you didn't produce these W-2s to
6  Dr. Rice?
7     A. They weren't available at the time.
8     Q. Now, when you say you think you have
9  them, you think you have them at your house
10  now or you think you could obtain them?
11     A. I would need to probably request the
12  IRS to send out duplicates or to contact the
13  company in question.
14     MR. THATCH:
15        Well, Josh, just for the record,
16  yesterday we requested documents
17  pertaining to Mr. Holmes' retirement
18  account at the University of New
19  Orleans. We would like to make the
20  same request with respect to documents
21  pertaining to Mrs. Holmes' retirement
22  account at Delgado Community College.
23     MR. PALMINTIER:
24        Yes, to the extent that Miss
25  Holmes is able to get those documents

Page 32

1  and give them to us, we will
2  definitely provide them for you.
3     MR. THATCH:
4        And then also with respect to
5  W-2s for 2006 and 2007 with User
6  Friendly Phone Book, to the extent
7  that Mrs. Holmes has them or you are
8  able to request those from the IRS, we
9  talked off the record earlier today
10  about making a similar request to the
11  IRS for a full -- full set of the tax
12  forms for both Mr. and Mrs. Holmes and
13  so maybe we can lump that request for
14  the User Friendly tax forms in with
15  that request.
16     MR. PALMINTIER:
17        Sure.
18  EXAMINATION BY MR. THATCH:
19     Q. All right, Mrs. Holmes. Let's go
20  back to talk a little bit more about your
21  employment with Delgado Community College.
22  When did you -- When did you stop working for
23  Delgado?
24     A. I stopped working in 2006, January.
25     Q. So that was a few months after

JENEEN MARIE BAUDOIN-HOLMES  September 25, 2011

Page 33

1 Hurricane Katrina touched down in New Orleans;
2 correct?
3   A. Yes.
4   Q. Did you work full time for Delgado
5 Community College during the period between
6 the time that Hurricane Katrina hit and the
7 time when your employment ended in January of
8 2006?
9   A. Yes.
10   Q. And can you tell me what your salary
11 was at Delgado Community during that time
12 period?
13   A. The same as it was the day of
14 Katrina.
15   Q. And that would have been $33,766.43?
16   A. That was a partial year. They had
17 -- I am not sure if that included cafeteria
18 plan or not. Roughly, yes.
19   Q. Roughly --
20   A. That's -- That's an approximate.
21 Without having the document in front of me,
22 I'd have to go from this, yes.
23   Q. Now, when you say you're not sure if
24 that salary amount included an amount for a
25 cafeteria plan, what exactly do you mean?

Page 34

1   A. If there were anything that was
2 taken out that was covered, sheltered benefits
3 such as the retirement, I -- I believe my
4 salary may have been a little bit higher than
5 that at that time.
6   Q. So you believe --
7   A. I believe my salary may have been
8 more around 36,000. I think this is the
9 difference from the shelter of the retirement
10 benefits.
11   MR. THATCH:
12     Well, Josh, we'll take a look at
13 the records that we receive from both
14 retirement plans and the W-2s and we
15 can sort them out. Again, if we have
16 any questions, we may need to reopen.
17   MR. PALMINTIER:
18     I understand.
19 EXAMINATION BY MR. THATCH:
20   Q. Now, Mrs. Holmes, during the time
21 period between when Katrina touched down in
22 New Orleans and the end of your employment
23 with Delgado Community, did you hold the same
24 job?
25   A. Yes, sir.

