## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION        NO. 05-4182 K2
                    JUDGE DUVAL
PERTAINS TO MRGO        MAG. WILKINSON

FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
 05-6314, 05-6324, 05-6327, 05-6359,
 06-0225, 06-0886, 06-1885, 06-2152,
 06-2278, 06-2287, 06-2824, 06-4024,
 06-4065, 06-4066, 06-4389, 06-4634,
 06-4931, 06-5032, 06-5155, 06-5159,
 06-5156, 06-5162, 06-5260, 06-5771,
 06-5786, 06-5937, 07-0206, 07-0621,
 07-1073, 07-1271, 07-1285

* * *

VIDEOTAPED DEPOSITION OF
FRED NELSON HOLMES, JR.,
30231 Glenboro Drive, Spring, Texas 77386,
given at The Woodlands Waterway Marriott Hotel
and Convention Center, 1601 Lake Robbins
Drive, The Woodlands, Texas on Saturday,
September 24, 2011.

## Page 2

1  APPEARANCES:
2
3  REPRESENTING THE PLAINTIFFS:
    LAW OFFICE OF GERALD N. ANDRY, JR.
4    (BY: GERALD N. ANDRY, JR., ESQUIRE)
    710 Carondelet Street
    New Orleans, Louisiana 70130
5    504-581-4334 (NOT PRESENT)
    - AND -
6  DEGRAVELLES, PALMINTIER, HOLTHAUS &
    FRUGE, L.L.P.
7    (BY: JOSHUA M. PALMINTIER, ESQUIRE)
    618 Main Street
8    Baton Rouge, Louisiana 70801-1910
    225-344-3735
9    - AND -
    THE ANDRY LAW GROUP, LLC
10    (BY: JONATHAN B. ANDRY, ESQUIRE)
    610 Baronne Street
11    New Orleans, Louisiana 70113-1004
    504-525-5535 (NOT PRESENT)
12
13
14  REPRESENTING THE UNITED STATES OF AMERICA:
    U.S. DEPARTMENT OF JUSTICE
15    (BY: CONOR KELLS, ESQUIRE)
    Torts Branch, Civil Division
16    P.O. Box 888
    Benjamin Franklin Station
17    Washington, D.C. 20044
    202-616-4289
18
19  REPRESENTING WASHINGTON GROUP INTERNATIONAL,
    INC.:
20    JONES DAY
    (BY: CHRISTOPHER THATCH, ESQUIRE)
21    51 Louisiana Avenue, N.W.
    Washington, D.C. 20001-2113
22    202-879-4645
23
    ALSO PRESENT:
24    JENEEN MARIE BAUDOIN-HOLMES
25

## Page 3

1  APPEARANCES CONTINUED:
2
3
4
5
6  VIDEOGRAPHER: KEN HART (HART VIDEO)
7
8
9
10  REPORTED BY:
11    ROGER D. JOHNS, CCR
12    CERTIFIED COURT REPORTER
13    STATE OF LOUISIANA

## Page 4

1            S T I P U L A T I O N
2
3     It is stipulated and agreed by and between
4  counsel for the parties hereto
5  that the deposition of the aforementioned
6  witness is hereby being taken under the
7  Federal Rules of Civil Procedure, for all
8  purposes, in accordance with law;
9     That the formalities of certification and
10  filing are specifically waived;
11     That the formality of reading and signing
12  of the transcript is specifically not waived;
13     That all objections, save those as to the
14  form of the question and the responsiveness of
15  the answer, are hereby reserved until such
16  time as this deposition, or any part thereof,
17  may be used or sought to be used in evidence.
18
19            * * * *
20
21     ROGER D. JOHNS, RDR, CRR, Certified Court
22  Reporter, for the State of Louisiana,
23  officiated in administering the oath to the
24  witness.
25



Page 33

1    Q. Did you have a BlackBerry or any
2    other mobile communications device?
3    A. No, sir. Just a standard phone.
4    Q. No iPhone?
5    A. No.
6    Q. I don't know if the iPhones were out
7    at that time actually. Did you all have
8    Internet service at Perrin Drive?
9    A. No.
10   Q. Cable TV service?
11   A. Cable TV, yes, sir.
12   Q. Do you recall how much you paid for
13   monthly when Katrina hit for any of those
14   services?
15   A. Not right offhand, no, sir.
16   Q. You owned two cars at the time that
17   the storm hit. Is that correct?
18   A. Yes, that is correct.
19   Q. Can you tell me what those cars
20   were?
21   A. A 2002 Camry and a 1998 Carolla.
22   Q. Did you have car payments on those
23   cars?
24   A. No, sir. I believe -- I believe
25   they were paid off at that time.

