UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION
                                NO. 05-4182

PERTAINS TO:
                                SECTION "K"(2)

*Boutte v. Lafarge*          C.A. No. 05-5531
*Mumford v. Ingram*          C.A. No. 05-5724
*Lagarde v. Lafarge*         C.A. No. 06-5342
*Perry v. Ingram Barge*      C.A. No. 06-6299
*Benoit v. Lafarge*          C.A. No. 06-7516
*Weber v. Lafarge*           C.A. No. 08-4459
*Parfait Family v. USA*      C.A. No. 07-3500

## ORDER AND REASONS

Before the Court is Lafarge North America, Inc.'s Motion for Summary Judgment (Doc. 20405) filed in the above-listed cases. These cases seek redress for the damages plaintiffs incurred as a result of the north and south breaches of the eastern flood wall along the Inner-Harbor Navigation Canal ("IHNC") which resulted in the inundation of the Lower Ninth Ward of New Orleans, Louisiana during the passage of Hurricane Katrina over it. Plaintiffs allege that Lafarge North America, Inc. ("Lafarge") improperly handled Barge ING 4727 ("the Barge") and that as a result, the Barge was a substantial cause of the two breaches.

Lafarge has moved for summary judgment claiming that the lack of causation on the part of the Barge is the dispositive issue in all of these remaining Barge Track Cases, and thus judgment should be entered in its favor in the remaining suits without further litigation. This motion is based on the testimony and evidence adduced during that trial and the Court's written findings rendered after a 13-day bench trial and post-trial briefing wherein the Court found there was overwhelming evidence that the ING 4727 did not cause in any manner the cataclysmic

flooding of the Lower Ninth Ward, and thus found Lafarge to be without liability. *In re Katrina Canal Breaches Consolidated Litigation*, 2011 WL1792542 (E.D.La. January 20, 2010).

Plaintiffs maintain, *inter alia,* that Lafarge's motion ignores the applicable standards for summary judgment and that the Court's decision itself demonstrates that a reasonable jury could reject the Court's findings favorable to Lafarge and find in favor of Plaintiffs "as the majority of the findings presented in [the Findings of Fact and Conclusions of Law] require the weighing of evidence, evaluation of experts and determination of the credibility of witnesses." The Court, for the reasons that follow find plaintiffs' opposition without merit and will grant Lafarge's motion.

**Background**

In the aftermath of the levee breaches and inundation of New Orleans and the surrounding area, the judges of the United States District Court for the Eastern District of the United States created this umbrella litigation known as *In re Katrina Canal Breaches Consolidated Litigation*, C.A. No. 05-4182. Its purpose has been to facilitate and expedite the crucial discovery required to swiftly litigate those matters concerning liability, insurance coverage, and the like that arose thereafter. To accomplish that task, certain categories of cases were created and tracks established to resolve in a timely, cost-efficient manner the pending litigation.

In particular, a driving motivation for the creation of this umbrella was the need for joint discovery to be managed in a cost-effective fashion. As stated in Case Management Order No. 4 on March 1, 2007, "As the first phase nears completion, the Court finds that entry of this case

management order governing, and geared toward substantial resolution in the foreseeable future of, class certification **and common liability issues, including disclosure, discovery, further motion practice, trial preparation and related proceedings in the Levee, MRGO and Insurance categories of cases is appropriate.**"  (Doc. 3299) (emphasis added).

Thus, on September 18, 2007, the Barge Consolidation Order (Doc. 7723) was entered when these subject cases were transferred into this Court.  This consolidation was ordered because the referenced cases also included third-party and in one case *(Parfait*, C. A. No. 07-3500) direct claims that fault other than that of the United States or its contractor caused or contributed to the breach.  As such, the Court found those claims similar to those asserted in the LEVEE and MRGO case categories in the consolidated litigation.

On the same day, Case Management and Scheduling Order No. 5 established a scheduling order for these consolidated cases including all discovery in the LEVEE/ BARGE/MRGO[1] categories.  (Doc.  7724 at pp. 7-15).[2]  The Consolidation Order stated that discovery in all of the cases was open as to all issues, and coordination with the on-going discovery in MRGO and LEVEE cases was ordered with Case Management Order No. 4 incorporated.  Procedures for naming experts, exchanging reports, etc. were set forth in Case Management Order No. 5.  Also, in that order, a Final Pretrial Conference was notice with the trial of the Barge cases with a jury set to commence on June 15, 2009.  Clearly, the discovery

---

[1]The LEVEE category consisted of cases concerning the breaches at the Industrial Canal allegedly caused by the United States and the Washington Group International, Inc.  The BARGE category consisted of cases concerning the breaches at the Industrial Canal allegedly caused by the Ingram Barge.  The MRGO category consisted of cases concerning the flooding caused by the Corps' failure to maintain the MRGO waterway properly.

