# Rebuttal Report

### of

# Robert Glenn Bea, Ph.D., P.E.

For

**Katrina Canal Breaches Consolidated Litigation**

[Civil Action Number: 05-4182 "K" (2)]

United States District Court

Eastern District of Louisiana

Pertains to MR-GO, Armstrong [No. 10-866]

April 3, 2012

Robert G. Bea, under penalty of perjury, states as follows:

1.      This rebuttal report summarizes work performed for the Katrina Canal Breaches Consolidated Litigation [USDC, E.D. La. No. 05-4182 "K" (2) Pertains to MR-GO (Mississippi River – Gulf Outlet), Armstrong (No. 10-866)] related to analyses of the U.S. Army Corps of Engineers (USACE) Inner Harbor Navigation Canal (IHNC) Lock Expansion Project East Bank Industrial Area (EBIA) engineering and site clearing excavations conducted by the Washington Group International (WGI) for the USACE on development of the North  Breach and South Breach at the Lower 9th Ward during hurricane Katrina.

2.      This rebuttal report contains the additional information I have developed since I submitted my Expert Report on February 1, 2012 regarding my forensic engineering findings, opinions and conclusions relative to the causes of the two breaches (North Breach and South Breach) that occurred in the New Orleans Hurricane Protection System (NOHPS) along the east bank of the Inner Harbor Navigation Canal (IHNC) adjacent to the Lower 9th Ward during Hurricane Katrina on August 29, 2005. This report also summarizes results from my initial reviews of the Defense Expert reports submitted by Drs. Marr, Silva-Tulla, Brandon, and Stark during the period March 9 through March 12, 2012. If called to testify, I could and would testify competently as follows:

3.      My rebuttal report is divided into three sections. Section I provides a summary of results from additional forensic engineering analyses I have performed to evaluate the causation of the North Breach and South Breach at the Lower 9th Ward. Section II provides a summary of results from my engineering forensic analyses of the breach causation analyses provided by Drs. Marr, Silva-Tulla, Brandon, and Stark  of the

1

causes of the North Breach and South Breach at the Lower 9th Ward that developed during Hurricane Katrina, and Section III provides a summary of my findings regarding the foregoing analyses. The following table of contents will serve as a guide to help reading this Expert Report.

4.    This Rebuttal Report reflects my opinions and comments based upon currently available information.  I hereby reserve the right to supplement this rebuttal report and my original expert report and to expand or modify any of my opinions based on review of any additional material that may become available through ongoing discovery and/or through any additional work or review of additional work performed by others.

## TABLE OF CONTENTS

I.   ADDITIONAL ANALYSES ............................................................................................. 3

  EAST BANK INDUSTRIAL AREA SITE CLEARING EXCAVATIONS ........................................... 3
  HYDRAULIC PRESSURE CONDUCTIVITY ANALYSES ........................................................... 16
  HYDRAULIC CONDUCTIVITY PRESSURE ANALYSES VALIDATIONS .................................... 24
  ENGINEERING STANDARD OF CARE ................................................................................ 38

II.  PRELIMINARY DEFENSE EXPERT REPORT REVIEW OBSERVATIONS ...................... 54

  INTRODUCTORY COMMENTS ........................................................................................... 54
  OVERVIEW ..................................................................................................................... 55
  PURPORTED LOW TOP OF WALL ELEVATIONS ............................................................... 62
  NORTH AND SOUTH BREACH LEVEE EROSION ANALYSES ............................................... 70
  CAUSATION ANALYSES OF NORTH AND SOUTH BREACHES ............................................. 85
  SOUTH BREACH TIMING ................................................................................................. 92
  CONSIDERATION OF PROTECTED SIDE FLOOD WATERS IN BEA'S STABILITY ANALYSES ........ 96
  JOURDAN AVENUE CANAL MODELING IN HYDRAULIC CONDUCTIVITY ANALYSES ............... 100
  DRAINED AND UNDRAINED SWAMP-MARSH DEPOSIT SHEAR STRENGTHS ......................... 101
  CONCLUDING REMARKS .................................................................................................. 106

III. SUMMARY AND CONCLUSIONS ...........................................................................106

NORTH BREACH .............................................................................................. 106

SOUTH BREACH .............................................................................................. 109

CAUSATION ANALYSES PERFORMED BY DRS. MARR AND SILVA-TULLA.................. 111

FORENSIC ENGINEERING QUALIFICATIONS ........................................................ 112

IV.   REFERENCES...........................................................................................117

V.   APPENDIX A – EVALUATION OF HYDRAULIC CODUCTIVITIES ....................................128

COMPRESSIBILITY CONSIDERATIONS IN ANALYSES OF FIELD HYDRAULICTESTING TO DETERMINE
HYDRAULIC CONDUCTIVITIES - PERMEABILITIES ................................................. 128

REFERENCES .................................................................................................. 131

VI.   APPENDIX B – SURGE OVERTOPPING EROSION ANALYSES...........................133

SITE CHARACTERIZATION................................................................................. 133

FLOODWALL GEOMETRY.................................................................................. 133

FLOODWALL EMBANKMENT SOIL CHARACTERISTICS & ARMORING ........................ 134

STORM SURGE LOADING .................................................................................. 137

REVIEW OF MARR (2012) OVERTOPPING ANALYSES ......................................... 138

IMPACTS TO FAILURE EVALUATION AT NORTH AND SOUTH BREACH .................... 141

REFERENCES .................................................................................................. 144

# I.   Additional Analyses

## East Bank Industrial Area Site Clearing Excavations

5.    Three dimensional (3D) Geographic Information System (GIS) graphic models of the East Bank Industrial Area (EBIA) – Inner Harbor Navigation Canal (IHNC) area were developed based on the EBIA Lock Expansion Site Clearing Project documentation obtained from the U.S. Army Corps of Engineers (USACE) and Washington Group International (WGI) that was provided through a sequence of document productions from the U.S. Department of Justice (DOJ).   A list of these documents is included in the list of Reliance Documents accompanying this report.

6.     These 3D GIS graphic models detail the general aggregate extents of the excavation work – location, aerial extent, depth, and general type of backfill.   The accuracy of these models is limited to the available information. Due to Court's scheduling order, and the very tight time constraints associated with writing this Rebuttal Report, not all pertinent data sources could be incorporated into the 3D GIS graphic models.   I reserve the right to update and modify the 3D GIS graphic models to incorporate additional Site Clearing excavation documentation contained in my Rebuttal Report Expert Reliance Documents (existing information). Elevations utilized in preparations of the 3D GIS graphic models are based on the WGI EBIA surveys 'WINK 2002 datum'. My present understanding is that -1.0 feet is required to convert the WINK 2002 datum to NAVD88 (2004.65) elevations.

7.     The intent of these 3D GIS graphic models is to show depths of excavations relative to the local ground elevation associated with the excavation. A number of these excavations would have exacerbated the hydraulic conductivity pressure 'connections' with the underlying saturated, high water content swamp - marsh deposits (Dunbar 2012, Rogers 2012). These excavations were the result of site activities such as building demolition, grid trenching, utility removal, pile removal, buried structure removal, and transite/Asbestos Containing Material (ACM) removal.   These graphics are identified as the 'EBIA Swiss Cheese graphics'  (Figures 1 – 3). Different GIS aerial photography 'overlays' were used to facilitate identification and correlation of the EBIA site clearing excavations with geographic features.

8.     Backfill materials used in the EBIA excavations ranged from onsite spoil materials to imported high permeability river sand.   WGI records indicate that permeable

river sand (labeled as "Sand" in the Swiss Cheese Figures 1 - 3) was used, at a minimum, in Boland Area 2, Area 8, and in Boland transite/ACM areas.  These pervious backfill materials were, in cases such as the North Breach site, placed in contact with pre-existing pervious shell fill layers that quickly conveyed water pressures directly to the EBIA floodwall, leading to hydrostatic loading of the wall as a result of the navigation improvement project. In addition to regions of sand backfill placement (sand, imported 'river sand'), other regions included "voids" (removal of material without subsequent backfilling) such as the borrow pits and pile extraction areas.  All other regions were predominantly backfilled with a composite mixture of materials (predominantly onsite clays, with mixtures of sands and shells).   The major excavation features modeled at the Boland Marine and Saucer Marine parcels are described in the following paragraphs (Figures 4 – 9).

9.     **Floodwall** – The floodwall location and extents were based on the alignment from WINK 2002.  The top of wall elevation for the entire site was set at +13 feet, a representative value from surveys completed by WINK prior to hurricane Katrina as well as post-Katrina surveys performed on behalf of the USACE Interagency Performance Evaluation Taskforce (USACE IPET 2007).  I am aware that there were variations in the top of wall elevation.   These variations have been analyzed and determined to have had no impact on the excavation modeling or failure analyses.

10.     **Building Footprints** – The site demolition plans were used to delineate building footprints as well as general locations for piles and utility corridors.   The disturbed area associated with the structure foundations was assumed to be a depth of 4 feet below grade with side slopes of 0.5:1 (horizontal:vertical).   Extents of the pre-

existing drainage ditch were also estimated from these drawings (in addition to aerial imagery from 1998).

11.    **Deep Foundations** – Foundation piles were located under some of the structures at the EBIA site.  The encounter and removal of these foundation piles (distinguished by WGI as 'onshore' piles and 'offshore' piles) was logged by WGI in a journal titled "Demolition Status of Underground Utilities and On Shore Pilings" (for 'onshore' pilings, which was the focus of this modeling effort).  The total length of pile extracted was documented (not necessarily the length of each individual pile extracted) and some documentation was developed by WGI denoting pile locations.  Based on the available information, it was evaluated that the top of pile was 3 feet below grade and each pile was, on average, 30 feet long.  The locations and quantity of piles (several thousand) are estimates. The available information indicates the voids left by the pile extractions were not backfilled other than with surface grading soils.

12.    **Utility Corridors** – The site demolition plans were used to delineate general locations for piles and utility corridors.  Utilities included water lines, sewer lines, and gas lines.  Utility trenches were evaluated to extend down to a depth of 5 feet, with a top width of 6 feet and bottom width of 4 feet.

13.    **Grid Trenching** – Grid trenching was performed by WGI across the site following structure demolition in an attempt to identify any large buried objects.  Field logs were used to identify approximate locations.  The grid trench alignments were not surveyed and the field sketches were not drawn 'to scale.'  Grid trenches were evaluated to extend to an average depth of 5 feet (as noted in the WGI Work Plan), with a top width of 6 feet and bottom width of 4 feet.

14.     **Special Excavations** – There were a number of deep excavations (more than 5 feet) at the site.  These include the removal of the Sewer Lift Station, the removal of a concrete foundation element referred to as the "Wedding Cake," and other excavations such as Underground Storage Tank (UST) removals.  Dimensions associated with the Sewer Lift Station and Wedding Cake were based on cofferdam designs prepared by WGI subcontractors.

15.     **RECAP Activities** – WGI performed soil contamination testing and developed a remediation program to remove contaminated soils.  The limits of soil removal were based on test results, where samples were collected on a grid system. Areas between samples (grid points) were removed and confirmation tests were performed after excavation (and before backfill) to confirm sufficient extents of contaminated materials were removed.  The remediation areas were assumed to have side slopes of 1:1 (horizontal:vertical).  Depths of excavations were determined based on reported vertical excavation depths in the "No Further Action At This Time" (NFAAT) reports.

16.     **Surekote Road Removal** – The removal of Surekote road was delineated in the USACE site demolition drawings (which showed Surekote Road).  A road surface – subgrade removal disturbed depth of 3 feet was evaluated based on the available photographs and quantity estimates.

17.     My interpretation of the Swiss Cheese GIS EBIA excavation and site clearing activities is that there exists a very high correlation of these activities with the local features identified in my Expert Report (Bea 2012, Case 1 and Case 2 excavations) that were associated with the locations and Forensic Engineering analyses of the

causation of the North Breach and South Breach that developed at the Lower 9th Ward during Hurricane Katrina.



Figure 1: EBIA Swiss Cheese Excavations and Backfill GIS graphic (pre-Katrina aerial base photograph).

8



Figure 2: EBIA Swiss Cheese Excavations and Backfill GIS graphic (pre-Katrina aerial base photograph).



Figure 3: EBIA Swiss Cheese Excavations and Backfill GIS graphic (post-Katrina aerial base photograph).



189-090903-01 MY Trench where lift station discharge was removed



189-091003-11 MY Welding cap on end of gas line between AM45 & 46

Figure 4: EBIA Swiss Cheese Utility Excavations.



065091901-14 MCD – Grid Trench



063091201-27 SAU – Grid Trenching

Figure 5: EBIA Swiss Cheese Grid Tench Excavations and native soils used for backfilling trenches (photographs from WGI006324).

.



067100201-10 SAU – Exploratory Excavation At Sewer Lift Station



067100201-08 SAU – Exploratory Excavation At Sewer Lift Station

Figure 6: EBIA Swiss Cheese Special Excavations (Sewer Lift Station with 'sandy' native backfill).



042061201-27 BOL – Pilings At #36



051071101-21 SAU – BH17E

Figure 7: EBIA Swiss Cheese Special Excavations (piles extracted and voids left unfilled) (Photo from top WGI001109 and bottom WGI003212).



221110204-11 East wall of 57A thru 61A (Area 1) excavation at McDonough Marine showing layers



229012105-01 Placing imported sand backfill material at north side of Area 2 at Boland Marine

Figure 8: EBIA Swiss Cheese Risk Evaluation and Correction Action Program (RECAP) Excavations and imported 'sandy' backfilling.

15



231021805-07 Placing imported sand backfill in Phase 2 ACM excavation east of Area 8 at Boland Marine

Figure 9: EBIA Swiss Cheese Excavations imported 'sandy' backfilling (photograph from top WGI014980 and bottom WGI0154024). Note Surkote Road overpass adjacent to Lower 9th Ward floodwall with pump station roof in background of bottom photograph).

## Hydraulic Pressure Conductivity Analyses

18.     The hydraulic conductivity analyses summarized in my February 1, 2012 Expert Report and in the associated analyses I performed with the aide of Mr. Cobos-Roa and Dr. Xavier Grunauer, (documented in Appendix D of the Bea Expert Report) primarily addressed the <u>hydraulic pressures developed in the buried swamp – marsh deposits under the protected side flood wall – levee systems</u> (Figure 10) at the North Breach, South Breach, and Near Breach locations during Hurricane Katrina.



Figure 10: Hydraulic conductivity 'Uplift Pressures' developed by the buried swamp – marsh deposits on the underside of the levee on the protected side (base figure after Rogers 2007).

19.　These hydraulic conductivity analyses have been and were based on 'Steady Flow' conditions for the soils below the phreatic surface (initial water surface elevation in the soils). These 'Steady Flow' (constant volume) conditions are those in which there are no significant changes in the soil void ratio (ratio of soil void volume to solid volume)[1] and saturation (percentage of void volume filled with water) during the hydraulic 'loadings'(time dependent hydrostatic pressures) imposed by rising water in contact with the soils (Lambe and Whitman 1969; Wolff 1999, 2002; USACE 1956; USACE 1999, ETL 1110-2-556; USACE 2005b, ETL 1110-2-569; USACE 2011a, ETL 1110-2-573; USACE 2011b, EC 1110-2-6066; USACE 1993a, EM 1110-2-1901; USACE 2000, EM 1110-2-1913; USACE 1994, EM 1110-2-2504).

20.　The time dependent hydraulic loading (rising and falling surge water elevation) conditions are 'transient', i.e., there are time-dependent changes in the surge

---

[1] Porosity is also referred to in hydraulic conductivity analyses. Porosity is the ratio of void volume to the total volume of the soil-water system.

water elevations that result in 'Steady Flow' time-dependent or transient hydraulic conductivity effects.

21.     My 'Forensic Engineering' training, knowledge, experience, practice and resulting professional judgment compel me to conclude that the use of 'Steady Flow' conditions is most appropriate for the purposes of determination of the hydraulic 'Uplift Pressures' that are of critical importance in Forensic Engineering analyses of the causation of the North Breach and South Breach and the performance of the Near Breach location at the Lower 9th Ward during Hurricane Katrina. In the following paragraphs, I will define what constitutes 'Steady Flow' and 'Non-Steady Flow' hydraulic conductivity soil – water transport and pressure development conditions. Then, I will summarize the reasons which justify and validate the application of 'Steady Flow' conditions in my Forensic Engineering analyses of the causation of the North Breach and South Breach at the Lower 9th Ward that developed during Hurricane Katrina.

22.     The fundamental equations for analyses of water flow in soils result in two categories of flow analyses (Lambe and Whitman, 1969) : a) 'Steady Flow', and b) 'Non-Steady Flow.' 'Steady Flow' analyses result in 'Steady State' hydraulic conductivity characteristics. This means there are no significant changes in the soil void ratios (pore space occupied by water or gas) and no significant changes in the soil water contents (the soils do not consolidate when stressed in compression and do not expand when stressed in tension) and there are no significant changes in the soil saturations (the soils are fully saturated and absent of free gas bubbles). These are indicated as constant 'e' (void ratio) and 'S' (saturation) conditions (Lambe and Whitman 1969, page 274).

23.     *'Non-Steady Flow'*  conditions are those in which the soils experience significant changes in void ratios and water contents, changes in saturations, or combinations of these. Conditions in which there are changes in void ratios and water contents are either consolidation for compressive stresses or expansion for tension stresses. Conditions in which there are changes in saturation and no changes in void ratios are constant volume for decreases in saturation and imbibition for saturation increases. Soil flow conditions that involve both compression and expansion characteristics and changes in void ratio involve significant changes in soil strains. These significant changes violate the fundamental 'small strain' conditions for the flow analyses model. As stated by Lambe and Whitman (1969) these "are complex flow conditions for which satisfactory solutions have not been found."

24.     In the analyses I performed with the assistance of  Mr. Cobos-Roa and Dr. Grunauer (Bea 2012), '*Steady Flow*' conditions have been used to perform the hydraulic conductivity '*Uplift Pressure'* effects that act on the undersides of the fine-grained 'blanket' formed by the protected side levee (Figure 10). The justifications for this use are summarized in the following paragraphs.

25.     Rapidly applied hydraulic loadings imposed by the Hurricane Katrina rising surge waters in the IHNC (2.7 feet water elevation increase per hour) do not provide sufficient time for the buried swamp-marsh deposits that are confined above and below by lower permeability soils to significantly consolidate or expand – changing void ratios or saturations. These very high water content saturated organic clay deposits behave in an essentially undrained manner that allows the surge water pressures to be

transmitted directly under the sheet piling (terminated above the buried swamp-marsh deposits) and develop large uplift pressures that act to destabilize the I-walls.

26.      Samples and testing of the swamp-marsh deposits buried under dredge spoils and IHNC waters since the 1920s (Rogers 2012, Dunbar 2012) have not shown any evidence to indicate these deposits are not fully saturated or that these deposits contain significant amounts of free gas.  To the contrary, all indications are that these deposits were fully saturated.

27.      Hydraulic conductivity results (e.g. deposits horizontal and vertical permeabilitiy characteristics) developed from analyses of field pump and 'slug' tests performed at the Lower 9th Ward during 2011 (Fugro 2012, Rogers 2012) in the buried swamp – marsh deposits have been based on analytical models that are based on '*Steady Flow*' hydraulic conditions (Appendix A, Campbell, Starrett, Fowler, and Klein, 1990). Consequently, the hydraulic conductivity characteristics (permeabilities) that have been used in the '*Steady Flow'* hydraulic conductivity analyses and in the subsequent 'I-wall' lateral stability analyses have been determined using consistent and scientifically reliable methods.

28.      Analysis of records obtained from instrumented 'piezometers' (devices placed in the soils to record the water pressures associated with exposure to specified layers of soil) such as those installed in the buried swamp – marsh layers found beneath the 17th Street Canal breach and near breach locations (Bea 2008b, 2008c; Bea and Cobos-Roa 2007, 2008b, 2008c, USACE 2007c) and those found beneath the EBIA and Lower 9th Ward (Piezometers #3 and #6, Bea 2012) and elsewhere in the Greater New Orleans area and Southern Louisiana (Rogers 2012, Dunbar 2012) with water elevations

in the adjacent canals indicate 'almost immediate' increases in the piezometer water elevations with large increases in the water elevations in the adjacent canals (Figure 11). The hydraulic conductivity <u>water pressures</u> developed in these high water content saturated organic clay and organic deposits (Peat, Humus) demonstrate that these deposits are in 'direct pressure communication' with the high water elevations in the adjacent canals. Such 'direct pressure communications' were established by thorough analyses of the records from piezometers embedded in the buried sand deposits exposed under the London Avenue Canal USACE I-wall test site ( USACE 2008; Black & Veatch 2009; Brandon 2007a, 2007b). These test results resulted in the conclusion that: *<u>"The sand aquifer was likely saturated so that only a small volume of flow was needed to significantly raise pore-water pressures"</u>* (Phase II Interim Guidance for Evaluating Existing I-Walls, USACE EC 1110-2-6066, 1 April 2011, page 6-19).





Figure 10: Recorded piezometer and canal water elevations in buried swamp – marsh deposits located at 17th Street Canal (top) and at the Lower 9th Ward (bottom) (Bea and Cobos-Roa 2007, 2008a; Bea 2012).

29.     Since 2006, the USACE has issued advanced guidelines for design of new and analyses of existing 'I-walls' (USACE 2006b, USACE 2011a, 2011b). These guidelines have been founded on the extensive studies performed by and for the USACE to take advantage of the 'lessons learned' from the performance of I-walls (sheet pile supported embedded in levees) in the Greater New Orleans area during and following Hurricane Katrina. These guidelines have explicitly addressed 'seepage' – hydraulic conductivity analyses associated with I-walls. These guidelines have been based on extensive testing performed for and by the USACE to determine two principal types of seepage effects: a) those involving significant transport of water and soils that can result in soil – levee – I-wall soil 'piping' and 'blowout' failures, and 2) those involving significant increases in the porewater pressures on the protected side of I-walls that when 'blanketed' by the very fine grained cohesive soils that comprise many I-wall levees and foundation strata thereby generating large hydraulic 'Uplift Pressures.' Of particular importance in the hydraulic conductivity pressure analyses I performed are the 'Uplift Pressures' that act to destabilize the I-wall levees on the protected sides. <u>On the other hand, the USACE I-wall seepage analyses intended to determine '*Uplift Pressures'* are incorrectly based on '*Steady Flow'* hydraulic conductivity analyses and analytical processes.</u>

30.     Since 2005, I have performed extensive 'Forensic Engineering' evaluations and analyses associated with the failure of I-walls and sheet pile walls that developed in the Greater New Orleans Area during Hurricane Katrina (Bea 2008a, 2008b, 2008c, 2009a, 2009b, 2009c). These 'case history' based Forensic Engineering analyses have involved the breach at the 17th Street Canal (Orleans Parish side) and the near-

breach at the 17th Street Canal (Jefferson Parish side), the London Avenue Canal North breach and near breach, the London Avenue Canal South breach and near-breach, the Bayou Bienvenue flood control structure breach, the Bayou Dupre flood control structure breach, and the North, South, and Near Breaches that developed at the Lower 9th Ward during Hurricane Katrina. These analyses have consistently explained the breach and near breach causations including their locations and the time period for their development. The timing of development of the breaches have been corroborated with available reliable eyewitness reports and testimony, as well as, video and still photographs. <u>All of the hydraulic conductivity analyses associated with these Forensic Engineering analyses have been based on '*Steady Flow*' soil water flow conditions.</u> The qualitative and quantitative analyses including those from the steady flow analyses and associated I-wall – sheet pile wall '*Uplift Pressure*' stability analyses have been published in multiple peer review journal publications and in expert reports and other documents produced in connection with the Forensic Engineering analyses of the breaches addressed in the Canal Breach Litigation, the MRGO-Robinson Litigation, the Barge Litigation, and the Litigation that has specifically addressed the effects of the East Bank Industrial Area site clearing activities.

## Hydraulic Conductivity Pressure Analyses Validations

31.     A critically important part of forensic engineering analyses is validation – verification of the complex qualitative (reasoning, sensemaking) and quantitative (numerical simulations) 'models' used in such analyses. In my forensic engineering work associated with this litigation, I have provided validations of the quantitative analytical 'models' that have been associated with results from field experimental programs (e.g.

USACE E99 pile load tests, USACE Atachafalaya levee load tests) and from analyses of breaches involving soil levee – sheet pile supported concrete 'I-walls' and sheet pile walls that occurred during Hurricane Katrina (17th Street Canal, London Avenue Canal North, London Avenue Canal South, Bayou Dupre, Bayou Bienvenue). These validations have been documented in my previous Expert Reports to the Court (Canals, MRGO Armstrong, Tenent Memorial Hospital, Lower 9th Ward) and in refereed conference and journal papers which are listed in my Appendix A of my February 21, 2012 Expert Report.

32.    All of these quantitative model validations have involved analyses of the hydraulic conductivity pressure – and as appropriate – flow (water quantities, velocities) assessments. All of the hydraulic conductivity pressure and flow analyses have been correctly and consistently based on '*Steady Flow*' conditions in which there are no significant changes in soil – water porosity, void ratio, or saturation.

