**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | * * * * | CIVIL ACTION NO. 05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO: | * * * | |
| MRGO *Armstrong*, No. 10-866 | * * * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | * | |

**DEFENDANT WASHINGTON GROUP INTERNATIONAL, INC.'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION TO STRIKE**
**PORTIONS OF DR. ROBERT BEA'S "REBUTTAL REPORT"**

Pursuant to Federal Rules 26 and 37(c), the Court should strike the first fifty-three

pages of Dr. Robert Bea's Rebuttal Report, which he appropriately labels "Additional Analyses"

rather than "Rebuttal." None of the opinions described in the "Additional Analyses" are based

on information or evidence that was unavailable at the time Dr. Bea submitted his February 1,

2012 Expert Report (the "initial report"). Nothing described in the "Additional Analyses" rebuts

opinions presented in Defendants' expert reports. Nothing described in the "Additional

Analyses" corrects otherwise inaccurate statements in Dr. Bea's initial report. In short, Dr. Bea's

"Additional Analyses" have no other purpose than to expand and buttress opinions already

asserted in his initial report, or to belatedly add new opinions that easily could have been

presented in his initial report. Whether disguised as a "rebuttal report" (Fed. R. Civ. P.

26(a)(2)(D)) or offered as a "supplemental report" (Fed. R. Civ. P. 26(e)(2)), the Plaintiffs

submission of "Additional Analyses" at this late date (after submission of Defendants' expert

1090200v.1

reports, after Dr. Bea's two-day deposition, and two weeks before close of discovery) is prejudicial to Defendants and inappropriate as a matter of law.

Indeed, because of the time and effort Dr. Bea must have expended drafting these fifty-three pages of inappropriate "Additional Analyses," he apparently was unable to fully analyze Defendants' expert reports and submit anything more than a "preliminary" rebuttal of the opinions contained therein by the Court's deadline.  *See* Bea Rebuttal Report at 54-106 (Ex. 1) (Dr. Bea's "Preliminary Defense Expert Report Review Observations").  Thus, at some later date not contemplated in the Court's Scheduling Order, Dr. Bea intends to submit another rebuttal report containing "important new and updated results from my ongoing forensic engineering analyses of the Defense Expert Reports." *Id.* ¶¶ 79, 142.  Obviously, it is impossible for WGI to depose Dr. Bea on his rebuttal report or prepare pretrial submissions (let alone prepare for trial itself) when his standard-of-care and causation opinions remain a moving target.  Thus, in addition to striking the "Additional Analyses" section of his Rebuttal Report, Dr. Bea should be barred from submitting any further untimely expert opinions.

### Background

Pursuant to the Court's November 23, 2011 Scheduling Order, Plaintiffs submitted Dr. Bea's initial report and four appendices on February 1, 2012.  (Order, Nov. 23, 2011, Dkt. 20592)  Defendants then submitted their expert reports on March 9 and March 12, and took Dr. Bea's deposition on March 27 and March 28.  The Court required Dr. Bea to submit his rebuttal to Defendants' expert reports, if any, by April 3, 2012.  (Minute Entry, Mar. 23, 2012, Dkt. 20722).   The parties scheduled Dr. Bea's deposition on his rebuttal report for Monday, April 16.  Discovery in this case closes on April 20, and the parties must submit any *Daubert* Motions to the Court by April 30. (Order, Mar. 19, 2012, Dkt. 20705).

The Rebuttal Report that Defendants received from Dr. Bea on April 3 is divided into three main sections. The first section entitled, "Additional Analyses," contains new opinions and information in an attempt to bolster the "forensic engineering findings, opinions and conclusions" set forth in his initial report. *See* Bea Rebuttal Report at 2, 3-53. In contrast, the second section entitled, "Preliminary Defense Expert Report Review Observations," summarizes the results of Dr. Bea's review of certain Defendants' expert reports, and sets forth what he considers to be some of the "critical errors," "misconceptions," and/or "critical flaws" in their analyses. *See id.* at 2, 54-106. Finally, the third section, entitled "Summary and Conclusions," contains a synopsis of Dr. Bea's opinions relative to his review of Defendants' experts' reports. *See id.* at 106–16.

