# Expert Report

of

# Robert Glenn Bea, Ph.D., P.E.

For

**Katrina Canal Breaches Consolidated Litigation**

[Civil Action Number: 05-4182 "K" (2)]

United States District Court

Eastern District of Louisiana

Pertains to MR-GO, Armstrong [No. 10-866]

February 1, 2012

e.  Revised my first principles based analyses based on new information gathered during the history of my investigations (updating) (ASCE 1989);

f.  Through application of classical statistical and probabilistic reliability methods, quantitatively analyzed the variabilities and uncertainties associated with input information and analytical methods to determine their potential rates of 'error' (uncertainties associated with important structure performance characteristics); and

g.  Published results from the analyses in public reports (two) and peer reviewed conference and technical journal papers (22).

## II.   FORENSIC ENGINEERING INVESTIGATIONS

### Summary

29.   Based on my forensic engineering studies, my fundamental conclusion is that the breaches that developed in the man-made flood protection structures adjacent to the Lower 9th Ward during Hurricane Katrina were initiated with surge water pressures developed on the water side of the flood protection structures (concrete floodwall and supporting sheet piling) coupled with <u>hydraulic seepage</u> and <u>uplift pressures</u> generated in the marsh layers under the soil levee (Figure 1) through nearby excavations backfilled with high permeability materials.

30.   Early development of the high hydraulic seepage and uplift pressures was abetted by the nearby backfilled excavations developed during the USACE Lock Expansion Project East Bank Industrial Area (EBIA) site clearing activities performed by Washington Group International (WGI) under the supervision of the USACE (Figure 1). These excavations resulted in facilitating significant increases in the hydraulic conductivity and porewater pressure

development paths. This led to much quicker and greater increases in seepage pressures and hydraulic gradients and led to decreases in the lateral resistance of the levee – floodwall sections.

31. As the breaches evolved, differential movements of the man-made flood protection structures resulted in opening the vertical joints (water stops) between sections of the concrete floodwall. These openings allowed flood waters to enter early into the adjacent Lower 9th Ward. As the breach further developed, there were failures of some joints between adjacent sections of the sheet piling.

32. The North Breach developed early (0400 – 0500 AM CDT) before overtopping by the IHNC surge waters. The North Breach completed development by 0600 AM CDT. The South Breach developed later after overtopping by waves and the surge waters (0700 – 0800 AM CDT). The South Breach completed development by 0900 am CDT (Figures 2 and 3, Table 1).

33. The floodwall between the North and South Breach showed clear signs of being in the early stages of failure. The segment of the floodwall immediately adjacent to a flooded borrow pit had been overtopped with the consequent formation of a 'tension gap' on the flooded side and a deep erosion trench on the protected side, yet this segment of floodwall did not breach. This section of the floodwall did not fail because the coupled hydraulic seepage and uplift pressures were inhibited from development in the swamp - marsh deposits under the borrow pit by clay linings purposely placed on the walls of the borrow pit (slope dressing) and the very low permeability clays that existed on the bottom of the borrow pit covering the top of the swamp – marsh deposits. These results were corroborated with performance of other similar floodwalls that suffered heavy overtopping during Hurricane Katrina with resultant deep erosion of the protected side soils and did not fail.

53. The effects of these site remediation activities clearly extended well below the specified soil excavation levels cited earlier. Removal of barges, piles, underground storage tanks, and underground utilities (e.g. sewer, water, gas lines) reached and substantially exceeded elevations of -10 feet to -25 feet (NAVD88); thus intersecting the underlying marsh deposits. When backfilled with porous – pervious – materials, hydraulic 'connections' would be developed between the backfilled excavations and the buried pervious – permeable marsh and swamp layers. Given the substantial number of excavations developed by WGI during its removal of surface (e.g. building foundations) and subsurface (piling, pipelines, storage tanks) obstructions and during removal of highly polluted soils that extended to significant depths (Figures 33a and 33b), the surface soils of the EBIA became like Swiss cheeze or an intensely bombed battlefield riddled with deep holes. When these excavations were backfilled with very porous soils (e.g. sands, shells, uncompacted native soils), and in some cases not backfilled at all (e.g. holes remaining after piling extractions, Morris 2011), the entire community of excavations provided an substantial number of hydraulic connections with the buried water conductive swamp – marsh deposits. When the waters in the IHNC were able to flood the surface of the EBIA, these hydraulic connections facilitated seepage and hydraulic pressures that had important negative effects on the integrity of the hurricane flood protection structures at the Lower 9th Ward.

