Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
                                 JUDGE DUVAL
PERTAINS TO MRGO                 MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
         05-6314, 05-6324, 05-6327, 05-6359,
         06-0225, 06-0886, 06-1885, 06-2152,
         06-2278, 06-2287, 06-2824, 06-4024,
         06-4065, 06-4066, 06-4389, 06-4634,
         06-4931, 06-5032, 06-5155, 06-5159,
         06-5156, 06-5162, 06-5260, 06-5771,
         06-5786, 06-5937, 07-0206, 07-0621,
         07-1073, 07-1271, 07-1285
                    * * *
              (V O L U M E  II)
    Deposition of ROBERT G. BEA, PH.D.,
given at the offices of Stone Pigman Walther
Wittmann, LLC, 546 Carondelet Street, New
Orleans, Louisiana 70130, on March 28th, 2012.
REPORTED BY:
    JOSEPH A. FAIRBANKS, JR., CCR, RPR
    CERTIFIED COURT REPORTER #75005

Page 2

1  APPEARANCES:
2  REPRESENTING THE PLAINTIFFS:
3      BRUNO & BRUNO
4      (BY:  JOSEPH M. BRUNO, ESQUIRE)
5      (BY:  SCOTT JOANEN, ESQUIRE)
6      855 Baronne Street
7      New Orleans, Louisiana 70113
8      504-525-1335
9  - AND -
10     DOMENGEAUX, WRIGHT, ROY & EDWARDS
11     (BY:  ELWOOD C. STEVENS, JR., ESQUIRE)
12     556 Jefferson Street, Suite 500
13     Lafayette, Louisiana 70501
14     337-233-3033
15
16 REPRESENTING THE UNITED STATES OF AMERICA:
17     U.S. DEPARTMENT OF JUSTICE
18     (BY:  ROBIN DOYLE SMITH, ESQUIRE)
19     (BY:  RUPERT MITSCH, ESQUIRE)
20     (BY:  JACK WOODCOCK, ESQUIRE)
21     Torts Branch, Civil Division
22     P.O. Box 888
23     Benjamin Franklin Station
24     Washington, D.C. 20044
25     202-616-4289

Page 3

1  REPRESENTING WASHINGTON GROUP INTERNATIONAL,
2      INC.:
3      JONES DAY
4      (BY:  DEBRA S. CLAYMAN, ESQUIRE)
5      (BY:  ADRIAN WAGER-ZITO, ESQUIRE)
6      (BY:  CHRISTOPHER N. THATCH, ESQUIRE)
7      51 Louisiana Avenue, N.W.
8      Washington, D.C. 20001-2113
9      202-879-4645
10 - and -
11     STONE PIGMAN WALTHER WITTMANN, L.L.C.
12     (BY:  WILLIAM D. TREEBY, ESQUIRE)
13     546 Carondelet Street
14     New Orleans, Louisiana 70130
15     504-581-3200
16
17 ALSO PRESENT:
18     FRANCISCO SILVA-TULLA
19     TIMOTHY STARK
20     TOM BRANDON
21
22 VIDEOGRAPHER:  GILLEY DELORIMIER (DEPO-VUE)
23
24
25

Page 4

1           E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:                         PAGE
4  MR. TREEBY   ................................8
5  MR. SMITH    ..............................171
6
7              E X H I B I T   I N D E X
8  EXHIBIT NO.                             PAGE
9  Bea Exhibit 26 ..............................8
10 Bea Exhibit 27 .............................21
11 Bea Exhibit 28 .............................22
12 Bea Exhibit 29 .............................25
13 Bea Exhibit 30 .............................30
14 Bea Exhibit 31 .............................31
15 Bea Exhibit 32 .............................34
16 Bea Exhibit 33 .............................45
17 Bea Exhibit 34 .............................84
18 Bea Exhibit 35 .............................85
19 Bea Exhibit 36 .............................90
20 Bea Exhibit 37 .............................96
21 Bea Exhibit 38 ............................126
22 Bea Exhibit 40 ............................155
23 Bea Exhibit 41 ............................246
24 Bea Exhibit 42 ............................267
25 Bea Exhibit 43 ............................276

