Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
                                 JUDGE DUVAL
PERTAINS TO MRGO                 MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885, 06-2152,
06-2278, 06-2287, 06-2824, 06-4024,
06-4065, 06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155, 06-5159,
06-5156, 06-5162, 06-5260, 06-5771,
06-5786, 06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

* * *

(V O L U M E   I)

Deposition of ROBERT G. BEA, PH.D., given at the offices of Stone Pigman Walther Wittmann, LLC, 546 Carondelet Street, New Orleans, Louisiana 70130, on March 27th, 2012.

REPORTED BY:
JOSEPH A. FAIRBANKS, JR., CCR, RPR
CERTIFIED COURT REPORTER #75005

Page 2

1  APPEARANCES:
2  REPRESENTING THE PLAINTIFFS:
3      BRUNO & BRUNO
4      (BY:  JOSEPH M. BRUNO, ESQUIRE)
5      855 Baronne Street
6      New Orleans, Louisiana 70113
7      504-525-1335
8  - AND -
9      DOMENGEAUX, WRIGHT, ROY & EDWARDS
10     (BY:  ELWOOD C. STEVENS, JR., ESQUIRE)
11     556 Jefferson Street, Suite 500
12     Lafayette, Louisiana 70501
13     337-233-3033
14
15 REPRESENTING THE UNITED STATES OF AMERICA:
16     U.S. DEPARTMENT OF JUSTICE
17     (BY:  ROBIN DOYLE SMITH, ESQUIRE)
18     (BY:  RUPERT MITSCH, ESQUIRE)
19     (BY:  JACK WOODCOCK, ESQUIRE)
20     Torts Branch, Civil Division
21     P.O. Box 888
22     Benjamin Franklin Station
23     Washington, D.C. 20044
24     202-616-4289
25

Page 3

1  REPRESENTING WASHINGTON GROUP INTERNATIONAL,
2      INC.:
3      JONES DAY
4      (BY:  DEBRA S. CLAYMAN, ESQUIRE)
5      (BY:  ADRIAN WAGER-ZITO, ESQUIRE)
6      (BY:  CHRISTOPHER N. THATCH, ESQUIRE)
7      51 Louisiana Avenue, N.W.
8      Washington, D.C. 20001-2113
9      202-879-4645
10 - and -
11     STONE PIGMAN WALTHER WITTMANN, L.L.C.
12     (BY:  WILLIAM D. TREEBY, ESQUIRE)
13     546 Carondelet Street
14     New Orleans, Louisiana 70130
15     504-581-3200
16
17 ALSO PRESENT:
18     FRANCISCO SILVA-TULLA
19     TIMOTHY STARK
20     TOM BRANDON
21
22 VIDEOGRAPHER:  GILLEY DELORIMIER (DEPO-VUE)
23
24
25

Page 4

1           E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:                          PAGE
4  MR. TREEBY  ................................7
5
6              E X H I B I T   I N D E X
7
8  EXHIBIT NO.                              PAGE
9  Bea Exhibit 1 ..............................10
10 Bea Exhibit 2 ..............................72
11 Bea Exhibit 3 ..............................78
12 Bea Exhibit 4 ..............................86
13 Bea Exhibit 5 ..............................98
14 Bea Exhibit 5A .............................99
15 Bea Exhibit 6 .............................127
16 Bea Exhibit 7 .............................132
17 Bea Exhibit 8 .............................136
18 Bea Exhibit 9 .............................154
19 Bea Exhibit 10 ............................157
20 Bea Exhibit 11 ............................170
21 Bea Exhibit 12 ............................173
22 Bea Exhibit 13 ............................177
23 Bea Exhibit 14 ............................180
24 Bea Exhibit 15 ............................203
25 Bea Exhibit 16 ............................219

Page 161

1   10 to the -7 centimeters per second.
2       Is that right?
3   A.  That's correct.
4   Q.  But then, I don't know if we have this
5   page -- I don't have it.  Oh, on Exhibit 9,
6   which if you will turn back to that, which I
7   think we've already identified somewhere --
8       MR. STEVENS:
9           That's the declaration.
10  EXAMINATION BY MR. TREEBY:
11  Q.  Yes.  The declaration to the Court on
12  behalf of the plaintiffs in Robinson.  That's
13  what it is.
14      If you would turn to the last page of
15  this excerpted section, Paragraph 182 --
16  A.  Yes.
17  Q.  -- I'll just read it.  It says, The
18  defense experts correctly observed that in my
19  July 2008 expert report I presented detailed
20  results that referenced the seepage results
21  associated with a best estimate, free-field, in
22  situ horizontal permeability of 10 to the -3
23  centimeters per second.  Is that right?
24  A.  That's correct.
25  Q.  And if you would turn back two pages

