# Expert Report

# Site Characterization of Eastern side of the Inner Harbor Navigation Canal (IHNC) in the Lower 9th Ward of New Orleans

For

Katrina Canal Breaches Consolidated Litigation

[Civil Action Number: 05-4182 "K" (2)]

United States District Court

Eastern District of Louisiana

Pertains to MR-GO, Robinson [No. 06-2268]

By

J. David Rogers, Ph.D., P.E., P.G., C.E.G., C.HG.

January 5, 2012

## Pump Tests Ratio K(v)/K(h)

| Well | Pump Test 1 | Pump Test 2 | Well | Pump Test 1 | Pump Test 2 |
|---|---|---|---|---|---|
| PW-01 | 0.22 | 0.10 | | | |
| OW-01S | 0.14 | 0.29 | OW-01D | 1.00 | 1.00 |
| OW-02S | 0.00 | 0.10 | OW-02D | 1.00 | 0.06 |
| OW-03S | 0.00 | 0.00 | OW-03D | 1.00 | 0.10 |
| OW-04S | 0.44 | 0.10 | OW-04D | 0.02 | 0.10 |
| OW-05S | 1.00 | 0.10 | OW-05D | 0.00 | 0.10 |
| OW-06S | 13.00 | 0.10 | OW-06D | 1.00 | 0.62 |
| | | | | | |
| PW-02 | 1.00 | 0.00 | | | |
| OW-07S | 0.15 | 0.51 | OW-07D | 0.00 | 0.00 |
| OW-08S | 0.04 | 1.00 | OW-08D | 1.00 | 0.00 |
| OW-09S | 0.41 | 1.00 | OW-09D | 1.00 | 1.00 |
| OW-10S | 1.00 | 0.43 | OW-10D | 1.00 | 10.00 |
| OW-11S | 1.00 | 0.37 | OW-11D | 1.00 | 1.00 |
| OW-12S | 0.10 | 1.00 | OW-12D | 1.00 | 0.12 |

**Figure 216 presents a summary of vertical to horizontal ($K_v/K_h$) ratios calculated using the partially penetrating well subroutine of AquifertestPro software.  The inverse value of these would be the $K_h/K_v$ ratios, which is the convention we have chosen to employ in this report.**

The Kh/Kv ratio in New Orleans depends on a number of factors, especially, the time of burial and consolidation, effective stress, load cycling, and partial cementation.  Very youthful, underconsolidated sediments, like the marsh and swamp deposits of New Orleans, may exhibit more severe anisotropy if they had have been subjected to desiccation or surcharging.

## Excavation and Backfill Standard of Care

Pursuant to Task Order 26, the Corps and its contractor, WGI, engaged in substantial demolition, excavation, and remediation activity within the vicinity of the IHNC eastern floodwall where the North and South Breaches occurred (west of Jourdan Avenue, north of Claiborne Avenue and south of Florida Avenue).  This activity included, among other things, demolishing and removing concrete structures, utility pipelines, and other debris that existed above and below ground at the EBIA.  To the extent this work created a hole, trench or other opening, WGI and the Corps were required to backfill the opening with proper materials and then properly compact that material.

Any time excavations and backfilling activities similar to those engaged in by the Corps and WGI occur adjacent to a flood control measure, a geotechnical analysis involving, among other things, a wall stability analysis, a seepage analysis, and a global stability analysis must be performed in order

to determine whether the excavation and backfilling will have an adverse impact on the adjacent flood control measure. The evaluations should consider the original design case and ascertain if the resulting activity would result in degraded conditions (reduction in system capacity and/or increase in system demands).

Often times, the entity or company engaging in the excavation work has a policy or procedure that details specific mandatory steps it must take to be reasonably certain its excavation work does not compromise or jeopardize the adjacent flood control measure. In this case, the Corps and/or WGI had at least four sources that required them to perform a geotechnical analysis on the impact their excavation and backfilling activity would have on the IHNC floodwall: (1) a stated policy; (2) engineering regulations and manuals, (3) a Code of Federal Regulations, and (4) standard engineering practices. Moreover, even if these various sources did not explicitly apply to the EBIA work performed by the Corps and WGI, they at a minimum establish the prevailing standard of care in the industry that a reasonably prudent geotechnical firm would adhere to when completing any excavations in the vicinity of a flood protection structure.

