GERARD COLLETTI                                    April 2, 2008

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES          CIVIL ACTION

CONSOLIDATED LITIGATION                NO. 05-4182 K2

                                       JUDGE DUVAL

PERTAINS TO                            MAG. WILKINSON

(Robinson, No. 06-2268)


          Deposition of GERARD A. (JERRY)

COLLETTI, given at the U.S. Army Corps of

Engineers New Orleans District offices, 7400

Leake Avenue, New Orleans, Louisiana

70118-3651, on April 2nd, 2008.


REPORTED BY:

          JOSEPH A. FAIRBANKS, JR., CCR, RPR

          CERTIFIED COURT REPORTER #75005

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

|  | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | REPRESENTING THE PLAINTIFFS: |
| 3 | |
| 4 | LAMBERT AND NELSON |
| 5 | (BY: HUGH P. LAMBERT, ESQUIRE) |
| 6 | 701 Magazine Street |
| 7 | New Orleans, Louisiana 70130 |
| 8 | 504-581-1750 |
| 9 | - and - |
| 10 | BRUNO & BRUNO |
| 11 | (BY: JOSEPH M. BRUNO, ESQUIRE) |
| 12 | (BY: FLORIAN BUCHLER, ESQUIRE) |
| 13 | (BY: SCOTT JOANEN, ESQUIRE) |
| 14 | 855 Baronne Street |
| 15 | New Orleans, Louisiana 70113 |
| 16 | 504-525-1335 |
| 17 | - and - |
| 18 | ANDRY LAW FIRM |
| 19 | (BY: JONATHAN B. ANDRY, ESQUIRE) |
| 20 | 610 Baronne Street |
| 21 | New Orleans, Louisiana 70113 |
| 22 | 504-586-8899 |
| 23 | - AND - |
| 24 | |
| 25 | |

|  | Page 3 |
|---|---|
| 1 | SHER, GARNER, CAHILL, RICHTER, KLEIN & |
| 2 | HILBERT, L.L.C. |
| 3 | (BY: MATTHEW CLARK, ESQUIRE) |
| 4 | 909 Poydras Street, 28th Floor |
| 5 | New Orleans, Louisiana 70112-1033 |
| 6 | 504-299-2100 |
| 7 | |
| 8 | REPRESENTING THE UNITED STATES OF AMERICA: |
| 9 | UNITED STATES DEPARTMENT OF JUSTICE, |
| 10 | TORTS BRANCH, CIVIL DIVISION |
| 11 | (BY: DAN BAEZA, ESQUIRE) |
| 12 | (BY: KEITH LIDDLE, ESQUIRE) |
| 13 | P.O. Box 888 |
| 14 | Benjamin Franklin Station |
| 15 | Washington, D.C. 20044 |
| 16 | 202-616-4289 |
| 17 | |
| 18 | REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS: |
| 19 | CORPS OF ENGINEERS, OFFICE OF COUNSEL |
| 20 | (BY: DAVID R. DYER, ESQUIRE) |
| 21 | 7400 Leake Avenue's |
| 22 | New Orleans, Louisiana 70118-3651 |
| 23 | 504-862-2843 |
| 24 | |
| 25 | |

|  | Page 4 |
|---|---|
| 1 | ALSO PRESENT: |
| 2 | JOSEPH E. BEARDEN, III, ESQ. |
| 3 | KEA SHERMAN, ESQ. |
| 4 | THOMAS P. ANZELMO, ESQ. |
| 5 | ROBERT B. FISHER, JR., ESQ. |
| 6 | CHARLES LANIER, ESQ. |
| 7 | CHRISTOPHER THATCH, ESQ. (VIA I-DEP) |
| 8 | ADAM CHUD, ESQ. (VIA I-DEP) |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | VIDEOGRAPHER: |
| 25 | GILLEY DELORIMIER (DEPO-VUE) |

|  | Page 5 |
|---|---|
| 1 | E X A M I N A T I O N   I N D E X |
| 2 | |
| 3 | EXAMINATION BY:                    PAGE |
| 4 | |
| 5 | MR. BRUNO   ...............................7 |
| 6 | E X H I B I T   I N D E X |
| 7 | |
| 8 | EXHIBIT NO.                    PAGE |
| 9 | Exhibit Colletti 1 ...........................7 |
| 10 | Exhibit Colletti 2 .........................12 |
| 11 | Exhibit Colletti 2 .........................14 |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

2 (Pages 2 to 5)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                              April 2, 2008

Page 6

```
 1            S T I P U L A T I O N
 2         IT IS STIPULATED AND AGREED by and
 3   among counsel for the parties hereto that the
 4   deposition of the aforementioned witness may be
 5   taken for all purposes permitted within the
 6   Federal Rules of Civil Procedure, in accordance
 7   with law, pursuant to notice;
 8         That all formalities, save reading
 9   and signing of the original transcript by the
10   deponent, are hereby specifically waived;
11         That all objections, save those as to
12   the form of the question and the responsiveness
13   of the answer, are reserved until such time as
14   this deposition, or any part thereof, is used
15   or sought to be used in evidence.
16
17
18           * * *
19
20
21
22         JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23   Certified Court Reporter in and for the State
24   of Louisiana, officiated in administering the
25   oath to the witness.
```

Page 7

```
 1         GERARD A. (JERRY) COLLETTI
 2   P.O. Box 60267, New Orleans, Louisiana
 3   70160-0267, a witness named in the above
 4   stipulation, having been first duly sworn, was
 5   examined and testified on his oath as follows:
 6   EXAMINATION BY MR. BRUNO:
 7     Q.  Good morning, Mr. Colletti.  As I said
 8   before, my name is Joseph Bruno.
 9         MR. BAEZA:
10           Before we get started, just to
11         make sure of the usual stipulations,
12         Federal Rules and CMOs?
13         MR. BRUNO:
14           Oh, yes.  Yes.  Yes.  Yes.
15   EXAMINATION BY MR. BRUNO:
16     Q.  And actually I'd like to mark as
17   Exhibit Colletti Number 1 a document that
18   counsel was kind enough to give me this
19   morning.
20         Mr. Colletti, would you, for the
21   record, explain what this document is.
22         (Exhibit Colletti 1 was marked for
23   identification and is attached hereto.)
24     A.  This is my résumé going back all my
25   years here at the Corps --
```

Page 8

```
 1     Q.  Great.  All right.
 2     A.  -- as well as my high school
 3   background, as well as some knowledge, skills
 4   and abilities which is things we submit when we
 5   apply for the a new position.  So that was back
 6   in 2006, which kind of shows some of the
 7   background.
 8     Q.  All right.  Well, I deeply appreciate
 9   you providing this to us.  In fact, if you'll
10   just confirm that everything that's contained
11   in this document is true and correct to the
12   best of your knowledge, information and belief,
13   it will shorten --
14     A.  It is.
15     Q.  Oaky.  All right.  Let's see.  Now,
16   we've -- you graduated UNO?
17     A.  1982.
18     Q.  '82.  And you got a BS in civil
19   engineering.  Are you a licensed civil engineer
20   in any state?
21     A.  I'm not a professional licensed.  I'm
22   an EIT, as they call it.  An engineer in
23   training.  I never went forward and got the
24   professional license, no.
25     Q.  Why don't you just share with us for
```

Page 9

```
 1   the record, so that we will know, what is -- is
 2   the only distinction between an engineer in
 3   training and a licensed professional engineer
 4   the fact of obtaining the license?
 5     A.  Basically, it's, you then can stamp
 6   the drawings and such --
 7     Q.  Right.
 8     A.  -- and design.  And I've never been in
 9   the design background, so --
10     Q.  So you didn't need it.
11     A.  -- I saw no need for it.
12     Q.  What do you have to do -- if that's
13   what you wanted to do, what would you have to
14   do, just make an application?
15     A.  At the time, after four years you take
16   a test.  You take a test with the Louisiana
17   state licensing board, and if you pass that
18   test then you're licensed.
19     Q.  Okay.  All right.  Now, and I gather
20   from your résumé that your first employment and
21   actually sole employment all these many years
22   has been with the United States Army Corps of
23   Engineers.
24     A.  Pretty much professionally wise.  I
25   mean, I worked at a gas station and I threw
```

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 10

1  newspapers and, you know --
2      Q.  Like we all did.  I sol shoes, which
3  is probably the worst thing you can do.
4          All right.  Well, then, let's just
5  kind of go through each paragraph in a general
6  sense.  You've broken this down into groupings
7  of time.  You start with May '77 to August '85.
8  And you indicate you were a trainee through
9  journeyman engineer.
10     A.  Correct.
11     Q.  All right.  Just quickly what is a
12  trainee?
13     A.  Trainee -- I was a co-op student.
14     Q.  What does that mean?
15     A.  That was a student -- while I was
16  going to UNO to pursue my bachelor's degree, I
17  was working here part-time.  Well, full-time
18  actually, by semester.  And I did that I
19  believe it was seven semesters, actually school
20  semesters until '82 when I graduated.  Then I
21  came on full-time as a civil engineer.  And
22  from there, I worked up -- you started at a
23  GS-07 level, worked to a GS-11 level.
24     Q.  All right.  Now --
25         MR. BRUNO:

Page 11

1          Is that your Bates number?
2      MR. BAEZA:
3          It not Bates stamped.
4      MR. BRUNO:
5          Is that a reference number that
6      we can use?
7      MR. BAEZA:
8          I believe it is a reference
9      number.  It's just the way that we
10     Bates stamp the documents looks a
11     little bit differently, generally,
12     from the way it's formatted on here.
13     It's a smaller font and a different
14     font.  But that's the right, um --
15     container designation.
16     MR. BRUNO:
17         I just want to know that if I use
18     this number it will make some sense to
19     you guys, that's all.
20     MR. BAEZA:
21         Yeah, and if we just include it
22     as an exhibit it should be fine.
23     MR. BRUNO:
24         Yeah.  Again, because I don't
25     have copies.  Given the frequency of

Page 12

1      these depositions, it's been kind of
2      hard.
3      MR. BAEZA:
4          Because we have millions of
5      documents it's kind of hard to look at
6      on and say, oh, yeah, yeah, that's
7      definitely ours.
8      MR. BRUNO:
9          All right.  Well, let me --
10  EXAMINATION BY MR. BRUNO:
11     Q.  Mr. Colletti, I'm going to show you a
12  document, and we'll mark this as Colletti
13  Number 2.  We'll accept the responsibility to
14  photocopy it and provide it to the court
15  reporter.  Let me show that to you and ask you
16  if you can identify, first, what this thing is.
17         (Exhibit Colletti 2 was marked for
18  identification and is attached hereto.)
19     A.  Okay, this is the organizational chart
20  for the district.  This top page is the
21  overall, um -- organization.
22  EXAMINATION BY MR. BRUNO:
23     Q.  All right.  Can you tell me -- and I
24  understand there may be some technical changes,
25  but since '77 does that generally reflect the

Page 13

1  way the district office is organized?
2      A.  Well, we've changed names of
3  organizations, from '77.  You know, you didn't
4  have, as we call it, PPP, Planning, Programs
5  and Project Management Divisions.  So there's
6  been changes in that sense.  There's been name
7  changes to types of things.
8      Q.  Uh-huh.
9      A.  You know, but primarily as far as the
10  Corps is concerned, other than going to a life
11  cycle business process type of thing, it's
12  pretty much remained --
13     Q.  Okay.
14     A.  -- somewhat the same.
15     Q.  Are you able to discern from your
16  review of the document what year does that
17  reflect the actual titles and positions, et
18  cetera, of the various organization?
19     A.  Well, we've got Colonel Wagenaar and
20  Colonel Starkel up there, so that had to be
21  between, I'd say, somewhere between, oh, '06 --
22  so, '03, to -- somewhere between 2003, 2006.
23     Q.  Okay.  All right.  Let me have it
24  back, if I may.
25     A.  (Tendering.)

4 (Pages 10 to 13)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                          April 2, 2008

Page 14

1     Q.  Can you explain for me, if there is a
2  way to explain this, at what point in the
3  organization you go from military to non
4  military personnel?
5     A.  Well, pre-Katrina, military, you had
6  military only in the executive office.  You had
7  them in the executive office and you
8  occasionally had a captain or a major that was
9  assigned maybe either to a construction
10  division, or we had one many years ago in
11  operations division.  But your leadership, you
12  had a commander and a deputy commander was the
13  primaries.
14     Q.  A commander and a deputy commander.
15  And to make the connection to this document,
16  which by the way I'm marking as Colletti number
17  2, the commander when this organizational chart
18  was prepared was Richard Wagenaar?
19       (Exhibit Colletti 2 was marked for
20  identification and is attached hereto.)
21     A.  Wagenaar.
22  EXAMINATION BY MR. BRUNO:
23     Q.  And the deputy commander was Major
24  Murray Starkel.
25     A.  That's correct.

Page 15

1     Q.  Okay.  All right.  The actual working
2  divisions of this office are its engineering
3  divisions, real estate, planning, operations
4  and the like, wouldn't you agree?
5     A.  The technical divisions, you know,
6  construction -- engineering, construction,
7  project management, planning --
8     Q.  Okay.
9     A.  -- real estate, contracting.
10     Q.  What is your appreciation of the role
11  of the United States Army Corps of Engineers in
12  the context of our government; what do you guys
13  do?
14     A.  Well, basically, we do what Congress
15  directs us to do in terms of we're here to
16  serve in the states and local governments.
17  They request projects, and of course we
18  evaluate those projects and we request Congress
19  to authorize them, and if they're authorized
20  we'll build them.
21     Q.  All right.  Clearly, though, and tell
22  me if I'm misinterpreting what you said,
23  Congress is your boss.
24     A.  That's the way I see it, yes.  We act
25  upon what they direct us to do.

Page 16

1     Q.  And the services that you provide to
2  the Congress are, generally, engineering
3  services?
4     A.  Well, we do a little bit of
5  everything, you know, within the Corps, so you
6  start out in the planning phase, then you go to
7  engineering, then construction, and then
8  finally operations gets it --
9     Q.  Okay.
10     A.  -- you know.
11     Q.  Do y'all actually build -- I mean,
12  frankly, yesterday we had, at counsel 's
13  request, and legitimately so, a request that we
14  distinguish between when the Corps actually
15  does the build as opposed to let contracts to
16  third parties to build.  So in that context,
17  does the Corps actually build?  Do you have
18  journeymen working for you with hammers and
19  nails and fix --
20     A.  Contractors build our levees, for the
21  most part.
22     Q.  Right.
23     A.  We do have a hired labor unit that we
24  can do minor, you know, repairs to levees and
25  such.  We have one unit, a dirt moving unit

Page 17

1  that does, you know, some minor repairs if need
2  be.
3     Q.  Okay.
4     A.  But we don't go build full levee
5  sections or anything of that sort.
6     Q.  All right.  Is it fair for me to
7  conclude that the actual, as you've described
8  it, repair work that you do is repair work
9  that's done in connection with the maintenance
10  of flood control structures?
11     A.  Primarily, yes.  We have a
12  responsibility on the Mississippi River and
13  Tributaries Project for a major maintenance
14  requirement, whereas the locals do minor
15  maintenance and routine maintenance.  Um -- if
16  I could give an example for that, if there's a
17  levee slide, if it's a small slide that we feel
18  that the sponsor, the non-federal sponsor, the
19  levee district or whichever could do, you know,
20  then we would direct them the go ahead and make
21  that repair.  If we believe it's above their
22  capabilities and we consider that major
23  maintenance, and that's decided by the
24  commander --
25     Q.  Uh-huh.

5 (Pages 14 to 17)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                April 2, 2008

Page 18

1     A.  -- we then would, you know, use either
2  our own forces if we had them available,
3  because like I said, we only have one unit, or
4  we can, you know, go to contract and have it
5  repaired that way.
6     Q.  All right.  Well, let me then learn
7  about that unit.  First of all, where is it on
8  the chart?  Is it on the chart?
9     A.  It's within operations division.  It
10 will be showing them in the physical support
11 branch of operations division.  I'm not sure
12 where we're at now.
13    Q.  I'm going to hand it to you.  I don't
14 even know why I tried.
15    A.  Let's see.  I thought ops was in the
16 back.  Okay.  Here's operations division.
17    Q.  Is there, in the bottom left-hand
18 corner, a number?
19    A.  On this?
20    Q.  Yeah.  You see that number there?
21 Would you read that?
22    A.  This is the start of operations
23 division.
24       MR. BAEZA:
25          No, the MBD--

Page 19

1  EXAMINATION BY MR. BRUNO:
2     Q.  Yeah.  If you would read that into the
3  record I would appreciate it.
4     A.  MVD-007-000002678.
5     Q.  Okay.  Thanks.
6     A.  Page 11 of this document.
7     Q.  Great.  And do you find the --
8     A.  And then you'll see on here it says
9  physical support branch, Page 14?  So if we go
10 to Page 14 that's going to be Hired Labor Unit
11 D, at the bottom.
12    Q.  All right.  And for the record,
13 Page 14 has a number on it MVD-007-looks like
14 000002681.  And again, for the record, Colletti
15 2 is, itself, marked MVD-007-000002668.
16       All right.  So on Page 14 I see at the
17 top the operations division, and then below
18 that I see the physical support branch.  Okay,
19 so the physical support branch is there to
20 provide labor and equipment to do minor
21 repairs.
22    A.  Right.  We -- you know, those units --
23 we have four units, three of them are floating
24 plant units which generally do repairs to our
25 locks and navigation structures.  And Unit D is

Page 20

1  an earth moving unit that can do, you know,
2  earth repairs.
3     Q.  All right.  You're getting a little
4  ahead of me.  I'd like to just take it in baby
5  steps, if you don't mind.  So the chief at this
6  time was Accardo, and it looks to me like below
7  him he's got a, um -- marine management
8  section.
9     A.  Uh-huh.
10    Q.  Okay.  And then below that, he's got a
11 Dredge WHEELER.  What do those guys do?
12    A.  Okay.  That's the ocean going dredge
13 that we use out here.  It's a hopper dredge
14 that, um -- primarily we use it within
15 Southwest Pass to keep the Mississippi River
16 open.  It can be used elsewhere.  It's one of
17 the largest dredges in the country.
18    Q.  Okay.
19    A.  And --
20    Q.  And it's parked right out front.
21    A.  It's parked right out there right now.
22       And the marine -- you talked about the
23 marine management unit.  They support, you
24 know, that dredge.
25    Q.  The dredge.  Great.  Okay.

Page 21

1        Then on the right-hand side of the
2  page I see something called the facilities
3  management section, and then below that, a
4  shops unit.  What do those guys do?
5     A.  Shops unit, you've got plumbers,
6  you've got machinists, you've got welders and
7  such, and they support those hired labor units
8  when they're doing repairs at the locks and
9  such.
10    Q.  All right.  Now, and in the center is
11 what's called the maintenance section, and
12 below the maintenance section there are these
13 four hired labor units labeled A, B, C and D.
14 And these are the guys that actually do the
15 maintenance work, as needed or directed by the
16 deputy chief here.
17    A.  That's correct.
18    Q.  Okay.  Unit A:  That's a marine unit,
19 right?  Because there's a tow boat --
20    A.  Floating plant as we call it.
21    Q.  You call it a floating plant.
22    A.  We call it floating plant unit, yes.
23    Q.  So clearly they do work on water.
24    A.  (Nods affirmatively.)
25    Q.  And generally, the kind of maintenance

GERARD COLLETTI                                        April 2, 2008

Page 22

1   that these guys do would be to the locks -- and
2   anything else?
3       A.  Pretty much the locks.  I mean, we
4   have a control structure but, you know, we
5   haven't used those guys other than, you know,
6   maybe up on the handrails and things of that
7   sort.  But those folks generally do the lock
8   dewatering and repairs to the guide walls and
9   pretty much routine maintenance on those
10  structures.
11      Q.  When you open or close the spillway,
12  these guys do that?
13      A.  No.  No.
14      Q.  That's somebody else.
15      A.  No.  That's a whole separate group at
16  the spillway.  We could supplement those folks
17  up there, you know, if we needed additional
18  people.  These types after skilled enough to
19  where we could utilize them, but they're not
20  primary on that.  That's a whole separate unit.
21      Q.  So B and C are the same.
22      A.  A, B and C are pretty much all the
23  same.  They don't all have the same number of
24  people or the same equipment.
25      Q.  Right.  Generally speaking --

Page 23

1       A.  Generally speaking, yes.
2       Q.  -- they all work on water.
3       A.  Yes.
4       Q.  Is there an occasion where the work on
5   water guys would be called upon to do any levee
6   work?
7       A.  Generally, they don't.
8       Q.  Okay.
9       A.  The water guys.  The unit -- the dirt
10  unit, you know, their work is very different
11  than them, than the floating plant group.
12      Q.  You know, this is probably a good time
13  for me to get an understanding for the record
14  of the geographic area over which this office
15  has responsibility and, therefore, the
16  maintenance obligation.
17         Can you describe for me what that area
18  is?
19      A.  Okay.
20         MR. BAEZA:
21            Jerry, there's a map here if you
22         need to reference it.
23         MR. BRUNO:
24            If this is big enough.  I don't
25         know.

