UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO: MRGO | * | |
| *Armstrong*, No. 10-866 | * | SECTION "K"(2) |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |

**OPPOSITION TO DEFENDANTS' MOTIONS TO
STRIKE PORTIONS OF DR. ROBERT BEA'S "REBUTTAL REPORT"**

**NOW INTO COURT**, through undersigned counsel, come the Plaintiffs in the above enumerated action, to oppose the Defendant Washington Group International, Inc.'s Motion To Strike Portions Of Dr. Robert Bea's "Rebuttal Report" (Rec. Doc. 20764), to oppose The United States' Motion to Strike Portions of Dr. Robert Bea's "Rebuttal" Report (Rec. Doc. 20758), and to address the April 13, 2012, letter from counsel for WGI to the Court regarding Dr. Bea's April 11, 2012, pre-Rebuttal Deposition Submission.

I. Introduction

This Court's November 23, 2011, Order (Rec. Doc. 20592) set a February 3, 2012, deadline for Dr. Robert Bea's report. Plaintiffs served within the deadline Dr. Bea's Expert Report, appendices, and reliance materials presenting engineering analyses proving the causes of failure of the East Bank Industrial Area ("EBIA") flood wall adjacent to the area where Defendants' Task Order 26 project was executed.

Before Dr. Bea sat for deposition on March 27-28, Defendants had produced "most" of

1

their expert reports and reliance materials.  The two most comprehensive reports presenting the Defendants' theories are from Dr. Francisco Silva-Tulla (WGI) and Dr. Allan Marr (DOJ), with the other defense experts providing the underlying opinions that the main experts adopted.  Upon receiving these reports,  Dr. Bea analyzed them.  The reports have two main purposes: first, to prove the defense theory of the flood wall failure based upon *non-steady flow* analysis for the buried swamp/marsh layer, and, second, to ostensibly demonstrate that Dr. Bea's conclusions were "nonsense." (See Exhibit 1, Silva-Tulla dep., p. 108, l.18 - p. 109, l. 12).[1]

Dr. Bea developed his April 3, 2012, Rebuttal Report in compliance with the Fifth Circuit's well-settled purpose of rebuttal, which is to "explain, repel, counteract, or disprove the evidence of the adverse party." *Luttrell v. United States*, 320 F.2d 462, 464 (5th Cir. 1963) (citing *Shepard v. United States*, 64 F.2d 641, 642 (10th Cir. 1933)); *see also Johnson v. Big Lots Stores, Inc.*, 253 F.R.D. 381, 384 (E.D. La. 2008).  The Rebuttal Report contradicts and rebuts the opinions and conclusions proffered by Defendants' expert team (Stark, Brandon, Silva-Tulla and Marr) on the same subject matter identified in their reports.  (See Exhibit 2 - Declaration of Dr. Robert Bea).  For example, Dr. Bea's initial report is based upon the engineering principal of *steady flow* for the buried swamp/marsh layer, as he discussed in his deposition. (Bea Dep., Vol I at 164-69 (Ex. 4 to WGI's Mot.)).  As noted, the Defendants' experts posit *non-steady flow* conditions.  In  rebuttal, Dr. Bea evaluates the Defendants' *non-steady flow* position by performing his own analyses validating *steady flow* conditions as against the defense experts'

---

[1] In an abbreviated layman's understanding of the issue, the two opposing sets of experts disagree on whether a proper hydraulic conductivity analysis should be based upon Plaintiff's proposed *steady flow* conditions (constant void ratio and saturation percentage) or Defendants' proposed *non-steady flow* (varying void ratio and saturation percentage) conditions for the soils beneath the groundwater surface.

*non-steady flow* conditions. Dr. Bea then uses his analyses to critique the defense expert reports. This the Defendants call sandbagging; but it is classic rebuttal.[2]

So it goes in all three areas Defendants wish to shield from this Court's consideration of this claim: (1) Dr. Bea's so-called "Swiss cheese" modeling, (2) Dr. Bea's *steady flow* hydraulic analyses, and (3) Dr. Bea's discussion of engineering standards. In each instance, Dr. Bea's original report contemplated and discussed the general subject matter; his report was followed by defense expert reports criticizing his contentions, which was followed by analyses specifically undercutting the defense criticisms. This is how expert reports typically are formulated, and it is perfectly in keeping with the governing law.

