GERARD COLLETTI                                    April 2, 2008

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES        CIVIL ACTION

CONSOLIDATED LITIGATION              NO. 05-4182 K2

                                     JUDGE DUVAL

PERTAINS TO                          MAG. WILKINSON

(Robinson, No. 06-2268)


          Deposition of GERARD A. (JERRY)

COLLETTI, given at the U.S. Army Corps of

Engineers New Orleans District offices, 7400

Leake Avenue, New Orleans, Louisiana

70118-3651, on April 2nd, 2008.


REPORTED BY:

          JOSEPH A. FAIRBANKS, JR., CCR, RPR

          CERTIFIED COURT REPORTER #75005

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

| | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | REPRESENTING THE PLAINTIFFS: |
| 3 | |
| 4 | LAMBERT AND NELSON |
| 5 | (BY: HUGH P. LAMBERT, ESQUIRE) |
| 6 | 701 Magazine Street |
| 7 | New Orleans, Louisiana 70130 |
| 8 | 504-581-1750 |
| 9 | - and - |
| 10 | BRUNO & BRUNO |
| 11 | (BY: JOSEPH M. BRUNO, ESQUIRE) |
| 12 | (BY: FLORIAN BUCHLER, ESQUIRE) |
| 13 | (BY: SCOTT JOANEN, ESQUIRE) |
| 14 | 855 Baronne Street |
| 15 | New Orleans, Louisiana 70113 |
| 16 | 504-525-1335 |
| 17 | - and - |
| 18 | ANDRY LAW FIRM |
| 19 | (BY: JONATHAN B. ANDRY, ESQUIRE) |
| 20 | 610 Baronne Street |
| 21 | New Orleans, Louisiana 70113 |
| 22 | 504-586-8899 |
| 23 | - AND - |
| 24 | |
| 25 | |

| | Page 4 |
|---|---|
| 1 | ALSO PRESENT: |
| 2 | JOSEPH E. BEARDEN, III, ESQ. |
| 3 | KEA SHERMAN, ESQ. |
| 4 | THOMAS P. ANZELMO, ESQ. |
| 5 | ROBERT B. FISHER, JR., ESQ. |
| 6 | CHARLES LANIER, ESQ. |
| 7 | CHRISTOPHER THATCH, ESQ. (VIA I-DEP) |
| 8 | ADAM CHUD, ESQ. (VIA I-DEP) |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | VIDEOGRAPHER: |
| 25 | GILLEY DELORIMIER (DEPO-VUE) |

| | Page 3 |
|---|---|
| 1 | SHER, GARNER, CAHILL, RICHTER, KLEIN & |
| 2 | HILBERT, L.L.C. |
| 3 | (BY: MATTHEW CLARK, ESQUIRE) |
| 4 | 909 Poydras Street, 28th Floor |
| 5 | New Orleans, Louisiana 70112-1033 |
| 6 | 504-299-2100 |
| 7 | |
| 8 | REPRESENTING THE UNITED STATES OF AMERICA: |
| 9 | UNITED STATES DEPARTMENT OF JUSTICE, |
| 10 | TORTS BRANCH, CIVIL DIVISION |
| 11 | (BY: DAN BAEZA, ESQUIRE) |
| 12 | (BY: KEITH LIDDLE, ESQUIRE) |
| 13 | P.O. Box 888 |
| 14 | Benjamin Franklin Station |
| 15 | Washington, D.C. 20044 |
| 16 | 202-616-4289 |
| 17 | |
| 18 | REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS: |
| 19 | CORPS OF ENGINEERS, OFFICE OF COUNSEL |
| 20 | (BY: DAVID R. DYER, ESQUIRE) |
| 21 | 7400 Leake Avenue's |
| 22 | New Orleans, Louisiana 70118-3651 |
| 23 | 504-862-2843 |
| 24 | |
| 25 | |

| | Page 5 |
|---|---|
| 1 | E X A M I N A T I O N   I N D E X |
| 2 | |
| 3 | EXAMINATION BY:                    PAGE |
| 4 | |
| 5 | MR. BRUNO ................................7 |
| 6 | E X H I B I T   I N D E X |
| 7 | |
| 8 | EXHIBIT NO.                      PAGE |
| 9 | Exhibit Colletti 1 ...........................7 |
| 10 | Exhibit Colletti 2 ..........................12 |
| 11 | Exhibit Colletti 2 ..........................14 |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

2 (Pages 2 to 5)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 6

```
 1          S T I P U L A T I O N
 2         IT IS STIPULATED AND AGREED by and
 3   among counsel for the parties hereto that the
 4   deposition of the aforementioned witness may be
 5   taken for all purposes permitted within the
 6   Federal Rules of Civil Procedure, in accordance
 7   with law, pursuant to notice;
 8         That all formalities, save reading
 9   and signing of the original transcript by the
10   deponent, are hereby specifically waived;
11         That all objections, save those as to
12   the form of the question and the responsiveness
13   of the answer, are reserved until such time as
14   this deposition, or any part thereof, is used
15   or sought to be used in evidence.
16
17
18              *  *  *
19
20
21
22         JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23   Certified Court Reporter in and for the State
24   of Louisiana, officiated in administering the
25   oath to the witness.
```

Page 7

```
 1         GERARD A. (JERRY) COLLETTI
 2   P.O. Box 60267, New Orleans, Louisiana
 3   70160-0267, a witness named in the above
 4   stipulation, having been first duly sworn, was
 5   examined and testified on his oath as follows:
 6   EXAMINATION BY MR. BRUNO:
 7     Q.  Good morning, Mr. Colletti.  As I said
 8   before, my name is Joseph Bruno.
 9         MR. BAEZA:
10            Before we get started, just to
11         make sure of the usual stipulations,
12         Federal Rules and CMOs?
13         MR. BRUNO:
14            Oh, yes.  Yes.  Yes.  Yes.
15   EXAMINATION BY MR. BRUNO:
16     Q.  And actually I'd like to mark as
17   Exhibit Colletti Number 1 a document that
18   counsel was kind enough to give me this
19   morning.
20         Mr. Colletti, would you, for the
21   record, explain what this document is.
22         (Exhibit Colletti 1 was marked for
23   identification and is attached hereto.)
24     A.  This is my résumé going back all my
25   years here at the Corps --
```

Page 8

```
 1     Q.  Great.  All right.
 2     A.  -- as well as my high school
 3   background, as well as some knowledge, skills
 4   and abilities which is things we submit when we
 5   apply for the a new position.  So that was back
 6   in 2006, which kind of shows some of the
 7   background.
 8     Q.  All right.  Well, I deeply appreciate
 9   you providing this to us.  In fact, if you'll
10   just confirm that everything that's contained
11   in this document is true and correct to the
12   best of your knowledge, information and belief,
13   it will shorten --
14     A.  It is.
15     Q.  Oaky.  All right.  Let's see.  Now,
16   we've -- you graduated UNO?
17     A.  1982.
18     Q.  '82.  And you got a BS in civil
19   engineering.  Are you a licensed civil engineer
20   in any state?
21     A.  I'm not a professional licensed.  I'm
22   an EIT, as they call it.  An engineer in
23   training.  I never went forward and got the
24   professional license, no.
25     Q.  Why don't you just share with us for
```

Page 9

```
 1   the record, so that we will know, what is -- is
 2   the only distinction between an engineer in
 3   training and a licensed professional engineer
 4   the fact of obtaining the license?
 5     A.  Basically, it's, you then can stamp
 6   the drawings and such --
 7     Q.  Right.
 8     A.  -- and design.  And I've never been in
 9   the design background, so --
10     Q.  So you didn't need it.
11     A.  -- I saw no need for it.
12     Q.  What do you have to do -- if that's
13   what you wanted to do, what would you have to
14   do, just make an application?
15     A.  At the time, after four years you take
16   a test.  You take a test with the Louisiana
17   state licensing board, and if you pass that
18   test then you're licensed.
19     Q.  Okay.  All right.  Now, and I gather
20   from your résumé that your first employment and
21   actually sole employment all these many years
22   has been with the United States Army Corps of
23   Engineers.
24     A.  Pretty much professionally wise.  I
25   mean, I worked at a gas station and I threw
```

                                     3 (Pages 6 to 9)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

1  newspapers and, you know --
2     Q.  Like we all did.  I sol shoes, which
3  is probably the worst thing you can do.
4        All right.  Well, then, let's just
5  kind of go through each paragraph in a general
6  sense.  You've broken this down into groupings
7  of time.  You start with May '77 to August '85.
8  And you indicate you were a trainee through
9  journeyman engineer.
10    A.  Correct.
11    Q.  All right.  Just quickly what is a
12  trainee?
13    A.  Trainee -- I was a co-op student.
14    Q.  What does that mean?
15    A.  That was a student -- while I was
16  going to UNO to pursue my bachelor's degree, I
17  was working here part-time.  Well, full-time
18  actually, by semester.  And I did that I
19  believe it was seven semesters, actually school
20  semesters until '82 when I graduated.  Then I
21  came on full-time as a civil engineer.  And
22  from there, I worked up -- you started at a
23  GS-07 level, worked to a GS-11 level.
24    Q.  All right.  Now --
25       MR. BRUNO:

1        Is that your Bates number?
2     MR. BAEZA:
3        It not Bates stamped.
4     MR. BRUNO:
5        Is that a reference number that
6     we can use?
7     MR. BAEZA:
8        I believe it is a reference
9     number.  It's just the way that we
10    Bates stamp the documents looks a
11    little bit differently, generally,
12    from the way it's formatted on here.
13    It's a smaller font and a different
14    font.  But that's the right, um --
15    container designation.
16    MR. BRUNO:
17       I just want to know that if I use
18    this number it will make some sense to
19    you guys, that's all.
20    MR. BAEZA:
21       Yeah, and if we just include it
22    as an exhibit it should be fine.
23    MR. BRUNO:
24       Yeah.  Again, because I don't
25    have copies.  Given the frequency of

1        these depositions, it's been kind of
2     hard.
3     MR. BAEZA:
4        Because we have millions of
5     documents it's kind of hard to look at
6     on and say, oh, yeah, yeah, that's
7     definitely ours.
8     MR. BRUNO:
9        All right.  Well, let me --
10    EXAMINATION BY MR. BRUNO:
11    Q.  Mr. Colletti, I'm going to show you a
12  document, and we'll mark this as Colletti
13  Number 2.  We'll accept the responsibility to
14  photocopy it and provide it to the court
15  reporter.  Let me show that to you and ask you
16  if you can identify, first, what this thing is.
17       (Exhibit Colletti 2 was marked for
18  identification and is attached hereto.)
19    A.  Okay, this is the organizational chart
20  for the district.  This top page is the
21  overall, um -- organization.
22  EXAMINATION BY MR. BRUNO:
23    Q.  All right.  Can you tell me -- and I
24  understand there may be some technical changes,
25  but since '77 does that generally reflect the

1  way the district office is organized?
2     A.  Well, we've changed names of
3  organizations, from '77.  You know, you didn't
4  have, as we call it, PPP, Planning, Programs
5  and Project Management Divisions.  So there's
6  been changes in that sense.  There's been name
7  changes to types of things.
8     Q.  Uh-huh.
9     A.  You know, but primarily as far as the
10  Corps is concerned, other than going to a life
11  cycle business process type of thing, it's
12  pretty much remained --
13    Q.  Okay.
14    A.  -- somewhat the same.
15    Q.  Are you able to discern from your
16  review of the document what year does that
17  reflect the actual titles and positions, et
18  cetera, of the various organization?
19    A.  Well, we've got Colonel Wagenaar and
20  Colonel Starkel up there, so that had to be
21  between, I'd say, somewhere between, oh, '06 --
22  so, '03, to -- somewhere between 2003, 2006.
23    Q.  Okay.  All right.  Let me have it
24  back, if I may.
25    A.  (Tendering.)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

---

Page 14

1    Q.  Can you explain for me, if there is a
2  way to explain this, at what point in the
3  organization you go from military to non
4  military personnel?
5    A.  Well, pre-Katrina, military, you had
6  military only in the executive office.  You had
7  them in the executive office and you
8  occasionally had a captain or a major that was
9  assigned maybe either to a construction
10  division, or we had one many years ago in
11  operations division.  But your leadership, you
12  had a commander and a deputy commander was the
13  primaries.
14    Q.  A commander and a deputy commander.
15  And to make the connection to this document,
16  which by the way I'm marking as Colletti number
17  2, the commander when this organizational chart
18  was prepared was Richard Wagenaar?
19        (Exhibit Colletti 2 was marked for
20  identification and is attached hereto.)
21    A.  Wagenaar.
22  EXAMINATION BY MR. BRUNO:
23    Q.  And the deputy commander was Major
24  Murray Starkel.
25    A.  That's correct.

---

Page 15

1    Q.  Okay.  All right.  The actual working
2  divisions of this office are its engineering
3  divisions, real estate, planning, operations
4  and the like, wouldn't you agree?
5    A.  The technical divisions, you know,
6  construction -- engineering, construction,
7  project management, planning --
8    Q.  Okay.
9    A.  -- real estate, contracting.
10    Q.  What is your appreciation of the role
11  of the United States Army Corps of Engineers in
12  the context of our government; what do you guys
13  do?
14    A.  Well, basically, we do what Congress
15  directs us to do in terms of we're here to
16  serve in the states and local governments.
17  They request projects, and of course we
18  evaluate those projects and we request Congress
19  to authorize them, and if they're authorized
20  we'll build them.
21    Q.  All right.  Clearly, though, and tell
22  me if I'm misinterpreting what you said,
23  Congress is your boss.
24    A.  That's the way I see it, yes.  We act
25  upon what they direct us to do.

---

Page 16

1    Q.  And the services that you provide to
2  the Congress are, generally, engineering
3  services?
4    A.  Well, we do a little bit of
5  everything, you know, within the Corps, so you
6  start out in the planning phase, then you go to
7  engineering, then construction, and then
8  finally operations gets it --
9    Q.  Okay.
10    A.  -- you know.
11    Q.  Do y'all actually build -- I mean,
12  frankly, yesterday we had, at counsel 's
13  request, and legitimately so, a request that we
14  distinguish between when the Corps actually
15  does the build as opposed to let contracts to
16  third parties to build.  So in that context,
17  does the Corps actually build?  Do you have
18  journeymen working for you with hammers and
19  nails and fix --
20    A.  Contractors build our levees, for the
21  most part.
22    Q.  Right.
23    A.  We do have a hired labor unit that we
24  can do minor, you know, repairs to levees and
25  such.  We have one unit, a dirt moving unit

---

Page 17

1  that does, you know, some minor repairs if need
2  be.
3    Q.  Okay.
4    A.  But we don't go build full levee
5  sections or anything of that sort.
6    Q.  All right.  Is it fair for me to
7  conclude that the actual, as you've described
8  it, repair work that you do is repair work
9  that's done in connection with the maintenance
10  of flood control structures?
11    A.  Primarily, yes.  We have a
12  responsibility on the Mississippi River and
13  Tributaries Project for a major maintenance
14  requirement, whereas the locals do minor
15  maintenance and routine maintenance.  Um -- if
16  I could give an example for that, if there's a
17  levee slide, if it's a small slide that we feel
18  that the sponsor, the non-federal sponsor, the
19  levee district or whichever could do, you know,
20  then we would direct them the go ahead and make
21  that repair.  If we believe it's above their
22  capabilities and we consider that major
23  maintenance, and that's decided by the
24  commander --
25    Q.  Uh-huh.

---

JOHNS PENDLETON COURT REPORTERS              800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                        April 2, 2008

Page 18

1    A.  -- we then would, you know, use either
2  our own forces if we had them available,
3  because like I said, we only have one unit, or
4  we can, you know, go to contract and have it
5  repaired that way.
6    Q.  All right.  Well, let me then learn
7  about that unit.  First of all, where is it on
8  the chart?  Is it on the chart?
9    A.  It's within operations division.  It
10  will be showing them in the physical support
11  branch of operations division.  I'm not sure
12  where we're at now.
13    Q.  I'm going to hand it to you.  I don't
14  even know why I tried.
15    A.  Let's see.  I thought ops was in the
16  back.  Okay.  Here's operations division.
17    Q.  Is there, in the bottom left-hand
18  corner, a number?
19    A.  On this?
20    Q.  Yeah.  You see that number there?
21  Would you read that?
22    A.  This is the start of operations
23  division.
24      MR. BAEZA:
25        No, the MBD--

Page 19

1  EXAMINATION BY MR. BRUNO:
2    Q.  Yeah.  If you would read that into the
3  record I would appreciate it.
4    A.  MVD-007-000002678.
5    Q.  Okay.  Thanks.
6    A.  Page 11 of this document.
7    Q.  Great.  And do you find the --
8    A.  And then you'll see on here it says
9  physical support branch, Page 14?  So if we go
10  to Page 14 that's going to be Hired Labor Unit
11  D, at the bottom.
12    Q.  All right.  And for the record,
13  Page 14 has a number on it MVD-007-looks like
14  000002681.  And again, for the record, Colletti
15  2 is, itself, marked MVD-007-000002668.
16      All right.  So on Page 14 I see at the
17  top operations division, and then below
18  that I see the physical support branch.  Okay,
19  so the physical support branch is there to
20  provide labor and equipment to do minor
21  repairs.
22    A.  Right.  We -- you know, those units --
23  we have four units, three of them are floating
24  plant units which generally do repairs to our
25  locks and navigation structures.  And Unit D is

Page 20

1  an earth moving unit that can do, you know,
2  earth repairs.
3    Q.  All right.  You're getting a little
4  ahead of me.  I'd like to just take it in baby
5  steps, if you don't mind.  So the chief at this
6  time was Accardo, and it looks to me like below
7  him he's got a, um -- marine management
8  section.
9    A.  Uh-huh.
10    Q.  Okay.  And then below that, he's got a
11  Dredge WHEELER.  What do those guys do?
12    A.  Okay.  That's the ocean going dredge
13  that we use out here.  It's a hopper dredge
14  that, um -- primarily we use it within
15  Southwest Pass to keep the Mississippi River
16  open.  It can be used elsewhere.  It's one of
17  the largest dredges in the country.
18    Q.  Okay.
19    A.  And --
20    Q.  And it's parked right out front.
21    A.  It's parked right out there right now.
22      And the marine -- you talked about the
23  marine management unit.  They support, you
24  know, that dredge.
25    Q.  The dredge.  Great.  Okay.

Page 21

1      Then on the right-hand side of the
2  page I see something called the facilities
3  management section, and then below that, a
4  shops unit.  What do those guys do?
5    A.  Shops unit, you've got plumbers,
6  you've got machinists, you've got welders and
7  such, and they support those hired labor units
8  when they're doing repairs at the locks and
9  such.
10    Q.  All right.  Now, and in the center is
11  what's called the maintenance section, and
12  below the maintenance section there are these
13  four hired labor units labeled A, B, C and D.
14  And these are the guys that actually do the
15  maintenance work, as needed or directed by the
16  deputy chief here.
17    A.  That's correct.
18    Q.  Okay.  Unit A:  That's a marine unit,
19  right?  Because there's a tow boat --
20    A.  Floating plant as we call it.
21    Q.  You call it a floating plant.
22    A.  We call it floating plant unit, yes.
23    Q.  So clearly they do work on water.
24    A.  (Nods affirmatively.)
25    Q.  And generally, the kind of maintenance

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                         April 2, 2008

Page 22

1   that these guys do would be to the locks -- and
2   anything else?
3      A.  Pretty much the locks.  I mean, we
4   have a control structure but, you know, we
5   haven't used those guys other than, you know,
6   maybe up on the handrails and things of that
7   sort.  But those folks generally do the lock
8   dewatering and repairs to the guide walls and
9   pretty much routine maintenance on those
10  structures.
11     Q.  When you open or close the spillway,
12  these guys do that?
13     A.  No.  No.
14     Q.  That's somebody else.
15     A.  No.  That's a whole separate group at
16  the spillway.  We could supplement those folks
17  up there, you know, if we needed additional
18  people.  These types after skilled enough to
19  where we could utilize them, but they're not
20  primary on that.  That's a whole separate unit.
21     Q.  So B and C are the same.
22     A.  A, B and C are pretty much all the
23  same.  They don't all have the same number of
24  people or the same equipment.
25     Q.  Right.  Generally speaking --

Page 23

1      A.  Generally speaking, yes.
2      Q.  -- they all work on water.
3      A.  Yes.
4      Q.  Is there an occasion where the work on
5   water guys would be called upon to do any levee
6   work?
7      A.  Generally, they don't.
8      Q.  Okay.
9      A.  The water guys.  The unit -- the dirt
10  unit, you know, their work is very different
11  than them, than the floating plant group.
12     Q.  You know, this is probably a good time
13  for me to get an understanding for the record
14  of the geographic area over which this office
15  has responsibility and, therefore, the
16  maintenance obligation.
17        Can you describe for me what that area
18  is?
19     A.  Okay.
20        MR. BAEZA:
21           Jerry, there's a map here if you
22        need to reference it.
23        MR. BRUNO:
24           If this is big enough.  I don't
25        know.

