UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| IN RE:  KATRINA CANAL BREACHES | *  CIVIL ACTION |
| CONSOLIDATED LITIGATION | *  NO. 05-4182 |
|  | *  SECTION "K" (2) |
| PERTAINS TO:  MRGO | *  JUDGE DUVAL |
|  | *  MAGISTRATE WILKINSON |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MOTION TO
EXCLUDE TESTIMONY AND OPINIONS OF SCOTT TAYLOR**

Plaintiffs' damage expert, Scott Taylor, purports to calculate each Plaintiff's respective quantum of damages arising from flood damage to immovable and movable property, as well as additional living expenses.[1]  Mr. Taylor's calculations do not satisfy the requirements of Rule 702 because they are not the product of reliable principles and methods; indeed, in certain respects, they are completely arbitrary.  The evidence shows that Mr. Taylor made little to no effort to ascertain the facts of any Plaintiff's pre- or post-Katrina circumstances, to verify the information that they provided to him (and that he subsequently used in his calculations), or to correct glaring errors in his reports.  Mr. Taylor instead made a series of highly suspect assumptions that have no legal or factual basis, but have the effect of grossly inflating Plaintiffs' damages estimates.  Because Mr. Taylor's estimates are so unreliable that they will not assist the

---

[1]      Mr. Taylor's Revised Report for Kenneth and Jeannine Armstrong, dated October 20, 2011, is attached hereto as Exhibit 1.  Mr. Taylor's Revised Report for Ethel Mae Coats, dated October 20, 2011, is attached hereto as Exhibit 2.  Mr. Taylor's Revised Report for Fred Holmes, dated October 20, 2011, is attached hereto as Exhibit 3.  Mr. Taylor's Revised Report for Alvin Livers, dated October 20, 2011, is attached hereto as Exhibit 4.  Mr. Taylor's Revised Report for Clifford Washington, dated October 20, 2011, is attached hereto as Exhibit 5.  Mr. Washington has withdrawn his claim arising for damage to his movable property.  *See* Dep. of Scott Taylor, dated February 9-10, 2012, attached hereto as Exhibit 6, at 499:16-500:19.

Court in its determination of the relevant facts and issues, the Court should grant WGI's motion and enter an Order excluding Mr. Taylor's testimony and opinions.[2]

I.   **STATEMENT OF THE FACTS**

On July 18, 2011, Plaintiffs served copies of the reports of their damages expert, Scott Taylor.  Mr. Taylor's report for each Plaintiff (Clifford Washington, Ethel Mae Coats, Alvin Livers, Fred Holmes, and Kenneth and Jeannine Armstrong)[3] consisted of three components: 1) a replacement and/or repair estimate prepared using Xactimate software purporting to show damage to the house caused by floodwaters; 2) a Flood Contents Worksheet purporting to list contents to the house that had been damaged by flooding; and 3) an estimate for additional living expenses purporting to identify the amount of expenses Plaintiffs had incurred, above and beyond their normal household expenses, as a result of their displacement.   In his repair/replacement estimates and the Flood Contents Worksheet, Mr. Taylor uses the term "replacement cost value", which Mr. Taylor defines as "the cost to replace things now as close to as possible they were before when you first had them."[4]  Although he labels certain costs as "actual cost value", Mr. Taylor does not apply depreciation to either contents or any components of the house, and as a result, the actual cash value is equal to the replacement cost value in his reports.[5]

Mr. Taylor conceded in his deposition that use of Xactimate did not render his structural estimates infallible.  While Xactimate is a useful tool to calculate material and labor costs, if the

---

[2]      On April 20, 2012, Mr. Taylor served a second series of revised reports for Ms. Coats, Mr. Livers, and Mr. Washington.  These reports are untimely and should be stricken in their entirety for that reason alone. Additionally, those reports do not correct any of the infirmities described below and should be similarly disallowed for the reasons stated in this memorandum.

[3]      A map showing the locations of each property is attached hereto as Exhibit 7.

[4]      Ex. 6 at 224:23-225:1.

[5]      It is Mr. Taylor's understanding that actual cash value has no application in "liability" situations (as opposed to insurance coverage disputes).  *Id*. at 102:18-106:24.

inputs the user enters into the software are inaccurate, the resulting estimate will be inaccurate as well.[6] The record shows that Mr. Taylor's inputs were replete with substantial errors.

**A.   Mr. Taylor's Estimates Did Not Accurately Reflect the Houses as They Existed at the Time of Katrina.**

In September 2011, WGI and the United States deposed each of the surviving Plaintiffs and the fiancé of the deceased Ms. Coats, Nathan Morgan. During their depositions, Plaintiffs identified several substantive errors in Mr. Taylor's various reports.   For example, the estimate and floor plan for the Washington report did not reflect the single-story house that existed prior to Katrina (which Mr. Washington characterized as "modest"[7]), but rather for the two-story house that Mr. Washington constructed on the same lot after completely demolishing the first house.[8] As Mr. Taylor acknowledges in his Report, this post-Katrina house represented a "significant upgrade[]" from its pre-Katrina condition.[9]

Similarly, in his report, Mr. Taylor described the Coats house as having been a double at the time of Katrina[10], when in fact the house was actually a single at the time of Katrina.[11] After Katrina, Ms. Coats and her fiancé, Nathan Morgan, converted the house from a single into a double.[12] Mr. Taylor testified that he had no basis upon which to dispute Mr. Morgan's sworn testimony on this point.[13] A practical implication of this glaring mistake is that a double has

---

[6]       *Id*. at 44:2-15.

[7]       Ex. 5 at p.1, "Inspection/Damages".

[8]       *See* Ex. 6 at 511:18-512:15.

[9]       Ex. 5 at p.1, "Inspection/Damages".

[10]      *See, e.g*., Ex. 2 at p.1, "Risk"; Structural Estimate at p. 30.

[11]      *See, e.g*., Excerpts of Dep. of Nathan Morgan, dated September 24, 2011, attached hereto as Exhibit 8, at 51:14-25.

