# EXHIBIT 6

SCOTT H. TAYLOR                                February 9, 2012

---

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION
                    NO. 05-4182
                    "K" (2)
PERTAINS TO:  MRGO          JUDGE DUVAL
FILED IN:  05-4181, 05-4182,   MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

DEPOSITION OF
SCOTT H. TAYLOR,
2557 James River Road, West Palm Beach,
Florida 33411, taken in the offices of Stone,
Pigman, Walther, Wittmann, 546 Carondelet
Street, New Orleans, Louisiana 70113, on
Thursday, February 9, 2012 and Friday,
February 10, 2012.

---

Page 2

1   APPEARANCES:
2   PALMINTIER LAW
      (BY: JOSHUA M. PALMINTIER, ESQ.)
3     818 Main Street
      Baton Rouge, Louisiana 80801
4       FOR THE PLAINTIFFS
5
      LAW OFFICES OF JOSEPH M. BRUNO
6       (BY: SCOTT JOANEN, ESQ.)
        855 Baronne Street
7       New Orleans, Louisiana 70113
          PLAINTIFFS LIAISON COUNSEL
8
9   JAY ANDRY LAW
      (BY: JAY ANDRY, ESQ.)
10    710 Carondelet Street
      New Orleans, Louisiana 70130
11      ATTORNEY FOR PLAINTIFFS
12
      STONE PIGMAN WALTHER WITTMANN
13      (BY: WILLIAM D. TREEBY, ESQ.
          HEATHER LONIAN, ESQ.)
14      546 Carondelet Street
        New Orleans, Louisiana  70130-3588
15        AND
        JONES DAY
16      (BY: ADRIAN WAGER-ZITO, ESQ.)
        51 Louisiana Avenue N.W.
17      Washington, D.C. 20001-2113
          ATTORNEYS FOR WASHINGTON GROUP
18          INTERNATIONAL, INC.
19
      UNITED STATES DEPARTMENT OF JUSTICE
20      (BY: JAMES F. MCCONNON, JR., ESQ.)
        Torts Branch, Civil Division
21      Post Office Box 888
        Ben Franklin Station
22      Washington, D.C. 20044
          ATTORNEY FOR UNITED STATES OF
23          AMERICA
24  REPORTED BY: ROGER D. JOHNS, RMR, CRR, CSR
          Certified Court Reporter,
25          State of Louisiana

---

Page 3

1                 S T I P U L A T I O N
2
3       It is stipulated and agreed by and between
4   counsel for the parties hereto
5   that the deposition of the aforementioned
6   witness is hereby being taken under the
7   Federal Rules of Civil Procedure, for all
8   purposes, in accordance with law;
9       That the formalities of reading and
10  signing are specifically not waived;
11      That the formalities of certification and
12  filing are specifically waived;
13      That all objections, save those as to the
14  form of the question and the responsiveness of
15  the answer, are hereby reserved until such
16  time as this deposition, or any part thereof,
17  may be used or sought to be used in evidence.
18
19                  * * * *
20
21      ROGER D. JOHNS, RDR, CRR, Certified Court
22  Reporter for the State of Louisiana,
23  officiated in administering the oath to the
24  witness.
25

---

Page 4

1                   I N D E X
2                                             PAGE
    Taylor Exhibit Number 1................. 10
3   Taylor Exhibit Number 2................. 11
    Taylor Exhibit Number 3................. 11
4   Taylor Exhibit 4....................... 12
    Taylor Exhibit 5....................... 12
5   Taylor Exhibit 6....................... 12
    Taylor Exhibit Number 7................ 12
6   Taylor Exhibit Number 8................ 12
    Taylor Exhibit Number 9................ 12
7   Taylor Exhibit 10...................... 13
    Exhibit Number 11...................... 32
8   Exhibits 1 and 2....................... 82
    Taylor Exhibit 12...................... 96
9   Exhibit 12............................. 99
    Taylor Exhibit Number 13............... 172
10  Taylor Exhibit 14...................... 175
    LM-ARMSTRONG-229 to 234................ 175
11  Taylor Exhibit 15...................... 178
    Taylor Exhibit 16...................... 183
12  Exhibit Taylor 17...................... 245
    Bates number 0154...................... 245
13  Taylor Exhibit 18...................... 269
    Bates number ALLSTATE-000025........... 270
14  Taylor Exhibit 19...................... 274
    Bates number IMIC-ARMS-0196 through 0198.. 275
15  Taylor Exhibit 20...................... 300
    LMIC-ARMS-0166 through 0189............ 301
16  Exhibits 3 and 4....................... 305
    Taylor Exhibit 21...................... 336
17  ACFIC-000692 through 693............... 337
    Taylor Exhibit 22...................... 338
18  ACFIC-00054 through 161................ 339
    DSC-0126............................... 343
19  DSC-00296.............................. 344
    DSC-00147.............................. 344
20  DSC-0168............................... 345
    DSC-170................................ 345
21  DSC-171................................ 345
    DSC-213................................ 345
22  DSC-214................................ 345
    DSC-241................................ 346
23  DSC-264................................ 346
    DSC-266................................ 346
24  DSC-279................................ 346
    DSC-280................................ 346
25  281.................................... 346

---

                              1 (Pages 1 to 4)

SCOTT H. TAYLOR                                    February 9, 2012

Page 5

I N D E X (CONTINUED)
PAGE
DSC-283........................... 346
DSC-287........................... 346
DSC-288........................... 346
DSC-293........................... 346
DSC-294........................... 346
DSC-295........................... 347
Taylor Exhibit 23............... 357
ACFIC-001053 through 1069......... 357
DSC-0129.......................... 365
DSC-0131, DSC-200 and 201........ 365
DSC-200 and 201.................. 366
DSC-271.......................... 366
DSC-278.......................... 367
Exhibit Taylor 24............... 378
ACFIC-00435 through 458......... 378
443............................... 380
Taylor Exhibit 25............... 390
Taylor Exhibit 26............... 390
ACFIC-000185 through 190......... 390
175............................... 395
185............................... 395
Taylor Exhibit 27............... 405
ACFIC-000687 through 691......... 405
Taylor Exhibits 5 and 6......... 408
Taylor Exhibit 28............... 437
Morgan Deposition 4............. 438
Taylor Exhibit 7................ 456
Taylor Exhibit Number 8......... 456
Taylor Exhibit 29............... 475
LIVERS-05........................ 476
LIVERS-06........................ 477
Bates stamped 09................ 477
LIVERS-012....................... 478
Taylor Exhibit 30............... 487
LIVERS-0140 through 0152......... 487
Exhibit 9 and 10................ 502
Taylor Exhibit 31............... 514
CITIZENS-000246 through 250...... 514
CITIZENS-000254.................. 514
CITIZENS-000254.................. 515
CITIZENS-000131.................. 515
CITIZENS-000250.................. 516
CITIZENS-000131.................. 517
Taylor Exhibit 32............... 517
Taylor Exhibit 33............... 523
CITIZENS-000339 through 000350... 523

Page 6

EXAMINATION INDEX
PAGE

EXAMINATION BY MS. WAGER-ZITO:............. 7
EXAMINATION BY MR. MCCONNON:............. 531


PLAINTIFF SUBJECT REPORTS
ARMSTRONG REPORTS......................... 84
HOLMES REPORTS............................ 304
COATS REPORTS............................. 408
LIVERS REPORTS............................ 455
WASHINGTON REPORTS........................ 499

Page 7

1          SCOTT H. TAYLOR,
2   2557 James River Road, West Palm Beach,
3   Florida 33411, after having been duly sworn by
4   the before-mentioned court reporter, did
5   testify as follows:
6   EXAMINATION BY MS. WAGER-ZITO:
7       Q.   Mr. Taylor, we met off the record,
8   but my name is Adrian Wager-Zito.  I'm one of
9   the lawyers for the Washington Group
10  Defendants.  Heather Lonian is with me; she's
11  with the law firm of Stone, Pigman, also
12  representing Washington Group.  And Jim
13  McConnon is here on behalf of the United
14  States.  Jim may be asking you some questions
15  at the end of the deposition.
16          Just for the record, could you
17  state your name?
18      A.   Scott Taylor.
19      Q.   And you gave the James River Road
20  address.  That's your business address; is
21  that correct?
22      A.   That's my business and home address.
23      Q.   Okay.  So you are no longer in South
24  Carolina?
25      A.   No, I am not.

Page 8

1       Q.   How long have you lived at the James
2   River address?
3       A.   About a year.
4       Q.   And prior to that where did you
5   live?
6       A.   In South Carolina.
7       Q.   And what was the address there, if
8   you remember?
9       A.   136 Bridgeton Drive (*), Greenville,
10  South Carolina.
11      Q.   And how long did you live at that
12  address?
13      A.   A couple of years prior to that.
14      Q.   Just a couple of instructions to get
15  started here.  I know you were deposed in the
16  Robinson case, but I'll just go through the
17  instructions again.  You need to answer the
18  questions that I ask orally so that the Court
19  Reporter can get them down.  No nods of the
20  head or shakes of the head.  Okay?
21      A.   Yes.
22      Q.   Okay.  If you don't understand one
23  of my questions, which is entirely possible,
24  if it's confusing, if you could, just let me
25  know and I will try and reask it, because if

2  (Pages 5 to 8)

SCOTT H. TAYLOR                                    February 9, 2012

Page 9

 1  you don't let me know it's confusing, I'll
 2  assume that you understood it.  Is that okay?
 3      A.  Yes.
 4      Q.  Okay.  Again, back to prior
 5  depositions.  Have you been deposed before?
 6      A.  In the Robinson case, yes.
 7      Q.  Other than the Robinson case?
 8      A.  Not as an expert witness, no.
 9      Q.  Were you deposed in other cases as a
10  fact witness?
11      A.  Actually, no.  I never have been
12  prior to that.
13      Q.  Have you given testimony in court?
14      A.  Yes.
15      Q.  Have you given testimony in court
16  other than in the Robinson case?
17      A.  Not as an expert witness.
18      Q.  And have you given testimony in
19  court as a fact witness?
20      A.  Yes.
21      Q.  And can you describe that
22  situation?
23      A.  I have given testimony in court in a
24  murder case in Texas some 25 years ago.
25      Q.  Okay.  And other than that, any

Page 10

 1  other testimony in court?
 2      A.  No.
 3      Q.  To get this out of the way, and
 4  we're obviously going to be coming back to
 5  them repeatedly over the course of the day,
 6  we're just going to mark all of your expert
 7  reports in this case.  We have marked them
 8  already.  We're going to give them to you.  So
 9  we have Taylor Exhibit Number 1, which is your
10  July 17th, 2011 expert report.
11          MS. WAGER-ZITO:
12          Scott, we have some for you, and
13      others --
14      MR. JOANEN:
15          I have them.
16      MS. WAGER-ZITO:
17          And others --
18      MR. JOANEN:
19          I was actually just looking.  If
20      you can, identify them by the name as
21      opposed to the date.  I am not
22      familiar with them enough to know
23      whether or not that date --
24      MS. WAGER-ZITO:
25          That's a good point.  I am going

Page 11

 1  to ask questions about them, but this
 2  is -- Taylor Exhibit 1 is the July 17,
 3  2011 report for the Armstrongs.
 4          Taylor Exhibit Number 2 is the
 5  October 20th, 2011 report for the
 6  Armstrongs.
 7          Taylor Exhibit Number 3 is the
 8  July 17, 2011 report for Fred Holmes.
 9      MR. PALMINTIER:
10          It looks like -- Unless I am
11  missing something, is the Kenneth
12  Armstrong -- Defendant Exhibit 1 is
13  the Armstrong report?
14      MS. WAGER-ZITO:
15          Yes.
16      MR. PALMINTIER:
17          And Defendant 2 is also the
18  Armstrong report?
19      MS. WAGER-ZITO:
20          Yes.
21      MR. PALMINTIER:
22          It's the revised report?
23      MS. WAGER-ZITO:
24          Yes.  That's why I am giving the
25  dates.

Page 12

 1      MR. PALMINTIER:
 2          I understand.
 3      MS. WAGER-ZITO:
 4          And we're marking them both
 5  because we're going to be using --
 6  we're going to be coming back to some
 7  of the old ones.  We're not going to
 8  go into great detail on the old ones,
 9  but I just want them on the record.
10  EXAMINATION BY MS. WAGER-ZITO:
11      Q.  Okay.  Exhibit 4, Taylor Exhibit 4
12  is the October 20th, 2011 report for the
13  Holmes.
14          Taylor Exhibit 5 is the July 17,
15  2011 expert report for Ethyl Coats.
16          Taylor Exhibit 6 is the October,
17  2011 expert report for Coats.
18          Taylor Exhibit Number 7 is the
19  July 17, 2011 report for the Liverses.
20          Taylor Exhibit Number 8 is the
21  October 20th, 2011 report for the Liverses.
22          Taylor Exhibit Number 9 is the
23  July 18th, 2011 report for the Washingtons for
24  the Charbonnet property.  That's Exhibit --
25      MS. WAGER-ZITO:

SCOTT H. TAYLOR                                    February 9, 2012

Page 13

1       Did I say 9?
2           MR. PALMINTIER:
3           Yes.
4   EXAMINATION BY MS. WAGER-ZITO:
5       Q.  And then finally, Taylor Exhibit 10
6   is the October 20th, 2011 report for Clifford
7   Washington for the Charbonnet property.
8           And again, Mr. Taylor, we're going
9   to be going back to these throughout the day.
10  For the most part, one by one we'll just be
11  going through each of the five Plaintiffs and
12  talking about them separately, but I do want
13  to ask you some questions with regard to the
14  reports generally.  And if you can answer them
15  as to all of them, great.  If not, we'll have
16  to go through them one by one.  But we have
17  marked all of the reports and what I want to
18  ask you initially is, with regard to the
19  revised reports, is it your intention in this
20  case to issue any further opinions regarding
21  the damages to any of the Plaintiffs in this
22  case?
23          MR. PALMINTIER:
24          I object.  I am going to object
25  to the form.

Page 14

1   EXAMINATION BY MS. WAGER-ZITO:
2       Q.  That was one of the instructions.
3   If your Counsel objects, you can still go
4   ahead and answer unless he instructs you not
5   to answer for any particular reason.
6       A.  I think I don't understand the full
7   context of what you're asking, though.
8       Q.  Do you intend to do any further work
9   with regard to determining the damages to any
10  of the Plaintiffs in this case and to issue
11  any further reports?
12      A.  Not unless instructed to.
13      Q.  Have you been asked to do any
14  further work?
15      A.  Not at this time, no.
16      Q.  Have you been told that you are
17  going to be asked to do any work at some point
18  in the future?
19      A.  No, not -- not per se.
20      Q.  So sitting here right now, your full
21  opinions are the opinions that are reflected
22  in the reports that we just marked as
23  exhibits?
24          MR. PALMINTIER:
25          Let me just say that to the

Page 15

1   extent that we feel it necessary to
2   revise the reports based upon
3   questions that may arise from this
4   deposition or from the depositions of
5   Counsel's experts, we may then choose
6   to revise, to make a revision to the
7   report.  We're going to leave it at
8   that.  We'll make it available.
9           MS. WAGER-ZITO:
10          And our response to that will be
11      that we are not waiving our objections
12      to your issuing any revised reports at
13      any future time.
14  EXAMINATION BY MS. WAGER-ZITO:
15      Q.  But what I am really getting at
16  right now is, is it your current intention to
17  be doing any further work in looking at the
18  damages to any of the Plaintiffs in this case
19  as far as you know right now?
20      A.  As far as I know right now, we have
21  completed everything that I need to do.  Yes.
22      Q.  And your opinions sitting here right
23  now are contained in the revised reports that
24  we marked for each of the Plaintiffs?
25      A.  Yes.

Page 16

1       Q.  And the one other instruction that I
2   failed to give you at the beginning, it might
3   be the most important one, if you could try
4   and wait until I finish asking my question
5   before you start to answer so we can get a
6   clean record, and I will try to wait until you
7   finish your answer before I ask my next
8   question.
9       A.  Okay.
10      Q.  Have you reviewed the reports that
11  were issued by the Defendants' experts in this
12  case?
13      A.  I have reviewed them.
14      Q.  Have you reviewed all of them?
15      A.  I have looked at each one of them,
16  yes.
17      Q.  And when you say "each one of them",
18  let me just go through them again for the
19  record.  Have you looked at the reports issued
20  by J. P. Duplessis for each of the
21  Plaintiffs?
22      A.  I have looked at each one, yes.
23      Q.  Okay.  And have you looked at all of
24  the reports issued by Mr. Schneider?
25      A.  Yes, I have.

JOHNS, PENDLETON COURT REPORTERS              504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 17

1      Q.  And have you looked at all the
2  reports for each of the Plaintiffs issued by
3  Mr. Truax?
4      A.  I'm -- I don't recall who Mr. Truax
5  is.
6      Q.  Have you looked at any of the
7  reports that -- And we can show them to you
8  later if you need to, but looked at the value
9  of each, or at certain of the Plaintiffs'
10  homes pre-Katrina and then did an appraisal
11  for post-Katrina value for any of the
12  reports?
13      A.  You might have to show me what
14  you're asking -- what you're asking
15  specifically so that I could -- I would hate
16  to give you an answer based on something I am
17  not clear as to which report it is.  And I
18  would have to look at it to determine if this
19  is one that I had actually looked at.
20      Q.  And we'll get to those later, again,
21  when we talk about each of the individual
22  Plaintiffs.  And what about the reports for
23  Mr. Danner, the reports issued by Mr. Danner?
24      A.  Again, I am not sure who Mr. Danner
25  is, so I would have to look at that to see if

Page 18

1  it's one I had looked at.
2      Q.  Did you look at any reports that
3  reflected on whether the damages to the
4  Plaintiffs' properties were caused by wind --
5      A.  I did.
6      Q.  -- and rain versus flooding?
7      A.  Yes, I did.
8      Q.  Did you look at any reports that
9  were issued by any of the experts relating to
10  the Coats property or the Armstrong property
11  that were issued earlier in this litigation in
12  the class certification phase?
13      A.  I don't recall looking at any of
14  those.
15      Q.  And you have not issued any rebuttal
16  reports for any of the named Plaintiffs; is
17  that correct?
18      A.  No.
19      Q.  Okay.  And again, as we just
20  discussed, is it your intention to issue any
21  written rebuttal reports?
22      MR. PALMINTIER:
23      I object to the form.
24  EXAMINATION BY MS. WAGER-ZITO:
25      Q.  You can go ahead and answer.

Page 19

1      MR. PALMINTIER:
2      You can answer.
3      THE WITNESS:
4      Unless instructed to, I don't
5  have any intention at this time.
6  EXAMINATION BY MS. WAGER-ZITO:
7      Q.  Do you plan on addressing any of the
8  criticisms raised by any of the Defendants'
9  experts of your reports?
10      A.  Only if I am asked specifically
11  about it.
12      Q.  And you haven't been asked to do so
13  yet?
14      A.  Not at this time.
15      Q.  Would you consider yourself
16  qualified to issue any opinions in response to
17  the Danner report that speaks to the issue of
18  wind versus rain?
19      A.  To the extent of my experience with
20  claims on damages to homes and wherein it lies
21  -- it discusses the physical damages
22  observable at that time, yes.
23      Q.  In the work that you did in this
24  case, did you look at damages caused by wind
25  and rain versus flooding?

Page 20

1      A.  I did not distinguish anything,
2  percentages or anything like that when it came
3  to cause on wind versus rain -- wind and rain
4  versus flood, because my task was to look at
5  the flood damages.
6      Q.  And again, we'll get into that as we
7  talk about each of them.  Are you qualified to
8  issue an opinion as to -- an appraisal type of
9  opinion as to the value of any of the
10  properties --
11      A.  Yes.
12      Q.  -- at issue in this case?
13      A.  Yes, I am qualified.
14      Q.  Are you licensed as an appraiser?
15      A.  I am a licensed independent adjustor
16  and have -- and have appraised literally
17  thousands of properties.
18      Q.  Did you do any appraisals of the
19  homes of any of the Plaintiffs in this case?
20      A.  Prior to this or --
21      Q.  In connection with the work that you
22  did.
23      A.  Yes.
24      Q.  You appraised the values of the
25  homes as opposed to the repair costs or the

SCOTT H. TAYLOR                                    February 9, 2012

---

Page 21

1    replacement costs?
2        A.  Oh, I see what -- I apologize.  I
3    didn't know you were distinguishing it at that
4    point.  No, I did not appraise the -- I didn't
5    do a valuation report that was exhaustive, but
6    I did do a valuation report in accordance with
7    the damages.  I have compared them to the
8    damages just for my own record when I am
9    looking at things.  But in the process of what
10   I do, it's very common to do a valuation
11   report, which the software we use that we
12   provided you with does, it does that as part
13   of what I do.  I look at that, yes.
14       Q.  Did you produce any of those
15   valuations that you did on --
16       A.  I don't recall turning those in to
17   anybody.  I just use it for reference at
18   times.
19       Q.  Do you have any of those
20   valuations?
21       A.  No, I don't.
22       Q.  What happened to them?
23       A.  Well, I don't actually print them
24   out.  I just look at the numbers.  I refer to
25   -- I refer to numbers based off of -- off of

---

Page 22

1    the damages I am putting in.  I look at it to
2    see if they seem in keeping with valuations.
3        Q.  So it for more of a sanity check --
4        A.  Exactly.
5        Q.  -- or validity check?
6        A.  Exactly.  You always -- It's a -- It
7    is a part of the inspection checklist that I
8    use, you know, when I go through things.
9    There are certain things I check against, you
10   know, "It looks like it's okay with this", and
11   then I go on.
12       Q.  So is there any way for us to know
13   the valuations that you reached for any of the
14   Plaintiffs' properties in this litigation?
15       A.  No, because I never produced --
16   actually printed them out and produced those
17   that I recall.
18       Q.  And when you talk about the
19   software, is that the Xactimate software?
20       A.  Yes, it is.  Yes, it is.
21       MR. PALMINTIER:
22           You need to let her finish the
23       question.
24       THE WITNESS:
25           I'm sorry.

---

Page 23

1        MR. PALMINTIER:
2            That's okay.
3    EXAMINATION BY MS. WAGER-ZITO:
4        Q.  As I said, that may be the most
5    important instruction and the -- it is clearly
6    the most violated instruction by both of us.
7            And in connection with the work
8    that you did on this case, how would you
9    describe what your area of expertise is?
10       A.  My area of expertise is determining
11   the damages to -- to a home in -- in that I
12   give a dollar amount for either replacement of
13   the home in a rebuild or in a restoration.
14   And so that's where my area of expertise is.
15   Restoration or rebuild, depending on the
16   circumstances.
17       Q.  And rebuild, would rebuild be
18   repair?
19       A.  No, rebuild would be starting from
20   scratch.  It would be re- -- starting over.
21       Q.  And in connection with the work that
22   you did on this case, did you only do
23   estimates for rebuilding as opposed to
24   repairing any of the homes?
25       A.  No, I did both.  I did in some

---

Page 24

1    cases, I used a rebuild strategy; and in
2    others I used a repair strategy.
3        Q.  And again, we'll get to each of the
4    homes separately.  How did you make a decision
5    as to whether or not to do a repair versus a
6    rebuild?
7        A.  If the house was missing, in the
8    case -- two of the cases, I'm certain of that,
9    they were missing completely, then it had to
10   be a start from scratch rebuild.  And so you
11   could not do a repair of something that
12   doesn't exist.
13       Q.  If the house was still there, what
14   was your strategy?
15       A.  If possible, then my strategy would
16   be to repair it.  Whenever possible, a repair
17   strategy is what I take, because in my
18   experience in what I have been asked to do is
19   to determine the damages there are in
20   order to put the -- put the claimant or the
21   homeowner back like they were before, as close
22   to identically to what they were before.
23       Q.  Is it possible, especially if a home
24   is, as some of them were in this case, knocked
25   off of a slab, that the home can be brought

---

JOHNS, PENDLETON COURT REPORTERS          504 219-1993

Page 25

1   back and repaired?
2       A.  In my opinion, no.  Because the
3   structural integrity would be compromised and
4   would not be able to be put back in its
5   current -- in its current condition.  It would
6   have to be demolished at that point.
7       Q.  And in your opinion, that's under
8   all circumstances that would be the case?
9       A.  I would -- I would not -- I would
10  not presume to know every circumstance, so,
11  therefore, I would say no, not necessarily in
12  all circumstances, but by and large that seems
13  to be the practice and it would be my opinion,
14  yes.
15      Q.  Are you a structural engineer?
16      A.  No, I am not.
17      Q.  So are you qualified to make the, or
18  to come to the conclusion as to whether or not
19  a home could be put back on its slab or on its
20  structure and be repaired?
21      A.  I am only qualified as a practical
22  matter as to whether it's -- it appears to be
23  a normal practice or not.  Structurally as an
24  engineer, no, I am not qualified.  I would
25  never presume to say that from a scientific

Page 26

1   engineering point of view it was -- it was
2   repairable or not.  But by observation and
3   experience, knowing what has been done and
4   through other reports that I have had to
5   peruse and look through that include
6   engineering reports, I have seen engineering
7   reports that declare things to be unstable and
8   compromised and I -- I can make opinions about
9   that based off of my experience, but not as an
10  expert in engineering.
11      Q.  So you're not a structural
12  engineer.
13      A.  No.
14      Q.  Are you qualified to, for a house
15  that is still there, are you qualified as a
16  structural engineer to make the decision as to
17  whether or not the foundation can be repaired
18  versus having to be replaced?
19      A.  Again, not as a structural engineer,
20  no.  Only as an insurance adjustor that's
21  licensed to do exactly what you said, which is
22  make an opinion about that.
23      Q.  But do you believe it's necessary to
24  bring in a structural engineer to make the
25  decision as to whether or not a home has been

Page 27

1   so compromised as to whether or not it has to
2   be rebuilt versus repaired?
3       MR. PALMINTIER:
4       I object to form.
5       THE WITNESS:
6       My opinion is that you don't --
7   that I don't need an engineer in many
8   cases to make that determination,
9   because my experience in the past has
10  been that in many cases it is clear
11  and it seems pragmatic that a house
12  cannot or can be repaired.  And I have
13  found both sides of that to be
14  acceptable by not only the homeowners,
15  but by the paying institution, whether
16  that was an insurance company or
17  whoever; they have accepted my
18  opinions about that and I have given
19  those in the past.  But again, it's
20  always left at the discretion of the
21  insurer, if it's an insurance company,
22  or -- or a homeowner if they're the
23  ones that are asking for my opinion.
24  EXAMINATION BY MS. WAGER-ZITO:
25      Q.  You said "in many cases".  Is it

Page 28

1   true in all cases?
2       A.  No, it is not.
3       Q.  And did you consult at all with a
4   structural engineer in connection with the
5   opinions that you gave in this case?
6       A.  I did not consult prior to preparing
7   my initial evaluation.  However, I was in
8   contact via the attorneys in this with an
9   engineer who provided an opinion.
10      Q.  With an engineer who provided an
11  opinion as to whether or not a home had to be
12  rebuilt versus repaired?
13      A.  I don't recall the specifics of what
14  was discussed when it came to those opinions,
15  no.  So I couldn't -- I couldn't answer that.
16      Q.  So you can't say whether or not you
17  consulted with a structural engineer on that
18  issue?
19      A.  I cannot.
20      Q.  Who did you consult with?  You
21  mentioned in your earlier answer that through
22  the lawyers you consulted with an engineer.
23      A.  The engineer that -- that was being
24  used was John Crawford, I believe.
25      Q.  Okay.  And what was the purpose of

7 (Pages 25 to 28)

SCOTT H. TAYLOR                                    February 9, 2012

Page 29

1  your discussions with Mr. Crawford?
2      A.  I didn't have --
3          MR. PALMINTIER:
4          I object to form.
5          THE WITNESS:
6          I'm sorry -- any where I have
7      them directly with Mr. Crawford.  I
8      have always asked our attorneys that I
9      have worked with to provide me any
10     information that would -- that would
11     in any way either refute or support my
12     -- my opinions and I have always
13     consulted with them to ask of -- ask
14     for that kind of investigation to be
15     done.  So I never -- I never had any
16     specific information that would have
17     told me yes or no, these are
18     repairable or not repairable.
19  EXAMINATION BY MS. WAGER-ZITO:
20     Q.  And you never spoke directly with
21  Mr. Crawford about anything in connection with
22  issuing your opinions in this case?
23     A.  Not in this case, no.
24     Q.  Did you review his reports in this
25  case?

Page 30

1      A.  I did.
2      Q.  And for what purpose?
3      A.  To verify that his opinions were
4  either concurrent with mine or opposed to them
5  in some way.
6      Q.  Were there any instances in which
7  they were opposed -- Were there any instances
8  in which Mr. Crawford's opinions were opposed
9  to your opinions?
10     A.  No.
11     Q.  We got into the -- You gave your
12  business address, but the name of the business
13  is Scott Taylor Adjusting Services?  Is that
14  --
15     A.  Yes.  It's -- I'm sorry.  I didn't
16  wait.  It's -- It's a proprietorship.  So it's
17  a single proprietorship.
18     Q.  And are you the only employee of
19  Scott Taylor --
20     A.  Yes.
21     Q.  -- Adjusting Services?
22     A.  Yes, I am.
23     Q.  So you have no employees working for
24  you or with you?
25     A.  Not at this time, no.

Page 31

1      Q.  Did you have any employees -- Have
2  you ever had employees working for you or with
3  you at Scott Taylor Adjusting Services?
4      A.  No, I have not.
5      Q.  So all of the work that you have
6  done on this case and all of the work in
7  connection with the opinions that you issued
8  in this case you did personally?
9      A.  I did, yes.
10     Q.  And apart from Scott Taylor
11  Adjusting Services, do you have any other
12  employment?
13     A.  No, not at this time I do not.
14     Q.  Have you in the past had any other
15  employment --
16     A.  Yes.
17     Q.  -- other than Scott Taylor Adjusting
18  Services?
19     A.  Yes.
20     Q.  How long has Scott Taylor Adjusting
21  Services been in existence?
22     A.  It's been in existence for several
23  years.  Precisely how long I am not sure,
24  because it's always been concurrent with other
25  -- if I had other employment, this was always

Page 32

1  something that I always maintained, an
2  adjusting service, consulting business, on the
3  side.  So I have done that for at least seven
4  years.
5      Q.  Why don't we mark as the next
6  exhibit the number which -- Exhibit Number
7  11.
8          MR. PALMINTIER:
9          No objection.
10  EXAMINATION BY MS. WAGER-ZITO:
11     Q.  Mr. Taylor, we just handed you a
12  document marked Taylor Exhibit 11.  Can you
13  tell me what this is?
14     A.  This is the C.V. that I prepared.
15     Q.  And did you prepare it for this
16  case?
17     A.  Yes, I did.
18     Q.  And is this an accurate and current
19  description of your credentials and experience
20  in this case?
21     A.  It's not exhaustive, but it's
22  representative, yes.
23     Q.  When you say it's not exhaustive,
24  what do you mean?
25     A.  In that I have not -- There are many

8 (Pages 29 to 32)

SCOTT H. TAYLOR                              February 9, 2012

Page 33

1    consulting positions and things that I have
2    done independently that are not listed on
3    here, including the consulting service that I
4    am listed under now.
5        Q.  And what's the consulting service
6    you're listed under now?
7        A.  Scott -- Scott Taylor Adjusting
8    Services.
9        Q.  And is there a reason that's not
10   included on here?
11       A.  Because it's not an employer and
12   it's just a service that I have provided on
13   the side.  So I have not listed it as a full
14   time position of any sort.
15       Q.  You say it's a service that you do
16   on the side.  How much time, how much of your
17   time is spent doing this, doing work for Scott
18   Taylor Adjusting Services?
19       A.  Currently it's all of my time,
20   because just recently I resigned from another
21   full time staff position at another firm.
22       Q.  And what firm is that?
23       A.  That is Totura and Company.
24       Q.  Can you spell that?
25       A.  T O T U R A.

Page 34

1        Q.  And is Totura and Company listed on
2    --
3        A.  Yes, it is.
4        Q.  -- your C.V.?
5        A.  Yes, it is.
6        Q.  Where would that be?
7        A.  It's the final item in my list of
8    employment.
9        Q.  And how long were you with Totura
10   and Company?
11       A.  Approximately 14 months.
12       Q.  What period of time was that?
13       A.  That most recently ended in December
14   of 2011.
15       Q.  So were you there for all of 2011
16   and just a couple of months in 2010?  Is that
17   --
18       A.  Yes.
19       Q.  Do I have that right?
20       A.  Yes, that's correct.
21       Q.  So that would include the time that
22   you were working on this case; correct?
23       A.  Yes.
24       Q.  But the work that you did for this
25   case was not for Totura and Company?

Page 35

1        A.  No, it was not.
2        Q.  And what did you do for Totura and
3    Company?
4        A.  I was the property claims manager
5    for the company.
6        Q.  And what did that entail?
7        A.  That entailed managing all the
8    adjustors that were in -- worked for the
9    company in property claims for the states of
10   Florida and Georgia and Virginia and any other
11   places where they had claims work.
12       Q.  And why did you leave that job?
13       A.  So that I would be able to do more
14   teaching and more consulting.
15       Q.  And prior to Totura and Company, I
16   am just looking at page 2 of Taylor Exhibit
17   11, and there's no dates on here, but is --
18   and it's titled "Recent adjusting/appraisal
19   activities and experience."  But is this list
20   on here in the order of your prior employment
21   or is some of this concurrent work?
22       A.  That's a good question.  Some of it
23   is concurrent.  If, for example, -- Well, no,
24   really it is -- it is in sequence.  It is in
25   sequence.  B3 Adjusting Services only existed

Page 36

1    for a short time and that was -- that bridged
2    a couple of the other events as well.  So some
3    of them were going on as a trainer and team
4    leader; for example, I worked throughout that
5    period doing -- working for others so that
6    they crossed over.  They were things that were
7    independent in there.
8        Q.  But going all the way back to the
9    first one on there, Frontier Adjustors, --
10       A.  Right.
11       Q.  -- and I don't want to go into
12   detail on these, but what period of time was
13   that work?
14       A.  That would have been in 2005.
15       Q.  And Royal Restorations?
16       A.  2006.  2005, 2006.
17       Q.  And what were you doing for Royal
18   Restorations?
19       A.  I was writing claims, damage claims
20   for Hurricane Rita.  And that was in Lake
21   Charles.
22       Q.  And Advanced Adjusting?
23       A.  Advanced Adjusting is an adjusting
24   firm, an independent adjusting firm, and I was
25   writing Katrina claims for them.

SCOTT H. TAYLOR                                    February 9, 2012

Page 37

1      Q.   So did this overlap with the work
2  that you were doing for Royal Restorations?
3      A.   No.  It did not.  Well, it followed
4  it almost immediately.
5      Q.   Although in Royal Restorations you
6  were doing work in connection with --
7      A.   Mostly with Rita.  In fact, it was
8  all with Rita, Hurricane Rita, but that was in
9  Lake Charles.
10      Q.   But Hurricane Rita was after
11  Katrina; correct?
12      A.   Right.  As you probably are aware,
13  Katrina claims tended to go on for quite some
14  time.
15      Q.   For quite some time.  I think we're
16  all aware of that.  And then the next entry is
17  Bankers Insurance.  What were you doing for
18  Bankers Insurance?
19      A.   I was a mediator and consultant and
20  negotiator as well.
21      Q.   And for what period of time were you
22  working for Bankers Insurance?
23      A.   That would have been in 2006.
24      Q.   And did that overlap at all with
25  what you were doing for Advanced Adjusting?

Page 38

1      A.   Yes, it did.  Because it was -- I
2  actually ran it through Advanced Adjusting.
3  They were -- I was approached by Bankers to
4  handle it and I deferred it to Advanced
5  Adjusting.  Since -- Since the connection to
6  that insurance company had come through them,
7  it seemed the appropriate thing to do is to
8  run it through them.
9      Q.   Now, were all of these jobs we have
10  gone through full time jobs for you?
11      A.   Yes.
12      Q.   But still at this time you were also
13  doing Scott Taylor Adjusting work?  Is that
14  true?
15      A.   Technically, yes.  There just wasn't
16  any activity at that time.
17      Q.   And the next listed item is Fleming
18  Hall Administrators?
19      A.   Uh-huh (affirmatively).
20      Q.   What was that?  What did that job
21  entail?
22      A.   That was writing claims for -- That
23  occurred in Hurricane Wilma in Florida.
24      Q.   And what period of time were you
25  with Fleming Hall Administrators?

Page 39

1      A.   That was in 2006 as well.
2      Q.   And was this at the same time that
3  you were working with Advanced Adjusting and
4  Bankers Insurance?
5      A.   No.  No.  The work had pretty well
6  dried up on those and once -- In insurance
7  adjusting, especially when it's catastrophic,
8  you end up following where the work is.  So
9  when you're doing that, you know, once it
10  dries up and you're not able to sustain a full
11  time employment there, you move on to the next
12  event or the next situation.  So they tend to
13  be rather transitory.
14      Q.   Okay.  The next entry is L&M LLC,
15  New Orleans.
16      A.   Uh-huh (affirmatively).
17      Q.   Can you explain what that is?
18      A.   That was evaluating claims in New
19  Orleans that had to do with Hurricane Katrina
20  and looking at those for whether everything
21  was covered or not and doing reinspections.
22      Q.   And what is L&M LLC?
23      A.   That's just the name of the
24  company.  I don't know what it stands for.
25      Q.   What do they do?  Is it an insurance

Page 40

1  company?
2      A.   No, no.  They were -- They were a --
3  They were a reinspection -- They were -- I'm
4  not sure exactly what their -- what their --
5  how they would describe themselves, but they
6  were an institution that had hired me to do
7  evaluations and reinspections for the purpose
8  of settling claims.
9      Q.   And what period of time did you work
10  for L&M?
11      A.   That went on for quite some time,
12  through the end of -- somewhere around the end
13  of 2007.
14      Q.   And when did it start?  2006?
15      A.   2006.
16      Q.   The next entry is National Adjustors
17  Academy.  Can you describe what type of work
18  you did for National Adjustors Academy?
19      A.   I was asked to write a curriculum
20  for them for training field adjustors and then
21  on use of the Xactimate software.  And so I
22  wrote a manual for them and then taught it
23  with their -- with their -- in their offices
24  for them.
25      Q.   And when you say "taught it", can

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

SCOTT H. TAYLOR                                      February 9, 2012

Page 41

1   you describe what that entailed?
2        A.  The courses that I teach are varied
3   at this time.  But at that time it was a five
4   day course that involved the nuts and bolts
5   issues associated with adjusting claims and
6   how you go about that and the -- and the
7   methodology that's used, how to -- how to do
8   each step in sequence and how to produce
9   claims in the end.  And that's a five day
10  course including construction elements that
11  teach them the basic construction of buildings
12  and mainly for residential purposes, but every
13  step of construction is gone over and how it's
14  accomplished and what its -- what its purpose
15  is and how you would write claims for those
16  damages.  So you get a thorough construction
17  overview of each element and then the
18  processes and procedures for putting together
19  damages and claims.
20       Q.  And you said that's using the
21  Xactimate software?
22       A.  That follows.  The Xactimate
23  software course is it's own course and I have
24  always taught that following, for new
25  adjustors, following the basic course, because

Page 42

1   the methods that are used in evaluating a loss
2   can be done independently of actually writing
3   the claim with a software.  You can write it
4   all by hand if you desire to.  As a matter of
5   fact, the final that I give all the students
6   is to write a claim without the use of any
7   software and nothing but a calculator.  And
8   they have to do a very thorough, exhaustive
9   thing that takes them most of the -- part of a
10  day to do, with the purpose of demonstrating
11  how, when they get finished, if they're
12  prepared now to start the software course.
13  The software can actually produce the same
14  claim in a much shorter time and so they
15  become very enthusiastic about learning that
16  software.
17       Q.  I bet they do.
18       A.  Yes.
19       Q.  And we will get into some questions
20  about the Xactimate software as we go through
21  the work that you did in this case.  But how
22  long have you been using the Xactimate
23  software?
24       A.  For seven years.
25       Q.  Is that how long it's been around?

Page 43

1        A.  No, it's been around for quite some
2   time.  Since the early '90s.
3        Q.  And how did you learn how to use
4   it?
5        A.  I learned it by -- by doing
6   tutorials on it myself and going through the
7   program exhaustively for days on end.  I
8   actually went to a class, but the instructor
9   was only teaching certain elements of it and
10  so I found I needed to learn it more
11  thoroughly and just went after it myself; and
12  there were some -- there were some videos that
13  I was able to procure to go through the rest
14  and learn myself, and so I did.
15       Q.  And you said when you were teaching
16  this you actually had your students do a claim
17  without using the software and actually doing
18  it by hand and comparing it to the results for
19  the software?
20       A.  Yes.
21       Q.  Is that what you said?
22       A.  Yes.
23       Q.  But you'd agree, wouldn't you, that
24  the software is only as good as the
25  information that's input into the software?

Page 44

1        A.  Of course.
2        Q.  And in preparing claims using the
3   software, it's critically important to input
4   accurate information relating to the claim
5   that you're adjusting relating to the property
6   that you're looking at?
7        A.  I would agree with that.
8        Q.  So you need to get the right
9   dimensions for the property; correct?
10       A.  Yes.
11       Q.  And you need to have the right
12  materials for the property; like for a home,
13  whether it's brick or if it's siding, you need
14  to have all of those correct inputs?
15       A.  Yes.
16       Q.  We're getting there.  But the next
17  entry on your employment listing is -- Well,
18  to go back, National Adjustors Academy, what
19  was the time period for that?
20       A.  That was a very short time period.
21  That would have been in -- That would have
22  been in 2006, somewhere in the early fall,
23  probably September.
24       Q.  And it was only for that short
25  period of time that you were teaching at

SCOTT H. TAYLOR                                February 9, 2012

Page 45

1    National Adjustors Academy?
2        A.  Yes.
3        Q.  So how many classes did you teach in
4    that period of time?
5        A.  Only one class in that -- in that
6    particular venue.
7        Q.  But have you taught this class in
8    other venues?
9        A.  Yes, I have.
10       Q.  How many times approximately?
11       A.  50.
12       Q.  In what other venues have you taught
13   this class?
14       A.  I have taught the class in, my
15   goodness, a lot of venues.  I have taught it
16   in hotels, I have taught it for conventions
17   for adjustors, I have taught it in insurance
18   carriers' offices.  I have taught it in
19   universities as a -- as a course that -- for
20   night training in -- in people that are doing
21   vocational rehabilitation.  So I've done it in
22   a lot of different venues.
23       Q.  So this is something you do as a
24   consultant?  That's one of the services you
25   offer as a consultant?

Page 46

1        A.  Yes.
2        Q.  That you can go teach this course --
3        A.  Yes.
4        Q.  -- anywhere, any time?
5        A.  Yes.
6        Q.  And are you still doing that?
7        A.  Yes.
8        Q.  Currently?
9        A.  Yes.
10       Q.  Part of this is my fault because I
11   don't finish my questions.
12       A.  I'm sorry.
13       Q.  Okay.  Next is American Integrity
14   Insurance.  Can you explain what you were
15   doing for American Integrity Insurance?
16       A.  American Integrity Insurance was a
17   new company in 2006.  They were an E and S
18   carrier for the -- in the state of Florida
19   and, as such, they were setting up their CAT
20   operations, catastrophe operations in Florida
21   for the first time and the claims manager was
22   a transplant from Fleming Hall Associates, or
23   Administrators, and the work I had done for
24   them at -- at -- captured their attention and
25   they had asked me to come in and consult with

Page 47

1    them on setting up their claim -- their CAT
2    operations and so that's what I did.  And I
3    taught their classes for the adjusting
4    services isolated with the issues that they
5    wanted to adjust for and had their software
6    prepared for that.
7        Q.  You said "E and S".  Just for the
8    record, what is that?
9        A.  Excess and surplus.
10       Q.  And were the courses that you were
11   teaching there the same courses that we were
12   just discussing?
13       A.  Virtually, yes.
14       Q.  Were there other courses that you
15   were teaching there?
16       A.  Well, because it's a five day course
17   that I wrote the book on it, there are
18   sub-courses within it and those are often what
19   I am asked to look into so that the -- so that
20   the client can choose and pick what they want
21   to address.  If they want to address the roles
22   of an adjustor or negotiate claims or if they
23   want to talk about dimensioning houses or how
24    -- how to go about working with interviews
25   and employments with insureds, but whatever it

Page 48

1    is.  There's different sub-courses and
2    sections in the book that they often will use
3    or they want to look at.
4        Q.  So overall it was the parts of the
5    same courses that --
6        A.  Part of the same courses.
7        Q.  -- you already described?
8        A.  Yes.
9        Q.  How long did you work with American
10   Integrity Insurance?
11       A.  Approximately three months.
12       Q.  And that was in 2006?
13       A.  2006.
14       Q.  The next listing is B3 Adjusting
15   Services.
16       A.  Uh-huh (affirmatively).
17       Q.  Can you describe what that is and
18   the work that you did for them?
19       A.  That was concurrent with American
20   Integrity and with the CAT claim operations in
21   New Orleans, all of that, as a
22   consulter/trainer.  That was my service.  And
23   that would have been the counterpart or
24   actually the -- actually what I am calling now
25   Scott Taylor Adjusting Services.  I found that

SCOTT H. TAYLOR                                    February 9, 2012

1  B3 was not a very -- a very productive word to
2  use for it, because it had to do with -- I
3  used B3 for three brothers that initially
4  started working years ago together and it
5  seemed to be obsolete at this point so I just
6  changed the name.
7      Q.  So B3 Services was your own company?
8      A.  Yes.
9      Q.  And that's now what you're calling
10 Scott Taylor --
11     A.  Adjusting Services.
12     Q.  -- Adjusting Services?
13     A.  Yes.
14     Q.  And then next is Advanced
15 Adjusting.  Can you describe what that is?
16     A.  Advanced Adjusting is a full service
17 independent adjusting firm that takes claims
18 from carriers and assigns adjustors to those
19 claims to evaluate damages.
20     Q.  And what were you -- It says here
21 you were vice president of operations.  What
22 were you doing for Advanced Adjusting?
23     A.  Well, Advanced Adjusting didn't come
24 about until the onset of the storms of 2005.
25 And, as a result, they had a lot of growth to

1  do and needed a lot of operations to be put in
2  place, and that's what I seemed to be good at
3  providing.  And they recognized that when they
4  had issued me claims during Rita.  And so they
5  had called me and asked me if I would be
6  willing to take over their operations and
7  training and some other things for them and
8  begin to build this database of adjustors and
9  staff them properly so they could become a
10 national company rather than just a storm
11 company.  Because a CAT company is restricted
12 to wherever the storms are, versus a national
13 daily claimant company can handle claims
14 throughout the year in varieties of locations.
15     Q.  And how long did you work for
16 Advanced Adjusting?
17     A.  From 2007 until 2010.
18     Q.  And again, this was concurrent with
19 your Scott Taylor Adjusting Services?
20     A.  Yes.  That -- Scott Taylor Adjusting
21 Services, you know, I activate it when I am
22 not busy and I can take time to do other
23 things.  So that's -- that's when it usually
24 gets in play.  And, for example, right now I
25 don't work for anybody else right now so it's

1  in full force.
2      Q.  And right now your full time work is
3  your work on this litigation?
4      A.  No, no, no.  No.  I have other
5  clients that I am working with as well.
6      Q.  But right now you're full time
7  working with Scott Taylor Adjusting Services?
8      A.  Yes.
9      Q.  And having gone through this list,
10 we started in 2005.  Is that when -- is 2005
11 when you started doing adjusting type work?
12     A.  That was when I started doing
13 insurance adjusting as an independent adjustor
14 and trainer, yes.
15     Q.  And going back to the first page of
16 Taylor Exhibit 11 and your work history, the
17 first listing is actually the ministry.
18     A.  Uh-huh (affirmatively).
19     Q.  Can you just tell me what period of
20 time that entailed?
21     A.  From 1984 through 2005.
22     Q.  And can you explain, can you tell us
23 why you stopped working in ministry?
24     A.  Teenagers.  My boys.
25     Q.  Your own or --

1      A.  My own.
2      Q.  -- the ones that you were
3  ministering to?
4      A.  Perhaps both.  I'm not sure.  No, my
5  boys were becoming older, my youngest was
6  coming up and getting older, and as they got
7  older, maintaining the ministry full time at
8  somewhat of a disadvantaged pay rate was not
9  meeting the needs of the family as well and I
10 needed to really be able to find something
11 that would take care of them a little bit
12 better.
13     Q.  And so at that point in time you
14 decided to change your focus?
15     A.  Changed focus.  I had always done
16 construction work for -- since -- since high
17 school.  So even when I was in ministry I was
18 always doing construction projects on the side
19 for people and any time necessary.  And in
20 ministry it's often necessary to supplement
21 your income because there just isn't enough of
22 it.  However, ministry became -- once you
23 become involved in it enough and you're full
24 time in it, you find that it's all-absorbing
25 in your time and you don't have time for many

JOHNS, PENDLETON COURT REPORTERS                  504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 53

1  more of these projects.  And so the further
2  along you go, the more that you find that if
3  you're going to stay in ministry, you're going
4  to have to give up an awful lot of ability to
5  take care of your family.  So I had to make a
6  choice at some point.
7       Q.  So you made that choice and decided
8  to leave the ministry and go back into, or to
9  work in construction and adjusting; is that
10 correct?
11      A.  Construction and adjusting.  I had
12 written estimates for so many years that
13 adjusting was a natural extension of that.
14 Because I have written estimates for remodels
15 and roofing and those kinds of things for
16 many, many years and that's -- as such, I was
17  -- I was fairly adept with it and understood
18 how to work with customers and my ministry
19 background was -- had prepared me to work with
20 people pretty closely.  So it was a natural
21 choice in directions to go.
22      Q.  In making the decision to go into
23 adjusting, what types of formal training did
24 you have to go through?
25      A.  The same training that I ended up

Page 54

1  providing later, was I found it necessary to
2  go through a nuts and bolts course of my own
3  which in many cases confirmed what I had
4  already known as a private contractor in
5  construction.  But in many cases it didn't.
6  It actually supplemented my knowledge
7  considerably.  I went through a five day
8  course on that, on the nuts and bolts of
9  adjusting, and found it extremely helpful.
10 Although it was antiquated, I found that part
11 of it actually helpful as well.  The fact that
12 old school and you had to know how to do
13 everything by hand and without the assistance
14 of technology, but when I -- when I developed
15 my own course, I bridged it to technology so
16 that it would -- it would become much more
17 current.  And so I did go through that
18 training, as well as a 40 hour licensing
19 course.
20      MS. WAGER-ZITO:
21      Go off the record for a second.
22      (Whereupon a discussion was held
23  off the record.)
24      (Recess.)
25 EXAMINATION BY MS. WAGER-ZITO:

Page 55

1       Q.  Let's go back on.  We were talking,
2  Mr. Taylor, about what you did to prepare
3  yourself to become an adjustor and we were
4  talking about this five day course you took.
5  When did you take this course?
6       A.  In 2005.
7       Q.  And other than this five day course
8  was there any other training that you took to
9  prepare yourself to be an adjustor?
10      A.  Initially, no.  Just the licensing
11 course that I mentioned earlier as well, which
12 is a 40 hour course that is required to get
13 your initial adjustor's license.
14      Q.  So the licensing course was a 40
15 hour course.  When did you take that?
16      A.  In 2005 also.
17      Q.  Any other courses?
18      A.  In the course of adjusting you tend
19 to take a lot of supplemental courses along
20 the way.  Every -- not every state -- Most
21 states require continuing education in order
22 to maintain your license, but you also find
23 that any time that there's a certain area that
24 you would like to have more specialized
25 training, you will pick up a course on that.

Page 56

1  Or if you want a further certification, you
2  can do that as well.  So I have taken several
3  other courses, and most of those are listed.
4       Q.  Most of those are listed?
5       A.  Below, under"Licenses/
6  Certifications/Training".
7       Q.  Is there anything, are there any
8  courses that you took that aren't listed
9  here?
10      A.  I'm certain there are probably some
11 I have taken.  I just don't recall any of them
12 at the moment.
13      Q.  So specifically there's nothing else
14 that you can recall?
15      A.  Not at this time, no.
16      Q.  And listed here are also licenses.
17 Are all of these licenses current?
18      A.  No.  There's no need to keep your
19 state licenses current if you're not going to
20 adjust in those states; and there is a fee
21 associated with that, and if you don't
22 anticipate needing to be there, then you let
23 it lapse until you do need it and then you
24 reactivate it.
25      Q.  Okay.  So can you tell me of the

14 (Pages 53 to 56)

SCOTT H. TAYLOR                                      February 9, 2012

Page 57

1   licenses that are listed here on page 2 of
2   Taylor Exhibit 11 which ones are current?
3       A.  The Florida license is current --
4   Actually, I would like to make a correction.
5   I have an additional license, and that's the
6   Louisiana state license.  I neglected to add
7   that to that.  And I do have that and I have
8   it with me if necessary, and it's current as
9   well.
10      Q.  It's not necessary.
11      A.  But I have the Florida license, the
12  South Car- -- not the South Carolina.  The
13  NFIP flood license is current and my Louisiana
14  license is current.
15      Q.  When did you first get licensed in
16  Louisiana?
17      A.  Approximately a year ago.  It was --
18  I don't recall exactly when it was, but the
19  licensing procedures were different during
20  Katrina than they are now.  They didn't even
21  have a license available.  There wasn't a
22  Louisiana adjustor's license program during
23  Katrina.  And I believe Katrina actually
24  spawned it.
25      Q.  Now, is the licensing in different

Page 58

1   states dependent on your initial license?  Do
2   you have to get licensed in one state and then
3   you have reciprocity in other states?  Is that
4   how it works in adjusting?
5       A.  Largely that's true.  Now, there is
6   a part of what I do in training is try to sort
7   through that for adjustors that are trying to
8   get licensed in different areas, and there are
9   tables that I have prepared in the past that
10  show which states are reciprocal with other
11  states and what's in addition -- additional
12  requirements in this state if you want a
13  license versus that state.  And so your answer
14  is yes, there are -- there is reciprocity in
15  many cases.  Not in all cases, but in many
16  cases.
17      Q.  Now, your Louisiana state license,
18  were you able to obtain that via reciprocity
19  with another state?
20      A.  Yes, I was.
21      Q.  And which state was that?
22      A.  At the time it was South Carolina
23  because I was still living in South Carolina
24  at the time.  I still had my resident
25  adjustor's license current there at the time

Page 59

1   and that's -- they go to a resident license to
2   get that.
3       Q.  So in order to get your initial
4   license, where was your initial license?
5       A.  My initial license was in Texas.
6       Q.  And did you have to take the 40 hour
7   licensing course to get your license in
8   Texas?  Is that how it worked?
9       A.  Yes.
10      Q.  And then from that course or from
11  that Texas license you were then able to get
12  licensed in these other states?
13      A.  In many of the other states.
14  However, Texas was the target state for me
15  because after research and discussing with
16  insurance professionals around the country, it
17  was determined that Texas held the strongest
18  license and had the most reciprocity with it
19  and so, therefore, because it was considered
20  to be the most recognized license in the
21  country, that's where I went to get it.  So I
22  went there, got that, and then later when I
23  began adjusting residential claims in South
24  Carolina I had to get a license there as
25  well.  However, they are not reciprocal to

Page 60

1   Texas if it's a residence license, so I had to
2   actually start all over in South Carolina.
3       Q.  And what did you have to do in South
4   Carolina?  Did you have to take another
5   course?
6       A.  Another 40 hour course, yes.
7       Q.  What did you have to do to get your
8   license in Louisiana?
9       A.  It was purely reciprocal.  It was
10  all done through reciprocity.
11      Q.  So do you, other than what we have
12  discussed and what's listed here, do you have
13  any other licenses?
14      A.  No, ma'am.
15      Q.  And underneath the licenses you also
16  have the "Other training and qualifications"
17  listed.  Have you done any other training that
18  you believe is relevant to the adjusting work
19  that you're doing?
20      A.  Yes.  I've been actually a
21  consultant with Xactimate at times concerning
22  their software.  As an end user, they -- they
23  often consult with end users that seem to have
24  a grasp of some of the more advanced functions
25  and I'm -- I'm given opportunities to review

                              15 (Pages 57 to 60)

SCOTT H. TAYLOR                                    February 9, 2012

Page 61

1    beta copies of new advances.  And so they ask
2    for my review prior to putting out new
3    editions at times.  And I have been to Salt
4    Lake City twice to consult with their
5    corporate headquarters on some of these
6    issues, particularly in flood.
7        Q.  How much of your time has been spent
8    since Katrina on Katrina-related work?
9        A.  I'm not sure if that's specific
10   enough for me to drill down to an answer on
11   that.  But I don't -- Maybe you could put it
12   in more specific context.
13       Q.  Just in terms of percentage of your
14   time.  How much of your time has been spent
15   working on Katrina work-related versus other
16   issues?
17       A.  That would really be hard for me to
18   say.  I have worked full time for two
19   different companies that actually had me on
20   their books for several years, so, you know,
21   during those times not very much time was
22   spent on Katrina.  I have returned to Katrina
23   work when asked to by whatever various groups,
24   but for the most part, you know, I don't -- I
25   don't make it a part of my bread and butter,

Page 62

1    you know.  It's not the ongoing income that I
2    have.
3        Q.  We talked earlier about appraisals
4    and you said you had done thousands of
5    appraisals, I think.  Am I misstating your
6    testimony?
7        A.  Well, it depends on how you're
8    defining "appraisal".  You know, if we're
9    talking about coming up with a total valuation
10   of a home from, say, a mortgage company
11   standpoint, then no, that's not what I have
12   done.  But appraising damages, that's a
13   different matter.  So yes, I have done
14   thousands of appraisals when it comes to
15   damages estimates.
16       Q.  And earlier when I was discussing
17   appraisals, and this is my fault, I wasn't
18   being clear, I was talking about appraising a
19   home for purposes of determining the value of
20   a home as opposed to appraising it for
21   purposes of damages.  Have you ever done
22   appraisal work for determination of a value of
23   a home?
24       A.  Yes.
25       Q.  And in what connection did you do

Page 63

1    that type of work?
2        A.  In connection with insurance
3    claims.  Many times the underwriters are
4    asking us as an additional service to provide
5    a valuation of the home to determine whether
6    it's insured to value or not.
7        Q.  Are you a licensed appraiser in any
8    state?
9        A.  My adjusting license qualifies me as
10   an appraiser for an insurance company as --
11   for that purpose.  But only for that purpose.
12       Q.  So not for mortgage companies or
13   banks or --
14       A.  Not for lending.
15       Q.  Okay.  And how would you describe
16   the difference between appraising a property
17   versus adjusting a property?
18       A.  For damages, it's basically the
19   same.  So if I am looking at damages, then I
20   am appraising damages or I'm adjusting damages
21   and it's -- the terms are interchangeable in
22   that regard.
23       Q.  When were you first retained to do
24   the work that you did in this case, in the
25   Katrina canal breaches litigation?

Page 64

1        A.  You know, I don't recall exactly
2    when that was.  It was prior to the Robinson
3    case that I was involved in previously.  So I
4    don't know exactly when that was.  It's all a
5    matter of record I'm sure.
6        Q.  When were you first retained to do
7    the work that you did for purposes of the case
8    that we're here for today?  We'll call it the
9    MRGO case as opposed to the Robinson case.
10       A.  I know that in the Robinson case,
11   upon finishing that, it was -- it was
12   discussed that there would probably be other
13   cases that spin off of it or work from that
14   because it is a large class action overall and
15   that there may be other -- other things that
16   come from that.  So I was aware then that
17   there might be further work to do and I would
18   have presumed that they wouldn't want to
19   change horses, so to speak, by starting all
20   over with different appraisers, different
21   experts.
22       Q.  And it's a legal issue, but it's not
23   in fact a class action, but --
24       A.  I'm sorry.
25       Q.  -- that's okay.  That's not

SCOTT H. TAYLOR                                         February 9, 2012

Page 65

1  necessarily something that you should be too
2  concerned about.
3        When were you first asked to do
4  the work that you did in connection with the
5  five properties that we're here to talk about
6  today?
7        A.  I really can't recall exactly when
8  that was.
9        Q.  And we looked at the reports and we
10 marked them before; the initial reports are
11 all dated in July of 2011.  How much prior to
12 that were you asked to work on those reports?
13       A.  Well, I'm certain it would have been
14 at least a couple of months, because it takes
15 that long to produce those initial ones when
16 you -- when you're not on site all the time,
17 and it's especially the longer period of time
18 since the actual damages, the long -- the
19 longer and more difficult it is to protract
20 the information.  So it does take longer.  So
21 I don't know exactly when, but it would have
22 been sometime in the spring of 2011.
23       Q.  Do you have any records that would
24 reflect when you were first retained?
25       A.  I'm certain I have some emails that

Page 66

1  I could find that -- Let me think back.  I
2  remember getting a call from Jon Andry while I
3  was in -- in my office in Fort Lauderdale when
4  I was still working with Totura and Company
5  and they called me there.  But I just don't --
6  don't remember exactly when that was.  That
7  would have been the onset of it at that
8  point.
9        Q.  And you said there was probably
10 emails.  Do you know if there are emails?
11       A.  No, I don't for certain.
12       MR. THATCH:
13           If there are any emails, we would
14       ask that they be produced.
15       MR. PALMINTIER:
16           To the extent that there are, we
17       will produce them.
18 EXAMINATION BY MR. THATCH:
19       Q.  Do you recall there being any email
20 traffic with regard to what they were asking
21 you to do in this case, or giving you the
22 addresses or anything like that?
23       A.  No.  That was not done through
24 email.  It was only done after -- after I came
25 here.  So I had no idea where these properties

Page 67

1  would be.
2        Q.  And do you have any bills that might
3  reflect when you first started working on this
4  case?
5        A.  I'm certain I can produce an invoice
6  from when I turned my invoices in.  But
7  isolating the exact date that they asked me to
8  do it is -- I am not certain.  I am not
9  certain if I can or not.
10       Q.  And I am not really trying to get an
11 exact date.  I am really trying to get at, you
12 know, when you did first start working on
13 this, how much time did you spend on these
14 reports --
15       A.  Uh-huh (affirmatively).
16       Q.  -- and anything you can recall along
17 those lines.
18       A.  Uh-huh (affirmatively).  So I, you
19 know, again, I -- I can't tell you exactly
20 when.  I know that it would have been sometime
21 in the spring and I worked on and off on those
22 reports for several -- for at least a couple
23 of months I'm certain.  So there was -- there
24 was a good bit of time.  And it required some
25 consulting back and forth and phone calls and

Page 68

1  questions asked and one thing and another.
2  There was a lot of time involved in it.  So it
3  did take -- it took some time.  And sometimes
4  it takes a while to get your answers, too, so
5  you ask a question, maybe weeks later you get
6  an answer on it.  So you've got some delays,
7  you know.
8        Q.  I won't comment on that.  But I do
9  want to ask you about who did you first speak
10 with about doing work on the properties that
11 we're talking about today?
12       A.  Jon Andry.
13       Q.  And to the best you can recall, what
14 were you told by Mr. Andry about what you were
15 going to be doing?
16       A.  I would be looking at damages on
17 four or five -- four or five homes they said,
18 four different Plaintiffs, and it would be
19 similar to the same thing that was done in the
20 Robinson case.
21       Q.  And when you say similar to the same
22 thing that was done in the Robinson case, what
23 did that mean to you?
24       A.  Looking at homes that had been
25 damaged by flood and determining what those

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

SCOTT H. TAYLOR                                          February 9, 2012

Page 69

1   damages were.
2        Q.  Did you discuss any assumptions that
3   the lawyers were asking you to make in
4   connection with the work that you were doing?
5        A.  No.
6        Q.  For example, were you asked to
7   assume that all the damage was caused by
8   flood?
9        A.  No, I wasn't asked to assume
10  anything.  I think that the -- that one of the
11  reasons that they contacted me before and
12  presently for this case was that they knew
13  that I could make an independent evaluation of
14  things and that I would be able to produce an
15  opinion about what the cause was.
16       Q.  Other than Jon Andry, who else did
17  you speak with about doing this work from the
18  lawyers?
19       A.  I have spoken with a variety of
20  people in the offices when I got there.  I
21  spoke with Michelle Perchner about making
22  arrangements to come out.  And upon arrival I
23  began speaking with Josh Palmintier.  I had
24  not met him up to that point, but -- and, you
25  know, I -- I can't recall anybody specifically

Page 70

1   other than some of the administrative staff I
2   might have talked with.
3        Q.  And with regard to your
4   conversations with Josh, how many
5   conversations did you have about this work?
6        A.  That's hard to say.  I've had
7   conversations with him ongoing since -- since
8   arriving to look at the homes.  So I don't --
9   I don't recall how many conversations.  I
10  couldn't tell you.
11       Q.  In those conversations were you
12  asked to -- were you given any assumptions
13  that you were to rely upon in connection with
14  the work that you were doing?
15       A.  Again, I'm not sure --
16       MR. PALMINTIER:
17            Object.  Object to form.  Vague.
18       THE WITNESS:
19            Well, that was my concern.  It
20       seemed a bit vague as to what
21       assumptions are we discussing?  I'm
22       not sure what the -- what the --
23  EXAMINATION BY MR. THATCH:
24       Q.  Were you told anything about how to
25  -- what the correct measure of damages would

Page 71

1   be in this case?
2        A.  No.  No.  I think that's why they
3   wanted -- they want me here, is to determine
4   what the measure of damages are.  Not -- Not
5   to presume upon anything.
6        Q.  You're not a lawyer; correct?
7        A.  No.  Do I sound like one?
8        Q.  Again, no comment.
9            You're not going to be issuing any
10  opinions in this case with regard to what the
11  correct measure of damages would be for these
12  particular Plaintiffs; correct?
13       A.  As far as I know, I have not been
14  asked to do so.
15       Q.  And you're not qualified to give an
16  opinion on the correct measure of damages?
17       MR. PALMINTIER:
18            Object to form.
19       THE WITNESS:
20            Well, I'm not sure that I am not
21       qualified to give an opinion.  I have
22       done so many of these homes that have
23       been damaged by hurricanes, and
24       Katrina and other things, that I have
25       an opinion and I think it's valid.

Page 72

1   EXAMINATION BY MR. THATCH:
2        Q.  And I am sorry, the question was
3   probably confusing.  By "measure of damages" I
4   don't mean amounts of damages versus -- you
5   know, for repair versus rebuilding or anything
6   along those lines.  Are you qualified to give
7   an opinion as to what the correct measure of
8   damages would be, again, whether it should be
9   repair versus rebuild versus some other
10  measure?
11       A.  I think I'm qualified to give an
12  opinion, yes.  If that's the question, I'm
13  qualified to give an opinion based on the
14  experience that I've had and the resolve --
15  the resolution of those experiences, you
16  know.  When something is turned in and it's
17  accepted by both parties as valid, then it
18  seems to me that that builds some credibility
19  as to your opinion.
20       Q.  And I think the important point
21  there would be "accepted by both parties".
22  You understand that your opinions are not
23  accepted by both parties in this case;
24  correct?
25       A.  Oh, I'm certain they're not.

                              18 (Pages 69 to 72)

JOHNS, PENDLETON COURT REPORTERS              504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 73

1     Q.  And that ultimately it will be the
2  Judge who decides which of the experts'
3  opinions should be accepted in this case.
4     A.  Absolutely, I understand.
5     Q.  I want you to take a look again at
6  Taylor Exhibit 11, which is your C.V. and if
7  you can look at the last page, which is the
8  fee schedule.
9     A.  Uh-huh (affirmatively).
10     Q.  Is it correct, Mr. Taylor, that
11  ultimately the higher the damages are in this
12  case, the higher your fee will be?
13     A.  No.  That is not true.  Mainly
14  because when they asked for a fee schedule, I
15  provided for them this initially as an example
16  of how this is done for insurance purposes.
17  Because the vast majority of my work is for
18  insurance companies doing claims work.  And,
19  as a result, the tendency and the nature of an
20  insurance company is to pay a flat fee based
21  on the damages.  I gave them samples of that
22  and that is what I gave them to show them this
23  is what is generally used as a measure.  And
24  these -- those are flat fees, and what you
25  assessed -- what you said a moment ago was

Page 74

1  actually true about this particular document,
2  but this isn't what we accepted in the end as
3  my method of payment and the way I would be
4  paid.
5     Q.  Okay.  So the document that's
6  attached to Taylor Exhibit 11 is incorrect
7  when it comes to your fees?
8     A.  When it comes to what I am actually
9  going to be paid, this is incorrect.  Because
10  I am not being paid on a percentage basis or
11  on a damage assessed percentage or flat fee on
12  this.
13     Q.  So can you tell us how you are being
14  paid if this is not correct?
15     A.  For everything up to this point, it
16  has been on a report basis, a per report
17  basis, and which was assessed on my own time
18  and expense involved in putting those
19  together.
20     Q.  And going forward how are you going
21  to be paid?
22     A.  It will all be time and expense.
23     Q.  So I just want to make this
24  perfectly clear.  Your fees are in no way
25  connected to the amounts of appraised damages

Page 75

1  in the reports?  Is that correct?
2     A.  That's correct.
3     Q.  Is there another document that we
4  should be looking at that would reflect your
5  fees since this one is incorrect?
6     A.  You could look at the paid invoice
7  that was paid to me for these reports.
8     Q.  Would this document be correct if we
9  just took out the "Range of damages" and
10  "Associated fee schedule per property", the
11  boxes that --
12     A.  If it was replaced with the -- If
13  that portion was replaced with the report
14  fees, yes.
15     Q.  Well, tell me again.  Maybe I am
16  just getting confused here.  The report fees
17  were done on an hourly basis?
18     A.  On a time and expense basis.
19     Q.  Would that fall into the some extent
20  as the phase 1 activities that are described?
21     A.  Yes.
22     Q.  So it says there "Reports will be
23  written after the initial trip --"
24     A.  Yes.
25     Q.  "-- and will be charged according to

Page 76

1  the attached schedule".
2     A.  Yes, that's correct.
3     Q.  So we should take out "will be
4  charged according to the attached schedule";
5  correct?
6     A.  Yes.
7     Q.  And replace that with what?
8     A.  The actual invoice that I turned in,
9  which was a time and expense for each report.
10     Q.  Okay.  But you don't have that
11  agreement in writing anywhere?
12     A.  I have an invoice that was paid.
13     Q.  No, I understand that.  But just an
14  overall in general applicable to this -- to
15  all your work on this case, you don't have a
16  single document, or you don't have it written
17  down in one place?
18     A.  Only the -- Well, only the invoice
19  that I sent and the one that they paid.
20     Q.  Have you only sent one invoice?
21     A.  There's only been one to date and it
22  was for phase 1.  Yes.
23     Q.  Does that reflect how many hours
24  that you spent?
25     A.  It's not broken out, no.

SCOTT H. TAYLOR                                    February 9, 2012

Page 77

1      Q.  But in total does it reflect how
2   many hours that you have spent, that you spent
3   in preparing the reports in this case?
4      A.  No.  What I gave them was a report
5   fee that was based on the complexity of each
6   report.  And the more complex it became, the
7   more -- because it was -- it was not
8   determined until after this initial -- this
9   initial statement that you see here was sent
10  that they did not want to pay on the basis of
11  a flat fee because it seemed to be a conflict
12  of interest.  So, therefore, I had to revise
13  what I was going to do in terms of I was going
14  to have to do it on a complexity basis and on
15  a report basis.  And so once that was
16  determined, I had to -- I had to -- I had to
17  just determine which ones took more time and
18  which ones were more complex and I compared
19  them in my experience to the kinds of expert
20  fees that I had to pay as a claims manager for
21  everything from engineers to mitigation
22  experts to whoever that I was actually subbing
23  work out from -- to as a claims manager, and
24  it seemed very consistent with the -- just
25  charged the same fees that I was seeing that I

Page 78

1   am used to having to acknowledge and pay as
2   part of our claims.
3      Q.  So now I am really getting
4   confused.  So it wasn't based upon time and
5   expense?
6      A.  It is.  It's based on time.  Mostly
7   time.  And the problem is, is that when you
8   have already done a good bit of it, you
9   haven't documented every moment that you spent
10  when you have to go back and then go back and
11  say, well, how much time did that take.  And
12  then rather than doing it on figuring out the
13  exact number of hours, I looked at the
14  complexity of it and the amount of pages
15  involved in it.  And when you look at the
16  amount of pages and you figure up this must
17  take this amount of time to do that,
18  therefore, you -- you just base it on that.
19  And so the invoice is the invoice.  It's got
20  -- For example, the Armstrong one is going to
21  be higher than, say, the first Washington, you
22  know, or whatever, because it's got -- that is
23  more involved in getting it done.  It took
24  longer to go through everything.  It took --
25  There were more photos.  You know, just those

Page 79

1   kind of things.  I just got more involved.
2      Q.  Okay.  So when you started your work
3   on this case --
4      A.  Uh-huh (affirmatively).
5      Q.  -- you believed you were going to be
6   working under this fee schedule?  Is that
7   accurate?
8      A.  Initially that was -- that was the
9   way that I presented it to them and it was
10  never discussed, because I had already done
11  some work for them in the past and I don't
12  even recall how it was billed the first time.
13  I don't recall that at all.  And so I just
14  gave them a normal approach to doing appraisal
15  work in insurance because that's what I had to
16  go by.  That's usually what I went by for
17  this.
18      Q.  So you can't recall in Robinson if
19  the fee schedule was used or not?
20      A.  I can't recall exactly how that was
21  done.
22      Q.  But at some point in time it was
23  determined that you wouldn't be using the fee
24  schedule?
25      A.  Right.

Page 80

1      Q.  But that was after you had already
2   started working?
3      A.  I had already started working and I
4   wasn't -- but I wasn't finished either, you
5   know.  I was in the midst of it and I had to
6   change directions because I agreed with them.
7   I thought, well, you know, if this is a matter
8   of awards, I don't want to be associated with
9   percentages of awards.
10      Q.  Do you recall any conversations that
11  you had with any of the Plaintiffs' lawyers
12  about the fact that it would be inappropriate
13  to use a fee schedule?
14      A.  Yes.  Yes.
15      Q.  What do you recall about those
16  conversations?
17      A.  That -- Exactly what you said.  It
18  might be inappropriate to use a fee schedule
19  because it would seem like a conflict.
20      Q.  And who were those conversations
21  with, if you recall?
22      A.  Jon Andry.
23      Q.  Were you ever told that it was
24  actually a violation of Louisiana law to use a
25  contingency fee basis for your work?

20  (Pages 77 to 80)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 81

1        MR. PALMINTIER:
2        I object to form.
3      THE WITNESS:
4        I don't ever recall having a
5      discussion with Jon Andry about
6      anything that was in violation of
7      anything.
8    EXAMINATION BY MS. WAGER-ZITO:
9      Q.  Other than the work that you've done
10   as an adjustor in Louisiana, have you done any
11   other contracting work in Louisiana?  Roofing,
12   any of the type of construction work that you
13   talked about doing earlier?
14     A.  The closest thing to that would have
15   been with Royal Restoration, and in that
16   regard I was functioning both as a -- as an
17   adjustor for them and as a consultant as to,
18   you know, the time and materials it would take
19   to produce their -- their construction
20   projects.  So that's the closest to any real
21   construction.  But I was never actually
22   involved in the actual construction.
23     Q.  So that was more preparing bids for
24   work?
25     A.  For -- In terms of in Louisiana,

Page 82

1    yes.
2      Q.  And did that work that you were
3    doing require a Louisiana state license?
4      A.  No.
5      Q.  Okay.  We finally come to actually
6    talking about some of the individual
7    Plaintiffs.  So if you can pull out of -- And
8    you can put this document away.
9          If you can pull out of the
10   exhibits that we gave you earlier the
11   exhibiting relating to the Armstrong property,
12   which I believe are Exhibits 1 and 2.  They're
13   the only ones I am going to get to.  After we
14   go off of 1 and 2 I'm going to lose my train
15   --
16       MR. PALMINTIER:
17       So which ones?
18     MS. LONIAN:
19       1 and 2.
20       MR. PALMINTIER:
21       Got you.
22   EXAMINATION BY MS. WAGER-ZITO:
23     Q.  And for the most part we're going to
24   be talking about the revised report.  But
25   there may be some questions on 1 as well.  So

Page 83

1    if you can pull those out.  And if you can
2    tell me, do you recall how long it took you to
3    prepare the Armstrong reports?
4      A.  No.  No.  No, not precisely.
5      Q.  Can you give me any estimate at all
6    as to how much time it took you?
7      A.  Oh, possibly up to 40 to 50 hours
8    possibly.
9      Q.  40 to 50 hours --
10     A.  Over the course of a couple of
11   months, yeah.
12     Q.  That's where it's dangerous to
13   answer my question before I ask it.
14     A.  I'm sorry.
15     Q.  40 to 50 hours for both reports, for
16   Exhibit 1 and for Exhibit 2?
17       MR. PALMINTIER:
18       Listen, make sure you're not
19       guessing.  We don't want you to guess
20       here.  Okay?
21       THE WITNESS:
22       Well, if you want a precise
23       answer, then, no, I don't recall.
24   EXAMINATION BY MS. WAGER-ZITO:
25     Q.  And your Counsel is right that

Page 84

1    ordinarily we do not ask you to guess or allow
2    you to guess, but I am just trying to get your
3    best time, and I completely understand it's
4    your best estimate, but that it was 40 to 50
5    hours for both reports?
6      A.  Yes.
7      Q.  Okay.  Did anyone assist you in the
8    preparation of the Armstrong reports?
9      A.  Not directly, no.
10     Q.  Indirectly?
11     A.  I have to rely on questions that I
12   ask of people.  You know, I have to consult
13   with people to get the answers that I am
14   looking for.  So yes, I have to make phone
15   calls constantly and I have -- and I'll try to
16   reach people and find out what they --
17   different answers.  If I run into a question
18   that I can't answer when I am putting it
19   together, then I'll make phone calls.  So yes,
20   I have to -- I have to rely on those people
21   that know the answers when I -- when I don't
22   have them.
23     Q.  Okay.  And now I am talking
24   specifically about the Armstrong reports.
25     A.  Uh-huh (affirmatively).

21 (Pages 81 to 84)

SCOTT H. TAYLOR                                    February 9, 2012

Page 85

1    Q.  In connection with actually drafting
2  the reports, did you draft the reports
3  yourself?
4    A.  Yes.
5    Q.  Did you have any assistance in
6  drafting the reports?
7    A.  No.
8    Q.  Did Counsel provide any comments on
9  the reports?
10    A.  Certainly we discussed them.  Yes.
11    Q.  Did you make any changes to the
12  reports as a result of your discussions with
13  Counsel?
14    A.  It seems evident when I have two
15  copies of it in front of me that we did, we
16  certainly did.  We made revisions as needed.
17  Sometimes if there are -- if there were
18  corrections needed, I'm perfectly willing to
19  make them, because I want it to be accurate.
20    Q.  Do you recall any corrections that
21  you made to the original report, Exhibit 1, as
22  a result of conversations with Counsel?
23    A.  I don't know the precise changes
24  that were made in that one at this time.  I am
25  certain that we can discover the differences

Page 86

1  as we look forward.
2    Q.  That wasn't my question, and I am
3  sorry if it was confusing.  Now I am just
4  talking about when you prepared Exhibit 1 --
5    A.  Uh-huh (affirmatively).
6    Q.  -- and you submitted that and it's
7  actually labeled "Final report", so you
8  believed it to be final at the time.  In
9  connection with putting that report together,
10  do you recall any conversations with Counsel
11  that caused you to make any particular changes
12  to Exhibit 1?
13      MR. PALMINTIER:
14      I object to the form just in that
15    -- what type of conversations with
16    Counsel I guess is that?
17  EXAMINATION BY MS. WAGER-ZITO:
18    Q.  Well, if you understand the question
19  --
20      MR. PALMINTIER:
21      You can answer.
22  EXAMINATION BY MS. WAGER-ZITO:
23    Q.  -- you can answer.  Because that's
24  exactly what my question is.  What did you do
25  to the report as a result of any conversations

Page 87

1  you may have had with Counsel?
2    A.  I think, and I don't recall
3  precisely, but there was a phone call or two
4  that came from Counsel, and I am not even sure
5  which Counsel, because there were so many
6  different ones involved --
7    Q.  We have that problem, too.
8    A.  That's exactly -- that -- whereby
9  they said, "Well, you used the wrong word
10  here" or this is -- this is -- or there's a
11  spelling error or there were some things like
12  that that they wanted to isolate -- They
13  wanted it to be clean, you know, and there had
14  to be some corrections made.  As far as
15  overall content, it was -- it was pretty close
16  initially, you know, when I turned it in.  So
17  there weren't a lot of changes.
18    Q.  And I really was getting towards
19  content as opposed to typos or ministerial
20  issues with it.
21    A.  Uh-huh (affirmatively).
22    Q.  Can you recall any more substantive
23  comments that were made by Counsel saying "You
24  just got this wrong"?
25    A.  Not -- I don't recall any specific

Page 88

1  details of anything substantive that was
2  changed.
3    Q.  And when I originally asked you the
4  question, did anyone assist you in the
5  preparation of the reports, you said you would
6  make phone calls to people if you needed
7  information.  Can you tell me in connection
8  with the preparation of the Armstrong report
9  who you would have spoken with along those
10  lines, who you would have consulted with, if
11  anyone?
12    A.  Generally I would go through Counsel
13  to do that, because once I had finished with
14  my initial assessment on site, then any -- I
15  understood that any changes or any additional
16  information could be gotten through the
17  Counsel and so that was my first recourse
18  because I knew they were in touch with the
19  individual Plaintiffs on a regular basis; and
20  if I needed something that was to be provided
21  by a Plaintiff, for example, then I would call
22  Counsel to see if they had it and if they
23  could get it to me.
24    Q.  And again, I want to talk
25  specifically about the Washington report.

22 (Pages 85 to 88)

SCOTT H. TAYLOR                                    February 9, 2012

Page 89

1        MR. PALMINTIER:
2            Armstrong.
3    EXAMINATION BY MS. WAGER-ZITO:
4        Q.  Armstrong report.  Do you recall any
5    conversations or working with any consultants
6    on the Armstrong report to get answers to
7    questions?
8        A.  Not after the initial meetings that
9    we had.
10       Q.  And what initial meetings did you
11   have?
12       A.  I met with Counsel concerning the
13   losses.  I met with the Armstrongs at their
14   present -- I guess it's present.  I don't know
15   if it's still present or not -- location, and
16   discussed the loss with them extensively.
17       Q.  Okay.  And let's take them one at a
18   time.  What did Counsel tell you about the
19   loss to the Armstrongs?
20       A.  They gave me the location of it, of
21   the original one, and the names and contact
22   numbers for the Armstrongs where they were
23   currently, and for the most part they allowed
24   me to do the -- to do the investigation of it
25   and relied on me to determine what was

Page 90

1    necessary and what to ask and discuss with the
2    Armstrongs.  You know, a lot of -- but it was
3    -- My -- My work was restricted to damages.
4    So the circumstances of the loss and other
5    periphery were not really the main germane
6    things to what I was doing.  I was to deal
7    with the damages, and I pretty -- I pretty
8    well restricted it to those kinds of
9    questions.
10       Q.  Do you recall any other
11   conversations with Counsel about the Armstrong
12   report?
13       A.  I don't recall any specific ones,
14   no.
15       Q.  And now let's talk about your
16   contact with the Armstrongs.
17       A.  Uh-huh (affirmatively).
18       Q.  What do you recall about discussions
19   with them in particular?
20       A.  In particular?  I couldn't -- I
21   could go on for a while about the
22   conversations, I'm sure, but there wasn't
23   anything that was particularly unique in their
24   situation versus any other ones that I have
25   dealt with in the past.  So it doesn't jump

Page 91

1    out as extremely different from a lot of other
2    situations with Katrina.  I discussed with
3    them the things that I always discuss with
4    someone when I am evaluating a loss, and that
5    is what was the house like before, what did it
6    seem like, what did you notice happening and
7    how did it happen and what's going on with
8    this, so that I can get an idea of the nature
9    of the damages; and is the house still there,
10   is it livable, those kinds of questions.  A
11   lot of those kind of questions and I just go
12   through a mental checklist of the kind of
13   things that would be true in a case where a
14   lot of water was in a house.  And as I went
15   through, nothing jumped out at me at that time
16   as particularly different.  I'm not really
17   sure exactly, you know, contextually what you
18   are looking for, so I would be willing to
19   answer specific questions about that.
20       Q.  Well, how much time did you spend
21   with the Armstrongs?
22       A.  It was --
23       Q.  Approximately.
24       A.  I would -- I would say it was
25   certainly several hours, because I do recall

Page 92

1    that they were -- they had a lot of things
2    that they wanted to talk about.  I do recall
3    that.  They had -- They had a lot of issues
4    with their property that they wanted to go
5    over.  What I find to be true in almost every
6    case is that the vast majority of what you
7    need from them comes out in the conversation
8    and if you try to circumvent their story, that
9    you never get.  So you have to let them tell
10   their story; and when they tell their story
11   you start pulling the pieces out that you need
12   in order to assess what you need.  And as an
13   insurance adjustor, that's one of the critical
14   things that you do in dealing with damages.
15   The story always produces the damages.  If not
16   the actual physical evidence that's left, it's
17   a combination of that and the story.  And it's
18   whatever they remember.  But when you start
19   prodding them about the circumstances of it,
20   that's when they start remembering details and
21   suddenly you start getting more of the damages
22   as a result of that.  So you have to let them
23   tell you what happened and how it happened.
24   So it took a good while.
25       Q.  And you believe several hours?

23 (Pages 89 to 92)

JOHNS, PENDLETON COURT REPORTERS            504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

1       A.  (Witness nods head affirmatively.)
2       Q.  How many times did you meet with
3   them?
4       A.  Once.
5       Q.  So one occasion.  Did you have any
6   subsequent contact with them, phone calls?
7       A.  Not directly.  Only through
8   Counsel.
9       Q.  And what did that entail?  Did you
10   have a question for them that you would call
11   Counsel and say, "Could you ask the Armstrongs
12   X"?
13       A.  I don't recall anything specific,
14   because by the time I had everything that I
15   gathered, I was able to begin to piece
16   together some things as to the physical
17   damages.  And once I had finished what I
18   needed there, mostly what I needed was
19   contents.  I needed some information on
20   contents and I needed them to provide that.
21   But I went through Counsel on that.
22       Q.  So do you in fact recall having some
23   questions for the Armstrongs regarding their
24   contents that you ran through Counsel to get
25   the answers to?

1       A.  Not specifically that I asked about
2   it after the fact.  On site I always give an
3   overview with the -- with the homeowners in
4   the situations like this as to what kinds of
5   contents that they should be considering and
6   actually getting those documented, and I go
7   through a list of things that they should do
8   in order to do that.  And apparently it took
9   quite some time for them to do that in the
10   Armstrong case, because they produced a list
11   that was more complete than most of the others
12   had completed.  So it seems they followed
13   instructions fairly well in regards to that;
14   that they went through an awful lot of things
15   in order to get -- to come up with their
16   list.
17       Q.  Were you aware at the time that you
18   met with them that they had already filed some
19   insurance claims and had prepared previous
20   contents lists?
21       A.  I wasn't entirely void -- I would
22   have presumed that they would have had some
23   insurance and then dealt with the insurance.
24   But it's always been my practice that in
25   assessing damages, that I do it

1   independently.  And so I don't ask people to
2   provide me -- unless I am working for a
3   carrier that that would create an issue for, I
4   would not ask for them to produce anything to
5   show me any previous damages, previously
6   assessed damages.  Part of the reason for
7   this, and it's part of what I actually teach
8   other adjustors to do, is you need to write
9   your own estimate; don't look at somebody
10   else's and then write yours.
11       Q.  Do you have a written list that you
12   give to people when you're asking them to
13   prepare their contents list?
14       A.  I don't.  I usually give them a
15   spreadsheet graph, it's a blank, and I explain
16   to them how to go through it and what to list.
17       Q.  And you say "usually".  Did you in
18   fact give the Armstrongs one of these graphs
19   to fill out?
20       A.  I think I did.  I don't recall for
21   certain, but I believe I did.  Because it's my
22   practice to do that.
23       Q.  And is that attached to your
24   report?
25       A.  My version of the output is, yes.  I

1   used the same one for producing my end
2   result.  That's why I asked them -- That's why
3   I give them a blank of that, so that I am
4   looking at the same thing.
5       Q.  We'll mark the next exhibit.  It's
6   Exhibit 12.
7       A.  If you don't mind, I need to take a
8   break for a second.
9       Q.  Oh, absolutely.
10       (Recess.)
11   EXAMINATION BY MS. WAGER-ZITO:
12       Q.  Ready?  Mr. Taylor, we just handed
13   you a document that's marked Taylor Exhibit
14   12.  Have you seen this before?
15       A.  No, I have not.
16       Q.  So I take it by that answer that
17   this is not the document that you were
18   discussing that you give to clients to help
19   them prepare their listing of their contents?
20       A.  That's not entirely true either.  It
21   is the same form that I give them.  However,
22   again, I did not receive this one back so I
23   didn't want to say that I have seen this
24   before, because I have not seen this precise
25   document.  This is a handwritten document, and

JOHNS, PENDLETON COURT REPORTERS            504 219-1993

SCOTT H. TAYLOR                                        February 9, 2012

1   I did not get this handwritten version of it.
2       Q.  Okay.  Do you recall receiving back
3   from the Armstrongs a document listing their
4   contents?
5       A.  The document that I got listing the
6   Armstrongs' contents came through Counsel and
7   it was a prepared document that I understood
8   was based on whatever the Armstrongs gave
9   them.
10      Q.  And is that attached to your
11  report?
12      A.  Is what attached to my report?
13      Q.  The document that you received
14  back.  Is that the contents report that's
15  attached --
16      A.  No.  The contents that's on my
17  report is the one that's dedacted from the
18  information that was sent to me digitally.
19      Q.  Did you say "dedacted"?
20      A.  Yes.  I prepared it from the digital
21  report that was sent to me.  But it wasn't in
22  entirety, because I -- again, I rely on my
23  best judgment.  So I look at reports and if I
24  think that there are things that are not in
25  keeping, then I will eliminate those.  Or if

1   they have got the numbers off, then I will
2   look at that closely and I will say "This
3   doesn't appear to be correct" and I'll turn in
4   a report that's acceptable by most standards
5   or that I have seen to be acceptable in the
6   past.  So I will make corrections.  Now, I
7   could not tell you precisely what they are on
8   this one because I haven't seen this one
9   before.  But by and large, I do recall that
10  the report that was sent to me by Counsel,
11  there were not that many corrections that I
12  made, if any, on this particular one, but I
13  reserve the right to say that I did make some
14  changes, because I usually do.
15      Q.  Okay.  If you could look at Exhibit
16  2, --
17      A.  Uh-huh (affirmatively).
18      Q.  -- which is the revised Armstrong
19  report, --
20      A.  Uh-huh (affirmatively).
21      Q.  -- and look at the Contents
22  Inventory List, and not looking at the
23  substance of what's written on here, but just
24  looking at the form of the list, to me it
25  looks like it's the same as Exhibit 12.

1       MR. PALMINTIER:
2           The actual form you mean?
3       MS. WAGER-ZITO:
4           Yes.
5       MR. PALMINTIER:
6           Yes.  Okay.
7       THE WITNESS:
8           Is that a question?
9   EXAMINATION BY MS. WAGER-ZITO:
10      Q.  Do you see any differences between
11  Exhibit 12 and the contents list that's
12  attached to Exhibit 2?
13      A.  Certainly I do.  There are some
14  number changes on it.  Like, for example, item
15  number 3.
16      Q.  And, again, I wasn't talking about
17  the -- I said without looking at --
18      A.  Oh, the form.
19      Q.  -- the actual substance of what's on
20  there.  The form itself looks the same to me.
21      A.  It is -- It is the same form.  It's
22  taken from the same form.  If you look at
23  Exhibit 12, it has several columns that are
24  not necessary for the -- for the Armstrongs to
25  have filled out and X's placed across those

1   columns.  Versus the other one where the
2   columns were eliminated because it was a
3   digital version that I was using.  If that
4   makes sense.
5       Q.  But you say that you didn't use
6   Exhibit 12 in connection with preparing your
7   contents form; correct?
8       MR. PALMINTIER:
9           I object to form.
10      THE WITNESS:
11          Again, I received mine through
12      Counsel so I did not have the
13      handwritten one to rely upon.
14  EXAMINATION BY MS. WAGER-ZITO:
15      Q.  And you have no idea whether or not
16  the Armstrongs used Exhibit 12 in connection
17  with providing information to Counsel?
18      A.  Well, I have an idea that they did,
19  because it's what I provided to them.  I
20  provided to them this -- this sheet and enough
21  copies for them to either make photocopies and
22  continue the list or to use those that I have
23  given them.  I actually drew the X, I believe,
24  that's shown on this form.
25      Q.  I'm sorry, then I am confused.  I

JOHNS, PENDLETON COURT REPORTERS                        504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 101

1    asked you if you had -- I guess I had asked
2    you if you had seen Exhibit 12 before and you
3    hadn't.
4        A.  Well, not filled out, I haven't.
5        Q.  Well, Exhibit 12 is in fact the
6    document that -- not filled out, the document
7    that you gave to them to list their contents?
8        A.  As a blank, yes.
9        Q.  And then when it comes back to you
10   filled out and you're preparing to use it in
11   connection with your report, what do you do
12   there?
13       A.  Well, one of the changes, and that's
14   why I brought up number 3 as an item, it says
15   "shelves".  They listed 3 shelves.  They
16   didn't put the quantity in the "Quantity"
17   column and, as a result, there had to be some
18   mathematics done in order to determine the per
19   shelf value.  And rather than -- Often I will
20   look up shelving and find values that are
21   concurrent with that or similar or appear to
22   be.  And in this case I found shelving at some
23   location where, whether it was a website or
24   whatever, that cost $16.76; multiplied by 3,
25   it was 54.01, which was close to what they

Page 102

1    were asking for, which was $50.  They gave
2    totals rather than breaking it out.  And I
3    tried to be more specific than that.
4        Q.  Other than that, what else did you
5    -- what else did you do to this list?
6        A.  I would have to go through item by
7    item to see any changes and differences in
8    it.  And I don't -- I haven't done that to see
9    after the fact, after I produced mine.  I
10   haven't gone back to say where were the
11   changes made.  But if you have any specific
12   questions, I'll be glad to answer those.
13       Q.  We may get to some of those as we go
14   through.  One of the items listed here, it's
15   listed on Exhibit 12, but it's not listed in
16   your report, and there's a column for "Age".
17       A.  Uh-huh (affirmatively).
18       Q.  Why is it that you do not ask the
19   age of the contents?
20       A.  Mainly because they didn't provide
21   the age.  That's -- That's extra information
22   that I do find helpful at times.  And if they
23   give me that in there -- if they list it in
24   there, I will certainly factor that in as to
25   how old is this thing or when did you buy it.

Page 103

1    There's reasons I factor it in, though, and it
2    depends on the circumstance.
3        Q.  Can you explain that?  Why did you
4    not ask them here to give you the age?
5        A.  Initially, I did.  I showed them the
6    columns to fill out.  I am not sure that the X
7    should have been through -- through the bottom
8    of that, because --
9        Q.  Well, it's interesting here because
10   at the top you have "Age".
11       A.  It goes from photo- -- I just didn't
12   line up my pencil when I scratched the bottom
13   part.  But I started at the top and went back
14   across.  But the idea is that if they had put
15   the age, then I would know how far back to
16   research to see what the purchase price was if
17   I needed to do that.
18       Q.  So they did not give you the ages.
19       A.  They did not.
20       Q.  What's the relevance of the age?
21   You just said to go back and figure out what
22   it cost.  Is there any other --
23       A.  The purchase price.
24       Q.  Is there any other purpose for the
25   age of the contents?

Page 104

1        A.  Not in a liability situation.  In my
2    experience with liability situations, because
3    I have extensive experience in third party
4    property claims, liability is liability and
5    it's not -- it's not an item that is
6    determined -- there's not a determined
7    depreciation on liability.  Basically when we
8    get a liability claim as an insurance company,
9    they want to know what the purchase price is
10   for things, not what the actual cash value
11   today is.  And so you have to look at that and
12   you have to find out.  That's why I leave the
13   column open on that, so they can tell me how
14   old it was and I can look back to see what it
15   cost to buy that if I need to, you know.  You
16   know, if it seems like something jumps out on
17   a list and is way out of line with something
18   that I know to be the case, then I'll go back
19   and see, "Well, that was a 1984 model, let me
20   go back and see what those cost and see if I
21   can find some answers for that, because this
22   seems like it's out of kilter."  So when I
23   find discrepancies, I will do that.  But in
24   this case, liability was whether -- whether --
25   liability was the issue that I was looking at

SCOTT H. TAYLOR                                February 9, 2012

Page 105

1   rather than whether it was a covered item or
2   not.  Because it's not actually an insurance
3   claim.
4       Q.  And when you say "liability", what
5   are you referring to?
6       A.  Okay.  The difference is this.  A
7   third party -- I'm sure you understand third
8   party versus first party claims.  A first
9   party claim generally, I am looking for
10  coverage on something when I am an insurance
11  investigator.  I am looking at coverage
12  because I have to look at a policy and see if
13  it's covered in a policy.  And if it is, then
14  it's covered under certain policies, and many
15  policies will have an actual cash value
16  determination because they're paid according
17  to actual cash value with depreciation.  And
18  in this case, it wasn't a first party claim,
19  it was a third party kind of approach.  It's a
20  liability issue.  And when we get liability
21  claims in where somebody else is making a
22  claim against the insurer, then in that case I
23  just determine whether -- If liability is
24  given, then all I have to do is, as an
25  appraiser of the damages, is appraise the

Page 106

1   total amount of damages without regard to
2   depreciation.  So there was no depreciation to
3   figure in on these contents because it wasn't
4   a first party claim.  It wasn't a -- It wasn't
5   a claim at all.  It was -- But my approach has
6   always been, as a claim investigator, if it's
7   first party, you work in what is covered under
8   a policy as an insurance policy.  If It's not
9   first party, then you're not asked to do
10  that.  Even the insurer won't ask you to do
11  that.
12      Q.  And who told you in this case to do
13  it as a liability claim as opposed to looking
14  at the actual cash value?
15      A.  Nobody.
16      MR. PALMINTIER:
17          I object to form.
18      THE WITNESS:
19          Nobody had to tell me.  Because I
20      already know that that's the accepted
21      form.  You don't -- It's not something
22      that I would have done.  I didn't ask
23      about that because I didn't need to
24      ask about that.
25  EXAMINATION BY MS. WAGER-ZITO:

Page 107

1       Q.  So it's your testimony that to
2   determine the appropriate measure of damages
3   in this case, that depreciation was not an
4   issue that you should look at?
5       A.  It was not.  It was my opinion that
6   it was not an issue to look at.
7       Q.  Are you aware that in the Robinson
8   opinion that the Judge criticized the failure
9   to depreciate the contents --
10      A.  No.
11      Q.  -- for the Plaintiffs in that case?
12      A.  No, I am not.
13      Q.  Would that make any difference to
14  your opinion as to how you did it in this
15  case?
16      A.  If I was instructed by the Judge to
17  do so, I would do it.  That would be a legal
18  opinion and I would certainly have to regard
19  that.  But I -- I -- It would not have -- If I
20  had known that ahead of time and been told
21  that, that he wanted me to do that, and the
22  Judge had asked me to do it, of course I would
23  have done that.  But I was not instructed that
24  way in any sense.
25      Q.  So if in fact depreciation should be

Page 108

1   considered in this case, would you agree that
2   the numbers in your reports for contents are
3   overstated?
4       MR. PALMINTIER:
5           I object to form.
6       THE WITNESS:
7           I don't -- First of all, I don't
8       agree that depreciation should be
9       taken.  So it's hard for me to say
10      hypothetically what I would do because
11      I don't agree that depreciation should
12      be taken in a situation like this.
13  EXAMINATION BY MS. WAGER-ZITO:
14      Q.  Hypothetically as an expert, agree
15  with me that depreciation is relevant.
16  Hypothetically.  Okay?  If that is true, are
17  your contents numbers in these reports
18  overstated?
19      MR. PALMINTIER:
20          I object to form.
21      THE WITNESS:
22          If depreciation is mandated, then
23      depreciation was not put in here, then
24      obviously there would be an adjustment
25      to be made.

                        27 (Pages 105 to 108)

JOHNS, PENDLETON COURT REPORTERS          504 219-1993

SCOTT H. TAYLOR                                February 9, 2012

---

Page 109

1         (Jay Andry enters conference
2     room).
3    EXAMINATION BY MS. WAGER-ZITO:
4         Q.   And if that were the case, then we
5    would need to go back and adjust all the
6    contents numbers; correct?
7         A.   If I was instructed to do so, I
8    would.  At this point I don't -- I don't see
9    it.
10        Q.   And again we're talking
11   hypothetically.
12        A.   Hypothetical.
13        Q.   So these numbers would be overstated
14   and you would have to go back and adjust
15   them.
16        A.   If I was asked to consider
17   depreciation, yes.
18        Q.   What would you have to do to adjust
19   them?  Do you have to go through item by item
20   and figure out the age and the appropriate
21   adjustments that need to be made?
22        A.   There are several factors involved
23   in depreciation, and those are not the only
24   ones.
25        Q.   Okay.  So tell me as the expert what

Page 110

1    you would have to do to appropriately factor
2    in depreciation.
3         A.   And if we're still talking about
4    hypothetically, then in -- then
5    hypothetically, then I would have to consider
6    age, I would have to determine -- consider
7    condition, functional value, I would have to
8    consider all of those things.  Age, condition,
9    and functional value.  And in some cases you
10   actually have to consider appreciation.
11        Q.   And you did not do that in this case
12   for any of the contents for any of the
13   Plaintiffs; correct?
14        A.   I did not.
15        Q.   Okay.
16        MS. WAGER-ZITO:
17        Can we just go off the record for
18     a second?
19        (Whereupon a discussion was held
20        off the record.)
21   EXAMINATION BY MS. WAGER-ZITO:
22        Q.   Back on the record.  And I think we
23   touched on this a little bit earlier, but now
24   I want to discuss particularly in the context
25   of the Armstrong reports.  Were you asked to

Page 111

1    make any specific assumptions with regard to
2    the Armstrong property?
3         A.   Not that I recall, no.
4         Q.   Did you have any discussions with
5    anybody in connection with doing your work on
6    the Armstrong property as to the causation of
7    the damages to the Armstrongs?  And by that I
8    mean flood versus wind and rain damage.
9         A.   Not distinguishing the two, no.  I
10   mean, the cause, yes, but it was always
11   presumed in -- that it was a flood situation.
12        Q.   Okay.  And is that true with all of
13   the properties?
14        A.   Yes.
15        Q.   So in connection with all of the
16   work that you did for all five Plaintiffs, you
17   assumed that all of the damages were caused by
18   flooding?
19        A.   "Assumed" may not be the exact
20   correct word, because I observed that flood
21   appeared to be the cause.  I was not asked to
22   specifically identify the cause, one versus
23   the other.  I was asked to do what normally I
24   would do, which is assess the cause myself.
25        Q.   What are your qualifications for

Page 112

1    assessing flood damage versus damage from wind
2    and rain?
3         A.   I have had plenty of experience at
4    looking at damages from a wind perspective
5    working through the insurance companies that
6    were dealing with wind policies.  Therefore, I
7    would have looked at wind damages to try to
8    isolate those, and I have done that many,
9    many, many times and I found that the wind and
10   the flood both -- I found them from both
11   sides.  So I have done flood claims and I have
12   done wind claims.  I have done both and I have
13   had to in some cases isolate the distinction
14   between them.  I've had to -- There might be a
15   company that has both the wind and the flood
16   policy and they want you to break it apart, so
17   they have asked you to do that.  So I have
18   experience in doing that.
19        Q.   And did you do that with regard to
20   these five properties?
21        A.   I did not do that with regard to
22   these because my assessment was that these
23   were wholly destroyed by flood in terms of --
24   the destruction value of the flood was in
25   every case enough to substantiate the damages

SCOTT H. TAYLOR                                    February 9, 2012

Page 113

 1   that I put in there by themselves and that the
 2   wind was an ancillary issue to the flood, not
 3   -- not the other way around. That the wind
 4   may have -- Whether the wind came or not, the
 5   flood was enough to destroy these, and it was
 6   much simpler to go at it from the perspective
 7   that everybody commonly knew that a flood had
 8   occurred in the area and it was enough to
 9   completely destroy the house.
10       Q.  So it's possible for all or some of
11   these that there were damages caused by wind
12   and rain separate from the flooding damages?
13       A.  Well, it's always possible and
14   there's always going to be additional damages
15   done if you have a large volume of wind.
16       Q.  But the assessment that you did in
17   this case for all five of these Plaintiffs
18   were that all of their damages were caused by
19   flood? And you didn't try to distinguish
20   between flood damage and wind and rain
21   damage?
22       A.  That's not entirely what I -- what I
23   said.  I didn't say that all damages were
24   caused by flood, but that the total amount of
25   damages that I put in the report were covered

Page 114

 1   by flood damages.  The flood -- The numbers
 2   that I put in would have been available for --
 3   would have been produced by flood damages
 4   without regard to the wind.  Obviously I know
 5   going into this that we were looking at a
 6   flood situation and what I needed to do was to
 7   demonstrate that there was enough flood that
 8   it would show up that everything that I put in
 9   there would have occurred through a flood
10   event, and that's what I did.
11       Q.  But you didn't look to determine
12   whether or not any of the damages were caused
13   by wind and rain?
14       A.  I certainly could have looked at
15   that, but I did not look at it with that in
16   mind.
17       Q.  Okay.  And at least with regard to
18   some of the properties, the houses weren't
19   there any more so you couldn't do a
20   determination as to whether the damage was
21   caused by flood versus wind and rain?
22       MR. PALMINTIER:
23         I object to form.
24       THE WITNESS:
25         In my experience with Katrina and

Page 115

 1   in New Orleans in detail and having
 2   looked at so many houses in New
 3   Orleans, it be my experience that when
 4   a house has been demolished after --
 5   post-Katrina, there were very few
 6   homes that were blown down.  Virtually
 7   all the homes that were destroyed and
 8   completely razed were flood-damaged
 9   homes.
10   EXAMINATION BY MS. WAGER-ZITO:
11       Q.  But that wasn't my question.  My
12   question was whether or not the houses were
13   even there for you to look at to make a
14   determination as to what amount of damages
15   might have been caused by wind and rain versus
16   flood.
17       A.  Well, you'll have to pardon me.  I
18   thought that's where you were -- why you were
19   asking the question, was to determine if it
20   was -- if it was wind or rain and wind and
21   rain or flood, and the houses that I saw that
22   were completely demolished were all flood.
23       Q.  But in certain instances in this
24   case the houses weren't there; correct?
25       A.  Presuming that if they're not there

Page 116

 1   it's because they were destroyed.
 2       Q.  And --
 3       A.  Not because they disappeared.
 4       Q.  Because they were destroyed, but you
 5   couldn't determine, you don't distinguish with
 6   regard to those houses certainly what amount
 7   of damage might have been caused by wind and
 8   rain versus what amount of damage was caused
 9   by flood?
10       A.  Clearly I can't determine that
11   absolutely if they're not there.
12       Q.  Okay.  And you do know that many of
13   these Plaintiffs, if not all of them, made
14   claims of their insurers for damages that were
15   caused by wind and rain?
16       A.  It would seem logical that they
17   would.  You know, I was not privy to the
18   claims that were made prior to me bringing --
19   coming out.
20       Q.  But you're privy to that now;
21   correct?
22       A.  I'm becoming more aware as time --
23   as the time goes on and what claims were made
24   because -- as I look at other reports.
25       Q.  But at the time you were doing your

29 (Pages 113 to 116)

SCOTT H. TAYLOR                                    February 9, 2012

Page 117

1    work you were not aware of that?
2        A.  I was not -- Again, as I explained
3    before, because you asked the same question in
4    another form earlier, I generally try to do my
5    work independently; and unless given and
6    provided and asked to compare against other
7    claims, I don't.  I do it independently.
8        Q.  In your conversations with the
9    Armstrongs, did you ask them about any other
10   insurance claims that they had made?  And I
11   understand you're saying you didn't want to
12   use that in connection with preparing your
13   report.  My question is whether you asked them
14   about any other claims that they made.
15       A.  No.  I did not.
16       Q.  So when you were doing your report
17   you did not know that they had made claims for
18   wind and rain damage?
19       A.  I did not know conclusively.
20       Q.  We have looked at, and you have got
21   in front of you, the original report from July
22   and the revised report from October.
23   Generally what were you told about the reasons
24   for preparing revised reports?
25       A.  You know, it's -- it's hard for me

Page 118

1    to say.  I don't recall what the reasons were
2    for the precise ones, except that if there was
3    new information that had come to light they
4    wanted me to address it.  And until we get
5    into the details, I wouldn't be able to answer
6    that specifically.
7        Q.  I want to go back to -- We talked
8    about you had one meeting with the
9    Armstrongs.
10       A.  (Witness nods head affirmatively.)
11       Q.  You a said it lasted several hours.
12       A.  Yes.
13       Q.  At that meeting did you discuss with
14   them the floor plan of their house?  Did you
15   ask them to sketch out the floor plan?
16       A.  Yes, I -- No, I didn't ask them to
17   sketch it out.  I asked them at that point how
18   many rooms that they had and in general where
19   they were located, and I produce my own notes
20   on it, but I -- I produced -- but my notes are
21   indecipherable to anybody but me.  I've found
22   many people -- at least some are, and as a
23   result, you know, I take my notes and I take
24   my information and I start beginning to put it
25   into a form that everybody else can

Page 119

1    understand.  So no, I didn't ask them to
2    produce a sketch or anything like that.
3        Q.  Do you have notes that you prepare
4    -- And I understand the notes that you take
5    when you're with them are indecipherable and
6    then you turn them into something else.  Did
7    you produce those notes to anyone?
8        A.  No.
9        Q.  You do still have those notes?
10       A.  No.  I discard those almost always
11   after the fact because it has so many code
12   phrases and terms in it that it is -- It's not
13   of any functional value to anybody.
14       Q.  So you don't have those any more.
15   Was anyone else at the meeting with the
16   Armstrongs?  Was Counsel present?
17       A.  Yes.
18       Q.  And who was there?
19       A.  Josh Palmintier was there.
20       Q.  Anyone else?
21       A.  No.
22       Q.  Before you met with the Armstrongs,
23   had you gone out to the site where their house
24   was located?
25       A.  I did.

Page 120

1        Q.  And did you take pictures?
2        A.  I did.
3        Q.  And are those pictures in the
4    report?
5        A.  Yes, they are.
6        Q.  Do you have any photos that you took
7    that are not in the report?
8        A.  That I took?
9        Q.  Yes.
10       A.  No.
11       Q.  So all the photos you took, you
12   actually used in the report?
13       A.  Yes.
14       Q.  Did the Armstrongs give you photos?
15       A.  Let me -- Let me back up one second,
16   because I don't want to misspeak
17   accidentally.  Any functional photos.  If I
18   have a photo that's blurry and you can't see
19   it, I'll delete it; and it's easy to see that
20   because I leave the sequence numbers on my
21   photos.  So it going to show them in sequence
22   anyway.  If I delete something, then it would
23   show something missing.  So it's possible that
24   something was illegible so I just deleted it.
25       Q.  Well, if you could look at the

30 (Pages 117 to 120)

SCOTT H. TAYLOR                                          February 9, 2012

|                                                Page 121 |
| --- |

1   photos, and let's for this purpose, let use
2   Exhibit 2, which is the revised report, --
3       A.  Okay.
4       Q.  -- I would point you to a number,
5   but I really can't.  So it's actually just
6   photo sheet page 1.
7       A.  I see it.
8       Q.  And you say that you leave the
9   sequence numbers on them.  The reason I am
10  asking is because I don't see that.  So I
11  don't know if I am missing something here or
12  --
13      A.  Yes, it's at the top of each photo
14  on the right side.  It says DSCN-2312 and 2313
15  in this case.  They were in sequence.
16      Q.  Okay.  Do those numbers mean
17  anything?
18      A.  No.  Not particularly.  The camera
19  decides those numbers.
20      Q.  Okay.  When were these photos
21  taken?  I mean, it says "6/13/2011".
22      A.  Right.  That would have been the
23  date of inspection.
24      Q.  Okay.
25      A.  Or at least the date that the camera

|                                                Page 122 |
| --- |

1   had on it.  Sometimes the dates are not quite
2   right.
3       Q.  So this is where the house was
4   located, but the house is no longer there for
5   the Armstrongs; correct?
6       A.  Okay.  Let me back up one second.
7   The "date taken" there is actually the date
8   that it was entered into -- the claim entered
9   into Xactimate.  Because Xactimate is
10  producing that date and it -- Obviously when
11  you look at the next page, that date taken of
12  6/15/2011 can't possibly be correct on that,
13  because that's just -- that's mainly the date
14  that it was inserted into the estimate, into
15  Xactimate.
16      Q.  And obviously the other pictures
17  could not have been taken on those dates?
18      A.  Right.
19      Q.  That was going to be one of our
20  questions.
21      A.  Come to think of it, that will be
22  true also of mine, because if I think about
23  it, I didn't -- Was it in June?  I am not sure
24  about that.  It could have been.  I may have
25  put them -- inserted them in the same day I

|                                                Page 123 |
| --- |

1   took them.  Who knows.  Because I often do
2   that so I don't lose them, you know.  But 6/15
3   certainly isn't the date that I took them, and
4   I didn't take those picture, but I was able to
5   at least notch that the homeowner took those.
6   I entered that into the information.
7       Q.  But I am looking at the photo sheet
8   1 which are the two pictures.
9       A.  Uh-huh (affirmatively).
10      Q.  Those are the only two pictures that
11  you took of the Armstrong house?
12      A.  Yes.  There wasn't much to see
13  there.  The first picture is actually of the
14  site.  The second one is the site along with a
15  slab located next door because I'm showing
16  slab sizes.  I'm showing where homes had
17  been.  I wanted it to be just shown as an area
18  where homes had been located.  I was just
19  trying to demonstrate that.  So the foreground
20  is the ground in front of the residence.  The
21  background is -- because I am shooting at an
22  angle -- showing the next door's slab.
23  There's a -- There is a lot between that
24  existing house and -- and I also wanted to
25  show an existing house in the picture, too.  I

|                                                Page 124 |
| --- |

1   try to show context when I show pictures like
2   this because nothing but an open field doesn't
3   give you any context.
4       Q.  But is the context of this
5   additional house to show that this is what the
6   Armstrongs' house looked like?
7       A.  No.  No.  It just shows the
8   neighborhood and it showed that there was a
9   house missing next to it and it shows a
10  context for which this picture was taken.
11      Q.  And were the Armstrongs with you
12  when you went to take these pictures?
13      A.  No.
14      Q.  So going back to your meeting with
15  the Armstrongs and, you know -- You never saw
16  the Armstrongs' home?
17      A.  Not physically, no.
18      Q.  So in terms of figuring out and
19  entering information into Xactimate, were they
20  the ones that told you how big the house was,
21  how many rooms it had, where the rooms were
22  located?
23      A.  They were.  We discussed at some
24  length and they told me the square footage of
25  the house and that kind of thing.  And in my

JOHNS, PENDLETON COURT REPORTERS                     504 219-1993

SCOTT H. TAYLOR                                February 9, 2012

---

Page 125

1    notes I just jotted it down and I asked them
2    about the design of it and the function of the
3    rooms and that kind of thing and produced from
4    that a viable sketch that I used.
5        Q.  And did you share that sketch with
6    them and say to them, "Did I get it right?"
7        A.  No.  The requirement for turning
8    this in was before there could be a whole lot
9    of extra time.  There wasn't a whole lot of
10   time once I finished the work that it had to
11   be turned in.  There wasn't time to revise it
12   initially and so it had to be turned in before
13   we could do any -- any re-evaluation of it.
14       Q.  Did you ever show it to them after
15   you turned it in to say, "Did I get it right?"
16       A.  Of course I never met with them
17   again, so no.
18       Q.  Well, you did say before that you
19   would pose questions to them through Counsel.
20       A.  Uh-huh (affirmatively).
21       Q.  Even though you never met with them
22   again, did you ever through Counsel go to
23   them, did you ever ask Counsel to show them
24   the sketch that you made of their home to
25   determine whether or not you had gotten the

Page 126

1    sketch right?
2        A.  Not specifically.  You know, I did
3    ask Counsel, "Is there any corrections that
4    you know of based on your conversations that
5    need to be made on this?"
6        Q.  And do you know whether or not
7    Counsel ever showed them your sketches and
8    your drawings of the house to ask them if you
9    had gotten it right?
10       A.  No, I don't.
11       Q.  What, if any, questions did you ask
12   of the Armstrongs to ascertain the type of
13   building materials that had been used in their
14   house and the quality?
15       A.  I ask them usually -- You know,
16   because you're saying what in particular did I
17   ask, I don't recall specifically, but I know
18   that as a general rule I ask them the flooring
19   type; I ask them the height of the ceilings; I
20   ask them the materials, whether they were
21   custom or it was a standard tract home build,
22   or the type of shingle that might have been on
23   the roof, what kind of roof they had; I ask
24   them what kind of trim that they had around
25   the house.  Did they have crown molding, did

Page 127

1    they have baseboards, did they have granite
2    countertops versus -- versus laminate; did
3    they have custom cabinets of wood, what did
4    they have.  And as I go through those things,
5    I begin to be able to piece together the style
6    and type of house that they had.  And I recall
7    that this one was not bottom of the barrel,
8    but it wasn't the top, at the top of the line
9    either.  So it was somewhere in a medium to
10   high grade home that they had.  And so, you
11   know, the materials that I put back in it were
12   the similar style and quality.
13       Q.  Okay.  Do you have a list of things
14   that you ask them when you're going through
15   this?  You know, "What type of floor did you
16   have?"
17       A.  Not a prepared list, no, I don't.
18       Q.  We already determined that you took
19   notes, but you didn't keep any of the notes.
20       A.  No.  Those -- Again, like I said, I
21   mean, when I finish taking the notes and
22   actually produce something, that it's the only
23   thing that anybody else could read anyway.  So
24   I have not kept my notes as a practice.
25       Q.  And I think we have already

Page 128

1    determined that the Armstrongs gave you some
2    photos; correct?  Those are the photos that
3    are in your report?
4        A.  I think they gave me -- It seems
5    like they gave me some to look at and I may
6    have had to ask Counsel to send me the rest
7    digitally or send them to me after the fact.
8    I am not sure.  I am not sure whether they --
9    whether this came from a disk or from emails.
10   I am not sure.
11       Q.  And that's really not important, but
12   you did get photos from the Armstrongs of
13   their house?
14       A.  Well, I requested them because I
15   understood that they had them.  I don't recall
16   whether I got them at that moment or not.  It
17   possible I did.  It's possible.  If I did,
18   then that's where they came from.  But I
19   understood that they had them and I do
20   understand that they did come from them.
21       Q.  Do you know if you got any photos of
22   the house other than the ones that are
23   attached to the report?
24       A.  I do not.
25       Q.  Did you get any photos from the

32 (Pages 125 to 128)

SCOTT H. TAYLOR                                    February 9, 2012

Page 129

1  Armstrongs that were taken pre-Katrina?
2      A.  Unless they're in here, I did not.
3      Q.  We have already determined certainly
4  that the dates on these photos are wrong;
5  correct?
6      A.  The date taken, yes.
7      Q.  Yes.  So we have no idea what day
8  these photos were taken?
9      A.  Well, we can presume that they
10 happened after August 29th, 2005.
11     Q.  2005.  But there are no photos in
12 here that show you the quality of the
13 materials in the Armstrongs' home; correct?
14     A.  That's not -- That's not really
15 correct.  You can see from the exterior some
16 of those materials.  For example, you can see
17 that it has brick.  You can see that it's got
18 a laminate roof.  You can see that those are
19 aluminum windows.  You can see that they used
20 plywood instead of OSB for the sheathing
21 material on the roof.  You can see that it was
22 a hip roof.  You see the number of things
23 about it.
24         You see some columns in some of
25 those pictures.  You can see that they had

Page 130

1  cabinets inside that were laminate wood of
2  some sort.  There's a variety of things that
3  you can see in there.  So as you go through
4  it, you can -- once you -- there are certain
5  determining factors.  For example, a brick
6  facade is considered to be a higher end facade
7  than a vinyl siding facade.  And that presumes
8  certain functions of the house and what kind
9  of other materials they also used.  So the
10 lowest end houses are not going to have brick
11 and they're not going to have anything but
12 standard features.
13     Q.  Would you consider laminate cabinets
14 to be mid to high range?
15     A.  Not necessarily.  The ones in here
16 are probably -- When I say mid to high range,
17 they could be anywhere from -- There's several
18 degrees in Xactimate and I did not use the
19 highest ones by any means.  I don't recall
20 exactly which ones.  I could look and probably
21 tell you, though, in there which ones were
22 being used in the cabinets.
23     Q.  Are you looking for that?
24     A.  I am.
25     Q.  Okay.

Page 131

1      A.  Well, it appears in the estimate
2  that the cabinets aren't even included in it
3  because we had -- in some cases I was hearing
4  that they were wanting to add their own
5  contents list with cabinets because they had
6  specific prices and I think I dropped the
7  cabinets from this one presuming I was going
8  to get something on that and I didn't.  So
9  it's actually missing from the estimate.  I
10 don't see any cabinets in it.  So I am certain
11 I didn't over-estimate the cabinets since
12 they're not there.
13     Q.  The cabinets, did they end up on the
14 contents list?
15     A.  In this?  I'm not sure, but I don't
16 think they did.  I don't recall them being on
17 the Armstrong content list.  In some cases I
18 did see one cabinet on the content list.
19     Q.  Could you tell from the pictures the
20 flooring?
21     A.  Not -- No, not really.  This was not
22 a -- This was nothing -- There wasn't enough
23 there -- It's possible to look at it.  No,
24 there's nothing to really indicate -- It
25 appears that I am looking at one that might

Page 132

1  have some carpet in it, the last picture that
2  they provided.  But that's not certain based
3  on the kind of devastation that's there.  It's
4  not certain if that's carpet remnants or what
5  that is.
6      Q.  Could you tell the quality of the
7  appliances that they had?
8      A.  From the pictures?  Is that what
9  you're saying?
10     Q.  Yes.
11     A.  Not -- Not these, no.  I would -- I
12 would have probably got into that from the --
13 Those look fairly standard, the dishwasher
14 does.  That's the only thing I see there that
15 would give us any indication.
16     Q.  Is that something you would ask them
17 questions about?
18     A.  I would have, yes.
19     Q.  Did you ask them questions about the
20 quality of the furnishings in their home?
21     A.  I did in regards to when I said fill
22 out -- you need to fill out the values of them
23 on your contents list, the furnishings.
24     Q.  Did you question them about the
25 quality so that you could look at their

SCOTT H. TAYLOR                                    February 9, 2012

Page 133

1  contents list and see whether or not they got
2  those numbers right?
3      A.  When I give the instructions on a
4  contents list, I always tell them "You need to
5  say the type and the material that it was made
6  of" and those kind of things.  And in my
7  experience I rarely get what I ask for.  I
8  rarely get the details that I am looking for
9  in order to get -- to drill down to the
10  numbers that I'd like to.  But I give them
11  every -- every opportunity to give me as much
12  as they can.
13      Q.  So if you don't get the level of
14  detail on the quality, do you just take their
15  numbers and assume that they're right?
16      A.  For the most part, unless I see
17  something that jumps out, yes.
18      Q.  And do you do any QCing, quality
19  checking for lack of a better word, of those
20  numbers?
21      A.  I will.  I will take items and I
22  will find similar things, I will do some
23  pricing research.  At the time that I was
24  doing this, I worked after hours in my office
25  for the most part to do most of these reports

Page 134

1  and in that context I was able to use --
2  utilize XactContents, which is a feature in
3  Xactimate, which is a premium feature for some
4  users, whereby they can go and do -- type in
5  "table and chairs" and put approximate date
6  and -- and style and you get a -- 500
7  different options on what you look at.  And if
8  I find that this is within reason of those
9  options, then I'll stay with it.  You know, if
10  it's not, then I might change the numbers and
11  drop it down or bring it up if it was too low.
12      Q.  But given that you didn't get the
13  age of the contents, did you do that in this
14  case?
15      A.  I can presume that those -- Again, I
16  wasn't depreciating, so -- You have to
17  understand I was not depreciating.  I was
18  merely going by years -- by year that it was
19  purchased, if there was contents.  So all I
20  could do is look at a 2005 model of something
21  and see what it cost in 2005.
22      Q.  I understand that.  But you don't
23  have the dates for any of these.  So even if
24  you're not depreciating, you still need the
25  date to look at to determine whether or not

Page 135

1  these numbers are correct.
2      A.  But if you go back at least as far
3  as 2005 you know your starting point for
4  dates.
5      Q.  But were you assuming, given that
6  they didn't give you dates, that all of the
7  contents that they listed were in fact 2005?
8      A.  I didn't assume anything.  Because I
9  didn't -- I didn't approach it like that.  I
10  looked at that date -- In fact, I did some
11  entering of figures for different dates and if
12  -- unless something jumps out at you as being
13  out of the norm, I wasn't doing specific price
14  research on every item in there.
15      Q.  Were you doing specific price
16  research on any item in there?
17      A.  If there's large ticket items I will
18  often go in and look at -- run it through
19  XactAnalysis and see if it's in keeping.  And
20  I didn't -- And anything that I didn't change
21  was in keeping with the normal price
22  structure.  And sometimes I will put in more
23  than one date on those and say no, this is a
24  1985 model, you know, and what did it cost new
25  versus what it -- you know, because again, I

Page 136

1  was looking at new values.  I wasn't looking
2  at depreciated values.
3      Q.  But you didn't have any dates in
4  this instance to do that.
5      A.  No, I did not.
6      Q.  So you assumed that the Armstrongs'
7  numbers were all correct?
8      A.  Unless I saw otherwise, I presumed
9  they were correct.  Unless I presumed --
10      Q.  If you assume with me hypothetically
11  that no changes were made from the contents
12  list that the Armstrongs gave you that we
13  talked about earlier through Counsel that are
14  Exhibit 12, and the report, the content list
15  in Exhibit 2, assume that those were all the
16  same, so you found all of the information that
17  the Armstrongs gave you with regard to their
18  contents to be good information?
19      A.  Well, I have already pointed out one
20  difference and that was that when they weren't
21  using quantity numbers, but listing it in the
22  description, that I had to alter that and find
23  something else that fit, because I was -- I
24  was using a spreadsheet version of it and
25  needed to make sure that I did -- that if I

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 137

1    put in 3 shelves, that it didn't -- that I
2    wasn't looking at three $50 shelves.  Because
3    that's the way that they had marked it, "3"
4    and they put "50", and I presumed at that
5    point that it was $50 total, not $50 each.
6    Because they didn't distinguish.
7        Q.   Can you recall any other issues on
8    the Armstrongs' contents?
9        A.   Not specifically, but I am certain
10   that there was more than one change to that.
11   There would have been multiple changes along
12   those lines.
13       Q.   Did you -- We know the answer to
14   this question because you didn't speak to the
15   Armstrongs.  Again, you assumed that the
16   shelves weren't $50 each?
17       A.   I assumed that they were not $50
18   each because what I saw is that they would --
19   As you start looking at things and you see
20   four pots that were cast-iron, I doubt that
21   each one cost $280.  It didn't -- It wasn't in
22   keeping with what is logical.  That they would
23   put the number, but then put a total next to
24   it.  And they said "hunting boots" times
25   three, and they list $300, you're presuming

Page 138

1    it's not $300 per pair, you know.
2        Q.   But you had no further conversations
3    with the Armstrongs about their content list?
4        A.   Not directly, no.
5        Q.   And again, we can compare the
6    contents list in the report with this list to
7    see if you made any changes to it.
8        A.   Yes.
9        Q.   You didn't make any assumptions
10   regarding the quality of the furnishings
11   because you just used the numbers they gave
12   you?
13       A.   Exactly.
14       Q.   Is that correct?
15       A.   Yes.
16       Q.   Did you look at the pictures they
17   gave you to try to determine whether you could
18   see what the quality of the furnishings were?
19       A.   I did.  I looked at those.  And I
20   didn't see anything that jumped out, again,
21   that told me that they were off on their
22   descriptions.
23       Q.   Did you have a discussion with the
24   Armstrongs when you met with them regarding
25   their additional living expenses?

Page 139

1        A.   Yes, I did.
2        Q.   What do you recall discussing with
3    them?
4        A.   I gave them a description of how
5    they were to calculate additional living
6    expenses and walked through that with them and
7    said, "To the best of your knowledge, see what
8    you can do with this and if it works out and
9    it's feasible, I will use those figures."  And
10   so I gave them the formula by which to
11   determine additional living expenses.
12       Q.   What was the formula that you told
13   them?
14       A.   The formula that you use in figuring
15   your additional living expenses is to take
16   your normal living expenses and contrast that
17   against the actual expenses that occur and you
18   deduct the difference; and you do it in each
19   category for which there would be an expense.
20       Q.   Did you ask them for any documents
21   reflecting their normal living expenses?
22       A.   I asked them if they had any
23   documents and they said they would have some.
24   They indicated they would have some receipts.
25   They would have some documentation to show

Page 140

1    what kind of additional living expenses they
2    had.
3        Q.   Did you get those document from
4    them?
5        A.   I did not get them directly from
6    them, no.
7        Q.   Did you get them indirectly?
8        A.   I got some documents that I believe
9    were sent to me later, but I am not positive,
10   because, you know, they -- I am not sure if it
11   was them or somebody else, on that particular
12   house -- and found that it was woefully
13   inadequate for me to do my calculations from.
14   It wasn't enough there to piece it together.
15   Because to use -- to use receipts and to use
16   receipts well, you have to have all of them
17   and you need dates on everything and you have
18   to have it all chronicled in a logical order
19   that shows what the actual expenses were.  And
20   there are several categories that I found to
21   be missing.  They would either be missing all
22   of their additional fuel expenses or their
23   utilities or their laundry or something.  It
24   would be something that was a normal expense
25   normally included as an additional living

SCOTT H. TAYLOR                                    February 9, 2012

Page 141

1  expense that they had nothing on and, you
2  know, -- and I knew, presumably, that they,
3  from my experience in the past, that they had
4  missed those items and that they weren't
5  available. But I also understand that if time
6  goes by and the situation is dire enough, that
7  we have found that somebody in an insurance
8  claim, for example, would not be able to
9  produce what they needed either and, as such,
10  when I work with claims examiners from
11  insurance carriers, they will look at things
12  and make awards based on reasonable expenses.
13  And that's what's been done in this case.
14  That's the way I have calculated it, and what
15  I did is I used what the normal coverage is
16  for additional living expenses and calculated
17  that against their -- against their -- against
18  their valuation of the home, what it would
19  have come to. And again, you asked earlier
20  about a valuation. That's just a reference
21  right out of Xactimate that I just used and I
22  said that's what it's coming to. These are --
23  Since I don't have an actual policy to go off
24  of, I have to use whatever the damages were.
25  So I took the damages and used that as my

Page 142

1  valuation.
2      Q. So in this case for all five of the
3  Plaintiffs you used the standard 20 percent?
4      A. That's exactly right.
5      Q. For each of the Plaintiffs without
6  regard to their actual additional living
7  expenses?
8      A. That's correct. Inasmuch that if
9  they gave me receipts and I could not find a
10  -- build a time line off of those and
11  demonstrate that they had largely not
12  completed what the task was in getting that,
13  that I went with an accepted standard in the
14  industry that I am used to doing it in.
15      Q. And I understand that. I am just
16  trying to make clear that in this case for all
17  five Plaintiffs you used the 20 percent
18  because you, in your opinion, did not have
19  enough information of exact expenses to do it
20  using the exact expenses?
21      MR. PALMINTIER:
22      I object to form.
23      THE WITNESS:
24      Yes and no. The exact expenses,
25  I don't know what they were, so I am

Page 143

1  not going to presume that they were
2      less than what the -- that they were
3      -- that they weren't more than what
4      the receipts showed.
5  EXAMINATION BY MS. WAGER-ZITO:
6      Q. No, I understand that. I am not
7  asking you to make that determination. All I
8  am saying is, in this case you did not feel
9  like you had adequate information relating to
10  the exact expenses for any of the Plaintiffs;
11  correct?
12      MR. PALMINTIER:
13      I object to form.
14      THE WITNESS:
15      I would agree that I did not have
16      enough to piece together an exact
17      expense report for ALE.
18  EXAMINATION BY MS. WAGER-ZITO:
19      Q. For any of the Plaintiffs?
20      A. For any of the Plaintiffs.
21      Q. So, therefore, because you didn't
22  have that information for any of the
23  Plaintiffs, you used the 20 percent number for
24  each of them?
25      A. Yes.

Page 144

1      Q. Okay. And the 20 percent number
2  comes from 20 percent of the damage number
3  which comes out of Xactimate?
4      A. That's correct.
5      Q. So if that number is wrong, the
6  number that came out of Xactimate for the
7  damages, then the ALE number is similarly
8  wrong?
9      A. Yes, potentially.
10      Q. Because it's just a calculation?
11      A. Exactly.
12      Q. And I saw in the Robinson case that
13  you used a 50, or you discussed a 50 percent
14  number for the contents --
15      A. Uh-huh (affirmatively).
16      Q. -- as also being a number that you
17  use in the industry for contents, 50 percent
18  of the damages. You didn't use that for these
19  five Plaintiffs at all, did you?
20      A. No, because if you can get more
21  detail, you always want it. And when I was
22  first asked to come back to do this work, that
23  was one of the things that I mentioned early
24  on to Counsel, that it would be much better to
25  actually go with the actual contents that they

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 145

1  had rather than just try to come up with a 50
2  percent rule.  Because the 50 percent rule
3  usually is somewhat low.  And that's the other
4  thing that I found.  That if you want to make
5  them whole again like they were before, that
6  the minimum would be 50 percent and on most
7  policies -- because that's the way that they
8  do in insurance work, is they will say "We
9  really think --"  An agent will tell an
10  insured "We really think you ought to have at
11  least 50 percent of your coverage of your
12  dwelling as a contents amount."  At least.
13  And in most cases that I have seen, they go
14  higher than that.  They actually go more than
15  50 percent.  But the 50 percent rule is a
16  standard rule that you learn in your licensing
17  course.  There's a 10 percent rule for
18  coverage B, there's a 20 percent rule for
19  coverage C, which is -- and then there's the
20  50 percent rule for contents.
21      Q.  When you were preparing the reports
22  for the Armstrongs, did you review the
23  deposition testimony that they had given in
24  2007 in this case?
25      A.  For the Armstrongs?

Page 146

1      Q.  Yes.
2      A.  No.
3      Q.  When you did your revised report in
4  this case, did you review the depositions that
5  had been taken of the Armstrongs?  In between
6  July of 2011 and October of 2011 when you did
7  Exhibits 1 and 2, the Armstrongs were
8  deposed.
9      A.  It is possible, but I don't know for
10  certain.  I don't know for certain, because I
11  do recognize that there were some depositions
12  taken, but I don't recall which ones I had
13  been -- discussed with anybody.  And I
14  certainly hadn't seen them before discussing a
15  revision, you know.  I know that there were
16  some questions about it; there might have been
17  some corrections that needed to be made based
18  on those, and some of that was discussed on a
19  phone call.  So most of my revisions were
20  based off of a phone call or two that we had.
21      Q.  But those phone calls were with
22  Counsel; correct?
23      A.  Yes.
24      Q.  Do you recall in any of these
25  conversations with Counsel that they said to

Page 147

1  you "We learned this information in the
2  deposition of the Armstrongs regarding the
3  damages to their home or to their contents"
4  and that that's the reason why you had to make
5  revisions to your report?
6      A.  I don't recall if that's the reason
7  why.  I do know that they had made -- that
8  they had had depositions, but I don't recall
9  them saying that it was because of the
10  depositions.  I don't recall that.
11      Q.  Okay.  And again, you do not recall
12  reading the deposition transcripts; correct?
13      A.  Not prior to the -- Not prior to the
14  revision, no.
15      Q.  And is the same true for all of the
16  Plaintiffs?  You didn't review any of their
17  deposition transcripts?
18      A.  Not -- No, I did not.  Not before
19  making any revisions that were asked.  But
20  again, when I looked at that, I -- I made
21  whatever revisions were being requested based
22  on the information they gave me at the time on
23  the phone call.
24      Q.  Subsequent to making the revisions
25  have you reviewed any of the deposition

Page 148

1  transcripts?
2      A.  Yes.
3      Q.  Did you learn anything based upon
4  reading those depositions that has caused you
5  to determine that you need to make any further
6  revisions to your reports?
7      A.  It's possible, you know.  I would
8  just have to look at the reports again and
9  compare those against those same deposition
10  questions.  Because any time there was
11  something that I read that stepped out and I
12  looked at and saw, "I didn't remember that,"
13  then I would -- I hadn't had a chance since
14  then to go back and revise the report.  So I
15  haven't -- I haven't -- I couldn't make that
16  decision right then.
17      Q.  And the question was more specific
18  than that.  Are you planning on making any
19  revisions to any of your reports based upon
20  anything that you read in the depositions?
21      A.  Only if requested by Counsel.
22      Q.  So you didn't look at any of them
23  and say, "Oh, I got that wrong, I need to
24  change my report"?
25      A.  Oh, I never said that, no.  I

37 (Pages 145 to 148)

SCOTT H. TAYLOR                              February 9, 2012

Page 149

1  wouldn't say that. I don't -- I have to stand
2  by my report. But if there's a mistake in it,
3  I am certainly willing to make a revision if
4  there's a mistake. Or if there's a
5  discrepancy that's determined that is my
6  discrepancy.
7      Q. And I understand that. And now I am
8  not speaking hypothetically. I want to know
9  if you -- and I think I know the answer, but
10  you did not see anything in those depositions,
11  now having read them, that has caused you to
12  actually say "I made a mistake, I need to fix
13  this report"?
14      MR. PALMINTIER:
15          Object to the form. Asked and
16      answered.
17      THE WITNESS:
18          I don't know that I found
19      anything specific at this point.
20  EXAMINATION BY MS. WAGER-ZITO:
21      Q. Have you discussed all of the
22  contact that you have had with the Armstrongs
23  in connection with preparing your reports?
24      A. Yes.
25      MS. WAGER-ZITO:

Page 150

1          You want to break now or you want
2      to -- We can go off the record.
3          (Whereupon a discussion was held
4      off the record.)
5          (Recess.)
6  EXAMINATION BY MS. WAGER-ZITO:
7      Q. Back on the record. You visited the
8  Armstrong property just the one time? Is that
9  correct?
10      A. Yes.
11      Q. There was nothing to see?
12      A. Yes.
13      Q. What was the purpose for visiting
14  the property, given that there was nothing to
15  see there at the time?
16      A. To verify the location and to get
17  its context.
18      Q. Get --
19      A. The context of the location. In
20  other words, what type of -- what type of area
21  it was, what kind of homes were in the area.
22      Q. But the homes in the area don't
23  really speak to the Armstrongs' home;
24  correct? I mean, you could have a mansion
25  next to a one bedroom/one bath house; right?

Page 151

1      A. Certainly you could.
2      Q. And the Armstrongs weren't with you
3  so they couldn't say to you, "Yeah, our house
4  looked just like that one"; correct?
5      A. They were not with me.
6      Q. Was anyone with you? Were the
7  lawyers with you?
8      A. Mr. Palmintier was with me.
9      Q. Was there anyone with you who had
10  seen the house before it was torn down, either
11  pre- or post-Katrina?
12      A. No.
13      Q. And the house was intentionally torn
14  down? It wasn't -- This was not one of the
15  homes that was washed away as a result of
16  Katrina; correct?
17      A. I presume that's correct based on
18  the photos.
19      Q. Okay. And we already talked about
20  photos and the photos that you took, a couple
21  of photos, but then you got photos from the
22  Armstrongs.
23      A. Yes.
24      Q. And there are no other photos that
25  you're aware of of the Armstrong property;

Page 152

1  correct?
2      A. Correct.
3      Q. Did you take any notes while you
4  were visiting the property?
5      A. They're on my normal scope sheet,
6  the one I already described as hieroglyphics.
7      Q. And the one that you no longer have;
8  right?
9      A. Contact.
10      Q. How long did this site visit take to
11  the Armstrong property?
12      A. Probably no more than 15 minutes.
13      Q. And did you learn anything from this
14  visit that was relevant to the conclusions in
15  your Armstrong reports?
16      A. Certainly everything I see is
17  relevant to it in that I comprise things based
18  on the totality of the information that I
19  gather. So I --
20      Q. But again, given that there's -- in
21  this instance there's nothing there, there's
22  no house there; there's not even a slab there
23  any longer. Correct?
24      A. Exactly.
25      Q. So in this instance did you learn

SCOTT H. TAYLOR                                    February 9, 2012

Page 153

1  anything from this site visit that was
2  relevant to your report?
3      A.  Yes, I learned there wasn't a slab
4  there.
5      Q.  And how does that inform your
6  opinion?
7      A.  That means it has to be questioned
8  as to square footage.  I have to get the
9  numbers from another source.
10     Q.  And what source did you use to get
11 those numbers?
12     A.  The Armstrongs.
13     Q.  Did they have any documents that you
14 were able to use to inform your understanding
15 of what the square footage was of the
16 property?
17     A.  No.  Not that they showed me.
18     Q.  And using the Xactimate software you
19 will agree that the square footage is critical
20 to the output of the Xactimate analysis?
21     A.  I would agree.
22     Q.  And I may have asked this, but just
23 one visit to the site, right?  You only made
24 one visit to the site?
25     A.  That's correct.

Page 154

1      Q.  And now I would like to actually
2  look at the report itself.  And unless I say
3  otherwise, we're going to look at the October
4  version of the report.  So Exhibit 2.
5  Correct?
6      A.  Yes.
7      Q.  And just starting on the first page
8  of the report under the heading of "Coverage
9  versus indemnification" you state "No values
10 are listed in the above coverage section
11 because the primary issue is indemnity, not
12 whether coverage is being afforded."  Do you
13 see that?
14     A.  Uh-huh (affirmatively).
15     Q.  And I think we talked about this a
16 little bit before, but was this an assumption
17 that was given to you by the lawyers or is
18 this -- is this statement an assumption that
19 you made?
20     A.  It is an assumption I made because
21 it was -- there was no insurance policy to
22 refer to.
23     Q.  Okay.  So this is an
24 insurance-related assumption as opposed to a
25 legal opinion as to what the proper measure of

Page 155

1  damages is; correct?
2      A.  Absolutely.
3      Q.  And that it's for that same reason
4  that above that in the coverage section all of
5  those numbers are zeros?
6      A.  Yes, that's correct.  Actually, you
7  know, that is correct.  It would -- It would
8  have defaulted to that if I didn't put
9  coverage numbers in there.
10     Q.  And further to my theme of going
11 backwards instead of forwards here, above
12 that, "Enclosures", it says, you know,
13 "Estimate, Statement of Loss, photos,
14 diagrams, floor plan, contents spreadsheet and
15 Edmunds Boat Valuation".
16     A.  Uh-huh (affirmatively).
17     Q.  Did you consider any other documents
18 other than what you ended up putting in the
19 report in connection with preparing the
20 report?
21     A.  No physical documents, no.
22     Q.  And just while I am doing this
23 introductory, we'll get this out of the way,
24 this same language is in all of the other
25 reports as well?

Page 156

1      A.  Yes.
2      Q.  Although some of the enclosures
3  might be involved because there are no other
4  boats involved in any of the properties, but
5  are all of your answers the same for all of
6  the Plaintiffs?
7      A.  Yes.  Yes, they are.
8      Q.  And in your opinion, are you aware
9  that the Armstrongs did in fact have insurance
10 coverage for their home prior to Katrina?
11     A.  I was not privy to that and it
12 didn't fall under my instructions to
13 investigate.
14     Q.  And in your opinion, is it relevant
15 that the Armstrongs had insurance coverage?
16         MR. PALMINTIER:
17         I object to form.
18         THE WITNESS:
19         That would merely be an opinion.
20     If I was doing an insurance
21     investigation it might.
22 EXAMINATION BY MS. WAGER-ZITO:
23     Q.  So would you have liked to have
24 known that the Armstrongs had insurance?
25     A.  I don't think it's relevant to this

                              39 (Pages 153 to 156)

SCOTT H. TAYLOR                                     February 9, 2012

Page 157

1    point so I wouldn't --
2        Q.  Well, you said it might be relevant,
3    and again that's my fault for not following
4    up.  How might it have been relevant?  How
5    might it be relevant?
6        A.  If there was an insurance claim that
7    I was investigating.
8        Q.  And were you aware prior to or at
9    the time you were doing your report that the
10   Armstrongs had actually made a claim on their
11   insurance policy?
12       A.  No.
13       Q.  So, therefore.  You weren't aware
14   that they made a claim for Katrina-related
15   wind and rain damage?
16       A.  No.
17       Q.  And do you believe that it's
18   relevant that the Armstrongs believe that some
19   of their damage was caused by wind and rain
20   and that they made an insurance claim for
21   that?
22           MR. PALMINTIER:
23               I object to form.
24           THE WITNESS:
25               I can't speak to what they think

Page 158

1               was relevant.  Only what I thought was
2               relevant.
3        EXAMINATION BY MS. WAGER-ZITO:
4        Q.  Is it relevant to you that they
5    believe that some of their damages were caused
6    by wind and rain?
7            MR. PALMINTIER:
8                I object to form.
9            THE WITNESS:
10               Again, no, because it didn't fall
11               under my instructions for what I was
12               looking for.
13       EXAMINATION BY MS. WAGER-ZITO:
14       Q.  What were your instructions as to
15   what you were looking for?
16       A.  To evaluate flood damages.
17       Q.  So would the fact of wind or rain
18   damage be relevant to an evaluation of flood
19   damages?
20       A.  It wasn't within my scope to
21   evaluate that.  So no.
22       Q.  Hypothetically if it were determined
23   that some of the damages to any of the
24   Plaintiffs' properties were caused by wind or
25   rain, would that lower the amount of damages

Page 159

1    that were caused by flood?
2            MR. PALMINTIER:
3                I object to form.
4            THE WITNESS:
5                The simple answer is no.
6        EXAMINATION BY MS. WAGER-ZITO:
7        Q.  Is there a hard answer?  Why do you
8    say that?
9        A.  I say that because with or without
10   wind and rain considerations, there was enough
11   damage to encompass the damages that I put
12   whether there was any wind or not.
13       Q.  Hypothetically assume that the wind
14   caused the roof to blow off a house and, as a
15   result of that, the wind destroyed the roof
16   and also caused damage in the attic.  Does
17   that affect your opinion as to damages caused
18   by flood to that property?
19       A.  No.  Does it.
20       Q.  Why is that?
21       A.  Because there was still sufficient
22   damage to reach a conclusion that we have --
23   we had a total loss and at that point there's
24   nothing to support the roof that's still
25   existing.  You can't save the roof without

Page 160

1    everything under it.
2        Q.  But if you're apportioning who
3    caused the damages and who's going to pay for
4    them, is it relevant if the wind and rain took
5    the roof off --
6            MR. PALMINTIER:
7                Object.
8        EXAMINATION BY MS. WAGER-ZITO:
9        Q.   -- and the flood caused the other
10   damages?
11           MR. PALMINTIER:
12               I object to form.
13           THE WITNESS:
14               It's not my experience that the
15               wind and rain damages that I observed
16               in other situations had a very large
17               impact on the total damages.  It was
18               negligible when there was the amount
19               of water that we found in these
20               homes.
21       EXAMINATION BY MS. WAGER-ZITO:
22       Q.  And the amount of water that was
23   found in the home, you didn't see how much
24   water was in the homes; correct?
25       A.  Not in these particular homes.

40 (Pages 157 to 160)

SCOTT H. TAYLOR                                    February 9, 2012

Page 161

1    Q.  Are you relying on Mr. Crawford's
2  reports for the amount of water that was in
3  the homes?
4    A.  No.
5    Q.  What are you relying on for your
6  opinion as to the amount of water in the
7  homes?
8    A.  It depends on which home you're
9  speaking of.
10    Q.  Well, let's talk about the
11  Armstrongs' house.
12    A.  The Armstrongs.  In that case I am
13  relying upon the testimony of the Armstrongs
14  and the photos that I have -- did get from
15  them.
16    Q.  Can you tell from those photos
17  whether or not any damage was caused by wind
18  and rain versus flooding?
19    A.  I can give an opinion, but it's an
20  opinion.
21    Q.  And is it your opinion with regard
22  to the Armstrongs that there was no damage
23  caused by wind and rain?
24    A.  I can't say that directly, no.  I
25  can't say definitively there was not damage

Page 162

1  from wind and rain.
2    Q.  And if they made an insurance claim
3  for damage caused by wind and rain, would you
4  disagree with the claim that they made?
5      MR. PALMINTIER:
6      I object to form.
7      THE WITNESS:
8      I wasn't asked to do that so I
9    can't object to that.  I mean I can't
10    speak to that.
11  EXAMINATION BY MS. WAGER-ZITO:
12    Q.  And if they made an insurance claim,
13  would you say that they were filing a false
14  insurance claim if they made a claim for
15  damages based upon wind and rain?
16      MR. PALMINTIER:
17      I object to form.
18      THE WITNESS:
19      I wouldn't --
20      MR. PALMINTIER:
21      I object to form.
22      THE WITNESS:
23      I wouldn't say that.  I can't
24    speak to that.
25  EXAMINATION BY MS. WAGER-ZITO:

Page 163

1    Q.  But you wouldn't change your opinion
2  as to damages at all by virtue of the fact
3  that they made a claim for wind and rain
4  damage?
5      MR. PALMINTIER:
6      I object to form.
7      THE WITNESS:
8      I would not.
9  EXAMINATION BY MS. WAGER-ZITO:
10    Q.  Okay.  Back to the report.  Still on
11  the first page, but at least going in the
12  right direction, because there's nowhere else
13  to go.  Under "Risk" you say in the last
14  sentence "The interior had basic features but
15  was very well supplied with furnishings of
16  above average quality."  What's the basis for
17  that statement?
18    A.  The testimony from the Armstrongs.
19    Q.  And we talked a little bit before
20  about the pictures.  Did those pictures
21  support the claim that the furnishings were
22  above average quality?
23    A.  To the best of my ability to discern
24  them, yes.
25    Q.  And which pictures do you believe

Page 164

1  support the statement that the furnishings
2  were above average quality?
3    A.  I refer to the last picture and to
4  the -- and to the picture on page 9 of the
5  photo sheet.
6    Q.  The last picture being the picture
7  on photo sheet 11?
8    A.  Photo sheet 11, showing the -- a
9  sectional sofa and the -- and the furniture
10  and furnishings that appear to be piled up in
11  the top picture of page 9, and that's just to
12  indicate that the house was still full.  And
13  as I looked at the furnishings that they
14  currently had and asked how they compared,
15  they said they were similar.  So they had very
16  nice furnishings in their other home.
17    Q.  And we'll get to that, but for now I
18  am just talking about the pictures and how
19  they support.
20    A.  There's limited support.
21    Q.  There's limited support from the
22  pictures.
23    A.  Right.
24    Q.  And nothing else in the pictures
25  supports the claim that the furnishings were

41 (Pages 161 to 164)

SCOTT H. TAYLOR                                    February 9, 2012

Page 165

1    above average quality?
2        A.  Well, I will say that the back -- in
3    the backyard, the pictures that show that they
4    had a gazebo set up and they had -- they were
5    protecting it and they had trampolines and
6    they had items like that, that they were used
7    to living with some -- some sense of comfort.
8    With the kinds of things they had, it seemed
9    that they were used to living with nice
10   amenities.
11       Q.  Anything else from the pictures?
12       A.  No.
13       Q.  If we go down to the section on
14   "Inspection and damages", you say actually
15   the inspection did occur on June 15th.  The
16   report says the inspection occurred on or
17   about June 15, 2011, but the photos say June
18   13, 2011.
19       A.  As I said, again, either the camera
20   or the -- or the -- or the software has a
21   tendency to put its own dates in there, so
22   it'll put it in there.  Whether you start --
23   If I started the file on the 13th or the 15th
24   or whatever date I started the file, it's
25   going to start documenting things.  And if I

Page 166

1    later add something later, it's going to do
2    that.  It's showing 6/15 for some of those
3    photos and 13 for the other one.  And it's
4    possible that we visited the site of the home
5    on the 13th and the 15th I took photos -- got
6    the photos and met with them.
7        Q.  Okay.
8        A.  So that's why I said "on or about".
9    We had a two or three day period that we were
10   doing this inspection.
11       Q.  You go on there to say that "The
12   inspection was accomplished after examining a
13   combination of aerial photos, photos from the
14   homeowner, and videos supplied by the
15   homeowner."  We have already talked about the
16   photos from the homeowner.  What aerial photos
17   did you look at?
18       A.  Just online aerial photos of the
19   area.
20       Q.  Aerial photos from around the time
21   that you were doing the inspection, or were
22   these aerial photos that went back to just
23   post-Katrina?
24       A.  Most of them were post-Katrina.
25   They were on random websites, just looking at

Page 167

1    different things.
2        Q.  Were they when the house was still
3    there?
4        A.  I believe I did see something with
5    the house still there.  That did help me to
6    make sure the shape of the roof was correct.
7        Q.  Were they good enough aerial photos
8    that you could actually say yes, this is the
9    Armstrongs' home, or was it just more of an
10   aerial photo of a neighborhood that was their
11   neighborhood?
12       A.  It was more the latter.  It was more
13   that.
14       Q.  Okay.  And then the videos, I have
15   heard about this video of the fireman going by
16   saying "That's the Armstrongs' house."  Is
17   that the video that you're talking about?
18       A.  Right.  I was able to view it.
19       Q.  Are there any other videos?
20       A.  No.
21       Q.  And were you able to see enough in
22   that video to get information that would
23   inform your opinion?
24       A.  Absolutely.
25       Q.  What did you learn from that video

Page 168

1    about the Armstrongs' house?
2        A.  That the numbers that were given to
3    me in terms of water levels were reasonable,
4    for one thing.
5        Q.  How high was the water that you saw
6    in the video?
7        A.  As I recall, it was nearly roof
8    level at the time I saw it.  And that doesn't
9    mean that it was -- that was the highest it
10   was.  It was just what I observed.
11       Q.  Do you know when that video was
12   taken?
13       A.  Not precisely, no.
14       Q.  Any idea?  I mean, was it taken on
15   the morning of the 29th or was it taken a
16   couple of days later?  Just --
17       A.  I really couldn't tell you.  I
18   really couldn't tell you at all.
19       Q.  It goes on and says "The homeowners
20   supplied photos and videos of the inside and
21   outside of the home".  Were there any videos
22   of the inside of the home?
23       A.  I'm certain that there probably were
24   or I wouldn't have included that in my
25   comments at that time.  I don't recall the

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 169

1  details of those, but that is probably how I
2  became informed partially on the contents.
3      Q.  But you cannot sitting here right
4  now, you can't think of any videos that you
5  saw that were of the inside of the home?
6      A.  It was the same video where the
7  outside was being -- at least I believe it
8  was.  I don't know.  I don't recall now, but
9  it would have -- Certainly I wouldn't have put
10 it in the report if it was -- if that's not
11 what I observed.
12     Q.  Well, at the top when you talk about
13 the enclosures, you have "photos" on there,
14 but there's no videos.  What I am trying to
15 get at is are there any other videos besides
16 this one of the fireman pointing out the
17 Armstrongs' home?
18     A.  Not that I am aware of.
19     Q.  Okay.  And you point out in there
20 "The home has now been demolished, and even
21 the slab has been removed."  Do you know when
22 the home was demolished?
23     A.  No.
24     Q.  You say "The damage to the home was
25 catastrophic.  Observation of the roof

Page 170

1  shingles show that that water was above the
2  highest peak of the roof at some point."
3  What's the basis for that statement since you
4  didn't get to see the home?
5      A.  That would have been the video,
6  viewing the video.  And there is one photo in
7  here that they included that shows water
8  damage or appears to be water damage, what we
9  found to be consistent with water damage on
10 the roof.  It's one of the front sections of
11 the home.
12     Q.  And can you just tell me which photo
13 you're talking about?
14     A.  Well, actually it's in the back.
15 Excuse me.  Pardon me.  It's on page 8 of the
16 photo report.
17     Q.  And in the bottom photo obviously?
18     A.  Yes.  As I am looking at that, I can
19 tell you that, as a roofing contractor, that
20 the tendency for wind damage on roofs is
21 around the eaves and around peaks, not in the
22 center sections of roofs.  That we found that
23 homes that had been submerged in water,
24 however, were random in where the shingle
25 damage was.  Wherever the seal was broken it

Page 171

1  had a tendency to lift off more shingles.
2      Q.  And is that true for wind damage
3  caused by hurricanes of the magnitude of
4  Katrina?
5      A.  The magnitude of the hurricane is
6  not germane to it when it comes to wind versus
7  water.  Because wind damage occurs almost
8  always around the edges first.  And if you
9  don't see wind damage around the edges, then
10 wind was not as big a factor as the other.
11     Q.  You say "not as big a factor".  It
12 could still be a factor.
13     A.  I would not rule it out.
14     Q.  Going down to the next subheading,
15 "Restoration/repairs", you say "Considering
16 the evidence of catastrophic damage, it is
17 clear the only reasonable conclusion
18 commensurate with indemnifying the homeowner
19 is that the house should be demolished and
20 rebuilt.  To return this home to pre-loss
21 conditions it is likely, based on the
22 condemnation of the home and slab, that even
23 the foundation was put at risk."  You were not
24 able to evaluate the foundation.
25     A.  No, certainly not.

Page 172

1      Q.  So you cannot say that the
2  foundation of the Armstrongs' home was at
3  risk?
4      A.  I can't say conclusively.
5      Q.  And you also never had the
6  opportunity to evaluate the home while it was
7  still standing.  By the time you got there it
8  had already been torn down.
9      A.  That's correct.
10     Q.  Okay.  So you cannot say
11 conclusively that the damage was so
12 catastrophic that it had to be torn down and
13 rebuilt?
14     A.  I can't say that.
15     Q.  We talked about the Armstrongs
16 having filed claims for wind and rain damage
17 and I haven't shown you any documents along
18 those lines.  I just want to show you some
19 documents that we received from the
20 Armstrongs.  This is Number 13?
21         MR. MCCONNON:
22         Yes.
23         (Exhibit Taylor Number 13 marked
24      and attached to transcript.)
25 EXAMINATION BY MS. WAGER-ZITO:

43 (Pages 169 to 172)

SCOTT H. TAYLOR                                    February 9, 2012

Page 173

1      Q.  Since you've never seen this before,
2   I'll describe it for the record, Mr. Taylor.
3   This exhibit, Taylor Exhibit 13, is a copy of
4   a document; the front page is entitled
5   "Liberty Mutual Fire Insurance Company's
6   Notice of Removal".  Attached to that, among
7   other documents, is a document that is
8   "Petition For Damages, Breach of Contract and
9   Bad Faith."  And that's -- there aren't great
10  document numbers on this, Mr. Taylor, so if
11  you could go in about four pages and tell me
12  if you see that, the document I just
13  described, the Petition For Damages.
14     A.  Breaches, yes, I see it.
15     Q.  And if you look down under the
16  subheading III --
17     A.  Uh-huh (affirmatively).
18     Q.  -- it says "That on or about August
19  29, 2005, Hurricane Katrina came upon land and
20  struck southern Louisiana, causing major winds
21  and wind-driven waters that destroyed
22  Plaintiffs property and contents."  Do you see
23  that?
24     A.  Yes.
25     Q.  Do you disagree with what the

Page 174

1   Armstrongs represented to the Court in that
2   pleading?
3          MR. PALMINTIER:
4           I object to form.
5          THE WITNESS:
6           I wouldn't have concluded that.
7   EXAMINATION BY MS. WAGER-ZITO:
8      Q.  But the Armstrongs represented that
9   to a court of law in a pleading; correct?
10         MR. PALMINTIER:
11          I object to form.
12         THE WITNESS:
13          I can't speak to that.  This has
14         just been shown to me and I have no
15         knowledge of it prior to this.
16  EXAMINATION BY MS. WAGER-ZITO:
17     Q.  You'll admit that that's what it
18  says; correct?
19     A.  I stipulate that it does say that,
20  yes.
21     Q.  And again, you didn't -- you haven't
22  seen this before and you did not discuss with
23  the Armstrongs at all that they made this
24  claim?
25     A.  No.

Page 175

1      Q.  Nor that they in fact not only made
2   a claim with the insurance company, but then
3   filed a lawsuit against the insurance company?
4          MR. PALMINTIER:
5           I object to form.
6          THE WITNESS:
7           No, I was not aware of that.
8   EXAMINATION BY MS. WAGER-ZITO:
9      Q.  Okay.  I'll mark the next document
10  Taylor Exhibit 14.  I ask you to just take a
11  look at that.  For the record, this is a
12  document which fortunately does have some
13  Bates numbers on it.  It's LM-ARMSTRONG-229 to
14  234.  It's a document entitled "Confidential
15  receipt and release agreement".  Have you had a
16  chance to look this over, Mr. Taylor?
17     A.  No, I have not.
18     Q.  This is a document that reflects a
19  settlement agreement between the Armstrongs
20  and their insurance carriers based upon their
21  claims, among other things, for damages caused
22  by the wind and rain as a result of Hurricane
23  Katrina.  Do you see that?
24         MR. PALMINTIER:
25          Where does it state that?

Page 176

1          THE WITNESS:
2           I'm not sure where I am supposed
3          to look.
4          MR. PALMINTIER:
5           Yes.  Give us the page or the
6          area that you're talking about.  Or we
7          can find it.
8          THE WITNESS:
9           Just point me to where you want
10         me to look.
11  EXAMINATION BY MS. WAGER-ZITO:
12     Q.  Well, if you read the "Whereas"
13  clauses in the settlement agreement, among
14  others, "Whereas, thereafter the Armstrongs
15  asserted various claims for additional funds
16  for damages to the residence, contents of the
17  residence --"
18     A.  I have not seen that.  I see a
19  different "whereas".
20         MR. JOANEN:
21          The fourth "whereas".
22         THE WITNESS:
23          Oh, on the front page.
24  EXAMINATION BY MS. WAGER-ZITO:
25     Q.  Then if you look at the last page of

SCOTT H. TAYLOR                                February 9, 2012

Page 177

1  this document, Exhibit A, which is the
2  "Statement of amounts paid in satisfaction"
3  --
4      A.  The last page?
5      Q.  The last page.  Which is Bates
6  numbered ARMSTRONG-234.
7      A.  Uh-huh (affirmatively).
8      Q.  Does this appear to reflect that the
9  Armstrongs received monies in satisfaction of
10  their claims against Liberty Mutual?
11      A.  I'm not sure I can speak to that,
12  because I don't understand the -- the
13  difference between the numbers on the --
14      MR. PALMINTIER:
15        She asked you if you see it.
16      THE WITNESS:
17        I see it.
18      MR. PALMINTIER:
19        Just answer the question.
20      THE WITNESS:
21        I don't know what it means.
22  EXAMINATION BY MS. WAGER-ZITO:
23      Q.  Would the fact that the Armstrongs
24  obtained monies from their insurance company
25  for damages that they claimed were the result

Page 178

1  of wind and rain affect your opinion at all?
2      MR. PALMINTIER:
3        I object to form.
4      THE WITNESS:
5        It would not affect whether I
6      thought damages were by the flood or
7      not.  No.
8  EXAMINATION BY MS. WAGER-ZITO:
9      Q.  So you would not be of the opinion
10  that if they did in fact obtain monies from
11  their insurance company for damages as a
12  result of wind and rain, and it was your
13  opinion that those same damages were caused by
14  flood, they wouldn't be getting money for the
15  same damages twice?
16      MR. PALMINTIER:
17        I object to form.
18      THE WITNESS:
19        I can't speak to that.
20  EXAMINATION BY MS. WAGER-ZITO:
21      Q.  I'm going to show you another
22  document.  I'm going to mark this Exhibit 15,
23  Taylor Exhibit 15.
24        Have you had a chance to look at
25  Taylor Exhibit 15?

Page 179

1      A.  Briefly.
2      Q.  And what does this look like to you?
3      A.  This looks like an insurance claim
4  report from Liberty Mutual.
5      Q.  And for what damages?  What was the
6  claim for?
7      A.  I would have to look at the captions
8  for the insured, the insurance.  I don't see
9  the policy information.
10      Q.  No, I understand that, but if you
11  look at the second page it says "Roof",
12  "Coverage A Roof"?
13      A.  Uh-huh (affirmatively).  It doesn't
14  speak to cause in that.
15      Q.  Would you agree with me that if the
16  Armstrongs made a claim against Liberty Mutual
17  for wind and rain damage, that the claims
18  being adjusted here are for wind and rain
19  damage?
20      MR. PALMINTIER:
21        I object to form.
22      THE WITNESS:
23        It would seem logical.
24  EXAMINATION BY MS. WAGER-ZITO:
25      Q.  And this document is looking at

Page 180

1  damages for the Armstrongs' home, for the same
2  home that you looked at.
3      A.  The addresses are the same, yes.
4      Q.  And I want to go back to Exhibit
5  14.  And if you could go back, which is the
6  settlement agreement, just looking at, again,
7  looking at the last page --
8      MR. PALMINTIER:
9        We're talking about -- I'm
10      sorry.  Are we talking about the
11      document that's titled "Confidential
12      receipt and release agreement"?
13      MS. WAGER-ZITO:
14        Yes.
15  EXAMINATION BY MS. WAGER-ZITO:
16      Q.  If we look at the last page, I just
17  want to go into this in a little bit more
18  detail.  It appears that the Armstrongs were
19  paid $35,000 plus a little for their -- for
20  the dwelling, which would be their house.
21      A.  That's correct.
22      Q.  And $9,610 for other structures.  Do
23  you have any idea what that was for?  Did you
24  look at other structures on their property?
25      A.  There weren't any other structures

45 (Pages 177 to 180)

SCOTT H. TAYLOR                                    February 9, 2012

Page 181

1  existing.
2      Q.  Did they tell you about any other
3  structures on their property?
4      A.  Well, fencing is considered other
5  structures.
6      Q.  Okay.  And then they were paid
7  $16,545 for personal property.  Would that be
8  contents?
9      A.  That would be.
10     Q.  And then would loss of use be ALE
11  expenses?
12     A.  Yes, it would.
13     Q.  So they were paid $9,875 for loss of
14  use.
15         MR. PALMINTIER:
16             I object to form.  Calls for a
17         legal conclusion.
18         THE WITNESS:
19             It's what -- It's certainly what
20         it appears to be here.
21  EXAMINATION BY MS. WAGER-ZITO:
22     Q.  And does seeing any of this affect
23  any of your opinions regarding amounts of
24  money owed to the Armstrongs?
25         MR. PALMINTIER:

Page 182

1             I object to form.  Asked and
2         answered and it calls for a legal
3         conclusion.
4         THE WITNESS:
5             I can't speak to what is owed to
6         them, or what damages occurred.
7  EXAMINATION BY MS. WAGER-ZITO:
8      Q.  If you had seen any of this before,
9  would it have affected your conclusions?
10         MR. PALMINTIER:
11             I object to form.  Asked and
12         answered.
13         THE WITNESS:
14             Again, I can't speak to it
15         because I have not -- I wasn't asked
16         to look at it in terms of payments.
17  EXAMINATION BY MS. WAGER-ZITO:
18     Q.  In any of the work that you have
19  done in other cases, have you ever looked at
20  other claims made by a party to try and see
21  how it factors into what you were looking at?
22     A.  Could you specify what you mean by
23  "cases"?
24     Q.  Any other work that you have done as
25  an adjustor, as a claims adjustor.

Page 183

1      A.  Yes.
2      Q.  And why do you do that?
3      A.  Because I am instructed to.  The
4  instructions come in a claim.  When you get a
5  claim, there's often instructions included.
6  And an instruction may well be look at prior
7  losses.
8      Q.  So the only reason you didn't do it
9  in this case was because nobody asked you to?
10     A.  That's correct.
11     Q.  I'll mark Taylor Exhibit 16.  Taylor
12  Exhibit 16 is a document entitled "Liberty
13  Mutual, Additional living expense worksheet",
14  and it's Bates stamped LMIC-ARMS-0194 to
15  0195. Mr. Taylor, can you just take a look --
16  Have you ever seen this before?
17     A.  Not this one, no.
18     Q.  This appears to be relating to a
19  claim made by the Armstrongs arising out of
20  Katrina, the date of loss, 8/29/2005;
21  correct?
22     A.  It -- I would agree with that.
23     Q.  And it relates to the same property
24  that you were asked to opine on; correct?
25     A.  Yes.

Page 184

1      Q.  And this relates to additional
2  living expenses for the Armstrongs arising out
3  of Katrina?
4          MR. PALMINTIER:
5              I object to form.
6          THE WITNESS:
7              It's what it appears -- It looks
8          like an ALE worksheet for that event,
9          yes.
10  EXAMINATION BY MS. WAGER-ZITO:
11     Q.  And it addresses their housing costs
12  from September 1st, 2005 to September 30th,
13  2005?  So post-Katrina?
14         MR. PALMINTIER:
15             I object to form.
16         THE WITNESS:
17             That's what it appears, yes.
18  EXAMINATION BY MS. WAGER-ZITO:
19     Q.  And then it also talks about two
20  months of temporary housing while ceilings are
21  being repaired?
22     A.  I didn't see that.  I'm sure it's
23  somewhere in here.
24     Q.  Directly underneath the "Cook
25  Conference Center and Hotel" costs.  Says "Two

SCOTT H. TAYLOR                                    February 9, 2012

Page 185

1    months of temporary housing".  Do you see
2    that?
3        A.  I might be missing it somewhere.
4        Q.  Do you see it?
5        A.  Oh, okay.  All right.  Oh, I see.  I
6    thought there was a heading for it.  And what
7    was your question?
8            MR. JOANEN:
9            Do you see it?
10           THE WITNESS:
11           Yes, I see it.
12   EXAMINATION BY MS. WAGER-ZITO:
13       Q.  There is an amount there that they
14   have listed for their temporary housing costs
15   for two months while their ceilings were being
16   repaired.
17           MR. PALMINTIER:
18           I object to form.
19           THE WITNESS:
20           That's what it looks -- Well, I
21           mean, I don't know how it came about,
22           that number, but I see it, yes.
23   EXAMINATION BY MS. WAGER-ZITO:
24       Q.  And then if you look further down,
25   it's got an entry for "Motel, restaurant

Page 186

1    receipts.  Do you see that under "Food"?
2        A.  Yes, I see that.
3        Q.  Mr. Taylor, does this appear to you
4    to be at least relating to a claim for
5    additional living expenses for the Armstrongs
6    relating to their expenses that they incurred
7    as a result of being displaced from Katrina?
8            MR. PALMINTIER:
9            I object to form.
10           THE WITNESS:
11           That's what it appears to be,
12           yes.
13   EXAMINATION BY MS. WAGER-ZITO:
14       Q.  And if Liberty Mutual paid this
15   amount that was requested and reflected on
16   this form, would that be duplicative of the
17   amount that you were opining that they should
18   be due for additional living expenses --
19           MR. PALMINTIER:
20           I object to form.
21   EXAMINATION BY MS. WAGER-ZITO:
22       Q.  -- arising out of Katrina?
23           MR. PALMINTIER:
24           I object to form.  Assumes facts
25           not in evidence.

Page 187

1            THE WITNESS:
2            If that were the case, then it
3            would -- that would be perceived as a
4            duplication.
5    EXAMINATION BY MS. WAGER-ZITO:
6        Q.  Okay.  Thank you.  Briefly, the
7    language that we looked at earlier, the
8    "Coverage versus indemnification", the
9    language in the beginning of the report, was
10   any of that language supplied to you by
11   Counsel?
12       A.  No, it was not.
13       Q.  That language, and this relates to
14   all the reports, that was your language that
15   you put in?
16       A.  Yes.
17       Q.  Do you want to go back to Exhibit 1,
18   which was the original report for the
19   Armstrongs?  And under the "Coverage versus
20   indemnification" section --
21       A.  Uh-huh (affirmatively).
22       Q.  -- it says in there "Indemnifying
23   the homeowner means taking care of the
24   physical, mental, and emotional restoration of
25   the homeowner and his family.  To indemify

Page 188

1    them means to consider what it takes to return
2    them to pre-loss conditions.  That means
3    restoring their home, their contents, and
4    their financial security.  Whatever they had
5    before the loss is what this estimate seeks to
6    restore."  We noticed that in the subsequent
7    reports you deleted the phrase "financial
8    security".  Can you tell me, the first
9    question, what did you mean by "financial
10   security" in the original report?
11       A.  In the original report when I put
12   "financial security", in my mind it was their
13   livelihood, what they -- whether they would be
14   able to continue to do their job and maintain
15   an income as a result of this.
16       Q.  Why did you take it out of the
17   second report?
18       A.  I was in -- I was told that I was
19   giving a legal definition by doing so and that
20   -- that I can't give legal definitions.
21       Q.  So you are not opining on whether or
22   not Katrina affected their ability to continue
23   working?
24       A.  I am not qualified to make that
25   assertion and I was asked to disqualify that

47 (Pages 185 to 188)

JOHNS, PENDLETON COURT REPORTERS          504 219-1993

Page 189

1    statement by removing it.
2        Q.  Okay.  And that gives us less to
3    talk about.
4        A.  Okay.
5        Q.  All we want to know -- And that
6    direction was given to you by Counsel?
7        A.  Yes.
8        Q.  And when you state in here that
9    "Whatever they had before the loss is what
10   this estimate seeks to restore", you'd agree
11   that in order to come to that, to render an
12   opinion on that, you would have to know what
13   they had before; correct?
14       A.  Presum- -- Presuming that, yes.
15       Q.  Okay.  And we talked about this a
16   little before, but you have to know the type
17   and the quality of the building materials?
18       A.  Yes.
19       Q.  And you would have to know -- you
20   have to have an accurate floor plan, an
21   accurate floor plan of the house; right?
22       A.  Not necessarily.
23       Q.  How do you restore them to what they
24   had before without having an accurate floor
25   plan of what they had before?

Page 190

1        A.  In terms of the dollar amounts, it
2    won't change if you have the right square
3    footage and the right number of rooms.
4        Q.  The usage for the rooms doesn't
5    matter?
6        A.  It does to some smaller degree.
7        Q.  To what degree in the number of
8    bathrooms would matter; right?
9        A.  Exactly.
10       Q.  The number of kitchens would matter?
11       A.  Exactly.
12       Q.  So if you don't have an accurate
13   floor plan, you would certainly need to have
14   accurate measurements; correct?
15       A.  Accurate square footage.  Total
16   square footage.
17       Q.  And with regard to the contents, you
18   have to have an accurate assessment of the
19   number of items, the quantity of the
20   contents?
21       A.  Yes.
22       Q.  And you have to have an accurate
23   assessment of the quality of the items?
24       A.  To some degree, yes.
25       Q.  And you have to have an accurate

Page 191

1    assessment of the age of the items?
2        A.  In a lesser degree, yes.
3        Q.  And we discussed a little, not
4    necessarily for depreciation, but just to know
5    even how to replace them?
6        A.  Exactly.  Some things were at
7    different prices in the life of an item in
8    existence.  You know, in 1983 something cost
9    this to produce versus 1995 to produce the
10   same thing.
11       Q.  And electronics equipment would be a
12   good example of contents that the prices
13   changed significantly over time depending on
14   the age; correct?
15       A.  As the technology -- Yes,
16   absolutely.  Things change.
17       Q.  And if you're making assumptions
18   regarding any of these factors, if the age or
19   the quantity or the size is incorrect, you
20   can't restore the person to the position they
21   were in before.
22       A.  Not precisely and entirely, no.
23       Q.  But it's also possible if these
24   numbers are not correct you could be
25   over-compensating?

Page 192

1        A.  Certainly.
2        Q.  And in order to provide an accurate
3    number for additional living expenses, you
4    need to have an idea of what their living
5    expenses were prior to Katrina; correct?
6        A.  For total accuracy, yes.
7        Q.  Well, your goal is to come as near
8    to total accuracy as possible; correct?
9        A.  Always, yes.
10       Q.  So to get an idea of what the living
11   expenses were before, you need to speak with
12   them and find out what their lifestyle was
13   before Katrina?
14       A.  Yes.
15       Q.  And how much time do you recall
16   spending with the Armstrongs talking about
17   additional living expenses and what their
18   expenses were before Katrina?
19       A.  At least 30 minutes.  Probably
20   longer.
21       Q.  And if they don't recall discussing
22   that with you, they just -- they're wrong
23   about that?  You recall having that discussion
24   with them?
25       A.  I do.  I always -- mainly because I

48 (Pages 189 to 192)

SCOTT H. TAYLOR                                    February 9, 2012

Page 193

1    always do have that discussion.
2         Q.  And if you still had your notes it
3    would reflect that you had had that
4    conversation with them?  Would you have made
5    notes about those discussions?
6         A.  Most likely I would have, yes.
7         Q.  In doing your assessment of
8    additional living expenses, and we talked
9    about this before, you either had receipts or
10   receipts in this case or you didn't have all
11   the receipts, you made a determination that
12   the right number was the 20 percent number.
13   That that's the best you could do in this case
14   absent better evidence; right?
15        A.  That's correct.
16        Q.  And in coming to that conclusion and
17   reaching a number which you put in in all of
18   these reports, do you ever do any reality
19   check of that number, such as looking at how
20   much money did the people being compensated
21   even earn in that year?
22        A.  Earnings are not -- are not a factor
23   in additional living expenses.
24        Q.  Well, let's just say hypothetically
25   in 2006, the year that -- Let's take the year

Page 194

1    that you are compensating them for.  August
2    29, 2005 to August 29, 2006.  The Armstrongs
3    had no earnings.  How could they have had
4    living expenses of $35,000?
5              MR. PALMINTIER:
6              I object to form.
7    EXAMINATION BY MS. WAGER-ZITO:
8         Q.  Where are they getting the money to
9    pay those expenses?
10             MR. PALMINTIER:
11             I object to form.
12             THE WITNESS:
13             Well, that's a hypothetical
14        question.  A hypothetical answer might
15        be that they had savings.  You know, I
16        don't know.
17   EXAMINATION BY MS. WAGER-ZITO:
18        Q.  And did you have any conversations
19   with any of the Plaintiffs about putting this
20   number down in the report of your additional
21   living expenses?  "Is that number right?  Did
22   you have the money to actually pay that amount
23   of money?"
24        A.  That's -- That was outside my scope
25   of what I was asked to do, so no.

Page 195

1         Q.  So is there any, again, reality
2    check, sanity check, anything that you did to
3    the additional living expenses other than say
4    20 percent?
5              MR. PALMINTIER:
6              I object to form.
7              THE WITNESS:
8              I'm not sure what you mean by
9         "sanity check" or -- If the inference
10        is that it's overreaching, then I
11        would object to that and say I don't
12        think it's overreaching.
13   EXAMINATION BY MS. WAGER-ZITO:
14        Q.  Well, again, the question is simply
15   you're opining that the additional living
16   expenses, you know, for any of these
17   Plaintiffs was a straight 20 percent of the
18   number that you came to for the property
19   damages to their homes.  And did you ask any
20   of them whether or not they could have
21   possibly spent that amount of money in that
22   one year period?
23        A.  One year was not -- was not the only
24   consideration.
25             MR. JOANEN:

Page 196

1              Scott, listen to the question.
2         Listen to the question.  It's a
3         subject and verb in there.
4              THE WITNESS:
5              Okay.
6              MR. JOANEN:
7              Maybe you can read the question
8         back and --
9              MS. WAGER-ZITO:
10             We don't need to --
11             THE WITNESS:
12             Well, let me see if I can figure
13        out what you're asking.  Did I think
14        it was overreaching?  Is that what
15        you're saying?
16             MR. PALMINTIER:
17             Did you call them?
18             THE WITNESS:
19             Did I can them?
20   EXAMINATION BY MS. WAGER-ZITO:
21        Q.  For the Armstrongs, the additional
22   living expenses in your report that you are
23   opining on, are $38,881.
24        A.  Uh-huh (affirmatively).
25        Q.  And the question is whether you

JOHNS, PENDLETON COURT REPORTERS          504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 197

1   asked them whether they thought that this
2   number was a reasonable number for their
3   additional living expenses post-Katrina.
4       A.  No, I did not ask them.
5       Q.  And did you do any examination as to
6   whether or not that's a reasonable number
7   based upon their income, their savings, any
8   other sources of money that they had available
9   to them post-Katrina?
10      A.  I was not aware of any of their
11  funds.
12      Q.  Okay.  And we were talking a little
13  bit about the reasonable conclusion -- the
14  only reasonable conclusion was that this house
15  had to be demolished and rebuilt, and are you
16  aware that the Defendants' experts disagree
17  with that conclusion and say that the house
18  could have been repaired?
19      A.  No.
20      Q.  If the house could be repaired, do
21  you know if the cost would have been less than
22  a complete demolish and rebuild?
23      A.  I don't know without putting a
24  pencil to it.  I would have to do the
25  calculations, and it would take some time.

Page 198

1       Q.  And you have not endeavored to make
2   any determination as to what it would have
3   cost to repair the Armstrongs' home as opposed
4   to demolishing and rebuilding it?
5       A.  No, I would not.  I did not do that.
6       Q.  Just based upon your experience, do
7   you think it would be less?
8       A.  There are too many factors for me to
9   make that conclusion without looking into it.
10      Q.  Well, have you examined the
11  Defendants' expert reports enough to provide a
12  critique of their reports or rebuttal to their
13  reports?  I know you haven't done a written
14  rebuttal, but have you come to an opinion?
15      A.  Everybody's got an opinion.  And all
16  I've had is one look at each one of them.  So
17  there's not enough for me to -- I would hate
18  to take apart somebody else's work without
19  examining it in great detail.
20      Q.  And sitting here right now is it
21  your intention to study it further and provide
22  a critique of it?
23          MR. PALMINTIER:
24          I object to form.  Asked and
25      answered.

Page 199

1           THE WITNESS:
2           Only if Counsel has asked me to
3       do that.
4   EXAMINATION BY MS. WAGER-ZITO:
5       Q.  Would you be in a position to do
6   that if they asked you?
7       A.  We haven't discussed it at this
8   time, so I am not sure.
9       Q.  I think I asked you before.  I asked
10  you before if you had read the Armstrongs'
11  depositions, but were you aware prior to
12  issuing your report that the countertops in
13  the kitchen had been there since the
14  Armstrongs moved in in 1985?
15      A.  No, not entirely.  I didn't know
16  when they were put in.
17      Q.  And that the cabinets had been there
18  since 1985?
19      A.  No.  I wasn't aware of that.
20      Q.  And that the floors were vinyl or
21  linoleum in the kitchens and the bathrooms and
22  that they were there -- they were installed in
23  the '90s?
24      A.  I don't recall that.
25      Q.  And that the microwave was purchased

Page 200

1   in the 1980s?
2       A.  I don't recall that either.
3       Q.  And that the dishwasher was from
4   1991?
5       A.  No.
6       Q.  And that all of the -- none of the
7   televisions in the house were flat screen
8   televisions?
9       A.  Not aware of that.
10      Q.  Is any of this information, as far
11  as you're concerned, relevant to your
12  conclusions?
13      A.  Well, without evaluating against my
14  conclusions line by line, then I can't say
15  that.
16      Q.  Do you need to evaluate that line by
17  line to say if your conclusions are correct?
18      A.  That would be one way to do it.
19  Yes.
20      Q.  Are you aware that the Armstrongs
21  testified that the furniture in their house
22  was purchased at a store called Springer
23  Furniture?
24      A.  No, I am not.
25      Q.  And have you ever heard of Springer

50 (Pages 197 to 200)

SCOTT H. TAYLOR                                    February 9, 2012

Page 201

1   Furniture?
2       A.  No, I have not.
3       Q.  So you couldn't characterize
4   Springer Furniture or stores like it as --
5   where they're high end furniture stores or if
6   they're average quality furniture stores?
7       A.  I would not be able to determine
8   that.
9       Q.  And again, is any of that relevant
10  to the opinions that you reached in this case?
11      A.  Where they purchased the furniture?
12  Only if I knew the exact circumstances of the
13  purchases.
14      Q.  But the quality of the furniture is
15  relevant to your opinions.
16      A.  Quality is relevant, yes.
17      Q.  And other than asking the Armstrongs
18  for a contents report, did you take any other
19  steps to ascertain the quality of either the
20  furniture or the appliances or the materials
21  in the Armstrong home?
22      A.  Not specifically, no.
23      Q.  And would you agree that doing that
24  is necessary to make your opinion valid?
25      A.  I would --

Page 202

1           MR. PALMINTIER:
2           I object to form.
3           THE WITNESS:
4           I would agree that it would
5       substantiate, further substantiate my
6       opinion, yes.
7   EXAMINATION BY MS. WAGER-ZITO:
8       Q.  And I just want to make perfectly
9   clear for the record that it's your opinion
10  that the only cause of the loss of the home
11  for the Armstrongs was flood?
12          MR. PALMINTIER:
13          I object to form.  It's been
14      asked and answered.
15          THE WITNESS:
16          I have never said that that was
17      the only cause.  I only said that that
18      was all I was assessing.
19  EXAMINATION BY MS. WAGER-ZITO:
20      Q.  Is it your opinion there was no
21  other cause of damages to the Armstrongs'
22  contents in the flood?
23          MR. PALMINTIER:
24          Objection, asked and answered.
25          THE WITNESS:

Page 203

1           Again, I only assessed the flood
2       damages to those contents.
3   EXAMINATION BY MS. WAGER-ZITO:
4       Q.  Let me ask it this way.  You
5   assessed their damages as if the only cause
6   was flood?
7           MR. PALMINTIER:
8           I object to form.
9           THE WITNESS:
10          I assessed the damages only in
11      regards to flood.
12  EXAMINATION BY MS. WAGER-ZITO:
13      Q.  But it's your opinion that
14  everything they lost, they lost because of
15  flood?
16      A.  I would say that, yes.
17      Q.  And that they -- and they lost their
18  entire home because of flood?  That's your
19  opinion?
20      A.  It is my opinion.
21      Q.  And they lost all of their contents
22  only as a result of flooding?
23          MR. PALMINTIER:
24          Objection.  Asked and answered.
25          THE WITNESS:

Page 204

1           I didn't stipulate "only", but it
2       is as a result of flooding.
3   EXAMINATION BY MS. WAGER-ZITO:
4       Q.  But I am asking you now.  Is that
5   your opinion, it was only as a result of
6   flooding?
7           MR. PALMINTIER:
8           I object to form.
9           THE WITNESS:
10          Again, I only looked at it from
11      the point of flooding, so I can't
12      answer to the wind.  I would have to
13      evaluate the wind and I didn't.
14  EXAMINATION BY MS. WAGER-ZITO:
15      Q.  Is it your opinion that they lost
16  all of their contents in their home?
17      A.  Everything that was there appeared
18  to have been destroyed.
19      Q.  Okay.  So in your mind, everything
20  they lost, they lost everything in their home?
21      A.  It appeared so.
22      Q.  And you attributed it all to flood?
23  You attributed all of their losses to flood?
24      A.  I did.
25      Q.  To make this easier down the road,

51 (Pages 201 to 204)

SCOTT H. TAYLOR                                    February 9, 2012

Page 205

1  the same is true for all of the other
2  Plaintiffs?
3      A.  Yes.
4      Q.  And to the extent that Mr. and Mrs.
5  Armstrong testified in September, 2011 that
6  they had wind damage to their home and lost
7  some of their contents as a result of wind,
8  your report does not take that into effect?
9      MR. PALMINTIER:
10         Object to form.  It's asked and
11      answered and calls for a legal
12      conclusion.
13      THE WITNESS:
14         I did not take that into
15      consideration.
16  EXAMINATION BY MS. WAGER-ZITO:
17      Q.  You state in your report "The origin
18  of the flood is under review."  What do you
19  mean by that?
20      A.  Meaning that I cannot speak to it.
21  Otherwise, I would.
22      Q.  Okay.  And you are not rendering any
23  opinion as to the causation of the flood?
24      A.  Absolutely not.
25      Q.  And you're not rendering any opinion

Page 206

1  as to the source of the waters in any of the
2  Plaintiffs' homes?
3      A.  No, I am not.
4      Q.  And the same is true for all the
5  other Plaintiffs that we're going to talk
6  about in terms of not rendering an opinion on
7  the cause of the flooding or the source of the
8  water?
9      A.  That's correct.
10      Q.  Were you able to see any water lines
11  in the Armstrong house?
12      A.  If I did, it was only on photos or
13  on the video and I don't -- you know, on the
14  top of my head I don't recall it so I would
15  have to look.
16         And a quick look, I see water
17  lines, page 5 of the photo report, water lines
18  visible on the cabinets in the background.
19      MS. WAGER-ZITO:
20         Could you -- Josh, could you give
21      him a pen?
22  EXAMINATION BY MS. WAGER-ZITO:
23      Q.  Could you circle that water line on
24  the picture that you're talking about?
25      A.  Yes.  There are multiple water lines

Page 207

1  visible (writing).  Would you like to see
2  them?
3      Q.  Yes, I would, please.
4      A.  (Witness hands document to Counsel.)
5      Q.  Thank you.  And I think you
6  mentioned earlier that you thought that the
7  water went up above the roof line or to the
8  roof line?
9      A.  It certainly went above the roof
10  line in my experience based on what I saw in
11  the photos.
12      Q.  And I am looking here and these --
13  the circles you drew were on a picture of the
14  kitchen so that the top of it is obviously not
15  the roof line.  Are there other pictures that
16  show the water line above the roof line or at
17  the roof line?
18      A.  On the roof pictures.
19      Q.  Can you show us those?
20      MS. LONIAN:
21         For the record, can you just
22      state what photo and page you--
23      THE WITNESS:
24         This is picture -- It's
25      identified as picture 10 on page 5 of

Page 208

1      the photo report.
2  EXAMINATION BY MS. WAGER-ZITO:
3      Q.  Okay.  And that's the kitchen?
4      A.  That's the kitchen photo.
5      Q.  Right.
6      A.  (Writing).
7      Q.  Just tell us which picture you're
8  looking at now.
9      A.  The picture that ends with the code
10  24-P on page 8 of the photo report.  You see
11  sporadic shingles, shingles missing in chunks
12  that are nowhere near edges, indicating --
13  implying water had stood on those areas.  Now,
14  that's what happens.  We saw it over and over
15  again in confirmed locations where houses had
16  been totally submerged.  Seeing very similar
17  damages to houses that had been under water to
18  at some point.  It doesn't take very long for
19  it to loosen the seals.  Water sits under a
20  shingle, it loosens the seal because water is
21  supposed to shed down a shingle, not come up
22  from underneath.
23      Q.  Go back to the first page of your
24  report.  Under the heading "Affected parties"
25  it says "As the resolution of this loss

SCOTT H. TAYLOR                                         February 9, 2012

Page 209

1    proceeds it will necessity further
2    consultation with the homeowners and one
3    should anticipate changes to the report as it
4    pertains to the details of the loss, the
5    resolution and the associated time lines."  Is
6    it your intention -- Well, just tell us what
7    you mean by that.
8         A.  That's a rather wordy way of saying
9    there may be changes once we discover more
10   information.
11        Q.  Is that your language or did that
12   come from lawyers?
13        A.  That was mine.  But it could have
14   been more simple.
15        Q.  And that same language is in -- It's
16   in your initial report and it's in your
17   revised report.
18        A.  Yes.
19        Q.  And you said that you are not as of
20   now planning on issuing a rebuttal report.
21   How do you intend to determine when you're
22   done?
23        MR. PALMINTIER:
24            I object to form in that it
25        misstates previous testimony.

Page 210

1         THE WITNESS:
2             I really don't know when I'll be
3         done.  Only that at this point I'm
4         finished with my reporting.  If I am
5         asked to do more, then I am asked to
6         do more.  I can't determine the
7         conclusion of this.
8    EXAMINATION BY MS. WAGER-ZITO:
9         Q.  You have no plan to speak to the
10   Armstrongs any further?
11        A.  Not without instructions, no.
12        Q.  What do you mean by "associated time
13   lines"?
14        A.  In what phrase again?
15        Q.  In that phrase, the last words in
16   that sentence.
17        A.  What I am talking about there is the
18   chronology.  If there's corrections that need
19   to be made due to the chronology of the whole
20   situation and loss, then I am willing and able
21   when instructed to make those corrections if
22   more information comes to light.  When I say
23   "time lines", it's the chronology.
24        Q.  We discussed before the aerial
25   photos and you told me what you looked at.

Page 211

1    You can't point us to exactly what you looked
2    at; is that correct?
3         A.  Only if they were included in the --
4    in the actual documents.  And I don't believe
5    anything was in Armstrong.
6         Q.  There are no aerial photos.  I'll
7    represent that to you.
8         A.  So I merely looked at them online.
9         Q.  You need to take a break?
10        A.  It would be good to stand up for a
11   second.
12        MS. WAGER-ZITO:
13            Why don't we go off the record.
14        (Recess.)
15   EXAMINATION BY MS. WAGER-ZITO:
16        Q.  Back on the record.  Now, we have
17   talked a lot about the roof damage and we've
18   shown you some of the documents from the
19   claims made to Liberty Mutual.  Liberty Mutual
20   came out and looked at the roof and actually
21   had some adjustments prepared for roof damage;
22   correct?
23        MR. PALMINTIER:
24            I object.
25   EXAMINATION BY MS. WAGER-ZITO:

Page 212

1         Q.  We looked at some of those before.
2         MR. PALMINTIER:
3             I object to form.
4         THE WITNESS:
5             Inasmuch as it showed it on these
6         exhibits, yes.
7    EXAMINATION BY MS. WAGER-ZITO:
8         Q.  And in your experience as an
9    adjustor doing insurance work, would an
10   insurance company pay out for roof damage
11   caused by wind and rain if they didn't believe
12   it to have been caused by wind and rain?
13   Don't they try and separate their perils?
14        MR. PALMINTIER:
15            Object.
16        THE WITNESS:
17            Sometimes they object.
18   EXAMINATION BY MS. WAGER-ZITO:
19        Q.  And in your experience isn't one of
20   the reasons adjustors are called in is to
21   figure out was this actually caused by wind
22   and rain versus flood?
23        A.  In my experience, yes, often they
24   are asked to determine that.
25        Q.  And the reason for that is that the

53 (Pages 209 to 212)

SCOTT H. TAYLOR                                            February 9, 2012

Page 213

1  insurers don't want to pay out any money that
2  they don't have to and that they don't believe
3  that their policy covers?
4           MR. PALMINTIER:
5           I object to form.
6           THE WITNESS:
7           Well, that would certainly seem
8  logical, yes.
9  EXAMINATION BY MS. WAGER-ZITO:
10      Q.  And we talked about your conclusion
11  that the house had to be demolished and
12  rebuilt and was subject to being condemned.
13  Is that an accurate statement of your
14  conclusion?
15      A.  Did I say subject to being
16  condemned?
17      Q.  You used the phrase "condemnation".
18      A.  I would have to look at it.
19      Q.  If you look at the first paragraph
20  under "Restoration/repairs", "To return the
21  home to pre-loss conditions it is likely,
22  based on the condemnation of the home and
23  slab, that even the foundation was put at
24  risk."
25      A.  It was a natural conclusion based on

Page 214

1  the fact it's gone now, because there was so
2  many razed homes that they left the
3  foundation.
4      Q.  So that is the sole basis for your
5  opinion?
6      A.  That's --
7      Q.  For that statement?
8      A.  For that statement.
9      Q.  And do you have any familiarity with
10  the condemnation processes in effect in St.
11  Bernard Parish after Katrina?
12      A.  Not the details of it, no.
13      Q.  And are you aware that the Armstrong
14  house wasn't demolished until November of
15  2006, so not immediately after Katrina?
16      A.  I was not aware of when it was
17  demolished.
18      Q.  And are you aware that it was a
19  decision that they made to have the house
20  demolished?
21      A.  No, I was not.
22      Q.  Are you aware that Mr. Armstrong
23  testified that none of the contractors or
24  adjustors who inspected the house prior to its
25  demolition told him that it was either

Page 215

1  structurally unsound or that it couldn't be
2  repaired?
3      A.  No, I am not aware of that.
4      Q.  Does that affect your opinion at
5  all?
6      A.  It's not really what I was asked to
7  do, so it doesn't affect my opinion.
8      Q.  Are you aware that Mr. Armstrong
9  testified that he did not want to rebuild his
10  house on Hamlet in the first place because he
11  wanted to move to higher ground?
12      A.  No, I was not aware of that.
13      Q.  Does this affect your opinion at all
14  as to the amount of damages --
15      A.  No.
16      Q.  -- he should receive?
17      A.  No, it doesn't.
18      Q.  So it's your view that whether or
19  not a homeowner -- whether or not any of the
20  Plaintiffs wanted to go back to their home or
21  rebuild it at all doesn't affect how you
22  calculate the damages?
23      A.  No.
24      Q.  Your calculation of the damages was
25  purely going to be a rebuilding of the

Page 216

1  property?
2      A.  Not in all cases, no.
3      Q.  Did you opine that any of these
4  Plaintiffs could repair their homes?
5      A.  Yes.
6      Q.  Which ones?
7      A.  Livers and -- The other name.
8      Q.  Coats?
9      A.  Coats, yes.  And also the Washington
10  home on Charbonnet.
11      Q.  Was it your opinion that the homes
12  could be repaired or that they could be
13  rebuilt?
14      A.  They could be restored.  That is
15  repaired, yes.  At least that's -- that is
16  what -- what the estimate was for, restoration
17  estimate.
18      Q.  And obviously we'll get to those
19  eventually.
20      A.  Uh-huh (affirmatively).
21      Q.  And you have no firsthand
22  observation to support your contention that
23  the foundation or the slab of the Armstrong
24  home was at risk?
25      A.  No.

SCOTT H. TAYLOR                                              February 9, 2012

Page 217

```
 1       Q.  And what is the basis for your
 2   contention that the foundation was at risk?
 3   Just that it was gone?
 4       A.  That it was gone.  Because of seeing
 5   so many of them where it wasn't gone.
 6       Q.  And are you aware that the
 7   Defendants' expert inspected the slab while it
 8   was still there in 2007?
 9       A.  No.
10       Q.  Did you review Mr. Daniel's report?
11       A.  Who's Mr. Danner?
12       Q.  The Defendants' expert.  Mr.
13   Danner.
14       A.  I looked at the restoration expert's
15   or -- I looked at those reports, yes.
16       Q.  There were four different defense
17   experts.  Did you look at all --
18       A.  I get confused.
19       Q.  That's understandable.  But one of
20   them specifically looked at the Armstrong --
21   looked at the slab for the Armstrongs' home in
22   2007 and saw no evidence that the foundation
23   slab had suffered damage, suffered the extent
24   of damage that you describe in your report.
25   Do you recall reading that?
```

Page 218

```
 1       A.  I do not recall reading that.
 2       Q.  So you have no basis to dispute his
 3   contention; correct?
 4           MR. PALMINTIER:
 5           I object to form.
 6           THE WITNESS:
 7           I can't dispute something I
 8         wasn't even aware of, no.
 9   EXAMINATION BY MS. WAGER-ZITO:
10       Q.  And are you aware that the
11   Defendants' expert, Mr. Duplessis, prepared a
12   repair estimate for the Armstrong property?
13       A.  I did read a repair sometime for the
14   Armstrong property.
15       Q.  Did you review those estimates that
16   he prepared?
17       A.  I briefly looked through it, yes.
18       Q.  Do you dispute what he says in those
19   estimates?
20       A.  It's hard to dispute it when I
21   haven't gone line by line through it.  It --
22   You know, I could see -- I can see -- That's
23   -- That's an argument fraught with danger
24   when you're disputing something that you can't
25   identify the details of your dispute.
```

Page 219

```
 1       Q.  Meaning because the house isn't
 2   there?
 3       A.  Well, --
 4           MR. PALMINTIER:
 5           I object to form.
 6           THE WITNESS:
 7           -- whether the house is there or
 8       not, I am not going to dispute his
 9       assertions if I haven't read every
10       detail of it and -- and examined it
11       against my own.
12   EXAMINATION BY MS. WAGER-ZITO:
13       Q.  Again, do you plan to do that?
14       A.  Only if I am asked to.
15       Q.  And you state in your report that
16   the flooring in the Armstrong house was
17   carpeting, ceramic tile and hardwood floors.
18   Does that sound right?
19       A.  That sounds right.  It Sound --
20   Yes.  That does sound correct.
21       Q.  Are you aware that Mrs. Armstrong
22   testified that they had soft tiles, not
23   ceramic tiles, in the kitchens and the
24   bathrooms?
25       A.  I'm aware now.
```

Page 220

```
 1       Q.  Does that affect your report?
 2       A.  It did not at the time.  I am
 3   certainly able or was willing to make
 4   corrections if those -- if those facts were in
 5   error.
 6       Q.  So if in fact your report has
 7   numbers in there that are replacing the floors
 8   with ceramic tile and hardwood floor that
 9   should have been linoleum, those numbers are
10   overstated; correct?
11       A.  Not necessarily overstated.  They're
12   just not correct.  I don't know whether the --
13   what the -- what the surfaces were if they
14   weren't what I said they were.
15       Q.  Wouldn't it also be true that
16   ceramic tile and hardwood flooring is, in
17   Xactimate, is more expensive than linoleum?
18       A.  I can think of examples where it's
19   not.
20       Q.  But you would have to know exactly
21   which linoleum?
22       A.  Exactly.
23       Q.  And you don't know that?
24       A.  And I don't know that.
25       Q.  And, generally speaking, isn't it
```

SCOTT H. TAYLOR                                February 9, 2012

Page 221

1  true that ceramic tile and hardwood floors are
2  more expensive than linoleum?
3       A.  I will stipulate to that, yes.
4       Q.  And in the "Remarks" section of the
5  report, which is on page 2, you say "The
6  homeowners provided a list of contents to the
7  best of their recollection.  While the list
8  was lengthy, it did not encompass everything
9  in the home.  As this loss continues towards
10 resolution and additional questioning and
11 commiseration occurs, it has been this
12 adjustor's experience that memories will be
13 triggered.  Additionally, as the homeowners
14 recall features of their home and add these
15 are accounted for, changes to all three areas
16 of indemnity will be necessary.  Updating
17 specific details for clarity will allow even
18 more precise estimating and will necessitate
19 augmentation of the current estimate as more
20 pricing options become available."  But as
21 you've said, you're not doing this?
22      A.  This is merely a disclaimer that
23 says if things become aware -- I become aware
24 of more and am asked to do more, then the
25 numbers can change.

Page 222

1       Q.  Now, the list that the Armstrongs
2  prepared for you they did about six years
3  after Katrina?  Is that right?
4       A.  I'm sorry?
5       Q.  The list of contents, the contents
6  list that we looked at earlier that the
7  Armstrongs prepared for you, was prepared
8  about six years after Katrina; right?
9       A.  I don't know when that list was
10 prepared precisely.
11      Q.  Well, do you think that list was
12 prepared before they met with you?
13      A.  I don't think it was entirely
14 prepared before I met with them, no.  It
15 couldn't have been since they used my form.
16      Q.  Right.  That's what I am trying to
17 get, is they used your form; therefore, I am
18 agreeing with you.
19      MR. PALMINTIER:
20          Listen to the question.
21      THE WITNESS:
22          I'm sorry, I misunderstood what
23      you were asking.  I thought you were
24      asking if they had prepared it years
25      ago or something.

Page 223

1  EXAMINATION BY MS. WAGER-ZITO:
2       Q.  So is it your understanding that
3  they prepared that list for you?
4       A.  Yes.
5       Q.  And do you think that their memory
6  regarding the contents of their home was
7  better six years after the event than it was
8  closer to the event, in the months after the
9  event?
10      MR. PALMINTIER:
11          Object to the form.
12      Speculative.
13      THE WITNESS:
14          I can't be certain of that, no.
15      I can't be certain either way.  Some
16      people remember more as time goes on
17      and just add it to their lists that
18      they already have.
19 EXAMINATION BY MS. WAGER-ZITO:
20      Q.  So it's your opinion that their
21 memories will improve as they get further away
22 from the event?
23      MR. PALMINTIER:
24          I object to form.
25      THE WITNESS:

Page 224

1          I am not saying that.
2       MR. PALMINTIER:
3          Misstates testimony.
4       THE WITNESS:
5          I am saying that it may be
6      augmented.  They may have other
7      memories.
8  EXAMINATION BY MS. WAGER-ZITO:
9       Q.  You haven't heard anything from the
10 Armstrongs indicating that they have got any
11 better memories now than they did before?
12      A.  No.
13      Q.  In the "Statement of Loss" in your
14 report, you refer to the RCV, the replacement
15 cost value.
16      A.  Uh-huh (affirmatively).
17      Q.  And then there's -- we've heard
18 discussions about, and we see in there, the
19 ACV, which stands for actual cost value?
20      A.  Yes.
21      Q.  In your experience as an adjustor,
22 what does replacement cost value mean?
23      A.  Replacement cost is the cost to
24 replace things now as close to as possible as
25 they were before when you first had them.

JOHNS, PENDLETON COURT REPORTERS                504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 225

1    That means new cost.
2         Q.  But when you're replacing, let's
3    talk about a refrigerator, and a refrigerator
4    from 1990, what are you replacing it with?
5         A.  Well, obviously I can't buy a 1990
6    refrigerator, so I have to buy a current
7    refrigerator.  It has to be like kind and
8    quality and that's what replacement cost is
9    supposed to reflect.  Supposed to reflect like
10   kind and quality.
11        Q.  So in this instance what are you
12   replacing that refrigerator with?  What would
13   be a refrigerator of like kind and quality?
14        A.  Whatever the current model is that
15   is most similar to that in a new condition
16   would be the replacement cost value.
17        Q.  So the replacement for that
18   refrigerator would be brand new; right?
19        A.  It would be brand new, yes.
20        Q.  So it would be better than what you
21   were replacing.
22        A.  It would be better if there was
23   depreciation, yes.  But it would be the same
24   if you were replacing it as a new item.
25        Q.  I don't understand that.

Page 226

1         A.  If you're paying for replacement
2    cost value, you're paying for a new item and
3    that's -- that's what the -- this was based
4    on.
5         Q.  So it would be better than what you
6    were replacing.
7         A.  It would not be better than it was
8    when the purchaser purchased it.  And that's
9    what it's based on, when the purchaser
10   purchased it.  That's replacement cost.
11        Q.  But it's better than what they had.
12        A.  If it's -- If it's in any way
13   depreciated, yes.
14        Q.  Unless they bought it the day
15   before.  And if it was a car, it would still
16   be worth less.
17        A.  Right.
18        Q.  And what is actual cost value?
19        A.  Actual cash value.  That's --
20        Q.  ACV is actual cash value?
21        A.  Actual cash value.  And it refers to
22   the replacement cost value less depreciation.
23        Q.  And in your report in the Statement
24   of Loss your numbers for RCV and ACV are the
25   same.

Page 227

1         A.  Yes.
2         Q.  How can that be?
3         A.  Because the ACV has no depreciation
4    on it.  And so the actual cash value means a
5    new purchase in this case.  Because the RCV is
6    a new purchase.  So is the ACV if it's not
7    depreciated.
8         Q.  But isn't ACV by definition
9    appreciated?
10        A.  Depreciated you mean?
11        Q.  Depreciation.
12        A.  Not necessarily.  Actual cash value
13   can mean appreciated value as well.
14        Q.  Let's go back to the refrigerator.
15        A.  Uh-huh (affirmatively).
16        Q.  It's a 1990 refrigerator.  You say
17   in your opinion to give them the replacement
18   cost value, you have to buy them a new
19   refrigerator; say it was an average quality
20   refrigerator, but you're buying them a brand
21   new average quality refrigerator.
22        A.  Uh-huh (affirmatively).
23        Q.  It costs more money than the
24   refrigerator that they purchased in 1990.
25        A.  Uh-huh (affirmatively).

Page 228

1         Q.  The ACV of that refrigerator is not
2    the same, is it?
3         A.  It's the -- The ACV is what it costs
4    in this case to provide them with exactly what
5    they had if there's not going to be any
6    depreciation.
7         Q.  But that refrigerator is not worth
8    the same amount of money as a brand new
9    refrigerator.
10        A.  To me, no.  But to the owner it
11   would be.  Because that's what it would take
12   for them to replace it.  A brand new one.  You
13   can't find one that's used without its own
14   problems that you might -- that you may not be
15   aware of.
16        Q.  But the one they had might have had
17   its own problems, too.
18        A.  We don't know that.
19        Q.  Well, they do.
20        A.  Well, they might, but I would be
21   presuming against them in that case.  And when
22   it comes to this, this is not what I was asked
23   to do, was decide how to devalue their loss.
24        Q.  Wouldn't it just be true that in
25   this instance, the way you were doing it, ACV

57 (Pages 225 to 228)

SCOTT H. TAYLOR                                February 9, 2012

Page 229

1   has no place in this analysis?  As opposed to
2   saying that RCV equals ACV?
3       A.  It could have been deleted.  I will
4   say this, though.  Xactimate always includes
5   that in the report.  That's produced by the
6   report.  This Statement of Loss is produced
7   from your conclusions in the report.
8       Q.  But do you have to tell Xactimate
9   not to depreciate it?
10      A.  No.  I have to tell Xactimate to
11  depreciate it in order to get it to depreciate
12  it.  I depreciate each item one by one.  And
13  if I didn't, it's going to produce an ACV
14  number that's identical to the RCV.
15      Q.  Okay.  So that's why these numbers
16  are the same?
17      A.  Yes.
18      Q.  Because you --
19      A.  I did not depreciate.
20      Q.  You did not depreciate.  And in this
21  instance with the Armstrongs, in Exhibit 2,
22  which is the revised report, you have the
23  dwelling, the damages to the dwelling, the
24  replacement cost value at $194,407 and the
25  than contents at $181,498, which is

Page 230

1   significantly higher than the 50 percent
2   number that we talked about before; correct?
3       A.  Yes.
4       Q.  And you did that based upon the list
5   that the Armstrongs gave you of their
6   contents?
7       A.  That's correct.
8       Q.  And in looking at that list did you
9   try and make any determination of, you know,
10  "Did you really have that much clothing in
11  the house?  Did you really have that much
12  furniture in the house?"
13      A.  I couldn't speak to that line by
14  line at this time, but if you compared it
15  against theirs, I think you will find slight
16  changes here and there where I either
17  questioned it and put in a question or I
18  determined that that didn't seem reasonable
19  and I changed it on my own accord.  If I
20  changed it on my own accord, it's usually
21  because it's decreasing the amount because it
22  might have seemed exorbitant.
23      Q.  Can you remember any instances with
24  the Armstrongs where you decreased something?
25      A.  The very first thing that I

Page 231

1   mentioned before in number 3, item number 3,
2   the shelves, I actually found shelves that
3   cost $16.67 and there were three of them, and
4   so the total was 99 cents less than the total
5   that they gave.  Or it's actually -- Let me
6   take that back.  It was, with tax, $54, but if
7   you multiplied that times 3 it would be less
8   than $50.  16.67.  Or right at -- I think it's
9   right at $50.  It's something very close to
10  that.  But obviously I changed the numbers to
11  reflect that I found things that you could buy
12  for that.  And I found the same thing true in
13  other cases where I broke it down and just
14  reduced the amount.
15      Q.  Any other instances in the
16  Armstrongs' contents list that you can recall
17  --
18      A.  No.
19      Q.  -- than just the shelves?
20      A.  I'm certain there are other areas,
21  but I don't recall specifically.
22      Q.  When it comes to items like
23  clothing, do you not depreciate those items at
24  all?
25      A.  Well, I am presuming they didn't buy

Page 232

1   their clothing in a thrift store, so I didn't
2   depreciate any of them at that point, no.
3       Q.  I now want to get into a little more
4   -- We are not going to go through the numbers
5   from the Xactimate program, but, generally
6   speaking, your estimate is the result of the
7   28 pages that come from Xactimate?
8       A.  Yes.
9       Q.  And you state that the estimate was
10  compiled using the best practices for
11  independent insurance adjustors.  Can you
12  explain -- And that's on the third page of the
13  report, the first page of the estimate.
14      A.  Yes.  I know what --
15      Q.  Can you explain what you mean by
16  that?
17      A.  "Best practices" means that you're
18  basing your estimating on the dimensioning of
19  the rooms and precise numbers rather than a --
20  rather than a vague description of something
21  and throwing in arbitrary numbers of
22  something.  You are using exact dimensions and
23  you're using exact pricing on those
24  dimensions.  If you look at any items on
25  there, it will tell you how many squares are

SCOTT H. TAYLOR                                    February 9, 2012

Page 233

1    going to be on the roof or how many feet,
2    board feet of trim work there's going to be.
3    And it will reflect perimeters of the ceilings
4    of those rooms.  It will reflect the size of
5    the floor to its -- down to its last square
6    inch.  So the pricing is done based off the
7    dimensioning and it's done with fairly close
8    precision, you know.  So there's not a lot of
9    room for error on that.  That's why you see
10   figures of 810.44 lineal feet on it rather
11   than --
12       Q.  811?
13       A.  Rather than 811.  Exactly.
14       Q.  And you understand this a lot better
15   than we do, but could you explain how
16   Xactimate works?  Are you putting into a
17   computer a room that's 11 feet by 10 feet and
18   it's a wood floor and -- What kind of
19   information do you put into it to get the
20   results that we're seeing here?
21       A.  Well, if you want to pay for my
22   class, I'll really give you a good lesson.
23       Q.  I don't want five days.
24       A.  No.  No, the Xactimate class is only
25   two days.  But honestly, it's a valid question

Page 234

1    and I appreciate it.  You might want to drill
2    down just to something very specific, because
3    I could -- that's a long answer, a very long
4    answer.
5        Q.  Well, then let's look at, only
6    because it's short, --
7        A.  Okay.
8        Q.  -- the roof.
9        A.  Okay.
10       Q.  Well, or the first thing that's
11   here.
12       A.  That's fine.  If you will -- I can
13   explain --
14       Q.  I am only going to ask this for one
15   report, I promise.
16       A.  I will give you a run at the roof
17   then and show you the process.  If you look at
18   the -- hold your finger on page 2 of the
19   report and then move over to the diagraming
20   section --
21       Q.  This is a little diagram of the roof
22   (indicating)?
23       A.  Yes, that's a small diagram.  You
24   can see it much bigger in the back, though.
25   That would be on page 26.

Page 235

1        Q.  Okay.
2        A.  The roof is first dimensioned with
3    the -- based off the interior of the home.
4    The interior of the home is given in the
5    dimension -- in the square footage.  So the
6    square footage is already known and we know
7    the shape of the roof by the -- by the aerial
8    photos that are not actually in here, but that
9    are seen and were not really in dispute at
10   this point.  But knowing basically the shape
11   of the roof, this roof fits precisely over the
12   interior that is represented below it.  That's
13   the way that the sketch actually works.  If
14   you know the interior dimensions and shape,
15   then you can place the roof on top of it in
16   Xactimate and it does that and you just tell
17   it how long the eaves are hanging over the
18   edges also; and when you do that, stipulate
19   that and then drop it right on there and
20   create the shape through techniques that's
21   used in Xactimate in order to create the shape
22   to follow on it.  Once that's done, it then
23   does its own calculation based on the
24   dimensions you put in and the slope of the
25   roof you've inserted into it.  The slope can

Page 236

1    be observed by photographs, which we do have.
2    So we have those as well.  So we have the
3    shape and the slope of the roof readily
4    identified and then the roof is dropped onto
5    that.  So we use this sketch then to determine
6    everything that's been added to this
7    (indicating).
8        Xactimate has gone to the extent
9    that the first several items up -- up through
10   11 on the list of items on page 2 are all the
11   structural building of the roof, the rafters
12   and truss system that builds that roof based
13   on the shape that you put in there.
14       Q.  Let me stop you there a second.
15       A.  Yes.
16       Q.  So it's telling you how to build
17   that roof or are you telling it how to do it?
18       A.  It's telling you based on the shape
19   that you put in there.  Okay.  That's why
20   Xactimate has become the accepted standard by
21   all the insurance companies, because when --
22   when they have tested this against builders'
23   computations, they have always been accurate
24   in that.  When you have a hip roof, it takes
25   this many rafters to do this many square feet

                              59 (Pages 233 to 236)

SCOTT H. TAYLOR                                    February 9, 2012

Page 237

1    of it.  It takes this much lumber to do that,
2    this many two-by-fours, this many
3    two-by-eights, this many two-by whatever's,
4    and it builds this roof according to the shape
5    and design you put into it.  And the slope.
6    The slope will change the length of the
7    rafters.  So because of that, it knows exactly
8    how long they have to be and it's -- and here,
9    in some of the cases you don't get to choose a
10   9 and a half foot rafter, you know.  When you
11   buy lumber, you're buying 10 foot pieces or 12
12   foot.  So it actually lists them, how many of
13   each type of piece of lumber.  Because so much
14   of it is waste.  So it actually calculates all
15   of that out.  It doesn't -- And it says if I
16   had to buy this many two-by-tens, that's how
17   many it takes to do this, and plus the labor
18   on average that it takes to put that in.
19   Okay?
20          So it's building the roof first.
21   And then on top of that, then we go over to
22   page -- page 3 -- That's building the roof on
23   page 2, but on page 3, which shows the roof
24   and then it shows what is going on top of it.
25   So we built the structure of the roof on page

Page 238

1    2.  On page 3 we're actually putting together
2    the shingles and the surface of it.
3          Q.  And including the labor?
4          A.  And this also includes the labor to
5    do such.  It will take 3 -- It will take 3-tab
6    shingles, 25 year, 3-tab, 31.67 squares.  It
7    came out to 31.67 squares because the
8    calculation that I put in is -- I told it to
9    take the number of squares -- the square feet,
10   divide it by 100, and that will tell you the
11   number of squares.  With the caveat that you
12   also have to do a calculation to round up to
13   the next bundle of shingles.  So you can't
14   break open one packet of shingles and then
15   throw the rest away and -- or then -- and then
16   deduct the rest because you have to throw the
17   rest away or get rid of them.  You're stuck
18   with them.  So since there are 3 bundles of
19   shingles in every square, you have to have
20   31.67 or 31 and two-thirds squares to do
21   that.
22          However, the removal of the roof,
23   which is what we are assuming that they also
24   had done at some point before they rebuilt all
25   of this, was only 27.28 squares, because

Page 239

1    that's actually how much is on the roof.  Now,
2    why do you say that?  Because there's waste.
3    All the cut off, there's allowed 15 percent
4    waste.  So that's been calculated on that.
5    When you cut off the edges of the shingles,
6    especially on the hip roof, because there's so
7    many edges and surfaces that the shingles have
8    to be cut off.
9          Then you go down to the felt.  The
10   felt is the subsurface below the shingles that
11   covers the wood.  It's the black stuff you see
12   on roofs.  It's the tar paper.  And that is a
13   30 pound felt that's put on there in the exact
14   dimensions of -- the same shape of the roof,
15   which is how much was removed.  It's also the
16   same amount you put back on in felt.
17          Ridge cap is the edges that are
18   slightly different and they're put -- in this
19   case, because it was a 3-tab shingle, and I
20   observed that it was a 3-tab shingle, with
21   3-tab -- 3-tab cut-down ridge caps, ridge caps
22   can sometimes be an add-on feature because
23   they're more expensive.  New Orleans is the
24   perfect example of that, because you will have
25   a shingled roof with a tiled ridge.  You have

Page 240

1    seen those a lot of times.  Tiles are much
2    more expensive to ridge with than shingles
3    are, so you would -- that would be an add-on.
4          Q.  You say you observed that.  That's
5    just from the pictures that you saw?
6          A.  Oh, yeah.  Well, I mean, basically a
7    ridge cap composition shingle is the lowest
8    level of ridge you can put on there.  So they
9    didn't get any bonuses on this.  They got the
10   basic-basic roof here.
11         Q.  What did they have before?
12         A.  The basic roof.  That's what I
13   observed and that's what -- that's what I put
14   back on it.  So the ridge cap is done now.
15         The drip edge is merely the edge
16   that goes around the perimeter of the outside
17   to allow the shingles not to put -- put water
18   back into the eaves.  It allows it to flow off
19   the roof and not wick underneath.
20         The ridge -- Remove and replace
21   valley metal, valley metal goes into every
22   valley in order to prevent accidents when
23   somebody steps in a valley from breaking the
24   shingles and creating a rain source of water
25   leak.

JOHNS, PENDLETON COURT REPORTERS              504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 241

1        Exhaust cap through the roof,
2  those are the -- any vents that go through.
3  They cost extra to put in because they have to
4  be flashed and shingled around.
5        The roof vent, the same thing.
6  Turbines have to be flashed and shingled
7  around, plus they cost money for the vents
8  themselves.
9        And then you have the regular
10  flashing pipe jacks, which are any exhaust
11  vents through the roof from plumbing.
12  Plumbing stacks.
13     Q.  And I appreciate that explanation
14  and it makes more sense to me now, but again,
15  you put this into Xactimate and it kind of
16  spits it out.  For purposes of the unit cost,
17  does it do a "Okay, I am in New Orleans in
18  2011"?
19     A.  Yes.  That's exactly what it does.
20     Q.  And where does it get that
21  information?
22     A.  Xactimate updates its databases for
23  every zip code in the United States every
24  three months, and that's another reason it is
25  the standard by which insurance companies

Page 242

1  work.
2     Q.  And labor costs, the same thing?
3     A.  Exactly.
4     Q.  You have to let me finish.
5     A.  I'm sorry.
6     Q.  Input into Xactimate are the labor
7  costs for the locale for a certain time
8  period?
9     A.  Yes.
10     Q.  Did it factor in, you know, what was
11  going on in New Orleans at the time and that
12  there was a lot of work to be done?  Did that
13  make it more expensive?  Did that make it less
14  expensive?  Are those types of issues factored
15  into Xactimate?
16     A.  Yes.  During the catastrophe
17  Xactimate --
18     Q.  Does it assume gouging?
19     A.  It assumes some of that, but the
20  main thing is it looks at market -- market
21  conditions in any given locale where there's a
22  -- sometimes up to daily they will do
23  re-evaluations of certain things.  If there
24  are a lot of roofs blown off, for example, in
25  a tornado that came through, for example, then

Page 243

1  they will look at that market and say "Nobody
2  can buy shingles for less than $400 a square.
3  So, therefore, we have to change our price"
4  and they issue the price change right then and
5  the user of Xactimate, all they have to do is
6  connect to XactAnalysis and it changes their
7  price structure for that zip code.
8     Q.  So is it your opinion that insurance
9  companies are relying solely on Xactimate and
10  not saying to adjustors "You need to go out
11  and get X number of bids for a new roof"?
12     A.  It's generally not the adjustor's
13  job to do -- to do that anyway.  And in an
14  insurance claim it's not the adjustor's job to
15  find multiple bids on anything.
16     Q.  Regardless of whose job it is to get
17  bids, is it your testimony that insurance
18  companies will rely on Xactimate as opposed to
19  saying that "We need to go out and get three
20  bids for this project and then we will decide
21  what to pay for your claim"?
22     A.  That seems almost a straw argument,
23  because it's asking two different conclusions.
24  It's -- It's -- One doesn't follow the other
25  necessarily.  That's apples and oranges, in

Page 244

1  other words.  Getting multiple bids and your
2  relying on a certain database aren't really
3  the same thing.  Multiple bids aren't going to
4  use a database to determine their -- to
5  determine how much they charge.  That's going
6  to be coming from a contractor, not somebody
7  that supplies prices for shingles, for
8  example.
9     Q.  Okay.  But in deciding on what to
10  pay out on a claim, --
11     A.  Uh-huh (affirmatively).
12     Q.  -- will an insurance company rely on
13  a pricing analysis performed by Xactimate or
14  are they going to go out and get bids for the
15  project, for the particular claim?
16     A.  It's been my experience that most
17  insurance companies have come to rely on
18  Xactimate's pricing more so than contractor
19  bids.
20     Q.  In the bids that we saw earlier with
21  the Armstrongs for Liberty Mutual, they went
22  out and got bids for the roof; correct?
23        MR. PALMINTIER:
24        I object to the form.
25        THE WITNESS:

61 (Pages 241 to 244)

SCOTT H. TAYLOR                                February 9, 2012

Page 245

1        I didn't see -- Okay.  But I did
2    not see that in theirs.  I didn't see
3    multiple bids.
4    EXAMINATION BY MS. WAGER-ZITO:
5        Q.  But your experience recently has
6    been that insurance companies are relying on
7    Xactimate as opposed to going out and getting
8    bids?
9        MR. PALMINTIER:
10       I object to the form.  Asked and
11   answered.
12   EXAMINATION BY MS. WAGER-ZITO:
13       Q.  I am going to hand you Exhibit
14   Taylor 17 and ask you to take a look at that.
15       MR. PALMINTIER:
16       And this is the exhibit next,
17   correct?
18       MS. WAGER-ZITO:
19       I said it's Exhibit 17.
20   EXAMINATION BY MS. WAGER-ZITO:
21       Q.  And what I want you to look at in
22   there is the page starting with the Bates
23   number 0154.
24       A.  I'm sorry?  Sorry, I was
25   distracted.  I was reading these, comparing

Page 246

1    these two estimates.  One second.
2        Okay.  You can ask me what you
3    need to ask me on these.  I'm prepared to
4    address it.
5        Q.  All right.
6        MR. PALMINTIER:
7        I object to the form.  I just
8        object to this exhibit being used.
9        And the reason for the objection is
10       improper foundation, or the proper
11       foundation hasn't been laid, as well
12       as we really don't know, you know,
13       what this exhibit is in reference to.
14       In other words, who spoke to who.  And
15       the exhibit doesn't really say
16       anything on it to let us know that
17       information.
18   EXAMINATION BY MS. WAGER-ZITO:
19       Q.  You can again look at the page
20   starting with 0154.
21       A.  On which one?  Exhibit 17 or 15?
22       Q.  Yes, 17.
23       A.  Uh-huh (affirmatively).  Okay.
24       Q.  And the pages following that.  But
25   again, this -- back to the first page for a

Page 247

1    second.  The insured is Kenneth Armstrong.
2    The property is the same address that we have
3    been talking about.  The date of loss is
4    8/29/2005.  So it's Katrina.  It says "Date
5    inspected", somebody who actually did get to
6    look at the property, 6/27/2006.
7        A.  Uh-huh (affirmatively).
8        Q.  It says "In the following pages you
9    will find the estimated cost of repairs to
10   your home using prices that are usual and
11   customary in your area at this time.  We
12   encourage you to work with a contractor of
13   your choice in completing these repairs."  And
14   then if you look at the next page, there's a
15   description of -- for a roof.  Now, does this
16   appear to be something that was generated by a
17   program like something like Xactimate?
18       MR. PALMINTIER:
19       I object to form.
20   EXAMINATION BY MS. WAGER-ZITO:
21       Q.  Or was it --
22       A.  I can tell you that this was
23   generated by Xactimate and I can identify the
24   price list that was used on it as well.
25       Q.  Is it the same -- Is this the same

Page 248

1    roof that you are talking about in your
2    report?
3        MR. PALMINTIER:
4        I object to form.
5        THE WITNESS:
6        I don't -- I don't know that.
7    But I will say this.  I would set my
8    roof against theirs 100 times out of
9    100 and be much more accurate than
10   theirs, because they didn't properly
11   dimension it.  The reason I know that
12   is because of the description in the
13   box.  If you look at the diagram on
14   page 155 of that, you will see there
15   is no diagram.  It's a box.  That was
16   not sketched.  It was -- Those were
17   filled in dimensions that were not
18   properly sketched.  So it has no shape
19   given to it.  It has nothing to
20   demonstrate the veracity of their
21   sketch.  They don't have a diagram.
22   They have entered information.  They
23   don't have properly sketched
24   information.  So -- And it also
25   doesn't say that it includes the

62 (Pages 245 to 248)

SCOTT H. TAYLOR                                    February 9, 2012

Page 249

1      entire roof.  It only says 25 -- 25.7
2      squares.
3          MR. PALMINTIER:
4          What was the initial question?
5      I'm sorry.
6          MS. WAGER-ZITO:
7          He answered the question.
8          MR. PALMINTIER:
9          Okay.
10     EXAMINATION BY MS. WAGER-ZITO:
11         Q.  Now, you said you could tell exactly
12     when the price list was from?
13         A.  Uh-huh (affirmatively).  Not
14     exactly, but very close.
15         Q.  And how do you do that?
16         A.  If you look on page 154, it gives
17     the name of the price list, which is LANO,
18     which stands for Louisiana, New Orleans.  And
19     "4" means it was the fourth update of that
20     price list for the year, which is going to be
21     6, which is 2006.  So that means that they --
22     this was a 2006, fourth generation price
23     list.  So it was very current at the time that
24     it was done.
25         Q.  And you don't know if they were

Page 250

1      replacing the entire roof or just a part of
2      the roof --
3          A.  It doesn't show that.
4          Q.  -- as a result of that?
5          A.  It doesn't show that, because you
6      don't have anything to demonstrate the proper
7      dimensioning of it.
8          Q.  And you can't tell if this is the
9      same roof that they were looking at --
10         A.  No.
11         Q.  -- as the roof you were looking at?
12         A.  No.  Because there's no sketch
13     there.
14         Q.  So you don't know if they got paid
15     for the same roof that you were proposing to
16     pay them for?
17         A.  I wouldn't know.  You're right.
18         Q.  And it's your testimony that the
19     Xactimate is a better way of adjusting claims
20     than going out and getting contractor bids?
21         MR. PALMINTIER:
22         I object to form.  Misstates the
23     testimony.
24         THE WITNESS:
25         I think that you have a mixed bag

Page 251

1      there.  There's several techniques for
2      it.  Different insurance companies use
3      different techniques for doing it.
4      But almost all of them accept
5      Xactimate as the industry standard for
6      what the estimate should look like.
7      EXAMINATION BY MS. WAGER-ZITO:
8          Q.  And I asked in your opinion, you
9      believe Xactimate is better than -- a better
10     way of doing it than getting contractor bids?
11         MR. PALMINTIER:
12         I object to form.
13         THE WITNESS:
14         They're not mutually exclusive at
15     all.  Many contractors use Xactimate.
16     Many.  In fact, probably in today's
17     roofing world, most of them do.  So
18     there's two versions of Xactimate.
19     One is for insurance, one is for
20     remodeling and construction.
21     EXAMINATION BY MS. WAGER-ZITO:
22         Q.  I bet there are.
23         A.  Yeah.  One of them doesn't deal with
24     insurance issues when you look at the
25     reports.  The other one -- because it's just

Page 252

1      remodeling and rebuilding, which is a major
2      feature of Xactimate.
3          Q.  Now, I think you said this, but you
4      believe that general contractors are using
5      Xactimate to prepare their estimates for
6      clients?
7          A.  Many of them are, yes.
8          Q.  But they do it somewhat differently?
9          A.  If they're using the contractor
10     version of them.  Some of them go ahead and
11     use the regular insurance version of it
12     because they want to be able to submit to an
13     insurance company.
14         Q.  And why would they be doing that?
15     Because they're doing the repairs -- they're
16     doing insured repairs?
17         A.  Right.
18         Q.  How do they differ?  How does the
19     contractor version differ from the insurance
20     version?
21         A.  The contracting price is the same.
22     The difference is that they don't have any
23     insurance policy information or claim
24     information or that kind of thing.  It doesn't
25     have deductibles written in and all of that

63 (Pages 249 to 252)

SCOTT H. TAYLOR                                   **February 9, 2012**

Page 253

1  kind of thing.  It's just a bid process.
2       Q.  Does the insurance version have
3  depreciation in it?
4       A.  It does.  It does include that as an
5  option, yes.
6       Q.  And you didn't use that option?
7       A.  Oh, no.
8       Q.  Is there a different Xactimate for
9  commercial properties?
10      A.  There are some differences in --
11  There are some additional features that can be
12  used for the commercial properties, yes.
13      Q.  What's your understanding of where
14  the Armstrongs decided to live after Katrina?
15      A.  I really don't have much of an
16  opinion on that.  I don't know that we
17  discussed that --
18      Q.  Did you discuss that?
19      A.  -- at all.
20      Q.  They did not rebuild their home;
21  correct?
22      A.  It doesn't appear they did.  At
23  least not there.
24      Q.  But it's still your opinion that the
25  measure of damages should be what it cost to

Page 254

1  rebuild their home?
2       A.  I would say so, yes.
3       Q.  And if you're wrong about that being
4  as a matter of law the correct measure of
5  damages, then this estimate is not applicable
6  to the Armstrongs' damages?
7           MR. PALMINTIER:
8           I object to form.
9  EXAMINATION BY MS. WAGER-ZITO:
10      Q.  Correct?
11      A.  I can't make that assertion.
12      Q.  Because you don't know as a matter
13  of law what the correct measure of damages is?
14      A.  That's one reason I can't make the
15  assertion, yes.
16      Q.  Is there any other reason that you
17  can't make the assertion?
18      A.  I wouldn't venture a legal opinion
19  on it, for one thing.
20      Q.  If you disagreed with a price in
21  Xactimate for either a material or a labor
22  amount or any of the different variables, do
23  you have a way of overriding that?
24      A.  There are certain techniques that
25  can be used, but they're all discoverable.

Page 255

1       Q.  What do you mean, they're all
2  discoverable?  Discoverable in the legal sense
3  or --
4       A.  No, no, no.  I mean, there's a way
5  of discerning it.  Let's put it that way.
6       Q.  It would show up on here?  It would
7  somehow show up on these documents that you
8  made some kind of variation from Xactimate?
9       A.  Not on those documents.  But in the
10  hard files it would, in the computer files,
11  because when you've got it on the screen it
12  doesn't produce the same report there as it
13  does.  But it shows price variations if
14  there's a price variation.
15      Q.  And we can hopefully make this
16  easy.  Did you do that?  Did you do any
17  overrides of any variable in Xactimate for any
18  of your estimates in this case?
19      A.  No.  I was very careful not to
20  change prices.
21      Q.  If there was an error in the
22  Xactimate price, would you have a way of
23  knowing that?
24      A.  If there was a serious error in a
25  price and it appeared that it was over- or

Page 256

1  under-pricing something substantially, I've
2  seen enough estimates that I would probably
3  spot it.
4       Q.  And did that happen at all in this
5  case with any of the Plaintiffs?
6       A.  No.
7       Q.  If the Court were to determine in
8  this case that some of the damage to the
9  Armstrongs' house was not caused by flood
10  waters, would the Court still be able to
11  utilize your estimate to determine the
12  damages?
13          MR. PALMINTIER:
14          I object to form.  Calls for a
15  legal conclusion.
16          THE WITNESS:
17          Well, I think they should be able
18  to.  I don't see why they wouldn't.
19  EXAMINATION BY MS. WAGER-ZITO:
20      Q.  How would they be able to do that?
21  If the Court were to say the roof and the
22  contents in the attic were caused by wind and
23  rain damage, could they still -- could the
24  Court still use your report to determine the
25  damages?

**JOHNS, PENDLETON COURT REPORTERS**                    **504 219-1993**

SCOTT H. TAYLOR                                        February 9, 2012

1          MR. PALMINTIER:
2          I object to form.  The same
3     objection.
4          THE WITNESS:
5          And the same answer.  They
6     could.  They could use it if they
7     wanted to.  Certainly.
8     EXAMINATION BY MS. WAGER-ZITO:
9          Q.   And what would they have to do?
10         A.   It depends on what they -- how they
11    wanted to stipulate.
12         MR. PALMINTIER:
13         Same objection --
14         THE WITNESS:
15         There's -- It throws --
16         MR. PALMINTIER:
17         -- again.
18         THE WITNESS:
19         It throws a couple of questions
20    to my mind, you know.  So I -- It's a
21    little bit hard to guess what they
22    might want to do.
23    EXAMINATION BY MS. WAGER-ZITO:
24         Q.   Well, what questions --
25         MR. PALMINTIER:

1          Don't guess.
2     EXAMINATION BY MS. WAGER-ZITO:
3          Q.   -- would it raise in your mind?
4          A.   Well, it just -- it asks questions
5     as to which portions would be destroyed and
6     which portions wouldn't be destroyed.  So --
7          Q.   And the question was, can the Court
8     do that.
9          MR. PALMINTIER:
10         Object.
11    EXAMINATION BY MS. WAGER-ZITO:
12         Q.   In your mind, is there a way that
13    you can look at this, you're sitting on the
14    witness stand and the Judge says to you, "Mr.
15    Taylor, I appreciate your report, I am finding
16    that the damage to the roof and the contents
17    in the attic were caused by wind and rain and
18    not flooding; what's your opinion as to the
19    damages?  Can I figure it out from your
20    report?"
21         MR. PALMINTIER:
22         The same objection.
23         THE WITNESS:
24         Not conclusively from my report.
25    Somebody -- It would have to take

1     another analysis altogether.
2     EXAMINATION BY MS. WAGER-ZITO:
3          Q.   Okay.  And if the Court were to
4     determine that some of the damage to the
5     Armstrongs' house was caused by flood water
6     coming from different sources, could the Court
7     use your report as is to determine the damages
8     to the Armstrongs' house?
9          MR. PALMINTIER:
10         I object to form.  Calls for a
11    legal conclusion.
12         THE WITNESS:
13         Okay.  Well, honestly, I don't
14    think that -- there's nothing in my
15    report that would indicate where --
16    when water occurred and how it
17    occurred.  So I didn't even address
18    that.  I never address that in
19    there.  So --
20    EXAMINATION BY MS. WAGER-ZITO:
21         Q.   And I understand that.  So all I am
22    saying is that could the Court use your report
23    to determine the damages to the Armstrongs'
24    property if the Court were to say some of the
25    water came from the breaches that the

1     Plaintiffs allege that my client and the
2     government caused and some of the water came
3     from somewhere else?  Could the Court use your
4     analysis to determine --
5          MR. PALMINTIER:
6          Objection.
7     EXAMINATION BY MS. WAGER-ZITO:
8          Q.   -- the damages?
9          A.   If that was the way they were
10    approaching it, I -- I think they could find
11    however they wanted to.  I don't think that
12    it's -- It's certainly not addressed in my
13    report to give them a distinctive ability to
14    do that, no.
15         Q.   And to shorten our time together,
16    would your answer be the same for all the
17    other Plaintiffs?
18         A.   Yes.
19         MR. PALMINTIER:
20         The same objection.
21         THE WITNESS:
22         Yes.
23    EXAMINATION BY MS. WAGER-ZITO:
24         Q.   And I think you testified earlier
25    that you believe you spent 40 to 50 hours on

SCOTT H. TAYLOR                                    February 9, 2012

Page 261

1    the Armstrong analysis?  Is that correct?
2        A.  I think so.
3        Q.  Do your invoices reflect how many
4    hours you've spent on this case?
5        A.  No.
6        Q.  So you just sent a number saying
7    "You owe me X"?
8        A.  It's reflected by the number of
9    pages produced and how -- and the scope of the
10   damages.  In other words, if I had a lot of
11   damages in there that I worked on for a long
12   time and it took me a long time and the pages
13   began to pile up, a report of that size and
14   scope would be that price, period.
15       Q.  How is that reflected on the
16   invoice, if at all?  Or did you just send an
17   invoice to the Plaintiffs' Counsel saying --
18   with just a number on it?
19       A.  For -- A number for each of the
20   different -- each of the different claims.  I
21   basically looked at the number of pages
22   involved in it and went through it and said
23   this one -- and looked at the time that I'd
24   spent on it and made a subjective analysis as
25   to which one was more exhaustive; maybe I had

Page 262

1    to study more photos that weren't even my
2    photos.  The Armstrong took a little while
3    longer because I had photos that I was
4    supplied from someone else that I had to
5    analyze and spend time with.  Just whatever it
6    was.  There was a number of things that went
7    into it.  And yes, I got different numbers
8    based on those subjective analysis.
9        Q.  You said you had photos from someone
10   else.  Does that mean from the Armstrongs or
11   were they photos from --
12       A.  The ones included in here.
13       Q.  So it was just your two photos and
14   then the Armstrongs' photos?
15       A.  And the Armstrongs' photos.
16       Q.  And then the one video you told us
17   about?
18       A.  And the video that I had seen, yes.
19       Q.  Okay.  Were there any other photos?
20       A.  Not that I recall, no.
21       MS. WAGER-ZITO:
22           Josh, I think we would like
23       copies of the invoices.
24       MR. PALMINTIER:
25           Okay.

Page 263

1        MS. WAGER-ZITO:
2            Thank you.
3    EXAMINATION BY MS. WAGER-ZITO:
4        Q.  If you could turn to page 20 of your
5    report, Exhibit 2.  And at the top of that
6    page it reflects a line item total of 157,000
7    plus and then material sales tax.  Now, is
8    that something Xactimate throws in there?
9        A.  Yes.
10       Q.  Okay.  And then overhead at 10
11   percent, is that directly from Xactimate?
12       A.  No.  It is, but I have to tell it to
13   do that.
14       Q.  And where did that number come from?
15       A.  That's an industry standard for both
16   contractors and for insurance companies.
17       Q.  And the same thing for profit?
18       A.  Yes.
19       Q.  Okay.  So you tell Xactimate to put
20   in the 10 percent overhead and the 10 percent
21   profit?
22       A.  Uh-huh (affirmatively).  Yes.
23       Q.  And that brings you to your
24   replacement cost value of $194,000.
25       A.  That's correct.

Page 264

1        Q.  And is the 10 percent overhead and
2    profit the same -- is that a New Orleans
3    number or is that a nationwide number?  Is it
4    regional?  Where does that come from?
5        A.  That's accepted across the country
6    as a standard for contractors.
7        Q.  And in your opinion, is there a
8    typical ratio for the cost of building
9    materials relative to labor costs for single
10   family residences?
11       A.  There are -- There are some ratios,
12   but they differ regionally.  It depends on
13   where you are.  When there are unions
14   involved, the ratio of the labor increases.
15       Q.  What are the typical ratios in New
16   Orleans?
17       A.  I wouldn't know the precise ratios.
18       Q.  Did you look at the numbers in your
19   reports to determine if the ratios appear
20   correct?
21       A.  I have come to accept the numbers of
22   the ratios in Xactimate and I have not
23   analyzed the ratio between the labor and
24   material costs for this price list, no.
25       Q.  Okay.  When you apply -- we looked

66 (Pages 261 to 264)

SCOTT H. TAYLOR                              February 9, 2012

Page 265

1   at this number before -- the 157,000 is labor
2   and materials; correct?
3       A.  It is.
4       Q.  Is sales tax typically paid on labor
5   as well as materials?
6       A.  Not always.  Sometimes it is,
7   sometimes it isn't.  But in this case most
8   likely it is not.
9       Q.  So was that a mistake in your report
10  to apply the 9 percent?
11      A.  Oh, I didn't do it.  Xactimate did
12  it on its own.
13      Q.  Did Xactimate only apply it to the
14  materials here?
15      A.  Generally it does, yes.
16      Q.  So in this case the materials are
17  51,393.  So does that mean the remainder of
18  the -- if you deduct that from the 157, that's
19  all labor?
20      A.  Right.  Right.
21      Q.  Does that ratio seem --
22      A.  That seems normal.  A two-thirds to
23  one-third ratio is fairly normal.  Two-thirds
24  labor and one-third material.
25      Q.  That's your experience in the

Page 266

1   industry, that that's normal?
2       A.  Yes, it is.
3       Q.  When you were looking at the
4   contents list for the Armstrongs, in
5   particular with the appliances, did you
6   consider the age of the appliances?
7       A.  No, I did not.
8       Q.  Did you consider the brand?
9       A.  Not -- Briefly I looked at those
10  when I saw something.  If I saw it, I
11  considered it, but unless it jumped out I did
12  not change anything.
13      Q.  But they didn't tell you the age or
14  the brand or the condition?  You didn't know
15  it; correct?
16      A.  That's exactly right.
17      Q.  So you just took their word for all
18  of those factors with regard to the contents?
19      A.  Yes.
20      Q.  And you just assumed that the
21  pricing that they gave you was reasonable?
22      A.  In most -- In nearly every case,
23  yes.  I don't know of any instance in this
24  particular one where I didn't.
25      Q.  Were there any instances in any of

Page 267

1   the Plaintiffs' contents lists that you did?
2       A.  I would have to -- We would have to
3   address each one individually.  If I saw
4   something, it might -- it might trigger a
5   memory as I went back through it and say, "Oh,
6   yeah, this one is different."  Or I'd say "I
7   made a change here."
8       Q.  We'll do that with the individual
9   Plaintiffs and see if you -- If you were to do
10  that to try and figure out, okay, what was
11  this worth, how old is it, how would you do
12  that?  Internet research?
13      A.  Again, if you run things through
14  XactAnalysis using their system, it compares
15  pricing across a variety of vendors and it'll
16  find those items for you.  You enter a
17  description, it finds them for you and then
18  prices them, gives you an average price, gives
19  you an obsolescence issue; if there's an
20  obsolescence issue, it says "This is no longer
21  available.  Here is the most accurate
22  replacement for that item."
23      Q.  You said XactAnalysis.  Did you mean
24  Xactimate?
25      A.  Well, actually it is Xact- -- It is

Page 268

1   XactAnalysis through what is called
2   XactContents, which is all parts of
3   Xactimate.  Yes.  It's all part of the same
4   thing.
5       Q.  In doing your work in this case you
6   didn't actually use that feature, did you?
7   Correct?
8       A.  I did use that feature to do some
9   check point analysis where I ran a few items
10  through to see if they were coming out right.
11  I sampled everything.  I sampled it and I
12  looked at it, okay, this -- let's run this and
13  see what it gives me.
14      Q.  So that was kind of the sanity check
15  on this, or the reality check?
16      A.  Okay.
17          MR. PALMINTIER:
18          I'll object to form.
19          THE WITNESS:
20          Reality check.  Okay.
21          MS. WAGER-ZITO:
22          He likes the form of that one.
23  EXAMINATION BY MS. WAGER-ZITO:
24      Q.  Did you do any of that for the
25  Armstrongs' contents list?

                          67 (Pages 265 to 268)

JOHNS, PENDLETON COURT REPORTERS              504 219-1993

SCOTT H. TAYLOR                                February 9, 2012

Page 269

1     A.  I'm certain I did, because I made it
2  a practice to do that at least on something on
3  everyone.
4     Q.  Do you have any documents reflecting
5  that?
6     A.  No.  It would be voluminous, because
7  it produces such a volume and it's used just
8  as an inspection trigger for me.
9     Q.  Were you aware that in addition to
10  filing a claim against Liberty Mutual, the
11  Armstrongs also filed a claim against Allstate
12  for flood damages?
13     A.  No, I was not aware of that.
14     Q.  And did that affect your opinions in
15  any way?
16     A.  At this point, no.
17     Q.  If you had known that at the time,
18  would that have affected your opinions?
19     A.  Not under the task I was assigned.
20  I was assigned to assess the flood damages.
21  Not to evaluate the payments.
22     Q.  I hand you a document that we're
23  going to mark as Taylor Exhibit 18.  Taylor
24  Exhibit 18 is a one-page document titled at
25  the top "Allstate Insurance Company".  It's

Page 270

1  got a Bates number ALLSTATE-000025.
2     A.  Uh-huh (affirmatively).
3     Q.  "Insured, Jeneen Armstrong".  The
4  date is October 11, 2005 and it appears to be
5  a listing of -- it says "Property loss
6  worksheet", and I assume this is not something
7  you have seen before.  Correct, Mr. Taylor?
8     A.  That's correct.
9     Q.  The total of this -- I mean, it's
10  got different categories including hard
11  furniture, soft furniture, clothing and
12  linens, electronics, books/CDs/DVDs, artwork,
13  and personal property.  Are these the same
14  types of items that you asked the Armstrongs
15  to list on their contents list?
16     A.  Yes, similarly.  I didn't break them
17  into categories like that.  Those same
18  categories, I didn't distinguish between hard
19  and soft furniture, for example.
20     Q.  I wouldn't know how to distinguish
21  between hard and soft furniture.  The total on
22  this list is $145,100 before any
23  depreciation.  Do you see that?
24     A.  Yes.
25     Q.  The total on the list that you used

Page 271

1  was $181,498.  Is that correct?
2     A.  Yes.
3     Q.  And this list includes depreciation
4  numbers that are different by category.  Is
5  that standard in the insurance industry?
6     A.  No.
7     Q.  When you're doing insurance
8  adjusting as opposed to the work that you do
9  here, do you depreciate personal property?
10     A.  If the policy is an ACV policy, yes.
11     Q.  And if it's an ACV policy and you're
12  depreciating, are there standard depreciation
13  numbers that you would use?
14     A.  No.
15     Q.  You would do it on an item by item
16  basis?
17     A.  It's the only objective way to do
18  it.  It's not -- It's considered lazy
19  adjusting to use blanket depreciation.
20     Q.  So let's say you were, again, doing
21  this for the Armstrongs; you would take every
22  item on this list of their contents that we
23  talked about before, you'd need to know the
24  age of the item; right?
25     A.  You need to know a number of things.

Page 272

1     Q.  And we talked about that before and
2  I don't want to go over it, --
3     A.  Yes.
4     Q.  -- but you would go through that
5  analysis for every single item on the list?
6     A.  Yes.  To be thorough.  To be
7  thorough.  And many of it -- many times it's
8  subjective.  But to be thorough, that is the
9   -- that's the way you're taught to do it.
10     Q.  When you're doing it in practice, is
11  that what you actually do?  Item by item?
12     A.  Often we do.  Often I do.  That's
13  why insurance adjustors don't like to do
14  contents.
15     Q.  So when you're trying to determine
16  this when you're doing it item by item, --
17     A.  Uh-huh (affirmatively).
18     Q.  -- what source do you use for what
19  the appropriate depreciation amount is?
20     A.  There's several methods.  One of
21  those is age and condition compared against
22  and contrasted with life expectancy.  And then
23  it becomes a percentage of that based on the
24  percentage of life expectancy that's been used
25  up.  That's -- That's one of the most thorough

68 (Pages 269 to 272)

SCOTT H. TAYLOR                                    February 9, 2012

Page 273

1   methods.
2        Q.   Is this one of the topics that you
3   teach about in your course?
4        A.   I do.
5        Q.   Is this something that can be done
6   in the Xactimate software?
7        A.   Yes, it can.
8        Q.   So you can put in an item -- Do you
9   need its original cost?
10       A.   Yes.
11       Q.   So you put in the item, you put in
12   the original cost, and you put in the -- How
13   do you do it, as opposed to me guessing?
14       A.   You list its age and its life
15   expectancy.  And once -- if it's already -- if
16   it's in XactAnalysis, it knows the life
17   expectancy of an item before you do it and,
18   therefore, you can add the age of it and
19   that's enough to do that.  But another factor,
20   and more expensive items it's important to use
21   this item, is its condition and its functional
22   value.  Those are things that have to be
23   considered subjectively in order to determine
24   if you're actually using accurate
25   depreciation.

Page 274

1        Q.   And for items that have been
2   destroyed such as they were in this instance,
3   you would be -- for condition you would have
4   to just ask the insured what was the condition
5   of the item?
6        A.   You would -- You would have to,
7   yes.
8        Q.   And it's your testimony that it's
9   your practice and what you would do is you
10   would do it item by item?
11       A.   I would.
12       Q.   So if it were hypothetically
13   required in this case that you would, we
14   depreciate the items, that's what we would
15   have to do for all the items, for the contents
16   for all the Plaintiffs?
17       A.   I would agree, hypothetically.
18       Q.   And this list that we were just
19   talking about in Taylor Exhibit 18 is dated
20   October 11, 2005.  So this was much closer to
21   the time of loss than the contents list that
22   the Armstrongs put together for you; correct?
23       A.   Uh-huh (affirmatively).  Yes.
24       Q.   Let's take a look at Taylor Exhibit
25   19.  And Taylor Exhibit 19 is a document, it's

Page 275

1   from Liberty Mutual, it's titled "Proof of
2   loss".  Bates number lMIC-ARMS-0196 through
3   0198.  And, Mr. Taylor, you see on here it
4   says "Insured, Kenneth Armstrong"?
5        A.   Yes.
6        Q.   And date of loss is August 29, 2005?
7        A.   Yes.
8        Q.   And the property is the same
9   property that we have been talking about?
10       A.   Yes.
11       Q.   And in "Description of loss", it
12   says -- Well, "Type of loss", it says -- the
13   box "Other" is checked and it says "Attic
14   content."
15       A.   Yes, I see that.
16       Q.   And "Description of loss", it says
17   "Due to the multiple holes in our roof we
18   lost all of our attic content, along with
19   ceilings."  Do you see that?
20       A.   Yes.
21       Q.   And then the following two pages are
22   the attic contents that were claimed to be
23   lost.  Do you see that?
24       A.   Yes.
25       Q.   Would it be relevant to compare this

Page 276

1   list of contents to the list that you were
2   provided by the Armstrongs?
3        A.   In what way do you mean "relevant"?
4        Q.   This document was prepared -- This
5   is another document that was prepared closer
6   in time to Katrina than the ones they prepared
7   for you; correct?
8        A.   Yes.
9        Q.   And this is in connection with the
10   contents that they claim were lost due to wind
11   and rain damage based upon what we saw earlier
12   in their litigation?
13       A.   If we stipulate that, yes.
14       Q.   Do you know if these contents were
15   also included in the contents list that was
16   supplied to you and then you have included in
17   your analysis?
18       A.   I see some similarities in some of
19   the items.
20       Q.   And if the Armstrong were paid,
21   received money from Liberty Mutual for these
22   contents in connection with their claim, would
23   they be double-dipping, so to speak, if they
24   were also included in your analysis?
25            MR. PALMINTIER:

JOHNS, PENDLETON COURT REPORTERS                  504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 277

```
1        I object to form.
2        THE WITNESS:
3        Well, I can't speak to what --
4    whether they're doing that.  I don't
5    want to render a legal opinion about
6    that kind of thing.
7    EXAMINATION BY MS. WAGER-ZITO:
8        Q.  If they were paid twice for the same
9    contents, would you consider that to be a
10   benefit to the Armstrongs?
11       MR. PALMINTIER:
12       I object to form.
13       THE WITNESS:
14       Well, I can't deny that it would
15   be helpful to get more money.
16   EXAMINATION BY MS. WAGER-ZITO:
17       Q.  And that they would be getting paid
18   twice for the same items?
19       MR. PALMINTIER:
20       I object to the form.
21       THE WITNESS:
22       If these are the same items,
23   yes.
24   EXAMINATION BY MS. WAGER-ZITO:
25       Q.  Did you give the Armstrongs any
```

Page 278

```
1    advice or guidance as to how to value items
2    for sentimental value?
3        A.  Not that I recall.  I don't recall
4    giving them any specific advice on sentimental
5    value.
6        (Whereupon a discussion was held
7        off the record.)
8    EXAMINATION BY MS. WAGER-ZITO:
9        Q.  Do you understand the term
10   "betterment" in the context of your work?
11       MR. PALMINTIER:
12       I object to form.
13       THE WITNESS:
14       Well, I am aware of the term
15   "betterment" that is used in the
16   insurance industry.
17   EXAMINATION BY MS. WAGER-ZITO:
18       Q.  What does that mean to you?  What
19   does that term mean in the insurance industry?
20       A.  To improve something.  If you're
21   going to improve it.
22       Q.  Improve it in relation to what?
23       A.  To the original -- To the original
24   condition of whatever it is you're dealing
25   with.
```

Page 279

```
1        Q.  Does it mean that the insureds are
2    coming out ahead of the game, getting more
3    money for something than the value of the
4    insured property?
5        A.  Generally that's not what we would
6    refer to, or I as an adjustor, a veteran, no.
7        Q.  Is there something you would refer
8    to?
9        A.  As a betterment?
10       Q.  Yes.
11       A.  It would be improving the condition
12   of something.  Let's say, for example, you had
13   a broken counter and the only way to replace
14   that would be to use a new one.  You couldn't
15   use a used one.  Well, that's a betterment.
16   Because now they're getting a new counter and
17   they had an old one before.
18       Q.  And in the industry that happens
19   sometimes?
20       A.  All the time.
21       Q.  All the time.  Would you agree that
22   by not depreciating the items, the contents
23   for the Plaintiffs in this case, that
24   betterment is arising out of that situation to
25   the Plaintiffs?
```

Page 280

```
1        MR. PALMINTIER:
2        Objection.
3        THE WITNESS:
4        Only per my definition as I just
5        described it, then, yes.  Because
6        you're not going to give them a used
7        item.
8    EXAMINATION BY MS. WAGER-ZITO:
9        Q.  And that's fairly across the board
10   for all of their contents to the extent you're
11   not depreciating them?
12       MR. PALMINTIER:
13       I object to form.
14       THE WITNESS:
15       Yes.
16   EXAMINATION BY MS. WAGER-ZITO:
17       Q.  And is there a way to quantify that,
18   or would the quantification be what the items
19   would have been valued at if they were
20   depreciated versus what you're giving them?
21       MR. PALMINTIER:
22       I object to form.
23       THE WITNESS:
24       Yes.
25   EXAMINATION BY MS. WAGER-ZITO:
```

SCOTT H. TAYLOR                                                    February 9, 2012

Page 281

```
 1      Q.  And I don't want -- we're not going
 2  to go through all the contents on any of the
 3  Plaintiffs' lists, but we do want to talk
 4  about some of the contents on the list.  So if
 5  you could look at in Exhibit 2, if you could
 6  look at item number 168 --
 7      MR. JOANEN:
 8          Adrian, if we're going to go into
 9      that exact detail, do you think we
10      could take a little break, stretch our
11      legs?
12      MS. WAGER-ZITO:
13          Do you want to stretch your legs?
14      Yes, we can take a break.
15      THE WITNESS:
16          I'm getting a little --
17      MS. WAGER-ZITO:
18          We can go off the record.
19          (Whereupon a discussion was held
20      off the record.)
21          (Recess.)
22  EXAMINATION BY MS. WAGER-ZITO:
23      Q.  Back on the record.  Again just a
24  couple of things on the contents less.  If you
25  look at item number 168, which is missing from
```

Page 282

```
 1  mine --
 2      A.  It's missing from mine, too.
 3      Q.  It's missing.  You know what?
 4      A.  Maybe it's in the other one.
 5      Q.  No, it's not.  Maybe that's not a
 6  great example.
 7      MS. LONIAN:
 8          Page 9 is missing.
 9      MS. WAGER-ZITO:
10          What?
11      MS. LONIAN:
12          Page 9 is missing.
13      THE WITNESS:
14          Yes, it's missing out of both
15      versions.
16      MS. WAGER-ZITO:
17          Off the record for a second.
18          (Whereupon a discussion was held
19      off the record.)
20  EXAMINATION BY MS. WAGER-ZITO:
21      Q.  We're going to skip that one.  Maybe
22  go back to it tomorrow when we can get it.
23      MS. WAGER-ZITO:
24          And we will correct the exhibit
25      tomorrow.
```

Page 283

```
 1      MR. PALMINTIER:
 2          Okay.
 3  EXAMINATION BY MS. WAGER-ZITO:
 4      Q.  Do you recall that Mr. Armstrong,
 5  one of the items that they lost was a fishing
 6  boat?
 7      A.  I do recall that, yes.
 8      Q.  And you discussed this in your
 9  report on page 18, I believe.  Do you see
10  that?
11      A.  Uh-huh (affirmatively).
12      Q.  Under "Description"?  It says "The
13  largest ticket item is a 1998 Scout Eldorado
14  fishing boat with Evinrude engine.  Retail for
15  a six year old boat is around $14,000 without
16  the engine.  The engine and boat together
17  would be worth in excess of $15,000, which is
18  the amount entered in the worksheet.
19  Supporting documentation is attached."  And
20  then the documentation is contained in the
21  last two pages of your report.
22      A.  Right.
23      Q.  So you just took that number, or how
24  did you come to the number that you put in the
25  report?
```

Page 284

```
 1      A.  I believe that was from Edmunds, an
 2  NADA valuation.  Let me -- we can see the
 3  website on this, but it's --
 4      Q.  I mean, look at literally the
 5  second-to-last page of the report.
 6      A.  Yes, I am looking at that.  And
 7  that's an Internet price for that, for a 2005
 8  Scout boat.  I didn't have any earlier age on
 9  that as far as I know.  What did I say?
10  1998.  Yeah.  I didn't have anything for --
11  couldn't find a 1998.  So you find the oldest
12  one you can.
13      Q.  Are you aware that Mr. Armstrong
14  testified that he sold the boat prior to
15  Katrina -- that if he had sold the boat prior
16  to Katrina, he believed he would have gotten
17  $5,000 to $6,000 for it?
18      A.  Not aware of that.
19      Q.  Does that change your opinion at all
20  on the value of the boat?
21      A.  Not based on my research it doesn't,
22  no.
23      Q.  Did you ask Mr. Armstrong what he
24  believed the value of the boat to be?
25      A.  I don't recall specifically, but it
```

**JOHNS, PENDLETON COURT REPORTERS**                    504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 285

1    would have been my practice to do so.
2        Q.   Scott has graciously found page 9
3    for us, and it's behind page 13.
4        A.   Okay.
5        Q.   So if you could turn to that and go
6    to item number 168.
7        A.   Okay.
8        Q.   And it's a baseball card collection
9    --
10       A.   Uh-huh (affirmatively).
11       Q.   -- that's valued at $7,500.
12       A.   Uh-huh (affirmatively).
13       Q.   When you looked at this contents
14   list and you said you were looking for things
15   that jumped out at you, is this one of the
16   things that jumped out at you?
17       A.   I mean, it certainly did, and I
18   looked at it; and if the cards were that old,
19   I recall having a conversation with them about
20   baseball cards at some point when we were
21   talking about things and I said, "You have to
22   give us an assessed value.  And I am not going
23   to be able to dispute it."
24       Q.   Are you aware that Mr. Armstrong
25   testified that he wasn't certain that the

Page 286

1    collection had ever been appraised?
2        A.   Not -- No, I wasn't.
3        Q.   Are you aware that Mr. Armstrong got
4    the value from his son?
5        A.   No.
6        Q.   Are you aware that the baseball card
7    collection belonged to his son and not to him?
8        A.   No.
9        Q.   And did you ask for or do you have
10   an itemized listing detailing which cards were
11   included in the collection?
12       A.   No, I don't.
13       Q.   But it's your testimony that you
14   believe you had some conversations with Mr.
15   Armstrong about the baseball card collection?
16       A.   That there was a baseball card
17   collection involved, yes.
18       Q.   Was that the sum and substance of
19   the conversation, that there was a collection,
20   and no discussion about what was contained
21   within that baseball card collection?
22       A.   There wasn't -- No, there wasn't a
23   specific discussion on the contents of the
24   collection.
25       Q.   Were you aware of whether or not the

Page 287

1    Armstrongs had any personal property articles
2    insurance?
3        A.   No, I am not aware.
4        Q.   Going back to the boat for a second,
5    are you aware that Mr. Armstrong testified
6    that he paid between $14,000 and $15,000 for
7    the boat when he purchased it?
8        A.   No.
9        Q.   Would that in any way affect your
10   opinion on the value of the boat?
11       A.   It would strengthen my opinion on
12   what I put in there.
13       Q.   If he purchased the boat for $14,000
14   to $15,000 in 1999, you think that in 2005 or
15   when you were doing this in 2011 the value
16   should be the same?
17       A.   If it's RCV, yes.
18       Q.   Is it your opinion that you couldn't
19   replace it with a 1999 boat?
20       A.   It wouldn't be the same any more.
21   You can't find a 1999 boat that's brand new.
22       Q.   You could find a 1999 boat that was
23   the same as the one he lost, though; correct?
24       A.   There's too many things that could
25   be different about the boat with conditions.

Page 288

1        Q.   Would you agree that providing Mr.
2    Armstrong with a brand new boat in this
3    instance would be an instance of betterment as
4    you defined that before?
5            MR. PALMINTIER:
6            I object to form.
7            THE WITNESS:
8            I can't speak to that because it
9        really doesn't go into what I did.  I
10       did an RCV valuation of it.  That's
11       all.
12   EXAMINATION BY MS. WAGER-ZITO:
13       Q.   If that's all you were doing, then
14   why did you -- why were you looking at the
15   NADA numbers for the boat?
16       A.   Because it gave me the ACV value of
17   it when it was brand new.  That's what I was
18   looking for.
19       Q.   But you looked at the RCV.  You
20   looked at the NADA numbers for 2005.
21       A.   For what?
22       Q.   For the boat?
23       A.   For a brand new boat in 2005.  I was
24   looking for the model number and that's the
25   only one I could find with that same model.

72 (Pages 285 to 288)

SCOTT H. TAYLOR                                    February 9, 2012

Page 289

1      Q.   It's the same model number, but it
2   was not the boat that he lost.
3      A.   It's not the same year, no.  But it
4   was similar.
5      Q.   Do you know if the options on the
6   2005 boat that's described in the attachment
7   to your report, do you know how that compares
8   to the options that were actually on the boat
9   that Mr. Armstrong lost?
10      A.   No, I do not.
11      Q.   And we talked before about the
12   additional living expenses, and I don't want
13   to go over everything we discussed before, but
14   do you know when the Armstrongs settled into a
15   permanent residence after Katrina?
16      A.   No, I do not.
17      Q.   Is that relevant to your
18   determination of the ALE?
19      A.   No.
20      Q.   Would that be relevant to your
21   determination of the ALE if you were trying to
22   figure out the actual expenses for the
23   Armstrongs?
24      A.   Certainly if I was using all
25   receipts, all documentation, I would have to

Page 290

1   have it all the way through the time they
2   moved into a new permanent residence.
3      Q.   But because you were just doing the
4   straight 20 percent, you didn't need to know
5   that?
6      A.   I do -- No, I didn't.  You're
7   exactly right.
8      Q.   Okay.  We already talked about
9   whether or not you were able to review the
10   Armstrongs' pre-Katrina receipts and you said
11   they didn't have enough of them.  Is that
12   correct?
13      A.   That is correct.
14      Q.   Or their pre-Katrina bills?
15      A.   They didn't even provide any
16   pre-Katrina bills.
17      Q.   Well, to do an ALE where you're
18   looking at actuals, you would need to compare
19   the pre-Katrina bills and compare them to the
20   post-Katrina bills, correct, if you were
21   looking for actuals?
22      A.   If I was doing this as an insurance
23   adjustor, then that is the comparison.
24   However, it is accepted policy to take
25   verbatim what they -- what their previous

Page 291

1   bills were and then you use receipts to
2   justify the additional.
3      Q.   And are you aware that the
4   Armstrongs paid off their mortgage on their
5   home with insurance proceeds so that they
6   didn't have to continue paying any mortgage --
7      A.   No, I was not aware of that.
8      Q.   -- after?  And is it fair to assume
9   that they had no further insurance premiums on
10   their house after Katrina?
11      A.   I can't speak to that.
12      Q.   Do you think that they would have
13   still been paying insurance premiums after
14   their house was destroyed?
15      A.   I can't -- I can't speak to that.
16      Q.   And is the fact that they didn't
17   have any mortgage payments any further and
18   hypothetically didn't have any insurance
19   premiums any further, does that affect your
20   opinion of the Armstrongs' ALE calculations?
21      A.   No, it does not.
22      Q.   I assume, but I'll just confirm,
23   that you did not look at any of the ALE claims
24   that the Armstrongs made to Liberty Mutual.
25   Correct?

Page 292

1      A.   No, I did not.
2      Q.   Are you aware that the Armstrongs
3   moved to the North Shore in June of '06 and
4   decided to stay there after Katrina and made
5   that their permanent residence?
6          MR. PALMINTIER:
7          I object to form.
8      THE WITNESS:
9          I am not aware of that.
10   EXAMINATION BY MS. WAGER-ZITO:
11      Q.   So if the Armstrongs had established
12   a new permanent residence in June of 2006,
13   would that affect your calculation of ALE?
14      A.   I can't speak to that.  It's not a
15   fact I was aware of.
16      Q.   But if you did know that, would that
17   affect how you calculate ALE if they
18   established a new permanent residence --
19          MR. PALMINTIER:
20          I object to form.
21   EXAMINATION BY MS. WAGER-ZITO:
22      Q.   -- in less than a year?
23          MR. PALMINTIER:
24          I object to form.
25      THE WITNESS:

73 (Pages 289 to 292)

SCOTT H. TAYLOR                                    February 9, 2012

---

Page 293

1         I was asked to evaluate based on
2    the facts that I had at hand and I
3    couldn't stipulate any differently.
4    EXAMINATION BY MS. WAGER-ZITO:
5         Q.  And the facts you had at hand were
6    that you didn't know what the Armstrongs'
7    actual expenses were as a result of, or what
8    their actual ALE was as a result of Katrina?
9         MR. PALMINTIER:
10        I object to form.
11        THE WITNESS:
12        I did not know exactly what it
13    was.
14    EXAMINATION BY MS. WAGER-ZITO:
15        Q.  And you didn't seek to figure that
16    out?
17        A.  I did, based on receipts I was given
18    and it was not enough to determine it based on
19    that.
20        Q.  But did you ask them any questions
21    about, you know, where they moved to right
22    after Katrina and when they established a new
23    permanent residence after Katrina?
24        A.  I asked them some cursory
25    questions.  When I say cursory, I asked them

Page 294

1    how long they were out of their house.  And
2    once they established it was at least a year
3    or it appeared to be more than a year, I
4    stopped asking questions as to that because I
5    knew that if I didn't have enough receipts
6    that I would end up with 20 percent.
7         Q.  You say it appeared to be more than
8    a year.  So they didn't tell you that they
9    established a new permanent residence in June
10   of '06?
11        A.  They did not.
12        Q.  And you said it's typical -- the
13   reason you used the 20 percent is that that's
14   the typical number reached in a year period?
15   Is that your testimony?
16        A.  No.
17        Q.  Where is the 20 percent coming from?
18        A.  20 percent is based off of the
19   coverage A amount and it's a percentage of
20   that amount.  And insurance companies
21   typically cut off ALE at one year.  They
22   typically do that.
23        Q.  And they typically cut it off at one
24   year and use this 20 percent number?
25        A.  Generally speaking, that's a general

Page 295

1    -- generalization, yes.
2         Q.  Is there any statistical evidence
3    supporting the use of the 20 percent number?
4         A.  Only that it is commonly taught in
5    licensing courses.
6         Q.  And is it taught in the course that
7    you teach?
8         A.  No, because it's not a -- it's not a
9    licensing course.
10        Q.  And again, if it's determined that
11   your number for the total RCV for the
12   Armstrongs' house is incorrect, or if
13   depreciation should have been applied, then 20
14   percent would be 20 percent of a lower
15   number?
16        A.  If that's the standard.
17        Q.  And you believe that's still a
18   correct amount to compensate them for?
19        A.  I believe it's still a correct
20   amount, yes.
21        Q.  If the evidence were to show that
22   the Armstrongs' post-Katrina expenses didn't
23   exceed their pre-Katrina expenses in any way,
24   would you still believe that they were
25   entitled to ALE of $38,000 plus?

Page 296

1         A.  I really can't speak to that because
2    that -- that's not the way I understood it
3    happened.
4         Q.  When you say that's not the way you
5    understood it happened, what do you mean by
6    that?
7         A.  I understood they had other
8    expenses.
9         Q.  And what was that understanding
10   based on?
11        A.  Based on the attempt to provide the
12   receipts that they did.
13        Q.  What receipts did they provide?
14        A.  At this moment I don't have them in
15   front of me so I couldn't speak to them, but
16   they were not sufficient to build the
17   chronology that I needed to be able to show
18   that everything was covered.
19        Q.  At one point -- Did they give you
20   any receipts?
21        A.  There were some documents I was sent
22   that had some scanned images of some receipts,
23   but they -- they were so inadequate and so
24   incomplete that there was no way to piece
25   together the chronology.

74 (Pages 293 to 296)

Page 297

1    Q.  So you have no way of saying at all
2  what their actual expenses were?
3    A.  No.
4    Q.  And how detailed a conversation did
5  you have with them about what their ALE
6  expenses were?  Did you ask them how much they
7  spent on housing?
8    A.  Because we only had one meeting
9  where I was present with them, I asked them to
10  complete an ALE evaluation and went over it in
11  detail as to what it would involve.  And I
12  gave them the details of what it should
13  involve and that they needed to compile as
14  many things as they could find to document
15  their actual expenses after the loss for as
16  long as they were out of their permanent
17  residence.
18    Q.  Did you give them a document similar
19  to the contents worksheet that we looked at
20  before?
21    A.  No, I did not.  I gave them a
22  description of it, and in some cases I -- I
23  make it a habit of actually drawing something
24  out for them and showing them how the columns
25  work.  Put one in one column, you list the

Page 298

1  actual -- the previous expenses that you're
2  accustomed to having; the second column, you
3  put the actual expenses that you did have
4  after the event occurred; and then the third
5  column is the difference between those.  And
6  then you add up the third column for actual --
7  for additional living expenses.
8    Q.  And did you do that here with the
9  Armstrongs?
10    A.  I would have done that with them at
11  least in description.  Whether I handed them a
12  document -- Because I don't have a document
13  for that form to hand them, I gave them a
14  description of "This is how you should do it."
15    Q.  And to your recollection they never
16  filled this out and provided that to you?
17    A.  They did not as far as I know.  That
18  was never filled out, provided to me.  I got
19  --
20    Q.  Was it ever -- Did you ever ask --
21    A.  -- I got a lot of receipts that was
22  not a chain that could be followed.
23    Q.  Did you ever ask Counsel to ask them
24  to fill that out?
25    A.  By the time that we were getting

Page 299

1  down to the wire on everything from contents
2  and -- No, I didn't.  Because I'd already
3  determined I was going to have to use the 20
4  percent.  It would have taken me longer to
5  produce the other and document everything in
6  it to go to the 20 percent.
7    Q.  If they were to be able to fill out
8  that form now, would you change your opinion
9  as to the ALE for the Armstrongs?
10    A.  If it was complete, I would.
11    Q.  I think we're done with the
12  Armstrongs.
13      MS. WAGER-ZITO:
14        Actually, why don't we go off the
15  record for a second.
16      (Whereupon a discussion was held
17  off the record.)
18      (End of day's proceedings.)
19        *   *   *
20
21
22
23
24
25

Page 300

1        SCOTT TAYLOR,
2  after having been duly sworn by the
3  before-mentioned court reporter, did resume
4  testifying as follows on February 10, 2012:
5  EXAMINATION BY MS. WAGER-ZITO:
6    Q.  Good morning, Mr. Taylor.  I know
7  that you were just reminded that you're still
8  under oath, but for the record we'll just
9  confirm that you're still under oath.
10  Correct?
11    A.  Yes.
12    Q.  I know I promised I was done with
13  the Armstrongs, but I'm not.  Just one other
14  question.
15      I would like to hand you a
16  document that we're going to mark as Taylor
17  Exhibit -- or that we have marked as Taylor
18  Exhibit 20.  You'll get it in a second.  I am
19  just going to ask you to take a look at it to
20  see if you have looked at it before and
21  whether or not this would be -- this kind of
22  information would be relevant to your
23  consideration of additional living expenses
24  for the Armstrongs.
25      While you're looking at it, I'll

SCOTT H. TAYLOR                                    February 9, 2012

---

Page 301

1   identify it for the record.  Taylor Exhibit 20
2   is -- the first page is a handwritten letter
3   dated July 18, 2006.  It's signed from Kenneth
4   and Jeneen Armstrong.  The Bates numbers are
5   LMIC-ARMS-0166 through 0189.  The letter
6   starts "To whom it may concern: I am
7   submitting a copy of the expenses we have
8   endured since Hurricane Katrina."  Do you see
9   that?
10       A.  Yes.
11       Q.  Have you had a chance to look it
12  over?
13       A.  Not really.
14       Q.  Can you look at it and tell me if
15  you've seen this, any of this information
16  before?
17       A.  I can tell you I have not seen this
18  before.
19       Q.  Is this the type of information that
20  you would ordinarily look at in connection
21  with determining additional living expenses?
22       A.  It is the type of information, yes.
23          MR. PALMINTIER:
24             Adrian, where does this come
25          from?  Which Bates stamp is this?

---

Page 302

1          MS. LONIAN:
2             It's from the Liberty Mutual
3          Insurance Company.  We produced all of
4          this previously.
5          MR. PALMINTIER:
6             Okay.
7   EXAMINATION BY MS. WAGER-ZITO:
8       Q.  You say this is the type of
9   information that you would look at; correct?
10       A.  Yes.
11       Q.  And did you ask the Armstrongs if
12  they had these types of receipts reflecting
13  their additional living expenses?
14       A.  Yes, I did.
15       Q.  And what were you told?
16       A.  They told me they would find what
17  they could and get that to the attorneys.
18       Q.  But you never saw these documents?
19       A.  No, I did not.
20       Q.  Would this affect your opinion as to
21  the Armstrongs' additional living expenses,
22  this type of information?
23       A.  This type of information would.
24       Q.  And we talked yesterday about the
25  notion of using the 20 percent number for

---

Page 303

1   additional living expenses in lieu of actuals
2   if you don't feel like you have adequate
3   information to determine actuals.  Correct?
4       A.  Yes.
5       Q.  And I don't want to mischaracterize
6   your testimony.  I am just doing the best I
7   can summarizing it.  The 20 percent concept is
8   an insurance concept; is that correct?  Is
9   that where it comes from, the insurance world?
10       A.  Yes.
11       Q.  And you are not doing an insurance
12  adjustment in this case; correct?
13       A.  No.  Correct.
14       Q.  That was a bad question.  No, that
15  was my fault that was a bad question.  Okay.
16  It's true that you're not doing an insurance
17  adjustment?
18       A.  That's correct.
19       Q.  So you just chose to use this 20
20  percent number in this tort case because it's
21  the best thing that you've got?
22          MR. PALMINTIER:
23             I object to form.
24          THE WITNESS:
25             It's my practice to use that.

---

Page 304

1   EXAMINATION BY MS. WAGER-ZITO:
2       Q.  Whether it's an insurance case or
3   it's a tort case?
4       A.  I did not distinguish in that
5   regard.  It's the only world that I am
6   familiar with.
7       Q.  But you would agree that the best
8   evidence of additional living expenses would
9   be actual numbers; correct?
10       A.  I would agree that the best evidence
11  is a complete chronology with all the actual
12  numbers.
13       Q.  And so we don't have to do this
14  again, the same would be true for all the
15  Plaintiffs in this case; correct?
16       A.  Yes.
17       Q.  You didn't have actual numbers for
18  any of the Plaintiffs?
19       A.  That's correct.
20       Q.  Okay.  Now we will in fact turn to
21  the Holmeses.  And again, you can just put
22  that to the side.  We will mostly be looking
23  at the revised report, but I think I do have a
24  couple of questions about the original
25  report.  So we'll be looking at Exhibits 2 and

---

JOHNS, PENDLETON COURT REPORTERS                504 219-1993

SCOTT H. TAYLOR                                         February 9, 2012

Page 305

3.
          MS. LONIAN:
               Exhibits 3 and 4.
    EXAMINATION BY MS. WAGER-ZITO:
    Q.   3 and 4.  And just for the record,
Exhibit 3, is this a copy of your original
report that you prepared for the Holmes
residence and dated July 17, 2011?
    A.   I believe so.
    Q.   Do you have any reason to believe
it's not the report?
    A.   No.
    Q.   And Exhibit 4 is the revised report
dated October 20th, 2011.  Is this a true and
correct copy of your revised report?
    A.   I believe it is also.
    Q.   Did anyone assist you in the
preparation of either of the reports for Mr.
and Mrs. Holmes?
    A.   No.
    Q.   Did anyone else author any of the
portions of the report?
    A.   No.
    Q.   Similar to the Armstrong report,
were these reports reviewed by Counsel?

Page 306

    A.   Yes.
    Q.   Were any changes made by Counsel
other than as we discussed yesterday,
typographical type errors?
    A.   No.
    Q.   In connection with the preparation
of the reports, were you given any
instructions by Counsel that were different
from any of the instructions that you were
given when you were preparing the Armstrongs'
reports?
    A.   No.
    Q.   And were the assumptions that you
were told to make with regard to the Holmes
report any different from the assumptions that
you were told to make with regard to the
Armstrongs?
         MR. PALMINTIER:
              I object to form.
         THE WITNESS:
              No.
    EXAMINATION BY MS. WAGER-ZITO:
    Q.   And with regard to any of the other
Plaintiffs' reports, so we don't have to ask
these questions again, would your answers be

Page 307

the same?
    A.   Yes.
    Q.   Did you meet with or have any
communication with Mr. or Mrs. Holmes before
you submitted Exhibit 3, your original
report?
    A.   I did have communication, yes.
    Q.   Did you meet with them?
    A.   No.
    Q.   What kind of communication did you
have?
    A.   Telephone communication and -- and
email communication.
    Q.   With who?
    A.   With Mr. Holmes.
    Q.   Can you tell me about the telephone
call with Mr. Holmes, to your best
recollection, how long it was, what did you
discuss?
    A.   I visited with Mr. Holmes twice on
the phone.  Once initially to get the basic
facts concerning the loss, similar to what I
would have asked the Armstrongs and discussed,
and he provided me as much information as
necessary for me to combine that with my own

Page 308

inspection and other research to create the
first report.  Or the final report.
    Q.   I'm sorry.  Do you recall how long
this phone conversation was?
    A.   Possibly 30 minutes or so.
    Q.   And you said some email
communication.  Do you have copies of those
emails?
    A.   No, I actually don't.  I don't even
own the computer that I was using at the time.
    Q.   Does your Counsel -- Did you share
those emails with Counsel?
    A.   No.
    Q.   How much email communication did you
have?
    A.   No more than one email.  Everything
that was emailed to me from Mr. Holmes is in
 -- is in the reports.  It's actually included
in there.
    Q.   What was in there?  The photos?
    A.   The photos.  The photos.
    Q.   Was anything else emailed to you
other than the photos?
    A.   No.
    Q.   And are all the photos that Mr.

                              77 (Pages 305 to 308)

SCOTT H. TAYLOR                                    February 9, 2012

Page 309

1  Holmes shared with you attached to your
2  report?
3      A.  Yes.
4      Q.  And we'll get to those photos
5  later.  Just to be clear, it was, to your best
6  recollection one 30 minute conversation that
7  you had with Mr. Holmes?
8      A.  No, there were -- there were two.
9  Because it took some time for him to get it
10 together, and I called him a second time to
11 get the photos.
12     Q.  So was the second phone call -- How
13 long was the second phone call?
14     A.  No more than five minutes.
15     Q.  So was that more or less along the
16 lines, "I really need those photos.  Can you
17 get them to me"?
18     A.  Yes.
19     Q.  Any substantive discussion about the
20 loss in that second phone call?
21     A.  No.
22     Q.  So essentially it was one 30 minute
23 phone call with Mr. Holmes prior to preparing
24 this report?
25     A.  It's possible that the phone call

Page 310

1  was longer.  It's very possible.
2      Q.  But only that one phone call,
3  however long it was?
4      A.  Yes.
5      Q.  And then did you ever meet with or
6  communicate with the Holmeses after they got
7  you the materials?
8      A.  No.
9      Q.  Did you discuss with Mr. Holmes in
10 that phone call the preparation of a contents
11 list?
12     A.  Yes.
13     Q.  And was that conversation similar to
14 the conversation that you described yesterday
15 with the Armstrongs, about how they should
16 prepare a contents list?
17     A.  Similar, yes.
18     Q.  Did they email the contents list to
19 you when they emailed the photos to you?  Was
20 that part of --
21     A.  No.
22     Q.  When did you get the contents list?
23     A.  I don't recall exactly when I
24 received that.  I went through Counsel to get
25 that.

Page 311

1      Q.  Okay.  So did you ever discuss the
2  contents list with Mr. or Mrs. Holmes?
3      A.  No.
4      Q.  And just to be clear, you have never
5  met with them personally?
6      A.  That's correct.
7      Q.  When you had the phone call with Mr.
8  Holmes, was anyone else on the phone?  Was
9  Counsel on the phone?
10     A.  No.
11     Q.  So was it just the two of you?
12     A.  Yes.
13     Q.  In that phone call did you discuss
14 the floor plans, the floor plan of the house?
15     A.  Yes.
16     Q.  And how much information was Mr.
17 Holmes able to provide you about the floor
18 plan of his home?
19     A.  Mr. Holmes was able to give me the
20 general idea, count of rooms and that kind of
21 thing, and the -- and the basic layout idea of
22 it, of the house.
23     Q.  Did he give you square footage?
24     A.  I think he probably did.  I don't
25 recall for certain.

Page 312

1      Q.  Where did you get the square footage
2  for the house that you used in your report?
3      A.  Either I got it from him or I used
4  telem- -- tel- -- not telemetry, but
5  pictography that will do the same thing.
6      Q.  Explain that to me.
7      A.  These are aerial views of homes and
8  gives you the ability to literally use the
9  program, Xactimate, to actually draw out the
10 -- draw out on the photos that you get the
11 actual home; and it measures it for you based
12 off of pictography.  There's algorithms
13 involved in it, much like GeoEstimator.  You
14 may have heard of that.  It's a program called
15 Aerial Sketch.
16     Q.  And are the photos that you used
17 attached to your report?
18     A.  Yes.
19     Q.  Can you tell me using -- Let's use
20 Exhibit 4.  Which photos you used to prepare
21 your sketches of the Holmes residence.
22     A.  Based on what's here, the best
23 estimate would have been that I used the ones
24 on page 3 of the photo sheets.  And those are
25 the second lot from the bottom, right towards

SCOTT H. TAYLOR                                    February 9, 2012

Page 313

1    the center of the photos. Each of those is
2    depicting the same thing. One has the slab
3    still, concrete still in place. The other
4    does not.
5        Q.   So this is the only evidence you had
6    of -- or this is the -- Is this the only
7    evidence you used in preparing your sketches
8    of the home?
9        A.   No.
10       Q.   The size of the home?
11       A.   To get a precise count using the
12   algorithms in the program, this is the square
13   footage evidence. However, the photos
14   themselves give you -- all the rest of the
15   photos combined give you a much better idea of
16   what the outside layout of the house was and
17   the shape of the roof and that kind of thing.
18   There are multiple photos that would have done
19   that.
20       Q.   But the two photos that you pointed
21   out on photo sheet page 3 are the only photos
22   you had that gave you a sense of the size of
23   the home overall?
24       A.   It's -- That's all that's necessary,
25   yes.

Page 314

1        Q.   You would agree that you'd get a
2    more accurate view of the size of the home
3    from an actual visit to the structure;
4    correct?
5        A.   I always want to have an actual
6    hands on visit of a structure to verify
7    things. However, I am very confident of the
8    numbers.
9        Q.   But you did not, could not actually
10   visit the Holmes property because by the time
11   you got involved it had already been removed?
12       A.   That's correct.
13       Q.   A couple of questions on these
14   photos, and we'll get to some of the other
15   photos later, but this says "Date taken,
16   7/10/2011. Do you know if that's the correct
17   date?
18       A.   No, that's not. That is not.
19       Q.   And it says "Taken by Scott".
20   That's not correct either?
21       A.   It's because I inserted that into
22   the program. It just automatically puts my
23   name on it.
24       Q.   And it says -- The description of it
25   is "Aerial view shortly after foundation was

Page 315

1    removed". How do you know that it was shortly
2    after the foundation was removed?
3        A.   Because when we see a foundation is
4    removed, it doesn't take long and they grow
5    grass on those spots; and there's still a
6    pretty -- pretty obvious imprint of where the
7    concrete was.
8        Q.   But you don't know when this picture
9    was taken?
10       A.   No.
11       Q.   And the second photos doesn't have a
12   date taken at all; correct?
13       A.   That's correct.
14       Q.   And it certainly wasn't taken by
15   you?
16       A.   That's correct.
17       Q.   One other question about your
18   drawing of the Holmes residence and the sizes
19   of it and the drawings that are included in
20   your report reflecting the residence. You
21   never shared those with Mr. Holmes; correct?
22       A.   No, I did not.
23       Q.   Or Mrs. Holmes?
24       A.   No.
25       Q.   And you have had no communication

Page 316

1    whatsoever with Mrs. Holmes; correct?
2        A.   That's correct.
3        Q.   So you never went back to them and
4    said, "This is what I am using. Can you tell
5    me if that's right or wrong"?
6        A.   No.
7        Q.   Do you know in their deposition they
8    actually looked at your drawings and sketches
9    of the home and pointed out where it was
10   incorrect?
11       A.   I'm aware of that, yes.
12       Q.   Did you change anything in your
13   revised report to reflect the changes that
14   they made?
15       A.   I did.
16       Q.   What did you do to your revised
17   report to make those changes? Did you change
18   any of the drawings of the rooms or the house
19   itself?
20       A.   I changed some of the location of
21   rooms and moved things around. The interior
22   was where the changes were made.
23       Q.   Did that affect the numbers in your
24   report?
25       A.   If they did, it was negligible.

SCOTT H. TAYLOR                                              February 9, 2012

Page 317

1    Q.  Did you review their depositions?
2    A.  I have seen them, yes.
3    Q.  Did you read them?
4    A.  I read through them, yes.
5    Q.  Did you make any other changes to
6    your report as a result of anything that you
7    learned in the depositions?
8    A.  No.  I did not read the deposition
9    before I made the changes.
10   Q.  You read the deposition after you
11   submitted your revised report?
12   A.  The full deposition, yes.
13   Q.  Do you intend to make any changes to
14   your report as a result of anything you
15   learned in the depositions?
16   A.  Only if I am asked to by Counsel.
17   Q.  You didn't read anything in the
18   depositions that's caused you to say "There's
19   a problem with my report that I need to
20   change"?
21   A.  No, nothing in the final report.
22   Q.  But you said you did use the changes
23   that were pointed out in the floor plans, to
24   change the floor plans in the revised report.
25   Is that --

Page 318

1    A.  That was accomplished through a
2    phone call with Counsel.  With Counsel.
3    Q.  So Counsel told you there were some
4    mistakes in the floor plans and you needed to
5    revise your report?
6         MR. PALMINTIER:
7         Object to form.
8         THE WITNESS:
9         Counsel informed me that there
10        were some changes that -- that might
11        be reflected in my -- in my revised
12        report, if I could look at that, and I
13        did.
14   EXAMINATION BY MS. WAGER-ZITO:
15   Q.  In this phone call that you had with
16   Mr. Holmes, did you discuss the building
17   materials used in the house?
18   A.  Briefly, yes.
19   Q.  What do you recall him telling you?
20   A.  I don't recall the details of that
21   conversation on the building materials at that
22   -- at this point.
23   Q.  So in connection with preparing your
24   report, what information did you use to
25   establish the quality of the building

Page 319

1    materials in the house?
2    A.  I got a lot more of the information
3    from the photos than I did from the phone
4    call.
5    Q.  The photos that are attached to the
6    report?
7    A.  Yes.
8    Q.  Did you discuss with Mr. Holmes in
9    that phone conversation the quality of the
10   furnishings contained in their house?
11   A.  I'm certain I did, yes.
12   Q.  What questions did you ask them in
13   order to ascertain the quality of the
14   furnishings?
15   A.  I would have asked him the same
16   questions I asked the Armstrongs.  I would
17   have asked "What type of material did you have
18   in the home, what type of furnishings; were
19   they expensive, were they inexpensive?  What
20   kind of quality were they?"  You know, I
21   always ask those questions.
22   Q.  And what did Mr. Holmes tell you
23   about the furnishings in his home?
24   A.  I don't know the details of what he
25   told me at this point, but it would have been

Page 320

1    in the report.  It would have been included in
2    the contents and in -- and in the structural
3    estimate.
4    Q.  And again, we'll get to that.  Did
5    you discuss with Mr. Holmes what the cause of
6    damage to their home was?  That is, flood
7    versus wind and rain versus anything else?
8         MR. PALMINTIER:
9         I object to form.
10        THE WITNESS:
11        I did not discuss wind and rain
12        versus flood.  I did discuss with him
13        what actually happened, the sequence
14        of events, I always do, so they can
15        tell me their story as I spoke about
16        yesterday.
17   EXAMINATION BY MS. WAGER-ZITO:
18   Q.  They weren't at their home during
19   Katrina; correct?
20   A.  I don't recall now whether he said
21   they were there or not.
22   Q.  Do you recall anything about what he
23   told you about the sequence of events or what
24   happened at their home?
25   A.  No, only what's in the report.  I

80  (Pages 317 to 320)

SCOTT H. TAYLOR                                    February 9, 2012

Page 321

1     would have included it there.
2         Q.   And there's nothing in the report
3     about Mr. Holmes being present during Katrina
4     and discussing what happened.
5         A.   Well, that would have been reflected
6     in the report if I did, if he did tell me
7     that.
8         Q.   So the fact that there's nothing in
9     the report on that point, does that reflect
10    that he didn't say anything about being
11    present during Katrina?
12        A.   It -- It -- The report is the report
13    and it's whatever's in there, yes.
14        Q.   And we discussed briefly that you
15    did discuss with him the contents.  Was the
16    discussion about the contents about what he
17    needed to do to get you a contents list?
18        A.   Yes.
19        Q.   So he didn't -- did you discuss in
20    that conversation the contents in their home?
21        A.   I'm certain that he probably gave
22    some information about the things he had in
23    his home at that point, because in the course
24    of telling their story, they always tell you
25    about some of the things that were there.  But

Page 322

1     the actual details of that, I don't recall at
2     this point.  I would have relied on the
3     follow-up list of contents.
4         Q.   Did you take any notes of this
5     meeting?
6         A.   Again, as -- as in the other cases,
7     I take my notes and those are never
8     discernible by anybody but me, and then after
9     I prepare the report I don't have those any
10    more.
11        Q.   And just to make clear and so we
12    don't have to do this again, that answer is
13    the same for all of the Plaintiffs; correct?
14        A.   That's correct.
15        Q.   So you have no notes from any of
16    your meetings or phone calls with any of the
17    Plaintiffs?
18        A.   That's correct.
19        Q.   And I just don't remember if I asked
20    this already or not, but did you receive any
21    photos from the Holmeses that are not
22    contained in your report?
23        A.   Other than the ones that I supplied
24    myself, no.
25        Q.   And I want to talk about the

Page 323

1     contents list.  You said that you eventually
2     got it from Counsel?
3         A.   Yes.
4         Q.   Correct?  Was it typewritten, was it
5     handwritten?  Do you recall?
6         A.   Yes, it was -- it was typed.
7         Q.   It was typed.  Is the list that's
8     attached to your report the list that was sent
9     by Mr. Holmes or Mrs. Holmes to Counsel?
10        A.   It is reflective of that I'm
11    certain, yes.
12        Q.   When you asked them to do the
13    contents list, did you ask them to put the age
14    of any of their contents?
15        A.   I always do.
16        Q.   Did you ask them to put the make and
17    the model?
18        A.   Yes, I did.
19        Q.   Can you turn to the contents list in
20    -- and again, we can use Exhibit 4, because
21    as far as we can tell Exhibits 3 and 4 are
22    identical.  And looking through this list,
23    there's no age listed for any of the
24    contents.
25        A.   Uh-huh (affirmatively).

Page 324

1         Q.   And there's no make or model listed
2     for any of the contents.
3         A.   Doesn't appear there are.  There are
4     makes like Panasonic TV.
5         Q.   For most of the contents there's no
6     make or model listed.
7         A.   That's correct.
8         Q.   And there's no ages listed.
9         A.   That's correct.
10        Q.   Did you go back to them and ask them
11    to provide any further information?
12        A.   I did not.
13        Q.   Did you make any changes to the
14    contents list?
15        A.   I don't recall any changes that I
16    made other than to put it in the form that I
17    used to calculate everything.  Because I use
18    it digitally, I have to make sure that the
19    quantity is listed in the "Quantity" column
20    and often it is not when you get the lists
21    from other sources.  And so I have to retype
22    it line by line in order for the data to be
23    correct when it adds it up.
24        Q.   Did you, when you were speaking with
25    Mr. Holmes about preparing the contents list,

SCOTT H. TAYLOR                                February 9, 2012

Page 325

1   discuss with him the concept of RCV versus
2   ACV?
3        A.  I did not.
4        Q.  Did you ask Mr. or Mrs. Holmes to
5   review either of your, or do you know if
6   Counsel asked them to review either of your
7   reports before they were submitted?
8        A.  I did not know.  I did not and I do
9   not know if they did.
10       Q.  We'll get back to some of the
11  contents lists later.  I want to again go back
12  to the beginning of your report.  We discussed
13  a lot of the background about the different
14  headings yesterday.  I am not going to go
15  through it again.  But I do want to ask you,
16  in your view, what's the relevance, in your
17  opinion, of whether or not any of the
18  Plaintiffs had any insurance coverage?
19            MR. PALMINTIER:
20            I object to form.
21            THE WITNESS:
22            I just appraised flood damage so
23         it had no relevance in my view.
24  EXAMINATION BY MS. WAGER-ZITO:
25       Q.  So it had no relevance to whether

Page 326

1   they had any insurance coverage for their
2   dwellings?
3        A.  It had no relevance to me.
4            MR. PALMINTIER:
5            I object to form.
6            THE WITNESS:
7            No.
8   EXAMINATION BY MS. WAGER-ZITO:
9        Q.  Or for their contents?
10            MR. PALMINTIER:
11            I object to form.
12            THE WITNESS:
13            No.
14  EXAMINATION BY MS. WAGER-ZITO:
15       Q.  Or for their additional living
16  expenses?
17            MR. PALMINTIER:
18            The same objection.
19            THE WITNESS:
20            No.
21  EXAMINATION BY MS. WAGER-ZITO:
22       Q.  Did you discuss with Mr. Holmes
23  whether or not he made any insurance claims?
24       A.  I did not.
25       Q.  And why not?

Page 327

1        A.  Because it had no relevance in what
2   I was asked to do.
3        Q.  And would your answer to those
4   questions be the same for all the other
5   Plaintiffs?
6        A.  Yes, it would.
7        Q.  And would your opinions in this case
8   differ at all if you knew that in fact any of
9   the Plaintiffs did have insurance coverage?
10            MR. PALMINTIER:
11            I object to form.
12            THE WITNESS:
13            It would not.  Since I was tasked
14         to provide assessment of flood.
15  EXAMINATION BY MS. WAGER-ZITO:
16       Q.  And it has no effect on your
17  opinions whether or not any of the Plaintiffs
18  actually received any insurance proceeds?
19            MR. PALMINTIER:
20            Object to the form.  Asked and
21         answered.  I am going to -- You have
22         asked these questions again and again
23         and again, and a lot of times they're
24         in the exact same way.  So to the
25         extent that you continue to ask these

Page 328

1   questions, I mean, I just -- you know,
2   just for form purposes, I am going to
3   instruct him not to answer the
4   questions any more.
5            MS. WAGER-ZITO:
6            Well, instructing him not to
7   answer the questions would be
8   completely inappropriate.
9            MR. PALMINTIER:
10            As is asking the same questions
11  over and over and over again.
12            MS. WAGER-ZITO:
13            I don't think you can point to
14  anything and say it was asked in the
15  same form over and over again, because
16  you don't have a transcript yet.
17            MR. PALMINTIER:
18            I have a memory.
19  EXAMINATION BY MS. WAGER-ZITO:
20       Q.  You can answer the question.
21       A.  You might have to repeat it then.
22            (Requested question read back.)
23            MR. PALMINTIER:
24            I'm going to again object to the
25  form.

82 (Pages 325 to 328)

JOHNS, PENDLETON COURT REPORTERS                   504 219-1993

SCOTT H. TAYLOR                                          February 9, 2012

Page 329

1          THE WITNESS:
2          Again, that's still not enough
3     for me to remember what the first part
4     of the question was.  Because it began
5     with the word "And".
6          MS. WAGER-ZITO:
7          You don't have to go back.
8     EXAMINATION BY MS. WAGER-ZITO:
9          Q.  Does it affect your opinion in any
10    way with regard to any of the Plaintiffs
11    whether or not they received any insurance
12    proceeds from another source in connection
13    with their losses from Katrina?
14          MR. PALMINTIER:
15          I object to form.  Asked and
16    answered repeatedly.
17          THE WITNESS:
18          No.
19    EXAMINATION BY MS. WAGER-ZITO:
20          Q.  I want to go to the report itself.
21    And actually, if you could look at Exhibit 3,
22    which is the original report.  And just for a
23    second I am going to ask you a question just
24    about the -- on the first page.
25          A.  Before we do that, do you mind if I

Page 330

1     take a break, a short break?  Just a very
2     short break.  Thank you.
3          (Recess.)
4     EXAMINATION BY MS. WAGER-ZITO:
5          Q.  Back on the record.  Again we're
6     just looking at Exhibit 3 which was the
7     original report.  And under the heading
8     "Coverage versus indemnity", the second
9     paragraph starts with "The homeowner is a
10    father and husband".  Do you see that?
11          A.  Yes.
12          Q.  And you know that Mr. Holmes -- that
13    the Holmeses actually do not have children?
14    Correct?
15          A.  I was not aware of it.
16          Q.  Did you discuss that with him in the
17    phone call you had with him?
18          A.  I don't recall.
19          Q.  And now we can go back to Exhibit
20    4.  I want to look under the heading of
21    "Risk".  You state that "The roof is a 3-tab
22    shingle and the exterior had the appearance of
23    being well-maintained."  What do you base your
24    opinion that the exterior had the appearance
25    of being well-maintained?

Page 331

1          A.  Going from the original photos I saw
2     no lack of maintenance on the exterior.  I saw
3     no evidence that it had been in distress prior
4     to the event.
5          Q.  You don't have any photos of the
6     home prior to Katrina; isn't that true?
7          A.  I do not.
8          Q.  And you were not able to physically
9     inspect the roof; correct?
10          A.  Correct.
11          Q.  Because you never saw the home?
12          A.  Correct.
13          Q.  And all of the photos that we have
14    in your report are post-Katrina; correct?
15          A.  Correct.
16          Q.  And which of these post-Katrina
17    photos in your report led you to determine
18    that the exterior had the appearance of being
19    well-maintained?
20          A.  I can't recall.
21          Q.  Can you look through the photos and
22    tell me which ones support that opinion?
23          A.  On the very first page, the first
24    two photos.
25          Q.  Are those the only photos that you

Page 332

1     believe support your opinion that the exterior
2     of the home was well-maintained?
3          A.  There may be others.
4          Q.  Having looked at the photos, can you
5     point out any others?
6          A.  Page 4, the soffit in the garage or
7     the carport, even though now damaged, appears
8     to be well-maintained.
9          Q.  Any others?
10          A.  No.
11          Q.  Okay.  You state in your report that
12    the interior had basic features, but was very
13    well supplied with furnishings of above
14    average quality."  You didn't physically
15    inspect any of the furnishings, did you?
16          A.  No, I did not.
17          Q.  What's the basis for your statement
18    that the basic features -- that the interior
19    was very well supplied with furnishings of
20    above average quality?
21          A.  If you look through the photos, you
22    can see that they're replete with very crowded
23    rooms full of furnishings.
24          Q.  Can you tell anything about the
25    quality of the furnishings from these

83 (Pages 329 to 332)

JOHNS, PENDLETON COURT REPORTERS                  504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 333

1   post-Katrina photos?  Not the amount of the
2   furnishings, but the quality of furnishings?
3       A.  I'm certain in some cases I can.  I
4   don't recall which ones led me to that
5   statement in my original report.
6       Q.  The same statements -- We're looking
7   at your revised report now.
8       A.  Or the revised report, yes.  Without
9   a thorough examination I wouldn't be able to
10  tell you which photos I referred to at that
11  time.
12      Q.  Can you look through this now and
13  point to any?  And if you can't, that's fine.
14  Just tell me.
15      A.  Photo 26, page 26 of the photo
16  sheets, the top photo is demonstrative of a
17  high end patio set of some sort.  Wrought iron
18  chairs.
19          Page 75 of the photos has what
20  appears to be an expensive barbeque set.
21      Q.  Is that it?
22      A.  I think that's sufficient to show
23  where my opinion came from.
24      Q.  Back to the report.  If you look at
25  -- again we're looking at Exhibit 4 -- under

Page 334

1   the heading "Cause and origin", you say "The
2   loss is a result of flood."  Is it your
3   opinion that there was no other cause of
4   damages to the Holmes house and structure?
5       MR. PALMINTIER:
6          I object to form.
7       THE WITNESS:
8          I can't speak to that.  I was
9          only asked to look at flood damages.
10  EXAMINATION BY MS. WAGER-ZITO:
11      Q.  Were you asked to assume that all of
12  the damages were flood damages?
13      A.  I was not asked to assume anything.
14      Q.  Is it your opinion that there was no
15  other cause of damages to the Holmeses'
16  contents other than flood?
17      MR. PALMINTIER:
18          I object to form.  Asked and
19          answered.
20      THE WITNESS:
21          As I appraised the flood damage
22          --
23      MS. WAGER-ZITO:
24          It was not asked and answered.
25      MR. PALMINTIER:

Page 335

1          Yesterday.
2       MS. WAGER-ZITO:
3          Not as to the Holmeses.  I'm
4   sorry.
5       THE WITNESS:
6          The damages that I listed were
7          according to flood damages.
8   EXAMINATION BY MS. WAGER-ZITO:
9       Q.  How did you come to the conclusion
10  that all of the damages to the Holmeses'
11  dwelling and contents were the result of
12  flood?
13      A.  It was apparent that there was
14  enough water in the house through the photos
15  and the water lines that were visible in the
16  house that flood had completely infused the
17  house and, as a result, all the damages could
18  be attributed to flood.
19      Q.  And you did not consider any other
20  possible causes of damages to the Holmes
21  dwelling or contents?
22      MR. PALMINTIER:
23          I object to form.
24      THE WITNESS:
25          It was not my task to consider

Page 336

1       other possibilities.
2   EXAMINATION BY MS. WAGER-ZITO:
3       Q.  Do you have any basis by which to
4   dispute that at least some of the damage to
5   the Holmeses' contents and dwelling were
6   caused by something other than flood waters?
7       A.  My experience is that when flood is
8   at these levels, that regardless of any other
9   cause, the damages would be complete as the
10  water reaches beyond the four foot level or
11  even before that.  If it rests there for a
12  while, the damage will be so extensive because
13  of mold and other issues that are developed
14  from the resting water and the standing
15  stagnant water that it will infuse all of the
16  home, including everything up to and through
17  the attic.
18      Q.  What about the roof?  Assuming the
19  assumption you just made of 4 feet of water.
20      A.  Well, even the underside of the roof
21  will be covered in mold because of the --
22  because of the flood that sits in there.
23      Q.  Let me show you what we're going to
24  mark as Taylor Exhibit 21.  Taylor Exhibit 21
25  is a two-page document.  The header of it or

JOHNS, PENDLETON COURT REPORTERS          504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 337

1   the top of it says "J & A Quality Renovations
2   LLC". The Bates numbers are ACFIC-000692
3   through 693. This appears to be a letter
4   addressed to Mr. Holmes and the "Re" line is
5   "Renovation of home located at 1205 Perrin,
6   Arabi, Louisiana 70032." Have you had a
7   chance to look at this, Mr. Taylor?
8       A. No. Not until now.
9       Q. No, I am asking if you have had a
10  chance to look at it now.
11      A. Yes.
12      Q. You have never seen this document
13  before; correct?
14      A. That's correct.
15      Q. And again, as we pointed out, it's a
16  letter addressed to Mr. Holmes and it states
17  "As per your request, we submit the following
18  proposal for all labor, equipment and material
19  required to renovate the home at 1205 Perrin,
20  Arabi, Louisiana. Specifically the scope of
21  work includes: Renovations to damaged areas
22  caused only by wind and wind driven rain." Do
23  you see that?
24      A. I see that.
25      Q. Looking at this document, does this

Page 338

1   affect your opinion at all as to whether some
2   of the damages to the Holmes property was
3   caused by wind and rain?
4           MR. PALMINTIER:
5           I object to form.
6           THE WITNESS:
7           No. I was only asked to do flood
8       damages.
9   EXAMINATION BY MS. WAGER-ZITO:
10      Q. And this reflects a total price,
11  total contract price of $25,824.50 for a
12  proposal to repair damages caused by wind and
13  rain; correct?
14      A. It appears so, yes.
15      Q. Do you have any basis to dispute
16  this estimate?
17      A. Not to dispute the estimate, no.
18      Q. Okay. I show you the next document
19  I'll mark Taylor Exhibit 22.
20          MR. PALMINTIER:
21          I'm sorry, this is 22?
22          MS. WAGER-ZITO:
23          Yes.
24  EXAMINATION BY MS. WAGER-ZITO:
25      Q. I'm going to identify this for the

Page 339

1   record, Mr. Taylor, but while I do so why
2   don't you just take a minute to look through
3   it. This is a document Bates stamped
4   ACFIC-000154 through 161. It purports to be
5   responses to interrogatories filed in a matter
6   captioned "Jeneen Holmes, wife of/and Fred N.
7   Holmes, Jr. versus Club Insurance Agency,
8   Incorporated".
9           MR. PALMINTIER:
10          Adrian, it's been brought to my
11      attention that -- Well, I mean, it's
12      just a question. Have these been
13      verified? I notice these are
14      responses to interrogatories and I
15      don't see a verification page. Is
16      there maybe one other page?
17          MS. WAGER-ZITO:
18          We can check on that, but I think
19      as you know from the deposition of Mr.
20      and Mrs. Holmes, since you were
21      present, that they reviewed these
22      documents and said that they were true
23      and correct copies of the
24      interrogatory responses that they
25      filed in their litigation against Club

Page 340

1   Insurance. That's all I've got.
2           MR. PALMINTIER:
3           Right. Right. And I would think
4       that there would be a verification.
5       That's all I am asking for.
6           MS. WAGER-ZITO:
7           I don't have anything.
8           MR. PALMINTIER:
9           You can go, you can move on. I
10      am just -- I'm sure there probably is
11      one and if we could get that, that
12      would be great.
13          MS. WAGER-ZITO:
14          We will look into that.
15          MR. PALMINTIER:
16          Okay.
17  EXAMINATION BY MS. WAGER-ZITO:
18      Q. Have you had a chance to look at
19  these, Mr. Taylor?
20      A. Yes.
21      Q. And do they in fact appear to be
22  answers to interrogatories filed by Mr. and
23  Mrs. Holmes in connection with litigation that
24  they filed?
25      A. It appears so.

85 (Pages 337 to 340)

SCOTT H. TAYLOR                                    February 9, 2012

Page 341

1      Q.   And if you look at Interrogatory
2  number 4 and the answer to Interrogatory
3  number 4, the interrogatory, and I don't want
4  to read all of this into the record, but the
5  question was "Providing as much detail as
6  possible, itemize the damages you contend you
7  are entitled to recover" and it goes on and
8  you can read that, and then the answer to the
9  interrogatory, the Holmeses state "We contend
10 that there was extensive wind damage to the
11 exterior of the house as well as a majority of
12 the contents of the household.  We contend
13 that the front door was blown off of its
14 hinges due to strong winds and caused a
15 whirlwind within the house and caused
16 extensive damages to the --" and it says
17 "inferior", but it should read "interior."
18 And the Holmeses said that at their
19 deposition.  "Extensive damages to the
20 interior of the property and its contents.  We
21 contend that the additional space in the rear
22 of the home was damaged severely from the
23 strong winds prior to the flood waters.  We
24 have attached a listing of contents to
25 supplement.  Repair costs of the home have yet

Page 342

1  to be determined.  We also contend that the
2  interior suffered water damage prior to the
3  flood water."  Do you see that?
4      A.   Yes, I do.
5      Q.   Did you see this prior to preparing
6  your report?
7      A.   No.
8      Q.   Do you have any basis to dispute the
9  information contained in that interrogatory
10 response?
11          MR. PALMINTIER:
12          I object to form.
13          THE WITNESS:
14          I was only asked to do flood
15      damage so I don't dispute anything on
16      their reports.
17 EXAMINATION BY MS. WAGER-ZITO:
18      Q.   And you don't dispute anything in
19 this interrogatory response?
20      A.   I am not disputing anything in
21 there.
22      Q.   Thank you.  You state in your report
23 "Resting level lines etched into porous
24 surfaces demonstrate water was in the home at
25 specific levels for extended periods of time."

Page 343

1  What resting level lines are you referring to?
2      A.   It would all be in the photos I'm
3  certain.  I don't recall which ones.
4      Q.   If I asked you to look through the
5  photos again, would you be able to tell me
6  which ones?
7      A.   I would be able to identify some,
8  I'm certain.
9      Q.   Could you do that for us, please?
10     A.   Page 10, the bottom photo has a
11 water line on the side, on the left side
12 that's visible.
13     Q.   And that's photo sheet 10?
14     A.   Photo sheet 10.
15     Q.   And is that the -- did you say the
16 bottom?
17     A.   The bottom photo, yes.
18     Q.   DSC-0126?
19     A.   Yes.
20     Q.   Thank you.  Actually, again, could
21 you circle the water line that you are
22 referring to?
23     A.   (Writing).
24     Q.   I've got it.  Thanks.  And you can
25 leave it in there.  Thanks.  That's going to

Page 344

1  be the official exhibit.  I can read them
2  upside down.
3      A.   Page 4 has a water line on the
4  column (writing).
5      Q.   And you circled that?
6      A.   Yes.
7      Q.   You're looking at the top photo, the
8  one --
9      A.   The top photo, yes.
10     Q.   DSC-00296?
11     A.   Yes.
12     Q.   Okay.  Thank you.
13     A.   There is a resting water line on the
14 fence on photo sheet 21 (writing).
15     Q.   And again, before we go too far I
16 just want to identify for the record you're
17 talking about which photo?  They both have
18 fences.
19     A.   The upper photo.
20     Q.   The upper photo, which is
21 DSC-00147?
22     A.   Go back to it.  Yes.
23     Q.   Okay.  And you drew --
24     A.   A circle.
25     Q.   -- a circle?

SCOTT H. TAYLOR                                          February 9, 2012

Page 345

1     A.  Yes.
2     Q.  Okay.
3     A.  It appears that on page 31, the
4  resting water line on DSC-0168 is below the
5  address (writing).  There is a resting water
6  line there.
7     Q.  And you circled that for us?
8     A.  I circled it.
9     Q.  Thank you.
10     A.  And it appears to be reinforced by
11  the photo 32 on page 32, DSC-170 (writing).
12  And DSC-171 on page 33 (writing).
13        It appears there's a resting water
14  line on the interior on DSC-213 on page 53.
15  And that is also reinforced on DSC-214 on 54
16  (writing).  And possibly on the backsplash in
17  the kitchen behind the area where the built-in
18  oven is.
19     Q.  And just looking at those photos,
20  how high do you estimate that water line is?
21     A.  That particular resting water line
22  appears to be at approximately the 4 to 4 and
23  a half foot level.
24     Q.  Thank you.  And you marked both of
25  those?

Page 346

1     A.  Yes, I did.
2     Q.  Thank you.
3     A.  There's a possible water line on
4  DSC-241 on page 66 (writing).  And I have
5  circled that.
6        DSC-264 demonstrates more than one
7  resting water line on the columns (writing)
8  and also on the shutters.
9        DSC-266 on page 76 has a fairly
10  clear water line on the brick (writing).
11        DSC-279 is a similar photo on page
12  81 to the previous one described on the front
13  of the house (writing).  As is DSC-280
14  (writing).  And 281 (writing).
15        DSC-283 appears to have a water
16  line on the brick that reinforces the water
17  line on the column (writing).
18        DSC-287 on page 85 has a water
19  line on the column (writing).
20        DSC-288 has water lines on the
21  column (writing).
22        DSC-293 on page 88 has multiple
23  water lines on columns and shutters
24  (writing).
25        DSC-294 has multiple water lines

Page 347

1  on columns and shutters (writing).  And
2  DSC-295 has column water lines (writing).
3     Q.  Thank you.  Do you have an opinion
4  as to how long water was in the Holmeses'
5  residence?
6     A.  It appears that it was an extended
7  period based on my experience of at least a
8  week or more.
9     Q.  Do you know precisely how long?
10     A.  No.
11     Q.  And the basis for your opinion is
12  what?
13     A.  Observation of many homes that were
14  similar and testimony of those homeowners.
15     Q.  In Katrina-related matters or in
16  other cases?
17     A.  In Katrina-related matters.
18     Q.  Is that from other homeowners who
19  were present during flooding?
20     A.  Yes.
21     Q.  And how many such people did you
22  speak with?
23     A.  Literally hundreds.
24     Q.  Did you speak with anyone who lived
25  in the same area as the Holmeses?

Page 348

1     A.  Yes, I did.
2     Q.  And in what connection were you
3  speaking with those people?
4     A.  In appraising their flood-related
5  damages.
6     Q.  And in those instances just
7  generally who were you working for at that
8  time?  Were you doing insurance adjusting?
9     A.  Yes, I was.
10     Q.  Going back to the beginning of your
11  report, the next section in this report
12  actually says "Associated parties".  Is that
13  --
14     A.  I'm sorry?
15     Q.  -- just a mistake?  Should that say
16  "affected persons"?
17     A.  Hang on.  I have got the pages out
18  of order.  I've got to fix this.
19        There we go.  All right.  And I am
20  at the first page again?
21     Q.  Yes.  There's the heading that says
22  "Associated parties."
23     A.  Associated with this claim.
24  Probably "affected" is a better word.
25     Q.  And in all the other reports it says

SCOTT H. TAYLOR                                    February 9, 2012

Page 349

1  "affected parties". That's the only reason I
2  am asking.
3      A. Yes.
4      Q. If there's a reason this one is
5  different, then I need the other reports.
6      A. No, that's a typographical error.
7      Q. That your lawyer should have caught
8  before sending it.
9         And the language in this, other
10 than the heading, the language is the same in
11 all of the reports. So I just want to ask you
12 about it in connection with this report and
13 then if it's the same in all of the other
14 reports, you can just tell me that. "The
15 parties directly affected by this loss are the
16 homeowners. As the resolution of this loss
17 proceeds it will necessitate further
18 consultation with the homeowners and one
19 should anticipate changes to the report as it
20 pertains to the details of the loss, the
21 resolution, and the associated time lines."
22 And we did discuss this yesterday, so I just
23 want to make it clear for the record that this
24 language is the same in all the reports and it
25 means the same thing as you testified to

Page 350

1  yesterday?
2      A. Yes.
3      Q. But as of now you have no intention
4  of speaking with any of the Plaintiffs or
5  updating any of the reports along the lines
6  set forth in this sentence?
7      A. Not unless I am requested by
8  Counsel.
9      Q. Okay. Now, you actually went and
10 inspected the Holmes property; correct?
11     A. I went to the site, yes.
12     Q. And there was no house there?
13     A. That's correct.
14     Q. And did you go to this site on June
15 15, 2011? I think that's the date on the
16 photo. But now we know --
17     A. On or about.
18     Q. Okay. Had you ever been to the site
19 prior to that inspection?
20     A. Not specifically to that site, no.
21     Q. And we just talked about that. You
22 had been to the neighborhood prior to that
23 inspection?
24     A. Yes.
25     Q. And about how many times?

Page 351

1      A. I couldn't recall how many times.
2      Q. Any estimate? And we understand
3  it's just an estimate.
4      A. More than 30.
5      Q. Did you visit the site at any time
6  after that initial inspection?
7      A. No.
8      Q. Can you tell me, tell us what you
9  did at that inspection? How long did it
10 take?
11     A. Probably no more than 15 or 20
12 minutes.
13     Q. Was anyone with you?
14     A. Mr. Palmintier.
15     Q. And did you take any notes when you
16 made this inspection?
17     A. Not at that time, no.
18     Q. Did you take notes after when you
19 got back from the inspection? You said not at
20 that time.
21     A. Well, no, I took no notes.
22     Q. And I want to go back to the photos
23 again, and we're not going to go through each
24 one, but I just want to -- we did a little bit
25 of this. We determined that the photos --

Page 352

1  that you didn't in fact take the photos on
2  page 3. Correct?
3      A. That's correct.
4      Q. But the photos on pages 1 and 2 you
5  took at the inspection?
6      A. That's correct. No, that's not
7  correct. On page 2 only.
8      Q. All right. The photos on page 3, do
9  you know who took those?
10     A. I don't. I was able to locate those
11 on the Internet and I don't recall where.
12     Q. But you know they're of the 1205
13 Perrin property?
14     A. Yes. It would have been through a
15 map search type thing that was allowing me to
16 find the precise location by doing a street
17 view.
18     Q. What's your confidence level that
19 this is in fact the 1205 Perrin property?
20     A. 100 percent.
21     Q. Is it indicated on here anywhere on
22 the photo itself?
23     A. Indirectly, yes.
24     Q. And can you tell me what you mean by
25 that?

SCOTT H. TAYLOR                                    February 9, 2012

Page 353

1      A.  At the -- At the bottom of the photo
2  at the top of the page, the top photo, on the
3  right side at the bottom you see the address
4  1201, which is the adjacent property.  Then
5  when you identify the house next to it, you
6  can see clearly that it is the -- it is
7  identical to the houses that are in the
8  homeowner supplied photos.
9      Q.  Well, where do you see -- Can you
10 circle where you see the 1201?
11     A.  (Writing).  It's sprayed on the
12 cement.
13     Q.  Which one?
14     A.  This page 1.
15     Q.  I am talking about page 3.  The
16 aerial photos.
17     A.  Oh.
18     Q.  How do you know those are in fact --
19     MR. PALMINTIER:
20        For the record, it seems like the
21     last couple of questions were in
22     reference to page 3 in the photos
23     whereas he was looking at a different
24     page.
25     MS. WAGER-ZITO:

Page 354

1        Yes.  Yes.  So we will strike all
2     of that, although not really.
3  EXAMINATION BY MS. WAGER-ZITO:
4     Q.  And I will ask you the questions
5  about page 3.  How do you know that these are
6  the 1205 Perrin Drive property?
7     A.  Because I zoomed in on them from
8  aerial photos that identified the streets.  It
9  was easy to extrapolate that from that.
10    Q.  Is there anything on the photos
11 themselves indicating the address that this is
12 in fact 1205?
13    A.  Not on these photos, no.
14    Q.  Okay.  And again, these photos, you
15 used the Internet?
16    A.  Yes.
17    Q.  And do you know what site you were
18 in, what website?
19    A.  It was most likely Google Earth.
20    Q.  Okay.  In going back to the
21 beginning of the report under the heading
22 "Inspection/damages", you state in there "The
23 real inspection occurred after examining a
24 combination of the aerial photos and photos
25 from the homeowner."  And we discussed this

Page 355

1  yesterday what you meant by real inspection
2  was because you couldn't look at the home.  Is
3  that correct?
4     A.  That's correct.
5     Q.  We talked about the aerial photos or
6  the -- this goes on and says, "A time line
7  could be logically concluded by observing the
8  different stages of demolition."  What do you
9  mean by that?
10    A.  In that one photo had a slab, one --
11 one did not.  One showed -- Two showed the
12 house after Katrina, and you conclude that
13 there were -- that there were stages of the
14 destruction of the home.
15    Q.  But could you really conclude a time
16 line, like actual times that different events
17 happened?
18    A.  Not a specific time line, no.
19    Q.  Okay.
20    A.  A general time line.
21    Q.  How many times before your
22 involvement in this case have you been hired
23 to assess damages to property that no longer
24 exists, to a home that's no longer there?
25    A.  I can't recall how many times.

Page 356

1     Q.  Would you agree that it's more
2  accurate to assess damage to a property based
3  on a physical inspection as opposed to a
4  review of photos?
5     A.  It is much easier.
6     Q.  But would you agree that your
7  assessment is more accurate if you can
8  actually assess an actual property, as opposed
9  to easier?
10    A.  Usually it is.
11    Q.  What do you mean by "usually it
12 is"?
13    A.  I mean that there are -- there are
14 methods now that are very accurate with some
15 of the telemetry that we have in order to do
16 that.
17    Q.  But you'd agree that the best
18 evidence is if you can actually visit a
19 property and inspect a property?
20    MR. PALMINTIER:
21       I object to form.
22    THE WITNESS:
23       I prefer that.
24 EXAMINATION BY MS. WAGER-ZITO:
25    Q.  And you state in your report

89 (Pages 353 to 356)

SCOTT H. TAYLOR                                    February 9, 2012

Page 357

1    "Observation of the roof and soffit
2  demonstrated that water intrusion above 8 feet
3  did occur at some point."  And can you tell us
4  how you made that determination?
5       A.  Through the photos.
6       Q.  Because, as we've demonstrated, you
7  could not have firsthand examined the roof?
8       A.  That's correct.
9       Q.  And the document we looked at
10 earlier -- I'm going to hand you a document
11 marked Taylor Exhibit 23.  For the record,
12 Taylor Exhibit 23 is a document that says on
13 the top "Estimate".  It's Bates stamped
14 ACFIC-001053 through 1069.  Can you just look
15 through that?
16           MR. PALMINTIER:
17           Can we go off the record for a
18      second?
19           MS. WAGER-ZITO:
20           Sure.
21           (Whereupon a discussion was held
22      off the record.)
23 EXAMINATION BY MS. WAGER-ZITO:
24      Q.  Back on the record.  Have you had a
25 chance to look at this document?

Page 358

1       A.  I have just now, yes.
2       Q.  It appears, it says on it, the
3  insured is Fred Holmes.  Can you see that in
4  the box?
5       A.  Yes.
6       Q.  And the loss address is 1205 Perrin
7  Drive?
8       A.  Yes.
9       Q.  And the date of loss is 8/29/2005,
10 so it's Katrina?
11      A.  Yes.
12      Q.  And do you understand that this is
13 an estimate for repairs for wind damages
14 arising out of Katrina?
15           MR. PALMINTIER:
16           I object to form.
17           THE WITNESS:
18           I don't see where it names wind
19      damages.
20 EXAMINATION BY MS. WAGER-ZITO:
21      Q.  Just assume with me hypothetically
22 that Mr. Holmes testified that this was a
23 repair in connection with wind damage to his
24 home.  And you see that some of the work
25 proposed to be done on this estimate is to the

Page 359

1  roof and the soffits?
2       A.  Are you asking me that?
3       Q.  Yes.
4       A.  Yes, I see that.
5       Q.  And if you look back at Taylor
6  Exhibit 21, which was the J & A Quality
7  Renovations document, does that also appear to
8  relate to work to repair roof damage to the
9  Perrin Drive property?
10      A.  Yes.
11      Q.  And do you have any basis to dispute
12 that the Holmeses sought insurance for repairs
13 for wind damage to their property as a result
14 of Hurricane Katrina --
15           MR. PALMINTIER:
16           I object to --
17 EXAMINATION BY MS. WAGER-ZITO:
18      Q.  -- to the roof?
19      A.  No.
20      Q.  Would anything in these documents
21 change your opinion in any way?
22      A.  No.
23      Q.  And I am not going to ask you to go
24 through the photos again, but is it your
25 testimony that your opinions relating to the

Page 360

1  roof damage is contained in the photos that
2  you saw?
3       A.  Yes.
4       Q.  You further state in your report
5  that "The sheathing, insulation, framing,
6  drywall, trim, finishing, and coverings of the
7  home were all either destroyed or
8  contaminated."  How did you make this
9  determination?
10      A.  The photos made it very clear.
11      Q.  Again, I don't want to go through
12 the photos again.  You state "The walls were
13 bowed, the roof line showed buckling, the
14 brick work had loose sections, and it was
15 clear that the home was at risk of being
16 condemned."  How did you make these
17 determinations?
18           MR. PALMINTIER:
19           Adrian, also can you show me?  I
20      just want to follow you as you're
21      reading it.  I know it's in the
22      report, but I just --
23           MS. WAGER-ZITO:
24           It's in the section on
25      "Inspection/damages".

SCOTT H. TAYLOR                                    February 9, 2012

Page 361

1      MR. PALMINTIER:
2      Okay.
3      MS. WAGER-ZITO:
4      And if you go to actually what I
5   was just reading, the language I just
6   read is on the second page.
7      MR. PALMINTIER:
8      Okay.
9      MS. WAGER-ZITO:
10     The first full paragraph on that
11   page.
12     MR. PALMINTIER:
13     I understand.  Thank you.
14   EXAMINATION BY MS. WAGER-ZITO:
15     Q.  And I think the question was how did
16   you make the determinations that are reflected
17   in the language I just read to you?
18     A.  My experience told me that in cases
19   that were similar the homes had been
20   condemned.
21     Q.  But you, as we determined, are not a
22   structural engineer; correct?
23     A.  That is correct.
24     Q.  And you are not an expert on what
25   authorities, what local authorities would be

Page 362

1   looking at in connection with making
2   condemnation determinations?
3      A.  That's correct.
4      Q.  And you have no knowledge that the
5   home was in fact condemned?
6      A.  That's correct.
7      Q.  Because the home was torn down
8   before you had a chance to review it.
9      A.  That's correct.
10     Q.  Did you review any of the
11   Defendants' expert reports on the Holmes
12   property?
13     A.  I have briefly looked at those.
14     Q.  And are you aware that the
15   Defendants' expert, Mr. Danner, stated in his
16   report "I did not see any indication of
17   structural damage to the residence caused by
18   flooding with the possible exception of the
19   screened in porch and shed, including, but not
20   limited to, damage to the roof, framing, and
21   the coverings, bowed walls, buckled roof lines
22   or loose sections of brick work noted by Mr.
23   Taylor.  I found no evidence to indicate that
24   the structural elements of the residence were
25   at risk of being condemned by local building

Page 363

1   authorities or any other entity"?  Do you
2   recall reading that?
3      A.  No, I don't recall reading that
4   precisely.
5      Q.  And do you dispute that language?
6      A.  I stand by my report.
7      Q.  You state further if your report
8   "Water remained in the home for some time,
9   allowing the furnishings, doors, and even
10   structural materials to migrate between
11   sections of the house."  How did you make that
12   determination?
13     A.  There are multiple photos in which
14   objects clearly have moved and they're not in
15   their natural location.
16     Q.  You say "objects".  What do you mean
17   -- You say in your report "structural
18   materials."  So I am trying to distinguish
19   between objects moving and structural
20   materials moving.
21     A.  Any- -- Anything that would normally
22   be affixed to the house that had moved would
23   be a structural material.
24     Q.  And you --
25     A.  There are multiple examples in the

Page 364

1   photos of things having been moved, and
2   including pieces of the structure.
3      Q.  What do you mean when you say
4   "pieces of the structure"?
5      A.  I could refer directly to the shed
6   in the back, the rear section that clearly was
7   out of place.
8      Q.  Okay.  What about in the home?
9      A.  In the home?  Primarily materials
10   that had moved around, including appliances.
11     Q.  And is that what you mean by
12   structural materials?  What I am trying to get
13   at, is do you mean walls?
14     A.  I would have to go back through to
15   identify particular structural materials, but
16   I have not.
17     Q.  Go back through the photos again?
18     A.  (Witness nods head affirmatively.)
19     Q.  And I'm sorry to have to do this,
20   but can you go through the photos and tell us
21   which ones reflect structural materials moving
22   in the home?  And specifically you state in
23   your report "migrated between sections of the
24   house."  If you can tell us which photos
25   evidence that.

JOHNS, PENDLETON COURT REPORTERS        504 219-1993

SCOTT H. TAYLOR                                   February 9, 2012

Page 365

1   A.  Page 8 of photos, both the top and
2   the bottom, show doors that are now off their
3   hinges and have moved from where they belong.
4       Q.  Do you know which doors these are?
5       A.  I do not.
6       Page 12, 129, DSC-0129, sheetrock
7   is not normally found on the floor.
8       Q.  Do you know where this photo was
9   taken in the home?
10      A.  No, I do not.
11      Q.  Or if this is in the home or if it's
12  in the backyard?
13      A.  It appears to be interior.
14      Q.  But you don't know that?
15      A.  I do not.
16          The exterior patio photos on 13,
17  DSC-0131, clearly the framing is not in line
18  with where it should be.
19      Q.  Well, I'm sorry, which one?  Which
20  photo?
21      A.  The top photo.
22      Q.  On which page?
23      A.  13.  The framing is not in line with
24  where it should be.
25      Q.  That's the patio.  That's not in the

Page 366

1   home.
2       A.  Yes.
3       Q.  Correct?
4       A.  That appears so, yes.
5           DSC-200 and 201 on 47 show
6   sheetrock displaced and on the floor.  Those
7   are -- Those appear, have every appearance of
8   being interior.
9       Q.  But you can't tell where in the home
10  this is?
11      A.  No.
12      Q.  Or if it's even in the home?
13      MR. PALMINTIER:
14          I object.  You need to answer.
15  EXAMINATION BY MS. WAGER-ZITO:
16      Q.  I don't know if you answered that
17  question.
18      A.  I can't tell precisely where it is.
19      Q.  Okay.  The question was "or if it's
20  even in the home".
21      A.  I can't tell precisely where it is,
22  no.
23          DSC-271 on page 79 demonstrates
24  that the left -- or that the right side
25  exterior is sagging substantially.

Page 367

1       Q.  Do you know what that is?
2       A.  That's an extension beyond the
3   covered porch.
4       Q.  So you believe that's a photo of an
5   extension beyond the covered porch?
6       A.  If you look at the -- at the roof
7   line, you can see that it extends at least six
8   feet past where the siding stops, and that
9   siding is clearly in distress and at the wrong
10  angle.
11      Q.  But is that an extension of the
12  porch or is that an extension to the house?
13      A.  That's a portion of the house.
14          DSC-278 on page 81 shows clear
15  buckling in the structure of the roof.  It is
16  bowed in that photo.
17      Q.  That's the roof, not in the house;
18  correct?
19      A.  That's the roof.
20          That's all in the photos that I
21  see on a second look.
22      Q.  Going back to the second page of
23  your report, under the heading "Restoration
24  and repairs", you state "Considering the
25  evidence of catastrophic damage, it is clear

Page 368

1   the only reasonable conclusion commensurate
2   with indemnifying the homeowner is that the
3   house should be demolished and rebuilt."
4   What's the basis for that conclusion?
5       A.  My experience is that when houses
6   are these -- are compromised the way I have
7   described in my report, that the solution has
8   been to demolish them and rebuild.
9       Q.  Did you ever consider that the house
10  could be salvaged and repaired or
11  rehabilitated?
12      A.  No.
13      Q.  Why not?
14      A.  As I just stated, in my experience
15  they have been demolished and rebuilt.
16      Q.  But you are not a structural
17  engineer and you're not giving an opinion that
18  this house could not have been rebuilt?
19  Structurally?
20      A.  Structurally as an engineer, no.
21      Q.  You said earlier -- We talked a
22  little bit earlier about your statement that
23  the exterior of the house had the appearance
24  of being well-maintained, and we talked about
25  photos that you thought reflected this.  If

JOHNS, PENDLETON COURT REPORTERS              504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 369

1  it's your opinion that the exterior -- that
2  the photos reflect a well-maintained exterior,
3  how do you reconcile that with your opinion
4  that the home could not be salvaged?
5      A.  I stand by my report.
6      Q.  Okay.  And again, going -- we
7  discussed your review of Mr. Danner's report
8  in that you've read it to some extent.  He
9  states "Removing and replacing the interior
10 walls, ceilings, floor coverings, woodwork and
11 electrical, plumbing, and HVAC elements may
12 have repaired the residence.  The exposed wood
13 framing may have been cleaned and
14 decontaminated prior to rehabilitating the
15 residence."  Did you disagree with Mr.
16 Danner's conclusion?
17     A.  I can't speak to his conclusions.
18     Q.  Is it your intention to critique his
19 conclusions?
20     A.  Not at this time.
21     Q.  Only if asked by Counsel?
22     A.  That's correct.
23     Q.  You state "To return the home to
24 pre-loss conditions it is likely, based on the
25 condemnation of the home and slab, that even

Page 370

1  the foundation was put at risk."  You never
2  saw the foundation of the home; correct?
3      A.  That is correct.
4      Q.  What's the basis for your conclusion
5  that the foundation was put at risk?
6      A.  That the foundation is now gone.
7      Q.  So just the fact that it's gone?  Is
8  that the sole basis for your opinion that the
9  foundation was put at risk?
10     A.  That's all I have at this time.
11     Q.  And you have no photos of the
12 foundation and you couldn't review -- or you
13 have no photos that form the basis for your
14 opinion that the foundation was put at risk?
15     A.  The lack of photos.
16     Q.  To your knowledge, did any of the
17 adjustors who inspected the property conclude
18 that it was structurally unsound?
19     A.  I have no knowledge of that.
20     Q.  And, to your knowledge, there was
21 never any determination made by anyone that
22 the house needed to be condemned?
23     A.  I have no knowledge of that.
24     Q.  Are you aware that Mr. Holmes
25 testified that the house wasn't demolished

Page 371

1  until 2008 or 2009?
2      A.  I am not aware of that.
3      Q.  Does that fact affect your opinion
4  in any way with regard to whether the house
5  needed to be condemned or that the foundation
6  was at risk?
7      A.  No.
8      Q.  Mr. Danner states in his report "The
9  main residence did not receive any
10 flood-related structural damage to its
11 foundation or structural framing.  No evidence
12 of movement relative to its foundation or
13 racking of the framing was noted."  Do you
14 have any basis to dispute that statement?
15     A.  I stand by my report.
16     Q.  Do you have any basis to dispute Mr.
17 Danner's statement?
18     A.  I cannot speak to his statements.
19     Q.  You state in your report "Soil
20 erosion and structural stresses could have
21 created voids and weakness in the slab."  Do
22 you have any direct evidence that there were
23 voids and weaknesses in the slab?
24     A.  I do not.
25     Q.  Okay.  So you have no personal

Page 372

1  knowledge that the house had to be demolished
2  or that the foundation was unsound?
3      A.  No.
4      Q.  You state in your "Remarks", going
5  further on the second page of your report with
6  regard to the contents, "The homeowner
7  prepared a list of contents as he recalled
8  them.  While the list was lengthy, it did not
9  encompass everything in the home."  Do you
10 know for a fact that the list did not
11 encompass everything in the home?
12     A.  I was able to at that time identify
13 things in the photos that were not listed.
14     Q.  Did you discuss any of those things
15 with Mr. Holmes or Mrs. Holmes?
16     A.  No.
17     Q.  Did you attempt to include any of
18 those items that you believe were not
19 included?
20     A.  I did not.
21     Q.  Can you tell us what any of those
22 items are sitting here right now?
23     A.  No.
24     Q.  And you go on to state "As this loss
25 continues toward resolution and additional

SCOTT H. TAYLOR                                    February 9, 2012

Page 373

1    questioning and commiseration occurs, it has
2    been this adjustor's experience that memories
3    will be triggered.  Additionally, as the
4    homeowners recall features of their home and
5    these are accounted for, changes to all three
6    areas of indemnity will be necessary.
7    Updating specific details for clarity will
8    allow even more precise estimating and will
9    necessitate augmentation of the current
10   estimate as more pricing options become
11   available."  And I do apologize if I asked
12   this yesterday, because this language is in
13   all of the reports.  Do you intend to do any
14   updating of any of the reports along the lines
15   that you discuss in this paragraph?
16       A.  Only if asked by Counsel.
17       Q.  And the same question with regard to
18   the "Recommendations" section at the bottom of
19   the report.  It says "Recommendations include,
20   but are not limited to, the three areas of
21   indemnity listed above.  Should any
22   beforementioned changes be necessary to the
23   listed areas of indemnity, it is recommended
24   that such changes be reasonably considered."
25   That language also is the same in all the

Page 374

1    reports.  Do you plan on doing anything along
2    those lines --
3        A.  Only --
4        Q.  -- for any of the Plaintiffs?
5        A.  Only if requested by Counsel.
6        Q.  Moving on in the report to the
7    actual estimate itself, and we're not going to
8    go through it in great detail, you told us how
9    Xactimate works yesterday, but the actual
10   estimate itself is contained in pages 2 to 29
11   of your report, in the revised report?
12       A.  Uh-huh (affirmatively).
13       Q.  And just to make it clear, was there
14   any difference in your methodology for this
15   estimate different in any way from the
16   methodology that you described yesterday with
17   regard to the Armstrong report?
18       A.  No.
19       Q.  And would the area pricing for
20   materials be the same as you testified for the
21   Armstrongs yesterday?
22       A.  I believe so.
23       Q.  And that would be true for all of
24   the Plaintiffs?
25       A.  Yes.

Page 375

1        Q.  And what about the labor costs?
2        A.  It would be the same.
3        Q.  And the same as we talked about
4    yesterday for the Armstrongs?
5        A.  Yes.
6        Q.  And it will be the same for the rest
7    of the Plaintiffs?
8        A.  Yes.
9        Q.  And your conclusions about overhead
10   and profit are the same as you described
11   yesterday for the Armstrongs?
12       A.  Yes.
13       Q.  And will be the same for the rest of
14   the Plaintiffs?
15       A.  Yes.
16       Q.  If the Court in this case determines
17   that the correct measure of damages is the
18   difference between the value of the Holmes
19   residence before Katrina and the value of the
20   residence after Katrina, would your report be
21   able to answer the question of what the
22   damages number should be?
23           MR. PALMINTIER:
24           I object to form.
25           THE WITNESS:

Page 376

1            I'm certain it would.
2    EXAMINATION BY MS. WAGER-ZITO:
3        Q.  How so?
4        A.  I stand by the report numbers.  It
5    is -- Those are the correct numbers for what
6    the damages are.
7        Q.  Is there anything in your report
8    that reflects the value of the Holmes
9    residence prior to Katrina?
10       A.  No.
11       Q.  Is there anything in your report
12   that reflects the value of the Holmes
13   residence subsequent to Katrina?
14       A.  Not the overall value, no.
15       Q.  So again, if the measure of damages
16   is the difference between the value before
17   Katrina and the value after Katrina, can your
18   report answer the question as to what the
19   appropriate amount of damages should be?
20           MR. PALMINTIER:
21           I object to form.
22           THE WITNESS:
23           My report was to assess the flood
24           damages and that's what it reflects
25           what it would cost to restore it from

SCOTT H. TAYLOR                                        February 9, 2012

Page 377

1    flood conditions.
2    EXAMINATION BY MS. WAGER-ZITO:
3        Q.  My question is asking, if the Court
4    determines that that's not the correct measure
5    of damages, is there anything in your report
6    that the Court can look to to determine the
7    valuation of the home pre-Katrina and the
8    valuation of the home subsequent to Katrina?
9        MR. PALMINTIER:
10       I object to form.
11       THE WITNESS:
12       The distinction between is not
13    something that I addressed in the
14    report.
15    EXAMINATION BY MS. WAGER-ZITO:
16       Q.  So the answer is "no"?
17       A.  I just stand by what I wrote for the
18    report.
19       Q.  And I understand that.  But I am
20    asking a different question.  I am just asking
21    you whether or not the Court can look to your
22    report, if the Court determines that the
23    proper measure of damages is the value of the
24    home prior to Katrina versus the value of the
25    home after Katrina.

Page 378

1        MR. PALMINTIER:
2        I object to form.
3        THE WITNESS:
4        This is the value of the home
5    restoration after Katrina and that's
6    all it is.
7    EXAMINATION BY MS. WAGER-ZITO:
8        Q.  The value of the home restoration?
9        A.  It's the cost of the home
10    restoration after.  That's all it is.
11       Q.  But there's nothing in there about
12    the value of the home before Katrina?
13       A.  No.
14       Q.  And there's nothing in there about
15    the value of the home unrestored after
16    Katrina?
17       A.  No.
18       Q.  We're going to mark Exhibit Taylor
19    24.  You can give one of those to your
20    lawyer.
21       Why don't you take a look at what
22    we have marked as Taylor Exhibit 24 and I'll
23    identify it for the record.  It's titled
24    "Flood 'N' Screen Closing Sheet".  It's Bates
25    numbered, among other Bates numbers,

Page 379

1    ACFIC-00435 through 458.  Will you take a
2    second to look through that, Mr. Taylor?  It
3    says on the front page "Insured name, Holmes,
4    Fred Holmes".
5        A.  Uh-huh (affirmatively).  Yes.
6        Q.  On the second page it says "Colonial
7    Claims Corporation, Service Invoice, Flood".
8    It's to Fidelity National.  Insured, Fred
9    Holmes.  Date of loss, 8/29/06.  So that would
10    be Katrina losses; correct, Mr. Taylor?
11       A.  Yes.
12       Q.  If you look on the third page of the
13    document, it discusses the coverage and the
14    policy number.  Have you seen this document
15    before?
16       A.  No.
17       Q.  So prior to the work that you did in
18    this case were you aware that Mr. Holmes'
19    flood insurer came up with a value for the
20    home in response to an insurance claim that
21    the Holmeses made for their residence?
22       A.  No.
23       Q.  Were you aware that the Colonial
24    Claims inspection and valuation for the
25    Holmeses' flood insurer, Fidelity, determined

Page 380

1    that the ACV was $109,280?
2        A.  No.
3        Q.  If you look at the page that's Bates
4    marked at the bottom 443, you can see the
5    estimated replacement cost on that page.  Do
6    you see that, 136,000?
7        A.  Yes.
8        Q.  Okay.  And the ACV number that's
9    reflected on there is $109,280?
10       A.  Yes.
11       Q.  Do you have any basis to dispute the
12    valuation?
13       A.  No.  I was not tasked to look at
14    valuations.  So, therefore, I don't have an
15    opinion.
16       Q.  If you look at page 23 of your
17    report, you have a line item total
18    $145,006.90.  This is the cost of the
19    materials and labor for the Holmes residence
20    prior to the application of sales tax and
21    overhead and profit?
22       A.  Pardon me?
23       Q.  I'm sorry?
24       A.  Could you repeat that?
25       Q.  Going back to your report, --

95 (Pages 377 to 380)

JOHNS, PENDLETON COURT REPORTERS          504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 381

1    A.  Yes.
2    Q.  -- page 23.  There's a line item
3  total of $145,006.90.  I'll wait until you get
4  there.
5    A.  What page again?
6    Q.  23.
7    A.  Oh, I thought you said 43.
8    Q.  Are you there?
9    A.  Yes.
10    Q.  So you have a line item total for
11  the dwelling, for the Holmeses' residence of
12  $145,006.90; correct?
13    A.  Yes.
14    Q.  So this is the cost of the material
15  and the labor prior to the sales tax or the
16  overhead?
17    A.  Yes.
18    Q.  And the profit?
19    A.  Yes.
20    Q.  And if we look at for the sales tax
21  line, you are applying sales tax to
22  $56,274.51.  So would that reflect the
23  material cost out of that 145,000 total?
24    A.  Yes.
25    Q.  So am I correct that in doing the

Page 382

1  application -- prior to the application of the
2  sales tax and the overhead and profit, the
3  ratio of labor cost for the Holmes residence
4  is approximately 60/40?  Do you see that?
5    A.  I do.
6    Q.  Do you believe that's an appropriate
7  or correct ratio?
8    A.  I do.
9    Q.  And yesterday I think the ratio was
10  70 to 30.  Is that correct?  For the
11  Armstrongs?
12    A.  I don't recall precisely.
13    Q.  So in your opinion, in your expert
14  opinion, a ratio of 60 to 40 is not a high
15  labor cost ratio?
16    A.  It is not.
17    Q.  Does not reflect a high labor cost?
18    A.  It does not.
19    Q.  And you can look at your July report
20  as well.  The RCV number in the July report
21  was $190,284.97 and in this report it's
22  $180,761.  Do you know what accounts for the
23  changes?
24    A.  I don't recall at this time what the
25  changes were that brought the number down.

Page 383

1    Q.  So without going through a line item
2  analysis you can't tell us what those changes
3  are?
4    A.  I could not.
5    Q.  And we're not going to do that.  Do
6  you believe that that might be reflective of
7  some of the changes made to the floor plans by
8  the Holmeses, by Mr. Holmes?
9    A.  It's possible, yes.
10    Q.  But again, you can't recall that?
11    A.  That's correct.
12    Q.  Okay.  And we've talked about the
13  fact that a contents list is attached and that
14  you created the contents list that's here
15  based upon the list that was provided to
16  Counsel.
17    A.  Yes.
18    Q.  But that the information on the list
19  came from Mr. and Mrs. Holmes?
20    A.  That's what I understand, yes.
21    Q.  And the instructions you gave to Mr.
22  and Mrs. Holmes were the same as the
23  instructions you gave -- In this case you only
24  spoke to Mr. Holmes; right?
25    A.  That's correct.

Page 384

1    Q.  But the instructions to Mr. Holmes
2  were the same as the instructions that you
3  gave to the Armstrongs?
4    A.  Yes.
5    Q.  And did you give those same
6  instructions to the other Plaintiffs as well?
7    A.  Yes.
8    Q.  And you discussed before that you
9  asked them the ages of the items, but they
10  didn't provide them to you.
11    A.  That's correct.
12    Q.  And that you asked for brand names
13  and in some instances they're there, but in
14  the vast majority there are no brand names
15  provided; correct?
16    A.  That's correct.
17    Q.  Did you ask them the original
18  purchase price of any of the contents in their
19  home?
20    A.  I asked them to provide those, yes.
21    Q.  And did they provide those, to your
22  knowledge?
23    A.  No.
24    Q.  They didn't?
25    A.  Not -- Not to my knowledge.

96 (Pages 381 to 384)

SCOTT H. TAYLOR                                    February 9, 2012

Page 385

1     Q.  Did you make any efforts to
2  determine the original purchase price for the
3  items on the Holmeses' contents list?
4     A.  I did not talk to them subsequent to
5  my report.
6     Q.  That wasn't my question.  My
7  question was, did you make any effort to
8  determine the original purchase price for any
9  of the contents listed on the Holmes report?
10  Did you do any independent research to try and
11  determine original purchase prices?
12     A.  I don't recall specifically what
13  research I did on this one.
14     Q.  Do you recall specifically what
15  research you did on any of the contents lists
16  for any of the Plaintiffs?
17     A.  On large ticket items I do.
18  Vehicles, boats, those kinds of things.
19     Q.  Okay.  And the Holmeses had a
20  vehicle and we know the Armstrongs had a
21  boat.  Any other items?  Did you do any
22  independent research on the original purchase
23  price --
24     A.  I don't recall.
25     Q.  -- other than large ticket items

Page 386

1  such as the car and the boat?
2     A.  I did do some research, but it was
3  sampling research and I don't recall which
4  items.
5     Q.  And what do you mean by "sampling
6  research"?
7     A.  As I spoke yesterday, I would look
8  up an item and find pricing on it; and if it
9  appeared to be consistent with what was on
10  there, then I gave a check mark and went on.
11     Q.  How many items do you believe you
12  did that for?
13     A.  At least a dozen on each -- on each
14  home.
15     Q.  And how did you choose which items
16  to do that for?
17     A.  I was very random.
18     Q.  Okay.  You say at least a dozen.
19  Was it less than two dozen?
20     A.  Probably.
21     Q.  Is there any documentation
22  reflecting any of the research that you did to
23  determine the original purchase price of any
24  of the contents items?
25     A.  Only on the large ticket items that

Page 387

1  are included in my reports.
2     Q.  Okay.  The only documentation that
3  you have of doing that research would in fact
4  be attached to the reports?
5     A.  That's correct.
6     Q.  So the sampling of the other items
7  that you just discussed, the random sampling,
8  you do not have any documentation reflecting
9  what that research showed?
10     A.  That's correct.
11     Q.  Or which items you sampled?
12     A.  That's correct.
13     Q.  Or how many items you sampled?
14     A.  That's correct.
15     Q.  And those answers would be the same
16  for all the Plaintiffs; correct?
17     A.  Yes.
18     Q.  Okay.  Was there any item on the
19  Holmeses' contents list that you had any
20  questions or concerns about that you can
21  recall right now?
22     A.  I don't recall any.
23     Q.  If you did have concerns about an
24  item, what would you have done?
25     A.  I would have either changed it

Page 388

1  myself or I would have asked more questions
2  about it.
3     Q.  And we know you didn't ask any more
4  questions; correct?
5     A.  That's correct.
6     Q.  And sitting here right now you can't
7  recall whether or not you made any changes to
8  any of the items on the lists?
9     A.  I don't recall.
10     Q.  And did you take any other steps,
11  other than what we have already discussed, to
12  ensure that the replacement cost values on the
13  contents lists were reasonable?
14     A.  No.
15     Q.  Did you remove any items from any of
16  the contents lists?
17     MR. PALMINTIER:
18        Are you asking generally in all
19     of these?
20     MS. WAGER-ZITO:
21        Well, now I am asking about the
22     Holmeses, but I will ask the same
23     question about the others as well.
24     MR. PALMINTIER:
25        Okay.

SCOTT H. TAYLOR                                    February 9, 2012

Page 389

1    EXAMINATION BY MS. WAGER-ZITO:
2        Q.  Do you recall removing any contents?
3        A.  Not on the Holmeses, I don't recall.
4        Q.  Do you recall removing any contents
5    from any of the lists?
6        A.  I do recall removing some things
7    from at least one list.
8        Q.  What do you recall about that?
9        A.  In the case of Washington contents,
10   I removed some things that seemed to be
11   duplicated.
12       Q.  Okay.  I'll try and remember that
13   when we get to it.
14           MS. WAGER-ZITO:
15           If you are still claiming the
16       Washington contents.
17           MR. PALMINTIER:
18           I'll have to check on that.
19       Anything in reference to Derbigny, of
20       course, is not -- it -- We have
21       already stipulated to Derbigny, the
22       property itself not being a part of
23       the cause of action any more.
24           MS. WAGER-ZITO:
25           Right.  And actually, can we go

Page 390

1        off the record for just a second?
2           (Discussion off the record.)
3    EXAMINATION BY MS. WAGER-ZITO:
4        Q.  Back on the record.  Mr. Taylor, in
5    coming to your conclusions on the value of the
6    contents, did you consider that some of the
7    contents may have been damaged by wind and
8    wind-driven rain and not flooding?
9        A.  I didn't -- I did not.
10       Q.  I'll mark the next exhibit Taylor
11   Exhibit 25.  Actually, I am going to mark two
12   exhibits.  We'll do Taylor Exhibit 25 and
13   Taylor Exhibit 26.
14           Start taking a look at 25.  I'll
15   identify it for the record.  Taylor Exhibit 25
16   is a three-page document.  It's Bates stamped
17   ACFIC-000175.  And it purports to be a letter
18   to V. J., who I would represent is Mr. and
19   Mrs. Holmes' attorney, and it's from Fred and
20   Jeneen Holmes.  And Exhibit Taylor Exhibit 26
21   is a document that's Bates stamped
22   ACFIC-000185 through 190.  And it's a listing
23   of contents, quantities, amount, and
24   location.
25           Mr. Taylor, have you seen either

Page 391

1    of these documents before?
2        A.  No.
3        Q.  And Taylor Exhibit 25, it states "V.
4    J., I have included a listing of items that
5    were damaged either by the wind or wind-driven
6    rain that was allowed to come into the house
7    prior to the flood waters through the front
8    door being blown off its hinges.  The rear
9    porch and attached shed was lifted and
10   dislodged, effectively destroying all
11   contents.  I still have more receipts for
12   items that were replaced.  Unfortunately, I do
13   not have original receipts for the items that
14   I had before the storm.  Please let me know if
15   you need any additional information."
16           And again, were you aware, Mr.
17   Taylor, that Fred and Jeneen Holmes made
18   claims for contents that they claim were
19   damaged as a result of wind and rain prior to
20   flooding?
21           MR. PALMINTIER:
22           I object to form.
23           THE WITNESS:
24           No, I was not.
25   EXAMINATION BY MS. WAGER-ZITO:

Page 392

1        Q.  Does this affect your opinion in any
2    way?
3        A.  No, it does not.
4        Q.  If the items that they claim were
5    damaged by wind and rain are the same items
6    that you have got in your report, would that
7    affect your opinion in any way?
8           MR. PALMINTIER:
9           I object to form.
10           THE WITNESS:
11           No.
12   EXAMINATION BY MS. WAGER-ZITO:
13       Q.  And if you look at Taylor Exhibit
14   26, again, this is in the form that we got it,
15   so it -- I think what happened is that the
16   first three pages and the last three pages
17   actually should be side-by-side.  And on the
18   last three pages there's a column heading that
19   appears to say "Damaged by" and then it's got
20   question marks.  And all of the damages, all
21   of the claimed damages state "wind --"  Some
22   of them say "wind/water/mold".  Some of them
23   say "wind-driven rain/mold".  And then some of
24   them say "wind/wind-driven rain/mold".  And
25   according to Mr. Holmes in his deposition,

SCOTT H. TAYLOR                                    February 9, 2012

Page 393

1    again, those -- the "Damages" line should have
2    gone next to the "Location" line.  Does this
3    affect your decision, your opinion in any way
4    as to whether or not some of the Holmeses'
5    contents were damaged by wind and wind-driven
6    rain?
7        A.  No.
8        Q.  And that many of the items on this
9    list are also included on your list of
10   contents, or the list that you have in your
11   report for contents?
12       A.  I'm not sure of the question you're
13   asking.
14       Q.  If you look at the list that's
15   contained in Taylor Exhibit 26 and your
16   contents list, you will see an overlap between
17   the items in Exhibit 26 and your list.
18       A.  Yes, I can see that.
19       Q.  Okay.  So this appears at least in
20   part to be some of the same items for which
21   you have included damages as a result of flood
22   in your list.
23       A.  Yes.
24       Q.  And the total claimed damages, if
25   you look at page 3 on Exhibit 26, are

Page 394

1    $85,615.  Do you see that?
2        A.  Yes.
3        Q.  And do you have any basis on which
4    to dispute that the items listed on Taylor
5    Exhibit 26 were in fact damaged by wind and
6    wind-driven rain as opposed to flood?
7            MR. PALMINTIER:
8            I object to form.
9            THE WITNESS:
10           I stand by my report.
11   EXAMINATION BY MS. WAGER-ZITO:
12       Q.  Do you have any basis to dispute
13   this list in Exhibit 26?
14       A.  Not as a list, no.
15       Q.  And do you have any basis to dispute
16   that the Holmeses claimed that the items on
17   this list in Exhibit 26 were damaged by wind
18   and wind-driven rain?
19       A.  I can't dispute that they claimed
20   it.
21           MR. JOANEN:
22           Adrian, if you're moving on, just
23       for clarity of the record, if you
24       could, in Exhibit 25 you said they're
25       including a listing of items, and

Page 395

1    there's a break between 175 and 185.
2    Is this the listing of items that is
3    referenced by 25?
4            MS. WAGER-ZITO:
5            That is my understanding based
6        upon the Holmeses' deposition.
7            MR. JOANEN:
8            And was this a complete list of
9        what was included in what was
10       referenced in 25?
11           MS. WAGER-ZITO:
12           That's all we have.
13           I am going to try to get through
14       the car in five minutes.
15   EXAMINATION BY MS. WAGER-ZITO:
16       Q.  In your report and in the photos we
17   see that a car was included in the contents
18   damaged for Mr. and Mrs. Holmes.  Correct?
19       A.  Yes.
20       Q.  Do you know what year the car was?
21   There appears to be some confusion.
22       A.  I would refer back to my -- need to
23   refer back to my report.
24       Q.  In your original report I believe,
25   and if you could look at Exhibit 3, --

Page 396

1        A.  I can.
2        Q.  -- I really need your help with
3    this.  It seems like you were assessing it as
4    if it was a 2002 Toyota Corolla.
5        A.  That was one of the areas that
6    seemed to be a question when the attorney --
7    when the Counsel called.  It wasn't very
8    clear.  They wanted some clarification on what
9    I was -- what I was saying.  And so I amended
10   it to be -- to try to be more clear.
11       Q.  So that's one of the differences
12   between the July report and the October
13   report?
14       A.  That's correct.
15       Q.  So in the October report --
16       A.  Uh-huh (affirmatively).
17       Q.  Well, strike that for a second.  In
18   the July report you've got a couple of
19   pictures of the car and in one picture you say
20   it's a 1992 Toyota Corolla and in the other --
21   based upon what the wheels look like.  And
22   then in the subsequent -- in a subsequent
23   picture you -- Actually now I am looking in
24   the October report and on photo sheet page 85,
25   you say "Wheel design is unique to 2002

SCOTT H. TAYLOR                                    February 9, 2012

---

Page 397

1   model". That's on page 85. But on the prior
2   page, on page 84, you have "1992 Toyota
3   Corolla has distinct taillights".
4       A.   That would have been an error.
5       Q.   Which one?
6       A.   The 1992.
7       Q.   So is it your belief that it was a
8   2002 Corolla?
9       A.   Yes.
10      Q.   And do you know that Mr. Holmes says
11  it was a 1998 Corolla?
12      A.   I'm not aware of that at this time.
13      Q.   Okay. Are you aware that Mr. Holmes
14  received an insurance payment for the Corolla?
15      A.   No, I am not.
16      Q.   And that he received $5,641 for the
17  Corolla?
18      A.   No, I am not aware of that.
19      Q.   Would that affect your opinion at
20  all as to the appropriate valuation that you
21  should use for the car in your report?
22      A.   No. Not based -- I based it on what
23  I researched.
24      Q.   Did you research a 1992 Corolla, a
25  2002 Corolla, or a 1998 Corolla?

---

Page 398

1       A.   I would need to refer back to my --
2   my attachments on it.
3       Q.   And if you look in the original
4   report -- and the reason I am asking is it's
5   very unclear to me from the original report
6   what you were researching.
7       A.   I don't see the research in this
8   copy of my report. I don't have that with me.
9       MR. PALMINTIER:
10          Well, did y'all give the same --
11      the same Exhibit 4 to both of us?
12      Because I am looking at Exhibit 4 and
13      I have this (indicating). I don't
14      think Mr. Taylor has that.
15      MS. LONIAN:
16          That might be part of that
17      (indicating).
18      THE WITNESS:
19          Oh, it is in here. Okay. I can
20      --
21      MS. WAGER-ZITO:
22          Yes, we did.
23      MR. PALMINTIER:
24          Okay.
25      THE WITNESS:

---

Page 399

1           I can speak to one of the errors
2       that was -- There is an error here, in
3       that I did not change the photos in my
4       subsequent report. I changed the
5       pricing and research in the subsequent
6       and in the discussion in the line item
7       that is included in the body of the
8       report. The photos may still be in
9       error though.
10  EXAMINATION BY MS. WAGER-ZITO:
11      Q.   Okay. And can you just tell me in
12  the revised report where we can find -- First
13  of all, what did you value the Corolla at?
14      A.   It would be important to look at the
15  -- in the line items to see that.
16      Q.   Can you tell us what that is?
17      A.   Give me a moment to find that.
18          On page 21 of the revised report.
19      Q.   Page 21?
20      A.   Yes.
21      Q.   Okay. So it is now a 1998 Corolla
22  and you have got the valuation of $10,054.80.
23  Correct?
24      A.   Yes.
25      Q.   Okay. And again, the insurance

---

Page 400

1   payment was $5,641.98.
2       A.   I am not aware of that.
3       Q.   And I think we have to break. I'll
4   show it to you in the document when we come
5   back.
6       MS. WAGER-ZITO:
7           But you want to take a break
8       now?
9       MR. PALMINTIER:
10          Okay. That works.
11      (Recess.)
12  EXAMINATION BY MS. WAGER-ZITO:
13      Q.   Back on the record. When we broke,
14  Mr. Taylor, we were trying to finish up on the
15  car, and we mostly did, but I would like you
16  to go back and look at Taylor Exhibit 22,
17  which were the Holmeses' Answers to
18  Interrogatories. It should be -- Go back.
19  There you go. And if you can look at the page
20  that's Bates stamped at the bottom 155, --
21      A.   Uh-huh (affirmatively).
22      Q.   -- and on that page there's
23  Interrogatory number 3 which asks "Have you
24  received any payments from any entity for any
25  damages or losses you sustained as a result of

---

SCOTT H. TAYLOR                                    February 9, 2012

Page 401

1  Hurricane Katrina? If the answer is yes, for
2  each such payment you received, then answer
3  some questions," and I don't want to read all
4  of them into the record.  And if you look at
5  Answer to Interrogatory number 3 it reflects
6  under number 3, at the very bottom of the
7  page, "GEICO, $5,641.98 for loss of vehicle".
8  Do you see that?
9       A.  I see that.
10      Q.  Okay.  And does this reflect that
11  the Holmeses got paid $5,641.98 for the Toyota
12  Corolla that you provided a valuation of
13  $10,054 for?
14           MR. PALMINTIER:
15           Object to form.  Speculative.
16           THE WITNESS:
17           I can't dispute what they were
18      paid, no.
19  EXAMINATION BY MS. WAGER-ZITO:
20      Q.  You have no basis to dispute that
21  that's what they were paid?
22      A.  I have nothing.
23      Q.  And if that was the valuation placed
24  on the same vehicle that you valued at
25  $10,000, the valuation by GEICO was

Page 402

1  $5,641.98.
2       A.  I see that.  Yes, I can see that.
3       Q.  Okay.  And I want to move on to
4  additional living expenses and just confirm
5  that you used the same methodology to
6  calculate the ALE for the Holmeses as you used
7  for the Armstrongs.
8       A.  I'm sorry.  Could you repeat that?
9       Q.  I want to move on to additional
10  living expenses now.
11      A.  Yes.
12      Q.  And I want to confirm with you that
13  you used the same methodology to calculate the
14  ALE for Mr. And Mrs. Holmes as you used for
15  the Armstrongs.
16      A.  Yes.
17      Q.  And that was the 20 percent of the
18  replacement cost value of their home?
19      A.  20 percent of the replacement cost
20  damages.
21      Q.  For their dwelling.
22      A.  Their dwelling, yes.
23      Q.  So that amount calculated for Mr.
24  and Mrs. Holmes was $36,152?
25      A.  Yes.

Page 403

1       Q.  And you used the same methodology
2  for all the other Plaintiffs; right?
3       A.  Yes.
4       Q.  And you state in your report that
5  Mr. and Mrs. Holmes were forced to relocate
6  permanently.  It's on page 22 of your report.
7       A.  Page 2?  Yes.
8       Q.  What's the basis for your statement
9  that they were forced to relocate
10  permanently?
11      A.  That the home is not there any
12  more.
13      Q.  Is it your testimony that there was
14  any reason why the Holmeses could not have
15  built a new home in New Orleans at the same
16  site?
17      A.  I didn't speak to that.
18      Q.  Okay.  Did you ask them whether or
19  not they were forced to relocate permanently
20  or whether they chose to relocate to Houston?
21      A.  No.
22      Q.  And you further state in your report
23  "Between the time of mandatory evacuation and
24  the time the homeowner was able to settle into
25  a permanent residence, more than one year

Page 404

1  transpired."  What's the basis for that
2  statement?
3       A.  It would have come from the phone
4  call that I had with Mr. Holmes.
5       Q.  Did you know that Mr. and Mrs.
6  Holmes moved into their permanent residence in
7  Texas in January, 2006?
8           MR. PALMINTIER:
9           I object to form.
10          THE WITNESS:
11          No.
12  EXAMINATION BY MS. WAGER-ZITO:
13      Q.  And they testified in their
14  deposition that that's when they moved into
15  their permanent residence in Houston?
16          MR. PALMINTIER:
17          I object to form.
18          THE WITNESS:
19          No.  I was not aware of that.
20  EXAMINATION BY MS. WAGER-ZITO:
21      Q.  Would that affect your opinion on
22  their additional living expense damages?
23      A.  No.  No, it would not.
24      Q.  Did you do any calculation, look at
25  -- looking at the additional living expenses

SCOTT H. TAYLOR                                    February 9, 2012

Page 405

1  for the Holmeses and compare that to their
2  income in the year following Katrina to see if
3  it was possible that they could have even
4  spent $36,152.25?
5       A.  I did not.
6       Q.  I would like to show you Taylor
7  Exhibit 27. Taylor Exhibit 27 is a document
8  that's titled "Plaintiffs' mediation
9  worksheet, Holmes," and it's Bates stamped
10  ACFIC-000687 through 691.  And on the second
11  page of the exhibit at the top it states
12  "Client, Fred Holmes, insured.  Automobile
13  Club, Inter-Insurance Exchange.  Date of loss,
14  August 29, 2005."  Some additional numbers.
15       MR. PALMINTIER:
16          Can we go off the record?
17       MS. WAGER-ZITO:
18          Sure.
19          (Whereupon a discussion was held
20       off the record.)
21  EXAMINATION BY MS. WAGER-ZITO:
22       Q.  We can go back on the record.  All I
23  am using this one for is the -- the page Bates
24  stamped 690 and 691.  The bottom of the page,
25  it starts -- it states "Additional living

Page 406

1  expenses, Houston, Texas."  It's got "Hotel
2  for one month".
3       MR. PALMINTIER:
4          I'm just going to object to the
5       -- lodge my objection to the use of
6       this document.
7          Subject to that, you can answer
8       the questions.
9  EXAMINATION BY MS. WAGER-ZITO:
10       Q.  Do you see that?
11       A.  The additional living expenses?
12       Q.  Yes.
13       A.  Yes.
14       Q.  This "Hotel one month, $1,050".
15       A.  I see that.
16       Q.  And then it says "Utilities for
17  eight months, $3,600".  And for subtotal of
18  $4,650 for additional living expenses.
19       A.  Uh-huh (affirmatively).
20       Q.  If I represent to you that Mr.
21  Holmes testified that these were the
22  additional living expenses that they incurred
23  and that he sought insurance for, would this
24  affect your opinion at all?
25       MR. PALMINTIER:

Page 407

1          I object to form.  Misstates
2       testimony.
3       THE WITNESS:
4          It would not affect my opinion,
5       no.
6  EXAMINATION BY MS. WAGER-ZITO:
7       Q.  And why is that?
8       A.  Because I stand by my report and my
9  technique.
10       Q.  Did you know that Mr. Holmes
11  testified that they didn't pay any rent for
12  their home in Texas for the year, for the year
13  that they lived there after Katrina, for the
14  first year that they lived there after
15  Katrina?
16       A.  No, I was not aware of that.
17       Q.  Does that affect your opinion at
18  all?
19       A.  No.
20       Q.  So even though they didn't incur any
21  rent expenses, that wouldn't cause you to
22  lower your valuation of the additional living
23  expenses incurred?
24       A.  I can't speak to what they -- what
25  they testified to subsequent to my report.

Page 408

1       Q.  Have you read the deposition to see
2  what they testified to?
3       A.  I read through it, yes.
4       Q.  Did you read the part where they
5  talked about what their additional living
6  expenses were?
7       A.  I read through it.  I don't recall
8  all the details.
9       Q.  So their testimony about what their
10  actual expenses were does not inform your
11  opinion as to what their additional living
12  expenses were?
13       A.  It does not change my opinion about
14  their additional living expenses.
15       Q.  Okay.  Moving on to Ms. Coats, and
16  if you could put -- You can put away the
17  Holmes reports.  And Ms. Coats' reports are
18  Taylor Exhibits 5 and 6.
19       MS. LONIAN:
20          Just so we can have a complete
21       copy for the record, could you, as
22       you're doing it, clip them back up
23       together as best you can?
24       THE WITNESS:
25          I'm doing that now.

SCOTT H. TAYLOR                                    February 9, 2012

Page 409

1       MS. LONIAN:
2          Thank you very much.
3       THE WITNESS:
4          I'm putting them right back in
5    the same order I believe they were.
6       MS. LONIAN:
7          And actually, just to defend my
8    paralegal on the record, yesterday the
9    contents list was out of order and
10   that's the order we received them in.
11      MR. PALMINTIER:
12         Okay.  I just thought that was a
13   heinous, heinous error.
14         Okay.  So this is 5 and 6;
15   correct?
16      MS. LONIAN:
17         5 and 6, yes.
18   EXAMINATION BY MS. WAGER-ZITO:
19      Q.  We'll wait until you get them out.
20      MS. WAGER-ZITO:
21         Off the record for a second.
22         (Whereupon a discussion was held
23   off the record.)
24   EXAMINATION BY MS. WAGER-ZITO:
25      Q.  That would be the July 17, 2011

Page 410

1    report for Ethyl Coats, is Exhibit 5.  Do you
2    have that?
3       A.  I do.
4       Q.  And is that a true and correct copy
5    of the original report for Ms. Coats?
6       A.  It appears to be, yes.
7       Q.  And then is Exhibit 6 a true and
8    correct copy of the October 20th, 2011 report
9    for Ms. Coats?
10      A.  It appears to be also, yes.
11      Q.  And obviously as Ms. Coats passed
12   away before you were retained, I know that you
13   were unable to speak with her.  But prior to
14   issuing your first report on her damages, did
15   you have a chance to review her 2007
16   deposition transcript?
17      A.  No.
18      Q.  And I take it, by the way you're
19   looking at me, that you are not aware that
20   there is a 2007 deposition transcript for Ms.
21   Coats?
22      A.  I only have what I have.
23      Q.  But you have never reviewed any
24   deposition transcript for Ethel Coats?
25      A.  No, I have not.

Page 411

1       Q.  And prior to issuing your original
2    report, Exhibit 5, did you meet with any of
3    Ms. Coats' family members?
4       A.  Yes, I met with a nephew.
5       Q.  And that was prior to your original
6    report?
7       A.  Yes.
8       Q.  And was that Charlie Coats?
9       A.  Yes.  Charles Coats, Jr.
10      Q.  Okay.  Did you meet with Mr. Morgan,
11   her fiance?
12      A.  No.
13      Q.  Have you ever met with Mr. Morgan?
14      A.  No.
15      Q.  And did you meet with any of her
16   succession representatives?
17      A.  I am not sure what a succession
18   representative --
19      Q.  Her heirs.  It's a Louisiana thing,
20   I believe.  Her heirs under her estate.
21      A.  I don't believe so.
22      Q.  Or actually it's not her heirs.
23   It's her executor --
24      MS. LONIAN:
25         Yes

Page 412

1    EXAMINATION BY MS. WAGER-ZITO:
2       Q.  -- of her estate.
3       A.  I don't believe so.
4       Q.  So is it fair to say the only person
5    you met with was Charlie Coats?
6       A.  That's the only person that I recall
7    getting any information for my report from.
8    Yes.
9       Q.  Okay.  And how long did your meeting
10   with Charlie Coats last?
11      A.  It was several hours.  I don't
12   recall exactly how long.
13      Q.  And was anyone present at that
14   meeting?
15      A.  Yes.
16      Q.  And who was that?
17      A.  Josh Palmintier was.
18      Q.  Was anyone else present at that
19   meeting?
20      A.  There may have been children in the
21   home.  I don't recall.
22      Q.  Okay.  Were you given any
23   photographs or documents at that meeting?
24      A.  Not at that time, no.
25      Q.  Were you subsequently provided

SCOTT H. TAYLOR                                    **February 9, 2012**

Page 413

1  photos?
2      A.  If there was any in the report, then
3  yes, but I think I took all of the photos that
4  were used in this report.  I think.  I am not
5  positive until I flip through them.
6      Q.  And we'll get to the photos later.
7  I don't want to get into too detailed in those
8  just yet.
9          The meeting with Charlie Coats was
10  actually at the Coats home; correct?
11      A.  That's correct.
12      Q.  And at the time that you were there,
13  the home had been rebuilt?
14      A.  That's correct.
15      Q.  Did you discuss with Mr. Coats the
16  floor plan of the house prior to its being
17  rebuilt?
18      A.  Yes.
19      Q.  What did he tell you about what the
20  house looked like before Katrina?
21      A.  He described the house being very
22  similar to its present state as far as the
23  actual layout.  There may have been some
24  changes that were reflected in the sketches
25  that I made on the rear section of it.  The

Page 414

1  extended portion.  As a shotgun double, often
2  the back end goes all the way across the two
3  sections of the house and it appears that
4  there may have been some augmentation there
5  and I put in, according to the notes I had at
6  the time, the changes.
7      Q.  And when you say it was similar,
8  prior to Katrina was the house a single or a
9  double?
10      A.  I believe it was a double.  I would
11  have to refer back to my report.
12      Q.  And we'll get into that.  What did
13  you do to try and find out how familiar
14  Charlie Coats was with the house prior to
15  Katrina?
16      A.  I discussed it with him at some
17  length.
18      Q.  But did you ask him, you know, how
19  often he had been there and how familiar he
20  was with it, how familiar he was with the
21  building materials, anything like that?
22      A.  I did not discuss building materials
23  with him.
24      Q.  Did you ask him how often he had
25  been to the house before Katrina?

Page 415

1      A.  Yes.
2      Q.  And what did he tell you?
3      A.  He said that he had been to that
4  house all of his life.  That he had been there
5  many, many times.
6      Q.  And you say you didn't discuss with
7  him the building materials?
8      A.  I may have, yes.  I may have.  As a
9  matter of fact, now that you mention it, I do
10  recall even discussing baseboards and that
11  kind of thing.
12      Q.  And what else did you discuss with
13  him about the building materials that were in
14  the house prior to Katrina?
15      A.  I discussed the nature of how the --
16  how the home was put together.
17      Q.  And what do you recall him telling
18  you about the building materials?
19      A.  I don't recall the details of what
20  he told me at that meeting at that time.  They
21  are included in my report, though.
22      Q.  And you don't have any notes
23  remaining of that meeting?
24      A.  No.
25      Q.  Did he show you any pictures from

Page 416

1  pre-Katrina that would reflect on the quality
2  of the building materials?
3      A.  No, not pre-Katrina.
4      Q.  Did you discuss the quality of the
5  furnishings that were in the Coats house prior
6  to Katrina?
7      A.  I am certain I would have discussed
8  that, yes.
9      Q.  And what did he tell you about the
10  quality of the furnishings?
11      A.  I don't recall what his testimony at
12  that time was.
13      Q.  And did he show you any pictures
14  that reflected the quality of the furniture
15  that was in the home prior to Katrina?
16      A.  No, he did not.
17      Q.  What did you do to ascertain the
18  quality of the furnishings that were in the
19  house prior to Katrina?
20      A.  I don't recall what I -- what
21  measure I used of that.  If you want to refer
22  to something in particular, I could answer it.
23      Q.  Right now I am trying to get at what
24  you discussed with Charlie Coats and what you
25  learned from him about the furniture.  Did you

104 (Pages 413 to 416)

**JOHNS, PENDLETON COURT REPORTERS**                    504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 417

1    have any other basis to determine, to
2    ascertain the quality of the materials or the
3    furniture in the house prior to Katrina other
4    than your conversation with Mr. Coats?
5        A.  Yes.  There was some photos that I
6    received through Counsel concerning it.
7        Q.  That were pre-Katrina photos?
8        A.  Not necessarily pre- -- Yes, --
9    Well, possibly.  Yes.
10       Q.  Okay.  And which photos are you
11   looking at?
12       A.  This would be on the first page of
13   the photo sheets.  But my guess is that
14   they're actually post-Katrina, all of them.  I
15   can't determine that for absolute certainty,
16   but they appear to be post-Katrina.
17       Q.  And I believe the question was
18   whether there were any pre-Katrina photos that
19   you used to determine the quality of the
20   building materials or the furniture
21   pre-Katrina.
22       A.  They were not pre-Katrina, but they
23   were original to the construction.
24       Q.  Okay.  So you're saying the photos
25   on photo sheet 1 and what else?

Page 418

1        A.  Photo sheet 2 and the first one on
2    photo sheet 3.  Were all supplied by the
3    homeowner via the Counsel.
4        Q.  The first photo says it's a
5    post-Katrina gutted shell.  Is that correct?
6        A.  Yes.
7        Q.  And it indicates that the date it
8    was taken was 6/14/2011.  That can't be
9    right.
10       A.  That can't be right.  Exactly.  That
11   was a submission to the claim at that time.
12       Q.  And you believe --
13       A.  Or the program.
14       Q.  This gutted shell informs your
15   opinion on the quality of the materials used
16   in the home and the furnishings in the home
17   pre-Katrina?
18       A.  Yes.
19       Q.  How so?
20       A.  As I stated in the report itself in
21   the "Line item" section, you can see that
22   there are lath marks on the existing studs,
23   lath being the structure upon which plaster is
24   used in order to complete walls.
25       Q.  Other than that, does this tell you

Page 419

1    anything about the materials in the home prior
2    to Katrina?
3        A.  It tells me there were brick
4    fireplaces in the home.
5        Q.  Anything else?
6        A.  It's not much different than what I
7    saw afterwards.  As far as what was inside,
8    the furnishings, it doesn't give me much
9    information, no.
10       Q.  It doesn't give you any information
11   about the furnishings, does it?
12       A.  I would agree.
13       Q.  Did you discuss with Charlie Coats
14   the cause of damage to the Coats home?
15       A.  I'm certain I did, yes.
16       Q.  And what did he tell you?
17       A.  He said that it was flooded.
18       Q.  Did you discuss what was the basis
19   of his knowledge of the cause of damages?  Was
20   he present in the home during Katrina?
21       A.  I don't recall if he was in the
22   home.  I know that he was in and about the
23   area at the time.  Or I believe he was.  I
24   believe that's what his testimony to me was.
25       Q.  I assume you weren't deposing him,

Page 420

1    so he wasn't testifying to you.
2        A.  He wasn't -- Exactly.  Pardon me.
3    His statement to me.
4        Q.  But you believe that he stayed in --
5    he stayed somewhere near the Coats home
6    actually during the storm?
7        A.  I think he might have, yes, based on
8    my recollection of our conversation.
9        Q.  But he was not present at the Coats
10   home during Katrina?
11       A.  Not that I know of.
12       Q.  Did you discuss with him the
13   contents in the Coats home?
14       A.  I'm certain I would have discussed
15   the contents, yes.
16       Q.  He's not the source of the contents
17   sheet -- Or did you discuss with him preparing
18   a listing of contents for Ms. Coats along the
19   lines of the contents reports that you have
20   for the other Plaintiffs?
21       A.  I believe that I began to discuss it
22   with him and my recollection is that he had
23   informed me he wasn't living there and I
24   ceased to discuss it at that point with him.
25       Q.  How did you go about getting a

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

Page 421

1    contents report for Ms. Coats?
2         A.  Having used the same methods with
3    the other Plaintiffs involved, I left that to
4    the -- to the Counsel to go, to retrieve those
5    documents with the same instructions.
6         Q.  Okay.  So the contents report that's
7    attached to the Coats report, which is Exhibit
8    6, came from Counsel?
9         A.  Yes.
10        Q.  And you don't know how it was
11   prepared?
12        A.  I'm certain it was prepared the same
13   way that the others were prepared, using the
14   --
15        Q.  The others were prepared by the
16   homeowners; correct?
17        A.  Yes.
18        Q.  Is it your understanding that Ms.
19   Coats was able to prepare this report?
20        A.  No.  No.  The same methodology is
21   what I am referring to.
22        Q.  Other than this meeting with Charlie
23   Coats, did you meet with anyone else from the
24   Coats family?
25        A.  No.  Not directly.

Page 422

1         Q.  And we looked briefly at the
2    pictures and it appears to me that the only
3    pictures from the homeowner are the ones that
4    we were talking about on photo sheet 1, photo
5    sheet 2, and the first picture on photo sheet
6    3.
7         A.  Yes, that's correct.
8         Q.  So this bottom picture on photo
9    sheet 3 says "Taken by Scott".  Is that
10   accurate?
11        A.  Yes.
12        Q.  And then the remaining pictures in
13   here appear to be -- Well, you tell me.  These
14   were pictures of the home in its current
15   state?
16        A.  Yes.
17        Q.  And does that apply to all of the
18   other pictures?
19        A.  Yes.
20        Q.  And you took all of those pictures?
21   Yes?
22        A.  Yes.
23        Q.  I'm sorry if I asked you this.  Did
24   you ever meet with Mr. Morgan?
25        A.  No.

Page 423

1         Q.  So you never discussed the contents
2    list with Mr. Morgan?
3         A.  No.
4         Q.  Do you know -- hear from Counsel
5    that it was Mr. Morgan who prepared the
6    contents list?
7         A.  I heard that, yes.
8         Q.  Does it appear to you that any of
9    the materials on the contents list were
10   actually Mr. Morgan's contents as opposed to
11   Ms. Coats' contents?
12        A.  I was not aware of that if that was
13   the case.
14        Q.  Did you review the contents list to
15   try to determine whether it appeared that any
16   of these might have been contents that were
17   Mr. Morgan's and not Ms. Coats'?
18        A.  No.
19        Q.  Did you ask any questions about any
20   of the items on the contents list?
21        A.  No.
22        Q.  So was this contents list exactly
23   the same as what was provided to you, with no
24   changes being made?
25        A.  As before, I always sample the list

Page 424

1    as it's presented to me and run sampling
2    pricing.  But other than that, it's the same.
3         Q.  Did you, after you prepared your
4    report and did your floor plans, did you
5    review those floor plans with anyone?
6         A.  No.
7         Q.  If we can go back to the contents
8    list briefly, if you could look at item 125 on
9    the contents list.
10        A.  Yes.
11        Q.  Okay.  125 says "Dresses, $10,000".
12        A.  Uh-huh (affirmatively).
13        Q.  Did you question that entry at all?
14        A.  There was no way for me to question
15   that.
16        Q.  Did that seem like a somewhat high
17   number for dresses?
18        A.  I'm not qualified to determine if
19   that's a high number on dresses.
20        Q.  And then the next entry is $5,000
21   for shirts.
22        A.  Yes.
23        Q.  Did you question that entry at all?
24        A.  I did not.
25        Q.  The next item is $5,000 for shorts.

106 (Pages 421 to 424)

SCOTT H. TAYLOR                                    February 9, 2012

Page 425

1    Did you question that item at all?
2        A.  I did not.  No.
3        Q.  The next item is $10,000 for suits.
4    Do you know whose suits those were?
5        A.  No, I don't.
6        Q.  Do you have any understanding that
7    the suits belonged to Ms. Coats as opposed to
8    Mr. Morgan?
9        A.  I was not aware of the distinction.
10       Q.  Did that number jump out to you for
11   any reason as something you thought you should
12   ask more questions about?
13       A.  I was not in a position to ask any
14   more questions at that point.  But no, I did
15   not.
16       Q.  What do you mean, you weren't in a
17   position to ask any further questions at this
18   point?
19       A.  I had to have this ready and I
20   prepared it as best I could in the time
21   frame.
22       Q.  This is the -- What we're looking at
23   now is the revised report.
24       A.  Right.
25       Q.  And the same numbers were in the

Page 426

1    original report.
2        A.  Right.
3        Q.  Did you have any time between the
4    original report and the revised report to ask
5    any questions?
6        A.  Clearly there was time.  I was not
7    asked to revise anything immediately following
8    my report.  My initial report.
9        Q.  Item number 133 is $20,000 of
10   children's clothing.  Do you know whose
11   clothing that was?
12       A.  No, I don't.
13       Q.  Do you understand that that's Miss
14   Coates' grandchildren's clothing?
15       A.  I wasn't aware of whose clothing it
16   was.
17       Q.  So you didn't ask anybody any
18   questions about the children's clothing listed
19   there?
20       A.  I did not.
21       Q.  Did that number seem at all out of
22   the ordinary to you?
23       A.  I didn't question it because I
24   didn't question the veracity of any of the --
25   of the general clothing issues.  I did not do

Page 427

1    that.
2        Q.  You say you didn't question the
3    veracity of any of the clothing issues.  Did
4    you question the veracity of any of the
5    contents on --
6        A.  Not that I recall.
7        Q.  I need to finish.
8        A.  I'm sorry.
9        Q.  -- on the contents list attached to
10   Ms. Coats' report?
11       A.  Not that I recall.
12       Q.  Further down there, 135 is "New
13   linoleum floor".  Is a floor something that
14   would normally go on the contents report as
15   opposed to the structure?
16       A.  No, it is not.
17       Q.  So should that item not be on there?
18       A.  I would free that should not be on
19   there.
20       Q.  Because you probably provided for a
21   new floor in the Xactimate --
22       A.  Yes, I did.
23       Q.  -- analysis?  And if there are any
24   other items that are structure in nature that
25   are on here, those similarly would belong in

Page 428

1    the Xactimate analysis as opposed to the
2    contents analysis?
3        A.  It would have to be looked at line
4    by line.
5        Q.  Okay.  Well, if they are on here,
6    would you agree that this isn't where they
7    belong?
8        A.  If they're not addressed in the
9    other, then they can remain.  But if they are
10   addressed in the other, then they don't belong
11   here.
12       Q.  And I may have some others for you
13   in a little bit.  Taylor Exhibit 28.
14          (Whereupon a discussion was held off
15          the record.)
16   EXAMINATION BY MS. WAGER-ZITO:
17       Q.  Actually, just put that aside.  I'm
18   going to get to that in a minute.  I'm going
19   to ask you some other questions first.  In the
20   section in your report on "Risk" you discuss
21    -- you state "The interior walls were plaster
22   over wood lath --"  Is it lath, lathe?
23       A.  Lath.
24       Q.  "-- prior to the named peril, with 9
25   foot ceilings in the front section with

107 (Pages 425 to 428)

JOHNS, PENDLETON COURT REPORTERS                504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 429

1   tapering to 7 feet in the rear addition." And
2   again, obviously you never inspected the home
3   prior to Katrina; right?
4       A.  That's correct.
5       Q.  And we have determined that all of
6   the photos in the report were taken
7   post-Katrina.
8       A.  That's correct.
9       Q.  And that you haven't seen any photos
10  that were taken pre-Katrina.
11      A.  That's correct.
12      Q.  Are you aware that Mr. Morgan
13  testified that Miss Coats had hired sheetrock
14  hangers when renovating the house before
15  Katrina?
16      A.  No, I'm not aware of it.
17      Q.  What, if any, impact would that have
18  on your opinion that the house had plaster
19  walls and wood lath prior to Katrina?
20      A.  The plaster still would have been in
21  place prior to then.
22      Q.  Are you aware that Miss Coats
23  referred to changing a wall of sheetrock in
24  the pre-Katrina renovation in her 2007
25  deposition?

Page 430

1       A.  No, I am not aware of that.
2       Q.  Would that affect your opinion at
3   all?
4       A.  No.
5       Q.  Some of the work that had been done
6   prior to Katrina for the renovation?
7       A.  No.
8       Q.  And you say in your report "The roof
9   is slate" and you indicate the possibility
10  that it will need to be replaced.  What's the
11  basis for that statement?
12      A.  It showed signs of distress.
13      Q.  And do you know what the roof looked
14  like before Katrina?
15      A.  No, I do not.
16      Q.  And did you make an assessment as to
17  whether or not the roof needed repair?
18      A.  I did.
19      Q.  And what was your assessment?
20      A.  That it had -- That it was at risk.
21      Q.  Are you aware that Mr. Morgan
22  testified at his deposition that the attic and
23  its contents received little or no damage from
24  the flood waters from Katrina?
25      A.  I was not aware of that.

Page 431

1       Q.  Does that affect your opinion at
2   all?
3       A.  No, it does not.
4       Q.  Why not?
5       A.  My experience has shown that what I
6   put in the report is accurate when it comes to
7   the kinds of damages that are going to occur
8   with flood.
9       Q.  Even if there's testimony that the
10  damage didn't occur?
11      A.  Even if, yes.
12      Q.  In the section on "Restoration/
13  repairs", you say "In order to restore the
14  home to its original condition it may be
15  necessary to retain a structural engineer to
16  determine the structural integrity of the
17  home."  Has this been done?
18      A.  Not that I am aware of.
19      Q.  Now, why in this instance do you
20  need to retain a structural engineer and you
21  didn't with any of the other Plaintiffs?
22      A.  Because the home is still there.
23      Q.  And the current occupants of the
24  home have made a determination that the home
25  is structurally sound?

Page 432

1       A.  Apparently.
2       Q.  So you have no information sitting
3   here right now on which to render an opinion
4   that the home is not structurally sound?
5       A.  Nothing more than my opinion.
6       Q.  But your opinion is not based upon
7   the opinion of a structural engineer.
8       A.  That's correct.
9       Q.  And you say here it would be
10  necessary to retain a structural engineer to
11  determine the structural integrity of the
12  home?
13      A.  I can still have my opinion.
14      Q.  But you state in here that it may be
15  necessary to retain a structural engineer.
16      A.  Yes, I said it may be necessary.
17      Q.  But that hasn't been done?
18  Correct?
19      A.  Not that I am aware of.
20      Q.  Further down in the "Restoration/
21  repairs" section you say "Contents lost in the
22  peril have been documented by occupants of the
23  home and priced in an attached spreadsheet."
24  Who are the occupants of the home, to your
25  knowledge?

SCOTT H. TAYLOR                                          February 9, 2012

Page 433

```
1        A.  At this time?
2        Q.  Who provided you the spreadsheet?
3   Was it Mr. Morgan?
4        A.  I didn't get anything from Mr.
5   Morgan directly.
6        Q.  What's your understanding of who the
7   occupants of the home are right now?
8        A.  I understood that the nephew was an
9   occupant of the home at the time.  Charles
10  Coats, Jr.
11       Q.  But he was not an occupant of the
12  home at the time of Katrina.
13       A.  That's -- That's correct.
14       Q.  Any other occupants of the home?
15       A.  At this time I am not aware of who
16  they are.
17       Q.  Do you understand that Mr. Morgan is
18  living in the home with some other family
19  members of Ms. Coats?
20       A.  I am not aware of that.
21       Q.  So you have no idea on the contents
22  spreadsheet that we just looked at whose
23  contents are listed?
24       A.  That's correct.
25       Q.  So they could be for Mr. Morgan;
```

Page 434

```
1   correct?
2        A.  I trust that what I asked for was
3   the contents that were in the home at the time
4   and that is what was delivered to me.  That's
5   what I am going -- basing it on.
6        Q.  You trust that, but you do not know
7   if the contents listed were the contents for
8   Mr. Morgan or anyone else who is currently
9   living in the home?
10       A.  I do not know that for certain.
11       Q.  And you know that Mr. Morgan is not
12  a Plaintiff in this case; correct?
13       A.  I am aware of that.
14       Q.  And Charles is not a Plaintiff in
15  this case?
16       A.  Yes.  I understand.
17       Q.  And none of Ms. Coats' children or
18  grandchildren are Plaintiffs in this case?
19       A.  I understand that, yes.
20       Q.  So if any of the contents on the
21  contents list belonged to anyone other than
22  Ms. Coats, they should not be included on the
23  contents list?
24       A.  I am not qualified to speak to
25  that.
```

Page 435

```
1        Q.  And I think you testified earlier
2   that Charles didn't live in the home.  Am I
3   wrong about that?
4        A.  I believe he did not live in the
5   home at the time of the flood.
6        Q.  But you're not sure if he lived at
7   the home at the time that you met with him?
8        A.  I believed he did.
9        Q.  Okay.  In the section of your report
10  -- in your report you, as with the other
11  reports, you state that you believe the cause
12  of the loss was flood.
13       A.  Yes.
14       Q.  And I do not want to go through
15  those questions again.  Would your answers be
16  the same to the questions I asked you earlier
17  about the causation of the loss for Ms. Coats
18  as it was for the other Plaintiffs?
19       A.  Yes.
20       Q.  Prior to issuing your report were
21  you aware that Ms. Coats received a $1,700
22  payment for roof damage and a $33 payment for
23  fence damage from her wind insurance policy?
24       A.  No, I am not.
25       Q.  And that she testified to this in
```

Page 436

```
1   her 2007 deposition?
2        A.  No, I'm not aware of this.
3        Q.  Does this change your opinion in any
4   way?
5        A.  No, it does not.
6        Q.  Do you have any basis to dispute
7   that Ms. Coats in fact received that money?
8        A.  I can't dispute that.
9        Q.  Or that she made those claims for
10  wind damages?
11       A.  No.
12       Q.  How did you come to arrange to meet
13  with Mr. Coats, Mr. Charles Coats?
14       A.  Through Counsel I received contact
15  information, a telephone number.
16       Q.  Okay.  And you said you had a
17  discussion with him about the -- because you
18  were in the home as it had been repaired, that
19  there was a discussion of the similarities and
20  differences between the pre-loss and the
21  post-loss layout, the construction and the
22  appointments of the home.
23       A.  Yes.
24       Q.  Is that correct?
25       A.  Yes.
```

109 (Pages 433 to 436)

SCOTT H. TAYLOR                                    February 9, 2012

Page 437

1    Q.  And did you ask him whether or not
2  the house was a single at the time of Katrina?
3    A.  I can't say for certain because of
4  the function, but, generally speaking, that
5  would be true if there is one kitchen and one
6  -- that had connections between them that
7  were not in there now.  Especially in the rear
8  section.
9    Q.  But did he tell you that prior to
10 Katrina there were two kitchens and two
11 bathrooms?
12   A.  I don't recall if he did or not.
13   Q.  Did you ask him that?
14   A.  I don't recall that question.
15   Q.  Would that not be relevant to your
16 opinion?
17   A.  If it was different than what's in
18 my report it would be.
19   Q.  Now if you can take a look at what
20 we marked as Taylor Exhibit 28.  And also if
21 you could turn in your report to page 30, and
22 that's Exhibit 6.  And I'll represent to you,
23 Mr. Taylor, that Taylor Exhibit 28 is a marked
24 up copy of page 30 of your report.
25   A.  Yes.

Page 438

1    Q.  And obviously also made the drawing
2  bigger.  And the markings on here were made by
3  Mr. Morgan in his deposition.  You see it's
4  marked "Morgan Deposition 4".
5    A.  Yes.
6    Q.  And he marked this up to reflect
7  what the home -- We asked him to mark on here
8  what the home looked like prior to Katrina.
9  And he testified that the home was a single
10 prior to Katrina.  And if you see on here
11 where you have kitchen number 2?
12   A.  Yes.
13   Q.  He testified under oath that this
14 was a dining room.  And where you have bath
15 number 2, he testified that that was a
16 closet.  Do you see that?
17   A.  Yes.
18   Q.  Do you have any reason to dispute
19 Mr. Morgan's testimony that this is what the
20 home looked like prior to Katrina?
21   A.  I do not.
22   Q.  Does this affect your opinion as to
23 the damages to Ms. Coats' home?
24   A.  It would reflect a change in my
25 opinion.

Page 439

1    Q.  And it would cause the number in
2  your opinion to be lower; correct?
3    A.  I can't say for certain because of
4  the function, but, generally speaking, that
5  would be true if there is one kitchen and one
6  bathroom versus two.
7    Q.  Because the kitchen would cost more
8  to either rebuild or repair than a dining
9  room?
10   A.  Generally speaking, that is true.
11 Yes.
12   Q.  And a bathroom would cost more to
13 repair or rebuild than a closet?
14   A.  Possibly, yes.
15   Q.  Is there any analysis that you can
16 conceive of that would have a closet costing
17 more than a bathroom?
18   A.  If the bathroom did not have plaster
19 walls and the closet did, then they could
20 become an equal value or even -- even the
21 closet could actually increase.
22   Q.  But you'd agree with me that it
23 would be important for you to know what the
24 closet looked like?
25   A.  Yes, in order to determine the

Page 440

1  difference.
2    Q.  And you don't know that?
3    A.  No.
4    Q.  So at least insofar as the fact that
5  your report has this extra bathroom and this
6  extra kitchen, it's incorrect?
7    A.  That's correct.  If that is the
8  case.  If that is in fact the facts.
9    Q.  But you haven't reviewed Mr.
10 Morgan's deposition; correct?
11   A.  I have seen it, yes.
12   Q.  Did you see the part of his
13 deposition where we discussed this layout?
14   A.  I recall -- I recall that there were
15 some differences in it, yes.
16   Q.  And as a result of seeing that
17 testimony, did that cause you to maybe think
18  "I have to go back and look at my report and
19 make some changes"?
20   A.  Well, I did not see it before I put
21 my revised reports together.  So I didn't have
22 the opportunity to do that.
23   Q.  It was available before you put your
24 revised report together.
25   A.  I can't speak to that.

110  (Pages 437 to 440)

JOHNS, PENDLETON COURT REPORTERS                   504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 441

1    Q.  And you didn't discuss with Mr.
2  Charlie Coats when you met with him the fact
3  that the house was a single before Katrina and
4  that it had been renovated to be a double?
5    A.  I did discuss it with him to some
6  degree, yes.
7    Q.  What did you discuss with him along
8  those lines?
9    A.  That there was a center wall that
10 separated the two sections of the house which
11 made it a -- concurrent with many of the
12 shotgun doubles that we see in New Orleans.  I
13 asked him specifically about that and he -- he
14 at that time told me that they had had one
15 family living at least at one point or at
16 least that they were connected, that there
17 were some openings between them.  So I
18 understood that there -- it could have been
19 functioning as a single, but it was still
20 built like a double.
21   Q.  Did you ask him specifically how
22 many kitchens there were prior to Katrina?
23   A.  I didn't ask him that, that I
24 recall.
25   Q.  And did you ask him how many

Page 442

1  bathrooms there were prior to Katrina?
2    A.  I did not ask him that, that I
3  recall.
4    Q.  But sitting here now you would agree
5  that your report is incorrect insofar as it
6  reflects that there were two kitchens and two
7  baths prior to Katrina?
8    A.  If in fact that is the case, then
9  that would reflect a difference in the report.
10   Q.  And you have absolutely no reason to
11 dispute that that was the case?
12   A.  I have no reason to refute anybody
13 else's testimony.
14   Q.  And you have no evidence that it was
15 as you drew it as opposed to how Mr. Morgan
16 drew it?
17   A.  Nothing to dispute it.
18   Q.  You state in your report that there
19 was evidence of warpage apparent inside as
20 floor was uneven.
21   A.  Yes.
22   Q.  Do you know if it was like that
23 before Katrina?
24   A.  I do not.
25   Q.  And you can't say one way or the

Page 443

1  other whether it was like that prior to
2  Katrina?
3    A.  No.
4    Q.  And you state in your report that
5  the slate roof was still in place, but that
6  ridge tiles were in disarray and that the
7  testing of the faces showed extensive movement
8  of an inch or more lift in several locations.
9  Is that correct?
10   A.  Yes.
11   Q.  Are you aware that a claim was made
12 on the homeowner's insurance policy for the
13 Coats home for damages related to Hurricane
14 Gustav?
15   A.  No, I was not.
16   Q.  Are you aware that more than $10,000
17 was paid as a result of Gustav related damages
18 to the roof?
19   A.  No, I was not.
20   Q.  Would that affect your opinion at
21 all?
22   A.  No.
23   Q.  And do you know if the roof was
24 repaired after Hurricane Gustav?
25   A.  I do not.

Page 444

1    Q.  And that was several years before
2  you inspected the home; correct?
3    A.  I understand Gustav was several
4  years before, yes.
5    Q.  And how can you distinguish between
6  damage to the roof that may have occurred
7  during Katrina and damage that may have
8  occurred from later storms?
9    A.  I can't speak to that because I
10 wasn't aware of it.
11   Q.  And would that make a difference to
12 your opinion at all?
13   A.  No.
14   Q.  What sort of testing of the faces of
15 the roof did you do?
16   A.  I did a lift test.  A lift test is
17 where you grasp the bottom of the tile and
18 move it.  If it lifts more than an inch, it
19 shows that it is loose.
20   Q.  And you also say that there was
21 extensive movement.  Is that how you determine
22 that there was extensive movement?
23   A.  Yes.
24   Q.  And what evidence do you have that
25 this damage to the roof was flood damage as

111 (Pages 441 to 444)

SCOTT H. TAYLOR                                      February 9, 2012

Page 445

1   opposed to -- flood damage from Katrina?
2        A.  The same evidence that I had on all
3   others.  There was -- There was an extensive
4   amount of water in the house and it resided
5   there for sometime.
6        Q.  What evidence do you have that
7   excludes other potential sources of damage to
8   the roof?
9        A.  I was asked to look at flood damages
10  only and that's all I looked at.
11       Q.  And we noted earlier that Mr. Morgan
12  testified that the attic was not flooded as a
13  result of Katrina.  Do you recall that?
14       A.  I recall that, yes.
15       Q.  Did that affect your opinion in any
16  way as to roof damage from Katrina?
17       A.  No.
18       Q.  Are you aware that Ms. Coats
19  testified in 2007 that no new roof was needed
20  after Katrina, it wasn't in that bad a shape?
21       A.  No, I am not aware of that.
22       Q.  And would this affect your opinion
23  in any way?
24       A.  No.
25       Q.  And you state in your report that

Page 446

1   the walls at the time of Katrina were made
2   from plaster based on a review of photos.  We
3   have established that there were no
4   pre-Katrina photos.  So is your testimony
5   based upon the photos that we discussed prior?
6        A.  Yes.
7        Q.  And again, even though Miss Coats
8   and Mr. Morgan say that they removed those
9   walls prior to Katrina and they started
10  renovating it and putting in sheetrock --
11       A.  I can't speak to that in detail.  I
12  wasn't privy to that conversation.
13       MS. WAGER-ZITO:
14          Why don't we go off the record
15          now and break for lunch.
16          (Recess.)
17  EXAMINATION BY MS. WAGER-ZITO:
18       Q.  Back on the record.  Okay.  We are
19  very close to being done with Ms. Coats.  But
20  I do want to go back to the contents list
21  along the lines that we were discussing
22  before, about some of the structural issues
23  that were on the contents list that may be
24  duplicative of items that are also included in
25  your repair estimates and see -- and ask you

Page 447

1   some questions about whether you think they're
2   in the right place.  And starting with number
3   8, which is a new linoleum floor for the
4   living room, would you agree that that is more
5   appropriately included in the --
6        A.  I would.
7        Q.  -- structure --
8        A.  Sorry.
9        Q.  -- repair?
10       A.  Yes.
11       Q.  Okay.  Number 12 is a gas heater
12  which they have in the living room.  Is that
13  more -- is that a space heater, do you think,
14  or --
15       A.  It appears that it would be.
16       Q.  So does that belong in the living
17  room, in the personal contents, or would that
18  belong in the structural repair?
19       A.  In the personal contents.  It would
20  be a standalone.
21       Q.  What about ceiling fans?  There are
22  three entries for ceiling fans.
23       A.  They can go either way.  But if it's
24  not in the structural, then it can certainly
25  go in the contents.

Page 448

1        Q.  But if they're in both, then one of
2   them should come off?
3        A.  I would agree.  Unless they were
4   boxed, you know.
5        Q.  What about a refrigerator; where do
6   they normally go?
7        A.  Refrigerator is a movable item.
8   It's a contents issue.
9        Q.  Okay.  So that would be
10  appropriately in the contents list?
11       A.  Yes.
12       Q.  What about a kitchen stove?
13       A.  Again, unless it's built in, it
14  would be -- even if it is, it's a contents
15  list.
16       Q.  What about a bathroom sink?
17       A.  A bathroom sink?
18       Q.  Yes.  Number 62.
19       A.  Generally that would be a structural
20  item.
21       Q.  And then the toilet?
22       A.  The same thing.
23       Q.  Okay.  And then there's a linoleum
24  floor for the bathroom.  And we talked about
25  one of them, but there's actually two of them

SCOTT H. TAYLOR                                    February 9, 2012

Page 449

1  in there. So those would appropriately belong
2  in the repair costs?
3      A. The -- Excuse me, can you repeat
4  which ones?
5      Q. There are two linoleum floors, two
6  additional linoleum floors.
7      A. Yes, those would be structural.
8      Q. Okay. And then numbers 84 and 85
9  are iron bar door cover and iron bar window
10 cover in the bedrooms. Are those contents or
11 should those be structural?
12     A. They are possessions and so if
13 they're not included in the structure, then
14 they would be -- you could include it in the
15 contents.
16     Q. So those could go either way?
17     A. They could.
18     Q. We just need to check -- we would
19 need to check and see if they're in both?
20     A. Right. I don't believe they're in
21 both.
22     Q. What about the dining room French
23 doors?
24     A. Normally it's a structural item, but
25 if they're not included in the structural item

Page 450

1  they could be included as a possession.
2      Q. So again, with that one we would
3  need to check to see if they're in both?
4      A. Yes.
5          MR. PALMINTIER:
6          You have to let her finish the
7      question.
8          THE WITNESS:
9          Sorry. Trying to help to go
10     quicker, and I am not.
11 EXAMINATION BY MS. WAGER-ZITO:
12     Q. Right. And again, did you make any
13 effort to go through the contents list to
14 remove any component parts of the structure
15 from the contents list?
16     A. I missed those. I missed those that
17 we have just discussed.
18     Q. And we may have discussed this, but
19 Mr. Morgan actually testified that his list
20 also contained his personal property. And I
21 believe you testified you didn't have a chance
22 to review Mr. Morgan's deposition before you
23 did your report. Is that correct?
24     A. That's correct.
25     Q. So would you agree that his personal

Page 451

1  property should come off the contents list?
2      A. Not necessarily. I was asked to
3  appraise the contents that were there and if
4  they were represented as there, then I
5  included them, not whose ownership.
6      Q. So even if he's not a Plaintiff, you
7  think she should be compensated for his
8  contents?
9      A. I can't speak to that.
10     Q. Well, if Ms. Coats should not be
11 under the law compensated for his contents,
12 you would agree that we'd have to figure out
13 which ones were his on the contents list and
14 take those out?
15         MR. PALMINTIER:
16         I object to form.
17         THE WITNESS:
18         That appears to be a legal
19     opinion. I wouldn't be qualified to
20     make that.
21 EXAMINATION BY MS. WAGER-ZITO:
22     Q. And we couldn't do that with this
23 contents list as it is now because it's not
24 apparent on the face of the contents list
25 which are his and which are Ms. Coats'.

Page 452

1          MR. PALMINTIER:
2          I object to form.
3          THE WITNESS:
4          I see no distinction there.
5  EXAMINATION BY MS. WAGER-ZITO:
6      Q. And you also see no distinction for
7  her grandchildren or her children, for their
8  contents on the contents list as it currently
9  exists?
10     A. I do not.
11     Q. Moving on to additional living
12 expenses for Ms. Coats, and I will not reask
13 the questions we asked before, did you
14 interview -- You didn't speak to Mr. Morgan.
15 Did you discuss with anyone about Ms. Coats'
16 pre-Katrina living expenses? How she lived,
17 you know, --
18     A. No. Not except -- Well, I did with
19 Charles. I did discuss what -- what the
20 conditions of the living were there.
21     Q. I'm sorry. That wasn't clear. Did
22 you discuss with Charles her living expense
23 costs? Like her phone bills and her dry
24 cleaning bills and her food bills or the types
25 of costs that you look at for additional

SCOTT H. TAYLOR                                    February 9, 2012

Page 453

1   living expenses?
2       A.  I did not discuss that with Charles.
3       Q.  So you have no understanding of her
4   pre-Katrina living expenses?
5       A.  I do not have specific details.
6       Q.  Okay.  And do you have any specific
7   details about Ms. Coats' post-Katrina living
8   expenses in that one year after Katrina?
9       A.  No.
10      Q.  And are you aware that Mr. Morgan
11  testified that virtually no bills continued,
12  no expenses continued with regard to Ms.
13  Coats' house post-Katrina in the immediate
14  aftermath of Katrina?
15      A.  I am not aware of that.
16      Q.  Would that have any impact on your
17  opinion regarding the amount of additional
18  living expenses that you calculated for Ms.
19  Coats?
20      MR. PALMINTIER:
21          Objection.
22      THE WITNESS:
23          My methodology I stand by.  It
24      wasn't prepared to answer that based
25      on the information I didn't have.

Page 454

1   EXAMINATION BY MS. WAGER-ZITO:
2       Q.  And what steps, if any, did you take
3   to ascertain Ms. Coats' actual additional
4   living expenses post-Katrina?
5       A.  I left instructions to -- with
6   Counsel that -- that the parties living there
7   would provide the same information that I
8   asked for in the other cases.
9       Q.  But you didn't get any information
10  regarding Ms. Coats' actual living expenses
11  post-Katrina; correct?
12      A.  I did not.
13      Q.  Are you aware that post-Katrina Ms.
14  Coats stayed at her house in Hammond and that
15  she had few expenses, if any?
16      A.  I was not aware.
17      MR. PALMINTIER:
18          Objection.
19  EXAMINATION BY MS. WAGER-ZITO:
20      Q.  Did you consider the duration of
21  time away from the home that Ms. Coats has
22  had?  The amount of time she spent away from
23  her home?
24      A.  I was not aware of the amount of
25  time.

Page 455

1       Q.  Then why is it that you assume that
2   Ms. Coats had additional living expenses for a
3   full year?
4       A.  Generally speaking, there were very
5   many cases that I saw where people were
6   displaced for upwards of two years and it
7   seemed a logical position to take.
8       Q.  But as to Ms. Coats specifically, do
9   you know how long she was displaced after
10  Katrina?
11      A.  No.
12      Q.  Okay.  Moving on to Mr. Livers --
13      MS. WAGER-ZITO:
14          Before we start that, off the
15      record.
16          (Whereupon a discussion was held
17      off the record.)
18  EXAMINATION BY MS. WAGER-ZITO:
19      Q.  Okay.  Back on the record.
20      MS. LONIAN:
21          We are now on Number 29.
22      MS. WAGER-ZITO:
23          No, 7 and 8.
24      MS. LONIAN:
25          7 and 8.

Page 456

1   EXAMINATION BY MS. WAGER-ZITO:
2       Q.  Do you have in front of you, Mr.
3   Taylor, Taylor Deposition Number 7 and Taylor
4   Deposition Exhibit Number 8?
5       A.  Yes.
6       Q.  And is that Taylor 7 a true and
7   correct copy of your July 17, 2011 report
8   regarding damages to Mr. Alvin Livers?
9       A.  Yes.
10      Q.  And is Taylor Deposition 8 a true
11  and correct copy of your report dated October
12  20th, 2011 for the damages to the residence of
13  Alvin Livers?
14      A.  Yes.
15      Q.  Prior to issuing your first report
16  on the damages to Mr. Livers, did you meet
17  with him or his wife?
18      A.  No.
19      Q.  Prior to issuing your revised report
20  for the Liverses, did you meet with either of
21  them?
22      A.  No.
23      Q.  Have you ever met with Mr. and Mrs.
24  Livers?
25      A.  No.

114 (Pages 453 to 456)

SCOTT H. TAYLOR                                        February 9, 2012

Page 457

1    Q.  Have you spoken to them on the
2  phone?
3    A.  Yes.
4    Q.  When did you speak with them on the
5  phone?
6    A.  I don't know the precise date, but
7  it was before the first report.
8    Q.  And who else was involved in that
9  phone call, if anyone?
10   A.  Nobody.
11   Q.  And how long did that call take?
12   A.  Probably 30 minutes.
13   Q.  Did you speak with them subsequent
14 to that?
15   A.  No.
16   Q.  So the sum and substance of your
17 contact with Mr. and Mrs. Livers regarding the
18 damages in this case was one 30 minute phone
19 call?
20   A.  Yes.
21   Q.  What did you discuss in this phone
22 call?
23   A.  Many of the similar things that were
24 discussed in each of the other cases.
25   Q.  So did you discuss the layout of

Page 458

1  their home?
2    A.  Not in any detail, because I had
3  already seen it.
4    Q.  Okay.  Did you discuss the quality
5  of the materials that they used -- that were
6  in their home pre-Katrina?
7    A.  No.
8    Q.  Did you discuss the quality of the
9  furnishings that were in their home?
10   A.  No.
11   Q.  And why not?
12   A.  I relied upon them to give me an
13 accurate account based on the contents list
14 that was submitted through Counsel.
15   Q.  And as to the quality of the
16 materials used in building their home, did you
17 think that you were able to learn enough from
18 your visit to the property?
19   A.  I did.
20   Q.  So you didn't need to ask them about
21 that?
22   A.  Correct.
23   Q.  And as to the floor plan of the
24 house, did you think it was necessary to speak
25 with them about that?

Page 459

1    A.  No.  I was able to see enough on
2  site.
3    Q.  Did you discuss photographs during
4  this phone call?  Whether they had any,
5  whether they could supply them to you?
6    A.  Yes.  I'm certain I did.
7    Q.  And they did in fact supply you with
8  some photographs?
9    A.  Through the attorneys, yes.
10   Q.  And we'll get to those, which ones
11 are theirs and which ones are yours, when we
12 go through your report in a little bit.
13        Did you discuss with them the
14 contents of their home?
15   A.  Yes.
16   Q.  And was that discussion much the
17 same as it was with the other Plaintiffs?  And
18 by that I mean you asked them to provide to
19 you the type of information that ultimately
20 ended up in the contents report?
21   A.  Yes.
22   Q.  So you didn't actually discuss the
23 contents?  You just told them what you needed
24 them to do?
25   A.  Yes.

Page 460

1    Q.  And they did in fact ultimately
2  supply you with the information that's
3  contained in the contents report that's
4  attached to your expert report?
5    A.  Through Counsel, yes.
6    Q.  And the photographs were ultimately
7  provided through Counsel; correct?
8    A.  Yes.
9    Q.  Did you discuss with them what the
10 cause of damage to their house was?
11   A.  Yes.
12   Q.  And what did they tell you?
13   A.  Flood.
14   Q.  In the course of that conversation
15 did they distinguish between damage to the
16 first floor of their home versus the damage to
17 the second floor of their home?
18   A.  No.
19   Q.  Did they ever tell you that they
20 believe that the second floor of their home
21 was not damaged by flood?
22       MR. PALMINTIER:
23       I object to form.
24       THE WITNESS:
25       No, they did not.  We did not

115 (Pages 457 to 460)

SCOTT H. TAYLOR                                    February 9, 2012

Page 461

1        discuss that.
2    EXAMINATION BY MS. WAGER-ZITO:
3        Q.  Has anyone ever told you that it's
4    their opinion that the second floor of the
5    Livers home was not damaged by flood?
6        A.  No.
7        Q.  Would that make a difference to your
8    opinion?
9        A.  No.
10       Q.  And why is that?
11       A.  I found sufficient evidence to see
12   that all the damages would have been
13   attributable to flood myself.
14       Q.  Did you see sufficient evidence to
15   determine that the second floor was damaged by
16   flood as opposed to all the damages that you
17   saw were from flood?  Did you look at the
18   second floor and determine that those -- that
19   there were damages that were caused by flood?
20       A.  I used the same methodology as in
21   the other cases, noting that any time that
22   water gets beyond a certain level that it
23   begins to infuse damage and mold in all
24   sections of the home which I attribute to
25   flood.

Page 462

1        Q.  And again, you had this one 30
2    minute phone call with them and that's all?
3    That's the only time you spoke to the
4    Liverses?
5        A.  Yes.
6        Q.  I am not sure if I asked this about
7    all of the Plaintiffs.  After your reports
8    were prepared, did you share the reports with
9    any of the Plaintiffs to ask them if they had
10   any comments on the reports, if they thought
11   there was anything wrong with any of the
12   information in the reports?
13       A.  No.
14           MR. PALMINTIER:
15           I object to form.  Asked and
16       answered.
17   EXAMINATION BY MS. WAGER-ZITO:
18       Q.  When did you visit the Livers
19   property?
20       A.  It was during the same trip that I
21   saw -- within 24 hours of seeing the other
22   properties.
23       Q.  And when you went to the Livers
24   property there was in fact a home there;
25   correct?

Page 463

1        A.  Yes.
2        Q.  You were able to go into the home
3    and look around?
4        A.  I did not go inside the home.
5        Q.  So you have never -- never went into
6    the second floor of the home?
7        A.  Never went inside the second floor
8    of the home.
9        Q.  So you saw the second floor, but
10   only from the outside?
11       A.  Through the windows.
12       Q.  Was the house not accessible when
13   you went to visit?
14       A.  No, it was not.
15       Q.  Why was that?
16       A.  I understood that it was locked and
17   that Mr. Livers was not able to provide a key
18   to get in.
19       Q.  Did you ask to go back a second time
20   when Mr. Livers was able to give you a key so
21   you could go in?
22       A.  I was not able to make another trip
23   to do that and I believed I had enough
24   information to write the report.
25       Q.  There was nothing wrong with -- I

Page 464

1    mean, it was -- it would have been safe to go
2    into the home at that point the time; is that
3    correct?
4           MR. PALMINTIER:
5           Can we go off the record?
6           (Whereupon a discussion was held
7       off the record.)
8    EXAMINATION BY MS. WAGER-ZITO:
9        Q.  And I want to look at the photos
10   just briefly in the report.  And if you can
11   tell me, because there's been some confusion
12   with some of the other photos, if these are
13   your photos, if they're their photos, or if
14   they're some combination.
15       A.  I believe I labeled the photos as to
16   who provided them.
17       Q.  Right.  But in some of the prior
18   ones that hasn't always been correct.  So I
19   just want to make sure that these -- we have
20   got these all right, that these are in fact --
21   So, for example, photo sheet 1 has the
22   homeowner took the photo.  It says on there
23   "Post-Katrina prior to decay."  And it says
24   date taken was 7/14/2011.  That's clearly
25   wrong, the date.

116 (Pages 461 to 464)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

SCOTT H. TAYLOR                                          February 9, 2012

Page 465

1      A.  Right.  The date is incorrect.  The
2  caption is my caption that I put on there.
3      Q.  And do you know what date --
4      A.  No.
5      Q.  -- this was taken?
6      A.  No.  It would have been
7  post-Katrina, but apparently shortly after.
8      Q.  And that's what you meant to convey
9  by putting in there "prior to decay"?
10     A.  Exactly.  Because decay is visible
11  in later photos.
12     Q.  But again, you have no idea what day
13  this was taken on?
14     A.  No.
15     Q.  And the second one says "Homeowner"
16  as well.  Clearly the date is wrong.  Do you
17  have any idea when that one was taken?
18     A.  No.
19     Q.  And page 2, 3, 4, through 13, are
20  those all in fact pictures that you got from
21  Mr. Livers through Counsel?
22     A.  Yes.  Yes.
23     Q.  And you don't know the date that any
24  of those pictures were taken?
25     A.  No.

Page 466

1      Q.  And do you know if any of these
2  pictures are of the second floor of the
3  house?
4      A.  Without reviewing each one, I don't
5  recall, no.
6      Q.  And then the remainder of the
7  photos, 14 through 33, indicate that they were
8  taken by you.
9      A.  Yes.
10     Q.  So these would in fact have been
11  taken around June 13th, 2011, the date that's
12  on them?
13     A.  Yes.
14     Q.  But as Josh indicated, you could
15  only take external pictures because you did
16  not have access to the house because it --
17     A.  Yes.
18     Q.  -- did not belong to the Liverses.
19     MR. PALMINTIER:
20         At the time that he went out
21     there.
22  EXAMINATION BY MS. WAGER-ZITO:
23     Q.  Okay.  Are there any photos that you
24  got from the Liverses that are not in the
25  report?

Page 467

1      A.  No.  Other than ones I took.
2      Q.  And we talked a little bit, you also
3  instructed them to prepare a contents list
4  similar to the way you went about doing it
5  with the other Plaintiffs; correct?
6      A.  Yes.
7      Q.  And was the list that you received
8  back, did you get that through Counsel?
9      A.  Yes.
10     Q.  Was it handwritten or was it typed?
11     A.  It was typed.
12     Q.  And then you took the information
13  and then typed it -- retyped it and put it in
14  the report?
15     A.  Yes.
16     Q.  And I see in this instance the
17  Liverses did include an age for their
18  property.  Do you see that?
19     A.  Yes, in some cases.
20     Q.  And in some cases included a make
21  for the property; some of their furniture --
22     A.  Yes.
23     Q.  -- they did indicate was Thomasville
24  furniture.  Do you see that?
25     A.  Yes.

Page 468

1      Q.  Did you use the age of the contents
2  for any purpose in preparing your report?
3      A.  I did not.
4      Q.  And that's because you weren't
5  depreciating or doing an actual cost value for
6  any of their property; right?
7      A.  That's correct.
8      Q.  And as we saw with Ms. Coats, did
9  you give Mr. Livers any instructions as to
10  whether any fixtures or other structural
11  components of the house should be included in
12  the contents list?
13     A.  I did not instruct as to that.
14     Q.  And if a fixture or structural
15  component is listed in both the contents list
16  and the estimate you prepared, it needs to
17  come out of one or the other; correct?
18     A.  I would agree.
19     Q.  Otherwise, the Plaintiffs would get
20  a double recovery for that?  Would you agree?
21     A.  It would seem to amount to that,
22  yes.
23     Q.  What instructions, if any, did you
24  give the Liverses to delineate between
25  contents that might have been damaged by flood

                              117 (Pages 465 to 468)

SCOTT H. TAYLOR                                February 9, 2012

Page 469

```
 1   and those that might have been damaged by
 2   other sources?
 3       A.  None.
 4       Q.  And that's because it's your opinion
 5   that it was all flood damage?
 6       A.  Yes.
 7       Q.  And did you give the Liverses any
 8   instructions regarding how to estimate
 9   replacement cost value versus actual cost
10   value?
11       A.  No.
12       Q.  Did you have any questions for Mr.
13   and Mrs. Livers about their list, their
14   contents list?
15       A.  No.  No, I did not.
16       Q.  You know that the Liverses were,
17   both Mr. and Mrs. Livers, were deposed before
18   you prepared your revised report; right?
19       A.  I understand that now, yes.
20       Q.  Did you review their depositions
21   before you prepared your revised report?
22       A.  No.
23       Q.  And have you reviewed it since
24   then?
25       A.  Yes.
```

Page 470

```
 1       Q.  And based upon your review of their
 2   depositions, do you believe there are any
 3   changes that need to be made in the Livers
 4   reports?
 5       A.  I haven't had sufficient time to go
 6   through the details of their deposition to
 7   determine augmentation of my report.
 8       Q.  And unless instructed by Counsel,
 9   you have no intention of doing that?
10       A.  That's correct.
11       Q.  So if they said in their deposition
12   that the damages -- that the second floor of
13   their home wasn't damaged as a result of
14   Katrina, that wouldn't make a difference to
15   the damages you estimate in your report?
16       A.  It wouldn't unless I was instructed
17   to do something like that.
18       Q.  And you include in your report
19   damages to the second story of their home;
20   correct?
21       A.  Yes.
22       Q.  And to the contents on the second
23   story of their home?
24       A.  I can't speak to where those
25   contents were.  Not without thorough review of
```

Page 471

```
 1   the contents list, since they did mention the
 2   rooms that they were in.
 3       Q.  You say since they did or since they
 4   did not?
 5       A.  Since they did.  They appeared to
 6   have.
 7       Q.  Okay.  And you do not have any
 8   pre-Katrina photos of the exterior of the
 9   Livers home; correct?
10       A.  Correct.
11       Q.  If you look at the report, on the
12   first page of the report, and we can use the
13   revised report for these purposes, in the
14   "Risk" section it states "The roof on both
15   sections is 3-tab shingle and the exterior had
16   the appearance of being well-maintained."  Do
17   you have any photographs that reflect that the
18   exterior was well-maintained pre-Katrina?
19       A.  Only as discussed before, that I saw
20   no evidence that it had been left in decay.
21   The only decay I saw was from flood.
22       Q.  But you only saw the home
23   post-Katrina.
24       A.  That's correct.
25       Q.  You do not know what it looked like
```

Page 472

```
 1   prior to Katrina.
 2       A.  That's correct.
 3       Q.  And the "Risk" section goes on to
 4   state "Contents appeared to be above average."
 5   What's the basis of that statement?
 6       A.  It was based on receiving the report
 7   of the contents from Mr. Livers.
 8       Q.  You don't have any pre-Katrina
 9   photos of the interior of the house; correct?
10       A.  Not pre-, no.
11       Q.  And at the time you inspected the
12   home, the home had been gutted?
13       A.  Yes.
14       Q.  Is that true?
15       A.  Yes.
16       Q.  So you weren't able to see any of
17   the contents of the home?
18       A.  That's correct.
19       Q.  And all of the pictures from the
20   home of the interior are post-Katrina and
21   really don't speak to the quality of the
22   furnishings in the home.  Isn't that true?
23       A.  I wouldn't say that.
24       Q.  So it's your testimony that the
25   photos that you have in part inform your
```

118 (Pages 469 to 472)

SCOTT H. TAYLOR                                          February 9, 2012

Page 473

1  opinion that the furnishings in the home were
2  of above average quality?
3      A.  In part, yes.
4      Q.  Can you tell us which of the photos
5  you're relying on for that statement?
6      A.  With review I can.
7          On page 6 of the photo sheets,
8  "JS-640 homeowner take" that's listed at the
9  top, you can see in the background the
10  backsplash of the kitchen and counter -- and
11  cabinetry in there showing that the
12  appointments at least were of high end.  And
13  if those were cabinets that were included on
14  the contents list, those appear to be high
15  end, too, with the arched beveled doors that
16  are visible in it.  Then many of the pictures
17  also have a variety of fans in each -- There
18  seems to be a fan in every room described,
19  which is an upgrade to a normal home.  And
20  that coupled with the list of items in the
21  supplied contents list informed my opinion.
22      Q.  Anything else?
23      A.  No.
24      Q.  Mr. Taylor, are you aware that the
25  Liverses' homeowner policy from State Farm

Page 474

1  paid the Liverses $15,000 for wind and rain
2  damage to the second floor of their home?
3      A.  No, I am not.
4      Q.  Would that fact change your opinion
5  in any way?
6          MR. PALMINTIER:
7          I object to form.
8          THE WITNESS:
9          No.
10  EXAMINATION BY MS. WAGER-ZITO:
11      Q.  Do you have any basis by which to
12  dispute the conclusion that there were other
13  causes of damages to the Liverses' house and
14  contents given that State Farm paid out a
15  claim for wind and rain damages?
16          MR. PALMINTIER:
17          I object to form.
18          THE WITNESS:
19          I was not asked to look at
20          anything other than flood, so I
21          didn't.
22  EXAMINATION BY MS. WAGER-ZITO:
23      Q.  So you can't dispute anything that
24  State Farm did or what they looked at or the
25  fact that they paid it out?

Page 475

1          MR. PALMINTIER:
2          Objection.
3          THE WITNESS:
4          I was not aware of any of it so I
5  can't dispute it.
6  EXAMINATION BY MS. WAGER-ZITO:
7      Q.  Mark the next exhibit --
8          MS. LONIAN:
9          This is going to be 29.
10  EXAMINATION BY MS. WAGER-ZITO:
11      Q.  Taylor Exhibit 29.  And Taylor
12  Exhibit 29 is a document -- the cover letter
13  is from State Farm Insurance Company dated
14  February 14, 2006 to Mr. and Mrs. Livers from
15  State Farm.  That indicates on the front page
16  that the date of loss is August 29, 2005,
17  which is the date of Katrina.  Correct, Mr.
18  Taylor?
19      A.  Yes.
20      Q.  So you would agree that this at
21  least appears to relate to claims arising out
22  of Katrina?
23      A.  Yes.
24      Q.  Okay.  And you have never seen this
25  document before; correct?

Page 476

1      A.  Correct.
2      Q.  Have you had a chance to look
3  through the document now?
4      A.  I am looking right now.
5      Q.  And if you look through it, it
6  appears to have an analysis of the cost to
7  repair the roof, which is on page 3 of the
8  document Bates stamped LIVERS-05?
9      A.  Yes.
10      Q.  And this is a homeowner's policy so
11  it wouldn't be covering flood damages; right?
12          MR. PALMINTIER:
13          I object to form.
14          THE WITNESS:
15          It doesn't appear to.
16  EXAMINATION BY MS. WAGER-ZITO:
17      Q.  Okay.  It doesn't appear to cover
18  flood damages.  Is that --
19          MR. PALMINTIER:
20          I object to form.
21          THE WITNESS:
22          I can't say either way.  I can't
23  truly say.
24  EXAMINATION BY MS. WAGER-ZITO:
25      Q.  Turn to the next page, which is

SCOTT H. TAYLOR                                                    February 9, 2012

Page 477

1   Bates stamped LIVERS-06.  It's talking about
2   the fencing.  And at the bottom of it, it says
3   "The above allowances are to replace the
4   wind-damaged fence."
5       A.  Yes, I see that.
6       Q.  Not flood-damaged?
7       A.  I see that.
8       Q.  And if you turn to the next page,
9   which is a continuation from the prior page,
10  where it's talking about damages to the master
11  bedroom and at the bottom of that it says "The
12  above allowances are to repair the water
13  damages to this room where the window broke
14  and glass was on the carpet and the drywall
15  and insulation was wet and damaged."  So that
16  would appear not to be flood-related damages?
17          MR. PALMINTIER:
18              I object to form.
19  EXAMINATION BY MS. WAGER-ZITO:
20      Q.  Correct?
21      A.  I couldn't say that based on that
22  statement.
23      Q.  And then if you look on the document
24  that's Bates stamped 09, which relates to the
25  room -- or it says "Exterior rear elevation",

Page 478

1   do you see that?
2       A.  Yes.
3       Q.  And in the middle of the page it
4   states "The above allowances are to repair the
5   wind damages to this elevation."  Do you see
6   that?
7       A.  Yes.
8       Q.  Do you have any basis to dispute
9   that statement?
10          MR. PALMINTIER:
11              Object.
12          THE WITNESS:
13              No.
14  EXAMINATION BY MS. WAGER-ZITO:
15      Q.  And then if you look at the page
16  that's Bates stamped LIVERS-012, the room is
17  the shed?  Do you see that?
18      A.  Yes.
19      Q.  It states at the bottom "The above
20  allowances are to repair the wind damage to
21  the shed."  Do you see that?
22      A.  Yes.
23      Q.  And do you have any basis to dispute
24  that State Farm at least was paying out a
25  claim to the Liverses for wind damage to their

Page 479

1   shed?
2           MR. PALMINTIER:
3               I object to form.
4           THE WITNESS:
5               No.
6   EXAMINATION BY MS. WAGER-ZITO:
7       Q.  You state on the second page of your
8   report that "Damages to the soffits made it
9   clear that water had risen at some point to
10  beyond the roof eaves."  Are you talking about
11  the second floor roof eaves or the first
12  floor?
13      A.  The first floor.
14      Q.  Do you have any indication that the
15  water rose above the second floor of this
16  house?
17      A.  I don't have any information
18  concerning that.
19      Q.  And do you have any evidence to
20  support your conclusion that the water did
21  reach the upper level of the house?
22          MR. PALMINTIER:
23              Object.
24          THE WITNESS:
25              Could you repeat that?

Page 480

1   EXAMINATION BY MS. WAGER-ZITO:
2       Q.  Do you have any evidence to support
3   your conclusion that the water reached the
4   upper level or encroached the upper level of
5   the house?
6       A.  Do I have any evidence?  It is my
7   opinion.
8       Q.  And what's that opinion based on?
9       A.  Based on what damages occur when
10  there's at least 4 or 5 feet of water in a
11  house.  Damages encroached the second floor.
12      Q.  Anything else?
13      A.  No.
14      Q.  And when we turn to your estimate,
15  and we're not going to get into detail about
16  how you prepared it, I assume it was prepared
17  the same way the other rooms were prepared?
18      A.  Yes.
19      Q.  What evidence supports your
20  conclusions that the second floor of the house
21  needed repairs as a result of flooding?  Is it
22  anything more than you just said to me?
23      A.  Other than I was able to observe
24  that it had been gutted and you would presume
25  that a gutted house does not -- is not gutted

JOHNS, PENDLETON COURT REPORTERS                           504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 481

1   for no reason.
2        Q.  Is that the sole basis of your
3   conclusion and the basis for your preparing an
4   estimate for damages to the second floor of
5   the house?
6        A.  No.
7        Q.  What else?
8        A.  I already spoke to that in a
9   previous question.
10       Q.  So other than what you said in
11  answer to the previous question about if
12  there's 4 feet of water, you assume that it
13  encroached on the second floor?
14           MR. PALMINTIER:
15               Object to form.
16           THE WITNESS:
17               I didn't assume in many of the
18           cases obviously because I saw that it
19           had gone all the way to the ceilings
20           in those -- in those other cases.
21  EXAMINATION BY MS. WAGER-ZITO:
22       Q.  Okay.  I'm sorry.  In this case you
23  didn't see that; correct?
24       A.  I did not.
25       Q.  So in the case of the Liverses, it

Page 482

1   is an assumption that the water encroached on
2   the second floor of the house?
3        A.  It is my experience that in those
4   cases that it does do that.
5        Q.  Okay.  So this is just based upon
6   your experience, but not actual knowledge in
7   this case as to the Liverses' property?
8        A.  Yes.
9        Q.  And then the second, the further
10  basis for that opinion is just the fact that
11  the house was gutted?
12       A.  That is further evidence, yes.
13       Q.  So even if the house was gutted for
14  another reason just because they wanted to
15  start over, it's tell your opinion that it was
16  flood damage to the second floor?
17       A.  Yes.
18       Q.  Anything else?
19       A.  No.
20       Q.  In going to the Liverses' contents
21  list, what efforts did you make to ascertain
22  whether the items and the quantities on the
23  list were accurate?
24       A.  I treated it as I did the others.  I
25  did sampling.

Page 483

1        Q.  Okay.  And the same thing for the
2   amounts claimed, that they were reasonable?
3        A.  Yes.
4        Q.  In your original report you
5   calculated an amount of damages for contents
6   based in part on the conclusion that the
7   Livers owned a $15,000 television at the time
8   of Katrina.
9        A.  In the which report?
10       Q.  In the initial Livers report.
11       A.  Okay.
12       Q.  Item number 57.
13       A.  Yes, I see that.
14       Q.  When you looked at this list, did
15  you question a $15,000 TV?
16       A.  Apparently I did.  Since I had
17  changed it from the second report.
18       Q.  Well, did you question it when you
19  got the list or did you change it because you
20  were told at the deposition that Mr. Livers
21  testified that the TV was only a $1,500 TV?
22       A.  I don't recall hearing anything
23  about that from the deposition.
24       Q.  So it's your testimony that you
25  looked at it and after you did the report, you

Page 484

1   thought that that looked too high?
2        A.  I'm certain that I would have looked
3   at it, but exactly why I changed it, I don't
4   recall whether it was my own opinion or
5   Counsel.
6        Q.  And again, Mr. Livers testified at
7   his deposition that the TV was $1,500, not
8   $15,000, and that's the amount you changed it
9   to in the subsequent report.  Is it a
10  coincidence that that's the amount it was
11  changed to?
12       A.  It appears that it was a
13  typographical error in the first report.  Too
14  many zeros.
15       Q.  But you don't recall why you changed
16  it, if it was because of what Mr. Livers side
17  or for some other reason?
18       A.  I don't recall.
19       Q.  But it was in the original report.
20  And in your original report there's a line
21  item for cabinets, and I think we looked at
22  the cabinets before, for $35,000.
23       A.  Yes.
24       Q.  Do you recall that?
25       A.  Yes.

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 485

1    Q.  Did you, when you were looking at
2  the report, think that that seemed a little
3  bit high?
4    A.  It is a very high number.
5    Q.  It's number 20.
6    A.  Are we referring to the original or
7  the second report?
8    Q.  The original.
9    A.  Yes, I see that.
10   Q.  And when you were preparing the
11 contents list and you actually had to input
12 the number 35,000 into this list, did you
13 think that number was a little high?
14   A.  I did.
15   Q.  Did you question anyone about it?
16   A.  I did not at that time.
17   Q.  And back to the TV for a second.
18 You're the one that put the 15,000 number into
19 the contents report; correct?
20   A.  Yes, I did.
21   Q.  So on the cabinets, you put that
22 number in the report but didn't question it at
23 that time; correct?
24   A.  Not at that time.
25   Q.  And you know that Mr. Livers, or do

Page 486

1  you know that Mr. Livers testified that the
2  estimated replacement cost value for the
3  cabinets was $15,000?
4    A.  I was not aware at that time, no.
5    Q.  Why is it that you changed the
6  number in the subsequent report to $15,000?
7    A.  As before, I was either instructed
8  to review it myself or I was instructed about
9  the testimony.  I don't recall.
10   Q.  But in any event, you reduced the TV
11 from 15,000 to 1,500 and you reduced the
12 cabinets from 35,000 to 15,000?
13   A.  That's correct.
14   Q.  Okay.  Did you do any further review
15 of the Liverses' contents list to see if there
16 were any other similar type errors?
17   A.  I don't recall at this time.
18   Q.  In light of these errors in the
19 report, do you consider the contents list
20 attached to your July report to be reliable,
21 the first report?
22   A.  If there are errors in it, then the
23 subsequent report seems to answer those.
24   Q.  But there were errors in the
25 original report; correct?

Page 487

1    A.  I would acknowledge that.
2    Q.  We'll mark Taylor Exhibit 30.
3       Mr. Taylor, we have just handed
4  you a document that's labeled -- it's been
5  marked Taylor Exhibit 30.  Why don't you take
6  a look at it and I'll identify it for the
7  record.  It's a document that at the top is a
8  fax cover sheet from AmSouth Bank, to Justin
9  Lester from Barbara Livers and it's dated
10 October 19th, 2005.  There's some handwriting
11 on the front cover that says "Flood contents,
12 no coverage, no flood policy".  The Bates
13 numbers, as far as I can tell, are LIVERS-0140
14 through 0152, we believe.  The numbers are --
15 may possibly be cut off.
16      Have you had a chance to look
17 through this?
18   A.  Briefly, yes.
19   Q.  Does this purport to be an inventory
20 prepared by the Liverses of the contents of
21 their home?
22   A.  I can't speak to who prepared it.
23   Q.  You can see that it's at least from
24 Barbara Livers?
25   A.  Yes.

Page 488

1    Q.  And if you go through it, it's got a
2  listing at the beginning, it has a listing of
3  theft prone items, but if you go further into
4  it starting on -- I can't really read the
5  Bates numbers.  I'll use the fax page
6  numbers.  Page number 7.  It appears to have
7  contents listings for a living room and a
8  dining room.
9    A.  Yes, I see that.
10   Q.  And then it goes on for the
11 kitchen.
12   A.  Yes.
13   Q.  And the master bedroom and an
14 additional bedroom.
15   A.  Yes.
16   Q.  Again, this document is dated in
17 October of 2005; correct?
18   A.  Yes.
19   Q.  It's a little closer in time to
20 Katrina than when the Liverses filled out the
21 contents report for your report?
22   A.  Yes.
23   Q.  Is there anything in this document
24 which would affect your opinion as to the
25 contents in the Livers home?

JOHNS, PENDLETON COURT REPORTERS              504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 489

1    A.  No.
2    Q.  If you had had this document, would
3  you have looked at it to try and compare it to
4  the contents information that the Liverses
5  provided to you?
6        MR. PALMINTIER:
7        I object to form.
8        THE WITNESS:
9        If I was asked to look at this, I
10   would.
11 EXAMINATION BY MS. WAGER-ZITO:
12   Q.  And what use would you have made of
13 it if you had known that it existed?
14   A.  I would have compared the lists.
15   Q.  Were you aware that the Liverses
16 testified that their master bedroom was on the
17 second floor of the house?
18   A.  I'm not aware of that.
19   Q.  Okay.  Are you aware that they
20 testified that they were able to salvage the
21 beds from that bedroom and they still have
22 them and are still using them today?
23   A.  No, I was not aware of that at that
24 time.
25   Q.  Would that affect your opinion at

Page 490

1  all if they were still using that property?
2    A.  It would not affect my opinion as to
3  whether the property was damaged or not by
4  flood, no.
5    Q.  If that property is included on your
6  contents list, would that affect your opinion
7  as to the validity or the reliability of the
8  contents list?
9    A.  Not necessarily.
10   Q.  And why do you say "not
11 necessarily"?
12   A.  I often include things that I
13 believe are damaged have been affected by
14 flood or mold that may still be used by the --
15 by the homeowners.
16   Q.  Even if they don't believe -- if
17 they're still using them and they don't
18 believe they're damaged?
19   A.  It's common practice to include
20 things that you believe are damaged, whether
21 they're included or not, if you know about
22 them.
23   Q.  Well, if you look at the contents
24 list, they have on there a mattress and box
25 spring from the master bedroom.

Page 491

1    A.  Yes.
2    Q.  So you included that on the contents
3  list.
4    A.  Yes.
5    Q.  And you are expressing an opinion
6  that damages should be awarded for that
7  property?
8    A.  I stand by my report.  Yes.
9    Q.  And are you aware that they also
10 testified that those beds were 20 years old,
11 not four years old?
12   A.  No, I am not aware of it.
13   Q.  Did you, when you interviewed the
14 Liverses, when you had the 30 minute
15 conversation with them, did you discuss with
16 them their pre-Katrina living expenses?
17   A.  Briefly, yes.
18   Q.  What did they tell you?  What did
19 you discuss with them?
20   A.  The same thing I did in all cases.
21 They were to document their pre-Katrina living
22 expenses and compare them against their actual
23 expenses afterwards.
24   Q.  So my question might have been
25 unclear.  You discussed with them a

Page 492

1  methodology for determining expenses as
2  opposed to discussing with them what their
3  actual pre-Katrina living expenses were.
4    A.  I'm not sure that entirely answers
5  the question or answers what I did.
6    Q.  Then strike that.  Did you talk to
7  them about what their utilities were like
8  before Katrina?
9    A.  I asked them to make comparisons
10 between their pre-Katrina utilities and
11 post-Katrina utilities.
12   Q.  But did you ask them, did you talk
13 to them, "Can you give me any numbers for what
14 your pre-Katrina expenses were"?
15   A.  Did I ask them for that?
16   Q.  Yes.
17   A.  I asked them to list those, yes.
18   Q.  But you never got any information
19 from them as to what their pre-Katrina
20 expenses were?
21   A.  No.
22   Q.  And you never got any information
23 from them as to what their actual post-Katrina
24 expenses were?
25   A.  No.

123 (Pages 489 to 492)

SCOTT H. TAYLOR                                    February 9, 2012

Page 493

1      Q.  So as with the other Plaintiffs, the
2  ALE for the Liverses is not based on actuals?
3  It's purely a mathematical conclusion?
4      A.  Yes.
5      Q.  And you state in your report that
6  "Between the time of the mandatory evacuation
7  and the time the homeowner was able to settle
8  into a permanent residence more than one year
9  transpired."  Is that what you wrote?
10      A.  Yes.
11      Q.  Do you know that in his deposition,
12  Mr. Livers testified that they moved into
13  their current house in April, 2006?
14      A.  No.
15      Q.  Do you know that Mr. Livers
16  testified that they had made -- he had made up
17  his mind not to return to the St. Claude
18  Avenue home by January of 2006?
19      A.  No.
20      Q.  Did these facts in any way affect
21  your opinion as to the reliability of the
22  amount that you state that the Liverses are
23  entitled to for additional living expenses?
24      A.  Let me clarify something concerning
25  those additional living expenses.  With the

Page 494

1  information that I'm given at the time, and I
2  expressed to them what those are supposed to
3  be, how to do the calculations, if they did
4  something else or if there was a difference in
5  the time frame in which they were out of the
6  permanent residence, then it's a simple --
7  just as it was a mathematical equation to
8  determine the amount of ALE, it is also a
9  mathematical equation that can be used using
10  the same figures that I used and use in my
11  report, and I have done the same thing in all
12  areas.  ALE, contents, and structural damage.
13  If it's determined that an amount is
14  incorrect, then the methodology is the same in
15  each case.  The methodology for determining
16  ALE is the same; the methodology for
17  determining contents is the same; and the
18  methodology for determining the structural
19  damage is the same.  And, as a result, it's a
20  matter of looking at that.  And if someone
21  were to determine that a number or a portion
22  of it was not acceptable, it's very possible
23  to take that same report and look at the
24  detail and deduct that portion.  So my report
25  can still stand as is, whether it's a

Page 495

1  structural thing as you spoke of yesterday or
2  a contents thing which we seem to spend a lot
3  of time on today.  But nonetheless, it seems
4  that the methodology is consistent and I
5  believe I have been consistent in expressing
6  that, but I also would say that if someone
7  were to determine that something was not
8  allowed in that, then the report is perfectly
9  capable, especially when it comes to the
10  amount of damages, to look at what portion is
11  not allowed and it could be reduced.
12      Q.  Okay.  And I appreciate that
13  commentary.  But all I was getting at here was
14  that for purposes of the Liverses and in fact
15  in this case for everybody, you do not have
16  actual costs for ALE and, therefore, you used
17  the 20 percent number.
18      A.  That is correct.
19      Q.  So what you're saying to me now is
20  if somebody were to come forward and say, "I
21  can show what the actual costs were for the
22  ALE and it's a lower number or a higher number
23  than is in your reports," --
24      A.  Yes.
25      Q.  -- that those reports can be, or you

Page 496

1  can decide not to rely on the report for that
2  particular number --
3      A.  I did not say that, that you
4  wouldn't rely on the report.  I said that you
5  could rely on the report to make a
6  determination of what the number should be.
7  Because the methodology is consistent.
8      Q.  To some extent you interrupted my
9  very long and rambling question.
10      A.  I'm sorry.
11      Q.  It's not your fault.  What I am
12  trying to get at here is you have an ALE
13  number in each of the reports.  Is that
14  correct?
15      A.  Yes.
16      Q.  That ALE number is 20 percent of the
17  -- in each case it's 20 percent of the RCV
18  number that you have for the structural damage
19  to each of the Plaintiffs.  Is that correct?
20      A.  That's correct.
21      Q.  If it is determined at trial that
22  the ALE, that we can determine the actual
23  additional living expenses for any Plaintiff,
24  for that Plaintiff we can then say "We're not
25  going to use the number that's in the Taylor

                      124 (Pages 493 to 496)

JOHNS, PENDLETON COURT REPORTERS          504 219-1993

SCOTT H. TAYLOR                                February 9, 2012

Page 497

1    report for ALE, we're going to use these
2    actual numbers"?
3          MR. PALMINTIER:
4          I object to form.
5    EXAMINATION BY MS. WAGER-ZITO:
6          Q.  Do you agree with that?
7          A.  I can't --
8          Q.  And the rest of your report will
9    still stand?
10         A.  I agree that my methodology is the
11   same, but I can't -- I can't necessarily speak
12   to the fact of what method somebody else is
13   going to use to determine ALE.
14         Q.  I think we don't really need to go
15   down that road.  All I was getting at was you
16   did not use actual numbers, actual expenses
17   for the ALE.
18         A.  That is correct.
19         Q.  If you could go back just very
20   briefly to Taylor Exhibit 30.  Still right in
21   front of you.  And on the second page of that
22   document --
23         A.  Yes.
24         Q.  -- there is a handwritten note that
25   says "Allen Livers, expenses for Katrina,

Page 498

1    August 28 to September 15, 2005."  Do you see
2    that?
3          A.  Yes.
4          Q.  Does that appear to reflect at least
5    some amount of additional living expenses for
6    Mr. Livers for a short period of time
7    post-Katrina?
8          A.  It appears to be a reference to
9    that, yes.
10         Q.  And you said in the conversation you
11   had with Mr. Livers you discussed with him a
12   methodology, or you discussed with him getting
13   information from him to determine the
14   additional living expenses, and you never got
15   that information from him; correct?
16         A.  I did not.
17         Q.  Okay.  Did you ever go to the
18   lawyers and say to them, "I need some
19   information on additional living expenses from
20   all of the Plaintiffs?  We didn't get
21   anything"?
22         A.  Yes.
23         Q.  You did say that to the lawyers?
24         A.  Yes.
25         Q.  And what did they say?  What did

Page 499

1    they tell you about that?
2          A.  They would attempt to get that
3    information.
4          Q.  And they never got that to you?
5          A.  It was not ever made available.
6          Q.  We're ready to move on to the
7    Washingtons.
8          A.  Can I take a quick break then?
9          Q.  Absolutely we can take a quick
10   break.
11         A.  Thank you.
12   (Recess.)
13         MS. WAGER-ZITO:
14         Back on the record.  Go ahead.
15         MR. PALMINTIER:
16         Okay.  Josh Palmintier, Counsel
17   for the Plaintiffs in this matter.  I
18   would like to put on the record
19   something concerning the claims
20   Clifford Washington had made and has
21   now and actually waived on September
22   27, 2011 in his deposition.  In his
23   deposition he has waived his claims
24   for emotional distress as well as his
25   claim for property damage with regard

Page 500

1    to the Derbigny address and contents
2    for that same address.  However,
3    reserving his right to additional
4    living expenses.  That is my
5    understanding as per the deposition
6    that was taken on September 27, 2011.
7    He also did indicate that there are no
8    contents on Charbonnet.
9          Is that your understanding as
10   well?
11         MS. WAGER-ZITO:
12         And that was going to be my
13   question.  Because the Charbonnet
14   report has a contents listing attached
15   to it.  Now it's our understanding
16   that the Washingtons are not living at
17   the Charbonnet property, so any
18   contents that were there were not the
19   contents of Mr. and Mrs. Washington
20   and, therefore, they are not claiming
21   any of the contents that are listed on
22   the Charbonnet property damage
23   report.
24         MS. LONIAN:
25         And specifically those contents

                              125 (Pages 497 to 500)

SCOTT H. TAYLOR                                              February 9, 2012

Page 501

1    were ones that were originally
2    attached to the Derbigny Street
3    property.  As far as we can tell, they
4    were switched over to the Charbonnet
5    property in the report.
6        MR. PALMINTIER:
7        My understanding from the
8    deposition is that the contents from
9    Derbigny have been waived and that
10   there are no contents as per -- as to
11   the Charbonnet address.  And that is
12   stated in the deposition.  And there
13   actually is a question from Mr. Bruno,
14   "The only claim he makes is a claim
15   for property damage.  Is that true?"
16   And to which Mr. Washington responded
17   "Yes, sir."
18       MS. WAGER-ZITO:
19       Okay.
20   EXAMINATION BY MS. WAGER-ZITO:
21       Q.   And as a result of that I am not
22   going to ask you any questions about the
23   contents portion of your report for the
24   Washingtons, --
25       A.   Okay.

Page 502

1        Q.   -- but I would like you to get in
2    front of you both Exhibit 9 and 10 and ask you
3    to confirm for me that Exhibit 9 is a true and
4    correct copy of your expert loss report for
5    Clifford Washington dated July 18, 2011.
6        A.   Yes.
7        Q.   And that Exhibit 10 is a true and
8    correct copy of your expert loss report for
9    Clifford Washington dated October 20th, 2011?
10       A.   Yes.
11       Q.   Prior to issuing your first report
12   on damages for the Washington property, did
13   you meet with Mr. Washington or his wife?
14       A.   Yes.
15       Q.   And can you tell us when you met
16   with them in the context of the first report,
17   which was the July 18, 2011?
18       A.   It would have been June, early
19   June.
20       Q.   And did you meet with both Mr. and
21   Mrs. Washington as far as you recall?
22       A.   Mrs. Washington was there for a
23   moment, but there was no meeting with her
24   really.  It was all meeting with Mr.
25   Washington.

Page 503

1        Q.   So she was present, but she wasn't
2    speaking at the meeting?
3        A.   She wasn't speaking and she wasn't
4    there for very long either.
5        Q.   Was anyone else present at the
6    meeting and participating in the meeting?
7        A.   Occasionally.  Not participating,
8    no.
9        Q.   Was Josh at the meeting?
10       A.   Oh, yes.  I'm sorry.  Yes.  Josh
11   Palmintier was.
12       Q.   How long was the meeting, to your
13   best recollection?
14       A.   It was at least two hours.
15       Q.   At that time when you met with Mr.
16   Washington, were you discussing both the
17   Derbigny property and the Charbonnet property?
18       A.   At times, yes.
19       Q.   Can you give us any idea of how much
20   of the time you spent discussing the
21   Charbonnet property as opposed to the Derbigny
22   property?
23       A.   I would say 80 percent of the time.
24   Maybe 90.
25       Q.   Was spent on the Charbonnet

Page 504

1    property?
2        A.   Yes.
3        Q.   Was there a reason for that?
4        A.   Because we were at the Charbonnet
5    property.
6        Q.   And what was your understanding
7    about where Mr. Washington was living at the
8    time of Katrina?
9        A.   At that time I understood that he
10   lived at the Derbigny property.
11       Q.   When you met with Mr. Washington in
12   June of 2011, did he give you any photos or
13   documents relating to either or both his
14   properties?
15       A.   He did not.
16       Q.   Tell us what you recall discussing
17   at the meeting.
18       A.   We discussed the same things I
19   discussed at each property, the procedures and
20   methods to come up with contents and
21   additional living expenses as previously
22   questioned about on other properties, and gave
23   him the same instructions.
24       Q.   Now, you said you were at the
25   Charbonnet property when this meeting

126 (Pages 501 to 504)

SCOTT H. TAYLOR                                    February 9, 2012

Page 505

1   occurred; right?
2       A.  We -- When our first meeting
3   occurred, yes.
4       Q.  And at that point, at that time the
5   Charbonnet property had been redone?
6       A.  Yes.
7       Q.  And extensively; correct?
8       A.  Yes.
9       Q.  Did you discuss the floor plan of
10  the house prior to Katrina?
11      A.  Yes.  Yes, I did.
12      Q.  And what did you discuss about
13  that?  Did you walk around and Mr. Washington
14  say to you, "This is completely different"?
15  How did that go?
16      A.  There was a quite extensive
17  questioning to where property lines were,
18  where buildings started and where they
19  stopped, and measurements taken.  There was a
20  lot of -- a lot of discussion on that at that
21  time.
22      Q.  And as a result of that were you
23  able to come up with a floor plan for the
24  pre-Katrina Charbonnet property?
25      A.  That's -- That was what I prepared

Page 506

1   in my first report, yes.
2       Q.  Was your attempt at a pre-Katrina --
3       A.  Yes, it was.
4       Q.  Did you show that to Mr. Washington
5   in an attempt to make sure that you got it
6   right?
7       A.  No, I did not.
8       Q.  Was there a reason why you didn't
9   show it to him?
10      A.  I rarely show it to the property
11  owners because I am rarely hired by property
12  owners to do that.  I don't turn the reports
13  back in to them.
14      Q.  Did you meet with Mr. or Mrs.
15  Washington any other times?  Or was it just
16  this one meeting?
17      A.  Yes, we met again.
18      Q.  And when was that?
19      A.  I believe it was the next day.
20      Q.  I want to continue talking about the
21  first meeting and then we'll get to the second
22  meeting.  So you discussed the floor plan of
23  the house as it was pre-Katrina at the first
24  meeting; right?
25      A.  Yes.

Page 507

1       Q.  Did you discuss the quality of the
2   building materials that had been used in the
3   pre-Katrina house?
4       A.  Yes.
5       Q.  And what do you recall about that?
6   What did Mr. Washington tell you?
7       A.  I don't recall the details of what
8   he told me about the pre-quality condition --
9   pre-Katrina condition or quality of the
10  materials at that time.  So I -- whatever I
11  put in the report is what I took from the
12  meeting.
13      Q.  Did they show you -- at any time
14  have you seen any pictures that purport to
15  show either the type or the quality of the
16  building materials of the Charbonnet property
17  pre-Katrina?
18      A.  I had nothing at that time to show
19  that, no.
20      Q.  We'll skip the questions on
21  furnishings since they're not seeking
22  contents.
23          Did you discuss with Mr.
24  Washington the cause of damage to his home, to
25  the Charbonnet home?

Page 508

1       A.  Yes.
2       Q.  And what did he tell?
3       A.  That it was flooded.
4       Q.  And then you said you -- I take it
5   you took notes at this meeting, but those
6   notes were destroyed similarly to all the
7   other notes of --
8       A.  Yes.
9       Q.  -- all the other Plaintiffs?  You
10  said you met again the next day.  What did you
11  discuss when you met the next day?
12      A.  We met at the Derbigny house the
13  next day.
14      Q.  And was the discussion at the
15  Derbigny house only about the Derbigny house?
16      A.  I think it was by and large just
17  about the Derbigny house at that point.  I
18  think he had some other questions about how to
19  do ALE.  I recall that being a very extensive
20  conversation, because it seemed to confuse
21  him.
22      Q.  What do you recall about that
23  discussion about ALE?
24      A.  That I had to repeat the same
25  instructions several times.

127 (Pages 505 to 508)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

Page 509

1    Q.  Were those instructions the same
2  instructions that you gave to all the other
3  Plaintiffs that we have talked about already?
4    A.  Yes.
5    Q.  We can get it out of the way right
6  now.  Did he ever give you any information
7  relating to his actual pre-Katrina expenses or
8  his actual post-Katrina expenses?
9    A.  He did not give it to me directly at
10  all.
11    Q.  Okay.  So with the Washingtons as
12  well as with all the other Plaintiffs, you
13  used the 20 percent number?
14    A.  Yes.
15    Q.  Okay.  Did you meet with the
16  Washingtons at all after you issued your first
17  report?
18    A.  No.
19    Q.  And other than these two meetings,
20  did you have any further communications of any
21  kind with the Washingtons?
22    A.  No.
23    Q.  In your report, and as we just
24  discussed, you did get some photos from the
25  Washingtons; correct?

Page 510

1    A.  Not directly from them.
2    Q.  Well, through the lawyers in this
3  case you got some pictures; correct?
4    A.  Yes.
5    Q.  And you also attached to your report
6  some pictures that you took yourself?
7    A.  Let me clarify.  The pictures that
8  are in my report were all taken by me as far
9  as I can recall.
10    Q.  Well, and that's what I was going to
11  ask you.  These appear to be all taken by you
12  and they appear to be obviously, if they were
13  taken by you, all post-renovation pictures of
14  the Charbonnet property.
15    A.  That's correct.
16    Q.  So what, if any, photos did you get
17  through Counsel, but from the Washingtons?
18    A.  I recall seeing a very rough sketch
19  that was sent to me that had come from another
20  source, and I don't even recall the source,
21  but it was described as something that had
22  come -- that was earlier and was an earlier
23  pre-Katrina condition photo of the property,
24  and this was post-deposition.
25    Q.  Post the Washingtons' depositions?

Page 511

1    A.  Post the Washingtons' depositions.
2    Q.  Okay.  Is that picture attached to
3  your report?
4    A.  No.  It was barely legible.  I
5  didn't include it, because it was --
6    Q.  So you have no usable pictures from
7  the Washingtons of their property either
8  pre-Katrina or post-Katrina?
9    A.  Well, the ones I took.
10    Q.  I said from the Washingtons.
11    A.  Oh, from the Washingtons.
12    Q.  Yes.
13    A.  No.
14    Q.  So the only pictures that you have
15  are the ones in here that you took when you
16  went to visit the property in June of 2011.
17    A.  Yes.
18    Q.  And you're aware that when Mr.
19  Washington restored the home, he added the
20  second floor to the house?
21    A.  I'm aware of that at this point.
22  Yes.
23    Q.  When you did your initial report
24  were you aware of that?
25    A.  I was not entirely aware of the

Page 512

1  circumstances at my first report.
2    Q.  And you revised your report to
3  reflect that understanding?
4    A.  Yes.
5    Q.  And where did that understanding
6  come from?
7    A.  I received a call from Counsel that
8  informed me that there were some discrepancies
9  in the physical layout of the house.
10    Q.  So you made some fairly significant
11  changes to the Washington report to reflect --
12    A.  Yes, I did.
13    Q.  -- those facts that you learned from
14  Counsel?
15    A.  Yes.
16    Q.  And you state in this report, again
17  that the loss is a result of flood; correct?
18    A.  Yes.
19    Q.  Are you aware that the Washingtons
20  filed a claim under this homeowner's insurance
21  and received payment for damage to the roof
22  that resulted from Hurricane Ivan a year prior
23  to Katrina?
24        MR. PALMINTIER:
25        I object to form.

128 (Pages 509 to 512)

SCOTT H. TAYLOR                                      February 9, 2012

Page 513

```
1        THE WITNESS:
2        No.
3   EXAMINATION BY MS. WAGER-ZITO:
4        Q.  Are you aware that the Washingtons
5   filed a claim under their homeowner's
6   insurance for damage to their roof caused by
7   Hurricane Cindy?
8        MR. PALMINTIER:
9        I object to form.
10       THE WITNESS:
11       No.
12  EXAMINATION BY MS. WAGER-ZITO:
13       Q.  What, if anything, do you rely upon
14  to conclude that this damage was or was not
15  repaired prior to Katrina?
16       MR. PALMINTIER:
17       I object to form.
18       THE WITNESS:
19       I did not address that in my
20       report at all.
21  EXAMINATION BY MS. WAGER-ZITO:
22       Q.  So if any of the damage to the roof
23  of the Washington home was as a result of
24  either Ivan or Cindy, would you have just
25  assumed it was the result of Katrina?
```

Page 514

```
1        A.  That doesn't seem logical, to assume
2   something if I knew it to be different
3   already.
4        Q.  But you had no knowledge that there
5   were damages to the roof as a result of Ivan
6   and Cindy.
7        A.  I had no knowledge of that.
8        Q.  So your assumptions, when you made
9   assumptions to damages to the roof of the
10  Washington home, was that all the damages were
11  as a result of Katrina?
12       MR. PALMINTIER:
13       I object to form.
14       THE WITNESS:
15       I would have assumed --
16       Everything I put in my report was what
17       I believed to be Katrina damages, yes.
18  EXAMINATION BY MS. WAGER-ZITO:
19       Q.  And are you aware that the
20  Washingtons filed a claim and received
21  payments under their homeowner's policy for
22  Katrina?
23       A.  I am not aware of that.
24       Q.  Taylor Exhibit 31.  Taylor Exhibit
25  31 is a document Bates stamped CITIZENS-000246
```

Page 515

```
1   through 250, but then attached to it is
2   another document that's CITIZENS-000254 and
3   another document that's CITIZENS-000131.
4        Mr. Taylor, have you had a chance
5   to look through these checks?
6        A.  Briefly, yes.
7        Q.  And these purport to be payments to
8   the Washingtons from Audubon Insurance Group
9   in varying amounts.  If you look at the
10  description of payment on the checks, it says
11   -- on the first page it says "For wind
12  storm".  Do you see that?  This is a check in
13  the amount of $17,892.30.
14       A.  I see that page.  I am looking for
15  the -- Okay.  I see the reference to wind.
16       Q.  The description of payment?
17       A.  Yes.  I see that.
18       Q.  Okay.
19       A.  Wind storm.  Yes, I see that.
20       Q.  And the second check is also a check
21  payable to Clifford Washington and in the
22  "Description of payment" it says "For other
23  structures, wind".
24       MR. PALMINTIER:
25       That's 00247?
```

Page 516

```
1        MS. WAGER-ZITO:
2        Yes.
3   EXAMINATION BY MS. WAGER-ZITO:
4        Q.  It's a check in the amount of
5   $4,800.
6        A.  I see that.
7        Q.  And the next check, the Bates number
8   is 00248.  It's a check in the amount of
9   $5,575, and under the "Description of payment"
10  it also states "For wind storm contents".
11       A.  Yes, I see that.
12       Q.  And the next check, 00249, is a
13  check in the amount of $5,710 and it says "For
14  additional living expenses."
15       A.  Yes.
16       Q.  You see that?  And the next check is
17  CITIZENS-000250.  It's a check in the amount
18  of $13,922.42 and under the "Description of
19  payment" it says "For wind storm".
20       A.  Yes, see that.
21       Q.  You see that?  And the next
22  document, which is not sequentially numbered,
23  but it's CITIZENS-000254, a listing of
24  payments and it says "Date of loss, 8/29/05"
25       --
```

129 (Pages 513 to 516)

SCOTT H. TAYLOR                                    February 9, 2012

Page 517

```
 1      A.  Yes, I see that.
 2      Q.  -- to insured Clifford Washington?
 3      A.  Yes.
 4      Q.  Do you see that?
 5      A.  Yes.
 6      Q.  And the final check in there is the
 7  document CITIZENS-000131.  It's a check in the
 8  amount of $1,500.  And under "Description of
 9  payment" it also says "For wind storm".  Do
10  you see that?
11      A.  Yes.
12      Q.  Now, as to any of these payments
13  that the Washingtons got from their insurer
14  that state on them that their descriptions are
15  related to wind and/or for additional living
16  expenses, would that affect any of the
17  conclusions you reached in your reports?
18      A.  No.
19      Q.  Are you aware that the Washingtons
20  sued their homeowner insurer contending that
21  they had not been adequately compensated for
22  wind damage?
23      A.  No.
24      Q.  Let me show you a document that we
25  just marked Taylor Exhibit 32.  For the
```

Page 518

```
 1  record, this is a pleading in a litigation
 2  captioned "Clifford Washington versus
 3  Louisiana Citizens Property Insurance
 4  Corporation".  There's no Bates numbers on
 5  this pleading.  I can't give those to you.
 6  And in the first -- Have you had a chance to
 7  look at this?
 8      A.  Just very briefly.
 9      Q.  On the first page of this document
10  under paragraph 5, it says "On August 29,
11  2005, Hurricane Katrina made landfall near
12  Grand Isle, Louisiana.  The hurricane made a
13  second landfall a short time later near the
14  Louisiana-Mississippi border.  As expected,
15  Hurricane Katrina produced a great deal of
16  rainfall and caused significant wind and flood
17  damage in Orleans Parish."  Do you see that?
18      A.  Yes.
19      Q.  And on the next page in paragraph 6
20  it states "As a result of Hurricane Katrina
21  wind forces, Petitioner's property listed
22  above was totally destroyed as well as all of
23  Petitioner's personal property at the above-
24  mentioned address, the damages to the property
25  to be proven at trial."  Does this purport to
```

Page 519

```
 1  be a Complaint filed by Clifford Washington
 2  arising out of wind damages from Hurricane
 3  Katrina?
 4          MR. PALMINTIER:
 5          I object to form.  Calls for a
 6      legal conclusion.
 7          THE WITNESS:
 8          I can't speak to a legal
 9      conclusion.
10  EXAMINATION BY MS. WAGER-ZITO:
11      Q.  Does it say in here that Clifford
12  Washington is seeking damages arising out of
13  winds from Hurricane Katrina that destroyed
14  his property?
15          MR. PALMINTIER:
16          I object to form.
17          THE WITNESS:
18          I can see that it says that, yes.
19  EXAMINATION BY MS. WAGER-ZITO:
20      Q.  And in paragraph 4, just to make it
21  clear, the address listed is 1910 Charbonnet
22  Street in New Orleans.  Do you see that?
23      A.  I see that, yes.
24      Q.  You have no basis to dispute the
25  assertions made in this Complaint by Mr.
```

Page 520

```
 1  Washington or the fact that he made these
 2  allegations?
 3          MR. PALMINTIER:
 4          I object to form.
 5          THE WITNESS:
 6          I can't dispute something I
 7      wasn't aware of.
 8  EXAMINATION BY MS. WAGER-ZITO:
 9      Q.  Well, now that you're aware of it,
10  can you dispute it?
11          MR. PALMINTIER:
12          I object to form.
13          THE WITNESS:
14          I can't make a legal opinion
15      about something like that.
16  EXAMINATION BY MS. WAGER-ZITO:
17      Q.  Can you dispute that he made the
18  claims for wind damages to his property on
19  Charbonnet Street in this litigation now that
20  you have seen it?
21          MR. PALMINTIER:
22          Object to the form of the
23      question and that it calls for a legal
24      conclusion.
25          THE WITNESS:
```

                                    130 (Pages 517 to 520)

SCOTT H. TAYLOR                                    February 9, 2012

Page 521

1        I can't make the legal
2     conclusion, so I can't object -- I
3     mean I cannot dispute it.
4   EXAMINATION BY MS. WAGER-ZITO:
5     Q.  If you go to your report on the
6   first page, under the "Risk" heading --
7     A.  Which report?
8     Q.  I'm sorry, the revised report.
9   Exhibit 10.
10     A.  Yes.
11     Q.  Under the "Risk" section on the very
12   first page it says "The risk," the property,
13   "had aluminum siding that was stolen
14   subsequent to the peril", which was Katrina;
15   correct?
16     A.  That peril is Katrina, yes.
17     Q.  And did Mr. Washington tell you that
18   the aluminum siding had been stolen?  How did
19   you know that?
20     A.  I'm looking for the comment that you
21   just referred to.  I don't see it.
22     Q.  It's the --
23       MR. PALMINTIER:
24         (Indicating).
25   EXAMINATION BY MS. WAGER-ZITO:

Page 522

1     Q.  It's a second full sentence under
2   the first paragraph.
3     A.  Oh, I see it.  Yes.
4     Q.  I had that same problem.
5     A.  Okay.  Yeah, I see that, although I
6   am certain I would only have included that if
7   I had been informed by Mr. Washington.
8     Q.  Okay.  And notwithstanding that the
9   aluminum siding had been stolen, was not lost
10   as a result of flooding from Katrina, you
11   included damages for that aluminum siding?
12     A.  Yes.
13     Q.  And why is that?
14     A.  I often include damages that have to
15   do with ancillary incidents subsequent to
16   perils if there's no good access to the
17   property.
18     Q.  What do you mean by that?
19     A.  What I mean is if there's a theft
20   that occurs when -- when a homeowner is
21   displaced, it's -- it is often included in
22   damages on the original peril because the
23   peril caused the inability for them to be at
24   that location to protect their own property.
25     Q.  But the theft of the aluminum siding

Page 523

1   was not caused by -- the loss of the aluminum
2   siding was not caused by the flood.
3       MR. PALMINTIER:
4         Object to form.
5       THE WITNESS:
6         I can't dispute that.
7   EXAMINATION BY MS. WAGER-ZITO:
8     Q.  How do you know when the siding was
9   stolen?
10     A.  Merely from what Mr. Washington
11   said.
12     Q.  What did he tell you about it?
13     A.  That it was after the storm before
14   they were able to get back there.
15     Q.  Did he tell you anything else about
16   that?
17     A.  Not that I recall.
18     Q.  I hand you a document that will be
19   marked Taylor Exhibit 33.  Why don't you go
20   ahead and review Taylor Exhibit 33.  For the
21   record, this is a document, it's a letter from
22   Rimkus, R I M K U S, Consulting Group, Inc. to
23   Michael Casey at York Claims Service, Inc.
24   Relating to insured Clifford Washington.  And
25   the Bates number is CITIZENS-000339 through

Page 524

1   000350.  Have you had a chance to look at
2   Taylor Exhibit 33, Mr. Taylor?
3     A.  Briefly.
4     Q.  This states in the first paragraph
5   of the letter "Mr. Washington reported that
6   his residence was damaged on August 29, 2005
7   as a result of Hurricane Katrina.  The
8   structure was located at 1910 Charbonnet
9   Street in New Orleans, Louisiana."  Do you see
10   that?
11     A.  Yes.
12     Q.  And that "Rimkus Consulting Group
13   was retained by York Claims Services on behalf
14   of Louisiana Citizens Insurance Company to
15   perform a structural evaluation of the
16   residence for damage due to wind and flooding
17   from Katrina."  Do you see that?
18     A.  Yes.
19     Q.  And that they performed an on site
20   inspection on September 26, 2006?
21     A.  Yes.
22     Q.  To your understanding, was that
23   date, September 26, 2006, before the property
24   was rebuilt?
25     A.  I am not aware of the exact date of

JOHNS, PENDLETON COURT REPORTERS          504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 525

1    the rebuild.
2        Q.  Would you agree with me that if it
3    was before the rebuild, that that inspection
4    would give them a better understanding of what
5    had happened as a result of Hurricane Katrina
6    than the inspection that you were able to make
7    of the property subsequent to its being
8    rebuilt in June of 2011?
9        A.  I can't speak to somebody else's
10   evaluation at all.
11       Q.  Do you think if you had had the
12   opportunity to review the property in
13   September, 2006 before it had been rebuilt
14   that that would have given you a better sense
15   of what had occurred as a result of Hurricane
16   Katrina than your inspection in June of 2011?
17       A.  Any earlier inspection is going to
18   give me a better idea than a later
19   inspection.  Closer to the peril.
20       Q.  And in this instance closer to the
21   peril and before the property had been
22   completely rebuilt?
23       A.  If you say that's when it was.  I'm
24   not sure.
25       Q.  Well, Mr. Washington testified that

Page 526

1    this inspection was prior to the rebuild.  Or
2    he testified when the rebuild was, and this
3    inspection was prior to it.  But
4    hypothetically.
5            In the conclusions, the first
6    paragraph says "There were broken roof decking
7    panels and missing shingles, soffits, fascia
8    and siding as a result of wind-blown debris
9    and forces associated with high winds during
10   Hurricane Katrina.  This wind damage likely
11   occurred prior to flooding."  Do you see
12   that?
13       A.  Yes, I see that.
14       Q.  The second conclusion states
15   "Rainwater intrusion from breaches of the
16   roof coverings likely caused limited damages
17   -- limited damage to the interior ceiling and
18   wall coverings and the electrical and
19   mechanical systems of the residence."  Do you
20   see that?
21       A.  Yes.
22       Q.  Do you have any basis to dispute the
23   conclusions of Rimkus Consulting as set forth
24   in Taylor Exhibit 33?
25           MR. PALMINTIER:

Page 527

1            I object to the form.
2            THE WITNESS:
3            I only have my report to go by
4    and my observations.  I can't dispute
5    theirs.
6    EXAMINATION BY MS. WAGER-ZITO:
7        Q.  So you can't dispute their
8    conclusions that there was wind damage to the
9    roof of the 1910 Charbonnet property as a
10   result of Hurricane Katrina?
11       A.  I would not dispute their findings.
12       Q.  Skipping over the contents
13   questions.  We discussed the ALE a little bit
14   already for the Washingtons.  So the only
15   question I have for you is on what basis do
16   you conclude that Mr. Washington should be
17   awarded additional living expenses as a result
18   of damage to a house that he wasn't residing
19   in at the time of Katrina?
20       A.  Additional living expenses that I
21   calculated were the actual additional living
22   expenses regardless of the residence, the
23   location.  So as the Plaintiff, as the
24   Plaintiff was suffering from relocation, the
25   additional living expenses that I concluded

Page 528

1    would be consistent whether -- whether -- no
2    matter which property he was at.
3        Q.  So you're not drawing any legal
4    conclusion that he is entitled to additional
5    living expenses as a result of the losses to
6    the Charbonnet property?
7        A.  Not a legal conclusion, no.
8            MS. WAGER-ZITO:
9            Why don't we go off the record.
10           (Whereupon a discussion was held
11   off the record.)
12   EXAMINATION BY MS. WAGER-ZITO:
13       Q.  I have one more question and then
14   Jim is going to ask some questions.
15           In looking at Exhibit 9, which was
16   your original report, my understanding was
17   before you learned that the Charbonnet
18   property originally had been a one story
19   property, you were doing an analysis of it as
20   it was when it was rebuilt.  Is that correct?
21       A.  Not entirely, no.  I understood
22   there were some changes made to it.
23       Q.  What was your understanding when you
24   did the original report?
25       A.  The sketch that I have in the

132 (Pages 525 to 528)

JOHNS, PENDLETON COURT REPORTERS          504 219-1993

SCOTT H. TAYLOR                                          **February 9, 2012**

Page 529

1   original report was the way that it was
2   reported to me by Mr. Washington as we made
3   all the measurements and calculations.
4       Q.  But it was the measurements and the
5   calculations for the rebuilt house; correct?
6       A.  No, it was for the original, it was
7   my understanding at that time.  It was for the
8   original construction at the time of Katrina.
9       Q.  Okay.  So what did you find out that
10  caused you to do the revisions in your second
11  report for the Charbonnet property for Mr.
12  Washington?
13      A.  I was contacted by Counsel post the
14  -- post-deposition of Mr. Washington
15  indicating that there were some discrepancies
16  and I would need to make some changes.
17      Q.  And what were you told about what
18  the discrepancies were for Mr. Washington?
19      A.  The discrepancies were the size and
20  shape and function of the house.  It was -- It
21  was off, the sketch was off.
22      Q.  Was it too big as it had been
23  written up in the first report?
24      A.  It wasn't so much that it was too
25  big.  It was a different layout than what was

Page 530

1   represented.
2       Q.  And the reason I am asking is I'm
3   somewhat curious that in the first report, the
4   replacement cost value for the dwelling was
5   $100,785.62 in the original report, Exhibit
6   9.
7       A.  Yes.
8       Q.  And the replacement cost value in
9   Exhibit 10 after you revised it was
10  $110,009.59.
11      A.  Yes.
12      Q.  And I am curious as to why that
13  number went up in the second report.
14      A.  When sketches change, it
15  necessitates a different amount of drywall, a
16  different amount of wood, a different amount
17  of roofing, a different amount of all kinds of
18  different things.  And as the sketch changed,
19  so does the estimate.
20      Q.  So again, this was, you know, kind
21  of this is what you put into Xactimate based
22  upon the new information you got about the
23  house and this is what came out?
24      A.  Yes.
25      Q.  Okay.

Page 531

1           MS. WAGER-ZITO:
2           With that, I have no further
3       questions.
4   EXAMINATION BY MR. MCCONNON:
5       Q.  Mr. Taylor, my name is Jim McConnon
6   and I am the Counsel for the United States of
7   America.  And I know it's been a long day and
8   you need to go catch a flight, so kind of let
9   me cut to the chase, if you will.
10          I'll explain to you where I am
11  heading with my line of questioning so that
12  hopefully we'll be able to move through this a
13  little quicker.
14          I'll represent that after
15  Hurricane Katrina the Federal government
16  established a number of programs to assist
17  people who were adversely affected by
18  Hurricane Katrina, and I'll list some
19  programs.  This is not an exhaustive list, but
20  what I want to focus in on, talk with you
21  about these.  The Federal government provided
22  benefits through the Department of Housing and
23  Urban Development for the Louisiana Road Home
24  Program, which provided monies to those people
25  affected by Hurricane Katrina to either

Page 532

1   repair, replace, or purchase their properties
2   outright.  Through the Federal Emergency
3   Management Agency, the Federal government
4   provided monies to eligible persons for living
5   expenses and in some instances personal
6   property.  And also for those people who had
7   the appropriate insurance, the National Flood
8   Insurance Program compensated people for
9   damage or destruction to their properties from
10  Hurricane Katrina.  So my focus with you is I
11  need to know if, one, the Plaintiffs discussed
12  with you any monies they may have received
13  under the various programs, and I will go
14  through each of the programs so you can answer
15  yes, either affirmatively or no, negatively;
16  and secondly, in light of the information
17  provided to you, if in fact they did say "We
18  did receive compensation", if that was
19  reported to you.  So that's kind where I am
20  heading.
21          So let me just walk down through
22  the programs.
23          Did any of the Plaintiffs discuss
24  with you that they had received monies from
25  the Federal Emergency Management Agency for

133 (Pages 529 to 532)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

Page 533

1    additional living expenses for their housing
2    costs due to being displaced because of
3    Hurricane Katrina, any of them?
4         A.  No.
5         Q.  No?  Hypothetically, if they had
6    shared with you that they had received
7    compensation for those additional living
8    expenses, would that have affected your
9    report?
10        A.  No.
11        Q.  And why not?
12        A.  Because I prepared my report based
13   on my understanding of what those expenses
14   would be, not on what they may or may not have
15   received.
16        Q.  Okay.  Did any of the Plaintiffs
17   discuss with you the monies they received
18   under the National Flood Insurance Program for
19   damages to their residences because of
20   Hurricane Katrina?
21        A.  No.
22        Q.  Again, hypothetically, if they had
23   told you that they had received monies under
24   the National Flood Insurance Program, would
25   that have affected your report?

Page 535

1    Road Home Program, would that have affected
2    your report?
3         A.  No.
4         Q.  And why not?
5         A.  My -- I was -- I was asked to
6    appraise flood damages and not -- not to
7    consider awards.
8         Q.  Apart from these three programs, did
9    any of the Plaintiffs discuss with you about
10   receiving any monies from any Federal program
11   apart from what I have just discussed with you
12   in these programs?
13        A.  No.
14        Q.  Do you want me to continue asking
15   questions?
16        A.  No.
17        Q.  Okay.
18        MS. WAGER-ZITO:
19          Off the record.
20          (Whereupon a discussion was held
21   off the record.)
22        MR. MCCONNON:
23          I have no further questions.
24        MR. PALMINTIER:
25          We have no questions.

Page 534

1         A.  No.  Because I prepared my damages
2    according to my observations.
3         Q.  Okay.  Did any of the Plaintiffs
4    discuss with you that they had received monies
5    from the Federal Emergency Management Agency
6    for personal property that was damaged or
7    destroyed due to Hurricane Katrina?
8         A.  No.
9         Q.  Hypothetically, if they had shared
10   with you that they had received monies under that
11   program for personal property, would that have
12   affected your opinions?
13        A.  No.
14        Q.  And why not?
15        A.  Because I prepared my reports on
16   their statements and not what they received.
17        Q.  Did any of the Plaintiffs discuss
18   with you the monies they received under the
19   Road Home Program for the purchase, repair, or
20   replacement to their residence that was
21   damaged or destroyed due to the flooding
22   caused by Hurricane Katrina?
23        A.  No.
24        Q.  Hypothetically, if they had shared
25   with you they had received monies under the

Page 536

1         *   *   *
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

JOHNS, PENDLETON COURT REPORTERS              504 219-1993

SCOTT H. TAYLOR                                          February 9, 2012

Page 537

1
2          WITNESS'S CERTIFICATE
3
4
5      I, SCOTT H. TAYLOR, read or have had
   the preceding testimony read to me, and hereby
   certify that it is a true and correct
6  transcription of my testimony, with the
   exception of any attached corrections or
7  changes.
8

   _____
9      (Witness' Signature)
10 _____
   DATE SIGNED
11
12 DEPONENT PLEASE INITIAL ONE:
13
   _____ Read with no corrections
14
15 _____ Read and correction sheet attached
16
17
   DATE TAKEN:  FEBRUARY 9 AND 10, 2012
18
19
20
21
22
23
24
25

Page 538

1
2          REPORTER'S CERTIFICATE
3
4      I, ROGER D. JOHNS, RMR, RDR, CRR,
5  Certified Court Reporter, do hereby certify
6  that the above-named witness, after having
7  been first duly sworn by me to testify to the
8  truth, did testify as hereinabove set forth;
9  that the testimony was reported by me in
10 shorthand and transcribed under my personal
11 direction and supervision, and is a true and
12 correct transcript, to the best of my ability
13 and understanding; that I am not of counsel,
14 not related to counsel or the parties hereto,
15 and not in any way interested in the outcome
16 of this matter.
17
18
19
20          ROGER D. JOHNS
21      CERTIFIED COURT REPORTER
22          STATE OF LOUISIANA
23
24
25

JOHNS, PENDLETON COURT REPORTERS                504 219-1993

SCOTT H. TAYLOR

February 9, 2012

Page 539

**A**

**ability** 53:4 163:23
188:22 260:13
312:8 538:12
**able** 25:4 35:13
39:10 43:13 52:10
58:18 59:11 69:14
93:15 118:5 123:4
127:5 134:1 141:8
153:14 167:18,21
171:24 188:14
201:7 206:10
210:20 220:3
252:12 256:10,17
256:20 285:23
290:9 296:17
299:7 311:17,19
331:8 333:9 343:5
343:7 352:10
372:12 375:21
403:24 421:19
458:17 459:1
463:2,17,20,22
472:16 480:23
489:20 493:7
505:23 523:14
525:6 531:12
**abovenamed** 538:6
**absent** 193:14
**absolute** 417:15
**absolutely** 73:4
96:9 116:11 155:2
167:24 191:16
205:24 442:10
499:9
**academy** 40:17,18
44:18 45:1
**accept** 251:4
264:21
**acceptable** 27:14
98:4,5 494:22
**accepted** 27:17
72:17,21,23 73:3
74:2 106:20
142:13 236:20
264:5 290:24

**access** 466:16
522:16
**accessible** 463:12
**accidentally** 120:17
**accidents** 240:22
**accomplished**
41:14 166:12
318:1
**accord** 230:19,20
**account** 458:13
**accounted** 221:15
373:5
**accounts** 382:22
**accuracy** 192:6,8
**accurate** 32:18
44:4 79:7 85:19
189:20,21,24
190:12,14,15,18
190:22,25 192:2
213:13 236:23
248:9 267:21
273:24 314:2
356:2,7,14 422:10
431:6 458:13
482:23
**accustomed** 298:2
**acfic000154** 4:18
339:4
**acfic000175** 390:17
**acfic000185** 5:11
390:22
**acfic000687** 5:13
405:10
**acfic000692** 4:17
337:2
**acfic001053** 5:5
357:14
**acfic00435** 5:9
379:1
**acknowledge** 78:1
487:1
**action** 1:7 64:14,23
389:23
**activate** 50:21
**activities** 35:19
75:20
**activity** 38:16

**actual** 65:18 76:8
81:22 92:16 99:2
99:19 104:10
105:15,17 106:14
139:17 140:19
141:23 142:6
144:25 211:4
224:19 226:18,19
226:20,21 227:4
227:12 289:22
293:7,8 297:2,15
298:1,3,6 304:9
304:11,17 312:11
314:3,5 322:1
355:16 356:8
374:7,9 408:10
413:23 454:3,10
468:5 469:9 482:6
491:22 492:3,23
495:16,21 496:22
497:2,16,16 509:7
509:8 527:21
**actuals** 290:18,21
303:1,3 493:2
**acv** 224:19 226:20
226:24 227:3,6,8
228:1,3,25 229:2
229:13 271:10,11
288:16 325:2
380:1,8
**add** 57:6 131:4
166:1 221:14
223:17 273:18
298:6
**added** 236:6
511:19
**addition** 58:11
269:9 429:1
**additional** 57:5
58:11 63:4 88:15
113:14 124:5
138:25 139:5,11
139:15 140:1,22
140:25 141:16
142:6 176:15
183:13 184:1
186:5,18 192:3,17

193:8,23 194:20
195:3,15 196:21
197:3 221:10
253:11 289:12
291:2 298:7
300:23 301:21
302:13,21 303:1
304:8 326:15
341:21 372:25
391:15 402:4,9
404:22,25 405:14
405:25 406:11,18
406:22 407:22
408:5,11,14 449:6
452:11,25 453:17
454:3 455:2
488:14 493:23,25
496:23 498:5,14
498:19 500:3
504:21 516:14
517:15 527:17,20
527:21,25 528:4
533:1,7
**additionally** 221:13
373:3
**addon** 239:22
240:3
**address** 7:20,20,22
8:2,7,12 30:12
47:21,21 118:4
246:4 247:2
259:17,18 267:3
345:5 353:3
354:11 358:6
500:1,2 501:11
513:19 518:24
519:21
**addressed** 260:12
337:4,16 377:13
428:8,10
**addresses** 66:22
180:3 184:11
**addressing** 19:7
**adds** 324:23
**adept** 53:17
**adequate** 143:9
303:2

**adequately** 517:21
**adjacent** 353:4
**adjust** 47:5 56:20
109:5,14,18
**adjusted** 179:18
**adjusting** 30:13,21
31:3,11,17,20
32:2 33:7,18
35:18,25 36:22,23
36:23,24 37:25
38:2,5,13 39:3,7
41:5 44:5 47:3
48:14,25 49:11,12
49:15,16,17,22,23
50:16,19,20 51:7
51:11,13 53:9,11
53:13,23 54:9
55:18 58:4 59:23
60:18 63:9,17,20
250:19 271:8,19
348:8
**adjustment** 108:24
303:12,17
**adjustments**
109:21 211:21
**adjustor** 20:15
26:20 47:22 51:13
55:3,9 81:10,17
92:13 182:25,25
212:9 224:21
279:6 290:23
**adjustors** 35:8 36:9
40:16,18,20 41:25
44:18 45:1,17
49:18 50:8 55:13
57:22 58:7,25
95:8 212:20
214:24 221:12
232:11 243:10,12
243:14 272:13
370:17 373:2
**administering** 3:23
**administrative**
70:1
**administrators**
38:18,25 46:23
**admit** 174:17

SCOTT H. TAYLOR                                                    February 9, 2012

Page 540

**adrian** 2:16 7:8
281:8 301:24
339:10 360:19
394:22
**advanced** 36:22,23
37:25 38:2,4 39:3
49:14,16,22,23
50:16 60:24
**advances** 61:1
**adversely** 531:17
**advice** 278:1,4
**aerial** 166:13,16,18
166:20,22 167:7
167:10 210:24
211:6 235:7 312:7
312:15 314:25
353:16 354:8,24
355:5
**affect** 159:17 178:1
178:5 181:22
215:4,7,13,21
220:1 269:14
287:9 291:19
292:13,17 302:20
316:23 329:9
338:1 371:3 392:1
392:7 393:3
397:19 404:21
406:24 407:4,17
430:2 431:1
438:22 443:20
445:15,22 488:24
489:25 490:2,6
493:20 517:16
**affirmatively** 38:19
39:16 48:16 51:18
67:15,18 73:9
79:4 84:25 86:5
87:21 90:17 93:1
98:17,20 102:17
118:10 123:9
125:20 144:15
154:14 155:16
173:17 177:7
179:13 187:21
196:24 216:20
224:16 227:15,22

227:25 244:11
246:23 247:7
249:13 263:22
270:2 272:17
274:23 283:11
285:10,12 323:25
364:18 374:12
379:5 396:16
400:21 406:19
424:12 532:15
**affixed** 363:22
**afforded** 154:12
**aforementioned**
3:5
**aftermath** 453:14
**age** 102:16,19,21
103:4,10,15,20,25
109:20 110:6,8
134:13 191:1,14
191:18 266:6,13
271:24 272:21
273:14,18 284:8
323:13,23 467:17
468:1
**agency** 339:7 532:3
532:25 534:5
**agent** 145:9
**ages** 103:18 324:8
384:9
**ago** 9:24 49:4 57:17
73:25 222:25
**agree** 43:23 44:7
108:1,8,11,14
143:15 153:19,21
179:15 183:22
189:10 201:23
202:4 274:17
279:21 288:1
304:7,10 314:1
356:1,6,17 419:12
428:6 439:22
442:4 447:4 448:3
450:25 451:12
468:18,20 475:20
497:6,10 525:2
**agreed** 3:3 80:6
**agreeing** 222:18

**agreement** 76:11
175:15,19 176:13
180:6,12
**ahead** 14:4 18:25
107:20 252:10
279:2 499:14
523:20
**ale** 143:17 144:7
181:10 184:8
289:18,21 290:17
291:20,23 292:13
292:17 293:8
294:21 295:25
297:5,10 299:9
402:6,14 493:2
494:8,12,16
495:16,22 496:12
496:16,22 497:1
497:13,17 508:19
508:23 527:13
**algorithms** 312:12
313:12
**allabsorbing** 52:24
**allegations** 520:2
**allege** 260:1
**allen** 497:25
**allow** 84:1 221:17
240:17 373:8
**allowances** 477:3
477:12 478:4,20
**allowed** 89:23
239:3 391:6 495:8
495:11
**allowing** 352:15
363:9
**allows** 240:18
**allstate** 269:11,25
**allstate000025** 4:13
270:1
**alter** 136:22
**altogether** 259:1
**aluminum** 129:19
521:13,18 522:9
522:11,25 523:1
**alvin** 456:8,13
**amended** 396:9
**amenities** 165:10

**america** 2:23 531:7
**american** 46:13,15
46:16 48:9,19
**amount** 23:12
78:14,16,17 106:1
113:24 115:14
116:6,8 145:12
158:25 160:18,22
161:2,6 185:13
186:15,17 194:22
195:21 215:14
228:8 230:21
231:14 239:16
254:22 272:19
283:18 294:19,20
295:18,20 333:1
376:19 390:23
402:23 445:4
453:17 454:22,24
468:21 483:5
484:8,10 493:22
494:8,13 495:10
498:5 515:13
516:4,8,13,17
517:8 530:15,16
530:16,17
**amounts** 72:4
74:25 177:2
181:23 190:1
483:2 515:9
**amsouth** 487:8
**analysis** 153:20
229:1 244:13
259:1 260:4 261:1
261:24 262:8
268:9 272:5
276:17,24 383:2
427:23 428:1,2
439:15 476:6
528:19
**analyze** 262:5
**analyzed** 264:23
**ancillary** 113:2
522:15
**andry** 2:9,9 66:2
68:12,14 69:16
80:22 81:5 109:1

**angle** 123:22
367:10
**answer** 3:15 8:17
13:14 14:4,5 16:5
16:7 17:16 18:25
19:2 28:15,21
58:13 61:10 68:6
83:13,23 84:18
86:21,23 91:19
96:16 102:12
118:5 137:13
149:9 159:5,7
177:19 194:14
204:12 234:3,4
257:5 260:16
322:12 327:3
328:3,7,20 341:2
341:8 366:14
375:21 376:18
377:16 401:1,2,5
406:7 416:22
453:24 481:11
486:23 532:14
**answered** 149:16
182:2,12 198:25
202:14,24 203:24
205:11 245:11
249:7 327:21
329:16 334:19,24
366:16 462:16
**answers** 68:4 84:13
84:17,21 89:6
93:25 104:21
156:5 306:25
340:22 387:15
400:17 435:15
492:4,5
**anticipate** 56:22
209:3 349:19
**antiquated** 54:10
**anybody** 21:17
50:25 69:25 111:5
118:21 119:13
127:23 146:13
322:8 426:17
442:12
**anyway** 120:22

SCOTT H. TAYLOR                                    February 9, 2012

127:23 243:13
**apart** 31:10 112:16
   198:18 535:8,11
**apologize** 21:2
   373:11
**apparent** 335:13
   442:19 451:24
**apparently** 94:8
   432:1 465:7
   483:16
**appear** 98:3 101:21
   164:10 177:8
   186:3 247:16
   253:22 264:19
   324:3 340:21
   359:7 366:7
   417:16 422:13
   423:8 473:14
   476:15,17 477:16
   498:4 510:11,12
**appearance** 330:22
   330:24 331:18
   366:7 368:23
   471:16
**appearances** 2:1
**appeared** 111:21
   204:17,21 255:25
   294:3,7 386:9
   423:15 471:5
   472:4
**appears** 25:22
   131:1,25 170:8
   180:18 181:20
   183:18 184:7,17
   186:11 270:4
   332:7 333:20
   337:3 338:14
   340:25 345:3,10
   345:13,22 346:15
   347:6 358:2
   365:13 366:4
   392:19 393:19
   395:21 410:6,10
   414:3 422:2
   447:15 451:18
   475:21 476:6
   484:12 488:6

498:8
**apples** 243:25
**appliances** 132:7
   201:20 266:5,6
   364:10
**applicable** 76:14
   254:5
**application** 380:20
   382:1,1
**applied** 295:13
**apply** 264:25
   265:10,13 422:17
**applying** 381:21
**appointments**
   436:22 473:12
**apportioning** 160:2
**appraisal** 17:10
   20:8 35:18 62:8
   62:22 79:14
**appraisals** 20:18
   62:3,5,14,17
**appraise** 21:4
   105:25 451:3
   535:6
**appraised** 20:16,24
   74:25 286:1
   325:22 334:21
**appraiser** 20:14
   63:7,10 105:25
**appraisers** 64:20
**appraising** 62:12
   62:18,20 63:16,20
   348:4
**appreciate** 234:1
   241:13 258:15
   495:12
**appreciated** 227:9
   227:13
**appreciation**
   110:10
**approach** 79:14
   105:19 106:5
   135:9
**approached** 38:3
**approaching**
   260:10
**appropriate** 38:7

107:2 109:20
   272:19 376:19
   382:6 397:20
   532:7
**appropriately**
   110:1 447:5
   448:10 449:1
**approximate** 134:5
**approximately**
   34:11 45:10 48:11
   57:17 91:23
   345:22 382:4
**april** 493:13
**arabi** 337:6,20
**arbitrary** 232:21
**arched** 473:15
**area** 23:9,10,14
   55:23 113:8
   123:17 150:20,21
   150:22 166:19
   176:6 247:11
   345:17 347:25
   374:19 419:23
**areas** 58:8 208:13
   221:15 231:20
   337:21 373:6,20
   373:23 396:5
   494:12
**arent** 56:8 131:2
   173:9 244:2,3
**argument** 218:23
   243:22
**arising** 183:19
   184:2 186:22
   279:24 358:14
   475:21 519:2,12
**armstrong** 6:6
   11:12,13,18 18:10
   78:20 82:11 83:3
   84:8,24 88:8 89:2
   89:4,6 90:11
   94:10 98:18
   110:25 111:2,6
   123:11 131:17
   150:8 151:25
   152:11,15 201:21
   205:5 206:11

211:5 214:13,22
   215:8 216:23
   217:20 218:12,14
   219:16,21 247:1
   261:1 262:2 270:3
   275:4 276:20
   283:4 284:13,23
   285:24 286:3,15
   287:5 288:2 289:9
   301:4 305:24
   374:17
**armstrong234**
   177:6
**armstrongs** 11:3,6
   89:13,19,22 90:2
   90:16 91:21 93:11
   93:23 95:18 97:3
   97:6,8 99:24
   100:16 111:7
   117:9 118:9
   119:16,22 120:14
   122:5 124:6,11,15
   124:16 126:12
   128:1,12 129:1,13
   136:6,12,17 137:8
   137:15 138:3,24
   145:22,25 146:5,7
   147:2 149:22
   150:23 151:2,22
   153:12 156:9,15
   156:24 157:10,18
   161:11,12,13,22
   163:18 167:9,16
   168:1 169:17
   172:2,15,20 174:1
   174:8,23 175:19
   176:14 177:9,23
   179:16 180:1,18
   181:24 183:19
   184:2 186:5
   187:19 192:16
   194:2 196:21
   198:3 199:10,14
   200:20 201:17
   202:11,21 210:10
   217:21 222:1,7
   224:10 229:21

230:5,24 231:16
   244:21 253:14
   254:6 256:9 259:5
   259:8,23 262:10
   262:14,15 266:4
   268:25 269:11
   270:14 271:21
   274:22 276:2
   277:10,25 287:1
   289:14,23 290:10
   291:4,20,24 292:2
   292:11 293:6
   295:12,22 298:9
   299:9,12 300:13
   300:24 302:11,21
   306:10,17 307:23
   310:15 319:16
   374:21 375:4,11
   382:11 384:3
   385:20 402:7,15
**arrange** 436:12
**arrangements**
   69:22
**arrival** 69:22
**arriving** 70:8
**articles** 287:1
**artwork** 270:12
**ascertain** 126:12
   201:19 319:13
   416:17 417:2
   454:3 482:21
**aside** 428:17
**asked** 14:13,17
   19:10,12 24:18
   29:8 40:19 46:25
   47:19 50:5 61:23
   65:3,12 67:7 68:1
   69:6,9 70:12
   71:14 73:14 88:3
   94:1 96:2 101:1,1
   106:9 107:22
   109:16 110:25
   111:21,23 112:17
   117:3,6,13 118:17
   125:1 139:22
   141:19 144:22
   147:19 149:15

SCOTT H. TAYLOR

February 9, 2012

Page 542

| | | | | |
|---|---|---|---|---|
| 153:22 162:8 | **asks** 258:4 400:23 | **assuming** 135:5 | **august** 129:10 | 400:2 404:19 |
| 164:14 177:15 | **asserted** 176:15 | 238:23 336:18 | 173:18 194:1,2 | 407:16 410:19 |
| 182:1,11,15 183:9 | **assertion** 188:25 | **assumption** 154:16 | 275:6 405:14 | 423:12 425:9 |
| 183:24 188:25 | 254:11,15,17 | 154:18,20,24 | 475:16 498:1 | 426:15 429:12,16 |
| 194:25 197:1 | **assertions** 219:9 | 336:19 482:1 | 518:10 524:6 | 429:22 430:1,21 |
| 198:24 199:2,6,9 | 519:25 | **assumptions** 69:2 | **author** 305:21 | 430:25 431:18 |
| 199:9 202:14,24 | **assess** 92:12 111:24 | 70:12,21 111:1 | **authorities** 361:25 | 432:19 433:15,20 |
| 203:24 205:10 | 269:20 355:23 | 138:9 191:17 | 361:25 363:1 | 434:13 435:21 |
| 210:5,5 212:24 | 356:2,8 376:23 | 306:13,15 514:8,9 | **automatically** | 436:2 443:11,16 |
| 215:6 219:14 | **assessed** 73:25 | **attached** 74:6 76:1 | 314:22 | 444:10 445:18,21 |
| 221:24 228:22 | 74:11,17 95:6 | 76:4 95:23 97:10 | **automobile** 405:12 | 453:10,15 454:13 |
| 245:10 251:8 | 203:1,5,10 285:22 | 97:12,15 99:12 | **available** 15:8 | 454:16,24 473:24 |
| 270:14 293:1,24 | **assessing** 94:25 | 128:23 172:24 | 57:21 114:2 141:5 | 475:4 486:4 |
| 293:25 297:9 | 112:1 202:18 | 173:6 283:19 | 197:8 221:20 | 489:15,18,19,23 |
| 307:23 317:16 | 396:3 | 309:1 312:17 | 267:21 373:11 | 491:9,12 511:18 |
| 319:15,16,17 | **assessment** 88:14 | 319:5 323:8 | 440:23 499:5 | 511:21,24,25 |
| 322:19 323:12 | 112:22 113:16 | 341:24 383:13 | **avenue** 2:16 493:18 | 512:19 513:4 |
| 325:6 327:2,20,22 | 190:18,23 191:1 | 387:4 391:9 421:7 | **average** 163:16,22 | 514:19,23 517:19 |
| 328:14 329:15 | 193:7 327:14 | 427:9 432:23 | 164:2 165:1 201:6 | 520:7,9 524:25 |
| 334:9,11,13,18,24 | 356:7 430:16,19 | 460:4 486:20 | 227:19,21 237:18 | **awful** 53:4 94:14 |
| 338:7 342:14 | **assigned** 269:19,20 | 500:14 501:2 | 267:18 332:14,20 | |
| 343:4 369:21 | **assigns** 49:18 | 510:5 511:2 515:1 | 472:4 473:2 | |
| 373:11,16 384:9 | **assist** 84:7 88:4 | 537:6,15 | **awarded** 491:6 | **B** |
| 384:12,20 388:1 | 305:17 531:16 | **attachment** 289:6 | 527:17 | **b3** 35:25 48:14 49:1 |
| 422:23 426:7 | **assistance** 54:13 | **attachments** 398:2 | **awards** 80:8,9 | 49:3,7 |
| 434:2 435:16 | 85:5 | **attempt** 296:11 | 141:12 535:7 | **back** 9:4 10:4 12:6 |
| 437:3 438:7 | **associated** 41:5 | 372:17 499:2 | **aware** 37:12,16 | 13:9 24:21 25:1,4 |
| 441:13 445:9 | 56:21 75:10 80:8 | 506:2,5 | 64:16 94:17 107:7 | 25:19 36:8 44:18 |
| 451:2 452:13 | 209:5 210:12 | **attention** 46:24 | 116:22 117:1 | 51:15 53:8 55:1 |
| 454:8 459:18 | 348:12,22,23 | 339:11 | 151:25 156:8 | 66:1 67:25 78:10 |
| 462:6,15 474:19 | 349:21 526:9 | **attic** 159:16 256:22 | 157:8,13 169:18 | 78:10 96:22 97:2 |
| 489:9 492:9,17 | **associates** 46:22 | 258:17 275:13,18 | 175:7 197:10,16 | 97:14 101:9 |
| 535:5 | **assume** 9:2 69:7,9 | 275:22 336:17 | 199:11,19 200:9 | 102:10 103:13,15 |
| **asking** 7:14 14:7 | 133:15 135:8 | 430:22 445:12 | 200:20 214:13,16 | 103:21 104:14,18 |
| 16:4 17:14,14 | 136:10,15 159:13 | **attorney** 2:11,22 | 214:18,22 215:3,8 | 104:20 109:5,14 |
| 27:23 63:4 66:20 | 242:18 270:6 | 390:19 396:6 | 215:12 217:6 | 110:22 118:7 |
| 69:3 95:12 102:1 | 291:8,22 334:11 | **attorneys** 2:17 28:8 | 218:8,10 219:21 | 120:15 122:6 |
| 115:19 121:10 | 334:13 358:21 | 29:8 302:17 459:9 | 219:25 221:23,23 | 124:14 127:11 |
| 143:7 196:13 | 419:25 455:1 | **attributable** 461:13 | 228:15 269:9,13 | 135:2 144:22 |
| 201:17 204:4 | 480:16 481:12,17 | **attribute** 461:24 | 278:14 284:13,18 | 148:14 150:7 |
| 222:23,24 243:23 | 514:1 | **attributed** 204:22 | 285:24 286:3,6,25 | 163:10 165:2 |
| 294:4 328:10 | **assumed** 111:17,19 | 204:23 335:18 | 287:3,5 291:3,7 | 166:22 170:14 |
| 337:9 340:5 349:2 | 136:6 137:15,17 | **audubon** 515:8 | 292:2,9,15 316:11 | 180:4,5 187:17 |
| 359:2 377:3,20,20 | 266:20 513:25 | **augmentation** | 330:15 362:14 | 196:8 208:23 |
| 388:18,21 393:13 | 514:15 | 221:19 373:9 | 370:24 371:2 | 211:16 215:20 |
| 398:4 530:2 | **assumes** 186:24 | 414:4 470:7 | 379:18,23 391:16 | 227:14 231:6 |
| 535:14 | 242:19 | **augmented** 224:6 | 397:12,13,18 | 234:24 239:16 |
| | | | | 240:14,18 246:25 |

SCOTT H. TAYLOR

February 9, 2012

267:5 281:23
282:22 287:4
316:3 324:10
325:10,11 328:22
329:7 330:5,19
333:24 344:22
348:10 351:19,22
354:20 357:24
359:5 364:6,14,17
367:22 380:25
390:4 395:22,23
398:1 400:5,13,16
400:18 405:22
408:22 409:4
414:2,11 424:7
440:18 446:18,20
455:19 463:19
467:8 485:17
497:19 499:14
506:13 523:14
**background** 53:19
123:21 206:18
325:13 473:9
**backsplash** 345:16
473:10
**backwards** 155:11
**backyard** 165:3
365:12
**bad** 173:9 303:14
303:15 445:20
**bag** 250:25
**bank** 487:8
**bankers** 37:17,18
37:22 38:3 39:4
**banks** 63:13
**bar** 449:9,9
**barbara** 487:9,24
**barbeque** 333:20
**barely** 511:4
**baronne** 2:6
**barrel** 127:7
**base** 78:18 330:23
**baseball** 285:8,20
286:6,15,16,21
**baseboards** 127:1
415:10
**based** 15:2 17:16

21:25 26:9 72:13
73:20 77:5 78:4,6
97:8 126:4 132:2
141:12 146:17,20
147:21 148:3,19
151:17 152:17
162:15 171:21
175:20 197:7
198:6 207:10
213:22,25 226:3,9
230:4 233:6 235:3
235:23 236:12,18
262:8 272:23
276:11 284:21
293:1,17,18
294:18 296:10,11
312:11,22 347:7
356:2 369:24
383:15 395:5
396:21 397:22,22
420:7 432:6 446:2
446:5 453:24
458:13 470:1
472:6 477:21
480:8,9 482:5
483:6 493:2
530:21 533:12
**basic** 41:11,25
163:14 240:12
307:21 311:21
332:12,18
**basically** 63:18
104:7 235:10
240:6 261:21
**basicbasic** 240:10
**basing** 232:18
434:5
**basis** 74:10,16,17
75:17,18 77:10,14
77:15 80:25 88:19
163:16 170:3
214:4 217:1 218:2
271:16 332:17
336:3 338:15
342:8 347:11
359:11 368:4
370:4,8,13 371:14

371:16 380:11
394:3,12,15
401:20 403:8
404:1 417:1
419:18 430:11
436:6 472:5
474:11 478:8,23
481:2,3 482:10
519:24 526:22
527:15
**bates** 4:12,13,14
5:17 175:13 177:5
183:14 245:22
270:1 275:2 301:4
301:25 337:2
339:3 357:13
378:24,25 380:3
390:16,21 400:20
405:9,23 476:8
477:1,24 478:16
487:12 488:5
514:25 516:7
518:4 523:25
**bath** 150:25 438:14
**bathroom** 439:6,12
439:17,18 440:5
448:16,17,24
**bathrooms** 190:8
199:21 219:24
437:11 442:1
**baths** 442:7
**baton** 2:3
**beach** 1:22 7:2
**becoming** 52:5
116:22
**bedroom** 150:25
477:11 488:13,14
489:16,21 490:25
**bedrooms** 449:10
**beds** 489:21 491:10
**beforementioned**
7:4 300:3 373:22
**began** 59:23 69:23
261:13 329:4
420:21
**beginning** 16:2
118:24 187:9

325:12 348:10
354:21 488:2
**begins** 461:23
**behalf** 7:13 524:13
**belief** 397:7
**believe** 26:23 28:24
57:23 60:18 82:12
92:25 95:21
100:23 140:8
157:17,18 158:5
163:25 167:4
169:7 211:4
212:11 213:2
251:9 252:4
260:25 283:9
284:1 286:14
295:17,19,24
305:9,10,16 332:1
367:4 372:18
374:22 382:6
383:6 386:11
395:24 409:5
411:20,21 412:3
414:10 417:17
418:12 419:23,24
420:4,21 435:4,11
449:20 450:21
460:20 464:15
470:2 487:14
490:13,16,18,20
495:5 506:19
**believed** 79:5 86:8
284:16,24 435:8
463:23 514:17
**belong** 365:3
427:25 428:7,10
447:16,18 449:1
466:18
**belonged** 286:7
425:7 434:21
**ben** 2:21
**benefit** 277:10
**benefits** 531:22
**bernard** 214:11
**best** 68:13 84:3,4
97:23 139:7
163:23 193:13

221:7 232:10,17
303:6,21 304:7,10
307:17 309:5
312:22 356:17
408:23 425:20
503:13 538:12
**bet** 42:17 251:22
**beta** 61:1
**better** 52:12 133:19
144:24 193:14
223:7 224:11
225:20,22 226:5,7
226:11 233:14
250:19 251:9,9
313:15 348:24
525:4,14,18
**betterment** 278:10
278:15 279:9,15
279:24 288:3
**beveled** 473:15
**beyond** 336:10
367:2,5 461:22
479:10
**bid** 253:1
**bids** 81:23 243:11
243:15,17,20
244:1,3,14,19,20
244:22 245:3,8
250:20 251:10
**big** 124:20 171:10
171:11 529:22,25
**bigger** 234:24
438:2
**billed** 79:12
**bills** 67:2 290:14,16
290:19,20 291:1
452:23,24,24
453:11
**bit** 52:11 67:24
70:20 78:8 110:23
154:16 163:19
180:17 197:13
257:21 351:24
368:22 428:13
459:12 467:2
485:3 527:13
**black** 239:11

SCOTT H. TAYLOR                                                    February 9, 2012

**blank** 95:15 96:3
   101:8
**blanket** 271:19
**blow** 159:14
**blown** 115:6 242:24
   341:13 391:8
**blurry** 120:18
**board** 233:2 280:9
**boat** 155:15 283:6
   283:14,15,16
   284:8,14,15,20,24
   287:4,7,10,13,19
   287:21,22,25
   288:2,15,22,23
   289:2,6,8 385:21
   386:1
**boats** 156:4 385:18
**body** 399:7
**bolts** 41:4 54:2,8
**bonuses** 240:9
**book** 47:17 48:2
**books** 61:20 270:12
**boots** 137:24
**border** 518:14
**bottom** 103:7,12
   127:7 170:17
   312:25 343:10,16
   343:17 353:1,3
   365:2 373:18
   380:4 400:20
   401:6 405:24
   422:8 444:17
   477:2,11 478:19
**bought** 226:14
**bowed** 360:13
   362:21 367:16
**box** 2:21 248:13,15
   275:13 358:4
   490:24
**boxed** 448:4
**boxes** 75:11
**boys** 51:24 52:5
**branch** 2:20
**brand** 225:18,19
   227:20 228:8,12
   266:8,14 287:21
   288:2,17,23

**384:12,14
breach** 173:8
**breaches** 1:7 63:25
   173:14 259:25
   526:15
**bread** 61:25
**break** 96:8 112:16
   150:1 211:9
   238:14 270:16
   281:10,14 330:1,1
   330:2 395:1 400:3
   400:7 446:15
   499:8,10
**breaking** 102:2
   240:23
**brick** 44:13 129:17
   130:5,10 346:10
   346:16 360:14
   362:22 419:3
**bridged** 36:1 54:15
**bridgeton** 8:9
**briefly** 179:1 187:6
   218:17 266:9
   318:18 321:14
   362:13 422:1
   424:8 464:10
   487:18 491:17
   497:20 515:6
   518:8 524:3
**bring** 26:24 134:11
**bringing** 116:18
**brings** 263:23
**broke** 231:13
   400:13 477:13
**broken** 76:25
   170:25 279:13
   526:6
**brothers** 49:3
**brought** 24:25
   101:14 339:10
   382:25
**bruno** 2:5 501:13
**buckled** 362:21
**buckling** 360:13
   367:15
**build** 50:8 126:21
   142:10 236:16

**296:16
builders** 236:22
**building** 126:13
   189:17 236:11
   237:20,22 264:8
   318:16,21,25
   362:25 414:21,22
   415:7,13,18 416:2
   417:20 458:16
   507:2,16
**buildings** 41:11
   505:18
**builds** 72:18
   236:12 237:4
**built** 237:25 403:15
   441:20 448:13
**builtin** 345:17
**bundle** 238:13
**bundles** 238:18
**business** 7:20,22
   30:12,12 32:2
**busy** 50:22
**butter** 61:25
**buy** 102:25 104:15
   225:5,6 227:18
   231:11,25 237:11
   237:16 243:2
**buying** 227:20
   237:11

───────
**C**
**cabinet** 131:18
**cabinetry** 473:11
**cabinets** 127:3
   130:1,13,22 131:2
   131:5,7,10,11,13
   199:17 206:18
   473:13 484:21,22
   485:21 486:3,12
**calculate** 139:5
   215:22 292:17
   324:17 402:6,13
**calculated** 141:14
   141:16 239:4
   402:23 453:18
   483:5 527:21
**calculates** 237:14

**calculation** 144:10
   215:24 235:23
   238:8,12 292:13
   404:24
**calculations** 140:13
   197:25 291:20
   494:3 529:3,5
**calculator** 42:7
**call** 64:8 66:2 87:3
   88:21 93:10
   146:19,20 147:23
   196:17 307:17
   309:12,13,20,23
   309:25 310:2,10
   311:7,13 318:2,15
   319:4 330:17
   404:4 457:9,11,19
   457:22 459:4
   462:2 512:7
**called** 50:5 66:5
   200:22 212:20
   268:1 309:10
   312:14 396:7
**calling** 48:24 49:9
**calls** 67:25 84:15
   84:19 88:6 93:6
   146:21 181:16
   182:2 205:11
   256:14 259:10
   322:16 519:5
   520:23
**camera** 121:18,25
   165:19
**canal** 1:7 63:25
**cant** 28:16 65:7
   67:19 69:25 79:18
   79:20 84:18
   116:10 120:18
   121:5 122:12
   157:25 159:25
   161:24,25 162:9,9
   162:23 169:4
   172:4,14 174:13
   178:19 182:5,14
   188:20 191:20
   200:14 204:11
   210:6 211:1 218:7

**218:24 223:14,15
   225:5 228:13
   238:13 250:8
   254:11,14,17
   277:3,14 287:21
   288:8 291:11,15
   291:15 292:14
   296:1 331:20
   333:13 334:8
   355:25 366:9,18
   366:21 369:17
   383:2,10 388:6
   394:19 401:17
   407:24 417:15
   418:8,10 436:8
   439:3 440:25
   442:25 444:9
   446:11 451:9
   470:24 474:23
   475:5 476:22,22
   487:22 488:4
   497:7,11,11 518:5
   519:8 520:6,14
   521:1,2 523:6
   525:9 527:4,7
**cap** 239:17 240:7
   240:14 241:1
**capable** 495:9
**caps** 239:21,21
**caption** 465:2,2
**captioned** 339:6
   518:2
**captions** 179:7
**captured** 46:24
**car** 57:12 226:15
   386:1 395:14,17
   395:20 396:19
   397:21 400:15
**card** 285:8 286:6
   286:15,16,21
**cards** 285:18,20
   286:10
**care** 52:11 53:5
   187:23
**careful** 255:19
**carolina** 7:24 8:6
   8:10 57:12 58:22

SCOTT H. TAYLOR                                   February 9, 2012

Page 545

58:23 59:24 60:2
60:4
**carondelet** 1:23
2:10,14
**carpet** 132:1,4
477:14
**carpeting** 219:17
**carport** 332:7
**carrier** 46:18 95:3
**carriers** 45:18
49:18 141:11
175:20
**case** 8:16 9:6,7,16
9:24 10:7 13:20
13:22 14:10 15:18
16:12 19:24 20:12
20:19 23:8,22
24:8,24 25:8 28:5
29:22,23,25 31:6
31:8 32:16,20
34:22,25 42:21
63:24 64:3,7,9,9
64:10 66:21 67:4
68:20,22 69:12
71:1,10 72:23
73:3,12 76:15
77:3 79:3 91:13
92:6 94:10 101:22
104:18,24 105:18
105:22 106:12
107:3,11,15 108:1
109:4 110:11
112:25 113:17
115:24 121:15
134:14 141:13
142:2,16 143:8
144:12 145:24
146:4 161:12
183:9 187:2
193:10,13 201:10
227:5 228:4,21
239:19 255:18
256:5,8 261:4
265:7,16 266:22
268:5 274:13
279:23 303:12,20
304:2,3,15 327:7

355:22 375:16
379:18 383:23
389:9 423:13
434:12,15,18
440:8 442:8,11
457:18 481:22,25
482:7 494:15
495:15 496:17
510:3
**cases** 9:9 24:1,8
27:8,10,25 28:1
54:3,5 58:15,15
58:16 64:13 110:9
112:13 131:3,17
145:13 182:19,23
216:2 231:13
237:9 297:22
322:6 333:3
347:16 361:18
454:8 455:5
457:24 461:21
467:19,20 481:18
481:20 482:4
491:20
**casey** 523:23
**cash** 104:10 105:15
105:17 106:14
226:19,20,21
227:4,12
**castiron** 137:20
**cat** 46:19 47:1
48:20 50:11
**catastrophe** 46:20
242:16
**catastrophic** 39:7
169:25 171:16
172:12 367:25
**catch** 531:8
**categories** 140:20
270:10,17,18
**category** 139:19
271:4
**caught** 349:7
**causation** 111:6
205:23 435:17
**cause** 20:3 69:15
111:10,21,22,24

179:14 202:10,17
202:21 203:5
206:7 320:5 334:1
334:3,15 336:9
389:23 407:21
419:14,19 435:11
439:1 440:17
460:10 507:24
**caused** 18:4 19:24
69:7 86:11 111:17
113:11,18,24
114:12,21 115:15
116:7,8,15 148:4
149:11 157:19
158:5,24 159:1,14
159:16,17 160:3,9
161:17,23 162:3
171:3 175:21
178:13 212:11,12
212:21 256:9,22
258:17 259:5
260:2 317:18
336:6 337:22
338:3,12 341:14
341:15 362:17
461:19 513:6
518:16 522:23
523:1,2 526:16
529:10 534:22
**causes** 335:20
474:13
**causing** 173:20
**caveat** 238:11
**cds** 270:12
**ceased** 420:24
**ceiling** 447:21,22
526:17
**ceilings** 126:19
184:20 185:15
233:3 275:19
369:10 428:25
481:19
**cement** 353:12
**center** 170:22
184:25 313:1
441:9
**cents** 231:4

**ceramic** 219:17,23
220:8,16 221:1
**certain** 17:9 22:9
24:8 43:9 55:23
56:10 65:13,25
66:11 67:5,8,9,23
72:25 85:25 95:21
105:14 115:23
130:4,8 131:10
132:2,4 137:9
146:10,10 168:23
223:14,15 231:20
242:7,23 244:2
254:24 269:1
285:25 311:25
319:11 321:21
323:11 333:3
343:3,8 376:1
416:7 419:15
420:14 421:12
434:10 439:3
459:6 461:22
484:2 522:6
**certainly** 85:10,16
91:25 99:13
102:24 107:18
114:14 116:6
123:3 129:3
146:14 149:3
151:1 152:16
169:9 171:25
181:19 190:13
192:1 207:9 213:7
220:3 257:7
260:12 285:17
289:24 315:14
447:24
**certainty** 417:15
**certificate** 537:2
538:2
**certification** 3:11
18:12 56:1
**certifications** 56:6
**certified** 2:24 3:21
538:5,21
**certify** 537:5 538:5
**chain** 298:22

**chairs** 134:5
333:18
**chance** 148:13
175:16 178:24
301:11 337:7,10
340:18 357:25
362:8 410:15
450:21 476:2
487:16 515:4
518:6 524:1
**change** 52:14 64:19
80:6 134:10
135:20 137:10
148:24 163:1
190:2 191:16
221:25 237:6
243:3,4 255:20
266:12 267:7
284:19 299:8
316:12,17 317:20
317:24 359:21
399:3 408:13
436:3 438:24
474:4 483:19
530:14
**changed** 49:6 52:15
88:2 191:13
230:19,20 231:10
316:20 387:25
399:4 483:17
484:3,8,11,15
486:5 530:18
**changes** 85:11,23
86:11 87:17 88:15
98:14 99:14
101:13 102:7,11
136:11 137:11
138:7 209:3,9
221:15 230:16
243:6 306:2
316:13,17,22
317:5,9,13,22
318:10 324:13,15
349:19 373:5,22
373:24 382:23,25
383:2,7 388:7
413:24 414:6

SCOTT H. TAYLOR

February 9, 2012

Page 546

423:24 440:19
470:3 512:11
528:22 529:16
537:7
**changing** 429:23
**characterize** 201:3
**charbonnet** 12:24
13:7 216:10 500:8
500:13,17,22
501:4,11 503:17
503:21,25 504:4
504:25 505:5,24
507:16,25 510:14
519:21 520:19
524:8 527:9 528:6
528:17 529:11
**charge** 244:5
**charged** 75:25 76:4
77:25
**charles** 36:21 37:9
411:9 433:9
434:14 435:2
436:13 452:19,22
453:2
**charlie** 411:8 412:5
412:10 413:9
414:14 416:24
419:13 421:22
441:2
**chase** 531:9
**check** 22:3,5,9
193:19 195:2,2,9
268:9,14,15,20
339:18 386:10
389:18 449:18,19
450:3 515:12,20
515:20 516:4,7,8
516:12,13,16,17
517:6,7
**checked** 275:13
**checking** 133:19
**checklist** 22:7
91:12
**checks** 515:5,10
**children** 330:13
412:20 434:17
452:7

**childrens** 426:10
426:18
**choice** 53:6,7,21
247:13
**choose** 15:5 47:20
237:9 386:15
**chose** 303:19
403:20
**chronicled** 140:18
**chronology** 210:18
210:19,23 296:17
296:25 304:11
**chunks** 208:11
**cindy** 513:7,24
514:6
**circle** 206:23
343:21 344:24,25
353:10
**circled** 344:5 345:7
345:8 346:5
**circles** 207:13
**circumstance**
25:10 103:2
**circumstances**
23:16 25:8,12
90:4 92:19 201:12
512:1
**circumvent** 92:8
**citizens** 518:3
524:14
**citizens000131**
5:22,23 515:3
517:7
**citizens000246**
5:20 514:25
**citizens000250**
5:22 516:17
**citizens000254**
5:21,21 515:2
516:23
**citizens000339**
5:24 523:25
**city** 61:4
**civil** 1:7 2:20 3:7
**claim** 42:3,6,14
43:16 44:4 47:1
48:20 104:8 105:3

105:9,18,22 106:4
106:5,6,13 122:8
141:8 157:6,10,14
157:20 162:2,4,12
162:14,14 163:3
163:21 164:25
174:24 175:2
179:3,6,16 183:4
183:5,19 186:4
243:14,21 244:10
244:15 252:23
269:10,11 276:10
276:22 348:23
379:20 391:18
392:4 418:11
443:11 474:15
478:25 499:25
501:14,14 512:20
513:5 514:20
**claimant** 24:20
50:13
**claimed** 177:25
275:22 392:21
393:24 394:16,19
483:2
**claiming** 389:15
500:20
**claims** 19:20 35:4,9
35:11 36:19,19,25
37:13 38:22 39:18
40:8 41:5,9,15,19
44:2 46:21 47:22
49:17,19 50:4,13
59:23 63:3 73:18
77:20,23 78:2
94:19 104:4 105:8
105:21 112:11,12
116:14,18,23
117:7,10,14,17
141:10 172:16
175:21 176:15
177:10 179:17
182:20,25 211:19
250:19 261:20
291:23 326:23
379:7,24 391:18
436:9 475:21

499:19,23 520:18
523:23 524:13
**clarification** 396:8
**clarify** 493:24
510:7
**clarity** 221:17
373:7 394:23
**class** 18:12 43:8
45:5,7,13,14
64:14,23 233:22
233:24
**classes** 45:3 47:3
**claude** 493:17
**clauses** 176:13
**clean** 16:6 87:13
**cleaned** 369:13
**cleaning** 452:24
**clear** 17:17 27:10
62:18 74:24
142:16 171:17
202:9 309:5 311:4
322:11 346:10
349:23 360:10,15
367:14,25 374:13
396:8,10 452:21
479:9 519:21
**clearly** 23:5 116:10
353:6 363:14
364:6 365:17
367:9 426:6
464:24 465:16
**client** 47:20 260:1
405:12
**clients** 51:5 96:18
252:6
**clifford** 13:6
499:20 502:5,9
515:21 517:2
518:2 519:1,11
523:24
**clip** 408:22
**close** 24:21 87:15
101:25 224:24
231:9 233:7
249:14 446:19
**closely** 53:20 98:2
**closer** 223:8 274:20

276:5 488:19
525:19,20
**closest** 81:14,20
**closet** 438:16
439:13,16,19,21
439:24
**closing** 378:24
**clothing** 230:10
231:23 232:1
270:11 426:10,11
426:14,15,18,25
427:3
**club** 339:7,25
405:13
**coates** 426:14
**coats** 6:7 12:15,17
18:10 216:8,9
408:15,17 410:1,5
410:9,11,21,24
411:3,8,9 412:5
412:10 413:9,10
413:15 414:14
416:5,24 417:4
419:13,14 420:5,9
420:13,18 421:1,7
421:19,23,24
423:11,17 425:7
427:10 429:13,22
433:10,19 434:17
434:22 435:17,21
436:7,13,13
438:23 441:2
443:13 445:18
446:7,19 451:10
451:25 452:12,15
453:7,13,19 454:3
454:10,14,21
455:2,8 468:8
**code** 119:11 208:9
241:23 243:7
**coincidence** 484:10
**collection** 285:8
286:1,7,11,15,17
286:19,21,24
**colonial** 379:6,23
**column** 101:17
102:16 104:13

297:25 298:2,5,6
324:19 344:4
346:17,19,21
347:2 392:18
**columns** 99:23
100:1,2 103:6
129:24 297:24
346:7,23 347:1
**combination** 92:17
166:13 354:24
464:14
**combine** 307:25
**combined** 313:15
**come** 25:18 38:6
46:25 49:23 64:16
69:22 82:5 94:15
118:3 122:21
128:20 141:19
144:22 145:1
183:4 189:11
192:7 198:14
208:21 209:12
232:7 244:17
263:14 264:4,21
283:24 301:24
335:9 391:6 400:4
404:3 436:12
448:2 451:1
468:17 495:20
504:20 505:23
510:19,22 512:6
**comes** 62:14 74:7,8
92:7 101:9 144:2
144:3 171:6
210:22 228:22
231:22 303:9
431:6 495:9
**comfort** 165:7
**coming** 10:4 12:6
52:6 62:9 116:19
141:22 193:16
244:6 259:6
268:10 279:2
294:17 390:5
**commensurate**
171:18 368:1
**comment** 68:8 71:8

521:20
**commentary**
495:13
**comments** 85:8
87:23 168:25
462:10
**commercial** 253:9
253:12
**commiseration**
221:11 373:1
**common** 21:10
490:19
**commonly** 113:7
295:4
**communicate**
310:6
**communication**
307:4,7,10,12,13
308:7,14 315:25
**communications**
509:20
**companies** 61:19
63:12 73:18 112:5
236:21 241:25
243:9,18 244:17
245:6 251:2
263:16 294:20
**company** 27:16,21
33:23 34:1,10,25
35:3,5,9,15 38:6
39:24 40:1 46:17
49:7 50:10,11,11
50:13 62:10 63:10
66:4 73:20 104:8
112:15 175:2,3
177:24 178:11
212:10 244:12
252:13 269:25
302:3 475:13
524:14
**companys** 173:5
**compare** 117:6
138:5 148:9
275:25 290:18,19
405:1 489:3
491:22
**compared** 21:7

77:18 164:14
230:14 272:21
489:14
**compares** 267:14
289:7
**comparing** 43:18
245:25
**comparison** 290:23
**comparisons** 492:9
**compensate** 295:18
**compensated**
193:20 451:7,11
517:21 532:8
**compensating**
194:1
**compensation**
532:18 533:7
**compile** 297:13
**compiled** 232:10
**complaint** 519:1,25
**complete** 94:11
197:22 297:10
299:10 304:11
336:9 395:8
408:20 418:24
**completed** 15:21
94:12 142:12
**completely** 24:9
84:3 113:9 115:8
115:22 328:8
335:16 505:14
525:22
**completing** 247:13
**complex** 77:6,18
**complexity** 77:5,14
78:14
**component** 450:14
468:15
**components** 468:11
**composition** 240:7
**comprise** 152:17
**compromised** 25:3
26:8 27:1 368:6
**computations**
236:23
**computer** 233:17
255:10 308:10

**conceive** 439:16
**concept** 303:7,8
325:1
**concern** 70:19
301:6
**concerned** 65:2
200:11
**concerning** 60:21
89:12 307:22
417:6 479:18
493:24 499:19
**concerns** 387:20,23
**conclude** 355:12,15
370:17 513:14
527:16
**concluded** 174:6
355:7 527:25
**conclusion** 25:18
159:22 171:17
181:17 182:3
193:16 197:13,14
197:17 198:9
205:12 210:7
213:10,14,25
256:15 259:11
335:9 368:1,4
369:16 370:4
474:12 479:20
480:3 481:3 483:6
493:3 519:6,9
520:24 521:2
526:14 528:4,7
**conclusions** 152:14
182:9 200:12,14
200:17 229:7
243:23 369:17,19
375:9 390:5
480:20 517:17
526:5,23 527:8
**conclusively**
117:19 172:4,11
258:24
**concrete** 313:3
315:7
**concurrent** 30:4
31:24 35:21,23
48:19 50:18

101:21 441:11
**condemnation**
171:22 213:17,22
214:10 362:2
369:25
**condemned** 213:12
213:16 360:16
361:20 362:5,25
370:22 371:5
**condition** 25:5
110:7,8 225:15
266:14 272:21
273:21 274:3,4
278:24 279:11
431:14 507:8,9
510:23
**conditions** 171:21
188:2 213:21
242:21 287:25
369:24 377:1
452:20
**conference** 109:1
184:25
**confidence** 352:18
**confident** 314:7
**confidential** 175:14
180:11
**confirm** 291:22
300:9 402:4,12
502:3
**confirmed** 54:3
208:15
**conflict** 77:11
80:19
**confuse** 508:20
**confused** 75:16
78:4 100:25
217:18
**confusing** 8:24 9:1
72:3 86:3
**confusion** 395:21
464:11
**connect** 243:6
**connected** 74:25
437:5 441:16
**connection** 20:21
23:7,21 28:4

SCOTT H. TAYLOR                                    February 9, 2012

Page 548

29:21 31:7 37:6
38:5 62:25 63:2
65:4 69:4 70:13
85:1 86:9 88:7
100:6,16 101:11
111:5,15 117:12
149:23 155:19
276:9,22 301:20
306:6 318:23
329:12 340:23
348:2 349:12
358:23 362:1
**connections** 437:6
**consider** 19:15
109:16 110:5,6,8
110:10 130:13
155:17 188:1
266:6,8 277:9
335:19,25 368:9
390:6 454:20
486:19 535:7
**considerably** 54:7
**consideration**
195:24 205:15
300:23
**considerations**
159:10
**considered** 59:19
108:1 130:6 181:4
266:11 271:18
273:23 373:24
**considering** 94:5
171:15 367:24
**consistent** 77:24
170:9 386:9 495:4
495:5 496:7 528:1
**consolidated** 1:7
**constantly** 84:15
**construction** 41:10
41:11,13,16 52:16
52:18 53:9,11
54:5 81:12,19,21
81:22 251:20
417:23 436:21
529:8
**consult** 28:3,6,20
46:25 60:23 61:4

84:12
**consultant** 37:19
45:24,25 60:21
81:17
**consultants** 89:5
**consultation** 209:2
349:18
**consulted** 28:17,22
29:13 88:10
**consulter** 48:22
**consulting** 32:2
33:1,3,5 35:14
67:25 523:22
524:12 526:23
**contact** 28:8 89:21
90:16 93:6 149:22
152:9 436:14
457:17
**contacted** 69:11
529:13
**contained** 15:23
283:20 286:20
319:10 322:22
342:9 360:1
374:10 393:15
450:20 460:3
**contaminated**
360:8
**contend** 341:6,9,12
341:21 342:1
**contending** 517:20
**content** 87:15,19
131:17,18 136:14
138:3 275:14,18
**contention** 216:22
217:2 218:3
**contents** 93:19,20
93:24 94:5,20
95:13 96:19 97:4
97:6,14,16 98:21
99:11 100:7 101:7
102:19 103:25
106:3 107:9 108:2
108:17 109:6
110:12 131:5,14
132:23 133:1,4
134:13,19 135:7

136:11,18 137:8
138:6 144:14,17
144:25 145:12,20
147:3 155:14
169:2 173:22
176:16 181:8
188:3 190:17,20
191:12 201:18
202:22 203:2,21
204:16 205:7
221:6 222:5,5
223:6 229:25
230:6 231:16
256:22 258:16
266:4,18 267:1
268:25 270:15
271:22 272:14
274:15,21 275:22
276:1,10,14,15,22
277:9 279:22
280:10 281:2,4,24
285:13 286:23
297:19 299:1
310:10,16,18,22
311:2 320:2
321:15,16,17,20
322:3 323:1,13,14
323:19,24 324:2,5
324:14,25 325:11
326:9 334:16
335:11,21 336:5
341:12,20,24
372:6,7 383:13,14
384:18 385:3,9,15
386:24 387:19
388:13,16 389:2,4
389:9,16 390:6,7
390:23 391:11,18
393:5,10,11,16
395:17 409:9
420:13,15,16,18
420:19 421:1,6
423:1,6,9,10,11
423:14,16,20,22
424:7,9 427:5,9
427:14 428:2
430:23 432:21

433:21,23 434:3,7
434:7,20,21,23
446:20,23 447:17
447:19,25 448:8
448:10,14 449:10
449:15 450:13,15
451:1,3,8,11,13
451:23,24 452:8,8
458:13 459:14,20
459:23 460:3
467:3 468:1,12,15
468:25 469:14
470:22,25 471:1
472:4,7,17 473:14
473:21 474:14
482:20 483:5
485:11,19 486:15
486:19 487:11,20
488:7,21,25 489:4
490:6,8,23 491:2
494:12,17 495:2
500:1,8,14,18,19
500:21,25 501:8
501:10,23 504:20
507:22 516:10
527:12
**context** 14:7 61:12
110:24 124:1,3,4
124:10 134:1
150:17,19 278:10
502:16
**contextually** 91:17
**contingency** 80:25
**continuation** 477:9
**continue** 100:22
188:14,22 291:6
327:25 506:20
535:14
**continued** 5:1
453:11,12
**continues** 221:9
372:25
**continuing** 55:21
**contract** 173:8
338:11
**contracting** 81:11
252:21

**contractor** 54:4
170:19 244:6,18
247:12 250:20
251:10 252:9,19
**contractors** 214:23
251:15 252:4
263:16 264:6
**contrast** 139:16
**contrasted** 272:22
**conventions** 45:16
**conversation** 92:7
193:4 285:19
286:19 297:4
308:4 309:6
310:13,14 318:21
319:9 321:20
417:4 420:8
446:12 460:14
491:15 498:10
508:20
**conversations** 70:4
70:5,7,9,11 80:10
80:16,20 85:22
86:10,15,25 89:5
90:11,22 117:8
126:4 138:2
146:25 194:18
286:14
**convey** 465:8
**cook** 184:24
**copies** 61:1 85:15
100:21 262:23
308:7 339:23
**copy** 173:3 301:7
305:6,15 398:8
408:21 410:4,8
437:24 456:7,11
502:4,8
**corolla** 396:4,20
397:3,8,11,14,17
397:24,25,25
399:13,21 401:12
**corporate** 61:5
**corporation** 379:7
518:4
**correct** 7:21 18:17
34:20,22 37:11

SCOTT H. TAYLOR                                    February 9, 2012

| | | | | |
|---|---|---|---|---|
| 44:9,14 53:10 | 337:13,14 338:13 | 98:11 126:3 | 88:17,22 89:12,18 | 44:1 45:19 46:2 |
| 70:25 71:6,11,12 | 339:23 350:10,13 | 146:17 210:18,21 | 90:11 93:8,11,21 | 47:16 54:2,8,15 |
| 71:16 72:7,24 | 352:2,3,6,7 355:3 | 220:4 537:6,13 | 93:24 97:6 98:10 | 54:19 55:4,5,7,11 |
| 73:10 74:14 75:1 | 355:4 357:8 | **cost** 101:24 103:22 | 100:12,17 119:16 | 55:12,14,15,18,25 |
| 75:2,8 76:2,5 98:3 | 361:22,23 362:3,6 | 104:15,20 134:21 | 125:19,22,23 | 59:7,10 60:5,6 |
| 100:7 109:6 | 362:9 366:3 | 135:24 137:21 | 126:3,7 128:6 | 83:10 107:22 |
| 110:13 111:20 | 367:18 369:22 | 191:8 197:21 | 136:13 144:24 | 125:16 145:17 |
| 115:24 116:21 | 370:2,3 375:17 | 198:3 224:15,19 | 146:22,25 148:21 | 273:3 295:6,9 |
| 122:5,12 128:2 | 376:5 377:4 | 224:22,23,23 | 187:11 189:6 | 321:23 389:20 |
| 129:5,13,15 135:1 | 379:10 381:12,25 | 225:1,8,16 226:2 | 199:2 207:4 | 460:14 |
| 136:7,9 138:14 | 382:7,10 383:11 | 226:10,18,22 | 261:17 298:23 | **courses** 41:2 47:10 |
| 142:8 143:11 | 383:25 384:11,15 | 227:18 229:24 | 305:25 306:2,8 | 47:11,14,18 48:5,6 |
| 144:4 146:22 | 384:16 387:5,10 | 231:3 241:3,7,16 | 308:11,12 310:24 | 55:17,19 56:3,8 |
| 147:12 150:9,24 | 387:12,14,16 | 247:9 253:25 | 311:9 317:16 | 295:5 |
| 151:4,16,17 152:1 | 388:4,5 395:18 | 263:24 264:8 | 318:2,2,3,9 323:2 | **court** 1:1 2:24 3:21 |
| 152:2,23 153:25 | 396:14 399:23 | 273:9,12 376:25 | 323:9 325:6 350:8 | 7:4 8:18 9:13,15 |
| 154:5 155:1,6,7 | 409:15 410:4,8 | 378:9 380:5,18 | 369:21 373:16 | 9:19,23 10:1 |
| 160:24 167:6 | 413:10,11,14 | 381:14,23 382:3 | 374:5 383:16 | 174:1,9 256:7,10 |
| 172:9 174:9,18 | 418:5 421:16 | 382:15,17 388:12 | 396:7 417:6 418:3 | 256:21,24 258:7 |
| 180:21 183:10,21 | 422:7 429:4,8,11 | 402:18,19 439:7 | 421:4,8 423:4 | 259:3,6,22,24 |
| 183:24 189:13 | 432:8,18 433:13 | 439:12 468:5 | 436:14 454:6 | 260:3 300:3 |
| 190:14 191:14,24 | 433:24 434:1,12 | 469:9,9 476:6 | 458:14 460:5,7 | 375:16 377:3,6,21 |
| 192:5,8 193:15 | 436:24 439:2 | 486:2 530:4,8 | 465:21 467:8 | 377:22 538:5,21 |
| 200:17 206:9 | 440:7,10 443:9 | **costing** 439:16 | 470:8 484:5 | **cover** 449:9,10 |
| 211:2,22 218:3 | 444:2 450:23,24 | **costs** 20:25 21:1 | 499:16 510:17 | 475:12 476:17 |
| 219:20 220:10,12 | 454:11 456:7,11 | 184:11,25 185:14 | 512:7,14 529:13 | 487:8,11 |
| 230:2,7 244:22 | 458:22 460:7 | 227:23 228:3 | 531:6 538:13,14 | **coverage** 105:10,11 |
| 245:17 253:21 | 462:25 464:3,18 | 242:2,7 264:9,24 | **counsels** 15:5 | 141:15 145:11,18 |
| 254:4,10,13 261:1 | 467:5 468:7,17 | 341:25 375:1 | **count** 311:20 | 145:19 154:8,10 |
| 263:25 264:20 | 470:10,20 471:9 | 449:2 452:23,25 | 313:11 | 154:12 155:4,9 |
| 265:2 266:15 | 471:10,24 472:2,9 | 495:16,21 533:2 | **counter** 279:13,16 | 156:10,15 179:12 |
| 268:7 270:7,8 | 472:18 475:17,25 | **couldnt** 28:15,15 | 473:10 | 187:8,19 294:19 |
| 271:1 274:22 | 476:1 477:20 | 70:10 90:20 | **counterpart** 48:23 | 325:18 326:1 |
| 276:7 282:24 | 481:23 485:19,23 | 114:19 116:5 | **countertops** 127:2 | 327:9 330:8 |
| 287:23 290:12,13 | 486:13,25 488:17 | 148:15 151:3 | 199:12 | 379:13 487:12 |
| 290:20 291:25 | 495:18 496:14,19 | 168:17,18 201:3 | **country** 59:16,21 | **covered** 39:21 |
| 295:18,19 300:10 | 496:20 497:18 | 215:1 222:15 | 264:5 | 105:1,13,14 106:7 |
| 302:9 303:3,8,12 | 498:15 502:4,8 | 230:13 279:14 | **couple** 8:13,14 | 113:25 296:18 |
| 303:13,18 304:9 | 505:7 509:25 | 284:11 287:18 | 34:16 36:2 65:14 | 336:21 367:3,5 |
| 304:15,19 305:15 | 510:3,15 512:17 | 293:3 296:15 | 67:22 83:10 | **covering** 476:11 |
| 311:6 314:4,12,16 | 521:15 528:20 | 351:1 355:2 | 151:20 168:16 | **coverings** 360:6 |
| 314:20 315:12,13 | 529:5 537:5 | 370:12 451:22 | 257:19 281:24 | 362:21 369:10 |
| 315:16,21 316:1,2 | 538:12 | 477:21 | 304:24 314:13 | 526:16,18 |
| 320:19 322:13,14 | **correction** 57:4 | **counsel** 2:7 3:4 | 353:21 396:18 | **covers** 213:3 |
| 322:18 323:4 | 537:15 | 14:3 83:25 85:8 | **coupled** 473:20 | 239:11 |
| 324:7,9,23 330:14 | **corrections** 85:18 | 85:13,22 86:10,16 | **course** 10:5 41:4,10 | **crawford** 28:24 |
| 331:9,10,12,14,15 | 85:20 87:14 98:6 | 87:1,4,5,23 88:12 | 41:23,23,25 42:12 | 29:1,7,21 |

SCOTT H. TAYLOR

February 9, 2012

Page 550

**crawfords** 30:8
161:1
**create** 95:3 235:20
235:21 308:1
**created** 371:21
383:14
**creating** 240:24
**credentials** 32:19
**credibility** 72:18
**critical** 92:13
153:19
**critically** 44:3
**criticisms** 19:8
**criticized** 107:8
**critique** 198:12,22
369:18
**crossed** 36:6
**crowded** 332:22
**crown** 126:25
**crr** 2:24 3:21 538:4
**csr** 2:24
**curious** 530:3,12
**current** 15:16 25:5
25:5 32:18 54:17
56:17,19 57:2,3,8
57:13,14 58:25
221:19 225:6,14
249:23 373:9
422:14 431:23
493:13
**currently** 33:19
46:8 89:23 164:14
434:8 452:8
**curriculum** 40:19
**cursory** 293:24,25
**custom** 126:21
127:3
**customary** 247:11
**customers** 53:18
**cut** 239:3,5,8
294:21,23 487:15
531:9
**cutdown** 239:21

**D**

**daily** 50:13 242:22
**damage** 36:19 69:7

74:11 111:8 112:1
112:1 113:20,21
114:20 116:7,8
117:18 144:2
157:15,19 158:18
159:11,16,22
161:17,22,25
162:3 163:4
169:24 170:8,8,9
170:20,25 171:2,7
171:9,16 172:11
172:16 179:17,19
205:6 211:17,21
212:10 217:23,24
256:8,23 258:16
259:4 276:11
320:6 325:22
334:21 336:4,12
341:10 342:2,15
356:2 358:23
359:8,13 360:1
362:17,20 367:25
371:10 419:14
430:23 431:10
435:22,23 444:6,7
444:25,25 445:1,7
445:16 460:10,15
460:16 461:23
469:5 474:2
478:20,25 482:16
494:12,19 496:18
499:25 500:22
501:15 507:24
512:21 513:6,14
513:22 517:22
518:17 524:16
526:10,17 527:8
527:18 532:9
**damaged** 68:25
71:23 332:7
337:21 341:22
390:7 391:5,19
392:5,19 393:5
394:5,17 395:18
460:21 461:5,15
468:25 469:1
470:13 477:15

490:3,13,18,20
524:6 534:6,21
**damages** 13:21
14:9 15:18 18:3
19:20,21,24 20:5
21:7,8 22:1 23:11
24:19 41:16,19
49:19 62:12,15,21
63:18,19,20,20
65:18 68:16 69:1
70:25 71:4,11,16
72:3,4,8 73:11,21
74:25 75:9 90:3,7
91:9 92:14,15,21
93:17 94:25 95:5
95:6 105:25 106:1
107:2 111:7,17
112:4,7,25 113:11
113:12,14,18,23
114:1,3,12
115:14 116:14
141:24,25 144:7
144:18 147:3
155:1 158:5,16,19
158:23,25 159:11
159:17 160:3,10
160:15,17 162:15
163:2 165:14
173:8,13 175:21
176:16 177:25
178:6,11,13,15
179:5 180:1 182:6
195:19 202:21
203:2,5,10 208:17
215:14,22,24
229:23 253:25
254:5,6,13 256:12
256:25 258:19
259:7,23 260:8
261:10,11 269:12
269:20 334:4,9,12
334:12,15 335:6,7
335:10,17,20
336:9 338:2,8,12
341:6,16,19 348:5
354:22 355:23
358:13,19 360:25

375:17,22 376:6
376:15,19,24
377:5,23 392:20
392:21 393:1,21
393:24 400:25
402:20 404:22
410:14 419:19
431:7 436:10
438:23 443:13,17
445:9 456:8,12,16
457:18 461:12,16
461:19 470:12,15
470:19 474:13,15
476:11,18 477:10
477:13,16 478:5
479:8 480:9,11
481:4 483:5 491:6
495:10 502:12
514:5,9,10,17
518:24 519:2,12
520:18 522:11,14
522:22 526:16
533:19 534:1
535:6
**danger** 218:23
**dangerous** 83:12
**daniels** 217:10
**danner** 17:23,23,24
19:17 217:11,13
362:15 371:8
**danners** 369:7,16
371:17
**data** 324:22
**database** 50:8
244:2,4
**databases** 241:22
**date** 10:21,23 67:7
67:11 76:21
121:23,25 122:7,7
122:10,11,13
123:3 129:6 134:5
134:25 135:10,23
165:24 183:20
247:3,4 270:4
275:6 314:15,17
315:12 350:15
358:9 379:9

405:13 418:7
457:6 464:24,25
465:1,3,16,23
466:11 475:16,17
516:24 524:23,25
537:10,17
**dated** 65:11 274:19
301:3 305:8,14
456:11 475:13
487:9 488:16
502:5,9
**dates** 11:25 35:17
122:1,17 129:4
134:23 135:4,6,11
136:3 140:17
165:21
**day** 2:15 10:5 13:9
41:4,9 42:10
47:16 54:7 55:4,7
122:25 129:7
166:9 226:14
465:12 506:19
508:10,11,13
531:7
**days** 43:7 168:16
233:23,25 299:18
**deal** 90:6 251:23
518:15
**dealing** 92:14
112:6 278:24
**dealt** 90:25 94:23
**debris** 526:8
**decay** 464:23 465:9
465:10 471:20,21
**december** 34:13
**decide** 228:23
243:20 496:1
**decided** 52:14 53:7
253:14 292:4
**decides** 73:2
121:19
**deciding** 244:9
**decision** 24:4 26:16
26:25 53:22
148:16 214:19
393:3
**decking** 526:6

SCOTT H. TAYLOR                                    February 9, 2012

Page 551

declare 26:7
decontaminated
  369:14
decreased 230:24
decreasing 230:21
dedacted 97:17,19
deduct 139:18
  238:16 265:18
  494:24
deductibles 252:25
defaulted 155:8
defend 409:7
defendant 11:12,17
defendants 7:10
  16:11 19:8 197:16
  198:11 217:7,12
  218:11 362:11,15
defense 217:16
deferred 38:4
defined 288:4
defining 62:8
definition 188:19
  227:8 280:4
definitions 188:20
definitively 161:25
degree 190:6,7,24
  191:2 441:6
degrees 130:18
delays 68:6
delete 120:19,22
deleted 120:24
  188:7 229:3
delineate 468:24
delivered 434:4
demolish 197:22
  368:8
demolished 25:6
  115:4,22 169:20
  169:22 171:19
  197:15 213:11
  214:14,17,20
  368:3,15 370:25
  372:1
demolishing 198:4
demolition 214:25
  355:8
demonstrate 114:7

123:19 142:11
  248:20 250:6
  342:24
demonstrated
  357:2,6
demonstrates
  346:6 366:23
demonstrating
  42:10
demonstrative
  333:16
deny 277:14
department 2:19
  531:22
dependent 58:1
depending 23:15
  191:13
depends 62:7 103:2
  161:8 257:10
  264:12
depicting 313:2
deponent 537:12
deposed 8:15 9:5,9
  146:8 469:17
deposing 419:25
deposition 1:21 3:5
  3:16 5:14 7:15
  15:4 145:23 147:2
  147:12,17,25
  148:9 316:7 317:8
  317:10,12 339:19
  341:19 392:25
  395:6 404:14
  408:1 410:16,20
  410:24 429:25
  430:22 436:1
  438:3,4 440:10,13
  450:22 456:3,4,10
  470:6,11 483:20
  483:23 484:7
  493:11 499:22,23
  500:5 501:8,12
depositions 9:5
  15:4 146:4,11
  147:8,10 148:4,20
  149:10 199:11
  317:1,7,15,18

469:20 470:2
  510:25 511:1
depreciate 107:9
  229:9,11,11,12,19
  229:20 231:23
  232:2 271:9
  274:14
depreciated 136:2
  226:13 227:7,10
  280:20
depreciating
  134:16,17,24
  271:12 279:22
  280:11 468:5
depreciation 104:7
  105:17 106:2,2
  107:3,25 108:8,11
  108:15,22,23
  109:17,23 110:2
  191:4 225:23
  226:22 227:3,11
  228:6 253:3
  270:23 271:3,12
  271:19 272:19
  273:25 295:13
derbigny 389:19,21
  500:1 501:2,9
  503:17,21 504:10
  508:12,15,15,17
describe 9:21 23:9
  40:5,17 41:1
  48:17 49:15 63:15
  173:2 217:24
described 48:7
  75:20 152:6
  173:13 280:5
  289:6 310:14
  346:12 368:7
  374:16 375:10
  413:21 437:4
  473:18 510:21
description 32:19
  136:22 139:4
  232:20 247:15
  248:12 267:17
  275:11,16 283:12
  297:22 298:11,14

314:24 515:10,16
  515:22 516:9,18
  517:8
descriptions
  138:22 517:14
design 125:2 237:5
  396:25
desire 42:4
destroy 113:5,9
destroyed 112:23
  115:7 116:1,4
  159:15 173:21
  204:18 258:5,6
  274:2 291:14
  360:7 508:6
  518:22 519:13
  534:7,21
destroying 391:10
destruction 112:24
  355:14 532:9
detail 12:8 36:12
  115:1 133:14
  144:21 180:18
  198:19 219:10
  281:9 297:11
  341:5 374:8
  446:11 458:2
  480:15 494:24
detailed 297:4
  413:7
detailing 286:10
details 88:1 92:20
  118:5 133:8 169:1
  209:4 214:12
  218:25 221:17
  297:12 318:20
  319:24 322:1
  349:20 373:7
  408:8 415:19
  453:5,7 470:6
  507:7
determination 27:8
  62:22 105:16
  114:20 115:14
  143:7 193:11
  198:2 230:9
  289:18,21 357:4

360:9 363:12
  370:21 431:24
  496:6
determinations
  360:17 361:16
  362:2
determine 17:18
  24:19 63:5 71:3
  77:17 89:25
  101:18 105:23
  107:2 110:6
  114:11 115:19
  116:5,10 125:25
  134:25 138:17
  139:11 148:5
  201:7 209:21
  210:6 212:24
  236:5 244:4,5
  256:7,11,24 259:4
  259:7,23 260:4
  264:19 272:15
  273:23 293:18
  303:3 331:17
  377:6 385:2,8,11
  386:23 417:1,15
  417:19 423:15
  424:18 431:16
  432:11 439:25
  444:21 461:15,18
  470:7 494:8,21
  495:7 496:22
  497:13 498:13
determined 59:17
  77:8,16 79:23
  104:6,6 127:18
  128:1 129:3 149:5
  158:22 230:18
  295:10 299:3
  342:1 351:25
  361:21 379:25
  429:5 494:13
  496:21
determines 375:16
  377:4,22
determining 14:9
  23:10 62:19 68:25
  130:5 301:21

SCOTT H. TAYLOR                                    February 9, 2012

                                                         Page 552

492:1 494:15,17
494:18
**devalue** 228:23
**devastation** 132:3
**developed** 54:14
336:13
**development**
531:23
**diagram** 234:21,23
248:13,15,21
**diagraming** 234:19
**diagrams** 155:14
**didnt** 21:3,4 29:2
30:15 49:23 54:5
57:20 96:23 100:5
101:16 102:20
103:11 106:22,23
113:19,23 114:11
117:11 118:16
119:1 122:23
123:4 127:19
131:8,11 134:12
135:6,8,9,9,20,20
136:3 137:1,6,14
137:21 138:9,20
143:21 144:18
147:16 148:12,22
155:8 156:12
158:10 160:23
170:4 174:21
183:8 184:22
193:9,10 199:15
204:1,13 212:11
229:13 230:18
231:25 232:1
240:9 245:1,2
248:10 253:6
259:17 265:11
266:13,14,24
268:6 270:16,18
284:8,10 290:4,6
290:11,15 291:6
291:16,18 293:6
293:15 294:5,8
295:22 299:2
304:17 317:17
321:10,19 332:14

352:1 384:10,24
388:3 390:9
403:17 407:11,20
415:6 426:17,23
426:24 427:2
431:10,21 433:4
435:2 440:21
441:1,23 450:21
452:14 453:25
454:9 458:20
459:22 474:21
481:17,23 485:22
498:20 506:8
511:5
**differ** 252:18,19
264:12 327:8
**difference** 63:16
105:6 107:13
136:20 139:18
177:13 252:22
298:5 374:14
375:18 376:16
440:1 442:9
444:11 461:7
470:14 494:4
**differences** 85:25
99:10 102:7
253:10 396:11
436:20 440:15
**different** 45:22
48:1 57:19,25
58:8 61:19 62:13
64:20,20 68:18
84:17 87:6 91:1
91:16 134:7
135:11 167:1
176:19 191:7
217:16 239:18
243:23 251:2,3
253:8 254:22
259:6 261:20,20
262:7 267:6
270:10 271:4
287:25 306:8,15
325:13 349:5
353:23 355:8,16
374:15 377:20

419:6 437:17
505:14 514:2
529:25 530:15,16
530:16,17,18
**differently** 252:8
293:3
**difficult** 65:19
**digital** 97:20 100:3
**digitally** 97:18
128:7 324:18
**dimension** 235:5
248:11
**dimensioned** 235:2
**dimensioning**
47:23 232:18
233:7 250:7
**dimensions** 44:9
232:22,24 235:14
235:24 239:14
248:17
**dining** 438:14
439:8 449:22
488:8
**dire** 141:6
**direct** 371:22
**direction** 163:12
189:6 538:11
**directions** 53:21
80:6
**directly** 29:7,20
84:9 93:7 138:4
140:5 161:24
184:24 263:11
349:15 364:5
421:25 433:5
509:9 510:1
**disadvantaged**
52:8
**disagree** 162:4
173:25 197:16
369:15
**disagreed** 254:20
**disappeared** 116:3
**disarray** 443:6
**discard** 119:10
**discern** 163:23
**discernible** 322:8

**discerning** 255:5
**disclaimer** 221:22
**discover** 85:25
209:9
**discoverable**
254:25 255:2,2
**discrepancies**
104:23 512:8
529:15,18,19
**discrepancy** 149:5
149:6
**discretion** 27:20
**discuss** 69:2 90:1
91:3 110:24
118:13 174:22
253:18 307:19
310:9 311:1,13
318:16 319:8
320:5,11,12
321:15,19 325:1
326:22 330:16
349:22 372:14
373:15 413:15
414:22 415:6,12
416:4 419:13,18
420:12,17,21,24
428:20 441:1,5,7
452:15,19,22
453:2 457:21,25
458:4,8 459:3,13
459:22 460:9
461:1 491:15,19
505:9,12 507:1,23
508:11 532:23
533:17 534:4,17
535:9
**discussed** 18:20
28:14 60:12 64:12
79:10 85:10 89:16
91:2 124:23
144:13 146:13,18
149:21 191:3
199:7 210:24
253:17 283:8
289:13 306:3
307:23 321:14
325:12 354:25

369:7 384:8 387:7
388:11 414:16
415:15 416:7,24
420:14 423:1
440:13 446:5
450:17,18 457:24
471:19 491:25
498:11,12 504:18
504:19 506:22
509:24 527:13
532:11 535:11
**discusses** 19:21
379:13
**discussing** 47:12
59:15 62:16 70:21
96:18 139:2
146:14 192:21
321:4 415:10
446:21 492:2
503:16,20 504:16
**discussion** 54:22
81:5 110:19
138:23 150:3
192:23 193:1
278:6 281:19
282:18 286:20,23
299:16 309:19
321:16 357:21
390:2 399:6
405:19 409:22
428:14 436:17,19
455:16 459:16
464:6 505:20
508:14,23 528:10
535:20
**discussions** 29:1
85:12 90:18 111:4
193:5 224:18
**dishwasher** 132:13
200:3
**disk** 128:9
**dislodged** 391:10
**displaced** 186:7
366:6 455:6,9
522:21 533:2
**dispute** 218:2,7,18
218:20,25 219:8

SCOTT H. TAYLOR                                          February 9, 2012

235:9 285:23
336:4 338:15,17
342:8,15,18
359:11 363:5
371:14,16 380:11
394:4,12,15,19
401:17,20 436:6,8
438:18 442:11,17
474:12,23 475:5
478:8,23 519:24
520:6,10,17 521:3
523:6 526:22
527:4,7,11
**disputing** 218:24
342:20
**disqualify** 188:25
**distinct** 397:3
**distinction** 112:13
377:12 425:9
452:4,6
**distinctive** 260:13
**distinguish** 20:1
113:19 116:5
137:6 270:18,20
304:4 363:18
444:5 460:15
**distinguishing** 21:3
111:9
**distracted** 245:25
**distress** 331:3
367:9 430:12
499:24
**district** 1:1,2
**divide** 238:10
**division** 2:20
**document** 32:12
74:1,5 75:3,8
76:16 82:8 96:13
96:17,25,25 97:3
97:5,7,13 101:6,6
140:3 173:4,7,10
173:12 175:9,12
175:14,18 177:1
178:22 179:25
180:11 183:12
207:4 269:22,24
274:25 276:4,5

297:14,18 298:12
298:12 299:5
300:16 336:25
337:12,25 338:18
339:3 357:9,10,12
357:25 359:7
379:13,14 390:16
390:21 400:4
405:7 406:6
475:12,25 476:3,8
477:23 487:4,7
488:16,23 489:2
491:21 497:22
514:25 515:2,3
516:22 517:7,24
518:9 523:18,21
**documentation**
139:25 283:19,20
289:25 386:21
387:2,8
**documented** 78:9
94:6 432:22
**documenting**
165:25
**documents** 139:20
139:23 140:8
153:13 155:17,21
172:17,19 173:7
211:4,18 255:7,9
269:4 296:21
302:18 339:22
359:20 391:1
412:23 421:5
504:13
**doesnt** 24:12 90:25
98:3 124:2 168:8
179:13 190:4
208:18 215:7,17
215:21 237:15
243:24 246:15
248:25 250:3,5
251:23 252:24
253:22 255:12
284:21 288:9
315:4,11 324:3
419:8,10 476:15
476:17 514:1

**doing** 15:17 33:17
33:17 36:5,17
37:2,6,17,25
38:13 39:9,21
43:5,17 45:20
46:6,15 49:22
51:11,12 52:18
60:19 68:10,15
69:4,17 70:14
73:18 78:12 79:14
81:13 82:3 90:6
111:5 112:18
116:25 117:16
133:24 135:13,15
142:14 155:22
156:20 157:9
166:10,21 188:19
193:7 201:23
212:9 221:21
228:25 251:3,10
252:14,15,16
268:5 271:7,20
272:10,16 277:4
287:15 288:13
290:3,22 303:6,11
303:16 348:8
352:16 374:1
381:25 387:3
408:22,25 467:4
468:5 470:9
528:19
**dollar** 23:12 190:1
**dont** 8:22 9:1 14:6
17:4 18:13 19:4
21:16,21,23 27:6
27:7 28:13 32:5
36:11 39:24 46:11
50:25 52:25 56:11
56:21 57:18 61:11
61:24,25 64:1,4
65:21 66:5,6,11
70:8,9 72:4 76:10
76:15,16 79:11,13
80:8 81:4 83:19
83:23 84:21 85:23
87:2,25 89:14
90:13 93:13 95:1

95:9,14,20 96:7
102:8 106:21
108:7,7,11 109:8
109:8 116:5 117:7
118:1 119:14
120:16 121:10,11
123:2 126:10,17
127:17 128:15
130:19 131:10,15
131:16 133:13
134:22 141:23
142:25 146:9,10
146:12 147:6,8,10
149:1,18 150:22
156:25 168:25
169:8,8 171:9
177:12,21 179:8
185:21 190:12
192:21 194:16
195:11 196:10
197:23 199:24
200:2 206:13,14
210:2 211:4,13
212:13 213:1,2,2
220:12,23,24
222:9,13 225:25
228:18 231:21
233:23 237:9
246:12 248:6,6,21
248:23 249:25
250:6,14 252:22
253:15,16 254:12
256:18 258:1
259:13 260:11
266:23 272:2,13
277:4 278:3 281:1
284:25 286:12
289:12 296:14
298:12 299:14
303:2,5 304:13
306:24 308:9,9
310:23 311:24
315:8 318:20
319:24 320:20
322:1,9,12,19
324:15 328:13,16
329:7 330:18

331:5 333:4 339:2
339:15 340:7
341:3 342:15,18
343:3 352:10,11
358:18 360:11
363:3 365:14
366:16 378:21
380:14 382:12,24
385:12,24 386:3
387:22 388:9
389:3 398:7,8,13
401:3 408:7
411:21 412:3,11
412:21 413:7
415:19,22 416:11
416:20 419:21
421:10 425:5
426:12 428:10
437:12,14 440:2
446:14 449:20
457:6 465:23
466:4 472:8,21
479:17 483:22
484:3,15,18 486:9
486:17 487:5
490:16,17 497:14
506:12 507:7
510:20 521:21
523:19 528:9
**door** 123:15 341:13
391:8 449:9
**doors** 123:22 363:9
365:2,4 449:23
473:15
**double** 414:1,9,10
441:4,20 468:20
**doubledipping**
276:23
**doubles** 441:12
**doubt** 137:20
**dozen** 386:13,18,19
**draft** 85:2
**drafting** 85:1,6
**draw** 312:9,10
**drawing** 297:23
315:18 438:1
528:3

**drawings** 126:8
  315:19 316:8,18
**dresses** 424:11,17
  424:19
**drew** 100:23
  207:13 344:23
  442:15,16
**dried** 39:6
**dries** 39:10
**drill** 61:10 133:9
  234:1
**drip** 240:15
**drive** 8:9 354:6
  358:7 359:9
**driven** 337:22
**drop** 134:11 235:19
**dropped** 131:6
  236:4
**dry** 452:23
**drywall** 360:6
  477:14 530:15
**dsc00147** 4:19
  344:21
**dsc00296** 4:19
  344:10
**dsc0126** 4:18
  343:18
**dsc0129** 5:6 365:6
**dsc0131** 5:6 365:17
**dsc0168** 4:20 345:4
**dsc170** 4:20 345:11
**dsc171** 4:21 345:12
**dsc200** 5:6,7 366:5
**dsc213** 4:21 345:14
**dsc214** 4:22 345:15
**dsc241** 4:22 346:4
**dsc264** 4:23 346:6
**dsc266** 4:23 346:9
**dsc271** 5:7 366:23
**dsc278** 5:8 367:14
**dsc279** 4:24 346:11
**dsc280** 4:24 346:13
**dsc283** 5:2 346:15
**dsc287** 5:2 346:18
**dsc288** 5:3 346:20
**dsc293** 5:3 346:22
**dsc294** 5:4 346:25

**dsc295** 5:4 347:2
**dscn2312** 121:14
**due** 186:18 210:19
  275:17 276:10
  341:14 524:16
  533:2 534:7,21
**duly** 7:3 300:2
  538:7
**duplessis** 16:20
  218:11
**duplicated** 389:11
**duplication** 187:4
**duplicative** 186:16
  446:24
**duration** 454:20
**duval** 1:9
**dvds** 270:12
**dwelling** 145:12
  180:20 229:23,23
  335:11,21 336:5
  381:11 402:21,22
  530:4
**dwellings** 326:2

— E —

**earlier** 18:11 28:21
  55:11 62:3,16
  81:13 82:10
  110:23 117:4
  136:13 141:19
  187:7 207:6 222:6
  244:20 260:24
  276:11 284:8
  357:10 368:21,22
  435:1,16 445:11
  510:22,22 525:17
**early** 43:2 44:22
  144:23 502:18
**earn** 193:21
**earnings** 193:22
  194:3
**earth** 354:19
**easier** 204:25 356:5
  356:9
**eastern** 1:2
**easy** 120:19 255:16
  354:9

**eaves** 170:21
  235:17 240:18
  479:10,11
**edge** 240:15,15
**edges** 171:8,9
  208:12 235:18
  239:5,7,17
**editions** 61:3
**edmunds** 155:15
  284:1
**education** 55:21
**effect** 205:8 214:10
  327:16
**effectively** 391:10
**effort** 385:7 450:13
**efforts** 385:1
  482:21
**eight** 406:17
**either** 23:12 29:11
  30:4 80:4 96:20
  100:21 127:9
  140:21 141:9
  151:10 165:19
  200:2 201:19
  214:25 223:15
  230:16 254:21
  305:18 312:3
  314:20 325:5,6
  360:7 387:25
  390:25 391:5
  439:8 447:23
  449:16 456:20
  476:22 486:7
  503:4 504:13
  507:15 511:7
  513:24 531:25
  532:15
**eldorado** 283:13
**electrical** 369:11
  526:18
**electronics** 191:11
  270:12
**element** 41:17
**elements** 41:10
  43:9 362:24
  369:11
**elevation** 477:25

478:5
**eligible** 532:4
**eliminate** 97:25
**eliminated** 100:2
**elses** 95:10 198:18
  442:13 525:9
**email** 66:19,24
  307:13 308:6,14
  308:16 310:18
**emailed** 308:17,22
  310:19
**emails** 65:25 66:10
  66:10,13 128:9
  308:8,12
**emergency** 532:2
  532:25 534:5
**emotional** 187:24
  499:24
**employee** 30:18
**employees** 30:23
  31:1,2
**employer** 33:11
**employment** 31:12
  31:15,25 34:8
  35:20 39:11 44:17
**employments**
  47:25
**enclosures** 155:12
  156:2 169:13
**encompass** 159:11
  221:8 372:9,11
**encourage** 247:12
**encroached** 480:4
  480:11 481:13
  482:1
**endeavored** 198:1
**ended** 34:13 53:25
  155:18 459:20
**ends** 208:9
**endured** 301:8
**engine** 283:14,16
  283:16
**engineer** 25:15,24
  26:12,16,19,24
  27:7 28:4,9,10,17
  28:22,23 361:22
  368:17,20 431:15

431:20 432:7,10
  432:15
**engineering** 26:1,6
  26:6,10
**engineers** 77:21
**ensure** 388:12
**entail** 35:6 38:21
  93:9
**entailed** 35:7 41:1
  51:20
**enter** 267:16
**entered** 122:8,8
  123:6 248:22
  283:18
**entering** 124:19
  135:11
**enters** 109:1
**enthusiastic** 42:15
**entire** 203:18 249:1
  250:1
**entirely** 8:23 94:21
  96:20 113:22
  191:22 199:15
  222:13 492:4
  511:25 528:21
**entirety** 97:22
**entitled** 173:4
  175:14 183:12
  295:25 341:7
  493:23 528:4
**entity** 363:1 400:24
**entries** 447:22
**entry** 37:16 39:14
  40:16 44:17
  185:25 424:13,20
  424:23
**equal** 439:20
**equals** 229:2
**equation** 494:7,9
**equipment** 191:11
  337:18
**erosion** 371:20
**error** 87:11 220:5
  233:9 255:21,24
  349:6 397:4 399:2
  399:9 409:13
  484:13

SCOTT H. TAYLOR

February 9, 2012

Page 555

**errors** 306:4 399:1
486:16,18,22,24
**especially** 24:23
39:7 65:17 239:6
437:7 495:9
**esq** 2:2,6,9,13,13
2:16,20
**essentially** 309:22
**establish** 318:25
**established** 292:11
292:18 293:22
294:2,9 446:3
531:16
**estate** 411:20 412:2
**estimate** 83:5 84:4
95:9 122:14 131:1
131:9 155:13
188:5 189:10
216:16,17 218:12
221:19 232:6,9,13
251:6 254:5
256:11 312:23
320:3 338:16,17
345:20 351:2,3
357:13 358:13,25
373:10 374:7,10
374:15 468:16
469:8 470:15
480:14 481:4
530:19
**estimated** 247:9
380:5 486:2
**estimates** 23:23
53:12,14 62:15
218:15,19 246:1
252:5 255:18
256:2 446:25
**estimating** 221:18
232:18 373:8
**etched** 342:23
**ethel** 410:24
**ethyl** 12:15 410:1
**evacuation** 403:23
493:6
**evaluate** 49:19
158:16,21 171:24
172:6 200:16

204:13 269:21
293:1
**evaluating** 39:18
42:1 91:4 200:13
**evaluation** 28:7
69:13 158:18
297:10 524:15
525:10
**evaluations** 40:7
**event** 39:12 114:10
184:8 223:7,8,9
223:22 298:4
331:4 486:10
**events** 36:2 320:14
320:23 355:16
**eventually** 216:19
323:1
**everybody** 113:7
118:25 495:15
**everybodys** 198:15
**evidence** 3:17
92:16 171:16
186:25 193:14
217:22 295:2,21
304:8,10 313:5,7
313:13 331:3
356:18 362:23
364:25 367:25
371:11,22 442:14
442:19 444:24
445:2,6 461:11,14
471:20 479:19
480:2,6,19 482:12
**evident** 85:14
**evinrude** 283:14
**exact** 67:7,11 78:13
111:19 142:19,20
142:24 143:10,16
201:12 232:22,23
239:13 281:9
327:24 524:25
**exactly** 22:4,6
26:21 40:4 57:18
64:1,4 65:7,21
66:6 67:19 79:20
80:17 86:24 87:8
91:17 130:20

138:13 142:4
144:11 152:24
190:9,11 191:6
211:1 220:20,22
228:4 233:13
237:7 241:19
242:3 249:11,14
266:16 290:7
293:12 310:23
412:12 418:10
420:2 423:22
465:10 484:3
**examination** 6:1,2
6:3 7:6 12:10
13:4 14:1 15:14
18:24 19:6 23:3
27:24 29:19 32:10
54:25 66:18 70:23
72:1 81:8 82:22
83:24 86:17,22
89:3 96:11 99:9
100:14 106:25
108:13 109:3
110:21 115:10
143:5,18 149:20
150:6 156:22
158:3,13 159:6
160:8,21 162:11
162:25 163:9
172:25 174:7,16
175:8 176:11,24
177:22 178:8,20
179:24 180:15
181:21 182:7,17
184:10,18 185:12
185:23 186:13,21
187:5 194:7,17
195:13 196:20
197:5 199:4 202:7
202:19 203:3,12
204:3,14 205:16
206:22 208:2
210:8 211:15,25
212:7,18 213:9
218:9 219:12
223:1,19 224:8
245:4,12,20

246:18 247:20
249:10 251:7,21
254:9 256:19
257:8,23 258:2,11
259:2,20 260:7,23
263:3 268:23
277:7,16,24 278:8
278:17 280:8,16
280:25 281:22
282:20 283:3
288:12 292:10,21
293:4,14 300:5
302:7 304:1 305:4
306:22 318:14
320:17 325:24
326:8,14,21
327:15 328:19
329:8,19 330:4
333:9 334:10
335:8 336:2 338:9
338:24 340:17
342:17 354:3
356:24 357:23
358:20 359:17
361:14 366:15
376:2 377:2,15
378:7 389:1 390:3
391:25 392:12
394:11 395:15
399:10 400:12
401:19 404:12,20
405:21 406:9
407:6 409:18,24
412:1 428:16
446:17 450:11
451:21 452:5
454:1,19 455:18
456:1 461:2
462:17 464:8
466:22 474:10,22
475:6,10 476:16
476:24 477:19
478:14 479:6
480:1 481:21
489:11 497:5
501:20 513:3,12
513:21 514:18

516:3 519:10,19
520:8,16 521:4,25
523:7 527:6
528:12 531:4
**examined** 198:10
219:10 357:7
**examiners** 141:10
**examining** 166:12
198:19 354:23
**example** 35:23 36:4
50:24 69:6 73:15
78:20 88:21 99:14
129:16 130:5
141:8 191:12
239:24 242:24,25
244:8 270:19
279:12 282:6
464:21
**examples** 220:18
363:25
**exceed** 295:23
**exception** 362:18
537:6
**excess** 47:9 283:17
**exchange** 405:13
**excludes** 445:7
**exclusive** 251:14
**excuse** 170:15
449:3
**executor** 411:23
**exhaust** 241:1,10
**exhaustive** 21:5
32:21,23 42:8
261:25 531:19
**exhaustively** 43:7
**exhibit** 4:2,3,3,4,4
4:5,5,6,6,7,7,8,9
4:10,11,11,12,13
4:14,15,16,17 5:5
5:8,10,10,12,14
5:15,15,16,18,19
5:20,23,24 10:9
11:2,4,7,12 12:11
12:11,14,16,18,20
12:22,24 13:5
32:6,6,12 35:16
51:16 57:2 73:6

SCOTT H. TAYLOR

February 9, 2012

Page 556

74:6 83:16,16
85:21 86:4,12
96:5,6,13 98:15
98:25 99:11,12,23
100:6,16 101:2,5
102:15 121:2
136:14,15 154:4
172:23 173:3,3
175:10 177:1
178:22,23,25
180:4 183:11,12
187:17 229:21
245:13,16,19
246:8,13,15,21
263:5 269:23,24
274:19,24,25
281:5 282:24
300:17,18 301:1
305:6,13 307:5
312:20 323:20
329:21 330:6,19
333:25 336:24,24
338:19 344:1
357:11,12 359:6
378:18,22 390:10
390:11,12,13,15
390:20,20 391:3
392:13 393:15,17
393:25 394:5,13
394:17,24 395:25
398:11,12 400:16
405:7,7,11 410:1
410:7 411:2 421:7
428:13 437:20,22
437:23 456:4
475:7,11,12 487:2
487:5 497:20
502:2,3,7 514:24
514:24 517:25
521:9 523:19,20
524:2 526:24
528:15 530:5,9
**exhibiting** 82:11
**exhibits** 4:8,16 5:13
14:23 82:10,12
146:7 212:6
304:25 305:3

323:21 390:12
408:18
**exist** 24:12
**existed** 35:25
489:13
**existence** 31:21,22
191:8
**existing** 123:24,25
159:25 181:1
418:22
**exists** 355:24 452:9
**exorbitant** 230:22
**expectancy** 272:22
272:24 273:15,17
**expected** 518:14
**expense** 74:18,22
75:18 76:9 78:5
139:19 140:24
141:1 143:17
183:13 404:22
452:22
**expenses** 138:25
139:6,11,15,16,17
139:21 140:1,19
140:22 141:12,16
142:7,19,20,24
143:10 181:11
184:2 186:5,6,18
192:3,5,11,17,18
193:8,23 194:4,9
194:21 195:3,16
196:22 197:3
289:12,22 293:7
295:22,23 296:8
297:2,6,15 298:1
298:3,7 300:23
301:7,21 302:13
302:21 303:1
304:8 326:16
402:4,10 404:25
406:1,11,18,22
407:21,23 408:6
408:10,12,14
452:12,16 453:1,4
453:8,12,18 454:4
454:10,15 455:2
491:16,22,23

492:1,3,14,20,24
493:23,25 496:23
497:16,25 498:5
498:14,19 500:4
504:21 509:7,8
516:14 517:16
527:17,20,22,25
528:5 532:5 533:1
533:8,13
**expensive** 220:17
221:2 239:23
240:2 242:13,14
273:20 319:19
333:20
**experience** 19:19
24:18 26:3,9 27:9
32:19 35:19 72:14
77:19 104:2,3
112:3,18 114:25
115:3 133:7 141:3
160:14 198:6
207:10 212:8,19
212:23 221:12
224:21 244:16
245:5 265:25
336:7 347:7
361:18 368:5,14
373:2 431:5 482:3
482:6
**experiences** 72:15
**expert** 9:8,17 10:6
10:10 12:15,17
26:10 77:19
108:14 109:25
198:11 217:7,12
218:11 361:24
362:11,15 382:13
460:4 502:4,8
**expertise** 23:9,10
23:14
**experts** 15:5 16:11
18:9 19:9 64:21
73:2 77:22 197:16
217:14,17
**explain** 39:17
46:14 51:22 95:15
103:3 232:12,15

233:15 234:13
312:6 531:10
**explained** 117:2
**explanation** 241:13
**exposed** 369:12
**expressed** 494:2
**expressing** 491:5
495:5
**extended** 342:25
347:6 414:1
**extends** 367:7
**extension** 53:13
367:2,5,11,12
**extensive** 104:3
336:12 341:10,16
341:19 443:7
444:21,22 445:3
505:16 508:19
**extensively** 89:16
505:7
**extent** 15:1 19:19
66:16 75:19 205:4
217:23 236:8
280:10 327:25
369:8 496:8
**exterior** 129:15
330:22,24 331:2
331:18 332:1
341:11 365:16
366:25 368:23
369:1,2 471:8,15
471:18 477:25
**external** 466:15
**extra** 102:21 125:9
241:3 440:5,6
**extrapolate** 354:9
**extremely** 54:9
91:1

_____
**F**
**facade** 130:6,6,7
**face** 451:24
**faces** 443:7 444:14
**fact** 9:10,19 37:7
42:5 54:11 64:23
80:12 93:22 94:2
95:18 101:5 102:9

107:25 119:11
128:7 135:7,10
156:9 158:17
163:2 175:1
177:23 178:10
214:1 220:6
251:16 291:16
292:15 304:20
321:8 327:8
340:21 352:1,19
353:18 354:12
362:5 370:7 371:3
372:10 383:13
387:3 394:5 415:9
436:7 440:4,8
441:2 442:8 459:7
460:1 462:24
464:20 465:20
466:10 474:4,25
482:10 495:14
497:12 520:1
532:17
**factor** 102:24 103:1
110:1 171:10,11
171:12 193:22
242:10 273:19
**factored** 242:14
**factors** 109:22
130:5 182:21
191:18 198:8
266:18
**facts** 186:24 220:7
293:2,5 307:22
440:8 493:20
512:13
**failed** 16:2
**failure** 107:8
**fair** 291:8 412:4
**fairly** 53:17 94:13
132:13 233:7
265:23 280:9
346:9 512:10
**faith** 173:9
**fall** 44:22 75:19
156:12 158:10
**false** 162:13
**familiar** 10:22

SCOTT H. TAYLOR

February 9, 2012

Page 557

304:6 414:13,19
414:20
**familiarity** 214:9
**family** 52:9 53:5
187:25 264:10
411:3 421:24
433:18 441:15
**fan** 473:18
**fans** 447:21,22
473:17
**far** 15:19,20 71:13
87:14 103:15
135:2 200:10
284:9 298:17
323:21 344:15
413:22 419:7
487:13 501:3
502:21 510:8
**farm** 473:25
474:14,24 475:13
475:15 478:24
**fascia** 526:7
**father** 330:10
**fault** 46:10 62:17
157:3 303:15
496:11
**fax** 487:8 488:5
**feasible** 139:9
**feature** 134:2,3
239:22 252:2
268:6,8
**features** 130:12
163:14 221:14
253:11 332:12,18
373:4
**february** 1:24,25
300:4 475:14
537:17
**federal** 3:7 531:15
531:21 532:2,3,25
534:5 535:10
**fee** 56:20 73:8,12
73:14,20 74:11
75:10 77:5,11
79:6,19,23 80:13
80:18,25
**feel** 15:1 143:8

303:2
**fees** 73:24 74:7,24
75:5,14,16 77:20
77:25
**feet** 233:1,2,10,17
233:17 236:25
238:9 336:19
357:2 367:8 429:1
480:10 481:12
**felt** 239:9,10,13,16
**fence** 344:14
435:23 477:4
**fences** 344:18
**fencing** 181:4
477:2
**fiance** 411:11
**fidelity** 379:8,25
**field** 40:20 124:2
**figure** 78:16 103:21
106:3 109:20
196:12 212:21
258:19 267:10
289:22 293:15
451:12
**figures** 135:11
139:9 233:10
494:10
**figuring** 78:12
124:18 139:14
**file** 165:23,24
**filed** 1:10 94:18
172:16 175:3
269:11 339:5,25
340:22,24 512:20
513:5 514:20
519:1
**files** 255:10,10
**filing** 3:12 162:13
269:10
**fill** 95:19 103:6
132:21,22 298:24
299:7
**filled** 99:25 101:4,6
101:10 248:17
298:16,18 488:20
**final** 34:7 42:5 86:7
86:8 308:2 317:21

517:6
**finally** 13:5 82:5
**financial** 188:4,7,9
188:12
**find** 52:10,24 53:2
55:22 66:1 84:16
92:5 101:20
102:22 104:12,21
104:23 133:22
134:8 136:22
142:9 176:7
192:12 228:13
230:15 243:15
247:9 260:10
267:16 284:11,11
287:21,22 288:25
297:14 302:16
352:16 386:8
399:12,17 414:13
529:9
**finding** 258:15
**findings** 527:11
**finds** 267:17
**fine** 234:12 333:13
**finger** 234:18
**finish** 16:4,7 22:22
46:11 127:21
242:4 400:14
427:7 450:6
**finished** 42:11 80:4
88:13 93:17
125:10 210:4
**finishing** 64:11
360:6
**fire** 173:5
**fireman** 167:15
169:16
**fireplaces** 419:4
**firm** 7:11 33:21,22
36:24,24 49:17
**first** 36:9 46:21
51:15,17 57:15
63:23 64:6 65:3
65:24 67:3,12
68:9 78:21 79:12
88:17 105:8,8,18
106:4,7,9 108:7

123:13 144:22
154:7 163:11
171:8 188:8
208:23 213:19
215:10 224:25
230:25 232:13
234:10 235:2
236:9 237:20
246:25 301:2
308:2 329:3,24
331:23,23 348:20
361:10 392:16
399:12 407:14
410:14 417:12
418:1,4 422:5
428:19 456:15
457:7 460:16
471:12 479:11,13
484:13 486:21
502:11,16 505:2
506:1,21,23
509:16 512:1
515:11 518:6,9
521:6,12 522:2
524:4 526:5
529:23 530:3
538:7
**firsthand** 216:21
357:7
**fishing** 283:5,14
**fit** 136:23
**fits** 235:11
**five** 13:11 41:3,9
47:16 54:7 55:4,7
65:5 68:17,17
111:16 112:20
113:17 142:2,17
144:19 233:23
309:14 395:14
**fix** 149:12 348:18
**fixture** 468:14
**fixtures** 468:10
**flashed** 241:4,6
**flashing** 241:10
**flat** 73:20,24 74:1
77:11 200:7
**fleming** 38:17,25

46:22
**flight** 531:8
**flip** 413:5
**flood** 20:4,5 57:13
61:6 68:25 69:8
111:8,11,20 112:1
112:10,11,15,23
112:24 113:2,5,7
113:19,20,24
114:1,1,3,6,7,9,21
115:16,21,22
116:9 158:16,18
159:1,18 160:9
178:6,14 202:11
202:22 203:1,6,11
203:15,18 204:22
204:23 205:18,23
212:22 256:9
259:5 269:12,20
320:6,12 325:22
327:14 334:2,9,12
334:16,21 335:7
335:12,16,18
336:6,7,22 338:7
341:23 342:3,14
376:23 377:1
378:24 379:7,19
379:25 391:7
393:21 394:6
430:24 431:8
435:5,12 444:25
445:1,9 460:13,21
461:5,13,16,17,19
461:25 468:25
469:5 471:21
474:20 476:11,18
482:16 487:11,12
490:4,14 512:17
518:16 523:2
532:7 533:18,24
535:6
**flooddamaged**
115:8 477:6
**flooded** 419:17
445:12 508:3
**flooding** 18:6 19:25
111:18 113:12

SCOTT H. TAYLOR                                              February 9, 2012

Page 558

161:18 203:22
204:2,6,11 206:7
258:18 347:19
362:18 390:8
391:20 480:21
522:10 524:16
526:11 534:21
**floodrelated** 348:4
371:10 477:16
**floor** 118:14,15
127:15 155:14
189:20,21,24
190:13 220:8
233:5,18 311:14
311:14,17 317:23
317:24 318:4
365:7 366:6
369:10 383:7
413:16 424:4,5
427:13,13,21
442:20 447:3
448:24 458:23
460:16,17,20
461:4,15,18 463:6
463:7,9 466:2
470:12 474:2
479:11,12,13,15
480:11,20 481:4
481:13 482:2,16
489:17 505:9,23
506:22 511:20
**flooring** 126:18
131:20 219:16
220:16
**floors** 199:20
219:17 220:7
221:1 449:5,6
**florida** 1:23 7:3
35:10 38:23 46:18
46:20 57:3,11
**flow** 240:18
**focus** 52:14,15
531:20 532:10
**follow** 235:22
243:24 360:20
**followed** 37:3
94:12 298:22

**following** 39:8
41:24,25 157:3
246:24 247:8
275:21 337:17
405:2 426:7
**follows** 7:5 41:22
300:4
**followup** 322:3
**food** 186:1 452:24
**foot** 237:10,11,12
336:10 345:23
428:25
**footage** 124:24
153:8,15,19 190:3
190:15,16 235:5,6
311:23 312:1
313:13
**force** 51:1
**forced** 403:5,9,19
**forces** 518:21 526:9
**foreground** 123:19
**form** 3:14 13:25
18:23 27:4 29:4
70:17 71:18 81:2
86:14 96:21 98:24
99:2,18,20,21,22
100:7,9,24 106:17
106:21 108:5,20
114:23 117:4
118:25 142:22
143:13 149:15
156:17 157:23
158:8 159:3
160:12 162:6,17
162:21 163:6
174:4,11 175:5
178:3,17 179:21
181:16 182:1,11
184:5,15 185:18
186:9,16,20,24
194:6,11 195:6
198:24 202:2,13
203:8 204:8
205:10 209:24
212:3 213:5 218:5
219:5 222:15,17
223:11,24 244:24

245:10 246:7
247:19 248:4
250:22 251:12
254:8 256:14
257:2 259:10
268:18,22 277:1
277:12,20 278:12
280:13,22 288:6
292:7,20,24
293:10 298:13
299:8 303:23
306:19 318:7
320:9 324:16
325:20 326:5,11
327:11,20 328:2
328:15,25 329:15
334:6,18 335:23
338:5 342:12
356:21 358:16
370:13 375:24
376:21 377:10
378:2 391:22
392:9,14 394:8
401:15 404:9,17
407:1 451:16
452:2 460:23
462:15 474:7,17
476:13,20 477:18
479:3 481:15
489:7 497:4
512:25 513:9,17
514:13 519:5,16
520:4,12,22 523:4
527:1
**formal** 53:23
**formalities** 3:9,11
**formula** 139:10,12
139:14
**fort** 66:3
**forth** 67:25 350:6
526:23 538:8
**fortunately** 175:12
**forward** 74:20 86:1
495:20
**forwards** 155:11
**found** 27:13 43:10
48:25 54:1,9,10

101:22 112:9,10
118:21 136:16
140:12,20 141:7
145:4 149:18
160:19,23 170:9
170:22 231:2,11
231:12 285:2
362:23 365:7
461:11
**foundation** 26:17
171:23,24 172:2
213:23 214:3
216:23 217:2,22
246:10,11 314:25
315:2,3 370:1,2,5
370:6,9,12,14
371:5,11,12 372:2
**four** 68:17,17,18
137:20 173:11
217:16 336:10
491:11
**fourth** 176:21
249:19,22
**frame** 425:21 494:5
**framing** 360:5
362:20 365:17,23
369:13 371:11,13
**franklin** 2:21
**fraught** 218:23
**fred** 11:8 339:6
358:3 379:4,8
390:19 391:17
405:12
**free** 427:18
**french** 449:22
**friday** 1:24
**front** 85:15 117:21
123:20 170:10
173:4 176:23
296:15 341:13
346:12 379:3
391:7 428:25
456:2 475:15
487:11 497:21
502:2
**frontier** 36:9
**fuel** 140:22

**full** 14:6,20 33:13
33:21 38:10 39:10
49:16 51:1,2,6
52:7,23 61:18
164:12 317:12
332:23 361:10
455:3 522:1
**function** 125:2
439:4 529:20
**functional** 110:7,9
119:13 120:17
273:21
**functioning** 81:16
441:19
**functions** 60:24
130:8
**funds** 176:15
197:11
**furnishings** 132:20
132:23 138:10,18
163:15,21 164:1
164:10,13,16,25
319:10,14,18,23
332:13,15,19,23
332:25 333:2,2
363:9 416:5,10,18
418:16 419:8,11
458:9 472:22
473:1 507:21
**furniture** 164:9
200:21,23 201:1,4
201:5,6,11,14,20
230:12 270:11,11
270:19,21 416:14
416:25 417:3,20
467:21,24
**further** 13:20 14:8
14:11,14 15:17
53:1 56:1 64:17
138:2 148:5
155:10 185:24
198:21 202:5
209:1 210:10
223:21 291:9,17
291:19 324:11
349:17 360:4
363:7 372:5

SCOTT H. TAYLOR                                    February 9, 2012

Page 559

403:22 425:17
427:12 432:20
482:9,12 486:14
488:3 509:20
531:2 535:23
**future** 14:18 15:13

**G**

**game** 279:2
**garage** 332:6
**gas** 447:11
**gather** 152:19
**gathered** 93:15
**gazebo** 165:4
**geico** 401:7,25
**general** 76:14
    118:18 126:18
    252:4 294:25
    311:20 355:20
    426:25
**generalization**
    295:1
**generally** 13:14
    73:23 88:12 105:9
    117:4,23 220:25
    232:5 243:12
    265:15 279:5
    294:25 348:7
    388:18 439:4,10
    448:19 455:4
**generated** 247:16
    247:23
**generation** 249:22
**geoestimator**
    312:13
**georgia** 35:10
**germane** 90:5
    171:6
**getting** 15:15 44:16
    52:6 66:2 75:16
    78:3,23 87:18
    92:21 94:6 142:12
    178:14 194:8
    244:1 245:7
    250:20 251:10
    277:17 279:2,16
    281:16 298:25

412:7 420:25
495:13 497:15
498:12
**give** 10:8 16:2
    17:16 23:12 42:5
    53:4 71:15,21
    72:6,11,13 83:5
    94:2 95:12,14,18
    96:3,18,21 102:23
    103:4,18 120:14
    124:3 132:15
    133:3,10,11 135:6
    161:19 176:5
    188:20 206:20
    227:17 233:22
    234:16 260:13
    277:25 280:6
    285:22 296:19
    297:18 311:19,23
    313:14,15 378:19
    384:5 398:10
    399:17 419:8,10
    458:12 463:20
    468:9,24 469:7
    492:13 503:19
    504:12 509:6,9
    518:5 525:4,18
**given** 9:13,15,18,23
    27:18 60:25 70:12
    100:23 105:24
    117:5 134:12
    135:5 145:23
    150:14 152:20
    154:17 168:2
    189:6 235:4
    242:21 248:19
    293:17 306:7,10
    412:22 474:14
    494:1 525:14
**gives** 189:2 249:16
    267:18,18 268:13
    312:8
**giving** 11:24 66:21
    188:19 278:4
    280:20 368:17
**glad** 102:12
**glass** 477:14

**go** 8:16 12:8 13:16
    14:3 16:18 18:25
    22:8,11 36:11
    37:13 41:6 42:20
    43:13 44:18 46:2
    47:24 53:2,8,21
    53:22,24 54:2,17
    54:21 55:1 59:1
    78:10,10,24 79:16
    82:14 88:12 90:21
    91:11 92:4 94:6
    95:16 102:6,13
    103:21 104:18,20
    109:5,14,19
    110:17 113:6
    118:7 125:22
    127:4 130:3 134:4
    135:2,18 141:23
    144:25 145:13,14
    148:14 150:2
    163:13 165:13
    166:11 173:11
    180:4,5,17 187:17
    208:23 211:13
    215:20 227:14
    232:4 237:21
    239:9 241:2
    243:10,19 244:14
    252:10 272:2,4
    281:2,8,18 282:22
    285:5 288:9
    289:13 299:6,14
    324:10 325:11,14
    329:7,20 330:19
    340:9 344:15,22
    348:19 350:14
    351:22,23 357:17
    359:23 360:11
    361:4 364:14,17
    364:20 372:24
    374:8 389:25
    400:16,18,19
    405:16,22 420:25
    421:4 424:7
    427:14 435:14
    440:18 446:14,20
    447:23,25 448:6

449:16 450:9,13
459:12 463:2,4,19
463:21 464:1,5
470:5 488:1,3
497:14,19 498:17
499:14 505:15
521:5 523:19
527:3 528:9 531:8
532:13
**goal** 192:7
**goes** 103:11 116:23
    141:6 168:19
    223:16 240:16,21
    341:7 355:6 414:2
    472:3 488:10
**going** 10:4,6,8,25
    12:5,6,7 13:8,9,11
    13:24 14:17 15:7
    36:3,8 43:6 51:15
    53:3,3 56:19
    68:15 71:9 74:9
    74:20,20 77:13,13
    78:20 79:5 82:13
    82:14,23 91:7
    113:14 114:5
    120:21 122:19
    124:14 127:14
    130:10,11 131:7
    134:18 143:1
    154:3 155:10
    160:3 163:11
    165:25 166:1
    167:15 171:14
    178:21,22 206:5
    215:25 219:8
    228:5 229:13
    232:4 233:1,2
    234:14 237:24
    242:11 244:3,5,14
    245:7,13 249:20
    250:20 269:23
    278:21 280:6
    281:1,8 282:21
    285:22 287:4
    299:3 300:16,19
    325:14 327:21
    328:2,24 329:23

331:1 336:23
338:25 343:25
348:10 351:23
354:20 357:10
359:23 367:22
369:6 372:4 374:7
378:18 380:25
383:1,5 390:11
395:13 406:4
428:18,18 431:7
434:5 475:9
480:15 482:20
496:25 497:1,13
500:12 501:22
510:10 525:17
528:14
**good** 10:25 35:22
    43:24 50:2 67:24
    78:8 92:24 136:18
    167:7 191:12
    211:10 233:22
    300:6 522:16
**goodness** 45:15
**google** 354:19
**gotten** 88:16
    125:25 126:9
    284:16
**gouging** 242:18
**government** 260:2
    531:15,21 532:3
**graciously** 285:2
**grade** 127:10
**grand** 518:12
**grandchildren**
    434:18 452:7
**grandchildrens**
    426:14
**granite** 127:1
**graph** 95:15
**graphs** 95:18
**grasp** 60:24 444:17
**grass** 315:5
**great** 12:8 13:15
    173:9 198:19
    282:6 340:12
    374:8 518:15
**greenville** 8:9

SCOTT H. TAYLOR                                    February 9, 2012

**ground** 123:20
215:11
**group** 2:17 7:9,12
515:8 523:22
524:12
**groups** 61:23
**grow** 315:4
**growth** 49:25
**guess** 83:19 84:1,2
86:16 89:14 101:1
257:21 258:1
417:13
**guessing** 83:19
273:13
**guidance** 278:1
**gustav** 443:14,17
443:24 444:3
**gutted** 418:5,14
472:12 480:24,25
480:25 482:11,13

**H**

**habit** 297:23
**hadnt** 101:3 146:14
148:13
**half** 237:10 345:23
**hall** 38:18,25 46:22
**hamlet** 215:10
**hammond** 454:21
**hand** 42:4 43:18
54:13 245:13
269:22 293:2,5
298:13 300:15
357:10 523:18
**handed** 32:11
96:12 298:11
487:3
**handle** 38:4 50:13
**hands** 207:4 314:6
**handwriting**
487:10
**handwritten** 96:25
97:1 100:13 301:2
323:5 467:10
497:24
**hang** 348:17
**hangers** 429:14

**hanging** 235:17
**happen** 91:7 256:4
**happened** 21:22
92:23,23 129:10
296:3,5 320:13,24
321:4 355:17
392:15 525:5
**happening** 91:6
**happens** 208:14
279:18
**hard** 61:17 70:6
108:9 117:25
159:7 218:20
255:10 257:21
270:10,18,21
**hardwood** 219:17
220:8,16 221:1
**hasnt** 246:11
432:17 464:18
**hate** 17:15 198:17
**havent** 19:12 78:9
98:8 101:4 102:8
102:10 148:15,15
172:17 174:21
198:13 199:7
218:21 219:9
224:9 429:9 440:9
470:5
**head** 8:20,20 93:1
118:10 206:14
364:18
**header** 336:25
**heading** 154:8
185:6 208:24
330:7,20 334:1
348:21 349:10
354:21 367:23
392:18 521:6
531:11 532:20
**headings** 325:14
**headquarters** 61:5
**hear** 423:4
**heard** 167:15
200:25 224:9,17
312:14 423:7
**hearing** 131:3
483:22

**heater** 447:11,13
**heather** 2:13 7:10
**height** 126:19
**heinous** 409:13,13
**heirs** 411:19,20,22
**held** 54:22 59:17
110:19 150:3
278:6 281:19
282:18 299:16
357:21 405:19
409:22 428:14
455:16 464:6
528:10 535:20
**help** 96:18 167:5
396:2 450:9
**helpful** 54:9,11
102:22 277:15
**hereinabove** 538:8
**hereto** 3:4 538:14
**hes** 420:16 451:6
**hieroglyphics**
152:6
**high** 52:16 127:10
130:14,16 168:5
201:5 333:17
345:20 382:14,17
424:16,19 473:12
473:14 484:1
485:3,4,13 526:9
**higher** 73:11,12
78:21 130:6
145:14 215:11
230:1 495:22
**highest** 130:19
168:9 170:2
**hinges** 341:14
365:3 391:8
**hip** 129:22 236:24
239:6
**hired** 40:6 355:22
429:13 506:11
**history** 51:16
**hold** 234:18
**holes** 275:17
**holmes** 6:6 11:8
305:7,19 306:14
307:4,15,17,20

308:17 309:1,7,23
310:9 311:2,8,17
311:19 312:21
314:10 315:18,21
315:23 316:1
318:16 319:8,22
320:5 321:3 323:9
323:9 324:25
325:4 326:22
330:12 334:4
335:20 337:4,16
338:2 339:6,7,20
340:23 350:10
358:3,22 362:11
370:24 372:15,15
375:18 376:8,12
379:3,4,9,18
380:19 382:3
383:8,19,22,24
384:1 385:9
390:19,20 391:17
392:25 395:18
397:10,13 402:14
402:24 403:5
404:4,6 405:9,12
406:21 407:10
408:17
**holmeses** 12:13
304:21 310:6
322:21 330:13
334:15 335:3,10
336:5 341:9,18
347:4,25 359:12
379:21,25 381:11
383:8 385:3,19
387:19 388:22
389:3 393:4
394:16 395:6
400:17 401:11
402:6 403:14
405:1
**home** 7:22 23:11,13
24:23,25 25:19
26:25 28:11 44:12
62:10,19,20,23
63:5 124:16
125:24 126:21

127:10 129:13
132:20 141:18
147:3 150:23
156:10 160:23
161:8 164:16
166:4 167:9
168:21,22 169:5
169:17,20,22,24
170:4,11 171:20
171:22 172:2,6
180:1,2 188:3
198:3 201:21
202:10 203:18
204:16,20 205:6
213:21,22 215:20
216:10,24 217:21
221:9,14 223:6
235:3,4 247:10
253:20 254:1
291:5 311:18
312:11 313:8,10
313:23 314:2
316:9 319:18,23
320:6,18,24
321:20,23 331:6
331:11 332:2
336:16 337:5,19
341:22,25 342:24
355:2,14,24
358:24 360:7,15
362:5,7 363:8
364:8,9,22 365:9
365:11 366:1,9,12
366:20 369:4,23
369:25 370:2
372:9,11 373:4
377:7,8,24,25
378:4,8,9,12,15
379:20 384:19
386:14 402:18
403:11,15 407:12
412:21 413:10,13
415:16 416:15
418:16,16 419:1,4
419:14,20,22
420:5,10,13
422:14 429:2

SCOTT H. TAYLOR                                    February 9, 2012

Page 561

431:14,17,22,24
431:24 432:4,12
432:23,24 433:7,9
433:12,14,18
434:3,9 435:2,5,7
436:18,22 438:7,8
438:9,20,23
443:13 444:2
454:21,23 458:1,6
458:9,16 459:14
460:16,17,20
461:5,24 462:24
463:2,4,6,8 464:2
470:13,19,23
471:9,22 472:12
472:12,17,20,22
473:1,19 474:2
487:21 488:25
493:18 507:24,25
511:19 513:23
514:10 531:23
534:19 535:1
**homeowner** 24:21
27:22 123:5
166:14,15,16
171:18 187:23,25
215:19 330:9
353:8 354:25
368:2 372:6
403:24 418:3
422:3 464:22
465:15 473:8,25
493:7 517:20
522:20
**homeowners** 27:14
94:3 168:19 209:2
221:6,13 347:14
347:18 349:16,18
373:4 421:16
443:12 476:10
490:15 512:20
513:5 514:21
**homes** 17:10 19:20
20:19,25 23:24
24:4 68:17,24
70:8 71:22 115:6
115:7,9 123:16,18

150:21,22 151:15
160:20,24,25
161:3,7 170:23
195:19 206:2
214:2 216:4,11
312:7 347:13
361:19
**honestly** 233:25
259:13
**hopefully** 255:15
531:12
**horses** 64:19
**hotel** 184:25 406:1
406:14
**hotels** 45:16
**hour** 54:18 55:12
55:15 59:6 60:6
**hourly** 75:17
**hours** 76:23 77:2
78:13 83:7,9,15
84:5 91:25 92:25
118:11 133:24
260:25 261:4
412:11 462:21
503:14
**house** 24:7,13
26:14 27:11 91:5
91:9,14 113:9
115:4 118:14
119:23 122:3,4
123:11,24,25
124:5,6,9,20,25
126:8,14,25 127:6
128:13,22 130:8
140:12 150:25
151:3,10,13
152:22 159:14
161:11 164:12
167:2,5,16 168:1
171:19 180:20
189:21 197:14,17
197:20 200:7,21
206:11 213:11
214:14,19,24
215:10 219:1,7,16
230:11,12 256:9
259:5,8 291:10,14

294:1 295:12
311:14,22 312:2
313:16 316:18
318:17 319:1,10
334:4 335:14,16
335:17 341:11,15
346:13 350:12
353:5 355:12
363:11,22 364:24
367:12,13,17
368:3,9,18,23
370:22,25 371:4
372:1 391:6
413:16,20,21
414:3,8,14,25
415:4,14 416:5,19
417:3 429:14,18
437:2 441:3,10
445:4 453:13
454:14 458:24
460:10 463:12
466:3,16 468:11
472:9 474:13
479:16,21 480:5
480:11,20,25
481:5 482:2,11,13
489:17 493:13
505:10 506:23
507:3 508:12,15
508:15,17 511:20
512:9 527:18
529:5,20 530:23
**household** 341:12
**houses** 47:23
114:18 115:2,12
115:21,24 116:6
130:10 208:15,17
353:7 368:5
**housing** 184:11,20
185:1,14 297:7
531:22 533:1
**houston** 403:20
404:15 406:1
**hundreds** 347:23
**hunting** 137:24
**hurricane** 36:20
37:8,10 38:23

39:19 171:5
173:19 175:22
301:8 359:14
401:1 443:13,24
512:22 513:7
518:11,12,15,20
519:2,13 524:7
525:5,15 526:10
527:10 531:15,18
531:25 532:10
533:3,20 534:7,22
**hurricanes** 71:23
171:3
**husband** 330:10
**hvac** 369:11
**hypothetical**
194:13,14
**hypothetically**
108:10,14,16
109:11,12 110:4,5
136:10 149:8
158:22 159:13
193:24 274:12,17
291:18 358:21
526:4 533:5,22
534:9,24

-----

**I**

**id** 133:10 261:23
267:6 299:2
**idea** 66:25 91:8
100:15,18 103:14
129:7 168:14
180:23 192:4,10
311:20,21 313:15
433:21 465:12,17
503:19 525:18
**idemnify** 187:25
**identical** 229:14
323:22 353:7
**identically** 24:22
**identified** 207:25
236:4 354:8
**identify** 10:20
111:22 218:25
247:23 301:1
338:25 343:7

344:16 353:5
364:15 372:12
378:23 390:15
487:6
**iii** 173:16
**ill** 8:16 9:1 84:15
84:19 98:3 102:12
104:18 120:19
134:9 173:2 175:9
183:11 210:2
211:6 233:22
268:18 291:22
300:25 338:19
378:22 381:3
389:12,18 390:10
390:14 400:3
437:22 487:6
488:5 531:10,14
531:18
**illegible** 120:24
**im** 7:8 17:4 22:25
24:8 29:6 30:15
40:3 46:12 52:4
56:10 60:25,25
61:9 63:20 64:5
64:24 65:13,25
67:5,23 70:15,21
71:20 72:11,12,25
82:14 83:14 85:18
90:22 91:16
100:25 105:7
116:22 123:15,16
131:15 168:23
176:2 177:11
178:21,22 180:9
184:22 195:8
210:3 219:25
222:4,22 231:20
242:5 245:24
246:3 249:5 269:1
281:16 300:13
308:3 316:11
319:11 321:21
323:10 328:24
333:3 335:3
338:21,25 340:10
343:2,8 348:14

SCOTT H. TAYLOR                                                    February 9, 2012

Page 562

357:10 364:19
365:19 376:1
380:23 393:12
397:12 402:8
406:4 408:25
409:4 419:15
420:14 421:12
422:23 424:18
427:8 428:17,18
429:16 436:2
452:21 459:6
481:22 484:2
489:18 492:4
494:1 496:10
503:10 511:21
521:8,20 525:23
530:2
**images** 296:22
**immediate** 453:13
**immediately** 37:4
214:15 426:7
**impact** 160:17
429:17 453:16
**implying** 208:13
**important** 16:3
23:5 44:3 72:20
128:11 273:20
399:14 439:23
**imprint** 315:6
**improper** 246:10
**improve** 223:21
278:20,21,22
**improving** 279:11
**inability** 522:23
**inadequate** 140:13
296:23
**inappropriate**
80:12,18 328:8
**inasmuch** 142:8
212:5
**inch** 233:6 443:8
444:18
**incidents** 522:15
**include** 26:5 34:21
253:4 372:17
373:19 449:14
467:17 470:18

490:12,19 511:5
522:14
**included** 33:10
131:2 140:25
168:24 170:7
183:5 211:3
262:12 276:15,16
276:24 286:11
308:18 315:19
320:1 321:1
372:19 387:1
391:4 393:9,21
395:9,17 399:7
415:21 434:22
446:24 447:5
449:13,25 450:1
451:5 467:20
468:11 473:13
490:5,21 491:2
522:6,11,21
**includes** 229:4
238:4 248:25
271:3 337:21
**including** 33:3
41:10 238:3
270:10 336:16
362:19 364:2,10
394:25
**income** 52:21 62:1
188:15 197:7
405:2
**incomplete** 296:24
**incorporated** 339:8
**incorrect** 74:6,9
75:5 191:19
295:12 316:10
440:6 442:5 465:1
494:14
**increase** 439:21
**increases** 264:14
**incur** 407:20
**incurred** 186:6
406:22 407:23
**indecipherable**
118:21 119:5
**indemnification**
154:9 187:8,20

**indemnifying**
171:18 187:22
368:2
**indemnity** 154:11
221:16 330:8
373:6,21,23
**independent** 20:15
36:7,24 49:17
51:13 69:13
232:11 385:10,22
**independently** 33:2
42:2 95:1 117:5,7
**index** 6:1
**indicate** 131:24
164:12 259:15
362:23 430:9
466:7 467:23
500:7
**indicated** 139:24
352:21 466:14
**indicates** 418:7
475:15
**indicating** 208:12
224:10 234:22
236:7 354:11
398:13,17 521:24
529:15
**indication** 132:15
362:16 479:14
**indirectly** 84:10
140:7 352:23
**individual** 17:21
82:6 88:19 267:8
**individually** 267:3
**industry** 142:14
144:17 251:5
263:15 266:1
271:5 278:16,19
279:18
**inexpensive** 319:19
**inference** 195:9
**inferior** 341:17
**inform** 153:5,14
167:23 408:10
472:25
**information** 29:10
29:16 43:25 44:4

65:20 88:7,16
93:19 97:18
100:17 102:21
118:3,24 123:6
124:19 136:16,18
142:19 143:9,22
147:1,22 152:18
167:22 179:9
200:10 209:10
210:22 233:19
241:21 246:17
248:22,24 252:23
252:24 300:22
301:15,19,22
302:9,22,23 303:3
307:24 311:16
318:24 319:2
321:22 324:11
342:9 383:18
391:15 412:7
419:9,10 432:2
436:15 453:25
454:7,9 459:19
460:2 462:12
463:24 467:12
479:17 489:4
492:18,22 494:1
498:13,15,19
499:3 509:6
530:22 532:16
**informed** 169:2
318:9 420:23
473:21 512:8
522:7
**informs** 418:14
**infuse** 336:15
461:23
**infused** 335:16
**initial** 28:7 55:13
58:1 59:3,4,5
65:10,15 75:23
77:8,9 88:14 89:8
89:10 209:16
249:4 351:6 426:8
483:10 511:23
537:12
**initially** 13:18 49:3

55:10 73:15 79:8
87:16 103:5
125:12 307:21
**input** 43:25 44:3
242:6 485:11
**inputs** 44:14
**inserted** 122:14,25
235:25 314:21
**inside** 130:1 168:20
168:22 169:5
419:7 442:19
463:4,7
**insofar** 440:4 442:5
**inspect** 331:9
332:15 356:19
**inspected** 214:24
217:7 247:5
350:10 370:17
429:2 444:2
472:11
**inspection** 22:7
121:23 165:14,15
165:16 166:10,12
166:21 269:8
308:1 350:19,23
351:6,9,16,19
352:5 354:22,23
355:1 356:3
360:25 379:24
524:20 525:3,6,16
525:17,19 526:1,3
**installed** 199:22
**instance** 136:4
152:21,25 225:11
228:25 229:21
266:23 274:2
288:3,3 431:19
467:16 525:20
**instances** 30:6,7
115:23 230:23
231:15 266:25
348:6 384:13
532:5
**institution** 27:15
40:6
**instruct** 328:3
468:13

SCOTT H. TAYLOR

February 9, 2012

Page 563

**instructed** 14:12
19:4 107:16,23
109:7 183:3
210:21 467:3
470:8,16 486:7,8
**instructing** 328:6
**instruction** 16:1
23:5,6 183:6
**instructions** 8:14
8:17 14:2 94:13
133:3 156:12
158:11,14 183:4,5
210:11 306:8,9
383:21,23 384:1,2
384:6 421:5 454:5
468:9,23 469:8
504:23 508:25
509:1,2
**instructor** 43:8
**instructs** 14:4
**insulation** 360:5
477:15
**insurance** 26:20
27:16,21 37:17,18
37:22 38:6 39:4,6
39:25 45:17 46:14
46:15,16 48:10
51:13 59:16 63:2
63:10 73:16,18,20
79:15 92:13 94:19
94:23,23 104:8
105:2,10 106:8
112:5 117:10
141:7,11 145:8
154:21 156:9,15
156:20,24 157:6
157:11,20 162:2
162:12,14 173:5
175:2,3,20 177:24
178:11 179:3,8
212:9,10 232:11
236:21 241:25
243:8,14,17
244:12,17 245:6
251:2,19,24
252:11,13,19,23
253:2 263:16

269:25 271:5,7
272:13 278:16,19
287:2 290:22
291:5,9,13,18
294:20 302:3
303:8,9,11,16
304:2 325:18
326:1,23 327:9,18
329:11 339:7
340:1 348:8
359:12 379:20
397:14 399:25
406:23 435:23
443:12 475:13
512:20 513:6
515:8 518:3
524:14 532:7,8
533:18,24
**insurancerelated**
154:24
**insured** 63:6
145:10 179:8
247:1 252:16
270:3 274:4 275:4
279:4 358:3 379:3
379:8 405:12
517:2 523:24
**insureds** 47:25
279:1
**insurer** 27:21
105:22 106:10
379:19,25 517:13
517:20
**insurers** 116:14
213:1
**integrity** 25:3
46:13,15,16 48:10
48:20 431:16
432:11
**intend** 14:8 209:21
317:13 373:13
**intention** 13:19
15:16 18:20 19:5
198:21 209:6
350:3 369:18
470:9
**intentionally**

151:13
**interchangeable**
63:21
**interest** 77:12
**interested** 538:15
**interesting** 103:9
**interinsurance**
405:13
**interior** 163:14
235:3,4,12,14
316:21 332:12,18
341:17,20 342:2
345:14 365:13
366:8 369:9
428:21 472:9,20
526:17
**international** 2:18
**internet** 267:12
284:7 352:11
354:15
**interrogatories**
339:5,14 340:22
400:18
**interrogatory**
339:24 341:1,2,3
341:9 342:9,19
400:23 401:5
**interrupted** 496:8
**interview** 452:14
**interviewed** 491:13
**interviews** 47:24
**introductory**
155:23
**intrusion** 357:2
526:15
**inventory** 98:22
487:19
**investigate** 156:13
**investigating** 157:7
**investigation** 29:14
89:24 156:21
**investigator** 105:11
106:6
**invoice** 67:5 75:6
76:8,12,18,20
78:19,19 261:16
261:17 379:7

**invoices** 67:6 261:3
262:23
**involve** 297:11,13
**involved** 41:4
52:23 64:3 68:2
74:18 78:15,23
79:1 81:22 87:6
109:22 156:3,4
261:22 264:14
286:17 312:13
314:11 421:3
457:8
**involvement**
355:22
**iron** 333:17 449:9,9
**isle** 518:12
**isnt** 52:21 74:2
123:3 212:19
219:1 220:25
227:8 265:7 331:6
428:6 472:22
**isolate** 87:12 112:8
112:13
**isolated** 47:4
**isolating** 67:7
**issue** 13:20 14:10
18:20 19:16,17
20:8,12 28:18
64:22 95:3 104:25
105:20 107:4,6
113:2 154:11
243:4 267:19,20
448:8
**issued** 16:11,19,24
17:2,23 18:9,11
18:15 31:7 50:4
509:16
**issues** 41:5 47:4
61:6,16 87:20
92:3 137:7 242:14
251:24 336:13
426:25 427:3
446:22
**issuing** 15:12 29:22
71:9 199:12
209:20 410:14
411:1 435:20

456:15,19 502:11
**item** 34:7 38:17
99:14 101:14
102:6,7 104:5
105:1 109:19,19
135:14,16 191:7
225:24 226:2
229:12 231:1
263:6 267:22
271:15,15,22,24
272:5,11,11,16,16
273:8,11,17,21
274:5,10,10 280:7
281:6,25 283:13
285:6 380:17
381:2,10 383:1
386:8 387:18,24
399:6 418:21
424:8,25 425:1,3
426:9 427:17
448:7,20 449:24
449:25 483:12
484:21
**itemize** 341:6
**itemized** 286:10
**items** 102:14
133:21 135:17
141:4 165:6
190:19,23 191:1
231:22,23 232:24
236:9,10 267:16
268:9 270:14
273:20 274:1,14
274:15 276:19
277:18,22 278:1
279:22 280:18
283:5 372:18,22
384:9 385:3,17,21
385:25 386:4,11
386:15,24,25
387:6,11,13 388:8
388:15 391:4,12
391:13 392:4,5
393:8,17,20 394:4
394:16,25 395:2
399:15 423:20
427:24 446:24

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

SCOTT H. TAYLOR

February 9, 2012

Page 564

473:20 482:22
488:3
**itll** 165:22 267:15
**ivan** 512:22 513:24
514:5
**ive** 45:21 60:20
70:6 72:14 112:14
118:21 198:16
256:1 340:1
343:24 348:18

---

**J**

**jacks** 241:10
**james** 1:22 2:20 7:2
7:19 8:1
**january** 404:7
493:18
**jay** 2:9,9 109:1
**jeneen** 270:3 301:4
339:6 390:20
391:17
**jim** 7:12,14 528:14
531:5
**joanen** 2:6 10:14
10:18 176:20
185:8 195:25
196:6 281:7
394:21 395:7
**job** 35:12 38:20
188:14 243:13,14
243:16
**jobs** 38:9,10
**john** 28:24
**johns** 2:24 3:21
538:4,20
**jon** 66:2 68:12
69:16 80:22 81:5
**jones** 2:15
**joseph** 2:5
**josh** 69:23 70:4
119:19 206:20
262:22 412:17
466:14 499:16
503:9,10
**joshua** 2:2
**jotted** 125:1
**jr** 2:20 339:7 411:9

433:10
**js640** 473:8
**judge** 1:9 73:2
107:8,16,22
258:14
**judgment** 97:23
**july** 10:10 11:2,8
12:14,19,23 65:11
117:21 146:6
301:3 305:8
382:19,20 396:12
396:18 409:25
456:7 486:20
502:5,17
**jump** 90:25 425:10
**jumped** 91:15
138:20 266:11
285:15,16
**jumps** 104:16
133:17 135:12
**june** 122:23 165:15
165:17,17 292:3
292:12 294:9
350:14 466:11
502:18,19 504:12
511:16 525:8,16
**justice** 2:19
**justify** 291:2
**justin** 487:8

---

**K**

**katrina** 1:7 36:25
37:11,13 39:19
57:20,23,23 61:8
61:15,22,22 63:25
71:24 91:2 114:25
151:16 156:10
171:4 173:19
175:23 183:20
184:3 186:7,22
188:22 192:5,13
192:18 214:11,15
222:3,8 247:4
253:14 276:6
284:15,16 289:15
291:10 292:4
293:8,22,23 301:8

320:19 321:3,11
329:13 331:6
355:12 358:10,14
359:14 375:19,20
376:9,13,17,17
377:8,24,25 378:5
378:12,16 379:10
401:1 405:2
407:13,15 413:20
414:8,15,25
415:14 416:6,15
416:19 417:3
419:2,20 420:10
429:3,15,19 430:6
430:14,24 433:12
437:2,10 438:8,10
438:20 441:3,22
442:1,7,23 443:2
444:7 445:1,13,16
445:20 446:1,9
453:8,14 455:10
470:14 472:1
475:17,22 483:8
488:20 492:8
497:25 504:8
505:10 512:23
513:15,25 514:11
514:17,22 518:11
518:15,20 519:3
519:13 521:14,16
522:10 524:7,17
525:5,16 526:10
527:10,19 529:8
531:15,18,25
532:10 533:3,20
534:7,22
**katrinarelated**
61:8 157:14
347:15,17
**keep** 56:18 127:19
**keeping** 22:2 97:25
135:19,21 137:22
**kenneth** 11:11
247:1 275:4 301:3
**kept** 127:24
**key** 463:17,20
**kilter** 104:22

**kind** 29:14 79:1
91:11,12 105:19
124:25 125:3
126:23,24 130:8
132:3 133:6 140:1
150:21 225:7,10
225:13 233:18
241:15 252:24
253:1 255:8
268:14 277:6
300:21 307:10
311:20 313:17
319:20 415:11
509:21 530:20
531:8 532:19
**kinds** 53:15 77:19
90:8 91:10 94:4
165:8 385:18
431:7 530:17
**kitchen** 199:13
207:14 208:3,4
345:17 438:11
439:5,7 440:6
448:12 473:10
488:11
**kitchens** 190:10
199:21 219:23
437:10 441:22
442:6
**knew** 69:12 88:18
113:7 141:2
201:12 294:5
327:8 514:2
**knocked** 24:24
**know** 8:15,25 9:1
10:22 15:19,20
21:3 22:8,10,12
25:10 39:9,24
50:21 54:12 61:20
61:24 62:1,8 64:1
64:4,10 65:21
66:10 67:12,19,20
68:7 69:25 71:13
72:5,16 78:22,25
80:5,7 81:18
84:12,21 85:23
87:13,16 89:14

90:2 91:17 103:15
104:9,15,16,18
106:20 114:4
116:12,17 117:17
117:19,25 118:23
121:11 123:2
124:15 126:2,4,6
126:15,17 127:11
127:15 128:21
134:9 135:3,24,25
137:13 138:1
140:10 141:2
142:25 146:9,10
146:15,15 147:7
148:7 149:8,9,18
155:7,12 168:11
169:8,21 177:21
185:21 189:5,12
189:16,19 191:4,8
194:15,16 195:16
197:21,23 198:13
199:15 206:13
210:2 218:22
220:12,20,23,24
222:9 228:18
230:9 232:14
233:8 235:6,14
237:10 242:10
246:12,12,16
248:6,11 249:25
250:14,17 253:16
254:12 257:20
264:17 266:14,23
270:20 271:23,25
276:14 282:3
284:9 289:5,7,14
290:4 292:16
293:6,12,21
298:17 300:6,12
314:16 315:1,8
316:7 319:20,24
325:5,8,9 328:1
330:12 339:19
347:9 350:16
352:9,12 353:18
354:5,17 360:21
365:4,8,14 366:16

SCOTT H. TAYLOR                                    February 9, 2012

Page 565

367:1 372:10
382:22 385:20
388:3 391:14
395:20 397:10
404:5 407:10
410:12 414:18
419:22 420:11
421:10 423:4
425:4 426:10
430:13 434:6,10
434:11 439:23
440:2 442:22
443:23 448:4
452:17 455:9
457:6 465:3,23
466:1 469:16
471:25 485:25
486:1 490:21
493:11,15 521:19
523:8 530:20
531:7 532:11
**knowing** 26:3
235:10 255:23
**knowledge** 54:6
139:7 174:15
362:4 370:16,19
370:20,23 372:1
384:22,25 419:19
432:25 482:6
514:4,7
**known** 54:4 107:20
156:24 235:6
269:17 489:13
**knows** 123:1 237:7
273:16

— L —

**labeled** 86:7 464:15
487:4
**labor** 237:17 238:3
238:4 242:2,6
254:21 264:9,14
264:23 265:1,4,19
265:24 337:18
375:1 380:19
381:15 382:3,15
382:17

**lack** 133:19 331:2
370:15
**laid** 246:11 437:4
**lake** 36:20 37:9
61:4
**laminate** 127:2
129:18 130:1,13
**land** 173:19
**landfall** 518:11,13
**language** 155:24
187:7,9,10,13,14
209:11,15 349:9
349:10,24 361:5
361:17 363:5
373:12,25
**lano** 249:17
**lapse** 56:23
**large** 25:12 64:14
98:9 113:15
135:17 160:16
385:17,25 386:25
508:16
**largely** 58:5 142:11
**largest** 283:13
**lasted** 118:11
**lath** 418:22,23
428:22,22,23
429:19
**lathe** 428:22
**lauderdale** 66:3
**laundry** 140:23
**law** 2:2,5,9 3:8 7:11
80:24 174:9 254:4
254:13 451:11
**lawsuit** 175:3
**lawyer** 71:6 349:7
378:20
**lawyers** 7:9 28:22
69:3,18 80:11
151:7 154:17
209:12 498:18,23
510:2
**layout** 311:21
313:16 413:23
436:21 437:3
440:13 457:25
512:9 529:25

**lazy** 271:18
**leader** 36:4
**leak** 240:25
**learn** 43:3,10,14
145:16 148:3
152:13,25 167:25
458:17
**learned** 43:5 147:1
153:3 317:7,15
416:25 512:13
528:17
**learning** 42:15
**leave** 15:7 35:12
53:8 104:12
120:20 121:8
343:25
**led** 331:17 333:4
**left** 27:20 92:16
214:2 343:11
366:24 421:3
454:5 471:20
**legal** 64:22 107:17
154:25 181:17
182:2 188:19,20
205:11 254:18
255:2 256:15
259:11 277:5
451:18 519:6,8
520:14,23 521:1
528:3,7
**legible** 511:4
**legs** 281:11,13
**lending** 63:14
**length** 124:24
237:6 414:17
**lengthy** 221:8
372:8
**lesser** 191:2
**lesson** 233:22
**lester** 487:9
**letter** 301:2,5 337:3
337:16 390:17
475:12 523:21
524:5
**level** 133:13 168:8
240:8 336:10
342:23 343:1

345:23 352:18
461:22 479:21
480:4,4
**levels** 168:3 336:8
342:25
**liability** 104:1,2,4,4
104:7,8,24,25
105:4,20,20,23
106:13
**liaison** 2:7
**liberty** 173:5
177:10 179:4,16
183:12 186:14
211:19,19 244:21
269:10 275:1
276:21 291:24
302:2
**license** 55:13,22
57:3,5,6,11,13,14
57:21,22 58:1,13
58:17,25 59:1,4,4
59:5,7,11,18,20
59:24 60:1,8 63:9
82:3
**licensed** 20:14,15
26:21 57:15 58:2
58:8 59:12 63:7
**licenses** 56:5,16,17
56:19 57:1 60:13
60:15
**licensing** 54:18
55:10,14 57:19,25
59:7 145:16 295:5
295:9
**lies** 19:20
**lieu** 303:1
**life** 191:7 272:22,24
273:14,16 415:4
**lifestyle** 192:12
**lift** 171:1 443:8
444:16,16
**lifted** 391:9
**lifts** 444:18
**light** 118:3 210:22
486:18 532:16
**liked** 156:23
**likes** 268:22

**limited** 164:20,21
362:20 373:20
526:16,17
**line** 103:12 104:17
127:8 142:10
200:14,14,16,17
206:23 207:7,8,10
207:15,16,16,17
218:21,21 230:13
230:14 263:6
324:22,22 337:4
343:11,21 344:3
344:13 345:4,6,14
345:20,21 346:3,7
346:10,16,17,19
355:6,16,18,20
360:13 365:17,23
367:7 380:17
381:2,10,21 383:1
393:1,2 399:6,15
418:21 428:3,4
484:20 531:11
**lineal** 233:10
**linens** 270:12
**lines** 67:17 72:6
88:10 137:12
172:18 206:10,17
206:17,25 209:5
210:13,23 309:16
335:15 342:23
343:1 346:20,23
346:25 347:2
349:21 350:5
362:21 373:14
374:2 420:19
441:8 446:21
505:17
**linoleum** 199:21
220:9,17,21 221:2
427:13 447:3
448:23 449:5,6
**list** 34:7 35:19 51:9
94:7,10,16 95:11
95:13,16 98:22,24
99:11 100:22
101:7 102:5,23
104:17 127:13,17

SCOTT H. TAYLOR

February 9, 2012

Page 566

131:5,14,17,18
132:23 133:1,4
136:12,14 137:25
138:3,6,6 221:6,7
222:1,5,6,9,11
223:3 230:4,8
231:16 236:10
247:24 249:12,17
249:20,23 264:24
266:4 268:25
270:15,15,22,25
271:3,22 272:5
273:14 274:18,21
276:1,1,15 281:4
285:14 297:25
310:11,16,18,22
311:2 321:17
322:3 323:1,7,8
323:13,19,22
324:14,25 372:7,8
372:10 383:13,14
383:15,18 385:3
387:19 389:7
393:9,9,10,14,16
393:17,22 394:13
394:14,17 395:8
409:9 423:2,6,9
423:14,20,22,25
424:8,9 427:9
434:21,23 446:20
446:23 448:10,15
450:13,15,19
451:1,13,23,24
452:8 458:13
467:3,7 468:12,15
469:13,14,18
471:1 473:14,20
473:21 482:21,23
483:14,19 485:11
485:12 486:15,19
490:6,8,24 491:3
492:17 531:18,19
**listed** 33:2,4,6,13
34:1 38:17 56:3,4
56:8,16 57:1
60:12,17 101:15
102:14,15,15

135:7 154:10
185:14 323:23
324:1,6,8,19
335:6 372:13
373:21,23 385:9
394:4 426:18
433:23 434:7
468:15 473:8
500:21 518:21
519:21
**listen** 83:18 196:1,2
222:20
**listing** 44:17 48:14
51:17 96:19 97:3
97:5 136:21 270:5
286:10 341:24
390:22 391:4
394:25 395:2
420:18 488:2,2
504:14 516:23
**listings** 488:7
**lists** 94:20 223:17
237:12 267:1
281:3 324:20
325:11 385:15
388:8,13,16 389:5
489:14
**literally** 20:16
284:4 312:8
347:23
**litigation** 1:7 18:11
22:14 51:3 63:25
276:12 339:25
340:23 518:1
520:19
**little** 52:11 110:23
154:16 163:19
180:17,19 189:16
191:3 197:12
232:3 234:21
257:21 262:2
281:10,16 351:24
368:22 428:13
430:23 459:12
467:2 485:2,13
488:19 527:13
531:13

**livable** 91:10
**live** 8:5,11 253:14
435:2,4
**lived** 8:1 347:24
407:13,14 435:6
452:16 504:10
**livelihood** 188:13
**livers** 6:7 216:7
455:12 456:8,13
456:16,24 457:17
461:5 462:18,23
463:17,20 465:21
468:9 469:13,17
470:3 471:9 472:7
475:14 483:7,10
483:20 484:6,16
485:25 486:1
487:9,24 488:25
493:12,15 497:25
498:6,11
**livers012** 5:18
478:16
**livers0140** 5:19
487:13
**livers05** 5:16 476:8
**livers06** 5:17 477:1
**liverses** 12:19,21
456:20 462:4
466:18,24 467:17
468:24 469:7,16
473:25 474:1,13
478:25 481:25
482:7,20 486:15
487:20 488:20
489:4,15 491:14
493:2,22 495:14
**living** 58:23 138:25
139:5,11,15,16,21
140:1,25 141:16
142:6 165:7,9
183:13 184:2
186:5,18 192:3,4
192:10,17 193:8
193:23 194:4,21
195:3,15 196:22
197:3 289:12
298:7 300:23

301:21 302:13,21
303:1 304:8
326:15 402:4,10
404:22,25 405:25
406:11,18,22
407:22 408:5,11
408:14 420:23
433:18 434:9
441:15 447:4,12
447:16 452:11,16
452:20,22 453:1,4
453:7,18 454:4,6
454:10 455:2
488:7 491:16,21
492:3 493:23,25
496:23 498:5,14
498:19 500:4,16
504:7,21 516:14
517:15 527:17,20
527:21,25 528:5
532:4 533:1,7
**llc** 39:14,22 337:2
**lmarmstrong229**
4:10 175:13
**lmicarms0166** 4:15
301:5
**lmicarms0194**
183:14
**lmicarms0196** 4:14
275:2
**local** 361:25 362:25
**locale** 242:7,21
**locate** 352:10
**located** 118:19
119:24 122:4
123:15,18 124:22
337:5 524:8
**location** 89:15,20
101:23 150:16,19
316:20 352:16
363:15 390:24
393:2 522:24
527:23
**locations** 50:14
208:15 443:8
**locked** 463:16
**lodge** 406:5

**logical** 116:16
137:22 140:18
179:23 213:8
455:7 514:1
**logically** 355:7
**long** 8:1,11 31:20
31:23 34:9 42:22
42:25 48:9 50:15
65:15,18 83:2
152:10 208:18
234:3,3 235:17
237:8 261:11,12
294:1 297:16
307:18 308:3
309:13 310:3
315:4 347:4,9
351:9 412:9,12
455:9 457:11
496:9 503:4,12
531:7
**longer** 7:23 65:17
65:19,20 78:24
122:4 152:7,23
192:20 262:3
267:20 299:4
310:1 355:23,24
**lonian** 2:13 7:10
82:18 207:20
282:7,11 302:1
305:2 398:15
408:19 409:1,6,16
411:24 455:20,24
475:8 500:24
**look** 17:18,25 18:2
18:8 19:24 20:4
21:13,24 22:1
26:5 47:19 48:3
70:8 73:5,7 75:6
78:15 86:1 95:9
97:23 98:2,15,21
99:22 101:20
104:11,14 105:12
107:4,6 114:11,15
115:13 116:24
120:25 122:11
128:5 130:20
131:23 132:13,25

SCOTT H. TAYLOR

February 9, 2012

Page 567

| | | | | |
|---|---|---|---|---|
| 134:7,20,25 | 518:7 524:1 | 285:14 288:14,18 | 203:21 204:15,20 | **maintained** 32:1 |
| 135:18 138:16 | **looked** 16:15,19,22 | 288:24 290:18,21 | 204:20 205:6 | **maintaining** 52:7 |
| 141:11 148:8,22 | 16:23 17:1,6,8,19 | 300:25 304:22,25 | 275:18,23 276:10 | **maintenance** 331:2 |
| 154:2,3 166:17 | 18:1 65:9 78:13 | 323:22 330:6 | 283:5 287:23 | **major** 173:20 |
| 173:15 175:11,16 | 112:7 114:14 | 333:6,25 337:25 | 289:2,9 432:21 | 252:1 |
| 176:3,10,25 | 115:2 117:20 | 344:7 345:19 | 522:9 | **majority** 73:17 |
| 178:24 179:2,7,11 | 124:6 135:10 | 353:23 362:1 | **lot** 45:15,22 49:25 | 92:6 341:11 |
| 180:16,24 182:16 | 138:19 147:20 | 396:23 398:12 | 50:1 53:4 55:19 | 384:14 |
| 183:6,15 185:24 | 148:12 151:4 | 404:25 410:19 | 68:2 87:17 90:2 | **making** 53:22 |
| 198:16 206:15,16 | 164:13 180:2 | 417:11 425:22 | 91:1,11,14 92:1,3 | 69:21 105:21 |
| 213:18,19 217:17 | 182:19 187:7 | 476:4 485:1 | 94:14 123:23 | 147:19,24 148:18 |
| 232:24 234:5,17 | 204:10 210:25 | 494:20 515:14 | 125:8,9 211:17 | 191:17 362:1 |
| 243:1 245:14,21 | 211:1,8,20 212:1 | 521:20 528:15 | 233:8,14 240:1 | **management** 532:3 |
| 246:19 247:6,14 | 217:14,15,20,21 | **looks** 11:10 22:10 | 242:12,24 261:10 | 532:25 534:5 |
| 248:13 249:16 | 218:17 222:6 | 98:25 99:20 179:3 | 298:21 312:25 | **manager** 35:4 |
| 251:6,24 258:13 | 261:21,23 264:25 | 184:7 185:20 | 319:2 325:13 | 46:21 77:20,23 |
| 264:18 274:24 | 266:9 268:12 | 242:20 | 327:23 495:2 | **managing** 35:7 |
| 281:5,6,25 284:4 | 285:13,18 288:19 | **loose** 360:14 | 505:20,20 | **mandated** 108:22 |
| 291:23 300:19 | 288:20 297:19 | 362:22 444:19 | **louisiana** 1:2,24 2:3 | **mandatory** 403:23 |
| 301:11,14,20 | 300:20 316:8 | **loosen** 208:19 | 2:7,10,14,16,25 | 493:6 |
| 302:9 318:12 | 332:4 357:9 | **loosens** 208:20 | 3:22 57:6,13,16 | **mansion** 150:24 |
| 329:21 330:20 | 362:13 413:20 | **lose** 82:14 123:2 | 57:22 58:17 60:8 | **manual** 40:22 |
| 331:21 332:21 | 422:1 428:3 | **loss** 42:1 89:16,19 | 80:24 81:10,11,25 | **map** 352:15 |
| 333:12,24 334:9 | 430:13 433:22 | 90:4 91:4 155:13 | 82:3 173:20 | **mark** 10:6 32:5 |
| 337:7,10 339:2 | 438:8,20 439:24 | 159:23 181:10,13 | 249:18 337:6,20 | 96:5 175:9 178:22 |
| 340:14,18 341:1 | 445:10 471:25 | 183:20 188:5 | 411:19 518:3,12 | 183:11 269:23 |
| 343:4 355:2 | 474:24 483:14,25 | 189:9 202:10 | 524:9,14 531:23 | 300:16 336:24 |
| 357:14,25 359:5 | 484:1,2,21 489:3 | 208:25 209:4 | 538:22 | 338:19 378:18 |
| 367:6,21 377:6,21 | **looking** 10:19 | 210:20 221:9 | **louisianamississi...** | 386:10 390:10,11 |
| 378:21 379:2,12 | 15:17 18:13 21:9 | 224:13 226:24 | 518:14 | 438:7 475:7 487:2 |
| 380:3,13,16 | 35:16 39:20 44:6 | 228:23 229:6 | **low** 134:11 145:3 | **marked** 10:7 13:17 |
| 381:20 382:19 | 63:19 68:16,24 | 247:3 270:5 | **lower** 158:25 | 14:22 15:24 32:12 |
| 386:7 390:14 | 75:4 84:14 91:18 | 274:21 275:2,6,11 | 295:14 407:22 | 65:10 96:13 137:3 |
| 392:13 393:14,25 | 96:4 98:22,24 | 275:12,16 297:15 | 439:2 495:22 | 172:23 300:17 |
| 395:25 396:21 | 99:17 104:25 | 307:22 309:20 | **lowest** 130:10 | 345:24 357:11 |
| 398:3 399:14 | 105:9,11 106:13 | 334:2 349:15,16 | 240:7 | 378:22 380:4 |
| 400:16,19 401:4 | 112:4 114:5 123:7 | 349:20 358:6,9 | **lumber** 237:1,11,13 | 437:20,23 438:4,6 |
| 404:24 424:8 | 130:23 131:25 | 372:24 379:9 | **lunch** 446:15 | 487:5 517:25 |
| 437:19 440:18 | 133:8 136:1,1 | 401:7 405:13 | | 523:19 |
| 445:9 452:25 | 137:2,19 158:12 | 435:12,17 475:16 | **M** | **market** 242:20,20 |
| 461:17 463:3 | 158:15 166:25 | 502:4,8 512:17 | **maam** 60:14 | 243:1 |
| 464:9 471:11 | 170:18 179:25 | 516:24 523:1 | **mag** 1:10 | **marking** 12:4 |
| 474:19 476:2,5 | 180:6,7 182:21 | **losses** 89:13 183:7 | **magnitude** 171:3,5 | **markings** 438:2 |
| 477:23 478:15 | 193:19 198:9 | 204:23 329:13 | **main** 2:3 90:5 | **marks** 392:20 |
| 487:6,16 489:9 | 207:12 208:8 | 379:10 400:25 | 242:20 371:9 | 418:22 |
| 490:23 494:23 | 230:8 250:9,11 | 528:5 | **maintain** 55:22 | **master** 477:10 |
| 495:10 515:5,9 | 266:3 284:6 | **lost** 203:14,14,17 | 188:14 | 488:13 489:16 |

SCOTT H. TAYLOR

February 9, 2012

Page 568

490:25
**material** 129:21
  133:5 254:21
  263:7 264:24
  265:24 319:17
  337:18 363:23
  381:14,23
**materials** 44:12
  81:18 126:13,20
  127:11 129:13,16
  130:9 189:17
  201:20 264:9
  265:2,5,14,16
  310:7 318:17,21
  319:1 363:10,18
  363:20 364:9,12
  364:15,21 374:20
  380:19 414:21,22
  415:7,13,18 416:2
  417:2,20 418:15
  419:1 423:9 458:5
  458:16 507:2,10
  507:16
**mathematical**
  493:3 494:7,9
**mathematics**
  101:18
**matter** 25:22 42:4
  62:13 64:5 80:7
  190:5,8,10 254:4
  254:12 339:5
  415:9 494:20
  499:17 528:2
  538:16
**matters** 347:15,17
**mattress** 490:24
**mcconnon** 2:20 6:3
  7:13 172:21 531:4
  531:5 535:22
**mean** 32:24 68:23
  72:4 99:2 111:8
  111:10 121:16,21
  127:21 150:24
  162:9 168:9,14
  182:22 185:21
  188:9 195:8
  205:19 209:7

210:12 224:22
  227:10,13 232:15
  240:6 255:1,4
  262:10 265:17
  267:23 270:9
  276:3 278:18,19
  279:1 284:4
  285:17 296:5
  328:1 339:11
  352:24 355:9
  356:11,13 363:16
  364:3,11,13 386:5
  425:16 459:18
  464:1 521:3
  522:18,19
**meaning** 205:20
  219:1
**means** 130:19
  153:7 177:21
  187:23 188:1,2
  225:1 227:4
  232:17 249:19,21
  349:25
**meant** 355:1 465:8
**measure** 70:25
  71:4,11,16 72:3,7
  72:10 73:23 107:2
  154:25 253:25
  254:4,13 375:17
  376:15 377:4,23
  416:21
**measurements**
  190:14 505:19
  529:3,4
**measures** 312:11
**mechanical** 526:19
**mediation** 405:8
**mediator** 37:19
**medium** 127:9
**meet** 93:2 307:3,8
  310:5 411:2,10,15
  421:23 422:24
  436:12 456:16,20
  502:13,20 506:14
  509:15
**meeting** 52:9 118:8
  118:13 119:15

124:14 297:8
  322:5 412:9,14,19
  412:23 413:9
  415:20,23 421:22
  502:23,24 503:2,6
  503:6,9,12 504:17
  504:25 505:2
  506:16,21,22,24
  507:12 508:5
**meetings** 89:8,10
  322:16 509:19
**members** 411:3
  433:19
**memories** 221:12
  223:21 224:7,11
  373:2
**memory** 223:5
  267:5 328:18
**mental** 91:12
  187:24
**mention** 415:9
  471:1
**mentioned** 28:21
  55:11 144:23
  207:6 231:1
  518:24
**merely** 134:18
  156:19 211:8
  221:22 240:15
  523:10
**met** 7:7 69:24
  89:12,13 94:18
  119:22 125:16,21
  138:24 166:6
  222:12,14 311:5
  411:4,13 412:5
  435:7 441:2
  456:23 502:15
  503:15 504:11
  506:17 508:10,11
  508:12
**metal** 240:21,21
**method** 74:3
  497:12
**methodology** 41:7
  374:14,16 402:5
  402:13 403:1

421:20 453:23
  461:20 492:1
  494:14,15,16,18
  495:4 496:7
  497:10 498:12
**methods** 42:1
  272:20 273:1
  356:14 421:2
  504:20
**michael** 523:23
**michelle** 69:21
**microwave** 199:25
**mid** 130:14,16
**middle** 478:3
**midst** 80:5
**migrate** 363:10
**migrated** 364:23
**mind** 96:7 114:16
  188:12 204:19
  257:20 258:3,12
  329:25 493:17
**mine** 30:4 100:11
  102:9 122:22
  209:13 282:1,2
**minimum** 145:6
**ministerial** 87:19
**ministering** 52:3
**ministry** 51:17,23
  52:7,17,20,22
  53:3,8,18
**minute** 309:6,22
  339:2 428:18
  457:18 462:2
  491:14
**minutes** 152:12
  192:19 308:5
  309:14 351:12
  395:14 457:12
**mischaracterize**
  303:5
**missed** 141:4
  450:16,16
**missing** 11:11 24:7
  24:9 120:23
  121:11 124:9
  131:9 140:21,21
  185:3 208:11

281:25 282:2,3,8
  282:12,14 526:7
**misspeak** 120:16
**misstates** 209:25
  224:3 250:22
  407:1
**misstating** 62:5
**mistake** 149:2,4,12
  265:9 348:15
**mistakes** 318:4
**misunderstood**
  222:22
**mitigation** 77:21
**mixed** 250:25
**model** 104:19
  134:20 135:24
  225:14 288:24,25
  289:1 323:17
  324:1,6 397:1
**mold** 136:13,21
  392:22,23,24
  461:23 490:14
**molding** 126:25
**moment** 56:12
  73:25 78:9 128:16
  296:14 399:17
  502:23
**money** 178:14
  181:24 193:20
  194:8,22,23
  195:21 197:8
  213:1 227:23
  228:8 241:7
  276:21 277:15
  279:3 436:7
**monies** 177:9,24
  178:10 531:24
  532:4,12,24
  533:17,23 534:4
  534:10,18,25
  535:10
**month** 406:2,14
**months** 34:11,16
  48:11 65:14 67:23
  83:11 184:20
  185:1,15 223:8
  241:24 406:17

SCOTT H. TAYLOR                                    February 9, 2012

Page 569

morgan 5:14
411:10,13 422:24
423:2,5 425:8
429:12 430:21
433:3,5,17,25
434:8,11 438:3,4
442:15 445:11
446:8 450:19
452:14 453:10
morgans 423:10,17
438:19 440:10
450:22
morning 168:15
300:6
mortgage 62:10
63:12 291:4,6,17
motel 185:25
movable 448:7
move 39:11 215:11
234:19 340:9
402:3,9 444:18
499:6 531:12
moved 199:14
290:2 292:3
293:21 316:21
363:14,22 364:1
364:10 365:3
404:6,14 493:12
movement 371:12
443:7 444:21,22
moving 363:19,20
364:21 374:6
394:22 408:15
452:11 455:12
mrgo 1:9 64:9
multiple 137:11
206:25 243:15
244:1,3 245:3
275:17 313:18
346:22,25 363:13
363:25
multiplied 101:24
231:7
murder 9:24
mutual 173:5
177:10 179:4,16
183:13 186:14

211:19,19 244:21
269:10 275:1
276:21 291:24
302:2
mutually 251:14

**N**

nada 284:2 288:15
288:20
name 7:8,17 10:20
30:12 39:23 49:6
216:7 249:17
314:23 379:3
531:5
named 18:16
428:24
names 89:21
358:18 384:12,14
national 40:16,18
44:18 45:1 50:10
50:12 379:8 532:7
533:18,24
nationwide 264:3
natural 53:13,20
213:25 363:15
nature 73:19 91:8
415:15 427:24
near 192:7 208:12
420:5 518:11,13
nearly 168:7
266:22
necessarily 25:11
65:1 130:15
189:22 191:4
220:11 227:12
243:25 417:8
451:2 490:9,11
497:11
necessary 15:1
26:23 52:19,20
54:1 57:8,10 90:1
99:24 201:24
221:16 307:25
313:24 373:6,22
431:15 432:10,15
432:16 458:24
necessitate 221:18

349:17 373:9
necessitates 530:15
necessity 209:1
need 8:17 15:21
17:8 22:22 27:7
44:8,11,13 56:18
56:23 92:7,11,12
95:8 96:7 104:15
106:23 109:5,21
126:5 132:22
133:4 134:24
140:17 148:5,23
149:12 190:13
192:4,11 196:10
200:16 210:18
211:9 243:10,19
246:3 271:23,25
273:9 290:4,18
309:16 317:19
349:5 366:14
391:15 395:22
396:2 398:1 427:7
430:10 431:20
449:18,19 450:3
458:20 470:3
497:14 498:18
529:16 531:8
532:11
needed 43:10 50:1
52:10 85:16,18
88:6,20 93:18,18
93:19,20 103:17
114:6 136:25
141:9 146:17
296:17 297:13
318:4 321:17
370:22 371:5
430:17 445:19
459:23 480:21
needing 56:22
needs 52:9 468:16
negatively 532:15
neglected 57:6
negligible 160:18
316:25
negotiate 47:22
negotiator 37:20

neighborhood
124:8 167:10,11
350:22
nephew 411:4
433:8
never 9:11 22:15
25:25 29:15,15,20
79:10 81:21 92:9
124:15 125:16,21
148:25 172:5
173:1 202:16
259:18 298:15,18
302:18 311:4
315:21 316:3
322:7 331:11
337:12 370:1,21
410:23 423:1
429:2 463:5,5,7
475:24 492:18,22
498:14 499:4
new 1:24 2:7,10,14
39:15,18 41:24
46:17 48:21 61:1
61:2 115:1,2
118:3 135:24
136:1 225:1,15,18
225:19,24 226:2
227:5,6,18,21
228:8,12 239:23
241:17 242:11
243:11 249:18
264:2,15 279:14
279:16 287:21
288:2,17,23 290:2
292:12,18 293:22
294:9 403:15,15
427:12,21 441:12
445:19 447:3
519:22 524:9
530:22
nfip 57:13
nice 164:16 165:9
night 45:20
nods 8:19 93:1
118:10 364:18
norm 135:13
normal 25:23

79:14 135:21
139:16,21 140:24
141:15 152:5
265:22,23 266:1
473:19
normally 111:23
140:25 363:21
365:7 427:14
448:6 449:24
north 292:3
notch 123:5
note 497:24
noted 362:22
371:13 445:11
notes 118:19,20,23
119:3,4,7,9 125:1
127:19,19,21,24
152:3 193:2,5
322:4,7,15 351:15
351:18,21 414:5
415:22 508:5,6,7
notice 91:6 173:6
339:13
noticed 188:6
noting 461:21
notion 302:25
notwithstanding
522:8
november 214:14
number 4:2,3,3,5,6
4:6,7,9,12,13,14
5:15 10:9 11:4,7
12:18,20,22 32:6
32:6 78:13 99:14
99:15 101:14
121:4 129:22
137:23 143:23
144:1,2,5,6,7,14
144:16 172:20,23
185:22 190:3,7,10
190:19 192:3
193:12,12,17,19
194:20,21 195:18
197:2,2,6 229:14
230:2 231:1,1
238:9,11 243:11
245:23 261:6,8,18

SCOTT H. TAYLOR

February 9, 2012

261:19,21 262:6
263:14 264:3,3
265:1 270:1
271:25 275:2
281:6,25 283:23
283:24 285:6
288:24 289:1
294:14,24 295:3
295:11,15 302:25
303:20 341:2,3
375:22 379:14
380:8 382:20,25
400:23 401:5,6
424:17,19 425:10
426:9,21 436:15
438:11,15 439:1
447:2,11 448:18
455:21 456:3,4
483:12 485:4,5,12
485:13,18,22
486:6 488:6
494:21 495:17,22
495:22 496:2,6,13
496:16,18,25
509:13 516:7
523:25 530:13
531:16
**numbered** 177:6
378:25 516:22
**numbers** 21:24,25
89:22 98:1 108:2
108:17 109:6,13
114:1 120:20
121:9,16,19 133:2
133:10,15,20
134:10 135:1
136:7,21 138:11
153:9,11 155:5,9
168:2 173:10
175:13 177:13
191:24 220:7,9
221:25 226:24
229:15 231:10
232:4,19,21 262:7
264:18,21 271:4
271:13 288:15,20
301:4 304:9,12,17

314:8 316:23
337:2 376:4,5
378:25 405:14
425:25 449:8
487:13,14 488:5,6
492:13 497:2,16
518:4
**nuts** 41:4 54:2,8

─────────

**O**

**oath** 3:23 300:8,9
438:13
**object** 13:24,24
18:23 27:4 29:4
70:17,17 71:18
81:2 86:14 100:9
106:17 108:5,20
114:23 142:22
143:13 149:15
156:17 157:23
158:8 159:3 160:7
160:12 162:6,9,17
162:21 163:6
174:4,11 175:5
178:3,17 179:21
181:16 182:1,11
184:5,15 185:18
186:9,20,24 194:6
194:11 195:6,11
198:24 202:2,13
203:8 204:8
205:10 209:24
211:24 212:3,15
212:17 213:5
218:5 219:5
223:11,24 244:24
245:10 246:7,8
247:19 248:4
250:22 251:12
254:8 256:14
257:2 258:10
259:10 268:18
277:1,12,20
278:12 280:13,22
288:6 292:7,20,24
293:10 303:23
306:19 318:7

320:9 325:20
326:5,11 327:11
327:20 328:24
329:15 334:6,18
335:23 338:5
342:12 356:21
358:16 359:16
366:14 375:24
376:21 377:10
378:2 391:22
392:9 394:8
401:15 404:9,17
406:4 407:1
451:16 452:2
460:23 462:15
474:7,17 476:13
476:20 477:18
478:11 479:3,23
481:15 489:7
497:4 512:25
513:9,17 514:13
519:5,16 520:4,12
520:22 521:2
523:4 527:1
**objection** 32:9
202:24 203:24
246:9 257:3,13
258:22 260:6,20
280:2 326:18
406:5 453:21
454:18 475:2
**objections** 3:13
15:11
**objective** 271:17
**objects** 14:3 363:14
363:16,19
**observable** 19:22
**observation** 26:2
169:25 216:22
347:13 357:1
**observations** 527:4
534:2
**observe** 480:23
**observed** 111:20
160:15 168:10
169:11 236:1
239:20 240:4,13

**observing** 355:7
**obsolescence**
267:19,20
**obsolete** 49:5
**obtain** 58:18
178:10
**obtained** 177:24
**obvious** 315:6
**obviously** 10:4
108:24 114:4
122:10,16 170:17
207:14 216:18
225:5 231:10
410:11 429:2
438:1 481:18
510:12
**occasion** 93:5
**occasionally** 503:7
**occupant** 433:9,11
**occupants** 431:23
432:22,24 433:7
433:14
**occur** 139:17
165:15 357:3
431:7,10 480:9
**occurred** 38:23
113:8 114:9
165:16 182:6
259:16,17 298:4
354:23 444:6,8
505:1,3 525:15
526:11
**occurs** 171:7
221:11 373:1
522:20
**october** 11:5 12:12
12:16,21 13:6
117:22 146:6
154:3 270:4
274:20 305:14
396:12,15,24
410:8 456:11
487:10 488:17
502:9
**offer** 45:25
**office** 2:21 66:3
133:24

**offices** 1:23 2:5
40:23 45:18 69:20
**official** 344:1
**officiated** 3:23
**oh** 21:2 72:25 83:7
96:9 99:18 148:23
148:25 176:23
185:5,5 240:6
253:7 265:11
267:5 353:17
381:7 398:19
503:10 511:11
522:3
**okay** 7:23 8:20,22
9:2,4,25 12:11
16:9,23 18:19
22:10 23:2 28:25
39:14 46:13 56:25
63:15 64:25 74:5
76:10 79:2 82:5
83:20 84:7,23
89:17 97:2 98:15
99:6 105:6 108:16
109:25 110:15
111:12 114:17
116:12 121:3,16
121:20,24 122:6
127:13 130:25
144:1 147:11
151:19 154:23
163:10 166:7
167:14 169:19
172:10 175:9
181:6 185:5 187:6
189:2,4,15 196:5
197:12 204:19
205:22 208:3
229:15 234:7,9
235:1 236:19
237:19 241:17
244:9 245:1 246:2
246:23 249:9
259:3,13 262:19
262:25 263:10,19
264:25 267:10
268:12,16,20
283:2 285:4,7

SCOTT H. TAYLOR                                    February 9, 2012

290:8 302:6
303:15 304:20
311:1 332:11
338:18 340:16
344:12,23 345:2
350:9,18 354:14
354:20 355:19
361:2,8 364:8
366:19 369:6
371:25 380:8
383:12 385:19
386:18 387:2,18
388:25 389:12
393:19 397:13
398:19,24 399:11
399:21,25 400:10
401:10 402:3
403:18 408:15
409:12,14 411:10
412:9,22 417:10
417:24 421:6
424:11 428:5
435:9 436:16
446:18 447:11
448:9,23 449:8
453:6 455:12,19
458:4 466:23
471:7 475:24
476:17 481:22
482:5 483:1,11
486:14 489:19
495:12 498:17
499:16 501:19,25
509:11,15 511:2
515:15,18 522:5,8
529:9 530:25
533:16 534:3
535:17
**old** 12:7,8 54:12
102:25 104:14
267:11 279:17
283:15 285:18
491:10,11
**older** 52:5,6,7
**oldest** 284:11
**once** 39:6,9 52:22
77:15 88:13 93:4

93:17 125:10
130:4 209:9
235:22 273:15
294:2 307:21
**onepage** 269:24
390:16
**ones** 12:7,8 27:23
52:2 57:2 65:15
77:17,18 82:13,17
87:6 90:13,24
109:24 118:2
124:20 128:22
130:15,19,20,21
146:12 216:6
262:12 276:6
312:23 322:23
331:22 333:4
343:3,6 364:21
422:3 449:4
451:13 459:10,11
464:18 467:1
501:1 511:9,15
**onethird** 265:23,24
**ongoing** 62:1 70:7
**online** 166:18
211:8
**onset** 49:24 66:7
**open** 104:13 124:2
238:14
**openings** 441:17
**operations** 46:20
46:20 47:2 48:20
49:21 50:1,6
**opine** 183:24 216:3
**opining** 186:17
188:21 195:15
196:23
**opinion** 20:8,9 25:2
25:7,13 26:22
27:6,23 28:9,11
69:15 71:16,21,25
72:7,12,13,19
107:5,8,14,18
142:18 153:6
154:25 156:8,14
156:19 159:17
161:6,19,20,21

163:1 167:23
178:1,9,13 189:12
198:14,15 201:24
202:6,9,20 203:13
203:19,20 204:5
204:15 205:23,25
206:6 214:5 215:4
215:7,13 216:11
223:20 227:17
243:8 251:8
253:16,24 254:18
258:18 264:7
277:5 284:19
287:10,11,18
291:20 299:8
302:20 325:17
329:9 330:24
331:22 332:1
333:23 334:3,14
338:1 347:3,11
359:21 368:17
369:1,3 370:8,14
371:3 380:15
382:13,14 392:1,7
393:3 397:19
404:21 406:24
407:4,17 408:11
408:13 418:15
429:18 430:2
431:1 432:3,5,6,7
432:13 436:3
437:16 438:22,25
439:2 443:20
444:12 445:15,22
451:19 453:17
461:4,8 469:4
473:1,21 474:4
480:7,8 482:10,15
484:4 488:24
489:25 490:2,6
491:5 493:21
520:14
**opinions** 13:20
14:21,21 15:22
19:16 26:8 27:18
28:5,14 29:12,22
30:3,8,9 31:7

71:10 72:22 73:3
181:23 201:10,15
269:14,18 327:7
327:17 359:25
534:12
**opportunities**
60:25
**opportunity** 133:11
172:6 440:22
525:12
**opposed** 10:21
20:25 23:23 30:4
30:7,8 62:20 64:9
87:19 106:13
154:24 198:3
229:1 243:18
245:7 271:8
273:13 356:3,8
394:6 423:10
425:7 427:15
428:1 442:15
445:1 461:16
492:2 503:21
**option** 253:5,6
**options** 134:7,9
221:20 289:5,8
373:10
**orally** 8:18
**oranges** 243:25
**order** 24:20 35:20
55:21 59:3 92:12
94:8,15 101:18
133:9 140:18
189:11 192:2
229:11 235:21
240:22 273:23
319:13 324:22
348:18 356:15
409:5,9,10 418:24
431:13 439:25
**ordinarily** 84:1
301:20
**ordinary** 426:22
**origin** 205:17 334:1
**original** 85:21
89:21 117:21
187:18 188:10,11

273:9,12 278:23
278:23 304:24
305:6 307:5
329:22 330:7
331:1 333:5
384:17 385:2,8,11
385:22 386:23
391:13 395:24
398:3,5 410:5
411:1,5 417:23
426:1,4 431:14
483:4 484:19,20
485:6,8 486:25
522:22 528:16,24
529:1,6,8 530:5
**originally** 88:3
501:1 528:18
**orleans** 1:24 2:7,10
2:14 39:15,19
48:21 115:1,3
239:23 241:17
242:11 249:18
264:2,16 403:15
441:12 518:17
519:22 524:9
**osb** 129:20
**ought** 145:10
**outcome** 538:15
**output** 95:25
153:20
**outright** 532:2
**outside** 168:21
169:7 194:24
240:16 313:16
463:10
**oven** 345:18
**overall** 48:4 64:14
76:14 87:15
313:23 376:14
**overcompensating**
191:25
**overestimate**
131:11
**overhead** 263:10
263:20 264:1
375:9 380:21
381:16 382:2

**overlap** 37:1,24
393:16
**overreaching**
195:10,12 196:14
**overrides** 255:17
**overriding** 254:23
**overstated** 108:3
108:18 109:13
220:10,11
**overview** 41:17
94:3
**owe** 261:7
**owed** 181:24 182:5
**owned** 483:7
**owner** 228:10
**owners** 506:11,12
**ownership** 451:5

**P**

**packet** 238:14
**page** 4:2 5:1 6:1
35:16 51:15 57:1
73:7 121:6 122:11
154:7 163:11
164:4,11 170:15
173:4 176:5,23,25
177:4,5 179:11
180:7,16 206:17
207:22,25 208:10
208:23 221:5
232:12,13 234:18
234:25 236:10
237:22,22,23,23
237:25 238:1
245:22 246:19,25
247:14 248:14
249:16 263:4,6
282:8,12 283:9
284:5 285:2,3
301:2 312:24
313:21 329:24
331:23 332:6
333:15,19 339:15
339:16 343:10
344:3 345:3,11,12
345:14 346:4,9,11
346:18,22 348:20

352:2,7,8 353:2
353:14,15,22,24
354:5 361:6,11
365:1,6,22 366:23
367:14,22 372:5
379:3,6,12 380:3
380:5,16 381:2,5
393:25 396:24
397:1,2,2 399:18
399:19 400:19,22
401:7 403:6,7
405:11,23,24
417:12 437:21,24
465:19 471:12
473:7 475:15
476:7,25 477:8,9
478:3,15 479:7
488:5,6 497:21
515:11,14 518:9
518:19 521:6,12
**pages** 78:14,16
173:11 232:7
246:24 247:8
261:9,12,21
275:21 283:21
348:17 352:4
374:10 392:16,16
392:18
**paid** 74:4,9,10,14
74:21 75:6,7
76:12,19 105:16
177:2 180:19
181:6,13 186:14
250:14 265:4
276:20 277:8,17
287:6 291:4
401:11,18,21
443:17 474:1,14
474:25
**pair** 138:1
**palm** 1:22 7:2
**palmintier** 2:2,2
11:9,16,21 12:1
13:2,23 14:24
18:22 19:1 22:21
23:1 27:3 29:3
32:8 66:15 69:23

70:16 71:17 81:1
82:16,20 83:17
86:13,20 89:1
99:1,5 100:8
106:16 108:4,19
114:22 119:19
142:21 143:12
149:14 151:8
156:16 157:22
158:7 159:2 160:6
160:11 162:5,16
162:20 163:5
174:3,10 175:4,24
176:4 177:14,18
178:2,16 179:20
180:8 181:15,25
182:10 184:4,14
185:17 186:8,19
186:23 194:5,10
195:5 196:16
198:23 202:1,12
202:23 203:7,23
204:7 205:9
209:23 211:23
212:2,14 213:4
218:4 219:4
222:19 223:10,23
224:2 244:23
245:9,15 246:6
247:18 248:3
249:3,8 250:21
251:11 254:7
256:13 257:1,12
257:16,25 258:9
258:21 259:9
260:5,19 262:24
268:17 276:25
277:11,19 278:11
280:1,12,21 283:1
288:5 292:6,19,23
293:9 301:23
302:5 303:22
306:18 318:6
320:8 325:19
326:4,10,17
327:10,19 328:9
328:17,23 329:14

334:5,17,25
335:22 338:4,20
339:9 340:2,8,15
342:11 351:14
353:19 356:20
357:16 358:15
359:15 360:18
361:1,7,12 366:13
375:23 376:20
377:9 378:1
388:17,24 389:17
391:21 392:8
394:7 398:9,23
400:9 401:14
404:8,16 405:15
406:3,25 409:11
412:17 450:5
451:15 452:1
453:20 454:17
460:22 462:14
464:4 466:19
474:6,16 475:1
476:12,19 477:17
478:10 479:2,22
481:14 489:6
497:3 499:15,16
501:6 503:11
512:24 513:8,16
514:12 515:24
519:4,15 520:3,11
520:21 521:23
523:3 526:25
535:24
**panasonic** 324:4
**panels** 526:7
**paper** 239:12
**paragraph** 213:19
330:9 361:10
373:15 518:10,19
519:20 522:2
524:4 526:6
**paralegal** 409:8
**pardon** 115:17
170:15 380:22
420:2
**parish** 214:11
518:17

**part** 3:16 13:10
21:12 22:7 42:9
46:10 48:6 54:10
58:6 61:24,25
78:2 82:23 89:23
95:6,7 103:13
133:16,25 250:1
268:3 310:20
329:3 389:22
393:20 398:16
408:4 440:12
472:25 473:3
483:6
**partially** 169:2
**participating** 503:6
503:7
**particular** 14:5
45:6 71:12 74:1
86:11 90:19,20
98:12 126:16
140:11 160:25
244:15 266:5,24
345:21 364:15
416:22 496:2
**particularly** 61:6
90:23 91:16
110:24 121:18
**parties** 3:4 72:17
72:21,23 208:24
348:12,22 349:1
349:15 454:6
538:14
**parts** 48:4 268:2
450:14
**party** 104:3 105:7,8
105:8,9,18,19
106:4,7,9 182:20
**passed** 410:11
**patio** 333:17
365:16,25
**pay** 52:8 73:20
77:10,20 78:1
160:3 194:9,22
212:10 213:1
233:21 243:21
244:10 250:16
407:11

SCOTT H. TAYLOR

February 9, 2012

Page 573

**payable** 515:21
**paying** 27:15 226:1
226:2 291:6,13
478:24
**payment** 74:3
397:14 400:1
401:2 435:22,22
512:21 515:10,16
515:22 516:9,19
517:9
**payments** 182:16
269:21 291:17
400:24 514:21
515:7 516:24
517:12
**peak** 170:2
**peaks** 170:21
**pen** 206:21
**pencil** 103:12
197:24
**people** 45:20 52:19
53:20 69:20 84:12
84:13,16,20 88:6
95:1,12 118:22
193:20 223:16
347:21 348:3
455:5 531:17,24
532:6,8
**perceived** 187:3
**percent** 142:3,17
143:23 144:1,2,13
144:17 145:2,2,6
145:11,15,15,17
145:18,20 193:12
195:4,17 230:1
239:3 263:11,20
263:20 264:1
265:10 290:4
294:6,13,17,18,24
295:3,14,19 294:4
299:6 302:25
303:7,20 352:20
402:17,19 495:17
496:16,17 503:23
509:13
**percentage** 61:13
74:10,11 272:23

272:24 294:19
**percentages** 20:2
80:9
**perchner** 69:21
**perfect** 239:24
**perfectly** 74:24
85:18 202:8 495:8
**perform** 524:15
**performed** 244:13
524:19
**peril** 428:24 432:22
521:14,16 522:22
522:23 525:19,21
**perils** 212:13
522:16
**perimeter** 240:16
**perimeters** 233:3
**period** 34:12 36:5
36:12 37:21 38:24
40:9 44:19,20,25
45:4 51:19 65:17
166:9 195:22
242:8 261:14
294:14 347:7
498:6
**periods** 342:25
**periphery** 90:5
**permanent** 289:15
290:2 292:5,12,18
293:23 294:9
297:16 403:25
404:6,15 493:8
494:6
**permanently** 403:6
403:10,19
**perrin** 337:5,19
352:13,19 354:6
358:6 359:9
**person** 191:20
412:4,6
**personal** 181:7
270:13 271:9
287:1 371:25
447:17,19 450:20
450:25 518:23
532:5 534:6,11
538:10

**personally** 31:8
311:5
**persons** 348:16
532:4
**perspective** 112:4
113:6
**pertains** 1:9 209:4
349:20
**peruse** 26:5
**petition** 173:8,13
**petitioners** 518:21
518:23
**phase** 18:12 75:20
76:22
**phone** 67:25 84:14
84:19 87:3 88:6
93:6 146:19,20,21
147:23 307:21
308:4 309:12,13
309:20,23,25
310:2,10 311:7,8
311:9,13 318:2,15
319:3,9 322:16
330:17 404:3
452:23 457:2,5,9
457:18,21 459:4
462:2
**photo** 103:11
120:18 121:6,13
123:7 164:5,7,8
167:10 170:6,12
170:16,17 206:17
207:22 208:1,4,10
312:24 313:21
333:15,15,16
343:10,13,14,17
344:7,9,14,17,19
344:20 345:11
346:11 350:16
352:22 353:1,2
355:10 365:8,20
365:21 367:4,16
396:24 417:13,25
418:1,2,4 422:4,4
422:5,8 464:21,22
473:7 510:23
**photocopies** 100:21

**photographs** 236:1
412:23 459:3,8
460:6 471:17
**photos** 78:25 120:6
120:11,14,17,21
121:1,20 128:2,2
128:12,21,25
129:4,8,11 151:18
151:20,20,21,21
151:24 155:13
161:14,16 165:17
166:3,5,6,13,13
166:16,16,18,20
166:22 167:7
168:20 169:13
206:12 207:11
210:25 211:6
235:8 262:1,2,3,9
262:11,13,14,15
262:19 308:20,21
308:21,23,25
309:4,11,16
310:19 312:10,16
312:20 313:1,13
313:15,18,20,21
314:14,15 315:11
319:3,5 322:21
331:1,5,13,17,21
331:24,25 332:4
332:21 333:1,10
333:19 335:14
343:2,5 345:19
351:22,25 352:1,4
352:8 353:8,16,22
354:8,10,13,14,24
354:24 355:5
356:4 357:5
359:24 360:1,10
360:12 363:13
364:1,17,20,24
365:1,16 367:20
368:25 369:2
370:11,13,15
372:13 395:16
399:3,8 413:1,3,6
417:5,7,10,18,24
429:6,9 446:2,4,5

464:9,12,13,13,15
465:11 466:7,23
471:8 472:9,25
473:4 504:12
509:24 510:16
**phrase** 188:7
210:14,15 213:17
**phrases** 119:12
**physical** 19:21
92:16 93:6 124:17
155:21 187:24
356:3 512:9
**physically** 124:17
331:8 332:14
**pick** 47:20 55:25
**pictography** 312:5
312:12
**picture** 123:4,13,25
124:10 132:1
164:3,4,6,6,11
206:24 207:13,24
207:25 208:7,9
315:8 396:19,23
422:5,8 511:2
**pictures** 120:1,3
122:16 123:8,10
124:1,12 129:25
131:19 132:8
138:16 163:20,20
163:25 164:18,22
164:24 165:3,11
207:15,18 240:5
396:19 415:25
416:13 422:2,3,12
422:14,18,20
465:20,24 466:2
466:15 472:19
473:16 507:14
510:3,6,7,13
511:6,14
**piece** 93:15 127:5
140:14 143:16
237:13 296:24
**pieces** 92:11 237:11
364:2,4
**pigman** 1:23 2:12
7:11

SCOTT H. TAYLOR                                          February 9, 2012

Page 574

pile 261:13
piled 164:10
pipe 241:10
place 50:2 76:17
  215:10 229:1
  235:15 313:3
  364:7 429:21
  443:5 447:2
placed 99:25
  401:23
places 35:11
plaintiff 6:5 88:21
  434:12,14 451:6
  496:23,24 527:23
  527:24
plaintiffs 2:4,7,11
  13:11,21 14:10
  15:18,24 16:21
  17:2,9,22 18:4,16
  20:19 22:14 68:18
  71:12 80:11 82:7
  88:19 107:11
  110:13 111:16
  113:17 116:13
  142:3,5,17 143:10
  143:19,20,23
  144:19 147:16
  156:6 158:24
  173:22 194:19
  195:17 205:2
  206:2,5 215:20
  216:4 256:5 260:1
  260:17 261:17
  267:1,9 274:16
  279:23,25 281:3
  304:15,18 306:24
  322:13,17 325:18
  327:5,9,17 329:10
  350:4 374:4,24
  375:7,14 384:6
  385:16 387:16
  403:2 405:8
  420:20 421:3
  431:21 434:18
  435:18 459:17
  462:7,9 467:5
  468:19 493:1

496:19 498:20
499:17 508:9
509:3,12 532:11
532:23 533:16
534:3,17 535:9
plan 19:7 118:14
  118:15 155:14
  189:20,21,25
  190:13 210:9
  219:13 311:14,18
  374:1 413:16
  458:23 505:9,23
  506:22
planning 148:18
  209:20
plans 311:14
  317:23,24 318:4
  383:7 424:4,5
plaster 418:23
  428:21 429:18,20
  439:18 446:2
play 50:24
pleading 174:2,9
  518:1,5
please 207:3 343:9
  391:14 537:12
plenty 112:3
plumbing 241:11
  241:12 369:11
plus 180:19 237:17
  241:7 263:7
  295:25
plywood 129:20
point 10:25 14:17
  21:4 25:6 26:1
  49:5 52:13 53:6
  66:8 69:24 72:20
  74:15 79:22 109:8
  118:17 121:4
  135:3 137:5
  149:19 157:1
  159:23 169:19
  170:2 176:9
  204:11 208:18
  210:3 211:1 232:2
  235:10 238:24
  268:9 269:16

285:20 296:19
318:22 319:25
321:9,23 322:2
328:13 332:5
333:13 357:3
420:24 425:14,18
441:15 464:2
479:9 505:4
508:17 511:21
pointed 136:19
  313:20 316:9
  317:23 337:15
pointing 169:16
policies 105:14,15
  112:6 145:7
policy 105:12,13
  106:8,8 112:16
  141:23 154:21
  157:11 179:9
  213:3 252:23
  271:10,10,11
  290:24 379:14
  435:23 443:12
  473:25 476:10
  487:12 514:21
porch 362:19 367:3
  367:5,12 391:9
porous 342:23
portion 75:13
  367:13 414:1
  494:21,24 495:10
  501:23
portions 258:5,6
  305:22
pose 125:19
position 33:14,21
  191:20 199:5
  425:13,17 455:7
positions 33:1
positive 140:9
  413:5
possession 450:1
possessions 449:12
possibilities 336:1
possibility 430:9
possible 8:23 24:15
  24:16,23 113:10

113:13 120:23
128:17,17 131:23
146:9 148:7 166:4
191:23 192:8
224:24 309:25
310:1 335:20
341:6 346:3
362:18 383:9
405:3 494:22
possibly 83:7,8
  122:12 195:21
  308:5 345:16
  417:9 439:14
  487:15
post 2:21 510:25
  511:1 529:13
postdeposition
  510:24 529:14
postkatrina 17:11
  115:5 151:11
  166:23,24 184:13
  197:3,9 290:20
  295:22 331:14,16
  333:1 417:14,16
  418:5 429:7 453:7
  453:13 454:4,11
  454:13 464:23
  465:7 471:23
  472:20 492:11,23
  498:7 509:8 511:8
postloss 436:21
postrenovation
  510:13
potential 445:7
potentially 144:9
pots 137:20
pound 239:13
practical 25:21
practice 25:13,23
  94:24 95:22
  127:24 269:2
  272:10 274:9
  285:1 303:25
  490:19
practices 232:10,17
pragmatic 27:11
pre 151:11 417:8

472:10
preceding 537:5
precise 83:22 85:23
  96:24 118:2
  221:18 232:19
  264:17 313:11
  352:16 373:8
  457:6
precisely 31:23
  83:4 87:3 98:7
  168:13 191:22
  222:10 235:11
  347:9 363:4
  366:18,21 382:12
precision 233:8
prefer 356:23
prekatrina 17:10
  129:1 290:10,14
  290:16,19 295:23
  377:7 416:1,3
  417:7,18,21,22
  418:17 429:10,24
  446:4 452:16
  453:4 458:6 471:8
  471:18 472:8
  491:16,21 492:3
  492:10,14,19
  505:24 506:2,23
  507:3,9,17 509:7
  510:23 511:8
preloss 171:20
  188:2 213:21
  369:24 436:20
premium 134:3
premiums 291:9,13
  291:19
preparation 84:8
  88:5,8 305:18
  306:6 310:10
prepare 32:15 55:2
  55:9 83:3 95:13
  96:19 119:3 252:5
  310:16 312:20
  322:9 421:19
  467:3
prepared 32:14
  42:12 47:6 53:19

SCOTT H. TAYLOR                                    February 9, 2012

| | | | | |
|---|---|---|---|---|
| 58:9 86:4 94:19 | 131:7 137:25 | 199:11 214:24 | 291:5 327:18 | **promise** 234:15 |
| 97:7,20 127:17 | 189:14 228:21 | 284:14,15 309:23 | 329:12 349:17 | **promised** 300:12 |
| 211:21 218:11,16 | 231:25 | 331:3,6 341:23 | **process** 21:9 | **prone** 488:3 |
| 222:2,7,7,10,12 | **presumingly** 141:2 | 342:2,5 350:19,22 | 234:17 253:1 | **proof** 275:1 |
| 222:14,24 223:3 | **pretty** 39:5 53:20 | 369:14 376:9 | **processes** 41:18 | **proper** 154:25 |
| 246:3 276:4,5,6 | 87:15 90:7,7 | 377:24 379:17 | 214:10 | 246:10 250:6 |
| 305:7 372:7 | 315:6,6 | 380:20 381:15 | **procure** 43:13 | 377:23 |
| 421:11,12,13,15 | **prevent** 240:22 | 382:1 391:7,19 | **prodding** 92:19 | **properly** 50:9 |
| 423:5 424:3 | **previous** 94:19 | 397:1 410:13 | **produce** 21:14 41:8 | 248:10,18,23 |
| 425:20 453:24 | 95:5 209:25 | 411:1,5 413:16 | 42:13 65:15 66:17 | **properties** 18:4 |
| 462:8 468:16 | 290:25 298:1 | 414:8,14 415:14 | 67:5 69:14 81:19 | 20:10,17 22:14 |
| 469:18,21 480:16 | 346:12 481:9,11 | 416:5,15,19 417:3 | 95:4 118:19 119:2 | 65:5 66:25 68:10 |
| 480:16,17 487:20 | **previously** 64:3 | 419:1 428:24 | 119:7 127:22 | 111:13 112:20 |
| 487:22 505:25 | 95:5 302:4 504:21 | 429:3,19,21 430:6 | 141:9 191:9,9 | 114:18 156:4 |
| 533:12 534:1,15 | **price** 103:16,23 | 435:20 437:9 | 229:13 255:12 | 158:24 253:9,12 |
| **preparing** 28:6 | 104:9 135:13,15 | 438:8,10,20 | 299:5 | 462:22 504:14,22 |
| 44:2 77:3 81:23 | 135:21 243:3,4,7 | 441:22 442:1,7 | **produced** 22:15,16 | 532:1,9 |
| 100:6 101:10 | 247:24 249:12,17 | 443:1 446:5,9 | 66:14 94:10 102:9 | **property** 12:24 |
| 117:12,24 145:21 | 249:20,22 252:21 | 456:15,19 464:17 | 114:3 118:20 | 13:7 18:10,10 |
| 149:23 155:19 | 254:20 255:13,14 | 464:23 465:9 | 125:3 229:5,6 | 35:4,9 44:5,9,12 |
| 306:10 309:23 | 255:22,25 261:14 | 472:1 477:9 | 261:9 302:3 | 63:16,17 75:10 |
| 313:7 318:23 | 264:24 267:18 | 502:11 505:10 | 518:15 | 82:11 92:4 104:4 |
| 324:25 342:5 | 284:7 338:10,11 | 512:22 513:15 | **produces** 92:15 | 111:2,6 150:8,14 |
| 420:17 468:2 | 384:18 385:2,8,23 | 526:1,3,11 | 269:7 | 151:25 152:4,11 |
| 481:3 485:10 | 386:23 | **private** 54:4 | **producing** 96:1 | 153:16 159:18 |
| **prequality** 507:8 | **priced** 432:23 | **privy** 116:17,20 | 122:10 | 173:22 180:24 |
| **present** 89:14,14 | **prices** 131:6 191:7 | 156:11 446:12 | **productive** 49:1 | 181:3,7 183:23 |
| 89:15 119:16 | 191:12 244:7 | **probably** 37:12 | **professionals** 59:16 | 195:18 216:1 |
| 297:9 321:3,11 | 247:10 255:20 | 44:23 56:10 64:12 | **profit** 263:17,21 | 218:12,14 247:2,6 |
| 339:21 347:19 | 267:18 385:11 | 66:9 72:3 130:16 | 264:2 375:10 | 259:24 270:5,13 |
| 412:13,18 413:22 | **pricing** 133:23 | 130:20 132:12 | 380:21 381:18 | 271:9 275:8,9 |
| 419:20 420:9 | 221:20 232:23 | 152:12 168:23 | 382:2 | 279:4 287:1 |
| 503:1,5 | 233:6 244:13,18 | 169:1 192:19 | **program** 43:7 | 314:10 338:2 |
| **presented** 79:9 | 266:21 267:15 | 251:16 256:2 | 57:22 232:5 | 341:20 350:10 |
| 424:1 | 373:10 374:19 | 311:24 321:21 | 247:17 312:9,14 | 352:13,19 353:4 |
| **presently** 69:12 | 386:8 399:5 424:2 | 340:10 348:24 | 313:12 314:22 | 354:6 355:23 |
| **president** 49:21 | **primarily** 364:9 | 351:11 386:20 | 418:13 531:24 | 356:2,8,19,19 |
| **presum** 189:14 | **primary** 154:11 | 427:20 457:12 | 532:8 533:18,24 | 359:9,13 362:12 |
| **presume** 25:10,25 | **print** 21:23 | **problem** 78:7 87:7 | 534:11,19 535:1 | 370:17 389:22 |
| 71:5 129:9 134:15 | **printed** 22:16 | 317:19 522:4 | 535:10 | 450:20 451:1 |
| 143:1 151:17 | **prior** 8:4,13 9:4,12 | **problems** 228:14 | **programs** 531:16 | 458:18 462:19,24 |
| 480:24 | 20:20 28:6 35:15 | 228:17 | 531:19 532:13,14 | 467:18,21 468:6 |
| **presumed** 64:18 | 35:20 61:2 64:2 | **procedure** 3:7 | 532:22 535:8,12 | 482:7 490:1,3,5 |
| 94:22 111:11 | 65:11 116:18 | **procedures** 41:18 | **project** 243:20 | 491:7 499:25 |
| 136:8,9 137:4 | 147:13,13 156:10 | 57:19 504:19 | 244:15 | 500:17,22 501:3,5 |
| **presumes** 130:7 | 157:8 174:15 | **proceedings** 299:18 | **projects** 52:18 53:1 | 501:15 502:12 |
| **presuming** 115:25 | 183:6 192:5 | **proceeds** 209:1 | 81:20 | 503:17,17,21,22 |

504:1,5,10,19,25
505:5,17,24
506:10,11 507:16
510:14,23 511:7
511:16 518:3,21
518:23,24 519:14
520:18 521:12
522:17,24 524:23
525:7,12,21 527:9
528:2,6,18,19
529:11 532:6
534:6,11
**proposal** 337:18
338:12
**proposed** 358:25
**proposing** 250:15
**proprietorship**
30:16,17
**protect** 522:24
**protecting** 165:5
**protract** 65:19
**proven** 518:25
**provide** 29:9 63:4
85:8 93:20 95:2
102:20 192:2
198:11,21 228:4
290:15 296:11,13
311:17 324:11
327:14 384:10,20
384:21 454:7
459:18 463:17
**provided** 21:12
28:9,10 33:12
73:15 88:20
100:19,20 117:6
132:2 221:6 276:2
298:16,18 307:24
383:15 384:15
401:12 412:25
423:23 427:20
433:2 460:7
464:16 489:5
531:21,24 532:4
532:17
**providing** 50:3
54:1 100:17 288:1
341:5

**pull** 82:7,9 83:1
**pulling** 92:11
**purchase** 103:16
103:23 104:9
227:5,6 384:18
385:2,8,11,22
386:23 532:1
534:19
**purchased** 134:19
199:25 200:22
201:11 226:8,10
227:24 287:7,13
**purchaser** 226:8,9
**purchases** 201:13
**purely** 60:9 215:25
493:3
**purport** 487:19
507:14 515:7
518:25
**purports** 339:4
390:17
**purpose** 28:25 30:2
40:7 41:14 42:10
63:11,11 103:24
121:1 150:13
468:2
**purposes** 3:8 41:12
62:19,21 64:7
73:16 241:16
328:2 471:13
495:14
**put** 24:20,20 25:4
25:19 50:1 61:11
82:8 101:16
103:14 108:23
113:1,25 114:2,8
118:24 122:25
127:11 134:5
135:22 137:1,4,23
137:23 155:8
159:11 165:21,22
169:9 171:23
187:15 188:11
193:17 199:16
213:23 230:17
233:19 235:24
236:13,19 237:5

237:18 238:8
239:13,16,18
240:8,13,17,17
241:3,15 255:5
263:19 273:8,11
273:11,12 274:22
283:24 287:12
297:25 298:3
304:21 323:13,16
324:16 370:1,5,9
370:14 408:16,16
414:5 415:16
428:17 431:6
440:20,23 465:2
467:13 485:18,21
499:18 507:11
514:16 530:21
**puts** 314:22
**putting** 22:1 41:18
61:2 74:18 84:18
86:9 155:18
194:19 197:23
233:16 238:1
409:4 446:10
465:9

——————
**Q**
**qcing** 133:18
**qualifications**
60:16 111:25
**qualified** 19:16
20:7,13 25:17,21
25:24 26:14,15
71:15,21 72:6,11
72:13 188:24
424:18 434:24
451:19
**qualifies** 63:9
**quality** 126:14
127:12 129:12
132:6,20,25
133:14,18 138:10
138:18 163:16,22
164:2 165:1
189:17 190:23
201:6,14,16,19
225:8,10,13

227:19,21 318:25
319:9,13,20
332:14,20,25
333:2 337:1 359:6
416:1,4,10,14,18
417:2,19 418:15
458:4,8,15 472:21
473:2 507:1,9,15
**quantification**
280:18
**quantify** 280:17
**quantities** 390:23
482:22
**quantity** 101:16,16
136:21 190:19
191:19 324:19,19
**question** 3:14 16:4
16:8 22:23 35:22
68:5 72:2,12
83:13 84:17 86:2
86:18,24 88:4
93:10 99:8 115:11
115:12,19 117:3
117:13 132:24
137:14 148:17
177:19 185:7
188:9 194:14
195:14 196:1,2,7
196:25 222:20
230:17 233:25
249:4,7 258:7
300:14 303:14,15
315:17 328:20,22
329:4,23 339:12
341:5 361:15
366:17,19 373:17
375:21 376:18
377:3,20 385:6,7
388:23 392:20
393:12 396:6
417:17 424:13,14
424:23 425:1
426:23,24 427:2,4
437:14 450:7
481:9,11 483:15
483:18 485:15,22
491:24 492:5

496:9 500:13
501:13 520:23
527:15 528:13
**questioned** 153:7
230:17 504:22
**questioning** 221:10
373:1 505:17
531:11
**questions** 7:14 8:18
8:23 11:1 13:13
15:3 42:19 46:11
68:1 82:25 84:11
89:7 90:9 91:10
91:11,19 93:23
102:12 122:20
125:19 126:11
132:17,19 146:16
148:10 257:19,24
258:4 293:20,25
294:4 304:24
306:25 314:13
319:12,16,21
327:4,22 328:1,4
328:7,10 353:21
354:4 387:20
388:1,4 401:3
406:8 423:19
425:12,14,17
426:5,18 428:19
435:15,16 447:1
452:13 469:12
501:22 507:20
508:18 527:13
528:14 531:3
535:15,23,25
**quick** 206:16 499:8
499:9
**quicker** 450:10
531:13
**quite** 37:13,15
40:11 43:1 94:9
122:1 505:16

——————
**R**
**racking** 371:13
**rafter** 237:10
**rafters** 236:11,25

SCOTT H. TAYLOR                                    February 9, 2012

Page 577

237:7
**rain** 18:6 19:18,25
  20:3,3 111:8
  112:2 113:12,20
  114:13,21 115:15
  115:20,21 116:8
  116:15 117:18
  157:15,19 158:6
  158:17,25 159:10
  160:4,15 161:18
  161:23 162:1,3,15
  163:3 172:16
  175:22 178:1,12
  179:17,18 212:11
  212:12,22 240:24
  256:23 258:17
  276:11 320:7,11
  337:22 338:3,13
  390:8 391:6,19
  392:5,23,24 393:6
  394:6,18 474:1,15
**rainfall** 518:16
**rainwater** 526:15
**raise** 258:3
**raised** 19:8
**rambling** 496:9
**ran** 38:2 93:24
  268:9
**random** 166:25
  170:24 386:17
  387:7
**range** 75:9 130:14
  130:16
**rarely** 133:7,8
  506:10,11
**rate** 52:8
**ratio** 264:8,14,23
  265:21,23 382:3,7
  382:9,14,15
**ratios** 264:11,15,17
  264:19,22
**razed** 115:8 214:2
**rcv** 224:14 226:24
  227:5 229:2,14
  287:17 288:10,19
  295:11 325:1
  382:20 496:17

**rdr** 3:21 538:4
**reach** 84:16 159:22
  479:21
**reached** 22:13
  201:10 294:14
  480:3 517:17
**reaches** 336:10
**reaching** 193:17
**reactivate** 56:24
**read** 127:23 148:11
  148:20 149:11
  176:12 196:7
  199:10 218:13
  219:9 317:3,4,8
  317:10,17 328:22
  341:4,8,17 344:1
  361:6,17 369:8
  401:3 408:1,3,4,7
  488:4 537:4,5,13
  537:15
**readily** 236:3
**reading** 3:9 147:12
  148:4 217:25
  218:1 245:25
  360:21 361:5
  363:2,3
**ready** 96:12 425:19
  499:6
**real** 81:20 354:23
  355:1
**reality** 193:18
  195:1 268:15,20
**really** 15:15 35:24
  52:10 61:17 65:7
  67:10,11 78:3
  87:18 90:5 91:16
  121:5 128:11
  129:14 131:21,24
  145:9,10 150:23
  168:17,18 210:2
  215:6 230:10,11
  233:22 235:9
  244:2 246:12,15
  253:15 288:9
  296:1 301:13
  309:16 354:2
  355:15 396:2

472:21 488:4
  497:14 502:24
**rear** 341:21 364:6
  391:8 413:25
  429:1 437:7
  477:25
**reask** 8:25 452:12
**reason** 14:5 33:9
  95:6 121:9 134:8
  147:4,6 155:3
  183:8 212:25
  241:24 246:9
  248:11 254:14,16
  294:13 305:10
  349:1,4 398:4
  403:14 425:11
  438:18 442:10,12
  481:1 482:14
  484:17 504:3
  506:8 530:2
**reasonable** 141:12
  168:3 171:17
  197:2,6,13,14
  230:18 266:21
  368:1 388:13
  483:2
**reasonably** 373:24
**reasons** 69:11
  103:1 117:23
  118:1 212:20
**rebuild** 23:13,15,17
  23:17,19 24:1,6
  24:10 72:9 197:22
  215:9,21 253:20
  254:1 368:8 439:8
  439:13 525:1,3
  526:1,2
**rebuilding** 23:23
  72:5 198:4 215:25
  252:1
**rebuilt** 27:2 28:12
  171:20 172:13
  197:15 213:12
  216:13 238:24
  368:3,15,18
  413:13,17 524:24
  525:8,13,22

528:20 529:5
**rebuttal** 18:15,21
  198:12,14 209:20
**recall** 17:4 18:13
  21:16 22:17 28:13
  56:11,14 57:18
  64:1 65:7 66:19
  67:16 68:13 69:25
  70:9 79:12,13,18
  79:20 80:10,15,21
  81:4 83:2,23
  85:20 86:10 87:2
  87:22,25 89:4
  90:10,13,18 91:25
  92:2 93:13,22
  95:20 97:2 98:9
  111:3 118:1
  126:17 127:6
  128:15 130:19
  131:16 137:7
  139:2 146:12,24
  147:6,8,10,11
  168:7,25 169:8
  192:15,21,23
  199:24 200:2
  206:14 217:25
  218:1 221:14
  231:16,21 262:20
  278:3,3 283:4,7
  284:25 285:19
  308:3 310:23
  311:25 318:19,20
  320:20,22 322:1
  323:5 324:15
  330:18 331:20
  333:4 343:3 351:1
  352:11 355:25
  363:2,3 373:4
  382:12,24 383:10
  385:12,14,24
  386:3 387:21,22
  388:7,9 389:2,3,4
  389:6,8 408:7
  412:6,12,21
  415:10,17,19
  416:11,20 419:21
  427:6,11 437:12

437:14 440:14,14
  441:24 442:3
  445:13,14 466:5
  483:22 484:4,15
  484:18,24 486:9
  486:17 502:21
  504:16 507:5,7
  508:19,22 510:9
  510:18,20 523:17
**recalled** 372:7
**receipt** 175:15
  180:12
**receipts** 139:24
  140:15,16 142:9
  143:4 186:1
  193:10,11 289:25
  290:10 291:1
  293:17 294:5
  296:12,13,20,22
  298:21 302:12
  391:11,13
**receive** 96:22
  215:16 322:20
  371:9 532:18
**received** 97:13
  100:11 172:19
  177:9 276:21
  310:24 327:18
  329:11 397:14,16
  400:24 401:2
  409:10 417:6
  430:23 435:21
  436:7,14 467:7
  512:7,21 514:20
  532:12,24 533:6
  533:15,17,23
  534:4,10,16,18,25
**receiving** 97:2
  472:6 535:10
**recess** 54:24 96:10
  150:5 211:14
  281:21 330:3
  400:11 446:16
  499:12
**reciprocal** 58:10
  59:25 60:9
**reciprocity** 58:3,14

SCOTT H. TAYLOR

February 9, 2012

Page 578

58:18 59:18 60:10
**recognize** 146:11
**recognized** 50:3
59:20
**recollection** 221:7
298:15 307:18
309:6 420:8,22
503:13
**recommendations**
373:18,19
**recommended**
373:23
**reconcile** 369:3
**record** 7:7,16 12:9
16:6,19 21:8 47:8
54:21,23 64:5
110:17,20,22
150:2,4,7 173:2
175:11 202:9
207:21 211:13,16
278:7 281:18,20
281:23 282:17,19
299:15,17 300:8
301:1 305:5 330:5
339:1 341:4
344:16 349:23
353:20 357:11,17
357:22,24 378:23
390:1,2,4,15
394:23 400:13
401:4 405:16,20
405:22 408:21
409:8,21,23
428:15 446:14,18
455:15,17,19
464:5,7 487:7
499:14,18 518:1
523:21 528:9,11
535:19,21
**records** 65:23
**recourse** 88:17
**recover** 341:7
**recovery** 468:20
**redone** 505:5
**reduced** 231:14
486:10,11 495:11
**reevaluation**

125:13
**reevaluations**
242:23
**refer** 21:24,25
154:22 164:3
224:14 279:6,7
364:5 395:22,23
398:1 414:11
416:21
**reference** 21:17
141:20 246:13
353:22 389:19
498:8 515:15
**referenced** 395:3
395:10
**referred** 333:10
429:23 521:21
**referring** 105:5
343:1,22 421:21
485:6
**refers** 226:21
**reflect** 65:24 67:3
75:4 76:23 77:1
177:8 193:3 225:9
225:9 231:11
233:3,4 261:3
316:13 321:9
364:21 369:2
381:22 382:17
401:10 416:1
438:6,24 442:9
471:17 498:4
512:3,11
**reflected** 14:21
18:3 186:15 261:8
261:15 318:11
321:5 361:16
368:25 380:9
413:24 416:14
**reflecting** 139:21
269:4 302:12
315:20 386:22
387:8
**reflective** 323:10
383:6
**reflects** 175:18
263:6 338:10

376:8,12,24 401:5
442:6
**refrigerator** 225:3
225:3,6,7,12,13
225:18 227:14,16
227:19,20,21,24
228:1,7,9 448:5,7
**refute** 29:11 442:12
**regard** 13:13,18
14:9 63:22 66:20
70:3 71:10 81:16
106:1 107:18
111:1 112:19,21
114:4,17 116:6
136:17 142:6
161:21 190:17
266:18 304:5
306:14,16,23
329:10 371:4
372:6 373:17
374:17 453:12
499:25
**regarding** 13:20
93:23 138:10,24
147:2 181:23
191:18 223:6
453:17 454:10
456:8 457:17
469:8
**regardless** 243:16
336:8 527:22
**regards** 94:13
132:21 203:11
**regional** 264:4
**regionally** 264:12
**regular** 88:19
241:9 252:11
**rehabilitated**
368:11
**rehabilitating**
369:14
**rehabilitation**
45:21
**reinforced** 345:10
345:15
**reinforces** 346:16
**reinspection** 40:3

**reinspections** 39:21
40:7
**relate** 359:8 475:21
**related** 443:13,17
517:15 538:14
**relates** 183:23
184:1 187:13
477:24
**relating** 18:9 44:4,5
82:11 143:9
183:18 186:4,6
359:25 504:13
509:7 523:24
**relation** 278:22
**relative** 264:9
371:12
**release** 175:15
180:12
**relevance** 103:20
325:16,23,25
326:3 327:1
**relevant** 60:18
108:15 152:14,17
153:2 156:14,25
157:2,4,5,18
158:1,2,4,18
160:4 200:11
201:9,15,16
275:25 276:3
289:17,20 300:22
437:15
**reliability** 490:7
493:21
**reliable** 486:20
**relied** 89:25 322:2
458:12
**relocate** 403:5,9,19
403:20
**relocation** 527:24
**rely** 70:13 84:11,20
97:22 100:13
243:18 244:12,17
496:1,4,5 513:13
**relying** 161:1,5,13
243:9 244:2 245:6
473:5
**remain** 428:9

**remainder** 265:17
466:6
**remained** 363:8
**remaining** 415:23
422:12
**remarks** 221:4
372:4
**remember** 8:8 66:2
66:6 92:18 148:12
223:16 230:23
322:19 329:3
389:12
**remembering**
92:20
**reminded** 300:7
**remnants** 132:4
**remodeling** 251:20
252:1
**remodels** 53:14
**removal** 173:6
238:22
**remove** 240:20
388:15 450:14
**removed** 169:21
239:15 314:11
315:1,2,4 389:10
446:8
**removing** 189:1
369:9 389:2,4,6
**render** 189:11
277:5 432:3
**rendering** 205:22
205:25 206:6
**renovate** 337:19
**renovated** 441:4
**renovating** 429:14
446:10
**renovation** 337:5
429:24 430:6
**renovations** 337:1
337:21 359:7
**rent** 407:11,21
**repair** 20:25 23:18
24:2,5,11,16,16
72:5,9 198:3
216:4 218:12,13
338:12 341:25

358:23 359:8
430:17 439:8,13
446:25 447:9,18
449:2 476:7
477:12 478:4,20
532:1 534:19
**repairable** 26:2
29:18,18
**repaired** 25:1,20
26:17 27:2,12
28:12 184:21
185:16 197:18,20
215:2 216:12,15
368:10 369:12
436:18 443:24
513:15
**repairing** 23:24
**repairs** 171:15
213:20 247:9,13
252:15,16 358:13
359:12 367:24
431:13 432:21
480:21
**repeat** 328:21
380:24 402:8
449:3 479:25
508:24
**repeatedly** 10:5
329:16
**replace** 76:7 191:5
224:24 228:12
240:20 279:13
287:19 477:3
532:1
**replaced** 26:18
75:12,13 391:12
430:10
**replacement** 21:1
23:12 224:14,22
224:23 225:8,16
225:17 226:1,10
226:22 227:17
229:24 263:24
267:22 380:5
388:12 402:18,19
469:9 486:2 530:4
530:8 534:20

**replacing** 220:7
225:2,4,12,21,24
226:6 250:1 369:9
**replete** 332:22
**report** 10:10 11:3,5
11:8,13,18,22
12:12,15,17,19,21
12:23 13:6 15:7
17:17 19:17 21:5
21:6,11 74:16,16
75:13,16 76:9
77:4,6,15 82:24
85:21 86:7,9,25
88:8,25 89:4,6
90:12 95:24 97:11
97:12,14,17,21
98:4,10,19 101:11
102:16 113:25
117:13,16,21,22
120:4,7,12 121:2
128:3,23 136:14
138:6 143:17
146:3 147:5
148:14,24 149:2
149:13 153:2
154:2,4,8 155:19
155:20 157:9
163:10 165:16
169:10 170:16
179:4 187:9,18
188:10,11,17
194:20 196:22
199:12 201:18
205:8,17 206:17
208:1,10,24 209:3
209:16,17,20
217:10,24 219:15
220:1,6 221:5
224:14 226:23
229:5,6,7,22
232:13 234:15,19
248:2 255:12
256:24 258:15,20
258:24 259:7,15
259:22 260:13
261:13 263:5
265:9 283:9,21,25

284:5 289:7
304:23,25 305:7
305:11,13,15,22
305:24 306:15
307:6 308:2,2
309:2,24 312:2,17
315:20 316:13,17
316:24 317:6,11
317:14,19,21,24
318:5,12,24 319:6
320:1,25 321:2,6
321:9,12,12 322:9
322:22 323:8
325:12 329:20,22
330:7 331:14,17
332:11 333:5,7,8
333:24 342:6,22
348:11,11 349:12
349:19 354:21
356:25 360:4,22
362:16 363:6,7,17
364:23 367:23
368:7 369:5,7
371:8,15,19 372:5
373:19 374:6,11
374:11,17 375:20
376:4,7,11,18,23
377:5,14,18,22
380:17,25 382:19
382:20,21 385:5,9
392:6 393:11
394:10 395:16,23
395:24 396:12,13
396:15,18,24
397:21 398:4,5,8
399:4,8,12,18
403:4,6,22 407:8
407:25 410:1,5,8
410:14 411:2,6
412:7 413:2,4
414:11 415:21
418:20 421:1,6,7
421:19 424:4
425:23 426:1,4,4
426:8,8 427:10,14
428:20 429:6
430:8 431:6 435:9

435:10,20 437:18
437:21,24 440:5
440:18,24 442:5,9
442:18 443:4
445:25 450:23
456:7,11,15,19
457:7 459:12,20
460:3,4 463:24
464:10 466:25
467:14 468:2
469:21 470:7,15
470:18 471:11,12
471:13 472:6
479:8 483:4,9,10
483:17,25 484:9
484:13,19,20
485:2,7,19,22
486:6,19,20,21,23
486:25 488:21,21
491:8 493:5
494:11,23,24
495:8 496:1,4,5
497:1,8 500:14,23
501:5,23 502:4,8
502:11,16 506:1
507:11 509:17,23
510:5,8 511:3,23
512:1,2,11,16
513:20 514:16
521:5,7,8 527:3
528:16,24 529:1
529:11,23 530:3,5
530:13 533:9,12
533:25 535:2
**reported** 2:24
524:5 529:2
532:19 538:9
**reporter** 2:24 3:22
7:4 8:19 300:3
538:5,21
**reporters** 538:2
**reporting** 210:4
**reports** 6:5,6,6,7,7
6:8 10:7 13:14,17
13:19 14:11,22
15:2,12,23 16:10
16:19,24 17:2,7

17:12,22,23 18:2
18:8,16,21 19:9
26:4,6,7 29:24
65:9,10,12 67:14
67:22 75:1,7,22
77:3 83:3,15 84:5
84:8,24 85:2,2,6,9
85:12 88:5 97:23
108:2,17 110:25
116:24 117:24
133:25 145:21
148:6,8,19 149:23
152:15 155:25
161:2 187:14
188:7 193:18
198:11,12,13
217:15 251:25
264:19 305:18,25
306:7,11,24
308:18 325:7
342:16 348:25
349:5,11,14,24
350:5 362:11
373:13,14 374:1
387:1,4 408:17,17
420:19 435:11
440:21 462:7,8,10
462:12 470:4
495:23,25 496:13
506:12 517:17
534:15
**represent** 211:7
390:18 406:20
437:22 531:14
**representative**
32:22 411:18
**representatives**
411:16
**represented** 174:1
174:8 235:12
451:4 530:1
**representing** 7:12
**request** 337:17
**requested** 128:14
147:21 148:21
186:15 328:22
350:7 374:5

SCOTT H. TAYLOR

February 9, 2012

Page 580

| | | | | |
|---|---|---|---|---|
| **require** 55:21 82:3 | 221:10 349:16,21 | 293:7,8 317:6,14 | 469:23 | 198:20 208:5 |
| **required** 55:12 | 372:25 | 334:2 335:11,17 | **reviewing** 466:4 | 219:18,19 222:3,8 |
| 67:24 274:13 | **resolve** 72:14 | 359:13 391:19 | **revise** 15:2,6 77:12 | 222:16 225:18 |
| 337:19 | **responded** 501:16 | 393:21 400:25 | 125:11 148:14 | 226:17 231:8,9 |
| **requirement** 125:7 | **response** 15:10 | 440:16 443:17 | 318:5 426:7 | 235:19 243:4 |
| **requirements** | 19:16 342:10,19 | 445:13 470:13 | **revised** 11:22 13:19 | 246:5 250:17 |
| 58:12 | 379:20 | 480:21 494:19 | 15:12,23 82:24 | 252:17 265:20,20 |
| **research** 59:15 | **responses** 339:5,14 | 501:21 505:22 | 98:18 117:22,24 | 266:16 268:10 |
| 103:16 133:23 | 339:24 | 512:17 513:23,25 | 121:2 146:3 | 271:24 283:22 |
| 135:14,16 267:12 | **responsiveness** | 514:5,11 518:20 | 209:17 229:22 | 290:7 293:21 |
| 284:21 308:1 | 3:14 | 522:10 524:7 | 304:23 305:13,15 | 312:25 316:5 |
| 385:10,13,15,22 | **rest** 43:13 128:6 | 525:5,15 526:8 | 316:13,16 317:11 | 340:3,3 348:19 |
| 386:2,3,6,22 | 238:15,16,17 | 527:10,17 528:5 | 317:24 318:11 | 352:8 353:3 |
| 387:3,9 397:24 | 313:14 375:6,13 | **resulted** 512:22 | 333:7,8 374:11 | 366:24 372:22 |
| 398:7 399:5 | 497:8 | **results** 43:18 | 399:12,18 425:23 | 383:24 387:21 |
| **researched** 397:23 | **restaurant** 185:25 | 233:20 | 426:4 440:21,24 | 388:6 389:25 |
| **researching** 398:6 | **resting** 336:14 | **resume** 300:3 | 456:19 469:18,21 | 403:2 409:4 |
| **reserve** 98:13 | 342:23 343:1 | **retail** 283:14 | 471:13 512:2 | 416:23 418:9,10 |
| **reserved** 3:15 | 344:13 345:4,5,13 | **retain** 431:15,20 | 521:8 530:9 | 425:24 426:2 |
| **reserving** 500:3 | 345:21 346:7 | 432:10,15 | **revision** 15:6 | 429:3 432:3 433:7 |
| **resided** 445:4 | **restoration** 23:13 | **retained** 63:23 64:6 | 146:15 147:14 | 447:2 449:20 |
| **residence** 60:1 | 23:15 81:15 | 65:24 410:12 | 149:3 | 450:12 464:17,20 |
| 123:20 176:16,17 | 171:15 187:24 | 524:13 | **revisions** 85:16 | 465:1 468:6 |
| 289:15 290:2 | 213:20 216:16 | **retrieve** 421:4 | 146:19 147:5,19 | 469:18 476:4,11 |
| 292:5,12,18 | 217:14 367:23 | **return** 171:20 | 147:21,24 148:6 | 497:20 500:3 |
| 293:23 294:9 | 378:5,8,10 431:12 | 188:1 213:20 | 148:19 529:10 | 505:1 506:6,24 |
| 297:17 305:8 | 432:20 | 369:23 493:17 | **rid** 238:17 | 509:5 |
| 312:21 315:18,20 | **restorations** 36:15 | **returned** 61:22 | **ridge** 239:17,21,21 | **rimkus** 523:22 |
| 347:5 362:17,24 | 36:18 37:2,5 | **retype** 324:21 | 239:25 240:2,7,8 | 524:12 526:23 |
| 369:12,15 371:9 | **restore** 188:6 | **retyped** 467:13 | 240:14,20 443:6 | **risen** 479:9 |
| 375:19,20 376:9 | 189:10,23 191:20 | **review** 29:24 60:25 | **right** 14:20 15:16 | **risk** 163:13 171:23 |
| 376:13 379:21 | 376:25 431:13 | 61:2 145:22 146:4 | 15:19,20,22 34:19 | 172:3 213:24 |
| 380:19 381:11 | **restored** 216:14 | 147:16 205:18 | 36:10 37:12 44:8 | 216:24 217:2 |
| 382:3 403:25 | 511:19 | 217:10 218:15 | 44:11 50:24,25 | 330:21 360:15 |
| 404:6,15 456:12 | **restoring** 188:3 | 290:9 317:1 325:5 | 51:2,6 79:25 | 362:25 370:1,5,9 |
| 493:8 494:6 524:6 | **restricted** 50:11 | 325:6 356:4 362:8 | 83:25 98:13 | 370:14 371:6 |
| 524:16 526:19 | 90:3,8 | 362:10 369:7 | 121:14,22 122:2 | 428:20 430:20 |
| 527:22 534:20 | **rests** 336:11 | 370:12 410:15 | 122:18 125:6,15 | 471:14 472:3 |
| **residences** 264:10 | **result** 49:25 73:19 | 423:14 424:5 | 126:1,9 133:2,15 | 521:6,11,12 |
| 533:19 | 85:12,22 86:25 | 446:2 450:22 | 141:21 142:4 | **rita** 36:20 37:7,8,8 |
| **resident** 58:24 59:1 | 92:22 96:2 101:17 | 469:20 470:1,25 | 148:16 150:25 | 37:10 50:4 |
| **residential** 41:12 | 118:23 151:15 | 473:6 486:8,14 | 152:8 153:23 | **river** 1:22 7:2,19 |
| 59:23 | 159:15 175:22 | 523:20 525:12 | 163:12 164:23 | 8:2 |
| **residing** 527:18 | 177:25 178:12 | **reviewed** 16:10,13 | 167:18 169:3 | **rmr** 2:24 538:4 |
| **resigned** 33:20 | 186:7 188:15 | 16:14 147:25 | 185:5 189:21 | **road** 1:22 7:2,19 |
| **resolution** 72:15 | 203:22 204:2,5 | 305:25 339:21 | 190:2,3,8 193:12 | 204:25 497:15 |
| 208:25 209:5 | 205:7 232:6 250:4 | 410:23 440:9 | 193:14 194:21 | 531:23 534:19 |

SCOTT H. TAYLOR

February 9, 2012

Page 581

535:1
**robinson** 8:16 9:6,7
  9:16 64:2,9,10
  68:20,22 79:18
  107:7 144:12
**roger** 2:24 3:21
  538:4,20
**roles** 47:21
**roof** 126:23,23
  129:18,21,22
  159:14,15,24,25
  160:5 167:6 168:7
  169:25 170:2,10
  179:11,12 207:7,8
  207:9,15,16,17,18
  211:17,20,21
  212:10 233:1
  234:8,16,21 235:2
  235:7,11,11,15,25
  236:3,4,11,12,17
  236:24 237:4,20
  237:22,23,25
  238:22 239:1,6,14
  239:25 240:10,12
  240:19 241:1,5,11
  243:11 244:22
  247:15 248:1,8
  249:1 250:1,2,9
  250:11,15 256:21
  258:16 275:17
  313:17 330:21
  331:9 336:18,20
  357:1,7 359:1,8
  359:18 360:1,13
  362:20,21 367:6
  367:15,17,19
  430:8,13,17
  435:22 443:5,18
  443:23 444:6,15
  444:25 445:8,16
  445:19 471:14
  476:7 479:10,11
  512:21 513:6,22
  514:5,9 526:6,16
  527:9
**roofing** 53:15
  81:11 170:19

**roofs** 170:20,22
  239:12 242:24
**room** 109:2 233:9
  233:17 438:14
  439:9 447:4,12,17
  449:22 473:18
  477:13,25 478:16
  488:7,8
**rooms** 118:18
  124:21,21 125:3
  190:3,4 232:19
  233:4 311:20
  316:18,21 332:23
  437:5 471:2
  480:17
**rose** 479:15
**rouge** 2:3
**rough** 510:18
**round** 238:12
**royal** 36:15,17 37:2
  37:5 81:15
**rule** 126:18 145:2,2
  145:15,16,17,18
  145:20 171:13
**rules** 3:7
**run** 38:8 84:17
  135:18 234:16
  267:13 268:12
  424:1

--------

**S**

**safe** 464:1
**sagging** 366:25
**sales** 263:7 265:4
  380:20 381:15,20
  381:21 382:2
**salt** 61:3
**salvage** 489:20
**salvaged** 368:10
  369:4
**sample** 423:25
**sampled** 268:11,11
  387:11,13
**samples** 73:21
**sampling** 386:3,5
  387:6,7 424:1

482:25
**sanity** 22:3 195:2,9
  268:14
**satisfaction** 177:2,9
**save** 3:13 159:25
**savings** 194:15
  197:7
**saw** 115:21 124:15
  136:8 137:18
  144:12 148:12
  168:5,8 169:5
  207:10 208:14
  217:22 240:5
  244:20 266:10,10
  267:3 276:11
  302:18 331:1,2,11
  360:2 370:2 419:7
  455:5 461:17
  462:21 463:9
  468:8 471:19,21
  471:22 481:18
**saying** 87:23
  117:11 126:16
  132:9 143:8 147:9
  167:16 196:15
  209:8 224:1,5
  229:2 243:10,19
  259:22 261:6,17
  297:1 396:9
  417:24 495:19
**says** 49:20 75:22
  101:14 121:14,21
  155:12 165:16
  168:19 173:18
  174:18 179:11
  184:25 187:22
  208:25 218:18
  221:23 237:15
  247:4,8 249:1
  258:14 267:20
  270:5 275:4,12,12
  275:13,16 283:12
  314:15,19,24
  337:1 341:16
  348:12,21,25
  355:6 357:12
  358:2 373:19

379:3,6 397:10
  406:16 418:4
  422:9 424:11
  464:22,23 465:15
  477:2,11,25
  487:11 497:25
  515:10,11,22
  516:13,19,24
  517:9 518:10
  519:18 521:12
  526:6
**scanned** 296:22
**schedule** 73:8,14
  75:10 76:1,4 79:6
  79:19,24 80:13,18
**schneider** 16:24
**school** 52:17 54:12
**scientific** 25:25
**scope** 152:5 158:20
  194:24 261:9,14
  337:20
**scott** 1:22 2:6 7:1
  7:18 10:12 30:13
  30:19 31:3,10,17
  31:20 33:7,7,17
  38:13 48:25 49:10
  50:19,20 51:7
  196:1 285:2 300:1
  314:19 422:9
  537:4
**scout** 283:13 284:8
**scratch** 23:20
  24:10
**scratched** 103:12
**screen** 200:7
  255:11 378:24
**screened** 362:19
**se** 14:19
**seal** 170:25 208:20
**seals** 208:19
**search** 352:15
**second** 54:21 96:8
  110:18 120:15
  122:6 123:14
  179:11 188:17
  211:11 236:14
  246:1 247:1

282:17 287:4
  298:2 299:15
  300:18 309:10,12
  309:13,20 312:25
  315:11 329:23
  330:8 357:18
  361:6 367:21,22
  372:5 379:2,6
  390:1 396:17
  405:10 409:21
  460:17,20 461:4
  461:15,18 463:6,7
  463:9,19 465:15
  466:2 470:12,19
  470:22 474:2
  479:7,11,15
  480:11,20 481:4
  481:13 482:2,9,16
  483:17 485:7,17
  489:17 497:21
  506:21 511:20
  515:20 518:13
  522:1 526:14
  529:10 530:13
**secondly** 532:16
**secondtolast** 284:5
**section** 154:10
  155:4 165:13
  187:20 221:4
  234:20 348:11
  360:24 364:6
  373:18 413:25
  418:21 428:20,25
  431:12 432:21
  435:9 437:8
  471:14 472:3
  521:11
**sectional** 164:9
**sections** 48:2
  170:10,22 360:14
  362:22 363:11
  364:23 414:3
  441:10 461:24
  471:15
**security** 188:4,8,10
  188:12
**see** 17:25 21:2 22:2

SCOTT H. TAYLOR

February 9, 2012

Page 582

77:9 88:22 99:10
102:7,8 103:16
104:14,19,20,20
105:12 109:8
120:18,19 121:7
121:10 123:12
129:15,16,17,18
129:19,21,22,24
129:25 130:3
131:10,18 132:14
133:1,16 134:21
135:19 137:19
138:7,18,20 139:7
149:10 150:11,15
152:16 154:13
160:23 167:4,21
170:4 171:9
173:12,14,22
175:23 176:18
177:15,17 179:8
182:20 184:22
185:1,4,5,9,11,22
186:1,2 196:12
206:10,16 207:1
208:10 218:22,22
224:18 233:9
234:24 239:11
245:1,2,2 248:14
256:18 267:9
268:10,13 270:23
275:3,15,19,23
276:18 283:9
284:2 300:20
301:8 315:3
330:10 332:22
337:23,24 339:15
342:3,5 353:3,6,9
353:10 358:3,18
358:24 359:4
362:16 367:7,21
380:4,6 382:4
393:16,18 394:1
395:17 398:7
399:15 401:8,9
402:2,2 405:2
406:10,15 408:1
418:21 438:3,10

438:16 440:12,20
441:12 446:25
449:19 450:3
452:4,6 459:1
461:11,14 467:16
467:18,24 472:16
473:9 477:5,7
478:1,5,17,21
481:23 483:13
485:9 486:15
487:23 488:9
498:1 515:12,14
515:15,17,19
516:6,11,16,20,21
517:1,4,10 518:17
519:18,22,23
521:21 522:3,5
524:9,17 526:11
526:13,20
seeing 77:25
181:22 208:16
217:4 233:20
440:16 462:21
510:18
seek 293:15
seeking 507:21
519:12
seeks 188:5 189:10
seen 26:6 96:14,23
96:24 98:5,8
101:2 145:13
146:14 151:10
173:1 174:22
176:18 182:8
183:16 235:9
240:1 256:2
262:18 270:7
301:15,17 317:2
337:12 379:14
390:25 429:9
440:11 458:3
475:24 507:14
520:20
send 128:6,7
261:16
sending 349:8
sense 100:4 107:24

165:7 241:14
255:2 313:22
525:14
sent 76:19,20 77:9
97:18,21 98:10
140:9 261:6
296:21 323:8
510:19
sentence 163:14
210:16 350:6
522:1
sentimental 278:2
278:4
separate 113:12
212:13
separated 441:10
separately 13:12
24:4
september 44:23
184:12,12 205:5
498:1 499:21
500:6 524:20,23
525:13
sequence 35:24,25
41:8 120:20,21
121:9,15 320:13
320:23
sequentially 516:22
serious 255:24
service 32:2 33:3,5
33:12,15 48:22
49:16 63:4 379:7
523:23
services 30:13,21
31:3,11,18,21
33:8,18 35:25
45:24 47:4 48:15
48:25 49:7,11,12
50:19,21 51:7
524:13
set 165:4 248:7
333:17,20 350:6
526:23 538:8
setting 46:19 47:1
settle 403:24 493:7
settled 289:14
settlement 175:19

176:13 180:6
settling 40:8
seven 32:3 42:24
severely 341:22
shakes 8:20
shape 167:6 235:7
235:10,14,20,21
236:3,13,18 237:4
239:14 248:18
313:17 445:20
529:20
share 125:5 308:11
462:8
shared 309:1
315:21 533:6
534:9,24
sheathing 129:20
360:5
shed 208:21 362:19
364:5 391:9
478:17,21 479:1
sheet 100:20 121:6
123:7 152:5 164:5
164:7,8 313:21
343:13,14 344:16
378:24 396:24
417:25 418:1,2
420:17 422:4,5,5
422:9 464:21
487:8 537:15
sheetrock 365:6
366:6 429:13,23
446:10
sheets 312:24
333:16 417:13
473:7
shelf 101:19
shell 418:5,14
shelves 101:15,15
137:1,2,16 231:2
231:2,19
shelving 101:20,22
shes 7:10
shingle 126:22
170:24 208:20,21
239:19,20 240:7
330:22 471:15

shingled 239:25
241:4,6
shingles 170:1
171:1 208:11,11
238:2,6,13,14,19
239:5,7,10 240:2
240:17,24 243:2
244:7 526:7
shirts 424:21
shooting 123:21
shore 292:3
short 36:1 44:20,24
234:6 330:1,2
498:6 518:13
shorten 260:15
shorter 42:14
shorthand 538:10
shortly 314:25
315:1 465:7
shorts 424:25
shotgun 414:1
441:12
show 17:7,13 58:10
73:22 95:5 114:8
120:21,23 123:25
124:1,1,5 125:14
125:23 129:12
139:25 165:3
170:1 172:18
178:21 207:16,19
234:17 250:3,5
255:6,7 295:21
296:17 333:22
336:23 338:18
360:19 365:2
366:5 400:4 405:6
415:25 416:13
495:21 506:4,9,10
507:13,15,18
517:24
showed 103:5
124:8 126:7 143:4
153:17 212:5
355:11,11 360:13
387:9 430:12
443:7
showing 123:15,16

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

SCOTT H. TAYLOR                                    February 9, 2012

123:22 164:8
166:2 297:24
473:11
**shown** 100:24
123:17 172:17
174:14 211:18
431:5
**shows** 124:7,9
140:19 170:7
237:23,24 255:13
367:14 444:19
**shutters** 346:8,23
347:1
**side** 32:3 33:13,16
52:18 121:14
304:22 343:11,11
353:3 366:24
484:16
**sidebyside** 392:17
**sides** 27:13 112:11
**siding** 44:13 130:7
367:8,9 521:13,18
522:9,11,25 523:2
523:8 526:8
**signature** 537:9
**signed** 301:3
537:10
**significant** 512:10
518:16
**significantly**
191:13 230:1
**signing** 3:10
**signs** 430:12
**similar** 68:19,21
101:21 127:12
133:22 164:15
208:16 225:15
289:4 297:18
305:24 307:22
310:13,17 346:11
347:14 361:19
413:22 414:7
457:23 467:4
486:16
**similarities** 276:18
436:19
**similarly** 144:7

270:16 427:25
437:4 508:6
**simple** 159:5
209:14 494:6
**simpler** 113:6
**simply** 195:14
**single** 30:17 76:16
264:9 272:5 414:8
437:2 438:9 441:3
441:19
**sink** 448:16,17
**sir** 501:17
**site** 65:16 88:14
94:2 119:23
123:14,14 152:10
153:1,23,24 166:4
350:11,14,18,20
351:5 354:17
403:16 459:2
524:19
**sits** 208:19 336:22
**sitting** 14:20 15:22
169:3 198:20
258:13 372:22
388:6 432:2 442:4
**situation** 9:22
39:12 90:24 104:1
108:12 111:11
114:6 141:6
210:20 279:24
**situations** 91:2
94:4 104:2 160:16
**six** 222:2,8 223:7
283:15 367:7
**size** 191:19 233:4
261:13 313:10,22
314:2 529:19
**sizes** 123:16 315:18
**sketch** 118:15,17
119:2 125:4,5,24
126:1 235:13
236:5 248:21
250:12 312:15
510:18 528:25
529:21 530:18
**sketched** 248:16,18
248:23

**sketches** 126:7
312:21 313:7
316:8 413:24
530:14
**skip** 282:21 507:20
**skipping** 527:12
**slab** 24:25 25:19
123:15,16,22
152:22 153:3
169:21 171:22
213:23 216:23
217:7,21,23 313:2
355:10 369:25
371:21,23
**slate** 430:9 443:5
**slight** 230:15
**slightly** 239:18
**slope** 235:24,25
236:3 237:5,6
**small** 234:23
**smaller** 190:6
**sofa** 164:9
**soffit** 332:6 357:1
**soffits** 359:1 479:8
526:7
**soft** 219:22 270:11
270:19,21
**software** 21:11
22:19,19 40:21
41:21,23 42:3,7
42:12,13,16,20,23
43:17,19,24,25
44:3 47:5 60:22
153:18 165:20
273:6
**soil** 371:19
**sold** 284:14,15
**sole** 214:4 370:8
481:2
**solely** 243:9
**solution** 368:7
**somebody** 95:9
105:21 140:11
141:7 198:18
240:23 244:6
247:5 258:25
495:20 497:12

525:9
**somewhat** 52:8
145:3 252:8
424:16 530:3
**son** 286:4,7
**sorry** 22:25 29:6
30:15 46:12 64:24
72:2 83:14 86:3
100:25 180:10
222:4,22 242:5
245:24,24 249:5
308:3 335:4
338:21 348:14
364:19 365:19
380:23 402:8
422:23 427:8
447:8 450:9
452:21 481:22
496:10 503:10
521:8
**sort** 33:14 58:6
130:2 333:17
444:14
**sought** 3:17 359:12
406:23
**sound** 71:7 219:18
219:19,20 431:25
432:4
**sounds** 219:19
**source** 153:9,10
206:1,7 240:24
272:18 329:12
420:16 510:20,20
**sources** 197:8
259:6 324:21
445:7 469:2
**south** 7:23 8:6,10
57:12,12 58:22,23
59:23 60:2,3
**southern** 173:20
**space** 341:21
447:13
**spawned** 57:24
**speak** 64:19 68:9
69:17 137:14
150:23 157:25
162:10,24 174:13

177:11 178:19
179:14 182:5,14
192:11 205:20
210:9 230:13
276:23 277:3
288:8 291:11,15
292:14 296:1,15
334:8 347:22,24
369:17 371:18
399:1 403:17
407:24 410:13
434:24 440:25
444:9 446:11
451:9 452:14
457:4,13 458:24
470:24 472:21
487:22 497:11
519:8 525:9
**speaking** 69:23
149:8 161:9
220:25 232:6
294:25 324:24
348:3 350:4 439:4
439:10 455:4
503:2,3
**speaks** 19:17
**specialized** 55:24
**specific** 29:16 61:9
61:12 87:25 90:13
91:19 93:13 102:3
102:11 111:1
131:6 135:13,15
148:17 149:19
221:17 234:2
278:4 286:23
342:25 355:18
373:7 453:5,6
**specifically** 3:10,12
17:15 19:10 56:13
69:25 84:24 88:25
94:1 111:22 118:6
126:2,17 137:9
201:22 217:20
231:21 284:25
337:20 350:20
364:22 385:12,14
441:13,21 455:8

SCOTT H. TAYLOR                                              February 9, 2012

Page 584

500:25
**specifics** 28:13
**specify** 182:22
**speculative** 223:12
  401:15
**spell** 33:24
**spelling** 87:11
**spend** 67:13 91:20
  262:5 495:2
**spending** 192:16
**spent** 33:17 61:7,14
  61:22 76:24 77:2
  77:2 78:9 195:21
  260:25 261:4,24
  297:7 405:4
  454:22 503:20,25
**spin** 64:13
**spits** 241:16
**spoke** 29:20 69:21
  246:14 320:15
  383:24 386:7
  462:3 481:8 495:1
**spoken** 69:19 88:9
  457:1
**sporadic** 208:11
**spot** 256:3
**spots** 315:5
**sprayed** 353:11
**spreadsheet** 95:15
  136:24 155:14
  432:23 433:2,22
**spring** 65:22 67:21
  490:25
**springer** 200:22,25
  201:4
**square** 124:24
  153:8,15,19 190:2
  190:15,16 233:5
  235:5,6 236:25
  238:9,19 243:2
  311:23 312:1
  313:12
**squares** 232:25
  238:6,7,9,11,20
  238:25 249:2
**st** 214:10 493:17
**stacks** 241:12

**staff** 33:21 50:9
  70:1
**stages** 355:8,13
**stagnant** 336:15
**stamp** 301:25
**stamped** 5:17
  183:14 339:3
  357:13 390:16,21
  400:20 405:9,24
  476:8 477:1,24
  478:16 514:25
**stand** 149:1 211:10
  258:14 363:6
  369:5 371:15
  376:4 377:17
  394:10 407:8
  453:23 491:8
  494:25 497:9
**standalone** 447:20
**standard** 126:21
  130:12 132:13
  142:3,13 145:16
  236:20 241:25
  251:5 263:15
  264:6 271:5,12
  295:16
**standards** 98:4
**standing** 172:7
  336:14
**standpoint** 62:11
**stands** 39:24
  224:19 249:18
**start** 16:5 24:10
  40:14 42:12 60:2
  67:12 92:11,18,20
  92:21 118:24
  137:19 165:22,25
  390:14 455:14
  482:15
**started** 8:15 49:4
  51:10,11,12 67:3
  79:2 80:2,3
  103:13 165:23,24
  446:9 505:18
**starting** 23:19,20
  64:19 135:3 154:7
  245:22 246:20

447:2 488:4
**starts** 301:6 330:9
  405:25
**state** 2:25 3:22 7:17
  46:18 55:20 56:19
  57:6 58:2,12,13
  58:17,19,21 59:14
  63:8 82:3 154:9
  175:25 189:8
  205:17 207:22
  219:15 232:9
  330:21 332:11
  341:9 342:22
  354:22 356:25
  360:4,12 363:7
  364:22 367:24
  369:23 371:19
  372:4,24 392:21
  403:4,22 413:22
  422:15 428:21
  432:14 435:11
  442:18 443:4
  445:25 472:4
  473:25 474:14,24
  475:13,15 478:24
  479:7 493:5,22
  512:16 517:14
  538:22
**stated** 362:15
  368:14 418:20
  501:12
**statement** 77:9
  154:18 155:13
  163:17 164:1
  170:3 177:2 189:1
  213:13 214:7,8
  224:13 226:23
  229:6 332:17
  333:5 368:22
  371:14,17 403:8
  404:2 420:3
  430:11 472:5
  473:5 477:22
  478:9
**statements** 333:6
  371:18 534:16
**states** 1:1 2:19,22

7:14 35:9 55:21
  56:20 58:1,3,10
  58:11 59:12,13
  241:23 337:16
  369:9 371:8 391:3
  405:11,25 471:14
  478:4,19 516:10
  518:20 524:4
  526:14 531:6
**station** 2:21
**statistical** 295:2
**stay** 53:3 134:9
  292:4
**stayed** 420:4,5
  454:14
**step** 41:8,13
**stepped** 148:11
**steps** 201:19
  240:23 388:10
  454:2
**stipulate** 174:19
  204:1 221:3
  235:18 257:11
  276:13 293:3
**stipulated** 3:3
  389:21
**stolen** 521:13,18
  522:9 523:9
**stone** 1:23 2:12
  7:11
**stood** 208:13
**stop** 236:14
**stopped** 51:23
  294:4 505:19
**stops** 367:8
**store** 200:22 232:1
**stores** 201:4,5,6
**storm** 50:10 391:14
  420:6 515:12,19
  516:10,19 517:9
  523:13
**storms** 49:24 50:12
  444:8
**story** 92:8,10,10,15
  92:17 320:15
  321:24 470:19,23
  528:18

**stove** 448:12
**straight** 195:17
  290:4
**strategy** 24:1,2,14
  24:15,17
**straw** 243:22
**street** 1:24 2:3,6,10
  2:14 352:16 501:2
  519:22 520:19
  524:9
**streets** 354:8
**strengthen** 287:11
**stresses** 371:20
**stretch** 281:10,13
**strike** 354:1 396:17
  492:6
**strong** 341:14,23
**strongest** 59:17
**struck** 173:20
**structural** 25:3,15
  26:11,16,19,24
  28:4,17 236:11
  320:2 361:22
  362:17,24 363:10
  363:17,19,23
  364:12,15,21
  368:16 371:10,11
  371:20 431:15,16
  431:20 432:7,10
  432:11,15 446:22
  447:18,24 448:19
  449:7,11,24,25
  468:10,14 494:12
  494:18 495:1
  496:18 524:15
**structurally** 25:23
  215:1 368:19,20
  370:18 431:25
  432:4
**structure** 25:20
  135:22 237:25
  243:7 314:3,6
  334:4 364:2,4
  367:15 418:23
  427:15,24 447:7
  449:13 450:14
  524:8

SCOTT H. TAYLOR

February 9, 2012

Page 585

**structures** 180:22
  180:24,25 181:3,5
  515:23
**stuck** 238:17
**students** 42:5 43:16
**studs** 418:22
**study** 198:21 262:1
**stuff** 239:11
**style** 127:5,12
  134:6
**subbing** 77:22
**subcourses** 47:18
  48:1
**subheading** 171:14
  173:16
**subject** 6:5 196:3
  213:12,15 406:7
**subjective** 261:24
  262:8 272:8
**subjectively** 273:23
**submerged** 170:23
  208:16
**submission** 418:11
**submit** 252:12
  337:17
**submitted** 86:6
  307:5 317:11
  325:7 458:14
**submitting** 301:7
**subsequent** 93:6
  147:24 188:6
  376:13 377:8
  385:4 396:22,22
  399:4,5 407:25
  457:13 484:9
  486:6,23 521:14
  522:15 525:7
**subsequently**
  412:25
**substance** 98:23
  99:19 286:18
  457:16
**substantially** 256:1
  366:25
**substantiate**
  112:25 202:5,5
**substantive** 87:22

**subsurface** 239:10
**subtotal** 406:17
**succession** 411:16
  411:17
**suddenly** 92:21
**sued** 517:20
**suffered** 217:23,23
  342:2
**suffering** 527:24
**sufficient** 159:21
  296:16 333:22
  461:11,14 470:5
**suits** 425:3,4,7
**sum** 286:18 457:16
**summarizing** 303:7
**supervision** 538:11
**supplement** 52:20
  341:25
**supplemental**
  55:19
**supplemented** 54:6
**supplied** 163:15
  166:14 168:20
  187:10 262:4
  276:16 322:23
  332:13,19 353:8
  418:2 473:21
**supplies** 244:7
**supply** 459:5,7
  460:2
**support** 29:11
  159:24 163:21
  164:1,19,20,21
  216:22 331:22
  332:1 479:20
  480:2
**supporting** 283:19
  295:3
**supports** 164:25
  480:19
**supposed** 176:2
  208:21 225:9,9
  494:2
**sure** 17:24 31:23
  40:4 52:4 61:9
  64:5 70:15,22

**taylor** 1:22 4:2,3,3
  4:4,4,5,5,6,6,7,8,9
  4:10,11,11,12,13
  4:14,15,16,17 5:5

88:1 309:19
90:22 91:17 103:6
105:7 122:23
128:8,8,10 131:15
136:25 140:10
167:6 176:2
177:11 184:22
195:8 199:8
324:18 340:10
357:20 393:12
405:18 411:17
435:6 462:6
464:19 492:4
506:5 525:24
**surface** 238:2
**surfaces** 220:13
  239:7 342:24
**surplus** 47:9
**sustain** 39:10
**sustained** 400:25
**switched** 501:4
**sworn** 7:3 300:2
  538:7
**system** 236:12
  267:14
**systems** 526:19

**T**

**table** 134:5
**tables** 58:9
**taillights** 397:3
**take** 24:17 50:6,22
  52:11 53:5 55:5
  55:15,19 59:6
  60:4 65:20 68:3
  73:5 76:3 78:11
  78:17 81:18 89:17
  96:7,16 118:23,23
  119:4 120:1 123:4
  124:12 133:14,21
  139:15 152:3,10
  175:10 183:15
  188:16 193:25
  197:25 198:18
  201:18 205:8,14
  208:18 211:9
  228:11 231:6

238:5,5,9 245:14
258:25 271:21
274:24 281:10,14
290:24 300:19
315:4 322:4,7
330:1 339:2
351:10,15,18
352:1 378:21
379:1 388:10
400:7 410:18
437:19 451:14
454:2 455:7
457:11 466:15
473:8 487:5
494:23 499:8,9
508:4
**taken** 1:23 3:6 56:2
  56:11 99:22 108:9
  108:12 121:21
  122:7,11,17
  124:10 129:1,6,8
  146:5,12 168:12
  168:14,15 299:4
  314:15,19 315:9
  315:12,14 365:9
  418:8 422:9 429:6
  429:10 464:24
  465:5,13,17,24
  466:8,11 500:6
  505:19 510:8,11
  510:13 537:17
**takes** 42:9 49:17
  65:14 68:4 188:1
  236:24 237:1,17
  237:18
**talk** 17:21 20:7
  22:18 47:23 65:5
  88:24 90:15 92:2
  161:10 169:12
  189:3 206:5 225:3
  281:3 322:25
  385:4 492:6,12
  531:20
**talked** 62:3 70:2
  81:13 118:7
  136:13 151:19
  154:15 163:19

166:15 172:15
189:15 193:8
211:17 213:10
230:2 271:23
272:1 289:11
290:8 302:24
350:21 355:5
368:21,24 375:3
383:12 408:5
448:24 467:2
509:3
**talking** 13:12 55:1
  55:4 62:9,18
  68:11 82:6,24
  84:23 86:4 99:16
  109:10 110:3
  164:18 167:17
  170:13 176:6
  180:9,10 192:16
  197:12 206:24
  210:17 247:3
  248:1 274:19
  275:9 285:21
  344:17 353:15
  422:4 477:1,10
  479:10 506:20
**talks** 184:19
**tapering** 429:1
**tar** 239:12
**target** 59:14
**task** 20:4 142:12
  269:19 335:25
**tasked** 327:13
  380:13
**taught** 40:22,25
  41:24 45:7,12,14
  45:15,16,17,18
  47:3 272:9 295:4
  295:6
**tax** 231:6 263:7
  265:4 380:20
  381:15,20,21
  382:2

SCOTT H. TAYLOR

February 9, 2012

Page 586

5:8,10,10,12,13
5:14,15,15,16,18
5:20,23,24 7:1,7
7:18 10:9 11:2,4,7
12:11,14,16,18,20
12:22 13:5,8
30:13,19 31:3,10
31:17,20 32:11,12
33:7,18 35:16
38:13 48:25 49:10
50:19,20 51:7,16
55:2 57:2 73:6,10
74:6 96:12,13
172:23 173:2,3,10
175:10,16 178:23
178:25 183:11,11
183:15 186:3
245:14 258:15
269:23,23 270:7
274:19,24,25
275:3 300:1,6,16
300:17 301:1
336:24,24 337:7
338:19 339:1
340:19 357:11,12
359:5 362:23
378:18,22 379:2
379:10 390:4,10
390:12,13,15,20
390:25 391:3,17
392:13 393:15
394:4 398:14
400:14,16 405:6,7
408:18 428:13
437:20,23,23
456:3,3,3,6,10
473:24 475:11,11
475:18 487:2,3,5
496:25 497:20
514:24,24 515:4
517:25 523:19,20
524:2,2 526:24
531:5 537:4
**teach** 41:2,11 45:3
46:2 95:7 273:3
295:7
**teaching** 35:14

43:9,15 44:25
47:11,15
**team** 36:3
**technically** 38:15
**technique** 407:9
**techniques** 235:20
251:1,3 254:24
**technology** 54:14
54:15 191:15
**teenagers** 51:24
**tel** 312:4
**telem** 312:4
**telemetry** 312:4
356:15
**telephone** 307:12
307:16 436:15
**television** 483:7
**televisions** 200:7,8
**tell** 32:13 51:19,22
56:25 67:19 70:10
74:13 75:15 83:2
88:7 89:18 92:9
92:10,23 98:7
104:13 106:19
109:25 130:21
131:19 132:6
133:4 145:9
161:16 168:17,18
170:12,19 173:11
181:2 188:8 208:7
209:6 229:8,10
232:25 235:16
238:10 247:22
249:11 250:8
263:12,19 266:13
294:8 301:14,17
307:16 312:19
316:4 319:22
320:15 321:6,24
323:21 331:22
332:24 333:10,14
343:5 349:14
351:8,8 352:24
357:3 364:20,24
366:9,18,21
372:21 383:2
399:11,16 413:19

415:2 416:9
418:25 419:16
422:13 437:9
460:12,19 464:11
473:4 482:15
487:13 491:18
499:1 501:3
502:15 504:16
507:6 508:2
521:17 523:12,15
**telling** 236:16,17
236:18 318:19
321:24 415:17
**tells** 419:3
**temporary** 184:20
185:1,14
**tend** 39:12 55:18
**tended** 37:13
**tendency** 73:19
165:21 170:20
171:1
**term** 278:9,14,19
**terms** 61:13 63:21
77:13 81:25
112:23 119:12
124:18 168:3
182:16 190:1
206:6
**test** 444:16,16
**tested** 236:22
**testified** 200:21
205:5 214:23
215:9 219:22
260:24 284:14
285:25 287:5
349:25 358:22
370:25 374:20
404:13 406:21
407:11,25 408:2
429:13 430:22
435:1,25 438:9,13
438:15 445:12,19
450:19,21 453:11
483:21 484:6
486:1 489:16,20
491:10 493:12,16
525:25 526:2

**testify** 7:5 538:7,8
**testifying** 300:4
420:1
**testimony** 9:13,15
9:18,23 10:1 62:6
107:1 145:23
161:13 163:18
209:25 224:3
243:17 250:18,23
274:8 286:13
294:15 303:6
347:14 359:25
403:13 407:2
408:9 416:11
419:24 431:9
438:19 440:17
442:13 446:4
472:24 483:24
486:9 537:5,6
538:9
**testing** 443:7
444:14
**texas** 9:24 59:5,8
59:11,14,17 60:1
404:7 406:1
407:12
**thank** 187:6 207:5
263:2 330:2
342:22 343:20
344:12 345:9,24
346:2 347:3
361:13 409:2
499:11
**thanks** 343:24,25
**thatch** 66:12,18
70:23 72:1
**thats** 7:20,22 10:25
11:24 12:24 23:2
23:14 25:7 26:20
33:9 34:20 35:22
39:23 41:7,9,20
43:25 45:24 47:2
49:9 50:2,23,23
53:16 57:5 58:5
59:1,21 61:9
62:11,12 64:25,25
70:6 71:2 72:12

74:5 75:2 76:2
79:15,16 81:20
83:12 86:23 87:8
92:13,16,20 96:2
96:2,13,20 97:14
97:16,17 98:4
99:11 100:24
101:13 102:21,21
104:12 106:20
113:22 114:10
115:18 120:18
122:13,13 128:11
128:18 129:14,14
132:2,3,4,14
137:3 141:13,14
141:20,22 142:4,8
144:4 145:3,7
147:4,6 149:5
151:17 153:25
155:6 157:3
159:24 164:11
166:8 167:16
169:10 172:9
173:9 174:17
180:11,21 183:10
184:17 185:20
186:11 193:13,15
194:13,24 197:6
203:18 206:9
208:3,4,14 209:8
214:6 216:15
217:19 218:22,23
222:16 225:8
226:3,3,8,10,19
228:11,13 229:5
229:14,15 230:7
232:12 233:9,17
234:3,10,12,23
235:12,20,22
236:6,9,19 237:16
237:22 239:1,4,13
240:4,12,13,13
241:19,24 243:25
244:5 254:14
263:15,25 264:5
265:18,25 266:1
266:16 270:8

SCOTT H. TAYLOR                                    February 9, 2012

Page 587

272:9,12,24,25,25
273:19 274:14
279:5,15 280:9
282:5 284:7
285:11 287:21
288:10,13,17,24
289:6 294:13,25
295:16,17 296:2,4
303:18 304:19
311:6 313:24,24
314:12,16,18,20
315:13,16 316:2,5
317:18 322:14,18
323:7 324:7,9
329:2 333:13,22
337:14 340:1,5
343:12,13,25
349:1,6 350:13,15
352:3,6,6 355:4
355:24 357:8
362:3,6,9 365:25
365:25 367:2,4,13
367:17,19,20
369:22 370:10
376:24 377:4
378:5,10 380:3,8
382:6 383:11,14
383:20,25 384:11
384:16 387:5,10
387:12,14 388:5
390:21 393:14
395:12 396:11,14
397:1 400:20
401:21 404:14
405:8 409:10
412:6 413:11,14
419:24 421:6
422:7 424:19
426:13 429:4,8,11
432:8 433:13,13
433:24 434:4
437:22 440:7
445:10 450:24
460:2,3 462:2,3
464:24 465:8
466:11 468:4,7
469:4 470:10

471:24 472:2,18
473:8 477:24
478:16 484:8,10
486:13 487:4
496:20,25 505:25
510:10,15 515:2,3
515:25 525:23
532:19
**theft** 488:3 522:19
522:25
**theirs** 230:15 245:2
248:8,10 459:11
527:5
**theme** 155:10
**thereof** 3:16
**theres** 35:17 48:1
55:23 56:13,18
76:21 87:10
102:16 103:1
104:6 113:14
123:23 130:2,17
131:24 135:17
145:17,18,19
149:2,4,4 152:20
152:21,21,22
159:23 163:12
164:20,21 169:14
183:5 198:17
210:18 224:17
228:5 233:2,8
239:2,3,6 242:21
247:14 250:12
251:1,18 255:4,14
257:15 259:14
267:19 272:20
287:24 312:12
315:5 317:18
321:2,8 323:23
324:1,5,8 345:13
346:3 348:21
349:4 378:11,14
381:2 392:18
395:1 400:22
431:9 448:23,25
464:11 480:10
481:12 484:20
487:10 518:4

522:16,19
**theyre** 27:22 42:11
72:25 82:12
105:16 115:25
116:11 129:2
130:11 131:12
133:15 152:5
192:22 201:5,6
220:11 239:18,23
251:14 252:9,15
252:15 254:25
255:1 277:4
279:16 327:23
332:22 352:12
363:14 384:13
394:24 417:14
428:8 447:1 448:1
449:13,19,20,25
450:3 464:13,14
490:17,18,21
507:21
**thing** 38:7 42:9
68:1,19,22 81:14
96:4 102:25
124:25 125:3
127:23 132:14
145:4 168:4
191:10 230:25
231:12 234:10
241:5 242:2,20
244:3 252:24
253:1 254:19
263:17 268:4
277:6 303:21
311:21 312:5
313:2,17 349:25
352:15 411:19
415:11 448:22
483:1 491:20
494:11 495:1,2
**things** 21:9 22:8,9
26:7 33:1 36:6
50:7,23 53:15
64:15 69:14 71:24
79:1 87:11 90:6
91:3,13 92:1,14
93:16 94:7,14

97:24 104:10
110:8 127:4,13
129:22 130:2
133:6,22 137:19
141:11 144:23
152:17 165:8,25
167:1 175:21
191:6,16 221:23
224:24 231:11
242:23 262:6
267:13 271:25
273:22 281:24
285:14,16,21
287:24 297:14
314:7 316:21
321:22,25 364:1
372:13,14 385:18
389:6,10 457:23
490:12,20 504:18
530:18
**think** 14:6 37:15
62:5 66:1 69:10
71:2,25 72:11,20
87:2 95:20 97:24
110:22 122:21,22
127:25 128:4
131:6,16 145:9,10
149:9 154:15
156:25 157:25
169:4 195:12
196:13 198:7
199:9 207:5
220:18 222:11,13
223:5 230:15
231:8 250:25
252:3 256:17
259:14 260:10,11
260:24 261:2
262:22 281:9
287:14 291:12
299:11 304:23
311:24 328:13
333:22 339:18
340:3 350:15
361:15 382:9
392:15 398:14
400:3 413:3,4

420:7 435:1
440:17 447:1,13
451:7 458:17,24
484:21 485:2,13
497:14 508:16,18
525:11
**third** 104:3 105:7,7
105:19 232:12
298:4,6 379:12
**thomasville** 467:23
**thorough** 41:16
42:8 272:6,7,8,25
333:9 470:25
**thoroughly** 43:11
**thought** 80:7
115:18 158:1
178:6 185:6 197:1
207:6 222:23
368:25 381:7
409:12 425:11
462:10 484:1
**thousands** 20:17
62:4,14
**three** 48:11 49:3
137:2,25 166:9
221:15 231:3
241:24 243:19
373:5,20 392:16
392:16,18 447:22
535:8
**thrift** 232:1
**throw** 238:15,16
**throwing** 232:21
**throws** 257:15,19
263:8
**thursday** 1:24
**ticket** 135:17
283:13 385:17,25
386:25
**tile** 219:17 220:8,16
221:1 444:17
**tiled** 239:25
**tiles** 219:22,23
240:1 443:6
**time** 3:16 14:15
15:13 19:5,14,22
30:25 31:13 33:14

SCOTT H. TAYLOR
February 9, 2012

Page 588

| | | | | |
|---|---|---|---|---|
| 33:16,17,19,21 | 372:12 382:24 | 138:21 139:12 | **touched** 110:23 | 339:22 374:23 |
| 34:12,21 36:1,12 | 397:12 403:23,24 | 188:18 210:25 | **toyota** 396:4,20 | 410:4,7 439:5,10 |
| 37:14,15,21 38:10 | 407:12 412:24 | 214:25 238:8 | 397:2 401:11 | 456:6,10 472:14 |
| 38:12,16,24 39:2 | 413:12 414:6 | 262:16 302:15,16 | **tract** 126:21 | 472:22 501:15 |
| 39:11 40:9,11 | 415:20 416:12 | 306:14,16 318:3 | **traffic** 66:20 | 502:3,7 537:5 |
| 41:3,3 42:14 43:2 | 418:11 419:23 | 319:25 320:23 | **train** 82:14 | 538:11 |
| 44:19,20,25 45:4 | 425:20 426:3,6 | 361:18 374:8 | **trainer** 36:3 48:22 | **truly** 476:23 |
| 46:4,21 50:22 | 433:1,9,12,15 | 415:20 441:14 | 51:14 | **truss** 236:12 |
| 51:2,6,20 52:7,13 | 434:3 435:5,7 | 459:23 461:3 | **training** 40:20 | **trust** 434:2,6 |
| 52:19,24,25,25 | 437:2 441:14 | 483:20 507:8 | 45:20 50:7 53:23 | **truth** 538:8 |
| 55:23 56:15 58:22 | 446:1 454:21,22 | 529:17 533:23 | 53:25 54:18 55:8 | **try** 8:25 16:3,6 58:6 |
| 58:24,25 61:7,14 | 454:25 461:21 | **tomorrow** 282:22 | 55:25 56:6 58:6 | 84:15 92:8 112:7 |
| 61:14,18,21 65:16 | 462:3 463:19 | 282:25 | 60:16,17 | 113:19 117:4 |
| 65:17 67:13,24 | 464:2 466:20 | **top** 103:10,13 | **trampolines** 165:5 | 124:1 138:17 |
| 68:2,3 74:17,22 | 470:5 472:11 | 121:13 127:8,8 | **transcribed** 538:10 | 145:1 182:20 |
| 75:18 76:9 77:17 | 483:7 485:16,23 | 164:11 169:12 | **transcript** 172:24 | 212:13 230:9 |
| 78:4,6,7,11,17 | 485:24 486:4,17 | 206:14 207:14 | 328:16 410:16,20 | 267:10 385:10 |
| 79:12,22 81:18 | 488:19 489:24 | 235:15 237:21,24 | 410:24 538:12 | 389:12 395:13 |
| 83:6 84:3 85:24 | 493:6,7 494:1,5 | 263:5 269:25 | **transcription** 537:6 | 396:10 414:13 |
| 86:8 89:18 91:15 | 495:3 498:6 | 333:16 337:1 | **transcripts** 147:12 | 423:15 489:3 |
| 91:20 93:14 94:9 | 503:15,20,23 | 344:7,9 353:2,2 | 147:17 148:1 | **trying** 58:7 67:10 |
| 94:17 107:20 | 504:8,9 505:4,21 | 357:13 365:1,21 | **transitory** 39:13 | 67:11 84:2 123:19 |
| 116:22,23,25 | 507:10,13,18 | 405:11 473:9 | **transpired** 404:1 | 142:16 169:14 |
| 125:9,10,11 | 518:13 527:19 | 487:7 | 493:9 | 222:16 272:15 |
| 133:23 141:5 | 529:7,8 | **topics** 273:2 | **transplant** 46:22 | 289:21 363:18 |
| 142:10 147:22 | **times** 21:18 45:10 | **torn** 151:10,13 | **treated** 482:24 | 364:12 400:14 |
| 148:10 150:8,15 | 60:21 61:3,21 | 172:8,12 362:7 | **treeby** 2:13 | 416:23 450:9 |
| 157:9 166:20 | 63:3 93:2 102:22 | **tornado** 242:25 | **trial** 496:21 518:25 | 496:12 |
| 168:8,25 172:7 | 112:9 137:24 | **tort** 303:20 304:3 | **tried** 102:3 | **turbines** 241:6 |
| 191:13 192:15 | 231:7 240:1 248:8 | **torts** 2:20 | **trigger** 267:4 269:8 | **turn** 98:3 119:6 |
| 197:25 199:8 | 272:7 327:23 | **total** 62:9 77:1 | **triggered** 221:13 | 263:4 285:5 |
| 209:5 210:12,23 | 350:25 351:1 | 106:1 113:24 | 373:3 | 304:20 323:19 |
| 220:2 223:16 | 355:16,21,25 | 137:5,23 159:23 | **trim** 126:24 233:2 | 437:21 476:25 |
| 230:14 242:7,11 | 415:5 503:18 | 160:17 190:15 | 360:6 | 477:8 480:14 |
| 247:11 249:23 | 506:15 508:25 | 192:6,8 231:4,4 | **trip** 75:23 462:20 | 506:12 |
| 260:15 261:12,12 | **titled** 35:18 180:11 | 263:6 270:9,21,25 | 463:22 | **turned** 67:6 72:16 |
| 261:23 262:5 | 269:24 275:1 | 295:11 338:10,11 | **truax** 17:3,4 | 76:8 87:16 125:11 |
| 269:17 274:21 | 378:23 405:8 | 380:17 381:3,10 | **true** 28:1 38:14 | 125:12,15 |
| 276:6 279:20,21 | **today** 64:8 65:6 | 381:23 393:24 | 58:5 73:13 74:1 | **turning** 21:16 |
| 290:1 298:25 | 68:11 104:11 | **totality** 152:18 | 91:13 92:5 96:20 | 125:7 |
| 308:10 309:9,10 | 489:22 495:3 | **totally** 208:16 | 108:16 111:12 | **tutorials** 43:6 |
| 314:10 333:11 | **todays** 251:16 | 518:22 | 122:22 147:15 | **tv** 324:4 483:15,21 |
| 342:25 348:8 | **toilet** 448:21 | **totals** 102:2 | 171:2 205:1 206:4 | 483:21 484:7 |
| 349:21 351:5,17 | **told** 14:16 29:17 | **totura** 33:23 34:1,9 | 220:15 221:1 | 485:17 486:10 |
| 351:20 355:6,15 | 68:14 70:24 80:23 | 34:25 35:2,15 | 228:24 231:12 | **twice** 61:4 178:15 |
| 355:18,20 363:8 | 106:12 107:20 | 66:4 | 303:16 304:14 | 277:8,18 307:20 |
| 369:20 370:10 | 117:23 124:20,24 | **touch** 88:18 | 305:14 331:6 | **two** 24:8 61:18 |

JOHNS, PENDLETON COURT REPORTERS
504 219-1993

85:14 87:3 111:9
123:8,10 146:20
166:9 184:19,25
185:15 233:25
243:23 246:1
251:18 262:13
275:21 283:21
309:8 311:11
313:20 331:24
355:11 386:19
390:11 414:2
437:10,10 439:6
441:10 442:6,6
448:25 449:5,5
455:6 503:14
509:19
**twoby** 237:3
**twobyeights** 237:3
**twobyfours** 237:2
**twobytens** 237:16
**twopage** 336:25
**twothirds** 238:20
265:22,23
**type** 20:8 40:17
51:11 63:1 81:12
86:15 126:12,19
126:22 127:6,15
133:5 134:4
150:20,20 189:16
237:13 275:12
301:19,22 302:8
302:22,23 306:4
319:17,18 352:15
459:19 486:16
507:15
**typed** 323:6,7
467:10,11,13
**types** 53:23 242:14
270:14 302:12
452:24
**typewritten** 323:4
**typical** 264:8,15
294:12,14
**typically** 265:4
294:21,22,23
**typographical**
306:4 349:6

484:13
**typos** 87:19

_____

**U**

**uhhuh** 38:19 39:16
48:16 51:18 67:15
67:18 73:9 79:4
84:25 86:5 87:21
90:17 98:17,20
102:17 123:9
125:20 144:15
154:14 155:16
173:17 177:7
179:13 187:21
196:24 216:20
224:16 227:15,22
227:25 244:11
246:23 247:7
249:13 263:22
270:2 272:17
274:23 283:11
285:10,12 323:25
374:12 379:5
396:16 400:21
406:19 424:12
**ultimately** 73:1,11
459:19 460:1,6
**unable** 410:13
**unclear** 398:5
491:25
**underneath** 60:15
184:24 208:22
240:19
**underpricing** 256:1
**underside** 336:20
**understand** 8:22
12:2 14:6 72:22
73:4 76:13 84:3
86:18 105:7
117:11 119:1,4
128:20 134:17,22
141:5 142:15
143:6 149:7
177:12 179:10
225:25 233:14
259:21 278:9
351:2 358:12

361:13 377:19
383:20 426:13
433:17 434:16,19
444:3 469:19
**understandable**
217:19
**understanding**
153:14 223:2
253:13 296:9
395:5 421:18
425:6 433:6 453:3
500:5,9,15 501:7
504:6 512:3,5
524:22 525:4
528:16,23 529:7
533:13 538:13
**understood** 9:2
53:17 88:15 97:7
128:15,19 296:2,5
296:7 433:8
441:18 463:16
504:9 528:21
**underwriters** 63:3
**uneven** 442:20
**unfortunately**
391:12
**unions** 264:13
**unique** 90:23
396:25
**unit** 241:16
**united** 1:1 2:19,22
7:13 241:23 531:6
**universities** 45:19
**unrestored** 378:15
**unsound** 215:1
370:18 372:2
**unstable** 26:7
**update** 249:19
**updates** 241:22
**updating** 221:16
350:5 373:7,14
**upgrade** 473:19
**upper** 344:19,20
479:21 480:4,4
**upside** 344:2
**upwards** 455:6
**urban** 531:23

**usable** 511:6
**usage** 190:4
**use** 21:11,17 22:8
40:21 42:6 43:3
48:2 49:2 80:13
80:18,24 100:5,22
101:10 117:12
121:1 130:18
134:1 139:9,14
140:15,15,15
141:24 144:17,18
153:10,14 181:10
181:14 236:5
244:4 251:2,15
252:11 253:6
256:24 257:6
259:7,22 260:3
268:6,8 271:13,19
272:18 273:20
279:14,15 291:1
294:24 295:3
299:3 303:19,25
312:8,19 317:22
318:24 323:20
324:17 397:21
406:5 468:1
471:12 488:5
489:12 494:10
496:25 497:1,13
497:16
**user** 60:22 243:5
**users** 60:23 134:4
**usual** 247:10
**usually** 50:23 79:16
95:14,17 98:14
126:15 145:3
230:20 356:10,11
**utilities** 140:23
406:16 492:7,10
492:11
**utilize** 134:2
256:11

_____

**V**

**vague** 70:17,20
232:20
**valid** 71:25 72:17

201:24 233:25
**validity** 22:5 490:7
**valley** 240:21,21,22
240:23
**valuation** 21:5,6,10
62:9 63:5 141:18
141:20 142:1
155:15 284:2
288:10 377:7,8
379:24 380:12
397:20 399:22
401:12,23,25
407:22
**valuations** 21:15
21:20 22:2,13
380:14
**value** 17:8,11 20:9
62:19,22 63:6
101:19 104:10
105:15,17 106:14
110:7,9 112:24
119:13 224:15,19
224:22 225:16
226:2,18,19,20,21
226:22 227:4,12
227:13,18 229:24
263:24 273:22
278:1,2,5 279:3
284:20,24 285:22
286:4 287:10,15
288:16 375:18,19
376:8,12,14,16,17
377:23,24 378:4,8
378:12,15 379:19
390:5 399:13
402:18 439:20
468:5 469:9,10
486:2 530:4,8
**valued** 280:19
285:11 401:24
**values** 20:24
101:20 132:22
136:1,2 154:9
388:12
**variable** 255:17
**variables** 254:22
**variation** 255:8,14

SCOTT H. TAYLOR

February 9, 2012

Page 590

| | | | | |
|---|---|---|---|---|
| **variations** 255:13 | 212:22 280:20 | **volume** 113:15 | 268:21,23 277:7 | 499:13 500:11 |
| **varied** 41:2 | 320:7,7,12 325:1 | 269:7 | 277:16,24 278:8 | 501:18,20 513:3 |
| **varieties** 50:14 | 330:8 339:7 | **voluminous** 269:6 | 278:17 280:8,16 | 513:12,21 514:18 |
| **variety** 69:19 130:2 | 377:24 439:6 | | 280:25 281:12,17 | 516:1,3 519:10,19 |
| 267:15 473:17 | 460:16 469:9 | **W** | 281:22 282:9,16 | 520:8,16 521:4,25 |
| **various** 61:23 | 518:2 | **wagerzito** 2:16 6:2 | 282:20,23 283:3 | 523:7 527:6 528:8 |
| 176:15 532:13 | **veteran** 279:6 | 7:6,8 10:11,16,24 | 288:12 292:10,21 | 528:12 531:1 |
| **varying** 515:9 | **viable** 125:4 | 11:14,19,23 12:3 | 293:4,14 299:13 | 535:18 |
| **vast** 73:17 92:6 | **vice** 49:21 | 12:10,25 13:4 | 300:5 302:7 304:1 | **wait** 16:4,6 30:16 |
| 384:14 | **video** 167:15,17,22 | 14:1 15:9,14 | 305:4 306:22 | 381:9 409:19 |
| **vehicle** 385:20 | 167:25 168:6,11 | 18:24 19:6 23:3 | 318:14 320:17 | **waived** 3:10,12 |
| 401:7,24 | 169:6 170:5,6 | 27:24 29:19 32:10 | 325:24 326:8,14 | 499:21,23 501:9 |
| **vehicles** 385:18 | 206:13 262:16,18 | 54:20,25 81:8 | 326:21 327:15 | **waiving** 15:11 |
| **vendors** 267:15 | **videos** 43:12 | 82:22 83:24 86:17 | 328:5,12,19 329:6 | **walk** 505:13 532:21 |
| **vent** 241:5 | 166:14 167:14,19 | 86:22 89:3 96:11 | 329:8,19 330:4 | **walked** 139:6 |
| **vents** 241:2,7,11 | 168:20,21 169:4 | 99:3,9 100:14 | 334:10,23 335:2,8 | **wall** 429:23 441:9 |
| **venture** 254:18 | 169:14,15 | 106:25 108:13 | 336:2 338:9,22,24 | 526:18 |
| **venue** 45:6 | **view** 26:1 167:18 | 109:3 110:16,21 | 339:17 340:6,13 | **walls** 360:12 |
| **venues** 45:8,12,15 | 215:18 314:2,25 | 115:10 143:5,18 | 340:17 342:17 | 362:21 364:13 |
| 45:22 | 325:16,23 352:17 | 149:20,25 150:6 | 353:25 354:3 | 369:10 418:24 |
| **veracity** 248:20 | **viewing** 170:6 | 156:22 158:3,13 | 356:24 357:19,23 | 428:21 429:19 |
| 426:24 427:3,4 | **views** 312:7 | 159:6 160:8,21 | 358:20 359:17 | 439:19 446:1,9 |
| **verb** 196:3 | **vinyl** 130:7 199:20 | 162:11,25 163:9 | 360:23 361:3,9,14 | **walther** 1:23 2:12 |
| **verbatim** 290:25 | **violated** 23:6 | 172:25 174:7,16 | 366:15 376:2 | **want** 12:9 13:12,17 |
| **verification** 339:15 | **violation** 80:24 | 175:8 176:11,24 | 377:2,15 378:7 | 36:11 47:20,21,23 |
| 340:4 | 81:6 | 177:22 178:8,20 | 388:20 389:1,14 | 48:3 56:1 58:12 |
| **verified** 339:13 | **virginia** 35:10 | 179:24 180:13,15 | 389:24 390:3 | 64:18 68:9 71:3 |
| **verify** 30:3 150:16 | **virtually** 47:13 | 181:21 182:7,17 | 391:25 392:12 | 73:5 74:23 77:10 |
| 314:6 | 115:6 453:11 | 184:10,18 185:12 | 394:11 395:4,11 | 80:8 83:19,22 |
| **version** 95:25 97:1 | **virtue** 163:2 | 185:23 186:13,21 | 395:15 398:21 | 85:19 88:24 96:23 |
| 100:3 136:24 | **visible** 206:18 | 187:5 194:7,17 | 399:10 400:6,12 | 104:9 110:24 |
| 154:4 252:10,11 | 207:1 335:15 | 195:13 196:9,20 | 401:19 404:12,20 | 112:16 117:11 |
| 252:19,20 253:2 | 343:12 465:10 | 199:4 202:7,19 | 405:17,21 406:9 | 118:7 120:16 |
| **versions** 251:18 | 473:16 | 203:3,12 204:3,14 | 407:6 409:18,20 | 144:21 145:4 |
| 282:15 | **visit** 152:10,14 | 205:16 206:19,22 | 409:24 412:1 | 149:8 150:1,1 |
| **versus** 18:6 19:18 | 153:1,23,24 314:3 | 208:2 210:8 | 428:16 446:13,17 | 172:18 176:9 |
| 19:25 20:3,4 24:5 | 314:6,10 351:5 | 211:12,15,25 | 450:11 451:21 | 180:4,17 187:17 |
| 26:18 27:2 28:12 | 356:18 458:18 | 212:7,18 213:9 | 452:5 454:1,19 | 189:5 202:8 213:1 |
| 50:12 58:13 61:15 | 462:18 463:13 | 218:9 219:12 | 455:13,18,22 | 215:9 232:3 |
| 63:17 72:4,5,9,9 | 511:16 | 223:1,19 224:8 | 456:1 461:2 | 233:21,23 234:1 |
| 90:24 100:1 105:8 | **visited** 150:7 166:4 | 245:4,12,18,20 | 462:17 464:8 | 245:21 252:12 |
| 111:8,22 112:1 | 307:20 | 246:18 247:20 | 466:22 474:10,22 | 257:22 272:2 |
| 114:21 115:15 | **visiting** 150:13 | 249:6,10 251:7,21 | 475:6,10 476:16 | 277:5 281:1,3,13 |
| 116:8 127:2,2 | 152:4 | 254:9 256:19 | 476:24 477:19 | 289:12 303:5 |
| 135:25 154:9 | **vocational** 45:21 | 257:8,23 258:2,11 | 478:14 479:6 | 314:5 322:25 |
| 161:18 171:6 | **void** 94:21 | 259:2,20 260:7,23 | 480:1 481:21 | 325:11,15 329:20 |
| 187:8,19 191:9 | **voids** 371:21,23 | 262:21 263:1,3 | 489:11 497:5 | 330:20 341:3 |

JOHNS, PENDLETON COURT REPORTERS

504 219-1993

SCOTT H. TAYLOR

February 9, 2012

344:16 349:11,23
351:22,24 360:11
360:20 400:7
401:3 402:3,9,12
413:7 416:21
435:14 446:20
464:9,19 506:20
531:20 535:14
**wanted** 47:5 71:3
87:12,13 92:2,4
107:21 118:4
123:17,24 215:11
215:20 257:7,11
260:11 396:8
482:14
**wanting** 131:4
**warpage** 442:19
**washed** 151:15
**washington** 2:17,17
2:22 6:8 7:9,12
13:7 78:21 88:25
216:9 389:9,16
499:20 500:19
501:16 502:5,9,12
502:13,21,22,25
503:16 504:7,11
505:13 506:4,15
507:6,24 511:19
512:11 513:23
514:10 515:21
517:2 518:2 519:1
519:12 520:1
521:17 522:7
523:10,24 524:5
525:25 527:16
529:2,12,14,18
**washingtons** 12:23
499:7 500:16
501:24 509:11,16
509:21,25 510:17
510:25 511:1,7,10
511:11 512:19
513:4 514:20
515:8 517:13,19
527:14
**wasnt** 38:15 57:21
62:17 69:9 78:4

80:4,4 86:2 90:22
94:21 97:21 99:16
105:18 106:3,4,4
115:11 123:12
125:9,11 127:8
131:22 134:16
135:13 136:1
137:2,21 140:14
151:14 153:3
158:20 162:8
182:15 199:19
214:14 217:5
218:8 285:25
286:2,22,22
315:14 370:25
385:6 396:7 420:1
420:2,23 426:15
444:10 445:20
446:12 452:21
453:24 470:13
503:1,3,3 520:7
527:18 529:24
**waste** 237:14 239:2
239:4
**water** 91:14 160:19
160:22,24 161:2,6
168:3,5 170:1,7,8
170:9,23 171:7
206:8,10,16,17,23
206:25 207:7,16
208:13,17,19,20
240:17,24 259:5
259:16,25 260:2
335:14,15 336:10
336:14,15,19
342:2,3,24 343:11
343:21 344:3,13
345:4,5,13,20,21
346:3,7,10,15,16
346:18,20,23,25
347:2,4 357:2
363:8 392:22
445:4 461:22
477:12 479:9,15
479:20 480:3,10
481:12 482:1
**waters** 173:21

206:1 256:10
336:6 341:23
391:7 430:24
**way** 10:3 22:12
29:11 30:5 36:8
55:20 74:3,24
79:9 104:17
107:24 113:3
137:3 141:14
145:7 155:23
200:18 203:4
209:8 223:15
226:12 228:25
235:13 250:19
251:10 254:23
255:4,5,22 258:12
260:9 269:15
271:17 272:9
276:3 279:13
280:17 287:9
290:1 295:23
296:2,4,24 297:1
327:24 329:10
359:21 368:6
371:4 374:15
392:2,7 393:3
410:18 414:2
421:13 424:14
436:4 437:4
442:25 445:16,23
447:23 449:16
467:4 474:5
476:22 480:17
481:19 493:20
509:5 529:1
538:15
**weakness** 371:21
**weaknesses** 371:23
**website** 101:23
284:3 354:18
**websites** 166:25
**wed** 451:12
**week** 347:8
**weeks** 68:5
**wellmaintained**
330:23,25 331:19
332:2,8 368:24

369:2 471:16,18
54:7 59:21,22
79:16 91:14 93:21
94:14 103:13
124:12 142:13
166:22 207:7,9
244:21 261:22
262:6 267:5
297:10 310:24
316:3 350:9,11
386:10 462:23
463:5,7,13 466:20
467:4 511:16
530:13
**west** 1:22 7:2
**wet** 477:15
**weve** 211:17 224:17
357:6 383:12
**whatevers** 237:3
321:13
**whats** 33:5 58:11
60:12 91:7 98:23
99:19 103:20
141:13 163:16
170:3 253:13
258:18 312:22
320:25 325:16
332:17 352:18
368:4 370:4 403:8
404:1 430:10
433:6 437:17
472:5 480:8
**whatsoever** 316:1
**wheel** 396:25
**wheels** 396:21
**whirlwind** 341:15
**wholly** 112:23
**whos** 160:3 217:11
**wick** 240:19
**wife** 339:6 456:17
502:13
**wilkinson** 1:10
**william** 2:11
**willing** 50:6 85:18
91:18 149:3
210:20 220:3

**wilma** 38:23
**wind** 18:4 19:18,24
20:3,3 111:8
112:1,4,6,7,9,12
112:15 113:2,3,4
113:11,15,20
114:4,13,21
115:15,20,20
116:7,15 117:18
157:15,19 158:6
158:17,24 159:10
159:12,13,15
160:4,15 161:17
161:23 162:1,3,15
163:3 170:20
171:2,6,7,9,10
172:16 175:22
178:1,12 179:17
179:18 204:12,13
205:6,7 212:11,12
212:21 256:22
258:17 276:10
320:7,11 337:22
337:22 338:3,12
341:10 358:13,18
358:23 359:13
390:7 391:5,19
392:5,21,22,24
393:5 394:5,17
435:23 436:10
474:1,15 478:5,20
478:25 515:11,15
515:19,23 516:10
516:19 517:9,15
517:22 518:16,21
519:2 520:18
524:16 526:10
527:8
**windblown** 526:8
**winddamaged**
477:4
**winddriven** 173:21
390:8 391:5
392:23,24 393:5
394:6,18
**window** 449:9
477:13

SCOTT H. TAYLOR                                              February 9, 2012

**windows** 129:19
463:11
**winds** 173:20
341:14,23 519:13
526:9
**wire** 299:1
**witness** 3:6,24 9:8
9:10,17,19 19:3
22:24 27:5 29:5
70:18 71:19 81:3
83:21 93:1 99:7
100:10 106:18
108:6,21 114:24
118:10 142:23
143:14 149:17
156:18 157:24
158:9 159:4
160:13 162:7,18
162:22 163:7
174:5,12 175:6
176:1,8,22 177:16
177:20 178:4,18
179:22 181:18
182:4,13 184:6,16
185:10,19 186:10
187:1 194:12
195:7 196:4,11,18
199:1 202:3,15,25
203:9,25 204:9
205:13 207:4,23
210:1 212:4,16
213:6 218:6 219:6
222:21 223:13,25
224:4 244:25
248:5 250:24
251:13 256:16
257:4,14,18
258:14,23 259:12
260:21 268:19
277:2,13,21
278:13 280:3,14
280:23 281:15
282:13 288:7
292:8,25 293:11
303:24 306:20
318:8 320:10
325:21 326:6,12

326:19 327:12
329:1,17 334:7,20
335:5,24 338:6
342:13 356:22
358:17 364:18
375:25 376:22
377:11 378:3
391:23 392:10
394:9 398:18,25
401:16 404:10,18
407:3 408:24
409:3 450:8
451:17 452:3
453:22 460:24
474:8,18 475:3
476:14,21 478:12
479:4,24 481:16
489:8 513:1,10,18
514:14 519:7,17
520:5,13,25 523:5
527:2 537:9 538:6
**witnesss** 537:2
**wittmann** 1:23
2:12
**woefully** 140:12
**wont** 68:8 106:10
190:2
**wood** 127:3 130:1
233:18 239:11
369:12 428:22
429:19 530:16
**woodwork** 369:10
**word** 49:1 87:9
111:20 133:19
266:17 329:5
348:24
**words** 150:20
210:15 244:1
246:14 261:10
**wordy** 209:8
**work** 14:8,14,17
15:17 19:23 20:21
23:7,21 31:5,6
33:17 34:24 35:11
35:21 36:13 37:1
37:6 38:13 39:5,8
40:9,17 42:21

46:23 48:9,18
50:15,25 51:2,3
51:11,16 52:16
53:9,18,19 60:18
61:8,23 62:22
63:1,24 64:7,13
64:17 65:4,12
68:10 69:4,17
70:5,14 73:17,18
76:15 77:23 79:2
79:11,15 80:25
81:9,11,12,24
82:2 90:3 106:7
111:5,16 117:1,5
125:10 141:10
144:22 145:8
182:18,24 198:18
212:9 233:2 242:1
242:12 247:12
268:5 271:8
278:10 297:25
337:21 358:24
359:8 360:14
362:22 379:17
430:5
**worked** 29:9 35:8
36:4 59:8 61:18
67:21 133:24
261:11
**working** 30:23 31:2
34:22 36:5 37:22
39:3 47:24 49:4
51:5,7,23 61:15
66:4 67:3,12 79:6
80:2,3 89:5 95:2
112:5 188:23
348:7
**workrelated** 61:15
**works** 58:4 139:8
233:16 235:13
374:9 400:10
**worksheet** 183:13
184:8 270:6
283:18 297:19
405:9
**world** 251:17 303:9
304:5

**worth** 226:16 228:7
267:11 283:17
**wouldnt** 43:23
64:18 79:23 118:5
149:1 157:1
162:19,23 163:1
168:24 169:9
174:6 178:14
220:15 228:24
250:17 254:18
256:18 258:6
264:17 270:20
287:20 333:9
407:21 451:19
470:14,16 472:23
476:11 496:4
**write** 40:19 41:15
42:3,6 95:8,10
463:24
**writing** 36:19,25
38:22 42:2 76:11
207:1 208:6
343:23 344:4,14
345:5,11,12,16
346:4,7,10,13,14
346:14,17,19,21
346:24 347:1,2
353:11
**written** 18:21
53:12,14 75:23
76:16 95:11 98:23
198:13 252:25
529:23
**wrong** 87:9,24
129:4 144:5,8
148:23 192:22
254:3 316:5 367:9
435:3 462:11
463:25 464:25
465:16
**wrote** 40:22 47:17
377:17 493:9
**wrought** 333:17

**X**

**xact** 267:25
**xactanalysis**

135:19 243:6
267:14,23 268:1
273:16
**xactcontents** 134:2
268:2
**xactimate** 22:19
40:21 41:21,22
42:20,22 60:21
122:9,9,15 124:19
130:18 134:3
141:21 144:3,6
153:18,20 220:17
229:4,8,10 232:5
232:7 233:16,24
235:16,21 236:8
236:20 241:5,22
242:6,15,17 243:5
243:9,18 244:13
245:7 247:17,23
250:19 251:5,9,15
251:18 252:2,5
253:8 254:21
255:8,17,22 263:8
263:11,19 264:22
265:11,13 267:24
268:3 273:6 312:9
374:9 427:21
428:1 530:21
**xactimates** 244:18
**xs** 99:25

**Y**

**yall** 398:10
**yeah** 83:11 151:3
240:6 251:23
267:6 284:10
522:5
**year** 8:3 50:14
57:17 134:18
193:21,25,25
195:22,23 238:6
249:20 283:15
289:3 292:22
294:2,3,8,14,21
294:24 395:20
403:25 405:2
407:12,14 453:8

SCOTT H. TAYLOR

February 9, 2012

Page 593

455:3 493:8
512:22
**years** 8:13 9:24
31:23 32:4 42:24
49:4 53:12,16
61:20 134:18
222:2,8,24 223:7
444:1,4 455:6
491:10,11
**yesterday** 302:24
306:3 310:14
320:16 325:14
335:1 349:22
350:1 355:1
373:12 374:9,16
374:21 375:4,11
382:9 386:7 409:8
495:1
**york** 523:23 524:13
**youd** 43:23 189:10
271:23 314:1
356:17 439:22
**youll** 115:17
174:17 300:18
**youngest** 52:5
**youre** 14:7 17:14
17:14 26:11 33:6
39:9,10 44:5,6
49:9 51:6 52:23
53:3,3 56:19
60:19 62:7 65:16
71:6,9,15 83:18
95:12 101:10
106:9 116:20
117:11 119:5
126:16 127:14
132:9 134:24
137:25 151:25
160:2 161:8
167:17 170:13
176:6 191:17
195:15 196:13,15
200:11 205:25
206:24 208:7
209:21 218:24
221:21 225:2
226:1,2 227:20

232:17,23 237:11
238:17 250:17
254:3 258:13
271:7,11 272:9,10
272:15,16 273:24
278:20,24 280:6
280:10,20 290:6
290:17 298:1
300:7,9,25 303:16
344:7,16 360:20
368:17 393:12
394:22 408:22
410:18 417:24
435:6 473:5
485:18 495:19
511:18 520:9
528:3
**youve** 68:6 81:9
173:1 221:21
235:25 255:11
261:4 301:15
303:21 369:8
396:18

---

**Z**

**zeros** 155:5 484:14
**zip** 241:23 243:7
**zoomed** 354:7

---

**0**

**000** 180:19 194:4
263:6,24 265:1
283:15,17 284:17
284:17 287:6,6,13
287:14 295:25
380:6 381:23
401:25 424:11,20
424:25 425:3
426:9 443:16
474:1 483:7,15
484:8,22 485:12
485:18 486:3,6,11
486:12,12
**000350** 5:24 524:1
**00247** 515:25
**00248** 516:8
**00249** 516:12

**006** 380:18 381:3
381:12
**009** 530:10
**01** 101:25
**0152** 5:19 487:14
**0154** 4:12 245:23
246:20
**0189** 4:15 301:5
**0195** 183:15
**0198** 4:14 275:3
**05** 516:24
**050** 406:14
**054** 399:22 401:13
**054181** 1:10
**054182** 1:8,10
**055237** 1:10
**056073** 1:10
**056314** 1:10
**056324** 1:11
**056327** 1:11
**056359** 1:11
**06** 292:3 294:10
379:9
**060225** 1:11
**060886** 1:11
**061885** 1:11
**062152** 1:12
**062278** 1:12
**062287** 1:12
**062824** 1:12
**064024** 1:12
**064065** 1:12
**064066** 1:13
**064389** 1:13
**064634** 1:13
**064931** 1:13
**065032** 1:13
**065155** 1:13
**065159** 1:14
**065161** 1:14
**065162** 1:14
**065260** 1:14
**065771** 1:14
**065786** 1:14
**065937** 1:15
**070206** 1:15
**070621** 1:15

**071073** 1:15
**071271** 1:15
**071285** 1:15
**09** 5:17 477:24

---

**1**

**1** 4:2,8 10:9 11:2,12
75:20 76:22 82:12
82:14,19,25 83:16
85:21 86:4,12
121:6 123:8 146:7
187:17 352:4
353:14 406:14
417:25 422:4
435:21 464:21
483:21 484:7
486:11 517:8
**10** 1:25 4:2,7 5:19
13:5 145:17
207:25 233:17
237:11 263:10,20
263:20 264:1
300:4 314:16
343:10,13,14
399:22 401:13,25
424:11 425:3
443:16 502:2,7
521:9 530:9
537:17
**100** 238:10 248:8,9
270:22 352:20
530:5
**1069** 5:5 357:14
**109** 380:1,9
**11** 4:3,3,7 32:7,12
35:17 51:16 57:2
73:6 74:6 164:7,8
233:17 236:10
270:4 274:20
**110** 530:10
**12** 4:4,4,5,5,6,6,8,9
96:6,14 98:25
99:11,23 100:6,16
101:2,5 102:15
136:14 237:11
365:6 447:11
**1201** 353:4,10

**1205** 337:5,19
352:12,19 354:6
354:12 358:6
**125** 424:8,11
**129** 365:6
**13** 4:7,9 121:21
165:18 166:3
172:20,23 173:3
285:3 365:16,23
465:19 516:18
**133** 426:9
**135** 427:12
**136** 8:9 380:6
**13th** 165:23 166:5
466:11
**14** 4:10 34:11
175:10 180:5
283:15 287:6,13
418:8 464:24
466:7 475:14
**145** 270:22 380:18
381:3,12,23
**15** 4:11 122:12
123:2 152:12
165:17 166:2
178:22,23,25
239:3 246:21
283:17 287:6,14
350:15 351:11
474:1 483:7,15
484:8 485:18
486:3,6,11,12
498:1
**152** 402:24 405:4
**154** 249:16
**155** 248:14 400:20
**157** 263:6 265:1,18
**15th** 165:15,23
166:5
**16** 4:11 101:24
181:7 183:11,12
231:3,8
**161** 4:18 339:4
**168** 281:6,25 285:6
**17** 4:12 11:2,8
12:14,19 245:14
245:19 246:21,22

---

JOHNS, PENDLETON COURT REPORTERS

SCOTT H. TAYLOR                                    February 9, 2012

| | | | | |
|---|---|---|---|---|
| 305:8 409:25 | 229:21 234:18 | 524:23 525:13 | **250** 5:20 515:1 | **30** 5:18 192:19 |
| 456:7 515:13 | 236:10 237:23 | **2007** 40:13 50:17 | **2557** 1:22 7:2 | 239:13 308:5 |
| **172** 4:9 | 238:1 263:5 281:5 | 145:24 217:8,22 | **26** 5:10 234:25 | 309:6,22 351:4 |
| **175** 4:10,10 5:11 | 304:25 352:4,7 | 410:15,20 429:24 | 333:15,15 390:13 | 382:10 437:21,24 |
| 395:1 | 374:10 403:7 | 436:1 445:19 | 390:20 392:14 | 457:12,18 462:1 |
| **178** 4:11 | 418:1 422:5 | **2008** 371:1 | 393:15,17,25 | 487:2,5 491:14 |
| **17th** 10:10 | 438:11,15 465:19 | **2009** 371:1 | 394:5,13,17 | 497:20 515:13 |
| **18** 4:13 269:23,24 | **20** 4:15 142:3,17 | **201** 5:6,7 366:5 | 524:20,23 | **300** 4:15 137:25 |
| 274:19 283:9 | 143:23 144:1,2 | **2010** 34:16 50:17 | **269** 4:13 | 138:1 |
| 301:3 502:5,17 | 145:18 193:12 | **2011** 10:10 11:3,5,8 | **27** 5:12 238:25 | **301** 4:15 |
| **180** 382:22 | 195:4,17 263:4 | 12:12,15,17,19,21 | 247:6 405:7,7 | **304** 6:6 |
| **181** 229:25 271:1 | 290:4 294:6,13,17 | 12:23 13:6 34:14 | 499:22 500:6 | **305** 4:16 |
| **183** 4:11 | 294:18,24 295:3 | 34:15 65:11,22 | **270** 4:13 | **30th** 184:12 |
| **185** 5:12 395:1 | 295:13,14 299:3,6 | 121:21 122:12 | **274** 4:14 381:22 | **31** 5:20 238:6,7,20 |
| **18th** 12:23 | 300:18 301:1 | 146:6,6 165:17,18 | **275** 4:14 | 238:20 345:3 |
| **19** 4:14 274:25,25 | 302:25 303:7,19 | 205:5 241:18 | **28** 5:14 232:7 | 514:24,25 |
| **190** 5:11 382:21 | 351:11 402:17,19 | 287:15 305:8,14 | 238:25 428:13 | **32** 4:7 5:23 345:11 |
| 390:22 | 426:9 485:5 | 314:16 350:15 | 437:20,23 498:1 | 345:11 517:25 |
| **1910** 519:21 524:8 | 491:10 495:17 | 409:25 410:8 | **280** 137:21 380:1,9 | **33** 5:24 345:12 |
| 527:9 | 496:16,17 509:13 | 418:8 456:7,12 | **281** 4:25 346:14 | 435:22 466:7 |
| **194** 229:24 263:24 | **200012113** 2:17 | 464:24 466:11 | **284** 382:21 | 523:19,20 524:2 |
| **1980s** 200:1 | **2002** 396:4,25 | 499:22 500:6 | **29** 5:16 173:19 | 526:24 |
| **1983** 191:8 | 397:8,25 | 502:5,9,17 504:12 | 183:20 194:2,2 | **33411** 1:23 7:3 |
| **1984** 51:21 104:19 | **20044** 2:22 | 511:16 525:8,16 | 247:4 275:6 358:9 | **336** 4:16 |
| **1985** 135:24 199:14 | **2005** 36:14,16 | **2012** 1:24,25 300:4 | 374:10 379:9 | **337** 4:17 |
| 199:18 | 49:24 51:10,10,21 | 537:17 | 405:14 455:21 | **338** 4:17 |
| **1990** 225:4,5 | 55:6,16 129:10,11 | **20th** 11:5 12:12,21 | 475:9,11,12,16 | **339** 4:18 |
| 227:16,24 | 134:20,21 135:3,7 | 13:6 305:14 410:8 | 516:24 518:10 | **343** 4:18 |
| **1991** 200:4 | 173:19 183:20 | 456:12 502:9 | 524:6 | **344** 4:19,19 |
| **1992** 396:20 397:2 | 184:12,13 194:2 | **21** 4:16 336:24,24 | **29th** 129:10 168:15 | **345** 4:20,20,21,21 |
| 397:6,24 | 247:4 270:4 | 344:14 359:6 | | 4:22 |
| **1995** 191:9 | 274:20 275:6 | 399:18,19 | **3** | **346** 4:22,23,23,24 |
| **1998** 283:13 284:10 | 284:7 287:14 | **22** 4:17 338:19,21 | **3** 4:3,16 11:7 99:15 | 4:24,25 5:2,2,3,3 |
| 284:11 397:11,25 | 288:20,23 289:6 | 400:16 403:6 | 101:14,15,24 | 5:4 |
| 399:21 | 358:9 405:14 | **23** 5:5 357:11,12 | 137:1,3 231:1,1,7 | **347** 5:4 |
| **1999** 287:14,19,21 | 475:16 487:10 | 380:16 381:2,6 | 237:22,23 238:1,5 | **35** 180:19 194:4 |
| 287:22 | 488:17 498:1 | **2313** 121:14 | 238:18 305:1,3,5 | 484:22 485:12 |
| **19th** 487:10 | 518:11 524:6 | **234** 4:10 175:14 | 305:6 307:5 | 486:12 |
| **1st** 184:12 | **2006** 36:16,16 | **24** 5:8 378:19,22 | 312:24 313:21 | **357** 5:5,5 |
| | 37:23 39:1 40:14 | 462:21 | 323:21 329:21 | **36** 402:24 405:4 |
| **2** | 40:15 44:22 46:17 | **245** 4:12,12 | 330:6 352:2,8 | **365** 5:6,6 |
| **2** 1:8 4:3,8 11:4,17 | 48:12,13 193:25 | **24p** 208:10 | 353:15,22 354:5 | **366** 5:7,7 |
| 35:16 57:1 82:12 | 194:2 214:15 | **25** 5:10 9:24 238:6 | 393:25 395:25 | **367** 5:8 |
| 82:14,19 83:16 | 247:6 249:21,22 | 249:1,1 338:11 | 400:23 401:5,6 | **378** 5:8,9 |
| 98:16 99:12 121:2 | 292:12 301:3 | 390:11,12,14,15 | 406:17 418:2 | **38** 196:23 295:25 |
| 136:15 146:7 | 404:7 475:14 | 391:3 394:24 | 422:6,9 465:19 | **380** 5:9 |
| 154:4 221:5 | 493:13,18 524:20 | 395:3,10 405:4 | 476:7 | **390** 5:10,10,11 |

SCOTT H. TAYLOR

**393** 265:17
**395** 5:11,12
**3tab** 238:5,6
  239:19,20,21,21
  330:21 471:15

**4**

**4** 4:4,16 5:14 12:11
  12:11 249:19
  305:3,5,13 312:20
  323:20,21 330:20
  332:6 333:25
  336:19 341:2,3
  344:3 345:22,22
  398:11,12 406:18
  438:4 465:19
  480:10 481:12
  516:5 519:20
**40** 54:18 55:12,14
  59:6 60:6 83:7,9
  83:15 84:4 260:25
  382:4,14
**400** 243:2
**405** 5:12,13
**407** 229:24
**408** 5:13 6:7
**42** 516:18
**43** 381:7
**437** 5:14
**438** 5:14
**44** 233:10
**443** 5:9 380:4
**455** 6:7
**456** 5:15,15
**458** 5:9 379:1
**47** 366:5
**475** 5:16
**476** 5:16
**477** 5:17,17
**478** 5:18
**487** 5:18,19
**498** 229:25 271:1
**499** 6:8

**5**

**5** 4:4 5:13 12:14
  206:17 207:25

**284:**17 397:16
  400:1 401:7,11
  402:1 408:18
  409:14,17 410:1
  411:2 424:20,25
  480:10 516:9,13
  518:10
**50** 45:11 83:7,9,15
  84:4 102:1 137:2
  137:4,5,5,16,17
  144:13,13,17
  145:1,2,6,11,15
  145:15,20 230:1
  231:8,9 260:25
  338:11
**500** 134:6 285:11
  483:21 484:7
  486:11 517:8
**502** 5:19
**51** 2:16 265:17
  381:22
**514** 5:20,20,21
**515** 5:21,22
**516** 5:22
**517** 5:23,23
**523** 5:24,24
**53** 345:14
**531** 6:3
**54** 101:25 231:6
  345:15
**545** 181:7
**546** 1:23 2:14
**56** 381:22
**57** 483:12
**575** 516:9
**59** 530:10

**6**

**6** 4:5 5:13 12:16
  121:21 122:12
  123:2 166:2 247:6
  249:21 284:17
  408:18 409:14,17
  410:7 418:8 421:8
  437:22 473:7
  518:19
**60** 382:4,14

**600** 406:17
**610** 180:22
**615** 394:1
**62** 448:18 530:5
**641** 397:16 400:1
  401:7,11 402:1
**650** 406:18
**66** 346:4
**67** 231:3,8 238:6,7
  238:20
**690** 405:24
**691** 5:13 405:10,24
**693** 4:17 337:3

**7**

**7** 4:5 5:15 6:2 12:18
  249:1 285:11
  314:16 429:1
  455:23,25 456:3,6
  464:24 488:6
**70** 382:10
**700** 435:21
**70013** 337:6
**70113** 1:24 2:7
**70130** 2:10
**7013035** 88 2:14
**710** 2:10 516:13
**75** 333:19
**76** 101:24 346:9
**761** 382:22
**785** 530:5
**79** 366:23

**8**

**8** 4:6 5:15 12:20
  170:15 183:20
  208:10 247:4
  357:2 358:9 365:1
  379:9 447:3
  455:23,25 456:4
  456:10 516:24
**80** 399:22 503:23
**800** 516:5
**80801** 2:3
**81** 346:12 367:14
**810** 233:10
**811** 233:12,13

**818** 2:3
**82** 4:8
**824** 338:11
**84** 6:6 397:2 449:8
**85** 346:18 394:1
  396:24 397:1
  449:8
**855** 2:6
**875** 181:13
**88** 346:22
**881** 196:23
**888** 2:21
**892** 515:13

**9**

**9** 1:24 4:6 5:19
  12:22 13:1 164:4
  164:11 180:22
  181:13 237:10
  265:10 282:8,12
  285:2 428:24
  502:2,3 528:15
  530:6 537:17
**90** 380:18 381:3,12
  503:24
**90s** 43:2 199:23
**922** 516:18
**96** 4:8
**97** 382:21
**98** 400:1 401:7,11
  402:1
**99** 4:9 231:4