# EXHIBIT 12

**KENNETH ARMSTRONG, SR.**                                   **September 12, 2011**

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
                                 JUDGE DUVAL
PERTAINS TO MRGO                 MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
     05-6314, 05-6324, 05-6327, 05-6359,
     06-0225, 06-0886, 06-1885, 06-2152,
     06-2278, 06-2287, 06-2824, 06-4024,
     06-4065, 06-4066, 06-4389, 06-4634,
     06-4931, 06-5032, 06-5155, 06-5159,
     06-5156, 06-5162, 06-5260, 06-5771,
     06-5786, 06-5937, 07-0206, 07-0621,
     07-1073, 07-1271, 07-1285

             * * *

     Deposition of KENNETH PAUL ARMSTRONG,
SR., given at the offices of Bruno & Bruno, 855
Baronne Street, New Orleans, Louisiana 70113,
on September 12th, 2011.
REPORTED BY:
     JOSEPH A. FAIRBANKS, JR., CCR, RPR
     CERTIFIED COURT REPORTER #75005

Page 2

1  APPEARANCES:
2
3  REPRESENTING THE PLAINTIFFS:
4      LAW OFFICE OF GERALD N. ANDRY, JR.
5      (BY:  GERALD N. ANDRY, JR., ESQUIRE)
6      710 Carondelet Street
7      New Orleans, Louisiana 70130
8      504-581-4334
9  - AND -
10     DEGRAVELLES, PALMINTIER, HOLTHAUS &
11     FRUGE, L.L.P.
12     (BY:  JOSHUA M. PALMINTIER, ESQUIRE)
13     618 Main Street
14     Baton Rouge, Louisiana 70801-1910
15     225-344-3735
16 - AND -
17     THE ANDRY LAW GROUP, LLC
18     (BY:  JONATHAN B. ANDRY, ESQUIRE)
19     610 Baronne Street
20     New Orleans, Louisiana 70113-1004
21     504-525-5535
22
23
24
25

Page 3

1  REPRESENTING THE UNITED STATES OF AMERICA:
2      U.S. DEPARTMENT OF JUSTICE
3      (BY:  JAMES F. O'CONNON, JR., ESQUIRE)
4      Torts Branch, Civil Division
5      P.O. Box 888
6      Benjamin Franklin Station
7      Washington, D.C. 20044
8      202-616-4289
9
10 REPRESENTING WASHINGTON GROUP INTERNATIONAL,
11     INC.:
12     JONES DAY
13     (BY:  DEBRA S. CLAYMAN, ESQUIRE)
14     51 Louisiana Avenue, N.W.
15     Washington, D.C. 20001-2113
16     202-879-4645
17 - and -
18     STONE PIGMAN WALTHER WITTMANN, L.L.C.
19     (BY:  WILLIAM D. TREEBY, ESQUIRE)
20     (BY:  JAY C. GULOTTA, ESQUIRE)
21     546 Carondelet Street
22     New Orleans, Louisiana 70130
23     504-581-3200
24
25 VIDEOGRAPHER:  KEN HART (HART VIDEO)

Page 4

1           E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:                        PAGE
4  MS. CLAYMAN ................................8
5  MR. MCCONNON ..............................317
6
7              E X H I B I T   I N D E X
8
9  EXHIBIT NO.                             PAGE
10 Exhibit 1    ..............................62
11 Exhibit 2    ..............................99
12 Exhibit 3    .............................139
13 Exhibit 4    .............................162
14 Exhibit 5    .............................171
15 Exhibit 6    .............................188
16 Exhibit 7    .............................241
17 Exhibit 8    .............................248
18 Exhibit 9    .............................254
19 Exhibit 10   .............................258
20 Exhibit 11   .............................260
21 Exhibit 12   .............................263
22 Exhibit 13   .............................276
23 Exhibit 14   .............................279
24 Exhibit 15   .............................284
25 Exhibit 16   .............................296

Page 13

1   Q. But you made a claim --
2   A. I made a claim --
3   Q. -- to the claims department?
4   A. Correct. Loss of sales and commission
5   in the territory I worked.
6   Q. And are you represented by counsel in
7   either of these claims that you filed against
8   BP?
9   A. Not yet. Not yet. I'm waiting to see
10  if there is a -- if it's a valid claim.
11  Q. Have you been involved in any other
12  lawsuits besides, well, I guess these aren't --
13  any other claims besides these two claims?
14  A. No. No.
15  Q. Do you recall file any litigation
16  against your homeowner's insurance company
17  Liberty Mutual?
18  A. Yes. Oh, yes, I did. Yes, I did.
19  Q. Okay. Do you remember about when that
20  was?
21  A. I'm not sure. It was after the storm.
22  I'm not sure exactly what the date is.
23  Q. Okay. Well, were you represented by
24  counsel in that action?
25  A. Um -- we were represented by Frank

Page 14

1   Ippolito in one for loss of content.
2   Q. I'm sorry. Can you repeat that?
3   A. Loss of content on our home. We were
4   only paid $14,000, and our homeowner's didn't
5   want to pay for none of our content in the
6   storm.
7   Q. And the $14,000 was coverage from your
8   flood insurance policy?
9   A. Correct. And that was content flood.
10  Q. And was a lawyer representing you in
11  this action against Liberty Mutual?
12  A. Only in the one against Liberty Mutual
13  for content. It was Frank Ippolito.
14  Q. And what is the status of the case
15  right now?
16  A. It's closed.
17  Q. Was there a settlement?
18  A. Um -- yeah. I think we settled. I'm
19  not exactly sure on the amount. I would be
20  guessing if I said it.
21  Q. I'm sorry?
22  A. I'd be guessing.
23  Q. You don't know if it was settled.
24  A. No, it's settled, but I would be
25  guessing what the amount was.

