# EXHIBIT 16

**JEANNINE ARMSTRONG, SR.**                                    **September 13, 2011**

---

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION         NO. 05-4182 K2
            JUDGE DUVAL
PERTAINS TO MRGO          MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
       05-6314, 05-6324, 05-6327, 05-6359,
       06-0225, 06-0886, 06-1885, 06-2152,
       06-2278, 06-2287, 06-2824, 06-4024,
       06-4065, 06-4066, 06-4389, 06-4634,
       06-4931, 06-5032, 06-5155, 06-5159,
       06-5156, 06-5162, 06-5260, 06-5771,
       06-5786, 06-5937, 07-0206, 07-0621,
       07-1073, 07-1271, 07-1285

            * * *

       Deposition of JEANNINE ARMSTRONG,
given at the offices of Bruno & Bruno, 855
Baronne Street, New Orleans, Louisiana 70113,
on September 13th, 2011.
REPORTED BY:
       JOSEPH A. FAIRBANKS, JR., CCR, RPR
       CERTIFIED COURT REPORTER #75005

---

Page 3

1  REPRESENTING WASHINGTON GROUP INTERNATIONAL,
2      INC.:
3      JONES DAY
4      (BY:  DEBRA S. CLAYMAN, ESQUIRE)
5      51 Louisiana Avenue, N.W.
6      Washington, D.C. 20001-2113
7      202-879-4645
8  - and -
9      STONE PIGMAN WALTHER WITTMANN, L.L.C.
10     (BY:  WILLIAM D. TREEBY, ESQUIRE)
11     546 Carondelet Street
12     New Orleans, Louisiana 70130
13     504-581-3200
14
15 VIDEOGRAPHER:
16     KEN HART (HART VIDEO)
17
18 ALSO PRESENT:
19     KENNETH PAUL ARMSTRONG, SR.
20
21
22
23
24
25

---

Page 2

1  APPEARANCES:
2
3  REPRESENTING THE PLAINTIFFS:
4      LAW OFFICE OF GERALD N. ANDRY, JR.
5      (BY:  GERALD N. ANDRY, JR., ESQUIRE)
6      710 Carondelet Street
7      New Orleans, Louisiana 70130
8      504-581-4334
9  - AND -
10     DEGRAVELLES, PALMINTIER, HOLTHAUS &
11     FRUGE, L.L.P.
12     (BY:  JOSHUA M. PALMINTIER, ESQUIRE)
13     618 Main Street
14     Baton Rouge, Louisiana 70801-1910
15     225-344-3735
16
17 REPRESENTING THE UNITED STATES OF AMERICA:
18     U.S. DEPARTMENT OF JUSTICE
19     (BY:  JAMES F. MCCONNON, JR., ESQUIRE)
20     Torts Branch, Civil Division
21     P.O. Box 888
22     Benjamin Franklin Station
23     Washington, D.C. 20044
24     202-616-4289
25

---

Page 4

1      E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:              PAGE
4  MS. CLAYMAN ................................10
5  MR. MCCONNON .............................164
6  MR. ANDRY    .............................166
7
8      E X H I B I T   I N D E X
9
10 EXHIBIT NO.                  PAGE
11 Exhibit 1   ................................84
12 Exhibit 2   ................................89
13 Exhibit 3   ...............................111
14 Exhibit 4   ...............................116
15 Exhibit 5   ...............................132
16 Exhibit 6   ...............................136
17 Exhibit 7   ...............................140
18 Exhibit 8   ...............................147
19 Exhibit 9   ...............................150
20 Exhibit 10  ...............................154
21 Exhibit 11  ...............................163
22
23
24
25

---

**JEANNINE ARMSTRONG, SR.**                                    **September 13, 2011**

Page 13

1    Q.  So a total of three times?
2    A.  Yes.
3    Q.  And other than your deposition
4  transcript, what other types of materials did
5  you review in preparation for your deposition?
6    A.  That's about it.
7    Q.  Did you review any documents or any
8  exhibits?
9    A.  Yes.
10    Q.  Did you review the exhibits that were
11  used yesterday in your husband's deposition?
12    A.  Yes.
13    Q.  Have you reviewed your husband's
14  deposition transcript?
15    A.  I've never read through his whole one,
16  no.
17    Q.  Did you talk to anyone other than your
18  lawyers in preparation for this deposition?
19    A.  No.
20    Q.  Okay.  I want to update the
21  information you gave during your last
22  deposition.  Since you were last deposed in
23  July 2007, have you been involved in any
24  lawsuits other than this one?
25    A.  Yes.

