# EXHIBIT 19

---

**Page 1**

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
                                 JUDGE DUVAL
PERTAINS TO MRGO                 MAG. WILKINSON


FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
          05-6314, 05-6324, 05-6327, 05-6359,
          06-0225, 06-0886, 06-1885, 06-2152,
          06-2278, 06-2287, 06-2824, 06-4024,
          06-4065, 06-4066, 06-4389, 06-4634,
          06-4931, 06-5032, 06-5155, 06-5159,
          06-5156, 06-5162, 06-5260, 06-5771,
          06-5786, 06-5937, 07-0206, 07-0621,
          07-1073, 07-1271, 07-1285

                    * * *




              VIDEOTAPED DEPOSITION OF
               FRED NELSON HOLMES, JR.,
    30231 Glenboro Drive, Spring, Texas 77386,
    given at The Woodlands Waterway Marriott Hotel
    and Convention Center, 1601 Lake Robbins
    Drive, The Woodlands, Texas on Saturday,
    September 24, 2011.
```

---

**Page 2**

```
 1   APPEARANCES:
 2
     REPRESENTING THE PLAINTIFFS:
 3       LAW OFFICE OF GERALD N. ANDRY, JR.
         (BY:  GERALD N. ANDRY, JR., ESQUIRE)
 4       710 Carondelet Street
         New Orleans, Louisiana 70130
 5       504-581-4334 (NOT PRESENT)
     - AND-
 6       DEGRAVELLES, PALMINTIER, HOLTHAUS &
         FRUGE, L.L.P.
 7       (BY:  JOSHUA M. PALMINTIER, ESQUIRE)
         618 Main Street
 8       Baton Rouge, Louisiana 70801-1910
         225-344-3735
 9   - AND-
         THE ANDRY LAW GROUP, LLC
10       (BY:  JONATHAN B. ANDRY, ESQUIRE)
         610 Baronne Street
11       New Orleans, Louisiana 70113-1004
         504-525-5535 (NOT PRESENT)
12
13
14   REPRESENTING THE UNITED STATES OF AMERICA:
         U.S. DEPARTMENT OF JUSTICE
15       (BY: CONOR KELLS, ESQUIRE)
         Torts Branch, Civil Division
16       P.O. Box 888
         Benjamin Franklin Station
17       Washington, D.C. 20044
         202-616-4289
18
19   REPRESENTING WASHINGTON GROUP INTERNATIONAL,
         INC.:
20       JONES DAY
         (BY:  CHRISTOPHER THATCH, ESQUIRE)
21       51 Louisiana Avenue, N.W.
         Washington, D.C. 20001-2113
22       202-879-4645
23
     ALSO PRESENT:
24      JENEEN MARIE BAUDOIN-HOLMES
25
```

---

**Page 3**

