UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| IN RE:  KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NO. 05-4182 |
| | * | |
| PERTAINS TO:  MRGO | * | SECTION "K" (2) |
| | * | |
| | * | JUDGE DUVAL |
| | * | |
| | * | MAGISTRATE WILKINSON |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |

**MEMORANDUM IN SUPPORT OF MOTION TO
<u>EXCLUDE TESTIMONY AND OPINIONS OF DR. ROBERT GLENN BEA</u>**

William D. Treeby, 12901
James C. Gulotta, Jr., 6590
Heather S. Lonian, 29956
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Facsimile:  (504) 581-3361

Adrian Wager-Zito
Debra S. Clayman
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3891
Facsimile:  (202) 626-1700

*Attorneys for Washington Group
International, Inc.*

# Table of Contents

Page

I.  LEGAL STANDARD ....................................................................................................2

    A.  The Daubert Standard ......................................................................................2

II.  BACKGROUND .......................................................................................................6

    A.  The Critical Issues of the "Marsh Layer" (Organic Clay) and Excavations ...........6

    B.  Joint Soils Investigation ...................................................................................8

    C.  Dr. Bea's Seepage Analyses ...........................................................................10

    D.  Dr. Bea's Unchanging Conclusions Despite "Changing" Facts ...........................12

III.  ARGUMENT ........................................................................................................13

    A.  Dr. Bea's So-Called "Analytical Cross-Sections" Contain Fictional
        Excavations and Erroneous, Unsupportable Assumptions ...................................14

        1.  North Breach Case 1 Cross-Sections .......................................................15

        2.  North Breach Case 2 Cross-Sections .......................................................17

        3.  South Breach Case 1 Cross-Sections .......................................................19

        4.  South Breach Case 2 Cross-Sections .......................................................24

        5.  So-Called Near Breach Case 1 Cross-Sections .........................................27

        6.  Hydraulic Properties for "Backfilled Excavations" in the Cross-
            Sections ...............................................................................................31

    B.  Dr. Bea Deliberately Manipulated the $m_v$ Values from the Joint Soils
        Investigation to Create an Unrealistic Soil Condition and Achieve a Pre-
        Conceived Result, in Violation of *Daubert*. ......................................................32

        1.  $m_v$ Values Were Determined from the EBIA Pumping Tests....................33

        2.  Dr. Bea Knowingly Manipulated the $m_v$ Value. .......................................35

        3.  Dr. Bea's "Justification" for Manipulating Data Has no Basis in
            Science or Fact. .....................................................................................39

IV.  CONCLUSION ......................................................................................................42

# Appendix of Exhibits

Deposition Transcript of Mr. Diego Cobos-Roa, 4/1/2012 ............................................................1

ILIT Report, Chapter 6 (July 31, 2006), excerpt. ........................................................................2

IPET Report, Volume V, Appendix 17 (2009), excerpt. ...............................................................3

Dr. Robert Bea's 1/29/2009 Declaration in *Robinson*, excerpts. ................................................4

July 8, 2010 Trial Transcript from BARGE, excerpt....................................................................5

Dr. Robert Bea's 3/25/2008 Declaration in *Robinson*, excerpt. .................................................6

Excerpt of Fugro Master Cost Track for Invoicing. ....................................................................7

Deposition Transcript of Dr. Robert Bea, 3/27/2012 (Vol. 1)......................................................8

Deposition Transcript of Dr. Robert Bea, 3/28/2012 (Vol. 2)......................................................9

Deposition Transcript of Dr. Robert Bea, 4/16/2012 (Vol. 3).....................................................10

Deposition Transcript of Dr. J. David Rogers, 3/16/2012 (Vol. 1), excerpts. ............................11

Report of Dr. Robert Bea, dated 8/3/09, for BARGE litigation, excerpt.....................................12

Deposition Transcript of Dr. J. David Rogers, 3/17/2012 (Vol. 2), excerpts. ............................13

Table of Dr. Robert Bea's Evidence related to North Breach Cross-Sections. ...........................14

Declaration of Dr. Francisco Silva-Tulla, dated 4/30/2012.........................................................15

MMG Boring Logs (77A, 79A, 81A). ........................................................................................16

Boland Marine Borehole Map. ...................................................................................................17

Demolition Design Memorandum No. 1, dated February 1999. ..................................................18

Saucer Marine NFAATT, excerpts. ............................................................................................19

QAR 248. ...................................................................................................................................20

Figure showing location of Saucer Marine Cross-Sections.........................................................21

QAR 688. ...................................................................................................................................22

QAR 690. ...................................................................................................................................23

1092102v.1

WGI Photographs...................................................................................................24

WGI Photograph Index .........................................................................................25

August 2001 RECAP Submittal Report..................................................................26

Appendix B to Expert Report of Dr. Francisco Silva-Tulla, dated 3/12/2012, excerpt....................................................................................................27

Exhibits 24 & 25 to Deposition of Dr. Robert Bea.................................................28

Exhibit 14 to Deposition of Dr. Robert Bea. .........................................................29

Exhibit 41 to Deposition of Dr. Robert Bea. .........................................................30

Exhibit 42 to Deposition of Dr. Robert Bea. .........................................................31

*Groundwater*, Freeze & Cherry (1979), excerpt....................................................32

*Soil Mechanics*, R.F. Craig, (7th ed. 2004), excerpt. ..................................................33

Pumping Test Analysis Report, South EBIA...........................................................34

Applied Groundwater Modeling: Simulation of Flow and Advective Transport, Anderson & Woessner (1992), excerpt...............................................35

Aquifer Hydraulics: A Comprehensive Guide to Hydrogeologic Data Analysis, Batu (1998), excerpt..........................................................................36

USACE EM 110-2-1421 (1999), excerpt. ...............................................................37

Deposition Transcript of Thomas L. Brandon, 4/13/2012, excerpt. ..........................................38

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| | * |
| IN RE:  KATRINA CANAL BREACHES | *   CIVIL ACTION |
| CONSOLIDATED LITIGATION | * |
| | *   NO. 05-4182 |
| | * |
| PERTAINS TO:  MRGO | *   SECTION "K" (2) |
| | * |
| | *   JUDGE DUVAL |
| | * |
| | *   MAGISTRATE WILKINSON |
| | * |
| * * * * * * * * * * * * * * * * * * * * * * * * * | * |

## MEMORANDUM IN SUPPORT OF MOTION TO
## EXCLUDE TESTIMONY AND OPINIONS OF DR. ROBERT GLENN BEA

      In any scientific inquiry the actual facts are essential.  In any scientific inquiry accepted scientific methods are also essential.  Here, Dr. Bea has ignored geotechnical engineering science, and has ignored known facts on the ground at the East Bank Industrial Area ("EBIA") pre-Katrina, in favor of junk science combined with hypothetical, conceptual, "idealized"-but-unsupported suppositions.  As a result Washington Group International, Inc. ("WGI"), through undersigned counsel, respectfully submits the following memorandum in support of its motion to exclude the testimony and opinions of Plaintiffs' expert Dr. Bea pursuant to Rule 702 of the Federal Rules of Evidence.

      In his report and "rebuttal" report[1], Dr. Bea attempts to attribute the cause of the failure of the floodwall at the North and South Breaches of the Inner Harbor Navigation Canal

---

[1]     Two copies of Dr. Bea's February 1, 2012 Expert Report ("Bea Report"), and an electronic version, were provided to the Court pursuant to Court Order in connection with the Motions to Strike portions of Dr. Bea's April 3, 2012 "Rebuttal" Report ("Bea Rebuttal Report").  This Memorandum cites to the February 1, 2012 Bea Report and the April 3, 2012 Rebuttal Report by reference.  If the Court requires additional copies of those reports, WGI will provide them.

1092063v.1

("IHNC") to work done by WGI during WGI's environmental remediation of the EBIA. Dr. Bea's opinions do not satisfy the requirements of Rule 702 because they are not supported by the actual conditions found at the site and are not the product of reliable principles and methods. Because both Dr. Bea's assumptions and his methods are unreliable, they will not assist the Court. Therefore, the Court should grant WGI's motion and enter an Order excluding Dr. Bea's testimony and opinions.

## I.  LEGAL STANDARD

### A.  The Daubert Standard

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto, in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.  In determining the admissibility of expert testimony, courts have a "gatekeeping obligation" to ensure that all expert testimony meets certain standards of relevance and reliability.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993); s*ee also, Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (en banc); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (Holding that the reliable and relevant standard announced in *Daubert* for scientific expert testimony applies to all types of expert testimony.).

Rule 702, as amended in 2000, incorporates the standards for reliability set forth in *Daubert* and *Kumho*.  In *Daubert*, the Supreme Court set forth a non-exclusive list of factors to determine the reliability of expert testimony: (1) whether the expert's technique or theory can or has been tested; (2) whether the technique has been subjected to peer review or publication;

1092063v.1

(3) the known or potential error rate; (4) the existence or maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted. *Id.* at 593-94; Fed. R. Evid. 702 Advisory Committee Notes. Not all of the *Daubert* factors apply to all expert testimony, and numerous other factors have been used to assess the reliability of a variety of expert testimony. *See Black v. Food Lion*, 171 F.3d 308, 311-12 (5th Cir. 1999). What is important in all cases, however, is that the expert forms his opinion based on intellectual rigor and reliable methodology recognized by other experts in the relevant field. *Kumho*, 526 U.S. at 152. *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) ("But the existence of sufficient facts and a reliable methodology is in all instances mandatory.").

