# EXHIBIT 6

## DECLARATION OF DR. ROBERT GLENN BEA

Robert G. Bea, under penalty of perjury, states as follows:

1.  This Declaration is submitted on behalf of the Plaintiffs in *Robinson v. United States* in connection with the Flood Control Act ("FCA") immunity issues. As detailed below, this Declaration constitutes my FCA expert report concerning the performance during Hurricane Katrina, of the man-made features bordering the Inner Harbor Navigation Canal (IHNC) at the Lower 9th Ward. In particular, this Declaration will address engineering forensic studies providing insights into the reasons for breaches, failures, and overtopping that developed with respect to those features. If called to testify, I could and would testify competently as follows:

2.  My Declaration is divided into three sections. Section I provides an overview of my qualifications to serve as an expert on the issues discussed herein. Section II provides a summary of engineering forensic analyses to determine the causes of the breaches, failures, and overtopping that developed with respect to the man-made features along the IHNC at the Lower 9th Ward during and following Hurricane Katrina. Section III summarizes the major conclusions drawn from this work. The following table of contents will serve as a guide to help reading this Declaration.

Canal (IHNC) exacerbated the hurricane surge experienced at this location. The increased surge contributed significantly to the failures of the floodwalls, EBSBs (New Orleans Back Levee) and Levees on both east and west sides of the IHNC.

19.     At the Lower 9th Ward, industrial site clearing activities outside the floodwall and levee at the East Bank Industrial Area (EBIA) consisting of ground excavations to remove buried storage tanks and other debris were major contributors to the catastrophic breaches that developed at the Lower 9th Ward. These EBIA site clearing activities were associated with the USACE navigation lock expansion project (completed early 2005).  These EBIA site clearing activities were not conducted in accordance with USACE guidelines for excavations near or within a federally constructed flood control project (USACE 2005). Water which entered through these breaches not only devastated the Lower 9th Ward, but as well contributed to the catastrophic flooding of the St. Bernard Parish – Lower 9th Ward 'bowl'.

20.     Results of analyses performed to determine the timing and causes of the Reach 1 flood protection structures at the Lower 9th Ward, clearly demonstrate the adverse effects of excavations developed during the USACE IHNC Lock Expansion Project site clearing operations. These operations were completed just prior to hurricane Katrina (about May 2005). The locations of the breaches are directly correlated with the locations of these excavations. Both the sand backfilled, native soil backfilled and non-backfilled excavations provided ready and early access of the rising waters in the IHNC to communicate with the buried marsh and swamp layers that underlie this entire area. The hydraulic flow and pressure effects were sufficient to initiate very early movements of the supporting levee and floodwalls – well before overtopping, opening up the vertical water-stop joints, and eventually developing complete breaching as the floodwalls were overtopped.

37.     It is reported by WGI ("Technical Completion Report," 2005) that in the majority of cases the canal bank was excavated as required to a depth of four feet, additional observations of contamination prompted excavations to depths exceeding nine feet. The records provided by WGI indicate that a total of 12,259 tons of contaminated soils were removed from the Boland site and 35,636 tons of contaminated soils were removed from the Saucer site.

38.     In addition to removal of canal-side soils that had previously provided stability and protection to the flood protection structure, numerous underground storage tanks and debris were removed. At the Saucer site, large underground storage tanks had to be removed. In addition, a buried railroad tank car required construction of a cofferdam so that the tank car could be filled with air, floated free, lifted and transported from the site (Figures 23 - 25). At the northern Boland site, a wharf extended along most of the IHNC. Following removal of the wharf materials, the piles comprising the foundation were pulled and transported from the site. Excavations to remove contaminated soils were made immediately adjacent to the floodwall at the Boland Marine Site (Figures 26 - 27).



Figure 23: Cofferdam at Boland Marine site dug to depth exceeding 25 feet (WGI 2005).



Figure 24: Cofferdam at Boland Marine site dug to depth exceeding 20 feet. Water entry was associated with penetration of organic layers encountered at – 16 feet (WGI 2005).

29



Figure 25: Removing buried railroad tank car inside coffer dam at Boland Marine site (WGI 2005).



Figure 26: Excavations to remove contaminated soils at Boland Marine site immediately adjacent to floodwall (WGI 2005).

30



Figure 27: Excavations to remove contaminated soils at Boland Marine site immediately adjacent to floodwall (WGI 2005).

