# EXHIBIT 10

**ROBERT G. BEA, PH.D.**                              **April 16, 2012**

---

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
                JUDGE DUVAL
PERTAINS TO MRGO          MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
     05-6314, 05-6324, 05-6327, 05-6359,
     06-0225, 06-0886, 06-1885, 06-2152,
     06-2278, 06-2287, 06-2824, 06-4024,
     06-4065, 06-4066, 06-4389, 06-4634,
     06-4931, 06-5032, 06-5155, 06-5159,
     06-5156, 06-5162, 06-5260, 06-5771,
     06-5786, 06-5937, 07-0206, 07-0621,
     07-1073, 07-1271, 07-1285
               * * *

     Deposition of ROBERT G. BEA, PH.D.,
given at the offices of Stone Pigman Walther
Wittmann, LLC, 546 Carondelet Street, New
Orleans, Louisiana 70130, on April 16th, 2012.
REPORTED BY:
     JOSEPH A. FAIRBANKS, JR., CCR, RPR
     CERTIFIED COURT REPORTER #75005

---

Page 2

1   APPEARANCES:
2   REPRESENTING THE PLAINTIFFS:
3       BRUNO & BRUNO
4       (BY:  JOSEPH M. BRUNO, ESQUIRE)
5       (BY:  SCOTT JOANEN, ESQUIRE)
6       855 Baronne Street
7       New Orleans, Louisiana 70113
8       504-525-1335
9   - AND -
10      LEVIN, PANATONIO, THOMAS, MITCHELL,
11      RAFFERTY & PROCTOR, P.A.
12      (BY:  MATTHEW D. SCHULTZ, ESQUIRE)
13      316 S. Baylen St., Suite 600,
14      Pensacola, Florida 32502
15      850-435-7140
16  - and -
17      SHER, GARNER, CAHILL, RICHTER, KLEIN &
18      HILBERT, L.L.C.
19      (BY:  ASHLEY COKER, ESQUIRE)
20      909 Poydras Street, 28th Floor
21      New Orleans, Louisiana 70112
22      504-299-2100
23
24
25

---

Page 3

1   REPRESENTING WASHINGTON GROUP INTERNATIONAL,
2       INC.:
3       STONE PIGMAN WALTHER WITTMANN, L.L.C.
4       (BY:  WILLIAM D. TREEBY, ESQUIRE)
5       546 Carondelet Street
6       New Orleans, Louisiana 70130
7       504-581-3200
8   - and -
9
10      JONES DAY
11      (BY:  NORA WARREN, ESQUIRE)
12      (BY:  CHRISTOPHER N. THATCH, ESQUIRE)
13      (BY:  DEBRA S. CLAYMAN, ESQUIRE, VIA
14      TELEPHONE)
15      51 Louisiana Avenue, N.W.
16      Washington, D.C. 20001-2113
17      202-879-4645
18
19
20
21
22
23
24
25

---

Page 4

1   REPRESENTING THE UNITED STATES OF AMERICA:
2       U.S. DEPARTMENT OF JUSTICE
3       (BY:  ROBIN DOYLE SMITH, ESQUIRE)
4       (BY:  RUPERT MITSCH, ESQUIRE)
5       Torts Branch, Civil Division
6       P.O. Box 888
7       Benjamin Franklin Station
8       Washington, D.C. 20044
9       202-616-4289
10
11  ALSO PRESENT:
12      FRANCISCO SILVA-TULLA
13      TIMOTHY STARK
14
15  VIDEOGRAPHER:  GILLEY DELORIMIER (DEPO-VUE)
16
17
18
19
20
21
22
23
24
25

ROBERT G. BEA, PH.D.                           April 16, 2012

Page 5

1          E X A M I N A T I O N   I N D E X
2
3    EXAMINATION BY:                    PAGE
4    MR. TREEBY   ................................7
5    MR. SMITH   ..............................175
6    MR. TREEBY   .............................301
7
8          E X H I B I T   I N D E X
9
10   EXHIBIT NO.                       PAGE
11   Bea Exhibit 45 ..............................19
12   Bea Exhibit 46 ..............................37
13   Bea Exhibit 47 ..............................47
14   Bea Exhibit 48 ..............................48
15   Bea Exhibit 49 ..............................53
16   Bea Exhibit 50 ..............................55
17   Bea Exhibit 51 ..............................68
18   Bea Exhibit 52 ..............................74
19   Bea Exhibit 53 ...........................108
20   Bea Exhibit 54 ...........................111
21   Bea Exhibit 55 ...........................128
22   Bea Exhibit 56 ...........................166
23   Bea Exhibit 57 ...........................177
24
25

Page 6

1          S T I P U L A T I O N
2          IT IS STIPULATED AND AGREED by and
3    among counsel for the parties hereto that the
4    deposition of the aforementioned witness may be
5    taken for all purposes permitted within the
6    Federal Rules of Civil Procedure, in accordance
7    with law, pursuant to notice;
8          That all formalities, save reading
9    and signing of the original transcript by the
10   deponent, are hereby specifically waived;
11         That all objections, save those as to
12   the form of the question and the responsiveness
13   of the answer, are reserved until such time as
14   this deposition, or any part thereof, is used
15   or sought to be used in evidence.
16
17
18                 *  *  *
19
20
21
22         JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23   Certified Court Reporter in and for the State
24   of Louisiana, officiated in administering the
25   oath to the witness.

Page 7

1              ROBERT G. BEA, PH.D.
2    60 Shuey Drive, Moraga, California 94556, a
3    witness named in the above stipulation, having
4    been first duly sworn, was examined and
5    testified on his oath as follows:
6    EXAMINATION BY MR. TREEBY:
7         Q.   Good morning, Dr. Bea.
8         A.   Good morning.
9         Q.   I want to ask you questions this
10   morning to begin with about some basic
11   scientific principles.
12              First, wouldn't you agree that when
13   one is engaged in a scientific investigation of
14   any problem it is important to use applicable
15   and accurate data.
16         A.   Yes.
17         Q.   And wouldn't you agree that a
18   scientific analysis made during a scientific
19   investigation should rely, when available, on
20   known facts and not on speculation?
21         A.   Yes.
22         Q.   And also, wouldn't you agree, Dr. Bea,
23   that in a scientific investigation it is
24   sometimes necessary to use hypotheses?
25         A.   Yes.

Page 8

1         Q.   And when one is testing an hypothesis,
2    it is important to use, as premises, whenever
3    possible, actual facts rather than speculative
4    information?
5         A.   Yes.
6         Q.   The permeability of specific soils is
7    a material property of those soils; isn't that
8    correct?
9         A.   Yes.
10        Q.   And material properties of soils is
11   something that one can determine
12   scientifically, right?
13        A.   Yes.
14        Q.   And maybe I should get something
15   straight.  You do differentiate, in your report
16   other otherwise, between hydraulic conductivity
17   and permeability?
18        A.   Yes.
19        Q.   Tell me the differentiation that you
20   make.
21        A.   Well, in hydraulic conductivity, I'm
22   including two important elements in
23   conductivity, one of which is transmission of
24   fluid determined largely by the soil
25   permeability.  The other is the transmission of

                              2 (Pages 5 to 8)

ROBERT G. BEA, PH.D.                                              April 16, 2012

Page 9

1   pressure.  And the pressure is influenced by
2   permeability, but much more influenced by the
3   compressibility characteristics of water.
4       Q.  Okay.  Dr. Bea, I didn't really ask
5   you about pressure, I asked you about hydraulic
6   conductivity versus permeability.  And have you
7   answered me and told me the differ -- do you
8   believe your answer told me what you
9   differentiate between hydraulic conductivity
10  and permeability?
11      A.  Yes.
12      Q.  Okay.  Hydraulic conductivity of
13  specific soils is a material property of the
14  soil given the fluid that flows through those
15  soils; isn't that correct?
16      A.  Correct.
17      Q.  And these material properties of these
18  soils and these fluids are matters that one can
19  determine scientifically, right?
20      A.  Correct.
21      Q.  In this case, you relied on Dr. David
22  Rogers for some of the information you included
23  in your various reports; right?
24      A.  Correct.
25      Q.  And you know, do you not, the

Page 10

1   qualification of Dr. Rogers?
2       A.  Yes, sir.
3       Q.  In fact, you served on the faculty of
4   UC Berkeley with Dr. Rogers; isn't that so?
5       A.  Yes, sir.
6       Q.  And you know in this case Dr. Rogers
7   relied upon the services of expertise of a
8   gentleman named Kevin Pope.  Is that right?
9       A.  Yes.
10      Q.  And you know, do you not, that
11  Dr. Rogers, using the services of Kevin Pope,
12  used scientific -- standard scientific methods
13  to evaluate results from pumping tests at sites
14  selected by the plaintiffs' expert team to
15  determine the hydraulic conductivity or
16  permeability of the organic clay layers that
17  you believe were implicated in the flood wall
18  failures in the East Bank Industrial Area?
19  Right?
20          MR. JOANEN:
21              Object to the form.
22      A.  Please repeat -- reform your question,
23  please.
24  EXAMINATION BY MR. TREEBY:
25      Q.  Okay.  You know, do you not, that

Page 11

1   Dr. Rogers used the services of Kevin Pope who
2   used standard scientific methods to evaluate
3   results from pumping tests, right?
4       A.  That's correct.
5       Q.  And you know that that evaluation was
6   done at sites selected by the plaintiffs'
7   expert team, is that right?
8       A.  Yes, sir.
9       Q.  And the purpose of those pumping tests
10  was to determine the permeability of the
11  organic clay layers that you believe were
12  implicated in the flood wall failures in the
13  East Bank Industrial Area, isn't that right?
14      A.  Yes, sir.
15      Q.  And the results of these analyses by
16  Dr. Rogers and Kevin Pope determined a best
17  estimate that the material property
18  permeability of those soils was 1 times 10 to
19  the -5 centimeters per second, right?
20      A.  Correct.
21      Q.  And you also now know, do you not,
22  that these same standard scientific methods
23  used to evaluate results from these pumping
24  tests by Dr. Rogers with the help of Kevin Pope
25  produced another material property for those

Page 12

1   same soils, namely, the storage coefficient of
2   those soils, isn't that right?
3       A.  Correct.
4       Q.  And I believe we established the last
5   time you were deposed on your original report
6   that you know that when a scientist who is
7   qualified knows the storage coefficient of
8   given soils, that scientist can use well
9   recognized and commonly used equations to
10  convert storage coefficient to coefficient of
11  volume change known scientifically as M sub V.
12      Isn't that right?
13      A.  Well, that's one approach to
14  determination of the coefficient of volume
15  change M sub V.
16      Q.  Those two terms, storage coefficient
17  and M sub V are related to one another in ways
18  that can be computed using well-known formulas;
19  correct?
20      A.  Correct.
21      Q.  Now, I realize, Dr. Bea, that you are
22  not competent to actually run transient flow
23  analyses in computers.  Right?
24          MR. JOANEN:
25              Object to the form.

ROBERT G. BEA, PH.D.                                        April 16, 2012

Page 13

1    A.  I think that's incorrect.
2  EXAMINATION BY MR. TREEBY:
3    Q.  Okay.  I understood your testimony --
4  we can look at -- maybe I'm misstating it
5  slightly, but I thought you had told us that
6  you were not competent to use the computers to
7  run these analyses; you did hand calculations
8  to check them and you oversaw people who used
9  computers, but that you, yourself, were not
10 competent to run those tests in computers.
11       Did I misunderstand?
12   A.  I think you --
13       MR. JOANEN:
14           I'll just object to the form.
15           You can answer the question.
16   A.  I think you are -- if I had time,
17 perhaps even training and experience, then I
18 could run the computer program in this case
19 SEEP/W.  However, I don't have those three
20 things to enable me to operate that program.
21 EXAMINATION BY MR. TREEBY:
22   Q.  Maybe the word competent threw you
23 off.  I'm not sure.
24       When I said competent, I was saying
25 you weren't trained to do it.

Page 14

1       You didn't have experience doing it
2  yourself; isn't that correct?
3    A.  Didn't have experience doing that
4  particular program work.  I've written computer
5  programs myself, and so am competent to write
6  them, with training, experience, knowledge to
7  operate them.
8    Q.  Okay.  But in this case, you used the
9  services of others to perform the computer
10 analysis of flows and stability, isn't that
11 right?
12   A.  Yes, sir.
13   Q.  Have you written any computer programs
14 for flow analyses?
15   A.  Yes, but not flow through soils.
16   Q.  Okay.  And in this case, you used the
17 services of a graduate student Mr. Diego
18 Cobos-Roa to perform those services, isn't that
19 right?
20   A.  Yes.
21   Q.  And for that matter, you are not
22 practiced or trained to actually run steady
23 state flow or steady flow analyses in computers
24 using SEEP/W.  Isn't that right?
25   A.  That's correct.

Page 15

1    Q.  But you do know, do you not, that the
2  UC Berkeley graduate student Diego Cobos-Roa
3  used software published by GEO-SLOPE
4  International, a suite known as GeoEstudios, to
5  run transient flow analyses, by means of
6  computer, that you used in your original report
7  in this case, right?
8    A.  Correct.
9    Q.  And in fact, you know that that same
10 graduate student Diego Cobos-Roa used the same
11 software to run transient flow analyses via
12 computer for you in connection with your
13 testimony in the barge litigation.  Right?
14   A.  Correct.
15   Q.  And you know that the same graduate
16 student used the same software to run transient
17 flow analyses via computer for you in
18 connection with your testimony in the Robinson
19 case, correct?
20   A.  Correct.
21   Q.  And also know the same graduate
22 student used the same software to run transient
23 flow analyses via computer for you after you
24 had been hired by plaintiffs' attorneys in this
25 case to work for them in connection with your

Page 16

1  authorship of various papers that you cite in
2  your references related to case studies of the
3  flood wall levee failures in the East Bank
4  Industrial Area back in 2008, isn't that right?
5    A.  Your question is very complex.
6    Q.  Okay.
7    A.  If you could --
8    Q.  I'll break it down.
9    A.  -- break it down.  Thank you.
10   Q.  Diego Cobos-Roa ran transient flow
11 analyses for you in connection with your
12 authorship of various papers about the East
13 Bank Industrial Area flood wall levee failures
14 in 2008; right?
15   A.  Correct.
16   Q.  One of the specific software programs
17 developed by GEO-SLOPE International that this
18 grad student Mr. Cobos-Roa used to do these
19 computer runs for you beginning in 2008 through
20 2012 is known as SEEP/W; right?
21   A.  Correct.
22   Q.  And I believe you know, do you not,
23 that SEEP/W can be used as a tool to accomplish
24 a steady state flow analysis.  Right?
25   A.  Correct.

4 (Pages 13 to 16)

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 17

1      Q.   And I believe you know, at least from
2    the testimony of Diego Cobos-Roa that you
3    attended last Monday, that when you begin to
4    use SEEP/W on a given day, given session, you
5    can choose -- in fact, you must choose whether
6    you want to do a steady flow analysis or a
7    transient flow analysis with that program.
8    Isn't that right?
9      A.   You can choose in the program to use a
10   steady flow analysis.  Alternatively, you can
11   choose to do a nonsteady flow analysis.  As
12   subsets to those two fundamental kinds of
13   analyses, you can do steady state analysis or
14   you can do transient state analysis.
15     Q.   One of the choices on -- have you ever
16   looked at the computer screen while Diego
17   Cobos-Roa was actually inputting data on
18   SEEP/W?
19     A.   On several occasions, yes.
20     Q.   Okay.  Well, then you know that when
21   you get to that screen you have a choice,
22   steady flow, steady state flow, or transient
23   flow.  Isn't that right?
24     A.   Yes.
25     Q.   Okay.  And you know, in this case,

Page 18

1    that Diego Cobos-Roa chose to run a transient
2    flow analysis, right?
3      A.   We ran both kinds of analyses, both
4    steady state and transient.
5      Q.   We have not seen, in all the model
6    runs, any instance in which the choice -- in
7    this case, in which the choice made was steady
8    state flow analysis.  Are you testifying here
9    under oath that that happened?
10     A.   Yes.
11     Q.   In this case.
12     A.   Please define this case.
13     Q.   I'm talking about the Armstrong case
14   for which reports were given to us by Cobos-Roa
15   done in 2011 and 2012.
16     A.   Now that I have your time frame,
17   please repeat your question.
18     Q.   Isn't it true that the model runs that
19   we have from 2011 and 2012 from Cobos-Roa, in
20   those model runs Cobos-Roa never made the
21   choice steady state flow analysis but always
22   made the choice transient flow analysis.
23     A.   I'm not familiar in detail with the
24   analyses you've been provided, so I'm unable to
25   respond to your question.

Page 19

1      Q.   You haven't looked at the materials
2    given us as reliance materials for your report
3    that include those model runs?
4      A.   I have not looked at the model runs
5    you were provided with.
6      Q.   So if I represent to you that our
7    experts have looked through those and do not
8    see any instance in which Cobos-Roa chose
9    steady state analysis, you're not in a position
10   to disagree with me.
11     A.   That's correct.
12     Q.   Now, when you come to the screen that
13   calls for a compressibility input, an input of
14   the coefficient of volume change, M sub V, let
15   me show you the page that the computer program
16   has at that point.  I'm going to show you a
17   copy of the screen shot from this input
18   parameter which we're going to mark as Bea
19   Exhibit number 45.  (Tendering.)
20          The first page -- and there are three
21   pages in this exhibit.  Now, on the first page,
22   which was taken from one of the model runs that
23   we were given, do you see the place where one
24   must insert M sub V?
25          (Bea Exhibit 45 was marked for

Page 20

1    identification and is attached hereto.)
2      A.   Are you referring to the material
3    model pull down screen in this case labeled
4    centrigraded undrained?
5    EXAMINATION BY MR. TREEBY:
6      Q.   I'm referring to the pull down
7    sheet -- if you have the same thing I'm looking
8    at, which I think you do, there's a window, I
9    guess it's called, it says, key in vol water
10   content function.
11          You see that?
12          MR. JOANEN:
13          (Indicating.)
14     A.   Yes, I see the label for the subset
15   screen shown on the first page of 45.
16          MR. JOANEN:
17          And I'd just like to note for the
18   record that the contrast is fairly
19   difficult to read.
20          MR. TREEBY:
21          The contrast?
22          MR. JOANEN:
23          Yes.  With the blue and the white
24   mix, it's hard to read, especially
25   with the lighting in here.

JOHNS, PENDLETON COURT REPORTERS              504 219-1993

**ROBERT G. BEA, PH.D.**                                    **April 16, 2012**

Page 21

1    MR. TREEBY:
2        I thought I had bad eyesight, but
3    I guess I'm doing well. I'm proud of
4    myself now.
5    EXAMINATION BY MR. TREEBY:
6        Q. Well, do you see the box that calls
7    for M sub V there? I can tell you it's
8    about -- I'll point to it, and perhaps then you
9    can find it. It's right here on this window.
10       A. Yes.
11       Q. Okay. What's there? Can you read the
12   number that has been inserted on that screen
13   shot?
14       A. 0 per pounds per square foot (psf).
15       Q. Do you have any idea what the program
16   does when it's given that input?
17       A. Well, it should proceed with the
18   calculation based on incompressible flow.
19       Q. Do you know what -- how incompressible
20   zero translates to in this software?
21       A. In this particular instance, No.
22       Q. Okay. Would it surprise you if I told
23   you that if you put a true zero -- if you were
24   able to put a true zero in that box, the
25   program wouldn't function?

Page 22

1        A. I think that's accurate, because
2    that's the reason we input very small M sub
3    Vs --
4        Q. Well, in fact, this --
5        A. -- close to zero.
6        Q. Excuse me. I didn't mean to interrupt
7    you. Pardon me.
8        If you recall, because you were at his
9    deposition, I asked that question of Cobos-Roa
10   and he said he didn't know what it translated
11   to either.
12       A. Yep.
13       Q. So if I represent to you that in fact
14   it translates to 10 to the -20, 1 over psf, you
15   can't argue with that.
16       A. Correct.
17       Q. Turn to the next page, if you will,
18   which is another screen shot from a model that
19   was run and given us. In the M sub V box, what
20   does this one say?
21       A. 1 times 10 to the -9 per psf.
22       Q. Do you know why the variation between
23   the two inputs that were in these models; zero
24   in one case, 10 to the -9, 1 over psf in the
25   other?

Page 23

1    MR. JOANEN:
2        Object to the form.
3        A. I know the reason for the 10 to the -9
4    per psf. That number was identified based on
5    performing the analyses in steady flow
6    conditions. The 10 to the -9 was determined
7    based on the soil-water dilatational modulus.
8        Q. I'm not trying to cover ground we
9    covered in the other deposition, and I don't
10   think you understood my question or I think you
11   would have answered it more easily than that.
12       I'm asking if you know the reason for
13   the difference between an input of zero in one
14   case and an input of 10 to the -9, 1 over psf
15   in the other? The reason for the difference.
16       A. No, I don't -- can't explain the
17   difference.
18       Q. That's all I was asking.
19       A. Okay. Sorry. I was trying to be too
20   complete in my answer.
21       Q. Okay. And you also know, in fact you
22   testified at your last deposition, that 1 times
23   10 to the -9, 1 over psf, is not the actual
24   coefficient of volume change, M sub V, that a
25   scientist would compute from the storage

Page 24

1    coefficient determined by Dr. Rogers and Kevin
2    Pope for these site specific clay materials
3    existing at the East Bank Industrial Area.
4        Isn't that right?
5        A. There are two basic ways to compute --
6    determine M sub V. One way depends on the
7    compressibility characteristics of the soil
8    skeleton. That approach uses storage
9    coefficient. The alternative approach treats
10   the materials of concern here, the buried
11   swamp-marsh deposits as an incompressible
12   system. And the incompressible system is
13   focused on the pore water phase in the sample.
14   That approach uses the dilatational wave
15   velocity to determine M sub V. The other
16   approach uses storage coefficient and other
17   similar parameters to define M sub V. The two
18   M sub Vs are different things.
19       Q. You finished?
20       A. I hope so.
21       Q. Let me get an answer to the question I
22   asked you, rather than the one you wanted to
23   answer.
24   MR. JOANEN:
25       I'm going to object to the

6 (Pages 21 to 24)

ROBERT G. BEA, PH.D.                                          April 16, 2012

Page 25

```
 1    statement by counsel.
 2    MR. TREEBY:
 3         I object to the irresponsiveness.
 4    MR. JOANEN:
 5         It was very responsive.  It was
 6    exactly responsive to the question you
 7    asked.
 8    MR. TREEBY:
 9         Not at all.
10    MR. JOANEN:
11         It very much is so.  And that
12    will determined by somebody else.
13    This is not an opportunity for you to
14    grandstand.  You asked him a question,
15    under Rule 30 he gives an answer.
16    This is a deposition upon oral
17    questioning.
18    MR. TREEBY:
19         You finished?
20    MR. JOANEN:
21         I will be when I'm finished.  I'm
22    making my objection.  I'm entitled to
23    do so.
24    MR. TREEBY:
25         No, you're not entitled to make a
```

Page 26

```
 1    speaking objection.
 2    MR. JOANEN:
 3         Sure I am.  I'm making a record
 4    under Rule 30.
 5    MR. TREEBY:
 6         You are not allowed to make a
 7    speaking objection, Scott, and you
 8    well know it.
 9    MR. JOANEN:
10         I am preserving my rights under
11    Rule 30.
12    MR. TREEBY:
13         Make an objection as to form.  Do
14    it right.
15    MR. JOANEN:
16         No.  There's other reasons to
17    make objections, and I'm doing so,
18    under Rule 30.
19    MR. TREEBY:
20         You don't have a right to make a
21    speaking objection.
22    MR. JOANEN:
23         I believe I do, and so I've done
24    so.
25    MR. TREEBY:
```

Page 27

```
 1         We disagree.  And we may have to
 2    solve that with the magistrate if it
 3    gets to be out of hand.
 4    EXAMINATION BY MR. TREEBY:
 5    Q.  Okay.  Dr. Bea, I was simply asking
 6    whether you used the site specific coefficient
 7    of volume change M sub V that a scientist would
 8    compute from the storage coefficient determined
 9    by Rogers and Pope for the site specific clay
10    materials existing at the EBIA.  Did you or not
11    use the actual coefficient that could have been
12    calculated from the work they did?  That's a
13    yes or no.
14    A.  Well, I used the coefficient --
15    storage coefficient to determine M sub V.  That
16    is not the M sub V for the approach that I used
17    to determine M sub V from the field results.
18    Q.  I'm trying to find out if you used the
19    M sub V that you've already testified one could
20    compute from storage coefficient at the site
21    specific materials in the EBIA, whether you
22    used that or something else.
23         Isn't it true you did not use that
24    site specific coefficient of volume change that
25    could have been computed from storage
```

Page 28

```
 1    coefficient given by Pope and Rogers?
 2    MR. JOANEN:
 3         Object to the form.
 4         If you understand the question,
 5    you can answer.
 6    EXAMINATION BY MR. TREEBY:
 7    Q.  That's a yes or no.
 8         Did you use it or not?  You've
 9    answered in your prior deposition, but I'm
10    trying to establish it here in one place.
11    A.  Well, I'm trying to establish that use
12    has many meanings.  Use it in the sense of
13    understanding that you could determine M sub V
14    in that manner?  Yes, sir.  I did.  But that is
15    not the approach I used to determine M sub V
16    for the hydraulic conductivity pressure
17    analyses I performed.
18    Q.  We're going to get there.  But I'm
19    still trying to find out, and I think it's a
20    yes or no answer -- I'll try to make it simple
21    so that it doesn't confuse you.  I don't think
22    you're confused at all, but apparently one of
23    us is.  Maybe it's me.  Let's take it a step at
24    a time.
25         You agree that Pope and Rogers
```

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

**ROBERT G. BEA, PH.D.**                                      **April 16, 2012**

Page 29

1  determined a storage coefficient at the south
2  EBIA site; right?
3      A.  Yes.
4      Q.  You agree that that storage
5  coefficient using standard formulas that
6  scientists use all the time could be used to
7  calculate the coefficient of volume change,
8  M sub V?
9      A.  Yes.
10     Q.  You did not do that; isn't that true?
11     A.  That's correct.
12     Q.  And you did not use what that
13  computation would have given in the flow
14  analysis that Cobos-Roa did, isn't that true?
15     A.  That's correct.
16     Q.  I'm sure it was my questions that
17  caused the confusion, Dr. Bea, but we'll see if
18  I can do better.
19         I will ask you to assume, since you
20  haven't done that computation -- right?
21     A.  Have not done what --
22     Q.  The computation to take the storage
23  coefficient that Rogers and Pope developed and
24  computed it to determine what the coefficient
25  of volume change would be.  Isn't that correct?

Page 30

1  You've not done that computation?
2      A.  That is incorrect.
3      Q.  Well, what is the result of that
4  computation?
5      A.  Well, a number close to 1 times 10 to
6  the -5 per pounds per square foot.
7      Q.  Okay.  Well, if we calculate 2 times
8  10 to the -5, 1 over psf, would you disagree
9  with that?
10     A.  No.
11     Q.  So if that is the correct assumption
12  for M sub V for the site specific materials at
13  the EBIA south pump site -- if that was the
14  correct assumption -- I'm asking you -- the
15  flow analyses using SEEP/W would not result in
16  uplift pressures that indicate any danger to
17  the flood wall, isn't that right?
18     A.  That's correct.  That's been the
19  basis, consistently, for the analyses performed
20  by Dr. Silva-Tulla, Dr. Tim Stark, Dr. Brandon,
21  and Dr. Marr.  Those analyses based on that
22  M sub V show no significant transfer of fluid
23  and pressure.
24     Q.  Okay.  You know, do you not, that the
25  SEEP/W analyses you had the grad student run

Page 31

1  for you produced as an output pore pressures
2  for your various cross-section cases, isn't
3  that right?
4      A.  That's correct.
5      Q.  And you also know, do you not, that if
6  you had used a higher M sub V value in
7  Cobos-Roa 's SEEP/W runs, the pore pressures
8  would have been lower during the elapsed time
9  for the Katrina storm surge, isn't that right?
10     A.  Correct.
11     Q.  And those pore pressures that were
12  received as outputs from SEEP/W were an
13  important input to your limit equilibrium slope
14  stability analyses computed by SLOPE/W for each
15  of the cross-section cases in your reports,
16  isn't that correct?
17     A.  Yes.
18     Q.  And you would agree, would you not,
19  that if the pore pressures that were input into
20  Cobos-Roa 's SLOPE/W computer model runs were
21  too high -- were determined to be too high, it
22  would have an effect on your limited
23  equilibrium slope stability analyses, right?
24         (Whereupon Mr. Bruno entered the
25  deposition in progress.)

Page 32

1      A.  Please restate your question.  I
2  became lost in it.
3  EXAMINATION BY MR. TREEBY:
4      Q.  Okay.  I apologize.  Let me see if we
5  can break it down.
6         We have established that Cobos-Roa 's
7  running of the SEEP/W analysis produced pore
8  pressures.
9      A.  Correct.
10     Q.  You believe those pore pressures are
11  correct, and that's a matter that we don't
12  agree with.  Okay?  Take that as a given.  But
13  if those pore pressures had been determined
14  using a lower M sub V in the flow analysis --
15  I'm sorry.  Strike that.  I misspoke.  If the
16  higher compressibility figures had been used,
17  that we just discussed, in the flow analysis,
18  it would have produced lower pore pressures;
19  right?
20     A.  That's correct this time.
21     Q.  And if those lower pore pressures were
22  input into the SLOPE/W model runs, it would
23  have an effect on those stability analyses,
24  right?
25     A.  Correct.

8  (Pages 29 to 32)

**JOHNS, PENDLETON COURT REPORTERS**              **504 219-1993**

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 33

1    Q.  And the effect would be to cause the
2  factor of safety to be safer.  Right?
3        MR. JOANEN:
4            Object to the form.
5    A.  The use of "safeter" with --
6  EXAMINATION BY MR. TREEBY:
7    Q.  Well --
8    A.  -- a factor of safety is --
9    Q.  Higher.  The factor of safety would be
10  higher.
11    A.  Correct.
12    Q.  Okay.  I was trying to be a forensic
13  engineer there for a minute.  Forgive me.
14        So, if -- let's walk through this one
15  more time so that we're established.  If the
16  M sub V input into your flow analysis had been
17  higher, in other words, it would have been the
18  numbers we talked about and that you told me
19  you had come up with, we agreed on, 2 times 10
20  to the -5, 1 over psf, if that M sub V had been
21  put into the flow analysis, it would have
22  produced lower pore pressures.  Right?
23    A.  Yes, and hence --
24    Q.  Excuse me.
25    A.  Well, that's what the defense experts

Page 34

1  have consistently shown.
2    Q.  Right.
3    A.  But we're performing different
4  analyses.  The defense experts are performing
5  what is officially, if I could use that term,
6  defined as nonsteady flow, unsaturated flow
7  analyses.
8        The analyses I have been performing
9  have been -- and I'm referring specifically to
10  the buried swamp-marsh deposits, and I'll call
11  them deposits from this point forward -- I have
12  chosen, with reasons, to use steady flow
13  analysis, unsaturated conditions that require
14  to satisfy those conditions no significant
15  changes in void ratio and/or saturation.  I
16  have based M sub V not on storage coefficient
17  but, rather, on the dilatational wave velocity
18  that is sensitive to the water compressibility.
19  That's what discriminates the difference
20  between the two sets of analyses.  We are
21  working different problems.
22    Q.  Okay.  You made an interesting
23  statement.  You said -- maybe you misspoke.
24  You said that Dr. -- I'm not going to talk
25  about the other experts.  Dr. Silva is the

Page 35

1  expert that we have put forward in this case.
2  You have said that he used unsaturated flow
3  analyses?  Is that what your testimony is under
4  oath?
5    A.  No.
6    Q.  Oh.
7    A.  I'm referring to the M sub V
8  characteristics.
9    Q.  Did he use unsaturated flow analyses
10  or saturated flow analyses?
11        MR. JOANEN:
12            Object to the form.  By that, you
13            mean Dr. Silva-Tulla?
14        MR. TREEBY:
15            Yes.
16    A.  And what materials are you referring
17  to?  The reason for my question --
18  EXAMINATION BY MR. TREEBY:
19    Q.  I'll answer you.  I don't need the
20  reason for your --
21        MR. BRUNO:
22            Whoa, whoa, whoa.  Wait.  Slow
23            down, Bill.
24        MR. TREEBY:
25            No, he's not asking questions.

Page 36

1        MR. BRUNO:
2            Slow own, Bill.
3        MR. TREEBY:
4            No, he's not asking questions.
5        MR. BRUNO:
6            I know, but --
7        MR. TREEBY:
8            He's not asking questions.
9        MR. BRUNO:
10            Just keep it light.
11  EXAMINATION BY MR. TREEBY:
12    Q.  I'm talking about the organic clays.
13    A.  Thank you.  That's exactly the
14  definition that I needed, sir.
15    Q.  And they were treated in Dr. Silva 's
16  flow analyses as saturated.  Right?
17    A.  Correct.
18    Q.  Not unsaturated.
19    A.  Correct.
20    Q.  Okay.  I don't want any confusion
21  here.
22        I show you document that we have
23  marked Bea Exhibit number 46 which is a range
24  of values for the coefficient of volume change,
25  M sub V, of various porous materials in the

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 37

```
 1   British units, and this is adapted from
 2   Domenico and Mifflin in '65, and Vennard &
 3   Street in 1982.
 4        Are you familiar with those
 5   references?
 6        (Bea Exhibit 46 was marked for
 7   identification and is attached hereto.)
 8   A. Yes.
 9   EXAMINATION BY MR. TREEBY:
10   Q. I mean, we have the book from which
11   this was adapted and -- I mean, we have the
12   pages from the book from which this was adapted
13   if you have any desire to look at that based on
14   my question, but we'll see.
15        This is a plot that was adapted from
16   Domenico and Mifflin, 1965, and Vennard &
17   Street, 1982, that shows the range of values of
18   the coefficient of volume change M sub V for
19   various types of soil and rock.
20        Do you understand this plot?
21   A. Well, I understand the ordinate and
22   abscissa. I don't understand the basis for the
23   determination of those points. I would have to
24   review the references cited to understand those
25   data points.
```

Page 38

```
 1   Q. Okay. So let me see if I understand
 2   your response. I may not be. There is, on the
 3   left-hand side, a coefficient of volume change
 4   stated in M sub V, 1 over psf in a range from
 5   10 to the -3 up to 10 to the -10 --
 6   A. Correct.
 7   Q. -- 1 over psf. And then there are
 8   various materials along the bottom scale. And
 9   you understand the design is to show the range
10   of M sub V for those materials is between those
11   dots. You do understand that's what the
12   intention of the plot is.
13   A. Yes, but I don't know how those dots
14   are being determined. For example, are the
15   dots being determined under drained or
16   undrained conditions? Can you tell me?
17   Q. I think I will be able to once
18   Dr. Silva tells me.
19   A. Okay.
20   Q. Under drained conditions.
21        Do you understand the plot?
22   A. No, not yet.
23   Q. Okay. What else do you need to know?
24   A. Are the materials saturated?
25   Q. Yes.
```

Page 39

```
 1   A. And they're being tested under drained
 2   conditions; is that correct?
 3        MR. JOANEN:
 4        Well, I'm going to object to this
 5   line of questioning where you present
 6   an exhibit, the witness has indicated
 7   that he doesn't have a full
 8   understanding of the exhibit because
 9   all the rest of the materials have
10   haven't been provided to him --
11        MR. TREEBY:
12        Let's get the magistrate. This
13   is going to stop. This is going to
14   stop, Scott.
15        MR. JOANEN:
16        Get him on the line. I'm going
17   to finish my objection.
18        MR. TREEBY:
19        Please do so we can read it to
20   the magistrate.
21        MR. JOANEN:
22        I'm objecting to the line of
23   questioning because now the witness is
24   having to ask questions as to what
25   this means. I think that's
```

Page 40

```
 1   inappropriate for a deposition on oral
 2   examination. That's my point.
 3        MR. SCHULTZ:
 4        And under 30(C)(2) he's required
 5   to object to the manner of taking the
 6   deposition or he waives it, which is
 7   what he is doing.
 8        MR. TREEBY:
 9        Wait, now. Who's going to defend
10   the deposition? Am I going to have
11   triple team? Joe, you want to weigh
12   in before we get the magistrate on the
13   phone?
14        MR. BRUNO:
15        I'm here for your wife and
16   family. They told me make sure your
17   blood pressure is contained.
18        MR. TREEBY:
19        It is.
20        MR. BRUNO:
21        I don't know. I'm here to make
22   sure that it is.
23        MR. TREEBY:
24        So do you want to defend the
25   witness, too?
```

10  (Pages 37 to 40)

JOHNS, PENDLETON COURT REPORTERS          504 219-1993

**ROBERT G. BEA, PH.D.**                                    **April 16, 2012**

1    MR. BRUNO:
2        I'm not defending the witness.
3    I'm defending the prosecution --
4    MR. TREEBY:
5        Well, Matt Schultz decided to
6    weigh in, so I want to --
7    MR. SCHULTZ:
8        I'm not defending the witness,
9    I'm just telling you why you're wrong.
10   MR. BRUNO:
11       Do you think you're being
12   overwhelmed?
13   MR. TREEBY:
14       No.  I just think one lawyer --
15   MR. BRUNO:
16       Bill, relax.  He'll whisper it in
17   next time.  All right?  It's no big
18   deal.  You want to call the
19   magistrate?  Let's do it.  I don't
20   care.  I could care less.
21   MR. TREEBY:
22       Are we going to continue to do
23   this kind of stuff, Scott?  Because I
24   don't want to be spending --
25   MR. BRUNO:

1        Are we on the record?
2    MR. TREEBY:
3        Yeah, we're on the record.
4    MR. BRUNO:
5        Well, then I will weigh in,
6    because he has every right to make any
7    objection he wants, Bill.  Come on.
8    We're going to fight about how he
9    makes an objection?
10   MR. TREEBY:
11       We had this fight last week in
12   San Francisco with Andy Owen, and the
13   magistrate got on the phone and said
14   quit doing that.
15   MR. BRUNO:
16       No.  That's not what happened.
17   MR. JOANEN:
18       I read the deposition and that's
19   not what it says.  I am preserving the
20   right pursuant to Rule 30, which I'm
21   allowed to do.
22   EXAMINATION BY MR. TREEBY:
23       Q.  Okay.  What else don't you understand
24   about the plot?
25       A.  I don't understand how the, the data

1    points are derived.
2        Q.  You mean you don't understand the
3    source from which they're derived?
4        A.  I don't understand how they were
5    derived.  These are data points shown on a
6    plot.
7        Q.  Right.
8        A.  The derivation of those data points is
9    crucial to the interpretation of what's being
10   shown on the plot.
11       Q.  Okay.  We'll go ahead and mark this
12   document.
13   MR. TREEBY:
14       We're going to come back to this
15   so we don't waste time.  We're going
16   to come back to this.  We'll get all
17   this together and you can look at the
18   source maybe even during a break.
19   EXAMINATION BY MR. TREEBY:
20       Q.  I believe you have testified in this
21   case that the organic clays were under
22   undrained conditions during the Katrina storm
23   surge.  Is that not correct?
24       A.  Please define the context application
25   of the term you used, undrained.  Undrained to

1    evaluate hydraulic conductivity, or undrained
2    to evaluate soil shear strengths?
3        Q.  Are you saying you don't understand my
4    question?
5        A.  That's correct.  That's correct.
6        Q.  Okay.  You're saying -- that's fine.
7    If don't understand the question, that's fine.
8        For a given value of M sub V and
9    permeability, isn't it true that you can
10   compute the value of the coefficient of
11   compressibility C sub V using a standard
12   formula familiar to geotechnical engineers?
13       A.  Yes.
14       Q.  Do you know that formula?
15       A.  I don't have it in my memory, but I
16   have it in my references.
17       Q.  Well, using that standard formula, and
18   using your M sub V value of 1 times 10 to the
19   minus 9, 1 over psf, and a permeability of 1
20   times 10 to -5 centimeters per second,
21   Dr. Silva has computed -- I assume you haven't
22   computed the C sub V value that could result.
23   Right?
24       A.  Well, it's because 10 to the -9 per
25   psf and C sub V do not belong with each other.

11 (Pages 41 to 44)

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 45

1    Q.  Have you computed it?  Have you made
2  the computation?  You said it can be done.
3        Have you done it?
4      MR. JOANEN:
5          Object to the form.
6      A.  Yes.
7  EXAMINATION BY MR. TREEBY:
8      Q.  What did it result in?
9      A.  It resulted in a very low C sub V,
10  meaning that the material is behaving
11  fundamentally as an incompressible material.
12      Q.  No.  Have you done -- we got lost
13  there, so let's start over.
14        You have told me for a given value of
15  M sub V and permeability, given values for both
16  of those, you can compute the value of the
17  coefficient of compressibility, C sub V, using
18  a standard formula familiar to geotechnical
19  engineers.  You said you knew that.
20      A.  Yes.
21      Q.  Using that standard formula, have you,
22  up till now, using your M sub V of 1 times 10
23  to the -9, 1 over psf, and permeability of 1
24  times 10 to the minus centimeters per second,
25  computed a C sub V value?

Page 46

1        Have you done that computation?
2      A.  I think I have.  But what is making me
3  falter, I don't recall I had to use a specified
4  value of permeability.  I would need to refer
5  to the formulation that you have been
6  discussing in order to appropriately respond to
7  your question.
8      Q.  I'm not really asking you to do it,
9  but I will tell you, and if you want to write
10  it down, the formula, it's in Lambe & Whitman,
11  Page 407.  It's Equation 27.3.  And the
12  formula, you want if you want to write it
13  down -- you want me to give you my book or do
14  you want to look it up yourself?
15      A.  Page and equation number, please.
16      Q.  It's Equation number 27.3 on Page 407.
17      A.  I don't have 407.
18      Q.  Here's the formula:  C sub V equals --
19      A.  May I see it, please?
20      Q.  Oh, okay.  Okay.  Let's go ahead and
21  mark this page as Exhibit 47.  (Tendering.)
22  And I believe you'll find it on the back page.
23  We didn't copy the whole book, but it's on the
24  back page, 27.3.  We've done the calculation,
25  but if you want to do it yourself, that's fine,

Page 47

1  too.
2        (Bea Exhibit 47 was marked for
3  identification and is attached hereto.)
4      A.  Yes.  Thank you.
5  EXAMINATION BY MR. TREEBY:
6      Q.  Okay.  Dr. Silva has done this
7  calculation.  I can tell you it would take a
8  little time to do the computation.  Right?
9      A.  Yes.
10      Q.  Okay.  He has done this computation,
11  and he computed a C sub V value equal to
12  165 million feet per year, or
13  16,500,000 centimeters squared per hour.
14        Does that sound look it might be in
15  the range of possibility?
16      A.  Yes.
17      Q.  Do you have any reason to disagree
18  with that?
19      A.  I'm sure Dr. Silva-Tulla has
20  calculated it correctly and checked his
21  calculation.
22      Q.  I show you a document we're marking
23  Bea Exhibit number 48.  (Tendering.)  These are
24  some Pages -- and particularly, I want you to
25  look at Figure 3.7 from the book Soil Strength

Page 48

1  and Slope Stability by Duncan and Wright.  And
2  that figure is on the second page of this
3  exhibit.
4        Are you familiar with Duncan & Wright?
5        (Bea Exhibit 48 was marked for
6  identification and is attached hereto.)
7      A.  Yes.  This figure is in Dr. Brandon 's
8  expert report, I recall.
9  EXAMINATION BY MR. TREEBY:
10      Q.  Okay.  Would you tell us where on this
11  figure your model of the organic clay would
12  plot in terms of C sub V?
13      A.  Rather than absorb your time doing
14  that, could you supply me with the calculation
15  that would convert the M sub V that I've used
16  to an appropriate characteristic on this plot?
17  I can't do the conversions in my head, here.
18      Q.  I'm asking you to assume that -- I'm
19  dealing with the number that we've asked you to
20  assume, which is 165 million feet per year, or
21  16,500,000 centimeters squared per hour.  Okay?
22  Now, I'm asking you where on this -- where on
23  this plot would you put -- where on this figure
24  would you put the organic clay in terms of
25  C sub V?  We have sands and gravels, we have

12 (Pages 45 to 48)

ROBERT G. BEA, PH.D.                                        April 16, 2012

1  silts, we have clays.
2         Where would you put it?
3     A.  Well, I would put it in a category
4  that would be fundamentally very, very low
5  permeability.
6     Q.  And where would that be?  I mean, just
7  in terms of descriptives, would it be a clay, a
8  silt, between clay and silt?  Where would it
9  be?  It wouldn't be sands and gravels, right?
10       (Brief interruption.)
11  EXAMINATION BY MR. TREEBY:
12    Q.  Do you remember the question?
13    A.  No.  Sorry.
14    Q.  Where would the organic clays fall on
15  this plot?
16    A.  What's the drainage path lengths you
17  wish to assume?
18    Q.  Assume a hundred feet.
19    A.  A hundred feet.
20    Q.  Just assume the maximum that's on
21  there.
22    A.  Well, I would assume it would plot in
23  the long time period of years, meaning behaving
24  as a very impermeable material, or the upper
25  right-hand corner.

1        (Brief recess.)
2  EXAMINATION BY MR. TREEBY:
3     Q.  Okay.  We're still looking at Bea
4  exhibit number 48.  And you have indicated,
5  Dr. Bea, that you would plot the C sub V for
6  your soils in the East Bank Industrial Area
7  somewhere up in the right-hand corner -- upper
8  corner of this plot.
9        Is that what you're saying?
10    A.  Well --
11    Q.  Isn't that what you said?  I'm sorry.
12  I'll read back your answer.
13    A.  Yes.  Please.
14    Q.  Okay.  Where would the organic clays
15  fall on this plot?  And I told you to assume
16  100 feet.  And you say, I would assume it
17  would -- here's your answer:  It would plot in
18  the very long period of years, meaning behaving
19  as very impermeable material, or the upper
20  right-hand corner.
21    A.  Correct.
22    Q.  Okay.  That's what I thought.
23        And that would mean 10 feet squared
24  per year, or 1 centimeter squared per hour.
25  Right?

1     A.  Well, I'm sure we could determine that
2  and plot it.
3     Q.  Well, isn't that --
4     A.  I'd have to do the calculation, sir.
5     Q.  No, but on this plot, isn't the top
6  line C sub V equals 1 centimeter squared per
7  hour equals 10 feet squared per year?
8     A.  Yes.  That's right.  And the top line
9  is labeled 10,000 years.
10    Q.  And that's very different, is it not,
11  than the C sub V that we calculated, that you
12  assumed Dr. Silva was right about, which is
13  16,500,000 centimeters squared per hour.
14    A.  Well, you can plot that point that
15  Dr. Silva-Tulla determined on this plot and
16  save all of this back and forth --
17    Q.  Well --
18    A.  -- and then we'll know.
19    Q.  Well, but that's at the opposite end
20  of the scale.  Can you explain that
21  inconsistency?
22    A.  Well, I explained the inconsistency in
23  the sense that I did not use C sub Vs or the
24  premised M sub Vs that's this questioning is
25  focused on.  I used very different values.  And

1  that led to my explanation to you that what
2  I've come to understand is we are indeed
3  working different problems.
4        My approach is based on
5  incompressible, undrained flow in which the
6  compressibility characteristics of the buried
7  swamp-marsh deposits is based on the
8  compressibility characteristics of the pore
9  fluid.  The M sub Vs and associated C sub Vs
10  that you are focusing on here presumes that the
11  buried swamp-marsh deposit compressibility is
12  determined by the pore -- pardon me, by the
13  deposit skeleton grains.  Those are two
14  different things intended for two different
15  kinds of analyses.
16    Q.  There was some confusion regarding
17  which of the two reports we received from your
18  attorneys as your rebuttal report, and I
19  believe that confusion has now been resolved
20  and we have been provided with a third document
21  we just received on April 12, which is the
22  correct version of the final report.  It has a
23  date on it of April 3rd, and I'm marking what I
24  believe to be the final corrected version of
25  the final report as Bea Exhibit number 49.  And

JOHNS, PENDLETON COURT REPORTERS                          504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

---

Page 53

1 I want you to -- I'm going to give you a copy
2 of that.
3          And would you quickly, if you can,
4 review this document to make sure it's the
5 corrected version of your final rebuttal
6 report.
7          (Bea Exhibit 49 was marked for
8 identification and is attached hereto.)
9     A.  I don't think that's possible to
10 quickly review the document that's 144 pages.
11 EXAMINATION BY MR. TREEBY:
12    Q.  I'm not asking you to, but there were
13 only a couple of pages -- I'm told there were
14 only a couple of pages that were implicated.
15 One I believe was Paragraph 23 --
16    MR. JOANEN:
17         Um --
18    MR. TREEBY:
19         I don't need to go into this.
20 I'm just trying -- or maybe counsel
21 can stipulate this is it.
22    MR. JOANEN:
23         I don't know what you produced to
24         him, other than, as I understand it,
25         what you're referring to as

---

Page 54

1         Paragraph 32, there was a correction,
2 and then flipping to Page 142 there
3 were corrections.
4    MR. TREEBY:
5         No, there was another one, too.
6 But, you know, Paragraph 32 was one of
7 the paragraphs implicated.  And I
8 still see it, there's actually a typo
9 in that.  And the other one was
10 Paragraph -- I shouldn't have left the
11 e-mail up on my desk.
12 EXAMINATION BY MR. TREEBY:
13    Q.  Well, I'm going to have to ask you to
14 trust me, this is your final report, then.  And
15 I represent to you that this was sent to us
16 over an e-mail that made two corrections.
17 There was also a formatting issue which I could
18 care less about on Page 142, I believe it was.
19         But look at Paragraph 32 and tell me
20 if this is the correct paragraph, 32 on Page
21 25.
22    A.  Oh, 32 is correct.
23    Q.  Okay.  Now, let me clear up something
24 we found in your reliance list to your April
25 3rd report of your -- that's been called your

---

Page 55

1 rebuttal report.  And we're marking this as Bea
2 Exhibit 50.  (Tendering.)  This is what we were
3 given, and I would ask you to turn to Page 7.
4         Okay.  Page 7, if you go down -- are
5 you on Page 7?
6         (Bea Exhibit 50 was marked for
7 identification and is attached hereto.)
8    A.  Yes, sir.
9 EXAMINATION BY MR. TREEBY:
10    Q.  From the bottom, count up 8 and 9, you
11 see North Breach Case 1, moving excavation,
12 north breach Case 2, moving excavation,
13 underscore 2?
14    A.  Yes.
15    Q.  You see that?
16    A.  Yes.
17    Q.  We opened all of the pdfs in your
18 reliance materials, and there's nothing we can
19 find with that description.  Can you please
20 tell us what is meant by those entries, moving
21 excavation?
22    A.  I think this was the studies we were
23 conducting to determine the effect of changing
24 the position of the excavation on the EBIA side
25 of the I-wall.

---

Page 56

1    Q.  Can you explain to me why there is
2 no -- those studies are not in your reliance
3 materials?
4    A.  I thought they were.
5    MR. TREEBY:
6         Okay.  We would ask counsel,
7 please produce those reliance
8 materials.  And we are going to have
9 to keep this open, because I now know
10 apparently what's going on, and we
11 have --
12    MR. GILBERT:
13         I'm going to I object to this.
14 There's no reason for all that.
15    MR. TREEBY:
16         Wait.  Wait.  Wait.
17    MR. JOANEN:
18         This is questions and answers
19 under Rule 26 and Rule 30.
20    MR. TREEBY:
21         I realize what he's done, based
22 on what he's just said, that this is
23 something we are very interested in
24 and want to examine him about -- wait
25 a minute -- and so I want those

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                        April 16, 2012

1    reliance materials, Scott.
2        MR. JOANEN:
3            And you're entitled to them --
4        MR. TREEBY:
5            Thank you.
6        MR. JOANEN:
7            -- I assume.  You asked him
8    whether you had them.  He said he
9    believes that you do have them.
10       MR. TREEBY:
11           We don't.
12       MR. JOANEN:
13           We're taking your assertion that
14   you don't have them.  We'll look into
15   that.  You don't get to badger the
16   witness about this, though.
17       MR. TREEBY:
18           That's right.
19   EXAMINATION BY MR. TREEBY:
20       Q.  Page 8.
21       A.  Mr. Treeby, I don't have a recall of
22   the final, but this was the focus of one of the
23   sets of hand calculations we discussed during
24   my last deposition, located to the right-hand
25   side of my desk at my home in Moraga.  I

1    have -- as soon as I returned, as you
2    requested, I photocopied those and included
3    them in the reliance material, and, in
4    addition, in my ongoing analysis report
5    submitted I think it's April 11th.
6        MR. BRUNO:
7            Tell me that again.  I'll go make
8        some calls.
9        MR. TREEBY:
10           Just a minute.  Let me finish.
11   EXAMINATION BY MR. TREEBY:
12       Q.  Page 8, five and six down from the top
13   of the page on the list, South Breach Case 1,
14   moving excavation underscore, 2; South Breach
15   Case 1 moving excavation.  Is your testimony
16   the same with regard to those entries?
17       A.  Yes.
18       Q.  Again, we've looked through every pdf,
19   don't see anything by that description.  So we
20   need to have those materials.  And if you're
21   there, we need to have you tell us what
22   description they might have, because there's
23   nothing by those descriptions.
24           Turn to Page 3 of your reported which
25   we've marked Bea Exhibit 49.

1            In Paragraph 5, you refer to the 3D
2    graphic GIS models that you included as Figures
3    1 through 3 in this report.  Right?
4        A.  Correct.
5        Q.  These are the same so-called Swiss
6    cheese models that you told us during your last
7    deposition were being prepared by Rune
8    Storesund and a recently hired GIS expert;
9    right?
10       A.  That's correct.  First, let me address
11   this cute phrase you have invented that you
12   label Swiss cheese.  I'm sure you would agree
13   with me that this cute phrase is not a
14   scientific term.  Isn't that right?
15       MR. JOANEN:
16           I'm going to object to the form
17       of the question.
18       A.  Well, it is for people who make
19   cheese.
20   EXAMINATION BY MR. TREEBY:
21       Q.  But not for scientists who work in
22   geotechnical work.  That's a scientific term,
23   is it?
24       A.  It's meant to be a descriptive term.
25       Q.  Is it scientific or not?

1        A.  Well, I've used it in --
2        Q.  Oh, I know you have.  And we're going
3    to talk about that.
4            Is it scientific?
5        A.  I see nothing in the term that's not
6    scientific.
7        Q.  You invented that phrase for this
8    case; right?
9        A.  Well, the phrase existed before I used
10   it in this case.
11       Q.  Am I correct to assume this term is an
12   effort by you to, quote, convey technical
13   information into litigation with the
14   communication skills to present complex facts
15   in layman's terms?
16       A.  Correct.  Thank you, sir.
17       Q.  That is your idea, isn't it, to treat
18   the judge in this case as a layman?  Right?
19       A.  Well, to treat the judge as a layman
20   in the technical elements that we're dealing
21   with so that he can understand those technical
22   elements and reach a proper judgment.
23       Q.  And you thought you needed to use the
24   term Swiss cheese in order to bring the complex
25   facts in this case down to his level.  Right?

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                        April 16, 2012

Page 61

1    A.  Correct.
2        MR. JOANEN:
3            Object to the form.
4    EXAMINATION BY MR. TREEBY:
5    Q.  That's what a forensic engineer does,
6    according to you and M.D. Barrentine; isn't
7    that right?
8    A.  I don't bring communications down.  I
9    bring communications up.
10   Q.  Do you know the name of the GIS expert
11   that Dr. Storesund hired to help him with the
12   so-called Swiss cheese model?
13   A.  No, I do not.
14   Q.  You still don't have his name?
15   A.  No, I don't.
16   Q.  So we're not going to be told who did
17   these GIS models?
18       MR. JOANEN:
19           Object to the form of the
20           question.
21   A.  Well, I can't tell you.  I don't know.
22   EXAMINATION BY MR. TREEBY:
23   Q.  Do you know what company he's with?
24   A.  No.
25   Q.  Do you know when he was hired?

Page 62

1    A.  Approximately.
2    Q.  When?
3    A.  It was shortly after my -- shortly
4    before my deposition -- previous deposition.
5    We were working to bring together the
6    information we had developed.  And that push
7    was in direct response to the defense experts'
8    evaluation of site remediation activities on
9    the EBIA site.  So because we were attempting
10   to pull that together quickly, Rune Storesund,
11   Dr. Storesund, had to temporarily hire a
12   qualified geographic information system expert,
13   and he worked until we were able to complete
14   this in time for my rebuttal report.
15   Q.  And you've not met him to this date.
16   Right?
17   A.  Correct.
18   Q.  And you, therefore, don't know his
19   credentials.  Right?
20   A.  That's correct.
21   Q.  At your first deposition you testified
22   that you started collecting data for the 3D
23   graphic GIS models when you began the phase of
24   your project that involved collecting
25   information about WGI 's site work at the EBIA.

Page 63

1    Correct?
2        MR. JOANEN:
3            Object to the form.
4    A.  That's referring to the work done in
5    2011 and 2012.
6    EXAMINATION BY MR. TREEBY:
7    Q.  So are you saying you didn't have any
8    of the WGI information about -- that had been
9    given to plaintiffs counsel in 2008 until 2011?
10   A.  No, not at all.
11   Q.  You're not saying that.
12   A.  That's correct.
13   Q.  So you had that available to you in
14   2008, what Washington Group International
15   produced with respect to its work.
16   A.  Well, personally, I didn't.  It
17   existed in cardboard boxes here in New Orleans.
18   Q.  It was available to you; right?
19   A.  I certainly could have come here and
20   began to review of that information, but I did
21   not.
22   Q.  But you weren't prohibited from it by
23   the plaintiffs' lawyer, I take it.
24   A.  Absolutely not.
25   Q.  Okay.  So that material for the 3D

Page 64

1    graphic GIS models was available since that
2    date when it was produced in 2008.  Isn't that
3    right?
4    A.  Yes.  And that was a portion of the
5    information that Mr. Chad Morris used in our
6    GIS development during that time frame.
7    Q.  But Dr. Storesund and his new GIS
8    expert didn't actually begin putting together
9    the 3D graphic GIS model until shortly before
10   your prior deposition March 27 and 28.  Is that
11   right?
12   A.  Well, no.  They had been accumulating
13   the information since we started this phase of
14   our work.  They began the formal development of
15   the illustrations included in my report to
16   directly respond to comparable graphics that
17   had been produced by the defense experts.
18   Those graphics are intended for use as
19   demonstratives during the trial, as well.
20   Q.  So when did Dr. Storesund and the new
21   GIS expert actually begin putting the 3D
22   graphic GIS model together?
23   A.  Well, Dr. Storesund began that effort
24   when he agreed to become a part of this phase
25   of the work.  That was an ongoing process

16 (Pages 61 to 64)

ROBERT G. BEA, PH.D.                                   April 16, 2012

Page 65

1    during 2011 and 2012.  The additional person
2    power to assist him was added just before my
3    deposition here.
4        Q.  Did you always intend to create the 3D
5    graphic GIS models?
6        A.  Yes.
7        Q.  You state in Paragraph 5 of your
8    report that the 3D graphic models were
9    developed based on, quote, documentation
10   obtained from the U.S. Army Corps of Engineers
11   and Washington Group International that was
12   provided through a sequence of document
13   productions from the U.S. Department of
14   Justice.
15       Do you see that section?
16       A.  Yes, sir.
17       Q.  When was this documentation obtained
18   from the U.S. Department of Justice first made
19   available to you?
20       A.  Well, it's been, um -- coming
21   available in a long series of transmissions
22   from the Department of Justice to the legal
23   team, and then there's another step after it's
24   been obtained by the plaintiffs' legal team for
25   it to reach myself and Dr. Storesund.  So it's

Page 66

1    a whole series of productions.
2        Q.  Is it your position that before this
3    documentation was produced by the Department of
4    Justice that the information you needed to
5    create this GIS model was not available to you
6    from any other sources?
7        MR. JOANEN:
8            Object to the form.
9        A.  Please repeat your question, sir.
10   EXAMINATION BY MR. TREEBY:
11       Q.  Is it your position that before this
12   documentation was produced by the Department of
13   Justice, the information you needed to create
14   this GIS model was not available to you from
15   any other sources?
16       A.  Well, we had --
17       MR. JOANEN:
18           Same objection.
19       A.  -- a large collection of paper in
20   boxes that resided in, I recall, the office of
21   Mr. Scott Joanen seated across from you, so in
22   that form information was available.  It had
23   nod been digitized and put in a condition that
24   was in fact accessible or usable for this
25   purpose.  Most of the electronic form, not all,

Page 67

1    came through the Department of Justice
2    productions.
3    EXAMINATION BY MR. TREEBY:
4        Q.  Who drafted Paragraph 6 through 16 of
5    your rebuttal report, Pages 4 through 7?
6        A.  Well, I wrote Paragraph 4 on Page --
7        Q.  Pages 4 through 7, paragraphs 6
8    through 16.
9        A.  Dr. Storesund.
10       Q.  In Paragraph 6, Page 4, your report
11   says, these 3D graphic models detail the,
12   quote, general aggregate extents of the
13   excavation work-location, aerial extent, depth,
14   and general type of backfill.
15       Do you see that?
16       A.  Yes, sir.
17       Q.  Who was responsible for determining
18   the general type of backfill that is shown in
19   your 3D model?
20       A.  Dr. Storesund, assisted by Mr. Scott
21   Joanen.  Mr. Andy Owen did receive input
22   assistance from Mr. Chad Morris.  And the
23   person he hired to do the translation to GIS
24   mapping, he did no such determination, so it
25   was primarily being done by Dr. Storesund.  He

Page 68

1    was also assisted by Dr. David Rogers.
2        Q.  Okay.  I want to mark as Exhibit Bea
3    Exhibit 51 a document from your reliance
4    materials dated March 29th, 2012, entitled
5    EBIA-IHNC WGI Excavation Model Narrative by
6    Rune Storesund.
7        Have you seen this is before?
8        (Bea Exhibit 51 was marked for
9    identification and is attached hereto.)
10       A.  I think so.
11   EXAMINATION BY MR. TREEBY:
12       Q.  The first paragraph contains a
13   description of the 3D model that Dr. Storesund
14   with the help of the unknown GIS expert created
15   for your rebuttal report; right?
16       A.  Please repeat your question.
17       Q.  The first paragraph contains a
18   description of the 3D GIS -- or the 3D model
19   that Dr. Storesund created for your rebuttal
20   report; right?
21       A.  Yes, sir.
22       Q.  I'm going to direct you to the first
23   paragraph, second line from the bottom.  Quote:
24   No estimates have been made regarding
25   backfilling method, material, equipment, of the

17 (Pages 65 to 68)

ROBERT G. BEA, PH.D.                                          April 16, 2012

Page 69

1    excavations, close quote.
2         Do you see that?
3    A.  Yes, sir.
4    Q.  This is dated March 29, 2012; right?
5    A.  Yes, sir.
6    Q.  So if Dr. Storesund didn't do it, who
7    identified the general type of material that
8    WGI used to backfill the excavations contained
9    in the so-called Swiss cheese graphics?
10        MR. JOANEN:
11             Object to the form.
12   A.  Dr. Storesund produced all of those
13   graphics.  The identification of the backfill
14   associated with those came through the
15   production of those graphics involving the
16   individuals I cited.
17   EXAMINATION BY MR. TREEBY:
18   Q.  Can you square that with his statement
19   in the first paragraph that we just read?
20   A.  No, I cannot.
21        MR. JOANEN:
22             Let me object to the form of the
23        question.  If you understand it, you
24        can answer it.  If you don't
25        understand it, ask him to restate it,

Page 70

1        please.
2        MR. TREEBY:
3             Come on.  He's answered the
4        question.  I believe the answer is
5        recorded.
6        MR. JOANEN:
7             And I had an objection to it.
8        MR. BRUNO:
9             You just ask it again, Bill.
10       Come on.  Now, stop this.  You want to
11       read back the answer?
12       MR. TREEBY:
13            How many people are you going
14       to --
15       MR. BRUNO:
16            No, you're aggravating me, that's
17       all.
18       MR. TREEBY:
19            If you aggravated, you ought to
20       leave if you can't control yourself.
21       MR. BRUNO:
22            No, you can't control yourself.
23       MR. TREEBY:
24            I'm controlled.
25       MR. BRUNO:

Page 71

1             No, you're not.  You ask a
2        question, and then when he answers
3        it -- I mean didn't answer it, you say
4        he already answered it.  The record is
5        going speak for it.  Let's read it
6        back.
7    EXAMINATION BY MR. TREEBY:
8    Q.  I'm trying to understand how you give
9    Dr. Storesund the responsibility for estimates
10   regarding backfilling methods, material and
11   equipment of the excavations when he says he
12   didn't do them.  Can you answer that?
13        MR. JOANEN:
14             Object to the form of the
15        question.
16   A.  No, I can't.
17   EXAMINATION BY MR. TREEBY:
18   Q.  Okay.  Back to Paragraph 6 of your
19   rebuttal report.  Third line down.  And I'm
20   quoting:  Due to Court 's scheduling and the
21   very tight time constraints associated with
22   writing this rebuttal report, not all pertinent
23   data sources could be incorporated into the 3D
24   GIS graphic models.  I reserve the right to
25   update and modify the 3D GIS graphic models to

Page 72

1    incorporate additional site clearing excavation
2    documentation contained in my rebuttal report
3    expert reliance documents.
4         Did I read that correctly?
5    A.  Correct.
6    Q.  Specifically, what pertinent data
7    sources or parts of pertinent data sources have
8    not been included in the GIS graphic models on
9    Figures 1 through 3?
10   A.  I don't know specifically, but I do
11   know that there is information that
12   Dr. Storesund was continuing to review as of
13   last Friday.
14   Q.  Have you personally reviewed these
15   pertinent data sources that have not been
16   included?
17   A.  No, I have not.
18   Q.  Are those pertinent data sources
19   identified by name, either in your rebuttal
20   report or in your list of reliance materials?
21   A.  I think they're not identified.
22   Q.  So you would agree, then, that the 3D
23   GIS graphic models that are included in your
24   rebuttal report are incomplete.  Is that right?
25        MR. JOANEN:

18 (Pages 69 to 72)

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 73

1       Object to the form.
2       A.  Well, I'm not certain they're
3   incomplete, because of my lack of knowledge
4   concerning the additional information that I
5   referred to here.  Given that additional
6   information has not produced anything
7   significant relative to this topic, the
8   graphics would remain unchanged.
9       Q.  So you can't tell us how many
10  revisions of the GIS models you might plan to
11  make.  Is that right?
12      A.  Well, I hope there are no more
13  revisions.  But I can't assure you that there
14  wouldn't be.  And that's the reason for this
15  statement.
16      Q.  Turn to what you euphemistically
17  called the Swiss cheese graphics on Pages 8
18  through 10.  8, 9 and 10 of your report.
19      Isn't it true that the only difference
20  between Figures 1, 2 and 3 is the underlying
21  aerial photograph?
22      A.  Yes.
23      Q.  Figure 1 is the 2002 aerial, Figure 2
24  is the pre-Katrina 2005 aerial, and Figure 3 is
25  the post-Katrina 2005 aerial.  Right?

Page 74

1       A.  Correct.
2       Q.  The graphic overlays showing
3   excavations are exactly the same in each
4   figure; right?
5       A.  I think that's true.
6       Q.  Okay.  Let's mark the next document
7   Bea Exhibit number 52.  (Tendering.)  I'm
8   handing you an enlarged version of Figure 1
9   from Page 8 of your rebuttal report, because
10  the copy in your report is pretty hard to read.
11      (Bea Exhibit 52 was marked for
12  identification and is attached hereto.)
13      A.  It is.
14  EXAMINATION BY MR. TREEBY:
15      Q.  The top page is exactly as it appears
16  in the report, just bigger.  The subsequent
17  pages are enlargements of specific segments of
18  Figure 1 so that we can read them better.
19  Page 2 of this document, for example, if you
20  would look at it, is an enlarged copy of the
21  Boland Marine graphic as it appears in Figure
22  1.  Does that make sense?
23      A.  Yes, sir.
24      Q.  Okay.  Turn back to, if you would, the
25  page -- just keep that there and turn back to

Page 75

1   Page 4 in your report.  In Paragraph 7, you
2   state, the intent of these 3D graphic models is
3   to show depths of excavations relative to the
4   local ground elevation associated with the
5   excavation.
6       Did I read that right?
7       A.  Yes, sir.
8       Q.  Now, look at, if you would,
9   Exhibit 52, the enlarged version of Figure 1.
10      Could you please explain to me how to
11  determine the depths of each of the excavations
12  on Boland Marine from reading this graphic?
13      A.  No, I can't.
14      Q.  Okay.  And would your answer be the
15  same for each of these blowups?  We've even
16  made them as big as we can.  You can't really
17  tell from these graphics the depths of the
18  excavations when they're supposed to say.
19      A.  I think that's a fair observation.  I
20  had to access the digital versions from
21  Dr. Storesund in order to determine that level
22  of detail.  It was not possible to convert it
23  to 8-1/2 x 11 and maintain that detail.  You
24  need the digital record.
25      Q.  So even with these blown up to 11 x

Page 76

1   17, by each area, you can't tell me what depths
2   anything is supposed to show, is that correct?
3       A.  I can't tell you for certain.  That is
4   correct.  Some of the figures show up, but you
5   need to know precisely what those figures were
6   referring to.
7       Q.  And we can't tell that from your
8   report or its exhibits, right?
9       A.  I think that's fair, yes.
10      Q.  Well, what is the deepest excavation
11  on Boland according to your so-called Swiss
12  cheese model?
13      A.  Well, I'd have to recall from memory,
14  and that's a very dangerous thing to do.  But
15  my memory says we were on the order of 20 feet,
16  25 feet deep at the Boland Marine wedding cake
17  structure they had the cofferdam built around
18  it.
19      Q.  But that's from memory, that's not
20  from this map.
21      A.  That's correct.
22      Q.  And I guess the same would be true if
23  I asked you the same question about Saucer
24  Marine?
25      A.  Correct.

ROBERT G. BEA, PH.D.                                    April 16, 2012

1    Q.  Can you tell me where on the Boland
2  Marine blowup the wedding cake structure is
3  located?  From looking at the map, in other
4  words.
5    A.  I cannot.
6    Q.  Can you tell me where the sewer lift
7  station located on the blowup of the Saucer
8  Marine map?
9    A.  Well, it's located toward the northern
10  end of Saucer.  My memory says approximately
11  300 feet from the I-wall.
12    Q.  No -- yeah.  Thank you.  Maybe I
13  didn't ask -- can you show me where that is on
14  this blowup of the Saucer Marine section in
15  your GIS Swiss cheese model?
16    A.  No, sir, I can't.
17    Q.  Okay.  We couldn't either.
18        Can you show me, on any of these maps
19  that we've blown up as big as we can, at least
20  with our systems here, where the Case 1 and
21  Case 2 cross-section excavations are from your
22  February 1 report?
23        In other words, are they shown on this
24  map?  That's my question.
25    A.  Well, the cross-section at Boland

1  Marine with that deep excavation would be to
2  the west of Surekote Road, which you can see
3  there, and there's a white building in the
4  aerial photograph that this portrayal has been,
5  um -- put on, and my memory says the grid
6  trenching that is shown at that location is
7  close to the location of the Case 1 excavation.
8    Q.  I'm going -- because I can't see that
9  here, could you circle that in red for us and
10  draw an arrow out -- and I assume you're using
11  the blowup of the Boland Marine site.  Right?
12    A.  Yes, sir.  This one.
13    Q.  That's Page 2 of this exhibit.
14    A.  Yes, sir.  (Witness complies.)
15    Q.  Is it your testimony that the red
16  circle you have placed on this map -- and if
17  you would, take that same red pen, and put --
18  draw a line out to the side, to the white side,
19  and write down, Case 1 excavation, if that's
20  what it is.
21    A.  (Witness complies.)
22    Q.  And I believe you testified that the
23  grid trenching that's shown on this map is
24  close to this.  Is that correct?
25    A.  Correct.

1    Q.  Do you know what lines are supposed to
2  be demonstrating grade trenching on that
3  exhibit?
4    A.  I don't recall, no.
5    Q.  Okay.  Is the Case 2 cross-section for
6  the North Breach also on that -- shown on that
7  map anywhere?
8    A.  Well, the Case 2 cross-section isn't
9  shown on the map because it's a vertical cut
10  through the soil, and this is a plan view.  But
11  the cross-section is at the intersection of the
12  1969 I-wall and the 1980 T-wall.  So it's close
13  here to the north end.
14    Q.  Okay.  But what I'm trying to
15  understand is, and I think you've answered,
16  it's not shown on that document?
17    A.  That's correct.
18    Q.  Would the same be true at the south
19  breach for your Case 1 and Case 2?  Look at the
20  Saucer Marine and tell me if the Case 1 and
21  Case 2 cross-sections are shown on that map.
22    A.  Well, I don't even have to look,
23  because the map is a plan view -- aerial view,
24  and the cross-sections are a vertical section
25  that was studied.  And the cross-sections are

1  not shown on the plan view.
2    Q.  Well, but the location of the
3  cross-section isn't shown there either, is it?
4    A.  No, it isn't.
5    Q.  On either the north or South Breach.
6    A.  That's correct.
7    Q.  I understand this is a plan view.
8    A.  Okay.
9    Q.  But you could show the location of the
10  cross-section if you wished.
11    A.  Sure.
12    Q.  But it's not been done.
13    A.  Correct.
14    Q.  On the GIS model.
15    A.  Correct.  For orientation on the GIS
16  model, the location of the breach at the north
17  end, Boland, and similarly at the Saucer site,
18  are identified.
19    Q.  On Paragraph 7, Page 4 of your
20  rebuttal report -- back to your rebuttal
21  report, Exhibit 49 I believe it is.
22    A.  Page, sir?
23    Q.  Page 4, Paragraph 7.  You state, a
24  number of these excavations -- referring to the
25  GIS model -- would have exacerbated the

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 81

1    so-called hydraulic conductivity pressure
2    connections with the underlying saturated high
3    water content swamp-marsh deposit.
4         Do you see that?
5         A.  Yes, sir.
6         Q.  Can you tell me which excavations
7    shown in your GIS model, specifically,
8    exacerbated the hydraulic conductivity pressure
9    connections as you call them?
10        A.  At what location would you like me to
11   respond?
12        Q.  Take the Boland site.
13        A.  And refer to the plan view?
14        Q.  Yes.  That's what I'm talking about,
15   your GIS model.
16        Which ones of those would have
17   exacerbated what you call hydraulic
18   conductivity connections?
19        A.  For Case 1?
20        Q.  Sure.
21        A.  Right.
22        Q.  Yes.  Start with Boland.
23        A.  I have shown here in red and drawn the
24   arrows to the, um -- areas of excavation and
25   backfilling that are shown in the Case 1

Page 82

1    cross-section.
2         Q.  Okay.  And what about Case 2?
3         A.  Case 2 is not shown.  You didn't ask
4    me to.  But it's associated with this corner
5    and is cut across in the east-west direction at
6    that corner.
7         Q.  So why don't you mark an arrow to that
8    with the red pen and call it Case 2
9    excavations.
10        A.  (Witness complies.)  Yes, sir.
11        Q.  Okay.  And I take it from your
12   testimony those are the only excavations that
13   you are referring to when you say -- at the
14   north breach when you say a number of these
15   excavations would have exacerbated the
16   so-called hydraulic conductivity pressure
17   connections with the underlying saturated high
18   water content swamp-marsh deposits.
19        A.  Correct.
20        Q.  Okay.  That's -- and on the south
21   breach, I want you to do the same thing.  Go to
22   the Saucer Marine site and tell me which
23   excavations are included within what you
24   describe as a number of these excavations that
25   would have exacerbated the so-called hydraulic

Page 83

1    conductivity pressure connections with the
2    underlying saturated high water content
3    swamp-marsh deposits.
4         A.  (Witness complies.)
5         Q.  Mark Case 1 excavations and Case 2
6    excavations.
7         A.  Yes, sir.
8         Q.  Okay.  Let me see what you've done.
9         A.  (Tendering.)
10        Q.  The circles that you've placed at the
11   Saucer Marine site are the locations of these
12   excavations that you refer to; is that correct?
13        A.  Referred to where?
14        Q.  When you say on Paragraph 7, Page 4 of
15   your rebuttal report, that a number of these
16   excavations would have exacerbated the
17   so-called hydraulic conductivity pressure
18   connections with the underlying saturated high
19   water content swamp-marsh deposits.
20        A.  And you're referring specifically to
21   the two analytical cross-sections.
22        Q.  No.  I thought we'd gotten this
23   straight.  I was asking you to tell me any
24   excavations that you contend exacerbated
25   this -- these what you call hydraulic

Page 84

1    conductivity pressure connections with the
2    underlying saturated high water content
3    swamp-marsh deposits.  Any excavations.
4         A.  Well, I misunderstood your question.
5    That was the reason I drew two specific
6    cross-sections, I thought, at your request,
7    identified as Case 1 and Case 2, at your
8    request.  So I'm identifying specifically to
9    those cross-sections the excavations.
10        In a general sense, any excavation
11   that was poorly backfilled and extended to
12   points close to our buried swamp-marsh deposits
13   is a contributor to the collective hydraulic
14   effects at both the north breach and south
15   breach.
16        Q.  Okay.  I'll read to you my question
17   and your answer:  Okay.  I take it from your
18   testimony that those are the only excavations
19   that you are referring to at the north breach
20   when you say a number of these excavations
21   would have exacerbated the so-called hydraulic
22   conductivity pressure connections with the
23   underlying saturated high water content
24   swamp-marsh deposits.
25        Your answer was, correct.

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 85

1          You want to retract that answer now?
2      A.  No.  I want to connect that answer to
3  the two cross-sections you asked me
4  specifically, I thought, to address.
5      Q.  The record will be clear what's going
6  on.
7          Okay.  Then I need for you to tell me
8  any of the excavations that are shown on this
9  drawing that exacerbated the so-called
10  hydraulic conductivity pressure connections
11  with the underlying saturated high water
12  content swamp-marsh deposits.
13      A.  You can draw a big circle around the
14  entire area.  Any excavation that was deep
15  enough and poorly backfilled puts us in contact
16  with this swamp-marsh deposit.
17      Q.  What is deep enough?
18      A.  Well, that depends on where you are.
19  If you're close to the outer edge of the EBIA
20  site, the swamp-marsh deposits are shallower
21  than they are immediately under the I-wall
22  site.  And so the depth of the excavation
23  varies depending on where you are in the area.
24      Q.  Are you able, sitting here, looking at
25  what you've given us in your GIS model, to tell

Page 86

1  me and mark which excavations you contend are
2  deep enough and close enough to the I-wall to
3  have exacerbated the hydraulic conductivity
4  pressure connections?
5      A.  No, I could not.  But we could -- I
6  just can't do it sitting here with any level of
7  detail.
8      Q.  That's fairly important to us in this
9  case.  But you can't do that?
10      A.  No--
11      Q.  What would it take --
12          MR. TREEBY:
13              Excuse me.  Let me finish my
14          question before you object.
15  EXAMINATION BY MR. TREEBY:
16      Q.  What would it take, in a deposition,
17  which is the only vehicle I have to ask you
18  questions about it, for you to tell us that?
19  Because we can't tell it from your plan.
20  You've already said that.
21          We can't tell it.  Right?  We can't
22  tell the depth.  You can't even tell the depth.
23      A.  No.  I can't.  That's correct.
24      Q.  So how can I get that information from
25  you?

Page 87

1      A.  Well, we would have to do a
2  correlation for you to identify specific
3  excavations, then connect that to their depth,
4  then correlate that with the contact elevation
5  for the varied swamp-marsh deposit, and you
6  could produce a table that would portray that
7  information.  That's one of the powers of the
8  GIS system and one of the reasons we went to
9  this extent of work.  But sitting here today, I
10  can't do that for you.
11      Q.  Do you have such a table?
12      A.  No.  I would be more than glad to
13  produce it, if I had it.
14      Q.  Have you done such a correlation?
15      A.  No.
16      Q.  So despite the fact you write a report
17  saying a number of these excavations has that
18  effect, you can't tell us which ones.
19      A.  Well, I could point --
20      Q.  Right now?
21      A.  I could point to general ones, um --
22  and we cited, for example, the wedding cake
23  structure previously discussed.  We've had
24  discussions concerning the piles that were
25  pulled and the voids left behind from those

Page 88

1  piles.  We could cite the Area 8 that we've
2  discussed, that although it did not put you in
3  contact with the buried swamp-marsh deposit, it
4  put the system in contact with other sandy,
5  shelly materials that were in contact.
6          So it is a multi-connection problem.
7  It's not a individual excavation problem.  And
8  hence my inability to provide the detail that
9  you're requesting.
10      Q.  Has anyone done such a correlation?
11      A.  I think only in a general sense.
12  Certainly --
13      Q.  Well -- excuse me.
14      A.  Certainly, Dr. Rogers and Storesund
15  went through that process for their
16  deductive-based Case 2 cross-sections, both
17  locations.  I, with Chad Morris, had to go
18  through the same process for the Case 1
19  locations.
20      Q.  You used the words in your answer only
21  in a general sense.  I'm asking you not in a
22  general sense, you've given it us to in a
23  general sense.
24      A.  Yes, sir.
25      Q.  I'm asking for you, in a specific,

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 89

1    site specific excavation sense, if you can tell
2    us, or anyone else can tell us, today, if they
3    were called to do so, which excavations
4    exacerbate what you call hydraulic conductivity
5    pressure connections with the underlying
6    saturated high water content swamp-marsh
7    deposits.
8         MR. JOANEN:
9              Let me object to the form of the
10             question.
11   EXAMINATION BY MR. TREEBY:
12        Q.   And the answer?
13        A.   Well, I did answer it.  Case 1 and
14   case 2, I drew, as you requested, the locations
15   of the cross-sections.  I circled the
16   excavations that are shown within those
17   cross-sections, and I responded both for the
18   north breach and the south breach.
19        Q.   But you cannot give us all the
20   specific, site specific excavations that you
21   are referring to in your report, Page 4,
22   Paragraph 7, when you say a number of these
23   excavations would have caused such
24   exacerbation.  Is that correct?
25        MR. JOANEN:

Page 90

1              Objection to the form of the
2              question.  Also, it's been asked and
3              answered.
4         A.   The key word you use is all.
5    EXAMINATION BY MR. TREEBY:
6         Q.   Right.
7         A.   That means everything.
8         Q.   Each.
9         A.   And the answer is no --
10        Q.   Thank you.
11        A.   -- I cannot.
12        Q.   That's what I thought.
13        MR. JOANEN:
14             Move to strike that comment.
15             There's no reason for that, Bill.
16             It's questions and answers.
17             Deposition upon oral examination.
18   EXAMINATION BY MR. TREEBY:
19        Q.   Were you aware that Dr. Rogers stated
20   he didn't know where the Case 1 and Case 2
21   excavations came from?
22        A.   I would find that surprising.
23        Q.   Isn't it true that this so-called
24   exacerbation would only occur after steady flow
25   is established?

Page 91

1         A.   No.
2         Q.   Were any of the excavations that you
3    think exacerbated what you call the hydraulic
4    conductivity pressure connections with the
5    underlying saturated high water content
6    swamp-marsh deposits, were any of them located
7    on McDonough Marine, Indian Towing, Mayer
8    Yacht, ITT?
9         MR. JOANEN:
10             Object to the form.
11        A.   Please repeat your question.
12   EXAMINATION BY MR. TREEBY:
13        Q.   Were any of the excavations that you
14   think exacerbated what you call hydraulic
15   conductivity pressure connections with the
16   underlying saturated high water content
17   swamp-marsh deposits located on McDonough
18   Marine, Indian Towing, Mayer Yacht, or the ITT
19   sites?
20        MR. JOANEN:
21             Same objection.
22        A.   I don't recall specifically, except
23   for the McDonough site that we did study as we
24   identified as the near breach site.  There were
25   excavations there, but they did not establish

Page 92

1    good hydraulic contact with the buried
2    swamp-marsh deposits at that location.  I just
3    don't recall the other sites you cite.
4    EXAMINATION BY MR. TREEBY:
5         Q.   Are you able to identify which
6    excavations were, as you call it, poorly
7    backfilled, on this GIS model that we've marked
8    as Bea Exhibit 52?
9         A.   These are identified in the GIS model
10   as those with sandy backfills.  To provide the
11   level of detail that you're requesting, I'd
12   have to produce this correlation that you are
13   asking about.
14        Q.   So they would be the ones that are
15   colored with the color that says predominantly
16   sand backfill?
17        A.   Yes, sir.
18        (Brief recess.)
19        MR. JOANEN:
20             Bill, before we proceed, I wanted
21             to address the issues you brought up
22             in the reliance materials.  The North
23             Breach Case 1, moving excavation 2, as
24             well as South Breach Case 1 moving
25             excavation 2, and South Breach Case 1

23 (Pages 89 to 92)

ROBERT G. BEA, PH.D.                                    April 16, 2012

---

Page 93

1    moving excavation.  Those were
2    erroneously placed on the reliance
3    materials.  They are not utilized.
4    They were actually withdrawn, so they
5    were not produced to you.
6    MR. SMITH:
7         He said he relied on them.
8    MR. TREEBY:
9         You've made it more important
10   now.
11   EXAMINATION BY MR. TREEBY:
12   Q.  Okay.  I guess we got to go back into
13   that.  Those are listed, sounded like you said
14   you relied on those moving excavations.
15   A.  No.  It was because the hand
16   calculations I'd done had disclosed flaws in
17   those analyses, and we did not have time to
18   repeat the analyses, and consequently, I
19   requested they be withdrawn.  But I had the
20   hand calculation that you asked me about during
21   my deposition, and I have produced that.  The
22   others were withdrawn.
23   MR. SMITH:
24        The test is matters considered.
25   The test for production is --

---

Page 94

1    MR. JOANEN:
2         You can --
3    MR. SMITH:
4         No, I'm representing a party
5    here.  The test is matters considered.
6    I was speaking to counsel.  You stated
7    that they weren't produced because he
8    did not rely on them.  He considered
9    them, and he rejected them as reliance
10   materials.  But he considered them.
11   Then they must be produced.
12   MR. JOANEN:
13        You've made your record.  Thank
14   you.
15   MR. TREEBY:
16        For the record, Washington Group
17   agrees with that position.  It's a
18   consistent position we've taken.
19   We've produced matters that we
20   considered that we didn't rely upon.
21   Your side has told us in the past you
22   have produced those materials, as
23   well.  So we demand their production.
24   Okay.
25   THE WITNESS:

---

Page 95

1         May I ask a question?  Why would
2    you want them if they're wrong?
3    EXAMINATION BY MR. TREEBY:
4    Q.  We want to see the mistake that was
5    made, and we're entitled to see it because you
6    considered it.  That's the law.  I didn't make
7    the law.
8    A.  Yes, sir.
9    Q.  Okay.  Dr. Bea, I wanted to ask you
10   why the grid trenches are not indicated at
11   Mayer Yacht, McDonough Marine, and ITT in your
12   GIS models.
13   A.  Well, they should be.
14   Q.  Well, the GIS models we were given,
15   those sites are greyed out.
16   MR. JOANEN:
17        And counsel, if I can just
18   clarify here, this is demonstrative
19   evidence.  It is not complete yet.
20   We're still working on it, preparing
21   it for trial.
22   MR. SMITH:
23        Welcome to my world, Bill.
24   MR. TREEBY:
25        Well, we will -- just so

---

Page 96

1    everybody understands, we believe that
2    should be stricken and not considered
3    in any way since we can't examine the
4    witness on a document we don't have.
5    MR. JOANEN:
6         To clarify that, it's a
7    demonstrative evidence, as we have
8    expressed in our papers and here
9    today.
10   MR. TREEBY:
11        I take it, then, your stipulation
12   is that the GIS models are not
13   evidence and won't be admitted as
14   evidence.  Is that correct?
15   MR. JOANEN:
16        I'm not stipulating to that at
17   all.  They're intended to be a
18   demonstrative evidence that will be
19   completed and presented at trial.
20   MR. TREEBY:
21        A demonstrative is something
22   different than evidence.
23   MR. BRUNO:
24        The Court may choose to accept
25   it, Bill.  It is a demonstrative.

---

24  (Pages 93 to 96)

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 97

1      MR. SMITH:
2          Not if you don't offer it into
3    evidence.  You're representing today
4    you're not intending to offer it into
5    evidence.  You're using it solely as a
6    demonstrative exhibit.
7      MR. BRUNO:
8          That's true.  But you have to
9    remember, in the Robinson trial, the
10   Court asked to be put into the record
11   a great number of demonstrative
12   exhibits.  In fact, they showed up in
13   the appendices, Robin.
14     MR. TREEBY:
15         Let's continue.
16   EXAMINATION BY MR. TREEBY:
17     Q.  Turn to paragraph 8 of your report,
18   Pages 4 and 5.  You state there that river sand
19   was used, quote, at a minimum, at Boland area
20   2, Area 8, and in Boland Transite/ACM areas.
21   Right?
22     A.  Yes.
23     Q.  And looking at the GIS model which is
24   Figure 1 of your report, you've indicated the
25   use of sand in two areas at Boland Marine, one

Page 98

1    at the north end stretching from the canal to
2    the edge of Surekote Road and the other at the
3    south end.  Right?
4      A.  I'd have to look at the --
5      Q.  Please, yes.  You may want to look at
6    the blown up version of Boland.
7      A.  Yeah.  Please repeat your question.
8      Q.  You've indicated the use of sand in
9    two areas at Boland Marine, one at the north
10   end stretching from the canal to the edge of
11   Surekote Road and the other at the south end.
12   Right?
13     A.  Correct.
14     Q.  According to the legend on Figure 1,
15   those areas are, quote, predominantly sand
16   backfill, close quote.  Right?
17     A.  Correct.
18     Q.  What specific documents did you rely
19   on to reach the conclusion that these two
20   shaded areas on Boland were predominantly
21   filled with sand?
22     A.  We used primarily the photographic
23   documentation that was produced.
24     Q.  Is that Figures 8 and 9 in this
25   rebuttal report?

Page 99

1      A.  These are examples, yes.
2      Q.  Are there others?
3      A.  Um -- yes.  There's a very extensive
4    photographic record that's been developed and
5    produced.
6      Q.  Are you talking about those areas
7    photographs now?
8      A.  No.  Ground level photographs so we
9    could determine the backfill.
10     Q.  Could you please point us in your
11   reliance materials to those photographs.  Where
12   they are on the reliance list.  I think we've
13   put the reliance list as Exhibit 50.  It should
14   be there in front of you somewhere.
15         Can you tell us which photographs
16   support the proposition that you have just
17   stated.
18     A.  The original list of reliance
19   materials referred to in the very first line
20   has a folder in it that I produced that has the
21   specific photographs taken during the site
22   clearing activities.  In addition, that list
23   includes aerial photographs relied on utilized
24   by Chad Morris as he was evaluating backfill
25   material.

Page 100

1          Similarly, with the April 3rd report,
2    there are folders included there that contain
3    additional photographs that were incorporated
4    into this process.
5      Q.  Where are those additional
6    photographs -- not the ones that were on your
7    original report reliance materials, but where
8    are any additional photographs that you say
9    identify sand backfill on this reliance
10   material list Bea Exhibit 50?
11     MR. JOANEN:
12         Object to the form.
13     A.  It's in the second collection of
14   references that are cited here at that point of
15   the April 3rd report.
16   EXAMINATION BY MR. TREEBY:
17     Q.  Wait.  This says, all items listed or
18   referred to.  I don't see any other photographs
19   referred to that would show sand backfill
20   except the two that I pointed you to, Figures 8
21   and 9.
22         Are there more?
23     A.  Yes.
24     Q.  Are they referred to in your report?
25     A.  The first line that says original list

25 (Pages 97 to 100)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                                April 16, 2012

Page 101

1  of reliance materials provided in connection
2  with the February 1st, 2012 report.  That's the
3  first list.  The second lift are all items
4  listed or referred to in the April 3rd, 2012
5  report.
6      Q.  Okay.
7      A.  Main text and references.  Now,
8  there's yet another list I would have to review
9  that follows on these pages in order to
10 identify if there are additional ones shown
11 here.
12     Q.  Put aside anything referenced by
13 February 1, 2012.  We've looked at all those
14 reliance materials.  Put that aside.  I'm not
15 asking about that.
16         I'm now asking, are there any
17 photographs that indicate sand backfill on this
18 reliance list that are not Figures 8 and 9 in
19 your rebuttal report?
20     A.  Yes.
21     Q.  Where are they?
22     A.  They're cited in those first two
23 collections of photographs that we have
24 produced.  I would need to look down this
25 production list to identify additional ones.

Page 102

1      Q.  Please do.
2      A.  There are several --
3      Q.  I don't see any, so tell me where they
4  are on this list.  I'm looking for them on this
5  list.  Don't refer me to the February 1.  I'm
6  not asking about that.  I'm not asking about
7  February 1.
8      A.  That's part of this list, sir.
9      Q.  I'm not asking about that.  Eliminate
10 that from the question.
11     A.  Okay.
12     Q.  If I haven't made that clear, I hope
13 it's clear now.
14     A.  Yes, sir.
15     Q.  I'm trying to find out any other
16 photographs.
17     MR. JOANEN:
18         I'm going to object because I
19     don't understand the question.
20     A.  I do.
21 EXAMINATION BY MR. TREEBY:
22     Q.  Do you understand the question?
23     A.  Yes.
24     Q.  Thank you.
25     MR. JOANEN:

Page 103

1      But I'm entitled to understand
2  it.
3  MR. TREEBY:
4      I'll explain it to you, Scott,
5  off the record.
6  MR. TREEBY:
7      Thank you.
8  MR. TREEBY:
9      Off the record.
10 (Off the record.)
11 MR. JOANEN:
12     We're back on the record.  You
13 wanted him to flip through the pages.
14 He's going to do that.  And he's going
15 to look at each one of these items to
16 determine whether there are
17 photographs identified in these file
18 folders as listed on this report.
19 That's what I thought we just
20 clarified.  So now we're back on the
21 record.
22 MR. TREEBY:
23     We're not on the record.
24 MR. JOANEN:
25     Well, I'm keeping this time and

Page 104

1  so it's part of your time.
2  MR. TREEBY:
3      Do whatever you want, Scott.
4  MR. JOANEN:
5      I will.  I want the record to
6  reflect that.  We're keeping time.
7  MR. TREEBY:
8      The court reporter keeps the
9  time, not you.
10 MR. JOANEN:
11     I can keep the time if I like.
12 MR. TREEBY:
13     Whatever.
14 MR. JOANEN:
15     We're not on the record.  Would
16 you like to get on the record?
17 MR. TREEBY:
18     Just make a note there.  Put a
19 check on the original exhibit.
20     Okay.  Back on the record.
21 EXAMINATION BY MR. TREEBY:
22     Q.  Dr. Bea, which additional items in the
23 list contain photographs that identify sand
24 backfill?
25     A.  Page 9, last line.

                          26 (Pages 101 to 104)

**ROBERT G. BEA, PH.D.**                                    **April 16, 2012**

Page 105

1  Q. Any others?
2  A. No, sir.
3  Q. Okay. So we know where to look in
4  that folder.
5  A. Right.
6  Q. Okay. And I take it from your
7  testimony that those photographs, whatever
8  photographs there are in Washington Group 's
9  photographs that you've listed and put in that
10  folder, that -- will they tell us which ones
11  are involving sand backfill?
12  A. I don't know.
13  Q. You don't know. Okay.
14      Other than photographs, as you have
15  now defined it, did you rely on anything else
16  to determine sand backfill that you've talked
17  about here in Paragraph 8, Pages 4 and 5?
18  A. Yes. There were summaries of backfill
19  material in some of the EBIA site clearing
20  documentation. I received summaries of those
21  backfill tallies during the process of
22  compiling this information.
23  Q. Are these summaries in your reliance
24  materials?
25  A. I believe so, cited as Washington

Page 106

1  Group International documentation concerning
2  backfill in the various areas, numbers of cubic
3  yards of river sand that were imported in that
4  remediation work.
5  Q. And there should be an item with some
6  name like that in your reliance material list?
7  A. Correct. And they were all Washington
8  Group International documents.
9  Q. I don't see such a list -- item on
10  your list. But it either is or is not there,
11  and we will determine that.
12      If they're not on that list, will you
13  provide them us to, please?
14  A. Of course.
15  Q. Okay. If some portions of these two
16  areas that you have identified as being
17  predominantly backfill with sand were actually
18  backfilled with clays from the borrow pit, how
19  would that impact your analysis?
20      MR. JOANEN:
21          Object to the form.
22  A. Which analysis?
23  EXAMINATION BY MR. TREEBY:
24  Q. Your flow analysis, your stability
25  analysis, either one.

Page 107

1      MR. JOANEN:
2          Object to the form.
3  A. We have not analyzed the lower area at
4  Boland Marine. The areas we have analyzed are
5  identified as Case 1 and Case 2 in my expert
6  report, and I think again cited in my rebuttal
7  report, and they're, again, cited in my ongoing
8  analysis report dated April 11th.
9  EXAMINATION BY MR. TREEBY:
10  Q. Just for the record, since you've
11  mentioned it now, I'm not asking you any
12  questions about your so-called ongoing rebuttal
13  report. We have moved to strike that as well
14  as portions of this report. But since that
15  material was given to us so recently, there's
16  no way we could cover that material today. So
17  that's fine, I'm just putting that on the
18  record and you don't need to respond to that.
19      MR. JOANEN:
20          And for the record, I would say
21      that those materials were specifically
22      requested by counsel at Dr. Bea 's
23      last deposition.
24      MR. TREEBY:
25          We vehemently disagree with that

Page 108

1      assertion.
2  EXAMINATION BY MR. TREEBY:
3  Q. Now, my question is -- I take it from
4  your answer that the north area at Boland
5  Marine you have identified as being
6  predominantly backfilled with sand.
7      Would it impact your assessment if it
8  were not true that they were predominantly
9  backfilled with sand but were, in fact,
10  predominantly backfilled with clays from the
11  borrow pit? Would that impact your assessment?
12      MR. JOANEN:
13          Object to the form.
14  A. If it influences the cross-sections we
15  have analyzed, of course.
16  EXAMINATION BY MR. TREEBY:
17  Q. Well, the predominant sand area there
18  covers those cross-sections, does it not?
19  A. Correct.
20  Q. Okay. Next one: We mark the next
21  document as Bea Exhibit number 53.
22      Do you have it?
23      (Bea Exhibit 53 was marked for
24  identification and is attached hereto.)
25  A. Yes, sir.

**JOHNS, PENDLETON COURT REPORTERS**                    **504 219-1993**

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 109

1    EXAMINATION BY MR. TREEBY:
2        Q.  This is the Corps quality assurance
3    report, or QAR 200, dated October 11, 2001.
4            Have you seen this document before?
5        A.  I think so.
6        Q.  Turn to the second page, fourth
7    paragraph.
8        A.  Titled removal of Transite
9    contaminated concrete and soil?
10       Q.  Yes.  And then it says, Gill removed
11   and disposed 16 loads of Transite soil totaling
12   448 tons, dot, dot, dot.  Gill hauled clay fill
13   from borrow pit to backfill the excavated
14   Transite area.
15           Is that what it says?
16       A.  Yes.
17       Q.  Turn to the page with Bates number
18   ending 1244 in the same document.
19           At the bottom left side, under
20   materials received, it reads, no sand delivery.
21           Do you see that?
22       A.  Yes, sir.
23       Q.  Then the first sentence on the page,
24   handwritten -- you see that?
25       A.  Yes, sir.

Page 110

1        Q.  It says, Gill Industries continued
2    with Transite removal at north end of BOL along
3    E fence line, close quote.
4            Skip a few lines down, and it says,
5    backfilled excavation parens, partial, with
6    clay from borrow pit, close quotes.
7            You see that?
8        A.  Yes, sir.
9        Q.  Look at Figure 6 in Appendix B, which
10   we're going to give you.  This is actually an
11   exhibit, Bea Exhibit 1 to your first
12   deposition.  (Tendering.)  Look at Appendix B.
13       A.  Yes, sir.
14       Q.  Figure 6.
15       A.  Yes, sir.
16       Q.  Do you see the area at the north end
17   of Boland along the east fence line in this
18   diagram?
19       A.  Um -- yes, sir.  It's Buildings 6, 5
20   and 4.
21       Q.  And that is an area that is relevant
22   in your so-called Swiss cheese theory, isn't
23   it?
24       A.  Correct.  Those buildings have
25   different numbers depending on the documents

Page 111

1    you're looking at.
2        Q.  So would you agree that on October 11,
3    2001, that area was backfilled with clay
4    material, not sand?
5        MR. JOANEN:
6            Object to the form.
7        A.  Well, I believe the location being
8    referred to here that you previously cited is
9    the Transite removal area.  The area circled in
10   red includes -- is identified on this map,
11   Building 6, 5 and 4, another area identified as
12   number 6, and another one I find difficult to
13   read, and I think it's crosshatched.  Perhaps
14   that's the Transite area.
15   EXAMINATION BY MR. TREEBY:
16       Q.  And that's covered by the circle, the
17   red circle, is it not?
18       A.  Yes, sir.
19       Q.  Yeah.  Okay.  Look at the next
20   document we're marking Bea Exhibit number 54.
21   This document is dated October 16, 2001; am I
22   right?  Top of the page, upper were right?
23           (Bea Exhibit 54 was marked for
24   identification and is attached hereto.)
25       A.  Yes, sir.

Page 112

1    EXAMINATION BY MR. TREEBY:
2        Q.  Look at the first page in the middle
3    under the letter E, Work Performed Today.  You
4    see that?
5        A.  My E --
6        Q.  No, under the E.
7        A.  Yes, sir.  I see that.
8        Q.  Work Performed Today.  You see that?
9        A.  Yes, sir.
10       Q.  And it says, down under the big E, it
11   says, excavated borrow pit at McDonough Marine
12   and backfilled ACM excavations at Boland Marine
13   with borrow material.
14           Isn't that what it says?
15       A.  Yes, sir.
16       Q.  Now, go to the page ending Bates
17   number 1150 in that same document.  5 lines up
18   from the end of the handwritten notes in the
19   middle of the page.  It says, Completed
20   backfill of excavation along east fence line at
21   Boland, number 7, 7A and.
22           6.  Isn't that what it says?  You see
23   that?
24       A.  Not yet, sir.
25       Q.  Oh, I'm sorry.  Look in the middle of

28  (Pages 109 to 112)

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 113

1  the page.  The last line of the section I'm
2  talking about says, pumped water from three
3  excavations.  You see that?
4      A.  Yes, sir.
5      Q.  Go up five lines.  The line begins
6  Completed backfill of excavation along east
7  fence line at Boland number 7, 7A and 6; is
8  that right?
9      A.  Yes, sir.
10     Q.  Again, Washington Group was
11  backfilling ACM Transite excavations with clay
12  from the borrow pit according to this document.
13  Is that right?
14         MR. JOANEN:
15             Object to the form.
16  EXAMINATION BY MR. TREEBY:
17     Q.  Borrow material?
18     A.  Well, it says, Completed backfill of
19  excavation along E fence line at Boland 7, 7A
20  and 6.
21     Q.  This is all one report.  The first
22  page says it was backfilled with borrow
23  material, doesn't it?  Page 1 that we looked
24  at?
25     A.  Yes.

Page 114

1      Q.  Okay.  Did you consider these daily
2  QAR 's from the Corps or daily quality control
3  reports from Washington Group in preparing your
4  GIS model?
5      A.  Well, Dr. Storesund, together with the
6  individuals I cited previously, they did.  I
7  did not review all of the daily documents.
8      Q.  Do you know why these daily reports
9  aren't identified in your reliance materials?
10     A.  They may be in a previously cited
11  documentation.  If they're not, it's an
12  omission.
13     Q.  You know, and I've got to go back to
14  this:  You said, well, Dr. Storesund, together
15  with the individuals I cited previously.
16         Have you, since you've testified
17  earlier this morning, determined who this GIS
18  expert is?
19         MR. JOANEN:
20             Object to the form.
21     A.  No.
22  EXAMINATION BY MR. TREEBY:
23     Q.  No?  Okay.
24         Look at Saucer Marine on your GIS
25  model in Figure 1.  This is the maps.  But then

Page 115

1  there's a blowup of Saucer.
2         MR. JOANEN:
3             And we're going back to
4  Exhibit 52?
5         MR. TREEBY:
6             It's the maps.  If that's the
7  number on it -- I assume it is.  I
8  think the doctor knows what document
9  I'm talking about because he has it
10  front of him.
11         MR. JOANEN:
12             I just want the record to be
13  clear, Mr. Treeby.
14  EXAMINATION BY MR. TREEBY:
15     Q.  You got it?
16     A.  Is this the figure?
17     Q.  Saucer, yes.  I don't see any sand
18  fill on Saucer.  Is that right?
19     A.  Well, I don't either, but that doesn't
20  mean there wasn't any sand fill on Saucer.  But
21  you can't tell from this graphic.
22     Q.  Well, there is a legend on Page 1 of
23  that exhibit that says, predominantly sand
24  fill, and has a color.  None of that color
25  appears on this GIS model on Saucer; isn't that

Page 116

1  right?
2      A.  That's correct.
3      Q.  Okay.  I would assume that means that
4  whoever was doing the model couldn't find any
5  evidence of sand being a predominant backfill
6  on Saucer.  Is that fair?
7      A.  Well, that could be a dangerous
8  assumption.  You'd have to go to specific
9  excavations, which is possible in the GIS
10  database, and then see what backfill was
11  allocated to that excavation.
12     Q.  Is there a GIS -- the GIS database
13  you're referring to, is that in your matters
14  considered attached to your rebuttal report?
15     A.  Well, we're producing the
16  demonstrative that's come from that GIS
17  database.  I don't think we have produced the
18  GIS database for you.
19     Q.  But you're saying you could go to that
20  and see if there were some sand --
21  predominantly backfilled sand on the Saucer
22  Marine if you looked in that.  Is that right?
23     A.  Correct.
24     Q.  And you can't tell me right now
25  whether there were or not any such sites at

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 117

1    Saucer Marine.  Is that correct?
2        A.  Not sitting here, I can't.  That's
3    correct.
4            MR. TREEBY:
5                We demand the production of the
6            GIS database that you're referring
7            to -- he's been referring to.
8    EXAMINATION BY MR. TREEBY:
9        Q.  Go back to Paragraph 8 of your
10   rebuttal report, second line.  You there?
11       A.  Not yet.
12       Q.  Okay.
13       A.  Page?
14       Q.  Paragraph 8.
15           MR. JOANEN:
16               Page 5.
17       A.  Yes, sir.
18   EXAMINATION BY MR. TREEBY:
19       Q.  The second line actually, which is on
20   Page --
21       A.  4.
22       Q.  -- 4.  It says -- actually, it's not
23   the second line, but I want to refer you to the
24   second line on Page 5.
25       A.  Yes, sir.

Page 118

1        Q.  I'm quoting.  These pervious backfill
2    materials were, in cases such as the North
3    Breach site, placed in contact with preexisting
4    pervious shell filled layers that quickly
5    conveyed water pressures directly to the EBIA
6    flood wall leading to hydrostatic loading of
7    the wall as a result of the navigation
8    improvement project, close quote.
9            Is that correct?
10       A.  Yes, sir.
11       Q.  Explain to me using the GIS model that
12   we have in Figure 1 exactly where the
13   preexisting shell fill layers are on Boland
14   Marine that you're referring to in this
15   sentence.
16       A.  The best place to reference that
17   information is in my expert report.  And the
18   expert report contains the cross-sections
19   identified as Case 1 and Case 2, and they
20   define the geometry of the contacts.
21       Q.  So these are the only shell fill
22   layers you're referring to in that sentence?
23       A.  Yes.
24       Q.  The ones in your hypothetical
25   conceptual cross-sections that we talked about

Page 119

1    at your last deposition.  Right?
2        A.  Yes.
3        Q.  Okay.  By preexisting, you mean that
4    Washington Group did not do any fill with shell
5    at this location; isn't that true?
6        A.  Well, that is not true in a
7    generality.  There were some backfill materials
8    that the photograph clearly showed included
9    some shell.  You could see the bivalve mollusks
10   white shells.  The shells being referred to
11   here are those associated with the Surekote
12   Road overpass.  And that overpass preexisted
13   the WGI site clearing activities.  So we're
14   trying to carefully discriminate between shell
15   sandy backfill that preexisted the WGI site
16   clearing activities.
17       Q.  I'm just asking about the word
18   preexisting in your report.  And I think you've
19   answered me, but maybe my question was too
20   complex before, or maybe it was unclear.
21           When you use that term preexisting at
22   this point in your report, isn't it true that
23   you're talking about fill that preexisted
24   Washington Group 's work at the site?
25       A.  Correct.

Page 120

1        Q.  So it could not be fill -- this
2    preexisting fill that you refer to could not be
3    fill Washington Group placed; is that true?
4        A.  Correct.
5        Q.  And isn't it true -- now I'm switching
6    to the south breach.  Okay?
7            And isn't it true that you have no
8    evidence even of preexisting pervious shell
9    fill layers at the south breach site?
10       A.  Please repeat your question.
11       Q.  Isn't it true that you have no
12   evidence of preexisting pervious shell fill
13   layers at the south breach site?
14       A.  Yes, sir.
15       Q.  Now, Dr. Bea, isn't it true that if
16   there were preexisting pervious shell fill
17   layers at either of the breach sites, right at
18   the floodwalls, the flood waters wouldn't have
19   needed any excavations further outboard, toward
20   the canal, to cause your theoretical water
21   pressures to have the effects you have claimed?
22           MR. JOANEN:
23               I'll object to the form.
24               But you can answer.
25       A.  No.

30 (Pages 117 to 120)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                            April 16, 2012

Page 121

1    EXAMINATION BY MR. TREEBY:
2        Q.  I think maybe the subject of my poor
3    question, so let me try to clarify this.
4            When you say no, I think you're
5    saying, but I want to be sure, that if pervious
6    shell backfill right against the flood wall
7    existed, once the flood waters came up to that
8    location, that water pressure, under your
9    theories, would immediately have the effects of
10   destabilizing the wall.
11       MR. JOANEN:
12           Object to the form.
13       A.  Well, that's incorrect.
14   EXAMINATION BY MR. TREEBY:
15       Q.  Oh, that's not correct?
16       A.  That's correct.
17       Q.  Why not?
18       A.  Well, the hydrostatic pressures
19   exerted at the face of the wall are acting to
20   displace the wall to the protected side.  If an
21   excavation outboard, as you put it, is
22   contributing to hydraulic pressures that go
23   under the wall that destabilize the soils on
24   the protected side, that's a combination
25   effect, one pushing, one uplift pressure.  The

Page 122

1    result, destabilization of the wall.
2        Q.  So -- excuse me.  I would have
3    assumed, and apparently you disagree, that if
4    there was pervious shell fill material all the
5    way down below the tip of the sheet pile, once
6    the water put the load on from above when the
7    floodwaters occurred, that would be the
8    closest, quote, area that hydrostatic pressure
9    could affect the wall.  But that's not true?
10       A.  No, that's true.
11       Q.  Oh.
12       A.  The way you have reformed your
13   statement, that part is true.
14       Q.  Oh, okay.  Fine.
15           Now, similarly, if a gap forms, as you
16   have postulated, at the floodwalls, under your
17   theories, and the gap goes all the way down to
18   the tip of the sheet pile, would not that have
19   the most immediate effect to destabilize the
20   flood wall?
21       MR. JOANEN:
22           Object to the form.
23       A.  Well, it's certainly a dominant,
24   important part of the destabilization.  The
25   tension crack is an important consideration,

Page 123

1    and indeed I included it in my work.
2    Unfortunately, Dr. Marr omitted it in his work.
3    So how the analyst is handling this tension
4    crack or hydrostatic contact on the flood side
5    of the wall is absolutely crucial.
6    EXAMINATION BY MR. TREEBY:
7        Q.  Okay.  With the soil properties in
8    your flow models, the permeabilities and the
9    compressibilities, the water pressures from the
10   flood waters would be transmitted nearly
11   immediately to the land side going down through
12   that gap, isn't that right?
13       A.  If that gap -- if the gap has produced
14   contact with the buried deposits, then that is
15   one of the very important contributors to
16   destabilization of the levee on the protected
17   side.  The, um -- ongoing analysis report I
18   submitted to you on the 11th, actually
19   quantifies that contribution compared to
20   contributions from other sandy backfilled
21   excavations.
22       Q.  Are you saying that you ran a new
23   model for this later -- this report that we got
24   a couple days ago?  Did you run another model?
25       A.  No.  You asked me --

Page 124

1        Q.  Then you've answered my question.
2        A.  No, I haven't.  You asked me in my
3    deposition about the analyses that I had done
4    that addressed this point, specifically the
5    tension gap hydraulic effects compared to
6    excavation effects.  I replied to you
7    affirmatively that I have done such
8    calculations.  You asked that I produce them,
9    and in fact suggested we call my wife to have
10   them produced.  When I got home, I photocopied
11   them and produced them immediately to you.
12   These are included in Section 6 of my April
13   11th report.  And so you can refer to the
14   documentation to get the contribution of the
15   tension crack and excavations.  I didn't
16   produce any new analyses.
17       Q.  So you're saying you did that by hand
18   calculations?  Is that your testimony?
19       A.  That's correct.
20       Q.  You did this comparison you're now
21   describing as a hand calculation?
22       A.  That's correct.
23       Q.  Okay.
24       A.  And, in fact, it was that hand
25   calculation that disclosed the errors and flaws

31 (Pages 121 to 124)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 125

1    in the computer calculation that led to my
2    requirement to withdraw them.
3        Q.   Turn to Page 5, Paragraph 9, if you
4    would.
5        A.   Yes, sir.
6        Q.   You state, I am aware that there were
7    variations at the top-of-wall elevation; is
8    that right?
9        A.   Yes, sir.
10       Q.   Than you state, in the last line, at
11   Paragraph 9, that these, quote, variations have
12   been analyzed and determined to have no impact
13   on the excavation modeling or failure analysis,
14   close quote.  Is that right?
15       A.   That's correct.
16       Q.   Have you provided any written evidence
17   of the analysis that included variations in the
18   top of wall in your reliance materials?
19       A.   In my rebuttal report, I have produced
20   analyses that address the potential effects of
21   lower wall elevations in the vicinity of north
22   and south breaches.
23       Q.   Where?  I haven't seen it.
24       A.   The analyses I'm referring to are --
25   begin on Page 70 as I address the north and

Page 126

1    south breach levee erosion analyses.  There is
2    an appendix to my report, Appendix B,
3    Section 6, that provides further detail to that
4    analysis.
5        Q.   You say it starts on Page 70.  Where
6    does it end?
7        A.   On 84.
8        Q.   You're speaking of your erosion
9    analyses, then, when you make that statement
10   that you have analyzed the variations in the
11   top of wall; is that right?
12       A.   That's correct.  And their
13   contributions to protected side trench erosion,
14   and that contribution to destabilization of the
15   wall.
16       Q.   Are there any other analyses that
17   you're referring to in the last line at
18   Paragraph 9 that we looked at, when you say the
19   variations of  have been analyzed and
20   determined to have no impact, other than your
21   erosion analysis?
22            MR. JOANEN:
23                Objection to the form.
24       A.   Well, I did look at the elevation of
25   the wall effect at the -- purported effect at

Page 127

1    the north breach causation analysis proposed by
2    Dr. Marr.  And the results of that analysis are
3    detailed in my April 11th report.  So that
4    report is going specifically at the loading
5    conditions for the purported sheet pile tearing
6    initiation at that point.  That analysis takes
7    into account, explicitly, that purported low
8    wall elevation.
9        Q.   In Paragraph 10 on the bottom of
10   Page 5 of your report, you say that, quote,
11   site demolition plans, close quote, were used
12   to, quote, delineate building footprints as
13   well as general locations for piles and utility
14   corridors.
15            Do you see that language?
16       A.   Page again, please, sir?
17       Q.   Paragraph 10, bottom of Page 5.  First
18   sentence.
19       A.   Yes, sir.
20       Q.   Okay.  My question is, simply, what
21   site demolition plans are you referring to?
22       A.   Oh, these would be site demolition
23   plans produced by Washington Group
24   International as part of the EBIA site clearing
25   activities.

Page 128

1        Q.   And these were made available to you
2    long before your original report, isn't that
3    true?
4            MR. JOANEN:
5                Object to the form.
6        A.   Well, as I previously stated in a 2008
7    production, it was something of the order of 30
8    boxes of paper documentation that was produced.
9    I personally did not review that information.
10   And it's been in the subsequent electronic
11   productions that I and the individuals I cited
12   have been able to review the information cited
13   here.
14   EXAMINATION BY MR. TREEBY:
15       Q.   In fact, let me show you a document
16   marked 55.
17            In fact, didn't Chad Morris use these
18   site demolition plans to create certain figures
19   in your January 29th, 2009 expert report in
20   Robinson?
21            (Bea Exhibit 55 was marked for
22   identification and is attached hereto.)
23       A.   Yes.
24   EXAMINATION BY MR. TREEBY:
25       Q.   So these were available to you from

32 (Pages 125 to 128)

JOHNS, PENDLETON COURT REPORTERS                504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 129

1    January 29th, 2009, at least, right?
2         MR. JOANEN:
3              I want to object to the form.
4         Also, you're referencing an exhibit
5         that has not been provided to the
6         witness.
7         MR. TREEBY:
8              He knew about it. He said he
9         knew it, so I assumed he was looking
10        at it.
11   EXAMINATION BY MR. TREEBY:
12        Q.  Do you see it now?
13        A.  Yes, sir.
14        Q.  So this doesn't change your answer,
15   does it, looking at the document?
16        A.  No.
17        Q.  Okay.  So you had this available to
18   you since at least January 29, 2009, right?
19        A.  Correct.
20        Q.  Okay.  Paragraph 10 of your report,
21   the second sentence.  You state that you assume
22   that, quote, disturbed areas associated with
23   the structure foundations, close quote, was
24   four feet below grade with side slopes of .5 to
25   1, right?

Page 130

1         A.  Yes.
2         Q.  What evidence did you consider to
3    support that assumption?
4         A.  The evidence I personally considered
5    were photographs that were taken during the
6    building demolition activities.
7         Q.  Turn to Page 6 of your report,
8    Paragraph 11.  You indicate that you relied on
9    journal entries entitled, quote, demolition
10   status of underground utilities and onshore
11   piling, close quote, to determine the piling
12   removals at the East Bank Industrial Area; is
13   that right?
14        A.  Yes, sir.
15        Q.  What are those journal entries you're
16   referring to?
17        A.  Well, they'd be included in the WGI
18   documentation that we reviewed in the process
19   of developing the Swiss cheese demonstrative
20   graphics.
21        Q.  And we've looked it your reliance
22   materials and didn't find any documents with
23   that description, these journal entries.
24             Do you believe that they are on the
25   list somewhere?

Page 131

1         A.  Um -- I don't know.
2         Q.  Isn't it true that these journal
3    entries were made available to you long before
4    your original report was written on February 1,
5    this year?
6         MR. JOANEN:
7              Object to the form.
8         A.  I think I've addressed that question
9    in the sense of availability.  The initial
10   production and paper and boxes, that was
11   available to me, but I didn't travel from
12   California to come here to review the
13   information.  The information was not
14   transmitted to me there.  In that phase of
15   work, Chad Morris accessed that information.
16   Another colleague I was working with at that
17   time also reviewed parts of that information,
18   during that time period.  I personally never
19   did review that information during that time
20   period.
21   EXAMINATION BY MR. TREEBY:
22        Q.  And that, when we say that time
23   period, you realize that's 2008, right?
24        A.  That's correct.
25        Q.  Okay.  Are all of the pilings that you

Page 132

1    believe left voids in the EBIA soils identified
2    in your GIS model graphics, Figure 1?
3         A.  Yes.  We attempted to do that.  It's
4    very difficult because they're so small and the
5    area is so large.
6         Q.  It's true, isn't it, that these
7    pilings are not shown on your computer modeling
8    for your failure or non failure cases?
9         A.  That's correct.
10        MR. JOANEN:
11             Object to the form.
12   EXAMINATION BY MR. TREEBY:
13        Q.  That means you did not consider them
14   significant.  Isn't that true?
15        A.  No, that's incorrect.
16        Q.  Look at the enlarged copy of Figure 1
17   for Boland Marine.  It's the exhibit there that
18   has those maps; I think it's 52.
19             Can you tell me where to find the
20   pilings that we're talking about here?
21        A.  Well, there are two categories of
22   piling.  One category is to the Industrial
23   Canal side associated with removal of the wharf
24   structure; the other category of piling are
25   those that acted to provide support to

33 (Pages 129 to 132)

JOHNS, PENDLETON COURT REPORTERS                  504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 133

1    buildings and other structures.
2        Q.   Okay.  So the blue dots along the
3    Boland coastline there, the very small blue
4    dots, the little tiny blew dots, those were
5    part of the Jourdan Avenue wharf, right?
6        A.   That's correct.
7        Q.   But there are no such blue dots along
8    the Mayer Yacht and McDonough Marine site,
9    isn't that correct?
10       A.   I believe that is correct.
11       Q.   But in any event, you don't disagree
12   with Mr. Cobos-Roa that those pilings are not
13   considered in your modeling using SEEP/W or
14   SLOPE/W.  Isn't that right?
15       A.   That's correct, sir.
16       Q.   Turn to Figure 7 on Page 14 of your
17   report.
18       A.   Which report?
19       Q.   Your rebuttal report.
20       A.   Yes, sir.
21       Q.   Do you consider it significant that
22   piling removals, removal holes, as you allege
23   it there, to be important to your opinions in
24   this case?
25       A.   Yes.

Page 134

1        Q.   So if holes like these were not
2    backfilled, that would be important to your
3    opinions, is that right?
4        A.   Yes.
5        Q.   Similarly, if holes like these on the
6    site were backfilled properly, then that would
7    also be important to your pipes, is that right?
8        A.   Yes.
9        Q.   As for this Figure 7, you can see it
10   here, it's not cut off, the original WGI
11   caption on the bottom photo says, BH17E, right?
12       A.   Yes.
13       Q.   You know, do you not, that BH stand
14   for bore hole?
15       A.   Yes.
16       Q.   Not piling.
17       A.   Yes.
18       Q.   Why do you call it a piling?
19       A.   Well, it's an example of an open
20   excavation --
21       Q.   Why do you call it a piling?
22           MR. JOANEN:
23               Objection.  He's answering the
24           question.
25           MR. TREEBY:

Page 135

1            No, it's not responsive.
2            MR. JOANEN:
3            You cut him off.
4            MR. TREEBY:
5                I did.  I cut him off because his
6            any is non responsive.
7    EXAMINATION BY MR. TREEBY:
8        Q.   Go ahead and finish your non
9    responsive answer.
10           MR. JOANEN:
11               Objection to the characterization
12           of Dr. Bea's answer.
13       A.   I personally chose the photograph to
14   illustrate an open hole left on the EBIA site,
15   as you encouraged me during my deposition.  I
16   kept all of the identification information
17   associated with the photographs so there
18   couldn't be any confusion this time, and then
19   referred to this as examples of the kind of
20   hole left by pile extractions.
21       I have other photographs directly of
22   pile excavation holes, as well.
23   EXAMINATION BY MR. TREEBY:
24       Q.   Why didn't you use those?
25       A.   That's a good question.

Page 136

1        Q.   Yeah, it is.
2            But the caption that you added to
3    Figure 7 says, quote, piles extracted and voids
4    left unfilled, close quote.  Right?
5        A.   Correct.
6        Q.   Is it, then, despite the caption, a
7    statement that Washington Group International
8    did not backfill the voids from bore holes that
9    it used for sampling purposes in the EBIA?
10           MR. JOANEN:
11               Object to the form.
12   EXAMINATION BY MR. TREEBY:
13       Q.   Do you understand the question?
14       A.   No.
15       Q.   You don't understand the question?
16       A.   Oh, I do understand the question.
17       Q.   Okay.
18       A.   One is referring to sampling
19   operations.  The other element we're discussing
20   is referring to pile extraction voids.
21       Q.   I assume it would be important and
22   favorable to your opinion if bore holes were
23   made and not backfilled.  Isn't that right?
24       A.   It could be, yeah.
25       Q.   So conversely, if in fact, instead of

JOHNS, PENDLETON COURT REPORTERS          504 219-1993

ROBERT G. BEA, PH.D.                                            April 16, 2012

---

Page 137

1  conjecture, the bore holes, including this bore
2  hole, had been backfilled, that would impact
3  your opinions in a manner to the opposite,
4  isn't that right?
5          MR. JOANEN:
6              Object to the form.
7      A.  Well, if we have sealed conduits that
8  can provide hydraulic connections with the
9  buried deposits, that's an important thing,
10 which means water is not communicating through
11 those holes.  But for other holes not
12 backfilled, that's an important -- a potential
13 contribution to the hydraulic conductivity.
14 EXAMINATION BY MR. TREEBY:
15     Q.  Is it your testimony that bore holes
16 done by Washington Group at the EBIA were not
17 backfilled?
18     A.  No.
19     Q.  Do you know whether or not they were
20 backfilled?
21     A.  I think they were backfilled.
22     Q.  If you think they were backfilled, why
23 would you use this picture and say piles
24 extracted and voids left unfilled, and this is
25 an illustration?

---

Page 138

1          MR. JOANEN:
2              Objection.  Asked and answered.
3      I'll also object to the form of the
4      question.
5      A.  I answered that question previously.
6  EXAMINATION BY MR. TREEBY:
7      Q.  We'll see.
8          MR. JOANEN:
9              Move to strike that conjecture
10     and comment for the record.  There's
11     no need for that.
12 EXAMINATION BY MR. TREEBY:
13     Q.  Have you looked at the evidence that
14 would show whether or not these bore holes were
15 backfilled and capped?
16     A.  I have seen evidence that indicates
17 that bore holes used for sampling soils were
18 backfilled.
19     Q.  And capped.
20     A.  Yes.
21     Q.  What did you see; what you do say you
22 saw that shows that?
23     A.  Well, I remember photographs where the
24 type of operation was happening specifically
25 associated with the MMG boring series

---

Page 139

1  constructed or performed along the entire
2  length of the EBIA.
3      Q.  Turn to Page 6, Paragraph 12.
4      A.  Yes, sir.
5      Q.  Do you contend that all of the utility
6  excavations referenced in this paragraph
7  extended to a depth of five feet?
8      A.  No.
9      Q.  Well, which of the utility trenches
10 did you evaluate that you say extended to a
11 depth of five feet?
12     A.  Those could be identified, as we
13 previously discussed, through access reference
14 to the geographic information system we've
15 compiled for this demonstrative I'm
16 referencing.
17     Q.  That's the GIS database that we
18 haven't been given?
19     A.  Well, I'm not certain about the
20 haven't been given.  The system exists online.
21 It's accessible online.  I'm not sure if you've
22 been given the URL access for that, but you
23 certainly could be.
24     Q.  Is it in your reference list, that URL
25 access?

---

Page 140

1      A.  I'm not sure.  I'd have to review that
2  list.
3      Q.  Does it have any security code to it?
4      A.  What's that?
5      Q.  The answer is yes?
6          MR. JOANEN:
7              I don't think --
8      A.  No.  I said, what is it?
9  EXAMINATION BY MR. TREEBY:
10     Q.  Okay.  Does this URL site that you say
11 exists have a security code to it?
12     A.  Yes.  Yes, it does.
13     Q.  And have we been given that?
14     A.  I do not know.
15         (Lunch break.)
16 EXAMINATION BY MR. TREEBY:
17     Q.  Dr. Bea, I just want to clear
18 something up in the record.
19         Is it your understanding that
20 Washington Group did not produce its documents
21 in electronic form in February of 2008, all of
22 them?  All of its documents?
23     A.  Correct.
24     Q.  You didn't understand that that was
25 true?

---

35 (Pages 137 to 140)

ROBERT G. BEA, PH.D.                                    April 16, 2012

| Page 141 |
|---|

1    A.  Correct.
2        MR. TREEBY:
3            Mr. Joanen, would you confirm
4        that in fact they were all produced
5        electronically in 2008 on concordance?
6    MR. JOANEN:
7            I don't know that everything was
8        produced.  I remember there being some
9        dispute as to whether there was
10       information regarding the other sites.
11   MR. BRUNO:
12           Yeah.
13   MR. JOANEN:
14           ITT -- I can't remember the other
15       one.  So I don't know that everything
16       was produced.  Likewise --
17   MR. TREEBY:
18           I will represent on the record,
19       for the record, that all of the
20       documents that Washington Group
21       produced in paper, in August of 2006,
22       which was about 35 boxes of paper,
23       plus all of the documents that were
24       pulled by Washington Group from the
25       government repository, were given to

| Page 142 |
|---|

1        the plaintiffs in concordance in
2        February of 2008.  And --
3    MR. BRUNO:
4            That's not my memory.
5    MR. TREEBY:
6            The witness is not apparently
7        privy to that.
8    MR. BRUNO:
9            That's not my memory either.
10   MR. TREEBY:
11           We will be able to provide an
12       affidavit of the number of gigabytes
13       and the exact representation of what
14       was produced, and we will give that to
15       the Court at the appropriate time.
16   EXAMINATION BY MR. TREEBY:
17       Q.  And Dr. Bea, it became apparent as I'm
18   thinking about the testimony this morning that
19   specific information about depths and locations
20   and sizes of excavations, if I ask you
21   questions about them, you're going to need to
22   refer to this GIS database, is that correct?
23       A.  Correct.
24       Q.  And to the extent your report actually
25   refers to things like field logs --

| Page 143 |
|---|

1    specifically refers to Washington Group
2    documents such as field logs, it's correct that
3    you know at least in paper form those were
4    given in at least August of 2006.  Is that
5    correct?
6        A.  I don't recall August of 2006.
7        Q.  Well, your recollection is 2008.  Is
8    that correct?
9        A.  That's correct.  Because in 2006 I was
10   still working with the Independent Levee
11   Investigation Team.
12       Q.  Let's pin that down.
13           When were you first engaged by
14   plaintiffs' counsel to work in litigation
15   related to the EBIA floodwall breaches?
16       MR. JOANEN:
17           I'll object to the form of the
18       question.
19       A.  Well, my Rule 26 declaration recounts
20   all of the legal engagements, so you can refer
21   to that document.
22   EXAMINATION BY MR. TREEBY:
23       Q.  From your memory, when were you first
24   engaged for litigation as opposed to the ILIT
25   report?  Just give me a year, if you can.

| Page 144 |
|---|

1        A.  March 2007.
2        Q.  Okay.  And just to -- I'm going to try
3    to, because of your prior testimony, skim
4    through a lot of this very quickly, but on Page
5    7, Paragraph 14, in the first sentence --
6        A.  Of?
7        Q.  Your report.
8        A.  Which?
9        MR. JOANEN:
10           The rebuttal report?
11   EXAMINATION BY MR. TREEBY:
12       Q.  The one I'm examining you on.
13       A.  Page 7?
14       Q.  Page 7, Paragraph 14.  First sentence,
15   quote, there were a number of deep excavations,
16   more than five feet, at the site.
17           You see that?
18       A.  Yes.
19       Q.  In order to give me a precise answer
20   to that question, you'd have to have the GIS
21   database; is that right?
22       A.  That's correct.
23           I comment to you that the GIS database
24   includes, to my knowledge, all documentation
25   that you produced for our use.  We have

ROBERT G. BEA, PH.D.                                          April 16, 2012

Page 145

1   categorized that documentation as it applies to
2   the three general areas that are subjects of my
3   work, including photographs that are attributed
4   to each one of the areas.  So the GIS database
5   is an extensive collection of the background
6   information that resulted in the Swiss cheese
7   illustrations.
8        Q.  So that database you would rely on to
9   make your general allegations about depths and
10  size and consequences of excavation, is that
11  correct?
12       A.  Correct, sir.
13       Q.  And that was not produced in your
14  reliance materials, isn't that right?
15       A.  What's it in your --
16       Q.  It being your GIS database.
17       A.  Well --
18          MR. JOANEN:
19              Object to the form.
20       A.  -- as I've previously testified, it's
21  not in my memory whether we did or did not
22  produce the access to the website together with
23  the pass code information.  I just don't
24  recall.
25  EXAMINATION BY MR. TREEBY:

Page 146

1        Q.  If you would turn to Page 16 of your
2   report, please --
3        A.  Yes, sir.
4        Q.   -- the title of this section is
5   hydraulic pressure conductivity analyses.  Is
6   that correct?
7        A.  That's correct.
8        Q.  I want to ask you about that title for
9   a minute.  Diego Cobos-Roa testified he has
10  never heard that term in any course he's taken.
11          Do you have any basis to disagree with
12  him on that?
13       A.  No.
14       Q.  Did you use the -- ever use that term
15  hydraulic pressure conductivity when you taught
16  engineering courses at UC Berkeley?
17       A.  Yes.
18       Q.  Did Cobos-Roa take any of those
19  courses?
20       A.  No, as he so testified.
21       Q.  And he also testified that, and you
22  were there, that he never read that term
23  hydraulic pressure conductivity in any
24  engineering textbook.
25          Do you have any reason to disagree

Page 147

1   with him about that?
2        A.  No.
3        Q.  Have you ever read that term in any
4   engineering textbook?
5        A.  I think so.
6        Q.  What textbook?
7        A.  Called Margins of Quality.  And the
8   previous edition was titled Load Engineering.
9        Q.  Margins of Quality?
10       A.  Correct.
11       Q.  And the other title was?
12       A.  Load Engineering.
13       Q.  And who was the author?
14       A.  I am.
15       Q.  So you use that in a textbook.  Do you
16  know of anybody else who's ever used that in a
17  textbook?
18       A.  No.
19       Q.  If you would refer to Page 20,
20  Paragraph 27 of your rebuttal report, Bea
21  Exhibit 49.  Are you there?
22       A.  Yes, sir.
23       Q.  There you state that, and I quote,
24  Hydraulic conductivity results, paren, e.g.,
25  deposits horizontal and vertical permeability

Page 148

1   characteristics, close parens, developed from
2   analyses of field pump and, small quotes, slug,
3   close small quote, tests performed at the Lower
4   Ninth Ward during 2011, parens, Fugro 2012,
5   Rogers 2012, close parens, in the buried
6   swamp-marsh deposits have been based on
7   analytical models that are based on steady flow
8   hydraulic conditions.
9           Did I read that correctly?
10       A.  Yes.
11       Q.  Are you stating here under oath that
12  the pumping test analyses Kevin Pope did for
13  Dr. Rogers using the Theis method were based on
14  steady flow analysis, yes or no?
15       A.  I don't recall, but that detail is
16  addressed in Appendix A to my report.
17       Q.  Are you stating here under oath that
18  the pumping test analyses Kevin Pope did for
19  Dr. Rogers using the Hantush-Jacob method were
20  based on steady flow analysis, yes or no?
21       A.  The answer to that is addressed in
22  Appendix A to my report.
23       Q.  You can't answer me yes or no?  Is
24  that what you're saying?
25       A.  I'm saying a more complete answer is

37 (Pages 145 to 148)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                      April 16, 2012

Page 149

1    Appendix A in my report.
2        Q.   And I'll be happy to look to Appendix
3    A of your report for a more complete answer,
4    but what would be the yes or no answer?
5        A.   To my knowledge, it's based, as we
6    used it, on steady flow conditions.
7        Q.   If you would turn to Page 30 of your
8    quote rebuttal report, Paragraph 39.  You
9    there?
10       A.   Yes.
11       Q.   You use a term, and I quote, and you
12   put it in small quotes, transient, close small
13   quote, small quote, steady flow, close small
14   quote, conditions.
15           You see that term?
16       A.   Yes, sir.
17       Q.   That phrase?  Is this another phrase
18   that you have invented?
19       A.   No.
20       Q.   Can you point me to any geotechnical
21   engineering text that uses that phrase,
22   transient steady flow conditions?
23       A.   Well, the terms are appropriately
24   defined in the text written by Lambe & Whitman
25   dated 1969.

Page 150

1        Q.   That phrase transient steady flow
2    conditions, is it your testimony that that's
3    found in Lambe 's reference book?
4            MR. JOANEN:
5                Object to the form.
6        A.   The definition of steady flow is
7    defined in the book.  That's reason that it is
8    in separate quotation marks, and similarly with
9    the word transient.
10   EXAMINATION BY MR. TREEBY:
11       Q.   I understand the word transient is
12   found, I understand the word steady flow is
13   found.  And I understand the word conditions is
14   probably found.
15           My question is, can you point to me to
16   a geotechnical engineering text that uses those
17   four words, transient steady flow conditions,
18   in that phrase?
19           MR. JOANEN:
20               Object to the form.  Asked and
21               answered.
22       A.   No.
23   EXAMINATION BY MR. TREEBY:
24       Q.   Thank you.  Now, you have a section in
25   your report, Paragraphs 38 through 46,

Page 151

1    beginning on Page 29, going into Page 38.
2        A.   Yes, sir.
3        Q.   And you call it engineering standard
4    of care, I believe.  Is that right?
5        A.   Incorrect, sir.
6        Q.   I'll have to be really on somebody who
7    gave me that if it's not true, so -- wait,
8    there is a section called Engineering Standard
9    of Care, Page 38.
10       A.   But it doesn't show up on, again,
11   Pages 29 into Page 38.
12       Q.   Oh, okay.  I'm sorry.  Engineering
13   standard of care shows up on Page 38; right?
14       A.   Correct.
15       Q.   Okay.  That's where I was starting,
16   and I don't know where I got those page
17   numbers.
18           I'm sorry.  It was a bad question in
19   the first place.
20           Your section on engineering standard
21   of care begins on Page 38 and continues through
22   Page 53; is that correct?
23       A.   That's correct.
24       Q.   And that's a total of about sixteen
25   pages, right?

Page 152

1        A.   Yes, sir.
2        Q.   Did you draft this section?
3        A.   I drafted complete parts of this
4    section.  I was assisted in drafting other
5    parts.  And in preparation of the text, I wrote
6    all parts.  I produced the Word document that
7    contains all the words.
8        Q.   Who helped you?
9        A.   My wife.
10       Q.   Okay.  You said you were helped by
11   someone else.  That's the other person you were
12   referring to?
13       A.   I'm referring to people that were
14   helping me gather information that went into
15   this section.
16       Q.   Okay.  You say you drafted complete
17   parts of this section, and then you say I was
18   assisted in drafting other parts.  I'm asking,
19   who did any assisting in drafting other parts?
20       A.   Mr. Scott Joanen, sitting across from
21   you; Mr. Andy Owen, as well.
22       Q.   So Scott Joanen wrote part of this, or
23   drafted part of this, and Andy Owen drafted
24   parts of this, and you drafted the other parts
25   of it, and then you put it together in a Word

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 153

1  document.
2      A.  Correct.
3      Q.  Is that your testimony?
4      MR. JOANEN:
5          Object to the form.
6  EXAMINATION BY MR. TREEBY:
7      Q.  Is there any information cited in this
8  new standard of care analysis on Pages 38 to 53
9  of your, quote, rebuttal report, that you did
10 not have available to you when you prepared
11 your February 1, 2012 report in this case?
12     A.  Yes.
13     Q.  What, specifically?
14     A.  The map of deaths in the Lower Ninth
15 Ward attributed to drowning during hurricane
16 Katrina.
17     Q.  The map of what?  I didn't understand
18 what you said.  The map of what?
19     A.  If you'll look on Page 53, Figure 23
20 is a map titled Deadly Flooding from Hurricane
21 Katrina 's Levee Breaches.  It's attributed to
22 an article written by Mark Schleifstein titled
23 Study of Hurricane Katrina 's -- misspelled --
24 dead show most were old, lived near levee
25 breaches, end quote, from the Times-Picayune,

Page 154

1  August 27th, 2009.
2      Q.  And that wasn't available to you on
3  February 1, 2012?  Is that what you're saying?
4      A.  That's correct.
5      Q.  Okay.
6      A.  I went --
7      Q.  Other than that --
8      A.  I researched it.  I went to respond to
9  the questioning you gave me at my deposition.
10     Q.  We'll see.  Okay.
11     MR. JOANEN:
12         I'll move to strike that comment
13     again.  That's just inappropriate.
14     MR. TREEBY:
15         Okay.  It's not inappropriate.
16     MR. JOANEN:
17         It most certainly is.
18     MR. TREEBY:
19         I didn't ask any such question.
20     I just said something to myself.  It's
21     on the record.  The Court can do what
22     it will with it.  But I didn't ask any
23     such question in my -- of this
24     witness, or anyone else, frankly, that
25     would produce that map.  And I so

Page 155

1  represent.
2  EXAMINATION BY MR. TREEBY:
3      Q.  Going on from there, Dr. Bea:
4      A.  Yes, sir.
5      Q.  Other than that August 27, 2009 map,
6  is there anything other than that that was not
7  available to you when you prepared your
8  February 1 2012 report in this case?
9      A.  A draft copy of Dr. Sykora 's
10 deposition; I'm not sure that I had access or
11 attained the Viegel deposition transcript; the
12 Dr. Lucia deposition cited on Page 45.
13         I think that's a complete list.
14     Q.  Turn to Page 39, top of the page.
15 This is your April 3rd report?
16     A.  Yes, sir.
17     Q.  You're quoting there a definition of
18 standard of care for, quote, a professional,
19 close quote, from a, quote, bench approved jury
20 instruction, close quote, in a 2003 article
21 from Joshua Kardon, right?
22     A.  That's correct.
23     Q.  What Court approved this jury
24 instruction?
25     A.  I don't know.  But that is defined in

Page 156

1  the references of Dr. Joshua Kardon 's
2  dissertation.
3      Q.  Are you stating, as a fact, that
4  Joshua Kardon in that article, tells us what
5  Court approved that instruction?
6      A.  I referred --
7      MR. JOANEN:
8          Object to the form.
9      A.  -- to his dissertation, not to the
10 article.
11 EXAMINATION BY MR. TREEBY:
12     Q.  Okay.  Whatever -- the dissertation
13 that you cite and that's in your reliance
14 materials -- right?
15     A.  It's there.
16     Q.  Okay -- are you stating that it states
17 what Court provided that jury instruction?
18     A.  I believe it does, yes.
19     Q.  And if it doesn't, your memory is
20 faulty?
21     A.  That's correct.
22     Q.  Okay.  The next paragraph, 48, you
23 say, Louisiana specifies a similar standard to
24 the bench approved jury instruction.  But
25 there's no citation for this proposition.

ROBERT G. BEA, PH.D.                                    April 16, 2012

                                                            Page 157
1   Well, it's not there.  There's no citation.
2       A.  That's correct.
3       Q.  Are you referring to a Louisiana
4   statute?
5       A.  Um -- I think so, yes.
6       Q.  Do you know any Court that has used
7   that jury instruction of your own knowledge?
8       A.  No.
9       Q.  Is that part of what a forensic
10  engineer does, offer advice on jury
11  instructions?
12      A.  Well, we don't offer advice on jury
13  instructions, but we take such instructions to
14  provide foundational insight into what the
15  Court determines or evaluates as definitions of
16  the standard of care.
17      Q.  On Page 44 of your April 3rd report,
18  you cite several times to Washington Group
19  International 's recommendation report, capital
20  R, capital R; right?
21      A.  Correct.
22      Q.  And I asked you during your March 28
23  deposition whether you had reviewed that
24  recommendation report in connection with your
25  analysis for your February 1, 2012 report.

                                                            Page 158
1        You remember that?
2       A.  Yes, sir.
3       Q.  You said you had not reviewed it;
4   right?
5       A.  That's correct.
6       Q.  So you first reviewed the
7   recommendation report after your deposition, is
8   that correct?
9       A.  To best of my memory, that is correct.
10      Q.  Did you review the whole thing or just
11  parts?
12      A.  Parts.
13      Q.  But you do recognize that Washington
14  Group had provided this in paper form in 2006.
15  Correct?
16      A.  Well, as I testified, I was not
17  engaged in this work until after that time, so
18  I can't testify when it was originally
19  produced.
20      Q.  Well, you've -- was this in the
21  materials that were provided that you referred
22  to earlier as being provided to you in -- or
23  accessed to you in 2008?
24      A.  Yes.
25      Q.  Turn to Paragraph 60 on Page 45 of

                                                            Page 159
1   your report.  Are you there?
2       A.  Yes, sir.
3       Q.  You discuss the Washington Group
4   International groundwater monitoring report in
5   that paragraph; right?
6       A.  Yes, sir.
7       Q.  This is the same groundwater
8   monitoring report you discussed in your
9   February 1, 2012 report on Pages -- well, I'll
10  just stop there, because you probably don't
11  remember the pages.  But you did discuss it,
12  did you not, in your February 1, 2012 report?
13      A.  Yes, sir.
14      Q.  In fact, right there in Paragraph 60,
15  you refer to Figures 37A and 37B of your
16  earlier report, right?
17      A.  Correct.
18      Q.  So that you had available to you
19  before the February 1 report, right?
20      A.  That's correct.
21      Q.  If you would, look at Paragraph 61 on
22  Page, Paragraph 61 on Page 46.  Do you see
23  that?
24      A.  Yes, sir.
25      Q.  You describe photographs clearly

                                                            Page 160
1   indicating the waters of the IHNC were in
2   direct communication with the soils adjacent to
3   the flood wall at the north end of the Boland
4   Marine site, and you refer to a photograph on
5   the next page.  Is that right?
6       A.  Yes, sir.
7       Q.  Then you cite to Figure -- okay.
8        Does this photograph show waters from
9   the IHNC communicating with the soils adjacent
10  to the flood wall?
11      A.  It shows the floodwaters communicating
12  to the west side of Surekote Road.  The
13  photograph terminates to the left with the
14  temporary trailers that were put on the east
15  side of Surekote Road, so you can't see the
16  water completely to the face of the I-wall.
17      Q.  Because the flood wall is behind these
18  trailers.  Right?
19      A.  That's correct.
20      Q.  And you can't see any water behind the
21  trailers, right?
22      A.  That's correct.  Unfortunately, the
23  photograph didn't pan far enough to the
24  left-hand side to capture that.
25      Q.  How do you know that all of the

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 161

```
 1  ponding water you see in this photo is from the
 2  IHNC?
 3      A.  Well, it's directly connected to the
 4  IHNC to the right-hand side of the photograph.
 5      Q.  There are actually ponding that isn't
 6  connected, isn't that true, in this picture, in
 7  the foreground?
 8      A.  Well, the pond adjacent to the
 9  telephone pole in the foreground doesn't show
10  direct connections, but if you continue looking
11  at detail to the right and then scan down
12  south, you can see the connections to the
13  larger pond that then is connected to the IHNC.
14      Q.  Please refer to Paragraph 140 on Page
15  102 of your report.  Are you there?
16      A.  Yes.
17      Q.  If you would refer -- I'm going to
18  begin reading at the second sentence, third
19  line of that paragraph.  And I want you to
20  follow, if you would.  This effective undrained
21  shear strength -- you see that?
22      A.  Yes, sir.
23      Q.  This effective undrained shear
24  strength was based on results from laboratory
25  undrained shear strengths on these soils as
```

Page 162

```
 1  well as interpreted results from in situ cone
 2  penetrometer tests, parenthesis, CPTs, close
 3  parenthesis, period, close quote.
 4          Did I read that correctly?
 5      A.  Yes, sir.
 6      Q.  Is this term effective -- or this
 7  phrase, let me put it that way:  Is this
 8  four-word phrase effective undrained shear
 9  strength another term you have invented?
10          MR. JOANEN:
11              Object to the form of the
12          question.
13      A.  I don't think so.
14  EXAMINATION BY MR. TREEBY:
15      Q.  Can you point us to any geotechnical
16  engineering text that uses that phrase, the
17  whole phrase?
18      A.  I can refer to the dissertation at
19  Northwestern University written by
20  Dr. Schmertman that uses that term in the
21  context of the Hvorslev -- H-V-O-R-S-L-E-V --
22  definition of effective shear strengths for
23  cohesive soils.
24      Q.  Again, it's your testimony that John
25  Schmertman in his dissertation used the whole
```

Page 163

```
 1  phrase in that order, effective undrained shear
 2  strength.
 3      A.  Correct.  That term also shows up in
 4  my thesis written under the direction of John
 5  Schmertman in which we investigated effective
 6  undrained shear strengths of cohesive soils.
 7  So you could find that, as well, in my master's
 8  thesis.
 9      Q.  Item number 9 on Page 130 of your
10  rebuttal report, Page 130 -- I say in Item
11  number 9.  Perhaps it's Paragraph 9.  I don't
12  know.
13      A.  Yes, sir.
14      Q.  But you're there, right?
15      A.  Yes, sir.
16      Q.  The bottom photograph in that page?
17      A.  Theis solution.
18      Q.  And that paragraph begins as follows:
19  A brief review of the Theis solution reveals
20  that the compressibility of soil and water is
21  not taken into account.  In the paper tilted,
22  quote, Modified Theis Equation by Considering
23  the Bending Effect of the Confining unit, close
24  quote, by Xu Sheng Wang, Chong Xi Chen, Jiu J.
25  Jiao, we learn that the Theis equation was
```

Page 164

```
 1  derived under the assumption that total stress
 2  in the aquifer was constant and the mechanical
 3  behavior of the confining units was neglected,
 4  close single quote.
 5          Did I read that correctly?
 6      A.  Yes, you did.
 7      Q.  Now, you did not provide us the Wang
 8  article you referenced in your reliance
 9  materials, did you know that?
10      A.  No, I did not.  I thought I did.  But
11  if I omitted it, that's an oversight.
12      Q.  It was certainly cited, but it wasn't
13  provided.  In any case, we were able to find
14  the article from the MIT library online, and I
15  believe I have a copy of the article to show
16  you.
17          First, did you read this entire
18  article yourself?
19      A.  No.
20      Q.  Who read it for you?
21      A.  Mr. Kevin Pope, the man who coauthored
22  this section with me.
23      Q.  Did you read anything except this what
24  you have indicated is a quote from the Wang
25  article, yourself, or was that simply
```

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 165

1  provided -- was that quote simply provided by
2  Kevin Pope?
3      A.  No, I read over articles dealing with
4  the interpretation of results from field
5  hydraulic testing to background my knowledge on
6  this topic.  The particularly useful article,
7  again to the best of my memory, I included both
8  in my reference list and in my reliance
9  materials.
10     Q.  You may have answered my question, but
11 if so it's my inadequacy of understanding to
12 know what the answer was.
13         So my question again is this:  And
14 I'll try to make it simpler.  There is a quote
15 from the Wang article --
16     A.  Yes.
17     Q.  -- in that paragraph.
18     A.  Correct.
19     Q.  Did you even look at the article to
20 read that the quote was accurate?  Or did you
21 rely on Kevin Pope to give you that quote?
22     A.  The latter.
23     Q.  Thank you.  Now, I show you what I
24 believe to be the article you cited and quoted
25 on Page 130 of your, quote, rebuttal report,

Page 166

1  close quote.  And we've marked it Bea Exhibit
2  number 56.  And since -- and I have
3  highlighted -- no, I haven't highlighted what
4  he quoted.
5         But I think you can find what Kevin
6  Pope gave you in the opening paragraph, I
7  think.  Yes.  You can find the quote that
8  Mr. Pope gave you as the third sentence, I
9  believe, under the Abstract section of the
10 article.
11        And it's just that sentence that he
12 gave you?
13        (Bea Exhibit 56 was marked for
14 identification and is attached hereto.)
15     A.  Yes.
16 EXAMINATION BY MR. TREEBY:
17     Q.  Is that correct?
18     A.  Yes, sir.
19     Q.  Okay.  Now, the first sentence in your
20 Paragraph 9 on your rebuttal report, Page 130,
21 the first sentence that begins A brief review,
22 was that sentence written by Kevin Pope or is
23 that a sentence you wrote?
24     A.  Kevin.
25     Q.  So you did not read this article to

Page 167

1  determine if perhaps the quote he gave you was
2  taken out of context, did you?
3      A.  I did read the article and did not
4  determine that the quote was taken out of
5  context.
6      Q.  You didn't read the article?
7      A.  I did.  D-I-D.
8      Q.  Okay.  I'm going to go back -- I
9  thought you testified just a few minutes ago
10 that you didn't read the article.
11     A.  I had read this article.  If I so
12 testified earlier, my memory was flawed and my
13 testimony was consequently flawed.  I do recall
14 when you produced the article from Elsevier
15 Publishers that I had read it.
16     Q.  You gave a very lengthy answer.  Let
17 me read it to you so we get a clear record
18 here.  It begins on Line 9.  And it says,
19 Question:  Did you read anything except this
20 what you have indicated is a quote from the
21 Wang article yourself, or was that simply
22 provided -- was that quote simply provided by
23 Kevin Pope?
24         And you answered, No, I read over
25 articles dealing with the interpretation of

Page 168

1  results from field hydraulic testing to
2  background my knowledge on this topic.  The
3  particularly useful article, again, to the best
4  of my memory, I include identification both in
5  my reference list and in my reliance materials.
6         And that was a confusing answer to me,
7  so I asked you the clarify it.
8         And I said, You may have answered my
9  question, but if so, it's my inadequacy of
10 understanding to know what the answer was, so
11 my question again is this, and I'll make it
12 simpler:  There is a quote from the Wang
13 article.
14         Yes.
15         Answer:  Correct.
16         Question:  Did you even look at the
17 article to read that the quote was accurate, or
18 did you rely on Kevin Pope to give you that,
19 quote, answer?
20         The latter.
21         The latter was you relied on Kevin
22 Pope to give you that quote, not that you read
23 the article.  So you want to change that?
24     A.  Well, Kevin did provide the quote, the
25 text.  I did read this article --

                              42 (Pages 165 to 168)

JOHNS, PENDLETON COURT REPORTERS              504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 169

1    Q.  Okay.
2    A.  -- to prepare my report.
3    Q.  Now, in that first sentence, you are
4  asserting -- or Kevin pole is asserting and you
5  adopted his assertion, that the Theis method
6  does not account for compressibility of soil
7  and water.  Is that right?
8    A.  Correct.
9    Q.  Please point out where in this article
10  the Theis method is mentioned in the context of
11  not taking the compressibility of the soil into
12  account.
13       Have you finished?
14    A.  No, I have not.
15       And your question is?
16    Q.  We'll go back.  And so we make sure
17  we've got what we're talking about here, in
18  your first sentence of your report that we
19  quoted, Paragraph 9, Page 130, you state, In
20  the Theis solution the compressibility of soil
21  and water is not taken into account.
22       And then I ask you, You are asserting
23  there to the Theis method does not account for
24  compressibility of soil and water, right?
25       And you said, Correct.

Page 170

1    A.  Correct.
2    Q.  And I then asked you to show me
3  anything in this article where the Theis method
4  is mentioned in the context of not taking the
5  compressibility of the soil into account.
6    A.  Yes.
7    Q.  And where would that be?
8    A.  On Page 983, first paragraph in the
9  left-hand column, thirteen lines down from the
10  top, the sentence reads:  It will be
11  demonstrated that the Theis solution is a
12  special case in which the confining unit has no
13  rigidity, or the aquifer matrix is
14  incompressible.
15       The stress analysis continues on that
16  page to the right-hand column and concludes,
17  This equation assumes the aquifer is saturated
18  or almost saturated by water and the soil
19  grains are assumed incompressible, which is the
20  case for the aquifer system in this study.
21    Q.  Is that it?
22    A.  There are other sentences that refer
23  to the incompressibility element contained in
24  the Theis solution.
25    Q.  In fact, the very first sentence in

Page 171

1  this report, on Page 981, in the highlighted
2  passage, says that the Theis equation has been
3  widely used to study the transient movement of
4  groundwater.  Isn't that true?
5    A.  Yes.
6    Q.  And then it -- under Introduction, in
7  the second sentence, it says, It is well known
8  that the first solution of transient drawn down
9  around a pumping well was given by Theis.
10       Isn't that correct?
11    A.  I think you read that correctly.
12    Q.  And then on the next page, 982, in
13  fact, it gives the formulas for the Theis
14  solution, does it not?
15    A.  Yes.
16    Q.  And that includes compressibility,
17  does it not?
18    A.  Well, there's a storage coefficient
19  that is included in the formulation.  Is that
20  what you're referring to?
21    Q.  Yes.  We've already covered that.
22  That's directly related to M sub V, is it not?
23    A.  That's correct.
24    Q.  Okay.
25    A.  And as the article unfolds, the

Page 172

1  incompressibility condition is cited as being
2  part of that complete solution.
3    Q.  We're going to take it piece by piece
4  here so that we all are on the same page, so to
5  speak.  983.
6       MR. JOANEN:
7           I'm going to object to the
8       comments.  Questions, answers.  We
9       don't need those comments.
10  EXAMINATION BY MR. TREEBY:
11    Q.  Page 983.  I've highlighted these
12  places so you can find them easily.  That
13  paragraph, alpha, in that formula, is
14  compressibility, is it not?  Do you see it?
15  You know what paragraph I'm in?  The
16  highlighted paragraph, Page 983.  I highlighted
17  it for you.
18    A.  I've seen the highlight.  I'm looking
19  up the definition of alpha --
20    Q.  Okay.
21    A.  -- if I might.
22    Q.  Well, I think it's right there in the
23  paragraph.  That's why I was trying to keep you
24  there.  If you'll look at the very last two
25  lines, doesn't it say, alpha is the

43 (Pages 169 to 172)

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 173

1    compressibility of the elastic aquifer matrix?
2        A.  Yes.  That's correct, sir.
3        Q.  So alpha is compressibility, right?
4        A.  Well --
5        Q.  In that formula.
6        A.  This is the compressibility of the
7    elastic aquifer system.
8        Q.  Right.  And if you will look on Page
9    984, under the paragraph Model and Solutions,
10   you see that?
11       A.  Yes, sir.
12       Q.  And it says, for the aquifer well
13   system showed in Figure 2, the transient radial
14   flow of the confined aquifer can be described
15   with the following equation.  It gives an
16   Equation 14, and then it says, where q is the
17   sink or source term, according to 8 and 10, 14,
18   can be rewritten as, and then it gives Equation
19   15, which clearly shows transient flow and
20   compressibility in the equation.
21          Does it not?
22       MR. JOANEN:
23              Object to the form.
24       A.  Well, I can't look at that equation
25   and tell you that it clearly shows what you

Page 174

1    contend it shows.
2    EXAMINATION BY MR. TREEBY:
3        Q.  Okay.  Isn't it true that what the
4    authors are doing in this article, taken as a
5    whole, since you read the whole thing now, are
6    trying to extend the Theis method to account
7    for the rigidity of a confining layer in a rock
8    profile, in other words, a rock aquifer
9    overlain by a rock confining layer?  Isn't that
10   what they're trying to solve?
11       A.  That's apparently it, yes.
12       Q.  So there is a thin rock layer on top
13   which is called a confining layer --
14       A.  Yes.
15       Q.  -- is flexible, and they want to
16   account for what happens when that is flexible
17   and adjust the Theis theory to deal with that
18   unique situation.  Right?
19       A.  Correct.
20       Q.  And their case study involves aquifers
21   more than a hundred feet deep, if I read it
22   correctly.
23       A.  Yes.
24       Q.  Now, one other thing:  Going to some
25   language that you gave us, on Page 983, you

Page 175

1    read the sentence that starts in the first
2    column and goes over to the top of the second
3    column.  Right?  The equation assumes that the
4    aquifer is saturated, or almost saturated, and
5    the soil grains are assumed incompressible.
6          Isn't that what that says?
7        A.  That's what I intended to read.
8        Q.  So grains that are non organic are
9    always assumed incompressible.  Right?  It's
10   the structure that's not assumed to be
11   incompressible; isn't that correct?
12       A.  I don't think that's correct.
13       Q.  Okay.
14       (Brief recess.)
15       MR. TREEBY:
16              Thank you, Dr. Bea.  That's my
17       questions for now.
18   EXAMINATION BY MR. SMITH:
19       Q.  Good afternoon, Dr. Bea.
20       A.  Good afternoon.
21       Q.  Robin Smith for the United States.  I
22   know you're wall aware of that.  I'm just
23   putting it on the record.
24       A.  Yes, sir.
25       Q.  I have a few questions for you today.

Page 176

1    And I'll try to speak up so you can hear me and
2    so the court reporter can get my words, as
3    well.
4          I'll start by asking you about your
5    hydraulic pressure conductivity analyses using
6    SEEP/W.  Those analyses, I think we've heard
7    testimony previously, were performed by
8    Mr. Diego Cobos-Roa.  Correct?
9        A.  Correct.
10       Q.  And the purpose of those analyses, as
11   you state in your rebuttal report -- and I'm
12   going to quote from Paragraph 18 -- was to
13   address the hydraulic pressures developed in
14   the buried swamp-marsh deposits under the
15   protected side levee.  Is that correct?
16       A.  Yes.
17       Q.  Is that your statement?
18       A.  Yes.
19       Q.  In these analyses, would you agree
20   that steady state flow mechanics were used to
21   assess the pressure effects of changes in
22   hydraulic loading?
23       A.  Well, we used steady flow analyses.
24   And there were two subsets to that category of
25   analyses, one of which was steady state flow

44 (Pages 173 to 176)

**ROBERT G. BEA, PH.D.**                                    **April 16, 2012**

Page 177

1    and the other of which was transient state
2    flow.  As Mr. Cobos-Roa testified, for the
3    majority of work done in this phase, we relied
4    on a sequence of transient flow analyses based
5    on steady flow conditions.
6        Q.  Would it be fair to say that the focus
7    of these analyses was the transmission of
8    hydraulic pressure, not hydraulic flows?
9        A.  That's correct.
10       Q.  Isn't it's true that SEEP/W is
11   formulated only for flow that follows Darcy's
12   Law?
13       A.  Yes.
14       Q.  And isn't it true that your hand
15   calculations that I believe you've testified
16   were intended the validate Mr. Cobos-Roa 's
17   SEEP/W modeling employed Darcy's Law to compute
18   seepage quantity contributions to total flow?
19       A.  Correct.
20       Q.  I'm going to mark as Bea exhibit
21   number 57 a drawing that you provided as
22   Appendix F of your supplemental report that you
23   provided to us on April the 11th.
24           (Bea Exhibit 57 was marked for
25   identification and is attached hereto.)

Page 178

1        A.  Yes, sir.
2    EXAMINATION BY MR. TREEBY:
3        Q.  Can you show us, Dr. Bea, on
4    Exhibit 57, where you computed hydraulic
5    pressure conductivity?
6        A.  I didn't compute hydraulic pressure
7    conductivity, as the exhibit and document is
8    titled Multi Excavation and Tension Crack
9    Seepage Quantities Contribution to Total Flows.
10       Q.  So this hand calculation was not
11   intended to validate or verify the pressure
12   transmissions that were the focus of the SEEP/W
13   modeling performed by Mr. Cobos-Roa.
14       A.  That's correct.
15       Q.  This hand calculation was intended to
16   verify flows; correct?
17       A.  Correct.
18       Q.  Not pressures.
19       A.  Correct.
20       Q.  During his deposition, Mr. Cobos-Roa
21   agreed that a stress deformation finite element
22   program such as PLAXIS or SIGMA/W would be
23   better suited to this sort of pressure
24   transmission investigation than SEEP/W.
25           Do you remember that?

Page 179

1        A.  Yes.
2        Q.  When you directed him to use SEEP/W to
3    perform these analyses, your hydraulic pressure
4    conductivity analyses, did you have any basis
5    for believing that SEEP/W was able to
6    accurately model stress deformation behavior?
7        A.  Um -- we were not attempting to model
8    stress deformation behavior with SEEP/W, we
9    were modeling hydraulic conductivity pressure
10   transmission.
11       Q.  Would you agree that stress
12   deformation analyses consider expansion and
13   contraction of soil units during wetting?
14       A.  Yes.
15       Q.  And to your knowledge, isn't it true
16   that SEEP/W does not calculate these sorts of
17   volumetric changes?  If you know.
18       A.  To the best of my knowledge, it can,
19   um -- if instructed, recognize both compression
20   changes to volume and expansion or suction
21   changes to volume.  In the analyses I used,
22   those parameters were intentionally set so that
23   we were modeling the steady flow conditions
24   with no significant changes in volume or
25   saturation.

Page 180

1        Q.  If I understood your question --
2        A.  For the buried swamp-marsh layers.
3        Q.  If I understood your answer to my
4    question, I think you indicated that you
5    believed that SEEP/W is able to account for the
6    compression effects of soil changes during
7    wetting.  Correct?
8        A.  Yes.
9        Q.  My question was whether SEEP/W can
10   calculate volumetric changes that occur during
11   wetting.
12       A.  I don't recall.
13       Q.  Isn't it true, Dr. Bea, that at least
14   some of the soils in and near the levee at the
15   IHNC during Hurricane Katrina experienced
16   volumetric changes during wetting prior to the
17   flood wall failures?
18       A.  Yes. Mr. Cobos-Roa so testified, to my
19   recollection.
20       Q.  And in fact, those soils specifically
21   that experienced volumetric change were those
22   soils that were located above the phreatic
23   surface, correct?
24       A.  Correct.
25       Q.  The partially saturated soils would

**JOHNS, PENDLETON COURT REPORTERS**                **504 219-1993**

ROBERT G. BEA, PH.D.                                April 16, 2012

Page 181

1    have experienced volumetric changes; correct?
2        A.  Correct.
3        Q.  And it's your understanding that those
4    changes are correctly modeled by the SEEP/W
5    software.  Correct?
6        A.  They can be.
7        Q.  Now, let's just go back to your
8    Appendix F drawing that we've marked as Exhibit
9    number 57.
10           Is this exhibit intended to validate
11   the SEEP/W analysis of either the north breach
12   or the south breach?
13       A.  No.
14       Q.  What is the purpose of this drawing?
15       A.  I wanted to learn the potential
16   contributions from excavations placed at
17   different distances from the flood wall to
18   quantities of flow, since it was amenable to my
19   calculation, including the tension gap that can
20   also serve as a conduit for hydraulic flow.
21       Q.  And your calculations on Page 2,
22   showed, in fact, that the tension gap itself
23   contributed almost half of the flow; is that
24   correct?
25       A.  Correct.

Page 182

1        Q.  48 percent.
2        A.  Correct.
3        Q.  Twice as much as any of the other
4    excavations that you've drawn, is that correct?
5        A.  Correct.
6        Q.  And four times as much as the -- four
7    times as much as the excavation that's farthest
8    from the flood wall, correct?
9        A.  Correct.
10       Q.  Let's talk about the geometry in the
11   first page of this exhibit.  You show an
12   excavation 150 feet from the sheet pile;
13   correct?
14       A.  Correct.
15       Q.  And as you've drawn it, this
16   excavation extends into the lower organic clay
17   layer.  Correct?
18       A.  Correct.
19       Q.  And that's the layer that extends
20   underneath the sheet pile tip.  Correct?
21       A.  Correct.
22       Q.  What is the width of this excavation?
23       A.  Um -- it was not, um -- the width of
24   the excavation did not enter my calculations.
25       Q.  So it's not specified.

Page 183

1        A.  Correct.
2        Q.  Did it not enter into your
3    calculations because the dimensions of the
4    excavation are irrelevant?
5        A.  Because the dimensions within the
6    context of the simplified analysis are not a
7    dominant factor.
8        Q.  So Bea Exhibit number 57, your
9    Appendix F, demonstrates contributions of
10   excavations of unspecified size, correct?
11       A.  Correct.
12       Q.  Because the size of those excavations
13   is irrelevant to this analysis.  Correct?
14       A.  Correct.
15       Q.  I mean, largely irrelevant.
16       A.  Right.
17       Q.  I think that was the gist of your
18   answer to my question.
19       A.  Yes.
20       Q.  Not entirely irrelevant, but it
21   mattered so little that you didn't need to
22   specify the size of those excavations.
23   Correct?
24       A.  They were assumed to be large.
25       Q.  Assumed to be large?

Page 184

1        A.  Yeah.  So that -- that they could
2    conduct the quantity of water attributed to a
3    particular excavation numbered 1 through 3.
4        Q.  Well, how large?
5        A.  Um -- I attempted to answer your
6    question large enough to conduct water to and
7    then through the buried swamp-marsh deposit.
8        Q.  That's a conclusory statement,
9    Dr. Bea, and this is your drawing.  So I'm
10   asking you how large these excavations would
11   have to be to satisfy the description that you
12   just gave me.
13           MR. JOANEN:
14              Objection to the form of the
15           question.  It's been asked and
16           answered.
17              If you understand the question,
18           you can answer it.
19       A.  Well, I tried.  The excavation has to
20   be, first, large enough to bring the backfill
21   in the excavation into contact with the buried
22   swamp-marsh layer.  And I've described the
23   geometry on the drawing.  At that point, I
24   can't, and as you cited, use Darcy's Law
25   together with steady flow to evaluate these

46 (Pages 181 to 184)

ROBERT G. BEA, PH.D.                                          April 16, 2012

Page 185

1    four contributing flow quantities.
2        Q.  How large would the excavation that
3    you've described here as being 150 feet from
4    the flood wall have to be to be large enough to
5    satisfy the description that you gave me?
6        A.  Not very large, meaning if I had to,
7    um -- speculate, which I don't like to do,
8    perhaps fifty feet in plan dimension.  It has
9    to be deep enough to bring it into contact with
10   the horizontal swamp-marsh deposit that I've
11   shown on the first page.
12       Q.  Dr. Bea, you used the term speculate.
13       A.  I don't like to speculate.
14       Q.  Did you have the assistance of a
15   reference book when you drew this Figure?
16       A.  Of course.
17       Q.  What reference book did you use?
18       A.  Lambe & Whitman.
19       Q.  And did Lambe & Whitman tell you how
20   large these excavations would need to be to
21   satisfy Darcy's flow law?
22       A.  No.
23       Q.  So you used your own independent
24   engineering judgment the determine that.
25       A.  That's correct.

Page 186

1        Q.  And as you sit here today, based on
2    that judgment, you understand that these would
3    have had to be fifty feet in width measured
4    normal to the flood wall.  Correct?
5        A.  Correct.
6        Q.  Is this excavation that you've drawn
7    here in Bea Exhibit 57 that's 150 feet away
8    from the flood wall intended to or represent
9    any excavation created by WGI?
10       A.  No.
11       Q.  If I understand your testimony, then,
12   is it true that the flow volumes generated by
13   the excavation that's 150 feet from the flood
14   wall do not depend upon the size of the
15   excavation as long as it's at least 50 feet in
16   width?
17       A.  That's the basis of my analysis.
18       Q.  Is it also, then, your testimony today
19   that if the width of this excavation were 1
20   foot that that excavation would not be -- would
21   not satisfy the description that you used for
22   these excavations in your Bea Exhibit 57?
23           MR. JOANEN:
24               Object to the form.
25       A.  No.  That's not what I'm attempting to

Page 187

1    say.  For Excavation 4, which is the tension
2    crack, that's a very narrow feature adjacent to
3    the wall.  A foot could not be an unreasonable
4    estimate for that simplified feature.
5        Q.  I wasn't asking you about that.  I'm
6    asking you about Number 1.
7        A.  Well, I'm answering in general for all
8    of them.
9        Q.  Let me ask you specifically about
10   Number 1.  Because I think you told me that in
11   order for your calculations on this exhibit to
12   be true, that Excavation number 1 would have to
13   have a dimension of, in your judgment, 50 feet.
14       A.  Or it could be significantly smaller.
15       Q.  And that's the point I'm getting at.
16       A.  Okay.
17       Q.  You think that it could be 25 feet.
18       A.  Correct.  I would need to calculate
19   the flow volumes themselves, not the, um --
20   proportionate contribution, in order to answer
21   the question concerning geometry that you
22   posed.  The quantity of flow is proportional to
23   the cross-sectional area through which I need
24   to flow, times the velocity of flow through
25   that cross-section.  So I have to go several

Page 188

1    layers deeper to prescribe the geometric
2    characteristics that you are asking about, and
3    I have not done those analyses.
4        Q.  So to put it in the shortest possible
5    terms, size matters.
6            MR. JOANEN:
7                Objection to the form of the
8            question.
9    EXAMINATION BY MR. SMITH:
10       Q.  You understand my question, Dr. Bea?
11       A.  Yes.  Certainly, the cross-sectional
12   area and its contact with this buried
13   swamp-marsh deposits, those sizes matter a
14   great deal.
15   EXAMINATION BY MR. SMITH:
16       Q.  How long would it take for water from
17   Excavation number 1 to reach the floodwall?
18       A.  Well, we could actually determine that
19   if we prescribed a horizontal conductivity for
20   k.  We know the distance.  Given the velocity,
21   we could calculate the time.  I would speculate
22   that the time requirement would be large,
23   because we're covering a great deal of distance
24   of movement of water through a low permeability
25   material.  It would take a long time.

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                        April 16, 2012

Page 189

1        Q.  Is it assumed in your drawing,
2   Dr. Bea, that the dimensions of each of the
3   three excavations numbered 1, 2, 3 had the same
4   dimensions?
5        A.  Yes.
6        Q.  So I think you've mentioned in your
7   answer, then, that the flow quantities, the
8   seepage quantities, as well as the seepage
9   velocities, would be affected by the K value of
10  the soils.  Correct?
11       A.  Yes.
12       Q.  Specifically, the soils in the
13  excavations.
14       A.  (Nods affirmatively.)
15       Q.  And the soils in the lower organic
16  clay, or the swamp-marsh unit, as you've
17  described it.
18       A.  Correct.
19       Q.  And the correlation would be, and tell
20  me if I'm wrong, that the lower hydraulic
21  conductivity of the soils, the longer it would
22  take for the water to migrate from the
23  excavations to the floodwall.  Correct?
24       A.  Correct.  The point of time for
25  migration in the context of the defense experts

Page 190

1   has been addressed in their reports.  Long
2   time.
3        Q.  Yes, Dr. Bea.  And I've asked you
4   about Excavation number 1, but would the same
5   be true of Excavations number 2 and number 3;
6   none of those three numbered excavations are
7   intended to represent any excavation created by
8   WGI in the EBIA.  Correct?
9        A.  Correct.
10       Q.  This is just a theoretical drawing;
11  correct?
12       A.  That's correct.
13       Q.  It has nothing to do with any specific
14  excavations created by WGI, correct?
15           MR. JOANEN:
16               Object to the form.
17       A.  That's fair.  I'm attempting to build
18  insight, my insight for myself, um --
19  concerning potential contributions of
20  excavations at differing distances from the
21  floodwall.  Those analyses were part of the
22  analytical effort I hope to complete by the
23  time of my rebuttal report.  As I testified, I
24  found errors in those analyses.  We stopped the
25  effort as of the time I wrote my rebuttal

Page 191

1   report.
2   EXAMINATION BY MR. TREEBY:
3        Q.  But in fact, this exhibit doesn't
4   provide any volumes, does it?
5        A.  No, it doesn't.
6        Q.  All --
7        A.  Only relative contributions.
8        Q.  Exactly.  All it establishes is a
9   ratio of contributions of excavations of equal
10  size, correct?
11       A.  Right.
12       Q.  So all this really demonstrates is
13  that the farther away from the flood wall an
14  excavation is, the less it contributes to flow
15  on the protected side.  Correct?
16       A.  Yes.
17           MR. JOANEN:
18               Object to the form.
19       A.  Yes.
20           MR. SMITH:
21               Come on, Scott.  If you don't
22           understand the question, that's not a
23           basis for objecting to the form.
24           MR. JOANEN:
25               I'm objecting to the form.  Leave

Page 192

1   it at that.  If you have any more
2   comments, put them on the record now.
3   But I'm objecting to form, and I think
4   it's objectionable.
5   MR. SMITH:
6       You're just interrupting the
7   deposition.
8   MR. JOANEN:
9       I'm objecting to the form, and
10  I'm entitled to do so, and I'll
11  continue to do so.
12  MR. SMITH:
13      What's wrong with the form of the
14  question?
15  MR. JOANEN:
16      Because I didn't think the
17  question took into consideration the
18  fact there was a crack.  You're
19  talking about the various excavations,
20  and this is specifically designed to
21  examine the contribution of the crack
22  at the flood wall.  That's why I
23  objected to the form.
24  MR. SMITH:
25      All right.

48 (Pages 189 to 192)

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 193

1        MR. JOANEN:
2            That's it.  If you disagree,
3    that's fine.
4            (Reporter interruption.)
5    EXAMINATION BY MR. SMITH:
6        Q.  Dr. Bea, you understand this Appendix
7    F to be a validation of the modeling performed
8    by Mr. Cobos-Roa?
9        A.  No.
10       Q.  Why were you interested in seepage
11   quantity contributions to total flows at the
12   flood wall if your hydraulic pressure
13   conductivity analyses don't consider flows?
14       A.  I was attempting to develop judgment
15   concerning potential contributions to flow from
16   both, or from the tension crack and from those
17   three, um -- example excavations.  So I'm
18   attempting to build judgment on the relative
19   importance of, um -- those features.
20       Q.  Let's turn to the second page of this
21   exhibit.  There you show your calculations.
22   And as I understand this, this is your
23   expression of Darcy's Law:  Q equals KIA.
24   Correct?
25       A.  Correct.

Page 194

1        Q.  K being the hydraulic conductivity, I
2    being the gradient, and A being the
3    cross-section area.
4        A.  Correct.
5        Q.  And you've left K just as a constant
6    here, correct?
7        A.  Correct.
8        Q.  Because you're only analyzing relative
9    contributions.  Correct?
10       A.  Correct.  And the K that I am
11   addressing here is associated with the buried
12   swamp-marsh deposits.  I had not included a K
13   permeability for any of the features, either
14   excavations or the tension crack.
15       Q.  Right.  So the significant variable,
16   as expressed in these equations, is the
17   gradient.  Correct?
18       A.  Correct.
19       Q.  And the gradient becomes larger the
20   closer you become to the floodwall.  Correct?
21       A.  That's correct.  That was a question
22   you asked Mr. Cobos-Roa.
23       Q.  What does -- I see the ratio, for
24   instance, for the farthest excavation of 17F
25   over 200F.  Correct?  That's the fallen -- the

Page 195

1    change in head over the distance.  Correct?
2        A.  Yes, sir.
3        Q.  And that's in feet.  That's what F
4    represents?
5        A.  That is correct.
6        Q.  The 2.5F next to that ratio, what DOES
7    that represent?
8        A.  That is representing the thickness of
9    the swamp-marsh deposit through which that flow
10   is occurring.
11       Q.  And what's the basis for a selection
12   of a 2.5-foot dimension for the swamp-marsh
13   layer?
14       A.  Well, I founded the example, um -- on
15   a 10-foot thick layer, swamp-marsh deposit, and
16   equally apportioned that thickness to each of
17   the potential -- or the each of the example
18   contributors to the flow quantity.
19       Q.  The first page of your diagram
20   indicates that the dimensions, the depths of
21   the swamp-marsh unit was 10 feet, not 2-1/2
22   feet.
23       A.  Could you --
24       Q.  Yes.  Dr. Bea, I'm sorry, I didn't
25   mean the interrupt you, but if you need me to

Page 196

1    the help you find it, I think it's at the
2    extreme right-hand side of the swamp-marsh
3    unit.
4        A.  Yes, sir.
5        Q.  Is that 10F, does that indicate the
6    depth of the swamp-marsh --
7        A.  No, that's the thickness.
8        Q.  The thickness.
9        A.  Correct.
10       Q.  That's what I meant when I said depth.
11   I'm sorry.  The thickness of the swamp-marsh
12   unit is 10 feet.  And what does 2 1/2 F, if
13   that reflects -- does that not reflect the
14   thickness of the unit, as well, in your Page 2
15   of your exhibit?
16       A.  The 2.5 feet is one quarter of the
17   10 feet, and that's the thickness of the buried
18   swamp-marsh layer that I apportioned to the
19   flow from each of the four excavations, and
20   consequently, that's why each of the four has
21   that 2.5 feet thickness.
22       Q.  I'd like you to direct your attention
23   to Paragraph 137 in your rebuttal report.
24       A.  Yes, sir.
25       Q.  I'm going to read you a portion of

49 (Pages 193 to 196)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                      April 16, 2012

Page 197

1  that paragraph. It's about midway down. It
2  begins, based upon these analyses. Well,
3  actually, just for context, let's read the
4  sentence before that. I think it will be
5  useful. Therefore, I --
6       Therefore, I, with the assistance of
7  Mr. Diego Cobos-Roa performed several hydraulic
8  conductivity analyses using different materials
9  to assess its potential effects on the results.
10      Is the antecedent of its different
11  materials?
12      A. Yes.
13      Q. So their potential effects on the
14  results.
15      Based upon these analyses, I concluded
16  that this culvert was far enough for the area
17  involved in development of the lateral
18  stability failure that it did not have a
19  significant influence on the results from the
20  lateral stability analyses. Figures 44 and 45,
21  in parens.
22      A. Yes, sir.
23      Q. I want to ask you some questions about
24  that statement. Does this statement which I've
25  just read, specifically the second sentence

Page 198

1  there about your conclusions, does this mean
2  the uplift pressure in the vicinity of the
3  Jourdan Avenue canal culvert in your opinion
4  did not impact the stability analysis, or the
5  critical failure surface did not extend to the
6  Jourdan Avenue canal culvert?
7       MR. JOANEN:
8          I'm going to object to the form
9       of the question. I did not understand
10      that one, I admit, but I'll reserve an
11      objection. I thought it was compound,
12      but.
13      A. I find your question difficult to
14  understand.
15  EXAMINATION BY MR. SMITH:
16      Q. Let me reframe it, then. Okay? Let
17  me reframe the question.
18      The statement that I read to you in
19  Paragraph 137 about the conclusion, about the
20  culverts being far enough not to have a
21  significant influence on the results of the
22  lateral stability analyses.
23      A. Correct.
24      Q. Do you mean that the uplift pressures
25  in the vicinity of the Jourdan Avenue box

Page 199

1  culvert were not affected by the presence of
2  the Jourdan Avenue box culverts?
3       A. No.
4       Q. Do you mean that the Jourdan Avenue
5  Canal culvert, because of its distant the
6  location from the floodwall, did not impact the
7  stability of the levee and floodwall during
8  Hurricane Katrina?
9       A. Correct.
10      Q. And what's the basis of that opinion?
11      A. The analyses that we performed to
12  determine the geometric characteristics of the
13  lateral instability features at the north and
14  south breaches. Those analyses included two
15  stages that we've talked about. The first
16  stage, in 2008 through 2009, treated the
17  Jourdan Avenue Canal differently than we
18  treated the canal during the 2011-2012 sets of
19  analyses. In the first, we treated the canal
20  as a very permeable hydraulic conductive
21  feature. In this set, we treated it as a
22  relatively impermeable feature. And the
23  results from both sets of analyses indicated to
24  us that the Jourdan Avenue Canal was not having
25  a significant effect on the lateral instability

Page 200

1  feature or the hydraulic uplift pressures in
2  the vicinity of that feature, or those
3  features.
4       Q. Dr. Bea, have you provided to us in
5  your reliance materials the 2008-2009 lateral
6  stability analyses that you've just now
7  described to us?
8       A. I think so.
9       Q. Were these the lateral stability
10  analyses that formed the basis for your
11  opinions in the barge litigation?
12      A. These preceded the barge litigation.
13  We did additional analyses that then linked
14  2009 to 2010. So you actually have three sets
15  of analyses. You have two different treatments
16  to Jourdan Avenue Canal.
17      Q. Unless my memory fails me, Dr. Bea,
18  Mr. Cobos-Roa was very careful to say he didn't
19  do any work in 2010.
20      A. Um -- I believe that's correct. The
21  analyses that Mr. Cobos-Roa did were in 2009.
22  One of my reports, in the barge trial, comes
23  forward, in the best of my memory, in 2010. So
24  that's the reason I referred to the -- or
25  intended to refer to the time period as

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                April 16, 2012

Page 201

1    '08-'09, '09 and '10, and '11 and '12.
2        Q.  But you mentioned, just before I asked
3    you that question about 2010, three set of
4    analyses, not three sets of reports.
5        A.  Well, the three sets of analyses did
6    result in three different sets of reports.  The
7    first one were intended as part of the MRGO
8    Robinson work; the second set was part of the
9    barge trial work; and the third part is the
10   section that we're addressing today.
11       Q.  So when you say that you concluded
12   based on these what are essentially, I guess,
13   parametric studies now --
14       A.  Yes.
15       Q.  -- your use of them is as parametric
16   studies --
17       A.  Yes.
18       Q.  -- bearing the hydraulic conductivity
19   of the materials surrounding the Jourdan Avenue
20   Canal box culvert, would it be fair to say that
21   you did not find that up the uplift pore
22   pressures were significantly affected by the
23   change in permeability?
24       A.  Well, they were affected by the change
25   in permeability in the buried swamp-marsh

Page 202

1    deposits.  They were not significantly affected
2    by the permeabilities assigned to the Jourdan
3    Avenue Canal.
4        Q.  I'm specifically referring to the
5    uplift pressures that you've made so much of in
6    your reports, both in barge and in this case.
7    In both that case and in this case you've
8    included figures that have ovals that
9    illustrate where high hydraulic gradients,
10   uplift pressures, are being calculated in your
11   modeling --
12       A.  Yes, sir.
13       Q.  -- on the protected side of the levee
14   flood wall.
15       A.  Generally, at the surface intersection
16   of the levee with the ground surface, in the
17   cross-sections identified as the levee toe.
18   That's in general where we focused those
19   hydraulic gradients.
20       Q.  And, in fact, it's the existence of
21   those gradients that you deem critical as the
22   evidence that the excavations created by WGI
23   destabilized the levee and floodwall.  Isn't
24   that correct?
25       A.  Well --

Page 203

1        Q.  First of all, if you could, answer yes
2    or no, and I'll be happy to let you explain.
3            Isn't it the existence of these uplift
4    pressures that you've described, that you've
5    circled or ovaled, whatever you want to call
6    it, it's not exactly a circle, we can call it's
7    an ellipse.  But in your exhibits in barge and
8    in this case, you've identified those high
9    uplift pressures as being a destabilizing
10   factor on the protected side that you attribute
11   to the excavation created by WGI.  Correct?
12       A.  That's one of the contributors.  In
13   addition, we've accounted for tension cracks.
14   So there's more than, um -- excavations
15   involved.
16       Q.  I'm just talking about what's at stake
17   in this litigation.  The negligent conduct
18   that's at issue in this litigation is not the
19   tension crack.  Do we agree about that?
20       MR. JOANEN:
21           I'm going to object to the form
22       of the question.
23   EXAMINATION BY MR. SMITH:
24       Q.  I'll withdraw the question, Dr. Bea.
25   I didn't mean it to be a hard question.

Page 204

1            Anything that WGI did that is
2    evidenced on the protected side of the flood
3    wall, isn't that embodied completely in those
4    high uplift pressures that you've indicated in
5    your illustrations both in barge and in this
6    case?
7        A.  That's a contributor.
8        Q.  Is there any other effect --
9        A.  Yeah.
10       Q.  -- from the excavations -- let me
11   finish my question.
12           Is there any other effect that you've
13   identified on the protected side of the flood
14   wall that you attributed to the excavations or
15   the other site clearing work performed by WGI?
16       A.  No.
17       Q.  And so in your statement, then, that
18   varying the hydraulic conductivities of the
19   materials surrounding the Jourdan Avenue box
20   culvert did not affect the stability analyses
21   of the levee and flood wall, are you suggesting
22   or implying -- or are you asserting that
23   varying hydraulic conductivities at those soils
24   surrounding the box culvert did not affect the
25   hydraulic uplift pressures that you've

51 (Pages 201 to 204)

ROBERT G. BEA, PH.D.                                      April 16, 2012

Page 205

1   calculated?
2       A.  Significantly, that's correct.
3       Q.  Do you recall me asking this very same
4   line of questions with Mr. Cobos-Roa during his
5   deposition about the effects of the hydraulic
6   conductivity of the soils surrounding the
7   Jourdan Avenue box culvert?
8       A.  Yes.
9       Q.  Do you remember me specifically asking
10  him whether varying those material properties
11  so that they had a higher hydraulic
12  conductivity would affect the uplift pressures
13  that were computed by SEEP/W?  Let me just tell
14  you I just read the question.  I asked him that
15  question, and here is his answer.  I'll read
16  you his answer.
17          Well, yes, we assigned the properties
18  of sand, or a very high hydraulic conductivity,
19  and this essentially acts as a drain, relieving
20  he excess pore pressures in the vicinity of
21  this box culvert -- of this box or culvert I
22  believe is what is in the transcript at this
23  time.  We don't have a final yet.
24          But do you recall his testimony to
25  that effect?

Page 206

1       A.  Yes.  The sand -- it's not clear to me
2   in his testimony whether he was referring to
3   sand around the box culvert in the current
4   phase of work referenced in my expert report or
5   sand around the box culvert in the 2008-9
6   series of reports.  It's not clear to me in
7   your question, nor in his answer, which was
8   being referred to.
9       Q.  In fact, it doesn't really matter for
10  purposes of a parametric study when it was
11  done, does it?
12      A.  No, not really.
13      Q.  You've just given me a very
14  long-winded answer that has nothing to do with
15  anything.
16          MR. JOANEN:
17              I'm going to object to the
18          characterization.  He gave you an
19          answer.  That's what it is.
20  EXAMINATION BY MR. SMITH:
21      Q.  I didn't ask you what study it was in,
22  Dr. Bea.
23          Do you disagree with Mr. Cobos-Roa
24  that modeling sand around the Jourdan Avenue
25  box culvert acts as a drain on seepage

Page 207

1   gradients in the vicinity of the box culvert?
2       A.  It depends on the characteristics of
3   the sand and the features its embedded in.
4   Sand is very conductive to water.  If we have
5   simulated it as a large body of sand, as we did
6   in the early analyses, that's a very different
7   thing than if it's a narrow veneer of
8   backfilling sand such as we considered in this
9   last set of analyses.
10      Q.  And I asked you whether you agreed or
11  disagreed with Mr. Cobos-Roa 's testimony.  He
12  didn't give me a qualified answer, he gave me
13  an unqualified answer.
14      A.  Well --
15      Q.  Do you disagree with Mr. Cobos-Roa,
16  then?
17      A.  Um -- potentially, yes.
18      Q.  Do you recall what material properties
19  were assigned to that sand in the modeling?
20      A.  Um -- I would ask you, if you could,
21  to define which models of Jourdan Canal we're
22  discussing.  Are you specifically asking about
23  the model of Jourdan Avenue Canal illustrated
24  in Figure 45, Page 100?
25      Q.  No, I'm not.  I'm not.  I'm asking

Page 208

1   about the same ones that Mr. Cobos-Roa was
2   talking about.
3       A.  I previously testified I was concerned
4   there was confusion in this portion of your
5   questioning concerning which simulation had
6   been, um -- in question, and I was attempting
7   to avoid further confusion in that answer that
8   Mr. Cobos-Roa gave you.
9       Q.  Okay.  I'd like to avoid further
10  confusion, too.
11      A.  Thank you.
12      Q.  Can you tell me, if you know as you
13  sit here today, the material properties that
14  you assigned to the sand in the parametric
15  studies that were being discussed, the material
16  properties, specifically the hydraulic
17  conductivity value that was assigned to the
18  fill materials surrounding the Jourdan Avenue
19  Canal?
20      A.  10 to the -6 centimeters per second.
21      Q.  Is that the highest hydraulic
22  conductivity value that was assigned in your
23  parametric studies?
24      A.  To my knowledge, that is the highest
25  that was assigned to the Jourdan Avenue Canal

JOHNS, PENDLETON COURT REPORTERS                      504 219-1993

ROBERT G. BEA, PH.D.                                            April 16, 2012

Page 209

1  in the current phase of parametric studies.
2      Q.  Okay.  I didn't ask you that.  Because
3  in this phase you've already told me you didn't
4  put sand around it.  Didn't you?
5      A.  We had clay.
6      Q.  Exactly.  And my question was about
7  the sand.
8      A.  And that goes to the earlier phase.
9      Q.  I don't care what phase.
10     A.  I'd have to --
11     Q.  If I goes to the earlier phase, that's
12  fine.
13     A.  Well --
14     Q.  Do you recall?
15     A.  No, I don't.  I'd have to refer to the
16  documents.  It's documented, and the record
17  should reflect that documentation.
18     Q.  Returning again to your statement in
19  Paragraph 137 about your conclusion that the
20  water inside -- this is the next statement I
21  guess that I didn't read.  So I don't want to
22  mislead you, but it's the next sentence.  It
23  says, I further concluded that the water inside
24  the culverts would be isolated from the actual
25  flow regime composed by the hurricane surge

Page 210

1  because of the concrete structure encapsulating
2  this storm drainage drain water filled
3  horizontal water column.
4      Did I read that correctly?
5      A.  Yes, sir.
6      Q.  Are you aware that Dr. Rogers
7  testified that there were perforations in this
8  culvert?
9      A.  Yes, sir.
10     Q.  And wouldn't those perforations make
11  that box culvert pervious?
12     A.  Well, not pervious to inflow.  It
13  could make it pervious to outflow from the
14  storm waters that were being transferred at
15  that time.  And that helps explain the linear
16  set of sand boils that Dr. Rogers testified to
17  in his deposition.  So it's highly likely that
18  those linear set of features was representing
19  outflow through these perforations, carrying
20  with it the sand to the surface that he
21  observed as linear sand boil features.
22     Q.  If the water can flow out from the box
23  culvert, it can also flow in; correct?
24     A.  Not if it's flowing out.
25     Q.  If it's not flowing out.  I didn't

Page 211

1  state that as a premise.  It's not to you to
2  attach a premise to my question.  That wasn't
3  the question.  Water can flow out if it can
4  flow in; correct?
5      A.  Sure.
6      Q.  If water is flowing in, then that can
7  act as a drain.  Correct?
8      A.  Correct.
9      Q.  Dr. Rogers was asked about the sheet
10  piles that were used to, I guess, protect the
11  work that was being done when the canal was
12  being boxed in.  And he was asked whether those
13  sheet piles were left in place, and as I recall
14  he said he didn't know.
15      Do you know whether those sheet piles
16  were left in place, Dr. Bea?
17     A.  No, I don't.
18     Q.  Do you have any specific information
19  about the hydraulic conductivity values of the
20  backfill materials surrounding the Jourdan
21  Avenue box culvert?
22     A.  No.
23     Q.  Do the hydraulic conductivity values
24  of that backfill material affect the factor of
25  safety in your analyses?

Page 212

1      A.  Not substantially, no.
2      Q.  Dr. Bea, you've testified that in the
3  2008-2009 period you modeled the fill material
4  at Jourdan Avenue Canal as a high permeability
5  material.  What was the basis for that
6  characterization at that time?
7      A.  We were -- or we had concluded, at
8  that time, it had been backfilled with coarse
9  grain materials/sand.
10     Q.  And what information did you receive
11  following that that led you to model it as a
12  low hydraulic conductivity material for your
13  studies in this litigation?
14     A.  That was information primarily
15  developed by Dr. Dave Rogers that led to the
16  characterization shown in Figure 46, Page 101
17  of my rebuttal report.
18     Q.  What information is that that you're
19  referring to that he developed?
20     A.  The cross-section.
21     Q.  Yes.  And what information is this
22  cross-section based on?  What new
23  information -- since 2008 and 2009 when you did
24  your previous study, what new information was
25  received to change your characterization of

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 213

1    those fill materials?
2        A.   The report from Dr. Rogers.
3        Q.   And what was it in Dr. Rogers' report
4    that led you to conclude it was a low hydraulic
5    conductivity material?
6        A.   Well, first it was Dr. Rogers that
7    supplied this characterization, and then
8    Dr. Rogers and I had direct discussions about
9    how best to go about simulating the
10   cross-section that he had provided.  I did not
11   access any new information myself.
12       Q.   So you relied entirely on Dr. Rogers,
13   correct?
14       A.   That's correct.
15       Q.   In your prior deposition I believe you
16   testified that in this litigation, the studies,
17   the modeling performed by Mr. Cobos-Roa treated
18   the Jourdan Avenue Canal as a water column.
19   Correct?
20       A.   Correct.  Horizontal water column.
21       Q.   Horizontal water column.  Which
22   essentially creates an impenetrable barrier to
23   flow.  Correct?
24       A.   Correct.
25       Q.   And this impenetrable barrier to flow

Page 214

1    creates hydraulic vertical gradients at the
2    western side of the box culvert in the 2012
3    Cobos-Roa SEEP/W analysis, doesn't it?
4        A.   Yes, it does.
5            (Brief recess.)
6    EXAMINATION BY MR. SMITH:
7        Q.   Dr. Bea, I'd like to direct your
8    attention to Paragraph 18 in your rebuttal
9    report.
10       A.   Yes, sir.  Paragraph 18?
11       Q.   Paragraph 18, on Page 16.
12       A.   Yes, sir.
13       Q.   On my copy it's 16.  I'm not sure if
14   it's the same.  You refer there to the
15   hydraulic pressures developed in the buried
16   swamp-marsh deposits under the protected side
17   flood wall-levee system that's underscored.
18   Correct?
19       A.   Yes.
20       Q.   And then you put in parens, Figure 10.
21       A.   Yes.
22       Q.   I wanted to ask you some questions
23   about Figure 10.  The legend underneath this
24   figure describes this as hydraulic
25   conductivity, quote, uplift pressures developed

Page 215

1    by the buried swamp-marsh deposits on the
2    underside of the levee on the protected side.
3    And then, in parens, base figure after Rogers
4    2007.
5            Is the purpose of this illustration to
6    show the soil mechanical changes that occur as
7    a result of the excavations on the flood side
8    of the floodwall?
9        A.   No.
10       Q.   What is the purpose of this
11   illustration?
12       A.   To show the -- a characterization of
13   the term uplift pressures as I'm using it in my
14   work.
15       Q.   And so this Figure 10 has no specific
16   connection with the acts that are at issue in
17   this litigation.  Is that correct?
18       A.   That's correct.
19       Q.   Would it be fair to say that Figure 10
20   those the hydraulic conductivity uplift
21   pressures developed by a gap at the flood wall?
22       A.   That would be a contributor to those
23   pressures.
24       Q.   What else besides the gap at the flood
25   wall would contribute to the pressures that are

Page 216

1    shown in Figure 10?
2        A.   Well, it could have pressures
3    transmitted from the IHNC shown through water
4    conductive layers that then are reflected in
5    additional pressures acting in uplift.  You
6    could conclude that by looking at the hydraulic
7    pressure at the bottom of the cartooned I-wall
8    and compare them to the hydraulic pressure
9    shown as you swing to the right.  The one
10   acting in uplift is greater than the one acting
11   horizontally, so there is an additional
12   contribution being shown in this illustration.
13       Q.   I'm sorry.  Are you suggesting that
14   one of these arrows or several of these arrows
15   separately illustrate the contribution of the
16   IHNC?
17       A.   Yes.
18       Q.   Which arrows specifically illustrate
19   the contribution of the IHNC?
20       A.   Well, you could take the difference
21   between the bottom arrow which is moving from
22   left to right, that's a horizontal hydrostatic
23   pressure.  Normally, that would -- normally
24   meaning at that point, the vertical pressure
25   would be identical.  But it's not.  It's

ROBERT G. BEA, PH.D.                                          April 16, 2012

Page 217

1  larger.  And so the difference being shown in
2  this cartoon is due to seepage effects that are
3  adding to that pressure.  So the two arrows
4  tell the story.  The difference is the
5  contribution from under base seepage.
6      Q.  Are we to conclude from this drawing
7  that the strength of the hydraulic pressure
8  that's being exerted is illustrated by the
9  length of the arrow in the blue region?
10     A.  Yes.
11     Q.  So the longer arrows indicate more
12 hydraulic pressures.
13     A.  Yes, sir.
14     Q.  And the shorter arrows indicate
15 smaller hydraulic pressures.
16     A.  Yes, sir.
17     Q.  The horizontal arrows that are to the
18 left of the floodwall in this cartoon are shown
19 beginning at the water layer that's above the
20 soil unit; correct?
21     A.  Again, at what is shown as the water
22 surface labeled high water, under that is the
23 identification of the IHNC, so at that point.
24 Then linearly, with depth, is a function of the
25 density of water, the pressures are increasing

Page 218

1  until you reach the bottom of that wall.
2      Q.  And those pressures increase as you
3  progressively move from the top to the bottom
4  of the wall as a result of what influences?
5      A.  The density of water and the distance
6  below the surface of the water to a particular
7  point.  So it, in technical terms, is the unit
8  weight of, in this case, saline water, times
9  the distance or depth below the surface to
10 define the hydrostatic pressure.
11     Q.  Are we to take away from this Figure
12 number 10, then, that the greatest hydraulic
13 uplift pressures are being exerted immediately
14 to the right of the floodwall tip?
15     A.  Well, that's what this cartoon is
16 suggesting, yes.
17     Q.  And those pressures grow smaller and
18 smaller as you move toward the Lower Ninth
19 Ward, correct?
20     A.  Correct.
21     Q.  There are a series of what I'll call
22 half arrows that parallel the curved surface
23 that extends to the right from the tip of the
24 sheet pile.  Do you see those?
25     A.  Yes, sir.

Page 219

1      Q.  What do those half arrows represent?
2      A.  Well, they represent the direction of
3  movement of the area identified as the passive
4  wedge.  It's got a characterization of the
5  strength as solved.  And acting on top of that
6  is the levee fill colored in orange.
7      Q.  I see to the right in this figure you
8  have a designation weak stratum.  There is an
9  arrow that seems to extend from a reddish or a
10 brownish line that extends to the right end of
11 the side of this figure.
12         What is that intended to illustrate?
13     A.  This layer is a layer characteristic
14 of the layer we found at the 17th Street Canal.
15 It was a layer deposited as a result of
16 historic hurricanes that had moved clays from
17 Lake Pontchartrain into the 17th Street Canal
18 area where they've settled to the bottom and
19 were progressively buried by swamp-marsh
20 deposits.  It was an unusually low strength
21 layer, high sensitivity, meaning that it was
22 very sensitive to shearing strains, and I
23 identified the layer as black tooth paste.  So
24 it was a particularly important feature in that
25 particular breach.

Page 220

1      Q.  So even though you've labeled this
2  with geographic designations that would suggest
3  that this is intended to illustrate forces that
4  were occurring in the Lower Ninth Ward, the
5  EBIA, in fact, this isn't based on any
6  cross-section from the IHNC, is it?
7      A.  That's correct.  It is, as you put it,
8  a cartoon indicating uplift pressures.
9      Q.  In your report, Dr. Bea, you state
10 that you calculated hydraulic conductivity
11 uplift pressures for the south breach using a
12 surge elevation of 14 feet.  Is that correct?
13     A.  Well, I think it is a whole series of
14 surge elevations and 14 feet was one of them.
15     Q.  Okay.  For the surge for your analyses
16 that were based on a surge elevation of
17 14 feet, did you do any parametric studies to
18 demonstrate whether the time that elapsed as
19 the surge rose up to that elevation was a
20 sensitive parameter in your hydraulic
21 conductivity pressure analyses?
22     A.  Um -- yes, we did.  In the 2008-9, and
23 I think as well in '9-10, we compared results
24 from the sequential transient analysis with the
25 steady state pressures and concluded that the

55 (Pages 217 to 220)

JOHNS, PENDLETON COURT REPORTERS                      504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 221

1    transient pressures, by the time we reached
2    14 feet, were, I think it's a correct quote, 80
3    to 90 percent of the steady state pressures.
4        Q.   And isn't it true, then, that when
5    those pressures reached 90 percent of steady
6    state that that's essentially considered, for
7    engineering purposes, a steady state condition?
8        A.   Yes.
9        Q.   So if the canal water level -- if the
10   canal water levels stayed at 14 feet for a
11   month as opposed to receding as it did during
12   Hurricane Katrina, would that increase the
13   uplift pressures on the levee protected side?
14       A.   Not further after steady state.
15       Q.   And the same thing would be true if
16   that surge elevation was maintained for a year
17   following Hurricane Katrina, correct?
18       A.   Well, I'd have to perform analyses to
19   confirm that, because for that time period
20   creep effects can enter the process, meaning,
21   um -- stress dependent, um -- time dependent
22   deformations of the soil structure system, and
23   I've not studied those long-time effects.
24       Q.   On Page 17 -- I guess this is
25   Paragraph 19, second sentence, you state:

Page 222

1    These, quote, steady flow, in parens you have
2    the words constant volume, conditions are those
3    in which there are no significant changes in
4    the soil void ratio, parenthesis, ratio of soil
5    void volume to solid volume, close parens, and
6    saturation, parenthesis, percentage of void
7    volume filled with water, close parens, during
8    the hydraulic, quote, loadings, parenthesis,
9    time dependent hydrostatic pressures, close
10   parens, imposed by rising water in contact with
11   the soils.
12          If, as you've described for us, your
13   modeling of the effects of the changing surge
14   on the canal side during Hurricane Katrina
15   rapidly reached steady state conditions, as
16   you've reported to us, doesn't that indicate
17   that in fact a change in void ratio has
18   occurred as opposed to there's been no change
19   in void ratio?
20       A.   No.
21       Q.   Do the changes in total stress and
22   pore water pressure caused by the canal side
23   rising surge elevation cause changes in the
24   effective stress in the soils on the protected
25   side of the levee?

Page 223

1        A.   I can't comment for sure.  I think
2    they did not have an important effect on
3    effective stress, because the total stress
4    effect of the elevated water was also reflected
5    in the horizontal stress, and that would imply
6    not a change in the effective stress for that
7    condition.
8        Q.   Do you have an opinion whether changes
9    in effective stress would have caused a change
10   in the void ratios of the soils on the
11   protected side of the levee?
12       A.   Please repeat your question.
13       Q.   Do you ever an opinion whether changes
14   in effective stress as a result of rising surge
15   on the flood side of the flood wall caused a
16   change in the void ratio of the soils in the
17   levee on the protected side?
18       A.   Well, in our analyses we conditioned
19   them intentionally so they would not change,
20   significantly, the void ratios.
21       Q.   So you prevented that from occurring
22   in your modeling.  Is that correct?
23       A.   That's correct.
24       Q.   Do you know whether your assigning an
25   impossibly low value of compressibility to the

Page 224

1    lower organic clay accelerated the response of
2    the soil in that layer to changes in load?
3        A.   It was not impossibly low.  As I
4    attempted to explain to you this morning, I
5    based that compressibility on incompressible
6    conditions.  Those conditions are addressed by
7    Lambe & Whitman.  I based the evaluation on the
8    dilatational velocity associated with these
9    buried swamp-marsh deposits that is
10   approximately 5,055 feet per second.  And I can
11   relate that value directly to the dilatational
12   modulus, and that dilatational modulus is the
13   inverse of the compressibility.  I used first
14   principles methods to determine M sub V.
15       Q.   Is it your opinion that the soils in
16   the lower organic clay unit, as they existed in
17   the East Bank Industrial Area on August the
18   29th, 2005, when the surge began to rise over
19   the EBIA, were in fact incompressible?
20       A.   Yes.  And I so stated in my expert
21   report and rebuttal report as the first premise
22   I used to condition the analyses to steady
23   flow.
24       Q.   Did you apply those analyses to any
25   other soil units in the East Bank Industrial

56 (Pages 221 to 224)

ROBERT G. BEA, PH.D.                                          April 16, 2012

Page 225

1   Area?
2      A.   Um -- my memory says that we applied
3   steady flow conditions to the interdistributary
4   clays under the swamp-marsh deposits and, as
5   appropriate, similarly for the fine-grained
6   soils above that deposit.  When our
7   understanding was those materials were not
8   fully saturated, then we reverted in the
9   analyses to partially saturated conditions.  So
10  within the modeling, there's a combination,
11  depending on loading and the characteristics of
12  the soil.
13     Q.   Were any other soil units in the East
14  Bank Industrial Area, other than the lower
15  organic clay, incompressible?
16     A.   I would again have to --
17     Q.   Yes owe no, please?  Could you just
18  say yes or no?  It's a yes or no question.
19          Were any of the other soil units in
20  the East Bank Industrial Area, on October,
21  August 29th, 2005, at the time we're interested
22  in, were any of the other soil units, other
23  than the lower organic clay, incompressible?
24  Yes or no?
25     A.   I would have to refer to the details

Page 226

1   in the analyses.  I will not answer a yes/no
2   question.
3      Q.   You don't know then.  You just don't
4   know.
5          MR. JOANEN:
6              I'm going to object.  Allow him
7       to finish his answer, please.
8      A.   I would --
9          MR. JOANEN:
10             Please let him finish his answer.
11     A.   I would need to refer to the details
12  of the simulations for the layers I specified
13  to be able to answer your question truthfully,
14  sir.
15  EXAMINATION BY MR. SMITH:
16     Q.   So you don't know whether you assigned
17  an incompressibility value to any other soil
18  units?  As you sit here today, you don't know
19  that.
20     A.   I think as I testified we assigned
21  that to the interdistributary clays below and
22  the fine grain soils above.  But to confirm
23  that, I need to refer to the details of the
24  analysis.
25     Q.   Do you know of any other soils

Page 227

1   anywhere in the world that have a M sub V value
2   of 10 to the -9?
3      A.   Uh-huh.
4      Q.   Would you just please tell us what
5   those are and where they are?
6      A.   Sure.  Go down here to the mouth of
7   the river, to the East Bay area.  Y'all find
8   such materials.  Go to West Delta Block 134.
9   You'll find some.
10     Q.   Excuse me.  Wait a minute.  I need to
11  know what they are there.
12     A.   They're clays.
13     Q.   Clays.
14     A.   Water saturated clays.  We could go to
15  comparable materials in the Niger River Delta.
16          We can go the comparable materials in
17  the Congo Delta.
18          There's a wide variety of locations in
19  the offshore world in which these
20  incompressible behavior materials exist and
21  have existed and have been analyzed for many
22  years.
23     Q.   When you refer to steady flow, I think
24  you've previously told us that that term can
25  have two meanings.  Right?  It can be steady

Page 228

1   flow in a transient analysis, and there can be
2   steady flow in a steady state analysis.
3   Correct?
4      A.   Um -- the categories of flow analysis
5   are steady flow and nonsteady flow.  Each of
6   those analyses can have steady state analysis
7   or transient state analysis.
8      Q.   So it's your understanding that in a
9   steady state analysis you can have unsteady
10  flows?
11     A.   No.
12     Q.   So?
13     A.   Steady state analysis implies no
14  changes in boundary conditions, meaning inputs
15  and outputs; it's indeed at a steady state.
16          For a transient flow, I can have
17  changes in the inputs and outputs.  Both of
18  those kinds of analyses can be driven by steady
19  flow conditions or nonsteady flow conditions.
20          The defense experts have exploited the
21  second one.  The ones that I've exploited are
22  the first ones that led my comment this morning
23  that indeed, my understanding now says we're
24  working different problems.
25     Q.   Indeed.  So then there's three sets of

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 229

1    conditions, if I understand your testimony
2    today:  You can have steady flows in a steady
3    state analysis, or you can have steady flows in
4    a transient analysis, but you can't have
5    unsteady flows in a steady state analysis, you
6    can only have steady flows in a steady state
7    analysis.  Is that correct?
8        A.  Your understanding is not correct.
9        Q.  Okay.  Well, explain to me, then, your
10   understanding of a steady state analysis.
11           You said that you can only have steady
12   flows in a steady state analysis; is that
13   correct?
14       A.  No.
15       Q.  You can have transient flows in a
16   steady state analysis?
17       A.  No.
18       Q.  So you can only have steady flows in a
19   steady state analysis.
20       A.  Um --
21       Q.  Is there a third category in addition
22   to the transient flows and steady flows and
23   unsteady flows?
24       A.  I watched this confusion enter your
25   questioning in or for Mr. Cobos-Roa at the

Page 230

1    conclusion of his deposition.  I've attempted
2    to define for you, as crisply as I can, that
3    there are two types of hydraulic conductivity
4    analyses.  One is called steady flow.  The
5    other is called nonsteady flow.  Each of those
6    analyses can have steady state conditions or
7    transient conditions.  So I can have steady
8    state in transient as a part of nonsteady flow,
9    and I can have the same for steady flow.
10          Does that give this discussion a
11   proper framework for communication?  I hope so.
12       Q.  If you change the total stress on a
13   saturated clay and prevent drainage from
14   occurring, does the pore pressure change?
15       A.  Yes.
16       Q.  And does the void ratio remain
17   constant?
18       A.  If we prevent it for each, yes.
19       Q.  If you shear a saturated organic clay
20   and prevent drainage from occurring, does the
21   pore pressure in that organic clay unit change?
22       A.  Yes.
23       Q.  Are these changes in pore pressures in
24   organic clay included in your analysis?
25       A.  Which pressures are you referring to?

Page 231

1        Q.  Shear-induced pore pressures.
2        A.  Um -- in the undrained analyses, the
3    pore pressures influential in the
4    characterization of shear strength are not
5    included.  In the drained -- so-called drained,
6    I termed them effective stress analyses, we
7    work to determine the effective stress that is
8    important in determining the shear strength of
9    the soil in that characterization.
10       Q.  Do you consider the change in pore
11   pressure due to changes in total stress to be
12   significant in the shear strength of saturated
13   clays?
14       A.  It depends on whether or not I allow
15   drainage and how long I allow that stress to be
16   exerted on the soil.
17       Q.  Under short-term loading conditions,
18   do you consider the change in pore pressures
19   due to changes in total stress to be important
20   in the shear strength of saturated clays?
21       A.  That will depend on the drainage
22   condition that I have, that's Step 1.  And
23   secondly, it will depend on how I approach the
24   characterization of the shear strength of the
25   soil for that loading condition.  I can

Page 232

1    approach that using undrained analyses, or
2    effective stress analyses.
3            And for the buried swamp-marsh
4    deposits, we've used both.  In my ongoing
5    analysis report that you selected this exhibit
6    from, I demonstrated for you how the analysis
7    using either of the approaches can produce very
8    comparable results.  And these analytical
9    elements are discussed extensively in the often
10   referenced Lambe & Whitman textbook under the
11   chapters dealing with undrained and drained
12   soils shear strength characterization.
13       Q.  In your hydraulic conductivity
14   pressure analyses in which you calculate uplift
15   pressures, do you assume that all excess pore
16   pressures from changes in total stress and
17   shear stress are dissipated?
18       A.  No.
19       Q.  In calculating your hydraulic
20   conductivity uplift pressures, is it your
21   understanding that the SEEP/W analyses
22   performed by Mr. Cobos-Roa prevent void ratio
23   and volume changes from occurring?
24       A.  That would be true for the buried
25   swamp-marsh deposits.  For other soils, that

58 (Pages 229 to 232)

ROBERT G. BEA, PH.D.                                            April 16, 2012

Page 233

1    could or could not be true. So there's a
2    combination of soil compressibility that's
3    being introduced in the analyses I performed.
4        Q.   Does SEEP/W calculate shear-induced
5    pore pressures?
6        A.   No.
7        Q.   In calculating lateral stability
8    factors of safety as part of your hydraulic
9    conductivity analyses, do you understand that
10   full consolidation of the lower organic clay
11   has occurred?
12       A.   No.
13       Q.   Do you disagree with Mr. Cobos-Roa at
14   this point?
15       A.   Well, I'd have to know at what point
16   and what element you're referencing.
17       Q.   Well, I asked him during his
18   deposition, if he used drained parameters and
19   pore pressures in your steady state seepage
20   analysis, then you have assumed full
21   consolidation of the soil. And then I
22   clarified what I meant by that by saying,
23   seepage pressures and strength parameters. And
24   he agreed with that.
25       A.   Well, I find your question very

Page 234

1    confusing. Perhaps it's the time of day for
2    me, but listening to your question to
3    Mr. Cobos-Roa, I was similarly confused because
4    of a mixture of analyses that are embedded in
5    your question.
6        Q.   Let's go to Paragraph 139 in your
7    rebuttal report. It's on Page 102.
8        A.   Thank you. Yes, sir.
9        Q.   The paragraph begins, To my knowledge,
10   no drain tests were ever performed on samples
11   from the swamp-marsh deposits. Actually, I'm
12   going to just let you read that to yourself,
13   and then I'm going to ask you some questions
14   about it. It's a long paragraph and I'll save
15   the court reporter's fingers for other
16   punishment.
17       A.   Yes, sir.
18       Q.   Do agree that the stress-strain curves
19   that Mr. Cobos-Roa modeled were obtained from
20   undrained tests?
21       A.   That was the intent, yes.
22       Q.   Would you agree, then, that the
23   friction angle obtained, which you say is,
24   quote, representative of the available
25   laboratory tests, close quote, is an undrained

Page 235

1    friction angle and not a drained friction
2    angle?
3        A.   Well, it's a friction angle that has
4    been derived to perform effective stress shear
5    strength characterizations for the buried
6    swamp-marsh deposits. I recall the value of
7    internal friction best estimate was 25 degrees.
8        Q.   Is Phi prime equals 26 degrees a
9    drained friction angle?
10       A.   No, it's a friction angle intended for
11   use in drained conditions where the effective
12   stress is multiplied times the tangent of that
13   angle of internal friction to then determine
14   the shear strength.
15       Q.   Well, I'm just reading your paragraph.
16   Your paragraph says, using this procedure, a
17   drained friction angle of Phi prime equals
18   26-degree was determined.
19       A.   That's correct.
20       Q.   And I just asked you if that was a
21   drained friction angle, and you gave me a long
22   answer, you didn't just say yes.
23            Can I ask you again the question? A
24   simple question? Is Phi prime equals
25   26 degrees a drained friction angle?

Page 236

1        A.   Yes.
2        Q.   And this Phi prime equals 26 degrees,
3    just to nail this down, was obtained from
4    undrained test data. Correct?
5        A.   Correct.
6        Q.   So can you tell us what procedure you
7    used to determine the drained friction angle on
8    the basis of undrained soil tests?
9        A.   Um -- that's defined in the appendix
10   of our -- or in the appendix of the Phase II
11   report written by Mr. Cobos-Roa and
12   Dr. Grunauer. The step-by-step process is
13   described there.
14       Q.   Also authored by Mr. Storesund.
15   Dr. Storesund.
16       A.   Yes. Well, no. That's incorrect,
17   sir. The Phase II report was not written by
18   Dr. Storesund. This is the Phase II
19   GeoEstudios report written by the two authors I
20   cited.
21       Q.   Well --
22       A.   They have an appendix that details
23   this 26 degrees derivation.
24       Q.   I think we'll just rely on the
25   testimony of Mr. Cobos-Roa at that point. I

JOHNS, PENDLETON COURT REPORTERS                              504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 237

1   believe he testified that part of that study
2   was written by Mr. Storesund.  An entire
3   section of the Phase II study was written by
4   Dr. Storesund, not by himself.  But that's not
5   a question, though.  We'll just rely on the
6   record here.
7        A.  Well, Mr. Storesund 's name never
8   shows up on the Phase II study from
9   GeoEstudios.
10       Q.  In fact, nobody 's name IS on the
11  cover of that study.
12       A.  Yes, there is.
13       Q.  I stand corrected, sir.  You're
14  correct.  It is on the Phase II study.
15       A.  It's a pleasure.
16       Q.  There's just no names on the Phase I
17  study.
18       A.  No, there are names on the Phase I, to
19  the best of my recollection.
20       Q.  Paragraph 46, Dr. Bea.  I don't have a
21  page number for you, we'll have to search for
22  it together.  Page 37.
23       A.  Yes, sir.
24       Q.  In this paragraph, you allude to the
25  London Avenue Canal floodwall tests; correct?

Page 238

1        A.  Yes.
2        Q.  And you state there that it involved
3   testing analysis to determine the hydraulic
4   pressure effect generated in the marsh
5   lacustrine clay -- misspelled here -- and Pine
6   Island beach sands found at this location.
7   These hydraulic conductivity analyses were
8   based on steady flow.
9            Were there any Pine Island beach sands
10  found at the EBIA?
11       A.  The lower sands are characterized as
12  coming from that same set of deposits.
13       Q.  Were there any sands, Pine Island
14  beach sands, coming from that same deposit,
15  that were relevant to the hydraulic
16  conductivities -- your hydraulic conductivity
17  pressure analyses or your lateral stability
18  analyses?
19       A.  Well --
20       Q.  Let me withdraw the question.  It
21  sounds like we're getting into a lengthy
22  answer.
23           In fact, those lower sands did not
24  play any role in your analyses, did they?
25       A.  That's incorrect.  There was a

Page 239

1   piezometer embedded in those as part of that
2   PZ-7, PZ-3 elements, and that piezometer
3   embedded in the sand was reflecting the
4   Hurricane Gustav and Ike elevated water levels.
5   Yes, it did play a role in developing my
6   understanding of how these materials were
7   responding to elevated water levels.
8        Q.  What's the basis of your understanding
9   that the piezometer was embedded in the Pine
10  Island beach sand?
11       A.  It was the information supplied to us
12  by the Department of Justice.  I pursued it to
13  the point of finding out the piezometer had
14  been screened, and where it was embedded, and
15  that background information is included in my
16  reliance material.  You provided it.
17       Q.  I want to ask you some additional
18  questions about this paragraph, specifically,
19  about the core documents that you've cited
20  here.  Because you say that your conclusion --
21  your primary conclusion that you state in the
22  preceding paragraph, Paragraph 45, is
23  substantiated by the guidelines published by
24  the Corps of Engineers.
25           Do you know whether Engineer Manual

Page 240

1   1110-2- I think this may be a typo -- it's
2   either a typo in your Paragraph 46 or in my
3   question, and I'm not sure which --
4            MR. TREEBY:
5            6066.
6            MR. SMITH:
7            No, I'm talking about the 19 --
8   EXAMINATION BY MR. SMITH:
9        Q.  I think it's 1913.  You've just got
10  13.  You see the -- it's the next-to-last
11  reference there.
12       A.  EM.
13       Q.  Yeah, the EM11-10-2-13?
14       A.  Yes.
15       Q.  Do you know whether that engineer
16  Manual should be 2-1913?
17           MR. SMITH:
18           I'm going to withdraw that
19           question, to the extent there was a
20           question.
21  EXAMINATION BY MR. SMITH:
22       Q.  In Paragraph 25 of your rebuttal
23  report, it's on Page 19, you state that rapidly
24  applied hydraulic loadings imposed by Hurricane
25  Katrina rising surge waters -- I'm going to

JOHNS, PENDLETON COURT REPORTERS          504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 241

1    skip ahead -- do not provide sufficient time
2    for the buried swamp-marsh deposits to
3    significantly consolidate or expand changing
4    void ratios for saturations.
5         Is that your opinion here today?
6    A.   Yes.
7    Q.   And essentially, would you agree that
8    that's a definition of undrained soil
9    conditions?
10   A.   Yes.
11   Q.   And isn't it true that you base your
12   strength ratios for the soils on the -- in the
13   lower organic clay on the protected side based
14   upon drain strengths?
15   A.   We've used two approaches to
16   characterize the shear strength; drain strength
17   and undrained strength.
18   Q.   In this study, for this litigation, in
19   fact, you only used drained strength, correct?
20   A.   I think that's correct.  Yes, sir.
21        No, that's not correct.  Please amend
22   the record.  In the work I provided at your
23   request, I provided the comparison for this
24   phase of work between undrained and drained
25   shear strength treatment of the breach

Page 242

1    causation at the north breach.
2    Q.   Yeah.  I saw that comparison.  But in
3    fact, the opinions set forth in your expert
4    report in this case did not consider that prior
5    study, did they?
6    A.   That's not correct.
7    Q.   Well, I thought you just testified
8    that you provided that after your first
9    deposition.
10   A.   I did.  You asked for it.
11   Q.   Right.  Because it isn't set forth
12   anywhere in your initial expert report, is it?
13   A.   No, it is not, but in my deposition
14   you asked how I was validating the results from
15   these analyses.  I explained that I had been
16   using first-principles-based hand calculations,
17   and I think my response was received with
18   incredulity, so on my return to Moraga, as you
19   requested, I produced those hand calculations
20   for your consideration.
21   Q.   Dr. Bea, are the site conditions at
22   the London Avenue Canal similar to conditions
23   in the IHNC?  In the EBIA area that we're
24   interested in in this case.
25        MR. JOANEN:

Page 243

1         I'm going to just object to the
2    form.
3    A.   Only in a very loose way.  They both
4    involve complex geologic conditions, I-walls.
5    The configurations of the soils are different,
6    the configurations of what's on the water side
7    of the walls are different, so there are
8    similarities, but there are very important
9    differences.
10   EXAMINATION BY MR. TREEBY:
11   Q.   Does the EBIA have a shallow layer of
12   clean sand?
13   A.   Well, the only evidence we saw of that
14   were the backfilled excavations that we
15   discussed during my deposition and early today,
16   for example at the northern end of the Boland
17   Marine site described as river sand.
18   Q.   In your opinion, are the sands at the
19   London Avenue Canal more compressible than the
20   organic clay at the IHNC?
21   A.   How do you define the term, please, so
22   I can be responsive, compressible?
23   Q.   The same way we've used it throughout
24   the deposition of you today and the last two
25   days.  We've not had any disagreement about

Page 244

1    compressibility that I understand.
2    A.   I think we have.
3    Q.   Okay.  Well, I'll let you define it
4    however you want.
5         Do you think the sands at London
6    Avenue canal are more compressible than the
7    organic clay at the IHNC?
8         MR. JOANEN:
9         Objection to the form.
10        You can answer if you understand
11   it.
12   A.   For the loading conditions, and
13   analyses I am performing, the volumetric
14   coefficient of compressibility are -- they're
15   very close to each other because the
16   compressibility is being determined by the pore
17   water system, not by the soil skeleton system.
18   So their dilatational velocities are very close
19   to each other.  For that definition of
20   compressibility, they're close.
21        For the definition of compressibility
22   that is dependent on water drainage and soil
23   structure, there's A different conclusion.  I'm
24   referring to the first case.
25   Q.   And what is that different conclusion?

61 (Pages 241 to 244)

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 245

1      A.   The different conclusion is that the
2  two materials, under the conditions I've
3  described, have comparable dilatational
4  velocities, and that leads to a very comparable
5  coefficient of volume change.
6      Q.   So under those two conditions that
7  you're just described, right.  I think you've
8  given us two methods of defining
9  compressibility.  Right?
10     A.   Yes, sir.
11     Q.   That was the gist, basically, of your
12  answer.
13     A.   Yes.
14     Q.   So let's take the first one.  In the
15  first situation, you said they were similar.
16  Correct?  Compressibility would be similar
17  under the first regime --
18     A.   Yes, sir.
19     Q.   -- that you just described.
20     A.   Yes.
21     Q.   And under the second regime, you said
22  they'd be different.
23     A.   Yes.
24     Q.   Under the second regime, would the
25  sands at London Avenue Canal be more or less

Page 246

1  compressible than the organic clay at the IHNC?
2      A.   I would think less.
3      Q.   Would you expect the clean sand at
4  London Avenue canal to develop shear-induced
5  pore pressures under hydraulic loading?
6      A.   They could.  If they're being sheared.
7      Q.   In Paragraph 29 of your -- sorry.
8  Page 29, Paragraph 37 of your rebuttal
9  report --
10     A.   Page 29, Paragraph --
11     Q.   Paragraph 37.  Top of Page 29 in my
12  copy.
13     A.   37 shows at the bottom of Page 28.
14     Q.   Yes.  I'm interested in the sentence
15  that starts, Because of the unique geological.
16  Top of Page 29.  Because of the unique
17  geological.
18          You see that sentence?
19     A.   Yes, sir.
20     Q.   Because of the unique geological and
21  geotechnical characteristics of the Sherman
22  Island levees, particular attention was devoted
23  to seepage pressure, et cetera.
24          What are the unique geological
25  characteristics of the Sherman Island site?

Page 247

1      A.   Well, they're very similar in many
2  ways to the comparable buried swamp-marsh
3  layers found at the Lower Ninth Ward.
4      Q.   Well, let's talk about the unique
5  ones, not the ones that are similar.  Because,
6  you know, in common parlance, unique means
7  there isn't any others like that.  So I'd like
8  for you to describe for me the unique
9  geological features at the Sherman Island levee
10  site.
11     A.   Well, in terms of these deposits, they
12  have higher organic contents than those found
13  at the Lower Ninth Ward.
14     Q.   What are some of the other -- when you
15  say that there are, you use the plural,
16  characteristics, what are all the unique
17  geological characteristics of the Sherman
18  Island levees?
19     A.   Well, it has a different geologic
20  history in terms of the formation of the basic
21  deposits, and it's had a different but similar
22  history of the development of the levee island
23  system to that here in New Orleans.  But
24  they're very good analogues of each other.
25     Q.   That's great.

Page 248

1  MR. JOANEN:
2      I'm going to object to the form.
3  There's no reason to --
4  MR. SMITH:
5      That's not responsive, Scott.
6  Okay?  That's not responsive.
7  MR. JOANEN:
8      He's given you a response.
9  There's no reason to make comments.
10  MR. SMITH:
11     I asked him --
12  MR. JOANEN:
13     There's no reason to make
14  comments.
15  MR. SMITH:
16     I did not -- look, you're yelling
17  at me for making an editorial comment,
18  and your witness constantly makes
19  editorial comments that are non
20  responsive.
21  MR. JOANEN:
22     It's a deposition on oral
23  examination.  You ask the question, he
24  provides an answer.  That's the
25  procedure.

ROBERT G. BEA, PH.D.                                      April 16, 2012

Page 249

```
 1        MR. SMITH:
 2           If I could just get an answer I'd
 3      be happy.
 4        MR. JOANEN:
 5           He's given you very many
 6      responsive answers.
 7   EXAMINATION BY MR. SMITH:
 8      Q.  We've just got a minute, Dr. Bea, so
 9   let's see if we can get one more question
10   answered.
11           Where is the silty clay shown in
12   Figure 13 on Page 30 of your report?
13      A.  There isn't any.
14      Q.  In fact, your text in Paragraph 37
15   says there is silty clay there, correct?
16      A.  The area I have identified here as the
17   organic clay with peat layers is encompassed by
18   that sentence that reads through the buried
19   swamp-marsh organic clay and silty clay,
20   parentheses, with peat layers, close
21   parentheses, deposits buried under these
22   levees.  So the dotted area includes those
23   materials.
24        (Brief recess.)
25   EXAMINATION BY MR. SMITH:
```

Page 250

```
 1      Q.  Dr. Bea, in your 2012 lateral
 2   stability analyses, does your shear strength
 3   and your organic clay vary with the canal water
 4   level elevation?
 5        (Off the record.)
 6   EXAMINATION BY MR. SMITH:
 7      Q.  Dr. Bea, there was a question that I
 8   asked prior to going off the record.  That
 9   question is still pending.  Do you have an
10   answer?
11      A.  Yes.  It does vary.
12      Q.  So for your 2012 lateral stability
13   analysis, just to be clear, the strength of the
14   organic clay underneath the levee on the
15   protected side changes as the water level on
16   the canal side rises from 12 feet to 14 feet,
17   correct?
18      A.  Correct.
19      Q.  And in what way does it change?
20      A.  The effective stress being used to
21   multiply the tangent of the effective value of
22   internal friction is changing as a function of
23   water elevation.  That effect is contained in
24   the confirming hand calculations I included in
25   my April 11th report.
```

Page 251

```
 1      Q.  Would it be fair to say that as the
 2   water level rises on the canal side the shear
 3   strength in the organic clay on the protected
 4   side drops?
 5      A.  Correct.
 6      Q.  So they have an inverse relationship,
 7   correct?
 8      A.  There's a coupling, yes.
 9      Q.  Now, you've previously referenced your
10   2008 lateral stability analyses in which you
11   used undrained shear strengths in the organic
12   clay.
13      A.  Yes, sir.
14      Q.  In those analyses in which you used
15   undrained shear strength in the organic clay,
16   was the shear strength of the organic clay also
17   a function of canal water level?
18      A.  No.
19      Q.  In fact, in your 2008 lateral
20   stability analyses, the shear strength of the
21   organic clay was constant for every canal water
22   level.  Isn't that correct?
23      A.  That's correct.  The effect of the
24   changing level for the undrained analysis is
25   captured in the uplift pressures associated
```

Page 252

```
 1   with that set of analyses demonstrated in my --
 2      Q.  I'm going to strike that as
 3   non-responsive.
 4        MR. JOANEN:
 5           I'm going to object to that.  The
 6      record is the record.
 7        MR. TREEBY:
 8           Object to the objection.
 9   EXAMINATION BY MR. SMITH:
10      Q.  I'm going to direct your attention now
11   to Paragraph 8 in your rebuttal report.  On
12   Page 5, third sentence, you say, These pervious
13   backfill materials were, in cases such as the
14   north breach site, placed in contact with
15   preexisting pervious shell fill layers -- we've
16   read this sentence before, I'm not going to
17   read the rest of it again.  But you say here --
18   you assert here that they quickly conveyed
19   water pressures directly to the EBIA.
20           In your analysis, were these pervious
21   backfill materials above or below the phreatic
22   surface?
23      A.  A mixture during normal conditions,
24   but under the approximately 15 inches of
25   rainfall that preceded Hurricane Katrina, they
```

63 (Pages 249 to 252)

ROBERT G. BEA, PH.D.                                      April 16, 2012

Page 253

1  were probably totally below the then phreatic
2  surface.
3      Q.  Does your assertion that this
4  pervious -- preexisting pervious shell fill
5  layers quickly conveyed water pressure directly
6  to the EBIA flood wall, did you compute the
7  time that was required for that conductivity to
8  occur?
9      A.  No.
10     Q.  Would it matter whether those shell
11  fill layers were saturated or unsaturated in
12  computing the time required for that
13  transmission?
14     A.  Yes.
15     Q.  Do you know whether they were modeled
16  as saturated or unsaturated layers in your
17  modeling performed by Mr. Cobos-Roa?
18     A.  Would you please define for me?
19     Q.  The preexisting pervious shell fill
20  layers that were discussed in here.
21         In Mr. Cobos-Roa 's 2012 SEEP/W
22  analyses, do you know whether they were treated
23  as saturated or unsaturated materials?
24     A.  I think they were treated as a
25  combination, depending on their position

Page 254

1  relative to the phreatic surface.  Those
2  details are available to us in the
3  documentation of the SEEP/W analyses for that
4  case.
5      Q.  And would that location of the
6  phreatic surface have been a surface that you
7  specified as an input to the SEEP/W analysis?
8      A.  Yes.
9      Q.  And what would that specification be
10  based on, then?
11     A.  Well, the groundwater elevations
12  determined during the WGI work, that together
13  with evaluation of the effects of the 15 inches
14  of rainfall I cited, that would go into our
15  evaluation of the location of the phreatic
16  surface.
17     Q.  And how did you evaluate the impact of
18  the 15 inches of rainfall?
19     A.  That it would add, essentially, to the
20  normal phreatic surface, bringing it closer to
21  the surface.
22     Q.  Did you have any scientific basis for
23  calculating the elevation to which the phreatic
24  surface would have been raised by 15 inches of
25  rainfall?

Page 255

1      A.  Well, only that the sandy materials
2  would quickly allow the water to penetrate
3  below the surface to the phreatic surface much
4  as water at a beach penetrates below the
5  surface of the beach.  We did not perform any
6  detailed analyses to track that transformation.
7      Q.  You cite 15 inches of rainfall.  Are
8  you referring to some report of 15 inches of
9  rainfall following prior to surge rising above
10  the EBIA ground surface?
11     A.  The 15 inches of rainfall I'm
12  referring to is rainfall that preceded the
13  arrival of the center of Hurricane Katrina.
14  The hydrograph that we applied is contained in
15  my reports.  So I'd have to go back, check the
16  hydrograph, check the addition to the phreatic
17  surface, to answer your question accurately.
18     Q.  Do you recall whether you took all
19  those steps prior to specifying the phreatic
20  surface in the SEEP/W model that was run by
21  Mr. Cobos-Roa in 2012?
22     A.  Yes.  We did.
23     Q.  But you didn't apply any scientific
24  basis for determining how much that rainfall
25  would have raised the phreatic surface, is that

Page 256

1  correct?
2      A.  I think I described the methods that
3  we, or I, used, and I think they're scientific.
4      Q.  You didn't calculate it.
5      A.  Well, I calculated the addition to the
6  phreatic surface of approximately 15 inches.
7  So if the phreatic surface in the local deposit
8  under normal conditions was at zero, I raise
9  that by 15 inches, then that then intersects
10  with the application of the hydrograph
11  reflecting the rising water in the IHNC.
12     Q.  So you assume for purposes of your
13  analysis that the unsaturated soils were
14  completely saturated as a result of 15 inches
15  of rainfall?
16     A.  Well, that would depend on their
17  elevation.  If they're above that 15-inch
18  phreatic surface, they remained unsaturated.
19     Q.  I'm talking about the rise.  You said
20  you raised the phreatic surface by 15 inches to
21  reflect 15 inches of rainfall.
22     A.  Correct.
23     Q.  And you raised it immediately, without
24  taking into account the hydraulic conductivity
25  of those unsaturated soils.  Is that your

64 (Pages 253 to 256)

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 257

1    testimony?
2        A.  No.  The sandy materials have a very
3    high hydraulic conductivity.  If I took a
4    sample of those soils and they were in their
5    normal condition and poured water on the
6    surface of the soil, where do you think the
7    water would go?  Well, it would go to the
8    bottom, wherever that surface would, and the
9    increase in elevation is proportional to amount
10   of water I poured into that sand. (Gesturing.)
11       Q.  So you didn't base it on any analysis
12   of the hydraulic conductivities of the
13   surficial soils, did you?
14       A.  Um -- only to the extent that I
15   describe.  We did not treat it as an
16   impermeable clay.
17       Q.  Right.  So you just assumed, based
18   upon your general knowledge of sands, sandy
19   materials, that those soils would have become
20   fully saturated within the amount of time it
21   took for that 15 inches of rainfall to fall, is
22   that correct?
23       A.  As long as they're below the then
24   phreatic surface.  The materials above would
25   remain unsaturated.

Page 258

1        Q.  We're not talking about those, are we?
2        A.  Yes, we are.
3        Q.  No, we're not.  We're talking about
4    the soils that became saturated as a result of
5    rainfall.
6        MR. JOANEN:
7            I object.  Is that a question?
8        A.  Well, they --
9        MR. JOANEN:
10           There's no question pending.
11       MR. SMITH:
12           That's never stopped him before,
13   Scott.
14       MR. JOANEN:
15           There's no reason for comments.
16           Question and answers, please.
17   EXAMINATION BY MR. SMITH:
18       Q.  In Paragraph 8, you refer to borrow
19   pits.  What borrow pits are you referring to?
20       A.  The borrow pits that were constructed
21   on the EBIA site with the purpose of using
22   material excavated from those locations to
23   serve as backfill.  An example would be the
24   large McDonough Marine site borrow pit.
25       Q.  Where were these other borrow pits in

Page 259

1    addition to the McDonough Marine borrow pit
2    located?
3        A.  Um -- the -- I don't recall.
4        Q.  Do you have any evidence that there
5    were other borrow pits in the EBIA other than
6    the McDonough Marine borrow pit?
7        A.  I think our record does include those.
8    I cannot recall their locations at this time.
9        Q.  Okay.  In this Paragraph 8, you
10   describe these borrow pits as voids.  What's
11   the basis for describing them as voids?
12       A.  They're not backfilled.
13       Q.  So do you have evidence that there
14   were numerous borrow pits in the EBIA that were
15   not backfilled at the time of Hurricane
16   Katrina?
17       A.  The McDonough borrow pit is one of the
18   most outstanding examples of an unfilled,
19   intentionally water flooded borrow pit.
20       Q.  Right.  And that's the only one that's
21   previously been discussed in this litigation,
22   to my knowledge.
23       A.  Yes.
24       Q.  And I'm asking you, since you have
25   rendered an opinion here about these borrow

Page 260

1    pits --
2        A.  Plural.
3        Q.  First of all, let me just back up.
4            Did you write Paragraph 8, or did
5    Mr. Storesund write Paragraph 8?
6        A.  Mr. Storesund provided me with drafts.
7    I transferred those drafts, myself, to the text
8    you see written in this paragraph and section.
9        Q.  Did you note that he used the term
10   borrow pits when -- was this one of your edits,
11   or was this something he provided you?
12       A.  I don't recall whether it was plural
13   or singular, but my memory says it was plural.
14   And I wrote it as such.
15       Q.  Well, this just occurred since your
16   last deposition a couple of weeks ago, correct?
17       A.  Pardon?
18       Q.  You received this paragraph from
19   Mr. Storesund within the last two weeks;
20   correct?
21       A.  That's correct.
22       Q.  And you don't, as you recall here
23   today, know whether you, at the time that you
24   signed this and authored this report, you were
25   aware of other borrow pits other than McDonough

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 261

1   Marine.
2       A.  Oh, I was.  And said that I could not
3   recall their locations.  But within the
4   database I referred to, that we used to build
5   the demonstrative identified as the Swiss
6   cheese graphics, that information is included
7   there.  I just don't recall.
8       Q.  Is it your opinion, today, that these
9   other borrow pits contributed to the breaches?
10      A.  No, that's not my opinion.
11      Q.  Dr. Bea, is the elevation of the
12  floodwall, the top and bottom elevations of the
13  flood wall adjacent to the EBIA, are those data
14  pointes significant geometries for your seepage
15  analyses?
16      A.  Well, the bottom certainly is because
17  that defines the elevation of the sheet pile
18  that is important in the seepage analyses.  The
19  top of the flood wall is not of primary
20  importance in the seepage analyses, but is
21  important in the lateral stability analyses.
22      Q.  In Paragraph 9, you say that the
23  top-of-wall elevations for the entire site was
24  set at +13 feet.  You describe which as a
25  representative value.

Page 262

1       A.  Yes.
2       Q.  And I take it by using the word set,
3   you're saying that that is the specification
4   that you used in your seepage analyses.
5           Correct?
6       A.  Yes.
7       Q.  Okay.  And so by setting the top of
8   the wall elevation, you're effectively setting
9   the bottom sheet pile tip depth at the same
10  time.  Correct?
11      A.  Um -- yes.
12      Q.  It's a single unit, in other words.
13      A.  Yes.
14      Q.  Top goes up, bottom goes up.  Top goes
15  down, bottom goes down.
16      A.  Well, not necessarily, and that's
17  because the top elevation is a variable.  And
18  we attempted to, as accurately as possible,
19  identify the lower elevation where the sheet
20  piles terminated.  And, likewise, for a
21  representative elevation for the top of the
22  floodwall.
23      Q.  So you say in Paragraph 9 that you set
24  the top wall elevation +13.  Are you testifying
25  today that you set the varying floodwall tip

Page 263

1   depth?
2       A.  No.
3       Q.  No.  So that was uniform, as well.
4       A.  Correct.
5       Q.  Okay.
6       A.  Up to the intersection of the 1969
7   floodwall with the 1980, um -- T-wall, that
8   that T-wall had piles substantially deeper,
9   intentionally, so that they could cut off the
10  water-conductive swamp-marsh layers.
11      Q.  Did you perform any analyses, any
12  quantitative or qualitative analyses to
13  determine whether variations in the top-of-wall
14  elevations would have an impacts on your
15  failure analyses?
16      A.  Yes.
17      Q.  And have you provided documentation of
18  those analyses in your report?
19      A.  Yes.
20      Q.  Where?
21      A.  They're dealing with the evaluation of
22  overtopping erosion effects.
23      Q.  Okay.  Mr. Treeby asked you about that
24  this morning.
25      A.  Yes.  He did.

Page 264

1       Q.  I read that section.  I could not find
2   a single word in that entire section talking
3   about changes in floodwall elevation.
4       A.  Would you like me to consult the
5   section?
6       Q.  No, I wouldn't, Dr. Bea.
7           Is it your testimony today that you
8   believe that there's something in your report
9   that tells us that you varied the floodwall
10  elevation in performing the analyses that you
11  describe in that section?
12      A.  Yes.  And, in fact, Dr. Marr provided
13  a plot which we incorporated into -- or I
14  incorporated into my report that explicitly
15  addresses the overturning -- or pardon me, I'm
16  getting fatigued -- the overtopping erosion as
17  a function of the top-of-wall elevation.
18      Q.  Dr. Bea, in Paragraph 13, you state
19  that grid trenches were evaluated to extend
20  down to an average depth of five feet.
21          How was this average computed?
22      A.  It was determined from the records
23  that I had available -- we had available to
24  define the average depths of the grid trenches.
25  We corroborated that, as well as we could, with

66 (Pages 261 to 264)

JOHNS, PENDLETON COURT REPORTERS            504 219-1993

ROBERT G. BEA, PH.D.                                          April 16, 2012

Page 265

1   the photographic record of those grid trenches.
2   Certainly, five feet might represent an
3   average.  In some areas, it was shallower, in
4   other areas it was deeper, as we could best
5   evaluate it.
6       Q.  Did you personally compute that
7   average?
8       A.  No.
9       Q.  Who computed that average?
10      A.  Well, I believe the average was
11  computed by Washington Group International as
12  they reported volumes of excavated materials.
13      Q.  Is the average depth of the grid
14  trenching a significant datum in your seepage
15  analyses?
16      A.  Well, it's important to know how deep
17  those grid trenches were, potentially both the
18  shallower elevations and the deeper elevations,
19  as they could influence contact with the buried
20  swamp-marsh deposits at the location of the
21  grid trenching.
22      Q.  And in fact --
23      A.  So we had to follow that personally.
24      Q.  In fact, in your own cross-sections,
25  the lower organic clay layer doesn't ever come

Page 266

1   within 5 feet of the surface in the north
2   breach zone; isn't that correct?
3       A.  I'd have to consult the cross-section,
4   but I think you probably have and you can read
5   the elevations.  The organic swamp-marsh
6   deposits are changing elevations as you move
7   from the Lower Ninth Ward toward the Industrial
8   Canal site.  We had to contour those changes in
9   elevation to know their proximity to the --
10      Q.  Dr. Bea -- Dr. Bea --
11      MR. JOANEN:
12          Let him finish the question,
13      please.
14      MR. SMITH:
15          No.  I'm --
16      MR. JOANEN:
17          You asked him a question.  Let
18      him finish his answer.
19      MR. SMITH:
20          He's answered the question, and
21      this is non-responsive.
22      MR. JOANEN:
23          You cannot cut him off.  Let him
24      finish his answer.  You asked a
25      question.

Page 267

1       MR. SMITH:
2           Then you can't cut me off.
3       Because if he can go on for five
4       minutes --
5       MR. JOANEN:
6           I haven't cut you off at all.
7       You're cutting him off, so I'm raising
8       my objection.  You cut him off.
9       MR. SMITH:
10          We'll continue this deposition
11      until I'm done, because he's not
12      answering the questions, he's just
13      talking.  He told us this morning all
14      about the raising and falling
15      elevation, and that's not responsive.
16      MR. JOANEN:
17          I disagree.  He's allowed to
18      finish his question.  Please proceed.
19  EXAMINATION BY MR. SMITH:
20      Q.  Dr. Bea in Paragraph 17, you were
21  asked about this morning, I think you
22  admitted that you haven't done a correlation
23  even though you say there exists a very high
24  correlation, with these local features
25  identified in my Expert Report Case 1 and Case

Page 268

1   2 excavations.
2           What are these local features?
3       A.  They're in the cross-sections for Case
4   1 and Case 2 in my expert report.
5       Q.  Dr. Bea, can you define for me the
6   term hydrostatic pressure?
7       A.  Yes, sir.
8       Q.  How would you define hydrostatic
9   pressure?
10      A.  It would be the pressure that
11  developed by a fluid as a function of the
12  density of the fluid and the depth below the
13  surface of the fluid.
14      Q.  Isn't it in fact, isn't it the force
15  exerted by gravity on the fluid as a function
16  of its unit weight?
17      A.  Well, unit weight is a function of
18  gravity.
19      Q.  So it's density, then.  Of its
20  density.
21      A.  Correct.
22      Q.  Okay.  Isn't hydrostatic pressure a
23  neutral pressure?
24      A.  In all directions, yes.
25      Q.  And doesn't hydrostatic mean no flow?

67 (Pages 265 to 268)

ROBERT G. BEA, PH.D.                                        April 16, 2012

Page 269

1    A. No.
2    Q. The static in hydrostatic does not
3  refer to water that's not moving? Is that your
4  testimony?
5    A. Well, I can have hydrostatic pressure,
6  for example, in a dam, and the bottom of the
7  reservoir is connected to a pipeline duct and,
8  hence, the hydrostatic pressure is influencing
9  the movement of fluid from the reservoir.
10   Q. Isn't it true, Dr. Bea, that
11 hydrostatic pressure, by definition, does not
12 change with time?
13   A. Well, that is a very dangerous
14 over-generalization. If the density of the
15 fluid is changing as a function of time, and it
16 does in this set of challenges we face, then
17 that has to be reflected correctly in the
18 definition of the effective hydrostatic
19 pressure.
20   Q. Is it your testimony that the density
21 of the waters involved in your analyses changed
22 significantly over time?
23   A. Yes.
24   Q. The densities of the water.
25   A. Yes. And that's because of salinity.

Page 270

1    Q. Even though it's incompressible, the
2  densities change.
3    A. Yes, it does. That's known as fluid
4  mechanics.
5    Q. I'm happy. I'm happy to get a very
6  emphatic answer from you, Dr. Bea.
7       Dr. Bea, if it can be shown that the
8  flow underneath the levee during Hurricane
9  Katrina was not steady flow, would your
10 opinions regarding the causation of WGI 's
11 excavations be scientifically valid?
12   A. Well, I'd have to be able to evaluate
13 the proof that you propose.
14   Q. I'm asking you to assume that it can
15 be proved. If it can be proven that the flow
16 underneath the levee was not steady flow, would
17 your causation theories lack scientific
18 validity?
19   A. Yes.
20   Q. Did you consider -- you've
21 emphatically stated to me, in fact, you almost
22 emphasized, so that that I would understand
23 that the densities of the water changed during
24 Hurricane Katrina. Did you consider this
25 change in density in your flow analyses?

Page 271

1    A. Yes, I did.
2    Q. Where does that change in density --
3  where is that reflected in your analyses?
4    A. It shows up in the density of water
5  that I use to compute pressures. I change the
6  density between 63 pounds per cubic foot to
7  64 pounds per cubic foot to reflect the
8  increase in the salinity of the water that was
9  propagating into the Industrial Canal.
10   Q. In Paragraph 23, you quote Lambe &
11 Whitman for the proposition that satisfactory
12 solutions have not been found for these complex
13 flow conditions.
14      You see that statement?
15   A. No, sir, I don't. Please -- it's
16 Paragraph 23.
17   Q. Yeah. As stated by Lambe & Whitman,
18 1969, these, quote, are complex flow conditions
19 for which satisfactory solutions have not been
20 found.
21   A. That's correct.
22   Q. That statement was written forty years
23 ago, Dr. Bea. Do you think that that quote
24 still applies to today 's engineering practice?
25   A. Um -- to my knowledge, yes, it does.

Page 272

1    Q. Paragraph 25. You state that
2  rapidly -- we've talked about this before. You
3  talk about the rapidly applied hydraulic
4  loadings, they don't provide time for the
5  swamp-marsh deposits to drain.
6       What's the basis for your assertion
7  that during the loading conditions that we're
8  analyzing here there was not sufficient time
9  for the buried swamp-marsh deposits to
10 significantly consolidate or expand?
11   A. Well, one of the primary sources that
12 I cited were the piezometer records that
13 reflected high water conditions that inundated
14 the East Bank Industrial Area. And those water
15 pressures were reflected very quickly in the
16 piezometers embedded in the organic clay layers
17 identified as swamp-marsh deposits.
18   Q. Do you consider that to be a
19 qualitative and quantitative analysis?
20   A. Well, we did do both, and that's
21 contained in my expert report.
22   Q. And your reference to the piezometer
23 data, that's your qualitative and quantitative
24 analysis of whether sufficient time elapsed for
25 the buried swamp-marsh deposits to change their

JOHNS, PENDLETON COURT REPORTERS                           504 219-1993

ROBERT G. BEA, PH.D.                                         April 16, 2012

Page 273

1    quarter ratios?
2        A.  Well, we saw the pressures instantly,
3    or very rapidly.  And given the location's
4    confinement and characteristics of the
5    swamp-marsh deposits, there wasn't time for
6    significant change in void ratios.
7        Q.  Well, I know that's your conclusion.
8    But I guess my question is, what quantitative
9    and qualitative analysis of the piezometer
10   results did you perform to determine whether
11   there was sufficient time for the buried
12   swamp-marsh deposits to change their void
13   ratios?
14       A.  Well, we performed analyses based on
15   our steady flow conditions, and they're
16   documented in my February expert report as
17   pertains to analysis of, I think it is, PZ-3.
18   Piezometer number 3.  Those were explicit
19   quantitative analyses.
20       Q.  In fact, aren't there recognized
21   engineering tools that engineers use to analyze
22   a problem like this to determine whether or not
23   soils of a specific hydraulic conductivity are
24   able to change their void ratios within the
25   period of rapidly changing hydraulic loads?

Page 274

1        MR. JOANEN:
2            Object to the form.
3        A.  Yes.  There are such tools.
4    EXAMINATION BY MR. SMITH:
5        Q.  Yes.  And in fact isn't SEEP/W a
6    software program that has the capability of
7    computing whether or not soils consolidate or
8    expand, change their void ratios, within the
9    period during which load changes occur?
10       A.  Well, the program is computing
11   responses based on inputs provided to that
12   program.  The program does not magically
13   develop these changes.  They're responses to
14   our inputs.
15       Q.  Right.  I didn't think there was any
16   magic involved.  It's a calculation, isn't it,
17   Dr. Bea?
18       A.  Yes, it is.
19       Q.  That's all SEEP/W is, it's an
20   extensive computation machine, right?
21       A.  Yes.
22       Q.  Applying regular formulas that
23   engineers can use by hand, right?
24       A.  Some.
25       Q.  Some.  Which is why Lambe & Whitman 's

Page 275

1    statement isn't really true today, isn't it?
2        A.  I don't know that Lambe & Whitman 's
3    statement today is not true.
4        Q.  I applaud your consistency, at least
5    on this occasion.
6        A.  Thank you.
7        Q.  Even if it's incorrect.
8        A.  Thank you.
9        Q.  Would you characterize the increase in
10   flood level at the EBIA during Hurricane
11   Katrina as rapid loading?
12       A.  The peak of loading, yes.
13   Approximately 2.7 feet per hour.  That's rapid.
14       Q.  In Paragraph 26, you say that all
15   indications are that these deposits were fully
16   saturated.  That's the very end of the
17   paragraph.
18           Did you consult the Fugro final test
19   data before making this assertion?
20       A.  The final test data, um -- let's see.
21   I did not personally make that evaluation.
22       Q.  What indications are you referring to
23   when you say all indications are that these
24   deposits were fully saturated?
25       A.  Well, the first one is the deposits

Page 276

1    have been below water surface for approximately
2    a century.  Another are the response
3    characteristics associated with those deposits.
4    Another is the lack of observed gas escape from
5    samples retrieved from these deposits.
6        Q.  Any others?
7        A.  I think that's complete.
8        Q.  Dr. Bea, do you know whether steady
9    flow conditions were achieved during the
10   pumping test performed by the parties at
11   various locations during 2011?
12       A.  My knowledge, based on what I have
13   learned, says we had a mixture of conditions,
14   both steady and nonsteady flow.  That knowledge
15   comes directly to me from Mr. Kevin Pope.
16       Q.  Do you know how long it took?  Do you
17   know what the smallest elapsed time was during
18   the pumping tests that were performed in 2011
19   by the parties in order for steady flow
20   conditions to be obtained?
21       A.  No, I don't.
22       Q.  Do you believe that in any occasion
23   during those tests steady flow conditions were
24   obtained immediately?
25       A.  No, I do not.

69 (Pages 273 to 276)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                      April 16, 2012

Page 277

1    Q.  In Paragraph 27, you say the hydraulic
2  conductivity characteristics have been
3  determined using consistent and scientifically
4  reliable methods.  Are you referring to the
5  parties' 2011 exploration and testing program?
6    A.  Yes, sir.
7    Q.  Do the permeabilities, the hydraulic
8  conductivity values for the lower organic clay
9  that were determined based upon the 2011 field
10  testing and exploration program, do those
11  hydraulic conductivity values provide a basis
12  for concluding that steady flow conditions
13  existed in the area of analysis performed by
14  Dr. Cobos-Roa in his 2012 investigation?
15    A.  No.
16    Q.  What does your use of the phrase
17  direct pressure communication mean?
18    A.  Oh, that the pressures exerted at
19  Point A are rapidly communicated, transmitted,
20  to another distant Point B.
21    Q.  How fast does this transmission occur?
22    A.  It can happen at a rate of 5,055 feet
23  per second in the materials we're discussing.
24    Q.  The saturated soils.
25    A.  That's correct.

Page 278

1    Q.  Is that pressure transmission a result
2  of seepage?
3    A.  It's a result of pressure.
4    Q.  Right.  And I'm asking you whether
5  that's also a result of seepage.
6    A.  Well, as I use the term seepage, it's
7  got two components, one, the transfer of
8  fluids, and other, the transfer of pressure.
9  If you will allow me to include both of those,
10  then yes, seepage.
11    Q.  No, I'm just talking about the
12  transfer of fluids when I use the term seepage.
13    A.  If you want the transfer of fluids,
14  not necessarily.
15    Q.  So you can have pressure transmission,
16  in your theory of causation, without any
17  transfer, any movement of fluids, is that
18  correct?
19    A.  Well, it's not just my theory, it's
20  the theory contained in Lambe & Whitman.
21    Q.  Well, my question is just about your
22  theory.
23        MR. JOANEN:
24          Please allow him to finish.  He
25        wasn't finished his answer.

Page 279

1        MR. SMITH:
2          My question is just about --
3          He's already answer the question.
4        MR. JOANEN:
5          He wasn't finished.
6        MR. SMITH:
7          He said it wasn't his theory.  He
8        said, it's not just my theory.  And I
9        didn't ask him if it's just in his
10        theory.
11    A.  I don't have a theory.
12  EXAMINATION BY MR. SMITH:
13    Q.  In your analysis, then, Dr. Bea.
14  Let's change the word then to analysis.  In
15  your analysis that you rely on for your opinion
16  in this case, does pressure transmission occur
17  in the absence of the movement of fluids
18  through soil?
19    A.  Yes.
20    Q.  Let's go to Page 44.  Sorry.  It's
21  Paragraph 44.  I apologize.  44 in your --
22        MR. JOANEN:
23          Sorry.  Page or --
24        MR. SMITH:
25          Paragraph 44.

Page 280

1    A.  Yes, sir.
2  EXAMINATION BY MR. SMITH:
3    Q.  At the bottom of that page, last
4  sentence begins, Conspicuously absent from the
5  defense experts' reports is any inclusion of,
6  quote, variability or, quote, uncertainty in
7  soil conditions due either to a fundamental
8  misunderstanding or, Heaven forbid -- and then
9  this term is in parentheses -- confirmational
10  bias.  Oh, did I say parenthesis?  I meant to
11  say quotation marks.
12    A.  Yes.  You did.  But that's --
13  EXAMINATION BY MR. SMITH:
14    Q.  In quotation marks it says the phrase
15  confirmational bias.  I misrepresented that.
16    A.  Yes.
17    Q.  Do you know whether the defense
18  experts included or considered variability or
19  uncertainty in soil conditions in their
20  evaluations?
21    A.  I think they did.  Because --
22    Q.  You've answered my question.
23        And couldn't they have considered
24  variability and uncertainty in taking that into
25  account without describing it in the reports?

70 (Pages 277 to 280)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                          April 16, 2012

Page 281

1    A.  Well, they could, but that would not
2  be adequate forensic engineering.  I had to
3  know --
4    Q.  In fact, you know that they relied
5  on --
6       MR. JOANEN:
7          Mr. Smith, he's not finished his
8       answer.
9  EXAMINATION BY MR. SMITH:
10   Q.  -- this copious soils date obtained at
11 considerable time and expense--
12      MR. JOANEN:
13         Let him finish his answer.
14      MR. SMITH:
15         He's answered my question.
16      MR. JOANEN:
17         And he was half way through it.
18      MR. SMITH:
19         Okay.  We'll stay here until
20      we're done.
21      MR. JOANEN:
22         Please finish your answer.
23   A.  We will stay here till we're done.
24      It's incumbent on me, as a forensic
25 engineer, to have a quantitative understanding

Page 282

1  of these variabilities, both natural and those
2  associated with the analytical methods I
3  employ.
4       MR. SMITH:
5          I'm going to move to strike your
6       editorial comment as unresponsive.
7       MR. SMITH:
8          I take exception to that.
9  EXAMINATION BY MR. SMITH:
10   Q.  In fact, don't you know, Dr. Bea, that
11 the defense experts relied on the copious soils
12 data obtain at considerable time and expense
13 last year, soils data that shows variability
14 and uncertainty in the soil conditions?  Isn't
15 that true?
16   A.  Yes.
17   Q.  You state in your rebuttal report that
18 you've read defense experts' reports; is that
19 true?
20   A.  Yes.
21   Q.  You read all of them?
22   A.  Yes.
23   Q.  Did you read their appendices, as
24 well?
25   A.  Yes.

Page 283

1    Q.  Do you know whether Dr. Marr included
2  in his report or his appendices any
3  understanding of variability and uncertainty in
4  soil conditions?
5    A.  Yes, he does.
6    Q.  Okay.  So then it's not true that it's
7  conspicuously absent in Dr. Marr 's report,
8  isn't that so?
9    A.  Well, it's the formal treatment of the
10 uncertainties that I am referring to in
11 Paragraph 44.
12   Q.  In fact, in Paragraph 44, you don't
13 say that.  You say conspicuously absent in the
14 defense expert reports is any inclusion of any
15 variability or uncertainty in soil condition.
16 Isn't that true?
17   A.  You've read the sentence correctly.
18   Q.  In Paragraph 60 of your rebuttal
19 report --
20   A.  60?
21   Q.  Six zero.
22   A.  Yes, sir.
23   Q.  -- you mention some information.  I'm
24 not going to describe it all on the record, but
25 you're talking about a high water table running

Page 284

1  through the EBIA site and what you think, that
2  that provides a basis of knowledge for the
3  geotechnical engineer.
4       And then you say, this information
5  provided early warning signals that the EBIA
6  river sand backfilled excavations at the north
7  end of the Boland Marine site had established
8  direct hydraulic connections with the sandy
9  shell fill under the Surekote Road overpass.
10      What were those what you describe as
11 early warning signals?
12   A.  Well, the contours shown in Figure 21
13 are anomalous for the EBIA site and indicate
14 that the water elevations in the soils adjacent
15 to the Industrial Canal have been carried,
16 distorted close to the north breach location.
17   Q.  And who created Figure 21, Dr. Bea?
18   A.  This figure is a recreation of the
19 figure included in the WGI groundwater report
20 done by Dr. Marino.  His improvement on that
21 base figure was color contours that could be
22 seen more easily by the eye in identification
23 of the north breach site.
24   Q.  Do you know what these water table
25 elevations are based on?

71 (Pages 281 to 284)

JOHNS, PENDLETON COURT REPORTERS                       504 219-1993

ROBERT G. BEA, PH.D.                                        April 16, 2012

Page 285

1    A.  Measurements.
2    Q.  What measurements?
3    A.  Measurements in the well locations --
4  monitoring well locations shown in Figure 21.
5    Q.  And do you know when those
6  measurements were obtained?
7    A.  My memory says 2005.
8    Q.  Do you know whether those wells -- you
9  know the conditions under which those
10 measurements were obtained?
11   A.  Um --
12   Q.  Do you know the weather conditions?
13   A.  Only in a general way.
14   Q.  Do you know whether it had rained
15 extensively prior to those measurements being
16 obtained?
17   A.  Um -- rain here is --
18   Q.  No. that's not my question.  My
19 question is --
20   A.  Normal --
21   Q.  -- do you know whether it had rained
22 at the time those water table elevations were
23 obtained?
24   A.  Sitting here, I don't remember if that
25 information is included in the Washington Group

Page 286

1  International groundwater monitoring report.
2    Q.  Do you know whether there was more
3  than a single measurement of water table
4  elevation at each of these data points?
5    A.  Yes, I recall there were multiple
6  measurements.
7    Q.  And do you recall whether those
8  measurements were obtained over time?
9    A.  Yes.  I recall they were.
10   Q.  If, in fact, contrary to your memory,
11 there was only a single measurement of the
12 water table at each of these data points, would
13 that provide a sufficient basis for concluding
14 what the true water table was in the EBIA?
15   A.  Well, I think the measurements are
16 speaking for themselves.
17   Q.  In fact, only for the particular point
18 in time at which those measurements are
19 obtained, correct?
20   A.  That's correct.
21   Q.  And you don't know whether those
22 conditions existed prior to the work performed
23 by WGI, isn't that correct?
24   A.  That's correct.  I don't have --
25   Q.  You don't know whether this water

Page 287

1  table that you depict in Figure 21 existed
2  prior to Hurricane Katrina, do you?
3    A.  Well, it's a short time period between
4  the reporting of these water elevations and
5  Katrina.
6    Q.  And you don't know whether they
7  changed between the time these data points were
8  obtained and the onset of Hurricane Katrina, do
9  you?
10   A.  Well, I would expect them to change,
11 certainly, with the 15 inches of rainfall we
12 discussed previously.
13   Q.  And you don't know, do you, whether
14 they changed prior to the onset of this
15 15 inches of rainfall, do you?
16   A.  I would expect them to change.  And in
17 fact, the quotation that I included here from
18 the deposition of George Bacuta is an
19 indication that those people were concerned
20 with a distortion of the groundwater and its
21 flow.  And that's the reason I included that
22 quotation.
23   Q.  Dr. Bea, do you have a similar data
24 point for the water table on the protected side
25 of the flood wall adjacent to these

Page 288

1  measurements?
2    A.  No, I don't.
3    Q.  Do you know whether the water table on
4  the protected side of the EBIA was lower than
5  these elevations shown in Figure 21?
6    A.  Well, if I don't have the data, I
7  can't speculate.
8    Q.  But, so, in fact, if at that time
9  these data were obtained, the water -- the
10 groundwater level on the land side of the flood
11 wall was substantially lower than the water
12 table elevations shown in this figure, wouldn't
13 that cause a flow of groundwater away from the
14 canal?
15   A.  Yes, sir.
16      (Brief recess.)
17 EXAMINATION BY MR. SMITH:
18   Q.  In Paragraph 82, Dr. Bea, you assert
19 that the causation analyses by Drs. Marr and
20 Silva-Tulla are deeply and pervasively flawed.
21 You say they're developed and repeated
22 throughout the four parts of their causation
23 analyses.
24      Using the four parts that you describe
25 here, let's just start with Number A, local

72 (Pages 285 to 288)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 289

1    I-wall overturning and stability analyses.
2    Please list all of the deep or pervasive flaws
3    in his local I-wall overturning instability
4    analyses.
5        A.  I'll go first to the north breach.
6    The deep flaw is the presumption of significant
7    separation of the flood wall prior to
8    instability that then results in significant
9    erosion of the levee on the protected side.
10       Another deep flaw is the lack of
11   recognition at the north breach of a full
12   tension crack along the wall and sheet piling.
13       Another flaw in the instability
14   analysis is the lack of determination of the
15   tensile force source required to initiate and
16   propagate the tear at the north breach at the
17   intersection between the 1968 -- 1969, pardon
18   me, sheet piling and the 1980 T-wall sheet
19   piling.
20       The lack of recognition of significant
21   uplift pressures on the protected side in
22   decreasing the passive soil resistance that he
23   utilized in his Shoring Suite local overturning
24   stability analyses.
25       At the south breach, the south breach

Page 290

1    does not recognize uplift pressure effects.  It
2    has a very mixed treatment of tension crack
3    effects.  Um -- it, too, depends crucially on
4    the formation of an erosion trench on the
5    protected side due to the purported low
6    elevation of the segments of the flood wall at
7    the south breach.
8        I think that's a reasonably complete
9    list for A.
10       Q.  Okay.  How about B?
11       A.  B.  North breach: Dr. Marr does not
12   provide any erosion analyses at the north
13   breach based on his purported wall separation
14   theory postulate, and the amount of erosion
15   required to destabilize the wall is never
16   quantitatively evaluated, that I could locate.
17       At the south breach, Dr. Marr performs
18   a surge overtopping analysis of the erosion
19   trench development that ignores the grass cover
20   armoring on the levee at the protected side,
21   relies on a soil that has relatively high
22   erodibility, and to achieve his required
23   erosion depth to develop local wall instability
24   he has to extend the hydrograph after its peak
25   for another hour, maintaining the severity of

Page 291

1    that flow, even though the surge hydrograph
2    showed clearly an important drop from
3    approximately 14.2 feet to 10 feet.
4        Oh, another important flaw in the
5    south breach overtopping analyses, he elects
6    not to base his analysis on his best estimate
7    of erodibility, but takes a lower bound in
8    order to achieve the erosion depths.
9        He ignores the erosion depth
10   information developed by the U.S. Army Corps of
11   Engineers for the area of the Lower Ninth Ward.
12       He ignores the surveying information
13   developed subsequent to Katrina at the two
14   terminuses of the south breach in which we
15   define the erosion trench depths, and at the
16   same time define the shear strength of the
17   remaining soils adjacent to the face of the
18   exposed sheet piling at the north end of the
19   south breach and the south end of the south
20   breach.
21       I think that's a reasonable list for
22   B.
23       Q.  Can you give us a list for C?
24       A.  Yes.  His hydraulic conductivity
25   analyses are deeply flawed because of lack of

Page 292

1    recognition and treatment of the pressures
2    associated with steady flow conditions, um --
3    and, um -- the associated effects of the EBIA
4    excavations on the flood side of the I-wall.
5        In addition, in those hydraulic
6    conductivity analyses, he does not conduct
7    those analyses according do the guidelines
8    issued by the U.S. Army Corps of Engineers in
9    2011 for the reanalysis of existing I-walls
10   subject to hurricane loading conditions.
11       Those defects, by the way, relative
12   that those guidelines are also present in A and
13   B.
14       I think that's a complete list for C.
15       Q.  And could you give us a list for D.
16       A.  D:  The primary elements are involved
17   with a coherent synthesis of the failure modes
18   involved in breach causation.  For example, the
19   analyses performed by Dr. Marr at the south
20   breach based on the development of the erosion
21   trench leads to the conclusion that that
22   erosion trench reaches a depth to cause the
23   destabilization at approximately 11:00 a.m. the
24   day of Katrina's passage.  That stands in stark
25   contrast with the results from

73 (Pages 289 to 292)

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 293

1   Dr. Silva-Tulla 's analysis that indicates that
2   breach developed at approximately 8:00 a.m.
3   There is an important difference between the
4   two and three hours.
5       Dr. Marr has not brought forward any
6   significant information, analyses, to
7   substantiate the use of the analytical models
8   he employed in his analyses; for example,
9   substantiation of the appropriateness of the
10  Shoring Suite analysis connected to his finite
11  element soil structure interaction analysis to
12  conclude such things as the effective tension
13  crack depth and its associated loading and
14  seepage effects.
15      The synthesis is deeply flawed at the
16  north breach because its sequence is not in
17  conformance with the findings from the exponent
18  analyses of that breach causation sequence. I
19  think that's a reasonably complete list for D.
20  Q.  Dr. Bea, in the next paragraph,
21  Paragraph 83, you describe some conclusions
22  reached by Dr. Marr and others.  And at the
23  very end of that paragraph you assert that they
24  were apparently very careful to avoid or
25  intentionally omit any discussion of the

Page 294

1   hydraulic pressure effects associated with the
2   results from the hydraulic conductivity
3   analyses.
4       You're aware, aren't you, Dr. Bea,
5   that the defense experts used the undrained
6   strength parameters in a total stress stability
7   analysis, aren't you?
8   A.  Yes, but that's not what this sentence
9   is pertaining to.
10  Q.  And if they used the total stress
11  stability analysis and undrained strength
12  parameters, then hydraulic pressure effects
13  associated with the results from hydraulic
14  conductivity analyses play no role in these
15  analyses, do they?
16  A.  That's incorrect.
17  Q.  Is it your opinion that the hydraulic
18  pressure effects associated with the results
19  from the hydraulic conductivity analyses would
20  influence the undrained strength parameters
21  calculated by the defense experts?
22  A.  No.
23  Q.  Paragraph 86:
24      MR. JOANEN:
25          If I could, just for the record,

Page 295

1   and Gilley will confirm this, I
2   believe we're going past the allotted
3   seven hours.  I'd like to get an
4   understanding, as a professional
5   courtesy to Dr. Bea, how long you
6   anticipate that we'll go and see
7   whether he's up for it.
8   MR. SMITH:
9       I don't think I have much.  It
10  won't be very much longer, I don't
11  think.
12  THE WITNESS:
13      What does that mean?
14  MR. SMITH:
15      Well, it's the kind of like near.
16  You know, it might we 500 feet, you
17  know, 300 feet.  I don't know.
18  MR. JOANEN:
19      There's no reason for that.
20  We're asking you a question.  I asked
21  as a matter of professional courtesy.
22  MR. BRUNO:
23      And then you're coming back at us
24  like that?  Come on.
25  MR. SMITH:

Page 296

1       It will probably be fifteen
2   minutes.
3   MR. BRUNO:
4       You up for it?
5   MR. JOANEN:
6       Is that okay with you?
7   MR. SMITH:
8       It could be less.
9   MR. BRUNO:
10      That's fine.  We have peace.
11  Let's move.
12  A.  So that will be approximately 6:25.
13  EXAMINATION BY MR. SMITH:
14  Q.  In Paragraph 86, it's probably about
15  halfway down through Paragraph 86, Dr. Bea, it
16  begins, Consequently.
17  A.  Yes, sir.
18  Q.  It says, Consequently, another input
19  regarding the effects of hydraulic conductivity
20  uplift pressure effects is effectively
21  eliminated due to his inappropriate adoption of
22  nonsteady flow hydraulic conductivity analyses.
23      What input are you referring to?
24  A.  The selection of the frequently
25  discussed coefficient of volume change

74 (Pages 293 to 296)

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 297

1    identified as M sub V.
2        Q.   In the following paragraph,
3    Paragraph 87, you list a number of guidelines,
4    and then you say, toward the middle of that
5    paragraph, these guidelines provide detailed
6    information to determine wall over topping,
7    hydrostatic and hydrodynamic conditions and
8    effects associated with hurricane surge -- I'll
9    let you read the rest of the sentence. I'm
10   going to ask you a question about that.
11       A.   Yes, sir.
12       Q.   Do you contend that Engineer Circular
13   1110-2-6066 provides detailed procedures for
14   performing hydraulic conductivity analyses?
15       A.   Um -- is the reference you cited USACE
16   2011 guidelines for I-walls?
17       Q.   Yes, it is. That is. That's
18   engineering design of I-walls. It's mentioned
19   earlier in the paragraph.
20       A.   And let me read your --
21       Q.   And the question was, yes, do you
22   contend that that engineer circular, EC
23   1110-2-6066 provides detailed procedures for
24   performing hydraulic conductivity analyses?
25       A.   It does by reference to other

Page 298

1    guidelines for the conduct of such analyses.
2        Q.   So --
3        A.   There are approximately four of them.
4        Q.   Then would it be fair to say that the
5    engineer circular that I just referenced does
6    not provide detailed procedures for performing
7    hydraulic conductivity analyses?
8        A.   Correct.
9            MR. JOANEN:
10               Object to the form.
11       A.   It's done by reference.
12   EXAMINATION BY MR. SMITH:
13       Q.   Right. So they're not in that
14   engineer circular, are they?
15       A.   That's correct.
16       Q.   Okay. What are those detailed
17   procedures?
18       A.   Well, they apply to determination of
19   hydraulic conductivity effects under levees.
20   There is one that applies to dams, um --
21   another that applies to, um -- sheet pile,
22   um -- levee systems. I think that's a
23   reasonably complete list.
24       Q.   Do you know any of the details in
25   those procedures?

Page 299

1        A.   I have read every one of them front to
2    back several times, so I understand some of the
3    details.
4        Q.   Could you just give us an example of
5    one of the detailed procedures that you're
6    alluding to here?
7        A.   Well, one that is important is the
8    treatment of seepage flow effects utilizing
9    flownets, traditional means used by engineers
10   to determine seepage effects associated with
11   these types of structures.
12           Another excellent one that is included
13   in the body of the report is treatment of the
14   appropriate factors of safety to be applied to
15   the results from the analyses to judge
16   acceptability of the results from the analyses.
17       Q.   Paragraph 90, looks like the third
18   sentence, says, this range of uncertainties --
19       A.   Yes, sir.
20       Q.   -- has been corroborated as part of
21   the investigations. And I'm not going to read
22   the rest of that sentence.
23           Do we have any documentation of this
24   corroboration?
25       A.   Yes.

Page 300

1        Q.   And where would we find that
2    corroboration?
3        A.   The explicit factors of safety
4    analyses, including Type 1 variability, is
5    included in my 2008 and '9 expert reports,
6    submitted as a part of the MRGO Robinson phase
7    of my investigations.
8        Q.   In Paragraph 127, Dr. Bea -- I'm just
9    about done, this may be my last question -- you
10   describe Dr. Marr 's tension crack pressure
11   development analyses as flawed.
12           Could you list and describe these
13   flaws that you're referring to?
14       A.   Well, the most evident one is at the
15   North Breach where Dr. Marr, based on his
16   finite element soil structure interaction
17   analyses, concludes that the pressure
18   effective -- or the soil pressure -- horizontal
19   soil pressure effective at the face of the
20   sheet piling is such that a crack was not
21   present. Unfortunately, in that analysis, he
22   leaves out the countering effect of the
23   hydrostatic pressures in such a crack. That is
24   precisely the reason the Army Corps of
25   Engineers issued their guidelines in 2011 to

JOHNS, PENDLETON COURT REPORTERS                       504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 301

```
 1    prescribe, require a full depth crack
 2    development in I-wall analysis.  And in fact,
 3    it can propagate below the bottom of the sheet
 4    piling.  Dr. Marr seems to not be familiar with
 5    either those guidelines or the background work
 6    done to develop the guidelines.
 7        Q.  Thank you, Dr. Bea.  I have no more
 8    questions for you.
 9        A.  Yes, sir, thank you.
10        MR. TREEBY:
11            Five minutes?  Will y'all let me
12        have five minutes?
13        MR. JOANEN:
14            I would ask Dr. Bea if he's --
15        MR. BRUNO:
16            Will you accommodate Mr. Treeby
17        for five minutes?
18        THE WITNESS:
19            You have till 6:25, by agreement.
20    EXAMINATION BY MR. TREEBY:
21        Q.  Dr. Bea, you've listed many
22    publications that you've identified on Page 4
23    of Appendix A of your original report.
24            With regard to the referenced journal
25    articles you published that concern the
```

Page 302

```
 1    failures of leaves or flood walls during
 2    Katrina.  Did you disclose to any of the
 3    journals or publications that you had been
 4    retained as an expert in this litigation?
 5        A.  Yes.
 6        Q.  Did you disclose that fact in the text
 7    of any of the articles themselves?
 8        A.  No.
 9        Q.  Did you discuss the fact that you had
10    been retained as an expert to any of the bodies
11    to which you submitted papers for -- let me
12    start over and make a complete question.
13            Did you disclose the fact that you had
14    been retained as a litigation expert to any of
15    the bodies to which you've submitted papers for
16    conference or symposium proceedings regarding
17    the Katrina levee or floodwall failures?
18        A.  Um -- when you use the term bodies,
19    please clarify.
20        Q.  Committees, whoever was responsible
21    for the conference or symposium proceedings.
22        A.  Um -- let's see.  I can think of four
23    conference journal publications that I authored
24    in which I disclosed to the responsible people
25    my engagement in the litigation.
```

Page 303

```
 1        Q.  Did you disclose that fact in the text
 2    of any of the papers themselves submitted for
 3    those conferences or symposium proceedings?
 4        A.  No.
 5        Q.  Did you present your findings publicly
 6    at any of the conferences or symposiums?
 7        A.  Yes.
 8        Q.  If so, did you disclose the fact in
 9    those public setting that you had been retained
10    as a litigation expert to your audiences?
11        A.  No.
12        Q.  You have a list of non refereed
13    publications regarding Katrina levee or
14    floodwall failures; correct?
15        A.  I think I provided that, yes.
16        Q.  Right.  Did you disclose the fact that
17    you had been retained as a litigation expert to
18    any of the bodies in the same sense that I
19    defined it before to which you submitted what
20    you refer to as non refereed publications?
21        A.  Yes.
22        Q.  Did you disclose that fact in the text
23    of any of their articles themselves?
24        A.  No.
25        Q.  You typically review journal articles
```

Page 304

```
 1    and attend conferences or symposium proceedings
 2    that are relevant to your field; is that right?
 3        A.  Yes, sir.
 4        Q.  Generally speaking, would you prefer
 5    to know whether the author or speaker whose
 6    work you are reviewing has a connection to the
 7    issue about which he or she is opining as a
 8    litigation expert?
 9        MR. JOANEN:
10            Object to the form.
11        A.  I don't find that as an important a
12    basis to judge what I'm hearing, or to
13    understand what I'm hearing from one of my
14    professional colleagues.
15    EXAMINATION BY MR. TREEBY:
16        Q.  Specifically, would you want to know
17    whether the author or speaker was being paid by
18    a person or entity that had a financial
19    interest in the opinion being offered at such
20    proceedings?
21        A.  Please repeat your question.
22        Q.  If you attended a conference or a
23    seminar, would you want to know whether the
24    author or speaker was being paid by a person or
25    entity that had a financial interest in the
```

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                          April 16, 2012

Page 305

```
 1   opinion being offered?
 2       A.  No.
 3       Q.  It is correct to say that in your
 4   articles and papers concerning the Katrina
 5   levee and flood wall failures you are highly
 6   critical of the Corps of Engineers, would that
 7   be fair to say?
 8       A.  Yes.
 9       Q.  And you wrote those articles and
10   papers at the same time you were being paid as
11   an expert by people who were suing the Corps of
12   Engineers, isn't that true?
13       A.  That's not true.
14       Q.  Do you believe you have any
15   professional or ethical duty to disclose that
16   information in the texts of your papers and
17   articles?
18       A.  No.  It's not required.
19       Q.  That's all I have.
20          MR. BRUNO:
21             Thank you.
22
23
24
25
```

Page 306

```
 1          WITNESS' CERTIFICATE
 2
 3          I, ROBERT G. BEA, Ph.D., do hereby
 4   certify that the foregoing testimony was given
 5   by me, and that the transcription of said
 6   testimony, with corrections and/or changes, if
 7   any, is true and correct as given by me on the
 8   aforementioned date.
 9
10   _____    _____
11   DATE SIGNED        ROBERT G. BEA, Ph.D.
12
13   _____ Signed with corrections as noted.
14
15   _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25   DATE TAKEN:  April 16th, 2012
```

Page 307

```
 1          REPORTER'S CERTIFICATE
 2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
 3   Certified Court Reporter in and for the State
 4   of Louisiana, do hereby certify that the
 5   aforementioned witness, after having been first
 6   duly sworn by me to testify to the truth, did
 7   testify as hereinabove set forth;
 8          That said deposition was taken by me
 9   in computer shorthand and thereafter
10   transcribed under my supervision, and is a true
11   and correct transcription to the best of my
12   ability and understanding.
13          I further certify that I am not of
14   counsel, nor related to counsel or the parties
15   hereto, and am in no way interested in the
16   result of said cause.
17
18
19
20
21
22
23   _____
24   JOSEPH A. FAIRBANKS, JR., CCR, RPR
25   CERTIFIED COURT REPORTER #75005
```

ROBERT G. BEA, PH.D.

April 16, 2012

Page 308

**A**

ability 307:12
able 21:24 38:17
  62:13 85:24 92:5
  128:12 142:11
  164:13 179:5
  180:5 226:13
  270:12 273:24
abscissa 37:22
absence 279:17
absent 280:4 283:7
  283:13
absolutely 63:24
  123:5
absorb 48:13
abstract 166:9
accelerated 224:1
accept 96:24
acceptability
  299:16
access 75:20
  139:13,22,25
  145:22 155:10
  213:11
accessed 131:15
  158:23
accessible 66:24
  139:21
accommodate
  301:16
accomplish 16:23
account 127:7
  163:21 169:6,12
  169:21,23 170:5
  174:6,16 180:5
  256:24 280:25
accounted 203:13
accumulating
  64:12
accurate 7:15 22:1
  165:20 168:17
accurately 179:6
  255:17 262:18
achieve 290:22
  291:8
achieved 276:9

acm 97:20 112:12
  113:11
act 211:7
acted 132:25
acting 121:19
  216:5,10,10 219:5
action 1:4
activities 62:8
  99:22 119:13,16
  127:25 130:6
acts 205:19 206:25
  215:16
actual 8:3 23:23
  27:11 209:24
adapted 37:1,11,12
  37:15
add 254:19
added 65:2 136:2
adding 217:3
addition 58:4 99:22
  203:13 229:21
  255:16 256:5
  259:1 292:5
additional 65:1
  72:1 73:4,5 100:3
  100:5,8 101:10,25
  104:22 200:13
  216:5,11 239:17
address 59:10 85:4
  92:21 125:20,25
  176:13
addressed 124:4
  131:8 148:16,21
  190:1 224:6
addresses 264:15
addressing 194:11
  201:10
adequate 281:2
adjacent 160:2,9
  161:8 187:2
  261:13 284:14
  287:25 291:17
adjust 174:17
administering 6:24
admit 198:10
admitted 96:13
  267:22

adopted 169:5
adoption 296:21
advice 157:10,12
aerial 67:13 73:21
  73:23,24,25 78:4
  79:23 99:23
affect 122:9 204:20
  204:24 205:12
  211:24
affidavit 142:12
affirmatively 124:7
  189:14
aforementioned
  6:4 306:8 307:5
afternoon 175:19
  175:20
aggravated 70:19
aggravating 70:16
aggregate 67:12
ago 123:24 167:9
  260:16 271:23
agree 7:12,17,22
  28:25 29:4 31:18
  32:12 59:12 72:22
  111:2 176:19
  179:11 203:19
  234:18,22 241:7
agreed 6:2 33:19
  64:24 178:21
  207:10 233:24
agreement 301:19
agrees 94:17
ahead 43:11 46:20
  135:8 241:1
allegations 145:9
allege 133:22
allocated 116:11
allotted 295:2
allow 226:6 231:14
  231:15 255:2
  278:9,24
allowed 26:6 42:21
  267:17
allude 237:24
alluding 299:6
alpha 172:13,19,25
  173:3

alternative 24:9
alternatively 17:10
amenable 181:18
amend 241:21
america 4:1
amount 257:9,20
  290:14
analogues 247:24
analyses 11:15
  12:23 13:7 14:14
  14:23 15:5,11,17
  15:23 16:11 17:13
  18:3,24 23:5
  28:17 30:15,19,21
  30:25 31:14,23
  32:23 34:4,7,8,20
  35:3,9,10 36:16
  52:15 93:17,18
  124:3,16 125:20
  125:24 126:1,9,16
  146:5 148:2,12,18
  176:5,6,10,19,23
  176:25 177:4,7
  179:3,4,12,21
  188:3 190:21,24
  193:13 197:2,8,15
  197:20 198:22
  199:11,14,19,23
  200:6,10,13,15,21
  201:4,5 204:20
  207:6,9 211:25
  220:15,21 221:18
  223:18 224:22,24
  225:9 226:1 228:6
  228:18 230:4,6
  231:2,6 232:1,2
  232:14,21 233:3,9
  234:4 238:7,17,18
  238:24 242:15
  244:13 250:2
  251:10,14,20
  252:1 253:22
  254:3 255:6
  261:15,18,20,21
  262:4 263:11,12
  263:15,18 264:10
  265:15 269:21

270:25 271:3
  273:14,19 288:19
  288:23 289:1,4,24
  290:12 291:5,25
  292:6,7,19 293:6
  293:8,18 294:3,14
  294:15,19 296:22
  297:14,24 298:1,7
  299:15,16 300:4
  300:11,17
analysis 7:18 14:10
  16:24 17:6,7,10
  17:11,13,14 18:2
  18:8,21,22 19:9
  29:14 32:7,14,17
  33:16,21 34:13
  58:4 106:19,22,24
  106:25 107:8
  123:17 125:13,17
  126:4,21 127:1,2
  127:6 148:14,20
  153:8 157:25
  170:15 181:11
  183:6,13 186:17
  198:4 214:3
  220:24 226:24
  228:1,2,4,6,7,9,13
  229:3,4,5,7,10,12
  229:16,19 230:24
  232:5,6 233:20
  238:3 250:13
  251:24 252:20
  254:7 256:13
  257:11 272:19,24
  273:9,17 277:13
  279:13,14,15
  289:14 290:18
  291:6 293:1,10,11
  294:7,11 300:21
  301:2
analyst 123:3
analytical 83:21
  148:7 190:22
  232:8 282:2 293:7
analyze 273:21
analyzed 107:3,4
  108:15 125:12

ROBERT G. BEA, PH.D.

April 16, 2012

Page 309

126:10,19 227:21
**analyzing** 194:8
272:8
**andy** 42:12 67:21
152:21,23
**angle** 234:23 235:1
235:2,3,9,10,13
235:17,21,25
236:7
**anomalous** 284:13
**answer** 6:13 9:8
13:15 23:20 24:21
24:23 25:15 28:5
28:20 35:19 50:12
50:17 69:24 70:4
70:11 71:3,12
75:14 84:17,25
85:1,2 88:20
89:12,13 90:9
108:4 120:24
129:14 135:9,12
140:5 144:19
148:21,23,25
149:3,4 165:12
167:16 168:6,10
168:15,19 180:3
183:18 184:5,18
187:20 189:7
203:1 205:15,16
206:7,14,19
207:12,13 208:7
226:1,7,10,13
235:22 238:22
244:10 245:12
248:24 249:2
250:10 255:17
266:18,24 270:6
278:25 279:3
281:8,13,22
**answered** 9:7 23:11
28:9 70:3 71:4
79:15 90:3 119:19
124:1 138:2,5
150:21 165:10
167:24 168:8
184:16 249:10
266:20 280:22

281:15
**answering** 134:23
187:7 267:12
**answers** 56:18 71:2
90:16 172:8 249:6
258:16
**antecedent** 197:10
**anticipate** 295:6
**anybody** 147:16
**apologize** 32:4
279:21
**apparent** 142:17
**apparently** 28:22
56:10 122:3 142:6
174:11 293:24
**appearances** 2:1
**appears** 74:15,21
115:25
**appendices** 97:13
282:23 283:2
**appendix** 110:9,12
126:2,2 148:16,22
149:1,2 177:22
181:8 183:9 193:6
236:9,10,22
301:23
**applaud** 275:4
**applicable** 7:14
**application** 43:24
256:10
**applied** 225:2
240:24 255:14
272:3 299:14
**applies** 145:1
271:24 298:20,21
**apply** 224:24
255:23 298:18
**applying** 274:22
**apportioned**
195:16 196:18
**approach** 12:13
24:8,9,14,16
27:16 28:15 52:4
231:23 232:1
**approaches** 232:7
241:15
**appropriate** 48:16

142:15 225:5
299:14
**appropriately** 46:6
149:23
**appropriateness**
293:9
**approved** 155:19
155:23 156:5,24
**approximately**
62:1 77:10 224:10
252:24 256:6
275:13 276:1
291:3 292:23
293:2 296:12
298:3
**april** 1:22 52:21,23
54:24 58:5 100:1
100:15 101:4
107:8 124:12
127:3 155:15
157:17 177:23
250:25 306:25
**aquifer** 164:2
170:13,17,20
173:1,7,12,14
174:8 175:4
**aquifers** 174:20
**area** 10:18 11:13
16:4,13 24:3 50:6
76:1 85:14,23
88:1 97:19,20
107:3 108:4,17
109:14 110:16,21
111:3,9,9,11,14
122:8 130:12
132:5 187:23
188:12 194:3
197:16 219:3,18
224:17 225:1,14
225:20 227:7
242:23 249:16,22
272:14 277:13
291:11
**areas** 81:24 97:20
97:25 98:9,15,20
99:6 106:2,16
107:4 129:22

145:2,4 265:3,4
**arent** 114:9 273:20
294:4,7
**argue** 22:15
**armoring** 290:20
**armstrong** 18:13
**army** 65:10 291:10
292:8 300:24
**arrival** 255:13
**arrow** 78:10 82:7
216:21 217:9
219:9
**arrows** 81:24
216:14,14,18
217:3,11,14,17
218:22 219:1
**article** 153:22
155:20 156:4,10
164:8,14,15,18,25
165:6,15,19,24
166:10,25 167:3,6
167:10,11,14,21
168:3,13,17,23,25
169:9 170:3
171:25 174:4
**articles** 165:3
167:25 301:25
302:7 303:23,25
305:4,9,17
**ashley** 2:19
**aside** 101:12,14
**asked** 9:5 22:9
24:22 25:7,14
48:19 57:7 76:23
85:3 90:2 93:20
97:10 123:25
124:2,8 138:2
150:20 157:22
168:7 170:2
184:15 190:3
194:22 201:2
205:14 207:10
211:9,12 233:17
235:20 242:10,14
248:11 250:8
263:23 266:17,24
267:21 295:20

**asking** 23:12,18
27:5 30:14 35:25
36:4,8 46:8 48:18
48:22 53:12 83:23
88:21,25 92:13
101:15,16 102:6,6
102:9 107:11
119:17 152:18
176:4 184:10
187:5,6 188:2
205:3,9 207:22,25
259:24 270:14
278:4 295:20
**assert** 252:18
288:18 293:23
**asserting** 169:4,4
169:22 204:22
**assertion** 57:13
108:1 169:5 253:3
272:6 275:19
**assess** 176:21 197:9
**assessment** 108:7
108:11
**assigned** 202:2
205:17 207:19
208:14,17,22,25
226:16,20
**assigning** 223:24
**assist** 65:2
**assistance** 67:22
185:14 197:6
**assisted** 67:20 68:1
152:4,18
**assisting** 152:19
**associated** 52:9
69:14 71:21 75:4
82:4 119:11
129:22 132:23
135:17 138:25
194:11 224:8
251:25 276:3
282:2 292:2,3
293:13 294:1,13
294:18 297:8
299:10
**assume** 29:19
44:21 48:18,20

49:17,18,20,22
50:15,16 57:7
60:11 78:10 115:7
116:3 129:21
136:21 232:15
256:12 270:14
**assumed** 51:12
122:3 129:9
170:19 175:5,9,10
183:24,25 189:1
233:20 257:17
**assumes** 170:17
175:3
**assumption** 30:11
30:14 116:8 130:3
164:1
**assurance** 109:2
**assure** 73:13
**attach** 211:2
**attached** 20:1 37:7
47:3 48:6 53:8
55:7 68:9 74:12
108:24 111:24
116:14 128:22
166:14 177:25
**attained** 155:11
**attempted** 132:3
184:5 224:4 230:1
262:18
**attempting** 62:9
179:7 186:25
190:17 193:14,18
208:6
**attend** 304:1
**attended** 17:3
304:22
**attention** 196:22
214:8 246:22
252:10
**attorneys** 15:24
52:18
**attribute** 203:10
**attributed** 145:3
153:15,21 184:2
204:14
**audiences** 303:10
**august** 141:21

143:4,6 154:1
155:5 224:17
225:21
**author** 147:13
304:5,17,24
**authored** 236:14
260:24 302:23
**authors** 174:4
236:19
**authorship** 16:1,12
**availability** 131:9
**available** 7:19
63:13,18 64:1
65:19,21 66:5,14
66:22 128:1,25
129:17 131:3,11
153:10 154:2
155:7 159:18
234:24 254:2
264:23,23
**avenue** 3:15 133:5
198:3,6,25 199:2
199:4,17,24
200:16 201:19
202:3 204:19
205:7 206:24
207:23 208:18,25
211:21 212:4
213:18 237:25
242:22 243:19
244:6 245:25
246:4
**average** 264:20,21
264:24 265:3,7,9
265:10,13
**avoid** 208:7,9
293:24
**aware** 90:19 125:6
175:22 210:6
260:25 294:4

---
**B**
**back** 16:4 43:14,16
46:22,24 50:12
51:16 70:11 71:6
71:18 74:24,25
80:20 93:12

103:12,20 104:20
114:13 115:3
117:9 167:8
169:16 181:7
255:15 260:3
295:23 299:2
**backfill** 67:14,18
69:8,13 92:16
98:16 99:9,24
100:9,19 101:17
104:24 105:11,16
105:18,21 106:2
106:17 109:13
112:20 113:6,18
116:5,10 118:1
119:7,15 121:6
136:8 184:20
211:20,24 252:13
252:21 258:23
**backfilled** 84:11
85:15 92:7 106:18
108:6,9,10 110:5
111:3 112:12
113:22 116:21
123:20 134:2,6
136:23 137:2,12
137:17,20,21,22
138:15,18 212:8
243:14 259:12,15
284:6
**backfilling** 68:25
71:10 81:25
113:11 207:8
**backfills** 92:10
**background** 145:5
165:5 168:2
239:15 301:5
**bacuta** 287:18
**bad** 21:2 151:18
**badger** 57:15
**bank** 10:18 11:13
16:3,13 24:3 50:6
130:12 224:17,25
225:14,20 272:14
**barge** 15:13 200:11
200:12,22 201:9
202:6 203:7 204:5

**baronne** 2:6
**barrentine** 61:6
**barrier** 213:22,25
**base** 215:3 217:5
241:11 257:11
284:21 291:6
**based** 21:18 23:4,7
30:21 34:16 37:13
52:4,7 56:21 65:9
148:6,7,13,20
149:5 161:24
177:4 186:1 197:2
197:15 201:12
212:22 220:5,16
224:5,7 238:8
241:13 254:10
257:17 273:14
274:11 276:12
277:9 284:25
290:13 292:20
300:15
**basic** 7:10 24:5
247:20
**basically** 245:11
**basis** 30:19 37:22
146:11 179:4
186:17 191:23
195:11 199:10
200:10 212:5
236:8 239:8
254:22 255:24
259:11 272:6
277:11 284:2
286:13 304:12
**bates** 109:17
112:16
**bay** 227:7
**baylen** 2:13
**bea** 1:19 5:11,12,13
5:14,15,16,17,18
5:19,20,21,22,23
7:1,7,22 9:4 12:21
19:18,25 27:5
29:17 36:23 37:6
47:2,23 48:5 50:3
50:5 52:25 53:7
55:1,6 58:25 68:2

68:8 74:7,11 92:8
95:9 100:10
104:22 107:22
108:21,23 110:11
111:20,23 120:15
128:21 140:17
142:17 147:20
155:3 166:1,13
175:16,19 177:20
177:24 178:3
180:13 183:8
184:9 185:12
186:7,22 188:10
189:2 190:3 193:6
195:24 200:4,17
203:24 206:22
211:16 212:2
214:7 220:9
237:20 242:21
249:8 250:1,7
261:11 264:6,18
266:10,10 267:20
268:5 269:10
270:6,7 271:23
274:17 276:8
279:13 282:10
284:17 287:23
288:18 293:20
294:4 295:5
296:15 300:8
301:7,14,21 306:3
306:11
**beach** 238:6,9,14
239:10 255:4,5
**bearing** 201:18
**beas** 135:12
**began** 62:23 63:20
64:14,23 224:18
**beginning** 16:19
151:1 217:19
**begins** 113:5
151:21 163:18
166:21 167:18
197:2 234:9 280:4
296:16
**behaving** 45:10
49:23 50:18

ROBERT G. BEA, PH.D.                                        April 16, 2012

**behavior** 164:3
179:6,8 227:20
**believe** 9:8 10:17
11:11 12:4 16:22
17:1 26:23 32:10
43:20 46:22 52:19
52:24 53:15 54:18
70:4 78:22 80:21
96:1 105:25 111:7
130:24 132:1
133:10 151:4
156:18 164:15
165:24 166:9
177:15 200:20
205:22 213:15
237:1 264:8
265:10 276:22
295:2 305:14
**believed** 180:5
**believes** 57:9
**believing** 179:5
**belong** 44:25
**bench** 155:19
156:24
**bending** 163:23
**benjamin** 4:7
**berkeley** 10:4 15:2
146:16
**best** 11:16 118:16
158:9 165:7 168:3
179:18 200:23
213:9 235:7
237:19 265:4
291:6 307:11
**better** 29:18 74:18
178:23
**bh** 134:13
**bh17e** 134:11
**bias** 280:10,15
**big** 41:17 75:16
77:19 85:13
112:10
**bigger** 74:16
**bill** 35:23 36:2
41:16 42:7 70:9
90:15 92:20 95:23
96:25

**bivalve** 119:9
**black** 219:23
**blew** 133:4
**block** 227:8
**blood** 40:17
**blown** 75:25 77:19
98:6
**blowup** 77:2,7,14
78:11 115:1
**blowups** 75:15
**blue** 20:23 133:2,3
133:7 217:9
**bodies** 302:10,15
302:18 303:18
**body** 207:5 299:13
**boil** 210:21
**boils** 210:16
**bol** 110:2
**boland** 74:21 75:12
76:11,16 77:1,25
78:11 80:17 81:12
81:22 97:19,20,25
98:6,9,20 107:4
108:4 110:17
112:12,21 113:7
113:19 118:13
132:17 133:3
160:3 243:16
284:7
**book** 37:10,12
46:13,23 47:25
150:3,7 185:15,17
**bore** 134:14 136:8
136:22 137:1,1,15
138:14,17
**boring** 138:25
**borrow** 106:18
108:11 109:13
110:6 112:11,13
113:12,17,22
258:18,19,20,24
258:25 259:1,5,6
259:10,14,17,19
259:25 260:10,25
261:9
**bottom** 38:8 55:10
68:23 109:19

127:9,17 134:11
163:16 216:7,21
218:1,3 219:18
246:13 257:8
261:12,16 262:9
262:14,15 269:6
280:3 301:3
**bound** 291:7
**boundary** 228:14
**box** 4:6 21:6,24
22:19 198:25
199:2 201:20
204:19,24 205:7
205:21,21 206:3,5
206:25 207:1
210:11,22 211:21
214:2
**boxed** 211:12
**boxes** 63:17 66:20
128:8 131:10
141:22
**branch** 4:5
**brandon** 30:20
48:7
**breach** 55:11,12
58:13,14 79:6,19
80:5,16 82:14,21
84:14,15,19 89:18
89:18 91:24 92:23
92:24,25 118:3
120:6,9,13,17
126:1 127:1
181:11,12 219:25
220:11 241:25
242:1 252:14
266:2 284:16,23
289:5,11,16,25,25
290:7,11,13,17
291:5,14,19,20
292:18,20 293:2
293:16,18 300:15
**breaches** 1:4
125:22 143:15
153:21,25 199:14
261:9
**break** 16:8,9 32:5
43:18 140:15

**brief** 49:10 50:1
92:18 163:19
166:21 175:14
214:5 249:24
288:16
**bring** 60:24 61:8,9
62:5 184:20 185:9
**bringing** 254:20
**british** 37:1
**brought** 92:21
293:5
**brownish** 219:10
**bruno** 2:3,3,4
31:24 35:21 36:1
36:5,9 40:14,20
41:1,10,15,25
42:4,15 58:6 70:8
70:15,21,25 96:23
97:7 141:11 142:3
142:8 295:22
296:3,9 301:15
305:20
**build** 190:17
193:18 261:4
**building** 78:3
111:11 127:12
130:6
**buildings** 110:19
110:24 133:1
**built** 76:17
**buried** 24:10 34:10
52:6,11 84:12
88:3 92:1 123:14
137:9 148:5
176:14 180:2
184:7,21 188:12
194:11 196:17
201:25 214:15
215:1 219:19
224:9 232:3,24
235:5 241:2 247:2
249:18,21 265:19
272:9,25 273:11

---

**C**

**cahill** 2:17
**cake** 76:16 77:2

87:22
**calculate** 29:7 30:7
179:16 180:10
187:18 188:21
232:14 233:4
256:4
**calculated** 27:12
47:20 51:11
202:10 205:1
220:10 256:5
294:21
**calculating** 232:19
233:7 254:23
**calculation** 21:18
46:24 47:7,21
48:14 51:4 93:20
124:21,25 125:1
178:10,15 181:19
274:16
**calculations** 13:7
57:23 93:16 124:8
124:18 177:15
181:21 182:24
183:3 187:11
193:21 242:16,19
250:24
**california** 7:2
131:12
**call** 34:10 41:18
81:9,17 82:8
83:25 89:4 91:3
91:14 92:6 124:9
134:18,21 151:3
203:5,6 218:21
**called** 20:9 54:25
73:17 89:3 147:7
151:8 174:13
230:4,5
**calls** 19:13 21:6
58:8
**canal** 1:4 98:1,10
120:20 132:23
198:3,6 199:5,17
199:18,19,24
200:16 201:20
202:3 207:21,23
208:19,25 211:11

ROBERT G. BEA, PH.D.

212:4 213:18
219:14,17 221:9
221:10 222:14,22
237:25 242:22
243:19 244:6
245:25 246:4
250:3,16 251:2,17
251:21 266:8
271:9 284:15
288:14
**cant** 22:15 23:16
48:17 61:21 70:20
70:22 71:16 73:9
73:13 75:13,16
76:1,3,7 77:16
78:8 86:6,9,19,21
86:21,22,23 87:10
87:18 96:3 115:21
116:24 117:2
141:14 148:23
158:18 160:15,20
173:24 184:24
223:1 229:4 267:2
288:7
**capability** 274:6
**capital** 157:19,20
**capped** 138:15,19
**caption** 134:11
136:2,6
**capture** 160:24
**captured** 251:25
**cardboard** 63:17
**care** 41:20,20 54:18
151:4,9,13,21
153:8 155:18
157:16 209:9
**careful** 200:18
293:24
**carefully** 119:14
**carondelet** 1:21 3:5
**carried** 284:15
**carrying** 210:19
**cartoon** 217:2,18
218:15 220:8
**cartooned** 216:7
**case** 9:21 10:6
13:18 14:8,16

15:7,19,25 16:2
17:25 18:7,11,12
18:13 20:3 22:24
23:14 35:1 43:21
55:11,12 58:13,15
60:8,10,18,25
77:20,21 78:7,19
79:5,8,19,19,20
79:21 81:19,25
82:2,3,8 83:5,5
84:7,7 86:9 88:16
88:18 89:13,14
90:20,20 92:23,24
92:25 107:5,5
118:19,19 133:24
153:11 155:8
164:13 170:12,20
174:20 202:6,7,7
203:8 204:6 218:8
242:4,24 244:24
254:4 267:25,25
268:3,4 279:16
**cases** 31:2,15 118:2
132:8 252:13
**categories** 132:21
228:4
**categorized** 145:1
**category** 49:3
132:22,24 176:24
229:21
**causation** 127:1
242:1 270:10,17
278:16 288:19,22
292:18 293:18
**cause** 33:1 120:20
222:23 288:13
292:22 307:16
**caused** 29:17 89:23
222:22 223:9,15
**ccr** 1:24 6:22 307:2
307:24
**center** 255:13
**centimeter** 50:24
51:6
**centimeters** 11:19
44:20 45:24 47:13
48:21 51:13

208:20
**centrigraded** 20:4
**century** 276:2
**certain** 73:2 76:3
128:18 139:19
**certainly** 63:19
88:12,14 122:23
139:23 154:17
164:12 188:11
261:16 265:2
287:11
**certificate** 306:1
307:1
**certified** 1:25 6:23
307:3,25
**certify** 306:4 307:4
307:13
**cetera** 246:23
**chad** 64:5 67:22
88:17 99:24
128:17 131:15
**challenges** 269:16
**change** 12:11,15
19:14 23:24 27:7
27:24 29:7,25
36:24 37:18 38:3
129:14 168:23
180:21 195:1
201:23,24 212:25
222:17,18 223:6,9
223:16,19 230:12
230:14,21 231:10
231:18 245:5
250:19 269:12
270:2,25 271:2,5
272:25 273:6,12
273:24 274:8
279:14 287:10,16
296:25
**changed** 269:21
270:23 287:7,14
**changes** 34:15
176:21 179:17,20
179:21,24 180:6
180:10,16 181:1,4
215:6 222:3,21,23
223:8,13 224:2

228:14,17 230:23
231:11,19 232:16
232:23 250:15
264:3 266:8 274:9
274:13 306:6
**changing** 55:23
222:13 241:3
250:22 251:24
266:6 269:15
273:25
**chapters** 232:11
**characteristic**
48:16 219:13
**characteristics** 9:3
24:7 35:8 52:6,8
148:1 188:2
199:12 207:2
225:11 246:21,25
247:16,17 273:4
276:3 277:2
**characterization**
135:11 206:18
212:6,16,25 213:7
215:12 219:4
231:4,9,24 232:12
**characterizations**
235:5
**characterize**
241:16 275:9
**characterized**
238:11
**check** 13:8 104:19
255:15,16
**checked** 47:20
**cheese** 59:6,12,19
60:24 61:12 69:9
73:17 76:12 77:15
110:22 130:19
145:6 261:6
**chen** 163:24
**choice** 17:21 18:6,7
18:21,22
**choices** 17:15
**chong** 163:24
**choose** 17:5,5,9,11
96:24
**chose** 18:1 19:8

135:13
**chosen** 34:12
**christopher** 3:12
**circle** 78:9,16 85:13
111:16,17 203:6
**circled** 89:15 111:9
203:5
**circles** 83:10
**circular** 297:12,22
298:5,14
**citation** 156:25
157:1
**cite** 16:1 88:1 92:3
156:13 157:18
160:7 255:7
**cited** 37:24 69:16
87:22 100:14
101:22 105:25
107:6,7 111:8
114:6,10,15
128:11,12 153:7
155:12 164:12
165:24 172:1
184:24 236:20
239:19 254:14
272:12 297:15
**civil** 1:4 4:5 6:6
**claimed** 120:21
**clarified** 103:20
233:22
**clarify** 95:18 96:6
121:3 168:7
302:19
**clay** 10:16 11:11
24:2 27:9 48:11
48:24 49:7,8
109:12 110:6
111:3 113:11
182:16 189:16
209:5 224:1,16
225:15,23 230:13
230:19,21,24
233:10 238:5
241:13 243:20
244:7 246:1
249:11,15,17,19
249:19 250:3,14

ROBERT G. BEA, PH.D.

April 16, 2012

251:3,12,15,16,21
257:16 265:25
272:16 277:8
**clayman** 3:13
**clays** 36:12 43:21
49:1,14 50:14
106:18 108:10
219:16 225:4
226:21 227:12,13
227:14 231:13,20
**clean** 243:12 246:3
**clear** 54:23 85:5
102:12,13 115:13
140:17 167:17
206:1,6 250:13
**clearing** 72:1 99:22
105:19 119:13,16
127:24 204:15
**clearly** 119:8
159:25 173:19,25
291:2
**close** 22:5 30:5 69:1
78:7,24 79:12
84:12 85:19 86:2
98:16 110:3,6
118:8 125:14
127:11 129:23
130:11 136:4
148:1,3,5 149:12
149:13 155:19,20
162:2,3 163:23
164:4 166:1 222:5
222:7,9 234:25
244:15,18,20
249:20 284:16
**closer** 194:20
254:20
**closest** 122:8
**coarse** 212:8
**coastline** 133:3
**coauthored** 164:21
**cobosroa** 14:18
15:2,10 16:10,18
17:2,17 18:1,14
18:19,20 19:8
22:9 29:14 31:7
31:20 32:6 133:12

146:9,18 176:8
177:2,16 178:13
178:20 180:18
193:8 194:22
197:7 200:18,21
205:4 206:23
207:11,15 208:1,8
213:17 214:3
229:25 232:22
233:13 234:3,19
236:11,25 253:17
253:21 255:21
277:14
**code** 140:3,11
145:23
**coefficient** 12:1,7
12:10,10,14,16
19:14 23:24 24:1
24:9,16 27:6,8,11
27:14,15,20,24
28:1 29:1,5,7,23
29:24 34:16 36:24
37:18 38:3 44:10
45:17 171:18
244:14 245:5
296:25
**cofferdam** 76:17
**coherent** 292:17
**cohesive** 162:23
163:6
**coker** 2:19
**colleague** 131:16
**colleagues** 304:14
**collecting** 62:22,24
**collection** 66:19
100:13 145:5
**collections** 101:23
**collective** 84:13
**color** 92:15 115:24
115:24 284:21
**colored** 92:15
219:6
**column** 170:9,16
175:2,3 210:3
213:18,20,21
**combination**
121:24 225:10

233:2 253:25
**come** 19:12 33:19
42:7 43:14,16
52:2 63:19 70:3
70:10 116:16
131:12 191:21
265:25 295:24
**comes** 200:22
276:15
**coming** 65:20
238:12,14 295:23
**comment** 90:14
138:10 144:23
154:12 223:1
228:22 248:17
282:6
**comments** 172:8,9
192:2 248:9,14,19
258:15
**committees** 302:20
**common** 247:6
**commonly** 12:9
**communicated**
277:19
**communicating**
137:10 160:9,11
**communication**
60:14 160:2
230:11 277:17
**communications**
61:8,9
**company** 61:23
**comparable** 64:16
227:15,16 232:8
245:3,4 247:2
**compare** 216:8
**compared** 123:19
124:5 220:23
**comparison** 124:20
241:23 242:2
**competent** 12:22
13:6,10,22,24
14:5
**compiled** 139:15
**compiling** 105:22
**complete** 23:20
62:13 95:19

148:25 149:3
152:3,16 155:13
172:2 190:22
276:7 290:8
292:14 293:19
298:23 302:12
**completed** 96:19
112:19 113:6,18
**completely** 160:16
204:3 256:14
**complex** 16:5 60:14
60:24 119:20
243:4 271:12,18
**complies** 78:14,21
82:10 83:4
**components** 278:7
**composed** 209:25
**compound** 198:11
**compressibilities**
123:9
**compressibility** 9:3
19:13 24:7 32:16
34:18 44:11 45:17
52:6,8,11 163:20
169:6,11,20,24
170:5 171:16
172:14 173:1,3,6
173:20 223:25
224:5,13 233:2
244:1,14,16,20,21
245:9,16
**compressible**
243:19,22 244:6
246:1
**compression**
179:19 180:6
**computation** 29:13
29:20,22 30:1,4
45:2 46:1 47:8,10
274:20
**compute** 23:25
24:5 27:8,20
44:10 45:16
177:17 178:6
253:6 265:6 271:5
**computed** 12:18
27:25 29:24 31:14

44:21,22 45:1,25
47:11 178:4
205:13 264:21
265:9,11
**computer** 13:18
14:4,9,13 15:6,12
15:17,23 16:19
17:16 19:15 31:20
125:1 132:7 307:9
**computers** 12:23
13:6,9,10 14:23
**computing** 253:12
274:7,10
**conceptual** 118:25
**concern** 24:10
301:25
**concerned** 208:3
287:19
**concerning** 73:4
87:24 106:1
187:21 190:19
193:15 208:5
305:4
**conclude** 213:4
216:6 217:6
293:12
**concluded** 197:15
201:11 209:23
212:7 220:25
**concludes** 170:16
300:17
**concluding** 277:12
286:13
**conclusion** 98:19
198:19 209:19
230:1 239:20,21
244:23,25 245:1
273:7 292:21
**conclusions** 198:1
293:21
**conclusory** 184:8
**concordance** 141:5
142:1
**concrete** 109:9
210:1
**condition** 66:23
172:1 221:7 223:7

ROBERT G. BEA, PH.D.                                            April 16, 2012

224:22 231:22,25
257:5 283:15
**conditioned** 223:18
**conditions** 23:6
  34:13,14 38:16,20
  39:2 43:22 127:5
  148:8 149:6,14,22
  150:2,13,17 177:5
  179:23 222:2,15
  224:6,6 225:3,9
  228:14,19,19
  229:1 230:6,7
  231:17 235:11
  241:9 242:21,22
  243:4 244:12
  245:2,6 252:23
  256:8 271:13,18
  272:7,13 273:15
  276:9,13,20,23
  277:12 280:7,19
  282:14 283:4
  285:9,12 286:22
  292:2,10 297:7
**conduct** 184:2,6
  203:17 292:6
  298:1
**conducting** 55:23
**conductive** 199:20
  207:4 216:4
**conductivities**
  204:18,23 238:16
  257:12
**conductivity** 8:16
  8:21,23 9:6,9,12
  10:15 28:16 44:1
  81:1,8,18 82:16
  83:1,17 84:1,22
  85:10 86:3 89:4
  91:4,15 137:13
  146:5,15,23
  147:24 176:5
  178:5,7 179:4,9
  188:19 189:21
  193:13 194:1
  197:8 201:18
  205:6,12,18
  208:17,22 211:19

211:23 212:12
213:5 214:25
215:20 220:10,21
230:3 232:13,20
233:9 238:7,16
253:7 256:24
257:3 273:23
277:2,8,11 291:24
292:6 294:2,14,19
296:19,22 297:14
297:24 298:7,19
**conduit** 181:20
**conduits** 137:7
**cone** 162:1
**conference** 302:16
  302:21,23 304:22
**conferences** 303:3
  303:6 304:1
**configurations**
  243:5,6
**confined** 173:14
**confinement** 273:4
**confining** 163:23
  164:3 170:12
  174:7,9,13
**confirm** 141:3
  221:19 226:22
  295:1
**confirmational**
  280:9,15
**confirming** 250:24
**conformance**
  293:17
**confuse** 28:21
**confused** 28:22
  234:3
**confusing** 168:6
  234:1
**confusion** 29:17
  36:20 52:16,19
  135:18 208:4,7,10
  229:24
**congo** 227:17
**conjecture** 137:1
  138:9
**connect** 85:2 87:3
**connected** 161:3,6

161:13 269:7
293:10
**connection** 15:12
  15:18,25 16:11
  101:1 157:24
  215:16 304:6
**connections** 81:2,9
  81:18 82:17 83:1
  83:18 84:1,22
  85:10 86:4 89:5
  91:4,15 137:8
  161:10,12 284:8
**consequences**
  145:10
**consequently** 93:18
  167:13 196:20
  296:16,18
**consider** 114:1
  130:2 132:13
  133:21 179:12
  193:13 231:10,18
  242:4 270:20,21
  272:18
**considerable**
  281:11 282:12
**consideration**
  122:25 192:17
  242:20
**considered** 93:24
  94:5,8,10,20 95:6
  96:2 116:14 130:4
  133:13 207:8
  221:6 280:18,23
**considering** 163:22
**consistency** 275:4
**consistent** 94:18
  277:3
**consistently** 30:19
  34:1
**consolidate** 241:3
  272:10 274:7
**consolidated** 1:5
**consolidation**
  233:10,21
**conspicuously**
  280:4 283:7,13
**constant** 164:2

194:5 222:2
230:17 251:21
**constantly** 248:18
**constraints** 71:21
**constructed** 139:1
  258:20
**consult** 264:4 266:3
  275:18
**contact** 85:15 87:4
  88:3,4,5 92:1
  118:3 123:4,14
  184:21 185:9
  188:12 222:10
  252:14 265:19
**contacts** 118:20
**contain** 100:2
  104:23
**contained** 40:17
  69:8 72:2 170:23
  250:23 255:14
  272:21 278:20
**contains** 68:12,17
  118:18 152:7
**contaminated**
  109:9
**contend** 83:24 86:1
  139:5 174:1
  297:12,22
**content** 20:10 81:3
  82:18 83:2,19
  84:2,23 85:12
  89:6 91:5,16
**contents** 247:12
**context** 43:24
  162:21 167:2,5
  169:10 170:4
  183:6 189:25
  197:3
**continue** 41:22
  97:15 161:10
  192:11 267:10
**continued** 110:1
**continues** 151:21
  170:15
**continuing** 72:12
**contour** 266:8
**contours** 284:12,21

**contraction** 179:13
**contrary** 286:10
**contrast** 20:18,21
  292:25
**contribute** 215:25
**contributed** 181:23
  261:9
**contributes** 191:14
**contributing**
  121:22 185:1
**contribution**
  123:19 124:14
  126:14 137:13
  178:9 187:20
  192:21 216:12,15
  216:19 217:5
**contributions**
  123:20 126:13
  177:18 181:16
  183:9 190:19
  191:7,9 193:11,15
  194:9
**contributor** 84:13
  204:7 215:22
**contributors**
  123:15 195:18
  203:12
**control** 70:20,22
  114:2
**controlled** 70:24
**conversely** 136:25
**conversions** 48:17
**convert** 12:10
  48:15 75:22
**convey** 60:12
**conveyed** 118:5
  252:18 253:5
**copious** 281:10
  282:11
**copy** 19:17 46:23
  53:1 74:10,20
  132:16 155:9
  164:15 214:13
  246:12
**core** 239:19
**corner** 49:25 50:7,8
  50:20 82:4,6

**corps** 65:10 109:2
114:2 239:24
291:10 292:8
300:24 305:6,11
**correct** 8:8 9:15,16
9:20,24 11:4,20
12:3,19,20 14:2
14:25 15:8,14,19
15:20 16:15,21,25
19:11 22:16 29:11
29:15,25 30:11,14
30:18 31:4,10,16
32:9,11,20,25
33:11 36:17,19
38:6 39:2 43:23
44:5,5 50:21
52:22 54:20,22
59:4,10 60:11,16
61:1 62:17,20
63:1,12 72:5 74:1
76:2,4,21,25
78:24,25 79:17
80:6,13,15 82:19
83:12 84:25 86:23
89:24 96:14 98:13
98:17 106:7
108:19 110:24
116:2,23 117:1,3
118:9 119:25
120:4 121:15,16
124:19,22 125:15
126:12 129:19
131:24 132:9
133:6,9,10,15
136:5 140:23
141:1 142:22,23
143:2,5,8,9
144:22 145:11,12
146:6,7 147:10
151:14,22,23
153:2 154:4
155:22 156:21
157:2,21 158:5,8
158:9,15 159:17
159:20 160:19,22
163:3 165:18
166:17 168:15

169:8,25 170:1
171:10,23 173:2
174:19 175:11,12
176:8,9,15 177:9
177:19 178:14,16
178:17,19 180:7
180:23,24 181:1,2
181:5,24,25 182:2
182:4,5,8,9,13,14
182:17,18,20,21
183:1,10,11,13,14
183:23 185:25
186:4,5 187:18
189:10,18,23,24
190:8,9,11,12,14
191:10,15 193:24
193:25 194:4,6,7
194:9,10,17,18,20
194:21,25 195:1,5
196:9 198:23
199:9 200:20
202:24 203:11
205:2 210:23
211:4,7,8 213:13
213:14,19,20,23
213:24 214:18
215:17,18 217:20
218:19,20 220:7
220:12 221:2,17
223:22,23 228:3
229:7,8,13 235:19
236:4,5 237:14,25
241:19,20,21
242:6 245:16
249:15 250:17,18
251:5,7,22,23
256:1,22 257:22
260:16,20,21
262:5,10 263:4
266:2 268:21
271:21 277:25
278:18 286:19,20
286:23,24 298:8
298:15 303:14
305:3 306:7
307:11
**corrected** 52:24

53:5 237:13
**correction** 54:1
**corrections** 54:3,16
306:6,13,15
**correctly** 47:20
72:4 148:9 162:4
164:5 171:11
174:22 181:4
210:4 269:17
283:17
**correlate** 87:4
**correlation** 87:2,14
88:10 92:12
189:19 267:22,24
**corridors** 127:14
**corroborated**
264:25 299:20
**corroboration**
299:24 300:2
**couldnt** 77:17
116:4 135:18
280:23
**counsel** 6:3 25:1
53:20 56:6 63:9
94:6 95:17 107:22
143:14 307:14,14
**count** 55:10
**counteracting**
300:22
**couple** 53:13,14
123:24 260:16
**coupling** 251:8
**course** 106:14
108:15 146:10
185:16
**courses** 146:16,19
**court** 1:1,25 6:23
71:20 96:24 97:10
104:8 142:15
154:21 155:23
156:5,17 157:6,15
176:2 234:15
307:3,25
**courtesy** 295:5,21
**cover** 23:8 107:16
237:11 290:19
**covered** 23:9

111:16 171:21
**covering** 188:23
**covers** 108:18
**cpts** 162:2
**crack** 122:25 123:4
124:15 178:8
187:2 192:18,21
193:16 194:14
203:19 289:12
290:2 293:13
300:10,20,23
301:1
**cracks** 203:13
**create** 65:4 66:5,13
128:18
**created** 68:14,19
186:9 190:7,14
202:22 203:11
284:17
**creates** 213:22
214:1
**credentials** 62:19
**creep** 221:20
**crisply** 230:2
**critical** 198:5
202:21 305:6
**crosshatched**
111:13
**crosssection** 31:2
31:15 77:21,25
79:5,8,11 80:3,10
82:1 187:25 194:3
212:20,22 213:10
220:6 266:3
**crosssectional**
187:23 188:11
**crosssections** 79:21
79:24,25 83:21
84:6,9 85:3 88:16
89:15,17 108:14
108:18 118:18,25
202:17 265:24
268:3
**crucial** 43:9 123:5
**crucially** 290:3
**cubic** 106:2 271:6,7
**culvert** 197:16

198:3,6 199:1,5
201:20 204:20,24
205:7,21,21 206:3
206:5,25 207:1
210:8,11,23
211:21 214:2
**culverts** 198:20
199:2 209:24
**current** 206:3
209:1
**curved** 218:22
**curves** 234:18
**cut** 79:9 82:5
134:10 135:3,5
263:9 266:23
267:2,6,8
**cute** 59:11,13
**cutting** 267:7

---

**D**

**daily** 114:1,2,7,8
**dam** 269:6
**dams** 298:20
**danger** 30:16
**dangerous** 76:14
116:7 269:13
**darcys** 177:11,17
184:24 185:21
193:23
**data** 7:15 17:17
37:25 42:25 43:5
43:8 62:22 71:23
72:6,7,15,18
236:4 261:13
272:23 275:19,20
282:12,13 286:4
286:12 287:7,23
288:6,9
**database** 116:10,12
116:17,18 117:6
139:17 142:22
144:21,23 145:4,8
145:16 261:4
**date** 52:23 62:15
64:2 281:10 306:8
306:11,25
**dated** 68:4 69:4

107:8 109:3
111:21 149:25
**datum** 265:14
**dave** 212:15
**david** 9:21 68:1
**day** 3:10 17:4 234:1
292:24
**days** 123:24 243:25
**dead** 153:24
**deadly** 153:20
**deal** 41:18 174:17
188:14,23
**dealing** 48:19
60:20 165:3
167:25 232:11
263:21
**deaths** 153:14
**debra** 3:13
**decided** 41:5
**declaration** 143:19
**decreasing** 289:22
**deductivebased**
88:16
**deem** 202:21
**deep** 76:16 78:1
85:14,17 86:2
144:15 174:21
185:9 265:16
289:2,6,10
**deeper** 188:1 263:8
265:4,18
**deepest** 76:10
**deeply** 288:20
291:25 293:15
**defects** 292:11
**defend** 40:9,24
**defending** 41:2,3,8
**defense** 33:25 34:4
62:7 64:17 189:25
228:20 280:5,17
282:11,18 283:14
294:5,21
**define** 18:12 24:17
43:24 118:20
207:21 218:10
230:2 243:21
244:3 253:18

264:24 268:5,8
291:15,16
**defined** 34:6
105:15 149:24
150:7 155:25
236:9 303:19
**defines** 261:17
**defining** 245:8
**definition** 36:14
150:6 155:17
162:22 172:19
241:8 244:19,21
269:11,18
**definitions** 157:15
**deformation**
178:21 179:6,8,12
**deformations**
221:22
**degrees** 235:7,8,25
236:2,23
**delineate** 127:12
**delivery** 109:20
**delorimier** 4:15
**delta** 227:8,15,17
**demand** 94:23
117:5
**demolition** 127:11
127:21,22 128:18
130:6,9
**demonstrate**
220:18
**demonstrated**
170:11 232:6
252:1
**demonstrates**
183:9 191:12
**demonstrating**
79:2
**demonstrative**
95:18 96:7,18,21
96:25 97:6,11
116:16 130:19
139:15 261:5
**demonstratives**
64:19
**densities** 269:24
270:2,23

**density** 217:25
218:5 268:12,19
268:20 269:14,20
270:25 271:2,4,6
**department** 4:2
65:13,18,22 66:3
66:12 67:1 239:12
**depend** 186:14
231:21,23 256:16
**dependent** 221:21
221:21 222:9
244:22
**depending** 85:23
110:25 225:11
253:25
**depends** 24:6 85:18
207:2 231:14
290:3
**depict** 287:1
**deponent** 6:10
**deposed** 12:5
**deposit** 52:11,13
81:3 85:16 87:5
88:3 184:7 185:10
195:9,15 225:6
238:14 256:7
**deposited** 219:15
**deposition** 1:19 6:4
6:14 22:9 23:9,22
25:16 28:9 31:25
40:1,6,10 42:18
57:24 59:7 62:4,4
62:21 64:10 65:3
86:16 90:17 93:21
107:23 110:12
119:1 124:3
135:15 154:9
155:10,11,12
157:23 158:7
178:20 192:7
205:5 210:17
213:15 230:1
233:18 242:9,13
243:15,24 248:22
260:16 267:10
287:18 307:8
**deposits** 24:11

34:10,11 52:7
82:18 83:3,19
84:3,12,24 85:12
85:20 89:7 91:6
91:17 92:2 123:14
137:9 147:25
148:6 176:14
188:13 194:12
202:1 214:16
215:1 219:20
224:9 225:4 232:4
232:25 234:11
235:6 238:12
241:2 247:11,21
249:21 265:20
266:6 272:5,9,17
272:25 273:5,12
275:15,24,25
276:3,5
**depovue** 4:15
**depth** 67:13 85:22
86:22,22 87:3
139:7,11 196:6,10
217:24 218:9
262:9 263:1
264:20 265:13
268:12 290:23
291:9 292:22
293:13 301:1
**depths** 75:3,11,17
76:1 142:19 145:9
195:20 264:24
291:8,15
**derivation** 43:8
236:23
**derived** 43:1,3,5
164:1 235:4
**describe** 82:24
159:25 247:8
257:15 259:10
261:24 264:11
283:24 284:10
288:24 293:21
300:10,12
**described** 173:14
184:22 185:3
189:17 200:7

203:4 222:12
236:13 243:17
245:3,7,19 256:2
**describes** 214:24
**describing** 124:21
259:11 280:25
**description** 55:19
58:19,22 68:13,18
130:23 184:11
185:5 186:21
**descriptions** 58:23
**descriptive** 59:24
**descriptives** 49:7
**design** 38:9 297:18
**designation** 219:8
**designations** 220:2
**designed** 192:20
**desire** 37:13
**desk** 54:11 57:25
**despite** 87:16 136:6
**destabilization**
122:1,24 123:16
126:14 292:23
**destabilize** 121:23
122:19 290:15
**destabilized** 202:23
**destabilizing**
121:10 203:9
**detail** 18:23 67:11
75:22,23 86:7
88:8 92:11 126:3
148:15 161:11
**detailed** 127:3
255:6 297:5,13,23
298:6,16 299:5
**details** 225:25
226:11,23 236:22
254:2 298:24
299:3
**determination**
12:14 37:23 67:24
289:14 298:18
**determine** 8:11
9:19 10:15 11:10
24:6,15 27:15,17
28:13,15 29:24
51:1 55:23 75:11

75:21 99:9 103:16
105:16 106:11
130:11 167:1,4
185:24 188:18
199:12 224:14
231:7 235:13
236:7 238:3
263:13 273:10,22
297:6 299:10
**determined** 8:24
11:16 23:6 24:1
25:12 27:8 29:1
31:21 32:13 38:14
38:15 51:15 52:12
114:17 125:12
126:20 235:18
244:16 254:12
264:22 277:3,9
**determines** 157:15
**determining** 67:17
231:8 255:24
**develop** 193:14
246:4 274:13
290:23 301:6
**developed** 16:17
29:23 62:6 65:9
99:4 148:1 176:13
212:15,19 214:15
214:25 215:21
268:11 288:21
291:10,13 293:2
**developing** 130:19
239:5
**development** 64:6
64:14 197:17
247:22 290:19
292:20 300:11
301:2
**devoted** 246:22
**diagram** 110:18
195:19
**didnt** 9:4 14:1,3
22:6,10 46:23
63:7,16 64:8 69:6
71:3,12 77:13
82:3 90:20 94:20
95:6 124:15

128:17 130:22
131:11 135:24
140:24 153:17
154:19,22 160:23
167:6,10 178:6
183:21 192:16
195:24 200:18
203:25 206:21
207:12 209:2,3,4
209:21 210:25
211:14 235:22
255:23 256:4
257:11 274:15
279:9
**diego** 14:17 15:2,10
16:10 17:2,16
18:1 146:9 176:8
197:7
**differ** 9:7
**difference** 23:13,15
23:17 34:19 73:19
216:20 217:1,4
293:3
**differences** 243:9
**different** 24:18
34:3,21 51:10,25
52:3,14,14 96:22
110:25 181:17
197:8,10 200:15
201:6 207:6
228:24 243:5,7
244:23,25 245:1
245:22 247:19,21
**differentiate** 8:15
9:9
**differentiation**
8:19
**differently** 199:17
**differing** 190:20
**difficult** 20:19
111:12 132:4
198:13
**digital** 75:20,24
**digitized** 66:23
**dilatational** 23:7
24:14 34:17 224:8
224:11,12 244:18

245:3
**dimension** 185:8
187:13 195:12
**dimensions** 183:3,5
189:2,4 195:20
**direct** 62:7 68:22
160:2 161:10
196:22 213:8
214:7 252:10
277:17 284:8
**directed** 179:2
**direction** 82:5
163:4 219:2
**directions** 268:24
**directly** 64:16
118:5 135:21
161:3 171:22
224:11 252:19
253:5 276:15
**disagree** 19:10 27:1
30:8 47:17 107:25
122:3 133:11
146:11,25 193:2
206:23 207:15
233:13 267:17
**disagreed** 207:11
**disagreement**
243:25
**disclose** 302:2,6,13
303:1,8,16,22
305:15
**disclosed** 93:16
124:25 302:24
**discriminate**
119:14
**discriminates**
34:19
**discuss** 159:3,11
302:9
**discussed** 32:17
57:23 87:23 88:2
139:13 159:8
208:15 232:9
243:15 253:20
259:21 287:12
296:25
**discussing** 46:6

136:19 207:22
277:23
**discussion** 230:10
293:25
**discussions** 87:24
213:8
**displace** 121:20
**disposed** 109:11
**dispute** 141:9
**dissertation** 156:2
156:9,12 162:18
162:25
**dissipated** 232:17
**distance** 188:20,23
195:1 218:5,9
**distances** 181:17
190:20
**distant** 199:5
277:20
**distorted** 284:16
**distortion** 287:20
**district** 1:1,2
**disturbed** 129:22
**division** 4:5
**doctor** 115:8
**document** 36:22
43:12 47:22 52:20
53:4,10 65:12
68:3 74:6,19
79:16 96:4 108:21
109:4,18 111:20
111:21 112:17
113:12 115:8
128:15 129:15
143:21 152:6
153:1 178:7
**documentation**
65:9,17 66:3,12
72:2 98:23 105:20
106:1 114:11
124:14 128:8
130:18 144:24
145:1 209:17
254:3 263:17
299:23
**documented**
209:16 273:16

**documents** 72:3
98:18 106:8
110:25 114:7
130:22 140:20,22
141:20,23 143:2
209:16 239:19
**doesnt** 28:21 39:7
113:23 115:19
129:14 151:10
156:19 161:9
172:25 191:3,5
206:9 214:3
222:16 265:25
268:25
**doing** 14:1,3 21:3
26:17 40:7 42:14
48:13 116:4 174:4
**domenico** 37:2,16
**dominant** 122:23
183:7
**dont** 13:19 23:9,16
26:20 28:21 32:11
35:19 36:20 37:22
38:13 40:21 41:19
41:24 42:23,25
43:2,4,15 44:3,7
44:15 46:3,17
53:9,19,23 57:11
57:14,15,21 58:19
61:8,14,15,21
62:18 69:24 72:10
79:4,22 82:7
91:22 92:3 96:4
97:2 100:18 102:3
102:5,19 105:12
105:13 106:9
107:18 115:17,19
116:17 131:1
133:11 136:15
140:7 141:7,15
143:6 145:23
148:15 151:16
155:25 157:12
159:10 162:13
163:11 172:9
175:12 180:12
185:7,13 191:21

193:13 205:23
209:9,15,21
211:17 226:3,3,16
226:18 237:20
259:3 260:12,22
261:7 271:15
272:4 275:2
276:21 279:11
282:10 283:12
285:24 286:21,24
286:25 287:6,13
288:2,6 295:9,10
295:17 304:11
**dot** 109:12,12,12
**dots** 38:11,13,15
133:2,4,4,7
**dotted** 249:22
**doyle** 4:3
**dr** 7:7,22 9:4,21
10:1,4,6,11 11:1
11:16,24 12:21
24:1 27:5 29:17
30:20,20,20,21
34:24,25 35:13
36:15 38:18 44:21
47:6,19 48:7 50:5
51:12,15 61:11
62:11 64:7,20,23
65:25 67:9,20,25
68:1,13,19 69:6
69:12 71:9 72:12
75:21 88:14 90:19
95:9 104:22
107:22 114:5,14
120:15 123:2
127:2 135:12
140:17 142:17
148:13,19 155:3,9
155:12 156:1
162:20 175:16,19
178:3 180:13
184:9 185:12
188:10 189:2
190:3 193:6
195:24 200:4,17
203:24 206:22
210:6,16 211:9,16

212:2,15 213:2,3
213:6,8,12 214:7
220:9 236:12,15
236:18 237:4,20
242:21 249:8
250:1,7 261:11
264:6,12,18
266:10,10 267:20
268:5 269:10
270:6,7 271:23
274:17 276:8
277:14 279:13
282:10 283:1,7
284:17,20 287:23
288:18 290:11,17
292:19 293:1,5,20
293:22 294:4
295:5 296:15
300:8,10,15 301:4
301:7,14,21
**draft** 152:2 155:9
**drafted** 67:4 152:3
152:16,23,23,24
**drafting** 152:4,18
152:19
**drafts** 260:6,7
**drain** 205:19
206:25 210:2
211:7 234:10
241:14,16 272:5
**drainage** 49:16
210:2 230:13,20
231:15,21 244:22
**drained** 38:15,20
39:1 231:5,5
232:11 233:18
235:1,9,11,17,21
235:25 236:7
241:19,24
**draw** 78:10,18
85:13
**drawing** 85:9
177:21 181:8,14
184:9,23 189:1
190:10 217:6
**drawn** 81:23 171:8
182:4,15 186:6

**drew** 84:5 89:14
185:15
**drive** 7:2
**driven** 228:18
**drop** 291:2
**drops** 251:4
**drowning** 153:15
**drs** 288:19
**duct** 269:7
**due** 71:20 217:2
231:11,19 280:7
290:5 296:21
**duly** 7:4 307:6
**duncan** 48:1,4
**duty** 305:15
**duval** 1:6

---

**E**

**earlier** 114:17
158:22 159:16
167:12 209:8,11
297:19
**early** 207:6 243:15
284:5,11
**easily** 23:11 172:12
284:22
**east** 10:18 11:13
16:3,12 24:3 50:6
110:17 112:20
113:6 130:12
160:14 224:17,25
225:13,20 227:7
272:14
**eastern** 1:2
**eastwest** 82:5
**ebia** 27:10,21 29:2
30:13 55:24 62:9
62:25 85:19
105:19 118:5
127:24 132:1
135:14 136:9
137:16 139:2
143:15 190:8
220:5 224:19
238:10 242:23
243:11 252:19
253:6 255:10

258:21 259:5,14
261:13 275:10
284:1,5,13 286:14
288:4 292:3
**ebiaihnc** 68:5
**ec** 297:22
**edge** 85:19 98:2,10
**edition** 147:8
**editorial** 248:17,19
282:6
**edits** 260:10
**effect** 31:22 32:23
33:1 55:23 87:18
121:25 122:19
126:25,25 163:23
199:25 204:8,12
205:25 223:2,4
238:4 250:23
251:23 300:22
**effective** 161:20,23
162:6,8,22 163:1
163:5 222:24
223:3,6,9,14
231:6,7 232:2
235:4,11 250:20
250:21 269:18
293:12 300:18,19
**effectively** 262:8
296:20
**effects** 84:14
120:21 121:9
124:5,6 125:20
176:21 180:6
197:9,13 205:5
217:2 221:20,23
222:13 254:13
263:22 290:1,3
292:3 293:14
294:1,12,18
296:19,20 297:8
298:19 299:8,10
**effort** 60:12 64:23
190:22,25
**either** 22:11 72:19
77:17 80:3,5
106:10,25 115:19
120:17 142:9

181:11 194:13
232:7 240:2 280:7
301:5
**elapsed** 31:8
220:18 272:24
276:17
**elastic** 173:1,7
**electronic** 66:25
128:10 140:21
**electronically**
141:5
**elects** 291:5
**element** 136:19
170:23 178:21
233:16 293:11
300:16
**elements** 8:22
60:20,22 232:9
239:2 292:16
**elevated** 223:4
239:4,7
**elevation** 75:4 87:4
125:7 126:24
127:8 220:12,16
220:19 221:16
222:23 250:4,23
254:23 256:17
257:9 261:11,17
262:8,17,19,21,24
264:3,10,17 266:9
267:15 286:4
290:6
**elevations** 125:21
220:14 254:11
261:12,23 263:14
265:18,18 266:5,6
284:14,25 285:22
287:4 288:5,12
**eliminate** 102:9
**eliminated** 296:21
**ellipse** 203:7
**elsevier** 167:14
**em** 240:12
**em1110213** 240:13
**email** 54:11,16
**embedded** 207:3
234:4 239:1,3,9

239:14 272:16
**embodied** 204:3
**emphasized** 270:22
**emphatic** 270:6
**emphatically**
  270:21
**employ** 282:3
**employed** 177:17
  293:8
**enable** 13:20
**encapsulating**
  210:1
**encompassed**
  249:17
**encouraged** 135:15
**engaged** 7:13
  143:13,24 158:17
**engagement** 302:25
**engagements**
  143:20
**engineer** 33:13
  61:5 157:10
  239:25 240:15
  281:25 284:3
  297:12,22 298:5
  298:14
**engineering** 146:16
  146:24 147:4,8,12
  149:21 150:16
  151:3,8,12,20
  162:16 185:24
  221:7 271:24
  273:21 281:2
  297:18
**engineers** 44:12
  45:19 65:10
  239:24 273:21
  274:23 291:11
  292:8 299:9
  300:25 305:6,12
**enlarged** 74:8,20
  75:9 132:16
**enlargements**
  74:17
**enter** 182:24 183:2
  221:20 229:24
**entered** 31:24

**entire** 85:14 139:1
  164:17 237:2
  261:23 264:2
**entirely** 183:20
  213:12
**entitled** 25:22,25
  57:3 68:4 95:5
  103:1 130:9
  192:10
**entity** 304:18,25
**entries** 55:20 58:16
  130:9,15,23 131:3
**equal** 47:11 191:9
**equally** 195:16
**equals** 46:18 51:6,7
  193:23 235:8,17
  235:24 236:2
**equation** 46:11,15
  46:16 163:22,25
  170:17 171:2
  173:15,16,18,20
  173:24 175:3
**equations** 12:9
  194:16
**equilibrium** 31:13
  31:23
**equipment** 68:25
  71:11
**erodibility** 290:22
  291:7
**erosion** 126:1,8,13
  126:21 263:22
  264:16 289:9
  290:4,12,14,18,23
  291:8,9,15 292:20
  292:22
**erroneously** 93:2
**errors** 124:25
  190:24
**escape** 276:4
**especially** 20:24
**esquire** 2:4,5,12,19
  3:4,11,12,13 4:3,4
**essentially** 201:12
  205:19 213:22
  221:6 241:7
  254:19

**establish** 28:10,11
  91:25
**established** 12:4
  32:6 33:15 90:25
  284:7
**establishes** 191:8
**estimate** 11:17
  187:4 235:7 291:6
**estimates** 68:24
  71:9
**et** 246:23
**ethical** 305:15
**euphemistically**
  73:16
**evaluate** 10:13 11:2
  11:23 44:1,2
  139:10 184:25
  254:17 265:5
  270:12
**evaluated** 264:19
  290:16
**evaluates** 157:15
**evaluating** 99:24
**evaluation** 11:5
  62:8 224:7 254:13
  254:15 263:21
  275:21
**evaluations** 280:20
**event** 133:11
**everybody** 96:1
**evidence** 6:15
  95:19 96:7,13,14
  96:18,22 97:3,5
  116:5 120:8,12
  125:16 130:2,4
  138:13,16 202:22
  243:13 259:4,13
**evidenced** 204:2
**evident** 300:14
**exacerbate** 89:4
**exacerbated** 80:25
  81:8,17 82:15,25
  83:16,24 84:21
  85:9 86:3 91:3,14
**exacerbation** 89:24
  90:24
**exact** 142:13

**exactly** 25:6 36:13
  74:3,15 118:12
  191:8 203:6 209:6
**examination** 5:3
  7:6 10:24 13:2,21
  20:5 21:5 27:4
  28:6 32:3 33:6
  35:18 36:11 37:9
  40:2 42:22 43:19
  45:7 47:5 48:9
  49:11 50:2 53:11
  54:12 55:9 57:19
  58:11 59:20 61:4
  61:22 63:6 66:10
  67:3 68:11 69:17
  71:7,17 74:14
  86:15 89:11 90:5
  90:17,18 91:12
  92:4 93:11 95:3
  97:16 100:16
  102:21 104:21
  106:23 107:9
  108:2,16 109:1
  111:15 112:1
  113:16 114:22
  115:14 117:8,18
  121:1,14 123:6
  128:14,24 129:11
  131:21 132:12
  135:7,23 136:12
  137:14 138:6,12
  140:9,16 142:16
  143:22 144:11
  145:25 150:10,23
  153:6 155:2
  156:11 162:14
  166:16 172:10
  174:2 175:18
  178:2 188:9,15
  191:2 193:5
  198:15 203:23
  206:20 214:6
  226:15 240:8,21
  243:10 248:23
  249:7,25 250:6
  252:9 258:17
  267:19 274:4

279:12 280:2,13
  281:9 282:9
  288:17 296:13
  298:12 301:20
  304:15
**examine** 56:24 96:3
  192:21
**examined** 7:4
**examining** 144:12
**example** 38:14
  74:19 87:22
  134:19 193:17
  195:14,17 243:16
  258:23 269:6
  292:18 293:8
  299:4
**examples** 99:1
  135:19 259:18
**excavated** 109:13
  112:11 258:22
  265:12
**excavation** 55:11
  55:12,21,24 58:14
  58:15 67:13 68:5
  72:1 75:5 76:10
  78:1,7,19 81:24
  84:10 85:14,22
  88:7 89:1 92:23
  92:25 93:1 110:5
  112:20 113:6,19
  116:11 121:21
  124:6 125:13
  134:20 135:22
  145:10 178:8
  182:7,12,16,22,24
  183:4 184:3,19,21
  185:2 186:6,9,13
  186:15,19,20
  187:1,12 188:17
  190:4,7 191:14
  194:24 203:11
**excavations** 69:1,8
  71:11 74:3 75:3
  75:11,18 77:21
  80:24 81:6 82:9
  82:12,15,23,24
  83:5,6,12,16,24

ROBERT G. BEA, PH.D.                                    April 16, 2012

84:3,9,18,20 85:8
86:1 87:3,17 89:3
89:16,20,23 90:21
91:2,13,25 92:6
93:14 112:12
113:3,11 116:9
120:19 123:21
124:15 139:6
142:20 144:15
181:16 182:4
183:10,12,22
184:10 185:20
186:22 189:3,13
189:23 190:5,6,14
190:20 191:9
192:19 193:17
194:14 196:19
202:22 203:14
204:10,14 215:7
243:14 268:1
270:11 284:6
292:4
**excellent** 299:12
**exception** 282:8
**excess** 205:20
232:15
**excuse** 22:6 33:24
86:13 88:13 122:2
227:10
**exerted** 121:19
217:8 218:13
231:16 268:15
277:18
**exhibit** 5:10,11,12
5:13,14,15,16,17
5:18,19,20,21,22
5:23 19:19,21,25
36:23 37:6 39:6,8
46:21 47:2,23
48:3,5 50:4 52:25
53:7 55:2,6 58:25
68:2,3,8 74:7,11
75:9 78:13 79:3
80:21 92:8 97:6
99:13 100:10
104:19 108:21,23
110:11,11 111:20

111:23 115:4,23
128:21 129:4
132:17 147:21
166:1,13 177:20
177:24 178:4,7
181:8,10 182:11
183:8 186:7,22
187:11 191:3
193:21 196:15
232:5
**exhibits** 76:8 97:12
203:7
**exist** 227:20
**existed** 60:9 63:17
121:7 224:16
227:21 277:13
286:22 287:1
**existence** 202:20
203:3
**existing** 24:3 27:10
292:9
**exists** 139:20
140:11 267:23
**expand** 241:3
272:10 274:8
**expansion** 179:12
179:20
**expect** 246:3
287:10,16
**expense** 281:11
282:12
**experience** 13:17
14:1,3,6
**experienced** 180:15
180:21 181:1
**expert** 10:14 11:7
35:1 48:8 59:8
61:10 62:12 64:8
64:21 68:14 72:3
107:5 114:18
118:17,18 128:19
206:4 224:20
242:3,12 267:25
268:4 272:21
273:16 283:14
300:5 302:4,10,14
303:10,17 304:8

305:11
**expertise** 10:7
**experts** 19:7 33:25
34:4,25 62:7
64:17 189:25
228:20 280:5,18
282:11,18 294:5
294:21
**explain** 23:16
51:20 56:1 75:10
103:4 118:11
203:2 210:15
224:4 229:9
**explained** 51:22
242:15
**explanation** 52:1
**explicit** 273:18
300:3
**explicitly** 127:7
264:14
**exploited** 228:20
228:21
**exploration** 277:5
277:10
**exponent** 293:17
**exposed** 291:18
**expressed** 96:8
194:16
**expression** 193:23
**extend** 174:6 198:5
219:9 264:19
290:24
**extended** 84:11
139:7,10
**extends** 182:16,19
218:23 219:10
**extensive** 99:3
145:5 274:20
**extensively** 232:9
285:15
**extent** 67:13 87:9
142:24 240:19
257:14
**extents** 67:12
**extracted** 136:3
137:24
**extraction** 136:20

**extractions** 135:20
**extreme** 196:2
**eye** 284:22
**eyesight** 21:2

---

**F**

**face** 121:19 160:16
269:16 291:17
300:19
**fact** 10:3 15:9 17:5
22:4,13 23:21
66:24 87:16 97:12
108:9 124:9,24
128:15,17 136:25
141:4 156:3
159:14 170:25
171:13 180:20
181:22 191:3
192:18 202:20
206:9 220:5
222:17 224:19
237:10 238:23
241:19 242:3
249:14 251:19
264:12 265:22,24
268:14 270:21
273:20 274:5
281:4 282:10
283:12 286:10,17
287:17 288:8
301:2 302:6,9,13
303:1,8,16,22
**factor** 33:2,8,9
183:7 203:10
211:24
**factors** 233:8
299:14 300:3
**facts** 7:20 8:3 60:14
60:25
**faculty** 10:3
**fails** 200:17
**failure** 125:13
132:8,8 197:18
198:5 263:15
292:17
**failures** 10:18
11:12 16:3,13

180:17 302:1,17
303:14 305:5
**fair** 75:19 76:9
116:6 177:6
190:17 201:20
215:19 251:1
298:4 305:7
**fairbanks** 1:24
6:22 307:2,24
**fairly** 20:18 86:8
**fall** 49:14 50:15
257:21
**fallen** 194:25
**falling** 267:14
**falter** 46:3
**familiar** 18:23 37:4
44:12 45:18 48:4
301:4
**family** 40:16
**far** 160:23 197:16
198:20
**farther** 191:13
**farthest** 182:7
194:24
**fast** 277:21
**fatigued** 264:16
**faulty** 156:20
**favorable** 136:22
**feature** 187:2,4
199:21,22 200:1,2
219:24
**features** 193:19
194:13 199:13
200:3 207:3
210:18,21 247:9
267:24 268:2
**february** 77:22
101:2,13 102:5,7
131:4 140:21
142:2 153:11
154:3 155:8
157:25 159:9,12
159:19 273:16
**federal** 6:6
**feet** 47:12 48:20
49:18,19 50:16,23
51:7 76:15,16

ROBERT G. BEA, PH.D.

April 16, 2012

77:11 129:24
139:7,11 144:16
174:21 182:12
185:3,8 186:3,7
186:13,15 187:13
187:17 195:3,21
195:22 196:12,16
196:17,21 220:12
220:14,17 221:2
221:10 224:10
250:16,16 261:24
264:20 265:2
266:1 275:13
277:22 291:3,3
295:16,17
**fence** 110:3,17
112:20 113:7,19
**field** 27:17 142:25
143:2 148:2 165:4
168:1 277:9 304:2
**fifteen** 296:1
**fifty** 185:8 186:3
**fight** 42:8,11
**figure** 47:25 48:2,7
48:11,23 73:23,23
73:24 74:4,8,18
74:21 75:9 97:24
98:14 110:9,14
114:25 115:16
118:12 132:2,16
133:16 134:9
136:3 153:19
160:7 173:13
185:15 207:24
212:16 214:20,23
214:24 215:3,15
215:19 216:1
218:11 219:7,11
249:12 284:12,17
284:18,19,21
285:4 287:1 288:5
288:12
**figures** 32:16 59:2
72:9 73:20 76:4,5
98:24 100:20
101:18 128:18
159:15 197:20

202:8
**file** 103:17
**filed** 1:8
**fill** 109:12 115:18
115:20,24 118:13
118:21 119:4,23
120:1,2,3,9,12,16
122:4 208:18
212:3 213:1 219:6
252:15 253:4,11
253:19 284:9
**filled** 98:21 118:4
210:2 222:7
**final** 52:22,24,25
53:5 54:14 57:22
205:23 275:18,22
**financial** 304:18,25
**find** 21:9 27:18
28:19 46:22 55:19
90:22 102:15
111:12 116:4
130:22 132:19
163:7 164:13
166:5,7 172:12
196:1 198:13
201:21 227:7,9
233:25 264:1
300:1 304:11
**finding** 239:13
**findings** 293:17
303:5
**fine** 44:6,7 46:25
107:17 122:14
193:3 209:12
226:22 296:10
**finegrained** 225:5
**fingers** 234:15
**finish** 39:17 58:10
86:13 135:8
204:11 226:7,10
266:12,18,24
267:18 278:24
281:13,22
**finished** 24:19
25:19,21 169:13
278:25 279:5
281:7

**finite** 178:21
293:10 300:16
**first** 7:4,12 19:20
19:21 20:15 59:10
62:21 65:18 68:12
68:17,22 69:19
99:19 100:25
101:3,22 109:23
110:11 112:2
113:21 127:17
143:13,23 144:5
144:14 151:19
158:6 164:17
166:19,21 169:3
169:18 170:8,25
171:8 175:1
182:11 184:20
185:11 195:19
199:15,19 201:7
203:1 213:6
224:13,21 228:22
242:8 244:24
245:14,15,17
260:3 275:25
289:5 307:5
**firstprinciplesba...**
242:16
**five** 58:12 113:5
139:7,11 144:16
264:20 265:2
267:3 301:11,12
301:17
**flaw** 289:6,10,13
291:4
**flawed** 167:12,13
288:20 291:25
293:15 300:11
**flaws** 93:16 124:25
289:2 300:13
**flexible** 174:15,16
**flip** 103:13
**flipping** 54:2
**flood** 10:17 11:12
16:3,13 30:17
118:6 120:18
121:6,7 122:20
123:4,10 160:3,10

160:17 180:17
181:17 182:8
185:4 186:4,8,13
191:13 192:22
193:12 202:14
204:2,13,21
214:17 215:7,21
215:24 223:15,15
253:6 261:13,19
275:10 287:25
288:10 289:7
290:6 292:4 302:1
305:5
**flooded** 259:19
**flooding** 153:20
**floodwall** 143:15
188:17 189:23
190:21 194:20
199:6,7 202:23
215:8 217:18
218:14 237:25
261:12 262:22,25
263:7 264:3,9
302:17 303:14
**floodwalls** 120:18
122:16
**floodwaters** 122:7
160:11
**floor** 2:20
**florda** 2:14
**flow** 12:22 14:14,15
14:23,23 15:5,11
15:17,23 16:10,24
17:6,7,10,11,22
17:22,23 18:2,8
18:21,22 21:18
23:5 29:13 30:15
32:14,17 33:16,21
34:6,6,12 35:2,9
35:10 36:16 52:5
90:24 106:24
123:8 148:7,14,20
149:6,13,22 150:1
150:6,12,17
173:14,19 176:20
176:23,25 177:2,4
177:5,11,18

179:23 181:18,20
181:23 184:25
185:1,21 186:12
187:19,22,24,24
189:7 191:14
193:15 195:9,18
196:19 209:25
210:22,23 211:3,4
213:23,25 222:1
224:23 225:3
227:23 228:1,2,4
228:5,5,16,19,19
230:4,5,8,9 238:8
268:25 270:8,9,15
270:16,25 271:13
271:18 273:15
276:9,14,19,23
277:12 287:21
288:13 291:1
292:2 296:22
299:8
**flowing** 210:24,25
211:6
**flownets** 299:9
**flows** 9:14 14:10
177:8 178:9,16
193:11,13 228:10
229:2,3,5,6,12,15
229:18,22,22,23
**fluid** 8:24 9:14
30:22 52:9 268:11
268:12,13,15
269:9,15 270:3
**fluids** 9:18 278:8
278:12,13,17
279:17
**focus** 57:22 177:6
178:12
**focused** 24:13
51:25 202:18
**focusing** 52:10
**folder** 99:20 105:4
105:10
**folders** 100:2
103:18
**follow** 161:20
265:23

ROBERT G. BEA, PH.D.

April 16, 2012

**following** 173:15
212:11 221:17
255:9 297:2
**follows** 7:5 101:9
163:18 177:11
**foot** 21:14 30:6
186:20 187:3
271:6,7
**footprints** 127:12
**forbid** 280:8
**force** 268:14
289:15
**forces** 220:3
**foregoing** 306:4
**foreground** 161:7,9
**forensic** 33:12 61:5
157:9 281:2,24
**forgive** 33:13
**form** 6:12 10:21
12:25 13:14 23:2
26:13 28:3 33:4
35:12 45:5 59:16
61:3,19 63:3 66:8
66:22,25 69:11,22
71:14 73:1 89:9
90:1 91:10 100:12
106:21 107:2
108:13 111:6
113:15 114:20
120:23 121:12
122:22 126:23
128:5 129:3 131:7
132:11 136:11
137:6 138:3
140:21 143:3,17
145:19 150:5,20
153:5 156:8
158:14 162:11
173:23 184:14
186:24 188:7
190:16 191:18,23
191:25 192:3,9,13
192:23 198:8
203:21 243:2
244:9 248:2 274:2
298:10 304:10
**formal** 64:14 283:9

**formalities** 6:8
**formation** 247:20
290:4
**formatting** 54:17
**formed** 200:10
**forms** 122:15
**formula** 44:12,14
44:17 45:18,21
46:10,12,18
172:13 173:5
**formulas** 12:18
29:5 171:13
274:22
**formulated** 177:11
**formulation** 46:5
171:19
**forth** 51:16 242:3
242:11 307:7
**forty** 271:22
**forward** 34:11 35:1
200:23 293:5
**found** 54:24 150:3
150:12,13,14
190:24 219:14
238:6,10 247:3,12
271:12,20
**foundational**
157:14
**foundations** 129:23
**founded** 195:14
**four** 129:24 150:17
182:6,6 185:1
196:19,20 288:22
288:24 298:3
302:22
**fourth** 109:6
**fourword** 162:8
**frame** 18:16 64:6
**framework** 230:11
**francisco** 4:12
42:12
**franklin** 4:7
**frankly** 154:24
**frequently** 296:24
**friction** 234:23
235:1,1,3,7,9,10
235:13,17,21,25

236:7 250:22
**friday** 72:13
**front** 99:14 115:10
299:1
**fugro** 148:4 275:18
**full** 39:7 233:10,20
289:11 301:1
**fully** 225:8 257:20
275:15,24
**function** 20:10
21:25 217:24
250:22 251:17
264:17 268:11,15
268:17 269:15
**fundamental** 17:12
280:7
**fundamentally**
45:11 49:4
**further** 120:19
126:3 208:7,9
209:23 221:14
307:13

---

### G

**gap** 122:15,17
123:12,13,13
124:5 181:19,22
215:21,24
**garner** 2:17
**gas** 276:4
**gather** 152:14
**general** 67:12,14
67:18 69:7 84:10
87:21 88:11,21,22
88:23 127:13
145:2,9 187:7
202:18 257:18
285:13
**generality** 119:7
**generally** 202:15
304:4
**generated** 186:12
238:4
**gentleman** 10:8
**geoestudios** 15:4
236:19 237:9
**geographic** 62:12

139:14 220:2
**geologic** 243:4
247:19
**geological** 246:15
246:17,20,24
247:9,17
**geometric** 188:1
199:12
**geometries** 261:14
**geometry** 118:20
182:10 184:23
187:21
**george** 287:18
**geoslope** 15:3
16:17
**geotechnical** 44:12
45:18 59:22
149:20 150:16
162:15 246:21
284:3
**gesturing** 257:10
**getting** 187:15
238:21 264:16
**gigabytes** 142:12
**gilbert** 56:12
**gill** 109:10,12 110:1
**gilley** 4:15 295:1
**gis** 59:2,8 61:10,17
62:23 64:1,6,7,9
64:21,22 65:5
66:5,14 67:23
68:14,18 71:24,25
72:8,23 73:10
77:15 80:14,15,25
81:7,15 85:25
87:8 92:7,9 95:12
95:14 96:12 97:23
114:4,17,24
115:25 116:9,12
116:12,16,18
117:6 118:11
132:2 139:17
142:22 144:20,23
145:4,16
**gist** 183:17 245:11
**give** 46:13 53:1
71:8 89:19 110:10

142:14 143:25
144:19 165:21
168:18,22 207:12
230:10 291:23
292:15 299:4
**given** 1:20 9:14
12:8 17:4,4 18:14
19:2,23 21:16
22:19 28:1 29:13
32:12 44:8 45:14
45:15 55:3 63:9
73:5 85:25 88:22
95:14 107:15
139:18,20,22
140:13 141:25
143:4 171:9
188:20 206:13
245:8 248:8 249:5
273:3 306:4,7
**gives** 25:15 171:13
173:15,18
**glad** 87:12
**go** 43:11 46:20
53:19 55:4 58:7
82:21 88:17 93:12
112:16 113:5
114:13 116:8,19
117:9 121:22
135:8 167:8
169:16 181:7
187:25 213:9
227:6,8,14,16
234:6 254:14
255:15 257:7,7
267:3 279:20
289:5 295:6
**goes** 122:17 175:2
209:8,11 262:14
262:14,14,15
**going** 19:16,18
24:25 28:18 34:24
39:4,13,13,16
40:9,10 41:22
42:8 43:14,15
53:1 54:13 56:8
56:10,13 59:16
60:2 61:16 68:22

ROBERT G. BEA, PH.D.

70:13 71:5 78:8
85:5 102:18
103:14,14 110:10
115:3 123:11
127:4 142:21
144:2 151:1 155:3
161:17 167:8
172:3,7 174:24
176:12 177:20
196:25 198:8
203:21 206:17
226:6 234:12,13
240:18,25 243:1
248:2 250:8 252:2
252:5,10,16 282:5
283:24 295:2
297:10 299:21
**good** 7:7,8 92:1
135:25 175:19,20
247:24
**gotten** 83:22
**government** 141:25
**grad** 16:18 30:25
**grade** 79:2 129:24
**gradient** 194:2,17
194:19
**gradients** 202:9,19
202:21 207:1
214:1
**graduate** 14:17
15:2,10,15,21
**grain** 212:9 226:22
**grains** 52:13
170:19 175:5,8
**grandstand** 25:14
**graphic** 59:2 62:23
64:1,9,22 65:5,8
67:11 71:24,25
72:8,23 74:2,21
75:2,12 115:21
**graphics** 64:16,18
69:9,13,15 73:8
73:17 75:17
130:20 132:2
261:6
**grass** 290:19
**gravels** 48:25 49:9

**gravity** 268:15,18
**great** 97:11 188:14
188:23 247:25
**greater** 216:10
**greatest** 218:12
**greyed** 95:15
**grid** 78:5,23 95:10
264:19,24 265:1
265:13,17,21
**ground** 23:8 75:4
99:8 202:16
255:10
**groundwater** 159:4
159:7 171:4
254:11 284:19
286:1 287:20
288:10,13
**group** 3:1 63:14
65:11 94:16 105:8
106:1,8 113:10
114:3 119:4,24
120:3 127:23
136:7 137:16
140:20 141:20,24
143:1 157:18
158:14 159:3
265:11 285:25
**grow** 218:17
**grunauer** 236:12
**guess** 20:9 21:3
76:22 93:12
201:12 209:21
211:10 221:24
273:8
**guidelines** 239:23
292:7,12 297:3,5
297:16 298:1
300:25 301:5,6
**gustav** 239:4

---

**H**

**half** 181:23 218:22
219:1 281:17
**halfway** 296:15
**hand** 13:7 27:3
57:23 93:15,20
124:17,21,24

177:14 178:10,15
242:16,19 250:24
274:23
**handing** 74:8
**handling** 123:3
**handwritten**
109:24 112:18
**hantushjacob**
148:19
**happen** 277:22
**happened** 18:9
42:16
**happening** 138:24
**happens** 174:16
**happy** 149:2 203:2
249:3 270:5,5
**hard** 20:24 74:10
203:25
**hauled** 109:12
**havent** 19:1 29:20
39:10 44:21
102:12 124:2
125:23 139:18,20
166:3 267:6,22
**head** 48:17 195:1
**hear** 176:1
**heard** 146:10 176:6
**hearing** 304:12,13
**heaven** 280:8
**hell** 41:16
**help** 11:24 61:11
68:14 196:1
**helped** 152:8,10
**helping** 152:14
**helps** 210:15
**hereinabove** 307:7
**heres** 46:18 50:17
**hereto** 6:3 20:1
37:7 47:3 48:6
53:8 55:7 68:9
74:12 108:24
111:24 128:22
166:14 177:25
307:15
**hes** 35:25 36:4,8
40:4 56:21,22
61:23 70:3 103:14

103:14 117:7
134:23 146:10
248:8 249:5
266:20 267:11,12
267:17 279:3
281:7,15 295:7
301:14
**high** 31:21,21 81:2
82:17 83:2,18
84:2,23 85:11
89:6 91:5,16
202:9 203:8 204:4
205:18 212:4
217:22 219:21
257:3 267:23
272:13 283:25
290:21
**higher** 31:6 32:16
33:9,10,17 205:11
247:12
**highest** 208:21,24
**highlight** 172:18
**highlighted** 166:3,3
171:1 172:11,16
172:16
**highly** 210:17
305:5
**hilbert** 2:18
**hire** 62:11
**hired** 15:24 59:8
61:11,25 67:23
**historic** 219:16
**history** 247:20,22
**hole** 134:14 135:14
135:20 137:2
**holes** 133:22 134:1
134:5 135:22
136:8,22 137:1,11
137:11,15 138:14
138:17
**home** 57:25 124:10
**hope** 24:20 73:12
102:12 190:22
230:11
**horizontal** 147:25
185:10 188:19
210:3 213:20,21

216:22 217:17
223:5 300:18
**horizontally**
216:11
**hour** 47:13 48:21
50:24 51:7,13
275:13 290:25
**hours** 293:4 295:3
**hundred** 49:18,19
174:21
**hurricane** 153:15
153:20,23 180:15
199:8 209:25
221:12,17 222:14
239:4 240:24
252:25 255:13
259:15 270:8,24
275:10 287:2,8
292:10 297:8
**hurricanes** 219:16
**hvorslev** 162:21,21
**hydraulic** 8:16,21
9:5,9,12 10:15
28:16 44:1 81:1,8
81:17 82:16,25
83:17,25 84:13,21
85:10 86:3 89:4
91:3,14 92:1
121:22 124:5
137:8,13 146:5,15
146:23 147:24
148:8 165:5 168:1
176:5,13,22 177:8
177:8 178:4,6
179:3,9 181:20
189:20 193:12
194:1 197:7
199:20 200:1
201:18 202:9,19
204:18,23,25
205:5,11,18
208:16,21 211:19
211:23 212:12
213:4 214:1,15,24
215:20 216:6,8
217:7,12,15
218:12 220:10,20

ROBERT G. BEA, PH.D.                                    April 16, 2012

Page 324

222:8 230:3
232:13,19 233:8
238:3,7,15,16
240:24 246:5
256:24 257:3,12
272:3 273:23,25
277:1,7,11 284:8
291:24 292:5
294:1,2,12,13,17
294:19 296:19,22
297:14,24 298:7
298:19
**hydrodynamic**
297:7
**hydrograph** 255:14
255:16 256:10
290:24 291:1
**hydrostatic** 118:6
121:18 122:8
123:4 216:22
218:10 222:9
268:6,8,22,25
269:2,5,8,11,18
297:7 300:23
**hypotheses** 7:24
**hypothesis** 8:1
**hypothetical**
118:24

**I**

**id** 20:17 51:4 76:13
92:11 93:16 98:4
140:1 196:22
208:9 209:10,15
214:7 221:18
233:15 247:7
249:2 255:15
266:3 270:12
295:3
**idea** 21:15 60:17
**identical** 216:25
**identification** 20:1
37:7 47:3 48:6
53:8 55:7 68:9
69:13 74:12
108:24 111:24
128:22 135:16

166:14 168:4
177:25 217:23
284:22
**identified** 23:4 69:7
72:19,21 80:18
84:7 91:24 92:9
103:17 106:16
107:5 108:5
111:10,11 114:9
118:19 132:1
139:12 202:17
203:8 204:13
219:3,23 249:16
261:5 267:25
272:17 297:1
301:22
**identify** 87:2 92:5
100:9 101:10,25
104:23 262:19
**identifying** 84:8
**ignores** 290:19
291:9,12
**ihnc** 160:1,9 161:2
161:4,13 180:15
216:3,16,19
217:23 220:6
242:23 243:20
244:7 246:1
256:11
**ii** 236:10,17,18
237:3,8,14
**ike** 239:4
**ilit** 143:24
**ill** 13:14 16:8 21:8
28:20 34:10 35:19
50:12 58:7 84:16
103:4 120:23
138:3 143:17
149:2 151:6
154:12 159:9
165:14 168:11
176:1,4 192:10
198:10 203:2,24
205:15 218:21
234:14 243:3
289:5 297:8
**illustrate** 135:14

202:9 216:15,18
219:12 220:3
**illustrated** 207:23
217:8
**illustration** 137:25
215:5,11 216:12
**illustrations** 64:15
145:7 204:5
**im** 8:21 13:4,23
18:13,23,24 19:16
20:6,7 21:3,23 23:8
23:12 24:25 25:21
25:21,22 26:3,17
27:18 28:9,11,18
29:16 30:14 32:15
34:9,24 35:7
36:12 39:4,16,22
40:15,21 41:2,3,8
41:9 42:20 46:8
47:19 48:18,18,22
50:11 51:1 52:23
53:1,12,13,20
54:13 56:13 59:12
59:16 68:22 70:24
71:8,19 73:2 74:7
78:8 79:14 81:14
84:8 88:21,25
94:4 96:16 101:14
101:16 102:4,5,6
102:9,15,18 103:1
103:25 107:11,17
112:25 113:1
115:9 118:1
119:17 120:5
125:24 139:15,19
139:21 140:1
142:17 144:2,12
148:25 151:12,18
152:13,18 155:10
161:17 167:8
172:7,15,18
175:22 176:11
177:20 184:9
186:25 187:5,7,15
189:20 190:17
191:25 192:3,9,10
193:17 195:24

196:11,25 198:8
202:4 203:16,21
206:17 207:25,25
207:25 214:13
215:13 216:13
226:6 234:11,13
235:15 240:3,7,18
240:25 243:1
244:23 246:14
248:2 252:2,5,10
252:16 255:11
256:19 259:24
264:15 266:15
267:7,11 270:5,5
270:14 278:4,11
282:5 283:23
297:9 299:21
300:8 304:12,13
**immediate** 122:19
**immediately** 85:21
121:9 123:11
124:11 218:13
256:23 276:24
**impact** 106:19
108:7,11 125:12
126:20 137:2
198:4 199:6
254:17
**impacts** 263:14
**impenetrable**
213:22,25
**impermeable** 49:24
50:19 199:22
257:16
**implicated** 10:17
11:12 53:14 54:7
**implies** 228:13
**imply** 223:5
**implying** 204:22
**importance** 193:19
261:20
**important** 7:14 8:2
8:22 31:13 86:8
93:9 122:24,25
123:15 133:23
134:2,7 136:21
137:9,12 219:24

223:2 231:8,19
243:8 261:18,21
265:16 291:2,4
293:3 299:7
304:11
**imported** 106:3
**imposed** 222:10
240:24
**impossibly** 223:25
224:3
**improvement**
118:8 284:20
**inability** 88:8
**inadequacy** 165:11
168:9
**inappropriate** 40:1
154:13,15 296:21
**inches** 252:24
254:13,18,24
255:7,8,11 256:6
256:9,14,20,21
257:21 287:11,15
**include** 19:3 168:4
259:7 278:9
**included** 9:22 58:2
59:2 64:15 72:8
72:16,23 82:23
100:2 119:8 123:1
124:12 125:17
130:17 165:7
171:19 194:12
199:14 202:8
230:24 231:5
239:15 250:24
261:6 280:18
283:1 284:19
285:25 287:17,21
299:12 300:5
**includes** 99:23
111:10 144:24
171:16 249:22
**including** 8:22
137:1 145:3
181:19 300:4
**inclusion** 280:5
283:14
**incomplete** 72:24

ROBERT G. BEA, PH.D.                                          April 16, 2012

Page 325

73:3
incompressibility
  170:23 172:1
  226:17
incompressible
  21:18,19 24:11,12
  45:11 52:5 170:14
  170:19 175:5,9,11
  224:5,19 225:15
  225:23 227:20
  270:1
inconsistency
  51:21,22
incorporate 72:1
incorporated 71:23
  100:3 264:13,14
incorrect 13:1 30:2
  121:13 132:15
  151:5 236:16
  238:25 275:7
  294:16
increase 218:2
  221:12 257:9
  271:8 275:9
increasing 217:25
incredulity 242:18
incumbent 281:24
independent
  143:10 185:23
indian 91:7,18
indicate 30:16
  101:17 130:8
  196:5 217:11,14
  222:16 284:13
indicated 39:6 50:4
  95:10 97:24 98:8
  164:24 167:20
  180:4 199:23
  204:4
indicates 138:16
  195:20 293:1
indicating 20:13
  160:1 220:8
indication 287:19
indications 275:15
  275:22,23
individual 88:7

individuals 69:16
  114:6,15 128:11
industrial 10:18
  11:13 16:4,13
  24:3 50:6 130:12
  132:22 224:17,25
  225:14,20 266:7
  271:9 272:14
  284:15
industries 110:1
inflow 210:12
influence 197:19
  198:21 265:19
  294:20
influenced 9:1,2
influences 108:14
  218:4
influencing 269:8
influential 231:3
information 8:4
  9:22 60:13 62:6
  62:12,25 63:8,20
  64:5,13 66:4,13
  66:22 72:11 73:4
  73:6 86:24 87:7
  105:22 118:17
  128:9,12 131:13
  131:13,15,17,19
  135:16 139:14
  141:10 142:19
  145:6,23 152:14
  153:7 211:18
  212:10,14,18,21
  212:23,24 213:11
  239:11,15 261:6
  283:23 284:4
  285:25 291:10,12
  293:6 297:6
  305:16
initial 131:9 242:12
initiate 289:15
initiation 127:6
input 19:13,13,17
  21:16 22:2 23:13
  23:14 31:13,19
  32:22 33:16 67:21
  254:7 296:18,23

inputs 22:23
  228:14,17 274:11
  274:14
inputting 17:17
insert 19:24
inserted 21:12
inside 209:20,23
insight 157:14
  190:18,18
instability 199:13
  199:25 289:3,8,13
  290:23
instance 18:6 19:8
  21:21 194:24
instantly 273:2
instructed 179:19
instruction 155:20
  155:24 156:5,17
  156:24 157:7
instructions 157:11
  157:13,13
intend 65:4
intended 52:14
  64:18 96:17 175:7
  177:16 178:11,15
  181:10 186:8
  190:7 200:25
  201:7 219:12
  220:3 235:10
intending 97:4
intent 75:2 234:21
intention 38:12
intentionally
  179:22 223:19
  259:19 263:9
  293:25
interaction 293:11
  300:16
interdistributary
  225:3 226:21
interest 304:19,25
interested 56:23
  193:10 225:21
  242:24 246:14
  307:15
interesting 34:22
internal 235:7,13

250:22
international 3:1
  15:4 16:17 63:14
  65:11 106:1,8
  127:24 136:7
  157:19 159:4
  265:11 286:1
interpretation 43:9
  165:4 167:25
interpreted 162:1
interrupt 22:6
  195:25
interrupting 192:6
interruption 49:10
  193:4
intersection 79:11
  202:15 263:6
  289:17
intersects 256:9
introduced 233:3
introduction 171:6
inundated 272:13
invented 59:11
  60:7 149:18 162:9
inverse 224:13
  251:6
investigated 163:5
investigation 7:13
  7:19,23 143:11
  178:24 277:14
investigations
  299:21 300:7
involve 243:4
involved 62:24
  197:17 203:15
  238:2 269:21
  274:16 292:16,18
involves 174:20
involving 69:15
  105:11
irrelevant 183:4,13
  183:15,20
irresponsiveness
  25:3
island 238:6,9,13
  239:10 246:22,25
  247:9,18,22

isnt 8:7 9:15 10:4
  11:13 12:2,12
  14:2,10,18,24
  16:4 17:8,23
  18:18 24:4 27:23
  29:10,14,25 30:17
  31:2,9,16 44:9
  50:11 51:3,5
  59:14 60:17 61:6
  64:2 73:19 79:8
  80:3,4 90:23
  110:22 112:14,22
  115:25 119:5,22
  120:5,7,11,15
  123:12 128:2
  131:2 132:6,14
  133:9,14 136:23
  137:4 145:14
  161:5,6 171:4,10
  174:3,9 175:6,11
  177:10,14 179:15
  180:13 202:23
  203:3 204:3 220:5
  221:4 241:11
  242:11 247:7
  249:13 251:22
  266:2 268:14,14
  268:22 269:10
  274:5,16 275:1,1
  282:14 283:8,16
  286:23 305:12
isolated 209:24
issue 54:17 203:18
  215:16 304:7
issued 292:8
  300:25
issues 92:21
item 106:5,9 163:9
  163:10
items 100:17 101:3
  103:15 104:22
itt 91:8,18 95:11
  141:14
ive 14:4 26:23
  48:15 52:2 60:1
  114:13 131:8
  145:20 172:11,18

ROBERT G. BEA, PH.D.

April 16, 2012

Page 326

184:22 185:10
190:3 197:24
221:23 228:21
230:1 245:2
**iwall** 55:25 77:11
79:12 85:21 86:2
160:16 216:7
289:1,3 292:4
301:2
**iwalls** 243:4 292:9
297:16,18

**J**

**january** 128:19
129:1,18
**jiao** 163:25
**jiu** 163:24
**joanen** 2:5 10:20
12:24 13:13 20:12
20:16,22 23:1
24:24 25:4,10,20
26:2,9,15,22 28:2
33:3 35:11 39:3
39:15,21 42:17
45:4 53:16,22
56:17 57:2,6,12
59:15 61:2,18
63:2 66:7,17,21
67:21 69:10,21
70:6 71:13 72:25
89:8,25 90:13
91:9,20 92:19
94:1,12 95:16
96:5,15 100:11
102:17,25 103:6
103:11,24 104:4
104:10,14 106:20
107:1,19 108:12
111:5 113:14
114:19 115:2,11
117:15 120:22
121:11 122:21
126:22 128:4
129:2 131:6
132:10 134:22
135:2,10 136:10
137:5 138:1,8

140:6 141:3,6,13
143:16 144:9
145:18 150:4,19
152:20,22 153:4
154:11,16 156:7
162:10 172:6
173:22 184:13
186:23 188:6
190:15 191:17,24
192:8,15 193:1
198:7 203:20
206:16 226:5,9
242:25 244:8
248:1,7,12,21
249:4 252:4 258:6
258:9,14 266:11
266:16,22 267:5
267:16 274:1
278:23 279:4,22
281:6,12,16,21
282:7 294:24
295:18 296:5
298:9 301:13
304:9
**joe** 40:11
**john** 162:24 163:4
**jones** 3:10
**joseph** 1:24 2:4
6:22 307:2,24
**joshua** 155:21
156:1,4
**jourdan** 133:5
198:3,6,25 199:2
199:4,17,24
200:16 201:19
202:2 204:19
205:7 206:24
207:21,23 208:18
208:25 211:20
212:4 213:18
**journal** 130:9,15
130:23 131:2
301:24 302:23
303:25
**journals** 302:3
**jr** 1:24 6:22 307:2
307:24

**judge** 1:6 60:18,19
299:15 304:12
**judgment** 60:22
185:24 186:2
187:13 193:14,18
**jury** 155:19,23
156:17,24 157:7
157:10,12
**justice** 4:2 65:14,18
65:22 66:4,13
67:1 239:12

**K**

**k2** 1:5
**kardon** 155:21
156:1,4
**katrina** 1:4 31:9
43:22 153:16,21
153:23 180:15
199:8 221:12,17
222:14 240:25
252:25 255:13
259:16 270:9,24
275:11 287:2,5,8
291:13 302:2,17
303:13 305:4
**katrinas** 292:24
**keep** 36:10 56:9
74:25 104:11
172:23
**keeping** 103:25
104:6
**keeps** 104:8
**kept** 135:16
**kevin** 10:8,11 11:1
11:16,24 24:1
148:12,18 164:21
165:2,21 166:5,22
166:24 167:23
168:18,21,24
169:4 276:15
**key** 20:9 90:4
**kia** 193:23
**kind** 41:23 135:19
295:15
**kinds** 17:12 18:3
52:15 228:18

**klein** 2:17
**knew** 45:19 129:8,9
**know** 9:25 10:6,10
10:25 11:5,21
12:6 15:1,9,15,21
16:22 17:1,20,25
21:19 22:10,22
23:3,12,21 26:8
30:24 31:5 36:6
38:13,23 40:21
44:14 51:18 53:23
54:6 56:9 60:2
61:10,21,23,25
62:18 72:10,11
76:5 79:1 90:20
105:3,12,13 114:8
114:13 131:1
134:13 137:19
140:14 141:7,15
143:3 147:16
151:16 155:25
157:6 160:25
163:12 164:9
165:12 168:10
172:15 175:22
179:17 188:20
208:12 211:14,15
223:24 226:3,4,16
226:18,25 227:11
233:15 239:25
240:15 247:6
253:15,22 260:23
265:16 266:9
273:7 275:2 276:8
276:16,17 280:17
281:3,4 282:10
283:1 284:24
285:5,8,9,12,14
285:21 286:2,21
286:25 287:6,13
288:3 295:16,17
295:17 298:24
304:5,16,23
**knowledge** 14:6
73:3 144:24 149:5
157:7 165:5 168:2
179:15,18 208:24

234:9 257:18
259:22 271:25
276:12,14 284:2
**known** 7:20 12:11
15:4 16:20 171:7
270:3
**knows** 12:7 115:8

**L**

**label** 20:14 59:12
**labeled** 20:3 51:9
217:22 220:1
**laboratory** 161:24
234:25
**lack** 73:3 270:17
276:4 289:10,14
289:20 291:25
**lacustrine** 238:5
**lake** 219:17
**lambe** 46:10
149:24 150:3
185:18,19 224:7
232:10 271:10,17
274:25 275:2
278:20
**land** 123:11 288:10
**language** 127:15
174:25
**large** 66:19 132:5
183:24,25 184:4,6
184:10,20 185:2,4
185:6,20 188:22
207:5 258:24
**largely** 8:24 183:15
**larger** 161:13
194:19 217:1
**lateral** 197:17,20
198:22 199:13,25
200:5,9 233:7
238:17 250:1,12
251:10,19 261:21
**law** 6:7 95:6,7
177:12,17 184:24
185:21 193:23
**lawyer** 41:14 63:23
**layer** 174:7,9,12,13
182:17,19 184:22

ROBERT G. BEA, PH.D.

April 16, 2012

195:13,15 196:18
217:19 219:13,13
219:14,15,21,23
224:2 243:11
265:25
**layers** 10:16 11:11
118:4,13,22 120:9
120:13,17 180:2
188:1 216:4
226:12 247:3
249:17,20 252:15
253:5,11,16,20
263:10 272:16
**layman** 60:18,19
**laymans** 60:15
**leading** 118:6
**leads** 245:4 292:21
**learn** 163:25
181:15
**learned** 276:13
**leave** 70:20 191:25
**leaves** 300:22 302:1
**led** 52:1 125:1
212:11,15 213:4
228:22
**left** 54:10 87:25
109:19 132:1
135:14,20 136:4
137:24 160:13
194:5 211:13,16
216:22 217:18
**lefthand** 38:3
160:24 170:9
**legal** 65:22,24
143:20
**legend** 98:14
115:22 214:23
**length** 139:2 217:9
**lengths** 49:16
**lengthy** 167:16
238:21
**letter** 112:3
**levee** 16:3,13
123:16 126:1
143:10 153:21,24
176:15 180:14
199:7 202:13,16

202:17,23 204:21
215:2 219:6
221:13 222:25
223:11,17 247:9
247:22 250:14
270:8,16 289:9
290:20 298:22
302:17 303:13
305:5
**levees** 246:22
247:18 249:22
298:19
**level** 60:25 75:21
86:6 92:11 99:8
221:9 250:4,15
251:2,17,22,24
275:10 288:10
**levels** 221:10 239:4
239:7
**levin** 2:10
**library** 164:14
**lift** 77:6 101:3
**light** 36:10
**lighting** 20:25
**likewise** 141:16
262:20
**limit** 31:13
**limited** 31:22
**line** 39:5,16,22 51:6
51:8 68:23 71:19
78:18 99:19
100:25 104:25
110:3,17 112:20
113:1,5,7,19
117:10,19,23,24
125:10 126:17
161:19 167:18
205:4 219:10
**linear** 210:15,18,21
**linearly** 217:24
**lines** 79:1 110:4
112:17 113:5
170:9 172:25
**linked** 200:13
**list** 54:24 58:13
72:20 99:12,13,18
99:22 100:10,25

101:3,8,18,25
102:4,5,8 104:23
106:6,9,10,12
130:25 139:24
140:2 155:13
165:8 168:5 289:2
290:9 291:21,23
292:14,15 293:19
297:3 298:23
300:12 303:12
**listed** 93:13 100:17
101:4 103:18
105:9 301:21
**listening** 234:2
**litigation** 1:5 15:13
60:13 143:14,24
200:11,12 203:17
203:18 212:13
213:16 215:17
241:18 259:21
302:4,14,25
303:10,17 304:8
**little** 47:8 133:4
183:21
**lived** 153:24
**llc** 1:21
**load** 122:6 147:8,12
224:2 274:9
**loading** 118:6
127:4 176:22
225:11 231:17,25
244:12 246:5
272:7 275:11,12
292:10 293:13
**loadings** 222:8
240:24 272:4
**loads** 109:11
273:25
**local** 75:4 256:7
267:24 268:2
288:25 289:3,23
290:23
**locate** 290:16
**located** 57:24 77:3
77:7,9 91:6,17
180:22 259:2
**location** 78:6,7

80:2,9,16 81:10
92:2 111:7 119:5
121:8 199:6 238:6
254:5,15 265:20
284:16
**locations** 83:11
88:17,19 89:14
127:13 142:19
227:18 258:22
259:8 261:3 273:3
276:11 285:3,4
**logs** 142:25 143:2
**london** 237:25
242:22 243:19
244:5 245:25
246:4
**long** 49:23 50:18
65:21 128:2 131:3
186:15 188:16,25
190:1 231:15
234:14 235:21
257:23 276:16
295:5
**longer** 189:21
217:11 295:10
**longtime** 221:23
**longwinded** 206:14
**look** 13:4 37:13
43:17 46:14 47:14
47:25 54:19 57:14
74:20 75:8 79:19
79:22 98:4,5
101:24 103:15
105:3 110:9,12
111:19 112:2,25
114:24 126:24
132:16 149:2
153:19 159:21
165:19 168:16
172:24 173:8,24
248:16
**looked** 17:16 19:1,4
19:7 58:18 101:13
113:23 116:22
126:18 130:21
138:13
**looking** 20:7 50:3

77:3 85:24 97:23
102:4 111:1 129:9
129:15 161:10
172:18 216:6
**looks** 299:17
**loose** 243:3
**lost** 32:2 45:12
**lot** 144:4
**louisiana** 1:2,22 2:7
2:21 3:6,15 6:24
156:23 157:3
307:4
**low** 45:9 49:4 127:7
188:24 212:12
213:4 219:20
223:25 224:3
290:5
**lower** 31:8 32:14
32:18,21 33:22
107:3 125:21
148:3 153:14
182:16 189:15,20
218:18 220:4
224:1,16 225:14
225:23 233:10
238:11,23 241:13
247:3,13 262:19
265:25 266:7
277:8 288:4,11
291:7,11
**lucia** 155:12
**lunch** 140:15

---

### M

**machine** 274:20
**mag** 1:7
**magic** 274:16
**magically** 274:12
**magistrate** 27:2
39:12,20 40:12
41:19 42:13
**main** 101:7
**maintain** 75:23
**maintained** 221:16
**maintaining**
290:25
**majority** 177:3

JOHNS, PENDLETON COURT REPORTERS

504 219-1993

**making** 25:22 26:3
46:2 248:17
275:19
**man** 164:21
**manner** 28:14 40:5
137:3
**manual** 239:25
240:16
**map** 76:20 77:3,8
77:24 78:16,23
79:7,9,21,23
111:10 153:14,17
153:18,20 154:21
155:5
**mapping** 67:24
**maps** 77:18 114:25
115:6 132:18
**march** 64:10 68:4
69:4 144:1 157:22
**margins** 147:7,9
**marine** 74:21 75:12
76:16,24 77:2,8
77:14 78:1,11
79:20 82:22 83:11
91:7,18 95:11
97:25 98:9 107:4
108:5 112:11,12
114:24 116:22
117:1 118:14
132:17 133:8
160:4 243:17
258:24 259:1,6
261:1 284:7
**marino** 284:20
**mark** 19:18 43:11
46:21 68:2 74:6
82:7 83:5 86:1
108:20 153:22
177:20
**marked** 19:25
36:23 37:6 47:2
48:5 53:7 55:6
58:25 68:8 74:11
92:7 108:23
111:23 128:16,21
166:1,13 177:24
181:8

**marking** 47:22
52:23 55:1 111:20
**marks** 150:8
280:11,14
**marr** 30:21 123:2
127:2 264:12
283:1,7 288:19
290:11,17 292:19
293:5,22 300:10
300:15 301:4
**marsh** 238:4
**masters** 163:7
**material** 8:7,10
9:13,17 11:17,25
20:2 45:10,11
49:24 50:19 58:3
63:25 68:25 69:7
71:10 99:25
100:10 105:19
106:6 107:15,16
111:4 112:13
113:17,23 122:4
188:25 205:10
207:18 208:13,15
211:24 212:3,5,12
213:5 239:16
258:22
**materials** 19:1,2
24:2,10 27:10,21
30:12 35:16 36:25
38:8,10,24 39:9
55:18 56:3,8 57:1
58:20 68:4 72:20
88:5 92:22 93:3
94:10,22 99:11,19
100:7 101:1,14
105:24 107:21
109:20 114:9
118:2 119:7
125:18 130:22
145:14 156:14
158:21 164:9
165:9 168:5 197:8
197:11 200:5
201:19 204:19
208:18 211:20
212:9 213:1 225:7

227:8,15,16,20
239:6 245:2
249:23 252:13,21
253:23 255:1
257:2,19,24
265:12 277:23
**matrix** 170:13
173:1
**matt** 41:5
**matter** 14:21 32:11
188:13 206:9
253:10 295:21
**mattered** 183:21
**matters** 9:18 93:24
94:5,19 116:13
188:5
**matthew** 2:12
**maximum** 49:20
**mayer** 91:7,18
95:11 133:8
**mcdonough** 91:7
91:17,23 95:11
112:11 133:8
258:24 259:1,6,17
260:25
**mean** 22:6 35:13
37:10,11 43:2
49:6 50:23 71:3
115:20 119:3
183:15 195:25
198:1,24 199:4
203:25 268:25
277:17 295:13
**meaning** 45:10
49:23 50:18 185:6
216:24 219:21
221:20 228:14
**meanings** 28:12
227:25
**means** 15:5 39:25
90:7 116:3 132:13
137:10 247:6
299:9
**meant** 55:20 59:24
196:10 233:22
280:10
**measured** 186:3

**measurement**
286:3,11
**measurements**
285:1,2,3,6,10,15
286:6,8,15,18
288:1
**mechanical** 164:2
215:6
**mechanics** 176:20
270:4
**memory** 44:15
76:13,15,19 77:10
78:5 142:4,9
143:23 145:21
156:19 158:9
165:7 167:12
168:4 200:17,23
225:2 260:13
285:7 286:10
**mention** 283:23
**mentioned** 107:11
169:10 170:4
189:6 201:2
297:18
**met** 62:15
**method** 68:25
148:13,19 169:5
169:10,23 170:3
174:6
**methods** 10:12
11:2,22 71:10
224:14 245:8
256:2 277:4 282:2
**middle** 112:2,19,25
297:4
**midway** 197:1
**mifflin** 37:2,16
**migrate** 189:22
**migration** 189:25
**million** 47:12 48:20
**minimum** 97:19
**minus** 44:19 45:24
**minute** 33:13 56:25
58:10 146:9
227:10 249:8
**minutes** 167:9
267:4 296:2

301:11,12,17
**mislead** 209:22
**misrepresented**
280:15
**misspelled** 153:23
238:5
**misspoke** 32:15
34:23
**misstating** 13:4
**mistake** 95:4
**misunderstand**
13:11
**misunderstanding**
280:8
**misunderstood**
84:4
**mit** 164:14
**mitchell** 2:10
**mitsch** 4:4
**mix** 20:24
**mixed** 290:2
**mixture** 234:4
252:23 276:13
**mmg** 138:25
**model** 18:5,18,20
19:3,4,22 20:3
22:18 31:20 32:22
48:11 61:12 64:9
64:22 66:5,14
67:19 68:5,13,18
76:12 77:15 80:14
80:16,25 81:7,15
85:25 92:7,9
97:23 114:4,25
115:25 116:4
118:11 123:23,24
132:2 173:9 179:6
179:7 207:23
212:11 255:20
**modeled** 181:4
212:3 234:19
253:15
**modeling** 125:13
132:7 133:13
177:17 178:13
179:9,23 193:7
202:11 206:24

ROBERT G. BEA, PH.D.

April 16, 2012

Page 329

207:19 213:17
222:13 223:22
225:10 253:17
**models** 22:23 59:2
59:6 61:17 62:23
64:1 65:5,8 67:11
71:24,25 72:8,23
73:10 75:2 95:12
95:14 96:12 123:8
148:7 207:21
293:7
**modes** 292:17
**modified** 163:22
**modify** 71:25
**modulus** 23:7
224:12,12
**mollusks** 119:9
**monday** 17:3
**monitoring** 159:4,8
285:4 286:1
**month** 221:11
**moraga** 7:2 57:25
242:18
**morning** 7:7,8,10
114:17 142:18
224:4 228:22
263:24 267:13,21
**morris** 64:5 67:22
88:17 99:24
128:17 131:15
**mouth** 227:6
**move** 90:14 138:9
154:12 218:3,18
266:6 282:5
296:11
**moved** 107:13
219:16
**movement** 171:3
188:24 219:3
269:9 278:17
279:17
**moving** 55:11,12
55:20 58:14,15
92:23,24 93:1,14
216:21 269:3
**mrgo** 1:7 201:7
300:6

**multi** 178:8
**multiconnection**
88:6
**multiple** 286:5
**multiplied** 235:12
**multiply** 250:21

### N

**nail** 236:3
**name** 61:10,14
72:19 106:6 237:7
237:10
**named** 7:3 10:8
**names** 237:16,18
**narrative** 68:5
**narrow** 187:2
207:7
**natural** 282:1
**navigation** 118:7
**near** 91:24 153:24
180:14 295:15
**nearly** 123:10
**necessarily** 262:16
278:14
**necessary** 7:24
**need** 35:19 38:23
46:4 53:19 58:20
58:21 75:24 76:5
85:7 101:24
107:18 138:11
142:21 172:9
183:21 185:20
187:18,23 195:25
226:11,23 227:10
**needed** 36:14 60:23
66:4,13 120:19
**neglected** 164:3
**negligent** 203:17
**neutral** 268:23
**never** 18:20 131:18
146:10,22 237:7
258:12 290:15
**new** 1:21 2:7,21 3:6
63:17 64:7,20
123:22 124:16
153:8 212:22,24
213:11 247:23

**nexttolast** 240:10
**niger** 227:15
**ninth** 148:4 153:14
218:18 220:4
247:3,13 266:7
291:11
**nod** 66:23
**nods** 189:14
**non** 132:8 135:6,8
175:8 248:19
303:12,20
**nonresponsive**
252:3 266:21
**nonsteady** 17:11
34:6 228:5,19
230:5,8 276:14
296:22
**nora** 3:11
**normal** 186:4
252:23 254:20
256:8 257:5
285:20
**normally** 216:23
216:23
**north** 55:11,12
79:6,13 80:5,16
82:14 84:14,19
89:18 92:22 98:1
98:9 108:4 110:2
110:16 118:2
125:21,25 127:1
160:3 181:11
199:13 242:1
252:14 266:1
284:6,16,23 289:5
289:11,16 290:11
290:12 291:18
293:16 300:15
**northern** 77:9
243:16
**northwestern**
162:19
**note** 20:17 104:18
260:9
**noted** 306:13,15
**notes** 112:18
**notice** 6:7

**number** 19:19
21:12 23:4 30:5
36:23 46:15,16
47:23 48:19 50:4
52:25 74:7 80:24
82:14,24 83:15
84:20 87:17 89:22
97:11 108:21
109:17 111:12,20
112:17,21 113:7
115:7 142:12
144:15 163:9,11
166:2 177:21
181:9 183:8 187:6
187:10,12 188:17
190:4,5,5 218:12
237:21 273:18
288:25 297:3
**numbered** 184:3
189:3 190:6
**numbers** 33:18
106:2 110:25
151:17
**numerous** 259:14

### O

**oath** 6:25 7:5 18:9
35:4 148:11,17
**object** 10:21 12:25
13:14 23:2 24:25
25:3 28:3 33:4
35:12 39:4 40:5
45:5 56:13 59:16
61:3,19 63:3 66:8
69:11,22 71:14
73:1 86:14 89:9
91:10 100:12
102:18 106:21
107:2 108:13
111:6 113:15
114:20 120:23
121:12 122:22
128:5 129:3 131:7
132:11 136:11
137:6 138:3
143:17 145:19
150:5,20 153:5

156:8 162:11
172:7 173:23
186:24 190:16
191:18 198:8
203:21 206:17
226:6 243:1 248:2
252:5,8 258:7
274:2 298:10
304:10
**objected** 192:23
**objecting** 39:22
191:23,25 192:3,9
**objection** 25:22
26:1,7,13,21
39:17 42:7,9
66:18 70:7 90:1
91:21 126:23
134:23 135:11
138:2 184:14
188:7 198:11
244:9 252:8 267:8
**objectionable**
192:4
**objections** 6:11
26:17
**observation** 75:19
**observed** 210:21
276:4
**obtain** 282:12
**obtained** 65:10,17
65:24 234:19,23
236:3 276:20,24
281:10 285:6,10
285:16,23 286:8
286:19 287:8
288:9
**occasion** 275:5
276:22
**occasions** 17:19
**occur** 90:24 180:10
215:6 253:8 274:9
277:21 279:16
**occurred** 122:7
222:18 233:11
260:15
**occurring** 195:10
220:4 223:21

ROBERT G. BEA, PH.D.                                    April 16, 2012

230:14,20 232:23
**october** 109:3
  111:2,21 225:20
**offer** 97:2,4 157:10
  157:12
**offered** 304:19
  305:1
**office** 66:20
**offices** 1:20
**officially** 34:5
**officiated** 6:24
**offshore** 227:19
**oh** 35:6 46:20 54:22
  60:2 112:25
  121:15 122:11,14
  127:22 136:16
  151:12 261:2
  277:18 280:10
  291:4
**okay** 9:4,12 10:25
  13:3 14:8,16 16:6
  17:20,25 21:11,22
  23:19,21 27:5
  30:7,24 32:4,12
  33:12 34:22 36:20
  38:1,19,23 42:23
  43:11 44:6 46:20
  46:20 47:6,10
  48:10,21 50:3,14
  50:22 54:23 55:4
  56:6 63:25 68:2
  71:18 74:6,24
  75:14 77:17 79:5
  79:14 80:8 82:2
  82:11,20 83:8
  84:16,17 85:7
  93:12 94:24 95:9
  101:6 102:11
  104:20 105:3,6,13
  106:15 108:20
  111:19 114:1,23
  116:3 117:12
  119:3 120:6
  122:14 123:7
  124:23 127:20
  129:17,20 131:25
  133:2 136:17

140:10 144:2
151:12,15 152:10
152:16 154:5,10
154:15 156:12,16
156:22 160:7
166:19 167:8
169:1 171:24
172:20 174:3
175:13 187:16
198:16 208:9
209:2 220:15
229:9 244:3 248:6
259:9 262:7 263:5
263:23 268:22
281:19 283:6
290:10 296:6
298:16
**old** 153:24
**omission** 114:12
**omit** 293:25
**omitted** 123:2
  164:11
**once** 38:17 121:7
  122:5
**ones** 81:16 87:18
  87:21 92:14 100:6
  101:10,25 105:10
  118:24 208:1
  228:21,22 247:5,5
**ongoing** 58:4 64:25
  107:7,12 123:17
  232:4
**online** 139:20,21
  164:14
**onset** 287:8,14
**onshore** 130:10
**open** 56:9 134:19
  135:14
**opened** 55:17
**opening** 166:6
**operate** 13:20 14:7
**operation** 138:24
**operations** 136:19
**opining** 304:7
**opinion** 136:22
  198:3 199:10
  223:8,13 224:15

241:5 243:18
259:25 261:8,10
279:15 294:17
304:19 305:1
**opinions** 133:23
  134:3 137:3
  200:11 242:3
  270:10
**opportunity** 25:13
**opposed** 143:24
  221:11 222:18
**opposite** 51:19
  137:3
**oral** 25:16 40:1
  90:17 248:22
**orange** 219:6
**order** 46:6 60:24
  75:21 76:15 101:9
  128:7 144:19
  163:1 187:11,20
  276:19 291:8
**ordinate** 37:21
**organic** 10:16
  11:11 36:12 43:21
  48:11,24 49:14
  50:14 175:8
  182:16 189:15
  224:1,16 225:15
  225:23 230:19,21
  230:24 233:10
  241:13 243:20
  244:7 246:1
  247:12 249:17,19
  250:3,14 251:3,11
  251:15,16,21
  265:25 266:5
  272:16 277:8
**orientation** 80:15
**original** 6:9 12:5
  15:6 99:18 100:7
  100:25 104:19
  128:2 131:4
  134:10 301:23
**originally** 158:18
**orleans** 1:22 2:7,21
  3:6 63:17 247:23
**ought** 70:19

**outboard** 120:19
  121:21
**outer** 85:19
**outflow** 210:13,19
**output** 31:1
**outputs** 31:12
  228:15,17
**outstanding** 259:18
**ovaled** 203:5
**ovals** 202:8
**overgeneralization**
  269:14
**overlain** 174:9
**overlays** 74:2
**overpass** 119:12,12
  284:9
**oversaw** 13:8
**oversight** 164:11
**overtopping**
  263:22 264:16
  290:18 291:5
**overturning** 264:15
  289:1,3,23
**overwhelmed**
  41:12
**owe** 225:17
**owen** 42:12 67:21
  152:21,23

— — — — — — —
**P**
**page** 5:3,10 19:15
  19:20,21 20:15
  22:17 46:11,15,16
  46:21,22,24 48:2
  54:2,18,20 55:3,4
  55:5 57:20 58:12
  58:13,24 67:6,10
  74:9,15,19,25
  75:1 78:13 80:19
  80:22,23 83:14
  89:21 104:25
  109:6,17,23
  111:22 112:2,16
  112:19 113:1,22
  113:23 115:22
  117:13,16,20,24
  125:3,25 126:5

127:10,16,17
130:7 133:16
139:3 144:4,13,14
146:1 147:19
149:7 151:1,1,9
151:11,13,16,21
151:22 153:19
155:12,14,14
157:17 158:25
159:22,22 160:5
161:14 163:9,10
163:16 165:25
166:20 169:19
170:8,16 171:1,12
172:4,11,16 173:8
174:25 181:21
182:11 185:11
193:20 195:19
196:14 207:24
212:16 214:11
221:24 234:7
237:21,22 240:23
246:8,10,11,13,16
249:12 252:12
279:20,23 280:3
301:22
**pages** 19:21 37:12
  47:24 53:10,13,14
  67:5,7 73:17
  74:17 97:18 101:9
  103:13 105:17
  151:11,25 153:8
  159:9,11
**paid** 304:17,24
  305:10
**pan** 160:23
**panatonio** 2:10
**paper** 66:19 128:8
  131:10 141:21,22
  143:3 158:14
  163:21
**papers** 16:1,12
  96:8 302:11,15
  303:2 305:4,10,16
**paragraph** 53:15
  54:1,6,10,19,20
  59:1 65:7 67:4,6

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

67:10 68:12,17,23
69:19 71:18 75:1
80:19,23 83:14
89:22 97:17
105:17 109:7
117:9,14 125:3,11
126:18 127:9,17
129:20 130:8
139:3,6 144:5,14
147:20 149:8
156:22 158:25
159:5,14,21,22
161:14,19 163:11
163:18 165:17
166:6,20 169:19
170:8 172:13,15
172:16,23 173:9
176:12 196:23
197:1 198:19
209:19 214:8,10
214:11 221:25
234:6,9,14 235:15
235:16 237:20,24
239:18,22,22
240:2,22 246:7,8
246:10,11 249:14
252:11 258:18
259:9 260:4,5,8
260:18 261:22
262:23 264:18
267:20 271:10,16
272:1 275:14,17
277:1 279:21,25
283:11,12,18
288:18 293:20,21
293:23 294:23
296:14,15 297:2,3
297:5,19 299:17
300:8
**paragraphs** 54:7
67:7 150:25
**parallel** 218:22
**parameter** 19:18
220:20
**parameters** 24:17
179:22 233:18,23
294:6,12,20

**parametric** 201:13
201:15 206:10
208:14,23 209:1
220:17
**pardon** 22:7 52:12
260:17 264:15
289:17
**paren** 147:24
**parens** 110:5 148:1
148:4,5 197:21
214:20 215:3
222:1,5,7,10
**parentheses** 249:20
249:21 280:9
**parenthesis** 162:2
162:3 222:4,6,8
280:10
**parlance** 247:6
**part** 6:14 64:24
102:8 104:1
122:13,24 127:24
133:5 152:22,23
157:9 172:2
190:21 201:7,8,9
230:8 233:8 237:1
239:1 299:20
300:6
**partial** 110:5
**partially** 180:25
225:9
**particular** 14:4
21:21 184:3 218:6
219:25 246:22
286:17
**particularly** 47:24
165:6 168:3
219:24
**parties** 6:3 276:10
276:19 277:5
307:14
**parts** 72:7 131:17
152:3,5,6,17,18
152:19,24,24
158:11,12 288:22
288:24
**party** 94:4
**pass** 145:23

**passage** 171:2
292:24
**passive** 219:3
289:22
**paste** 219:23
**path** 49:16
**pdf** 58:18
**pdfs** 55:17
**peace** 296:10
**peak** 275:12 290:24
**peat** 249:17,20
**pen** 78:17 82:8
**pending** 250:9
258:10
**penetrate** 255:2
**penetrates** 255:4
**penetrometer**
162:2
**pensacola** 2:14
**people** 13:8 59:18
70:13 152:13
287:19 302:24
305:11
**percent** 182:1
221:3,5
**percentage** 222:6
**perforations** 210:7
210:10,19
**perform** 14:9,18
179:3 221:18
235:4 255:5
263:11 273:10
**performed** 28:17
30:19 112:3,8
139:1 148:3 176:7
178:13 193:7
197:7 199:11
204:15 213:17
232:22 233:3
234:10 253:17
273:14 276:10,18
277:13 286:22
292:19
**performing** 23:5
34:3,4,8 244:13
264:10 297:14,24
298:6

**performs** 290:17
**period** 49:23 50:18
131:18,20,23
162:3 200:25
212:3 221:19
273:25 274:9
287:3
**permeabilities**
123:8 202:2 277:7
**permeability** 8:6
8:17,25 9:2,6,10
10:16 11:10,18
44:9,19 45:15,23
46:4 49:5 147:25
188:24 194:13
201:23,25 212:4
**permeable** 199:20
**permitted** 6:5
**person** 65:1 67:23
152:11 304:18,24
**personally** 63:16
72:14 128:9 130:4
131:18 135:13
265:6,23 275:21
**pertaining** 294:9
**pertains** 1:7 273:17
**pertinent** 71:22
72:6,7,15,18
**pervasive** 289:2
**pervasively** 288:20
**pervious** 118:1,4
120:8,12,16 121:5
122:4 210:11,12
210:13 252:12,15
252:20 253:4,4,19
**ph** 1:19 7:1 306:3
306:11
**phase** 24:13 62:23
64:13,24 131:14
177:3 206:4 209:1
209:3,8,9,11
236:10,17,18
237:3,8,14,16,18
241:24 300:6
**phi** 235:8,17,24
236:2
**phone** 40:13 42:13

**photo** 134:11 161:1
**photocopied** 58:2
124:10
**photograph** 73:21
78:4 119:8 135:13
160:4,8,13,23
161:4 163:16
**photographic**
98:22 99:4 265:1
**photographs** 99:7
99:8,11,15,21,23
100:3,6,8,18
101:17,23 102:16
103:17 104:23
105:7,8,9,14
130:5 135:17,21
138:23 145:3
159:25
**phrase** 59:11,13
60:7,9 149:17,17
149:21 150:1,18
162:7,8,16,17
163:1 277:16
280:14
**phreatic** 180:22
252:21 253:1
254:1,6,15,20,23
255:3,16,19,25
256:6,7,18,20
257:24
**picture** 137:23
161:6
**piece** 172:3,3
**piezometer** 239:1,2
239:9,13 272:12
272:22 273:9,18
**piezometers** 272:16
**pigman** 1:20 3:3
**pile** 122:5,18 127:5
135:20,22 136:20
182:12,20 218:24
261:17 262:9
298:21
**piles** 87:24 88:1
127:13 136:3
137:23 211:10,13
211:15 262:20

ROBERT G. BEA, PH.D.                                    April 16, 2012

263:8
piling 130:11,11
  132:22,24 133:22
  134:16,18,21
  289:12,18,19
  291:18 300:20
  301:4
pilings 131:25
  132:7,20 133:12
pin 143:12
pine 238:5,9,13
  239:9
pipeline 269:7
pipes 134:7
pit 106:18 108:11
  109:13 110:6
  112:11 113:12
  258:24 259:1,6,17
  259:19
pits 258:19,19,20
  258:25 259:5,10
  259:14 260:1,10
  260:25 261:9
place 19:23 28:10
  118:16 151:19
  211:13,16
placed 78:16 83:10
  93:2 118:3 120:3
  181:16 252:14
places 172:12
plaintiffs 2:2 10:14
  11:6 15:24 63:9
  63:23 65:24 142:1
  143:14
plan 73:10 79:10
  79:23 80:1,7
  81:13 86:19 185:8
plans 127:11,21,23
  128:18
plaxis 178:22
play 238:24 239:5
  294:14
please 10:22,23
  18:12,17 32:1
  39:19 43:24 46:15
  46:19 50:13 55:19
  56:7 66:9 68:16

70:1 75:10 91:11
  98:5,7 99:10
  102:1 106:13
  120:10 127:16
  146:2 161:14
  169:9 223:12
  225:17 226:7,10
  227:4 241:21
  243:21 253:18
  258:16 266:13
  267:18 271:15
  278:24 281:22
  289:2 302:19
  304:21
pleasure 237:15
plot 37:15,20 38:12
  38:21 42:24 43:6
  43:10 48:12,16,23
  49:15,22 50:5,8
  50:15,17 51:2,5
  51:14,15 264:13
plural 247:15
  260:2,12,13
plus 141:23
point 19:16 21:8
  34:11 40:2 51:14
  87:19,21 99:10
  100:14 119:22
  124:4 127:6
  149:20 150:15
  162:15 169:9
  184:23 187:15
  189:24 216:24
  217:23 218:7
  233:14,15 236:25
  239:13 277:19,20
  286:17 287:24
pointed 100:20
pointes 261:14
points 37:23,25
  43:1,5,8 84:12
  286:4,12 287:7
pole 161:9 169:4
pond 161:8,13
ponding 161:1,5
pontchartrain
  219:17

poor 121:2
poorly 84:11 85:15
  92:6
pope 10:8,11 11:1
  11:16,24 24:2
  27:9 28:1,25
  29:23 148:12,18
  164:21 165:2,21
  166:6,8,22 167:23
  168:18,22 276:15
pore 24:13 31:1,7
  31:11,19 32:7,10
  32:13,18,21 33:22
  52:8,12 201:21
  205:20 222:22
  230:14,21,23
  231:1,3,10,18
  232:15 233:5,19
  244:16 246:5
porous 36:25
portion 64:4
  196:25 208:4
portions 106:15
  107:14
portray 87:6
portrayal 78:4
posed 187:22
position 19:9 55:24
  66:2,11 94:17,18
  253:25
possibility 47:15
possible 8:3 53:9
  75:22 116:9 188:4
  262:18
postkatrina 73:25
postulate 290:14
postulated 122:16
potential 125:20
  137:12 181:15
  190:19 193:15
  195:17 197:9,13
potentially 207:17
  265:17
pounds 21:14 30:6
  271:6,7
poured 257:5,10
power 65:2

powers 87:7
poydras 2:20
practice 271:24
practiced 14:22
preceded 200:12
  252:25 255:12
preceding 239:22
precise 144:19
precisely 76:5
  300:24
predominant
  108:17 116:5
predominantly
  92:15 98:15,20
  106:17 108:6,8,10
  115:23 116:21
preexisted 119:12
  119:15,23
preexisting 118:3
  118:13 119:3,18
  119:21 120:2,8,12
  120:16 252:15
  253:4,19
prefer 304:4
prekatrina 73:24
premise 211:1,2
  224:21
premised 51:24
premises 8:2
preparation 152:5
prepare 169:2
prepared 59:7
  153:10 155:7
preparing 95:20
  114:3
prescribe 188:1
  301:1
prescribed 188:19
presence 199:1
present 4:11 39:5
  60:14 292:12
  300:21 303:5
presented 96:19
preserving 26:10
  42:19
pressure 9:1,1,5
  28:16 30:23 40:17

81:1,8 82:16 83:1
  83:17 84:1,22
  85:10 86:4 89:5
  91:4,15 121:8,25
  122:8 146:5,15,23
  176:5,21 177:8
  178:5,6,11,23
  179:3,9 193:12
  198:2 216:7,8,23
  216:24 217:3,7
  218:10 220:21
  222:22 230:14,21
  231:11 232:14
  238:4,17 246:23
  253:5 268:6,9,10
  268:22,23 269:5,8
  269:11,19 277:17
  278:1,3,8,15
  279:16 290:1
  294:1,12,18
  296:20 300:10,17
  300:18,19
pressures 30:16
  31:1,7,11,19 32:8
  32:10,13,18,21
  33:22 118:5
  120:21 121:18,22
  123:9 176:13
  178:18 198:24
  200:1 201:22
  202:5,10 203:4,9
  204:4,25 205:12
  205:20 214:15,25
  215:13,21,23,25
  216:2,5 217:12,15
  217:25 218:2,13
  218:17 220:8,11
  220:25 221:1,3,5
  221:13 222:9
  230:23,25 231:1,3
  231:18 232:15,16
  232:20 233:5,19
  233:23 246:5
  251:25 252:19
  271:5 272:15
  273:2 277:18
  289:21 292:1

300:23
presumes 52:10
presumption 289:6
pretty 74:10
prevent 230:13,18
  230:20 232:22
prevented 223:21
previous 62:4
  147:8 212:24
previously 87:23
  111:8 114:6,10,15
  128:6 138:5
  139:13 145:20
  176:7 208:3
  227:24 251:9
  259:21 287:12
primarily 67:25
  98:22 212:14
primary 239:21
  261:19 272:11
  292:16
prime 235:8,17,24
  236:2
principles 7:11
  224:14
prior 28:9 64:10
  144:3 180:16
  213:15 242:4
  250:8 255:9,19
  285:15 286:22
  287:2,14 289:7
privy 142:7
probably 150:14
  159:10 253:1
  266:4 296:1,14
problem 7:14 88:6
  88:7 273:22
problems 34:21
  52:3 228:24
procedure 6:6
  235:16 236:6
  248:25
procedures 297:13
  297:23 298:6,17
  298:25 299:5
proceed 21:17
  92:20 267:18

proceedings 302:16
  302:21 303:3
  304:1,20
process 64:25
  88:15,18 100:4
  105:21 130:18
  221:20 236:12
proctor 2:11
produce 56:7 87:6
  87:13 92:12 124:8
  124:16 140:20
  145:22 154:25
  232:7
produced 11:25
  31:1 32:7,18
  33:22 53:23 63:15
  64:2,17 66:3,12
  69:12 73:6 93:5
  93:21 94:7,11,19
  94:22 98:23 99:5
  99:20 101:24
  116:17 123:13
  124:10,11 125:19
  127:23 128:8
  141:4,8,16,21
  142:14 144:25
  145:13 152:6
  158:19 167:14
  242:19
producing 116:15
production 69:15
  93:25 94:23
  101:25 117:5
  128:7 131:10
productions 65:13
  66:1 67:2 128:11
professional
  155:18 295:4,21
  304:14 305:15
profile 174:8
program 13:18,20
  14:4 17:7,9 19:15
  21:15,25 178:22
  274:6,10,12,12
  277:5,10
programs 14:5,13
  16:16

progress 31:25
progressively
  218:3 219:19
prohibited 63:22
project 62:24 118:8
proof 270:13
propagate 289:16
  301:3
propagating 271:9
proper 60:22
  230:11
properly 134:6
properties 8:10
  9:17 123:7 205:10
  205:17 207:18
  208:13,16
property 8:7 9:13
  11:17,25
proportional
  187:22 257:9
proportionate
  187:20
propose 270:13
proposed 127:1
proposition 99:16
  156:25 271:11
prosecution 41:3
protect 211:10
protected 121:20
  121:24 123:16
  126:13 176:15
  191:15 202:13
  203:10 204:2,13
  214:16 215:2
  221:13 222:24
  223:11,17 241:13
  250:15 251:3
  287:24 288:4
  289:9,21 290:5,20
proud 21:3
proved 270:15
proven 270:15
provide 88:8 92:10
  106:13 132:25
  137:8 142:11
  157:14 164:7
  168:24 191:4

241:1 272:4
  277:11 286:13
  290:12 297:5
  298:6
provided 18:24
  19:5 39:10 52:20
  65:12 101:1
  125:16 129:5
  156:17 158:14,21
  158:22 164:13
  165:1,1 167:22,22
  177:21,23 200:4
  213:10 239:16
  241:22,23 242:8
  260:6,11 263:17
  264:12 274:11
  284:5 303:15
provides 126:3
  248:24 284:2
  297:13,23
proximity 266:9
psf 21:14 22:14,21
  22:24 23:4,14,23
  30:8 33:20 38:4,7
  44:19,25 45:23
public 303:9
publications
  301:22 302:3,23
  303:13,20
publicly 303:5
published 15:3
  239:23 301:25
publishers 167:15
pull 20:3,6 62:10
pulled 87:25
  141:24
pump 30:13 148:2
pumped 113:2
pumping 10:13
  11:3,9,23 148:12
  148:18 171:9
  276:10,18
punishment 234:16
purported 126:25
  127:5,7 290:5,13
purpose 11:9 66:25
  176:10 181:14

215:5,10 258:21
purposes 6:5 136:9
  206:10 221:7
  256:12
pursuant 6:7 42:20
pursued 239:12
push 62:6
pushing 121:25
put 21:23,24 33:21
  35:1 48:23,24
  49:2,3 66:23 78:5
  78:17 88:2,4
  97:10 99:13
  101:12,14 104:18
  105:9 121:21
  122:6 149:12
  152:25 160:14
  162:7 188:4 192:2
  209:4 214:20
  220:7
puts 85:15
putting 64:8,21
  107:17 175:23
pz3 239:2 273:17
pz7 239:2

**Q**

qar 109:3 114:2
qualification 10:1
qualified 12:7
  62:12 207:12
qualitative 263:12
  272:19,23 273:9
quality 109:2 114:2
  147:7,9
quantifies 123:19
quantitative
  263:12 272:19,23
  273:8,19 281:25
quantitatively
  290:16
quantities 178:9
  181:18 185:1
  189:7,8
quantity 177:18
  184:2 187:22
  193:11 195:18

**quarter** 196:16
273:1
**question** 6:12
10:22 13:15 16:5
18:17,25 22:9
23:10 24:21 25:6
25:14 28:4 32:1
35:17 37:14 44:4
44:7 46:7 49:12
59:17 61:20 66:9
68:16 69:23 70:4
71:2,15 76:23
77:24 84:4,16
86:14 89:10 90:2
91:11 95:1 98:7
102:10,19,22
108:3 119:19
120:10 121:3
124:1 127:20
131:8 134:24
135:25 136:13,15
136:16 138:4,5
143:18 144:20
150:15 151:18
154:19,23 162:12
165:10,13 167:19
168:9,11,16
169:15 180:1,4,9
183:18 184:6,15
184:17 187:21
188:8,10 191:22
192:14,17 194:21
198:9,13,17 201:3
203:22,24,25
204:11 205:14,15
206:7 208:6 209:6
211:2,3 223:12
225:18 226:2,13
233:25 234:2,5
235:23,24 237:5
238:20 240:3,19
240:20 248:23
249:9 250:7,9
255:17 258:7,10
258:16 266:12,17
266:20,25 267:18
273:8 278:21

279:2,3 280:22
281:15 285:18,19
295:20 297:10,21
300:9 302:12
304:21
**questioning** 25:17
39:5,23 51:24
154:9 208:5
229:25
**questions** 7:9 29:16
35:25 36:4,8
39:24 56:18 86:18
90:16 107:12
142:21 172:8
175:17,25 197:23
205:4 214:22
234:13 239:18
267:12 301:8
**quickly** 53:3,10
62:10 118:4 144:4
252:18 253:5
255:2 272:15
**quit** 42:14
**quotation** 150:8
280:11,14 287:17
287:22
**quote** 60:12 65:9
67:12 68:23 69:1
97:19 98:15,16
110:3 118:8 122:8
125:11,14 127:10
127:11,12 129:22
129:23 130:9,11
136:3,4 144:15
147:23 148:3
149:8,11,13,13,14
153:9,25 155:18
155:19,19,20
162:3 163:22,24
164:4,24 165:1,14
165:20,21,25
166:1,7 167:1,4
167:20,22 168:12
168:17,19,22,24
176:12 214:25
221:2 222:1,8
234:24,25 271:10

271:18,23 280:6,6
**quoted** 165:24
166:4 169:19
**quotes** 110:6 148:2
149:12
**quoting** 71:20
118:1 155:17

_____

## R

**radial** 173:13
**rafferty** 2:11
**rain** 285:17
**rained** 285:14,21
**rainfall** 252:25
254:14,18,25
255:7,9,11,12,24
256:15,21 257:21
258:5 287:11,15
**raise** 256:8
**raised** 254:24
255:25 256:20,23
**raising** 267:7,14
**ran** 16:10 18:3
123:22
**range** 36:23 37:17
38:4,9 47:15
299:18
**rapid** 275:11,13
**rapidly** 222:15
240:23 272:2,3
273:3,25 277:19
**rate** 277:22
**ratio** 34:15 191:9
194:23 195:6
222:4,4,17,19
223:16 230:16
232:22
**ratios** 223:10,20
241:4,12 273:1,6
273:13,24 274:8
**reach** 60:22 65:25
98:19 188:17
218:1
**reached** 221:1,5
222:15 293:22
**reaches** 292:22
**read** 20:19,24

21:11 39:19 42:18
50:12 69:19 70:11
71:5 72:4 74:10
74:18 75:6 84:16
111:13 146:22
147:3 148:9 162:4
164:5,17,20,23
165:3,20 166:25
167:3,6,10,11,15
167:17,19,24
168:17,22,25
171:11 174:5,21
175:1,7 196:25
197:3,25 198:18
205:14,15 209:21
210:4 234:12
252:16,17 264:1
266:4 282:18,21
282:23 283:17
297:9,20 299:1,21
**reading** 6:8 75:12
161:18 235:15
**reads** 109:20
170:10 249:18
**realize** 12:21 56:21
131:23
**really** 9:4 46:8
75:16 151:6
191:12 206:9,12
275:1
**reanalysis** 292:9
**reason** 22:2 23:3,12
23:15 35:17,20
47:17 56:14 73:14
84:5 90:15 146:25
150:7 200:24
248:3,9,13 258:15
287:21 295:19
300:24
**reasonable** 291:21
**reasonably** 290:8
293:19 298:23
**reasons** 26:16
34:12 87:8
**rebuttal** 52:18 53:5
55:1 62:14 67:5
68:15,19 71:19,22

72:2,19,24 74:9
80:20,20 83:15
98:25 101:19
107:6,12 116:14
117:10 125:19
133:19 144:10
147:20 149:8
153:9 163:10
165:25 166:20
176:11 190:23,25
196:23 212:17
214:8 224:21
234:7 240:22
246:8 252:11
282:17 283:18
**recall** 22:8 46:3
48:8 57:21 66:20
76:13 79:4 91:22
92:3 143:6 145:24
148:15 167:13
180:12 205:3,24
207:18 209:14
211:13 235:6
255:18 259:3,8
260:12,22 261:3,7
286:5,7,9
**receding** 221:11
**receive** 67:21
212:10
**received** 31:12
52:17,21 105:20
109:20 212:25
242:17 260:18
**recess** 50:1 92:18
175:14 214:5
249:24 288:16
**recognition** 289:11
289:20 292:1
**recognize** 158:13
179:19 290:1
**recognized** 12:9
273:20
**recollection** 143:7
180:19 237:19
**recommendation**
157:19,24 158:7
**record** 20:18 26:3

ROBERT G. BEA, PH.D.                                        April 16, 2012

42:1,3 71:4 75:24
85:5 94:13,16
97:10 99:4 103:5
103:9,10,12,21,23
104:5,15,16,20
107:10,18,20
115:12 138:10
140:18 141:18,19
154:21 167:17
175:23 192:2
209:16 237:6
241:22 250:5,8
252:6,6 259:7
265:1 283:24
294:25
**recorded** 70:5
**records** 264:22
272:12
**recounts** 143:19
**recreation** 284:18
**red** 78:9,15,17
81:23 82:8 111:10
111:17
**reddish** 219:9
**refer** 46:4 59:1
81:13 83:12 102:5
117:23 120:2
124:13 142:22
143:20 147:19
159:15 160:4
161:14,17 162:18
170:22 200:25
209:15 214:14
225:25 226:11,23
227:23 258:18
269:3 303:20
**refereed** 303:12,20
**reference** 118:16
139:13,24 150:3
165:8 168:5
185:15,17 240:11
272:22 297:15,25
298:11
**referenced** 101:12
139:6 164:8 206:4
232:10 251:9
298:5 301:24

**references** 16:2
37:5,24 44:16
100:14 101:7
156:1
**referencing** 129:4
139:16 233:16
**referred** 73:5 83:13
99:19 100:18,19
100:24 101:4
111:8 119:10
135:19 156:6
158:21 200:24
206:8 261:4
**referring** 20:2,6
34:9 35:7,16
53:25 63:4 76:6
80:24 82:13 83:20
84:19 89:21
116:13 117:6,7
118:14,22 125:24
126:17 127:21
130:16 136:18,20
152:12,13 157:3
171:20 202:4
206:2 212:19
230:25 244:24
255:8,12 258:19
275:22 277:4
283:10 296:23
300:13
**refers** 142:25 143:1
**reflect** 104:6
196:13 209:17
256:21 271:7
**reflected** 216:4
223:4 269:17
271:3 272:13,15
**reflecting** 239:3
256:11
**reflects** 196:13
**reform** 10:22
**reformed** 122:12
**reframe** 198:16,17
**regard** 58:16
301:24
**regarding** 52:16
68:24 71:10

141:10 270:10
296:19 302:16
303:13
**regime** 209:25
245:17,21,24
**region** 217:9
**regular** 274:22
**rejected** 94:9
**relate** 224:11
**related** 12:17 16:2
143:15 171:22
307:14
**relationship** 251:6
**relative** 73:7 75:3
191:7 193:18
194:8 254:1
292:11
**relatively** 199:22
290:21
**relax** 41:16
**relevant** 110:21
238:15 304:2
**reliable** 277:4
**reliance** 19:2 54:24
55:18 56:2,7 57:1
58:3 68:3 72:3,20
92:22 93:2 94:9
99:11,12,13,18
100:7,9 101:1,14
101:18 105:23
106:6 114:9
125:18 130:21
145:14 156:13
164:8 165:8 168:5
200:5 239:16
**relied** 9:21 10:7
93:7,14 99:23
130:8 168:21
177:3 213:12
281:4 282:11
**relies** 290:21
**relieving** 205:19
**rely** 7:19 94:8,20
98:18 105:15
145:8 165:21
168:18 236:24
237:5 279:15

**remain** 73:8 230:16
257:25
**remained** 256:18
**remaining** 291:17
**remediation** 62:8
106:4
**remember** 49:12
97:9 138:23 141:8
141:14 158:1
159:11 178:25
205:9 285:24
**removal** 109:8
110:2 111:9
132:23 133:22
**removals** 130:12
133:22
**removed** 109:10
**rendered** 259:25
**repeat** 10:22 18:17
66:9 68:16 91:11
93:18 98:7 120:10
223:12 304:21
**repeated** 288:21
**replied** 124:6
**report** 8:15 12:5
15:6 19:2 48:8
52:18,22,25 53:6
54:14,25 55:1
58:4 59:3 62:14
64:15 65:8 67:5
67:10 68:15,20
71:19,22 72:2,20
72:24 73:18 74:9
74:10,16 75:1
76:8 77:22 80:20
80:21 83:15 87:16
89:21 97:17,24
98:25 100:1,7,15
100:24 101:2,5,19
103:18 107:6,7,8
107:13,14 109:3
113:21 116:14
117:10 118:17,18
119:18,22 123:17
123:23 124:13
125:19 126:2
127:3,4,10 128:2

128:19 129:20
130:7 131:4
133:17,18,19
142:24 143:25
144:7,10 146:2
147:20 148:16,22
149:1,3,8 150:25
153:9,11 155:8,15
157:17,19,24,25
158:7 159:1,4,8,9
159:12,16,19
161:15 163:10
165:25 166:20
169:2,18 171:1
176:11 177:22
190:23 191:1
196:23 206:4
212:17 213:2,3
214:9 220:9
224:21,21 232:5
234:7 236:11,17
236:19 240:23
242:4,12 246:9
249:12 250:25
252:11 255:8
260:24 263:18
264:8,14 267:25
268:4 272:21
273:16 282:17
283:2,7,19 284:19
286:1 299:13
301:23
**reported** 1:23
58:24 222:16
265:12
**reporter** 1:25 6:23
104:8 176:2 193:4
307:3,25
**reporters** 234:15
307:1
**reporting** 287:4
**reports** 9:23 18:14
31:15 52:17 114:3
114:8 190:1
200:22 201:4,6
202:6 206:6
255:15 280:5,25

ROBERT G. BEA, PH.D.

April 16, 2012

Page 336

282:18 283:14
300:5
**repository** 141:25
**represent** 19:6
22:13 54:15
141:18 155:1
186:8 190:7 195:7
219:1,2 265:2
**representation**
142:13
**representative**
234:24 261:25
262:21
**representing** 2:2
3:1 4:1 94:4 97:3
195:8 210:18
**represents** 195:4
**request** 84:6,8
241:23
**requested** 58:2
89:14 93:19
107:22 242:19
**requesting** 88:9
92:11
**require** 34:13
301:1
**required** 40:4
253:7,12 289:15
290:15,22 305:18
**requirement** 125:2
188:22
**researched** 154:8
**reserve** 71:24
198:10
**reserved** 6:13
**reservoir** 269:7,9
**resided** 66:20
**resistance** 289:22
**resolved** 52:19
**respect** 63:15
**respond** 18:25 46:6
64:16 81:11
107:18 154:8
**responded** 89:17
**responding** 239:7
**response** 38:2 62:7
224:1 242:17

248:8 276:2
**responses** 274:11
274:13
**responsibility** 71:9
**responsible** 67:17
302:20,24
**responsive** 25:5,6
135:1,6,9 243:22
248:5,6,20 249:6
267:15
**responsiveness**
6:12
**rest** 39:9 252:17
297:9 299:22
**restate** 32:1 69:25
**result** 30:3,15
44:22 45:8 118:7
122:1 201:6 215:7
218:4 219:15
223:14 256:14
258:4 278:1,3,5
307:16
**resulted** 45:9 145:6
**results** 10:13 11:3
11:15,23 27:17
127:2 147:24
161:24 162:1
165:4 168:1 197:9
197:14,19 198:21
199:23 220:23
232:8 242:14
273:10 289:8
292:25 294:2,13
294:18 299:15,16
**retained** 302:4,10
302:14 303:9,17
**retract** 85:1
**retrieved** 276:5
**return** 242:18
**returned** 58:1
**returning** 209:18
**reveals** 163:19
**reverted** 225:8
**review** 37:24 53:4
53:10 63:20 72:12
101:8 114:7 128:9
128:12 131:12,19

140:1 158:10
163:19 166:21
303:25
**reviewed** 72:14
130:18 131:17
157:23 158:3,6
**reviewing** 304:6
**revisions** 73:10,13
**rewritten** 173:18
**richter** 2:17
**right** 8:12 9:19,23
10:8,19 11:3,7,13
11:19 12:2,12,23
14:11,19,24 15:7
15:13 16:4,14,20
16:24 17:8,23
18:2 21:9 24:4
26:14,20 29:2,20
30:17 31:3,9,23
32:19,24 33:2,22
34:2 36:16 41:17
42:6,20 43:7
44:23 47:8 49:9
50:25 51:8,12
57:18 59:3,9,14
60:8,18,25 61:7
62:16,19 63:18
64:3,11 68:15,20
69:4 71:24 72:24
73:11,25 74:4
75:6 76:8 78:11
81:21 86:21 87:20
90:6 97:21 98:3
98:12,16 105:5
111:22,22 113:8
113:13 115:18
116:1,22,24 119:1
120:17 121:6
123:12 125:8,14
126:11 129:1,18
129:25 130:13
131:23 133:5,14
134:3,7,11 136:4
136:23 137:4
144:21 145:14
151:4,13,25
155:21 156:14

157:20 158:4
159:5,14,16,19
160:5,18,21
161:11 163:14
169:7,24 172:22
173:3,8 174:18
175:3,9 183:16
191:11 192:25
194:15 216:9,22
218:14,23 219:7
219:10 227:25
242:11 245:7,9
257:17 259:20
274:15,20,23
278:4 298:13
303:16 304:2
**righthand** 49:25
50:7,20 57:24
161:4 170:16
196:2
**rights** 26:10
**rigidity** 170:13
174:7
**rise** 224:18 256:19
**rises** 250:16 251:2
**rising** 222:10,23
223:14 240:25
255:9 256:11
**river** 97:18 106:3
227:7,15 243:17
284:6
**road** 78:2 98:2,11
119:12 160:12,15
284:9
**robert** 1:19 7:1
306:3,11
**robin** 4:3 97:13
175:21
**robinson** 15:18
97:9 128:20 201:8
300:6
**rock** 37:19 174:7,8
174:9,12
**rogers** 9:22 10:1,4
10:6,11 11:1,16
11:24 24:1 27:9
28:1,25 29:23

68:1 88:14 90:19
148:5,13,19 210:6
210:16 211:9
212:15 213:2,3,6
213:8,12 215:3
**role** 238:24 239:5
294:14
**rose** 220:19
**rpr** 1:24 6:22 307:2
307:24
**rule** 25:15 26:4,11
26:18 42:20 56:19
56:19 143:19
**rules** 6:6
**run** 12:22 13:7,10
13:18 14:22 15:5
15:11,16,22 18:1
22:19 30:25
123:24 255:20
**rune** 59:7 62:10
68:6
**running** 32:7
283:25
**runs** 16:19 18:6,18
18:20 19:3,4,22
31:7,20 32:22
**rupert** 4:4

**S**

**safer** 33:2
**safeter** 33:5
**safety** 33:2,8,9
211:25 233:8
299:14 300:3
**saline** 218:8
**salinity** 269:25
271:8
**sample** 24:13 257:4
**samples** 234:10
276:5
**sampling** 136:9,18
138:17
**san** 42:12
**sand** 92:16 97:18
97:25 98:8,15,21
100:9,19 101:17
104:23 105:11,16

ROBERT G. BEA, PH.D.                                        April 16, 2012

106:3,17 108:6,9 108:17 109:20 111:4 115:17,20 115:23 116:5,20 116:21 205:18 206:1,3,5,24 207:3,4,5,8,19 208:14 209:4,7 210:16,20,21 212:9 239:3,10 243:12,17 246:3 257:10 284:6
**sands** 48:25 49:9 238:6,9,11,13,14 238:23 243:18 244:5 245:25 257:18
**sandy** 88:4 92:10 119:15 123:20 255:1 257:2,18 284:8
**satisfactory** 271:11 271:19
**satisfy** 34:14 184:11 185:5,21 186:21
**saturated** 35:10 36:16 38:24 81:2 82:17 83:2,18 84:2,23 85:11 89:6 91:5,16 170:17,18 175:4,4 180:25 225:8,9 227:14 230:13,19 231:12,20 253:11 253:16,23 256:14 257:20 258:4 275:16,24 277:24
**saturation** 34:15 179:25 222:6
**saturations** 241:4
**saucer** 76:23 77:7 77:10,14 79:20 80:17 82:22 83:11 114:24 115:1,17 115:18,20,25 116:6,21 117:1

**save** 6:8,11 51:16 234:14
**saw** 138:22 242:2 243:13 273:2
**saying** 13:24 44:3,6 50:9 63:7,11 87:17 116:19 121:5 123:22 124:17 148:24,25 154:3 233:22 262:3
**says** 20:9 42:19 67:11 71:11 76:15 77:10 78:5 92:15 100:17,25 109:10 109:15 110:1,4 112:10,11,14,19 112:22 113:2,18 113:22 115:23 117:22 134:11 136:3 167:18 171:2,7 173:12,16 175:6 209:23 225:2 228:23 235:16 249:15 260:13 276:13 280:14 285:7 296:18 299:18
**scale** 38:8 51:20
**scan** 161:11
**scheduling** 71:20
**schleifstein** 153:22
**schmertman** 162:20,25 163:5
**schultz** 2:12 40:3 41:5,7
**scientific** 7:11,13 7:18,18,23 10:12 10:12 11:2,22 59:14,22,25 60:4 60:6 254:22 255:23 256:3 270:17
**scientifically** 8:12 9:19 12:11 270:11 277:3
**scientist** 12:6,8

23:25 27:7
**scientists** 29:6 59:21
**scott** 2:5 26:7 39:14 41:23 57:1 66:21 67:20 103:4 104:3 152:20,22 191:21 248:5 258:13
**screen** 17:16,21 19:12,17 20:3,15 21:12 22:18
**screened** 239:14
**sealed** 137:7
**search** 237:21
**seated** 66:21
**second** 11:19 44:20 45:24 48:2 68:23 100:13 101:3 109:6 117:10,19 117:23,24 129:21 161:18 171:7 175:2 193:20 197:25 201:8 208:20 221:25 224:10 228:21 245:21,24 277:23
**secondly** 231:23
**section** 65:15 77:14 79:24 113:1 124:12 126:3 146:4 150:24 151:8,20 152:2,4 152:15,17 164:22 166:9 201:10 237:3 260:8 264:1 264:2,5,11
**security** 140:3,11
**see** 19:8,23 20:11 20:14 21:6 29:17 32:4 37:14 38:1 46:19 54:8 55:11 55:15 58:19 60:5 65:15 67:15 69:2 78:2,8 81:4 83:8 95:4,5 100:18 102:3 106:9 109:21,24 110:7

110:16 112:4,7,8 112:22 113:3 115:17 116:10,20 119:9 127:15 129:12 134:9 138:7,21 144:17 149:15 154:10 159:22 160:15,20 161:1,12,21 172:14 173:10 194:23 218:24 219:7 240:10 246:18 249:9 260:8 271:14 275:20 295:6 302:22
**seen** 18:5 68:7 109:4 125:23 138:16 172:18 284:22
**seep** 13:19 14:24 16:20,23 17:4,18 30:15,25 31:7,12 32:7 133:13 176:6 177:10,17 178:12 178:24 179:2,5,8 179:16 180:5,9 181:4,11 205:13 214:3 232:21 233:4 253:21 254:3,7 255:20 274:5,19
**seepage** 177:18 178:9 189:8,8 193:10 206:25 217:2,5 233:19,23 246:23 261:14,18 261:20 262:4 265:14 278:2,5,6 278:10,12 293:14 299:8,10
**segments** 74:17 290:6
**selected** 10:14 11:6 232:5
**selection** 195:11 296:24

**seminar** 304:23
**sense** 28:12 51:23 74:22 84:10 88:11 88:21,22,23 89:1 131:9 303:18
**sensitive** 34:18 219:22 220:20
**sensitivity** 219:21
**sent** 54:15
**sentence** 109:23 118:15,22 127:18 129:21 144:5,14 161:18 166:8,11 166:19,21,22,23 169:3,18 170:10 170:25 171:7 175:1 197:4,25 209:22 221:25 246:14,18 249:18 252:12,16 280:4 283:17 294:8 297:9 299:18,22
**sentences** 170:22
**separate** 150:8
**separately** 216:15
**separation** 289:7 290:13
**sequence** 65:12 177:4 293:16,18
**sequential** 220:24
**series** 65:21 66:1 138:25 206:6 218:21 220:13
**serve** 181:20 258:23
**served** 10:3
**services** 10:7,11 11:1 14:9,17,18
**session** 17:4
**set** 179:22 199:21 201:3,8 207:9 210:16,18 238:12 242:3,11 252:1 261:24 262:2,23 262:25 269:16 307:7
**sets** 34:20 57:23

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

199:18,23 200:14
201:4,5,6 228:25
**setting** 262:7,8
303:9
**settled** 219:18
**seven** 295:3
**severity** 290:25
**sewer** 77:6
**shaded** 98:20
**shallow** 243:11
**shallower** 85:20
265:3,18
**shear** 44:2 161:21
161:23,25 162:8
162:22 163:1,6
230:19 231:4,8,12
231:20,24 232:12
232:17 235:4,14
241:16,25 250:2
251:2,11,15,16,20
291:16
**sheared** 246:6
**shearinduced**
231:1 233:4 246:4
**shearing** 219:22
**sheet** 20:7 122:5,18
127:5 182:12,20
211:9,13,15
218:24 261:17
262:9,19 289:12
289:18,18 291:18
298:21 300:20
301:3
**shell** 118:4,13,21
119:4,9,14 120:8
120:12,16 121:6
122:4 252:15
253:4,10,19 284:9
**shells** 119:10,10
**shelly** 88:5
**sheng** 163:24
**sher** 2:17
**sherman** 246:21,25
247:9,17
**shoring** 289:23
293:10
**short** 287:3

**shorter** 217:14
**shortest** 188:4
**shorthand** 307:9
**shortly** 62:3,3 64:9
**shortterm** 231:17
**shot** 19:17 21:13
22:18
**shouldnt** 54:10
**show** 19:15,16
30:22 36:22 38:9
47:22 75:3 76:2,4
77:13,18 80:9
100:19 128:15
138:14 151:10
153:24 160:8
161:9 164:15
165:23 170:2
178:3 182:11
193:21 215:6,12
**showed** 97:12
119:8 173:13
181:22 291:2
**showing** 74:2
**shown** 20:15 34:1
43:5,10 67:18
77:23 78:6,23
79:6,9,16,21 80:1
80:3 81:7,23,25
82:3 85:8 89:16
101:10 132:7
185:11 212:16
216:1,3,9,12
217:1,18,21
249:11 270:7
284:12 285:4
288:5,12
**shows** 37:17 138:22
151:13 160:11
163:3 173:19,25
174:1 237:8
246:13 271:4
282:13
**shuey** 7:2
**side** 38:3 55:24
57:25 78:18,18
94:21 109:19
121:20,24 123:4

123:11,17 126:13
129:24 132:23
160:12,15,24
161:4 176:15
191:15 196:2
202:13 203:10
204:2,13 214:2,16
215:2,7 219:11
221:13 222:14,22
222:25 223:11,15
223:17 241:13
243:6 250:15,16
251:2,4 287:24
288:4,10 289:9,21
290:5,20 292:4
**sigma** 178:22
**signals** 284:5,11
**signed** 260:24
306:11,13,15
**significant** 30:22
34:14 73:7 132:14
133:21 179:24
194:15 197:19
198:21 199:25
222:3 231:12
261:14 265:14
273:6 289:6,8,20
293:6
**significantly**
187:14 201:22
202:1 205:2
223:20 241:3
269:22 272:10
**signing** 6:9
**silt** 49:8,8
**silts** 49:1
**silty** 249:11,15,19
**silva** 34:25 36:15
38:18 44:21 47:6
51:12
**silvatulla** 4:12
30:20 35:13 47:19
51:15 288:20
293:1
**similar** 24:17
156:23 242:22
245:15,16 247:1,5

247:21 287:23
**similarities** 243:8
**similarly** 80:17
100:1 122:15
134:5 150:8 225:5
234:3
**simple** 28:20
235:24
**simpler** 165:14
168:12
**simplified** 183:6
187:4
**simply** 27:5 127:20
164:25 165:1
167:21,22
**simulated** 207:5
**simulating** 213:9
**simulation** 208:5
**simulations** 226:12
**single** 164:4 262:12
264:2 286:3,11
**singular** 260:13
**sink** 173:17
**sir** 10:2,5 11:8,14
14:12 28:14 36:14
51:4 55:8 60:16
65:16 66:9 67:16
68:21 69:3,5
74:23 75:7 77:16
78:12,14 80:22
81:5 82:10 83:7
88:24 92:17 95:8
102:8,14 105:2
108:25 109:22,25
110:8,13,15,19
111:18,25 112:7,9
112:15,24 113:4,9
117:17,25 118:10
120:14 125:5,9
127:16,19 129:13
130:14 133:15,20
139:4 145:12
146:3 147:22
149:16 151:2,5
152:1 155:4,16
158:2 159:2,6,13
159:24 160:6

161:22 162:5
163:13,15 166:18
173:2,11 175:24
178:1 195:2 196:4
196:24 197:22
202:12 210:5,9
214:10,12 217:13
217:16 218:25
226:14 234:8,17
236:17 237:13,23
241:20 245:10,18
246:19 251:13
268:7 271:15
277:6 280:1
283:22 288:15
296:17 297:11
299:19 301:9
304:3
**sit** 186:1 208:13
226:18
**site** 24:2 27:6,9,20
27:24 29:2 30:12
30:13 62:8,9,25
72:1 78:11 80:17
81:12 82:22 83:11
85:20,22 89:1,20
91:23,24 99:21
105:19 118:3
119:13,15,24
120:9,13 127:11
127:21,22,24
128:18 133:8
134:6 135:14
140:10 144:16
160:4 204:15
242:21 243:17
246:25 247:10
252:14 258:21,24
261:23 266:8
284:1,7,13,23
**sites** 10:13 11:6
91:19 92:3 95:15
116:25 120:17
141:10
**sitting** 85:24 86:6
87:9 117:2 152:20
285:24

ROBERT G. BEA, PH.D.

April 16, 2012

| | | | | |
|---|---|---|---|---|
| **situ** 162:1 | 69:9 76:11 81:1 | 291:17 | **speaking** 26:1,7,21 | 31:14,23 32:23 |
| **situation** 174:18 | 82:16,25 83:17 | **soilwater** 23:7 | 94:6 126:8 286:16 | 48:1 106:24 |
| 245:15 | 84:21 85:9 90:23 | **solely** 97:5 | 304:4 | 197:18,20 198:4 |
| **six** 58:12 283:21 | 107:12 110:22 | **solid** 222:5 | **special** 170:12 | 198:22 199:7 |
| **sixteen** 151:24 | 231:5 | **solution** 163:17,19 | **specific** 8:6 9:13 | 200:6,9 204:20 |
| **size** 145:10 183:10 | **software** 15:3,11 | 169:20 170:11,24 | 16:16 24:2 27:6,9 | 233:7 238:17 |
| 183:12,22 186:14 | 15:16,22 16:16 | 171:8,14 172:2 | 27:21,24 30:12 | 250:2,12 251:10 |
| 188:5 191:10 | 21:20 181:5 274:6 | **solutions** 173:9 | 74:17 84:5 87:2 | 251:20 261:21 |
| **sizes** 142:20 188:13 | **soil** 8:24 9:14 24:7 | 271:12,19 | 88:25 89:1,20,20 | 289:1,24 294:6,11 |
| **skeleton** 24:8 52:13 | 37:19 44:2 47:25 | **solve** 27:2 174:10 | 98:18 99:21 116:8 | **stage** 199:16 |
| 244:17 | 79:10 109:9,11 | **solved** 219:5 | 142:19 190:13 | **stages** 199:15 |
| **skills** 60:14 | 123:7 163:20 | **somebody** 25:12 | 211:18 215:15 | **stake** 203:16 |
| **skim** 144:3 | 169:6,11,20,24 | 151:6 | 273:23 | **stand** 134:13 |
| **skip** 110:4 241:1 | 170:5,18 175:5 | **soon** 58:1 | **specifically** 6:10 | 237:13 |
| **slightly** 13:5 | 179:13 180:6 | **sorry** 23:19 32:15 | 34:9 72:6,10 81:7 | **standard** 10:12 |
| **slope** 31:13,14,20 | 215:6 217:20 | 49:13 50:11 | 83:20 84:8 85:4 | 11:2,22 29:5 |
| 31:23 32:22 48:1 | 221:22 222:4,4 | 112:25 151:12,18 | 91:22 107:21 | 44:11,17 45:18,21 |
| 133:14 | 224:2,25 225:12 | 195:24 196:11 | 124:4 127:4 | 151:3,8,13,20 |
| **slopes** 129:24 | 225:13,19,22 | 216:13 246:7 | 138:24 143:1 | 153:8 155:18 |
| **slow** 35:22 36:2 | 226:17 231:9,16 | 279:20,23 | 153:13 180:20 | 156:23 157:16 |
| **slug** 148:2 | 231:25 233:2,21 | **sort** 178:23 | 187:9 189:12 | **stands** 292:24 |
| **small** 22:2 132:4 | 236:8 241:8 | **sorts** 179:16 | 192:20 197:25 | **stark** 4:13 30:20 |
| 133:3 148:2,3 | 244:17,22 257:6 | **sought** 6:15 | 202:4 205:9 | 292:24 |
| 149:12,12,13,13 | 279:18 280:7,19 | **sound** 47:14 | 207:22 208:16 | **start** 45:13 81:22 |
| **smaller** 187:14 | 282:14 283:4,15 | **sounded** 93:13 | 216:18 239:18 | 176:4 288:25 |
| 217:15 218:17,18 | 289:22 290:21 | **sounds** 238:21 | 304:16 | 302:12 |
| **smallest** 276:17 | 293:11 300:16,18 | **source** 43:3,18 | **specification** 254:9 | **started** 62:22 64:13 |
| **smith** 4:3 5:5 93:6 | 300:19 | 173:17 289:15 | 262:3 | **starting** 151:15 |
| 93:23 94:3 95:22 | **soils** 8:6,7,10 9:13 | **sources** 66:6,15 | **specified** 46:3 | **starts** 126:5 175:1 |
| 97:1 175:18,21 | 9:15,18 11:18 | 71:23 72:7,7,15 | 182:25 226:12 | 246:15 |
| 188:9,15 191:20 | 12:1,2,8 14:15 | 72:18 272:11 | 254:7 | **state** 6:23 14:23 |
| 192:5,12,24 193:5 | 50:6 121:23 132:1 | **south** 29:1 30:13 | **specifies** 156:23 | 16:24 17:13,14,22 |
| 198:15 203:23 | 138:17 160:2,9 | 58:13,14 79:18 | **specify** 183:22 | 18:4,8,21 19:9 |
| 206:20 214:6 | 161:25 162:23 | 80:5 82:20 84:14 | **specifying** 255:19 | 65:7 75:2 80:23 |
| 226:15 240:6,8,17 | 163:6 180:14,20 | 89:18 92:24,25 | **speculate** 185:7,12 | 97:18 125:6,10 |
| 240:21 248:4,10 | 180:22,25 189:10 | 98:3,11 120:6,9 | 185:13 188:21 | 129:21 147:23 |
| 248:15 249:1,7,25 | 189:12,15,21 | 120:13 125:22 | 288:7 | 169:19 176:11,20 |
| 250:6 252:9 | 204:23 205:6 | 126:1 161:12 | **speculation** 7:20 | 176:25 177:1 |
| 258:11,17 266:14 | 222:11,24 223:10 | 181:12 199:14 | **speculative** 8:3 | 211:1 220:9,25 |
| 266:19 267:1,9,19 | 223:16 224:15 | 220:11 289:25,25 | **spending** 41:24 | 221:3,6,7,14,25 |
| 274:4 279:1,6,12 | 225:6 226:22,25 | 290:7,17 291:5,14 | **square** 21:14 30:6 | 222:15 228:2,6,7 |
| 279:24 280:2,13 | 232:12,25 241:12 | 291:19,19,19 | 69:18 | 228:9,13,15 229:3 |
| 281:7,9,14,18 | 243:5 256:13,25 | 292:19 | **squared** 47:13 | 229:5,6,10,12,16 |
| 282:4,9 288:17 | 257:4,13,19 258:4 | **speak** 71:5 172:5 | 48:21 50:23,24 | 229:19 230:6,8 |
| 295:8,14,25 296:7 | 273:23 274:7 | 176:1 | 51:6,7,13 | 233:19 238:2 |
| 296:13 298:12 | 277:24 281:10 | **speaker** 304:5,17 | **st** 2:13 | 239:21 240:23 |
| **socalled** 59:5 61:12 | 282:11,13 284:14 | 304:24 | **stability** 14:10 | 264:18 272:1 |

JOHNS, PENDLETON COURT REPORTERS

504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

282:17 307:3
**stated** 38:4 90:19
 94:6 99:17 128:6
 224:20 270:21
 271:17
**statement** 25:1
 34:23 69:18 73:15
 122:13 126:9
 136:7 176:17
 184:8 197:24,24
 198:18 204:17
 209:18,20 271:14
 271:22 275:1,3
**states** 1:1 4:1
 156:16 175:21
**static** 269:2
**stating** 148:11,17
 156:3,16
**station** 4:7 77:7
**status** 130:10
**statute** 157:4
**stay** 281:19,23
**stayed** 221:10
**steady** 14:22,23
 16:24 17:6,10,13
 17:22,22 18:4,7
 18:21 19:9 23:5
 34:12 90:24 148:7
 148:14,20 149:6
 149:13,22 150:1,6
 150:12,17 176:20
 176:23,25 177:5
 179:23 184:25
 220:25 221:3,5,7
 221:14 222:1,15
 224:22 225:3
 227:23,25 228:2,2
 228:5,6,9,13,15
 228:18 229:2,2,3
 229:5,6,6,10,11
 229:12,16,18,19
 229:22 230:4,6,7
 230:9 233:19
 238:8 270:9,16
 273:15 276:8,14
 276:19,23 277:12
 292:2

**step** 28:23 65:23
 231:22
**stepbystep** 236:12
**steps** 255:19
**stipulate** 53:21
**stipulated** 6:2
**stipulating** 96:16
**stipulation** 7:3
 96:11
**stone** 1:20 3:3
**stop** 39:13,14 70:10
 159:10
**stopped** 190:24
 258:12
**storage** 12:1,7,10
 12:16 23:25 24:8
 24:16 27:8,15,20
 27:25 29:1,4,22
 34:16 171:18
**storesund** 59:8
 61:11 62:10,11
 64:7,20,23 65:25
 67:9,20,25 68:6
 68:13,19 69:6,12
 71:9 72:12 75:21
 88:14 114:5,14
 236:14,15,18
 237:2,4,7 260:5,6
 260:19
**storm** 31:9 43:22
 210:2,14
**story** 217:4
**straight** 8:15 83:23
**strains** 219:22
**stratum** 219:8
**street** 1:21 2:6,20
 3:5 37:3,17
 219:14,17
**strength** 47:25
 161:21,24 162:9
 163:2 217:7 219:5
 219:20 231:4,8,12
 231:20,24 232:12
 233:23 235:5,14
 241:12,16,16,17
 241:19,25 250:2
 250:13 251:3,15

251:16,20 291:16
 294:6,11,20
**strengths** 44:2
 161:25 162:22
 163:6 241:14
 251:11
**stress** 164:1 170:15
 178:21 179:6,8,11
 221:21 222:21,24
 223:3,3,5,6,9,14
 230:12 231:6,7,11
 231:15,19 232:2
 232:16,17 235:4
 235:12 250:20
 294:6,10
**stressstrain** 234:18
**stretching** 98:1,10
**stricken** 96:2
**strike** 32:15 90:14
 107:13 138:9
 154:12 252:2
 282:5
**structure** 76:17
 77:2 87:23 129:23
 132:24 175:10
 210:1 221:22
 244:23 293:11
 300:16
**structures** 133:1
 299:11
**student** 14:17 15:2
 15:10,16,22 16:18
 30:25
**studied** 79:25
 221:23
**studies** 16:2 55:22
 56:2 201:13,16
 208:15,23 209:1
 212:13 213:16
 220:17
**study** 91:23 153:23
 170:20 171:3
 174:20 206:10,21
 212:24 237:1,3,8
 237:11,14,17
 241:18 242:5
**stuff** 41:23

**sub** 12:11,15,17
 19:14,24 21:7
 22:2,19 23:24
 24:6,15,17,18
 27:7,15,16,17,19
 28:13,15 29:8
 30:12,22 31:6
 32:14 33:16,20
 34:16 35:7 36:25
 37:18 38:4,10
 44:8,11,18,22,25
 45:9,15,17,22,25
 46:18 47:11 48:12
 48:15,25 50:5
 51:6,11,23,24
 52:9,9 171:22
 224:14 227:1
 297:1
**subject** 121:2
 292:10
**subjects** 145:2
**submitted** 58:5
 123:18 300:6
 302:11,15 303:2
 303:19
**subsequent** 74:16
 128:10 291:13
**subset** 20:14
**subsets** 17:12
 176:24
**substantially** 212:1
 263:8 288:11
**substantiate** 293:7
**substantiated**
 239:23
**substantiation**
 293:9
**suction** 179:20
**sufficient** 241:1
 272:8,24 273:11
 286:13
**suggest** 220:2
**suggested** 124:9
**suggesting** 204:21
 216:13 218:16
**suing** 305:11
**suite** 2:13 15:4

289:23 293:10
**suited** 178:23
**summaries** 105:18
 105:20,23
**supervision** 307:10
**supplemental**
 177:22
**supplied** 213:7
 239:11
**supply** 48:14
**support** 99:16
 130:3 132:25
**supposed** 75:18
 76:2 79:1
**sure** 13:23 26:3
 29:16 40:16,22
 47:19 51:1 53:4
 59:12 80:11 81:20
 121:5 139:21
 140:1 155:10
 169:16 211:5
 214:13 223:1
 227:6 240:3
**surekote** 78:2 98:2
 98:11 119:11
 160:12,15 284:9
**surface** 180:23
 198:5 202:15,16
 210:20 217:22
 218:6,9,22 252:22
 253:2 254:1,6,6
 254:16,20,21,24
 255:3,3,5,10,17
 255:20,25 256:6,7
 256:18,20 257:6,8
 257:24 266:1
 268:13 276:1
**surficial** 257:13
**surge** 31:9 43:23
 209:25 220:12,14
 220:15,16,19
 221:16 222:13,23
 223:14 224:18
 240:25 255:9
 290:18 291:1
 297:8
**surprise** 21:22

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

**surprising** 90:22
**surrounding**
  201:19 204:19,24
  205:6 208:18
  211:20
**surveying** 291:12
**swampmarsh**
  24:11 34:10 52:7
  52:11 81:3 82:18
  83:3,19 84:3,12
  84:24 85:12,16,20
  87:5 88:3 89:6
  91:6,17 92:2
  148:6 176:14
  180:2 184:7,22
  185:10 188:13
  189:16 194:12
  195:9,12,15,21
  196:2,6,11,18
  201:25 214:16
  215:1 219:19
  224:9 225:4 232:3
  232:25 234:11
  235:6 241:2 247:2
  249:19 263:10
  265:20 266:5
  272:5,9,17,25
  273:5,12
**swing** 216:9
**swiss** 59:5,12 60:24
  61:12 69:9 73:17
  76:11 77:15
  110:22 130:19
  145:6 261:5
**switching** 120:5
**sworn** 7:4 307:6
**sykora** 155:9
**symposium** 302:16
  302:21 303:3
  304:1
**symposiums** 303:6
**synthesis** 292:17
  293:15
**system** 24:12,12
  62:12 87:8 88:4
  139:14,20 170:20
  173:7,13 214:17

221:22 244:17,17
  247:23
**systems** 77:20
  298:22

—— T ——
**table** 87:6,11
  283:25 284:24
  285:22 286:3,12
  286:14 287:1,24
  288:3,12
**take** 28:23 29:22
  32:12 47:7 63:23
  78:17 81:12 82:11
  84:17 86:11,16
  96:11 105:6 108:3
  146:18 157:13
  172:3 188:16,25
  189:22 216:20
  218:11 245:14
  262:2 282:8
**taken** 6:5 19:22
  94:18 99:21 130:5
  146:10 163:21
  167:2,4 169:21
  174:4 306:25
  307:8
**takes** 127:6 291:7
**talk** 34:24 60:3
  182:10 247:4
  272:3
**talked** 33:18
  105:16 118:25
  199:15 272:2
**talking** 18:13 36:12
  81:14 99:6 113:2
  115:9 119:23
  132:20 169:17
  192:19 203:16
  208:2 240:7
  256:19 258:1,3
  264:2 267:13
  278:11 283:25
**tallies** 105:21
**tangent** 235:12
  250:21
**taught** 146:15

**team** 10:14 11:7
  40:11 65:23,24
  143:11
**tear** 289:16
**tearing** 127:5
**technical** 60:12,20
  60:21 218:7
**telephone** 3:14
  161:9
**tell** 8:19 21:7 38:16
  46:9 47:7 48:10
  54:19 55:20 58:7
  58:21 61:21 73:9
  75:17 76:1,3,7
  77:1,6 79:20 81:6
  82:22 83:23 85:7
  85:25 86:18,19,21
  86:22,22 87:18
  89:1,2 99:15
  102:3 105:10
  115:21 116:24
  132:19 173:25
  185:19 189:19
  205:13 208:12
  217:4 227:4 236:6
**telling** 41:9
**tells** 38:18 156:4
  264:9
**temporarily** 62:11
**temporary** 160:14
**tendering** 19:19
  46:21 47:23 55:2
  74:7 83:9 110:12
**tensile** 289:15
**tension** 122:25
  123:3 124:5,15
  178:8 181:19,22
  187:1 193:16
  194:14 203:13,19
  289:12 290:2
  293:12 300:10
**term** 34:5 43:25
  59:14,22,24 60:5
  60:11,24 119:21
  146:10,14,22
  147:3 149:11,15
  162:6,9,20 163:3

173:17 185:12
  215:13 227:24
  243:21 260:9
  268:6 278:6,12
  280:9 302:18
**termed** 231:6
**terminated** 262:20
**terminates** 160:13
**terminuses** 291:14
**terms** 12:16 48:12
  48:24 49:7 60:15
  149:23 188:5
  218:7 247:11,20
**test** 93:24,25 94:5
  148:12,18 236:4
  275:18,20 276:10
**tested** 39:1
**testified** 7:5 23:22
  27:19 43:20 62:21
  78:22 114:16
  145:20 146:9,20
  146:21 158:16
  167:9,12 177:2,15
  180:18 190:23
  208:3 210:7,16
  212:2 213:16
  226:20 237:1
  242:7
**testify** 158:18
  307:6,7
**testifying** 18:8
  262:24
**testimony** 13:3
  15:13,18 17:2
  35:3 58:15 78:15
  82:12 84:18 105:7
  124:18 137:15
  142:18 144:3
  150:2 153:3
  162:24 167:13
  176:7 186:11,18
  205:24 206:2
  207:11 229:1
  236:25 257:1
  264:7 269:4,20
  306:4,6
**testing** 8:1 165:5

168:1 238:3 277:5
  277:10
**tests** 10:13 11:3,9
  11:24 13:10 148:3
  162:2 234:10,20
  234:25 236:8
  237:25 276:18,23
**text** 101:7 149:21
  149:24 150:16
  152:5 162:16
  168:25 249:14
  260:7 302:6 303:1
  303:22
**textbook** 146:24
  147:4,6,15,17
  232:10
**texts** 305:16
**thank** 16:9 36:13
  47:4 57:5 60:16
  77:12 90:10 94:13
  102:24 103:7
  150:24 165:23
  175:16 208:11
  234:8 275:6,8
  301:7,9 305:21
**thatch** 3:12
**thats** 11:4 12:13
  13:1 14:25 19:11
  22:1,2 23:18
  27:12 28:7 29:11
  29:15 30:18,18
  31:4 32:11,20
  33:25 34:19 36:13
  38:11 39:25 40:2
  42:16,18 44:5,5,6
  44:7 46:25 49:20
  50:22 51:8,10,19
  51:24 53:9,10
  54:25 57:18 59:10
  59:22 60:5 61:5
  62:20 63:4,12
  70:16 73:14 74:5
  75:19 76:9,14,19
  76:19,21 77:24
  78:13,19,23 79:17
  80:6 81:14 82:20
  86:8,23 87:7

| | | | | |
|---|---|---|---|---|
| 90:12 95:6 97:8 | 259:20,20 260:21 | 101:22 106:12 | 223:1 226:20 | 104:1,6,9,11 |
| 99:4 101:2 102:8 | 261:10 262:16 | 107:7 114:11 | 227:23 236:24 | 131:17,18,19,22 |
| 103:19 107:17 | 267:15 269:3,25 | 132:4 174:10 | 240:1,9 241:20 | 135:18 142:15 |
| 111:14,16 115:6 | 270:3 271:21 | 227:12 244:14,20 | 242:17 244:2,5 | 158:17 188:21,22 |
| 116:2,16 117:2 | 272:20,23 273:7 | 246:6 247:1,24 | 245:7 246:2 | 188:25 189:24 |
| 121:13,15,16,24 | 274:19 275:13,16 | 256:3,17 257:23 | 253:24 256:2,3 | 190:2,23,25 |
| 122:9,10 124:19 | 276:7 277:25 | 259:12 263:21 | 257:6 259:7 266:4 | 200:25 205:23 |
| 124:22 125:15 | 278:5 280:12 | 268:3 273:15 | 267:21 271:23 | 210:15 212:6,8 |
| 126:12 131:23,24 | 285:18 286:20,24 | 274:13 288:21 | 273:17 274:15 | 220:18 221:1,19 |
| 132:9,15 133:6,15 | 287:21 290:8 | 298:13 | 276:7 280:21 | 221:21 222:9 |
| 135:25 137:9,12 | 291:21 292:14 | **theyve** 219:18 | 284:1 286:15 | 225:21 234:1 |
| 139:17 142:4,9 | 293:19 294:8,16 | **thick** 195:15 | 290:8 291:21 | 241:1 253:7,12 |
| 143:9 144:22 | 296:10 297:17 | **thickness** 195:8,16 | 292:14 293:19 | 257:20 259:8,15 |
| 146:7 150:2,7 | 298:15,22 305:13 | 196:7,8,11,14,17 | 295:9,11 298:22 | 260:23 262:10 |
| 151:15,23,24 | 305:19 | 196:21 | 302:22 303:15 | 269:12,15,22 |
| 152:11 154:4,13 | **theis** 148:13 163:17 | **thin** 174:12 | **thinking** 142:18 | 272:4,8,24 273:5 |
| 155:13,22 156:13 | 163:19,22,25 | **thing** 20:7 76:14 | **third** 52:20 71:19 | 273:11 276:17 |
| 156:21 157:2 | 169:5,10,20,23 | 82:21 137:9 | 161:18 166:8 | 281:11 282:12 |
| 158:5 159:20 | 170:3,11,24 171:2 | 158:10 174:5,24 | 201:9 229:21 | 285:22 286:8,18 |
| 160:19,22 164:11 | 171:9,13 174:6,17 | 207:7 221:15 | 252:12 299:17 | 287:3,7 288:8 |
| 171:22,23 172:23 | **theoretical** 120:20 | **things** 13:20 24:18 | **thirteen** 170:9 | 291:16 305:10 |
| 173:2 174:11 | 190:10 | 52:14 142:25 | **thomas** 2:10 | **times** 11:18 22:21 |
| 175:7,10,12,16 | **theories** 121:9 | 293:12 | **thought** 13:5 21:2 | 23:22 30:5,7 |
| 177:9 178:14 | 122:17 270:17 | **think** 13:1,12,16 | 50:22 56:4 60:23 | 33:19 44:18,20 |
| 182:7,19 184:8 | **theory** 110:22 | 20:8 22:1 23:10 | 83:22 84:6 85:4 | 45:22,24 157:18 |
| 185:25 186:7,13 | 174:17 278:16,19 | 23:10 28:19,21 | 90:12 103:19 | 182:6,7 187:24 |
| 186:17,25 187:2 | 278:20,22 279:7,8 | 38:17 39:25 41:11 | 164:10 167:9 | 218:8 235:12 |
| 187:15 190:12,17 | 279:10,11 290:14 | 41:14 46:2 53:9 | 198:11 242:7 | 299:2 |
| 191:22 192:22 | **thereof** 6:14 | 55:22 58:5 68:10 | **three** 13:19 19:20 | **timespicayune** |
| 193:2,3 194:21,25 | **theres** 20:8 26:16 | 72:21 74:5 75:19 | 113:2 145:2 189:3 | 153:25 |
| 195:3,3 196:7,10 | 54:8 55:18 56:14 | 76:9 79:15 88:11 | 190:6 193:17 | **timothy** 4:13 |
| 196:17,20 200:20 | 58:22 65:23 78:3 | 91:3,14 99:12 | 200:14 201:3,4,5 | **tiny** 133:4 |
| 200:24 202:18 | 90:15 99:3 101:8 | 107:6 109:5 | 201:6 228:25 | **tip** 122:5,18 182:20 |
| 203:12,18 204:7 | 107:15 115:1 | 111:13 115:8 | 293:4 | 218:14,23 262:9 |
| 205:2 206:19 | 138:10 156:25 | 116:17 119:18 | **threw** 13:22 | 262:25 |
| 207:6 209:11 | 157:1 171:18 | 121:2,4 131:8 | **tight** 71:21 | **title** 146:4,8 147:11 |
| 213:14 214:17 | 203:14 222:18 | 132:18 137:21,22 | **till** 45:22 281:23 | **titled** 109:8 147:8 |
| 215:18 216:22 | 225:10 227:18 | 140:7 147:5 | 301:19 | 153:20,22 178:8 |
| 217:8,19 218:15 | 228:25 233:1 | 155:13 157:5 | **tilted** 163:21 | **today** 87:9 89:2 |
| 220:7 221:6 | 237:16 244:23 | 162:13 166:5,7 | **tim** 30:20 | 96:9 97:3 107:16 |
| 223:23 231:22 | 248:3,9,13 251:8 | 171:11 172:22 | **time** 6:13 12:5 | 112:3,8 175:25 |
| 233:2 235:19 | 258:10,15 264:8 | 175:12 176:6 | 13:16 18:16 28:24 | 186:1,18 201:10 |
| 236:9,16 237:4 | 295:19 | 180:4 183:17 | 29:6 31:8 32:20 | 208:13 226:18 |
| 238:25 241:8,20 | **thesis** 163:4,8 | 187:10,17 189:6 | 33:15 41:17 43:15 | 229:2 241:5 |
| 241:21 242:6 | **theyre** 39:1 43:3 | 192:3,16 196:1 | 47:8 48:13 49:23 | 243:15,24 260:23 |
| 247:25 248:5,6,24 | 58:20 72:21 73:2 | 197:4 200:8 | 62:14 64:6 71:21 | 261:8 262:25 |
| 251:23 258:12 | 75:18 95:2 96:17 | 220:13,23 221:2 | 93:17 103:25 | 264:7 271:24 |

ROBERT G. BEA, PH.D.

April 16, 2012

275:1,3
**toe** 202:17
**told** 9:7,8 13:5
21:22 33:18 40:16
45:14 50:15 53:13
59:6 61:16 94:21
187:10 209:3
227:24 267:13
**tons** 109:12
**tool** 16:23
**tools** 273:21 274:3
**tooth** 219:23
**top** 51:5,8 58:12
74:15 111:22
125:18 126:11
155:14 170:10
174:12 175:2
218:3 219:5
246:11,16 261:12
261:19 262:7,14
262:14,17,21,24
**topic** 73:7 165:6
168:2
**topofwall** 125:7
261:23 263:13
264:17
**topping** 297:6
**torts** 4:5
**total** 151:24 164:1
177:18 178:9
193:11 222:21
223:3 230:12
231:11,19 232:16
294:6,10
**totaling** 109:11
**totally** 253:1
**towing** 91:7,18
**track** 255:6
**traditional** 299:9
**trailers** 160:14,18
160:21
**trained** 13:25
14:22
**training** 13:17 14:6
**transcribed** 307:10
**transcript** 6:9
155:11 205:22

**transcription** 306:5
307:11
**transfer** 30:22
278:7,8,12,13,17
**transferred** 210:14
260:7
**transformation**
255:6
**transient** 12:22
15:5,11,16,22
16:10 17:7,14,22
18:1,4,22 149:12
149:22 150:1,9,11
150:17 171:3,8
173:13,19 177:1,4
220:24 221:1
228:1,7,16 229:4
229:15,22 230:7,8
**transite** 97:20
109:8,11,14 110:2
111:9,14 113:11
**translated** 22:10
**translates** 21:20
22:14
**translation** 67:23
**transmission** 8:23
8:25 177:7 178:24
179:10 253:13
277:21 278:1,15
279:16
**transmissions**
65:21 178:12
**transmitted** 123:10
131:14 216:3
277:19
**travel** 131:11
**treat** 60:17,19
257:15
**treated** 36:15
199:16,18,19,21
213:17 253:22,24
**treatment** 241:25
283:9 290:2 292:1
299:8,13
**treatments** 200:15
**treats** 24:9
**treeby** 3:4 5:4,6 7:6

10:24 13:2,21
20:5,20 21:1,5
25:2,8,18,24 26:5
26:12,19,25 27:4
28:6 32:3 33:6
35:14,18,24 36:3
36:7,11 37:9
39:11,18 40:8,18
40:23 41:4,13,21
42:2,10,22 43:13
43:19 45:7 47:5
48:9 49:11 50:2
53:11,18 54:4,12
55:9 56:5,15,20
57:4,10,17,19,21
58:9,11 59:20
61:4,22 63:6
66:10 67:3 68:11
69:17 70:2,12,18
70:23 71:7,17
74:14 86:12,15
89:11 90:5,18
91:12 92:4 93:8
93:11 94:15 95:3
95:24 96:10,20
97:14,16 100:16
102:21 103:3,8,22
104:2,7,12,17,21
106:23 107:9,24
108:2,16 109:1
111:15 112:1
113:16 114:22
115:5,13,14 117:4
117:8,18 121:1,14
123:6 128:14,24
129:7,11 131:21
132:12 134:25
135:4,7,23 136:12
137:14 138:6,12
140:9,16 141:2,17
142:5,10,16
143:22 144:11
145:25 150:10,23
153:6 154:14,18
155:2 156:11
162:14 166:16
172:10 174:2

175:15 178:2
191:2 240:4
243:10 252:7
263:23 301:10,16
301:20 304:15
**trench** 126:13
290:4,19 291:15
292:21,22
**trenches** 95:10
139:9 264:19,24
265:1,17
**trenching** 78:6,23
79:2 265:14,21
**trial** 64:19 95:21
96:19 97:9 200:22
201:9
**tried** 184:19
**triple** 40:11
**true** 18:18 21:23,24
27:23 29:10,14
44:9 73:19 74:5
76:22 79:18 90:23
97:8 108:8 119:5
119:6,22 120:3,5
120:7,11,15 122:9
122:10,13 128:3
131:2 132:6,14
140:25 151:7
161:6 171:4 174:3
177:10,14 179:15
180:13 186:12
187:12 190:5
221:4,15 232:24
233:1 241:11
269:10 275:1,3
282:15,19 283:6
283:16 286:14
305:12,13 306:7
307:10
**trust** 54:14
**truth** 307:6
**truthfully** 226:13
**try** 28:20 121:3
144:2 165:14
176:1
**trying** 23:8,19
27:18 28:10,11,19

33:12 53:20 71:8
79:14 102:15
119:14 172:23
174:6,10
**turn** 22:17 55:3
58:24 73:16 74:24
74:25 97:17 109:6
109:17 125:3
130:7 133:16
139:3 146:1 149:7
155:14 158:25
193:20
**twall** 79:12 263:7,8
289:18
**twice** 182:3
**two** 8:22 12:16
17:12 22:23 24:5
24:17 34:20 52:13
52:14,17 54:16
83:21 84:5 85:3
97:25 98:9,19
100:20 101:22
106:15 132:21
172:24 176:24
199:14 200:15
217:3 227:25
230:3 236:19
241:15 243:24
245:2,6,8 260:19
278:7 291:13
293:4
**type** 67:14,18 69:7
138:24 300:4
**types** 37:19 230:3
299:11
**typically** 303:25
**typo** 54:8 240:1,2

──────────

**U**

**uc** 10:4 15:2 146:16
**uhhuh** 227:3
**um** 53:17 65:20
78:5 81:24 87:21
99:3 110:19
123:17 131:1
157:5 179:7,19
182:23,23 184:5

185:7 187:19
190:18 193:17,19
195:14 200:20
203:14 207:17,20
208:6 220:22
221:21,21 225:2
228:4 229:20
231:2 236:9
257:14 259:3
262:11 263:7
271:25 275:20
285:11,17 290:3
292:2,3 297:15
298:20,21,22
302:18,22
**unable** 18:24
**uncertainties**
283:10 299:18
**uncertainty** 280:6
280:19,24 282:14
283:3,15
**unchanged** 73:8
**unclear** 119:20
**underground**
130:10
**underlying** 73:20
81:2 82:17 83:2
83:18 84:2,23
85:11 89:5 91:5
91:16
**underneath** 182:20
214:23 250:14
270:8,16
**underscore** 55:13
58:14
**underscored**
214:17
**underside** 215:2
**understand** 28:4
37:20,21,22,24
38:1,9,11,21
42:23,25 43:2,4
44:3,7 52:2 53:24
60:21 69:23,25
71:8 79:15 80:7
102:19,22 103:1
136:13,15,16

140:24 150:11,12
150:13 153:17
184:17 186:2,11
188:10 191:22
193:6,22 198:9,14
229:1 233:9 244:1
244:10 270:22
299:2 304:13
**understanding**
28:13 39:8 140:19
165:11 168:10
181:3 225:7 228:8
228:23 229:8,10
232:21 239:6,8
281:25 283:3
295:4 307:12
**understands** 96:1
**understood** 13:3
23:10 180:1,3
**undrained** 20:4
38:16 43:22,25,25
44:1 52:5 161:20
161:23,25 162:8
163:1,6 231:2
232:1,11 234:20
234:25 236:4,8
241:8,17,24
251:11,15,24
294:5,11,20
**unfilled** 136:4
137:24 259:18
**unfolds** 171:25
**unfortunately**
123:2 160:22
300:21
**uniform** 263:3
**unique** 174:18
246:15,16,20,24
247:4,6,8,16
**unit** 163:23 170:12
189:16 195:21
196:3,12,14
217:20 218:7
224:16 230:21
262:12 268:16,17
**united** 1:1 4:1
175:21

**units** 37:1 164:3
179:13 224:25
225:13,19,22
226:18
**university** 162:19
**unknown** 68:14
**unqualified** 207:13
**unreasonable**
187:3
**unresponsive** 282:6
**unsaturated** 34:6
34:13 35:2,9
36:18 253:11,16
253:23 256:13,18
256:25 257:25
**unspecified** 183:10
**unsteady** 228:9
229:5,23
**unusually** 219:20
**update** 71:25
**uplift** 30:16 121:25
198:2,24 200:1
201:21 202:5,10
203:3,9 204:4,25
205:12 214:25
215:13,20 216:5
216:10 218:13
220:8,11 221:13
232:14,20 251:25
289:21 290:1
296:20
**upper** 49:24 50:7
50:19 111:22
**url** 139:22,24
140:10
**usable** 66:24
**usace** 297:15
**use** 7:14,24 8:2
12:8 13:6 17:4,9
27:11,23 28:8,11
28:12 29:6,12
33:5 34:5,12 35:9
46:3 51:23 60:23
64:18 90:4 97:25
98:8 119:21
128:17 135:24
137:23 144:25

146:14,14 147:15
149:11 179:2
184:24 185:17
201:15 235:11
247:15 271:5
273:21 274:23
277:16 278:6,12
293:7 302:18
**useful** 165:6 168:3
197:5
**uses** 24:8,14,16
149:21 150:16
162:16,20
**utilities** 130:10
**utility** 127:13 139:5
139:9
**utilized** 93:3 99:23
289:23
**utilizing** 299:8

**V**

**valid** 270:11
**validate** 177:16
178:11 181:10
**validating** 242:14
**validation** 193:7
**validity** 270:18
**value** 31:6 44:8,10
44:18,22 45:14,16
45:25 46:4 47:11
189:9 208:17,22
223:25 224:11
226:17 227:1
235:6 250:21
261:25
**values** 36:24 37:17
45:15 51:25
211:19,23 277:8
277:11
**variabilities** 282:1
**variability** 280:6
280:18,24 282:13
283:3,15 300:4
**variable** 194:15
262:17
**variation** 22:22
**variations** 125:7,11

125:17 126:10,19
263:13
**varied** 87:5 264:9
**varies** 85:23
**variety** 227:18
**various** 9:23 16:1
16:12 31:2 36:25
37:19 38:8 106:2
192:19 276:11
**vary** 250:3,11
**varying** 204:18,23
205:10 262:25
**vehemently** 107:25
**vehicle** 86:17
**velocities** 189:9
244:18 245:4
**velocity** 24:15
34:17 187:24
188:20 224:8
**veneer** 207:7
**vennard** 37:2,16
**verify** 178:11,16
**version** 52:22,24
53:5 74:8 75:9
98:6
**versions** 75:20
**versus** 9:6
**vertical** 79:9,24
147:25 214:1
216:24
**vicinity** 125:21
198:2,25 200:2
205:20 207:1
**videographer** 4:15
**viegel** 155:11
**view** 79:10,23,23
80:1,7 81:13
**void** 34:15 222:4,5
222:6,17,19
223:10,16,20
230:16 232:22
241:4 273:6,12,24
274:8
**voids** 87:25 132:1
136:3,8,20 137:24
259:10,11
**vol** 20:9

ROBERT G. BEA, PH.D.                                    April 16, 2012

**volume** 12:11,14
19:14 23:24 27:7
27:24 29:7,25
36:24 37:18 38:3
179:20,21,24
222:2,5,5,7
232:23 245:5
296:25
**volumes** 186:12
187:19 191:4
265:12
**volumetric** 179:17
180:10,16,21
181:1 244:13
**vs** 22:3 24:18 51:23
51:24 52:9,9

**W**

**wait** 35:22 40:9
56:16,16,16,24
100:17 151:7
227:10
**waived** 6:10
**waives** 40:6
**walk** 33:14
**wall** 10:17 11:12
16:3,13 30:17
118:6,7 121:6,10
121:19,20,23
122:1,9,20 123:5
125:18,21 126:11
126:15,25 127:8
160:3,10,17
175:22 180:17
181:17 182:8
185:4 186:4,8,14
187:3 191:13
192:22 193:12
202:14 204:3,14
204:21 215:21,25
218:1,4 223:15
253:6 261:13,19
262:8,24 287:25
288:11 289:7,12
290:6,13,15,23
297:6 305:5
**walllevee** 214:17

**walls** 243:7 302:1
**walther** 1:20 3:3
**wang** 163:24 164:7
164:24 165:15
167:21 168:12
**want** 7:9 17:6
36:20 40:11,24
41:6,18,24 46:9
46:12,12,13,14,25
47:24 53:1 56:24
56:25 68:2 70:10
82:21 85:1,2 95:2
95:4 98:5 104:3,5
115:12 117:23
121:5 129:3
140:17 146:8
161:19 168:23
174:15 197:23
203:5 209:21
239:17 244:4
278:13 304:16,23
**wanted** 24:22 92:20
95:9 103:13
181:15 214:22
**wants** 42:7
**ward** 148:4 153:15
218:19 220:4
247:3,13 266:7
291:11
**warning** 284:5,11
**warren** 3:11
**washington** 3:1,16
4:8 63:14 65:11
94:16 105:8,25
106:7 113:10
114:3 119:4,24
120:3 127:23
136:7 137:16
140:20 141:20,24
143:1 157:18
158:13 159:3
265:11 285:25
**wasnt** 115:20 154:2
164:12 187:5
211:2 273:5
278:25 279:5,7
**waste** 43:15

**watched** 229:24
**water** 9:3 20:9
24:13 34:18 81:3
82:18 83:2,19
84:2,23 85:11
89:6 91:5,16
113:2 118:5
120:20 121:8
122:6 123:9
137:10 160:16,20
161:1 163:20
169:7,21,24
170:18 184:2,6
188:16,24 189:22
207:4 209:20,23
210:2,3,22 211:3
211:6 213:18,20
213:21 216:3
217:19,21,22,25
218:5,6,8 221:9
221:10 222:7,10
222:22 223:4
227:14 239:4,7
243:6 244:17,22
250:3,15,23 251:2
251:17,21 252:19
253:5 255:2,4
256:11 257:5,7,10
259:19 269:3,24
270:23 271:4,8
272:13,14 276:1
283:25 284:14,24
285:22 286:3,12
286:14,25 287:4
287:24 288:3,9,11
**waterconductive**
263:10
**waters** 120:18
121:7 123:10
160:1,8 210:14
240:25 269:21
**wave** 24:14 34:17
**way** 24:6 96:3
107:16 122:5,12
122:17 162:7
243:3,23 250:19
281:17 285:13

292:11 307:15
**ways** 12:17 24:5
247:2
**weak** 219:8
**weather** 285:12
**website** 145:22
**wed** 83:22
**wedding** 76:16 77:2
87:22
**wedge** 219:4
**week** 42:11
**weeks** 260:16,19
**weigh** 40:11 41:6
42:5
**weight** 218:8
268:16,17
**welcome** 95:23
**wellknown** 12:18
**wells** 285:8
**went** 87:8 88:15
152:14 154:6,8
**west** 78:2 160:12
227:8
**western** 214:2
**wetting** 179:13
180:7,11,16
**weve** 46:24 48:19
58:18,25 75:15
77:19 87:23 88:1
92:7 94:18,19
99:12 101:13
130:21 139:14
166:1 169:17
171:21 176:6
181:8 199:15
203:13 232:4
241:15 243:23,25
249:8 252:15
272:2
**wgi** 62:25 63:8 68:5
69:8 119:13,15
130:17 134:10
186:9 190:8,14
202:22 203:11
204:1,15 254:12
270:10 284:19
286:23

**wharf** 132:23 133:5
**whats** 21:11 43:9
49:16 56:10 85:5
140:4 145:15
192:13 195:11
199:10 203:16
239:8 243:6
259:10 272:6
**whisper** 41:16
**white** 20:23 78:3,18
119:10
**whitman** 46:10
149:24 185:18,19
224:7 232:10
271:11,17 274:25
275:2 278:20
**whoa** 35:22,22,22
**whos** 40:9 147:16
**wide** 227:18
**widely** 171:3
**width** 182:22,23
186:3,16,19
**wife** 40:15 124:9
152:9
**wilkinson** 1:7
**william** 3:4
**window** 20:8 21:9
**wish** 49:17
**wished** 80:10
**withdraw** 125:2
203:24 238:20
240:18
**withdrawn** 93:4,19
93:22
**witness** 6:4,25 7:3
39:6,23 40:25
41:2,8 57:16
78:14,21 82:10
83:4 94:25 96:4
129:6 142:6
154:24 248:18
295:12 301:18
306:1 307:5
**wittmann** 1:21 3:3
**wont** 96:13 295:10
**word** 13:22 90:4
119:17 150:9,11

JOHNS, PENDLETON COURT REPORTERS                      504 219-1993

ROBERT G. BEA, PH.D.                                    April 16, 2012

| | | | | |
|---|---|---|---|---|
| 150:12,13 152:6 | **189**:20 **192**:13 | 171:20 175:22 | **056314** 1:9 | 89:13 90:20 92:23 |
| 152:25 262:2 | **wrote** 67:6 152:5 | 192:6,18 194:8 | **056324** 1:9 | 92:24,25 97:24 |
| 264:2 279:14 | 152:22 166:23 | 212:18 233:16 | **056327** 1:9 | 98:14 101:13 |
| **words** 33:17 77:4 | 190:25 260:14 | 237:13 245:7 | **056359** 1:9 | 102:5,7 107:5 |
| 77:23 88:20 | 305:9 | 248:16 262:3,8 | **060225** 1:10 | 110:11 113:23 |
| 150:17 152:7 | | 267:7 283:25 | **060886** 1:10 | 114:25 115:22 |
| 174:8 176:2 222:2 | _____ | 294:4 295:23 | **061885** 1:10 | 118:12,19 129:25 |
| 262:12 | **X** | 299:5 300:13 | **062152** 1:10 | 131:4 132:2,16 |
| **work** 14:4 15:25 | **xi** 163:24 | **youve** 18:24 27:19 | **062278** 1:11 | 153:11 154:3 |
| 27:12 59:21,22 | **xu** 163:24 | 28:8 30:1 62:15 | **062287** 1:11 | 157:25 159:9,12 |
| 62:25 63:4,15 | | 79:15 83:8,10 | **062824** 1:11 | 159:19 184:3 |
| 64:14,25 87:9 | _____ | 85:25 86:20 88:22 | **064024** 1:11 | 186:19 187:6,10 |
| 106:4 112:3,8 | **Y** | 93:9 94:13 97:24 | **064065** 1:12 | 187:12 188:17 |
| 119:24 123:1,2 | **yacht** 91:8,18 95:11 | 98:8 105:9,16 | **064066** 1:12 | 189:3 190:4 |
| 131:15 143:14 | 133:8 | 107:10 114:16 | **064389** 1:12 | 196:12 231:22 |
| 145:3 158:17 | **yall** 227:7 301:11 | 119:18 124:1 | **064634** 1:12 | 267:25 268:4 |
| 177:3 200:19 | **yards** 106:3 | 139:21 158:20 | **064931** 1:13 | 300:4 |
| 201:8,9 204:15 | **yeah** 42:3 77:12 | 177:15 182:4,15 | **065032** 1:13 | **10** 11:18 22:14,21 |
| 206:4 211:11 | 98:7 111:19 136:1 | 185:3 186:6 189:6 | **065155** 1:13 | 22:24 23:3,6,14 |
| 215:14 231:7 | 136:24 141:12 | 189:16 194:5 | **065156** 1:14 | 22:23 30:5,8 |
| 241:22,24 254:12 | 184:1 204:9 | 200:6 202:5,7 | **065159** 1:13 | 33:19 38:5,5,5 |
| 286:22 301:5 | 240:13 242:2 | 203:4,4,8 204:4 | **065162** 1:14 | 44:18,20,24 45:22 |
| 304:6 | 271:17 | 204:12,25 206:13 | **065260** 1:14 | 45:24 50:23 51:7 |
| **worked** 62:13 | **year** 47:12 48:20 | 209:3 212:2 220:1 | **065771** 1:14 | 51:9 73:18,18 |
| **working** 34:21 52:3 | 50:24 51:7 131:5 | 222:12,16 227:24 | **065786** 1:15 | 127:9,17 129:20 |
| 62:5 95:20 131:16 | 143:25 221:16 | 239:19 240:9 | **065937** 1:15 | 173:17 195:21 |
| 143:10 228:24 | 282:13 | 245:7 251:9 | **070206** 1:15 | 196:12,17 201:1 |
| **worklocation** 67:13 | **years** 49:23 50:18 | 270:20 280:22 | **070621** 1:15 | 208:20 214:20,23 |
| **world** 95:23 227:1 | 51:9 227:22 | 282:18 283:17 | **071073** 1:16 | 215:15,19 216:1 |
| 227:19 | 271:22 | 301:21,22 302:15 | **071271** 1:16 | 218:12 227:2 |
| **wouldnt** 7:12,17,22 | **yelling** 248:16 | | **071285** 1:16 | 291:3 |
| 21:25 49:9 73:14 | **yep** 22:12 | _____ | **0809** 201:1 | **100** 50:16 207:24 |
| 120:18 210:10 | **youd** 116:8 144:20 | **Z** | **09** 201:1 | **101** 212:16 |
| 264:6 288:12 | **youll** 46:22 153:19 | **zero** 21:20,23,24 | | **102** 161:15 234:7 |
| **wright** 48:1,4 | 172:24 227:9 | 22:5,23 23:13 | _____ | **108** 5:19 |
| **write** 14:5 46:9,12 | **youre** 19:9 25:25 | 256:8 283:21 | **1** | **10f** 196:5 |
| 78:19 87:16 260:4 | 28:22 41:9,11 | **zone** 266:2 | **1** 11:18 22:14,21,24 | **10foot** 195:15 |
| 260:5 | 44:6 50:9 53:25 | | 23:14,22,23 30:5 | **11** 75:23,25 109:3 |
| **writing** 71:22 | 57:3 63:11 70:16 | _____ | 30:8 33:20 38:4,7 | 111:2 130:8 201:1 |
| **written** 14:4,13 | 71:1 78:10 83:20 | **0** | 44:18,19,19 45:22 | 292:23 |
| 125:16 131:4 | 85:19 88:9 92:11 | **0** 21:14 | 45:23,23 50:24 | **111** 5:20 |
| 149:24 153:22 | 97:3,4,5 111:1 | **00** 292:23 293:2 | 51:6 55:11 58:13 | **11102** 240:1 |
| 162:19 163:4 | 116:13,19 117:6 | **000** 47:13 48:21 | 58:15 59:3 72:9 | **111026066** 297:13 |
| 166:22 236:11,17 | 118:14,22 119:23 | 51:9,13 | 73:20,23 74:8,18 | 297:23 |
| 236:19 237:2,3 | 121:4 124:17,20 | **054181** 1:8 | 74:22 75:9 77:20 | **1150** 112:17 |
| 260:8 271:22 | 126:8,17 129:4 | **054182** 1:5,8 | 77:22 78:7,19 | **11th** 58:5 107:8 |
| **wrong** 41:9 95:2 | 130:15 142:21 | **055** 224:10 277:22 | 79:19,20 81:19,25 | 123:18 124:13 |
| | 148:24 154:3 | **055237** 1:8 | 83:5 84:7 88:18 | |
| | 155:17 163:14 | **056073** 1:8 | | |

JOHNS, PENDLETON COURT REPORTERS                        504 219-1993

ROBERT G. BEA, PH.D.

April 16, 2012

Page 347

127:3 177:23
250:25
**12** 52:21 139:3
201:1 250:16
**12012** 155:8
**1244** 109:18
**127** 300:8
**128** 5:21
**13** 240:10 249:12
261:24 262:24
264:18
**130** 163:9,10
165:25 166:20
169:19
**134** 227:8
**137** 196:23 198:19
209:19
**139** 234:6
**14** 133:16 144:5,14
173:16,17 220:12
220:14,17 221:2
221:10 250:16
291:3
**140** 161:14
**142** 54:2,18
**144** 53:10
**15** 173:19 252:24
254:13,18,24
255:7,8,11 256:6
256:9,14,20,21
257:21 287:11,15
**150** 182:12 185:3
186:7,13
**15inch** 256:17
**16** 47:13 48:21
51:13 67:4,8
109:11 111:21
146:1 214:11,13
**165** 47:12 48:20
**166** 5:22
**16th** 1:22 306:25
**17** 76:1 221:24
267:20
**175** 5:5
**177** 5:23
**17f** 194:24
**17th** 219:14,17

**18** 176:12 214:8,10
214:11
**19** 5:11 221:25
240:7,23
**1913** 240:9
**1965** 37:16
**1968** 289:17
**1969** 79:12 149:25
263:6 271:18
289:17
**1980** 79:12 263:7
289:18
**1982** 37:3,17
**1st** 101:2

**2**

**2** 30:7 33:19 40:4
55:12,13 58:14
73:20,23 74:19
75:23 77:21 78:13
79:5,8,19,21 82:2
82:3,8 83:5 84:7
88:16 89:14 90:20
92:23,25 97:20
107:5 118:19
173:13 181:21
189:3 190:5 195:6
195:12,21 196:12
196:12,14,16,21
268:1,4 275:13
291:3
**20** 22:14 76:15
147:19
**200** 109:3
**200012113** 3:16
**2001** 109:3 111:3
111:21
**2002** 73:23
**2003** 155:20
**20044** 4:8
**2005** 73:24,25
224:18 225:21
285:7
**2006** 141:21 143:4
143:6,9 158:14
**2007** 144:1 215:4
**2008** 16:4,14,19

63:9,14 64:2
128:6 131:23
140:21 141:5
142:2 143:7
158:23 199:16
212:23 251:10,19
300:5
**20082009** 200:5
212:3
**20089** 206:5 220:22
**2009** 128:19 129:1
129:18 154:1
155:5 199:16
200:14,21 212:23
**200f** 194:25
**2010** 200:14,19,23
201:3
**2011** 18:15,19 63:5
63:9 65:1 148:4
276:11,18 277:5,9
292:9 297:16
300:25
**20112012** 199:18
**2012** 1:22 16:20
18:15,19 63:5
65:1 68:4 69:4
101:2,4,13 148:4
148:5 153:11
154:3 157:25
159:9,12 214:2
250:1,12 253:21
255:21 277:14
306:25
**2026164289** 4:9
**2028794645** 3:17
**21** 195:21 284:12
284:17 285:4
287:1 288:5
**21913** 240:16
**23** 53:15 153:19
271:10,16
**25** 54:21 76:16
187:17 235:7
240:22 272:1
296:12 301:19
**26** 56:19 143:19
235:8,25 236:2,23

275:14
**26degree** 235:18
**27** 46:11,16,24
64:10 147:20
155:5 277:1
**27th** 154:1
**28** 64:10 157:22
246:13
**28th** 2:20
**29** 69:4 129:18
151:1,11 246:7,8
246:10,11,16
**29th** 68:4 128:19
129:1 224:18
225:21

**3**

**3** 38:5 46:11,16,24
47:25 58:24 59:3
72:9 73:20,24
184:3 189:3 190:5
273:18
**30** 25:15 26:4,11,18
40:4 42:20 56:19
128:7 149:7
249:12
**300** 77:11 295:17
**301** 5:6
**316** 2:13
**32** 54:1,6,19,20,22
**32502** 2:14
**35** 141:22
**37** 5:12 237:22
246:8,11,13
249:14
**37a** 159:15
**37b** 159:15
**38** 150:25 151:1,9
151:11,13,21
153:8
**39** 149:8 155:14
**3d** 59:1 62:22 63:25
64:9,21 65:4,8
67:11,19 68:13,18
68:18 71:23,25
72:22 75:2
**3rd** 52:23 54:25

100:1,15 101:4
155:15 157:17

**4**

**4** 67:5,6,7,10 75:1
80:19,23 83:14
89:21 97:18
105:17 110:20
111:11 117:21,22
187:1 301:22
**407** 46:11,16,17
**44** 157:17 197:20
279:20,21,21,25
283:11,12
**448** 109:12
**45** 5:11 19:19,25
20:15 155:12
158:25 197:20
207:24 239:22
**46** 5:12 36:23 37:6
150:25 159:22
212:16 237:20
240:2
**47** 5:13,13 46:21
47:2
**48** 5:14,14 47:23
48:5 50:4 156:22
182:1
**49** 5:15 52:25 53:7
58:25 80:21
147:21

**5**

**5** 11:19 30:6,8
33:20 44:20 59:1
65:7 97:18 105:17
110:19 111:11
112:17 117:16,24
125:3 127:10,17
129:24 196:16,21
224:10 252:12
266:1 277:22
**50** 5:16 55:2,6
99:13 100:10
186:15 187:13
**500** 47:13 48:21
51:13 295:16

ROBERT G. BEA, PH.D.                                        April 16, 2012

| | | |
|---|---|---|
| **5042992100** 2:22 | **70** 125:25 126:5 | **982** 171:12 |
| **5045251335** 2:8 | **70112** 2:21 | **983** 170:8 172:5,11 |
| **5045813200** 3:7 | **70113** 2:7 | 172:16 174:25 |
| **51** 3:15 5:17 68:3,8 | **70130** 1:22 3:6 | **984** 173:9 |
| **52** 5:18 74:7,11 | **74** 5:18 | |
| 75:9 92:8 115:4 | **75005** 1:25 307:25 | |
| 132:18 | **7a** 112:21 113:7,19 | |
| **53** 5:15,19 108:21 | | |
| 108:23 151:22 | **8** | |
| 153:8,19 | **8** 55:10 57:20 58:12 | |
| **54** 5:20 111:20,23 | 73:17,18 74:9 | |
| **546** 1:21 3:5 | 88:1 97:17,20 | |
| **55** 5:16,21 128:16 | 98:24 100:20 | |
| 128:21 | 101:18 105:17 | |
| **56** 5:22 166:2,13 | 117:9,14 173:17 | |
| **57** 5:23 177:21,24 | 252:11 258:18 | |
| 178:4 181:9 183:8 | 259:9 260:4,5 | |
| 186:7,22 | 293:2 | |
| **5f** 195:6 | **80** 221:2 | |
| **5foot** 195:12 | **81** 75:23 | |
| | **82** 288:18 | |
| **6** | **83** 293:21 | |
| **6** 67:4,7,10 71:18 | **84** 126:7 | |
| 110:9,14,19 | **8504357140** 2:15 | |
| 111:11,12 112:22 | **855** 2:6 | |
| 113:7,20 124:12 | **86** 294:23 296:14 | |
| 126:3 130:7 139:3 | 296:15 | |
| 208:20 296:12 | **87** 297:3 | |
| 301:19 | **888** 4:6 | |
| **60** 7:2 158:25 | | |
| 159:14 283:18,20 | **9** | |
| **600** 2:13 | **9** 22:21,24 23:3,6 | |
| **6066** 240:5 | 23:14,23 44:19,24 | |
| **61** 159:21,22 | 45:23 55:10 73:18 | |
| **63** 271:6 | 98:24 100:21 | |
| **64** 271:7 | 101:18 104:25 | |
| **65** 37:2 | 125:3,11 126:18 | |
| **68** 5:17 | 163:9,11,11 | |
| | 166:20 167:18 | |
| **7** | 169:19 227:2 | |
| **7** 5:4 47:25 55:3,4,5 | 261:22 262:23 | |
| 67:5,7 75:1 80:19 | 300:5 | |
| 80:23 83:14 89:22 | **90** 221:3,5 299:17 | |
| 112:21 113:7,19 | **909** 2:20 | |
| 133:16 134:9 | **910** 220:23 | |
| 136:3 144:5,13,14 | **94556** 7:2 | |
| 275:13 | **981** 171:1 | |