# EXHIBIT 26

August 2001

# RECAP Submittal Report – Borrow Pit Report
# Inner Harbor Navigation Canal –
# East Bank Industrial Area
# New Orleans, Louisiana

Prepared For



**US Army Corps of Engineers**

New Orleans District

Under Contract to
U.S. Army Corps of Engineers-Tulsa District
Total Environmental Restoration Contract
DACA56-94-D-0021     Task Order #0026

AI 51469

By:



BEA Exhibit 21

PAGE 1

WGI331697

EXHIBIT MSJ 105


| RECAP SUMITTAL REPORT – BORROW PIT REPORT | AI 51469 |
| INNER HARBOR NAVIGATION CANAL – EAST BANK INDUSTRIAL AREA | |

## EXECUTIVE SUMMARY

This is the report of the first sampling effort at the East Bank Industrial Area (EBIA). It reports the results of the sampling at the Proposed Borrow Pit location in the McDonough Marine Facility. The Borrow Pit was originally proposed to be in the International Tank Terminal Facility, but during drilling a significant number of underground obstructions were discovered that made the area unsuitable as a Borrow Pit and so the location was changed. The area at the McDonough Marine Facility was chosen because of its apparent lack of chemical impact; based on the analytical results this proved to be the case. A total of nine boreholes were drilled with twenty- three samples sent for inorganic analysis and twenty-four samples sent for organic analysis. In addition, two temporary wells were installed. Groundwater samples were sent for analysis of TDS and a slug test was run to determine well yield. Based on TDS concentration and the well yield, the groundwater was classified ground water 3A that daylights in the Inner Harbor Industrial Canal - a non-drinking water source. Thirty-one chemicals of concern (COCs) that had been detected at the EBIA as a whole and were analyzed. Twenty-one of the 31 COCs were detected. The Inorganics and Semi Volatile Organics concentrations were compared to the concentrations in Table 1 of the RECAP document (LDEQ 2000). Screening levels were developed for organics based on the area of the proposed Borrow Pit (approximately 0.85 acre). The highest concentrations of the soil intervals 0 –3 ft., 0 – 15 ft., and 0 – 22 ft. were used for comparison with the screening levels. Six contaminants of concern were found above RECAP screening standards or SS. These were lead, arsenic, barium, chromium, benzo(a)pyrene and benzo(b)fluoranthene. These were then managed under Management Option 1. To that end: the 95% UCLs were calculated for the 0 –3 ft., 0 – 15 ft., and 0 – 22 ft. soil intervals and compared to MO-1 standards from Table 2 of the RECAP document (LDEQ 2000) after applying a DF of 20 to the Soil protective of gw3ndw concentration. The 95% UCLs were below the applicable MO-1 RECAP standard for all COCs except lead at 0 – 3 ft. and arsenic at all intervals. Therefore the lead concentrations from the 0 – 3 ft. interval were subject to an elevated measurement technique (hot spot evaluation or kriging) and the kriged concentration was below the limiting RS. The arithmetic mean of the arsenic concentrations was determined for all intervals and compared to the previously approved site-specific background. The means of all intervals were below the site-specific background.

One borehole in the Proposed Borrow Pit area contained a small amount of phase; this borehole will be excluded from the Borrow Pit. Therefore, eight boreholes delimit the Borrow Pit at the McDonough Marine Facility. The evaluation of the contaminant levels in samples from these boreholes showed that there was no unacceptable risk. As required in Section 8 of RECAP 2000 we are requesting written authorization from LDEQ that the soil is appropriate for reuse on-site at other locations in the EBIA. This document provides the information required by LDEQ to authorize such use. Any remediation of the ninth borehole will be addressed during remediation of the entire McDonough Marine Facility. A No Further Action At This Time determination will be requested for the entire McDonough Marine facility.

This document contains the results of the comparison of the field screening and laboratory analytical results. These results justify the use of field screening data to determine the lower limit of contaminated soil and therefore limit the number of soil samples sent for off-site laboratory analysis.

| Washington Group International, Inc. | Page 6 |
| (504) 947-5900 | Revision date – July 2001 |

WGI331704