**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Armstrong*, No. 10-866 | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION**
**TO EXCLUDE THE EXPERT TESTIMONY OF ROBERT GLENN BEA**

## **TABLE OF CONTENTS**

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   I.   DR. BEA'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT DOES NOT FIT THE FACTS... . . . . . . . . . 7

       A.    DR. BEA'S REPORTS DO NOT SET FORTH THE FACTS ESSENTIAL TO HIS OPINIONS. . . . . . . . 8

       B.    DR. BEA'S CROSS-SECTIONS INCLUDE SPECULATIVE HOLES AND FILLS THAT DO NOT FIT THE
EVIDENCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       C.    DR. BEA'S CROSS-SECTIONS DESCRIBE THE ORGANIC CLAY AS INCOMPRESSIBLE, WHICH
GIVES IT A PERFORMANCE CHARACTERISTIC THAT IS CONTRARY TO THE KNOWN FACTS.. 25

       D.    DR. BEA'S OPINION TESTIMONY RESTS ON *EX HYPOTHESI* ASSUMPTIONS AND MISTAKES,
AND THEREFORE SHOULD BE EXCLUDED BECAUSE IT RESTS ON A LARGELY FICTITIOUS SET
OF FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

   II.   DR. BEA'S OPINION TESTIMONY DEPENDS ON CONFUSED ANALYSES THAT ARE INCONSISTENT
WITH GENERALLY ACCEPTED ENGINEERING PRACTICE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

       A.    DR. BEA'S STABILITY ANALYSIS IS FUNDAMENTALLY FLAWED BECAUSE DR. BEA
INSTRUCTED MR. COBOS-ROA TO FIND AND USE AN ARTIFICIAL COMPRESSIBILITY VALUE
RATHER THAN A TRUE VALUE IN USING SEEP/W TO COMPUTE PORE PRESSURES... . . . . . 35

       B.    DR. BEA'S OPINIONS DEPEND ON HIS CONFUSION OF "DRAINED" AND "UNDRAINED"
ANALYSES, AND HIS STABILITY ANALYSIS IS THEREFORE SCIENTIFICALLY INCORRECT AND
UNRELIABLE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## TABLE OF AUTHORITIES

### CASES

*Black v. Food Lion, Inc.*,
    171 F.3d 308 (5th Cir. 1999)...................................................... 7

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996)..................................................... 34

*Christophersen v. Allied-Signal Corp.*,
    939 F.2d 1106 (5th Cir. 1991)................................................. 6, 32

*Coffey v. Dowley Mfg., Inc.*,
    187 F. Supp. 2d 958 (M.D. Tenn. 2002)....................................... 34

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000)................................................. 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)...................................................... 5, 6, 7

*Ellipsis, Inc., v. The Color Works, Inc.*,
    428 F. Supp. 2e 752 (W.D. Tenn. 2006)....................................... 34

*Equal Rights Ctr. v. Post Properties, Inc.*,
    246 F.R.D. 29 (D.D.C. 2007)................................................ 4

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)....................................................... 5, 6

*Guillory v Domtar Industries, Inc*,
    95 F.3d 1320 (5th Cir. 1996)................................................. 32,33

*In re Paoli*,
    35 F.3d 717 (3d Cir. 1994).................................................. 6

*In re: Vioxx Prod. Liab. Litig.*,
    414 F. Supp. 2d 574(E.D. La. 2006)........................................... 5

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)....................................................... 6, 7

*McLean v. 988011 Ontario, Ltd.*,
    224 F.3d 797 (6th Cir. 2000)................................................ 34

*United States v. Delgado,*
    668 F.3d 219 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Thomas,*
    2006 WL 140558 (D. Md. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Valencia,*
    600 F.3d 389 (5th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## FEDERAL RULES

Fed. R. Civ. P. 11(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Evid. 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Armstrong*, No. 10-866 | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION**
**TO EXCLUDE THE EXPERT TESTIMONY OF ROBERT GLENN BEA**

To be admissible at trial, an expert's testimony and opinions must fit the facts.  If his opinions address hypothetical or assumed "facts" materially different from the facts established by admissible evidence, then the expert's testimony will not—*cannot*—assist in resolving the dispute at hand.  Plaintiffs' expert, Dr. Robert Glenn Bea, has offered opinions intended to assist the Court in determining whether excavations created by Defendant Washington Group International, Inc., caused the Lower Ninth Ward breaches.  But his cross-examination under oath reveals that his opinions rest on guesswork and on assumptions that lack evidentiary support.  His opinions are couched in idiosyncratic phraseology unknown within the engineering community.  He redefines generally accepted terminology.  He relies on contrived analyses that flout established geotechnical practices and procedures.

A graduate student performed computer-assisted seepage analyses because Dr. Bea does not know how to do them.  The student testified that Dr. Bea specified unrealistic soil-

property input values—values vastly different from the empirical values derived from the parties' joint exploration-and-testing program. Dr. Bea himself admits that though the organic clays under the levee were in an "undrained" condition, he analyzes the floodwall's stability based on the strength those soils would have had if they had been in a "drained" condition. His opinion that underseepage destabilized the floodwall depends on speculation that holes seen in post-Katrina photographs were causes, not results, of the flood. There is no competent evidence that the holes existed before the flood, much less that they were dug by WGI.

Almost certainly the plaintiffs will cast this challenge to Dr. Bea's testimony as a mere dispute between experts—something that courts routinely resolve at trial. But we are not asking the Court to compare Dr. Bea's testimony to the defendants' experts'. We are asking the Court to examine Dr. Bea's own cross-examination testimony, without reference to the opinions of his opponents. For his own testimony reveals that his opinions rest on analyses of hypothetical cross-sections that bear no resemblance to the actual site geometries. He imposes huge holes close to the floodwall at both breach sites, without any evidence that such holes existed before the breaches. He fills the holes with hypothetical fill and assigns permeability values that have no basis in any competent evidence. At the north-breach site he hypothesizes a huge wedge of shell fill and assigns a high permeability to it. At the south-breach site he hypothesizes high-permeability fill in a utility excavation without any evidence that the excavation was as large as hypothesized or was backfilled with high-permeability soils.

Ultimately the plaintiffs will ask the Court to trust Dr. Bea, to accept his forensic-engineering judgment. But the law is clear: the Court cannot entertain Dr. Bea's testimony

if, in the final analysis, his opinions rest on his own say-so.  The courts employ the Latin

phrase—*ipse dixit*—to describe what occurs when an expert in effect asks a court to "Trust

me, I'm a doctor."  A court simply may not entertain expert testimony because the expert

provides assurances that he has done (or, if given time, could do) the analysis.  An expert

must show his work.  If he cannot show his work, either because he has not yet done it or

has lost or discarded it, then his testimony is inadmissible.  That is the case here.  In some

instances Dr. Bea, by his own admission, has not done the analysis.  In other places he relies

on analyses that he discarded or that were lost or stolen.  In yet others he relies on hand-

drawn sketches and rough calculations that prove absolutely nothing relevant to this case.

Because Dr. Bea's opinions lack the requisite relevance and reliability to assist the Court

in its fact finding, his testimony must be excluded.

## BACKGROUND

The complaints in these cases allege that excavations performed in the East Bank

Industrial Area ("EBIA") undermined the integrity of the flood protection structures

abutting the Lower Ninth Ward along the eastern shoreline of the Inner Harbor Navigation

Channel ("IHNC")/Industrial Canal.[1]  By filing these complaints, the plaintiffs' counsel

averred to this Court, under Federal Rule of Civil Procedure 11, that these "factual

contentions have evidentiary support or, if specifically so identified, will likely have

evidentiary support after a reasonable opportunity for further investigation or discovery."[2]

The United States propounded written discovery to Plaintiffs on June 27, 2011,

requesting that Plaintiffs "specify what excavation work undermined the integrity of the

---

[1]Complaint ¶ 43.

[2]Fed. R. Civ. P. 11(b)(3).

flood protection structures along the eastern shoreline of the IHNC/Industrial Canal, abutting the Lower Ninth Ward of Orleans Parish."[3]  "Specify," in this context, included both the time and the geographical location of any "work," including the excavations that Plaintiffs alleged undermined the integrity of the floodwalls.[4] Plaintiffs objected to this interrogatory, asserting that it was premature and promising that "[t]his information will be available by way of expert discovery."[5] Subject to that objection, Plaintiffs simply recited the conclusory, non-specific allegations of their complaint.

Recognizing that the plaintiffs' recital did not comply with the Rule 33(b)(3) requirement that an interrogatory be answered fully, counsel for the United States met and conferred with Plaintiffs' counsel in an attempt to obtain sufficient information to defend against the Plaintiffs' overbroad allegation.[6]  The interrogatory , as United States counsel then pointed out, requested the specific factual basis of the complaint's allegation—facts that the plaintiffs were required to possess before filing their complaint, not at the conclusion of discovery.  By contending that they could not identify the specific work that allegedly caused them harm, the plaintiffs were conflating their burden of proving causation, which they obviously did not bear at the outset of discovery, with their burden to set forth the specific predicate facts on which their causation expert's opinions would eventually be founded.

---

[3]*See* USA's First Interrogatory No. 4, June 27, 2011.

[4]*Id.* at Definitions 2e, 2f.

[5]*See* Pls. Response to Interrogatory No. 4.

[6]*See* USA's August 11, 2011, e-mail letter; *Equal Rights Ctr. v. Post Properties, Inc.*, 246 F.R.D. 29, 35 (D.D.C. 2007).

Nearly six months later, after requesting a six-week extension for the completion of his initial report, Dr. Bea set forth his opinions in a series of reports.  He was then deposed. Now, after the close of discovery, the specific information requested at the outset of this phase of the litigation remains undisclosed.  Plaintiffs, through their causation expert Robert Glenn Bea, have failed to identify sufficient evidence to support their claim that WGI's excavations caused the breaches at the Lower Ninth Ward.  As we show below, Dr. Bea's opinions rest on speculation and hypothesis, and on an idiosyncratic methodology at variance with accepted engineering practice.

## LAW AND ARGUMENT

To be admissible, evidence of any kind must be relevant: it must tend to make a material fact more or less probable.[7]  This requirement, when applied to expert testimony, is often described in terms of "fit."  An expert's testimony is relevant if "there is an appropriate fit between the scientific testimony and the specific facts of the case."[8]  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[9]  If the gap is too great, the expert's testimony must be excluded as irrelevant to

---

[7] *United States v. Delgado,* 668 F.3d 219, 226 (5th Cir. 2012).

