UNITED STATES DISTRICT COURT EASTERN DISTRICT
OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO: MRGO | * | |
|     Armstrong, No. 10-866 | * | SECTION "K"(2) |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | | |

### PLAINTIFFS' MOTION FOR DEPOSITION REGARDING EXCAVATION DATA UNDERLYING OPINIONS OF DR. ALLEN MARR

PLAINTIFFS hereby request leave to take a deposition of Defendant WGI to address the identification, collection, and reporting of critical data underlying the opinions of defense geotechnical expert Dr. Allen Marr. The correct data were provided for the first time on the second day of Dr. Marr's two-day deposition, and Dr. Marr disclaims all but the most generalized knowledge regarding their identification, collection, and reporting. Granting leave to take the deposition will not in any way alter the Daubert or trial schedules.

### I. Background Facts

Dr. Allen Marr is a geotechnical expert for Defendant USA. (Doc. 20757: Def. USA's Final Witness List at 6.) Dr. Marr's testimony is of particular importance because he indicated that his "overall approach was to identify <u>any and all explanations</u> that have been offered for the cause of [floodwall] failure and to collect all information and data relevant to those failures." (Ex. A: Expert Report of Dr. A. Marr at 11) (emphasis added). Dr. Marr's March 12, 2012, expert report is entitled "What Caused the I-Wall Failures at the EBIA North and South Breaches?" (Id., Cover Page.) It addresses whether "poorly backfilled EBIA site clearing excavations by WGI" contributed to either breach. (Id. at § 5.2 at 60 et seq. (North Breach) & § 6.2 at 87 et seq. (South

1

Breach).) Dr. Marr specifically addresses whether underseepage might have been caused by "[e]xcavations to the depth of the organic clays (swamp) made on the canal side by WGI that were allegedly poorly backfilled." (Id. at 60, 88.)

Accordingly, Dr. Marr's opinions depend heavily upon the character of WGI's excavations, including their depth and location. Regarding the North Breach, Dr. Marr says Plaintiffs' underseepage analyses are flawed because Plaintiffs assume "porous backfill in contact with the organic clay soil which was not the case," Plaintiffs assert "locations of excavations much closer to the floodwall than the data show," and Plaintiffs erroneously characterize the compressibility of the underlying soils. (Id. at 61.) Dr. Marr's report sets forth specific excavation depths and locations, discusses seepage analyses performed using these values, and directs Plaintiffs to Appendix B of his report, which "gives detailed information on WGI excavations." (Id. at 62-65, 67.) Dr. Marr concludes that WGI excavations "had no impact on the flow conditions beneath the North Breach area." (Id. at 68.) Likewise for the South Breach, Dr. Marr indicates that "conditions and assumptions used in [underseepage] analyses are critical to the reasonableness and reliability of the results," (id. at 88), and identifies the same ostensible deficiencies in Plaintiffs' analyses vis-a-vis the excavations. (Id. at 89.) Dr. Marr again discusses depth and location of specific excavations and illustrates his point by using flow models including the sewer lift excavation. (Id. at 90-100.) In his "Summary and Conclusions," Dr. Marr again takes Plaintiffs to task for mischaracterizing the excavations, including their location, and concludes they were not a contributing factor to either breach. (Id. at 112-13.)

As noted above, Appendix B to Dr. Marr's report "gives detailed information on WGI excavations," (Id. at 62), and naturally is of supreme importance in assessing the validity of Dr. Marr's related opinions, which are themselves at they very core of this litigation. Of specific

2

concern with respect to this motion are two portions of Appendix B: Table B-1, entitled "WGI Excavations Legend," and Figure B-6, entitled "WGI Excavations Plan View." (Ex. B: Composite Exhibit of Table B-1 & Figure B-6 (original versions aka "Version 1").) As its title indicates, Table B-1 is a legend identifying all "excavations" throughout the entire EBIA, including 17 excavations at each of the critical Boland and Saucer Marine sites. Importantly, Table B-1 (Version 1) identifies for each area of excavation an Area Number, Area Square Footage, Excavation Depth, and Minimum Elevation (NAVD88 (2004.65)). Figure B-6 is a graphic representation of the excavations sites which correlates to the areas identified on Table B-1. As Dr. Marr testified, the graphic information reflected in Figure B-6 correlates directly to the tabular information contained in Table B-1 so that any change in Table B-1 would result in a corresponding change to Figure B-6. (Ex. C-2: Marr Dep., Vol. II at 171:20-24.)

