ALLEN MARR, PH.D.                                        April 24, 2012

| | |
|---|---|
| **Page 1** | **Page 3** |

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
            JUDGE DUVAL
PERTAINS TO MRGO          MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
    05-6314, 05-6324, 05-6327, 05-6359,
    06-0225, 06-0886, 06-1885, 06-2152,
    06-2278, 06-2287, 06-2824, 06-4024,
    06-4065, 06-4066, 06-4389, 06-4634,
    06-4931, 06-5032, 06-5155, 06-5159,
    06-5156, 06-5162, 06-5260, 06-5771,
    06-5786, 06-5937, 07-0206, 07-0621,
    07-1073, 07-1271, 07-1285
            * * *
            (V O L U M E  II)
    Deposition of W. ALLEN MARR, PH.D.,
P.E., given at the offices of Bruno & Bruno,
855 Baronne Street, New Orleans, Louisiana
70113, on April 24th, 2012.
REPORTED BY:
    JOSEPH A. FAIRBANKS, JR., CCR, RPR
    CERTIFIED COURT REPORTER #75005

**Page 3**

1   REPRESENTING WASHINGTON GROUP INTERNATIONAL,
2       INC.:
3   STONE PIGMAN WALTHER WITTMANN, L.L.C.
4   (BY:  WILLIAM D. TREEBY, ESQUIRE)
5   546 Carondelet Street
6   New Orleans, Louisiana 70130
7   504-581-3200
8
9   REPRESENTING THE UNITED STATES OF AMERICA:
10  U.S. DEPARTMENT OF JUSTICE
11  (BY:  ROBIN DOYLE SMITH, ESQUIRE)
12  (BY:  RUPERT MITSCH, ESQUIRE)
13  Torts Branch, Civil Division
14  P.O. Box 888
15  Benjamin Franklin Station
16  Washington, D.C. 20044
17  202-616-4289
18
19  ALSO PRESENT (VIA TELECONFERENCING):
20  FRANCISCO SILVA-TULLA
21  TIMOTHY STARK
22  TOM BRANDON
23
24
25

| | |
|---|---|
| **Page 2** | **Page 4** |

**Page 2**

1   APPEARANCES:
2   REPRESENTING THE PLAINTIFFS:
3       BRUNO & BRUNO
4       (BY:  JOSEPH M. BRUNO, ESQUIRE)
5       (BY:  SCOTT JOANEN, ESQUIRE)
6       855 Baronne Street
7       New Orleans, Louisiana 70113
8       504-525-1335
9   - AND -
10      LEVIN, PANATONIO, THOMAS, MITCHELL,
11      RAFFERTY & PROCTOR, P.A.
12      (BY:  MATTHEW D. SCHULTZ, ESQUIRE)
13      316 S. Baylen St., Suite 600,
14      Pensacola, Florda 32502
15      850-435-7140
16  - and -
17      DOMENGEAUX, WRIGHT, ROY & EDWARDS
18      (BY:  ELWOOD C. STEVENS, JR., ESQUIRE)
19      556 Jefferson Street, Suite 500
20      Lafayette, Louisiana 70501
21      337-233-3033
22
23
24
25

**Page 4**

1   E X A M I N A T I O N   I N D E X
2
3   EXAMINATION BY:                    PAGE
4   MR. STEVENS ................................7
5   MR. TREEBY  ..............................264
6   MR. STEVENS .............................269
7
8   E X H I B I T   I N D E X
9
10  EXHIBIT NO.                      PAGE
11  Exhibit Marr 24 ............................10
12  Exhibit Marr 25 ............................20
13  Exhibit Marr 26 ............................28
14  Exhibit Marr 27 ............................37
15  Exhibit Marr 28 ............................46
16  Exhibit Marr 29 ............................51
17  Exhibit Marr 30 ............................52
18  Exhibit Marr 31 ............................53
19  Exhibit Marr 32 ............................62
20  Exhibit Marr 33 ..........................119
21  Exhibit Marr 34 ..........................120
22  Exhibit Marr 35 ..........................164
23  Exhibit Marr 36 ..........................185
24  Exhibit Marr 37 ..........................212
25  Exhibit Marr 38 ..........................212

