**SCOTT H. TAYLOR** February 9, 2012

---

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   CIVIL ACTION
CONSOLIDATED LITIGATION
                NO. 05-4182
                  "K" (2)
PERTAINS TO: MRGO         JUDGE DUVAL
FILED IN: 05-4181, 05-4182,   MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

DEPOSITION OF
SCOTT H. TAYLOR,
2557 James River Road, West Palm Beach,
Florida 33411, taken in the offices of Stone,
Pigman, Walther, Wittmann, 546 Carondelet
Street, New Orleans, Louisiana 70113, on
Thursday, February 9, 2012 and Friday,
February 10, 2012.

---

Page 2

1  APPEARANCES:
2    PALMINTIER LAW
     (BY: JOSHUA M. PALMINTIER, ESQ.)
3    818 Main Street
     Baton Rouge, Louisiana 80801
4      FOR THE PLAINTIFFS
5
     LAW OFFICES OF JOSEPH M. BRUNO
6    (BY: SCOTT JOANEN, ESQ.)
     855 Baronne Street
7    New Orleans, Louisiana 70113
         PLAINTIFFS LIAISON COUNSEL
8
9    JAY ANDRY LAW
     (BY: JAY ANDRY, ESQ.)
10   710 Carondelet Street
     New Orleans, Louisiana 70130
11     ATTORNEY FOR PLAINTIFFS
12
     STONE PIGMAN WALTHER WITTMANN
13   (BY: WILLIAM D. TREEBY, ESQ.
        HEATHER LONIAN, ESQ)
14   546 Carondelet Street
     New Orleans, Louisiana 70130-3588
15     AND
     JONES DAY
16   (BY: ADRIAN WAGER-ZITO, ESQ.)
     51 Louisiana Avenue N.W.
17   Washington, D.C. 20001-2113
       ATTORNEYS FOR WASHINGTON GROUP
18       INTERNATIONAL, INC.
19
     UNITED STATES DEPARTMENT OF JUSTICE
20   (BY: JAMES F. MCCONNON, JR., ESQ.)
     Torts Branch, Civil Division
21   Post Office Box 888
     Ben Franklin Station
22   Washington, D.C. 20044
       ATTORNEY FOR UNITED STATES OF
23       AMERICA
24   REPORTED BY: ROGER D. JOHNS, RMR, CRR, CSR
         Certified Court Reporter,
25       State of Louisiana

---

Page 3

1           S T I P U L A T I O N
2
3      It is stipulated and agreed by and between
4  counsel for the parties hereto
5  that the deposition of the aforementioned
6  witness is hereby being taken under the
7  Federal Rules of Civil Procedure, for all
8  purposes, in accordance with law;
9      That the formalities of reading and
10 signing are specifically not waived;
11     That the formalities of certification and
12 filing are specifically waived;
13     That all objections, save those as to the
14 form of the question and the responsiveness of
15 the answer, are hereby reserved until such
16 time as this deposition, or any part thereof,
17 may be used or sought to be used in evidence.
18
19            * * * *
20
21     ROGER D. JOHNS, RDR, CRR, Certified Court
22 Reporter for the State of Louisiana,
23 officiated in administering the oath to the
24 witness.
25

---

Page 4

                  I N D E X
                                    PAGE
Taylor Exhibit Number 1.................. 10
Taylor Exhibit Number 2.................. 11
Taylor Exhibit Number 3.................. 11
Taylor Exhibit 4......................... 12
Taylor Exhibit 5......................... 12
Taylor Exhibit 6......................... 12
Taylor Exhibit Number 7.................. 12
Taylor Exhibit Number 8.................. 12
Taylor Exhibit Number 9.................. 12
Taylor Exhibit 10........................ 13
Exhibit Number 11........................ 32
Exhibits 1 and 2......................... 82
Taylor Exhibit 12........................ 96
Exhibit 12............................... 99
Taylor Number 13......................... 172
Taylor Exhibit 14........................ 175
LM-ARMSTRONG-229 to 234.................. 175
Taylor Exhibit 15........................ 178
Taylor Exhibit 16........................ 183
Exhibit Taylor 17........................ 245
Bates number 0154........................ 245
Taylor Exhibit 18........................ 269
Bates number ALLSTATE-000025............. 270
Taylor Exhibit 19........................ 274
Bates number lMIC-ARMS-0196 through 0198.. 275
Taylor Exhibit 20........................ 300
LMIC-ARMS-0166 through 0189.............. 301
Exhibits 3 and 4......................... 305
Taylor Exhibit 21........................ 336
ACFIC-000692 through 693................. 337
Taylor Exhibit 22........................ 338
ACFIC-000154 through 161................. 339
DSC-0126................................. 343
DSC-00296................................ 344
DSC-00147................................ 344
DSC-0168................................. 345
DSC-170.................................. 345
DSC-171.................................. 345
DSC-213.................................. 345
DSC-214.................................. 345
DSC-241.................................. 346
DSC-264.................................. 346
DSC-266.................................. 346
DSC-279.................................. 346
DSC-280.................................. 346
281...................................... 346

---

1 (Pages 1 to 4)

JOHNS, PENDLETON COURT REPORTERS                    504 219-1993

Page 17

1   Q.  And have you looked at all the
2   reports for each of the Plaintiffs issued by
3   Mr. Truax?
4       A.  I'm -- I don't recall who Mr. Truax
5   is.
6       Q.  Have you looked at any of the
7   reports that -- And we can show them to you
8   later if you need to, but looked at the value
9   of each, or at certain of the Plaintiffs'
10  homes pre-Katrina and then did an appraisal
11  for post-Katrina value for any of the
12  reports?
13      A.  You might have to show me what
14  you're asking -- what you're asking
15  specifically so that I could -- I would hate
16  to give you an answer based on something I am
17  not clear as to which report it is.  And I
18  would have to look at it to determine if this
19  is one that I had actually looked at.
20      Q.  And we'll get to those later, again,
21  when we talk about each of the individual
22  Plaintiffs.  And what about the reports for
23  Mr. Danner, the reports issued by Mr. Danner?
24      A.  Again, I am not sure who Mr. Danner
25  is, so I would have to look at that to see if

Page 18

1   it's one I had looked at.
2       Q.  Did you look at any reports that
3   reflected on whether the damages to the
4   Plaintiffs' properties were caused by wind --
5       A.  I did.
6       Q.  -- and rain versus flooding?
7       A.  Yes, I did.
8       Q.  Did you look at any reports that
9   were issued by any of the experts relating to
10  the Coats property or the Armstrong property
11  that were issued earlier in this litigation in
12  the class certification phase?
13      A.  I don't recall looking at any of
14  those.
15      Q.  And you have not issued any rebuttal
16  reports for any of the named Plaintiffs; is
17  that correct?
18      A.  No.
19      Q.  Okay.  And again, as we just
20  discussed, is it your intention to issue any
21  written rebuttal reports?
22          MR. PALMINTIER:
23              I object to the form.
24  EXAMINATION BY MS. WAGER-ZITO:
25      Q.  You can go ahead and answer.

Page 19

1           MR. PALMINTIER:
2               You can answer.
3           THE WITNESS:
4               Unless instructed to, I don't
5           have any intention at this time.
6   EXAMINATION BY MS. WAGER-ZITO:
7       Q.  Do you plan on addressing any of the
8   criticisms raised by any of the Defendants'
9   experts of your reports?
10      A.  Only if I am asked specifically
11  about it.
12      Q.  And you haven't been asked to do so
13  yet?
14      A.  Not at this time.
15      Q.  Would you consider yourself
16  qualified to issue any opinions in response to
17  the Danner report that speaks to the issue of
18  wind versus rain?
19      A.  To the extent of my experience with
20  claims on damages to homes and wherein it lies
21  -- it discusses the physical damages
22  observable at that time, yes.
23      Q.  In the work that you did in this
24  case, did you look at damages caused by wind
25  and rain versus flooding?

