# EXHIBIT 1

```
                                                          Page 1
          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF LOUISIANA

  IN RE: KATRINA CANAL BREACHES   CIVIL ACTION
  CONSOLIDATED LITIGATION         NO. 05-4182 K2
                JUDGE DUVAL
  PERTAINS TO MRGO          MAG. WILKINSON
  FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
        05-6314, 05-6324, 05-6327, 05-6359,
        06-0225, 06-0886, 06-1885, 06-2152,
        06-2278, 06-2287, 06-2824, 06-4024,
        06-4065, 06-4066, 06-4389, 06-4634,
        06-4931, 06-5032, 06-5155, 06-5159,
        06-5156, 06-5162, 06-5260, 06-5771,
        06-5786, 06-5937, 07-0206, 07-0621,
        07-1073, 07-1271, 07-1285
                * * *
             (V O L U M E  I)
       Deposition of FRANCISCO SILVA-TULLA,
  SC.D., P.E., given at the offices of Bruno &
  Bruno, LLP, 855 Baronne Street, New Orleans,
  Louisiana 70113, on April 12th, 2012.
  REPORTED BY:
       JOSEPH A. FAIRBANKS, JR., CCR, RPR
       CERTIFIED COURT REPORTER #75005
```

```
                                                          Page 2
   1   APPEARANCES:
   2   REPRESENTING THE PLAINTIFFS:
   3      DOMENGEAUX, WRIGHT, ROY & EDWARDS
   4      (BY:  ELWOOD C. STEVENS, JR., ESQUIRE)
   5      556 Jefferson Street, Suite 500
   6      Lafayette, Louisiana 70501
   7      337-233-3033
   8   - and -
   9      BRUNO & BRUNO
  10      (BY:  SCOTT L. JOAHEN, ESQUIRE)
  11      855 Baronne Street
  12      New Orleans, Louisiana 70113
  13      504-525-1335
  14
  15   REPRESENTING THE UNITED STATES OF AMERICA:
  16      U.S. DEPARTMENT OF JUSTICE.
  17      (BY:  ROBIN D. SMITH, ESQUIRE)
  18      (BY:  RUPERT MITSCH, ESQUIRE)
  19      Torts Branch, Civil Division
  20      P.O. Box 888
  21      Benjamin Franklin Station
  22      Washington, D.C. 20044
  23      202-616-4289
  24
  25
```

```
                                                          Page 3
   1   REPRESENTING WASHINGTON GROUP INTERNATIONAL,
   2       INC.:
   3       STONE PIGMAN WALTHER WITTMANN, L.L.C.
   4       (BY:  WILLIAM D. TREEBY, ESQUIRE)
   5       546 Carondelet Street
   6       New Orleans, Louisiana 70130
   7       504-581-3200
   8   - AND -
   9       JONES DAY
  10       (BY:  CHRISTOPHER THATCH, ESQUIRE,
  11       VIA TELECONFERENCING)
  12       2727 North Harwood Street
  13       Dallas, Texas 75201
  14       214-220-3939
  15
  16
  17
  18
  19
  20
  21
  22
  23
  24
  25
```

```
                                                          Page 4
   1            E X A M I N A T I O N   I N D E X
   2
   3   EXAMINATION BY:                           PAGE
   4   MR. STEVENS  ................................6
   5
   6              E X H I B I T   I N D E X
   7
   8   EXHIBIT NO.                               PAGE
   9   Exhibit Silva 1 .............................8
  10   Exhibit Silva 2 ............................28
  11   Exhibit Silva 3 ............................52
  12   Exhibit Silva 4 ............................62
  13   Exhibit Silva 5 ...........................130
  14   Exhibit Silva 6 ...........................132
  15
  16              S P E C I A L   I N D E X
  17
  18   NO.                                       PAGE
  19   Additional Items Requested No. 1 ...........31
  20   Additional Items Requested No. 2 ...........34
  21   Additional Items Requested No. 3 ...........44
  22
  23
  24
  25
```

