# EXHIBIT 12

Page 1

```
         UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
                                 JUDGE DUVAL
PERTAINS TO MRGO                 MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
     05-6314, 05-6324, 05-6327, 05-6359,
     06-0225, 06-0886, 06-1885, 06-2152,
     06-2278, 06-2287, 06-2824, 06-4024,
     06-4065, 06-4066, 06-4389, 06-4634,
     06-4931, 06-5032, 06-5155, 06-5159,
     06-5156, 06-5162, 06-5260, 06-5771,
     06-5786, 06-5937, 07-0206, 07-0621,
     07-1073, 07-1271, 07-1285

              * * *

           (V O L U M E  II)
   Deposition of J. DAVID ROGERS, PH.D.,
P.E., P.G., given at the offices of Stone
Pigman Walther Wittmann, LLC, 546 Carondelet
Street, New Orleans, Louisiana 70130, on March
17th, 2012.
```

Page 2

```
 1  APPEARANCES:
 2  REPRESENTING THE PLAINTIFFS:
 3     BRUNO & BRUNO
 4     (BY:  JOSEPH M. BRUNO, ESQUIRE)
 5     855 Baronne Street
 6     New Orleans, Louisiana 70113
 7     504-525-1335
 8  - AND -
 9     LAW OFFICE OF FRANK C. DUDENHEFER, JR.
10     (BY:  FRANK C. DUDENHEFER, JR.,
11     ESQUIRE)
12     601 Poydras Street, Suite 2655
13     New Orleans, Louisiana 70130.
14     504-525-2553
15
16  REPRESENTING THE UNITED STATES OF AMERICA:
17     U.S. DEPARTMENT OF JUSTICE
18     (BY:  ROBIN DOYLE SMITH, ESQUIRE)
19     (BY:  RUPERT MITSCH, ESQUIRE)
20     Torts Branch, Civil Division
21     P.O. Box 888
22     Benjamin Franklin Station
23     Washington, D.C. 20044
24     202-616-4289
25
```

Page 3

```
 1  REPRESENTING WASHINGTON GROUP INTERNATIONAL,
 2     INC.:
 3     JONES DAY
 4     (BY:  DEBRA S. CLAYMAN, ESQUIRE)
 5     (BY:  CHRIS THATCH, ESQUIRE)
 6     51 Louisiana Avenue, N.W.
 7     Washington, D.C. 20001-2113
 8     202-879-4645
 9  - and -
10     STONE PIGMAN WALTHER WITTMANN, L.L.C.
11     (BY:  WILLIAM D. TREEBY, ESQUIRE)
12     546 Carondelet Street
13     New Orleans, Louisiana 70130
14     504-581-3200
15
16  ALSO PRESENT:
17     FRANCISCO SILVA-TULLA
18
19  VIDEOGRAPHER:  KEN HART (HART VIDEO)
20
21
22
23  REPORTED BY:
24     JOSEPH A. FAIRBANKS, JR., CCR, RPR
25     CERTIFIED COURT REPORTER #75005
```

Page 4

```
 1          E X A M I N A T I O N   I N D E X
 2
 3  EXAMINATION BY:                         PAGE
 4  MR. TREEBY   ...............................7
 5  MR. MITSCH   .............................240
 6  MR. TREEBY   .............................252
 7
 8          E X H I B I T   I N D E X
 9
10  EXHIBIT NO.                             PAGE
11  Exhibit Rogers 3C ..........................35
12  Exhibit Rogers 31 ..........................44
13  Exhibit Rogers 32 ..........................45
14  Exhibit Rogers 33 ..........................64
15  Exhibit Rogers 34 ..........................71
16  Exhibit Rogers 35 ..........................88
17  Exhibit Rogers 36 ..........................91
18  Exhibit Rogers 37 ..........................97
19  Exhibit Rogers 38 .........................102
20  Exhibit Rogers 39 .........................107
21  Exhibit Rogers 40 .........................119
22  Exhibit Rogers 41 .........................137
23  Exhibit Rogers 42 .........................149
24  Exhibit Rogers 43 .........................178
25  Exhibit Rogers 44 .........................195
```

