# EXHIBIT 13

# What Caused the I-Wall Failures at the EBIA North and South Breaches?

Expert Report of:

**Dr. W. Allen Marr, PhD, PE, NAE**

Geocomp Corporation

125 Nagog Park

Acton, MA 01720

Prepared for:

The United States Department of Justice

1331 Pennsylvania Avenue NW, Suite 800N

Washington, DC

March 12, 2012

With Errata Corrected April 25, 2012

April 25, 2012

## EXECUTIVE SUMMARY

**North Breach**

The flood wall failed at the North Breach due to low global stability of the foundation soils which caused a portion of the flood wall to displace landward and place the sheet piling into tension along its horizontal axis.  This development of large tension in the sheeting was caused by a different design of the sheet piling north of the breach which created a much stiffer section of wall that displaced laterally much less than the adjacent section to the south.  The sheets north of the intersection were 34 ft long and those south of the intersection were 19 ½ ft long.  The longer length sheets to the north created a stiffer wall that displaced less than the wall to the south.  As the flood waters rose on the canal side, the southern section displaced landward more than the northern section.  This created a differential displacement in the vicinity of the intersection and a large tensile stress in the sheeting that it was not designed to withstand. The rising canal water level began to overtop the wall.



At the intersection of these two sections, the tensile force in the sheeting became sufficiently large to plastically stretch it along its horizontal axis and create excessive tension in the concrete I-Wall. At least two 19 ½ ft long sheets underwent significant deformation. Tension cracks developed in the concrete segment just south of the intersection. The concrete portion cracked, broke up and fell away creating an open gap.  Sufficient tensile overstress developed in one piece of sheeting to cause it to tear from its top downward for a length of 12 ft.   The tearing resulted in a transfer of tensile forces to the bottom of the sheeting and caused the 19 ½ ft long sheeting to start plastically deforming at the bottom.  At a certain point, the tensile force became sufficiently large in the bottom of the sheeting to initiate a decoupling of the joint in the adjacent sheets from bottom to top.





Water pouring through the created gaps rapidly softened and eroded away the landside top of the earthen embankment.  This action caused the sheets of the older segment of the wall to rotate landward. Rising water in the canal began to overtop the wall more. This caused further erosion of the adjacent sections of wall to the south and outward rotation of these sections in a sequential manner over time.  Water flowing through the rapidly widening breach eroded away the entire embankment portion of the flood wall and pulled the overturned sheets out of the



April 25, 2012

ground.  As the canal level continued to rise, overtopping increased to further scour away the levee embankment leading to more overturning towards the south.  The wall to the north of the breach was higher and the sheeting was 34 ft long.  It remained in its original position.  This process continued in a sequential manner towards the south.  At some point it is most likely that the water level on the land side reached above the top of the flood wall embankment and slowed down the erosion process.  This was then followed by a drop in the water level in the canal.  The failure had widened from an initial few feet to about 235 feet over the course of about 2-3 hours.

The flood wall failed at the South Breach due to overtopping of the wall by as much as 2.2 ft of continuously flowing water.  The overflowing water scoured away the land side of the flood wall and removed lateral support for the flood wall to the point that it rotated landward to fail by overturning and was pulled out of the ground by the forces of the overflowing water. Unlike the sheeting at the North Breach that tore apart, the sheeting at the South Breach remained entirely intact.

The North and South breaches occurred at low spots where the I-Wall had settled the most. Other segments of the EBIA flood wall did not fail but were in various stages of failure by overtopping and scour.  Progression to complete failure slowed and then stopped after the water level on the land side rose over the top of the embankment.

These opinions are my own that I developed from detailed studies of the known facts and observations, existing documents, field inspections, extensive analyses and engineering reasoning.  I am qualified to render these opinions and do so under the pains and penalties of perjury. I reserve the right to modify my opinions should additional information become available that might affect the basis for my opinions.

Respectfully submitted,

W. Allen Marr, PhD, PE, NAE

**South Breach**







April 25, 2012

**Table 4-2- Stiffness Parameters used in Plaxis Deformation and Flow Analyses**

| Parameter | Upper Organic Clay | Lower Organic Clay | Plaxis Analyses |
|---|---|---|---|
| $m_v$ | $1.0*10^{-4}$ | $1.6*10^{-4}$ | $3*10^{-5}$ (1) |
| $S_s$ | 0.007 | 0.011 | 0.002 |
| B | 0.9 | 0.9 | 0.9 |
| Poisson's Ratio | 0.478 | 0.478 | 0.478 |

*(1) reduced to account for $m_v$ at effective overburden stress rather than virgin compression*

Each soil layer was assigned a constant secant modulus value, $E_{50}$, independent of stress level throughout the layer. However stress dependency of the soil stress-strain curve is independently accounted for in the analysis by inputting an undrained strength that is a function of vertical effective stress.

