# EXHIBIT 15

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   CIVIL ACTION
CONSOLIDATED LITIGATION         NO. 05-4182 K2
                                JUDGE DUVAL
PERTAINS TO MRGO                MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
    05-6314, 05-6324, 05-6327, 05-6359,
    06-0225, 06-0886, 06-1885, 06-2152,
    06-2278, 06-2287, 06-2824, 06-4024,
    06-4065, 06-4066, 06-4389, 06-4634,
    06-4931, 06-5032, 06-5155, 06-5159,
    06-5156, 06-5162, 06-5260, 06-5771,
    06-5786, 06-5937, 07-0206, 07-0621,
    07-1073, 07-1271, 07-1285
              * * *
          (V O L U M E  I)
    Deposition of ROBERT G. BEA, PH.D.,
given at the offices of Stone Pigman Walther
Wittmann, LLC, 546 Carondelet Street, New
Orleans, Louisiana 70130, on March 27th, 2012.
REPORTED BY:
    JOSEPH A. FAIRBANKS, JR., CCR, RPR
    CERTIFIED COURT REPORTER #75005

Page 2

1  APPEARANCES:
2  REPRESENTING THE PLAINTIFFS:
3      BRUNO & BRUNO
4      (BY:  JOSEPH M. BRUNO, ESQUIRE)
5      855 Baronne Street
6      New Orleans, Louisiana 70113
7      504-525-1335
8  - AND -
9      DOMENGEAUX, WRIGHT, ROY & EDWARDS
10     (BY:  ELWOOD C. STEVENS, JR., ESQUIRE)
11     556 Jefferson Street, Suite 500
12     Lafayette, Louisiana 70501
13     337-233-3033
14
15 REPRESENTING THE UNITED STATES OF AMERICA:
16     U.S. DEPARTMENT OF JUSTICE
17     (BY:  ROBIN DOYLE SMITH, ESQUIRE)
18     (BY:  RUPERT MITSCH, ESQUIRE)
19     (BY:  JACK WOODCOCK, ESQUIRE)
20     Torts Branch, Civil Division
21     P.O. Box 888
22     Benjamin Franklin Station
23     Washington, D.C. 20044
24     202-616-4289
25

Page 3

1  REPRESENTING WASHINGTON GROUP INTERNATIONAL,
2      INC.:
3      JONES DAY
4      (BY:  DEBRA S. CLAYMAN, ESQUIRE)
5      (BY:  ADRIAN WAGER-ZITO, ESQUIRE)
6      (BY:  CHRISTOPHER N. THATCH, ESQUIRE)
7      51 Louisiana Avenue, N.W.
8      Washington, D.C. 20001-2113
9      202-879-4645
10 - and -
11     STONE PIGMAN WALTHER WITTMANN, L.L.C.
12     (BY:  WILLIAM D. TREEBY, ESQUIRE)
13     546 Carondelet Street
14     New Orleans, Louisiana 70130
15     504-581-3200
16
17 ALSO PRESENT:
18     FRANCISCO SILVA-TULLA
19     TIMOTHY STARK
20     TOM BRANDON
21
22 VIDEOGRAPHER:  GILLEY DELORIMIER (DEPO-VUE)
23
24
25

Page 4

1       E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:                      PAGE
4  MR. TREEBY  ...............................7
5
6       E X H I B I T   I N D E X
7
8  EXHIBIT NO.                          PAGE
9  Bea Exhibit 1 ..............................10
10 Bea Exhibit 2 ..............................72
11 Bea Exhibit 3 ..............................78
12 Bea Exhibit 4 ..............................86
13 Bea Exhibit 5 ..............................98
14 Bea Exhibit 5A .............................99
15 Bea Exhibit 6 ..............................127
16 Bea Exhibit 7 ..............................132
17 Bea Exhibit 8 ..............................136
18 Bea Exhibit 9 ..............................154
19 Bea Exhibit 10 .............................157
20 Bea Exhibit 11 .............................170
21 Bea Exhibit 12 .............................173
22 Bea Exhibit 13 .............................177
23 Bea Exhibit 14 .............................180
24 Bea Exhibit 15 .............................203
25 Bea Exhibit 16 .............................219

