# EXHIBIT 21

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
                                 JUDGE DUVAL
PERTAINS TO MRGO                 MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
    05-6314, 05-6324, 05-6327, 05-6359,
    06-0225, 06-0886, 06-1885, 06-2152,
    06-2278, 06-2287, 06-2824, 06-4024,
    06-4065, 06-4066, 06-4389, 06-4634,
    06-4931, 06-5032, 06-5155, 06-5159,
    06-5156, 06-5162, 06-5260, 06-5771,
    06-5786, 06-5937, 07-0206, 07-0621,
    07-1073, 07-1271, 07-1285
            * * *
        (V O L U M E  II)
    Deposition of ROBERT G. BEA, PH.D.,
given at the offices of Stone Pigman Walther
Wittmann, LLC, 546 Carondelet Street, New
Orleans, Louisiana 70130, on March 28th, 2012.
REPORTED BY:
    JOSEPH A. FAIRBANKS, JR., CCR, RPR
    CERTIFIED COURT REPORTER #75005

Page 2

1   APPEARANCES:
2   REPRESENTING THE PLAINTIFFS:
3       BRUNO & BRUNO
4       (BY:  JOSEPH M. BRUNO, ESQUIRE)
5       (BY:  SCOTT JOANEN, ESQUIRE)
6       855 Baronne Street
7       New Orleans, Louisiana 70113
8       504-525-1335
9   - AND -
10      DOMENGEAUX, WRIGHT, ROY & EDWARDS
11      (BY:  ELWOOD C. STEVENS, JR., ESQUIRE)
12      556 Jefferson Street, Suite 500
13      Lafayette, Louisiana 70501
14      337-233-3033
15
16  REPRESENTING THE UNITED STATES OF AMERICA:
17      U.S. DEPARTMENT OF JUSTICE
18      (BY:  ROBIN DOYLE SMITH, ESQUIRE)
19      (BY:  RUPERT MITSCH, ESQUIRE)
20      (BY:  JACK WOODCOCK, ESQUIRE)
21      Torts Branch, Civil Division
22      P.O. Box 888
23      Benjamin Franklin Station
24      Washington, D.C. 20044
25      202-616-4289

Page 3

1   REPRESENTING WASHINGTON GROUP INTERNATIONAL,
2       INC.:
3       JONES DAY
4       (BY:  DEBRA S. CLAYMAN, ESQUIRE)
5       (BY:  ADRIAN WAGER-ZITO, ESQUIRE)
6       (BY:  CHRISTOPHER N. THATCH, ESQUIRE)
7       51 Louisiana Avenue, N.W.
8       Washington, D.C. 20001-2113
9       202-879-4645
10  - and -
11      STONE PIGMAN WALTHER WITTMANN, L.L.C.
12      (BY:  WILLIAM D. TREEBY, ESQUIRE)
13      546 Carondelet Street
14      New Orleans, Louisiana 70130
15      504-581-3200
16
17  ALSO PRESENT:
18      FRANCISCO SILVA-TULLA
19      TIMOTHY STARK
20      TOM BRANDON
21
22  VIDEOGRAPHER:  GILLEY DELORIMIER (DEPO-VUE)
23
24
25

Page 4

        E X A M I N A T I O N   I N D E X

EXAMINATION BY:                         PAGE
MR. TREEBY  ................................8
MR. SMITH   ..............................171

        E X H I B I T   I N D E X
EXHIBIT NO.                             PAGE
Bea Exhibit 26 .............................8
Bea Exhibit 27 ............................21
Bea Exhibit 28 ............................22
Bea Exhibit 29 ............................25
Bea Exhibit 30 ............................30
Bea Exhibit 31 ............................31
Bea Exhibit 32 ............................34
Bea Exhibit 33 ............................45
Bea Exhibit 34 ............................84
Bea Exhibit 35 ............................85
Bea Exhibit 36 ............................90
Bea Exhibit 37 ............................96
Bea Exhibit 38 ...........................126
Bea Exhibit 40 ...........................155
Bea Exhibit 41 ...........................246
Bea Exhibit 42 ...........................267
Bea Exhibit 43 ...........................276

