# EXHIBIT 24

# Assessment of IHNC Hurricane Katrina Failures

Technical Report to

**Katrina Canal Breaches Consolidated Litigation**

[Civil Action Number: 05-4182 "K" (2)]

United States District Court Eastern District of Louisiana

Pertains to *Armstrong*, C.A. [No. 10-866]

By Dr. Thomas L. Brandon, P.E.

Newport, Virginia

March 8, 2012

**Soil Stratigraphy and Cross Section Development**

This study aims to disclose the causal relationship between the loading created by the storm surge that rose above the EBIA and the failure of the adjacent floodwall. To establish this relationship, it is necessary to investigate the engineering properties of the various soils that lay beneath the surge and were stressed by it. In order to perform this investigation, a cross section was developed for the north and south failure areas. The cross sections depict the soil layers, the levee and floodwall, and the water (storm surge) that exerted pressure on the soils and the floodwall at both breach location. The stratigraphy and cross sections used in this report reflect the author's evaluation of soil borings described in the Lake Pontchartrain and Vicinity Hurricane Protection Project General Design Memorandums, post-Katrina borings drilled by IPET, borings performed as part of the IHNC New Lock and Connecting Channels Project, and borings undertaken during this litigation.

An important factor in interpreting old boring logs and surveys to determine the site conditions in 2005 is the conversion between the older datums (NGVD and Cairo) to NAVD88. The IPET report provides the details of their assessment in Volume 2. Based on the IPET assessment, 2.5 ft must be subtracted from NGVD elevations to obtain NAVD88 elevations, and this procedure was adopted in this report.

The cross sections also reflect data obtained by means of cone penetration tests (CPTs) and vane shear tests (VSTs) during the litigation. The quantity of available information is demonstrated by Figure 1, which shows the exploration holes soon after Katrina. The number of exploration holes has greatly increased since this figure was constructed.

Task Order 41 (Contract No. W912P8-07-D-0022, "Borings from Seabrook to Michoud Canal, Seabrook to IHNC Lock, and IHNC Lock to Bayou Bienvenue"), generated a number of soil borings and CPTs in the area of interest for the current litigation. And as part of this litigation, 31 undisturbed borings, 47 CPTs, and 26 VSTs were conducted in the vicinity of the IHNC flood protection structures. These new exploration events greatly increase the amount of data available to assess the engineering properties of the subsurface soils. Shown on Figure 2 are the new exploration holes in the vicinity of the east bank of the IHNC that were made since the IPET study.

Based on both the old and new exploration programs, cross sections for the north and the south failure areas were developed with the assistance of Mr. Joe Dunbar of ERDC. These north and south sections are shown in Figure 3 and Figure 4, respectively. These figures depict the author's best judgment of the stratigraphy at the north and south breaches, taking into account all available evidence.

Ward. However, it is not reasonable to expect the results of limit equilibrium analyses to accurately predict the time of failure for IHNC, and it would be misleading to claim such. As evident from the above analyses, small changes in shear strength and stratigraphy result in differences in the calculated factor of safety. Analyses performed using the same analytic method, but employing different failure surface shapes, can significantly change the factor of safety. The analyses performed in this report assume *plane strain* or two-dimensional conditions. Different values of factor of safety would be determined using a three-dimensional analysis. A single cross section was used to represent the north failure, which was about 200 ft in length. A single cross section was also used to represent the south failure, which was about 900 ft in length. The stratigraphic layering and the ground surface elevation would be expected to vary along the length of the failure area, so the use of only one section per failure zone is a necessary engineering approximation and not exact.

Even with the assumptions and limitations inherent in limit equilibrium analysis, the results clearly show that a shear failure was the likely cause of failure for the northern part of IHNC. This failure mode was not likely the cause of the failure of the southern portion of IHNC.

