# EXHIBIT 30

# Rebuttal Report

of

# Robert Glenn Bea, Ph.D., P.E.

For

**Katrina Canal Breaches Consolidated Litigation**

[Civil Action Number: 05-4182 "K" (2)]

United States District Court

Eastern District of Louisiana

Pertains to MR-GO, Armstrong [No. 10-866]

April 3, 2012

uplift pressure.[17] Lee Guillory, the Project Delivery Team manager, explained that the Corps expected geotechnical support from WGI in that they had a staff at home office in Denver that could be called upon for any geotech support. Further, the Corps had an expectation that WGI would advise Corps about the particularities and nuances of the site, and that they would advise Corps of any geotechnical issues that they encountered.[18] This expectation included any potential effect or damage to the flood wall, and that the licensed engineers that WGI hired would address those issues.[19] This was particularly important to Mr. Guillory because he was not an expert on seepage issues.[20]

57.     On June 1, 1999, the Corps issued to WGI a Statement of Work for Demolition and Site Preparation. Here the Corps identified project requirements: WGI **"shall furnish all engineering services**, materials, supplies, labor, as required, in connection with the technical review of site documents...associated with the demolition and remediation" of the EBIA.[21] In addition, WGI was to "prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to be filled by sampling or other investigations."[22] Among the documents provided to WGI was the Assessment of Potential Hazardous, Toxic and Radiological Waste, Volume 5 of 9, Appendix C, which

---

[17] EM 1110-2-1913 – Design and Construction of Levees.
[18] Corps of Engineers (Guillory) deposition, p. 150-151.
[19] Corps of Engineers (Guillory) deposition, p. 166-167.
[20] Corps of Engineers (Guillory) deposition, p. 219
[21] Corps Statement of Work dated June 1, 1999.; *see also* USA Summary Judgment Memorandum at p. 40, Aug. 8, 2010 (Doc. No. 19988-4) ("To be sure, the Corps brought its own engineering expertise to bear in reviewing and approving WGI's work plans. But reliance on *WGI's engineering expertise and its subcontractors' expertise cannot be discounted.* The EBIA remediation and demolition was premised on the requirement that WGI would "furnish all services, materials, supplies, labor, and travel, as required," including specifically "*all engineering services.*") (emphasis added).

[22] Corps Statement of Work dated June 1, 1999.

discussed sampling and analysis of groundwater, and most importantly identified the sheet pile curtain tip depth as -8 feet.[23]

58. WGI tasked Dennis O'Conner with this review responsibility.[24] Notably, Mr. O'Conner is not an engineer.[25] Mr. O'Conner, along with Jim Blazek of Materials Management Group (WGI's remediation sub-contractor), reviewed the materials and developed the Recommendation Report, dated December 2, 1999.[26] WGI defined the purpose of the report as "present[ing] recommendations regarding scope and duration of remediation/ demolition activities" at the EBIA.[27] WGI conceded that there were a number of "data gaps" that would affect the schedule, cost, and scope of work.[28] These data gaps might need to be filled by "sampling or other investigations."[29]

59. WGI's review of the Assessment of Potential Hazardous, Toxic and Radiological Waste, Volume 5 of 9, Appendix C, led to the understanding that EBIA's "groundwater was impacted but…the size of the contaminant plume was not determined."[30] This became a "data gap" as the contamination plume areas and depths were not identified.[31] WGI stated that the impact of some data gaps would need to be addressed by "associated fieldwork."[32] As the defense expert Dr. Lucia recognized, this

---

[23] 1997 New Lock and Connecting Channels report, Volume 5 of 9, Appendix C.

[24] WGI (Roe) deposition, p. 41.

[25] O'Conner deposition, p. 16.

[26] WGI (Roe) deposition, p. 63-64.

[27] Recommendation Report, § 1.0.

[28] Recommendation Report, § 1.0.

[29] Recommendation Report, § 2.0.

[30] Recommendation Report, § 3.1.1.1.

[31] Recommendation Report, § 3.1.1.1.

[32] Recommendation Report, § 3.1.1.1.

44

included an understanding of the groundwater pathways and where the water was likely to go. [33]

60.     Of equal interest was WGI's acknowledgment that there was a high water table running through the EBIA site,[34] and that during the course of excavations "there is a high probability that groundwater will be encountered."[35] Such information gives the geotechnical engineer the knowledge that the soil layers are hydraulically charged and having a greater response to pressure gradients. As shown in Figures 37a and 37b of my February 1, 2012 Expert report and discussed therein, the USACE and WGI had information that clearly indicated the ground water level (phreatic surface) in the soils adjacent to the IHNC had been allowed to penetrate essentially unchanged to the face of the floodwall (WGI 2005 Ground Water Monitoring Report, Figure 21). This information provided 'early warning signals' that the EBIA river sand backfilled excavations at the north end of the Boland Marine site had established direct hydraulic 'connections' with the sandy – shell fill under the Surkote Road overpass. As indicated in the e-mail exchange betweeen George Bacuta (C MVN, USACE) and Richard Lesser and Lee Guillory (8/3/2005 5:18 PM):

> "Note that the 1997 report groundwater flow information (actually the groundwater data was collected in 1993/1992?) indicate the influence of the structures (foundation of buildings, canal drainage, etc.) present at that time on the shallow gw (ground water) flow. After remediation, the structures are gone, the soil subsurface had been modified on account of excavation/removal/new fill,

---

[33] Dr. Lucia, deposition transcript, p. 131. l. 7-24.

[34] Recommendation Report, § 4.1.

[35] Recommendation Report, § 5.13.

45

*the groundwater flow information (taken by WGI in Man/June 2005) <u>points to a flow away from the Canal</u>. (underline added for emphasis)."* (Exhibit 16, Deposition of Geeorge Bacuta).

61.  Photographs of this area clearly indicated that the waters in the IHNC were in direct communication with the soils adjacent to the floodwall at the north end of the Boland Marine Site (Figure 22).



Figure 21: Section from WGI Ground Water Monitoring report showing the ground water elevation contours at the Boland Marine site (after Marino 2010). Note the ground water elevations near the IHNC reach to the location of the future North Breach.



Figure 22: Photograph (WGI013699) looking south from the Surkote Road overpass toward the EBIA and IHNC (WGI 2005) after storm has passed.

62.     After the documentation review, WGI recommended that specific work plans be prepared to provide "guidance and requirements for technical field execution."[36] The plans and procedures were not definable features of site work, but WGI recommended that "considerable effort should be put forth to ensure that each plan be specifically tailored to meet the needs of the demolition and site preparation efforts."[37] As part of the Project Work Plan, WGI indicated that "systematic units of work" would be

---

[36] Recommendation Report, § 5.1.2.

[37] Recommendation Report, § 5.1.2