# EXHIBIT 34

## Page 1

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION            NO. 05-4182 K2
                                   JUDGE DUVAL
PERTAINS TO:  MRGO AND ROBINSON
              (No. 06-2268)

        Deposition of GEORGE C. BACUTA, Ph.D.,
given at the U.S. Nuclear Regulatory
Commission, One Whiteflint North, 11555
Rockville Pike, Rockville, Maryland 20852-2738,
on July 2nd, 2008.




REPORTED BY:
     JOSEPH A. FAIRBANKS, JR., CCR, RPR
     CERTIFIED COURT REPORTER #75005
```

## Page 2

```
 1   APPEARANCES:
 2   REPRESENTING THE PLAINTIFFS:
 3        BRUNO & BRUNO
 4        (BY:  SCOTT JOANEN, ESQUIRE)
 5        855 Baronne Street
 6        New Orleans, Louisiana 70113
 7        504-525-1335
 8
 9   REPRESENTING THE UNITED STATES OF AMERICA:
10        UNITED STATES DEPARTMENT OF JUSTICE,
11        TORTS BRANCH, CIVIL DIVISION
12        (BY:  JEFFREY P. EHRLICH, ESQUIRE)
13        (BY:  JACK WOODCOCK, ESQUIRE)
14        P.O. Box 888
15        Benjamin Franklin Station
16        Washington, D.C. 20044
17        202-616-4289
18
19   ALSO PRESENT:
20        LAURA ROUGEAU, ESQ.
21        ERIC GOLDBERG, ESQ.
22        PHILIP WATSON, ESQ.
23        ADRIAN WAGER-ZITO, ESQ.
24        CHRIS THATCH, ESQ.
25        RICHARD T. SEYMOUR, ESQ.
```

## Page 3

```
 1   PRESENT VIA I-DEP:
 2        CHRISTOPHER ALFIERI, ESQ.
 3        SCOTT GASPARD, ESQ.
 4
 5   VIDEOGRAPHER:
 6        BRAD FISCHER
 7
 8   ESCORTS UNDER NRC SECURITY REGULATIONS:
 9        MAXWELL SMITH, ESQ. (NRC)
10        CHARLES E. MULLINS, ESQ. (NRC)
```

## Page 4

```
              E X A M I N A T I O N   I N D E X

EXAMINATION BY:                          PAGE

MR. JOANEN     ................................7
MS. WAGER-ZITO ............................191
MR. JOANEN     ............................207
              E X H I B I T   I N D E X

EXHIBIT NO.                              PAGE
Exhibit 1     .............................19
Exhibit 2     .............................19
Exhibit 3     .............................73
Exhibit 4     .............................73
Exhibit 5     .............................86
Exhibit 6     .............................87
Exhibit 7     ............................103
Exhibit 8     ............................110
Exhibit 9     ............................110
Exhibit 10    ............................124
Exhibit 11    ............................126
Exhibit 12    ............................133
Exhibit 13    ............................139
Exhibit 14    ............................153
Exhibit 15    ............................154
```

1 (Pages 1 to 4)

### Page 1

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION            NO. 05-4182 K2
                                   JUDGE DUVAL
PERTAINS TO: MRGO AND ROBINSON
             (No. 06-2268)

        Deposition of GEORGE C. BACUTA, Ph.D.,
given at the U.S. Nuclear Regulatory
Commission, One Whiteflint North, 11555
Rockville Pike, Rockville, Maryland 20852-2738,
on July 2nd, 2008.




REPORTED BY:
       JOSEPH A. FAIRBANKS, JR., CCR, RPR
       CERTIFIED COURT REPORTER #75005
```

### Page 2

```
 1  APPEARANCES:
 2  REPRESENTING THE PLAINTIFFS:
 3       BRUNO & BRUNO
 4       (BY: SCOTT JOANEN, ESQUIRE)
 5       855 Baronne Street
 6       New Orleans, Louisiana 70113
 7       504-525-1335
 8
 9  REPRESENTING THE UNITED STATES OF AMERICA:
10       UNITED STATES DEPARTMENT OF JUSTICE,
11       TORTS BRANCH, CIVIL DIVISION
12       (BY: JEFFREY P. EHRLICH, ESQUIRE)
13       (BY: JACK WOODCOCK, ESQUIRE)
14       P.O. Box 888
15       Benjamin Franklin Station
16       Washington, D.C. 20044
17       202-616-4289
18
19  ALSO PRESENT:
20       LAURA ROUGEAU, ESQ.
21       ERIC GOLDBERG, ESQ.
22       PHILIP WATSON, ESQ.
23       ADRIAN WAGER-ZITO, ESQ.
24       CHRIS THATCH, ESQ.
25       RICHARD T. SEYMOUR, ESQ.
```

