# EXHIBIT 3

Page 1

```
        UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES   CIVIL ACTION
CONSOLIDATED LITIGATION         NO. 05-4182 K2
              JUDGE DUVAL
PERTAINS TO MRGO          MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
     05-6314, 05-6324, 05-6327, 05-6359,
     06-0225, 06-0886, 06-1885, 06-2152,
     06-2278, 06-2287, 06-2824, 06-4024,
     06-4065, 06-4066, 06-4389, 06-4634,
     06-4931, 06-5032, 06-5155, 06-5159,
     06-5156, 06-5162, 06-5260, 06-5771,
     06-5786, 06-5937, 07-0206, 07-0621,
     07-1073, 07-1271, 07-1285
                    * * *
            (V O L U M E  II)
     Deposition of W. ALLEN MARR, PH.D.,
P.E., given at the offices of Bruno & Bruno,
855 Baronne Street, New Orleans, Louisiana
70113, on April 24th, 2012.
REPORTED BY:
     JOSEPH A. FAIRBANKS, JR., CCR, RPR
     CERTIFIED COURT REPORTER #75005
```

Page 2

```
 1  APPEARANCES:
 2  REPRESENTING THE PLAINTIFFS:
 3      BRUNO & BRUNO
 4      (BY: JOSEPH M. BRUNO, ESQUIRE)
 5      (BY: SCOTT JOANEN, ESQUIRE)
 6      855 Baronne Street
 7      New Orleans, Louisiana 70113
 8      504-525-1335
 9  - AND -
10      LEVIN, PANATONIO, THOMAS, MITCHELL,
11      RAFFERTY & PROCTOR, P.A.
12      (BY: MATTHEW D. SCHULTZ, ESQUIRE)
13      316 S. Baylen St., Suite 600,
14      Pensacola, Florida 32502
15      850-435-7140
16  - and -
17      DOMENGEAUX, WRIGHT, ROY & EDWARDS
18      (BY: ELWOOD C. STEVENS, JR., ESQUIRE)
19      556 Jefferson Street, Suite 500
20      Lafayette, Louisiana 70501
21      337-233-3033
22
23
24
25
```

Page 3

```
 1  REPRESENTING WASHINGTON GROUP INTERNATIONAL,
 2      INC.:
 3      STONE PIGMAN WALTHER WITTMANN, L.L.C.
 4      (BY: WILLIAM D. TREEBY, ESQUIRE)
 5      546 Carondelet Street
 6      New Orleans, Louisiana 70130
 7      504-581-3200
 8
 9  REPRESENTING THE UNITED STATES OF AMERICA:
10      U.S. DEPARTMENT OF JUSTICE
11      (BY: ROBIN DOYLE SMITH, ESQUIRE)
12      (BY: RUPERT MITSCH, ESQUIRE)
13      Torts Branch, Civil Division
14      P.O. Box 888
15      Benjamin Franklin Station
16      Washington, D.C. 20044
17      202-616-4289
18
19  ALSO PRESENT (VIA TELECONFERENCING):
20      FRANCISCO SILVA-TULLA
21      TIMOTHY STARK
22      TOM BRANDON
23
24
25
```

Page 4

```
 1          E X A M I N A T I O N   I N D E X
 2
 3  EXAMINATION BY:                        PAGE
 4  MR. STEVENS ................................7
 5  MR. TREEBY .............................264
 6  MR. STEVENS ............................269
 7
 8          E X H I B I T   I N D E X
 9
10  EXHIBIT NO.                            PAGE
11  Exhibit Marr 24 ............................10
12  Exhibit Marr 25 ............................20
13  Exhibit Marr 26 ............................28
14  Exhibit Marr 27 ............................37
15  Exhibit Marr 28 ............................46
16  Exhibit Marr 29 ............................51
17  Exhibit Marr 30 ............................52
18  Exhibit Marr 31 ............................53
19  Exhibit Marr 32 ............................62
20  Exhibit Marr 33 ............................119
21  Exhibit Marr 34 ............................120
22  Exhibit Marr 35 ............................164
23  Exhibit Marr 36 ............................185
24  Exhibit Marr 37 ............................212
25  Exhibit Marr 38 ............................212
```

