# EXHIBIT 23

---

Page 1

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION
CONSOLIDATED LITIGATION        * NO. 05-4182
                               * Consolidated
PERTAINS TO: MRGO              * SECTION K(2)
                               *
Armstrong, No. 10-866          * JUDGE DUVAL
                               * MAG. WILKINSON
* * * * * * * * * * * * * * *
```

       Deposition of THOMAS L. BRANDON,
Ph.D., P.E., taken in the above-entitled
cause, pursuant to the following stipulation,
before Dawn H. Hymel, Certified Court
Reporter, at the offices of Bruno & Bruno, 855
Baronne Street, New Orleans, Louisiana, on
Friday, the 13th of April, 2012, commencing at
9:21 a.m.

---

Page 2

```
 1   APPEARANCES:
 2   Appearing on Behalf of Plaintiffs:
 3      O'DONNELL & ASSOCIATES, PC
        BY: ANDREW P. OWEN, ESQ.
 4      800 Wilshire Boulevard
        Suite 500
 5      Los Angeles, California  90017
            -and-
 6      BARON & BUDD, P.C.
        BY: THOMAS SIMS, ESQ.
 7      701 Brazos Street
        Suite 500
 8      Austin, Texas  78701-3232
            -and-
 9      LEWIS SCOTT JOANEN, ESQ.
        4905 Freret Street
10      Suite B
        New Orleans, Louisiana  70115
11          -and-
        DOMENGEAUX WRIGHT ROY & EDWARDS, LLC
12      BY: ELWOOD C. STEVENS, JR., ESQ.
        556 Jefferson Street
13      Suite 500
        Lafayette, Louisiana  70501
14
15   Appearing on Behalf of the United States of
     American through its agency, U.S. Army Corps
16   of Engineers:
17      UNITED STATES OF AMERICA
        BY: ROBIN D. SMITH, ESQ.
18      Benjamin Franklin Station
        P.O. Box 888
19      Washington, D.C.  20004
20
     Appearing on Behalf of Washington Group
21   International:
22      STONE, PIGMAN, WALTHER, WITTMANN L.L.C.
        BY: JAMES C. GULOTTA, JR., ESQ.
23         HEATHER LONIAN, ESQ.
           WILLIAM D. TREEBY, ESQ.
24      546 Carondelet Street
        New Orleans, Louisiana  70130
25
```

---

Page 3

```
 1   ALSO PRESENT:
 2      FRANCISCO SILVA-TULLA, Sc.D., P.E.
 3
 4   REPORTED BY:
 5      DAWN H. HYMEL
        Certified Court Reporter #81016
```

---

Page 4

```
                  I N D E X
                                       PAGE
EXAMINATION BY:
   Mr. Owen                             5

              E X H I B I T S

Brandon 1   Resume' of Thomas L
            Brandon, Ph.D., P.E.        8

Brandon 2   3/9/2012 Technical Report of
            Dr. Thomas L. Brandon, P.E.  17
Brandon 3   Appendix 11, Analysis of
            Performance of the Inner
            Harbor Navigation Canal     34
Brandon 4   Chapter Six: The St.
            Bernard and Lower Ninth
            Ward Protected Area         40
Brandon 5   Expert Report of Joseph
            B. Dunbar, Ph.D., RPG       56

Brandon 6   Excerpt from Dr. Marr's
            Report                      92
Brandon 7   Excerpt from Dr. Marr's
            Report                      94

Brandon 8   Boring Logs                104

Brandon 9   Appendix B, Development of
            Lower 9th Ward Floodwall
            Analysis Cross Sections    119

