# EXHIBIT 28

Page 1

```
         UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES     CIVIL ACTION
CONSOLIDATED LITIGATION           NO. 05-4182 K2
                JUDGE DUVAL
PERTAINS TO MRGO            MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
     05-6314, 05-6324, 05-6327, 05-6359,
     06-0225, 06-0886, 06-1885, 06-2152,
     06-2278, 06-2287, 06-2824, 06-4024,
     06-4065, 06-4066, 06-4389, 06-4634,
     06-4931, 06-5032, 06-5155, 06-5159,
     06-5156, 06-5162, 06-5260, 06-5771,
     06-5786, 06-5937, 07-0206, 07-0621,
     07-1073, 07-1271, 07-1285
                   * * *

         Deposition of ROBERT G. BEA, PH.D.,
given at the offices of Stone Pigman Walther
Wittmann, LLC, 546 Carondelet Street, New
Orleans, Louisiana 70130, on April 16th, 2012.
REPORTED BY:
     JOSEPH A. FAIRBANKS, JR., CCR, RPR
     CERTIFIED COURT REPORTER #75005
```

Page 2

```
APPEARANCES:
REPRESENTING THE PLAINTIFFS:
     BRUNO & BRUNO
     (BY: JOSEPH M. BRUNO, ESQUIRE)
     (BY: SCOTT JOANEN, ESQUIRE)
     855 Baronne Street
     New Orleans, Louisiana 70113
     504-525-1335
- AND -
     LEVIN, PANATONIO, THOMAS, MITCHELL,
     RAFFERTY & PROCTOR, P.A.
     (BY: MATTHEW D. SCHULTZ, ESQUIRE)
     316 S. Baylen St., Suite 600,
     Pensacola, Florida 32502
     850-435-7140
- and -
     SHER, GARNER, CAHILL, RICHTER, KLEIN &
     HILBERT, L.L.C.
     (BY: ASHLEY COKER, ESQUIRE)
     909 Poydras Street, 28th Floor
     New Orleans, Louisiana 70112
     504-299-2100
```

Page 3

```
REPRESENTING WASHINGTON GROUP INTERNATIONAL,
     INC.:
     STONE PIGMAN WALTHER WITTMANN, L.L.C.
     (BY: WILLIAM D. TREEBY, ESQUIRE)
     546 Carondelet Street
     New Orleans, Louisiana 70130
     504-581-3200
- and -

     JONES DAY
     (BY: NORA WARREN, ESQUIRE)
     (BY: CHRISTOPHER N. THATCH, ESQUIRE)
     (BY: DEBRA S. CLAYMAN, ESQUIRE, VIA
     TELEPHONE)
     51 Louisiana Avenue, N.W.
     Washington, D.C. 20001-2113
     202-879-4645
```

Page 4

```
REPRESENTING THE UNITED STATES OF AMERICA:
     U.S. DEPARTMENT OF JUSTICE
     (BY: ROBIN DOYLE SMITH, ESQUIRE)
     (BY: RUPERT MITSCH, ESQUIRE)
     Torts Branch, Civil Division
     P.O. Box 888
     Benjamin Franklin Station
     Washington, D.C. 20044
     202-616-4289

ALSO PRESENT:
     FRANCISCO SILVA-TULLA
     TIMOTHY STARK

VIDEOGRAPHER: GILLEY DELORIMIER (DEPO-VUE)
```

Page 5

# EXAMINATION INDEX

| EXAMINATION BY: | PAGE |
|---|---|
| MR. TREEBY | 7 |
| MR. SMITH | 175 |
| MR. TREEBY | 301 |

# EXHIBIT INDEX

| EXHIBIT NO. | PAGE |
|---|---|
| Bea Exhibit 45 | 19 |
| Bea Exhibit 46 | 37 |
| Bea Exhibit 47 | 47 |
| Bea Exhibit 48 | 48 |
| Bea Exhibit 49 | 53 |
| Bea Exhibit 50 | 55 |
| Bea Exhibit 51 | 68 |
| Bea Exhibit 52 | 74 |
| Bea Exhibit 53 | 108 |
| Bea Exhibit 54 | 111 |
| Bea Exhibit 55 | 128 |
| Bea Exhibit 56 | 166 |
| Bea Exhibit 57 | 177 |

Page 6

# STIPULATION

IT IS STIPULATED AND AGREED by and among counsel for the parties hereto that the deposition of the aforementioned witness may be taken for all purposes permitted within the Federal Rules of Civil Procedure, in accordance with law, pursuant to notice;

That all formalities, save reading and signing of the original transcript by the deponent, are hereby specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are reserved until such time as this deposition, or any part thereof, is used or sought to be used in evidence.

\* \* \*

JOSEPH A. FAIRBANKS, JR., CCR, RPR, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

Page 7

ROBERT G. BEA, PH.D. 60 Shuey Drive, Moraga, California 94556, a witness named in the above stipulation, having been first duly sworn, was examined and testified on his oath as follows:

EXAMINATION BY MR. TREEBY:

Q. Good morning, Dr. Bea.

A. Good morning.

Q. I want to ask you questions this morning to begin with about some basic scientific principles.

First, wouldn't you agree that when one is engaged in a scientific investigation of any problem it is important to use applicable and accurate data.

A. Yes.

Q. And wouldn't you agree that a scientific analysis made during a scientific investigation should rely, when available, on known facts and not on speculation?

A. Yes.

Q. And also, wouldn't you agree, Dr. Bea, that in a scientific investigation it is sometimes necessary to use hypotheses?

A. Yes.

Page 8

Q. And when one is testing an hypothesis, it is important to use, as premises, whenever possible, actual facts rather than speculative information?

