# EXHIBIT 33

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:   KATRINA CANAL BREACHES        CIVIL ACTION
CONSOLIDATED LITIGATION
                                       NO. 05-4182
                                         "K" (2)
PERTAINS TO:   MRGO-ROBINSON           JUDGE DUVAL

FILED IN:   05-4181, 05-4182,          MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

Videotaped Deposition of

WASHINGTON GROUP INTERNATIONAL BY
PHILLIP LEE STAGGS,
225 South Tropical Trail, Merritt Island,
Florida 32952, taken in the Marriott Hotel,
3435 North Atlantic Avenue, Cocoa Beach,
Florida 32931, on Saturday, the 26th day of
April, 2008.

PHILLIP STAGGS                                                    4/26/2008

Page 110

1    MS. WAGER-ZITO:
2        Objection.
3    EXAMINATION BY MR. BRUNO:
4        Q. And that's what you're doing. I
5    mean, the fact is that this --
6    MS. WAGER-ZITO:
7        Objection.
8    EXAMINATION BY MR. BRUNO:
9        Q. -- all comes from the original Task
10   Order 26. Right?
11   MR. TREEBY:
12       Ask that the commentary be
13       stricken.
14   EXAMINATION BY MR. BRUNO:
15       Q. Isn't that accurate?
16   MS. WAGER-ZITO:
17       Objection.
18   THE WITNESS:
19       It results as I stated. As we
20       had a scope of work for site
21       characterization.
22   EXAMINATION BY MR. BRUNO:
23       Q. All right.
24       A. And as a result of site
25   characterization, this plan was developed.

Page 111

1        Q. All right. The point is that the
2    Corrective Action Plan described -- and I
3    don't know, help me understand, what is the
4    degree of specificity in the Corrective Action
5    Plan which identified this excavation 4 foot
6    deep 15 feet from the floodwall on the water
7    side of the flood structure?
8        A. Yes, it did.
9        Q. I said what was the degree of
10   specificity?
11       A. What was the degree?
12       Q. Yes.
13       A. It identified the size of the
14   excavation, the location, that it was under
15   Surekote Road.
16       Q. Okay.
17       A. The size, length, and depth of the
18   excavation.
19       Q. All right. So one who would be
20   evaluating the plans could ascertain, could
21   they not, that this 4 foot excavation was 15
22   feet from the floodwall on the water side.
23   Right?
24       A. Yes.
25       Q. Okay. And the United States Army

Page 112

1    Corps of Engineers approved those
2    specifications, did they not?
3        A. Yes.
4        Q. Okay. And in approving those
5    specifications, the United States Army Corps
6    of Engineers did not say anything to you about
7    using clay. Isn't that true?
8        A. Re -- Restate your question.
9        Q. I thought you told me that this
10   whole episode about installing the clay
11   resulted from Mr. Guillory sending a memo to
12   somebody that you don't know and that they,
13   upon seeing the hole, undertook some, I don't
14   know, something, without really knowing what,
15   they did something; and what they did resulted
16   in them telling you to put clay. Did I get
17   that wrong?
18   MR. EHRLICH:
19       Objection.
20   MS. WAGER-ZITO:
21       Objection.
22   THE WITNESS:
23       I don't know the timing of the
24       memos relative to the excavation. I
25       don't know if it was done prior to or

Page 113

1    after -- You said as a result of
2    seeing the excavation. It could have
3    been done a couple of months before in
4    anticipation of that work.
5    EXAMINATION BY MR. BRUNO:
6        Q. My question was, was it done in
7    connection with the approval of the Corrective
8    Action Plan and the specifications contained
9    therein? That was my question.
10       A. I don't believe that was the case.
11       Q. Okay.
12       A. I think it was something that was
13   subsequent to that.
14       Q. That's my point. All right? The
15   point is, that the specifications indicated
16   the excavation, they indicated where the
17   excavation was relative to the floodwall, and
18   the United States Army Corps of Engineers
19   approved those specifications without any
20   comment to you to put clay as they later told
21   you to do. Isn't that true?
22       A. Based on my recollection, that's
23   correct.
24       Q. All right. Now, what, if you know,
25   is the time sequence, okay? How much time

