# EXHIBIT 47

# Expert Report

# Site Characterization of Eastern side of the Inner Harbor Navigation Canal (IHNC) in the Lower 9th Ward of New Orleans

For

Katrina Canal Breaches Consolidated Litigation

[Civil Action Number: 05-4182 "K" (2)]

United States District Court

Eastern District of Louisiana

Pertains to MR-GO, Robinson [No. 06-2268]

By

J. David Rogers, Ph.D., P.E., P.G., C.E.G., C.HG.

January 5, 2012



Figure 82  Connection of new PZ-27 sheet piles to pre-existing sheet piles (extending to El. -8 ft).

The original Chalmette Area Plan (USACE, 1966)  called for Surekote Road to be shifted to the west and installation of an overhead rolling gate to allow vehicular traffic to enter and exit the EBIA area (Figure 83).  A revised design was presented as part of the Florida Avenue Complex work where Surekote Road traversed up and over the newly constructed floodwall (Figure 84).  The plans called for the installation of a new I-wall floodwall in this area, with a notch in the wall (sealed with a clay plug) to allow for the crossing of Surekote Road.

Figure 85 shows the approximate alignment of Surekote Road (red hashed area) prior to implementation of the Florida Avenue project.  Figure 86 shows the alignment of Surekote Road following completion of the Florida Avenue project (purple hashed area).  Surekote Road was primarily constructed of lightweight materials (such as shell fill) to reduce the 'weight' of the road and minimize consolidation settlements of the underlying materials.  Surekote Road ramped up and over the flood protection system before and after the Florida Avenue project.



**Figure 83  Configuration of the entry through the flood protection system at the north end of the EBIA per the Chalmette Area Plan (USACE, 1966).**



**Figure 84  Crossing of Surekote Road over the newly constructed flood protection system per the Florida Avenue Complex project (USACE, 1980).**



**Figure 85  Surekote Road crossing prior to implementation of the Florida Avenue Complex Project.**



**Figure 86  Alignment of Surekote Road per the Florida Avenue Complex Plans.  Fill placed on the side slopes are noted in the dashed lines.**

## WGI Demolition and Remediation

The major activities identified for the demolition and remediation work included the following (WGI, 2005):

- Site Assessments and Surveys – Initial review of site conditions, discussion of equipment and methods, review of potential staging areas, review of utilities, and potential health and safety hazards.  Vibration monitoring was performed along Jourdan Avenue to assess potential impacts to residents during activities;

- Site Investigation Sampling and Analysis – Eight types of investigation sampling were proposed: asbestos characterization; drummed waste characterization; site investigation samples obtained through grid sampling via drilling; site investigation samples taken from the bank; supplementary investigation samples taken to better define areas of contamination for subsequent remediation; air samples taken during remediation; confirmation samples taken from the sidewalls and bottoms of the excavation pits; and final post remediation groundwater characterization.  ;

- Geophysical Survey – A geophysical (electrical conductivity) survey was conducted on 25-ft spacings to identify anomalies buried at the site such as tanks and concrete footings.  In addition to the geophysical survey, side scan sonar was used to identify submerged items along the margin of the canal bank.  Identified submerged items were then located using a mobile GPS system.

- Grid Trenching – Coincident with the geophysical surveys, exploratory trenches were excavated at 25-ft centers, offset from the geophysical survey by 12 ½ ft, to identify and locate subsurface obstructions and contamination.  ;

- Above Ground Structure Demolition – Following removal of hazardous materials from the structures, WGI demolished 35 buildings using a track-hoe mounted shears and buckets.  Scrap metal, where possible, was segregated from the building rubble and recycled.  Structure associated utility lines, transformers, and power poles were also removed during this phase;

- Surface Cleanup, Concrete Foundation and Onshore Foundation Piling Removal – More than 35 concrete slabs of various sizes were removed.  Stockpiles of solid waste (such as unused and spent shot blast used to remove paint during vessel maintenance) were also removed.  Two deep excavations were completed as part of this work phase:  removal of the Sewer Lift Station (Saucer Marine) and the Wedding Cake structure (Boland Marine).  A sheet pile cofferdam with waler bracing was used to facilitate the removal of these structures;

- Barge Removal and Disposal – Numerous abandoned barges were identified prior to initiation of work by WGI.  A total of twelve barges were removed from the EBIA, with ten barges from Saucer Marine and two barges from Boland Marine.  One barge previously contained a rail tank car.  A cofferdam was constructed around the rail tank car in order to facilitate it's removal;

- <u>Wharf and Offshore Piling Removal and Disposal</u> – The wharf at Boland Marine extended for most of the site.  The wharf deck was sectioned and removed.  Following removal of the deck, the foundation piles were pulled and disposed of;

- <u>RECAP Soil Excavation, Remediation, and Disposal</u> – Areas requiring excavation/remediation, based on the testing results of collected in-situ samples, were identified in the Corrective Action Plans for each of the EBIA parcels.  Prior to the start of the excavation work, WGI delineated the boundaries in the field.   Excavation work commenced and removed contaminated material was placed in stockpiles lined with plastic and berms were installed along the perimeter to limit runoff.  The contaminated stockpiles were covered with plastic to (a) prevent run-on/off; (b) keep rains from soaking the materials and thereby increasing the unit weight of the material; and (c) to comply with the site's general discharge permit.

  Contaminated soils were removed at regular intervals and disposed of at approved disposal facilities.  Following completion of excavation to the required dimensions, soil sampling was initiated on the excavation bottom and sidewalls.  If the sample results indicated that contamination was still present, excavation and removal of contaminated soils was extended until testing of sidewall and bottom samples indicated the material was within acceptable limits.

  WGI notes that "on-going sampling efforts identified additional areas of contaminated materials.  In these instances, these areas were remediated in the same manner as the originally identified contaminated areas" (WGI, 2005).

