# EXHIBIT 50

J. DAVID ROGERS                                                                             March 17, 2012

---

Page 1

```
           UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES     CIVIL ACTION
CONSOLIDATED LITIGATION           NO. 05-4182 K2
                JUDGE DUVAL
PERTAINS TO MRGO                  MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
          05-6314, 05-6324, 05-6327, 05-6359,
          06-0225, 06-0886, 06-1885, 06-2152,
          06-2278, 06-2287, 06-2824, 06-4024,
          06-4065, 06-4066, 06-4389, 06-4634,
          06-4931, 06-5032, 06-5155, 06-5159,
          06-5156, 06-5162, 06-5260, 06-5771,
          06-5786, 06-5937, 07-0206, 07-0621,
          07-1073, 07-1271, 07-1285

                      * * *

                  (V O L U M E  II)
           Deposition of J. DAVID ROGERS, PH.D.,
P.E., P.G., given at the offices of Stone
Pigman Walther Wittmann, LLC, 546 Carondelet
Street, New Orleans, Louisiana 70130, on March
17th, 2012.
```

Page 2

```
 1  APPEARANCES:
 2  REPRESENTING THE PLAINTIFFS:
 3      BRUNO & BRUNO
 4      (BY:  JOSEPH M. BRUNO, ESQUIRE)
 5      855 Baronne Street
 6      New Orleans, Louisiana 70113
 7      504-525-1335
 8  - AND -
 9      LAW OFFICE OF FRANK C. DUDENHEFER, JR.
10      (BY:  FRANK C. DUDENHEFER, JR.,
11      ESQUIRE)
12      601 Poydras Street, Suite 2655
13      New Orleans, Louisiana 70130.
14      504-525-2553
15
16  REPRESENTING THE UNITED STATES OF AMERICA:
17      U.S. DEPARTMENT OF JUSTICE
18      (BY:  ROBIN DOYLE SMITH, ESQUIRE)
19      (BY:  RUPERT MITSCH, ESQUIRE)
20      Torts Branch, Civil Division
21      P.O. Box 888
22      Benjamin Franklin Station
23      Washington, D.C. 20044
24      202-616-4289
25
```

Page 3

```
 1  REPRESENTING WASHINGTON GROUP INTERNATIONAL,
 2      INC.:
 3      JONES DAY
 4      (BY:  DEBRA S. CLAYMAN, ESQUIRE)
 5      (BY:  CHRIS THATCH, ESQUIRE)
 6      51 Louisiana Avenue, N.W.
 7      Washington, D.C. 20001-2113
 8      202-879-4645
 9  - and -
10      STONE PIGMAN WALTHER WITTMANN, L.L.C.
11      (BY:  WILLIAM D. TREEBY, ESQUIRE)
12      546 Carondelet Street
13      New Orleans, Louisiana 70130
14      504-581-3200
15
16  ALSO PRESENT:
17      FRANCISCO SILVA-TULLA
18
19  VIDEOGRAPHER:  KEN HART (HART VIDEO)
20
21
22
23  REPORTED BY:
24      JOSEPH A. FAIRBANKS, JR., CCR, RPR
25      CERTIFIED COURT REPORTER #75005
```

Page 4

```
 1            E X A M I N A T I O N   I N D E X
 2
 3  EXAMINATION BY:                        PAGE
 4  MR. TREEBY   ................................7
 5  MR. MITSCH   ..............................240
 6  MR. TREEBY   ..............................252
 7
 8            E X H I B I T   I N D E X
 9
10  EXHIBIT NO.                            PAGE
11  Exhibit Rogers 3C ..........................35
12  Exhibit Rogers 31 ..........................44
13  Exhibit Rogers 32 ..........................45
14  Exhibit Rogers 33 ..........................64
15  Exhibit Rogers 34 ..........................71
16  Exhibit Rogers 35 ..........................88
17  Exhibit Rogers 36 ..........................91
18  Exhibit Rogers 37 ..........................97
19  Exhibit Rogers 38 .........................102
20  Exhibit Rogers 39 .........................107
21  Exhibit Rogers 40 .........................119
22  Exhibit Rogers 41 .........................137
23  Exhibit Rogers 42 .........................149
24  Exhibit Rogers 43 .........................178
25  Exhibit Rogers 44 .........................195
```

1 (Pages 1 to 4)

JOHNS, PENDLETON COURT REPORTERS                                                        504 219-1993

Page 37

1  was 10 to the minus 4 under the embankment and
2  10 to the minus 3 outside the embankment.
3       Let me ask you this: Why would the
4  soils be less permeable under the embankment
5  than outside the embankment?
6       A. Well, I was asked about that
7  yesterday.
8          MR. BRUNO:
9             Yeah. You did.
10      A. That was because of the consolidation
11 that occurs under the surcharge of the
12 embankment. So the porosity is diminished, so
13 the permeability is diminished by increasing
14 density. You're densifying the organics
15 underneath the embankment. The load of the
16 embankment.
17      Q. The load of the embankment is
18 compressing the soils?
19      A. Yes. The peats. The organic soils.
20      Q. And that means if one puts more load
21 on these soils it would be compressed more and
22 be less permeable. Is that right?
23      A. Generally, yes.
24      Q. So these soils would be considered
25 compressible soils. Isn't that the case?

