UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | * * * * * * * * * * * | CIVIL ACTION<br><br>NO. 05-4182<br><br>SECTION "K" (2)<br><br>JUDGE DUVAL<br><br>MAGISTRATE WILKINSON |
| PERTAINS TO:  MRGO<br>        *Armstrong, No.* 10-866 | | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |

**REPLY MEMORANDUM TO PLAINTIFFS' OPPOSITION TO MOTION TO
EXCLUDE TESTIMONY AND OPINIONS OF DR. ROBERT GLENN BEA**

William D. Treeby, 12901
James C. Gulotta, Jr., 6590
Heather S. Lonian, 29956
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Facsimile:  (504) 581-3361

Adrian Wager-Zito
Debra S. Clayman
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3891
Facsimile:  (202) 626-1700

*Attorneys for Washington Group
International, Inc.*

# Table of Contents

Page

Appendix of Exhibits ................................................................................................. ii

I.      THE LEGAL STANDARD TO EXCLUDE JUNK SCIENCE IS MET HERE ................ 2

II.     THE OPPOSITION DISTORTS THE JOINT SOILS INVESTIGATION PROGRAM; DR. BEA'S "CRITICAL" BEST ESTIMATES OF PERMEABILITY ARE SHOWN TO BE A SMOKE SCREEN ............................................................................................. 4

III.    DR. BEA'S CROSS-SECTION "FACTS" ARE STILL NON-EXISTENT ..................... 7

        A.      North Breach Case 1 Cross-Sections ......................................................... 7

        B.      North Breach Case 2 Cross-Sections ....................................................... 10

                1.      Borehole 81A is not representative of soil conditions at the North Breach. ................................................................................ 10

                2.      Twenty-foot-deep "shell fill" feature shown in Dr. Bea's cross-sections did not exist pre-Katrina. ........................................... 11

        C.      South Breach Case 1 Cross-Sections ....................................................... 13

                1.      Dr. Bea modeled a deep, backfilled excavation next to the South Breach that did not exist prior to Katrina .................................... 13

                2.      The permeability value that Dr. Bea assigned to the backfill in his South Breach Case 1 cross-sections is not consistent with the backfill that WGI used in the EBIA .......................................... 15

        D.      South Breach Case 2 Cross-Sections ....................................................... 16

                1.      Dr. Bea's assumption that WGI excavated a deep utility trench in the vicinity of the South Breach is belied by the record evidence ............ 16

                2.      Dr. Bea's two-dimensional modeling of the South Breach Case 2 cross-sections render his analyses wholly unreliable ................................ 17

        E.      So-Called Near Breach Case 1 Cross-Sections ........................................ 18

IV.     DR. BEA'S "REAL WORLD" WAS NOT IN THE LOWER NINTH WARD—HIS "EXPLANATIONS" FOR COMPRESSIBILITY ARE MERE SMOKESCREENS TO DIVERT ATTENTION FROM HIS FLAWED ANALYSES. ......................................... 20

        A.      Dr. Bea's "Dilatational Wave Velocity Theory" Has No Bearing on this Case and Should be Ignored. .................................................................... 20

                1.      "Dilatational Wave Velocity" Was Contrived by Dr. Bea Only Recently as a Last-Ditch Effort to Close Gaps in His Analyses and Mislead Or Even Deceive the Court. ......................................... 21

                2.      Dr. Bea's Alleged Dilatational Wave Velocity Value Does Not Apply To Events Like The Katrina Storm Surge But Rather To A Dynamic Event Such As A Nuclear Explosion Or An Earthquake And Has Nothing To Do With The Behavior Of The Organic Clay Layer At The EBIA During Katrina. ......................................... 24

## Table of Contents

(continued)

Page

B.  Dr. Bea's Alleged Transient + Steady Flow Analysis Is Not Supported by the Facts and Is Contrary to Accepted Geotechnical Science..............................26

C.  Lambe and Whitman and SEEP/W in No Way Validate Dr. Bea's "Analyses."........................................................................................................28

V.  CONCLUSION...........................................................................................................32

1095224v.1

## Appendix of Exhibits

Appendix No.

Exhibit 26 to Deposition of Dr. Robert Bea ........................................................................39

Agreement with Fugro Consultants, Inc., dated 6/20/2011 ................................................40

Trial Transcript in BARGE, 7/8/2010 (afternoon session), excerpts.....................................41

Dr. Robert Bea's Technical Report III in *Robinson*, excerpts.............................................42

Trial Transcript in BARGE, 7/8/2010 (morning session), excerpts. ....................................43

IPET Report, Volume V, Appendix 17 (2009), excerpts.....................................................44

Deposition Transcript of Chad Morris, 3/9/2012, excerpts .................................................45

Deposition Transcript of Dr. J. David Rogers, 3/16/2012 (Vol. 1), excerpts ..........................46

Expert Report of Dr. J. David Rogers, dated 1/5/2012, excerpts.........................................47

Deposition Transcript of Dr. Thomas L. Brandon, 4/13/2012, excerpts ...................................48

Design Mem. No. 4, Florida Ave. Complex, June 1980........................................................49

Deposition Transcript of Dr. J. David Rogers, 3/17/2012 (Vol. 2), excerpts ..........................50

Expert Report of Dr. Timothy Stark, dated 3/12/012, excerpts ..............................................51

WGI's Photographs of Gas Line Removal ..........................................................................52

MMG Boring Log (71G) .................................................................................................53

Borrow Pit Driling Report, June 2001, excerpt ..................................................................54

May 2, 2002 Memo from Eng'g Division ...........................................................................55

Expert Report of Dr. Francisco Silva-Tulla, 3/12/2012, excerpt..........................................56

Declaration of Dr. Francisco Silva-Tulla, dated 5/30/2012..................................................57

*The Response of Soils to Dynamic Loads*, Whitman (1970), excerpt......................................58

*Soil Mechanics*, Lambe & Whitman (1969), excerpts..........................................................59

*Handbook of Physical Constants*, Clark (1966), excerpt.....................................................60

*Soil Mechanics in Engineering Practice*, Terzaghi & Peck (1996), excerpt ...........................61

SEEP/W Manual (2009), excerpt......................................................................................62

Declaration of Dr. T. William Lambe, dated 5/30/2012........................................................63

1095224v.1

**REPLY MEMORANDUM TO PLAINTIFFS' OPPOSITION TO MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF DR. ROBERT GLENN BEA**

The Motion before the Court is *not* about "what caused the North and South Breaches at the Lower Ninth Ward flood wall."[1]   The Motion instead asserts that Dr. Robert Glenn Bea has ignored actual facts in favor of unsupported hypotheses and has substituted junk science for recognized geotechnical engineering principles.   The Opposition attempts to change the subject "to deflect attention"[2] from these shortcomings.   The Opposition contains no explanation for Dr. Bea's substitution of conceptual/hypothetical cross sections for carefully documented pre-Katrina conditions at the East Bank Industrial Area ("EBIA").   Instead, the Opposition attacks the well-founded opinions of true geotechnical engineering experts (whose expertise is not before the Court on this Motion) rather than provide well-reasoned arguments to explain the unheard-of pseudo-scientific jargon engaged in by Dr. Bea.

There is no doubt that Dr. Bea is a practiced *forensic engineer*.   Dr. Bea has extensive experience in the offshore oil and gas industry.   But the statement that Dr. Bea had "extensive 'boots on the ground' experience investigating levee failures," before becoming involved with Plaintiffs as an advocate in this case, is simply untrue.   Dr. Bea had **no** levee failure investigation work prior to Katrina.[3]   His many publications--of articles, papers, and symposium presentations--have involved oil and gas pipelines and offshore platform safety, not levee failures.[4]   It is a misrepresentation to say that Dr. Bea had "extensive 'boots on the ground' experience investigating levee failures."

---

[1]   Plaintiffs' Opposition To Defendants United States And Washington Group International, Inc.'s Motions to Exclude Testimony And Opinions Of Dr. Robert Bea (herein "Opposition"), at p. 1.

[2]   Opposition, at p. 1.

[3]   WGI Mem., Ex. 8, Bea Dep., Vol. 1, p. 46: 15-24 and WGI Mem., Ex. 9, Bea. Dep. Vol 2, p. 175: 24-176: 23. Bea's only other levee, floodwall, or flood control structure failure investigations were on the Upper Mississippi River in 2008 and on the Sacramento River within the four years prior to March, 2012.

[4]   Bea Deposition, Vol. 1, p. 50:3-15.   Out of 644 publications listed in Appendix A to his Expert Report (pp. 4-40), Dr. Bea only **claimed** that a total of 10 related to "floodwall, levee or flood control failures that were published prior to Hurricane Katrina…." Bea Deposition, Vol. 1, p. 50:16-21; p. 51:1-p. 54:16; Vol. 2, p. 7:8-p.  8:15; Ex. 39, Exhibit 26 to Dr. Bea's deposition, Vol. 2.   Dr. Bea identified items 39, 76 from pp. 4-8 of

The Opposition's inapposite citation to this Court's prior opinions in BARGE and *Robinson* is similarly inappropriate and unavailing.[5]  In *Robinson*, without WGI present, the Court was not attempting to determine the cause of failure of the IHNC/EBIA levees and floodwalls.  In BARGE, again without WGI present, the Court simply determined that the barge did not contribute to the levee/floodwall failure.[6]

Once again, WGI's motion to exclude the testimony and opinions of Dr. Robert Glenn Bea is not undertaken lightly--the remedy sought is rarely granted.  However rare, this is such a case.  Dr. Bea's opinions in this case are not supported by facts or by science and should be excluded.

