# EXHIBIT 44

# Appendix 17
# Finite Element Seepage Study – Seepage Analysis for Foundation Breaches

Early in the IPET investigation of the breaches on the outflow canals, questions were raised about the underseepage in the marsh layer under the levee on the 17th Street Canal as the cause of the breach. For the breaches on London Avenue Canal, field observations indicated that underseepage in the sand layer under the marsh layer and the levees may have contributed to these breaches. Several other organizations investigating the levee breaches did some seepage analyses or speculated that either underseepage or through seepage caused the breaches. To address these concerns, a number of transient finite element seepage analyses were performed.

## 17th Street Canal Seepage Analysis

The seepage for the 17th Street Canal was conducted early in the IPET investigation of the performance of the floodwalls and levees. The focus of this initial seepage investigation was the time frame it would take for the marsh material to saturate and develop seepage pressures that could affect the stability of the floodwall and levee system. Early on in the investigation, the marsh material was referred to as peat.

The geological conditions in the New Orleans area are presented in Appendix V-2. A summary for the outfall canals are presented here. The soil conditions in the area of the New Orleans outfall canals has been determined through evaluation of existing and recently drilled engineering borings, earlier geologic mapping studies of the area (Dunbar et al. 1994 and 1995; Dunbar, Torrey, and Wakeley, 1999; Kolb, Smith, and Silva, 1975; Kolb, 1962; Kolb and Van Lopik, 1958; and Saucier, 1963 and 1994), and new studies performed since August 2005.

Geologic mapping of the surface and subsurface in the vicinity of the canal failures identifies distinct depositional environments, related to Holocene (less than 10,000 years old) sea-level rise and deposition of sediment by Mississippi River distributary channels during this period. Overlying the Pleistocene surface beneath the 17th Street Canal are approximately 50 to 60 ft of shallow water, fine-grained sediments consisting of bay sound or estuarine, beach, and lacustrine deposits as indicated in the cross section shown in Figure V-17-1. Overlying this shallow water sequence are approximately 10 to 20 ft of marsh and swamp deposits that correspond to the latter

Volume V The Performance – Levees and Floodwalls – Technical Appendix

V-17-1

This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

# Inner Harbor Navigation Canal (IHNC) Seepage Analysis

In the IPET Final Draft Report (June 1, 2006), it noted that other possible modes of failure beside overtopping/erosion for the breaches of the IHNC I-wall along the Lower Ninth Ward included "sliding instability and piping and erosion from underseepage." The report goes on to say that "*Piping and erosion from underseepage is unlikely because the I-walls were founded in a clay levee fill, a marsh layer made up of organics, clay and silt, and a clay layer. Because of the thickness, the low permeabilities of these materials, and the relatively short duration of the storm, this failure mode was considered not likely and was eliminated as a possible mode of failure.*" In the NSF-Berkeley report (ILIT Final Report, July 31, 2006), they stated "*This greatly underestimates the permeability, and especially the laterally permeability of the marsh deposits. It also continues the very dangerous assumption that underseepage was not a serious problem for 'short duration' storm surge loading that plagued the original design of many sections of the New Orleans regional defense system, and led to use of sheetpile curtains that far too short to effectively (and safely) cut off underseepage flows.*"

The value of coefficient of permeability assigned to the marsh layer in the NSF-Berkeley report was $10^{-2}$ cm/sec. This is three orders of magnitude higher than the highest coefficient of permeability IPET determined from consolidation tests on undisturbed samples of the marsh layer, as shown in Figure V-17-15. Consolidation tests performed by IPET show that the coefficient of permeability of the marsh material decreases as consolidation pressure decreases, from a maximum of $10^{-5}$ cm/sec for low consolidation pressures, to values as low as $10^{-8}$ cm/sec for consolidation pressure equal to 4,000 psf.

