# EXHIBIT 48

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES * CIVIL ACTION
CONSOLIDATED LITIGATION      * NO. 05-4182
                             * Consolidated
PERTAINS TO: MRGO            * SECTION K(2)
                             *
Armstrong, No. 10-866        * JUDGE DUVAL
                             * MAG. WILKINSON
* * * * * * * * * * * * * * *

     Deposition of THOMAS L. BRANDON, Ph.D., P.E., taken in the above-entitled cause, pursuant to the following stipulation, before Dawn H. Hymel, Certified Court Reporter, at the offices of Bruno & Bruno, 855 Baronne Street, New Orleans, Louisiana, on Friday, the 13th of April, 2012, commencing at 9:21 a.m.

Page 2

```
 1   APPEARANCES:
 2   Appearing on Behalf of Plaintiffs:
 3     O'DONNELL & ASSOCIATES, PC
       BY:  ANDREW P. OWEN, ESQ.
 4     800 Wilshire Boulevard
       Suite 500
 5     Los Angeles, California  90017
            -and-
 6     BARON & BUDD, P.C.
       BY:  THOMAS SIMS, ESQ.
 7     701 Brazos Street
       Suite 500
 8     Austin, Texas  78701-3232
            -and-
 9     LEWIS SCOTT JOANEN, ESQ.
       4905 Freret Street
10     Suite B
       New Orleans, Louisiana  70115
11          -and-
       DOMENGEAUX WRIGHT ROY & EDWARDS, LLC
12     BY:  ELWOOD C. STEVENS, JR., ESQ.
       556 Jefferson Street
13     Suite 500
       Lafayette, Louisiana  70501
14
15   Appearing on Behalf of the United States of
     American through its agency, U.S. Army Corps
16   of Engineers:
17     UNITED STATES OF AMERICA
       BY:  ROBIN D. SMITH, ESQ.
18     Benjamin Franklin Station
       P.O. Box 888
19     Washington, D.C.  20004
20
     Appearing on Behalf of Washington Group
21   International:
22     STONE, PIGMAN, WALTHER, WITTMANN L.L.C.
       BY:  JAMES C. GULOTTA, JR., ESQ.
23        HEATHER LONIAN, ESQ.
          WILLIAM D. TREEBY, ESQ.
24     546 Carondelet Street
       New Orleans, Louisiana  70130
25
```

Page 3

```
 1   ALSO PRESENT:
 2     FRANCISCO SILVA-TULLA, Sc.D., P.E.
 3
 4   REPORTED BY:
 5     DAWN H. HYMEL
       Certified Court Reporter #81016
```

Page 4

```
 1                    I N D E X
 2                                         PAGE
 3   EXAMINATION BY:
 4     Mr. Owen                              5
 5
 6               E X H I B I T S
 7
 8   Brandon 1   Resume' of Thomas L
                 Brandon, Ph.D., P.E.        8
 9
     Brandon 2   3/9/2012 Technical Report of
10               Dr. Thomas L. Brandon, P.E. 17
11   Brandon 3   Appendix 11, Analysis of
                 Performance of the Inner
12               Harbor Navigation Canal    34
13   Brandon 4   Chapter Six:  The St.
                 Bernard and Lower Ninth
14               Ward Protected Area        40
15   Brandon 5   Expert Report of Joseph
                 B. Dunbar, Ph.D., RPG      56
16
     Brandon 6   Excerpt from Dr. Marr's
17               Report                     92
18   Brandon 7   Excerpt from Dr. Marr's
                 Report                     94
19
     Brandon 8   Boring Logs               104
20
     Brandon 9   Appendix B, Development of
21               Lower 9th Ward Floodwall
                 Analysis Cross Sections   119
22
     Brandon 10  Discussions and Closures  158
23
     Brandon 11  Circular No. 1110-2-6066  173
24
     Brandon 12  Rebuttal Report of Robert
25               Glenn Bea, Ph.D., P.E.    207
```

Page 105

1   are the boring logs for those three soil
2   borings, 81A, 79A and 77A.  This is -- This
3   Exhibit 8 is an excerpt from a huge document.
4   I believe it's the NFAATT report.  It's an
5   excerpt from it.
6       Okay.  Have you seen these soil borings
7   before?
8   A.  Yes.
9   Q.  Okay.  All right.  Can you look at the
10  last three pages of that exhibit?  And this is
11  a boring log for 81A.
12  A.  Okay.
13  Q.  First of all, can you approximate, based
14  on Brandon Exhibit 7, how far away 81A is from
15  the breach using the scale?
16  A.  Not any precision at all really.
17  That's -- I mean, you're talking about --
18  Q.  I marked it up.  The estimate that I got
19  was about 25 feet.
20  A.  Maybe that, yeah, but you can't, like I
21  said, you can't get any precision --
22  Q.  Not precision.
23  A.  -- with this scale.
24  Q.  Is it fair -- Is an approximation of 25
25  feet fair?

