# EXHIBIT 24

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES          *
CONSOLIDATED LITIGATION                *          CIVIL ACTION
                                       *
                                       *          NO. 05-4182
PERTAINS TO: MRGO                      *
          *Armstrong*, No. 10-866      *          SECTION  "K"(2)
* * * * * * * * * * * * * * * * * * * * * * * *

## PLAINTIFFS' OPPOSITION TO DEFENDANTS UNITED STATES AND WASHINGTON GROUP INTERNATIONAL, INC.'S MOTIONS TO EXCLUDE TESTIMONY AND OPINIONS OF DR. ROBERT BEA

## **Table of Contents**

I.     Introduction……………………………………………...…………………………...1

II.    Governing Law…………………….……………………..…………………………..3

III.   Dr. Bea's Opinions Are Based on a Concise and Thorough Review and Analysis of the
       Facts ………………………………………………………………………………..5

       A.    Dr. Bea's Study of the Buried Swamp/Marsh Layer Achieved Critical Success
             (i.e., Defense Experts Reach Similar Conclusions
             Regarding Permeability)........................................................................................5

       B.    The Continued Attacks on Dr. Bea Regarding Permeability Are Unfounded…..8

IV.    Dr. Bea's Presentation of Cross-Sections and Soil Compressibility Values Are
       Appropriate………………………………………………………………………10

       A.    Dr. Bea's Cross-Sections Are Scientifically Valid Because They Are Based on
             Sound Engineering Assessments and Documented Evidence…………………...10

             1.    North Breach Case 1 Cross-Sections……………………………………11

             2.    North Breach Case 2 Cross-Sections……………………………………13

             3.    South Breach Case 1 Cross-Sections……………………………………19

             4.    South Breach Case 2 Cross-Sections…………………………………… 21

             5.    Near Breach Cross-Sections……………………………………………22

B.    The Compressibility Values Utilized in Dr. Bea's Model Were Well Reasoned..24

             1.    Dr. Bea Relied Upon Long-Established Principles To Model Actual EBIA
                   Conditions………………………………………………………………24

             2.    Dr. Bea's Model Inputs Are Well Reasoned and Model Real World
                   Conditions…………………………………………………………….....27

             3.    Dr. Bea's Steady Flow Analysis Utilized A Transient Loading
                   Condition………………………………………………………………...28

V.     Conclusion………………………………………………………………………32

**NOW INTO COURT**, through undersigned counsel, come the Armstrong Plaintiffs, who in opposition to the Defendants United States and Washington Group International, Inc.'s Motions to Exclude Testimony and Opinions of Dr. Robert Bea (Rec. Docs. 20823 and 20822), do state as follows:

I.    *Introduction*

This case is about what caused the North and South Breaches at the Lower Ninth Ward flood wall.  Internal inconsistencies between defense expert theories force Defendants to attack Dr. Bea to deflect attention away from their own experts significant shortcomings. Likewise, the defense experts are in conflict regarding the ***cause*** of the North Breach.  The defense experts are in conflict regarding the ***timing*** of the South Breach.  These conflicts necessarily show that there is another explanation for the flood wall failure at both the North and South Breach sites.

As to the timing of the North Breach, all experts are in substantial agreement.  They all agree that the breach occurred before the flood wall was overtopped.  Because pre-overtopping failure inherently requires as a component cause some below-ground issue, the defense experts resort to their imagination to refute Dr. Bea's subsurface explanation.   This resort is demonstrated by the fact that the defense experts are in conflict as to what caused the North Breach.

WGI's expert, Dr. Silva-Tulla, claims that approximately three hours of  wave overtopping from two to three foot waves created a four to five foot deep scour trench on the protected side of the flood wall, which caused a tear in the sheet pile wall.[1]  However this Court has already concluded, based upon the IHNC Lockmaster's observations during the storm and

---

[1] Ex. 1, Silva-Tulla Depo., Vol. I, pp. 144:2-145:7; p. 179:6-10.

1

a *de facto* summary judgment that would dispose of the entire action, their attacks really go to the weight of Dr. Bea's opinions instead of its admissibility.

### 1.   *North Breach Case 1 Cross-Sections*

WGI is wrong in claiming that Dr. Be "does not have a shred of evidence to support his Case 1 cross-sections." (WGI Mem., p. 16.)   The photos and discussion in Dr. Bea's expert report and deposition are evidence of WGI's excavation and remediation activity at Boland Marine.   In fact, the United States acknowledges this evidentiary basis for Dr. Bea's cross-section (USA Mem., p. 17), although they attempt to dismiss it away as "unscientific."   Dr. Bea's initial report details these photographs at pages 20 and 24-29 (Figs. 1, 5a-8b).[39] Figure 3 of Appendix B depicts two areas of obvious and significant soil disturbance adjacent to the North Breach.[40] Figures 5a, 5b, 6, 7, and 8 also detail WGI's excavation activity in this area.[41] Dr. Bea employed "inductive" and "deductive" analyses to determine how these holes were developed.[42] Defendants' experts asimilarly drew inferences and conclusions from aerial photographic evidence and otherwise drew conclusions from the on-site evidence.[43]   As Defense expert Dr. Thomas Brandon made clear: "Geotechnical engineering is a judgment field."[44]   Dr. Brandon observed that, "[a]t best, cross-sections are an engineering approximation," and that "frankly, in geotechnical engineering, when you are drawing cross-sections, you are allowed to have a

---

[39] Ex. 8.

