# EXHIBIT

# *25*

# Expert Report

### of

# Robert Glenn Bea, Ph.D., P.E.

For

**Katrina Canal Breaches Consolidated Litigation**

[Civil Action Number: 05-4182 "K" (2)]

United States District Court

Eastern District of Louisiana

Pertains to MR-GO, Armstrong [No. 10-866]

February 1, 2012

Robert G. Bea, under penalty of perjury, states as follows:

1.      This report summarizes work performed for the Katrina Canal Breaches Consolidated Litigation [USDC, E.D. La. No. 05-4182 "K" (2) Pertains to MR-GO (Mississippi River – Gulf Outlet), Armstrong (No. 10-866)] related to analyses of the U.S. Army Corps of Engineers (USACE) Inner Harbor Navigation Canal (IHNC) Lock Expansion Project East Bank Industrial Area (EBIA) engineering and site clearing excavations conducted by the Washington Group International (WGI) for the USACE on development of the North  Breach and South Breach at the Lower 9th Ward during hurricane Katrina.

2.      This Expert Report contains my forensic engineering findings, opinions and conclusions relative to the causes of the two breaches (North Breach and South Breach) that occurred in the New Orleans Hurricane Protection System (NOHPS) along the east bank of the Inner Harbor Navigation Canal (IHNC) adjacent to the Lower 9th Ward during Hurricane Katrina on August 29, 2005. If called to testify, I could and would testify competently as follows:

3.      My Expert Report is divided into four sections. Section I provides an overview of my qualifications to serve as an expert on the issues discussed herein. This section also provides a history of my involvement in forensic engineering studies of the failures in the NOHPS during Hurricane Katrina. Section II provides a summary of my engineering forensic analyses to determine the causes of the North Breach and South Breach at the Lower 9th Ward that developed during Hurricane Katrina. Section III provides a summary of my primary findings regarding the Engineering Standard of Care Requirements for excavations performed adjacent to flood protection structures. Section IV summarizes the primary conclusions reached as a result of these analyses. Section V provides the references cited in this report. The following table of contents will serve as a guide to help reading this Expert Report.

publications. This includes 22 refereed journal and conference papers that have addressed engineering and organizational causes of the major breaches that developed in the Greater New Orleans Area during Hurricane Katrina.

17.     I have been recognized by the National Academy of Engineering, the International Energy Center, the Academy of Management, the American Society of Civil Engineers (ASCE), and American Society of Mechanical Engineers (ASME) for my pioneering contributions to development and application of advanced methods for risk assessment and management including human, organizational, and institutional factors.

18.     In May 2007, I received the first University of California Berkeley Chancellor's award for research in the public interest for my work in development of understanding of the causes of the failure of the flood protection system for Greater New Orleans and for my proposals for preventing and mitigating such failures in the future. In December 2007, I received a Proclamation from the New Orleans City Council in gratitude for "research and efforts in promotion flood protection and to aid in the recovery of New Orleans and Louisiana." On April 5, 2011, I received a Certificate of Recognition from the United States Senate "In Honor and Appreciation for the help you have provided to the people of Louisiana during disasters resulting from hurricanes, the Gulf Coast Oil Spill, and the Oil Moratorium."

19.     I am a registered professional civil, structural, and geotechnical engineer (retired) in Louisiana, Texas, Florida, California, Washington, Oregon, and Alaska.

20.     Additional information regarding my qualifications to perform these forensic engineering investigations is contained in my 2012 Vita (Appendix A).

53.    The effects of these site remediation activities clearly extended well below the specified soil excavation levels cited earlier. Removal of barges, piles, underground storage tanks, and underground utilities (e.g. sewer, water, gas lines) reached and substantially exceeded elevations of -10 feet to -25 feet (NAVD88); thus intersecting the underlying marsh deposits. When backfilled with porous – pervious – materials, hydraulic 'connections' would be developed between the backfilled excavations and the buried pervious – permeable marsh and swamp layers. Given the substantial number of excavations developed by WGI during its removal of surface (e.g. building foundations) and subsurface (piling, pipelines, storage tanks) obstructions and during removal of highly polluted soils that extended to significant depths (Figures 33a and 33b), the surface soils of the EBIA became like Swiss cheeze or an intensely bombed battlefield riddled with deep holes. When these excavations were backfilled with very porous soils (e.g. sands, shells, uncompacted native soils), and in some cases not backfilled at all (e.g. holes remaining after piling extractions, Morris 2011), the entire community of excavations provided an substantial number of hydraulic connections with the buried water conductive swamp – marsh deposits. When the waters in the IHNC were able to flood the surface of the EBIA, these hydraulic connections facilitated seepage and hydraulic pressures that had important negative effects on the integrity of the hurricane flood protection structures at the Lower 9th Ward.

