# EXHIBIT 30

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES        CIVIL ACTION

CONSOLIDATED LITIGATION              NO. 05-4182 K2

                                     JUDGE DUVAL

PERTAINS TO MRGO                     MAG. WILKINSON

FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,

          05-6314, 05-6324, 05-6327, 05-6359,

          06-0225, 06-0886, 06-1885, 06-2152,

          06-2278, 06-2287, 06-2824, 06-4024,

          06-4065, 06-4066, 06-4389, 06-4634,

          06-4931, 06-5032, 06-5155, 06-5159,

          06-5156, 06-5162, 06-5260, 06-5771,

          06-5786, 06-5937, 07-0206, 07-0621,

          07-1073, 07-1271, 07-1285

                      *   *   *

                   (V O L U M E  I)

        Deposition of ROBERT G. BEA, PH.D.,

given at the offices of Stone Pigman Walther

Wittmann, LLC, 546 Carondelet Street, New

Orleans, Louisiana 70130, on March 27th, 2012.

REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

 1   professor for geotechnical engineering; right?
 2       A.   That's correct.
 3       Q.   Have you taught courses in
 4   geotechnical engineering or soil mechanics at
 5   UC Berkeley?
 6       A.   I have taught parts of courses.  I
 7   haven't had responsibility for the entire
 8   course.
 9       Q.   When you say parts of courses, can you
10   be specific?
11       A.   Certainly.
12       Q.   Not lengthily specific, but specific.
13       A.   As an example, I have extensive --
14            MR. STEVENS:
15                 Object to the form of the
16            question.  You're handcuffing the
17            witness.  Don't handcuff the witness,
18            Mr. Treeby.
19            MR. TREEBY:
20                 I'll give the keys to the
21            handcuffs, doctor.
22       A.   An example would be the design of deep
23   foundations, pile foundations.  I have
24   extensive experience in that area.  In fact, it
25   started here in New Orleans where the design of

```
 1              The second place are, is in the
 2   engineering report we wrote for the canals
 3   litigation in which I performed similar kinds
 4   of analyses.
 5              To the best of my knowledge, that's
 6   the two places the results are published.
 7       Q.   Okay.  And you used the word results.
 8   I'm asking about the actual hand calculations.
 9              Do we have any of those?
10       A.   No, you don't.  The only one that
11   still exists is the one I cited.
12       Q.   Isn't one you cited?
13       A.   Is the one I cited.
14       Q.   Is the one you cited.
15       A.   Yes, sir.
16       Q.   I want a copy of that.  It's
17   apparently not in the reliance materials, and
18   we want a copy of that.
19       A.   I will be pleased to provide it.  It's
20   sitting to the right hand of my desk at home.
21       Q.   So the actual calculations that we
22   have been given, to date, to the extent we have
23   been given them, are the computer -- what you
24   call the electronic digital calculations done
25   by Diego Cobos-Roa, Xavier Vera-Grunauer or
```

1   my first question was, That you have no role in
2   determining whether Mr. Cobos-Roa is awarded a
3   doctorate degree from UC Berkeley.  And you
4   say, not correct.  And then I asked you, Then
5   that, means you do have a role.  And you said,
6   Well, no, I don't -- so I'm confused.
7       A.   I apologize for confusion.  I'm
8   sponsoring a portion of the research that he
9   does.  That has a determinant ability on his
10  ability to support himself while he's
11  conducting his Ph.D. work.  So as a research
12  sponsor and adviser, that is a determining role
13  in the conduct of his program.  I Have no
14  determining role in approving his dissertation.
15      Q.   Tell us what qualifications you
16  personally know of that Mr. Cobos-Roa has that
17  would allow him to perform electronic digital
18  flow analyses?
19      A.   He's taken the full suite courses at
20  the University of California at Berkeley.  He
21  was one of the first arrivals here following
22  Katrina.  I think he was here along with
23  Dr. Silva-Tulla in that earlier campaign.  So
24  he was part of the forensic engineering soils
25  testing we did here, as well.

```
 1            17th Street Canal gave us some of the
 2    early alerts relative to hydraulic conductivity
 3    effects.  He was in the field that day.  I
 4    followed him quickly.
 5            And then, as we began analyzing the
 6    breaches in more detail he became a member of
 7    that effort through the Independent Levee
 8    Investigation Team that was also occupying
 9    Dr. Rune Storesund and Dr. Grunauer.
10            Then, he carried forward,
11    continuously, through the litigation work that
12    started I think I called it Phase III in 2007.
13            So he's been continuously performing
14    these kinds of studies during that entire time.
15       Q.   Maybe my question wasn't clear.  I
16    understand he's had experience here in New
17    Orleans since Katrina.
18       A.   Yes.
19       Q.   My question was what qualifications he
20    had.  One thing you said was that he had taken
21    the full suite of courses at U Cal Berkeley.
22       A.   Correct.
23       Q.   And it was that course work that
24    qualified him, is that --
25       A.   No, it's a combination of those
```

