# EXHIBIT 36

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Armstrong*, No. 10-866 | § | |
| | § | |

**DECLARATION OF THOMAS L. BRANDON, Ph. D., P.E.**

I, Thomas L. Brandon, declare as follows:

1. I am the Director of the W. C. English Geotechnical Engineering Research Laboratory and an Associate Professor of Civil and Environmental Engineering at Virginia Tech.

2. I have examined the GEO-SLOPE[1] (SEEP/W and SLOPE/W) files provided by the plaintiffs that summarize their analyses regarding the behavior of the I-walls at the IHNC during Hurricane Katrina. I feel that I am qualified to provide an expert review of their data files and results because of the following reasons:

- I have taught seepage analysis and slope stability analysis to undergraduate and graduate students for the past 27 years.
- I have been an active licensed user of different versions of SLOPE/W and SEEP/W for many years.
- I have taught short courses for engineering firms and government groups in the proper use of SLOPE/W and SEEP/W for engineering projects.
- I have had an active geotechnical engineering consulting practice in reviewing SLOPE/W and SEEP/W files and results for quality control and quality assurance purposes. The bulk of these assessments has been on I-walls, levees, and earth dams.
- I have been involved in the development of current procedures for analyzing and designing I-walls adopted by the US Army Corps of Engineers.

3. The files provided by the plaintiffs were for four north breach cross sections, four south breach cross sections, and two "near breach" cross sections. The individual files that I examined are listed in Table 1, following the naming procedure adopted by the plaintiffs.

---

[1] GEO-SLOPE International Ltd., 1400, 633 - 6th Avenue S.W., Calgary, Alberta, T2P 2Y5, Canada

Table 1  SEEP/W and SLOPE/W files analyzed.

| | | |
|---|---|---|
| North Breach | Case I | Upper Bound |
| North Breach | Case I | Lower Bound |
| North Breach | Case 2 | Upper Bound |
| North Breach | Case 2 | Lower Bound |
| South Breach | Case I | Upper Bound |
| South Breach | Case I | Lower Bound |
| South Breach | Case 2 | Upper Bound |
| South Breach | Case 2 | Lower Bound |
| No Fail | Case I | Upper Bound |
| No Fail | Case I | Lower Bound |

4. One GeoStudio file, the parent file of a set of analyses, contains the results of at least one steady state seepage analysis, about 27 separate stages of a transient seepage analysis, and 27 slope stability analyses.  I only examined the files with the "marsh" permeability of $1 \times 10^{-5}$ cm/sec.  Other files were provided to us with marsh permeability values of $1 \times 10^{-4}$ cm/sec and $1 \times 10^{-6}$ cm/sec, and other files had the probability function activated.  These files were not evaluated due to time constraints.

5. My analyses were not assessed based on the validity of the geotechnical engineering properties that were assigned to the soil layers or on the determination of the soil layering.  They were based on the correctness of the analysis.  In other words, if a qualified engineer experienced in performing seepage and slope stability analysis had been tasked to perform the same analyses using the same properties, would they obtain the same answers as reported by Robert Bea and his student?

6. It is clear that the analyses presented by Bea in his reports are so rife with errors that the resulting hydraulic gradients and factors of safety are invalid.  In this declaration, only the major errors are presented in detail; however, there are dozens of other additional, significant errors in the analyses that greatly impact his results.

**Failure to find critical failure surface**

7. A key part of performing slope stability analyses is determining the critical failure surfaces.  The critical failure surface will yield the lowest factor of safety, and the lowest value factor of safety value is the appropriate value to report[2].  Commercial slope-stability programs, including SLOPE/W, have numerous options to describe the failure surfaces and iterative methods to determine the failure surface that results in the minimum factor of safety.  It is clear that the student who performed the analyses for the plaintiffs, was inexperienced in doing these types of analyses, and the results contain serious errors.

---

[2] Duncan, J.M. and Wright, S.G. (2005), *Soil Strength and Slope Stability*, John Wiley & Sons, Inc.  Hoboken, NJ.

8.  Using the data files as provided by the plaintiffs, I performed a rudimentary search for the critical failure surface (lowest factor of safety). These results are shown in Table 2. Most often, these searches were done using circular failure surfaces, which are known to provide higher factors of safety than non-circular failure surfaces[3].

9.  It is clear from the results shown in Table 2 that the plaintiffs did not correctly find the critical failure surface and the minimum factor of safety. The percent difference in the results produced by Bea and that obtained after performing a basic search ranged from 4% to 58%. If I had taken the time to perform a more thorough search, the differences would probably have been even greater.

