**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Armstrong*, No. 10-866 | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION
TO EXCLUDE THE EXPERT TESTIMONY OF ROBERT GLENN BEA**

**TABLE OF CONTENTS**

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    DR. BEA'S OPINIONS ARE IRRELEVANT BECAUSE HE DID NOT ANALYZE THE
DESTABILIZING EFFECT, IF ANY, OF HOLES ACTUALLY DUG BY WGI BUT
INSTEAD ANALYZED THE EFFECT OF HYPOTHETICAL HOLES... . . . . . . . . . . . . . . . . . . . . . . . 3

        A.    DR. BEA'S IMPOSITION OF DEEP HOLES IN HIS CASE 1
CROSS-SECTIONS DOES NOT FIT THE FACTS... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.    DR. BEA'S NORTH-BREACH CASE 2 STUDY IS IRRELEVANT BECAUSE IT
DOES NOT ANALYZE ANY WGI EXCAVATION, AND IT IS UNRELIABLE
BECAUSE IT ANALYZES A WEDGE OF SHELL THAT IS EVEN DEEPER THAN
THE SHELL SOIL LOGGED AT BORING 81A... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.    DR. BEA'S SOUTH-BREACH CASE 2 AND NEAR-BREACH STUDIES LACK
EVIDENTIARY SUPPORT.... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    II.    DR. BEA'S OPINIONS REST ON INCOMPETENT COMPUTER MODELING AND JUNK
SCIENCE... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.    THE COMPUTER MODELING BY DIEGO COBOS-ROA DOES NOT PROVIDE A
RELIABLE BASIS FOR DR. BEA'S OPINIONS... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.    DR. BEA'S ABUSE OF THE PHYSICS OF FLUIDS FLOWING THROUGH POROUS
MEDIA MAKES HIS OPINIONS COMPLETELY UNRELIABLE AND THEREFORE
INADMISSIBLE... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## TABLE OF AUTHORITIES

### CASES

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
     509 U.S. 579, 589, 592, 597 (1993)............................................ 13, 14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
     43 F.3d 1311, 1319 (9th Cir. 1995)............................................... 13

*Kumho Tire Co. v. Carmichael,*
     526 U.S. 137, 149 (1999). ....................................................... 14

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
|              CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Armstrong*, No. 10-866 | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION**
**TO EXCLUDE THE EXPERT TESTIMONY OF ROBERT GLENN BEA**

In their Opposition the plaintiffs argue that Dr. Bea's cross-sections are reliable because he has reasoned that WGI dug holes where pools appear in post-flood photographs.  These photographs, and Dr. Bea's "inductive analysis" of them, provide the only evidentiary basis for the cross-sections on which his seepage and stability analyses rely.  Remarkably, the plaintiffs have "not yet discovered" any other evidence to support Dr. Bea's cross-sections, although they are continuing to "review . . . the existing documentation of WGI's site clearing activities to identify specific excavations or other activities that could have developed these unusual holes."[1]  Dr. Bea's "inductive analysis" involves no scientific methodology.  It consists of "Dr. Bea's conclusion, based upon these photographs and graphics detailed in his report and Appendix B, . . . [that] there is no other plausible explanation for how these uniquely deformed holes were created other than by

_____

[1]Plt. Opp. 13; *accord id.* at 19.

Katrina's storm surge eroding poorly backfilled excavations."[2]  "The photos and discussion in Dr. Bea's report and deposition," the plaintiffs say, "are [sufficient] evidence of WGI's excavation and remediation activity . . . ."[3]

Dr. Bea's seepage analysis can be relied on, the plaintiffs argue, because he adopted approaches described in Lambe and Whitman's *Soil Mechanics* and modeled the organic clay as incompressible according to the SEEP/W user's manual.  These arguments fail because Dr. Bea has misapplied the teachings of Lambe and Whitman and has ignored empirical data confirming that the organic-clay layer under the EBIA levee is in fact compressible.  There is nothing that warrants Dr. Bea's *ex hypothesi* assumption that the organic clay under the EBIA is incompressible.  Further, the plaintiffs do not even attempt to defend Dr. Bea's improper, scientifically indefensible assignment of "drained" strengths to the "undrained" organic clay under the levee.  His attempt to estimate drained strengths from Fugro's undrained-strength data amounts to "junk science" and, like his confusion of transient and steady-state analyses, renders his opinion testimony unreliable and of no benefit whatsoever to the Court as the trier of fact.

The "root issue here" is not, as the plaintiffs would have it, "whose engineering judgment is correct."[4]  Nor is this "about what caused" the breaches.[5]  The root issue here is *whether Dr. Bea's opinion testimony is relevant and sufficiently reliable to assist in determining whether holes dug by WGI did in fact cause the breaches.*  Because Dr. Bea has

---

[2]*Id.* at 12; *accord id.* at 19.

[3]*Id.* at 11.

[4]*Id.* at 24 (emphasis omitted).

[5]*Id.* at 1.

analyzed holes not dug by WGI and relies on *ipse dixit* and junk science to create and analyze his "idealized" cross-sections, his testimony is neither relevant nor reliable and must therefore be excluded.

