226 F.R.D. 95
United States District Court,
District of Columbia.

DAG ENTERPRISES, INC., et al., Plaintiffs,

v.

EXXON MOBIL CORPORATION, et al., Defendants.

Civ.A. No. 00–0182(CKK).   |   Feb. 11, 2005.

**Synopsis**

**Background:** Distributor/would-be bidder for assets divested by merged petroleum corporation at time of merger sued corporation alleging that distributor had been unfairly prevented from preparing bid for those assets, asserting claims for, inter alia, unfair competition and fraudulent misrepresentation. Distributor, after close of discovery, served subpoena duces tecum on non-party buyer of divested assets, seeking post-merger profit figures from those assets, to serve as foundation for distributor's proffered expert testimony on damages. Corporation moved for protective order to preclude distributor from seeking profit information, and distributor moved to compel production from buyer.

**Holdings:** The District Court, Kollar–Kotelly, J., held that:

[1] no "good cause" for extending discovery deadline existed, given distributor's pre-deadline notice of importance of information sought from buyer and failure to seek it;

[2] rules' duty to supplement experts' reports could not justify deadline extension; and

[3] prejudice against corporation also weighed in favor of denying extension.

Corporation's motion granted.

West Headnotes (6)

[1]    **Federal Civil Procedure**
          Effect
       **Witnesses**
          Subpoena duces tecum

       Subpoena to third party constitutes "discovery" and is not exempt from discovery deadlines in scheduling orders. Fed.Rules Civ.Proc.Rules 16, 26, 45, 28 U.S.C.A.

[2]    **Federal Civil Procedure**
          Order

       Primary factor in whether "good cause" exists to modify scheduling order is diligence of party seeking extension. Fed.Rules Civ.Proc.Rule 16(b), 28 U.S.C.A.

       1 Cases that cite this headnote

[3]    **Federal Civil Procedure**
          Order

       In unfair competition action against merged petroleum corporation brought by distributor/would-be bidder for assets divested in merger, there was no "good cause" for modifying scheduling order to permit distributor to subpoena after discovery deadline, from non-party buyer of divested assets, post-merger profit figures from assets, to serve as foundation for distributor's proffered expert testimony on damages; distributor clearly had notice well before deadline that corporation intended to challenge experts' use of corporation's own pre-merger profit estimate, which included both supplier's and distributor's profits, to represent what distributor alone could have earned, yet failed to seek buyer's information until after deadline despite opportunity to do so. Fed.Rules Civ.Proc.Rules 16(b), 45, 28 U.S.C.A.

       1 Cases that cite this headnote

[4]    **Federal Civil Procedure**
          Failure to respond;  sanctions
       **Federal Civil Procedure**
          Order
       **Witnesses**
          Subpoena duces tecum

       District court's denial of plaintiff's request for extension of discovery deadline in order to subpoena additional evidence from third party, on ground of lack of diligence on plaintiff's part, did not constitute "sanction" for discovery violation, and thus could not constitute inappropriate sanction; court was not precluding evidence in response to a discovery violation, since no



evidence yet existed, but rather was refusing to find good cause for modification of scheduling order. Fed.Rules Civ.Proc.Rules 16(b), 37, 45, 28 U.S.C.A.

4 Cases that cite this headnote

[5]   **Federal Civil Procedure**
       Order
      **Witnesses**
       Subpoena duces tecum

In unfair competition action against merged petroleum corporation brought by distributor/would-be bidder for assets divested in merger, civil procedure rules' duty to supplement experts' reports could not supply "good cause" for modifying scheduling order to permit distributor to subpoena, from non-party buyer of assets, post-merger profit figures from assets, to serve as foundation for distributor's proffered expert testimony on damages; distributor in fact sought to substitute new information and new damages theory, rather than supplement, and duty created by rules could not be used to confer right to obtain information after discovery deadline. Fed.Rules Civ.Proc.Rules 16(b), 26(a)(2)(A), (e)(1), 28 U.S.C.A.

9 Cases that cite this headnote

[6]   **Federal Civil Procedure**
       Order
      **Witnesses**
       Subpoena duces tecum

In unfair competition action against merged petroleum corporation brought by distributor/would-be bidder for assets divested in merger, factor of prejudice weighed in favor of finding no "good cause" for modifying scheduling order to permit distributor to subpoena after discovery deadline, from non-party buyer of divested assets, post-merger profit figures from assets, to serve as foundation for distributor's proffered expert testimony on damages; corporation would be prejudiced by new round of discovery even though it had acted diligently, and no prejudice to distributor was shown since profit information sought might not be good indicator of what distributor, as much smaller entity than buyer, could have earned. Fed.Rules Civ.Proc.Rules 16(b), 45, 28 U.S.C.A.

2 Cases that cite this headnote

**Attorneys and Law Firms**

*96 Ernest Gellhorn, Geoffrey Paul Gitner, Watergate, Washington, DC, Tricia Purks Hoffler, Sekou M. Gary, Jerome A. Stone, Jr., Dana Walker Tucker, Willie E. Gary, Gary, William, Parenti, Finney, Lewis, McManus, Watson & Sperando, Stuart, FL, for Plaintiffs.

Stuart Harvey Harris, William R. O'Brien, Washington Lawyers' Committee, Joe Robert Caldwell, Jr., Baker Botts, LLP, John Whitelaw Nields, Jr., Marcia Press Kaplan, Howery Simon Arnold & White, Charles Frederick Lettow, Cleary, Gottlieb, Steen & Hamilton, Washington, DC, for Defendants.

**Opinion**

**MEMORANDUM OPINION**

KOLLAR–KOTELLY, District Judge.

> "A little neglect may breed mischief; for want of a nail the shoe was lost; for want of a shoe the horse was lost; for want of a horse the rider was lost; for want of a rider the battle was lost."
>
> —Benjamin Franklin, Poor Richard's Almanac (1757).

Currently pending before the Court are two conflicting discovery-related motions filed by the parties in the above-captioned action. First, Defendants have submitted a motion for a protective order, pursuant to Federal Rules of Civil Procedure 16 and 26, in order to prevent the acquisition of new discovery sought by Plaintiffs through a subpoena *duces tecum* served on non-party ConocoPhillips on September 9, 2003. Second, Plaintiffs have filed a corresponding motion to compel production of information subpoenaed from non-party ConocoPhillips pursuant to Federal Rule of Civil Procedure 45(d). Both motions relate to an attempt by Plaintiffs to procure financial information relating to the operating margins of ConocoPhillips' Mid–Atlantic Assets ("Divestiture Assets") via a subpoena served almost five

months after discovery in this case closed on April 11, 2003, pursuant to this Court's Scheduling Order. Plaintiffs contend that such "newly-discovered" information is essential to "supplement" their expert reports and respond adequately to Defendants' *Daubert* motions attacking the reliability of their experts' methodology.

Two major issues lie at the heart of this dispute: (1) "Should Plaintiffs be able to obtain highly confidential, competitively significant information from ConocoPhillips for use in this litigation when they acquired knowledge of the materials upon an apparent breach of a confidentiality agreement signed with ConocoPhillips in another context?"; and (2) "Can Plaintiffs establish 'good cause' for the extension of discovery for materials available but never sought despite numerous opportunities during the discovery period?". Upon a consideration of the motions, the parties' subsequent oppositions and replies, the entire record herein, and the relevant caselaw, the Court shall grant Defendants' Motion for a Protective Order Regarding Plaintiffs' Untimely Rule 45 Subpoena Duces Tecum and shall deny Plaintiffs' Motion to **\*97** Compel Production of Information Subpoenaed from Third–Party ConocoPhillips.

### I: BACKGROUND

*A. Procedural Posture*

The facts of this case arise out of the merger of Defendants Exxon and Mobil. In October of 1999, the Federal Trade Commission ("FTC") entered into an agreement with Defendants Exxon and Mobil pursuant to which the FTC agreed it would not pursue antitrust actions against the corporations or the newly formed corporation as a result of the merger, provided that the corporations divested themselves of certain assets ("Divestiture Assets"). *See* Am. Compl. ¶ 2. The Divestiture Assets consisted of 1210 service stations and convenience stores throughout the northeast and mid-Atlantic states. *Id.* On December 2, 1999, December 2, 1999, Defendants announced that they had agreed to sell the Divestiture Assets to Tosco Corporation. *Id.* ¶ 66.

On February 2, 2000, Plaintiff DAG Enterprises ("DAG") filed suit to enjoin the sale of the Divestiture Assets to Tosco. Defs.' Mot. to Dismiss at 1. Plaintiff DAG alleged Defendants violated antitrust laws (Counts One, Two, and Three) and engaged in unfair competition (Count Four), fraudulent misrepresentations (Count Five), and tortious interference with prospective economic advantage (Count Six). *Id.* Plaintiff amended its Complaint to include additional counts under the Civil Rights Act, 42 U.S.C. §§ 1981, 1982, 1985 (Counts Seven and Eight) and added Eyob "Joe" Mamo ("Mamo") as an additional plaintiff with regard to the two new counts. *Id.* Plaintiffs' allegations center around the claim that Defendants refused Plaintiffs access to materials necessary to prepare a bid to purchase the Divestiture Assets.