Page 35

1   Q. So you had the same job
2 responsibilities and same job title?
3   A. Yes, sir.
4   Q. And you continued to receive the
5 benefits that you were receiving before
6 Katrina from Delgado during the time period
7 after the storm?
8   A. Yes, sir.
9   Q. Can you tell me approximately when
10 you ended employment with Delgado Community?
11 I know you mentioned January, 2006. Do you
12 have a more approximate date in mind?
13   A. I officially worked through the end
14 of January. However, I believe I was only
15 paid for the first part of January.
16   Q. When you say only paid for the first
17 part of January, can you tell me what the
18 first part would have amounted to? A week,
19 two weeks?
20   A. It would have been on a W-2 for that
21 year.
22   Q. And can you tell me why you only
23 received income payment from Delgado for part
24 of January, although working all the way
25 through the end of the month?

Page 36

1   A. Furlough. The furlough letter time
2 frame.
3   Q. And what were the circumstances of
4 you ending your employment with Delgado
5 Community?
6   MR. PALMINTIER:
7     I object to form.
8   THE WITNESS:
9     I didn't officially end my
10 employment. It was that I had to
11 obtain living and return back on a
12 certain date, which was impossible to
13 find for us, to locate housing.
14 EXAMINATION BY MR. THATCH:
15   Q. Can you tell me what you were told?
16 You mentioned receiving a letter from Delgado
17 Community. Can you tell me what that letter
18 said?
19   A. It entailed that we had to -- I had
20 to return by a certain date or my job would be
21 eliminated.
22   Q. And prior to receiving that letter
23 from Delgado had you had any other
24 communications with Delgado about the furlough
25 or your continuing employment beyond January,

9 (Pages 33 to 36)

JOHNS, PENDLETON COURT REPORTERS  504 219-1993

JENEEN MARIE BAUDOIN-HOLMES September 25, 2011

Page 113

1  A. Okay.
2  Q. He suggested that there was a larger
3  loan at play. I was curious why only $10,000
4  was listed in the answer to this
5  interrogatory.
6  MR. KELLS:
7  And if you want to, you know, --
8  MR. PALMINTIER:
9  I will supplement that.
10 MR. KELLS:
11 Josh, if you want to double check
12 into it and, you know, let me know a
13 response to that yourself, I'm
14 perfectly comfortable with you getting
15 back to me on that.
16 MR. PALMINTIER:
17 Will do, Conor.
18 MR. KELLS:
19 That's it. I don't think I have
20 anything additional to add at this
21 point.
22 MR. PALMINTIER:
23 Okay.
24 MR. KELLS:
25 Subject to it being reopened for

Page 114

1  additional materials that'll be
2  provided later, I have nothing more to
3  add.
4  MR. PALMINTIER:
5  Okay. Done?
6  MR. THATCH:
7  Yes.
8  VIDEO OPERATOR:
9  Off the record.
10 * * *

Page 115

2  WITNESS'S CERTIFICATE
4  I, JENEEN MARIE BAUDOIN-HOLMES, read
5  or have had the preceding testimony read to
6  me, and hereby certify that it is a true and
7  correct transcription of my testimony, with
8  the exception of any attached corrections or
9  changes.

12 _____
   (Witness' Signature)
13 _____
   DATE SIGNED

15 DEPONENT PLEASE INITIAL ONE:

17 ____ Read with no corrections

18 ____ Read and correction sheet attached

20 DATE TAKEN: SEPTEMBER 25, 2011

Page 116

2  REPORTER'S CERTIFICATE

4  I, ROGER D. JOHNS, RMR, RDR, CRR,
5  Certified Court Reporter, do hereby certify
6  that the above-named witness, after having
7  been first duly sworn by me to testify to the
8  truth, did testify as hereinabove set forth;
9  that the testimony was reported by me in
10 shorthand and transcribed under my personal
11 direction and supervision, and is a true and
12 correct transcript, to the best of my ability
13 and understanding; that I am not of counsel,
14 not related to counsel or the parties hereto,
15 and not in any way interested in the outcome
16 of this matter.

20 ROGER D. JOHNS
21 CERTIFIED COURT REPORTER
22 STATE OF LOUISIANA

29 (Pages 113 to 116)

JOHNS, PENDLETON COURT REPORTERS 504 219-1993