Page 34

1    Q. And do you recall how much you paid
2    for car insurance?
3    A. No, not -- not then.
4    Q. I'm going to take a stab here. Can
5    you estimate for me roughly how much you would
6    have paid for food per month at the Perrin
7    Drive home when Katrina hit?
8    A. No, I couldn't.
9    Q. So a grocery bill per month, you're
10   not sure how much you all would have spent in
11   groceries --
12   A. No, sir.
13   Q. -- each month?
14   A. No, sir.
15   Q. Did you eat out regularly at that
16   time?
17   A. No, sir, we didn't.
18   Q. How often would you say you ate out?
19   A. I don't know, -- I don't know, at
20   most twice a week at, you know -- maybe twice
21   a month. It really depended what was going
22   on.
23   Q. Did you take your lunch to work or
24   did you eat out for lunch?
25   A. We -- We took our lunch to work.

Page 35

1    Q. Did you have any dry cleaning
2    expenses?
3    A. No, sir.
4    Q. Did you have student loans at the
5    time that Katrina hit?
6    A. Yes, I did.
7    Q. Do you recall how much your student
8    loan payment was at that time?
9    A. No, sir, not at that time, no, sir.
10   Q. Did you have any life insurance at
11   the time that Katrina hit in 2005?
12   A. Not that I am aware of.
13   Q. Aside from the various monthly
14   expenses, living expenses that we just
15   described, is there any other expense that you
16   can think of that you and your wife paid per
17   month at the time that Katrina hit?
18   A. Not that I think of. Not that I can
19   think of, no, sir.
20   Q. And do you have any documentation
21   that would show us what these expenses were at
22   the time that Katrina hit?
23   A. No, sir, unfortunately.
24   Q. Now, you mentioned that you worked
25   for the University of New Orleans when Katrina

Page 36

1    touched down. Is that correct?
2    A. Yes, sir.
3    Q. And you were an office supply
4    manager at that point in time at University of
5    New Orleans?
6    A. Yes, sir.
7    Q. What were your other job titles at
8    the University of New Orleans, aside from the
9    ones that we have already discussed while you
10   were in college?
11   A. So in Property Control, I started as
12   a coordinator and became assistant manager.
13   Q. And then after you were working in
14   Property Control, is that when you became
15   office supply manager?
16   A. That is correct.
17   Q. And how long did you work as the
18   office supply manager at University of New
19   Orleans?
20   A. Unfortunately, not as long as it
21   should have been. I had -- It was roughly a
22   year that I was in the position.
23   Q. Let me hand you another document
24   here. Hopefully sort some of this out.
25        (Document marked as F. Holmes

FRED NELSON HOLMES JR.                                      September 24, 2011

Page 41

1    you received from the University of New
2    Orleans?
3        A. No, sir.
4        Q. Now, you mentioned that you had a
5    retirement plan through the Louisiana State
6    Employees Retirement System, or LASERS. Is
7    that correct?
8        A. Yes, sir, that's correct.
9        Q. Do you recall what the terms of that
10   retirement plan were?
11       A. In terms of --
12       Q. Well, was it a traditional pension
13   plan? In other words, you worked for a
14   certain amount of time and the money that you
15   have accrued is paid to you at a certain point
16   when you retire?
17       A. Yes, sir.
18       Q. Do you have any documents -- We
19   received some documents from Dr. Rice, but do
20   you recall -- Well, let me just break out the
21   LASERS account issue right here.
22           Now, do you recognize this
23   document, Mr. Holmes?
24           (Document marked as F. Holmes
25       Exhibit 4 attached to transcript.)

Page 42

1        A. Yes, sir.
2        Q. Can you tell me what it is?
3        A. That's a LASERS report in regards to
4    my account.
5        Q. And did you provide this document to
6    Dr. Rice?
7        A. Yes, sir, I did.
8        Q. And did you simply pull it off the
9    Internet?
10       A. Yes, sir.
11       Q. And did you discuss this document at
12   any time with Dr. Rice?
13       A. Not at length, no, sir. Just that I
14   had sent it. That was all.
15       Q. So you told him you sent it, but you
16   haven't had any discussions --
17       A. Correct.
18       Q. -- since sending it with him?
19       A. Correct.
20       Q. He hasn't asked you any questions
21   about it?
22       A. No, sir.
23       Q. Now, according to this document, you
24   would have accrued $13,491.35 in total
25   contributions as of 2006. Is that correct?