[2]Amended by Doc. 9004 granting Doc. 8974; amended by Doc. 10881 granting Doc. 9569 establishing new deadlines and cutoffs.

3

that occurred prior to the BARGE exemplar trial was as to all of the BARGE designated cases and was opened and closed pursuant to case Management Order No. 5.

Through the ensuing years, revised Case Management Orders were entered. Eventually, it became clear that the MRGO cases against the United States should not be tied to the BARGE cases which were brought solely against Lafarge. Thus, on March 24, 2009, the BARGE and MRGO (EBIA trial) were severed. After the Court denied BARGE class certification (Doc. 18852), by stipulation, the parties agreed to an exemplar non-jury trial and new deadlines were established on July 27, 2009. It is clear from reading all of the various orders promulgated together with the colloquies at innumerable status conferences that the purpose of the consolidation was to facilitate and complete causation discovery as to all of the breaches of all of the levees. That was the purpose of the consolidation and any other approach belies the dictates and orders of the Court.

The non-jury trial then commenced on June 21, 2010. This extensive trial concerned the negligence claims brought in two of the suits by four specific plaintiffs[3] as stipulated by the parties against Lafarge. Specifically, plaintiffs contended that Lafarge's cumulative decisions and negligent conduct leading up to and through Hurricane Katrina resulted in the Barge causing both breaches. They brought these negligence claims based on both maritime law and Louisiana state law and sought the application of the *Pennsylvania* Rule[4] and the *Louisiana* Rule[5].

---

[3] C.A. No. 05-5724:Josephine Richardson, Holiday Jewelers, Inc. and C.A. No. 06-7516: John Alford and Jerry Alford. These suits were consolidated under the BARGE umbrella in the *In re Katrina Consolidated Canal Breach Litigation,* C.A. No. 05-4182. There are numerous other plaintiffs in each case.

[4] *The Pennsylvania*, 86 U.S. 125, 136 (1873).

[5] *The Louisiana*, 70 U.S. 164, 168 (1865).

Witnesses were called and testified that the Barge in question had been improperly moored, broke free of its moorings prior to the storm, and that as a result of microbursts, tidal movement and weather conditions including a 20 foot tidal wave, had careened from a location toward the southern end of the canal northward, hitting the floodwall to cause the North Breach. Those plaintiffs also contended that the Barge then moved southward, bouncing off of the floodwall and eventually hitting the floodwall at the southern end causing the cataclysmic South Breach with the Barge leaving the canal and landing in the Ninth Ward.

Defendant adduced expert and lay testimony as well as exhibits to prove that it was scientifically and physically impossible for the Barge to have been present when the breaches at either the north or the south occurred. The Court heard testimony that the winds which the IHNC experienced were not in the proper direction for the Barge to allide in a manner so as to have caused the failures of the IHNC floodwall, and that the tides were insufficient as well. In addition, Lafarge argued that the physical evidence at both breaches supported those conclusions and belied much of the limited eye-witness testimony.

The Court issued a forty-two page opinion in which it found that based on the evidence and testimony, in essence, that the plaintiffs' allegations were refuted by the laws of nature considering the undisputed physical evidence adduced as to the weather conditions at the area during Hurricane Katrina. In addition, physical evidence consisting of photographs of the wave action in the Industrial Canal during Hurricane Katrina likewise demonstrated that plaintiffs' allegations were unfounded. Finally, the irrefutable picture of the Barge on top of the telephone wires with an undisturbed school bus at its side demonstrated beyond cavil that the Barge floated over the floodwall after it was compromised. The Court noted in its opinion,

>    As stated by Dr. Bea in commenting on the significance of the image found at RB-063 in DX-361 which image was captured at trial and marked as DX-360 with a red dot over the spot where the submerged school bus rests with the Barge resting to the left or east of it:
>
>> Well, I was always concerned about how the barge could get to its final resting position with that school bus in the way. It indicated clearly to me that the water level inside the Lower Ninth Ward was very deep, and that the barge had been able to float over the top of that school bus, hence, explaining how it could appear where it did relative to the barge after the waters had receded.
>
> (Transcript, Bea at 2685) (Appendix No. 15, DX-360).
>
>    Thus, for all the reasons stated above, the Court finds that the ING 4727 caused neither or the South Breach of the IHNC floodwalls, nor the catastrophic flooding caused thereby for which plaintiffs seek damages. The flooding began around 7:00 a.m. at the South Breach and the area was so flooded by the time the Barge exited the IHNC around 10:00 a.m. that it floated over a bus and telephone wires. Simply put, the Barge was a consequence not a cause.