33.    Since 2008, I have been the Principal Investigator in a research project sponsored by the National Science Foundation (NSF). The research project is identified as the NSF RESIN (Resilience and Sustainability) California Delta Infrastructure Systems Risk Assessment and Management (RAMs) Project.[2] This project has involved 12 Co-Principal Investigators, 19 Graduate Student Researchers and Post-Doctoral Stdents, and 48 External Advisors and Collaborators (representing the various infrastructure systems from state government agencies and private comapnies). An important part of this project has involved analyses of the performance characteristics of

---

[2] http://ccrm.berkeley.edu/resin_site_sandbox3/index.shtml,
http://www.youtube.com/watch?v=n7nAz9MH3-0

the levees during storm flooding conditions. These levees are one of the critically important infrastructure systems located in the California Delta.

34.    These flood protection levees are very similar to those that protect the Greater New Orleans area. They are manmade 'legacy' levees (initially developed in the 1850s) that have experienced a large number of failures – breaches – developed during storm flood and 'normal' water conditions (Figure 11). These levees were built on the swamp – marsh deposits developed by the Sacramento – San Joaquin River Delta. Like the levees that protect the Greater New Orleans area, these levees were first built using 'hand tools' (wheelbarrows and shovels) and 'human laborers'. As the multiple interconnected, interactive, and interdependent infrastructure systems (e.g. human habitation, recreation fresh water supply, transportation, electric power, telecommunications, gas storage, natural environmental) were developed in this area, the levees were periodically 'improved'. Their crest elevations and cross-sections were increased and additional drainage facilities provided.



Figure 11: California Delta 'legacy' levees breach with a frequency of almost 2 per year due to storm high water seepage effects developed in the buried swamp – marsh deposits under the levees.

26

35.     The primary goal of the NSF RESIN research project is to develop, validate, and apply advanced 'Interconnected, Interactive, Interdependent Infrastructure Systems' RAM methods to help better manage this vital public and natural 'infrastructure systems resource' – and in the process develop a new field within the engineering profession – 'Infrastructure Engineering' (Bea et al, NSF Project Proposal, 2008).

36.     During 2009 – 2011, the research was focused on one specific location in the California Delta – Sherman Island (Figure 12). Sherman Island is bordered by the Sacramento and San Joaquin rivers and is located at the 'entrance' to the California Delta. Sherman Island is a cross-road for a wide variety of critical public infrastructure systems and is located within a very important and sensitive natural environmental infrastructure system. Sherman Island is part of the system of similar islands that provide a 'transportation system' for fresh water from northern California that is exported to southern California by the California aqueduct system. Because Sherman Island is located at the interface between the saline waters of San Francisco Bay and the fresh waters of the California Delta, if the levees defending this island breached, the island which is now located approximately 30 feet below sea level would flood catastrophically. The flooding of this island and other nearby islands would allow the saline waters of San Francisco Bay to intrude into the fresh water system that provides fresh water for the California infrastructure systems in the Greater San Francisco area and in Central and Southern California. There would also be catastrophic effects to the other infrastructure systems located in and crossing this area. Like the levees that protect the Greater New Orleans Area, it is extremely important to accurately understand the risks associated with failure of the Sherman Island levees so that appropriate risk management approaches and

strategies can be developed and employed to manage the risks to be acceptable and desirable (Bea et al, 2009).



Figure 12: Sherman Island in the California Delta – Sacramento River to North, San Joaquin River to south of Sherman Island (Bea, Brodsky, and Storesund 2011). Location of recording piezometer arrray shown.

37.     During 2009 to 2011, part of the NSF RESIN research team addressed the performance of the Sherman Island flood protection levees during storm flooding events. Because of the historic dominance of hydraulic conductivity – seepage – breaching of the Delta levees, the project addressed validations of the qualitative and quantitative analytical models used to evaluate these effects (e.g. SeepW). The results from this work were documented in a report to the National Science Foundation titled "*A Method to Determine Probability of Failure Cause by Seepage Under Levees, Sherman Island Pilot*

*Project*" (Bea, Brodsky, and Storesund 2011).[3] Because of the unique geological and geotechical characteristics of the Sherman Island levees, particular attention was devoted to seepage pressure and seepage water movements through the buried swamp – marsh organic clay and silty clay (with Peat layers) deposits buried under these levees. These analyses utilized the "Levee Vulnerability" technology and hydraulic conductivity processes developed and applied as part of the California Department of Water Resources 'Delta Risk Management Strategy' (URS Corporation / Jack R. Benjamin & Associates, Inc.  2008).

38.     Five piezometer locations on the southern portion of the Sherman Island levee bordering the San Joaquin River were studied (Figure 12). These piezometers were installed by the California Deparment of Water Resources and Sherman Island Levee District at part of their '5 Year Plan' to evaluate the probabilties of failure (breaching leading to flooding of the island). The piezometer readings (pressure) allowed definition of 9 'transient' (time varying) hydraulic loading conditions (rising water levels in the river) associated with severe storms that occurred during the winter of 2006. The piezometers were embedded in the buried swamp-marsh deposits under the levee (Figure 13).

---

[3] *A Method to Determine Probability of Failure Caused by Seepage Under Levees* by Robert G. Bea, R. Miles Brodsky, and Rune Storesund has been provided as a reliance document that accompanies this expert report. Source citation is *2011 RESIN Sherman Island Pilot Project 2 Seeepage Report to National Science Foundation, Center for Catastrophic Risk Management, Institute for Economics and Business Research, University of California, Berkeley, April 2011.*



Figure 13: Sherman Island piezometer locations and soil stratrigraphy (Bea, Brodsky, Storesund 2011).

39. The same qualitative and quantitative analytical methods used to evaluate the 'Steady Flow' hydraulic conductivity effects at the Lower 9th Ward were used in analyses of the 9 'transient' hydraulic loading 'Steady Flow' hydraulic pressure conditions. These 'transient' 'Steady Flow' hydraulic loading conditions included severe storms that affected the California Delta and San Joaquin and Sacramento rivers during 2006 (Figures 14 - 17). These conditions included those in which the levees were overtopped by the river mean water elevations (equivalent of hurricane surge) and wind waves.

30



Figure 14: Sherman Island levees during 2006 'transient' storm water 'loading' conditions (Bea, Brodsky, and Storesund 2011).



Figure 15: Sherman Island levees during 'transient' storm water 'loading' conditions (Bea, Brodsky, and Storesund 2011).

31



Figure 16: Sherman Island levees during 'transient' storm water 'loading' conditions (Bea, Brodsky, and Storesund 2011).



Figure 17: Sherman Island levees during 'transient' storm water 'loading' conditions (Bea, Brodsky, and Storesund 2011).

40.     The levee – soil characteristics were evaluated using several analytical models to describe the soil stratrigraphy, geometry, and hydraulic loading (river water elevation) and soil-water conductivity characteristics. '*Steady Flow*' conditions were used for all of the hydraulic conductivity analyses. The same computer program – SeepW - used for the Lower 9th Ward hydraulic conductivity analyses was used to perform these analyses (Figure 18). The same procedures used to determine the hydraulic conductivities of the soils were used in these analyses (results from field and laboratory permeability tests).  The horizontal hydraulic conductivities of the buried swamp – marsh organic clay deposits were determined to have a 'best estimate' value of 1 x 10[-4] centimeters per second (cm/s) with a plus – minus one Standard Deviation range between 1 x 10[-3] and 1 x 10[-5] cm/s (inset Figure 18).



Figure 18: Example SeepW '*Steady Flow*' hydraulic conducitivity analysis results that show development of the hydraulic pressures below the levee for the 'transient' storm water elevation in the San Joaquin River (Bea, Brodsky, and Storesund 2011).

41.     The results from the measured pizometer pore water pressures and the analytically determined pore water pressures were compared using a 'Bias' term. 'Bias' (Bx) associated with the porewater prediction analytical process (inputs, numerical analysis, outputs - x) is defined as the ratio of the <u>measured</u> pore water pressure ('true' value, Tx) to the analytlical <u>predicted</u> pore water pressure ('nominal' value, Nx) (Bx = Tx/Bx). Based on results from field and laboratory tests, all of the soil – levee characteristics were characterized statisticallly. 'Best Fit' probability distributions were used for all of the important properties. Potential variabilities in the geometry – stratrigraphy of the 2D cross-section were analyzed using three different potential realizations of the geometry – stratigraphy. 'Best Estimate' stratigraphy, geometry, and hydraulic loading and soil-water conductivity characteristics were identified using this process.

42.     A mean (average) 'Bias' of unity (Bx = 1.0) means that the pore water pressures predicted by the analytical model <u>equal</u> the measured pore water pressures. The data also allowed estimation of the uncertainty - variability associated with the 'Bias'. This uncertainty was expressed as the Coefficient of Variation ($COV_{Bx}$) of the 'Bias' – the ratio of the Standard Deviation to the Mean of the Bias values. The statistical distribution that provided a 'best fit' to the Bias data was a LogNormal distribution (a Normal distribution of the logarithms of the Bias values).

43.     The Mean Bias values from the 9 piezometer measurements ranged from 0.80 to 0.96 (Table 1). The overall Mean Bias was 0.89. This indicates that the analytical

model had a tendency to 'over predict' the hydraulic conductivity pressures in the buiried

swamp – marsh deposits by about 10%. The Bias COV was 8% (Figure 19). [4]



Figure 19: Statistical characteristics of 'Steady State' hydraulic conductivity pressure analytical model 'Bias' in Sherman Island swamp – marsh (Peat) deposits (Bea, Brodsky, Storesund, 2011).

44.     This Bias COV is based on the Mean or average results from the analytical models employed in the comprisons with the piezometer measurements. This Bias COV does not include the uncertainties in the soil conditions, characteristics, and hydraulic pressure conductivity characteristics (e.g. horizontal and vertical permeabilities). When these Type I (natural variabilities) uncertainties were included, the Bias COV increased to 30% to 40% (example shown in Figure 20). Conspicuously absent from the Defense Experts' reports is any inclusion of any "variability" or "uncertainty"

---

[4] For comparison, the COV associated with quality controlled manufactured steel tension yield strengths is in the range of 8% to 10%, for high quality controlled concrete compressive strengths is in the range of 8% to 15%, and for natural deposits cohesive clay soil shear strength is in the range of 20% to 30% (Bea 2011).

in soil conditions due either to a fundamental misunderstanding or heaven forbid "confirmational bias".



Figure 20: Example piezometer 6 Results With Soil Characteristics Type 1 Uncertainties Included (Bea, Brodsky, Storesund 2011).

Table 1: Comparison of Measured and Predicted Hydraulic Conductivity Pore Water Pressures During Transient Hydraulic Loading Conditions.

| Piezometer Record No. | Measured Pore Pressure (pounds per square inch) | Avg. Predicted Pore Pressure (pounds per square inch) | Bias, Bx |
|:---:|:---:|:---:|:---:|
| 1 | 3.15 | 3.28 | 0.96 |
| 2 | 5.13 | 5.47 | 0.94 |
| 3 | 5.13 | 5.46 | 0.94 |
| 4 | 7.21 | 7.86 | 0.92 |
| 5 | 16.18 | 19.41 | 0.83 |
| 6 | 21.11 | 26.59 | 0.79 |
| 7 | 7.4 | 8.09 | 0.92 |
| 8 | 13.49 | 15.74 | 0.86 |
| 9 | 20.44 | 25.59 | 0.80 |

45.     The primary conclusion I have drawn from these research results is that the '*Steady Flow*' hydraulic conductivity pressure analyses results developed using quantitative analysis processes employed in the computer program SeepW provide acceptably accurate results to use in Forensic Engineering evaluations of the soil pore water pressures developed under the levee – flood wall system that protected the Lower 9th Ward during Hurricane Katrina.

46.     This conclusion is substantiated by the guidelines published by the USACE during 2011 for the design and analysis of I-walls subjected to hurricane surge and wave conditions (USACE 2011). These guidelines explicitly address both seepage (water velocity and quantity) and uplift pressure effects on the performance of levee – I-wall flood protection structures (USACE EC 1110-2-6066, EM 1110-2-1901, EM 1110-2-13, EM 1110-2-2504). As detailed in the references cited, these guidelines have been validated using results from a large number of full scale field load test experiments during a 50-year period (E99 Atachafalaya floodwall tests; Paducah, Kentucky cofferdam sheetpile tests; Tell City, Indiana I-wall tests. See Appendix H in USACE EC 110-2-6066), hydraulic conductivity field experiments (e.g. those performed as part of the London Avenue Canal floodwall tests, Brandon et al 2008, USACE 2008, Black & Veatch 2009) and I-wall performance analyses of breaches that developed in the Greater New Orleans Area flood protection structures during Hurricane Katrina (USACE EC 110-2-6066). It is important to recognize that the London Avenue Canal floodwall tests involved extensive testing and analysis to determine the hydraulic pressure effects generated in the marsh, lacurstrine clay (lake deposits) and Pine Island Beach sands found at this location. These hydraulic conductivity analyses were based on '*Steady*

*Flow*' conditions (USACE 2008, Black & Veach 2009). This full scale field experimental program developed very important information regarding the rapid formation and propagation of the 'tension crack' that develops on the flood side of sheet pile supported concrete I-walls.' Results from this experimental program will be addressed in the next section of this rebuttal report in the context of assessment of the analytical methods used by the Defense Experts to determine the causation of the North Breach and South Breach at the Lower 9th Ward during Hurricane Katrina.

## Engineering Standard of Care

**Engineers' Creed:**

As a Professional Engineer, I dedicate my professional knowledge and skill to the advancement and betterment of human welfare.

**I pledge:**

> To give the utmost performance.
> To participate in none but honest enterprise.
> To live and work according to the laws of man and the highest standards of professional conduct.
> To place service before profit, the honor and standing of the profession before personal advantage, and the public welfare above all other considerations.

In humility and with need for Divine Guidance, I make this pledge.

*(Adopted by the National Society of Professional Engineers, June 1954).*

47.     Any analysis of the standard of care must begin with an understanding of the fundamental principles of the scientific method.[5]   The utilization of sceptical empiricism, or the belief that theories must be tested against observations of the natural

---

[5] Reference my February 1, 2012 Expert Report that addresses application of the scientific method in my Forensic Engineering causation analyses.

world rather than resting on intuition, lies at the heart of any engineering analysis. A good working definition of the standard of care for a professional is presented in a standardized jury instruction Bench Approved Jury Instruction 6.37 (BAJI) which reads:

> *"In performing professional services for a client, a professional has the duty to have that degree of learning and skill ordinarily possessed by reputable professionals, practicing in the same or similar locality and under similar circumstances. It is further his or her duty to use the care and skill ordinarily used in like cases by reputable members of his or her profession practicing in the same or similar locality under similar circumstances, and to use reasonable diligence and his or her best judgment in the exercise of professional skill and in the application of learning, in an effort to accomplish the purpose for which he was employed."* (Kardon, 2003).

48.     Louisiana specifies a similar standard, wherein the general standard of care applicable to all professionals, including engineers, is that the services be performed with the same degree of skill and care exercised by others in the same profession in the same general area.  Specifically, <u>an engineer has a duty to do no harm to an engineered system</u>; and the responsibility of any prudent engineer, particularly a geotechnical engineer, is to evaluate and monitor the potential impact certain work may have on adjacent structures.

49.     This evaluation process begins at the project's inception and continues throughout project's duration (Bea 2011).  If conditions previously understood to exist change because of some project modification, some new, unforeseen discovery, or other event, (e.g., different field conditions are found relative to the initial design conditions), a reasonably prudent engineer must re-evaluate their design/plan and determine whether these

changed conditions are going to have an impact on the surrounding environment.  This is termed in engineering as employing *"The Observational Method."*  I addressed thhis topic extensively during the MRGO – *Robinson* litigation and trial.

50.     In this case, the USACE (and its contractors) installed the floodwall that lined the eastern bank of the IHNC between Florida and Claiborne Avenue in about 1967 – 1969 (Rogers 2012).  Once the Corps and WGI undertook their EBIA site clearing activity pursuant to the TERC and Task Order 26, they had a duty to evaluate potential impacts of the contemplated excavation activity on the adjacent floodwall.  Put simply, the Corps and WGI—an architect-engineer (A-E) contractor—had a duty to "not break the wall" and to not do any act which would increase it's risk of failure.  As specified by Dr. David Rogers, the Risk Consequence Analysis (identifying the risk involved versus what would be the consequence of failure) must control.[6]  Guidance on the "Standard of Care" is also available through technical writings.[7]  Based upon evidence available to date, these resources were ignored.

51.      WGI, by assigning a non-engineer to evaluate the project and develop an integrated systems approach to the work, failed to identify the interdependency between the alteration of field conditions and the increase of the hydraulic gradient through the permeable layer beneath the sheet pile.

52.     The first Fundamental Canon of the American Society of Civil Engineers' (ASCE) Code of Ethic's states *"Engineers shall hold paramount the safety, health, and welfare of the public and shall strive to comply with the principles of sustainable development in the performance of the professional duties."*

---

[6] Rogers deposition, p. 205, l. 7-21.
[7] Sykora deposition (draft copy), p. 64, l.2-8; Kardon, Bea, and Williamson 2006, Bea 1999, 2005.

In order to meet this tenet, all engineering disciplines recognize that guiding principles are necessary to inform decisions, drive actions, and align behaviors to assure that the proper execution of a project. The first such principle is to quantify, communicate, and manage any risk associated with the work. Here, WGI failed to meet a basic engineering principle because it failed to quantify the risk to the adjacent floodwall associated with the changing field conditions at the EBIA and communicate the effect on underseepage factors of safety.

53. Despite substantial documentation indicting that geotechnical and associated hydrological analysis was a component part of the design of the EBIA project, no such evaluations were performed on the excavation and backfill activities at Boland and Saucer Marine. Because of this failure, the Corps and WGI did not recognize that their excavation activities were opening conduits and connections for storm water and the IHNC floodwall, creating a hydraulic connectivity that played a substantial role in causing the North and South Breaches. In essence, the eyes could not see what the mind was unprepared to comprehend.

54. **The TERC, Task Order 26, and the EBIA Site Clearing Activity:** Because the EBIA project was considered a Hazardous, Toxic, and Radioactive Waste (HTRW) site, the Corps sought funding through the Total Environmental Restoration Contract (TERC) program. In such situations, the Corps merely instigates/initiates the project, and the contractor is expected to provide complete architectural-engineering services support the implementation of the project.[8]

55. To facilitate the EBIA project, the Corps engaged WGI pursuant to the TERC contract, through what became known as Task Order 26. The TERC contract specified that the Corps would provide a Statement of Work, but the contractor would have to provide

---

[8] WGI (Viegel) deposition, p. 87.

additional input to support the planning, scheduling, and formulation of the Statement of Work for the Task Order.[9]  The TERC also indicated that the Corps would provide backup data to the contractor to begin the process.[10]  Requirements related to the remedial action were to be described in the Statement of Work, and WGI was required to perform all necessary actions to address specific requirements of the Task Order.[11]  Specific requirements concerning investigations and studies were to be included in the Task Order.[12] WGI was to provide complete architect-engineering services to support the implementation of remedial actions, with the specific requirements to be identified in the Task Order.[13] George Bacuta, the Project Delivery Team geochemist, believed that WGI's accurate understanding of the floodwall's sheet pile tip depth was important enough that this document was provided.[14]

56.    WGI was required to write a Work Plan (WP), which would describe WGI's detailed approach for the performance of the Task Order.[15]  This WP is based on the Corps's Statement of Work.[16]  In developing the plans and specifications for this project, WGI was obligated to evaluate its excavation and backfill procedures to determine their impact on the stability of the flood project.  Such considerations would include the necessary subsurface investigations to obtain geotechnical properties necessary for underseepage analysis, including seepage forces, hydraulic gradients, and

---

[9] TERC, at Section 2**.**

[10] TERC, at Section 2.

[11] TERC, at Section 2.2.

[12] TERC, at Section 2.3.

[13] TERC,  at Section 2.4.

[14] Bacuta deposition, p. 102.

[15] Corps Statement of Work dated June 1, 1999.

[16] Sykora says this is a general description of work the contractor is required to perform,  TERC Section 3.

uplift pressure.[17] Lee Guillory, the Project Delivery Team manager, explained that the Corps expected geotechnical support from WGI in that they had a staff at home office in Denver that could be called upon for any geotech support. Further, the Corps had an expectation that WGI would advise Corps about the particularities and nuances of the site, and that they would advise Corps of any geotechnical issues that they encountered. [18] This expectation included any potential effect or damage to the flood wall, and that the licensed engineers that WGI hired would address those issues.[19] This was particularly important to Mr. Guillory because he was not an expert on seepage issues.[20]

57.     On June 1, 1999, the Corps issued to WGI a Statement of Work for Demolition and Site Preparation.  Here the Corps identified project requirements: WGI "**shall** **furnish** **all** **engineering** **services**, materials, supplies, labor, as required, in connection with the technical review of site documents...associated with the demolition and remediation" of the EBIA.[21]  In addition, WGI was to "prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to be filled by sampling or other investigations."[22]  Among the documents provided to WGI was the Assessment of Potential Hazardous, Toxic and Radiological Waste, Volume 5 of 9, Appendix C, which

---

[17] EM 1110-2-1913 – Design and Construction of Levees.

[18] Corps of Engineers (Guillory) deposition, p. 150-151.

[19] Corps of Engineers (Guillory) deposition, p. 166-167.

[20] Corps of Engineers (Guillory) deposition, p. 219

[21] Corps Statement of Work dated June 1, 1999.; *see also* USA Summary Judgment Memorandum at p. 40, Aug. 8, 2010 (Doc. No. 19988-4) ("To be sure, the Corps brought its own engineering expertise to bear in reviewing and approving WGI's work plans. But reliance on *WGI's engineering expertise and its subcontractors' expertise cannot be discounted*. The EBIA remediation and demolition was premised on the requirement that WGI would "furnish all services, materials, supplies, labor, and travel, as required," including specifically "*all engineering services*.")  (emphasis added).

[22] Corps Statement of Work dated June 1, 1999.

discussed sampling and analysis of groundwater, and most importantly identified the sheet pile curtain tip depth as -8 feet.[23]

58. WGI tasked Dennis O'Conner with this review responsibility.[24] Notably, Mr. O'Conner is not an engineer.[25] Mr. O'Conner, along with Jim Blazek of Materials Management Group (WGI's remediation sub-contractor), reviewed the materials and developed the Recommendation Report, dated December 2, 1999.[26] WGI defined the purpose of the report as "present[ing] recommendations regarding the scope and duration of remediation/ demolition activities" at the EBIA.[27] WGI conceded that there were a number of "data gaps" that would affect the schedule, cost, and overall scope of work.[28] These data gaps might need to be filled by "sampling or other investigations."[29]

59. WGI's review of the Assessment of Potential Hazardous, Toxic and Radiological Waste, Volume 5 of 9, Appendix C, led to the understanding that EBIA's "groundwater was impacted but...the size of the contaminant plume was not determined."[30] This became a "data gap" as the contamination plume areas and depths were not identified.[31] WGI stated that the impact of some data gaps would need to be addressed by "associated fieldwork."[32] As the defense expert Dr. Lucia recognized, this

---

[23] 1997 New Lock and Connecting Channels report, Volume 5 of 9, Appendix C.

[24] WGI (Roe) deposition, p. 41.

[25] O'Conner deposition, p. 16.

[26] WGI (Roe) deposition, p. 63-64.

[27] Recommendation Report, § 1.0.

[28] Recommendation Report, § 1.0.

[29] Recommendation Report, § 2.0

[30] Recommendation Report, § 3.1.1.1.

[31] Recommendation Report, § 3.1.1.1.

[32] Recommendation Report, § 3.1.1.1.

included an understanding of the groundwater pathways and where the water was likely to go.[33]

60.     Of equal interest was WGI's acknowledgment that there was a high water table running through the EBIA site,[34] and that during the course of excavations "there is a high probability that groundwater will be encountered."[35] Such information gives the geotechnical engineer the knowledge that the soil layers are hydraulically charged and having a greater response to pressure gradients. As shown in Figures 37a and 37b of my February 1, 2012 Expert report and discussed therein, the USACE and WGI had information that clearly indicated the ground water level (phreatic surface) in the soils adjacent to the IHNC had been allowed to penetrate essentially unchanged to the face of the floodwall (WGI 2005 Ground Water Monitoring Report, Figure 21). This information provided 'early warning signals' that the EBIA river sand backfilled excavations at the north end of the Boland Marine site had established direct hydraulic 'connections' with the sandy – shell fill under the Surkote Road overpass. As indicated in the e-mail exchange betweeen George Bacuta (C MVN, USACE), Richard Lesser and Lee Guillory (8/3/2005 5:18 PM):

> *"Note that the 1997 report groundwater flow information (actually the groundwater data was collected in 1993/1992?) indicate the influence of the structures (foundation of buildings, canal drainage, etc.) present at that time on the shallow gw (ground water) flow. After remediation, the structures are gone, the soil subsurface had been modified on account of excavation/removal/new fill,*

---

[33] Dr. Lucia, deposition transcript, p. 131. l. 7-24.

[34] Recommendation Report, § 4.1.

[35] Recommendation Report, § 5.13.

*the groundwater flow information (taken by WGI in May/June 2005) <u>points to a flow away from the Canal</u>. (underline added for emphasis)."* (Exhibit 16, Deposition of Geeorge Bacuta).