### Argument

The Federal Rules require the proponent of expert testimony to provide a written report containing "a complete statement of all opinions the witness will express and the basis and reasons for them," the "facts or data considered by the witness in forming" his opinions, and "any exhibits that will be used to summarize or support" those opinions. Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii). "A party must make these disclosures at the times and in the sequence that the court orders." *Id.* 26(a)(2)(D). The purpose of the rule is to "eliminate the former process of 'trial by ambush,' and mandate full disclosure of relevant information necessary to evaluate the case or to prepare for trial at an *early stage of the proceedings*." *Beller v. United States*, 221 F.R.D. 689, 693 (D.N.M. 2003) (emphasis added); *Sierra Club v. Cedar Point Oil Co*., 73 F.3d 546, 571 (5th Cir. 1996) (As amended, Rule 26 requires *initial* expert reports to be " 'detailed and complete' "; the rule is intended to prevent "the disclosure of 'sketchy and vague' expert

information, as was the practice under the former rule" (quoting Fed. R. Civ. P. 26 advisory committee's notes)).

Rule 26(a) also allows experts to submit a written rebuttal report. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii). The purpose of such a report is "*solely* to contradict or rebut evidence on the same subject matter" identified in another party's expert report. *Id.* (emphasis added); *Procter & Gamble Co. v. McNeil-PPC, Inc.*, 615 F. Supp. 2d 832, 838 (W.D. Wis. 2009) (proper scope of a rebuttal report is "limited to responding to the issues raised by the opposing parties' experts"). "A party may not offer testimony under the guise of 'rebuttal' only to provide additional support for his case in chief." *Noffsinger v. The Valspar Corp.*, No. 09-C-916, 2011 WL 9795, at *6 (N.D. Ill. Jan. 3, 2011) (citing *Peals v. Terre Haute Police Dept.*, 535 F.3d 621, 630 (7th Cir. 2008)).

Finally, as this Court made clear in *Robinson*, a party may submit a supplemental expert report under Rule 26(e) only where:

> "the party learns that in some material respect the disclosure was incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing," or as ordered by the court.

*In re: Katrina Canal Breaches Consol. Litig.*, No. 05-4182, 2009 WL 1067029 at *2 (E.D. La. Apr. 21, 2009) (citation omitted in original). But like rebuttal expert reports, supplemental expert reports may not be used to add new opinions based on previously-available information, *Simmons v. Johnson*, No. 06-325-A-M2, 2008 WL 474203, at *2 (M.D. La. Feb. 14, 2008) (citations omitted), or to "expan[d] a theory already asserted" in the expert's initial report. *Gen. Elec. Capital Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd.*, No. SA-03-CA-189, 2004 WL 5495589, at *2 (W.D. Tex. Oct. 8, 2004). A party's unjustifiable "[f]ailure to comply with the

requirements of Rule 26(a) requires 'automatic and mandatory exclusion' of the proffered expert opinion pursuant to Rules 26 and 37(c)(1)."   *Buxton v. Lil' Drug Store Prods.,* 2007 WL 2254492, at *7 (S.D. Miss. Aug. 1, 2007) (citation omitted); *Simmons*, 2008 WL 474203 at *2; Fed. R. Civ. P. 37 (c) (1) ("If a party fails to provide information  or identify a witness . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing or at a trial . . .").

  A. <u>East Bank Industrial Area Site Clearing Excavations</u>

   In pages 3 through 16 of his rebuttal report, Dr. Bea introduces "[t]hree dimensional (3D) Geographic Information System (GIS) graphic models of the EBIA," also known as "EBIA Swiss Cheese graphics."   Rebuttal Report 3-4 & Figures 1-3.   These models attempt to detail—for the first time—the "aggregate extents" of WGI's excavation work in the EBIA, including location, aerial extent, depth and type of backfill.   *Id.* ¶ 6.   The models and accompanying text are designed to buttress key opinions presented in Dr. Bea's initial report, such as the following:

> Given the substantial number of excavations developed by WGI during its removal of surface (e.g. building foundations) and subsurface (piling, pipelines, storage tanks) obstructions and during removal of highly polluted soils that extended to significant depths (Figures 33a and 33b), **the surface soils of the EBIA became like Swiss cheeze** [sic] or an intensely bombed battlefield riddled with deep holes. . . .   [T]he entire community of excavations provided an [sic] substantial number of hydraulic connections with the buried water conductive swamp-marsh deposits.   When the waters in the IHNC were able to flood the surface of the EBIA, these hydraulic connections facilitated seepage and hydraulic pressures that had important negative effects on the integrity of the hurricane flood protection structures at the Lower 9th Ward.