## IV.   EXCAVATIONS ADJACENT TO FLOOD PROTECTION STRUCTURES

125.   The IHNC Lock Replacement Project required, as part of the site preparation and demolition, the removal of subsurface debris and abandoned utilities (Brown, Cunningham, and Gannuch 2000; R,. Christopher Goodwin & Associates, Inc. 1992, WGI 2000a). Very limited documentation was available for this review to assess the specific protocols employed during the demolition phase of this project (WGI 2005a).  However, the following conclusions can be reached based on the available information (Bea and Storesund 2008):

a) USACE design guidelines clearly establish the requirement to evaluate seepage impacts on flood control structures as a result of subsurface activity in the proximity of existing flood protection elements;

b) The demolition and excavation activities as part of the IHNC Lock Replacement Project were well-within the zone of influence for existing flood protection elements and change in seepage effects should have been carefully evaluated during the interim construction period between demolition activities and completion of the new flood protection system associated with the new navigation lock.  However, during this investigation no analyses were found that demonstrated these evaluations were completed as part of the IHNC Lock Replacement Project. It is very likely no such analyses were ever contemplated or completed.

126.   All USACE design guidelines pertaining to flood protection systems require seepage analyses to be performed as part of design (USACE, 1989; USACE, 1993a; USACE, 1994; and USACE, 2000.).  These USACE guidelines clearly demonstrate the intent that any foundation condition that may impact the seepage potential under a levee must be evaluated. Specific requirements in these guidelines are summarized in the following excerpts.

a)      EM 1110-2-1913, Design and Construction of Levees (USACE, 2000):

*Without control, underseepage in pervious foundations beneath levees may result in (a) excessive hydrostatic pressures beneath an impervious top stratum on the landside, (b) sand boils, and (c) piping beneath the levee itself.  Underseepage problems are most acute when a pervious stratum underlies a levee and extends both landward and riverward of the levee and where a relatively thin top stratum exists on the landside of the levee.*

b)      Special conditions, such as pipeline crossings beneath levee footprints are highlighted in EM 1110-2-1923 (USACE, 2000):

*General.  The installation of pipes or other structures within the levee or foundation probably requires the greatest care and closest supervision and inspection of any aspect of levee construction.  Most failures of levee systems have initiated at the soil-structure interface and therefore every effort must be made to ensure that these areas are not susceptible to piping.  <u>Of overriding importance is good compaction of the backfill material along the structure.</u> (underline added for emphasis) Pipes installed by open trench excavation should be installed in the dry and a dewatering system should be used where necessary. Pipes installed by directional drilling, microtunneling, or other trenchless methods requires special consideration.*

*b. Pipes crossing through or beneath levees*

*…After the trench has been excavated, it should be backfilled to the pipe invert elevation.  In impervious zones, the backfill material should be compacted with mechanical compactors to 95 percent standard density at about optimum water content…First-class bedding should be used for concrete pipe and other rigid pipe, as shown in EM 1110-2-2902, except no granular bedding should be used in impervious zones…Pipes crossing beneath levees also*

*require special consideration. Such crossings should be designed by qualified geotechnical engineers…Penetration through the top stratum of fine-grained materials may concentrate seepage at those locations…*

    c)    EM 1110-2-2502, Retaining and Flood Walls (USACE, 1989):

<u>General Considerations</u>. *Water-retaining structures are subject to through-seepage, underseepage, and seepage around their sides or ends. Seepage control is a primary consideration for flood wall design. Uncontrolled seepage may result in water pressures and uplift forces on the wall base in excess of design assumptions and consequent structural instability…Seepage control entails the design of measures to ensure that seepage pressures and velocities are maintained below tolerable values…As flood walls are usually found on alluvial materials, pervious zones of significant thickness are often present at some depth below relatively impervious top stratum materials and may be hydraulically connected…Because of horizontal stratification of alluvial deposits, the horizontal permeability may be greatly in excess of the vertical permeability…Underseepage control measures vary because the selection and design of appropriate control scheme is highly dependent on site-specific conditions, particularly the stratification and permeability of foundation materials, availability of right-of-way, and local construction practices and costs.*