Page 113

1   concept, a lengthy explanation, and it's all in
2   the record. Okay?
3         Now, what I'm asking is not about
4   concept, and not about what you saw in
5   photographs after Katrina. I'm asking about
6   any evidence you have pre-Katrina for any
7   excavation at that location that was a 15 to
8   17-foot deep excavation with anything near
9   these dimensions, 25 feet wide, 100 feet long,
10  15 to 17 feet deep, at that location. Any
11  evidence.
12      A.   And your question of me is do I have a
13  document that says a hole, excavation, with
14  those dimensions, was developed at that
15  location by WGI pre-Katrina? The answer to
16  that is no. I don't have a complete enough
17  record to trace it.
18      Q.   As a result, you don't know when any
19  such excavation was performed by Washington
20  Group. Isn't that logical?
21      A.   That's correct.
22      Q.   Uh-huh. If you have no evidence that
23  Washington Group performed such an excavation
24  anything like 25 feet wide, 100 feet deep, 15
25  to 17 feet wide, 100 feet long, 15 to 17 feet

Page 114

1   deep, at that location, isn't it fundamentally
2   erroneous to contend there was such an
3   excavation by Washington Group in this lawsuit?
4       A.   No.
5       Q.   Okay. We can just make up our facts
6   as we go along, is that correct?
7       A.   Oh, no, sir. I'm a qualified forensic
8   engineer. I would never try to make up facts.
9       Q.   Okay. Appendix B of your report,
10  Page 3, if you would turn there. Page 3 of
11  Appendix B.
12      A.   Yes, sir.
13      Q.   You state there, and if I can find
14  where -- sorry, I referred you to the wrong
15  page. There's a typo in my outline. Heaven
16  forbid.
17        If you would refer to Page 8 of
18  Appendix B, please.
19      A.   Yes, sir.
20      Q.   If you would look down in the middle
21  of the page -- if you go up in the paragraph in
22  the text, six lines, there's a reference to
23  Figure 4. Do you see that?
24      A.   Six lines from the top or bottom?
25      Q.   Bottom. Up from the bottom of the

Page 115

1   text.
2       A.   Yes, sir.
3       Q.   Figure 4 shows the location of the
4   backfilled excavation after the floodwaters
5   from Hurricane Katrina had receded. Do you see
6   that?
7       A.   Yes.
8       Q.   I don't find such a Figure 4. Can you
9   tell me where it is?
10      A.   It should be Figure 3.
11      Q.   Oh. So that's a mistake to say Figure
12  4 there.
13      A.   Yes. It's referring to 3 below it.
14      Q.   Okay.
15      A.   That's an error on my part.
16      Q.   Now, aside from this -- I think I've
17  got the answer to that question. I don't need
18  to do it.
19        Let me just ask a general question:
20  You've given me your answer about the -- you
21  have a similar conceptual excavation in your
22  cases that relate to the South Breach; is that
23  correct?
24      A.   Correct.
25      Q.   Is it correct, as well, that you don't

Page 116

1   have any -- maybe because the record isn't
2   complete, or for whatever reason, you don't
3   have any evidence, pre-Katrina, that shows that
4   Washington Group did an excavation like the one
5   in your conceptual cross-section, is that
6   correct?
7       A.   And you are asking your question
8   specific to those locations. Is that correct?
9       Q.   Well, you've already answered me as to
10  the North Breach on those cases. We've looked
11  at that.
12      A.   Right.
13      Q.   Now I'm talking about the South
14  Breach. You have a similar conceptual
15  cross-section and you show an excavation to
16  depth.
17      A.   Correct.
18      Q.   And --
19      A.   That's the Case 1.
20      Q.   Okay. And in fact, you have -- well,
21  is it true you don't have any evidence
22  pre-Katrina that Washington Group performed
23  such an excavation?
24      A.   At that location.
25      Q.   At that location.