Page 162

1   in this excerpt, Bea Exhibit 9, to Page 121,
2   the last sentence, we may have already read
3   this -- well, it reads:  However, the analyses
4   indicated hydraulic uplift pressure developed
5   under the relatively less permeable levee soils
6   were relatively insensitive to the range in
7   horizontal permeability analyzed, which was 10
8   to the -3 to 10 to the -5 centimeters per
9   second.
10      MR. STEVENS:
11          Yes, you have read it.
12  EXAMINATION BY MR. TREEBY:
13  Q.  And then on Page 123 --
14      MR. TREEBY:
15          Thank you, Elwood.
16  EXAMINATION BY MR. TREEBY:
17  Q.  On Page 123, Paragraph 170, in the
18  middle of that paragraph, there's a line that
19  begins, e.g., Table 6.
20      Do you see that?
21  A.  Yes, sir.
22  Q.  There's a sentence, and it's all
23  underlined, this whole sentence:  The most
24  regrettable element in the fog created by
25  Dr. Mosher in his December 2008 expert report

Page 163

1   is that he fails to recognize that we have
2   found that the important hydraulic uplift
3   pressures are virtually independent of the
4   permeability values assigned to the marsh and
5   swamp layers.
6       Is that right?
7   A.  You read that correctly.
8   Q.  But now, after all of this what I'll
9   call changes in opinions, having more
10  information, you come to the position that you
11  essentially agree with IPET on the permeability
12  value for the so-called marsh layer.  Isn't
13  that correct?
14  A.  What value?
15  Q.  10 to the -5.
16  A.  Correct.
17  Q.  So 10 to the -5 centimeters per second
18  is now your best judgment estimate, right?
19  A.  For the swamp-marsh deposits, correct.
20  Q.  So you've gone from estimates as high
21  as 10 to the -2, up to, now, 10 to the -5, as
22  your best estimate.  Is that fair?
23  A.  That's not fair.  I did not make the
24  10 to the -2 estimate personally.
25  Q.  Who did it?  It was in ILIT.

Page 164

1   A.  At that point in time, um -- Professor
2   Ray Seed, Jon Bray, Juan Pestana were
3   evaluating those characteristics.  They made
4   that estimate.
5   Q.  So if Dr. Rogers said he made that
6   estimate, he's not telling the truth?
7   A.  No.  If Dr. Rogers said he made that
8   estimate, or helped them make the estimate,
9   he's telling the truth.
10  Q.  And he said, in deposition, ten days
11  ago or so, that the basis for it were some
12  tests on the 17th Street Canal.
13      Does that surprise you?
14  A.  No.
15  Q.  You are aware, aren't you, that your
16  estimate of compressibility is inconsistent
17  with the compressibility value reported by
18  Dr. Rogers and calculated by his colleague
19  Kevin Pope; am I right?
20  A.  In our, um -- hydraulic conductivity
21  analyses, we have consistently used a
22  compressibility that is very, very low, meaning
23  the, um -- a hydraulic conductivity analyses
24  that we are performing are identified as those
25  appropriate for steady flow conditions.  The

Page 165

```
 1  basis for the selection of I think it's
 2  frequently referenced a compressibility factor
 3  of 10 to the -9 pound per square foot is
 4  intended to treat incompressible, fully
 5  saturated flow conditions without change in
 6  soil void ratio.
 7       Q.  You stated earlier, and we've just
 8  covered it, that you found that the results of
 9  your analysis were relatively insensitive to
10  whether a marsh layer had a hydraulic
11  conductivity of 10 to the -2 centimeters per
12  second or 10 to the -6 centimeters per second.
13  Right?
14       A.  We're referring to uplift pressure
15  effects.  That is correct.
16       Q.  And those uplift pressure effects,
17  gradient -- is that what that has to do with;
18  gradient?
19       A.  That's partially what it has to do.
20  The gradient is an index that we're using to
21  reflect the hydraulic uplift effects.  The
22  gradients are not point gradients at a single
23  point, but are taken over the depth of the
24  blanket at the protected side of the toe of the
25  levee.
```