## Corps' Policy Mandated a Geotechnical Analysis

As evidenced by the testimony of various Corps representatives and Corps employees, the Corps had a policy that required them and/or WGI to perform a geotechnical analysis on the potential impact their excavation and backfilling activity could have on the adjacent IHNC floodwall. For example, John Greishaber, who testified as a representative for the Corps, said:

- "In the course of the design, we look at all aspects of the **geotechnical loading that a wall could see**. And one of the aspects we would look at is the **effect of seepage**."[1]
- "We'd follow the design guidelines. We **make sure** that whatever is done does not violate the integrity of whatever the flood protection is."[2]
- "The way **we would evaluate** an excavation near the floodwall is to **verify** that the excavation does not jeopardize the integrity of the floodwall…**we make sure** that we do not compromise the stability of the walls…."[3]
- This engineering review would entail **"wall stability analysis, [] seepage analysis, and [] global stability analysis."**[4]
- If there is a hole near a flood control structure, engineering evaluation of the hole's potential impact on the structure is **mandatory** and not discretionary.[5]
- To perform this evaluation, the Corps' policy is to "go in and rerun the loading on the sheet pile," analyze "the difference between the ground line **that was assumed in the plans and specifications** for the design of the wall **and modify it** to the new ground line that results from having excavated the hole."[6]
- It was the Corps' **"process and procedure"** at the design phase, and to **"revisit"** the design upon modifications, to perform a geotechnical analysis on the potential for

---

[1] Greishaber Depo. Vol. I at 36:7-37:1.
[2] Greishaber Depo. Vol. I at 41:20-42:10.
[3] Greishaber Depo. Vol. I at 53:4-12; 54:2-16.
[4] Greishaber Depo. Vol. I at 123:5-124:7.
[5] Greishaber Depo. Vol. I at 88:7-21.
[6] Greishaber Depo. Vol. I at 91:2-93:13.

underseepage in the backfilled holes at the EBIA and the potential impact that underseepage could have on the adjacent floodwalls.[7]   Indeed, **"good engineering and sound engineering principles require[d] [the Corps to] document those kinds of analyses."**[8]

- The removal of the hundreds of piles at the Boland Marine site [North Breach] **"[had] to be looked at"** by the Corps because it was the Corps' **"own internal procedure[]"** to evaluate whether there was any potential impact on nearby flood control structures.[9]
- If Mr. Guillory encountered a hole or excavation down to 20-25 feet, he was **"required to give that to the engineering department for their review."**[10]
- Once WGI discovered the massive contaminants and Boland and Saucer Marine, **wall stability analysis, seepage analysis, and global stability analysis had to occur before WGI could continue its excavations**.[11]

Walter Baumy is another Corps representative whose testimony reflects the Corps' policy necessitating a geotechnical evaluation:

- The Corps **"would expect"** to perform engineering evaluations of any excavations done by WGI at the Boland and Saucer Marine excavations.[12]
- The Corps' **geotechnical engineering division would perform an engineering evaluation**" on excavations within 300 feet of the center line of a floodwall.[13]

Gerald Colletti, a Corps employee since 1977, also addressed the Corps' procedure for analyzing a project's potential impact on adjacent flood control structures:

- The Corps' **geotechnical branch** performs **stability analyses** for projects within the vicinity of floodwalls and levees on projects **to determine if there may be any adverse impact on those structures**.[14]
- If the Corps (or its contractors) performs **excavations that are within 300 feet of the IHNC eastern floodwall**, then **"geotechnical looks at it** from a…geotechnical structural standpoint.  **Factor of safety, what impact it may have on the adjacent wall or levee**."[15]
- "[W]hat you've got is you've got a federal navigation project that has a potential to affect or impact a federal flood control hurricane protection project.  So, **those two managers** [project and engineering] **need to get together**…**get engineering involved** and say, okay, what's actually happening here?  So, the technical evaluation comes from engineering."[16]
-

---

[7] Greishaber Depo. Vol. I at 103:3-18.
[8] Greishaber Depo. Vol. I at 123:5-124:7.
[9] Greishaber Depo. Vol. I at 145:22-146:6; 147:1-148:14; 173:8-174:19.
[10] Greishaber Depo. Vol. I at 168:9-22.
[11] Greishaber Depo. Vol. I at 147:1-148:14.
[12] Baumy Depo. Vol. I at 236:6-13.
[13] Baumy Depo. Vol. I at 237:24-239:13.
[14] Colletti Depo. at 30:10-19.
[15] Colletti Depo. at 32:21-35:9; 40:17-43:9; 103:12-20.
[16] Colletti Depo. at 103:21-105:1.