Page 24

1       A.  No.  This is just the New Orleans
2   area.  Actually, you know, our district -- we
3   go from the east pretty much the Slidell area
4   on up all the way into -- we go beyond the Old
5   River control structure to near Black Hawk,
6   Louisiana, that's mid central, and then over
7   towards Alexandria, Alexandria almost to the
8   Texas border, not quite, and then we come down
9   along the Sabine River, just west of Lake
10  Charles.
11      Q.  So.
12      A.  So we got about thirty thousand square
13  miles of that area.
14         MR. BAEZA:
15            There's a smaller map right here.
16         MR. BRUNO:
17            Owe, there we go.  There's a
18         little box around it.
19  EXAMINATION BY MR. BRUNO:
20      Q.  So I can conclude from that that the
21  geographic --
22      A.  Yeah.  But that box --
23      Q.  That's not big enough.
24      A.  No, we go way --
25         MR. BAEZA:

Page 25

1            That's just a map of Louisiana.
2            This box reps what's here.
3   EXAMINATION BY MR. BRUNO:
4       Q.  And clearly the geographic area is, in
5   its entirety, located in Louisiana.
6       A.  Yes.
7       Q.  Okay.
8       A.  Our district is.
9       Q.  Okay.  And then I'm just wondering if
10  there's a logical conclusion that can be made
11  here that the amount of work that you guys do
12  on the waters, about 75 percent of the
13  maintenance work that you do, and the land work
14  is about 25 percent?  Or does that make sense?
15      A.  No.  No, it doesn't.  You know, like I
16  said, you know, locks -- those groups that are
17  going to the locks, these are always doing
18  repairs at locks.  There's always barges
19  hitting the guide walls and, you know, or
20  sometimes they actually hit gates and things,
21  and so those units are actually going around
22  the state throughout, you know, to all the
23  different locks, control structures from a
24  navigation standpoint.  Whereas the work -- the
25  dirt unit, you know, is primarily on levees and

JOHNS PENDLETON COURT REPORTERS                    800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 26

1    such.
2       Q.  Got you.  All right.  Let's go back to
3    just the general organizational chart that we
4    have got here.  It appears to me, and again I
5    could be wrong, but all of the resource
6    management folks, logistics, civilian
7    personnel, information management, counsel,
8    internal review, safety, security, public
9    affairs, all those guys really support the
10   technical staff.
11      A.  For the most part, yes.
12      Q.  Because what you guys do, generally,
13   not everything, is the engineering component.
14      A.  Well, I mean, we do management.  You
15   know, we do operation and maintenance within
16   operations.  So -- but those are called the
17   support offices, so I would say that's --
18      Q.  Okay.  All right.  So how about this:
19   If we really want to focus on what the work of
20   this office, we would look at the
21   organizational chart where it says the
22   technical staff.  We could have a better
23   understanding of what this office actually
24   does.
25      A.  From the technical standpoint?  Yes.

Page 27

1       Q.  All right.  Now, I see here that there
2    is an engineering division, there's a real
3    estate division, there's a contracting
4    division, there's a planning, programs and
5    project management division, a construction
6    division and an operations division.
7       A.  (Nods affirmatively.)
8       Q.  Now I recognize that there's different
9    variants of those names over time, but are
10   there any divisions that have been disbanded or
11   removed in your tenure here?
12      A.  Not from a division standpoint.  Like
13   I said, the only one that really got created
14   from the time that I've been here was the
15   planning, programming and project management,
16   which they consolidated planning division, and
17   when they went to the life cycle project
18   management, they added that component.
19      Q.  Okay.  You anticipated my next
20   question, which is which divisions were added,
21   but you gave me that one.  Any other divisions
22   added?
23      A.  Um -- not that I'm aware of.  We've
24   always had the standard others which carried
25   you straight forward.

Page 28

1       Q.  All right.  So let's talk then
2    generally about the engineering division.  I
3    see that it is divided into a variety of what
4    appear to me to be disciplines within
5    engineering; structures, hydraulics and
6    hydraulic branch, geotechnical branch, design
7    services branch, cost engineering branch,
8    engineering control branch, general
9    engineering, and the civil branch.
10          Is it accurate for me to conclude that
11   this is basically broken up by discipline?
12      A.  I mean, the way they do their work in
13   engineering division, they pretty much split
14   out by -- not necessarily by discipline but by
15   the types of work that they do.  If you have
16   structural design versus hydraulics, doing
17   hydraulic analyses and water stream management,
18   gauging and such, so they break it out that
19   way.
20      Q.  Got you.  Now, I haven't gone very
21   carefully through your vitae, but have you
22   worked in the engineering division during your
23   tenure?
24      A.  Very, very briefly, when I first
25   graduated college there was a training program

Page 29

1    at the district that required you to go through
2    the various offices for orientation.
3       Q.  Okay.
4       A.  So it was very, very brief.  And you
5    only spent maybe a day or two in a specific
6    office as you went around.
7       Q.  All right.  Over the course of your
8    tenure here, your many, many years, have you
9    had an opportunity to get some understanding of
10   how the engineering division is organized?
11      A.  Yes.
12      Q.  Okay.  So very generally, what does
13   the structures branch do?
14      A.  Those folks primarily deal with your
15   structural design, flood walls in particular.
16   That's your main structural component of the
17   engineering division.  I mean, they do -- they
18   do some analyses for operations division, if we
19   were replacing a guide wall or such, for one of
20   our structures, but it's pretty much as the
21   term states, they deal with solid structures.
22      Q.  Okay.  How about hydraulics and
23   hydrologic?
24      A.  That's the water folks.  They deal
25   with hydraulic design, collection of hydraulic

JOHNS PENDLETON COURT REPORTERS              800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 30

1   data and hydrology data, rainfall, river
2   forecasting, any type of analyses that are done
3   for studies in projects, when they go in they
4   do a hydraulic analysis.
5       Q.  Would those folks be the ones that
6   would evaluate and understand wave action?
7       A.  I would think so.  Best of my
8   knowledge, I believe that's the folks that work
9   with that.
10      Q.  Next one is geotechnical branch.  What
11  do those folks do?
12      A.  That's your soils, soils and stability
13  folks.  They do analyses -- stability analyses
14  on your flood walls and your levees and such.
15  They do analysis of permits for our operations
16  division when we review permits that may affect
17  the levees or the flood walls.  They do
18  geotechnical analysis to determine if there is
19  any adverse impacts on it and such.
20      Q.  Are you aware of any set of guidelines
21  which would give third parties some indication
22  of when it's necessary and/or appropriate tod
23  obtain a permit to work around a flood control
24  structure?
25      A.  Well, that's something I've dealt with

Page 31

1   for many years.  We never had anything actually
2   published, but we have specific guidelines,
3   criteria that we use.  You know, we've had lots
4   of people ask for that, we just never got
5   around to doing it.
6       Q.  Okay.  Do you know if any other
7   districts have such a guideline in print?
8       A.  That I don't know.
9       Q.  Okay.  Well, I'm just curious and I
10  have to ask, how does the third-party person
11  know to come to you and request a permit if
12  there is nothing really out there written?
13      A.  Generally, you know, the
14  contractors -- it's part of the state -- as far
15  as I know, it's parts of the state, um --
16  licensing, they're supposed to know that,
17  although I don't believe that they always do.
18  But generally, when they go get a parish
19  building permit, that's where we work through
20  the levee district or the local sponsor who
21  actually is issuing the permit, or the letter
22  of no objection, whatever it may be, as far as
23  that, and we have to stay on the parish to make
24  sure that they say, look, you also have to get
25  a levee district permit for such work.

Page 32

1       Q.  How about when the Corps itself is the
2   agency doing the work, and by that I don't
3   mean, you know, actually carrying the shovel
4   but maybe designing and/or contracting work?
5       A.  Well, there's another component when
6   you're talking about permitting, and I'm not
7   sure if that's what you're saying.  When we
8   talk about our regulatory branch, which is work
9   either in a wetlands or on a navigable
10  waterway, then a Department of the Army permit
11  is actually issued, versus the levee district.
12  And then in some case us you need both.
13      Q.  Uh-huh.
14      A.  If you had like a dock with a walkway
15  back to the levee.  So there's some overlap
16  there.  But in terms of what we do work, our
17  work is strictly on the project itself.  So
18  what we get is a right of entry from the
19  sponsor, which in most cases is the state levee
20  district.
21      Q.  I understand, and I know that I'm
22  asking these questions without the level of
23  knowledge that you have, but we learned
24  yesterday about -- and I don't want to draw
25  objections as to whether I'm being accurate in

Page 33

1   my memory of what was said, but generally
2   speaking, I was given to understand that there
3   was a need to assess holes and excavations that
4   may be done at or near flood control
5   structures.
6           Is that the kind of think that you
7   were thinking about when you said that they
8   needed -- and I think you used the word permit.
9   Forgive me.  I don't recall precisely what word
10  you used, but is that what you were thinking
11  about?
12      A.  Yes.  And if I can elaborate, on the
13  Mississippi River and Tributaries Project, and
14  sometimes you'll hear me say MR&T project --
15      Q.  You guys love those acronyms?
16      A.  Oh, they got plenty.  But that's a big
17  one, and that's the main line Mississippi River
18  and the Atchafalaya Basin protection levees.
19  Very different than the hurricane protection
20  levees and structures.
21          For Mississippi River and Tributaries
22  Project, subsurface work, excavations, pile
23  driving, wells, water wells, gas wells, things
24  of that sort, seismic surveys, work within
25  1500 feet of the center line of the Mississippi

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 34

1    River and tributaries levees requires a permit.
2    Okay?
3         For hurricane protection where you
4    don't have water against those structures
5    generally on a regular basis like you might
6    have here on the river, we use 300 feet.  And
7    those are just -- that's our district, what
8    we've used for as long as I've been here in
9    terms of the distances from the levee center
10   line.  So it's 300 feet for hurricane
11   protection projects, it's 1500 feet on MR&T,
12   for subsurface type work.
13       Q.  Let me ask you a specific question,
14   because at least in my mind, and because it's
15   the subject of what we're talking about,
16   clearly, is the MRGO, which is a little
17   mixture, you've got not quite like the river
18   but it's close.  In the instance of that
19   hurricane protection structure that runs along
20   the MRGO from, generally, La Loutre to
21   Bienvenue, which number do you think, if you
22   don't know, would apply, the 300-foot number or
23   the 1500-foot number?
24       A.  300.
25       Q.  300.

Page 35

1        A.  That's a hurricane protection project
2    and we applied 300 feet.
3        Q.  Okay.  Let me also then ask you, again
4    because that's what we're here to talk about,
5    Lower Nine, at the locations of the north and
6    south breach on the east side --
7        A.  Okay.
8        Q.  -- okay?  300 or 1500?
9        A.  300.
10       Q.  300.  And that's because it's a
11   hurricane protection levee as opposed to?
12       A.  And floodwall.
13       Q.  What would you call this levee out
14   here?
15       A.  That's Mississippi River.
16       Q.  I know.  But in the context of
17   hurricane --
18           MR. BAEZA:
19               Referring to the levee right
20           outside this office?
21           MR. BRUNO:
22               Right.
23           MR. BAEZA:
24               Okay.
25           MR. LAMBERT:

Page 36

1            The one we're sitting on.
2        MR. BRUNO:
3            This itself is a levee right
4        here.
5        THE WITNESS:
6            He's right.
7    EXAMINATION BY MR. BRUNO:
8        Q.  I recognize you wouldn't call this a
9    hurricane protection levee, but what
10   nomenclature would be appropriate to
11   distinguish it from a hurricane protection
12   levee?
13       A.  A riverine, MR&T.
14       Q.  MR&T?
15       A.  Mississippi River and Tributaries.
16   It's part of the Mississippi River and
17   Tributaries Project.
18       Q.  Got you.  And is that considered a
19   flood control project or is that considered a
20   navigation project, if you know?
21       A.  The levee is considered a flood
22   control project.
23       Q.  Okay.  But it just has a different
24   name, it's called riverine versus hurricane
25   protection.

Page 37

1        A.  Correct.
2        Q.  I guess I'm getting it.
3        A.  And that's based on what it's designed
4    for.
5        Q.  And would I be correct in concluding,
6    perhaps logically, depending upon who's
7    listening to me, that the flood protection from
8    the riverine type situation is from rising
9    waters from winter runoff up north as opposed
10   to the hurricane protection which is surge that
11   is visited upon us from high winds connected
12   with a hurricane.
13       A.  Correct.
14       Q.  Not so bad, huh?
15       A.  That's always the way I understood
16   them.
17       Q.  All right.  Good.  Now, do you know,
18   in the context of the 300 feet relative to
19   hurricane protection structures, relative to
20   proposed excavations and the like, what the
21   nature of the assessment is?  What are they
22   assessing?
23       A.  Basically, we're looking for impacts
24   on that levee or structure.  If you're coming
25   in as an applicant and you're proposing to put

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

1  a pipeline in and crossing that levee, you
2  know, we have criteria that says you cannot go
3  through the levee, you have to go up and over
4  the levee and cover it.  So we have standard
5  criteria that we use.  We do everything on a
6  case-by-case basis, but when we do that
7  evaluation we generally do a geotechnical
8  evaluation, we send it through our engineering
9  division, depending on the type of proposal it
10 may go to geotechnical, it may go to
11 hydraulics, it may go to the levees unit and
12 civils branch, or the waterways group in
13 civilis branch.  It depends on the type of
14 proposal that an applicant would have.
15     Q.  Then if I may, allow me to give you an
16 example, which is a hypothet because it's just
17 the nature of how we have to do it.  I don't
18 want to haul in here the WGI contract, but I
19 will if we need to.
20     Generally, I'm just curious, are you
21 at least generally familiar with the work that
22 was done by the WGI on the water side of the
23 hurricane protection structure at or near the
24 north and south breaks at the Lower Ninth Ward?
25     A.  I'm not sure.

1     MR. BAEZA:
2        Before he answers, I'm just going
3  to object again, as we did yesterday,
4  Because the EBI has not been added to
5  the complaint.
6     MR. BRUNO:
7        Understood.  And I told you that
8  I would agree with you that that
9  objection would be -- I would agree
10 that it's continuing.  We understand
11 the controversy, we recognize that
12 it's a controversy, and I'm not going
13 to hold it against you if you didn't
14 object at any --
15    MR. BAEZA:
16       Each day?
17    MR. BRUNO:
18       -- each and every point each day
19 or whatever.  I know it's a
20 controversy and I understand your
21 position and, no, I'm not going to
22 say, you know, you didn't cross your T
23 properly.
24    MR. BAEZA:
25       All right.  Thanks.

1     A.  I don't know who is W --
2  EXAMINATION BY MR. BRUNO:
3     Q.  The Washington Group International did
4  some -- well, just assume this to be accurate,
5  that the WGI, the Washington Group
6  International, was hired by the United States
7  Army Corps of Engineers in connection with a
8  TERC.  Do you know what a TERC is, a Total
9  Environmental Remediation Contract?  Does that
10 sound at all familiar?
11    A.  No.
12    Q.  Fair enough.
13    A.  No.
14    Q.  That's fine.  Then we won't go there.
15 We'll go there from the perspective of a
16 hypothet.
17       You're digging a hole within 300 feet
18 of the center line of the east side hurricane
19 protection structure on the Industrial Canal
20 and you're going down about 25 feet to remove,
21 I don't know, some object down there.  Do you
22 know what kind of -- and you're on the water
23 side, if I didn't make that clear.
24       Just generally, what kind of an
25 assessment your engineering division would do

1  in that context?
2     MR. BAEZA:
3        Objection.  Vague, calls for
4  speculation.  The witness says he
5  doesn't have personal knowledge of
6  this contract.
7     MR. BRUNO:
8        Right.  And I did take that out
9  of the hypothet.  I made it into a
10 hypothet.  I'm not making any
11 reference to WGI.  It's a pure
12 hypothet.
13       Hole, gave you the location, gave
14 you the depth, gave you within 300
15 feet.  Okay?
16    MR. BAEZA:
17       Object to vagueness, calls for
18 speculation.
19    MR. BRUNO:
20       Understood.
21    A.  So if I understand you correctly,
22 you're talking about a hole in the Industrial
23 Canal, within 300 feet --
24 EXAMINATION BY MR. BRUNO:
25    Q.  -- Uh-huh.

JOHNS PENDLETON COURT REPORTERS            800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 42

1    A.  Of the structure.  Generally, if it
2  was not under the emergency conditions, if it
3  was an applicant coming in to do that versus
4  us, we would require a Department of the Army
5  permit through our regulatory branch and also
6  the Orleans Levee District would require a
7  permit or a letter of no objection because of
8  the impacts it may have on the wall.
9    Q.  Got you.
10    A.  Okay?  When that request would come
11  through, it goes through our engineering
12  division, and geotechnical looks at it from a
13  structural -- geotechnical structural
14  standpoint.  Factor of safety, what impact it
15  may have on the adjacent wall or levee.  Okay?
16       It would also go to the waterways
17  group because of the navigation interests going
18  through there.  You know, so primarily it goes
19  through a complete engineering evaluation
20  within the Corps.
21    Q.  All right.  Now, I believe you
22  qualified your answer to be in the context of a
23  third party.  What about if it's the Corps
24  doing the work again through a contractor; is
25  there any difference in the evaluation?

Page 43

1    A.  No.  We just -- we do that prior to
2  developing the scope of work.  And that's
3  done -- the same type of think is done where we
4  would be developing the plans and specs
5  in-house --
6    Q.  Right.
7    A.  -- and saying, you know, here's the
8  scope of work, we've done the engineering
9  analysis, here's what needs to be done.
10    Q.  All right.  I don't want to get too,
11  too far ahead of myself because I want to
12  address this in our discussion of the
13  contracting division, and the Corps obviously
14  has the capacity and in fact in the past has
15  developed its own plans and specs, right?
16    A.  Yes, sir.
17    Q.  And the Corps also, from time to time,
18  will contract with the contracting party to do
19  all of the planning, specifications, scope of
20  work, itself.
21    A.  Use of like an
22  architectural/engineering firm, yes.
23    Q.  Right.
24    A.  Yes.
25    Q.  And in that context -- I'm sorry.  In

Page 44

1  the context, to the extent that it may or may
2  not be different from the Corps developing its
3  own plans, is the assessment of this hole any
4  different?
5    A.  It shouldn't be.  Generally, we
6  would -- you know, if we do an
7  architectural/engineering contract, we're
8  giving them guidance in the standards of what
9  we expect from them.  So it should be -- you
10  know, I don't do those but it should be the
11  same as what we would do in-house.
12    Q.  All right.  Let's move to the design
13  services branch of the engineering division.
14       Do you know what those guys do?
15    A.  Um -- most of those guys, I believe,
16  do -- I think surveys is in there, the
17  surveying group is in there, and the, um -- GIS
18  folks are in there.  I don't deal with them
19  very much.
20    Q.  Okay.  All right.  Next, what is the
21  cost engineering branch; do you know what those
22  guys do?
23    A.  I believe those folks, they do the
24  cost estimating for the government estimates
25  for any type of contracting.

Page 45

1    Q.  Do they also do this cost-benefit
2  analysis?  Or do you know?
3    A.  I don't know.
4    Q.  Next one is the engineering control
5  branch.  What do those guys do?
6    A.  Those guys track -- to the best of my
7  knowledge, they track the funding, the project
8  fundings of all the different work that goes
9  through engineering division.  You know,
10  they're more the -- I believe they're very
11  similar to our funding management group.
12    Q.  All right.  Next one is general
13  engineering branch.  What do those guys do?
14    A.  Um -- I'm not certain.
15    Q.  Fair enough.
16    A.  As a matter of fact, I think they've
17  been disbanded.  I'm not sure if they still
18  exist.
19    Q.  Okay.  Lack of work?
20    A.  I'm not sure.
21    Q.  Next one is the civil branch.
22    A.  Civil branch is a group that I work
23  generally with.  That's the levees designer
24  group.  They also have the waterways, channel
25  stabilization, deal with the revetments group

JOHNS PENDLETON COURT REPORTERS          800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 46

1    and such.  But primarily most of my knowledge
2    with civil branch is through their levees.
3    They do the levee design and engineering review
4    of permits and such.
5        Q.   While we're at that, at this point
6    where are you in all this?  Which division are
7    you in?
8        A.   I'm in operations division.
9        Q.   Okay.  All right.  So the
10   opportunities that you would have to interact
11   with the civil branch are in the context of
12   levees generally.
13       A.   Most of my, you know, working
14   relationship with engineering division has
15   always been through the we call it flood
16   control permits, deal with the levee district
17   permitting, um -- as far as work related to and
18   associated with the levees and impacts on the
19   levees.  Which we talked about earlier, within
20   either 300, 1500 feet, we deal -- you know,
21   operations division receives the permit
22   request.  We act -- the Corps of Engineers acts
23   as an engineering consultant or advisor to the
24   levee districts.  Okay?
25       Q.   Okay.  So in fact -- and we kind of

Page 47

1    joked about this yesterday.  But you're the man
2    when it comes to the request for a permit from
3    the Corps to do work around -- within 300 feet
4    of a hurricane protection structure.
5        A.   From the Corps' standpoint, yes, my
6    office -- well, I used to do it personally.
7    Now, you know, it's people within my office.
8    But yes, we control -- we wrote the letter of
9    no objection if the work was going to be
10   approved, or we wrote a letter requesting
11   additional information if the applicant didn't
12   have enough information for us to do an
13   adequate review.  Or we wrote a letter of
14   objection if we -- you know, said we object.
15       Now, what we're doing is we're not
16   writing that to the applicant, we're writing
17   that to the levee district.  So we're advising
18   the levee district.
19       Q.   And you're writing the levee district
20   because, as I believe you've testified, the
21   levee district requires a permit to be given to
22   anyone who does work within 300 feet of the
23   center line of a hurricane protection structure
24   over which they have -- what's the right word,
25   um -- I guess not jurisdiction, but they're the

Page 48

1    local sponsor of.
2        A.   They're the local sponsor.  And it's
3    either a permit or a letter of no objection.
4    And, you know, my knowledge of that is that
5    they used to just call it a permit.  My
6    knowledge of that is that if it's within the
7    existing right-of-way it's termed a permit.  If
8    it's beyond the right-of-way, but may have
9    impacts to the levee or the floodwall, then
10   it's a letter of no objection.
11       Q.   Well, I know what the answer is going
12   to be, but I have to ask it for the record
13   anyway.  Do you remember, in your tenure,
14   having been notified by the Orleans Levee
15   District of a request for a permit by the
16   Washington Group International to work within
17   300 feet of the center line of the hurricane
18   protection structure at the Lower Ninth Ward
19   area on the east bank?
20       A.   Me, no.  I don't.  But then again --
21       Q.   That doesn't mean it didn't happen?
22       A.   Right.  That's correct.
23       Q.   It could have happened.
24       A.   That's correct.
25       Q.   You don't remember.