**II. Governing Law**

The USA's motion misstates the standard governing this Court's inquiry into whether to strike portions of Dr. Bea's rebuttal report. It claims that four factors are to be considered "in determining whether to exclude expert testimony in violation of a scheduling order," citing *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375 (5th Cir. 1996). (USA Mot. at 4.) The USA fails to mention that the *Barrett* case was reviewing a trial court order striking a plaintiff's experts as a sanction for failing repeatedly to show for deposition and for admittedly failing to file initial reports within the court-imposed deadlines. *Id*. at 379-80. The four cited factors are those forming the appellate court's abuse-of-discretion analysis of the sanctions order striking the experts, not the factors employed at the trial level to determine whether a violation of the court's order occurred. *Id*. at 380 (citing *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546 (5th Cir.

---

[2] Dr. Bea's failure to rebut in this manner would limit him to his original report. (Minute Entry March 23, 2012) (Rec.Doc. 20722.)

3

1996)) (employing WGI's cited factors to determine whether trial court abused discretion in striking experts "as a sanction for violation of a discovery order . . . ."). Interestingly, none of trial court decisions cited by Defendants employ the four factors that the USA urges this Court to employ. In short, the USA urges this Court to use the wrong standard.

The proper procedure for a trial court determining the admissibility of rebuttal evidence is simply to ask whether the testimony is offered "either to counter facts presented in the defendant's case in chief, *McVey v. Phillips Petroleum Co.*, 288 F.2d 53, 54 (5th Cir. 1961), or to rebut evidence unavailable earlier through no fault of the plaintiff, *Allen v. Prince George's County*, 737 F.2d 1299, 1305 (4th Cir. 1984)." *Tramonte v. Fibreboard Corp.*, 947 F.2d 762, 764 (5th Cir. 1991) (citations in original). A court ordinarily should "allow the plaintiff to present whatever evidence it deems necessary to making its prima facie case without requiring it to anticipate and negate the defendant's case in its own case in chief." *McAfee v. Murray Ohio Mfg.*, 66 F. Appx. 523 (5th Cir. 2003) (unpublished). It is a matter "to be left to the sound discretion of the trial judge." *Tramonte*, 947 F.2d at 764.

Accordingly, in the trial-level decisions cited by Defendants themselves, we find the courts determining the propriety of rebuttal reports by asking whether the rebuttal is limited to "the same subject matter identified in the other party's report," *D'Andrea Bros. LLC v. United States*, 2012 WL 644010 at * 3 (Fed. Cl. Feb 10, 2012); whether the rebuttal responds to "issues raised by the opposing parties' experts," *Procter & Gamble Co. V. McNiel-PPC*, 615 F. Supp. 2d 832, 838 (W.D. Wis. 2009); or whether it "can fairly be deemed as responding to the conclusions of defendant's experts." *Noffsinger v. The Valspar Corp.*, 2011 WL 9795 at *7 (N.D. Ill., Jan 3, 2011). Similarly, WGI cites the *D'Andrea* case in urging that a rebuttal report "must be limited

4

to address[ing] the adverse party's evidence," when, in fact, the *D'Andrea* opinion says "a plaintiff's surrebuttal expert is free to support its opinions with evidence not cited in the [opponent's] rebuttal report," so long as it rebuts "the same subject matter." *D'Andrea*, 2012 WL 644010 at *3. Dr. Bea's rebuttal report easily passes this test.

### III. Dr. Bea's Rebuttal of Distinct Allegations

The fundamental conclusion in Dr. Bea's February 1, 2012 Expert Report was that the EBIA breaches were initiated when surge water pressures developed on the water side of the flood wall coupled with hydraulic seepage and uplift pressures generated in the marsh layers under the soil levee through nearby excavations backfilled with high permeability soils. (Bea Expert Report, ¶ 29 (WGI, Ex.2)). Dr. Bea correlated the Defendants' excavation and backfilling operations that facilitated "significant increases of the hydraulic conductivity and porewater pressure development paths... and led to decreases in the lateral resistance of the levee - floodwall sections." (Bea Expert Report, ¶ 30 (WGI, Ex.2). As discussed above, Dr. Bea's reliance upon *steady flow* analyses of the buried swamp/marsh layer sufficiently establishes the elements of the Plaintiffs' case in chief.

The Defendants' reliance upon their *non-steady flow* conditions within the buried swamp/marsh layer erroneously negates under seepage induced flood wall instability. Thereafter, the various defense experts present differing theories of flood wall failure based primarily upon overtopping induced erosion on the protected side of the flood wall with resultant wall instability. This two stage defense theorum required Dr. Bea's analyses of both the erroneous *non-steady flow* condition within the buried swamp/marsh layer as well as the overtopping induced erosion instability. The conclusions rendered from these analyses are the heart of Dr.

Bea's Rebuttal Report.