Page 24

1      A.  No.  This is just the New Orleans
2   area.  Actually, you know, our district -- we
3   go from the east pretty much the Slidell area
4   on up all the way into -- we go beyond the Old
5   River control structure to near Black Hawk,
6   Louisiana, that's mid central, and then over
7   towards Alexandria, Alexandria almost to the
8   Texas border, not quite, and then we come down
9   along the Sabine River, just west of Lake
10  Charles.
11     Q.  So.
12     A.  So we got about thirty thousand square
13  miles of that area.
14        MR. BAEZA:
15           There's a smaller map right here.
16        MR. BRUNO:
17           Owe, there we go.  There's a
18        little box around it.
19  EXAMINATION BY MR. BRUNO:
20     Q.  So I can conclude from that that the
21  geographic --
22     A.  Yeah.  But that box --
23     Q.  That's not big enough.
24     A.  No, we go way --
25        MR. BAEZA:

Page 25

1           That's just a map of Louisiana.
2           This box reps what's here.
3   EXAMINATION BY MR. BRUNO:
4      Q.  And clearly the geographic area is, in
5   its entirety, located in Louisiana.
6      A.  Yes.
7      Q.  Okay.
8      A.  Our district is.
9      Q.  Okay.  And then I'm just wondering if
10  there's a logical conclusion that can be made
11  here that the amount of work that you guys do
12  on the waters, about 75 percent of the
13  maintenance work that you do, and the land work
14  is about 25 percent?  Or does that make sense?
15     A.  No.  No, it doesn't.  You know, like I
16  said, you know, locks -- those groups that are
17  going to the locks, these are always doing
18  repairs at locks.  There's always barges
19  hitting the guide walls and, you know, or
20  sometimes they actually hit gates and things,
21  and so those units are actually going around
22  the state throughout, you know, to all the
23  different locks, control structures from a
24  navigation standpoint.  Whereas the work -- the
25  dirt unit, you know, is primarily on levees and

JOHNS PENDLETON COURT REPORTERS              800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                              April 2, 2008

Page 26

1  such.
2      Q.  Got you.  All right.  Let's go back to
3  just the general organizational chart that we
4  have got here.  It appears to me, and again I
5  could be wrong, but all of the resource
6  management folks, logistics, civilian
7  personnel, information management, counsel,
8  internal review, safety, security, public
9  affairs, all those guys really support the
10  technical staff.
11     A.  For the most part, yes.
12     Q.  Because what you guys do, generally,
13  not everything, is the engineering component.
14     A.  Well, I mean, we do management.  You
15  know, we do operation and maintenance within
16  operations.  So -- but those are called the
17  support offices, so I would say that's --
18     Q.  Okay.  All right.  So how about this:
19  If we really want to focus on what the work of
20  this office, we would look at the
21  organizational chart where it says the
22  technical staff.  We could have a better
23  understanding of what this office actually
24  does.
25     A.  From the technical standpoint?  Yes.

Page 27

1      Q.  All right.  Now, I see here that there
2  is an engineering division, there's a real
3  estate division, there's a contracting
4  division, there's a planning, programs and
5  project management division, a construction
6  division and an operations division.
7      A.  (Nods affirmatively.)
8      Q.  Now I recognize that there's different
9  variants of those names over time, but are
10  there any divisions that have been disbanded or
11  removed in your tenure here?
12     A.  Not from a division standpoint.  Like
13  I said, the only one that really got created
14  from the time that I've been here was the
15  planning, programming and project management,
16  which they consolidated planning division, and
17  when they went to the life cycle project
18  management, they added that component.
19     Q.  Okay.  You anticipated my next
20  question, which is which divisions were added,
21  but you gave me that one.  Any other divisions
22  added?
23     A.  Um -- not that I'm aware of.  We've
24  always had the standard others which carried
25  you straight forward.

Page 28

1      Q.  All right.  So let's talk then
2  generally about the engineering division.  I
3  see that it is divided into a variety of what
4  appear to me to be disciplines within
5  engineering; structures, hydraulics and
6  hydraulic branch, geotechnical branch, design
7  services branch, cost engineering branch,
8  engineering control branch, general
9  engineering, and the civil branch.
10         Is it accurate for me to conclude that
11  this is basically broken up by discipline?
12     A.  I mean, the way they do their work in
13  engineering division, they pretty much split
14  out by -- not necessarily by discipline but by
15  the types of work that they do.  If you have
16  structural design versus hydraulics, doing
17  hydraulic analyses and water stream management,
18  gauging and such, so they break it out that
19  way.
20     Q.  Got you.  Now, I haven't gone very
21  carefully through your vitae, but have you
22  worked in the engineering division during your
23  tenure?
24     A.  Very, very briefly, when I first
25  graduated college there was a training program

Page 29

1  at the district that required you to go through
2  the various offices for orientation.
3      Q.  Okay.
4      A.  So it was very, very brief.  And you
5  only spent maybe a day or two in a specific
6  office as you went around.
7      Q.  All right.  Over the course of your
8  tenure here, your many, many years, have you
9  had an opportunity to get some understanding of
10  how the engineering division is organized?
11     A.  Yes.
12     Q.  Okay.  So very generally, what does
13  the structures branch do?
14     A.  Those folks primarily deal with your
15  structural design, flood walls in particular.
16  That's your main structural component of the
17  engineering division.  I mean, they do -- they
18  do some analyses for operations division, if we
19  were replacing a guide wall or such, for one of
20  our structures, but it's pretty much as the
21  term states, they deal with solid structures.
22     Q.  Okay.  How about hydraulics and
23  hydrologic?
24     A.  That's the water folks.  They deal
25  with hydraulic design, collection of hydraulic

8 (Pages 26 to 29)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 30

1    data and hydrology data, rainfall, river
2    forecasting, any type of analyses that are done
3    for studies in projects, when they go in they
4    do a hydraulic analysis.
5        Q.  Would those folks be the ones that
6    would evaluate and understand wave action?
7        A.  I would think so.  Best of my
8    knowledge, I believe that's the folks that work
9    with that.
10       Q.  Next one is geotechnical branch.  What
11   do those folks do?
12       A.  That's your soils, soils and stability
13   folks.  They do analyses -- stability analyses
14   on your flood walls and your levees and such.
15   They do analysis of permits for our operations
16   division when we review permits that may affect
17   the levees or the flood walls.  They do
18   geotechnical analysis to determine if there is
19   any adverse impacts on it and such.
20       Q.  Are you aware of any set of guidelines
21   which would give third parties some indication
22   of when it's necessary and/or appropriate tod
23   obtain a permit to work around a flood control
24   structure?
25       A.  Well, that's something I've dealt with

Page 31

1    for many years.  We never had anything actually
2    published, but we have specific guidelines,
3    criteria that we use.  You know, we've had lots
4    of people ask for that, we just never got
5    around to doing it.
6        Q.  Okay.  Do you know if any other
7    districts have such a guideline in print?
8        A.  That I don't know.
9        Q.  Okay.  Well, I'm just curious and I
10   have to ask, how does the third-party person
11   know to come to you and request a permit if
12   there is nothing really out there written?
13       A.  Generally, you know, the
14   contractors -- it's part of the state -- as far
15   as I know, it's parts of the state, um --
16   licensing, they're supposed to know that,
17   although I don't believe that they always do.
18   But generally, when they go get a parish
19   building permit, that's where we work through
20   the levee district or the local sponsor who
21   actually is issuing the permit, or the letter
22   of no objection, whatever it may be, as far as
23   that, and we have to stay on the parish to make
24   sure that they say, look, you also have to get
25   a levee district permit for such work.

Page 32

1        Q.  How about when the Corps itself is the
2    agency doing the work, and by that I don't
3    mean, you know, actually carrying the shovel
4    but maybe designing and/or contracting work?
5        A.  Well, there's another component when
6    you're talking about permitting, and I'm not
7    sure if that's what you're saying.  When we
8    talk about our regulatory branch, which is work
9    either in a wetlands or on a navigable
10   waterway, then a Department of the Army permit
11   is actually issued, versus the levee district.
12   And then in some case us you need both.
13       Q.  Uh-huh.
14       A.  If you had like a dock with a walkway
15   back to the levee.  So there's some overlap
16   there.  But in terms of what we do work, our
17   work is strictly on the project itself.  So
18   what we get is a right of entry from the
19   sponsor, which in most cases is the state levee
20   district.
21       Q.  I understand, and I know that I'm
22   asking these questions without the level of
23   knowledge that you have, but we learned
24   yesterday about -- and I don't want to draw
25   objections as to whether I'm being accurate in

Page 33

1    my memory of what was said, but generally
2    speaking, I was given to understand that there
3    was a need to assess holes and excavations that
4    may be done at or near flood control
5    structures.
6            Is that the kind of think that you
7    were thinking about when you said that they
8    needed -- and I think you used the word permit.
9    Forgive me.  I don't recall precisely what word
10   you used, but is that what you were thinking
11   about?
12       A.  Yes.  And if I can elaborate, on the
13   Mississippi River and Tributaries Project, and
14   sometimes you'll hear me say MR&T project --
15       Q.  You guys love those acronyms?
16       A.  Oh, they got plenty.  But that's a big
17   one, and that's the main line Mississippi River
18   and the Atchafalaya Basin protection levees.
19   Very different than the hurricane protection
20   levees and structures.
21           For Mississippi River and Tributaries
22   Project, subsurface work, excavations, pile
23   driving, wells, water wells, gas wells, things
24   of that sort, seismic surveys, work within
25   1500 feet of the center line of the Mississippi

JOHNS PENDLETON COURT REPORTERS              800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 34

1  River and tributaries levees requires a permit.
2  Okay?
3      For hurricane protection where you
4  don't have water against those structures
5  generally on a regular basis like you might
6  have here on the river, we use 300 feet.  And
7  those are just -- that's our district, what
8  we've used for as long as I've been here in
9  terms of the distances from the levee center
10  line.  So it's 300 feet for hurricane
11  protection projects, it's 1500 feet on MR&T,
12  for subsurface type work.
13     Q.  Let me ask you a specific question,
14  because at least in my mind, and because it's
15  the subject of what we're talking about,
16  clearly, is the MRGO, which is a little
17  mixture, you've got not quite like the river
18  but it's close.  In the instance of that
19  hurricane protection structure that runs along
20  the MRGO from, generally, La Loutre to
21  Bienvenue, which number do you think, if you
22  don't know, would apply, the 300-foot number or
23  the 1500-foot number?
24     A.  300.
25     Q.  300.

Page 35

1      A.  That's a hurricane protection project
2  and we applied 300 feet.
3      Q.  Okay.  Let me also then ask you, again
4  because that's what we're here to talk about,
5  Lower Nine, at the locations of the north and
6  south breach on the east side --
7      A.  Okay.
8      Q.  -- okay?  300 or 1500?
9      A.  300.
10     Q.  300.  And that's because it's a
11  hurricane protection levee as opposed to?
12     A.  And floodwall.
13     Q.  What would you call this levee out
14  here?
15     A.  That's Mississippi River.
16     Q.  I know.  But in the context of
17  hurricane --
18         MR. BAEZA:
19             Referring to the levee right
20         outside this office?
21         MR. BRUNO:
22             Right.
23         MR. BAEZA:
24             Okay.
25         MR. LAMBERT:

Page 36

1          The one we're sitting on.
2          MR. BRUNO:
3              This itself is a levee right
4          here.
5          THE WITNESS:
6              He's right.
7  EXAMINATION BY MR. BRUNO:
8      Q.  I recognize you wouldn't call this a
9  hurricane protection levee, but what
10  nomenclature would be appropriate to
11  distinguish it from a hurricane protection
12  levee?
13     A.  A riverine, MR&T.
14     Q.  MR&T?
15     A.  Mississippi River and Tributaries.
16  It's part of the Mississippi River and
17  Tributaries Project.
18     Q.  Got you.  And is that considered a
19  flood control project or is that considered a
20  navigation project, if you know?
21     A.  The levee is considered a flood
22  control project.
23     Q.  Okay.  But it just has a different
24  name, it's called riverine versus hurricane
25  protection.

Page 37

1      A.  Correct.
2      Q.  I guess I'm getting it.
3      A.  And that's based on what it's designed
4  for.
5      Q.  And would I be correct in concluding,
6  perhaps logically, depending upon who's
7  listening to me, that the flood protection from
8  the riverine type situation is from rising
9  waters from winter runoff up north as opposed
10  to the hurricane protection which is surge that
11  is visited upon us from high winds connected
12  with a hurricane.
13     A.  Correct.
14     Q.  Not so bad, huh?
15     A.  That's always the way I understood
16  them.
17     Q.  All right.  Good.  Now, do you know,
18  in the context of the 300 feet relative to
19  hurricane protection structures, relative to
20  proposed excavations and the like, what the
21  nature of the assessment is?  What are they
22  assessing?
23     A.  Basically, we're looking for impacts
24  on that levee or structure.  If you're coming
25  in as an applicant and you're proposing to put

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 38

1  a pipeline in and crossing that levee, you
2  know, we have criteria that says you cannot go
3  through the levee, you have to go up and over
4  the levee and cover it. So we have standard
5  criteria that we use. We do everything on a
6  case-by-case basis, but when we do that
7  evaluation we generally do a geotechnical
8  evaluation, we send it through our engineering
9  division, depending on the type of proposal it
10 may go to geotechnical, it may go to
11 hydraulics, it may go to the levees unit and
12 civils branch, or the waterways group in
13 civilis branch. It depends on the type of
14 proposal that an applicant would have.
15     Q.  Then if I may, allow me to give you an
16 example, which is a hypothet because it's just
17 the nature of how we have to do it. I don't
18 want to haul in here the WGI contract, but I
19 will if we need to.
20         Generally, I'm just curious, are you
21 at least generally familiar with the work that
22 was done by the WGI on the water side of the
23 hurricane protection structure at or near the
24 north and south breaks at the Lower Ninth Ward?
25     A.  I'm not sure.

Page 39

1     MR. BAEZA:
2         Before he answers, I'm just going
3  to object again, as we did yesterday,
4  Because the EBI has not been added to
5  the complaint.
6     MR. BRUNO:
7         Understood. And I told you that
8  I would agree with you that that
9  objection would be -- I would agree
10 that it's continuing. We understand
11 the controversy, we recognize that
12 it's a controversy, and I'm not going
13 to hold it against you if you didn't
14 object at any --
15     MR. BAEZA:
16        Each day?
17     MR. BRUNO:
18        -- each and every point each day
19 or whatever. I know it's a
20 controversy and I understand your
21 position and, no, I'm not going to
22 say, you know, you didn't cross your T
23 properly.
24     MR. BAEZA:
25        All right. Thanks.

Page 40

1     A.  I don't know who is W --
2  EXAMINATION BY MR. BRUNO:
3     Q.  The Washington Group International did
4  some -- well, just assume this to be accurate,
5  that the WGI, the Washington Group
6  International, was hired by the United States
7  Army Corps of Engineers in connection with a
8  TERC. Do you know what a TERC is, a Total
9  Environmental Remediation Contract? Does that
10 sound at all familiar?
11     A.  No.
12     Q.  Fair enough.
13     A.  No.
14     Q.  That's fine. Then we won't go there.
15 We'll go there from the perspective of a
16 hypothet.
17         You're digging a hole within 300 feet
18 of the center line of the east side hurricane
19 protection structure on the Industrial Canal
20 and you're going down about 25 feet to remove,
21 I don't know, some object down there. Do you
22 know what kind of -- and you're on the water
23 side, if I didn't make that clear.
24         Just generally, what kind of an
25 assessment your engineering division would do

Page 41

1  in that context?
2     MR. BAEZA:
3         Objection. Vague, calls for
4  speculation. The witness says he
5  doesn't have personal knowledge of
6  this contract.
7     MR. BRUNO:
8         Right. And I did take that out
9  of the hypothet. I made it into a
10 hypothet. I'm not making any
11 reference to WGI. It's a pure
12 hypothet.
13        Hole, gave you the location, gave
14 you the depth, gave you within 300
15 feet. Okay?
16     MR. BAEZA:
17        Object to vagueness, calls for
18 speculation.
19     MR. BRUNO:
20        Understood.
21     A.  So if I understand you correctly,
22 you're talking about a hole in the Industrial
23 Canal, within 300 feet --
24 EXAMINATION BY MR. BRUNO:
25     Q.  -- Uh-huh.

                                    11 (Pages 38 to 41)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                        April 2, 2008

---

Page 42

1    A.  Of the structure.  Generally, if it
2  was not under the emergency conditions, if it
3  was an applicant coming in to do that versus
4  us, we would require a Department of the Army
5  permit through our regulatory branch and also
6  the Orleans Levee District would require a
7  permit or a letter of no objection because of
8  the impacts it may have on the wall.
9    Q.  Got you.
10    A.  Okay?  When that request would come
11  through, it goes through our engineering
12  division, and geotechnical looks at it from a
13  structural -- geotechnical structural
14  standpoint.  Factor of safety, what impact it
15  may have on the adjacent wall or levee.  Okay?
16        It would also go to the waterways
17  group because of the navigation interests going
18  through there.  You know, so primarily it goes
19  through a complete engineering evaluation
20  within the Corps.
21    Q.  All right.  Now, I believe you
22  qualified your answer to be in the context of a
23  third party.  What about if it's the Corps
24  doing the work again through a contractor; is
25  there any difference in the evaluation?

Page 43

1    A.  No.  We just -- we do that prior to
2  developing the scope of work.  And that's
3  done -- the same type of think is done where we
4  would be developing the plans and specs
5  in-house --
6    Q.  Right.
7    A.  -- and saying, you know, here's the
8  scope of work, we've done the engineering
9  analysis, here's what needs to be done.
10    Q.  All right.  I don't want to get too,
11  too far ahead of myself because I want to
12  address this in our discussion of the
13  contracting division, and the Corps obviously
14  has the capacity and in fact in the past has
15  developed its own plans and specs, right?
16    A.  Yes, sir.
17    Q.  And the Corps also, from time to time,
18  will contract with the contracting party to do
19  all of the planning, specifications, scope of
20  work, itself.
21    A.  Use of like an
22  architectural/engineering firm, yes.
23    Q.  Right.
24    A.  Yes.
25    Q.  And in that context -- I'm sorry.  In

Page 44

1  the context, to the extent that it may or may
2  not be different from the Corps developing its
3  own plans, is the assessment of this hole any
4  different?
5    A.  It shouldn't be.  Generally, we
6  would -- you know, if we do an
7  architectural/engineering contract, we're
8  giving them guidance in the standards of what
9  we expect from them.  So it should be -- you
10  know, I don't do those but it should be the
11  same as what we would do in-house.
12    Q.  All right.  Let's move to the design
13  services branch of the engineering division.
14        Do you know what those guys do?
15    A.  Um -- most of those guys, I believe,
16  do -- I think surveys is in there, the
17  surveying group is in there, and the, um -- GIS
18  folks are in there.  I don't deal with them
19  very much.
20    Q.  Okay.  All right.  Next, what is the
21  cost engineering branch; do you know what those
22  guys do?
23    A.  I believe those folks, they do the
24  cost estimating for the government estimates
25  for any type of contracting.

Page 45

1    Q.  Do they also do this cost-benefit
2  analysis?  Or do you know?
3    A.  I don't know.
4    Q.  Next one is the engineering control
5  branch.  What do those guys do?
6    A.  Those guys track -- to the best of my
7  knowledge, they track the funding, the project
8  fundings of all the different work that goes
9  through engineering division.  You know,
10  they're more the -- I believe they're very
11  similar to our funding management group.
12    Q.  All right.  Next one is general
13  engineering branch.  What do those guys do?
14    A.  Um -- I'm not certain.
15    Q.  Fair enough.
16    A.  As a matter of fact, I think they've
17  been disbanded.  I'm not sure if they still
18  exist.
19    Q.  Okay.  Lack of work?
20    A.  I'm not sure.
21    Q.  Next one is the civil branch.
22    A.  Civil branch is a group that I work
23  generally with.  That's the levees designer
24  group.  They also have the waterways, channel
25  stabilization, deal with the revetments group

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 46

1  and such. But primarily most of my knowledge
2  with civil branch is through their levees.
3  They do the levee design and engineering review
4  of permits and such.
5      Q.  While we're at that, at this point
6  where are you in all this?  Which division are
7  you in?
8      A.  I'm in operations division.
9      Q.  Okay. All right. So the
10 opportunities that you would have to interact
11 with the civil branch are in the context of
12 levees generally.
13     A.  Most of my, you know, working
14 relationship with engineering division has
15 always been through the we call it flood
16 control permits, deal with the levee district
17 permitting, um -- as far as work related to and
18 associated with the levees and impacts on the
19 levees. Which we talked about earlier, within
20 either 300, 1500 feet, we deal -- you know,
21 operations division receives the permit
22 request. We act as the Corps of Engineers acts
23 as an engineering consultant or advisor to the
24 levee districts. Okay?
25     Q.  Okay. So in fact -- and we kind of

Page 47

1  joked about this yesterday. But you're the man
2  when it comes to the request for a permit from
3  the Corps to do work around -- within 300 feet
4  of a hurricane protection structure.
5      A.  From the Corps' standpoint, yes, my
6  office -- well, I used to do it personally.
7  Now, you know, it's people within my office.
8  But yes, we control -- we wrote the letter of
9  no objection if the work was going to be
10 approved, or we wrote a letter requesting
11 additional information if the applicant didn't
12 have enough information for us to do an
13 adequate review. Or we wrote a letter of
14 objection if we -- you know, said we object.
15     Now, what we're doing is we're not
16 writing that to the applicant, we're writing
17 that to the levee district. So we're advising
18 the levee district.
19     Q.  And you're writing the levee district
20 because, as I believe you've testified, the
21 levee district requires a permit to be given to
22 anyone who does work within 300 feet of the
23 center line of a hurricane protection structure
24 over which they have -- what's the right word,
25 um -- I guess not jurisdiction, but they're the

Page 48

1  local sponsor of.
2      A.  They're the local sponsor. And it's
3  either a permit or a letter of no objection.
4  And, you know, my knowledge of that is that
5  they used to just call it a permit. My
6  knowledge of that is that if it's within the
7  existing right-of-way it's termed a permit. If
8  it's beyond the right-of-way, but may have
9  impacts to the levee or the floodwall, then
10 it's a letter of no objection.
11     Q.  Well, I know what the answer is going
12 to be, but I have to ask it for the record
13 anyway. Do you remember, in your tenure,
14 having been notified by the Orleans Levee
15 District of a request for a permit by the
16 Washington Group International to work within
17 300 feet of the center line of the hurricane
18 protection structure at the Lower Ninth Ward
19 area on the east bank?
20     A.  Me, no. I don't. But then again --
21     Q.  That doesn't mean it didn't happen?
22     A.  Right. That's correct.
23     Q.  It could have happened.
24     A.  That's correct.
25     Q.  You don't remember.