[12]      *See, e.g*., *id.*, at 53:2-17; 71:2-7.

[13]      Ex. 6 at 437:19-438:21.

1090108v.2

twice as many kitchens and bathrooms as a single.  Generally speaking, kitchens and bathrooms are the most expensive rooms to repair or replace.[14]

      **B.**    **Mr. Taylor's Contents Lists Contained Substantial Errors.**

Mr. Taylor's contents lists were at least as unreliable as his estimates.  In his report on the Livers' contents, Mr. Taylor stated, *inter alia*, that, at the time of Katrina, the Livers owned a television set with a replacement cost value of $15,000.[15]  Mr. Livers (who earned approximately $20-30,000 per year in the years immediately preceding his retirement in 2003, and who received $2400/month in total from his pension and Social Security benefits at the time of Katrina[16]) testified that this television set actually cost $1,500 rather than $15,000.[17]  Thus, Mr. Taylor's estimate for this item was erroneous by a factor of ten.  Elsewhere in his contents list, Mr. Taylor identified the custom cabinets in the Livers house as having a replacement cost value of $35,000.[18]  Mr. Livers testified that these cabinets had only cost him $15,000.[19]  These two errors *alone*, totaling $33,500 in inflated damages, represented nearly ***30%*** of Mr. Taylor's calculation of $114,366.49 for the Livers' contents.[20]  Tellingly, these errors did not arise during the application of complex formulas or theorems; rather, they resulted from the same carelessness and disregard for facts that pervade every report Mr. Taylor has produced in this case.

---

[14]     *Id.* at 438:22-439:11.

[15]     Original Flood Contents Worksheet for Alvin Livers, attached hereto as Exhibit 9, at p. 3, line item 57.

[16]     Excerpts of Dep. of Alvin Livers, dated September 14, 2011, attached hereto as Exhibit 10, at 28:25-29:6; 213:21-214:18.

[17]     *Id.* at 205:1-12.

[18]     *Id.* at 206:20-207:5.

[19]     *Id.*

[20]     Ex. 9 at p. 2.

1090108v.2

After these errors were called to Plaintiffs' attention in their depositions, Mr. Taylor submitted revised reports in October 2011.[21]  While these revisions did address the specific, glaring errors addressed above (with the exception of the Coats' house, which is inexplicably still described in Mr. Taylor's revised report as having been a double at the time of Katrina[22]), they did little to correct the systematic problems inherent in Mr. Taylor's methodology that render his opinions unreliable.

## II.   LAW & ARGUMENT

### A.   Standard of Review

The admissibility of expert testimony, opinion or otherwise, is governed by Rule 702 of the Federal Rules of Evidence, as it is written and as the Supreme Court has applied it in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and their progeny.  If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto, in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.

Pursuant to Rule 702, in order for a witness qualified as an expert to provide testimony involving specialized knowledge, the proffered testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue."  The opinion testimony must be both relevant and reliable.  Under the Federal Rules of Evidence and *Daubert*, the trial court acts as

---

[21]      Notably, Mr. Taylor's revisions were determined by Plaintiffs' counsel.  Mr. Taylor testified that, following the depositions, Plaintiffs' counsel called him and told him what changes needed to be made, based on their review of the deposition testimony.  He did not review the deposition testimony himself until after he made the revisions.  Ex. 6 at 146:3-148:3.

[22]      Ex. 2 at p.1, "Risk"; Structural Estimate at p. 30.

gatekeeper to ensure that all expert testimony meets the standards of relevance and reliability. *Daubert,* 509 U.S. at 589; *see also, Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998)(en banc).  Rule 702, as amended in 2000, incorporates the *Daubert* and *Kumho Tire Co* standards.  *Daubert*, in turn, provides a non-exhaustive, flexible list of factors to consider when assessing the reliability of expert testimony.[23]  The relevance and reliability standards announced in *Daubert* for scientific expert testimony apply to all types of expert testimony. *Johnson*, 277 F.R.D. at 164 (citing *Kumho Tire*).

As the proponents of Mr. Taylor's testimony and opinions, Plaintiffs bear the burden of establishing by a preponderance of the evidence that his testimony is both relevant and reliable and, therefore, admissible.  *Daubert*, 509 U.S. at 592 n.10.   Plaintiffs cannot meet this burden, as Mr. Taylor's opinions are reached through unreliable methodology, based on speculation, and will not assist the trier of fact. Mr. Taylor's testimony and opinions should, therefore, be excluded.  Countenancing such evidence at trial, even without a jury, would waste judicial and party resources.

### B.    Mr. Taylor's Calculations Are Not Reliable or Relevant Because He Assumed All Damage to Plaintiffs' Movable and Immovable Property Was Caused by Flooding.

In each of his reports, Mr. Taylor opines, "The loss is the result of a flood."[24]  A review of his deposition testimony reveals that Mr. Taylor did not come to this conclusion by reviewing all of the available evidence and eliminating other potential causes of damage based on his observations.   Rather, Mr. Taylor began his analysis by assuming that all the damage to

---

[23]    These factors are: (1) whether the expert's technique or theory can or has been tested; (2) whether the technique has been subjected to peer review or publication; (3) the known or potential error rate; (4) the existence or maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted.  *Johnson v. Samsung Elec. Am. Inc.*, 277 F.R.D. 161, 164 (E.D. La. 2011)(citing *Daubert*).

[24]    *See, e.g.*, Ex. 1 at p. 1, "Cause and Origin".