Page 15

1   Q. But you did recover an amount?
2   A. Yes.
3   Q. Okay. Besides this lawsuit against
4   Liberty Mutual and the two claims against BP,
5   is there any other legal actions --
6   A. Not that I can think of right now.
7   Q. Okay. Have you given any depositions
8   since the last one you gave in this action in
9   July 2007?
10  A. Um -- no.
11  Q. Have you testified in any court
12  proceeding?
13  A. No.
14  Q. Have you been sued by anybody?
15  A. Um -- with Katrina or anything? Or
16  before? I was sued in -- my son was involved
17  in a car accident and I was sued.
18  Q. When was that?
19  A. Um -- right before the storm. 2005,
20  you know, early, or 2004.
21  Q. Okay. Do you know what court that was
22  in?
23  A. Um -- insurance handled it. We were
24  never -- we were only notified of the lawsuit.
25  We were never involved in any testimony or

Page 16

1   anything like that.
2   Q. Have you ever filed for bankruptcy?
3   A. Never.
4   Q. Have you ever been involved in any
5   kind of criminal proceeding?
6   A. Um -- no.
7   Q. I'm just going to update your personal
8   background right now. I take it you are still
9   married to Jeannine Armstrong.
10  A. Correct.
11  Q. That will be --
12  A. Yes. Yes.
13  Q. That will be thirty years this year?
14  A. Correct. Yes.
15  Q. I'm want to update the status of your
16  children. How old is your oldest son Kenneth?
17  A. 28.
18  Q. And where is he living?
19  A. Chalmette, Louisiana.
20  Q. And what about Katie?
21  A. Chalmette, Louisiana.
22  Q. And how old is she?
23  A. 26. 25. I've been corrected.
24  Q. And Renee?
25  A. She's 20. She lives in Baton Rouge

**KENNETH ARMSTRONG, SR.**                                         September 12, 2011

Page 17

1  most of the time.  She's a student at LSU.
2     Q.  And is she living with you during the
3  summer?
4     A.  Correct.
5     Q.  And where are you living now?
6     A.  Meraux, Louisiana.
7     Q.  Can you give me your address?
8     A.  2400 Aramis Drive.
9     Q.  That's in St. Bernard Parish?
10    A.  Correct.
11    Q.  How far from your prior house in
12 Chalmette on Hamlet Drive is that?
13    A.  Um -- probably about four miles.  Four
14 and a half miles.
15    Q.  Four miles in which direction?
16    A.  Going more southeast.
17    Q.  So are you closer to the Mississippi
18 River?
19    A.  Correct.
20    Q.  And how long have you been living on
21 Aramis Drive?
22    A.  Um -- about a year and a half.  Year
23 and three months, something like that.
24    Q.  This is a house; right?
25    A.  Yes, ma'am.

Page 18

1     Q.  Okay.  Do you own the house?
2     A.  I own a 15-year mortgage.
3     Q.  Do you remember when you purchased it?
4     A.  Um -- last year, June of last year.
5     Q.  Can you give me a brief description of
6  the house?  How big is it?
7     A.  About 2700 square foot living, 3100
8  total under roof.
9     Q.  How many levels?
10    A.  One.
11    Q.  And how many bedrooms?
12    A.  Five.
13    Q.  How many baths?
14    A.  Um -- two and a half.
15    Q.  And when was the house built?
16    A.  I'm not sure.
17    Q.  You bought it from somebody else?
18    A.  Bought it redone after the storm.
19    Q.  Do you know what happened to that
20 house during Katrina?
21    A.  Um -- I know it was flooded.  I'm not
22 exactly sure what was the extent of the damage.
23    Q.  Okay.  I'm going to update your
24 employment information now.
25        Are you still working for Southern

Page 19

1  Eagle Sales and Services?
2     A.  Yes.
3     Q.  And I believe at the time of your last
4  deposition your title was district sales
5  manager.  Is that still your title?
6     A.  Team leader, now.
7     Q.  So --
8     A.  Same title, changed name.
9     Q.  So is that a promotion or --
10    A.  No.  No.  It was just a different
11 owner of the company, and he changed the
12 titles, that's all.
13    Q.  Have your responsibilities changed and
14 all?
15    A.  No.
16    Q.  Are you still responsible for the same
17 area in Chalmette?
18    A.  Well, now.  I wasn't, now I'm back in
19 Chalmette, New Orleans.
20    Q.  How long were you not in Chalmette?
21    A.  Um -- April of last year -- let's see.
22 I was gone about a year and a half.  I was
23 working Plaquemines -- the west bank of this
24 area.
25    Q.  That's Plaquemines Parish?

Page 20

1     A.  Yeah.  Where the oil spill was.
2     Q.  Why were you moved to Plaquemines
3  Parish?
4     A.  Just when they came they changed the
5  district territory.  We don't change sales
6  people.  We changed the team leader.
7     Q.  And your change from working in
8  Chalmette to Plaquemines Parish, did that have
9  anything to do with Hurricane Katrina?
10    A.  No.  No, unh-unh.
11    Q.  And when did you go back to working in
12 Chalmette?
13    A.  August the 5th of this year.
14    Q.  Is your wife Jeannine currently
15 working?
16    A.  Yes.
17    Q.  And where is she working?
18    A.  Um -- on Houma, in Metairie.  It's the
19 same day surgery center.  I'm not exactly sure
20 of the name.
21    Q.  When did she start working there?
22    A.  I'm not sure.
23    Q.  Do you know what her position is?
24    A.  She's a nurse.
25    Q.  Is this a part-time job or full-time?

Page 53

1  Q. During this period while you were
2  living in an apartment in Covington, was your
3  wife diagnosed with pneumonia?
4  A. Yes. She was.
5  Q. Can you describe her condition?
6  A. She was diagnosed with an airborne
7  fungal that was diagnosed in her back or her
8  spine. And, you know, that was it.
9  Q. Okay. Did she have any surgery or
10 medical treatment for that condition?
11 A. Yes, she did.
12 Q. Do you remember when that was?
13 A. No, I don't. I was living in
14 Covington when the surgery took place, though.
15 Q. And while you will living in this
16 apartment in Covington, did you make frequent
17 visits back to your house on Hamlet Drive?
18 A. Um -- somewhat. You know, we passed.
19 I worked, actually, in Chalmette during that
20 time frame, um -- a couple days a week, maybe
21 one day, sometime two, depending on -- as the
22 parish came back more and more, I worked more
23 out there.
24    Remember, there's nothing to visit
25 other than the shell of a house.

Page 54

1  Q. While you were living in Covington,
2  did you make the decision to demolish your
3  house?
4  A. Um -- it might have been that time.
5  It might have been in that time frame. I'm not
6  exactly sure when it was.
7  Q. Did you hire anyone to inspect your
8  house and give you an estimate for repairs
9  before you decided to demolish your house?
10 A. We did have a guy come out and give an
11 estimate of the damage or what it would take to
12 replace what was damaged.
13 Q. Do you know who that guy was?
14 A. Um -- I can't remember his name. He
15 was a local guy. I can't -- at the time, they
16 were doing a lot of that work.
17 Q. Do you remember what month that was?
18 A. No.
19 Q. Okay. Did either that guy or a
20 contractor ever -- or anybody else ever tell
21 you that the foundation of your home on Hamlet
22 Drive was structurally unsound?
23 A. Um -- no. I don't recall that.
24 Q. Did anyone ever tell you that the
25 house could not be repaired?