Page 14

1    Q.  What lawsuits are those?
2    A.  Um -- we were involved in a lawsuit
3  against Liberty Mutual.
4    Q.  And that was filed in August 2007, is
5  that right?
6    A.  I believe so.
7    Q.  And what was the name of your
8  attorney?
9    A.  Frank Ippolito.
10    Q.  Ippolito.  And what's the status of
11  that case right now?
12    A.  That's settled.
13    Q.  Do you recall the amount of the
14  settlement?
15    A.  Um -- I'm not sure of the whole
16  settlement, but I believe we came out with
17  about $16,000.
18    Q.  And do you know what the $16,000
19  represented?
20    A.  That was the content.
21    Q.  Contents from any particular area in
22  your home?
23    A.  From the attic.
24    Q.  Did you get any additional -- was any
25  of the $16,000 related to damage to the

Page 15

1  structure of your house?
2    A.  No.
3    Q.  Did you claim in your lawsuit against
4  Liberty Mutual that there was additional damage
5  to the structure of your house that you were
6  entitled to recover for?
7    A.  Could you explain that?
8    Q.  Sure.  Other than your claim for
9  $16,000 in contents relating to damage to
10  property in the attic, did you make any other
11  claims in this lawsuit against Liberty Mutual?
12    A.  Not to my understanding.
13    Q.  Okay.  Are there any other lawsuits
14  that you've been involved in since your last
15  deposition in July 2007?
16    A.  No.
17    Q.  Have you given any other depositions
18  since July 2007?
19    A.  No.
20    Q.  Have you testified in any court
21  proceeding?
22    A.  No.
23    Q.  Have you been sued for anything?
24    A.  No.
25    Q.  Have you filed for bankruptcy?

Page 16

1    A.  No.
2    Q.  Have you been involved in any criminal
3  proceeding?
4    A.  No.
5    Q.  Just a couple of background questions:
6  You were born in November of 1962; is that
7  right?
8    A.  Yes.
9    Q.  And where were you born?
10    A.  I was born in New Orleans.
11    Q.  Where in New Orleans?
12    A.  It was called The Marine Hospital.
13    Q.  And did you grow up in New Orleans, as
14  well?
15    A.  I grew up in St. Bernard Parish.
16    Q.  And where are you living right now?
17    A.  In St. Bernard Parish.
18    Q.  And just for the record, I know we
19  covered this yesterday with your husband, but
20  what's the address in St. Bernard Parish?
21    A.  It's 2400 Aramis Drive, Meraux,
22  Louisiana.
23    Q.  And when did you move to this
24  location?
25    A.  In June 2010.

4  (Pages 13 to 16)

**JOHNS, PENDLETON COURT REPORTERS**                         **504 219-1993**

**JEANNINE ARMSTRONG, SR.**                              **September 13, 2011**

Page 97

```
 1        A.  No.
 2        Q.  And you don't have claim for a loss of
 3   consortium, is that right?
 4        A.  No.
 5        Q.  Okay.  Let's put this Exhibit Number 1
 6   aside.
 7            I'm going to talk about your house on
 8   Hamlet Drive for a little while.  When you
 9   purchased -- when you and your husband
10   purchased the house on Hamlet Drive in 1985, it
11   was a three bedroom, two bath house; is that
12   right?
13        A.  Yes.
14        Q.  At some point you turned the dining
15   room into a fourth bedroom for your oldest
16   daughter Katie; is that right?
17        A.  Yes.
18        Q.  And do you know what year that was
19   that you converted the dining room into a
20   fourth bedroom?
21        A.  Um -- Katie was either in eighth grade
22   or a freshman in high school.
23        Q.  And what year was Katie born?
24        A.  1986.
25        Q.  So approximately how old was Katie, do
```