```
 1   APPEARANCES CONTINUED:
 2
 3
 4
 5
 6   VIDEOGRAPHER:  KEN HART (HART VIDEO)
 7
 8
 9
10   REPORTED BY:
11       ROGER D. JOHNS, CCR
12       CERTIFIED COURT REPORTER
13       STATE OF LOUISIANA
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1         S T I P U L A T I O N
 2
 3       It is stipulated and agreed by and between
 4   counsel for the parties hereto
 5   that the deposition of the aforementioned
 6   witness is hereby being taken under the
 7   Federal Rules of Civil Procedure, for all
 8   purposes, in accordance with law;
 9       That the formalities of certification and
10   filing are specifically waived;
11       That the formality of reading and signing
12   of the transcript is specifically not waived;
13       That all objections, save those as to the
14   form of the question and the responsiveness of
15   the answer, are hereby reserved until such
16   time as this deposition, or any part thereof,
17   may be used or sought to be used in evidence.
18
19           * * * *
20
21       ROGER D. JOHNS, RDR, CRR, Certified Court
22   Reporter, for the State of Louisiana,
23   officiated in administering the oath to the
24   witness.
25
```

1 (Pages 1 to 4)

| Page 77 | Page 79 |
|---|---|
| 1  Q. So just to clarify, you believe that<br>2  you bought the house on Glenboro Drive in<br>3  Spring in 2008? Is that correct?<br>4  A. I am not -- I am really not 100<br>5  percent sure.<br>6  Q. So during the time that you first<br>7  moved in, which was January of '06, between<br>8  that period and -- between that date and the<br>9  time in which you bought the house --<br>10  A. Yes, sir.<br>11  Q. -- you were continuing to pay -- you<br>12  were paying rent that entire time?<br>13  A. No, sir. I mean, we -- I don't<br>14  recall when we actually purchased the home. I<br>15  believe it was just for the one year after.<br>16  So it may have actually been '07. I am not<br>17  100 percent sure, though.<br>18  Q. So you moved in initially in January<br>19  of '06.<br>20  A. Yes, sir.<br>21  Q. You signed a year lease to rent.<br>22  And you believe then you actually may have<br>23  moved in that following year?<br>24  A. Yes, sir. It could be. I am not<br>25  100 percent sure, though. | 1  A. Yes, sir.<br>2  Q. -- did you pay the rent after that<br>3  initial year, or was that rent paid for by<br>4  someone else?<br>5  A. That was still part of the ongoing.<br>6  Q. So the entire period of time that<br>7  you lived there before you bought the house --<br>8  A. Uh-huh (affirmatively).<br>9  Q. -- you did not pay rent there?<br>10  A. That's correct.<br>11  Q. Now, when you bought the house at<br>12  Glenboro Drive, you still owned the house on<br>13  Perrin Drive in New Orleans; is that correct?<br>14  A. Yes, sir, that's correct.<br>15  Q. And were you continuing, were you<br>16  still paying the mortgage there when you<br>17  bought the house at Glenboro Drive?<br>18  A. Yes, sir, unfortunately.<br>19  Q. Were you at some point paying<br>20  utilities at Perrin Drive?<br>21  A. Not after the fact. I don't believe<br>22  so.<br>23  Q. So after the storm you don't believe<br>24  that you paid for utilities at Perrin Drive at<br>25  any point in time? |

| Page 78 | Page 80 |
|---|---|
| 1  Q. It's not a trick question. I<br>2  promise.<br>3  A. Yes, sir, I understand.<br>4  Q. I am just trying to nail down<br>5  dates.<br>6  A. I understand. I understand. I<br>7  really don't recall, though.<br>8  Q. But if you signed a year lease to<br>9  rent and then bought shortly thereafter, that<br>10  would put us in January of '07. Correct?<br>11  A. Correct. But I believe they gave us<br>12  a couple of extensions, but I am not -- I<br>13  really don't recall 100 percent.<br>14  Q. When you say they gave you a couple<br>15  of extensions, you're referring to the<br>16  Catholic Charities group?<br>17  A. Not necessarily Catholic Charities<br>18  group. I believe it was the group, the actual<br>19  realtor who owned the property.<br>20  Q. I see.<br>21  A. I believe that's Fannie Mae.<br>22  Q. So after the year, the initial year<br>23  that you spent living at Glenboro Drive during<br>24  which Catholic Charities was paying for the<br>25  rent at that residence, -- | 1  A. I don't think so.<br>2  Q. Now, the house at Perrin Drive in<br>3  New Orleans was ultimately demolished. Is<br>4  that correct?<br>5  A. Yes, sir.<br>6  Q. Do you recall when that happened?<br>7  A. No, sir, I do not.<br>8  Q. Do you recall who demolished the<br>9  house?<br>10  A. That would have been through the<br>11  orders of the Road Home. They actually<br>12  purchased the property.<br>13  Q. So you believe it was demolished<br>14  then after you sold it to Road Home?<br>15  A. Oh, absolutely.<br>16  Q. Did you receive any documentation or<br>17  any communication detailing or describing the<br>18  demolition?<br>19  A. No, sir.<br>20  Q. None? Nothing telling you when it<br>21  was going to happen or did happen?<br>22  A. No, sir.<br>23  Q. How did you find out it was<br>24  demolished?<br>25  A. I found out after the fact. We went |

Page 185

1    A.  Yes, sir.
2    Q.  And when did you create that list?
3    A.  I mean, it's been kind of a work in
4  progress, but, I mean, we started it
5  immediately after, as soon as we could.  It
6  was handwritten and then we just transferred
7  it over.
8    Q.  So when you started it, when would
9  you say you started to create it?
10 Approximately.
11   A.  Shortly after the storm,
12 unfortunately.
13   Q.  And you created it along with your
14 wife?
15   A.  Yes.
16   Q.  And at least initially you were
17 relying on your memories of the house and
18 where things were located to put that list
19 together?
20   A.  Yes, sir.
21   Q.  Now, when you went back to the house
22 two times to New Orleans as we talked about
23 before, you looked back at the contents at
24 that point and added to that list?  Is that
25 correct?

Page 186

1    A.  As -- Right.  I mean, as much as we
2  could remember.  Yes, sir.
3    Q.  And you mentioned that it's a work