A court evaluating proposed expert testimony should consider whether the expert's opinion is adequately grounded in the scientific method. *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) ("[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method.") (quoting *Daubert*, 509 U.S. at 590). The scientific method "involves defining a problem, collecting data, analyzing the data, developing a hypothesis, testing the hypothesis, and selecting a final hypothesis or conclusion." *Allstate Ins. Co. v. Ford Motor Co*., Case. No. CV-08-2276-PHZ-NVW, 2010 WL 1654145, at *5 (D.Ariz. 2010). The scientific method does not support manipulation of the method or facts to reach a certain result, and a court should exclude an expert's opinions that do. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, n.7 (11th Cir. 2005) ("In evaluating the reliability of an expert's method, however, a district court may properly consider whether the expert's methodology has been contrived to reach a particular result.").

When an expert bases his opinions and testimony on conjectural facts that have no support in the record, that testimony does not conform to the scientific method or meet the

1092063v.1

admissibility standard of Rule 702.  Rather, the opinions of the proffered expert must be based on the established facts.  *See Daubert,* 509 U.S. at 591 ("Proposed testimony must be supported by appropriate validation ... based on what is known."); *see also Guidroz-Brault v. Missouri Pacific R.R. Co.*, 254 F.3d 825, 830-831 (9th Cir. 2001) (the expert's "opinion was properly excluded because it was not sufficiently founded on facts").  When an expert does not use proper data in his analyses or ignores the proper data, his opinions are invalid and inadmissible.  *See Irvine, IRG v. Murad Skin Research Laboratories, Inc.*, 194 F.3d 313, 321 (1st Cir. 1999) (holding that the expert's testimony regarding damages was unreliable where he failed to rely on "adequate factual data"); *United States v. City of Miami*, 115 F.3d 870, 874 (11th Cir. 1997) (holding that the expert's testimony was unreliable when it was "premised on erroneous data").

Courts have consistently used Rule 702 to exclude expert opinions based on unverified facts and assumptions.  *See e.g., TK-7 Corp. v. Barbouti*, 993 F.2d 722, 727 (10th Cir. 1993) (excluding testimony for a lack of foundation in the numbers used to form the expert's opinion); *Total Containment, Inc. v. Dayco Products, Inc.*, 2001 WL 1167506 at *7 (E.D. Pa. Sept. 6, 2001) (finding the expert opinion was unreliable and should be excluded, because the figures relied upon were unsupported and not shown to be a reasonable assumption); *Otis v. Doctor's Associates, Inc.*, 1998 WL 673595 at *4 (N.D. Ill. Sept. 14, 1998) (finding a failure to verify facts or conduct independent research to derive figures rendered the expert's opinion unreliable).

As detailed below, it is obvious from the reports prepared by Dr. Bea, from his deposition testimony, and the deposition testimony of his chief graduate student assistant, Mr. Diego Cobos-Roa, that Dr. Bea's opinions are not admissible Rule 702 or the relevant case

1092063v.1

law.   The opinions he offers are based both on unreasonable speculations about facts and purported scientific methodology that is unreliable.

Dr. Bea has established his own method contrary to the scientific method.   He began with the premise that pore pressures would be transmitted from the canal side to the landside of the EBIA levee virtually instantaneously through a layer of organic clay and searched for a way to manipulate the hydrogeological soil properties in his computer modeling to reach that result.[2]   When the data from the soils investigation did not support his hypothesis, Dr. Bea altered the assumptions and facts on which his hypothesis was based.   To maintain the premise of his models, he manipulated both the essential soil parameters for flow analyses as well as the geometry and stratigraphy of the EBIA in order to create the outcome he had predetermined.   In order to do this, he ignored the facts established by the parties' joint soils investigation at the EBIA; he ignored soil parameter results from the reports of the Plaintiffs' own engineering geologist and hydrogeologist; and he ignored the evidence of the reports describing WGI's work for the United States Corps of Engineers ("USACE") at the EBIA.   Dr. Bea's assumptions of the essential facts are wrong, and Dr. Bea's method is so contrary to any recognizable scientific method that his report should be deemed unreliable and inadmissible.

Plaintiffs bear the burden of establishing by a preponderance of the evidence that this expert testimony is both relevant and reliable and, therefore, admissible.  *Daubert*, 509 U.S. at 592 n.10.  Plaintiffs cannot meet this burden, as the opinions of Dr. Bea were reached through unreliable methodology and are based on speculation unsupported by actual site-specific facts, both as to soil properties and as to the geometry of excavations performed in the EBIA by WGI

---

[2]      Ex. 1, Cobos-Roa 4/10/12 Dep., at 191:19-192:7; 272:5-19 (*hereinafter* Cobos-Roa Dep.).

1092063v.1

at the direction of the USACE.  The opinions and the testimony of Dr. Bea should, therefore, be excluded.

## II.   BACKGROUND

### A.   The Critical Issues of the "Marsh Layer" (Organic Clay) and Excavations

On March 17, 2011, this Court ordered the parties to participate in a joint soil sampling to facilitate knowledge of the soil properties of the EBIA.[3]  By issuing this Order, the Court was seeking to resolve one of the issues that had been identified as having critical importance to the analysis of the failure of the floodwalls -- the actual engineering soil properties of what had been described colloquially as "the marsh layer" underlying the EBIA site.  As was determined by the detailed joint soils investigation performed by third party Fugro Consulting, Inc. ("Fugro"), what had been described as "the marsh layer" in fact consisted of a layer of organic clay.   Utilizing appropriate ASTM standards for soil classification--namely ASTM D2487, "Standard Practice for Classification of Soils for Engineering Purposes--Fugro classified the former "marsh layer" as an "organic clay layer."

The permeability[4] of the former "marsh layer" has been a point of controversy among the parties since 2006 when the ILIT and IPET teams reported their findings in their respective reports.  The ILIT report, for which Dr. Bea served as a co-sponsor/co-author, initially estimated the organic clay's permeability to be **$1 \times 10^{-2}$ cm/s**.[5]  The IPET report criticized such a

---

[3]     March 17, 2011 Scheduling Order, Doc. 20200.

[4]     Geotechnical engineers routinely use the term permeability to refer to the hydraulic conductivity of a soil.  Both terms are used interchangeably in this Memorandum.

[5]     Ex. 2, ILIT Report, at  6-12 (2006).

1092063v.1

high value for the coefficient of permeability and estimated that the range of permeability for this layer of organic clay was between **1x10⁻⁵ cm/s** and **1x10⁻⁸ cm/s**.[6]

Since 2008, Dr. Bea has presented *three* "best estimates" for the permeability of the former "marsh layer" to this Court.  In *Robinson*, Dr. Bea opined that the permeability of the "marsh layer" was **1x10⁻³ cm/s**.[7]  In the BARGE trial, Dr. Bea testified that his best estimate at that time was **1x10⁻⁴ cm/s**, and that the "marsh layer" was "critical" to his analyses.[8]  The Court in the BARGE trial found that the permeability of the "marsh layer" was an important issue, "because these are the core … differences in this case vis-à-vis the theories of the case."[9]  Now, Dr. Bea's current report opines that the best estimate of the permeability of this critical soil layer is **1x10⁻⁵ cm/s**.[10]

The Court also will recall that in earlier proceedings in this case Plaintiffs contended that two particular excavations performed by WGI at the direction of the USACE, the so-called wedding cake structure and the sewer lift station, substantially contributed to the failure of the EBIA levee.[11]  Plaintiffs contended that the excavations were "improperly backfilled" with pervious sand fill, which facilitated the conduction of water from the Katrina storm surge through the so-called "marsh layer" to undermine the EBIA levee.[12]  Plaintiffs' contentions, of

---

[6]     Ex. 3, IPET Report, Volume V, Chapter 17, at 17-17 (draft was published in 2006, final was published in 2009).

[7] `    Ex. 4, Bea Declaration in *Robinson*, January 29, 2009, at 132, ¶182.

[8]     Ex. 5, BARGE Transcript, 7/8/2010, at 2733:2; 2737:9-11.

[9]     *Id.* at 2734:15-20.

[10]    Bea Report, Appendix C, at 1.

[11]    *See* MRGO PSLC's Opposition to Washington Group International, Inc.'s Motion for Summary Judgment, Doc. 16216, at p. 2.

[12]    *Id.*

1092063v.1

course, were based on opinions furnished by Dr. Bea in reports and declarations submitted to the Court in both the *Robinson* and BARGE cases.[13]

###### B.     Joint Soils Investigation

It was based on this understanding of the importance of the soil properties of the "marsh layer" -- and the continuing disagreement among the parties as to those properties -- that the Court issued the March 17 Order creating the joint soil boring and sampling at the EBIA. Pursuant to this Court's Order, all parties and their experts met and conferred throughout the spring and early summer of 2011 to create a joint sampling and testing program for investigation of the soils at the EBIA.  The joint soils investigation was intended to ensure that the testing necessary to support the parties' geotechnical expert reports proceeded efficiently, to minimize any disputes regarding the methodologies employed for testing, and to enable all parties to share jointly in the results (and the costs) of the final program.

After several weeks of negotiations, the parties settled on Fugro to perform the soils investigation and the corresponding laboratory testing.  Each party identified the field and laboratory work that it believed was necessary to provide its experts with sufficient data to reach their opinions, and the parties prepared a joint soils investigation proposal for Fugro to provide an estimate of the cost.  The proposal included a wide variety of soils sampling, laboratory and field tests, and other geotechnical field work to be performed at the EBIA, including soil borings, Geoprobe soundings, installation of standpipe and vibrating wire piezometers, slug tests in standpipe piezometers, field vane testing, piezo-cone penetration tests, and pumping tests.

Field work began on or about June 21, 2011, and was completed on November 3, 2011.  All told, the joint soils investigation involved over 30 personnel from Fugro, the

---

[13]     *See e.g.* Ex. 6, Declaration of Bea in *Robinson*, March 25, 2008, at ¶¶ 19-20, 38-40, and 44-45.