39. Fill used to backfill the excavations ranged from imported sand (Figures 28 and 29) to 're-worked' fill materials from the EBIA.



Figure 28: Backfilling excavations with imported sand at Boland Marine site (WGI 2005).



Figure 29: Backfilling excavations with imported sand at Boland Marine site (WGI 2005).

40. The excavations consistently encountered a "buried swamp" at an elevation between approximately –15 feet and –25 feet (MSL) (Figures 30 - 32).



Figure 30: Buried cypress tree stumps encountered in borrow pit at McDonough Marine (WGI 2005). Note proximity of flood wall in background.

32

41.     The effects of these site remediation activities clearly extended well below the specified soil excavation levels cited earlier. Removal of barges, piles, and underground storage tanks could easily have reached to elevations of minus 10 feet to 25 feet; thus intersecting the underlying marsh deposits (Figures 20 - 27).

42.     WGI completed its work, removed its equipment, and demobilized from the job site in May 2005 (WGI 2005).

43.     The WGI experiences associated with the EBIA site clearing excavations (seepage, high permeability organic layers, soil heaving) were corroborated during a construction project conducted to the north of the Lower 9th Ward at Dwyer Road (Rosenberg 2008). Excavations conducted at this location (2000-2003) encountered similar high permeability organic layers at comparable depths encountered by WGI at the EBIA. These high permeability organic layers were associated with significant and persistent water seepage that had not been anticipated by the USACE and their consultants at the time that the background engineering work was done for the Dwyer Road construction. The contractor repeatedly encountered severe seepage and soil heaving problems that threatened the stability of the earthworks and that had to be solved 'on the job.'

44.     The information that is available clearly indicates a high degree of correlation of the site remediation work conducted by WGI at the EBIA sites and the breach locations in the flood protection structure adjacent to the Lower 9th Ward. This remediation work (removal of soils, formation of cavities, vibrations) very probably had important effects on the soils relied upon to provide stability and protection for the flood protection structure. Removal and disturbance of the surface soils overlying the permeable subsoils (Marsh and Swamp layers) would have facilitated the under seepage.

45.     Information regarding waterside excavations indicate that work near the area of the breaches placed permeable material down to elevations of approximately –25 feet, more than 10 feet deeper than the sheet pile tip; thus producing significantly shorter paths for hydraulic pressures to reach beneath the embankment soils and levee toe, starting material saturation and softening potentially faster, as opposed to the subsoils being hydraulically charged from more than two hundred feet away (e.g. charged from the IHNC canal).  Figures 33 through 36 show an evolution of the excavation along the IHNC waterside, and how alarmingly close the IHNC canal was moved to the floodwall early in 2005.  Figures 34 and 35 shows excavations located from 10 to 60 feet from the I-walls.

46.     The USACE has specific guidelines for work near or within federally constructed flood control projects (USACE 2005). These guidelines stipulate: *"The Corps of Engineers provides engineering review to ensure that any work within or near the flood control unit does not reduce the level of protection and to assure the continued integrity of the flood control system."* Further, these guidelines stipulate: *"Excavation and backfill in the critical area of a flood control project could have a direct impact on the stability of the flood control project. Improper excavation in the levee embankment or in the critical area can create unstable slopes and slope failures, which damage the levee embankment and weaken the flood protection structure. Additional damages to the levee embankment or flood protection structure can also be caused by underseepage conditions associated with piping and heave. This removal of material from the flood control structure foundation (piping) can ultimately produce collapse of a levee embankment or floodwall. All excavation and backfill activities within the critical area are to be reviewed and approved by the COE and the local sponsor before construction begins."* *"The critical area is generally considered the area from 300 feet riverward to 500 feet landward of a*

early access of the rising waters in the IHNC to communicate with the buried marsh and swamp layers that underlie this entire area. The hydraulic flow and pressure effects were sufficient to initiate very early movements of the supporting levee and floodwalls – well before overtopping, opening up the vertical water-stop joints, and eventually developing complete breaching as the floodwalls were overtopped.

92.     My analyses, evaluations, assessments and conclusions have been based on the background information and documentation cited in this Declaration. I reserve the right to modify my analyses, evaluations, assessments, and conclusions in the case that new or additional information becomes available in the future.

I declare under the penalty of perjury under the laws of the United States of American that the foregoing is true and correct.

Executed on March 25, 2008 in Moraga, California.

Robert Bea, Ph.D, PE