[8] *In re: Vioxx Prod. Liab. Litig.*, 414 F. Supp. 2d 574, 579 (E.D. La. 2006) (*citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993)).

[9] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

the matter at hand.[10]  Testimony that fails to fit the facts of the case is unhelpful and cannot

assist in resolving factual disputes.[11]

Relevance is assured by requiring that proffered expert testimony be supported by

"good grounds, based on what is known."[12]  Opinion testimony that does not apply to the

specific facts of the case should not be admitted even if the reasoning is scientifically

sound.[13]  Thus, even opinions founded on generally accepted practices and procedures

must be excluded if the data analyzed bear little semblance to the competently established

facts of the case.[14]

Expert testimony, like other evidence, must also be reliable.[15]  This admissibility

requirement applies to all scientific testimony.[16]  Expert opinions must exhibit the same

intellectual rigor as is characteristic of the expert's field of practice or study.[17]  *Any* step that

renders the analysis unreliable renders the expert's testimony inadmissible.[18]  Opinions

that result from unscientific reasoning must be excluded even if cloaked in scientific jargon

---

[10]*Id.* (*citing Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991) (holding that deficiencies in expert's underlying facts and data go to admissibility, not weight), *abrogated on other grounds by Daubert.*

[11]*Daubert*, 509 U.S. at 591-92; Fed. R. Evid. 702.

[12]*Daubert*, 509 U.S. at 590.

[13]*See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000).

[14]*See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 154 (1999).

[15]*United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

[16]*Kumho Tire,* 526 U.S. at 147 (*quoting Daubert,* 509 U.S. at 589).

[17]*Kumho Tire*, 526 U.S. at 152.

[18]*See In re Paoli*, 35 F.3d 717, 745 (3d Cir. 1994).

or pseudo-scientific mumbo jumbo.[19]

## I. DR. BEA'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT DOES NOT FIT THE FACTS.

For someone who claims to have devoted 14,000 hours to "the work done here," Dr. Bea displays an astonishing ignorance of *the facts of this case*.[20]  If this case is about anything, it is about the holes dug by WGI.  Yet when questioned about them, Dr. Bea knew almost nothing.  He couldn't say where specific holes mentioned in his report were located.  And when asked to show the location of specific areas mentioned in his report, he misplaced them.  He did not know how deep the holes were, even though he theorizes that poorly-filled holes created a conduit down to the organic-clay layer that lies more than ten feet below the surface.[21]  He did not even know how deep the holes would have to have been to

---

[19]*See Black v. Food Lion, Inc.*, 171 F.3d 308, 311-14 (5th Cir. 1999).

[20]The interval from August 30, 2005, to March 27, 2012, the date when Dr. Bea approximated his hours of work, comprises 2,401 days.  Bea Dep., Vol. I, 44:3-6, March 27, 2012 ("Bea Dep., Vol. I"). If Dr. Bea had spent *five hours and fifty minutes working on these matters every day*—seven days a week for nearly six-and-a-half years, without missing a day—then his 14,000-hour total would be true.  The daily quota would be much higher if it were assumed that he took some time off from this endeavor to teach at the university or for personal reasons.  But if it were assumed that he did not take any time off to teach or lecture or travel, but worked on these matters five days a week without interruption, then the daily allotment for "the work done here" rises to eight hours and 10 minutes.

[21]Ten feet is about the closest the lower organic clay gets to the surface in the areas of interest (near the breaches).  Dr. Bea's cross-sections do not differentiate between the upper and lower organic-clay layers.  *See* Bea Rpt. 80, 95-96, February 1, 2012 ("Bea Rpt.") (lumping them together as "swamp").  Though the soils in these two layers fall within the organic-clay classification, they have different water contents.  The upper layer is interrupted by the sheet pile; the lower layer lies below the sheet pile, which explains why it is the layer of principal interest.  Dr. Bea theorizes that this layer instantaneously conveyed hydraulic pressure from the surge as it rose above the EBIA to the soils beneath the levee and beyond it as far as the buried Jourdan Avenue drainage culvert.  Since nothing in his reports or his testimony identifies the depth of the lower organic-clay layer, this factual component of his theory cannot be precisely ascertained.)

reach this key stratum.[22]

### A. DR. BEA'S REPORTS DO NOT SET FORTH THE FACTS ESSENTIAL TO HIS OPINIONS.

Dr. Bea's extemporary ignorance could be excused if his reports set forth the essential

facts.  But they do not.  They confirm that Dr. Bea is confused about the facts.  They show

that the facts essential to his causation theory are not the facts of this case.  The reports

rely on documents that do not support Dr. Bea's factual assertions.  The reports routinely

mislabel photographs, either ascribing what is depicted to the wrong place or describing

what is depicted erroneously.[23]  Some labels make unsubstantiated factual assertions.

These labels should be recognized for what they are:  invitations to trust Dr. Bea's photo

interpretations even though they spring from his own subjective impressions and not from

any scientific methodology.

Perhaps most telling in this regard is Dr. Bea's interpretation of graphics that

superimpose WGI's excavations onto an aerial photograph.[24]  These graphics were devised

to sustain his assertion that WGI's site-clearing activities caused "the surface soils of the

EBIA [to become] like Swiss cheese [sic] or an intensely bombed battlefield riddled with

*deep* holes."[25]  These graphics  supposedly support Dr. Bea's hypothesis that "the entire

---

[22]Bea Rebuttal Dep. 265:25 – 266:5, April 16, 2012 ("Bea Rebuttal Dep.").

[23]Whether these mistakes result from carelessness or from *mala fides* is irrelevant to this motion.  But cropping a photograph to eliminate an explicit geographic reference and then labeling the photograph with a different site may betoken something other than a lack of care.

[24]Bea Rebuttal Rpt. 7, ¶ 17, April 3, 2012 ("Bea Rebuttal Rpt.").

[25]Bea Rpt. 52, ¶ 53 (emphasis added).  *But see* the report of Dr. Rogers, the plaintiffs' geologist, who accurately described only "[t]wo deep excavations . . . : removal of the Sewer Lift Station (Saucer Marine) and the Wedding Cake structure (Boland Marine)."  Rogers Rpt. 106, January 5, 2012 ("Rogers Rpt.")

community of  excavations provided an [sic] substantial number of hydraulic connections with the buried water conductive swamp – marsh deposits . . . [and] facilitated seepage and hydraulic pressures that had important negative effects on the integrity of the hurricane flood protection structures . . . ."[26]

To propagate his analogy, Dr. Bea dubbed the aerial photos on which WGI's excavations were superimposed "EBIA Swiss Cheese Excavations and Backfill GIS graphic[s]."[27]  As his rebuttal report explains, "[t]hese 3D GIS graphic models detail the general aggregate extents of [WGI's] excavation work . . . ."[28]  The intent of these graphics "is to show depths of excavations relative to the local ground elevation . . . ."[29]  Accomplishing this objective is key to Dr. Bea's hypothesis that "[a] number of these excavations *would have* exacerbated the hydraulic conductivity pressure 'connections' with the underlying saturated, high water content swamp - marsh deposits."[30]  But the graphics do not provide a basis for determining how deep any of the holes were, much less whether any of them were deep enough to reach the lower organic clay.  None of his reports identify the specific excavations that actually *did* destabilize the floodwall under Dr. Bea's theory.  And when pressed "to tell me any of the excavations that are shown on this drawing that exacerbated the so-called hydraulic conductivity pressure connection with the underlying saturated high water content swamp marsh deposits", he suggested that "You can draw a big circle

---

[26]Bea Rpt. 52, ¶ 53.; *accord* Bea Rebuttal Rpt. 4.

[27]Bea Rebuttal Rpt. 8-10, Figs. 1-3.

[28]Bea Rebuttal Rpt. 4.

[29]*Id.*

[30]Bea Rebuttal Rpt. 4 (emphasis added); *accord* Bea Rebuttal Dep. 84:10-15.

around the entire area.  Any excavation that was deep enough and poorly backfilled puts us in contact with this swamp-marsh deposit."[31]  Lacking any detailed knowledge about the holes at the heart of his opinions, Dr. Bea simply retreated to a tautological response.

Dr. Bea takes the opportunity afforded by his rebuttal report to "interpret" the pejoratively labeled "Swiss Cheese GIS," *i.e.,* the aerial photographs on which light-green shading was placed by an unknown person who intended (but failed) to show the depth of WGI's excavations:[32]

> *My interpretation* of the Swiss Cheese GIS EBIA excavation and site clearing activities *is that there exists a very high correlation* of these activities with the local features identified in my Expert Report (Bea 2012, Case 1 and Case 2 excavations) that were associated with the locations and Forensic Engineering analyses of the causation of the North Breach and South Breach that developed at the Lower 9th Ward during Hurricane Katrina.[33]

The unwary reader might be misled into believing that Dr. Bea's "interpretation" rests on an analysis of the deep excavations or that someone had followed some scientific methodology to establish a correlation between WGI's "excavations and [other unspecified] site clearing activities" and "the North and South Breaches."  But no such analysis exists.  When asked how anyone could tell "which excavations you contend are deep enough and close enough to the I-wall to have exacerbated the hydraulic conductivity pressure connections,"[34] Dr. Bea gave this answer:

> Well, *we would have to do a correlation* for you to identify specific

---

[31]Bea Rebuttal Dep. 85-7-16.

[32]When deposed, Dr. Bea could not name the "expert" and did not know his credentials. *See id.* 61:10 – 62:20; Bea Dep., Vol. I, 236:1 – 237:9; Bea Dep., Vol. II, 41:3-25, March 28, 2012 ("Bea Dep., Vol. II").

[33]Rebuttal Rpt. 7, ¶ 17 (emphasis added).

[34]Bea Rebuttal Dep. 85:24 – 86:25.

excavations, then connect that to their depth, then correlate that with the contact elevation for the varied swamp-marsh deposit, and you could produce a table that would portray that information.  That's one of the powers of the GIS system and one of the reasons we went to this extent of work.  But sitting here today, I can't do that for you.

Q.  Do you have such a table?

A.  No.  I would be more than glad to produce it, if I had it.
Q.  Have you done such a correlation?

A.  No.

Q.  So despite the fact you write a report saying a number of these excavations has that effect, you can't tell us which ones.

A.  Well, I could point --

Q.  Right now?

A.  I could point to general ones, um—and we cited, for example, the wedding cake structure previously discussed.  We've had discussions concerning the piles that were pulled and the voids left behind from those piles.  We could cite the Area 8 that we've discussed, that although it did not put you in contact with the buried swamp-marsh deposit, it put the system in contact with other sandy, shelly materials that were in contact.  So it is a multi-connection problem.  It's not a individual excavation problem.  And hence my inability to provide the detail that you're requesting.