Dr. Marr's March 12 report contained "original" versions (Version 1) of Table B-1 and Figure B-6. Dr. Marr's report states that he relied upon the information contained in Appendix B in assessing "any possible cause of failure." (Ex. A at 12.) Plaintiffs relied upon this information in preparing for Dr. Marr's deposition and were prepared to address it on the first day of his two-day deposition, which occurred on April 23-24, 2012.[1]

On the first morning of Dr. Marr's deposition, discovery having closed, defense counsel announced that Version 1 of Table B-1, and therefore Figure B-6, attached to Dr. Marr's report was inaccurate; that WGI was verifying the correct information for inclusion in those appendices; and that the correct information would be provided once verified. (Ex. C-1, Vol. I at 23:2-24:21.)

---

[1] Dr. Marr was the last expert deposed. With consent of all parties, his deposition occurred after the discovery cutoff.

Plaintiffs' counsel had to await the revised information before questioning Dr. Marr on this critical issue.[2] On the morning of the second day of deposition, Defendants provided revised versions of Table B-1 and Figure B-6 ("Version 2"). (Ex. C-2, Vol. II at 164:12-165:3.) Defendants took the position that Version 1 attached to Dr. Marr's report was a "draft" that was produced in error, and that the revised version (Version 2) was the proper "final" version that should have been attached. Attached as Exhibit D are Version 2 of Table B-1 and Figure B-6 produced the second day of Dr. Marr's deposition.[3]

There are many substantive differences between Version 1 (attached to Dr. Marr's report) and Version 2 (produced the second day of his deposition). By way of example, Version 1 includes a column for "Min Elevation" while Version 2 eliminates that column and contains two new elevation columns: "Minimum Elevation of Excavation" and "Ground Surface Elevation" for each excavation. Likewise, the obviously critical "Depth" values for excavations are different in many instances. For example, Boland Area ID 8, which goes from a depth of 14 feet on Version 1 to a depth of 7 feet on Version 2. Indeed, comparing every Boland Area ID reveals that 7 of the 16 excavation areas are shallower on Version 2 than on Version 1. None is deeper.

---

[2] Plaintiffs should clarify here that, according to Dr. Marr, his flow models used the values that would be provided in the "revised" Table B-1 and Figure B-6 (aka Version 2). As discussed infra, the core issue here is not whether Dr. Marr's opinions were subverted by the use of erroneous excavation figures; the issue is Plaintiffs' inability to cross-examine Dr. Marr on the source of the information, the criteria used for inclusion or exclusion in Table B-1, the manner in which depths and elevations were calculated, etc.

[3] If this were merely an issue of replacing an inadvertently produced "draft" with an inadvertently withheld "final" version of the table and figure, Plaintiffs must question why the already-prepared "final" version was not provided at once when the error was discovered before the deposition began, rather than waiting until the beginning of Day 2 to produce the Version 2. For what it is worth, Dr. Marr described the Version 1 information in his report as "outdated." (Ex. C, Vol. I at 24:1.) Plaintiffs do not know when either spreadsheet was created or what rendered Version 1 "outdated."

Another revealing distinction is that in Version 1, WGI's grid trenching at both breach sites is depicted on Figure B-6; but in Version 2, the grid trenching is eliminated altogether, apparently no longer qualifying as an "excavation" for Dr. Marr's consideration. (Compare Ex. B, Figure B-6 with Ex. D, Figure B-6; see also Ex. C-2, Vol II at 171:6-18.)