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

**EXH. C - 2**

ALLEN MARR, PH.D.                                    April 24, 2012

Page 161

1    geotechnical program such as you were
2    describing Dr. Silva went through earlier in
3    our --
4        Q.   Geometry, soil properties, load,
5    analysis, and conclusions.
6        A.   Yes.
7        Q.   Okay.
8        A.   And also, then discusses the great --
9    the important role of good engineering judgment
10   in almost everything we do.
11       Q.   Okay.  And then Number 82.  I didn't
12   ask you this, but what year were you initially
13   retained in this litigation?
14       MR. SMITH:
15            It's in his report.
16   EXAMINATION BY MR. STEVENS:
17       Q.   Can we --
18       A.   I get dates mixed up.  I'm sorry.
19       Q.   That's all right.  Thank for looking
20   for it.  Robin is right, it.  Is in your
21   report.
22       MR. SMITH:
23            I forget where.  I know it's in
24   there somewhere.  There it is.
25            Page 11.

Page 162

1    EXAMINATION BY MR. STEVENS:
2        Q.   You were retained by the DOJ in early
3    March of 2011; correct?
4        A.   Yes.
5        Q.   Have you consulted with or conferred
6    directly with Dr. Francisco Silva in connection
7    with forming your opinions expressed in your
8    report of March 12, 2012?
9        A.   Yes.
10       Q.   Okay.  How often have you consulted
11   with Dr. Silva?
12       A.   Not much.  Once we started writing
13   reports -- we collaborated, as I described
14   earlier, in the early phases on the layout of
15   the supplemental site work, the conduct of that
16   work, and the collection of data, particularly
17   things like the location and depths of the WGI
18   excavations.  Um -- my staff helped review some
19   of those documents to try to, as a quality
20   control measure on location and size of those,
21   um -- buildings and excavations.
22            And we had a joint look at a assembly
23   of the subsurface information into the
24   subsurface profiles in early working versions.
25   And after that, we've had very little contact.

Page 163

1        Q.   And did you have any contact with
2    Mr. Treeby in connection with the WGI
3    excavation locations?
4        A.   Um -- yes.
5        Q.   All right.  How often did you confer
6    with Mr. Treeby in that regard?
7        A.   Essentially, little.  I think, um --
8    he was in one or two of the joint meetings of
9    experts and attorneys we had early in this
10   work.
11       Q.   Don't tell me what anybody said during
12   that.  Just asking.  And as far as the site,
13   supplemental site investigation, did you also
14   have input with Mr. Treeby in connection with
15   that project?
16       A.   Yes.
17       Q.   And was he at the site when you were
18   there?  I didn't ask you, did you go to the
19   site?
20       A.   Several times.
21       Q.   During the supplemental site
22   investigation last summer?
23       A.   Yes.  I think I indicated earlier in
24   my answer I was there a number of times at each
25   significant step of the field program.

Page 164

1        Q.   You did say that.
2            And was Mr. Treeby there at each of
3    those times?
4        A.   No.
5        Q.   Was he there some of those times?
6        A.   I only recall being at the site with
7    him once, maybe twice, at the site itself.
8            Now, don't hold me to one or two, but
9    it's a small number.
10           (Brief recess.)
11   EXAMINATION BY MR. STEVENS:
12       Q.   You gave us -- or yesterday you told
13   us Appendix B -- we'll mark for identification
14   as Marr number 35, Table B-1 of your Appendix
15   B, revised.  Right?  (Tendering.)  We were
16   produced that this morning -- or provided that
17   this morning.
18            Is that now a correct version of
19   Appendix B-1?
20            (Exhibit Marr 35 was marked for
21   identification and is attached hereto.)
22       A.   Assuming this is the file that
23   Mr. Smith sent you, yes.
24       MR. TREEBY:
25            I provided that.

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ALLEN MARR, PH.D.                                    April 24, 2012

Page 165

1      MR. STEVENS:
2          Let the record reflect it was Mr.
3      Treeby who got it for you.
4    EXAMINATION BY MR. STEVENS:
5      Q.  So assuming that this is the correct
6    Table B-1 of your work that Mr. Treeby
7    provided, can you tell us, what was the
8    difference between this one and the one that
9    was in your report?
10     A.  There were some -- I can't be
11   specific.  But in general, there were -- some
12   of the depths have modified somewhat.  And, you
13   know, we could go down through them, one by
14   one, and identify what the changes are, if you
15   wish.
16     Q.  Well, can you tell me generally, were
17   the depths higher or lower, or some of each?
18   Deeper or more shallow?
19     A.  Many of them are the same, and some of
20   them are 1 to 2 feet less deep.
21     Q.  Okay.  We'll take some time to look at
22   these and compare later, but just in the first
23   few that I looked at just to take a quick
24   sampling, at the Boland Marine site, the first
25   16, Area numbers 1 through 16, and then another