Page 20

1       A.  I did not distinguish anything,
2   percentages or anything like that when it came
3   to cause on wind versus rain -- wind and rain
4   versus flood, because my task was to look at
5   the flood damages.
6       Q.  And again, we'll get into that as we
7   talk about each of them.  Are you qualified to
8   issue an opinion as to -- an appraisal type of
9   opinion as to the value of any of the
10  properties --
11      A.  Yes.
12      Q.  -- at issue in this case?
13      A.  Yes, I am qualified.
14      Q.  Are you licensed as an appraiser?
15      A.  I am a licensed independent adjustor
16  and have -- and have appraised literally
17  thousands of properties.
18      Q.  Did you do any appraisals of the
19  homes of any of the Plaintiffs in this case?
20      A.  Prior to this or --
21      Q.  In connection with the work that you
22  did.
23      A.  Yes.
24      Q.  You appraised the values of the
25  homes as opposed to the repair costs or the

Page 37

1  Q. So did this overlap with the work
2  that you were doing for Royal Restorations?
3  A. No. It did not. Well, it followed
4  it almost immediately.
5  Q. Although in Royal Restorations you
6  were doing work in connection with --
7  A. Mostly with Rita. In fact, it was
8  all with Rita, Hurricane Rita, but that was in
9  Lake Charles.
10  Q. But Hurricane Rita was after
11  Katrina; correct?
12  A. Right. As you probably are aware,
13  Katrina claims tended to go on for quite some
14  time.
15  Q. For quite some time. I think we're
16  all aware of that. And then the next entry is
17  Bankers Insurance. What were you doing for
18  Bankers Insurance?
19  A. I was a mediator and consultant and
20  negotiator as well.
21  Q. And for what period of time were you
22  working for Bankers Insurance?
23  A. That would have been in 2006.
24  Q. And did that overlap at all with
25  what you were doing for Advanced Adjusting?

Page 38

1  A. Yes, it did. Because it was -- I
2  actually ran it through Advanced Adjusting.
3  They were -- I was approached by Bankers to
4  handle it and I deferred it to Advanced
5  Adjusting. Since -- Since the connection to
6  that insurance company had come through them,
7  it seemed the appropriate thing to do is to
8  run it through them.
9  Q. Now, were all of these jobs we have
10  gone through full time jobs for you?
11  A. Yes.
12  Q. But still at this time you were also
13  doing Scott Taylor Adjusting work? Is that
14  true?
15  A. Technically, yes. There just wasn't
16  any activity at that time.
17  Q. And the next listed item is Fleming
18  Hall Administrators?
19  A. Uh-huh (affirmatively).
20  Q. What was that? What did that job
21  entail?
22  A. That was writing claims for -- That
23  occurred in Hurricane Wilma in Florida.
24  Q. And what period of time were you
25  with Fleming Hall Administrators?

Page 39

1  A. That was in 2006 as well.
2  Q. And was this at the same time that
3  you were working with Advanced Adjusting and
4  Bankers Insurance?
5  A. No. No. The work had pretty well
6  dried up on those and once -- In insurance
7  adjusting, especially when it's catastrophic,
8  you end up following where the work is. So
9  when you're doing that, you know, once it
10  dries up and you're not able to sustain a full
11  time employment there, you move on to the next
12  event or the next situation. So they tend to
13  be rather transitory.
14  Q. Okay. The next entry is L&M LLC,
15  New Orleans.
16  A. Uh-huh (affirmatively).
17  Q. Can you explain what that is?
18  A. That was evaluating claims in New
19  Orleans that had to do with Hurricane Katrina
20  and looking at those for whether everything
21  was covered or not and doing reinspections.
22  Q. And what is L&M LLC?
23  A. That's just the name of the
24  company. I don't know what it stands for.
25  Q. What do they do? Is it an insurance

Page 40

1  company?
2  A. No, no. They were -- They were a --
3  They were a reinspection -- They were -- I'm
4  not sure exactly what their -- what their --
5  how they would describe themselves, but they
6  were an institution that had hired me to do
7  evaluations and reinspections for the purpose
8  of settling claims.
9  Q. And what period of time did you work
10  for L&M?
11  A. That went on for quite some time,
12  through the end of -- somewhere around the end
13  of 2007.
14  Q. And when did it start? 2006?
15  A. 2006.
16  Q. The next entry is National Adjustors
17  Academy. Can you describe what type of work
18  you did for National Adjustors Academy?
19  A. I was asked to write a curriculum
20  for them for training field adjustors and then
21  on use of the Xactimate software. And so I
22  wrote a manual for them and then taught it
23  with their -- with their -- in their offices
24  for them.
25  Q. And when you say "taught it", can

Page 41

```
 1   you describe what that entailed?
 2       A.  The courses that I teach are varied
 3   at this time.  But at that time it was a five
 4   day course that involved the nuts and bolts
 5   issues associated with adjusting claims and
 6   how you go about that and the -- and the
 7   methodology that's used, how to -- how to do
 8   each step in sequence and how to produce
 9   claims in the end.  And that's a five day
10   course including construction elements that
11   teach them the basic construction of buildings
12   and mainly for residential purposes, but every
13   step of construction is gone over and how it's
14   accomplished and what its -- what its purpose
15   is and how you would write claims for those
16   damages.  So you get a thorough construction
17   overview of each element and then the
18   processes and procedures for putting together
19   damages and claims.
20       Q.  And you said that's using the
21   Xactimate software?
22       A.  That follows.  The Xactimate
23   software course is it's own course and I have
24   always taught that following, for new
25   adjustors, following the basic course, because
```

Page 42

```
 1   the methods that are used in evaluating a loss
 2   can be done independently of actually writing
 3   the claim with a software.  You can write it
 4   all by hand if you desire to.  As a matter of
 5   fact, the final that I give all the students
 6   is to write a claim without the use of any
 7   software and nothing but a calculator.  And
 8   they have to do a very thorough, exhaustive
 9   thing that takes them most of the -- part of a
10   day to do, with the purpose of demonstrating
11   how, when they get finished, if they're
12   prepared now to start the software course.
13   The software can actually produce the same
14   claim in a much shorter time and so they
15   become very enthusiastic about learning that
16   software.
17       Q.  I bet they do.
18       A.  Yes.
19       Q.  And we will get into some questions
20   about the Xactimate software as we go through
21   the work that you did in this case.  But how
22   long have you been using the Xactimate
23   software?
24       A.  For seven years.
25       Q.  Is that how long it's been around?
```

Page 43

```
 1       A.  No, it's been around for quite some
 2   time.  Since the early '90s.
 3       Q.  And how did you learn how to use
 4   it?
 5       A.  I learned it by -- by doing
 6   tutorials on it myself and going through the
 7   program exhaustively for days on end.  I
 8   actually went to a class, but the instructor
 9   was only teaching certain elements of it and
10   so I found I needed to learn it more
11   thoroughly and just went after it myself; and
12   there were some -- there were some videos that
13   I was able to procure to go through the rest
14   and learn myself, and so I did.
15       Q.  And you said when you were teaching
16   this you actually had your students do a claim
17   without using the software and actually doing
18   it by hand and comparing it to the results for
19   the software?
20       A.  Yes.
21       Q.  Is that what you said?
22       A.  Yes.
23       Q.  But you'd agree, wouldn't you, that
24   the software is only as good as the
25   information that's input into the software?
```