Page 133

```
 1  critical sliding surface in those figures.
 2  EXAMINATION BY MR. STEVENS:
 3      Q.  The critical sliding surface that
 4  you've determined is this arc of green
 5  underneath?
 6      A.  Well, no, that's -- it's -- actually,
 7  the critical one is the darker green line.
 8  It's just a line that was just composed of a
 9  series of straight line segments.
10      Q.  Point to it on that exhibit, or draw
11  an arrow to it with this blue pen.  I see
12  better with Page 37 because it's in yellow.
13      A.  Right.
14      Q.  The green line contained within a
15  yellow formation, if you will.
16          Now, to a lay person who really
17  doesn't understand what he's looking at, you
18  just drew arrows to the limit equilibrium line?
19  Is that --
20      A.  That is the critical sliding surface.
21      Q.  Okay.  Well, if you don't mind, I'll
22  add to your drawing, or you can write critical
23  sliding surface at the end of each of those
24  arrows.
25      A.  (Witness complies.)
```

Page 134

```
 1      Q.  Now, there are three sketches or three
 2  graphs here, Figure E48, E49, and E50, correct?
 3      A.  Correct.
 4      Q.  E48 is for six hours; right?
 5      A.  Correct.
 6      Q.  Or at the 6-hour mark.  Figure 49 is
 7  at the 20-hour mark, and the last one, Figure
 8  50, E50, is at the 30-hour mark.  Or, as you
 9  told us earlier, the time of failure.  True?
10      A.  That is correct.
11      Q.  Okay.  The 30 hours, the 30-hour mark,
12  you began the clock, so to speak, at the moment
13  when the water level in the IHNC was at what
14  level?
15      A.  Well, the -- at one-foot elevations.
16      Q.  At one-foot elevation.  +1, right?
17      A.  Plus 1 NAVD88(2004.65).
18      Q.  And at the time of failure, 30 hours
19  later, for the north breach, it was at what
20  level?
21      A.  It was 14-point -- I think it's 14.7.
22  I'm not sure about the .7, but it's a little
23  bit above 14.  Plus 14 elevation.
24      Q.  Okay.  So the water level is at plus
25  14 when the north breach occurs -- plus 14.7.
```

Page 135

```
 1      A.  Let me check that.  It's actually
 2  14.2.
 3      Q.  Is when the north breach occurred?
 4      A.  That's -- for the north breach, um --
 5  well, that's the maximum water surface
 6  elevation from the hydrograph.
 7      Q.  At the moment of the -- at the 30-hour
 8  mark when the north bleach occurred, correct?
 9          MR. TREEBY:
10              Object to the form of the
11          question.  You've got two questions
12          there.
13      A.  That's right.  When you link the two.
14  I mean, it's not -- the maximum is 14.2.
15  EXAMINATION BY MR. STEVENS:  --
16      Q.  Okay.
17      A.  -- at 9:00 a.m.  And the onset of
18  failure is before that.  And, you know, the,
19  um -- water level at the onset of failure was
20  near -- near the top of the flood wall.  We
21  don't know exactly what the elevation was.
22      Q.  And the elevation of the top of the
23  flood wall at the north breach was what,
24  Dr. Silva?
25      A.  Let me find that.  At the north
```

Page 136

```
 1  breach, the flood wall elevation is, um --
 2  11.3 feet.
 3      Q.  11.3 feet.
 4      A.  11.3 feet.
 5      Q.  And what was the elevation of the
 6  water in the Industrial Canal?  Or what was the
 7  elevation of the water against flood wall at
 8  the time of failure?
 9      A.  Yeah.  The time of failure, the water
10  elevation was right around that elevation, top
11  of the wall.
12      Q.  11.3 feet?
13      A.  11.3 feet, plus or minus an
14  undetermined amount of a foot or so.
15      Q.  All right.  What time was the time of
16  failure, according to your analyses?
17      A.  Well, the time of failure was not
18  really according to my analysis.  They actually
19  got the time of failure from the hydrologists.
20  And I included the time of failure from the
21  hydrologists in my report just to -- because it
22  happens that -- it happens that it agrees
23  pretty well with the results we got from our
24  stability -- our analysis.
25      Q.  And what was the time?
```