1 (Pages 1 to 4)

Page 21

1  representing to you that Exhibit 29, which is a
2  piece of -- or is, rather, the Fugro final
3  report for the borings that the plaintiffs
4  participated in --
5      A.  All right.
6      Q.  -- and you said it wouldn't surprise
7  you that there were thirty test specimens
8  selected from those borings that the plaintiffs
9  participated in that asked for organic contents
10 type testing.
11     A.  Right.
12     Q.  That wouldn't surprise you.
13     A.  No.  Because we were all interested in
14 that.  Both parties were interested in that.
15     Q.  Okay.  Were you aware that the
16 established procedure allowed the experts to be
17 present, and they could request a test in any
18 part of the extruded specimen that they were
19 looking at?
20     A.  I hadn't thought of that, but I can
21 see how that would have been -- that would have
22 been, um -- an available option to us, yeah.
23     Q.  Okay.  And I'm going to show you a
24 document that we're marking as Rogers 30.  And
25 this is not something that Fugro did, this is

Page 22

1  just for ease of reference.
2           (Reporter interruption.)
3  EXAMINATION BY MR. TREEBY:
4      Q.  For ease of reference, we have made a
5  table -- and it's subject to you checking it --
6  of the test specimens that plaintiffs
7  participated in that asked for organic contents
8  testing.  And we counted them up and it looks
9  like thirty.  And it indicates what boring it's
10 from, what site it's from, the depth of the top
11 of the specimen, the depth of the bottom of the
12 specimen, the average depth of the specimen,
13 and the organic content by percentage under the
14 USCS classification.
15     A.  Yes.
16     Q.  Okay.  And there are thirty of them.
17     A.  All right.
18     Q.  Okay.  You knew, did you not, that the
19 defendants' experts did ask for laboratory
20 tests, as well, for additional borings, or
21 specimens from additional borings, to
22 determine, among other things, the organic
23 content of the soils in many of the borings
24 that only the defendants participated in?
25 Right?

Page 23

1      A.  Yes.  I would presume that they would
2  do that.
3      Q.  And you've already indicated, and I
4  would hope that you respect the professional
5  qualifications of the defendants' experts who
6  were involved in that process.  Isn't that
7  right?
8      A.  That's right.
9      Q.  If I told you that the bases for the
10 selection of the portions of extrusions to be
11 laboratory tested for organic content was to
12 select those with the highest apparent organic
13 content, would that surprise you?
14     A.  No, that would be in general line with
15 practice.  Basically, as geotechnical
16 engineers, we always are focusing on the
17 weakest links and the weakest players, so those
18 are the ones we're going to run the tests on,
19 typically.
20     Q.  As a professional charged with the
21 responsibility for select ing the test samples,
22 you would expect that to be the case; isn't
23 that true?
24     A.  That's what I hope would be the case,
25 yes.

Page 24

1      Q.  That the criteria for selection would
2  be those samples with the apparent highest
3  organic content.
4      A.  Correct.
5      Q.  That, for example, is what you would
6  expect from someone with the professional
7  credentials of Tom Brandon.
8      A.  Yes.
9      Q.  Was Tom Brandon the one who was there
10 on the occasions that you observed extrusions?
11     A.  No.
12     Q.  Who was, for the defendants?
13     A.  Tim Stark and Francisco Silva.
14     Q.  And would you say the same about them?
15     A.  Yes.
16     Q.  ==And if that was the criteria used by
17 those professionals to select the test samples,
18 and the result was the final Fugro report
19 showing the virtual absence of true peat,
20 shouldn't that be trusted?==
21     A.  ==No, that's now how I would -- I would
22 not have produced a log like that.  I would
23 note the peat seams instead of -- the whole
24 unit is an organic clay.  So if you take -- if
25 you take those materials -- you can report it==