### 4.1.3        Permeability (Hydraulic Conductivity)

My seepage analyses comprised two analysis cases: steady-state seepage and transient seepage. Both cases require representative values of permeability. Appendix J reviews data from laboratory tests and an extensive field test program. I helped establish the protocols and procedures for these tests and observed a representative portion of the tests in the field and at the Fugro and GTX laboratories. I was satisfied that the tests were run in general accordance with the applicable procedures.

In selecting values of permeability for our flow analyses, I relied heavily on the opinions of Dr. Naymik, who evaluated the field testing exhaustively[82], Dr. Brandon who did an extensive study of the permeability characteristics of New Orleans organic clays[83] and Dr. Stark who looked at permeability of peats and organic clays[84]. Table 4-3 summarizes the values of permeability used in our analyses. Appendix J gives the justification for selecting these values as reasonable upper bounds for permeability. I chose to use the same values of permeability in the horizontal and vertical directions, and to ignore the effect of higher effective stresses under the embankment to make the analysis trend to a worse-case result and to simplify the interpretation of transient flow results.

The transient flow case requires a second coefficient called Specific Storage Coefficient. Appendix J explains this parameter and gives the basis for the value of 0.002 /ft used in our transient flow analyses for organic clays.

---

[82] Naymik Expert Report (2012)
[83] Brandon Expert Report (2012)
[84] Stark Expert Report (2012)

April 25, 2012

**Table 4-3 Permeability used in Seepage Analyses**

| Strata | Permeability k | |
|---|---|---|
| | [cm/sec] | [ft/day] |
| UPPER ORGANIC CLAY | 1.00E-05 | 2.83E-02 |
| LOWER ORGANIC CLAY | 1.00E-05 | 2.83E-02 |
| INTERDISTRIBUTARY | 1.00E-06 | 2.83E-03 |
| INTRADELTA | 1.00E-03 | 2.83E+00 |
| CLAY/FILL | 1.00E-06 | 2.83E-03 |

### 4.2    FLOOD WALL EMBANKMENT

Due to the reconstruction activities that took place post-Katrina, much of the embankment fill that existed at EBIA the time of the storm is no longer present. Some samples of the pre-Katrina flood wall fill at the south end of the wall near the Claiborne Ave Bridge were collected for classification testing as part of the 2011 Supplemental Site Investigation, however no strength tests were performed on this material. The USACE Chalmette Area Plan General Design Memorandum (GDM) gives an undrained strength of 500 psf for the flood wall fill[85]. IPET also used $S_u$ = 500 psf for the embankment fill in their assessment of IHNC[86]. Based on this information, an undrained strength of 500 psf was assigned to the embankment fill for all analyses presented in this report.

### 4.3    SHEET PILING

USACE design drawings indicate the 1969 I-Wall and the 1980 I-Wall were constructed using PZ-27 sheeting[87]. Figure 4-8 provides the standard properties for PZ-27. These properties were assigned to the sheeting in all analyses presented in this report.

---

[85] USACE (1966), Design Memorandum No. 3, Plate 38
[86] IPET Volume V, Table 11-5
[87] USACE (1980), Design Memorandum No. 4, Plate 43

In my opinion, any floating object large enough to burst the wall would have had visible dimensions larger than the description given in Mr. Villavasso's testimony. Exponent Failure Analysis Associates did not find any evidence that would indicate an impact had occurred to three sheetpiles recovered from the failure area. In my opinion, the likelihood that the wall failed by this mechanism is quite low because (1) there is insufficient supporting evidence and (2) there is another more complete and credible mechanism that explains the cause of the failure that is also consistent with Mr. Villavasso's observations.

## 5.2    EXCESSIVE SEEPAGE BENEATH I-WALL

This potential mechanism involves the postulation of a permeable layer of organic clay beneath the I-Wall in contact with an excavation filled with very pervious material that permitted water to flow from the canal to the land side, and increase pore water pressures at the flood wall embankment toe during the relatively short duration of the storm (Bea 2012, ILIT 2006, Seed et al. 2008).  The postulated large flows resulted in one or both of the following failure mechanisms:

- Localized "blowout" at the toe of the flood walls on the protected side due to large flows and high pore pressures in the land side toe, made worse by poorly backfilled EBIA site clearing excavations by WGI.
- Loss of lateral stability due to excess uplift pressures resulting in a translational stability failure and also made worse by poorly backfilled EBIA Site clearing excavations by WGI.[108]

ILIT suggested a third mechanism in which the quantity of underseepage  was so large that it caused the flooding[109] but this mechanism is not discussed in Dr. Bea's report of February 1, 2012.