Page 161

1  10 to the -7 centimeters per second.
2      Is that right?
3      A.  That's correct.
4      Q.  But then, I don't know if we have this
5  page -- I don't have it.  Oh, on Exhibit 9,
6  which if you will turn back to that, which I
7  think we've already identified somewhere --
8      MR. STEVENS:
9          That's the declaration.
10  EXAMINATION BY MR. TREEBY:
11      Q.  Yes.  The declaration to the Court on
12  behalf of the plaintiffs in Robinson.  That's
13  what it is.
14          If you would turn to the last page of
15  this excerpted section, Paragraph 182 --
16      A.  Yes.
17      Q.  -- I'll just read it.  It says, The
18  defense experts correctly observed that in my
19  July 2008 expert report I presented detailed
20  results that referenced the seepage results
21  associated with a best estimate, free-field, in
22  situ horizontal permeability of 10 to the -3
23  centimeters per second.  Is that right?
24      A.  That's correct.
25      Q.  And if you would turn back two pages

Page 162

1  in this excerpt, Bea Exhibit 9, to Page 121,
2  the last sentence, we may have already read
3  this -- well, it reads:  However, the analyses
4  indicated hydraulic uplift pressure developed
5  under the relatively less permeable levee soils
6  were relatively insensitive to the range in
7  horizontal permeability analyzed, which was 10
8  to the -3 to 10 to the -5 centimeters per
9  second.
10      MR. STEVENS:
11          Yes, you have read it.
12  EXAMINATION BY MR. TREEBY:
13      Q.  And then on Page 123 --
14      MR. TREEBY:
15          Thank you, Elwood.
16  EXAMINATION BY MR. TREEBY:
17      Q.  On Page 123, Paragraph 170, in the
18  middle of that paragraph, there's a line that
19  begins, e.g., Table 6.
20          Do you see that?
21      A.  Yes, sir.
22      Q.  There's a sentence, and it's all
23  underlined, this whole sentence:  The most
24  regrettable element in the fog created by
25  Dr. Mosher in his December 2008 expert report

Page 163

1  is that he fails to recognize that we have
2  found that the important hydraulic uplift
3  pressures are virtually independent of the
4  permeability values assigned to the marsh and
5  swamp layers.
6      Is that right?
7      A.  You read that correctly.
8      Q.  But now, after all of this what I'll
9  call changes in opinions, having more
10  information, you come to the position that you
11  essentially agree with IPET on the permeability
12  value for the so-called marsh layer.  Isn't
13  that correct?
14      A.  What value?
15      Q.  10 to the -5.
16      A.  Correct.
17      Q.  So 10 to the -5 centimeters per second
18  is now your best judgment estimate, right?
19      A.  For the swamp-marsh deposits, correct.
20      Q.  So you've gone from estimates as high
21  as 10 to the -2, up to, now, 10 to the -5, as
22  your best estimate.  Is that fair?
23      A.  That's not fair.  I did not make the
24  10 to the -2 estimate personally.
25      Q.  Who did it?  It was in ILIT.

Page 164

1      A.  At that point in time, um -- Professor
2  Ray Seed, Jon Bray, Juan Pestana were
3  evaluating those characteristics.  They made
4  that estimate.
5      Q.  So if Dr. Rogers said he made that
6  estimate, he's not telling the truth?
7      A.  No.  If Dr. Rogers said he made that
8  estimate, or helped them make the estimate,
9  he's telling the truth.
10      Q.  And he said, in deposition, ten days
11  ago or so, that the basis for it were some
12  tests on the 17th Street Canal.
13          Does that surprise you?
14      A.  No.
15      Q.  You are aware, aren't you, that your
16  estimate of compressibility is inconsistent
17  with the compressibility value reported by
18  Dr. Rogers and calculated by his colleague
19  Kevin Pope; am I right?
20      A.  In our, um -- hydraulic conductivity
21  analyses, we have consistently used a
22  compressibility that is very, very low, meaning
23  the, um -- a hydraulic conductivity analyses
24  that we are performing are identified as those
25  appropriate for steady flow conditions.  The

Page 209

At the south breach, we identified two nearby excavations, excavation activity associated with grid trenching, road removal, and utility line removal, that were excavations important in the causation of the south breach.

As you move from those nearby excavations, we move toward the Industrial Canal, and that's what I was referring to as the contributing effects of poorly backfilled excavation as you move westward.