Page 105

1  Boland --
2      Q.  I understand.
3      A.  -- and that date is 2001.
4      Q.  Other than that, my question was, do
5  you have any evidence, other than the aerial
6  photograph and these borings that were done
7  before any excavations at Boland Marine, do you
8  have any evidence that Washington Group
9  backfilled at Boland Marine with sand?
10     A.  We were looking at those photographs
11 earlier.
12     Q.  You're talking about the photograph on
13 Page 12 of Appendix B at the top of the page?
14 Is that what you're talking about?
15     A.  No.
16     Q.  No?  That's not what you're talking
17 about?
18     A.  I'm referring to Figure 31, Page 50.
19 And then I'll be glad to.
20     Q.  It's the same picture.
21     A.  Well, if it is, that's great.
22     Q.  Well, it is.
23     A.  Great.
24     Q.  You can't tell from that picture how
25 deep that excavation is; isn't that correct?

Page 106

1      A.  I'm only observing the backfilling
2  with the river sands.
3      Q.  I understand.  You can't tell how deep
4  that is, can you?
5      A.  How deep what is that?
6      Q.  The excavation shown in the picture.
7      A.  No, I cannot.
8      Q.  Thank you.  And you can't tell the
9  dimensions of the excavation from this picture,
10 can you?
11     A.  No.
12     Q.  If you would, go to Page 80 of your
13 report.
14     A.  Yes, sir.
15     Q.  Figures 43 and 44, you show conceptual
16 cross-sections for your North Breach Case 1-1
17 and 2-1; is that right?
18     A.  Correct.
19     Q.  Those cross-sections are also shown in
20 Appendix B, Pages 14 through 17, along with
21 cross-sections for North Breach Case 1-2 and
22 2-2; correct?
23     A.  Which figures were --
24     Q.  Appendix B.  I'm just trying to make
25 sure that we're right in equating these

Page 107

1  figures.  If you look at them, Appendix B,
2  Pages 14, 15, 16 and 17 --
3      A.  Figure 14 or pages?
4      Q.  No, Pages 14, 15, 16, 17.
5      A.  Yes, sir.  So we have two figures on
6  Page 80.
7      Q.  Two figures on Page 80.
8      A.  We have four figures that you have
9  just referenced.
10     Q.  Right.  But they are showing --
11 they're showing -- together they're showing
12 your conceptual cross-sections for your North
13 Breach Case 1-1 and 2-1, and then in Appendix
14 B, Case 1-2 and 2-2.  Is that correct?
15     A.  That's correct, sir.
16     Q.  Explain to me how you developed these
17 conceptual cross-sections for North Breach
18 Cases 1-1, 1-2, 2-1 and 2-2.  Just give me just
19 a general description of how -- pithy, if you
20 will -- as to how you developed these
21 conceptual cross-sections.
22     A.  I describe the process in two
23 categories.  One, I've termed inductive; the
24 other I termed deductive.  The inductive was
25 based, at the start, primarily with aerial

Page 108

1  photography taken after Hurricane Katrina, but
2  very carefully after Katrina, before Rita, and
3  ground level photography taken in those time
4  periods, together with the soil boring
5  information that we had available at that time,
6  together with the WGI site clearing photographs
7  that we had available at that time.  That
8  formed the primary database that we then used
9  to determine extents, depths of the features
10 identified here in Case number 1-1 and Case
11 number 1-2.
12         The difference between 1-1 and 1-2 is
13 then addressing another factor I introduced in
14 my report was how we were dealing with
15 uncertainties in these profiles.  So they're
16 representing our best estimates of the
17 potential contacts between the excavations and
18 the buried swamp-marsh deposits.
19         The Case 2 series were developed using
20 deductive methods.  Here's where, in that
21 phase, we have a greatly improved but still
22 incomplete record of the excavation activity.
23 So, we started with those records, brought in
24 the soil boring information that I referred to.
25 There was some work with ground level