**Method of Analysis - Total vs. Effective Stress Analysis**

The stability analyses described in this report are *total stress* or *undrained* analyses. This is evident from the shear strength parameters shown in Table 1 ($\phi = 0$ and $s_u = c$). In this type of analysis, the duration of the loading is assumed to be short enough such that appreciable pore water pressures induced by the loading are not dissipated. Accordingly, undrained or total stress strengths are assigned to the soils which are assumed to behave in an undrained manner.[22] Assigning undrained strengths to clays, silts, and peats is consistent with geotechnical practice, and is especially valid for load durations as short as the flood loading during Katrina. The bulk of the test data that was collected both before and after Hurricane Katrina were collected from tests that measured strengths appropriate for undrained analysis.

In most practical engineering projects, the choice of performing a drained or undrained analysis is based on judgment and experience. Normally, analyses involving clays, silts, peats, and organic clay soils should treat the soils as undrained materials. Gravels, sands, and sometimes non-plastic silts are treated as drained materials. In cases where the engineer lacks sufficient experience to correctly apply judgment, a quantitative analysis can be performed to assist in the decision.

It is possible to determine if a material will behave in a drained or undrained manner during loading using conventional soil mechanics principles. Shown in Figure 12 is a chart which can be used for this purpose. The main soil parameters required for the use of this chart are the coefficient of consolidation ($c_v$) and the length of the drainage path (D). This figure shows the time required for 99% pore water pressure dissipation based on the values of $c_v$ and the drainage path length. This time should be compared to the duration of loading to provide a determination if the soil deposit behaves in a drained

---

[22] Bea (2012) assigned *effective stress* or *drained* strength parameters to the lower marsh soils. This is an important difference in the analyses described in this report and the Bea analyses. The lower organic clay was the only fine grained soil unit considered to behave in a drained manner in Bea's report.

19

In order for the plaintiffs' limit equilibrium analysis to have any validity, they would have had to calculate correct pore water pressures due to transient seepage (which they attempted with assumed parameters) combined with shear-induced pore pressures (which they didn't attempt) and pore pressures due to changes in surface total stress (which they didn't attempt). Ignoring two of the three mechanisms for the development of pore pressure in the organic clay is a significant flaw.

Bea's recent report[1] cites Bea and Cobos-Roa[12] extensively for analysis results of the IHNC flood walls. It is interesting to note that most of their figures in this paper show results for a permeability value of $10^{-3}$ cm/sec, yet they used *undrained* strengths for the organic clay layers for both the north and south breaches. In their most recent analysis[3], they use a permeability value in the organic clay that is 100 times smaller, yet they now claim the organic clay behaves as a drained material.

**Seepage Analysis for IHNC**

The inclusion of a seepage analysis in levee design is another area where geotechnical experience and judgment is normally applied. If the levee and foundation materials mainly consist of fine grained soils, such as clays, silts, peats, and organic clay soils, then seepage analyses are normally *not* warranted. Seepage analyses are warranted for two general conditions:

(1) If drained or effective stress strengths are used for a soil layer, seepage analyses are required to determine pore pressures. The pore pressures are used to calculate effective stresses, which in turn, are used to calculate shear strengths in a stability analysis. However, the pore pressures obtained from the seepage analyses do not include shear-induced pore pressures. The soil must be drained for these pore water pressures to be valid in the strength assessment.
(2) If underseepage is a concern due to soil layers having high permeabilities, and resulting large flows, then seepage analyses are required to determine hydraulic gradients and uplift pressures.

Neither of these conditions was met for the IHNC sections. In the analyses described above, only undrained strengths were assigned to the materials at elevations above about -50 ft NAVD88. The canal water level only applies a boundary water pressure to the slope and I-wall, and internal water pressures are not incorporated into the analysis. Although a seepage analysis may be performed, the results of the analysis don't numerically affect the calculated factors of safety. Internal water pressures are not used with total stress or undrained strength parameters. The undrained shear strength is independent of the total normal stress on the failure plane.