### Page 3

```
 1  PRESENT VIA I-DEP:
 2       CHRISTOPHER ALFIERI, ESQ.
 3       SCOTT GASPARD, ESQ.
 4
 5  VIDEOGRAPHER:
 6       BRAD FISCHER
 7
 8  ESCORTS UNDER NRC SECURITY REGULATIONS:
 9       MAXWELL SMITH, ESQ. (NRC)
10       CHARLES E. MULLINS, ESQ. (NRC)
```

### Page 4

```
            E X A M I N A T I O N   I N D E X

EXAMINATION BY:                              PAGE

MR. JOANEN       ................................7
MS. WAGER-ZITO   .............................191
MR. JOANEN       .............................207

            E X H I B I T   I N D E X

EXHIBIT NO.                                  PAGE
Exhibit 1    ................................19
Exhibit 2    ................................19
Exhibit 3    ................................73
Exhibit 4    ................................73
Exhibit 5    ................................86
Exhibit 6    ................................87
Exhibit 7    ...............................103
Exhibit 8    ...............................110
Exhibit 9    ...............................110
Exhibit 10   ...............................124
Exhibit 11   ...............................126
Exhibit 12   ...............................133
Exhibit 13   ...............................139
Exhibit 14   ...............................153
Exhibit 15   ...............................154
```

```
 1        Object to the form.
 2    MS. WAGER-ZITO:
 3        There's got to be something
 4    objectionable in there.
 5    MR. EHRLICH:
 6        I have no idea what he's talking
 7    about, that's why I made it.  I don't
 8    think the witness does either.
 9    MR. JOANEN:
10        Oh, I'm sorry.
11    THE WITNESS:
12        Let me take a look at that.
13    MR. JOANEN:
14        Okay.  (Tendering.)
15    A.   No.  Especially with money, no.
16 EXAMINATION BY MR. JOANEN:
17    Q.   I'm trying to make it easy here.
18        I'm going show you next which is the
19 project work plan.  This is WGI 41879 through
20 WGI 41944.  It's dated October, 2000, called
21 the IHNC master copy.
22    A.   Maybe just for your information type
23 deal --
24    Q.   Well, I have some questions about it.
25        You were involved with the analysis of
                                          Page 109
```

```
 1 that and ultimate acceptance?  Is that correct?
 2    A.   No.  I mean -- I didn't sign off on
 3 it, but it could be this is for your
 4 information.
 5    Q.   I'll show you what I'll mark as
 6 Exhibit 8.
 7    MR. EHRLICH:
 8        Actually, could we mark this as
 9    Exhibit 8, the document you just
10    showed him?
11    MR. JOANEN:
12        Exhibit 8.
13        (Exhibit 8 was marked for
14 identification and is attached hereto.)
15    MR. EHRLICH:
16        Thanks.
17 EXAMINATION BY MR. JOANEN:
18    Q.   I'll show you what I'll mark as
19 Exhibit 9.  This is Bates stamp Number WGI 3336
20 through 3344.  And looking at that, the reason
21 I show you that is because you're indicated as
22 one of the reviewers for that project work
23 plan.
24        (Exhibit 9 was marked for
25 identification and is attached hereto.)
                                          Page 110
```

```
 1    A.   Yeah.  I commented on it, then, on the
 2 draft project work plan, but the financial ones
 3 they just signed off on it.  I was not involved
 4 in the signature.  As well as Joan Spadaro, I
 5 think.
 6 EXAMINATION BY MR. JOANEN:
 7    Q.   Well, if you look at the date here,
 8 response dated October 27th, 2000 -- can you
 9 look at the date of the work plan?
10    A.   October 2000?
11    Q.   And you can look at the signature
12 page, too.
13    A.   Right here?
14    MR. EHRLICH:
15        You want him to look at Exhibit 8
16    again?
17    MR. JOANEN:
18        Let me see it.
19    A.   Yeah.  I might have reviewed that, but
20 I did not sign off on it.  Sometimes they just
21 give it for your information.  All of a sudden
22 I see something that's been agreed upon with
23 Washington Group, you know.  But I may or may
24 not have reviewed before.  There's a lot of
25 documents in there.
                                          Page 111
```

```
 1 EXAMINATION BY MR. JOANEN:
 2    Q.   Did any part of your analysis of this
 3 project work plan concern itself with
 4 excavations that went below five feet?
 5    A.   There are, especially when it pertains
 6 to any contamination that would be -- or what
 7 LDEQ would say you're going to have to go
 8 deeper for remediation, you know, then I have
 9 to look more deeply into it and, um -- find out
10 whether it's reasonable to do that or not.
11    Q.   In this project work plan it deals
12 with -- it addresses the borrow pit.  And on
13 this document it's 3.3.1.
14    A.   Yes.
15    Q.   ==What was the purpose of the borrow
16 pit?==
17    A.   ==The borrow pit is to make use of a
18 material from the site that are least
19 contaminated to fill those areas that would be
20 excavated and disposed off site because of
21 environmental issues.==
22    Q.   ==The -- was the soil at the borrow pit
23 clean enough to be used?==
24    A.   ==Yeah.  That's what -- it's all agreed
25 upon with LDEQ.  LDEQ has to sign off on that,==
                                          Page 112
```