ALLEN MARR, PH.D.                                                April 24, 2012

Page 81

1    Q.  Is that a fair statement of what you
2  told us yesterday?
3    A.  No.
4       MR. TREEBY:
5          Object.  Form.
6  EXAMINATION BY MR. STEVENS:
7    Q.  All right.  Then I'm just going to ask
8  you to start over.  Tell us what caused, in
9  your view, the tear of the sheet piling at the
10 old weld.
11   A.  High lateral forces in the sheeting.
12   Q.  Okay.  And what lateral forces are you
13 referring to?
14   A.  The forces acting along the alignment
15 of the wall.  In the sheeting.
16   Q.  And did you --
17   A.  Tensile forces acting along that
18 alignment.
19   Q.  And did you measure the tensile forces
20 acting upon that levee?
21   A.  No.
22   Q.  Did you compute the tensile forces
23 actings upon that levee?
24   A.  Yes.
25   Q.  And what was the computed value of

Page 82

1  those tensile forces?
2    A.  Well, the Exponent results gave us
3  500,000 pounds along the full length of the
4  wall.  Or full depth of the wall.
5    Q.  All right.  And they called it planar
6  tensile loads of approximately 500,000 pounds
7  before separation.  Am I saying that word
8  correctly?
9    A.  Yes.
10   Q.  Planar.  And they called it a
11 relatively uniform planar tensile load of
12 500,000 pounds before separation; correct?
13      MR. SMITH:
14         No.
15   A.  I don't recall the exact word, so I'd
16 probably need to refer to the report to see
17 that that's exactly what they said.
18 EXAMINATION BY MR. STEVENS:
19   Q.  Sure.  We marked it as Marr number.
20 Exponent.  I'll refer you to it.  It's on Page
21 iii.
22   A.  Yes.
23   Q.  Okay.  Now, you say that you converted
24 that to 25,000 pounds per foot along the wall.
25 Right?

Page 83

1    A.  Yes.
2    Q.  All right.  My question to you is,
3  what force generated that amount of tensile
4  load?
5    A.  Water and soil pushing against the
6  wall.
7    Q.  Okay.  From the canal side.
8    A.  Yes.
9    Q.  What input parameters did you use, or
10 to your knowledge did Exponent use, to make
11 that calculation or computation?
12   A.  Which calculation are you referring
13 to?
14   Q.  Strike that.  If I understand
15 Exponent's results correctly, they're saying
16 500,000 pounds of planar tensile loading would
17 be required to cause that sheet piling to tear.
18 True?
19   A.  No.
20   Q.  Well, I quote, horizontal flattening
21 deformation --
22      MR. TREEBY:
23         Where are you quoting from?
24      MR. STEVENS:
25         The same Page 3 of the Exponent

Page 84

1  report marked as Marr 21.
2  EXAMINATION BY MR. STEVENS:
3    Q.  And, you know, I think I might have
4  just understood why you said no.  Second
5  sentence of the third paragraph on Page iii:
6  Also --
7       MR. SMITH:
8          What exhibit are you referring
9  to?  We don't have that page.
10      MR. TREEBY:
11         We don't have that page.  It's
12 not part of the exhibit.
13      MR. STEVENS:
14         It is part of the exhibit.  This
15 is the marked exhibit.  Your copy may
16 not have it.  What pages do you have?
17      MR. TREEBY:
18         22 and 21.
19      MR. SMITH:
20         21 and 22.
21      MR. STEVENS:
22         Well, this is iii, plus 20 and
23 21.  Let's see if we can find you
24 another one.  Isn't that part of his
25 appendices?

21 (Pages 81 to 84)

Page 85

1  EXAMINATION BY MR. STEVENS:
2     Q.  Don't you attach it to your report,
3  dock?
4        MR. TREEBY:
5           I'm not sure, but I think that
6        was reliance or matters considered.
7        MR. STEVENS:
8           It might have been reliance
9        materials, whatever.
10 EXAMINATION BY MR. STEVENS:
11    Q.  All right.  Well, I'm going to quote
12 from this, and you can all come look over my
13 shoulder and read along, or I can give it back
14 to the good doctor and he can read it for us.
15 Let me highlight it.
16       I've drawn a square around the quoted
17 section.  And on Page iii, if you would, read
18 it us to, Doc.
19       MR. STEVENS:
20          And we'll make copies available
21       to everyone so soon as we can get them
22       reproduced.
23 EXAMINATION BY MR. STEVENS:
24    Q.  If you would, read it out loud
25 verbatim, and then we'll discuss it.