Brandon 10  Discussions and Closures   158

Brandon 11  Circular No. 1110-2-6066   173

Brandon 12  Rebuttal Report of Robert
            Glenn Bea, Ph.D., P.E.     207
```

Page 49

1   spacing based upon the information you
2   receive, then certainly the way you change the
3   spacing would be influenced about what the
4   consequences of failure are, so -- But the way
5   it works contractually, you have to get a map,
6   draw places for borings on there, send a crew
7   out there to do the holes.
8   Q.  Okay.
9   A.  Then once you have that data, then you
10  can consider these things about, are the site
11  conditions adequate for the spacing I've got?
12  Are the consequences of failure to the point
13  that I need to be extra careful that I deduce
14  the soil parameters?  And things like that.
15  There's no -- Geotechnical engineering is a
16  judgment field.  There's no pre-prescribed
17  cookie-cutter way to plan an exploration
18  program.
19  Q.  And so engineers can have, you know, I
20  ask you, it's 200 to 500 feet, and you can ask
21  another engineer and he may say 150 feet to
22  300 feet, right?
23  A.  Certainly.  Yeah.
24  Q.  Okay.  All right.  If you can go back to
25  your report, page 5.

Page 50

1   A.  Yes.
2   Q.  Okay.  Who developed these, Figures 3 and
3   4 here, your two cross sections?
4   A.  Joe Dunbar and I.
5   Q.  Okay.  And did you say you did read
6   Dr. Dunbar's --
7   A.  I have not.
8   Q.  You have not.  Okay.  You write on page
9   2, at the very bottom, with respect to Figures
10  3 and 4, these figures depict the author's
11  best judgment of the stratigraphy at the north
12  and south breaches, taking into account all
13  available evidence.
14      Did I read that right?
15  A.  Correct.
16  Q.  Can you tell me what you mean by all
17  available evidence?
18  A.  I guess the borings that we thought were
19  quality borings, cones, information we thought
20  was credible that we could include on the
21  cross sections.
22  Q.  Okay.  Was there any material -- Okay.
23  So quality material, credible material.  Was
24  there any material that you had access to that
25  you just said, forget it, I'm not going to --

Page 51

1   I know those are not quality, I know those are
2   not credible, I'm not going to consider those?
3   A.  Not necessarily, because the main point
4   of interest for doing the type of analysis
5   that I did has to do from the floodwall to the
6   land side.  Everything that's to the flood
7   side or the canal side of the I-wall is of a
8   lot less significance.  And so I guess I
9   sharpened my pencil and took closer looks at
10  everything from the wall toward the land side,
11  but I don't -- I can't think of anything that
12  I just said, you know, ignore this completely
13  based upon it being poor.
14      You know, there's certain things that,
15  you know, an example would be, if you have
16  borings where the soils are classified with
17  laboratory tests, then those have a higher
18  reliability than borings where soils are
19  classified solely by visual inspection, and so
20  if you have side by side borings, then one
21  would rely more on the classification based
22  upon standardized tests as opposed to the more
23  qualitative visual description.
24  Q.  Do the laboratory testing, the laboratory
25  testing versus the field testing, do you ever

Page 52

1   get orders of magnitude different results
2   between those two?
3   A.  That's -- I can't answer that question,
4   because what are you talking about for orders
5   of magnitude?
6   Q.  Magnitude in terms of permeability.
7   A.  Ask your question again just to make sure
8   that --
9   Q.  If I take out a soil sample and I do a
10  field test and I do a laboratory test, is it
11  common to get, on permeability, is it common
12  to get different results for each test?
13  A.  You know, there -- It -- That's an
14  impossible question to answer as you've asked
15  it, because there's different things that are
16  involved.  I mean, you know, if you're running
17  a field test, there's different types of field
18  tests that can give you some variation.
19  There's different types of lab tests.  And
20  then the lab tests themselves, there's other
21  parameters you can control.  I mean, you know,
22  lab tests that has to do with whether the
23  sample is trimmed vertically or horizontally.
24  A lot of field tests measure probably 85
25  percent horizontal, 15 percent vertical, so

13 (Pages 49 to 52)

DR. THOMAS L. BRANDON                                       April 13, 2012

Page 117