A. Yes.

Q. The permeability of specific soils is a material property of those soils; isn't that correct?

A. Yes.

Q. And material properties of soils is something that one can determine scientifically, right?

A. Yes.

Q. ==And maybe I should get something straight. You do differentiate, in your report other otherwise, between hydraulic conductivity and permeability?==

A. ==Yes.==

Q. ==Tell me the differentiation that you make.==

A. ==Well, in hydraulic conductivity, I'm including two important elements in conductivity, one of which is transmission of fluid determined largely by the soil permeability. The other is the transmission of==

Page 9

1   pressure.  And the pressure is influenced by
2   permeability, but much more influenced by the
3   compressibility characteristics of water.
4       Q.  Okay.  Dr. Bea, I didn't really ask
5   you about pressure, I asked you about hydraulic
6   conductivity versus permeability.  And have you
7   answered me and told me the differ -- do you
8   believe your answer told me what you
9   differentiate between hydraulic conductivity
10  and permeability?
11      A.  Yes.
12      Q.  Okay.  Hydraulic conductivity of
13  specific soils is a material property of the
14  soil given the fluid that flows through those
15  soils; isn't that correct?
16      A.  Correct.
17      Q.  And these material properties of these
18  soils and these fluids are matters that one can
19  determine scientifically, right?
20      A.  Correct.
21      Q.  In this case, you relied on Dr. David
22  Rogers for some of the information you included
23  in your various reports; right?
24      A.  Correct.
25      Q.  And you know, do you not, the

Page 10

1   qualification of Dr. Rogers?
2       A.  Yes, sir.
3       Q.  In fact, you served on the faculty of
4   UC Berkeley with Dr. Rogers; isn't that so?
5       A.  Yes, sir.
6       Q.  And you know in this case Dr. Rogers
7   relied upon the services of expertise of a
8   gentleman named Kevin Pope.  Is that right?
9       A.  Yes.
10      Q.  And you know, do you not, that
11  Dr. Rogers, using the services of Kevin Pope,
12  used scientific -- standard scientific methods
13  to evaluate results from pumping tests at sites
14  selected by the plaintiffs' expert team to
15  determine the hydraulic conductivity or
16  permeability of the organic clay layers that
17  you believe were implicated in the flood wall
18  failures in the East Bank Industrial Area?
19  Right?
20          MR. JOANEN:
21              Object to the form.
22      A.  Please repeat -- reform your question,
23  please.
24  EXAMINATION BY MR. TREEBY:
25      Q.  Okay.  You know, do you not, that

Page 11

1   Dr. Rogers used the services of Kevin Pope who
2   used standard scientific methods to evaluate
3   results from pumping tests, right?
4       A.  That's correct.
5       Q.  And you know that that evaluation was
6   done at sites selected by the plaintiffs'
7   expert team, is that right?
8       A.  Yes, sir.
9       Q.  And the purpose of those pumping tests
10  was to determine the permeability of the
11  organic clay layers that you believe were
12  implicated in the flood wall failures at the
13  East Bank Industrial Area, isn't that right?
14      A.  Yes, sir.
15      Q.  And the results of these analyses by
16  Dr. Rogers and Kevin Pope determined a best
17  estimate that the material property
18  permeability of those soils was 1 times 10 to
19  the -5 centimeters per second, right?
20      A.  Correct.
21      Q.  And you also now know, do you not,
22  that these same standard scientific methods
23  used to evaluate results from these pumping
24  tests by Dr. Rogers with the help of Kevin Pope
25  produced another material property for those

Page 12

1   same soils, namely, the storage coefficient of
2   those soils, isn't that right?
3       A.  Correct.
4       Q.  And I believe we established the last
5   time you were deposed on your original report
6   that you know that when a scientist who is
7   qualified knows the storage coefficient of
8   given soils, that scientist can use well
9   recognized and commonly used equations to
10  convert storage coefficient to coefficient of
11  volume change known scientifically as M sub V.
12          Isn't that right?
13      A.  Well, that's one approach to
14  determination of the coefficient of volume
15  change $M_V$.
16      Q.  Those two terms, storage coefficient
17  and $M_V$ are related to one another in ways
18  that can be computed using well-known formulas;
19  correct?
20      A.  Correct.
21      Q.  Now, I realize, Dr. Bea, that you are
22  not competent to actually run transient flow
23  analyses in computers.  Right?
24          MR. JOANEN:
25              Object to the form.

Page 17

1    Q.  And I believe you know, at least from
2   the testimony of Diego Cobos-Roa that you
3   attended last Monday, that when you begin to
4   use SEEP/W on a given day, given session, you
5   can choose -- in fact, you must choose whether
6   you want to do a steady flow analysis or a
7   transient flow analysis with that program.
8   Isn't that right?
9        A.  You can choose in the program to use a
10  steady flow analysis.  Alternatively, you can
11  choose to do a nonsteady flow analysis.  As
12  subsets to those two fundamental kinds of
13  analyses, you can do steady state analysis or
14  you can do transient state analysis.
15       Q.  One of the choices on -- have you ever
16  looked at the computer screen while Diego
17  Cobos-Roa was actually inputting data on
18  SEEP/W?
19       A.  On several occasions, yes.
20       Q.  Okay.  Well, then you know that when
21  you get to that screen you have a choice,
22  steady flow, steady state flow, or transient
23  flow.  Isn't that right?
24       A.  Yes.
25       Q.  Okay.  And you know, in this case,

Page 18

1   that Diego Cobos-Roa chose to run a transient
2   flow analysis, right?
3        A.  We ran both kinds of analyses, both
4   steady state and transient.
5        Q.  We have not seen, in all the model
6   runs, any instance in which the choice -- in
7   this case, in which the choice made was steady
8   state flow analysis.  Are you testifying here
9   under oath that that happened?
10       A.  Yes.
11       Q.  In this case.
12       A.  Please define this case.
13       Q.  I'm talking about the Armstrong case
14  for which reports were given to us by Cobos-Roa
15  done in 2011 and 2012.
16       A.  Now that I have your time frame,
17  please repeat your question.
18       Q.  Isn't it true that the model runs that
19  we have from 2011 and 2012 from Cobos-Roa, in
20  those model runs Cobos-Roa never made the
21  choice steady state flow analysis but always
22  made the choice transient flow analysis.
23       A.  I'm not familiar in detail with the
24  analyses you've been provided, so I'm unable to
25  respond to your question.