29 (Pages 110 to 113)

JOHNS PENDLETON COURT REPORTERS                              800 562-1285

Page 114

1  passed between the approval of the Corrective
2  Action Plan and the request by the United
3  States Army Corps of Engineers that you
4  install clay as a fill for that excavation?
5  I'm sorry, not as a -- I think it's a partial
6  fill. Not the whole fill, to be fair. Clap
7  cap.
8      A.  I don't have recollection of that.
9          Let me back up and try to clarify
10 something. We had a borrow pit and the borrow
11 pit was full of clay. So the intent
12 originally was that all excavations were
13 filled with clay.
14     Q.  So what was different --
15     A.  So absent the -- any direction in
16 the Corrective Action Plan -- because it
17 really directed -- It was an environmental
18 work plan. It was really geared towards
19 removing the contaminated soils.
20     Q.  So what was different about what the
21 government told you to do from the Corrective
22 Action Plan, if there was any difference?
23     A.  No difference.
24     Q.  Well, what was the purpose of the
25 memo then?

Page 115

1      A.  There was --
2          MS. WAGER-ZITO:
3              I object to the form.
4              You can answer.
5          THE WITNESS:
6              The purpose of the memo was just
7          what we talked about, to have the
8          engineer evaluate the consideration of
9          excavation in proximity to the levee.
10 EXAMINATION BY MR. BRUNO:
11     Q.  All right. So your testimony is
12 that the Corrective Action Plan itself called
13 for you to put clay?
14     A.  The Corrective Action Plan I don't
15 believe specified whether you were using clay
16 fill or whatever. The Corrective Action Plan
17 was an environmental plan that was really
18 geared towards removal of the contaminated
19 material.
20     Q.  Well, help me understand this. The
21 only document that I would look at -- If I
22 wanted to find out what -- if there was a
23 specification for what fill to use, okay,
24 would I not look at the Corrective Action
25 Plan?

Page 116

1      A.  I'd have to review it and see if it
2  -- if it did address that.
3      Q.  Well, where else would I go?
4      A.  I don't know if -- if the -- there
5  were general descriptions of the -- of the
6  backfill in the work plan or -- or if there
7  was something in the Corrective Action Plan.
8      Q.  Your answer before was, "I don't
9  believe --" I am going to read the whole
10 thing, but Roger has got some --
11         MR. BRUNO:
12             Maybe you want to read it for
13         me.
14 EXAMINATION BY MR. BRUNO:
15     Q.  "The Corrective Action Plan I don't
16 believe specified whether you were using clay
17 fill or whatever. The Corrective Action Plan
18 was an environmental plan that was really
19 geared towards removal of the contaminated
20 material." That was your testimony. Right?
21     A.  Okay.
22     Q.  All right. Is that your testimony
23 now?
24     A.  It is. If you want to dissect the
25 plans, I'd be happy to -- to review a plan and

Page 117

1  give you specific information related to the
2  plan. Trying to recall information from plans
3  from six or eight years ago, I don't have as
4  vivid a recall as if I had the document in
5  front of me.
6      Q.  Well, you're right, except for the
7  fact that you spent a whole day looking at
8  documents in order to prepare yourself for
9  this very 30 (b)(6) deposition. Some of those
10 documents you requested, some of the documents
11 the lawyers picked for you.
12         MR. TREEBY:
13             Object to the commentary. I ask
14         it to be stricken.
15         MR. BRUNO:
16             No, I am not going to tolerate
17         that.
18 EXAMINATION BY MR. BRUNO:
19     Q.  You were asked to be a corporate
20 representative; right?
21     A.  I volunteered to be a
22 representative.
23     Q.  You volunteered. That's even
24 better. And so in order to be a volunteer, in
25 order to come here and testify as a 30 (b)(6)