  Once an excavation area was 'cleared' based on suitable test results, backfilling operations were initiated.  Borrow material was used from onsite areas where the future bypass channel would likely be situated (WGI notes that this lowered costs and helped reduce the future dredging volume).  Backfilled soils were apparently compacted using track-walking during placement operations.

- <u>Clearance Sampling and Analysis</u> – "As each contaminated area under RECAP was remediated to its dimensions required by the state of Louisiana, or remediated to a larger dimension dictated by field observations and supplemental sampling, clearance samples were collected from the side walls and bottoms of each excavation to determine if the contaminants of concern had been remediated to within RECAP standards…If sample test results remained above RECAP standards, excavation of the contaminated area would continue until sample results determined that RECAP standards had been met.  In this fashion, concurrent remediation and on-going exploration/characterization activities assured environmental protection with real-time data generation, evaluation, and remediation action, without any interim steps of report writing and administrative review.

  Post remediation clearance activities consisted of installing monitoring wells…at twelve locations throughout EBIA for the collection of groundwater samples which were analyzed to determine if remediation activities were successful at removing contaminates of concern from tidally influenced soils.  Test results of the groundwater samples indicated industrial impacts to the site's groundwater were not observed" (WGI, 2005);

- <u>Canal Bank and Surekote Road Removal and Disposal</u> – "For remediation, RECAP specifications required the canal bank be excavated to a depth four feet below existing grade and fifteen feet from the edge of the water onto land…The landside of these excavations became the 'new' shoreline when work was completed.

  Surekote Road was removed in two phases.  The first phase involved the segment from International Tank Terminal to the south end of Boland Marine.  The asphalt layer was rotomilled and recycled by the subcontractor.  Following completion of remediation work at Boland Marine, the final section of roadway was removed.  Again, the materials were recycled" (WGI, 2005);

- <u>Miscellaneous Abatement Operations</u> – Miscellaneous abatement operations consisted of asbestos, PCB, and Underground Storage Tank (UST) removals.  Friable asbestos was present on pipes and heating systems in the EBIA.  Non-friable asbestos containing materials were discovered at Boland Marine.

  Upon completion of the grid sampling, PCB impacts were identified principally at the International Tank Terminal site, along the canal bank.  WGI used a water treatment program to treat the excavation water discharge due to the close proximity of the canal and direct seepage of water into the excavations from the canal.

  Grid trenching identified Underground Storage Tanks at Saucer Marine and Indian Towing identified USTs.  The contents were drained and the USTs removed.

- <u>Final Site Grading and Restoration</u> – Following completion of the remediation work, the site was graded with an approximate 1% slope towards the canal to facilitate drainage.  The site was seeded; and

- <u>Demobilization</u> – Following completion of site activities, WGI initiated demobilization activities. Onsite equipment was decontaminated and returned.  Portable site infrastructure such as the office buildings, portable toilets, storage facilities, and utilities were removed. Site demobilization was largely complete by May 2005.

A series of reports were produced during execution of the site demolition and remediation activities. These reports included:

- <u>Precision, Accuracy, Representativeness, Comparability, Completeness, and Sensitivity (PARCCS)</u> – The site-specific PARCCS report (a report was prepared for each site) evaluated the quality of the analytic data (collected during the field sampling program) used to characterize the contaminant level of the EBIA onsite soils.  The evaluation resulted in a determination of acceptable or unacceptable data for site characterization;

- <u>Risk Evaluation/Corrective Action Program (RECAP)</u> – The RECAP reports summarize the site characterization test results and assessment of remediation needs for the EBIA parcels. Constituents of Concern (COC) were highlighted.  The report provides an overview of the site, completed testing, and implications associated with the testing results.  Proposed

exceptions and deviations from the submitted Sampling and Analysis Plan (SAP) were also noted.

- <u>No Further Action At This Time (NFAATT)</u> – The NFAATT report documents that the remediation of contaminated areas within the EBIA "achieved the objective of ensuring that the levels of COCs remaining on the site are below the applicable LDEQ RECAP SS or MO-1 RECAP Standards that are protective of health in a non-industrial exposure scenario and are protective of groundwater" (WGI, 2005).  The report detailed the COCs, dates when excavations were performed, the horizontal and vertical extents of the contamination, as well as a summary of the amounts of soil removed (and the name of the waste management unit that received the waste materials).

    Approval of the NFAATT and a "No Further Action At This Time Determination" from LDEQ allows for unrestricted use of the property (and allows the USACE the ability to proceed with work on the new Lock Expansion project).  NFAATT reports were prepared for each site as the remediation work was completed.  A summary of actual remediation work performed was presented in these reports

- <u>Technical Completion Report and Record Drawings</u> – The Technical Completion Report and Record Drawings summarized the activities of WGI at the EBIA related to Task Order #26 (and its associated modifications).  A review of the site history and previous site investigations was presented.  The regulatory drivers were discussed as well as a review of the 'definable' scope of work. Figures were presented that noted the pre-work conditions, extent of site characterization, excavated areas, temporary monitoring well locations, and final grade.  The report also included a suite of photographs illustrating major work activities at the site.  This report was issued in August 2005

A summary of site activities and completion dates (based on available WGI documentation) is presented in Table 1.

Figure 105 shows an aerial photograph of the site in 2002 (Gulf Coast Aerial, 1992) as the remedial excavation activities were underway.  By this time, all surface structures had been removed.  Figure 106 shows the site in 2005 after completion of all the site remediation work, prior to Hurricane Katrina.