Page 38

1       A. Yes. Organic soils, the higher the
2  organic content, the more compressible they
3  generally are.
4       Q. And the less permeable.
5       A. Yes.
6       Q. Okay. Changing the subject again.
7       A. All right.
8       Q. Trying to move fast.
9          You stated that you did not want to do
10 pumping tests in the EBIA or near the EBIA
11 breach sites because those areas had
12 experienced the most disturbance; isn't that
13 right?
14      A. Yes.
15      Q. Tell us what you mean by disturbances
16 as it relates to site selection for the various
17 tests used to determine hydraulic properties of
18 the soils.
19      A. Well, the areas where you had the
20 breaches, they put in two generations of large
21 rock revetment cofferdams. So you have this --
22 you know, you have all the site development
23 stuff that went on, like with the EBIA
24 construction and taking those things out of
25 there. And then after Katrina, they came in

Page 39

1  and put these very large rock embankments in to
2  serve as cofferdams around the breaches.
3       So they're pre-loaded by the rock
4  cofferdams. And then you have the three years
5  of corrective work where they're moving the
6  entire embankment, cutting it down to its
7  foundations, and moving that material over and
8  pre-loading loading sites and then rebuilding
9  all of that. So there's a lot of load being
10 placed and load being removed, two or three
11 generations of it. So it's not going to be
12 entirely representative of the situation that
13 existed back in August 2005 when Katrina hit.
14 They should be more compressed now because of
15 all that surcharging that was carried out after
16 Katrina.
17      Q. I note in your answer, though, you did
18 include all the disturbances that occurred
19 from -- shall we say from 1919 or something
20 like that, all the way up through Katrina. Up
21 to Katrina.
22      A. Right. That's what they're trying to
23 model. The person I'm serving, Dr. Bea, is
24 trying to model what the situation was on
25 August 29th, 2005. So I'm looking for sites

Page 40

1  that are as similar to August 29th, 2005, as I
2  can find. So that's why I ended up going way
3  down to the south end, because that was the
4  least disturbed area, in my view, within the
5  EBIA.
6       Q. So you acknowledge that the EBIA area,
7  prior to Katrina, had experienced considerable
8  disturbance for 85 years.
9       A. Yes.
10      Q. Construction, demolition,
11 construction, moving things, pilings, all kinds
12 of things going on. Right?
13      A. Yeah. Except at that south end. That
14 extreme south end was a fairly benign area. It
15 has the dredge spoils on it and it has the wall
16 and levee, but it's not nearly as much other
17 disturbance down there because they didn't
18 rebuild that section.
19         See, from the corner all the way up
20 to -- you know, from the corner by Claiborne
21 Street bridge all the way to Florida Avenue,
22 that entire section was completely rebuilt
23 after Katrina.
24      Q. Go to Page 112 of your report, Figure
25 106. You there?

Page 221

1   the Boland Marine site area. Right?
2          (Exhibit Rogers 48 was marked for
3   identification and is attached hereto.)
4       A.  Right.
5   EXAMINATION BY MR. TREEBY:
6       Q.  You've got the wrong document. We'll
7   give you the right one now.
8          Okay. Here we go. First, I know this
9   is an excerpt, but do you recognize this
10  document, the recap submittal report, as
11  something you looked at?
12      A.  Dr. Storesund looked at it, and then I
13  saw some of the boring logs, the plan and the
14  boring log. This plan I've seen and the boring
15  logs.
16      Q.  Okay. Look at the Bates, the page on
17  Bates number WGI 062601.
18      A.  That's the plan map?
19      Q.  Yes. It shows the location of the
20  borings. Do you see that?
21      A.  Yes.
22      Q.  And 81-A, in fact, is between Surekote
23  Road and the flood wall, up in the corner --
24      A.  Right.
25      Q.  -- is that right?