## I.     THE LEGAL STANDARD TO EXCLUDE JUNK SCIENCE IS MET HERE

In a bench trial, where the judge acts as both the gatekeeper and finder of fact, "the *Daubert* standards of admissibility of expert testimony must still be met …."[7]  The ultimate question still is "[w]hether an expert will assist the factfinder" under Rule 702.[8]  "'[W]hen the court sits as trier of fact, … [it] is then in the best position to know whether expert testimony would help [it] understand the case.'"[9]  Only in the latter sense, in which the trial judge's own confidence in hearing scientific evidence at trial exceeds the confidence that he may have in a

---

(continued…)

Appendix A to his report, under "Archival Journals"; items 13, 19, 23, 36 and 77 from pp. 13-39 of Appendix to his report, under Refereed and Non-Refereed Conference Proceedings and Symposium Proceedings, Technical Reports, and Articles in Non-Archival Magazines or Journals.  Dr. Bea also identified items 11, 12 and 13 from Books or Chapters in Books.  **However, a review of those materials in fact shows that *none* of these publications involved failures of levees, floodwalls or flood control structures.**

[5]     Opposition, at pp. 1-2, fn. 2; *Id.* at pp. 4-5.

[6]     "[T]he Court makes no finding as to the ultimate cause(s) of that failure [North Breach]", and "[t]he Court will not make findings as to the specific cause(s) for the South Breach…."  2011 WL 1792542 at *13, 14.

[7]     *Schilder Dairy, LLC v. DeLaval, Inc.*, 2011 WL 2634251 at *2 (D.Idaho 7/5/11); *see also, Seaboard Lumber Co. v. U.S.*, 308 F.3d 1283, 1302 (Fed. Cir. 2002).

[8]     *French v. Allstate Indem. Co.*, 637 F.3d 571, 578 (5th Cir. 2011) (quoting *Mercado v. Austin Police Dep't*, 754 F.2d 1266, 1269 (5th Cir. 1985)).

[9]     *Id.*

- 2 -

1095224v.1

jury's ability to understand scientific evidence, are *Daubert* standards considered relaxed.[10]   The judge is under no duty, even in a bench trial, to hear scientific evidence at trial that will not assist him in finding the relevant facts.

As a result, judges have, in fact, excluded expert testimony prior to a bench trial because of the flaws found in a proffered expert's methodology.[11]   Should the Court find that Dr. Bea's methods are scientifically unreliable, the Court has a duty to exclude his opinions and testimony under Rule 702.

Plaintiffs accuse WGI of twisting the *Daubert* inquiry into a "*de facto* summary judgment that would dispose of the entire action."[12]   The Court should not avoid a thorough *Daubert* inquiry merely because Plaintiffs' theory of causation is based on one expert's flawed and inadmissible analysis.   In *Rink v. Cheminova, Inc.*, the district court was faced with a similar situation.[13]   The district court found (and the appellate court affirmed) that the plaintiffs' causation expert's methods were unreliable, and his testimony was therefore inadmissible.[14]   The court also found that because the plaintiffs' other experts relied on the inadmissible report, their own reports were also unreliable and inadmissible.[15]   As a result, the district court found "that there was no reliable expert evidence" of causation.[16]   Without the expert testimony, "the putative class representatives failed to make a sufficient showing for an element on which they

---

[10]   *See David E. Watson, P.C. v. U.S.*, 668 F.3d 1008, 1015 (8th Cir. 2011) ("When the district court sits as the finder of fact, "'[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.'" (quoting *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011)). Thus, Courts may relax *Daubert's* application for bench trials. *Id.*

[11]   *See Johnson v. Big Lot Stores, Inc.*, 2008 WL 1930681, at *20 (E.D.La. 4/29/08).

[12]   Opposition at p. 11.

[13]   400 F.3d 1286 (11th Cir. 2005).

[14]   *Id.* at pp. 1292-94.

[15]   *Id.* at pp. 1294-95.

[16]   *Id.* at p. 1295.

- 3 -

had the burden of proof."[17]  On appeal, the appellate court held that "the district court properly granted summary judgment" in favor of the defendant.[18]

Plaintiffs cannot bear their burden of demonstrating that Dr. Bea's opinions are scientifically reliable.  There is no reason to delay until trial a decision excluding Dr. Bea's unfounded opinions.

## II.   THE OPPOSITION DISTORTS THE JOINT SOILS INVESTIGATION PROGRAM-----DR. BEA'S "CRITICAL" BEST ESTIMATES OF PERMEABILITY ARE SHOWN TO BE A SMOKE SCREEN

The history of Dr. Bea's changing opinions and the rationale for the joint soils investigation are relevant to understanding Dr. Bea's current opinions.  Plaintiffs, in their Opposition, try to rewrite the relevant history.  For example the Opposition states: "Dr. Rogers concluded that Fugro and the Defendants elected to ignore the minority of materials within the boring's varied soil and assign an identification based upon the majority of the material found in the boring. This identification was based upon a standard (ASTM 2487) not included within the SOP."[19]  That statement is misleading.  The soils classification standard, ASTM D 2487 was *required* by the joint soils investigation program, and was explicitly agreed to by Plaintiffs.[20]  Plaintiffs and Dr. Rogers have no legitimate cause to complain.  Further, the classifications applied to the soils in Fugro's logs do not affect the analyses of the critical soil properties at issue in this case.  Plaintiffs' and Defendants' experts agree as to the permeability determined by Fugro's testing.  As Plaintiffs admit, determination of the soil permeability was the main purpose of engaging Fugro.[21]

---

[17]   *Id*. at pp. 1295-96.

[18]   *Id*. at p. 1296.

[19]   Opposition at p. 7.

[20]   Ex. 40, Agreement with Fugro Consultants, Inc. by the parties, dated June 20, 2011, on page 4 of 11, states: "'Full Soil Classification Tests', where assigned by the Experts … will be performed utilizing the appropriate test procedures, including ASTM D 2487…."

[21]   Opposition at p. 7.

Similarly, Plaintiffs attempt to distance Dr. Bea from the opinions expressed in the ILIT report.[22]  This is contrary to Dr. Bea's prior testimony in the BARGE litigation[23] and to claims of his co-leadership of the ILIT team and co-authorship of the ILIT report as bases for his qualifications to offer an expert opinion in *this* case.[24]  Dr. Bea still cites, in his report in *this* case, to the ILIT report as a basis for determining his "best estimate" of the horizontal conductivity for the "marsh layer."[25]

In their Opposition, Plaintiffs refer to a range of permeability values mentioned by Dr. Bea in his prior reports for which he claimed to have considered underseepage effects.[26]  Regardless, in virtually every report and opinion authored or offered by Dr. Bea since 2006, he has referred to a "best estimate" for permeability on which he based his reported seepage analysis results.  Dr. Bea's "best estimate" of the permeability has changed multiple times since 2006.

In the very last declaration that he submitted in *Robinson* (dated January 29, 2009), Dr. Bea confirmed that he relied on a "best estimate" of **$1x10^{-3}$ cm/sec** for the permeability of the "marsh layer."[27]  Further, a review of his reports issued in *Robinson* reveals that he relied on a permeability of **$1x10^{-3}$ cm/sec** to model his failure scenario.[28]  It was supposedly because of the uncertainty of the characteristics of this "critical" layer, that Dr. Bea

---

[22]   Opposition at p. 8.

[23]   A: I don't think I've been criticized. I think the independent levee team was correctly appropriately criticized for the use of their very high water conductivity that we used in stages 1 and 2 of the IPET -- ILIT work.

Q: And you were co-leader of that team; is that fair?

A: That's correct.

Q. At the time that the ILIT team, which you were a co-leader of, came up with its conclusions regarding seepage and underseepage, you were in agreement with those conclusions, correct?

A: That's correct.

Q: And at all times when the ILIT team put out a report, any portion of its report, at the time it was put out, you were in agreement with those conclusions; fair?

A: That's correct.

Ex. 41, BARGE Transcript, 7/8/2010 (afternoon), at pp. 2753:19-2754:14.

[24]   Bea Report at p. 5, ¶¶ 7-8.

[25]   Bea Report at p. 72, ¶77.

[26]   Opposition at p. 10.

[27]   WGI Mem., Ex. 4, Bea Declaration in *Robinson*, January 29, 2009, at p. 132, ¶182.

[28]   *See* Ex. 42, Technical Report III in *Robinson*, at pp. 95-99.

suggested in a report in *Robinson* that "[f]uture work on the breach site (and non-failure sites) should be carried out to assess the permeability of this complex deposit."[29]

Later Dr. Bea testified before this Court in BARGE on July 8, 2010, that the borings done at the EBIA prior to that date were sufficient to allow him to characterize the soils in the vicinity of both the North and South Breaches.[30]   Based on his understanding of the soil properties Dr. Bea testified that his "best estimate" for the "marsh layer's" permeability was **$1x10^{-4}$ cm/sec**.[31]

However, after the studies conducted by Fugro and analyses performed by Dr. David Rogers, Dr. Bea now concedes that the best estimate of the permeability of the "marsh layer" is **$1x10^{-5}$ cm/sec.**   This estimate is the same as the upper bound value for permeability first estimated by IPET in 2006[32] and now by WGI's experts.   At **$1x10^{-5}$ cm/sec**, IPET, WGI's and the Government's current experts all agree that failure could not have occurred as a result of underseepage.[33]   Dr. Bea's opinion, of course, is to the contrary.   He now is anxious to tell the Court that he long ago believed that failure ***caused*** by underseepage occurred across a range of permeabilities as low as **$1x10^{-5}$ cm/sec**.   His shifting opinions disrespect both the scientific and the judicial process in which he has been a prominent participant for over six years.

WGI's and the Government's experts have now thoroughly analyzed Dr. Bea's work and have determined exactly ***why*** permeability, that he continues to call a "critical" material property, does not appear to be critical to Dr. Bea's analyses after all.   Defendants' experts discovered the answer to that "why".   It was because Dr. Bea consistently, and until now secretly, manipulated another essential hydrogeologic property, compressibility.   Dr. Bea's

---

[29]   *Id.,* at p. 67.

[30]   Ex. 43, BARGE Transcript, 7/8/2010 (morning), at pp. 2626:23-2627:2; 2628:10-14.

[31]   Ex. 41, BARGE Transcript, 7/8/2010 (afternoon), at p. 2737:9-11.

[32]   Ex. 44, IPET Report, Vol. V, Appendix 17 at p. 17-17.

[33]   *See id.* at pp. 17-29 to 17-39.

manipulation of compressibility had long ago rendered permeability virtually meaningless to his incorrect and deceptive analyses.