Weber (1969) found a similar variation of permeability with effective overburden pressure using field permeability (piezometer) tests on peat in the California Delta, as shown in Figure V-17-15. Weber's peat coefficient of permeability values are roughly the same as the values determined from the IPET consolidation tests on marsh material from New Orleans, but the scatter of the values from consolidation tests is greater. The difference may be due to the fact that the consolidation tests represent point values, whereas the field tests represent average values for a larger volume of soil. There may also be some inherent differences between the materials.

The permeability values for the marsh materials used by NSF-Berkeley in their seepage analyses were at least **1,000** times too high. Their values are higher than the permeability values for the sand layer at the London Avenue Canal determined from field pump tests. The NSF-Berkeley report states, "*The values of lateral permeability used in these analyses were based on experience with similar geologic units from other regions, our own field observations, and the accumulated reports indicating high lateral permeability. A best-estimated coefficient of lateral permeability of $k_h \sim 10^{-2}$ cm/sec was modeled for the most open of the marsh sub-strata.*" There is no possible or plausible explanation for NSF-Berkeley's choice of permeability values for the marsh material. These permeability values were also used in all of their PLAXIS analyses, and they were higher than any other material, including the sand layers.



Figure V-17-25. Contours of Total Head for Steady-State Solution, Canal Elevation = 12.5 ft, Head at Protected Side = -6 ft (Equipotential Lines = -4, -2, 0, 2, 4, 6, 8, 10, 12 ft)

Figure V-17-26 shows the results of the transient finite element seepage analysis for the most realistic representation of the geometry and material property. It can be seen that the seepage conditions have not reached the steady-state condition. The levee on the canal side has not even reached full saturation.

As designed, the pre-Katrina site conditions were a clay blanket starting at the toe of the levee on the canal side. This is similar to the clay blanket used upstream of a dam to reduce underseepage and seepage pressures down stream. While unlikely, a worst case condition would be that the clay blanket had the same permeability as the marsh material, Figure V-17-27. Figure V-17-28 shows the initial steady-state underseepage conditions used for the transient analysis. V-17-29 shows the steady state solution for the canal water level at 12.5 (top of the wall) and the protected side at -6.0 for no clay blanket. The phreatic surface intersects the protected levee slope.

Figure V-17-30 shows the results of the transient finite element seepage analysis for the clay blanket with the same permeability as the marsh material. Again, the levee on the canal side does not even reach full saturation.

In order to answer questions raised by NRC based on NSF Berkeley analyses, another unrealistic set of conditions were assessed. These conditions included no clay blanket, and increasing the permeability of the marsh by 100 times beyond the highest limit of published values. Figure V-17-31 shows the steady state solution for the canal water level at 12.5 (top of the wall) and the protected side at -6.0 for 100 times increase in permeability. Figure V-17-32 shows the results of the transient finite element seepage analysis for the 100 times increase in marsh permeability. Even with this completely unrealistically high permeability, the seepage does not reach the steady state conditions.

Table V-17-8 shows a comparison of the exit gradient for the steady state condition and transient analysis of the storm surge in the canal. The transient solution has a 40 percent reduction in uplift pressure on the protected side as compared to the steady state analysis. The transient solution also has a 48 percent reduction in the exit gradient as compared to the steady state solution.

| Table V-17-8 Comparison of Exit Gradient for Steady State Condition and Transient Analysis | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total Head at Sheetpile on Protected Side (ft) | Uplift Force on Protected Side (kips) | Percent Reduction in Uplift from Steady State | Change in Head at Toe of Levee (ft) | Length of Seepage Path (ft) | Exit Gradient = H/L | Percent Reduction in Gradient from Steady State |
| Steady State | 10 | 11.4 | | 6-4.59=1.41 | 10.79-6=4.79 | 0.29 | |
| Transient | 6 | 6.8 | 40 | 6-5.30=0.70 | 10.79-6=4.79 | 0.15 | 48 |

This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.