Page 106

1   A.  That's fine.
2   Q.  Okay.  And looking at the boring log
3   itself for 81A, can you tell me how many, can
4   you estimate for me, based on the log, how
5   many feet of soil has shell in it?
6   A.  That contains some bit of shell, you're
7   saying?
8   Q.  Yeah.
9   A.  Well, I'd have to add it up.  Two and a
10  quarter, six -- Yeah, there's -- Looks like
11  they say that there's some shells in it down
12  to 17 feet or thereabouts.
13  Q.  Okay.  Would it be accurate to label
14  this, the soil, excuse me, that's depicted in
15  81A as pervious?
16  A.  No.
17  Q.  It would not be accurate?  How would you
18  label it?  If pervious is not accurate, how
19  would you label it?
20  A.  Well, first of all, pervious is not a
21  quantifying term.  Normally if you're doing a
22  seepage analysis for the Corps, pervious would
23  be at least ten to minus two or greater in
24  terms of permeability.  The thing that would
25  make this to me not pervious and it wouldn't

Page 107

1   be pervious from a Corps seepage standpoint is
2   the silt and the silty sand component.  When
3   you look at the permeability of the soil, the
4   fine content, the small stuff carries the day.
5   That's what determines if a soil has a high
6   permeability or a low permeability.  I think
7   if you did dutifully read my report, you'll
8   see that there's a correlation from Kenney
9   where the permeability is considered to be
10  solely a function of the D5 fraction, which is
11  the five percent fraction.
12  Q.  Right.
13  A.  And so if you have materials with silt
14  and silty sand in it, you're almost starting
15  at a permeability of ten to the minus three
16  and below.  The mere presence of a material
17  with a descriptor saying "with shells" doesn't
18  really tell you a lot about the permeability.
19      As a good example, go anywhere in the San
20  Francisco area, drill a hole in bay mud, bay
21  mud has got shells for 30 feet, but bay mud is
22  considered to be the poster child for being a
23  clay, you know.
24      So for this right here, if these were
25  described solely as pure shells with no other

Page 108

1   materials, then perhaps it might be pervious,
2   but the presence of silty sand and silt in
3   this makes it a very low permeability
4   material.  It would be ten to the minus three
5   or below.  If I would -- You know, frankly, I
6   doubt that I would do a job where I'd base my
7   permeability solely on visual descriptions of
8   material.  I don't see any Atterberg limits or
9   grain size analyses.  So these descriptions
10  right here are one guy named S. Bender who is
11  out there on one day, what he assumes this
12  soil to be.
13      And this is the reason why I'm not super
14  keen on basing anything on visuals, because
15  let's hope that Bender had some field
16  experience in describing these things, but,
17  you know, these right here I would not
18  determine to be pervious based on the
19  descriptions that Mr. Bender or Mrs. Bender
20  has supplied us here.
21  Q.  Could you assign a permeability to 81A?
22  A.  You know, not with -- Like I was just
23  saying, if, if, if I was going to do that, as
24  part of this boring I would have them, as a
25  minimum, do a wash 200 analysis where you

27 (Pages 105 to 108)

Page 121

1   to have a certain latitude.  It's a judgment
2   type of issue.
3   Q.  Sure.
4   A.  Yeah.  And so, you know, this one right
5   here (indicating), you know, I've got no
6   evidence that there's this much of a large
7   backfill excavation there, or this large
8   yellow area up here, I don't think that that's
9   necessarily reflected -- You know, frankly,
10  it's not labeled here even what material that
11  is, you know, so I would think that that's a
12  problem.  But other than that specifically,
13  those two areas, the rest might be okay.
14  Q.  Can I ask you the same question for, if
15  you turn to page 17, for Figure 13, North
16  Breach, Case 2-2?
17  A.  Well, this one, yeah, I don't think,
18  there's no information that I've seen that
19  there's this shell fill going down to the tip
20  of the sheet pile.  I mean, I don't see how
21  one would infer that from boring 81A.  That's
22  a -- That's a bit of a stretch to do that.
23  Q.  Can you tell me -- Oh, I'm sorry.  Go
24  ahead.
25  A.  As I said, that you're allowed a certain

Page 122

1   amount of latitude in drawing cross sections.
2   I don't think I would quite agree, if his
3   elevations are correct for B-8G, it looks like
4   the actual swamp layer's a bit deeper shown in
5   the boring than on his, if you're basing that
6   on water contents.  You know, because he has
7   swamp and materials with water contents in the
8   fifties, and it looks like this swamp layer
9   pinches out before you get to boring 8 there,
10  because particularly if you're trying to base
11  this on water contents.  But, you know, it's
12  certainly not a section I would have drawn.
13      Now, I would mainly argue that the
14  presence of one boring having shell fill down
15  to the tip of the wall seems to be a stretch
16  without some confirming information --
17  Q.  Okay.
18  A.  -- of some sort.
19  Q.  So if it were up to you, how would, just
20  with respect to the shell fill on 81A, how
21  would you change that portion of Figure 2-2?
22  A.  Well, see, I would -- To me, this would
23  not be a figure representative of the failed
24  section.
25      (Mr. Treeby entered the room).