[40] Ex 20, p.8.

[41] *Id*., p. 9-12.

[42] Ex. 20, Bea. App. B at 3; Bea Depo. Vol. II, pp. 107:16-109:6.  Deductive reasoning works from the "top down" (e.g., postulating a theory and testing it for confirmation) while inductive reasoning works the opposite way (e.g., observing known facts that give rise to and support a theory).

[43] *See, e.g.*, Ex. 13, Marr Report, pp. 77, 80, 85, 111-12, 117; Ex. 22, Stark Report, p. 107.

[44] Ex. 23, Brandon Depo., p. 49:15-16.

certain latitude.  It is a judgment type of issue."[45]   Defense experts reiterated time and again the notion that geotechnical engineering is an inherently judgment-oriented science.[46]

As for Dr. Bea's application of engineering judgment, he based his inductive analysis on a careful study of aerial and ground photographs and review of the processes that were active during Hurricane Katrina that could have developed these unusual holes at the North Breach.[47] Analysis of this evidence showed that the holes were developed by the inrushing floodwaters that removed coarse grained materials, which were present in the holes before Hurricane Katrina.[48] Dr. Bea's conclusion, based upon these photographs and graphics detailed in his report and Appendix B, is that these holes were artifacts of poorly backfilled excavations developed during the EBIA site-clearing activities.[49]   Put another way, there is no other plausible explanation for how these uniquely deformed holes were created other than by Katrina's storm surge eroding poorly backfilled excavations.[50]   Defense geotechnical expert Dr. Marr did not analyze these holes in any way.[51]   Yet, the United States argues that Dr. Bea's inductive analysis is "subjective, unscientific interpretation." (USA Mem., p. 17.)  That position cannot be squared with Dr. Bea's accepted inductive analyses in the *Robinson* and *Barge* lawsuits, with the United States' failure

---

[45] *Id.* at pp. 55:2-14 & 120:23-121:2.

[46] Ex. 24, Brandon Report, pp. 2, 19, 22-23, 35 (applying or discussing engineering "judgment" including his "best judgment of the [soil] stratigraphy"); Ex. 23, Brandon Depo., p. 54:4-19; Ex. 13, Marr Report, p. 107; Ex. 25, Dunbar Depo., pp. 26:24-27:4 & 264:9-25; Ex. 26, Naymik Depo., pp. 147:14-24,  150:19-151:2  & 151:24-152:18; Ex. 27, Sykora Depo., p. 98:3-25.)

[47]  Ex. 21, Bea Depo. Vol. II, pp. 107:16-109:6; Ex. 8, Bea Report, pp. 20, 23-29 (Figs. 1, 4-8b) and App. B, p. 8 (Fig. 3).

[48]  Ex. 21, Bea Depo. Vol. II, pp. 107:16-109:6, 110:12-111:25; Ex. 8, Bea Report, pp. 20, 23-29 (Figs. 1, 4-8b) and App. B, p. 8 (Fig. 3).

[49]  *Id.*; *see also* Ex. 20, Bea App. B, pp. 8-12 (Figs. 3, 5a, 5b, 6, 7, and 8).

[50]  *Id.*

[51]   Ex. 2, Marr Depo., Vol. II, p. 222:2-5.

to cite to any evidence, treatise, handbook, or opinion that Dr. Bea's forensic engineering inductive analysis is unsound, or with its own expert's failure to analyze the holes in any way.

Dr. Bea's deductive analysis involved (and continues to involve) review of the existing documentation of WGI's site clearing activities to identify specific excavations or other activities that could have developed these unusual holes at the North Breach.  While it is true that Plaintiffs have not yet discovered documentation of an excavation that is 15 feet deep, 25 feet wide and 100 feet long (other than the photographs detailed above),[52] they have discovered documentation concerning WGI's excavation and backfill activity adjacent to the North Breach at Boland Marine that Dr. Bea has concluded played a substantial factor in causing the failure.[53]

And, contrary to WGI's representation, Dr. Rogers never testified that he developed the Case 1 cross-section for the North Breach.  (WGI Mem., p. 16.)  Dr. Bea (with assistance from Chad Morris) developed the North Breach Case 1 cross-section.[54]  Dr. Rogers (with Dr. Storesund's assistance) created the Cross 2 cross-sections.[55]  Thus, it is not surprising that Dr. Rogers was not familiar with the excavation detailed in the North Breach Case 1 cross-section.

### 2.  North Breach Case 2 Cross-Sections

Defendants next attack the North Breach Case 2 cross-sections, revealing several profound problems with their motion as well as their own experts' analyses of the failure mechanisms at this location.

---

[52]   Ex. 8, Bea Report, pp. 20, 24-29 (Figs. 1, 5a-8b).

[53]    Ex. 20, Bea App. B at pp. 8-31; Ex. 21, Bea Depo. Vol. II, p. 111:17-112:23; Ex. 28, Bea Rebuttal Depo., pp. 77:18-85:23, 87:16-88:9; Ex. 29, Sykora Report, p. 97, Exh. F (Boland Marine structure removal);  p. 102, Exh. K (Boland Marine ACM/hazardous material excavations);  p. 104, Exh. M  (Boland Marine RECAP excavations at) and p. 105, Exh. N (Saucer Marine  RECAP excavations at).  *See also* discussion of North Breach Case 2, *infra*.