65.     During this phase of my investigation (March 2011 – January 2012), a substantial amount of 'new' information has been provided by the Department of Justice and Washington Group International (WGI). This new information has provided additional important insights into the characteristics of the soils and floodwall at the study locations. Earlier studies and current detailed studies of this new information have identified important 'gaps' in the available information (Rogers 2012; Morris 2011; Bea 2008a, 2009a). Recently (January 16, 2012), additional information on the EBIA site clearing activities was produced by the Department of Justice. Future developments in this investigation may provide additional opportunities to obtain and review additional information that pertains to the soil and floodwall characteristics at the study locations. I reserve the right to revise my analyses and conclusions based on the additional information that could be developed from future document productions.

66.     In addition, during this phase of my investigation, an extensive program of soil sampling and laboratory testing and field testing was conducted at the Lower 9th Ward during the Summer and Fall of 2011 (Rogers 2012; Fugro Consultants Inc. 2011). This testing provided very important information which has been used to characterize the performance characteristics of the soils; particularly, the information that has been developed from the in situ testing performed to determine the hydraulic conductivity properties of the swamp – marsh deposits that underlie the floodwall and other areas in the Lower 9th Ward. Due to the cost-sharing agreement developed between the Plaintiffs and Defense, I have had access only to the testing work performed at the request of the Plaintiffs' experts. In addition, at this time the testing contractor, Fugro Consultants Inc., has not produced a satisfactory final report detailing the testing performed for the Plaintiffs. As additional information becomes available from the work performed for the Defense and from the work performed by Fugro Inc. for the Plaintiffs, I

reserve the right to revise these analyses and conclusions based on the additional information that would be developed from these potential future sources.

67.     This phase of my investigation has benefited from a large amount of new information that has become available as a result of the document productions and laboratory and field testing. One key insight provided by this new information, is that the current soil conditions and characteristics at the three study locations have changed in important ways since Hurricane Katrina. Construction and re-construction of the temporary levees that provided interim protection after Hurricane Katrina had important effects on the soil conditions. In addition, construction of the new levee – floodwall structure that currently provides hurricane protection for the Lower 9th Ward has had similar effects (Rogers 2012).

68.     Another important insight provided by this information regards the significant uncertainties associated with the soil – floodwall structure characteristics at the three study locations (Bea 1990, 2000, 2005, 2006, 2009, 2011). Part of this variability is 'natural' or inherent (Type 1, aleatory); it is associated with the complex geologic and anthropogenic processes that have influenced the in situ soil – floodwall characteristics. This category of uncertainty is fundamentally 'information insensitive' – in practical terms, the uncertainties cannot be impacted significantly by gathering additional information.

69.     Part of this uncertainty is due to the lack of sufficient information to define the soil, levee, floodwall characteristics in 'deterministic' ways; this uncertainty is due to the lack of knowledge concerning the characteristics (Type 4, knowledge development and utilization). This category of uncertainty is 'information sensitive' – efforts to gather additional information can impact this category of uncertainty.

70.     Another part of this uncertainty is due to 'imperfections' embedded in analytical models (Type 2 – model, parametric, state uncertainties, epistemic). These imperfections are based on those associated with analytical inputs, processing, and outputs. These uncertainties are also information sensitive. During this investigation, the Type 2 uncertainties have been addressed by developing 'validations' of the analytical models. These validations involve comparing results from the analytical models that reflect inputs, processing, and outputs with results from 'field tests'. The comparisons characterize the analytical model uncertainties in the form of 'Bias' – the ratio of the true or observed characteristics in the field with the nominal characteristics that result from the analytical models. In this work, the objective has been to develop and employ analytical models that are 'un-Biased'; on the average, the results from the analytical models are the same as the results from the field tests (experiments, observations).