1  things.  The course work gives us basic
2  understanding of the physics and mechanics.
3  Professor Raymond Seed was one of his
4  instructors.  Professor Jonathan Bray.  So
5  that's the course work background.
6           The next one is field work, performing
7  borings, observing hydraulic responses.
8           And the third one is what I call the
9  crucible of the previous two, and that's doing
10 forensic engineering study on breaches.  So
11 that we're able to bring that entire suite of
12 tools, knowledge, technology, to its pinnacle
13 challenge, which is to understand these complex
14 soil structure interaction issues.  That's what
15 qualifies Mr., to be doctor, Cobos-Roa.
16     Q.   Are you personally experienced using
17 the digital tools that Mr. Cobos-Roa used in
18 the work he did in this case?  And I'm not
19 talking about 17th Street Canal, I'm talking
20 about this case.
21     A.   Only to the extent of understanding
22 what's documented in the user's manual that
23 becomes a road map for users of these general
24 purpose flow analyses tools, such as SEEP/W
25 that was used in our analysis.  So I'm familiar

```
 1   with the contents of those manuals.  I don't
 2   perform the calculations personally, but
 3   Dr. Cobos-Roa -- pardon me, to be Dr. Cobos-Roa
 4   and I would be discussing analyses.
 5           At that point, we would decide on how
 6   to approach the analyses, and then he would do
 7   the input, the processing and the output, bring
 8   that back to me for verification.  That's where
 9   my hand calculations become important, to make
10   sure the computer is not telling fibs.  Once we
11   got closure on that, we go to the next problem.
12   So it's done interactively.
13        Q.   Was Mr. Cobos-Roa paid for any of his
14   work in this case?
15        A.   Yes.
16        Q.   How much?
17        A.   I have no idea.
18        Q.   By whom was he paid?
19        A.   By the, um -- legal teams that we were
20   representing.  He was paid directly by those
21   teams.  I had no influence or effect on his
22   payment.
23        Q.   So he had a separate contract with the
24   lawyers, is that it?
25        A.   That's correct.
```

```
 1     A.   I do not know.
 2     Q.   What if any work did GeoEstudios S.A.
 3   perform on this case?
 4     A.   Well, both Dr. Grunauer and
 5   Mr. Cobos-Roa are members of GeoEstudios and
 6   both have participated in this work.
 7     Q.   Do you know how much GeoEstudios was
 8   paid for work in this case?
 9     A.   No, I don't.
10     Q.   Do you know if it has a contract with
11   any of the attorneys in this case?
12     A.   I do not know any of the contractual
13   arrangements between Mr. Cobos-Roa and
14   Dr. Grunauer.
15     Q.   You said that earlier, but I'm asking
16   about GeoEstudios S.A., that entity.
17     A.   I don't know.
18     Q.   Was there any particular reason you
19   selected GeoEstudios S.A. over any other firm
20   to perform work in this case?
21     A.   Yes.
22     Q.   What is it?
23     A.   They're uniquely qualified by the
24   experience, knowledge and training of
25   Dr. Grunauer and Mr. Cobos-Roa.
```

```
 1   page numbers are up at the top.  You there?
 2        A.   Yes.
 3        Q.   Right under the figure, the paragraph
 4   reads, As noted, the seepage-pore pressure -
 5   uplift pressure analyses employed a very wide
 6   range in hydraulic conductivity of the varied
 7   marsh-swamp layers, 10 to the -2 centimeters to
 8   10 to the -6 centimeters per second, four
 9   orders of magnitude.  For this entire range of
10   hydraulic conductivity, the transient water
11   pressures developed at the time of breach
12   development were within 70 percent to
13   80 percent of the sediment steady state
14   conditions.  The results are relatively
15   insensitive to a plausible range in hydraulic
16   conductivity.
17             You see that statement?
18        A.   Yes, sir.
19        Q.   Did that puzzle you?
20        A.   For a while.
21        Q.   What?
22        A.   For a while.  But then we came to
23   understand it.
24        Q.   Despite the statement we just read in
25   Bea Exhibit number 7, in the remainder of that
```

 1   compressible.
 2       Q.   Well, do you say that these soils are
 3   not compressible?
 4       A.   The non compressibility that we're
 5   referring to is associated with the swamp --
 6   buried swamp-marsh layers.  Given the time
 7   duration of the applied hydraulic loadings,
 8   there is not time for consolidation or
 9   expansion which affects void ratio.  That's
10   just where the process starts.
11       Q.   Now, let me get an answer to my
12   question.
13       A.   I'm sorry.
14       Q.   Are you saying that these organic
15   soils in the swamp-marsh layer, to use your
16   terminology, are not compressible?
17       A.   They're compressible if you provide it
18   time and boundary conditions to allow them to
19   consolidate.
20       Q.   Were the other clays that were in
21   these soils in the East Bank Industrial Area,
22   as demonstrated by all the soils tests that
23   were done, were these also modeled by you as
24   incompressible?
25       A.   At or below the phreatic surface, the

 1   this sentence?
 2        A.   Nearby are those excavations that are
 3   close to the floodwall.  And close to depends
 4   on the loading conditions.  Earlier, we were
 5   talking about the hand calculations I had
 6   performed.  The hand calculations that I had
 7   performed were intended to provide insight as
 8   to a distance effect on the conduct of
 9   pressure.
10             If you're close, the effects are
11   large, including tension cracks.  If you are
12   very distant, they are not as large, but that
13   has to be said carefully depending on what's
14   around the area that can provide hydraulic
15   connections.
16        Q.   Okay.  How far is nearby from the
17   floodwall?  All you've told me is nearby is the
18   same as close to.
19        A.   500 feet.  A few hundred feet.
20        Q.   Anything within 500 feet.
21        A.   Has a important effect on the
22   pressures exerted on the protected side of the
23   floodwall.
24        Q.   So that would be every excavation in
25   the East Bank Industrial Area, then, because I