Table 2   Factor of Safety (FS) values reported by Bea compared to those obtained by Brandon for searching for the minimum factor of safety. The values of factor of safety were those calculated for the last time step (97,200 seconds), corresponding to a canal water elevation of 14 ft.

| Cross section | | | FS Bea | FS Brandon | % Difference |
|---|---|---|---|---|---|
| North Breach | Case I | Upper Bound | 0.888 | 0.689 | 29% |
| North Breach | Case I | Lower Bound | 1.307 | 0.915 | 43% |
| North Breach | Case 2 | Upper Bound | 0.491 | 0.471 | 4% |
| North Breach | Case 2 | Lower Bound | 1.245 | 0.787 | 58% |
| South Breach | Case I | Upper Bound | 0.929 | 0.612 | 52% |
| South Breach | Case I | Lower Bound | 1.202 | 0.875 | 37% |
| South Breach | Case 2 | Upper Bound | 0.945 | 0.718 | 32% |
| South Breach | Case 2 | Lower Bound | 1.208 | 1.064 | 14% |
| No Fail | Case I | Upper Bound | 1.124 | 1.046 | 7% |
| No Fail | Case I | Lower Bound | 1.274 | 1.137 | 12% |

10. The values shown in Table 2 above are just for the last step of the analysis, corresponding to a canal water elevation of 14 ft. However, a thorough search for the critical failure surface is required for all of the individual analysis steps. In many cases, especially for the North Breach failure area, Bea bases his time of failure on factor-of-safety values determined for intermediate canal water levels.

11. The implications of this error are significant. First, it means that the times-to-failure for virtually all sections would be less than reported by Bea. Second, the canal water elevation where failure occurs would also be substantially less than that reported by Bea. In particular, the soil-strength parameters chosen by Bea for the South Breach indicate that failure occurred at a canal water elevation below 14 ft. However, the factors of safety shown in Table 2 just correct only one of many categories of errors in Bea's analyses. If all of the errors were corrected, the final factors of safety and the percent difference from what Bea reported would likely be different from the values shown in the table.

---

[3] Brandon, Thomas L. (2012), Technical Report to Katrina Canal Breaches Consolidated Litigation [Civil Action Number: 05-4182 "K" (2)] United States District Court Eastern District of Louisiana, Pertains to *Armstrong*, C.A. [No. 10-866], March 8, 2012.

3

**Subsurface Void in North Breach Sections**

12. The defendants' experts uncovered a serious error in the North Breach cross sections. It was not possible to discern this error from simple visual inspection of the cross sections, since its discovery required magnification of certain portions of the cross section. Figure 1a shows a screen shot of the North Breach Case 1 Lower Bound cross section. Circled on the cross section is the boundary between the Jourdan Avenue Canal fill material, the clay fill, the toe fill, and the "marsh" layer, as modeled by Bea. Figure 1b shows the circled area greatly magnified. A void can be observed between the Jourdan Avenue Canal fill and the neighboring soils, shown as the white area in the center of the figure. Although this error might appear to be slight if judged by the size shown in the graphical depiction, the numerical difference is considerable.

13. The void acts similar to a "seepage block," and increases the hydraulic gradient and decrease the factor of safety. Using the North Breach Case 1 and Case 2 Lower Bound analyses as examples, the presence of this void decreased the factor of safety by 20% to 24%, and increased the hydraulic gradients by 30% to 50%.



Figure 1a  Screen capture of the North Breach Case 1 Lower Bound cross section.



Figure 1b  Magnified view of cross section shown in Figure 1a showing void.

14. There is no project information that indicates that a void is present at this location and Cobos-Roa testified that he did not intend to model a gap and that any gap in the model was a mistake[4]. If a void was indeed present, it would not be modeled in the manner as shown above. It would be necessary to assign hydraulic boundary conditions to the nodes surrounding the void in the finite element model in order for reasonable values of pore pressure and gradient to be obtained.

15. I am not sure how many sections contain voids such as that described above. Voids were verified in the North Breach Case 1 and Case 2 Lower Bound analyses. Voids may be present in other cross sections, but finding them is a lengthy process since they are well hidden in the data files.

**Incorrect Gap Force**

16. An important part of I-wall performance during Hurricane Katrina was the development of a gap between the I-wall and the canal-side embankment. This feature was described both by ILIT and IPET. Bea, in several declarations and depositions, has indicated the importance of incorporating a gap in the seepage and stability analyses.

17. The engineering calculations for determining the water pressure force acting on the wall are simple. The force depends only on the tip elevation of the sheet pile, the canal water elevation, and the unit weight of water. Since Bea indicates that the tip elevations of the sheet pile in his analyses are constant, then all sections should have the same force acting on the sheet pile in the gap for the same canal water elevation.