**ARGUMENT**

**I.   DR. BEA'S OPINIONS ARE IRRELEVANT BECAUSE HE DID NOT ANALYZE THE DESTABILIZING EFFECT, IF ANY, OF HOLES ACTUALLY DUG BY WGI BUT INSTEAD ANALYZED THE EFFECT OF HYPOTHETICAL HOLES.**

**A. DR. BEA'S IMPOSITION OF DEEP HOLES IN HIS CASE 1 CROSS-SECTIONS DOES NOT FIT THE FACTS.**

The plaintiffs concede that certain post-Katrina photographs and Dr. Bea's interpretation of them are the only evidence that WGI dug the deep holes that Dr. Bea imposes on his "Case 1" cross-sections:  "The photos and discussion in Dr. Bea's report and deposition are evidence of WGI's excavation and remediation activity at Boland Marine."[6] "[H]e based his inductive analysis on a careful study of aerial and ground photographs and review of the processes that were active during Hurricane Katrina that could have developed these unusual holes," and concluded that "these holes were artifacts of poorly backfilled excavations" because, in his opinion, "there is no other plausible explanation for" them.[7]   The same explanation is given for the deep excavation in Dr. Bea's south-breach cross-sections:  "Dr. Bea based his inductive analyses of the South Breach on aerial and ground photographs and analyses of the processes that were active during Hurricane Katrina that could have developed these soil deformations at this location."[8]

---

[6]*Id.* at 11.

[7]*Id.* at 12.

[8]*Id.* at 19.

Those pictures, and Dr. Bea's interpretation of them, are all that support his opinion that WGI dug deep holes near the floodwall where it breached.  "Dr. Bea's deductive analysis involved (and continues to involve) review of the existing documentation of WGI's site clearing activities to identify specific excavations or other activities that could have developed these unusual holes at the North Breach" and the South Breach.[9]  Nearly five years after receiving the Task Order 26 documentation and more than three years after Dr. Bea testified under oath that WGI's excavations caused the IHNC breaches, the plaintiffs inform this Court that they are continuing to "review . . . the existing documentation of WGI's site clearing activities to identify specific excavations or other activities that could have developed these unusual holes" but "have not yet discovered documentation of an excavation" matching Dr. Bea's Case 1 excavations.[10]  This speaks for itself.

The plaintiffs apparently do not understand (or do not want the Court to recognize) that the absence of competent evidence supporting the deep excavations in Dr. Bea's cross-sections dooms their case.  The crux of Dr. Bea's opinion is that WGI's deep excavations, "backfilled with very porous soils, . . . provided . . . hydraulic connections with the buried water conductive swamp – marsh deposits," thereby "facilitat[ing] seepage and hydraulic pressures that had important negative effects on the integrity of the hurricane flood protection structures."[11]  Vainly attempting to excuse their inability to identify any excavations deep enough to provide hydraulic connections to the organic-clay layer, the plaintiffs now desperately point to other "excavation and backfill activity adjacent to" the

---

[9]*Id.* at 13, 19.

[10]*Id.* at 13; *accord id.* at 19.

[11]Bea Rpt. ¶ 53.

breaches "that Dr. Bea has concluded played a substantial factor in causing the failure[s]."[12] It is far too late in the day to attempt  a rescue of their fundamentally flawed case in this way.  Dr. Bea has issued numerous reports and testified many times.  Plaintiffs cannot now come into court and point to "site clearing activities" identified in a defense expert's report "that could have developed" the deep holes on which Dr. Bea bases his opinions.[13]

The absence of competent evidence substantiating the specific excavations in the Case 1 cross-sections renders Dr. Bea's opinions irrelevant because the specific excavations modeled by Diego Cobos-Roa did not exist.  The lynchpin of Dr. Bea's opinion that WGI's excavations destabilized the floodwall is the vertical seepage gradients supposedly calculated by Diego Cobos-Roa using SEEP/W to analyze the seepage created by applying the force of Katrina's surge to Dr. Bea's cross-sections.[14]  Where SEEP/W shows high gradients—namely, at or near the levee toe on the protected side of the floodwall where the north and south breaches occurred—Dr. Bea claims to have objective, scientific evidence that corroborates his theory.[15]  Where SEEP/W shows low gradients—namely, near the levee toe on the protected side of the floodwall adjacent to the McDonough Marine parcel (the so-called "near breach" location)—he claims to have objective, scientific evidence that further corroborates his theory.[16]

---

[12]Plt. Opp. 13, 20.

[13]*Id.* at 13 & n.53; *accord id.* at 19-20 & nn.66-67.

[14]*See* Bea Rpt. ¶¶ 90-91, 104 & Figs. 45, 46, 65, 66.  *Vertical seepage gradient* is the change in total head from one point to another, divided by the distance between the points.

[15]*See id.*

[16]*See id.* ¶ 98 & Fig. 58.

The vertical uplift gradients that Dr. Bea cites as the scientific basis of his opinions are case specific.  He posits that the specific excavations in the north- and south-breach case studies caused the high uplift gradients that destabilized the floodwall.  Contrariwise he posits that the specific excavation in the "near breach" case study,  the "clay-lined" borrow pit, did not raise the gradients.

His report attempts to make this plain with a series of figures that emphasize the vertical seepage gradients calculated for each of his case studies.  Two figures identify the nominal gradients for the north-breach cases:



Figure 45: Computed vertical seepage gradients for North Breach Case 1-1 for an IHNC water surface elevation (WSE) of 9 feet. Contours show vertical gradients in 0.1 increments.



Figure 46: Computed vertical seepage gradients for North Breach Case 2-1 for an IHNC water surface elevation (WSE) of 9 feet. Contours show vertical gradients in 0.1 increments.