On March 1, 2000, this Court denied Plaintiffs' motion for a temporary restraining order, and Tosco acquired the Divestiture Assets from ExxonMobil on February 29, 2000.[1] *See DAG Enters. v. Exxon Mobil Corp.,* Civ. A. No. 00–0182 (D.D.C. Mar. 1, 2000) (oral ruling at motions hearing denying temporary restraining order). On November 8, 2000, this Court granted Defendants' motion to dismiss Plaintiffs' antitrust claims. *DAG Enters.,* Civ. A. No. 00–0182 (D.D.C. Nov. 8, 2000) (memorandum opinion and order dismissing antitrust claims). On September 30, 2001, this Court granted Defendants' second motion to dismiss in part; the Court found that Plaintiffs could not state a claim for relief with regard to Count Six (tortious interference) and Count Eight (42 U.S.C. § 1985), and held that Count Seven (42 U.S.C. §§ 1981 and 1982) warranted dismissal inasmuch as it brought claims on behalf of Plaintiff Mamo. *DAG Enters.,* Civ. A. No. 00–0182 (D.D.C. Sept. 30, 2001) (memorandum opinion and order dismissing select claims).[2]

*B. The Court's Clear Admonishments Regarding Promptness and Compliance*

On August 20, 2002, this Court set out a Scheduling and Procedures Order ("Scheduling Order") outlining the pertinent, binding deadlines for discovery and setting forth the Court's calendar management techniques. Defs.' Mot. for Protective Order, Ex. 4 ("Scheduling Order"). In the Scheduling Order, the Court provided that "All discovery will be completed on or before April 11, 2003." *Id.* at 5. In its Order, the Court stressed that the parties should take the deadlines seriously and would ignore them at their peril:

> Motions for extensions of time are strongly discouraged. Parties should not expect **\*98** the court to grant extensions, as they will be granted only in truly exceptional or compelling circumstances.

*Id.* at 2. At the August 13, 2002, status conference during which the Court set the April 11, 2003, deadline, the Court recognized that the nine months it had outlined for discovery was "very generous." Aug. 13, 2002 Tr. 30:19–20; 15:24–16.2. The Court repeatedly emphasized that discovery beyond

the deadline would not be permitted. *Id.* at 21:2–5; 21:9–11 ("No extensions. Nothing. I don't care what happens in your case. Absolutely no extensions."); 24:6–10 ("I am not extending [the discovery period] so ... fights about discovery ... are not going to extend this case"); 25:8–16 ("April [11] is the end of discovery and ... no extensions"); 25:20–26:3.

At the same hearing, the Court set deadlines for submission of expert reports. The Court made plain that all expert discovery was to be completed within the generous nine-month discovery period, and explicitly told the parties in no uncertain terms that the Court expected full and complete expert reports submitted within the applicable deadlines. *Id.* at 34:8–10, 34:19–23. The Court warned that "all experts need to be done within this [discovery] time period," and that the expert reports are "full reports ... you need to do the full complete thing so we don't have arguments about what their opinions are and what the boundaries are ...." *Id.* at 21:9–11; 32:23–33:2; 34:8–10 (admonishing counsel to "look at the rule" because it is "very detailed" in terms of the contents of expert reports); *see also id.* at 28:6–9 ("For experts I said I will require you to do a full report ...."). Counsel for Plaintiffs agreed that the schedule set by the Court was "fair." *Id.* at 21:12.

*C. The Focus on Margin Information During the Discovery Period*

Plaintiffs subsequently submitted six expert reports, including the reports of two damages experts, James T. McClave and George Overstreet, on January 21, 2003, after the parties agreed to a short extension of the Court's original January 10, 2003, deadline. Defendants subsequently responded to Plaintiffs' damages experts with a 42–page report from their expert, David Kaplan, that analyzed Plaintiffs' reports. One expert, Dr. Overstreet, then submitted two "corrections" to his original report. The parties then engaged in full-day depositions of each other's experts. Expert discovery focused, to a large extent, on damages calculations predicting what DAG might have earned had it—rather than Tosco/ConocoPhillips—been permitted to buy the Divestiture Assets. Essential to the calculation of damages in this expert discovery process was the projected profit margin DAG would earn on hypothetical future sales at those stations that were part of the divestiture assets. As such, one key issue that arose during the expert discovery process was the assumption by Plaintiffs' damages experts that the combined supplier/distributor margin listed in the Divestiture Asset Bid Book, which was provided by ExxonMobil to potential bidders during the divestiture process in 2000, accurately represented the margins DAG might earn as a distributor.

In his initial report on January 21, 2003, Plaintiffs' expert Dr. McClave unequivocally stated that the Bid Book, which he described as "[b]y far the most important document he reviewed, was the 'source' of his margin information." Defs.' Reply, Ex. 4 (Preliminary Expert Report of Dr. James T. McClave, Jan. 21, 2003) at 2, 4. However, in a report filed on March 12, 2003, defense expert David Kaplan pointed out that Dr. McClave's reliance on the Bid Book margins was a "mistake" that, when corrected, would mean that Dr. McClave's damages model would actually yield zero damages. *Id.,* Ex. 4 (Preliminary Expert Report of David P. Kaplan, Mar. 12, 2003) at 32–33. Defense expert Kaplan also specifically noted that Plaintiffs' experts had made no effort to examine data concerning the performance of the stations in the post-acquisition period—i.e., from the 2000 divestiture to Tosco/ConocoPhillips to present. *Id.* at 28–29. During the deposition process within the discovery period, Defendants, using Mr. Kaplan's arguments as a springboard, attacked many of Plaintiffs' experts about their use of margin information. *See, e.g., id.,* Ex. 7 (Dep. of Pls.' Expert Jack C. Burdett) at 116, 122–24 (confirming that **\*99** supplier margins should be excluded from DAG's predicted margins); *id.,* Ex. 8 (Dep. of Pls.' Expert Michael D. Baskin) at 415–16 (same); *id.,* Ex. 9 (Dep. of Pls.' Expert George A. Overstreet, Jr.) at 156–57, 163 (same).

Perhaps realizing these problems, Plaintiffs' expert Dr. McClave shifted gears and altered his original stance regarding margin information during his deposition held on April 9, 2003. Discarding the 2000 Bid Book as the source of his information, Dr. McClave testified that Mr. Mamo, one of the named Plaintiffs in this case, was the *real* source of the margin numbers he used for DAG. *Id.,* Ex. 5 (Dep. of Pls.' Expert Dr. James T. McClave) at 77–78, 90, 112–15, 118, 131, 134–37, 145–47. During his deposition, Dr. McClave repeatedly insisted that information regarding the margins and financial performance of *other* suppliers and distributors was unnecessary and irrelevant to his analysis; instead, he predicated his findings on Mr. Mamo's assurance that DAG would earn Bid Book margins. *Id.* at 112:25–113:4 ("I use these numbers ... because of Mr. Mamo's representation to me that the margin information themselves are representative of something he believes he could have achieved."); 114:24–115:1 ("I'm relying on the representation by Mr. Mamo that yes, that these numbers as stated here are reasonable estimates."); 116:13–19 ("ultimately ... the important thing was what were the margins that DAG Enterprises, not Mobil,

could earn"); 131:17 (Dr. McClave used Bid Book margins because "Mr. Mamo believes that those are numbers he could realize"); 137:3–14 ("I'm relying on Mr. Mamo for [margin] information. Q: Entirely? A: Yes."); 146:1–4, 146:21–22 (other expert's opinions about appropriate margins "is to some extent not relevant because what's relevant to me is the numbers I utilized with Mr. Mamo's expectation of what he could have realized .... I ultimately relied on him."); 147:21–23 ("I'm accepting the margins as represented by [Mr. Mamo] as reasonable").

Around this same time-period, Plaintiffs served a subpoena *duces tecum* on non-party ConocoPhillips pursuant to Federal Rule of Civil Procedure 45 on March 4, 2003. *See* ConocoPhillips' Opp'n, Ex. 1 (March 4, 2003, subpoena). ConocoPhillips served objections to the subpoena on March 18, 2003, while concurrently delivering to Plaintiffs' counsel some 452 pages of responsive materials. *Id.,* Ex. 2 (March 18, 2003, objections and responses). ConocoPhillips then served a supplemental response, with 107 pages of additional materials on March 24, 2003. *Id.,* Ex. 3 (certificate of service and chart with Bates ranges of documents produced). Importantly, Plaintiffs' March 4, 2003, subpoena did not request information about the post-divestiture operation or financial performance of the stations within the Divestiture Assets from ConocoPhillips, despite the contemporaneous battle regarding margin information during expert discovery. Rather, the March 4, 2003, subpoena sought only information about ConocoPhillips' participation in the bid process and its communications with ExxonMobil and the Federal Trade Commission ("FTC"). ConocoPhillips' Opp'n, Ex. 1 (March 4, 2003, subpoena) at 6–7.