Page 43

1        A. That's correct.
2        Q. Under the "Total contributions"
3    column there?
4        A. That is correct.
5        Q. Now, when you ended your employment
6    with the University of New Orleans, do you
7    understand what happened to that money?
8        A. From what I understand, I wasn't
9    what they would deem as being vested. You
10   have to have ten years to be deemed as
11   vested. I have 9.2 years. That was eight --
12   eight months short.
13       Q. Now, you said you were -- you had
14   9.2 months --
15       A. 9.2 years.
16       Q. I'm sorry, 9.2 years. Excuse me.
17   So then you were not enrolled in the LASERS
18   program from your beginning of -- from the
19   beginning of your employment with the
20   University of New Orleans. Is that correct?
21       A. That is correct. Not as a student
22   worker, no. That's correct. You're not
23   eligible for those benefits.
24       Q. Do you recall when you signed up for
25   the benefits?

Page 44

1        A. That would have been in '99. Is
2    that -- No, I'm sorry.
3        Q. It says 1996 here.
4        A. '96, yes, sir. '99 is when I
5    started in Property. I'm sorry.
6        Q. Just so I understand, the total
7    contributions here, $13,491.35, because you
8    were not vested in this program, it's your
9    understanding that you could not have access
10   to that money?
11       A. I am not sure exactly how it's going
12   to work out. I know I don't get full benefit
13   as I would have. If I am able to recover any
14   of it, I'm not certain.
15       Q. But this account still exists?
16       A. Yes, sir, it does exist.
17       Q. Have you received any documentation
18   from LASERS since Katrina, explaining to you
19   what will ultimately happen to the
20   contribution that you made to this plan?
21       A. No, sir, not yet.
22       Q. Have you had any discussions with
23   them?
24       A. Not yet.
25       Q. Mr. Holmes, when did you stop

11 (Pages 41 to 44)

Page 45

1  working for the University of New Orleans?
2      A. January of 2006 was when they
3  furloughed me.
4      Q. So then you worked -- you continued
5  to work for the University of New Orleans
6  after Katrina. Is that correct?
7      A. That is correct. I had benefit
8  time.
9      Q. And were you working -- You were
10 working remotely from Texas?
11     A. Yes, sir.
12     Q. And what exactly were you doing
13 during that time?
14     A. They had allowed me to order,
15 requisitions, you know, for office supplies,
16 and everything was handled via fax.
17     Q. And how many hours per week did you
18 work during the time period between when
19 Katrina hit and when you stopped working for
20 the University of New Orleans in January in
21 '06?
22     A. It wasn't quite -- it didn't quite
23 work out that way. It was just whatever work
24 needed to be done they asked me to do. It
25 wasn't predicated to a number of hours.

Page 46

1      Q. So you were still being paid your
2  base salary --
3      A. Correct.
4      Q. -- for that period of time?
5      A. Correct.
6      Q. And did you receive that base salary
7  for that entire period until you quit or until
8  you left in January of '06?
9      A. Right. It was a layoff. The
10 furlough is a layoff. I'm sorry.
11     Q. Now, did you continue to receive
12 your benefits through January of 2006 from the
13 University of New Orleans?
14     A. Yes.
15     Q. Now, you mentioned the furlough.
16 Can you explain to me the circumstances
17 surrounding your departure from the University
18 of New Orleans?
19     A. I mean, they -- it was -- I was
20 pretty much given the ultimatum that either I
21 show up for work that morning or they were
22 going to lay me off, and unfortunately I
23 didn't have housing to be able to go back.
24     Q. And they communicated that to you
25 during that January, 2006 time frame?

Page 47

1      A. Yes, sir.
2      Q. Now, when they -- Did you have an
3  idea before that conversation in January of
4  2006 that you may lose your job if you weren't
5  able to report to work?
6      A. There was -- There was never up to
7  that point, there was never any indication.
8  There were promises that, you know, "We're
9  going to work with you. We understand your
10 circumstance", and then one day just given the
11 ultimatum.
12     Q. What promises or assurances did they
13 make to you?
14     A. Just that they would allow me to
15 have the ability to work remotely. They
16 didn't say for what kind of time frame or
17 anything like that. They just said that they
18 would be able to give the ability to work
19 remotely.
20     Q. Did you understand then that that
21 ability to work remotely would be indefinite?
22     A. No, of course not.
23     Q. And they didn't give you any time
24 frame --
25     A. No.