*In re Katrina Canal Breaches Consolidated Litigation*, 2011 WL1792542 (E.D.La. January 20, 2010). With this as background, the Court will now take up the instant motion.

**Standard Applicable for Motion for Summary Judgment**

Rule 56(a) of the Federal Rules of Civil Procedure provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Plaintiffs must show a "genuine issue" of material fact, not just a factual dispute. *Scott v. Harris,* 550 U.S. 372, 380 (2007) (when opposing parties tell two different stories, **one of which is blatantly contradicted by the record, so that no reasonable jury could believe it**, a court should not adopt that version for purposes of ruling.); *Little v. Liquid Air Corp,* 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc) (summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the non-movant).

Indeed, a trial judge may not permit a jury to accept testimony that is contrary to a law of nature. *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998)

Thus, evidence manifestly at variance with the laws of nature and the physical facts is of no probative value and may not support a jury verdict." *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729 (5th Cir. 1977) (what Hobson says his chickens did, chickens do not do). Likewise, equivocal or vague testimony cannot be relied on to overcome summary judgment. *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 271-72 (5th Cir. 2002); *Kampen v. Am. Ixuzu Motors, Inc.* 157 F.3d 306, 308 (5th Cir. 1998) (en banc) (expert testimony consisting of "conclusory, unsupported assertions" does not create genuine issue). Indeed, unsubstantiated interpretation of its own evidence will not support the denial of a motion for summary judgment. *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753-54 (5th Cir. 2000) (affirming summary judgment, finding that inference of causation did not follow from plaintiff's expert evidence).

In addition, the Court may use trial testimony from the prior trial in support of this motion as it is functionally the equivalent of an affidavit, which is not subject to cross-examination and which is contemplated under Rule 56(c)(1)(A). *Kelley v. Price-Macemon, Inc.*, 992 F.2d 1408, 1415 n. 12 (5th Cir. 1993) (It is well-settled that a certified transcript of a judicial proceeding may be considered on a motion for summary judgment). *See Randolph v. Laeisz*, 896 F.2d 964 (5th Cir. 1990) (considering– without discussion–the testimony given during the trial of the main action on a motion for summary judgment in a severed action); *Beiswenger Enterprises Corp. v. Carletta*, 46 F. Supp.2d 1297, 1299 (M.D.Fla. 1999) (trial testimony, even when from a proceeding in which the parties, subject matter, and counsel are not the same can be used because it is sworn testimony which is at least as reliable as that found in affidavits citing

*Langston v. Johnson*, 478 F.2d 915, 917 n. 17 (D.C. Cir. 1973)).  Plaintiffs' protestations to the contrary are without basis and their reliance on Fed. R. Evid. 804(1) is misguided as this testimony is not being offered at **trial** but in the context of a motion for summary judgment.

As noted, Lafarge has moved this Court to enter judgment in its favor in the remaining cases based on this Court's decision rendered on *In re Katrina Canal Breaches Consolidated Litigation*, 2011 WL1792542 (E.D.La. January 20, 2010).  As this Court can properly rely on the overwhelming physical evidence as well as the admissible trial testimony, and based on the standard as articulated above, clearly, Lafarge's motion has merit.

**The Physical Evidence Overwhelmingly Demonstrates that the Barge Did Not and Could Not Have Caused the North and South Breaches**

    **A.**    **Prevailing Wind Direction Makes Theory that Barge Caused Breaches Physically Impossible**

As this Court noted previously, based on the laws of physics, a fundamental characteristic of a hurricane is the inward counter-clockwise spiraling nature of winds.  Based on that fact, those areas which fall in the north-west quadrant of the wind field of a hurricane–that is those areas to the north-west of the "eye" of a hurricane–experience winds blowing in a north, north-easterly direction prior to the eye of the hurricane passing a particular location.  Thus, it is irrefutable that the Industrial Canal ("IHNC") and the Barge experienced north, northeasterly winds from 7:00 a.m. to 9:45 a.m. on the morning of August 29, 2005,  (Trial Transcript, Dooley at 1848), and the breaches occurred when these winds were at work.