61.    Photographs of this area clearly indicated that the waters in the IHNC were in direct communication with the soils adjacent to the floodwall at the north end of the Boland Marine Site (Figure 22).



Figure 21: Section from WGI Ground Water Monitoring report showing the ground water elevation contours at the Boland Marine site (after Marino 2010). Note the ground water elevations near the IHNC reach to the location of the future North Breach.



Figure 22: Photograph (WGI013699) looking south from the Surkote Road overpass toward the EBIA and IHNC (WGI 2005) after storm has passed.

62.     After the documentation review, WGI recommended that specific work plans be prepared to provide "guidance and requirements for technical field execution."[36] The plans and procedures were not definable features of site work, but WGI recommended that "considerable effort should be put forth to ensure that each plan be specifically tailored to meet the needs of the demolition and site preparation efforts."[37] As part of the Project Work Plan, WGI indicated that "systematic units of work" would be "integrated into the overall project" and that "**engineering details**" of the PWP would include "**geotechnical**" and "**geology/hydrology**" engineering details.[38]

---

[36] Recommendation Report, § 5.1.2.

[37] Recommendation Report, § 5.1.2

[38] Recommendation Report, § 5.1.2.1.5 [emphasis added].

63.     In acknowledging that demolition would be a "substantial portion of the overall project work," WGI implemented a comprehensive approach to the site demolition activities that included "inspection and evaluation of demolition and site preparation results."[39] WGI recognized that certain permits would be necessary, and that one of the "permits required was expected to be" from the Orleans Levee Board.[40] For the remediation aspect of the project, WGI acknowledged responsibility of site investigation for the "identification of the horizontal and vertical extent of the impact" and "identification and characterization of migration pathways and receiving media."[41]

64.     The Corps presented to WGI a Second Statement of Work on May 15, 2000.  Again, WGI was to "**furnish all services...as required**" to develop the work plans "in accordance with the…Recommendation Report."[42]

65.     Prior to the completion of the Project Work Plan, WGI began development of the Recap Submittal Report - Criteria Document in June, 2000.  In that report, WGI mistakenly informed the Corps's EBIA Project Delivery Team that "the floodwall to the east of the site is supported on sheet pile that reaches a depth of at least 25 feet and this would essentially interrupt the water flow in the easterly direction at lower elevations to 25 ft."[43] The EBIA Project Delivery Team had convinced themselves that there were no problems with IHNC water reaching the face of the floodwall because the floodwall sheet piling were deep enough to cut off any 'seepage flows'. This mistake combined with the

---

[39] Recommendation Report, § 5.1.2.1.8. [emphasis added].

[40] Recommendation Report, § 5.1.4.

[41] Recommendation Report, § 5.8.

[42] Corps Statement of Work dated May 15, 2000. [emphasis added].

[43] WGI 003567 - § 4.2.

other mistakes that accumulated during the life of the floodwall protecting the Lower 9th Ward proved to be disastrous when Hurricane Katrina tested this 'system'.

66.     The final Project Work Plan, dated October, 2000, indicated that WGI was being "tasked to **furnish all services**...for the project site development and remedial action" of the EBIA.[44]   As such, WGI was responsible for the implementation of the overall project, MMG was to provide environmental engineering and overall project support, while WGI subcontractors would complete the demolition aspects.[45]

67.     In 2005, just before Katrina, George Bacuta, the Corps's PDT geochemist, highlighted the concern for understanding the extent of the groundwater plume by pointing out that the soil subsurface had been modified enough that current groundwater flow pointed to flow away from the canal to "groundwater and drainage across the floodwall - geotech maps show that the sheet pile goes down to -8 feet.;"[46]

68.      Despite the concern here for groundwater conductivity beneath the floodwall, the misunderstanding of the consequences resulting from altered field conditions on the flood side of the EBIA floodwall led to a fundamental misunderstanding of the hydrological forces in effect during hurricane Katrina.   The cumulative effects of failures to properly observe early warning 'signals', to properly interpret these 'signals,' and take appropriate corrective action did not meet the Engineering Standard of Care.   This substandard conduct was ultimately a substantial factor in causing the failures which inundated the Lower 9th Ward.

---

[44] Project Work Plan, § 1.0. [Emphasis added].

[45] Project Work Plan, § 2.1.

[46] Email dated August 3, 2005, WGI 079929.

69.     Another core principle required of all engineers is to adapt to dynamic conditions of the project.  As in many engineered systems, a project is designed to conform to performance levels deemed appropriate at the time of the design. In the present case, the original design of the flood wall is found in the 1966 Design Memorandum No. 3.  However, the field conditions of the EBIA were drastically changed by the work WGI was performing. WGI failed to consider the impact of these changing field conditions and failed to exercise the level of care expected of prudent engineers by <u>not</u> adapting their work to address these altered aspects of the project.

70.     When expressing the applicalbe Engineering Standard of Care, it must be emphasized and particular attention must be focused on the word 'Care.' This raises the question: "What is 'Care' with regard to engineering?"  In engineering 'Care' is defined as consisting of five elements: 1) Attentiveness, 2) Responsibility, 3) Competence, 4) Responsiveness, and 5) Integrity (Toronto 1993, Kardon 2003). Toronto (1993) examined the ethic of care, and describe care as a response of one person to anoter based on more than self-interest; a "taking of the …needs of the other as the basis for action." Tornoto (1993) defined engineering 'Care' as an "activity that includes everything that we do to maintain, continue, and repair our 'world' so that we can live as well as possible."

71.     Toronto (1993) describes the five elements of the ethic of care as:

a.  **Attentiveness:** caring about; noticing the need to care, or recognizing the need of others.

b.  **Responsibility:** taking care; having more than an obligation, but a responsibility arising in part from one's position or knowledge.

c.  **Compentncy:** care giving; having the abilitiy to carry out the caring act effectively and correctly.

d. **Responsiveness:** care receiving; being receptive to care, being aware of the care receiver's perceptions.

e. **Integrity:** acknowledging the interrelationship of the above four elements.

72. Toronto states: *"Those who engage in care processes must make judgments about needs, conflicting needs, strategies for achieving ends, the responsiveness of care-receivers, and so forth. Care rests on judgments that extend far beyond personal awareness…[and] require an assessment of needs in a social and political, as well as personal, context."* Other practitioners have addressed how the eithic of care can be applied to the process of engineering design (Pantizidou 1999, Kardon 1999, Bea 2009).

73. *Kardon (1999) states: "Care is necessary in every engineering activity. The art of engineering comes into play whenever an engineer makes an aesthetic, economic, or technical choice amoung several possible solutions. Engineering is also a service profession, the purpose of which is to assist others in accomplishing goals. An Engineer's performance in any of the activites can be assessed considering the engineer.'*[47]

74. At one point during day two of my recent Expert Report deposition (March 28, 2012), I became somewhat emotional as I remembered and reflected upon the damage done in the Lower 9th Ward to the people, their homes and property, their families and lives. I understand and believe that several hundred people lost their lives in the Lower 9th Ward as a direct result of the flooding caused by Hurricane Katrina (Figure 23). I arrived in the Lower 9th Ward very early after Hurricanes Katrina and Rita passed

---

[47] I was Dr. Joshua Kardon's Doctoral Research Advisor 1998 – 2003.

(September 29, 2005). The place was a quiet, mud-caked, soggy destroyed 'battlefield'. I looked into some of the homes adjacent to Jourdan Road that had not been obliterated. People's treasured life 'things' were strewn about in the mud. I saw a car next to one home with a shovel handle sticking from under the rear tire of a car that had become stuck in the mud as the residents tried to use the car to evaculate their home and belongings. I walked alone through a nearby church, over the strewn pews and water logged bibles, and saw the 'blood, sweat, and tears' of those who had struggled hard to build their lives, families, community, and church in this place.  I cried tears of frustration because I knew what they felt like because I too had experienced the same thing almost 40 years to the day earlier as my family attempted to salvage our home and belongings following the breaching of the levees that protected New Orleans East during Hurricane Betsy (1965).[48]

75.    But, these tears were also because I "care" deeply as a professional engineer.   Over the course of 23 years, I instilled in several hundred engineering undergraduate and graduate students at the University of California Berkeley that it is our job to give 'Care', to have 'Integrity', and to 'Do No Harm' – the hypocratic oath of an engineer (Bea 2001a, *Thoughts at Graduation; Bea 2001 b, The World Needs Engineers with Integrity*)[49]. So, I confess, that when reminded of the carnage the North and South breaches along the IHNC-EBIA caused, I did become emotional during my recent deposition. I feel very strongly that engaging in substandard "engineering" activities

---

[48] The same levees broke again during Hurricane Katrina – one in the same place that failed during Hurricane Betsy (ILIT 2006). *"Those who cannot remember the past are condemned to repeat it."* (George Santayana, *The Life of Reason*, 1905-1906) as recited at p.8, *Guiding Principles for the Nation's Critical Infrastructure* (ASCE, 2009).

[49] Copies of these documents have been included in my reliance materials that accompany this report.

which take the lives of innocent people, destroys their homes, their livelihoods, and their neighborhoods and their lives IS NOT an acceptable demonstration of "generally recognized engineering principles and practices" nor a proper 'Engineering Standard of Care.' This is especially true, when such tragedies are the result of both predictable and preventable failures of engineered flood protection systems.



Figure 23: From "Study of Hurricane Katriona's dead show most were old, lived near levee breaches" (by Mark Schleifstein, The Times-Picayune, August 27, 2009).

## II.  Preliminary Defense Expert Report Review Observations

## Introductory Comments

76.     I received the last of the nine Defense Expert reports on March 22, 2012 (Dalrymple report).  I received the first of the Defense Expert reports on March 10, 2012. By March 24, 2012 I received the majority (not all) of the reliance documents and requested files used in development of the Defense Expert reports. I have read each of the Defense Expert Reports. However, I have had little time (approximately 8 days) to perform detailed reviews of these reports and the associated reliance documents and requested files. I have not had time to review the majority of the reliance documents and requested files.  As a result, and detailed earlier, I reserve the right to supplement this rebuttal report and my original expert report and to expand or modify any of my opinions based on review of defendants' experts' materials as well as any additional material that may become available through ongoing discovery and/or through any additional work or review of additional work performed by others.

77.     In addition, time devoted to travel, preparation for my deposition and the deposition itself, concerning the contents of my February 1,  2012 Expert Report, consumed every bit of the period March 25 through March 29. This left me with approximately 4 days to write this Rebuttal Report, counting the day of my return travel.

78.     Due to the very limited time I was provided by the Court to review the Defense Expert Reports and to write this Rebuttal Report, I concentrated my reviews on the reports written by Drs. Marr, Silva-Tulla, Brandon, and Stark. I have not been provided with sufficient time to fully perform independent analyses to validate the new information and analytical results provided by the Defense Experts in their reports.

Consequently, my review and observations documented in this report are preliminary and subject to change. Nonetheless, several critical errors/misconceptions by my counterparts are readily apparent.

79.     I have initiated and plan to complete and document additional analyses of the information and results contained in the Defense Expert Reports, reliance documents and requested analysis files. As allowed by the Court's calendar, I will submit a report to to the Court to document the important new and updated results from my ongoing forensic engineering analyses of the information and results contained in the Defense Expert Reports, reliance documents and requested analysis files.

## Overview

80.     The Defense Expert reports written by Drs. Marr, Silva-Tulla, Brandon, and Stark (all 2012) have provided important new and very useful information and results from their analyses pertaining to the causation of the North Breach and South Breach at the Lower 9th Ward during Hurricane Katrina.

81.     The additional Defense Expert reports written by Drs. Sykora, Lucia, Naymik, Dalrymple and Mr. Dunbar (all 2012) have provided new and useful information, results, and analyses that provide important 'input' information used by the aforementioned Defense Experts in their causation analyses of the North Breach and South Breach (e.g. locations, depths, extents, and backfill characteristics of EBIA excavations). One such example is Dr. Dalrymple's analyses of the flooding of the Lower 9th Ward which rely heavily on the breach development and timing characteristics determined by Drs. Marr and Silva-Tulla.

82.     As I will develop further in the following parts of this section of my Rebuttal Report, the causation analyses of the North Breach and South breach developed by Drs. Marr and Silva Tullaare deeply and pervasively flawed. These critical flaws are developed and repeated throughout the four parts of their causation analyses:

a) Local I-wall overturning instability analyses,

b) Levee soil overtopping erosion analyses,

c) Hydraulic conductivity uplift pressure analyses, and

d) Synthesis, corroboration, and validation of the 'forensic engineering' analyses processes.

Critial to an understanding of the deficiencies in parts (a), (b), and (c) is the complete lack of appropriate validation and corroboration of the qualitative and quantitative analyses−(d)− used in the breach causation analyses performed by Drs. Marr and Silva-Tulla.[50]

83.     Drs. Marr, Silva-Tulla, Brandon, and Stark have concluded that the hydraulic conductivities of the buried swamp – marsh deposits coupled with the EBIA excavations backfilled with 'river sand' and poorly compacted 'native soils' did not contribute significantly to the causation of the North Breach or South Breach. To arrive at this conclusion, they have incorrectly introduced and adopted '*Non Steady Flow*' hydraulic conductivity analyses (Lambe and Whitman 1969) focused on water 'seepage' flow quantities and velocities – not generation of hydraulic pressures. These '*Non Steady Flow*' analyses are based on the introduction of highly time dependent soil void ratio changes (compression consolidation, expansion suction) in the analyses. Although it is

---

[50] See reliance document titled "Validity and Reliability of Engineering Analytical Models and Processes," Center for Catastrophic Risk Management, Univesity of California Berkeley (2001).

not clear at this time, their analyses apparently did not also introduce important changes in the soil saturation. Using different analytical hydraulic conductivity analysis programs and processes, they unanimously agree that the water seepage flow quantities and velocities were not important contributors to the breach causation. However, in doing so they were apparently very careful to avoid or intentionally omit any discussion of the hydraulic pressure effects associated with the results from the hydraulic conductivity analyses.

84.     To explain the causation of the North Breach and the South Breach, Drs. Marr and Silva-Tullaintroduced deep (5 to 6 feet below the levee crest elevations) 'overtopping erosion' of the soils on the protected sides of the levee. This erosion would remove soil that otherwise provided lateral resistance to resist the lateral hydrostatic and hydrodynamic forces imposed on the flood side of the flood wall and sheet piling. These 'locallized' deep erosion 'trenches' act to destabilize the sheet piling supported concrete I-walls (referring to the multiple water-stop connected flood wall sections). The erosion trenches result in reduction of the lateral 'passive soil pressures' that contribute to the wall – sheet piling lateral stability.

85.     Drs. Marr and Silva-Tullahave relied on 'basic geotechnical engineering analytical models' to determine the conditions under which the I-walls at the North Breach and South Breach develop. The analytial model used by Dr. Marr is identified as 'Shoring Suite' (CivilTech Software 2010). The analytical model used by Dr. Silva-Tullais identified as 'CWALSHT' (USACE 2011b, Dawkins 1991).

86.     As far as I have been able to determine, this is the first application of the Shoring Suite analytical model to analysis of the I-wall breaches that developed in the

Greater New Orleans area during Hurricane Katrina. My review of Dr. Marr's resume and reliance documents has not disclosed any similar previous applications of Shoring Suite to analysis of sheet pile supported I-walls subjected to hurricane wave and surge loadings. While this analytical model employs 'basic' fundamental principles in soil mechanics and geotechnical engineering for structures such as retaining walls, Dr. Marr is then forced to combine results from other analytical models to develop the esssential information required for the Shoring Suite quantitative analytical process. One of the important inputs required for the Shoring Suite analyses is characterization of the hydrostatic pressures developed on the flood side of the I-wall by separation of the I-wall from the soils on the flood side of the levee – the so called 'tension crack'. Consequently, another input regarding the effects of hydraulic conductivity uplift pressure effects – is effectively 'eliminated' due to his inappropriate adoption of '*Non Steady Flow*' hydraulic conductivity ('seepage') analyses. In my experience, this combination of quantitative analytical models, input quantities, and 'assumptions' is unique and unproven for the purposes of forensic engineering analyses of I-wall breach causation. Dr. Marr has offered no validations of the assumptions, combinations of analytical models, and quantitative input characteristics used in the combination of analytical models he unilaterally developed and used in his causation analyses of the North Breach and South Breach. These multiple flaws are not insubstantial and result in critically inaccurate results.

87.   Dr. Silva-Tullautilizes the CWALSHT analytical model originally developed by the USACE for analyses of sheet pile retaining walls (Dawkins 1990). The current CWALSHT model was developed by the USACE following Hurricane Katrina

(USACE 2006, 2011a, 2011b). The USACE issued preliminary guidelines for the design of new floodwalls and analysis of existing floodwalls in 2006 and final guidelines in 2011. The final guidelines are titled "Engineering and Design, DESIGN OF I-WALLS (USACE EC 1110-2-6066). The analytical models and guidelines contained in this document have been validated with "four different full scale sheet pile I-wall load tests "performed over a period of approximately  50 years" (USACE 2011). These guidelines provide detailed information to determine wall overtopping hydrostatic and hydrodynamic conditions and effects associated with hurricane suge and winds, formation of overtopping erosion trenches, formation of 'tension cracks, and most importantly <u>analysis of seepage and hydraulic uplift effects</u> (USACE 2011). These guidelines provide detailed procedures for performing hydraulic conductivity analyses associated with I-walls including USACE EM 1110-2-1901 (Seepage Analysis and Control for Dams), EM 1110-2-1913 (Design & Construction of Levees), EM 1110-2-2504 (Design of Sheet Pile Walls), and ETL 1110-2-569 (Design Guidance for Levee Underseeepage). These guidelines also contain extensive references to the results from the London Avenue Canal floodwall tests previously cited. The guidelines for performing hydraulic conductivity analyses to determine the I-wall supporting levee '*Uplift Pressures*' associated with I-walls subjected to huricane surge and wave conditions are founded and based on '*Steady Flow*' conditions and characteristics – <u>not '*Non Steady Flow*' conditions and characteristics mistakenly utilized by Drs. Marr, Silva-Tulla, Brandon, and Stark</u>.

88.     The documentation of Dr. Silva-Tulla's CWALSHT analyses of the I-wall overturning stability occupies 2 pages in Appendix 8 of his Expert Report. The results

from Dr. Silva-Tulla's analyses indicate that the "calculated Factor-of-Safety (FS) equals 1.0 when the depth of scour equals 4 feet" – with reference to the I-walls at the locations of the North Breach and South Breach. Dr. Silva-Tullaprovides no information concerning under what conditions, how or when the depth of scour equals 4 feet. Dr. Silva-Tullaequates a Factor-of-Safety (FS = ratio of total 'Capacity' forces to total 'Demand' forces = C / D) of unity to 'failure'. Given the lack of validations in determination of the Demand and Capacity forces and given the complete lack of evaluation of the uncertainties associated with their analyses (Figure 21, Bea 2009, 2011a), this type of 'assumption' is deadly and entirely unacceptable in 'Forensic Engineering' failure causation analyses. I will address these I-wall stability analyses in greater detail later in this report.



Figure 24: Relationship of the median Factor-of-Safety to the 'Probability of Failure' for two values of total uncertainty (Type 1 and Type 2) in the Demand and Capacity variables (Lognormally distributed).

89.     As shown in Figure 24, when the 'median' (50th percentile value) Factor-of-Safety (FS) is equal to unity (FS=1.0), the Probability of Failure (Pf) is equal to 50% - 1 chance in 2 trials of failure. When the Factor-of-Safety is equal to 1.3, the Probability of Failure is equal to about 20% (1 chance in 5 trials) and 30% (1 chance in about 3 trials) for uncertainties in the range of 30% to 40% (Bea 2011, 2009, 1990, 2000, 2002). Even when the median Factor-of-Safety is in the range of 1.5, the Probabilities of Failure are in the range of 10% to 20%.

90.     The uncertainties identified in Figure 24 are expressed as the Coefficients of Variation (ratio of Standard Deviation value of variable to Mean value of variable) of the Factors-of-Safety reflecting the uncertainties in the Demand and Capacity variables (FS = C/D). The magnitudes of these uncertainties have been based on extensive studies of the Type 1 (natural variabilities) and Type 2 (analytical model uncertainties) uncertainties associated with geotechnical systems such a flood protection levees (Bea 2011a, 2011b; Wolff USACE 1999). This range of uncertainties has been corroborated as part of the investigations of the failures of the flood protection structures in the Greater New Orleans Area during Hurricane Katrina performed by Diego Cobos-Roa and myself (2005 – 2012, investigation documents included in reliance materials that accompany this report.) These uncertainties are reflective of the 'Daubert Error Rates' that have critical importance in 'Forensic Engineering' causation analyses.

## Purported Low Top of Wall Elevations

91.     The breach causation analyses performed by Drs. Marr and Silva-Tulla[51] indicate that the overtopping erosion of the soils on the protected side of the supporting levee was exascerbated by 'unusual' low crown (top) elevations of the concrete flood walls constructed in the late 1960s following Hurricane Betsy in 1965 (Figure 25). They propose that these low top of wall elevation sections were fundamentally responsible for causation of both breaches.[52] The purported low crown elevations that existed at the time of Hurricane Katrina at the North and South Breach locations are approximately 6 to 12 inches lower than the adjacent sections of the 1960s sheet piling supported I-walls. The I-wall top elevations reported by the USACE in the Interagency Performance Evaluation Taskforce (IPET) investigation report documents the 1969 floodwall had 'spot' elevations between 11.9 feet and 13.0 feet (NAVD88)[53] between the North Breach and the south end of the South Breach to the Claiborne bridge – with the greater elevations toward the south.  The 'range' of elevations documented in the IPET report (USACE 2007, Volume II) are 11. 1 feet to 13.1 feet (NAVD88). The IPET analyses of the available survey data indicate that the 1960 I-wall had 'average' top elevations of 12.5 feet (NAVD88).

---

[51] Drs. Marr and Silva-Tulla are the defense experts that have addressed the specific issues associated with the causation of the North Breach and South Breach – the reasons for the locations, timing, and mechanics of development of the breaches. The other experts have addressed 'pieces and parts' of the breach causation physics and mechanics and the important issues associated with the applicable Standards of Care associated with the EBIA site clearing excavations as they potentially influenced the locations and causation of the breaches addressed by Drs. Sykora and Lucia.

[52] This section of the floodwall will be identified as the 1969 sheet pile supported floodwall or I-wall.

[53] Unless otherwise specified, all elevation references will be to NAVD 88 2004.65 datum).



**Figure 3-1 Surveyed Elevation of Floodwall Over Time**

Figure 25: Lower 9th Ward top of floodwall elevations (Marr 2011). Red dashed circles are superimposed on the original figure to define unexplained survey differences at specific locations.

92.     The purported low elevations of the concrete flood walls at or near the locations of the North Breach and South Breach used by Drs Marr and Silva in their breach causation analyses are apparently based on three surveys performed by the Orleans Levee District (OLD) during the 1990s. At this time, there are important unresolved issues associated with the accuracy of these surveys including their hand written records with hand written strike-through data notes, a single datum point reference, and subsequent conversions of the survey data elevations to current datum elevations (e.g. NAVD88). There are several unusual and unexplained significant differences (4 to 12 inches) between the results from three surveys of the same location (indicated with superimposed red dashed circles in Figure 25).

North Breach Analyses

93.     Both Drs. Marr and Silva determined that the North Breach developed before surge overtopping (elevation +11.4 feet NAVD88). Consequently, only wave overtopping could have contributed to water overtopping erosion associated with the puported low section at the North Breach (approximately 12 inches lower than the flood wall panels at the south end of the North Breach). Dr. Marr theorizes that wave overtopping exascerbated by the low 1960s I-wall section and the adjacent higher 1980 T-wall crest elevation (+14.5 feet NAVD88). However, Dr. Marr does not document any analyses to determine the magnitude and location of this wave overtopping erosion. Both Drs. Marr and Silva-Tullaattribute initiation of the North Breach to failure of the sheet pile connection between the 1969 I-Wall and the 1980 T-wall (Figure 26). I will address the postulated wall – sheet pile separation mechanics later in this report.









Figure 26: Purported 'mechanics' of development of the North Breach (Marr 2012).

94.     The erosion at the North Breach is attributed to the separation of the sheet piling and concrete flood wall panels at the intersection of the 1969 I-wall and the 1980 T-wall and the consequent flow of water through this separation (Figure 26). No analyses of such a flow of water or its erosive effects could be found in Dr. Marr's or Dr. Silva-Tulla's expert reports. Their analyses of the I-wall overturning mode of failure which will be discussed subsequently shows that approximately 4 to 6 feet of 'overtopping scour' is needed to destabilize the I-wall. There is no explanation or analysis provided to determine the approximately 4 to 6 feet of 'local water jetting through the crack' scour needed to locally destabilize the I-wall at the North Breach. The determination of the scour that accompanies the purported initiating wall separation appears 'out of the blue'; the scour at the North Breach is not detailed in Appendix O of Dr. Marr's expert report.