1090200v.1

Bea Initial Report, ¶¶ 53, 140 (Ex. 2); *see id.* ¶¶ 29-31 (breaches in EBIA were caused in part by "hydraulic seepage and uplift pressures generated in the marsh layers under the soil levee (Figure 1) through <u>nearby excavations</u> backfilled with high permeability materials") (emphasis added).

During Dr. Bea's deposition on March 27-28, 2012, counsel tried to ascertain the bases for this "Swiss cheese" opinion, in particular which "nearby" excavations (i.e., location, depth, backfill material) he contends created the hydraulic connections that lead to the North and South breaches.   In some instances, Dr. Bea admitted that he had not found any pre-Katrina evidence to support the excavations that he claimed WGI performed in the EBIA.

> Q. . . .  I'm asking about any evidence you have pre-Katrina for any excavation at that [north breach] location [shown in Figure 43 on page 80 of your report and in Figure 11 on page 15 of Appendix B] that was a 15 to 17-foot deep excavation with anything near these dimensions, 25 feet wide, 100 feet long, 15 to 17 feet deep, at that location.  Any evidence.
>
> A.      And your question of me is do I have a document that says a hole, excavation, with those dimensions, was developed at that location by WGI pre-Katrina?  The answer to that is no.  I don't have a complete enough record to trace it.
>
> Q.      As a result, you don't know when any such excavation was performed by Washington Group.  Isn't that logical?
>
> A.  That's correct.

Bea Dep., Vol. II at 113, Mar. 28, 2012 (Ex. 3); *see id.* at 116-17 ("I don't think we were able to trace the Case 1 excavation [near the South breach] to a specific document concerning WGI's work at that location.  The document trail went cold.").

In response to other questions about the locations or depth of various excavations referred to in his initial report, Dr. Bea revealed for the first time that he (and the persons assisting him) did not have time to "develop a detailed mapping of the excavations on the East Bank Industrial Area" for his initial report, but he has "continued that work, and it will be part of

6

my rebuttal report." Bea Dep., Vol. I at 213, Mar. 27, 2012 (Ex. 4); *id.* at 236 (the rebuttal report will provide a "comprehensive map and maps" that will "capture the essence and details in what we are calling the Swiss cheese graphics"); *see also* Bea Dep., Vol. II at 137 (Ex. 3) ("Those photographs [of grid trenches that I claim extend deeper than five feet] will be a part of the database associated with the three-dimensional Swiss cheese graphics that will be provided to you on or about April 3rd."). Dr. Bea further testified that some of the materials that he and others were using to create the GIS model, including documents containing the details of certain soil removal, building removal and grid trenching operations in the EBIA relevant to the North and South breaches, had not been identified in the reliance materials produced with his initial report, but would be identified later in his reliance materials for his Rebuttal Report. Bea Dep., Vol. I at 213 (Ex. 4).

Equally troubling is the fact that plaintiffs retained a *new* expert in geographic information systems (GIS) and mapping to develop the Swiss cheese model for Dr. Bea's Rebuttal Report. *Id.* at 236-37. (Defendants do not presently know the identity of this new GIS expert because as of March 27, 2012, Dr. Bea had "never met" him and did not know his name. *Id.*) Defendants of course learned of this fact *after* they deposed Plaintiffs' other "geographic mapping" expert, Mr. Chad Morris, P.L.S. (*See* Pls. Final Wit. List, Apr. 6, 2012, Dkt. 20762). On July 18, 2011, Mr. Morris produced an expert report entitled, "Survey and Spatial Data In the Vicinity of the Inner Harbor Navigation Canal (IHNC)." Although the Report concluded that WGI's work in "the vicinity" of the North and South Breaches "was extensive" and "included multiple excavations and pile removals," Morris Report at 15-16, 27 (Ex. 5), it also did not contain precise information about the location, depths, extent or backfill of any such excavations. Mr. Morris subsequently confirmed in his deposition that he had not determined "the exact depth

1090200v.1

and location of each individual hole" made in the EBIA—although it "may be possible to piece it together"—and he had not been asked to create a GIS model for use at trial. Morris Dep. at 91, 96, Mar. 9, 2012 (Ex. 6); *see also id.* at 98, 126, 148, 160, 193-95.[1]

Defendants are now subject to the precise harm Rule 26(a)(2)(B) is designed to prevent. "The intent of the rule is to ensure that deposition testimony can proceed with parties *already armed with the expert's report* so as to be able to evaluate the opinions to be offered." *Beller*, 221 F.R.D. at 694 (emphasis added). The submission of a new expert report with additional and crucial facts and analyses supporting previously stated opinions—after plaintiffs' expert reports were due, after defendants' expert reports were due, and after depositions exposed flaws in the plaintiffs' experts' initial opinions—is highly prejudicial to defendants and not permitted under the law. It is exactly the type of sandbagging prohibited by the federal rules governing expert disclosures.