<u>Basements and other Excavations</u>. *The seepage aspects and the foundation stability of walls which have had basements excavated on either side of and adjacent to the wall since the original design and construction were completed should be investigated.*

    d)    EM 1110-2-2504, Design of Sheet Pile Walls (USACE, 1994):

*Where seepage occurs, the differential water pressure is dissipated by vertical flow beneath the sheet pile wall. This distribution of the unbalanced water pressure can be obtained from*

122

*a seepage analysis. The analysis should consider the permeability of the surrounding soil as well as the effectiveness of any drains if present. Techniques of seepage analysis applicable to sheet pile wall design include flow nets, line of creep method, and method of fragments. These simplified techniques may or may not yield conservative results. Therefore, it is the designer's responsibility to decide whether the final design should be based on a more rigorous analysis, such as finite element method. Upward seepage in front of the sheet pile wall tends to reduce the effective weight of the soil, thus reducing its ability to offer lateral support. In pervious material the effects of upward seepage can cause piping of material away from the wall or, in extreme cases, causes the soil to liquefy. Lengthening the sheet pile, thus increasing the seepage path, is one effective method of accommodating seepage. For sheet pile walls that retain backfill, a drainage collector system is recommended. Some methods of seepage analysis are discussed in EM 1110-2-1901.*

  e)  EM 1110-2-1901, Seepage Analysis and Control for Dams (USACE, 1993a):

*General. All dams on earth foundations are subject to underseepage. Seepage control in earth foundations is necessary to prevent excessive uplift pressures and piping through the foundation…The purpose of the project, i.e., long-term storage, flood control, hydropower, etc., may impose limitations on the allowable quantity of seepage…*

  127.  The 'over arching' requirements in the Code of Federal Regulations § 208.10 Part 208 – Flood Control Regulations, Army Corps of Engineers, DOD, Section (5) stipulates:

*No improvement shall be passed over, under, or through the walls, levees, improved channels or floodways, nor shall any excavation or construction be permitted within the limits of the project right-of-way, nor shall any change be made in any feature of the works without prior determination by the District Engineer of the Department of the Army, or his*

*authorized representative, that such improvement, excavation, construction, or alteration will not adversely affect the functioning of the protective facilities. Such improvements or alterations as may be found to be desirable and permissible under the above determination shall be constructed in accordance with standard engineering practice. Advice regarding the effect of proposed improvements or alterations on the functioning of the project and information concerning methods of construction acceptable under standard engineering practice shall be obtained from the District Engineer or, if otherwise obtained, shall be submitted for his approval. Drawings or prints showing such improvements or alterations as finally constructed shall be furnished to the District Engineer after completion of the work.*

128. In conclusion, the USACE guidelines, the U.S. Code of Federal Regulations, and the Engineering Standard-of-Care (Kardon 2005) clearly require seepage conditions that may impact a flood control structure be analyzed and appropriate mitigation efforts implemented should unacceptable seepage conditions be found to exist. This requirement is found in all USACE design guidelines associated with flood control structures and levees. This is a mandory requirement of the Flood Control Regulations of the U.S. Army Corps of Engineers.

129. During my Phase 4 forensic engineering investigations that addressed the relationships between the EBIA site clearing activites conducted by WGI under the supervision of the USACE and the failure of the flood protection structures at the Lower 9th Ward during Hurricane Katrina, I did not find any documented evidence that the applicable Engineering Standard of Care regulations and requirements were acknowledged and properly addressed by WGI and the USACE during the USACE IHNC Lock Expansion Project EBIA site clearing and remediation project. The lack of regard for and complete deviation from mandated and expected prudent engineering practices and USACE regulations in connection with this project were

substantial factors in causing the catastrophic failures along the IHNC and the flooding of the Lower 9th Ward. This persistent neglect proved to have disastrous consequences.