Page 117

1    A.  All of the evidence that we cited for
2  both Cases 1 and 2 are contained in my report.
3  I don't think we were able to trace the Case 1
4  excavation to a specific document concerning
5  WGI's work at that location.  The document
6  trail went cold.
7    Q.  Are you saying you didn't get
8  documents you asked for?
9    A.  We have gotten documents in dribs and
10 drabs --
11   Q.  From Washington Group?  Wait.
12 Washington Group?
13   A.  How to put it:  From both Washington
14 Group and the Department of Justice.  I have
15 not been able to make a discrimination of how
16 the information was coming.  It's when the
17 information is compiled that I then attempt to
18 develop the background shown here.  The exact
19 suppliers of the documents I don't know, sir.
20   Q.  Well, pardon me, but in this case I
21 represent Washington Group.
22   A.  Yes.
23   Q.  And I will represent to you -- counsel
24 is here who can confirm this -- Washington
25 Group International produced every daily

Page 118

1  quality control report from Day 1 of its work
2  in 2000 to the day it finished in May of 2005.
3  And all of the subcontractors, as well.
4       Are you saying you didn't get those?
5  We did that, by the way, in 2008.  February
6  2008.
7    A.  You're ahead of me.  I was just going
8  to ask that.
9       I can't answer your question for sure.
10 And the reason is, I did not review,
11 personally, all of the documents.  I was
12 assisted, as I described yesterday, by Mr. Andy
13 Owen.  I omitted, sir, yesterday, citing
14 Mr. Chris Yount and Mr. Scott Joanen, then
15 Dr. Rune Storesund, Dr. Dave Rogers, and then I
16 was provided with documents deemed to be
17 important to the development of both Case 1 and
18 Case 2, and those are the documents I reviewed.
19 So my documents represent a subset of the
20 total.
21   Q.  Go back, if you will -- go back to
22 Exhibit 17 -- Bea Exhibit 17, if you will,
23 which is the no further action report for
24 Boland Marine which we marked as Bea
25 Exhibit 17.

Page 119

1       And we've looked at this map on
2  several occasions.  It's the last page of that
3  exhibit which is an extract from the Boland
4  Marine no further action report.
5    A.  Yes.
6    Q.  This map shows the location of the --
7  locations of the remediation excavations at the
8  Boland Marine site, the site that was adjacent
9  to where the North Breach occurred.  Do you see
10 that?
11   A.  Yes.
12   Q.  Do any of the excavations on the
13 NFAATT map match the backfilled excavation that
14 is shown in your conceptual cross-sections that
15 appear on Figure 43 of your report and Figure
16 10 of your Appendix B?
17   A.  No.
18   Q.  And none of those excavations on the
19 NFAATT map are as close as 60 feet from the
20 floodwall, isn't that correct?
21   A.  That's correct.
22   Q.  And look at table -- the prior page, I
23 believe it is, in the same exhibit.  According
24 to the table, none of the excavations on the
25 NFAATT map were more than 8 feet deep.  Isn't

Page 120

1  that correct?
2    A.  Correct.
3    Q.  And I believe you've testified earlier
4  that the only evidence, which was that hand
5  drawn map, showed the average depths of ACM
6  Transite contamination at Boland was estimated
7  to be plus or minus 2 feet, correct?
8    A.  Correct.
9    Q.  You don't have any evidence that ACM
10 Transite excavations at Boland were even
11 10 feet deep, much less 15 to 17 feet deep;
12 isn't that correct?
13   A.  That's correct.
14   Q.  I believe you said you had reviewed
15 Dr. Rogers' testimony.
16   A.  I said I had not, sir.
17   Q.  Oh.  I'm sorry.  I get confused.  I
18 thought you had not Chad Morris, but you had
19 Rogers.
20   A.  No, I have not reviewed either.  So if
21 I gave you the wrong impression, I'm sorry.
22   Q.  Well, it's probably my faulty memory.
23 We'll see.  But it doesn't matter.  I'm now
24 going to refer to you Dr. Rogers' deposition,
25 which is Bea 36.

Page 137

1  A. Well, I've got evidence so far that
2  there are sections in grid trenching that
3  certainly exceeded 5 feet.
4  Q. Where?
5  A. This is photographic evidence
6  associated with the grid trenching work
7  provided by Washington Group International, and
8  those photographs should be in my reliance
9  material. Those photographs will be a part of
10 the database associated with the
11 three-dimensional Swiss cheese graphics that
12 will be provided to you on or about April 3rd.
13 Q. Well, let me say this: If and when
14 that is ever accepted as an appropriate
15 rebuttal, I hope you spell cheese right.
16 That's all I would say about that.
17     MR. STEVENS:
18        Bill. Bill, please.
19        (Off the record.)
20 A. Are you talking about the z or the s?
21 EXAMINATION BY MR. TREEBY:
22 Q. The z. There's no z in cheese, as I
23 know it.
24 A. Well, spelling was one of my problems.
25 Q. I'd like to engage you, but I won't.