Page 166

```
 1       Q.  If you would look at Bea Exhibit 10,
 2  which is an excerpt from the Robinson technical
 3  report that you submitted --
 4       A.  Yes, sir.
 5       Q.  -- you state the following, at the
 6  top.
 7       A.  Page?
 8       Q.  Page 65.  I'm sorry.
 9       A.  Okay.
10       Q.  The top of Page 65, under the heading
11  Marsh Permeability, you state:  Quote, marsh,
12  parens, swamp, wetland, peat, humus, close
13  parens, deposits are highly compressible
14  materials that exhibit rapid decrease of
15  hydraulic conductivity, parens permeability, K,
16  close parens, as stresses increase and void
17  spaces decrease, citing Mesri, 2007.  The
18  factors influencing the behavior of such soils
19  depend not only on stresses but on depositional
20  mechanics, aging and decomposition, amount,
21  type and orientation of fibers and saturation.
22          Did I read that correctly?
23       A.  Yes, you did.
24       Q.  Dr. Bea, you would agree, would you
25  not, that compressibility is an essential
```

Page 167

```
 1  parameter to analyze transient flow?
 2       A.  In what?
 3       Q.  In what?  What do you mean in what?
 4       A.  In what soils?
 5       Q.  In this case, in soils.
 6       A.  Well, we're submerged.  We're fully
 7  saturated.  We're not exposed to changes in
 8  void ratio, changes in saturation for a number
 9  of reasons.  Mesri 's work, much like Tim
10  Stark 's work, is addressing a wide variety of
11  marsh-swamp layers and a wide variety of
12  conditions, and that's what I'm reflecting
13  based on Mesri 's work.
14       Q.  Now, back to my question, which was,
15  Would you agree that compressibility is an
16  essential parameter to analyze transient flow?
17       A.  No.
18       Q.  You would not.
19       A.  That's correct.
20       Q.  So you would disagree with the text
21  that say that's the case, and Dr. Rogers who
22  said that was the case.
23       A.  He's talking about in a very wide
24  variety of conditions, talking about
25  depositional mechanics, aging, decomposition,
```

Page 168

```
 1  humidification, amount, type, and orientation
 2  of fibers, and most importantly, saturation.
 3          We're in saturated conditions, there
 4  is no free gas that we're aware of, bloatings
 5  come on rapidly so there's not time for
 6  consolidation.  We have adopted consistently
 7  steady flow, um -- conditions.
 8       Q.  Are you aware that in this case Kevin
 9  Pope, for Dr. Rogers, performed pumping test
10  analyses?
11       A.  Yes.
12       Q.  Are you aware that those pumping test
13  analyses, in these in situ soils, produced a
14  figure for compressibility?
15       A.  I have questioned Kevin Pope and
16  Dr. Rogers on that point.  Compressibility was
17  not used in the determination of hydraulic
18  conductivity permeability.
19       Q.  You've not answered my question, so
20  let me ask it again.
21       A.  I'm sorry.
22       Q.  Are you aware that those pumping test
23  analyses that he performed produced a value for
24  compressibility?
25       A.  I am aware, yes, sir.
```

Page 169

1    Q.  It also produced a value for hydraulic
2  conductivity in these soils, at these sites.
3    A.  Yes, sir.
4    Q.  Why did you ignore the figure for
5  compressibility that these tests, on these
6  sites, produced by your experts?
7    A.  The experts, when they analyzed the
8  test data, used analytical relationships in
9  which the flow is steady, meaning it's fully
10 saturated, there is no change in void ratio, MV
11 or partially saturated flow conditions did not
12 enter the determination of permeability.
13   Q.  Who are these experts you're talking
14 about?  The experts, when they analyzed the
15 test data, who are you talking about?
16   A.  I'm talking about Kevin Pope and
17 Dr. Rogers.
18   Q.  Dr. Rogers stated that these tests
19 produced a compressibility value.
20      My question to you, which you haven't
21 answered yet, is why did you not use that
22 compressibility value in your flow analysis?
23   A.  Because it violates the basic premise
24 of flow analysis.  The basic premise was steady
25 flow.  Their analyses can produce a

Page 170

1  compressibility factor, but it's introduction
2  into the steady flow analyses for these
3  conditions, I deemed, personally, as
4  inappropriate.
5    Q.  Do you consider Freeze and Cherry to
6  be an authoritative reference book as it
7  relates to groundwater flow?
8    A.  Yes.
9    Q.  That's the book that Dr. Rogers cited
10 in his site characterization expert report.
11 Did you know that?
12   A.  Yes.
13   Q.  I show you a document we've marked Bea
14 11.  (Tendering.)  Now I've copied the pages
15 from Freeze and Cherry that relate to
16 groundwater flow analysis.  And this contains
17 the cover page for the book and then Pages 63
18 through 66.
19      First, you've already agreed that the
20 analysis of groundwater flow during the Katrina
21 storm surge would be a transient flow analysis,
22 right?
23      (Bea Exhibit 11 was marked for
24 identification and is attached hereto.)
25   A.  No.