Richard Varuso has worked for the Corps since 1994 and has spent a significant portion of his time in the Corps' geotechnical branch.  He also described the obligation to perform a geotechnical analysis:

- The excavations near the floodwalls along the IHNC "**have to be reviewed**" by the geotechnical engineers.  Geotechnical would "**have to look at** the site specific data for that location and determine…**how close we could get and how deep we could go with that excavation**."[17]
- It is a "fair assessment" to conclude that the Corps "needs to do some kind of an assessment; they **need to figure out whether or not there is an underseepage potential**…."[18]

This testimony from Corps representatives and experienced Corps employees makes clear that the Corps had a policy that required an engineering analysis on how their excavation work being performed within 300 feet of IHNC floodwall could potentially impact and affect that floodwall.

## Engineering Regulations and Manuals Mandated a Geotechnical Analysis

In addition to Corps' own policy that geotechnical evaluations that addressed seepage, wall stability, and global stability, the Corps also has several Engineering Regulations and Manuals that also required engineering analyses of how their excavation projects along the EBIA could potentially impact the integrity of nearby IHNC floodwall.

### ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999)

**Section 8: Engineering Documents**

Section 8 required a Design Documentation Report ("DDR") for the EBIA excavations.[19]  A DDR is a "record of final design effort after the feasibility phase" and "provides the technical basis for the plans and specifications and serves as a summary of the final design."[20]  The DDR covers the preconstruction engineering and design phase and the construction phase of the project.[21]  In effect, the DDR is the engineering master plan for a Corps project containing a discussion of all the engineering, geotechnical, and other analyses for the Corps' field personnel implementing the master plan.

As Appendix D instructs, the DDR is "not finalized until project construction is completed.  During the construction phase, *design decisions made in connection with contract modifications shall be added to*

---

[17] Varuso Depo. at 177:15-178:5.
[18] Varuso Depo. at 198:7-21.
[19] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 3, §8.2.
[20] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 3, §8.2.
[21] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 3, §8.2.

*the DDR.*"[22]   Amendments to the DDR must reflect changes in the original DDR and the new engineering, geotechnical and other analyses relating to these changes.[23]   Accordingly, the DDR must include "*results of geotechnical investigations*, which supplement previous studies…."[24]

The initial DDR was drafted in 1999, but it did not address the EBIA excavation project as it eventuated.  The EBIA excavation project that preceded the IHNC Lock Replacement was modified several times when WGI began excavating in 2001 and discovered soil contaminants and other subsurface structures and obstructions at the Boland Marine and Saucer Marine locations. Based upon my review of the 1999 DDR and the amended 2001 DDR No. 2, neither contained any geotechnical investigation of the excavations' potential impact on the adjacent IHNC floodwall.

## Section 10: Technical Coordination

Section 10 ER 1110-2-1150 states that "Districts *shall conduct* analyses and investigations in accordance with approved engineering criteria and guidance, coordinate engineering activities, and seek advice on problems encountered during project development from appropriate MSC, HQUSACE, and other engineering staffs."[25]  As discussed above, once the Corps and WGI encountered buried foundations, pipelines, and other obstructions at the Boland Marine and Saucer Marine locations, the DDR required modification and geotechnical assessments required within the 300 foot buffer zone to address the potential for the removal of these structures to negatively impact the adjacent IHNC floodwall.[26]

## Section 15:  Engineering During Construction

Section 15 of ER 1110-2-1150 requires that the Corps' engineers should be consulted whenever "modification of [Plans & Specifications]…and preparation of engineering considerations and instructions to field personnel.  The engineers must also provide support for contract claims and modifications…."[27]  This requirement was further discussed by Mr. Greishaber, who detailed the Corps' mandatory policy of reevaluating any changes and modifications that could impact adjacent flood control structures at the EBIA[28] (any excavations within the 300 foot buffer zone on either side of the IHNC floodwall). This engineering evaluation must include analyses of underseepage, global stability, and temporary retaining structures installed at both the Boland Marine and Saucer Marine

---

[22] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. D-1, §D-1.4 (emphasis added).