Page 49

1        A.   That's correct. that's correct.
2        Q.   Who should I ask?  Who would be the
3    person I might want to ask if I wanted to find
4    out if any such permit -- I'm sorry -- if the
5    Corps was ever put on notice by the levee board
6    of such a request for a permit?
7        A.   From the standpoint of the Corps of
8    Engineers, I would check within our operations
9    manager of Completed Works, which used to be
10   me.  So within operations division, if there
11   was a request -- and you're talking about a
12   third-party request, correct?
13       Q.   I don't know.
14       A.   Because --
15       Q.   Let me ask you how to ask the
16   question, if you don't mind.  It is my
17   understanding that the Corps hired the WGI to
18   do this work.  Okay?  So I don't know who ought
19   to -- withdraw.  I think I'm understanding that
20   whether it's the Corps itself or a third party
21   doing work within 300 feet that a permit is
22   required from the Orleans Levee District to do
23   the work within 300 feet of the center line of
24   that hurricane protection structure at the
25   Lower Nine.  Am I wrong in that assessment?

                                    13  (Pages 46 to 49)

GERARD COLLETTI                                    April 2, 2008

Page 50

1    A.  Well, the way we've done business, if
2  it's the Corps directing the work, it's not
3  like it is with the third party, an applicant
4  that comes in.  What we do is we evaluate the
5  work, we provide a scope of work or whatever
6  that contractor is going to do, and we work
7  that directly with the levee district.  Our
8  group in operations doesn't get involved with a
9  permit in that sense because it's work with the
10  levee district, and all, to my knowledge, they
11  request a right of entry and that contractor
12  does it just like as if we were building --
13    Q.  Okay.
14    A.  -- a new levee section.
15    Q.  All right.  But it sounds to me like
16  even though a permit may not be required, if
17  it's the Corps that's doing the work, that the
18  levee board is brought into the mix.
19       Am I interpreting what you're saying
20  correctly?
21    A.  Yes.  Yes.
22    Q.  They are brought into the mix?
23    A.  They should be, yes.
24    Q.  All right.  But in the case where the
25  Corps is doing the work, the operations

Page 51

1  division is not a part of that process, it is
2  the engineering division that's the part of the
3  process.
4    A.  Actually, it's generally the project
5  management group, PPPMD, as we say.  They have
6  a manager from a construction standpoint, or a
7  reconstruction standpoint, so you've got PPPMD,
8  you have engineering, construction, contract,
9  real estate, because they, real estate,
10  requests the right of entry, we just --
11  operations is not dealing with that until it's
12  all finished.
13    Q.  Okay.  Again, for example, when the
14  New Orleans Sewerage & Water Board made its
15  request for a permit to dredge the 17th Street
16  Canal, that permit request would have come in
17  through operations.
18    A.  That's correct.  Through the
19  regulatory branch.
20    Q.  All right.  Now, just so that I can
21  understand how it works, and if I may, I'd just
22  like to use that as an example, the operations
23  division, does it pass on the technical
24  engineering aspects of the request for the
25  permit, or does the operations division draw on

Page 52

1  the expertise and technical services provided
2  by the engineering division?
3    A.  That's correct.
4    Q.  That's an or.
5      MR. BAEZA:
6        Which one?
7  EXAMINATION BY MR. BRUNO:
8    Q.  Which won?  You got to pick one.
9    A.  Operations division receives the
10  request --
11    Q.  Right.
12    A.  -- and we process that, and basically
13  we sent it for the technical review to
14  engineering division.
15    Q.  Okay.  All right.
16    A.  And then they send it back, operations
17  division responds in writing either to the
18  applicant or by permit to the applicant.  So
19  the processing is done in operations division,
20  technical analysis and engineering.
21    Q.  Were you here when the Sewerage &
22  Water Board made any one of their I believe
23  four permit requests for permission to dredge
24  the 17th?
25      MR. BAEZA:

Page 53

1        Objection.  Relevance.
2      MR. BRUNO:
3        Give me some leeway here.
4    A.  I mean, I don't remember what years
5  they were.
6  EXAMINATION BY MR. BRUNO:
7    Q.  '79 to '84.
8    A.  Well, I was here.  You know, like I
9  said, I was a student up until '82.  So '84 --
10  you know, that would have been all handled
11  through regulatory branch, so I wasn't directly
12  involved with that.
13    Q.  Okay.  Understood.
14    A.  I don't believe I was.
15    Q.  That's all right.  Now let's talk
16  about the real estate division.  And it seems
17  to be broken down into appraisal and planning,
18  management, disposal and control, direct
19  federal acquisition, local sponsor and
20  inleasing.  Okay?
21    A.  You got me on these.
22    Q.  All right.  Well, if you don't know
23  then I'll just --
24    A.  No.
25    Q.  You don't work --

14  (Pages 50 to 53)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                          April 2, 2008

Page 54

1     A.  Very basic with real estate.  I mean,
2   my knowledge with real estate is, you know,
3   they need to coordinate with the sponsors when
4   we're acquiring real estate for projects or
5   they're acquiring real estate interests for
6   projects, um -- but all of those terminologies
7   and things I really have very, very limited
8   knowledge in real estate.
9     Q.  Then let's skip it.  Let's go to the
10  contracting division.  And I gather you have a
11  lot more interplay with these guys.
12    A.  Actually --
13    Q.  No?
14    A.  -- operations division, from my
15  background in operation, we don't deal with
16  contracting a whole lot.  That's usually on the
17  front end.  Again operations is --
18    Q.  The back end?
19    A.  -- the tail end.
20    Q.  Generally, do you know what the
21  contracting guys do?
22    A.  Well, I know they're broken into
23  different -- there's a procurement group, you
24  know, for procuring I guess supplies and
25  equipment types of things, um -- the

Page 55

1   contracting folks, in terms of my awareness of
2   them, they're the ones who actually, you know,
3   solicit the -- I guess the contractors, the
4   bidders --
5     Q.  Right.
6     A.  -- in that sense, and then they
7   actually sign the award.  They're the
8   contracting officers that sign and issue the
9   award for the contracts.  But again --
10    Q.  Right.  You got a Projects East,
11  Projects West, and then you have a polcy, which
12  they probably need a spelling branch, but it's
13  probably the Policy Branch.  Huh?
14    A.  I have no idea.  I know them as
15  contracting and procurement.  There's a
16  procurement, there's a contracting.
17    Q.  All right.  Let's move on, then, to
18  the next one.  Planning, programs and project
19  management division.  This is one of those
20  Peter picked a pickled pepper, whatever it is.
21    A.  PPPMD.
22    Q.  PPP makes it a lot easier.
23        Do you have interaction with these
24  guys?
25    A.  Yes.

Page 56

1     Q.  Okay.  So what does the PPPMD do?
2     A.  Those guys are on the front end of the
3   projects.  They do the studies -- the types of
4   studies for any type of new projects that are
5   coming on board.  They also -- if a project is
6   still under construction, um -- let's use the
7   Lake Pontchartrain project.  It's been under
8   construction for many years.  There's a project
9   manager for all construction work that's going
10  to be done on that.  So they're the front end.
11  They would be the ones that would go to
12  engineering division saying, we want to build
13  this reach of levee.  And they have the funding
14  from the construction side of that for the
15  funding.  So, um -- they would direct
16  engineering to prepare the designs, the plans
17  and specifications for that, and they control
18  that management of the construction side of
19  things.
20    Q.  All right.  And just to run through
21  the various titles here, Support Services,
22  Project Management East and West, Coastal
23  Restoration, Programs Management, Economic and
24  Social Analysis, Environmental Planning and
25  Compliance.  All of that is in the front end,

Page 57

1   the planning for the contracts.
2     A.  Right.  And the east and the west, I
3   believe, is just splitting the state up and,
4   you know, the projects within this area -- and
5   I don't know where that line of delineation is
6   for east and west, but, you know, generally
7   speaking when I think of west, most of the time
8   from operations standpoint we're thinking out
9   towards Lafayette-Lake Charles, versus east
10  being New Orleans and surrounding area.
11    Q.  All right.  And then we have the
12  construction division, and it has a Contract
13  Administration and a Quality Assurance branch.
14        Do you work with these guys?
15    A.  A little bit.  Because they're getting
16  closer to completion of the actual
17  construction.  These are the folks that are out
18  there managing the contracts to build the
19  levees or build the flood walls.  They have
20  inspectors that are in the field, project
21  engineers that are in the field for each
22  project or contract that's out there.  They do
23  the administration and overseeing of those
24  construction projects, yes.
25        MR. BAEZA:

15 (Pages 54 to 57)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                         April 2, 2008

Page 58

1          Which how which group is that?
2     A.  That's the construction division.
3          MR. BRUNO:
4               Construction division.
5     EXAMINATION BY MR. BRUNO:
6     Q.  And within that, we have quality
7     assurance.  What --
8     A.  I believe that's the inspectors group.
9     That's the group that's ensuring that the work
10    is being done in accordance with the contract
11    specs --
12    Q.  Okay.
13    A.  -- you know.  I'm pretty sure that's
14    where the inspectors come in.  QA, QC; quality
15    assurance, quality control.
16    Q.  All right.  And that's different from
17    the engineering assessment discussion that we
18    had before; in other words, if there's some
19    need to do an engineering assessment with
20    regard to holes and the like, that's not the
21    quality assurance branch, that's the
22    engineering division.
23    A.  That's correct.
24    Q.  Okay.  All right.  Then finally we
25    have the operations division.

Page 59

1     A.  I know those guys.
2     Q.  Those guys you know.  Okay.  This is
3     broken down into Technical Support, Readiness,
4     Physical Support, Regulatory, Management
5     Support, Mississippi River Baton Rouge to Gulf,
6     Atchafalaya, Calcasieu and the Pass, the
7     Mississippi River Gulf Outlet, and the Gulf
8     Intracoastal Waterway.
9          All right.  So obviously we're talking
10    about, if not geographic areas within the
11    district, we're talking about projects within
12    the district.  Right?
13    A.  Right.  The way that's set up, we have
14    branches, separate branches, that's the ones
15    you were calling out at the beginning, up at
16    the top.  And then as you got into the actual
17    operation managers for those specific projects,
18    completed projects, Mississippi River to the
19    Gulf, Calcasieu River and Pass, MRGO, you have
20    a specific operations manager that handles that
21    specific project and maybe some other smaller
22    types of projects that are in or around those
23    same areas.
24    Q.  That's what I was sort of thinking
25    about when I was reading this.  I was wondering

Page 60

1     to myself, is it because -- let's take for
2     example the Gulf Intracoastal Waterway, that
3     that's such a big project that it needs its
4     own --
5     A.  Little group.
6     Q.  -- little group?
7     A.  That's correct.
8     Q.  And if there's some kind of a project
9     in or around that waterway, would it be within
10    that branch or would it go somewhere else?
11    A.  No, generally, we try to keep it
12    within the area of those projects.  The Gulf
13    Intracoastal Waterway project is so large --
14    most of the operations managers consist of the
15    manager, an assistant deputy manager, and maybe
16    one either lower graded engineer or program
17    person to handle the funding of it.  But the
18    work is actually out there in the field.
19    Q.  Of course.
20    A.  So on that project, most of that is
21    all your locks, you have six locks along the
22    GIWW, so they have very -- I'm not sure if we
23    got any other periodic project -- well, they
24    have the spillway, as well, within that
25    project.  The others are usually other little

Page 61

1     waterways, smaller waterways adjacent to or in
2     the general vicinity of it.
3     Q.  All right.  Well, talk in more detail
4     about some of these.  Let's start at the top,
5     first so we can just get a global understanding
6     of the organization of the operations division.
7          You got your technical support.  How
8     is that different from the engineering support?
9     If it's different it all.
10    A.  It is in a way.  You know, technical
11    support branch has various flood control
12    function, navigation function, environmental
13    function, um -- we have technical or support
14    function within there, um -- we got the
15    channels unit that does surveying on the river.
16    Those folks directly support the operations
17    managers.  So if they're going to go do a
18    dredging project and you need environmental
19    clearances, NEPA compliance, you know, they
20    work with the environmental folks.
21         The navigation function chief of that
22    technical support group is kind of, the way I
23    used the call it -- I was the flood control
24    function at one time.  I actually did a year of
25    the navigation function.  I was more or less

JOHNS PENDLETON COURT REPORTERS          800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                        April 2, 2008

Page 62

1  the referee, if you think of it in that sense.
2  What we're trying to do is, all of those
3  operations managers are competing for the same
4  resources in terms of getting their project
5  maintained. So that function chief within tech
6  support was more or less playing, you know, the
7  facilitator of the various operations managers,
8  to say, okay, well, you've got money available
9  but your P&S aren't ready yet. And you have
10 your P&S ready, and if we can get the money --
11 you see what I mean?
12     Q. Quickly. P&S?
13     A. Plans and specifications --
14     Q. Okay.
15     A. -- for your projects.
16     Q. All right.
17     A. And so that's what the technical
18 support function of operations does. They
19 directly support the operations managers in
20 maintaining their projects.
21     Q. Now, you say support, but who has the
22 actual authority to make the call?
23     A. The call comes from the operations
24 manager. They're the funding mechanism. The
25 operations manager is the one that directs what

Page 63

1  they want technical support branch personnel to
2  do.
3     Q. All right. Well, on this chart, and
4  again -- they're calling the head guy or girl a
5  chief.
6     A. Yes.
7     Q. Is he a manager?
8     A. That's a branch chief. Technical
9  support branch is a branch chief.
10     Q. Right. But the operations division
11 itself, I don't see the word manager, it says
12 chief.
13     A. Chief. Yes.
14     Q. Manager/chief?
15     A. My boss is the division chief.
16     Q. All right. So the manger --
17     A. I'm the assistant chief.
18     Q. When you made reference to the manager
19 who makes the call on money, that's the chief?
20     A. Operations manager. No, that's the
21 operation manager. They control the funding
22 for their projects. You have seven operations
23 managers within ops.
24     Q. Can you show me where -- I guess I'm
25 confused. Show me where --

Page 64

1     A. You're going to start right here with
2  the Mississippi River Baton Rouge to Gulf,
3  Mujica, Nord, Falk, Russo is not here anymore
4  but GIWW, now you have another one -- well,
5  actually you got two others. We must have
6  another page somewhere. You should have -- if
7  not, this was -- you should have Completed
8  Works as well as the Old River Control Project.
9  We have an operations manager for that, as
10 well.
11     Q. All right. I'm just still a little
12 confused. Forgive me, but where is this
13 manager person?
14     A. Starting right here --
15     Q. The manager of the --
16     A. Of the Mississippi River Baton Rouge
17 to Gulf --
18     Q. He has the power of the -- to say --
19     A. He manages his project.
20     Q. So he decides whether to spend money
21 or not.
22     A. Yes.
23     Q. But I guess what I'm trying to
24 understand is, suppose you have the manager of
25 the Atchafalaya Basin and the manager of the

Page 65

1  Mississippi River Gulf Outlet both wanting
2  money, who's the referee between those two
3  guys?
4     A. Okay. If they don't have the money,
5  the management support branch, they're or money
6  folks that deal directly -- they're basically
7  equivalent to what they had in PPPMD in the
8  program side of things, they request the money
9  from division or headquarters. So they're
10 getting the actual monies into the district or
11 making the requests outside of the district to
12 get additional monies. But when we get our
13 appropriation at the beginning of the year,
14 when Congress passes the budget and we get our
15 monies, the monies come in through management
16 support branch, and then it's provided to those
17 operations managers.
18     Q. All right. Well, I want to spend some
19 more time on that. And so let me get through
20 just the other branches first.
21         So the Technical Support Branch --
22 he's supporting folks with the Mississippi
23 River Gulf Outlet who may have some jockeying
24 for the funds.
25     A. Right. And, you know, there's --

                                    17 (Pages 62 to 65)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 66

1    let's go to like a GIWW where you have a lock.
2    You have several locks.  You know, if they need
3    a repair to the control house at the lock, or
4    there's some minor electrical repairs or
5    whatever, there's a support group within
6    technical support branch that can do either
7    procurement of supplies and equipment or they
8    can do a small design.  If it's a large
9    project, that goes to engineering division.
10   But small routine types of work, repair of a
11   roadway or something, access, or repair the
12   fence, simple type of stuff, we keep that --
13   because we can act more quickly and it's not as
14   important as the big projects that engineering
15   division --
16       Q.  I think I'm understanding it now.
17   Obviously it makes more sense, and for reasons
18   of efficiency, for you guys to's have access to
19   a mall little engineer group --
20       A.  Yes.
21       Q.  -- to handle your small engineering
22   projects.
23       A.  That's correct.
24       Q.  That's what the technical support is.
25       A.  Small routine types of things.

Page 67

1        Q.  All right.  Next one is the Readiness
2    branch.  What do those guys do?
3        A.  That's your emergency management
4    folks.  They call it readiness in terms of
5    preparedness for natural and manmade disasters
6    and such.  They direct all of your disaster
7    recovery response and such.  They're the focal
8    point for the district.
9        Q.  Okay.  Physical Support.
10       A.  Okay.  That's the group that has the
11   WHEELER, the hired labor units, the marine
12   management group.
13       Q.  Okay.  All right.  That's your --
14   that's when you guys do your own --
15       A.  Right.  Lock repairs --
16       Q.  -- actual work.
17       A.  Lock repairs, minor levee repairs,
18   things of that sort.
19           MR. LAMBERT:
20           Is the WHEELER the dredge?
21           THE WITNESS:
22           Yes.  The Dredge WHEELER.
23           MR. LAMBERT:
24           That's the name of the vessel?
25           THE WITNESS:

Page 68

1           Yes.  W-H-E-E-L-E-R.
2    EXAMINATION BY MR. BRUNO:
3        Q.  Next one is Regulatory Branch?
4        A.  Regulatory Branch, that's your
5    wetlands group.  That's your regulatory folks
6    that handle the 404 and Section 10, with 404 is
7    fill in wetlands, and Section 10 is
8    construction that's on a navigable waterway of
9    the United States.  They do --
10       Q.  That's the whole wetland
11   certification, you know, if I want to find out
12   if I can build, the first thing I have to do is
13   make sure the land is not wet, and if it is wet
14   there's a program which allows me to trade land
15   or pay funds to you guys to develop the land.
16       A.  They handle the jurisdictional
17   determinations of it being a wetland or not,
18   you know, and the qualities of that wetlands,
19   and then the other side of that there is the
20   processing of the actual permits --
21       Q.  All right.
22       A.  -- within that group.
23       Q.  Let's skip the management support just
24   for a moment and walk over to the these various
25   projects.  And let's -- we might as well just

Page 69

1    focus on the Mississippi River Gulf Outlet
2    because that's what we're here to talk about.
3    And we talking about the operations component
4    of an existing project.
5           Am I correct in understanding that you
6    guys are managing the day-to-day aspects of
7    that particular project?
8        A.  The operation and maintenance.  That's
9    what we're responsible for.
10       Q.  All right.  Now, did you work, during
11   your tenure, with the Mississippi River Gulf
12   Outlet I guess you want to call it a group or a
13   branch within the operations division?
14       A.  Very little, other than that one year
15   that I spent on a cross-training assignment.
16   When one of the guys was on long-term training
17   I was the navigation function chief within
18   technical support branch.  So I was kind of
19   that referee.  But I never got into, you know,
20   the actual project itself.  It was more of,
21   okay, Edmond's got monies in this one and
22   doesn't have specs, that type of thing.  But
23   details of the projects, no.  And most of these
24   are navigation side of things.  I was primarily
25   on the flood control side.  Other than that one

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                          April 2, 2008

1   year.
2      Q.  All right.  During that one year, so
3   that I can get a handle on it, you were in
4   technical support.  Within technical support
5   you were offering engineering services with
6   regard to navigation issues to the Mississippi
7   River Gulf Outlet.
8      A.  Actually, it wasn't engineering
9   services, it was more -- like I said, it was
10  more of like a facilitator, you know, to make
11  sure that the projects were prioritized in a
12  sensible way, whether there was availability of
13  funds, whether there was availability of
14  resources, contractors, dredge 's availability,
15  things of that sort.
16     Q.  All right.
17     A.  You kind of ran it all down for the
18  various managers.
19     Q.  I would guess, and again I don't know,
20  that the primary operations issues with regard
21  to the gulf outlet is the issue of keeping the
22  channel open for navigation.
23     A.  Uh-huh.
24     Q.  Is that accurate?
25     A.  That's correct.

1      Q.  All right.  Because obviously its
2   purpose was to allow deep draft vessels to go
3   from the gulf to the river.  And so the
4   operations component is to make certain that it
5   was clear, and to make it clear you have to
6   determine the need for dredging.
7      A.  That's correct.
8      Q.  All right.  And as I think I
9   understand it, most of the dredging issues were
10  nearer to the gulf.
11     A.  Again, I don't know.
12     Q.  Fair enough.
13     A.  I have no idea.
14     Q.  Now, is the -- do you know whether or
15  not the -- in addition to making certain that
16  the gulf outlet was navigable, the operations
17  division was charged with making certain that
18  the gulf outlet did no damage to the
19  surrounding marsh, swamp, et cetera.  Was that
20  part of an operations function or not?  If you
21  know.
22         MR. BAEZA:
23             Objection.  Vagueness.
24         MR. BRUNO:
25             Okay.

1      A.  Um -- I don't believe -- my knowledge
2   of what those operations managers did, they
3   would not do that.  Impacts are generally
4   analyzed by the engineering division folks.  So
5   I mean, you know, they don't do those types of
6   impact statements.
7          When the project is designed and such,
8   and it's going through the dredging, they go
9   through engineering division for those plans
10  and specifications, so I'm assuming that's
11  done then.
12  EXAMINATION BY MR. BRUNO:
13     Q.  Right.  Well, I'm not necessarily
14  talking about at the front end.  What I'm
15  talking about is at the back end.  It's pretty
16  clear from the documents and all the
17  depositions that we have taken thus far that
18  the Corps recognized that there was a problem
19  with erosion of the banks that was caused by
20  the MRGO.  And I just -- what I'm just trying
21  to generally understand is whether or not the
22  monitoring of this erosion issue was an
23  operations function, and if it wasn't an
24  operation function what division would have
25  that responsibility.