### A.     The Swiss Cheese Graphics

A fundamental element of the analysis contained within Dr. Bea's Expert Report is the intersection of the permeable marsh layer and the hydraulic conditions that developed during hurricane Katrina.  Dr. Bea's analysis of this element was performed in his Appendix C, wherein he proved that the hydraulic connectivity of the IHNC influenced the soils response in the EBIA's buried swamp/marsh layer.   Additional analyses of the soil stratigraphy and penetrations developed by the Defendants' excavation and backfill regime were also included in Dr. Bea's Appendix B.  Dr. Bea specified that his review of the soil surface of the EBIA (based upon inputs by Chad Morris, Dr. David Rogers, and other consultants) looked like Swiss cheese.  (Bea Expert Report, ¶ 30 (WGI Ex.2)).

In his report, Dr. Silva Tulla cited the Joint Exploration and Testing protocol as the higher standard analysis for "calculating the impact of the excavations on the performance of the EBIA levees." (See Exhibit 3 - Silva-Tulla Report, p. 35).   Likewise, Dr. Stark criticized Dr. Bea's lack of reliance upon GIS based mapping to establish the precise location and of each excavation of the EBIA.  In response, Dr. Bea developed his "Swiss cheese" demonstrative exhibit to illustrate the penetrations of the EBIA soil surface though out the EBIA site.  This demonstrative exhibit does not contain any "new" information.

Further, plaintiffs have not hired any new experts to produce the "Swiss cheese" demonstrative.  In the same sense as Dr. Silva-Tulla and many of the other defense experts, Dr. Bea and his consulting experts rely upon assistants to perform baseline data and graphic representations to develop their finished work product.  Plaintiffs have not asked Dr. Bea to

6

utilize his abilities to generate computer aided design (CAD) graphics, nor should they be required to.  Dr. Bea simply correlated the excavations of the EBIA with the causation of the adjacent North and South Breaches in his Expert Report.  When the defense experts presented multiple assertions that there were no important improperly backfilled excavations on the EBIA that would have influenced breach causation, Dr. Bea presented the "Swiss cheese" computer illustration to "paint a picture" of the information contained within the various and voluminous documents produced by the defendants.

> B.   **Hydraulic Pressure Conductivity Analyses and Validations**

Defendants next take issue with Dr. Bea's utilization of the *steady flow* analyses, and erroneously state that "the justification for applying such conditions when determining the cause of the North and South breaches does not appear anywhere in [his] initial report or appendices."  Such an assertion is flat out wrong and a total misunderstanding of his opinion or blatant misrepresentation.

Dr. Bea's reliance upon *steady flow* analyses of the buried swamp/marsh layer is well established and presented throughout his Expert Report.  His presentation of analyses based upon *steady flow* analyses of the buried swamp/marsh layer sufficiently establishes the elements of the Plaintiffs' case in chief.  Dr. Bea presented his engineering analyses with numerical analytical models used to help evaluate the performance of the flood wall at three study sites in the EBIA.  These analyses were summarized in his Appendix D and associated reliance materials.  The Defendants chose to rely on the erroneously applied *non-steady flow* conditions within the buried swamp/marsh layer to negate under seepage induced  flood wall instability, and generally insisted that Dr. Bea had a "misunderstanding of soil mechanics fundamentals."  (See Exhibit 3, Silva-

Tulla Report, p. 68, Item 6).

In rebuttal, Dr. Bea presented additional proof that *non-steady flow* analyses should not be used in soil conditions that have constant void ratios and constant saturation percentages. By illustrating the ongoing project studying the Sherman Islands levees, Dr. Bea substantiates his position mandating *steady flow analyses* of the EBIA's buried swamp/ marsh layer. Analysis of the Sherman Island piezometer records analyses directly refutes the defense assertions that *non-steady flow* analyses should be used to help evaluate the breach and near breach causation analyses of Dr. Bea's Expert Report.

Similarly, Dr. Bea identified specific Corps manuals analyzing hydraulic conductivity based on *steady flow* conditions as further evidence that utilization of the *steady flow analysis* was more appropriate than *non-steady flow* analyses.

C. **Engineering Standard of Care**

The defendants claim that Dr. Bea "attempts to shore up deficiencies in his initial expert report" relative to his Engineering Standard of Care analyses. The predominant feature of Dr. Bea's Expert Report is his engineering analysis of the flood wall failures. This analysis determined that the defendants' demolition and excavation activities were "well-within the zone of influence for existing flood protection elements and change in seepage effects should have been carefully evaluated." (Bea Expert Report, ¶ 125 (b)). Because he could find no evidence that demonstrated such analyses were performed, Dr. Bea opined that it was "likely no such analyses were ever contemplated or completed." (Bea Expert Report, ¶ 125 (b)). Dr. Bea then enumerated various Corps design guidelines that required that a seepage analyses be performed as part of EBIA project. Here, it is clear that Dr. Bea's initial report set forth the types of

analyses that should have been performed to preclude the flood wall failure.