Page 49

1      A.  That's correct. that's correct.
2      Q.  Who should I ask? Who would be the
3  person I might want to ask if I wanted to find
4  out if any such permit -- I'm sorry -- if the
5  Corps was ever put on notice by the levee board
6  of such a request for a permit?
7      A.  From the standpoint of the Corps of
8  Engineers, I would check within our operations
9  manager of Completed Works, which used to be
10 me. So within operations division, if there
11 was a request -- and you're talking about a
12 third-party request, correct?
13     Q.  I don't know.
14     A.  Because --
15     Q.  Let me ask you how to ask the
16 question, if you don't mind. It is my
17 understanding that the Corps hired the WGI to
18 do this work. Okay? So I don't know who ought
19 to -- withdraw. I think I'm understanding that
20 whether it's the Corps itself or a third party
21 doing work within 300 feet that a permit is
22 required from the Orleans Levee District to do
23 the work within 300 feet of the center line of
24 that hurricane protection structure at the
25 Lower Nine. Am I wrong in that assessment?

                                    13 (Pages 46 to 49)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                        April 2, 2008

Page 50

1    A.  Well, the way we've done business, if
2  it's the Corps directing the work, it's not
3  like it is with the third party, an applicant
4  that comes in.  What we do is we evaluate the
5  work, we provide a scope of work or whatever
6  that contractor is going to do, and we work
7  that directly with the levee district.  Our
8  group in operations doesn't get involved with a
9  permit in that sense because it's work with the
10  levee district, and all, to my knowledge, they
11  request a right of entry and that contractor
12  does it just like as if we were building --
13    Q.  Okay.
14    A.  -- a new levee section.
15    Q.  All right.  But it sounds to me like
16  even though a permit may not be required, if
17  it's the Corps that's doing the work, that the
18  levee board is brought into the mix.
19        Am I interpreting what you're saying
20  correctly?
21    A.  Yes.  Yes.
22    Q.  They are brought into the mix?
23    A.  They should be, yes.
24    Q.  All right.  But in the case where the
25  Corps is doing the work, the operations

Page 51

1  division is not a part of that process, it is
2  the engineering division that's the part of the
3  process.
4    A.  Actually, it's generally the project
5  management group, PPPMD, as we say.  They have
6  a manager from a construction standpoint, or a
7  reconstruction standpoint, so you've got PPPMD,
8  you have engineering, construction, contract,
9  real estate, because they, real estate,
10  requests the right of entry, we just --
11  operations is not dealing with that until it's
12  all finished.
13    Q.  Okay.  Again, for example, when the
14  New Orleans Sewerage & Water Board made its
15  request for a permit to dredge the 17th Street
16  Canal, that permit request would have come
17  through operations.
18    A.  That's correct.  Through the
19  regulatory branch.
20    Q.  All right.  Now, just so that I can
21  understand how it works, and if I may, I'd just
22  like to use that as an example, the operations
23  division, does it pass on the technical
24  engineering aspects of the request for the
25  permit, or does the operations division draw on

Page 52

1  the expertise and technical services provided
2  by the engineering division?
3    A.  That's correct.
4    Q.  That's an or.
5      MR. BAEZA:
6        Which one?
7  EXAMINATION BY MR. BRUNO:
8    Q.  Which won?  You got to pick one.
9    A.  Operations division receives the
10  request --
11    Q.  Right.
12    A.  -- and we process that, and basically
13  we sent it for the technical review to
14  engineering division.
15    Q.  Okay.  All right.
16    A.  And then they send it back, operations
17  division responds in writing either to the
18  applicant or by permit to the applicant.  So
19  the processing is done in operations division,
20  technical analysis and engineering.
21    Q.  Were you here when the Sewerage &
22  Water Board made any one of their I believe
23  four permit requests for permission to dredge
24  the 17th?
25      MR. BAEZA:

Page 53

1        Objection.  Relevance.
2      MR. BRUNO:
3        Give me some leeway here.
4    A.  I mean, I don't remember what years
5  they were.
6  EXAMINATION BY MR. BRUNO:
7    Q.  '79 to '84.
8    A.  Well, I was here.  You know, like I
9  said, I was a student up until '82.  So '84 --
10  you know, that would have been all handled
11  through regulatory branch, so I wasn't directly
12  involved with that.
13    Q.  Okay.  Understood.
14    A.  I don't believe I was.
15    Q.  That's all right.  Now let's talk
16  about the real estate division.  And it seems
17  to be broken down into appraisal and planning,
18  management, disposal and control, direct
19  federal acquisition, local sponsor and
20  inleasing.  Okay?
21    A.  You got me on these.
22    Q.  All right.  Well, if you don't know
23  then I'll just --
24    A.  No.
25    Q.  You don't work --

14 (Pages 50 to 53)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

1    A.  Very basic with real estate.  I mean,
2  my knowledge with real estate is, you know,
3  they need to coordinate with the sponsors when
4  we're acquiring real estate for projects or
5  they're acquiring real estate interests for
6  projects, um -- but all of those terminologies
7  and things I really have very, very limited
8  knowledge in real estate.
9    Q.  Then let's skip it.  Let's go to the
10 contracting division.  And I gather you have a
11 lot more interplay with these guys.
12   A.  Actually --
13   Q.  No?
14   A.  -- operations division, from my
15 background in operation, we don't deal with
16 contracting a whole lot.  That's usually on the
17 front end.  Again operations is --
18   Q.  The back end?
19   A.  -- the tail end.
20   Q.  Generally, do you know what the
21 contracting guys do?
22   A.  Well, I know they're broken into
23 different -- there's a procurement group, you
24 know, for procuring I guess supplies and
25 equipment types of things, um -- the

1  contracting folks, in terms of my awareness of
2  them, they're the ones who actually, you know,
3  solicit the -- I guess the contractors, the
4  bidders --
5    Q.  Right.
6    A.  -- in that sense, and then they
7  actually sign the award.  They're the
8  contracting officers that sign and issue the
9  award for the contracts.  But again --
10   Q.  Right.  You got a Projects East,
11 Projects West, and then you have a polcy, which
12 they probably need a spelling branch, but it's
13 probably the Policy Branch.  Huh?
14   A.  I have no idea.  I know them as
15 contracting and procurement.  There's a
16 procurement, there's a contracting.
17   Q.  All right.  Let's move on, then, to
18 the next one.  Planning, programs and project
19 management division.  This is one of those
20 Peter picked a pickled pepper, whatever it is.
21   A.  PPPMD.
22   Q.  PPP makes it a lot easier.
23      Do you have interaction with these
24 guys?
25   A.  Yes.

1    Q.  Okay.  So what does the PPPMD do?
2    A.  Those guys are on the front end of the
3  projects.  They do the studies -- the types of
4  studies for any type of new projects that are
5  coming on board.  They also -- if a project is
6  still under construction, um -- let's use the
7  Lake Pontchartrain project.  It's been under
8  construction for many years.  There's a project
9  manager for all construction work that's going
10 to be done on that.  So they're the front end.
11 They would be the ones that would go to
12 engineering division saying, we want to build
13 this reach of levee.  And they have the funding
14 from the construction side of that for the
15 funding.  So, um -- they would direct
16 engineering to prepare the designs, the plans
17 and specifications for that, and they control
18 that management of the construction side of
19 things.
20   Q.  All right.  And just to run through
21 the various titles here, Support Services,
22 Project Management East and West, Coastal
23 Restoration, Programs Management, Economic and
24 Social Analysis, Environmental Planning and
25 Compliance.  All of that is in the front end,

1  the planning for the contracts.
2    A.  Right.  And the east and the west, I
3  believe, is just splitting the state up and,
4  you know, the projects within this area -- and
5  I don't know where that line of delineation is
6  for east and west, but, you know, generally
7  speaking when I think of west, most of the time
8  from operations standpoint we're thinking out
9  towards Lafayette-Lake Charles, versus east
10 being New Orleans and surrounding area.
11   Q.  All right.  And then we have the
12 construction division, and it has a Contract
13 Administration and a Quality Assurance branch.
14      Do you work with these guys?
15   A.  A little bit.  Because they're getting
16 closer to completion of the actual
17 construction.  These are the folks that are out
18 there managing the contracts to build the
19 levees or build the flood walls.  They have
20 inspectors that are in the field, project
21 engineers that are in the field for each
22 project or contract that's out there.  They do
23 the administration and overseeing of those
24 construction projects, yes.
25      MR. BAEZA:

JOHNS PENDLETON COURT REPORTERS        800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 58

1          Which how which group is that?
2     A.  That's the construction division.
3         MR. BRUNO:
4              Construction division.
5  EXAMINATION BY MR. BRUNO:
6     Q.  And within that, we have quality
7  assurance.  What --
8     A.  I believe that's the inspectors group.
9  That's the group that's ensuring that the work
10  is being done in accordance with the contract
11  specs --
12     Q.  Okay.
13     A.  -- you know.  I'm pretty sure that's
14  where the inspectors come in.  QA, QC; quality
15  assurance, quality control.
16     Q.  All right.  And that's different from
17  the engineering assessment discussion that we
18  had before; in other words, if there's some
19  need to do an engineering assessment with
20  regard to holes and the like, that's not the
21  quality assurance branch, that's the
22  engineering division.
23     A.  That's correct.
24     Q.  Okay.  All right.  Then finally we
25  have the operations division.

Page 59

1     A.  I know those guys.
2     Q.  Those guys you know.  Okay.  This is
3  broken down into Technical Support, Readiness,
4  Physical Support, Regulatory, Management
5  Support, Mississippi River Baton Rouge to Gulf,
6  Atchafalaya, Calcasieu and the Pass, the
7  Mississippi River Gulf Outlet, and the Gulf
8  Intracoastal Waterway.
9         All right.  So obviously we're talking
10  about, if not geographic areas within the
11  district, we're talking about projects within
12  the district.  Right?
13     A.  Right.  The way that's set up, we have
14  branches, separate branches, that's the ones
15  you were calling out at the beginning, up at
16  the top.  And then as you got into the actual
17  operation managers for those specific projects,
18  completed projects, Mississippi River to the
19  Gulf, Calcasieu River and Pass, MRGO, you have
20  a specific operations manager that handles that
21  specific project and maybe some other smaller
22  types of projects that are in or around those
23  same areas.
24     Q.  That's what I was sort of thinking
25  about when I was reading this.  I was wondering

Page 60

1  to myself, is it because -- let's take for
2  example the Gulf Intracoastal Waterway, that
3  that's such a big project that it needs its
4  own --
5     A.  Little group.
6     Q.  -- little group?
7     A.  That's correct.
8     Q.  And if there's some kind of a project
9  in or around that waterway, would it be within
10  that branch or would it go somewhere else?
11     A.  No, generally, we try to keep it
12  within the area of those projects.  The Gulf
13  Intracoastal Waterway project is so large --
14  most of the operations managers consist of the
15  manager, an assistant deputy manager, and maybe
16  one either lower graded engineer or program
17  person to handle the funding of it.  But the
18  work is actually out there in the field.
19     Q.  Of course.
20     A.  So on that project, most of that is
21  all your locks, you have six locks along the
22  GIWW, so they have very -- I'm not sure if we
23  got any other periodic project -- well, they
24  have the spillway, as well, within that
25  project.  The others are usually other little

Page 61

1  waterways, smaller waterways adjacent to or in
2  the general vicinity of it.
3     Q.  All right.  Well, talk in more detail
4  about some of these.  Let's start at the top,
5  first so we can just get a global understanding
6  of the organization of the operations division.
7         You got your technical support.  How
8  is that different from the engineering support?
9  If it's different it all.
10     A.  It is in a way.  You know, technical
11  support branch has various flood control
12  function, navigation function, environmental
13  function, um -- we have technical or support
14  function within there, um -- we got the
15  channels unit that does surveying on the river.
16  Those folks directly support the operations
17  managers.  So if they're going to go do a
18  dredging project and you need environmental
19  clearances, NEPA compliance, you know, they
20  work with the environmental folks.
21         The navigation function chief of that
22  technical support group is kind of, the way I
23  used the call it -- I was the flood control
24  function at one time.  I actually did a year of
25  the navigation function.  I was more or less

16  (Pages 58 to 61)

JOHNS PENDLETON COURT REPORTERS            800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                                    April 2, 2008

Page 62

1  the referee, if you think of it in that sense.
2  What we're trying to do is, all of those
3  operations managers are competing for the same
4  resources in terms of getting their project
5  maintained. So that function chief within tech
6  support was more or less playing, you know, the
7  facilitator of the various operations managers,
8  to say, okay, well, you've got money available
9  but your P&S aren't ready yet. And you have
10 your P&S ready, and if we can get the money --
11 you see what I mean?
12    Q.  Quickly. P&S?
13    A.  Plans and specifications --
14    Q.  Okay.
15    A.  -- for your projects.
16    Q.  All right.
17    A.  And so that's what the technical
18 support function of operations does. They
19 directly support the operations managers in
20 maintaining their projects.
21    Q.  Now, you say support, but who has the
22 actual authority to make the call?
23    A.  The call comes from the operations
24 manager. They're the funding mechanism. The
25 operations manager is the one that directs what

Page 63

1  they want technical support branch personnel to
2  do.
3    Q.  All right. Well, on this chart, and
4  again -- they're calling the head guy or girl a
5  chief.
6    A.  Yes.
7    Q.  Is he a manager?
8    A.  That's a branch chief. Technical
9  support branch is a branch chief.
10    Q.  Right. But the operations division
11 itself, I don't see the word manager, it says
12 chief.
13    A.  Chief. Yes.
14    Q.  Manager/chief?
15    A.  My boss is the division chief.
16    Q.  All right. So the manger --
17    A.  I'm the assistant chief.
18    Q.  When you made reference to the manager
19 who makes the call on money, that's the chief?
20    A.  Operations manager. No, that's the
21 operation manager. They control the funding
22 for their projects. You have seven operations
23 managers within ops.
24    Q.  Can you show me where -- I guess I'm
25 confused. Show me where --

Page 64

1    A.  You're going to start right here with
2  the Mississippi River Baton Rouge to Gulf,
3  Mujica, Nord, Falk, Russo is not here anymore
4  but GIWW, now you have another one -- well,
5  actually you got two others. We must have
6  another page somewhere. You should have -- if
7  not, this was -- you should have Completed
8  Works as well as the Old River Control Project.
9  We have an operations manager for that, as
10 well.
11    Q.  All right. I'm just still a little
12 confused. Forgive me, but where is this
13 manager person?
14    A.  Starting right here --
15    Q.  The manager of the --
16    A.  Of the Mississippi River Baton Rouge
17 to Gulf --
18    Q.  He has the power of the -- to say --
19    A.  He manages his project.
20    Q.  So he decides whether to spend money
21 or not.
22    A.  Yes.
23    Q.  But I guess what I'm trying to
24 understand is, suppose you have the manager of
25 the Atchafalaya Basin and the manager of the

Page 65

1  Mississippi River Gulf Outlet both wanting
2  money, who's the referee between those two
3  guys?
4    A.  Okay. If they don't have the money,
5  the management support branch, they're or money
6  folks that deal directly -- they're basically
7  equivalent to what they had in PPPMD in the
8  program side of things, they request the money
9  from division or headquarters. So they're
10 getting the actual monies into the district or
11 making the requests outside of the district to
12 get additional monies. But when we get our
13 appropriation at the beginning of the year,
14 when Congress passes the budget and we get our
15 monies, the monies come in through management
16 support branch, and then it's provided to those
17 operations managers.
18    Q.  All right. Well, I want to spend some
19 more time on that. And so let me get through
20 just the other branches first.
21       So the Technical Support Branch --
22 he's supporting folks with the Mississippi
23 River Gulf Outlet who may have some jockeying
24 for the funds.
25    A.  Right. And, you know, there's --

                                    17 (Pages 62 to 65)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 66

1  let's go to like a GIWW where you have a lock.
2  You have several locks.  You know, if they need
3  a repair to the control house at the lock, or
4  there's some minor electrical repairs or
5  whatever, there's a support group within
6  technical support branch that can do either
7  procurement of supplies and equipment or they
8  can do a small design.  If it's a large
9  project, that goes to engineering division.
10 But small routine types of work, repair of a
11 roadway or something, access, or repair the
12 fence, simple type of stuff, we keep that --
13 because we can act more quickly and it's not as
14 important as the big projects that engineering
15 division --
16     Q.  I think I'm understanding it now.
17 Obviously it makes more sense, and for reasons
18 of efficiency, for you guys to's have access to
19 a mall little engineer group --
20     A.  Yes.
21     Q.  -- to handle your small engineering
22 projects.
23     A.  That's correct.
24     Q.  That's what the technical support is.
25     A.  Small routine types of things.

Page 67

1     Q.  All right.  Next one is the Readiness
2  branch.  What do those guys do?
3     A.  That's your emergency management
4  folks.  They call it readiness in terms of
5  preparedness for natural and manmade disasters
6  and such.  They direct all of your disaster
7  recovery response and such.  They're the focal
8  point for the district.
9     Q.  Okay.  Physical Support.
10    A.  Okay.  That's the group that has the
11 WHEELER, the hired labor units, the marine
12 management group.
13    Q.  Okay.  All right.  That's your --
14 that's when you guys do your own --
15    A.  Right.  Lock repairs --
16    Q.  -- actual work.
17    A.  Lock repairs, minor levee repairs,
18 things of that sort.
19        MR. LAMBERT:
20        Is the WHEELER the dredge?
21        THE WITNESS:
22        Yes.  The Dredge WHEELER.
23        MR. LAMBERT:
24        That's the name of the vessel?
25        THE WITNESS:

Page 68

1        Yes.  W-H-E-E-L-E-R.
2  EXAMINATION BY MR. BRUNO:
3     Q.  Next one is Regulatory Branch?
4     A.  Regulatory Branch, that's your
5  wetlands group.  That's your regulatory folks
6  that handle the 404 and Section 10, with 404 is
7  fill in wetlands, and Section 10 is
8  construction that's on a navigable waterway of
9  the United States.  They do --
10    Q.  That's the whole wetland
11 certification, you know, if I want to find out
12 if I can build, the first thing I have to do is
13 make sure the land is not wet, and if it is wet
14 there's a program which allows me to trade land
15 or pay funds to you guys to develop the land.
16    A.  They handle the jurisdictional
17 determinations of it being a wetland or not,
18 you know, and the qualities of that wetlands,
19 and then the other side of that there is the
20 processing of the actual permits --
21    Q.  All right.
22    A.  -- within that group.
23    Q.  Let's skip the management support just
24 for a moment and walk over to the these various
25 projects.  And let's -- we might as well just

Page 69

1  focus on the Mississippi River Gulf Outlet
2  because that's what we're here to talk about.
3  And we talking about the operations component
4  of an existing project.
5        Am I correct in understanding that you
6  guys are managing the day-to-day aspects of
7  that particular project?
8     A.  The operation and maintenance.  That's
9  what we're responsible for.
10    Q.  All right.  Now, did you work, during
11 your tenure, with the Mississippi River Gulf
12 Outlet I guess you want to call it a group or a
13 branch within the operations division?
14    A.  Very little, other than that one year
15 that I spent on a cross-training assignment.
16 When one of the guys was on long-term training
17 I was the navigation function chief within
18 technical support branch.  So I was kind of
19 that referee.  But I never got into, you know,
20 the actual project itself.  It was more of,
21 okay, Edmond's got monies in this one and
22 doesn't have specs, that type of thing.  But
23 details of the projects, no.  And most of these
24 are navigation side of things.  I was primarily
25 on the flood control side.  Other than that one

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 70

1  year.
2      Q.  All right.  During that one year, so
3  that I can get a handle on it, you were in
4  technical support.  Within technical support
5  you were offering engineering services with
6  regard to navigation issues to the Mississippi
7  River Gulf Outlet.
8      A.  Actually, it wasn't engineering
9  services, it was more -- like I said, it was
10 more of like a facilitator, you know, to make
11 sure that the projects were prioritized in a
12 sensible way, whether there was availability of
13 funds, whether there was availability of
14 resources, contractors, dredge 's availability,
15 things of that sort.
16     Q.  All right.
17     A.  You kind of ran it all down for the
18 various managers.
19     Q.  I would guess, and again I don't know,
20 that the primary operations issues with regard
21 to the gulf outlet is the issue of keeping the
22 channel open for navigation.
23     A.  Uh-huh.
24     Q.  Is that accurate?
25     A.  That's correct.

Page 71

1      Q.  All right.  Because obviously its
2  purpose was to allow deep draft vessels to go
3  from the gulf to the river.  And so the
4  operations component is to make certain that it
5  was clear, and to make it clear you have to
6  determine the need for dredging.
7      A.  That's correct.
8      Q.  All right.  And as I think I
9  understand it, most of the dredging issues were
10 nearer to the gulf.
11     A.  Again, I don't know.
12     Q.  Fair enough.
13     A.  I have no idea.
14     Q.  Now, is the -- do you know whether or
15 not the -- in addition to making certain that
16 the gulf outlet was navigable, the operations
17 division was charged with making certain that
18 the gulf outlet did no damage to the
19 surrounding marsh, swamp, et cetera.  Was that
20 part of an operations function or not?  If you
21 know.
22     MR. BAEZA:
23         Objection.  Vagueness.
24     MR. BRUNO:
25         Okay.

Page 72

1      A.  Um -- I don't believe -- my knowledge
2  of what those operations managers did, they
3  would not do that.  Impacts are generally
4  analyzed by the engineering division folks.  So
5  I mean, you know, they don't do those types of
6  impact statements.
7          When the project is designed and such,
8  and it's going through the dredging, they go
9  through engineering division for those plans
10 and specifications, so I'm assuming that's
11 done then.
12 EXAMINATION BY MR. BRUNO:
13     Q.  Right.  Well, I'm not necessarily
14 talking about at the front end.  What I'm
15 talking about is at the back end.  It's pretty
16 clear from the documents and all the
17 depositions that we have taken thus far that
18 the Corps recognized that there was a problem
19 with erosion of the banks that was caused by
20 the MRGO.  And I just -- what I'm just trying
21 to generally understand is whether or not the
22 monitoring of this erosion issue was an
23 operations function, and if it wasn't an
24 operation function what division would have
25 that responsibility.

Page 73

1      A.  I think it was collective between
2  operation and engineering division.  We did put
3  rock -- I do know we -- you know, through that
4  project, they did line portions of the channel
5  with rock.
6      Q.  Right.
7      A.  Um -- but again, the details of how
8  that was done, I do know they worked through
9  technical support, I believe, you know, and I
10 think they worked through engineering -- I'm
11 certain they worked through engineering
12 division because of the size of that project.
13     Q.  Okay.  And when you say that project,
14 would that be the foreshore protection at the
15 southern bank of the MRGO between Bayou La
16 Loutre and Bayou Bienvenue?
17     A.  I believe that's correct, but I'm not
18 certain, not 100 percent certain.
19     Q.  Who should I talk to to get more
20 information about the monitoring of an ongoing
21 project to assess whether or not that project
22 was causing any kind of damage to anybody?
23     A.  That specific operations manager.
24     Q.  Over time.
25     A.  Over time.