Plaintiffs' property was caused by flooding, and did not even consider, much less exclude, other potential causes:

> Q.      In the work that you did in this case, did you look at damages caused by wind and rain versus flooding?
>
> A.      I did not distinguish anything, percentages or anything like that when it came to cause on wind versus rain -- wind and rain versus flood, because my task was to look at the flood damages.[25]

> *      *      *      *      *      *      *      *      *      *      *

> Q.      But you didn't look to determine whether or not any of the damages were caused by wind and rain?
>
> A.      I certainly could have looked at that, but I did not look at it with that in mind.[26]

> *      *      *      *      *      *      *      *      *      *      *

> Q.      Did you have any discussions with anybody in connection with doing your work on the Armstrong property as to the causation of the damages to the Armstrongs?  And by that I mean flood versus wind and rain damage.
>
> A.      Not distinguishing the two, no.  I mean, the cause, yes, but it was always presumed in -- that it was a flood situation.
>
> Q.      Okay.  And is that true with all of the properties?
>
> A.      Yes.[27]

> *      *      *      *      *      *      *      *      *      *      *

> Q.      And did you do [attempt to isolate wind and flood damage] with regard to these five properties?
>
> A.      I did not do that with regard to these because my assessment was that these were wholly destroyed by flood in terms of --the destruction value of the flood was in every case enough to substantiate the damages that I put in there by themselves and that the wind was an ancillary issue to the flood, not not the other way around.  That the wind may have -- Whether the wind came or not, the flood was enough to destroy these, and *it*

---

[25]      Ex. 6 at 19:23-20:5.

[26]      *Id.* at 114:11-16.

[27]      *Id.* at 111:4-14; *see also id.* at 111:25-113:9.

1090108v.2

*was much simpler to go at it from the perspective that everybody commonly knew that a flood had occurred in the area and it was enough to completely destroy the house.*[28]

While WGI does not dispute that each property at issue suffered damage from floodwaters, the evidence also shows that Plaintiffs' houses and contents also suffered prior damage from wind, wind-driven rain, and other sources.  As a result, any proper assessment of damages must distinguish between these sources, as has been done by Defendants' damages experts.

For example, the Armstrongs filed claims under their homeowners insurance for wind damage to their house and contents.[29]  Believing that the insurance company's initial payment for wind and rain damage to be insufficient, they contacted their homeowners insurer and requested a re-inspection.[30]  The Armstrongs also obtained two estimates for wind and roof damage from their contractor and submitted these to their homeowners insurer.[31]  As a result of these communications, their homeowners insurer re-inspected the Armstrong house, found additional wind and rain-damage to the structure, and issued a payment of approximately $35,000.[32]  Following this additional payment, the Armstrongs submitted a letter detailing additional, uncompensated damage to the contents in their attic that they contended were damaged by wind and wind-driven rain.[33]  They subsequently sued their homeowners insurer, alleging that Hurricane Katrina "caus[ed] major winds and wind-driven waters that destroyed plaintiff's

---

[28]     *Id.* at 111:25-113:9 (emphasis added).

[29]     Excerpts of Dep. of Kenneth Armstrong, dated July 9, 2007, attached hereto as Exhibit 11, at 21:12-22:25.  Mr. Armstrong testified that he understood that the claim under his homeowners insurance was for wind and wind-driven rain damage.  Excerpts of Dep. of Kenneth Armstrong, dated September 12, 2011, attached hereto as Exhibit 12, at 271:3-6.

[30]     Ex. 12 at 262:23-263:10.

[31]     *Id.* at 265:4-266:25; Armstrong Correspondence with Liberty Mutual Insurance Company attached hereto in globo as Exhibit 13.

[32]     Ex. 12 at 276:2-278:18; Liberty Mutual Estimated Cost of Repairs, dated June 2006, attached hereto as Exhibit 14.

[33]     Ex. 12 at 278:19-281:4; Proof of Loss for Attic Contents, attached hereto as Exhibit 15; Excerpts of Dep. of Jeannine Armstrong, dated September 13, 2011, attached hereto as Exhibit 16, at 121:5-11.

1090108v.2

property and contents."[34]   The Armstrongs reached an out-of-court settlement with their homeowners insurer, and as a result received an additional $16,000 for wind and rain damage to the contents of their attic.[35]

Mr. Taylor testified in his deposition that the Flood Contents Worksheet for the Armstrongs contains items that the Armstrongs previously identified to their insurance company as having been damaged first by wind and/or rain[36], and for which they have already been compensated on that basis.  With regard to the structure, Mr. Taylor prepared an estimate to completely demolish and replace the house, thereby including the wind and wind-rain damage for which the Armstrongs have already been compensated.  In his deposition, Mr. Taylor testified that he could not exclude the possibility that some of the Armstrongs' property had been damaged by wind and rain:

> Q.     And is it your opinion with regard to the Armstrongs that there was no damage caused by wind and rain?
>
> A.     I can't say that directly, no.  I can't say definitively there was not damage from wind and rain.[37]

WGI is not contending that Mr. Taylor was required to accept the conclusions of adjustors and/or contractors who, unlike Mr. Taylor[38], had the opportunity to inspect the property before it was demolished.[39]  But he is not allowed to simply assume what the Plaintiffs are required to prove -- that all of the recoveries they seek are the result of the Defendants' alleged conduct.

---

[34]     Petition, dated August 2, 2007, Case No. 109-700, 34th Judicial District Court for the Parish of St. Bernard, State of Louisiana, attached hereto as Exhibit 17 at Ex. A.

[35]     Ex. 16 at 13:20-15:2.

[36]     Ex. 6 at 274:25-276:19.

[37]     *Id*. at 161:21-162:1.

[38]     The Armstrong house was demolished several years prior to Mr. Taylor's retention.  *See*  Excerpts of Dep. of Jeannine Armstrong, dated July 9, 2007, attached hereto as Exhibit 18, at 13:16-14:3; Ex. 6 at 64:6-65:22.

[39]     In his deposition, Mr. Taylor acknowledged that, generally speaking, it was better to inspect a property closer to the date of loss and prior to its demolition.  Ex. 6 at 525:11-19.