Page 55

1  A. Um -- I don't think anybody ever said
2  that, that the house couldn't be repaired. But
3  the cost to probably repair it would have been
4  greater, you know, just, um -- I don't want to
5  say more than the house was worth, but it would
6  have been an astronomical amount.
7  Q. Do you remember how much that was?
8  A. No. No, I don't. Plus, the cost of
9  everything went up after the storm. To
10 rebuild, everything -- you know, everything I
11 don't want to say doubled in price, I would be
12 guessing, but everything went up, you know, to
13 rebuild your home at the time.
14 Q. Had the prices not been astronomical,
15 would you have wanted to repair?
16 A. Not back there, no. No. I think that
17 was an option that we stayed away from.
18 Q. Why is that?
19 A. We wanted to move to where we were,
20 um-- to higher ground.
21 Q. The home that you did move to in
22 Meraux?
23 A. Correct.
24 Q. That is higher ground?
25 A. Yes, it is.

Page 56

1  Q. Because it's closer to the river?
2  A. I would venture -- that's what they
3  say.
4  Q. Okay. Did you live in your apartment
5  in Covington up until the time that you moved
6  to Meraux --
7  A. No.
8  Q. -- or did you live somewhere else?
9  A. No. No. We moved -- actually, we
10 moved to Mandeville, which is the next city
11 over, next parish, into the next parish.
12 Q. Closer to the lake?
13 A. Yes.
14 Q. Do you remember when you moved there?
15 A. No.
16 Q. Do you know about how long you lived
17 in that apartment?
18    It was an apartment; right?
19 A. It was a townhouse, yeah.
20 Q. Townhouse?
21 A. I don't know. A couple years, I
22 guess. I mean, we just moved back what, in
23 2010? June 2010? So we were gone five years,
24 so. Between the Covington and that, we
25 probably -- that's where we spent the rest of

14 (Pages 53 to 56)

**KENNETH ARMSTRONG, SR.**                                **September 12, 2011**

Page 113

```
 1   the window, um -- you go across from the window
 2   was -- where you got kitchen written was the,
 3   um -- the stovetop -- electric stovetop.  And
 4   to the left of that was an oven that was set
 5   into the wall.
 6       Q.  Was that electric, also?
 7       A.  Yes.
 8       Q.  Okay.  Let's start with the cabinets.
 9           What were the cabinets made of?
10       A.  Wood.
11       Q.  Were they painted?
12       A.  No.
13       Q.  Do you know what kind of wood?
14       A.  No, I don't.
15       Q.  Okay.  And the microwave.  Do you know
16   how old that was?
17       A.  No, I don't.  It worked, though.
18       Q.  The refrigerator.  Do you know how old
19   that was?
20       A.  No, I don't.
21       Q.  What kind of refrigerator; was it side
22   by side?
23       A.  Side by side.
24       Q.  And what about the stove, do you know
25   about how old that was?
```

Page 114

```
 1       A.  Um -- no, I'm not --
 2       Q.  Thinking back to when you moved into
 3   the house, did you do any remodeling to the
 4   kitchen as a whole at any point?
 5       A.  Um --
 6       Q.  Tear out what was there when you moved
 7   in and put in new things?
 8       A.  No.
 9       Q.  So would you say that all of the
10   appliances in the kitchen were there when you
11   moved in?
12       A.  No.  Oh, I'm sorry.  Right underneath,
13   um -- where you got 31, to the right of the
14   window, below the microwave, was a dishwasher.
15       Q.  Okay.
16       A.  The dishwasher was fairly new.
17           Everything in the house, basically,
18   appliance wise, had to be replaced.  I'm not
19   exactly sure of the oven -- the stovetop.  I'm
20   not -- you know, of the burners.  I don't know.
21   But the oven was replaced, um -- the dishwasher
22   was replaced, microwave and refrigerator was
23   replaced.
24       Q.  So none of those items had been there
25   since you moved in in 1985.
```

Page 115

```
 1       A.  No.  No.
 2       Q.  Do you remember what decade they were
 3   replaced in?
 4       A.  Um -- I would say -- I guess I don't
 5   know.
 6       Q.  What were the counters made of?
 7       A.  Um -- probably -- I didn't look
 8   under -- Formica, I would think.
 9       Q.  Were those the same as when you moved
10   in?
11       A.  Yes.
12       Q.  And the cabinets, were those original
13   when you moved in?
14       A.  Um -- I think the cabinets were.  I
15   don't think we did anything with the cabinets.
16       Q.  Moving to the breakfast nook, did you
17   have a table and chairs in there?
18       A.  Yes, I did.  I had table, chairs, I
19   had a, um -- a, um -- the thing with all our,
20   um -- china in it.  We had to move out of the
21   dining room when we redid that.  We moved
22   that -- that table and set into the living room
23   and got rid of -- I think Katie might have took
24   the other one up to Baton Rouge.
25       Q.  The other china closet?
```

Page 116

```
 1       A.  No, no.  The other table.
 2       Q.  Oh, the other -- the dining room
 3   table.
 4       A.  No.  The dining room table went to the
 5   nook table.
 6       Q.  I see.
 7       A.  And the smaller table went with my
 8   daughter.
 9       Q.  Understood.  How many chairs did
10   the --
11       A.  Six, I think we had.  Six to eight.
12       Q.  Do you know when you got the furniture
13   that was in there?
14       A.  Um -- it was later in our marriage.
15   We didn't buy that right away.
16       Q.  All right.  So you mentioned
17   barbecues -- you go out the French doors in the
18   kitchen, and you mentioned there was a barbecue
19   out there -- barbecue pit?
20       A.  Barbecue pit.
21       Q.  How old was the barbecue pit?
22       A.  Oh, I'm not sure.
23       Q.  I'm sorry?
24       A.  Not sure.
25       Q.  Not sure.  Was it there when you moved
```

29 (Pages 113 to 116)