Page 98

```
 1   you think, when the room -- when she moved into
 2   her own room?
 3        A.  I'd say thirteen, fourteen.
 4        Q.  Okay.  And before that, she shared a
 5   room with Renee, is that right?
 6        A.  Yes.
 7        Q.  So that would -- the year would be
 8   approximately 2000 when you converted the
 9   dining room into a fourth bedroom for Katie.
10        A.  Yes.
11        Q.  Okay.  At the time in 2000 when you
12   made the conversion from the dining room to the
13   bedroom, what other home improvements did you
14   make?
15        A.  At that time?
16        Q.  Yes.
17        A.  Um -- we put up a wall in the foyer
18   that blocked that dining room, put a closet in
19   the foyer and then a closet in her bedroom.
20        Q.  Did you put new carpeting in her
21   bedroom?
22        A.  Yes.  And we also put ceramic tile in
23   the foyer.
24        Q.  Did you put new carpeting in any of
25   the other bedrooms in the house at this time?
```

Page 99

```
 1        A.  Not at that time.
 2        Q.  Did you subsequently put -- or later
 3   put new flooring in any other rooms in the
 4   house?
 5        A.  Yes.
 6        Q.  When was that?
 7        A.  I put hardwood floors in the den and
 8   up the hallway in, um -- November of '04.
 9        Q.  Do you know what kind of hardwood they
10   were?
11        A.  I don't know the type of wood.
12        Q.  Okay.  Did you replace the floors in
13   any of the other rooms?
14        A.  We replaced the kitchen floor.
15        Q.  When was that?
16        A.  In the nineties.
17        Q.  In the early nineties or the late
18   nineties?
19        A.  I'm not sure.
20        Q.  And do you know who installed the
21   hardwood floors in November of 2004?
22        A.  Um -- it was a guy named Dave LeBlanc.
23        Q.  Is that an independent contractor?
24        A.  I would think so.  He had his own
25   little flooring company.
```

Page 100

```
 1        Q.  Do you know the name of the flooring
 2   company where Mr. LeBlanc worked?
 3        A.  Um -- we bought the floors from I
 4   believe it's Flooring Showcase.
 5        Q.  Okay.  So you just hired Dave to
 6   install them?
 7        A.  Yes.
 8        Q.  I believe you said you replaced the
 9   kitchen floors in the 1990s?
10        A.  Uh-huh.
11        Q.  I don't know if you said in the
12   earlier or later part of the nineties.
13        A.  I'm not sure.
14        Q.  Okay.  And what kind of flooring did
15   you put down in the kitchen?
16        A.  It was a tile.
17        Q.  Ceramic tile?
18        A.  Um -- it actually wasn't ceramic, it
19   was a soft tile, like a --
20        Q.  A vinyl tile?
21        A.  Maybe.
22        Q.  Okay.  Do you recall replacing any of
23   the flooring in either of the bathrooms while
24   you were living on Hamlet Drive?
25        A.  Yes.
```

**JOHNS, PENDLETON COURT REPORTERS**                    **504 219-1993**

**JEANNINE ARMSTRONG, SR.**                    **September 13, 2011**

Page 105

1   oven?
2       A.  I'm not sure.
3       Q.  Do you know when the oven was
4   purchased?
5       A.  Um -- we had -- we bought another oven
6   around -- around 1989.
7       Q.  And that was electric?
8       A.  Yes.
9       Q.  Was this a double oven or a single
10  oven?
11      A.  Single.
12      Q.  And did it have burners on top for
13  boil boiling water?
14      A.  The oven?
15      Q.  Yes.
16      A.  No.  The oven was in the wall.
17      Q.  Oh, I see.  Did the cooktop -- how
18  many burners did the cooktop have?
19      A.  Four.
20      Q.  What about the microwave, how old was
21  the microwave?
22      A.  I'm not sure.  We bought it after we
23  moved in.  So.
24      Q.  You think you bought it in the
25  eighties?