4  in progress.  When would you say that that
5  list was complete?
6    A.  Probably within a year, I guess.  If
7  I had to estimate.
8    Q.  Within a year of when you evacuated
9  for Katrina?
10   A.  When we began actually writing it
11 out.
12   Q.  Now, this list, this contents list
13 that you provided to Mr. Taylor, did he ever
14 ask you any questions about that list?
15   A.  No, sir.  I don't recall.
16   Q.  So you didn't have any discussions
17 with him at all about the substance of what
18 was in that contents list?
19   A.  I don't recall.
20   Q.  Okay.  The same report, Scott
21 Taylor's report, if you go all the way to the
22 back, you'll see a spreadsheet that he has put
23 together here in the report of contents.  And
24 again, there aren't page numbers on these
25 pages, but the spreadsheet follows immediately

Page 187

1  after page 89 of the photos.
2    A.  Correct.
3    Q.  Do you see that?
4    A.  Uh-huh (affirmatively).  Yes, sir.
5    Q.  Now, do you recognize this list as
6  it appears in Scott Taylor's report?
7    A.  I recognize the contents.  It's part
8  of what we had provided him.
9    Q.  And go ahead and take a look at the
10 list, just the first several pages, just to
11 sort of familiarize yourself with it.
12   A.  Okay.
13   Q.  Does this look to be the list,
14 contents list that you provided to Scott
15 Taylor?
16   A.  Yes, sir.
17   Q.  Is there anything here that looks to
18 be different than the list that you provided
19 to him?
20   A.  I provided three -- three of the
21 fields.
22   Q.  And which three fields in this
23 spreadsheet were those?
24   A.  Description, price, and location.
25 So it would be the first three.

Page 188

1    Q.  Did you also provide the quantity
2  that's directly to the left of "description"?
3    A.  Yes, sir.  I'm sorry.
4    Q.  Now, you said you described the
5  price, which here in Taylor's report is under
6  a column that's labeled as "Base RCV".  How
7  did you come up with those dollar amounts?
8    A.  It was best estimates of what we
9  recalled spending.
10   Q.  Did you do any research, independent
11 research?
12   A.  It was just based on what we thought
13 we had paid for it at that time.  Yes, sir.
14   Q.  So you were basing it on your
15 recollection of what you had paid for it at
16 that time?
17   A.  Yes, sir.
18   Q.  Did you intend then for the dollar
19 amounts you provided Scott Taylor that are
20 reflected here in the spreadsheet of contents
21 to represent what the items were worth at the
22 time of the storm?
23   A.  I'm sorry, ask me again.  Can you
24 repeat that?  Sorry.
25   Q.  For the price, the price listings

Page 265

1  a couple of minutes ago?
2       MR. PALMINTIER:
3          I object to form.
4  EXAMINATION BY MR. THATCH:
5    Q.  Do you understand that document to
6  have been true and correct when filed?
7       MR. PALMINTIER:
8          I object to form.
9       THE WITNESS:
10         Again, I believe so.
11 EXAMINATION BY MR. THATCH:
12   Q.  Okay.  Let me hand you another
13 document here.
14         (Document marked as F. Holmes
15      Exhibit 18 attached to transcript.)
16   A.  Thank you.
17   Q.  All right, Mr. Holmes.  Do you
18 recognize this document?
19   A.  I believe so.
20   Q.  Can you tell me what it is?
21   A.  A response to interrogatories
22 against Club Insurance.
23   Q.  And do you recall having ever seen
24 this document before?
25   A.  I'm not sure.  I may have, I

Page 266

1  believe.
2    Q.  Well, if you look on page 1 of this
3  document, under Interrogatory number 1 it says
4  "Utilizing the three-page contents list you
5  provided to ACFIC in your discovery responses"
6  -- Do you see that?
7    A.  Yes, sir.
8    Q.  Do you recall providing a three-page
9  contents list as part of your discovery
10 responses to Auto Club Financial in this case?
11   A.  I recall providing documentation.  I
12 don't recall.
13   Q.  If we go back a couple of pages
14 here, it's actually page 175 is the Bates
15 number.
16   A.  Okay.
17   Q.  You have it?
18      MR. PALMINTIER:
19         Which one?
20      MR. THATCH:
21         Page 175.
22      MR. PALMINTIER:
23         Yes, I've got it.
24 EXAMINATION BY MR. THATCH:
25   Q.  Have you seen this document before,

Page 267

1  this page in this document that's Bates
2  stamped ACFIC-000175?
3    A.  Yes, sir.
4    Q.  Can you tell me what it is?
5    A.  A -- Looks like a letter sent to V.
6  J. Dauterive.
7    Q.  And was this letter -- this is the
8  letter that you sent the V. J. attaching the
9  list of contents that we described a few
10 minutes ago?
11   A.  Correct.
12   Q.  And it says here "V. J., I have
13 included a listing of items that were damaged
14 either by the wind or wind-driven rain that
15 was allowed to come into the house prior to
16 the flood waters through the front door being
17 blown off of its hinges.  The rear porch and
18 attached shed was lifted and dislodged,
19 effectively destroying all contents."  Is that
20 correct?
21   A.  That's -- That's what we wrote, yes,
22 sir.
23   Q.  If you go back a couple of pages
24 more, there's a Bates that's ACFIC-000185.  Do
25 you see that document?

Page 268

1    A.  Yes, sir.
2    Q.  Can you tell me what that is?
3    A.  Just a listing of items.
4    Q.  Do you understand this to be the
5  listing of contents from your home on Perrin
6  Drive that you provided to V. J. that was
7  referred to on page 175 in that brief letter?
8    A.  I don't think it's complete.
9       MR. PALMINTIER:
10         I object to form.
11      THE WITNESS:
12         I don't think it's a complete
13      listing.
14 EXAMINATION BY MR. THATCH:
15   Q.  I see three pages here.  Do you
16 believe there are more than three pages?
17   A.  I don't recall.
18   Q.  Now, this contents list here that's
19 provided, did you provide this list to Scott
20 Taylor at any point?
21   A.  I don't recall.  I really don't
22 recall.
23   Q.  And if you look back a couple of
24 pages, starting at 188 -- Well, it looks like
25 what happened here is this list was created in

Page 269