Plaintiffs' expert team, and the Defendants' expert team, as well as oversight from the parties' legal counsel.  Countless hours have been devoted to the project over the course of four months. To date, the parties have spent or obligated themselves to pay approximately $2,062,342 with Fugro to complete the joint soils investigation.[14]  This amount does not include the cost of professional services on behalf of the Plaintiffs, the Department of Justice, and WGI by about 12 of the 30 individuals involved. The joint soils investigation was costly and time-consuming, but it served the purpose of producing EBIA site-specific soil characteristics for use in the current litigation.

Dr. David Rogers and Mr. Kevin Pope were two of the key individuals representing the Plaintiffs in the parties' joint soils investigation at the EBIA.[15] The Plaintiffs conducted pumping tests as part of the joint soils investigation to determine site specific properties for the organic soil layers that Dr. Bea claims contributed to the floodwall failures at the EBIA.[16]  The pumping tests were conducted at sites that the Plaintiffs decided were most relevant to their analysis of the floodwall failures.[17]  Dr. Rogers and Mr. Pope, along with Dr. Rune Storesund, oversaw the Plaintiffs' pumping tests.[18]  Mr. Pope evaluated the results from the pumping tests using accepted scientific methods and provided those results to Dr. Rogers, who then provided the results to Dr. Bea for use in his analyses.[19]  In particular,

---

[14]     Ex. 7, Excerpt of Fugro Master Cost Track for Invoicing.

[15]     Ex. 8, Bea 3/27/12 Dep., Vol. 1, at 80:14-18 (*hereinafter* "Bea Dep., Vol 1").

[16]     Ex. 9, Bea 3/28/12 Dep., Vol. 2, at 163:3-11 (*hereinafter* "Bea Dep., Vol 2").

[17]     Ex. 10, Bea 4/16/12 Dep., Vol. 3, at 11:5-14 (*hereinafter* "Bea Dep., Vol 3").

[18]     Bea Dep., Vol. 1, at 80:14-18.

[19]     Bea Dep., Vol. 3, at 10:24-11:14.

Dr. Rogers used Mr. Pope's evaluation of the pumping test results to develop the EBIA site characterization that Dr. Bea relied on to conduct his seepage analysis.[20]

Dr. Bea states in his report that he relied on this testing to characterize the soil at the EBIA for his analysis:

> This testing provided very important information which has been used to characterize the performance characteristics of the soils; particularly the information that has been developed from the in situ testing performed to determine the hydraulic conductivity properties of the swamp-marsh deposits that underlie the floodwall and other areas in the Lower 9th Ward.[21]

**C.    Dr. Bea's Seepage Analyses**

Dr. Bea and his expert team used a computer program called SEEP/W, published and licensed to users by GeoSlope International, Inc., to conduct their seepage analyses in this case.[22]   SEEP/W is a software program used to analyze, through numerical methods (in this case using finite elements) steady state and transient groundwater seepage problems within materials such as soil and rock.   Cross-sections, representing the geometry and hydrogeological soil properties of the analyzed site, are a critical input in SEEP/W.[23]   One of the important outputs computed during a SEEP/W analysis is the distribution of pore pressures versus time resulting from the applied hydraulic loads.   The estimated pore pressures then become a critical input in the SLOPE/W analysis, a computer program also published and licensed to users by GeoSlope International, Inc., which is used to conduct stability analyses.[24]   SLOPE/W is a software program used to evaluate limit equilibrium slope stability in terms of a factor of safety for the analyzed soil model.

---

[20]     *Id.* at 11:15-20.

[21]     Bea Report, App. B, at 1-2.

[22]     Bea Dep., Vol. 1, at 72:10-16.

[23]     *See* Bea Dep., Vol. 2, at 202:13-203:2.

[24]     *See* Bea Dep., Vol. 3 at 31:11-17.

Dr. Bea himself does not have a license or the requisite training and experience to use either the SEEP/W or SLOPE/W software.[25] He relied on Mr. Cobos-Roa, to run both the SEEP/W computer models for the seepage analyses and the SLOPE/W computer models for the stability analyses.[26] Dr. Bea, however, was intimately involved with the process. Along with Dr. Rogers and Mr. Pope, Dr. Bea provided and took responsibility for the inputs that Mr. Cobos-Roa used to run the SEEP/W computer models.[27] Mr. Kevin Pope determined the organic clay's hydrogeological properties based on pumping tests done near the EBIA by Fugro Consulting, Inc. ("Fugro"), as part of the joint soils investigation.[28] These hydrogeological properties included the coefficient of permeability, and the storage coefficient.[29] Well known relationships exist to compute the coefficient of volume change, $m_v$, a measure of the soil compressibility, from the storage coefficient.[30] Dr. Bea also reviewed the outputs that were created by the software to verify their accuracy and ensure that the results met his expectations.[31]

Based on the site specific pumping tests reported by Dr. Rogers and Mr. Pope, Dr. Bea now concludes that the "best estimate" of the organic clay layer's permeability is **1x10<sup>-5</sup>** **cm/s**, and he uses this soil property for the SEEP/W analyses in his current report.[32] This is the very same upper bound permeability coefficient found applicable to the organic clay layer by

---

[25]     Bea Dep., Vol. 2, at 177:24-178:4; Bea Dep., Vol. 3, at 13:3-14:25.

[26]     Bea Dep., Vol. 2, at 195:12-19; Cobos-Roa Dep., at 220:18-221:2.

[27]     Bea Dep., Vol. 2, at 251:14-23.

[28]     Bea Dep., Vol. 1, at 168:8-169:3.

[29]     Ex. 11, Rogers 3/16/12 Dep., Vol. 1, at 287:24-288:10 (*hereinafter* Rogers Dep., Vol 1).

[30]     *Id.* at 294:1-15.

[31]     Bea Dep., Vol. 2, at 180:5-181:8; 195:20-196:10.

[32]     Bea Report, App. C, at 1 ("A best estimate of in situ horizontal saturated hydraulic conductivity ($k_x$) of **$1\text{x}10^{-5}$ centimeters per second (cm/s)** was determined via a series of pump tests in several sites near the east levee of the IHNC.").

IPET in 2006 and which was determined to be insufficiently permeable to support transmission of pore pressure to the levee foundation as a result of the Katrina storm surge.  WGI's geotechnical engineering expert, Dr. Francisco Silva-Tulla and the United States' expert, Dr. Allen Marr, concurred that the joint soils investigation yielded a permeability coefficient for the organic clay layer with an upper bound in the **$10^{-5}$ cm/s** range, which is not permeable enough to support Dr. Bea's seepage theory.

Dr. Bea's current analyses also rely on cross-sections which he developed, including conceptual excavations near the North and South Breaches.[33]  Dr. Bea's cross-sections input by Mr. Cobos-Roa into the SEEP/W and SLOPE/W models in this case do not include either the wedding cake or sewer lift excavations performed by WGI.  These excavations, of course, were featured prominently in Dr. Bea's prior seepage analyses.[34]  Although the Plaintiffs in this matter had previously cited these excavations as critical to Dr. Bea's failure analysis (in their Opposition to Motion for Summary Judgment), neither of these excavations now appear to be factors at all in Dr. Bea's current reports.

**D.      Dr. Bea's Unchanging Conclusions Despite "Changing" Facts**

Despite the fact that Dr. Bea now agrees with the permeability value he originally disdained, he continues to reach the conclusion that "hydraulic seepage and uplift pressures generated in the marsh layers under the soil levee" were a contributing factor to the failure of the floodwall at the North and South Breaches.[35]  Nor has his conclusion changed, even though he no longer models the wedding cake structure and sewer lift excavation as exacerbating the

---

[33]      *See, e.g.,* Bea Dep., Vol. 2, at 107:16-109:6.

[34]      *See* Ex. 12, BARGE August 3, 2009 Report, App. C, at 37, ¶32.

[35]      Bea Report, at 18, ¶29.

effects of underseepage at the IHNC.  Dr. Bea does not offer any scientifically valid explanation as to how changes in such important inputs would lead him to the same results.

Dr. Bea simply began with the ***premise*** that the pore pressures from the water in the IHNC would be transmitted quickly through the "marsh layer".[36]  The ***actual*** permeability of the organic clay layer and the resulting pore pressures generated at the EBIA did not support this premise, but Dr. Bea manipulated other factors of his analysis in order to reach the same predetermined conclusion.  A review of his underlying analyses reveals how he achieves the same results as would be obtained if the soils were highly pervious by manipulating other material properties inputs critical to his analyses.  In other words, Dr. Bea made permeability largely irrelevant by inventing excavations (that do not exist) and by selecting an unheard of, and impossible, compressibility value for the EBIA soils during the Katrina event.

In order to achieve his pre-ordained premise, Dr. Bea has relied on manipulated data in at least two forms, which will be addressed in this motion: (1) reliance on erroneous cross-sections that do not represent the geometry for excavations present at the EBIA and (2) manipulation of the coefficient of volume change, $m_v$ , of the organic clay layer and other fine-grained materials in his model.  Dr. Bea relies on fictitious data with no basis in reality, therefore, creating an unreliable factual foundation to which he applies unreliable methodology.

Dr. Bea's methods are unscientific and unreliable, his facts are non-existent, and his opinions should be excluded pursuant to Rule 702.

### III.    ARGUMENT

Dr. Bea began his work with a desired result and worked backward to develop deceptive analyses to shore up his pre-determined conclusion.  His work suffers from

---

[36]    Cobos-Roa Dep., at 272:5-19.

1092063v.1

fundamental scientific deficiencies that make his opinions invalid and inadmissible.  He eschews a straightforward approach in favor of a convoluted one.  He repeatedly makes erroneous and unsupported adjustments to data based only upon his own hypotheses without any support from the underlying data.  He uses models that include assumptions with no basis in fact.

These flaws compel the exclusion of his testimony.