Q.  Has anyone done such a correlation?

A.  I think only in a general sense.[35]

When pressed further, Dr. Bea cited his "Case 1" and "Case 2" cross-sections, and "the excavations shown within those cross-sections," but he admitted that he could not identify all of the excavations that hypothetically created a conduit to the lower organic clay.[36]  "To

---

[35]Bea Rebuttal Dep. 87:1 – 88:11.

[36]*Id.* 88:14 – 90:11.

provide the level of detail that you are requesting, I'd have to produce this correlation that you are asking about."[37]

Dr. Bea's cross-examination testimony reveals that his opinion rests on a theory unhinged from the specific facts of this case. What his reports present as an authoritative opinion is mere supposition derived from a hypothesis not based on any scientific analysis of the specific facts of this case. An examination of Dr. Bea's "Case 1" and "Case 2" cross-sections confirms this.

**B.   DR. BEA'S CROSS-SECTIONS INCLUDE SPECULATIVE HOLES AND FILLS THAT DO NOT FIT THE EVIDENCE.**

To sustain his opinions, Dr. Bea analyzes "the performance of the floodwall – levee . . . at three sites (locations, cross-sections): (1) the North Breach site . . . , (2) the Near Breach site . . . , and (3) the South Breach site."[38]   "In performing these analyses, I developed and analyzed several different characterizations of the local geotechnical conditions ('cross-sections') that existed at the North Breach site and South Breach site at the time of Hurricane Katrina. These characterizations involve *specific backfilled excavations* that my forensic engineering investigations indicate were present at the time of Hurricane Katrina."[39]   Although he cautions that "[t]hese analyses are intended [merely] to illustrate the processes by which the backfilled excavations in the EBIA induced and enhanced the geotechnical processes that led to development of the North Breach and South Breach" and

---

[37]*Id.* 92:10-13.

[38]Bea Rpt. 62, ¶ 63.

[39]*Id.* 61, ¶ 62 (emphasis added).  *Cf. id.* 63-65, Figs. 38-40 (showing cross-section locations); *id.* 80, Figs. 43, 44 (showing north-breach cross-sections); *id.* 91, Figs. 56, 57 (showing "near breach" cross-sections); *id.* 95-96, Figs. 63, 64 (showing south-breach cross-sections).

asserts that he is "not suggesting that only the backfilled excavations described in the analytical cross-sections were the sole contributors to development of the North Breach and South Breach," the seepage and stability analyses of these cross-sections by Diego Cobos-Roa, a UC Berkeley graduate student, provide the only technical basis for his opinions.

Although Dr. Bea claims the benefit of "additional important insights into the characteristics of the soils and floodwall at the study locations," from documents and from the parties' "extensive program of soil sampling and laboratory testing and field testing," he still finds considerable "uncertainty due to the lack of sufficient information to define the soil, levee, floodwall characteristics in 'deterministic' ways."[40]  But as his testimony under cross-examination reveals, Dr. Bea's uncertainty stems from his failure to consider the available evidence and not, as his report suggests, from either a lack of sufficient information or "uncertainties [that] cannot be impacted significantly by gathering additional information."[41]

Dr. Bea created ten cross-sections (four each at the north- and south-breach sites and two at the so-called near-breach site) "to address the . . . uncertainties associated with the limited information (knowledge) on the soil, levee, and floodwall characteristics."[42]  He divides these ten cross-sections into "two sets" [*i.e.,* "Case 1" and "Case 2"] and asserts that they "are reasonable representations of the geotechnical and floodwall conditions that

---

[40]*Id.* 67, ¶ 69.

[41]*Id.* ¶ 68.

[42]*Id.* 69. ¶ 71.

existed at the three analysis sites at the time of Hurricane Katrina."[43]  This assertion is patently false, as we now show.

## The  North-Breach "Case 1" cross-sections include a huge hole not dug by WGI.

To analyze the north breach, Dr. Bea created four "idealized cross-sections" that supposedly represent "the features and characteristics that existed at the North Breach site at the time of Hurricane Katrina."[44]  These cross-sections appear on page 80 of his report, as figures 43 and 44, and in Appendix B, on pages14-17, as figures 10-13 .  These cross-sections were analyzed for seepage and stability by Mr. Cobos-Roa.[45]

The two Case 1 cross-sections depict "a large backfilled excavation adjacent to the west side of Surekote Road developed during the EBIA site clearing activities located near the waterside levee toe in the vicinity of the North Breach."[46]  Dr. Bea posits that this excavation was located approximately 60 feet from the sheet pile and approximately 10 feet deep and 25 feet wide.[47]  To convey the false impression that some evidence supports the existence of such an excavation, Dr. Bea advises the reader that "[t]he backfilled excavation (yellow rectangle left of Surekote Road embankment) was modeled as a rectangular shape with vertical walls to simplify the modeling process.  The walls of this

---

[43]*Id.*

[44]*Id.* at 79; *see also id.* 68, 78.

[45]GeoEStudios/Cobos-Roa Rpt. 22-23, Figs. 6-7, January 9, 2012 ("Cobos-Roa Rpt.").

[46]Bea Rpt. App. B, 8.  The only difference between the two Case 1 cross-sections is the horizontal dimensions of the lower organic clay layer (which Dr. Bea refers to as the "buried swamp – marsh deposit").  *See id.* 14.  For purposes of this motion, the thickness of the organic-clay layer is irrelevant.  What matters here is that both Case 1 sections "consider[] the same waterside excavation," for which there is no evidence.  *Id.*

[47]*Id.* 8, 13-14.

excavation would have been sloped to maintain stability of the walls.  The reader should not interpret the vertical straight excavation walls as a representation of *the real shape* of the walls of the backfilled excavation."[48]

Under cross-examination Dr. Bea admitted that he could not identify when, if ever, WGI created this "real" excavation.[49]  He could identify no evidence for this huge hole in any document created by WGI or the Corps of Engineers to plan or track the work done under Task Order 26:

> Q. In fact, isn't it true you don't know that Washington Group did such an excavation? . . .
>
> A. We only know that excavations were done in this area by Washington Group International during the site clearing operations at this location, and I reference the record that we have available to substantiate that assertion.
>
> Q. What excavation do you say Washington Group did at that location? At that location.  Tell me what it is.
>
> A. We identified both grid trenching and fiberoptic cable removing excavations.  That was as close as we could get to connecting the WGI site clearing work and what we observed following Hurricane Katrina and before Hurricane Rita.
>
> * * * *
>
> Q. Now, what I'm asking is not about concept, and not about what you saw in photographs after Katrina.  I'm asking about any evidence you have pre-Katrina for any excavation at that location that was a 15 to 17-foot excavation with anything near these dimensions, 25 feet wide, 100 feet long, 15 to 17 feet deep, at that location.  Any evidence.
>
> A. And your question of me is do I have a document that says a hole, excavation, with those dimensions, was developed at that location by WGI pre-Katrina? The answer to that is no.[50]

---

[48]*Id.* 14 (emphasis added).

[49]Bea Dep., Vol. II, 112:1-3.

[50]Bea Dep., Vol. II, at 112:6-113:16.

When confronted with the "No Further Action At This Time" (NFAATT) report for the

Boland Marine site, which locates all excavations and other site-clearing activities, Dr. Bea

conceded that the Task Order 26 records do not document his "conceptual" excavation:

> Q. This map shows the location of the - - locations of the remediation
> excavations at the Boland Marine site, the site that was adjacent to where the
> North Breach occurred.  Do you see that?
>
> A. Yes.
>
> Q. Do any of the excavations on the NFAATT map match the backfilled
> excavation that is shown in your conceptual cross-sections that appear on
> Figure 43 of your report and Figure 10 of your Appendix B?
>
> A. No.
>
> Q. And none of those excavations on the NFAATT map are as close as 60 feet
> from the floodwall, isn't that correct?
>
> A. That's correct.[51]

Dr. Bea also conceded that there is no evidence that any excavation at Boland Marine was

even 10-feet deep, let alone 15- to 17-feet:

> Q.  And look at table -- the prior page, I believe it is, in the same exhibit.
> According to the table, none of the excavations on the NFAATT map were
> more than 8 feet deep. Isn't that correct?
>
> A.  Correct.
>
> Q.  And I believe you've testified earlier that the only evidence, which was
> that hand-drawn map, showed the average depths of ACM Transite
> contamination at Boland was estimated to be plus or minus 2 feet, correct?
>
> A.  Correct.
>
> Q.  You don't have any evidence that ACM Transite excavations at Boland
> were even 10 feet deep, much less 15 to 17 feet deep; isn't that correct?

---

[51]Bea Dep., Vol. II, 119:6-21; *see also* Bea Dep., Vol. II, Exh. 17.

A.  That's correct.[52]

The only evidence Dr. Bea can point to is a collection of post-flood photographs that shows pools of unknown depth near the north breach.  His methodology consists of drawing arrows and placing ovals on the photographs and then labeling them with unsubstantiated and unprovable assertions.[53]  All that connects these pools to WGI is Dr. Bea's subjective, unscientific interpretation—which in the final analysis is nothing more than his own say-so and not a sound basis for allowing him to testify about the causes of the north breach.

**The North-Breach "Case 2" sections do not include holes dug or filled by WGI.**

The Case 2 cross-sections do not include holes dug or filled by WGI.  Like the Case 1 cross-sections, the Case 2 sections include hypothetical, *i.e.,* nonexistent, excavations.  Dr. Bea claims that the excavations in these "cross-sections are based on study and analysis of the available documents that detail the EBIA site clearing activities and excavations."[54]  He says "Case 2 for the North Breach considers a series of *excavations and modifications to the clay embankment* performed as part of the EBIA development and clearing activities."[55]  He says "a shell and sand filled excavation is located against the sheet pile."[56]  This hypothetical levee modification, supposedly "performed as part of the EBIA development and clearing activities," apparently lies somewhere within the ocher mound of shell fill that

---

[52]Bea Dep., Vol. II, 119:22 – 120:13.

[53]*See* Bea Rpt. 20, 24-29 (Figs. 1, 5a-8b).

[54]Bea Rpt. App. B, at 4.

[55]*Id.* 15 (emphasis added).