Plaintiffs inquired into the differences between Version 1 and Version 2, including the reasons they differ and any interpretive differences that might bear on Dr. Marr's opinions. But because Defendants take the position that Version 1 is a "draft" that was inadvertently produced and not relied upon, Dr. Marr was instructed not to answer nearly every question that addressed Version 1 or compared the two versions. (Ex. C-2, Vol. II at 173:23-174:12; 178:6-17; 180:16-181:6; 181:18-25; 187:22-188:4; 188:14-23.)[4]

Most compelling here is that although Dr. Marr expressly relies upon Table B-1 and Figure B-6, (Ex. C-1, Vol. I at 24; Ex. C-2, Vol. II at 171-72), he knows virtually nothing about the table and figure or about the data underlying these reliance materials. Among other things:

- Dr. Marr could not "be specific" as to what changed from Version 1 to Version 2 of this lengthy table, other than "some of the depths have been modified somewhat." (Id. at 165:5-15.) Dr. Marr did not know the source for the change in depths. (Id. at 168:25-169:1.) Nor did Dr. Marr personally "participate[] a lot" in the formulation of Figure B-6. (Id. at 170:12-21.)
- Dr. Marr testified that the data underlying Table B-1 was "prepared by WGI" and that WGI provided it to him. (Id. at 167:9-12; 169:2-8.) Dr. Marr said Table B-1 "is created from WGI documents," but he did not know which documents. (Id. at 184:6-15; 191:1-21.) Some person or persons on his staff spot-checked some of the documents. Dr. Marr did not know whether the underlying documents had been produced as part of his reliance materials. (Id. at 184:16-185:2.)

---

[4] Asking whether WGI ever determined the same excavations to have different depths (and why those calculations may have changed) is not an attempt to inquire into "draft" opinions. The methodology behind the data reporting is relevant to their accuracy and, hence, the reliability of Dr. Marr's opinions.

5

- Dr. Marr testified that the data underlying Table B-1 was "prepared by WGI" and that WGI provided it to him. (Id. at 167:9-12; 169:2-8.) Dr. Marr said Table B-1 "is created from WGI documents," but he did not know which documents. (Id. at 184:6-15; 191:1-21.) Some person or persons on his staff spot-checked some of the documents. Dr. Marr did not know whether the underlying documents had been produced as part of his reliance materials. (Id. at 184:16-185:2.)

- When asked to review his reliance list and identify the source of the depth data contained in his Table B-1 (and hence Figure B-6), Dr. Marr stated he "did not personally do this work" but that, upon searching the reliance list attached to his report ("reliance documents from WGI") the source "most likely" was a spreadsheet of excavation locations. (Id. at 185:16-186:1.) He testified that some role in creating this data was played by a Mr. or Dr. Mayo, who works for WGI geotechnical expert Dr. Silva-Tulla. (Id. at 186:15-23.)

- Dr. Marr knows the spreadsheet was prepared specifically for use in litigation. (Id. at 186:24-187:5.) But when asked what documents were relied upon to create the spreadsheet that "most likely" is the source of Dr. Marr's reliance materials (B-1 & B-6), he responded "not exactly." (Id. at 187:10-14.)

- Dr. Marr does not know what criteria were used by WGI in deciding whether a given hole or trench qualified for inclusion as an "excavation" on the excavation legend. (Id. at 192:19-22.) For example, he does not know whether the extraction of pilings at the Saucer Marine or Boland Marine were included in the excavation data. (Id. at 189:4-16.). He thought "WGI folks working with Francisco Silva" would know. (Id. at 192:23-25.)[5]

Plaintiffs counted on deposing Dr. Marr concerning all relevant facts surrounding Table B-1 and Figure B-6, given that Dr. Marr expressly relies on these data to opine that WGI's excavations did not contribute to the IHNC floodwall failures and to opine that Plaintiffs' expert analyses are flawed in their interpretation and utilization of excavation data, including such basic facts as depth and location of excavations. But Dr. Marr was not even able to describe/define what counts as an "excavation" in his analyses because he relied entirely on others to set the criteria for inclusion, to review source documents, to identify excavations, to map the