Page 166

1    one called WCS -- do you know what WCS stands
2    for?  It should be like the 17th area on your
3    legend.  The original B-1 for Boland Marine
4    area ID'd as number 1 was 9 feet, now on this
5    one it's 7 1/2.
6          Area 2 was 8 feet, now it's 6 feet.
7          Area 3 remained the same at 3.
8          Then there were -- the next change
9    really is Area 6.  Used to be a 9-foot depth,
10   now it's an 8-foot depth.
11         Area 7, same.  Area 8 used to be a
12   14-foot depth, now it's a 7-foot depth.  That's
13   a substantial change.
14     A.  Yes.
15     Q.  Okay.
16     MR. SMITH:
17         Object to the form.  That's an
18     interesting observation, Elwood.
19     A.  Thank you.
20   EXAMINATION BY MR. STEVENS:
21     Q.  All right.  Area 10 at Boland Marine
22   used to be 6, now it's 5 1/2.  And Area 1 used
23   to be 7, now it's 6.  Area 12 remained the
24   same.  We get to Area 15, it used to be
25   10 feet, now it's 8.  16 remained the same.

Page 167

1    And the WCS, whatever that is, remained the
2    same at 26.5-foot depth.
3          And do we know what WCS is?  I asked
4    you that already.  What does that mean?
5      A.  Wedding cake structure.
6      Q.  Okay.  Very good.
7          The question is, why are these
8    differences appearing now?
9      A.  I think I indicated yesterday that
10   when we put together our report we picked up
11   the incorrect version of the spreadsheet in
12   which this data was prepared by WGI.
13     Q.  So all of this is depth data was
14   provided to you by WGI.
15     A.  Yes.
16     Q.  And when you say we picked up the
17   wrong spreadsheet, who is we?
18     A.  It's one of the members of the team
19   that we went over today.
20     Q.  Okay.  And I think you told us the
21   person who was working with you on
22   excavations -- I can't remember that person's
23   name.
24     MR. TREEBY:
25         Let's go off the record a minute.

Page 168

1      MR. STEVENS:
2          No, let's not go off record.
3      MR. TREEBY:
4          What you're doing -- we did
5      not -- I'll put it on the record.  We
6      had a similar thing, if you will
7      recall, with Dr. Bea picking up the
8      wrong document and giving it to us,
9      and there were all kinds of -- and we
10     didn't cross-examine him, because we
11     were told this is the correct one,
12     this is the one I'm relying on.  We
13     could have asked a lot of very
14     embarrassing questions of Dr. Bea.  We
15     did not do that because we took your
16     word for it that the correct exhibit
17     was now being given to us.  And now
18     you're doing exactly that, and I
19     object to it.  I think it's improper.
20     You're looking at a draft, it's been
21     represented as a draft, and drafts are
22     not admissible in this case.  That's
23     my objection.
24   EXAMINATION BY MR. STEVENS:
25     Q.  What was the source of the change?

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ALLEN MARR, PH.D.                                    April 24, 2012

Page 169

1    A.  I don't know.
2    Q.  Okay.  And the source of the data, in
3  either event, the draft and/or the version of
4  B-1 that we've attached to your deposition as
5  Marr 35 is from WGI, correct?
6       MR. TREEBY:
7            Same objection.
8    A.  Yes.
9  EXAMINATION BY MR. STEVENS:
10   Q.  It is.  Okay.
11       I'm going to mark for identification
12  as -- that one is already marked as 35.  Hold
13  on to 35.  31 was the large plat, if you will,
14  formerly known as WGI 's plan view dated 23
15  April 12, Figure B-6 of your report.  This,
16  too, was modified since your deposition began.
17  Or you provided us with a modified version this
18  morning.  Correct?
19       MR. TREEBY:
20            Objection.  Two questions there.
21  EXAMINATION BY MR. STEVENS:
22   Q.  We got this this morning, did we not,
23  sir?
24   A.  I think --
25       MR. SMITH:

Page 170

1            Object to form.
2    A.  That's my understanding.
3  EXAMINATION BY MR. STEVENS:
4    Q.  And at your request we did not discuss
5  this yesterday because you wanted to have it
6  updated or modified.
7       MR. STEVENS:
8            Object to the form.
9  EXAMINATION BY MR. STEVENS:
10   Q.  True?
11   A.  Yes.
12   Q.  All right.  Can you tell us what was
13  changed or modified on this version of B-6 from
14  the version of B-6 that we originally received?
15       MR. TREEBY:
16            Same objection.
17   A.  Well, this is not something I
18  personally have participated a lot in, so I
19  would just have to freshly go through these one
20  by one and find the differences and point them
21  out to you.
22  EXAMINATION BY MR. STEVENS:
23   Q.  Okay.
24   A.  We can do that if you want.  But
25  again, it's the same thing as with Table B-1,

Page 171

1  it was in preparing the report, the person who
2  pulled the file for this figure inadvertently
3  pulled an earlier version of it.
4    Q.  All right.  Just looking at it, you
5  know, like the old Weekly Reader used to have
6  what's wrong with this picture, as I look at
7  the original B-6 and compare it to the B-6 we
8  got today, a glaring difference is the fact
9  that the grid trenches are no longer contained
10  on this diagram.
11       True?
12       MR. TREEBY:
13            Is that a question?  Objection.
14  EXAMINATION BY MR. STEVENS:
15   Q.  Is that correct?
16       MR. SMITH:
17            Objection.  Form.
18   A.  Yes.
19  EXAMINATION BY MR. STEVENS:
20   Q.  Is it your understanding, sir, that
21  the changes reflected on B-6 correlate to the
22  changes on B-1 on the table that we marked as
23  Marr 35?
24   A.  Yes.
25   Q.  Okay.  Did you, as a result of the

Page 172

1  changes to B-1 and/or B-6, have any additional
2  calculations performed, analyses run, models
3  demonstrated?
4    A.  No.
5    Q.  Does this change in B-1 and/or B-6 in
6  any way affect any of the opinions or
7  conclusions that you've arrived at in your
8  report?
9    A.  No.
10   Q.  Does it change the output, the results
11  of any of the calculations or computations you
12  did in connection with your report?
13   A.  No.
14   Q.  Okay.  If the depths of the
15  excavations contained on the modified B-1 were
16  used in any of your modeling, your seepage
17  analysis, for example, would the result change?
18   A.  We used the results on the modified
19  B-6 and --
20   Q.  That is the point.
21   A.  -- Table B-1.
22   Q.  You did not use the results or the
23  depths demonstrated on the original B-1 in
24  conducting your computer analysis of seepage or
25  flow.

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ALLEN MARR, PH.D.                                    April 24, 2012

Page 173

```
 1       A.  We used --
 2          MR. SMITH:
 3             Object to the form.
 4          MR. TREEBY:
 5             Objection.  Form.
 6    EXAMINATION BY MR. STEVENS:
 7       Q.  The original B-1 I'm calling the one
 8    that was included with your report.
 9          MR. SMITH:
10             Same objection.
11          MR. TREEBY:
12             Objection.
13    EXAMINATION BY MR. STEVENS:
14       Q.  Did you use the results or the depths
15    demonstrated on the Exhibit B-1, or was it
16    Figure B-1, that we got with your report in any
17    of your computer analyses -- seepage analyses
18    or flow analyses?
19          MR. TREEBY:
20             Object to form.
21       A.  Yes.
22    EXAMINATION BY MR. STEVENS:
23       Q.  Okay.  And tell us how you used those
24    depths from B-1 that came with your report as
25    opposed to the B-1 we were presented this
```

Page 174

```
 1    morning.
 2          MR. SMITH:
 3             Wait.  I'm going to -- wait.
 4    Okay.  Are you -- you're asking about
 5    the original B-1, not the revised B-1.
 6          MR. STEVENS:
 7             Yeah.  Correct.
 8          MR. SMITH:
 9             Okay.  That's a draft.  I'm not
10    going to allow you to inquire into the
11    draft.
12          MR. SCHULTZ:
13             He's inquiring into what was used
14    in the model.
15          MR. STEVENS:
16             Yeah.  And he said he did.
17          MR. SMITH:
18             But you're asking about any of
19    the runs that they did, not about his
20    report.  There's a difference.  I
21    mean, they did lots of runs, but
22    they're not necessarily used in
23    forming his opinions in this case.  In
24    other words, if they --
25          MR. TREEBY:
```