Page 44

```
 1       A.  Of course.
 2       Q.  And in preparing claims using the
 3   software, it's critically important to input
 4   accurate information relating to the claim
 5   that you're adjusting relating to the property
 6   that you're looking at?
 7       A.  I would agree with that.
 8       Q.  So you need to get the right
 9   dimensions for the property; correct?
10       A.  Yes.
11       Q.  And you need to have the right
12   materials for the property; like for a home,
13   whether it's brick or if it's siding, you need
14   to have all of those correct inputs?
15       A.  Yes.
16       Q.  We're getting there.  But the next
17   entry on your employment listing is -- Well,
18   to go back, National Adjustors Academy, what
19   was the time period for that?
20       A.  That was a very short time period.
21   That would have been in -- That would have
22   been in 2006, somewhere in the early fall,
23   probably September.
24       Q.  And it was only for that short
25   period of time that you were teaching at
```

```
                                    Page 89
 1       MR. PALMINTIER:
 2           Armstrong.
 3   EXAMINATION BY MS. WAGER-ZITO:
 4       Q.  Armstrong report.  Do you recall any
 5   conversations or working with any consultants
 6   on the Armstrong report to get answers to
 7   questions?
 8       A.  Not after the initial meetings that
 9   we had.
10       Q.  And what initial meetings did you
11   have?
12       A.  I met with Counsel concerning the
13   losses.  I met with the Armstrongs at their
14   present -- I guess it's present.  I don't know
15   if it's still present or not -- location, and
16   discussed the loss with them extensively.
17       Q.  Okay.  And let's take them one at a
18   time.  What did Counsel tell you about the
19   loss to the Armstrongs?
20       A.  They gave me the location of it, of
21   the original one, and the names and contact
22   numbers for the Armstrongs where they were
23   currently, and for the most part they allowed
24   me to do the -- to do the investigation of it
25   and relied on me to determine what was
```

```
                                    Page 90
 1   necessary and what to ask and discuss with the
 2   Armstrongs.  You know, a lot of -- but it was
 3   -- My -- My work was restricted to damages.
 4   So the circumstances of the loss and other
 5   periphery were not really the main germane
 6   things to what I was doing.  I was to deal
 7   with the damages.  And so I pretty -- I pretty
 8   well restricted it to those kinds of
 9   questions.
10       Q.  Do you recall any other
11   conversations with Counsel about the Armstrong
12   report?
13       A.  I don't recall any specific ones,
14   no.
15       Q.  And now let's talk about your
16   contact with the Armstrongs.
17       A.  Uh-huh (affirmatively).
18       Q.  What do you recall about discussions
19   with them in particular?
20       A.  In particular?  I couldn't -- I
21   could go on for a while about the
22   conversations, I'm sure, but there wasn't
23   anything that was particularly unique in their
24   situation versus any other ones that I have
25   dealt with in the past.  So it doesn't jump
```

```
                                    Page 91
 1   out as extremely different from a lot of other
 2   situations with Katrina.  I discussed with
 3   them the things that I always discuss with
 4   someone when I am evaluating a loss, and that
 5   is what was the house like before, what did it
 6   seem like, what did you notice happening and
 7   how did it happen and what's going on with
 8   this, so that I can get an idea of the nature
 9   of the damages; and is the house still there,
10   is it livable, those kinds of questions.  A
11   lot of those kind of questions and I just go
12   through a mental checklist of the kind of
13   things that would be true in a case where a
14   lot of water was in a house.  And as I went
15   through, nothing jumped out at me at that time
16   as particularly different.  I'm not really
17   sure exactly, you know, contextually what you
18   are looking for, so I would be willing to
19   answer specific questions about that.
20       Q.  Well, how much time did you spend
21   with the Armstrongs?
22       A.  It was --
23       Q.  Approximately.
24       A.  I would -- I would say it was
25   certainly several hours, because I do recall
```

```
                                    Page 92
 1   that they were -- they had a lot of things
 2   that they wanted to talk about.  I do recall
 3   that.  They had -- They had a lot of issues
 4   with their property that they wanted to go
 5   over.  What I find to be true in almost every
 6   case is that the vast majority of what you
 7   need from them comes out in the conversation
 8   and if you try to circumvent their story, that
 9   you never get.  So you have to let them tell
10   their story; and when they tell their story
11   you start pulling the pieces out that you need
12   in order to assess what you need.  And as an
13   insurance adjustor, that's one of the critical
14   things that you do in dealing with damages.
15   The story always produces the damages.  If not
16   the actual physical evidence that's left, it's
17   a combination of that and the story.  And it's
18   whatever they remember.  But when you start
19   prodding them about the circumstances of it,
20   that's when they start remembering details and
21   suddenly you start getting more of the damages
22   as a result of that.  So you have to let them
23   tell you what happened and how it happened.
24   So it took a good while.
25       Q.  And you believe several hours?
```

SCOTT H. TAYLOR                                              February 9, 2012

Page 125

```
 1   notes I just jotted it down and I asked them
 2   about the design of it and the function of the
 3   rooms and that kind of thing and produced from
 4   that a viable sketch that I used.
 5       Q.  And did you share that sketch with
 6   them and say to them, "Did I get it right?"
 7       A.  No.  The requirement for turning
 8   this in was before there could be a whole lot
 9   of extra time.  There wasn't a whole lot of
10   time once I finished the work that it had to
11   be turned in.  There wasn't time to revise it
12   initially and so it had to be turned in before
13   we could do any -- any re-evaluation of it.
14       Q.  Did you ever show it to them after
15   you turned it in to say, "Did I get it right?"
16       A.  Of course I never met with them
17   again, so no.
18       Q.  Well, you did say before that you
19   would pose questions to them through Counsel.
20       A.  Uh-huh (affirmatively).
21       Q.  Even though you never met with them
22   again, did you ever through Counsel go to
23   them, did you ever ask Counsel to show them
24   the sketch that you made of their home to
25   determine whether or not you had gotten the
```

Page 126

```
 1   sketch right?
 2       A.  Not specifically.  You know, I did
 3   ask Counsel, "Is there any corrections that
 4   you know of based on your conversations that
 5   need to be made on this?"
 6       Q.  And do you know whether or not
 7   Counsel ever showed them your sketches and
 8   your drawings of the house to ask them if you
 9   had gotten it right?
10       A.  No, I don't.
11       Q.  What, if any, questions did you ask
12   of the Armstrongs to ascertain the type of
13   building materials that had been used in their
14   house and the quality?
15       A.  I ask them usually -- You know,
16   because you're saying what in particular did I
17   ask, I don't recall specifically, but I know
18   that as a general rule I ask them the flooring
19   type; I ask them the height of the ceilings; I
20   ask them the materials, whether they were
21   custom or it was a standard tract home build,
22   or the type of shingle that might have been on
23   the roof, what kind of roof they had; I ask
24   them what kind of trim that they had around
25   the house.  Did they have crown molding, did
```

Page 127

```
 1   they have baseboards, did they have granite
 2   countertops versus -- versus laminate; did
 3   they have custom cabinets of wood, what did
 4   they have.  And as I go through those things,
 5   I begin to be able to piece together the style
 6   and type of house that they had.  And I recall
 7   that this one was not bottom of the barrel,
 8   but it wasn't the top, at the top of the line
 9   either.  So it was somewhere in a medium to
10   high grade home that they had.  And so, you
11   know, the materials that I put back in it were
12   the similar style and quality.
13       Q.  Okay.  Do you have a list of things
14   that you ask them when you're going through
15   this?  You know, "What type of floor did you
16   have?"
17       A.  Not a prepared list, no, I don't.
18       Q.  We already determined that you took
19   notes, but you didn't keep any of the notes.
20       A.  No.  Those -- Again, like I said, I
21   mean, when I finish taking the notes and
22   actually produce something, that it's the only
23   thing that anybody else could read anyway.  So
24   I have not kept my notes as a practice.
25       Q.  And I think we have already
```

Page 128

```
 1   determined that the Armstrongs gave you some
 2   photos; correct?  Those are the photos that
 3   are in your report?
 4       A.  I think they gave me -- It seems
 5   like they gave me some to look at and I may
 6   have had to ask Counsel to send me the rest
 7   digitally or send them to me after the fact.
 8   I am not sure.  I am not sure whether they --
 9   whether this came from a disk or from emails.
10   I am not sure.
11       Q.  And that's really not important, but
12   you did get photos from the Armstrongs of
13   their house?
14       A.  Well, I requested them because I
15   understood that they had them.  I don't recall
16   whether I got them at that moment or not.  It
17   possible I did.  It's possible.  If I did,
18   then that's where they came from.  But I
19   understood that they had them and I do
20   understand that they did come from them.
21       Q.  Do you know if you got any photos of
22   the house other than the ones that are
23   attached to the report?
24       A.  I do not.
25       Q.  Did you get any photos from the
```