Page 137

1   A.  And the time, for the north breach, it
2   fairly was around 6:10 a.m. on the 29th.  And
3   for the south breach, fairly was around
4   7:00 a.m.
5   Q.  And your hydrologists, that would have
6   been Mark Worthington and Matt Mayo?
7   A.  No, that's Dr. Dalrymple.
8   Q.  And what was the elevation of the
9   water in the IHNC at the time of the south
10  breach?
11  A.  At what time?
12  Q.  At the time of the south breach you
13  told me was 7:00 a.m.
14  A.  Yeah.  But, I mean, your question was
15  what is the --
16  Q.  Elevation of the water in the
17  Industrial Canal --
18  A.  Yes.
19  Q.  -- at the time of the south breach,
20  7:00 a.m.
21  A.  At the time of the south breach
22  failure?
23  Q.  Yes.
24  A.  It's at 12.1 feet.
25  Q.  And you told me that the -- the top

Page 138

1   elevation of the flood wall itself at the north
2   breach was 11.3 feet.  What was the top
3   elevation at the area of the south breach?
4   A.  It was at 12.1 feet.
5   Q.  Now, back to these exhibits of the
6   6-hour, 20-hour and 30-hour.  We got a little
7   afield with the south breach when we were
8   looking at that info.  Explain to me what you
9   are attempting to display between the graphs on
10  Page 36 and 37.  You used green here for the
11  critical slide surface, or sliding surface.
12  And then on this one, it's yellow with a green
13  line.
14  A.  Well, those figures are one of many
15  that can be found in the reliance materials,
16  and they were included in the appendix to give
17  the reader an idea of the geometry of the
18  sliding surfaces that we were analyzing.
19  Q.  Okay.  Why is this one in yellow and
20  these in green?
21  A.  Oh, no particular reason.  I mean,
22  these are -- we get these as screen shots, and
23  I really couldn't tell you why one came out
24  yellow and the other one green.
25  Q.  Well, the reason I ask that is, at the

Page 139

1   time, at the top, or on the side, there's a
2   scale or color bar.
3   A.  Yeah.
4   Q.  And the color bar says that one color
5   means a safety factor of 1.5 and the other
6   means a safety factor of something else.
7   A.  Yeah.  Okay.  That's right.  So the
8   color relates to the level of stability.
9   Q.  Okay.  So which one is more stable,
10  green or yellow?
11  A.  The yellow is less stable.
12  Q.  Okay.  And the -- which would make
13  sense.  It's more stable at 6 hours and 20
14  hours than it is at 30; true?
15  A.  That is true.
16  Q.  And according to the color bar, what
17  is the level of stability or the safety factor
18  for something shaded in yellow?
19  A.  It's, um -- between 1.5 and 1.8.
20  Q.  Okay.  And at what point in your
21  experience would -- or should we expect failure
22  in terms of the safety factor?
23  A.  Well, I mean, when you do a limit
24  equilibrium stability analysis --
25  Q.  I meant factor of safety.  I said it

Page 140

1   backward.
2   A.  When you do a limit equilibrium
3   stability analysis, the factor of safety of 1
4   indicates that the driving forces and the
5   resisting forces equal each other.  So that is
6   the threshold, you know, of the failure.  In
7   reality, I mean, this analysis indicate that
8   when you get near a safety factor of 1 you can
9   expect instability.  And that's probably about
10  as close as you can define it with this.
11  Q.  All right.  Let me understand
12  something else about Silva number 6, the
13  Exhibit 6, Page 36, Figures 48 and 49 which
14  show the critical sliding surface in a kind of
15  mixture of greens where the factor of safety
16  would be somewhere between 2.0 and 2.5.  I'm
17  just roughly guesstimating the shades of the
18  green.  Correct?  (Tendering.)
19  A.  Correct.  It would be around 2, yes.
20  Q.  So things at the 6-hour mark are still
21  fairly stable?  Or as stable as they were
22  before?
23  A.  They were -- they had -- the level of
24  stability expressed in terms of safety factor
25  is around 2.