Page 25

1  that way, but there are some of these that are
2  fairly high that, um -- when you see water
3  contents above 150 percent, you know it's got a
4  lot of organics in it. And when you see things
5  that are climbing up, you know, above
6  300 percent, you know you've got a pure, you
7  know, really rich peat layer sitting down
8  there.
9       So we would typically note those that
10 the unified soil classification would be as a
11 organic clay, but we would note seams -- peat
12 seams, and then we'd note how thick the peat
13 seams appear to be, like 6 to 12 inches, or 18
14 to 30 inches, that kind of thing. That's
15 typically what you'd see on the logs that I've
16 done where we intersect peat horizons. We like
17 the know that it's there and have it noted on
18 the logs.
19     Q. That's not classifying it according to
20 ASTM 2487; isn't that right?
21     A. Well, ASTM 2487 is not an engineering
22 geologic classification, it's purely soil
23 mechanics. It's no engineering geology
24 involved. It's just -- it's a very
25 prescriptive standard where you're looking at

Page 26

1  sieve analyses, plasticity assessments, and
2  you're making a determination what bin to put
3  it in. And that's because they're trying to
4  classify it by behavior type.
5       But as a geologist, we like to know --
6  we'll put down things like paludal clay, which
7  is not in the ASTM spec, because that tells us
8  the environment of deposition, what kind of
9  clay we expect to see. And it tells us,
10 qualitatively, a little bit more about it than
11 just the soil classification.
12      So the ASTM standards are strictly for
13 the soil assignment. They're not, you know,
14 the descriptors. So the descriptive stuff is
15 what I'm talking about, where you describe what
16 you're seeing; you know, fibrous, peaty
17 structure, you know, traces of moss, decayed
18 wood, those kind of things. Those are visual
19 descriptors that are more -- that you tend to
20 get out of engineering geologists or geological
21 engineers who have more geology training and
22 background.
23     Q. Okay. If you would look at
24 Exhibit 29, and look at boring EBIA B26-B.
25      Do you have it?

Page 27

1      A. Yes.
2      Q. There were four soil tests
3  beginning -- there were one, two, three, four,
4  five, six soils tests requested from this
5  boring that involved organics, or suspected
6  organics, and they were done at 14, 19, 20, 21,
7  22 and 23. Is that right? Feet.
8      A. Yes.
9      Q. And none of them shallower than
10 20 feet show water content above 150.
11     A. One's close, yeah, the one at 14 --
12 145. So that's very close.
13     Q. Okay. Can I get an answer to my
14 question? None of them are above 150.
15     A. Correct.
16     Q. Thank you. And none of them, under
17 the ASTM classification, are classifieds as
18 peat; isn't that right?
19     A. Correct. They're very close, though.
20 There's a high organic content. And I don't
21 know why they put, you know, layer of organic
22 clay from 14 to 15. Oh, I see. It's there.
23 They're differentiating it from fat clay. All
24 right. That's fine.
25     Q. All right. And yesterday, you said

Page 28

1  something about, well, if there had been more
2  detail.
3       Remember that detailed testing you
4  were talking about?
5      A. Yes.
6      Q. Isn't that what this is? They're
7  measuring every foot. From 20 feet down to
8  23 feet, they're testing every foot for organic
9  content.
10     A. Right. No, for water content.
11     Q. No. For organic content, too.
12     A. Oh. From 20 to 24?
13     Q. Yeah.
14     A. Yeah. Right. Right.
15     Q. So somebody was doing a detailed soils
16 analysis of those soils that had the highest
17 organic content. Right?
18     A. Well, they were running the basic test
19 that you'd want to run when you're in organic
20 materials, right. That's correct. Those
21 are -- that's the basic stuff that you'd want
22 to run. They didn't do the burn off tests or
23 anything, I don't think, but they did run
24 organic content and water content.
25     Q. Did you understand the plaintiffs