Each of these proposed mechanisms depends on the premise that large underseepage caused pore water pressures to increase on the land side of the floodwall quite rapidly during the storm to high levels.  The postulated causes of the large underseepage are:

- High permeability of the organic clay layers.
- Excavations to the depth of the organic clays (swamp) made on the canal side by WGI that were allegedly poorly backfilled.
- Development of tension gaps on the canal side of the floodwall as it was subjected to increased lateral forces from the rising canal level.[110]

Dr. Bea indicates in his expert report that he relied on computer models of flow and stability to reach these conclusions.[111]  Since the conditions and assumptions used in these analyses are critical to the reasonableness and reliability of the results, I made an assessment of this information to the extent possible with the provided information.

Dr. Bea indicates "results for all of the cases and parameters analyzed during this phase of my investigation are summarized in Appendix D."[112]  He states that he used two fundamental types of

---

[108] Bea expert report 2/1/12, pg 125 ¶131.
[109] ILIT (2006), pg 6-16
[110] Bea expert report 2/1/12, pg 125 ¶131.
[111] Bea expert report 2/1/12, pg 125 ¶132.
[112] Bea expert report 2/1/12, pg 74 ¶80.

analytical models to investigate two interrelated and interactive modes of failure development: (1) hydraulic conductivity analyses to determine 'seepage' pressures and forces that affected the floodwall performance, and (2) coupled hydraulic conductivity limit equilibrium lateral stability analyses to help determine the conditions for which the floodwall would fail.[113]

Before examining the results of Dr. Bea's analyses, it is important to examine the conditions for the analyses and the parameters used in his analyses. Appendix T provides my assessment of the flow analyses that form the basis of Dr. Bea's determination of gradients and excess pore pressures in the land side portions of the flood wall. The background for his analyses is provided in Appendix D of his report.

Dr. Bea wraps up his Appendix D with conclusions from his analyses. For the North Breach, he concludes "the scenarios where granular backfilled excavations were in contact with the top of the buried swamp-marsh deposits (Cases 1-1 and 2-1) indicate a high likelihood of hydraulic failure as vertical hydraulic gradients exceeded 0.8, uplift Factors of Safety are below unity, and the lateral stability probabilities of failure exceed 50% for a canal water elevation between +8 and +10 ft, corresponding to a time frame between 4:00 and 5:00 AM (CDT)."[114]

These failure modes are all based on flawed flow analyses that greatly overestimate the pore pressures and vertical hydraulic gradients in the land side portion of the flood wall and its foundation because of the following incorrect modeling conditions:

- Assumption of porous backfill in contact with the organic clay soil which was not the case.
- Locations of excavations much closer to the flood wall than data show.
- Assumption of a very low value of coefficient of soil compressibility, $m_v$, of $1*10^{-9}$ /psf, a value that is comparable to the compressibility of concrete, and on the order of 10,000 to 100,000 times less than a realistic value for these soils.

I found Dr. Bea's flow analyses as described in his Appendix D to be unreliable due to these important issues. The large discrepancy in coefficient of volume compressibility leads to Dr. Bea's conclusion that "The hydraulic seepage analyses show that pore pressures develop rapidly and near-steady state conditions are reached within less than 30 hours of the initiation of the surge starting on August 28, 2005."[115] This conclusion is wrong because the value of coefficient of compressibility used in his flow analyses does not represent reality for the EBIA soils. As demonstrated in Appendix T, Dr. Bea's use of a soil compressibility of $1*10^{-9}$/psf combined with the SEEP/W assumption of incompressible water, **made his flow analyses reach steady state seepage conditions rapidly.** This is especially important to his conclusions relative to excessive seepage under the floodwall since they all depend on near steady-state seepage conditions developing during the storm.

For a more realistic assessment of possible flow conditions during the storm, my group performed flow analyses using the computer program PLAXIS. This is a widely used program in engineering practice and one that I have personally used for more than 20 years. For the same conditions it gives essentially the same results as the SEEP-W program used by Dr. Bea. We used the PLAXIS program because it can also provide factor of safety for shear stability and calculate deformations of the wall. Appendix L describes

---

[113] Bea expert report 2/1/12, pg 74 ¶81.
[114] Bea report Appendix D, pg 38
[115] Bea expert report 2/1/12, pg 125 ¶133.