Q. I followed you up until the last sentence. And let me read it to you, and you make sense of it if you would. As you move from those nearby excavations, the ones you've described at the north breach and the south breach, we move toward the Industrial Canal and that's what I was referring to as the contributing effects of poorly backfilled excavation as you move westward.

A. I'm sorry for the bad description. What I'm attempting to describe is there are multiple excavations that enter the picture of hydraulic pressure conductivity to the protected side. The most important ones are close. They're the major contributors to that

Page 210

hydraulic pressure effect.

As you move toward the Industrial Canal, there are different kinds of excavations, with different kinds of backfill, and it's those backfilled with porous materials, be it chunks of clay not compacted at all, or river sands that are put into the excavations that are the next contributors.

Q. Can you be more specific about what this next section of excavations you're talking about, those -- you say as you move toward the Industrial Canal, there are different kinds of excavations with different kind of backfill, and it's those backfilled with porous materials. Okay. Let's stop there. Where are they? Tell us what they are.

A. Well, if we start at the canal edge, the 1500 -- I've forgotten the exact number of the piles that were withdrawn -- they, to our knowledge, were not backfilled. They got surface materials over the top. We could find in the record, which is incomplete, no evidence of any backfilling.

As you move progressively toward the

Page 211

floodwall, through such things as the contaminated soil areas that were removed on the Saucer Marine site, those, again, as we can trace the record, were backfilled with sands. Because the soils that were removed were polluted, they had to be trucked off the site.

As you move further to the wall, other excavations that we associated with grid trenching, road removal, are the next ones of concern.

Q. And you've talked about those earlier. Okay.

A. Yes, sir.

Q. Describe your work, if you will, in evaluating the locations and sizes of excavations in the East Bank Industrial Area and the type of backfill used.

First, who performed the work?

A. I'll describe that as I answer your question. The work was done in, um -- two phases. The first phase of work was done principally by Chad Morris and myself, assisted by Mr. Scott Joanen. This is a phase in which we are working with sequential aerial photography, sequential ground photography, and

Page 212

the pictures that were provided in the boxes I referred to of, um -- of the East Bank Industrial Area site clearing operations, including backfill.

The identification of critical areas to the north breach, south breach, and near breach between the two that we discussed earlier, are documented in my expert reports, in the coauthored appendix by Chad Morris and myself.

Phase II: Phase II is now -- we have, of course, the results from Phase I, aerial photography, ground photography, the pictures from Washington Group International as they went through the site clearing operations.

Now, we've got an avalanche of new information on details of soil removal associated with contaminated soils, removal operations associated with removing buildings, particularly Building 6A adjacent to the north breach, and then a multitude of details associated with the grid trenching operations.

In Phase II, that work falls to Dave Rogers, Rune Storesund, Bob Bea. We are assisted in the mountain of information

Page 213

1  correlation by Mr. Chris Yount and Mr. Andy
2  Owen.
3      Q.  Has all of the work that you've just
4  described been provided in your matters
5  considered?
6      A.  No.
7      Q.  What has not been provided in your
8  matters considered that you just referred to as
9  the work you did to evaluate the locations and
10 sizes of excavations and types of backfill
11 used?
12     A.  Well, one of the things that we did
13 not have the opportunity to provide at the time
14 I had to provide my expert report, February the
15 1st, we wanted to develop a detailed mapping of
16 the excavations on the East Bank Industrial
17 Area.  I have continued that work, and it will
18 be a part of my rebuttal report that you will
19 receive on April 3rd.
20     Q.  That will, then, be all your matters
21 considered?
22     A.  Yes.  For this topic.
23     Q.  In Paragraph 29, you refer to Figure 1
24 of your report.  Right?
25     A.  Yes, sir.

Page 214

1      Q.  Turn to Figure 1 on Page 20.
2      A.  Yes, sir.
3      Q.  Are you suggesting by Figure 1 there
4  is a connection between the backfill activities
5  shown in the photograph in the lower left-hand
6  corner and the breach shown in the photograph
7  in the lower right-hand corner, Figure 1?
8      A.  Yes.
9      Q.  In the photo the dozer on the left
10 side of the page, part of your evidence of
11 high -- excuse me.  Is the photo of the dozer
12 on the left side of the page part of your
13 evidence of high permeability materials being
14 used in, quote, nearby, close quote,
15 excavations?
16     A.  Yes, sir.
17     Q.  What evidence do you have as to the
18 location of the dozer work at the bottom
19 left-hand corner of Figure 1?
20     A.  Um -- the dozer work shown here is
21 obviously close to the Florida Avenue bridge,
22 which is shown in the background.  My
23 recollection is the captioned photographs
24 provided by WGI connect this area to the area I
25 previously referred to as Area 1.  This is the