Page 109

1    photography provided by WGI, and that became
2    the primary source of the Case 2
3    cross-sections.
4         And we had two sub-cases representing
5    the uncertainty associated with the contact of
6    the -- with the buried swamp-marsh deposits.
7    Q.  Okay.  Thank you for that explanation.
8    It was important.  I don't want to repeat it, I
9    just want to go from there.  Okay?
10        In your cross-sections for the North
11   Breach Case 1-1 which is on Page 80, Figure 43,
12   and 1-2 which is on Page 15 of Appendix B --
13   and you're going to need to keep your fingers
14   in Appendix B, Pages 14 through 17.  I didn't
15   write it your this way, you did, so it's your
16   responsibility to keep your fingers in the
17   right place.  Okay?
18   A.  I'll mark them.
19   Q.  Okay.  That's Case 1-2, right, on Page
20   15, Figure 11, Appendix B?
21   A.  The North Breach Case 1-2 is on Page
22   15, and it's Figure 11, North Breach Case 1-2.
23   Q.  That's what I think I just said.
24   Okay.
25   A.  Yes, sir.

Page 110

1    Q.  You show in both those cases a
2    backfilled excavation.  You see that?
3    A.  Yes.
4    Q.  You describe it as a deep backfilled
5    rectangular excavation located approximately 60
6    feet from the sheet pile.  Do you see that?
7    A.  Yes.
8    Q.  You also say the excavation was
9    25 feet wide, 100 feet long, and approximately
10   10 feet deep.  Do you see that?
11   A.  Yes.
12   Q.  Now, if you turn to Figure 43 of your
13   report, this cross-section appears to show a
14   conceptual backfilled excavation that is deeper
15   than 10 feet from ground surface, maybe closer
16   to 15 to 17 feet from ground surface.
17        So are you intending to represent
18   depth in terms of some reference datum, or are
19   you intending to describe depth from ground
20   surface?
21   A.  The depth referenced for the 10 feet
22   is based on analysis of the ground level
23   photography following Katrina and prior to
24   Rita, and it's referring to that ground surface
25   elevation.  The shallow or surface materials

Page 111

1    had been removed during the inflow and outflow.
2    Q.  So if I understand your answer
3    correctly, it would show, if there was any
4    validity to your conceptual excavation, before
5    Katrina, you would -- this excavation, to have
6    backfill to that depth, would have had to have
7    been a hole dug 15 to 17 deep, right?
8    A.  That figure sounds correct.
9    Q.  Okay.
10   A.  And that's what the cross-section, I
11   think, shows.
12   Q.  That's what your conceptual
13   cross-section shows; right?
14   A.  Yes, sir.
15   Q.  Okay.  Isn't it true you don't know
16   what was -- back up.
17        An excavation requires removal of
18   something; right?
19   A.  Correct.
20   Q.  And you don't know what was removed
21   from this conceptual backfilled excavation, if
22   in fact it was ever there, right?
23   A.  I document in my expert report the
24   bases that we could find in the record for that
25   cross-section.

Page 112

1    Q.  When was this excavation performed by
2    Washington Group, if you contend that it was?
3    A.  I can't identify that.  The record is
4    not complete enough for me to be able to do
5    that.
6    Q.  In fact, isn't it true you don't know
7    that Washington Group did such an excavation?
8    Isn't that true?
9    A.  We only know that excavations were
10   done in this area by Washington Group
11   International during the site clearing
12   operations at this location, and I reference
13   the record that we have available to
14   substantiate that assertion.
15   Q.  What excavation do you say Washington
16   Group did at that location?  At that location.
17   Tell me what it is.
18   A.  We identified both grid trenching and
19   fiberoptic cable removing excavations.  That
20   was as close as we could get to connecting the
21   WGI site clearing work and what we observed
22   following Hurricane Katrina and before
23   Hurricane Rita.
24   Q.  You know, you've given me your
25   explanation for how you came up with your