For the second condition, judgment indicates that seepage analyses are not warranted due to the low permeability of the site soils. This is supported by the author's visual observation of the extrusion of the IHNC soil samples, as well as a myriad of laboratory and field tests. It takes movement of water to erode or heave soils, and the low permeability at the site does not allow sufficient flow to cause failure.

**Values of Permeability**

The most important part of a seepage analysis is the value of permeability or hydraulic conductivity assigned to the soil. Prior to Hurricane Katrina, scant permeability data were available for IHNC soils. This was probably due to the fact that judgment indicates that the IHNC soils have very low permeability, and the additional expense of conducting permeability tests was not warranted because erosion and piping were not plausible failure mechanisms. The author assessed the consolidation tests conducted after Hurricane Katrina to determine values of permeability for the organic clay soils. The results of this analysis were provided in a written response to NAE/NRC comments and in Appendix 17 as Figure V-17-15, which is included below as Figure 13. Also included on these data were the results of field tests conducted by Weber[25] on California peats. Although the California peats are substantially different in character than the New Orleans organic clays, these data were included only because little additional data existed for New Orleans organic clays.



Figure 13   Permeability values as a function of effective stress assembled by the author for IPET in response to NAE/NRC review (IPET 2007).

---

[25] Weber, W. G., Jr. (1969) "Performance of Embankments Constructed over Peat," *Journal of the Soil Mechanics and Foundations Division*, ASCE, January 1969, pp. 53-76.

23

much greater consolidation stress, therefore the permeability would be expected to be much less than the values obtained from the in situ tests.

**Results of Permeability Assessment**

An extravagant amount of permeability tests have been conducted on the IHNC soils. Engineering judgment would have led engineers familiar with levee design and underseepage analysis to immediately recognize that the permeability of the organic clay soils were low enough such that (1) total stress or undrained analyses were required, and (2) seepage analyses were not warranted. In response to the unreasonable permeability estimates originally made by the ILIT group and subsequently in documents generated by the plaintiffs for this litigation; and due to their lack of experience in levee design and underseepage analysis, particularly in the New Orleans area; a considerable effort has been made to measure the permeability of the organic clay soils using both laboratory and field means. Based on the results, it is clear that a reasonable *upper bound* permeability estimate for the lower organic clay soil would be about $1 \times 10^{-5}$ cm/sec. The upper bound value would be appropriate for a design where a conservative assessment of pore pressures and hydraulic gradients is desired. A value of permeability of about $2 \times 10^{-6}$ cm/sec would be a more appropriate average value to be used in analyses if accuracy in predicting pore pressures and hydraulic gradients is desired.

It is also clear from the permeability assessment that the organic clay material *should not* have been treated as a drained material, as done by the plaintiffs. Total stress or undrained strength parameters should have been assigned to the organic clay soil, and the appropriate analyses should have been conducted.

**Utility of Seepage Analyses**

IPET was criticized by the ILIT group for not conducting a seepage analysis as part of their IHNC analysis. The ILIT group stated:

> "Exoneration, *a priori*, of underseepage dangers should be discontinued immediately, and underseepage analyses should be required for the full regional flood protection system."

As indicated earlier, engineering judgment is adequate to justify to omission of a seepage analysis. It is a simple task to demonstrate how seepage issues were not a major factor in the IHNC failures. The ILIT, and in the recent report by Bea[3], presumed that the hydraulic gradient was the single controlling factor affecting both erosion and heave in levees and I-walls. This also assumes that different soil types have the same erosion characteristics regardless of soil type if the gradient and unit weights are equal. It has been recognized in geotechnical engineering practice for over 70 years that this is not the case.

Piping and erosion stability was first calculated using the *creep ratio* procedure. This procedure was first introduced by Bligh in 1927[39] and modified by Lane in 1934[40]. The creep ratio (CR) is calculated by

---

[39] Bligh, W. G. (1927), *The Practical Design of Irrigation Works*, Van Nostrand Co., New York.