28 (Pages 109 to 112)

```
 1   too, for reuse purposes, because it's one of
 2   the -- one of the specific guidelines for reuse
 3   in the RECAP document.
 4       Q.  In this, it indicates that the soil
 5   that -- the reuse soil from the borrow pit
 6   would be for storm water control berms?
 7       A.  I don't know.  I don't know what the
 8   particularly -- but they need material to do
 9   some work to stabilize, to stabilize the area
10   or fill up some, um -- some, um -- you know,
11   some, um -- materials that are excavated and
12   mostly for, you know, the fill in the area
13   comes from the clays of the borrow pit.
14       Q.  When this October, 2000 report was
15   finalized --
16       A.  Uh-huh.
17       Q.  -- was there a calculation of how much
18   soil would be removed from the East Bank
19   Industrial Area?
20       A.  You really don't know.  You have an
21   estimate, you know, but as you go on with the
22   RECAP guideline -- with the RECAP process, then
23   you're going to discover stuff.  Then when you
24   discover stuff, um -- Washington Group is going
25   to write the report, then we look at it and see
                                          Page 113
```

```
 1   if this is a reasonable and within compliance
 2   with LDEQ, then we go the LDEQ and probably
 3   say, um -- I think we just would, you know,
 4   excavate like three feet because this may be
 5   just a -- the contaminants here, looking at
 6   probably in the five feet range probably is
 7   because of some fall-in from the surface, the
 8   way they do the sampling and testing and all
 9   that stuff, you know.
10       Q.  The estimates that were taken for the
11   soil removal, would WGI then be able to
12   calculate how big of a borrow pit it would need
13   to refill the area with native soils?
14       A.  You have a general estimate.  You
15   could do that in the initial part of the game,
16   you know, the construction work.  Then, as you
17   need more, then you're going to have to look
18   for more, preferably on site.  But if you can't
19   find on site then you probably get some
20   off-site material.
21       Q.  In this project work report, were
22   there any specifications of what type of
23   off-site soil would be used?
24       A.  No, as long as they're clean.  They're
25   clean and --
                                          Page 114
```

```
 1       Q.  I will show you, which is on Page
 2   3-30, 3-31, and 3-32, of this project work
 3   plan, the -- they're talking about grid
 4   trenching and contaminated soils areas?
 5       A.  Uh-huh.
 6       Q.  Would you look at that table.
 7       A.  These are an estimate.  This is
 8   what -- what's the date on this one?
 9       Q.  October, 2000.
10       A.  October, 2000?  Yeah.  These are kind
11   of estimates that they have.  Because you still
12   haven't started RECAP here.  RECAP is, you
13   know, borings -- rig type borings and kind of
14   the limiting areas that LDEQ and you -- and the
15   Corps, would want to -- and Washington Group,
16   would want to dispose off site.  So as you go
17   towards that, you know, towards that -- as you
18   finish up a RECAP report, then you have a CAP
19   report proposing the volume of the material to
20   be excavated and dispose off site.  Then you
21   get a better handle on the volume.
22       Q.  As of October, 2000, just looking at
23   the depth of the excavations --
24       A.  Yeah.
25       Q.  -- what was the deepest excavation
                                          Page 115
```

```
 1   that was going to take place?
 2       A.  Well, about three feet, I think.  And
 3   there is one -- well, it's not a depth, but
 4   it's, it's just a mound, you know.  Maybe this
 5   is a height, seven feet.  It's a mound seven
 6   feet thick.  Okay.
 7       Q.  Okay.  Turn, then, to Page 3-34.  If
 8   you look in the second paragraph, it says the
 9   soil remediation area is defined as the area
10   15 feet west of the floodwall.
11           So the floodwall was taken into
12   consideration as a delineating factor?
13       A.  Yeah.
14       Q.  And then it says, in the third
15   sentence, during the course of the excavation
16   there's a high probability that groundwater
17   will be encountered.
18       A.  2000.  Well, this just a plan, a work
19   plan, you know.  It's just saying there's a
20   probability.  But really, the truth is when you
21   do the RECAP investigation that's when you'll
22   find out what's really in there.
23       Q.  Do you recall at any time --
24       A.  This is an approximation.
25       Q.  Do you recall at any time during your
                                          Page 116
```