Page 86

1     A.  This is the area marked in blue.
2     Q.  Yes, sir.
3     A.  Inside the blue box.  Also, horizontal
4  flattening deformation measured on the subject
5  north breach pilings indicate that both the top
6  and bottom of the pilings experienced
7  relatively uniform, planar tensile loads of
8  approximately 500,000 pounds before separation.
9  Our analyses also indicate that fracture of the
10 repair weld at the top of the wall likely
11 initiated before the joint separation.
12    Q.  Now, it says 500,000 pounds of load --
13 relatively uniform planar tensile load was
14 applied to the wall before separation.
15       Separation being what?  Separation of
16 what?
17    A.  Of the sheet piles.
18    Q.  Okay.  Our analysis also indicated
19 that fracture of the repair weld at the top of
20 the wall likely initiated before joint
21 separation.
22       Is that the same separation?  Joint
23 separation of the sheet piles?
24    A.  You mean as referred to in the
25 previous sentence?

Page 87

1     Q.  Yes.
2     A.  Yes.
3     Q.  Okay.  Now, where did the
4  500,000-pounds of load, which was -- when it
5  says relatively uniform planar, I assume that
6  means all across the whole breach.
7        MR. TREEBY:
8           Object.  Form.
9  EXAMINATION BY MR. STEVENS:
10    Q.  Right?
11       MR. TREEBY:
12          Object.  Form.
13    A.  No.
14 EXAMINATION BY MR. STEVENS:
15    Q.  When they say relatively uniform
16 across the -- well, I got to go back up.
17 Well -- you have the copy.  Let me see it.
18       When they say relatively uniform
19 planar tensile loads of 500,000 pounds, are
20 they referring to all across the entire breach?
21    A.  No.
22    Q.  What are they saying when they say
23 planar tensile loads?  And relatively
24 uniform --
25       MR. TREEBY:

Page 88

1           Object.  Form.
2     A.  Well, they say as I've read.  Also,
3  horizontal flattening deformation measured on
4  the subject north breach pilings indicate that
5  both the top and bottom of the pilings
6  experienced relatively uniform planar tensile
7  loads of approximately 500,000 pounds before
8  separation.
9  EXAMINATION BY MR. STEVENS:
10    Q.  Now, describe that to us in English.
11       Does that mean that the entire wall,
12 top to bottom and full width, of the north
13 breach experienced the same tensile loads of
14 500,000 pounds simultaneously?
15       MR. TREEBY:
16          Object.  Form.
17       MR. STEVENS:
18          He's an expert witness and I'll
19       cross-examine him.  Thank you.
20    A.  No.
21 EXAMINATION BY MR. STEVENS:
22    Q.  What does it mean?
23    A.  It means that 500,000 pounds was
24 applied to the two sheets that were extracted
25 from the failure zone in order to cause them to

Page 89

1  flatten the measured amount.
2      Q.  In the laboratory.
3      A.  No.
4      Q.  It says -- well -- wherever they did
5  the testing?
6          MR. TREEBY:
7              Object to form.
8          MR. SMITH:
9              Object to the form.
10 EXAMINATION BY MR. STEVENS:
11     Q.  It means that based upon their
12 analysis, and during the storm event,
13 500,000-pound was applied to the sheets that
14 had been extracted.
15         MR. SMITH:
16             Object to the form.
17         MR. TREEBY:
18             Object as to form.
19 EXAMINATION BY MR. STEVENS:
20     Q.  Is that correct?
21     A.  No.
22     Q.  All right.  Explain what the 500,000
23 pounds means in the context of what occurred
24 during this hurricane.
25     A.  The 500,000 pounds here does not refer

Page 90

1  to, um -- what happened during the earthquake
2  in Exponent's report.  During the hurricane in
3  Exponent's report.
4      Q.  What does it reflect?
5      A.  It reflects the results of a
6  computation that they did on two sheets,
7  starting from their initial shape, how much
8  force pulling these sheets apart would be
9  required to cause them to plastically deform to
10 the shape that was measured on the extracted
11 sheets.
12     Q.  Okay.  Now that we're on the same
13 page, because that's kind of what I thought you
14 were saying, would it not be correct, in
15 layman's terms, to say that 500,000 pounds of
16 planar tensile force had to be applied to these
17 extracted sheets during the storm event or else
18 they would not look as they did when they
19 arrived at the laboratory or at Exponent's
20 facility?
21         MR. TREEBY:
22             Objection.  Form.
23 EXAMINATION BY MR. STEVENS:
24     Q.  I can rephrase the question.  This is
25 taking way too long.  You're being very