```
 1       MR. GULOTTA:
 2          Tom's felt computer deprived anyway
 3   today.
 4       MR. SMITH:
 5          He probably has.
 6   BY MR. OWEN:
 7   Q.  So on this disk there's a zip file called
 8   final expert report.  I click on that and
 9   there's a list of PDFs and a list of other
10   folders.  You said you did a seepage, a quick
11   seepage analysis.  Could you --
12   A.  This looks different than -- Now, can --
13   Q.  It's got to be their zip file.  They
14   won't --
15   A.  Yeah.
16   Q.  We'll do this another time.  But do you
17   recognize the actual names of the folders, the
18   Phase2 --
19   A.  No.  Frankly, I can't recall if that's
20   the format that I put it in or somebody zipped
21   it after the fact.
22   Q.  Was your seepage report a PDF, do you
23   recall, was it a Word document PDF?
24   A.  I don't understand.
25   Q.  Oh, I think you -- I think you testified
```

Page 118

```
 1   this morning that you did a seepage analysis.
 2   A.  Yeah.
 3   Q.  Was it, when you turned it over, was it
 4   in a PDF, was it in a Word document?
 5   A.  No, it's just these files right here.
 6   Oh, there's summary plots within this, but
 7   there's, actually a summary table, but the
 8   input and output is all contained there.
 9   Q.  And did you say the name of the file
10   contained the word seepage?
11   A.  Yeah, I'm almost certain, best I recall,
12   it does.
13   Q.  I'll do it at lunch.  Let's not spend any
14   more time on that.
15       Okay.  Going back to the cross sections,
16   and I think I know the answer to this, but
17   with respect -- You know that ILIT had cross
18   sections in their report?
19   A.  Yep.
20   Q.  Okay.  And I take it you -- Did you look
21   at those as part of your analysis and study
22   for this, your report, did you consider those?
23   A.  Not at all.  I had written as part --
24   It's -- I recall that Bea had this, but I
25   then, and some other people, wrote a response
```

Page 119

```
 1   to the National Academy of Engineering and the
 2   National Resource Council critiquing the ILIT
 3   cross sections.  I know that Professor Bea's
 4   got a copy of that because he's cited other
 5   things, but our point was is their cross
 6   sections were off by up to four to eight feet
 7   in some cases.
 8   Q.  Okay.
 9   A.  And so I don't think their cross sections
10   have much utility --
11   Q.  I understand.
12   A.  -- in doing an analysis.
13   Q.  Okay.  I'd like to mark as Brandon
14   Exhibit 9, there you go, Doctor.
15       Do you recognize this document, Doctor?
16   A.  Yes.
17   Q.  And this is Appendix B to Dr. Bea's
18   original report in this case; is that right?
19   A.  Yes.
20   Q.  Okay.  And I would assume, did you review
21   the various cross sections that are detailed
22   in this Appendix B?
23   A.  Yes, but frankly, I have difficulty in
24   keeping them straight.  The way that they're
25   labeled -- At my office in Virginia I printed
```

Page 120