Page 19

1        Q.  You haven't looked at the materials
2   given us as reliance materials for your report
3   that include those model runs?
4        A.  I have not looked at the model runs
5   you were provided with.
6        Q.  So if I represent to you that our
7   experts have looked through those and do not
8   see any instance in which Cobos-Roa chose
9   steady state analysis, you're not in a position
10  to disagree with me.
11       A.  That's correct.
12       Q.  Now, when you come to the screen that
13  calls for a compressibility input, an input of
14  the coefficient of volume change, M sub V, let
15  me show you the page that the computer program
16  has at that point.  I'm going to show you a
17  copy of the screen shot from this input
18  parameter which we're going to mark as Bea
19  Exhibit number 45.  (Tendering.)
20            The first page -- and there are three
21  pages in this exhibit.  Now, on the first page,
22  which was taken from one of the model runs that
23  we were given, do you see the place where one
24  must insert M sub V?
25            (Bea Exhibit 45 was marked for

Page 20

1   identification and is attached hereto.)
2        A.  Are you referring to the material
3   model pull down screen in this case labeled
4   centrigraded undrained?
5   EXAMINATION BY MR. TREEBY:
6        Q.  I'm referring to the pull down
7   sheet -- if you have the same thing I'm looking
8   at, which I think you do, there's a window, I
9   guess it's called, it says, key in vol water
10  content function.
11            You see that?
12            MR. JOANEN:
13                (Indicating.)
14       A.  Yes, I see the label for the subset
15  screen shown on the first page of 45.
16            MR. JOANEN:
17                And I'd just like to note for the
18            record that the contrast is fairly
19            difficult to read.
20            MR. TREEBY:
21                The contrast?
22            MR. JOANEN:
23                Yes.  With the blue and the white
24            mix, it's hard to read, especially
25            with the lighting in here.

Page 21

1  MR. TREEBY:
2      I thought I had bad eyesight, but
3      I guess I'm doing well. I'm proud of
4      myself now.
5  EXAMINATION BY MR. TREEBY:
6      Q. Well, do you see the box that calls
7  for M sub V there? I can tell you it's
8  about -- I'll point to it, and perhaps then you
9  can find it. It's right here on this window.
10     A. Yes.
11     Q. Okay. What's there? Can you read the
12 number that has been inserted on that screen
13 shot?
14     A. 0 per pounds per square foot (psf).
15     Q. Do you have any idea what the program
16 does when it's given that input?
17     A. Well, it should proceed with the
18 calculation based on incompressible flow.
19     Q. Do you know what -- how incompressible
20 zero translates to in this software?
21     A. In this particular instance, No.
22     Q. Okay. Would it surprise you if I told
23 you that if you put a true zero -- if you were
24 able to put a true zero in that box, the
25 program wouldn't function?

Page 22

1      A. I think that's accurate, because
2  that's the reason we input very small M sub
3  Vs --
4      Q. Well, in fact, this --
5      A. -- close to zero.
6      Q. Excuse me. I didn't mean to interrupt
7  you. Pardon me.
8          If you recall, because you were at his
9  deposition, I asked that question of Cobos-Roa
10 and he said he didn't know what it translated
11 to either.
12     A. Yep.
13     Q. So if I represent to you that in fact
14 it translates to 10 to the -20, 1 over psf, you
15 can't argue with that.
16     A. Correct.
17     Q. Turn to the next page, if you will,
18 which is another screen shot from a model that
19 was run and given us. In the M sub V box, what
20 does this one say?
21     A. 1 times 10 to the -9 per psf.
22     Q. Do you know why the variation between
23 the two inputs that were in these models; zero
24 in one case, 10 to the -9, 1 over psf in the
25 other?

Page 23

1  MR. JOANEN:
2      Object to the form.
3      A. I know the reason for the 10 to the -9
4  per psf. That number was identified based on
5  performing the analyses in steady flow
6  conditions. The 10 to the -9 was determined
7  based on the soil-water dilatational modulus.
8      Q. I'm not trying to cover ground we
9  covered in the other deposition, and I don't
10 think you understood my question or I think you
11 would have answered it more easily than that.
12         I'm asking if you know the reason for
13 the difference between an input of zero in one
14 case and an input of 10 to the -9, 1 over psf
15 in the other? The reason for the difference.
16     A. No, I don't -- can't explain the
17 difference.
18     Q. That's all I was asking.
19     A. Okay. Sorry. I was trying to be too
20 complete in my answer.
21     Q. Okay. And you also know, in fact you
22 testified at your last deposition, that 1 times
23 10 to the -9, 1 over psf, is not the actual
24 coefficient of volume change, M sub V, that a
25 scientist would compute from the storage

Page 24

1  coefficient determined by Dr. Rogers and Kevin
2  Pope for these site specific clay materials
3  existing at the East Bank Industrial Area.
4         Isn't that right?
5      A. There are two basic ways to compute --
6  determine M sub V. One way depends on the
7  compressibility characteristics of the soil
8  skeleton. That approach uses storage
9  coefficient. The alternative approach treats
10 the materials of concern here, the buried
11 swamp-marsh deposits as an incompressible
12 system. And the incompressible system is
13 focused on the pore water phase in the sample.
14 That approach uses the dilatational wave
15 velocity to determine M sub V. The other
16 approach uses storage coefficient and other
17 similar parameters to define M sub V. The two
18 M sub Vs are different things.
19     Q. You finished?
20     A. I hope so.
21     Q. Let me get an answer to the question I
22 asked you, rather than the one you wanted to
23 answer.
24     MR. JOANEN:
25     I'm going to object to the