Page 154

1   of the borrow pit relative to the levee.
2       Q.  All right.  Now, so when Montegut
3   tells you, "Look, the Corps is going to
4   evaluate from a geotechnical perspective
5   whether the borrow pit may do some damage to
6   the flood structure," does that indicate to
7   you that because you know you're digging holes
8   at other locations at the site, that you need
9   to be vigilant on that issue generally?
10      A.  There was no indication from him
11  that we had any other areas on the site where
12  that was a consideration.
13      Q.  All right.  I gather from your
14  answer that -- Well, let me ask you this.
15  Were you at all curious to learn what it was
16  about the borrow site that caused Guillory to
17  feel the need to perform this engineering
18  investigation?
19      A.  Really wasn't within our scope or --
20  You know, I didn't have a reason to be
21  interested in it.
22      Q.  Okay.  Well, the answer is then you
23  were not curious.
24      A.  No.  The answer would be the
25  answer.

Page 155

1       Q.  Well, the question was, were you
2   curious.
3       A.  Okay.
4       Q.  The answer is yes or no?
5       A.  No, I wasn't curious.
6       Q.  Fair enough.  Fair enough.  All
7   right.  How close did the boundary of the
8   borrow pit get to that 15 foot line?
9       A.  I think I said before that I don't
10  know that.  I think we talked about that
11  earlier, and I don't know the distance from
12  the borrow pit to the edge of the levee.
13      Q.  Now, what was the clay that was
14  removed from the borrow pit supposed to be
15  used for?
16      A.  For backfill of the excavations.
17      Q.  Which?
18      A.  And grading as needed.  I mean,
19  generally you had a final contour of the site
20  that you were trying to achieve, too, so that
21  you didn't have ponding water.  So in addition
22  to just backfilling the holes, you might have
23  to put it in areas just to adjust the grade to
24  make the site drain properly.
25      Q.  All right.  Let's see now.  You

Page 156

1   would agree that on June 1, 1999 the Corps
2   issued a statement of work for the demolition
3   and site preparation for the Inner Harbor
4   Navigation Canal lock replacement project on
5   the EBIA adjacent to the Industrial Canal?
6       A.  If that -- If that's the date of the
7   document, then yes.
8       Q.  Okay.  And you would also agree that
9   the June 1, 1999 statement of work for Task
10  Order 26 set forth the project requirements
11  that WGI would, and I am quoting, "furnish all
12  engineering services, materials, supplies,
13  labor as required in connection with the
14  technical review of site documents associated
15  with the demolition and remediation of the
16  EBIA"?  Right?
17      A.  If that's what's stated there.  I
18  mean.  You're reading it and I don't have it
19  in front of me.
20      Q.  I'm sorry.  You want to see it?  Do
21  you agree with that?  Is it false?
22      A.  It --
23      Q.  I am just asking if it's true or
24  false.
25      A.  You're reading the document and I

Page 157

1   don't have it in front of me, so I -- I -- I
2   guess I don't understand the question.  If
3   you're reading it verbatim, then that is what
4   it is.
5       Q.  The question is, do you agree that
6   -- I mean, you see, you have to understand,
7   you're not sitting here as yourself; you're
8   sitting here as WGI?
9           MS. WAGER-ZITO:
10          But not for this topic.
11          MR. BRUNO:
12          Well, I don't know about that.  I
13  am not going to get into a debate with
14  you.  I mean, it's --
15          MR. TREEBY:
16          Well, we're the ones who
17  designated him for topics.
18          MR. BRUNO:
19          18 -- Yeah, but, Bill, there's 30
20  topics.
21          MR. TREEBY:
22          I understand, but this isn't one
23  of them.
24          MR. BRUNO:
25          I think it is.