**Table 1  Chronology of site activities within the EBIA demolition and remediation area.**

| Activity | ITT | Saucer | Mayer | Indian | McDonough | Boland |
|---|---|---|---|---|---|---|
| Site Assessment and Surveys | Dec-00 | Dec-00 | Dec-00 | Dec-00 | Dec-00 | Dec-00 |
| Site Investigation Sampling/Analysis | 2/01 - 3/01 | 7/01 - 8/01 | 8/01 - 9/01 | 1-Aug | 5/01 - 6/01 | 9/01 - 11/01 |
| Geophysical Survey | Jun-01 | Sep-01 | Sep-01 | Oct-01 | Oct-01 | Mar-01 |
| Grid Trenching | Sep-01 | Sep-01 | Mar-02 | Oct-01 | Oct-01 | May-02 |
| Above Ground Structure Demolition | May-01 | May-01 | May-01 | Aug-01 | Sep-01 | Jun-01 |
| Surface Cleanup &Onshore Foundation Removal | May-01 | May-01 | May-01 | Aug-01 | Sep-01 | Jun-01 |
| Sewer Lift Station | | 8/01 - 11/01 | | | | |
| Wedding Cake | | | | | | 6/01 - 03/02 |
| Barge Removal and Disposal | | 12/01-6/02 | | | | 12/01-6/02 |
| Wharf and Offshore Pile Removal | | | Feb-05 | | Feb-05 | 5/02-10/02 |
| RECAP Soil Excavation | Jul-04 | Jun-04 | Nov-03 | May-04 | Jun-02 | Dec-04 |
| Clearance Sampling | May-02 | May-03 | Apr-04 | Mar-04 | Nov-04 | Dec-04 |
| Miscellaneous Abatement | Jun-02 | | Mar-03 | | Jun-04 | Nov-04 |
| Final Site Grading | Sep-04 | Sep-04 | May-04 | Oct-04 | Nov-04 | May-05 |
| Canal Bank and Surekote Road Removal | Jan-03 through May-05 | | | | | |
| Demobilization | May-05 | | | | | |
| **PARCCS Report** | **Sep-01** | **Nov-01** | **Dec-01** | **Jan-02** | **Jul-01** | **Feb-02** |
| **RECAP Report** | **Nov-01** | **May-02** | **May-02** | **Jun-02** | **Oct-01** | **Dec-02** |
| **NFAAT Report** | **Sep-04** | **Apr-03** | **May-04** | **Jun-04** | **Dec-04** | **Apr-05** |



**Figure 105  2002 aerial photo of the upper IHNC.  Note how the Jourdan Avenue Canal has been infilled and the eastern and western banks of the IHNC have been cleared of all commercial structures and improvements, as part of the Industrial Canal Lock Replacement Project by the Army Corps of Engineers.**



**Figure 106** Aerial photo of the upper IHNC taken in 2005, shortly before Hurricane Katrina. The blue colored Florida Avenue lift bridge has just been completed and opened for traffic in May 2005.

## Groundwater Evaluation

WGI completed a post-remediation groundwater assessment at the EBIA project area.  The purpose of the assessment was to: collect adequate data for groundwater classification; identify any groundwater contamination, and assess whether groundwater was impacted above Louisiana's RECAP action levels by EBIA's historic industrial activities.

The groundwater investigation effort included (WGI, 2005):

- Drilling installation and development of twelve temporary monitoring wells;
- Conducting slug tests in two monitoring wells;
- Collecting groundwater samples from all monitoring wells and analyzing samples for a site wide lists of COCs;
- Collecting 'undisturbed' aquifer formation samples from two monitoring wells and testing the samples for permeability in the geotechnical laboratory;
- Measuring static water level in all twelve monitoring wells;
- Surveying of monitoring wells for their horizontal and vertical controls; and
- Abandonment of the monitoring wells.

The field activities were completed between April 18 and April 26, 2005 (WGI, 2005).  Soil borings performed as part of the groundwater well installation identified that site materials consisted primarily of gray lean clays with intermixed organics.  The boring performed at MW-12 identified 5 ft of silty sand, extending from an Elevation of +3.9 ft down to an Elevation of -1.1 ft.

Slug tests were performed in MW-7 and MW-8.  These slug tests found the in-situ permeability of the tested unit to be approximately $2 \times 10^{-5}$ to $5 \times 10^{-5}$ cm/s.  Geotechnical laboratory testing of samples retrieved from the field yielded results of $2 \times 10^{-8}$ to $4 \times 10^{-8}$ cm/s.  As noted in the ASTM standard (ASTM, 2009):

"*The correlation between results obtained using these test methods and the hydraulic conductivities of in-place field materials has not been fully investigated.  Experience has sometimes shown that hydraulic conductivities measured on small test specimens are not necessarily the same as larger-scale values. Therefore, the results should be applied to field situations with caution and by qualified personnel.*"

### Site Surveys

Site surveys were performed by Wink Inc.  Survey control was first set up at the site in February 2002. Survey services included control establishment, topographic surveys, and bathymetric surveys in the IHNC canal.  Vertical control was based on NGS Survey Control R 189, located near the Florida Avenue pump station.

# Hurricanes Katrina and Rita (2005)

On August 29, 2005 during Hurricane Katrina both sides of the IHNC were overtopped by the storm surge converging on the IHNC from Lakes Borgne and Pontchartrain. Sustained overtopping flow undermined the landside toe of the I-walls, in places gouging down as much as 5+ feet below the crest of the earthen levee.  In addition, there was ample physical evidence of under seepage at both

1.Fresh water marsh consists of a vegetative mat underlain by clays and organic clays.  Fresh water marshes generally form as a band along the landward border of established marshes and in those areas repeatedly subjected to fresh water inundation.   In most instances an upper mat of roots and plant parts at least 12 inches thick overlies fairly soft organic clays, which become firmer and less organic with depth.  Peat layers are often discontinuous and their organic content is usually between 20 and 50%.

2. Floating marsh or flotant is a vegetative mat underlain by organic ooze.  This is sometimes referred to as a "floating fresh marsh" or "floating three-cornered grass marsh."  The vegetative mat is typically between 4 and 14 inches thick, floating on 3 to 15 ft of finely divided muck or organic ooze, grading into clay with depth.  The ooze often consolidates with depth and grades into a black organic clay or peat layer.