Page 222

1       A.  Correct.
2       Q.  Now, look back at the third page in
3   this document which is Bates numbered -- it's
4   Page 8 but it's WGI 061765. Do you have that
5   page?
6       A.  Yes.
7       Q.  And if you would, look in the last
8   paragraph beginning in the second sentence.
9   After the word therefore, it says, It is
10  anticipated that these seven areas will be
11  excavated and confirmation samples will be
12  collected to demonstrate that the levels of
13  remaining COCs meet the MO-1 recap RS.
14         You see that?
15      A.  Yes.
16      Q.  These results will then be combined
17  with the existing data to show that the site
18  should receive a no further action at this time
19  determination under MO-1.
20         That's the end of the quote.
21      A.  Right.
22      Q.  The seven proposed excavation areas
23  are listed on this page. Do you see that?
24      A.  Yes.
25      Q.  With corresponding bore holes in those

Page 223

1   area designations. Correct?
2       A.  Yes.
3       Q.  Bore hole 81-A was not located in any
4   of these seven areas for excavation; right?
5       A.  That's my understanding, yes.
6       Q.  Is it your understanding from reading
7   this, or did you know that before?
8       A.  Previously, yeah. That was our
9   understanding.
10      Q.  Okay. We've marked a two-paged
11  document which also comes from the -- which
12  comes from the MFAT submittal report in June of
13  2005 as Exhibit 49, bearing Bates number WGI
14  065641. And there's a map attached.
15         Have you seen this document before?
16      A.  No. I don't recall seeing it.
17      Q.  Look at the areas that were excavated
18  at Boland Marine.
19      A.  Right.
20      Q.  There was no excavation in the area
21  where bore hole 81-A was taken. Right?
22      A.  Right.
23      Q.  Do you have any evidence that an
24  excavation was done by Washington Group at the
25  location where bore hole 81-A was taken?

Page 224

1       A.  No.
2       Q.  Do you have evidence that Washington
3   Group did any work whatsoever at the location
4   where bore hole 81-A was taken?
5       A.  No.
6       Q.  Can you think of any reason why the
7   contractor should have placed a protective clay
8   seal at a location that was never excavated?
9       A.  Well, if somebody had looked carefully
10  at all the geology along that north property
11  line there, they might have been able -- they
12  should have been able to piece together the
13  fact that you had a contiguous stretch of
14  pervious materials that reach over to that
15  corner. Because the Surekote Road fill has
16  been moved to the west, and so it's just a big
17  mass of pervious shell fill. And then that
18  shell fill dives down there in the corner,
19  according to the boring. And that would
20  bring -- when you get flood stage up on the
21  platform where -- the working area, then you
22  could get rapid pore pressure conductance being
23  directed toward the corner of the wall.
24      Q.  Was it your understanding that
25  Washington Group was contracted to look at

Page 245

1   tell me what the difference is between a shell
2   fill and a shell sand fill.
3       A.  Well, the shell sand fill is also
4   pretty common.  Because it's not as porous,
5   it's a better working grade to pour something
6   on, because all the little interstices are more
7   filled with sand than with the pure shells.  So
8   they like to use that beneath pavement and
9   things like that.  Sidewalks.
10      Q.  What's your estimate of the
11  permeability of shell fill?
12      A.  Well, shell fills, if it's clean, is
13  very -- you know, highly permeable.  It's going
14  to be between .1 and 1 centimeter per second
15  type material.  But if you put sand in it, it's
16  going to diminish the permeability somewhat.
17      Q.  So what's your estimate, then, of the
18  permeability of the shell sand fill?
19      A.  Probably something, you know, between,
20  um -- 1 times 10 to the minus 2, and 10 to the
21  minus 3, in that range.
22      Q.  Okay.  Please go to Figure 104 at
23  Page 105.  It's Figure 104 at Page 105.  And
24  look at that box that's marked as Number 1.
25      A.  Yes.

Page 246

1       Q.  How far away from the levee, from the
2   flood wall, was that?  Approximately.
3       A.  I can't tell.  I don't have a scale
4   here.  The part of the levee flood wall it's
5   close to is the diagonal section coming up
6   towards the Florida Avenue bridge.
7       Q.  When Mr. Treeby was asking you
8   questions about this, I thought you had said
9   that it was approximately 300 feet.
10      Am I incorrect about that?  Or --
11      A.  I thought within 200 to 300 feet,
12  yeah, was the range.  And that would be from
13  going to the south, to the -- to the east,
14  going straight down on the page, the way the
15  page is oriented.
16      Q.  Now, am I correct --
17      A.  He was asking me with reference to the
18  north breach, if I remember.
19      Q.  Right.  Exactly.  Okay.
20      Now, I also recollect that in response
21  to questions by Mr. Treeby that you had said
22  that you weren't concerned about the depth of
23  that excavation as much as the fact that it had
24  been filled with some shell fill.  Right?
25      A.  Right.  Sand fill.  Sand backfill.