### III.   DR. BEA'S CROSS-SECTION "FACTS" ARE STILL NON-EXISTENT

Plaintiffs concede that Dr. Bea's cross-sections are necessary to "demonstrate how and why the North and South Breaches occurred, as well as how and why the floodwall did not fail at McDonough Marine."[34]   In fact, these cross-sections were entered into computer models by Dr. Bea's graduate student, Mr. Cobos-Roa, to support Dr. Bea's hypotheses that the floodwalls failed due to underseepage.   Accordingly, as Plaintiffs admit, the cross-sections *should be* "reasonable representations of the geotechnical and floodwall conditions that existed … when Hurricane Katrina arrived."[35]   Nevertheless, they suggest, despite the lack of any evidence, that they are still looking for and may eventually find something to support Dr. Bea's conceptual, hypothetical cross-sections and the excavations depicted on the cartoons pictured in his Expert Report.[36]   If real evidence existed for these made-up features, Plaintiffs' expert team would have found them by now.   Because no actual facts support these hypothetical cross-sections, Dr. Bea's opinions are unreliable and should be excluded.

#### A.     North Breach Case 1 Cross-Sections

In its Memorandum, WGI argues that Dr. Bea's North Breach Case 1 cross-sections are unreliable and irrelevant because they model a 25-foot wide x 100-foot long x 15-foot deep excavation within sixty feet of the North Breach that undisputedly did not exist before Katrina.[37]   In their Opposition, Plaintiffs concede that in fact Dr. Bea has found no pre-Katrina evidence—despite having access to thousands of photographs, daily reports and work plans detailing WGI's work in the EBIA—that this fictional excavation actually existed pre-Katrina, or

---

[34]   Opposition, at p. 10.

[35]   *Id.*.

[36]   *See, e.g.,* Opposition, at pp. 13, 19.

[37]   WGI Mem., at pp. 16-17 & Revised Ex. 14.

that such an excavation was part of WGI's site clearing operations in the EBIA.[38]  That lack should be the end of the Court's inquiry.[39]

Instead, Plaintiffs attempt to deflect attention away from the fact that Dr. Bea modeled a fabricated excavation at the North Breach by insisting that Dr. Bea has pre-Katrina evidence of other excavations and backfilling activity near the North Breach that WGI performed.[40]  Yet, as WGI painstakingly detailed in its opening brief (and Plaintiffs do not dispute), none of these "other" pre-Katrina excavations on Boland Marine come close to matching the location and dimensions of the fictitious excavation shown in Dr. Bea's North Breach Case 1 cross-sections.[41]  Thus, these "other" excavations, which Dr. Bea chose not to model, are wholly irrelevant to determining the reliability of his North Breach Case 1 cross-sections and the flow and stability analyses that he ran based on these cross-sections.

Plaintiffs next cite to post-Katrina aerial and ground photographs in Dr. Bea's Expert Report showing what they describe as "unusual holes" or "significant soil disturbance" at the North Breach.[42]  They claim that Dr. Bea used "inductive" reasoning to conclude that these "unusual holes" must be "artifacts" of WGI's "poorly backfilled excavations."[43]  But these post-Katrina photographs are not evidence that WGI did ***anything*** pre-Katrina, let alone excavate and backfill a 100-foot long, 15-foot deep hole within sixty feet of the North Breach as Dr. Bea represents in his North Breach cross-sections.  Dr. Bea admitted as much in his deposition.[44]  Without a shred of evidence to connect photographs of an unusual post-Katrina disturbance near the North Breach to WGI's undeniably well-documented pre-Katrina excavations on Boland

---

[38]  Opposition at p. 13.

[39]  *See*, *e.g.*, *Coffey v. Dowley Mfg. Inc.*, 187 F. Supp. 2d 958, 974–79 (M.D. Tenn. 2002) (where expert's analysis is "based on hypotheses and 'guesstimations' that have little grounding in actual physical realities," exclusion is warranted under *Daubert*).

[40]  Opposition at pp. 11, 13.

[41]  WGI Mem., Revised Ex. 14 ("Evidence Dr. Bea Cites In Support of North Breach Case 1 Cross Sections").

[42]  Opposition at pp. 11, 13 (citing Bea Report at pp. 20, 24-29 & App. B, Fig. 3).

[43]  Opposition at p. 12.

[44]  WGI Mem., at p. 16 (citing Bea Dep Vol. 2 at 113:5-21).

Marine, Dr. Bea's "induction" is nothing more than an unsupportable hypothesis.  It certainly is not evidentiary support for cross-sections that purport to be "reasonable representations" of pre-Katrina conditions in the EBIA.[45]

To be sure, Plaintiffs' expert, Chad Morris, P.L.S., who helped Dr. Bea "develop" the North Breach Case 1 cross-sections,[46] testified that he could not tell if there were any pre-Katrina excavations within fifty feet of the North Breach from looking at post-Katrina aerial photographs:  "I don't think [aerial photographs] are the proper tool for that."[47]  And, Plaintiffs' expert on pre-Katrina "site characterization" in the EBIA (who opines at length about WGI's excavations in the EBIA) testified that he does not "know what that particular [excavation] is" in Dr. Bea's Case 1 cross-sections.[48]

Finally, Plaintiffs rely on the deposition testimony of the government's expert, Dr. Thomas Brandon, for the proposition that that Court should give Dr. Bea a certain amount of "latitude" in developing his cross-sections because drawing cross-sections involves engineering "judgment."[49]  The rest of Dr. Brandon's testimony on this issue was that although "you're allowed a certain amount of latitude in drawing" cross-sections, it still is "important to look at all the information you're given."[50]  For example, showing "a large backfill[ed] excavation" in the North Breach Case 1-2 cross-section (as Dr. Bea did) is "a problem" when "I've got no evidence" that such an excavation ever existed.[51]

---

[45]   *See* Opposition at p. 10.

[46]   Opposition at p. 13.

[47]   Ex. 45, Morris Dep. at pp. 193:11-194:15.

[48]   WGI Mem. Ex. 13, Rogers Dep. Vol. 2 at pp. 248:13-250:6. According to Dr. Rogers, site characterization involves: "Developing a model for what the underground looks like, what the stratigraphy and the layers of soil, the geology, the hydrology, the anthropogenic changes that have occurred from mankind working in an area, altering things, excavating, filling, changing things." Ex. 46, Rogers Dep. Vol. 1 at p. 13:3-11.  Plaintiffs assertion that because Dr. Rogers did not create the Case 1 cross-sections, it is "not surprising" that he was unfamiliar with the excavation in Dr. Bea's Case 1-2 cross-section, is wholly unavailing. Opposition at p. 13. Dr. Rogers was retained to know about all the excavations in the EBIA.  *See* Ex. 47, Rogers Rep. at 106-13 & 228-37.

[49]   Opposition at pp. 11-12 (citing Brandon Dep. at pp. 49, 55, 120).

[50]   Ex. 48, Brandon Dep. at pp. 124:17-125:2.

[51]   *Id.* at p. 121:4-13.

1095224v.1

B.      **North Breach Case 2 Cross-Sections**

Dr. Bea's North Breach Case 2 cross-sections also are unreliable because they show a 20-foot-deep, highly-permeable, "shell fill" polygon at the North Breach, which did not exist pre-Katrina.[52]  Dr. Bea's only so-called evidence of this deep, pervious "shell fill" feature comes from the 2001 MMG Boring 81A.[53]  But as described below, Boring 81A is not representative of the pre-Katrina geotechnical conditions at the North Breach.  And, even if it was representative, Boring 81A does not support either the depth of this "shell fill" or Dr. Bea's made-up permeability value for this "fill", which was really a mixture of shell, silt and sand.

1.      **Borehole 81A is not representative of soil conditions at the North Breach.**

MMG Borehole 81A was located (pre-Katrina) at the northeast corner of Boland Marine between Surekote Road and the floodwall, about 24 feet north of the northern edge of the north breach.[54]  The borehole was uniquely situated relative to the other MMG boreholes along the floodwall because it was drilled into the eastern slope or shoulder of Surekote Road at the same place where the Road "traversed up and over" the deeper 1980s floodwall.[55]  For this reason, the ground surface elevation at borehole 81A was higher than any other location along the floodwall, at about +7.85 feet NAVD88(2004.65).[56]  And, there is more shell mixed with silt and sand in boring 81A than in any other MMG boring along the floodwall.[57]

Nevertheless, Plaintiffs argue that because boring 81A was the closest soil boring to the "breach initiation point" (*i.e.*, the location where the sheet pile initially tore), it is

---

52    *See* WGI Mem., at p. 17-19.

53    *See* Opposition at pp.15-18.

54    WGI Mem., Exs. 17 & 27; Ex. 48, Brandon Dep., at pp. 105:3-106:1.

55    *See* Ex. 47, Rogers Rep. at pp. 80-82 & Fig. 84; *id*., at p. 80 & Fig 86 (indicating "shell fill" used to build up the "side slopes" of Surekote Road in this area).

56    *See* IPET Pre-Katrina 3Ft Interior (Adjusted) Resolution LiDAR Coverage; e03_29090h1c1.img and e03_29090h1c1_hillshaded.img. from https://ipet.wes.army.mil.

57    *See, e.g.*, WGI Mem., Ex. 16 (MMG Boring Logs).

representative of pre-Katrina soil conditions along the entire breach site.[58]   That argument is flawed.  *First*, Dr. Bea has no evidence that the anomalous deep shell/silt/sand fill in borehole 81A—located about twenty-four feet north of the leading edge of the North Breach—reflects the soil conditions at the so-called "breach initiation point."

*Second*, Dr. Bea's two-dimensional cross-sections are not being used to model the "breach initiation point."  As evidenced in the North Breach Case 2 SEEP/W output files, Dr. Bea's two-dimensional flow and stability models assume that this Bea-fabricated 20-foot-deep "shell fill" extended infinitely in the north-south direction across the entire length of the North Breach.[59]  Such a feature never existed.  Boring 79A, near the center of the North Breach shows shell/silt/sand fill extending down only six feet.[60]  And, boring 77A, at the south end of the North Breach, shows shell/silt/sand fill extending down only five feet.[61]  Thus, boring 81A cannot and does not represent the pre-Katrina soil conditions across the length of the entire North Breach site as Dr. Bea's conceptual cross-sections and seepage models portray.