Figure V-17-26. Contours of Total Head for Transient Solution, Canal Elevation = 12.5 ft, Head at Protected Side = -6 ft (Equipotential Lines = -4, -2, 0, 2, 4, 6, 8, 10, 12 ft)

Volume V The Performance – Levees and Floodwalls – Technical Appendix
This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

V-17-31



Figure V-17-27. Clay Blanket Assumed to have the same permeability as Marsh #1



Figure V-17-28. 2D Contours of Total Head for Steady-State Solution, Canal Elevation = 1.13 ft applied from x=0 to x = 202 ft, Head at Protected Side = -11.5 ft (Equipotential Lines = -10, -8, -6, -4, -2, 0 ft)

This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.



Figure V-17-29. Contours of Total Head for Steady-State Solution, Canal Elevation = 12.5 ft, Head at Protected Side = -6 ft (Equipotential Lines = -4, -2, 0, 2, 4, 6, 8, 10, 12 ft)



Figure V-17-30. Contours of Total Head for Transient Solution, Canal Elevation = 12.5 ft, Head at
Protected Side = -6 ft (Equipotential Lines = -4, -2, 0, 2, 4, 6, 8, 10, 12 ft)



Figure V-17-31. Contours of Total Head for Steady-State Solution, Canal Elevation = 12.5 ft, Head at
Protected Side = -6 ft (Equipotential Lines = -4, -2, 0, 2, 4, 6, 8, 10, 12 ft)

Volume V The Performance – Levees and Floodwalls – Technical Appendix

V-17-35

This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.



Figure V-17-32. Contours of Total Head for Transient Solution, Canal Elevation = 12.5 ft, Head at Protected Side = -6 ft (Equipotential Lines = -4, -2, 0, 2, 4, 6, 8, 10, 12 ft)

In conclusion, the NSF-Berkeley findings and recommendations on underseepage, especially regarding the IHNC breaches along the Lower Ninth Ward, stated in their 31 July 2006 final report, are based on unrealistic and unproven permeability values that led to faulty and deceptive analysis results, typical garbage in garbage out. The writers of the NSF-Berkeley report either did not completely read the IPET Draft Final Report or they intentionally ignored information that did not support their hypothesis. The NSF-Berkeley report states, "*Unfortunately, even IPET's own analyses do not suggest a high likelihood of failure of the north breach section at the canal water levels present as early as 5:00 am (approximately Elev. +9 feet, MSL), so this would <u>not</u> appear to be the explanation for the observed in the neighborhood. Instead, it is proposed that observed water rise on the inboard (protected) side Florida Avenue was more likely the result of large underseepage flows through the highly pervious "marsh" deposits along this frontage.*"

IPET's slope stability analyses show that failure of the IHNC East Bank, North Breach at the Lower Ninth Ward could occur before the canal water level reached the top of the wall. There is clear evidence that water levels in the northern region of the Lower Ninth Ward, south of Florida Avenue, were rising early in the morning of August 29, 2005. Several eyewitness accounts had water flowing into houses and down streets between 0430 and 0500. Stopped clock data has the water level in this area at Elevation +3.0 by 0600, which makes the depth of water between 5 and

This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

10 ft. These observed water levels and the associated volume of water needed to achieve them in the northern region of the Lower Ninth Ward, south of Florida Avenue, **did not come from underseepage** as suggested by the NSF-Berkeley report. This can only occur if the levee is breached, which is what the IPET Draft Final Report stated, "*Eyewitness reports indicate that water level in the 9th Ward near Florida Avenue was rising when the water level in the IHNC was still below the top of the wall. Stability analyses indicate that foundation failure would occur before overtopping at the north breach on the east side of the IHNC. This breach location is thus the likely source of the early flooding in the 9th Ward.*" Even with outrageously unrealistically high permeability values used by the NSF-Berkeley group, underseepage could not produce the volume of water observed in this area. The NSF-Berkeley group would have realized this if they had reviewed the hydrograph for the Lower Ninth Ward inundation presented in Appendix V-11 and reproduced here in Figure V-17-33.