Page 123

1   A.  Because I think if you're basing your
2   cross section on a boring outside of the
3   failure in an area that didn't fail, it's
4   difficult for me to imagine that that would be
5   representative of a section within the area
6   that did indeed fail.  And so I would -- And I
7   tried to explain this to some degree in my
8   report, but when you're a geotechnical
9   engineer, you have to make some approximations
10  in your analyses, and one is, you come up with
11  cross sections you think are representative
12  for the area that failed.
13      What we have here, best as I can tell, is
14  a cross section representative for an area
15  that didn't fail outside of the failure area,
16  and, you know, looking at this, the idea of
17  borings 75, 75A and 77A --
18  Q.  79A and 77A, looking on Brandon Exhibit
19  7?
20  A.  Yeah.  So what I would come up with
21  perhaps would have been a more -- Yeah, see,
22  those don't show up in either Figure 10,
23  Figure 11, Figure 12 or Figure 13, so, to me,
24  ignoring two borings within the failed area
25  and including one boring outside the failed

Page 124

1   area would be inadmissible.  This wouldn't be
2   something that I would rely on.
3   Q.  In looking at Brandon Exhibit 7, this
4   one, yeah, that 81A, --
5   A.  Uh-huh.
6   Q.  -- can you possibly -- is it possible for
7   you to estimate the perimeter that that boring
8   81A encompasses?
9   A.  We don't do that.  You don't
10  necessarily -- You know, the way it would work
11  is, if I looked at boring 79A and 77A, just as
12  well I might assume 81A to be a complete
13  anomaly.  It's at a corner right here.  It's
14  outside the failed area.  It could have been
15  just one specific area where they ended up
16  having to backfill shells.
17  Q.  Right.
18  A.  And then the fact that it's an area that
19  didn't fail tells me it must have been a
20  pretty decent backfill to not fail.  So, you
21  know, as I said, you're allowed a certain
22  amount of latitude in drawing sections, but it
23  is important to look at all the information
24  you're given in coming up with sections to
25  represent the north breach.  Where all the

Page 125

1  business is happening with a boring outside
2  the north breach is poor engineering.
3  Q.  Okay.  I believe you mentioned earlier
4  that you were aware that there was excavation
5  work performed by WGI at the Boland Marine
6  location; is that right?
7  A.  Yes.
8  Q.  Okay.  Did you review any documents
9  concerning that excavation work?
10 A.  No.
11 Q.  Okay.  So what's the extent of your
12 knowledge what that actual excavation work
13 occurred at Boland Marine?
14 A.  You know, honestly, the main extent of my
15 knowledge on that is what Bea has put in his
16 reports.  You know, I know that -- and I've
17 read part of Tim Stark's report and Tim did
18 address that.  I don't know -- I presume that
19 Dr. Silva did, as well, and perhaps Allen, but
20 the bulk of my knowledge really is from Bea's
21 report.
22 Q.  Okay.  So independent of Bea's report,
23 there was no document put in front of you that
24 was, this is the excavation work that WGI did
25 at Boland Marine?  You didn't review any of

Page 126

1  those?
2  A.  No, I didn't.  No.  I didn't -- You know,
3  I might have had something turned in to me
4  amongst the gigabytes of files that I have
5  that pertain to that, but I didn't do an
6  assessment at all of -- Like something like
7  this, I didn't analyze this type of thing
8  where I looked at the location of excavations
9  or anything like that.
10 Q.  Okay.  And then -- So your cross sections
11 then didn't take into account any of the
12 excavation work?
13 A.  No, they didn't.
14 Q.  Okay.  Is there a criteria that you have
15 of an excavation that, if it met that
16 criteria, I'd have to put it in my cross
17 section?
18 A.  If there were excavations on the land
19 side, certainly I would have to put those in
20 my cross sections, because my analysis for
21 stability is mainly concerned with what
22 happens from the sheet pile to the land side.
23 Q.  To the land side.
24 A.  On the flood side, if there, if there was
25 an excavation that was large, and by large, I