[54]   Ex. 15, Bea Depo. Vol. I at 211:14-213:2; Ex. 21, Bea Depo. Vol. II at 121:3-123:25; 129:19-130:4.

[55]   *Id.*

The North Breach failure initiated near the interface between the shallow 1960s sheet pile wall with the deeper 1980s floodwall.[56]  At the onset of failure, the North Breach protected side soils were displaced, allowing the floodwall to fail and rotate inward towards the protected side, and then to flip over with the inrush of water.[57]  As the failed floodwall is "washed" into the protected area, the southern section of intact floodwall is pulled out of the ground creating a "breach zone."[58]  The breach zone/tear of the sheet piling was a result of the failure, not a cause of the failure.[59]  As a result, the soil conditions at the breach initiation zone are the principal layers of interest.[60]  Unlike the breach initiation area, the entirety of the breach zone includes areas that were damaged subsequent to failure; thus, these areas cannot be presumed to be the same as the breach initiation zone without assessing soil conditions at the breach initiation site first, and then comparing/contrasting with adjacent areas.[61]

Defendants claim that the cross-section used by Dr. Bea is unreliable because the depth of shell fill portrayed in the cross-section does not agree with their skewed interpretation of soil borings located in the general vicinity of the North Breach. (WGI Mem., pp.17-19; USA Mem., pp. 17-20.)  As shown below, Defendants' own analyses of the North Breach evaluated soil conditions approximately 100 to 150 feet south of the North Breach initiation zone, not at the breach initiation zone itself.  Thus, Dr. Bea's methodology is more reliable than that of their own experts.

---

56  Ex. 8, Bea Report, p. 86 ¶ 96.

57  *Id.* at pp. 86-87 ¶ 96.

58  *See, e.g.*, *id.* at  p. 90,  Fig. 55.

59  *Id.* at p. 86 ¶ 96.

60  Ex. 20, Bea App. B, pp. 16-31.

61  *Id.* at pp. 16-31.

Specifically, Defendants ignore the more pertinent soil boring information near the breach initiation zone (<25 ft.). WGI says "boring 81A is <u>not</u> even within the failure zone for the North Breach. In contrast, MMG Boring 79A is located at the center of the North Breach . . . MMG boring 77A is at the south end of the North Breach . . . Neither of these borings—which actually are located along the North Breach—indicate that 'shell fill' extends below the sheet pile tip at the North Breach as Dr. Bea posits." (WGI Mem., p. 19.)

However, Figure 1 below (Figure 55 from Bea Expert Report) illustrates the failure sequence at the North Breach with MMG Borings 81A, 79A, and 77A superimposed. Clearly, MMG soil boring 81A is the <u>closest</u> soil boring to the breach initiation point (also known as "tear of the sheet pile") of all the MMG soil borings. Thus, the soil conditions revealed by MMG soil boring 81A are the most representative of soil conditions at the breach site, as compared to MMG soil borings 79A and 77A.

Figure 2 below shows an overlay of MMG soil borings 81A, 79A, and 77A from defense expert Dr. Marr's report depicting a cartoon narrative of the North Breach failure initiation. [62] While the failure sequence differs from that shown by Dr. Bea, the breach initiation zone is the <u>same</u>. The failure area shown by Dr. Marr does not even include the vicinity where MMG soil boring 79a or 77A were conducted. The only soil boring that would appear within the failure initiation extents shown by Dr. Marr is MMG soil boring 81A (which was omitted from his consideration). Figure 3 below shows another figure from Dr. Marr's report with the locations of MMG soil borings 81A, 79A, and 77A indicated.

Furthermore, all Defendants' experts' cross-sections (below) misrepresent the soil conditions at the North Breach initiation zone by being situated 100 to 150 feet south. There is a

---

[62]   Ex. 13, Marr Expert Report, p. 2.

major change in soil stratigraphy between 81A and 79A that is not accounted for by the any of the Defendants' experts.  While this severe omission introduces fatal flaws in their soil cross-sections, for purposes of Defendants' *Daubert* motions, their arguments with respect to Dr. Bea's North Breach Case 2 cross-sections plainly go to the weight of Dr. Bea's testimony, not its admissibility.                                                                                          .



Figure 55: Separation of floodwall at the north end of the North Breach and subsequent 'flipping' of the free end by the inrushing floodwaters (after Cushing 2009).

*Figure 1:  Breach sequence at North Breach site from Bea (2012) report (Figure 55).*

MMG soil boring 81A is the closest soil boring to the failure initiation site of all the

MMG soil borings.

The flood wall failed at the North Breach due to low global stability of the foundation soils which caused a portion of the flood wall to displace landward and place the sheet piling into tension along its horizontal axis. This development of large tension in the sheeting was caused by a different design of the sheet piling north of the breach which created a much stiffer section of wall that displaced laterally much less than the adjacent section to the south. The sheets north of the intersection were 34 ft long and those south of the intersection were 19 ½ ft long. The longer length sheets to the north created a stiffer wall that displaced less than the wall to the south. As the flood waters rose on the canal side, the southern section displaced landward more than the northern section. This created a differential displacement in the vicinity of the intersection and a large tensile stress in the sheeting that it was not designed to withstand. The rising canal water level began to overtop the wall.