71.     These categories of uncertainties have been addressed explicitly during this investigation using two basic approaches. The first approach was to develop two sets of analytical cross-section characterizations at the three locations. This approach was intended to address the knowledge (Type 4) uncertainties associated with the limited information (knowledge) on the soil, levee, and floodwall characteristics that existed at the time of Hurricane Katrina. These characterizations have been identified as Case 1 and Case 2. Based on the information currently available and given the uncertainties described herein, these two sets of analysis cross-sections are reasonable representations of the geotechnical and floodwall conditions that existed at the three analysis sites at the time of Hurricane Katrina. The Case 1 cross-sections were developed primarily with inductive analyses of the available information. The Case 2 cross-sections were developed primarily through the use of deductive analyses of the

79.     Identification of these 'best judgment' cases took account of the different types of uncertainties and 'biases' that forensic engineering investigations of failures must address (ASCE 1989; Bea 2011), performance characteristics at the breach and near breach sites at the Lower 9th Ward, and detailed studies of the recent information produced by the U.S. Government and WGI concerning the EBIA site clearing activities and subsequent work performed by the USACE at the Lower 9th Ward following Hurricane Katrina. Results from my forensic engineering analyses of these 'best judgment' cases will be summarized in the next sections of this report.

80.     Results for all of the cases and parameters analyzed during this phase of my investigation are summarized in Appendix D. The plausible ranges in the important soil characteristics were analyzed to determine the 'sensitivities' of the results from the floodwall – levee performance analyses. These 'sensitivity' analyses enabled identification of the important parameters in the analytical models that developed primary influences on the floodwall performance characteristics. Also, this enabled development of an understanding of the potential 'error rates' associated with results from these analyses (Kardon, Bea, and Williamson 2006).

81.     Two fundamental types of 'two-dimensional' (2D, planar), 'nonlinear' (referring to the soil stress – strain, force – deformation characteristics), 'static' (time durations of load – force application are long relative to the dynamic response characteristics of the soil-structure systems so 'dynamic' mass and damping effects are not introduced), 'anisotropic' (different horizontal and vertical soil properties) numerical analyses were performed as part of my forensic engineering investigation analyses (Appendix D; Cobos-Roa and Grunauer, 2011, 2012). These two fundamental types of analytical models were developed to investigate two inter-related and interactive modes of failure development: (1) hydraulic conductivity analyses to determine

74

88.    As summarized in Appendix B, the Case 2-1 cross-section (Figure 44) is based on study and analysis of the available documents that detail the EBIA site clearing activities and excavations, available information on the design and construction of the flood protection structures at the Lower 9th Ward, and information on the geologic and geotechnical characteristics of soils in the vicinity of the Lower 9th Ward (Rogers 2012, Morris 2011).

89.    Both of these cross-sections are representations of the features and characteristics that existed at the North Breach site at the time of Hurricane Katrina. The analytical results from the analyses of these two cross-sections based on the 'best estimate' hydraulic and soil behavior characteristics produce results – breach development characteristics that are corroborated with the currently available evidence including in-field observations conducted by myself and my colleagues, photographic evidence, eyewitness testimony, interior flooding hydrographs and analyses of this flooding, stopped clock data, and results from other detailed forensic engineering studies of these breaches (ILIT 2006, IPET 2007, Team Louisiana 2006, Seed et al 2008a, 2008b, 2—8c, 2008d).



Figure 43: North Breach cross-section Case 1-1.



Figure 44: North Breach cross section Case 2-1.

90.     As summarized in Figures 45 through 48, the Case 1-1 (Figure 45) and Case 2-1 (Figure 46) hydraulic conductivity analyses result in vertical hydraulic gradients between 0.7 and 0.8 between 3:00 and 6:00 AM (CDT) on August 29, 2005 (Figure 47), corresponding to a canal surge water elevation between +8 and +10 feet (NAVD88). Uplift Factors-of-Safety for both cases also show high failure potential (Factors-of-Safety equal to or less than unity) at approximately 4:00 AM (Figure 48).