---

[4] Deposition of Diego Cobos-Roa at 285-86.

18. Bea's calculation of the gap forces is incorrect in all of his sections. The error ranges from his calculated gap force being from 13% to 17% too high to about 10% too low. No values used by Bea were correct. If the gap force used was too high, the resulting factor of safety can be expected to be too low. If the gap force was too low, the calculated factor of safety would be too high.

19. Errors in this calculation were obvious from initial inspection of his cross sections. Shown in Figure 2 is the analysis for North Breach Case II Lower Bound analysis. The blue arrows in the figure show the direction of water pressure forces. It can be seen that water pressures are acting on the wall from the land side of the I-wall. The water pressures should act only on the canal side of the I-wall.



Figure 2    Section for North Breach Case II Lower Bound analysis showing erroneous water pressure forces.

**Incorrect Application of Undrained Strength Ratio**

20. Bea reported that he used the concept of an undrained strength ratio (Su/p) to calculate the strength in the interdistributary clay[5]. For this method, the shear strength is assumed to be a portion, 26% in Bea's case, of the effective consolidation stress. Correct use of this procedure is a two-step process. First, the effective consolidation stress and the associated shear strength are calculated for the long term condition (low canal water level). Second, this undrained strength is used in the interdistributary clay for all subsequent higher canal water levels. In other words, the strength in the interdistributary clay does not change with changing canal water level.

21. In an attempt to use this technique, Bea's student used the SHANSEP option within SLOPE/W. Unfortunately, the student did not heed the warning on page 173 of the SLOPE/W manual:

> "Caution: In order to have the correct SHANSEP strength behavior, special care is required to make sure that the effective overburden stress in the soft clay layer is modeled correctly."

---
[5] Bea Appendix C, p. 40

6

22. The effective overburden stress was calculated incorrectly in Bea's models, resulting in a new effective stress and a new shear strength being calculated for each of the 27 canal water levels. The shear strength in the interdistributary clay was not constant. The net effect of this was that Bea used something numerically akin to a "drained" strength in the interdistributary clay, which is just as erroneous as using a drained strength in the organic clay (marsh).

23. It is not possible to accurately predict the significance of this error. In many cases, it seems that the undrained shear strength of the interdistributary clay would be underestimated, and the resulting factor of safety would be too low. As the canal water level increased, the magnitude of the error would increase. Stability analyses might show preferential failure surfaces through the interdistributary clay, when the actual failure surface might be located in the organic clay.

**Inconsistent Permeability of Jourdan Avenue Fill Material**

24. Bea includes a rectangle to represent the Jourdan Avenue Canal (or culvert) in all of his cross sections. He is unclear in the text of his reports about the permeability values that he assigned to this feature. However, the true permeability values used can be obtained by reviewing his SEEP/W files. Bea was not consistent on applying the same values of permeability for the failed sections (north and south breaches) and the "near failure" sections. The permeability assigned to the north and south breach Jourdan Avenue Canal fill materials was $1.64 \times 10^{-7}$ ft/sec. The permeability assigned to the "near failure" Jourdan Avenue Canal fill materials was $1.31 \times 10^{-6}$ ft/sec.

25. Assigning the Jourdan Avenue Canal fill material a lower permeability is similar to installing a "seepage block."[6] The lower permeability, used in a transient analysis as done by Bea, would serve to increase the pore pressures, decrease the calculated factor of safety, and increase the gradients. It is misleading to compare the performance of the north and south failed section with the "near breach" section if different permeabilities as used for the Jourdan Avenue Canal fill materials. If the same permeability was used for the fill materials in the "near breach" cross sections as in the north and south cross sections, the factor of safety would be decreased by about 10%. No reason for using a different permeability for the same physical feature in the different cross sections was provided by the plaintiffs. It seems likely that it was used to artificially increase the factor of safety of the "near breach" sections relative to the north and south breach sections.

**Additional Errors**

26. There are many additional significant errors that were found in the plaintiffs' analysis. It is likely that many other errors remain undiscovered in their data files. An incomplete list of examples of other errors is included below:

   a) The engineering parameters used in the cross sections are not consistent with the values provided in the reports nor with the values sent to us by Thomas Simms, one of the plaintiffs' attorneys. The values are not consistent section to section, nor are they consistent

---

[6] TM 3-424 "Investigation of Underseepage and Its Control," USACE 1956.