Two figures identify the nominal gradients for the south-breach cases:



Figure 65: Computed vertical seepage gradients for South Breach Case 1-1 for an IHNC surge water surface elevation (WSE) of +14 feet. Contours show vertical gradients in 0.1 increments.



Figure 66: Computed vertical seepage gradients for South Breach Case 2-1 for an IHNC surge water surface elevation (WSE) of +14 feet. Contours show vertical gradients in 0.1 increments.

And one figure identifies the nominal gradient[17] for the near-breach case:



Figure 58: Computed vertical seepage gradients for Near Breach Case 1-1 and an IHNC surge water elevation of +14 feet. Contours show vertical gradients in 0.1 increments.

Dr. Bea uses these seepage gradients not only to justify his claim that poorly backfilled excavations caused the breaches but also to calculate when failure conditions developed. These gradients supposedly show that the conditions for floodwall failure "coincide with the estimated times of failure determined as a result of the investigations performed by" ILIT, IPET, Team Louisiana, and by Dr. Bea himself.[18]  He implies that his analyses are accurate because they provide a basis for concluding that the two breaches occurred at the times that other investigators concluded they occurred.  But if the development of these conditions in the Cobos-Roa modeling depends on the presence of the hypothetical holes in Dr. Bea's cross-sections, as he says it does, then the lack of competent evidence for these specific holes eliminates the claimed scientific basis for Dr. Bea's assertion that his analysis

---

[17]The gradients identified in these figures are merely nominal for two reasons:  some of these gradients are not even consistent with the gradients calculated by Mr. Cobos-Roa, and those that are consistent lack validity because Mr. Cobos-Roa's modeling is rife with errors that invalidate his calculations.  The Brandon Declaration (Exh. 33) details some of the serious modeling errors.

[18]Bea Rpt. ¶¶ 90, 91 & Figs. 47, 48.  *Cf. id.* ¶ 104 & Figs. 67, 68 (analogous south-breach discussion and figures).

is consistent with the analyses of other investigators.  If Dr. Bea's opinion now rests not on the specific excavations in the cross-sections analyzed by Mr. Cobos-Roa but instead on other excavations "that Dr. Bea has concluded played a substantial factor in causing the failure," then there is no objective analysis of whether those excavations could create high uplift gradients and, if so, where and when.  Dr. Bea has no seepage or stability modeling to support an opinion that holes far different from the holes considered in the Case 1 studies would have caused the breaches.  In the absence of any studies measuring the effects of different excavations, the only support for an opinion that they would have destabilized the floodwall is Dr. Bea's *ipse dixit.*

Without modeling those excavations, Dr. Bea lacks a sufficient scientific basis to opine when failure conditions developed.[19]  Even more devastating, Dr. Bea has no objective scientific analysis to justify an opinion that those other, unmodeled, excavations would have created the high uplift gradients that Dr. Bea cites to justify his opinion that WGI's work destabilized the floodwall.  At bottom all that remains is Dr. Bea's say-so, his assurance that *if* those other excavations were to be modeled then they would generate sufficient gradients to destabilize the levee.  *If* those other excavations were to be modeled, then destabilizing gradients would develop at the same times as they develop in the modeling that has been performed.

**B. DR. BEA'S NORTH-BREACH CASE 2 STUDY IS IRRELEVANT BECAUSE IT DOES NOT ANALYZE ANY WGI EXCAVATION, AND IT IS UNRELIABLE BECAUSE IT ANALYZES A WEDGE OF SHELL THAT IS EVEN DEEPER THAN THE SHELL SOIL LOGGED AT BORING 81A.**

Plaintiffs defend Dr. Bea's Case 2 cross-sections on the basis of Boring 81A, which they say justifies the cross-sections because it is nearer to the place where the north breach initiated than Borings 79A and 77A. [20]  Here again they frame the issue as being whether

---

[19]Plt. Opp. 13 & n.53; *accord id.* at 20 & n.66

[20]*See id.* at 13-18.

"Dr. Bea's methodology is more reliable than that of [Defendants'] experts."[21]  In so doing they completely ignore the fundamental flaw in Dr. Bea's Case 2 study:  his erroneous assertion that these cross-sections are based on WGI's "site clearing activities and excavations" and that the study therefore "considers a series of excavations and modifications to the embankment [*i.e.,* the levee] performed as part of the EBIA development and clearing activities."[22]  The truth is that nothing, absolutely nothing, in the Case 2 cross-sections can be attributed to anything done by WGI.  Boring 81A was drilled before WGI began its work, and there is no evidence that WGI's activities included "a series of excavations and modifications to" the levee.  Whatever else can be said of Dr. Bea's north-breach Case 2 cross-sections, it cannot honestly be said that they pertain to work "performed as part of the EBIA development and clearing activities."

Plaintiffs also miss the mark in arguing that Dr. Bea's Case 2 cross-sections are justified by the proximity of Boring 81A to the place where the breach began.  The argument fails to address the principal problem with the cross-sections, namely, that they slope the shell fill down from the bottom of Boring 81A to the tip of the sheetpile without any justification for doing so.[23]  The problem with Case 2 is not that it considers Boring 81A but that it *only* considers 81A and then, based on a single data point at some distance from the breach, expands the shell fill beyond what that bit of data warrants.  A comparison of Dr. Bea's Case 1 and Case 2 cross-sections confirms that Case 2 is based on pure speculation.  For Case 1 Dr. Bea slants the shell up from Boring 81A to the floodwall.  For Case 2 he slants it down to the floodwall.  But there is no evidence that the fill found at Boring 81A slanted up or down or anywhere at all.