### D. The Genesis of the Current Dispute

The basis of this dispute arises out of two events that occurred nearly five months after the discovery period closed on April 11, 2003, and expert discovery was complete. *First,* on July 25, 2003, Defendants submitted a set of *Daubert* motions seeking to strike the reports and preclude testimony by three of Plaintiffs' experts, including damages experts McClave and Overstreet. With respect to Dr. McClave's expert report, Defendants have focused their attack on his damages model, asserting that (1) Dr. McClave improperly inflated the margins he used in his report by using the Bid Book numbers that reflected a combined supplier-jobber margin; (2) his belated reliance on Mr. Mamo for his margin information was improper in light of his repeated admissions in his report that the Bid Book was the "source" of his information, as well as implausible given that he failed to test Mr. Mamo's assertions for reasonableness; (3) his reliance on Mr. Mamo to predict margins for hundreds of stores over a five-state area was improper, given Mr. Mamo's limited experience as a distributor for "a very few" stations in the D.C. area; and (4) his *ex post facto* attempt to amend his report **\*100** by claiming to rely on Mr. Mamo rather than the Bid Book for margin information was improper under Rule 26's expert disclosure requirements. *See* Defs.' Mot. for Protective Order at 4 & n.8.

*Second,* on August 1, 2003, ConocoPhillips announced that it was going to divest itself of the Divestiture Assets it had acquired from Tosco—the very assets at the heart of this suit. Upon this announcement, ConocoPhillips began to disseminate information to enable interested parties to bid on the Divestiture Assets. Included within these materials was the performance data from 2000 through 2003 for the Divestiture Assets, and a summary in tabulated form that identified the margins experienced by these stations since they were acquired by Tosco to the present time. Pls.' Opp'n to Defs.' Mot. for Protective Order at 4.

On August 19, 2003, Plaintiff DAG, acting as an interested bidder on these assets, obtained ConocoPhillips' bid information relating to the Divestiture Assets ("Bid Information") pursuant to a confidentiality agreement with ConocoPhillips signed on August 11, 2003. Skok Decl., Ex. A ("Confidentiality Agreement"). The Confidentiality Agreement reflects a clear desire by ConocoPhillips to keep sensitive information regarding the operation and profit margins of their businesses out of the public sector and away from any tactical use by competitors. Specifically, the Confidentiality Agreement included a covenant by the recipient:

- "not to use any Evaluation Material or notes, summaries, or other material derived therefrom (collectively, 'Notes') except to determine whether you wish to propose to enter into a transaction with the Company and the terms thereof," *id.* at 1;

- "not to disclose any Evaluation Materials or Notes other than to those of your officers, directors, employees, consultants, advisors, and representatives of any potential sources of financing (collectively, 'Representatives') with a need to know the information contained therein; *provided,* that such Representatives shall have agreed to be bound by the terms of this Agreement; *provided, further,* that you agree to be

responsible for any breach of this Agreement by any of your representatives," *id.;* and

- "not to disclose that the Evaluation Material has been made available, that you or your Representatives have inspected any Evaluation Material, or that you and the Company may be considering a Transaction or have had, are having or propose to have any discussions with respect thereto." *Id.*

Pursuant to the Confidentiality Agreement, signed by Plaintiff Mamo, DAG was sent a package of information concerning the assets to be sold. ConcocoPhillips' Opp'n at 4. According to Plaintiffs, this Bid Information identified margins that "differed significantly from those used by the Plaintiffs' experts and what had been contained in the Mobil bid information." *Id.*

Both Defendants' *Daubert* motions and ConocoPhillips' margin information called Plaintiffs' predicted prospective damages into serious question. Apparently, these two events caused Plaintiffs to significantly rethink their damages strategy and question the viability of their original expert reports. Plaintiffs had once seen information about the margins and financial performance of *other* suppliers as unnecessary and irrelevant: Dr. McClave had stated as much in his report and deposition, and Plaintiffs failed to seek such information from ConocoPhillips as part of their March 4, 2003, subpoena within the discovery period. Perhaps warned of possible fatal deficiencies in their expert reports by Defendants' *Daubert* motions and informed of additional margin information by the Bid Information provided by ConocoPhillips, Plaintiffs took the unseemly step of breaching their Confidentiality Agreement with ConocoPhillips, bringing up ConocoPhillips' margin information with this Court, and asking for relief to advance their position in this litigation.

During a status conference on August 20, 2003, after they had sought and obtained an extension of time to reply to the pending *Daubert* motions, Plaintiffs announced that they had obtained access to "newly-discovered ***101** evidence" relating to the margins and historical performance of the Divestiture Assets as part of their bid to ConocoPhillips for the assets. Aug. 20, 2003 Tr. at 21:18–22:1; 25:2–5. This evidence, according to Plaintiffs, would necessitate "supplementing" Drs. McClave and Overstreet's reports and would moot the pending *Daubert* motions. *Id.* at 21:1—23:1 (noting that the Bid Information "shows that both Dr. McClave and Professor Overstreet significantly understated the margins, and that the margins in the Mobil bid book were significantly understated by a factor of some 50 or 60 percent"); *id.* at 38:11–12 (calling the evidence "newly-discovered"). Specifically, Plaintiffs represented that, on the eve of the status conference, they had obtained information that ConocoPhillips was providing to potential bidders for the Divestiture Assets, and that such information was relevant to their proof of damages. *Id.* at 21:23–22:1.

Plaintiffs represented to the Court, and repeatedly confirmed in response to questions from the Court, that they diligently sought such information during the discovery period but were unable to obtain it. Plaintiffs' counsel specifically stated: "This is information that we never had before. We attempted to get it, but we never were able to get it. This is the best evidence of what the actual net operating income and margins are for these stations." *Id.* at 22:2–5. Counsel for Defendants objected, noting, "This is information that they could have had before .... I don't have any information that they tried to get this from a third party or submitted a subpoena from anyone, served a subpoena on anyone to attempt to get this information." *Id.* at 24:6–7, 15–18. Plaintiffs' counsel claimed otherwise, stating that "We subpoenaed records from Conoco Phillips and Tosco and we never got that information. They objected to it." *Id.* at 24:21–23. Plaintiffs' counsel conceded, however, that DAG never filed a motion to compel or took further action with respect to the purported subpoenas. *Id.* at 24:24–25:2.

On the basis of this "newly-discovered evidence," Plaintiffs requested that the Court deny Defendants' pending *Daubert* motions and permit Plaintiffs to "supplement" their expert reports. *Id.* at 22:16–23:4. The Court acceded to Plaintiffs' request to amend its expert reports based on the explicit assumption that Plaintiffs "now have information access that they didn't have before," but had previously requested. *Id.* at 23:15–24:1. However, the Court recognized that this was "not the typical supplementation" and that Plaintiffs were actually asking to "substitut[e] another report." *Id.* at 36:23–25. Indeed, Dr. McClave is essentially seeking to switch to a *third* position and flip-flop once more concerning the value of other parties' margin information; now, Dr. McClave suggests that "[f]rom a statistical perspective, results based on these actual [Bid Information] data will be much more reliable than projections based on the original bid book." Pls.' Mot. to Compel, Ex. 3 (Decl. of Dr. James T. McClave) at ¶ 3. From the Court's perspective, Plaintiffs were not seeking to *supplement* their previous reports by filing updated information that brought their old figures to present; rather, they were seeking to throw out the old figures altogether, rely

on entirely new values premised upon a completely different theory of damage calculation, and draft new expert reports incorporating the ConocoPhillips' data.

Importantly, at the August 20, 2003, hearing, the Court repeatedly directed Plaintiffs that their motion to "supplement" should "set out whatever it is that indicates that you made an effort to try to get this material beforehand" and contain a full explanation of why they did not include such information in the reports they previously filed. *Id.* at 30:14–20; *id.* at 36–21–25; *see also id.* at 37:22–23 ("you're going to have to address the issue of why you're coming up with new material that's totally different"). Indeed, the Court's granting of relief was contingent upon this showing by Plaintiffs. In their Opposition to Defendants' Motion for a Protective Order, Plaintiffs now significantly backtrack from the representations they made before this Court during the August 20, 2003, hearing. According to Plaintiffs:

> During the hearing counsel for the Plaintiffs represented that the Plaintiffs had previously sought to obtain performance information from Conoco–Phillips. This was an incorrect statement. Counsel honestly **\*102** believed his statement was correct when made, but it was not and can only apologize to the Court and the parties for the misstatement. On February 20, 2003, Plaintiffs' co-counsel issued a subpoena to Conoco–Phillips. It did not, however, request performance indication for the [Divestiture] Assets.