Page 48

1      Q. -- aside from that conversation in
2  January of 2006 when they told you to report
3  to work or your job is lost?
4      A. Right.
5      Q. They didn't communicate to you at
6  any point before then how long you could work
7  remotely?
8      A. No. No, it wasn't determined yet.
9      Q. Do you recall who you spoke to at
10 the University of New Orleans with respect to
11 whether or not you would be allowed to work
12 remotely?
13     A. That would have been my boss's boss,
14 Harriet Reynolds.
15     Q. I'm sorry, you said Harriet
16 Reynolds?
17     A. Correct.
18     Q. And is Miss Reynolds still with the
19 University of New Orleans?
20     A. I'm not sure. I don't think so. I
21 think she retired. I'm not sure.
22     Q. And you mentioned that Harriet
23 Reynolds was your boss's boss.
24     A. Correct.
25     Q. Who was your boss at that time?

Page 49

1    A. My boss at that time was Roy
2 Robertson.
3    Q. And do you know if Mr. Robertson is
4 still employed by the University of New
5 Orleans?
6    A. Yes, he is, to my knowledge.
7    Q. Did you ever have any conversations
8 with Mr. Robertson about whether or not you
9 would be allowed to continue to work with the
10 University of New Orleans?
11    A. Yes. I mean, we -- that was -- that
12 was the ultimate plan.
13    Q. So you when say that was the
14 ultimate plan, he had communicated to you that
15 you expected to be able to work for them for a
16 certain period of time?
17    A. Yes, that's correct.
18    Q. And did that period of time extend
19 beyond January, 2006?
20    A. No, it did not.
21    Q. You said you were unable to find
22 housing.
23    A. That's correct.
24    Q. During that period of time when
25 Katrina hit and January of 2006 --

Page 50

1    A. Uh-huh (affirmatively).
2    Q. -- did you make any trips back to
3 New Orleans to visit the area?
4    A. We did. Yes.
5    Q. Do you recall how many times you
6 came back to New Orleans?
7    A. Twice, maybe three times.
8    Q. And do you remember when you made
9 those trips? Let's take the first one.
10    A. The first one, the first time I went
11 back, it would have been early November.
12    Q. Early November of 2005?
13    A. Correct.
14    Q. And how long did you stay in New
15 Orleans when you made that trip back?
16    A. Not long at all. I can't recall if
17 it was a day or two days, but it wasn't long.
18    Q. So no more than two days?
19    A. Exactly.
20    Q. And what did you do in New Orleans
21 during those two days?
22    A. We went back, looked at the
23 property, looked at other relatives's
24 property. That was it.
25    Q. Did you spend any time looking for

Page 51

1 housing in New Orleans during that trip back?
2    A. At that time? No. It was just to
3 go back and see our property.
4    Q. Now, tell me about the second time
5 that you went back to New Orleans. You
6 mentioned that you might have been back three
7 times, maybe two. When was the second time
8 that you went back?
9    A. The second time? I really don't
10 recall. It was a few months after that, but
11 I'm not sure.
12    Q. So would it have been a few months
13 after November, at the beginning of 2006, do
14 you think?
15    A. I can't recall.
16    Q. And do you recall how long you
17 stayed in New Orleans during that trip?
18    A. Roughly a day. It wasn't long at
19 all.
20    Q. So no more than a day?
21    A. That I can recall, yes, sir.
22    Q. And what did you do during that trip
23 back to New Orleans?
24    A. Again, it was just seeing -- just
25 seeing everything there with my property.

Page 52

1    Q. Did you spend any time during that
2 trip looking for any housing in New Orleans?
3    A. No, sir.
4    Q. Did you speak to any realtors during
5 that time?
6    A. Not there, no. Not when I went
7 back.
8    Q. Now, you said you might have been
9 back a third time to New Orleans. Do you
10 recall when that was?
11    A. After us talking, I believe it was
12 just twice.
13    Q. All right. So there was no third
14 trip back; is that correct?
15    A. At that time, no, sir.
16    Q. And when you made these two trips
17 back to New Orleans, did you travel back by
18 yourself or did you travel with other people?
19 Did anybody come with you?
20    A. My wife's grandfather.
21    Q. And did he make the trip with you
22 both times that you went back?
23    A. Yes, sir.
24    Q. What's your wife's grandfather's
25 name?