As this Court stated in that regard:

The center of Katrina passed New Orleans sometime between 8:45 and 9:00 a.m. on the morning of August 29, 2005. (Transcript, Dooley at 1848).   Thus,

> between 7:00 and 9: 45 a.m., the prevailing winds were in a northeasterly direction at the IHNC which is at 15°. (Transcript, Dooley at 1849).  As the system got closer to the IHNC, the winds  became more northerly, then as the system passed beyond the IHNC, the winds became more westerly.  Eventually, the winds came more out of the west as Katrina moved farther away. In reality, the maximum one-minute sustained wind speed at the IHNC as Katrina passed was between 70 and 80 knots. (Transcript, Dooley at 1849-50 and DX-347, AD-066)[6].  A clear visual translation of these wind bearings on the Barge in the IHNC is found at Appendix No. 8, DX 196, Cushing Report at 80.
>
> These facts were confirmed applying the best wind data for the IHNC using a hindcast that was produced by Oceanweather, Inc. ("OWI").  The hindcast looked at the horizontal pressure patterns of the storm and the vertical pressure patterns of the storm.  Using these factors, the wind field of the storm was reconstructed.  In fact this company's work was also used in the IPET investigation. (Transcript, Dooley at 1851).
>
> Dr. Dooley using four grid points produced by OWI interpolated them to demonstrate precisely the direction and force of the winds experienced by the IHNC as best as could be determined using this data. (Appendix No.7  DX-347, AD-018).[7]  This study confirmed that at 4:30 a.m. the wind was from the northeast at 46.66°. (See DX-347, AD-21).  By 7:00 a.m., the wind was still coming out of the northeast at 29.49°.  (See DX-347, AD-23).   At 7:30, the wind continued to become more northerly in direction and was now blowing at 20.11° . (See DX-347, AD-24)**.  Thus, from 4:00 to 7:45 a.m.[8] is clear and beyond peradventure that the winds at the IHNC blew in a northeasterly direction.  Therefore, since the Lafarge Terminal lies on the west bank of the IHNC, these winds would have pushed the Barge towards the west and away from the east bank where the breaches occurred.**

(Findings of Fact, Conclusions of Law at 15-17) (emphasis added).

This conclusion was further validated by the wind data obtained from the Lakefront Airport, which is about 4.1 to 4.2 miles north of the IHNC, where the wind direction recorded was in line with the hindcast models.  Given the fact that the North and South Breaches

---

[6] DX-347 comprise the demonstrative exhibits used at trial by Dr. Dooley.

[7] Point "E" of this graph indicates the IHNC.

[8] These times are the outer boundaries of the estimated times of the occurrence of the IHNC breaches.

occurred before the wind shifted, it is physically impossible for the Barge to have caused these breaches.

      B.      **Physical Evidence Confirms Findings**

The Court also considered actual photographs of the IHNC taken during the storm passage taken by Lockmaster O'Dowd. [9] He testified that during the storm, after day break, that the waves were moving towards the river (in a southern direction) and were about between a foot and two feet. This testimony was irrefutably supported by the pictures introduced at trial, (DX-37, LNA001347), including his testimony that no giant wave ever hit the lock. (Transcript, O'Dowd at 2226). In addition, O'Dowd testified that the wind was coming "out of the north, blowing towards the west." This fact was later confirmed with the testimony of Dr. Joseph Suhayda, the Interim Director of the LSU Hurricane Center. (Transcript, Suhayda at 3012-13, 3042-43). Again, these prevailing winds, waves and currents make plaintiffs' theory of the case impossible.

In addition, as noted earlier, it is clear that the Barge was impelled across the area of the Southern Breach by the high-water based on the photographs of the undisturbed school bus over which the Barge floated in the high water and the Barge resting on power lines that were in tact demonstrating that it was on top of those lines when the flow reversed. (Findings of Fact, Conclusions of Law at 35). Likewise, the striations on the bottom of the barge matched the bent rebar at the far southern end of the breach, away from the main "bow" where the breach had already formed. (Findings of Fact, Conclusions of Law 34).

---

[9] A series of pictures were admitted at trial, DX-37. While not identified by individual number in the transcript, the Court will used the LNA exhibit number designation in this opinion for the ease of the reviewing court.

C.     **Plaintiffs' Experts Opinions Are Without Probative Value**

Based on the overwhelming physical, scientific evidence that the wind, wave and tidal action made it impossible for the Barge to physically impact the IHNC Eastbank floodwall, the Court finds that plaintiffs' legal arguments and expert testimony do not create a question of fact which precludes the granting of this motion for summary judgment.