95.     Another mysterious development in Dr. Marr's causation analysis of the intiation of the North Breach regards the processes and forces required to develop the 12-foot long tear in the sheet piling at the interface between the 1969 I-wall and 1980 T-wall at the north end of the North Breach. The Analyses performed by Exponent – Failure Analysis Associates (2012) indicates that a uniform tensile force of approximately 500,000 pounds acting along the plane of the sheet piling – floodwall would be required to develop the separation – tearing of the sheet piling. Dr. Marr does not provide any quantitative analyses to explain where this force came from or how such a tensile force was developed.

96.     The results from the preliminary analyses I have performed during my review of the Defense Expert reports indicate such a loading would have significantly 'bowed' the I-wall section (one or more feet at the center) and that the tensile forces

would have been concentrated at the 'locally stiffened' intersection with the much stiffer T-wall and its right-angle intersection with the perpendicular wall section that leads to the Surkote Road overpass. Such a lateral loading acting on the 1960s I-wall section would have initiated failure of the entire I-wall supporting levee – sheet piling – concrete wall 'system'.  On the basis of these analyses, I concluded that the sheetpile tear at the north end of the North Breach I-wall to T-wall intersection and connection was a <u>'result, not a cause'</u> of the 1960s I-wall system failure.  I am in the process of completing, validating, and documenting the results from my hand-calculations. I will include the results of this work in a future report to the Court.

97.    In my previous expert reports concerned with 'Forensic Engineering' causation analyses of the failures that developed in the Greater New Orleans flood protection system, I have explained the 'multi-modal' aspect of the different modes of failure that are activitated during such failures. These modes of failure are interdependent, interconnected, and interactive. I have explained the process of Forensic Engineering causation analyses of such processes as like a 'photo finish horse race without a camera.'  Different horses are interacting as they race toward the finish line and it is not an straight-forward process to determine which horse – failure mode – was a 'result' of a failure or a primary 'cause' of a failure. It is easy to mistake a result for a cause in 'Forensic Engineering' – this is one of the very important reasons for 'independent corroborations' (triangulation in navigation and surveying) and for neutralizing a wide variety of cognitive 'biases' (e.g. instutional, confirmational, weak signals in a strong noise environment) (Bea 2011).

98.     Both Drs. Marr and Silva-Tullaconclude that the I-wall at the North Breach develops at approximately 6:00 a.m. (CDT) the morning of August 29, 2005. **They rely exclusively on eyewitness based reports of water elevations in the Lower 9th Ward in the vicinity of the North Breach (Site 1 – Pump Station) and a single eyewitness report by a pump station operator – William Villivasso to identify the time of development of the North Breach.** Dr. Silva-Tulladoes not provide any evidence in his Expert Report to define the time of development of the North Breach.

99.     Drs. Marr and Silva-Tullaprovide no other justifications or corroborating evidence to define the time or modes of failure involved in development of the North Breach. The numerous concerns with the testimony provided by William Villivasso are not cited or recognized by Drs. Marr and Silva-Tulla. These concerns were addressed by Judge Duval in his Findings of Fact and Conclusions of Law in the 'BARGE' case (Civil Action No. 05-4182, Section "K") of January 20, 2011. Because of the many complex challenges associated with developing valid understanding of and sensemaking from eyewitness reports developed during traumatic conditions, my 'Forensic Engineering' causation analyses have not relied in any major way on this questionable source of information.

100.    The location of the North Breach is solely attributed by Drs. Marr and Silva-Tullato the purported low elevations of the 1969 I-wall at this location combined with the separation of the floodwall panel – sheet piling 'interface' with the 1980 T-wall at the north end of the North Breach that results in unexplained and unanalyzed 'local erosion' to a depth between 4 feet and 6 feet.  The other Defense Experts have remained silent on this point. Dr. Silva-Tulla's I-wall analyses indicate that 4 feet of scour is

required while Dr. Marr's I-wall analyses indicate that 5.7 feet of scour is required to cause the local overturning failure of the I-wall at the North Breach. No explanation is provided to explain this important difference.

101.    There is another concern with the I-wall failure causation analyses performed by Drs. Marr and Silva-Tulla to explain how, when, and why the North Breach developed where it did. Both Drs. Marr and Silva-Tulla attribute the North Breach failure to a 'local' failure of the I-wall at the north end of the North Breach.  Both rely on the sheet pile supported I-wall analytical models I have previously described (Dr. Marr's Shoring Suite analyses and Dr. Silva-Tulla's CAWALSHT analyses). Both of these analytical models are based on 2-dimensional (2D) conditions that presume there are no significant 'out of plane' forces and interactions; i.e., the 3-dimensional forces and interactions can be ignored because the system's length or width is very large and the 'end effects' can be ignored.

102.    However, in the case of the North Breach 'localized failure', this is not the case. This aspect was developed by myself and Dr. Marino during the Lower 9th Ward Barge Trial. Dr. Marino analyzed the North Breach as a 'narrow' (one panel wide) breach. I analyzed the North Breach as a 'wide' (180 foot - 6 I-wall panel wide) failure. My analyses (Figure 28) showed that the width of the feature involved in the breach development would have to be less than approximately 100 feet in width before the 3D 'end' effects would become important. The results from my analyses were corroborated by the results develped by Dr. Marino (2010) (Figure 29). The analyses performed gy Dr. Marino for a 'narrow width' feature at the North Breach resulted in latateral stability

Factors-of-Safety (10.5 foot deep 'tension crack') ranging from 2.72 to 3.2 (Marino Table 5.2, 2010).

103.    Unfortunately, neither Dr. Marr or Dr. Silva-Tullaseem to have been aware of this previous work. Further, they appear to have overlooked the important differences between the types of analyses they have performed for a 'local' failure and the major limitations in the analytical models that they have used to address such a failure. This is another critical flaw in their causation analyses of the North Breach.



Figure 28: Breach width influnces on the Factor-of-Safety (lateral stability) at the North Breach location (Bea 2010).



Figure 29: Narrow width breach failure analysis at the North Breach (Marino 2010). Lateral Stability Factors-of-Safety (10.5 foot deep 'tension crack') ranged from 2.72 to 3.2 (Marino Table 5.2, 2010).

## North and South Breach Levee Erosion Analyses

104.    Dr. Marr provides a detailed analysis of the development of erosion trenches on the protected side of the Lower 9th Ward   1969 I-wall. This analysis addresses the surge (mean water elevation) overtopping hydrodynamic scouring effects that is based on the combination of two analytical models – one for the 'jet' that is formed as the surge water overtopps the I-wall – and another for the 'pool' ('tail water') that the 'jet' encounters as it plunges over the I-wall. The combination of these two hydrodynamic models results in definition of a time history of water scouring velocities

that act on the levee soils in the water impact region and within the scour depression formed as the levee soils are eroded.

105.    The next step in the analytical process involves use of soil erosion test results developed and analyzed by Dr. J. L. Briaud. Dr. Briaud was a member of the Independent Levee Investigation Team (ILIT). Dr. Briaud made major contributions to the ILIT analytical work that addressed the overtopping of the MRGO 'levees.' Dr. Briaud's experimental soil erosion experiments involved exposing soil samples obtained from levees in the Greater New Orleans area to hydraulic flows parallel to the surface of the soil samples. Dr. Marr applied the theoretical horizontal hydraulic 'shearing' flows determined from the combination of the two analytical approaches to evaluate the soil erodibility.

106.    In the soil erodibility analyses, Dr. Marr makes another critical 'assumption' regarding the soils present on the protected side of the I-walls in the vicinity of the North and South Breaches. Without providing any justifications, Dr. Marr states: "In this study, the soil at the levee crest (levee fill) is considered to be low plasticity clay)." Unfortunately, Dr. Marr is either unaware of or ignores the studies performed during the USACE IPET investigations of overtopping erosion of the levee tops in the Lower 9th Ward (IPET 2007). At both of the locations studied by the USACE IPET, the soil at the tops of the levee were determined to be "Fat Clay" and "Fat Clay with sand / silt lenses".  Fat Clays are high plasticity clays.

107.    Another important fact overlooked by Dr. Marr is that the tops of the levees were covered with dense, deeply rooted, periodically mowed grass (Figure 30). As I demonstrated and corroborated during the MRGO – *Robinson* deliberations, such grass

has very important 'armoring' effects that delay erosion of the soil by water by one or more hours – even under very intense overflows (Figure 31). Erroneously, the surge water overtopping analyses performed by Dr. Marr have initiated erosion of the soil with the first surge water that overtopps the I-walls. This results in substantial over-estimation of the soil – erosion scour 'trench' depths. Dr. Marr conveniently gives himself at least a one hour head-start on the erosion and scour of the soil on the protected side of the Lower 9th Ward levees.



Figure 30a: Grass on surface of protected levee following Hurricane Katrina (Silva-Tulla 2012). Author in scour trench measuring the depths and soil shear strengths with a Torvane. Photograph looking north from south of the South Breach.



Figure 30 (b): Grass on surface of protected levee following Hurricane Katrina (Marr 2012).



Figure 31: Expected 'steady water flow' turff - grass 'lift-off' times based on field test data (Bea and Storesund 2009, Technical Advisory Committee for Flood Defense in the Netherlands 2007).

108.    Further, at one location close to the south end of the Lower 9th Ward and north of the Claiborne Avenue Bridge, the floodwall was overtopped for approximately 3 hours with Hurricane Katrina surge water (USACE IPET 2007). It was noted in the IPET investigation report that (V-13-8): *"As an approximation of the overtopping water impact, a 2.5 ft crest of water cascaded from a 6-ft height onto the levee crown.....Scour depth was 30in and width was approximately 8 ft."* At another similar location closer to the Claiborne Avenue bridge the IPET investigation report stated (V-13-5): *"Depth of scour was to the bottom of the I-wall concrete cap (2 ft), and scour width was approximately 7 ft."* <u>These values are far less than the "6 to 8" feet "depth" postulated by Dr. Marr in his Expert Report.</u>

109.    LiDAR surveys performed before (2002) and after (2005) Hurricane Katrina indicate the scour trench depths north and south of the South Breach are approximately 2 to 3 feet deep (Figure 32, Marino 2010). The scour trench depths have been referenced to the ground surface elevation on the protected sidde at the face of the I-wall prior to Hurricane Katrina. These depths were corroborated with tape measured depths performed I performed in the scour trenches at the Lower 9th Ward on September 2, 2005 – following Hurricane Katrina and before Hurricane Rita (September 24, 2005) (Figure 33).



Figure 32: Scour trench depths north and south of the South Breach (Marino 2010).



Figure 33: Measuring erosion trench depths between the North Breach and South Breach.

110.    Because of the 'scatter' present in the laboratory soil erosion test results developed by Dr. Briaud, Dr. Marr attempts to 'bound' the scatter for "High Erodibility" – "Medium Erodibility" soils tested by Dr. Briaud. Dr. Briaud tested soils from a very wide variety of levee locations in the Greater New Orleans area. These levees had a very wide variety of types of soils covering the levees – ranging from uncompated sandy – silty soils to compacted 'fat clays'. Even though Dr. Briaud tested representative samples from nearby levee locations, Dr. Marr choose to use the data based on tests performed on 'non representative' soil samples. To compound this flaw, the erodibility functions were treated as 'unlimited' – the erodibility functions used in the analyses did not have any limit on the erosion rate as a function of the water – soil interface shearing velocities.

Close study of the experimental data and consideration of limiting suspended sediment 'bed load transport' shows that there are such limits developed by the limiting amount of soil that can be transported by the water and the effects of these limiting amounts of suspended soils on the erosion rates (Storesud, Bea, and Huang 2010).

111.   Dr. Marr makes another critical mistake in his overtopping scour depth analyses for the South Breach. Figure 34 summarizes the results from the combined hydrodynamic shear stress analyses combined with the laboratory soil erosion testing analyses. A range of scour depths are indicated in Figure 34 for the purported average wall elevation at the South Breach location. Table 2 summarizes the results contained in Dr. Marr's report (Appendix O, page 9) pertaining to the estimated scour depths at the South Breach location. Figure 35 is the IHNC Hurricane Katrina hydrograph used by Dr. Marr to perform the overtopping soil erosion – scour analyses.



Figure 34: Computed overtopping protected side levee erosion – scour depth as a function of the I-wall top elevations (Marr 2011, Appendix R).

Table 2: Estimated scour depths for the South Breach Location as a function of the Hurricane Katrina surge water elevations (Marr 2011, Appendix O, page 9).

**Table O-4 Estimated Scour Depth at Section 3**

| Water Elevation, ft NAVD88 (2004.65) | Scour Depth, ft |
|---|---|
| 12.55 | 0.5 |
| 13.70 | 3.5 |
| 14.20 | 4.7 |



Figure O-4- Canal Side and Land Side Hydrographs

Figure 35: IHNC Hurricane Katrina hydrograph (water elevation versus time) used to perform the overtopping erosion – scour analyses for the South Breach location (Marr 2011, Appendix O, page 8).

112.    First, the correlation of surge water elevation with time must be defined (Table 2, Figure 35, Figure 36). A surge water elevation of about +12.2 feet [54] is developed at 7 a.m. (CDT), a surge water elevation of +13.7 feet is developed at 8 a.m., and a surge water elevation of 14.2 feet is developed at 9 a.m. Returning to Figure 26, for the South Breach location, the average erosion depth is shown to be about 3.2 feet, the 'less erodible' low plasticity clay scour depth is shown to be about 1.5 feet, and the 'more erodible' low plasticity clay scour depth is shown to be about 5.0 feet.

---

[54] 'About' is warranted here since the IHNC water elevations at the Lower 9th Ward have been primarily based on the Lock Master visual sightings on a fixed water elevation staff at the north end of the IHNC Locks.

113.    Table 3 summarizes the results of the I-wall overturning failure mode –
breach development analyses performed by Dr. Marr. This table shows the scour depth as
a function of the Hurricane Katrina surge water elevations. Compare this table with the
results summarized in Table 2. The first surge water elevation of 14.2 feet is developed at
9 a.m., results in a scour depth of 4.7 feet, and a Factor-of-Safety (FS) determined using
Shoring Suite of FS = 0.9 (implied to indicate I-wall overturning failure). The table
shows a second equal surge water elevation of 14.2 feet that is required to erode the scour
trench an additional 1.0 foot to its 'failure completion' depth of 5.7 feet (FS = 0.86).

Table 3: Computed Factor-of-Safety (FS, ratio of total 'capacity' force resistance to
imposed total 'demand' force) after formation of computed scour trench depth at the
South Breach location (Marr 2011, Appendix O, page 16).

**Table O-7 Factor of Safety after Formation of Scour Trench- Section 3 (South Breach)**

| Canal Side Water El, NAVD88 (2004.65) | Scour Trench Depth, ft | Computed Crack Depth, ft | FS Plaxis | FS Shoring Suite** |
|---|---|---|---|---|
| 12.55 | 0.6 | 0 | 1.83* | 5.25 |
| 13.7 | 3.7 | 3.7 | 1.78* | 1.36 |
| 14.2 | 4.7 | 12.5 | 1.32** | 0.95 |
| 14.2 | 5.7 | 12.5 | <1.00** | 0.86 |

*_**Mode of failure: overtopping._*

114.    The first issue associated with these I-wall overturning stability – failure
analyses regards the scour depth of 4.7 feet.  This is not the average value that was
computed.  This is the value associated with the 'more erodible' soil.  The computed
scour depth is not validated with the observed data from adjacent I-walls that had
comparable elevations and did not fail (scour depths of 2 feet to 3 feet – better estimated
with the 'Less Erodible' results shown in Figure 34).

115.    The second issue regards the scour depth of 5.7 feet. This is associated with the surge water elevation staying at 14.2 feet for an additional hour. But, the surge water elevation did not stay at this elevation until 10 a.m. As shown in Figure 28, the surge water elevation dropped to 12.2 feet by 10 a.m.



Figure 36: Complete Hurricane Katrina IHNC surge hydrograph (USACE IPET 2007).

116.    Figure 37 summarizes results from the surge overtopping erosion analyses performed by Dr. Storesund and muself (summarized in Appendix B). Plaintiff Experts were supplied with copies of Marr's erosion/scour analyses. To quantitatively evaluate the influence of the 'unlimited erosion rates,' the calculations were re-run, but using a maximum erosion rate of 300 millimeters per hour (mm/hr, approximately twice the average maximum erosion rate for 'lean' and 'fat' clay soils) (Figure 38). These 'truncated' erosion rate analyses found the maximum scour to be significantly shallower.

Figure 37 shows a comparison between Marr 2012 and revised scour depths based on truncated erosion rates. The erosion trench depth range based on the correct surge hydrograph and the 'truncated' soil erosion rates are in excellent agreement with those observed and measured at the Lower 9th Ward for the levee 'lean' and 'fat' clay soils. The erosion 'retardant' effects of the grass mat that armored the top of the levee are not included in these analyses.



Figure 37: Comparisons of scour depths based on 'unlimited' and 'truncated' soil erodibility rates (Appendix B).



Figure 38: Erosion function used to characterize erodibility for Low Erodibility levee surrface soils (Storesund, Bea, Huang 2010).

117.    I will complete my critique of the overtopping levee soil erosion – scour analyses documented in Appendix O of Dr. Marr's report with the following quotations:

"*Parts of the calculation method used here are new. They were obtained by combining well-known method(s) to estimate the hydraulic shear stress caused by a free falling jet with an established method to estimate scour depth resulting fom the imposed hydrauilc shear stress. **However, this combined result has not been verified with field measurements on actual cases.**"* (bold underline added for emphasis)

"*These factors combine to create consderable uncertainty in the exact values of scour depth given in Figure R-10 (Figure 8 above). However, the relationships are scientifically correct and calculated values give useful insight to how scour depths develop. The main point of this effort is to demonstrate that the physics of soil erosion*

*and scour show <u>the potential for the development of significant scour depths of 6 to 8 ft</u> on the land side of the floodwall. As shown elsewhere in this report, this depth of scour is sufficient to cause the floodwall to fail by overturning."* (underline added for emphasis)

118.    Both Dr. Marr's and Dr. Silva-Tulla's South Breach failure mode analyses rely on an unvalidated combination of analytical models to determine the overtopping soil erosion – scour depth 'trenches' required by their subsequent analyses of the I-wall overturning stability to cause development of the South Breach. In desperation, as idicated in the foregoing quotation from Dr. Marr's report, an unvalidated estimation is made that the scour depths at the Lower 9th Ward could have been (i.e.: "possibly" were) 6 feet to 8 feet deep. The analyses required to justify this statement are not contained in Dr. Marr's report – Appendix O. Further, the analyses that Dr. Storesund and I performed (Appendix B) show that while such erosion scour trench depths could be developed under some conditions, these conditions do not include those that existed at the time of Hurricane Katrina at the Lower 9th Ward. There is absolutely no corroborating evidence that such scour depths could or did develop at either the North Breach or the South Breach.

119.    These analyses are not indicative of the use of high quality 'Forensic Engineering' qualitatitive and quantiative analysis methods, synthesis – integration processes, and validation – corroboration processes intended to determine the plausible explanations of how and why failures develop.

## Causation Analyses of North and South Breaches

120.    Next, I would like to address the causation analyses of the North Breach and South Breach performed by Drs. Marr and Silva-Tulla. My observations pertain to their two different analyses of the stability characteristics of the I-walls as affected by surge water 'overtopping' erosion – or in the case of the North Breach, a combination of wave overtopping erosion and 'jetting-through-the-crack' erosion.

121.    As I noted earlier, Dr. Marr has relied on a combination of quantitative analytical models to address causation of the North and South Breaches. Fundamental in these analyses was the unilateral exclusion of hydraulic conductivity uplift pressure effects. Seemingly, the exclusion of these uplift pressure effects was predicated on his hydraulic 'seepage' water flow quantities and velocities focused analyses.  His analyses 'demonstrated' that these 'seepage' effects were not significant. Even though the buried high water content swamp – marsh organic clay deposits are fully saturated and even though the imposed hydraulic loadings are rapidly applied over a few hours (the time history of increased water elevation caused by the Hurricane Katrina surge waters, Figure 11), Drs. Marr, Silva-Tulla, Brandon, and Stark all rely on 'Non Steady Flow' conditions in which time related changes in soil void ratios are required.

122.    As adequately demonstrated by their 2D and 3D 'Non Steady Flow' analyses, these changes require substantial amounts of time to develop. They fail to recognize that the hydraulic loadings are rapidly applied, that time is not available for 'soil consolidation or expansion' that is dictated by the soil permeabilities and stratrigraphy, and that in absence of these effects, it is the soil pore water that must carry the imposed hydraulic pressures. These hydraulic pore water pressures are attenuated by

the soil permeabilities and rapidly transmitted to the protected side of the levees at the Lower 9th Ward. Such effects were observed by the USACE in analysis of the piezometer records obtained at the 17th Street Canal Safe Water Level studies following Hurricane Katrina (USACE 2007) and at the London Avenue Canal Floodwall Tests (USACE 2008, Black & Veach 2009). It is for this very reason that the current USACE guidelines for the design of new and analysis of existing I-walls (USACE 2011) requires that these uplift pressures be determined and included in analyses of the performance of sheet pile supported I-walls subjected to hurricane surge and wave loading effects. **These surge water uplift pressure effects have not been included in the causation analyses performed by Drs. Marr and Silva-Tulla.**

123.    Previously, I noted that Drs. Marr and Silva-Tullause different quantitative analytical models to evaluate the local I-wall overturning mode of failure: Dr. Marr uses a combination of results from the 2D Finite Element Analyses (FEA performed with the computer program identified as Plaxis) and results from the Shoring Suite active – passive soil pressure based analyses. Dr. Marr relies on results from his FEA analyses to indicate when the lateral soil pressures on the flood side of the I-walls reach or are near zero (Figure 12). In his report, Dr. Marr notes:

*"For each loading condition, the soil pressures and pore pressures on the wall are evaluated in Plaxis. Figure O-5 shows the plot of the stresses on the wall for the canal at El 14.2 ft with no scour trench (Note: negative pressures indicate compression). As shown in the figure, the total normal stresses acting on the wall are compressive. Therefore the soil is in contact with the wall and there is no crack."* (underline added for emphasis).

124.   As demonstrated by analyses of the results from the USACE E99 floodwall tests (1985) and the USACE London Avenue flood wall tests, this reasoning is deeply flawed. Dr. Marr fails to recognize the hydrostatic water pressures that can develop below the ground level due to the development and propagation of a 'tension crack.' These hydrostatic pressures can equal and substantially exceed the 'effective normal (lateral soil) stresses (pressures) (Figure 12 – North Breach, Figure 13 – South Breach). When this happens the 'tension crack' rapidly propagates to and below the tips of the sheet piling. This results in a substantial increase in the lateral loadings that the I-wall must withstand.  In addition, this results in a substantial decrease in the 'effective levee cross-section' that resists lateral loadings. The 'tension crack' effectively cuts the soil levee in half – much as a cake slicer would do to remove a slice of cake.  Dr. Brandon has labeled the tension crack development as "fundamentally unpredictable" (Brandon et al 1980) – and consequently, as per the USACE I-wall design and analysis gidelines he helped develop (USACE 2011) full crack depths are utilized in analyses of existing I-walls.

125.   Based on his deeply and fundamentally flawed analysis, Dr. Marr concludes:*"…the effect of a crack forming on the canal side of the wall at the North Breach is not analyzed"* (Figure 39). A similar set of flawed analyses of the 'tension crack' development and propagation (Figure 40) pervades Dr. Marr's analyses of the South Breach global lateral stability and local overturning stability analyses. Results from these analyses are summarized in Table 5 (North Breach global sliding stability), Table 6 (South Breach global sliding stability), Table 7 (North Breach I-wall overturning stability), and Table 8 (South Breach I-wall overturning stability).



**Figure N-5 Pressure against wall- Section 6**

Figure 39: Wall pressures at North Breach location with no 'tension crack' (Marr 2012).



Figure 40: Wall pressures with 'tension crack' depth evaluations at South Breach location (Marr 2012).

Table 5: Global sliding stability failure analysis results at the North Breach location (Marr 2012).

**Table N-5 Factor of Safety against Global Stability Failure - Section 6 (North Breach)**

| Canal Side Water El, NAVD88 (2004.65) | Land Side Water El, NAVD88 (2004.65) | FS Plaxis | FS SLIDE (Spencer) | |
|---|---|---|---|---|
| | | | Circular | Non-Circular (Optimized) |
| 1.13 | N/A | 1.25 | 1.36 | 1.25 |
| 9.5 | N/A | 1.18 | 1.26 | 1.21 |
| 10.5 | 1.6 | 1.80 | 1.89 | 1.76 |
| 11.4 | 2.4 | 1.77 | 1.88 | 1.75 |

Table 6: Global sliding stability failure analysis results at the South Breach location (Marr 2012).

**Table O-5 Factor of Safety Against Global Sliding Failure - Section 3 (South Breach)**

| Canal Side Water El, NAVD88 (2004.65) | Land Side Water El, NAVD88 (2004.65) | Computed Crack Depth, ft | FS Plaxis | FS SLIDE (Spencer) | |
|---|---|---|---|---|---|
| | | | | Circular | Non-Circular (Optimized) |
| 1.13 | N/A | 0 | 1.68 | 1.80 | 1.64 |
| 9.5 | N/A | 0 | 1.33 | 1.50 | 1.41 |
| 10.5 | 1.6 | 0 | 1.86 | 2.06 | 1.89 |
| 11.4 | 2.4 | 0 | 1.85 | 2.04 | 1.89 |
| 12.55 | 3.5 | 0 | 1.85 | 2.03 | 1.89 |
| 13.7 | 5 | 0 | 1.91 | 2.07 | 1.93 |
| 14.2 | 8 | 0 | 2.31 | 2.49 | 2.32 |

Table 7: Local I-wall overturning instability analyses Factors-of-Safety at the North Breach based on Dr. Marr's Shoring Suite results with 'hypothetical' tension crack depths (2012).