In *Lampe Berger USA Inc. v. Scentier, Inc.*, No. 04-354-C-M2, 2008 WL 3386716 (M.D. La. Aug. 8, 2008), the Court struck the plaintiff's supplemental report which amended an exhibit relating to damages contained in plaintiff's initial expert report. The plaintiff's expert claimed during her deposition that the amended exhibit was based on information not available to her when she prepared her original expert report. However, the amended exhibit cited as reliance materials bates numbered documents that were listed as reliance materials in her first report, thus belying her claim that the documents were previously unavailable to her. The *Lampe Berger* Court struck the supplemental report, noting that the

---

[1]     Plaintiffs' other testifying expert, Dr. David Rogers, provided an expert report on January 5, 2012, on "Site Characterization" in the EBIA. But his expert report also fails to provide details and supporting evidence for the specific excavations and backfilling that plaintiffs allege contributed to the North and South breaches.

plaintiff's expert "could have calculated the additional . . . alleged damages within the expert report deadline," and to allow the supplemental report into evidence "would simply flout the deadlines this Court has been reluctant to extend on several occasions." *Lampe Berger USA*, 2008 WL 3386716, at *3-4.

        As in *Lampe Berger*, all of the information used to create the Swiss Cheese Model was available to plaintiffs well in advance of the submission of Dr. Bea's initial expert report. Indeed, WGI or the Corps produced the site demolition plans, Wink surveys, No Further Action At This Time (NFAATT) Reports, Project Work Plan, Sewer Lift Station and Wedding Cake cofferdam designs, piling removal journals, and color photographs that Dr. Bea refers to as the source of his new GIS model *by 2008*. Some of these materials were even part of Dr. Bea's reliance materials for his initial report. Rebuttal reports "are not . . . the proper place for presenting new arguments" based on previously-available information. *R&O Constr. Co. v. Rox Pro Int'l Group, Ltd.*, No. 2:09CV01749, 2011 WL 2923703, at *2 (D. Nev. July 18, 2011) (citing *1–800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 2d 1151, 1167 (D. Utah 2010)). But this is exactly what Dr. Bea did when he concluded, based on his "interpretation of the Swiss Cheese GIS EBIA excavation and site clearing activities," that "there exists a high correlation of these activities with the local features identified in my Expert Report (Bea 2012, Case 1 and Case 2 excavations) that were associated with the locations and Forensic Engineering analyses of the causation of the North Breach and South Breach . . . ." Bea Rebuttal Report ¶ 17.

    B.   Hydraulic Pressure Conductivity Analyses and Validations

        The next set of "Additional Analyses" in Dr. Bea's Rebuttal Report is intended to bolster the hydraulic conductivity analyses summarized in his initial report and documented in Appendix D of that report. Bea Rebuttal Report ¶ 18. During his recent deposition, Dr. Bea claimed that the hydraulic conductivity analyses found in his initial report are based "on steady

flow conditions." *See* Bea Dep., Vol. I at 164-69 (Ex. 4); Bea Dep., Vol. II at 166-71 (Ex. 3). But the justification for applying such conditions when determining the cause of the North and South breaches does not appear anywhere in Dr. Bea's initial report or appendices. Thus, Dr. Bea uses his Rebuttal Report to rectify this deficiency, to disclose a new theory and to provide an untimely twenty-page summary of "the reasons which justify and validate the application of *'Steady Flow'* conditions." Bea Rebuttal Report ¶ 21; s*ee id.* at 16-38.