## V.  CONCLUSIONS

130.  The EBIA excavations performed by WGI for the USACE IHNC navigation Lock Expansion Project were a substantial contributing factor to the breaches along the East side of the IHNC-Lower Ninth Ward during Hurricane Katrina. These excavations resulted in facilitating significant increases in the hydraulic conductivity and porewater pressure development paths. This led to much quicker and greater increases in seepage pressures and hydraulic gradients and led to decreases in the lateral resistance of the levee – floodwall sections.

131.  My forensic engineering analyses of development of the North and South Breaches at the Lower 9th Ward during Hurricane Katrina show that there were multiple modes of failure involved in development of these failures. These failure modes include:

a) under levee seepage and hydraulic pressure – flow gradients exacerbated by the poorly backfilled EBIA site clearing excavations that led to localized 'blowouts' at the toe of the levees on the protected sides,

b) under levee hydraulic uplift pressures exacerbated by the poorly backfilled EBIA site clearing excavations that acted to reduce the lateral stability of the floodwall – levee system,

c) in the case of the South Breach, overtopping erosion of the soils on the protected sides reducing the lateral capacity of the flood protection structures,

d) development of 'tension gaps' between the supporting soils and floodwall supporting sheet piling as they inclined toward the protected side under the rising surge waters in the

125

139. The applicable USACE guidelines, the U.S. Code of Federal Regulations, and the generally applicable Engineering Standard-of-Care clearly require seepage conditions that may impact a flood control structure be analyzed and appropriate mitigation efforts implemented should unacceptable seepage conditions be found to exist. This requirement is found in all USACE design guidelines associated with flood control structures and levees. This is a mandatory requirement of the Flood Control Regulations of the U.S. Army Corps of Engineers. During Phase 4 of my forensic engineering investigations that have addressed the relationships between the EBIA site clearing activities conducted by WGI under the supervision of the USACE and the failure of the flood protection structures at the Lower 9th Ward during Hurricane Katrina, I did not find any documented evidence that these Engineering Standard of Care regulations and requirements were acknowledged and properly addressed by WGI and the USACE during the USACE IHNC Lock Expansion Project EBIA site clearing and remediation project. The lack of regard for and complete deviation from mandated and expected prudent engineering practices and USACE regulations in connection with this project were substantial factors in causing the catastrophic failures along the IHNC and the flooding of the Lower 9th Ward. This persistent neglect proved to have disastrous consequences.

140. The effects of the EBIA site remediation activities clearly extended well below the specified soil excavation levels that were originally specified. Removal of barges, piles, underground storage tanks, and underground utilities (e.g. sewer, water, gas lines) reached and substantially exceeded elevations of -10 feet to -25 feet (NAVD88); thus intersecting the underlying marsh deposits. When backfilled with porous – pervious – materials, hydraulic 'connections' would be developed between the backfilled excavations and the buried pervious – permeable marsh and swamp layers. Given the substantial number of excavations developed by

129

WGI during its removal of surface (e.g. building foundations) and subsurface (piling, pipelines, storage tanks) obstructions and during removal of highly polluted soils that extended to significant depths, the surface soils of the EBIA became like Swiss cheeze or an intensely bombed battlefield riddled with deep holes. When these excavations were backfilled with very porous soils (e.g. sands, shells, uncompacted native soils), and in some cases not backfilled at all (e.g. holes remaining after piling extractions), the entire community of excavations provided a substantial number of hydraulic connections with the buried water conductive swamp – marsh deposits. When the waters in the IHNC were able to flood the surface of the EBIA, these hydraulic connnections facilitated seepage and hydraulic pressures that had important negative effects on the integrity of the hurricane flood protection structures at the Lower 9th Ward.

141. During this phase of my investigation (March 2011 – January 2012), a substantial amount of 'new' information has been provided by the U.S. Government and Washington Group International (WGI). This new information has provided additional important insights into the characteristics of the soils and floodwall at the study locations. Earlier studies and current detailed studies of this new information has identified important 'gaps' in the available information (Rogers 2012; Morris 2011; Bea 2008a, 2009a). Recently (January 16, 2012), additional information on the EBIA site clearing activities has been produced by the Department of Justice. Future developments in this investigation may provide additional opportunities to obtain and review additional information that pertains to the soil and floodwall characteristics at the study locations. I reserve the right to revise my analyses and conclusions based on the additional information that could be developed from future Defense document productions.