Page 138

1  let's go on.
2  A. I did misspell it.
3  Q. Okay. Is any photograph of grid
4  trenching that is in your report evidence that
5  grid trenching went below 5 feet?
6  A. No.
7  Q. Some photograph that you think you
8  have, that you might put in a subsequent
9  report.
10 A. No, I think the photographs are in my
11 reliance material. I attempted to put in there
12 all of the WGI photographs that I had obtained.
13 If I missed any, they're retrievable.
14 Q. Turn to Page 120 of your report, if
15 you would.
16 A. Yes, sir.
17 Q. This section of your report, Pages 120
18 through 124, entitled Excavations Adjacent to
19 Flood Protection Structures, right?
20 A. Yes, sir.
21 Q. In the second-to-last sentence, in
22 Paragraph 125 -- oh, I'm sorry. It's the
23 second-to-last sentence of 125 before you get
24 to A.
25 A. Yes, sir.

Page 139

1  Q. In the third line, end of the line, it
2  says, Very limited documentation was available
3  for this review to assess the specific
4  protocols employed during the demolition phase
5  of this project, and you cite WGI 2005A.
6  A. Correct.
7  Q. This review. When did you conduct
8  what you're referring to as this review?
9  A. Let's see. The first generation of
10 this review, my memory says, is contained in my
11 2008-9 MRGO Robinson expert report. And then
12 we repeated that effort in this phase of my
13 work. So it's a synthesis of the two.
14 Q. So why did you cite Washington Group
15 International 2005a for this proposition?
16 That's the technical completion report which is
17 in evidence.
18 A. That's the principal document I relied
19 on.
20 Q. When you say demolition phase, are you
21 referring to the remediation excavations, as
22 well?
23 A. Yes.
24 Q. What limit to the documentation for
25 Washington Group 's excavation and demolition

Page 140

1  activities in Task Order 26 do you contend
2  there was? What limit do you contend there
3  was?
4      You say very limited documentation.
5  A. Right.
6  Q. What limit do you say there was?
7  A. The limit of the documents I had
8  available to perform the study.
9  Q. Did you review the recommendation
10 report?
11 A. If I didn't cite it, no.
12 Q. Did you have it to review? We gave it
13 to the plaintiffs' counsel. Did you have it to
14 review?
15 A. I don't know the answer, but I
16 certainly could consult my library to answer
17 your question appropriately.
18 Q. Did you review the project work plan?
19 A. I believe so.
20 Q. Did you review the subcontractor work
21 plans for specific features of work?
22 A. No.
23 Q. Are you saying you didn't have that
24 available to you?
25 A. I'm saying, in response to your

Page 141

1  question, I don't recall reviewing that.
2  Q.  I understand that.  But I'm dealing
3  where your sentence that says very limited
4  documentation was available for this review.
5  You've said this review continued up
6  till you did this report; right?
7  A.  And that's correct.
8  Q.  Okay.  My question, then, is, are you
9  saying you didn't have it available to you to
10 review when I talk about this subcontractor
11 work plans for specific features of work?
12 A.  I don't know.
13 Q.  Did you review the daily contractor
14 quality control reports?
15 A.  Some.
16 Q.  So you had them available for yourself
17 to review?
18 A.  The ones I did review, that's correct.
19 That's how I got them.
20 Q.  Okay.  But available -- we gave them
21 all at the same time in 2008.  So I'm trying to
22 find out if you got them.  That's what I'm
23 trying to find out.
24     MR. BRUNO:
25         That's not true.  Objection.

Page 142

1     MR. TREEBY:
2         That is true, Joe.  You're not --
3     MR. BRUNO:
4         Elwood, would you make the
5     objection, please?
6         Objection.  It's not accurate.
7     MR. TREEBY:
8         Okay.  It is accurate.  Scott
9     know it's accurate.  But go ahead.
10        You don't know what you're talking
11    about, Joe.
12 A.  Please repeat it.
13 EXAMINATION BY MR. TREEBY:
14 Q.  Did you have it available to review?
15 A.  Please define it.  You said, did you
16 have it available.  I was trying to get at it.
17 Q.  I don't blame you for not
18 remembering ing the question.  I don't blame
19 you.  It's not your fault.  I'll repeat it.
20     Did you have available to review the
21 subcontractor work plans for specific features
22 of work?
23 A.  I don't think so.
24 Q.  You don't think you had it available.
25 A.  That's correct.