Page 171

1  EXAMINATION BY MR. TREEBY:
2    Q.  You don't think so?
3    A.  A transient flow analysis has several
4  meanings.  In the context that we have used
5  transient flow, we mean the hydraulic loadings,
6  are transient.  The flow is being treated as
7  steady state.  So that we produce --
8        Are you ready for me?
9    Q.  I was listening the whole time.
10   A.  We produce time dependent on hydraulic
11 pressures, that's transient, time-dependent.
12 The analyses of the pressure effects are based
13 on steady state flow mechanics.
14      Now, within hydrology and within this
15 area, there are transient flow mechanics.  We
16 are not addressing the second category.
17   Q.  Look at transient -- what -- on Page
18 64 of Freeze and Cherry, you've said these
19 soils are saturated.  That's the term you used;
20 right?
21   A.  Well, saturation is one of two
22 components.  I cited two.  One is saturation,
23 no gas; and the second is no changes in void
24 ratio.  Both of those enter the none steady
25 flow condition, for which there is no

Page 172

1  recognized solution.
2    Q.  Looking at Freeze and Cherry, he's
3  describing transient saturated flow.  Is that
4  right?
5    A.  A groundwater problem, that's correct.
6    Q.  Well, we're talking about ground
7  waters here, aren't we?
8    A.  Yes.  And we're not talking about
9  flows, we're talking about conduct of
10 pressures.
11   Q.  Okay.  He is talking about transient
12 saturated flow; is that right?
13   A.  That's correct.
14   Q.  Okay.  And he states, and would you
15 agree, on Page 65, that a solution to the
16 transient saturated flow analysis requires
17 knowledge of three basic parameters?  Is that
18 right?
19   A.  That's what is here, correct.
20   Q.  And those three are hydraulic
21 conductivity, compressibility, and porosity.
22 Isn't that correct?
23   A.  Correct.
24   Q.  And Dr. Rogers' pumping test analyses
25 that you relied upon, at least partially,

Page 213

1  correlation by Mr. Chris Yount and Mr. Andy
2  Owen.
3      Q.  Has all of the work that you've just
4  described been provided in your matters
5  considered?
6      A.  No.
7      Q.  What has not been provided in your
8  matters considered that you just referred to as
9  the work you did to evaluate the locations and
10 sizes of excavations and types of backfill
11 used?
12     A.  Well, one of the things that we did
13 not have the opportunity to provide at the time
14 I had to provide my expert report, February the
15 1st, we wanted to develop a detailed mapping of
16 the excavations on the East Bank Industrial
17 Area.  I have continued that work, and it will
18 be a part of my rebuttal report that you will
19 receive on April 3rd.
20     Q.  That will, then, be all your matters
21 considered?
22     A.  Yes.  For this topic.
23     Q.  In Paragraph 29, you refer to Figure 1
24 of your report.  Right?
25     A.  Yes, sir.

Page 214

1      Q.  Turn to Figure 1 on Page 20.
2      A.  Yes, sir.
3      Q.  Are you suggesting by Figure 1 there
4  is a connection between the backfill activities
5  shown in the photograph in the lower left-hand
6  corner and the breach shown in the photograph
7  in the lower right-hand corner, Figure 1?
8      A.  Yes.
9      Q.  In the photo the dozer on the left
10 side of the page, part of your evidence of
11 high -- excuse me.  Is the photo of the dozer
12 on the left side of the page part of your
13 evidence of high permeability materials being
14 used in, quote, nearby, close quote,
15 excavations?
16     A.  Yes, sir.
17     Q.  What evidence do you have as to the
18 location of the dozer work at the bottom
19 left-hand corner of Figure 1?
20     A.  Um -- the dozer work shown here is
21 obviously close to the Florida Avenue bridge,
22 which is shown in the background.  My
23 recollection is the captioned photographs
24 provided by WGI connect this area to the area I
25 previously referred to as Area 1.  This is the