[23] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. D-1, §D-1.4; D-3, §D-7.11.

[24] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. D-3, §D-7.11 (emphasis added).

[25] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 4, §10 (emphasis added).

[26] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 4, §10.

[27] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 19.

[28] Greishaber Depo. Vol. I at 90:14-96:15.

locations.[29]  In fact, these analyses should have been completed before WGI could go forward with its work.[30]

In addition, Section 15.6 ("Engineering support for claims and modifications") states that "[e]ngineering *shall* provide design and cost estimating assistance for claims and modifications when requested and be knowledgeable of all claims and modifications....  Engineering input into this process is *essential to ensure the continuity of the design process through construction....*"[31]

But, it appears that this requirement was not followed. Lee Guillory's testimony indicates that he never requested assistance or review by the geotechnical division to comment on or analyze the EBIA excavations at Boland Marine and Saucer Marine.[32]  Thus, engineering could not "be knowledgeable of all claims and modifications" because Mr. Guillory never informed them of the claims and modifications generated by WGI's excavation work along the EBIA within the 300 foot buffer zone.

### Section 17:  Design Quality

Section 17 of ER 1110-2-1150 required engineering to have responsibility for the "[e]xecution of the design and technical quality" of the project.[33]  Because of this, it was "essential that coordination and planning the work effort occur at the earliest stages of project development, through preparation and execution of the Management Plan."[34]  In addition, Section 17 mandates that "[t]echnical quality *shall* be achieved mainly through a process that includes...*adequate coordination among the project team and technical disciplines*."[35]  Finally, [q]uality is further achieved by participation in *value engineering studies* and thorough internal checking and review by *qualified engineers*"[36] (i.e. those individuals with technical expertise to analyze geotechnical impacts).

With respect to the excavation work at the EBIA, Mr. Guillory's testimony reflects that there was not "adequate coordination" with geotechnical because there was no "coordination and planning the work effort" with geotechnical once WGI discovered the subsurface structures and obstructions at the Boland Marine and Saucer Marine sites.[37]  Confirming what Section 17 states, Mr. Greishaber testified that such coordination and planning should have been obligatory.[38]  As discussed, the Corps

---

[29] Greishaber Depo. Vol. I at 123:5-124:7; 159:20-160:25; 173:8-174:19.

[30] Greishaber Depo. Vol. I 147:1-148:14.

[31] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 20, §15.6 (emphasis added).

[32] Guillory Depo. Vol. I at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10.

[33] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17.

[34] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17.

[35] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17 (emphasis added).

[36] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17 (emphasis added).

[37] Guillory Depo. Vol. I at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10; Bacuta Depo. at 176:20-178:12.

[38] Grieshaber Depo Vol. I at 88:7-21; 123:5-124:7; 147:1-148:14; 159:20-160:25; 173:8-174:19.

should not have allowed WGI to proceed with the excavations at Boland and Saucer without evaluating "the potential negative impact of the pile removal on the floodwall…."[39]

Section 17 also required a "qualified engineer" to check and review the excavation plans at these two locations.[40] To the extent the Corps tasked George Bacuta with reviewing the excavation plans,[41] it appears that Mr. Bacuta is a geochemist and not a "qualified engineer,"[42] and Mr. Bacuta never actually reviewed any of the EBIA clean-up excavation plans.[43]

### EM 1110-2-1913; Engineering and Design - Design and Construction of Levees (April 2000)

The Corps' Engineering Manuals "contain mandatory requirements for engineering procedures and design standards," as well as "policy standards for uniform engineering practice related to civil works projects."[44] Certain of these requirements are designed "to ensure project safety and function."[45]

According to the Corps, "flood protection is extremely important," and they must assure that their projects "do not jeopardize the flood protection."[46] To adhere to this reasonable safety policy, Mr. Greishaber testified that the Corps follows EM 1110-2-1913.[47]