1      A.  I think it was collective between
2   operation and engineering division.  We did put
3   rock -- I do know we -- you know, through that
4   project, they did line portions of the channel
5   with rock.
6      Q.  Right.
7      A.  Um -- but again, the details of how
8   that was done, I do know they worked through
9   technical support, I believe, you know, and I
10  think they worked through engineering -- I'm
11  certain they worked through engineering
12  division because of the size of that project.
13     Q.  Okay.  And when you say that project,
14  would that be the foreshore protection at the
15  southern bank of the MRGO between Bayou La
16  Loutre and Bayou Bienvenue?
17     A.  I believe that's correct, but I'm not
18  certain, not 100 percent certain.
19     Q.  Who should I talk to to get more
20  information about the monitoring of an ongoing
21  project to assess whether or not that project
22  was causing any kind of damage to anybody?
23     A.  That specific operations manager.
24     Q.  Over time.
25     A.  Over time.

JOHNS PENDLETON COURT REPORTERS              800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                         April 2, 2008

1    Q. All right.
2    A. And it's changed. It was Edmond
3 Russo, it was -- prior to him it was Bob Gunn
4 who's now deceased. Um -- Michelle Daigle was
5 I think after Russo. Richard Entwistle is the
6 current -- actually, he's getting ready to
7 move. So they change over time.
8    Q. Okay. All right.
9    A. But that person is who does the
10 overall management of the project.
11    Q. Let me just ask you one or two more
12 questions in this context because you've
13 indicated I ought to be asking somebody else,
14 but let me just round it out. We've seen a
15 bunch of what have been labeled reconnaissance
16 reports. Are you familiar with a
17 reconnaissance report?
18    A. A little bit. Not a whole lot. My
19 background, like I said, I don't get into that.
20 I know they're done.
21    Q. Okay. Well, my first question is,
22 does the operations division do them?
23    A. I've never done one and I haven't seen
24 us generate them. I believe the reconnaissance
25 reports are done through project management

1 folks. But again, I can't say with certainty
2 that -- that specific ops manager would know
3 that.
4    Q. But it's within operations, you think.
5    A. As far as the reconnaissance report?
6 I think it's -- if anything, it's probably a
7 combination of things. But we don't do
8 specific reports, you know, that's all ours,
9 per se. All ours.
10    Q. How about this? Last question,
11 promise, on this issue: Do you know whether or
12 not, routinely, your op managers for the
13 Atchafalaya, Mississippi River, Calcasieu, Gulf
14 Intracoastal, do they do a routine
15 reconnaissance report for each of these, you
16 know, geographies or projects?
17    A. I don't know if you'd call it
18 reconnaissance reports. I mean, we do surveys
19 of the channels to determine, you know,
20 conditions. We do condition surveys and things
21 of that sort. But I'm not sure what you're
22 saying in terms of reconnaissance. I mean,
23 yeah, if you go do a survey, that's
24 reconnaissance, but -- so we do that. But --
25    Q. This thing has the words

1 reconnaissance report on it, and in particular,
2 the ones we have seen discuss the MRGO and
3 discuss the erosion issue.
4    A. I would say the best person to ask
5 would be one of those navigation ops managers.
6 I was an ops manager, but I was a flood control
7 manager.
8    Q. All right.
9    (Brief recess.)
10 EXAMINATION BY MR. BRUNO:
11    Q. Okay. Mr. Colletti, we just need to
12 cover one more, I believe, section of this
13 organizational chart, and that's the management
14 support branch, that's the money.
15    A. That's the money -- the operations and
16 maintenance monies that come into the district.
17 That group within operations division -- it
18 comes to the district, and then they -- you
19 know, they manage those operations managers and
20 anyone else, general regulatory has their own
21 budget, readiness has their own budget, and
22 then the operations managers either receive
23 O&M, operation and maintenance, general funds
24 or, in the position I used to be in, flood
25 control funds. I had MR&T and O&M, generally.

1 So those fund are distributed to those
2 managers, and then the managers control them.
3    Q. Before we talk about how the money
4 flows out, I would like to talk about how the
5 budget is established in the first instance on
6 the maintenance side. Okay?
7    A. Uh-huh.
8    Q. And I imagine that Congress has to be
9 told, if -- and I think we've established, but
10 Congress is your boss, right?
11    A. That's correct.
12    Q. You guys are charged with maintaining
13 the projects that the Congress of the United
14 States asks you guys to design and build,
15 right?
16    A. That's correct.
17    Q. And so the Congress also expects you
18 to tell them when those projects are in need of
19 monies to maintain them, right?
20    A. That's correct.
21    Q. And I would -- and I don't know if I'm
22 going too far here, but would you expect that
23 the Congress would expect you to tell them when
24 those projects are falling apart or when
25 they're breaking?

20 (Pages 74 to 77)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 78

1    A.  And we do that, yes.
2    Q.  All right.
3    A.  We do that through the division
4  office, through headquarters.  We don't deal
5  directly from --
6    Q.  Well, I know you don't call up Senator
7  Vitter and ask him for some money, but --
8    A.  Right.
9    Q.  -- the concept is that this office,
10 being charged with oversight of the projects
11 within this area, this office is expected to
12 tell the Congress when there's a need for
13 maintenance.  Right?
14   A.  Correct.
15   Q.  But you don't decide how much money to
16 spend on maintenance, the Congress decides how
17 much money to spend on maintenance.
18   A.  Well, you know, we decide what needs
19 to be done, and we get an estimate and we
20 provide that through the division office, then
21 it goes through headquarters, and it may not
22 even make it all the way there because it's
23 vetted throughout, it's prioritized.  The work
24 is prioritized at the division and then the
25 headquarters national level.  So, you know, we

Page 79

1  can request it and say, here's what we need,
2  but it's very seldom that you get all of what
3  you need.
4    Q.  Of course.  But I mean, globally, you
5  would agree with me that if you were the
6  Congress and you had charged this office with
7  the responsibility of maintaining the projects,
8  and if this office became aware of the fact
9  that a particular project was causing damage
10 such that it would visit liability on the
11 United States of America, that this office
12 should communicate that fact to the Congress.
13       MR. BAEZA:
14            Objection.  Vagueness, calls for
15       speculation and a legal conclusion in
16       terms of liability.
17   A.  I mean, you know, in terms of
18 maintenance of the channel, we do that.  I'm
19 not aware of -- you know, if anything was
20 determined one way or the other --
21 EXAMINATION BY MR. BRUNO:
22   Q.  And I'm not saying that anything like
23 that occurred.  I'm just trying to understand
24 whether or not you agree with that general
25 principal that the Congress ought to know if

Page 80

1  one of its projects is -- I mean, for example,
2  if you've got a dam and the dam is about to
3  break, and you know that if it breaks it's
4  going to put water on the neighbor's property
5  and it's likely that the neighbor is going to
6  be very upset and want to be paid, you would
7  expect the Congress would want you to tell
8  them.
9        MR. BAEZA:
10            Objection.  Vagueness, calls for
11       speculation.
12 EXAMINATION BY MR. BRUNO:
13   Q.  Right?
14   A.  Well, again, we don't tell Congress
15 directly from here.  So if we thought there was
16 a problem, we would tell our division office,
17 and if -- it goes up the chain.
18   Q.  All right.  The Corps of Engineers as
19 a whole, then.  Let's not talking about the New
20 Orleans office.  You would expect that if the
21 Corps was aware of a project that was about to
22 cause harm to some third party that the Corps
23 should tell the Congress.
24       MR. BAEZA:
25            I renew my objection.

Page 81

1  EXAMINATION BY MR. BRUNO:
2    Q.  Right?
3    A.  Yes.
4    Q.  All right.  So -- and you guys do
5  that.  Don't you?  You try.
6    A.  I mean, from headquarters' standpoint,
7  I guess they do.  I've never been there.  You
8  know?
9    Q.  All right.  But the operations group
10 does inspect, from time to time, its projects,
11 does it not?
12   A.  Yes.
13   Q.  Is that an operations function, or is
14 that a function that belongs to one of these
15 other branches?
16   A.  No, operations division would be the
17 lead.  If they're the manager of that project,
18 they would be the lead.  But we may bring along
19 with us, depending on who it is, it may be an
20 environmentalist, it may be another engineering
21 technical specialist from engineering division,
22 you know, that may have some input to that.  So
23 lot of these inspections, it's not just an
24 individual or two from operations division,
25 it's a team.

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 82

1    Q.  All right.  Understanding that it's a
2  team, who within the team has the primary
3  responsibility for reporting observations after
4  inspection which suggest the need for
5  maintenance?  Let's be as general as we can be.
6    A.  The operations manager --
7    Q.  All right.
8    A.  -- of the project.
9    Q.  So if it's a MRGO project, it's going
10  to be, on this chart, Mr. Russo.
11    A.  Correct.
12    Q.  Where are the hurricane protection
13  levees in this?
14    A.  That's what I said, they're missing on
15  there.  There is an operations manager for
16  Completed Works, which is not -- for some
17  reason is not showing up.  They're missing an
18  operations manager for Completed Works and an
19  operations manager for Old River Control.
20    Q.  All right.  Let's go to Page 11 to 15
21  and see if maybe they're there.
22    A.  And that was me.
23    Q.  All right.  If we go to Page 11 --
24  let's just make sure I've got this right.
25  Under the operations division at the bottom, it

Page 83

1  says Pages 11 to 15, right?
2    A.  Okay.  There's got to be two more.
3    Q.  Okay.  We're going to go to the back
4  part of it.  I just want to make sure I'm going
5  to the right part.  To Page 11.  So let's go to
6  Page 11, see if it's hiding out there.
7    All right.  Page 11 we see -- we find
8  Completed Works.  So let me show you --
9    MR. BRUNO:
10    Do we have another copy?
11  EXAMINATION BY MR. BRUNO:
12    Q.  It's here.
13    A.  I found it.
14    Q.  We found it.  The front page tells us
15  go the Page 11, we're going to Page 11, now
16  we're on Page 11 and we see that this is a more
17  detailed breakdown of the operations division.
18    A.  Yep.  That's right.
19    Q.  They're all there.
20    A.  They're all there.
21    Q.  Okay.  All right.  So across the top,
22  we have our -- it appears to be set up just a
23  tad differently, because it's got our operation
24  managers across the top.
25    A.  Uh-huh.

Page 84

1    Q.  Okay.  Let's walk through those.  So
2  we have our operations manager for Calcasieu,
3  and that's on Page 2.  Right?
4    A.  (No audible response.)
5    Q.  We have got our operations manager for
6  Atchafalaya, and that's on Page 2, right?
7    A.  Yep.
8    Q.  Okay.  We have our op manager for the
9  River from Baton Rouge to the Gulf, and that's
10  shown on Page 2.
11    A.  (No audible response.)
12    Q.  Then we have our op manager for the
13  Gulf Outlet, and that's shown on Page 2, right?
14    A.  Correct.
15    Q.  We have our open manager for the
16  Intracoastal Waterway, that's shown on Page 2.
17  Right?
18    A.  Correct.
19    Q.  And then with have two more; we have
20  our op manager for Completed Works and our op
21  manager for the Old River --
22    A.  Control.
23    Q.  -- Control.  Let's talk about him
24  first and we can focus on the op manager for
25  Completed Works.

Page 85

1    So what is the Old River Control
2  Structure?
3    A.  The ops manager for Old River Control
4  Structure is our water control structures.
5  It's a complex, as we call it.  It's three
6  separate and distinct structures up, you know,
7  northwest of Baton Rouge that diverts water to
8  the Atchafalaya River and out.  By law, we're
9  required to divert 30 percent of the flows
10  within the Mississippi at the latitude
11  Mississippi and the Red Rivers to the
12  Atchafalaya and on down.  That manager has
13  those structures up there, he also has the
14  Morganza control structure which is further
15  downriver.  That's also an outlet during flood
16  periods that they control.
17    Q.  And then we have our op manager for
18  Completed Works.  Now, what are within the
19  rubric of Completed Works?
20    A.  Okay.  I know that guy very well.
21    Q.  Who might that guy be?
22    A.  That guy was me at the time.  And so I
23  know that position very well.  The ops manager
24  for Completed Works has the inspection of
25  Completed Works program -- or project, I should

GERARD COLLETTI                                  April 2, 2008

---

Page 86

1   say.  It has the Mississippi River levees
2   maintenance project, it has six small flood
3   control navigation projects north of Lake
4   Pontchartrain, such as the Tangipahoa, um --
5   the -- shoot, I'm having a brain lapse here on
6   all the different ones.
7       Q.  That's okay.
8       A.  The Tickfaws and Tchefunctes and the
9   small ones up there.
10      Q.  Right.
11      A.  And then we also did the solicitation
12  of views program.  It's similar -- it's like a
13  pre application permits.
14      Q.  I want to spend some more time on
15  that.  But before we do, since we found two
16  more op managers, I just want to look at this
17  piece of paper and see if there's some other
18  stuff on this piece of paper that's not on Page
19  2.
20      A.  Okay.
21      Q.  All right.  This seems to show the
22  other branches -- let see.  The first one on
23  the second row, physical support, you see that
24  there on Page 2.
25      A.  Yep.

---

Page 87

1       Q.  We see technical support.  We talked
2   about that, that's there on Page 2.
3       A.  Okay.
4       Q.  And regulatory, that's there.  Right?
5       A.  Yes.
6       Q.  Management support?  That's there.
7       A.  That's there.
8       Q.  And finally, readiness is there, too.
9       A.  That's correct.
10      Q.  Okay.  All right.  So it looks like
11  for some unknown reason the ops manager and the
12  Old River manager were left off, which is fine,
13  we found them.
14      A.  Yep.
15      Q.  Okay.  Then under -- then it shows
16  more detail under the regulatory branch.
17      A.  Correct.
18      Q.  And it appears that very simply the
19  geography is carved up into three general
20  sections, eastern, western and central.  And so
21  can I --
22      A.  That's correct.
23      Q.  -- just assume that the permits come
24  in, they just are divided --
25      A.  It's based by parish.  They break them

---

Page 88

1   up by parish, yes.
2       Q.  Can I just assume that the City of New
3   Orleans proper would be within the eastern
4   evaluation section?
5       A.  That's correct.
6       Q.  Okay.  Then I see a surveillance and
7   enforcement section.  What do those guys do?
8       A.  Okay.  That's the folks that do the
9   jurisdictional determinations.  If you're
10  coming in as an applicant and you say I got a
11  piece of property out here and I want to know
12  if it's wet --
13      Q.  Uh-huh.
14      A.  -- they do the actual, either
15  themselves or they now have, if it's a certain
16  size piece of property, that can be done by
17  contract and verified by these folks, but
18  they're responsible for jurisdictional
19  determinations and the need for an actual
20  Department of the Army permit.
21      They also -- and when you say
22  enforcement, if there is a violation out there,
23  you know, you're doing something on property
24  and your neighbor says, wait a minute, I don't
25  think you have a permit for that, or you're

---

Page 89

1   destroying these wetlands, they're the ones who
2   actually will go out and issue a cease and
3   desist order.  From that standpoint.
4       Q.  All right.  Then we move to Page 12
5   which breaks down all of these op manager
6   branches, for lack of a better word -- I think
7   we called them branches.
8       A.  Well, actually, they're just --
9   they're not really.  The ops manager positions
10  are not branches.  We don't refer to them as
11  branches.
12      Q.  We'll just call them op managers.
13      A.  Just ops managers.
14      Q.  Okay.  All right.  And so we're
15  interested, today, in the Industrial Canal and
16  the MRGO and the levees.
17      A.  Okay.
18      Q.  So who is the person who would be the
19  open manager in connection with the -- gulf
20  outlet, we have already established that,
21  that's got its own manager.
22      A.  Yes.
23      Q.  All right.  How about the, um -- Inner
24  Harbor Navigation Canal?
25      A.  Inner Harbor Navigation Canal, the

---

JOHNS PENDLETON COURT REPORTERS              800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 90

1   navigation portion of that is going to be the
2   GIWW manager, who is --
3       Q.  That's on Page 13.
4       A.  On Page 13, yes.
5       Q.  Now, you said the navigation side.  So
6   that do I gather from that that the levees on
7   either side of the Industrial Canal -- short
8   version of the IHNC -- would fall within a
9   different -- under a different op manager?
10      A.  That was overseen by Completed Works.
11      Q.  Okay.  Okay, fine.  So the only thing
12  that the Intracoastal manager would concern his
13  or herself with would be the navigation
14  component, which would include the locks, so --
15      A.  Dredging of the channel.
16      Q.  -- concerned about the dredging of the
17  channel, making it accessible to vessels, et
18  cetera.
19      A.  That's correct.
20      Q.  All right.  Would he have anything --
21  or she have anything to do with permits to do
22  work on water in that channel?
23      A.  The manager?
24      Q.  Yes.
25      A.  Yes.  Because, you know, there is an

Page 91

1   impact of what's being done to the channel,
2   within the channel, and if there was a
3   permit -- thirty-party permit, per se, that
4   came in, that manager would have an
5   opportunity, if it was on the flood side of the
6   floodwall or the levee --
7       Q.  Right.
8       A.  -- they would have an opportunity to
9   the say, wait a minute, this is going to impact
10  navigation in this reach.  So they would look
11  at that request, as well.
12      Q.  Who would tell them?
13      A.  Generally, that would be the Completed
14  Works manager.  We'd see that, that it's in
15  that channel, and we would say, hey, look, you
16  know you need to take look at this and tell us.
17         If it was going through regulatory,
18  because if it's a regulatory permit, as well,
19  regulatory generally has the lead on that.  So
20  they would either send it to Completed Works,
21  Completed Works would then tell that
22  individual, look, you got to also send it to
23  GIWW.
24      Q.  All right.  And if it's within that
25  300 feet of the center line of the levee, it

Page 92

1   goes to ops?
2       A.  Uh-huh.
3       Q.  I'm sorry, Completed Works, and then
4   you would decide if you wanted to bring in your
5   navigation folks or anybody else.
6       A.  Right.  But again, if it's in the
7   water, it would start in regulatory and then
8   come through Completed Works.  Because the
9   reason for that is, if you're going to have a
10  regulatory permit, a Department of the Army
11  permit, we want that permit to be reviewed
12  initially, first.  We wouldn't want to say,
13  look, it has no impacts on the levee and,
14  therefore, we send a letter to the levee
15  district, they issue a permit, that applicant
16  says, hey, I got my permit, I got a letter from
17  the Corps --
18      Q.  Got you.
19      A.  -- and then navigation wise we're
20  going to object to it.
21      Q.  All right.
22      A.  It wouldn't be smart.
23      Q.  All right.  So I think I'm hearing you
24  tell me that because the River and Harbors Act
25  of 1899, which is work on water permit --

Page 93

1       A.  Right.
2       Q.  -- statute, right?
3       A.  Whatever year.  I'm not sure on the
4   year.  But, yeah, you probably are -- I know
5   it's the River and Harbor Act, yes.
6       Q.  So navigation is first, we make
7   sure -- and because there's a permit required
8   way virtue of statute, that's the first level,
9   the second level is because it may impact my
10  levees I want to make certain that it's not
11  going to impact my levees.
12      A.  Correct.
13      Q.  Okay.  And because the levees fall
14  within your jurisdiction, that's your baby.
15      A.  Uh-huh.
16      Q.  Okay.  And as a completed works.
17         Now, just again, curiosity if nothing
18  else, why Completed Works as opposed to -- I
19  mean, did Completed Works encompass more than
20  just levees?  I mean, you've got like these
21  project descriptors like the Intracoastal
22  Waterway, you've got the Atchafalaya, you've
23  got the MRGO --
24      A.  Well, from Completed Works, in this
25  sense, it's the flood control projects.  Those

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                        April 2, 2008

Page 94

1   others are navigation projects, with the
2   exception of the Old River because it's a water
3   distribution type of project. So, you know,
4   Completed Works handles -- well, we had almost
5   thirteen miles of federal levees, MR&T and
6   hurricane protection. So we oversee that in
7   Completed Works.
8      Q. All right. Can I conclude that all
9   flood control structures fall within the ambit
10  of the Completed Works op manager?
11     A. Federally authorized structures, yes.
12     Q. Okay. Now, let me ask you this: We
13  know that flood control structures are
14  different from all of the other projects that
15  you guys have the responsibility to monitor in
16  that flood control requires that the local
17  sponsor put up 30 percent of the money to build
18  it.
19     A. Right. Cost sharing, yes.
20     Q. There's a cost sharing there. And
21  there is no cost sharing for any other of those
22  projects, right?
23     A. Well, the MR&T project is 100 percent
24  federal.
25     Q. Right.

Page 95

1      A. But the hurricane protection projects,
2   under separate authorization, those are cost
3   shared.
4      Q. That's right.
5      A. Construction, yes.
6      Q. And I think we're saying the same
7   thing.
8      A. From a construction standpoint, yes.
9      Q. I want to get this record just as
10  clear as we can possibly get it. And I don't
11  know if I do it -- from which approach we take
12  it, but the Completed Works, the flood control
13  projects -- the Completed Works cover only
14  flood control projects, right?
15     A. (Nods affirmatively.)
16     Q. So you're dealing with something a
17  little bit different than everybody else who's
18  a manager deals with.
19     A. Those other ops managers?
20     Q. Yeah.
21     A. Yes.
22     Q. You got to deal with the local
23  sponsor, right?
24     A. Yes.
25     Q. And because you got to deal with the

Page 96

1   local sponsor, you also have an issue about
2   getting either some consent or some resolution
3   to the money issue because the government is
4   only going to pay 70 percent.
5          MR. BAEZA:
6             Object to vagueness.
7   EXAMINATION BY MR. BRUNO:
8      Q. Right?
9      A. Well, when you're talking about that
10  cost share, you're talking about construction
11  cost.
12     Q. Not maintenance?
13     A. No, not maintenance. Maintenance --
14  once a hurricane project -- authorized
15  hurricane project is fully constructed,
16  completed, it's 100 percent operation
17  maintenance cost to the sponsor.
18     Q. Okay. I guess I got sideways because
19  in the documents that I've read I came across a
20  bunch of documents which described, how shall I
21  say, a dialogue within the Corps about who
22  should pay for foreshore protection in the
23  MRGO.
24     A. That would have been with the ops
25  manager for the MRGO.