Thereafter, the Defendants presented reports from Dr. David Sykora (WGI) and from Dr. Lucia (DOJ).  In his report, Dr. Sykora selected portions of contract documents to re-define WGI's role from an Architecture-Engineer (A-E) contractor to merely a "general contractor [on a short leash] performing demolition and environmental restoration work." (See Exhibit 4 - Dr. Sykora Report, p. 36).  In so doing, Dr. Sykora denied that WGI had any "role or responsibility to provide geotechnical engineering services."(Id., at p. 76, ¶ c.).

Dr. Lucia's position was even simpler: that no one associated with the EBIA project had any responsibility for analyzing seepage during the EBIA project because seepage and uplift possibilities had been refuted thirty years earlier in the original flood wall design memorandum. (See Exhibit 5 - Dr. Lucia Report, p. 74, ¶ 1).

Both Dr. Sykora and Dr. Lucia relied upon the same body of Task Order 26 related documents to substantiate their respective positions.  However, each ignored pertinent portions of those documents and recharacterized prior deposition testimony.  Because of the denials of any geotechnical engineering obligations (as opposed to a defense based demurrer relative to the proper utilization of engineering principles),  it became necessary to present two constituent factors for consideration in rebuttal of the defense assertions.

First, Dr. Bea identified the contract documents governing the relationship between WGI and the Corps.  This was consistent with Dr. Sykora's admission in deposition that his conclusions relative to the engineering standard of care were based in part on the specifications of the job, partly on the contract, and partly on what others do in similar circumstances.  Dr. Bea's second constituent factor was the basic principles of the Engineering Standard of Care.

Dr. Bea's Rebuttal Report illustrates that Dr. Sykora and Dr. Lucia's conclusions ignore the standard of care incumbent upon an engineer, ignore WGI's contractual obligation to provide architectural-engineer services, and fail to assign accountability for the changing soil conditions that were overlooked by both WGI and the Corps.  Likewise, these experts' conclusions were nullified by the admissions of both WGI and Corps personnel (secured through prior deposition testimony) that the differing field conditions resultant of the EBIA work were not taken into consideration.

### IV.     Dr. Bea's Forensic Engineering Quantitative Analyses

Dr. Bea's April 11, 2012 submission was developed to address specific inquiry by defense counsel to document hand calculation validations of the computer model outputs presented in the Expert Report.  These hand calculations do not constitute new opinions.

The defense experts have attacked both the utilization of the computer program Dr. Bea relied upon to present his calculations relative to ***steady flow analyses*** as well as the input parameters utilized to run the computer model.  To refute these unfounded and insulting allegations, Dr. Bea performed hand calculations to evaluate those issues raised during his March 27 and 28 deposition and during the April 10 deposition of Mr. Diego Cobos-Roa.

### V.     CONCLUSION

As demonstrated above,  the challenged portion of Dr. Bea's Rebuttal Report addresses, contradicts and rebuts opinions and conclusions by Defendants Expert Team on the "same subject matter" identified in their expert reports. Likewise, the  Pre-Rebuttal Deposition Submission compilation of "hand calculations" are not "new", "outrageous" or intended to "flout" the Court's deadlines, but instead offer a pre-view to defense counsel and their experts, with a

"glossary" to assist all parties in hopefully agreeing to consistent terminology to use in continuing the debate the "on-going" debate for the benefit of this court's ultimate task.

For these reasons, the Defendant Washington Group International, Inc.'s and Motion To Strike Portions Of Dr. Robert Bea's "Rebuttal Report" (Rec. Doc. 20764), in conjunction with the April 13, 2012, letter from counsel for WGI to the Court regarding Dr. Bea's April 11, 2012, pre-Rebuttal Deposition Submission, and The United States' Motion to Strikes Portions of Dr. Robert Bea's "Rebuttal" Report (Rec. Doc. 20758) should be denied.

Respectfully Submitted,

PLAINTIFFS' LIAISON COUNSEL
  s/ *Joseph M. Bruno*
JOSEPH M. BRUNO (La. Bar No. 3604)
BRUNO & BRUNO, L.L.P.
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

MR-GO PLAINTIFFS SUB-GROUP LITIGATION COMMITTEE

    s/ *James Parkerson Roy*
JAMES PARKERSON ROY (La. Bar No. 11511)
MR-GO PSLC Liaison Counsel
Domengeaux Wright Roy & Edwards LLC
P.O. Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

for

11

                MR-GO PLAINTIFFS SUB GROUP LITIGATION COMMITTEE
Jonathan Andry (The Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 16th day of April, 2012.

                /s/ *Joseph M. Bruno*
                Joseph M. Bruno