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 74

1    Q.  All right.
2    A.  And it's changed.  It was Edmond
3  Russo, it was -- prior to him it was Bob Gunn
4  who's now deceased.  Um -- Michelle Daigle was
5  I think after Russo.  Richard Entwistle is the
6  current -- actually, he's getting ready to
7  move.  So they change over time.
8    Q.  Okay.  All right.
9    A.  But that person is who does the
10  overall management of the project.
11    Q.  Let me just ask you one or two more
12  questions in this context because you've
13  indicated I ought to be asking somebody else,
14  but let me just round it out.  We've seen a
15  bunch of what have been labeled reconnaissance
16  reports.  Are you familiar with a
17  reconnaissance report?
18    A.  A little bit.  Not a whole lot.  My
19  background, like I said, I don't get into that.
20  I know they're done.
21    Q.  Okay.  Well, my first question is,
22  does the operations division do them?
23    A.  I've never done one and I haven't seen
24  us generate them.  I believe the reconnaissance
25  reports are done through project management

Page 75

1  folks.  But again, I can't say with certainty
2  that -- that specific ops manager would know
3  that.
4    Q.  But it's within operations, you think.
5    A.  As far as the reconnaissance report?
6  I think it's -- if anything, it's probably a
7  combination of things.  But we don't do
8  specific reports, you know, that's all ours,
9  per se.  All ours.
10    Q.  How about this?  Last question,
11  promise, on this issue:  Do you know whether or
12  not, routinely, your op managers for the
13  Atchafalaya, Mississippi River, Calcasieu, Gulf
14  Intracoastal, do they do a routine
15  reconnaissance report for each of these, you
16  know, geographies or projects?
17    A.  I don't know if you'd call it
18  reconnaissance reports.  I mean, we do surveys
19  of the channels to determine, you know,
20  conditions.  We do condition surveys and things
21  of that sort.  But I'm not sure what you're
22  saying in terms of reconnaissance.  I mean,
23  yeah, if you go do a survey, that's
24  reconnaissance, but -- so we do that.  But --
25    Q.  This thing has the words

Page 76

1  reconnaissance report on it, and in particular,
2  the ones we have seen discuss the MRGO and
3  discuss the erosion issue.
4    A.  I would say the best person to ask
5  would be one of those navigation ops managers.
6  I was an ops manager, but I was a flood control
7  manager.
8    Q.  All right.
9    (Brief recess.)
10  EXAMINATION BY MR. BRUNO:
11    Q.  Okay.  Mr. Colletti, we just need to
12  cover one more, I believe, section of this
13  organizational chart, and that's the management
14  support branch, that's the money.
15    A.  That's the money -- the operations and
16  maintenance monies that come into the district.
17  That group within operations division -- it
18  comes to the district, and then they -- you
19  know, they manage those operations managers and
20  anyone else, general regulatory has their own
21  budget, readiness has their own budget, and
22  then the operations managers either receive
23  O&M, operation and maintenance, general funds
24  or, in the position I used to be in, flood
25  control funds.  I had MR&T and O&M, generally.

Page 77

1  So those fund are distributed to those
2  managers, and then the managers control them.
3    Q.  Before we talk about how the money
4  flows out, I would like to talk about how the
5  budget is established in the first instance on
6  the maintenance side.  Okay?
7    A.  Uh-huh.
8    Q.  And I imagine that Congress has to be
9  told, if -- and I think we've established, but
10  Congress is your boss, right?
11    A.  That's correct.
12    Q.  You guys are charged with maintaining
13  the projects that the Congress of the United
14  States asks you guys to design and build,
15  right?
16    A.  That's correct.
17    Q.  And so the Congress also expects you
18  to tell them when those projects are in need of
19  monies to maintain them, right?
20    A.  That's correct.
21    Q.  And I would -- and I don't know if I'm
22  going too far here, but would you expect that
23  the Congress would expect you to tell them when
24  those projects are falling apart or when
25  they're breaking?

20 (Pages 74 to 77)

JOHNS PENDLETON COURT REPORTERS              800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                      April 2, 2008

Page 78

1    A.   And we do that, yes.
2    Q.   All right.
3    A.   We do that through the division
4  office, through headquarters.  We don't deal
5  directly from --
6    Q.   Well, I know you don't call up Senator
7  Vitter and ask him for some money, but --
8    A.   Right.
9    Q.   -- the concept is that this office,
10 being charged with oversight of the projects
11 within this area, this office is expected to
12 tell the Congress when there's a need for
13 maintenance.  Right?
14   A.   Correct.
15   Q.   But you don't decide how much money to
16 spend on maintenance, the Congress decides how
17 much money to spend on maintenance.
18   A.   Well, you know, we decide what needs
19 to be done, and we get an estimate and we
20 provide that through the division office, then
21 it goes through headquarters, and it may not
22 even make it all the way there because it's
23 vetted throughout, it's prioritized.  The work
24 is prioritized at the division and then the
25 headquarters national level.  So, you know, we

Page 79

1  can request it and say, here's what we need,
2  but it's very seldom that you get all of what
3  you need.
4    Q.   Of course.  But I mean, globally, you
5  would agree with me that if you were the
6  Congress and you had charged this office with
7  the responsibility of maintaining the projects,
8  and if this office became aware of the fact
9  that a particular project was causing damage
10 such that it would visit liability on the
11 United States of America, that this office
12 should communicate that fact to the Congress.
13        MR. BAEZA:
14            Objection.  Vagueness, calls for
15        speculation and a legal conclusion in
16        terms of liability.
17   A.   I mean, you know, in terms of
18 maintenance of the channel, we do that.  I'm
19 not aware of -- you know, if anything was
20 determined one way or the other --
21 EXAMINATION BY MR. BRUNO:
22   Q.   And I'm not saying that anything like
23 that occurred.  I'm just trying to understand
24 whether or not you agree with that general
25 principal that the Congress ought to know if

Page 80

1  one of its projects is -- I mean, for example,
2  if you've got a dam and the dam is about to
3  break, and you know that if it breaks it's
4  going to put water on the neighbor's property
5  and it's likely that the neighbor is going to
6  be very upset and want to be paid, you would
7  expect the Congress would want you to tell
8  them.
9        MR. BAEZA:
10           Objection.  Vagueness, calls for
11       speculation.
12 EXAMINATION BY MR. BRUNO:
13   Q.   Right?
14   A.   Well, again, we don't tell Congress
15 directly from here.  So if we thought there was
16 a problem, we would tell our division office,
17 and if -- it goes up the chain.
18   Q.   All right.  The Corps of Engineers as
19 a whole, then.  Let's not talking about the New
20 Orleans office.  You would expect that if the
21 Corps was aware of a project that was about to
22 cause harm to some third party that the Corps
23 should tell the Congress.
24       MR. BAEZA:
25           I renew my objection.

Page 81

1  EXAMINATION BY MR. BRUNO:
2    Q.   Right?
3    A.   Yes.
4    Q.   All right.  So -- and you guys do
5  that.  Don't you?  You try.
6    A.   I mean, from headquarters' standpoint,
7  I guess they do.  I've never been there.  You
8  know?
9    Q.   All right.  But the operations group
10 does inspect, from time to time, its projects,
11 does it not?
12   A.   Yes.
13   Q.   Is that an operations function, or is
14 that a function that belongs to one of these
15 other branches?
16   A.   No, operations division would be the
17 lead.  If they're the manager of that project,
18 they would be the lead.  But we may bring along
19 with us, depending on who it is, it may be an
20 environmentalist, it may be another engineering
21 technical specialist from engineering division,
22 you know, that may have some input to that.  So
23 lot of these inspections, it's not just an
24 individual or two from operations division,
25 it's a team.

                              21 (Pages 78 to 81)

JOHNS PENDLETON COURT REPORTERS          800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                     April 2, 2008

Page 82

1    Q.  All right.  Understanding that it's a
2  team, who within the team has the primary
3  responsibility of reporting observations after
4  inspection which suggest the need for
5  maintenance?  Let's be as general as we can be.
6    A.  The operations manager --
7    Q.  All right.
8    A.  -- of the project.
9    Q.  So if it's a MRGO project, it's going
10  to be, on this chart, Mr. Russo.
11    A.  Correct.
12    Q.  Where are the hurricane protection
13  levees in this?
14    A.  That's what I said, they're missing on
15  there.  There is an operations manager for
16  Completed Works, which is not -- for some
17  reason is not showing up.  They're missing an
18  operations manager for Completed Works and an
19  operations manager for Old River Control.
20    Q.  All right.  Let's go to Page 11 to 15
21  and see if maybe they're there.
22    A.  And that was me.
23    Q.  All right.  If we go to Page 11 --
24  let's just make sure I've got this right.
25  Under the operations division at the bottom, it

Page 83

1  says Pages 11 to 15, right?
2    A.  Okay.  There's got to be two more.
3    Q.  Okay.  We're going to go to the back
4  part of it.  I just want to make sure I'm going
5  to the right part.  To Page 11.  So let's go to
6  Page 11, see if it's hiding out there.
7        All right.  Page 11 we see -- we find
8  Completed Works.  So let me show you --
9        MR. BRUNO:
10        Do we have another copy?
11  EXAMINATION BY MR. BRUNO:
12    Q.  It's here.
13    A.  I found it.
14    Q.  We found it.  The front page tells us
15  go the Page 11, we're going to Page 11, now
16  we're on Page 11 and we see that this is a more
17  detailed breakdown of the operations division.
18    A.  Yep.  That's right.
19    Q.  They're all there.
20    A.  They're all there.
21    Q.  Okay.  All right.  So across the top,
22  we have our -- it appears to be set up just a
23  tad differently, because it's got our operation
24  managers across the top.
25    A.  Uh-huh.

Page 84

1    Q.  Okay.  Let's walk through those.  So
2  we have our operations manager for Calcasieu,
3  and that's on Page 2.  Right?
4    A.  (No audible response.)
5    Q.  We have got our operations manager for
6  Atchafalaya, and that's on Page 2, right?
7    A.  Yep.
8    Q.  Okay.  We have our op manager for the
9  River from Baton Rouge to the Gulf, and that's
10  shown on Page 2, right?
11    A.  (No audible response.)
12    Q.  Then we have our op manager for the
13  Gulf Outlet, and that's shown on Page 2, right?
14    A.  Correct.
15    Q.  We have our open manager for the
16  Intracoastal Waterway, that's shown on Page 2.
17  Right?
18    A.  Correct.
19    Q.  And then with have two more; we have
20  our op manager for Completed Works and our op
21  manager for the Old River --
22    A.  Control.
23    Q.  -- Control.  Let's talk about him
24  first and we can focus on the op manager for
25  Completed Works.

Page 85

1        So what is the Old River Control
2  Structure?
3    A.  The ops manager for Old River Control
4  Structure is our water control structures.
5  It's a complex, as we call it.  It's three
6  separate and distinct structures up, you know,
7  northwest of Baton Rouge that diverts water to
8  the Atchafalaya River and out.  By law, we're
9  required to divert 30 percent of the flows
10  within the Mississippi at the latitude
11  Mississippi and the Red Rivers to the
12  Atchafalaya and on down.  That manager has
13  those structures up there, he also has the
14  Morganza control structure which is further
15  downriver.  That's also an outlet during flood
16  periods that they control.
17    Q.  And then we have our op manager for
18  Completed Works.  Now, what are within the
19  rubric of Completed Works?
20    A.  Okay.  I know that guy very well.
21    Q.  Who might that guy be?
22    A.  That guy was me at the time.  And so I
23  know that position very well.  The ops manager
24  for Completed Works has the inspection of
25  Completed Works program -- or project, I should

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                        April 2, 2008

Page 86

1  say.  It has the Mississippi River levees
2  maintenance project, it has six small flood
3  control navigation projects north of Lake
4  Pontchartrain, such as the Tangipahoa, um --
5  the -- shoot, I'm having a brain lapse here on
6  all the different ones.
7      Q.  That's okay.
8      A.  The Tickfaws and Tchefunctes and the
9  small ones up there.
10     Q.  Right.
11     A.  And then we also did the solicitation
12 of views program.  It's similar -- it's like a
13 pre application permits.
14     Q.  I want to spend some more time on
15 that.  But before we do, since we found two
16 more op managers, I just want to look at this
17 piece of paper and see if there's some other
18 stuff on this piece of paper that's not on Page
19 2.
20     A.  Okay.
21     Q.  All right.  This seems to show the
22 other branches -- let see.  The first one on
23 the second row, physical support, you see that
24 there on Page 2.
25     A.  Yep.

Page 87

1      Q.  We see technical support.  We talked
2  about that, that's there on Page 2.
3      A.  Okay.
4      Q.  And regulatory, that's there.  Right?
5      A.  Yes.
6      Q.  Management support?  That's there.
7      A.  That's there.
8      Q.  And finally, readiness is there, too.
9      A.  That's correct.
10     Q.  Okay.  All right.  So it looks like
11 for some unknown reason the ops manager and the
12 Old River manager were left off, which is fine,
13 we found them.
14     A.  Yep.
15     Q.  Okay.  Then under -- then it shows
16 more detail under the regulatory branch.
17     A.  Correct.
18     Q.  And it appears that very simply the
19 geography is carved up into three general
20 sections, eastern, western and central.  And so
21 can I --
22     A.  That's correct.
23     Q.  -- just assume that the permits come
24 in, they just are divided --
25     A.  It's based by parish.  They break them

Page 88

1  up by parish, yes.
2      Q.  Can I just assume that the City of New
3  Orleans proper would be within the eastern
4  evaluation section?
5      A.  That's correct.
6      Q.  Okay.  Then I see a surveillance and
7  enforcement section.  What do those guys do?
8      A.  Okay.  That's the folks that do the
9  jurisdictional determinations.  If you're
10 coming in as an applicant and you say I got a
11 piece of property out here and I want to know
12 if it's wet --
13     Q.  Uh-huh.
14     A.  -- they do the actual, either
15 themselves or they now have, if it's a certain
16 size piece of property, that can be done by
17 contract and verified by these folks, but
18 they're responsible for jurisdictional
19 determinations and the need for an actual
20 Department of the Army permit.
21         They also -- and when you say
22 enforcement, if there is a violation out there,
23 you know, you're doing something on property
24 and your neighbor says, wait a minute, I don't
25 think you have a permit for that, or you're

Page 89

1  destroying these wetlands, they're the ones who
2  actually will go out and issue a cease and
3  desist order.  From that standpoint.
4      Q.  All right.  Then we move to Page 12
5  which breaks down all of these op manager
6  branches, for lack of a better word -- I think
7  we called them branches.
8      A.  Well, actually, they're just --
9  they're not really.  The ops manager positions
10 are not branches.  We don't refer to them as
11 branches.
12     Q.  We'll just call them op managers.
13     A.  Just ops managers.
14     Q.  Okay.  All right.  And so we're
15 interested, today, in the Industrial Canal and
16 the MRGO and the levees.
17     A.  Okay.
18     Q.  So who is the person who would be the
19 open manager in connection with the -- gulf
20 outlet, we have already established that,
21 that's got its own manager.
22     A.  Yes.
23     Q.  All right.  How about the, um -- Inner
24 Harbor Navigation Canal?
25     A.  Inner Harbor Navigation Canal, the

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 90

1  navigation portion of that is going to be the
2  GIWW manager, who is --
3      Q.  That's on Page 13.
4      A.  On Page 13, yes.
5      Q.  Now, you said the navigation side.  So
6  that do I gather from that that the levees on
7  either side of the Industrial Canal -- short
8  version of the IHNC -- would fall within a
9  different -- under a different op manager?
10     A.  That was overseen by Completed Works.
11     Q.  Okay.  Okay, fine.  So the only thing
12 that the Intracoastal manager would concern his
13 or herself with would be the navigation
14 component, which would include the locks, so --
15     A.  Dredging of the channel.
16     Q.  -- concerned about the dredging of the
17 channel, making it accessible to vessels, et
18 cetera.
19     A.  That's correct.
20     Q.  All right.  Would he have anything --
21 or she have anything to do with permits to do
22 work on water in that channel?
23     A.  The manager?
24     Q.  Yes.
25     A.  Yes.  Because, you know, there is an

Page 91

1  impact of what's being done to the channel,
2  within the channel, and if there was a
3  permit -- thirty-party permit, per se, that
4  came in, that manager would have an
5  opportunity, if it was on the flood side of the
6  floodwall or the levee --
7      Q.  Right.
8      A.  -- they would have an opportunity to
9  the say, wait a minute, this is going to impact
10 navigation in this reach.  So they would look
11 at that request, as well.
12     Q.  Who would tell them?
13     A.  Generally, that would be the Completed
14 Works manager.  We'd see that, that it's in
15 that channel, and we would say, hey, look, you
16 know you need to take look at this and tell us.
17         If it was going through regulatory,
18 because if it's a regulatory permit, as well,
19 regulatory generally has the lead on that.  So
20 they would either send it to Completed Works,
21 Completed Works would then tell that
22 individual, look, you got to also send it to
23 GIWW.
24     Q.  All right.  And if it's within that
25 300 feet of the center line of the levee, it

Page 92

1  goes to ops?
2      A.  Uh-huh.
3      Q.  I'm sorry, Completed Works, and then
4  you would decide if you wanted to bring in your
5  navigation folks or anybody else.
6      A.  Right.  But again, if it's in the
7  water, it would start in regulatory and then
8  come through Completed Works.  Because the
9  reason for that is, if you're going to have a
10 regulatory permit, a Department of the Army
11 permit, we want that permit to be reviewed
12 initially, first.  We wouldn't want to say,
13 look, it has no impacts on the levee and,
14 therefore, we send a letter to the levee
15 district, they issue a permit, that applicant
16 says, hey, I got my permit, I got a letter from
17 the Corps --
18     Q.  Got you.
19     A.  -- and then navigation wise we're
20 going to object to it.
21     Q.  All right.
22     A.  It wouldn't be smart.
23     Q.  All right.  So I think I'm hearing you
24 tell me that because the River and Harbors Act
25 of 1899, which is work on water permit --

Page 93

1      A.  Right.
2      Q.  -- statute, right?
3      A.  Whatever year.  I'm not sure on the
4  year.  But, yeah, you probably are -- I know
5  it's the River and Harbor Act, yes.
6      Q.  So navigation is first, we make
7  sure -- and because there's a permit required
8  way virtue of statute, that's the first level,
9  the second level is because it may impact my
10 levees I want to make certain that it's not
11 going to impact my levees.
12     A.  Correct.
13     Q.  Okay.  And because the levees fall
14 within your jurisdiction, that's your baby.
15     A.  Uh-huh.
16     Q.  Okay.  And as a completed works.
17         Now, just again, curiosity if nothing
18 else, why Completed Works as opposed to -- I
19 mean, did Completed Works encompass more than
20 just levees?  I mean, you've got like these
21 project descriptors like the Intracoastal
22 Waterway, you've got the Atchafalaya, you've
23 got the MRGO --
24     A.  Well, from Completed Works, in this
25 sense, it's the flood control projects.  Those

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

---

Page 94

1  others are navigation projects, with the
2  exception of the Old River because it's a water
3  distribution type of project.  So, you know,
4  Completed Works handles -- well, we had almost
5  thirteen miles of federal levees, MR&T and
6  hurricane protection.  So we oversee that in
7  Completed Works.
8      Q.  All right.  Can I conclude that all
9  flood control structures fall within the ambit
10  of the Completed Works op manager?
11      A.  Federally authorized structures, yes.
12      Q.  Okay.  Now, let me ask you this:  We
13  know that flood control structures are
14  different from all of the other projects that
15  you guys have the responsibility to monitor in
16  that flood control requires that the local
17  sponsor put up 30 percent of the money to build
18  it.
19      A.  Right.  Cost sharing, yes.
20      Q.  There's a cost sharing there.  And
21  there is no cost sharing for any other of those
22  projects, right?
23      A.  Well, the MR&T project is 100 percent
24  federal.
25      Q.  Right.

Page 95

1      A.  But the hurricane protection projects,
2  under separate authorization, those are cost
3  shared.
4      Q.  That's right.
5      A.  Construction, yes.
6      Q.  And I think we're saying the same
7  thing.
8      A.  From a construction standpoint, yes.
9      Q.  I want to get this record just as
10  clear as we can possibly get it.  And I don't
11  know if I do it -- from which approach we take
12  it, but the Completed Works, the flood control
13  projects -- the Completed Works cover only
14  flood control projects, right?
15      A.  (Nods affirmatively.)
16      Q.  So you're dealing with something a
17  little bit different than everybody else who's
18  a manager deals with.
19      A.  Those other ops managers?
20      Q.  Yeah.
21      A.  Yes.
22      Q.  You got to deal with the local
23  sponsor, right?
24      A.  Yes.
25      Q.  And because you got to deal with the

Page 96

1  local sponsor, you also have an issue about
2  getting either some consent or some resolution
3  to the money issue because the government is
4  only going to pay 70 percent.
5          MR. BAEZA:
6              Object to vagueness.
7  EXAMINATION BY MR. BRUNO:
8      Q.  Right?
9      A.  Well, when you're talking about that
10  cost share, you're talking about construction
11  cost.
12      Q.  Not maintenance?
13      A.  No, not maintenance.  Maintenance --
14  once a hurricane project -- authorized
15  hurricane project is fully constructed,
16  completed, it's 100 percent operation
17  maintenance cost to the sponsor.
18      Q.  Okay.  I guess I got sideways because
19  in the documents that I've read I came across a
20  bunch of documents which described, how shall I
21  say, a dialogue within the Corps about who
22  should pay for foreshore protection in the
23  MRGO.
24      A.  That would have been with the ops
25  manager for the MRGO.