1090108v.2

Like the Armstrongs, the Holmeses also prepared a list of contents that they contended were damaged by wind and/or rain.  This list was included within interrogatory responses that the Holmeses served on their homeowners insurer in a Katrina-related coverage lawsuit.[40] The Holmeses ultimately reached an out-of-court settlement that resulted in their homeowners insurer paying an additional $20,000 for wind and/or rain-related damage.[41]  At his deposition, Mr. Taylor acknowledged that many of the items that the Holmeses had previously identified as having been damaged by wind and/or rain (and for which they had received payment from their homeowners insurer on that basis) were included in the list of items that he contends were damaged by flood.[42]  When asked to identify the factual basis by which he disputed that the items on the Holmeses' list were in fact damaged by wind and/or rain rather than by flooding, Mr. Taylor replied simply, "I stand by my report."[43]

With regard to the Coats property, Mr. Taylor was unable to exclude the possibility that something other than floodwaters damaged the roof, because he was never asked to consider that possibility:

> Q.     What evidence do you have that excludes other potential sources of damage to the roof?
>
> A.     I was asked to look at flood damages only and that's all I looked at.[44]

He further testified that he had no basis to dispute that wind and rain caused some damage to the Livers' home and contents, because, once again, he had not been instructed to look for any

---

[40]     Excerpts of Dep. of Fred Holmes, dated September 24, 2011, attached hereto as Exhibit 19 at 265:11-267:22.  Holmes Insurance Litig. Int. Resps., ACFIC 000175; 185-190, attached hereto in globo as Exhibit 20.

[41]     Ex. 19. at 270:16-271:18.

[42]     Ex. 6 at 390:10-393:23; Ex. 20.

[43]     Ex. 6 at 394:3-10.

[44]     *Id*. at 445:6-10.

1090108v.2

damage other than flood damage.[45]  Similarly, he testified that he had no basis by which to dispute the findings of an insurance adjuster who'd inspected the Washington property prior to its demolition and concluded that the house had suffered damage from wind and/or rain.[46]

In his reports, Mr. Taylor went so far as to assume that, because the Armstrong and Holmes properties were no longer standing at the time of his inspection, the houses had been rendered structurally unsound by floodwaters and were condemned as a result.  In his Armstrong report, for example, Mr. Taylor states: "To return the home to pre-loss conditions it is likely, based on the condemnation of the home and slab that even the foundation was put at risk."[47]  Identical language is contained in the Holmes report.[48]  And yet, as Mr. Taylor's deposition testimony reveals, there is no factual basis for his conclusion that either house was condemned.

> Q.     And we talked about your conclusion that the [Armstrong] house had to be demolished and rebuilt and was subject to being condemned.  Is that an accurate statement of your conclusion?
>
> [Mr. Taylor is referred to the referenced language in his report]
>
> A.     ***It was a natural conclusion based on the fact it's gone now, because there was so many razed homes that they left the foundation.***
>
> Q.     So that is the sole basis for your opinion…for that statement?
>
> A.     For that statement.[49]
>
> *     *     *
>
> Q.     And you have no knowledge that the [Holmeses'] home was in fact condemned?
>
> A.     That's correct.[50]

---

[45]     *Id.* at 474:11-21.

[46]     *Id.* at 523:18-527:4.

[47]     Ex. 1 at p. 2, "Restoration/Repairs".

[48]     Ex. 3 at p. 2, "Restoration/Repairs".

[49]     Ex. 6 at 213:14-214:8 (emphasis added).

[50]     *Id.* at 362:3-6.

1090108v.2

In fact, neither house was condemned.  No adjuster or contractor who physically inspected the Armstrong property post-Katrina expressed an opinion that the house was either structurally unsound or could not have been repaired.[51]  The Armstrongs voluntarily demolished the house and sold the property to the Road Home program, opting to relocate to "higher ground".[52]  Similarly, the Holmes house was not demolished until the Holmeses sold the house to the Road Home program several years after Katrina.[53]

> Q.    What's the basis for your conclusion that the [Holmeses'] foundation was put at risk?
>
> A.    That the foundation is now gone.
>
> Q.    So just the fact that it's gone?  Is that the sole basis for your opinion that the foundation was put at risk?
>
> A.    That's all I have at this time.
>
> Q.    And you have no photos of the foundation…that form the basis for your opinion that the foundation was put at risk?
>
> A.    The lack of photos.
>
> Q.    To your knowledge, did any of the adjustors who inspected the property conclude that it was structurally unsound?
>
> A.    I have no knowledge of that.
>
> Q.    And, to your knowledge, there was never any determination made by anyone that the house needed to be condemned?
>
> A.    I have no knowledge of that.[54]

At no point in their depositions did the Armstrongs or the Holmeses ever testify that they had received condemnation orders from St. Bernard Parish or any other authority.

---

[51]    Ex. 12 at 54:19-55:6.

[52]    *Id.* at 55:6-25; Ex. 11 at 31:14-16.

[53]    Ex. 19 at 80:2-15.

[54]    Ex. 6 at 370:4-23.

1090108v.2

In summary, Mr. Taylor (who is not a structural engineer[55]): 1) visited an empty lot; 2) concluded that because the lot was empty, the house that was previously there necessarily must have been condemned; 3) determined that because the house was condemned, it necessarily had to have been rendered structurally unsound; 4) concluded that because the house was rendered structurally unsound, it must have been rendered unsound by floodwaters, and 5) *ergo*, the Armstrongs' and Holmeses' losses were caused entirely by floodwaters.  Relying on this completely illogical *ipse dixit*, Plaintiffs assert the Defendants are obligated to pay full replacement costs for houses that could have been repaired.

The primary aim of the reliability inquiry under Rule 702 "is to exclude expert testimony based merely on subjective belief or unsupported speculation." *Certain Underwriters at Llloyd's v. McDermott Int'l*,  2002 WL 14379, at *3 (E.D. La. 2002); *see also Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 418-19 (7th Cir. 2005) (opinion based solely on expert's experience and CV inadmissible). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric v. Joiner*, 522 U.S. 136, 146 (1997).

An expert's failure to consider alternate causes of damage, or selective consideration of facts, can render the expert's opinion unreliable.  "Thus, if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony."  *Waytec Elec. Corp. v. Rohm and Haas Elec. Materials, LLC*, 459 F. Supp. 2d 480, 489 (W.D. Va.