**JOHNS, PENDLETON COURT REPORTERS**                          **504 219-1993**

Page 237

1      A.  Diamond, yes.
2      Q.  Okay.  And did you have personal
3  articles insurance on the engagement ring?
4      A.  No, we did not.  I don't know.  I
5  don't know if we reported that to the insurance
6  company, because they did ask for some stuff
7  that we had.  I just don't remember if that was
8  one of the things that we asked.  But we had
9  lost some diamond earrings a storm before that.
10 My wife was soaking in some ammonia, and my
11 sister, helping us clean up, dumped them out
12 and we couldn't -- we wouldn't claim them.
13     Q.  You could not claim them.
14     A.  No.
15     Q.  I'm looking at Item Number 164 is
16 jewelry.  Is this your wife's jewelry?
17     A.  Yeah.  I think it was, that's
18 something that -- there were maybe some things
19 that I had, but it was a list that they had put
20 together of things that we had lost.
21     Q.  And that was on the list that you
22 faxed over to your lawyers or to Mr. Taylor?
23     A.  I'm sure it was probably we had
24 jewelry in this much.
25     Q.  Okay.  Let's look down to Number 168,

Page 238

1  baseball card collection.
2      A.  Yes.
3      Q.  Do you have any personal articles
4  insurance on the baseball card collection?
5      A.  No, we did not.
6      Q.  How big was the collection?
7      A.  Um -- my son had started it as a young
8  kid, and even had it up until today.
9      Q.  And this is your son's collection,
10 correct?
11     A.  Correct.
12     Q.  Do you know if he ever had it
13 appraised before the storm?
14     A.  Um -- I'm not sure.  I'm not sure if
15 he did or didn't.
16     Q.  And he came up with this number $7500?
17     A.  Yes.
18     Q.  And you don't know what that number is
19 based on?
20     A.  I'm sure it's based on some of the
21 players that he had.
22     Q.  And you don't know who those players
23 are?
24     A.  No.
25     Q.  Number 175 is the Mickey Mantle

Page 239

1  baseball.  Was that your baseball?
2      A.  No.  It was given to him by -- my
3  wife's uncle was in the color guard at Yankee
4  stadium and got the ball, and he didn't have no
5  children so he gave it to my son.
6      Q.  Do you know what year the baseball
7  was?
8      A.  I could only look at it and see who
9  signed it, and -- you know, in order to tell
10 you how old it was.
11     Q.  Do you know if that baseball had ever
12 been appraised?
13     A.  Well, I had brought it to work, and a
14 guy I work with, he, um -- he looked at it for
15 me and, um -- he said based on some of the
16 things that if I was to sell it that I wouldn't
17 take no less than twelve fifty for it.
18     Q.  Did you ever try to sell it?
19     A.  No.  No.
20     Q.  Do you know what qualifications the
21 guy at work had?
22     A.  No.  No, I do not.
23     Q.  Number 176, the World Series Mets
24 baseball.  Whose baseball was that?
25     A.  That was actually his.

Page 240

1      Q.  Your son's?
2      A.  Yes.
3      Q.  Do you know what year the Mets were in
4  the World Series?
5      A.  Yeah.  He got it, um -- from my
6  sister-in-law's, um -- friend was married to
7  Lenny Dykstra, and he got the ball for him.
8      Q.  Did your son have to pay for it?
9      A.  No.
10     Q.  Do you know if he ever got it
11 appraised?
12     A.  No.  No, I don't.  I don't know where
13 the figure's coming from.
14     Q.  Was the ball signed?
15     A.  Yes.
16     Q.  By who?
17     A.  I want to say Lenny Dykstra and a few
18 of the guys.  I'm not a baseball novice, so I
19 wouldn't -- I don't know how many people signed
20 it.
21     Q.  And Number 262 on Page 14.  It says
22 light fixture/fans.
23     A.  Yes.
24     Q.  It says quantity 1.  That's not
25 accurate; right?

Page 261

1  that appears on the first page of this document
2  his name is Dennis Eastep?
3     A.  Um -- I'm not sure if he's the one I
4  talked to, that we disputed the actual, um --
5  the actual, um -- estimate they were giving us.
6     Q.  Okay.  Let's look at what the actual
7  estimate is.  If you can turn to Page 10, which
8  is the very last page, it's 0110.
9         First of all, what kind of damage did
10 you understand that your homeowner's policy
11 would cover?  What kind of damage to your home
12 would your homeowner's insurance?
13    A.  Um -- well, I thought they would,
14 um -- cover mostly, um -- damage from the roof
15 and things like that.  And when I went to my,
16 um -- insurance, we met with them in Baton
17 Rouge, we were told that we would get the whole
18 policy that we had, which wasn't the case, from
19 one of the guys who was there doing the
20 adjusting or giving the checks or whatever.
21    Q.  When did you have this meeting?  Was
22 that before or after --
23    A.  Yeah.  This was way before this.
24    Q.  Okay.  So it was before October --
25    A.  Right.

Page 262

1     Q.  -- 29th --
2     A.  We met with somebody from Liberty
3  Mutual and they gave us some, um -- just
4  telling us where to go and things we'd have to
5  file, things like that.
6     Q.  All right.  So let's look at Page 10
7  of this document.  It says, Recap By Category
8  with Depreciation, and it lists the actual --
9  or the replacement cost value, RCV, and the
10 ACV, actual cost value, for various items to
11 your home, like general demolition, fireplaces,
12 heat, vent, air conditioning, roofing, soffit,
13 fascia and gutter.
14        Do you know why -- or did Liberty
15 Mutual ever tell you why after this first
16 inspection that's all they would cover you for?
17    A.  Um -- I want to say they were trying
18 to say most of the damage was flood.
19    Q.  And flood would not be covered under
20 your homeowner's insurance policy?
21    A.  That's what he -- the guy told me on
22 the phone.
23    Q.  So the total estimate at the bottom,
24 the grand total after your premium is deducted,
25 was $2,727.89.  Is that consistent with your

Page 263

1  recollection of what they first offered you?
2     A.  To be honest with you, I know it was
3  low.  In our eyes, our estimate, we thought it
4  was low.  So that would be yes.
5     Q.  So you thought there was more damage
6  to your home caused by something other than
7  flood?
8     A.  I thought so.
9     Q.  Okay.  And what did you do?
10    A.  I asked for another estimate.
11    Q.  Okay.  Did you make the call?
12    A.  Um -- me and my wife.  One of us.
13    Q.  When you complained to Liberty Mutual
14 that the estimate was too low, did they ask you
15 to get estimates from contractors?
16    A.  Um -- I don't remember that, if that
17 was the case or not.  I don't remember the
18 phone conversation.
19    Q.  I'm going to mark as Exhibit Number --
20 Exhibit 12 a document that appears to be dated
21 March 29th, 2006, from Liberty Mutual -- or to
22 Liberty Mutual from Kenny Armstrong.
23        Have you ever seen this document
24 before?
25        (Exhibit 12 was marked for