Page 106

1       A.  Yeah.  Probably.
2       Q.  Okay.  What about the dishwasher?  Do
3   you know how old that was?
4       A.  Yeah.  The dishwasher, um -- we
5   replaced it when I was pregnant for Renee.  So
6   in 1991.
7       Q.  Do you remember what the brand is?
8       A.  No.
9       Q.  The freezer in the garage.  How long
10  have you had that?
11      A.  We didn't have that very long.  Um --
12  maybe three years.
13      Q.  Do you know the brand?
14      A.  No.
15      Q.  I understand that in 2004 when you
16  converted the dining room into a fourth bedroom
17  you moved your dining room set into the
18  breakfast nook.  Is that right?
19      A.  Yes.
20      Q.  And how old were the dining room table
21  and chairs that you moved into the breakfast
22  nook?
23      A.  Probably about five years old.
24      Q.  Do you know where you got them?
25      A.  Springer Furniture.

Page 107

1       Q.  Were there six chairs or eight chairs?
2       A.  Six.
3       Q.  Were they upholstered?
4       A.  No.  They're wood.
5       Q.  Just wood.  Do you know what kind of
6   wood?
7       A.  Light wood.
8       Q.  Okay.  And I understand you had a
9   China closet in the breakfast nook, as well.
10  Right?
11      A.  Yes.
12      Q.  And where was that from?
13      A.  Um -- the same place, Springer
14  Furniture.
15      Q.  It was also about five years old?
16      A.  Yes.
17      Q.  And what kind of flooring did you have
18  in the breakfast nook?
19      A.  Soft tile.
20      Q.  Soft tile.  Do you know how old the
21  barbecue pit was on the patio?
22      A.  No.
23      Q.  What about the washer and dryer in the
24  garage, do you know how old the washer was?
25      A.  I have no idea.

Page 108

1       Q.  The drier?
2       A.  Don't know.
3       Q.  Do you know what brand either of those
4   appliances was?
5       A.  No.
6       Q.  Did you have any flat screen TVs in
7   your house?
8       A.  No.
9       Q.  In the hall bathroom, do you know what
10  the counters were made of?
11      A.  Um -- it was just a vanity and the
12  top -- no.
13      Q.  Do you know where the vanity was
14  purchased?
15      A.  No.
16      Q.  Was there one sink or two sinks?
17      A.  One.
18      Q.  Moving to your master bedroom, since
19  you moved in, in 1985, you replaced the carpet
20  in your master bedroom?
21      A.  Yes.
22      Q.  And do you know when that was?
23      A.  No.
24      Q.  Do you know what kind of carpet was in
25  your master bedroom in 2005?

**JOHNS, PENDLETON COURT REPORTERS**              **504 219-1993**

**JEANNINE ARMSTRONG, SR.**                                    **September 13, 2011**

Page 113

1  Q. In this report Mr. Taylor represents
2  that he inspected your former property on
3  Hamlet Drive on June 15th, 2011.
4      Did you accompany Mr. Taylor when he
5  inspected your property on Hamlet Drive?
6  A. No.
7  Q. Do you know anyone who did?
8  A. I don't know.
9  Q. Did Mr. Taylor discuss with you his
10 inspection of the property?
11 A. Um -- I'm not sure. I don't remember.
12 Q. What did you discuss with Mr. Taylor
13 during your meeting at your house?
14 A. Um -- we discussed the, um -- the
15 layout, the floor plan of the house, and, um --
16 I guess personal property.
17 Q. And did you provide him, during this
18 meeting, any documents?
19 A. Um -- we gave him pictures.
20 Q. And when you say pictures, do you mean
21 photographs?
22 A. Yes.
23 Q. And these are photographs of what?
24 A. Of the house.
25 Q. Before Katrina or after Katrina?