```
 1   an Excel spreadsheet and then some of these
 2   pages, the columns bled into additional
 3   pages.
 4       A.  Okay.
 5       Q.  But on pages 188 through 190 you
 6   have listed throughout all three of those
 7   pages wind-driven rain and mold.  Is that
 8   correct?
 9           MR. PALMINTIER:
10               I object to form.
11           THE WITNESS:
12               That's what's written, yes, sir.
13   EXAMINATION BY MR. THATCH:
14       Q.  Now, do you recall -- First of all,
15   you recall creating this list?
16       A.  I recall providing information.  I
17   don't recall exact, but I remember providing.
18       Q.  Well, my question is did you create
19   the list?
20       A.  Yes, I believe so.
21       Q.  And did you create it on your own or
22   did you create it with other -- with your
23   wife's help, for instance?
24       A.  I'm sure I would have had my wife's
25   help.
```

Page 270

```
 1       Q.  And at the time that you created
 2   this list and provided it to V. J. in your
 3   case against Auto Club Financial, you
 4   understood that the contents listed here in
 5   this document were damaged by wind-driven
 6   rain?
 7           MR. PALMINTIER:
 8               Object to form.
 9   EXAMINATION BY MR. THATCH:
10       Q.  And/or wind?
11           MR. PALMINTIER:
12               I object to form.
13           THE WITNESS:
14               I don't know.
15   EXAMINATION BY MR. THATCH:
16       Q.  Now, your lawsuit against Auto Club
17   Financial was ultimately settled.  Is that
18   correct?
19       A.  Correct.
20       Q.  Do you recall the settlement
21   amount?
22       A.  Not right offhand, no, sir.
23       Q.  Let me see if this helps.
24           (Document marked as F. Holmes
25       Exhibit 19 attached to transcript.)
```

Page 271