**A.      Dr. Bea's So-Called "Analytical Cross-Sections" Contain Fictional Excavations and Erroneous, Unsupportable Assumptions**

Dr. Bea developed a series of geologic cross-sections to analyze seepage and global stability performance of the levees and floodwalls at three locations in the EBIA:  the North Breach (on the Boland Marine site), the South Breach (on the Saucer Marine site) and the so-called Near Breach (at the borrow pit on the McDonough Marine site).[37]  Dr. Bea claims that these Case 1 and Case 2 analytical cross-sections for each location "present reasonable representations of the geotechnical and floodwall conditions that existed at the three analysis sites at the time of Hurricane Katrina."[38]  And, they "illustrate the processes by which the backfilled excavations in the EBIA induced and enhanced the geotechnical processes that led to the development of the North Breach and South Breach."[39]

But as described in greater detail below, the conceptual cross-sections that Dr. Bea developed contain egregious errors, ranging from fictitious excavations and unsupported assumptions about WGI's work in the EBIA to blatant misrepresentations about the hydraulic properties of the backfill materials used in the EBIA pre-Katrina.  Dr. Bea (through a graduate student, Mr. Cobos-Roa) then apparently input these fabricated or erroneous features and

---

[37]      Bea Report, App. B at 1; *id.* Figures 1-3 (showing the location of Dr. Bea's various cross-sections).

[38]      *Id.* at 3.

[39]      *Id.*

1092063v.1

properties into his seepage and stability computer models.  Thus, both the cross-sections and the results of his computer models are wholly unreliable and should be excluded under Rule 702.

### 1.  North Breach Case 1 Cross-Sections

The Case 1-1 and Case 1-2 cross-sections for the North Breach[40] each contain a "deep backfilled rectangular" excavation, which is located about 60 feet from the sheet pile in the vicinity of the North Breach.[41]  The alleged excavation is "25 feet wide (direction normal [i.e. perpendicular] to levee alignment) extending west from the toe of the embankment of Surekote Road," and 100 feet long, starting at the north end of the North Breach and extending south.[42] Dr. Bea claims that prior to Hurricane Katrina, WGI dug this hole to a depth of 15 to 17 feet below ground surface, and backfilled it with river sand.[43]



Figure 10: North Breach, Case 1-1

---

[40]     *See* Bea Report, App. B, Figures 10 & 11.

[41]     *Id.* at 8, 13.

[42]     *Id.* at 8.

[43]     Bea Dep., Vol. 2, at 111:2-11, 266:23-268:5; Bea Report, App. B, Figures 10 & 11.

1092063v.1



Figure 11: North Breach, Case 1-2

Astonishingly, Dr. Bea does not have a shred of evidence to support his Case 1 cross-sections showing that WGI performed an excavation that was 25-feet wide, 100-feet long and at least 15-feet deep in the vicinity of the North Breach:

> Q: . . .  I'm asking about any evidence you have pre-Katrina for any excavation at that location that was a 15 to 17-foot deep excavation with anything near these dimensions, 25 feet wide, 100 feet long, 15 to 17 feet deep, at that location.  Any evidence.
>
> A.  And your question of me is do I have a document that says a hole, excavation, with those dimensions, was developed at that location by WGI pre-Katrina?  The answer to that is no.  I don't have a complete enough record to trace it.
>
> Q.  As a result, you don't know when any such excavation was performed by Washington Group.  Isn't that logical?
>
> A.  That's correct.[44]

Moreover, the Plaintiffs' expert on "site characterization," Dr. Rogers, testified that he developed the Case 1 cross-sections for the North Breach shown in Dr. Bea's Report, except for the backfilled excavation.  "I don't know what that particular one is in that case."[45]

---

[44]     Bea Dep., Vol. 2, at 113:5-21.

Given these admissions, it is not surprising that none of the extensive pre-Katrina documentation that Dr. Bea includes in his Expert Report, Rebuttal Report and reliance materials lends any credence to the existence of this fictitious "backfilled excavation" near the North Breach. To be sure, attached as Exhibit 14 is a table identifying the primary evidence Dr. Bea cites in his reports in support of his North Breach Case 1 cross-sections and the reasons that each such piece of evidence fails to substantiate the existence of his fabricated deep excavation.

### 2.      North Breach Case 2 Cross-Sections

The North Breach Case 2 cross-sections[46] contain a "deep sand and shell fill" layer that "abuts the floodwall at the location of the structural connection between the 1966 sheet pile wall and the 1980s (deeper) sheet pile wall."[47] The shell fill "extends from the sheet pile approximately 70 feet toward the IHNC," and "likely tapers upward, towards the toe of Surekote Road."[48] According to his Expert Report, the "[t]hickness of shell fill at this location is approximately 18 feet measured from the top of Surekote Road, down to the tip of the sheet pile."[49] In his seepage model, however, Dr. Bea used a depth of more than 20 feet for the shell fill.[50]

---

(continued…)

[45]      Ex. 13, Rogers 3/17/12 Dep., Vol. 2 at 248:13-250:6 (*hereinafter* Rogers Dep., Vol. 2).

[46]      Bea Report, App. B, Figures 12 & 13.

[47]      Bea Report, App. B at 16, 31.

[48]      *Id.* Notably, Dr. Bea admits all of the "shell fill" shown in his Case 2 cross-sections pre-existed WGI's work in the EBIA. (Bea Report, App. B at 18 (the shell fill "appears to be associated with the construction of the 90 degree bend of the floodwall" and the construction of Surekote Road "where it crosses over the 1966 floodwall (replaced in the early 1980s)"); (Bea Dep., Vol. 3 at 118:11-120:4 (the pre-existing shell fill shown in the Boland cross-sections was not placed by WGI)).

[49]      Bea Report, App. B at 16.

[50]      *See* Ex. 15, Silva-Tulla Decl., ¶ 6 & Ex. A at 1.

- 17 -



Figure 12: North Breach, Case 2-1.



Figure 13: North Breach, Case 2-2.

But just like the fictional "backfilled excavation" in his Case 1 cross-sections, there is no evidence that the 20-foot-deep "shell fill" feature shown in Dr. Bea's Case 2 cross-sections ever existed at the North Breach site before Katrina. Dr. Bea's so-called evidence of the depth of this "shell fill" comes from MMG Boring 81A, which shows "fill, shell with silty sand"

- 18 -

and "fill, silty sand and shell" down to a depth of only 16 feet.[51]   Moreover, as shown in the attached borehole location map from WGI's files, boring 81A is <u>not</u> even within the failure zone for the North breach.[52]   In contrast, MMG Boring 79A is located in the center of the North breach.[53]   Boring 79A shows "fill, silty sand", "fill, shell with silt", and "fill, shell" down to only <u>six feet</u>.[54]   MMG boring 77A is at the south end of the North breach.[55]   Boring 77A shows "fill, sand," "fill shell", and "fill, lean clay with shell" going down only <u>five feet</u>.[56]   Neither of these borings—which actually are located along the North breach—indicate that "shell fill" extends below the sheet pile tip at the North Breach as Dr. Bea posits in his cross-sections.   In fact, even boring 81A, which is outside the failure zone, does not show fill that would extend as deep as the sheet pile tip.   Thus, Dr. Bea's North Breach Case 2 cross-sections, and the models he ran based on these cross-sections, are unreliable.

### 3.     South Breach Case 1 Cross-Sections

The Case 1-1 and Case 1-2 cross-sections for the South Breach contain another deep and entirely fictional backfilled excavation located at the "waterside toe" of the levee.[57]   This alleged excavation is rectangular-shaped, 20 to 25 feet wide (direction perpendicular to levee alignment) and fifty feet long (starting at the north end of the south breach and extending southward)[58].   The depth of this fictional excavation prior to Hurricane Katrina, according to

---

[51]     *See* Ex. 16, MMG Boring Log for Boreholes 81A, 79A & 77A Oct. 4, 2001.

[52]     Ex. 17, Boland Marine Borehole Map.

[53]     *Id.*

[54]     Ex. 16, Log of Boring 79A.

[55]     Ex. 17.

[56]     Ex. 16, Log of Boring 77A.

[57]     Bea Report, App. B, Figures 33 & 35; *id.* at 42.

[58]     *Id.* at 35.

Dr. Bea, was about 18 feet below ground surface.[59]  It is a simple matter to locate where Dr. Bea places this fictional excavation because his "idealized" conceptual cross section figure includes, in small type, "29A" immediately above the so-called "backfilled excavation", which refers to MMG's boring 29A on the Saucer Marine site.[60]  This reference provides a clear location for Dr. Bea's fictional excavation.



Figure 33: South Breach cross section Case 1-1.

---

[59]     *Id.*, Figures 33 & 35; Bea Dep. Vol. 2 at 125:8-126:8.

[60]     Bea Report, App. B, Figures 33 & 35; Bea Dep., Vol. 2, at 126:22-127:13.

1092063v.1



Figure 35: South Breach cross-section Case 1-2.

Dr. Bea admittedly does not have any evidence that WGI performed an excavation that even remotely matches the dimensions of this hypothetical deep excavation near the South Breach.

Q.      Now I'm talking about the South Breach.  You have a similar conceptual cross-section and you show an excavation to depth.

A.      Correct. . . .  That's the Case 1.

Q.      . . . [I]s it true you don't have any evidence pre-Katrina that Washington Group performed such an excavation?

A.      At that location?

Q.      At that location.

A.      . . . .I don't think we were able to trace the Case 1 excavation to a specific document concerning WGI's work at that location.  The document trail went cold.[61]

In his Expert Report, Dr. Bea claims that the excavation in his South Breach Case 1 cross-sections are "associated with foundation and contaminated soils removals (Figure 32a,

---

[61]      Bea Dep., Vol. 2, at 116:3-117:6.

- 21 -

Figure 32b) and north – south grid trenching performed at this location on the EBIA as part of the site clearing – remediation performed by WGI (Figure 32c)."[62]  But as described below, these Figures provide no support whatsoever for this fictional excavation.