[56]*Id.* (citation omitted).

slopes down to the floodwall in the Case 2 cross-sections.[57]  Dr. Bea bases this hypothetical

excavation on the "logs" that characterize the soil strata at two locations where borings

were taken  by the Materials Management Group (MMG) in 2001 for use by WGI in

characterizing the site before it began to clear the site.[58]

The Case 2 cross-sections fail to fit the facts in three ways.  First, they do not include any

holes dug or filled by WGI.  Although his initial report characterizes the shell-filled areas as

"excavations," his rebuttal report omits any mention of such excavations and instead

describes only "pre-existing pervious shell fill layers that quickly conveyed water pressures

directly to the EBIA floodwall."[59]  Dr. Bea admitted that this fill preexisted WGI's work at

the site.[60]  There is no evidence that WGI created the "series of excavations and

modifications to the clay embankment" considered in Case 2.[61]

The second departure from the facts can be seen in the size of the shell fill that the Case

2 sections depict at the floodwall.  The only bases for imagining this huge pile of shell fill

are the two MMG boring logs and some post-flood photographs that show shells deposited

along the north edge of the breach by the in-rushing and out-flowing floodwaters.[62]  The

Case 2 sections imagine what the levee would have been like if the shell fill found at the

---

[57]*See* Bea Rpt. 80, Fig. 44; App. B, 15-17, Figs. 12-13.  As was true with the Case 1
sections, the dimensions of the lower organic-clay layer are the only difference between the
Case 2-1 and Case 2-1 sections, a difference that is irrelevant to this motion.

[58]*See* Bea Rpt. App. B, 15.

[59]Bea Rebuttal Rpt. 5, ¶ 8.

[60]Bea Rebuttal Dep. 119:21 – 120:4.  *Cf.* Rogers Dep., Vol. II, 223:23-224:5, March 17,
2012 ("Rogers Dep., Vol. II") (no WGI excavations were at MMG boring 81A site).

[61]Bea Rpt. App. B, 15.

[62]Bea Rpt. App. B, 29-30 (Figs. 25, 26a).

81A site, which was north of the breach, extended deeper than shown in the boring log and along the floodwall from north to south across the entire breach area.  But in so doing, the sections essentially ignore boring 79A, which is within the breach and reveals far less shell fill than boring 81A.[63]   Dr. Rogers, on whom Dr. Bea purports to rely for the "evidence" backing his Case 2 cross-sections, admitted that the 79A log shows shell fill no deeper than six feet, well above the sheet-pile tip.[64]   The supposedly "representative" Case 2 cross-sections make no attempt to reconcile the radically different information provided by the two borings.[65]  Instead of contracting the shell fill to reflect the fact that boring 81A is an outlier—no other boring anywhere shows more than a fraction of the shell fill found at 79A—the Case 2 cross-sections hypothesize that the levee at the north breach extended down to the tip of the sheet pile and along the entire length of the breach.[66]  Despite Dr. Bea's protestation that "I don't go willy-nilly through this and just add a foot because it might help something that I'm attempting to achieve" and his claim that "I do the best I can to make appropriate estimates at the time based on the information I have available," the Case 2 cross-sections do indeed appear to be an attempt to "cook the books."[67]  The Case 2 cross-sections show that Dr. Bea sloped the shell fill down from boring 81A to the bottom of the sheet pile, to generate a basis for asserting that "[t]hickness of shell fill at this

---

[63]*See* Bea Rpt. App. B, 15-17, Figs. 12-13.

[64]Rogers Dep., Vol. II, 229:24-230:16.

[65]Dr. Bea's report notes the distance between the borings is roughly 100 feet, and Figure 14 in Appendix B roughly illustrates just how far apart these borings were from one another.  Bea Rpt., App. B., 15, 18, Figure 14.

[66]Bea Rpt., App. B., 16-17, Figs. 12-13.

[67]Bea Dep., Vol. II 29:6-11.

location is approximately 18 feet measured from the top of Surekote Road, down to the tip of the sheet pile."[68]  With very limited evidence about the composition of the levee between the two points at either end of the north breach, Dr. Bea created cross-sections dominated by a large deposit of "pervious" fill at the flood wall.[69]

The third Case 2 departure from the facts of the case can be found in Dr. Bea's decision to ascribe a high permeability to the "pervious" shell fill that dominates his Case 2 cross-sections.   As both boring logs make crystal clear, what Dr. Bea labels "shell fill" in his cross-sections is in fact a composite soil composed of shells and silty sands.[70]  These fine soils limit the hydraulic conductivity of the composite, as Dr. Bea admitted under cross-examination.[71]  Nevertheless, Dr. Bea assigns to the shell fill a higher permeability value than to the sand fill.[72]  His decision to treat the shell fill as pervious and assign it an unjustifiably high hydraulic-conductivity value shows that in not one, not two, but three different ways his Case 2 analyses do not fit the facts.

**The South-Breach "Case 1" cross-sections include a huge hole not dug by WGI.**

As with the North Breach, Dr. Bea here too employed "idealized" cross-sections to analyze and opine on the causes of the south breach.[73]  Here again Dr. Bea claims to have

---

[68]Bea Rpt., App. B.,16.

[69]Bea Rpt. App. B, 17.  Dr. Bea regularly describes this fill as "pervious" without justifying his use of this pejorative adjective.

[70]*See* MMG Boring Log 79A; MMG Boring Log 81A.

[71]Bea Dep., Vol. II., 264:25-265:11.

[72]Bea Rpt., App. C, 2, Table 1.

[73]*See* Bea Rpt. 94 (Figs. 63, 64).

derived these cross-sections from observed topographic features and other available information.[74]  He again avers that "these cross-sections are representations of the features and characteristics that existed at the South Breach at the time of Hurricane Katrina."[75] And again these hypothesized cross-sections became the site geometry that Mr. Cobos-Roa analyze for seepage and stability.[76]

 "Case 1 for the South Breach considers a similar backfilled excavation as at the North Breach".[77]  Dr. Bea describes this excavation as having an estimated depth of approximately 8 to 10 feet.[78]  But the Case 1 cross-sections double its size, deepening it by another 10-12 feet.[79]  The report cites no evidence for either of these depths.  No method of estimating the depth is described.

More to the point, there is no evidence within the trove of Task Order 26 documents to suggest that WGI dug a hole where Dr. Bea imposed one in his Case 1 cross-sections.  And here again, when afforded an opportunity to identify any unambiguous evidence that this hypothesized excavation existed before the flood, Dr. Bea could not adduce any.  Shown the NFAATT map for the Saucer Marine site, he was forced to concede that the map showed no hole at or near the place where one appears in the "idealized" Case 1 cross-sections.[80]  And just as for the North Breach site, Dr. Bea conceded that no pre-flood evidence exists to

---

[74]*See id.* 94-95.

[75]*Id.* 96.

[76]Cobos-Roa Rpt. 51-52.

[77]Bea Rpt. App. B, 35.

[78]*Id.*

[79]Bea Rpt. 95 (Fig. 63) & App. B, 40 (Fig. 33); Bea Dep., Vol. II, at 124:20-125:12.

[80]Bea Dep., Vol. II, 127:14-22; Bea Dep., Vol. II, Exh. 38.

support his assertion that WGI dug a huge hole only 11 feet from the floodwall, as is depicted and analyzed by Dr. Bea in the South Breach Case 1 cross-sections.[81]  All that Dr. Bea can adduce as a basis for these cross-sections are the post-flood photographs that show water filling a hole of unknown origin and depth at the north end of the breach.[82]  Here again his method of analysis is to draw arrows and ovals and then label the photographs with conclusory assertions.[83]

These cross-sections, so critical to his opinion testimony, are based not on scientifically verifiable facts but on unscientific, speculative interpretations of photographs.  As a *forensic* engineer, Dr. Bea well knows the common mistake of confusing causes and effects. Nevertheless, he confidently asserts that "[t]his hole was produced by Hurricane Katrina surge waters flowing into the Lower 9th Ward through the breach removing the sandy fill backfill materials placed in EBIA site clearing excavations."[84]  We apparently must take his word for it and accept his assurance that he has not made this fundamental error, interpreting back-scour cut by rushing floodwaters as evidence of the breach's cause.

**The South-Breach "Case 2" utility excavation and sand fill do not fit the facts.**

The Case 2 cross-sections were created by Dr. Rogers to "represent[] . . . the features and characteristics that existed at the South Breach site at the time of Hurricane Katrina."[85]  The

---

[81]Bea Dep., Vol. II, 127:14-22.

[82]*See* Bea Rpt. 24-27 (Figs. 5a-7) & App. B, 35-36 (Figs. 31a, 31b); Bea Dep., Vol. II, 129:23-24.

[83]*See* Bea Rpt. 24-27 (Figs. 5a-7) & App. B, 35-36 (Figs. 31a, 31b).

[84]Bea Rpt. 27.

[85]Bea Rpt. 96 & App. B., 42; *see also* Bea Dep., Vol. II, at 123:21-22.  *Compare* Bea Rpt., 96-105 (discussing only Case 2-1), *with* App. B., 47 (including discussion of Case 2-2).

Case 2 cross-sections include a sand-filled excavation that is about 100-feet long and nearly 10-feet deep at its deepest point right at the floodwall.[86]  According to the report, this excavation was created by WGI to remove buried utilities.[87]  The report does not cite any evidence, and when Dr. Bea was asked to identify the basis of the excavation as it appears in the cross-sections he could not provide any.  He relied on Dr. Rogers for the cross-section and was sure that evidence for the excavation could be found in Dr. Rogers' report, although he couldn't say where.[88]

Dr. Bea did not know that Dr. Rogers had testified that he could find no evidence—none—to determine whether the utilities  hypothesized in the Case 2 excavations existed, whether the utilities had been removed, or, if they had, what fill had been placed in the excavations.[89]  Likewise, Mr. Cobos-Roa, who analyzed the cross-sections with SEEP/W and SLOPE/W, could not say whether the sand-filled Case 2 excavation truly did represent a condition that existed at the time of Hurricane Katrina.[90]

In fact, utility lines were removed from the Saucer Marine site.  But as the government's expert Timothy D. Stark, Ph.D., P.E., D.GE, details in his report, the lines were not nearly as deep as drawn by Dr. Rogers in the Case 2 cross-sections, and they were backfilled with the same low permeability clays that came out of them.[91]  Without any evidence whatsoever,

---

[86]Bea Rpt., 96, Fig. 64; App. B, 46-47, Figs. 41-42.

[87]Bea Rpt., App. B., 45

[88]Bea Dep., Vol. II, 128:9 – 132:13.

[89]Rogers Dep., Vol. II, 212:12 – 213:14.

[90]Cobos-Roa Dep., 170:21-172:23, April 10, 2012 ("Cobos-Roa Dep.").

[91]*See* Stark Rpt. 76-85.