---

[5] We already know, for example, that grid trenching covering the entire Boland Marine site qualified in Version 1 but not in Version 2. (Compare Ex. B, Figure B-6 with Ex. D, Figure B-6; see also Ex. C, Vol II at 171:6-18.) We also may surmise by the appearance of only 17 excavation areas for Boland and Saucer (each), that the (900+) removed pilings have not made the "excavation" list.

excavations, to identify and/or calculate the ground level at each excavation, to calculate or otherwise verify the depth of excavations, and so forth. In short, it appears that Dr. Marr was handed a data set by the attorneys and he relied upon it. Because he was involved only to that extent, Plaintiffs have been utterly deprived of their right to cross-examine Dr. Marr on "the facts and data" underlying his opinion (Fed. R. Evid. 702(b)), the principles and methods by which these data were derived (Fed. R. Evid. 702(c)), and Dr. Marr's application of the resulting principles and methods to the particular facts of this case (Fed. R. Evid. 702(d)). Plaintiffs have, thus, been deprived of an opportunity to explore the bases of Dr. Marr's opinions as contemplated by Fed. R. Evid. 703.

An analogous situation arose recently in this very case. Upon deposing Plaintiffs' geotechnical expert Dr. Robert Bea, Defendants learned that Dr. Bea relied upon underlying data formulated and supplied by an assistant, Mr. Diego Cobos-Roa. Although Mr. Cobos-Roa was purely a consulting expert whose role was limited to producing this underlying data, Defendants requested and Plaintiffs agreed to a deposition of Mr. Cobos-Roa, which occurred on April 10, 2012. The Defendants' examination of Mr. Cobos-Roa included extensive questioning on the underlying data, on Plaintiffs' testifying experts' opinions based upon the data, on Mr. Cobos-Roa's conversations and collaborations with the testifying experts, and the like. Thus, when Plaintiffs' expert was unable to explain the details of certain reliance data, Plaintiffs agreed to permit a deposition of the person who was identified as having created the reliance materials. Plaintiffs were not extended the same courtesy when they attempted to resolve the instant matter in the same manner.

Defendants first presented Plaintiffs with Version 2 of Table B-1 and Figure B-6 after the

discovery cutoff and midway through Dr. Marr's discovery deposition—the last expert deposition taken in this action. Thus, through no fault of their own, it was only after the discovery cutoff that Plaintiffs first learned of this significantly modified information and, more importantly, that Dr. Marr was unable to supply even the most rudimentary facts surrounding the collection of his reliance data (or even what would be deemed suitable as reliance material). It would be unfair to the Plaintiffs and it would be detrimental to the truth-seeking process this Court will undertake at trial to deny Plaintiffs the right to obtain clarifying discovery on such a fundamental issue.

## II.   The Governing Law

Rule 26(b)(1) permits a party to "obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense..." Fed. R. Civ. P. 26(b)(1). Therefore, "[t]he discovery rules are accorded a broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials." *Gulf Prod. Co. v. Hoover Oilfield Supply*, 2011 WL 1791286 at *2 (E.D. La. May 9, 2011). Expert discovery routinely addresses "the expert's data, method, or his application of the method to the data." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). Accordingly, "[o]n cross-examination counsel may probe the witness's qualifications, experience, and sincerity; weaknesses in the opinion's basis, the sufficiency of assumptions, as well as the strength of the opinion." *Blue Cross & Blue Shield of N.J. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 324 (E.D.N.Y. 2001) (internal quotations omitted); see also, e.g., *McGarity v. FM Carriers, Inc.*, 2012 WL 1028593 at *7 (S.D. Ga. Mar. 26, 2012) ("the identification of flawed data or facts relied upon by an expert is precisely the role of cross-examination . . . .") Plaintiffs' inability to examine Dr. Marr at deposition (or later at trial) on core data underlying his opinions both hampers their efforts to prepare for trial and compromises the Court's ability to assess the credibility and reliability of Dr. Marr's opinions.