Page 175

```
 1             You're asking about drafts.
 2          MR. SMITH:
 3             That's a fair distinction, but
 4    y'all made exactly this point when Bob
 5    Bea -- when I was sitting there,
 6    saying y'all wanted the -- even though
 7    he had abandoned it, for whatever
 8    reason you were entitled to see it.
 9          MR. SMITH:
10             Yeah.  That's right.  And we've
11    produced it.  You've got it.
12          MR. SCHULTZ:
13             We have all the runs but we're
14    not allowed to ask questions about
15    them.
16          MR. SMITH:
17             That's right.
18          MR. SCHULTZ:
19             Okay.
20    EXAMINATION BY MR. STEVENS:
21       Q.  All right.  Let me wrap this up and
22    we'll move on to something else.
23          In connection with your work in this
24    case, you did make computer runs with the B-1
25    that was included in our copy of the report?
```

Page 176

```
 1          MR. TREEBY:
 2             Object.  Object of the form of
 3    the question.  It's unclear.  You
 4    should call it a draft.  It's been now
 5    designated as a draft.  You should
 6    call it a draft to avoid confusion.
 7    Wait.  And the second thing is --
 8    wait.  And the second thing is, many
 9    of the dimensions on the draft are the
10    same as are on the final.  And so the
11    question you asked implies, did you
12    use any of these numbers?  Well, yes,
13    he used the ones that are the same as
14    the final.  So --
15          MR. STEVENS:
16             Stop.  I withdraw question, Bill.
17    I withdraw the question.
18    EXAMINATION BY MR. STEVENS:
19       Q.  Let me ask you this:  With regard to
20    the Boland Marine site and the 17 areas that I
21    walked through with you to see which ones
22    changed, did you use the draft version of those
23    17 depth dimensions in your modeling of this
24    case?
25          MR. TREEBY:
```

                              44 (Pages 173 to 176)

ALLEN MARR, PH.D.                                        April 24, 2012

Page 177

1        Same exact objection.  In fact,
2   you've made it --
3        MR. STEVENS:
4             Only.  Fine.  Let it stand.
5        MR. TREEBY:
6             Wait.  No.  You've made it clear,
7   because the wedding cake structure is
8   the same on both documents.  So of
9   course he used it.  But we're only
10  entitled to inquire about finals, not
11  drafts.  Your question is
12  inappropriate.  I'll leave it up to
13  Robin to take the rest of it.  But we
14  have an understanding that drafts --
15       MR. SMITH:
16            Yeah.  Elwood, ask him questions
17  about the corrected figure.
18       MR. STEVENS:
19            Okay.  Just want to know.  He can
20  answer yes or no.
21       MR. SMITH:
22            No.
23  EXAMINATION BY MR. STEVENS:
24       Q.   Did you run computer models that used
25  the depths in the draft--

Page 178

1        MR. SMITH:
2             Any of the depths?  The ones that
3   are correct?  The ones that didn't
4   change?
5   EXAMINATION BY MR. STEVENS:
6        Q.   All of them.  1 through 17, the 16
7   plus the wedding cake.  Did you use those 17
8   depths, as a group, as a subset, in running
9   computer analyses in relation to the north
10  breach before they were changed to the depths
11  that we now have presented to us?
12       MR. SMITH:
13            Look, I'm going to instruct him
14  not to answer this question because
15  this goes to draft work.  Okay?  You
16  can ask him about the opinions that
17  are set forth in his report --
18       MR. STEVENS:
19            Uh-huh.
20       MR. SMITH:
21            -- and the bases for those
22  opinions.  Okay?
23  EXAMINATION BY MR. STEVENS:
24       Q.   Okay.  Fine.  I got a better question.
25       MR. SMITH:

Page 179

1        Good.
2   EXAMINATION BY MR. STEVENS:
3        Q.   Using the 17 data points, if you will,
4   the depths -- 17 depths listed for Boland
5   Marine in the draft of your report --
6   hypothetically, if you used those figures
7   instead of the figures that are now contained
8   in the revised version of B-1 for those same 17
9   data points, or depths, would the result of
10  your analysis be different?
11       A.   I don't know.
12       Q.   So if we changed -- according to my
13  circles here, when we discussed them one at
14  time and compared them, 8 of the 17 depths
15  changed to a shallower depth.  There were 8
16  depths of greater depth in the draft.
17            If you hypothetically inputted all 17
18  of those, including the 8 of greater depth,
19  would your under seepage analyses results
20  change?
21       MR. SMITH:
22            Objection.
23       MR. TREEBY:
24            Objection to the form of the
25  question.