32 (Pages 125 to 128)

SCOTT H. TAYLOR                                                    February 9, 2012

Page 233

```
 1   going to be on the roof or how many feet,
 2   board feet of trim work there's going to be.
 3   And it will reflect perimeters of the ceilings
 4   of those rooms.  It will reflect the size of
 5   the floor to its -- down to its last square
 6   inch.  So the pricing is done based off the
 7   dimensioning and it's done with fairly close
 8   precision, you know.  So there's not a lot of
 9   room for error on that.  That's why you see
10   figures of 810.44 lineal feet on it rather
11   than --
12       Q.  811?
13       A.  Rather than 811.  Exactly.
14       Q.  And you understand this a lot better
15   than we do, but could you explain how
16   Xactimate works?  Are you putting into a
17   computer a room that's 11 feet by 10 feet and
18   it's a wood floor and -- What kind of
19   information do you put into it to get the
20   results that we're seeing here?
21       A.  Well, if you want to pay for my
22   class, I'll really give you a good lesson.
23       Q.  I don't want five days.
24       A.  No.  No, the Xactimate class is only
25   two days.  But honestly, it's a valid question
```

Page 234

```
 1   and I appreciate it.  You might want to drill
 2   down just to something very specific, because
 3   I could -- that's a long answer, a very long
 4   answer.
 5       Q.  Well, then let's look at, only
 6   because it's short, --
 7       A.  Okay.
 8       Q.  -- the roof.
 9       A.  Okay.
10       Q.  Well, or the first thing that's
11   here.
12       A.  That's fine.  If you will -- I can
13   explain --
14       Q.  I am only going to ask this for one
15   report, I promise.
16       A.  I will give you a run at the roof
17   then and show you the process.  If you look at
18   the -- hold your finger on page 2 of the
19   report and then move over to the diagraming
20   section --
21       Q.  This is a little diagram of the roof
22   (indicating)?
23       A.  Yes, that's a small diagram.  You
24   can see it much bigger in the back, though.
25   That would be on page 26.
```

Page 235

```
 1       Q.  Okay.
 2       A.  The roof is first dimensioned with
 3   the -- based off the interior of the home.
 4   The interior of the home is given in the
 5   dimension -- in the square footage.  So the
 6   square footage is already known and we know
 7   the shape of the roof by the -- by the aerial
 8   photos that are not actually in here, but that
 9   are seen and were not really in dispute at
10   this point.  But knowing basically the shape
11   of the roof, this roof fits precisely over the
12   interior that is represented below it.  That's
13   the way that the sketch actually works.  If
14   you know the interior dimensions and shape,
15   then you can place the roof on top of it in
16   Xactimate and it does that and you just tell
17   it how long the eaves are hanging over the
18   edges also; and when you do that, stipulate
19   that and then drop it right on there and
20   create the shape through techniques that's
21   used in Xactimate in order to create the shape
22   to follow on it.  Once that's done, it then
23   does its own calculation based on the
24   dimensions you put in and the slope of the
25   roof you've inserted into it.  The slope can
```

Page 236

```
 1   be observed by photographs, which we do have.
 2   So we have those as well.  So we have the
 3   shape and the slope of the roof readily
 4   identified and then the roof is dropped onto
 5   that.  So we use this sketch then to determine
 6   everything that's been added to this
 7   (indicating).
 8           Xactimate has gone to the extent
 9   that the first several items up -- up through
10   11 on the list of items on page 2 are all the
11   structural building of the roof, the rafters
12   and truss system that builds that roof based
13   on the shape that you put in there.
14       Q.  Let me stop you there a second.
15       A.  Yes.
16       Q.  So it's telling you how to build
17   that roof or are you telling it how to do it?
18       A.  It's telling you based on the shape
19   that you put in there.  Okay.  That's why
20   Xactimate has become the accepted standard by
21   all the insurance companies, because when --
22   when they have tested this against builders'
23   computations, they have always been accurate
24   in that.  When you have a hip roof, it takes
25   this many rafters to do this many square feet
```

59 (Pages 233 to 236)

```
                                    Page 129
 1   Armstrongs that were taken pre-Katrina?
 2       A.  Unless they're in here, I did not.
 3       Q.  We have already determined certainly
 4   that the dates on these photos are wrong;
 5   correct?
 6       A.  The date taken, yes.
 7       Q.  Yes.  So we have no idea what day
 8   these photos were taken?
 9       A.  Well, we can presume that they
10   happened after August 29th, 2005.
11       Q.  2005.  But there are no photos in
12   here that show you the quality of the
13   materials in the Armstrongs' home; correct?
14       A.  That's not -- That's not really
15   correct.  You can see from the exterior some
16   of those materials.  For example, you can see
17   that it has brick.  You can see that it's got
18   a laminate roof.  You can see that those are
19   aluminum windows.  You can see that they used
20   plywood instead of OSB for the sheathing
21   material on the roof.  You can see that it was
22   a hip roof.  You see the number of things
23   about it.
24           You see some columns in some of
25   those pictures.  You can see that they had
```

```
                                    Page 130
 1   cabinets inside that were laminate wood of
 2   some sort.  There's a variety of things that
 3   you can see in there.  So as you go through
 4   it, you can -- once you -- there are certain
 5   determining factors.  For example, a brick
 6   facade is considered to be a higher end facade
 7   than a vinyl siding facade.  And that presumes
 8   certain functions of the house and what kind
 9   of other materials they also used.  So the
10   lowest end houses are not going to have brick
11   and they're not going to have anything but
12   standard features.
13       Q.  Would you consider laminate cabinets
14   to be mid to high range?
15       A.  Not necessarily.  The ones in here
16   are probably -- When I say mid to high range,
17   they could be anywhere from -- There's several
18   degrees in Xactimate and I did not use the
19   highest ones by any means.  I don't recall
20   exactly which ones.  I could look and probably
21   tell you, though, in there which ones were
22   being used in the cabinets.
23       Q.  Are you looking for that?
24       A.  I am.
25       Q.  Okay.
```

```
                                    Page 131
 1       A.  Well, it appears in the estimate
 2   that the cabinets aren't even included in it
 3   because we had -- in some cases I was hearing
 4   that they were wanting to add their own
 5   contents list with cabinets because they had
 6   specific prices and I think I dropped the
 7   cabinets from this one presuming I was going
 8   to get something on that and I didn't.  So
 9   it's actually missing from the estimate.  I
10   don't see any cabinets in it.  So I am certain
11   I didn't over-estimate the cabinets since
12   they're not there.
13       Q.  The cabinets, did they end up on the
14   contents list?
15       A.  In this?  I'm not sure, but I don't
16   think they did.  I don't recall them being on
17   the Armstrong content list.  In some cases I
18   did see one cabinet on the content list.
19       Q.  Could you tell from the pictures the
20   flooring?
21       A.  Not -- No, not really.  This was not
22   a -- This was nothing -- There wasn't enough
23   there -- It's possible to look at it.  No,
24   there's nothing to really indicate -- It
25   appears that I am looking at one that might
```

```
                                    Page 132
 1   have some carpet in it, the last picture that
 2   they provided.  But that's not certain based
 3   on the kind of devastation that's there.  It's
 4   not certain if that's carpet remnants or what
 5   that is.
 6       Q.  Could you tell the quality of the
 7   appliances that they had?
 8       A.  From the pictures?  Is that what
 9   you're saying?
10       Q.  Yes.
11       A.  Not -- Not these, no.  I would -- I
12   would have probably got into that from the --
13   Those look fairly standard, the dishwasher
14   does.  That's the only thing I see there that
15   would give us any indication.
16       Q.  Is that something you would ask them
17   questions about?
18       A.  I would have, yes.
19       Q.  Did you ask them questions about the
20   quality of the furnishings in their home?
21       A.  I did in regards to when I said fill
22   out -- you need to fill out the values of them
23   on your contents list, the furnishings.
24       Q.  Did you question them about the
25   quality so that you could look at their
```