FRANCISCO SILVA-TULLA, SC.D.P.E.                                April 12, 2012

Page 141

1    Q.  And that's good.
2    A.  That's good.
3    Q.  Good enough, at least.  Not going to
4  have failure.
5    A.  Not likely you will have failure.
6    Q.  Okay.  And then as it approaches 1,
7  the probability of failure increases.  As you
8  go from 2.5 to --
9    A.  Yes.
10   Q.  -- 2.0 to 1.5, as you approach 1.0.
11       Okay.  At the top of each of these
12  little cones, there's a number in that little
13  box.  And if I look at this one, I can't hardly
14  read it.  I think it says 1.439 at 30 hours.  I
15  don't know if you can tell, if that's reported
16  someplace else.
17   A.  No.  That's right.  I can see that.
18   Q.  1.439.  What is it for the 6-hour and
19  the 20-hour?
20   A.  Well, for the 6-hour it's 1.97, in
21  this particular example.
22   Q.  Uh-huh.
23   A.  And for the 20-hour, it's -- for the
24  20-hour, I'm going to need your magnifying
25  glass.

Page 142

1    Q.  (Tendering.)
2    A.  It looks like 1.9, as well.  Or close
3  to that.
4    Q.  All right.  At 20 hours.
5    A.  I can't really read the number.
6    Q.  And then the 30-hour, we said was
7  11.4 --
8    A.  1.439.
9    Q.  Okay.  Now, that is approximately the
10  time of failure, correct?
11   A.  That is correct.
12   Q.  Okay.  So if the wall at the north
13  breach failed while the safety of factor was
14  still 1.4, that tells me there's something more
15  going on than just offsetting loads, horizontal
16  loads, if you will.
17   A.  You're absolutely correct, and that is
18  why we were looking at a statement before that
19  I said neither shear slide through foundation
20  soils nor seepage-induced mechanisms were
21  involved in the failure of the EBIA levees.
22  This type of mechanism was not part of the
23  failure.
24   Q.  Okay.  What caused the failure, then?
25   A.  Well, the failure was caused by the

Page 143

1  storm surge essentially overwhelming the
2  structure and causing erosion of the -- causing
3  erosion of the levee, which reduced the lateral
4  support of the flood wall.  The flood wall
5  deformed, the concrete cracked, and it failed
6  from the pressure of the water accumulating --
7  from the pressure of the water from the storm
8  surge after this lateral support was reduced
9  due to the erosion and scour.
10   Q.  Okay.  We'll come back to the erosion
11  and scour in a moment.  But at the 30-hour
12  mark, which is Figure -- you have it?
13   A.  E50.
14   Q.  In Figure E50, at the 30-hour mark,
15  which roughly corresponds with the moment of
16  failure -- that was at 6:10 a.m.  Correct?
17   A.  That's -- yes.  That's --
18   Q.  And at 6:10 a.m., the water had not
19  yet overwhelmed the levee, had it?  The flood
20  wall?  It was only at 11.3 feet.
21   A.  Well, it was -- at that time, the
22  water level was at or -- you know, it was at or
23  near -- it had been a little bit above, a
24  little bit below, but there had been several
25  hours of overtopping, from wave overtopping.

Page 144

1    Q.  Okay.
2    A.  So in a sense, yes, it had
3  overwhelmed.  At the time of failure, it had
4  overwhelmed the structure.
5    Q.  Okay.  Bear with me.  I'm talking to
6  an engineer, so I'm going to expect some
7  precision.  Right?  Don't expect it of me.
8  That's not fair.
9        But you say that had been several
10  hours of overtopping by the time the 30-hour
11  mark arrives.  Where do you get that
12  information?
13   A.  That information I get from the --
14  again, through conversation with our
15  hydrologist.  We got, um -- we got data on the
16  size of the waves.
17   Q.  Is that in your reliance materials?
18  Or is that contained in your report?
19   A.  I think it's in here, yes.
20   Q.  The wave overtopping?
21   A.  Yes.  Just let me find it for you.
22  It's on Page 54, Table Roman VI-1.
23   Q.  And my question to you is -- you said
24  there were several hours of wave overtopping.
25       When did it start and what was the