Page 137

1   what you mean.  Not geotechnical group.
2       Q.  Division.  Geotechnical engineering
3   division.  That's what I mean.
4       A.  Geotechnical branch of the local
5   district is --
6       Q.  Are you differentiating the
7   geotechnical division from the geotechnical
8   branch?
9       A.  Yeah.
10      Q.  Or are you saying they're the same
11  thing?
12      A.  I don't know how you're using it
13  there.  But the geotechnical branch is the
14  local geotechnical expertise in the New Orleans
15  District, that's here, that would have purview
16  over that kind of stuff, typically.
17      Q.  I show you Rogers Exhibit 41.
18          Have you seen this before?  This
19  document?
20          (Exhibit Rogers 41 was marked for
21  identification and is attached hereto.)
22      A.  No, I don't recall seeing it before.
23  Sorry.
24          Do you know who it's from?
25  EXAMINATION BY MR. TREEBY:

Page 138

1       Q.  Well, I believe it's from Gregory
2   Breerwood, deputy chief, operations division --
3       A.  Okay.
4       Q.  -- at the Corps.
5       A.  All right.  No, I had not seen this
6   before, that I recollect.
7       Q.  Well, this is a letter dated
8   April 6th, 2001 from Breerwood in the
9   operations division at the Corps to Stevan
10  Spencer.  And the first paragraph, if you look
11  at it, refers to a letter request from
12  Washington Group concerning permission to
13  remove existing structures, et cetera.  Do you
14  so that?
15      A.  Yes.
16      Q.  And the middle of the second
17  paragraphs states, We have no objection to your
18  board 's issuance of a permit for the proposed
19  work provided, and then it's got some things --
20  some provisos.
21      A.  Oh, okay.  I see it.
22      Q.  You see that?
23      A.  Yes.
24      Q.  Okay.  But you haven't seen this
25  before.

Page 139

1       A.  I don't remember seeing this before.
2   They told me about it but I don't remember
3   seeing the letter.
4       Q.  This letter of no objection is based
5   on engineering criteria.  Do you see that?
6       A.  Um -- where is that?  In the last
7   paragraph?  Yeah.  Okay.  It's based upon
8   engineering criteria.
9       Q.  Okay.  Now, do you know what
10  engineering criteria the Corps used in reaching
11  the conclusion that it didn't object to
12  Washington Group 's work?
13      A.  No.
14      Q.  Okay.  Turn to the page ending Bates
15  number 68.  Have you seen this before?
16      A.  No.
17      Q.  This is the November 7th, 2000 letter
18  that Washington Group initially sent to the
19  Orleans Levee District.  Do you see that?
20      A.  Yes.
21      Q.  On page 2 of the letter, if you will
22  look at it, Dennis O'Connor, the project
23  manager for Washington Group, describes aspects
24  of Washington Group 's work to be performed on
25  the East Bank Industrial Area.  Do you see

Page 140

1   that?
2       A.  Yes.
3       Q.  He states that the entire site will be
4   grid trenched to a depth of five feet; right?
5       A.  Yes.
6       Q.  He then says, the borrow pit will be
7   developed for backfill.  Right?
8       A.  Yes.
9       Q.  He says that there will be a removal
10  of also we're gas facilities, including the
11  Boland sewer lift station.  Right?
12      A.  Yes.
13      Q.  That there will be a demolition of all
14  above ground and subsurface structures,
15  including slabs, foundations, and barges that
16  are described on figures 3 through 5 that are
17  attached.  Do you see that?
18      A.  Yes.
19      Q.  And he indicates that it will include
20  excavations and remediation areas to three
21  feet.  Do you see that?
22      A.  I don't see the three feet part.
23  Where is --
24      Q.  I think it's here.  Oh, no.  I'm
25  sorry.  The three feet is not there.