April 25, 2012

our flow analyses and gives the results for the North Breach.  Figure 5-1 shows our calculation of flow conditions at the time the failure occurred at the North Breach including the correct geometry.  An excavation located over 180 ft away from the floodwall (at the left side of Figure 5-1) is included with its bottom at elev -5.8 ft.  The location is WGI excavation BM8.  The maximum depth excavated in this area is BM6.  Appendix B gives detailed information on WGI excavations.  Only BM8 and BM6 went deeper than 5 ft.  The analysis uses a canal water level of elev +11.4ft which occurred at 6 AM, the time of the North Breach failure.  The land side water level is positioned at the ground surface in this analysis.

Even with an upper bound permeability of $1*10^{-5}$ cm/sec in both the upper and lower organic clays, the effect of the raised water level in the canal has not reached the downstream toe because these total head contours are almost identical to pre-storm values shown in Figure 5-2 and described in Appendix L. This is because the time for flow is too short for the effect of the increased water level on the canal side to reach the land side.  The results show that flow remains transient for the duration of the storm and far from the near steady-state condition found by Dr. Bea.

Flow directions are perpendicular to the total head lines so flow in the organic clay at the toe of the levee is essentially horizontal.  Vertical gradients can be expected to be small.   Figure 5-3 shows total gradients for flow conditions near the time of the breach.  The maximum value is 0.5 but this is mostly a horizontal gradient.  Figure 5-4 gives contour plots of just vertical gradient.  The maximum vertical gradient in the Organic Clay is 0.4 (higher vertical gradients occur, but they are deep in the Interdistributary Clay layer). Calculated flow rates through the Organic Clay layer at the floodwall never exceed the rate of 0.27 gallons per day (7 minutes per teaspoon) per foot of length of flood wall at the peak water level in the canal.  A rate this low is many times less than what might possibly cause erosion or "blowout" of the land side flood wall toe.

manufactured value.  Measurements show nominal values of 0.9 inches [123] opening along the entire length of the connection compared to the typical manufactured value of 0.5 inches. It is clear that the fist of the adjacent sheet pulled out of this socket and in doing so widened the jaw of the socket along its entire length.  Sheets #2 and #3 were also plastically deformed from a width of 36 inches to about 49 inches[124].  Calculations by Exponent show that a large tensile force along the horizontal axis of the sheeting was required to stretch these sheets[124].  Z shapes of sheet piling are not intended to take significant tensile forces along the horizontal length of the wall.  The design of the EBIA I-Wall does not count on the I-Wall carrying any tensile force along its length.  However something caused enough tension in the sheeting to create a 12 foot long vertical tear at the top of the sheeting, plastically deform two sheets from top to bottom by about 13 inches, and separate the entire connection of sheet #3.

Photo 5-2 shows pieces of rebar sticking out of the non-failed portion of the concrete wall on the north side of the failure initiation point.  These rebar are deformed and stretched with indications that they have been plastically deformed. Several inches of concrete are missing from this face. These observations indicate that something caused a vertical tension crack to develop in the concrete near the end of the 1980 wall.  Figure 5-10 shows some dimensions on the aerial photograph of the exposed sheeting at the North Breach.  Seven 30 ft long sections can be identified.  The original length of these sections was 210 ft but the post failure length is estimated at about 236 ft (more or less as we cannot determine the exact end of the wall in Figure 5-8).  Besides the two sheets recovered at the 1969-1980 intersections, other sheets had to be plastically deformed for the wall to expand in length by at least 26 ft.  One can also see that portions of the concrete wall are missing while others remain intact.

---

[123] Exponent (2012), pg 6
[124] Exponent (2012), Figure 22

April 25, 2012



**Figure 5-10 Scaled dimensions of the North Breach[125]**

No previous reports or documents including IPET and ILET have explained the cause of these structural failures or related them to the cause of the North Breach. Dr. Bea mentions "failure of concrete flood wall panels and the vertical joints (water stops)" and "failure of the sheet pile – floodwall connections or the sheet piles and their interlocks"[126] as failure modes involved in the failure at the North and South Breaches but he never discusses these mechanisms anywhere else in his report.

These observed facts (the 12 ft long tear, the separated sheet pile joint and the plastically deformed sheets) must be understood and explained if one is to have a reliable answer to what caused the failure at the North Breach. The answer lies in determining what caused a large tensile force to develop in the sheeting along the full depth of the wall at the north end of the North Breach. This can only occur if there are differential movements in the flood wall system north and south of the tear that cause the sheeting to stretch plastically in the horizontal direction of the wall. This could occur if the sheeting south of the tear moved vertically or horizontally differently than the sheeting north of the tear.