Page 215

1  area out toward the Industrial Canal.  It then
2  ties to the next area, which is shown in the
3  photograph to the right.  This is the
4  backfilled area that we traced to the west side
5  of Surekote Road.  That then connects to the
6  Surekote Road sand shell fill, which then abuts
7  to the levee floodwall at the north breach.
8          These figures are intended to be
9  illustrative and by no means attribute
10 precision to this illustrative figure.
11     Q.  Okay.  You've described Area 1.  Let's
12 go there.  I think you have a map that shows
13 where Area 1 is.  It's in Appendix B, Page 9 of
14 your report.  Keep your finger back, though, at
15 Figure 1.
16     A.  Will do.  Please give me the --
17     Q.  Page 9, Figure 5A.
18         Are you there?
19     A.  Yes.
20     Q.  Area 1, near the bank, near the
21 Industrial Canal, the north end of Boland.
22 Right?
23     A.  Yes.
24     Q.  And that's what you're saying that
25 picture with the dozer is showing.

Page 216

1      A.  I think so.  That's why I said, um --
2      Q.  And you say you base that on WGI's
3  caption on the photo.  We're going to talk a
4  lot about WGI's caption on photos, but that's
5  what you say that represents, right?
6      A.  That's what I'm representing or
7  attempting to represent in this illustrative
8  figure.
9      Q.  Did somebody else provide you that
10 information, or did you come up with it on your
11 own?
12     A.  Which information?
13     Q.  The information about what was on the
14 caption of that photograph.
15     A.  In the original photographs that we
16 obtained, the captions were a part of the
17 photograph.
18     Q.  Right.  I understand that.  I'm asking
19 who on your team, was it you, personally, or
20 someone else, that you recall telling you that
21 this was Area 1?
22     A.  Which phase?  I explained to you that
23 there were two phases.
24     Q.  No.  Let's stick with our questions,
25 here.  You have just told us that your Figure

```
                                  Page 241
 1        Answer:  Correct.
 2        Question:  You're referring to the
 3   project to replace the ship lock at the
 4   Industrial Canal?  Is that correct?
 5        Answer:  That is correct.
 6        Question:  Can you describe what your
 7   position was when you were working on that
 8   project?
 9        Answer:  I was the senior project
10   manager for the project.  The overall manager.
11        Do you see that?
12     A.  Yes.
13     Q.  Page 30 in the deposition.  Tell me
14   when you're there.
15     A.  I'm there.
16     Q.  On Line 15.  Beginning on Line 15.
17        Question:  Now, you're aware that
18   there's a levee floodwall, hurricane protection
19   structure located to the east of the east bank
20   between that east bank area that you just
21   described as the location for the bypass
22   channel and the Lower Ninth Ward.
23        Answer:  Right.
24        Question:  Now, when the Corps was
25   developing this proposal to dredge the bypass
```

```
                                  Page 242
 1   channel at this east bank location, how did the
 2   location of that levee floodwall protection
 3   system factor into the facility?
 4        Answer:  It limited the size of that
 5   bypass channel because we couldn't violate the
 6   stability of the levee and the floodwall along
 7   the east side.  So that was the governing
 8   factor.  That was determined where the levee
 9   stability line was, then we tried to fit a
10   bypass channel to not go into that levee
11   stability line.
12        Question:  Okay.  Now you're
13   describing levee stability line.  Did the
14   geotechnical engineers at the Corps --
15        Answer:  Yes.
16        Question:  -- develop that levee
17   stability line?
18        Answer:  Yes.
19        Question:  And do you know if the
20   geotechnical branch in the engineering division
21   did an analysis to determine that the dredging
22   of the bypass channel at that location would
23   not affect the levee?
24        Answer:  I'm sure they did, yes.
25        And you have no evidence, I would
```

```
                                  Page 243
 1   assume, to refute Dicharry 's testimony.  Isn't
 2   that true?
 3     A.  True.
 4     Q.  And to continue with his testimony, on
 5   Line 23, Page 31, and the Corps --
 6        Question:  And the Corps ultimately
 7   determined that dredging the bypass channel
 8   would not have an effect.
 9        Answer:  That's correct.  We also had
10   to make sure, you know, when we build the new
11   floodwalls and levee on the east side, that
12   they wouldn't be violated by the bypass
13   channel, also.
14        (Off the record.)
15   EXAMINATION BY MR. TREEBY:
16     Q.  Have you seen any evidence to suggest
17   that Washington Group International had any
18   responsibility under Task Order 26 for
19   evaluating the impact of the proposed bypass
20   channel on the levee 's floodwalls in the East
21   Bank Industrial Area?
22     A.  No, I have not.
23     Q.  If you would turn to Page 45,
24   Paragraph 47 of your report.  Do you see that
25   paragraph?
```

```
                                  Page 244
 1     A.  Yes, sir.
 2     Q.  In that paragraph, if you would look
 3   down six lines -- well, before that, I assume
 4   you've looked at this sufficiently, you know
 5   that this paragraph deals with the borrow pit.
 6     A.  Correct.
 7     Q.  Which you described as being adjacent
 8   to what you call in your report the near breach
 9   site?
10     A.  Correct.
11     Q.  Okay.  The sentence beginning on that
12   line states that this location was chosen
13   because the extensive coring of the area
14   performed by Washington Group International had
15   identified the predominantly cohesive clayey
16   soils in this area.
17        Is that what you say?
18     A.  Yes.
19     Q.  And you cite to what you described as
20   WGI 2005A.  Is that right?
21     A.  Yes.
22     Q.  I show you a document we're marking
23   Bea Exhibit 20, which is the document you're
24   referring to there.  Is it not?
25        (Bea Exhibit 20 was marked for
```