Page 121

```
 1       You got it?
 2   A.  Got it.  Page?
 3   Q.  Page 248.  Now, before I go to my
 4   specific question about Dr. Rogers, he was the
 5   expert -- by the way, did you supervise him?
 6   A.  No.
 7   Q.  Okay.
 8   A.  Only his wife supervises David.
 9   Q.  Well, you knew he was in charge of
10   doing the site characterization for this EBIA
11   site, is that correct?  Among other things.
12   A.  That's incorrect.  He was one of the
13   people.  That's the Phase II work that I was
14   describing.  Phase I is where Chad Morris and
15   myself were working.  The Phase I work
16   placed -- I'm sorry.
17   Q.  Yeah.  I don't want to go back through
18   Phase I, Phase II, Phase III, Phase X.  I want
19   to the ask you about this report in this case.
20       Have you read this report?
21   A.  Yes.  I have.
22   Q.  It's entitled site characterization.
23   A.  That's right.
24   Q.  And that's what it was and that's the
25   expert we've been given who was characterizing
```

Page 122

```
 1   the site.  We also have Chad Morris' report.
 2   A.  That's the reason I --
 3   Q.  Okay.  So he was doing that.  Let me
 4   refer you, if you will, to Page 248, beginning
 5   on Line 19.  Do you see that?
 6   A.  Yes, sir.
 7   Q.  Okay.
 8       Question, by Mr. Mitsch:  Okay.  And
 9   would you go the Page 80 and Figure 43, please.
10       And he's talking about Page 80, Figure
11   43 in your report.
12   A.  Okay.  Let's go there.
13   Q.  Well, you can go there.  You can have
14   it in front of you.  That's fine.
15   A.  Thank you.
16   Q.  That's what we've been talking about.
17       I thought we had an understanding you
18   were going to mark that page.  No.  You've got
19   it now, right?
20   A.  Yes, sir.
21   Q.  Okay.  Figure 43: That's what he's
22   talking about.  Page 80, Figure 43.
23       Question: Okay.  And would you go to
24   Page 80, and Figure 43, please.
25       Answer: Okay.
```

Page 123

```
 1       Is that your understanding of what the
 2   cross-section of the that North Breach was?
 3       Answer: Well, with the exception of
 4   the backfilled excavation -- I don't know what
 5   that particular one is in that case.  But you
 6   see there the semi-contiguous nature of the
 7   sand and the shell coming over to 81-A is what
 8   I was talking about.
 9       Question: Okay.  And so let's just
10   take out that backfill, that box, the
11   backfilled excavation.
12       Answer: Right.  Like you see down
13   below.  This one down below, case 2-1, that was
14   another one of the options I gave him.  He put
15   in the excavations.  I didn't do those.
16       Is that correct?  You put in those
17   excavations.
18   A.  Partially.  That's the work I was
19   referring to as the Phase I work that Chad
20   Morris and myself did.
21       Dr. Rogers did the Phase II work, and
22   that resulted in the Case 2 cross-sections.
23   So, naturally, your questioning of him about
24   Figure 43 would result in the result you got.
25   Dave Rogers did not contribute to Figure 43.
```

Page 124

```
 1   Q.  If you go to Page 95 and 96.
 2   A.  Of what document is, sir?
 3   Q.  Your report, Figures 63 and 64.
 4   A.  Yes, sir.
 5   Q.  This is your Case 1 cross-section --
 6   on Page 95 is your Case 1 cross-section for the
 7   South Breach; right?
 8   A.  Correct, sir.
 9   Q.  And it has a backfilled excavation as
10   well, isn't that right?
11   A.  Correct.
12   Q.  And you describe the excavation as an
13   excavation a the waterside toe.  Isn't that
14   right?
15   A.  Correct.
16   Q.  And by waterside toe, you mean the toe
17   of the levee on the canal side of the Saucer
18   Marine site, is that correct?
19   A.  Correct.
20   Q.  And you also state the backfilled
21   excavation is 20 to 25 feet wide, 50 feet long,
22   and approximately 8 to 10 feet deep.  Is that
23   correct?
24   A.  Correct.
25   Q.  And on Figure 63 of your report, it
```