Page 91

1  precise, sir.  I appreciate it.  You asked me
2  to try to wrap up early today so you can make a
3  flight.  I told I would do my very best.  But
4  if we're going to mince words every question,
5  we'll be here till 7:00 p.m.
6          MR. SMITH:
7              No, we won't.
8          MR. STEVENS:
9              Yes, we will.
10         MR. SMITH:
11             He's going to leave.
12         MR. STEVENS:
13             He's going to leave when seven
14 hours is up.
15         MR. SMITH:
16             This deposition will end when he
17 leaves, and we're not bringing him
18 back.
19         MR. STEVENS:
20             Well, when the seven hours
21 expires and we have seven hours of
22 questions and answers, he can leave.
23         MR. TREEBY:
24             Don't blame him for your
25 imprecise questions.  That's not fair.

Page 92

1          MR. STEVENS:
2              Thank you.  Very good,
3  Mr. Treeby.  I'm doing my very best.
4  EXAMINATION BY MR. STEVENS:
5      Q.  I want to know, you tell me, sir,
6  you're the expert witness here, what
7  significance to you was this 500,000 pounds of
8  pressure in the context of what happened on the
9  morning of August 29, 2005, when the north
10 breach occurred.
11     A.  It told me how much force these
12 flattened sheets had experienced during that
13 failure, how much horizontal force had been
14 applied to them in order to flatten them as
15 much as they experienced.
16     Q.  Okay.  And ultimately, when that
17 horizontal force was applied -- and let me find
18 the exhibit -- they were pushed landward,
19 toward the Ninth Ward, correct?
20     A.  Yes.
21     Q.  All right.  And my question to you is,
22 did that 500,000 pounds of pressure or force
23 occur while the wall was still intact, or did
24 it occur over the entire duration of the time
25 it took from the wall to become -- to leave its

Page 97

1  correct that you calculated it to be correct
2  that Exponent's 500,000-pounds of force was
3  correct?
4     A.  No.
5     Q.  All right.  They were in error?
6     A.  No.
7     Q.  Okay.  Well, were your calculations --
8  did your calculations result in the same forces
9  that they arrived at?
10       MR. TREEBY:
11          Object.  Form.
12    A.  No.
13 EXAMINATION BY MR. STEVENS:
14    Q.  What is the difference between your
15 calculations and Exponent's calculations?
16    A.  Exponent calculated the forces
17 required to plastically deform the sheets to
18 their measured widths.  Our analysis calculated
19 whether it was possible for significant
20 horizontal forces to develop in the sheets from
21 the water and soil forces acting on the sheets.
22       They're two different calculations.
23 Two different methods of calculation.
24    Q.  So they determined that it would take
25 500,000 pounds of force to cause what was found

Page 98

1  after the fact.  Right?
2     A.  Yes.
3     Q.  And you determined that there were no
4  conditions in existence, um -- well, you
5  determined that there were in place conditions
6  in existence that would generate that amount of
7  force.
8     A.  No.
9        MR. SMITH:
10          Object to the form.
11 EXAMINATION BY MR. STEVENS:
12    Q.  Well, I'm right on part of it.  What
13 did you calculate, then, if that's not what you
14 did?
15    A.  We calculated, in this
16 three-dimensional soil model, the potential for
17 development of significant horizontal forces in
18 the sheeting.  And, um -- you know, out
19 calculation was less force than what Exponent
20 was able to get from their calculation.
21    Q.  So you're saying there wasn't enough
22 horizontal force transmitted through the soils
23 to cause that amount of deformation?
24       MR. TREEBY:
25          Object to form.