```
 1   them out just to have them kind of in
 2   sequence, but, you know, there's -- Yeah, long
 3   as you can tell me specifically which one
 4   we're talking about, I'm in good shape.
 5   Q.  Okay. Okay.  Can we look at page 15?
 6   A.  Yes.
 7   Q.  Okay.  I'm looking at Figure 11, North
 8   Case Breach, 1-2.
 9   A.  Yes.
10   Q.  Excuse me.
11       (Off-the-record discussion).
12   Q.  Okay.  All right.  In looking at Figure
13   11, are you able to tell me, sitting here,
14   what things are not accurate or not correct on
15   that figure, in your opinion?
16   A.  Well -- Yeah, I'd have to think of the
17   way to answer that.  I mean, you mean is there
18   something that he's showing factually
19   incorrect here?
20   Q.  Yes.
21   A.  Yeah.  Well, and this is just Case 1-2?
22   Q.  Yes, that's correct.
23   A.  ==Yeah.  Well, based on -- You know,==
24   ==frankly, in geotechnical engineering, when==
25   ==you're drawing cross sections, you are allowed==
```

Page 121

1  to have a certain latitude. It's a judgment
2  type of issue.
3  Q. Sure.
4  A. Yeah. And so, you know, this one right
5  here (indicating), you know, I've got no
6  evidence that there's this much of a large
7  backfill excavation there, or this large
8  yellow area up here, I don't think that that's
9  necessarily reflected -- You know, frankly,
10 it's not labeled here even what material that
11 is, you know, so I would think that that's a
12 problem. But other than that specifically,
13 those two areas, the rest might be okay.
14 Q. Can I ask you the same question for, if
15 you turn to page 17, for Figure 13, North
16 Breach, Case 2-2?
17 A. Well, this one, yeah, I don't think,
18 there's no information that I've seen that
19 there's this shell fill going down to the tip
20 of the sheet pile. I mean, I don't see how
21 one would infer that from boring 81A. That's
22 a -- That's a bit of a stretch to do that.
23 Q. Can you tell me -- Oh, I'm sorry. Go
24 ahead.
25 A. As I said, that you're allowed a certain

Page 122

1  amount of latitude in drawing cross sections.
2  I don't think I would quite agree, if his
3  elevations are correct for B-8G, it looks like
4  the actual swamp layer's a bit deeper shown in
5  the boring than on his, if you're basing that
6  on water contents. You know, because he has
7  swamp and materials with water contents in the
8  fifties, and it looks like this swamp layer
9  pinches out before you get to boring 8 there,
10 because particularly if you're trying to base
11 this on water contents. But, you know, it's
12 certainly not a section I would have drawn.
13     Now, I would mainly argue that the
14 presence of one boring having shell fill down
15 to the tip of the wall seems to be a stretch
16 without some confirming information --
17 Q. Okay.
18 A. -- of some sort.
19 Q. So if it were up to you, how would, just
20 with respect to the shell fill on 81A, how
21 would you change that portion of Figure 2-2?
22 A. Well, see, I would -- To me, this would
23 not be a figure representative of the failed
24 section.
25     (Mr. Treeby entered the room).

Page 123

1  A. Because I think if you're basing your
2  cross section on a boring outside of the
3  failure in an area that didn't fail, it's
4  difficult for me to imagine that that would be
5  representative of a section within the area
6  that did indeed fail. And so I would -- And I
7  tried to explain this to some degree in my
8  report, but when you're a geotechnical
9  engineer, you have to make some approximations
10 in your analyses, and one is, you come up with
11 cross sections you think are representative
12 for the area that failed.
13     What we have here, best as I can tell, is
14 a cross section representative for an area
15 that didn't fail outside of the failure area,
16 and, you know, looking at this, the idea of
17 borings 75, 75A and 77A --
18 Q. 79A and 77A, looking on Brandon Exhibit
19 7?
20 A. Yeah. So what I would come up with
21 perhaps would have been a more -- Yeah, see,
22 those don't show up in either Figure 10,
23 Figure 11, Figure 12 or Figure 13, so, to me,
24 ignoring two borings within the failed area
25 and including one boring outside the failed

Page 124

1  area would be inadmissible. This wouldn't be
2  something that I would rely on.
3  Q. In looking at Brandon Exhibit 7, this
4  one, yeah, that 81A, --
5  A. Uh-huh.
6  Q. -- can you possibly -- is it possible for
7  you to estimate the perimeter that that boring
8  81A encompasses?
9  A. We don't do that. You don't
10 necessarily -- You know, the way it would work
11 is, if I looked at boring 79A and 77A, just as
12 well I might assume 81A to be a complete
13 anomaly. It's at a corner right here. It's
14 outside the failed area. It could have been
15 just one specific area where they ended up
16 having to backfill shells.
17 Q. Right.
18 A. And then the fact that it's an area that
19 didn't fail tells me it must have been a
20 pretty decent backfill to not fail. So, you
21 know, as I said, you're allowed a certain
22 amount of latitude in drawing sections, but it
23 is important to look at all the information
24 you're given in coming up with sections to
25 represent the north breach. Where all the