Page 33

1   Q.  And the effect would be to cause the
2   factor of safety to be safer.  Right?
3       MR. JOANEN:
4           Object to the form.
5   A.  The use of "safeter" with --
6   EXAMINATION BY MR. TREEBY:
7   Q.  Well --
8   A.  -- a factor of safety is --
9   Q.  Higher.  The factor of safety would be
10  higher.
11  A.  Correct.
12  Q.  Okay.  I was trying to be a forensic
13  engineer there for a minute.  Forgive me.
14      So, if -- let's walk through this one
15  more time so that we're established.  If the
16  $M_{sub V}$ input into your flow analysis had been
17  higher, in other words, it would have been the
18  numbers we talked about and that you told me
19  you had come up with, we agreed on, 2 times 10
20  to the -5, 1 over psf, if that $M_{sub V}$ had been
21  put into the flow analysis, it would have
22  produced lower pore pressures.  Right?
23  A.  Yes, and hence --
24  Q.  Excuse me.
25  A.  Well, that's what the defense experts

Page 34

1   have consistently shown.
2   Q.  Right.
3   A.  But we're performing different
4   analyses.  The defense experts are performing
5   what is officially, if I could use that term,
6   defined as nonsteady flow, unsaturated flow
7   analyses.
8       The analyses I have been performing
9   have been -- and I'm referring specifically to
10  the buried swamp-marsh deposits, and I'll call
11  them deposits from this point forward -- I have
12  chosen, with reasons, to use steady flow
13  analysis, unsaturated conditions that require
14  to satisfy those conditions no significant
15  changes in void ratio and/or saturation.  I
16  have based $M_{sub V}$ not on storage coefficient
17  but, rather, on the dilatational wave velocity
18  that is sensitive to the water compressibility.
19  That's what discriminates the difference
20  between the two sets of analyses.  We are
21  working different problems.
22  Q.  Okay.  You made an interesting
23  statement.  You said -- maybe you misspoke.
24  You said that Dr. -- I'm not going to talk
25  about the other experts.  Dr. Silva is the

Page 35

1   expert that we have put forward in this case.
2   You have said that he used unsaturated flow
3   analyses?  Is that what your testimony is under
4   oath?
5   A.  No.
6   Q.  Oh.
7   A.  I'm referring to the $M_{sub V}$
8   characteristics.
9   Q.  Did he use unsaturated flow analyses
10  or saturated flow analyses?
11      MR. JOANEN:
12          Object to the form.  By that, you
13      mean Dr. Silva-Tulla?
14      MR. TREEBY:
15          Yes.
16  A.  And what materials are you referring
17  to?  The reason for my question --
18  EXAMINATION BY MR. TREEBY:
19  Q.  I'll answer you.  I don't need the
20  reason for your --
21      MR. BRUNO:
22          Whoa, whoa, whoa.  Wait.  Slow
23      down, Bill.
24      MR. TREEBY:
25          No, he's not asking questions.

Page 36

1       MR. BRUNO:
2           Slow own, Bill.
3       MR. TREEBY:
4           No, he's not asking questions.
5       MR. BRUNO:
6           I know, but --
7       MR. TREEBY:
8           He's not asking questions.
9       MR. BRUNO:
10          Just keep it light.
11  EXAMINATION BY MR. TREEBY:
12  Q.  I'm talking about the organic clays.
13  A.  Thank you.  That's exactly the
14  definition that I needed, sir.
15  Q.  And they were treated in Dr. Silva's
16  flow analyses as saturated.  Right?
17  A.  Correct.
18  Q.  Not unsaturated.
19  A.  Correct.
20  Q.  Okay.  I don't want any confusion
21  here.
22      I show you document that we have
23  marked Bea Exhibit number 46 which is a range
24  of values for the coefficient of volume change,
25  $M_{sub V}$, of various porous materials in the

|  | Page 49 |
|---|---|
| 1 | silts, we have clays. |
| 2 | Q. Where would you put it? |
| 3 | A. Well, I would put it in a category |
| 4 | that would be fundamentally very, very low |
| 5 | permeability. |
| 6 | Q. And where would that be? I mean, just |
| 7 | in terms of descriptives, would it be a clay, a |
| 8 | silt, between clay and silt? Where would it |
| 9 | be? It wouldn't be sands and gravels, right? |
| 10 | (Brief interruption.) |
| 11 | EXAMINATION BY MR. TREEBY: |
| 12 | Q. Do you remember the question? |
| 13 | A. No. Sorry. |
| 14 | Q. Where would the organic clays fall on |
| 15 | this plot? |
| 16 | A. What's the drainage path lengths you |
| 17 | wish to assume? |
| 18 | Q. Assume a hundred feet. |
| 19 | A. A hundred feet. |
| 20 | Q. Just assume the maximum that's on |
| 21 | there. |
| 22 | A. Well, I would assume it would plot in |
| 23 | the long time period of years, meaning behaving |
| 24 | as a very impermeable material, or the upper |
| 25 | right-hand corner. |

|  | Page 50 |
|---|---|
| 1 | (Brief recess.) |
| 2 | EXAMINATION BY MR. TREEBY: |
| 3 | Q. Okay. We're still looking at Bea |
| 4 | exhibit number 48. And you have indicated, |
| 5 | Dr. Bea, that you would plot the C sub V for |
| 6 | your soils in the East Bank Industrial Area |
| 7 | somewhere up in the right-hand corner -- upper |
| 8 | corner of this plot. |
| 9 | Is that what you're saying? |
| 10 | A. Well -- |
| 11 | Q. Isn't that what you said? I'm sorry. |
| 12 | I'll read back your answer. |
| 13 | A. Yes. Please. |
| 14 | Q. Okay. Where would the organic clays |
| 15 | fall on this plot? And I told you to assume |
| 16 | 100 feet. And you say, I would assume it |
| 17 | would -- here's your answer: It would plot in |
| 18 | the very long period of years, meaning behaving |
| 19 | as very impermeable material, or the upper |
| 20 | right-hand corner. |
| 21 | A. Correct. |
| 22 | Q. Okay. That's what I thought. |
| 23 | And that would mean 10 feet squared |
| 24 | per year, or 1 centimeter squared per hour. |
| 25 | Right? |