3. Brackish-fresh water marsh sequence consists of a vegetative mat underlain by peat.  The upper mat of roots and recent marsh vegetation is typically 4 to 8 inches thick and underlain by 1 to 10 ft of coarse to medium textured fibrous peat.  This layer is often underlain by a fairly firm, blue-grey clay and silty clay with thick lenses of dark grey clays and silty clays with high organic contents.  The great majority of marsh deposits in New Orleans are of this type, including the northern end of the IHNC.  These materials are typified by a very high peat and humus content, easily revealed by gravimetric water content (> 200%) and/or low dry bulk density (< 75 pcf) values.

4. Saline-brackish water marsh is identified by a vegetative mat underlain by clays.  These are sometimes termed "drained salt marshes" on older maps.  The typical sequence consists of a mat of roots, stems, and leaves from 2 to 8 inches thick, underlain by a fairly firm blue-grey clay containing roots and plant parts.  Tiny organic flakes and particles are disseminated through the clay horizon.  The clays tend to become less organic and firmer with depth.  The saline to brackish water marsh occupies a belt ½ to 8 miles wide flanking the present day shoreline, along the coast.

Figure 140 presents a summary of the physical characteristics of marsh soils in New Orleans, reported by Kolb and Van Lopik (1958b).  Note the very high organic contents.  Kolb and Van Lopik reported that inorganic (mineral) content of these soils seldom exceeded 10 to 20% of the total volume.  The strengths of marsh deposits are generally quite low, depending on their water content.   These materials are weak and highly compressible.  When subjected to surcharging, they shrink and compress markedly.

A complex estuarine deposit exists below the interdistributary layer and is comprised of a complex mix of clays, silts, sands, and broken shell material.  This deposit is about 30 feet thick and is underlain by Pleistocene deposits (undifferentiated, but commonly stiff clay).  Cross sections from The New Orleans District's Design Manual 02 Supplement 8 (U.S. Army Corps of Engineers, 1968, 1969, 1971) were not always able to differentiate this material, but much of it appears to be sand mixed with clays and silts.  These deposits lie at sufficient depth as to preclude their having any significant impact on levee stability.

Abandoned distributaries likely cut across the IHNC in some unknown locations.  Figure 160 presents an overlay of the Abbot map of New Orleans in 1863 and the Sulakowski map of 1873, on the WPA base map of 1937, which shows the IHNC. These early maps show a consistent pattern of northeastern-directed drainage, towards Bayou Bienvenue, across the axis the IHNC, which was excavated between 1918-23. Materials within the old channels are highly variable, and can be impossible to correlate laterally, depending on the spacing between adjacent borings.  Although basal units usually consist of sands, upper units are heterogeneous layers of silts, clays, sandy silts, and silty sands.  Natural levee deposits are commonly found around these old channels.

The other complication is the earthwork associated with the original construction of the IHNC between 1918-23 (Dabney, 1921; Coleman, 1924; and Young, 1924) and numerous developments and improvements made since the canal opened in May 1923.  The original excavation was carried out principally through the use of floating suction dredges, which spilled spoils onto the adjacent banks, bordered by earthen dikes.  Each dike was typically graded ahead of each dredging sequence, about two to three feet high, on the existing ground surface.  As more spoils were hydraulically placed, the perimeter dikes were gradually heightened, a few feet at a time.

The crowns of the dredge spoils containment dikes were typically tamped fill, which came from trimming the slopes on the protected side.  This slope was occasionally re-worked when material was added to even out the levee crests, as the levees shrank (due to oxidation of organics) and settled (due to consolidation of compressible marsh and swamp soils lying beneath).  The protection of the Lower 9th Ward diminished considerably as the natural ground surface settled south of Florida Avenue, as shown in the contours in Figure 161 (from WPA, 1937).  The dredge spoils containment dike formed a protective levee between the IHNC and the adjacent neighborhoods of New Orleans, which appears to have served its purpose until the fourth hurricane of 1947, which struck New Orleans in September.  The inboard side of the IHNC "levees" was covered with thick expanses of dredge spoils, generally of low relative density, because they were placed hydraulically. These spoils were subject to self-consolidation by natural drainage and surcharging, and these "spoils banks" often exhibited noticeable differential settlement. For this reason, structures founded upon them (after 1923) were usually founded on timber piles at least 30 ft deep (WPA, 1937).

## Pump Tests Ratio K(v)/K(h)

| Well | Pump Test 1 | Pump Test 2 | Well | Pump Test 1 | Pump Test 2 |
|------|-------------|-------------|------|-------------|-------------|
| PW-01 | 0.22 | 0.10 | | | |
| OW-01S | 0.14 | 0.29 | OW-01D | 1.00 | 1.00 |
| OW-02S | 0.00 | 0.10 | OW-02D | 1.00 | 0.06 |
| OW-03S | 0.00 | 0.00 | OW-03D | 1.00 | 0.10 |
| OW-04S | 0.44 | 0.10 | OW-04D | 0.02 | 0.10 |
| OW-05S | 1.00 | 0.10 | OW-05D | 0.00 | 0.10 |
| OW-06S | 13.00 | 0.10 | OW-06D | 1.00 | 0.62 |
| | | | | | |
| PW-02 | 1.00 | 0.00 | | | |
| OW-07S | 0.15 | 0.51 | OW-07D | 0.00 | 0.00 |
| OW-08S | 0.04 | 1.00 | OW-08D | 1.00 | 0.00 |
| OW-09S | 0.41 | 1.00 | OW-09D | 1.00 | 1.00 |
| OW-10S | 1.00 | 0.43 | OW-10D | 1.00 | 10.00 |
| OW-11S | 1.00 | 0.37 | OW-11D | 1.00 | 1.00 |
| OW-12S | 0.10 | 1.00 | OW-12D | 1.00 | 0.12 |

**Figure 216 presents a summary of vertical to horizontal ($K_v/K_h$) ratios calculated using the partially penetrating well subroutine of AquifertestPro software.  The inverse value of these would be the $K_h/K_v$ ratios, which is the convention we have chosen to employ in this report.**

The Kh/Kv ratio in New Orleans depends on a number of factors, especially, the time of burial and consolidation, effective stress, load cycling, and partial cementation. Very youthful, underconsolidated sediments, like the marsh and swamp deposits of New Orleans, may exhibit more severe anisotropy if they had have been subjected to desiccation or surcharging.