Page 247

1       Q.  Sand backfill?
2       A.  Right.
3       Q.  Okay.  And that that was the
4   conveyance sand, or the conveyance for the
5   water to travel from that box 1 to the north
6   breach area?  Is that correct?
7       A.  Right over to the corner, yeah.  In
8   proximity to the north breach, right.
9       Q.  And again, it's just that that was --
10  that was the conduit, as opposed to the -- it's
11  the fact that it was placed on top of the
12  ground as opposed to the actual depth?
13      A.  That's right.  It's not going to be a
14  problem till the hurricane surge comes up and
15  floods the whole area where the backfill is.
16      Q.  And what role does that shell that was
17  underneath Surekote Road play in all this?
18      A.  Well, it would have a fairly high
19  permeability, be able to convey moisture
20  through the fill.
21      Q.  So that also adds to the conveyance --
22  to the conduit of the water.
23      A.  Right.
24      Q.  Go to Page -- your Figure 207,
25  Page 219.

Page 248

1       The sand that you have just spoken
2   about and the shell fill that was -- you've
3   associated with Surekote Road, did that come
4   into contact with the -- did that have direct
5   contact with the dredge spoils that are
6   indicated on your Figure 207?
7       A.  Yeah.  It's sitting on top of the
8   dredge soils.
9       Q.  Okay.  So -- there wasn't any boundary
10  between it, it's just sitting right on top
11  of --
12      A.  That would be my presumption, yes.
13      Q.  Can you pull out Dr. Bea's report,
14  please?
15      MR. DUDENHEFER:
16          It's 26.
17      A.  26.
18  EXAMINATION BY MR. MITSCH:
19      Q.  Okay.  And would you go to Page 80,
20  and Figure 43, please.
21      A.  Okay.
22      Q.  Is that your understanding of what the
23  cross-section of that north breach was?
24      A.  Well, with the exception of the
25  backfilled excavation -- I don't know what that

Page 257

1  northeast in this area.  And that's why you see
2  more settlement down by the Florida Avenue
3  pumping plant than you see up at the Claiborne
4  Street end.
5      Q.  Was the thickening in general
6  demonstrated by the boring tests that we spent
7  all these millions of dollars on?
8      A.  Well, we didn't do a lot of borings
9  down --
10     Q.  Well, we did a lot of them.
11     A.  -- by the there plant.
12     Q.  We did a lot of them.
13     A.  Okay.  So --
14     Q.  If, in fact, your hypothesis based on
15 geology were true, would the demonstrated
16 thickness of those layers be shown on the
17 borings that were done throughout the EBIA from
18 north to south, even though you didn't
19 participate in them?
20     A.  Yeah.  Only if somebody really
21 carefully logged them.  See, I didn't log them,
22 so I can't tell you.  I wasn't impressed with
23 what I saw Fugro doing.  But as you pointed out
24 correctly this morning, you can order as many
25 tests as you want, and the tests do tell you

Page 258

1  how rich it is in organics.
2      Q.  And you also agreed that the people
3  who were selecting the test specimens were
4  competent --
5      A.  Right.
6      Q.  -- reputable people.  Is that right?
7      A.  Right.  If I would have been doing it
8  personally it would have been more detailed.
9  There would have been a lot more on the logs.
10 That's all.  That's solicitous of me, but I
11 threw it in there anyway.
12         MR. TREEBY:
13             Are we done?
14         MR. DUDENHEFER:
15             We're done.

Page 259

            WITNESS' CERTIFICATE

    I, J. DAVID ROGERS, Ph.D., do
hereby certify that the foregoing testimony was
given by me, and that the transcription of said
testimony, with corrections and/or changes, if
any, is true and correct as given by me on the
aforementioned date.


_____      _____
DATE SIGNED         J. DAVID ROGERS, Ph.D.

_____  Signed with corrections as noted.

_____  Signed with no corrections noted.









DATE TAKEN:  March 17th, 2012

Page 260

            REPORTER'S CERTIFICATE
    I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
Certified Court Reporter in and for the State
of Louisiana, do hereby certify that the
aforementioned witness, after having been first
duly sworn by me to testify to the truth, did
testify as hereinabove set forth;
    That said deposition was taken by me
in computer shorthand and thereafter
transcribed under my supervision, and is a true
and correct transcription to the best of my
ability and understanding.
    I further certify that I am not of
counsel, nor related to counsel or the parties
hereto, and am in no way interested in the
result of said cause.





                    _____
                    JOSEPH A. FAIRBANKS, JR., CCR, RPR
                    CERTIFIED COURT REPORTER #75005