### 2.   Twenty-foot-deep "shell fill" feature shown in Dr. Bea's cross-sections did not exist pre-Katrina.

But even if boring 81A was representative of the pre-Katrina soil conditions at the North Breach, Dr. Bea's Case 2 cross-sections still must be excluded because boring 81A does not show any so-called "shell fill" that extends as deep as the sheet pile tip.[62]  As WGI pointed out in its opening brief (and Plaintiffs do not dispute), Boring Log 81A shows "FILL, SHELL with SILTY SAND" and "FILL, SILTY SAND and SHELL" down to a depth of only about 16 feet.[63]  The pre-Katrina elevation at the top of borehole 81A (along Surekote Road) was

---

[58]   Opposition at p. 15.
[59]   WGI Mem., Ex. 15 (Silva-Tulla Decl., Ex. A at p. 1).
[60]   WGI Mem., at p. 19, & Ex. 17 (Boland Marine Borehole Map).
[61]   *Id*.
[62]   *See* WGI Mem., at p. 19.
[63]   WGI Mem., at pp. 18-19 (citing Ex. 16, Boring Log for 81A).

approximately +7.85 feet NAVD88(2004.65).[64]   Therefore, the shell/silt/sand fill in 81A extended down to a pre-Katrina elevation of only -8.15 feet NAVD88(2004.65).  In other words, the actual shell/silt/sand fill ended about 2.4 feet above the sheet pile tip of the original 1960s wall, and about 19.85 feet above the sheet pile tip of the deeper 1980s wall.[65]

Yet, in the fictional North Breach Case 2 cross-sections contained in his expert report and entered into his SEEP/W computer model, Dr. Bea conveniently ignores the actual facts and instead assumes that "shell fill" extends from the top of Surekote road all the way down to the tip of the sheet pile wall.[66]  This false assumption assists Dr. Bea's underseepage-failure-theory, but it has absolutely no factual support.

Additionally, Dr. Bea models the permeability of the "shell fill" in his Case 2 cross-sections as having a value of either **0.01 cm/sec** or $\mathbf{1x10^{-2}}$ **cm/sec** (North Breach Case 2-1) or **0.1 cm/sec** or $\mathbf{1x10^{-1}}$ **cm/sec** (North Breach Case 2-2).[67]  Such high permeability values are consistent with "clean" shell fill, or shell that is not mixed with any silt or sand.[68]  But as borings 81A and 79A indicate, the fill that Dr. Bea modeled in his North Breach Case 2 cross-sections was ***not*** clean or pure shell.[69]  There were silts and sands mixed in with the shells.  The mixture with silt and sand significantly reduces the hydraulic conductivity of the so-called "shell fill".[70]  Indeed, as the Government's experts agree "if you have [shells] with silt and silty sand in it,

---

[64]   *See supra*, p. 10, fn. 56.

[65]   This assumes that the sheet pile of the original 1960s floodwall extended, as Dr. Bea contends, to -10.5 feet elevation NAVD88(2004.65). Bea Report, at p. 36, ¶ 39. It also assumes that the sheet pile tip of the 1980s floodwall was at elevation -28 feet NAVD88(2004.65). *See* Bea Rebuttal Report, at p.5, ¶ 9 (top of wall elevation for the entire site was set by Dr. Bea at +13 feet); Ex. 49, Design Mem. No. 4, Florida Ave. Complex, June 1980 (as-built design for 1980s floodwall showing length of 41 feet from top of the floodwall to the sheetpile tip).  While WGI has clear evidence that the top of floodwall (and therefore sheet pile tips) was much lower than Dr. Bea states, even with his higher elevations, the lowest shell/sand/silt fill was about 2.4 feet above the sheet pile tips.

[66]   Bea Report, App. B, Figures 12 & 13; WGI Mem., at pp. 17-18.

[67]   *See* WGI Mem., Ex. 15 (Silva-Tulla Decl., Ex. B at p. 1).

[68]   *See, e.g.*, Ex. 50, Rogers Dep., Vol. 2, at p. 245:10-16; Ex. 51, Expert Report of T. Stark, Mar. 12, 2012, at p. 140.

[69]   WGI Mem., Ex. 16 (Boring Logs 81A, 79A).

[70]   WGI Mem, Ex. 9, Bea Dep. Vol. 2, pp. 264:14-265:7.

- 12 -

you're almost starting at a permeability of ten to the minus three and below."[71]   Thus, Dr. Bea's unjustifiable use of permeability values of **1x10$^2$ cm/sec** and **1x10$^{-1}$ cm/sec** for the shell fill, which is at least one or two factors of ten more permeable than existed even at the location of borehole 81A, makes his cross-sections (and the results of his seepage and stability models based on those cross-sections) entirely unreliable.[72]

### C.      South Breach Case 1 Cross-Sections

WGI contended in its Memorandum that Dr. Bea's South Breach Case 1 cross-sections are completely unreliable for two reasons.  First, the cross-sections include a 25-foot wide x 50-foot long x 18-foot deep backfilled excavation at the waterside toe of the levee that did not exist before Katrina.[73]   Second, Dr. Bea modeled the backfill material of this non-existent, pre-Katrina excavation with highly permeable fill (**1.0 cm/sec**), which WGI did not use to backfill excavations anywhere in the entire EBIA.[74]   Plaintiffs do not deny either of these assertions in their Opposition brief.[75]   As a result, Dr. Bea's South Breach cross-sections (and the results of any computer analyses based on those cross-sections) should be excluded.

### 1.      Dr. Bea modeled a deep, backfilled excavation next to the South Breach that did not exist prior to Katrina.

Plaintiffs admit that Dr. Bea has not found any evidence in all of the extensive, detailed documentation of WGI's work in the EBIA, that WGI performed an excavation along the South Breach with dimensions like the one that he modeled in his Case 1 cross-sections.[76]

---

[71]   Ex. 48, Brandon Dep. at pp. 106:2-107:18; Ex. 51, Stark Report at p. 140 ("the longest [sic. should be "lowest"] expected value of hydraulic conductivity for a poorly graded sand to a silty sand" like that found in boring 81A is **1x10$^{-3}$**) (citing Terzaghi et al., (1996)).

[72]   In any event, Dr. Bea's Case 2 cross-sections are not relevant.  As WGI previously pointed out (and the Plaintiffs do not dispute) the so-called "shell fill" in boring 81A pre-existed WGI's work in the EBIA.  WGI Mem., at p. 17, fn. 48.  Thus, to the extent the existence of shell fill somehow contributed to the levee failures, it has no bearing on the case against WGI.  This is particularly true where, as Plaintiffs' own site characterization expert concedes, WGI did not perform any excavations anywhere near borehole 81A.  Ex. 50, Rogers Dep. Vol. 2 at pp. 221:16-224:5.

[73]   WGI Mem., at pp. 19-24.

[74]   WGI Mem., at p. 32.

[75]   *See* Opposition at pp. 19-21.

[76]   Opposition at p. 19.

- 13 -

Instead, they again attempt to divert attention from this hypothetical excavation by pointing to pre-Katrina documents concerning WGI's other "excavation and backfill activity" near the South Breach.[77]   However, as WGI detailed in its opening brief, none of the other WGI excavations on the Saucer Marine site come close to matching the location and dimensions of the fictional excavation shown in Dr. Bea's Case 1 cross-sections.[78]   Thus, the other excavations, which Dr. Bea chose not to model, are irrelevant to determining the reliability of his South Breach Case 1 cross-sections and the flow and stability analyses that he ran based on these cross-sections.[79]

Finally, as discussed previously with respect to the North Breach Case 1 cross-sections, the fact that Dr. Bea used inductive reasoning to theorize, based on post-Katrina aerial and ground photographs, that WGI might have excavated and backfilled a 25-foot wide x 50-foot long x 18-foot deep excavation at the South Breach pre-Katrina is irrelevant.[80]   Dr. Bea admits he has no pre-Katrina evidence to support the theory:  "I don't think we were able to trace [it] . . . The document trail went cold."[81]   Undoubtedly, as Plaintiffs point out, there are times that inductive reasoning, based on scientific judgment and experience, may be appropriate.[82]   But in this instance, where a large and extraordinarily detailed record of pre-Katrina excavation activities in the EBIA exists from WGI's files, the USACE's files, WGI's subcontractors' files and

---

[77]   Opposition at p. 20.

[78]   WGI Mem., at pp. 22-23.  Plaintiffs argue that Dr. Bea never claimed that the 18-foot deep, 25-foot wide excavation shown in his South Breach Case 1 cross-section was a result of WGI's grid trenching activities. Opposition at p. 20.  Rather, they claim, grid trenching "is a separate issue at Saucer Marine."  *Id.*  WGI accepts Plaintiffs' admission.  Of course, Dr. Bea's Report states, under the heading "South Breach Site Case 1 Cross Sections": "The currently available information indicates this excavation was associated with foundation and contaminated soils removals (Figure 32a, Figure 32b) and ***north-south grid trenching performed at this location on the EBIA . . . by WGI*** (Figure 32c)."  Bea Report, App. B at p. 35 (emphasis added).

[79]   Moreover, Plaintiffs suggestion that Dr. Bea has somehow "concluded" that other WGI excavations on Saucer Marine "played a substantial factor in causing the [floodwall] failure" is absurd.  Opposition at p. 20.  Dr. Bea testified in his April 16, 2012 deposition that in order to identify which excavations in the EBIA were "deep enough and close enough to the I-wall" to contribute to the I-wall's failure "we would have to do a correlation for you to identify specific excavations, then connect that to their depth, then correlate that with the contact elevation for the varied swamp-marsh deposit."  WGI Mem. Ex. 10, Bea Dep., Vol. 3 at pp. 85:5-87:10.  When asked if he had done such a correlation, Dr. Bea said, "no."  *Id.* at p. 85:14-15.

[80]   *See* Opposition at pp. 19, 21.

[81]   WGI Mem., Ex. 9, Bea Dep., Vol. 2 at pp. 116:3-117:6.

[82]   Opposition at p. 21.

1095224v.1

deposition testimony, "inductions" from a post-Katrina photograph are not evidence of excavations WGI performed in the EBIA pre-Katrina.  Dr. Bea ignores this record because it does not support his causation theory.