Figure V-17-33. Hydrograph for the Lower Ninth Ward Inundation

The IPET slope stability analyses show that the levee would become unstable when the water level in the canal reached approximately Elevation +11.2 NAVD 88. Figure V-17-34 shows the reprint of the hydrograph for the IHNC, Figure 129, IPET Volume IV – Storm, page IV-185. The hydrograph shows that the water level in the canal at 0500 could have been Elevation +11.0, depending on which gage reading is used. Based on the variability of the soil properties and the gage readings that make up the hydrograph, the IPET analyses **would appear** to provide a probable explanation for the observed water in the neighborhood and foundation failure that resulted in the north breach. In order for this foundation failure to develop, it did not require unrealistic underseepage to occur to cause the breach.



Figure V-17-34. Hydrograph for IHNC

This calls into question the rest of the NSF-Berkeley investigation of the breaches along the IHNC east bank Lower Ninth Ward. They stated that the failure of south breach was due to underseepage. The NSF-Berkeley group states the crevasse splay shown in the foreground of Figure V-17-35 (Figure 6.45, NSF-Berkeley report ILIT Final Report, July 31, 2006) was due to reverse underseepage. The NSF-Berkeley report states, "*Finally, clear and uncompromising evidence of the high lateral permeability of these deposits at this site is presented in Figure 6.45, which shows a well-developed classic crevasse splay that resulted from reverse underseepage through these same highly pervious marsh deposits as the ponded floodwaters drained out from the Lower Ninth Ward after the hurricane passed.*"

A much more plausible explanation for the crevasse splay shown in the foreground of Figure V-17-35 is that it was caused by erosion when the Lower Ninth Ward drained back into the canal, Figure V-17-36. While the NSF-Berkeley group tries to use unclear and compromised evidence from observations to bolster their underseepage hypothesis, they overlooked the direct comparison of field observations between the south breach at the east bank of the IHNC Lower Ninth Ward, Figure V-17-37, and the I-wall on Citrus back levee along the GIWW, Figures V-17-38, V-17-39, and V17-40. The NSF-Berkeley report stated that the damage along Citrus Back Levee was due to: "*Scour trenches developed along the full length of the floodwall on the protected side, as overtopping cascaded over the tops of the floodwalls. In many instances, these trenches were located several feet from the base of wall (indicating progressive*

*tilting of the floodwalls, and thus the waters falling farther to the inboard side) and some had widths of 7 feet or more."* They go on to state: *"These scour-induced trenches reduced the lateral support for the sheetpiles and the concrete floodwall they supported, and the lateral forces of the outboard side storm surge pushed the laterally unbraced floodwall sideways."*

Comparing the scour trench located on the protected side of what was the I-wall running along the east bank of IHNC, south breach Lower Ninth Ward shown in Figure V-17-37, with the scour trench on the protected side of the I-wall of the Citrus Back Levee shown in Figure V-17-38, and the IPET slope stability analysis for the I-wall at the east bank IHNC at south breach show it to be stable, with water to the top of the wall, one would have to conclude that the most plausible explanation for the breach is scour of the protected side support of the I-wall from overtopping.

While the IPET team believes it is the importance to consider all possible modes of failure, it is most important to consider realistic materials and scenarios in order to help future designers understand the failures of the New Orleans Hurricane Protection System that took place so that it is not repeated in the future.

Because the unrealistic permeability assigned to the marsh material for the NSF-Berkeley seepage analyses was at least 1,000 times too high, the results of the seepage analyses described in that report do not reflect the real seepage conditions in the field. Because it was assigned such a high permeability, the marsh layer appeared in those analyses to have very low resistance to seepage, and to respond very quickly to the rise in canal water level. This behavior is not consistent with the actual behavior of marsh material and peat, especially when consolidated under the weight of the levees. Based on this mistaken choice of marsh permeability, and the ensuing unrepresentative analytical results, the authors of the NSF-Berkeley report offered this advice regarding design analyses:

> *"Exoneration, a priori, of underseepage dangers should be discontinued immediately, and underseepage analyses should be required for the full regional flood protection system."*

This is misguided advice based on an assumed permeability for the marsh material that is at least three orders of magnitude higher than the actual permeability. Underseepage analyses performed using this inappropriate value of permeability are misleading, and do not provide a reasonable basis for design to prevent or mitigate underseepage problems.