Page 127

1  mean both deep and has a considerable length,
2  then, just to be accurate, certainly I would
3  include it in my cross section.  You know, if
4  there was something 20 foot deep, 50 foot
5  wide, 200 feet long, certainly it would have
6  showed up.
7  Q.  Okay.
8  A.  It can't be a little discrete anomaly
9  within a 900 foot section to be included in a
10 cross section that's to be representative of
11 the entire thing.
12 Q.  Okay.  So I think you said if there was
13 an excavation that was 25 feet deep and --
14 A.  Well, I probably shouldn't have said
15 numbers.
16 Q.  Well, can you assign numbers to it?  I
17 mean, I guess that's what I'm trying to focus
18 on.
19 A.  I would say certainly if an excavation
20 ran the full length of the failure area, I
21 would have included it.
22 Q.  How about in terms of proximity on the
23 flood side to the floodwall, is that a, is
24 that a sensitive area?
25 A.  If there was a material replacing levee

Page 128

1  fill, like, if there was no levee fill
2  material there, then I would have certainly
3  included it in my cross section, assuming that
4  it was lengthy enough to be representative of
5  a cross section that could be analyzed.
6      One thing that has to be recognized when
7  you do these type of analyses is, because
8  we're doing two-dimensional analyses as
9  opposed to three-dimensional analyses, the way
10 to view this is that this picture is extruded
11 upward to infinity.
12 Q.  Right.
13 A.  And because we can only analyze 2-D.  So
14 implicit in coming up with this section and
15 assuming that the resulting pore pressures or
16 gradients have any validity at all would be
17 for the shell fill to be, for the north case,
18 200 feet long, and I think we know that's not
19 the case by looking at the other borings.  And
20 so that's, that's a pitfall here.
21     When you talk about including an
22 excavation within your cross section, it has
23 to be prevalent enough to be representative to
24 be included in the analysis, not for the sake
25 of drawing pictures.

Page 269

1  looking at it.  And Dave being a geologist,
2  they like to look at things, and -- But I
3  think, even now, having ability to look at
4  that data, he might want to change some of his
5  conclusions about the makeup of the EBIA and
6  also these hydraulic connection conclusions
7  he's got.
8  Q.  Okay.  Is it more valuable pulling out
9  the soil that you just described, is that more
10 valuable looking at it, you know, in the field
11 versus looking at it in a lab?
12 A.  Well, we actually look at it in the lab.
13 We take a big tube sample, you know, it's five
14 inches in diameter, it's 54 inches long, but
15 it's got 48 inches of soil in it, and we take
16 it back to the lab and then we extrude it, and
17 it's just sitting out there in front of us,
18 and we lop it off into four one-foot pieces
19 and take pictures of it.  But just looking at
20 the soil as it comes out of the ground is
21 invaluable, particularly when you're looking
22 at, you know, drained versus undrained
23 behavior and coming up with assessments of
24 probable permeabilities.
25 Q.  Okay.  Okay.  Why don't we take a brief

Page 270

1  break and I'll come back to see if there's
2  anything, any more questions to wrap up.  Is
3  that fair?
4  A.  Sure.
5     MR. OWEN:
6        Okay.  Off the record.
7        (A recess was taken from 4:07-
8  4:14).
9     MR. OWEN:
10       Back on the record.
11 BY MR. OWEN:
12 Q.  Okay.  Dr. Brandon, last question is, are
13 there any answers that you gave today that you
14 would like to change or supplement?
15 A.  No.
16    MR. OWEN:
17       Okay.  Then we're done.
18       (Whereupon, the deposition concluded
19 at 4:15 p.m.)

Page 271

1           WITNESS' CERTIFICATE
2
3
4     I, THOMAS L. BRANDON, Ph.D., P.E., do
5  hereby certify that the foregoing testimony
6  was given by me, and that the transcription of
7  said testimony, with corrections and/or
8  changes, if any, is true and correct as given
9  by me on the aforementioned date.
10
11 _____      _____
   DATE SIGNED              SIGNATURE
12
13
14 _____Signed with corrections as noted.
15
16 _____Signed with no corrections noted.
17
18 DATE TAKEN:  April 13, 2012

Page 272

1            C E R T I F I C A T E
2
3     This certification is valid only for a
4  transcript accompanied by my original
5  signature and original blue stamp on this
6  page.
7     I, Dawn H. Hymel, Certified Court Reporter
8  in and for the State of Louisiana, as the
9  officer before whom this testimony was taken,
10 do hereby certify that THOMAS L. BRANDON,
11 Ph.D., P.E., after having been duly sworn by
12 me upon authority of R.S. 37:2554, did testify
13 as set forth in the foregoing 270 pages; that
14 this testimony was prepared and transcribed by
15 me or under my personal direction and
16 supervision; and is a true and correct
17 transcript to the best of my ability and
18 understanding; that I am not related to
19 counsel or to the parties herein, nor am I
20 otherwise interested in the outcome of this
21 matter.
22
23       _____
          DAWN H. HYMEL, #81016
24        Certified Court Reporter