At the intersection of these two sections, the tensile force in the sheeting became sufficiently large to plastically stretch it along its horizontal axis and create excessive tension in the concrete I-Wall. At least two 19 ½ ft long sheets underwent significant deformation. Tension cracks developed in the concrete segment just south of the intersection. The concrete portion cracked, broke up and fell away creating an open gap. Sufficient tensile overstress developed in one piece of sheeting to cause it to tear from its top downward for a length of 12 ft. The tearing resulted in a transfer of tensile forces to the bottom of the sheeting and caused the 19 ½ ft long sheeting to start plastically deforming at the bottom. At a certain point, the tensile force became sufficiently large in the bottom of the sheeting to initiate a decoupling of the joint in the adjacent sheets from bottom to top.

Water pouring through the created gaps rapidly softened and eroded away the landside top of the earthen embankment. This action caused the sheets of the older segment of the wall to rotate landward. Rising water in the canal began to overtop the wall more. This caused further erosion of the adjacent sections of wall to the south and outward rotation of these sections in a sequential manner over time. Water flowing through the rapidly widening breach eroded away the entire embankment portion of the flood wall and pulled the overturned sheets out of the

North Breach









17

*Figure 2: Locations of MMG soil borings 81A, 79A, and 77A superimposed over Dr. Marr's North Breach failure initiation graphic.*

Note that in Figure 2 the <u>only</u> soil boring situated within his failure initiation graphic is 81A, which Dr. Bea uses and Dr. Marr, the Defendants' expert, ignores.



**Figure 5-10 Scaled dimensions of the North Breach[125]**

*Figure 3:  Locations of MMG borings 81A, 79A, and 77A.*

The soil boring closest (and most representative) of the North Breach failure initiation zone is MMG soil boring 81A.  Defendants characterize Dr. Bea's reliance on boring 81A as so scientifically unsound that it should be barred entirely.  Yet the potential insufficiency of their own expert's analysis is patent, giving rise to a classic "battle of the experts" that must instead be decided by way of a trial.[63]

---

[63]  Dr. Marr opines that underseepage played no role in the North Breach and that, instead, pressure from the canal's water and soils caused deformation and eventual breaching of the floodwall. (Ex. 13, Marr Report, pp. 2-3; 65-67. Dr. Marr opines that 500,000 pounds (25,000 lbs/ft$^2$) of planar tensile load caused the breach. (Ex. 2, Marr Dep.,

### 3.   South Breach Case 1 Cross-Sections

Similar to Dr. Bea's North Breach Case 1 cross-sections, Dr. Bea utilized both inductive and deductive analysis in creating his South Breach Case 1 cross-sections.  Dr. Bea based his inductive analyses of the South Breach on aerial and ground photographs and analyses of the processes that were active during Hurricane Katrina that could have developed these soil deformations at this location.[64]  In reviewing these photographs, Dr. Bea concluded—as he did with the North Breach—that there is no other plausible explanation for  how these uniquely deformed holes were created other than by Katrina's storm surge eroding poorly backfilled excavations.  And while Defense expert Dr. Marr, whose task was to consider all potential causes for the breaches, did not analyze these holes "in any way," the government still proffers an alternative interpretation for this photographic evidence ("back-scour cut by rushing floodwaters" (USA Mem., p. 22)).  By doing so, the government makes clear that this case is about competing expert inferences and conclusions derived from the existing evidence.[65]

Dr. Bea's deductive analysis involved (and continues to involve) review of the existing documentation of WGI's site clearing and remediation activities to identify specific operations that could have developed these unusual holes adjacent to the South Breach.  Though it is true that Plaintiffs have not yet discovered documentation of an excavation that has the precise measurements of those in the Case 1 cross-sections, they have discovered documentation

---

Vol. II, pp. 82:23-83:8; 92:5-15.)  However, his computer modeling did not bear out his notion that the water and soils created such force (*Id.*, pp. 98:15-20; 101:7-16); so Dr. Marr substituted his "judgment and experience" to conclude that such forces were present. (*Id.*, pp. 102:13-103:3.)  Given Dr. Marr's and Dr. Bea's competing judgments as to what occurred and why, the need for a full presentation at trial becomes even more obvious, and the propriety of a *Daubert* exclusion order even more doubtful.

[64]   Ex. 21, Bea Depo., Vol. II, pp. 107:16-109:6; 124:1-126:3.

[65]   Ex. 2, Marr Depo., Vol. II, p. 222:1-5.

concerning WGI's excavation and backfill activity adjacent to the South Breach that Dr. Bea has concluded played a substantial factor in causing the failure.[66]

WGI continues its mischaracterization of Dr. Bea's South Breach Case 1 analysis by stating his Rebuttal Report "assumed the 'disturbed areas' associated with the removal of structures in the EBIA was only '4 feet below grade,' not the 18 feet imagined in his cross-section." (WGI Mem., p. 22.)  This statement, however, applies only to the building structures that were removed and does not encompass all of the other structures, objects and materials that were removed.[67]

WGI then contorts Dr. Bea's deposition testimony concerning the grid trenching activity at Saucer Marine by contending that Dr. Bea somehow opined that this trenching activity created a hole that was "18 feet deep x 25 feet wide." (WGI Mem., p. 23.)  Dr. Bea never testified that the grid trenching at Saucer Marine extended to this depth.  As discussed, Dr. Bea's inductive analysis of the photographs and other documentation of the South Breach led him to conclude that an excavation of this magnitude more probably than not existed as there was no other way for such an unusual hole to have occurred at this location.  The grid trenching—which occurred in "grids" along the entire EBIA every 25 feet parallel and perpendicular to the IHNC to a depth of at least five feet—is a separate issue at Saucer Marine.