91.     Hydraulic conductivity results from the two 'best judgment' cross sections indicate very similar outcomes; very high likelihoods of hydraulically induced failure of the floodwall at the North Breach site during Hurricane Katrina. These conditions coincide with the estimated times of failure determined as a result of the investigations performed by ILIT (2006), IPET (2007), Team Louisiana (2006, Cobos-Roa and Bea (2008), and Bea (2008a, 2009a).



Figure 45: Computed vertical seepage gradients for North Breach Case 1-1 for an IHNC water surface elevation (WSE) of 9 feet. Contours show vertical gradients in 0.1 increments.



Figure 46: Computed vertical seepage gradients for North Breach Case 2-1 for an IHNC water surface elevation (WSE) of 9 feet. Contours show vertical gradients in 0.1 increments.



Figure 47: Time based developments of critical vertical seepage gradients for the North Breach Case 1-1 and Case 2-1 (IHNC surge water surface elevations as a function of time are shown in Figure 2).



Figure 48: Time based developments of uplift Factor-of-Safety for the North Breach Case 1-1 and Case 2-1 (IHNC surge water surface elevations as a function of time are shown in Figure 2).

92.    Coupled hydraulic conductivity – limit equilibrium lateral stability analysis results for the North Breach site Case 1-1 and Case 2-1 (Figure 49) shows a decreasing static factor of safety dropping below unity at a canal surge water elevation of +8 feet that develops at approximately 3:00 AM. Based on results from the limit equilibrium lateral stability analyses, Figure 50 shows a typical lateral instability failure surface developed at the North Breach site.



Figure 56: Near Breach cross-section Case 1-1.



Figure 57: Near Breach cross-section Case 1-2.

98.     The analyses performed for the Near Breach section adjacent to the flooded McDonough Marine EBIA flooded remediation borrow pit resulted in much lower probabilities of hydraulic failure for both of the cases analyzed (Cases 1-1 and 1-2). The critical vertical hydraulic gradients were less than 0.1 (Figure 58 and Figure 59) and the hydraulic uplift Factors-

of-Safety greater than 1.6 for the maximum conditions experienced during Hurricane Katrina (Figure 60).



Figure 58: Computed vertical seepage gradients for Near Breach Case 1-1 and an IHNC surge water elevation of +14 feet. Contours show vertical gradients in 0.1 increments.



Figure 59: Critical vertical hydraulic gradients for the Near Breach cross-sections Case 1-1 and Case 1-2.



Figure 64: South Breach cross section Case 2-1.

103.   Both of these cross-sections are representations of the features and characteristics that existed at the South Breach site at the time of Hurricane Katrina. The analytical results from the analyses of these two cross-sections based on the 'best estimate' hydraulic and soil behavior characteristics produce results – breach development characteristics that are corroborated with the currently available evidence including in-field observations conducted by myself and my colleagues, photographic evidence, eyewitness testimony, interior flooding hydrographs and analyses of this flooding, stopped clock data, and results from other detailed forensic engineering studies of these breaches.

104.   As summarized in Figures 65 through 68, the Case 1-1 (Figure 65) and Case 2-1 (Figure 66) hydraulic conductivity analyses result in vertical hydraulic gradients between 0.8 (Case 1-1) and 0.5 (Case 2-1) between 8:00 and 9:00 AM (CDT) on August 29, 2005 (Figure

67), corresponding to a canal surge water elevation between +13.8 and +14.2 feet (NAVD88). Uplift Factors-of-Safety also show high failure potential; for Case 1-1 the Factor-of-Safety is less than 1.0 and for Case 1-2 the Factor-of-Safety is less than 1.2 at approximately 8:00 AM (Figure 68).



Figure 65: Computed vertical seepage gradients for South Breach Case 1-1 for an IHNC surge water surface elevation (WSE) of +14 feet. Contours show vertical gradients in 0.1 increments.



Figure 66: Computed vertical seepage gradients for South Breach Case 2-1 for an IHNC surge water surface elevation (WSE) of +14 feet. Contours show vertical gradients in 0.1 increments.



Figure 67: Time based developments of critical vertical seepage gradients for the South Breach Case 1-1 and Case 2-1 (IHNC surge water surface elevations as a function of time are shown in Figure 2).



Figure 68: Time based developments of uplift Factor-of-Safety for the South Breach Case 1-1 and Case 2-1 (IHNC surge water surface elevations as a function of time are shown in Figure 2)