7

with the text labels used within SLOPE/W and SEEP/W to describe the different materials. Examples of the latter are shown in Figures 3a and 3b.  Figure 3a shows that the text within *Material Name* for the Jordan Canal [SIC] indicates a permeability of 1E-6 cm/sec (circled in red).  The text on the *Hyd. Conductivity Fn.* shows k=5E-05 cm/sec (circled in blue).  The user must click on the ellipsis next to the hydraulic conductivity function to determine the actual k used in the analysis.  That screen capture is shown in Figure 3b.  As shown in this figure, the actual permeability used was 1.64 x $10^{-7}$ ft/sec, which corresponds to 5 x $10^{-6}$ cm/sec.  The reviewer is shown three different values of permeability in only two screen pages!



Figure 3a  Screen capture from South Breach Case I Upper Bound Geo-Studio file.

8



Figure 3b   Screen capture of hydraulic conductivity function within SEEP/W for Jourdan Avenue Canal fill material.

- b) The hydraulic gradient is not calculated correctly or consistently with published guidelines (EM 1110-2-1913, TM 3-424, and others).
- c) The protected side hydraulic boundary conditions are not consistent with that described in the reports nor are they consistent from section to section.
- d) The presence of a gap is incorrectly applied to sections where a gap cannot be sustained owing to an effective stress cohesion equal to zero being assigned to the soil adjacent to the sheet pile.
- e) The "tension crack" function has been used incorrectly in an attempt to model the gap. The misuse of this function has the same effect as assuming a deeper sheet pile in many of the analyses.   This can be observed in Figure 1a and Figure 2, where the tension crack extends over six feet below the tip of the sheet pile.  This can greatly impact the calculated factors of safety.
- f) An artificially high phreatic surface results from the steady state seepage analysis, which is used as the starting point for the transient analysis.  The calculated phreatic surface should

9

       agree with field observations, which is below the ground surface.  This error is due primarily to improper protected-side hydraulic boundary conditions.

g) The gap exists prior to water reaching the levee embankment.  This is not plausible, and is not in agreement with what is stated in the text in Bea's reports.

h) The undrained strengths vary abruptly from toe to crest.  The variation should be gradual with horizontal distance, and should be proportional to the overburden stress.  This can be easily done in SLOPE/W.

i) Incorrect soil types are assigned between the steady state seepage analyses, the transient seepage analyses, and the slope stability analyses.  In other words, the soil type "changes" between analyses in some cases.

j) Not enough elements are used in the seepage analysis to obtain correct gradients.  In many cases, the protected side "blanket" was only one or two elements thick. The issues associated with this error are discussed in Duncan et al.[7]

27. Many of these errors are interrelated.  For example, if a wrong depth of tension crack was used, then an incorrect failure surface will be determined, regardless of the thoroughness of the search.  If a seepage block is falsely introduced into a cross section by incorporating a hidden void or a zone of low permeability, the pore pressures increase, and the critical failure surface might occur in a different soil layer than it would have occurred in for a correct analysis.

**Summary**

28. Based on my experience with reviewing seepage and slope stability results, I am qualified to assess the results presented by Bea as they would be assessed in the context of actual geotechnical engineering practice.  An engineering firm which submits a report with just a few of the errors described above would be severely criticized.  The firm would be justifiably faulted for not having an effective quality control program which failed to identify such errors.  In some cases, the firm might be allowed to resubmit the report with the errors corrected, at their cost, to salvage the report.

29. In my experience, if an engineering firm submitted a report containing errors of the magnitude and extent as contained in the analyses submitted by Bea, the firm would be dismissed, and would also lose the client's confidence in prior analyses that had been performed by the firm.  The submitted report with the mistakes made by Bea would clearly demonstrate that the firm had insufficient experience or aptitude to conduct seepage and slope stability analysis.  It would not be sensible to accept corrections from the firm because the client would not have any reasonable expectation of receiving reliable results from a firm that submitted a report so riddled with errors.   For every error that the reviewer might have found, many more might exist.

---

[7] Duncan, J. M.; O'Neil, B.; Brandon, T. L.; and VandenBerge, D. R. (2011), "Evaluation of Potential for Erosion in Levees and Levee Foundations," Report of a study performed by the Virginia Tech Center for Geotechnical Practice and Research, CGPR #64, 40 pages.

10

    30. Entrusting the SEEP/W and SLOPE/W analyses to a graduate student was a serious error in judgment. This error was compounded by not having his work reviewed by a qualified engineer, as routinely occurs in engineering practice.

    31. The errors described in this declaration cannot be classified as differences in opinions among experts. Plain and simple, these are just fundamental errors that might be expected from an inexperienced student doing analyses without appropriate supervision or engineering oversight. Geotechnical engineers of even modest aptitude and experience would have immediately recognized many of these overt errors.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 30, 2012.

*Thomas L. Brandon*
_____

Thomas L. Brandon, Ph.D., P.E.