Boring 81A may justify a study that examines what *might have happened* if the shell fill under Surekote Road extended all the way to the floodwall and all the way down to the tip

---

[21]*Id.* at 14.

[22]Bea Rpt. ¶ 88 & App. B, at 15.

[23]*See* Bea Rpt. 80, Fig. 44 & App. B, at 16-17, Figs. 12, 13.

of the sheetpile where the newer, deeper sheeting abutted the older, shallower sheeting. But clearly such a study would be based on speculation that the shell fill extended far from the borehole at depths below the shell at the borehole itself. The only evidence supporting the Case 2 study is evidence that before WGI began its work shell fill existed at a single point near, but not at, the floodwall, and at some distance from the place where the floodwall first broke. Dr. Bea can slant it up, slant it down, slant it anyway he likes. But doing so involves nothing but speculation, for there is no evidence that Boring 81A was anything more than an isolated outlier—physically and numerically—among a host of borings along the floodwall and across the EBIA, revealing but a few feet of shell everywhere else.

### C. DR. BEA'S SOUTH-BREACH CASE 2 AND NEAR-BREACH STUDIES LACK EVIDENTIARY SUPPORT.

Plaintiffs offer only the flimsiest support for Dr. Bea's south-breach Case 2 study. Conceding that they lack evidence of the gas-line removal posited by Dr. Bea, they argue that WGI must have removed a gas line because a forty-year-old project plan depicted one.[24] It is hard to think of a serious response to such fatuous speculation.

Plaintiffs' attempt to buttress Dr. Bea's near-breach study also strains credulity. Admitting that Dr. Bea's "deductive analysis" is the only evidence to support his claim that the borrow pit was lined with clay, they explain that "the borrow pit was predominantly clay, so when WGI engaged in reworking the borrow pit walls, they were necessarily dressing those walls with those very same cohesive clay materials."[25] Just so. But this really proves too much.

As WGI pointed out in its opening brief, if the "predominantly clay" soils at McDonough Marine explain why the massive excavation of them did not cause the floodwall to fail, then the predominantly clay soils at Boland Marine and Saucer Marine ought to explain why the

---

[24]*See* Plt. Opp. 21-22.

[25]*Id.* at 24.

far smaller excavations there and elsewhere likewise did not cause the floodwall to fail. Indeed, the predominance of clay soils beneath the EBIA and the flood-control structures explains *eo ipso* why WGI's work did not have any effect on the floodwall.  And by extension it also explains *eo ipso* why the Corps of Engineers did not waste time and money analyzing whether any of WGI's excavations would pose a threat of underseepage.  Simply knowing that the EBIA consisted predominantly of low permeability clay, particularly at depths being excavated by WGI, provided a sufficient basis for concluding that WGI's work would not cause underseepage during a hurricane.  ILIT's contention that underseepage caused the breaches in the Lower Ninth Ward was short lived, or would have been had Dr. Bea not nursed a shriveled vestige in a series of litigation reports bereft of evidentiary support and scientific validity.[26]

## II. Dr. Bea's opinions rest on incompetent computer modeling and junk science.

Quoting Dr. Thomas L. Brandon, the Director of the W.C. English Geotechnical Engineering Research Laboratory and an associate professor at the Virginia Polytechnic Institute, the plaintiffs point out that "'Geotechnical Engineering is a judgment field.'"[27]  On this truth they build two arguments, both fallacious.  First, they broadly argue that the "question here is whose engineering judgment is correct," and more narrowly they assert that Dr. Bea has here applied "the same type of analysis and . . . engineering judgment . . . [as] in earlier cases, and the same sort of analysis and application of engineering judgment that Defendants' experts apply in their own work."[28]  The Court's task is not to compare Dr. Bea's opinions to those of other experts.  Under *Daubert* the Court must "ensur[e] that an

---

[26]*See* Rogers Dep. 277:25 – 278:5 (explaining that ILIT "backed off that pretty—pretty quickly based on . . . a lot of information that would lead us to believe that [ILIT's initial high estimate of permeability] probably was not a realistic value").

[27]Plt. Opp. 11.

[28]*Id.* at 21, 32.

expert's testimony both rests on a reliable foundation and is relevant to the task at hand."[29] Dr. Bea's competent work in other cases is also beside the point. The plaintiffs are asking this Court to do what cannot be done under Rule 702: consider their expert's qualifications and on that basis conclude that his opinions are reliable. "Under *Daubert,* that's not enough."[30]

Engineering judgment justifies differences of opinion when accepted scientific principles are correctly applied to a defensible set of facts. The Defendants' experts have different opinions about what caused the floodwall to collapse, but those differences reflect the application of accepted scientific principles to a largely common set of facts that are well supported by evidence. The differences of opinion merely demonstrate the independence of the experts in bringing their engineering judgment to bear on these facts. It does not follow from these differences that "there is another explanation for the flood wall failure[s] . . . ."[31] What upsets the plaintiffs is not what they characterize as the defendants' experts' "internal inconsistencies." What upsets them is that the defendants' experts unanimously agree that underseepage played no role in the breaches.

More relevant to the pertinent legal point here, the "conflict" among the defendants' experts, if their differences can fairly be characterized as such, does not ease the plaintiffs' burden of demonstrating that Dr. Bea's "testimony both rests on a reliable foundation and is relevant to the task at hand."[32] Without respect to the defendants' differences or Dr. Bea's past qualifications, the Court "must determine whether" Dr. Bea's proffered

---

[29]*Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 597 (1993).