Pls.' Opp'n to Defs.' Mot. for Protective Order at 5.

Despite the significant change in the factual circumstances underpinning the Court's August 20, 2003, Order allowing Plaintiffs the opportunity to supplement their expert reports, Plaintiffs' counsel did not notify the Court or opposing party. Instead, Plaintiffs made a series of "informal" and "personal appeals" to ConocoPhillips to provide the Bid Information for use in this suit, and offered to enter into a "lawyers and experts eyes only" confidentiality agreement. *Id.* After ConocoPhillips failed to respond to Plaintiffs' efforts, Plaintiffs served a subpoena on ConocoPhillips for the Bid Information on September 9, 2003. *Id.* The new subpoena to ConocoPhillips, in relevant part, seeks detailed information regarding "the financial performance of the Assets from January 1, 2000 to the present date ...."[3] Defs.' Mot. for Protective Order, Ex. 1 (Sept. 9, 2003 ConocoPhillips subpoena) at 4. By serving the subpoena without leave from this Court, Plaintiffs were effectively attempting to extend discovery in this case without permission from this Court and to circumvent this Court's requirement that they make a showing of (1) what previous efforts they had made to obtain the information and (2) why they did not include the information in their previous filings.

*E. General Objections and Arguments*

ConocoPhillips has objected to the subpoena on the basis that (1) it was served well after the discovery deadline; (2) it seeks production of evidence that is irrelevant, as it is highly unlikely that DAG, a jobber that manages a handful of filling stations in the Washington, D.C., area, would have earned profit margins that approximate those garnered by ConocoPhillips, a massive company involved in every aspect of the petroleum industry, from exploration to retail, with offices around the globe and revenues in the billions of dollars, and that arguably employed different strategies and investment decisions with regard to the Divestiture Assets than DAG would have followed; (3) the subpoena will lead beyond the margin information to further intrusive discovery of ConocoPhillips; and (4) it seeks production of highly confidential, proprietary, and trade secret information that Plaintiffs have previously shown themselves unable or unwilling to keep secret. Defs.' Mot. for Protective Order at 6–7.

Defendants join with non-party ConocoPhillips and essentially enter four objections to Plaintiffs' attempted acquisition of the Bid Information via subpoena for use in new expert reports: (1) Plaintiffs' subpoena is untimely and in violation of the Court's Scheduling Order; (2) Plaintiffs have not demonstrated "good cause" to permit additional discovery, and have instead left a record full of false representations and devoid of diligence; (3) Plaintiffs should not be permitted to use belatedly subpoenaed information to remedy their deficient expert reports after the expert and discovery deadlines, especially when the information in question was easily obtainable during the discovery period; and (4) Defendants would be prejudiced if Plaintiffs are allowed to reopen fact discovery. *See generally* Defs.' Mot. for Protective Order; Defs.' Reply at 11–13. Specifically, in terms of prejudice, Defendants note that they have already incurred enormous expense in taking discovery of DAG's experts and responding to their theories: now, they face possibly great expense and additional delay, as it is likely that

- ConocoPhillips and Plaintiffs would litigate over the terms and scope of the new September 9, 2003, subpoena;

- Plaintiffs would submit another round of expert reports incorporating any **\*103** new margin information and related data into the relevant reports;

- A new round of discovery would begin, centered around the issue of whether the ConocoPhillips margin information could be used as basis for projecting Plaintiffs' predicted damages—given the size, income, and strategic disparities between ConocoPhillips and DAG, and given the fact that Plaintiffs' experts did not consider the information relevant or significant enough to request during the discovery period;

- Defendants would be forced to re-depose Plaintiffs' experts who had incorporated the new margin information into their reports;

- Defendants would likely offer rebuttal witness(es) to attack any damages theory proffered by Plaintiffs' experts using the Bid Information provided by ConocoPhillips as a basis; and

- Following a round of motions by the parties regarding Defendants' presumed renewal of their *Daubert* motions, the Court would have to intervene and decide whether Plaintiffs' expert testimony should be excluded given possible reliability concerns.

*Id.* As such, given these objections and possible prejudice, on September 22, 2003, Defendants filed a motion for a protective order to bar Plaintiffs' Rule 45 subpoena *duces tecum* served on ConocoPhillips.

Following Defendants' motion for a protective order, Plaintiffs filed a motion to compel production of the Bid Information from non-party ConocoPhillips on October 27, 2003. Plaintiffs make five major arguments in support of their motion to compel and their effort to rebut Defendants' motion for a protective order: (1) factors such as "surprise" and "inability to prepare" resulting from "newly-discovered," highly-relevant Bid Information support permitting Plaintiffs to supplement their expert reports; (2) the supplemental evidence is crucial to meet Defendants' *Daubert* motions and attack on the credibility and weight of Plaintiffs' experts; (3) Defendants' margin defense was unforeseen; (4) the subpoena served on ConocoPhillips was not "discovery" because it

seeks information from a third party; and (5) the October 13, 2003, edition of *Oil Express,* a petroleum industry news letter, contained an article that actually disclosed ConocoPhillips' margins in the relevant Divestiture Assets for 2001 and 2002 (but not 2000 and 2003), undermining ConocoPhillips' confidentiality claim and concerns.[4] *See generally* Pls.' Opp'n to Defs.' Mot. for Protective Order; Pls.' Mot. to Compel. As such, Plaintiffs contend that it would promote fairness and justice to deny Defendants' motion for a protective order and enforce Plaintiffs' subpoena.[5]

**\*104 II: DISCUSSION**

[1] This Court set a firm deadline of April 11, 2003, for the completion of discovery in this case, and made plain both on the record in open court and in its August 20, 2002, Scheduling Order setting out the deadline that there would be "[a]bsolutely no extensions." Aug. 13, 2002 Tr. 21:5; Defs.' Mot. for Protective Order, Ex. 4 ("Scheduling Order") at 5. In doing so, the Court noted that this case had been plagued with discovery disputes. A subpoena pursuant to Federal Rule of Civil Procedure 45 to a third-party is not exempt from discovery deadlines in scheduling orders. Rather, contrary to Plaintiffs' assertions, Rule 45 subpoenas are "discovery" under Rules 16 and 26 of the Federal Rules of Civil Procedure, and are subject to the same deadlines as other forms of discovery. *See, e.g., Integra Lifesciences I, Ltd. v. Merck KGaA,* 190 F.R.D. 556, 561 (S.D.Cal.1999) ("Case law establishes that subpoenas under Rule 45 are discovery, and must be utilized within the time period permitted for discovery in a case."); *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.,* 177 F.R.D. 443, 445 (D.Minn.1997) (subpoenas under Rule 45, invoking the authority of the court to obtain the pretrial production of documents and things, are discovery within the definition of Fed.R.Civ.P. 26(a)(5) and are therefore subject to the time constraints that apply to all other methods of formal discovery); *Rice v. United States,* 164 F.R.D. 556, 558 (N.D.Okl.1995) ("After careful consideration, the Court finds that the Rule 45 subpoenas duces tecum in this case constitute discovery."); *see also Puritan Inv. Corp. v. ASLL Corp.,* Civ. No. 97–1580, 1997 WL 793569, at \*1 (E.D.Pa. Dec. 9, 1997) ("Trial subpoenas may not be used, however, as a means to engage in discovery after the discovery deadline has passed."); *BASF Corp. v. Old World Trading Co.,* Civ. No. 86–5602, 1992 WL 24076, at \*2 (N.D.Ill. Feb. 4, 1992) ("Here, discovery has been closed for almost eleven months, and the court will not allow the parties to engage in discovery through trial subpoenas.").

A Scheduling Order is "intended to serve as 'the unalterable road map (absent good cause) for the remainder of the case.'" *Olgyay v. Soc. for Envtl. Graphic Design, Inc.,* 169 F.R.D. 219, 220 (D.D.C.1996) (quoting *Final Report of the Civil Justice Reform Act Advisory Group of the United States District Court for the District of Columbia* at 39 (Aug.1993)). "A scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'" *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 610 (9th Cir.1992) (quoting *Gestetner Corp. v. Case Equip. Co.,* 108 F.R.D. 138, 141 (D.Me.1985)). Indeed, "[d]isregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of litigation, and reward the indolent and the cavalier." *Id.* As such, Rule 16 of the Federal Rules of Civil Procedure makes plain that a scheduling order entered by a district judge "shall not be modified except upon a showing of good cause and by leave of the district judge ...." Fed.R.Civ.P. 16(b); *see also* LcvR 16.4 ("The court may modify the scheduling order at any time upon a showing of good cause.").