FRED NELSON HOLMES JR.                                September 24, 2011

Page 57

1  made landfall in New Orleans?
2      A. Yes, sir.
3      Q. Do you recall what time you left New
4  Orleans on August 28?
5      A. I don't recall. It was early
6  morning.
7      Q. And you evacuated by car; correct?
8      A. Yes, sir.
9      Q. Who did you evacuate with?
10     A. It was four of us. Myself and my
11 wife in one car, and my mother-in-law and her
12 father in the secondary car.
13     Q. And what is your mother-in-law's
14 name?
15     A. Kathy Baudoin.
16     Q. And her father is, we spoke of
17 earlier, Francis Hallal?
18     A. Hallal, that's correct.
19     Q. Where did your mother-in-law live at
20 the time of the storm?
21     A. 3316 Veronica Drive.
22     Q. That was the same house where you
23 all lived with her prior?
24     A. Correct. Yes, sir.
25     Q. And Mr. Hallal lived where?

Page 58

1      A. On Corinne Drive. That's in
2  Chalmette.
3      Q. Now, when you left New Orleans when
4  you evacuated, did you intend to evacuate to a
5  particular area?
6      A. We had -- We finally were able to
7  make reservations at a hotel here in Houston
8  area. That was the closest place that we
9  could find that would accept pets.
10     Q. So you made those reservations
11 before you left?
12     A. Correct. It was just a couple of
13 days before.
14     Q. And I meant to ask you about your
15 pets before, but --
16     A. That's okay.
17     Q. -- I neglected to. Tell me what
18 pets did you own at the time Katrina hit?
19     A. At that time, I had two dogs and a
20 cat.
21     Q. And did all -- Did they evacuate
22 with you?
23     A. Yes.
24        MR. THATCH:
25           Why don't we take a quick break.

Page 59

1        MR. PALMINTIER:
2           Sure.
3        MR. THATCH:
4           Because I could use some water as
5  well.
6        VIDEO OPERATOR:
7           Off the record.
8        (Recess.)
9        VIDEO OPERATOR:
10          We're now back on the record.
11 EXAMINATION BY MR. THATCH:
12     Q. All right. Mr. Holmes, -- I'm
13 sorry.
14     A. That's okay.
15     Q. Take your time.
16     A. Okay.
17     Q. Just a couple of follow-up questions
18 from some of the things we were talking about
19 before we broke. You mentioned that you had
20 medical insurance through the University of
21 New Orleans.
22     A. Yes, sir.
23     Q. Do you recall if and how much you
24 paid yourself for that insurance?
25     A. No, sir, I don't.

Page 60

1      Q. Do you remember if you paid
2  anything, or was that insurance provided
3  entirely by the university?
4      A. No, it -- I paid my percentage.
5      Q. And one other thing I wanted to ask
6  you. I know that during -- during the time
7  immediately after the storm hit that there
8  were several people who applied for temporary
9  housing through FEMA in New Orleans.
10     A. Yes, sir.
11     Q. Did you all at any time apply for
12 such housing?
13     A. We had -- We were -- Actually, what
14 we had applied for was for the FEMA trailer.
15 We actually had three reservations. One for
16 St. Bernard community; one through my wife's
17 employer; and one through my employer.
18 Unfortunately, none of those came through for
19 us.
20     Q. Do you recall why they didn't come
21 through?
22     A. For whatever reason, it either
23 booked up before -- beforehand or they didn't
24 even do the trailer there. They couldn't get
25 the site built.