To begin, the conclusions reached by this Court do not require the "weighing" of conflicting evidence. As stated above, evidence manifestly at variance with the laws of nature and the physical facts is of no probative value and may not support a jury verdict." *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729 (5th Cir. 1977). Likewise, such testimony cannot create a question of fact precluding summary judgment. *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 271-72 (5th Cir. 2002); *Kampen v. Am. Ixuzu Motors, Inc.* 157 F.3d 306, 308 (5th Cir. 1998).

Dr. David Mitchell's testimony concerning microbursts is unavailing in that the underlying "scientific" evidence was not scientifically sound given that Dr. Mitchell's testimony relied on non-"dealiased" radar[10] data which rendered Dr. Mitchell's opinions unreliable. In addition, even if there had been a microburst, there was no evidence presented to conclude that it would have been of sufficient strength and duration (three to five seconds at most) to have catapulted the Barge to the north breach then to the south breach. As noted, even if there had been valid radar evidence of a mesocyclone, there is no way to ascertain whether the

---

[10]Dealiasing is the process of using algorithm techniques to folding radar data to determine the actual velocity of winds. This process is necessitated by the fact that radar "flips" at 64 knots per hour because of the limitations of Doppler radar. Therefore, an aliasing process must take place because the wind appears t be coming toward the radar (being green in color) when it is in reality going away from the radar. (Testimony, Mr. Leslie Lemon, at 1755-57, 1761-65).

perturbation caused by the mesocyclone actually affected the ground as radar is actually limited to 700 or 800 feet above the surface. (Transcript, Mitchell at 1057).[11] As such, this testimony squarely fits under the rubric noted in *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753-54 (5th Cir. 2000) where unsubstantiated interpretation of its own evidence will not support the denial of a motion for summary judgment. Indeed as noted in the Court previous finding, Dr. Mitchell's testimony was further undercut by the fact that he had testified in other Katrina litigation that damage to houses in the area was not caused wind. (Transcript, Mitchell at 1045-1054). He had testified that there was never a mesocyclone or microburst wind from Hurricane Katrina that reached ground level at the location of a specific property located at 2637 Tennessee Street (DX-27) which is about 2 blocks from the north breach. (findings of Fact, Conclusions of Law, pp. 19-20).

Plaintiffs allegation that these other plaintiffs have a right to further discovery is meritless. As explained at length above, this Court provided counsel for all plaintiffs the opportunity to participate in a full discovery as to all causation issues in preparation for the January exemplar trial. Thus, any argument that these same attorneys should be afforded additional time for discovery "new" evidence is faulty if not disingenuous.

In addition, the claim that there is "new" evidence[12] that the Barge was "further" adrift "a bit closer to the west side of the IHNC than the east, on Sunday, August 28, 2005 at 6:52 p.m." is

---

[11]Even Plaintiffs' own expert, Hector Pazos admitted that he did not have solid evidence to demonstrate how the Barge could have traveled from the southern point where Mrs. LeBlanc and Mr. Tompkins had placed the Barge on Sunday to the North Breach. "What I have is not very solid. It's a remote possibility that, with variable winds that always exist, it could have traveled. Although it's not the most possible answer." Transcript, Hector Pazos at 851).

[12]Doc. 20441-2, Affidavit and *Curriculum Vitae* of Diswadev (Dev Roy, Ph.D.

not "new." The Court contemplated the possibility of the Barge being adrift in its original findings. There were no winds, no waves and no tides that could have pushed the Barge in the manner that Plaintiffs contend. Simply put, there is no valid, scientific data which supports plaintiffs' claims that the Barge lunged to the North to cause the North Breach then careened southward to cause the South Breach. Indeed, it is interesting to note that the named plaintiffs in the *Mumford/Benoit* trial did not even pursue an appeal of the Court's factual findings. The instant decision is not based on credibility; it is based on the fact that the Barge could not be propelled in the manner alleged given the irrefutable valid scientific and physical evidence presented unless the Barge sprouted wings and could fly against a 70 mile per hour wind. Accordingly,

**IT IS ORDERED** that Lafarge North America, Inc.'s Motion for Summary Judgment (Doc. 20405) is **GRANTED** and judgment shall be entered in favor of Lafarge North America, Inc. and against all plaintiffs named in the above-referenced matter with each party to bear its/his/her own costs. Lafarge shall prepare a judgment in conformance with this order and present it to the Court no later than March 27, 2012.

New Orleans, Louisiana, this  20th  day of March, 2012.

**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**