**Table N-7 Factor of Safety Against Overturning (with various scour/crack depths)**

| Canal Side Water El, NAVD88 (2004.65) | Land Side Water El, NAVD88 (2004.65) | Scour Depth, ft | Crack Depth, ft | FS (Shoring Suite Version 8) |
|---|---|---|---|---|
| 11.4 | N/A | 4 | 4 | 1.77 |
| 11.4 | N/A | 4 | 12.5 | 1.13 |
| 11.4 | N/A | 5.7 | 12.5 | 0.95 |

Table 8: Local I-wall overturning instability analyses Factors-of-Safety at the South Breach based on Dr. Marr's Shoring Suite results with 'hypothetical' tension crack depths (2012).

**Table O-7 Factor of Safety after Formation of Scour Trench- Section 3 (South Breach)**

| Canal Side Water El, NAVD88 (2004.65) | Scour Trench Depth, ft | Computed Crack Depth, ft | FS Plaxis | FS Shoring Suite** |
|---|---|---|---|---|
| 12.55 | 0.6 | 0 | 1.83* | 5.25 |
| 13.7 | 3.7 | 3.7 | 1.78* | 1.36 |
| 14.2 | 4.7 | 12.5 | 1.32** | 0.95 |
| 14.2 | 5.7 | 12.5 | <1.00** | 0.86 |

**Mode of failure: overtopping.

126.    Lack of appropriate treatment of the multiple 'tension crack' effects results in substantial overestimates in the lateral sliding stability analyses Factors-of-Safety (FS) documented in Tables 5 and 6. Comparable Factors-of-Safety also have been developed and documented recently by Dr. Brandon (2012). In addition, if the hydraulic conductivity uplift pressure effects on the protected side of the levee are recognized and properly considered, these global stability analysis Factors-of-Safety can be reduced significantly (30% or more) (Bea 2008, Bea and Cobos-Roa 2008).

127.    Dr. Marr's flawed 'tension crack' pressure development analyses are propagated into his Shoring Suite active – passive soil pressure based analyses of local overturning performance of the I-walls at both the North Breach and South Breach. This helps explain the remarkable differences between the similar – but not identical – analyses performed by Dr. Silva-Tulla.   Dr. Slva-Tula's CWALSHT based local overturning performance analyses include full 'tension crack' development loadings as prescribed by the USACE's guidelines for analyses of I-walls. Dr. Silva-Tullapredicts loss of I-wall stability for an erosion depth of 4 feet. Dr. Marr predicts loss of I-wall stability for an erosion depth of 5.7 (North Breach) to 4.7 feet (South Breach) (Table 7 –

North Breach, Table 8 – South Breach). This is also another excellent example of the needs – requirements – for validations of the integration of analytical processes and quantiatative analytical models employed in 'forensic engineering' evaluations of the causation of failure of complex engineered systems (Bea 2011, 2009).

128.    This confusion about and lack of proper treatement of the I-wall 'tension crack' loading effects is even more troubling when it is recognized that one of the Defense Experts, Dr. Thomas Brandon, was one of the key people involved in the analyses of the London Avenue Canal Load Test results and the post-Hurricane Katrina analyses of I-wall performance in the Greater New Orleans Area (Brandon 2007a, 2007b). Dr. Brandon was one of the key contributors to development of the USACE 2011 guidelines for the design of new and analysis of existing flood protection I-walls (USACE 2011) that included analysis of 'tension crack' loading effects and also to hydraulic conductivity uplift pressure effects. Nonetheless, he and the other defense experts, failed to account for or even acknowledge his important but contrary work.

## South Breach Timing

129.    The important and pervasive flaws in the causation analyses of the South Breach performed by Drs. Marr and Silva-Tullado not end here. The next problem regards the timing of development of the South Breach. Dr. Silva Tullaconcludes that the South Breach develops at 7:00 a.m. (Figure 41, Table 9). In the body of his Expert Report, Dr. Marr is more cautious regarding the timing of development of the South Breach. But, the results from Dr. Marr's forensic engineering analyses indicate the South Breach develops about 9 a.m. (4.7 ft scour) and not later than 10 a.m. (Table 3 above, Marr Expert Report, Appendix O, Table O-7). Consequently, while the evaluations of the

causation of the South Breach performed by Drs. Marr and Silva-Tullaare 'lock step correlated' regarding the purported low I-wall top elevations, their analyses of the timing of development of the South Breach inexplicably differ substantially by 2 hours to 3 hours.

130.   In addition, the information and analyses developed and corroborated during the ING 4727 'Barge Trial' forensic engineering investigations clearly showed that the South Breach developed well before 9 a.m. This timing for the breach development was required so that this portion of the Lower 9th Ward could flood to a depth that did not mean the ING 4727 barge had to 'high jump' over the school bus between the floodwall and the final resting place of the ING 4727 barge against the first row of houses adjacent to Jourdan Avenue (Figures 30 and 31). The flood water in this portion of the Lower 9th Ward had already reached an elevation of more than +12 feet (NAVD88).



Figure VI-2: IHNC Storm Surge Hydrograph (adapted from IPET, Vol V, Appendix 11 (2007)

Figure 41: Illlustration identifying timing of development of South Breach at 6 a.m. and North Breach at 7 a.m. from Dr. Silva-Tulla's Expert Report (Silva-Tulla2012).

Table 9: Table from Dr. Silva-Tulla's Expert Report identifying timing of development of South Breach (lower portion of table) and North Breach (upper portion of table).

Table VI-3:  Water Level, Overtopping, and Floodwall Failure at the EBIA

**North Breach** Minimum Floodwall Elevation[i] = +11.3 ft.

| Canal Water Surface Position, ft[ii] | Canal Water Surface Elevation[i], ft | Date/Time[iii] | Observations |
|---|---|---|---|
| -4 | +7.3 | 8-29-05 / 2:00 AM | |
| -3 | +8.3 | 8-29-05 / 3:24 AM | Wave overtopping / splashing starts[iv]. Agrees with Villavaso's observations |
| -2 | +9.3 | 8-29-05 / 4:00 AM | |
| +0 | +11.3 | 8-29-05 / 6:10 AM | Continuous Overtopping condition reached. Failure around 6:10 AM after about 3 hours of wave overtopping and just as continuous overtopping begins.  Agrees with Villavaso's observations |
| +2 | +13.3 | 8-29-05 / 7:30 AM | Post-failure |
| Maximum: +2.9 | +14.2 | 8-29-05 / 9:00 AM | |
| +2 | +13.3 | 8-29-05 / 9:48 AM | |
| +0 | +11.3 | 8-29-05 / 12:00 PM | |

[i] All Elevations refer to NAVD88(2004.65)
[ii] Distance of canal water surface above (+) or below (-) top of floodwall, in feet
[iii] Times approximate.  Interpolated linearly between hourly readings at the IHNC lock
[iv] IHNC Wave characteristics during Katrina:  Height < 1 m (=3 ft.), period about 2.2 s (Darlymple, R.A., 2012, personal communication, 7 March)

**South Breach** Minimum Floodwall Elevation[i] = +12.1 ft.

| Canal Water Surface Position, ft[ii] | Canal Water Surface Elevation[i], ft | Date/Time[iii] | Observations |
|---|---|---|---|
| -4 | +8.1 | 8-29-05 / 3:12 AM | |
| -3 | +9.1 | 8-29-05 / 3:48 AM | Wave overtopping / splashing starts[iv] |
| -2 | +10.1 | 8-29-05 / 4:48 AM | |
| +0 | +12.1 | 8-29-05 / 7:00 AM | Continuous Overtopping condition reached.  Failure around 7:00 AM after about 3 hours of wave overtopping and just as continuous overtopping begins. |
| +2 | +14.1 | 8-29-05 8:36 AM | Post-failure |
| Maximum: +2.1 | +14.2 | 8-29-05 9:00 AM | |
| +2 | +14.1 | 8-29-05 9:24 AM | |
| +0 | +12.1 | 8-29-05 10:24 AM | |



Figure 42: The school bus (green dashed circle) lies between the floodwall and the first row of homes adjacent to Jourdan Road (Bea 2010).



Figure 43: As shown in this photograph taken about 11 a.m. (CDT), the school bus was submerged (outlined with dashed white circle) with the top (elevation +10 feet) of the bus about 2 feet below the water surface – equal to the ING 4727 barge's unloaded draft (Bea 2010).


## Consideration of Protected Side Flood Waters in Bea's Stability Analyses

131.    Drs. Marr and Silva-Tullaintroduced a factor for consideration that I did not consider previously in my analyses of global lateral instability characteristics at the North and South Breach locations: inclusion of the stabalizing effects of the flood waters on the protected sides of the I-walls.  This assessment requires an accurate evaluation of the flood water depths at the locations of concern as a function of time. It is my professional opinion that the 'interior hydrographs' (flood water elevations as a function

time) used by Drs. Marr and Silva-Tullato perform their global lateral instabillity analyses do not provide a sufficiently accurate understanding and definition of these interior hydrographs. For example, Drs. Marr and Silva-Tullarely on a photograph taken during Hurricane Katrina of a truck with flood water at mid-height of its wheels located at Jackson Barracks – not adjacent to the North Breach and South Breach locations - to justify their 'adjustments' to the interior hydrograph developed by the USACE IPET investigations (based on 'early' eyewittness reports). They have not relied on the interior hydrograph for the locations of concern developed very recently by Dr. Dalrymple (2012) or the multiple interior hydrographs developed as a result of the interior flooding investigations conducted as part of the Barge trial which refute the water depths they assume here.

132.    In response to the requirement to evaluate the effects of the protected side floodwaters in the Lower 9th Ward adjacent to the North Breach and South Breach locations at the times of their development, I, with the assistance of Mr. Diego Cobos-Roa, performed a set of lateral stability analyses (SlideW) to assess the effects of water ponded on the protected side ('tail water'). Based on the interior flooding hydrographs provided by Kok 2012 and Spinks 2010, a flood water depth of 5 feet was imposed on the protected side at the North Breach section, which corresponds to approximately elevation -3 to -4 feet (NAVD88, the elevation of the area near the toe is between -7 and -8 feet NAVD88).

133.    At the time of development of the breach (between 4 and 6 a.m. CDT August 29, 2005) the results of the lateral analyses[55] indicated a static Factor-of-Safety of

---

[55] Lateral stability and vertical stability analyses summarized herein were performed in accordance with the USACE guidelines for the analyses of I-walls subject to hurricane loading conditions (2011).

approximately 1.3 (Figure 44). The IHNC surge water elevation at this time was +10 feet NAVD88. The Probability of Failure associated with this Factor-of-Safety and the attendant uncertainty (40%) would be about 30% (Figure 24). This increase in the Factor-of-Safety (previously 1.0) can be expected from the boundary conditions applied, as there are 5 feet (or 312 psf – pounds per square foot) of resisting force acting on the protected side toe. As discussed previously, I corroborated these results using basic 'hand calculation' (paper and pencil) analyses.

134.    In terms of heave gradients, the water column does not change the pore pressures within the layers beneath the landside toe, but they also provide a significant increase in 'Uplift Pressure' resisting forces when computing the uplift Factors-of-Safety. At the same time of failure, the acting uplift water pressure ranges between 520 psf and 530 psf, and the resisting pressure with this column of water is approximately 850 psf, which yields a Factor-of-Safety of about 1.5. The Probability-of-Failure of 'Uplift Pressure' failure would be approximately 25%.



Figure 44: Static lateral stability analyses Factor-of-Safety, North Breach, surge elevation at +10 feet NAVD88, 5 feet of 'tail water' on protected side.

135.    For analysis of the lateral stability at the the South Breach, a protected side flood water depth of 10 foot was applied based on the interior flooding hydrographs (Kok 2012, Spinks 2010), or an elevation of +5 feet NAVD88. At the time of development of the breach, between 7 and 8 a.m. on August 29, 2005, the results of the lateral stability analyses show a static Factor-of-Safety of 1.23 (Figure 45). The associated Probability of Failure would be about 20% (Figure 24). The IHNC surge elevation at this time was +13.8 feet NAVD. The increased Factor-of-Safety (in excess of 1.0) can be expected from the boundary conditions applied, as there is 10 feet (or 624 psf) of vertical resisting force acting on the protected side levee face. As discussed previously, I corroborated these analyses with basic 'hand calculation' analyses.

136.    In terms of heave gradients, the water column does not change the pore pressures within the layers beneath the landside toe, but they also provide a significant increase in resisting forces when computing the uplift factors of safety. At the same time of failure, the acting uplift water pressure ranges between 660 and 670 psf, and the resisting pressure with this column of water is approximately 1,260 psf, which yields a Factor-of-Safety of about 1.9. The equivalent Probability of Failure would be approximately 4% - indicating a low likelihood of vertical 'Uplift Pressure' induced instability.

Figure 45: Static lateral stability analyses Factor-of-Safety, South Breach, surge elevation at top of wall (+13.8 feet NAVD88), 5 feet of 'tail water' on protected side.

## Jourdan Avenue Canal Modeling in Hydraulic Conductivity Analyses

137.   During my recent deposition, I was questioned about how I had modeled the Jourdan Avenue Canal culvert in my hydraulic conductivity and lateral stability analyses. When modeling the backfilled canal at Jourdan Ave. Canal (Figure 46), I did not have any information on the materials used to backfill the old open channel around the concrete storm water drainage culvert. Therefore, I, with the assistance of Mr. Diego Cobos-Roa, performed several hydraulic conductivity analyses using different materials to assess its potential effects on the results. Based upon these analyses, I concluded that this culvert was far enough from the area involved in development of the lateral stability failure, that it did not have a significant influence on the results from the lateral stability analyses (Figures 44 and 45). I further concluded that the water inside the culvert would be isolated from the actual flow regime imposed by the hurricane surge because of the concrete structure encapsulating this storm drainage rain water filled 'horizontal water column'. The final models and results provided in my February 1, 2012 Expert Report

included a square feature filled with the material named 'Jourdan Canal', with an assigned horizontal and vertical hydraulic conductivity of $5 \times 10^{-6}$ cm/s.



Figure 46: Jourdan Avenue canal culvert cross section at the South Breach location (Rogers 2012).

## Drained and Undrained Swamp-Marsh Deposit Shear Strengths

138. During my recent deposition, I was questioned about the different characterizations of the shear strength properties of the buried swamp-marsh deposits that have been used in my 2008 and 2012 lateral stability analyses. During our Phase I and Phase II (2012) analyses of the shear strength characteristics of the buried swamp-marsh deposits as they related to the analyses of the lateral stability analyses of the I-wall, we (Bea, Cobos-Roa, Grunauer Appendix D in Bea 2012) treated the buried swamp-marsh deposits using 'Drained' – 'Effective Stress' – properties. In order to be able to apply the generated hydraulic pressures from the seepage analyses in the I-wall lateral stability

analyses, we developed 'Drained' – 'Total Stress' - values of resistance in these deposits (expressed as the tangent of the effective value of internal friction, tan $\phi$' of the soils).

139.    To my knowledge, no drained tests were ever performed on samples from the swamp-marsh deposits, so I utilized the 'element test' option in the Plaxis computer program (Binkgreve, et al 2011) to model several available undrained tests on comparable soils. This procedure allows the user to model a laboratory test, by specifying the type of test (unconsolidated undrained, consolidation, direct shear, etc.) and other important data such as confining stress. Once the test is setup, the program 'runs' the test, and based on the results (stress-strain paths, stress at failure) the user modifies the Mohr-Coulomb input parameters (drained friction angle, cohesion, unit weight) until the test output matches the results from the actual physical test. Using this procedure a drained friction angle of $\phi$' = 26 degrees was determined to be representative of the available laboratory tests. Similar procedures were followed during previous work in 2006, 2008 and 2009. Development of these 'Drained' –Effective Stress – characteristics are also documented in my February 1, 2012 Expert Report.

140.    I-wall lateral stability analyses based on 'Undrained' shear strength characteristics for the swamp-marsh deposits based on an effective undrained shear strengh (Su) of the swamp-marsh deposits were also performed. This effective undrained shear strength was based on results from laboratory undrained shear strengths on these soils as well as interpreted results from in-situ Cone Penetrometer Tests (CPTs). Development of these 'Undrained' shear strength characteristics for the swamp-marsh deposits is document in my 2008 Expert Report (Bea 2008a).

141.     Figures 47 and 48 compare the lateral stability results for the North Breach and South Breach, respectively. These results are for the identical soil – geometry – stratrigraphy characteristics, a swamp-marsh deposit horizontal conductivity of 1x10-3 cm/s, and for a full 'tension gap' condition. The comparisons are for the 'Drained' analyses performed during 2012 and for 'Undrained' analyses performed during 2008. For the North Breach, a Factor-of-Safety of FS = 1.0 is developed for an IHNC surge water elevation of about +9 feet and +8 feet for the 2008 and 2012 analyses, respectively. For the South Breach, a Factor-of-Safety of FS = 1.0 is developed for an IHNC surge water elevation of about +11.5 feet and +13 feet for the 2008 and 2012 analyses, respectively. The two different treatments of the shear strength result in very comparable IHNC surge elevations at 'failure' (implied to be defined with a Factor-of-Safety of FS = 1.0). The two ranges provide good indication of the 'uncertainties' associated with my Forensic Engineering causation analyses of the development of the North and South Breaches.



Figure 47: Comparison of lateral stability results (Factor-of-Safety versus IHNC surge water elevations) for North Breach based on 'Drained' (effective stress) and 'Undrained' (total stress) shear strength characterizations for the buried swamp-marsh deposits.



Figure 48: Comparison of lateral stability results (Factor-of-Safety versus IHNC surge water elevations) for South Breach based on 'Drained' (effective stress) and 'Undrained' (total stress) shear strength characterizations for the buried swamp-marsh deposits.

## Concluding Remarks

142.    Due to limitations in the time I have been provided to write this rebuttal report, I have not had the opportunity to perform the needed additional analyses to ascertain the cumulative effects of all of the issues raised by the Defense Experts. I have inititated these analyses and developed the preliminary results documented herein. Given the provision of additional time, I will complete and more thoroughly document the results from my analyses of global sliding instability Factors-of-Safety.

143.    Based on my existing analyses of the critiques and reviews developed by the Defense Experts and notwithstanding the errors , misinterpretations, mislablelings and/or confused locations/areas identified, acknowledged and discussed during my March 27 and 28 deposition, I have not changed the fundamental conclusions, opinions and findings documented in my February 1, 2012 Expert Report.  I would like to express my sincere appreciation to the Defense Experts for their thoughtful and useful analyses, and detailed (but inaccurate) insights, critiques, and reviews of my 'Forensic Engineering' causation analyses of the North and South Breaches that developed at the Lower 9th Ward during Hurricane Katrina, August 29, 2005.

## III. Summary and Conclusions

## North Breach

144.    The Defense Experts (Marr 2012, Silva-Tulla 2012) conclude that the North Breach was initiated with separation of the I-wall at the north end of the North Breach – initiated by tearing of the sheet piling at that location. This separation is followed by water jetting through the opening and eroding the soil levee supporting the I-

wall. The jetting erosion trench develops deep enough so that the I-wall is locally destabilized and the breach opening process proceeds toward the south end of the North Breach. They conclude that the breach developed before the IHNC surge waters overtopped the floodwall. They conclude that the North Breach develops about 6 a.m.

145.   Dr. Marr develops a correlation between the local elevation of the I-wall at this location and the development of the Breach. Dr. Marr's analysis of the available surveying data indicates that the I-wall at this location was approximately 1 foot lower than the approximately +12.5 foot NAVD 88 (2004.65) average elevation of the top of the I-wall that protected the Lower 9th Ward.  Dr. Marr theorizes that this low section of the I-wall allowed early wave overtopping.

146.   Based on their analyses of the 'Factors-of-Safety associated with I-wall lateral instability, Drs. Marr and Silva-Tulla conclude that the North Breach did not develop due to I-wall lateral instability.

147.   They also conclude that under levee 'seepage' velocities and flows are not sufficient to cause 'blowouts' or 'piping' failures at the North Breach. They remained silent regarding the hydraulic conductivity 'Uplift pressures' developed under the levee on the protected side at the North Breach location.

148.   The analyses performed by Exponent (2012a) to evaluate the tearing of the sheet piling at the north end of the North Breach indicate approximately 500,000 pounds would be required to initiate and propagate the 12-foot long tensile stress tear in the sheet piling. The Defense experts do not provide any analyses to determine how the forces are

developed to cause tearing of the sheet piling at the north end of the North Breach at the intersection of the older 1960s short sheet piling supporting the I-wall and the younger 1980s sheet piling supporting the T-Wall.

149.    Further, the Defense Experts do not provide any analyses to determine how deep a local erosion trench could be developed by water pouring through the opened floodwall 'joint'. They postulate that a 4 foot to 5.7 foot deep scour trench would be required to develop a localized overturning failure of the I-wall. Dr. Marr's local I-wall overturning analyses indicate a 5.7 foot deep scour trench would be required to cause the 'local' I-wall overturning failure. Dr. Silva-Tulla's analyses indicate a 4-foot deep scour trench would be required to cause the 'local' I-wall overturning failure. Dr. Marr's analysis indicate that a floodside 'tension crack' would not open, while Dr. Silva-Tulla's analyses indicate that such a 'tension crack' would open to the bottom of the sheet piling. Each provides justification for their inconsistent 'tension crack' analyses and the resultant loading effects on the I-wall.

150.    Dr. Marr bases the determination of the timing of the North Breach solely on the testimony of Mr. William Villavasso. Dr. Silva-Tulla does not provide an analysis to determine the timing of the North Breach as either related to the time required to develop the erosion trench associated with overturning failure (4 feet deep) or any other source of information that he documents.  Without any apparent justification, Dr. Silva-Tulla also concludes that the North Breach developed by 6 a.m.

151.    Due to the very limited time I was provided by the Court to prepare my Rebuttal Report, I was only able to perform preliminary 'hand calculations' (using pencil,

paper, and desk calculator) to determine the source of loading that could provide an explanation for development of the approximately 500,000 pounds of tensile force to cause the tearing of the sheet piling at the north end of the North Breach. My preliminary analyses indicate that the tear in the sheet piling was a 'result, not a cause' of the failure of the I-wall.

152.     The problems with the Defense Expert's analyses of the I-wall overturning mode of failure do not stop here. The next problem my analyses revealed is associated with their identification of a 'localized' failure of the I-wall at the north end of the North Breach. The analytical models Drs. Marr and Silva-Tulla admittedly used are based on 'wide wall' 2-dimensional behavior of the I-wall. Contrary to their conclusions, the analyses I performed and those performed by Dr. Marino as part of the Barge Trial clearly demonstrated that the Factors-of-Safety would be dramatically increased for such a 'localized' width of failure (30 feet – the width of one of the I-wall panels).

153.     It is my considered opinion that as a result of the accumulation of critical flaws in their causation analyses of the development of the North Breach, Drs. Marr and Silva-Tullado not provide plausible explanation(s) for development of the North Breach.

## South Breach

154.     Drs. Marr and Silva-Tulla repeat the general theme of their deeply flawed causation analyses of the North Breach development at the South Breach. Dr. Marr again identifies a 'low top elevation section' of the I-wall at the general location of the South Breach. This 'low top elevation section' of the I-wall provides an opportunity for early

IHNC surge water overtopping at this location. Dr. Marr develops a 'new unvalidated analytical model and process' to analyze development of a surge overtopping erosion – scour of the levee on the protected side. Again, Dr. Silva-Tulla does not perform any surge water overtopping erosion analyses, yet he opines that there was sufficient scour to cause failure.

155.    Using this 'new unvalidated analytical model and process' to analyze development of the surge overtopping erosion at the South Beach location, Dr. Marr determines that it would take about 3 to 4 hours to develop an erosion trench deep enough (4.7 to 5.7 feet deep) to result in I-wall overturning instability. However, Dr. Silva-Tulla's I-wall overturning analysis indicates that much less scour (4 feet deep) is required to bring the Factor-of-Safety for the I-wall overturning mode of failure.

156.    Both Dr. Marr and Dr. Silva-Tulla conclude the I-wall lateral instability mode of failure did not control causation of the South Breach. In lock-step, Dr. Brandon reaches a similar conclusion.

157.    They again conclude that under levee 'seepage' velocities and flows are not sufficient to cause 'blowouts' or 'piping' failures at the South Breach. As they did with regard to the North Breach, both remain silent regarding the hydraulic conductivity 'Uplift pressures' developed under the levee on the protected side at the South Breach location.

158.    Irreconcilably, Drs. Marr and Silva-Tullatreat development of the 'tension crack' loadings very differently. The combined result of these deeply flawed analyses is that Dr. Silva-Tulladetermines the time of full development of the South Breach is 8 a.m.

while Dr. Marr's analyses indicate a time of between 9 a.m. and 10 a.m. – 1 to 2 hours difference.