One of the ways Dr. Bea tries to "validate" his new opinion regarding *'Steady Flow'* conditions is through examination of a research project that he recently worked on in the California Delta involving flood protection levees. *See* Bea Rebuttal Report 25-38, Figs. 11-20 and Table 1 (referring to the "NSF RESIN (Resilience and Sustainability) California Delta Infrastructure Systems Risk Assessment and Management (RAMs) Project"). This engineering research project, which Dr. Bea apparently has been involved in since 2008, is not mentioned anywhere in Dr. Bea's initial report—not even on his resume. Thus, Defendants' geotechnical engineering experts never had the opportunity to review and evaluate Dr. Bea's opinions relating to this research or the extensive materials supporting those opinions before submitting their reports. The materials relating to the California Delta research project that Defendants' experts would need to review include, at a minimum, the website about the NSF RESIN California Delta Project (*id.* at 25 n.2), a 2008 National Science Foundation Proposal by Dr. Bea, et al. (*id.* at ¶ 35), a 2011 publication entitled, "A Method to Determine Probability of Failure Caused by Seepage Under Levees, Sherman Island Pilot Project" by R. Bea, et al. (*id.* at 29 n.3), and most importantly, thousands of pages of digital computer analyses upon which the results of the engineering study are based.

10

Again, this is exactly the type of sandbagging that the Federal Rules prohibit. *See supra,* pp. 3-4 (citing cases). Discovery closes in less than two weeks. WGI's geotechnical engineering expert is being deposed this week, and Dr. Bea's rebuttal deposition is next week. WGI intends to file a *Daubert* Motion in accordance with the Court's order shortly thereafter. Given this schedule, it is impossible for WGI's expert to evaluate and respond to this entirely new engineering analysis (which could have been included in his initial report) at this late date. Thus, the additional opinions in Dr. Bea's Rebuttal Report on pages 24-38 regarding '*Steady Flow'* conditions should be stricken. *See Simmons*, 2008 WL 474203, at *2 (where party, without substantial justification, fails to timely provide expert information required under Rule 26(a), "the party is not allowed to use that information . . . at a trial").

C.    Engineering Standard of Care

In the "Engineering Standard of Care" portion of his "Additional Analyses" section, Dr. Bea again attempts to shore up deficiencies in his initial expert report. *See* Bea Rebuttal Report at 38-53. In his initial report addressing engineering standard-of-care issues, Dr. Bea claimed that "[v]ery limited documentation" was available for him to review in assessing the specific protocols that WGI and the Corps employed in conducting demolition and remediation work in the EBIA. Bea Initial Report ¶ 125 (Ex. 2); Bea Dep., Vol. II at 139-41 (Ex. 3). Thus, he principally relied on WGI's 2005 Technical Completion Report to conduct his standard-of-care analysis. *Id*. at 139. Dr. Bea admitted that he did not review WGI's Recommendation Report, the subcontractor work plans for specific features of work, or the Total Environmental Restoration Contract (TERC) between WGI and the Corps, *id.* at 140-41, 147. Nor did he consider the deposition transcripts of all of the Corps and WGI personnel that worked on Task Order 26 or all of WGI's submissions to the Louisiana Department of Environmental Quality (LDEQ). *Id.* at 143-44. Indeed, with the exception of certain site-specific submissions to

LDEQ, none of these materials are cited in Dr. Bea's initial report or included in his "reliance materials."

Given the limited review Dr. Bea conducted, his initial expert report relating to standard of care consists of five pages. Bea Initial Report 120-25 (Ex. 2). Three and a half of the five pages contain only excerpts from various USACE Engineering Manuals and a section of the Code of Federal Regulations. *Id.* at 121-24. From these excerpts and a single reference to an engineering journal article by J.B. Kardon, et al., Dr. Bea concludes that a mandatory requirement exists that "seepage conditions that may impact a flood control structure be analyzed and appropriate mitigation efforts implemented should unacceptable seepage conditions be found to exist." *Id.* ¶¶ 126-128. Dr. Bea then opines, based on his admittedly limited review, that he "did not find any documented evidence that the applicable Engineering Standard of Care regulations and requirements were acknowledged and properly addressed by WGI and the USACE" during Task Order 26. *Id.* ¶ 129.[2]

In his deposition, Dr. Bea admitted that USACE Engineering Manuals and Regulations do not apply to third-party contractors unless such Manuals or Regulations are specified in the contract. Bea Dep. Vol. II at 150 (Ex. 3). He further admitted that he had no evidence that the Manuals he cited in his initial report were incorporated or referenced in the relevant Task Order that the Corps issued to WGI. *Id.* Finally, as described above, Dr. Bea

---

[2]     Plaintiffs' other engineering expert, Dr. J. David Rogers, provided what WGI understandably believed were the principal "standard of care" opinions for Plaintiffs. *See* Expert Report by J. David Rogers, Ph.D., Jan. 5, 2012 (Ex. 7), at 228-37 (regarding "Excavation and Backfill Standard of Care"). WGI questioned Dr. Rogers about those opinions at length during his March 17 deposition. Nearly two weeks later, Plaintiffs apparently commissioned Dr. Bea to expand his standard-of-care analysis in his Rebuttal Report.