Page 143

1  Q.  Did you have available to you the
2  daily contractor quality control reports?
3  A.  Some of them.
4  Q.  You don't think you had them all
5  available?
6  A.  That's correct.
7  Q.  Did you have available to you the
8  submittals made by Washington Group to the
9  Louisiana Department of Environmental Quality?
10 A.  Some of them.
11 Q.  You think they weren't available to
12 you -- all available to you?  The LDEQ reports?
13 Did somebody -- maybe we can cut through some
14 of this.
15     Did somebody, to your knowledge -- if
16 you know, did somebody select portions of
17 Washington Group's production and give you
18 just selected portions?
19 A.  Yes.
20 Q.  Who made those selections?  That's my
21 question.
22 A.  Well, I described the group to you
23 previously.
24 Q.  Okay.
25 A.  It consisted of those four

Page 144

1  individuals.  Five, actually.
2  Q.  Got you.  And would the same be true
3  for the depositions of the Corps personnel and
4  Washington Group personnel that worked on Task
5  Order 26, that you didn't have them all
6  available to you?
7  A.  Please repeat the question.
8  Q.  Did you have available to you the
9  depositions of the U.S. Army Corps of Engineers
10 personnel and Washington Group employees that
11 worked on Task Order 26?  Did you have those
12 depositions available to you?
13 A.  Some of them.  I'm not aware of all of
14 them.
15 Q.  Okay.  On Page 120, Paragraph 126, you
16 state, quote, All USACE design guidelines
17 pertaining to the flood protection systems
18 require seepage analyses to be performed as
19 part of design.
20     And then you cite to a number of Army
21 Corps of Engineers engineering manuals.  Do you
22 see that?
23 A.  Yes, sir.
24 Q.  Isn't it true that you now know that
25 any responsibility for following engineering

Page 145

1  manuals for conducting seepage analyses
2  relating to the design of levees in the East
3  Bank Industrial Area was not a responsibility
4  of Washington Group?
5     A.  I do not have that knowledge.  The
6  knowledge I do have says both the Army Corps of
7  Engineers and WGI share the responsibility to
8  do no harm, in the process of their work, to
9  the integrity and reliability of the flood
10 protection structures.
11    Q.  Is that your expertise as an attorney?
12    A.  No, sir.
13    Q.  Sounds like a legal opinion to me.
14    A.  That's my expertise as a researcher in
15 the area of the standard of care for
16 engineering.
17    Q.  I'm specifically talking about
18 engineering manuals.  Let's limit -- whoa.  Let
19 me get my question.
20    A.  I'm sorry, sir.  I apologize.
21    Q.  I'm talking only here about
22 engineering.
23        Do you know any engineering manual
24 published by the Army Corps of Engineers that
25 says it's applicable to thirty parties?

Page 146

1     A.  No.
2     Q.  Do you know what a TERC is, Total
3  Environmental Restoration Contract?
4     A.  In basic terms, yes.
5     Q.  Do you have any experience prior to
6  this case in working with a TERC?
7     A.  No.
8     Q.  Are you familiar with a contract
9  identified as Indefinite Delivery-Indefinite
10 Quantity contracts that are used by the Corps
11 of Engineers?
12    A.  I've got basic understanding.
13    Q.  Do you have any personal experience
14 prior to this case in working in a contract or
15 working under an indefinite delivery-indefinite
16 quantity contract?
17    A.  Yes.
18    Q.  When is that?
19    A.  U.S. Army Corps of Engineers South
20 Florida Flood Control District, years 1954
21 through 1959.
22    Q.  Any since then?
23    A.  None.
24    Q.  Did you review the actual total
25 environmental restoration contract between

Page 147

1  Washington Group International and the U.S.
2  Army Corps of Engineers Tulsa District that
3  governed Washington Group 's restoration work
4  in the EBIA?
5     A.  No, sir.
6     Q.  Have you reviewed Task Order 26 and
7  its related statements of work?
8     A.  I believe so.
9     Q.  What did with your review of those
10 documents consist of?
11    A.  Reading what was in the documents to
12 develop an understanding of the extent of work
13 to be performed.
14    Q.  We've already established that you
15 knew who Mr. Lee Guillory is; right?
16    A.  That's correct.
17    Q.  The construction manager and
18 contracting officer representative on Task
19 Order 26 for the Army Corps of Engineers,
20 right?
21    A.  Yes, sir.
22    Q.  Are you aware that Mr. Guillory
23 testified that Washington Group International
24 was not responsible for geotechnical
25 engineering relating to the levees and