Page 215

1  area out toward the Industrial Canal.  It then
2  ties to the next area, which is shown in the
3  photograph to the right.  This is the
4  backfilled area that we traced to the west side
5  of Surekote Road.  That then connects to the
6  Surekote Road sand shell fill, which then abuts
7  to the levee floodwall at the north breach.
8         These figures are intended to be
9  illustrative and by no means attribute
10 precision to this illustrative figure.
11     Q.  Okay.  You've described Area 1.  Let's
12 go there.  I think you have a map that shows
13 where Area 1 is.  It's in Appendix B, Page 9 of
14 your report.  Keep your finger back, though, at
15 Figure 1.
16     A.  Will do.  Please give me the --
17     Q.  Page 9, Figure 5A.
18        Are you there?
19     A.  Yes.
20     Q.  Area 1, near the bank, near the
21 Industrial Canal, the north end of Boland.
22 Right?
23     A.  Yes.
24     Q.  And that's what you're saying that
25 picture with the dozer is showing.

Page 216

1      A.  I think so.  That's why I said, um --
2      Q.  And you say you base that on WGI's
3  caption on the photo.  We're going to talk a
4  lot about WGI's caption on photos, but that's
5  what you say that represents, right?
6      A.  That's what I'm representing or
7  attempting to represent in this illustrative
8  figure.
9      Q.  Did somebody else provide you that
10 information, or did you come up with it on your
11 own?
12     A.  Which information?
13     Q.  The information about what was on the
14 caption of that photograph.
15     A.  In the original photographs that we
16 obtained, the captions were a part of the
17 photograph.
18     Q.  Right.  I understand that.  I'm asking
19 who on your team, was it you, personally, or
20 someone else, that you recall telling you that
21 this was Area 1?
22     A.  Which phase?  I explained to you that
23 there were two phases.
24     Q.  No.  Let's stick with our questions,
25 here.  You have just told us that your Figure

Page 233

It does.
MR. TREEBY:
    No, it doesn't.
MR. STEVENS:
    Well, stand by. Go to the Morris report, July 18, 2011.
MR. TREEBY:
    We're off the record.
MR. STEVENS:
    We're on this record.
MR. TREEBY:
    I'm not. I'm not on the record.
MR. STEVENS:
    All right. Y'all can take your break.
MR. TREEBY:
    Okay. And I object to what you're doing.
MR. STEVENS:
    Please, note it.
    Page 14 of the Chad Morris report dated July 18th has Figure 3-14. Photograph number 5 shows the same photograph, the bulldozer pushing dirt, placing imported sand backfill

Page 234

material at the north side of Area 2 at Boland Marine, which is the same caption contained on Bea number 16, the top photograph, except that photograph has a Bates stamp number WGI 064977A, and this photograph has a Bates stamp number of 1014984. Yet it purports to be the same photograph. It looks to be identical.
    All I want to know is, how is it they have two different Bates stamp numbers? And is it the same photograph? That might help everybody sort things out.
MR. TREEBY:
    Okay. We're off the record now?
MR. STEVENS:
    Okay. You going to answer it?
MR. TREEBY:
    I'm not answering your questions on the record.
    Wait. Are we off the record?
MR. STEVENS:
    No. If she wants me to answer a question, okay, we're off the record.

Page 235

    (Off the record.)
EXAMINATION BY MR. TREEBY:
    Q. Do you know what the depth of the excavation in Area 2 of Boland that we have identified is? Do you know what the depth of those excavations which are over near the canal bank at the south end of Boland, do you know what the depths are?
    A. I don't recall. We tabulated the depths, and all that information is going into the current effort I cited. So.
    Q. So we don't have it yet, but you're going to have it for your rebuttal report; is that what you're saying?
    A. That's correct. And you have it, but it's not in my head. It's within the records that we've developed in the course of this work.
    Q. If you would look at Exhibit 17 that we just gave you, which is the NFAATT Submittal Report for Boland Marine, June 2005, this is information that was done contemporaneously, it indicates that the excavations were five or six feet in Area 2. Is that right?
    A. Correct.