EM 1110-2-1913 states that any foundation condition that may impact the seepage potential under a levee must be evaluated. In particular, "[w]ithout control, underseepage in pervious foundations beneath levees may result in (a) excessive hydrostatic pressures beneath an impervious top stratum on the landside, (b) sand boils, and (c) piping beneath the levee itself."[48]

### EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989)

The Corps' Lock Evaluation Report states that the "structural components shall be designed according to the applicable portions of… EM-1110-2-2502."[49] This manual states that "[w]ater-retaining structures are subject to through-seepage, underseepage, and seepage around their sides or ends" and that "[u]ncontrolled seepage may result in water pressures and uplift forces on the wall base in excess of design assumptions and consequent structural instability…."[50] Because of this seepage potential, "[s]eepage control entails the design of measures to ensure that seepage

---

[39] Grieshaber Depo Vol. I at 147:1-148:14.

[40] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17.

[41] Guillory Depo. Vol. I at 188:8-17.

[42] Bacuta Depo. at 145:18-146:6.

[43] Bacuta Depo. at 142:21-25; 177:4-13.

[44] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 4, §10.1; p. 23, §19.1.2.

[45] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 23, §19.1.2.

[46] Greishaber Depo. Vol. I at 72:3-73:11.

[47] Greishaber Depo. Vol. I at 72:3-73:11.

[48] EM 1110-2-1913; Engineering and Design - Design and Construction of Levees (April 2000) at p. 5-1, §5-1.

[49] MRGO New Lock and Connecting Channels Evaluation Report: Main Report and Environmental Impact Statement March 1997),Vol. 3 at B-86, §B.2.8.

[50] EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989) at p. 7-3, §7-3.

pressures and velocities are maintained below tolerable values."[51]  As a result, "the seepage aspects and the foundation stability of walls which have had basements excavated on either side of and adjacent to the wall since the original design and construction were completed, should be investigated."[52]

### EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994)

EM 1110-2-2504 addresses standards for the design of sheet pile walls.  This manual states that "[c]oordination and cooperation among hydraulic, geotechnical, and structural engineers must be continuous from the inception of the project to final placement in operation."[53]  It also mandates that "for floodwalls, foundation underseepage conditions must also be assessed."[54]

### EM 1110-2-5027; Engineering and Design - Confined Disposal of Dredged Material (Sept. 1987)

EM 1110-2-5027 concerns the confined disposal of dredged materials.  Specifically, this manual required more extensive field investigations where "foundation deposits are weak and compressible," "highly variable," and where "[u]nderseepage and/or settlement problems are severe" and where "the consequences of the failure involve life, property, or damage to the environment."[55]

## 33 C.F.R. § 208.10 Mandates a Geotechnical Analysis

This regulation concerns local flood protection works and includes maintenance and operation of such structures and facilities.  It required the Corps and/or WGI perform a geotechnical evaluation on the potential impact their excavation activities could have on the IHNC floodwall.  In particular, Section 5 states:

No improvement shall be passed over, under, or through the walls, levees, improved channels or floodways, nor shall any excavation or construction be permitted within the limits of the project right-of-way, nor shall any change be made in any feature of the works without prior determination by the District Engineer of the Department of the Army, or his authorized representative, that such improvement, excavation, construction, or alteration *will not adversely affect the functioning of the protective facilities*.

Such improvements or alterations as may be found to be desirable and permissible under the above determination shall be constructed in accordance with standard engineering practice.

Advice regarding the effect of proposed improvements or alterations on the functioning of the project and information concerning methods of construction acceptable under standard engineering

---

[51] EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989) at p. 7-3, §7-3.
[52] EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989) at p. 7-25, §g.
[53] EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994) at p. 2-1, §2-1.
[54] EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994) at p. 3-1, §3-1a. ("Geotechnical Investigation").
[55] EM 1110-2-5027; Engineering and Design - Confined Disposal of Dredged Material (Sept. 1987) at p. 6-4, Table 6-1.

practice *shall be obtained from the District Engineer or, if otherwise obtained, shall be submitted for his approval.*  Drawings or prints showing such improvements or alterations as finally constructed shall be furnished the District Engineer after completion of the work.