Page 97

1          MR. LAMBERT:
2             Navigation.
3          THE WITNESS:
4             Navigation wise.
5   EXAMINATION BY MR. BRUNO:
6      Q. Wait. The dialogue that I saw was a
7   dialogue which discussed whether or not the
8   flood control project should pick up the costs
9   or the MRGO should pick up the costs, and the
10  local interest said, no, no, no, we don't want
11  to pay our 30 percent for the foreshore
12  protection because the need for foreshore
13  protection comes from the wakes of vessels.
14  And so I'm just -- I know that you don't have
15  these documents in front of you, but I'm just
16  trying to generally sort of understand, is
17  foreshore protection not a maintenance issue?
18         MR. BAEZA:
19            Object to vagueness and
20            ambiguity.
21     A. In terms of along the MRGO, I've heard
22  discussion as to whether or not it would have
23  an impacts on the levees.
24     Q. Right.
25     A. And I think that's where any

JOHNS PENDLETON COURT REPORTERS          800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

1    discussion may have come in, is do we need to
2    put rock along that bank to protect the levee,
3    whereas generally the rock is there for the
4    channel purposes.
5        Q.  Right.
6        A.  Again, that would have been -- that
7    type of discussion would have been generated
8    through the project manager from PPPMD, not
9    through operations.  We may have had some input
10   or discussions on it, but generally it would go
11   back to the construction manager to say will
12   this have an impact on the design of that
13   levee?
14       Q.  Can I conclude, then, from what you've
15   told me that the shore protection is a capital
16   improvement and not a maintenance issue?
17       MR. BAEZA:
18           Object the vagueness.
19       A.  I'm not sure what you're saying.
20   EXAMINATION BY MR. BRUNO:
21       Q.  Because you said it went back to
22   planning, which meant those are the guys that
23   build it, and if it's the building component or
24   the building side of the discussion -- let's
25   back off.

1            You build a house.  You can decide to
2    add a room to it or not.  That's a capital
3    improvement.
4        A.  Okay.
5        Q.  You got a hole in the roof.  That's a
6    maintenance issue.  I got to fix the roof.
7    Right?  I got the cut the grass.  I got to
8    paint the house.  Those are all maintenance
9    issues.
10           There's a distinction made between the
11   capital improvement to the project and the
12   maintenance of the project, right?
13       A.  Right.
14       Q.  Okay.  MRGO, we have already discussed
15   the fact that obviously dredging is a
16   maintenance issue.  Clear.  We'll get into the
17   levees in a moment.  What I'm trying to
18   understand, if you know, is whether or not the
19   foreshore protection is a maintenance or a
20   capital improvement.
21       A.  I don't know.
22       Q.  Okay.  Who should I ask?
23       A.  I would start with the ops manager for
24   that project.
25       Q.  MRGO.

1        A.  Which is MRGO project, yes.
2        MR. LAMBERT:
3            Who is that?
4        THE WITNESS:
5            At that time, it was Russo.
6    EXAMINATION BY MR. BRUNO:
7        Q.  We did that already.  He's just not
8    paying attention.
9            Now, next question:
10           All right.  You had alluded to the
11   fact that you had heard conversations about the
12   need for foreshore protection to protect the
13   levee.
14       A.  Uh-huh.
15       Q.  Can you remember when you first heard
16   those discussions?  And date wise -- I mean
17   time wise, and just generally, even if it's
18   within five years, ten years, twenty, it
19   doesn't matter.
20       A.  With certainty, I'd say no, but I
21   would guess it was within about the last five
22   years, I would say.
23       Q.  Okay.  All right.  Can you just tell
24   me what you heard.  I mean, I know that you
25   can't recount the details of the conversation,

1    but in a general sense what was the discussion?
2        MR. BAEZA:
3            Objection.  Hearsay.
4        A.  What I recall of it was will it have
5    an impact on the structural integrity of the
6    levee?
7    EXAMINATION BY MR. BRUNO:
8        Q.  It being what?
9        A.  It meaning the erosion along the bank.
10       Q.  I got you.  I got you.
11       A.  Because you don't have much area out
12   there.
13       Q.  Right.  So you can recall at least
14   having heard a conversation within this
15   institution, within this office, within this
16   building, about whether or not erosion on the
17   bank of the MRGO may impair the integrity of
18   the hurricane protection structure adjacent
19   thereto, right?
20       MR. BAEZA:
21           Objection.  Hearsay.
22       A.  Yes, there was -- you know, looked at
23   impacts.
24   EXAMINATION BY MR. BRUNO:
25       Q.  Okay.  Fair enough.

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 102

1        Now, to address counsel 's probably
2    interesting objection, who did you hear it
3    from?
4        MR. BAEZA:
5            I had to do it.
6        MR. BRUNO:
7            I don't blame you, man.
8        A.   I don't recall specifically, you know.
9    The manager -- the construction manager, if you
10   want to call it, from PPPMD at the time was Al
11   Naomi.  He would be more in tune with does it
12   have a direct impact because if that's the case
13   it goes back to construction, from a levee
14   standpoint.
15   EXAMINATION BY MR. BRUNO:
16       Q.   I'm sorry.  Say that again and slowly.
17   If it what?
18       A.   If it has an impact on the levee --
19       Q.   On the levee --
20       A.   -- then it moves from the navigation
21   side of things to a feature of the hurricane
22   project -- the hurricane project.  So then when
23   it moves back to a feature of the hurricane
24   project, it goes back to the project manager
25   for construction.

Page 103

1        Q.   All right.  Well, that gives me pause,
2    because wouldn't it be just like the discussion
3    that we had about the holes next to the
4    hurricane protection structure and the need for
5    an assessment; I mean, aren't those two the
6    same kind of things?
7        MR. BAEZA:
8            Objection.  Vague and ambiguous.
9        A.   I'm not sure what -- you know, what
10   you're quite asking in that respect.
11   EXAMINATION BY MR. BRUNO:
12       Q.   What I'm saying is this:  I thought we
13   learned today that within 300 feet -- if you're
14   doing work within 300 feet of a hurricane
15   protection structure, then engineering needs to
16   assess.  And the reason for the need for the
17   assessment is to ascertain whether or not the
18   work will damage or undermine the hurricane
19   protection structure.  Right?
20       A.   Correct.
21       Q.   Okay.  And that's an engineering
22   issue.  So now we have this situation where
23   we've got this channel whose bank is eroding
24   and the bank may impair the hurricane
25   protection structure.  So -- and you've told

Page 104

1    me, well, now, wait, when that happens we got
2    to go back to the project guy.  And I'm
3    thinking to myself, well, why wouldn't the
4    first person you talk to be the engineering
5    guys to sort of understand the process of
6    what's going on and how from an engineering
7    perspective how this erosion business may
8    impact the hurricane protection structure?
9        MR. BAEZA:
10           Objection.  Compound question.
11           Vague and ambiguous.
12       MR. BRUNO:
13           I pride myself on trying to
14           elicit the most number of objections
15           per question as I possibly can.  My
16           record is about five.
17           (Off the record.)
18       A.   I guess, and I'm not certain of the
19   answer, but what you've got is you've got a
20   federal navigation project that has a potential
21   to affect or impact a federal flood control
22   hurricane protection project.  So those two
23   managers need to get together and, you know,
24   then they get engineering involved and say,
25   okay, what's actually happening here?  So the

Page 105

1    technical evaluation comes from engineering.
2    EXAMINATION BY MR. BRUNO:
3        Q.   Right.  Okay.
4        A.   But the managers that are in control
5    of the projects are saying, okay, is it yours
6    or is it mine?
7        Q.   Do you know how that issue was
8    resolved?
9        A.   I don't.  No, I don't.
10       Q.   How would you have resolved it?
11       A.   From a maintenance standpoint, you
12   know, if it's me as a manager saying is this
13   maintenance, I'm going to go to engineering and
14   say, how is this impacting it?  And, again,
15   based on that engineering judgment, you know,
16   you go from there.
17       Q.   Right.
18       A.   Um -- you know, it's what's the actual
19   cause?  Is it the primary cause or is it the
20   secondary cause?
21       Q.   Now, as a matter of fact, because on
22   the completed project side you have the need
23   for a 30 percent contribution from the local
24   sponsor -- okay -- on the one hand, and on the
25   other hand if it's a navigation project it's

                                27 (Pages 102 to 105)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 106

1  100 percent federal --
2      A.  That's right.
3      Q.  -- would you at least agree with me
4  that there is -- if somebody -- if -- and this
5  is a big if, big capital I, big capital F -- if
6  somebody was interested only in the money,
7  there would be a motivation to try to turn it
8  into a flood control issue as opposed to a
9  navigation issue because you get 30 percent of
10 the money from somebody else.
11         MR. BAEZA:
12            Objection.  Calls for speculation
13         and argumentative.
14     A.  Yeah.  I mean, you know, I wouldn't
15 know how to answer that being that I'm not on
16 that side.  But --
17 EXAMINATION BY MR. BRUNO:
18     Q.  Well, just as a matter of human
19 nature, I mean, if I'm asking Mr. Anzelmo over
20 there to come up with 30 percent of a hundred
21 bucks, he might not be too happy.  Wouldn't
22 you, agree?
23     A.  I would say he probably wouldn't.
24     Q.  Wouldn't be happy.  He'd say, no, no,
25 no.  I'm not putting up my thirty bucks, your

Page 107

1  navigation project is making the waves, you pay
2  the hundred bucks.  Right?  I mean, that's just
3  logical.
4      A.  It's logical.
5      Q.  Okay.  Now, my learned co-counsel
6  asked me to confirm that if there was no MRGO,
7  there would be no wave wash and, therefore, no
8  erosion.  Isn't that true?
9          MR. BAEZA:
10            Objection.  Calls for speculation
11         and improper lay opinion.
12         MR. BRUNO:
13            Give me a break.
14         MR. BAEZA:
15            You want four more?
16         MR. BRUNO:
17            As long as it counts on his
18         record, not mine.
19     A.  You know, I mean, if there was no
20 waterway right there, then I would think a
21 reasonable person would say, no, it wouldn't
22 be, but you have Lake Borgne, you know, that's
23 over there that could have a potential impact
24 as well, so.
25 EXAMINATION BY MR. BRUNO:

Page 108

1      Q.  All right.  I'm with you.
2      A.  I don't know.
3      Q.  Now let's, um -- let's go to your very
4  specific area and that is the levee
5  maintenance.  And we have the inspection side
6  of that, and then we have, to the extent there
7  is a need to do maintenance, I'll be asking you
8  about how that happens and who pays for it.
9      A.  All right.
10     Q.  Now, first, all of -- I'm sorry.
11 Let's start with this:  Completed projects.  I
12 note the use of the adjective completed.  So
13 let's start with completed.  What does that
14 mean?
15     A.  Okay.  You have completed contracts,
16 you know, which is essentially, the way
17 hurricane protection projects have historically
18 been built, because you're generally in marshy
19 types of areas, not the best of foundations,
20 you build them in lifts, meaning, you know, you
21 put material out there, you leave it out there
22 for some time period, in the older days, before
23 some of the newer technology, it was generally
24 considered about a five-year type of time
25 period, to allow for that material to settle.

Page 109

1      Q.  Right.
2      A.  Then you'd come in with another
3  contract on a second lift, and you'd build up
4  on that and then you'd allow that to settle.
5      Q.  Right.
6      A.  Then, generally speaking, you would
7  have a third lift, which is usually the final
8  lift, in most cases.  You would -- by that time
9  you had a lot of compaction, you're now putting
10 the topping on, per se.  And you would build --
11 and you would generally build over and above
12 the design grade of what you're trying to
13 achieve.  That way, if you do have any
14 settlement over that last period, it should be
15 minimal and you should end up with something
16 around the authorized grade that you wanted to
17 build to.  At that point, you'd have a
18 completed project of that feature.
19     Q.  All right.  Wait.  Now, I know --
20     A.  Or I should say a completed project or
21 useful unit of the overall project.
22     Q.  All right.  Now -- but you're saying
23 completed project, and I need to kind of
24 explore that with you a tad more.
25         You've done -- you've said that

28 (Pages 106 to 109)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                      April 2, 2008

Page 110

1    because of the nature of building the hurricane
2    protection structure you do it in stages, and
3    you refer to an example where you have three
4    stages, three lifts.
5         A.   Uh-huh.
6         Q.   Is that for all levees?
7         A.   Well, it varies.  No, you know,
8    because like I said, it depends on the
9    conditions.  You might have -- you might be
10   able to accomplish the same thing with two
11   lifts --
12        Q.   Understood.
13        A.   -- you know.
14        Q.   But what I'm driving at is -- and
15   there's two ways to look at it, I submit to
16   you.  One is, the planning guy says, okay, we
17   know we want to build this hurricane protection
18   structure, and what we're going to build is
19   we're going to put an earthen embankment and
20   wore going to make it so high.  Right?
21        A.   Correct.
22        Q.   That's the whole standard project
23   hurricane business, et cetera.  Now, so, I can
24   envision where the planning guy says, we can
25   accomplish that in three lifts, four lifts,

Page 111

1    whatever, and so at the end of the four lifts
2    one might conclude that it was completed.
3         A.   That's correct.
4         Q.   The other view would be -- now, wait a
5    minute, the goal was to create a hurricane
6    protection structure of a certain height.  And
7    so the other way to look at it might be, and I
8    don't know the answer, whether or not you built
9    to the height that you thought you were going
10   the build to.
11             What I'd like to know is, from the
12   Corps' perspective, which of the two represents
13   a completed work, is it the completion of the
14   plan that was put in place to get to the
15   height, or is it the fact that you've got your
16   earthen mound to the height that you wanted it
17   to be?
18             MR. BAEZA:
19                  Before he answers I'm going to
20             object on vagueness grounds, and also
21             your characterization as the Corps'
22             position.  This isn't a 30(b)(6), this
23             is it just from his personal
24             knowledge.
25   EXAMINATION BY MR. BRUNO:

Page 112

1         Q.   Okay.  Your understanding of
2    completed -- how about this?  You're the
3    completed guy, so I'm imagining that it falls
4    within your jurisdiction after it's completed.
5    And I put that in quotes.  Right?
6         A.   Right.
7         Q.   So if it's not completed, it's not
8    within your jurisdiction.
9         A.   No, it's still in that --
10        Q.   Somebody else.
11        A.   That's correct.  PPP.
12        Q.   All right.  So I'm not asking you from
13   the Corps, but I'm asking you as the manager of
14   completed works.  Okay?  When does it fall
15   within your jurisdiction?  Is there a piece of
16   paper, is there a telephone call, is there an
17   E-mail?  How -- what is the indicator to you
18   that it's completed?
19        A.   When engineering division and that
20   project manager in PPPMD tell us that there's
21   no additional work scheduled for this project,
22   or this piece of the project, that it's to
23   elevation and section, so it's not just in
24   elevation it's the section of the rest of the
25   levee, you know, the slopes and the berms and

Page 113

1    anything else, so there is an no additional
2    construction scheduled for that piece of the
3    project.
4         Q.   All right.
5         A.   That's when it was considered
6    completed useful unit thereof.
7             (Brief interruption.)
8    EXAMINATION BY MR. BRUNO:
9         Q.   Okay.  Do you get a piece of paper
10   when those things occur?  In other words, what
11   you just told me was engineering, project guy
12   says no more work is expected, how is that
13   information conveyed to the op manager of
14   Completed Works?
15        A.   I don't recall getting a piece of
16   paper.  It was just verbal, you know, there is
17   no more work.  It was on the schedules, you
18   know, that they would have, this was it, that
19   was the third lift, it's been finished, that
20   contract is complete.  We do get a piece of
21   paper, you know, that says the contract of the
22   third lift is complete --
23        Q.   All right.
24        A.   -- and it may have had something in
25   there that there's no additional work on it.

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 114

1  I'd have to -- I don't know if there was or
2  not.
3      Q.  Now, we're going back now to my
4  earlier question, which was is it when the
5  scheduled work is completed or whether you got
6  to your design height?  We know in fact that
7  the hurricane protection structure at the MRGO
8  between Bayou La Loutre and Bayou Bienvenue had
9  been completed if one uses the notion no more
10  work planned.  But we also know that it never
11  reached its design height.  So -- and is that
12  true?  Do you know that to be fact?  Or am I
13  just making that up --
14     A.  Well, you know, in terms of what we
15  had, that project was above what was believed
16  to be its design height.  So it was done --
17  actually, you know, when it was completed, that
18  final lift completed, it's above the authorized
19  design height because you're allowing for that
20  little bit of last settlement that's in there.
21     Q.  All right.  So here's the question:
22  Do you know whether or not the hurricane
23  protection structure along MRGO between Bayou
24  La Loutre and Bayou Bienvenue ever moved to the
25  jurisdiction of the manager of completed works?

Page 115

1      A.  Yes.
2      Q.  It did.
3      A.  Uh-huh.
4      Q.  Okay.
5      A.  I mean, so in the sense of, you know,
6  was everything -- I'd have to verify if every
7  little piece that was called the Chalmette Loop
8  was all of it, but, you know, the piece in
9  there, if I recall correctly it was.
10     Q.  All right.  And what did that occur?
11     A.  Offhand, I don't know.  I'd say
12  eighties or early nineties, somewhere in there
13  most likely.
14     Q.  Okay.  Good.  Let's talk about the
15  levees at the outfall canals.  Well, let's call
16  them -- I don't know what we call them.  Let's
17  call them hurricane protection structures at
18  the outfall canals in New Orleans.
19         Did those fall within the jurisdiction
20  of the op manager for completed works?
21     A.  Yes.
22     Q.  That includes the 17th Street Canal
23  and London.
24     A.  Orleans and London.  Uh-huh.
25     Q.  And finally, let's talk about the

Page 116

1  hurricane protection structures along the
2  Industrial Canal.  Did that ever fall within
3  the jurisdiction of the op manager for
4  Completed Works?
5      A.  Yes.
6      Q.  Okay.  All right.
7         MR. BRUNO:
8             This is probably a good time to
9         break, if you don't mind, so we can
10        run to court, rather than get heavy
11        into something and break.
12        (Off the record.)
13  EXAMINATION BY MR. BRUNO:
14     Q.  Thanks for allowing us the little
15  break.
16        All right.  We were talking about --
17  let's go to Page 12 again so we can see where
18  we were.  We were talking about the operations
19  manager for completed works.
20     A.  Okay.
21     Q.  How long have you been associated with
22  that section?
23     A.  Well, for this last period of time
24  was, let's see, um -- December of '04 to my
25  promotion in October of '06.  '06, yeah.

Page 117

1         Right.  Now, that operation of
2  completed works is actually what I started in
3  when I was a student.  It was under a different
4  name and title and such.
5      Q.  Right.
6      A.  So, and then when I was in readiness
7  branch, when I was the chief of readiness
8  branch, that function, prior to it becoming an
9  operation manager 's position, was actually a
10  section within readiness branch.
11     Q.  All right.
12     A.  So I've been associated with it for
13  many years.
14     Q.  And now you're the supervisory chief
15  engineer of the entire operations division.
16     A.  Assistant chief.
17     Q.  Assistant chief.  So you report to --
18     A.  Chris Accardo.  To the chief.
19     Q.  To the chief of operations.
20     A.  Yes.
21     Q.  Okay.  All right.  Now, you were
22  associated with the Completed Works program it
23  looks like eight years, back in '77 to '85.
24     A.  Yes.
25     Q.  All right.  Now, I know that there may

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                      April 2, 2008

Page 118

1   be some small variances in the way business was
2   conducted in that group, or section that is,
3   the completed works section, but very
4   generally, the way that that group did business
5   in '77 --
6       A.  Uh-huh.
7       Q.  -- the same as it does business today?
8       A.  And consistent.  Pretty close, yeah.
9       Q.  Pretty close.
10      A.  It's very close.
11      Q.  Because I'm about to ask you questions
12  about the inspection of levees and such, and
13  I'm trying to avoid, you know, asking you for
14  each year.
15      A.  Right.
16      Q.  When I ask you questions about levee
17  inspection, will the answers be the same if I
18  were to ask you about levee inspection in '77,
19  and for each subsequent year up until today,
20  the answers will be the same?
21      MR. BAEZA:
22          Objection.  Vagueness.
23      A.  Pretty much, you know.
24  EXAMINATION BY MR. BRUNO:
25      Q.  Pretty much.  Maybe there's a

Page 119

1   nuance --
2       A.  Post Hurricane Katrina, we changed
3   slightly in terms of going a lot slower on an
4   inspection.
5       Q.  Well, I can understand why, but --
6       A.  And then --
7       Q.  I'll keep it to pre.  I'm really only
8   focused on pre.  All right?
9       A.  Okay.
10      Q.  So generally, would it be true that
11  pre-Katrina the inspections -- I mean, I know
12  they're not exactly the same every year, but
13  generally, the way inspections were conducted
14  were the same from '77 until Katrina.
15      A.  Yes.
16      Q.  Okay.  Now, we're interested in -- how
17  many miles of levee, and I guess I'm
18  necessarily limiting the question to hurricane
19  protection structures, was the manager of
20  Completed Works responsible to inspect -- and
21  we're talking about from '77 until Katrina.
22      MR. BAEZA:
23          Are we talking about the LPV?
24      MR. BRUNO:
25          He's got to answer that.  I don't

Page 120

1       know.
2       A.  Well, you got five different hurricane
3   protection projects.  It's a total of about
4   325 miles.
5   EXAMINATION BY MR. BRUNO:
6       Q.  All right.  Well, in order to satisfy
7   counsel 's objection, I candidly thought we had
8   established these facts but we can just do it
9   again very briefly.
10          I thought that I had asked you before
11  the lunch break whether or not the hurricane
12  protection structures built on the outfall
13  canals were considered to have been completed.
14      A.  Uh-huh.  The flood walls.
15      Q.  Correct.
16      A.  Uh-huh.
17      Q.  All right.  And I also thought I asked
18  you if the hurricane protection structures on
19  the Industrial Canal or the IHNC were
20  completed.
21      A.  Correct.
22      Q.  And you said yes.
23      A.  Yes.
24      Q.  And I also asked you if the hurricane
25  protection structures on the MRGO had been

Page 121

1   completed, and you said yes.
2       A.  Yes.
3       Q.  And perhaps in fairness to counsel,
4   because I'm asking about '77, we need to ask
5   the question one more time in terms of when
6   these things were considered to be completed.
7   Okay?  And I don't know if you can answer that,
8   but we'll try.
9           We'll go back to 1977.  And we know --
10  we know that in 1977 the hurricane protection
11  structure on the 17th Street Canal was not
12  completed.
13      A.  Right.  It wasn't there.
14      Q.  It wasn't there.  We also know that
15  the hurricane protection structure on Orleans
16  was not there.  Right?
17      A.  Yes.
18      Q.  And we know that in 1977 the hurricane
19  protection structure on London wasn't there.
20      A.  Correct.
21      Q.  All right.  We also know that on the
22  MRGO, the second or third lift, I forgot which
23  one, wasn't finished in '77.
24      A.  That's correct.
25      Q.  Okay.  And the IHNC, and I will

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                          April 2, 2008

Page 122

1    confess that I don't remember the dates, was
2    that finished in '77?
3       A.  I'm not certain on that.  But it could
4    have been, because that work was started
5    prior -- it was in the original project, you
6    know, as far as the IHNC.  The outfall canals
7    were later added.
8       Q.  Right.  That was in about --
9       A.  In the early nineties.
10      Q.  -- '91, '92, somewhere in there?
11      A.  Or early nineties, that's correct.
12      Q.  Okay.  So walking through those three,
13   again, we know that the MRGO third lift was
14   about, and very about, eighties, somewhere in
15   there?
16      A.  I'd say eighties, maybe early
17   nineties.  I mean, remember, it's being built
18   in pieces, too.
19      Q.  Right.
20      A.  Reaches as they go.
21      Q.  Okay.  And I guess I neglected to ask
22   you about the Citrus back levee in New Orleans
23   East.  Was that finished?
24      A.  I'm not certain whether it was
25   finished, you know, if it was totally complete.