Page 97

1          MR. LAMBERT:
2              Navigation.
3          THE WITNESS:
4              Navigation wise.
5  EXAMINATION BY MR. BRUNO:
6      Q.  Wait.  The dialogue that I saw was a
7  dialogue which discussed whether or not the
8  flood control project should pick up the costs
9  or the MRGO should pick up the costs, and the
10  local interest said, no, no, no, we don't want
11  to pay our 30 percent for the foreshore
12  protection because the need for foreshore
13  protection comes from the wakes of vessels.
14  And so I'm just -- I know that you don't have
15  these documents in front of you, but I'm just
16  trying to generally sort of understand, is
17  foreshore protection not a maintenance issue?
18          MR. BAEZA:
19              Object to vagueness and
20              ambiguity.
21      A.  In terms of along the MRGO, I've heard
22  discussion as to whether or not it would have
23  an impacts on the levees.
24      Q.  Right.
25      A.  And I think that's where any

---

25 (Pages 94 to 97)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                April 2, 2008

Page 98

1   discussion may have come in, is do we need to
2   put rock along that bank to protect the levee,
3   whereas generally the rock is there for the
4   channel purposes.
5       Q. Right.
6       A. Again, that would have been -- that
7   type of discussion would have been generated
8   through the project manager from PPPMD, not
9   through operations. We may have had some input
10  or discussions on it, but generally it would go
11  back to the construction manager to say will
12  this have an impact on the design of that
13  levee?
14      Q. Can I conclude, then, from what you've
15  told me that the shore protection is a capital
16  improvement and not a maintenance issue?
17          MR. BAEZA:
18              Object the vagueness.
19      A. I'm not sure what you're saying.
20  EXAMINATION BY MR. BRUNO:
21      Q. Because you said it went back to
22  planning, which meant those are the guys that
23  build it, and if it's the building component or
24  the building side of the discussion -- let's
25  back off.

Page 99

1           You build a house. You can decide to
2   add a room to it or not. That's a capital
3   improvement.
4       A. Okay.
5       Q. You got a hole in the roof. That's a
6   maintenance issue. I got to fix the roof.
7   Right? I got the cut the grass. I got to
8   paint the house. Those are all maintenance
9   issues.
10          There's a distinction made between the
11  capital improvement to the project and the
12  maintenance of the project, right?
13      A. Right.
14      Q. Okay. MRGO, we have already discussed
15  the fact that obviously dredging is a
16  maintenance issue. Clear. We'll get into the
17  levees in a moment. What I'm trying to
18  understand, if you know, is whether or not the
19  foreshore protection is a maintenance or a
20  capital improvement.
21      A. I don't know.
22      Q. Okay. Who should I ask?
23      A. I would start with the ops manager for
24  that project.
25      Q. MRGO.

Page 100

1       A. Which is MRGO project, yes.
2           MR. LAMBERT:
3               Who is that?
4           THE WITNESS:
5               At that time, it was Russo.
6   EXAMINATION BY MR. BRUNO:
7       Q. We did that already. He's just not
8   paying attention.
9           Now, next question:
10          All right. You had alluded to the
11  fact that you had heard conversations about the
12  need for foreshore protection to protect the
13  levee.
14      A. Uh-huh.
15      Q. Can you remember when you first heard
16  those discussions? And date wise -- I mean
17  time wise, and just generally, even if it's
18  within five years, ten years, twenty, it
19  doesn't matter.
20      A. With certainty, I'd say no, but I
21  would guess it was within about the last five
22  years, I would say.
23      Q. Okay. All right. Can you just tell
24  me what you heard. I mean, I know that you
25  can't recount the details of the conversation,

Page 101

1   but in a general sense what was the discussion?
2           MR. BAEZA:
3               Objection. Hearsay.
4       A. What I recall of it was will it have
5   an impact on the structural integrity of the
6   levee?
7   EXAMINATION BY MR. BRUNO:
8       Q. It being what?
9       A. It meaning the erosion along the bank.
10      Q. I got you. I got you.
11      A. Because you don't have much area out
12  there.
13      Q. Right. So you can recall at least
14  having heard a conversation within this
15  institution, within this office, within this
16  building, about whether or not erosion on the
17  bank of the MRGO may impair the integrity of
18  the hurricane protection structure adjacent
19  thereto, right?
20          MR. BAEZA:
21              Objection. Hearsay.
22      A. Yes, there was -- you know, looked at
23  impacts.
24  EXAMINATION BY MR. BRUNO:
25      Q. Okay. Fair enough.

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

---

Page 102

1     Now, to address counsel 's probably
2  interesting objection, who did you hear it
3  from?
4        MR. BAEZA:
5           I had to do it.
6        MR. BRUNO:
7           I don't blame you, man.
8     A.  I don't recall specifically, you know.
9  The manager -- the construction manager, if you
10 want to call it, from PPPMD at the time was Al
11 Naomi.  He would be more in tune with does it
12 have a direct impact because if that's the case
13 it goes back to construction, from a levee
14 standpoint.
15 EXAMINATION BY MR. BRUNO:
16    Q.  I'm sorry.  Say that again and slowly.
17 If it what?
18    A.  If it has an impact on the levee --
19    Q.  On the levee --
20    A.  -- then it moves from the navigation
21 side of things to a feature of the hurricane
22 project -- the hurricane project.  So then when
23 it moves back to a feature of the hurricane
24 project, it goes back to the project manager
25 for construction.

---

Page 103

1     Q.  All right.  Well, that gives me pause,
2  because wouldn't it be just like the discussion
3  that we had about the holes next to the
4  hurricane protection structure and the need for
5  an assessment; I mean, aren't those two the
6  same kind of things?
7        MR. BAEZA:
8           Objection.  Vague and ambiguous.
9     A.  I'm not sure what -- you know, what
10 you're quite asking in that respect.
11 EXAMINATION BY MR. BRUNO:
12    Q.  What I'm saying is this:  I thought we
13 learned today that within 300 feet -- if you're
14 doing work within 300 feet of a hurricane
15 protection structure, then engineering needs to
16 assess.  And the reason for the need for the
17 assessment is to ascertain whether or not the
18 work will damage or undermine the hurricane
19 protection structure.  Right?
20    A.  Correct.
21    Q.  Okay.  And that's an engineering
22 issue.  So now we have this situation where
23 we've got this channel whose bank is eroding
24 and the bank may impair the hurricane
25 protection structure.  So -- and you've told

---

Page 104

1  me, well, now, wait, when that happens we got
2  to go back to the project guy.  And I'm
3  thinking to myself, well, why wouldn't the
4  first person you talk to be the engineering
5  guys to sort of understand the process of
6  what's going on and how from an engineering
7  perspective how this erosion business may
8  impact the hurricane protection structure?
9        MR. BAEZA:
10          Objection.  Compound question.
11          Vague and ambiguous.
12       MR. BRUNO:
13          I pride myself on trying to
14          elicit the most number of objections
15          per question as I possibly can.  My
16          record is about five.
17          (Off the record.)
18    A.  I guess, and I'm not certain of the
19 answer, but what you've got is you've got a
20 federal navigation project that has a potential
21 to affect or impact a federal flood control
22 hurricane protection project.  So those two
23 managers need to get together and, you know,
24 then they get engineering involved and say,
25 okay, what's actually happening here?  So the

---

Page 105

1  technical evaluation comes from engineering.
2  EXAMINATION BY MR. BRUNO:
3     Q.  Right.  Okay.
4     A.  But the managers that are in control
5  of the projects are saying, okay, is it yours
6  or is it mine?
7     Q.  Do you know how that issue was
8  resolved?
9     A.  I don't.  No, I don't.
10    Q.  How would you have resolved it?
11    A.  From a maintenance standpoint, you
12 know, if it's me as a manager saying is this
13 maintenance, I'm going to go to engineering and
14 say, how is this impacting it?  And, again,
15 based on that engineering judgment, you know,
16 you go from there.
17    Q.  Right.
18    A.  Um -- you know, it's what's the actual
19 cause?  Is it the primary cause or is it the
20 secondary cause?
21    Q.  Now, as a matter of fact, because on
22 the completed project side you have the need
23 for a 30 percent contribution from the local
24 sponsor -- okay -- on the one hand, and on the
25 other hand if it's a navigation project it's

---

JOHNS PENDLETON COURT REPORTERS              800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 106

1   100 percent federal --
2       A.   That's right.
3       Q.   -- would you at least agree with me
4   that there is -- if somebody -- if -- and this
5   is a big if, big capital I, big capital F -- if
6   somebody was interested only in the money,
7   there would be a motivation to try to turn it
8   into a flood control issue as opposed to a
9   navigation issue because you get 30 percent of
10  the money from somebody else.
11          MR. BAEZA:
12             Objection.  Calls for speculation
13          and argumentative.
14      A.   Yeah.  I mean, you know, I wouldn't
15  know how to answer that being that I'm not on
16  that side.  But --
17  EXAMINATION BY MR. BRUNO:
18      Q.   Well, just as a matter of human
19  nature, I mean, if I'm asking Mr. Anzelmo over
20  there to come up with 30 percent of a hundred
21  bucks, he might not be too happy.  Wouldn't
22  you, agree?
23      A.   I would say he probably wouldn't.
24      Q.   Wouldn't be happy.  He'd say, no, no,
25  no.  I'm not putting up my thirty bucks, your

Page 107

1   navigation project is making the waves, you pay
2   the hundred bucks.  Right?  I mean, that's just
3   logical.
4       A.   It's logical.
5       Q.   Okay.  Now, my learned co-counsel
6   asked me to confirm that if there was no MRGO,
7   there would be no wave wash and, therefore, no
8   erosion.  Isn't that true?
9           MR. BAEZA:
10             Objection.  Calls for speculation
11          and improper lay opinion.
12          MR. BRUNO:
13             Give me a break.
14          MR. BAEZA:
15             You want four more?
16          MR. BRUNO:
17             As long as it counts on his
18          record, not mine.
19      A.   You know, I mean, if there was no
20  waterway right there, then I would think a
21  reasonable person would say, no, it wouldn't
22  be, but you have Lake Borgne, you know, that's
23  over there that could have a potential impact
24  as well, so.
25  EXAMINATION BY MR. BRUNO:

Page 108

1       Q.   All right.  I'm with you.
2       A.   I don't know.
3       Q.   Now let's, um -- let's go to your very
4   specific area and that is the levee
5   maintenance.  And we have the inspection side
6   of that, and then we have, to the extent there
7   is a need to do maintenance, I'll be asking you
8   about how that happens and who pays for it.
9       A.   All right.
10      Q.   Now, first, all of -- I'm sorry.
11  Let's start with this:  Completed projects.  I
12  note the use of the adjective completed.  So
13  let's start with completed.  What does that
14  mean?
15      A.   Okay.  You have completed contracts,
16  you know, which is essentially, the way
17  hurricane protection projects have historically
18  been built, because you're generally in marshy
19  types of areas, not the best of foundations,
20  you build them in lifts, meaning, you know, you
21  put material out there, you leave it out there
22  for some time period, in the older days, before
23  some of the newer technology, it was generally
24  considered about a five-year type of time
25  period, to allow for that material to settle.

Page 109

1       Q.   Right.
2       A.   Then you'd come in with another
3   contract on a second lift, and you'd build up
4   on that and then you'd allow that to settle.
5       Q.   Right.
6       A.   Then, generally speaking, you would
7   have a third lift, which is usually the final
8   lift, in most cases.  You would -- by that time
9   you had a lot of compaction, you're now putting
10  the topping on, per se.  And you would build --
11  and you would generally build over and above
12  the design grade of what you're trying to
13  achieve.  That way, if you do have any
14  settlement over that last period, it should be
15  minimal and you should end up with something
16  around the authorized grade that you wanted to
17  build to.  At that point, you'd have a
18  completed project of that feature.
19      Q.   All right.  Wait.  Now, I know I --
20      A.   Or I should say a completed project or
21  useful unit of the overall project.
22      Q.   All right.  Now -- but you're saying
23  completed project, and I need to kind of
24  explore that with you a tad more.
25             You've done -- you've said that

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

---

Page 110

1   because of the nature of building the hurricane
2   protection structure you do it in stages, and
3   you refer to an example where you have three
4   stages, three lifts.
5       A.  Uh-huh.
6       Q.  Is that for all levees?
7       A.  Well, it varies.  No, you know,
8   because like I said, it depends on the
9   conditions.  You might have -- you might be
10  able to accomplish the same thing with two
11  lifts --
12      Q.  Understood.
13      A.  -- you know.
14      Q.  But what I'm driving at is -- and
15  there's two ways to look at it, I submit to
16  you.  One is, the planning guy says, okay, we
17  know we want to build this hurricane protection
18  structure, and what we're going to build is
19  we're going to put an earthen embankment and
20  wore going to make it so high.  Right?
21      A.  Correct.
22      Q.  That's the whole standard project
23  hurricane business, et cetera.  Now, so, I can
24  envision where the planning guy says, we can
25  accomplish that in three lifts, four lifts,

---

Page 111

1   whatever, and so at the end of the four lifts
2   one might conclude that it was completed.
3       A.  That's correct.
4       Q.  The other view would be -- now, wait a
5   minute, the goal was to create a hurricane
6   protection structure of a certain height.  And
7   so the other way to look at it might be, and I
8   don't know the answer, whether or not you built
9   to the height that you thought you were going
10  the build to.
11          What I'd like to know is, from the
12  Corps' perspective, which of the two represents
13  a completed work, is it the completion of the
14  plan that was put in place to get to the
15  height, or is it the fact that you've got your
16  earthen mound to the height that you wanted it
17  to be?
18          MR. BAEZA:
19              Before he answers I'm going to
20          object on vagueness grounds, and also
21          your characterization as the Corps'
22          position.  This isn't a 30(b)(6), this
23          is it just from his personal
24          knowledge.
25  EXAMINATION BY MR. BRUNO:

---

Page 112

1       Q.  Okay.  Your understanding of
2   completed -- how about this?  You're the
3   completed guy, so I'm imagining that it falls
4   within your jurisdiction after it's completed.
5   And I put that in quotes.  Right?
6       A.  Right.
7       Q.  So if it's not completed, it's not
8   within your jurisdiction.
9       A.  No, it's still in that --
10      Q.  Somebody else.
11      A.  That's correct.  PPP.
12      Q.  All right.  So I'm not asking you from
13  the Corps, but I'm asking you as the manager of
14  completed works.  Okay?  When does it fall
15  within your jurisdiction?  Is there a piece of
16  paper, is there a telephone call, is there an
17  E-mail?  How -- what is the indicator to you
18  that it's completed?
19      A.  When engineering division and that
20  project manager in PPPMD tell us that there's
21  no additional work scheduled for this project,
22  or this piece of the project, that it's to
23  elevation and section, so it's not just in
24  elevation it's the section of the rest of the
25  levee, you know, the slopes and the berms and

---

Page 113

1   anything else, so there is an no additional
2   construction scheduled for that piece of the
3   project.
4       Q.  All right.
5       A.  That's when it was considered
6   completed useful unit thereof.
7          (Brief interruption.)
8   EXAMINATION BY MR. BRUNO:
9       Q.  Okay.  Do you get a piece of paper
10  when those things occur?  In other words, what
11  you just told me was engineering, project guy
12  says no more work is expected, how is that
13  information conveyed to the op manager of
14  Completed Works?
15      A.  I don't recall getting a piece of
16  paper.  It was just verbal, you know, there is
17  no more work.  It was on the schedules, you
18  know, that they would have, this was it, that
19  was the third lift, it's been finished, that
20  contract is complete.  We do get a piece of
21  paper, you know, that says the contract of the
22  third lift is complete --
23      Q.  All right.
24      A.  -- and it may have had something in
25  there that there's no additional work on it.

---

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                         April 2, 2008

Page 114

1   I'd have to -- I don't know if there was or
2   not.
3      Q.   Now, we're going back now to my
4   earlier question, which was is it when the
5   scheduled work is completed or whether you got
6   to your design height?  We know in fact that
7   the hurricane protection structure at the MRGO
8   between Bayou La Loutre and Bayou Bienvenue had
9   been completed if one uses the notion no more
10  work planned.  But we also know that it never
11  reached its design height.  So -- and is that
12  true?  Do you know that to be fact?  Or am I
13  just making that up --
14     A.   Well, you know, in terms of what we
15  had, that project was above what was believed
16  to be its design height.  So it was done --
17  actually, you know, when it was completed, that
18  final lift completed, it's above the authorized
19  design height because you're allowing for that
20  little bit of last settlement that's in there.
21     Q.   All right.  So here's the question:
22  Do you know whether or not the hurricane
23  protection structure along MRGO between Bayou
24  La Loutre and Bayou Bienvenue ever moved to the
25  jurisdiction of the manager of completed works?

Page 115

1      A.   Yes.
2      Q.   It did.
3      A.   Uh-huh.
4      Q.   Okay.
5      A.   I mean, so in the sense of, you know,
6   was everything -- I'd have to verify if every
7   little piece that was called the Chalmette Loop
8   was all of it, but, you know, the piece in
9   there, if I recall correctly it was.
10     Q.   All right.  And what did that occur?
11     A.   Offhand, I don't know.  I'd say
12  eighties or early nineties, somewhere in there
13  most likely.
14     Q.   Okay.  Good.  Let's talk about the
15  levees at the outfall canals.  Well, let's call
16  them -- I don't know what we call them.  Let's
17  call them hurricane protection structures at
18  the outfall canals in New Orleans.
19          Did those fall within the jurisdiction
20  of the op manager for completed works?
21     A.   Yes.
22     Q.   That includes the 17th Street Canal
23  and London.
24     A.   Orleans and London.  Uh-huh.
25     Q.   And finally, let's talk about the

Page 116

1   hurricane protection structures along the
2   Industrial Canal.  Did that ever fall within
3   the jurisdiction of the op manager for
4   Completed Works?
5      A.   Yes.
6      Q.   Okay.  All right.
7          MR. BRUNO:
8              This is probably a good time to
9          break, if you don't mind, so we can
10         run to court, rather than get heavy
11         into something and break.
12         (Off the record.)
13  EXAMINATION BY MR. BRUNO:
14     Q.   Thanks for allowing us the little
15  break.
16          All right.  We were talking about --
17  let's go to Page 12 again so we can see where
18  we were.  We were talking about the operations
19  manager for completed works.
20     A.   Okay.
21     Q.   How long have you been associated with
22  that section?
23     A.   Well, for this last period of time
24  was, let's see, um -- December of '04 to my
25  promotion in October of '06.  '06, yeah.

Page 117

1          Right.  Now, that operation of
2   completed works is actually what I started in
3   when I was a student.  It was under a different
4   name and title and such.
5      Q.   Right.
6      A.   So, and then when I was in readiness
7   branch, when I was the chief of readiness
8   branch, that function, prior to it becoming an
9   operation manager 's position, was actually a
10  section within readiness branch.
11     Q.   All right.
12     A.   So I've been associated with it for
13  many years.
14     Q.   And now you're the supervisory chief
15  engineer of the entire operations division.
16     A.   Assistant chief.
17     Q.   Assistant chief.  So you report to --
18     A.   Chris Accardo.  To the chief.
19     Q.   To the chief of operations.
20     A.   Yes.
21     Q.   Okay.  All right.  Now, you were
22  associated with the Completed Works program it
23  looks like eight years, back in '77 to '85.
24     A.   Yes.
25     Q.   All right.  Now, I know that there may

                                    30 (Pages 114 to 117)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 118

1   be some small variances in the way business was
2   conducted in that group, or section that is,
3   the completed works section, but very
4   generally, the way that that group did business
5   in '77 --
6       A.  Uh-huh.
7       Q.  -- the same as it does business today?
8       A.  And consistent.  Pretty close, yeah.
9       Q.  Pretty close.
10      A.  It's very close.
11      Q.  Because I'm about to ask you questions
12  about the inspection of levees and such, and
13  I'm trying to avoid, you know, asking you for
14  each year.
15      A.  Right.
16      Q.  When I ask you questions about levee
17  inspection, will the answers be the same if I
18  were to ask you about levee inspection in '77,
19  and for each subsequent year up until today,
20  the answers will be the same?
21      MR. BAEZA:
22          Objection.  Vagueness.
23      A.  Pretty much, you know.
24  EXAMINATION BY MR. BRUNO:
25      Q.  Pretty much.  Maybe there's a

Page 119

1   nuance --
2       A.  Post Hurricane Katrina, we changed
3   slightly in terms of going a lot slower on an
4   inspection.
5       Q.  Well, I can understand why, but --
6       A.  And then --
7       Q.  I'll keep it to pre.  I'm really only
8   focused on pre.  All right?
9       A.  Okay.
10      Q.  So generally, would it be true that
11  pre-Katrina the inspections -- I mean, I know
12  they're not exactly the same every year, but
13  generally, the way inspections were conducted
14  were the same from '77 until Katrina.
15      A.  Yes.
16      Q.  Okay.  Now, we're interested in -- how
17  many miles of levee, and I guess I'm
18  necessarily limiting the question to hurricane
19  protection structures, was the manager of
20  Completed Works responsible to inspect -- and
21  we're talking about from '77 until Katrina.
22      MR. BAEZA:
23          Are we talking about the LPV?
24      MR. BRUNO:
25          He's got to answer that.  I don't

Page 120

1       know.
2       A.  Well, you got five different hurricane
3   protection projects.  It's a total of about
4   325 miles.
5   EXAMINATION BY MR. BRUNO:
6       Q.  All right.  Well, in order to satisfy
7   counsel 's objection, I candidly thought we had
8   established these facts but we can just do it
9   again very briefly.
10          I thought that I had asked you before
11  the lunch break whether or not the hurricane
12  protection structures built on the outfall
13  canals were considered to have been completed.
14      A.  Uh-huh.  The flood walls.
15      Q.  Correct.
16      A.  Uh-huh.
17      Q.  All right.  And I also thought I asked
18  you if the hurricane protection structures on
19  the Industrial Canal or the IHNC were
20  completed.
21      A.  Correct.
22      Q.  And you said yes.
23      A.  Yes.
24      Q.  And I also asked you if the hurricane
25  protection structures on the MRGO had been

Page 121

1   completed, and you said yes.
2       A.  Yes.
3       Q.  And perhaps in fairness to counsel,
4   because I'm asking about '77, we need to ask
5   the question one more time in terms of when
6   these things were considered to be completed.
7   Okay?  And I don't know if you can answer that,
8   but we'll try.
9          We'll go back to 1977.  And we know --
10  we know that in 1977 the hurricane protection
11  structure on the 17th Street Canal was not
12  completed.
13      A.  Right.  It wasn't there.
14      Q.  It wasn't there.  We also know that
15  the hurricane protection structure on Orleans
16  was not there.  Right?
17      A.  Yes.
18      Q.  And we know that in 1977 the hurricane
19  protection structure on London wasn't there.
20      A.  Correct.
21      Q.  All right.  We also know that on the
22  MRGO, the second or third lift, I forgot which
23  one, wasn't finished in '77.
24      A.  That's correct.
25      Q.  Okay.  And the IHNC, and I will

JOHNS PENDLETON COURT REPORTERS            800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 122

1  confess that I don't remember the dates, was
2  that finished in '77?
3      A.  I'm not certain on that.  But it could
4  have been, because that work was started
5  prior -- it was in the original project, you
6  know, as far as the IHNC.  The outfall canals
7  were later added.
8      Q.  Right.  That was in about --
9      A.  In the early nineties.
10      Q.  -- '91, '92, somewhere in there?
11      A.  Or early nineties, that's correct.
12      Q.  Okay.  So walking through those three,
13  again, we know that the MRGO third lift was
14  about, and very about, eighties, somewhere in
15  there?
16      A.  I'd say eighties, maybe early
17  nineties.  I mean, remember, it's being built
18  in pieces, too.
19      Q.  Right.
20      A.  Reaches as they go.
21      Q.  Okay.  And I guess I neglected to ask
22  you about the Citrus back levee in New Orleans
23  East.  Was that finished?
24      A.  I'm not certain whether it was
25  finished, you know, if it was totally complete.