---

[55]     *Id.* at 361:21-23.

2006)(quoting *Cooper v. Smith & Nephew, Inc*. 259 F.3d 194, 202 (4th Cir. 2001)).  In *Waytec*, the plaintiff's expert opined that the defendant's chemical solution had damaged its equipment. The defendants moved to exclude this evidence on the grounds that, *inter alia*, the expert failed to consider or exclude other potential causes of the damage.  Finding the expert's conclusions "based more on correlation and guesswork rather than causation", the court ruled that the expert's testimony did not satisfy the reliability requirement of *Daubert*.  *Id*. at 488.

Mr. Taylor's assumption that all damages were caused by flooding is precisely the sort of unreliable "guesswork" that *Daubert* was intended to exclude. If an expert's opinion is based on unreliable facts, the opinion must be excluded.  *See Brown v. Parker-Hannifin Corp.,* 919 F.2d 308, 311 (5th Cir. 1990); *In re TMI Litig.*, 193 F.3d 613, 697 (3rd Cir. 1999); *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448 (3rd Cir. 2003).  Mr. Taylor's opinions are nothing more than subjective belief based on speculation, unreliable (and in certain cases, non-existent) facts, and his opinion should therefore be excluded as unreliable.

Mr. Taylor's opinions should also be stricken because they are irrelevant.  Mr. Taylor's reports do not and cannot inform the Court as to which damage was caused by flooding and which resulted from wind, rain, or other causes, unless the Court, as Mr. Taylor does, concludes that all the damage to all Plaintiffs' property was caused by flooding:

> Q.     [Imagine] you're sitting on the witness stand and the Judge says to you, "Mr. Taylor, I appreciate your report, I am finding that the damage to the roof and the contents in the attic were caused by wind and rain and not flooding; what's your opinion as to the damages?  Can I figure it out from your report?"
>
> A.     Not conclusively from my report.  Somebody -- It would have to take another analysis altogether.

Q.    Okay.   And if the Court were to determine that some of the damage to the Armstrongs' house was caused by flood water coming from different sources, could the Court use your report as is to determine the damages to the Armstrongs' house?[56]

A.    Okay.  Well, honestly, I don't think that -- there's nothing in my report that would indicate where --when water occurred and how it occurred.  So I didn't even address that.  I never address that in there."[57]

Because Mr. Taylor does not purport to segregate flood damage from wind, rain, or other types of damage, his reports offer the Court no guidance to assist it in such necessary segregation.  An estimate to repair or replace an entire house and all of its contents is not relevant here because it ignores other known causes of damage unrelated to flooding.

### C.    Mr. Taylor Did Not Apply Depreciation.

In all of his reports, Mr. Taylor states, "Depreciation…[has] not been applied, because this is not an insurance claim."[58]  In the *Robinson* case, the Court (which recognized Mr. Taylor as a damages expert in those proceedings), criticized Mr. Taylor's damages calculation on the basis that it did not take depreciation into account:  "It is the Court's opinion that the contents list was overvalued and did not appropriately account for depreciation."  *In re Katrina Canal Breaches Litig.*, 647 F. Supp. 2d 644, 636 n. 57 (E.D. La. 2009), *aff'd* 673 F.3d 381 (5th Cir. 2012).  In his deposition, Mr. Taylor conceded that, *if* the Court ruled that depreciation should be applied to Plaintiffs' contents claim, then his contents lists were indeed overvalued.[59]  When asked what would be necessary in order to properly apply depreciation to Plaintiffs' content list, Mr. Taylor rejected the use of blanket depreciation:

---

[56]    Plaintiffs' counsel objected to the form of both questions and also on the grounds that they called for a legal conclusion.

[57]    Ex. 6 at 258:12-259:19.  Mr. Taylor does purport to address the latter shortcoming in his untimely, impermissible rebuttal reports for Washington, Livers, and Coats.  Even in his rebuttal reports, however, Mr. Taylor does not address or purport to exclude wind, rain, or other potential causes of damage.

[58]    *See, e.g.*, Ex. 2 at p. 2, "Statement of Loss".

[59]    Ex. 6 at 108:14-25.

> Q.     What would you have to do to adjust them?  Do you have to go through item by item and figure out the age and the appropriate adjustments that need to be made?
>
> A.     There are several factors involved in depreciation, and those are not the only ones.
>
> Q.     Okay.  So tell me as the expert what you would have to do to appropriately factor in depreciation.
>
> A.     And if we're still talking about hypothetically….then I would have to consider age, I would have to…consider condition, functional value, I would have to consider all of those things.  Age, condition, and functional value.  And in some cases you actually have to consider appreciation.
>
> Q.     And you did not do that in this case for any of the contents for any of the Plaintiffs; correct?
>
> A.     I did not.[60]

Mr. Taylor further stated that item-by-item depreciation was the "only objective way" to apply depreciation, and that the use of blanket depreciation was "lazy".[61]  Unfortunately, Mr. Taylor neither applied item-by-item depreciation himself, nor did he give the Court any meaningful guidance or the information necessary in order to apply item-by-item depreciation itself.

Similarly, Mr. Taylor failed to apply depreciation to the Plaintiffs' structure and fixtures. Mr. Taylor, for example, opines that the furnishings in the Armstrong and Holmes houses were of "above-average quality."[62]  (Mr. Taylor reached this conclusion despite the fact that he has never seen pre-Katrina photos of the interior of either residence.[63])  In their depositions, the Armstrongs testified that:  the Formica counters and wooden cabinets in their kitchen were present when they bought the house in 1985;[64] the soft tile in their bathrooms and kitchen were

---

[60]     *Id.* at 109:18-110:14.

[61]     *Id.* at 271:11-19.

[62]     Ex. 1 at p. 1, "Risk"; Ex. 3 at p. 1, "Risk".