Page 264

1  identification and is attached hereto.)
2     A.  Um -- I mean, it's possible.  It's
3  from --
4  EXAMINATION BY MS. CLAYMAN:
5     Q.  Is this your handwriting?
6     A.  Um -- no.
7     Q.  Do you know whose handwriting it is?
8     A.  Could be my wife's.
9     Q.  Okay.  It says, Dear Liberty Mutual,
10 and the two yellow sheets attached are the
11 contents of my refrigerator/freezer and my
12 freezer.  These are for my Home Protector Plus
13 clause of our policy.  The next paragraph says,
14 the white sheets are estimates from two
15 contractors to repair our home.  If you have
16 any questions, please contact me.  And it lists
17 a phone number, and it lists your cellphone
18 number or your wife's cellphone number.  Thank
19 you, Kenny Armstrong.
20        And then let's turn the page.  I
21 believe it's the -- let's turn to the page at
22 the bottom Bates numbered 0151.
23        Is this a contractor estimate that you
24 received to repair your home on Hamlet Drive?
25    A.  Well, I don't know if it was the total

Page 265

1  home.  It looks like one was for -- to fix the
2  roof and one was for the gutting the home.
3      Am I on the right page; 0151?
4      Q.  Yes.  Okay.  First of all, do you
5  remember contacting a contractor to come out
6  and give you an estimate?
7      A.  I remember running into him at a
8  store, and he said he was working in the area
9  doing some of this.
10     Q.  Okay.
11     A.  And he said, would I want him to go to
12 my house?  I said, yeah, you can go out there
13 and give it a shot, see what it was.
14     Q.  Okay.  and this is December 8th, 2005.
15     A.  Yes.
16     Q.  So the general contractor is T MAC,
17 Inc.  Is that right?
18     A.  Correct.
19     Q.  Did you know anything about this
20 contractor?
21     A.  I know he lived in St. Bernard.  I
22 know he did contracting work out there.
23     Q.  Okay.  Were you with the contractor
24 that came out to your house when he came to
25 inspect it?

Page 266

1      A.  No, I was not.
2      Q.  Do you know if anyone was with him?
3      A.  No, I do not.
4      Q.  Do you know who came out from T MAC?
5      A.  Um -- no, I don't.  I don't know if it
6  was him or one of his workers, I'm not sure.
7      Q.  Okay.  The Re: line on this estimate
8  says, renovation of home located at 416 Hamlet
9  Drive.
10         That's your property; right?
11     A.  That was the old address, correct.
12     Q.  Okay.  It says, As per your request,
13 we submit the following proposal for all labor,
14 equipment and material required to renovate the
15 home 1416 Hamlet Drive.  Specifically, the
16 scope of work includes:  And then in all
17 capital letters it says, quote, Renovations to
18 damaged areas caused only by wind and wind
19 blown rain.
20         You see that?
21     A.  What page are you on?
22     Q.  I'm on the Page 0151.
23     A.  Okay.
24     Q.  Do you see that?
25     A.  Okay.  I see it.

Page 267

1      Q.  Were these the instructions you gave
2  to the contractor?
3      A.  No.  I did not.
4      Q.  Do you know why he was only evaluating
5  damage to the house caused by wind and
6  wind-blown rain?
7      A.  I'm not sure.  I'm not sure what was
8  his reason for only doing that area.
9      Q.  Did you speak to the contractor on the
10 phone after he created this estimate?
11     A.  Um -- no, actually, um -- we met with
12 him -- I went and met with him on one of his
13 workers or his wife, and she had this for me,
14 because he wasn't able to be there.
15     Q.  Did you ask him why he only evaluated
16 the areas of the structure of your home that
17 were damaged by wind or wind-blown rain?
18     A.  No, I did not.
19     Q.  Did you ask him for an estimate of the
20 cost to rebuild the rest of your house?
21     A.  Well, I think what was going on with
22 that was he was going out estimating damage of
23 things that he could fix or that needed to get
24 done.  We needed the house gutted if we were
25 going to keep it.  And at the time we wasn't

Page 268

1  sure what we were going to do or where we were
2  going to go with this home.
3      Q.  Okay.
4      A.  So --
5      Q.  Okay.  So do you know who determined
6  which areas of the house were damaged by wind
7  and wind-blown rain?
8      A.  For him?  For the contractor?
9      Q.  Yes.
10     A.  No.  I wasn't there.  So I don't
11 know --
12     Q.  It wasn't you, though.
13     A.  No.  I wasn't there.
14     Q.  All right.  So it looks like under the
15 heading Roof, he concluded that he would need
16 to remove damaged sections of the roof, 32.5
17 square of the 3-tab roof shingles and replace
18 with new.  Haul off roof debris.  And then it
19 says, Note: Contractor noticed signs of severe
20 uplift.
21         Do you know what that means?
22     A.  Um -- I mean, I'm not a contractor or
23 a roofer, so I don't -- I don't really know
24 what that means.
25     Q.  Okay.  And then it says, chimney stack

Page 269

1   is leaning and allowing water to enter the
2   home.
3       Q.  Did you notice that the chimney stack
4   was leaning on the top of your house?
5       A.  Um -- not to any degree of, um -- that
6   would make you notice it.
7       Q.  Do you know if this contractor went
8   inside your house?
9       A.  No, I don't know that.
10      Q.  Okay.  It says, also, vent cover is
11  missing and allowing water into home.
12      Was there a vent cover missing on the
13  top of your roof?
14      A.  After the storm, something might have
15  blew off, I'm not sure.
16      Q.  My recommendation is a total roof
17  replacement.  And then he has an estimate there
18  for $10,187.
19      Did you discuss this estimate with him
20  for the roof?
21      A.  No.  Like I say, I met there -- they
22  had a mobile home set up in the parking lot.  I
23  met there, and he had -- his wife had this for
24  me.  Or a lady that worked for him.
25      Q.  Okay.  And did you discuss this