Page 114

1  A. I believe it was after.
2  Q. Did you look at any other or give him
3  any other documents besides the photographs?
4  A. Not that I can remember.
5  Q. And did you discuss any documents that
6  you received from or submitted to the
7  insurance -- any insurance companies with
8  Mr. Taylor?
9  A. Um -- not that I remember.
10 Q. Did you discuss or review any
11 documents that you received from or submitted
12 to Road Home with Mr. Taylor?
13 A. I don't think so.
14 Q. Do you know -- or did you provide
15 Mr. Taylor with any copies of any of your
16 insurance claims relating to your house on
17 Hamlet Drive?
18 A. Not that I know of.
19 Q. Have you reviewed this loss report
20 that's marked as Exhibit 3?
21 A. Yeah. Yes.
22 Q. Do you disagree with anything in it?
23 A. Um -- not that I know offhand.
24 Q. If you turn to Page 19 --
25 A. I'm sorry.

Page 115

1  Q. 19. At the bottom of the page, under
2  the heading Coverage, there is a, the
3  right-hand column, it says ACV, which stands
4  for actual cost value, Total.
5      Do you see that?
6  A. Yes.
7  Q. Under Dwelling, Mr. Taylor has put a
8  figure of $194,407.31 total damages to your
9  dwelling.
10     Is that the total amount you're
11 claiming in this case for damages to your
12 dwelling?
13 A. Um -- I'm not certain on the dollar
14 amount.
15 Q. Okay. But you don't know offhand of
16 any other amounts of damages that you're
17 claiming for the dwelling.
18 A. Like I said, I don't know.
19 Q. Okay. For contents, it looks like
20 Mr. Taylor has come up with a figure of
21 $181,498.40. Do you see that?
22 A. Yes.
23 Q. Is this the total amount you are
24 claiming for contents of your home on Hamlet
25 Drive in this case?

Page 116

1  A. Yes.
2  Q. And then the last row says Additional
3  Living Expenses, $38,827.30. Is that the total
4  amount of additional living expenses that
5  you're claiming in this case?
6  A. I would guess so, yes.
7  Q. Do you remember providing Mr. Taylor
8  copies of any canceled checks relating to
9  additional living expenses?
10 A. Um -- not that I remember.
11 Q. I want to talk a little bit about the
12 contents of your house.
13 A. Okay.
14 Q. Yesterday your husband testified that
15 you and your children supplied a handwritten
16 list of contents to Mr. Taylor. Is that right?
17 A. Yes.
18 Q. We received a copy of that handwritten
19 list from your attorneys yesterday. I'm going
20 to mark that as Exhibit 4.
21     Have you seen this spreadsheet
22 entitled Flood Contents Worksheet before?
23     (Exhibit 4 was marked for
24 identification and is attached hereto.)
25 A. It looks familiar.

29 (Pages 113 to 116)

**JOHNS, PENDLETON COURT REPORTERS**                    **504 219-1993**

**JEANNINE ARMSTRONG, SR.**                              **September 13, 2011**

Page 117

1    EXAMINATION BY MS. CLAYMAN:
2        Q.  Do you know when it was created?
3        A.  Um -- we did this in the summer.  This
4    summer.
5        Q.  Was this after your meeting with
6    Mr. Taylor?
7        A.  Yes.
8        Q.  And did Mr. Taylor provide you with
9    the basic structure of this document?
10       A.  Yes.
11       Q.  And on the first page, it says,
12   Insured, Kenny Armstrong, and there is a
13   list with 21 items.  Do you know whose
14   handwriting that is on the first page?
15       A.  I believe that's Kenny's.
16       Q.  Do you know who came up with the
17   description in the third column over that says
18   Description?
19       A.  Where is that?  Oh.  I'm not sure.
20   You mean like -- what do you mean by that?
21       Q.  Did your husband come up with the
22   descriptions contained in this column, or is
23   that something you did as a collaborative
24   project between you and your husband?
25       A.  We did it together.