```
 1           Do you recognize this document,
 2   Mr. Holmes?
 3       A.  I believe so, yes, sir.
 4       Q.  If you go to the last page, which is
 5   ACFIC-000010, that's your signature on that
 6   page?
 7       A.  Yes, sir.
 8       Q.  Correct?
 9       A.  On the last page, yes, sir.
10       Q.  If you go back to the first page, at
11   the top it says "Amount of payment".
12       A.  Yes, sir.
13       Q.  "$20,000".  Do you see that?
14       A.  Yes, sir.  Okay.
15       Q.  Do you understand that to have been
16   the amount that you settled with Auto Club
17   for?
18       A.  Yes, sir.
19       Q.  Okay.  Let's talk for a minute about
20   your Road Home claim.  We talked about a
21   little bit earlier that following Katrina you
22   applied for assistance to the Road Home
23   Program.  Is that correct?
24       A.  That's correct.
25       Q.  And am I correct that Road Home
```

Page 272

```
 1   offered you four different options as part of
 2   its recovery program in connection with that
 3   assistance?
 4       A.  I don't recall a fourth.  I remember
 5   three.  I don't remember four.
 6       Q.  Well, it may just be that I am being
 7   particular and specific when I include the
 8   fourth option, which was decline assistance
 9   from Road Home.
10       A.  Oh, very good.
11       Q.  Do you remember the first three
12   options?
13       A.  I believe so.
14       Q.  Okay.  I'll show you a couple of
15   documents just to clarify.
16           (Document marked as F. Holmes
17       Exhibit 20 attached to transcript.)
18           Do you recognize this document,
19   Mr. Holmes?
20       A.  I believe I have seen this before,
21   yes, sir.
22       Q.  Can you tell me what it is?
23       A.  It looks like the Road Home
24   information.
25       Q.  On the page that's numbered at the
```

Page 293

1   -- they're incomplete. So I
2   have those forms with me. And instead
3   of doing it today, we can at some
4   point tomorrow fill those out, because
5   I need your authorizations and then
6   we'll file them and get the
7   documents.
8       MR. PALMINTIER:
9         We will fill those out tomorrow.
10      MR. THATCH:
11        Perfect.
12      MR. PALMINTIER:
13        All right.
14      MR. THATCH:
15        All right. That's it for me.
16      VIDEO OPERATOR:
17        We're now going off the record.
18           *  *  *

Page 295

1
2                REPORTER'S CERTIFICATE
3
4       I, ROGER D. JOHNS, RMR, RDR, CRR,
5   Certified Court Reporter, do hereby certify
6   that the above-named witness, after having
7   been first duly sworn by me to testify to the
8   truth, did testify as hereinabove set forth;
9   that the testimony was reported by me in
10  shorthand and transcribed under my personal
11  direction and supervision, and is a true and
12  correct transcript, to the best of my ability
13  and understanding; that I am not of counsel,
14  not related to counsel or the parties hereto,
15  and not in any way interested in the outcome
16  of this matter.
17
18
19
20              ROGER D. JOHNS
21           CERTIFIED COURT REPORTER
22              STATE OF LOUISIANA
23
24
25

Page 294

1
2                WITNESS'S CERTIFICATE
3
4       I, FRED NELSON HOLMES, JR., read or
5   have had the preceding testimony read to me,
6   and hereby certify that it is a true and
7   correct transcription of my testimony, with
8   the exception of any attached corrections or
9   changes.
10
11
         _____
12         (Witness' Signature)
13  _____
    DATE SIGNED
14
15  DEPONENT PLEASE INITIAL ONE:
16
       _____ Read with no corrections
17
18     _____ Read and correction sheet attached
19
20
    DATE TAKEN: SEPTEMBER 24, 2011
21
22
23
24
25