Figure 32a in Appendix B of Dr. Bea's Expert Report shows the buildings and/or foundations that WGI removed on Saucer Marine.  None of these buildings or foundations are adjacent to the toe of the levee.  Indeed, the closest structure to the south breach (identified as building 101) is more than fifty feet from the floodwall, and was described in a 1999 Demolition Design Memorandum as a 5 feet x 5 feet electrical service box surrounded by 4 bollards.[63]  Moreover, Dr. Bea states in his Rebuttal Report that he assumed the "disturbed areas" associated with the removal of structures in the EBIA was only "4 feet below grade," not the 18 feet imagined in his cross-section.[64]

Figure 32b in Appendix B of Dr. Bea's Expert Report is from WGI's 2002 RECAP Corrective Action Plan for Saucer Marine.  The figure shows the extent of proposed remediation excavations on Saucer Marine overlaid on an aerial photo.  Dr. Bea circled in red an area along the south breach (including borehole 29A), where he contends the hypothetical excavation in his Case 1 cross-section would have existed.  But oddly, there are no planned excavations indicated by WGI within his circled area.  (The white strip visible in the aerial photo simply is an access road to the former buildings on the site.)  Moreover, in the 2003 No Further Action At This Time Report (NFAATT) for Saucer Marine, WGI reported the actual location and depths of all of its RECAP excavations on the site.[65]  As Dr. Bea concedes, this NFAATT

---

[62]     Bea Report, App. B. at 35.

[63]     Ex. 18, Demolition Design Memo. No. 1, Feb. 1999, at -04192.

[64]     Bea Rebuttal Report at 5, ¶ 10.

[65]     Ex. 19, Excerpt of Saucer Marine NFAATT.

Report confirms that there were in fact no RECAP excavations anywhere near the location that he has posited in his fictitious Case 1 cross-section for Saucer Marine.[66]

Figure 32c in Appendix B of Dr. Bea's Expert Report is a December 18, 2001 map showing grid trenching (running north and south) on Saucer Marine. This particular map was an attachment to WGI's December 18, 2001 Daily Quality Control Report.[67] The Corps' Quality Assurance Inspector reported on that day that the north-south trenches on Saucer Marine were 2 feet wide and 5 feet deep.[68] Although Dr. Bea admits that grid trenches generally did not extend deeper than five feet below ground, he claimed during his first deposition to have photographic evidence that some grid trenches went deeper.[69] But WGI has found no evidence in Dr. Bea's Rebuttal Report or reliance materials—or in all of WGI's files—that substantiates a grid trench of 18-feet deep x 25-feet wide anywhere on the Saucer Marine site, let alone near borehole 29A as shown in Dr. Bea's fictitious cross-section.

Finally, Figure 34 in Appendix B of Dr. Bea's Report is a diagram of a proposed nine-foot excavation in Area 5, which comes from WGI's RECAP Corrective Action Plan for Saucer Marine. As the map included in WGI's NFAATT Report indicates, however, Area 5 is more than 190 feet from the floodwall at the location of Dr. Bea's cross-section.[70] Thus, Figure 34 also provides no support for the hypothetical deep excavation in Dr. Bea's Case 1 cross-section for the South breach.

---

[66]    Bea Dep., Vol. 2, at 127:14-128:2.

[67]    *See* Ex. 20, QAR 248 at -0204.

[68]    *Id.* at -0196.

[69]    Bea Dep., Vol. 2, at 136:22-137:12.

[70]    *See* Ex. 20, at -0073.

1092063v.1

Because the deep "backfilled excavation" did not exist, Dr. Bea's South Breach Case 1 cross-sections and the flow and stability computer models that Mr. Cobos-Roa ran based on these cross-sections, are unreliable and should be excluded.

### 4.    South Breach Case 2 Cross-Sections

Dr. Bea's South Breach Case 2 cross-sections show a "narrow" backfilled trench adjacent to the floodwall with a maximum depth near the sheet pile of about 10 feet below ground surface.[71]  He hypothesizes that this "pipeline abandonment excavation" was associated with WGI's removal of two utility lines (a 6-inch water line and a 2-inch gas line) that once ran through the floodwall at the Saucer Marine site near Station 30+00.[72]  (Inexplicably, Dr. Bea's Case 2 cross-sections actually are located 48 feet north of where the gas line existed and 71 feet north of where the water line existed on Saucer Marine.)[73]  Dr. Bea contends that WGI backfilled this alleged trench with *in situ* clay spoils "with little or no effective compaction," thus warranting a permeability value for the backfill that is "5 times larger than the surficial 'undisturbed' clays" on the site.[74]

---

[71]    Bea Report at 99; *Id.*, App. B, Figures 41 & 42.

[72]    *See* Bea Report at 99 & Figure 69, App. B at 43-47.

[73]    Ex. 21, Figure showing Location of Saucer Marine Cross-Sections.

[74]    Bea Report, App. C at 2.

- 24 -



Figure 41: South Breach, Case 2-1.



Figure 42:  Cross sectional view at the South Breach considering trench excavation of the utility crossing beneath the floodwall.

Once again, Dr. Bea has provided no credible evidence that the utilities WGI removed on Saucer Marine resulted in a trench even close to the dimensions shown in his fictional Case 2 cross-sections.  In fact, after examining additional information, in his Rebuttal

1092063v.1

Report, Dr. Bea concedes that the "utility trenches" from the removal of water lines, sewer lines and gas lines in the EBIA only extended to a depth of five feet.[75]

Additionally, contemporaneous field documentation refutes the existence of the trench with the dimensions and backfill properties used in Dr. Bea's cross-section. *First*, the work plan (as discussed during a preparatory meeting with WGI and the USACE on September 4, 2003) indicates that these utility lines were to be broken about 3 feet from the floodwall, and "[w]here the line is to be capped the trench should not exceed 2' feet in depth."[76]  Material to backfill the resulting trench will be placed in one-foot lifts and compacted.[77]  The USACE's daily Quality Assurance Report confirms that WGI removed the abandoned utilities at Saucer Marine and backfilled and compacted "the shallow trench in 1' lifts" using a BH-310 rubber tired backhoe and D41p dozer[78]  The USACE "[a]ssured shallow trench [was] adequately compacted."[79]

*Second*, photographs WGI took of the water line at Station 30+00 before any excavation occurred show that the pipe actually was visible from the ground surface.[80]  The subsequent excavation of the line near the floodwall accordingly was very shallow (as indicated in a contemporaneous photograph[81]), and unquestionably was less than the ten feet that Dr. Bea used in the cross-sections represented as Appendix B, Figures 41 and 42 in his report.

---

[75]     Bea Rebuttal Report at 6, ¶ 12.

[76]     Ex. 22, QAR 688 at -0343-44 (emphasis added).

[77]     *Id.* at -0344.

[78]     Ex. 23, QAR 690 at -0398 (emphasis added)).

[79]     *Id.*

[80]     *See* Ex. 24, WGI Photographs at WGI016081 & WGI016082; Ex. 25, WGI Photograph Index at WGI013826 (referencing September 8, 2003 photos taken at Saucer Marine "AM 30 South").

[81]     *See* Ex. 24 at WGI016083.

- 26 -

*Third*, Dr. Bea states in his Report that he relied on Dr. Rogers for the Case 2 cross-sections, App. B at 42, yet Dr. Rogers testified that he could not find evidence to verify (1) that these utilities at the south breach (as shown in 1969 as-built drawings) were in fact removed; and, (2) if they were removed, how the resulting trenches were backfilled.[82]  This non-existent 10-feet deep excavation is shown in Dr. Bea's Report, erroneously, to be 99 feet in the east-west dimension.[83]   This fictitious trench is thus considered by the model as "infinite" across the entire north-south length of the EBIA.[84]   Accordingly, analyzing a long, but narrow trench, when inserted into a 2-D model as Dr. Bea did here, leads to misleading results because the narrow trench is entered as 99-feet wide east-west excavation carried across the entire north - south length of the floodwall.

These non-existent excavations in the model also cause the stability analyses run by Mr. Cobos-Roa in SLOPE/W to be unreliable.  This is the classic "garbage in -- garbage out".  For all of these reasons, Dr. Bea's South Breach Case 2 cross-sections and the models he ran based on these cross-sections, are unreliable.

### 5.    So-Called Near Breach Case 1 Cross-Sections

Dr. Bea's idealized "Near Breach" cross-sections run through the borrow pit on the McDonough Marine site.[85]   The "eastern edge of the McDonough borrow pit" is located about 75 feet from the floodwall.[86]   According to Dr. Bea the excavation is 10 to 14 feet deep,

---

[82]      Rogers Dep., Vol. 2, at 212:12-216:1.

[83]      Ex. 15, Silva-Tulla Decl., ¶ 6 and Ex. A, at 2.

[84]      *Id.*

[85]      Bea Report at 90; *id.* at App. B, Figs. 29 & 30.

[86]      Bea Report, App. B. at 32

with its bottom located at elevation -10 feet.[87]  At the conclusion of site clearing operations, WGI and the USACE flooded the borrow pit with water from the IHNC.[88]



Figure 29: Near Breach cross-section Case 1-1.



Figure 30: Near Breach cross-section Case 1-2.

Dr. Bea contends his analysis of the Near Breach cross-sections proves that the floodwall adjacent to this "very extensive" flooded excavation did not fail because (1) WGI and the USACE specifically chose the location for the borrow pit "due to the predominately cohesive

---

[87]     *Id.*  Dr. Bea testified that all of his elevation references, despite the description he gives them in his expert report are referenced to datum NAVD88(2004.65).  (Bea Dep., Vol 1, at 89:19-25).

[88]     Bea Report at 45, ¶ 47.