Dr. Bea's Case 2 cross-sections characterize the excavation trenches as having been backfilled with sand or sandy-shell fill, as indicated by the ocher shading used to indicate high-permeability soils.[92]  Under cross-examination Dr. Bea could not avoid admitting that the utility-excavation trenches were filled with native materials.[93]

Let there be no mistake: the citation to Dr. Stark's report does not create a factual dispute.  Dr. Bea relies on Dr. Rogers for his Case 2 excavation, and Dr. Rogers admits to having no supporting evidence.[94]  When Dr. Bea was invited to identify where, on the Saucer Marine site, WGI backfilled *any* excavation using sand, Dr. Bea could not do so.[95]  Dr. Stark's report is cited only to avoid creating the false impression that might have remained if we had simply pointed out that the plaintiffs' experts have no evidence to support their Case 2 utility- removal excavations.  The pertinent point, not to be missed, is that Dr. Bea's site characterization is unreliable and does not fit the facts.

The significance of the Case 1 and Case 2 inaccuracies cannot be overestimated.  Dr. Bea's seepage and stability analyses depend on the computer modeling by Diego Cobos-

---

[92]Bea Rpt., App. C, Table 1; Bea Rpt., 96, Fig. 64; App. B 46-47; Figs. 41-42 (correlating color yellow to indicate higher permeability sand); Bea Dep., Vol. II, 242:21-244:7 (confirming that table in Appendix C correlates yellow to higher hydraulic conductivity materials such as sand and shell fill).

[93]*See* Bea Rpt., App. C, 2 ("Evidence indicates the pipeline removal excavation trenches identified in the South Breach Case 2 were backfilled with the excavated clay spoils . . . ."); Bea Dep., Vol. II, 254:20-256:2 (Dr. Bea testifies that the Case 2 "pipeline" trench was backfilled with "native material."); Bea Rebuttal Dep., 120:7-14 (Dr. Bea testifies there was no evidence of any preexisting pervious shell fill layers at the South Breach site).

[94]Rogers Dep., Vol. II, 212:23-213:1 ("Q. Do you have any proof that any utility excavation was not backfilled with appropriate material? A. No, I don't.").

[95]Bea Rebuttal Dep.,116:24-117:3.

Roa.  These cross-sections formed the foundation of those models.[96]  Mr. Cobos-Roa took

the cross-sections as he got them from Dr. Bea and ran the SEEP/W and SLOPE/W

programs without attempting to verify whether they were consistent with actual EBIA site

conditions.[97]  He understood that if the cross-sections were inaccurate, then the model

outputs would be inaccurate as well.[98]  He understood that if the cross-sections strayed

from the actual site geometry, then the computed flows, pore pressures, deformations, and

other outputs would not represent reality.[99]

### C. Dr. Bea's cross-sections describe the organic clay as incompressible, which gives it a performance characteristic that is contrary to the known facts.

In his report, Dr. Bea pays lip service to the extensive exploration-and-testing program

jointly undertaken by the parties last summer and fall: "This testing provided very

important information which has been used to characterize the performance

characteristics of the soils; particularly, the information that has been developed from the

in situ testing performed to determine the hydraulic conductivity properties of the swamp

– marsh deposits that underlie the floodwall and other areas in the Lower 9th Ward."[100]

The report reiterates this point, emphasizing that "[a] very important part of the 'best

estimate' soil properties used in the floodwall – levee performance analyses were those

associated with the swamp – marsh deposits in situ coefficients of permeability along the

---

[96]Cobos-Roa Dep., 138:14-23, 248:22-249:8

[97]Cobos-Roa Dep., 133:23-134:6, 137:14-24, 149:6-12, 164:17-165:2, 171:17-172:18, 248:15-17, 250:5-252:10.

[98]Cobos-Roa Dep. 138:14-23.

[99]Cobos-Roa Dep. at 248:18-249:8.

[100]Bea Rpt. 66, ¶ 66; *see also id.* 67, ¶ 67.

alignment of the Lower 9th Ward at the time of Hurricane Katrina."[101]  According to the report, these "best estimate" soil properties were incorporated in his "'best judgment' cases (cross-sections)."[102]

But in the entire report, not a single "best estimate" soil property is derived from the 2011 investigation, not even the "very important" organic-clay permeability.  Nevertheless, as if to emphasize the importance of the organic clay's hydraulic conductivity, Appendix C begins with a 21-page discussion of this soil property, comparing model results with field and laboratory values to confirm that the new 2011 information supports Dr. Bea's "best estimate," which is "[b]ased on  previous analyses."[103]  The report asserts that "the 'best estimate' in situ horizontal conductivity (permeability) for the swamp – marsh deposits under the floodwall – levee alignment was determined to be $1 \times 10^{-5}$ cm/s (0.00001 centimeters per second, 0.3 inches per day)"—a figure not derived from the 2011 investigation but from "previous analyses" by ILIT, IPET, and Mr. Cobos-Roa.[104]  The only "important insight" attributed to the parties' joint investigation is "the plausible lower and upper 'bound' 'range' of in situ horizontal hydraulic conductivities" of the "swamp – marsh deposits" under the floodwall, which he reports to be $1 \times 10^{-6}$ cm/s and $1 \times 10^{-4}$ cm/s.[105] But if he indeed bases his best estimate on previous analyses and not on data derived from the parties' joint exploration-and-testing program, one can perhaps be forgiven for being

---

[101]*Id.* 71-72, ¶ 77.

[102]*Id.* 71, ¶ 76.

[103]*Id.*, Appendix C, 19-20.

[104]*Id.* 72, ¶ 77.

[105]*Id.* 72, ¶ 77.

mystified as to the importance that he supposedly attaches to the very extensive and very costly (not to mention trial-delaying) 2011 investigation.

Oddly, soil compressibility, the most important soil-performance characteristic in Dr. Bea's seepage and stability analyses, is not mentioned in either Dr. Bea's report or its appendices.  More oddly still, the first mention of it occurs when Dr. Bea is being cross-examined about the ever-decreasing permeability estimates that he has used in his analyses.[106]  What makes this so odd is that Dr. Bea's "best estimate" of compressibility renders his "best estimate" of hydraulic conductivity all but irrelevant.  The nub of Dr. Bea's opinion is that uplift pressures in the organic clay on the protected side of the floodwall caused the breaches.[107]  But when he was asked whether his "seepage analysis was relatively insensitive to variations in hydraulic conductivity," he agreed that that was "correct if the seepage analyses that you are referring to are those associated with analysis of the pressure effects on the protected side."[108]

"For a while" Dr. Bea was puzzled by the fact that the calculated uplift pressures in his seepage analyses "are relatively insensitive to a plausible range in hydraulic conductivity," but he later "came to understand it."[109]  By January of this year, when Mr. Cobos-Roa was doing the final seepage analyses for Dr. Bea's report, Dr. Bea recognized that "maintaining the soil property in the lower organic clay . . . as virtually incompressible rendered [his]

---

[106]*See* Bea Dep., Vol. I, 150:7 – 164:25, (March 27, 2012) ("Bea Dep., Vol. I").

[107]*See* Bea Rpt. 18 ¶ 29.

[108]Bea Dep., Vol. II, 219:17 – 220:1.

[109]Bea Dep., Vol. I, 155:4-23.

analysis for uplift pressures relatively insensitive to changes in hydraulic conductivity."[110]

He knew that his "conscious choice" to "select[] the compressibility" value for the organic

clay instead of using a value empirically derived from the 2011 joint investigation would

reduce all of the parties' efforts to ascertain the best estimate of permeability a pointless

exercise.  In his analyses, *any* plausible permeability would not significantly affect his

seepage or stability analyses.[111]

Dr. Bea's cross-sections describe the "swamp – marsh" as incompressible even though it

is well recognized that saturated organic clays,  are almost always very compressible.  In

their seminal *Soil Mechanics in Engineering Practice,* Professors Karl Terzaghi and Ralph B.

Peck point this out in their brief description of this soil type:

> *Organic clay* is a clay that owes some of its significant physical properties
> to the presence of finely divided organic matter.  *When saturated, organic
> clay is likely to be very compressible,* but when dry its strength is very high.  It
> is usually dark gray or black and it may have a conspicuous odor.[112]

Echoing Terzaghi and Peck, Dr. Rogers, the plaintiffs' site characterization expert,

described the marsh soils in New Orleans as "highly compressible."[113]  His report notes that

the original IHNC levees settled considerably due to the "compressible marsh and swamp

---

[110]Bea Dep., Vol. II, 220:18 – 221:3.

[111]*See* Bea Dep., Vol. I., Exh. 7, at 20 ("these seepage – pore pressure – uplift pressure
analyses employed a very wide range in hydraulic conductivity of the buried marsh –
swamp layers – $10^{-2}$ cm/s to $10^{-6}$ cm/s – 4 orders of magnitude").  In other words, the soil
permeability could be 10,000 times less permeable than the estimate used by ILIT without
changing Dr. Bea's opinion.

[112]Karl Terzaghi et al., *Soil Mechanics in Engineering Practice* 6 (1st ed. 1948) (emphasis
added).

[113]Rogers Rpt., 143.

soils lying beneath."[114]  Their organic content makes them more compressible than other soils.[115]

The 2011 laboratory tests confirmed that the EBIA organic clays are compressible. Plaintiffs experts, including both Dr. Rogers and Dr. Bea, had the laboratory test results that the defendants' experts used to estimate the organic clay's compressibility.[116]  But Dr. Bea decided *ex hypothesi— i.e.,* on the basis of his steady-flow hypothesis—that he would disregard the available information.  Despite the contrary evidence, Dr. Bea believes "the soils in the lower organic clay unit, as they existed in the East Bank Industrial Area on August the 29th, 2005, when the surge began to rise over the EBIA, were in fact incompressible."[117]  He believes this because *in*compressibility, a key SEEP/W input parameter, fits his theory.  The organic clay *must* be incompressible in order for it to be true, as he theorizes, that pressures were rapidly transmitted through the soil from one side of the floodwall to the other before the floodwall failed.[118]

According to Cobos-Roa, Dr. Bea simply asked Geoestudios to "find a way how we can model" an incompressible condition, and once Geoestudios discovered that a "10 the minus 9" captured the incompressible response Dr. Bea wanted, that value was approved.[119]  In other words, "instead of using site specific [values]," Cobos-Roa and Dr. Bea "put an

---

[114]*Id.* 166.

[115]Rogers Dep., Vol. II, 37:20-38:3.

[116]Rogers Rpt. 183, 220.

[117]Bea Rebuttal Dep. 224:15-20.

[118]Cobos-Roa, Dep., 191:19-193:20; *see also id.* at 203:1-18 (agreeing that compressibility can be derived from the storage-coefficients plotted by Dr. Rogers).