8

In short, Plaintiffs were well within their rights to expect that Dr. Marr would supply at or before deposition all information necessary to assess the reliability of the excavation data on which he expressly relies in his report. Instead, brand new modified data were presented halfway through his deposition—after the discovery deadline had expired—and Dr. Marr was unable to testify to issues as basic as what constitutes an "excavation" in his legend and plan view of "excavations."[6]

Plaintiffs respectfully suggest that a 30(b)(6) deposition of WGI on this issue is the most efficient and expedient method of obtaining this information, given Dr. Marr's testimony that "WGI" supplied the appendices to his report. (Ex. C, Vol. II at 167:9-12; 169:2-8; 185:16-186:1.) Plaintiffs are willing to consider any alternative that would yield the relevant information, such as a deposition of the person or persons who compiled the underlying data; but Plaintiffs believe a corporate representative deposition would present a "one stop" discovery device that would avoid the series of fact or expert witness depositions that might otherwise be necessary to determine how this data was derived, formulated, prioritized, and assimilated into what we now know as Table B-1 and Figure B-6. Plaintiffs would propose a 30(b)(6) deposition of no more than 7 hours on the following subject:

---

[6] Based upon the parties' meet and confer, WGI seems to take the position that because another defense expert (Dr. Silva-Tulla) relies on the same or similar data, Plaintiffs could have gotten the information from Dr. Silva-Tulla (who was deposed before Dr. Marr), and thus Plaintiffs are not entitled to another deposition. Of course, Plaintiffs contend that going into Dr. Marr's deposition they had a right to anticipate Dr. Marr would provide all information within the broad parameters of Rule 26 with respect to materials Dr. Marr expressly relied upon and to assume the accuracy of data they had been given weeks before his deposition.

9

> All relevant facts surrounding the data reflected in Table B-1 and Figure B-6 to the expert report of Dr. Allen Marr, specifically including all facts necessary to establish: (a) the original sources of the data; (b) the methodology employed in obtaining, compiling, factually verifying, and sorting the data into Table B-1 and Figure B-6; and (c) the proper interpretation of the information contained in Table B-1 and Figure B-6.

Dr. Marr could not testify to these matters. Each is calculated to lead to the discovery of admissible evidence—namely, to verify the accuracy, completeness, and general reliability of the data on which Dr. Marr expressly relies to render causation opinions and to impugn the opinions of Plaintiffs' experts. This is discovery Plaintiffs would have taken within the discovery period had they possessed the "new" data and had they known Dr. Marr would be unable to address such issues. But their late revelation prevented Plaintiffs from doing so.

WHEREFORE, Plaintiffs respectfully request that the Court permit Plaintiffs to proceed with a 30(b)(6) deposition on the subject matter included above, or afford the Plaintiffs any other relief the Court deems appropriate to facilitate discovery regarding these reliance materials of Dr. Marr's.

Dated: May 14, 2012.

        Respectfully Submitted,

        PLAINTIFFS' LIAISON COUNSEL

        s/ Joseph M. Bruno
        JOSEPH M. BRUNO (La. Bar No. 3604)
        BRUNO & BRUNO, L.L.P.
        855 Baronne Street
        New Orleans, Louisiana 70113
        Telephone: (504) 525-1335
        Facsimile: (504) 561-6775
        Email: jbruno@brunobrunolaw.com

MR-GO PLAINTIFFS SUB-GROUP LITIGATION
COMMITTEE

s/ James Parkerson Roy
JAMES PARKERSON ROY (La. Bar No. 11511)
MR-GO PSLC Liaison Counsel
Domengeaux Wright Roy & Edwards LLC
P.O. Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com
for

MR-GO PLAINTIFFS SUB GROUP LITIGATION
COMMITTEE
Jonathan Andry (The Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

## CERTIFICATE OF CONFERENCE

I hereby certify pursuant to Fed. R. Civ. P. 37(a)(1) that I conferred or attempted to confer in good faith with counsel for both Defendants in an effort to obtain the requested discovery without court action.

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 14th day of May, 2012.

/s/ Joseph M. Bruno
Joseph M. Bruno