Page 180

1        MR. SMITH:
2             Object to the form, and asked and
3   answered.
4        A.   I'd have to take them one by one.
5   EXAMINATION BY MR. STEVENS:
6        Q.   Okay.
7        A.   And I'd have to give some thought to
8   it.  I can't just do it sitting here.
9        Q.   I understand.
10       A.   And, um -- you know, I think I've said
11  before that I used the ones in the table we
12  gave you this morning.
13       Q.   In reporting your results in your
14  March 12, 2012 report.  Correct?
15       A.   Yes.
16       Q.   All right.  Now my pending question to
17  you is, and I'll mark for identification as
18  Marr number 35(B) -- I only have one copy of a
19  marked one, but I circled as we went down list
20  a little bit ago, I circled the eight depths
21  that changed from the draft to the final
22  version of B-1.  (Tendering.)  Would you
23  confirm for me, sir, that there were eight
24  changes?
25       MR. TREEBY:

                              45 (Pages 177 to 180)

JOHNS, PENDLETON COURT REPORTERS                   504 219-1993

ALLEN MARR, PH.D.                                    April 24, 2012

Page 181

1        Again, object to the question.
2    It violates the Court's order.
3        MR. SMITH:
4            I'm going to object to the
5    question.  I'm going to instruct the
6    witness not to answer.  (Tendering.)
7        MR. TREEBY:
8            It violates a direct Court Order.
9        MR. SMITH:
10            I'm going to instruct him not to
11    answer.  If we have to go to the
12    Magistrate with this, we will.  He's
13    not going to answer that question.
14        MR. STEVENS:
15            That's fine.  I'll ask another
16    question.
17    EXAMINATION BY MR. STEVENS:
18        Q.  In connection with Exhibit 35(B) that
19    I just marked, would you agree that the eight
20    circled numbers are of shallower depths than
21    their corollary figures on the final B-1?
22        MR. SMITH:
23            I'm instructing the witness not
24    to answer any more questions about
25    that exhibit. (Tendering.)

Page 182

1    EXAMINATION BY MR. STEVENS:
2        Q.  Okay.  And you don't need to flip it
3    over or toss it back the me.  I'm attaching it
4    to the deposition.  I'm putting it in the pile
5    for the court reporter.
6        MR. TREEBY:
7            He's not going to answer
8    questions about it.  It's a draft.
9        MR. SMITH:
10            So stop putting it in front of
11    the witness.  He's not answering
12    questions about it.
13        MR. STEVENS:
14            I'll put it over here next to the
15    court reporter.  It just so happens
16    the pile is in front of the witness.
17    EXAMINATION BY MR. STEVENS:
18        Q.  So we can be safe, then, to the extent
19    that your report contains any conclusions that
20    are based on the data from Table B-1, that data
21    came from the final version that was given to
22    us today, not the draft that I marked as B-5.
23        MR. SMITH:
24            Object to the form of the
25    question.

Page 183

1    EXAMINATION BY MR. STEVENS:
2        Q.  Is this the draft?  They came from the
3    final, not the draft.
4        MR. SMITH:
5            Object to the form.
6    EXAMINATION BY MR. STEVENS:
7        Q.  Subject the his objection, could you
8    answer?
9        A.  I don't know the question.  I don't
10    think there's a question.
11        Q.  I'll ask it again.
12            To the extent your report contains any
13    conclusions based on data from Table B-1, was
14    that data from the final version of B-1 given
15    to us today?
16        A.  Yes.
17        Q.  Thank you.  Do you know what records
18    were relied upon to produce the data contained
19    in Figure B-1?
20        MR. SMITH:
21            Object to the form.  It's unclear
22    which Figure B-1 you're referring to.
23        MR. STEVENS:
24            The final.
25    (Off the record.)