Page 133

1  contents list and see whether or not they got
2  those numbers right?
3       A.  When I give the instructions on a
4  contents list, I always tell them "You need to
5  say the type and the material that it was made
6  of" and those kind of things.  And in my
7  experience I rarely get what I ask for.  I
8  rarely get the details that I am looking for
9  in order to get -- to drill down to the
10 numbers that I'd like to.  But I give them
11 every -- every opportunity to give me as much
12 as they can.
13      Q.  So if you don't get the level of
14 detail on the quality, do you just take their
15 numbers and assume that they're right?
16      A.  For the most part, unless I see
17 something that jumps out, yes.
18      Q.  And do you do any QCing, quality
19 checking for lack of a better word, of those
20 numbers?
21      A.  I will.  I will take items and I
22 will find similar things, I will do some
23 pricing research.  At the time that I was
24 doing this, I worked after hours in my office
25 for the most part to do most of these reports

Page 134

1  and in that context I was able to use --
2  utilize XactContents, which is a feature in
3  Xactimate, which is a premium feature for some
4  users, whereby they can go and do -- type in
5  "table and chairs" and put approximate date
6  and -- and style and you get a -- 500
7  different options on what you look at.  And if
8  I find that this is within reason of those
9  options, then I'll stay with it.  You know, if
10 it's not, then I might change the numbers and
11 drop it down or bring it up if it was too low.
12      Q.  But given that you didn't get the
13 age of the contents, did you do that in this
14 case?
15      A.  I can presume that those -- Again, I
16 wasn't depreciating, so -- You have to
17 understand I was not depreciating.  I was
18 merely going by years -- by year that it was
19 purchased, if there was contents.  So all I
20 could do is look at a 2005 model of something
21 and see what it cost in 2005.
22      Q.  I understand that.  But you don't
23 have the dates for any of these.  So even if
24 you're not depreciating, you still need the
25 date to look at to determine whether or not

Page 135

1  these numbers are correct.
2       A.  But if you go back at least as far
3  as 2005 you know your starting point for
4  dates.
5       Q.  But were you assuming, given that
6  they didn't give you dates, that all of the
7  contents that they listed were in fact 2005?
8       A.  I didn't assume anything.  Because I
9  didn't -- I didn't approach it like that.  I
10 looked at that date -- In fact, I did some
11 entering of figures for different dates and if
12  -- unless something jumps out at you as being
13 out of the norm, I wasn't doing specific price
14 research on every item in there.
15      Q.  Were you doing specific price
16 research on any item in there?
17      A.  If there's large ticket items I will
18 often go in and look at -- run it through
19 XactAnalysis and see if it's in keeping.  And
20 I didn't -- And anything that I didn't change
21 was in keeping with the normal price
22 structure.  And sometimes I will put in more
23 than one date on those and say no, this is a
24 1985 model, you know, and what did it cost new
25 versus what it -- you know, because again, I

Page 136

1  was looking at new values.  I wasn't looking
2  at depreciated values.
3       Q.  But you didn't have any dates in
4  this instance to do that.
5       A.  No, I did not.
6       Q.  So you assumed that the Armstrongs'
7  numbers were all correct?
8       A.  Unless I saw otherwise, I presumed
9  they were correct.  Unless I presumed --
10      Q.  If you assume with me hypothetically
11 that no changes were made from the contents
12 list that the Armstrongs gave you that we
13 talked about earlier through Counsel that are
14 Exhibit 12, and the report, the content list
15 in Exhibit 2, assume that those were all the
16 same, so you found all of the information that
17 the Armstrongs gave you with regard to their
18 contents to be good information?
19      A.  Well, I have already pointed out one
20 difference and that was that when they weren't
21 using quantity numbers, but listing it in the
22 description, that I had to alter that and find
23 something else that fit, because I was -- I
24 was using a spreadsheet version of it and
25 needed to make sure that I did -- that if I

SCOTT H. TAYLOR                                                February 9, 2012

Page 137

    1   put in 3 shelves, that it didn't -- that I
    2   wasn't looking at three $50 shelves.  Because
    3   that's the way that they had marked it, "3"
    4   and they put "50", and I presumed at that
    5   point that it was $50 total, not $50 each.
    6   Because they didn't distinguish.
    7       Q.  Can you recall any other issues on
    8   the Armstrongs' contents?
    9       A.  Not specifically, but I am certain
   10   that there was more than one change to that.
   11   There would have been multiple changes along
   12   those lines.
   13       Q.  Did you -- We know the answer to
   14   this question because you didn't speak to the
   15   Armstrongs.  Again, you assumed that the
   16   shelves weren't $50 each?
   17       A.  I assumed that they were not $50
   18   each because what I saw is that they would --
   19   As you start looking at things and you see
   20   four pots that were cast-iron, I doubt that
   21   each one cost $280.  It didn't -- It wasn't in
   22   keeping with what is logical.  That they would
   23   put the number, but then put a total next to
   24   it.  And they said "hunting boots" times
   25   three, and they list $300, you're presuming

Page 138

    1   it's not $300 per pair, you know.
    2       Q.  But you had no further conversations
    3   with the Armstrongs about their content list?
    4       A.  Not directly, no.
    5       Q.  And again, we can compare the
    6   contents list in the report with this list to
    7   see if you made any changes to it.
    8       A.  Yes.
    9       Q.  You didn't make any assumptions
   10   regarding the quality of the furnishings
   11   because you just used the numbers they gave
   12   you?
   13       A.  Exactly.
   14       Q.  Is that correct?
   15       A.  Yes.
   16       Q.  Did you look at the pictures they
   17   gave you to try to determine whether you could
   18   see what the quality of the furnishings were?
   19       A.  I did.  I looked at those.  And I
   20   didn't see anything that jumped out, again,
   21   that told me that they were off on their
   22   descriptions.
   23       Q.  Did you have a discussion with the
   24   Armstrongs when you met with them regarding
   25   their additional living expenses?

Page 139

    1       A.  Yes, I did.
    2       Q.  What do you recall discussing with
    3   them?
    4       A.  I gave them a description of how
    5   they were to calculate additional living
    6   expenses and walked through that with them and
    7   said, "To the best of your knowledge, see what
    8   you can do with this and if it works out and
    9   it's feasible, I will use those figures."  And
   10   so I gave them the formula by which to
   11   determine additional living expenses.
   12       Q.  What was the formula that you told
   13   them?
   14       A.  The formula that you use in figuring
   15   your additional living expenses is to take
   16   your normal living expenses and contrast that
   17   against the actual expenses that occur and you
   18   deduct the difference; and you do it in each
   19   category for which there would be an expense.
   20       Q.  Did you ask them for any documents
   21   reflecting their normal living expenses?
   22       A.  I asked them if they had any
   23   documents and they said they would have some.
   24   They indicated they would have some receipts.
   25   They would have some documentation to show

Page 140

    1   what kind of additional living expenses they
    2   had.
    3       Q.  Did you get those document from
    4   them?
    5       A.  I did not get them directly from
    6   them, no.
    7       Q.  Did you get them indirectly?
    8       A.  I got some documents that I believe
    9   were sent to me later, but I am not positive,
   10   because, you know, they -- I am not sure if it
   11   was them or somebody else, on that particular
   12   house -- and found that it was woefully
   13   inadequate for me to do my calculations from.
   14   It wasn't enough there to piece it together.
   15   Because to use -- to use receipts and to use
   16   receipts well, you have to have all of them
   17   and you need dates on everything and you have
   18   to have it all chronicled in a logical order
   19   that shows what the actual expenses were.  And
   20   there are several categories that I found to
   21   be missing.  They would either be missing all
   22   of their additional fuel expenses or their
   23   utilities or their laundry or something.  It
   24   would be something that was a normal expense
   25   normally included as an additional living