36 (Pages 141 to 144)

Page 145

1  level of the wave overtopping?
2     A.  Well, the waves were, um -- up to
3  three feet high.  So the overtopping from the
4  waves started when the canal level was 3 feet
5  below the level of the flood wall.  And the
6  time for that was approximately 3:24 a.m.  For
7  the north breach.
8     Q.  Okay.  And what about for the south
9  breach?
10    A.  Well, the south breach, the time was
11 approximately 3:48 a.m.
12    Q.  And you said because of that it had
13 caused scour erosion on the protected side of
14 the levee.  Correct?  Or the protected side of
15 the flood wall.
16    A.  It had caused scour and erosion from
17 the plunging water on the land side of the
18 flood wall.
19    Q.  Are we saying the same thing?  I agree
20 with what you said.  The land side.  I call it
21 the protected side, but same difference.
22        And in that time, from 3:24 a.m. to
23 approximately 6:10 a.m., the moment of failure,
24 have you calculated or analyzed with a computer
25 model the exact amount of erosion or scour that

Page 146

1  occurred at the north breach?
2     A.  No.
3     Q.  Any particular reason you did not?
4     A.  Well, you cannot really calculate the
5  exact amount.
6     Q.  Okay.  Did you calculate any amount?
7     A.  Yes.
8     Q.  Okay.  How did you do that and what
9  did you determine?
10    A.  Um -- we used a method of analysis
11 which is shown on Page 50, Item number 8, in
12 Table IV-1 is a computer program called
13 CWALSHT.
14    Q.  C-W-A-L-S-H-T.
15    A.  Correct.  And we used that to estimate
16 the scour required to cause the failure of the
17 flood wall.
18    Q.  Now, the result was based upon your
19 CWALSHT result that you should expect
20 unsatisfactory performance.  Is that another
21 way of saying failure?
22    A.  Well, unsatisfactory performance means
23 either failure or deformation, undesirable
24 deformations.
25    Q.  Okay.  But you should expect that

Page 147

1  which the factor of safety is approximately 1.
2  That's what that little sign means; right?
3  Approximately?
4     A.  That is correct.
5     Q.  And that factor of safety would
6  approach approximately 1 when the scour depth
7  exceeded 4 feet.
8     A.  Correct.
9     Q.  Correct.  All right.  Did your
10 model -- did you input that into the model?
11 Did you attempt 3 feet, 4 feet, 5 feet, to see
12 when you had unsatisfactory performance?
13    A.  Yes.  I mean -- yes.  Well, the
14 computer program does that.
15    Q.  It does that for you?
16    A.  Yes.
17    Q.  Okay.  When you ran this CWALSHT
18 program, did you include in any of your inputs
19 this unzipping of the sheet pile?
20    A.  No.
21    Q.  So you ran it as though the sheet pile
22 remained intact and had not separated?
23    A.  Yes.
24    Q.  Okay.  Did your model conclude that
25 four feet or more of scour would have occurred

Page 148

1  on the land side of the flood wall, at the
2  north breach, in the -- don't ever trust my
3  math -- in the three hours or a little short of
4  three hours?  What is that --
5          MR. STEVENS:
6              3:24 a.m. to 6:10 a.m. is how
7          many minutes, Bill?
8  EXAMINATION BY MR. STEVENS:
9     Q.  It's it a little less than three
10 hours.  It's 14 minutes less than three hours,
11 true?  Somebody help me.  Is there an engineer
12 in the house?
13         MR. TREEBY:
14             In lawyer time, 2.8 hours.
15 EXAMINATION BY MR. STEVENS:
16    Q.  In that 2.8 hours that it took from
17 3:24:00 a.m. when the wave overtopping first
18 began, to 6:10, did your computer model
19 demonstrate that there was greater than four
20 feet of scour on the land side of the floodwall
21 at the north breach?
22    A.  The model doesn't do that.
23    Q.  Okay.
24    A.  The model evaluates the level of
25 stability for a given level of lateral support.