Page 217

```
 1        MR. BRUNO:
 2            Which submittal, Bill?
 3        MR. TREEBY:
 4            The submittal on the page I just
 5        referenced was 64.
 6   EXAMINATION BY MR. TREEBY:
 7        Q.  You see that?  Page 64, January 17th,
 8   2001.  After that submittal, which had attached
 9   to it the drawings which are somewhat cut off
10   here, but that was attached to his letter -- do
11   you see that?
12        A.  This drawing?
13        Q.  Yes.  Yeah.  That one is cut off.
14        A.  Mine just shows the overhead power
15   lines.  Oh, I see.  They've got different
16   things on different sheets.
17        Q.  Oh, yeah, different sheets, plenty of
18   sheets attached, ditches, pipe guide details --
19        A.  Well, I'm still not seeing the buried
20   utility sheet details.
21        Q.  Well, you see some of the detail on
22   Page 66, do you not?
23        A.  Okay.  Yeah.  There's a waterline and
24   a sewer line.  So that drawing keeps going off
25   to the right but just didn't get copied?
```

Page 218

```
 1        Q.  Yes.  And we have -- they're hard to
 2   read because they're so small, but we have
 3   copies of the entire plans.
 4        A.  Right.
 5        Q.  In any case, that submittal -- I think
 6   the important point to your concern, for
 7   Washington Group, is that that submittal, with
 8   the drawings, was made on January 17th, 2001.
 9   Correct?
10        A.  Right.
11        Q.  And on April 3rd, 2001, after that,
12   the chief of the engineering division, Page 59
13   on the Bates number, said, We have no adverse
14   comments regarding the subject permit request.
15            That was after the request for more
16   information about utilities.
17        A.  Right.
18        Q.  And then after that, we have the
19   letter of no objection to the OLD.  April 6th,
20   2001.  Right?  First page.  Very first page.
21        A.  Okay.  All right.
22        Q.  From Gregory Breerwood, deputy chief,
23   operations division.
24        A.  Right.
25        Q.  That was after he got the engineering
```

Page 219

```
 1   division to sign off on it.
 2        A.  Right.
 3        Q.  Both geotech and structures.  Right?
 4        A.  That's how it appears.
 5        Q.  Okay.  So that's what you were talking
 6   about on Page 236, for a third and full
 7   paragraph, about the need to -- for any
 8   excavations that extended to the I-wall.
 9   Utilities.
10        A.  Right.  Utilities.  Correct.  Because
11   you know they're going -- they're penetrations.
12        Q.  Right.  And this indicates that was
13   done -- that was applied for and approved.
14        A.  Right.  But, that the removal was
15   going to occur.
16        Q.  Right.  And the plans were approved.
17        A.  Right.
18        Q.  And then later, there would be work
19   plans that should -- and I would assume you
20   would agree -- support that it was in fact done
21   and signed off and approved by the engineers
22   that the Corps of Engineers had out there
23   looking at the job, and the inspectors that
24   were out there looking at the job.
25        A.  Right.
```

Page 220

```
 1        Q.  Okay.  And you cannot -- you are not
 2   testifying and your report is not opining that
 3   that did not happen.  Is that correct?
 4        A.  Right.  We just like to see the
 5   documentation of it, that it did occur.
 6        Q.  In the last paragraph, above
 7   Conclusions, on Page 236, you make this
 8   statement -- I believe it's the last
 9   sentence -- This protective clay seal was not
10   applied against the very pervious shell
11   backfill and the cohesionless sand backfills
12   identified by Washington Group during their
13   site characterization and sampling phase.  And
14   you are specifically referring to Boring 81-A.
15        A.  Right.  That's along the north side.
16        Q.  I'm very familiar with it.
17        A.  Okay.
18        Q.  Are you familiar with 81-A?
19        A.  Well, I believe so.  I don't have it
20   in front of me right here.
21        Q.  Well, we'll get it in front of you in
22   a minute.
23            Okay.  I'm showing you Rogers 48.
24   This is a excerpt of the recap submittal for
25   Boland Marine, which 81-A would be roughly in
```