Figure 2-4 provides an illustration of the wall system in this area. It actually is the interface between two separate contracts to construct this section of floodwall. The floodwall south of the interface was constructed in 1969. It used 19.5 ft long sheets and was constructed with a top of wall elevation of +13.53 NAVD88 (+15.0 MSL as shown on as-built drawings). The floodwall to the north of the interface was constructed in 1980 using 34 ft long sheets with a top of wall at +14.53 NAVD88 (16.0 ft. MSL as shown on as-built drawings).

---

[125] Dave McDannial aerial imagery
[126] Bea February 1, 2012, page 126 ¶131

April 25, 2012



**Photo 5-3 Aerial View of Failed Sheeting at North Breach[146]**

---

[146] Dave McDannial Aerial Photograph

April 25, 2012

This study applied the following phases when calculating scour depth at the land side of an overtopped floodwall:

- Phase 1: Determination of plunging jet velocity and entry angle at point of impingement by analyzing the trajectory of the jet.
- Phase 2: Determination of the hydraulic shear stress induced by the plunging jet.
- Phase 3: Determination of scour depth corresponding to the applied shear stress.

These phases were performed in time increments using a spreadsheet employing an iterative calculation scheme. The reader is referred to Appendix R of this report for a more detailed description of the scour analysis procedure, input parameters and calculation results.

### 6.3.2    Brief Description of Input Parameters for Scour Calculations

In this study, the soil at the flood wall embankment crest (embankment fill) was considered to be low plasticity clay (CL according to the Unified Soil Classification System, USCS). The basis of the definition of erodibility of the embankment fill was the erosion function approach developed by Briaud (2008) and erosion test data presented by Briaud et al. (2009) and Govindasamy (2009). The average erodibility of the embankment fill soils were determined judgmentally based on these erosion test data along with upper and lower bounds that were termed "more erodible" and "less erodible" CL soils.

The hydrographs for overtopping (canal hydrograph) and land side floodwater (interior hydrograph) used in the scour calculations for this study was obtained from IPET (2009). These hydrographs are based on those given in the IPET report for the IHNC and Lower Ninth Ward (IPET Vol. IV Figure 136 and Vol. V Figure 11-1).

The wall height data was obtained from top of wall elevations from the 1999 Levee Board Survey and embankment crown elevations from the 2005 Wink Survey. A statistical analysis was performed on this data resulting in an average wall height of 7.24 ft with a standard deviation of 0.34 ft. Based on this information, the wall height used in the scour calculations was rounded to an average of 7 ft. The scour depths were computed for the following floodwall elevations [in ft, NAVD88 (2004.65)]: 10.5, 11.4, 11.7, 12.1, 12.5, 13.0, 13.5, and 14.2.

### 6.3.3    Scour Calculation Results

The results of the scour calculations are presented in Figure 6-13.  Scour depth is presented as a function of top of flood wall elevation. The three curves represent "average", "more erodible" and "less erodible" CL soils.  Figure 6-13 also shows the calculated scour depth at the location of the South Breach, corresponding to a top of wall elevation of 12.1 ft NAVD88 (2004.65). The calculated depths vary from 2 to 5 ft depending on erodibility of the soil.

These calculations are very approximate.  From review of post-Katrina photographs, estimated scour depths at other locations where the wall did not fail were about 2 to 4 ft deep proving that scour occurred.  The point of this section is to demonstrate that the physics of scour support the development of scour depths of 6 to 8 ft or more for the EBIA floodwall conditions.



**Figure 6-15 FOS vs. Time at Section 3 through the South Breach**

### 6.5    STRUCTURAL FAILURE OF THE I-WALL

Figure 6-16 shows an aerial view of the South Breach failure.  Despite enormous forces from the water loads and a lateral displacement of up to 167 ft landward from its initial position and a rotation of up to 90 degrees, the sheet pile wall never separated.  There are many locations where the photo shows that the concrete portion of the I-Wall failed in tension and some segments have no concrete remaining at all.  Failure of the concrete in these areas most likely occurred due to plastic elongation of the sheeting that fractured the concrete as discussed in Section 5.  The fully deformed length is approximate 944 ft compared to the original length of 820 ft so 124 ft of plastic deformation occurred. Gaps up to a few feet wide may have developed, allowing water to gush through and accelerating the scour.

April 25, 2012



**Figure 6-16 Scaled dimensions of the South Breach.**