Page 245

1   identification and is attached hereto.)
2   EXAMINATION BY MR. TREEBY:
3       Q.  You can find the citation on Page --
4       A.  Right.  I checked the citation.
5       Q.  You agree.  Okay.
6           This is Washington Group's technical
7   completion report.  It has a longer title, but
8   those are the first words on the report.
9           That's what you cite.  Show me, in
10  particular, in this document, where the
11  technical completion report states that the
12  borrow pit location was chosen because the area
13  was made up of cohesive clayey soils.
14          And just to help you, Page 19 of the
15  completion report refers to the borrow pit,
16  although you're free to look anywhere you want
17  in the document.
18      A.  19.
19      Q.  No, 19 in the completion report.  I'm
20  sorry.  You'll see there are page numbers at
21  the very bottom, which is, I'm sure, what you
22  were seeing, since they were big and bold.
23  Then there are page numbers up above that to
24  the right on the text pages.
25      A.  Yes, sir.

Page 246

1       Q.  Yeah.  That Page 19, the smaller
2   Page 19 number.
3       A.  Mine has 19 on the same page.
4       Q.  No.  It's page 35 at the bottom.  We
5   need t go by that number.  I think that will
6   help us.
7       A.  Yes, sir.
8       Q.  Okay.  This deals with the borrow pit.
9   But again you can look anywhere else you want
10  to.
11          You cited this report for the
12  proposition that I read, that it was chosen
13  because of the extensive coring performed by
14  Washington Group and had identified the
15  predominantly cohesive clayey soils in this
16  area.  That's what you cited.
17      A.  Yes.
18      Q.  This is what refers to borrow pit,
19  although you're free to look at anything else
20  in this document.  So I want to know where you
21  got that idea.
22      A.  Well, it says, at the top of Page 35,
23  With receipt of sample test results indicating
24  the entire excavation had reached clean soils,
25  backfilling operations commenced.

Page 247

1           I then made a connection, and here I'm
2   referring to backfill material, in the
3   remainder of that paragraph, to the WGI report
4   on the coring performed in this area, and it
5   had identified a predominantly, um -- fat clays
6   in the cores.
7       Q.  But what you say in your report, that
8   the reason it was chosen was because of that.
9       A.  Yes.
10      Q.  Where in this report does it say
11  that's why it was chosen?
12      A.  Well, this report is saying that the
13  site is going to be used as backfill material.
14      Q.  It does say that.  But where does it
15  say the reason it was chosen for backfill was
16  because Washington Group had identified this as
17  cohesive clayey soils?  In other words, that
18  connection you're making, you're just -- am I
19  correct you just made that assumption?
20      A.  No, I don't --
21      Q.  Okay.  Where does it --
22      A.  I don't make assumptions.
23      Q.  Well, this is a statement of fact
24  about why an action was taken.  Okay?
25          Is there anything you can show us in