Page 125

1   appears to show a backfilled excavation almost
2   20 feet deep below pre-Katrina ground surface.
3   Isn't that correct?
4        A.   Are you referring to Figure --
5        Q.   1-1. Case 1-1, Figure 63.
6        A.   Oh. Okay. Yes, sir. Now, repeat
7   your question.
8        Q.   This cross-section appears to show
9   this backfilled excavation almost 20 feet deep
10  below pre-Katrina ground surface; isn't that
11  correct?
12       A.   That's correct. The 8 to 10 feet was
13  being referenced to the ground elevation that
14  remained following Hurricane Katrina and before
15  Hurricane Rita.
16       Q.   I understand that based on your prior
17  long explanation of your -- of how you
18  proceeded here. So I understand that. I'm
19  just talking -- but this -- if this
20  hypothetical backfilled excavation occurred,
21  this would show that it was 20 feet below
22  ground surface when the excavation was done, is
23  that correct?
24       A.   I get approximately 16 feet. And
25  estimating ground surface at that location

Page 126

1   about +6, at the bottom of the elevation, at
2   approximately -10 -- pardon me, -11 to minus
3   12.
4        Q.   So if it's 12, and what did you say
5   the top was, 6?
6        A.   6.
7        Q.   That's 18 feet.
8        A.   Not 20.
9        Q.   If would look at that cross-section in
10  Figure 63, Page 95 -- you there?
11       A.   Yes.
12       Q.   Within the figure, immediately above
13  the alleged backfilled excavation, appears in
14  small print the reference 29A. Do you see
15  that?
16       A.   Yes.
17       Q.   And now I want to show you a document
18  we're marking Bea number 38. And this is --
19  those are selected pages, again, but this time
20  from the Saucer Marine no further action
21  report.
22       Q.   And now I want to show you a document
23  we're marking Bea number 38. And these are
24  selected pages, again, but this time from the
25  Saucer Marine no further action report

Page 127

1        A.   Yes, sir.
2        Q.   And the last page is a map, similar to
3   the one we looked at earlier for Boland.
4        A.   Right.
5        Q.   Do you see 29A on that map?
6        A.   Yes.
7        Q.   And that's the same 29A that you
8   describe in the cross-section on Figure 63,
9   Page 95. Is that right?
10       A.   I'm not sure. I think 29A, in the
11  cross-section, is referring to a soil boring.
12  Given that that is the same 29A I'm looking at
13  in this figure, they should be the same.
14       Q.   Okay. Does this NFAATT -- Bea 38,
15  NFAATT map, shows the excavations, however, on
16  that site, does it not?
17       A.   Yes.
18       Q.   And there is no excavation anywhere
19  near the location that you have this conceptual
20  backfilled excavation on your conceptual
21  cross-sections Figure 63. Isn't that correct?
22       A.   That's correct.
23       Q.   And looking again at Page 22 of that
24  same NFAATT report, Table 2, it shows no
25  excavation -- well, in that table, bore hole

Page 128

1   29A is not listed on that table, is it?
2        A.   No, it isn't.
3        Q.   If you would turn to Figure 64, right
4   across the page there, in your Case --
5        A.   Well, are we through with 38?
6        Q.   For now. I don't know. Never know,
7   but hope so. Moving right along.
8        A.   Yes.
9        Q.   Figure 64, Case 2-1.
10            Now, the cross-section for South
11  Breach Case 2-1 shows an area identified on
12  that conceptual drawing as trenched backfill.
13  Do you see that?
14       A.   Yes, sir.
15       Q.   And the same trenched backfill also
16  appears in the cross-section for South Breach
17  Case 2-2, which is back in Appendix B. Is that
18  right?
19       A.   That's correct.
20       Q.   Do you believe the contractors
21  Washington Group dug such a trench as you
22  describe here to remove utilities?
23       A.   Um -- the reference material for the
24  Case 2 cross-sections are cited in my report
25  and are also cited in Dr. Rogers' report.