Page 99

1  EXAMINATION BY MR. STEVENS:
2     Q.  Yes or no?
3     A.  No.
4     Q.  Okay.  I got to understand what the
5  difference is between their calculation -- you
6  don't disagree with them, that 500,000-pounds
7  of force was necessary to cause that amount of
8  deformation, or that deformation that was
9  found.
10       MR. SMITH:
11          Object to the form.
12       MR. TREEBY:
13          Object to the form.
14 EXAMINATION BY MR. STEVENS:
15    Q.  You don't disagree, do you?
16    A.  I don't disagree.
17    Q.  Okay.  Therefore, you agree that
18 500,000 pounds of force is an accurate
19 assessment of the force that would be necessary
20 to cause that amount of deformation.
21       MR. SMITH:
22          Object to the form.
23 EXAMINATION BY MR. STEVENS:
24    Q.  Yes or no?
25    A.  No.

Page 100

1     Q.  All right.  Do you have an opinion
2  either way?
3     A.  Yes.
4     Q.  What is your opinion?
5     A.  Exponent's calculation was correct in
6  that it would require roughly 500,000 pounds of
7  total lateral force to deform the sheets to the
8  shape they were measured in.
9     Q.  Okay.  And did you make any assessment
10 of where that amount of lateral force could
11 possibly come from to cause that amount of
12 deformation of the sheets to the shape they
13 were measured in?
14    A.  Yes.
15    Q.  What calculation did you do?
16    A.  Three-dimensional finite element
17 analysis that I referred to in Appendix B.
18    Q.  And did your three-dimensional finite
19 element analysis enable you to determine
20 whether or not the storm waters and the soil,
21 the water and soil from the canal side,
22 exhibited or demonstrated, produced --
23 generated is the word I'm struggling for, that
24 amount of pressure?
25       MR. TREEBY:

Page 101

1           Object.
2        MR. SMITH:
3           Object to the form.
4      A.  Yes.
5    EXAMINATION BY MR. STEVENS:
6      Q.  Okay.  What was the result?
7      A.  In our analyses, we were able to show
8    that very substantial forces developed in the
9    sheeting, to the point that-- up to the point
10   that the analysis numerically becomes unstable
11   and can't generate any further force.  We got
12   up to the equivalent of about 200,000-pounds of
13   force in the wall, at which point the program
14   that we were using becomes unstable and can't
15   deform any further.  And at the point we had to
16   stop due to time.
17     Q.  Okay.  So you've never actually
18   finished that assessment, if you will.
19        MR. TREEBY:
20           Object.  Form.  It's a statement,
21   not a question.
22        MR. SMITH:
23           Same objection.
24   EXAMINATION BY MR. STEVENS:
25     Q.  Yes or no?

Page 102

1      A.  I have completed that analysis to the
2    extent I was going to take it.
3      Q.  But you were not able to arrive at any
4    definitive opinion or conclusion.
5         MR. SMITH:
6            Object to the form.
7         MR. TREEBY:
8            Object as to form.
9    EXAMINATION BY MR. STEVENS:
10     Q.  Were you, sir?
11     A.  Yes.
12     Q.  Okay.  What is your conclusion?
13     A.  My conclusion is that the
14   three-dimensional finite element analyses
15   showed us that by the deformation of the south
16   wall moving laterally more than the north wall
17   there was the potential there to generate very
18   large forces in this wall, sufficient enough to
19   match what Exponent had calculated.  I took my
20   numerical analyses, and realizing that the
21   calculations were starting to break down in
22   that particular model, I used my judgment and
23   experience doing this kind of analysis to say
24   that, yes, it's very feasible here that as the
25   pressures continued to build that this force

Page 103

1    could develop in the wall -- that this
2    500,000-pounds of force could develop in the
3    wall.
4      Q.  Now, I want to ask you again, from
5    what source would that 500,000 pounds develop
6    in the wall?
7      A.  The application of the flood water
8    loads and the soil pressures acting on the
9    flood side.
10     Q.  Did you do any specific analysis or
11   computations to determine exactly what the
12   flood water load would have been at the time of
13   the storm?
14     A.  Yes.
15     Q.  What was the result?
16     A.  I don't know.
17     Q.  Where would it be reflected in your
18   report?
19     A.  It isn't.  It would be within the
20   details of the analysis.
21     Q.  And where would the details of the
22   analysis be located today?
23     A.  In the, um -- the files generated with
24   these runs.
25     Q.  And the runs are like the ones we