|  | Page 51 |
|---|---|
| 1 | A. Well, I'm sure we could determine that |
| 2 | and plot it. |
| 3 | Q. Well, isn't that -- |
| 4 | A. I'd have to do the calculation, sir. |
| 5 | Q. No, but on this plot, isn't the top |
| 6 | line C sub V equals 1 centimeter squared per |
| 7 | hour equals 10 feet squared per year? |
| 8 | A. Yes. That's right. And the top line |
| 9 | is labeled 10,000 years. |
| 10 | Q. And that's very different, is it not, |
| 11 | than the C sub V that we calculated, that you |
| 12 | assumed Dr. Silva was right about, which is |
| 13 | 16,500,000 centimeters squared per hour. |
| 14 | A. Well, you can plot that point that |
| 15 | Dr. Silva-Tulla determined on this plot and |
| 16 | save all of this back and forth -- |
| 17 | Q. Well -- |
| 18 | A. -- and then we'll know. |
| 19 | Q. Well, but that's at the opposite end |
| 20 | of the scale. Can you explain that |
| 21 | inconsistency? |
| 22 | A. Well, I explained the inconsistency in |
| 23 | the sense that I did not use C sub Vs or the |
| 24 | premised M sub Vs that's this questioning is |
| 25 | focused on. I used very different values. And |

|  | Page 52 |
|---|---|
| 1 | that led to my explanation to you that what |
| 2 | I've come to understand is we are indeed |
| 3 | working different problems. |
| 4 | My approach is based on |
| 5 | incompressible, undrained flow in which the |
| 6 | compressibility characteristics of the buried |
| 7 | swamp-marsh deposits is based on the |
| 8 | compressibility characteristics of the pore |
| 9 | fluid. The M sub Vs and associated C sub Vs |
| 10 | that you are focusing on here presumes that the |
| 11 | buried swamp-marsh deposit compressibility is |
| 12 | determined by the pore -- pardon me, by the |
| 13 | deposit skeleton grains. Those are two |
| 14 | different things intended for two different |
| 15 | kinds of analyses. |
| 16 | Q. There was some confusion regarding |
| 17 | which of the two reports we received from your |
| 18 | attorneys as your rebuttal report, and I |
| 19 | believe that confusion has now been resolved |
| 20 | and we have been provided with a third document |
| 21 | we just received on April 12, which is the |
| 22 | correct version of the final report. It has a |
| 23 | date on it of April 3rd, and I'm marking what I |
| 24 | believe to be the final corrected version of |
| 25 | the final report as Bea Exhibit number 49. And |

|  | Page 77 |
|---|---|
| 1 | Q. Can you tell me where on the Boland |
| 2 | Marine blowup the wedding cake structure is |
| 3 | located? From looking at the map, in other |
| 4 | words. |
| 5 | A. I cannot. |
| 6 | Q. Can you tell me where the sewer lift |
| 7 | station located on the blowup of the Saucer |
| 8 | Marine map? |
| 9 | A. Well, it's located toward the northern |
| 10 | end of Saucer. My memory says approximately |
| 11 | 300 feet from the I-wall. |
| 12 | Q. No -- yeah. Thank you. Maybe I |
| 13 | didn't ask -- can you show me where that is on |
| 14 | this blowup of the Saucer Marine section in |
| 15 | your GIS Swiss cheese model? |
| 16 | A. No, sir, I can't. |
| 17 | Q. Okay. We couldn't either. |
| 18 | Can you show me, on any of these maps |
| 19 | that we've blown up as big as we can, at least |
| 20 | with our systems here, where the Case 1 and |
| 21 | Case 2 cross-section excavations are from your |
| 22 | February 1 report? |
| 23 | In other words, are they shown on this |
| 24 | map? That's my question. |
| 25 | A. Well, the cross-section at Boland |

|  | Page 78 |
|---|---|
| 1 | Marine with that deep excavation would be to |
| 2 | the west of Surekote Road, which you can see |
| 3 | there, and there's a white building in the |
| 4 | aerial photograph that this portrayal has been, |
| 5 | um -- put on, and my memory says the grid |
| 6 | trenching that is shown at that location is |
| 7 | close to the location of the Case 1 excavation. |
| 8 | Q. I'm going -- because I can't see that |
| 9 | here, could you circle that in red for us and |
| 10 | draw an arrow out -- and I assume you're using |
| 11 | the blowup of the Boland Marine site. Right? |
| 12 | A. Yes, sir. This one. |
| 13 | Q. That's Page 2 of this exhibit. |
| 14 | A. Yes, sir. (Witness complies.) |
| 15 | Q. Is it your testimony that the red |
| 16 | circle you have placed on this map -- and if |
| 17 | you would, take that same red pen, and put -- |
| 18 | draw a line out to the side, to the white side, |
| 19 | and write down, Case 1 excavation, if that's |
| 20 | what it is. |
| 21 | A. (Witness complies.) |
| 22 | Q. And I believe you testified that the |
| 23 | grid trenching that's shown on this map is |
| 24 | close to this. Is that correct? |
| 25 | A. Correct. |