## Excavation and Backfill Standard of Care

Pursuant to Task Order 26, the Corps and its contractor, WGI, engaged in substantial demolition, excavation, and remediation activity within the vicinity of the IHNC eastern floodwall where the North and South Breaches occurred (west of Jourdan Avenue, north of Claiborne Avenue and south of Florida Avenue).  This activity included, among other things, demolishing and removing concrete structures, utility pipelines, and other debris that existed above and below ground at the EBIA.  To the extent this work created a hole, trench or other opening, WGI and the Corps were required to backfill the opening with proper materials and then properly compact that material.

Any time excavations and backfilling activities similar to those engaged in by the Corps and WGI occur adjacent to a flood control measure, a geotechnical analysis involving, among other things, a wall stability analysis, a seepage analysis, and a global stability analysis must be performed in order

to determine whether the excavation and backfilling will have an adverse impact on the adjacent flood control measure.  The evaluations should consider the original design case and ascertain if the resulting activity would result in degraded conditions (reduction in system capacity and/or increase in system demands).

Often times, the entity or company engaging in the excavation work has a policy or procedure that details specific mandatory steps it must take to be reasonably certain its excavation work does not compromise or jeopardize the adjacent flood control measure.  In this case, the Corps and/or WGI had at least four sources that required them to perform a geotechnical analysis on the impact their excavation and backfilling activity would have on the IHNC floodwall:  (1) a stated policy; (2) engineering regulations and manuals, (3) a Code of Federal Regulations, and (4) standard engineering practices.  Moreover, even if these various sources did not explicitly apply to the EBIA work performed by the Corps and WGI, they at a minimum establish the prevailing standard of care in the industry that a reasonably prudent geotechnical firm would adhere to when completing any excavations in the vicinity of a flood protection structure.

## Corps' Policy Mandated a Geotechnical Analysis

As evidenced by the testimony of various Corps representatives and Corps employees, the Corps had a policy that required them and/or WGI to perform a geotechnical analysis on the potential impact their excavation and backfilling activity could have on the adjacent IHNC floodwall.  For example, John Greishaber, who testified as a representative for the Corps, said:

- "In the course of the design, we look at all aspects of the **geotechnical loading that a wall could see**.  And one of the aspects we would look at is the **effect of seepage**."[1]
- "We'd follow the design guidelines.  We **make sure** that whatever is done does not violate the integrity of whatever the flood protection is."[2]
- "The way **we would evaluate** an excavation near the floodwall is to **verify** that the excavation does not jeopardize the integrity of the floodwall…**we make sure** that we do not compromise the stability of the walls…."[3]
- This engineering review would entail **"wall stability analysis, [] seepage analysis, and [] global stability analysis."**[4]
- If there is a hole near a flood control structure, engineering evaluation of the hole's potential impact on the structure is **mandatory** and not discretionary.[5]
- To perform this evaluation, the Corps' policy is to "go in and rerun the loading on the sheet pile," analyze "the difference between the ground line **that was assumed in the plans and specifications** for the design of the wall **and modify it** to the new ground line that results from having excavated the hole."[6]
- It was the Corps' **"process and procedure"** at the design phase, and to **"revisit"** the design upon modifications, to perform a geotechnical analysis on the potential for

---

[1] Greishaber Depo. Vol. I at 36:7-37:1.
[2] Greishaber Depo. Vol. I at 41:20-42:10.
[3] Greishaber Depo. Vol. I at 53:4-12; 54:2-16.
[4] Greishaber Depo. Vol. I at 123:5-124:7.
[5] Greishaber Depo. Vol. I at 88:7-21.
[6] Greishaber Depo. Vol. I at 91:2-93:13.

underseepage in the backfilled holes at the EBIA and the potential impact that underseepage could have on the adjacent floodwalls.[7]  Indeed, **"good engineering and sound engineering principles require[d] [the Corps to] document those kinds of analyses."**[8]

- The removal of the hundreds of piles at the Boland Marine site [North Breach] **"[had] to be looked at"** by the Corps because it was the Corps' **"own internal procedure[]"** to evaluate whether there was any potential impact on nearby flood control structures.[9]

- If Mr. Guillory encountered a hole or excavation down to 20-25 feet, he was **"required to give that to the engineering department for their review."**[10]

- Once WGI discovered the massive contaminants and Boland and Saucer Marine, **wall stability analysis, seepage analysis, and global stability analysis had to occur before WGI could continue its excavations**.[11]

Walter Baumy is another Corps representative whose testimony reflects the Corps' policy necessitating a geotechnical evaluation:

- The Corps **"would expect"** to perform engineering evaluations of any excavations done by WGI at the Boland and Saucer Marine excavations.[12]

- The Corps' **geotechnical engineering division would perform an engineering evaluation**" on excavations within 300 feet of the center line of a floodwall.[13]

Gerald Colletti, a Corps employee since 1977, also addressed the Corps' procedure for analyzing a project's potential impact on adjacent flood control structures:

- The Corps' **geotechnical branch** performs **stability analyses** for projects within the vicinity of floodwalls and levees on projects **to determine if there may be any adverse impact on those structures**.[14]