> **2.** **The permeability value that Dr. Bea assigned to the backfill in his South Breach Case 1 cross-sections is not consistent with the backfill that WGI used in the EBIA**

Dr. Bea's South Breach Case 1 cross-sections assume that WGI would have backfilled the fictional, 18-foot deep excavation with river sand.[83]  Dr. Bea purported to assign the river sand—at least in his Report—a permeability value of **1x10$^{-2}$ cm/sec** or **.01 cm/sec**.[84]  But in his SEEP/W model, Dr. Bea instead assumed the alleged South Breach Case 1 excavation was backfilled with a material having a permeability value of **1 cm/sec**, which is 100 times more permeable than river sand.[85]  Indeed, Plaintiffs' hydrogeology expert confirms that a permeability value of **1 cm/sec** is consistent with "clean" shell fill that does not contain any sand.[86]

None of Plaintiffs' experts contend (and none of the contemporaneous documents in the record indicate) that WGI ever backfilled an excavation anywhere on the EBIA with clean shell fill or gravel.[87]  For this reason, as WGI argued in its opening brief—and Plaintiffs did not dispute—Dr. Bea's seepage and stability models based on the South Breach Case 1 cross-sections do not represent the pre-Katrina geotechnical conditions that existed in the EBIA.[88]  Once again, Dr. Bea has either ignored the facts, or deliberately manipulated them to serve his purposes.  Either way, his South Breach Case 1 cross-sections and related computer models are unreliable and should be excluded.

---

[83]   *See* Bea Report, App. B, Figures 33 & 35; WGI Mem., Ex. 9, Bea Dep. Vol. 2 at pp. 254:22-255:3.

[84]   Bea Report, App. C at p. 2 (Table 1).

[85]   WGI Mem., at p. 32 (citing Ex. 15, Silva-Tulla Decl., Ex. B at 1).

[86]   *Id*. at p. 32 (citing Rogers Dep. Vol 2 at p. 245:10-16).

[87]   WGI Mem., at p. 32.

[88]   *Id*.

### D.   South Breach Case 2 Cross-Sections

In its opening brief, WGI argues that Dr. Bea's South Breach Case 2 cross-sections are unreliable for two basic reasons.   First, they show a narrow, 99-foot long (perpendicular to the floodwall) x 10-foot deep utility trench, extending from the floodwall towards the IHNC, a feature that never existed before Katrina.[89]   Second, Dr. Bea inappropriately analyzed these cross-sections in two dimensions.   As a result, in his SEEP/W model, the "narrow" trench widens to the entire north-south dimension of the floodwall.[90]   Plaintiffs have no credible arguments to refute these contentions, and therefore, Dr. Bea's Case 2 cross-sections (and any analysis based on the cross-sections) should be excluded.

#### 1.   Dr. Bea's assumption that WGI excavated a deep utility trench in the vicinity of the South Breach is belied by the record evidence.

Dr. Bea's sole support for the existence of the alleged deep trench in his cross-sections is a 1969 project plan that shows a buried six-inch water line and two-inch gas line penetrating the floodwall at the location of the South Breach.[91]   However, WGI has presented irrefutable, contemporaneous evidence that the utility lines that WGI removed at Saucer Marine did not result in a ten-foot deep trench adjacent to the floodwall.[92]   The trenches in fact were shallow and they were backfilled in one-foot lifts and compacted.[93]   Based on this evidence, Plaintiffs now concede that the hypothetical trench shown in Dr. Bea's Case 2 cross-sections could not have been the result of WGI removing a 6-inch water line at Saucer Marine as represented in Dr. Bea's Report.[94]

However, Plaintiffs continue to insist that Dr. Bea's cross-section showing a 10-foot deep utility trench next to the floodwall reasonably represents pre-Katrina conditions at the

---

[89]   WGI Mem., at pp. 25-27.

[90]   *Id.*, at p. 27.

[91]   Opposition at p. 21 (noting that the elevations of the buried utilities shown in the 1969 plans support Dr. Bea's assumption that WGI must have excavated a 10-foot deep trench).

[92]   WGI Mem., at pp. 26-27 (citing Exhibits 22-24).

[93]   *Id*.

[94]   Opposition at p. 21 ("Defendants' characterization of the water line removal appears accurate").

South Breach because WGI does not have a contemporaneous photograph showing the actual depth and removal of the 2-inch gas line.  Thus, they claim, the 1969 plan is "compelling evidence" that, in 2003, WGI excavated a 10-foot deep trench next to the floodwall.[95]  Plaintiffs' argument is unavailing.  First, Plaintiffs admit that the 1969 plan did not accurately predict the actual depth of the water line that WGI removed at Saucer Marine.[96]  Second, Dr. Rogers, who developed the Case 2 cross-sections, testified that he was unable to find any evidence that the 2-inch gas line, as shown in the 1969 plan, *ever* existed.[97]  Finally, the work plans, daily reports and photographs of WGI's removal of other 2 or 3-inch gas line in the EBIA prove that the associated excavations at the floodwall were shallow.[98]  Accordingly, Plaintiffs cannot sustain their burden to prove, by a preponderance of the evidence, that Dr. Bea's South Breach Case 2 cross-sections are reliable.[99]

> ## 2. Dr. Bea's two-dimensional modeling of the South Breach Case 2 cross-sections render his analyses wholly unreliable.

Plaintiffs do not dispute that if Dr. Bea used only a two-dimensional model to analyze the long, narrow trench shown in his Case 2 cross-sections, the results would be misleading and inappropriate.  Instead, they argue that Dr. Bea rectified this problem by using "[t]he results from previous analyses of a similar three-dimensional feature" to somehow "interpret the results" of his two-dimensional analyses.[100]  Whether or not Dr. Bea analyzed some sort of "similar" trenches in a three-dimensional model is completely irrelevant.  Despite repeated requests from Defendants to review this supposed three-dimensional analysis, Dr. Bea (and his graduate student, Mr. Cobos-Roa) claim the 3-D model was lost and/or stolen and thus

---

[95]  *Id.*

[96]  *Id.*

[97]  WGI Mem., Ex. 13, Rogers Dep. Vol. 2 at pp. 212:21-213:14.

[98]  *See, e.g.*, WGI Mem., Exs. 22-23 (work plans and QARs); Ex. 52 (photographs of gas line removal at Boland Marine, Indian Towing and Mayer Yacht).

[99]  *See Daubert*, 509 U.S. at p. 592, fn.10.

[100]  Opposition at pp. 21-22.

cannot be produced.[101]   Plaintiffs surely cannot claim that a long lost and unverifiable analysis that has never been produced in this litigation, and that is no longer available, is credible evidence of anything.   Accordingly, as described above, Dr. Bea's South Breach Case 2 cross-sections are wholly unreliable and should be excluded.

### E.      So-Called Near Breach Case 1 Cross-Sections

Dr. Bea's so-called "Near Breach" cross-sections run through the McDonough Marine borrow pit.[102]   The borrow pit was 10 to 14 feet deep, 75 feet from the floodwall at the McDonough Marine site, and was not backfilled.[103]   Dr. Bea hypothesized the "Near Breach" cross-sections to attempt to explain why this massive, open excavation did not cause the floodwall at the McDonough Marine site to fail due to underseepage, but smaller, backfilled excavations allegedly did cause such floodwall failures at the Boland Marine and Saucer Marine sites.[104]   His "analysis" depends on two critical assumptions:  (1) WGI and the USACE chose the location for the borrow pit because, unlike other areas in the EBIA, the McDonough Marine site contained cohesive clay soil that was suitable for backfilling; and (2) WGI and the USACE had concerns about seepage so it purposefully lined the borrow pit with clay.[105]   As explained in WGI's opening Memorandum, neither of these assumptions have any basis in fact.[106]

Plaintiffs' arguments to the contrary are baseless.   *First*, Plaintiffs point to deposition testimony from fact witnesses that proves that the borrow pit was filled with thousands of yards of clay, and WGI used that clay to backfill excavations in the EBIA.[107]   Of course, nobody disputes the borrow pit had clay in it, and nobody disputes that WGI used the clay to backfill excavations.   The point is that the entire EBIA had clayey soil similar to that

---

[101]   *See* WGI Mem., p. 40, fn.133.
[102]   *Id.*, at pp. 27-28.
[103]   *Id.*
[104]   *Id.* at pp. 28-29.
[105]   *Id.*
[106]   *Id.* at pp. 29-30.
[107]   Opposition at p. 23 (citing Guillory and Staggs Deposition testimony).

found in the borrow pit.[108]  Given that all of the sites in the EBIA contained clayey soil suitable for backfilling, WGI and the USACE undisputedly chose the McDonough Marine location for the borrow pit because it was relatively free of contamination, not because it contained clay.[109]

*Second*, Plaintiffs claim that Dr. Bea was able to "deduce" that the USACE and WGI had concerns about seepage from the fact that the USACE's geotechnical branch specifically analyzed whether the borrow pit proposed a stability problem for the nearby floodwall/levee.[110]  Of course, none of the evidence regarding the stability analyses--the USACE memorandum requesting the stability analysis relative to the borrow pit, the USACE memorandum providing the results of that stability analysis, or any of the fact witness testimony about the stability analysis--indicate that the USACE or WGI had concerns about seepage.[111]  Thus, Dr. Bea's "deduction" is nothing more than convenient speculation.

Finally, Plaintiffs claim that Dr. Bea has credible evidence that WGI in fact "dressed the slopes" of the borrow pit with clay to address their non-existent seepage concerns.[112]  But as established during his deposition, the only evidence that Dr. Bea has of this alleged "dressing" is a single WGI photograph from July 2, 2002 with a contemporaneous caption that states:  "Reworked Slope – Eastside – SE Borrow Pit."[113]  This caption means, as the daily Quality Assurance Report for July 2, 2002 makes clear, that the contractors were "excavating borrow material along the eastern slope of southeast pit at McDonough Marine."[114]  Dr. Bea's attempt to "deduce" any other conclusion from this photograph is, once again, pure speculation.