With respect to Dr. Bea's Figure 34 in Appendix B, it was never intended to provide support for the Case 1 cross-sections as WGI contends.  (WGI Mem., p.23.)  Rather, Dr. Bea

---

[66]   Ex. 20, Bea App. B , pp. 35-42 (Figs. 31a, 31b, 32a, 32b, 32c); *see also* Sykora Report, p. 99, Exh. H (detailing structures and piling removal at Saucer Marine) and p. 105, Exh. N (detailing RECAP excavations at Saucer Marine).

[67]   *See, e.g.*, Sykora Report, p. 99, Exh. H (detailing structures and piling removal at Saucer Marine) and p. 105, Exh. N (detailing RECAP excavations at Saucer Marine).

showed that diagram to illustrate how the walls of the excavations were tapered to enable the excavations to be dug to their intended depths without developing wall stability failures.

As with the North Breach cross-sections, Dr. Bea has graphically illustrated potential breach factors based upon inductive analysis—the same type of analysis and application of engineering judgment he relied upon in earlier cases, and the same sort of analysis and application of engineering judgment that Defendants' experts apply in their own work, as discussed above. According to Defendants' own expert, Dr. Brandon, "[a]t best, cross-sections are an engineering approximation."[68] The fact that different expert witnesses draw different inferences and reach different conclusions from the same evidence does not require the Court to prejudge the entire case via *Daubert*, which is what the Defendants ask from this Court.

### 4. *South Breach Case 2 Cross-Sections*

Defendants' contention that Dr. Bea has not provided any credible evidence supporting his South Breach Case 2 cross-sections is also flawed. (WGI Mem. at p. 25; USA Mem. at pp. 22-25.) The Corps' 1969 project plans showed the presence of two pipeline penetrations at the South Breach location.[69] The project plans show a six-inch water line penetrating the sheet pile floodwall, extending westward to a T-connection with the water main running along Surekote Road.[70] The top of penetration elevations (MSL) were identified (Figure 37) to be El. +2.26 feet for the six-inch water line and El. +2.48 feet for the two-inch gas line.[71] While Defendants' characterization of the water line removal appears accurate, there is no photo documentation of the gas line removal at this location. This flies in the face of the admonition that it was "very

---

[68] Ex. 23, Brandon Depo., p. 55:2-14.

[69] Ex. 30, Bea Rebuttal Report, pp. 43-47.

[70] *Id.* at p. 43.

[71] *Id.*

important" to "take photos before and after work is [] done" in order to document "WGI workmanship."[72]   As a result, the only compelling evidence of the gas line removal at Saucer Marine is the 1969 project plan depicted in Dr. Bea's report and in his Case 2 cross-sections.[73]

WGI contorts the modeling and analysis performed by Dr. Bea utilizing the Case 2 cross-sections by stating that "[t]his fictitious trench is thus considered by the model as 'infinite' across the entire north-south length of the EBIA. [] Accordingly, analyzing a long, but narrow trench, when inserted into a 2-D model as Dr. Bea did here, leads to misleading results because the narrow trench is entered as 99-feet wide east-west excavation carried across the entire north – south length of the floodwall." (WGI Mem., p. 27.)   This is a complete mixing and misinterpretation of how Dr. Bea's analyses were performed.   The trench was first analyzed as a two-dimensional feature.   The results from previous analyses of a similar three-dimensional feature were then used to interpret the results from the two-dimensional analyses.[74]

As a result, Dr. Bea's South Breach Case 2 cross-sections are reliable, and WGI has merely raised an issue of the parties' experts differing on how best to represent the cross-sections at the South Breach.

### 5.   *Near Breach Cross-Sections*

Rounding out its argument that Dr. Bea literally got nothing right, WGI complains that Dr. Bea's Near Breach (McDonough Marine borrow pit) cross-section is unreliable and should be excluded because (1) there is no evidence that WGI or the Corps selected the borrow pit because of the abundant clay materials there, and (2)  there is no evidence that WGI or the Corps

---

[72] Ex. 31, WGI Exh. 22 at p. 345.

[73] With respect to Dr. Rogers's testimony concerning the Case 2 cross-sections, at the time he drafted his expert report and sat for his deposition, he had not had the benefit of reviewing the QARs and related photographic evidence that were subsequently discovered.  (Rogers Depo., Vol. II, pp. 217:7-220:5.)

[74] Ex. 8, Bea Report, pp. 96-100 ¶¶ 104-107; p. 101 ¶ 108.

lined the borrow pit with clay or had related concerns for seepage at that location. (WGI Mem., pp. 27-30.) Once again, WGI is mistaken. Omitted from its brief are relevant testimony and documentary evidence refuting both contentions.

First, the evidence shows that, despite their attempted denial, WGI and the Corps selected McDonough as the borrow pit because it was relatively free of contaminants *and* because it contained cohesive clay soil that would be suitable for backfilling excavations and removal/remediation activities at the EBIA:

> Q.    Okay. And so this document contemplates that, and it says, if you need additional fill, WGI can provide it. It doesn't specify with any particularity where they go to get the backfill.