[30]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995).

[31]Plt. Opp. 1.

[32]*Daubert,* 509 U.S. at 597 (1993).

testimony "has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"[33]

**A. THE COMPUTER MODELING BY DIEGO COBOS-ROA DOES NOT PROVIDE A RELIABLE BASIS FOR DR. BEA'S OPINIONS.**

The plaintiffs concede that Dr. Bea's opinions rest on computer modeling by "his modeling assistant," Diego Cobos-Roa, a graduate student in whom Dr. Bea placed great confidence.[34]  That confidence was misplaced.  Dr. Bea mistakenly believed that Mr. Cobos-Roa was qualified "to perform electronic digital flow analyses" because he had "taken the full suite [of] courses at the University of California at Berkeley."[35]  In reality, Mr. Cobos-Roa took only one course in seepage modeling at Berkeley, a course that he only audited.[36] Other than that single audited course, his only formal seepage instruction consists of undergraduate courses in his native Colombia, courses that did not involve seepage modeling.[37]  In the Berkeley course, he learned to perform steady-state analyses, but not transient analyses, and the course did not include instruction in the use of SEEP/W.[38]  Prior to beginning to work with Dr. Bea on Katrina, the sum and substance of Mr. Cobos-Roa's modeling experience consisted of whatever ungraded class-work assignments he completed in an audited course—assignments that consisted of steady-state analyses, which are far simpler than the transient analyses required to evaluate the Katrina floodwall failures:

---

[33]*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149 (1999) (quoting *Daubert,* 509 U.S. at 592) (interpolation by Court).

[34]Plt. Opp. 29-30; *see also* Bea Dep. Vol. I, at 64:15-25; 71:23-25.

[35]Bea Dep. Vol. I, at 64:15-20.

[36]Cobos-Roa Dep. 241:15-24.

[37]*Id.* at 242:17-21.

[38]*Id.* at 242:7-16; 243:23-25.

Q.  Prior to that class in 2005, had you performed a steady state seepage analysis as part of any of the projects that you were involved in Columbia [sic]?

A.  No.

Q.  Prior to your involvement with the ILIT investigation in 2006, how many steady state seepage analyses, if any, had you performed?

A.  Outside the class, none.

Q.  Prior to your involvement with ILIT in 2006 had you ever performed a transient seepage analysis?

A.  No.[39]

Dr. Bea's opinion testimony depends on modeling by a largely self-taught graduate student, whose competence Dr. Bea is unable to judge.  Dr. Bea has no experience with SEEP/W.  His understanding of SEEP/W consists of "what's documented in the user's manual":  "I'm familiar with the contents of those manuals.  I don't perform the calculations personally."[40]

Dr. Bea claims to have verified Mr. Cobos-Roa's modeling outputs by performing "hand calculations . . . to make sure the computer is not telling fibs."[41]  But, with a single exception, those verifying hand calculations do not exist.[42]  And the lone existing hand calculation does not verify Mr. Cobos-Roa's outputs.  It was created long after the SEEP/W modeling had been completed, "to provide insight as to a distance effect on the conduct of pressure" as Dr. Bea was beginning to draft his rebuttal report.[43]  Because Dr. Bea could not produce any of the calculations that he supposedly relied on to verify Mr. Cobos-Roa's outputs, he was given an opportunity to provide an example by drawing a flow net based

---

[39]*Id.* at 242:17 – 243: 5.

[40]Bea Dep. Vol. I, at 66:16-22.

[41]*Id.* at 67:9-10;

[42]*Id.* at 60:8-11.

[43]*Id.* at 207:4-9; Bea Dep. Vol. II, at 182:15-17; *see also* Bea Rebuttal Dep. Exh. 57 (the hand-drawn "distance effect" flow calculation).

on his north-breach Case 1-1 cross-section.  His crude drawing belies the claim that he could verify the SEEP/W outputs with hand calculations.[44]   Characterizing Dr. Bea's flow net as "very inaccurate," Dr. Brandon found "six to ten elements in it that are incorrect, from the fact that if you have flow between dissimilar layers, you have to have a difference in angle of the flow lines.  He had flow lines that were intersecting other flow lines, which is improper.  He would have had to use a transformed section for anisotropic permeabilities."[45]  These are significant errors.  Dr. Brandon teaches flow nets to his graduate students, and if Dr. Bea's flow net had been drawn by one of them "the student would not get a passing grade on that."[46]

    If Dr. Bea had been able to evaluate Mr. Cobos-Roa's work, he would have discovered that it is "so rife with errors that the resulting hydraulic gradients and factors of safety are invalid."[47]  Dr. Brandon's cursory review of the SEEP/W files identified more than a dozen serious errors, leading him to conclude that Dr. Bea's opinion testimony rests on work that can only be characterized as junk science:  "Entrusting the SEEP/W and SLOPE/W analyses to a graduate student was a serious error in judgment.  This error was compounded by not having his work reviewed by a qualified engineer, as routinely occurs in engineering practice.  The [modeling] errors . . . cannot be classified as differences in opinions among experts.  Plain and simple, these are just fundamental errors."[48]

---

[44]*See* Bea Dep. Exh. 43 (hand-drawn flow net).

[45]Brandon Dep. 194:12-25.

[46]*Id.* at 194:25 – 195:3.