### A. Plaintiffs' Lack of Diligence during the Discovery Period Ensures That It Has Not Demonstrated "Good Cause" to Permit Additional Discovery

The Court, in accordance with relevant caselaw, made clear at the August 20, 2003, status hearing that a diligent attempt by Plaintiffs to obtain the margin information during the discovery period would be a prerequisite to redoing their expert reports. **\*105** August 20, 2003 Tr. at 30:17–20; 36:21–25 (stating that Plaintiffs, in any motion to supplement, must explain "why they weren't able to come up with this material before" and that they should "set out whatever it is that indicates [they] made an effort to try to get this material before hand"). At the hearing, Plaintiffs represented that they had pursued the information with diligence, stating: "This is information that we have never had before. We attempted to get it, but we never were able to get it." *Id.* at 22:2–3. Plaintiffs noted that they "subpoenaed records from ConocoPhillips and Tosco and we never got that information. They objected to it." *Id.* at 24:19–23. Plaintiffs now have backtracked from these representations, and "apologize to the Court and the parties for the misstatement." Pls.' Opp'n to Defs.' Mot. for Protective Order at 5. Plaintiffs admit that their February 28, 2003, subpoena on ConocoPhillips failed to request performance information for the Divestiture Assets, *id.,* but now submit that "good cause" exists—in part—because (1) Plaintiffs were not "aware of the existence of the information in a readily available and useable format" prior to the bid package created and disseminated by ConocoPhillips, and (2) they did not "pursue the Conoco–Phillips margin information as Plaintiff[s] did not contemplate an attack on their margins .... Rather, the Defendants by attacking the margins have interjected a defense that was unforeseen by the Plaintiffs," *id.* at 18.

**[2]** Because the deadline for discovery expired, Plaintiffs are obligated to seek a modification of the Scheduling Order by demonstrating "good cause" before serving additional discovery and redrafting their expert reports. Fed.R.Civ.P. 16(b); LcvR 16.4(b); *Olgyay,* 169 F.R.D. at 219–20. "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment. The district court may modify the pretrial schedule 'if it cannot reasonably be met despite the diligence of the party seeking the extension.'" *Johnson,* 975 F.2d at 609 (quoting Fed.R.Civ.P. 16 advisory committee notes (1983 amendment)); *see also* 3 *Moore's Federal Practice* § 16.14[b] (2003) ("[I]t seems clear that the factor on which courts are most likely to focus when making this determination is the relative diligence of the lawyer or lawyers who seek the change."). Importantly, "carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Id.; see also Integra Lifesciences I,* 190 F.R.D. at 559–60 (if a party that seeks to extend the scheduling order to take untimely discovery "was not diligent, the inquiry should end"); 6A Wright, Miller & Kane, *Federal Practice and Procedure* § 1522.1 at 231 (2d ed.1990) ("Good cause" "require[s] the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension."); 3 *Moore's Federal Practice* § 16.14[b] (2003) (" 'Good cause' is likely to be found when the moving party has been generally diligent, the need for more time was neither foreseeable nor its fault, and refusing to grant the continuance would create a substantial risk of unfairness to that party"). "Mere failure on the part of counsel to proceed promptly with the normal processes of discovery and trial preparation should not be considered good cause." *Olgyay,* 169 F.R.D. at 220 (quoting *Final Report of the Civil Justice Reform Act Advisory Group of the United States District Court for the District of Columbia* at 41 (Aug.1993)). In sum, "[a]lthough the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification." *Johnson,* 975 F.2d at 609 (citing *Gestetner Corp.,* 108 F.R.D. at 141). "If that party is not diligent, the inquiry should end." *Id.*

Courts in this District have routinely denied requests for discovery beyond a cut-off date where a party has shown a lack of diligence during the allowed time period. *See, e.g., Smith Wilson Co. v. Trading & Dev. Establ.,* Civ. No. 90–1125, 1991 WL 171689, at *1 (D.D.C. Aug. 20, 1991) ("As counsel well knows, this Court established a firm discovery cut-off after consulting with counsel for both sides in open court."); *Secord v. Cockburn,* 747 F.Supp. 779, 786 (D.D.C.1990) ("where a party fails to pursue discovery in the face of a court-ordered cutoff, as here, that party may not be heard to **\*106** plead prejudice resulting from his own inaction") (citation omitted); *Senkow v. Herrington,* Civ. No. 86–2220, 1989 WL 46747, at *1 (D.D.C. Apr. 25, 1989) (denying more time for discovery where court had allowed 120 days and had notified parties in its scheduling order that it was "not inclined to grant further continuance of discovery").

 **[3]**  Importantly, when analyzing the touchstone question of whether the requesting party has demonstrated "good cause," courts are guided by the rule that "when a plaintiff ... is aware of the existence of documents before the discovery cutoff date and issues discovery requests, including subpoenas after the discovery deadline has passed, then the subpoenas ... should be denied." *McNerney v. Archer Daniels Midland Co.,* 164 F.R.D. 584, 588 (W.D.N.Y.1995) (citing cases). Therefore, because it is now uncontested that Plaintiffs *did not* request the relevant margin information during the discovery period, the key question to assess in this instance is whether Plaintiffs did foresee—or could have foreseen—the kind of attack employed by Defendants on the margin information used by Plaintiffs' experts in their damages calculations where information such as the ConocoPhillips' margin information would have been possibly relevant or critical. If Plaintiffs did foresee or could have foreseen an attack on their experts' margins, but neglected to gather available materials from Defendants and third-parties such as ConocoPhillips on this issue, then they have failed to exercise the diligence required to make a showing of "good cause."

The Court begins its analysis by noting that Plaintiffs object to having their actions evaluated in the context of "What was foreseeable?"; implicitly, Plaintiffs instead argue that "What did Plaintiffs actually foresee?" should be sole diligence inquiry. *See* Pls.' Reply to Defs.' and ConocoPhillips' Oppositions to Pls.' Mot. to Compel at 3–4. Plaintiffs posit that their "request to supplement should be considered within the context of the reality of what [they] did accomplish, diligently and with the resources [they] had, during the discovery period, and not with the perfect clarity of hind-sight or the myopia of second-guessing." *Id.* at 3. Plaintiffs assert that any argument based on what they could have foreseen presumes that they "have a crystal ball," *id.* at 9, and submit that "[t]hey should not be held to be able to foresee every attack that Defendants would raise to their expert reports," *id.* at 4. While the Court certainly sympathizes with Plaintiffs' contention that certain resource inequities arise in our judicial system, the fact remains that

> to demonstrate diligence under Rule 16's "good cause" standard, the movant may be required to show the following: (1) that [the movant] was diligent in assisting the Court in creating a workable Rule 16 order, ... (2) that [the movant's] noncompliance with a Rule 16 deadline occurred or will occur, notwithstanding the [movant's] diligent efforts to comply, because of matters which *could not have been reasonably foreseen or anticipated* at the time of the Rule 16 scheduling conference, ... and (3) that [the movant] was diligent in seeking amendment of the Rule 16 order, once it became apparent that [the movant] could not comply with that order ....

*Jackson v. Laureate, Inc.,* 186 F.R.D. 605, 607–08 (E.D.Cal.1999) (internal citations omitted) (emphasis added); *see also Burton v. United States,* 199 F.R.D. 194, 197 (S.D.W.Va.2001) (same). As such, the focus in a court's diligence inquiry is not merely on "What did the movant accomplish?", but also on "What did the movant fail to accomplish?". While the Court does not expect that a diligent party could predict every possible line of attack or identify every possible piece of relevant evidence, it does expect that when a line of inquiry is reasonably obvious and important, a diligent party would conduct discovery to flesh out the issue and bolster its case within the binding timeframe.

In this case, Plaintiffs clearly had notice well before the discovery period ended that Defendants intended to take issue with their experts' assumption that the Year 2000 Bid Book's combined supplier/distributor margin accurately represented the margins that Plaintiffs might earn as a distributor running the Divestiture Assets. In a report filed on March 12, 2003, Defendants' expert David Kaplan pointed out that (1) Dr. McClave's reliance on the Bid Book margins was a **\*107** "mistake" that, when corrected, would mean that Dr. McClave's damages model would yield zero damages, Defs.' Reply in Support of Mot. for Protective Order, Ex.

4 (Preliminary Expert Report of David P. Kaplan, Mar. 12, 2003) at 32–33, and (2) Plaintiffs' experts had made no effort to examine data concerning the performance of the Divestiture Asset stations in the post-acquisition period, *id.* at 28–29.