15 (Pages 57 to 60)

JOHNS, PENDLETON COURT REPORTERS                              504 219-1993

FRED NELSON HOLMES JR.                                        September 24, 2011

Page 61

1   Q.  When you say they couldn't do the
2   trailer there, you mean they couldn't -- they
3   couldn't get the trailer to your location at
4   Perrin Drive?
5   A.  I don't recall if that was the
6   circumstance or not.
7   Q.  Do you have any documents or any
8   other materials that would reflect or show
9   that process of applying for a FEMA trailer?
10  A.  No, sir, I don't.
11  Q.  Now, you arrived in Houston after
12  you evacuated on August 29th, '05.
13  A.  That is correct.  The day after,
14  yes, sir.
15  Q.  And when you arrived, you resided at
16  the Motel 6 on 220 Bammel Westfield Road?  Is
17  that correct?
18  A.  Yes, sir, that's correct.
19  Q.  Do you recall if your room at the
20  Motel 6 had a kitchen?
21  A.  I believe it might have had a little
22  kitchenette.
23  Q.  Do you recall if you all used it?
24  A.  Huh?  Yes, sir.
25  Q.  Yes?  Did you cook, prepare most of

Page 62

1   your meals then during the day at that
2   kitchen?
3   A.  Absolutely.
4   Q.  And you stayed at that Motel 6 for
5   approximately one week, from August 29th, '05
6   to September 6th, '05?  Is that correct?
7   A.  I don't recall exactly how long that
8   we were there.
9   Q.  Let me show you another document,
10  see if this will refresh your recollection.
11      (Document marked as F. Holmes 5
12      and attached to transcript.)
13      Have you ever seen this document
14  before, Mr. Holmes?
15  A.  I don't recognize it right offhand.
16  I may -- I may have.  I'm not certain.
17  Q.  Well, this is a letter that we
18  received from the Andry Law Group, one of your
19  attorneys in this case, --
20  A.  Yes, sir.
21  Q.  -- just to help supplement some of
22  your prior discovery responses.
23  A.  Okay.
24  Q.  And on page 3 of this letter, the
25  second paragraph, there's a summary of

Page 63

1   finding.
2   A.  Yes, sir.
3   Q.  And it says that "Mr. Holmes and his
4   wife resided at Motel 6 located at 220 Bammel
5   Westfield in Houston, Texas from August 29th
6   until September 6th, 2005."  Is that a correct
7   -- correct, accurate depiction of the timing
8   that you spent at Motel 6?
9   A.  It looks accurate.
10  Q.  And who was staying with you at the
11  Motel 6 during that roughly one week period?
12  A.  It was me, my wife, and
13  mother-in-law.
14  Q.  And you had one room?
15  A.  Correct.
16  Q.  Where was your grandfather-in-law
17  staying?
18  A.  He was in a separate room in the
19  same hotel.
20  Q.  And who paid for the room that you,
21  your wife, and your mother-in-law stayed in?
22  A.  We did initially.
23  Q.  When you say you did initially, you
24  were there for a week.  Did your mother-in-law
25  pay for any of the other days that you resided

Page 64

1   in that motel?
2   A.  No, sir.  I mean, we -- we paid
3   initially, but then at some point FEMA had
4   assisted, FEMA and Red Cross had assisted.  I
5   don't recall what that point in time was,
6   though.
7   Q.  And why did you leave the Motel 6?
8   A.  It was just too many people in one
9   room.
10  Q.  And so you resided next at the
11  Comfort Suites on 150 Overload Trail in
12  Houston?
13  A.  Yes, sir, whenever they had an
14  availability, because the place that we were
15  staying at did not have availability.
16  Q.  And do you recall if that room had a
17  kitchen as well?
18  A.  I don't think so.
19  Q.  And you were there for
20  approximately, at the Motel -- I'm sorry at
21  the Comfort Suites, you were at the Comfort
22  Suites for approximately four months, from
23  roughly September 7th, '05 to January 8th,
24  '06?
25  A.  That looks to be about accurate.

16 (Pages 61 to 64)

JOHNS, PENDLETON COURT REPORTERS                              504 219-1993

Page 77

1  Q. So just to clarify, you believe that
2  you bought the house on Glenboro Drive in
3  Spring in 2008? Is that correct?
4  A. I am not -- I am really not 100
5  percent sure.
6  Q. So during the time that you first
7  moved in, which was January of '06, between
8  that period and -- between that date and the
9  time in which you bought the house --
10 A. Yes, sir.
11 Q. -- you were continuing to pay -- you
12 were paying rent that entire time?
13 A. No, sir. I mean, we -- I don't
14 recall when we actually purchased the home. I
15 believe it was just for the one year after.
16 So it may have actually been '07. I am not
17 100 percent sure, though.
18 Q. So you moved in initially in January
19 of '06.
20 A. Yes, sir.
21 Q. You signed a year lease to rent.
22 And you believe then you actually may have
23 moved in that following year?
24 A. Yes, sir. It could be. I am not
25 100 percent sure, though.