159.    To compound the problems with the causation analyses performed by Dr. Marr, Dr. Dalrymple in his Expert Report then bases his interior flooding analyses on the 8 a.m. time of development of the South Breach – 1 to 2 hours before Dr. Marr's analyses indicate that the South Breach developed.

160.    Likewise, my analyses indicate that as a result of an accumulation of critical flaws in their causation analyses of the development of the North Breach, Drs. Marr and Silva-Tullado not provide plausible explanation of the development of the North Breach.

## Causation Analyses Performed by Drs. Marr and Silva-Tulla

161.    Drs. Marr and Silva-Tulla have developed North Breach and South Breach causation analyses that are deeply flawed in many important respects. Their analyses of the purported overtopping erosion of the levee on the protected side of the I-wall is deeply flawed.  Dr. Marr's analyses of the development of the I-wall floodside 'tension crack' and the associated hydrostatic loadings on the flood side of the I-wall are also flawed. Their analyses of the I-wall lateral stability mode of failure is deeply flawed in several respects including the complete lack of recognition of 'Uplift pressure' effects on the I-wall – levee floodwall system. Their analyses of the over-turning mode of failure of the I-walls are deeply flawed due to their assumptions concerning 'width effects', development of the scour trenches and 'tension crack' loadings.

162.    Most importantly, their causation analyses of the North and South Breaches lack synthesis, corroboration and validations of the multiple analytical models they have applied in their causation analyses. Strangely, there seems to be a complete lack of recognition by Drs. Marr and Silva-Tulla of the detailed analytical processes and guidelines published by the USACE for analyzing existing I-walls subjected to hurricane loading conditions (USACE 2011).

163.    It is abundantly clear that the causation analyses developed, documented and employed by Drs. Marr and Silva-Tullado not meet current guidelines and requirements for development of high quality and reliable 'Forensic Engineering' causation analyses of failures associated with complex engineered systems.

## Forensic Engineering Qualifications

164.    In conclusion, I think it is useful to review the meaning of the term "Forensic Engineering:"  *"Forensic [fo-ren'sik] belonging to courts of law; used in law pleading." (Webster's Dictionary). "Forensic engineering. The application of the principles and practice of engineering to the elucidation of questions before courts of law. Practice by legally qualified professional engineers who are experts in their field, by both education and experience, and who have experience in the courts and an understanding of jurisprudence"* (Blacks Law Dictionary, Sixth Edition).

165.    Expanding on the term 'Forensic Engineer:'

*"The forensic engineer differs from other expert witnesses in that he is a technical professional 'by design.' He is a licensed Professional Engineer (PE) in one or more* states*, as required by State's law before one is allowed to proclaim himself an 'Engineer.' The title Forensic Engineer, as opposed to Civil, Mechanical, Chemical Engineers, etc., implies a higher level of specialty. Herein, a PE previously skilled in the design of new products and systems, has further studied the procedures of analysis and jurisprudence. In function, he has developed the ability to dissect the components of existing products and systems; analyzing them for physical points of failure. He also understands contractual obligations and professional liability in order to determine infractions to contracts and regulatory statutes by parties of the respective dispute. The successful forensic engineer effectively coordinates engineering and law throughout the case; and above all, conveys technical information into litigation with the communication skills to present complex facts in layman's terms.'* (Barrentine, M.D., "Forensic Engineering: The Integration of Engineering Analysis and Law into a Specialized Profession," Forensic Engineering, The National Academy of Forensic Engineers).

166.    During my professional career, I have received extensive formal and informal training in 'forensic engineering.' This training has been provided by organizations such as the National Transportation Safety Board (commercial aviation, marine transportation), the U.S. Coast Guard (marine transportation and security), the Chemical Safety Board and the associated Center for Chemical Process Safety (chemical

refineries), and the National Space and Atmospheric Administration (space exploration systems).

167.    The results of this training have been incorporated in the book I have written titled "Human and Organizational Factors: Risk Assessment & Management of Engineered Systems" (Bea 2001-2011). [56] Since 2001, this book has been as the foundation text for the graduae courses I have given at the University of California Berkeley.

168.    I have applied my 'Forensic Engineering' training since the inception of my first 'forensic engineering' experience with investigation of the failure – collapse of the offshore radar tower identified as Texas Tower #4 (collapsed on January 14, 1961, during an East coast Hurricane; Bea, Jin, and Sharples 2002).

169.    I have been a member of the American Society of Civil Engineers (ASCE) Task Committee on *Guidelines for Failure Investigation* of the Technical Council on Forensic Engineering since 1990. I participated in preparation and revisions to the ASCE publication titled *Guidelines for Failure Investigation*. Given my extensive background in engineering (practice, research, management, teaching), investigation of incidents, accidents, and disasters (more than 630 including the Piper Alpha North Sea platform, the Exxon Valdez tanker, the NASA Columbia shuttle, and most recently, the BP Deewater Horizon Macondo well disaster), and in the investigations of the failures of the flood protection system for the Greater New Orleans Area prior to March 2007 (ILIT) and after March 2007 (in connection with the district court proceedings), I do not think I have incorrectly used the words "Forensic Engineering" as they apply to the work I have done

---

[56] A PDF copy of this book has been provided as part of my reliance materials.

as part of the litigation proceedings. I have not attempted to glorify my investigations and conclusions associated with my Forensic Engineering investigations of the causes of the North Breach and South Breach at the Lower 9th Ward.

170.    Given the importance of the scientific issues presented in this litigation, it would be appropriate to require Drs. Marr, Silva-Tulla, Brandon, and Stark to properly document and qualify themselves as having the necessary professional training, knowledge, and experience specifically in 'Forensic Engineering' investigations of complex system failures and disasters. At a minimum, they should be required to demonstrate and document that they have the necessary qualifications to render reliable opinions involving Forensic Engineering analyses of important complex engineered systems such as the Greater New Orleans area flood protection facilities that performed so miserably and tragically during Hurricane Katrina.

171.    I reserve the right to revise my forensic engineering analyses, conclusions, professional opinions based on the additional information that could be developed from my continuing reviews of the Defense Expert Reports, reliance documents, requested files, and any other documents that are produced by any party. I also reserve the right to revise my forensic engieering analyses, conclusions, and professional opinions based on the qualitative and quantitative analysis work I have initiated as a result of my preliminary reviewes of the Defense Expert Reports, reliance documents and requested files.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 3, 2012 in Moraga, California.

Robert G. Bea, Ph.D, PE

## IV. REFERENCES

American Society of Civil Engineers (ASCE) (1989-2010). *Guidelines for Failure Investigations*, Committee on Guidelines for Failure Investigation, Technical Council on Forensic Engineering, ASCE, Herndon, VA.

ASCE (2007). *The New Orleans Hurricane Protection System: What Went Wrong and Why*, Report by the American Society of Civil Engineers Hurricane Katrina External Review Panel, ASCE, Herndon, VA.

ASCE (2009). Guiding Principles for the Nation's Critical Infrastructure, Herndon, VA.

Bakeer, R.M. (2009). LNA-Barge ING 4727 – Levee Failures During Hurricane Katrina, New Orleans, Expert Report to Chaffe McCall LLP, New Orleans, LA.

Bea, R.G. (1990). *Reliability Based Design Criteria for Coastal and Ocean Structures*, National Committee on Coastal and Ocean Engineering, The Institution of Engineers Australia, Barton, ACT.

Bea, R.G. (1999). "Human and Organizational Factors in Quality and Reliability of Engineered Systems," Proceedings on Managing Safety in Hazardous Processes, SHE Pacific Pty. Ltd., Melbourne, Australia.

Bea, R.G. (2000). *Human & Organizational Factors in Design & Reliability of Offshore Structures,* Centre for Oil & Gas Engineering, The University of Western Australia, Nedlands, WA.

Bea, R.G. (2001a). "Some thoughts at graduation," Center for Catastrophic Risk Management, University of California Berkeley, University of Western Australia Graduation Ceremony Keynote Speech; Included in engineering graduate course notes 2001 – 2011.

Bea, R.G. (2001b). "The World Needs Engineers with Integrity," Center for Catastrophic Risk Management, University of California Berkeley; Included in engineering graduate course notes 2001 – 2011.

Bea, R.G. (2002). *Load Engineering – Reliability based loadings for the life-cycle engineering of systems,* Vick Copy Publishers, Berkeley, CA.

Bea, R.G. (2005). "Reliability and Human Factors in Geotechnical Engineering," Journal of Geotechnical and Geoenvironmental Engineering, Paper No. GT/04/23943m American Society of Civil Engineers, Herndon, VA.

Bea, R.G. (2006a). "Reliability and Human Factors in Geotechnical Engineering," Journal of Geotechnical and Geoenvironmental Engineering, Vol. 132, No 5, ASCE.

Bea, R.G., (2006b). "Connecting the Lower Ninth Ward "Dots", Center for Catastrophic Risk Management, University of California, Berkeley.

Bea, R.G., (2007a). "Lessons from Failure of the Flood Proteccion System for the Greater New Orleans area During Hurricane Katrina," Proceedings of OMAE 2007: 6th Int. Conference on Offshore Mechanics and Arctic Engineering, American Society of Mechanical Engineers, New York, NY.

Bea, R.G., (2007b). "Reliability Assessment & Management Lessons from Hurricane Katrina," Proceedings of OMAE 2007: 6th Int. Conference on Offshore Mechanics and Arctic Engineering, American Society of Mechanical Engineers, New York, NY.

Bea, R. G. (2008a). Expert report concerning the performance during Hurricane Katrina of the man-made features bordering the Inner Harbor Navigation Canal at the Lower 9th Ward. Declaration submitted on behalf of the Plaintiffs in Robinson v. United States in connection with the Flood Control Act immunity issues, March 25, 2008.

Bea, R.G. (2008b). "Failure of the New Orleans 17th Street Canal Levell & Floodwall During Hurricane Katrina," From Research to Practice in Geotechnical Engineering (Eds. J.E. Laier, D. K. Crapps, and M. H. Hussein, Geotechnical Special Publication No 180, American Society of Civil Engineers, Herndon, VA.

Bea, R.G. (2008c). "Failure of the New Orleans 17th Street Canal Levee & Floodwall During Hurricane Katrina," Proceedings Schmertmann Symposium, GeoCongress 08, ASCE.

Bea, R.G. (2009a). Supplemental Analyses of the Floodwall Failure at the North Breach on the Inner Harbor Navigation Canal During Hurricane Katrina on August 29, 2005, Report to Goodwin Procter LLP, Washington, DC.

Bea, R.G. (2009b). Forensic Engineering Analysses of the London Avenue Canal Breaches, Center for Catastropic Risk Management, University of California Berkeley.

Bea, R.G. (2009c). Forensic Engineering Analyses of the 17th Street Canal Breach, Center for Catastrophic Risk Management, University of California Berkeley.

Bea, R.G. (2009d). *Margins of Quality for the Lifecycle of Engineered Systems*, Vick Copy Publishers, Berkeley, CA.

Bea, R.G. (2010). Barge Trial Direct Examination Testimony, United States Federal District Court, Eastern District of Louisana.

Bea, R.G. (2011). *Human and Organizational Factors: Quality & Reliability of Engineered Systems*, Vick Copy Publishers, Berkeley, CA.

Bea, R.G. (2012). Expert Report of Robert Glenn Bea, PhD., P.E., For Katrina Canal Breaches Consolidated Litigatioin, United States District Court, Eastern D9istrict of Louisiana, February 1, 2012.

Bea, R.G. and Cobos-Roa, D. (2007), Analyses of the Failure of the 17th Sreet Canal Flood Protection Structure During Hurricane Katrina, Report to Katrina Canal Breaches Consolidated Litigation, Risk Assessment and Management Services, Moraga, CA.

Bea, R.G. and Cobos-Roa D. (2008a). "Failure of the I-Wall Flood Protection Structures at the New Orleans Lower 9th Ward During Hurricane Katrina," Electronic Journal of Geotechnical Engineering, Stillwater, OK.

Bea, R.G. and Cobos-Roa, D. (2008b). "Discussion of Stability of I-Walls in New Orleans During Hurricane Katrina," Journal of Geotechnical and Geoenvironmental Engineering (In Press), American Society of Civil Engineers, Herndon, VA.

Bea, R. G. and Cobos-Roa, D. (2008c). Analyses of the Effects of the USACE IHNC Lock Expansion Project East Bank Industrial Area Site Clearing Excavations on Development of the Breaches at the Lower 9th Ward During Hurricane Katrina, Technical Report to Consolidated Katrina Litigation Plaintiffs Counselor Committee, Risk Assessment & Management Services, Moraga, CA.

Bea, R.G., and Cobos-Roa., D. (2008d). Analyses of Breaching of the MR-GO Bayou Dupre & Bayou Bienvenue Navigation Sructures During Hurricane Katrina, Report for Katrina Canal Breaches Consolidated Litigation, Civil Action Number:05-4182 "K" (2), United States District Court, Eastern District of Louisiana.

Bea, R.G., Roberts, K., Radke, J., Farger, D., mitroff, I., Roe, E., and Tierney, K. (2008). EFRI-RESIN: Assessing and Managing Failure Vulnerabilities of Interdependent Complex Infrastructure Systems, Proposal to the National Science Foundation, Center for Catastrophic Risk Management, University of California Berkeley.

Bea, R.G., and Cobos-Roa, D. (2009). 2D and 3D Seepage Analyses: Lower 9th Ward Breaches, Report for Katrina Canal Breaches Consolidated Litigation, Civil Action Number:05-4182 "K" (2), United States District Court, Eastern District of Louisiana.

Bea, R. G. and O'Reilly, D. (2009). "Discussion of Analysis of the Stability of I-Walls with Gaps Between the I-Wall and the Levee Fill," Journal of Geotechnical and Geoenvironmental Engineering, American Society of Civil Engineers, Herndon, VA.

Bea, R.G., Cobos-Roa, D., and Storesund, R. (2009). "Discussion of Overview of New Orleans Levee Failures: Lessons Learned and Their Impact on Natioinal Levee Design and Assessment," Journal of Geotechnical and Geoenvironmental Engineering, American Society of Civil Engineers, Herndon, VA.

Bea, R.G., and Cobos-Roa, D. (2009). "Discussion of Stability of I-Walls in New Orleans during Hurricane Katrina," Journal of Geotechnical and Geoenvironmental Engineering (In Press), American Society of Civil Engineers, Herndon, VA.

Bea, R.G. and Storesund, R. (2008). Review of USACE Excavation and Backfill Guidelines and Practices Near Flood Control Structures, Technical Report No.. IV, Katrina Canal Breaches Consolidated Litigation, Civil Action Number: 05:4182 "K" (2), United States District Court, Eastern District of Louisiana, Pertains to MR-GO, Robinson [No. 06-2268].

Bea, R.G. and Storesund, R. (2009). Validations of EBSB Wave Induced Erosion and Breaching analyses, Technical Report II, Report to Katrina Canal Braches Consolidated Litigation, U.S.District Court, Eastern District of Louisiana, Risk Assessment and Management Services, Moraga, CA.

Bea, R.G., Brodsky, R., and Storesund, R. (2011). A Method to Determine Probability o Failure Caused by Seepage Under Levees, Report to the National Science Foundation, 2011 RESIN Sherman Island Pilot Project 2 Seepage Report, Center for Catastrophic Risk Managmeent, Institute for Ecconomics and Business Research, University of California, Berkeley, April.

Binkgreve, R.B.J., Swolfs, W.M., and Engin, E. PLAXIS 2D (2011), Delft University of Technolkogy & Plaxis bv, The Netherlands, http://plaxis.nl/sop/135/info/manuals/

Black & Veatch (2009). *95% Report, Safe Water Elevation Evaluation, London Avenue Canal,* Report to USACE Hurricane Protection Office, New Orleans, LA.

Brandon, T.L. (2007a). *Analysis of the London Avenue Canal Load Test – Section 1 – Seepage and Stability Analysis,* Report to USACE, Washington DC.

Brandon, T.L. (2007b). *Analysis of the London Avenue Canal Load Test – Impeded Drainage Analysis Analysis,* Report to USACE, Washington DC.

Brandon, T.L. (2008). "Analysis fo the Ítability of I-Walls withGaps between the I-Wall and the Levee Fill," J. of Geotechnical and Geoenvironmental Engineering, Vol. 134, No. 5, American Society of Civil Engineers, Reston, VA.

Brandon, T.L, (2012). Assessment of IHNC Hurricane Katrina Failures, Technical Report to katrina Canal Breaches Consolidated Litigatioin, U.S. District Court Eastern District of Louisiana, March 8, 2012.

Brown, Cunningham, and Gannuch (2000).  "Inner Harbor Navigation Canal Lock Replacement Project, Orleans Parish, Louisiana, Lateral Flood Protection Design Report, Contract No. DACW 29-99-D-0022."  Prepared for: Department of the Army, New Orleans District, Corps of Engineers, New Orleans, Louisiana.

Campbell, M.D., Starrett, M.S., Fowler, J.D., and Klein, J.J. (1990). "Slug Tests and Hydraulic Conductivity," Journal of Ground Water Management, No. 4, Assocation of Ground Water Scientists and Engineers and the AmnericanPetroleum Institute.

CivilTech Softwre (2010). Shoring Suite, Version 8, User's Manual. http://www.civiltechsoftware.com/software/shoring.php

Cobos-Roa, D. and Bea, R.G. (2008). "Three-Dimensional Seepage Effects at Three New Orleans Levee Breaches During Hurricane Katrina," Electronic Journal of Geotechnical Engineering, Stillwater, OK.

Cobos-Roa, D., and Grunauer, X.V. (2011). Seepage and Stability Analyses for the North and South Breaches Along the East Bank of the IHNC in New Orleans During Hurricane Katrina in 2005, GeoEstudios S.A.

Cobos-Roa, D., and Grunauer, X.V. (2012). Seepage and Stability Analyses for the North and South Breaches Along the East Bank of the IHNC in New Orleans During Hurricane Katrina in 2005, GeoEstudios S.A.

Code of Federal Regulations § 208.10 Part 208 – Flood Control Regulation, Corps of Engineers, Dept. of the Army, DOD, Washington DC.

Committee on Homeland Security and Governmental Affairs (2006). Hurricane Katrina – A Nation Still Unprepared. United States Senate, Washington, DC.

Cushing, C.R.w & Co. (2009). Analysis of the Transit of the Barge ING 4727 During Hurricane Katrina and Reasons Why It Did Not Cause of the Failure of the Inner Harbor Navigation Canal Floodwall, Project Report No. 2581, Expert Report Prepared for Goodwin Procter LLP, Washington D.C.

Dalrymple, R.A. (2011). Interior Flooding of the Lower 9th Ward, Report to Dept. of Justice, Washington DC.

Dawkins, W.P. (1991). User's Guide: Computer Program for Design and Analysis of Sheet-Pile Walls By Classical Methods (CWALHT) Including Rowe's Moment Reduction, Department of the Army, Waterways Experiment Station, Corps of Engineers, Computer-Aided Struccctural Engineering (Case) Project, Instruction Report ITLK-91-1, Vicksburg, MS.

Deposition of Melvin M.L. McElwee (2008). Transcript, United States District Court, Eastern district of Louisiana, In RE: Katrina Canal Breaches, Civil Actioni, Consolidated Litigaton, No. 05-4182 K2, New Orleans, Louisiana.

Dunbar, J.B. (2012). Expert Report, Geologic Site Characterization, East Side of the Inner Harbor Navigation Canal (IHNC), for Katrina Canal Breaches Consolidated Litigation, U.S. District Court, Eastern District of Louisiana.

Duncan, J.M., Brandon, T.L, Wright, S.G., and Vroman, N. (2008). "Stability of I-Walls in New Orleans during Hurricane Katrina," J. of Geotechnical and Geoenvironmental Engineering, Vol. 134, No. 5, May, Reston, VA.

Exponent – Failure Analysis Associates (2012a). *IHNC North Brach Piling Failure Analysis*, Menlo Park, CA.

Exponent – Failure Analysis Associates (2012b). Katrina Canal Breaches Standard of Care Review Washington /Group International, Inc., Menlo Park, CA.

Federal Emergency Management Agency (FEMA) (2006). Hurricane Katrina in the Gulf Coast, FEMA 549, Washington DC, July.

Fugro Consultants, Inc. (2012). Geotechnical Data Report, Inner Harbor Navigation Canal, East Bank Industrial Area (IIHNC-EBIA) Field & Laboratory Testing Program, New Orleans, Louisiana, Draft Report Prepared for Washington Group International, Inc., (URS Energy and Construction, Inc.), c/o Stone Pigman Walther Wittman, L.L.C., United States Department of Justice, PSLC-MRGO, L.L.C., Fugro Report No. 04.57114007-2, March 2012.

Geo-Slope International Ltd (2007). *Seepage Modeling with SEEP/W 2007*, Second Edition, http://www.geo-slope.com/products/seepw2007.aspx.

Geo-Slope International Ltd (2007). Slope Stability Modeling with SLOPE/W, Second Edition, http://www.geo-slope.com/products/slopew2007.aspx.

Independent Levee Investigation Team (ILIT) (2006). Investigation of the Performance of the New Orleans Flood Protection System in Hurricane Katrina on August 29, 2005. University of California, Berkeley. Dated July 31, 2006. Available from: www.ce.berkeley.edu/~new_orleans. Date accessed: August 20, 2007.

Interagency Performance Evaluation Team (IPET). "Post-Katrina LiDAR (Chance 2005)." Available from: https://erdcpw.erdc.usace.army.mil/LDR/mapapp/. 2005.

Interagency Performance Evaluation Team. 2007a. "Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System. Final Report of the Interagency Performance Evaluation Task Force. Volume IV – The Storm. Final." Dated March 29, 2006. Available from: https://ipet.wes.army.mil/.

IPET – Interagency Performance Evaluation Task Force (2007), Final Report on the Interagency Performance Evaluation Task Force, Volume V, The Performance – Internal Drainage and Pumping.

IPET – Interagency Performance Evaluation Task Force (2007), Final Report on the Interagency Performance Evaluation Task Force, Volume II, Geodetic Vertical and Water Elevation Datums.

Kardon, J.B. (2002). "Applying the Franmework of the Ethic of Care to /civil EngineeringPractice," Proceedings Internationa. Conference on Research in Ethics and Engineering, Delft University of Technology, Delft, The Netherlands.

Kardon, J.B. (2003). The Standard of Care of Structural Engineers, Doctoral Dissertation, Submitted to the Graduate Division of the University of California, Berkeley, Professors R.B.  Williamson and R. G. Bea Co-Chairmen of the Research Dissertation Committee.

Kardon, J.B. (2005), "Concept of Care in Engineering," J. of Performance of Constructed Facilities, Vol. 19, No. 3, American Society of Civil Engineers, Herndon, VA.

Kardon, J. B., Bea, R.G., and Williamson, R.B. (2006): "Validity and Reliability of Forensic Engineering Methods and Processes," Proceedings 4th Forensic Congress, American Society of Civil Engineers.

Kok, Matthijs (2012). "Hydrographs New Orleans", Answers to questions February 2012, Delft University of Technology, Delft, The Netherlands.

Lambe, T.W. and Whitman, R.V. (1969). *Soil Mechanics*, John Wiley & Sons, Inc., New York.

Lucia, P.C. (2012). Evaluation of Compliance with the Standard of Care for the TERC Task Order 26 Remediationo f the East Bank Industrial Area of the Inner Harbor navigation Canal (IHNC) in the Lower 9th Ward of New Orleans, Report to U.S. Depoartment of Justice, for Katrina Canal Breaches Consolidated Litigation, U.S. District Court, Eastern District of Louisiana.

Marino, G.G. (2009). Failure Investigation of the North and South Breaches Along the IHNC During Hurricane Katrina, St. Bernard Parish, New Orleans, LA, Report to Wiedemann & Widemann, New Orleans, LA.

Marr, W.A (Allen) (2012). What Caused the I-Wall Failures at the EBIA North and South Breaches?, Report Prepared for the U.S. Department of Justice, Washington DC.

McCook, D. (2010). "A Discussion of Uplift and Exit Gradient Terminology and Factors of Safety," Kleinfelder Incl, USACE Infrastructure Conference, Atlanta, GA.

MMG (Materials Management Group) (2001), Inner Harbor Navigation Canal East Bank Industrial Area, New Orleans, Louisiana, McDonough Marine Site Assessment Drilling Report – II, June.

Money, R.L. (2006). "Comparison of 2D and 3D Seepage Model Results for Excavation Near Levee Toe, Proceedings GeoCongress 2006, ASCE.

Morris, C.A, (2011). Survey and Spatial Data in the Vicinity of the Inner Harbor Navigation Canal (IHNC), Expert Report for Katrina Canal Breaches Consolidated Litigation, Civil Action Number:05-4182 "K" (2), United States District Court, Eastern District of Louisiana.

Mitchell, J.K. (1976). Fundamentals of Soil Behavior, John Wiley & Sons, Inc., New York.

National Academy of Engineering and National Research Council (NAE / NRC) (2008). Report of the National Academy of Engineering / National Research Council Committee on New Orleans Regional Hurricane Protection Projects, The National Academies Press, Washington, DC.