conceded that he had considered very little documentation relating to WGI's excavation work in the EBIA in forming his opinion. *See supra.*

But on April 3, just six days after his deposition, Dr. Bea managed to produce a whole new sixteen-page standard-of-care analysis. Bea Rebuttal Report at 38-53. Dr. Bea's new analysis conveniently avoids discussion of the Corps Engineering Manuals that were central to his previous standard-of-care analysis. Instead, his new analysis depends on previously-undisclosed papers by J. Kardon and J.C. Toronto relating to engineering standard of care, *see* Bea Rebuttal Report 39, 50-51, and WGI/USACE documents and deposition testimony that he admittedly failed to consider in his prior standard-of-care analysis. *See id.* at 40-52 (citing, *e.g.,* TERC between WGI and the Corps, WGI's Recommendation Report, RECAP Submittal Report – Criteria Document, A. Viegel deposition, G. Bacuta deposition, L. Guillory deposition, S. Roe deposition, D. O'Conner deposition). This new analysis is not rebuttal. To be sure, there is not a single reference to Defendants' expert reports on standard of care (by Dr. David Sykora for WGI and Dr. Patrick Lucia for the United States) in his entire sixteen-page opinion. And, of course, Defendants' experts no longer have an opportunity to respond in their expert reports to Dr. Bea's new opinions.

There is no excuse for this kind of deliberate sandbagging. Courts in the Fifth Circuit are clear that even supplemental expert reports cannot be used to "fix" problems in initial reports. *Reliance Ins. Co. v. La. Land and Exploration Co.*, 110 F.3d 253, 258 (5th Cir. 1997). In *Reliance*, the Fifth Circuit affirmed the district court's refusal to allow the untimely supplementation of plaintiff's expert report where the initial report failed to opine as to the cause of the casualty at issue. This oversight was exposed during deposition, yet the court refused to allow plaintiff the opportunity to broaden its report, stating "to allow plaintiff to add more

13

material now and create essentially a new report would prejudice the defendants, who would then have to get an expert to address these last-minute conclusions, and thus disrupt the trial date in this case."   *Reliance Ins.*, 110 F.3d at 257-58; *see also Beller*, 221 F.R.D. at 691-95 (supplemental reports cannot be used to buttress opinions or "shore up problems" in opinions contained in initial reports).   Plaintiffs have had access to all of the deposition transcripts in this litigation and all of the documents cited in Dr. Bea's new analysis on standard of care for almost four years.   If Dr. Bea intended to rely on any of the testimony and documents he now claims support his standard of care opinion then he could have and should have disclosed them in his initial expert report—before WGI submitted its opposing expert report and before WGI took his deposition.

*          *          *

For all of the foregoing reasons and for all of the reasons cited in the United States' Motion to Strike (Dkt. No. 20759) , WGI respectfully requests the Court strike the fifty-three pages of "Additional Analyses" contained in Dr. Bea's Rebuttal Report.   WGI further requests that the Court prohibit Dr. Bea from submitting any additional untimely expert reports in this case.

Dated:  April 9, 2012                        Respectfully submitted,


                                             /s/Heather S. Lonian
                                             William D. Treeby, Bar No. 12901
                                             James C. Gulotta, Jr., Bar No. 6590
                                             Heather S. Lonian, Bar No. 29956
                                             STONE PIGMAN WALTHER WITTMANN L.L.C.
                                             546 Carondelet Street
                                             New Orleans, LA 70130
                                             Phone:  504-581-3200
                                             Fax:  504-581-3361

                                             and

                                             Adrian Wager-Zito
                                             Debra S. Clayman
                                             Christopher Thatch
                                             JONES DAY
                                             51 Louisiana Avenue, N.W.
                                             Washington, D.C. 20001-2113
                                             Phone:  1-202-879-3939
                                             Fax: 1-202-626-1700

                                             *Attorneys for Defendant*
                                             *Washington Group International, Inc.*



## CERTIFICATE OF SERVICE

        I, Heather S. Lonian, hereby certify that on April 9, 2012, I served a true copy of

the foregoing upon all parties by ECF.  Notice of this filing will be sent by e-mail to all counsel

of record by operation of the Court's electronic-filing system.

                                             /s/Heather S. Lonian


15