Page 148

1  floodwalls under Task Order 26?
2     A.  I don't think so.
3     Q.  You don't think you were aware of
4  that?
5     A.  That's correct.
6     Q.  Do you have any reason to dispute that
7  fact?
8     A.  If you stated it as you did from his
9  deposition, I have no basis to dispute it.
10    Q.  Were you aware that civil engineers
11 from the Army Corps of Engineers were on site
12 in the EBIA with Washington Group every day?
13    A.  Yes.
14    Q.  Were you aware that Mr. Guillory,
15 construction manager and contracting officer's
16 representative, and a professional engineer,
17 referred certain excavations to the United
18 States Army Corps of Engineers Geotechnical
19 Engineering Branch of he felt they might impact
20 levees and floodwalls?
21    A.  Yes, I have that general
22 understanding.
23    Q.  Looking again at Paragraph 126 on Page
24 120 of your report, your references there,
25 would you agree with this:  To the extent there

Page 149

1  are any mandatory requirements -- and I'm using
2  that term in quotes -- to the extent there are
3  any mandatory requirements in the engineering
4  manuals you cite in that paragraph, they did
5  not require anything to be done by Washington
6  Group on Task Order 26?
7       A.  Since you used the term mandatory
8  requirements in quotes, please define what you
9  mean by mandatory requirements.
10      Q.  In the engineering manuals there are
11 things that are guidelines for the Corps to
12 follow --
13      A.  Right.
14      Q.  -- and there are things that are
15 mandatory requirements for the Corps to follow.
16      A.  Correct.
17      Q.  That's the way I'm using mandatory
18 requirements.
19      A.  Understood.  And please, now that I've
20 got that understanding, please repeat your
21 question.
22      Q.  Would you agree that to the extent
23 there are any mandatory requirements in the
24 engineering manuals you cite in that paragraph,
25 they did not require anything to be done by

Page 150

1  Washington Group under Task Order 26?
2       A.  The requirements are general.  The
3  mandatory connection to Task Order 26 via
4  contract I don't know about.
5       Q.  In your experience with the United
6  States Army Corps of Engineers contract work,
7  doesn't the Corps specify which of its
8  engineering regulations or engineering manuals
9  should apply to a particular contract?
10      A.  Yes.
11      Q.  Did you see they evidence that any of
12 these engineering manuals were incorporated
13 into or referenced in WGI 's Task Order 26?
14      A.  No, I did not.
15      Q.  In Paragraph B on Page 121 --
16 Subparagraph b -- you there?
17      A.  Yes, sir.
18      Q.  -- you are quoting, I believe, from
19 Engineering Manual 1110-2-1923.
20          Is that correct?
21      A.  Yes, sir.
22      Q.  I will tell you that that should be a
23 reference to 1913, I believe.
24      A.  I may have --
25      Q.  I think that's a typo.  But in any

Page 151

1  case, you quote a section about the
2  installation of pipes or other structures
3  within the levee or foundation; is that
4  correct?
5       A.  Yes, sir.
6       Q.  That's what you're talking about,
7  installation of pipes or other structures
8  within the levee.
9       A.  Yes, sir.
10      Q.  To your knowledge, did Washington
11 Group install pipes or other structures within
12 the levee or foundation of the levee?
13      A.  I don't know.  The documentation I've
14 read does not indicate Washington Group
15 installed such things, but was associated with
16 the removal of such things on the flood side of
17 the wall.
18      Q.  Another part of the quote in Paragraph
19 b says, quote, Most failures of levee systems
20 have initiated at the soil structure interface
21 and, therefore, every effort must be made to
22 ensure that these areas are not susceptible to
23 piping.
24          Are you familiar with the term soil
25 piping?