Page 236

    Q. When did the work start on this document that you've not given us yet that is now going to be given to us with your rebuttal report?
    A. Well, the work has -- it started when we started this phase of our study. So it's been going on and we've been accumulating and tabulating the data. We're now at a point where we can bring it to a comprehensive map and maps that we can give to you to capture the essence and details in what we are calling the Swiss cheese graphics. That should be supplied as part of my rebuttal report due April 3rd.
    Q. Who's doing maps?
    A. Um -- Dr. Storesund, assisted by Andy Owen, um -- and a geographic information system expert that Dr. Storesund has brought in to assist him in developing and documenting the graphics. There are three people, to my knowledge, engaged in that activity at this minute.
    Q. Who is this new expert?
    A. I've never met him. We were forced to add to the team when the Judge decided that my expert report was due April 3rd. And so at

Page 237

1  that point, in order to complete the work for
2  you and document it, we had to add this
3  additional person to assist Dr. Storesund.
4      Q.  Who is this new expert?
5      A.  I don't know.
6      Q.  You don't know his name?
7      A.  No.  I've never met him.
8  Dr. Storesund has handled the selection and
9  engagement of this person.
10     Q.  Okay.  Would you turn to Page 40,
11 Paragraph 42 of your report.
12     A.  Page 40?
13     Q.  Yes.
14     A.  Yes, sir.
15     Q.  You state in that paragraph that,
16 quote, the proposed new locks would require a
17 bypass channel that would be constructed at the
18 East Bank Industrial Area, close quote.
19         You see that?
20     A.  Is that Paragraph 42?
21     Q.  Fourth line.
22     A.  Yes, sir.
23     Q.  The proposed new locks would require a
24 bypass channel that would be constructed at the
25 East Bank Industrial Area, EBIA, Rogers 2012.

Page 238

1      A.  Check.
2      Q.  Okay.  The channel, I assume you knew,
3  was to be dredged through the East Bank
4  Industrial Area.  Right?
5      A.  Correct.
6      Q.  Do you know the dimensions, width,
7  depths, and distance from the floodwall for the
8  proposed bypass channel?
9      A.  No.
10     Q.  You're not aware of that?
11     A.  I'm aware of it. I don't recall the
12 dimensions.
13     Q.  I show you a document which we're
14 marking Bea Exhibit 18.  And this is figures
15 from Appendix B from Dr. Silva's report.  And
16 we're just going to refer -- I don't know why
17 we had both attached, but for now we're just
18 going to refer to the front page, which is
19 Figure 2.
20         You see that?
21         (Bea Exhibit 18 was marked for
22 identification and is attached hereto.)
23     A.  Yes, sir.
24 EXAMINATION BY MR. TREEBY:
25     Q.  Down at the right-hand corner.

Page 239

1          You see the overlay of the proposed
2  bypass channel dimensions on the EBIA site.
3          Are you familiar enough to tell us if
4  that generally comports with your
5  understanding?
6      A.  Yes, sir.  It does comport with my
7  general understanding.
8      Q.  You would agree that the majority of
9  the EBIA would have been dredged or otherwise
10 removed to construct the bypass channel; right?
11     A.  Correct.
12     Q.  Are you aware that the Corps
13 geotechnical branch determined that dredging
14 the bypass channel would not negatively affect
15 the levees and floodwalls in the East Bank
16 Industrial Area?
17     A.  No.
18     Q.  You weren't aware of that?
19     A.  That's correct.
20     Q.  All right.  Are you familiar with
21 Gerald Dicharry?
22     A.  No.
23     Q.  You don't know the name?
24     A.  No.
25     Q.  I take it from that you've not

Page 240

1  reviewed his deposition in this case.
2      A.  That's correct.
3      Q.  I'm going to go ahead and mark this as
4  Bea Exhibit 19.  This is the entire deposition.
5  (Tendering.)  And first I'll refer you to
6  Page 10 of his deposition.  There are four
7  pages on each page.  Page 10 is in the top left
8  hand corner.
9          You see that?
10         (Bea Exhibit 19 was marked for
11 identification and is attached hereto.)
12     A.  Yes, sir.
13 EXAMINATION BY MR. TREEBY:
14     Q.  And I'm going to read Page 10, Lines
15 19 through 23.
16         Question:  Are you a licensed engineer
17 in the state of Louisiana?
18         Answer:  Yes.
19         Question:  Civil engineer?
20         Answer:  Yes.
21         And then Page 13, which is on, just
22 below that to the right, beginning on Line 9,
23 Question: Okay.  Now, you had mentioned that
24 you were involved in the IHNC lock replacement
25 project.