## Standard Engineering Practice Requires a Geotechnical Analysis and a Proper and Accepted Method of Compacting Backfilled Excavations

Independent of any policy, regulation, manual or code, a responsible engineer undertaking the same work performed by the Corps and WGI knows there are standard engineering practices that obligate the engineering firm to (1) perform a geotechnical evaluation of the potential impact its excavation work could have on an adjacent flood control structure, and (2) properly backfill and compact excavations in order to protect against and prevent underseepage from undermining the structure's design capacity (which includes an accepted safety factor).

A senior Corps representative, Mr. Greishaber, recognized this generally accepted principle as he testified that it was "good engineering and [a] sound engineering principle[]" to coordinate engineering activities with geotechnical engineers and seek geotechnical input on significant safety issues that the Corps encountered during the EBIA excavation.[56]

With respect to the Corps and WGI's excavation activity performed pursuant to Task Order 26 along the EBIA, standard engineering practice associated with site work being performed in the vicinity of a flood protection system requires, and as stated in the WGI Recommendation Report for Demolition and Site Preparation Activities, that geotechnical engineering be a component of the work at the site (WGI038645). At a minimum, a geotechnical engineer should have reviewed the additional subsurface information collected as part of the scope of work and ensured that all USACE required flood protection system evaluations were satisfied.  This is especially true for instances where the excavation work extended to the I-wall itself and/or encountered pervious fills that have the ability to quickly and rapidly convey water pressure directly to the flood wall.

Concerning the backfilling activity associated with this excavation activity, WGI consulted with the USACE and determined that a "clay seal" should be applied at those locations adjacent to the floodwall that might pose a potential hydraulic load on the existing I-wall structure.  This protective clay seal was not applied against the very pervious shell backfill and cohesionless sand backfills identified by WGI during their site characterization and sampling phase (specifically, MMG soil boring 81A, performed on October 4, 2001).

## Conclusions

Standard practice concerning geotechnical evaluations and protocols for mechanical compaction of "engineered fill" or "structural backfill" in areas adjacent to flood protection systems are essential to ensure that excavation activities will not degrade the capacity of the flood protection system, exposing the community depending on the protective system for their life safety.  These standards, were, in fact, pioneered and developed by the Army Corps of Engineers over several decades of painstaking research and painstaking evaluations of levee problems, which drew considerable

---

[56] Greishaber Depo. Vol. I at 123:5-124:7.

acclaim at the time,[57] and became benchmark standards, employed in one form or another, by virtually every flood control agency in the USA[58].

Because of this well-known hazard, several sources that required the Corps and/or WGI to engage in basic engineering analyses and proper backfilling practices, which included the Corps' own policy, engineering regulations and manuals, a Code of Federal Regulation, and standard engineering practices.  The Corps and WGI failed to meet this standard of care.

Without these critical and fundamental analyses, the people engaging in excavation and backfilling activity similar to the activity engaged in by the Corps and WGI at the EBIA will have an incomplete and insufficient understanding of whether they are jeopardizing the structural integrity of the adjacent flood control feature.

And, as evidenced by the testimony of Corps representative, Mr. Greishaber, a potential consequence of failing to engage in these mandatory analyses is the failure of that flood control measure, which results in "flood[ing] a city."[59]

---

[57] The April 1956 article by W.J. Turnbull and C. R. Foster of the Army Corps of Engineers titled "Stabilization of Materials by Compaction" (Journal of the Soil Mechanics & Foundations Division of ASCE, v. 82:934) received the Norman Medal of ASCE for 1959, the society's highest honor. The January 1956 article by C.I. Mansur and R.I. Kaufman of the Army Corps of Engineers titled "Underseepage, Mississippi River Levees, St. Louis District (Journal of the Soil Mechanics & Foundations Division of ASCE, v. 82:864) received the Thomas Fitch Rowland Prize of ASCE in 1958.

[58] See Mittler, E.L., L. Morgan, M. Shapiro, and K.Y. Grill. (2006). State Roles and Responsibilities in the national Flood Insurance Program, American Institutes for Research, Washington, DC., and Monday, J., K.Y. Grill, P. Esformes, M. Eng, T. Kinney, and M. Shapiro. (2006). An Evaluation of Compliance with the National Flood Insurance Program, Part A: Achieving Community Compliance, American Institutes for Research, Washington, DC.

[59] Greishaber Depo. Vol. I at 80:13-25.