Page 123

1    Again, keep in mind that the way these things
2    are built, you might have twenty miles but
3    their contract is only four miles.  So you
4    might have separate -- so a contract might be
5    complete, and a piece of that may be totally
6    complete and the other piece next to it is not.
7       Q.  All right.  But in order for me to
8    attempt, as I always try to do, to simplify if
9    I can for the record, we can agree that at the
10   point in time when the work was completed,
11   um -- the particular levee or hurricane
12   protection structure became the responsibility
13   of the operations manager, right?  You've told
14   me that already.
15      A.  That's correct.
16      Q.  And we've also established, I think,
17   that the particular methods utilized by the
18   operations managers for inspection were
19   generally the same throughout this whole period
20   of time.
21      A.  That's correct.
22      Q.  All right.  So in terms of any concern
23   that one might have about a particular
24   hurricane protection structure being completed
25   or not, it's simply a matter of when that

Page 124

1    hurricane protection structure went into the
2    jurisdiction of the operations manager, and at
3    that point in time it went into the inspection
4    cycle, if you will.  Right?
5          MR. BAEZA:
6             Objection.  Vague and ambiguous.
7       A.  Right.  Actually, the operations
8    manager, even during the early lifts, like when
9    a contract is complete, the operations manager
10   is the one who wrote the completion notice of
11   that contract to the Levee District.  Because
12   the operation manager was the liaison between
13   the levee district, or the sponsor, and the
14   Corps.
15   EXAMINATION BY MR. BRUNO:
16      Q.  Okay.
17      A.  And so we were aware of what's being
18   done throughout.
19      Q.  Well, but when you say that, you don't
20   mean to suggest -- I mean, like, for example,
21   we've already established that the hurricane
22   protection structures on the MRGO involved at
23   least three lifts over a span of time that's at
24   least fifteen years.  Right?
25      A.  Correct.

Page 125

1       Q.  All right.  You're not suggesting that
2    the operations manager had jurisdiction for
3    inspection between the first and second lift,
4    or are you telling me that?
5       A.  Actually, we would occasionally go
6    past those sections if you had something more
7    than a first lift.  Actually, we did pass some
8    of those sections, yes --
9       Q.  Okay.
10      A.  -- when we did -- and those
11   inspections, those are joint agency inspections
12   because they are being maintained by the
13   sponsor during those interim periods.  So.
14      Q.  They are?  I frankly was given to
15   understand that they were not required to be
16   maintained by the local sponsor until such time
17   as they were actually completed and transferred
18   to the local sponsor by some act, by some
19   writing or something.
20         MR. BAEZA:
21            Objection.  Is that even a
22            question?
23   EXAMINATION BY MR. BRUNO:
24      Q.  Comma, is that true?
25      A.  In essence, historically, all levees,

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 126

1   once that first contract was built, you know,
2   the sponsor agrees -- prior to its
3   construction -- any part of that project
4   construction beginning, the sponsor agrees to
5   operate and maintain, as well as all the lands,
6   easements, rights of way, et cetera, et cetera.
7   When that very first contract is completed, the
8   construction contract, first lift, we wrote the
9   letter saying it's completed, you know,
10  maintain throughout.
11     Q.  All right.
12     A.  And they've done that.
13     Q.  Okay.  I know you're not a contracts
14  guy, but since we're talking about the
15  responsibilities as you perceive them to be of
16  the local sponsor, let me ask you if you're
17  familiar with an act of assurance.
18     A.  Yes.
19     Q.  What is it?
20     A.  Basically, it's a cooperation
21  agreement between the sponsor and the Corps,
22  and that's where they have their -- we used to
23  call them the ABCs, you know, you'll agree to
24  operate and maintain, you'll agree to lands,
25  easements, rights-of-way, relocations,

Page 127

1   disposals, et cetera, et cetera, and to hold
2   harmless the Corps.  That was the basics of the
3   acts of assurance.
4      Q.  Now, the hold harmless, as you
5   appreciate it, was it to hold the Corps
6   harmless during the construction of a
7   particular component of the hurricane
8   protection structure, or is it a hold harmless
9   in perpetuity?
10        MR. BAEZA:
11           Objection.  Calls for a legal
12        conclusion.
13     A.  I was going to say, that's one for the
14  lawyers.
15  EXAMINATION BY MR. BRUNO:
16     Q.  All right.
17     A.  I really don't know how they interpret
18  that.
19     Q.  All right.  So let's talk about this
20  inspection.  Now, you've already told us that
21  at least as of Katrina there's about 325 miles
22  of hurricane protection structures that were
23  within the responsibility of the operations
24  manager for Completed Works.  Right?
25     A.  That's correct.

Page 128

1      Q.  Okay.  And we have already, in
2   general, learned that there was at least some
3   inspection obligation by the Corps.  Right?
4      A.  Correct.
5      Q.  Okay.  All right.  Now, the inspection
6   itself, was that done more than once a year?
7      A.  Okay.  We had an annual compliance --
8   an O&M annual compliance inspection.
9      Q.  Oh.  I'm sorry.  Whenever you give
10  me --
11     A.  Operations and maintenance --
12     Q.  Whenever you give me those acronyms,
13  please let me catch up to you.
14     A.  Okay.  Operation and maintenance, O&M
15  compliance, that's to ensure those joint
16  agencies, the primary agencies being the Corps
17  of Engineers, the sponsor and DOTD -- state
18  DOTD, on occasion we had other stakeholders
19  such as the Port of New Orleans make some of
20  these, the city emergency management folks may
21  come along, but the three primaries that deal
22  with the system, the levee system, are the
23  sponsor, DOTD and the Corps.  DOTD acts similar
24  to the Corps; as we are a federal advisor, DOTD
25  is a state advisor, engineering type advisor to

Page 129

1   the sponsor.
2         Okay.  It's a drive-by visual
3   inspection, and the purpose of that is to
4   ensure that that sponsor is making appropriate
5   efforts to maintain those structures,
6   structures being levees or flood walls.
7      Q.  All right.  Forgive me.  Let me stop
8   you because I want to make sure I didn't lose
9   this thread.  My first question was whether or
10  not it was done more than once a year.  And I
11  don't know that in my own brain I understood
12  that there was an answer.
13        We know that it was at least once a
14  year; right?
15     A.  Correct.
16     Q.  So what I'm trying to figure out is,
17  was this more than once a year for a particular
18  mile of hurricane protection structure?
19     A.  The way we did inspections -- and the
20  answer to that, it's complex, it's not really a
21  yes or no answer --
22     Q.  All right.  That's fair.
23     A.  -- because there is one annual
24  compliance inspection.  That's joint agency.
25  The levee district or the sponsor is out there

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 130

1   year-round cutting the grass and such, you
2   know, they have maintenance folks, they have
3   their police departments and such, so in
4   essence there's inspection. Whether it's
5   informal or not, there's inspections going on
6   throughout the year.
7        If there's a particular area of
8   concern, say they're cutting the grass in a
9   particular region and all of a sudden they say,
10  wait a minute, there's a levee slide, or
11  there's this hole out there that wasn't there
12  before, then a specific inspection -- site
13  inspection would then take place with the three
14  agencies.
15      Q.  Okay.  All right.
16      A.  So --
17      Q.  So one -- all right.  But I think I
18  understand you.  Let me see if I can articulate
19  it.  Which is always a test of my degree of
20  understanding.
21      On an annual basis, at a minimum of
22  once per year, the Corps undertook an
23  inspection of the hurricane protection
24  structures.  Right?
25      A.  Correct.  And it may not have

Page 131

1   covered -- and like I say, it's a compliance,
2   so we're just trying to get a general idea.
3       Q.  Let me slow you down because -- I'm
4   going let you.  I'm like Hemmingway, you know,
5   A, B, C.  Number one, let me just get the
6   frequency.  And then we'll talk about the
7   scope.
8       A.  All right.
9       Q.  So it's once a year.
10      A.  Yes.
11      Q.  Okay.  And it's all 325 miles.
12      A.  Uh-huh.
13      Q.  All right.  Now -- and it's
14  mandatory.
15      A.  It's required in terms of saying
16  suggested in the Code of Federal Regulations,
17  you know, they're saying you should do it at
18  least once a year.  It's mandatory, in essence,
19  for the sponsor because that's where the Code
20  of Federal Regulations spells out the
21  obligations of the sponsor.  But it suggests
22  that the Corps attend these, which we do.  And
23  we've always --
24      Q.  Okay.
25      A.  Which was always done.

Page 132

1       Q.  Do you happen to know, and trust me,
2   it's okay if you don't, the regulation number?
3       A.  That we use?
4       Q.  Well, that suggests that the sponsor
5   is required to do this once a year and that you
6   should attend.
7       A.  33 CFR 208.10.
8       Q.  Okay.
9       A.  That's the one.  That spells out your
10  O&M basic requirements.
11      Q.  Okay.  Now, again, before we get too
12  far along, let me just get this established:
13  This inspection that is required by 33 CFR
14  208.10 by the sponsor, is there some kind of a
15  paper trail or some documentation that is
16  required to demonstrate that it took place?
17      A.  The answer to that, pre-Katrina, was
18  no, we didn't maintain those types of
19  documents.  In the Code of Federal Regulations
20  they suggest that at least quarterly -- that
21  the sponsor inspects at least quarterly, and
22  then prior to -- as it states, prior to the
23  flood season, which we have always interpreted
24  either flood or hurricane if it's a hurricane
25  levee, because it's general, because it applies

Page 133

1   to the entire country.  But since we have
2   hurricanes we do that annual compliance prior
3   to the hurricane season --
4       Q.  Which is?
5       A.  -- for those.
6       Q.  June?
7       A.  June 1st.
8       Q.  June 1st.
9       A.  We try to do those in May -- well,
10  April-May time frame.  And then the MR&T,
11  riverine flooding is more of a springtime, so
12  we want to do that in the fall when the river
13  is low.
14      Q.  Okay.  Well, the riverine stuff is
15  done by the op manager for --
16      A.  Nope.  That's the same one.  Same guy.
17      Q.  It's done by the Completed Works guy?
18      A.  Uh-huh.
19      Q.  Okay.
20      A.  Yep.
21      Q.  Well, then, I'll have to re-cover that
22  ground then.  I'm very confused.  I thought
23  that you told me that each of the op managers
24  had an obligation to inspect their own --
25      A.  That's right.

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

---

Page 134

1    Q.  -- projects.
2    A.  Correct.
3    Q.  They do.
4    A.  And the MR&T flood control project
5  comes under the ops manager of Completed Works.
6  The river navigation project comes under
7  Mississippi River Baton Rouge to the Gulf.
8    Q.  MR&T.
9    A.  MR&T.
10   Q.  Is, um --
11   A.  Mississippi River and Tributaries.
12   Q.  Okay.  Again, I thought I asked you --
13  and maybe I didn't ask it -- I didn't finish
14  the analysis.  We did establish that the op
15  manager was in charge of Completed Works, and
16  we did define Completed Works to be all of the
17  hurricane protection structures.
18   A.  And --
19   Q.  -- and obviously --
20   A.  -- MR&T.
21   Q.  -- now we're learning that it includes
22  additional levees, and that is your MR&T, which
23  is --
24   A.  973 miles.
25   Q.  -- 973 miles, and that includes the

---

Page 135

1  Mississippi River Baton Rouge to the Gulf?
2    A.  No.
3    Q.  No?
4    A.  No.  Mississippi River Baton Rouge to
5  the Gulf is the navigation project, the river
6  and keeping the ships going down the river.
7    Q.  The MR&T are those little tributaries.
8    A.  The Atchafalaya Basin levees, the
9  floodway levees in the Atchafalaya Basin, all
10  the way down to Morgan City, Berwick, St. Mary
11  Parish.  Strictly levees.  Not navigation,
12  strictly levees.
13   Q.  And those are considered riverine.
14   A.  Yes.
15   Q.  Okay.  I see.  All right.
16   A.  They have an annual compliance
17  inspection --
18   Q.  For both.
19   A.  -- on those, right, as well.
20   Q.  All right.  And so we divide them up
21  between riverine and hurricane protection.
22       Now, I got a little bit confused when
23  you suggested that the regulation requires at
24  least quarterly.  Is it at least quarterly or
25  at least once?

---

Page 136

1    A.  It recommends -- no, it states
2  quarterly, however we never imposed that
3  pre-Katrina.
4    Q.  Okay.
5    A.  So it's a guide.  And the reason we
6  didn't impose that is because they're out there
7  year-round.
8    Q.  All right.
9    A.  And they're -- you know, so we're
10  watching, our folks that are doing construction
11  projects in the area, you know, so again it's
12  kind of informal inspections --
13   Q.  Okay.
14   A.  -- that are occurring.
15   Q.  And I know we want to go there, but I
16  need to satisfy myself that I've covered some
17  of the fundamentals.
18       All right.  So bottom line, with
19  regard to the regulation, insofar as it says at
20  least quarterly, you guys satisfied yourself
21  that that regulation was complied with by
22  virtue of the fact that you had knowledge that
23  the sponsor was in the field often enough to
24  allow you to conclude that the regulation was
25  complied with.  Right?

---

Page 137

1        MR. BAEZA:
2          Objection.  Ambiguous, calls for
3        a legal conclusion.  Perhaps it would
4        be better if we just had the
5        regulation in front of us.
6        MR. BRUNO:
7          I don't know if it would be
8        better.  I don't have a problem with
9        that.  If you like to do that, I don't
10       have a problem with it, but was what I
11       said accurate or inaccurate?
12   A.  Could you repeat it?
13  EXAMINATION BY MR. BRUNO:
14   Q.  Okay.  I thought you told us that the
15  regulation is a suggestion, and it suggests at
16  least four times a year, and you guys didn't
17  walk the 325 miles four times a year with the
18  local sponsor because you were satisfied that
19  they were out there in the field often enough
20  that you felt like doing it, walking with them,
21  once a year would satisfy the regulation.
22       Is that not true?
23       MR. BAEZA:
24          Objection.  Vague, ambiguous,
25        compound --

---

35 (Pages 134 to 137)

JOHNS PENDLETON COURT REPORTERS                800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 138

1    A.  Actually, we didn't walk.
2    EXAMINATION BY MR. BRUNO:
3    Q.  Drive.
4    A.  We drove.  It was a visual.
5    Q.  A drive-by.
6    A.  A visual drive-by.
7    Q.  But once a year versus four.
8    A.  Right.  But yet, like I said, we were
9    satisfied because of knowing what they're doing
10   and knowing that we're out there on other
11   occasions beyond that once a year type of
12   thing.
13   Q.  All right.  Did you have the authority
14   to demand that the local sponsor do this
15   inspection four times a year?
16       MR. BAEZA:
17           Objection.  Vague, ambiguous.
18   A.  I believe we could have, you know, if
19   we felt like that was necessary.
20   EXAMINATION BY MR. BRUNO:
21   Q.  Right.
22   A.  If we were going -- what I would say
23   see if we had suspicions that they were not
24   maintaining, or we had records that they were
25   neglecting their duties, which we didn't have

Page 139

1    that problem, but other districts have had
2    that, then I would say yes, we could go to that
3    regulation and say, you have to do this.
4    Q.  All right.  Now, again, just to nail
5    it down, the purpose of the involvement of the
6    United States Army Corps of Engineers is to
7    make certain that the local sponsor is in
8    compliance with the regulations, is that
9    correct?
10       MR. BAEZA:
11           Objection.  Vague and ambiguous.
12           He's speaking on his personal
13           knowledge, not the Corps of
14           Engineers'.
15   EXAMINATION BY MR. BRUNO:
16   Q.  Is that true?
17   A.  Yes.  That is correct.  We're ensuring
18   their compliance.
19   Q.  Now, however, in fairness to me, you,
20   in your capacity as the operations manager, is
21   the man whose job it is on behalf of the Corps
22   to make certain that the local sponsor is doing
23   what he's supposed to do, isn't it true?
24   A.  Well, it's the commander 's actual
25   responsibility, but I act on his behalf, yes.

Page 140

1    Q.  All right.  Good.  Thank you.
2        Now, I think you've already testified
3    to this, but the role of the Louisiana State
4    Department of Transportation and Development is
5    also in attendance on this annual drive-by.
6    A.  That is correct.
7    Q.  Okay.  And as far as you understand,
8    the role of the Department of Transportation
9    and Development is to act in an advisory role.
10   Right?
11   A.  As an engineering -- state engineering
12   advisor, yes, right.
13   Q.  Well, let me see if I can ask this --
14   what the heck, I know I'm going to draw an
15   objection anyway, so let's just go for it.
16       Did you believe as the operations
17   manager of Completed Work that you had an
18   obligation to do the inspection for the
19   purposes of ascertaining whether or not the
20   levees were safe?
21   A.  We did.
22       MR. BAEZA:
23           Objection.  Calls for
24           speculation, vague and ambiguous.
25       MR. BRUNO:

Page 141

1            We both want the same answer.
2    Trust me.
3        MR. BAEZA:
4            I know.
5    A.  These inspections were not structural
6    evaluation inspections, these were O&M
7    compliance to insure that the sponsor was
8    maintaining them in a reasonable fashion, that
9    they would be, you know, not left to a point
10   where they could be jeopardized.  Okay?  We're
11   not doing structural evaluation to say, you
12   know, there's a new difference of levee
13   stability analysis or anything like that.  None
14   of that.  We didn't do elevation surveys, per
15   se.  It was strictly an O&M compliance.
16   EXAMINATION BY MR. BRUNO:
17   Q.  All right.  As best you understand it,
18   was the Louisiana State Department of
19   Transportation and Development in a similar
20   role while you guys were doing this drive-by?
21   A.  Yes.
22   Q.  As you understand it, and as I
23   understand your testimony, the sponsor has the
24   primary responsibility for the maintenance
25   obligation.

JOHNS PENDLETON COURT REPORTERS          800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                      April 2, 2008

---

Page 142

1    A.   That's correct.
2    Q.   And the primary responsibility for
3  maintenance arises out of the act of assurance
4  which the local sponsor signed way back when
5  the project was put together.
6        MR. BAEZA:
7            Objection.  Calls for a legal
8        conclusion.
9  EXAMINATION BY MR. BRUNO:
10   Q.   Is that right?
11   A.   Yes.  That's the way I understood it.
12   Q.   Okay.  Now, let's get into what it was
13 that you guys were looking for when you were
14 driving by in terms of ascertaining compliance.
15       So before we get there, let me ask
16 you, what was your understanding of what the
17 sponsor had to do in order to comply?
18   A.   Okay.  Primarily, what they're out
19 there doing, they're mowing the grass, that's
20 number one.  That's what everybody sees, mowing
21 the grass.
22   Q.   Mowing the grass.
23   A.   Okay.  Now, you have, besides that,
24 you know, you may have animal burrows in some
25 of those levees, you may have erosion if you're

---

Page 143

1  next to a waterway, you may have levee slides.
2  You may have facilities that aren't being
3  appropriately maintained by the owner of that,
4  you know, such as a pipeline crossing or a
5  ramp.  You know, it's up to that facility owner
6  to maintain that portion of theirs.  Now, let's
7  say they're cutting the grass and the pipe is
8  getting exposed or something.  We're going to
9  point that out -- the levee board, you know, it
10 needs to go back to that facility owner through
11 their permit and say, hey, you got to go put
12 more material on this.
13   Q.   Right.  Now --
14   A.   So --
15   Q.   I'm sorry.  I didn't mean to
16 interrupt.  Keep going.
17   A.   Now, that's the basics.
18   Q.   Okay.  Now, again, as a layman
19 listening to what you just said, I would say
20 that some of these things that you've just
21 described are maintenance and some of them are
22 inspection.  In other words, mowing the grass
23 would sound to me like maintenance, but looking
24 for animal burrows would sound to me like
25 inspecting to see if they're there or not.