Page 123

1  Again, keep in mind that the way these things
2  are built, you might have twenty miles but
3  their contract is only four miles.  So you
4  might have separate -- so a contract might be
5  complete, and a piece of that may be totally
6  complete and the other piece next to it is not.
7      Q.  All right.  But in order for me to
8  attempt, as I always try to do, to simplify if
9  I can for the record, we can agree that at the
10  point in time when the work was completed,
11  um -- the particular levee or hurricane
12  protection structure became the responsibility
13  of the operations manager, right?  You've told
14  me that already.
15      A.  That's correct.
16      Q.  And we've also established, I think,
17  that the particular methods utilized by the
18  operations managers for inspection were
19  generally the same throughout this whole period
20  of time.
21      A.  That's correct.
22      Q.  All right.  So in terms of any concern
23  that one might have about a particular
24  hurricane protection structure being completed
25  or not, it's simply a matter of when that

Page 124

1  hurricane protection structure went into the
2  jurisdiction of the operations manager, and at
3  that point in time it went into the inspection
4  cycle, if you will.  Right?
5          MR. BAEZA:
6              Objection.  Vague and ambiguous.
7      A.  Right.  Actually, the operations
8  manager, even during the early lifts, like when
9  a contract is complete, the operations manager
10  is the one who wrote the completion notice of
11  that contract to the Levee District.  Because
12  the operation manager was the liaison between
13  the levee district, or the sponsor, and the
14  Corps.
15  EXAMINATION BY MR. BRUNO:
16      Q.  Okay.
17      A.  And so we were aware of what's being
18  done throughout.
19      Q.  Well, but when you say that, you don't
20  mean to suggest -- I mean, like, for example,
21  we've already established that the hurricane
22  protection structures on the MRGO involved at
23  least three lifts over a span of time that's at
24  least fifteen years.  Right?
25      A.  Correct.

Page 125

1      Q.  All right.  You're not suggesting that
2  the operations manager had jurisdiction for
3  inspection between the first and second lift,
4  or are you telling me that?
5      A.  Actually, we would occasionally go
6  past those sections if you had something more
7  than a first lift.  Actually, we did pass some
8  of those sections, yes --
9      Q.  Okay.
10      A.  -- when we did -- and those
11  inspections, those are joint agency inspections
12  because they are being maintained by the
13  sponsor during those interim periods.  So.
14      Q.  They are?  I frankly was given to
15  understand that they were not required to be
16  maintained by the local sponsor until such time
17  as they were actually completed and transferred
18  to the local sponsor by some act, by some
19  writing or something.
20          MR. BAEZA:
21              Objection.  Is that even a
22          question?
23  EXAMINATION BY MR. BRUNO:
24      Q.  Comma, is that true?
25      A.  In essence, historically, all levees,

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 126

1  once that first contract was built, you know,
2  the sponsor agrees -- prior to its
3  construction -- any part of that project
4  construction beginning, the sponsor agrees to
5  operate and maintain, as well as all the lands,
6  easements, rights of way, et cetera, et cetera.
7  When that very first contract is completed, the
8  construction contract, first lift, we wrote the
9  letter saying it's completed, you know,
10  maintain throughout.
11     Q.  All right.
12     A.  And they've done that.
13     Q.  Okay.  I know you're not a contracts
14  guy, but since we're talking about the
15  responsibilities as you perceive them to be of
16  the local sponsor, let me ask you if you're
17  familiar with an act of assurance.
18     A.  Yes.
19     Q.  What is it?
20     A.  Basically, it's a cooperation
21  agreement between the sponsor and the Corps,
22  and that's where they have their -- we used to
23  call them the ABCs, you know, you'll agree to
24  operate and maintain, you'll agree to lands,
25  easements, rights-of-way, relocations,

Page 127

1  disposals, et cetera, et cetera, and to hold
2  harmless the Corps.  That was the basics of the
3  acts of assurance.
4     Q.  Now, the hold harmless, as you
5  appreciate it, was it to hold the Corps
6  harmless during the construction of a
7  particular component of the hurricane
8  protection structure, or is it a hold harmless
9  in perpetuity?
10        MR. BAEZA:
11           Objection.  Calls for a legal
12        conclusion.
13     A.  I was going to say, that's one for the
14  lawyers.
15  EXAMINATION BY MR. BRUNO:
16     Q.  All right.
17     A.  I really don't know how they interpret
18  that.
19     Q.  All right.  So let's talk about this
20  inspection.  Now, you've already told us that
21  at least as of Katrina there's about 325 miles
22  of hurricane protection structures that were
23  within the responsibility of the operations
24  manager for Completed Works.  Right?
25     A.  That's correct.

Page 128

1     Q.  Okay.  And we have already, in
2  general, learned that there was at least some
3  inspection obligation by the Corps.  Right?
4     A.  Correct.
5     Q.  Okay.  All right.  Now, the inspection
6  itself, was that done more than once a year?
7     A.  Okay.  We had an annual compliance --
8  an O&M annual compliance inspection.
9     Q.  Oh.  I'm sorry.  Whenever you give
10  me --
11     A.  Operations and maintenance --
12     Q.  Whenever you give me those acronyms,
13  please let me catch up to you.
14     A.  Okay.  Operation and maintenance, O&M
15  compliance, that's to ensure those joint
16  agencies, the primary agencies being the Corps
17  of Engineers, the sponsor and DOTD -- state
18  DOTD, on occasion we had other stakeholders
19  such as the Port of New Orleans make some of
20  these, the city emergency management folks may
21  come along, but the three primaries that deal
22  with the system, the levee system, are the
23  sponsor, DOTD and the Corps.  DOTD acts similar
24  to the Corps; as we are a federal advisor, DOTD
25  is a state advisor, engineering type advisor to

Page 129

1  the sponsor.
2        Okay.  It's a drive-by visual
3  inspection, and the purpose of that is to
4  ensure that that sponsor is making appropriate
5  efforts to maintain those structures,
6  structures being levees or flood walls.
7     Q.  All right.  Forgive me.  Let me stop
8  you because I want to make sure I didn't lose
9  this thread.  My first question was whether or
10  not it was done more than once a year.  And I
11  don't know that in my own brain I understood
12  that there was an answer.
13        We know that it was at least once a
14  year; right?
15     A.  Correct.
16     Q.  So what I'm trying to figure out is,
17  was this more than once a year for a particular
18  mile of hurricane protection structure?
19     A.  The way we did inspections -- and the
20  answer to that, it's complex, it's not really a
21  yes or no answer --
22     Q.  All right.  That's fair.
23     A.  -- because there is one annual
24  compliance inspection.  That's joint agency.
25  The levee district or the sponsor is out there

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 130

1   year-round cutting the grass and such, you
2   know, they have maintenance folks, they have
3   their police departments and such, so in
4   essence there's inspection. Whether it's
5   informal or not, there's inspections going on
6   throughout the year.
7          If there's a particular area of
8   concern, say they're cutting the grass in a
9   particular region and all of a sudden they say,
10  wait a minute, there's a levee slide, or
11  there's this hole out there that wasn't there
12  before, then a specific inspection -- site
13  inspection would then take place with the three
14  agencies.
15     Q.   Okay. All right.
16     A.   So --
17     Q.   So one -- all right. But I think I
18  understand you. Let me see if I can articulate
19  it. Which is always a test of my degree of
20  understanding.
21         On an annual basis, at a minimum of
22  once per year, the Corps undertook an
23  inspection of the hurricane protection
24  structures. Right?
25     A.   Correct. And it may not have

Page 131

1   covered -- and like I say, it's a compliance,
2   so we're just trying to get a general idea.
3      Q.   Let me slow you down because -- I'm
4   going let you. I'm like Hemmingway, you know,
5   A, B, C. Number one, let me just get the
6   frequency. And then we'll talk about the
7   scope.
8      A.   All right.
9      Q.   So it's once a year.
10     A.   Yes.
11     Q.   Okay. And it's all 325 miles.
12     A.   Uh-huh.
13     Q.   All right. Now -- and it's
14  mandatory.
15     A.   It's required in terms of saying
16  suggested in the Code of Federal Regulations,
17  you know, they're saying you should do it at
18  least once a year. It's mandatory, in essence,
19  for the sponsor because that's where the Code
20  of Federal Regulations spells out the
21  obligations of the sponsor. But it suggests
22  that the Corps attend these, which we do. And
23  we've always --
24     Q.   Okay.
25     A.   Which was always done.

Page 132

1      Q.   Do you happen to know, and trust me,
2   it's okay if you don't, the regulation number?
3      A.   That we use?
4      Q.   Well, that suggests that the sponsor
5   is required to do this once a year and that you
6   should attend.
7      A.   33 CFR 208.10.
8      Q.   Okay.
9      A.   That's the one. That spells out your
10  O&M basic requirements.
11     Q.   Okay. Now, again, before we get too
12  far along, let me just get this established:
13  This inspection that is required by 33 CFR
14  208.10 by the sponsor, is there some kind of a
15  paper trail or some documentation that is
16  required to demonstrate that it took place?
17     A.   The answer to that, pre-Katrina, was
18  no, we didn't maintain those types of
19  documents. In the Code of Federal Regulations
20  they suggest that at least quarterly -- that
21  the sponsor inspects at least quarterly, and
22  then prior to -- as it states, prior to the
23  flood season, which we have always interpreted
24  either flood or hurricane if it's a hurricane
25  levee, because it's general, because it applies

Page 133

1   to the entire country. But since we have
2   hurricanes we do that annual compliance prior
3   to the hurricane season --
4      Q.   Which is?
5      A.   -- for those.
6      Q.   June?
7      A.   June 1st.
8      Q.   June 1st.
9      A.   We try to do those in May -- well,
10  April-May time frame. And then the MR&T,
11  riverine flooding is more of a springtime, so
12  we want to do that in the fall when the river
13  is low.
14     Q.   Okay. Well, the riverine stuff is
15  done by the op manager for --
16     A.   Nope. That's the same one. Same guy.
17     Q.   It's done by the Completed Works guy?
18     A.   Uh-huh.
19     Q.   Okay.
20     A.   Yep.
21     Q.   Well, then, I'll have to re-cover that
22  ground then. I'm very confused. I thought
23  that you told me that each of the op managers
24  had an obligation to inspect their own --
25     A.   That's right.

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                        April 2, 2008

---

Page 134

1    Q.  -- projects.
2    A.  Correct.
3    Q.  They do.
4    A.  And the MR&T flood control project
5  comes under the ops manager of Completed Works.
6  The river navigation project comes under
7  Mississippi River Baton Rouge to the Gulf.
8    Q.  MR&T.
9    A.  MR&T.
10   Q.  Is, um --
11   A.  Mississippi River and Tributaries.
12   Q.  Okay.  Again, I thought I asked you --
13  and maybe I didn't ask it -- I didn't finish
14  the analysis.  We did establish that the op
15  manager was in charge of Completed Works, and
16  we did define Completed Works to be all of the
17  hurricane protection structures.
18   A.  And --
19   Q.  -- and obviously --
20   A.  -- MR&T.
21   Q.  -- now we're learning that it includes
22  additional levees, and that is your MR&T, which
23  is --
24   A.  973 miles.
25   Q.  -- 973 miles, and that includes the

---

Page 135

1  Mississippi River Baton Rouge to the Gulf?
2    A.  No.
3    Q.  No?
4    A.  No.  Mississippi River Baton Rouge to
5  the Gulf is the navigation project, the river
6  and keeping the ships going down the river.
7    Q.  The MR&T are those little tributaries.
8    A.  The Atchafalaya Basin levees, the
9  floodway levees in the Atchafalaya Basin, all
10  the way down to Morgan City, Berwick, St. Mary
11  Parish.  Strictly levees.  Not navigation,
12  strictly levees.
13   Q.  And those are considered riverine.
14   A.  Yes.
15   Q.  Okay.  I see.  All right.
16   A.  They have an annual compliance
17  inspection --
18   Q.  For both.
19   A.  -- on those, right, as well.
20   Q.  All right.  And so we divide them up
21  between riverine and hurricane protection.
22       Now, I got a little bit confused when
23  you suggested that the regulation requires at
24  least quarterly.  Is it at least quarterly or
25  at least once?

---

Page 136

1    A.  It recommends -- no, it states
2  quarterly, however we never imposed that
3  pre-Katrina.
4    Q.  Okay.
5    A.  So it's a guide.  And the reason we
6  didn't impose that is because they're out there
7  year-round.
8    Q.  All right.
9    A.  And they're -- you know, so we're
10  watching, our folks that are doing construction
11  projects in the area, you know, so again it's
12  kind of informal inspections --
13   Q.  Okay.
14   A.  -- that are occurring.
15   Q.  And I know we want to go there, but I
16  need to satisfy myself that I've covered some
17  of the fundamentals.
18       All right.  So bottom line, with
19  regard to the regulation, insofar as it says at
20  least quarterly, you guys satisfied yourself
21  that that regulation was complied with by
22  virtue of the fact that you had knowledge that
23  the sponsor was in the field often enough to
24  allow you to conclude that the regulation was
25  complied with.  Right?

---

Page 137

1        MR. BAEZA:
2           Objection.  Ambiguous, calls for
3        a legal conclusion.  Perhaps it would
4        be better if we just had the
5        regulation in front of us.
6        MR. BRUNO:
7           I don't know if it would be
8        better.  I don't have a problem with
9        that.  If you like to do that, I don't
10       have a problem with it, but was what I
11       said accurate or inaccurate?
12   A.  Could you repeat it?
13  EXAMINATION BY MR. BRUNO:
14   Q.  Okay.  I thought you told us that the
15  regulation is a suggestion, and it suggests at
16  least four times a year, and you guys didn't
17  walk the 325 miles four times a year with the
18  local sponsor because you were satisfied that
19  they were out there in the field often enough
20  that you felt like doing it, walking with them,
21  once a year would satisfy the regulation.
22       Is that not true?
23       MR. BAEZA:
24          Objection.  Vague, ambiguous,
25       compound --

---

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                      April 2, 2008

---

Page 138

1    A.  Actually, we didn't walk.
2    EXAMINATION BY MR. BRUNO:
3    Q.  Drive.
4    A.  We drove.  It was a visual.
5    Q.  A drive-by.
6    A.  A visual drive-by.
7    Q.  But once a year versus four.
8    A.  Right.  But yet, like I said, we were
9    satisfied because of knowing what they're doing
10   and knowing that we're out there on other
11   occasions beyond that once a year type of
12   thing.
13   Q.  All right.  Did you have the authority
14   to demand that the local sponsor do this
15   inspection four times a year?
16       MR. BAEZA:
17          Objection.  Vague, ambiguous.
18   A.  I believe we could have, you know, if
19   we felt like that was necessary.
20   EXAMINATION BY MR. BRUNO:
21   Q.  Right.
22   A.  If we were going -- what I would say
23   see if we had suspicions that they were not
24   maintaining, or we had records that they were
25   neglecting their duties, which we didn't have

---

Page 139

1    that problem, but other districts have had
2    that, then I would say yes, we could go to that
3    regulation and say, you have to do this.
4    Q.  All right.  Now, again, just to nail
5    it down, the purpose of the involvement of the
6    United States Army Corps of Engineers is to
7    make certain that the local sponsor is in
8    compliance with the regulations, is that
9    correct?
10       MR. BAEZA:
11          Objection.  Vague and ambiguous.
12          He's speaking on his personal
13          knowledge, not the Corps of
14          Engineers'.
15   EXAMINATION BY MR. BRUNO:
16   Q.  Is that true?
17   A.  Yes.  That is correct.  We're ensuring
18   their compliance.
19   Q.  Now, however, in fairness to me, you,
20   in your capacity as the operations manager, is
21   the man whose job it is on behalf of the Corps
22   to make certain that the local sponsor is doing
23   what he's supposed to do, isn't it true?
24   A.  Well, it's the commander 's actual
25   responsibility, but I act on his behalf, yes.

---

Page 140

1    Q.  All right.  Good.  Thank you.
2        Now, I think you've already testified
3    to this, but the role of the Louisiana State
4    Department of Transportation and Development is
5    also in attendance on this annual drive-by.
6    A.  That is correct.
7    Q.  Okay.  And as far as you understand,
8    the role of the Department of Transportation
9    and Development is to act in an advisory role.
10   Right?
11   A.  As an engineering -- state engineering
12   advisor, yes, right.
13   Q.  Well, let me see if I can ask this --
14   what the heck, I know I'm going to draw an
15   objection anyway, so let's just go for it.
16       Did you believe as the operations
17   manager of Completed Work that you had an
18   obligation to do the inspection for the
19   purposes of ascertaining whether or not the
20   levees were safe?
21   A.  We did.
22       MR. BAEZA:
23          Objection.  Calls for
24          speculation, vague and ambiguous.
25       MR. BRUNO:

---

Page 141

1        We both want the same answer.
2    Trust me.
3        MR. BAEZA:
4           I know.
5    A.  These inspections were not structural
6    evaluation inspections, these were O&M
7    compliance to insure that the sponsor was
8    maintaining them in a reasonable fashion, that
9    they would be, you know, not left to a point
10   where they could be jeopardized.  Okay?  We're
11   not doing structural evaluation to say, you
12   know, there's a new difference of levee
13   stability analysis or anything like that.  None
14   of that.  We didn't do elevation surveys, per
15   se.  It was strictly an O&M compliance.
16   EXAMINATION BY MR. BRUNO:
17   Q.  All right.  As best you understand it,
18   was the Louisiana State Department of
19   Transportation and Development in a similar
20   role while you guys were doing this drive-by?
21   A.  Yes.
22   Q.  As you understand it, and as I
23   understand your testimony, the sponsor has the
24   primary responsibility for the maintenance
25   obligation.

---

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                           April 2, 2008

Page 142

1     A.  That's correct.
2     Q.  And the primary responsibility for
3  maintenance arises out of the act of assurance
4  which the local sponsor signed way back when
5  the project was put together.
6          MR. BAEZA:
7              Objection.  Calls for a legal
8          conclusion.
9  EXAMINATION BY MR. BRUNO:
10    Q.  Is that right?
11    A.  Yes.  That's the way I understood it.
12    Q.  Okay.  Now, let's get into what it was
13  that you guys were looking for when you were
14  driving by in terms of ascertaining compliance.
15        So before we get there, let me ask
16  you, what was your understanding of what the
17  sponsor had to do in order to comply?
18    A.  Okay.  Primarily, what they're out
19  there doing, they're mowing the grass, that's
20  number one.  That's what everybody sees, mowing
21  the grass.
22    Q.  Mowing the grass.
23    A.  Okay.  Now, you have, besides that,
24  you know, you may have animal burrows in some
25  of those levees, you may have erosion if you're

Page 143

1  next to a waterway, you may have levee slides.
2  You may have facilities that aren't being
3  appropriately maintained by the owner of that,
4  you know, such as a pipeline crossing or a
5  ramp.  You know, it's up to that facility owner
6  to maintain that portion of theirs.  Now, let's
7  say they're cutting the grass and the pipe is
8  getting exposed or something.  We're going to
9  point that out -- the levee board, you know, it
10  needs to go back to that facility owner through
11  their permit and say, hey, you got to go put
12  more material on this.
13    Q.  Right.  Now --
14    A.  So --
15    Q.  I'm sorry.  I didn't mean to
16  interrupt.  Keep going.
17    A.  Now, that's the basics.
18    Q.  Okay.  Now, again, as a layman
19  listening to what you just said, I would say
20  that some of these things that you've just
21  described are maintenance and some of them are
22  inspection.  In other words, mowing the grass
23  would sound to me like maintenance, but looking
24  for animal burrows would sound to me like
25  inspecting to see if they're there or not.