[63]     *See* Ex. 6 at 128:21-129:2; *id.* at 308:25-309:3.

[64]     Ex. 12 at 114:24-115:11.

installed in the 1990s[65]; they bought their microwave in the 1980s;[66] and their dishwasher in 1991[67]. Mr. Taylor testified that he was not aware of these facts prior to his deposition.[68] Even if these furnishings were excellently maintained by the Armstrongs, they would likely have suffered significant wear-and-tear over the years, and any replacements would result in a significant betterment over what was present in the house at the time of Katrina. (This is especially true with regard to the appliances.) Because Mr. Taylor's reports substantially overvalue Plaintiffs' damages, they are unreliable and should be excluded.

**D.    Mr. Taylor Performed No Meaningful Review or Analysis of Plaintiffs' Content Lists.**

With regard to the Flood Contents Worksheets attached to his reports, Mr. Taylor did not act as an expert because he performed no analysis that required expertise; indeed there is no evidence that he gave the contents lists provided to him by Plaintiffs any critical or meaningful review. In his deposition, Mr. Taylor testified that he met with each Plaintiff (with the exception of Ms. Coats[69]) and provided them with a blank contents list to fill out and instructions on how to do so. It was the Plaintiffs, ***not Mr. Taylor***, that determined the replacement cost value.[70]

Plaintiffs then completed the form by hand and submitted the forms to Plaintiffs' counsel, who apparently typed Plaintiffs' list into a spreadsheet before sending it to Mr. Taylor.[71] Mr. Taylor testified that, after completing his draft reports, he never submitted them to any of the

---

[65]        Ex. 16 at 100:8-9.

[66]        *Id*. at 105:20-106:1.

[67]        *Id*. at 106:2-8.

[68]        Ex. 6 at 199:9-200:4.

[69]        Mr. Taylor did not meet with Mr. Morgan, Mrs. Coats' children, or her succession representative regarding the preparation of the contents list. *Id*. at 411-412:3; 422:23-423:7.

[70]        *See, e.g*., Ex. 16 at 116:18-118:12.

[71]        Ex. 6 at 95:11-96:4; 96:12-98:14.

1090108v.2

Plaintiffs for review in order to ascertain whether they were correct.[72]

Additionally, Mr. Taylor made no inquiry with regard to the Plaintiffs' pre-Katrina finances in order to determine whether the values they provided him were realistic in light of each Plaintiffs' respective circumstances.[73]  (For example, Mr. Taylor might have questioned whether it was likely that a couple would own a television valued at 75% of their yearly income.) He made no attempt to determine what kinds of brands of goods they bought or what stores they frequented in order to determine whether the replacement items were equal in quality or value to the pre-Katrina items, even though he conceded that the quality of the goods Plaintiffs owned prior to Katrina was a relevant consideration.[74]

A review of the available handwritten lists submitted by Plaintiffs and the spreadsheets attached to Mr. Taylor's reports reveals that the Plaintiff's handwritten lists are virtually identical to the one contained in the corresponding report.[75]  As noted above, Mr. Taylor did not apply depreciation.  Nor did he remove entries that seemed unusual.

For example, the Armstrong list contains an entry for a baseball card collection valued at $7500.[76]  Mr. Armstrong testified at his deposition that this collection belonged to his son[77], and that his son was the source of the $7500 valuation.  He was not sure that the collection had ever

---

[72]    *Id.* at 462:6-13.

[73]    *See id.* at 197:1-11.

[74]    *See, e.g., id.* at 199:20-200:16.

[75]    The Armstrongs' handwritten list is attached hereto as Exhibit 21.  Mr. Holmes testified that the list attached to Mr. Taylor's report was the list he provided to Mr. Taylor.  He further testified that Mr. Taylor never asked him any questions about the list.  Ex. 19 at 186:12-188:4.  The handwritten list prepared by  Mr. Livers is attached hereto as Exhibit 22.  The handwritten list prepared by Ms. Coats is attached hereto as Exhibit 23.  Mr. Morgan testified that he dictated an additional list to Plaintiffs' counsel that supplemented Ms. Coats' list.  Ex. 8 at 120:10-123:4.  In certain instances, stylistic changes were made, but the entries remained substantively the same. *See, e.g.*, Ex. 1, Flood Contents Worksheet, line item 20; Ex. 21 at line item 20.

[76]    Ex. 1 at Flood Contents Worksheet, p. 9, item 168.  (In his Flood Contents Worksheet, p. 9 appears after p. 13).

[77]    The Armstrongs' son, Kenny, had reached the age of majority prior to Hurricane Katrina.  *See* Ex. 12 at 16:15-17.  (Kenny Armstrong was 28-years-old at the time of his parents' depositions in Sept. 2011.)  He is not asserting a claim against WGI on his own behalf, and thus there is no valid claim for this collection in any case.

- 18 -

been formally appraised.  He does not know how his son determined the value of the collection, and he does not know what cards were in the collection.  He further testified that the family did not have a personal articles insurance policy for the collection.[78]  Although Mr. Taylor testified that he and Mr. Armstrong did speak about the collection at some point, they did not discuss which cards were in the collection and he did not ask for listing of the cards in the collection.[79]  Despite a total lack of evidence regarding the contents of the collection or its value, Mr. Taylor included this item in his report.

Mr. Taylor's reports also overvalue certain Plaintiffs' damages because items are listed both as fixtures or component parts (in his repair estimates) and as contents.  For example, Ms. Coats and Mr. Morgan repaired and renovated the Coats house prior to Katrina, with Mr. Morgan performing a good deal of the work himself.  He testified that they purchased linoleum flooring and installed it in the kitchens and bathrooms.[80]  On the contents list that was submitted to Mr. Taylor, Mr. Morgan entered several listings for the linoleum flooring (with each line item allocated to a specific room)[81], even though Mr. Taylor includes line items for flooring in his estimates.[82]  Mr. Taylor acknowledged that, to the extent such duplications were present, they would represent an overvaluation of Plaintiffs' damages.[83]

Mr. Taylor's contents list for the Coats property also includes several items that belonged to Mr. Morgan, even though he and Ms. Coats were not married and he not is a party to this

---

[78]     Ex. 12 at 237:25-238:24.