Page 270

1   estimate with his wife or the lady working with
2   him?
3       A.  No.  No, I did not.
4       Q.  Okay.  Under Gutting, it says, gut
5   ceilings in living room and kitchen.  Includes
6   insulation and sheetrock.  Water entered these
7   areas when shingles on side of home were blown
8   off and were uplifted from roof.
9       A.  Okay.
10      Q.  Do you know why this estimate only
11  includes an estimate for gutting the ceilings
12  in the living room and the kitchen?
13      A.  I really don't understand his
14  terminology.  It was for gutting the home of
15  everything in it.  That was what that was.
16      Q.  Okay.  Did you understand that there
17  are shingles missing over -- on the roof that
18  were right above both the kitchen and the den
19  in your house?
20      A.  Um -- I mean, I saw the pictures.
21  There were shingles missing in various places.
22      Q.  Okay.  And he has a price there of
23  $4650.  It looks like all of these other costs
24  relate solely to the replacement of items in
25  the living room and kitchen.  Do you know why

Page 271

1   that is?
2       A.  No, I don't.
3       Q.  Did you understand that Liberty Mutual
4   would only pay for damage from Katrina that was
5   caused by wind and wind-blown rain?
6       A.  That's what they told us.
7       Q.  Is that what this estimate is for; is
8   that why this estimate only includes wind and
9   wind-blown rain, because you did this in
10  connection with your Liberty Mutual claim?
11          MR. PALMINTIER:
12              Object to form.
13      A.  No.  What happened was, um -- I don't
14  recall that.  But what it was at the time,
15  you're making decisions based on you don't know
16  what you're going to do next.  And this guy
17  comes up who is a local guy, he's not an
18  out-of-towner, he's from there, and says, look,
19  I'm going out and checking houses in the area,
20  and I can give you an estimate on what it would
21  take to fix some of your house.  And that's why
22  he went out there.
23      Q.  Okay.  On the bottom of Page 0152, the
24  second page of the estimate, it says, the front
25  door kicked in by rescue team.

Page 272

1       Do you know what that means?
2       A.  I think what he saw was they had some
3   footprints in the door, when they tried to go
4   in.  They had to go check every house to see if
5   there was somebody in it.  That's the only
6   thing I can think of.
7       Q.  Did you understand when you went to
8   look at it that a rescue team of some kind had
9   kicked in the door?
10      A.  No, I didn't notice that.  I didn't
11  know what that was, to be honest with you.
12      Q.  On the last page, there's a total
13  contract price of $51,692.
14      A.  Uh-huh.
15      Q.  Did you discuss this total price with
16  the contractor or any of the contractor's
17  representatives?
18      A.  No, I did not.
19      Q.  And if you want to turn one page back,
20  to Bates number 0150 --
21      A.  Uh-huh.
22      Q.  -- it says R & M Construction of
23  Louisiana, Inc.  And this looks like another
24  contractor estimate dated December 18th, 2005,
25  so it's about ten days later.

Page 273

1      Do you see that?
2   A. Yes.
3   Q. Do you know who R & M Construction of
4   Louisiana was or is?
5   A. Um -- I don't recall who that was.
6   Q. Do you know why they provided you this
7   estimate?
8   A. I don't want to be -- I'd only be
9   speculating, so I don't know what it is.
10  Q. Under the description, it says, um --
11  proposal for labor, equipment and materials to
12  renovate the home at 4016 Hamlet Drive.
13     That's your house; right?
14  A. Correct.
15  Q. Proposal to include damaged areas
16  caused by wind and wind-blown rain only.
17     Do you see that?
18  A. Yes, I do.
19  Q. So like the contractor -- like the T
20  MAC contractor, this estimate is only for areas
21  damaged by wind and wind-blown rain?
22     MR. PALMINTIER:
23        Object to form.
24  A. That's what it says.
25  EXAMINATION BY MS. CLAYMAN:

Page 274

1   Q. Okay. And the total at the bottom of
2   the page is $55,235?
3   A. Yes.
4   Q. Do you recall talking to anyone from
5   this contractor?
6   A. To be honest with you, I don't even
7   remember this, um -- paper here, this form.
8   Q. But you understand that both of these
9   estimates were submitted to Liberty Mutual in
10  March, on March 29th, 2006?
11  A. Right.
12  Q. Okay.
13  A. It could have been at the
14  recommendation of my insurance agent. That's
15  what I'm trying to remember back, how did we
16  come about doing this, where we needed to show
17  estimates of damage; the tree removal -- the
18  storm comes, who removes the tree?
19  Q. Is it your contention, or did you
20  understand that the trees that were damaged,
21  the damage was caused by wind or wind-driven
22  rain?
23     MR. PALMINTIER:
24        Object to form.
25  A. I'm not sure. I wasn't there.

Page 275

1   EXAMINATION BY MS. CLAYMAN:
2   Q. What happened after you submitted
3   these two contractor estimates to Liberty
4   Mutual?
5   A. Um -- like I said, I know they sent
6   out -- I don't know the specific times of when
7   the second adjuster came or the first adjuster
8   came. I don't know if it was in reference to
9   them getting this first or not getting this.
10  But he came out and, um -- he gave us more
11  money than -- a better estimate than the first
12  guy did.
13  Q. I just want to ask you, this estimates
14  from both these contractors, they were both
15  over $50,000, is that right?
16  A. That's what it says.
17  Q. Okay. And the estimate that the
18  Liberty Mutual adjuster gave you, the first
19  time he came out, was under $3000. Is that
20  right?
21  A. Um --
22  Q. That was --
23  A. On one of the papers. That sounds
24  about right.
25  Q. Yeah. That was Exhibit Number 11.

Page 276

1   A. Okay.
2   Q. All right. I'm going to give you the
3   damage estimate from Liberty Mutual dated June
4   2006.
5      Okay. We're marking as Exhibit Number
6   13, this is a Liberty Mutual Estimated Cost of
7   Repairs for your home on 4016 Hamlet Drive.
8      You see that?
9      (Exhibit 13 was marked for
10  identification and is attached hereto.)
11  A. Yes.
12  EXAMINATION BY MS. CLAYMAN:
13  Q. And it says, date inspected is
14  June 27th, 2006?
15  A. Yes.
16  Q. So it's roughly eight months after the
17  first inspection in October of 2005?
18  A. Yes.
19  Q. Okay. And the estimator here from
20  Liberty Mutual is Johnny Ward. Did you ever
21  meet Mr. Ward?
22  A. Yes. I think that was the one that
23  went to the house. If that's the second one, I
24  met him at the house.
25  Q. Okay. And what time of day did you

Page 277

1    meet him at the house?
2        A.  I don't recall.
3        Q.  Okay.
4        A.  After lunch.
5        Q.  Yeah.  How long did you spend at the
6    house?
7        A.  Um -- I'm not sure.  He was there when
8    I got there, so.  I'm not sure how long he had
9    been there.
10       Q.  Okay.  And on the first page, this
11   says, In the following pages you will find the
12   estimated cost of repairs to your home using
13   prices that are usual and customary in your
14   area at the time.
15           It's on Page 1.
16       A.  Okay.
17       Q.  And then it looks like on Page 8,
18   which has Bates numbers 0161 in the bottom
19   right-hand corner --
20       A.  Okay.
21       Q.  -- it looks like there is an
22   estimate -- this is a recap by room and a total
23   estimate to repair your home of $31,216.30.
24           Do you see that?
25       A.  Yeah.