Page 118

1        Q.  So you came up with what to put in the
2    description, and your husband wrote it down?
3        A.  Yeah.  We came up with it together.
4        Q.  Okay.  And who came up with the dollar
5    amounts that are listed in the column marked
6    Base RCV?
7        A.  We came up with that together.
8        Q.  And how did you come up with those
9    dollar amounts?
10       A.  Um -- recollection of what you paid
11   for it back then, and also we, um -- looked
12   like on the Internet, stuff like that.
13       Q.  Would you characterize the amounts of
14   money in this column as the cost to buy a new
15   one to replace what was lost?
16       A.  Um -- I'm really not sure how to
17   answer that.
18       Q.  We can take certain ones item by item.
19       A.  Okay.
20       Q.  You said you looked on the Internet;
21   is that right?
22       A.  Yes.
23       Q.  Did you print out copies of any of the
24   research you did --
25       A.  No.

Page 119

1        Q.  -- on the Internet?
2            Did you save any of your Internet
3    searches?
4        A.  No.
5        Q.  Did you discuss with Mr. Taylor what
6    Internet searches you did to come up with these
7    prices?
8        A.  No.  It would be like I had a
9    KitchenAid mixer.  How much does that cost?
10   Look it up on the Internet.  Oh, that's about
11   $300.  Okay.  That -- you know, just like that.
12       Q.  Okay.  It looks like there's a column
13   on this document that says make or model, and
14   then next to that it says age or year.
15       A.  Uh-huh.
16       Q.  Did Mr. Taylor ask you to fill out
17   those two columns?
18       A.  Not that I remember.
19       Q.  Okay.  Is this something you could
20   have done if Mr. Taylor had asked you to do it?
21       A.  I'm not an expert on this.  I just
22   know like we tried to get a good idea of what
23   things cost or what we had paid for them.
24       Q.  Okay.
25       A.  I couldn't do that.  I'm not the

Page 120

1    expert on that.
2        Q.  Okay.  Did you provide a list of
3    contents in your home to your flood insurance
4    company Allstate?
5        A.  I believe we did.
6        Q.  Okay.  That list was created before
7    you created this list for Mr. Taylor; is that
8    right?
9        A.  Yes.
10       Q.  Do you know where I might find a copy
11   of that list?
12       A.  I have no clue.
13       Q.  Okay.  You don't have a copy of it?
14       A.  No.
15       Q.  Okay.
16       A.  That was six years ago.
17       Q.  Do you know how that list that you
18   provided to your flood insurance company might
19   have been different from this list?
20       A.  I have no idea.
21       Q.  Do you recall doing Internet research
22   in connection with the list you prepared for
23   the flood insurance company?
24       A.  We didn't have a computer at that
25   time.

**JOHNS, PENDLETON COURT REPORTERS**                      **504 219-1993**

JEANNINE ARMSTRONG, SR.                                September 13, 2011

Page 121

1    Q.  So any dollar amounts you provided to
2  the flood insurance company would have been
3  from your own recollection?
4    A.  Yes.
5    Q.  What about to your homeowner insurance
6  company, did you provide a list of contents in
7  your house to the homeowner insurance company?
8    A.  I'm not sure.
9    Q.  Do you recall providing a list of
10  attic contents?
11    A.  Yes.  Yes, we did.
12    Q.  Do you think there was any other list
13  besides the attic contents?
14    A.  Not that I know of.
15    Q.  All right.  I'm just going to go
16  through some of the things in this Exhibit
17  Number 4.  Now, looking down at Item Number 11,
18  it says, dishes, set of twelve, $400.
19         What type of dishes were these?
20    A.  Um -- I'm not sure if that was dishes
21  that were in the China cabinet or, um -- dishes
22  that we, um -- ate off of like daily.
23    Q.  What kind of daily dishes did you
24  have?
25    A.  Um -- we had some CorningWare dishes,