– clayey soils in this area (WGI 2005a),"[89] and (2) "special attention was given during the EBIA site clearing work to line the walls of this known to-be-flooded excavation with low hydraulic conductivity cohesive soils – clays."[90]   The ostensible purpose of the preceding contentions is to support Dr. Bea's theory of causation with respect to the alleged "faulty" excavations.  His theory is that the alleged "faulty" excavations should have been lined or backfilled with clay in the manner in which he supposes the borrow pit was lined.  If the alleged faulty excavations had been lined or backfilled with clay, instead of being filled with allegedly pervious sand, they would not have contributed to the levee breaches--according to Dr. Bea.  Dr. Bea's contention regarding the preventative effects of clay liners or clay fill is to no avail because the borrow pit was never, in fact, lined with clay.  The borrow pit did not cause the levee to breach for the same reason that the alleged faulty excavations did not cause levee breaches--the soil properties of the organic clay layer at the EBIA simply cannot conduct seepage from any excavated source in a manner that would cause breaching during the Katrina storm surge.

Dr. Bea has no evidence to support his assumption that WGI or the USACE chose the McDonough Marine site for the location of the borrow pit because of "the predominately cohesive – clayey soils in this area."[91]   This notion is simply another of Dr. Bea's fancies. Rather, WGI and the USACE represented to the Louisiana Department of Environmental Quality (LDEQ) that they originally planned to have the borrow pit on the International Tank Terminal site, "but during drilling a significant number of underground obstructions were discovered that

---

[89]     Bea Report, at 45 & 128, ¶¶ 47, 138.

[90]     *Id.*

[91]     *Id.* at 45, ¶ 47; Bea Dep., Vol. 1 at 244:2-252:25.

made the area unsuitable."[92]   Thus, the parties chose the McDonough Marine site instead due to its "apparent lack of chemical impact."[93]

Indeed, as the Case 1 "Near Breach" cross-sections themselves show, the type of "clayey" material found at the McDonough Marine site was not unique in the EBIA.   MMG boring 71G, which Dr. Bea uses to support the stratigraphy in his "Near Breach" cross-sections, actually was located in the middle of the <u>Boland Marine</u> site, more than 700 feet away from the northern edge of the "near breach" section of floodwall.[94]

Finally, Dr. Bea does not have <u>any</u> documentary or testimonial evidence that anyone at the USACE or WGI lined the borrow pit with clay or had related "concerns for seepage under the floodwall."[95]   Rather, Dr. Bea admits that he simply "deduced" this fact, and indeed this motive, from a review of photographs—including a photograph (Figure 25 of Bea's Expert Report) that, admittedly, is <u>not</u> of the borrow pit[96].   Neither WGI's photographs (with their proper, contemporaneous captions), or the corresponding daily quality control reports from the field, support Dr. Bea's "deduction" about the borrow pit.[97]

Thus, Dr. Bea's "Near Breach" cross-sections and analysis are unreliable. Dr. Bea created this unscientific "Near Breach" analysis out of whole cloth to attempt to bolster his nonsensical opinions about breach causation.   As the joint soils investigation has shown, none of the native soils in the EBIA had high permeabilities.

---

[92]   Ex. 26, 8/2001 RECAP Submittal Report – Borrow Pit.

[93]   *Id.*

[94]   Ex. 27, 3/12/12 Expert Report of F. Silva-Tulla, App. B, Figure 3; Bea Report, App. B, Figures 29 & 30 (showing borehole 71G in "Near Breach" cross-section).

[95]   Bea Report at 45, ¶ 47; Bea Dep., Vol. 1, at 259:1-263:10.

[96]   Bea Dep., Vol. 1, at 269:19-270:6.

[97]   *See* Bea Dep., Vol. 1, at 271:11-276:7; Bea Dep., Vol. 2, at 14:22-16:14; Ex. 28, Bea Dep. Exs. 24 & 25.

6.    **Hydraulic Properties for "Backfilled Excavations" in the Cross-Sections**

After receiving Dr. Bea's initial Expert Report on February 3, 2012, Defendants requested that Plaintiffs provide additional information regarding the soil-property values for each soil in each cross-section that Dr. Bea used in his seepage and stability models.[98]   On February 23, 2012, Plaintiffs responded by producing a document that includes three different tables purporting to contain the hydraulic properties for each soil type used in Dr. Bea's North Breach, Near Breach and South Breach cross-sections.[99]

For the North Breach Cross Sections, Deposition Exhibit 41 shows that Dr. Bea modeled both the "shell fill" and the material in the "backfilled excavations" using the <u>same</u> permeability value of 0.01 cm/s (or **$1\text{x}10^{-2}$ cm/s**).  But during his deposition, Dr. Bea testified that in fact the river sand that he claims WGI used to backfill the so-called "excavations" shown in his North Breach cross-sections was <u>less</u> permeable than the "shell fill."[100]   According to Dr. Bea, only the sand should have been modeled with a horizontal hydraulic conductivity value of **$1\text{x}10^{-2}$ cm/s**.[101]

After a careful review of the Dr. Bea's actual SEEP/W computer modeling files, however, WGI discovered that Dr. Bea did not uniformly use 0.01 cm/s for the river sand backfill.  In some cases, such as the Case 1-1 and Case 1-2 North Breach cross-sections, he used 0.1 cm/s (or **$1\text{x}10^{-1}$ cm/s**), which makes the river sand a factor of ten times <u>more</u> permeable than

---

[98]       *See* Ex. 29, Bea Dep. Ex. 14 at 6.

[99]       *See* Ex. 30, Bea Dep. Ex. 41.

[100]      Bea Dep., Vol. 2, at 261:4-262:6 (if the river sand and shell fill were given the same hydraulic conductivity value in my model "that was a mistake").

[101]      *See* Bea Report, App. C at 2 (Table 1); Ex. 31, Bea Dep. Ex. 42 (containing Dr. Bea's handwritten permeability values for each soil layer in his North Breach cross-section).

1092063v.1

he represented in his Report and during his deposition.[102]   And in other cases, such as for the South Breach Case 1 cross-sections, Dr. Bea used an even <u>higher</u> permeability value of **1.0 cm/s,[103]** which is consistent with the permeability value assigned to clean shell fill or gravel.[104] None of the plaintiffs' experts contend that WGI backfilled any excavations in the EBIA with clean shells or gravel.

In sum, Dr. Bea either was inexcusably careless in reviewing the permeability values for the "excavation backfill" used his model, or he was intentionally manipulating these permeability values in the model to achieve a desired result.  In either case, his seepage model, and the stability model using pore pressures developed by his seepage model are unreliable.

**B.      Dr. Bea Deliberately Manipulated the $m_v$ Values from the Joint Soils Investigation to Create an Unrealistic Soil Condition and Achieve a Pre-Conceived Result, in Violation of *Daubert*.**

In addition to creating his hypothetical cross-sections with imaginary excavations and geometries, Dr. Bea intentionally altered a key soil parameter, one obtained by his own expert teams' analysis of the results of the joint soils investigation—the coefficient of volume change, $m_v$ —"to get a certain response."[105]   The record is undisputed that Dr. Bea instructed Mr. Cobos-Roa to model an imaginary soil at the EBIA that does not exist anywhere on Earth. This maneuver allowed Dr. Bea to reach predetermined opinions, favorable to the Plaintiffs, regarding causation of the levee/floodwall failures.  This type of backward-looking expert

---

[102]      *See* Ex. 15, Silva-Tulla Decl., ¶ 7 & Ex. B at 1.

[103]      *See id.*, Ex. B at 2.

[104]      As plaintiffs' own hydrogeologist expert testified, "clean" shell fill, which is not mixed with any sand, "is highly permeable.  It's going to be between .1 and 1 centimeter per second." (Rogers Dep., Vol. 2, at 245:10-16).

[105]      Cobos-Roa Dep., at 208:17-25.

1092063v.1

"analysis" is dishonest and wholly improper.  Dr. Bea's opinions based on this intentionally erroneous soil property must be stricken.

### 1.    $m_v$ Values Were Determined from the EBIA Pumping Tests.

Like permeability, the coefficient of volume change, $m_v$ , is a material soil property that was determined from the Plaintiffs' pumping tests at the EBIA. The $m_v$ value is a reflection of a soil's compressibility, and compressibility is a measure of a soil's relative volume change as a response to a change in effective stress.  Put simply, when weight or pressure are applied to the soil in such a way that the effective stresses change, the soil grains are rearranged, and the volume of the soil changes.[106]  All soils have an $m_v$ value for a given stress increment, and  the $m_v$ value (or an equivalent measure of soil compressibility) is critical to a proper characterization of the hydrogeological properties of any soil, including the organic clay layer at the EBIA that Dr. Bea claims contributed to the North and South Breaches.  Indeed, soil compressibility as reflected in the $m_v$ value is one of the basic parameters required for the transient flow analyses that all of the parties conducted in this case.[107]

The $m_v$ value is determined using accepted scientific methods that involve laboratory or field tests.  In this case, Plaintiffs' own pumping test analyses produced a compressibility value for the EBIA soils in terms of storage coefficient.[108]  When a qualified geotechnical engineer or hydrologist knows the storage coefficient and corresponding thickness

---

[106]    Because water-saturated soil is comprised of both solids and water in the pore spaces, the compressibility term accounts for both the compressibility of the soil "skeleton," and of the water.  Since the soil skeleton is usually much more compressible than water, the compressibility term is usually dominated by the compressibility of the soil skeleton.

[107]    Rogers Dep., Vol. 1, at 285:13-286:4;  Cobos-Roa Dep., at 185:4-8;
Ex. 32, *Groundwater*, Freeze & Cherry (1979), at 65.

[108]    Bea Dep., Vol. 1, at 172:24-173:7; Bea Dep., Vol. 3, at 11:21-12:3; Rogers Dep., Vol. 1, at 286:5-12.