[119]Cobos-Roa, Dep. 191:19-193:20.

incompressible [value] into the program intentionally to get a certain response."[120]

Unhinged from the *site specific* value of compressibility for the organic clay at the EBIA site,

Cobos-Roa, at Dr. Bea's direction, instead assumed a compressibility factor 10,000 times

greater than what that *site specific* data would support.[121]  Mr. Cobos-Roa knew of no soil in

the universe that is as incompressible as Dr. Bea instructed him to make the organic clay in

the SEEP/W model runs.[122]  Indeed, no soil is so incompressible.  Not even granite is as

incompressible as the organic clay in the Cobos-Roa seepage models.  Mr. Cobos-Roa

simply did as he was told, explaining, "It was not my decision."[123]

SEEP/W  models only what the user puts into the program.  Dr. Bea concedes this.[124]

Those inputs, including compressibility, can be (and usually are) calculated with generally

accepted and widely used formulas.[125]  Nevertheless, Dr. Bea chose not use a site-specific

value that could have been readily calculated and in fact was calculated by the defendants'

experts.  Dr. Bea made the organic clay incompressible because he needed it to be

incompressible in order for his "steady flow" analysis to yield the high uplift pressures that

---

[120]Cobos-Roa Dep. 208:10-21.

[121]Cobos-Roa Dep., 211:4-9 ("Q. Your assumed M sub V value in this case indicates that the marsh will consolidate approximately 10,000 times faster than if the site specific M sub V had been used.  Isn't that about right? A. Yes."

[122]Cobos-Roa Dep., 214:19-22 ("Q. . . . Do you know of any such soil in the universe that has those compressibility values? A. I don't.").  Dr. Bea, on the other hand, testified that such soils exist in the Niger River Delta.  *See* Bea Rebuttal Dep., 226:25-227:15.  Clearly, we are not dealing with the Niger River Delta *in this case.*  One need only refer back to Dr. Rogers' site characterization report to understand that the organic clays in New Orleans are highly compressible materials.  *See supra* at 28-29, notes 113-16.

[123]Cobos-Roa Dep., 297:23-298:2.

[124]Bea Rebuttal Dep., 273:20-274:21.

[125]*Id.*

are essential to his "hydraulic pressure conductivity analysis."  He disregarded the organic

clay's actual compressibility and prescribed an unrealistic compressibility that he deemed

consistent with his hypothesis that "steady flow" conditions quickly developed when the

surging floodwaters covered the EBIA.  He made this perfectly clear at his deposition.

When asked whether he "decided, *a priori,* to model the flow as steady flow and[,] to

approximate that condition, used a very low value [for compressibility] . . . in your flow

analyses," he responded unequivocally: "That's correct."[126]  And when asked whether

"[t]hese steady flow analyses disregard the site specific value of storage coefficient

determined from the pumping tests," a basis for computing compressibility, he answered

"Yes."[127]

 Dr. Bea does not dispute that his prescribed compressibility for the lower organic clay is

several orders of magnitude lower than the values that can be computed from the data

gathered during the 2011 investigation.[128]  Nor does he dispute that his seepage analyses

are sensitive to changes of this magnitude.  Instead, he defends his choice as being

consistent with his analytical framework.[129]  Whether that framework withstands scrutiny

is addressed below.  But apart from that inquiry, *Daubert* asks whether an expert's

testimony concerns the facts of the case.  *Daubert* demands that opinion testimony address

the facts of the case.  Testimony must satisfy that test even if the expert's theoretical

framework is internally consistent and valid on its own terms.  Dr. Bea's decision to

---

[126]Bea Dep., Vol. II, 166:4-10.

[127]*Id.* 166:11-15.

[128]Bea Rebuttal Dep. 28:25–30:23.

[129]*Id.* 30:24–31:17.

characterize the organic clay as incompressible may be consistent with his "steady flow" hypothesis. But his characterization strays far from the facts. On that basis alone, his opinion testimony should be excluded.

### D. DR. BEA'S OPINION TESTIMONY RESTS ON *EX HYPOTHESI* ASSUMPTIONS AND MISTAKES, AND THEREFORE SHOULD BE EXCLUDED BECAUSE IT RESTS ON A LARGELY FICTITIOUS SET OF FACTS.

Dr. Bea's opinion testimony must be excluded because his critical cross-sections and the incompressible organic clay in them do not fit the facts of this case. His opinions about the cause of the breaches depend on facts that he assumes *ex hypothesi* for purposes of this litigation. Expert testimony based on speculative "facts" inconsistent with facts supported by the record evidence is inadmissible.[130]   In *Guillory* the expert proffered opinions based on his analysis of a forklift that was different from the one involved in the accident at issue.[131]   The testimony was therefore deemed inadmissible because it was based on assumed facts that the expert contrived to support his re-creation of the event.[132]   The courts recognized that the expert could not explain the causes of the accident, because his conclusions were deduced from the wrong set of facts:

> Certainly nothing . . . requires a court to admit an opinion based on facts that are indisputably wrong. Even if Rule 703 will not require the exclusion of such an unfounded opinion, general principles of relevance will. In other words, *an opinion based totally on incorrect facts will not speak to the case at hand and hence will be irrelevant*. In any event such an opinion will not advance the express goal of "assisting the trier of fact" under rule 702.[133]

---

[130] *See Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996).

[131] *Id.* at 1330-31.

[132] *Id.* at 1331.

[133] *Id.* (emphasis supplied) (*quoting Christophersen*, 939 F.2d at 1114).

As the Court of Appeals explained, "[e]xpert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all.  Both analyses result in pure speculation.  We find the testimony properly excluded on this ground."[134]

   The reasons given for excluding the *Guillory* expert's testimony apply here too.  Dr. Bea's opinions about causation depend on the validity of the SEEP/W and SLOPE/W analyses of cross-sections that differ markedly from the actual site conditions.  Dr. J. David Rogers, the plaintiffs' site-characterization expert who gave Dr. Bea the Case 1 and Case 2 cross-sections as "options," was mystified by the imposition of the huge excavation in the Case 1 cross-sections.[135]  When asked whether Figure 43, the Case 1-1 cross-section represented "your understanding of what the cross-section of that north breach was?" Dr. Rogers answered, "Well, with the exception of the backfilled excavation—I don't know what that particular one is in that case."[136]  He agreed that "if we subtract out that box which is the backfilled excavation, that's your understanding—that comports with your understanding of what that cross-section of the . . . north breach should be."[137]  And as to the Case 2 cross-section, he flatly stated, "He put in the excavations.  I didn't do those."[138]

   Dr. Bea's opinion testimony should be excluded because his "representative" cross-sections represent not facts fairly inferred from the record evidence but a "fictitious set of

---

[134]*Id.*

[135]*See* Rogers Dep., Vol. II, 248:19 – 250:22.

[136]*Id.* 248:22 – 249:1.

[137]*Id.* 249:19 – 250:1; *see also id.* 252:8-9 ("I don't know anything about that excavation in Figure 43").

[138]*Id.* 249:9-10.

facts" that cannot assist in determining the cause of the breaches.[139]  The cross-sections,

featuring hypothetical backfills and excavations that hew more closely to Dr. Bea's

extrapolations and interpretations than to the record evidence, invite the sort of "apples to

oranges" comparison that is routinely excluded as irrelevant and therefore unhelpful.[140]

Exclusion of such evidence is precisely what Rule 702 requires.[141]

Neither Dr. Bea's reports nor his deposition testimony provides a sound evidentiary

basis for concluding that the holes and fills in Dr. Bea's eight north- and south-breach cross-

sections fit the facts of this case.  When asked for evidence, Dr. Bea could not find any basis

for his opinions other than some post-event photographs.  Essentially, therefore, this Court

is being asked to accept Dr. Bea's subjective, unscientific photo interpretations as a

sufficient basis for his opinion testimony.  Neither Rule 702 nor the relevant case law lets a

court entertain opinion testimony on such a flimsy basis.  "Clearly, *Daubert* and *Kumho Tire*

*Co.*, as well as Rule 702, require that expert opinion evidence be connected to existing data

---

[139]Rogers Dep., Vol II, 248-49.

[140]*See, e.g., Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison") (internal citations and quotations omitted).

[141]*See, e.g., McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record."); *see also Ellipsis, Inc., v. The Color Works, Inc.*, 428 F. Supp. 2e 752, 760-61 (W.D. Tenn. 2006) (excluding expert testimony where the expert's report contained "several factual and methodological flaws that substantially undermine the reliability of his entire report.  The record is replete with evidence that [the expert's] testimony is not based on sufficient facts or data, [the expert's] testimony is not the product of reliable principles and methods, and [the expert] did not apply the principles and methods reliably to the facts of this case, as required by Rule 702."); *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 976 (M.D. Tenn. 2002) (excluding expert testimony where the expert "relied on a finite element analysis that was the product of a number of 'guesstimations' and speculations. Like a house of cards, once those foundations are disproved, the whole analysis collapses.").

by something more than a chain of dubious inferences that amount to an expert's assertion that 'it is so because I say it is so.'"[142]

## II. DR. BEA'S OPINION TESTIMONY DEPENDS ON CONFUSED ANALYSES THAT ARE INCONSISTENT WITH GENERALLY ACCEPTED ENGINEERING PRACTICE.

### A. DR. BEA'S STABILITY ANALYSIS IS FUNDAMENTALLY FLAWED BECAUSE DR. BEA INSTRUCTED MR. COBOS-ROA TO FIND AND USE AN ARTIFICIAL COMPRESSIBILITY VALUE RATHER THAN A TRUE VALUE IN USING SEEP/W TO COMPUTE PORE PRESSURES.

The nub of Dr. Bea's opinion is that uplift pressures in the organic clay on the protected side of the floodwall caused the breaches.[143]  These pressures were calculated by Mr. Cobos-Roa using the incompressibility value specified by Dr. Bea.[144]  If he had specified a higher value, the computed pore pressures would have been lower, and the lower computed pore pressures would have materially changed his SLOPE/W stability analyses.[145]  If a higher compressibility had been used, a compressibility based on the site-specific information obtained during the 2011 investigation, then "the flow analyses using SEEP/W would not result in uplift pressures that indicate any danger to the flood wall."[146]  As Dr. Bea freely acknowledges, "[t]hat's been the basis, consistently, for the analyses

---

[142]*See United States v. Thomas*, CRIM. CCB-03-0150, 2006 WL 140558 at *23 (D. Md. 2006).

[143]*See* Bea Rpt. 18 ¶ 29.