Page 184

1    EXAMINATION BY MR. STEVENS:
2        Q.  Yeah.  It's Table B-1.  I've been
3    calling it -- if I've been calling that
4    excavation log a figure, I stand corrected.  It
5    was in fact a table.
6            Table B-1.  The question is, do you
7    know what documents were relied upon to form
8    that data, or to arrive at that data?
9        A.  Yes.
10        Q.  What documents were relied upon to
11    form that list of data?
12        A.  My understanding is this is created
13    from WGI documents.
14        Q.  Do you know which WGI documents?
15        A.  Not specifically, no.
16        Q.  Did you confirm, or even spot check,
17    any of those documents to confirm that the data
18    entries for depths in that column of Table B-1
19    were accurate?
20        A.  I did not personally.  Some of my
21    staff did.
22        Q.  Do you know whether or not the
23    documentation that those staff folks would have
24    used to derive this -- these depths were
25    produced in connection with your reliance

                            46  (Pages 181 to 184)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

ALLEN MARR, PH.D.                                    April 24, 2012

Page 185

1  materials?
2      A.  I don't know.
3      Q.  Do you have a list of your reliance
4  materials attached to your report?
5      A.  No.
6      Q.  We'll, it's at the back of your
7  report.  Page 120 of your report is reliance
8  documents.
9      A.  I apologize.  I missed it in table of
10  contents.
11     Q.  That makes two of us.  No problem.
12         If we could, we will mark for
13  identification as our next number, which is 36.
14  I'll mark a copy of your reliance documents and
15  attach it to the depo.
16         If you would, indicate to us or point
17  us to the source of the data contained for
18  depths in Table B-1 marked as Marr number 35.
19         (Exhibit Marr 36 was marked for
20  identification and is attached hereto.)
21     A.  I did not personally do this work, but
22  looking from the list of documents, reliance
23  documents from WGI, I think it's most likely
24  that it is in the document called Spreadsheet
25  of Excavation Locations, New Orleans,

Page 186

1  Louisiana.
2      Q.  What page is that on, sir?
3      A.  Page 128.
4      Q.  128.  There it is.  Fourth one from
5  the bottom of the page.  I'm going to put a
6  star by it, if you don't mind.
7      A.  May I request the opportunity for us
8  to check that, it was provided to in the
9  reliance documents, to make sure that it's the
10  current version also, so we don't have further
11  confusion over this.
12     Q.  Sure.  Like you did with the disk
13  yesterday?  Sure.  If we can pull it up, we'll
14  be happy to do that.
15         Do you know whether or not this
16  Spreadsheet of Excavation Locations by
17  Mr. Mayo -- do you know Mr. Mayo?  Mr. or Mrs.,
18  I'm not sure who Mayo is.  Do you know who Mayo
19  is? M-A-Y-O.
20     A.  Yes.
21     Q.  Do you know does that person work for
22  you or for WGI?
23     A.  He works for Francisco Silva-Tulla.
24     Q.  Okay.  And do you know if that
25  spreadsheet was prepared or generated for this

Page 187

1  litigation or for some other purpose?
2      A.  It was prepared for, in connection
3  with this event.
4      Q.  This litigation.
5      A.  The litigation, yes.
6      Q.  The event giving rise to this
7  litigation is the floodwall failure.  So we get
8  that definition straight.
9      A.  Thank you.
10     Q.  Now, do you know what documents
11  Mr. Mayo relied upon to create the spreadsheet
12  entitled Spreadsheet of Excavation Locations,
13  New Orleans, Louisiana?
14     A.  Not exactly.
15     Q.  All right.  Were you ever provided
16  with the underlying documentation?
17     A.  Um -- I think some of my group went
18  through some of that as a means of checking
19  that the information had been taken from
20  original documents and entered into the
21  spreadsheet properly.
22     Q.  Now, can you tell us what generated
23  the need for the adjustment between the draft
24  and the final version of Table B-1?
25         MR. TREEBY:

Page 188

1          Objection.
2          MR. SMITH:
3              I'm going to object and instruct
4  him not to answer.
5  EXAMINATION BY MR. STEVENS:
6      Q.  Well, let me ask it this way:  Did
7  anyone in your office, when they examined the
8  underlying documentation that gave rise to
9  Spreadsheet of Excavation Locations that you
10  identified for us on Page 128 inform you that
11  they had discovered errors that needed
12  correction?
13     A.  No.
14     Q.  Did anyone advise you in any way prior
15  to now as to what changed between the draft and
16  the final version with regard to the source of
17  information for these depths?
18         MR. TREEBY:
19             Object.
20         MR. SMITH:
21             I'm going to object and instruct
22  him not to answer.  You're asking him
23  about drafts.
24     MR. STEVENS:
25         All right.  We'll attach the