35 (Pages 137 to 140)

Page 141

1  expense that they had nothing on and, you
2  know, -- and I knew, presumingly, that they,
3  from my experience in the past, that they had
4  missed those items and that they weren't
5  available.  But I also understand that if time
6  goes by and the situation is dire enough, that
7  we have found that somebody in an insurance
8  claim, for example, would not be able to
9  produce what they needed either and, as such,
10 when I work with claims examiners from
11 insurance carriers, they will look at things
12 and make awards based on reasonable expenses.
13 And that's what's been done in this case.
14 That's the way I have calculated it, and what
15 I did is I used what the normal coverage is
16 for additional living expenses and calculated
17 that against their -- against their -- against
18 their valuation of the home, what it would
19 have come to.  And again, you asked earlier
20 about a valuation.  That's just a reference
21 right out of Xactimate that I just used and I
22 said that's what it's coming to.  These are --
23 Since I don't have an actual policy to go off
24 of, I have to use whatever the damages were.
25 So I took the damages and used that as my

Page 142

1  valuation.
2      Q.  So in this case for all five of the
3  Plaintiffs you used the standard 20 percent?
4      A.  That's exactly right.
5      Q.  For each of the Plaintiffs without
6  regard to their actual additional living
7  expenses?
8      A.  That's correct.  Inasmuch that if
9  they gave me receipts and I could not find a
10 -- build a time line off of those and
11 demonstrate that they had largely not
12 completed what the task was in getting that,
13 that I went with an accepted standard in the
14 industry that I am used to doing it in.
15     Q.  And I understand that.  I am just
16 trying to make clear that in this case for all
17 five Plaintiffs you used the 20 percent
18 because you, in your opinion, did not have
19 enough information of exact expenses to do it
20 using the exact expenses?
21         MR. PALMINTIER:
22           I object to form.
23         THE WITNESS:
24           Yes and no.  The exact expenses,
25     I don't know what they were, so I am

Page 143

1      not going to presume that they were
2      less than what the -- that they were
3      -- that they weren't more than what
4      the receipts showed.
5  EXAMINATION BY MS. WAGER-ZITO:
6      Q.  No, I understand that.  I am not
7  asking you to make that determination.  All I
8  am saying is, in this case you did not feel
9  like you had adequate information relating to
10 the exact expenses for any of the Plaintiffs;
11 correct?
12         MR. PALMINTIER:
13           I object to form.
14         THE WITNESS:
15           I would agree that I did not have
16      enough to piece together an exact
17      expense report for ALE.
18 EXAMINATION BY MS. WAGER-ZITO:
19     Q.  For any of the Plaintiffs?
20     A.  For any of the Plaintiffs.
21     Q.  So, therefore, because you didn't
22 have that information for any of the
23 Plaintiffs, you used the 20 percent number for
24 each of them?
25     A.  Yes.

Page 144

1      Q.  Okay.  And the 20 percent number
2  comes from 20 percent of the damage number
3  which comes out of Xactimate?
4      A.  That's correct.
5      Q.  So if that number is wrong, the
6  number that came out of Xactimate for the
7  damages, then the ALE number is similarly
8  wrong?
9      A.  Yes, potentially.
10     Q.  Because it's just a calculation?
11     A.  Exactly.
12     Q.  And I saw in the Robinson case that
13 you used a 50, or you discussed a 50 percent
14 number for the contents --
15     A.  Uh-huh (affirmatively).
16     Q.  -- as also being a number that you
17 use in the industry for contents, 50 percent
18 of the damages.  You didn't use that for these
19 five Plaintiffs at all, did you?
20     A.  No, because if you can get more
21 detail, you always want it.  And when I was
22 first asked to come back to do this work, that
23 was one of the things that I mentioned early
24 on to Counsel, that it would be much better to
25 actually go with the actual contents that they

Page 293

```
 1        I was asked to evaluate based on
 2     the facts that I had at hand and I
 3     couldn't stipulate any differently.
 4  EXAMINATION BY MS. WAGER-ZITO:
 5     Q.  And the facts you had at hand were
 6  that you didn't know what the Armstrongs'
 7  actual expenses were as a result of, or what
 8  their actual ALE was as a result of Katrina?
 9        MR. PALMINTIER:
10          I object to form.
11        THE WITNESS:
12          I did not know exactly what it
13     was.
14  EXAMINATION BY MS. WAGER-ZITO:
15     Q.  And you didn't seek to figure that
16  out?
17     A.  I did, based on receipts I was given
18  and it was not enough to determine it based on
19  that.
20     Q.  But did you ask them any questions
21  about, you know, where they moved to right
22  after Katrina and when they established a new
23  permanent residence after Katrina?
24     A.  I asked them some cursory
25  questions.  When I say cursory, I asked them
```

Page 294

```
 1  how long they were out of their house.  And
 2  once they established it was at least a year
 3  or it appeared to be more than a year, I
 4  stopped asking questions as to that because I
 5  knew that if I didn't have enough receipts
 6  that I would end up with 20 percent.
 7     Q.  You say it appeared to be more than
 8  a year.  So they didn't tell you that they
 9  established a new permanent residence in June
10  of '06?
11     A.  They did not.
12     Q.  And you said it's typical -- the
13  reason you used the 20 percent is that that's
14  the typical number reached in a year period?
15  Is that your testimony?
16     A.  No.
17     Q.  Where is the 20 percent coming from?
18     A.  20 percent is based off of the
19  coverage A amount and it's a percentage of
20  that amount.  And insurance companies
21  typically cut off ALE at one year.  They
22  typically do that.
23     Q.  And they typically cut it off at one
24  year and use this 20 percent number?
25     A.  Generally speaking, that's a general
```

Page 295

```
 1  -- generalization, yes.
 2     Q.  Is there any statistical evidence
 3  supporting the use of the 20 percent number?
 4     A.  Only that it is commonly taught in
 5  licensing courses.
 6     Q.  And is it taught in the course that
 7  you teach?
 8     A.  No, because it's not a -- it's not a
 9  licensing course.
10     Q.  And again, if it's determined that
11  your number for the total RCV for the
12  Armstrongs' house is incorrect, or if
13  depreciation should have been applied, then 20
14  percent would be 20 percent of a lower
15  number?
16     A.  If that's the standard.
17     Q.  And you believe that's still a
18  correct amount to compensate them for?
19     A.  I believe it's still a correct
20  amount, yes.
21     Q.  If the evidence were to show that
22  the Armstrongs' post-Katrina expenses didn't
23  exceed their pre-Katrina expenses in any way,
24  would you still believe that they were
25  entitled to ALE of $38,000 plus?
```

Page 296

```
 1     A.  I really can't speak to that because
 2  that -- that's not the way I understood it
 3  happened.
 4     Q.  When you say that's not the way you
 5  understood it happened, what do you mean by
 6  that?
 7     A.  I understood they had other
 8  expenses.
 9     Q.  And what was that understanding
10  based on?
11     A.  Based on the attempt to provide the
12  receipts that they did.
13     Q.  What receipts did they provide?
14     A.  At this moment I don't have them in
15  front of me so I couldn't speak to them, but
16  they were not sufficient to build the
17  chronology that I needed to be able to show
18  that everything was covered.
19     Q.  At one point -- Did they give you
20  any receipts?
21     A.  There were some documents I was sent
22  that had some scanned images of some receipts,
23  but they -- they were so inadequate and so
24  incomplete that there was no way to piece
25  together the chronology.
```