**FRANCISCO SILVA-TULLA, SC.D.P.E.**                                                        **April 12, 2012**

Page 177

1      A contributing?
2      MR. STEVENS:
3          Let's say caused.
4      EXAMINATION BY MR. STEVENS:
5      Q.  Was it the sole cause?
6      MR. TREEBY:
7          Sole cause.
8      MR. STEVENS:
9          Sole cause.
10     A.  No.
11     EXAMINATION BY MR. STEVENS:
12     Q.  Was it a significant contributing
13  factor in the failure?
14     A.  If by that you mean that the north
15  breach would not have occurred if the weld was
16  not there, it's unlikely.  It probably would
17  have failed anyway.
18     Q.  Even without the weld.  Even without
19  the weak weld.
20     MR. TREEBY:
21         And without consideration of
22     time?  Is that --
23  EXAMINATION BY MR. STEVENS:
24     Q.  At all.
25     A.  And by the time -- the weld starts to

Page 178

1   fail after the concrete has cracked, and you
2   would have had water going over, so, I think
3   that it would have failed regardless.
4      Q.  Okay.  So I guess that's the flip side
5   of saying the role that the weld played was
6   minor or insignificant in comparison to the
7   wall itself toppling.
8      A.  Well, we're trying as best we can to
9   describe a failure mechanism based on
10  observations after the fact.  And it was
11  evident to me that this weld had a role in
12  there.  And we incorporate this role, the weld,
13  in the failure mechanism.
14     Q.  Okay.  Well, when you say it had a
15  role, does that mean it was just part of the
16  failure continuum, or it had a role in the
17  sense that it contributed in some way to
18  causing the failure?
19     A.  It was part of the failure continuum,
20  and it probably accelerated the failure.
21     Q.  Okay.  But you said a minute ago, the
22  failure would have occurred regardless.
23     A.  Probably.
24     Q.  Okay.  Do you have an estimation or
25  have you even evaluated the depth of the land

Page 179

1   side erosion or scour at the area of the north
2   breach when the tear occurred?
3      A.  Well, the -- that would be, you know,
4   the four-foot depth that we get from the
5   analysis.
6      Q.  So you're saying the four feet of
7   scour caused by wave overtopping would already
8   have been present before the tear of the sheet
9   pile occurred?
10     A.  Yes.
11     Q.  What do you base that conclusion on?
12     A.  Well, as I mentioned earlier, I mean,
13  we determined the four foot depth of scour.
14  And we are aware of estimations that exceed
15  that, at that location, for the time of
16  failure.  We are aware of a number of places in
17  the area that had four foot deep scour
18  trenches.  And it seemed like -- it seemed like
19  a reasonable number to have, at the time.  I
20  don't -- we really have not tried to present
21  these as an exact estimation of the depth of
22  scour at a certain hour and a certain minutes.
23  We didn't try to do that.  I don't think
24  anybody can do that.
25     Q.  The scour that you refer to, whether

Page 180

1   it's three feet, four feet, five feet or more,
2   is at the base of the flood wall, immediately
3   adjacent, if you will.
4      A.  It's in the land side.
5      Q.  Uh-huh.
6      A.  It's just on the land side of the
7   flood wall.
8      Q.  Yeah.  As shown in the photograph with
9   Dr. Bea in the trench --
10     A.  Right.
11     Q.  -- at Page 59 of your report.
12  Correct?
13     A.  Right.
14     Q.  Let me change topics here.  We'll
15  switch over the something else before we go to
16  the south breach.
17     A.  Before we go where?
18     Q.  To the south breach.
19         You've been talking a lot about the
20  north breach.
21     A.  Yes.
22     Q.  But in the context of the north breach
23  area, the Boland Marine site, have you
24  attempted in any way to determine or calculate
25  the cumulative amount or the total quantities

JOHNS, PENDLETON COURT REPORTERS                               504 219-1993