Page 248

1   this report that says that's why this site was
2   selected?
3       A.  I'd have to review the entire report
4   in order to respond to your question.
5       Q.  Okay.  And you're free to do that.
6   And I don't think we want you to read --
7   anybody really wanties you to sit here and read
8   through it.  I can tell you, we've looked at
9   it.  That's not there.
10      A.  Okay.
11      Q.  And let me get you to turn to the next
12  page.  I'm sorry, it's a different question.
13          Now, you're free to rebut me, but I'm
14  telling you we've looked for it, that's not
15  what we find.
16      A.  And what do you want me to do?
17      Q.  If you stand by that, we're going to
18  prove that that's not what happened.  So if you
19  want to stand by it, I would suggest you might
20  find that reference, because you cited the
21  document.
22          But let me show you a document that
23  shows the real reason it was selected.
24      A.  Go.
25      Q.  Which we will mark Bea Exhibit 21.

Page 269

1  So I'm referring to the overlapping relative to
2  that east-west, north-south location.
3      Q.  If you look at the double line which
4  describes the borrow pit boundary -- do you see
5  that?
6      A.  Yes.
7      Q.  Do you see its easternmost extent?
8      A.  Yes.
9      Q.  Is it not true there is a space
10 between both Area 1 and Area 2 and the borrow
11 pit?
12     A.  Yes.
13     Q.  They're not in the same footprint.
14     A.  I explained what I meant by footprint.
15     Q.  Okay.  If I call the footprint the
16 boundary, the borrow pit boundary, it's not
17 within the borrow pit boundary, is it?
18     A.  That's correct.
19     Q.  Okay.  So in Paragraph 47 of your
20 report, when you say that clay was placed on
21 the eastern wall of the borrow pit -- you see
22 that?
23     A.  Not yet.
24     Q.  Just before citing to Figure 25.
25     A.  Yes, sir.

Page 270

1      Q.  And you refer to Figure 25.  You were,
2  in fact, referring to the eastern wall of Area
3  1.
4      A.  That is correct.
5      Q.  Not the borrow pit.
6      A.  That is correct.
7      Q.  Keep looking at the advice from the
8  geotechnical engineering branch, if you will,
9  which is Exhibit Bea Exhibit 23.
10         Does this advice include anything
11 about placing clay on the eastern wall of the
12 borrow pit to prevent seepage?
13     A.  No.
14     Q.  If seepage from the borrow pit was a
15 legitimate concern, wouldn't you have expected
16 the Army Corps's geotechnical branch to
17 mention it when conducting a stability analysis
18 for the proposed borrow pit extension to the
19 east?
20     A.  It would be, in the context of that
21 term, a part of a stability analysis.
22     Q.  My question is, if there was a -- you
23 formerly said you deduced that there was a
24 concern.
25         If there was a concern, wouldn't you

Page 271

1  expect it to be expressed here?
2      A.  Not necessarily.  It could be
3  expressed in a term called stability.  They
4  knew they were going to flood the borrow pit.
5  They were going to bring water from the
6  Industrial Canal to the eastern side.  They
7  were, in my opinion, demonstrating care for how
8  they constructed the borrow pit so that they
9  did not endanger the stability of the adjacent
10 floodwall.
11     Q.  Okay.  Putting aside Figure 25, which
12 we've dealt with, do you have any evidence that
13 clay was placed on the eastern wall of the
14 borrow pit?
15     A.  An example of the best evidence is in
16 Figure 26 where they're addressing the slope
17 that we previously referred to as the double
18 line with clay from the borrow pit.  The piles
19 of soil to the right are soils that they are
20 draining prior to that loader loading those
21 soils into the truck for transport elsewhere.
22     Q.  Okay.  Let's pursue that.
23         The next sentence of Paragraph 47, you
24 state, the other walls of the borrow pit were
25 dressed with clays obtained from the borrow