32 (Pages 125 to 128)

Page 129

```
 1      Q.  Can I get an answer to my question?
 2      A.  I tried to.  But if I didn't, you've
 3   been very patient with me.
 4      Q.  And I sometimes suffer from a lack of
 5   patience, and you'll have to forgive me for
 6   that.
 7          MR. STEVENS:
 8              We'll stipulate to that.
 9          MR. TREEBY:
10              And I will, as well.
11      A.  I think you've been very patient.
12   Thank you.
13   EXAMINATION BY MR. TREEBY:
14      Q.  But this would indicate that you
15   believe -- wouldn't this indicate you believe
16   that Washington Group dug such a trench to
17   remove utilities?
18      A.  Um -- yes.
19      Q.  And what evidence do you have that
20   Washington Group dug such a trench as you
21   describe in these figures?
22      A.  I cited it.
23      Q.  What, your post-Katrina photographs?
24      A.  Oh, no.  That's Case 1.
25      Q.  Okay.
```

Page 130

```
 1      A.  All the Case 2 work was led by
 2   Dr. Rogers.  And in his expert report, he
 3   documents the genesis of the Case 2, and that
 4   Case 2 is the same Case 2 we're discussing.
 5      Q.  Okay.  This alleged trench that you
 6   show on Figure -- we'll see about -- we'll get
 7   to that.
 8      A.  Okay.
 9      Q.  Figure 64 shows a trench that appears
10   to be 10 feet deep from the ground surface.  Is
11   that correct?
12      A.  No.
13      Q.  Oh, it's deeper than that?
14      A.  At the western edge, it's
15   approximately, referencing ground level, 4 to
16   5 feet.  It gets deeper as you approach the
17   floodwall, and at that location extends from
18   -3 feet to +5 feet, so approximately 8 feet at
19   that end of the excavation.
20      Q.  Did you review -- you've answered my
21   question.  I don't need to ask that one.
22          You did not review Dr. Rogers'
23   testimony regarding the so-called two deep
24   utilities at the South Breach.
25      A.  That's correct.
```

Page 131

```
 1      Q.  I will represent to you that he said
 2   that aside from some 1966 design plans he could
 3   not find any evidence those two utilities
 4   existed.  Did you know that?
 5      A.  Well, I couldn't.  I haven't seen his
 6   deposition testimony.
 7      Q.  Okay.  So you can't deny that.
 8          I will also represent he testified he
 9   could find no evidence in any work plans or
10   other project documents that the two utilities
11   that were designed, perhaps, were ever removed.
12          Do you have any basis to disagree with
13   Dr. Rogers' testimony if that's what it is?
14      A.  No.
15      Q.  You relied on him, I take it, for that
16   information in this conceptual drawing.
17      A.  That is correct, sir.
18      Q.  Nothing else.
19      A.  That's correct.
20      Q.  Would it be correct to say that you
21   first postulated an excavation and then tried
22   to find evidence to support your postulation?
23      A.  Could you be specific in what you're
24   referring to?
25      Q.  I'm referring to -- let's start with
```