Page 104

1    talked about yesterday?
2      A.  They're computer files of data that we
3    provided to you in the, um -- as part of our
4    reliance documents.
5      Q.  Okay.  Can you be any more specific
6    than that?  If I wanted to do like we did
7    yesterday with the big spreadsheet to look at
8    the erosion rates that we did yesterday, can
9    you steer us to the file that we would need to
10   pull up to look at the inputs for your
11   calculation of flood water loads?
12     A.  Not as I sit here now, no.
13     Q.  You also indicated that the soil
14   pressures acting on the wall would have been a
15   factor in establishing a source for the
16   500,000 pounds of pressure.  I'm sorry.  The
17   force.  Correct?
18     A.  Yes.
19     Q.  Same thing; what soil pressures did
20   you assume in your computations?
21     A.  I didn't assume anything.
22     Q.  Okay.  What soil pressure inputs did
23   you employ in your modeling?
24     A.  We'd have --
25        MR. SMITH:

Page 105

```
 1         Object to the form.
 2      A.  We'd have to look at the same input
 3   files to see what we used.
 4   EXAMINATION BY MR. STEVENS:
 5      Q.  Okay.  How much water and how much
 6   soil would it take to generate that amount of
 7   pressure, 500,000 pounds of planar tensile
 8   force?
 9         MR. TREEBY:
10             Object to the form of the
11         question.
12      A.  I can't answer the question.
13   EXAMINATION BY MR. STEVENS:
14      Q.  Okay.
15      A.  It's a combination of water and soil,
16   and there could be many different combinations.
17      Q.  In the context of this case, did you
18   make any effort to analyze the combination of
19   water and soil in existence at the moment of
20   this failure?
21         MR. TREEBY:
22             Object.  Asked and answered.
23      A.  Yes.
24   EXAMINATION BY MR. STEVENS:
25      Q.  What were the results of that
```

Page 106

```
 1   analysis?
 2         MR. TREEBY:
 3             Object.  Asked and answered.
 4      A.  That's the same three-dimensional
 5   analysis that we've been talking about for the
 6   last few minutes.
 7   EXAMINATION BY MR. STEVENS:
 8      Q.  Very good.  Let me ask you this:  At
 9   what time, based upon your calculations, what
10   time would this 500,000 pounds of force have
11   been reached at the north breach?
12      A.  I don't know.
13      Q.  Okay.  You agree with Dr. Silva-Tulla
14   and Dr. Stark, do you not, that the north
15   breach occurred at approximately 6:10 a.m.?
16         MR. SMITH:
17             Objection.
18   EXAMINATION BY MR. STEVENS:
19      Q.  Yes or no?
20         MR. SMITH:
21             Object to the form.
22      A.  My expert report says that I believe
23   the failure occurred around that time.
24   EXAMINATION BY MR. STEVENS:
25      Q.  Would it be accurate for me to assume,
```

Page 107

```
 1   then, that this 500,000 pounds of planar
 2   tensile force had to have occurred at or before
 3   6:10 a.m.?
 4      A.  Yes.
 5      Q.  As of 6:10 a.m., the water level in
 6   the IHNC, as I read your report, was 11,
 7   approximately 11.3 feet, and there was no surge
 8   overtopping at that time.
 9         MR. SMITH:
10             Object to the form.  There's no
11         question pending.
12   EXAMINATION BY MR. STEVENS:
13      Q.  Is that a correct statement of facts
14   expressed in your report?
15      A.  Yes.
16      Q.  Thank you.  At 6:10 a.m., when the
17   north breach occurred, how much scour depth was
18   there on the protected side of the floodwall?
19         MR. TREEBY:
20             Object.  Asked and answered.
21         MR. SMITH:
22             Same objection.
23      A.  Little to none.  There might have been
24   a little bit from wave overtopping.
25   EXAMINATION BY MR. STEVENS:
```

Page 108

```
 1      Q.  Would the presence of earthen levee on
 2   the protected side of the levee at the north
 3   breach have acted as a resisting force to the
 4   pressures from the floodwaters and soils on the
 5   canal side?
 6      A.  Yes.
 7      Q.  Did you compute or calculate the
 8   value, if you will, of that earthen levee on
 9   the protected side of the north breach?
10      A.  Yes.
11      Q.  Where is that reflected in your
12   report?
13      A.  It's not included in the report
14   explicitly.  It's in the same analyses that we
15   referred to earlier.
16      Q.  The same analyses being?
17      A.  The three-dimensional finite element
18   analysis.
19      Q.  Is it your opinion -- and if you would
20   help me here for a second, just to simplify it,
21   then we can get into the science behind it in a
22   minute.  Is it your opinion -- and I have my
23   legal pad on end, laying on its side, on end,
24   so it's straight up and down like a wall.  Is
25   it your opinion that these forces,
```