|  | Page 79 |
|---|---|
| 1 | Q. Do you know what lines are supposed to |
| 2 | be demonstrating grade trenching on that |
| 3 | exhibit? |
| 4 | A. I don't recall, no. |
| 5 | Q. Okay. Is the Case 2 cross-section for |
| 6 | the North Breach also on that -- shown on that |
| 7 | map anywhere? |
| 8 | A. Well, the Case 2 cross-section isn't |
| 9 | shown on the map because it's a vertical cut |
| 10 | through the soil, and this is a plan view. But |
| 11 | the cross-section is at the intersection of the |
| 12 | 1969 I-wall and the 1980 T-wall. So it's close |
| 13 | here to the north end. |
| 14 | Q. Okay. But what I'm trying to |
| 15 | understand is, and I think you've answered, |
| 16 | it's not shown on that document? |
| 17 | A. That's correct. |
| 18 | Q. Would the same be true at the south |
| 19 | breach for your Case 1 and Case 2? Look at the |
| 20 | Saucer Marine and tell me if the Case 1 and |
| 21 | Case 2 cross-sections are shown on that map. |
| 22 | A. Well, I don't even have to look, |
| 23 | because the map is a plan view -- aerial view, |
| 24 | and the cross-sections are a vertical section |
| 25 | that was studied. And the cross-sections are |

|  | Page 80 |
|---|---|
| 1 | not shown on the plan view. |
| 2 | Q. Well, but the location of the |
| 3 | cross-section isn't shown there either, is it? |
| 4 | A. No, it isn't. |
| 5 | Q. On either the north or South Breach. |
| 6 | A. That's correct. |
| 7 | Q. I understand this is a plan view. |
| 8 | A. Okay. |
| 9 | Q. But you could show the location of the |
| 10 | cross-section if you wished. |
| 11 | A. Sure. |
| 12 | Q. But it's not been done. |
| 13 | A. Correct. |
| 14 | Q. On the GIS model. |
| 15 | A. Correct. For orientation on the GIS |
| 16 | model, the location of the breach at the north |
| 17 | end, Boland, and similarly at the Saucer site, |
| 18 | are identified. |
| 19 | Q. On Paragraph 7, Page 4 of your |
| 20 | rebuttal report -- back to your rebuttal |
| 21 | report, Exhibit 49 I believe it is. |
| 22 | A. Page, sir? |
| 23 | Q. Page 4, Paragraph 7. You state, a |
| 24 | number of these excavations -- referring to the |
| 25 | GIS model -- would have exacerbated the |

Page 81

1  so-called hydraulic conductivity pressure
2  connections with the underlying saturated high
3  water content swamp-marsh deposit.
4      Do you see that?
5    A.  Yes, sir.
6    Q.  Can you tell me which excavations
7  shown in your GIS model, specifically,
8  exacerbated the hydraulic conductivity pressure
9  connections as you call them?
10   A.  At what location would you like me to
11 respond?
12   Q.  Take the Boland site.
13   A.  And refer to the plan view?
14   Q.  Yes. That's what I'm talking about,
15 your GIS model.
16      Which ones of those would have
17 exacerbated what you call hydraulic
18 conductivity connections?
19   A.  For Case 1?
20   Q.  Sure.
21   A.  Right.
22   Q.  Yes. Start with Boland.
23   A.  I have shown here in red and drawn the
24 arrows to the, um -- areas of excavation and
25 backfilling that are shown in the Case 1

Page 82

1  cross-section.
2    Q.  Okay. And what about Case 2?
3    A.  Case 2 is not shown. You didn't ask
4  me to. But it's associated with this corner
5  and is cut across in the east-west direction at
6  that corner.
7    Q.  So why don't you mark an arrow to that
8  with the red pen and call it Case 2
9  excavations.
10   A.  (Witness complies.) Yes, sir.
11   Q.  Okay. And I take it from your
12 testimony those are the only excavations that
13 you are referring to when you say -- at the
14 north breach when you say a number of these
15 excavations would have exacerbated the
16 so-called hydraulic conductivity pressure
17 connections with the underlying saturated high
18 water content swamp-marsh deposits.
19   A.  Correct.
20   Q.  Okay. That's -- and on the south
21 breach, I want you to do the same thing. Go to
22 the Saucer Marine site and tell me which
23 excavations are included within what you
24 describe as a number of these excavations that
25 would have exacerbated the so-called hydraulic

Page 83

1  conductivity pressure connections with the
2  underlying saturated high water content
3  swamp-marsh deposits.
4    A.  (Witness complies.)
5    Q.  Mark Case 1 excavations and Case 2
6  excavations.
7    A.  Yes, sir.
8    Q.  Okay. Let me see what you've done.
9    A.  (Tendering.)
10   Q.  The circles that you've placed at the
11 Saucer Marine site are the locations of these
12 excavations that you refer to; is that correct?
13   A.  Referred to where?
14   Q.  When you say on Paragraph 7, Page 4 of
15 your rebuttal report, that a number of these
16 excavations would have exacerbated the
17 so-called hydraulic conductivity pressure
18 connections with the underlying saturated high
19 water content swamp-marsh deposits.
20   A.  And you're referring specifically to
21 the two analytical cross-sections.
22   Q.  No. I thought we'd gotten this
23 straight. I was asking you to tell me any
24 excavations that you contend exacerbated
25 this -- these what you call hydraulic

Page 84

1  conductivity pressure connections with the
2  underlying saturated high water content
3  swamp-marsh deposits. Any excavations.
4    A.  Well, I misunderstood your question.
5  That was the reason I drew two specific
6  cross-sections, I thought, at your request,
7  identified as Case 1 and Case 2, at your
8  request. So I'm identifying specifically to
9  those cross-sections the excavations.
10      In a general sense, any excavation
11 that was poorly backfilled and extended to
12 points close to our buried swamp-marsh deposits
13 is a contributor to the collective hydraulic
14 effects at both the north breach and south
15 breach.
16   Q.  Okay. I'll read to you my question
17 and your answer: Okay. I take it from your
18 testimony that those are the only excavations
19 that you are referring to at the north breach
20 when you say a number of these excavations
21 would have exacerbated the so-called hydraulic
22 conductivity pressure connections with the
23 underlying saturated high water content
24 swamp-marsh deposits.
25      Your answer was, correct.