- If the Corps (or its contractors) performs **excavations that are within 300 feet of the IHNC eastern floodwall**, then **"geotechnical looks at it** from a…geotechnical structural standpoint.  **Factor of safety, what impact it may have on the adjacent wall or levee**."[15]

- "[W]hat you've got is you've got a federal navigation project that has a potential to affect or impact a federal flood control hurricane protection project.  So, **those two managers** [project and engineering] **need to get together**…**get engineering involved** and say, okay, what's actually happening here?  So, the technical evaluation comes from engineering."[16]

- 

---

[7] Greishaber Depo. Vol. I at 103:3-18.
[8] Greishaber Depo. Vol. I at 123:5-124:7.
[9] Greishaber Depo. Vol. I at 145:22-146:6; 147:1-148:14; 173:8-174:19.
[10] Greishaber Depo. Vol. I at 168:9-22.
[11] Greishaber Depo. Vol. I at 147:1-148:14.
[12] Baumy Depo. Vol. I at 236:6-13.
[13] Baumy Depo. Vol. I at 237:24-239:13.
[14] Colletti Depo. at 30:10-19.
[15] Colletti Depo. at 32:21-35:9; 40:17-43:9; 103:12-20.
[16] Colletti Depo. at 103:21-105:11.

Richard Varuso has worked for the Corps since 1994 and has spent a significant portion of his time in the Corps' geotechnical branch.  He also described the obligation to perform a geotechnical analysis:

- The excavations near the floodwalls along the IHNC "**have to be reviewed**" by the geotechnical engineers.  Geotechnical would "**have to look at** the site specific data for that location and determine…**how close we could get and how deep we could go with that excavation**."[17]
- It is a "fair assessment" to conclude that the Corps "needs to do some kind of an assessment; they **need to figure out whether or not there is an underseepage potential**…."[18]

This testimony from Corps representatives and experienced Corps employees makes clear that the Corps had a policy that required an engineering analysis on how their excavation work being performed within 300 feet of IHNC floodwall could potentially impact and affect that floodwall.

## Engineering Regulations and Manuals Mandated a Geotechnical Analysis

In addition to Corps' own policy that geotechnical evaluations that addressed seepage, wall stability, and global stability, the Corps also has several Engineering Regulations and Manuals that also required engineering analyses of how their excavation projects along the EBIA could potentially impact the integrity of nearby IHNC floodwall.

### ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999)

**Section 8: Engineering Documents**

Section 8 required a Design Documentation Report ("DDR") for the EBIA excavations.[19]  A DDR is a "record of final design effort after the feasibility phase" and "provides the technical basis for the plans and specifications and serves as a summary of the final design."[20]  The DDR covers the preconstruction engineering and design phase and the construction phase of the project.[21]  In effect, the DDR is the engineering master plan for a Corps project containing a discussion of all the engineering, geotechnical, and other analyses for the Corps' field personnel implementing the master plan.

As Appendix D instructs, the DDR is "not finalized until project construction is completed.  During the construction phase, *design decisions made in connection with contract modifications shall be added to*

---

[17] Varuso Depo. at 177:15-178:5.
[18] Varuso Depo. at 198:7-21.
[19] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 3, §8.2.
[20] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 3, §8.2.
[21] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 3, §8.2.

*the DDR.*"[22]   Amendments to the DDR must reflect changes in the original DDR and the new engineering, geotechnical and other analyses relating to these changes.[23]   Accordingly, the DDR must include "*results of geotechnical investigations*, which supplement previous studies....."[24]

The initial DDR was drafted in 1999, but it did not address the EBIA excavation project as it eventuated.  The EBIA excavation project that preceded the IHNC Lock Replacement was modified several times when WGI began excavating in 2001 and discovered soil contaminants and other subsurface structures and obstructions at the Boland Marine and Saucer Marine locations. Based upon my review of the 1999 DDR and the amended 2001 DDR No. 2, neither contained any geotechnical investigation of the excavations' potential impact on the adjacent IHNC floodwall.

**Section 10: Technical Coordination**

Section 10 ER 1110-2-1150 states that "Districts *shall conduct* analyses and investigations in accordance with approved engineering criteria and guidance, coordinate engineering activities, and seek advice on problems encountered during project development from appropriate MSC, HQUSACE, and other engineering staffs."[25]  As discussed above, once the Corps and WGI encountered buried foundations, pipelines, and other obstructions at the Boland Marine and Saucer Marine locations, the DDR required modification and geotechnical assessments required within the 300 foot buffer zone to address the potential for the removal of these structures to negatively impact the adjacent IHNC floodwall.[26]

**Section 15:  Engineering During Construction**

Section 15 of ER 1110-2-1150 requires that the Corps' engineers should be consulted whenever "modification of [Plans & Specifications]...and preparation of engineering considerations and instructions to field personnel.  The engineers must also provide support for contract claims and modifications....."[27]  This requirement was further discussed by Mr. Greishaber, who detailed the Corps' mandatory policy of reevaluating any changes and modifications that could impact adjacent flood control structures at the EBIA[28] (any excavations within the 300 foot buffer zone on either side of the IHNC floodwall). This engineering evaluation must include analyses of underseepage, global stability, and temporary retaining structures installed at both the Boland Marine and Saucer Marine

---

[22] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. D-1, §D-1.4 (emphasis added).

[23] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. D-1, §D-1.4; D-3, §D-7.11.

[24] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. D-3, §D-7.11 (emphasis added).

[25] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 4, §10 (emphasis added).

[26] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 4, §10.

[27] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 19.