---

[108]   *See, e.g*., Ex. 53 (MMG Boring 71G on the Boland Marine site); Ex. 54, Borrow Pit Drilling Report excerpt (comparing the soils at McDonough Marine to the soils at the originally-selected location for the borrow pit, the ITT site).

[109]   WGI Mem., at pp. 29-30 (citing Ex. 26).

[110]   Opposition at p. 24.

[111]   *See* Ex. 55, May 2, 2002 Memo from Eng'g Division.

[112]   Opposition at p. 24.

[113]   WGI Mem., Ex. 28, Bea Dep. Ex. 24; Bea Report at p. 45 & Figure 26.

[114]   WGI Mem., Ex. 28, Bea Dep. Ex. 25.

In short, none of the detailed record evidence supports Dr. Bea's claim that WGI and the USACE chose the McDonough Marine site for the borrow pit because the soils consisted largely of clay, or that WGI and the USACE specifically lined the borrow pit with clay out of concern for seepage.  Dr. Bea's Near Breach analysis proves nothing relevant.

**IV.    DR. BEA'S "REAL WORLD" WAS NOT IN THE LOWER NINTH WARD—HIS "EXPLANATIONS" FOR COMPRESSIBILITY ARE MERE SMOKESCREENS TO DIVERT ATTENTION FROM HIS FLAWED ANALYSES.**

Throughout the compressibility portion of their opposition brief, Plaintiffs refer to the "actual" and "real world" EBIA conditions that Dr. Bea supposedly modeled in his seepage analysis.  But that portion of Plaintiffs' brief lacks even a single reference to the only real evidence showing the compressibility of the organic clay layer at the EBIA: the pumping tests conducted during the parties' joint soils investigation.  Dr. Bea has consistently ignored that evidence, and he ignores it now.  Notwithstanding all of the smoke that Plaintiffs put forth concerning saturated versus unsaturated soil and steady versus non-steady flow, they cannot escape the fact that Dr. Bea's analysis—including his newly adopted "dilatational wave velocity" theory, which might be appropriate to model the response of the EBIA soils to an explosive blast in the canal-side of the levee, but undoubtedly not to a hurricane storm surge—has no connection whatsoever to the actual EBIA site-specific conditions.  Nor can Plaintiffs refute that, in place of those site-specific (truly real world) conditions, Dr. Bea used unrealistic, and non-existent, values that he knew would give him the results he needed to make Plaintiffs' case, as testified under oath by Mr. Diego Cobos Roa, the individual who ran the analyses for Dr. Bea.  That is not science, and it is improper under *Daubert*.  His opinions must therefore be stricken.

**A.    Dr. Bea's "Dilatational Wave Velocity Theory" Has No Bearing on this Case and Should be Ignored.**

Faced with the truth that Dr. Bea's **$1 \times 10^{-9}$ 1/psf $m_v$** (compressibility) value does not exist at the EBIA or in any soil, Plaintiffs now claim that Dr. Bea used the "dilatational wave

velocity," not storage coefficient, to calculate his $\mathbf{m_v}$ value.[115]  Plaintiffs' "explanation" has no merit.  Not only was Dr. Bea's "dilatational wave velocity scheme" cooked up at the eleventh hour in a misguided attempt to save Dr. Bea's analyses, but the values associated with Dr. Bea's "scheme"—both real and imagined—have no relevance whatsoever to the compressibility of the EBIA soil.  In fact, compressibilities determined using dilatational wave velocities apply to a completely different class of problems, namely situations involving dynamic events such as explosive blasts or earthquakes.  Thus when the Plaintiffs refer to the parties' experts simply "working different problems", the Plaintiffs are correct.[116]  Dr. Bea is interested in modeling the impact of an explosion on the EBIA organic clay, not a hurricane.  This diversionary tactic serves no other purpose but to confuse the issues at hand and mislead the Court.  Dr. Bea's "dilatational wave velocity scheme" is just more junk science.

> 1.    **"Dilatational Wave Velocity" Was Contrived by Dr. Bea Only Recently as a Last-Ditch Effort to Close Gaps in His Analyses and Mislead Or Even Deceive the Court.**

Wave velocities were never important to Dr. Bea until after his seepage analysis was already done, and only when Defendants' experts exposed gaping holes in Dr. Bea's methodology.  As such, Dr. Bea's "dilatational wave velocity theory" is nothing more than an attempt to deflect attention from his wholly improper $\mathbf{m_v}$ value and misinform or mislead the Court.

Although Plaintiffs refer to "dilatational wave velocity" rather matter-of-factly in their opposition brief, they fail to mention that the "theory" did not surface in this case until Dr. Bea's April 16, 2012, rebuttal deposition, *just a few weeks ago*.[117]  Dr. Bea did not refer to "dilatational wave velocity" even once during his initial March 27-28, 2012, deposition, despite

---

[115]    Opposition at p. 28.

[116]    *Id.*

[117]    WGI Mem., Ex. 10, Bea Dep., Vol. 3, at pp. 22:22-23:7, 24:5-18, 34:3-21.

fielding several questions regarding Mr. Cobos-Roa's inappropriate $m_v$ value.[118]   Nor did Dr. Bea refer to "dilatational wave velocity" in any of his pre-2012 analyses of the North and South Breaches, or his original expert report in this case.   "Dilatational wave velocity" is even absent from Dr. Bea's April 2012 rebuttal expert report, submitted for the express purpose of rebutting Defendants' experts' geotechnical opinions—including opinions exposing Dr. Bea's fictitious **$m_v$** value.[119]   Before his flawed methodology was exposed by the Defense experts, Dr. Bea had not even mentioned the fictitious **$m_v$** value he used to get the results he wanted.

Even more telling is the fact that the Defense experts mentioned the possibility of performing geophysical exploration – which could have included measuring dilatational wave velocities – at the EBIA as part of the joint soils investigation in the summer of 2011, and the Plaintiffs had no interest in doing so.[120]   At that time, all of the experts, including Plaintiffs' experts, agreed not to proceed with the measurements because the geophysical measurements, including dilatational wave velocity measurements, were not relevant to their analyses.[121]   Yet Dr. Bea now claims that dilatational wave velocity is the key to the compressibility value that he used to run his analysis in SEEP/W.

The truth is, after sifting through thousands of pages of SEEP/W computer runs from Dr. Bea's analysis, the Defendants' experts uncovered Dr. Bea's fictional **$m_v$** value, and Dr. Bea is now constrained to come up with an explanation in a futile attempt to save his opinions.

As if introducing dilatational wave velocity at the eleventh hour was not enough, Plaintiffs now make the surprising claim that Dr. Bea used **$m_v$** values in the range of "***1x10(-8)*** to ***1x10(-9)/psf***" for his analysis in SEEP/W.[122]   Dr. Bea has ***never*** suggested that Mr. Cobos-Roa

---

[118]   *See, e.g.*, WGI Mem., Ex. 8, Bea Dep., Vol. 1, at pp. 164:15-170:4; WGI Mem., Ex. 9, Bea Dep., Vol. 2, at pp. 165:4-166:15; 168:25-171:10; 220:5-221:6.

[119]   Ex. 56, Expert Report of F. Silva-Tulla, 3/12/12, at pp. 65-69.

[120]   Ex. 57, Silva Declaration, at p. 3, ¶8.

[121]   *Id.*

[122]   Opposition at p. 27 (emphasis added).

used an $m_v$ as high as $1 \times 10^{-8}$ $1/psf$ to conduct Dr. Bea's SEEP/W analysis; to the contrary, Mr. Cobos-Roa testified under oath that he input an $m_v$ value of $1 \times 10^{-9}$ $1/psf$ and in some cases even *zero*, and Dr. Bea's SEEP/W computer runs confirm those unreal values were used.[123]   The reason for Plaintiffs' sudden "adjustment" of Dr. Bea's $m_v$ values is clear:  When measured under appropriate loading conditions, dilatational wave velocity measurements in saturated clays like those at the EBIA generally yield a wave velocity in the vicinity of the velocity of sound in water, or approximately 5,000 ft/sec, which approximately corresponds to an $m_v$ value of $2 \times 10^{-8}$ $1/psf.$[124]   That $m_v$ value, although still wrong for these conditions, is much higher than the fictitious $m_v$ value of $1 \times 10^{-9}$ $1/psf$ that Mr. Cobos-Roa used in Dr. Bea's SEEP/W analysis. More importantly, the $2 \times 10^{-8}$ $1/psf$ $m_v$ value that roughly corresponds to dilatational wave velocities in organic clays conveniently falls within the "1x10(-8) to 1x10(-9)/psf" range of $m_v$ values now cited in Plaintiffs' brief.[125]   So, for the sole purpose of marrying Dr. Bea's "dilatational wave velocity scheme" with what Dr. Bea believes is a consistent $m_v$ value, Plaintiffs claim in their Opposition for the first time that Dr. Bea used an $m_v$ *range* of "1x10(-8) to 1x10(-9)/psf" in his seepage analysis.  As will be explained in more detail below, even if Dr. Bea used an $m_v$ value as high as $1 \times 10^{-8}$ $1/psf$ (which he did not), neither that value nor dilatational wave velocities in general have any bearing on the compressibility of the soil skeleton at the EBIA organic clay layer.  Nevertheless, Dr. Bea's alleged $m_v$ range of "1x10(-8) to 1x10(-9)/psf" is further evidence that Dr. Bea will do anything to "justify" his faulty opinions, including misrepresenting the record.

---

[123]   WGI Mem., Ex. 1, Cobos-Roa Dep. at pp. 192:21-194:6.
[124]   Ex. 57, Silva Declaration, at p. 3, ¶9.
[125]   *Id.*

- 23 -

   **2.**     **Dr. Bea's Alleged Dilatational Wave Velocity Value Does Not Apply To Events Like The Katrina Storm Surge But Rather To A Dynamic Event Such As A Nuclear Explosion Or An Earthquake And Has Nothing To Do With The Behavior Of The Organic Clay Layer At The EBIA During Katrina.**

In addition to the fact that Dr. Bea's "dilatational wave velocity theory" had no connection to his opinions until just last month, the dilatational wave velocity value that Dr. Bea claims he used to calculate $\mathbf{m_v}$ in his seepage analysis is not useful for determining compressibility of the soil skeleton, was not measured in any of the EBIA soils, and leads to absurd results when applied to non-dynamic conditions such as the conditions at the EBIA during the Katrina storm surge.