> A.    The record already shows that <u>we had the McDonough Marine borrow pit on site with thousands of yards of clay that were used exactly for those purposes</u>.[75]

> ******

> Q.    All right. Now, what, if you know, is the time sequence, okay? How much time passed between the approval of the Corrective Action Plan and the request by the United States Army Corps of Engineers that you install clay as a fill for that excavation . . .

> A.    I don't have recollection of that. Let me back up and try to clarify something. <u>We had a borrow pit and the borrow pit was full of clay. So the intent originally was that all excavations were filled with clay.</u>[76]

Second, with respect to dressing the slopes of the McDonough borrow pit with clays, Dr. Bea's deductive analysis concluded that this is precisely what WGI did. Indeed, it is undisputed that a geotechnical analysis was performed on the borrow pit, and Dr. Bea concluded that a

---

[75] Ex. 32, Guillory 30(b)(6) Depo., Vol. I, pp. 194:6-14, 195:9-13 (emphasis added).

[76] Ex. 33, Staggs 30(b)(6) Depo., pp. 113:24-114:13 (emphasis added), 155:13-16; *see also* Ex. 34, Bacuta Depo., pp. 112:15-113:13; Ex. 15, Bea Depo. Vol. I, pp. 243:23-247:6.

seepage analysis would likely have been included in that geotechnical analysis.[77]   And in light of these seepage concerns, WGI dressed the slopes of the McDonough borrow pit with clay.[78] Merely because the photo captions detailing WGI's work at McDonough do not expressly state that they were lining the borrow pit walls with clay does not mean that is not what occurred. (WGI Mem., p.  30.)   To the contrary, the borrow pit was predominantly clay, so when WGI engaged in reworking the borrow pit walls, they were necessarily dressing those walls with those very same cohesive clay materials.[79]   WGI's selective focus on MMG boring 71G conveniently ignores boring 57A, which is plainly depicted in Dr. Bea's Near Breach cross-sections.[80]   Boring 57A reveals predominately clay soil, which was ideal for backfilling excavations (provided it was compacted properly) due to its low permeability.

Accordingly, Dr. Bea's Near Breach cross-sections are entirely reliable, and all WGI has created is an issue for trial concerning the varying interpretations of the existing information by the parties' experts. The root issue here is *whose engineering judgment is correct.*   Defendants believe their engineers are correct and that Dr. Bea is mistaken in his application of engineering judgment.   Of course, Plaintiffs believe the reverse is true.   But these disagreements should be resolved through cross-examination at trial.

**B.**   ***The Compressibility Values Utilized In Dr. Bea's Model Were Well Reasoned***

**1.**   ***Dr. Bea Relied Upon Long-Established Principles To Model Actual EBIA Conditions***

With extensive "boots on the ground" experience investigating levee failures, combined

---

[77]  Ex. 15, Bea Depo., Vol. I, pp. 270:14-271:10.

[78]  *Id.*, pp. 271:11-272:8.

[79]  *Id*., pp. 271:22-273:10.

[80]  Ex. 20, Bea App. B, pp. 33-34 (Figs. 29, 30).

with a well-rounded understanding of the hydro-geological characteristics of the EBIA region, Dr. Bea commenced his "modeling" of the causative factors of the EBIA flood wall breaches. Dr. Bea's modeling utilized the software programs SEEP/W to analyze seepage and SLOPE/W to analyze sheer effects on the soils at the floodwall.

There are two fundamental ways to analyze the hydraulic conductivity pressure response of the buried swamp/marsh deposits. The first, **steady flow**, is based on hydraulic loading conditions that do not permit changes in void ratio, water content, or levels of saturation. The second, **non-steady flow**, analyzes the soil deposit to determine how the void ratio, water content, and/or saturation percentage changes during the hydraulic loading. These two fundamental approaches were substantiated by Dr. T. William Lambe and Dr. Robert V. Whitman of the Massachusetts Institute of Technology in their seminal textbook entitled *Soil Mechanics*.

Part IV of *Soil Mechanics* is devoted to the study of soil behavior when it is influenced by pore water and "the magnitude of forces transmitting through the mineral skeleton (physical interaction)."[81] Lambe and Whitman identify the "four possible types of flow" resultant from the basic equation calculating flow in soil:[82]

1.    The void ratio and the percentage of saturation are constant;
2.    The void ratio varies and the percentage of saturation is constant;
3.    The void ratio is constant and the percentage of saturation is varies;
4.    The void ratio varies and the percentage of saturation varies.[83]

---

[81]  Ex. 5, *Soil Mechanics*, p. 239.

[82]   The variability of different conditions dictates the possible type: e = void ratio (*Soil Mechanics*, p. 526);  S = percentage of saturation (*Soil Mechanics*, p. 527).

[83]   *Id.*, p. 274.

Lambe and Whitman define type 1 flow (where the void ratio and the percentage of saturation are constant) as *steady flow*; while the remaining three situations are referred to as *non-steady flow*.[84]  Because the buried swamp/marsh layer is located below the phreatic surface (and likely has been for nearly a century) it is considered to be completely saturated.  Such conditions warrant Dr. Bea's utilization of *steady flow* analyses, and such an approach was undertaken in modeling the response of the buried swamp/marsh layer when exposed to the hydrologic forces generated by Hurricane Katrina's storm surge.