[47]Brandon Decl. ¶ 6.  *Cf.* Marr Decl. ¶ 5 (concluding that Bea's analytical errors invalidate his factors of safety),  ¶ 24 (concluding that "Bea's calculations of Uplift Factor of Safety and Factor of Safety for Translational Stability, which he based on steady state seepage conditions with significantly increasing pore pressure, are wrong and unreliable").

[48]Brandon Decl. ¶¶ 30, 31.

### B. DR. BEA'S ABUSE OF THE PHYSICS OF FLUIDS FLOWING THROUGH POROUS MEDIA MAKES HIS OPINIONS COMPLETELY UNRELIABLE AND THEREFORE INADMISSIBLE.

Plaintiffs attempt to defend Dr. Bea's "hydraulic conductivity pressure" analysis by arguing that his analysis is consistent with the SEEP/W manual.  To that end, they quote a truism that again proves to much:  "'Flow of water through soil is one of the fundamental issues in geotechnical and geoenvironmental engineering.'"[49]  It is *Defendants' experts* who are analyzing the flow of water through soil.  Dr. Bea bases his opinion not on flow but on pressure transmission.  Because water can't flow through the relatively impermeable organic clay except in minute quantities, Dr. Bea concocts a theory at variance from the "fundamental issue" that SEEP/W was designed to analyze.  The Opposition's assertion that "pore-water pressure is more important than flow quantity" is self-serving nonsense.[50] Nothing in the SEEP/W manual warrants Dr. Bea's assertion that "greater emphasis should be placed on 'the state of the pore-water pressure in the ground' instead of how much water is flowing through the ground."[51]  After reviewing Dr. Bea's "new theory of groundwater flow, one in which pore pressures can move very quickly to create steady state pore pressures without flow occurring and with the soil remaining undrained," Dr. W. Allen Marr, a nationally recognized geotechnical expert and a testifying expert for the United States in this case, concluded that "Dr. Bea's theory violates the fundamental principles of flow through porous media and has no mathematical basis."[52]

The plaintiffs' identification of "the genesis of the differing expert positions" itself provides a clue that these *Daubert* motions rest on more than a dispute about whose engineering judgment is correct.  Plaintiffs point out that "Dr. Bea has based *his Mv* 'not on the storage coefficient but, rather, on the dilatational wave velocity that is sensitive to

---

[49]Plt. Opp. 26 (quoting SEEP/W manual).

[50]*Id.; see also* Marr Decl. ¶¶ 6-10.

[51]Plt. Opp. 26.

[52]Marr Decl. ¶ 6.

water compressibility.'  In essence, Dr. Bea and the Defense experts are 'working different problems' . . . ."[53]  This does not sound like a typical difference of opinions among experts. Scientific inquiries do not turn on which scientist gets to define the terms of the debate. Plaintiffs' suggestion that Dr. Bea is solving a different problem than the four geotechnical experts arrayed against him strongly suggests that he is so far off base that his opinions are not merely incorrect but are, in that emphatically redundant phrase, "incompetent, irrelevant, and immaterial."

It would be simplistic to suggest that Dr. Bea's decision to analyze the wrong problem explains all of the important differences between Dr. Bea's analyses and those of the defendants' experts.  To be sure, Dr. Bea *is* analyzing the wrong problem.  As WGI correctly points out, Dr. Bea is applying principles that describe the pressure effects of explosions or earthquakes, not floodwaters.[54]  And as we observed in our opening brief, Dr. Bea desperately resorted to these principles only as an after-the-fact attempt to justify his opinion that "uplift pressures" developed rapidly, during the hours that elapsed between the onset of storm-surge loading and the floodwall's failure.  No mention of "dilatational modulus" can be found in his report, nor did he refer to it during his first deposition when, over two days he was cross-examined on the basis for his decision to model the critical soil layer—the lower organic-clay layer that is not interrupted by the floodwall sheeting—as incompressible.  What he first described, and what his modeling assistant Diego Cobos-Roa also described, was not the choice of a value driven by "the 'dilatational velocity through saturated soil'" but rather an outcome-oriented search for a compressibility value that would produce immediate pore-water pressure changes on the protected side of the floodwall.  Diego Cobos-Roa searched for such a value, found one, and Dr. Bea approved its use.

---

[53]Plt. Opp. at 28 (emphasis added).

[54]*Cf.* Marr Decl. ¶16 (explaining that dilatational modulus "measur[es] the time it takes for a pressure pulse to pass through the soil specimen).

The plaintiff's claim that $1 \times 10^{-9}$/psf was "corroborated" by Lambe and Whitman is true only in the lexicological sense.[55]  The would-be bolstering of Dr. Bea's analysis *was* belated.  But it fails because the immediate physical changes produced by a bomb blast do not resemble the gradual changes that result when hydraulic pressure is applied to organic clay.  Months would have to elapse before the pressures identified by Dr. Bea as the basis of his opinions would develop.[56]  Dr. Bea forced the pressures to develop by instructing Mr. Cobos-Roa to model the organic clay as incompressible based on his *a priori* assumption that "the time duration of the applied hydraulic loadings" was insufficient "for consolidation or expansion" of the soils.[57]  He gave this instruction even though he knew that the organic-clay layer is "compressible if you provide it time and boundary conditions to allow them [sic] to consolidate."[58]

If Dr. Bea had allowed Mr. Cobos-Roa to use an empirically determined compressibility value, then SEEP/W, using conventional mathematical formulas for computing flow through porous media, would have provided outputs that disconfirmed Dr. Bea's assumption that the elapsed time was too short for consolidation of the soils.[59]  By inputting a value close to zero, Dr. Bea "cooked the books," and kept the software from calculating how much flow would occur between the onset of storm-surge loading and the floodwall's failure.  Dr. Bea's instruction to use an unrealistically low value caused the protected-side pore-water pressures to rise far higher than they would have risen if empirically-based value had been used.  This outcome-driven instruction lacks any empirical or scientifically-defensible theoretical basis.  Dr. Marr describes Dr. Bea's

---

[55]Plt. Opp. 27.