Plaintiffs' expert Dr. McClave was certainly aware of Defendants' challenge to his reliance on the Year 2000 Bid Book margins by the time his deposition was taken on April 9, 2003. As noted previously, Dr. McClave's initial report unequivocally stated that he regarded the Bid Book as "[b]y far the most important" document he reviewed, and deemed it the "source" of his margin information. *Id.,* Ex. 5 (Preliminary Expert Report of Dr. James T. McClave, Jan. 21, 2003) at 2, 4. In his deposition, Dr. McClave changed course, and noted that Mr. Mamo was the actual source of the margin numbers he used in his damages analysis. *See id.,* Ex. 6 (Dep. of Pls.' Expert Dr. James T. McClave) at 17–19, 77–78, 90, 112–115, 131, 134–37, 157–47. Defendants questioned other witnesses for Plaintiffs about margins within the applicable discovery period, including Mr. Burdett on March 28, 2003, and Mr. Baskin on April 1, 2003. *See id.,* Ex. 7 (Dep. of Pls.' Expert Jack C. Burdett) at 116, 122–24 (confirming that supplier margins should be excluded from DAG's predicted margins); *id.,* Ex. 8 (Dep. of Pls.' Expert Michael D. Baskin) at 415–16 (same).

All evidence indicates that Dr. McClave, and Plaintiffs in general, did not regard information about the post-divestiture financial performance of the Divestiture Assets under ConocoPhillips' control as particularly relevant. Plaintiffs did not request such information from ConocoPhillips when they had the opportunity in their March 4, 2003, subpoena, nor did they supplement that subpoena upon receipt of Mr. Kaplan's criticisms. Moreover, during his deposition, Dr. McClave repeatedly insisted that information regarding the margins and financial performance of *other* suppliers and distributors was unnecessary and irrelevant to his analysis; instead, he repeatedly stated that he predicated his findings on Mr. Mamo's assurance that DAG would earn Bid Book margins. *See, e.g., id.* Ex. 6 (Dep. of Pls.' Expert Dr. James T. McClave) at 112:25–113:4; 114:24–115:1; 116:13–19; 131:17; 137:3–14; 146:1–4; 146:21–22; 147:21–23.

Even if Defendants had not raised the margin issue during the discovery period, Plaintiffs' claim that the issue was not reasonably foreseeable is without support. It is certainly reasonably foreseeable that if this case goes to trial, the calculation of damages will be a crucial issue, and such a calculation would necessarily rely on Plaintiffs' projected profit margins. Plaintiffs will have to be able to show how they arrived at a given figure for damages and must be able to explain their assumptions underlying their predicted profit margins. Plaintiffs employed numerous economists and professors to conduct a damage calculation and predict what Plaintiffs might have earned had they been permitted to buy the Divestiture Assets. Clearly, Plaintiffs' predicted profit margins were a basic element of their claim, and attacking such an essential element was not part of an innovative, ground-breaking defense crafted by Defendants and used for the first time in this case. Rather, a reasonable plaintiff in DAG's and Mr. Mamo's position would not have been surprised that Defendants would challenge the margins relied upon by Plaintiffs' witnesses.

The Court concludes that (1) Plaintiffs were given notice that Defendants would challenge their projected profit margins during the discovery period, and (2) a reasonable party in Plaintiffs' position would have anticipated an attack by the opposing side on such an essential element to their damages' claim during the discovery period. As such, it was both foreseen and foreseeable that the present margin issue, articulated in part in Defendants' *Daubert* motions, would arise. It is plainly reasonable that data relating to the financial performance of the Divestiture Assets after Plaintiffs' failed in this acquisition attempt in the Year 2000 might aid in Plaintiffs' **\*108** damages calculations.[6] Plaintiffs had an opportunity to request ConocoPhillips' margin information but failed to do so, and failed to supplement their March 4, 2003, subpoena to ConocoPhillips after Defendants had clearly challenged their experts' margins. Plaintiffs had ample time and sufficient notice to seek discovery related to the post-divesture performance of the Divestiture Assets during the long discovery period allotted by the Court. As such, the Court finds that Plaintiffs were not diligent in their pursuant of ConocoPhillips' margin information, now demanded in Plaintiffs' September 9, 2003, subpoena. Plaintiffs' lack of diligence and failure to pursue available discovery within the agreed-upon allotted time ensures that Plaintiffs cannot establish the "good cause" necessary to persuade the Court to modify the Scheduling Order and permit Plaintiffs to opportunity to belatedly obtain the margin information discovery.

In such circumstances, it is appropriate for this Court to exercise its discretion and deny Plaintiffs' Motion to Compel and issue a protective order prohibiting the discovery sought by Plaintiffs' subpoena. *See, e.g., Minnesota Supply Co. v. Raymond Corp.,* Civ. No. 99–832, 2002 WL 31898162, at \*2, 2002 U.S. Dist. LEXIS 25400, at \*3–\*5 (D.Minn. Dec.

27, 2002) (protective order granted and subpoenas quashed as an "improper attempt to circumvent the scheduling order and discovery cut-off date"); *Integra Lifesciences I,* 190 F.R.D. at 560 (a party has a right to move for a protective order where the third-party subpoena is a violation of case management orders issued under Fed.R.Civ.P. 16 and 26); *Marvin Lumber & Cedar Co.,* 177 F.R.D. at 445 (prohibiting party from serving or enforcing subpoenas issued after the discovery cut-off); *McNerney,* 164 F.R.D. at 588 (subpoena issued after discovery cut-off date quashed); *Rice,* 164 F.R.D. at 558 (quashing untimely subpoenas when "[t]he information sought by [the party] through the Rule 45 subpoena duces tecum should have been obtained through discovery").

***B. Plaintiffs' Reliance on Rules 37 and 26 of the Federal Rules of Civil Procedure in an Attempt to Gain Access to and Use of ConocoPhillips' Margin Information Is Erroneous***

Plaintiffs attempt to escape the strictures of Federal Rule of Civil Procedure 16(b) and their own lack of diligence by recasting their efforts under Rule 37's sanctions for discovery violations and Rule 26's requirements to supplement discovery. Such an attempt is both misguided and unavailing.

**1. *Rule 37***

**[4]** Federal Rule of Civil Procedure 37 provides the Court with the ability to sanction a party for its failings and improprieties during the discovery process. *See* Fed.R.Civ.P. 37. The determination of which sanction is to be employed, including the preclusion of evidence, is within the sound discretion of the trial court. *See, e.g., Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153, 156 (3d Cir.1995). According to Plaintiffs, "the exclusion of critical evidence is an extreme sanction," Pls.' Opp'n to Defs.' Mot. for Protective Order at 10 (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 905 (3d Cir.1977)), and should only occur when there is a literal violation of Rule 26, *id.* As such, Plaintiffs assert that if the Court grants Defendants' motion for a protective order, the ConocoPhillips' margin information will be excluded from its expert reports. Plaintiffs argue that because alternative cures or sanctions are available, the Court should not resort to this "most extreme sanction." *Id.*

Despite Plaintiffs' assertions, Rule 37 is not relevant to the Court's current analysis. Defendants' motion for a protective order is not a Rule 37 discovery sanction motion. Discovery in this case officially concluded on April 11, 2003.

Despite notice and opportunity, Plaintiffs failed to obtain ConocoPhillips' **\*109** post-divestiture margin information during the discovery period. Plaintiffs only acquired such materials on August 19, 2003, from ConocoPhillips as a allegedly interested bidder on ConocoPhillips' planned sale of the Divestiture Assets. The margin information that is part of ConocoPhillips' Bid Information package cannot be used in this litigation by Plaintiffs as a result of the Confidentiality Agreement entered by Plaintiffs and ConocoPhillips. The only way that Plaintiffs could possibly employ the ConocoPhillips' margin information is by enforcing their September 9, 2003, subpoena (which, due to its broad scope, actually requests more information than is present in the Bid Information package), extending the discovery period by modifying the Scheduling Order, and obtaining the information in a legitimate and usable manner.

As such, Defendants are not requesting—and the Court is not ordering—the "preclusion" of any evidence in this litigation, as there is no "evidence" as of yet to preclude. The issue at hand is whether DAG should be permitted to start a whole new round of fact and expert discovery five months after the Court's explicit deadline, not whether Defendants have carried some hypothetical burden to demonstrate that Plaintiffs should be barred from using evidence under Rule 37 for failure to provide discovery. The Court is not sanctioning Plaintiffs. Rather, the Court is concluding that Plaintiffs' failure to show "good cause" and excuse their lack of diligence entails that (1) Plaintiffs cannot extend discovery and (2) may not attempt to circumvent the Court's Scheduling Order through various means. Rule 37 is therefore inapposite to the current situation, and the Court need not concern itself with such an analysis.