Page 78

1  Q. It's not a trick question. I
2  promise.
3  A. Yes, sir, I understand.
4  Q. I am just trying to nail down
5  dates.
6  A. I understand. I understand. I
7  really don't recall, though.
8  Q. But if you signed a year lease to
9  rent and then bought shortly thereafter, that
10 would put us in January of '07. Correct?
11 A. Correct. But I believe they gave us
12 a couple of extensions, but I am not -- I
13 really don't recall 100 percent.
14 Q. When you say they gave you a couple
15 of extensions, you're referring to the
16 Catholic Charities group?
17 A. Not necessarily Catholic Charities
18 group. I believe it was the group, the actual
19 realtor who owned the property.
20 Q. I see.
21 A. I believe that's Fannie Mae.
22 Q. So after the year, the initial year
23 that you spent living at Glenboro Drive during
24 which Catholic Charities was paying for the
25 rent at that residence, --

Page 79

1  A. Yes, sir.
2  Q. -- did you pay the rent after that
3  initial year, or was that rent paid for by
4  someone else?
5  A. That was still part of the ongoing.
6  Q. So the entire period of time that
7  you lived there before you bought the house --
8  A. Uh-huh (affirmatively).
9  Q. -- you did not pay rent there?
10 A. That's correct.
11 Q. Now, when you bought the house at
12 Glenboro Drive, you still owned the house on
13 Perrin Drive in New Orleans; is that correct?
14 A. Yes, sir, that's correct.
15 Q. And were you continuing, were you
16 still paying the mortgage there when you
17 bought the house at Glenboro Drive?
18 A. Yes, sir, unfortunately.
19 Q. Were you at some point paying
20 utilities at Perrin Drive?
21 A. Not after the fact. I don't believe
22 so.
23 Q. So after the storm you don't believe
24 that you paid for utilities at Perrin Drive at
25 any point in time?

Page 80

1  A. I don't think so.
2  Q. Now, the house at Perrin Drive in
3  New Orleans was ultimately demolished. Is
4  that correct?
5  A. Yes, sir.
6  Q. Do you recall when that happened?
7  A. No, sir, I do not.
8  Q. Do you recall who demolished the
9  house?
10 A. That would have been through the
11 orders of the Road Home. They actually
12 purchased the property.
13 Q. So you believe it was demolished
14 then after you sold it to Road Home?
15 A. Oh, absolutely.
16 Q. Did you receive any documentation or
17 any communication detailing or describing the
18 demolition?
19 A. No, sir.
20 Q. None? Nothing telling you when it
21 was going to happen or did happen?
22 A. No, sir.
23 Q. How did you find out it was
24 demolished?
25 A. I found out after the fact. We went

Page 293

1   -- they're incomplete. So I
2   have those forms with me. And instead
3   of doing it today, we can at some
4   point tomorrow fill those out, because
5   I need your authorizations and then
6   we'll file them and get the
7   documents.
8     MR. PALMINTIER:
9       We will fill those out tomorrow.
10    MR. THATCH:
11      Perfect.
12    MR. PALMINTIER:
13      All right.
14    MR. THATCH:
15      All right. That's it for me.
16    VIDEO OPERATOR:
17      We're now going off the record.
18          * * *

Page 294

WITNESS'S CERTIFICATE

I, FRED NELSON HOLMES, JR., read or have had the preceding testimony read to me, and hereby certify that it is a true and correct transcription of my testimony, with the exception of any attached corrections or changes.

_____
(Witness' Signature)
_____
DATE SIGNED

DEPONENT PLEASE INITIAL ONE:

_____ Read with no corrections

_____ Read and correction sheet attached

DATE TAKEN: SEPTEMBER 24, 2011

Page 295

REPORTER'S CERTIFICATE

I, ROGER D. JOHNS, RMR, RDR, CRR, Certified Court Reporter, do hereby certify that the above-named witness, after having been first duly sworn by me to testify to the truth, did testify as hereinabove set forth; that the testimony was reported by me in shorthand and transcribed under my personal direction and supervision, and is a true and correct transcript, to the best of my ability and understanding; that I am not of counsel, not related to counsel or the parties hereto, and not in any way interested in the outcome of this matter.


ROGER D. JOHNS
CERTIFIED COURT REPORTER
STATE OF LOUISIANA