National Institute for Standards and Technology (2006). Performance of Physical Structures in Hurricane Katrina and Hurricane Rita: A Reconnaissance Report, NIST Technical Note 1476, Gaithersburg, MD.

Naymik, T. (2012). In Re: Katrina Canal Breaches Consolidated litigation, United States District Court, Eastern District of Louisiana, Report Prepared for U.S. Department of Justice, Prepared by Geosyntec Consutants, Worthington, OH.

Pantazidou, M., and Nair, I. (1999). "Eithif of Care: Guiding Principles for Engineering Teaching and Practice," Journal of Engineering Education, April.

R. Christopher Goodwin & Associates, Inc., (1992), A Land Use History of Areas Adhjacent to the Inner Harbor Navigational Canal Lock, New Orleans, Report to U.S. Army Corps of Engineers, New Orleans District, CulturalResource Studies, Report No. COELMN/PD-92/08, Nov. 1992.

Rogers, J.D. (2012). Site Characterization of Eastern Side of the Inner Harbor Navigation Canal (IHNC) in the Lower 9th Ward of New Orleans. For Katrina Canal Breaches Consolidated Litigation, US, District Court Eastern district of Louisiana.

Rosenberg, D. (2008). Case Study of the SELA Dwyer Road Drainage Pumping Station Imprvements, Discharge Tubes and Canal, Report to Bruno and Bruno, New Orleans, Louisiana.

Rogers, J.D., (2012), Site Characterization of Eastern Side of the Inner Harbor Navigation Canal (IHNC) in the Lower 9thWard of New Orleans, Report for Katrina Canal Breaches Consolidated Litigation, Civil Action Number:05-4182 "K" (2), United States District Court, Eastern District of Louisiana.

Schleifstein, M.S. (2009). "Study of Hurricane Katrina's dead show most were old, lived near levee breaches," The Times-Picayune, August 27, 2009, New Orleans, LA.

Seed, R.B., Nicholson, P.G., Dalrymple, R.A., Battjes, J.A., Bea, R.G., Boutwell, G.P., Bray, J;.D., Collins, B.D., Harder, LF., Headland, J.R., Inamine, M.S., Kayen, R.E., Kuhr, R.A., Poestana, J.M., Silva-Tulla, F., Storesund, R., Tanaka, S., Wartman, J., Wolff, T.F., Wooten, R.L., and Zimmie, T.F. (2005). Preliminary Report on the Performance of the New Orleans Levee Systems in Hurricane Katrina on August 29, 2005, Report No. UCB/CITRIS –05/01, November 17, University of California Berkeley.

Seed, R. B., Bea, R. G., Abdelmalak, R. I., Athanasopoulos, A. G., Boutwell, G. P., Bray, J. D., Briaud, J. L., Cheung, C., Cobos-Roa, D., Cohen-Waeber, J., Collins, B. D., Ehrensing, L., Farber, D., Hanemann, M., Harder, L. F., Inkabi, K. S., Kammerer, A. M., Karadeniz, D., Kayen, R.E., Moss, R. E. S., Nicks, J., Nimmala, S., Pestana, J. M., Porter, J., Rhee, K., Riemer, M. F., Roberts, K., Rogers, J. D., Storesund, R., Govindasamy, A. V., Vera-Grunauer, X., Wartman, J. E., Watkins, C. M., Wenk Jr., E., and Yim, S. C. (2006), Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005, Final Report to the National Science Foundation, under Grants CMS-0413327 and CMS-0611632, July 31, 2006, 742 p.

Seed, R.B. et al (2008a), "New Orleans and Hurricane Katrina. I: Introduction, Overview, and the East Flank," Journal of Geotechnical and Geoenvironmental Engineering, Vol. 134, No 5, ASCE.

Seed, R.B. et al (2008b), "New Orleans and Hurricane Katrina. II: The Central Region and the Lower 9th Ward," Journal of Geotechnical and Geoenvironmental Engineering, Vol. 134, No 5, ASCE.

Seed, R.B. et al (2008c), "New Orleans and Hurricane Katrina. III: The 17th Street Drainage Canal," Journal of Geotechnical and Geoenvironmental Engineering, Vol. 134, No 5, ASCE.

Seed, R.B. et al (2008d), "New Orleans and Hurricane Katrina. IV: Orleans East Bank (Metro) Protected Basin," Journal of Geotechnical and Geoenvironmental Engineering, Vol. 134, No 5, ASCE.

Senate Committee on Homeland Security and Governmental Affairs (2006). Hurricane Katrina: A Nation Still Unprepared, Washington DC.

Silva-Tulla, F. (2012). Failures at the Inner Harbor Navigational Canal, East Bank Industrial Area, during Hurricane Katrina, Report to Jones Day, Washington, D.C.,., Stone Pigman Walther Wittmann L.L.C., GeoEngineering & Environment, Lexington, MA.

Stark, T.D. (2012). Expert Report, Effect of WGI Excavations on Floodwall Breaches in USACE IHNC Est Bank Industrial Area and Inundation of Lower 9th Ward During Hurricane Katrina in 2005, Expert reprot for Katrina Canal Breaches Consolidated Litigation, U.S. District Court, Report Prepared for U.S.Department of Justice, Washington, DC.,

Storesund, R., Bea, R. G., and Huang, Y. (2010). "Simulated Wave-Induced Erosion of the Mississippi River-Gulf Outlet Levees during Hurriccane Katrina," *J. Waterway, Port, Coastal, and Ocean Engineering,* American Society of Civil Engineers, May/June, Reston, VA.

Technical Advisory Committee for Flood Defence in the Netherlands (2010). Technical Report, Erosion Resistnce of Grassland as dike Covering, Delft, The Netherlands.

Team Louisiana (2006). The Failure of the New Orleans Levee System During Hurricane Katrina, Report to Louisiana Department of Transportation and Development, State Project No. 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,20, Baton Rouge, LA.

Terzaghi, K. and Peck, R.B. (1948). Soil Mechanics in Engineering Practice, John Wiley & Sons, Inc., New York.

Townsend, F. F. (2006). The Federal Response to Hurricane Katrina, Lessons Learned, Report to The President of the United States, The White House, Washington, DC.

Toronto, J.C.(1993). *Moral Boundaries: A Political Argument for an Ethic of Care*, Routledge, New York, NY.

URS Corporation / Jack R. Benjamin & Associates, Inc. (2008). Levee Vulnerability, Technical Memorandum, Delta Risk Management Srrategy (DRMS) Phase 1, Report to Caifornia Department of Water Resources (DWR), Sacramento, CA.

U.S. House of Representatives Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina (2006). A Failure of Initiative. U.S. Government Printing Office, Washington, DC, <http://www.gpoaccess.gov/congress/index.html> (Mar. 15, 2006).

USACE (1969), Design Memorandum DM03, Chalmette Area Plan, Lake Pontchartrain and Vicinity.

USACE (1956). Investigation of Underseepage and its Control, Lower Mississippi River Levees, Technical Memorandum No. 3-424, Waterways Experiment Station, Vicksburg, MS.

USACE (1989). "Engineering and Design, Retaining and Flood Walls, EM 1110-2-2502," Department of the Army, U.S. Army Corps of Engineers, Washington D.C. 20314-1000. <http://www.usace.army.mil/publications/eng-manuals/em1110-2-2502/toc.htm>. September 29, 1989.

USACE (1992). A Land Use History of Areas Adjacent to the Inner Harbor Navigation Canal Lock, New Orleans, Cultural Resource Series Report No. COELMN/PD-92/08.

USACE (1993a) "Engineering and Design, Seepage Analysis and Control for Dams, EM 1110-2-1901," Department of the Army, U.S. Army Corps of Engineers, Washington D.C. 20314-1000. <http://www.usace.army.mil/publications/eng-manuals/em1110-2-1901/toc.htm>. April 30.

USACE (reprinted 1993b). Kansas City District. "Guidebook, General Information for Sponsors of Flood Protection Projects Constructed by the Corps of Engineers," <http://www.nwk.usace.army.mil/local_protection/pdf/guidebook.pdf >. April 1972.

USACE (1994). "Engineering and Design, Design of Sheet Pile Walls, EM 1110-2-2504," Department of the Army, U.S. Army Corps of Engineers, Washington D.C. 20314-1000. <http://www.usace.army.mil/publications/eng-manuals/em1110-2-2504/toc.htm>. March 31, 1994.

USACE (1998a). "Inner Harbor Navigation Canal, Lock Replacement Project, Design Memorandum No. 1, Site Preparation and Demolition, Plan," U. S. Army Engineer District, New Orleans. File No. H-2-45013, Plates 3, 4 and 5 (CAD Files IHNC3.DGN, IHNC4.DGN, and IHNC5.DGN). March 1998a.

USACE (1998b). "Engineering and Design, Removal of Underground Storage Tanks (USTs), EM 1110-1-4006," Department of the Army, U.S. Army Corps of Engineers,

Washington D.C. 20314-1000.  <http://www.usace.army.mil/publications/eng-manuals/em1110-1-4006/toc.htm>.  September 30, 1998b.

USACE (1999), Evaluating the Reliability of Existing Levees, ETL 1110-2-556, Washington DC.

USACE (2000). "Engineering and Design, Design and Construction of Levees, EM 1110-2-1913,"  Department of the Army, U.S. Army Corps of Engineers, Washington D.C. 20314-1000.  <http://www.usace.army.mil/publications/eng-manuals/em1110-2-1913/toc.htm>.  April 30, 2000.

USACE (2003). Recommendations for Seepage Design Criteria, Evaluation and Design Practices, Report Prepared for the Sacramento District, Sacramento, CA.

USACE (2005a), Guidance for Work Proposed Near or Within A Federally Constructed Flood Control Project, USACE Washington D.C.

USACE (2005b), Design Guidance for Levee Underseepage, ETL 1110-2-569, Washington, DC.

USACE (2006), "Overview Briefing Lower 9th Ward and Inner Harbor Navigation Canal (IHNC)," University of Notre Dame, November 6.

USACE (2006b). Post Katrina Hurricane Flood Protection I-Wall Design Criteria, 20 April, 2006, Washington DC.

USACE (2007). Certification of Levee Systems for the National Flood Insurance Program (NFIP), Engineering and Design, September 12, Washington DC.

USACE Interagency Performance Evaluation Task Force (IPET) (2007). Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System. USACE, Washington DC.

USACE, New Orleans District Engineering Division (2007). 17th Street Canal Analysis of Existing Conditions, May 11, 2007.

USACE (2008), The London Avenue Site Specific Load Test, A Report by the Hurricane Protection Office of the US Army Corps of Engineers and the St. Louis District Corps of Engineers, Final Version, Washington, DC.

USACE Kansas City District (2008).  "Geotechnical Design and Dam Safety Section – Construction Guidance Page," <http://www.nwk.usace.army.mil/local_protection/guidance.html>.  Accessed May 12, 2008.

USACE and The St. Louis District Corps of Engineeers (2008). The London Avenue Site Specific Load Test, Final Version, Washington, DC.

USACE (2011a). Engineering and Design, Evaluation of I-Walls, CECW-CE, Technical Letter 1110-2-575, ETL 1110-2-573, Washington, DC.

USACE (2011b). Design of I-Walls, CECW-CE Circular No. 1110-2-6066, EC 1110-2-6066, April 1, 2011, Washington DC.

Vaughan, D (1996), *The Challenger Launch Decision: Risky Technology, Culture, and Deviance at NASA*, the University of Chicago Press, Chicago, IL.

Washington Group International, Inc. (2000). Project Work Plan, Project Site Development and Remedial Action of East Bank Industrial Area, Inner Harbor Navigation Canal Lock Replacement Project, Report to U.S. Army Corps of Engineers, New Orleans District, Report WGI041879.

Washington Group International, Inc. (2005a). Technical Completion Report and Record Drawings Inner Harbor Navigational Canal – East Bank Industrial Area, Report to U.S. Army Corps of Engineers, New Orleans District, Report WGI079460, July.

Washington Group International, Inc. (2005b). Groundwater Characterization / Monitoring Report, Monitoring Period – April 2005, Inner Harbor Navigation Canal – East Bank Industrial Area, 1800 – 2500 Surkekote Road, New Orleans, Louisiana, Parish: Orleans, AI-1398, Report to U.S. Army Corps of Engineers, New Orleans District, August.

Wolff, T. (1999). Evaluating the Reliability of Existing Levees, Appendix B, USACE ETL 1110-2-5566, May, Washington DC., Appendix B, USACE ETL 1110-2-5566, May, Washington DC.

Wolff, T. (2002). Pewrformance of Levee Underseepage Conotrols: A Critical Review, Geotechnical and Structrures Laboratory, ERDC/GSL TR-02-19, USACE Engineer Research and Development Center, Vicksburg, MS.

Woolley D. and Shabman, L. (2008). Decision-Making Chronology For the Lake Pontchartrain & Vicinity Hurricane Protection Project, Final Report for the Headquarters, U.S.Army Corps of Engineers, Institute for Water Resources of the U.S. Army Corps of Engineers, Washington, DC.

Wooten, R. L. et al (2009). Reconnaissance of the New Orleans Hurriane and Storm Damage Risk Reduction System after Hurricane Gustav, Report to Geoengineering Extreme Events Reconnaissance (GEER) Association, National Science Fondation, GEER Assocation Report No. GEEER-0115, Washington DC.

## V.  APPENDIX A – EVALUATION OF HYDRAULIC CODUCTIVITIES
### Dr. Robert Bea and Mr. Kevin Pope

## Compressibility Considerations in Analyses of Field HydraulicTesting to Determine Hydraulic Conductivities - Permeabilities

1.     Slug testing is one of the easiest tests conducted on a single well to determine hydraulic properties.  In a slug test a Slug (weighted pipe) is introduced or removed from the well.  This is accomplished one of two ways.  A slug is lowered into the well casing, quickly raising the water level; or a bailer is used to remove a "slug" of water from the well.  Water level measurements are taken prior to the introduction of the slug, and thent regular intervals after the introduction of the slug, until the well's water level recovers to its pre-introduction levels. Water level along with time are recorded and then entered into a formula to determine hydraulic properties.  For slug testing there are two commonly used solutions, the Hvorslev solution and the Bower and Rice solution.

2.     Freeze and Cherry (1979) page 340 state: "The simplest interpretation of piezometer-recovery data is that of Hvorslev (1951).  His initial analysis assumed a homogeneous, isotropic, infinite medium <u>in which both soil and water are incompressible.</u>

3.     Golder Associates Report on Pre-Design Investigation Slug Test Report, Industri-Plex Site, Woburn, Massachusetts (1991) Page 6 gives the following criteria for the Hvorslev and Bouwer and Rice methods. "Both the Hvorslev method(Hvorslev, 1951) and Bouwer and Rice method (Bouwer and Rice, 1976; Bouwer, 1989) were used in analyzing the field data.

4.    The theoretical analysis of each method is based on the following assumptions:

- Water is removed from the piezometer or added to the piezometer instantaneously;

- The aquifer is homogeneous and isotropic;

- Darcy's law is valid;

- <u>Both soil and water are incompressible;</u>

- The aquifer extends to infinity in all directions;

- The position of the water table does not change with time;

- Flow above the water table (in the capillary fringe) can be ignored;

- The aquifer is uniform with depth;

- Head losses as water enters the well (well losses) are negligible.

5.    AQTESOLV User's Manual (2007 Version 4.5)page 367 states that "The Hvorslev method employs a Quasi-steady-state model that <u>ignores elastic storage</u> in the aquifer" and on page 370 under Bower and Rice assumptions we see "flow to well is quasi-steady-state" – equivalent to 'Steady Flow' conditions.

6.    It should be noted that the Hvorslev solution (refence) is for slug tests in a confined aquifer and the Bower and Rice solution is primarily intended for evaluation of unconfined aquifers, however, the literature states that it could be applied to a confined aquifer – the condition appropriate for the buried swamp-marsh deposits beneath the Lower 9th Ward.

7.    Another method of assessing hydraulic properties of an aquifer is the use of a Pumping Test.  In a pumping test a pumping, or control well,is located in the center of an array of observation wells, usually distributed radially about the control well. Water

is then withdrawn from the central pumping well at a near-constant rate and the water level is observed in the observation wells.  Using the flow rate from the pumping well, along with drawdown measurements from the observation well, distance from the pumping well, and time data, hydraulic properties of the formation can be calculated by any of a number of accepted solutions.

8.      One of the most widely used solutions is the Theis Equation, or Solution. The Theis Solution was developed by Charles Vernon Theis in 1935 while working for the US Geological Survey.  He developed his solution based on heat transfer documents he was reviewing along with early hydrologic data.  The Theis Solution changed the way pump test would be conducted and the way in which they are evaluated.  Most pumping test solutions derived since 1935 are modifications of the original Theis Solution.  The Theis Solution was the first to account for unsteady-state flow that introduces the time factor and storativity.  It is also the first graphical solution rather than a strict formula-based solution.  Using the Thies Solution requires the data to be plotted on a log-log graph (curve) which is then compared with predetermined type curve.  When the data curves line up, you take the match point and enter location into a simple formula that gives you your hydraulic properties.

9.      A brief review of the Theis Solution reveals that the compressibility of soil and water is not taken into account. In the paper titled "Modified Theis equation by considering the bending effect of the confining unit," by Xu Sheng Wang, Chong Xi Chen, Jiu J. Jiao we learn that <u>"The Theis equation was derived under the assumption that total stress in the aquifer was constant and the mechanical behavior of the confining unit was neglected."</u>

10.     We do know that compressibility plays a noticeable role in confined aquifers and a lesser role in unconfined aquifers.  When ground water is pumped from confined aquifers the formation is not dewatered but some additional water results from expansion of the water as pressure is reduced (Storativity) and we see greater stresses placed on the formation.  As water is removed, the compressibility of the formation increases as the compressibility of the water decreases.  The opposite is true in an unconfined aquifer.   In an unconfined aquifer groundwater is removed from the formation causing it to dewater, having little effect on the compressibility of the formation and water contained within it.

11.     On a side note, the Defense Experts employed unconfined solutions for their pumping test data.  Unconfined solutions do not consider storativity, but rather specific yield. Specific yield does not specifically look at compressibility, but focuses more on effective porosity, since the effects of elasticity of the aquifer matrix and water are generally negligible.

## References

R. Allan Freeze and John A. Cherry (1979). *Groundwater*.

Robert J. Sterrett (2007). *Groundwater and Wells*, Third Edition.

G.P. Kruseman and N.S. de Riffer (2000). *Analysis and Evaluation of Pumping Test Data*, Second Edition.

Schlumberger Water Services (2011). Aquifer Test Pro User's Manual Version 2011.1.

Glenn M. Duffield (2007). AQTESOLV for Windows Version 4.5 User's Guide.

ASTM D4106-96 (2008). Standard Test Method for (Analytical Procedure) for Determining Transmissivity and Storage Coefficient of Nonleaky Confined Aquifers by the Theis Nonequilibiium Method.

ASTM D4043-96 (2004). Standard Guide for Selection of Aquifer Test Method in Determining Hydraulic Properties by Well Techniques.

Robert W. Stallman (1976). Techniques of Water-Resources Investigations of the United States Geological Survey, Chapter B1, Aquifer-Test Design, Observation and Data Analysis.

Golder Associates, Inc. (1991). Pre-Design Investigation Slug Test Report Industri-Plex Site, Woburn, Massachusetts.

Xu Sheng, Chong Xi Chen, and Jiu J. Jiao (2004), Modified Theis equation by considering the bending effect of the confining unit.

## VI. APPENDIX B – SURGE OVERTOPPING EROSION ANALYSES
## Dr. Robert Bea and Dr. Rune Storesund

## Site Characterization

1.      There are three primary characterization features required to analyze overtopping-induced erosion: floodwall geometry, embankment soil characteristics and armoring, and storm surge loading.

## Floodwall Geometry

2.      The ground surface profile and floodwall configuration were used to define the geometry at the time of Hurricane Katrina was based on site surveys completed by Wink[57] as well as wall surveys completed by Orleans Levee District.   The top of the floodwall was assumed to be at an elevation[58] of +12 feet NAVD 88 (best estimate), with a low elevation estimate of (11 ft) and a high elevation estimate of +13 feet.   Outboard (floodside) ground elevations varied from approximately +6 feet at the floodwall to about + 4 feet within the EBIA area (except at the north breach where Surekote Road ramps up and over the floodwall).

3.      Interior ground elevations on the protected side of the floodwall varied from about El. +4 feet to El. +6 feet.  The top of floodwall was reported to be approximately El. +11.3 feet at the North Breach site and El. +12.1 feet at the South Breach location.

4.      The South Breach site was much more exposed to incident waves and debris than the North Breach site.  The North Breach site was situated in a 90-degree bend in the floodwall and was flanked by Surekote Road ramping up and over the floodwall in order to provide

---

[57] Wink. (2005). Map of Survey, Eastbank Industrial Area, Inner Harbor Canal Elevations, Dwg. No. 680-01-1.
[58] All elevations are reported as NAVD88 (2004.65)

vehicular access to the EBIA.  Surekote Road had a crest elevation of approximately El. +12.5 feet and sloped down to the predominant site grade of approximately El. +4.5 feet.

## Floodwall Embankment Soil Characteristics & Armoring

5.      Erosion of the soils on the protected side of the floodwall can be calculated based on the hydraulic loads (demands) imposed on the soils based on the overtopped water cascading over the wall and impacting the ground and based on the ability of the soil to resist the hydraulic forces based on armoring and erodibility of the soils (capacity).

6.      Methods presented by USACE (2011) for overtopping of I-walls is a suitable means by which to calculate the impact of overtopping water on the landside soils.  Further modifications (Stein et al 1993 and Hanson et al 2002) appear appropriate to calculate the shear stress within the plunge pool.

7.      Grass turf mat covers on earthen embankments provides scour and erosion protection (USACE 2011).  No significant research has been conducted on damage function curves for grass turf based on jetting type overtopping, but correlations with flow velocity have been developed (Hewlett et al 1985, Seijffert and Verheij 1999) that estimate turf damage based on sustained exposure to hydraulic loading (measured via water velocity).  These correlations suggest that at a minimum, even a poor grass cover will provide 30-60 minutes of 'protection' before active erosion of soil initiates.  Defense Experts acknowledge the presence of grass turf and also acknowledge that there was no explicit accounting of the armoring effects of the present grass turf.  Incorporating the armoring effects of the grass turf impacts the failure sequence and timelines at both the North Breach and South Breach locations.

8.      Correlations for erodibility of earthen embankment soils have been developed using the Erosion Function Apparatus (EFA) test, pioneered by Prof. Jean Louis Briaud at Texas

134

A&M (Briaud et al 2001). Briaud et al (2009) presents a summary of EFA test samples, their geotechnical properties, and EFA test results. Table 1 shows a summary of the test results from Briaud 2009. As noted by Marr (2012), there is significant scatter in the presented data.

9.      However, the assumption that erosion rates can be estimated based on a linear function is incorrect. There are physical limits to the rate at which erosion can occur. The EFA testing apparatus is limited to the maximum velocity to which it can subject test specimens; as a result, it is not possible to ascertain the maximum erosion rate using the EFA. Storesund et al (2010) proposed a limit equivalent to double the maximum test value. The average erodibility rate for a lean clay (USCS classification of CL) in Table 1 is 160 millimeters per hour (mm/hr) The erodibility rate has a Coefficient of Variation of 155% (equivalent to prediction of earthquakes in inactive regions – reflective of a highly variable process, Bea 2011b). The maximum reported erosion rate for the lean clay (CL) was 1000 mm/hr. The average erodibility rate for a fat clay (USCS classification of CH) in Table 1 is 106 mm/hr with a Coefficient of Variation of 223%. The maximum reported erosion rate for the fat clay (CH) was 900 mm/hr.