Page 152

1       A.  Yes, sir.
2       Q.  What conditions are usually necessary
3  for piping to occur?
4       A.  Sandy, silty, high permeability, high
5  erodibility material.
6       Q.  Did you evaluate this failure mode for
7  either the north or south breach?
8       A.  Not really.
9       Q.  Okay.  Go to Table 7-1 in Engineering
10 Manual 1110-2-1913.  Which I will hand you, I
11 suppose, which is Exhibit 39.  (Tendering.)
12          You see table 7-1?  I'll tell you
13 where it's at, that might help.
14      A.  Thank you.
15      Q.  It's actually near the end, at
16 Page 7-2.  It's, I don't know, a few page -- at
17 the bottom it says 7-2.
18      A.  Yes, sir.  I've got it.
19      Q.  Okay.  And this table lists three
20 categories of fill.  You see that?
21      A.  Yes, sir.
22      Q.  One of those types is uncompacted
23 fill.
24      A.  Yes.
25      Q.  And under construction methods for

Page 165

1   Q.  Okay.
2   A.  -- but I did not employ storages
3   coefficient.
4   Q.  I'm not asking whether you employed
5   it.  I'm asking -- you need -- I know we're
6   getting close to lunch, but, I'm trying to get
7   finished here.  The pumping test resulted in
8   values of hydraulic conductivity and storage
9   coefficient for this, quote, marsh, close
10  quote, layer.  Is that correct?
11  A.  Yes.  We reviewed that yesterday.
12  Q.  Thank you.  And to evaluate the flow
13  regime during Katrina, you used the value of
14  hydraulic conductivity obtained from the
15  pumping tests, is that correct?
16  A.  That was one of the primary sources of
17  information we used to identify a specific
18  value together with ranges of that best
19  estimate value.
20  Q.  Your best estimate as stated in your
21  report is 10 to the -5 centimeters per second
22  for hydraulic conductivity, correct?
23  A.  That's correct, sir.
24  Q.  And that is exactly what Dr. Rogers
25  said his best estimate was, isn't that correct?

Page 166

1   A.  That's correct, sir.
2   Q.  Okay.  But, if I understood your
3   testimony yesterday -- this is the main reason
4   for any questions on this subject now -- you
5   decided, a priori, to model the flow as steady
6   flow and to approximate that condition, used a
7   very low value of M sub V equal the 1 times 10
8   to the -91 over PSF in, your flow analyses for
9   the EBIA during Katrina, correct?
10  A.  That's correct.
11  Q.  These steady flow analyses disregard
12  the site specific value of storage coefficient
13  determined from the pumping tests, isn't that
14  correct?
15  A.  Yes.
16  Q.  Please describe steady flow as you are
17  using that term in your testimony.
18  A.  That term is defined in the text by
19  Lambe and Whitman and can be discriminated as
20  follows:  The flow analysis does not include
21  changes in either void ratio or saturation in
22  the soils.  So we're treating only the part
23  defined as steady flow.
24  Q.  Is there flow in what you are calling
25  steady flow?

Page 167

1   A.  There is transmission of pressure.
2   That's the portion that this entire
3   investigation, at least on my part, has
4   attempted to focus on.
5   Q.  I appreciate the speech.  I understand
6   that from your testimony yesterday.  Now let's
7   get an answer to the question I asked, as
8   opposed to the one you wanted to answer.
9       My question was, is there flow in what
10  you are calling steady flow?
11  A.  Yes.  There's transmission of fluid.
12  Q.  Thank you.  Is there a change in the
13  quantity of flow with time in your analyses?
14  A.  Yes.
15  Q.  When does the flow change?
16  A.  Oh, it changes when I change the
17  hydraulic forcing function.  And we provided
18  the --
19  Q.  Okay.  Have you quantified --
20      MR. STEVENS:
21          Excuse me.  He was in the middle
22      of a sentence.
23  A.  We provided for you time snapshots of
24  those changes as a function in the changes in
25  the hydraulic forcing function represented by

Page 168

1   the surge water elevation hydrographs.
2   EXAMINATION BY MR. TREEBY:
3   Q.  Have you quantified how much flow
4   occurred?
5   A.  No.
6   Q.  Now, this will call for a speech:  I
7   don't mind telling you that.
8       MR. STEVENS:
9           Bill, we don't need the comments,
10      please.  Your prefatory comment --
11      MR. TREEBY:
12          Dr. Bea knows exactly where I'm
13      going in this, and quit objecting
14      before the question is finished.
15      MR. STEVENS:
16          I'm objecting because the
17      question is not a question.
18      MR. TREEBY:
19          Oh.  I'm not finished.  It will
20      be a question.  It will be a question.
21      I'm making it a question.
22      MR. STEVENS:
23          Now we have a speech.
24  EXAMINATION BY MR. TREEBY:
25  Q.  Can you, Dr. Bea, please, at any