---

Page 144

1  Erosion would sound to me something more like
2  an inspection obligation to see if there is any
3  erosion.
4        Am I making any sense?
5        MR. BAEZA:
6            Objection.  Argumentative.
7    A.   You're making perfect sense because,
8  remember, it's an operation and maintenance.
9  So the operations side of that covers
10 inspection throughout.
11 EXAMINATION BY MR. BRUNO:
12   Q.   All right.  So let's see if we can
13 finish the maintenance side.  Okay?
14       Is there anything more that the local
15 sponsor is required to do other than cut the
16 grass, in terms of maintenance?
17   A.   Sure.  If they find -- if they're
18 cutting the grass and they find animal burrows
19 or they find erosion or they find any other
20 whether you want to call it a deficiency or
21 whatever it may be --
22   Q.   I see.
23   A.   -- then they can take that action
24 either to repair it at that point, if it's
25 something they have to repair, or if it's a

---

Page 145

1  pipeline that doesn't have the material over,
2  they can go back to that pipeline owner, or
3  that ramp owner.
4    Q.   Okay.  All right.  I got you.  Now, is
5  there a line drawn with regard to who is
6  required to pay for those things?  And I'm
7  going to go through them one at a time.
8        First, grass cutting.  Who pays for
9  that?
10   A.   The sponsor.
11   Q.   That would be the local sponsor?
12   A.   Yes.
13   Q.   If they find erosion, who pays for the
14 repair?
15   A.   The sponsor.
16   Q.   All right.
17   A.   Again, let me clarify that.
18   Q.   That's right.  You had me at hello.
19       That depends on the size of the
20 erosion.
21   A.   That's correct.  And it depends on
22 whether or not that project, is -- if it's in
23 the first lift, you know, and it's minimal, if
24 it's one or two sand bags or a little load of
25 dirt, we would say, sponsor, go take care of

---

JOHNS PENDLETON COURT REPORTERS                 800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                          April 2, 2008

---

Page 146

1  that, and they would.
2      Q.  Right.
3      A.  But if it's the entire reach, you
4  know, hundreds of feet or thousands of feet and
5  the project still has construction remaining,
6  then they would come to us and say, look, you
7  know, that project is not 100 percent complete,
8  it still -- you need to go back and do it.  And
9  they could come back not to me but to the
10 project manager --
11     Q.  Right.
12     A.  -- in PPPMD, and they would either
13 repair it then or they would incorporate it
14 into the next construction project.
15     Q.  Fair enough.  Before we leave that
16 very specific point, and that is in the context
17 of uncompleted but works in progress, are there
18 written guidelines that would allow the local
19 sponsor or perhaps some third party to
20 understand where the lines are drawn as between
21 what the local sponsor is expected to pay for
22 versus what the Corps is expected to pay for?
23         MR. BAEZA:
24             Objection to vagueness.
25     A.  And I don't really know how to answer

---

Page 147

1  that question because I don't know if there's
2  something in writing that states that.  Just
3  the process that has historically been there is
4  that, you know, we work with these folks all
5  the time.  And so it was like, okay, is this
6  something you can do, or is it clearly above
7  and beyond, we think, reasonable for that
8  sponsor.
9      Q.  Okay.  Sounds like it was just kind of
10 a discussion, you just had a dialogue and you
11 tried to work it out.
12     A.  Yes.
13     Q.  Were there instances -- and again I'm
14 limiting the question to those uncomplete
15 projects because I'm going to ask the same
16 questions with regard to complete projects.
17         Were there instances where there was
18 some disagreement between the local sponsor and
19 the Corps over who should pay which required
20 somebody to gavel down on who was right and who
21 was wrong, that you can recall in your tenure?
22     A.  No, we always had a pretty good
23 working relationship with the sponsors.
24     Q.  All right.  Now, let's switch over to
25 completed projects.  Okay?  And again, same

---

Page 148

1  question with regard to who has to pay for
2  erosion repair and the like.  Would your answer
3  be the same?
4      A.  Well, it varies.  Again, it's not --
5      Q.  I love this.
6      A.  -- clear cut.
7      Q.  And no guidelines.  You guys had a
8  very good working relationship it sounds like
9  to me.
10     A.  If you're talking about just erosion,
11 yes, that would be the sponsor.  If the project
12 itself, say the levee, is damaged by hurricane
13 or coastal storm, then it can be repaired under
14 the original agreement.  Or if there's no funds
15 left for construction, then it can be repaired
16 under Public Law 99.  Being that it's a federal
17 project it can be done under Public Law 99
18 which is an emergency -- flood control coastal
19 emergency authorization.  If it's, let's say,
20 damaged by a runaway barge or, you know, a
21 train, whatever --
22     Q.  Right.  Yeah.  We haven't talked about
23 the train yet.
24     A.  -- it's not -- you know, it's not a
25 hurricane or coastal storm, then it's

---

Page 149

1  100 percent the responsibility of the sponsor.
2      Q.  Okay.  Now, there's been much
3  discussion in the news and a variety of other
4  locations about letting the trees grow too
5  close to the levee.
6          Have you heard such a discussion?
7      A.  (Nods affirmatively.)
8      Q.  You have.
9      A.  Yes, I have.
10     Q.  Yes, you have.  Okay.  Obviously this
11 hits home for you, right?
12     A.  Yes, it does.
13     Q.  So I got to ask you, when you guys are
14 doing your drive-by --
15         MR. BAEZA:
16             Joe, before you continue, I'm
17         going to have to object to how you're
18         referring to the inspection as a
19         drive-by.
20         MR. BRUNO:
21             That was his word.
22         MR. BAEZA:
23             It's a visual inspection.
24         MR. BRUNO:
25             Well --

---

JOHNS PENDLETON COURT REPORTERS                    800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                              April 2, 2008

---

Page 150

MR. BAEZA:
     In a car, and when you're
walking, it's still a visual
inspection.
MR. BRUNO:
     I, frankly, am required to use
the witness' characterization because
I don't want to be accused of
mischaracterizing his testimony.
     So --
EXAMINATION BY MR. BRUNO:
   Q.   And I'll let you change, I don't care,
I mean, I'm only using drive-by because of how
you say it.  You can say walk, you can say
whatever you want.  You're the deponent.
     What is the best way for me to
characterize the method chosen to do this
inspection?  Is it a --
   A.   Well, actually, I guess Dan is right.
It's a visual inspection, because there are
times we get out of the vehicle and walk.
   Q.   All right.
   A.   So --
   Q.   So let's see.  And the reason I didn't
characterize it as visual is because that might

---

Page 151

include walking or driving.  So -- all right.
The point is, so that the record is as clear as
we can make it, you are doing a visual
inspection.
   A.   That's correct.
   Q.   All right.  You are doing it from a
car.
   A.   Most of the time.
   Q.   Most of the time.  Although
occasionally the car will stop and someone
might get out of the car and evaluate something
more specifically.  Right?
   A.   That's correct.
   Q.   Okay.  All right.  But more often than
not, you're in a car.
   A.   That's correct.
   Q.   Okay.  Now, what would be the kind of
think that would motivate the group to stop the
car and get out of the car and do a more
specific inspection, if you can give me some
examples?
   A.   If there was some known area of
erosion or a levee slide or a problem area that
the levee board, or sponsor -- when I say levee
board, it's the sponsor.

---

Page 152

   Q.   No, I understand that.  And I think
the record is clear, we can agree that the
sponsor is whoever that might be, but more
often than not it's a levee board.
   A.   Right.
   Q.   Fair enough.
   A.   If they have a particular area that
though want to see, or because of some known
problem or something they said, hey, we had
some damage here by animals, we fixed it, we
want you to look at it, you know, normally we
would have done that already, but if it happens
to be close by we would do it then.
     Operation of a gate.  We'd stop along,
you know, the flood walls where we had gates.
You had different types of gates, mitered gates
versus pulley -- you know, pull chain gates,
swing gates, you had different types.  Normally
what we would like them to do is to demonstrate
that at least these gates are working.  You
know, so they would actually have their
maintenance folks there and demonstrate that
for the inspection party.
   Q.   Okay.  All right.  It sounds like,
what you've said, is that more often than not

---

Page 153

the local sponsor would be the person who would
suggest that you stop.  Right?
   A.   That's correct.
   Q.   Okay.  Were there instances where
either the Corps or the DOTD as the technical
support folks would say, stop the car, I want
to go see that.
   A.   Yes.
   Q.   Okay.  What are the kinds of things
that would provoke that kind of stuff?
   A.   If we had a suspicion of something,
you know, or we wanted to just operate that
gate -- a particular gate or whatever.  You
know, occasionally you might say, as a sponsor,
say, well, I want to operate this gate.  We'll
say, well, maybe that's because they're trying
to hide this, we want you to operate that one.
   Q.   All right.
   A.   So yes, we had that latitude to ask
for that and request that or -- and it may not
be that particular day, we may go back, you
know, a following day, depending on what was
going on.  But yes, we have that latitude.
   Q.   Okay.  Now, we've got to talk about
the trees, and I need to go back to where I

---

39 (Pages 150 to 153)

JOHNS PENDLETON COURT REPORTERS              800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 154

1  was, because it sounds like that would be a
2  drive-by situation with regard to trees.
3       First of all, are you aware of any
4  standard, guideline, technical advisory,
5  promulgated by anybody, which would address the
6  question of tree growth -- and I'm going to say
7  on the levee, first, as distinguished from near
8  or close to the levee.  Okay?
9       A.  (Nods affirmatively.)
10      Q.  So let's start with that.  Can you
11 answer that?
12      A.  On the levee.
13      Q.  On the levee.
14      A.  On the levee, the levee -- according
15 to guidance, the levee was to be cleared.  We
16 did not want trees in the levee.
17      Q.  And let's, for the record, define,
18 that's from the levee toe up to the crown, back
19 to the water side of the toe.
20      A.  That's correct.  In the right of way.
21 The right of way -- again, it's a levee right
22 of way.
23      Q.  Is the levee right of way wider than
24 what I've just described, which is toe to toe?
25      A.  Yes, it is.

Page 155

1       Q.  It is?
2       A.  Yes.
3       Q.  All right.  What is the right-of-way
4  for the levee?
5       A.  And that may vary.  You know, distance
6  wise, generally, from a levee it was generally
7  five feet on the land side, on the flood side
8  it could all the way to the water 's edge.
9       Q.  Okay.  Five feet.
10      A.  Now, again, you had berms on some
11 areas and it would extend further.
12      Q.  And we also have to clarify what's a
13 levee.  Okay?  Am I understanding you to use
14 the word levee to describe an earthen berm of
15 some height as opposed to an I-wall or a T-wall
16 that may be embedded in a berm?
17      A.  Yes.
18          MR. BAEZA:
19              Objection to vagueness.
20 EXAMINATION BY MR. BRUNO:
21      Q.  Now, so what we've been talking about
22 are levees.  And I haven't asked you about
23 I-walls or T-walls, and I'll reserve -- let's
24 just get the levees first.  Okay?  Now, bottom
25 line, you've have told us that there should be

Page 156

1  no trees within the right of way of the levee
2  as defined by an earthen berm.  Right?
3       A.  That's correct.
4       Q.  Okay.  Next question is, right next to
5  or close to.  Were trees -- I'm sorry.  Are you
6  aware of any standard, any requirement, any
7  technical advice that would regard whether or
8  not trees would be permitted close to the right
9  of way for a levee?
10          MR. BAEZA:
11              Objection.  Vague and ambiguous.
12      A.  Prior to Katrina.
13 EXAMINATION BY MR. BRUNO:
14      Q.  Yes.
15      A.  No one, ever, not from the Corps, not
16 from the DOTD, from academia -- no one ever
17 made a comment to my knowledge regarding trees
18 being an adverse impact to the levees.
19      Q.  Okay.  Now, are there any T-walls in
20 the 325 miles of hurricane protection system?
21      A.  Yes.
22      Q.  Okay.  Same question:  Trees.  And I
23 suppose we need to define the right of way for
24 a T-wall.  A T-wall could have a little berm,
25 but not necessary.  Right?

Page 157

1       A.  Usually T-walls did not.  You know,
2  I-walls, usually a combination.
3       Q.  Of both.
4       A.  I-wall and levee.
5       Q.  Let's talk about T-wall first, then.
6           Is there a standard, regulation,
7  advisory, et cetera, with regard to permitting
8  trees to grow within the right of way of a
9  T-wall?
10      A.  Generally not.  You know, again, as I
11 said, prior to Katrina trees were not an issue.
12      Q.  No, within the -- I hope you
13 understand my question.  Within the -- not
14 outside of, but within the right-of-way for a
15 T-wall, inside.
16      A.  I don't -- I'm not sure if I
17 understand your question correctly.
18      Q.  Okay.  Let me -- forgive me for
19 interrupting you, but you said that with regard
20 to levees trees were not permitted within the
21 right of way.  Right?
22      A.  That's correct.
23      Q.  Okay.  When it came to T-walls, are
24 you telling me that there was no guideline
25 within the right of way for T-wall?

JOHNS PENDLETON COURT REPORTERS          800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                      April 2, 2008

Page 158

1    A.  Well, generally when you built the
2  T-wall you removed everything that was anywhere
3  near it.  So.
4    Q.  And you've got a concrete slab which
5  constitutes the T.
6    A.  Correct.  Right.
7    Q.  Okay.
8    A.  So that's why I guess I'm --
9    Q.  Right.
10    A.  It's moved.
11    Q.  All right.  So I guess to get what's
12  in each of our brains onto the record, the fact
13  of the matter is, in a T-wall construction the
14  nature of the construction prohibits trees from
15  growing within the right of way.
16    A.  I'd generally say that's a fair
17  statement, yes.
18    Q.  Okay.  Now let's talk about I-walls,
19  because I-walls, as you've already indicated,
20  can have a small earth berm at its base, and it
21  could vary in height.
22        It also has a right of way, does it
23  not?
24    A.  Yes.
25    Q.  Okay.  And can you tell us, generally

Page 159

1  not specifically, what the right-of-way would
2  be for an I-wall?
3    A.  Well, again it varies.  But it's
4  usually based on the levee portion of that, you
5  know, where that piece of the levee that is
6  supposing that I-wall.
7    Q.  Okay.  So --
8    A.  So it goes from that toe.
9    Q.  The toe.  All right.
10        So would it be appropriate to say that
11  the right of way for an I-wall would be from
12  the earth berm toe, if it exists, to the earth
13  berm toe on the water side?  Or perhaps even to
14  the water.
15    A.  Yes.  However, as I say, I've got to
16  be clear, it varies.  And based on what was
17  acquired, the actual right of way.  Because we
18  learned that, even though we thought it was at
19  the toe, we learned on one of the outfall
20  canals that it actually didn't go all the way
21  to the toe, actual recorded right of way.
22    Q.  Meaning the actual recorded right of
23  way was within the berm and not to the toe.
24    A.  That's correct.
25    Q.  So that in that particular instance

Page 160

1  the toe of the levee was on private property.
2    A.  In that particular instance, I guess,
3  yes.
4    Q.  All right.  Now, here's my question:
5    A.  Whether it's private or somebody else
6  is --
7    Q.  Whoever.
8    A.  -- Sewerage & Water Board or somebody
9  else.
10    Q.  Not the Corps.
11    A.  Yes.
12    Q.  The right of way -- I'm sorry, I
13  shouldn't presume.  The right of way is not
14  owned by the Corps, the right of way is owned
15  by the local sponsor.
16    A.  That's correct.
17    Q.  And so we mean, by third-party,
18  someone other than the local sponsor.
19    A.  Yes.
20    Q.  All right.  Now, same question about
21  trees and the I-wall with the earth berm.  Is
22  there any standard guideline, technical
23  advisory, et cetera, that would indicate that
24  it's appropriate or inappropriate to allow tree
25  growth within the right of way of an I-wall?

Page 161

1        MR. BAEZA:
2            Objection.  Vague and ambiguous.
3    A.  And again, it didn't -- you know,
4  prior to Katrina there was no suggestions of
5  adverse impacts.  As a matter of fact, we built
6  the I-walls on the outfall canals with trees
7  next to them.
8  EXAMINATION BY MR. BRUNO:
9    Q.  All right.  You were going to -- that
10  was my very next question.  Because it has been
11  in fact reported, as a criticism, first, that
12  you couldn't even see from a car window the
13  hurricane protection structures along the 17th
14  Street Canal on the Orleans side.
15        Is that a true statement or an
16  inaccurate statement?
17        MR. BAEZA:
18            Objection in terms of relevance.
19        We're talking about the outfall canals
20        here.  I thought we were going to
21        be -- I thought you were just
22        discussing general principles with
23        regards to trees near flood protection
24        structures as they relate to the
25        structures in Robinson.

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

---

Page 162

1    MR. BRUNO:
2        Let's go off the record for a
3    second.
4    (Off the record.)
5    MR. BAEZA:
6        Joe, just before we continue with
7    those questions, I just want to lodge
8    a continuing objection to all of these
9    questions.  I had the Notice of
10   Deposition here, it is noticed to MRGO
11   Robinson only.
12   MR. BRUNO:
13       That's right.
14   MR. BAEZA:
15       And so any questions we have
16   related to 17th Street Canal, Orleans
17   Canal, London Avenue Canal are going
18   to be outside the scope of what has
19   been noticed in this deposition,
20   outside the scope of Robinson.
21   MR. BRUNO:
22       I agree with you.  As I said off
23   the record why I beg a little bit of
24   indulgence on this.
25   MR. BAEZA:

---

Page 163

1        Thank you.
2    MR. BRUNO:
3        Okay.  And I guess really, this
4    whole line speaks generally to an
5    argument that may be made by someone
6    that you guys didn't perform this
7    inspection or that you performed it in
8    such way that you breached some kind
9    of a duty.  And so I think perhaps,
10   peripherally, it may be relevant in
11   that regard.  But in any case, the --
12   MR. BAEZA:
13       We would object to the
14   characterization of duty.  It calls
15   for a legal conclusion.
16   MR. BRUNO:
17       I know.  I'm not asking a
18   question.  I'm speaking to you now.
19   MR. BAEZA:
20       I thought you were looking at
21   him.
22   MR. BRUNO:
23       No, no, no.  I was thinking --
24   you put a little grease on the wheel
25   in my brain and I went, oh, wait a

---

Page 164

1        minute, you know, we might need to add
2        something to this thought.
3    EXAMINATION BY MR. BRUNO:
4        Q.  So anyway, having said that, the truth
5    of it is, can you just very briefly, and I
6    don't want to spend a lot of time on this, but
7    driving by 17th Street Canal, could you see it?
8        A.  Sure.
9        Q.  Okay.
10       A.  They cut the grass, you know,
11   behind -- you know, there's a levee section
12   behind those homes.
13       Q.  Okay.  And you were satisfied that the
14   local sponsor had done what it was supposed to
15   do?
16       A.  Fulfilled their obligation duties,
17   yes.
18       Q.  All right.  With regard to I-walls
19   generally that are component parts of hurricane
20   protection structures at a water 's edge, do
21   you know whether or not the lack of an -- if
22   there is an earth berm on the land side --
23   okay -- is the lack of an earth berm on the
24   water side an indication of a problem like
25   erosion or sliding or any of these other things

---

Page 165

1    that you've described?
2        MR. BAEZA:
3            Objection.  Vague, ambiguous,
4        calls for speculation and an improper
5        lay opinion.
6        A.  I would refer that to our engineering
7    division, you know, because they're the ones
8    that do a technical evaluation.
9    EXAMINATION BY MR. BRUNO:
10       Q.  All right.  Well, but it's something
11   that you might encounter during an inspection.
12       MR. BAEZA:
13           Objection.  Argumentative.
14       MR. BRUNO:
15           Well no, how can that be
16       argumentative?
17   EXAMINATION BY MR. BRUNO:
18       Q.  If you're inspecting, you're there to
19   drive by and see if there is an erosion
20   problem.  Right?
21       A.  Let me clarify who's on these
22   inspections, as well.
23       Q.  All right.
24       A.  It's not just me as the ops manager.
25       Q.  Okay.