Page 144

1  Erosion would sound to me something more like
2  an inspection obligation to see if there is any
3  erosion.
4          Am I making any sense?
5          MR. BAEZA:
6              Objection.  Argumentative.
7     A.  You're making perfect sense because,
8  remember, it's an operation and maintenance.
9  So the operations side of that covers
10  inspection throughout.
11  EXAMINATION BY MR. BRUNO:
12    Q.  All right.  So let's see if we can
13  finish the maintenance side.  Okay?
14        Is there anything more that the local
15  sponsor is required to do other than cut the
16  grass, in terms of maintenance?
17    A.  Sure.  If they find -- if they're
18  cutting the grass and they find animal burrows
19  or they find erosion or they find any other
20  whether you want to call it a deficiency or
21  whatever it may be --
22    Q.  I see.
23    A.  -- then they can take that action
24  either to repair it at that point, if it's
25  something they have to repair, or if it's a

Page 145

1  pipeline that doesn't have the material over,
2  they can go back to that pipeline owner, or
3  that ramp owner.
4     Q.  Okay.  All right.  I got you.  Now, is
5  there a line drawn with regard to who is
6  required to pay for those things?  And I'm
7  going to go through them one at a time.
8        First, grass cutting.  Who pays for
9  that?
10    A.  The sponsor.
11    Q.  That would be the local sponsor?
12    A.  Yes.
13    Q.  If they find erosion, who pays for the
14  repair?
15    A.  The sponsor.
16    Q.  All right.
17    A.  Again, let me clarify that.
18    Q.  That's right.  You had me at hello.
19        That depends on the size of the
20  erosion.
21    A.  That's correct.  And it depends on
22  whether or not that project, is -- if it's in
23  the first lift, you know, and it's minimal, if
24  it's one or two sand bags or a little load of
25  dirt, we would say, sponsor, go take care of

JOHNS PENDLETON COURT REPORTERS                    800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 146

1   that, and they would.
2       Q.  Right.
3       A.  But if it's the entire reach, you
4   know, hundreds of feet or thousands of feet and
5   the project still has construction remaining,
6   then they would come to us and say, look, you
7   know, that project is not 100 percent complete,
8   it still -- you need to go back and do it.  And
9   they could come back not to me but to the
10  project manager --
11      Q.  Right.
12      A.  -- in PPPMD, and they would either
13  repair it then or they would incorporate it
14  into the next construction project.
15      Q.  Fair enough.  Before we leave that
16  very specific point, and that is in the context
17  of uncompleted but works in progress, are there
18  written guidelines that would allow the local
19  sponsor or perhaps some third party to
20  understand where the lines are drawn as between
21  what the local sponsor is expected to pay for
22  versus what the Corps is expected to pay for?
23          MR. BAEZA:
24              Objection to vagueness.
25      A.  And I don't really know how to answer

Page 147

1   that question because I don't know if there's
2   something in writing that states that.  Just
3   the process that has historically been there is
4   that, you know, we work with these folks all
5   the time.  And so it was like, okay, is this
6   something you can do, or is it clearly above
7   and beyond, we think, reasonable for that
8   sponsor.
9       Q.  Okay.  Sounds like it was just kind of
10  a discussion, you just had a dialogue and you
11  tried to work it out.
12      A.  Yes.
13      Q.  Were there instances -- and again I'm
14  limiting the question to those uncomplete
15  projects because I'm going to ask the same
16  questions with regard to complete projects.
17          Were there instances where there was
18  some disagreement between the local sponsor and
19  the Corps over who should pay which required
20  somebody to gavel down on who was right and who
21  was wrong, that you can recall in your tenure?
22      A.  No, we always had a pretty good
23  working relationship with the sponsors.
24      Q.  All right.  Now, let's switch over to
25  completed projects.  Okay?  And again, same

Page 148

1   question with regard to who has to pay for
2   erosion repair and the like.  Would your answer
3   be the same?
4       A.  Well, it varies.  Again, it's not --
5       Q.  I love this.
6       A.  -- clear cut.
7       Q.  And no guidelines.  You guys had a
8   very good working relationship it sounds like
9   to me.
10      A.  If you're talking about just erosion,
11  yes, that would be the sponsor.  If the project
12  itself, say the levee, is damaged by hurricane
13  or coastal storm, then it can be repaired under
14  the original agreement.  Or if there's no funds
15  left for construction, then it can be repaired
16  under Public Law 99.  Being that it's a federal
17  project it can be done under Public Law 99
18  which is an emergency -- flood control coastal
19  emergency authorization.  If it's, let's say,
20  damaged by a runaway barge or, you know, a
21  train, whatever --
22      Q.  Right.  Yeah.  We haven't talked about
23  the train yet.
24      A.  -- it's not -- you know, it's not a
25  hurricane or coastal storm, then it's

Page 149

1   100 percent the responsibility of the sponsor.
2       Q.  Okay.  Now, there's been much
3   discussion in the news and a variety of other
4   locations about letting the trees grow too
5   close to the levee.
6           Have you heard such a discussion?
7       A.  (Nods affirmatively.)
8       Q.  You have.
9       A.  Yes, I have.
10      Q.  Yes, you have.  Okay.  Obviously this
11  hits home for you, right?
12      A.  Yes, it does.
13      Q.  So I got to ask you, when you guys are
14  doing your drive-by --
15          MR. BAEZA:
16              Joe, before you continue, I'm
17          going to have to object to how you're
18          referring to the inspection as a
19          drive-by.
20          MR. BRUNO:
21              That was his word.
22          MR. BAEZA:
23              It's a visual inspection.
24          MR. BRUNO:
25              Well --

                                    38 (Pages 146 to 149)

JOHNS PENDLETON COURT REPORTERS              800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 150

1     MR. BAEZA:
2         In a car, and when you're
3    walking, it's still a visual
4    inspection.
5     MR. BRUNO:
6         I, frankly, am required to use
7    the witness' characterization because
8    I don't want to be accused of
9    mischaracterizing his testimony.
10       So --
11   EXAMINATION BY MR. BRUNO:
12    Q.   And I'll let you change, I don't care,
13   I mean, I'm only using drive-by because of how
14   you say it.  You can say walk, you can say
15   whatever you want.  You're the deponent.
16       What is the best way for me to
17   characterize the method chosen to do this
18   inspection?  Is it a --
19    A.   Well, actually, I guess Dan is right.
20   It's a visual inspection, because there are
21   times we get out of the vehicle and walk.
22    Q.   All right.
23    A.   So --
24    Q.   So let's see.  And the reason I didn't
25   characterize it as visual is because that might

Page 151

1    include walking or driving.  So -- all right.
2    The point is, so that the record is as clear as
3    we can make it, you are doing a visual
4    inspection.
5     A.   That's correct.
6     Q.   All right.  You are doing it from a
7    car.
8     A.   Most of the time.
9     Q.   Most of the time.  Although
10   occasionally the car will stop and someone
11   might get out of the car and evaluate something
12   more specifically.  Right?
13    A.   That's correct.
14    Q.   Okay.  All right.  But more often than
15   not, you're in a car.
16    A.   That's correct.
17    Q.   Okay.  Now, what would be the kind of
18   think that would motivate the group to stop the
19   car and get out of the car and do a more
20   specific inspection, if you can give me some
21   examples?
22    A.   If there was some known area of
23   erosion or a levee slide or a problem area that
24   the levee board, or sponsor -- when I say levee
25   board, it's the sponsor.

Page 152

1     Q.   No, I understand that.  And I think
2    the record is clear, we can agree that the
3    sponsor is whoever that might be, but more
4    often than not it's a levee board.
5     A.   Right.
6     Q.   Fair enough.
7     A.   If they have a particular area that
8    though want to see, or because of some known
9    problem or something they said, hey, we had
10   some damage here by animals, we fixed it, we
11   want you to look at it, you know, normally we
12   would have done that already, but if it happens
13   to be close by we would do it then.
14       Operation of a gate.  We'd stop along,
15   you know, the flood walls where we had gates.
16   You had different types of gates, mitered gates
17   versus pulley -- you know, pull chain gates,
18   swing gates, you had different types.  Normally
19   what we would like them to do is to demonstrate
20   that at least these gates are working.  You
21   know, so they would actually have their
22   maintenance folks there and demonstrate that
23   for the inspection party.
24    Q.   Okay.  All right.  It sounds like,
25   what you've said, is that more often than not

Page 153

1    the local sponsor would be the person who would
2    suggest that you stop.  Right?
3     A.   That's correct.
4     Q.   Okay.  Were there instances where
5    either the Corps or the DOTD as the technical
6    support folks would say, stop the car, I want
7    to go see that.
8     A.   Yes.
9     Q.   Okay.  What are the kinds of things
10   that would provoke that kind of stuff?
11    A.   If we had a suspicion of something,
12   you know, or we wanted to just operate that
13   gate -- a particular gate or whatever.  You
14   know, occasionally you might say, as a sponsor,
15   say, well, I want to operate this gate.  We'll
16   say, well, maybe that's because they're trying
17   to hide this, we want you to operate that one.
18    Q.   All right.
19    A.   So yes, we had that latitude to ask
20   for that and request that or -- and it may not
21   be that particular day, we may go back, you
22   know, a following day, depending on what was
23   going on.  But yes, we have that latitude.
24    Q.   Okay.  Now, we've got to talk about
25   the trees, and I need to go back to where I

39 (Pages 150 to 153)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                          April 2, 2008

---

Page 154

1   was, because it sounds like that would be a
2   drive-by situation with regard to trees.
3        First of all, are you aware of any
4   standard, guideline, technical advisory,
5   promulgated by anybody, which would address the
6   question of tree growth -- and I'm going to say
7   on the levee, first, as distinguished from near
8   or close to the levee. Okay?
9        A. (Nods affirmatively.)
10       Q. So let's start with that. Can you
11   answer that?
12       A. On the levee.
13       Q. On the levee.
14       A. On the levee, the levee -- according
15   to guidance, the levee was to be cleared. We
16   did not want trees in the levee.
17       Q. And let's, for the record, define,
18   that's from the levee toe up to the crown, back
19   to the water side of the toe.
20       A. That's correct. In the right of way.
21   The right of way -- again, it's a levee right
22   of way.
23       Q. Is the levee right of way wider than
24   what I've just described, which is toe to toe?
25       A. Yes, it is.

---

Page 155

1        Q. It is?
2        A. Yes.
3        Q. All right. What is the right-of-way
4   for the levee?
5        A. And that may vary. You know, distance
6   wise, generally, from a levee it was generally
7   five feet on the land side, on the flood side
8   it could all the way to the water 's edge.
9        Q. Okay. Five feet.
10       A. Now, again, you had berms on some
11   areas and it would extend further.
12       Q. And we also have to clarify what's a
13   levee. Okay? Am I understanding you to use
14   the word levee to describe an earthen berm of
15   some height as opposed to an I-wall or a T-wall
16   that may be embedded in a berm?
17       A. Yes.
18       MR. BAEZA:
19            Objection to vagueness.
20   EXAMINATION BY MR. BRUNO:
21       Q. Now, so what we've been talking about
22   are levees. And I haven't asked you about
23   I-walls or T-walls, and I'll reserve -- let's
24   just get the levees first. Okay? Now, bottom
25   line, you've have told us that there should be

---

Page 156

1   no trees within the right of way of the levee
2   as defined by an earthen berm. Right?
3        A. That's correct.
4        Q. Okay. Next question is, right next to
5   or close to. Were trees -- I'm sorry. Are you
6   aware of any standard, any requirement, any
7   technical advice that would regard whether or
8   not trees would be permitted close to the right
9   of way for a levee?
10       MR. BAEZA:
11            Objection. Vague and ambiguous.
12       A. Prior to Katrina.
13   EXAMINATION BY MR. BRUNO:
14       Q. Yes.
15       A. No one, ever, not from the Corps, not
16   from the DOTD, from academia -- no one ever
17   made a comment to my knowledge regarding trees
18   being an adverse impact to the levees.
19       Q. Okay. Now, are there any T-walls in
20   the 325 miles of hurricane protection system?
21       A. Yes.
22       Q. Okay. Same question: Trees. And I
23   suppose we need to define the right of way for
24   a T-wall. A T-wall could have a little berm,
25   but not necessary. Right?

---

Page 157

1        A. Usually T-walls did not. You know,
2   I-walls, usually a combination.
3        Q. Of both.
4        A. I-wall and levee.
5        Q. Let's talk about T-wall first, then.
6             Is there a standard, regulation,
7   advisory, et cetera, with regard to permitting
8   trees to grow within the right of way of a
9   T-wall?
10       A. Generally not. You know, again, as I
11   said, prior to Katrina trees were not an issue.
12       Q. No, within the -- I hope you
13   understand my question. Within the -- not
14   outside of, but within the right-of-way for a
15   T-wall, inside.
16       A. I don't -- I'm not sure if I
17   understand your question correctly.
18       Q. Okay. Let me -- forgive me for
19   interrupting you, but you said that with regard
20   to levees trees were not permitted within the
21   right of way. Right?
22       A. That's correct.
23       Q. Okay. When it came to T-walls, are
24   you telling me that there was no guideline
25   within the right of way for T-wall?

---

JOHNS PENDLETON COURT REPORTERS                 800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 158

1    A.  Well, generally when you built the
2  T-wall you removed everything that was anywhere
3  near it.  So.
4    Q.  And you've got a concrete slab which
5  constitutes the T.
6    A.  Correct.  Right.
7    Q.  Okay.
8    A.  So that's why I guess I'm --
9    Q.  Right.
10   A.  It's moved.
11   Q.  All right.  So I guess to get what's
12 in each of our brains onto the record, the fact
13 of the matter is, in a T-wall construction the
14 nature of the construction prohibits trees from
15 growing within the right of way.
16   A.  I'd generally say that's a fair
17 statement, yes.
18   Q.  Okay.  Now let's talk about I-walls,
19 because I-walls, as you've already indicated,
20 can have a small earth berm at its base, and it
21 could vary in height.
22      It also has a right of way, does it
23 not?
24   A.  Yes.
25   Q.  Okay.  And can you tell us, generally

Page 159

1  not specifically, what the right-of-way would
2  be for an I-wall?
3    A.  Well, again it varies.  But it's
4  usually based on the levee portion of that, you
5  know, where that piece of the levee that is
6  supposing that I-wall.
7    Q.  Okay.  So --
8    A.  So it goes from that toe.
9    Q.  The toe.  All right.
10      So would it be appropriate to say that
11 the right of way for an I-wall would be from
12 the earth berm toe, if it exists, to the earth
13 berm toe on the water side?  Or perhaps even to
14 the water.
15   A.  Yes.  However, as I say, I've got to
16 be clear, it varies.  And based on what was
17 acquired, the actual right of way.  Because we
18 learned that, even though we thought it was at
19 the toe, we learned on one of the outfall
20 canals that it actually didn't go all the way
21 to the toe, actual recorded right of way.
22   Q.  Meaning the actual recorded right of
23 way was within the berm and not to the toe.
24   A.  That's correct.
25   Q.  So that in that particular instance

Page 160

1  the toe of the levee was on private property.
2    A.  In that particular instance, I guess,
3  yes.
4    Q.  All right.  Now, here's my question:
5    A.  Whether it's private or somebody else
6  is --
7    Q.  Whoever.
8    A.  -- Sewerage & Water Board or somebody
9  else.
10   Q.  Not the Corps.
11   A.  Yes.
12   Q.  The right of way -- I'm sorry, I
13 shouldn't presume.  The right of way is not
14 owned by the Corps, the right of way is owned
15 by the local sponsor.
16   A.  That's correct.
17   Q.  And so we mean, by third-party,
18 someone other than the local sponsor.
19   A.  Yes.
20   Q.  All right.  Now, same question about
21 trees and the I-wall with the earth berm.  Is
22 there any standard guideline, technical
23 advisory, et cetera, that would indicate that
24 it's appropriate or inappropriate to allow tree
25 growth within the right of way of an I-wall?

Page 161

1      MR. BAEZA:
2          Objection.  Vague and ambiguous.
3    A.  And again, it didn't -- you know,
4  prior to Katrina there was no suggestions of
5  adverse impacts.  As a matter of fact, we built
6  the I-walls on the outfall canals with trees
7  next to them.
8  EXAMINATION BY MR. BRUNO:
9    Q.  All right.  You were going to -- that
10 was my very next question.  Because it has been
11 in fact reported, as a criticism, first, that
12 you couldn't even see from a car window the
13 hurricane protection structures along the 17th
14 Street Canal on the Orleans side.
15      Is that a true statement or an
16 inaccurate statement?
17      MR. BAEZA:
18          Objection in terms of relevance.
19      We're talking about the outfall canals
20      here.  I thought we were going to
21      be -- I thought you were just
22      discussing general principles with
23      regards to trees near flood protection
24      structures as they relate to the
25      structures in Robinson.

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                              April 2, 2008

Page 162

1    MR. BRUNO:
2        Let's go off the record for a
3    second.
4    (Off the record.)
5    MR. BAEZA:
6        Joe, just before we continue with
7    those questions, I just want to lodge
8    a continuing objection to all of these
9    questions.  I had the Notice of
10   Deposition here, it is noticed to MRGO
11   Robinson only.
12   MR. BRUNO:
13       That's right.
14   MR. BAEZA:
15       And so any questions we have
16   related to 17th Street Canal, Orleans
17   Canal, London Avenue Canal are going
18   to be outside the scope of what has
19   been noticed in this deposition,
20   outside the scope of Robinson.
21   MR. BRUNO:
22       I agree with you.  As I said off
23   the record why I beg a little bit of
24   indulgence on this.
25   MR. BAEZA:

Page 163

1        Thank you.
2    MR. BRUNO:
3        Okay.  And I guess really, this
4    whole line speaks generally to an
5    argument that may be made by someone
6    that you guys didn't perform this
7    inspection or that you performed it in
8    such way that you breached some kind
9    of a duty.  And so I think perhaps,
10   peripherally, it may be relevant in
11   that regard.  But in any case, the --
12   MR. BAEZA:
13       We would object to the
14   characterization of duty.  It calls
15   for a legal conclusion.
16   MR. BRUNO:
17       I know.  I'm not asking a
18   question.  I'm speaking to you now.
19   MR. BAEZA:
20       I thought you were looking at
21   him.
22   MR. BRUNO:
23       No, no, no.  I was thinking --
24   you put a little grease on the wheel
25   in my brain and I went, oh, wait a

Page 164

1        minute, you know, we might need to add
2        something to this thought.
3    EXAMINATION BY MR. BRUNO:
4        Q.  So anyway, having said that, the truth
5    of it is, can you just very briefly, and I
6    don't want to spend a lot of time on this, but
7    driving by 17th Street Canal, could you see it?
8        A.  Sure.
9        Q.  Okay.
10       A.  They cut the grass, you know,
11   behind -- you know, there's a levee section
12   behind those homes.
13       Q.  Okay.  And you were satisfied that the
14   local sponsor had done what it was supposed to
15   do?
16       A.  Fulfilled their obligation duties,
17   yes.
18       Q.  All right.  With regard to I-walls
19   generally that are component parts of hurricane
20   protection structures at a water 's edge, do
21   you know whether or not the lack of an -- if
22   there is an earth berm on the land side --
23   okay -- is the lack of an earth berm on the
24   water side an indication of a problem like
25   erosion or sliding or any of these other things

Page 165

1    that you've described?
2        MR. BAEZA:
3            Objection.  Vague, ambiguous,
4        calls for speculation and an improper
5        lay opinion.
6        A.  I would refer that to our engineering
7    division, you know, because they're the ones
8    that do a technical evaluation.
9    EXAMINATION BY MR. BRUNO:
10       Q.  All right.  Well, but it's something
11   that you might encounter during an inspection.
12       MR. BAEZA:
13           Objection.  Argumentative.
14       MR. BRUNO:
15           Well no, how can that be
16       argumentative?
17   EXAMINATION BY MR. BRUNO:
18       Q.  If you're inspecting, you're there to
19   drive by and see if there is an erosion
20   problem.  Right?
21       A.  Let me clarify who's on these
22   inspections, as well.
23       Q.  All right.
24       A.  It's not just me as the ops manager.
25       Q.  Okay.