[79]     Ex. 6 at 285:13-287:3.

[80]     *See, e.g.,* Ex. 8 at 114:25-116:1.

[81]     *See, e.g.,* Ex. 2 at Flood Contents Worksheet, pp. 1, 3, 4.

[82]     *See, e.g,* Ex. 2, Structural Estimate, at pp. 5-6.  Notably, Mr. Taylor's estimate calls for replacing the linoleum that was present prior to Katrina with oak flooring.

[83]     Ex. 6 at 448:1-3.

1090108v.2

lawsuit.  For example, the list contains items such as Mr. Morgan's work clothes,[84] his personal collection of Mardi Gras and crystal figurines,[85] his ties and cufflinks,[86] and his tools.[87]  Several line items refer to both Mr. Morgan's and Ms. Coats' clothing,[88] because Mr. Morgan, in preparing the list, did not separate or itemize them.  Mr. Taylor testified at his deposition that he has no understanding of what property on his contents list belonged to Mr. Morgan as opposed to Ms. Coats:  "I was not aware of the distinction."[89]  In addition, the Coats contents list contains an entry for $20,000 worth of "children's clothes".[90] Mr. Taylor was not able to provide any information (i.e, the age of the clothes, how many items of clothing, who they belonged to, the original purchase price) about this line item, even though it represented nearly 10% of his contents damage award for Ms. Coats.

> Q.      So you didn't ask anybody any questions about the children's clothing listed there?
>
> A.      I did not.
>
> Q.      Did that number seem at all out of the ordinary to you?
>
> A.      I didn't question it because I didn't question the veracity of any [of the] general clothing issues.  I did not do that.
>
> Q.      You say you didn't question the veracity of any of the clothing issues.  Did you question the veracity of any of the contents on …the contents list attached to Ms. Coats' report?
>
> A.      Not that I recall.[91]

Expert testimony must be supported by appropriate validation and "good grounds" in

---

[84]      Ex. 8 at 165:23-166:7.

[85]      *Id*. at 135:14-136:5.

[86]      *Id*. at 156:24-157:4.

[87]      *Id*. at 76:17-20.

[88]      *Id*. at 155:20-156:1.

[89]      Ex. 6 at 425:6-9.

[90]      Ex. 2 at Flood Contents Worksheet, p. 7.

[91]      Ex. 6 at 426:9-427:11.

1090108v.2

order to be considered reliable and, therefore, admissible.  *See Daubert*, 509 U.S. at 590; *Moore*, 151 F.3d at 269.  When the expert merely accepts as true the information or data given to him by his client, and bases his testimony on that information alone without further analysis, that testimony does not meet the admissibility standard of Rule 702.  *See Munoz v. Orr*, 200 F.3d 291 (5th Cir. 2000)(expert's reliance upon client's data gave rise to "common sense skepticism" when expert did not seek to verify any of the information presented to him); *Supply & Building Co. v. Estee Lauder International, Inc*., 2001 WL 1602976, *4 (S.D.N.Y.2001) (dismissing "[a]ssumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation" as unreasonable)); *Arista Records LLC v. Usenet.com, Inc.,* 608 F. Supp. 2d 409, 429 (S.D.N.Y. 2009) (citing, *Gary Price Studios, Inc. v. Randolph Rose Collection, Inc.,* 2006 WL 1319543, at *8 (S.D.N.Y. May 11, 2006)("[a]n expert who simply repeats the hearsay of the client who retained him, without any independent investigation or analysis, does not assist the trier of fact in understanding matters that require specialized knowledge.")  Courts have consistently used Rule 702 and particularly the first prong of the *Daubert* test to exclude expert opinions where the expert failed to conduct independent research to test the reliability of his assumptions.  *See e.g., JRL Enters., Inc. v. Procorp. Assoc., Inc.*, 2003 WL 21284020 (E.D. La. 2003); *TK-7 Corp. v. Barbouti*, 993 F.2d 722 (10th Cir. 1993); *Total Containment, Inc. v. Dayco Products, Inc.*, 2001 WL 1167506 (E.D. Pa. 2001); *JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc*., 1998 WL 17588 (E.D. Pa. 1998).

In the instant case, Mr. Taylor simply accepted the list provided to him by Plaintiffs' counsel; indeed, he did not even see the handwritten lists prepared by the Plaintiffs themselves, and therefore has no idea if the spreadsheets are an accurate reflection of what Plaintiffs actually wrote.  Mr. Taylor's own testimony reveals he gave no meaningful review or scrutiny to

Plaintiffs' content lists.   Moreover, Mr. Taylor did not perform any work that required specialized knowledge or expertise.   It was the Plaintiffs who prepared the list and determined the replacement cost values.   Mr. Taylor simply applied an 8% sales tax, which any lay person with a calculator can do.   Because Mr. Taylor's report and opinions do not satisfy the admissibility standards of Rule 702, the Court should not waste time hearing them.

>    **E.      Mr. Taylor's Additional Living Expense Calculations Are Unreliable and Completely Irrelevant.**

In his reports, Mr. Taylor defines additional living expenses as an amount "provided to bridge the gap between what it cost to live prior to the loss and what it costs during displacement, including relocation costs, emergency expenses, and the ancillary costs of travel and temporary measures taken to allow the family to live in a manner consistent with their normal lifestyle."[92]  Yet Mr. Taylor does not base his additional living expense calculations upon the available information evidencing Plaintiffs' 1) pre-Katrina expenses or 2) Plaintiffs' actual post-Katrina expenses, but instead applies a rule that has no factual or legal basis:

> It is typical for the additional living expenses to reach 20% of insured value in one year. A fully insured home will typically carry 80-100 percent of its Replacement Cost Value[93].