Page 278

1        Q.  And if you'll turn one page back, to
2    Page 7, it looks like they've added in some
3    other items like sales tax, overhead and
4    profit, and it says Net Claim at the bottom,
5    $35,202.03.
6            Is that how much you received from
7    Liberty Mutual?
8        A.  Um -- I don't remember the exact cost.
9    I'm not saying this is not it, but I don't
10   remember the exact cost.  It was higher than
11   the first estimate that they gave us.
12       Q.  Significantly higher?
13       A.  Well, it was n't high enough.
14       Q.  Okay.  That's fine.  And as far as you
15   know, none of this 35,000 was for contents, is
16   that right?
17       A.  No.  It was all for structure, if I'm
18   not mistaken.  If that's the total.
19       Q.  Uh-huh.  And after you received this
20   estimate for replacing or repairing the
21   structure of your home, did you make a claim
22   for contents to Liberty Mutual and your
23   homeowner's policy?
24       A.  Um -- I don't think we made a claim
25   for contents.  I don't think we did.  Unless we

Page 279

1    made a attic content.
2        Q.  Right.  I believe we have an attic
3    contents claim for you that I'm going to show
4    you in a second.
5        A.  Right.
6        Q.  I'll mark this next document
7    Exhibit 14.  It's called a Proof of Loss.
8            (Exhibit 14 was marked for
9    identification and is attached hereto.)
10       A.  Go ahead.
11   EXAMINATION BY MS. CLAYMAN:
12       Q.  Okay.  I've handed you what's been
13   marked Exhibit Number 14, and it says Proof of
14   Loss on the top.  And it appears to be a form
15   that been filled out in part handwriting and
16   part typed in.  Do you know whose handwriting
17   this is on the form?
18       A.  Um -- looks like my wife's.
19       Q.  Okay.  And it has your name as the
20   insured listed here, and then a mailing
21   address.
22           Is this your apartment?
23       A.  Yes, it is.
24       Q.  Um -- and Gonzales, is that also -- is
25   that right next to Prairieville?

Page 280

1        A.  Right.
2        Q.  Okay.  And at the bottom, it says,
3    Description of Loss, and it says, quote, due to
4    the multiple holes in our roof, we lost all of
5    our attic contents along with the ceilings.
6            Do you see that?
7        A.  Yes, I do.
8        Q.  How did the holes in the roof cause
9    you to lose all of your attic content and
10   ceilings?
11           MR. PALMINTIER:
12               Object to form.
13       A.  I'm sure some of the water leaked
14   through into the, um -- into the attic.  It
15   would go to the attic first.
16   EXAMINATION BY MS. CLAYMAN:
17       Q.  And when you say water, are you
18   talking about rainwater or some other kind of
19   water?  Or floodwater?
20       A.  I wasn't there.  But I know we had at
21   least water up the roof.  I don't know how high
22   up the roof.  So I don't know what was first.
23       Q.  But this claim was made to your
24   homeowner's insurance.
25       A.  Correct.

Page 277

1  meet him at the house?
2      A.  I don't recall.
3      Q.  Okay.
4      A.  After lunch.
5      Q.  Yeah.  How long did you spend at the
6  house?
7      A.  Um -- I'm not sure.  He was there when
8  I got there, so.  I'm not sure how long he had
9  been there.
10     Q.  Okay.  And on the first page, this
11 says, In the following pages you will find the
12 estimated cost of repairs to your home using
13 prices that are usual and customary in your
14 area at the time.
15         It's on Page 1.
16     A.  Okay.
17     Q.  And then it looks like on Page 8,
18 which has Bates numbers 0161 in the bottom
19 right-hand corner --
20     A.  Okay.
21     Q.  -- it looks like there is an
22 estimate -- this is a recap by room and a total
23 estimate to repair your home of $31,216.30.
24         Do you see that?
25     A.  Yeah.

Page 278

1      Q.  And if you'll turn one page back, to
2  Page 7, it looks like they've added in some
3  other items like sales tax, overhead and
4  profit, and it says Net Claim at the bottom,
5  $35,202.03.
6          Is that how much you received from
7  Liberty Mutual?
8      A.  Um -- I don't remember the exact cost.
9  I'm not saying this is not it, but I don't
10 remember the exact cost.  It was higher than
11 the first estimate that they gave us.
12     Q.  Significantly higher?
13     A.  Well, it was n't high enough.
14     Q.  Okay.  That's fine.  And as far as you
15 know, none of this 35,000 was for contents, is
16 that right?
17     A.  No.  It was all for structure, if I'm
18 not mistaken.  If that's the total.
19     Q.  Uh-huh.  And after you received this
20 estimate for replacing or repairing the
21 structure of your home, did you make a claim
22 for contents to Liberty Mutual and your
23 homeowner's policy?
24     A.  Um -- I don't think we made a claim
25 for contents.  I don't think we did.  Unless we

Page 279

1  made a attic content.
2      Q.  Right.  I believe we have an attic
3  contents claim for you that I'm going to show
4  you in a second.
5      A.  Right.
6      Q.  I'll mark this next document
7  Exhibit 14.  It's called a Proof of Loss.
8          (Exhibit 14 was marked for
9  identification and is attached hereto.)
10     A.  Go ahead.
11 EXAMINATION BY MS. CLAYMAN:
12     Q.  Okay.  I've handed you what's been
13 marked Exhibit Number 14, and it says Proof of
14 Loss on the top.  And it appears to be a form
15 that been filled out in part handwriting and
16 part typed in.  Do you know whose handwriting
17 this is on the form?
18     A.  Um -- looks like my wife's.
19     Q.  Okay.  And it has your name as the
20 insured listed here, and then a mailing
21 address.
22         Is this your apartment?
23     A.  Yes, it is.
24     Q.  Um -- and Gonzales, is that also -- is
25 that right next to Prairieville?