Page 122

1  and we had, um -- another set of dishes that I
2  had bought.  I couldn't tell you the name brand
3  of them.
4    Q.  Turning to the next page, it looks
5  like Page 2 has some different handwriting than
6  was on Page 1.  Do you know whose handwriting
7  is on the Description column for Items 22
8  through 28?
9    A.  Um -- I'm really not sure.
10    Q.  Do you know who else was involved?
11    A.  It would be, um -- it would be either
12  Kenny or I, or my son Ken and my daughter
13  Katie.
14    Q.  Item number 25 says Kitchen Gadgets.
15  Do you know what's included in this description
16  of kitchen gadgets for $700?
17    A.  Um -- I like kitchen gadgets.  Like a
18  lot of Pampered Chef gadgets, like a slicer
19  and, um -- garlic press and, um -- these fancy
20  little, um -- pie making things, and just all
21  kind of stuff like that.
22    Q.  Okay.  And looking down at Item number
23  34, China, 8-piece set for $1,500, is that
24  China you received in your, um -- at your
25  wedding at wedding gifts?

Page 123

1    A.  Yes.
2    Q.  Do you know what brand the China that
3  was?
4    A.  Um -- I'm not sure of the brand.
5    Q.  Looking down at Number 39,
6  Entertainment Center, do you know when the
7  Entertainment Center was purchased?
8    A.  I'm not sure.
9    Q.  Do you know roughly what decade?
10    A.  I would say in the nineties.
11    Q.  Okay.  Turning to the next page, Item
12  number 42 says Wall Art, $3,000.  Your husband
13  mentioned yesterday -- or testified yesterday
14  that he thought two of his pictures from Ducks
15  Unlimited were included in that wall art.
16    A.  Uh-huh.
17    Q.  Is the right?
18    A.  Could be.
19    Q.  Do you know what is included in this
20  wall art?
21    A.  Um -- we had a few Jazz Fest posters
22  that were matted and framed.  Um -- I'm not
23  sure, Crescent City Classic posters that were
24  framed are on here, also.
25    Q.  Anything else besides the Jazz

Page 124

1  posters?
2    A.  Um -- we had, um -- a Blue Dog poster
3  that was matted and framed.
4    Q.  Okay.  Do you know who wrote wall art
5  here?
6    A.  I'm not sure.  It was one of us.
7    Q.  Turning to the next page, Item 62, it
8  says DVDs, over 250.  Where were these DVDs
9  stored?
10    A.  Um -- some of them were stored in the
11  entertainment center that was in the den, some
12  of them were stored in my son's room.  He had a
13  rack in his room.
14    Q.  Okay.  Going down to the very last
15  item on this page, this is Page Number 4, it
16  says antique cabinet, $1000.  This was an
17  antique cabinet that you purchased from your
18  parents; is that right?
19    A.  We never purchased it from my parents.
20    Q.  They gave it to you?
21    A.  Yeah.  It was actually my
22  grandmother's, who gave it to my mother who
23  gave it to us.
24    Q.  Had you ever had the cabinet
25  appraised?

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

**JEANNINE ARMSTRONG, SR.**                    **September 13, 2011**

Page 169

1       WITNESS' CERTIFICATE
2
3           I, JEANNINE ARMSTRONG, do hereby
4   certify that the foregoing testimony was given
5   by me, and that the transcription of said
6   testimony, with corrections and/or changes, if
7   any, is true and correct as given by me on the
8   aforementioned date.
9
10  _____   _____
11  DATE SIGNED       JEANNINE ARMSTRONG
12
13  _____ Signed with corrections as noted.
14
15  _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN:  September 13th, 2011

Page 170

1       REPORTER'S CERTIFICATE
2           I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3   Certified Court Reporter in and for the State
4   of Louisiana, do hereby certify that the
5   aforementioned witness, after having been first
6   duly sworn by me to testify to the truth, did
7   testify as hereinabove set forth;
8           That said deposition was taken by me
9   in computer shorthand and thereafter
10  transcribed under my supervision, and is a true
11  and correct transcription to the best of my
12  ability and understanding.
13          I further certify that I am not of
14  counsel, nor related to counsel or the parties
15  hereto, and am in no way interested in the
16  result of said cause.
17
18
19
20
21
22
23  _____
24      JOSEPH A. FAIRBANKS, JR., CCR, RPR
25      CERTIFIED COURT REPORTER #75005

**JOHNS, PENDLETON COURT REPORTERS**                **504 219-1993**