1092063v.1

for a particular soil layer, that engineer or hydrologist can use well-recognized mathematical equations to convert storage coefficient to coefficient of volume change, which is commonly represented by the symbol $m_v$.[109] The $m_v$ value is defined as "the volume change per unit volume per unit increase in effective stress. The units of $m_v$ are the inverse of pressure."[110] The $m_v$ value represents the compressibility of the soil.

In this case, the storage coefficient for the organic clay layer at the EBIA was computed by Mr. Pope, under the supervision of Plaintiffs' expert, Dr. Rogers. They concluded that, based on the pumping tests conducted by Fugro at the direction of the Plaintiffs' expert team, the organic clay layer has an average storage coefficient value of $5.0 \times 10^{-3}$ which converts, using the five feet aquifer thickness used by the Plaintiffs in their calculations and using formulas well known to qualified engineers and geologists, to an $m_v$ value of **$2 \times 10^{-5}$ 1/psf** – rounded to one significant digit.[111]

The importance of storage coefficient (also a reflection of soil compressibility) in any scientific analysis of transient groundwater flow has been cited by a number of widely used textbooks in the field.[112] By Dr. Rogers' own admission, the storage coefficient value used to compute the $m_v$ of the organic clay layer is necessary for a complete site characterization when conducting a seepage analysis like the one that Dr. Bea conducted for the EBIA.

---

[109]   Bea Dep., Vol. 3, at 12:4-20.

[110]   Ex. 33, *Soil Mechanics*, R.F. Craig, 2004 7th Ed., at 229-230.

[111]   Ex. 34, Pumping Test Analysis Report, South EBIA; Ex. 15, Silva-Tulla Decl., at ¶ 9, Ex. C.

[112]   Ex. 35, *Applied Groundwater Modeling,* Anderson & Woessner (1992), at 194-199; Ex. 32, Freeze & Cherry (1979), at 65; Ex. 36, *Aquifer Hydraulics,* Batu (1998), at 53.

The US Army Corps of Engineer Manual on groundwater hydrology states that "[a]ccurate estimation of transmissivity and storage coefficient of an aquifer is critical to the prediction of groundwater flow patterns ." (Ex. 37, USACE EM 110-2-1421 (1999), at 6-5).

Q. Wouldn't you need storage coefficient for a complete site characterization?

A. If you're doing seepage analysis, yes.

Q. That was kind of one of the main purposes —

A. Right.

Q. — of this whole project, wasn't it?

A. Right.  Right.[113]

Moreover, the storage coefficient value for the organic clay layer determined by Dr. Rogers and Mr. Pope was a natural and necessary output of the Plaintiffs' own pumping tests—an event with approximately the same duration as the Katrina storm surge (estimated at 24-30 hours)—and the resulting $m_v$ value is specific to the soils that were tested during the parties' joint investigation.

### 2.   Dr. Bea Knowingly Manipulated the $m_v$ Value.

But Dr. Bea wasn't interested in conducting a seepage analysis that accurately reflected the site-specific soil characteristics at the EBIA.  In fact, Dr. Bea wasn't interested in considering the site-specific storage coefficient value at all.  According to Dr. Rogers, "[w]e weren't asked for [the storage coefficient].  It never came up.  It was there if they asked for it. Obviously it's there.  If they had asked for it, we would have talked about it.  But I wasn't asked."[114]  Because Dr. Bea and Mr. Cobos-Roa never requested or even discussed the $m_v$ value with Dr. Rogers, and Dr. Bea was determined to ignore the site specific compressibility value, the value was not mentioned as a hydrogeological parameter in Dr. Rogers' site characterization for the EBIA.[115]  And although he was aware that the Plaintiffs' pumping tests produced a value

---

[113]    Rogers Dep., Vol. 1, at 294:19-295:3.

[114]    Rogers Dep., Vol. 1, at 292:3-13.

[115]    Rogers Dep., Vol. 1, at 287:12-288:10.

for storage coefficient—in fact, despite having used in his analysis the permeability value produced by ***those same pump tests***— Dr. Bea made a deliberate decision not to use the site specific storage coefficient value in his computer-generated seepage analysis to reflect compressibility.[116]

Instead, and incredibly, Dr. Bea instructed Mr. Cobos-Roa to find a way to model the soils in SEEP/W model, so that the landside pore pressures would increase instantly— precisely the conditions necessary to support Dr. Bea's underseepage theory.  And Mr. Cobos-Roa complied by inserting his own $m_v$ value input into the model, irrespective of the results from the pumping tests, that would produce for Dr. Bea the results he needed to reach his pre-set goal for the behavior of the "EBIA soils".[117]

> A. * * * Dr. Bea asked GeoEstudios to – to find a way how we can model this . . . incompressible response of the soils.  So GeoEstudios essentially looked for a number that was representative of this condition and that's how – when we came back to Dr. Bea and said, 'Hey, if we use this value of 10 to the minus 9, it seem like we get this response.'  He accepted it and that's why we went to those values."[118]

Dr. Bea's cherry-picking of data and alteration of the site-specific $m_v$ value violates the *Daubert* progeny and is an offense to this Court for at least three reasons.

*First*, the $m_v$ value that Mr. Cobos-Roa invented for Dr. Bea, and that Dr. Bea approved for use in his seepage analysis to represent the compressibility of the organic clay layer (and other fine-grained soils) at the EBIA, simply does not exist anywhere in nature for a soil. Dr. Bea's $m_v$ value of **1 x 10$^{-9}$ 1/psf or 0.000000001 1/psf**, is nearly equivalent to an $m_v$ value of zero.  That value is ***16,000 times*** lower than the $m_v$ value produced by the Plaintiffs' own EBIA

---

[116]    Bea Dep., Vol. 3, at 28:25-29:15.

[117]    Of course the EBIA soils could not possibly have had the $m_v$ value thus artificially attributed to them.

[118]    Cobos-Roa Dep., at 192:21-194:6.

pumping tests[119].  Even the user's guidance (per Cobos-Roa) for the SEEP/W software that Mr. Cobos-Roa employed in this case recommends that, in the absence of a site-specific $m_v$ value, engineers should input data that is two orders of magnitude higher than the value used by Cobos-Roa for Dr. Bea.[120]  At worst, Dr. Bea's $m_v$ value is equivalent to "the center of a neutron star."[121]  At best, the value is—by Mr. Cobos-Roa's own admission—lower than any known soil material in the universe.[122]  Dr. Bea's manipulation of the $m_v$ value has the practical effect of converting the organic clay layer into a fictional strata consisting of something more incompressible than the coarsest gravel or porous rock.[123]  Regardless of how the fictitious material is described, one thing is clear:  Dr. Bea's phantom $m_v$ value certainly does not and has never existed in any soil at the EBIA.

*Second*, not only is Mr. Cobos-Roa's $m_v$ value (approved by Dr. Bea) impossibly incompressible, but that value was used to intentionally distort any true seepage analysis favorably to the Plaintiffs case.  The SEEP/W models run by Mr. Cobos-Roa with this outrageously low $m_v$ value artificially produced completely inaccurate pore pressure values at the EBIA.  Those pore pressure values were then used as an input to Dr. Bea's floodwall stability analysis in the SLOPE/W software, a computer model also run by Mr. Cobos-Roa.  These

---

[119]   Ex. 15, Silva-Tulla Decl., at ¶ 11.

[120]   Cobos-Roa Dep. at 190:1-191:13.  Mr. Cobos-Roa, obviously confused, testified that "[w]hat we actually used was $10^{-9}$ which is four orders of magnitude lower than the value I reported here."  By "here", Mr. Cobos Roa was referring to what he had represented through counsel during discovery as the $m_v$ value that he had actually used.  He had misrepresented the actual value he used.  He was confused because (1) he was comparing SI units to English units to get his "four orders" of magnitude; and, (2) the compressibility he reported was higher, not lower, in compressibility than what he actually used.

[121]   Ex. 38, Brandon 4/13/12 Dep., at 229:24-230:6.

[122]   Cobos-Roa Dep., at 214:15-22.

[123]   Ex. 15, Silva-Tulla Decl., at ¶ 11.

artificial pore pressures generated from an outrageous $m_v$ value are critical to Dr. Bea's opinion regarding the cause of the North and South Breaches at the EBIA. [124]

Dr. Bea himself admits that, if he had run his seepage analysis using the higher and realistic site-specific $m_v$ value that was produced from the Plaintiffs' pumping tests, his pore pressure outputs would have been lower during the elapsed time attributed to the Katrina storm surge.[125]  Dr. Bea also admits that those lower pore pressures would have resulted in a higher factor of safety than what Dr. Bea generated in his analyses that predicted floodwall failure through underseepage.[126]  Thus, when realistic values of $m_v$ are applied, as obtained repeatedly and reliably by **_all_** parties in their respective analyses of the joint soils investigation pumping tests, Dr. Bea's model output does not show the rapid pore pressure increases in response to the Katrina storm surge that he claims, which leads to scientifically correct conclusion that underseepage did not contribute to the EBIA breaches.[127]  Of course, Dr. Bea knew this, and he was aware that manipulating the $m_v$ value to create his make-believe soils would generate the outcome that he and the Plaintiffs desired--to "capture this incompressible response".[128]  His actions run contrary to Rule 702 and _Daubert_.

*Finally*, by disregarding the EBIA site-specific $m_v$ value and inputting his own impossibly incompressible value, Dr. Bea undermined the parties'—and this Court's— efforts to produce fact-based evidence about the material properties of the EBIA soils for use as support in the experts' respective analyses.  The parties spent considerable effort and money investigating

---

[124]     Bea Dep., Vol. 3, at 30:24-34:21; Ex. 15, Silva-Tulla Decl. at ¶ 12.

[125]     Bea Dep., Vol. 3, at 30:24-34:21

[126]     *Id.*

[127]     Ex. 15, Silva-Tulla Decl., at ¶ 15.