[144]*See* Bea Rebuttal Dep. 29:12-15.

[145]*Id.* 31:5-17; *see also id.* 33:14 – 34:2.

[146]Bea Rebuttal Dep. 29:22 – 30:18.

performed by Dr. Silva-Tulla, Dr. Tim Stark, Dr. Brandon, and Dr. Marr.  Those analyses

based on that M sub V show no significant transfer of fluid and pressure."[147]

Dr. Bea aptly and succinctly justifies his decision to prescribe a compressibility value:

"we're performing different analyses. . . . We are working different problems."  And this

explains in a nutshell why Dr. Bea can conclude that holes in the canal itself caused the

floodwall to fail, indeed, holes of any depth at any place caused the IHNC breaches.[148]  If it

were simply a matter of choice, a matter of whose analyses were better, then *Daubert*

would not prevent Dr. Bea from testifying.  But if, as we now show, Dr. Bea's "different"

analysis is contrary to accepted engineering practice and he is "working" the wrong

problem, then his testimony is inadmissible.

The authors of the foremost treatise on soil strength and stability, J. Michael Duncan and

Stephen G. Wright, frame the matter in terms that apply in the present legal context as fully

as in the practice of geotechnical engineering: "For slope stability analyses to be useful,

they must represent the *correct problem, correctly formulated.*  This requires (1) mastery of

the principles of soil mechanics, (2) knowledge of geology and site conditions, and (3)

knowledge of the properties of the soils at the site."[149]  Dr. Bea's reports and his own

---

[147]*Id.* 29:18-23.

[148]Dr. Bea's "fundamental conclusion" is that the breaches were caused by "nearby excavations backfilled with high permeability materials."  Bea Rpt. 18, ¶ 29.  When asked how he defines "nearby," he replied, "Nearby are those excavations that are close to the floodwall."  Bea Dep., Vol. I, 206:12 – 207:3.  When pressed to say "[h]ow far is nearby from the floodwall," he revealed not just how unwilling he was to be specific but also how willingly he engages in wordplay to obfuscate and mislead.  How *near* "are those excavations that are *close* to the floodwall"?  "500 feet.  A few hundred feet."  *Id.* 207:19.  *An excavation 500 feet west of the floodwall would not be in the EBIA.  It would be in the canal.*

[149]J. Michael Duncan & Stephen G. Wright, *Soil Strength and Slope Stability* 19 (2005) (emphasis in original).

testimony show that he lacks the requisite mastery and knowledge and has therefore incorrectly formulated and incorrectly solved the wrong problem.

Compressibility is a fundamental property that must be considered in evaluating soil behavior.[150]  In light of the importance that geotechnical engineers ascribe to understanding *in situ* soil properties, including the "compressibility" of those soils, the parties in this case jointly undertook a soil exploration in order to have a full and accurate understanding of the behavior of soils located at the EBIA.  Borings were pulled from multiples sites and testing completed, enabling the parties to compute "best estimates" of, among other things, hydraulic conductivity and storage coefficients, enabling any trained geotechnical engineer to compute a "best estimate" coefficient of compressibility.  Plaintiffs experts, including both Dr. Rogers and Dr. Bea, had this data available to them, including the consolidation tests that could have been used to calculate a "best estimate" based on the *known in situ soils at the EBIA site.*[151]

The actual *value* that Dr. Bea selected to define the compressibility of the lower organic clay (or, rather, incompressibility, as Dr. Bea would have the Court believe) is, as Cobos-Roa testified, a "key input parameter" when running the computer models.[152]  Thus, it begs the question why, given that site specific data was available to calculate a compressibility value

---

[150]Karl Terzaghi & Ralph B. Peck, *Soil Mechanics In Engineering Practice* 40 (1st ed. 1948).

[151]Rogers Rpt., 183, 220.

[152]Cobos-Roa, Dep., 191:14-192:8 (describing input of compressibility as a "key input parameter.")

for the EBIA, Dr. Bea would choose to employ a value with no correlation to the known data at that site.[153]

As previously noted, Dr. Bea spurned the available data and asked Mr. Cobos-Roa to "find a way how we can model" an incompressible condition.  Mr. Cobos-Roa discovered that a value of $1 \times 10^{-9}$ units of 1/psf captured the incompressible response that Dr. Bea wanted, and Dr. Bea instructed him to use that value.[154]  In other words, "instead of using site specific [values]," Cobos-Roa and Dr. Bea "put an incompressible [value] into the program intentionally to get a certain response."[155]  Unhinged from the *site specific* value of compressibility for the organic clay, the SEEP/W model runs calculated the outputs sought by Dr. Bea on the basis of an assumed, *i.e.,* hypothetical, compressibility factor that was 10,000 times greater than the empirically-derived site-specific data justified.[156]  As Mr. Cobos-Roa confessed, no soil has a compressibility as low as the compressibility that Dr. Bea told him to use.[157]

---

[153]*Id.*, 203:1-18 (agreeing that compressibility value could be derived from the storage coefficient numbers plotted in Dr. Rogers' report).

[154]*Id.*, 191:19-193:20.

[155]*Id.*, 208:10-22.

[156]*Id.*, 211:4-9 ("Q. Your assumed M sub V value in this case indicates that the marsh will consolidate approximately 10,000 times faster than if the site specific M sub V had been used.  Isn't that about right? A. Yes.").

[157]*Id.*, 214:19-22 ("Q. . . . Do you know of any such soil in the universe that has those compressibility values? A. I don't."). Dr. Bea, on the other hand, testified that such soils exist in the Niger River Delta.  *See* Bea Rebuttal Dep., 227:.  Clearly, we are not dealing with the Niger River Delta *in this case*.  One need only refer back to Dr. Rogers' site characterization report to understand that the organic clays in New Orleans are highly compressible materials.  *See supra* at 28-29, notes 113-16.

No practicing engineer would model the organic clay as Dr. Bea modeled it. Whether designing a structure or analyzing a failure, there is no justification for assigning an impossibly low compressibility value to any soil unit. Dr. Bea hid his machinations, pretending that "this phase of my investigation" benefitted from "an extensive program of soil sampling and laboratory testing and field testing . . . conducted at the Lower 9th Ward during the Summer and Fall of 2011."[158] He larded Appendix C with a 21-page discussion of the hydraulic conductivity of the organic clay, even though he knew that any plausible hydraulic-conductivity value would work equally well in his contrived seepage analysis. But any plausible hydraulic-conductivity value sufficed only because Dr. Bea instructed Mr. Cobos-Roa *not* to use any plausible compressibility value. Had Dr. Bea allowed Mr. Cobos-Roa to use any plausible compressibility value, as a practicing engineer would ordinarily do, then Dr. Bea's hypothesis would have been disproved. Had *any plausible compressibility value* been used in the SEEP/W runs, then the "uplift pressures"—the high vertical seepage gradients that Dr. Bea blames on WGI—would disappear. To avoid that, Dr. Bea "cooked the books," deciding *a priori* to set up the runs so that they would provide the results he craved.

In the final analysis, the SEEP/W outputs reflect only the inputs selected by the operator.[159] And those inputs, including compressibility, we now know were contrived. We know this not because Dr. Bea explained his methodology but because the defendants' experts combed Mr. Cobos-Roa's computer files to figure out where Dr. Bea went wrong. Had the defendants' expert not discovered Dr. Bea's machinations, then it can safely be

---

[158]Bea Rpt. 66, ¶ 66.

[159]Bea Rebuttal Dep., 273:20-274:21.

assumed that they would have never been disclosed.  At his first deposition, when he

learned that the defendants were aware that he had manipulated the organic-clay's

incompressibility, the only justification he could provide was his desire to transmit

pressures from the canal side of the floodwall to the protected side.  By the time of his

second deposition, he was able to articulate more than a conclusory excuse.  He claimed

that "[t]he 10 to the -9 was determined based on the soil-water dilatational modulus."[160]

This belated *post hoc* explanation should be seen for what it is and nothing more.  To

explain away his first-deposition testimony, Dr. Bea was prepared at his second deposition

to eliminate confusion by pointing out that the scientific notation $m_v$ is ambiguous:  "There

are two basic ways to compute—determine M sub V. . . . One way depends on  the

compressibility . . . . The alternative approach uses storage . . . . That approach uses the

dilatational wave velocity . . . . The two M sub Vs are different things."[161]

    Dr. Bea's wordplay cannot obscure what the chronology of his disclosures and

nondisclosures makes clear.  Dr. Bea's initial failure to reveal his methodology and his

initial inability to explain it as anything other than an outcome-driven choice, gives the

Court a glimpse behind the curtain.  Instead of calculating $m_v$ as geotechnical engineers do

day in and day out, he instructed Mr. Cobos-Roa to find a value that would give him the

result his "hydraulic conductivity pressure analysis" required.[162]  If the routine calculations

---

[160]Bea Rebuttal Dep. 23:6-7.

[161]*Id.* 23:21 – 24:18.

[162]The phrase "hydraulic pressure conductivity analysis" itself is a "Bea-ism."  Like EBSB,
it is a term concocted by Dr. Bea solely for litigation purposes.  It is not a term employed or
even understandable by experts in the field of geotechnical engineering.  Brandon Dep.,
243:2-8, April 13, 2012. ("Q.  Okay.  Did you perform, in your analyses, did you perform a
hydraulic conductivity analysis? A.  There's no concept -- If you searched through all the
(continued...)

for compressibility had been used, the flow analyses that Mr. Cobos-Roa performed would not have resulted in the uplift pressures that Dr. Bea believes posed a danger to the floodwalls.  He admits that this is true.[163]

Dr. Bea attributes his use of an unsubstantiated compressibility value to a simple matter of understanding the problem differently from his peers.[164]  If necessary, Dr. W. Allen Marr, a member of the National Academy of Engineering and an expert witness for the United States, will testify and explain that Dr. Bea's dilatational-modulus theory is scientifically untenable.  But Dr. Bea's dubious description of the EBIA organic clays demands that his testimony be excluded without further analysis.

### B. DR. BEA'S OPINIONS DEPEND ON HIS CONFUSION OF  "DRAINED" AND "UNDRAINED" ANALYSES, AND HIS STABILITY ANALYSIS IS THEREFORE SCIENTIFICALLY INCORRECT AND UNRELIABLE.