47  (Pages 185 to 188)

Page 189

```
 1        litigation of reliance documents as
 2        Marr number 36.
 3   EXAMINATION BY MR. STEVENS:
 4        Q.  Do you know whether or not the depths
 5   and the excavations listed on Table B-1 for
 6   both Boland Marine and Saucer Marine, do you
 7   know whether or not those excavations include
 8   the removal of pilings?
 9        MR. SMITH:
10            Object to the form.
11   EXAMINATION BY MR. STEVENS:
12        Q.  And I'm talking about wooden posts, or
13   those kinds of pilings, not sheet piles like
14   we've been talking about today.
15        A.  I don't know specifically which ones
16   might have included pilings.
17        Q.  Well, let me ask you this:  In
18   reviewing this list -- I'm just eyeballing, and
19   I'm looking at the draft, so let me look back
20   at the original -- I'm sorry, the final -- the
21   final would be Marr 35.  Right?  Not 35(B).
22        A.  (Tendering.)
23        Q.  Okay.
24        MR. STEVENS:
25            I need -- I made a mistake.  We
```

Page 190

```
 1   did it again.  Or I did it again.  I
 2   marked the same document with two
 3   different exhibit numbers.  Okay?  I
 4   need to mark as Marr 35(C), because
 5   I'll leave B as the one that has my
 6   marks on it.  35(C), I need a copy of
 7   the draft.  These are both finals.  I
 8   need a copy of the draft of Table B-1
 9   so we can have a comparison.
10   EXAMINATION BY MR. STEVENS:
11        Q.  Good.  Then I wasn't on the wrong
12   track here.  On Marr 35, the final, is it not a
13   fact that the deepest excavation noted on
14   either Page 1 or Page 2 of Marr 35 is the
15   wedding cake structure, 26.5 feet?
16        A.  That's correct.
17        Q.  I ask you, do you know what the
18   average depth or average length of the pilings
19   that were removed from the EBIA would have
20   been?
21        A.  No.
22        Q.  Can you agree with me that they would
23   have been substantially longer or deeper than
24   26.5 feet?  On average.
25        A.  I don't know.
```

Page 191

```
 1        Q.  Okay.  You told us a moment ago that
 2   you did not know which WGI documents were
 3   actually used to generate the depths contained
 4   on Table B-1.  Can you give us a general nature
 5   or description of those documents, underlined,
 6   the spreadsheet that we identified on Page 128?
 7        A.  I can tell you what I know, which is
 8   very very limited.
 9        Q.  Tell us what you know.  General nature
10   of the documents relied on.
11        A.  I know that, you know, what I was --
12   my understanding is that there were a lot of
13   documents that were kept on a day-to-day basis
14   by field personnel with WGI and the Corps of
15   Engineers, and that those -- they, um -- WGI
16   folks went through those documents to determine
17   locations and sizes of each of the excavations.
18        Q.  Do you know what type of documents
19   those are?  General description of the
20   documents?
21        A.  No.
22        Q.  Okay.  And you said you believed that
23   your office spot-checked those.  What is the
24   basis for your belief that your office
25   spot-checked these depth?
```

Page 192

```
 1        A.  A discussion request we had from WGI
 2   to see if we could provide some help with
 3   review of the large number of documents that
 4   they had to go through to obtain this
 5   information.
 6        Q.  Okay.  And if you don't mind, bear
 7   with me for one moment, I'm going to borrow
 8   Exhibit 35(B) back from you, sir, and I'm going
 9   to -- the 35(C), which is the draft version
10   that came with your report, I'm going to circle
11   the same entries for Area 1.
12        MR. TREEBY:
13            I object to any use of a draft in
14   this deposition.
15   EXAMINATION BY MR. STEVENS:
16        Q.  And I counted them up again.  I
17   misspoke.  There were changes to 7 numbers, not
18   8 of 17.
19            Can you tell us, with regard to Table
20   B-1, what criteria governed which excavations
21   would or would not be included on that table?
22        A.  I don't know.
23        Q.  Who would know?
24        A.  Um -- WGI folks working with Francisco
25   Silva.
```