Page 221

```
 1   true that ceramic tile and hardwood floors are
 2   more expensive than linoleum?
 3       A.  I will stipulate to that, yes.
 4       Q.  And in the "Remarks" section of the
 5   report, which is on page 2, you say "The
 6   homeowners provided a list of contents to the
 7   best of their recollection.  While the list
 8   was lengthy, it did not encompass everything
 9   in the home.  As this loss continues towards
10   resolution and additional questioning and
11   commiseration occurs, it has been this
12   adjustor's experience that memories will be
13   triggered.  Additionally, as the homeowners
14   recall features of their home and add these
15   are accounted for, changes to all three areas
16   of indemnity will be necessary.  Updating
17   specific details for clarity will allow even
18   more precise estimating and will necessitate
19   augmentation of the current estimate as more
20   pricing options become available."  But as
21   you've said, you're not doing this?
22       A.  This is merely a disclaimer that
23   says if things become aware -- I become aware
24   of more and am asked to do more, then the
25   numbers can change.
```

Page 222

```
 1       Q.  Now, the list that the Armstrongs
 2   prepared for you they did about six years
 3   after Katrina?  Is that right?
 4       A.  I'm sorry?
 5       Q.  The list of contents, the contents
 6   list that we looked at earlier that the
 7   Armstrongs prepared for you, was prepared
 8   about six years after Katrina; right?
 9       A.  I don't know when that list was
10   prepared precisely.
11       Q.  Well, do you think that list was
12   prepared before they met with you?
13       A.  I don't think it was entirely
14   prepared before I met with them, no.  It
15   couldn't have been since they used my form.
16       Q.  Right.  That's what I am trying to
17   get, is they used your form; therefore, I am
18   agreeing with you.
19           MR. PALMINTIER:
20              Listen to the question.
21           THE WITNESS:
22              I'm sorry, I misunderstood what
23           you were asking.  I thought you were
24           asking if they had prepared it years
25           ago or something.
```

Page 223

```
 1   EXAMINATION BY MS. WAGER-ZITO:
 2       Q.  So is it your understanding that
 3   they prepared that list for you?
 4       A.  Yes.
 5       Q.  And do you think that their memory
 6   regarding the contents of their home was
 7   better six years after the event than it was
 8   closer to the event, in the months after the
 9   event?
10           MR. PALMINTIER:
11              Object to the form.
12           Speculative.
13           THE WITNESS:
14              I can't be certain of that, no.
15           I can't be certain either way.  Some
16           people remember more as time goes on
17           and just add it to their lists that
18           they already have.
19   EXAMINATION BY MS. WAGER-ZITO:
20       Q.  So it's your opinion that their
21   memories will improve as they get further away
22   from the event?
23           MR. PALMINTIER:
24              I object to form.
25           THE WITNESS:
```

Page 224

```
 1              I am not saying that.
 2           MR. PALMINTIER:
 3              Misstates testimony.
 4           THE WITNESS:
 5              I am saying that it may be
 6           augmented.  They may have other
 7           memories.
 8   EXAMINATION BY MS. WAGER-ZITO:
 9       Q.  You haven't heard anything from the
10   Armstrongs indicating that they have got any
11   better memories now than they did before?
12       A.  No.
13       Q.  In the "Statement of Loss" in your
14   report, you refer to the RCV, the replacement
15   cost value.
16       A.  Uh-huh (affirmatively).
17       Q.  And then there's -- we've heard
18   discussions about, and we see in there, the
19   ACV, which stands for actual cost value?
20       A.  Yes.
21       Q.  In your experience as an adjustor,
22   what does replacement cost value mean?
23       A.  Replacement cost is the cost to
24   replace things now as close to as possible as
25   they were before when you first had them.
```

SCOTT H. TAYLOR                                                    February 9, 2012

Page 225

```
 1   That means new cost.
 2       Q.  But when you're replacing, let's
 3   talk about a refrigerator, and a refrigerator
 4   from 1990, what are you replacing it with?
 5       A.  Well, obviously I can't buy a 1990
 6   refrigerator, so I have to buy a current
 7   refrigerator.  It has to be like kind and
 8   quality and that's what replacement cost is
 9   supposed to reflect.  Supposed to reflect like
10   kind and quality.
11       Q.  So in this instance what are you
12   replacing that refrigerator with?  What would
13   be a refrigerator of like kind and quality?
14       A.  Whatever the current model is that
15   is most similar to that in a new condition
16   would be the replacement cost value.
17       Q.  So the replacement for that
18   refrigerator would be brand new; right?
19       A.  It would be brand new, yes.
20       Q.  So it would be better than what you
21   were replacing.
22       A.  It would be better if there was
23   depreciation, yes.  But it would be the same
24   if you were replacing it as a new item.
25       Q.  I don't understand that.
```

Page 226

```
 1       A.  If you're paying for replacement
 2   cost value, you're paying for a new item and
 3   that's -- that's what the -- this was based
 4   on.
 5       Q.  So it would be better than what you
 6   were replacing.
 7       A.  It would not be better than it was
 8   when the purchaser purchased it.  And that's
 9   what it's based on, when the purchaser
10   purchased it.  That's replacement cost.
11       Q.  But it's better than what they had.
12       A.  If it's -- If it's in any way
13   depreciated, yes.
14       Q.  Unless they bought it the day
15   before.  And if it was a car, it would still
16   be worth less.
17       A.  Right.
18       Q.  And what is actual cost value?
19       A.  Actual cash value.  That's --
20       Q.  ACV is actual cash value?
21       A.  Actual cash value.  And it refers to
22   the replacement cost value less depreciation.
23       Q.  And in your report in the Statement
24   of Loss your numbers for RCV and ACV are the
25   same.
```

Page 227

```
 1       A.  Yes.
 2       Q.  How can that be?
 3       A.  Because the ACV has no depreciation
 4   on it.  And so the actual cash value means a
 5   new purchase in this case.  Because the RCV is
 6   a new purchase.  So is the ACV if it's not
 7   depreciated.
 8       Q.  But isn't ACV by definition
 9   appreciated?
10       A.  Depreciated you mean?
11       Q.  Depreciation.
12       A.  Not necessarily.  Actual cash value
13   can mean appreciated value as well.
14       Q.  Let's go back to the refrigerator.
15       A.  Uh-huh (affirmatively).
16       Q.  It's a 1990 refrigerator.  You say
17   in your opinion to give them the replacement
18   cost value, you have to buy them a new
19   refrigerator; say it was an average quality
20   refrigerator, but you're buying them a brand
21   new average quality refrigerator.
22       A.  Uh-huh (affirmatively).
23       Q.  It costs more money than the
24   refrigerator that they purchased in 1990.
25       A.  Uh-huh (affirmatively).
```

Page 228

```
 1       Q.  The ACV of that refrigerator is not
 2   the same, is it?
 3       A.  It's the -- The ACV is what it costs
 4   in this case to provide them with exactly what
 5   they had if there's not going to be any
 6   depreciation.
 7       Q.  But that refrigerator is not worth
 8   the same amount of money as a brand new
 9   refrigerator.
10       A.  To me, no.  But to the owner it
11   would be.  Because that's what it would take
12   for them to replace it.  A brand new one.  You
13   can't find one that's used without its own
14   problems that you might -- that you may not be
15   aware of.
16       Q.  But the one they had might have had
17   its own problems, too.
18       A.  We don't know that.
19       Q.  Well, they do.
20       A.  Well, they might, but I would be
21   presuming against them in that case.  And when
22   it comes to this, this is not what I was asked
23   to do, was decide how to devalue their loss.
24       Q.  Wouldn't it just be true that in
25   this instance, the way you were doing it, ACV
```