Page 272

1  pit, and you reference Figure 26 as support for
2  that statement.  Right?
3      A.  Correct.
4      Q.  And your caption for Figure 26 says,
5  Dressing the walls of excavations for soil
6  borrow pit adjacent to floodwall with clays.
7  Right?
8      A.  Yes.
9      Q.  Okay.  I show you a document we're
10 going to mark as Bea 24, which is that same
11 photo, is it not, that you -- at the bottom,
12 it's the same photo that you used; is that
13 right?
14         (Bea Exhibit 24 was marked for
15 identification and is attached hereto.)
16     A.  That's correct.
17 EXAMINATION BY MR. TREEBY:
18     Q.  And this contemporaneous photo caption
19 says, reworked slope, east side southeast
20 borrow pit.
21     A.  Yes.
22     Q.  It doesn't say anything about lining
23 it with clay, does it?
24     A.  Well, the borrow pit is made from
25 clay.  And so they're reworking that slope and

Page 273

1  dressing it with clay.
2      Q.  Your caption and your description
3  would indicate that they intentionally selected
4  clay to dress the east side; isn't that fair?
5      A.  No.  It's not fair.
6      Q.  Oh.  Okay.
7      A.  I used the term dressing.  So they're
8  using materials from the borrow pit itself to
9  dress the slope.  That's the intent of that
10 caption.
11     Q.  This caption that was contemporaneous
12 would in fact be evidence that the slope was
13 being dressed to comply with the geotechnical
14 engineering branch 's instruction as to the
15 slope; isn't that correct?
16         I would request that you ask me to
17 repeat the question, because otherwise it takes
18 too much time.  Because he can't -- you can't
19 sometimes translate what he puts in.
20     A.  Thank you.  Please do.
21     Q.  Okay.  I'll repeat the question.
22         This contemporaneous caption is
23 evidence that the slope was being dressed to
24 comply with the geotechnical engineering
25 branch 's instruction as to slope; isn't that

Page 274

1  correct?
2      A.  That's correct.
3      Q.  Why did you remove Washington Group 's
4  photo caption when you put this photo in your
5  report?
6      A.  I don't recall.
7      Q.  Why did you intentionally leave out
8  many captions on many photos?
9      A.  One reason was I was trying to save
10 space, initially.  Once I discovered that
11 saving space was not constructive, I went back,
12 as thoroughly as I could, reexposing the
13 captions.
14     Q.  I show you a document we're marking
15 Bea Exhibit 25, which is QAR number 397.  And
16 it has a Bates number that it that ends in
17 2323.
18         Do you recognize this document?
19         (Bea Exhibit 25 was marked for
20 identification and is attached hereto.)
21     A.  I recall seeing parts of this
22 document.  And if I saw parts, I must have seen
23 the document.  And my memory is not capturing,
24 apparently, the parts that I don't recall.
25 EXAMINATION BY MR. TREEBY:

Page 275

1      Q.  Okay. this is dated July 2, 2002;
2  right?
3      A.  Yes.
4      Q.  And it's the same date as the photo
5  we've just talked about that had the caption
6  removed.  Is that right?
7      A.  Yes.
8      Q.  And look at, under follow-up site
9  work, on the second page of this document, it
10 says, Observed PC270 excavating borrow material
11 along the eastern slope of southeast pit at
12 McDonough Marine.  Assured that the eastern
13 slope of the pit shaped according to design
14 template.
15         You see that?
16     A.  Yes, sir.
17     Q.  So the contractors were removing
18 material from the slope to use for fill, then
19 they reshaped the slope to conform with the
20 design template for the borrow pit just as the
21 caption for the photo in Figure 26 describes.
22         Isn't that right?
23     A.  Correct.
24     Q.  Do you see any reference to dressing
25 the walls of the borrow pit with clay in this

Page 276

1  QAR?
2      A.  In the parts I have read rapidly, I
3  can't say.
4      Q.  Do you see any evidence in this QAR
5  the contractors reshaped the walls of the
6  borrow pit because of concerns for seepage?
7      A.  No, I can't say if I do or I don't.
8         MR. TREEBY:
9              I think we better end, because
10         the tape is ending.
11         (Off the record.)
12         MR. TREEBY:
13             On the record, if you will, would
14         you confirm that Tom Sims told you
15         that Diego Cobos-Roa provided that
16         description that we've discussed
17         before as to the compressibility that
18         was used on the input models?
19         MR. STEVENS:
20             That is correct.
21         MR. TREEBY:
22             Thank you.
23         (Recessed for the day.)
24
25