Page 132

```
 1   the deep excavations at the North Breach in
 2   your Cases 1 and South Breach in your Cases 1.
 3      A.  Yes, sir.
 4      Q.  That you postulated an excavation and
 5   then tried to find evidence to support it, and
 6   you found evidence, quote, evidence, in the
 7   form of post-Katrina, pre-Rita photographs.
 8      A.  I cited the genesis of the Case 1
 9   cross-sections, and I carefully, or attempted
10   to, articulate the various sources of
11   information that we used to define those
12   cross-sections.  It was much more than
13   post-Katrina photography.
14      Q.  Well, the record is what it is.
15   You've testified about it.
16      A.  Yes, sir.
17      Q.  And we'll be satisfied with that.
18      A.  Thank you.
19          (Brief recess.)
20   EXAMINATION BY MR. TREEBY:
21      Q.  Dr. Bea, if you would turn to Appendix
22   B of your report to Page 9.
23      A.  Yes, sir.
24      Q.  I'm sorry.  That's wrong.  Page 10,
25   Figure 5.  You got that?
```

```
                                    Page 197                                        Page 199
 1   Diego Cobos-Roa in the cases we're discussing.      1   inputs as opposed to outputs that reflected
 2   At the same time, check what's going on inside      2   processing?
 3   their computational process.  Then, when the        3        A.  I'm confused --
 4   outputs come out, I have to then validate what      4        Q.  Right.  Okay.  Let me --
 5   is coming out in terms of its sensibility.  And     5        A.  -- as to your question.
 6   it's at that point, as appropriate, I engage        6        Q.  I'm trying to understand your
 7   hand calculation techniques to assure myself        7   sentence.
 8   that the output is reliable.                        8        A.  Okay.
 9        I hope that's not too long of an               9        Q.  Does your sentence imply that when you
10   answer, but that's the process.                   10   get outputs from SEEP/W --
11        Q.  Let me just ask a question.              11        A.  Okay.
12        Dr. Bea, did you say that you check          12        Q.  -- that you're able to differentiate
13   what's going on inside that computational         13   between the influence of the inputs and the
14   process?                                          14   influence of the processing.
15        A.  I have t understand the basic theory    15        A.  Yes.
16   that is encoded in that process, because the     16        Q.  So when you get an output --
17   computer program is a general purpose computer   17        A.  Right.
18   program used for a wide variety of problems.     18        Q.  -- a numerical output from SLOPE/W, or
19   In this case, we were focused on a subset of     19   a graph from SLOPE/W --
20   that wide domain of problems.  So I have to be  20        A.  Correct.
21   sure that we're not mixing things for specific  21        Q.  -- or SEEP/W, for instance --
22   with things intended for general application.   22        A.  Correct.  Either one.
23        That's called forensic engineering.        23        Q.  -- you can look at that output and you
24        Q.  Did Dr. Rogers and Mr. Pope             24   can say, this is attributable to the input.
25   communicate directly with Mr. Cobos-Roa?         25        A.  Oh, no.  You have to perform

                                    Page 198                                        Page 200
 1        A.  In some cases, yes.                      1   parametric sensitivity studies that then
 2        Q.  And in some cases they communicated     2   enhance your ability to tell what parameters
 3   information to you?                               3   are controlling what things.  That's called
 4        A.  Correct.                                 4   parametric analysis.  And we documented --
 5        Q.  And you acted as an intermediary        5        Q.  You did that in this case; correct?
 6   between them and Mr. Cobos-Roa.                   6        A.  That's correct.  That's forensic
 7        A.  In some cases.  In addition,             7   engineering.
 8   Dr. Storesund was heavily involved in this        8        Q.  Would you agree that choices made by
 9   entire set of interactions.                       9   the operator of, for instance, SEEP/W, apart
10        Q.  In the section of Paragraph 70 that I  10   from the soil material property values that you
11   read to you previously, you said that you       11   assigned for the relevant soils in this
12   compared results that reflect inputs,           12   litigation, would you agree that decisions made
13   processing, and outputs.  I think you've        13   by the operator of the software can influence
14   previously stated that results is essentially   14   the outputs from that software even without
15   synonymous with outputs.                        15   changing the soil property values that are used
16        A.  Correct.                               16   to input the model runs?
17        Q.  So you didn't really compare results   17        A.  Yes.  That's why it's so important to
18   with outputs, they are one in the same.         18   carry the validation process coherently through
19        A.  Correct.                               19   all three of those steps.  If you lose control
20        Q.  And in looking at the outputs that you 20   of any one of the steps, you can lose control
21   got, let's just say for SEEP/W.                 21   of the output characterizations.
22        A.  Okay.                                  22        Q.  Would you agree that the seepage and
23        Q.  Were you able to differentiate between 23   stability model results that were obtained by
24   outputs that were -- that reflected, to use     24   Mr. Cobos-Roa and Dr. Grunauer form an
25   your word in the sentence, that reflected       25   essential underpinning of your opinions in this
```