Page 221

1  I think asked him that and he
2  already answered it.
3    A.  I guess your question has roughly the
4  same area.  And using those words, I will
5  agree.
6  EXAMINATION BY MR. STEVENS:
7    Q.  Fair enough.
8        Now, one more, 45, is an aerial
9  photograph taken from north of the Florida
10 Avenue Bridge toward the south, and the two
11 yellow arrows are intended to note the same
12 water-filled holes on the IHNC side of the
13 floodwall at both the north and south breach
14 that we just discussed in laying out all these
15 photographs.  Do you agree with that?
16   MR. TREEBY:
17       Object to the form of the
18       question.  I'll just object to the
19       form of the question.
20   A.  No.
21 EXAMINATION BY MR. STEVENS:
22   Q.  You don't agree that these two arrows
23 point to the two basic areas depicted in the
24 photographs we just identified from, oh, we
25 started with -- 38 to 44?

Page 222

1    A.  I agree with that question as stated.
2    Q.  All right.  Did you analyze, in any
3  way, these two water-filled holes, either at
4  the north breach or the south breach?
5    A.  No.
6    Q.  Okay.  Do you attach any significance
7  to the fact that there is water in the holes in
8  the location with the ellipses, for example, on
9  number 41?  Do you attach any significance to
10 fact that water is present in those holes near
11 the north breach after Katrina?
12   A.  No.
13   Q.  Do you have any explanation as to how
14 these water-filled holes were created?
15   A.  That's not something I focused on.
16   Q.  In your report, at Page 11,
17 Section 1.2 entitled Approach, you indicated
18 that, quote, my approach was to identify any
19 and all explanations that have been offered for
20 the cause of failure and to collect all
21 information and data relevant to these
22 failures, period, end of quote.
23       You are aware that Dr. Bea has
24 identified these water-filled holes that we've
25 been over in Exhibits 38 to 45 as contributing

Page 223

1  causes to the flood wall failures, are you not?
2    A.  These exhibits are from his rebuttal
3  report; correct?
4    Q.  Some are from his original report and
5  some are from his rebuttal report.
6    A.  I'm aware that he made some statements
7  about holes with water as part of his
8  explanation, but I don't recall details.
9    Q.  But that was an explanation that he
10 offered as a cause of failure.
11       Your report says that your approach
12 was to analyze every -- or any and all
13 explanations.  And you have not analyzed this
14 explanation, have you, sir?
15   A.  I considered it.
16   Q.  Tell me how you considered these
17 particular water-filled holes that are
18 described in Exhibits 38 through 45.
19   A.  Well, first of all, these photos
20 aren't clear that there's holes there.  All we
21 can see is water covering land.  We have no
22 idea of how deep these are.
23   Q.  Okay.
24   A.  Secondly, these -- the evidences
25 here -- or these photographs are taken well

Page 224

1  after the breach occurred.  Quite a bit of flow
2  had occurred in the opposite direction back
3  towards the canal.  They do indicate some
4  erosion occurring of soils that were originally
5  there.  We don't know under what circumstances
6  that occurred.  And if it was erosion caused by
7  rapidly flowing water, it would have been after
8  the failure was initiated and occurred and not
9  a cause of it.
10   Q.  Okay.  You indicate on Page 58 of your
11 report, under Section 5 entitled Potential
12 Causes of Failure of the North Breach, that the
13 potential mechanisms for failure at the north
14 breach include, and you give five bullet
15 points: I-wall was hit and burst by a large
16 floating object; 2, excessive seepage beneath
17 the I-wall made the land side flood wall
18 embankments unstable; 3, overtopping of the
19 wall causing scour and overturning failure of
20 the wall; 4, global instability of the
21 floodwall due to weak soils; and 5, structural
22 failure of the wall.
23       Am I fair in stating that you
24 eliminated the first -- no, you eliminated 1, 2
25 and 3.  You conclude that it was a function of