Page 85

1  Q. You want to retract that answer now?
2  A. No. I want to connect that answer to
3  the two cross-sections you asked me
4  specifically, I thought, to address.
5  Q. The record will be clear what's going
6  on.
7     Okay. Then I need for you to tell me
8  any of the excavations that are shown on this
9  drawing that exacerbated the so-called
10 hydraulic conductivity pressure connections
11 with the underlying saturated high water
12 content swamp-marsh deposits.
13 A. You can draw a big circle around the
14 entire area. Any excavation that was deep
15 enough and poorly backfilled puts us in contact
16 with this swamp-marsh deposit.
17 Q. What is deep enough?
18 A. Well, that depends on where you are.
19 If you're close to the outer edge of the EBIA
20 site, the swamp-marsh deposits are shallower
21 than they are immediately under the I-wall
22 site. And so the depth of the excavation
23 varies depending on where you are in the area.
24 Q. Are you able, sitting here, looking at
25 what you've given us in your GIS model, to tell

Page 86

1  me and mark which excavations you contend are
2  deep enough and close enough to the I-wall to
3  have exacerbated the hydraulic conductivity
4  pressure connections?
5  A. No, I could not. But we could -- I
6  just can't do it sitting here with any level of
7  detail.
8  Q. That's fairly important to us in this
9  case. But you can't do that?
10 A. No--
11 Q. What would it take --
12    MR. TREEBY:
13      Excuse me. Let me finish my
14      question before you object.
15 EXAMINATION BY MR. TREEBY:
16 Q. What would it take, in a deposition,
17 which is the only vehicle I have to ask you
18 questions about it, for you to tell us that?
19 Because we can't tell it from your plan.
20 You've already said that.
21    We can't tell it. Right? We can't
22 tell the depth. You can't even tell the depth.
23 A. No. I can't. That's correct.
24 Q. So how can I get that information from
25 you?

Page 87

1  A. Well, we would have to do a
2  correlation for you to identify specific
3  excavations, then connect that to their depth,
4  then correlate that with the contact elevation
5  for the varied swamp-marsh deposit, and you
6  could produce a table that would portray that
7  information. That's one of the powers of the
8  GIS system and one of the reasons we went to
9  this extent of work. But sitting here today, I
10 can't do that for you.
11 Q. Do you have such a table?
12 A. No. I would be more than glad to
13 produce it, if I had it.
14 Q. Have you done such a correlation?
15 A. No.
16 Q. So despite the fact you write a report
17 saying a number of these excavations has that
18 effect, you can't tell us which ones.
19 A. Well, I could point --
20 Q. Right now?
21 A. I could point to general ones, um --
22 and we cited, for example, the wedding cake
23 structure previously discussed. We've had
24 discussions concerning the piles that were
25 pulled and the voids left behind from those

Page 88

1  piles. We could cite the Area 8 that we've
2  discussed, that although it did not put you in
3  contact with the buried swamp-marsh deposit, it
4  put the system in contact with other sandy,
5  shelly materials that were in contact.
6     So it is a multi-connection problem.
7  It's not a individual excavation problem. And
8  hence my inability to provide the detail that
9  you're requesting.
10 Q. Has anyone done such a correlation?
11 A. I think only in a general sense.
12 Certainly --
13 Q. Well -- excuse me.
14 A. Certainly, Dr. Rogers and Storesund
15 went through that process for their
16 deductive-based Case 2 cross-sections, both
17 locations. I, with Chad Morris, had to go
18 through the same process for the Case 1
19 locations.
20 Q. You used the words in your answer only
21 in a general sense. I'm asking you not in a
22 general sense, you've given it us to in a
23 general sense.
24 A. Yes, sir.
25 Q. I'm asking for you, in a specific,

Page 225

```
 1   Area?
 2       A.  Um -- my memory says that we applied
 3   steady flow conditions to the interdistributary
 4   clays under the swamp-marsh deposits and, as
 5   appropriate, similarly for the fine-grained
 6   soils above that deposit.  When our
 7   understanding was those materials were not
 8   fully saturated, then we reverted in the
 9   analyses to partially saturated conditions.  So
10   within the modeling, there's a combination,
11   depending on loading and the characteristics of
12   the soil.
13       Q.  Were any other soil units in the East
14   Bank Industrial Area, other than the lower
15   organic clay, incompressible?
16       A.  I would again have to --
17       Q.  Yes owe no, please?  Could you just
18   say yes or no?  It's a yes or no question.
19           Were any of the other soil units in
20   the East Bank Industrial Area, on October,
21   August 29th, 2005, at the time we're interested
22   in, were any of the other soil units, other
23   than the lower organic clay, incompressible?
24   Yes or no?
25       A.  I would have to refer to the details
```

Page 226

```
 1   in the analyses.  I will not answer a yes/no
 2   question.
 3       Q.  You don't know then.  You just don't
 4   know.
 5           MR. JOANEN:
 6               I'm going to object.  Allow him
 7           to finish his answer, please.
 8       A.  I would --
 9           MR. JOANEN:
10               Please let him finish his answer.
11       A.  I would need to refer to the details
12   of the simulations for the layers I specified
13   to be able to answer your question truthfully,
14   sir.
15   EXAMINATION BY MR. SMITH:
16       Q.  So you don't know whether you assigned
17   an incompressibility value to any other soil
18   units?  As you sit here today, you don't know
19   that.
20       A.  I think as I testified we assigned
21   that to the interdistributary clays below and
22   the fine grain soils above.  But to confirm
23   that, I need to refer to the details of the
24   analysis.
25       Q.  Do you know of any other soils
```