[28] Greishaber Depo. Vol. I at 90:14-96:15.

locations.[29]  In fact, these analyses should have been completed before WGI could go forward with its work.[30]

In addition, Section 15.6 ("Engineering support for claims and modifications") states that "[e]ngineering *shall* provide design and cost estimating assistance for claims and modifications when requested and be knowledgeable of all claims and modifications....  Engineering input into this process is *essential to ensure the continuity of the design process through construction....*"[31]

But, it appears that this requirement was not followed. Lee Guillory's testimony indicates that he never requested assistance or review by the geotechnical division to comment on or analyze the EBIA excavations at Boland Marine and Saucer Marine.[32]  Thus, engineering could not "be knowledgeable of all claims and modifications" because Mr. Guillory never informed them of the claims and modifications generated by WGI's excavation work along the EBIA within the 300 foot buffer zone.

### Section 17:  Design Quality

Section 17 of ER 1110-2-1150 required engineering to have responsibility for the "[e]xecution of the design and technical quality" of the project.[33]  Because of this, it was "essential that coordination and planning the work effort occur at the earliest stages of project development, through preparation and execution of the Management Plan."[34]  In addition, Section 17 mandates that "[t]echnical quality *shall* be achieved mainly through a process that includes... *adequate coordination among the project team and technical disciplines*."[35]  Finally, [q]uality is further achieved by participation in *value engineering studies* and thorough internal checking and review by *qualified engineers*"[36] (i.e. those individuals with technical expertise to analyze geotechnical impacts).

With respect to the excavation work at the EBIA, Mr. Guillory's testimony reflects that there was not "adequate coordination" with geotechnical because there was no "coordination and planning the work effort" with geotechnical once WGI discovered the subsurface structures and obstructions at the Boland Marine and Saucer Marine sites.[37]  Confirming what Section 17 states, Mr. Greishaber testified that such coordination and planning should have been obligatory.[38]  As discussed, the Corps

---

[29] Greishaber Depo. Vol. I at 123:5-124:7; 159:20-160:25; 173:8-174:19.

[30] Greishaber Depo. Vol. I 147:1-148:14.

[31] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 20, §15.6 (emphasis added).

[32] Guillory Depo. Vol. I at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10.

[33] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17.

[34] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17.

[35] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17 (emphasis added).

[36] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17 (emphasis added).

[37] Guillory Depo. Vol. I at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10; Bacuta Depo. at 176:20-178:12.

[38] Grieshaber Depo Vol. I at 88:7-21; 123:5-124:7; 147:1-148:14; 159:20-160:25; 173:8-174:19.

should not have allowed WGI to proceed with the excavations at Boland and Saucer without evaluating "the potential negative impact of the pile removal on the floodwall…."[39]

Section 17 also required a "qualified engineer" to check and review the excavation plans at these two locations.[40]  To the extent the Corps tasked George Bacuta with reviewing the excavation plans,[41] it appears that Mr. Bacuta is a geochemist and not a "qualified engineer,"[42] and Mr. Bacuta never actually reviewed any of the EBIA clean-up excavation plans.[43]

## EM 1110-2-1913; Engineering and Design - Design and Construction of Levees (April 2000)

The Corps' Engineering Manuals "contain mandatory requirements for engineering procedures and design standards," as well as "policy standards for uniform engineering practice related to civil works projects."[44]   Certain of these requirements are designed "to ensure project safety and function."[45]

According to the Corps, "flood protection is extremely important," and they must assure that their projects "do not jeopardize the flood protection."[46]  To adhere to this reasonable safety policy, Mr. Greishaber testified that the Corps follows EM 1110-2-1913.[47]

EM 1110-2-1913 states that any foundation condition that may impact the seepage potential under a levee must be evaluated.  In particular, "[w]ithout control, underseepage in pervious foundations beneath levees may result in (a) excessive hydrostatic pressures beneath an impervious top stratum on the landside, (b) sand boils, and (c) piping beneath the levee itself."[48]

## EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989)

The Corps' Lock Evaluation Report states that the "structural components shall be designed according to the applicable portions of…EM-1110-2-2502."[49]   This manual states that "[w]ater-retaining structures are subject to through-seepage, underseepage, and seepage around their sides or ends" and that "[u]ncontrolled seepage may result in water pressures and uplift forces on the wall base in excess of design assumptions and consequent structural instability…."[50]  Because of this seepage potential, "[s]eepage control entails the design of measures to ensure that seepage

---

[39] Greishaber Depo Vol. I at 147:1-148:14.
[40] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17.
[41] Guillory Depo. Vol. I at 188:8-17.
[42] Bacuta Depo. at 145:18-146:6.
[43] Bacuta Depo. at 142:21-25; 177:4-13.
[44] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 4, §10.1; p. 23, §19.1.2.
[45] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 23, §19.1.2.
[46] Greishaber Depo. Vol. I at 72:3-73:11.
[47] Greishaber Depo. Vol. I at 72:3-73:11.
[48] EM 1110-2-1913; Engineering and Design - Design and Construction of Levees (April 2000) at p. 5-1, §5-1.
[49] MRGO New Lock and Connecting Channels Evaluation Report: Main Report and Environmental Impact Statement March 1997),Vol. 3 at B-86, §B.2.8.
[50] EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989) at p. 7-3, §7-3.

pressures and velocities are maintained below tolerable values."[51]  As a result, "the seepage aspects and the foundation stability of walls which have had basements excavated on either side of and adjacent to the wall since the original design and construction were completed, should be investigated."[52]

## EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994)

EM 1110-2-2504 addresses standards for the design of sheet pile walls.  This manual states that "[c]oordination and cooperation among hydraulic, geotechnical, and structural engineers must be continuous from the inception of the project to final placement in operation."[53]  It also mandates that "for floodwalls, foundation underseepage conditions must also be assessed."[54]

## EM 1110-2-5027; Engineering and Design - Confined Disposal of Dredged Material (Sept. 1987)

EM 1110-2-5027 concerns the confined disposal of dredged materials.  Specifically, this manual required more extensive field investigations where "foundation deposits are weak and compressible," "highly variable," and where "[u]nderseepage and/or settlement problems are severe" and where "the consequences of the failure involve life, property, or damage to the environment."[55]

## 33 C.F.R. § 208.10 Mandates a Geotechnical Analysis

This regulation concerns local flood protection works and includes maintenance and operation of such structures and facilities.  It required the Corps and/or WGI perform a geotechnical evaluation on the potential impact their excavation activities could have on the IHNC floodwall.  In particular, Section 5 states:

No improvement shall be passed over, under, or through the walls, levees, improved channels or floodways, nor shall any excavation or construction be permitted within the limits of the project right-of-way, nor shall any change be made in any feature of the works without prior determination by the District Engineer of the Department of the Army, or his authorized representative, that such improvement, excavation, construction, or alteration *will not adversely affect the functioning of the protective facilities*.