As an initial matter, it is important to understand that using dilatational wave velocity to determine the compressibility of the relevant EBIA soils in a non-dynamic situation such as the Katrina storm surge is improper on its face.  Organic clays like those at the EBIA are located below the water table, where the soil is, for practical purposes, completely saturated.[126] At that level, dilatational wave velocity measurements are dominated by the compressibility of the *water* in the clay pores (pore fluid), not the compressibility of the soil skeleton itself.[127]   In fact, dilatational wave velocities measured in ***any*** soil located below the water table will reflect mostly the compressibility of water.[128]  As explained by Dr. Robert V. Whitman, an author who Plaintiffs cite liberally throughout their opposition brief: "If a soil is saturated, measurement of dilatational [wave] velocity in situ is of limited use as a means for assessing the compressibility of the mineral skeleton."[129]

Of course, even if the dilatational wave velocity had some relevance to the compressibility of the soil skeleton in this case (which it does not), the dilatational wave velocity

---

[126]   Ex. 57, Silva Declaration, at p. 3, ¶8.

[127]   *Id.*

[128]   *Id.*

[129]   Ex. 58, Whitman, *The Response of Soils to Dynamic Loadings*, Contract Rep. No. 3-26, U.S. Army Corps of Engineers (1970), at pp. 183-184; *see* Ex. 59, Lambe & Whitman, *Soil Mechanics* (1969), at p. 455.

for the $m_v$ value that Mr. Cobos-Roa used to run Dr. Bea's analysis, like the $m_v$ value itself, is completely divorced from the actual conditions in the EBIA. As stated previously, saturated clays like those at the EBIA generally yield a wave velocity close to that of water, or approximately 5,000 ft/sec.[130] By contrast, the **1 x 10$^{-9}$ 1/psf $m_v$** value from Dr. Bea's analyses corresponds to a wave velocity of about ***17,000*** ft/sec (which is 5,300 m/sec), and which is equivalent to the velocity within solid rock.[131] Absurdly, Dr. Bea's other $m_v$ value of **zero**, corresponds to a wave velocity equal to ***infinity***, or faster than the speed of light.[132] Such materials do not exist in the EBIA organic clay layer. And try as they might, Plaintiffs cannot dispute the uncontroverted evidence that Mr. Cobos-Roa used **zero** and **1 x 10$^{-9}$ 1/psf** to run Dr. Bea's analysis, not **1 x 10$^{-8}$ 1/psf** as the Opposition now claims. Those values were selected simply to produce the results Dr. Bea wanted and had nothing to do with dilatational wave velocities or anything else relevant to this real world problem.

Moreover, the approximate ***17,000*** **ft/sec** dilatational wave velocity that corresponds to Dr. Bea's **1 x 10$^{-9}$ 1/psf $m_v$** value is attributable to a loading time of a fraction of a second, as opposed to the 30-hour loading time experienced during the Katrina storm surge.[133] That type of immediate loading time is most often found in dynamic events such as nuclear explosions, conventional explosive blasts, or earthquakes.[134] Certainly Plaintiffs do not expect this Court to believe that the soil at the EBIA was somehow affected by an explosive blast or earthquake on August 29, 2005, and not a hurricane. But that is exactly where Dr. Bea's dilatational wave velocity "theory" leads.

Under no circumstances would it be scientifically appropriate to apply Dr. Bea's alleged "dilatational wave velocity theory" to the pore pressure response of the organic clay layer

---

[130] Ex. 57, Silva Declaration, at p. 3, ¶9.

[131] *Id.*; Ex. 60, Clark, *Handbook of Physical Constants* (1966), at pp. 7-8, 17.

[132] Ex. 57, Silva Declaration, at p. 3, ¶9.

[133] Ex. 57, Silva Declaration, at p. 4, ¶10.

[134] *Id.*

- 25 -

at the EBIA during the Katrina storm surge.  This so-called "theory" is useless for determining compressibility for the conditions during the Katrina storm surge and is in no way relevant to the EBIA.  Moreover, "dilatational wave velocity" does not change the fact that, in the face of site-specific compressibility data, Mr. Cobos-Roa invented, and Dr. Bea approved, an unrealistic and misleading $m_v$ value to reach conclusions favorable to the Plaintiffs' case.  Dr. Bea's opinions should be excluded for that reason alone.

### B.    Dr. Bea's Alleged Transient + Steady Flow Analysis Is Not Supported by the Facts and Is Contrary to Accepted Geotechnical Science.

Plaintiffs admit, as they must, that Mr. Cobos-Roa used the SEEP/W software to perform a transient flow analyses for Dr. Bea.[135]  Plaintiffs also admit that, while running the transient flow analyses, Mr. Cobos-Roa manipulated the input data to model non-existent steady flow conditions within the clay and fill soils at the EBIA.[136]  There is no factual or scientific justification for such an approach, given the known soil properties that existed at the EBIA during hurricane Katrina.  Plaintiffs' arguments to the contrary are wrong for the following reasons.

*First*, Plaintiffs make much of the fact that the organic clay layer is "completely saturated," arguing that "[s]uch conditions warrant Dr. Bea's utilization of ***steady flow*** analyses."[137]  While Plaintiffs are correct that the organic clay layer is fully saturated (or nearly so), they are incorrect to suggest that 100% saturation immediately results in steady flow.  Rather, saturation is merely one component used to determine whether steady or non-steady flow occurs.[138]  The speed at which the load is applied to the soil must also be considered, along with—depending upon the soil's compressibility—the rate of soil consolidation, i.e., the extent to

---

[135]    Opposition at pp. 28-29.

[136]    *Id.* at pp. 29-30.

[137]    *Id.* at p. 26, (emphasis in original).

[138]    Ex. 57, Silva Declaration, at p. 4, ¶11.

which the soil changes in volume when the load is applied.[139]  This is a fundamental concept in geotechnical engineering.

       *Second*, Plaintiffs further distort science and the facts by claiming that fully saturated conditions "influence[s] the soils to behave in a nearly incompressible manner."[140] Saturation is not synonymous with incompressibility.  Quite the opposite, "[w]hen saturated, organic clay is likely to be *very compressible*."[141]  Plaintiffs' own expert, Dr. David Rogers, agrees, including with respect to the marsh soils that exist in New Orleans.[142]  More importantly, the pumping test results from the joint soils investigation showing an $m_v$ (compressibility) value of $2 \times 10^{-5}$ **1/psf** clearly demonstrate that the organic clays at the EBIA *are* compressible.[143]  Of course, Dr. Bea ignored the pumping test results, choosing instead to use an $m_v$ value corresponding to a compressibility value much lower than that for any known soil in the universe.[144]  His contention that the organic clay layer is so impossibly incompressible for loading conditions like a storm surge (or any other non-dynamic condition), whether due to saturated conditions or any other condition, is patently false.

       *Finally*, Plaintiffs continue to gloss over the practical implausibility of the alleged "direct pressure communication" that Dr. Bea claims occurred between the Katrina storm surge and the organic clay layer.[145]  Dr. Bea's erroneous opinions imply that the organic clay reached steady flow conditions essentially ***immediately*** when the load from the Katrina storm surge impacted the EBIA soil.[146]  In other words, the inflow of water into the system was immediately equal to the outflow of water (both equal to zero, according to Dr. Bea) as soon as the Katrina

---

[139]  *Id.*

[140]  Opposition at p. 31.

[141]  Ex. 61, Terzaghi and Peck, *Soil Mechanics in Engineering Practice* (3rd ed. 1996), at p. 4, (emphasis added).

[142]  Government Br. at pp. 28-29; Ex. 47, Expert Report of Rogers, at pp. 143, 166; Ex. 50, Rogers Dep., Vol. 2, at pp. 37:20-38:3.

[143]  WGI Mem., at pp. 33-35.

[144]  WGI Mem., at p. 37; WGI Mem., Ex. 1, Cobos-Roa Dep. at p. 214:15-22.

[145]  Opposition at p. 30.

[146]  *See, e.g.*, WGI Mem., Ex. 8, Bea Dep., Vol. 1, at pp. 193:6-194:6.

- 27 -

surge affected the soil, allowing instantaneous transfer of pressure through the organic clay to the protected side of the floodwall.  Incredibly, Dr. Bea compares the organic clay layer to a giant underground hydraulic pump.[147]  That purported analogy has no basis in science or fact.  It ignores a truthful assessment of the actual soil characteristics at the EBIA, including the actual compressibility of the organic clay layer for non-dynamic events.  And it ignores the fact that it would have taken *more than a year* at the EBIA to reach a steady flow condition from the heads created there by Katrina's surge (obviously longer than the actual 30-hour storm surge).[148]  To assert the immediate steady flow scenario that Dr. Bea assumes is classic "junk science".  Both the analogy and Dr. Bea's underlying theories defy logic and accepted scientific fundamentals.

In short, Dr. Bea's explanation for manipulating SEEP/W to create flow conditions in the EBIA organic clay layer boils down to his assumption that the organic clay is virtually incompressible.  Absolutely no evidence exists to support that assumption; in fact, the opposite is true.  This Court must come to the only logical conclusion that remains: Dr. Bea intentionally modeled the organic clay as incompressible to manufacture steady flow conditions that allowed him to reach his pre-determined conclusions.[149]  His opinions cannot be considered scientifically reliable.

**C.   Lambe and Whitman and SEEP/W Do Not Validate Dr. Bea's "Analyses."**

The Opposition repeatedly cites to the seminal text, *Soil Mechanics*, by Lambe and Whitman (1969), as well as the user manual for the SEEP/W software and the software itself.  On each occasion of consequence, however, the Opposition misapplies those sources to reach conclusions that are at direct odds with currently accepted geotechnical engineering principles and even with the sources themselves.

---

[147]   Ex. 43, BARGE Transcript 7/8/2010 (morning). at pp. 2647:3-2648:21.

[148]   Ex. 57, Silva Delclaration, at p. 4, ¶11.

[149]   WGI Mem., at pp. 39-42.