An engineer's interaction with the SEEP/W program is aided by a methodology manual that explains the parameters the program needs to perform calculations that reflect real world conditions.  The elemental tenet of the SEEP/W program is based upon the recognition that the "flow of water through soil is one of the fundamental issues in geotechnical and geo-environmental engineering."[85] Such hydraulic conductivity includes two important elements: one of which is the transmission of fluid, the other is the transmission of pressure.[86]

For engineering purposes, pore-water pressure is more important than flow quantity. Therefore the SEEP/W model recognizes that greater emphasis should be placed on "the state of the pore-water pressure in the ground" instead of how much water is flowing through the ground.[87]  This "pressure is influenced by permeability, but much more influenced by the compressibility characteristics of water."[88] In developing modeling parameters to capture the

---

[84]  *Id.*, pp. 274-275.

[85]  Ex. 35,  SEEP Manual, p. 1.

[86]  Ex. 28, Bea Rebuttal Depo., p. 8, l. 14 - p. 9, l. 1.

[87]  *Id.*

[88]  Ex. 28, Bea Rebuttal Depo., p. 9:1-3.

effect of such forces, the SEEP/W manual refers the user to Lambe and Whitman's *Soil Mechanics* to identify the appropriate seepage forces.[89] The purpose of the reference to Lambe and Whitman's work is clear: seepage analysis calculating the existence of excess pore water pressure due to external loading utilizes the fundamental mathematical equations utilized in the *Soil Mechanics* textbook.

### 2. *Dr. Bea's Model Inputs Are Well Reasoned and Model Real World Conditions*

To run the SEEP/W model, the manual specifies that one start with estimated material properties because "there can be a large reality gap... between laboratory determined results and actual in situ soil behavior."[90]   The manual then requires the user to interrogate the results "to ensure the constraints and material properties are consistent with what you intended to define and the results make sense."[91]

To model a soil region that will always remain below the phreatic surface, the SEEP/W manual indicates that a user should input a value close to zero to produce steady flow conditions because the model is addressing the compression of the soil-water system.  Dr. Bea's selection of soil characteristics (1x10(-8) to 1x10(-9)/psf) was corroborated by calculations identified by Lambe and Whitman where the coefficient of volume change with a constrained modulus was defined by the equation Mv = 1/D.[92]   Calculations established by Lambe and Whitman show the symbol "D" in the compressibility equation as the dilatational modulus.  The importance of this

---

[89]  Ex. 35, SEEP Manual, p. 206.

[90]  *Id.*, p. 30.

[91]  *Id.*, pp. 30-31.

[92]  Ex. 5, *Soil Mechanics*, p. 157.

equation is brought forth by Lambe and Whitman when they expressly recognize that "water is only relatively incompressible;" the result being that the "dilatational velocity through saturated soil is typically about 5,000 feet per second."[93]

Because a saturated soil (one with no air voids within the soil skeleton) behaves differently than an unsaturated soil (one with air voids within the soil skeleton), the dilatational velocity is "controlled by the compressibility of the pore phase and is affected little by the compressibility of the mineral skeleton."[94]  It is at this very juncture that the genesis of the differing expert positions can be seen. Dr. Bea has based his Mv "not on the storage coefficient but, rather, on the dilatational wave velocity that is sensitive to water compressibility." [95]  In essence, Dr. Bea and the Defense experts are "working different problems,"[96] which leads to drastically different results.

As illustrated below, and as will be proven at trial, Dr. Bea's utilization of the 1x10(-9)/psf property was appropriate and correct.  Dr. Bea performed his analyses consistent with long standing principles established by Lambe & Whitman based on **steady flow**.  "The 10 to the -9 was determined based on the soil-water dilatational modulus."[97]

### 3. *Dr. Bea's Steady Flow Analysis Utilized a Transient Loading Condition*

With appropriate engineering analyses confirmed and "modeled" soil inputs for the SEEP/W program confirmed by reference to the manual, Dr. Bea's final parameter would be the

---

[93]  *Id.*, p. 455.

[94]  *Id.*

[95]   Ex. 28, Bea Rebuttal Depo., pp. 34:3-21, 24:5-18.

[96]  *Id.*, pp. 51:10-52:15.

[97]  *Id.*, p. 23:3-7.

external stress (the storm surge) that would generate pore pressure transmission through soils beneath the phreatic surface. As already established, the two types of hydraulic conductivity analyses are **steady flow** and **non-steady flow**. As subsets of these two fundamental kinds of analyses, one "can have steady-state conditions or transient conditions."[98] In the study of fluid flow, the term "head" is utilized as the expression of the energy affecting the regime studied by an engineer. Total head (the sum of the pressure head and the elevation head) determines flow, because both pressure and elevation heads can contribute to the movement of fluid through soils.[99] Put simply, when a stress (or head) is applied to a soil, pore pressure builds. When the hydraulic loading conditions (boundary conditions) remain constant, a steady-state condition exists. When the hydraulic loading conditions change with time, a transient condition exists.[100]

Owing to the nature of hurricane storm surge (rising and falling surge water elevations), the real-world hydraulic loading conditions applied to the EBIA soils landscape are transient. Thus, the modeling of this loading condition in the SEEP/W analyses is classified as "time dependent, in the sense that the hydraulic loading conditions change over time."[101] One of the benefits of the SEEP/W program is that it allows the engineer to determine pressure without determining flow (pressure can be determined without having a molecule of water going from one side to the other) because the operator can either specify the pressure or flow as an input, and the output will still show pressure and flow.[102] To undertake such a study, Mr. Diego Cobos-

---

[98]  *Id.*, pp. 229:1-230:11, 17:1-14.