[56]Marr Decl. ¶¶ 9, 24, 42.

[57]Bea Dep. Vol. I, at 189:6-9; *see also* Marr Decl. ¶ 23.

[58]*Id.* at 189:17-19.

[59]*See* Marr Decl. ¶ 24.

instruction as "a blatant falsification of input data to produce a desired result.  They 'tweaked' the value of $m_v$ to make it some 30,000 times less than a realistic value for the organic clays.  This huge factor is hardly 'tweaking'; it is a falsification of input data."[60]  As a result, Dr. Bea's conclusion that WGI's excavations destabilized the floodwall and caused its failure has no sound basis.  For this reason, Dr. Bea's opinion testimony should be excluded.

Dr. Bea bills himself as a "forensic" engineer, a claim that any engineer can make.  No university grants a degree in forensic engineering, and no state sets any standard or issues any license to someone who wants to engage in "forensic" engineering.  Flashing his forensic-engineering credentials, Dr. Bea relies on his volubility to hide his technical incompetence.[61]  But his training and experience reveal that, whatever the worth of his "forensic engineering" claim, he is not a geotechnical engineer.

After a lengthy career in offshore ocean engineering, Dr. Bea in 1988, at the age of 51, finally "came to understand" the importance of "human, organizational, and governance issues" that can be "instrumental" in engineering failures.[62]  This prompted "a career transition from industry to academia," where he obtained a Ph.D. from the University of

---

[60]Marr Decl. ¶ 26.

[61]*See, e.g.,* Bea Rpt. ¶ 70 ("Another part of this uncertainty is due to 'imperfections' embedded in analytical models (Type 2 – model, parametric, state uncertainties, epistemic). These imperfections are based on those associated with analytical inputs, processing, and outputs. These uncertainties are also information sensitive. During this investigation, the Type 2 uncertainties have been addressed by developing 'validations' of the analytical models. These validations involve comparing results from the analytical models that reflect inputs, processing, and outputs with results from 'field tests'. The comparisons characterize the analytical model uncertainties in the form of 'Bias' – the ratio of the true or observed characteristics in the field with the nominal characteristics that result from the analytical models. In this work, the objective has been to develop and employ analytical models that are 'un-Biased'; on the average, the results from the analytical models are the same as the results from the field tests (experiments, observations)."), 17-18 (describing "Scientific Methods Used").

[62]Bea Rpt. App. A, at 3.

Western Australia in 2001.[63]  His doctoral thesis "deal[t] with human and organization

factors (HOF) that have a dominant influence on the quality and reliability of offshore

structures such as platforms (floating, bottom supported), mobile offshore drilling units,

pipelines, and ships."[64]  He later assumed a teaching position at the University of California

at Berkeley as a professor of naval architecture and offshore engineering.[65]  He did not

teach any courses in geotechnical engineering.[66]  For the past 25 years, Dr. Bea has devoted

himself "to research associated with the catastrophic failure of engineered systems."[67]

Nothing in this background or in his publication list suggests that Dr. Bea has the technical

competence to perform the analyses required to determine what caused the Lower Ninth

Ward breaches.[68]

    To camouflage his technical incompetence, Dr. Bea resorted to volubility and

distraction.  He issued an initial report and appendices totaling 287 pages.  There he falsely

claimed that "new information" from the parties' extensive exploration-and-testing

program "has provided additional important insights into the characteristics of the soils

and floodwall."[69]  In making this claim, he was concealing that he had decided to ignore the

only "new information" that would have changed his seepage analyses.  He falsely asserted

that "[t]his testing provided very important information which has been used to

characterize the performance characteristics of the soils; particularly, the information that

has been developed from the in situ testing performed to determine the hydraulic

---

[63]*Id.* at 1.

[64]Bea Thesis Abstract, at i.

[65]Bea Rpt. App. A, at 1.

[66]Bea Dep. Vol. I, at 37:6-8.

[67]Bea Rpt. 2; *accord id.* App. A, at 2.

[68]*See id.* App. A, at 4-40.

[69]*See id.* ¶ 65.

conductivity properties of the swamp – marsh deposits that underlie the floodwall and other areas in the Lower 9th Ward."[70]  In truth, the hydraulic-conductivity properties were all but irrelevant to Dr. Bea's analysis because his dilatational-modulus theory of steady flow was not sensitive to permeability changes.[71]  Any plausible hydraulic-conductivity value can be plugged into Dr. Bea's model without changing the results.  The truth is that Dr. Bea decided to ignore the "very important information" that "has been developed from the in situ testing" because using that information would eviscerate his opinion that WGI's excavations caused the breaches.