**2. *Rule 26***

**[5]** Plaintiffs also seek refuge under Federal Rule of Civil Procedure 26, which controls the identification of experts and the contents of their reports, as well as imposing a duty to supplement reports. Fed.R.Civ.P. 26(a)(2)(A). Specifically, Plaintiffs point to Rule 26(e)(1) as imposing a specific duty upon a litigant to supplement its experts' reports and deposition testimony when he or she learns of new information. Pls.' Opp'n to Defs.' Mot. for Protective Order at 7. Rule 26(e)(1) provides:

> [a] party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information

disclosed is incomplete .... With respect to testimony of an expert from whom a report is required ... the duty extends to both information contained in the report and to information provided through a deposition of the expert ....

Fed.R.Civ.P. 26(e)(1). Plaintiffs suggest that the margin information contained within the Bid Information released by ConocoPhillips constitutes "new facts" rather than new contentions or new opinions that were omitted from its experts' reports. Pls.' Opp'n to Defs.' Mot. for Protective Order at 9. According to Plaintiffs' rationale, because they have uncovered "new facts," they are under an obligation to supplement their previous experts' reports with the new data and the Court must allow the "supplementation." *Id.*

Despite Plaintiffs' contentions, as this Court recognized at the August 20, 2003, status hearing where Plaintiffs first raised the issue of the ConocoPhillips margin information, Plaintiffs were not requesting "the typical supplementation." Aug. 20, 2003 Tr. at 36:23–24. Rather, the Court recognized that Plaintiffs were seeking to *rework* their damages analyses and change the substance of their contentions—i.e., basically "substituting another report" for the ones that they already have submitted. *Id.* at 36:21–25; 38:6–7; *see also id.* at 37:7–18, 37:21–23 (Court recognized that the reports will involve "new information that's totally different" and "a totally new theory"). Indeed, Plaintiffs fundamentally misconstrue the idea of "supplementation" under Rule 26: "[s]upplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report *based upon information that was not available* at the time of the initial disclosure." Keener v. United States, 181 F.R.D. 639, 640 (D.Mont.1998) (emphasis added). During the discovery period, Plaintiffs had notice and should have foreseen that the margin issue would arise; the information **\*110** that they now seek was readily available, but Plaintiffs simply failed to request such data from ConocoPhillips, despite sending a subpoena to ConocoPhillips in March 2003. Importantly, although Rule 26(e) of the Federal Rules of Civil Procedure imposes a duty to supplement incorrect or incomplete information, it "does not, however, bestow upon litigants unfettered freedom to rely on supplements produced after a court-imposed deadline, even if the rule's pretrial time limit is satisfied." Reid v. Lockheed Martin Aeronautics Co., 205 F.R.D. 655, 662 (N.D.Ga.2001). "In short, Rule 26 imposes a *duty* on Plaintiffs; it grants them no *right* to produce information in a belated fashion." *Id.* (emphasis in original).

As such, Rule 26 provides no safe harbor for Plaintiffs' lack of diligence and failure to show "good cause." Plaintiffs' obligation to supplement their expert reports does not give them the right to ignore the Court's deadlines, reopen discovery, find "new facts," generate new expert reports, and then claim different damages.

### C. Both Defendants and ConocoPhillips Will Suffer Significant Prejudice If Plaintiffs Are Permitted to Reopen Discovery and Craft New Expert Reports Based Upon the ConocoPhillips Bid Information

 **[6]**   "The existence or degree of prejudice to the party opposing modification may supply an additional reason to deny a motion to modify a scheduling order, but it is irrelevant to the moving party's exercise of diligence and does not show good cause." 3 *Moore's Federal Practice* § 16.14 [b] (2003). The prejudice faced by Defendants and ConocoPhillips if the Court were to reopen discovery for Plaintiffs and allow them a new round of expert reports can be considered by this Court, but it is not ultimately determinative. However, the Court does note that both Defendants and ConocoPhillips would suffer significant prejudice if Plaintiffs are allowed to obtain and introduce the ConocoPhillips Bid Information.

*First,* Plaintiffs' attempt to instigate a new cycle of expert discovery would cause Defendants to incur significant expense and produce further delay in these proceedings. In responding to Plaintiffs' experts, Defendants have already incurred significant expense in (1) discovery; (2) evaluating Plaintiffs' experts' reports; (3) offering their own expert's report; (4) deposing Plaintiffs' experts; and (5) preparing substantive *Daubert* motions to challenge certain reports proffered by Plaintiffs' experts. As noted by the Court, Plaintiffs' request effectively seeks to add new facts that translate into new theories and estimations of damages. As described in Section I.E, if the Court allowed Plaintiffs to obtain the ConocoPhillips Bid Information via subpoena and "supplement" their expert reports (i.e., redo or substitute new expert reports), it is likely that: (1) ConocoPhillips and Plaintiffs would litigate over the terms and scope of the new September 9, 2003, subpoena; (2) Plaintiffs would submit another round of expert reports incorporating any new margin information and related data into the relevant reports; (3) a new round of discovery would begin, centered around the issue of whether the ConocoPhillips margin information could be used as basis for projecting Plaintiffs' predicted damages; (4) Defendants would be forced to re-depose Plaintiffs' experts who had incorporated the new

margin information into their reports; (5) Defendants would likely offer rebuttal witness(es) to attack any damages theory proffered by Plaintiffs' experts using the Bid Information provided by ConocoPhillips as a basis; and (6) following a round of motions by the parties regarding Defendants' presumed renewal of their *Daubert* motions, the Court would have to intervene and decide whether Plaintiffs' expert testimony should be excluded given possible reliability concerns. This six-step process will create significant expense for Defendants, despite the fact that they acted in a diligent manner during the discovery period, following the Court's deadlines and entering all necessary evidence. Compelling a party with "clean hands" to incur significant additional expense and spend a large amount of additional time in discovery when the opposing side has not acted with diligence and has not shown "good cause" is simply unwarranted.

**\*111** *Second,* ConocoPhillips, a third-party to this litigation with no direct interest in its outcome, will also suffer significant prejudice if Plaintiffs' subpoena is allowed to proceed in two distinct ways. First, Plaintiffs only uncovered the ConocoPhillips margin information on August 19, 2003, after contacting ConocoPhillips as an interested bidder pursuant to ConocoPhillips' planned sale of the Divestiture Assets. In order to obtain this information, Plaintiffs were compelled to sign a Confidentiality Agreement that explicitly provided that they could "not [ ] use any Evaluation Material or notes, summaries, or other material derived therefrom (collectively, 'Notes') except to determine whether you wish to propose to enter into a transaction with the Company and the terms thereof." Skok Decl., Ex. A ("Confidentiality Agreement") at 1. Plaintiffs use of the Bid Information acquired via this Confidentiality Agreement to (1) convince the Court on August 20, 2003, to temporarily grant its motion to supplement and (2) lay the foundation for a September 9, 2003, subpoena served on ConocoPhillips for post–2000 margin information likely violated this Confidentiality Agreement. Allowing Plaintiffs to breach such an agreement and then benefit from their breach—at the expense of ConocoPhillips—would be to permit ConocoPhillips to suffer an undue prejudice. Second, experts employed by Plaintiffs—Jack Burdett and Dr. McClave—have both represented that the ConocoPhillips Bid Information relating to margins that they now have is not clear and needs clarification. *See* Pls.' Mot. to Compel, Ex. 2 (Burdett Decl.) at ¶ 6A–6C; *id.,* Ex. 3 (McClave Decl.) at ¶¶ 5–7. In these circumstances, it is highly likely that Plaintiffs and their experts will allege similar ambiguities in the ConocoPhillips data that is to be produced pursuant to the September 9, 2003, subpoena, and would seek additional discovery from ConocoPhillips to clarify the data or bolster their contentions; similarly, Defendants would likely seek comparable discovery from ConocoPhillips to show that the data is not relevant to this case or probative of Plaintiffs' alleged damages. Complying with this additional discovery would take large amounts of time and effort by ConocoPhillips, leading to significant expense. To place such a burden on ConocoPhillips—when the information sought by Plaintiffs is of questionable relevance, when Plaintiffs have acted in a negligent manner, and when Plaintiffs have, in fact, violated their previous binding promises to ConocoPhillips—would be to countenance undue prejudice. As such, the significant prejudice faced by both Defendants and ConocoPhillips weighs against granting Plaintiffs' motion to compel.

### D. The Denial of Plaintiffs' Motion to Compel Does Not Create a Substantial Risk of Unfairness for Plaintiffs

While not a traditional factor that a court must consider in evaluating an attempt to extend discovery and modify a Scheduling Order under Federal Rule of Civil Procedure 16(b), the potential prejudice faced by the movant is a consideration when a Court decides whether to allow a party leave to amend the pleadings after the deadline for amendments established in the Scheduling Order has passed. *See* 3 *Moore's Federal Practice* § 16.14[b] (2003); *Southwestern Bell Tel. Co. v. City of El Paso,* 346 F.3d 541, 546–47 (5th Cir.2003). As such, the Court notes that a brief discussion of the risk of unfairness—or lack thereof—that Plaintiffs face if they are denied access to and use of the ConocoPhillips margin data may prove illuminating. Therefore, rather than simply considering "good cause" and the prejudice faced by Defendants and ConocoPhillips, the Court shall also focus on the importance of the information sought and the potential prejudice faced by Plaintiffs.