Table 1.  Summary of EFA Tests (Briaud et al 2009)

| No. | Soil Classification | Sample No. | Data Source | Liquid Limit (%) | Plastic Limit (%) | Plasticity Index (%) | Unit Weight γ (kN/m³) | Water Content (%) | Undrained Shear Strength (kPa) | % Passing #200 Sieve | Mean Particle Diameter D** (mm) | Critical Shear Stress Tc (Pa) | Critical Velocity, Vc (m/s) | MAX EROSION RATE (mm/hr) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CH | S1-B1-(0-2 ft)-TW | ILIT 2006 (Katrina) | 65 | 22 | 43 | 20.2 | 31.7 | - | 89.9 | - | 12 | 1.5 | - |
| 2 | CH | S2-B1-(0-2 ft)-TW | ILIT 2006 (Katrina) | 49 | 17 | 32 | 19.7 | 16.1 | - | 67.2 | - | 11.3 | 1.5 | 2.5 |
| 3 | CH | S7-B1-(0-2 ft)-TW | ILIT 2006 (Katrina) | 78 | 32 | 46 | 17.4 | 26.7 | - | 90.1 | - | 4.7 | 1 | 3.5 |
| 4 | CH | S8-B1-(0-2 ft)-TW | ILIT 2006 (Katrina) | 85 | 36 | 49 | 17.7 | 32.3 | - | 97.3 | - | 5 | 1 | 11 |
| 7 | CH | S12-B1-(0-2 ft)-TW | ILIT 2006 (Katrina) | 67 | 21 | 46 | 14.8 | 44.9 | - | 92 | - | 0.7 | 0.4 | 60 |
| 16 | CH | Sims | Kwak, K. 2000, p. 81 & 88 | 84 | 16 | 68 | 19.6 | 25.3 | 23 | 99.1 | 0.0012 | 2.9 | 0.8 | 16 |
| 23 | CH | Bedias (90) | Kwak, K. 2000, p. 81 & 9C | 55 | 16 | 39 | 19.6 | 23.6 | 62 | 91.3 | 0.04 | 0.2 | 0.3 | 50 |
| 31 | CH | 1459 | SSRICOS | 57 | 15 | 42 | 18.5 | 28.8 | - | 83.2 | 0.004 | 0.6 | 0.5 | 9 |
| 33 | CH | 1460 | SSRICOS | 70 | 20 | 50 | 17 | 36 | - | 94.8 | 0.001 | 9.4 | 1.3 | 60 |
| 34 | CH | 1462 | SSRICOS | 64 | 17 | 47 | 17.9 | 29.1 | - | 87.2 | 0.004 | 2.2 | 0.5 | 5 |
| 37 | CH | 1466 | SSRICOS | 54 | 25 | 29 | 19.3 | 22.4 | - | 99.4 | 0.009 | 3.7 | 0.9 | 800 |
| 40 | CH | EFA-1 | TxDOT | 99 | 77 | 22 | 18 | 32.6 | - | 98.3 | - | 0.4 | 0.3 | 12 |
| 45 | CH | EFA-6 | TxDOT | 88 | 70 | 18 | 17 | 32.9 | 51.3 | 97.4 | - | 5 | 1.1 | 5 |
| 46 | CH | EFA-7 | TxDOT | 74 | 58 | 16 | 17.5 | 37.8 | 49.2 | 86.9 | - | 3.4 | 0.8 | 8 |
| 47 | CH | EFA-8 | TxDOT | 74 | 58 | 16 | 18.5 | 20.4 | 17.8 | 86.9 | - | 0.3 | 0.3 | 50 |
| 52 | CH | EFA-13 | TxDOT | 69 | 53 | 16 | 18.2 | 13.9 | 0.7 | 93.3 | - | 5.5 | 1 | 3 |
| 54 | CH | EFA-15 | TxDOT | 80 | 48 | 32 | 17.5 | 39.1 | 44.5 | 94.4 | - | 0.5 | 0.3 | 7 |
| 55 | CH | EFA-17 | TxDOT | 59 | 37 | 22 | 19.1 | 24.9 | 38.7 | 90.7 | - | 9.9 | 1.5 | 3 |
| 57 | CH | EFA-19 | TxDOT | 74 | 55 | 19 | 17.8 | 44.5 | 31.4 | 93.7 | - | 1 | 0.4 | 8 |
| 60 | CH | EFA-22 | TxDOT | 81 | 25 | 56 | 18.8 | 30.4 | 26.2 | 85.3 | - | 2.8 | 0.8 | 10 |
| 65 | CH | EFA-27 | TxDOT | 54 | 18 | 36 | 16.7 | 28.5 | 21.5 | 81.2 | - | 1.6 | 0.6 | 5 |
| 72 | CH | EFA-38 | TxDOT | 66 | 19 | 47 | 24.3 | 35.4 | - | 77.8 | - | 4.4 | 1 | 300 |
| 73 | CH | B1-(30-32) | Meander Migration | 66 | 20 | 46 | 20.5 | 28.2 | 83 | - | - | 0.4 | 0.3 | 3 |
| 79 | CH | B3-(30-32) | Meander Migration | 64 | 24 | 40 | 21.2 | 23.5 | 140 | - | - | 0.5 | 0.3 | 200 |
| 80 | CH | B3-(38-40) | Meander Migration | 82 | 26 | 56 | 19.3 | 29.9 | 140 | - | - | 0.3 | 0.3 | 20 |
| 81 | CH | B3-(48-50) | Meander Migration | 85 | 29 | 56 | 20.1 | 31.6 | 140 | - | - | 0.2 | 0.3 | 900 |
| 9 | CL | Navasota River Layer 2 | Kwak, K. 2000, p. 81 & 83 | 26 | 6 | 20 | 18.8 | 26.6 | 32.1 | 57.7 | - | 0.7 | 0.4 | 8 |
| 12 | CL | San Jacinto Layer 1 | Kwak, K. 2000, p. 81 & 84 | 22 | 9 | 13 | 19.6 | 151.6 | 23.9 | 50.4 | - | 1 | 0.5 | 20 |
| 13 | CL | San Jacinto Layer 2 | Kwak, K. 2000, p. 81 & 85 | 22 | 9 | 13 | 19.6 | 151.6 | 23.9 | 50.4 | - | 0.2 | 0.2 | 600 |
| 15 | CL | San Jacinto Layer 4 | Kwak, K. 2000, p. 81 & 86 | 38 | 13 | 25 | 20.8 | 27.8 | 21.5 | 94.5 | - | 4.3 | 0.9 | 2.5 |
| 18 | CL | Trinity Layer 2 | Kwak, K. 2000, p. 81 & 87 | 42 | 9 | 33 | 22.1 | 22.2 | 11.5 | 68.4 | - | 4.2 | 0.9 | 5 |
| 19 | CL | San Marcos Layer 1 | Kwak, K. 2000, p. 81 & 87 | 41 | 17 | 24 | 19.6 | 22 | 27.3 | 78.3 | - | 0.3 | 0.2 | 7 |
| 20 | CL | San Marcos Layer 2 | Kwak, K. 2000, p. 81 & 88 | 40 | 19 | 21 | 20.2 | 24.4 | 29.7 | 73.4 | - | 1.1 | 0.5 | 8 |
| 21 | CL | Bedias (75) Layer 1 | Kwak, K. 2000, p. 81 & 89 | 48 | 14 | 34 | 20 | 18.1 | 10 | 86.8 | 0.048 | 1.7 | 0.6 | 45 |
| 28 | CL | Porcelain Clay | (TTI Rpt 2937-1,1999, p.21, 79) | 34 | 20 | 14 | 18 | 28.5 | 12.5 | 100 | 0.0062 | 0.9 | 0.4 | 8.5 |
| 30 | CL | 1454 | SSRICOS | 35 | 14 | 21 | 19.2 | 20 | - | 76 | 0.028 | 0.4 | 0.4 | 150 |
| 31 | CL | 1456 | SSRICOS | 39 | 13 | 26 | 19.7 | 21.8 | - | 60.2 | 0.046 | 1.6 | 0.7 | 400 |
| 35 | CL | 1464 | SSRICOS | 42 | 25 | 17 | 19.1 | 26.7 | - | 96.4 | 0.011 | 2 | 0.4 | 1000 |
| 41 | CL | EFA-2 | TxDOT | 32 | 21 | 11 | 19.9 | 30.3 | 20.9 | 64.7 | - | 4.9 | 1 | 40 |
| 42 | CL | EFA-3 | TxDOT | 47 | 34 | 13 | 19.5 | 28.1 | 13.6 | 100 | - | 0.5 | 0.3 | 20 |
| 43 | CL | EFA-4 | TxDOT | 47 | 35 | 12 | 17.8 | 25.4 | - | 94.3 | - | 2.6 | 0.6 | 300 |
| 44 | CL | EFA-5 | TxDOT | 35 | 24 | 11 | 21.1 | 16.5 | 54.4 | 75.9 | - | 0.4 | 0.3 | 500 |
| 48 | CL | EFA-9 | TxDOT | 37 | 24 | 13 | 19.8 | 23.7 | 57.6 | 83.7 | - | 0.5 | 0.3 | 600 |
| 49 | CL | EFA-10 | TxDOT | 35 | 25 | 10 | 19.8 | 18.8 | 28.3 | 84.6 | - | 1.6 | 0.6 | 50 |
| 51 | CL | EFA-12 | TxDOT | 36 | 25 | 11 | 20.8 | 21.6 | 30.3 | 38.7 | - | 0.3 | 0.2 | 550 |
| 53 | CL | EFA-14 | TxDOT | 49 | 30 | 19 | 18.9 | 31.8 | 13.6 | 96.5 | - | 0.4 | 0.3 | 7 |
| 56 | CL | EFA-18 | TxDOT | 47 | 32 | 15 | 19.8 | 24.2 | 6.3 | 90.7 | - | 2 | 0.6 | 30 |
| 61 | CL | EFA-23 | TxDOT | 38 | 14 | 24 | 19.9 | 20 | 62.3 | 82.7 | - | 1.6 | 0.6 | 15 |
| 63 | CL | EFA-25 | TxDOT | 45 | 12 | 33 | 19.1 | 24 | 6.3 | 77.9 | - | 1.6 | 0.6 | 40 |
| 64 | CL | EFA-26 | TxDOT | 28 | 12 | 16 | 15.6 | 35.9 | 8.9 | 58.7 | - | 1.6 | 0.6 | 50 |
| 67 | CL | EFA-29 | TxDOT | 38 | 16 | 22 | 19.2 | 19 | 32.4 | 56.9 | - | 2.1 | 0.7 | 200 |
| 70 | CL | EFA-36 | TxDOT | 26 | 17 | 9 | 20.4 | 16.2 | - | 77.1 | - | 4.4 | 1 | 55 |
| 71 | CL | EFA-37 | TxDOT | 26 | 19 | 7 | 17.7 | 21.8 | 70.1 | 94.4 | - | 4.4 | 1 | 7 |
| 74 | CL | B1-(40-42) | Meander Migration | 32 | 13 | 19 | 20.3 | 30 | 34 | - | - | 0.1 | 0.1 | 3 |
| 75 | CL | B2-(30-32) | Meander Migration | 39 | 15 | 23 | 20.8 | 21.7 | 45 | - | - | 0.4 | 0.4 | 30 |
| 78 | CL | B3-(20-22) | Meander Migration | 47 | 13 | 34 | 20.4 | 23.3 | 92 | - | - | 0.5 | 0.3 | 8 |
| 14 | Clay/Silt | San Jacinto Layer 3 | Kwak, K. 2000, p. 81 & 85 | - | - | - | 16.7 | 26.9 | 4.8 | 60.7 | - | 1 | 0.4 | 7 |
| 38 | CL-ML | 1467 | SSRICOS | 20 | 13 | 7 | 22.1 | 11.4 | - | 50.2 | 0.073 | 0.2 | 0.2 | 300 |
| 69 | CL-ML | EFA-35 | TxDOT | 22 | 16 | 6 | 19.6 | 20.7 | 22 | 68.7 | - | 4.4 | 1 | 350 |
| 17 | Fine Gravel | Trinity Layer 1 | Kwak, K. 2000, p. 81 & 86 | - | - | - | 22 | 7.7 | - | 11.5 | 6 | 1 | 0.5 | 40 |
| 22 | Fine Sand with Clay/Silt | Bedias (75) Layer 2 | Kwak, K. 2000, p. 81 & 89 | - | - | - | 21.3 | 17.5 | - | 35.1 | 0.13 | 0.3 | 0.2 | 150 |
| 26 | MH | LAR 1-F-08-01-PT2 | Sacramento-Ayres | 51 | 45 | 6 | 109.7 | 44.4 | - | 91.4 | 0.044 | 88.3 | 4.5 | 50 |
| 24 | ML | LAR 1-F-08-01-PT2 | Sacramento-Ayres | 49 | 35 | 14 | 113.5 | 37.7 | - | 97.6 | 0.018 | 6 | 1.2 | 800 |
| 25 | ML | LAR 1-F-08-02-PT1 | Sacramento-Ayres | 42 | 37 | 5 | 117.2 | 31.4 | - | 97 | 0.03 | 8 | 1.2 | 12.5 |
| 27 | ML | LAR 1-F-08-04-PT2 | Sacramento-Ayres | 39 | 35 | 4 | 98.8 | 36.2 | - | 88.4 | 0.06 | 31.4 | 1.8 | 1000 |
| 36 | ML | 1465 | SSRICOS | 47 | 29 | 18 | 19.3 | 28.7 | - | 99.4 | 0.01 | 0.4 | 0.3 | 150 |
| 8 | SC | Navasota Layer 1 | Kwak, K. 2000, p. 81 & 82 | 28 | 14 | 14 | 18 | 28.5 | - | 26.2 | 0.125 | 4 | 0.9 | 1 |
| 10 | SC | Brazos Layer 1 | Kwak, K. 2000, p. 81 & 83 | 24 | 9 | 15 | 20.2 | 17.3 | - | 30 | 0.265 | 0.4 | 0.3 | 2.5 |
| 11 | SC | Brazos Layer 2 | Kwak, K. 2000, p. 81 & 84 | 24 | 9 | 15 | 20.2 | 17.3 | - | 30 | 0.265 | 0.7 | 0.4 | 90 |
| 39 | SC | 1468 | SSRICOS | 15 | 13 | 2 | 20.4 | 17.3 | - | 33.6 | 0.13 | 0.3 | 0.2 | 100 |
| 50 | SC | EFA-11 | TxDOT | 43 | 30 | 13 | 18.5 | 42.1 | 6.3 | 11.6 | - | 0.2 | 0.2 | 10000 |
| 58 | SC | EFA-20 | TxDOT | 27 | 16 | 11 | 19.6 | 17.8 | 15.7 | 15.4 | - | 1.6 | 0.6 | 60 |
| 66 | SC | EFA-28 | TxDOT | 38 | 16 | 22 | 22 | 9.5 | 32.4 | 43.1 | - | 9.9 | 1.5 | 3 |
| 68 | SC | EFA-30 | TxDOT | 38 | 15 | 23 | 21.5 | 12.8 | 44 | 39.9 | - | 4.4 | 1 | 350 |
| 77 | SC | B3-(10-12) | Meander Migration | - | - | - | 23.3 | 12.1 | - | - | - | 0.2 | 0.2 | 100 |
| 59 | SM-SC | EFA-21 | TxDOT | 23 | 18 | 5 | 18 | 20.5 | 37.2 | 43.9 | - | 1.9 | 0.7 | 20 |
| 62 | SM-SC | EFA-24 | TxDOT | 19 | 13 | 6 | 19 | 21.7 | 22 | 32.3 | - | 4 | 0.9 | 300 |
| 5 | SP | S11-(0-0.5 ft)-LC-TW | ILIT 2006 (Katrina) | - | - | - | 12.3 | 1 | - | - | - | 0.2 | 0.2 | 3000 |
| 6 | SP | S11-(0-0.5 ft)-HC-TW | ILIT 2006 (Katrina) | - | - | - | 13.3 | 1 | - | - | - | 0.6 | 0.3 | 1100 |
| 29 | SP | Coarse Sand | (TTI Rpt 2937-1,1999, p.11, 58) | - | - | - | 13.8 | - | - | - | 3.375 | 2.2 | 0.6 | 10000 |
| 76 | SP | B2-(48-50) | Meander Migration | - | - | - | 20.6 | 19.6 | - | - | - | 0.3 | 0.2 | 1000 |

136

## Storm Surge Loading

The storm surge hydrograph as developed by IPET[59] is shown in Figure 1.



Figure 1: Hydrograph showing storm surge 'still water' elevation vs time during Hurricane Katrina. Storm surge reached an average Stillwater elevation of +11 feet at 0600 CDT, +12 feet at 0700 CDT, and peaked at a maximum surge of ~+14.2 feet at 0900 CDT.

10.    The storm surge rose relatively slowly up until 10 p.m. (CDT) on August 28, 2005. The water level in the IHNC then quickly rose, reaching elevation +11 feet at 6 a.m., elevation +12 feet at 7 a.m. and the peak surge of elevation of +14.2 feet at 9 a.m. on August 29, 2005.

---

[59] IPET, "Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System, Final Report of the Interagency Performance Evaluation Task Force, Volume V – The Performance – Levees and Floodwalls." Available from: Date accessed: https://ipet.wes.army.mil/. March 24, 2012. (Figure 51, page V-70)

## Review of Marr (2012) Overtopping Analyses

11.     Insufficient time was available to complete a thorough review of the presented analyses.  It should be noted that no accounting was made for the presence of grass turf, which would likely have provided 30-60 minutes of overtopping before active scour of the landside soils would begin.  The erosion rates used by Marr had no limit and were in great excess of any of the EFA samples tested by Briaud et al 2009.  Values in excess of 4,800 mm/hr were used in the analyses.

12.     The range of total erosion/scour predicted by Marr (2012) in the 'more erodible' low plasticity clay was on the order of 2.6 feet (minimum) to 9.8 feet (maximum).  These scour depths do not reflect the anticipated scour at the time of failure, rather, are hypothetical maxima assumed continued overtopping.  Analyses of scour using methods presented by Hanson were also included in the scour/erosion analyses.  These calculations found scour to be on the order of 0.5 to 1.5 ft (maximum scour depth).  Plaintiff Experts were supplied with copies of Marr's erosion/scour analyses.  To quantitatively evaluate the influence of the 'unlimited erosion rates,' the calculations were re-run, but using a maximum erosion rate of 300 mm/hr (approximately twice the average maximum erosion rate for CL/CH materials).  These 'truncated' erosion rate analyses found the maximum scour to be significantly shallower.

13.     Figure 2 shows a comparison between Marr 2012 and revised scour depths based on truncated erosion rates.  Table 2 presents a summary of select results from Marr 2012 and re-evaluated (truncated) scour analyses. It is important to note that these results do not include the effects of the grass cover present on the protected side of the I-wall levee at the Lower 9th Ward at the time of Hurricane Katrina. This cover would delay the initiation of the soil erosion by more than one hour.



Figure 2:  Comparison of scour depth based on 'unlimited' erodibility rates and truncated erodibility rates.

**Table 2. Summary of Predicted Scour by Marr (2012) and Revised Scour Based on Truncated Erosion Rates**

| Soil Type | Top of Wall Elevation (ft) NAVD88 (2004.65) | GeoComp Analyses - Appendix R (March 2012) | | | | | | | Bea Analyses (March 2012) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Max Erosion Rate (mm/hr) | Scour Duration (hrs) [Time, CDT] | Predicted (Briaud) Max Scour Depth (ft) | Predicted (Briaud) Max Scour Depth (ft) at 7:00 AM | Predicted (Briaud) Max Scour Depth (ft) at 8:00 AM | Predicted (Briaud) Max Scour Depth (ft) at 9:00 AM | Predicted (Hanson) Max Scour Depth (ft) | Truncated Max Erosion Rate (mm/hr) | Scour Duration (hrs) [Time, CDT] | Predicted (Briaud) Max Scour Depth (ft) |
| Plasticity Clay "More Erodible" Low | 10.5 | 4853 | 6.8 hrs [12:03 pm] | 9.8 ft | 4.5 ft | 7.1 ft | 9.25 ft | 1.5 ft | 300 | 3.75 hrs [09:00 am] | 3.7 ft |
| | 11.4 | | | | | | | | *Insufficient Time To Evaluate* | | |
| | 11.7 | | | | | | | | | | |
| | 12.1 | 4853 | 2.75 hrs [09:44 am] | 4.8 ft | 0 ft | 3.5 ft | 4.7 ft | 0.7 ft | 300 | 2 hrs [09:00 am] | 2.0 ft |
| | 12.5 | | | | | | | | *Insufficient Time To Evaluate* | | |
| | 13.0 | | | | | | | | | | |
| | 13.5 | | | | | | | | | | |
| | 14.2 | | | | | | | | | | |
| Plasticity Clay "Average" Low | 10.5 | 1333 | 6.7 hrs [11:59 am] | 6.2 ft | 3.2 ft | 4.7 ft | 5.9 ft | 1.5 ft | 300 | 3.75 hrs [09:00 am] | 3.7 ft |
| | 11.4 | | | | | | | | *Insufficient Time To Evaluate* | | |
| | 11.7 | | | | | | | | | | |
| | 12.1 | 1333 | 2.8 hrs [09:48 am] | 3.2 ft | 0 ft | 2.4 ft | 3.1 ft | 0.7 ft | 300 | 2 hrs [09:00 am] | 1.7 ft |
| | 12.5 | | | | | | | | *Insufficient Time To Evaluate* | | |
| | 13.0 | | | | | | | | | | |
| | 13.5 | | | | | | | | | | |
| | 14.2 | | | | | | | | | | |
| Plasticity Clay "Less Erodible" Low | 10.5 | 422 | 6.1 hrs [11:21 pm] | 2.6 ft | 1.5 ft | 2.0 ft | 2.4 ft | 1.5 ft | 300 | 3.75 hrs [09:00 am] | 2.3 ft |
| | 11.4 | | | | | | | | *Insufficient Time To Evaluate* | | |
| | 11.7 | | | | | | | | | | |
| | 12.1 | 422 | 2.8 hrs [09:48 am] | 1.3 ft | 0 ft | 0.9 ft | 1.3 ft | 0.7 ft | 300 | 2 hrs [09:00 am] | 1.3 |
| | 12.5 | | | | | | | | *Insufficient Time To Evaluate* | | |
| | 13.0 | | | | | | | | | | |
| | 13.5 | | | | | | | | | | |
| | 14.2 | | | | | | | | | | |

**Impacts to Failure Evaluation at North and South Breach**

14.     The depth of scour just prior to failure of the North Breach and South Breach is an important aspect of the forensic evaluation.  It is plausible that scour may have been a factor in the South Breach failure, but all evidence indicates that the North Breach failure occurred before overtopping and was not influenced by overtopping-induced erosion.

15.     The scour evaluations completed by Marr (2012) indicate that very little scour occurred at the North Breach before it failed at approximately 6 am.  Surekote Road acted as a wave barrier, reducing the hydraulic energy projecting into the corner. As shown in Figure 3, water had to flow around the roadway to fill the northeast corner of the EBIA.



Figure 3: Storm surge flowing around Surekote Road which ramps down as it traverses up and over the floodwall.

16.   Very little, if any overtopping, would have occurred by 6 am.  No wave induced overtopping would be expected prior to 6 am due to the presence of Surekote Road.  The maximum scour likely realized at the North Breach had the wall failed as late as 9 am, would only have been 3-4 feet.

17.   The elevation of the top of the wall is not as significant a factor as the assumed erodibility rate of the protected side soils.

142

18.   It should also be noted that the configuration of the floodwall at the connection of

the deep sheet piles (1980s floodwall) with the shallower (1966) sheet piles would

displace much less than the floodwall further away from this connection point.  The

wall would rotate/deflect towards the protected side with the connection between the

deep/shallow piles acting as a 'door hinge', allowing the wall to rotate and 'spill'

water onto the protected side, inducing further erosion and scour (Figure 4).  Marr

(2012) does not account for this in his evaluation.



Figure 4: Marr (2012) suggests shear failure at connection with 1980s wall, but this location is much more rigid than the other sections of the floodwall further away (and at the same low, or lower elevation than the connection between the 1980s wall and 1960s wall).  The configuration of the failed floodwall does not support this; rather, it supports underseepage induced instability prior to overtopping (photo from PICTOMETRY).

## References

Briaud, J. L. et al. (2001). "Erosion Function Apparatus for Scour Rate Predictions," Journal of Geotechnical and Geoenvironmental Engineering, ASCE, 127, 2, 105-113.

Briaud, et al (2009) Simplified Method for Estimating Scour at Bridges Texas department of Transportation Report No. 0-5505-1; Available at link: https://ceprofs.civil.tamu.edu/briaud/SimplifiedScourEstimation%5C0-5505-1_whole_06-22-09.pdf

Hanson, G.J., Robinson, K.M. and Cook, K.R. (2002). "Scour Below an Overfall: Part II. Prediction."
Transactions of the American Society of Agricultural Engineers, 45(4): 957‐964.

Hewlett, H.W.M. et al. (1985).  "Design of Reinforced Grass Waterways."  Construction Industry Research and Information Association, CIRIA.  Report 116.

Marr, Allen.  (2012). "What Caused the I-Wall Failures at the EBIA North and South Breaches?"  Expert Report of: Dr. W. Allen Marr, PhD, PE, NAE.  Geocomp Corporation. 125 Nagog Park, Acton, MA 01720.  Prepared for United States Department of Justice, 1331 Pennsylvania Avenue NW, Suite 800N, Washington, D.C.  March 12, 2012.

Seijffert, Jan Willem and Hank Verheij.  (1999).  "Chapter 14.  Grass Covers and Reinforcement Measures."  Rijkswaterstaat, Hydraulic Engineering Division, Delft. Pages 289 – 302.

Stein, O.R., Julien, P.Y. and Alonso, C.V. (1993). "Mechanics of Jet Scour Downstream of a Headcut,"Journal of Hydraulic Research, The International Association for Hydro‐Environment Engineering and Research (IAHR), 31(6), 732‐738.

Storesund, Rune, Robert G. Bea, Yuli Huang. (2010).  "Simulated Wave-Induced Erosion of the Mississippi River Gulf Outlet Levees During Hurricane Katrina."  Journal of Waterway, Port, Coastal, and Ocean Engineering.  May/June 2010.  Vol. 136, No. 3. Pp177-189.

U.S. Army Corps of Engineers.  (2011). "Engineering and Design of I-Walls."  EC 1110-2-6066.  Department of the Army.  U.S. Army Corps of Engineers, Washington DC 20314-1000.  April 1, 2011.  Available from: http://140.194.76.129/publications/eng-circulars/EC_1110-2-6066/EC_1110-2-6066.pdf. Date accessed: March 16, 2012.