Page 169

1  length you wish to, or any minor length you
2  wish to, explain your justification to model
3  the flow problem in this case as steady flow.
4       A.  Yes.
5       MR. STEVENS:
6            Amen.  We're finally on the topic
7       at noon the second day.
8            Please proceed, Dr. Bea.
9       A.  It's based on the following key
10 elements:  The first is rapidly applied
11 hydraulic loading.  And when I use the term
12 rapidly applied, I'm referring to hurricane
13 surge hydrographs.
14           The second basis is dealing with and
15 addressing the buried swamp-marsh layers.  They
16 are saturated soils without significant free
17 gas in situ.
18           Item 3:  I am referencing pump tests
19 that have determined hydraulic conductivity
20 based on the saturated nature of the soil and
21 the incompressibility of the fluid/soil
22 mixture.
23           No. 3:  I'm basing this analysis on
24 results from piezometer tests in which we
25 measure the hydraulic loading, we measure the

Page 170

1  hydraulic pressure responses, and those
2  included PZ-3 that we discussed yesterday and
3  the piezometers installed by the Army Corps of
4  Engineers as part of their 17th Street Canal
5  safe water level study, and, as well, the work
6  done at the London Avenue test facility to
7  measure response in those soils to transient
8  loadings.
9            The next basis is the current United
10 States Army Corps of Engineers design
11 guidelines for I-walls.  And that includes
12 references to a number of engineering manuals.
13           And the last is, we've corroborated
14 these analyses with hind casting the breach
15 development at the 17th Street Canal, London
16 Canal north, London Canal south, Bayou
17 Bienvenue south, Bayou Dupre north, and all of
18 those applications of steady flow analysis have
19 been published publicly and documented in the
20 course of this series of litigations.
21      Q.  Okay.  How long do you say it took to
22 achieve steady state in the East Bank
23 Industrial Area?
24      A.  Please define what you are considering
25 in the definition of that term steady state.

Page 171

1       Q.  Steady flow.  Steady state flow which
2  is exactly what Lambe & Whitman say it is.  But
3  that's what I'm talking about.  Your steady
4  flow.  How long -- excuse me.
5       A.  Yes, sir.
6       Q.  How long do you say it took to achieve
7  that steady flow?
8       A.  I am not calculating flow.  I'm
9  calculating pressure.  And the available
10 information says it takes minutes.
11           (Lunch break.)
12 EXAMINATION BY MR. SMITH:
13      Q.  Good afternoon, Dr. Bea.
14      A.  Good afternoon.
15      Q.  I know you know my name, it's Robin
16 Smith and I represent the United States.
17           We've met before in this litigation,
18 haven't we?
19      A.  Yes.
20      Q.  If you'll bear with me, I'm getting
21 over a cold so any voice isn't the strongest.
22 I'll do my best the speak up.  And if you don't
23 understand me, you'll let me know, I'm sure.
24      A.  Yes.  Same for me.
25      Q.  Certainly.  Dr. Bea, I'd like you to

Page 172

1  turn to Paragraph 70 in your report.
2       A.  Yes, sir.
3       Q.  I'm going to read to you a portion of
4  this paragraph and I'm going to ask you some
5  questions about it.  I'm going to start I think
6  it's the third, fourth sentence in, During this
7  investigation.
8       A.  Yes.
9       Q.  During this investigation, the Type 2
10 uncertainties have been addressed by
11 developing, quote, validations, close quote, of
12 the analytical models.  These validations
13 involve comparing results from the analytical
14 models that reflect inputs, processing, and
15 outputs, with results from, quote, field tests,
16 close quote.  The comparisons characterized the
17 analytical model uncertainties in the form of,
18 quote, bias, close quote.  The ratio of the
19 true or observed characteristics in the field
20 with the nominal characteristics that result
21 from the analytical models.
22           Did I read take correctly?
23      A.  Yes.
24      Q.  Specifically, Dr. Bea, what analytical
25 models are you referring to?