---

JOHNS PENDLETON COURT REPORTERS              800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

---

Page 166

1    A.  Okay?  You have usually a geotech
2  engineer with you, usually a civil --
3    Q.  All right.
4    A.  -- someone from levees section or
5  structures section, you have construction
6  representatives from our construction
7  division --
8    Q.  All right.
9    A.  -- someone from our PM, the project
10  manager 's position, as well as the engineers
11  from DOTD --
12    Q.  Right.
13    A.  -- as well.  So you're not limited to
14  just two or three people.  It's numerous.
15    Q.  Got you.  So that as far as you're
16  concerned, the Corps had, on this inspection
17  tour, sufficient technical support in order to
18  address as many issues as you could think of
19  that might be -- that might arise in the course
20  of an inspection.  Is that fair?
21        MR. BAEZA:
22           Objection.  Vague, ambiguous,
23      calls for improper lay opinion.
24    A.  I'd say we tried to get as many
25  disciplines out there on these inspections as

---

Page 167

1  we could.  Yes.
2  EXAMINATION BY MR. BRUNO:
3    Q.  All right.  And who had the
4  responsibility of putting together the team for
5  the Corps, was that the op manager or
6  somebody's else?
7    A.  That was the ops manager, yes.
8    Q.  All right.  So it's not a lay opinion.
9  That was your responsibility to put together
10  the team, right?
11    A.  Yes.
12    Q.  Okay.  You thought you had the right
13  guys there.
14    A.  Yes.
15    Q.  Okay.  And just again, I know you've
16  said it, but you had a soils guy, you had a
17  structural guy -- who else did you have?
18    A.  A levees guy.
19    Q.  Who?
20    A.  A levees.
21    Q.  Levees guy and a construction guy.
22    A.  Construction guy, sometimes real
23  estate, sometimes project management, usually.
24  Usually the colonel or his deputy, as well.
25    Q.  Okay.  Now, a drive-by obviously works

---

Page 168

1  where there's a road.  But the MRGO --
2        MR. BAEZA:
3           Again, we talked about this
4      before.  You're calling it drive-bys
5      again.
6        MR. BRUNO:
7           No, it is a drive-by there
8      because you have to get to it.  Before
9      you can stop the car, you got to have
10      a car.
11        MR. BAEZA:
12           I don't want to argue about the
13      semantics, it's just a drive-by seems
14      like a mischaracterization of what
15      he's been saying.  It's a visual
16      inspection.
17        MR. BRUNO:
18           Well, it might be if I was
19      suggesting something nefarious about
20      the drive-by, which I'm not.  What I'm
21      saying is you're using a car as
22      opposed to a plane or a helicopter or
23      your feet for access.  We're talking
24      about access now.
25  EXAMINATION BY MR. BRUNO:

---

Page 169

1    Q.  So a car works if there's roads.  What
2  happens with MRGO where there's no road?
3    A.  You're talking about the piece between
4  the two structures?
5    Q.  I'm talking about the hurricane
6  protection structure that is alongside the
7  southern shore of the MRGO from the, I guess,
8  Reach 1 -- we've generally called it Reach 2,
9  to approximately Verret.
10    A.  Okay.  Well, I'll show you how we
11  went.  We'd generally start at -- when we're
12  doing that area, which was in Lake Borgne, we
13  would come from Caernarvon, along the levee --
14  you're driving the levee, or on the -- or near
15  the toe of the levee.
16    Q.  Uh-huh.
17    A.  Until you get to the Bayou Dupre
18  control structure.  All right?  That's a
19  waterway, and there is no bridge there.  The
20  levee district, in this case it was the Lake
21  Borgne Levee District, had a barge waiting, and
22  we would put the vehicles on the barge and it
23  would bring us to the other side, and then we'd
24  drive that whole piece.
25    Q.  Okay.  So you did drive the MRGO

---

JOHNS PENDLETON COURT REPORTERS          800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 170

1   levee.
2       A.   Yes.
3       Q.   Okay.
4       A.   So.  I mean, that's how we got along
5   that area.  You know, we're driving, and we're
6   visually inspecting.
7       Q.   How about the Reach 1 levees?
8       A.   Okay.
9       Q.   On let's talk -- and let's break it
10  down.  Between the southern bank and the
11  northern bank of the Intracoastal Waterway.
12  Could you all drive that?
13      A.   Yes.  We'd come across the Paris Road
14  bridge, and you come in here and you get to the
15  levee, there's a little road, blocked off for
16  access to -- levee district let's us in.  You
17  can come this, you can drive along the levee
18  system here.
19      Q.   Okay.
20      A.   Or you can drive all the way up to the
21  Bayou Bienvenue control structure.
22      Q.   Okay.  So your testimony is you guys
23  actually did drive the entire length of the
24  hurricane protection structure from the -- the
25  hurricane protection structure which surrounds

Page 171

1   the Lower Nine and St. Bernard, um -- by car.
2   Right?
3       A.   Well --
4       Q.   Except for the point where you got on
5   the barge and you went over the thing.
6            MR. BAEZA:
7                Objection.  I believe the witness
8            didn't say they inspected in the Lower
9            Ninth Ward with respect to the flood
10           walls along the IHNC.
11  EXAMINATION BY MR. BRUNO:
12      Q.   Well, that would be part of it.
13      A.   Can I clarify what we do?
14      Q.   Yeah.
15      A.   And what you said was 100 percent.
16  Remember, we're looking for O&M compliance so
17  we never necessarily did 100 percent.  We're
18  getting an idea.  We may have done this, and
19  then turn around.
20      Q.   Okay.
21      A.   So we may not have gone all the way to
22  this point.  But yes, we did do along the
23  walls, along the IHNC walls when we were coming
24  from the other direction.
25           We came -- generally started down

Page 172

1   there by West End and 17th Street Canal, back
2   there, we'd come along the lake front, and then
3   you'd come along the IHNC.
4       Q.   Okay.
5       A.   And then you come this way and come
6   back.  So we were covering a major portion of
7   it.
8       Q.   All right.
9       A.   But I would not say we did
10  100 percent.
11      Q.   Understood.  Let's talk now about the
12  New Orleans East hurricane protection
13  structures.  Were those also inspected on this
14  annual inspection effort?
15      A.   All right.  We would generally come
16  along the lake front, once we come across here,
17  and we'd come -- at the airport, come along the
18  lake front, all the way out to South Point to
19  GIWW, so we've have got -- here's South Point
20  down to the GIWW here.  We may not do
21  100 percent all the way down.  Sometimes we
22  would come all the way through here, other
23  times, depending on where we were at and time
24  frames, if we stopped, you know, we'd do the
25  majority of it.  We may stop here and get on

Page 173

1   the highway and come across to make the other
2   side.
3       Q.   Okay.  All right.  Now, let's see.  We
4   do know that there was a broken, um -- I don't
5   know whether the right word is -- railway gate
6   that was a component part of the hurricane
7   protection structure on the west bank of the
8   Industrial Canal.
9            MR. BAEZA:
10               Objection.  Vague and ambiguous.
11           Are you saying that the railway was
12           part of hurricane protection system?
13  MR. BRUNO:
14               No.  I said the railway gate.
15  MR. BAEZA:
16               The gate.
17  MR. BRUNO:
18               And I'm calling it the railway
19           gate because the railway passed
20           through the gate.  I think it's called
21           W-20?
22      A.   28?
23  EXAMINATION BY MR. BRUNO:
24      Q.   28.  28.
25      A.   29?

44  (Pages 170 to 173)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 174

1    Q.  It's in the twenties.
2    A.  It's up in there.  It's up at the top.
3    Q.  You recall it?
4    A.  Yes.
5    Q.  Okay.  And you recall that it is in
6  fact on the west bank of the IHNC, as opposed
7  to the east bank?
8    A.  Yes.
9    Q.  And I think it's the CSX railroad that
10  passes through it?
11    A.  I believe that's correct.  I'm not
12  certain.
13    Q.  All right.  Now, and I think you
14  testified about this in Congress?  The question
15  is, is it Congressional testimony?
16    A.  I think I did.
17    Q.  Thank you.  You testified about this
18  before the Senate, I think.
19    A.  Right.
20    Q.  Did you?
21        MR. BAEZA:
22            Objection.  Can you provide the
23        witness his statements before the
24        Senate?
25        MR. BRUNO:

Page 175

1            If you want to, yeah.  I mean,
2        it's not that heavy.  I just wanted to
3        confirm that he testified about it,
4        not so much that I was going to get
5        into a heavy detail about it.
6  EXAMINATION BY MR. BRUNO:
7    Q.  All I want to find out is, you guys
8  knew that the gate hadn't been repaired, right?
9    A.  Yes.
10    Q.  Okay.  And did you find that to be
11  something that you wanted -- he wanted to see
12  it, I don't want to see it -- did you find that
13  missing gate to be, I don't know how else to
14  characterize it other than was it a problem for
15  you?
16        MR. BAEZA:
17            Objection.  Vague and ambiguous.
18    A.  A problem such as that, we had been
19  working with the levee district, they were
20  responsible for getting that repaired, they
21  were in -- I believe they were in litigation,
22  to my knowledge, and they were actually in the
23  process of having that gate in place when
24  Katrina came along.
25    Q.  All right.

Page 176

1    A.  So what they did at that time was sand
2  bag, which is a flood fighting tool, and that
3  was deemed appropriate --
4    Q.  All right.
5    A.  -- by them.
6    Q.  To put it in context, you guys would
7  have done this inspection in approximately June
8  of 2005, right?
9    A.  Uh-huh.
10    Q.  And you would have noticed the missing
11  gate.
12    A.  Uh-huh.
13    Q.  And as I appreciate what you're
14  telling us, you understood from the levee
15  board, well -- that they were in litigation or
16  litigation was being concluded -- right?
17    A.  Right.
18        MR. BAEZA:
19            Objection.  Vague.
20  EXAMINATION BY MR. BRUNO:
21    Q.  And they received a check?  Or you
22  don't know.
23    A.  I don't know about that.
24        MR. BAEZA:
25            Objection.  Vague.

Page 177

1  EXAMINATION BY MR. BRUNO:
2    Q.  And is your understanding that they
3  were going to repair the gate?
4    A.  That is correct.
5        MR. BAEZA:
6            Objection.  Vague.
7  EXAMINATION BY MR. BRUNO:
8    Q.  All right.  And that satisfied you.
9    A.  Yes.
10    Q.  All right.  Let's see.  Let's talk
11  about -- make sure I cover what I want to
12  cover.  Let's talk about the IHNC now.  And
13  you'll please forgive me, because now the
14  depositions are running together in my head, I
15  don't recall if I asked if you had knowledge of
16  the WGI.  Did I ask you that?  The Washington
17  Group International?
18    A.  You asked earlier, yeah.
19    Q.  And you don't know about that project.
20    A.  I don't know a whole lot about it, no.
21    Q.  All right.  Can you recall conducting
22  or being a part of any inspection, any annual
23  inspection where you noticed that there was a
24  chain-link fence installed -- and again, I
25  don't know if it was on the water side or the

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                        April 2, 2008

Page 178

1   land side of the hurricane protection structure
2   on the east bank of the IHNC between the
3   ultimate location of the north and south
4   breach?
5          MR. BAEZA:
6              Objection.  Vague and ambiguous.
7          MR. BRUNO:
8              It may be long, but it ain't
9          vague and it ain't ambiguous.
10      A.  I don't remember.  No.  Exactly -- no.
11  EXAMINATION BY MR. BRUNO:
12      Q.  If you don't remember, fine.
13      A.  No.
14      Q.  Would you view the installation of a
15  chain-link fence within the -- withdraw.  Let
16  me first establish.  At that particular
17  location -- do you know where I'm talking
18  about, first?
19      A.  Yeah.  On the east side.
20      Q.  East side between the two breaks.
21      A.  Uh-huh.
22      Q.  Lower Ninth Ward.  Right?
23      A.  Uh-huh.
24      Q.  So we got the location.
25          Next question:  Is that an I-wall, a

Page 179

1   T-wall or a levee that's there, pre-Katrina?
2       A.  Whew.  In that section -- I'm not sure
3   if it's I-wall or T-wall, you know, but you
4   have earthen sections combination in there, so
5   I suspect it's I-wall.
6       Q.  Yeah.
7       A.  But I'd have to go to engineering
8   division.
9       Q.  That's fine.  Because it's a general
10  and I suppose specific, but -- let's assume for
11  the sake of this discussion, okay, that it's an
12  I-wall with an earth berm.  All right?
13      A.  (Nods affirmatively.)
14      Q.  If you had seen a chain-link fence
15  installed within the right of way of the earth
16  berm I-wall, so that it's installed actually on
17  the berm between the toe landward and on the
18  water side, would that be something that would
19  cause you some concern as a potential
20  maintenance issue, potential problem for the
21  levee, et cetera?
22          MR. BAEZA:
23              Objection.  Compound, calls for
24          speculation.
25      A.  Actually, we permit, through the

Page 180

1   sponsor, allowable encroachments, security
2   fences being an allowable encroachment.
3       Q.  Okay.
4       A.  So technically, yes.  And it is --
5   it's a maintenance hindrance, but it's not
6   something that, you know, stops you from doing
7   maintenance.
8       Q.  Okay.  All right.  Now, do you know --
9   well, I think we know this:  The local sponsor
10  for the IHNC hurricane protection structures on
11  the east and west bank is who?
12      A.  Is the Orleans Levee District.
13      Q.  Okay.  And as such, the Orleans Levee
14  District owns the right of way on which these
15  structures are built, right?
16      A.  Yes.  Best of my knowledge, yes.
17      Q.  All right.  And as such, the Orleans
18  Levee District, as the local sponsor, has the
19  inspection and maintenance obligation, whatever
20  that may be, as defined by some statute.
21          MR. BAEZA:
22              Objection.  Vague.
23      A.  I'd say yes.
24  EXAMINATION BY MR. BRUNO:
25      Q.  Okay.  Now, are you aware of any

Page 181

1   dredging activities in the IHNC pre-Katrina?
2       A.  No.  I'm not saying no, there wasn't,
3   I'm just saying no, I'm not aware.
4       Q.  No, I got your answer.  That's why I
5   asked it the way I asked it, because if you
6   don't know then I leave it alone.
7           And this happens when other lawyers
8   ask me to ask questions for them.  So I want to
9   make sure I'm doing what they've asked me to
10  do.
11          Who would be the person that I should
12  speak to in order to get some understanding
13  about dredging the IHNC?
14      A.  It would be the ops manager for that
15  project, and around Katrina time -- was it Ulm,
16  maybe?  Actually, it was vacant at the time.
17  It was in between managers.  But Michelle Ulm.
18      Q.  And you've already said this to us,
19  but the manager for the Intracoastal Waterway
20  would be responsible for the IHNC.
21      A.  The gulf -- yeah.  GIWW.
22      Q.  The op manager for the Intracoastal
23  waterway has within his or her jurisdiction the
24  IHNC.
25      A.  That's correct.

JOHNS PENDLETON COURT REPORTERS               800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                April 2, 2008

---

Page 182

1    Q.  And that from the lake to the river.
2    A.  Yes.
3    Q.  Okay.  Are you at all familiar with a
4  lock expansion project on the Industrial Canal?
5    A.  Talking about the new lock?
6    Q.  The new lock.
7    A.  Well, I'm familiar.
8    Q.  You know about it.
9    A.  Yeah.  I know about it.
10        MR. BAEZA:
11           And to reiterate, continuing
12      objection with relation to the lock
13      expansion project.
14        MR. BRUNO:
15           I already agreed with you that it
16      was continuing.  See, the problem with
17      that is if you keep objecting it
18      indicates that we have no agreement,
19      which suggests that you had to object
20      in the past, which would be a problem,
21      so we better make sure we have our
22      agreement the says that you don't have
23      to object.
24           (Off the record.)
25  EXAMINATION BY MR. BRUNO:

---

Page 183

1    Q.  All right.  Do you know if the dock
2  board has anything to do with this lock
3  expansion?
4    A.  I know they are --
5        MR. BAEZA:
6           Objection.  Vague.
7    A.  -- in there, I don't know to which
8  degree, but --
9  EXAMINATION BY MR. BRUNO:
10    Q.  All right.  Is there a local sponsor
11  for the MRGO?
12    A.  You mean the navigation project?
13    Q.  Yeah.
14    A.  No --
15    Q.  There wouldn't be one.  That's what I
16  thought.
17        All right, um -- were there any aerial
18  inspections made of the hurricane protection
19  structures?
20    A.  Not that I made.  That I'm aware of.
21    Q.  Okay.
22    A.  Talking about from a plane or
23  helicopter, I'm assuming.
24    Q.  Yes.  Well, wouldn't -- I guess if
25  you're only looking for maintenance issues you

---

Page 184

1  wouldn't be interested in doing any lidar or
2  anything of that nature, would you?
3    A.  Nope.
4    Q.  That would be your engineering side,
5  or the project guys.
6        MR. BAEZA:
7           Objection.  Vague.
8    A.  If it was dealing with the, you know,
9  construction of the project, I mean, but
10  generally they didn't do lidar, they did old --
11  back in those days, it was still old time
12  surveying.
13  EXAMINATION BY MR. BRUNO:
14    Q.  Okay.  All right.  I'm going to ask
15  you -- we're almost done.
16        I'm going to ask you to help me with
17  some of these names because it will help me in
18  preparation for these depos that are coming up
19  soon.
20        Chris Accardo.  You've already
21  mentioned him.  Who is he?
22    A.  He's currently my boss.  He's the
23  current chief of operations division.
24    Q.  Chief of the operations division.
25  Okay.

---

Page 185

1    A.  Uh-huh.
2    Q.  And Walter Baumy.  I know we have
3  talked about him.  What is he?
4    A.  He's the chief of engineering
5  division.
6    Q.  All right.  Alfred Naomi?
7    A.  Al was the project manager in PPPMD
8  for the Lake Pontchartrain and Vicinity
9  Project.  He's since been moved across the
10  lake -- I mean across the river.
11    Q.  Vann Stutts?
12    A.  Vann Stutts was -- well, he's retired
13  now.  Well, he retired and came back.
14    Q.  Okay.
15    A.  But he was in the -- I'm not sure
16  whether it was -- what was the name of that
17  section of -- he might have been in that
18  general engineering section.  He was in
19  engineering division.
20    Q.  Gregory Miller?
21    A.  Greg is in PPPMD.
22    Q.  Okay.  Nancy Powell?
23    A.  Nancy is the Chief of Hydraulics, H&H
24  branch of engineering division.
25    Q.  Do you happen to know a Melvin

---

JOHNS PENDLETON COURT REPORTERS            800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                April 2, 2008

Page 186

1  McElwee?
2      A.  The name doesn't ring any bells.
3      Q.  All right.  Edmond Russo?
4      A.  Edmond used to work with us.  He's now
5  moved to HRDC, the engineering research and
6  development center.
7      Q.  What did he do when he was here?  He's
8  on this list somewhere, I thought.
9      A.  Right.  He was the MRGO manager at the
10 time, ops manager.
11     Q.  All right.  General Heiberg?
12     A.  General Heiberg used to be our -- I
13 don't remember if he was our district
14 commander, but he was the big guy.  He was the
15 chief of engineers way back when.  Seventies?
16 Sometimes in the seventies?
17     Q.  District chief for this office.
18     A.  Well, he actually left this office and
19 was the Chief of Engineers for the whole Corps,
20 I believe.
21     Q.  All right.  And Victor Landry?  I'm
22 sorry.  That may be --
23     A.  That's Vic, Sr.?  Big Vic as we call
24 him?  We've got Big Vic and Little Vic here.
25     Q.  I guess Big Vic, first.

Page 187

1      A.  Big Vic is who hired me here, back
2  then, but he was -- when he left here he was
3  our executive assistant to the commander.
4      Q.  Okay.  I'm going to ask for another
5  little break and see if we're not done.
6          MR. BAEZA:
7          Okay.
8          (Brief recess.)
9  EXAMINATION BY MR. BRUNO:
10     Q.  All right.  Mr. Colletti, how long
11 would it take to do this annual inspection that
12 we've been talking about now for the past
13 whatever amount of minutes?
14     A.  You're talking about which inspection?
15 There were several inspections, the New Orleans
16 East --
17     Q.  The annual --
18     A.  The ones in Orleans Levee District is
19 one thing, the ones in Lake Borgne Levee
20 District is a whole separate issue.  So you got
21 different levee district sponsors, they were
22 different inspections.
23     Q.  Let me clarify that for the record,
24 then.
25          When we have been describing this

Page 188

1  annual inspection which took place in June, I
2  was perhaps under the misapprehension that you
3  did all 325 miles in one day.
4      A.  Oh, no.
5      Q.  No.  Okay.
6      A.  Definitely not.
7      Q.  So it was broken down in some fashion,
8  right?
9      A.  We did it by sponsor is what we did.
10     Q.  All right.  So the Orleans Levee
11 District would be one day?
12     A.  Yes.
13     Q.  The Lake Borgne Levee District would
14 be another day?
15     A.  Yes.
16     Q.  And I guess the East Jefferson Levee
17 District would be another day.
18     A.  Yes.
19     Q.  And those are the only local sponsors.
20 Have I missed any?
21     A.  For the Lake Pontchartrain & Vicinity
22 Project, they're the sponsors.
23     Q.  Right.  And there are certainly other
24 sponsors for the --
25     A.  Right.  And you now have a component

Page 189

1  of St. Charles Parish that has been added to
2  Lake Pontchartrain Vicinity Project.  So
3  Pontchartrain Levee District.  So there's
4  actually four sponsors, now, for the Lake
5  Pontchartrain & Vicinity Project.
6      Q.  Well, I guess the largest one, or
7  maybe I'm mistaken, but it seems like the
8  largest one would be the Orleans Levee District
9  inspection day.
10     A.  That's correct.
11     Q.  How long would that take?
12     A.  Generally, we'd start about eight
13 o'clock in the morning and finish up somewhere
14 around 1:00, 1:30, 2:00 o'clock.  So five to
15 six hours.
16     Q.  How about the Lake Borgne?
17     A.  Well, the Lake Borgne, the longest
18 part was getting across on that barge, so
19 probably about the same.  You didn't have as
20 many miles to cover, but you didn't have a good
21 road, per se, you were on the levee, so you
22 took it slower, and then you had to get on that
23 barge and go across, so.
24     Q.  All right.  And then finally, East
25 Jefferson, how long would that take?

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI

April 2, 2008

---

Page 190

1    A.  East Jefferson, we'd do that
2  simultaneously.  We'd do the MR&T and the
3  hurricane protection together.  We'd start
4  right here at the parish line on the river,
5  drive up to Kenner, because you only had that
6  short piece of the river levee, and then we'd
7  do the rest.  Um -- we finished in the
8  afternoons, usually 1:30 or so.  So all of them
9  generally about anywhere from four to six
10 hours.
11    Q.  All right.  Now, I just ask this
12 because as class counsel I have to.  How do you
13 answer the criticism that the major or most
14 important issue during an inspection was
15 planning lunch?
16    MR. BAEZA:
17       Objection.  Vague, ambiguous.
18    A.  Actually --
19    MR. BAEZA:
20       Argumentative.
21    A.  Actually, the Corps did not plan
22 lunch.  So I guess that's how I would answer
23 that question.
24 EXAMINATION BY MR. BRUNO:
25    Q.  Who did?

---

Page 191

1    A.  Generally that was the sponsor that
2  planned the lunch.
3    Q.  It wasn't the Department of
4  Transportation and Development.
5    A.  Not to my knowledge, no.
6    Q.  All right.  That's all I've got.
7  Thank you very much.  Appreciate your time.
8    A.  Okay.
9    MR. BAEZA:
10       We haven't determined if we have
11    any questions, as well, so if we can
12    just take a --
13    (Brief recess.)
14    MR. BAEZA:
15       We're done.
16
17
18
19
20
21
22
23
24
25

---

Page 192

1             WITNESS' CERTIFICATE
2
3       I, GERARD A. (JERRY) COLLETTI, do
4  hereby certify that the foregoing testimony was
5  given by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10 _____   _____
11 DATE SIGNED       GERARD A. (JERRY) COLLETTI
12
13 _____  Signed with corrections as noted.
14
15 _____  Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25 DATE TAKEN:  April 2nd, 2008

---

Page 193

1             REPORTER'S CERTIFICATE
2       I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3  Certified Court Reporter in and for the State
4  of Louisiana, do hereby certify that the
5  aforementioned witness, after having been first
6  duly sworn by me to testify to the truth, did
7  testify as hereinabove set forth;
8       That said deposition was taken by me
9  in computer shorthand and thereafter
10 transcribed under my supervision, and is a true
11 and correct transcription to the best of my
12 ability and understanding.
13       I further certify that I am not of
14 counsel, nor related to counsel or the parties
15 hereto, and am in no way interested in the
16 result of said cause.
17
18
19
20
21
22
23       _____
24       JOSEPH A. FAIRBANKS, JR., CCR, RPR
25       CERTIFIED COURT REPORTER #75005

---

49 (Pages 190 to 193)

b1c1c612-6810-4774-a26e-25b1d9ab4489