JOHNS PENDLETON COURT REPORTERS              800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 166

1    A.  Okay?  You have usually a geotech
2  engineer with you, usually a civil --
3    Q.  All right.
4    A.  -- someone from levees section or
5  structures section, you have construction
6  representatives from our construction
7  division --
8    Q.  All right.
9    A.  -- someone from our PM, the project
10  manager 's position, as well as the engineers
11  from DOTD --
12    Q.  Right.
13    A.  -- as well.  So you're not limited to
14  just two or three people.  It's numerous.
15    Q.  Got you.  So that as far as you're
16  concerned, the Corps had, on this inspection
17  tour, sufficient technical support in order to
18  address as many issues as you could think of
19  that might be -- that might arise in the course
20  of an inspection.  Is that fair?
21      MR. BAEZA:
22         Objection.  Vague, ambiguous,
23      calls for improper lay opinion.
24    A.  I'd say we tried to get as many
25  disciplines out there on these inspections as

Page 167

1  we could.  Yes.
2  EXAMINATION BY MR. BRUNO:
3    Q.  All right.  And who had the
4  responsibility of putting together the team for
5  the Corps, was that the op manager or
6  somebody's else?
7    A.  That was the ops manager, yes.
8    Q.  All right.  So it's not a lay opinion.
9  That was your responsibility to put together
10  the team, right?
11    A.  Yes.
12    Q.  Okay.  You thought you had the right
13  guys there.
14    A.  Yes.
15    Q.  Okay.  And just again, I know you've
16  said it, but you had a soils guy, you had a
17  structural guy -- who else did you have?
18    A.  A levees guy.
19    Q.  Who?
20    A.  A levees.
21    Q.  Levees guy and a construction guy.
22    A.  Construction guy, sometimes real
23  estate, sometimes project management, usually.
24  Usually the colonel or his deputy, as well.
25    Q.  Okay.  Now, a drive-by obviously works

Page 168

1  where there's a road.  But the MRGO --
2      MR. BAEZA:
3         Again, we talked about this
4      before.  You're calling it drive-bys
5      again.
6      MR. BRUNO:
7         No, it is a drive-by there
8      because you have to get to it.  Before
9      you can stop the car, you got to have
10      a car.
11      MR. BAEZA:
12         I don't want to argue about the
13      semantics, it's just a drive-by seems
14      like a mischaracterization of what
15      he's been saying.  It's a visual
16      inspection.
17      MR. BRUNO:
18         Well, it might be if I was
19      suggesting something nefarious about
20      the drive-by, which I'm not.  What I'm
21      saying is you're using a car as
22      opposed to a plane or a helicopter or
23      your feet for access.  We're talking
24      about access now.
25  EXAMINATION BY MR. BRUNO:

Page 169

1    Q.  So a car works if there's roads.  What
2  happens with MRGO where there's no road?
3    A.  You're talking about the piece between
4  the two structures?
5    Q.  I'm talking about the hurricane
6  protection structure that is alongside the
7  southern shore of the MRGO from the, I guess,
8  Reach 1 -- we've generally called it Reach 2,
9  to approximately Verret.
10    A.  Okay.  Well, I'll show you how we
11  went.  We'd generally start at -- when we're
12  doing that area, which was in Lake Borgne, we
13  would come from Caernarvon, along the levee --
14  you're driving the levee, or on the -- or near
15  the toe of the levee.
16    Q.  Uh-huh.
17    A.  Until you get to the Bayou Dupre
18  control structure.  All right?  That's a
19  waterway, and there is no bridge there.  The
20  levee district, in this case it was the Lake
21  Borgne Levee District, had a barge waiting, and
22  we would put the vehicles on the barge and it
23  would bring us to the other side, and then we'd
24  drive that whole piece.
25    Q.  Okay.  So you did drive the MRGO

JOHNS PENDLETON COURT REPORTERS          800   562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

---

Page 170

1  levee.
2      A.  Yes.
3      Q.  Okay.
4      A.  So.  I mean, that's how we got along
5  that area.  You know, we're driving, and we're
6  visually inspecting.
7      Q.  How about the Reach 1 levees?
8      A.  Okay.
9      Q.  On let's talk -- and let's break it
10 down.  Between the southern bank and the
11 northern bank of the Intracoastal Waterway.
12 Could you all drive that?
13     A.  Yes.  We'd come across the Paris Road
14 bridge, and you come in here and you get to the
15 levee, there's a little road, blocked off for
16 access to -- levee district let's us in.  You
17 can come this, you can drive along the levee
18 system here.
19     Q.  Okay.
20     A.  Or you can drive all the way up to the
21 Bayou Bienvenue control structure.
22     Q.  Okay.  So your testimony is you guys
23 actually did drive the entire length of the
24 hurricane protection structure from the -- the
25 hurricane protection structure which surrounds

---

Page 171

1  the Lower Nine and St. Bernard, um -- by car.
2  Right?
3      A.  Well --
4      Q.  Except for the point where you got on
5  the barge and you went over the thing.
6          MR. BAEZA:
7              Objection.  I believe the witness
8          didn't say they inspected in the Lower
9          Ninth Ward with respect to the flood
10         walls along the IHNC.
11 EXAMINATION BY MR. BRUNO:
12     Q.  Well, that would be part of it.
13     A.  Can I clarify what we do?
14     Q.  Yeah.
15     A.  And what you said was 100 percent.
16 Remember, we're looking for O&M compliance so
17 we never necessarily did 100 percent.  We're
18 getting an idea.  We may have done this, and
19 then turn around.
20     Q.  Okay.
21     A.  So we may not have gone all the way to
22 this point.  But yes, we did do along the
23 walls, along the IHNC walls when we were coming
24 from the other direction.
25         We came -- generally started down

---

Page 172

1  there by West End and 17th Street Canal, back
2  there, we'd come along the lake front, and then
3  you'd come along the IHNC.
4      Q.  Okay.
5      A.  And then you come this way and come
6  back.  So we were covering a major portion of
7  it.
8      Q.  All right.
9      A.  But I would not say we did
10 100 percent.
11     Q.  Understood.  Let's talk now about the
12 New Orleans East hurricane protection
13 structures.  Were those also inspected on this
14 annual inspection effort?
15     A.  All right.  We would generally come
16 along the lake front, once we come across here,
17 and we'd come -- at the airport, come along the
18 lake front, all the way out to South Point to
19 GIWW, so we've have got -- here's South Point
20 down to the GIWW here.  We may not do
21 100 percent all the way down.  Sometimes we
22 would come all the way through here, other
23 times, depending on where we were at and time
24 frames, if we stopped, you know, we'd do the
25 majority of it.  We may stop here and get on

---

Page 173

1  the highway and come across to make the other
2  side.
3      Q.  Okay.  All right.  Now, let's see.  We
4  do know that there was a broken, um -- I don't
5  know whether the right word is -- railway gate
6  that was a component part of the hurricane
7  protection structure on the west bank of the
8  Industrial Canal.
9          MR. BAEZA:
10             Objection.  Vague and ambiguous.
11         Are you saying that the railway was
12         part of hurricane protection system?
13 MR. BRUNO:
14             No.  I said the railway gate.
15 MR. BAEZA:
16         The gate.
17 MR. BRUNO:
18             And I'm calling it the railway
19         gate because the railway passed
20         through the gate.  I think it's called
21         W-20?
22     A.  28?
23 EXAMINATION BY MR. BRUNO:
24     Q.  28.  28.
25     A.  29?

---

44  (Pages 170 to 173)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 174

1    Q.  It's in the twenties.
2    A.  It's up in there.  It's up at the top.
3    Q.  You recall it?
4    A.  Yes.
5    Q.  Okay.  And you recall that it is in
6  fact on the west bank of the IHNC, as opposed
7  to the east bank?
8    A.  Yes.
9    Q.  And I think it's the CSX railroad that
10  passes through it?
11    A.  I believe that's correct.  I'm not
12  certain.
13    Q.  All right.  Now, and I think you
14  testified about this in Congress?  The question
15  is, is it Congressional testimony?
16    A.  I think I did.
17    Q.  Thank you.  You testified about this
18  before the Senate, I think.
19    A.  Right.
20    Q.  Did you?
21        MR. BAEZA:
22            Objection.  Can you provide the
23        witness his statements before the
24        Senate?
25        MR. BRUNO:

Page 175

1            If you want to, yeah.  I mean,
2        it's not that heavy.  I just wanted to
3        confirm that he testified about it,
4        not so much that I was going to get
5        into a heavy detail about it.
6  EXAMINATION BY MR. BRUNO:
7    Q.  All I want to find out is, you guys
8  knew that the gate hadn't been repaired, right?
9    A.  Yes.
10    Q.  Okay.  And did you find that to be
11  something that you wanted -- he wanted to see
12  it, I don't want to see it -- did you find that
13  missing gate to be, I don't know how else to
14  characterize it other than was it a problem for
15  you?
16        MR. BAEZA:
17            Objection.  Vague and ambiguous.
18    A.  A problem such as that, we had been
19  working with the levee district, they were
20  responsible for getting that repaired, they
21  were in -- I believe they were in litigation,
22  to my knowledge, and they were actually in the
23  process of having that gate in place when
24  Katrina came along.
25    Q.  All right.

Page 176

1    A.  So what they did at that time was sand
2  bag, which is a flood fighting tool, and that
3  was deemed appropriate --
4    Q.  All right.
5    A.  -- by them.
6    Q.  To put it in context, you guys would
7  have done this inspection in approximately June
8  of 2005, right?
9    A.  Uh-huh.
10    Q.  And you would have noticed the missing
11  gate.
12    A.  Uh-huh.
13    Q.  And as I appreciate what you're
14  telling us, you understood from the levee
15  board, well -- that they were in litigation or
16  litigation was being concluded -- right?
17    A.  Right.
18        MR. BAEZA:
19            Objection.  Vague.
20  EXAMINATION BY MR. BRUNO:
21    Q.  And they received a check?  Or you
22  don't know.
23    A.  I don't know about that.
24        MR. BAEZA:
25            Objection.  Vague.

Page 177

1  EXAMINATION BY MR. BRUNO:
2    Q.  And is your understanding that they
3  were going to repair the gate?
4    A.  That is correct.
5        MR. BAEZA:
6            Objection.  Vague.
7  EXAMINATION BY MR. BRUNO:
8    Q.  All right.  And that satisfied you.
9    A.  Yes.
10    Q.  All right.  Let's see.  Let's talk
11  about -- make sure I cover what I want to
12  cover.  Let's talk about the IHNC now.  And
13  you'll please forgive me, because now the
14  depositions are running together in my head, I
15  don't recall if I asked if you had knowledge of
16  the WGI.  Did I ask you that?  The Washington
17  Group International?
18    A.  You asked earlier, yeah.
19    Q.  And you don't know about that project.
20    A.  I don't know a whole lot about it, no.
21    Q.  All right.  Can you recall conducting
22  or being a part of any inspection, any annual
23  inspection where you noticed that there was a
24  chain-link fence installed -- and again, I
25  don't know if it was on the water side or the

JOHNS PENDLETON COURT REPORTERS                800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                        April 2, 2008

Page 178

1  land side of the hurricane protection structure
2  on the east bank of the IHNC between the
3  ultimate location of the north and south
4  breach?
5         MR. BAEZA:
6            Objection.  Vague and ambiguous.
7         MR. BRUNO:
8            It may be long, but it ain't
9         vague and it ain't ambiguous.
10  A.  I don't remember.  No.  Exactly -- no.
11 EXAMINATION BY MR. BRUNO:
12  Q.  If you don't remember, fine.
13  A.  No.
14  Q.  Would you view the installation of a
15 chain-link fence within the -- withdraw.  Let
16 me first establish.  At that particular
17 location -- do you know where I'm talking
18 about, first?
19  A.  Yeah.  On the east side.
20  Q.  East side between the two breaks.
21  A.  Uh-huh.
22  Q.  Lower Ninth Ward.  Right?
23  A.  Uh-huh.
24  Q.  So we got the location.
25       Next question:  Is that an I-wall, a

Page 179

1  T-wall or a levee that's there, pre-Katrina?
2   A.  Whew.  In that section -- I'm not sure
3  if it's I-wall or T-wall, you know, but you
4  have earthen sections combination in there, so
5  I suspect it's I-wall.
6   Q.  Yeah.
7   A.  But I'd have to go to engineering
8  division.
9   Q.  That's fine.  Because it's a general
10 and I suppose specific, but -- let's assume for
11 the sake of this discussion, okay, that it's an
12 I-wall with an earth berm.  All right?
13  A.  (Nods affirmatively.)
14  Q.  If you had seen a chain-link fence
15 installed within the right of way of the earth
16 berm I-wall, so that it's installed actually on
17 the berm between the toe landward and on the
18 water side, would that be something that would
19 cause you some concern as a potential
20 maintenance issue, potential problem for the
21 levee, et cetera?
22       MR. BAEZA:
23          Objection.  Compound, calls for
24       speculation.
25  A.  Actually, we permit, through the

Page 180

1  sponsor, allowable encroachments, security
2  fences being an allowable encroachment.
3   Q.  Okay.
4   A.  So technically, yes.  And it is --
5  it's a maintenance hindrance, but it's not
6  something that, you know, stops you from doing
7  maintenance.
8   Q.  Okay.  All right.  Now, do you know --
9  well, I think we know this:  The local sponsor
10 for the IHNC hurricane protection structures on
11 the east and west bank is who?
12  A.  Is the Orleans Levee District.
13  Q.  Okay.  And as such, the Orleans Levee
14 District owns the right of way on which these
15 structures are built, right?
16  A.  Yes.  Best of my knowledge, yes.
17  Q.  All right.  And as such, the Orleans
18 Levee District, as the local sponsor, has the
19 inspection and maintenance obligation, whatever
20 that may be, as defined by some statute.
21       MR. BAEZA:
22          Objection.  Vague.
23  A.  I'd say yes.
24 EXAMINATION BY MR. BRUNO:
25  Q.  Okay.  Now, are you aware of any

Page 181

1  dredging activities in the IHNC pre-Katrina?
2   A.  No.  I'm not saying no, there wasn't,
3  I'm just saying no, I'm not aware.
4   Q.  No, I got your answer.  That's why I
5  asked it the way I asked it, because if you
6  don't know then I leave it alone.
7       And this happens when other lawyers
8  ask me to ask questions for them.  So I want to
9  make sure I'm doing what they've asked me to
10 do.
11      Who would be the person that I should
12 speak to in order to get some understanding
13 about dredging the IHNC?
14  A.  It would be the ops manager for that
15 project, and around Katrina time -- was it Ulm,
16 maybe?  Actually, it was vacant at the time.
17 It was in between managers.  But Michelle Ulm.
18  Q.  And you've already said this to us,
19 but the manager for the Intracoastal Waterway
20 would be responsible for the IHNC.
21  A.  The gulf -- yeah.  GIWW.
22  Q.  The op manager for the Intracoastal
23 waterway has within his or her jurisdiction the
24 IHNC.
25  A.  That's correct.

                                    46 (Pages 178 to 181)

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 182

1    Q.  And that from the lake to the river.
2    A.  Yes.
3    Q.  Okay.  Are you at all familiar with a
4  lock expansion project on the Industrial Canal?
5    A.  Talking about the new lock?
6    Q.  The new lock.
7    A.  Well, I'm familiar.
8    Q.  You know about it.
9    A.  Yeah.  I know about it.
10      MR. BAEZA:
11         And to reiterate, continuing
12      objection with relation to the lock
13      expansion project.
14      MR. BRUNO:
15         I already agreed with you that it
16      was continuing.  See, the problem with
17      that is if you keep objecting it
18      indicates that we have no agreement,
19      which suggests that you had to object
20      in the past, which would be a problem,
21      so we better make sure we have our
22      agreement the says that you don't have
23      to object.
24         (Off the record.)
25  EXAMINATION BY MR. BRUNO:

Page 183

1    Q.  All right.  Do you know if the dock
2  board has anything to do with this lock
3  expansion?
4    A.  I know they are --
5      MR. BAEZA:
6         Objection.  Vague.
7    A.  -- in there, I don't know to which
8  degree, but --
9  EXAMINATION BY MR. BRUNO:
10      Q.  All right.  Is there a local sponsor
11  for the MRGO?
12      A.  You mean the navigation project?
13      Q.  Yeah.
14      A.  No --
15      Q.  There wouldn't be one.  That's what I
16  thought.
17         All right, um -- were there any aerial
18  inspections made of the hurricane protection
19  structures?
20      A.  Not that I made.  That I'm aware of.
21      Q.  Okay.
22      A.  Talking about from a plane or
23  helicopter, I'm assuming.
24      Q.  Yes.  Well, wouldn't -- I guess if
25  you're only looking for maintenance issues you

Page 184

1  wouldn't be interested in doing any lidar or
2  anything of that nature, would you?
3    A.  Nope.
4    Q.  That would be your engineering side,
5  or the project guys.
6      MR. BAEZA:
7         Objection.  Vague.
8    A.  If it was dealing with the, you know,
9  construction of the project, I mean, but
10  generally they didn't do lidar, they did old --
11  back in those days, it was still old time
12  surveying.
13  EXAMINATION BY MR. BRUNO:
14      Q.  Okay.  All right.  I'm going to ask
15  you -- we're almost done.
16         I'm going to ask you to help me with
17  some of these names because it will help me in
18  preparation for these depos that are coming up
19  soon.
20         Chris Accardo.  You've already
21  mentioned him.  Who is he?
22      A.  He's currently my boss.  He's the
23  current chief of operations division.
24      Q.  Chief of the operations division.
25  Okay.

Page 185

1    A.  Uh-huh.
2    Q.  And Walter Baumy.  I know we have
3  talked about him.  What is he?
4    A.  He's the chief of engineering
5  division.
6    Q.  All right.  Alfred Naomi?
7    A.  Al was the project manager in PPPMD
8  for the Lake Pontchartrain and Vicinity
9  Project.  He's since been moved across the
10  lake -- I mean across the river.
11      Q.  Vann Stutts?
12      A.  Vann Stutts was -- well, he's retired
13  now.  Well, he retired and came back.
14      Q.  Okay.
15      A.  But he was in the -- I'm not sure
16  whether it was -- what was the name of that
17  section of -- he might have been in that
18  general engineering section.  He was in
19  engineering division.
20      Q.  Gregory Miller?
21      A.  Greg is in PPPMD.
22      Q.  Okay.  Nancy Powell?
23      A.  Nancy is the Chief of Hydraulics, H&H
24  branch of engineering division.
25      Q.  Do you happen to know a Melvin

JOHNS PENDLETON COURT REPORTERS              800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 186

1  McElwee?
2      A.  The name doesn't ring any bells.
3      Q.  All right.  Edmond Russo?
4      A.  Edmond used to work with us.  He's now
5  moved to HRDC, the engineering research and
6  development center.
7      Q.  What did he do when he was here?  He's
8  on this list somewhere, I thought.
9      A.  Right.  He was the MRGO manager at the
10  time, ops manager.
11      Q.  All right.  General Heiberg?
12      A.  General Heiberg used to be our -- I
13  don't remember if he was our district
14  commander, but he was the big guy.  He was the
15  chief of engineers way back when.  Seventies?
16  Sometimes in the seventies?
17      Q.  District chief for this office.
18      A.  Well, he actually left this office and
19  was the Chief of Engineers for the whole Corps,
20  I believe.
21      Q.  All right.  And Victor Landry?  I'm
22  sorry.  That may be --
23      A.  That's Vic, Sr.?  Big Vic as we call
24  him?  We've got Big Vic and Little Vic here.
25      Q.  I guess Big Vic, first.

Page 187

1      A.  Big Vic is who hired me here, back
2  then, but he was -- when he left here he was
3  our executive assistant to the commander.
4      Q.  Okay.  I'm going to ask for another
5  little break and see if we're not done.
6      MR. BAEZA:
7          Okay.
8          (Brief recess.)
9  EXAMINATION BY MR. BRUNO:
10      Q.  All right.  Mr. Colletti, how long
11  would it take to do this annual inspection that
12  we've been talking about now for the past
13  whatever amount of minutes?
14      A.  You're talking about which inspection?
15  There were several inspections, the New Orleans
16  East --
17      Q.  The annual --
18      A.  The ones in Orleans Levee District is
19  one thing, the ones in Lake Borgne Levee
20  District is a whole separate issue.  So you got
21  different levee district sponsors, they were
22  different inspections.
23      Q.  Let me clarify that for the record,
24  then.
25          When we have been describing this

Page 188

1  annual inspection which took place in June, I
2  was perhaps under the misapprehension that you
3  did all 325 miles in one day.
4      A.  Oh, no.
5      Q.  No.  Okay.
6      A.  Definitely not.
7      Q.  So it was broken down in some fashion,
8  right?
9      A.  We did it by sponsor is what we did.
10      Q.  All right.  So the Orleans Levee
11  District would be one day?
12      A.  Yes.
13      Q.  The Lake Borgne Levee District would
14  be another day?
15      A.  Yes.
16      Q.  And I guess the East Jefferson Levee
17  District would be another day.
18      A.  Yes.
19      Q.  And those are the only local sponsors.
20  Have I missed any?
21      A.  For the Lake Pontchartrain & Vicinity
22  Project, they're the sponsors.
23      Q.  Right.  And there are certainly other
24  sponsors for the --
25      A.  Right.  And you now have a component

Page 189

1  of St. Charles Parish that has been added to
2  Lake Pontchartrain Vicinity Project.  So
3  Pontchartrain Levee District.  So there's
4  actually four sponsors, now, for the Lake
5  Pontchartrain & Vicinity Project.
6      Q.  Well, I guess the largest one, or
7  maybe I'm mistaken, but it seems like the
8  largest one would be the Orleans Levee District
9  inspection day.
10      A.  That's correct.
11      Q.  How long would that take?
12      A.  Generally, we'd start about eight
13  o'clock in the morning and finish up somewhere
14  around 1:00, 1:30, 2:00 o'clock.  So five to
15  six hours.
16      Q.  How about the Lake Borgne?
17      A.  Well, the Lake Borgne, the longest
18  part was getting across on that barge, so
19  probably about the same.  You didn't have as
20  many miles to cover, but you didn't have a good
21  road, per se, you were on the levee, so you
22  took it slower, and then you had to get on that
23  barge and go across, so.
24      Q.  All right.  And then finally, East
25  Jefferson, how long would that take?

JOHNS PENDLETON COURT REPORTERS              800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489

GERARD COLLETTI                                    April 2, 2008

Page 190

1     A.  East Jefferson, we'd do that
2  simultaneously.  We'd do the MR&T and the
3  hurricane protection together.  We'd start
4  right here at the parish line on the river,
5  drive up to Kenner, because you only had that
6  short piece of the river levee, and then we'd
7  do the rest.  Um -- we finished in the
8  afternoons, usually 1:30 or so.  So all of them
9  generally about anywhere from four to six
10  hours.
11     Q.  All right.  Now, I just ask this
12  because as class counsel I have to.  How do you
13  answer the criticism that the major or most
14  important issue during an inspection was
15  planning lunch?
16        MR. BAEZA:
17           Objection.  Vague, ambiguous.
18     A.  Actually --
19        MR. BAEZA:
20           Argumentative.
21     A.  Actually, the Corps did not plan
22  lunch.  So I guess that's how I would answer
23  that question.
24  EXAMINATION BY MR. BRUNO:
25     Q.  Who did?

Page 191

1     A.  Generally that was the sponsor that
2  planned the lunch.
3     Q.  It wasn't the Department of
4  Transportation and Development.
5     A.  Not to my knowledge, no.
6     Q.  All right.  That's all I've got.
7  Thank you very much.  Appreciate your time.
8     A.  Okay.
9        MR. BAEZA:
10           We haven't determined if we have
11        any questions, as well, so if we can
12        just take a --
13        (Brief recess.)
14        MR. BAEZA:
15           We're done.
16
17
18
19
20
21
22
23
24
25

Page 192

1              WITNESS' CERTIFICATE
2
3        I, GERARD A. (JERRY) COLLETTI, do
4  hereby certify that the foregoing testimony was
5  given by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10  _____   _____
11  DATE SIGNED      GERARD A. (JERRY) COLLETTI
12
13  _____  Signed with corrections as noted.
14
15  _____  Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN:  April 2nd, 2008

Page 193

1           REPORTER'S CERTIFICATE
2        I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3  Certified Court Reporter in and for the State
4  of Louisiana, do hereby certify that the
5  aforementioned witness, after having been first
6  duly sworn by me to testify to the truth, did
7  testify as hereinabove set forth;
8        That said deposition was taken by me
9  in computer shorthand and thereafter
10  transcribed under my supervision, and is a true
11  and correct transcription to the best of my
12  ability and understanding.
13        I further certify that I am not of
14  counsel, nor related to counsel or the parties
15  hereto, and am in no way interested in the
16  result of said cause.
17
18
19
20
21
22
23        _____
24        JOSEPH A. FAIRBANKS, JR., CCR, RPR
25        CERTIFIED COURT REPORTER #75005

JOHNS PENDLETON COURT REPORTERS              800  562-1285

b1c1c612-6810-4774-a26e-25b1d9ab4489