In summary, Mr. Taylor opines that it is typical for homeowner to spend 20% of the replacement cost value of his home, above and beyond that which he would have spent had he not been displaced, and that he therefore applied this highly dubious rule without regard to what the Plaintiffs actually spent while displaced.   He also presumed that each Plaintiff was displaced for an entire year, and did not even consider evidence demonstrating that some of the Plaintiffs had

---

[92]      *See, e.g.*, Ex. 5 at 1, "Coverage v. Indemnification".

[93]      *See., e.g.*, Ex. 4 at Structural Estimate, p. 19.

1090108v.2

established permanent residences well before one year had elapsed.[94]

For a household to spend 20% of the replacement cost value of its house in excess of its normal expenses over the course of one year, it would need to have a high amount of disposable income, savings, or access to some other source of funds.  As noted above, Mr. Taylor did not make any inquiries concerning Plaintiffs' pre- or post-Katrina finances.  With regard to their expenses, Mr. Taylor testified that he requested invoices and other documents depicting Plaintiffs' actual expenses, but these records were incomplete.  Rather than extrapolating additional living expenses based on the receipts or information Plaintiffs were able to provide, Mr. Taylor simply applied his 20% rule.[95]

Plaintiffs' deposition testimony reveals that none of the Plaintiffs actually spent anything close to what Mr. Taylor has calculated on their behalf.  Ms. Coats, for example, stayed at her sister's house in Hammond for several months until returning to New Orleans to live in a condo that Mr. Morgan purchased after the storm.[96]  Her sister did not charge her rent, although she did help her sister with certain expenses while she was a guest.  She continued to live with Mr. Morgan at his condo until the repairs were completed on his house.  During that time, she did not contribute to Mr. Morgan's rent.[97]  Mr. Morgan testified that almost none of Ms. Coats' pre-Katrina expenses continued while they were evacuated.[98]  Even if the Court were to find that WGI and the United States are not entitled to an offset for the hospitality of Ms. Coats' sister or Mr. Morgan, Mr. Taylor has no evidence to support the $43,599.88 in additional living expenses

---

[94]    For example, the Armstrongs established a permanent residence in Covington in June 2006.  *See* Ex. 18 at 9:7-22.

[95]    *See* Ex. 6 at 138:23-143:25.

[96]    Ex. 8 at 34:1-35:19.

[97]    *Id*. at 194:7-25.

[98]    *Id*. at 209:6-24.

1090108v.2

that he calculated for Ms. Coats.[99]

> Q.      Moving on to additional living expenses for Ms. Coats…[y]ou didn't speak to Mr. Morgan.  Did you discuss with anyone about Ms. Coats' pre-Katrina living expenses?
>
> A.      No…Well, I did with [Ms. Coats' nephew] Charles.  I did discuss what -- what the conditions of the living were there.
>
> Q.      Did you discuss with Charles her living expense costs?  Like her phone bills and her dry cleaning bills and her food bills or the types of costs that you look at for additional living expenses?
>
> A.       I did not discuss that with Charles.
>
> Q.      So you have no understanding of her pre-Katrina living expenses?
>
> A.      I do not have specific details.
>
> Q.       Okay.  And do you have any specific details about Ms. Coats' post-Katrina living expenses in that one year after Katrina?
>
> A.      No.
>
> Q.      And are you aware that Mr. Morgan testified that virtually no bills continued, no expenses continued with regard to Ms. Coats' house post-Katrina[]?
>
> A.       I am not aware of that.

Mr. Taylor was similarly uninformed regarding the actual additional living expenses of the other Plaintiffs.[100]

If a plaintiff actually spends less in monthly expenses after damage to an insured property, he cannot recover "additional" living expenses.  *See Thompson v. State Farm*, 2009 WL 537149 (E.D. La. 2009)(internal citations omitted)(there must be "evidence that additional expenses incurred or were required to maintain the plaintiff in a standard of living to that which he was accustomed"); *see also McGill v. Republic Fire and Cas. Ins. Co.*, 2008 WL 4792720 (E.D. La. 2008)("a plaintiff cannot simply point to living expenses, but must show evidence of

---

[99]     Ex. 2 at p. 2, "Statement of Loss".

[100]    Ex. 6 at 143:6-20.

additional expenses beyond the norm for his standard of living.  That is, he has to show his normal, baseline costs, and then expenses *beyond that baseline.*")  The plaintiff must provide evidence of the additional living expenses incurred.  *See Bradley v. Allstate Ins. Co.*, 606 F.3d 215 (5th Cir. 2010); *Khalimsky v. Liberty Mutual Fire Ins. Co.*, 2009 WL 982641, at *4 (E.D. La. 2009).  It is not sufficient to apply an arbitrary "general rule" that results in a windfall for the plaintiff.  Because Mr. Taylor's unreliable opinions on additional living expenses provide no insight into Plaintiffs' actual living expenses, they are irrelevant and should be excluded.

## III.    CONCLUSION

For the foregoing reasons, the Court should grant WGI's motion to exclude testimony and opinions of Scott Taylor.

Dated:  April 30, 2012                                    Respectfully submitted,


*/s/ William D. Treeby*
William D. Treeby, 12901                    Adrian Wager-Zito
James C. Gulotta, Jr., 6590                  Debra S. Clayman
Heather S. Lonian, 29956          and     JONES DAY
   Of                                                  51 Louisiana Avenue, N.W.
STONE PIGMAN WALTHER WITTMANN L.L.C.    Washington, D.C. 20001-2113
546 Carondelet Street                         Telephone:  (202) 879-3891
New Orleans, Louisiana  70130            Facsimile:  (202) 626-1700
Telephone:  (504) 581-3200
Facsimile:   (504) 581-3361

*Attorneys for Washington Group International, Inc., a division of URS Corporation*

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Motion to Exclude Testimony and Opinions of Scott Taylor has been served upon all counsel of record by electronic notice via the Court's CM/ECF system this 30th day of April, 2012.

*/s/ William D. Treeby*

1090108v.2