Page 280

1      A.  Right.
2      Q.  Okay.  And at the bottom, it says,
3  Description of Loss, and it says, quote, due to
4  the multiple holes in our roof, we lost all of
5  our attic contents along with the ceilings.
6          Do you see that?
7      A.  Yes, I do.
8      Q.  How did the holes in the roof cause
9  you to lose all of your attic content and
10 ceilings?
11         MR. PALMINTIER:
12             Object to form.
13     A.  I'm sure some of the water leaked
14 through into the, um -- into the attic.  It
15 would go to the attic first.
16 EXAMINATION BY MS. CLAYMAN:
17     Q.  And when you say water, are you
18 talking about rainwater or some other kind of
19 water?  Or floodwater?
20     A.  I wasn't there.  But I know we had at
21 least water up the roof.  I don't know how high
22 up the roof.  So I don't know what was first.
23     Q.  But this claim was made to your
24 homeowner's insurance.
25     A.  Correct.

Page 281

1  Q. Okay. And you understand that they
2  only covered damage from wind and wind-blown
3  rain, is that right?
4  A. That's what I was told, yes.
5  Q. Okay. And then attached to the form
6  is, it says, Attention PP -- I don't know if
7  that's an ON or an OV. I don't know what that
8  says. Do you know what that says?
9  A. No, I don't.
10 Q. Okay. Underneath, it says attic
11 contents. Do you know whose handwriting this
12 is?
13 A. That would be my wife.
14 Q. Okay. And did your wife make a list
15 of all these attic contents?
16 A. Um -- yeah. Looks like it.
17 Q. Did you have any involvement in
18 helping her with that?
19 A. I don't -- I mean, we might have had
20 some talks on the phone and that while I was at
21 work or something, but, you know --
22 Q. Do you know if this list of attic
23 contents was provided to Mr. Taylor?
24 A. Um -- I don't know if this one was. I
25 don't know.

Page 282

1  Q. All right. And looking at the second
2  page of this handwritten list, there's a grand
3  total at bottom of $16,005. Is that right?
4  A. Right.
5  Q. So that's the total attic content that
6  you claim was damaged during the storm?
7  A. That's probably most of it.
8  Q. Okay. Looking in the middle of the
9  page, it says 16 gauge rifle, 22 gauge rifle
10 and 410 gauge rifle. Whose rifles were those?
11 A. The 410 was mine. I forgot we had the
12 16 gauge. I forgot we had a 16 gauge. The 22
13 would have probably been my son's.
14 Q. So the 16 and the 4 were yours?
15 A. Yes.
16 Q. Okay. And who owned the -- whose was
17 the karaoke machine?
18 A. Oh, that was our family karaoke
19 machine.
20 Q. Okay. And then I guess maybe five or
21 six up from the bottom it says, fishing rods
22 times five?
23 A. Right.
24 Q. Were these five fishing rods -- were
25 there five fishing rods in the attic?

Page 283

1  A. Remember what I told you, I don't know
2  if we had put some of the fishing rods in the
3  attic or not.
4  Q. Okay. These were your fishing rods?
5  A. Could have been some of mine or my
6  son's.
7  Q. Okay. All right. Do you know what
8  the result of this claims to Liberty Mutual for
9  attic contents was?
10 A. I don't recall what, um -- what the
11 outcome was with that.
12 Q. I'll represent to you in the file
13 there is a letter denying your claim.
14 A. Right.
15 Q. Does that sound right?
16 A. Yeah. I thought there was. I didn't
17 think we got paid for any content from Liberty
18 Mutual. But I'm guessing on that.
19 Q. Okay. Did you submit another claim to
20 Liberty Mutual for additional living expenses?
21 A. Got me.
22 Q. I'll mark this next document. Okay,
23 I'm handing you what's been marked Exhibit
24 Number 15. It's a letter to Whom it May
25 Concern dated July 18th, 2006, from Kenneth and

Page 284

1  Jeannine Armstrong.
2      Have you ever seen this document
3  before?
4      (Exhibit 15 was marked for
5  identification and is attached hereto.)
6  A. Um -- no.
7  EXAMINATION BY MS. CLAYMAN:
8  Q. Do you know whose handwriting is on
9  the cover letter?
10 A. Yes.
11 Q. Who's that?
12 A. I think it's my wife 's.
13 Q. Okay. And it says, I'm submitting a
14 copy of expenses we have incurred since
15 Hurricane Katrina. And the date of this is
16 July 18th, 2006. I would like to submit a
17 claim for ALE, it says.
18     Do you know what ALE stands for?
19 A. No, I don't.
20 Q. The next line says, Please find a copy
21 of Verizon bill, water bill, Entergy bill, rent
22 at Lakeside Oaks, two receipts for apartment in
23 Baton Rouge for 10/05 and 11/05.
24     Do you know what these two receipts
25 for an apartment in Baton Rouge for 10/05 and

71 (Pages 281 to 284)

Page 321

1  hour or something like that, and.
2      Q.  Was it for living expenses?
3      A.  Yeah.  It was just to help out with
4  the situation.
5      Q.  Can you think of any other monies you
6  received from any other federal government
7  program?
8      A.  Not off the top of my head.  Nothing
9  else.  I mean, I don't know what else was out
10  there.
11     Q.  Okay.  That's all the questions I
12  have.  Thank you.
13         MS. CLAYMAN:
14             Thank you, Mr. Armstrong, for
15         your time.
16         (6 hours and 25 minutes elapsed time
17  used.)

Page 322

1         WITNESS' CERTIFICATE
2
3      I, KENNETH PAUL ARMSTRONG, SR., do
4  hereby certify that the foregoing testimony was
5  given by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10  _____   _____
11  DATE SIGNED    KENNETH PAUL ARMSTRONG, SR.
12
13  _____ Signed with corrections as noted.
14
15  _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN: September 12th, 2011

Page 323

1         REPORTER'S CERTIFICATE
2      I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3  Certified Court Reporter in and for the State
4  of Louisiana, do hereby certify that the
5  aforementioned witness, after having been first
6  duly sworn by me to testify to the truth, did
7  testify as hereinabove set forth;
8      That said deposition was taken by me
9  in computer shorthand and thereafter
10  transcribed under my supervision, and is a true
11  and correct transcription to the best of my
12  ability and understanding.
13      I further certify that I am not of
14  counsel, nor related to counsel or the parties
15  hereto, and am in no way interested in the
16  result of said cause.
17
18
19
20
21
22
23  _____
24  JOSEPH A. FAIRBANKS, JR., CCR, RPR
25  CERTIFIED COURT REPORTER #75005

81 (Pages 321 to 323)