[128]     Cobos-Roa Dep., at 193:12-14.

soils at the EBIA that, notwithstanding the passage of time, were actually involved in the Katrina event.  Indeed, the idea that those soils provide the best evidence of how the floodwall breaches occurred formed the basis of the parties' proposal based on this Court's direction, to conduct the joint testing program.  Dr. Bea's deliberate alteration of data, material properties of these soils, and the manipulation of the test results to fit his pre-conceived conclusions are an affront to the parties' joint investigation and an insult to the fact-finding process.

There is no place for Dr. Bea's alleged "analysis" in this case or in any courtroom. As gatekeeper, this Court must find his opinions unreliable and therefore inadmissible because they are based on non-existent facts and junk science.

### 3.      Dr. Bea's "Justification" for Manipulating Data Has no Basis in Science or Fact.

Dr. Bea attempts to rationalize his non-existent compressibility value by explaining that he is using some combination of transient and steady flow conditions to analyze seepage at the EBIA.  Bea's "analysis" is a figment of his imagination and in no way consistent with geotechnical science or with actual site conditions at the EBIA.

It is undisputed that Dr. Bea in fact ran transient flow analyses in this case, not steady flow analyses, or even a "transient steady flow" analysis.[129]  Mr. Cobos-Roa, the graduate student who actually ran the computer models, admitted these truths.[130]   Dr. Bea himself admitted these truths.  (Bea Dep., Vol. 3, at 15:1-8).  And the thousands of pages of modeling

---

[129]    In his so-called rebuttal report, Dr. Bea refers to a phrase unknown to geotechnical engineers: "'transient' 'Steady Flow' hydraulic loading conditions" when describing his seepage analysis.  (Bea Rebuttal Report, at 30).  The term does not exist in geotechnical engineering.  Dr. Bea admitted as much under oath.  (Bea Dep., Vol. 3, at 149:7-150:22 (testifying that he has never seen the term in any geotechnical engineering textbook)).

[130]    Cobos-Roa Dep., at 221:16-20, 257:3-6.

files from Dr. Bea's reliance materials support these truths.[131]  In fact, Dr. Bea has been running

transient flow analyses on the EBIA soils for years, including his analyses in the BARGE and

*Robinson* trials.[132]

But prior to this case no one had actually examined the thousands of pages of the

computer runs' inputs and outputs produced by SEEP/W and SLOPE/W in Dr. Bea's analyses of

the EBIA breaches.[133]  Only after being called to task by the expert reports of Drs. Silva-Tulla

and Marr did Dr. Bea do an abrupt about face and decide to identify his analysis as steady

flow—tellingly, his initial expert report in this case will be searched in vain for any description

of his analysis as "steady flow."  And Dr. Bea changed his tune deliberately because he knew

that his use of outrageous $m_v$ values had been uncovered by defense experts.  And he knew that

the use of site-specific $m_v$ values was fatal to his opinion that underseepage contributed to the

EBIA floodwall failures.

To be sure, only a transient flow analysis would be appropriate in this case, given

the conditions at the EBIA during the Katrina storm event.  Those conditions were transient

(changing) throughout the duration of the storm surge—as the water rose over the site and

---

[131]     Bea Dep., Vol. 3, at 19:1-11.

[132]     Bea Dep., Vol. 3, at 15:9-20; 16:10-15.

[133]     Dr. Bea and Mr. Cobos-Roa don't necessarily make it easy for people to review their files.  The pair conducted three-dimensional ("3D") seepage analyses for the EBIA breaches in 2008 and 2009 that Dr. Bea relies on extensively in the initial report he submitted for this case.  (*See, e.g.*, Bea Report, at 76, 99-101, 133).  But at deposition, Dr. Bea described a peculiar story about how the 3D analyses were lost—*twice*: Mr. Cobos-Roa's laptop that contained the analyses was stolen; then the hard drive that contained his back-up files was dropped and damaged; and finally, the hard drive was stolen.  (Bea Dep., Vol. 1, at 147:8-21).  Mr. Cobos-Roa told a somewhat different but similarly peculiar story: His laptop was stolen from his apartment and never retrieved; and subsequently he left the hard drive somewhere on campus during course work, never to be found.  (Cobos-Roa Dep., at 174:25-176:7).  Although it would take only a month to replicate the 3D analyses using inputs that are currently available, (Cobos-Roa Dep., at 183:14-25), the analyses still have not been provided to WGII.

eventually worked its way toward and over the floodwall, the subsurface flow regime definitely began to change very slowly in response to the soils' hydraulic conductivity and compressibility properties.  However, given the approximately 30 hour duration of the Katrina storm surge, there was not nearly enough time to attain steady state flow conditions.  To achieve steady flow would have required maintaining the peak canal water level unchanged for over several months— significantly longer than the Katrina storm surge.  Notably, the Katrina storm surge lasted about 24 to 30 hours, a comparable length of time to the 47 to 96 hour duration of the parties' EBIA pumping tests which Dr. Bea's expert team correctly evaluated as transient flow.  Those pumping tests necessarily produced a realistic, site-specific $m_v$ value (notwithstanding Dr. Bea's decision to ignore that value).  Dr. Bea now postulates, nonsensically, that the flow conditions at the entire EBIA site were immediately steady state upon the arrival of the storm surge and existed in a steady state condition throughout the surge.  In fact it would have taken more than a year to achieve a steady state condition, certainly longer than the surge itself.

Dr. Bea's intentions are clear:  By modeling the soils as virtually incompressible, he has *contrived* a steady state conditions to allow for pore pressures that are transmitted quickly—in fact, almost immediately—thus creating the appearance that pore pressures were artificially high, and as a result that underseepage did in fact contribute to the breaches.  Mr. Cobos-Roa left no doubt about Dr. Bea's plan:

Q. Why did you change from undrained to drained?

A. Because this time we -- well, we obviously were trying to see the difference between -- what the results were undrained versus drained, **but at the same time the _premise_ of the models were -- were that water pressures were able to be transported or transmitted across this swamp layer, therefore drain [sic] parameters could be used.**

**Q. So in other words, you called it a premise, but I take it then that the goal of the way you set up your Seep/W was to see if you could transmit pore pressures from the flood side to the protected side.  Is that correct?**

- 41 -

**A. Yes, sir."**[134]

Notwithstanding Dr. Bea's parsing of words and invented terminology, it is abundantly clear that he caused Mr. Cobos-Roa to run a transient flow analysis in SEEP/W and his analysis modeled transient conditions, "[b]ut *the response we – we tried to model*, again, going back to the issue of compressibility, is that of steady flow as described by Dr. Bea in his report."[135]   This method of manipulating the $m_v$ value under transient conditions to fabricate unrealistic steady state conditions is a complete fallacy and is in no way supported by fact or science.  Dr. Bea's opinions based on this improper methodology should not be countenanced or considered by this Court.

## IV.   CONCLUSION

WGI's motion to exclude the testimony and opinions of Dr. Robert Glenn Bea is not undertaken lightly--the remedy sought is rarely granted.  However, WGI is persuaded that Dr. Bea's lack of factual and scientific bases for his opinions warrants that result.  WGI has spent millions of dollars defending itself against claims that turn out to be based on false facts and junk science.  Dr. Bea's foundational SEEP/W and SLOPE/W computer models predicting flow and stability have not previously been examined to discover the make-believe geometry and impossible soil material inputs identified as erroneous in this Memorandum.

Of course many people were devastated or even destroyed by the flooding exacerbated by breaches in the EBIA floodwalls and levees.  And, it is clear from Dr. Bea's testimony that he has a passion to see a perceived wrong remedied.[136]  Perhaps this is what has

---

[134]   Cobos-Roa Dep., at 272:3-19 (emphasis added).

[135]   Cobos-Roa Dep., at 196:1-198:2 (emphasis added); *see also id.* at 221:8-222:30 (admitting there is no support for this approach in the SEEP/W manual, from the owners of the software, or from any of Mr. Cobos-Roa's engineering professors).

[136]   *See, e.g.*, Bea Rebuttal Report, ¶ ¶ 74-75.

clouded his methods and his opinions.  But such misguided passion, however well motivated it might be, cannot be substituted for truth.  **WGI's work, even apart from its lack of any geotechnical responsibility for the floodwalls, was simply not causally connected to the EBIA breaches.**  Dr. Bea's analyses prior to this case about the EBIA soil permeability, as this Court knows from prior experience, have produced a panoply of permeability ranges--orders of magnitude apart.  All of those varying analyses were masking even more vital and fatal flaws of fact and science.  For the reasons articulated above, the Court should grant WGI's motion to exclude his testimony and opinions regarding the cause of failure of the EBIA floodwall and levee.

Dated:  April 30, 2012                                Respectfully submitted,

                                                     */s/ William D. Treeby*_____
                                                     William D. Treeby, 12901
                                                     James C. Gulotta, Jr., 6590
                                                     Heather S. Lonian, 29956
                                                          Of
                                                     STONE PIGMAN WALTHER WITTMANN L.L.C.
                                                     546 Carondelet Street
                                                     New Orleans, Louisiana  70130
                                                     Telephone:  (504) 581-3200
                                                     Facsimile:   (504) 581-3361

                                                     and

                                                     Adrian Wager-Zito
                                                     Debra S. Clayman
                                                     JONES DAY
                                                     51 Louisiana Avenue, N.W.
                                                     Washington, D.C. 20001-2113
                                                     Telephone:  (202) 879-3891
                                                     Facsimile:  (202) 626-1700

                                                     Attorneys for Washington Group
                                                     International, Inc., a division of URS
                                                     Corporation

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Motion to Exclude Testimony and Opinions of Dr. Robert Glenn Bea has been served upon all counsel of record by electronic notice via the Court's CM/ECF system this 30th day of April, 2012.

_/s/ William D. Treeby_

1092063v.1