As previously noted, a stability analysis that analyzes the wrong problem or that analyzes the right problem the wrong way is not useful.  Dr. Bea's incorrect cross-sections reveal that he is analyzing the wrong problem.  His use of a drained analysis to determine the stability of undrained soils reveals that he is analyzing the problem incorrectly.   Dr. Bea's opinions rest on an invalid attempt to apply analyses for a soil condition that he *admits* was not the condition of the organic clays when the floodwall failed.  Despite having identified the condition as one of undrained loading of the organic clays, Dr. Bea chose to

---

[162](...continued)
geotechnical books, you wouldn't find the term hydraulic conductivity analysis."); *see also id.*, 253:24 - 254:3 ("Q. What do you mean by Bea-speak?  A.   He uses certain terms for these projects, like hydraulic conductivity analysis, that aren't part of geotechnical engineering vernacular, and that would be one there.")

[163]Bea Rebuttal Dep., 30:11-18.

[164]*Id.*, 228:23-24 ("my understanding now says we're working different problems.")

analyze the condition as a drained loading.  Dr. Bea does not analyze the problem correctly. Consequently, his opinions are unreliable and must be excluded.

A correct stability analysis begins with a correct identification of the soil conditions.  A soil's behavior hinges on whether it is in a "drained" or an "undrained" condition.  This is an either/or proposition—a soil is either drained or undrained; it cannot be both simultaneously.  Once a soil's condition is established using known scientific methods, the correct analysis uses established formulas and concepts specific to that drained or undrained condition.

Duncan and Wright define the foundational and distinct concepts of "drained" and "undrained" in this way: an "undrained condition" signifies a condition where "changes in loads occur more rapidly than water can flow in or out of the soil.  The pore pressures increase or decrease in response to changes in loads."[165]  A "drained condition," in contrast, refers to a condition "where changes in load are slow enough, or remain in place long enough, so that water is able to flow in or out of the soil, permitting the soil to reach a state of equilibrium with regard to water flow.  The pore pressures in the drained condition are controlled by the hydraulic boundary conditions, and are unaffected by the changes in loads."[166]

In other words, the "difference between undrained and drained conditions is *time*," and whether or not sufficient time elapses for changes in the load to cause changes in pore

---

[165]J. Michael Duncan & Stephen G. Wright, *Soil Strength and Slope Stability*, 20, (c) 2005, John Wiley & Sons, Inc., New York, New York.

[166]*Id.*

pressure.[167]  Dr. Bea does not dispute that these definitions are accurate and that *time* is the

crucial factor in determining whether pore pressures are impacted—and by how

much—during a loading condition.[168]

The organic clays were undrained when the breaches occurred.  They were undrained

because the influx of surge onto and over the EBIA rapidly increased the load that the

weight of the water imposed on the underlying soils.  The entire loading event took less

than 48 hours, and the most rapid changes took place in the last several hours before the

floodwall failed.  The organic clays could not drain as rapidly as the load was changing.

Because time is the key factor in determining whether a soil is drained or undrained, a

correct stability analysis includes an evaluation of the length of time that is required for the

soils at issue to transition from an undrained to a drained condition.[169]  But when

specifically asked whether he had calculated the time it would take for the lower-organic

clay to transition from an undrained to a drained condition when surge waters began to

rise, Dr. Bea admitted that he had not.[170]  Tellingly, when questioned about his analysis, Dr.

Bea was confused about what condition he had actually used for his analysis, first admitting

that he used an undrained condition as the correct condition, and later backtracking when

---

[167]*Id.* at 20, 27 (emphasis supplied)

[168]Bea Dep., Vol. II, 290:2-292:9.

[169]J. Michael Duncan & Stephen G. Wright, *Soil Strength and Slope Stability*, 27, (c) 2005, John Wiley & Sons, Inc., New York, New York.

[170] Bea Dep., Vol. II, 297:23-298:4 ("Q. In this case, did you calculate the time that it would take for the lower organic clay which you call the swamp-marsh to transition from an undrained to a drained condition when surge began to impose stresses on that soil? A. No.")

confronted with the fact that, according to his own report, he employed a drained condition.[171]

Dr. Bea's confusion is understandable given the undisputed evidence that the soils present at the EBIA site were, and continue to be, predominantly clays, known to any trained geotechnical engineer to exhibit certain characteristics.  It is also true, and beyond dispute, that the "time required for drainage of soil layers varies from minutes for sands and gravels to *tens or hundreds of years for clays*."[172]  Unsurprisingly, then, clays, like those found at the EBIA, are almost always analyzed in an undrained condition for short-term loading conditions like those that rapidly develop during a hurricane and then quickly dissipate after the storm passes.[173]  On this point, Dr. Bea seems to agree, as he testified that clays generally remain in an undrained condition for a long time after a load change given their low permeability.[174]  He agreed as well that to properly analyze the stability of the EBIA floodwall requires an accurate measurement of the soil and shear strengths.[175]  Unsurprisingly, "undrained" strengths of soils and "drained" strengths of soils are different concepts and are measured differently.[176]

---

[171]*Id.* at 299:19-302:24; Bea Rpt., App. C, 28.

[172]J. Michael Duncan & Stephen G. Wright, *Soil Strength and Slope Stability*, 30, (c) 2005, John Wiley & Sons, Inc., New York, New York (emphasis supplied).

[173]*Id.* at 28.

[174]Bea Dep., Vol. II, 307:21-25 ("Would you agree that clays generally remain in an undrained condition for a long time after a load change because the permeability of clay is low? A. Yes.")

[175]*Id.* 308:6-17.

[176]J. Michael Duncan & Stephen G. Wright, *Soil Strength and Slope Stability*, 23-25, (c) 2005, John Wiley & Sons, Inc., New York, New York (describing differences between

(continued...)

Apparently recognizing the analytical gap between the drained condition he analyzed in his initial report and the conclusions that he wished to reach, Dr. Bea issued a "Rebuttal Report" re-framing the issue as whether a "steady flow" or "non-steady flow" analysis was the appropriate method for analyzing the soil conditions at the EBIA site. But this attempt to re-frame the issues is little more than a legerdemain in terminology to avoid confronting the heart of the matter: if the organic clays at the EBIA site are known to have been in an undrained condition at the beginning of the loading event, as Dr. Bea concedes, then analyzing their behavior as though they were in a *drained* condition lacks scientific validity. In other words, any geotechnical engineer, once it was determined that the clay soils were in an *undrained* condition, would apply the known laws of soil mechanics and analyze the problem at hand using the methods for analyzing *undrained* soils.[177]

Dr. Bea concedes, as he must, that the surge is constantly rising above the EBIA until the breaches occur. The rising surge put more and more pressure on the organic clay, which resulted in "time-dependent or transient hydraulic conductivity effects."[178] His concession that the loads on the soils are time-dependent entails the conclusion that the soils were in

---

[176](...continued)
drained and undrained strengths).

[177] In the MGM motion picture "Legally Blonde," (c) 2001, protagonist Elle Woods exclaimed, after securing a dismissal of the murder case against her client by revealing that the prosecution's star witness was lying about showering after receiving a perm at the risk of deactivating the ammonium thyoculate and ruining her curls: "The rules of hair care are simple and finite. Any Cosmo girl would have known!" The same holds true for geotechnical engineers: the laws of soil mechanics are simple and finite. A soil in an *undrained condition* is analyzed using the known formulas and equations for soils in *undrained conditions*. Any geotechnical engineer would know.

[178] Bea Rebuttal Rpt., 17-18.

an undrained condition, which Dr. Bea also concedes.[179]  The rapidly applied loads caused

by rising surge waters "do not provide sufficient time for the buried swamp-marsh deposits

. . . to significantly consolidate or expand . . . . These . . . clay deposits behave in an

essentially undrained manner. . . ."[180]

But rather than analyze these swamp-marsh (clay) deposits in their undrained

condition, as engineering principles dictate, Dr. Bea assigned to them a "drained" friction

angle.  The friction angle became the basis of his strength and stability asessment.  He used

the friction angle and used pore pressures to compute a factor of safety, which is the

analysis appropriate for analyzing the strength of a drained soil.  In other words, he did a

drained stability analysis of the organic clays even though he agrees that those clays were

in an undrained condition.[181]

Dr. Bea determined his drained friction angle for these analyses from back analyses of

undrained (UU) triaxial tests.  The method he used is scientifically incorrect and leads to

meaningless values of drained friction angle.  His incorrect, scientifically indefensible

method contains two glaring mistakes that leave his stability analyses fatally flawed.  First,

his assumption that the initial effective confining stress within the sample was equal to the

externally applied total confining stress entails the incorrect assumption that the initial

pore pressure in each UU test was zero.  Second, his use of PLAXIS to compute the drained

friction angle assumed a fixed ratio of excess shear-generated pore pressure to applied

---

[179] Dr. Bea's use of terminologies, such as "Steady Flow," do not have any bearing on the simple proposition that the clay soils at the EBIA site were in an undrained condition prior to, and during, the storm surge load event.

[180] Bea Rebuttal Rpt., 19.

[181] Bea Rebuttal Rpt., 101-02; Bea Rebuttal Dep., 234:18-236:5.

shear stress.  This assumption was incorrect.  The ratio is not fixed.  It varies, not only across tests but also within a single test.  A drained friction angle cannot be computed from a UU triaxial test unless pore-water pressures are measured during the test.  But the pore-water pressures were not measured during the UU tests that Dr. Bea relies on.  If they had been measured, then Dr. Bea would have been able to use those measurements to determine the correct drained friction angle.  He would not have had to use (*i.e.,* try to use) PLAXIS to infer a drained friction angle.  Dr. Bea's determination of a drained friction angle from UU triaxial test data is not an acceptable engineering practice and its use produces unreliable results.

## CONCLUSION

  "Everyone is entitled to his own opinion but not his own facts," as the inimitable Daniel Patrick Moynahan so memorably phrased it.  Dr. Bea has his opinions and he is entitled to them.  But he is not entitled to his own facts.  No evidence supports the holes that Dr. Bea's case studies analyze.  No evidence supports Dr. Bea's assumption that the lower organic clay was incompressible.  Because his opinion is based on hypothesized holes that WGI did

not dig or fill, his opinion testimony is inadmissible.  It is also inadmissible because Dr.

Bea's analyses lack scientific validity.  For these reasons, the United States' motion to

exclude Dr. Bea's testimony should be granted.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch

 s/ Robin Doyle Smith
ROBIN DOYLE SMITH
Senior Trial Counsel, Torts Branch
CONOR KELLS
Trial Attorney, Torts Branch
Civil Division
U.S. Department of Justice
Benjamin Franklin Station,
P.O. Box 888
Washington, D.C.  20044
(202) 616-4400/616-5200 (fax)
robin.doyle.smith@usdoj.gov
Attorneys for the United States

**CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing was served upon all counsel of record by ECF.

<u>s\ Robin Doyle Smith</u>