57 (Pages 225 to 228)

|  | Page 253 |
|---|---|
| 1 | kind of thing. It's just a bid process. |
| 2 | Q. Does the insurance version have |
| 3 | depreciation in it? |
| 4 | A. It does. It does include that as an |
| 5 | option, yes. |
| 6 | Q. And you didn't use that option? |
| 7 | A. Oh, no. |
| 8 | Q. Is there a different Xactimate for |
| 9 | commercial properties? |
| 10 | A. There are some differences in -- |
| 11 | There are some additional features that can be |
| 12 | used for the commercial properties, yes. |
| 13 | Q. What's your understanding of where |
| 14 | the Armstrongs decided to live after Katrina? |
| 15 | A. I really don't have much of an |
| 16 | opinion on that. I don't know that we |
| 17 | discussed that -- |
| 18 | Q. Did you discuss that? |
| 19 | A. -- at all. |
| 20 | Q. They did not rebuild their home; |
| 21 | correct? |
| 22 | A. It doesn't appear they did. At |
| 23 | least not there. |
| 24 | Q. But it's still your opinion that the |
| 25 | measure of damages should be what it cost to |

|  | Page 254 |
|---|---|
| 1 | rebuild their home? |
| 2 | A. I would say so, yes. |
| 3 | Q. And if you're wrong about that being |
| 4 | as a matter of law the correct measure of |
| 5 | damages, then this estimate is not applicable |
| 6 | to the Armstrongs' damages? |
| 7 | MR. PALMINTIER: |
| 8 | I object to form. |
| 9 | EXAMINATION BY MS. WAGER-ZITO: |
| 10 | Q. Correct? |
| 11 | A. I can't make that assertion. |
| 12 | Q. Because you don't know as a matter |
| 13 | of law what the correct measure of damages is? |
| 14 | A. That's one reason I can't make the |
| 15 | assertion, yes. |
| 16 | Q. Is there any other reason that you |
| 17 | can't make the assertion? |
| 18 | A. I wouldn't venture a legal opinion |
| 19 | on it, for one thing. |
| 20 | Q. If you disagreed with a price in |
| 21 | Xactimate for either a material or a labor |
| 22 | amount or any of the different variables, do |
| 23 | you have a way of overriding that? |
| 24 | A. There are certain techniques that |
| 25 | can be used, but they're all discoverable. |

|  | Page 255 |
|---|---|
| 1 | Q. What do you mean, they're all |
| 2 | discoverable? Discoverable in the legal sense |
| 3 | or -- |
| 4 | A. No, no, no. I mean, there's a way |
| 5 | of discerning it. Let's put it that way. |
| 6 | Q. It would show up on here? It would |
| 7 | somehow show up on these documents that you |
| 8 | made some kind of variation from Xactimate? |
| 9 | A. Not on those documents. But in the |
| 10 | hard files it would, in the computer files, |
| 11 | because when you've got it on the screen it |
| 12 | doesn't produce the same report there as it |
| 13 | does. But it shows price variations if |
| 14 | there's a price variation. |
| 15 | Q. And we can hopefully make this |
| 16 | easy. Did you do that? Did you do any |
| 17 | overrides of any variable in Xactimate for any |
| 18 | of your estimates in this case? |
| 19 | A. No. I was very careful not to |
| 20 | change prices. |
| 21 | Q. If there was an error in the |
| 22 | Xactimate price, would you have a way of |
| 23 | knowing that? |
| 24 | A. If there was a serious error in a |
| 25 | price and it appeared that it was over- or |

|  | Page 256 |
|---|---|
| 1 | under-pricing something substantially, I've |
| 2 | seen enough estimates that I would probably |
| 3 | spot it. |
| 4 | Q. And did that happen at all in this |
| 5 | case with any of the Plaintiffs? |
| 6 | A. No. |
| 7 | Q. If the Court were to determine in |
| 8 | this case that some of the damage to the |
| 9 | Armstrongs' house was not caused by flood |
| 10 | waters, would the Court still be able to |
| 11 | utilize your estimate to determine the |
| 12 | damages? |
| 13 | MR. PALMINTIER: |
| 14 | I object to form. Calls for a |
| 15 | legal conclusion. |
| 16 | THE WITNESS: |
| 17 | Well, I think they should be able |
| 18 | to. I don't see why they wouldn't. |
| 19 | EXAMINATION BY MS. WAGER-ZITO: |
| 20 | Q. How would they be able to do that? |
| 21 | If the Court were to say the roof and the |
| 22 | contents in the attic were caused by wind and |
| 23 | rain damage, could they still -- could the |
| 24 | Court still use your report to determine the |
| 25 | damages? |

Page 257

```
 1        MR. PALMINTIER:
 2          I object to form.  The same
 3      objection.
 4        THE WITNESS:
 5          And the same answer.  They
 6      could.  They could use it if they
 7      wanted to.  Certainly.
 8   EXAMINATION BY MS. WAGER-ZITO:
 9      Q.  And what would they have to do?
10      A.  It depends on what they -- how they
11   wanted to stipulate.
12        MR. PALMINTIER:
13          Same objection --
14        THE WITNESS:
15          There's -- It throws --
16        MR. PALMINTIER:
17          -- again.
18        THE WITNESS:
19          It throws a couple of questions
20      to my mind, you know.  So I -- It's a
21      little bit hard to guess what they
22      might want to do.
23   EXAMINATION BY MS. WAGER-ZITO:
24      Q.  Well, what questions --
25        MR. PALMINTIER:
```

Page 258

```
 1          Don't guess.
 2   EXAMINATION BY MS. WAGER-ZITO:
 3      Q.  -- would it raise in your mind?
 4      A.  Well, it just -- it asks questions
 5   as to which portions would be destroyed and
 6   which portions wouldn't be destroyed.  So --
 7      Q.  And the question was, can the Court
 8   do that.
 9        MR. PALMINTIER:
10          Object.
11   EXAMINATION BY MS. WAGER-ZITO:
12      Q.  In your mind, is there a way that
13   you can look at this, you're sitting on the
14   witness stand and the Judge says to you, "Mr.
15   Taylor, I appreciate your report, I am finding
16   that the damage to the roof and the contents
17   in the attic were caused by wind and rain and
18   not flooding; what's your opinion as to the
19   damages?  Can I figure it out from your
20   report?"
21        MR. PALMINTIER:
22          The same objection.
23        THE WITNESS:
24          Not conclusively from my report.
25      Somebody -- It would have to take
```

Page 259

```
 1      another analysis altogether.
 2   EXAMINATION BY MS. WAGER-ZITO:
 3      Q.  Okay.  And if the Court were to
 4   determine that some of the damage to the
 5   Armstrongs' house was caused by flood water
 6   coming from different sources, could the Court
 7   use your report as is to determine the damages
 8   to the Armstrongs' house?
 9        MR. PALMINTIER:
10          I object to form.  Calls for a
11      legal conclusion.
12        THE WITNESS:
13          Okay.  Well, honestly, I don't
14      think that -- there's nothing in my
15      report that would indicate where --
16      when water occurred and how it
17      occurred.  So I didn't even address
18      that.  I never address that in
19      there.  So --
20   EXAMINATION BY MS. WAGER-ZITO:
21      Q.  And I understand that.  So all I am
22   saying is that could the Court use your report
23   to determine the damages to the Armstrongs'
24   property if the Court were to say some of the
25   water came from the breaches that the
```

Page 260

```
 1   Plaintiffs allege that my client and the
 2   government caused and some of the water came
 3   from somewhere else?  Could the Court use your
 4   analysis to determine --
 5        MR. PALMINTIER:
 6          Objection.
 7   EXAMINATION BY MS. WAGER-ZITO:
 8      Q.  -- the damages?
 9      A.  If that was the way they were
10   approaching it, I -- I think they could find
11   however they wanted to.  I don't think that
12   it's -- It's certainly not addressed in my
13   report to give them a distinctive ability to
14   do that, no.
15      Q.  And to shorten our time together,
16   would your answer be the same for all the
17   other Plaintiffs?
18      A.  Yes.
19        MR. PALMINTIER:
20          The same objection.
21        THE WITNESS:
22          Yes.
23   EXAMINATION BY MS. WAGER-ZITO:
24      Q.  And I think you testified earlier
25   that you believe you spent 40 to 50 hours on
```