Page 227

```
 1   anywhere in the world that have a M sub V value
 2   of 10 to the -9?
 3       A.  Uh-huh.
 4       Q.  Would you just please tell us what
 5   those are and where they are?
 6       A.  Sure.  Go down here to the mouth of
 7   the river, to the East Bay area.  Y'all find
 8   such materials.  Go to West Delta Block 134.
 9   You'll find some.
10       Q.  Excuse me.  Wait a minute.  I need to
11   know what they are there.
12       A.  They're clays.
13       Q.  Clays.
14       A.  Water saturated clays.  We could go to
15   comparable materials in the Niger River Delta.
16           We can go the comparable materials in
17   the Congo Delta.
18           There's a wide variety of locations in
19   the offshore world in which these
20   incompressible behavior materials exist and
21   have existed and have been analyzed for many
22   years.
23       Q.  When you refer to steady flow, I think
24   you've previously told us that that term can
25   have two meanings.  Right?  It can be steady
```

Page 228

```
 1   flow in a transient analysis, and there can be
 2   steady flow in a steady state analysis.
 3   Correct?
 4       A.  Um -- the categories of flow analysis
 5   are steady flow and nonsteady flow.  Each of
 6   those analyses can have steady state analysis
 7   or transient state analysis.
 8       Q.  So it's your understanding that in a
 9   steady state analysis you can have unsteady
10   flows?
11       A.  No.
12       Q.  So?
13       A.  Steady state analysis implies no
14   changes in boundary conditions, meaning inputs
15   and outputs; it's indeed at a steady state.
16           For a transient flow, I can have
17   changes in the inputs and outputs.  Both of
18   those kinds of analyses can be driven by steady
19   flow conditions or nonsteady flow conditions.
20           The defense experts have exploited the
21   second one.  The ones that I've exploited are
22   the first ones that led my comment this morning
23   that indeed, my understanding now says we're
24   working different problems.
25       Q.  Indeed.  So then there's three sets of
```

Page 229

1  conditions, if I understand your testimony
2  today: You can have steady flows in a steady
3  state analysis, or you can have steady flows in
4  a transient analysis, but you can't have
5  unsteady flows in a steady state analysis, you
6  can only have steady flows in a steady state
7  analysis. Is that correct?
8      A.  Your understanding is not correct.
9      Q.  Okay. Well, explain to me, then, your
10 understanding of a steady state analysis.
11         You said that you can only have steady
12 flows in a steady state analysis; is that
13 correct?
14     A.  No.
15     Q.  You can have transient flows in a
16 steady state analysis?
17     A.  No.
18     Q.  So you can only have steady flows in a
19 steady state analysis.
20     A.  Um --
21     Q.  Is there a third category in addition
22 to the transient flows and steady flows and
23 unsteady flows?
24     A.  I watched this confusion enter your
25 questioning in or for Mr. Cobos-Roa at the

Page 230

1  conclusion of his deposition. I've attempted
2  to define for you, as crisply as I can, that
3  there are two types of hydraulic conductivity
4  analyses. One is called steady flow. The
5  other is called nonsteady flow. Each of those
6  analyses can have steady state conditions or
7  transient conditions. So I can have steady
8  state in transient as a part of nonsteady flow,
9  and I can have the same for steady flow.
10        Does that give this discussion a
11 proper framework for communication? I hope so.
12     Q.  If you change the total stress on a
13 saturated clay and prevent drainage from
14 occurring, does the pore pressure change?
15     A.  Yes.
16     Q.  And does the void ratio remain
17 constant?
18     A.  If we prevent it for each, yes.
19     Q.  If you shear a saturated organic clay
20 and prevent drainage from occurring, does the
21 pore pressure in that organic clay unit change?
22     A.  Yes.
23     Q.  Are these changes in pore pressures in
24 organic clay included in your analysis?
25     A.  Which pressures are you referring to?

Page 231

1      Q.  Shear-induced pore pressures.
2      A.  Um -- in the undrained analyses, the
3  pore pressures influential in the
4  characterization of shear strength are not
5  included. In the drained -- so-called drained,
6  I termed them effective stress analyses, we
7  work to determine the effective stress that is
8  important in determining the shear strength of
9  the soil in that characterization.
10     Q.  Do you consider the change in pore
11 pressure due to changes in total stress to be
12 significant in the shear strength of saturated
13 clays?
14     A.  It depends on whether or not I allow
15 drainage and how long I allow that stress to be
16 exerted on the soil.
17     Q.  Under short-term loading conditions,
18 do you consider the change in pore pressures
19 due to changes in total stress to be important
20 in the shear strength of saturated clays?
21     A.  That will depend on the drainage
22 condition that I have, that's Step 1. And
23 secondly, it will depend on how I approach the
24 characterization of the shear strength of the
25 soil for that loading condition. I can

Page 232

1  approach that using undrained analyses, or
2  effective stress analyses.
3         And for the buried swamp-marsh
4  deposits, we've used both. In my ongoing
5  analysis report that you selected this exhibit
6  from, I demonstrated for you how the analysis
7  using either of the approaches can produce very
8  comparable results. And these analytical
9  elements are discussed extensively in the often
10 referenced Lambe & Whitman textbook under the
11 chapters dealing with undrained and drained
12 soils shear strength characterization.
13     Q.  In your hydraulic conductivity
14 pressure analyses in which you calculate uplift
15 pressures, do you assume that all excess pore
16 pressures from changes in total stress and
17 shear stress are dissipated?
18     A.  No.
19     Q.  In calculating your hydraulic
20 conductivity uplift pressures, is it your
21 understanding that the SEEP/W analyses
22 performed by Mr. Cobos-Roa prevent void ratio
23 and volume changes from occurring?
24     A.  That would be true for the buried
25 swamp-marsh deposits. For other soils, that