Such improvements or alterations as may be found to be desirable and permissible under the above determination shall be constructed in accordance with standard engineering practice.

Advice regarding the effect of proposed improvements or alterations on the functioning of the project and information concerning methods of construction acceptable under standard engineering

---

[51] EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989) at p. 7-3, §7-3.
[52] EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989) at p. 7-25, §g.
[53] EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994) at p. 2-1, §2-1.
[54] EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994) at p. 3-1, §3-1a.
("Geotechnical Investigation").
[55] EM 1110-2-5027; Engineering and Design - Confined Disposal of Dredged Material (Sept. 1987) at p. 6-4, Table 6-1.

practice *shall be obtained from the District Engineer or, if otherwise obtained, shall be submitted for his approval.*  Drawings or prints showing such improvements or alterations as finally constructed shall be furnished the District Engineer after completion of the work.

## Standard Engineering Practice Requires a Geotechnical Analysis and a Proper and Accepted Method of Compacting Backfilled Excavations

Independent of any policy, regulation, manual or code, a responsible engineer undertaking the same work performed by the Corps and WGI knows there are standard engineering practices that obligate the engineering firm to (1) perform a geotechnical evaluation of the potential impact its excavation work could have on an adjacent flood control structure, and (2) properly backfill and compact excavations in order to protect against and prevent underseepage from undermining the structure's design capacity (which includes an accepted safety factor).

A senior Corps representative, Mr. Greishaber, recognized this generally accepted principle as he testified that it was "good engineering and [a] sound engineering principle[]" to coordinate engineering activities with geotechnical engineers and seek geotechnical input on significant safety issues that the Corps encountered during the EBIA excavation.[56]

With respect to the Corps and WGI's excavation activity performed pursuant to Task Order 26 along the EBIA, standard engineering practice associated with site work being performed in the vicinity of a flood protection system requires, and as stated in the WGI Recommendation Report for Demolition and Site Preparation Activities, that geotechnical engineering be a component of the work at the site (WGI038645). At a minimum, a geotechnical engineer should have reviewed the additional subsurface information collected as part of the scope of work and ensured that all USACE required flood protection system evaluations were satisfied.  This is especially true for instances where the excavation work extended to the I-wall itself and/or encountered pervious fills that have the ability to quickly and rapidly convey water pressure directly to the flood wall.

Concerning the backfilling activity associated with this excavation activity, WGI consulted with the USACE and determined that a "clay seal" should be applied at those locations adjacent to the floodwall that might pose a potential hydraulic load on the existing I-wall structure.  This protective clay seal was not applied against the very pervious shell backfill and cohesionless sand backfills identified by WGI during their site characterization and sampling phase (specifically, MMG soil boring 81A, performed on October 4, 2001).

## Conclusions

Standard practice concerning geotechnical evaluations and protocols for mechanical compaction of "engineered fill" or "structural backfill" in areas adjacent to flood protection systems are essential to ensure that excavation activities will not degrade the capacity of the flood protection system, exposing the community depending on the protective system for their life safety.  These standards, were, in fact, pioneered and developed by the Army Corps of Engineers over several decades of painstaking research and painstaking evaluations of levee problems, which drew considerable

---

[56] Greishaber Depo. Vol. I at 123:5-124:7.

acclaim at the time,[57] and became benchmark standards, employed in one form or another, by virtually every flood control agency in the USA[58].

Because of this well-known hazard, several sources that required the Corps and/or WGI to engage in basic engineering analyses and proper backfilling practices, which included the Corps' own policy, engineering regulations and manuals, a Code of Federal Regulation, and standard engineering practices. The Corps and WGI failed to meet this standard of care.

Without these critical and fundamental analyses, the people engaging in excavation and backfilling activity similar to the activity engaged in by the Corps and WGI at the EBIA will have an incomplete and insufficient understanding of whether they are jeopardizing the structural integrity of the adjacent flood control feature.

And, as evidenced by the testimony of Corps representative, Mr. Greishaber, a potential consequence of failing to engage in these mandatory analyses is the failure of that flood control measure, which results in "flood[ing] a city."[59]

---

[57] The April 1956 article by W.J. Turnbull and C. R. Foster of the Army Corps of Engineers titled "Stabilization of Materials by Compaction" (Journal of the Soil Mechanics & Foundations Division of ASCE, v. 82:934) received the Norman Medal of ASCE for 1959, the society's highest honor. The January 1956 article by C.I. Mansur and R.I. Kaufman of the Army Corps of Engineers titled "Underseepage, Mississippi River Levees, St. Louis District (Journal of the Soil Mechanics & Foundations Division of ASCE, v. 82:864) received the Thomas Fitch Rowland Prize of ASCE in 1958.

[58] See Mittler, E.L., L. Morgan, M. Shapiro, and K.Y. Grill. (2006). State Roles and Responsibilities in the national Flood Insurance Program, American Institutes for Research, Washington, DC., and Monday, J., K.Y. Grill, P. Esformes, M. Eng, T. Kinney, and M. Shapiro. (2006). An Evaluation of Compliance with the National Flood Insurance Program, Part A: Achieving Community Compliance, American Institutes for Research, Washington, DC.

[59] Greishaber Depo. Vol. I at 80:13-25.