To start, the Opposition cites Part IV of *Soil Mechanics* as evidence of "*Long-Established Principles*" that support Dr. Bea's decision to model steady flow conditions at the EBIA.[150]  But the Opposition omits a portion of the introduction to Part IV where the authors make clear that Part IV "specifically considers" situations where "loads are applied slowly compared to the rate of consolidation and at some time (long compared to consolidation time) after a rapid loading"—in other words, situations where applied loads change slowly or well after the end of a rapid loading.[151]  Hurricane Katrina, by contrast, caused water levels to rise rapidly compared to the consolidation time for the soil, producing varying loads at the EBIA over a relatively short period of time (a transient condition).  Therefore, Part IV of Soil Mechanics, the "long-standing principles" that purportedly support Dr. Bea's modeling do not apply to conditions at the EBIA during Hurricane Katrina at all.[152]

Also as support for Dr. Bea's made-up steady flow conditions, the Opposition states "the SEEP/W model recognizes that greater emphasis should be placed on 'the state of the pore-water pressure in the ground' instead of how much water is flowing through the ground."[153]  Plaintiffs provide no support for this statement.  That is because nowhere in the SEEP/W manual or in any instruction for the program is the Opposition's statement found.[154]  In truth, SEEP/W is simply a numerical tool to solve flow equations that involve both flow quantities and heads (pressure).[155]  The program does not emphasize one factor over the other—unless the engineer inputs fraudulent parameters, as Dr. Bea and Mr. Cobos-Roa have done in this case.

---

[150]   Opposition at pp. 24-27.
[151]   Ex. 59, Lambe and Whitman at p. 239; The terms "slowly" or "rapid[ly]" as used in the text are used "compared to the rate of consolidation" time for the soil -- i.e., the time for nearly complete consolidation, which in the case of the EBIA organic clays would exceed 1 year for the Katrina storm surge conditions.
[152]   Ex. 57, Silva Declaration at p. 5, ¶13.
[153]   Opposition at p. 26.
[154]   Ex. 57, Silva Declaration at p. 2, ¶4.
[155]   *Id.*

Similarly, the Opposition states that "[o]ne of the benefits of the SEEP/W program is that it allows the engineer to determine pressure without determining flow."[156]  That is simply not true.  Due to the very nature of the flow equation it solves, SEEP/W must ***always*** output both parameters.[157]  Of course, the engineer can simply choose to ignore the flow quantities, or as here, manipulate the input data to obtain a pre-determined desired result.

Continuing with the Opposition's misuse of *Soil Mechanics*, in addressing the issue of pore-water pressure, the Opposition asserts that:

> "'[P]ressure is influenced by permeability, but much more influenced by the compressibility characteristics of water.'[88] In developing modeling parameters to capture the effect of such forces, the SEEP/W manual refers the user to Lambe and Whitman's *Soil Mechanics* to identify the appropriate seepage forces.[89]  The purpose of the reference to Lambe and Whitman's work is clear: seepage analysis calculating the existence of excess pore water pressure due to external loading utilizes the fundamental mathematical equations utilized in the Soil Mechanics textbook."[158]

The gloss that the Opposition places on the SEEP/W manual as to the purpose for the citation to *Soil Mechanics* is both deceptive and meaningless.  Of course water is generally considered essentially incompressible in soil mechanics groundwater flow problems.  A transient flow analysis uses *incompressible water* and *compressible soil skeleton*.  It is because of the compressibility of the soil skeleton that transient conditions develop in a saturated soil, not because of the compressibility characteristics of water.  The deformations in the soil skeleton prevent the immediate transmission of pressure that Dr. Bea incorrectly postulated and then instructed Mr. Cobos-Roa to force his SEEP/W model to produce.[159]  It is no surprise that the SEEP/W manual and *Soil Mechanics* use the same fundamental equations for flow through porous media.  But this in no way justifies Bea's misuse of those equations.

---

[156]   Opposition at p. 29.
[157]   Ex. 57, Silva Declaration at p. 2, ¶6.
[158]   Opposition at pp. 27-28.
[159]   Ex. 57, Silva Declaration at p. 6, ¶17.

Furthermore, the statements cited by Dr. Bea from the SEEP/W manual are provided by GeoStudios simply as a source of additional information, and in no way support Dr. Bea's insupportable conclusions.  The Plaintiffs failed, in their Opposition, to include the ***real*** reason that the SEEP/W manual refers to *Soil Mechanics* by Lambe and Whitman:

> "*Soil Mechanics* by Lambe and Whitman (1969, John Wiley and Sons Inc.) has a detailed discussion on seepage forces and when they are or are not relevant. The discussion that follows is based on their work."[160]

All the SEEP/W manual contributes here is that *Soil Mechanics*, is a fundamental text on soil mechanics issues, including the two fundamental methods of analyzing seepage problems.  However, this seminal text in no way supports Dr. Bea's flawed, fundamentally incorrect reasoning about the relative importance of pore pressure and flow quantity.  As discussed above, in any flow analysis "you can't have one without the other."

In an attempt to justify Mr. Cobos-Roa's deceptive **zero** to $1 \times 10^{-9}$ **1/psf m$_v$** values, the Opposition states "[t]o model a soil region that will always remain below the phreatic surface, the SEEP/W manual indicates that a user should input a value close to zero to produce steady flow conditions because the model is addressing that compression of the soil-water system."[161]  Once again, the Opposition provides no citation to the SEEP/W manual to support this statement, and for good reason: there is no such instruction in the manual or anywhere else.[162]

The Opposition also tries to buttress Dr. Bea's **$1 \times 10^{-9}$ 1/psf** and **zero m$_v$** values with references to *Soil Mechanics* regarding "dilatational wave velocity," stating that:

> "Dr. Bea's selection of soil characteristics (1x10(-8) to 1x10(-9)/psf) was corroborated by calculations identified by Lambe and Whitman where the coefficient of volume change with a constrained modulus was defined by the equation Mv = 1/D. Calculations established by Lambe and Whitman show the symbol

---

[160]   Ex. 62, SEEP/W, (4th Edition, May, 2009, manual), at p. 208-10.
[161]   Opposition at p. 27.
[162]   Ex. 57, Silva Declaration at p. 2, ¶5.

1095224v.1

'D' in the compressibility equation as the dilatational modulus.  The importance of this equation is brought forth by Lambe and Whitman when they expressly recognize that 'water is only relatively incompressible;' the result being that the 'dilatational velocity through saturated soil is typically about 5,000 feet per second.'"[163]

Those references are purposely deceptive.  Just two sentences after the *Soil Mechanics* quotes cited by the Opposition, Lambe and Whitman make very clear that "[d]ilatational velocity, which can be measured easily in the field, unfortunately does not provide useful information regarding the stiffness of the mineral skeleton."[164]  Thus the "calculations" that Dr. Bea claims to have relied on from *Soil Mechanics* for his $1 \times 10^{-9}$ **1/psf** $m_v$ value are in fact useless for determining the compressibility of the soil skeleton, precisely the soil property that relates to the $m_v$ value required to perform a correct transient flow analysis for the EBIA under the relevant Katrina conditions.

The Opposition's alleged "corroboration" by Lambe and Whitman is a sham.[165] Because Plaintiffs purport to rely so heavily on their misuse of what they admit is the seminal text, *Soil Mechanics*, WGI has asked Dr. T. William Lambe, one of its consulting experts, to comment for the benefit of the Court, and justice, with respect to the Opposition's citations to his text.  Dr. Lambe's Declaration is attached as an Exhibit to this Reply Memorandum.[166]

That the Opposition must resort to blatantly falsifying sources should be offensive to this Court.  There are obvious fatal flaws in Dr. Bea's analyses.  Without these "mistakes" he cannot support his "conclusions".  Dr. Bea's opinions must therefore be stricken.

## V.   CONCLUSION

It is difficult to select the most egregious of the multiple misstatements in the Opposition, but one that ranks high on the list, and that is a valid proxy for all the other

---

[163]   Opposition at pp. 27-28.
[164]   Ex. 59, Lambe & Whitman at p. 455.
[165]   Ex. 57, Silva Declaration at p. 6, ¶15.
[166]   Ex. 63, Dr. T. William Lambe's Declaration.

misstatements, is the statement that WGI "want[s] to avoid liability for their **negligent excavation** and **backfill activities** that were substantial factors in causing the North and South Breaches."[167]   Amazingly Dr. Bea did not point to a single excavation accomplished by WGI, from the voluminous and detailed records of all of the excavations, that he **now** says contributed to the failure of either breach.   Just as amazing is the fact that the only backfill Dr. Bea models in his seepage analyses is **non-existent** clean shell or clean sand backfill in **non-existent** excavations and he assigns to these backfills a **nonexistent** value of the coefficient of volume change, $m_v$ -- a key hydrogeological property.   Dr. Bea's opinions about under-seepage induced failure at either breach site are based on non-existent hypothetical scenarios and his reports do not reflect scientific conclusions based on real science.   His opinions should be excluded from consideration.

| | |
|---|---|
| Dated:  May 30, 2012 <br><br> Respectfully submitted, <br><br> _/s/ William D. Treeby_ <br> William D. Treeby, 12901 <br> James C. Gulotta, Jr., 6590 <br> Heather S. Lonian, 29956 <br>       Of <br> Stone Pigman Walther Wittmann L.L.C. <br> 546 Carondelet Street <br> New Orleans, Louisiana 70130 <br> Telephone:  (504) 581-3200 <br> Facsimile:   (504) 596-0807 | and <br><br> Adrian Wager-Zito <br> Debra S. Clayman <br> JONES DAY <br> 51 Louisiana Avenue, N.W. <br> Washington, D.C. 20001-2113 <br> Telephone:  (202) 879-3891 <br> Facsimile:  (202) 626-1700 <br><br> Attorneys for Washington Group International, Inc., a division of URS Corporation |

---

[167]   Opposition at p. 32 (emphasis added).

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Reply Memorandum to Plaintiffs' Opposition to Motion to Exclude Testimony and Opinions of Dr. Robert Glenn Bea has been served upon all counsel of record by electronic notice via the Court's CM/ECF system this 30th day of May, 2012.

/s/ *William D. Treeby*

1095224v.1