[99]  Ex. 5, *Soil Mechanics*, p. 252-3.

[100]  Ex. 28, Bea Rebuttal Depo., p. 228:4-19.

[101]  Ex. 36,  Cobos-Roa Depo., p. 213:14-16.

[102]  *Id.*, pp. 225:21-226:23.

Roa, Dr. Bea's computer modeling assistant, simulated a varying boundary condition over time to model the hurricane surge while still computing steady flow within the buried swamp/ marsh layer.[103] These "initial conditions [were] achieved by running steady state analysis... After that, [the model] performed a transient analysis." [104]

Once the computer modeling produced results, Dr. Bea utilized first principles hand calculations to verify the results.[105] These results proved a direct pressure communication between the high water elevation of the storm surge and the buried swamp/marsh layer in the EBIA. In the final analysis, it was Dr. Bea's opinion that this direct pressure communication led to the destructive failure of the EBIA floodwalls.

The modeled response of the soils within the buried swamp/marsh was further confirmed by Dr. Bea's analysis of the pressure head registered by piezometers during the summer of 2008.[106] After Hurricane Katrina, a series of piezometers were installed by the Corps of Engineers along the length of the EBIA floodwall. The PZ-3 series of four piezometers were installed in the vicinity of the north end of the South Breach site, with piezometer 3 installed on the EBIA waterside about 20 feet west (on the IHNC side) of the floodwall in such fashion as to sense and record the hydrologic response of the buried swamp marsh layer. In 2008, the peizometers recorded hydrological responses associated with two passing hurricanes, Gustav & Ike. Once the water rose to an elevation of +3 feet, the piezometers showed rapid responses to measured water elevations in the IHNC, proving that the buried swamp/marsh layer was in direct

---

[103] *Id.,* pp. 213:22 – 214:7.

[104] *Id.*, pp. 263:2-11.

[105] Ex. 21, Bea Depo., Vol. II, p. 197: l2-23.

[106] The pressure head or water pressure at a point in a soil mass is determined by a piezometer. The word "piezometer" literally means "pressure meter."

contact with the IHNC.  Similar results were recorded with piezometers installed at the south end of the North Breach.[107]

The fact that the piezometers rapidly respond only after the water in the canal is above the EBIA ground surface suggests that the main source of the hydraulic loading to the buried swamp/marsh layer was the remediated EBIA ground surface.  That the piezometers installed just on the landside levee toe showed no significant response indicates that the newer, deeper penetrating sheet piles have effectively isolated the buried swamp/marsh layer from the transmission of water pressures to the protected side.

To date, Dr. Bea has provided six justifications (or validations) of the fundamental approach he has used to determine the hydraulic conductivity uplift pressures.   Despite this presentation of overwhelming evidence, Defendants can only critique Dr. Bea's method of analysis by pointing out that their methodology achieved a different result.  But what should be clear is that the Defendants are working a different problem - one where the soil characteristics utilized for the buried swamp/marsh layer erroneously had air voids in it.

Dr. Bea's methodology identified a fully saturated soil condition within the buried swamp/marsh layer without voids in the soil skeletons.  Coincidentally, defense expert Dr. Marr concedes that the buried swamp/marsh layer is "essentially 100 percent" saturated.[108]  Such a condition influences the soils to behave in a nearly incompressible manner because pore pressures are transmitted instantaneously.

---

[107]  Ex.  8, Bea Expert Report, Appendix C, pp. 6-18.

[108]  Ex. 3, Marr Depo, Vol I, pp. 186:17-187:6.

Such a 100 percent saturated soil condition mandates the utilization of *steady flow* analyses to model the real-world conditions imparted on the buried swamp/marsh layer soils beneath the EBIA floodwall.

## V.   *Conclusion*

Defendants desire to avoid trial by striking Dr. Bea's testimony through their respective *Daubert* motions is understandable.  Both WGI and the United States want to avoid liability for their negligent excavation and backfill activities that were substantial factors in causing the North and South Breaches.  But all Defendants' motions have done is highlight the varying interpretations of the existing information by the parties' experts—including Defendants' own experts.  Their attacks go to the weight of Dr. Bea's opinions, not its admissibility.  The true question here is whose engineering judgment is correct.  And the answer is best reached through cross-examination at trial.  Accordingly, Defendants' Motions to Exclude the Testimony of Dr. Bea should be denied.

**Respectfully Submitted,**

**PLAINTIFFS LIAISON COUNSEL**

        /s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
Bruno & Bruno, LLP
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

**MR-GO   PLAINTIFFS   SUB   GROUP LITIGATION COMMITTEE**

Jonathan Andry (The Andry Law Firm, New Orleans, LA), Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL), James Parkerson Roy

32

(Domengeaux, Wright, et al., Lafayette, LA)

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a true and correct copy of the foregoing was served upon all counsel of record by ECF on May 21, 2012.

<u>/s/</u> Joseph M. Bruno