Appendix C is a 46-page summary "of the soil behavior properties (characteristics) used in analyses of the North Breach site (Boland Marine), the Near Breach site (McDonough Marine), and the South Breach site (Saucer Marine)."[72]  Twenty-one pages are devoted to "Soil Deposits Hydraulic Conductivity Properties," without any hint that the extensively analyzed "in situ horizontal hydraulic conductivities of the buried swamp – marsh deposits" are all but irrelevant to Dr. Bea's analysis.  Compressibility is not even mentioned in Appendix C, or for that matter anywhere in Dr. Bea's report.  Steady flow, which the Opposition identifies as the "approach" taken by Dr. Bea "in modeling the response of the buried swamp/marsh layer when exposed to . . . Hurricane Katrina," is not mentioned even once in Dr. Bea's report or appendices.[73]

The Opposition thus  inadvertently confirms that almost all of Dr. Bea's report and appendices are mere camouflage intended to prevent the Court from discerning the true basis of his opinions.  The Opposition asserts that "Dr. Bea performed his analyses consistent with long standing principles established by Lambe & Whitman based on ***steady***

---

[70]*Id.* ¶ 66.

[71]*See* Bea Dep. Vol. I, at 155:3-23.

[72]Bea Rpt. App. C, at 1.

[73]Plt. Opp. 26.

***flow***" (emphasis by Plaintiffs).[74]  But in Dr. Bea's report and appendices there is  no mention of either steady flow or the organic clay's incompressibility that supposedly produces it.  Nor is there any mention of the supposed theoretical basis of his analysis, the dilatational modulus that supposedly justifies his conclusion that pressures were rapidly transmitted from one side of the  floodwall to the other.  None of these are mentioned anywhere in the 287 pages of Dr. Bea's report and appendices.

     In opposing the defendants' *Daubert* motions, the plaintiffs' only hope is that the complexity of the science and Dr. Bea's tenacity in clinging to his opinions will prompt the Court to view the issue presented as merely one of "differing expert opinions," subject to being "proven at trial."[75]  If the question really were simply "whose engineering judgment is correct," then the plaintiffs undoubtedly would be correct in proposing that "the answer is best reached through cross-examination at trial."[76]  But the question is not "whose engineering judgment is correct" but whether Dr. Bea's engineering judgment rests on scientifically indefensible seepage analyses that he has contrived for purposes of this litigation.

     If the Court is not convinced that Dr. Bea's dilatational-modulus theory of steady flow is junk science, then it nevertheless can and should grant the defendants' motions for the reasons set forth in the first part of this brief and in the opening briefs, which show that Dr. Bea has analyzed a set of "idealized" facts that differ drastically from the competently established facts about what WGI did in fulfilling Task Order 26.  But if the Court desires to untangle the web of conflicting assertions about the science that Dr. Bea describes, then it can do so either on the basis of the Defendants' experts' declarations or after a hearing at which the defendants' experts more fully explain the basis of their deeply and uniformly

---

[74]*Id.* at 28.

[75]*Id.* at 25, 28.

[76]*Id.* at 32.

held opinion that Dr. Bea's analyses rest not on genuine science but on unscientific notions contrived by Dr. Bea from a confusion of accepted scientific principles.

## CONCLUSION

Dr. Bea's claims about "flows" of pressure from one side of the floodwall to the other through the organic clay under the levee call to mind Lewis Carroll's White Queen, who, in response to Alice's objection that "one *can't* believe impossible things," famously retorted: "I daresay you haven't had much practice . . . . When I was your age, I always did it for half-an-hour a day.  Why, sometimes I've believed as many as six impossible things before breakfast."  Dr. Bea believes impossible things, things that defy the laws of physical motion. Whether he believes these things in good faith or in a well-intentioned attempt to help Hurricane Katrina's victims is immaterial.  His opinions lack both factual and scientific underpinnings.  They are therefore irrelevant and unreliable.  The United States' motion to exclude his testimony should be granted.

<div style="margin-left:50%">

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch

 s/ Robin Doyle Smith
ROBIN DOYLE SMITH
Senior Trial Counsel, Torts Branch
Civil Division
U.S. Department of Justice
Benjamin Franklin Station,
P.O. Box 888
Washington, D.C.  20044
(202) 616-4400/616-5200 (fax)
robin.doyle.smith@usdoj.gov
Attorneys for the United States

</div>

**CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing was served upon all counsel of record by ECF on May 31, 2012.

s\ Robin Doyle Smith

EXHIBIT LIST--Defendant United States' Reply Memorandum in Support of its Motion
To Exclude the Expert Testimony of Robert Glenn Bea

| Exhibit # | Document | Document Date |
|---|---|---|
| 24 | Plaintiffs' Opposition to Daubert Motion | 2012 05-21 |
| 25 | Expert Report of Robert Bea | 2012 02-01 |
| 26 | Expert Report of Robert Bea, Appendix A | 2012 02-01 |
| 27 | Expert Report of Robert Bea, Appendix B | 2012 02-01 |
| 28 | Expert Report of Robert Bea, Appendix C | 2012 02-01 |
| 29 | Deposition of David Rogers | 2012 03-16&17 |
| 30 | Deposition of Robert Bea, Vol. I | 2012 03-27 |
| 31 | Deposition of Robert Bea, Vol. II | 2012 03-28 |
| 32 | Deposition of Diego Cobos-Roa | 2012 04-10 |
| 33 | Deposition of Thomas Brandon | 2012 04-13 |
| 34 | Thesis of Robert Bea, Abstract | 2000 12-00 |
| 35 | Declaration of Allen Marr | 2012 05-30 |
| 36 | Declaration of Thomas Brandon | 2012 05-30 |
| 37 | Deposition of Robert Bea, Rebuttal - Exh. 57 | 2012 04-16 |
| 38 | Deposition of Robert Bea, Vol II - Exh. 43 | 2012 03-28 |