A careful review of the record reveals that Plaintiffs do not face a substantial risk of unfairness if they are denied (1) the opportunity to acquire and employ the ConocoPhillips' margin information and related documentation, and (2) the opportunity to redraft their expert reports and redo expert discovery. It is far from clear on this record that the information would ultimately prove useful to Plaintiffs and reliable as a damages indicator. Indeed, both Defendants and ConocoPhillips have hotly contested the necessity and relevance of the data sought. Essentially, were the Court to countenance Plaintiffs' failure of diligence and allow the six-step **\*112** expert discovery process described in Section II.C. to result, the Court might well conclude that the new information is unreliable because a comparison between the

performance of the Divestiture Assets under ConocoPhillips and how those Assets would have performed under DAG cannot be made.

According to ConocoPhillips, the information in question "shows the assets' performance under the management of Tosco and ConocoPhillips, companies that have invested millions of dollars in the operation of this line of business after acquiring the assets from ExxonMobil." ConocoPhillips' Opp'n at 12. ConocoPhillips makes two key points. First, Tosco and ConocoPhillips were able to invest so heavily because of their great size relative to DAG; according to ConocoPhillips, "their success reflects that they invested more in the business than Mobil had previously." *Id.* Second, the companies chose to manage the Assets according to a different strategy than was employed under ExxonMobil. Tosco "nearly doubled the amount of money Mobil had spent on advertising in the region. It spent millions more on capital improvements and image improvements, on repair and maintenance, and on programs for assisting Mobil dealers. Its investments including converting nearly 100 retail outlets in the region to Circle K convenience stores." *Id.* (citing Skok Decl. ¶ 23). As such, ConocoPhillips contends that even had DAG wanted to make the same choices concerning the Divestiture Assets, it is highly unlikely that it could have made those decisions given its resources. *Id.* at 13.

ConocoPhillips and Defendants have raised substantial issues that significantly undercut Plaintiffs' assertions that the information sought is "critical" to their damage calculations. It is quite possible that even if the Court granted Plaintiffs' motion to compel and allowed them to redraft their expert reports, at the conclusion of the next six-step discovery process, it might be evident that a comparison may not be made between ConocoPhillips and DAG, rendering all information, time, and expense useless. Plaintiffs' experts have flip-flopped previously on what information was crucial and determinative, and there might well be too many variables in the ConocoPhillips' margin information to find that the data is helpful. Because there is a substantial chance that this lengthy and costly avenue may not yield any progress, the Court concludes that Plaintiffs cannot make a showing that

they face a "substantial risk of unfairness" if their motion is denied. In the end, Plaintiffs have failed to show "good cause" and have not presented evidence of diligence; Plaintiffs have not established a "substantial risk of unfairness," while both Defendants and ConocoPhillips have proven definite prejudice.

### III: CONCLUSION

For the reasons set forth above, Defendants' Motion for a Protective Order Regarding Plaintiffs' Untimely Rule 45 Subpoena *Duces Tecum* is granted, and Plaintiffs' Motion to Compel Production of Information Subpoenaed from Third–Party ConocoPhillips is denied. As Abraham Lincoln once advised, "The leading rule for the lawyer, as for the man of every other calling, is diligence. Leave nothing for to-morrow which can be done to-day." Abraham Lincoln, Fragment, Notes For a Law Lecture, July 1, 1850, *in* 2 Collected Works of Abraham Lincoln 81 (Roy Baslet *et al.,* eds., Rutgers University Press 1990) (1848–65). Plaintiffs' failure to conduct discovery with reasonable diligence within the Court's parameters ensures that their effort to circumvent the Court's deadlines for expert discovery, duck their previous confidentiality agreement with ConocoPhillips, and evade the rationale and impact of Defendants' pending *Daubert* motions is unavailing. As the Ninth Circuit once concluded,

> As the torrent of civil and criminal cases unleashed in recent years has threatened to inundate the federal courts, deliverance has been sought in the use of calendar management techniques. Rule 16 is an important component of those techniques. We will not snatch it away or destroy its effectiveness by requiring district courts to countenance the practices exemplified by the facts of this case.

*Johnson,* 975 F.2d at 611. An Order accompanies this Memorandum Opinion.

Footnotes

1   In September 2001, Tosco was acquired by the Phillips Petroleum Corporation, which in turn later merged with Conoco Inc. The acquisition included the Divestiture Assets. After the Phillips merger with Conoco, Tosco Corporation was merged into Phillips and dissolved, and shortly thereafter Phillips changed its name to ConocoPhillips Company. Mem. of Nonparty ConocoPhillips Company in Opp'n to Pls.' Mot. to Compel ("ConocoPhillips' Opp'n"), Ex. 4 (Decl. of W. Thomas Skok) ("Skok Decl.") at ¶ 4.

| | |
|---|---|
| 2 | In an Opinion and Order dated February 2, 2004, the Court granted Defendants' Motion to Dismiss Count Four (unfair competition) of Plaintiffs' Third Amended Complaint as to Plaintiff Mamo. *DAG Enters.,* Civ. A. No. 00–0182 (D.D.C. Feb. 2, 2000) (memorandum opinion and order dismissing Count Four as to Plaintiff Mamo). |
| 3 | The Court notes that had Plaintiffs previously requested this information, as they initially represented to the Court, they would not require a new subpoena to get the information from ConocoPhillips. |
| 4 | Plaintiffs note that they "would supplement their expert reports with this information [the *Oil Express* article], even if the Court determines not to enforce the Conoco subpoena on confidentiality grounds." Pls.' Opp'n to Defs.' Mot. for Protective Order at 5–6. The Court notes that the *Oil Express* article does not state that ConocoPhillips provided the data to the press. *See id.,* Ex. 1 (*Oil Express* article) at 1. To the contrary, the article contains hearsay information from an anonymous and unverified source. Plaintiffs lack access to the data that allegedly underpins this article, and would be seeking to "supplement" their reports with (1) an unverified news letter and (2) information beyond their custody and control. Moreover, Plaintiffs own expert Dr. McClave admits that the article contains "helpful information but it is incomplete and somewhat ambiguous." *Id.,* Ex. 3 at ¶ 4. Indeed, according to Dr. McClave, "it does not contain data for 2000 or 2003, which, according to Mr. Mamo, are more representative of the industry's typical results than 2001 and 2002. The article contains little or no cost information, and the discussion of margins found therein needs clarification." *Id.* This kind of unverified, unrepresentative, ambiguous hearsay has no place in an expert report and does not provide an expert with a basis for changing his or her report. |
| 5 | As part of their fairness argument, Plaintiffs claim that Defendants' previous motion to modify the Scheduling Order in order to take the out-of-time depositions of three of Plaintiffs' fact witnesses engendered delay. Pls.' Opp'n to Defs.' Mot. to Compel at 6. As such, Plaintiffs contend that it is only equitable that this Court allow them the opportunity to supplement their expert reports. *Id.* The Court finds Plaintiffs' attempted comparison wholly unsupported by the factual record. Defendants' need to take the Hollis and O'Basuyi depositions truly was a surprise, and Defendants—unlike Plaintiffs—acted with diligence during the discovery period. Defendants first learned that Dr. Jaynes, Plaintiffs' "discrimination" expert, had obtained and was relying on declarations from these third parties only through testimony at Dr. Jaynes' deposition held on April 18, 2003. *DAG Enters.,* Civ. A. No. 00–0182, at 2–3 (D.D.C. Jan. 28, 2004) (memorandum opinion and order allowing depositions after close of discovery). DAG did not produce copies of these declarations until May 2, 2003, weeks after the discovery period closed. *Id.* at 3. Moreover, DAG failed to produce these declarations in the face of numerous pre-deposition requests to produce all documents upon which Dr. Jaynes relied. *Id.* Accordingly, the Court concluded that Defendants presented "good cause" under Federal Rule of Civil Procedure 16 to extend discovery for the limited purpose of conducting three additional depositions. *Id.* at 9. As described herein, the present dispute arose out of Plaintiffs' lack of diligence in spite of a wealth of evidence and opportunity that pointed towards the potential relevance of ConocoPhillips' margin information. |
| 6 | The Court notes that the performance of the Divestiture Assets under ConocoPhillips might not necessarily be equivalent to what the performance of those stations would have been under the control of Plaintiffs, given the vast disparity between ConocoPhillips and DAG. Indeed, it is unclear whether such information would ultimately be relevant, admissible, influential, or determinative. |