```
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
 2

 3   ****************************************************************

 4   IN RE:  KATRINA CANAL
     BREACHES CONSOLIDATED
 5   LITIGATION

 6                              CIVIL ACTION 05-4182
                                SECTION "K"(2)
 7                              NEW ORLEANS, LOUISIANA
                                THURSDAY, JUNE 28, 2012, 10:00 A.M.
 8   PERTAINS TO:

 9   ARMSTRONG, NO. 10-866

10   ****************************************************************

11
                TRANSCRIPT OF MOTIONS HEARING PROCEEDINGS
12       HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
                      UNITED STATES JUDGE
13

14
     APPEARANCES:
15

16   FOR THE PLAINTIFFS:          BRUNO & BRUNO
                                  BY:  JOSEPH M. BRUNO, ESQUIRE
17                                     SCOTT L. JOANEN, ESQUIRE
                                  855 BARONNE STREET
18                                NEW ORLEANS LA  70113

19

20                                LAW OFFICE OF ELWOOD STEVENS JR
                                  BY:  ELWOOD STEVENS JR, ESQUIRE
21                                1205 VICTOR II BOULEVARD
                                  MORGAN CITY LA  70381
22

23
                                  CUMMINGS, CUMMINGS & DUDENHEFER
24                                BY: FRANK DUDENHEFER JR., ESQ.
                                  416 GRAVIER ST.
25                                NEW ORLEANS LA  70130
```

```
1    APPEARANCES CONTINUED:

2

3    FOR THE UNITED STATES
     OF AMERICA:                    DEPARTMENT OF JUSTICE
4                                   BY:  ROBIN D. SMITH, ESQUIRE
                                         JOHN WOODSTOCK, ESQUIRE
5                                        RUPERT MITSCH, ESQUIRE
                                   TORTS BRANCH, CIVIL DIVISION
6                                  BENJAMIN FRANKLIN STATION
                                   P.O. BOX 888
7                                  WASHINGTON, D.C. 20044

8

9    FOR WASHINGTON GROUP
     INTERNATIONAL, INC.:          STONE PIGMAN WALTHER WITTMANN
10                                 BY:  WILLIAM D. TREEBY, ESQUIRE
                                        HEATHER LONIAN, ESQUIRE
11                                      JAMES C. GULOTTA, JR
                                   546 CARONDELET STREET
12                                 NEW ORLEANS LA  70130

13

                                   JONES DAY
14                                 BY:  ADRIAN WAGER-ZITO, ESQUIRE
                                        DEBRA CLAYMAN, ESQUIRE
15                                      JULIA L. CRONIN, ESQUIRE
                                   51 LOUISIANA AVENUE N.W.
16                                 WASHINGTON DC  20001

17

18   OFFICIAL COURT REPORTER:    CATHY PEPPER, CCR, RMR, CRR
                                 CERTIFIED COURT REPORTER
19                               REGISTERED MERIT REPORTER
                                 500 POYDRAS STREET, ROOM B406
20                               NEW ORLEANS LA  70130
                                 (504) 589-7779
21

22   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.
23

24

25
```

1                    **P-R-O-C-E-E-D-I-N-G-S**

2              THURSDAY, JUNE 28, 2012

3            M O R N I N G   S E S S I O N

4              (COURT CALLED TO ORDER)

5

6

7        THE DEPUTY CLERK:  All rise.

8        VOICES:  Good morning, Judge.

9        THE COURT:  Good to see all of you here.

10             Any comments that I make in the beginning will

11   not be allotted to your time, and mine won't be too long.

12             First, just as an aside, I'm certainly glad I'm

13   not a reporter who had to digest and say what the

14   Supreme Court's ruling on health care meant in five minutes.

15   There were a lot of mistakes that were made.  I felt sorry for

16   her.

17             Of course, the Court has dealt with, not

18   specifically the issue that I have here today, but the failure

19   of the floodwall along the Industrial Canal, the North and

20   South Breaches.

21             In my previous ruling I made I took great pains

22   not to make a holding as to what caused it, just that it wasn't

23   the barge; so, this is a clean slate as far as I'm concerned.

24             Although the science is complex, I find --

25   geotechnical engineering, to some degree, rivals quantum

1    physics in some of its complexities -- I'm sure that's

2    hyperbole, but that what it is to me.

3                Frankly, the floodwall failed in those two spots

4    either because, one, it was overtopped and eroded from the

5    backside, there was underseepage that was caused by the alleged

6    defalcations of the Corps and WGI in not appropriately dealing

7    with the excavations and the fill thereof, or it would simply

8    have failed regardless of the excavation, as to underseepage.

9    The underseepage was going to occur, and I don't know if

10   anybody has opined this, because maybe the floodwall wasn't

11   deep enough into the ground.

12               What's before me, really, is was it overtopping

13   or underseepage, pretty much, with a lot of nuance and

14   complexity there.

15               I have reviewed everything, as much as I could,

16   and told you what I'm interested in.  Particularly, I'm

17   focusing on the rebuttal report right now because I want to

18   make sure -- it's my task to make sure that we have a trial

19   that seeks the truth, but also that is fair, by my watch.

20               Somebody is not going to like what I do and think

21   it's unfair, but at least I've got to be satisfied that it's

22   fair.  That's really the purpose for this hearing.

23               Mr. Treeby, it's all yours at this time.

24          MR. TREEBY:  Thank you, Your Honor.

25               If Your Honor please, we're going to use a

1    PowerPoint during this argument, and I think I've provided a

2    paper copy there for you to use as you see fit.

3            Where we have video clips from depositions

4    inserted into the PowerPoint, we're providing you with a

5    transcript of the testimony contained on the video clip.

6    Sometimes it's a little hard to understand.

7            The Court and counsel may, as you see fit, look

8    to the complete transcript to determine context.  We haven't

9    provided the complete transcript, but Your Honor has those.

10           THE COURT:  I do have it.

11           MR. TREEBY:  The court reporter begged me not to go too

12   fast.  I recall that when I argued a motion for summary

13   judgment before Your Honor, I was racing because of time

14   limits.

15           We've timed this.  I kind of know what it takes.

16   But things happen.  So I may have to ask for some indulgence

17   from the Court.  I know the Court has already said it doesn't

18   want to violate the time constraints, but I'll do the best I

19   can.

20           We're here on the defense motions to strike the

21   first 53 pages of Dr. Bea's so-called rebuttal report dated

22   April 3rd, 2012, which he immediately, on page 3, discloses

23   more candidly as additional analyses.

24           We're also here on our motion to strike the still

25   later and untimely expert and rebuttal reports, forensic

1    engineering quantitative analyses furnished to WGI late on the

2    night of April 12th, 2012, just before Dr. Bea's rebuttal

3    report deposition.

4            Because it was received so late and contained a

5    lot of new and somewhat complex theories, we could not even

6    examine Dr. Bea on that material.  I'll address our argument to

7    the questions posed to defendants in the Court's order of

8    June 14, as well as the cases the Court asked us to address

9    this past Tuesday.

10           THE COURT:  Yes, sir.

11           MR. TREEBY:  The Court's first item to focus our oral

12   arguments asks whether, in a rebuttal report, an expert may

13   buttress or bolster his original report.

14           The clear answer in the cases is no.  Rebuttal is

15   rebuttal, not additional analyses to cure defects in original

16   opinions.

17           Rule 26(a)(2)(D)(ii) states clearly that the

18   purpose of a rebuttal report is solely to contradict or rebut

19   evidence on the same subject matter identified in another

20   party's expert report.

21           Plaintiffs don't even try to argue that the

22   answer is not no in their memorandum.  In fact, they cite the

23   same cases we cite, *Procter & Gamble v. McNeil* and

24   *Noffsinger v. Valspar*.  The P&G court tells us that rebuttal

25   is, quote, limited to responding to the issues raised by the

1    opposing party's experts.

2         THE COURT:  If I interrupt you too much, Mr. Treeby, I

3    am going to give you some indulgence, because I want to be

4    fair.  I know interruptions sometimes affect the flow of the

5    argument.

6              One of the things that has vexed me in this is,

7    looking at the cases, they seem to be all over the place,

8    frankly.  If I'm an expert, and say my report is criticized in

9    another expert report, and the other expert has other theories,

10   may I rebut that criticism?  It would seem that I could.

11             So I'm wondering how one rebuts it.  You wouldn't

12   simply say, well, here is what I said here, and I still say

13   it's right.  I'm trying to understand how you rebut criticism

14   without amplifying your report, or just say, read it again, you

15   just don't understand it.

16             It's a quandary for the Court, just to let you

17   know that.  In some of the cases, I found -- I wasn't looking

18   for it, I just was trying to look for more amplification on

19   this -- some judges have allowed that -- you know that, I won't

20   cite all of the cases -- some of the cases that I cited about

21   the discretion of the judge.

22             So the distinction, frankly, one of the reasons

23   I'm having this argument is they trouble me, and I'm ready to

24   be enlightened.

25         MR. TREEBY:  I hope I can, Your Honor.  The cases are

1   somewhat all over the map, but I believe that's because the

2   facts of each of those cases is different.

3          THE COURT:  That's true.

4          MR. TREEBY:  I think that's what drives -- typically

5   drives.

6               But *Noffsinger* instructs, for example, that a

7   party may not offer testimony under the guise of rebuttal only

8   to provide additional support for its case in chief.

9               Now, as the Court knows from the cases we've

10  provided, as well as the *Scientific Components Corp.* case that

11  the Court gave us, *City of Gary, Pakootas* and *Bone Care*

12  *International*, a determination of whether or not a report is

13  proper rebuttal under Rule 26, and, if improper, what the

14  appropriate remedy is, is a very fact-specific inquiry

15  requiring the Court to first determine whether the reported

16  testimony is true rebuttal.

17              What Dr. Bea has done, both in Pages 1 through 53

18  of his rebuttal report -- and we're not talking about the rest

19  of his rebuttal report --

20         THE COURT:  Right.

21         MR. TREEBY:  -- and his entire untimely report that was

22  provided to us on April 12th is, first, based on the facts, we

23  believe, not rebuttal, which we hope to show.

24              On Page 1 of his rebuttal report, Paragraph 3,

25  Dr. Bea tells us, Section 1 -- and Section 1 is Pages 1 through

1    53 -- provides a summary of results from additional forensic

2    engineering analyses I have performed.

3                Nothing in those first 53 pages mentions

4    Dr. Marr's report or Dr. Silva's report, but, rather, expands

5    or tries to further explain his original report.

6                Dr. Bea admitted as much in his deposition when

7    he said that he started working -- in his original report, he

8    started working on the Swiss Cheese GIS model before he even

9    received defendant's expert reports.

10                Quoting from his March 27th deposition on

11   page 213, he says this, "One of the things that we did" -- "one

12   of the things that we did not have the opportunity to provide

13   at the time I had to provide my original report, February the

14   1st, we wanted to develop a detailed mapping of the excavations

15   on the East Bank Industrial Area.  I have continued that work,

16   and it will be part of my rebuttal report that you will receive

17   on April 3rd."

18                Then, during his April 16th deposition on this

19   so-called rebuttal report, when Dr. Bea was asked if he always

20   intended to create the 3D graphic GIS models, he replied,

21   "yes."

22                Most of the facts referenced in these two reports

23   that we're trying to strike were available to Dr. Bea and

24   plaintiffs four years ago, at least.

25                In *Tramonte v. Fibreboard*, the Fifth Circuit

1    stated the trial court generally admits rebuttal evidence to

2    rebut evidence unavailable earlier through no fault of the

3    plaintiff.

4            The *Noffsinger* court stated, the proper function

5    of rebuttal evidence is to contradict, impeach, or defuse the

6    impact of the evidence offered by an adverse party.

7            The court went on to say, if, as here, the

8    court's scheduling order permits rebuttal reports -- experts

9    and reports, a party may submit an expert rebuttal witness who

10   is limited to contradicting or rebutting evidence on the same

11   subject matter identified by another party in its expert

12   disclosures.

13        THE COURT:  Now, that's where I get into how do I rebut

14   that without in some way -- I don't want to use the word

15   "embellishing," but going beyond the scope of my original

16   report, if I'm an expert?  What is it that I can do?

17           Let's say we're talking about the same thing.

18   I'm really simplifying this, and you can please correct me.

19   Let's take the steady flow issue.  Dr. Bea uses the steady flow

20   analysis.  Your experts say that's totally improper.

21           One or both of them -- I'm talking about two that

22   I read -- when I say read, I went over thoroughly -- one in

23   particular may talk about how steady flow is not the

24   appropriate way to -- we use non-steady flow.  I'm really

25   simplifying this.

1              So, in rebutting, if one were to say, well,

2    steady flow really is good, and this is why, why isn't that

3    rebuttal, I guess is my question?  What is it?

4         MR. TREEBY:  Right.  Well, I hate to -- I hate to jump

5    out of order because of the PowerPoint, but I'm going to

6    address that question.

7         THE COURT:  Well, no --

8         MR. TREEBY:  I don't think it's rebuttal.  Yes, he says

9    he's using steady flow.  The fact of the matter, he's not.

10   That's the bottom line.  He's really not.  He used a transient

11   flow analysis that he now calls steady flow.

12             When he was caught with an absolutely impossible

13   compressibility figure, that's when he decided, oh, I have to

14   think up something else.  We're going to get to that in our

15   argument.  But that's not rebuttal; that's fixing a hole or a

16   problem that was brought up in his March 28 -- 27, 28

17   deposition.

18        THE COURT:  Some of the cases say that one can do that,

19   either by a supplemental -- I don't want to get you out of

20   order too much.

21        MR. TREEBY:  If Your Honor please, it's not that we

22   don't think he can talk about steady flow.  After page 53 in

23   his rebuttal report, he does try to rebut Dr. Silva and

24   Dr. Marr on that issue.  That's fine, but that's not what's in

25   page -- I forget the number, but it's a section right in the

1     middle of that.

2             THE COURT:  Right.  It's the second portion in the

3     middle of 1 to 53.

4             MR. TREEBY:  That's not what he does there.  It's very

5     prejudicial what he did there, and I hope to convince the

6     Court --

7             THE COURT:  I'll listen to that.

8             MR. TREEBY:  The four cases referenced by the Court

9     applied these same common rules defining rebuttal, and

10    determined, in most of the instances in those four cases, that

11    the rebuttal offered was truly rebuttal, with a couple of

12    exceptions.

13            All four of the cases referenced by the Court

14    cite -- their source, really, is a case called *Crowley v.*

15    *Chait,* C-H-A-I-T, which is 332 F.Supp.2d 530.  It's a

16    District of New Jersey case.

17            There, in the *Crowley* case, the Court explained

18    that Rule 26 -- and this is the part that was typically quoted

19    in all four of those cases -- does not automatically exclude

20    anything an expert could have included in his or her original

21    report.  Such a rule would lead to the inclusion of vast

22    amounts of arguably irrelevant material in an expert's report

23    on the off chance that failing to include any information in

24    anticipation of a particular criticism would forever bar the

25    expert from later introducing the relevant material.

1        All that is required is for the information to

2   repel other expert testimony, as the rebuttal report, the court

3   found, in one instance in that case does.  That's from

4   *Crowley v. Chait*.

5        We understand that rule.  We agree with that

6   rule.  That does not excuse what has happened here, as we hope

7   to demonstrate.

8        What has happened here is that Dr. Bea has used

9   his rebuttal to offer further opinions, new opinions to support

10  his old opinions; but, he has still not provided, still, to

11  this day, not provided what is required by Rule 26(a)(2)(B)(i)

12  and (ii), quote, a complete statement of all opinions and all

13  the bases and reasons for them and all the facts or data

14  considered in forming those opinions.

15       *Crowley v. Chait,* that seminal case from which

16  those other cases flow, also found -- in striking what was not

17  proper rebuttal found this, quote, rebuttal testimony does not

18  give the expert a chance for a do-over.  That's on Page 551 of

19  *Crowley v. Chait*.

20       Whereas, in the *Scientific Component Corp*. case,

21  the Court detected improper rebuttal, the Court fashioned a

22  fact specific remedy or sanction.

23       In most, if not all, of those cases, Rule 37 was

24  implicated.  In this case, we believe the appropriate reference

25  to determine a remedy or sanction is Rule 16 as to the

1     April 11th report, since here there is a specific scheduling

2     order providing for timely rebuttal reports, and that date was

3     April 3rd, not April 11th or 12th.

4              Here, we believe the appropriate remedy, as in

5     *Noffsinger*, is to limit Dr. Bea's proposed rebuttal opinions to

6     a critique of defendant's opinions, not to bolster or buttress

7     his original report with new analyses, new validations, and new

8     theories.

9              We're going to discuss why we believe this is the

10    appropriate remedy when we go to Item 4 in the Court's

11    June 14th order.

12             Our goal here is to prevent further analyses and

13    further, quote, validations of his prior analyses, when we've

14    never been given those analyses or validations by now, 10 weeks

15    and 3 days before trial, not 10 months as was the case in the

16    *Bone Care International* case.

17             We must be able to cross-examine Dr. Bea at trial

18    with all his facts and all his opinions previously disclosed in

19    the two expert reports that we have been able to depose him

20    about and, unless it is stricken, the same information related

21    to the April 11th report that we have not able to depose him

22    about.

23             To find otherwise would simply mean that

24    plaintiffs -- this case has been going on for a while.  The

25    facts have all been out there for a while.  All the data has

1   been disclosed for four-plus years -- that the plaintiffs in

2   this case, Dr. Bea in particular, would be able to hide the

3   ball in their initial, all-important expert report on

4   causation; and, then, after the report, and after the

5   deposition on the report, come up with new, previously unstated

6   bases for the original general opinion, underseepage caused the

7   failure, without the support required by Rule 26.

8            Since Dr. Bea's original opinions were,

9   frankly -- and we've said this in our *Daubert* motions -- of the

10  *ipse dixit* sort, underseepage caused the failure, trust me, I'm

11  an expert, that opens up the field for him to attempt to cure

12  all of the inaccurate assumptions about excavations -- he

13  didn't have one accurate excavation in his opinions -- and all

14  the misuse of science with ever new speculation.  That is not

15  rebuttal.

16           The bottom line is this:  The first 53 pages of

17  Dr. Bea's so-called rebuttal report consists of new analyses

18  and a promise of identifying new excavations under the guise of

19  a demonstrative.  All of these analyses could have and should

20  have been disclosed in Dr. Bea's original expert report.

21           The Court then asks, and it's a good question,

22  could Dr. Bea's rebuttal be considered a supplemental?

23           Given the arguments here, the Court's second

24  question is obviously appropriate.  Can Dr. Bea's rebuttal

25  report be considered a supplemental report pursuant to

1  Rule 26(e)(1) and (2)?  Again, we believe the unequivocal

2  answer, given the substance in Dr. Bea's report, is an emphatic

3  no.

4           There are and have been in this case, probably

5  will be, many opportunities and needs for supplemental reports,

6  as that term is used in Rule 26(e)(2).  That's been true for

7  plaintiffs; it's been true for the defendants.  Plaintiffs have

8  utilized supplemental reports to correct misstatements or

9  errors in Dr. Bea's reports.  Similarly, defendants have issued

10  corrections, such as revised Table B-1 by the United States, as

11  well as on other occasions.

12           But here is the law on supplemental reports:

13  This Court held, in *Robinson*, that a party may submit a

14  supplemental report under Rule 26(e) only where, quote, the

15  party learns that in some material respect the disclosure was

16  incomplete or incorrect, and if the additional or corrective

17  information has not otherwise been made known to the other

18  parties during the discovery process or in writing or as

19  ordered by the Court.

20           In fact, the parties obviously have a continuing

21  obligation, pursuant to Rule 26(e)(2), to correct incomplete or

22  incorrect expert disclosures; but, this provision in Rule 26

23  does not countenance providing new opinions, new analyses, or

24  new theories to bolster or buttress general opinions already

25  provided based on faulty science or based on previously

1    available information.

2                In this case, as the Court, I'm sure, knows,

3    hundreds of thousands of pages providing detailed work plans,

4    photographs, field records, documenting Washington Group's work

5    in the East Bank Industrial Area, were given to the plaintiffs

6    by Washington Group in 2007 and 2008.

7                The source materials to document

8    Washington Group's work were also made available to all the

9    parties in the United States' repository of documents in 2007.

10               The voluminous productions are the source

11   materials for detailing the location, size, shape, and depth of

12   excavations, and what was used to backfill them, done by

13   Washington Group in the process of environmentally remediating

14   the EBIA.  That data was all there.

15               All of this information has been available to

16   plaintiffs and Dr. Bea since then.  Faced with a similar

17   situation, Magistrate Noland, in the Middle District, in

18   *Simmons v. Johnson* found, quote, courts have routinely rejected

19   untimely supplemental expert reports and testimony where the

20   opinions are based upon information available prior to the

21   deadline for service of the initial expert reports.

22           THE COURT:  I know you're familiar with these.  I'm

23   looking in my bench memo.

24               Several courts have found it permissible for a

25   plaintiff, quote, to use supplementation of the expert report

1  as an opportunity to improve on the initial expert report,

2  citing cases.

3           One held that a supplementation of an expert

4  report was proper even if it was done as a direct or indirect

5  result of the fact that opposing counsel pursued the subject of

6  supplementation at the expert's deposition, citing other cases.

7           On another case, allowing supplemental report and

8  supplemental expert testimony that was disclosed in direct

9  response to opposing counsel's challenges to the original

10 report, concluding that there was no basis to exclude the

11 report simply because plaintiffs failed to anticipate the need

12 for it until the defect was pointed out by their opponent.

13           You may feel that these facts do not lend itself

14 to that.  You may not agree with those cases because, again,

15 like you say, a lot of them are fact dependent, and a lot of

16 them are, frankly, judge dependent.

17      MR. TREEBY:  It's a discretion.  Your Honor has

18 discretion in this.  I understand that.  We hope to persuade

19 you that it would be unfair, not --

20      THE COURT:  That's the whole purpose here.  That's the

21 purpose of this.

22      MR. TREEBY:  The *Dag Enterprises* case found that the

23 plaintiffs fundamentally misconstrued the idea of

24 supplementation under Rule 26.  The Court stated,

25 "Supplementation under the rules means correcting inaccuracies

1    or filling the interstices of an incomplete report based on

2    information that was not available at the time of the initial

3    disclosure."  It quotes *Keener v. United States*, the Montana

4    case.

5              As the Court can see from Dr. Bea's admissions,

6    all of Washington Group's data was available to him since 2008.

7              (WHEREUPON, at this point in the proceedings, a

8    videotaped excerpt of the deposition of Dr. Robert Bea was

9    played as follows:)

10   "QUESTION:  Are you saying you didn't have any of the

11   WGI information about -- that had been given to plaintiffs'

12   counsel in 2008 until 2011?

13             ANSWER:  No, not at all.

14             QUESTION:  You're not saying that?

15             ANSWER:  That is correct.

16             QUESTION:  So you had that available to you in 2008,

17   what Washington Group International produced with respect to

18   its work?

19             ANSWER:  Well, personally, I didn't.  It existed in

20   cardboard boxes here in New Orleans.

21             QUESTION:  That was available to you, right?

22             ANSWER:  I certainly could have come here and began the

23   review of that information, but I did not.

24             QUESTION:  But you weren't prohibited from it by the

25   plaintiffs' lawyers, I take it?

1         ANSWER:  Absolutely not.

2         QUESTION:  Okay.  So that material for the 3D graphic

3    GIS models was available since that date when it was produced

4    in 2008; isn't that right?

5         ANSWER:  Yes."

6         (WHEREUPON, at this point in the proceedings, a

7    videotaped excerpt of the deposition of Dr. Robert Bea was

8    concluded.)

9         MR. TREEBY:  The Court in *Beller* stated that

10   supplemental reports are not allowed to shore up problems,

11   deepen or strengthen opinions.  We've provided that citation to

12   the Court.

13         Dr. Bea admits in his third report dated

14   April 11th, which we received on April 12th, he admits it does

15   just that.  On Page 1, Paragraph 3, that this newest report

16   is -- and this is what's troubling -- ongoing forensic

17   engineering quantitative analyses I have performed to evaluate

18   issues raised by the defense during my March 27 and 28

19   deposition and during the April 10 deposition of

20   Mr. Diego Cobos-Roa.  This late report, as well as the earlier

21   one, is not rebuttal of anything raised by defendants' experts.

22         THE COURT:  The hand calculations, correct?

23         MR. TREEBY:  It's hand calculations, yes.

24         THE COURT:  I didn't understand the context.  "That I

25   only had five days to do this," I wasn't sure what prompted

1    that other than things that occurred at a deposition.  That's

2    what my guess is.

3         MR. TREEBY:  This Court, we believe, must exclude that

4    information.  To rule otherwise, the *Beller* court said, would

5    create a system -- and this is the problem -- where preliminary

6    reports could be followed by supplementary reports, and there

7    would be no finality to expert reports, as each side, in order

8    to buttress its case or position, could supplement existing

9    reports and modify opinions previously given.  This practice

10   would surely circumvent the full disclosure requirement

11   implicit in Rule 26 and lead to unlimited rounds of

12   depositions.

13        The notion that the defendants would be faced --

14   here, I'm beginning to get into what the prejudice is --

15        THE COURT:  Right.

16        MR. TREEBY:  -- that the defendants could be faced,

17   even now, with some scientifically designed 3D graphic GIS

18   model of Washington Group's work based on information provided

19   plaintiffs more than four years ago, created by an unknown

20   consulting expert -- Dr. Bea didn't even know who he was -- and

21   justify that presentation by calling it a supplemental report

22   is simply in violation of this Court's orders and the Federal

23   Rules.

24        To make it worse, we have still not even seen

25   this GIS model, much less the specific documents from that

1    model that will be relied on in rendering his opinions.

2          Item 3 on the Court's focus points is directed at

3    plaintiffs -- I'm going to skip over that.  I'm going to go to

4    Item 4 now.

5          THE COURT:  A little bit about the GIS.  You know

6    vastly more about it than I do.

7          I saw in the report, there were three,

8    ostensibly, demonstrative exhibits, figures.  I must say -- my

9    understanding of the purpose of those demonstrative exhibits

10   was to attempt to pinpoint the location of certain excavations.

11   That's my understanding.  I don't know if it goes into depth at

12   all.  I can't tell by looking at the -- I can't tell precisely

13   what it does.

14         MR. TREEBY:  Not only you can't tell, Dr. Bea can't

15   tell.  That's where we're at now.

16         Because you asked us three separate matters:  Why

17   they would be prejudicial, why a deposition before trial on

18   these issues would not be feasible and sufficient to remedy the

19   undue prejudice.

20         THE COURT:  Right.

21         MR. TREEBY:  As a factual matter, all three of these

22   sections of his so-called rebuttal report we think we can show

23   exceeds proper rebuttal.  The issue is here fairness.  Come

24   back to what Your Honor said at the beginning.

25         Prejudice begins with the basic rule, Rule 26.  I

1    started practicing law, as I suspect Your Honor did, about the

2    same time when trial by ambush was the norm.

3              THE COURT:  Exactly.

4              MR. TREEBY:  I can remember going over to

5    Civil District Court and trying to get discovery as a plaintiff

6    in an insurance case.  Forget it.  That was the norm.

7                   That's not what these Federal Rules embrace.

8              THE COURT:  That is true.

9              MR. TREEBY:  Rule 26 requires a complete statement of

10   all opinions the witness will express and the basis and reasons

11   for them, and all the data or other information considered in

12   forming them, and any exhibits that will be used to summarize

13   or support them.  The simple fact is that the plaintiffs have

14   not complied with those requirements.

15                  We would be prejudiced by a forced need to

16   address these additional, still incomplete opinions, as well as

17   their still incomplete foundations, at this late date.

18                  This is -- as Your Honor has said, maybe it's not

19   quantum physics, but, for this poor political science fellow --

20             THE COURT:  That's what I'm talking about.  My major is

21   the same as yours.

22             MR. TREEBY:  -- it's highly technical.

23                  Each new theory or analysis requires consultation

24   with our own experts to understand what's being said and the

25   basis for what's being said and to prepare to question Dr. Bea.

 1            This cannot occur when new theories are put forth

 2      during the deposition, as happened here; after the deposition,

 3      as happened here; and, on an ongoing basis, as is threatened

 4      here.

 5            Adding insult to injury, Dr. Bea continues to

 6      disclose incomplete new theories based on new, unsupplied

 7      facts, making it virtually impossible to even engage our own

 8      experts.

 9            THE COURT:  Are you saying -- for me to better

10      understand, on the GIS issue -- we'll talk about --

11            MR. TREEBY:  That's where I'm going.

12            THE COURT:  -- we've got these several pages, I don't

13      remember, 15 pages, whatever it was, and then we have three

14      images that are in the report.

15            Are you saying that, taken by themselves -- I

16      guess, the three images, what do they do?  How are they

17      prejudicial?  Is it what's behind --

18            MR. TREEBY:  Exactly.  You know that's where I'm going.

19            THE COURT:  Okay.

20            MR. TREEBY:  This harm can't be mitigated even if the

21      plaintiffs now produce Dr. Bea's complete theories and all of

22      the specific materials he relied on.  Frankly, I don't think it

23      can because it hasn't been done yet.  It's going to be done

24      before trial, we're told.

25            THE COURT:  What's going to be done before trial?

1          MR. TREEBY:  Well, you'll see.  Let me get there.  It's

2     just amazing to me.

3               Curing the prejudice would require additional

4     discovery.  We not only have to redepose Dr. Bea and those he

5     relied on, but defense experts would also need to, if not write

6     new reports, certainly revise and respond to those things.

7     These exercises are time consuming and costly.

8               Let me address the specific factual prejudice for

9     the first item, for the Swiss Cheese demonstrative.  Why would

10    that create undue prejudice?

11              The Court uses the term in your order of

12    June 14th, "demonstrative," because that's what the plaintiffs

13    have tried to call it in their memoranda; but, a GIS model is

14    not a demonstrative as that term is used in the Court's

15    pretrial order in our opinion.  That can be provided first time

16    on the eve of trial.

17              What a GIS model really consists of, once

18    completed, should be information relied on by the expert in

19    reaching his conclusions.

20         THE COURT:  You tell me what they show -- because I'm

21    looking at them, I know what they purport to show -- looking at

22    those in isolation.

23         MR. TREEBY:  Let me depart from my script.

24              Properly done, as I understand it -- and I've

25    look at it pretty closely --

1          THE COURT:  Right.

2          MR. TREEBY:  -- all of the data is gathered from those

3    thousands of pages of the work.  They are plotted based on

4    survey data, based on daily reports that give all of the

5    information about excavations; about what was backfilled; if it

6    was backfilled, how the backfill was done, how deep it was, how

7    big it was, the size of it.  All of that data is put into a

8    database.  All of it.  That's the GIS database.

9          Dr. Bea praises it.  It's a wonderful tool.  Yes,

10   it is, if it's ever completed, if we could ever see it and see

11   if the facts he puts in are right; but, we don't have it, as

12   we'll see.

13         THE COURT:  So as we look at these three, what do you

14   see -- you're going to see more than I see -- what do you see

15   when you see these three demonstratives?  Are you going to get

16   into that?

17         MR. TREEBY:  Yes, I am.

18         Dr. Bea's model is a work in progress; and, since

19   we don't have it yet, we couldn't properly even examine Dr. Bea

20   on that GIS model.

21         Here are some examples.  Slide 14.

22         THE COURT:  All right.

23         MR. TREEBY:  On Page 4, Paragraph 7 of his rebuttal

24   report, Dr. Bea states, "The intent of these 3D graphic models

25   is to show depths of excavations relative to the local ground

1   elevation associated with the excavation."  That's pretty

2   straightforward.

3           But then when we tried to question him on his

4   contentions regarding the depths of excavations at the EBIA, he

5   conceded that the depth of excavation information is not

6   included in the Swiss Cheese graphics attached to his rebuttal

7   report, so he couldn't answer any questions about it.  You'll

8   hear this.

9           THE COURT:  Well, I didn't see that.

10          (WHEREUPON, at this point in the proceedings, the

11  videotaped excerpt of Dr. Robert Bea's deposition was played as

12  follows:)

13          "QUESTION:  Turn back, if you would, to page -- just

14  keep that there, and turn back to Page 4 in your report.  In

15  Paragraph 7, you state, "The intent of these 3D graphic models

16  is to show depths of excavations relative to the local ground

17  elevation associated with the excavation."  Did I read that

18  right?

19          ANSWER:  Yes, sir.

20          QUESTION:  Now, look at, if you would, Exhibit 52, the

21  enlarged version of Figure 1.  Could you please explain to me

22  how to determine the depths of each of the excavations on

23  Boland Marine from reading this graphic?

24          ANSWER:  No, I can't.

25          QUESTION:  Okay.  And would your answer be the same for

1    each of these blow-ups?  We've even made them as big as we can,

2    that you can't really tell from these graphics the depths of

3    the excavations, what they are supposed to say.

4           ANSWER:  I think that's a fair observation.  I had to

5    access the digital versions from Dr. Storesund in order to

6    determine that level of detail.  It was not possible to convert

7    it to 8 and a half by 11 and maintain that detail.  We need the

8    digital record.

9           QUESTION:  So even with these blown up to 11 by 17 by

10   each area, you can't tell me what depths anything is supposed

11   to show; is that correct?

12          ANSWER:  I can't tell you for certain.  That is

13   correct.  Some of the figures show up, but you'd need to know

14   precisely what those figures were referring to.

15          QUESTION:  And we can't tell that from your report or

16   its exhibits, right?

17          ANSWER:  I think that's fair."

18          (WHEREUPON, at this point in the proceedings, the

19   videotaped excerpt of Dr. Robert Bea's deposition was

20   concluded.)

21          MR. TREEBY:  Now, he also claims -- it's more of

22   this -- Paragraph 7, Page 4 of his rebuttal report, Dr. Bea

23   states that a number of these excavations displayed in his

24   Swiss Cheese graphics model would have exacerbated the

25   hydraulic conductivity pressure connections with the underlying

1  saturated high water content swamp-marsh deposits.

2           When Washington Group tried to ascertain

3  precisely which excavations on the Swiss Cheese demonstrative

4  exacerbated the hydraulic conductivity pressure connections,

5  again, Dr. Bea said it was impossible for him to tell based on

6  the information provided in his incomplete model.

7           Instead, Dr. Bea said that to determine that, one

8  would have to perform a correlation based on two factors:  One,

9  whether the particular excavation shown in the demonstrative

10 was deep enough relative to the varying elevation of the

11 so-called *swamp-marsh layer*; and, two, whether the particular

12 excavation was, quote, poorly backfilled.

13          THE COURT:  So is it your anticipation, Mr. Treeby,

14 that there's ostensibly more to come?

15          MR. TREEBY:  Absolutely.  That's what's promised.

16 We'll see that.

17          THE COURT:  When?

18          MR. TREEBY:  On the eve of trial, Mr. Joanen told me.

19 I'm going to get to that.  He told me --

20          THE COURT:  That's not going to happen.

21          MR. TREEBY:  Well, I hope not.

22          THE COURT:  Well, not on the eve of trial.  That is not

23 going to happen.

24          MR. STEVENS:  We'll stipulate to that, Judge.  It's not

25 going to happen.

1          MR. TREEBY:  As you will hear in this next deposition

2     clip, Dr. Bea has not even done this correlation yet, and the

3     information he intends to rely on to do the correlation has not

4     been identified or provided to the defendants.

5               Please play that one.

6          (WHEREUPON, at this point in the proceedings, the

7     videotaped excerpt of Dr. Robert Bea's deposition was played as

8     follows:)

9          "QUESTION:  Are you able, sitting here looking at what

10    you've given us in your GIS model, to tell me and mark which

11    excavations you contend are deep enough and close enough to the

12    eyewall to have exacerbated the hydraulic conductivity pressure

13    connections?

14         ANSWER:  No, I could not, but we could.  I just, I

15    can't do it sitting here with that level of detail.

16         QUESTION:  That's fairly important to us in this case,

17    but you can't do that?  I mean, what would it take for you to

18    do -- what would it take, in a deposition, which is the only

19    vehicle I have to ask you questions about it, for you to tell

20    us that?

21              Because we can't tell it from your plan.  You've

22    already said that.  We can't tell it.  Right?  We can't tell

23    the depth.  You can't even tell the depth.

24         ANSWER:  No, I can't.  That's correct.

25         QUESTION:  So how can I get that information from you?

1          ANSWER:  Well, we would have to do a correlation for

2     you to identify specific excavations and then connect that to

3     their depth, then correlate that with the contact elevation for

4     the varied swamp-marsh deposit, and you can produce a table

5     that would portray that information.

6               That's one of the powers of the GIS system and

7     one of the reasons we went to this extent of work.  But sitting

8     here today, I can't do that for you.

9          QUESTION:  Do you have such a table?

10         ANSWER:  No.  I would be more than glad to produce it

11    for you, if I had it.

12         QUESTION:  Have you done such a correlation?

13         ANSWER:  No.

14         QUESTION:  Look at Saucer Marine on your GIS model in

15    Figure 1.  This is the maps.  But then there's a blow-up of

16    Saucer.

17              You got it?

18         ANSWER:  Is this the figure?

19         QUESTION:  Saucer, yes, sir.  I don't see any sand fill

20    on Saucer; is that right?

21         ANSWER:  Well, I don't either, but that doesn't mean

22    there wasn't any sand fill on Saucer.  But you can't tell from

23    this graphic.

24         QUESTION:  Well, there is a legend on Page 1 of that

25    exhibit that says predominantly sand fill and has a color.

1    None of that color appears on this GIS model on Saucer; isn't

2    that right?

3            ANSWER:  That's correct.

4            QUESTION:  Okay.  I would assume that means that

5    whoever was doing the model couldn't find any evidence of sand

6    being a predominant backfill on Saucer; is that fair?

7            ANSWER:  Well, that could be a dangerous assumption.

8    You would have to go to specific excavations, which is possible

9    in the GIS database, and then see what backfill was allocated

10   to that excavation.

11           QUESTION:  Is there a -- the GIS database you're

12   referring to, is that in your matters considered attached to

13   your rebuttal report?

14           ANSWER:  Well, we're producing the demonstrative that's

15   come from that GIS database.  I don't think we have produced

16   the GIS database for you.

17           QUESTION:  But you're saying you could go to that and

18   see if there were some sand, predominantly backfilled sand on

19   the Saucer Marine, if you looked in that; is that right?

20           ANSWER:  Correct.

21           QUESTION:  And you can't tell me right now whether

22   there were or not any such sites at Saucer Marine; is that

23   correct?

24           ANSWER:  Not sitting here, I can't.  That's correct."

25           MR. TREEBY:  We demand the production of the GIS

1    database that he's been referring to.

2            (WHEREUPON, at this point in the proceedings, the

3    videotaped excerpt of Dr. Robert Bea's deposition was

4    concluded.)

5            MR. TREEBY:  That information still has not been

6    provided.

7            THE COURT:  So what you're telling me is that, standing

8    alone, these, I'll call them, put them in quotes, demonstrative

9    exhibits and the rebuttal report mean absolutely nothing,

10   standing alone.

11           MR. TREEBY:  Absolutely nothing, but they are a work in

12   progress.

13           THE COURT:  Oh, no, I understand that.  But in and of

14   themselves, if they were introduced to this Court, they would

15   be as enlightening to me looking at them now, even with

16   explanation?

17           MR. TREEBY:  Yes.

18           THE COURT:  Because they don't go into depth, which is

19   one of the things this case is about, the depth of the

20   excavations.

21           MR. TREEBY:  That's right.

22           THE COURT:  All right.

23           MR. TREEBY:  It takes a qualified expert to create a

24   GIS model.  When Dr. Bea was asked at his deposition to tell us

25   who was creating the GIS model and when it would be finished,

1     he didn't know.

2                    Mr. Joanen, who defended the rebuttal deposition,

3     indicated that the model would be ready for trial, since it was

4     only what he called a demonstrative.

5          THE COURT:  But what it would do is it would -- again,

6     I'm using -- how about using purportedly -- it would

7     purportedly demonstrate, based on that data, the depth of

8     certain excavations.

9          MR. TREEBY:  Right, but --

10         THE COURT:  You would be finding that out at the eve of

11    trial?

12         MR. TREEBY:  With all kinds of volumes --

13         THE COURT:  You think that's very prejudicial?

14         MR. TREEBY:  -- to check it out.  Absolutely.

15         THE COURT:  On its face, it seems quite prejudicial.

16         MR. TREEBY:  We were able to look --

17         THE COURT:  Not that everything prejudicial is bad, but

18    it's the time.

19         MR. TREEBY:  Absolutely.  When we were able to look at

20    the reliance materials or the matters considered materials for

21    his rebuttal report, they didn't include any of the kind of

22    data that Dr. Bea claims he would need to create a proper GIS

23    model, but it was a work in progress.  The deposition, at

24    Page 7118 through 7221, says that in the deposition.

25                    Also, it's not just the depth.  It was whether it

1   was poorly backfilled, because he makes that a big deal,

2   whether it was backfilled and, if so, was it poorly backfilled.

3              THE COURT:  How would the GIS data indicate whether it

4   was poorly backfilled?  I mean, does the GIS data go into the

5   type of material --

6              MR. TREEBY:  Absolutely.  From the -- from the

7   thousands of pages -- okay, Washington Group doing this work

8   for the Corps, every day, everything they did was detailed on

9   daily reports.

10             THE COURT:  The Court has seen some of those in another

11  motion that --

12             MR. TREEBY:  Exactly.

13             THE COURT:  -- unfortunately, went awry.

14             MR. TREEBY:  But just a few, Your Honor, just a few of

15  thousands --

16             THE COURT:  Right.  Oh, no, I understand.  I

17  understand.

18             MR. TREEBY:  And the database needed -- would need to,

19  for each excavation, say, was it backfilled.

20                  He says the problem was poorly backfilled.  Well,

21  which ones do you intend, Dr. Bea, were poorly backfilled, and

22  what is your source for that?  What evidence do you have that

23  that's the case?

24                  I'm getting there.  I'm getting there.  I'm

25  sorry.

1        So, indeed, Dr. Bea admitted that in order for

2   the defendants to review the information that he will rely on

3   at trial to make his allegations about depth and size and

4   consequences of excavations -- and that's from his

5   deposition -- we would have to access his actual GIS database,

6   not the so-called Swiss Cheese graphic demonstratives attached

7   to his rebuttal report.

8        THE COURT:  How long has the GIS database been

9   available to the plaintiffs?  You said 2000 --

10       MR. TREEBY:  Well, the data to create it has been

11  available to them since 2007, the data to create it.  An expert

12  has to take that information --

13       THE COURT:  Right.  The data to create the database has

14  been available.

15       MR. TREEBY:  Right.

16       THE COURT:  One just has to go through the laborious

17  effort, I'm certain, of creating it.

18       MR. TREEBY:  Which we did, Your Honor, for our expert

19  reports.

20       In summary, the GIS model of the EBIA that is

21  found in Dr. Bea's rebuttal report tells us absolutely nothing

22  about the claim of correlations between Washington Group's

23  allegedly poorly backfilled excavations and the subsurface

24  organic layer in the East Bank Industrial Area that Dr. Bea

25  intends to present at trial to show underseepage.

1          As you already heard in the video clip from the

2   April 16 deposition I played earlier, Dr. Bea admits he has not

3   done those correlations yet, but he says, "that's one of the

4   powers of the GIS system and one of the reasons we went to this

5   extent of work."

6          Plaintiffs intend to give us this information in

7   the form of a demonstrative at the eve of trial, and that

8   violates Rule 26(a)(2)(B), classic sandbagging, trial by

9   ambush.

10         In the *Scientific Components Corp.* case, the

11   court observed correctly that it is obligatory on the part of

12   the rebuttal expert to provide all of the technical background

13   information adequate to illustrate his opinions, and cites

14   Rule 26(a)(2)(B).

15         Here is a blown-up version of what was provided

16   as a basis for the analyses still to be run to show

17   underseepage.

18         This is what we were first given.  That's the

19   first one.  That's the whole area.  That's Figure 1 in

20   Dr. Bea's rebuttal report.  He labeled that "EBIA Swiss Cheese

21   Excavations and Backfill GIS Graphic," Page 8 of his rebuttal

22   report.  It shows the entire EBIA.

23         There is a legend, if the Court will look.  In

24   the bottom right corner it says red polka dots equals

25   predominantly sand backfill, blue equals voids, and then

1    excavation contours/elevations in a variety of colors.

2              The next four images are blow-ups of the

3    individual areas on Figure 1, so we can attempt to read the

4    fine print.  The Court will see that critical data is missing.

5              First, the next slide shows, as Dr. Bea admitted

6    in his deposition -- this is Boland Marine -- there is no

7    identification of particular excavations.  The wedding cake

8    structure, this very famous excavation, wedding cake

9    excavation, is not even shown.  No building removals are shown,

10   no utility removals are shown, and none of the various

11   remediation related excavations are shown.

12             There is no identification of depths.  There is

13   no citation to any source materials for the two alleged sand

14   backfill areas indicated with red polka dots.  When he was

15   asked, Dr. Bea could not give us this information.  I can give

16   you cites to his deposition in that regard.

17             On the next slide, you see the next three

18   sites -- this is almost, really, as important -- you see the

19   three sites immediately south of Boland, McDonough Marine,

20   Indian Towing, Mayer Yacht.  They are completely grayed out.

21             You can make out the borrow pit in blue on

22   McDonough Marine and other large open excavation on

23   Indian Towing; but, again, no other specific excavations

24   identified, no depths indicated, no backfill material

25   indicated, no source materials.  The data source, in other

1    words, the bases for this isn't identified, and no piling

2    removals indicated.

3              No grid trenches shown, even though Dr. Bea

4    admitted during his deposition there should be grid trenches

5    shown there, at Volume 3, 95, Line 9 through 13.

6              Obviously, if Dr. Bea claims that there were

7    certain excavations performed by Washington Group that

8    contributed to the levee failures in Saucer Marine and

9    Boland Marine, Washington Group is entitled to explore why

10   similar excavations on neighboring sites didn't cause the

11   levees to fail.

12             Dr. Bea doesn't dispute that this is relevant,

13   that's why his Swiss Cheese demonstrative contains grayed-out

14   place holders for these other sites.  If the plaintiffs have

15   their way, Washington Group won't get the details they need to

16   evaluate his opinions and the bases for those opinions until

17   eve of trial, with no real opportunity to check their accuracy.

18   That alone constitutes undue prejudice.

19             The same thing is true, Slide 21 shows, on

20   Saucer Marine.  When I asked Dr. Bea -- you may recall from one

21   of the clips -- if Washington Group could assume that the lack

22   of red polka dots on Saucer Marine indicates that Dr. Bea

23   contends that sand backfill was not used on this site, he

24   replied, as you heard, quote, that could be a dangerous

25   assumption.

1            Instead, he testified that one would need to

2    examine each excavation in his GIS model, not simply look at

3    the demonstrative that was provided, to determine what his

4    opinions are and what the bases are for them about backfill.

5    But we don't have it.  It was not provided, even though it was

6    the asserted basis for his opinions.

7            The last slide is the ITT work area.  Again, it's

8    just grayed out, missing all the details.

9            Now, with his original report, Dr. Bea gave us

10   his SEEP/W and SLOPE/W computer models that supposedly

11   supported his opinions of underseepage-induced failure of the

12   floodwall.  Dr. Bea has drawn cross-sections.  These are taken

13   from his report.

14       THE COURT:  I've looked at these in the original motion

15   to strike.  I've looked at those in the original motion to

16   strike the report in its entirety.

17            Go ahead, sir.

18       MR. TREEBY:  They are supposed to provide boundary

19   conditions for his computer model assumptions.  All of that

20   work, including over 64,000 -- I had somebody go back and

21   tabulate it -- 64,000 pages of computer runs from SEEP/W and

22   SLOPE/W.

23            Those have been laboriously reviewed at great

24   expense by our experts, hundreds and hundreds of hours, checked

25   against the actual facts from the actual work done on the

1    actual site.

2              All of the plaintiffs' experts, including

3    Dr. Bea, have been examined on that work from Dr. Bea's

4    original expert report.  We're satisfied with that.  We're

5    satisfied with the cross-examination we did on that.

6              But none of those prior computer model runs could

7    possibly have used this new Swiss Cheese model information

8    because it did not exist.  The only meaningful purpose -- this

9    is -- really, this is a protective motion, more than anything

10   else -- the only meaningful purpose, scientific purpose, for

11   allowing more of these so-called *demonstratives* would be to

12   illustrate a computer model analysis that obviously has not yet

13   been run.

14             If new analyses are run, it would take additional

15   hundreds of man-hours to review those computer runs to evaluate

16   them and determine what mistaken facts are in those new runs.

17   That would be prejudicial at this late date, could not be

18   accomplished, along with the related review and consultation

19   with experts, within the 10 weeks and three days left before

20   trial.

21             Again, he's had all of the material he would have

22   needed to have produced this for over four years.  He didn't do

23   that.

24             You know, the question I had, and maybe it's just

25   me, how did this rebuttal report come about?  After Dr. Bea

1    admitted in his March 28th deposition that he had no

2    pre-Katrina evidence to support the excavations in those

3    cross-sections that he used to run his seepage analyses, I

4    would have to -- the apparent thing to me is he began the

5    process of trying to find some actual excavations upon which to

6    find further analyses.

7            Dr. Bea admitted that when he tried to find

8    support for his modeled cross-sections, he discovered he

9    couldn't trace it, and the trail ran cold.

10           (WHEREUPON, at this point in the proceedings, the

11   videotaped excerpt of Dr. Robert Bea's deposition was played as

12   follows:)

13           "QUESTION:  You show in both those cases a backfilled

14   excavation.  You see that?

15           ANSWER:  Yes.

16           QUESTION:  You describe it as a deep backfilled

17   rectangular excavation located approximately 60 feet from the

18   sheet pile.  Do you see that?

19           ANSWER:  Yes.

20           QUESTION:  You also say the excavation was 25 feet

21   wide, 100 feet long, and approximately 10 feet deep.  Do you

22   see that?

23           ANSWER:  Yes.

24           QUESTION:  So if I understand your answer correctly, it

25   would show, if there was any validity to your conceptual

1    excavation, before Katrina you would -- this excavation, to

2    have backfill to that depth, would have had to have been a hole

3    dug 15 to 17 feet deep, right?

4            ANSWER:  That figure sounds correct.  That's what the

5    cross-section, I think, shows.

6            QUESTION:  That's what your conceptual cross-section

7    shows, right?

8            ANSWER:  Yes, sir.

9            QUESTION:  When was this excavation performed by

10   Washington Group, if you contend that it was?

11           ANSWER:  I can't identify that.  The record is not

12   complete enough for me to be able to do that.

13           QUESTION:  Now, what I'm asking is not about concept

14   and not about what you saw in photographs after Katrina.  I'm

15   asking about any evidence you have pre-Katrina for any

16   excavation at that location that was a 15 to 17-foot deep

17   excavation with anything near these dimensions, 25 feet wide,

18   hundred feet long, 15 to 17 feet deep at that location, any

19   evidence?

20           ANSWER:  Your question of me is do I have a document

21   that says a hole, excavation, with those dimensions was

22   developed at that location by WGI pre-Katrina?  The answer to

23   that is no.  I don't have a complete enough record to trace it.

24           QUESTION:  As a result, you don't know when any such

25   excavation was performed by Washington Group, isn't that

1    logical?

2             ANSWER:  That's correct.

3             QUESTION:  Now I'm talking about the South Breach.  You

4    have a similar conceptual cross-section, and you show an

5    excavation to depth?

6             ANSWER:  Correct.

7             QUESTION:  And --

8             ANSWER:  That's the Case 1.

9             QUESTION:  And, in fact, you have, I would -- well, is

10   it true, you don't have any evidence pre-Katrina that

11   Washington Group performed such an excavation?

12            ANSWER:  At that location?

13            QUESTION:  At that location.

14            ANSWER:  All of the evidence that we cited for both

15   Cases 1 and 2 are contained in my report.  I don't think we

16   were able to trace the Case 1 excavation to a specific document

17   concerning WGI's work at that location.  The document trail

18   went cold."

19            (WHEREUPON, at this point in the proceedings, the

20   videotaped excerpt of Dr. Robert Bea's deposition was

21   concluded.)

22            MR. TREEBY:  Yes, the trail went cold because there was

23   no trail.

24                 To be of any use in this case, these planned

25   so-called GIS graphic demonstratives would need to either

1      provide a basis for the seepage analyses already done, or they

2      should provide inputs to further analyses that have not yet

3      been done.

4               In order to not prejudice Washington Group's

5      defense, we would have needed to have been provided this data

6      with Dr. Bea's initial report, so it could be checked against

7      the record of thousands of reports, submittals, photographs and

8      other evidence that documented Washington Group's work to

9      ensure that this GIS database is proper, that it accurately

10     represented what existed at the EBIA before Katrina.

11               Now, let me get on to the steady flow quickly.

12     Why would defendants be prejudiced by allowing Dr. Bea's newly

13     adopted so-called steady flow justification for his flawed

14     analyses.

15               This section of the first 53 pages consists

16     almost completely, almost completely -- let me -- after

17     page 53, he attacks Dr. Marr and Dr. Silva.  But in this

18     section, it consists almost completely of the supposed

19     validation by the California Delta Study.

20          THE COURT:  Right.

21          MR. TREEBY:  Contrary to plaintiffs' representation in

22     their opposition, the term "steady flow" is not mentioned once

23     in Dr. Bea's original report.  This was a new rationale he came

24     up with but hid from view to mask his inappropriate

25     substitution of a totally fabricated value for an essential

1    material property in any flow analyses using Mr. Cobos-Roa and
2    the SEEP/W computer program.
3           THE COURT:  I did look at this, went through the
4    reports as best I could to determine -- that's why I asked for
5    all of the reports -- to determine -- I'm going to leave this
6    to the plaintiffs to argue -- is your contention that in his
7    original report, that the basic concept of steady flow, or
8    however we describe it, was not utilized in the first report;
9    is that your position?
10          MR. TREEBY:  Yes.  That's right.
11          THE COURT:  You say it's not rebuttal because steady
12   flow -- well, one reason it's not -- I don't want to limit
13   you -- because steady flow was not really featured as a
14   rationale in the first report in discussing the permeability of
15   the soils and underseepage, etcetera?
16          MR. TREEBY:  That's right, Your Honor.
17          THE COURT:  I'll let the plaintiffs argue that.
18          MR. TREEBY:  Not a problem.
19          THE COURT:  I did my best to try to understand it, but
20   I think I'll let the lawyers --
21          MR. TREEBY:  Well, I hope I can help a little bit,
22   because I'm trying to learn this stuff myself, and it's not
23   easy.
24              Although Dr. Bea had never, as best we can tell,
25   based on his testimony and looking at his 600-and-some

1    references in his expert report, he had never investigated a

2    levee or dam failure in his entire career before Katrina, he

3    and Mr. Cobos-Roa did a seepage analysis for the first time

4    while studying the IHNC breaches.

5          On all of the prior analyses of the IHNC breaches

6    in the EBIA, they used SEEP/W computer program.  We don't have

7    any of those prior computer runs.  They were lost or stolen,

8    heard varying stories about it, so we don't know what material

9    properties they input into those prior analyses.  I know there

10   were varying permeability figures, but we don't know what other

11   material properties they input.

12         But we did get thousands, as I said, 64,000 pages

13   of computer runs for the latest SEEP/W, SLOPE/W runs, and those

14   flow analyses were distorted by inputting completely made up

15   soils properties for compressibility, which is one of the

16   absolutely essential material properties for such an analysis.

17         According to Mr. Cobos-Roa's sworn testimony,

18   this distortion involved inputting -- what he admitted, he

19   didn't know any material that had that kind of compressibility,

20   an $m_v$ -- for the stated purpose of accomplishing Dr. Bea's goal

21   to prove that pore pressure immediately increased throughout

22   the organic clay layer 10 to 15 feet under the ground surface,

23   from one side of the floodwall to the other, instantaneously.

24         Here is how that analysis came about.  Dr. Bea

25   asked Cobos-Roa, "How can I accomplish the goal, Diego, of a

1   response in the marsh layer from one side of the floodwall to

2   the other using the SEEP/W computer analysis software?"

3   Because Dr. Bea doesn't use the software himself.

4           In this next video clip of Mr. Cobos-Roa --

5   GeoEstudios -- he kind of laughs each time he says it -- is

6   Cobos-Roa.  This can be seen if you look at his deposition on

7   Page 199, Line 23.

8           (WHEREUPON, at this point in the proceedings, the

9   videotaped excerpt of Mr. Diego Cobos-Roa's deposition was

10  played as follows:)

11      ANSWER:  GeoEstudios interacted with Dr. Bea in the

12  selection of this -- of this parameter.  Dr. Bea asked

13  GeoEstudios to find a way how we can model this -- I'm sorry,

14  incompressible response of the soils.

15          So GeoEstudios essentially looked for a number

16  that was representative of this condition, and that's how --

17  when we came back to Dr. Bean and said, hey, if we use this

18  value of ten to the minus nine, it seems we get this response,

19  he accepted, and so we went with those values.

20          (WHEREUPON, at this point in the proceedings, the

21  videotaped excerpt of Mr. Diegos Cobos-Roa's deposition was

22  concluded.)

23      MR. TREEBY:  We went with those values.  That was

24  Dr. Bea's question to Mr. Cobos-Roa.  In other words, let's

25  start with the result we want to accomplish, an incompressible

1    response is the way he described it, in order to attempt to

2    assert that underseepage contributed to the floodwall failure.

3            Now, Mr. Graduate Student, you tell me how you

4    can manipulate the inputs to this software to get that

5    response.

6            There was no mention of steady flow.  This was a

7    transient flow analysis in SEEP/W.  You will search in vain --

8    and we've already talked about it -- that term, "steady flow,"

9    is not there.  It was an excuse invented by an admittedly glib

10   forensic engineer after he was caught cooking the books, to use

11   his term.

12           It constitutes a new basis and new reasons for

13   his underseepage opinions.  Those bases should have been in his

14   original report if they were to be considered by this Court in

15   a manner consistent with the Court orders and the Federal

16   Rules.

17           Now, here is a little illustration of what --

18   trying to understand this.  I think this is proof that his

19   so-called steady flow information is simply a new attempt to

20   justify his old fatally flawed opinions.

21           The Court will remember the multi-million dollar

22   soils investigation that a third-party contractor was hired to

23   accomplish in the EBIA at the Court's direction.

24           In order to save money, the plaintiffs then,

25   after the comprehensive soil investigation plan was developed

1    by all of the experts, when we got the proposal back and how

2    much it cost, only chose to meaningfully participate in one

3    type of test to determine the material properties in the soils

4    that would instruct flow analyses, pumping tests.

5            What does a pumping test do?  It's a controlled

6    field investigation that applies a hydraulic load to the soil

7    layer in question to determine two essential soil properties,

8    permeability and compressibility, required to perform seepage

9    analyses.

10              The storm surge during Katrina loaded this soil

11    layer in a similar way as the pumping tests did.  Both of these

12    events changed the steady state flow conditions into transient

13    flow conditions.

14              This slide from -- this is from the plaintiffs'

15    expert report by Dr. Rogers -- shows a graphic to demonstrate

16    one of the plaintiffs' pumping test arrays done at the south

17    end of the EBIA.  That's the floodwall, those two lines going

18    across there.

19              The Court will notice in red, right in the

20    middle, that's what's called a pumping well or control well.

21    And then the wells -- there are pairs of wells in an array

22    around, then, even on the other side of the floodwall, to

23    show -- or to measure properties when water is pumped out of

24    the pumping well to induce flow toward the pumping well.

25    That's what a pumping test does.

1          As water is pumped from the pumping well, flow is

2     induced, and measurements of flow and pore pressure at the

3     pumping well and at the observation wells are taken in the

4     organic clay layer.

5          This, again, is from Dr. Rogers' report.  It's

6     hard to read, but on the right is the pumping or control well

7     construction.  Then, at the left -- and you'll see that the

8     measurements are taken at the top -- they are designed to be

9     taken at the top and in the middle of the organic clay layer

10    because that's what was being examined by the experts.

11         So, as water is pumped from the pumping well,

12    flow is induced.  Measurements of flow and pore pressure at the

13    pumping and at the observation wells are taken in that layer.

14         While the pumping test was a more controlled

15    situation on a smaller scale, the duration of the minimum time

16    agreed to for the pumping test was roughly the same as the

17    duration of the storm surge.  The storm surge was roughly at a

18    maximum of about 30 hours; the pumping tests had a target of

19    from 48 to 72 hours, based on an agreed protocol for the

20    pumping tests.

21         Dr. Rogers, plaintiffs' other expert, testified

22    about the essential soil properties to accomplish a seepage

23    analysis.  I have a clip about his testimony.

24         (WHEREUPON, at this point in the proceedings, the

25    videotaped excerpt of Dr. Rogers' deposition was played as

1  follows:)

2      "QUESTION:  And to solve a transient flow problem, one

3  requires knowledge of three basic hydrogeological parameters,

4  right?

5      ANSWER:  Yeah, among others, yes.

6      QUESTION:  But the basic ones are these three that are

7  mentioned on Page 65 --

8      ANSWER:  Right.

9      QUESTION:  -- near the bottom of the page?

10     ANSWER:  Right.  K, alpha and n.

11     QUESTION:  Porosity?

12     ANSWER:  Right.  Porosity.  n is the porosity; and the

13  compressibility of the aquifer is Alpha; K is the permeability.

14     QUESTION:  So the three, in English, are hydraulic

15  conductivity, compressibility and porosity; is that right?

16     ANSWER:  Correct.

17     QUESTION:  And, in fact, your pumping test analysis

18  determined, and you've said this, the storage coefficient,

19  right?

20     ANSWER:  Right.

21     QUESTION:  And compressibility, as a basic

22  hydrogeologic parameter, is directly related to storage

23  coefficient?

24     ANSWER:  Right."

25         (WHEREUPON, at this point in the proceedings, the

1    videotaped excerpt of Dr. Rogers' deposition was concluded.)

2        MR. TREEBY:  The pumping tests measured flow and pore

3    pressures in that organic clay layer, and they were run in that

4    organic clay layer, which is an layer that everyone knew was

5    well below the water tables, a later of soil that's fully

6    saturated with water.

7            The idea for these pumping tests was to see what

8    volume of flow, what measure of pore pressure would be

9    developed at that soil layer when water was induced to flow

10   through that layer by pumping water and then be observed.

11           Okay.  Two of the three absolutely essential soil

12   properties were determined by those pumping tests, permeability

13   and compressibility.  They were determined from analyses

14   performed by Fugro and plaintiffs' experts.  Also by ours, but

15   I'm just citing to theirs.

16           Dr. Bea used the permeability determined from the

17   pumping tests in his SEEP/W seeping analysis.  No problem.  But

18   instead of the scientific value determined by the plaintiffs'

19   experts in their pumping tests, he used this totally false and

20   distorted compressibility value to give him what he wanted,

21   this immediate transfer of pressure.  That distortion caused

22   the SEEP/W program to provide Dr. Bea with unreasonably high

23   and false pore pressures from his seepage analyses.

24           Now, Dr. Bea's so-called steady flow

25   discussion -- we can argue all day about that, and we will at

1   trial, no doubt.  He critiques Dr. Silva and Marr about the way

2   they approach this problem, or what the problem is even.  But

3   his so-called steady flow discussion in the first 53 pages of

4   his rebuttal report consists of so-called California Delta

5   Study validations of his hydraulic conductivity approach.

6          Now, a proper cross-examination could not

7   possibly be done about that study based on the materials we

8   were provided.  By reading that deposition, the Court can see

9   that his so-called steady flow ideas have now, in his last

10  deposition, for the first time, morphed, incorporate something

11  called dilatational wave velocity theory.  We learned this on

12  April 16th.

13         (WHEREUPON, at this point in the proceedings, the

14  videotaped excerpt of Dr. Robert Bea's deposition was played as

15  follows:)

16         "QUESTION:  You also know -- in fact, you testified at

17  your last deposition -- that ten -- that one times 10 to the

18  minus nine, one over psf, is not the actual coefficient of

19  volume change, $m_v$, that a scientist would compute from the

20  storage coefficient determined by Dr. Rogers and Kevin Pope for

21  these site specific clay materials existing at the EBIA; isn't

22  that right?

23         ANSWER:  Well, there are two basic ways to compute --

24  determine $m_v$.  One way depends on the compressibility

25  characteristics of the soil skeleton.  That approach uses

1    storage coefficient.  The alternative approach treats the

2    materials of concern here, the buried swamp-marsh deposits, as

3    an incompressible system.  And the incompressible system is

4    focused on the pore water phase in the sample.

5            That approach uses the dilatational wave velocity

6    to determine $m_v$.  The other approach uses storage coefficient

7    and other similar parameters to define $m_v$.  The two $m_v$ are

8    different findings."

9        (WHEREUPON, at this point in the proceedings, the

10   videotaped excerpt of Dr. Robert Bea's deposition was

11   concluded.)

12       MR. TREEBY:  Well, that first approach that he

13   described and the other approach was -- that he chose to use

14   now, the first time, this new theory, new to this case or in

15   any of Dr. Bea's prior opinions, is not found in any report

16   done to date by Dr. Bea.  None.  Not even the one on April --

17       THE COURT:  How does that relate right now?  That may

18   be for another -- I hope not.  But how does it relate to

19   whether the steady flow discussion in his rebuttal report is,

20   in fact, rebuttal?

21           You kind of need to --

22       MR. TREEBY:  If Your Honor please, I've got two things

23   here.

24       THE COURT:  -- move on here.  We have been an hour and

25   10 minutes.  I'm going to give you some extra time, but we're

1    not --

2         MR. TREEBY:  I'm getting to close being finished.

3              One problem is this is a new theory that

4    obviously he wants to spring on us and now talk about.  We have

5    not deposed him on it.

6         THE COURT:  But that's not before me right at this

7    point.  You're just alerting me.

8         MR. TREEBY:  I understand, but this is a protective

9    measure, Your Honor.

10        THE COURT:  I understand.

11        MR. TREEBY:  I don't want more new reports talking

12   about dilatational wave theory or him getting on the stand and

13   talking about it when I haven't been able to examine him on it.

14   That's first time I heard those terms.

15             That's one thing.

16             Second thing, all of those pages in the so-called

17   rebuttal report are this California Delta Study.  For us to

18   understand that, we would need to have all of the data on that,

19   including all -- to find out exactly what was involved there.

20   He says it validates.  In his rebuttal report, for the first

21   time, it validates his approach.

22             We don't have any information on that.  We don't

23   have all the computer runs that were done there.  We don't even

24   know -- in fact, it's interesting to me, in the 600-and-some

25   references in his expert report, that study is not mentioned

1  once.

2       THE COURT:  Well, the interesting issue, what if, in an

3  expert report, an expert mentions 35 studies, learned

4  treatises.  I mean, I'm not sure that you've got to go and

5  analyze to micro detail all of them and depose and find out

6  every nuance of that report.  I'm not sure.

7       MR. TREEBY:  He says it validates it for the first time

8  in his rebuttal report.  Never heard of it before.  Wasn't in

9  his materials.

10       THE COURT:  I do understand that.

11       MR. TREEBY:  It's a moving target.

12            Why is it prejudicial?  I'm virtually finished.

13            One notable example is that study.  This study

14  was first disclosed, Page 25 of his rebuttal report.

15  Amazingly, it wasn't ever cited before.

16            To examine this reference and its applicability

17  and whether or not it really does validate anything here would

18  require defendants to receive underlying data from that, all

19  the analyses done, so we can see, are we comparing apples and

20  oranges, are we comparing bananas to avocados.

21            I mean, I have no idea, and we can't find from --

22  even from his materials considered in his rebuttal report,

23  because the basic underlying data is not there.  This would

24  require production of those pages, analysis of those thousands

25  of pages by our experts, and then still another deposition of

1    Dr. Bea, all while trial date is 10 weeks away.

2              Now, on the standard of care, I almost have

3    nothing to say.  What's the harm in letting him provide new

4    citations, new sources, new opinions about standard of care?

5         THE COURT:  It could almost be in a brief, but, go

6    ahead.

7         MR. TREEBY:  It is a brief.  It was written by the

8    lawyers.  But the harm is -- you know, is there, but --

9              We did depose him about that after we filed our

10   motion to strike.  It's strange that it appears they're going

11   to abandon Dr. Rogers as their real standard of care expert,

12   which was obvious before, and now it's Dr. Bea.

13             That's okay.  You know, we'll withdraw our motion

14   to strike that.  I've examined him on that.  I'm not concerned

15   about it.

16        THE COURT:  I must admit it wasn't high on my -- the

17   other two were much more prominent in my analyses as well.

18        MR. TREEBY:  But, basically, the reason the rules and

19   this Court's scheduling orders exist is to prevent precisely

20   what has happened here.

21             Dr. Bea's April 3rd report, Pages 1 through 53,

22   leave out the standard of care part, that's fine.  Dr. Bea's

23   subsequent April 12th should be stricken, and Dr. Bea should be

24   prohibited from testifying about those matters at trial.

25             Thank you, Your Honor.

```
 1            THE COURT:  I did tell you I'd give you some rebuttal,

 2   even though you went over.  Part of it was my questioning.  So

 3   I'm going to give you 10 minutes for rebuttal --

 4            MR. TREEBY:  Thank you, Your Honor.

 5            THE COURT:  -- since it's your motion.

 6                 Mr. Bruno, you're dividing up the task here?

 7            MR. BRUNO:  Yes, I'm dividing the task.  As you know, I

 8   can't do this alone, wouldn't even try.  But I will begin with

 9   your permission.

10            THE COURT:  Five minutes.

11            THE DEPUTY CLERK:  All rise, please.

12            (WHEREUPON, at this point in the proceedings, a brief

13   recess was taken.)

14            THE DEPUTY CLERK:  All rise, please.

15            MR. STEVENS:  Thank you very much, Your Honor.

16            THE COURT:  Certainly.

17            MR. BRUNO:  I just didn't know whether to ask the

18   question or not.

19            THE COURT:  Always ask that question.

20            MR. STEVENS:  I just used sign language.

21            THE COURT:  We don't want to engage -- we may engage in

22   other things that aren't right here, but we don't want the

23   Eighth Amendment to be violated.

24            MR. BRUNO:  It might have sped up my presentation.

25            THE COURT:  Go ahead, Mr. Bruno.  Are you going to
```

1    divide --

2          MR. BRUNO:  I will, if I may.

3              Judge, I am going to just talk about the law

4    issues.  I think we have to speak for a minute about the

5    motivation here.  Of course, if it's inappropriate, we'll

6    withdraw that part.

7              But, specifically, Elwood Stevens will speak to

8    the Court about the Swiss Cheese GIS issue, and Scott Joanen

9    will speak specifically to the steady flow, standard of care.

10         THE COURT:  All right.

11         MR. BRUNO:  But I think we have to begin --

12         THE COURT:  You don't have to speak about standard of

13   care now.

14         MR. BRUNO:  That's fine.

15             Judge, what's before you is a motion to strike a

16   portion of a rebuttal report, the consequence of which is that

17   a witness will be prohibited from testifying on certain

18   subjects.  That's what's before you.

19         THE COURT:  I do understand that.

20         MR. BRUNO:  Well, what I heard for the past hour and a

21   half -- I'm sorry, it seemed like an hour and a half -- I'm

22   kidding -- okay, cross-examination, *Daubert* attack on my

23   experts.  That's not what we're here for.

24             You specifically asked the defendants,

25   specifically, here's the e-mail, defendants' counsel must be

1  prepared to explain on what basis they maintain that the

2  Swiss Cheese GIS, the steady flow, the standard of care are not

3  discussed in expert reports of the defendants.  With all due

4  respect to defendants, I didn't hear a word about that.

5        THE COURT:  Well, he did say that steady flow was not

6  discussed, at least in those terms, in the expert report of

7  Dr. Bea.

8        MR. BRUNO:  Your question was -- I mean, I'm just

9  reading what you wrote, Judge --

10        THE COURT:  That's right.

11        MR. BRUNO:  -- you said --

12        THE COURT:  That's true.  Of defendants.  I understand.

13        MR. BRUNO:  I make the point because if you believe the

14  defendants are deserving of relief, the consequences are

15  severe.  That's why I want to focus on what specific relief

16  they've requested.

17        They are not requesting today, for example, that

18  you strike the demonstrative.  That's not before you.  They are

19  not suggesting in this motion that Professor Bea is the subject

20  of a *Daubert* attack.  That's in a separate motion that you have

21  under consideration.

22        The only issue before this Court is whether or

23  not there is a proper rebuttal report, and I didn't hear

24  anything about that.

25        The cases which you provided us I thought were

 1    extremely instructive.  I thought they were very helpful.  The

 2    *Pakootas* case says, where an expert conducts a new analysis.

 3              I didn't hear counsel say that Dr. Bea conducted

 4    a new analysis.  I heard him say he might do so in the future,

 5    which he won't, I can assure you.  I see that baseball bat

 6    behind you.  I got that.

 7              So where is the new analysis that he's conducted

 8    that would make this case appropriate for consideration by the

 9    Court?  There is no new analysis.

10              What's interesting about the *City of Gary* case,

11    it talks about a subject matter test, that is, if you look at

12    the rebuttal, does the rebuttal report discuss a subject matter

13    which was the subject of one of the defendants' reports.

14              Again, we didn't have the benefit of that in

15    their oral argument, but my learned co-counsel will share with

16    you precisely the component parts of the expert reports of the

17    defendants that speak to that issue.

18              In the *Scientific Components* case, the plaintiff

19    brought in a different expert to do the rebuttal, which we

20    don't really have here.  Even in that case, the Court said he

21    could speak to some of the issues raised by the original

22    expert.  It wasn't intended to be an effort to improve on the

23    plaintiffs' report.

24              Then, finally, Judge, and I think most

25    instructive, is the *Bone Care* case, wherein the court talks

1    about the fact that the issues were very complex.  The court

2    issued a provisional remedy, says, look, you know, I'm not sure

3    where we are.  The remedy sought is extremely severe.  I'm

4    going to try this case, and if I feel like you're being

5    prejudiced, I may strike it.

6               I mean, Judge, with all due respect, we've tried

7    this case with you.  You've tried the barge case.  We all know

8    that you're not going to let anybody take advantage of anybody

9    else.  I mean, that's just not going to happen.

10               You've given the defendants time.  In the *MRGO*

11   case, the government had additional opportunities to put on

12   evidence.  We had opportunities to put on evidence.  I think

13   it's really inappropriate to suggest that anybody took

14   advantage of anybody in this litigation, and it's not going to

15   happen here.  There is no evidence before you which suggests

16   that they are being disadvantaged.

17          THE COURT:  One of the things -- I don't know if you're

18   going to speak to this or not, Mr. Bruno, but Mr. Treeby -- you

19   tell me if this is a question for you or for your co-counsel --

20          MR. BRUNO:  Sure.  Yes.

21          THE COURT:  -- in argument, Mr. Treeby pointed out that

22   we're not quite certain what the GIS, in and of itself, as

23   presented in the first 15 pages or so, 22 pages, whatever it

24   is, of the report, is particularly meaningful unless

25   supplemental information is provided which correlates all of

1   that to the GIS -- somebody goes through the laborious effort

2   of correlating all of that and saying, well, this is the depth.

3              Do you agree that that demonstrative does not

4   show, for instance, depth?

5          MR. BRUNO:  Yes.  I'll briefly touch on that.  It's

6   really Elwood's --

7          THE COURT:  So I don't want to step on anyone's toes.

8          MR. BRUNO:  No, no, no.

9          THE COURT:  I'm interested in, then, what purpose does

10  it have if there is not more to come.  I'm curious about it.

11         MR. BRUNO:  It has only the purpose of allowing you to

12  digest thousands and thousands of pieces of paper.

13             Here is the irony of what Mr. Treeby says.  All

14  of the documents to which he refers are these quality control

15  documents which describe the work done by the Washington Group

16  on the EBIA.  It says, we went out to the site, we dug a hole,

17  it was so many feet deep.  We filled it with X, Y and Z.

18             Judge, every one of those pieces of paper is

19  going to be offered, not as a plaintiff exhibit, not as a

20  defendant exhibit, but as a joint exhibit.  Every piece of

21  paper that describes every hole and what went in it will be in

22  this record.

23             Now, there are thousands of those documents.

24         THE COURT:  True.

25         MR. BRUNO:  Now, I won't step on Elwood's toes, but

1   he'll show you that Dr. Silva-Tulla has got his own chart, map,

2   hole by number, by depth, by -- they've got one, which is why

3   this is rebuttal.

4           Now, it's not ready yet.  It's demonstrative.

5   It's subject to an attack.  I'm sure an attack is coming, and

6   it'll come when it's going to come.  You have my assurance

7   nobody is going to be sandbagged.

8           THE COURT:  What is subject to an attack?

9           MR. BRUNO:  Any time you put up a demonstrative

10  exhibit, a party can say, that doesn't demonstrate what it

11  purports to demonstrate.  They can say, you know, you've

12  drawn -- well, red light.  You've drawn the cars hitting each

13  other, and you're showing the red light to be red, when every

14  witness in the case has said it was green or yellow.

15          THE COURT:  I'll go to the more detailed questions for

16  your co-counsel.  Is that what you would prefer?

17          MR. BRUNO:  Yes.

18          Now, what I think -- let's remember, too, Judge,

19  chronologically what happened here.

20          You'll remember we had a dispute between the

21  parties.  We went to see Magistrate Wilkerson because I had

22  some concerns about the meeting and the implication of this

23  rebuttal report.

24          You'll remember we came to see you.  I apologized

25  because somehow it was suggested to you that we were looking

1   for more time.  That wasn't what I was looking for.  What I was

2   trying to understand from the Court and from the defendant,

3   what they understood to be a rebuttal report and when was one

4   due, and when was one not due.

5           Because, candidly, I was trying to decide, did I

6   want Bea to do one, did I want Dr. Rogers -- remember that

7   discussion?  Okay.

8           Mr. Treeby said -- he says, well, you know what,

9   anything that's based upon any piece of evidence known to the

10  parties, you don't have to make an expert report about that.

11  The only time you need an expert rebuttal report is if you're

12  doing a new analysis.

13          We confirmed that.  We shook hands on it.  We

14  parted with smiles on our face, and we went away.  That's why I

15  decided, well, I don't need a rebuttal report from Rogers.

16          Dr. Bea is Dr. Bea.  I gave the option to him.

17  He says, they've attacked me.  I'm almost 80 years old.  I'm a

18  Marine.  They tell me I'm incompetent, blah, blah, blah.  He

19  writes his report.

20          Now, so the test still is and will always be

21  what's new?  Does it rebut?  That's what the test is.

22          Now, I have to share with you, Judge, stop me,

23  raise your hand if you think I'm going too far afield, but

24  there is a motivation.

25          THE COURT:  You do see the thing that I put in here

 1    about histrionics, so you're duly warned.

 2         MR. BRUNO:  That's why I'm telling you in advance.  All

 3    you've got to do is this.

 4         THE COURT:  Unless you start calling somebody a name,

 5    which we're not going to do here --

 6         MR. BRUNO:  No, no, no.  What I was going to talk

 7    about --

 8         THE COURT:  Please don't impugn anyone.

 9         MR. BRUNO:  No, no, no, no, no.  What I'm suggesting to

10    you is just raise your hand, and I'll stop.

11              No, I'm going to suggest to you, Judge, that the

12    motivation is not that the defendants feel unprepared.  The

13    motivation is not that they are being sandbagged.

14              Here is the motivation.  Two experts, one for the

15    government and one for Washington Group.  The two experts are

16    directly opposed to each other with regard to the cause of the

17    failure of the North and South Breaches.

18              You said yourself, well, one of the things we'll

19    be looking at is whether overtopping caused the failures.

20    Well, what's interesting here is, at the North Breach, the wall

21    fell before the water went over the top.  At the South Breach,

22    the wall fell when the water got to the top.  Interesting.

23              Silva-Tulla says there was wave overtopping

24    because the waves were two to three feet high, according to

25    Dr. Dalrymple, when you have already found in the barge case

1    that they were one to two feet based upon the eyewitness

2    testimony of the lockmaster.

3              It gets better.  This wave overtopping splashes

4    over the top of the wall and creates a two-foot hole.

5         THE COURT:  We're not arguing a major motion now.  I've

6    read all of that and do recall it.

7         MR. BRUNO:  You know it.

8              So the government says wave overtopping has to be

9    completed discounted, wave overtopping cannot cause a two-foot

10   hole.

11             So the government's expert and the

12   Washington Group expert are doing this.  And read together,

13   their theory doesn't work.  So, as a result, the defendants

14   know they've got to put a zipper on Dr. Bea.  Come hell or high

15   water, either you throw him out on a *Daubert* motion, or you

16   limit him any way you can.  That's the true motivation of the

17   *Daubert*.  That's the true motivation of this.

18        THE COURT:  Whatever the motivation is, I'm looking for

19   what the law is and what the prejudice is.

20        MR. BRUNO:  Sure.  Absolutely.

21        THE COURT:  Motivations are really beyond me.  I never

22   will be wise enough to understand motivations, even some of my

23   own.  So, go ahead.

24        MR. BRUNO:  Well, you know, I was taught by

25   Wendell Gauthier, who always told me, you know, once you

1    understand why a person does what they are doing, it at least

2    gives you a better understanding of what it is they are trying

3    to accomplish.

4         THE COURT:  I'm sure they would like it if there's no

5    expert at all on your side.  That's an understandable

6    motivation.

7              Go ahead.

8         MR. BRUNO:  In any case, Judge, we feel like, on a

9    fundamental level, the defendant has not met its burden of

10   showing to you that Dr. Bea has put anything in these rebuttal

11   reports which was not discussed in his original report or which

12   doesn't directly respond to the defendants' reports.

13              I will now turn it over to Elwood to give you the

14   very specific pages.  Thank you.

15        THE COURT:  Yes, sir.  Thank you.

16        MR. STEVENS:  Thank you.

17        THE COURT:  Does counsel have one of those?  Whatever

18   we're giving --

19        MR. STEVENS:  Oh, I just said can you let me know when

20   we have 10 minutes left?

21        THE COURT:  Oh, I'm sorry.  I thought it was an

22   exhibit.  Janet, I'll let you do the time.

23        MR. STEVENS:  Judge, I probably should have stood up --

24   Elwood Stevens for the plaintiffs -- I probably should have

25   stood up right away, and we could have saved Mr. Treeby a whole

1   lot of breath, and we could have saved you a whole lot of time;

2   but, Mr. Treeby's argument, as counsel for WGI, and I assume he

3   argued the government's portion of the same motion, is contrary

4   to what his own experts say with regard to the Swiss Cheese

5   model.

6           Because we heard, over and over again, that this

7   Swiss Cheese model is very critical to their understanding and

8   appreciation of our case, and that they needed to be able to

9   defend themselves.  If I've misquoted Mr. Treeby, I will stand

10  by the record.

11          But I have deposition excerpts from their expert,

12  Dr. Silva-Tulla.  I can share copies with everybody.  If you

13  want to see one, I'll put yours on the --

14      THE COURT:  I guess the main thing -- let me get right

15  to it -- I'm concerned about what Mr. Treeby said.

16          Look, as I look at the first 15 pages of -- and

17  I'm saying 15, whatever it is -- talking about the GIS in the

18  first 53 of the rebuttal report -- again, I may not understand,

19  I'm certain I don't, all that's manifested there in these

20  demonstrative exhibits -- but, according to the deposition

21  testimony of your expert, Dr. Bea, they certainly do not --

22  they do not -- they have not been correlated yet -- it doesn't

23  show depth, which is kind of important.

24      MR. STEVENS:  Well, actually, it will.  That's what the

25  purpose of --

1          THE COURT:  You see, the will, then the will concerns

2     me.

3          MR. STEVENS:  It's a demonstrative aid.

4          THE COURT:  The will concerns me --

5          MR. STEVENS:  I understand.

6          THE COURT:  -- when will and how will.  Then, they'll

7     have a right to then -- you see, I thought there was a

8     representation made that that was all to come, that there was

9     no more to come.

10          I'm very concerned about more to come.  I'm not

11    sure how that, in and of itself, allows the defendant to

12    understand the basis upon which that -- because all

13    correlations are subject to whoever is correlating.

14          MR. STEVENS:  I understand.

15          THE COURT:  So somebody might say -- when I go through

16    the correlation of the GIS data, I say it's 12 feet deep or

17    8 feet deep or 5 feet deep, and somebody else might say it's

18    25 feet deep; but, as of yet, there has been no opinion on that

19    from the plaintiffs as to depth based on GIS correlation.

20          So what Mr. Treeby was basically arguing was,

21    wait a minute, this in and of itself, we don't like it, but

22    what we're really concerned about is what's to come.

23          What you're telling me is, there is more to come;

24    is that right?

25          MR. STEVENS:  Yes, Your Honor.

1    THE COURT:  Then it might not be coming.  You need to

2  understand that.

3    MR. STEVENS:  Oh, I understand.

4    THE COURT:  You understand I've said I don't want

5  anything else.

6    MR. STEVENS:  I understand.  Bear with me, Your Honor.

7    THE COURT:  I'm bearing with you, but I need precision

8  answers.

9    MR. STEVENS:  Thank you, sir.

10    You will recall in *Robinson,* there were --

11    THE COURT:  Forget *Robinson*.  This is this case.

12    MR. STEVENS:  Well, I understand, but it's --

13    THE COURT:  Forget *Robinson*.

14    MR. STEVENS:  Okay.

15    THE COURT:  Forget any other case I've decided.  This

16  is this case.

17    MR. STEVENS:  I understand.

18    THE COURT:  Forget what I did yesterday.  This is this

19  case.  Just tell me what the heck you're going to be doing.

20    MR. STEVENS:  I'm going to tell you, Your Honor.

21    THE COURT:  Don't tell me what I did in *Robinson*.  You

22  tell me what you're doing.  Don't tell me what I did.

23    MR. STEVENS:  Yes, sir.  I would like to compare for

24  you their GIS depiction and ours -- theirs is in 2D,

25  plaintiffs' is in 3D -- because there is a serious issue about

1    whether the depth of the dredging trenches and the holes and

2    the excavations ever connected with, hydraulically connected

3    with the marsh layer.

4         THE COURT:  You said yours is in 3D.  You're talking

5    about --

6              Janet, do you have the rebuttal report here?

7              Are you talking about the blow-ups that

8    Mr. Treeby showed?

9         MR. STEVENS:  Yes, sir.

10        THE COURT:  You're telling me that if an expert looked

11   at that, he can discern the depth thereof, of the alleged

12   location of the -- we'll call them holes, for lack of --

13   excavations.

14        MR. STEVENS:  Not by looking at this diagram in the --

15        THE COURT:  Well, what are you going to be able to look

16   at to determine, and how are you going to determine how it was

17   determined?

18        MR. STEVENS:  It's the same documentation they have.

19   These are based upon the reports we got from the defendants.

20             The defendants took the same data, and they

21   created their own two-dimensional data -- two-dimensional

22   graphic representation, if you will, Judge, of the same thing.

23             It's in Figure 5 of Appendix B to

24   Dr. Silva-Tulla's report, they lay it out in two-dimension.

25   There is no depth to anything.  This is the Boland Marine site.

1   It will give a citation as Boland Marine Number 8, depth

2   7 feet.

3          THE COURT:  You're showing me what, now?

4          MR. STEVENS:  It's Figure 5 of Appendix B to

5   Dr. Silva-Tulla's deposition.

6          THE COURT:  Thank you.

7          MR. STEVENS:  If you would like a hard copy, I can give

8   it to you.

9          THE COURT:  No, no, no.

10          MR. STEVENS:  I deposed Dr. Silva-Tulla and Dr. Marr.

11          When we deposed Dr. Silva-Tulla, we got this

12   diagram.  When we came in to depose Dr. Marr, he had, in

13   connection with his report of March 12th, a table, Table B-1 of

14   his report.

15          Now, what I've done, he had the same report, he

16   swapped it on us.  There was version 1, which is shown in red.

17   That's what it originally showed.  Then Marr Number 2 was

18   changed in the middle of the deposition.

19          When we walked in to depose Dr. Marr and I got to

20   that chart, which lists each of the Boland Marine excavations,

21   one, two, three, four, five, six, seven, eight, if you take

22   those numbers and you go back to this chart, Boland Marine

23   Number 8, 6, 5, that's the area that is being depicted in this

24   table.

25          They made alterations, for some reason, during

1    the deposition.  I couldn't question Dr. Marr about this table,

2    B-1, or his depiction of it.

3              He gave us his -- this was Dr. Silva-Tulla's

4    two-dimensional graphic representation of the NFAATT reports

5    and daily work logs.  This was Dr. Marr's.  If you'll notice,

6    the original one we got has grid trenching, all this gridded

7    area here in front of the Boland Marine site and here in front

8    of the South Breach at the Saucer Marine.

9              THE COURT:  As I understand it, these experts, one or

10   both purportedly correlated their information to a GIS system?

11             MR. STEVENS:  The same GIS system.

12             THE COURT:  I understand.

13             MR. STEVENS:  They are working as a team and using the

14   exact same data.

15             THE COURT:  I understand.

16             MR. STEVENS:  Well, when we found out this on day one,

17   we were not allowed to question Dr. Marr about this or Marr

18   version Number 1, because Marr version Number 1 had depths -- I

19   put them in red to show how many changed between one and two.

20             In Marr version 1 versus Marr version 2, this is

21   the depth in feet of the excavation.  Then they call this the

22   minimum elevation, or the bottom depth of the excavation in

23   relation to --

24             THE COURT:  Right.  Based on NAVD88?

25             MR. STEVENS:  Yes, sir.  Yes, sir.

1            So when you take Marr 1, that's version 1 here

2      and version 1 here, you can see that, for example, at the

3      Boland Marine Number 8, the depth went from 14 feet down to

4      7 feet.

5            So when we got the new chart, we compared them.

6      We got a new two-dimensional drawing from Dr. Marr on day two

7      of the deposition, which looks like this.  This diagram, you

8      will notice the grid trenching that was at Boland Marine is no

9      longer on the diagram, and the grid trenching that was

10     immediately adjacent to the floodwall at the Saucer Marine

11     site, the South Breach is missing.

12           Plus, the depths that they assigned to each in

13     the table, which is exactly what -- the same information that

14     our three -- our three-dimensional GIS is going to show, is the

15     same data that we got from them.  They told us, and we

16     questioned Dr. Silva-Tulla about it in his deposition, and he

17     admitted that each of these, they compared the daily report and

18     the NFAATT, and there was a judgment call made, do we do total

19     bottom depth, or do we do an average depth.

20           Ultimately, he said, these are based on averages.

21     They are representative depths.  So if a hole is 50 feet wide

22     and at one point it's 10 feet deep --

23           THE COURT:  I understand that the hole might not be

24     uniform at the bottom, as an example.  I understand.

25           MR. STEVENS:  Correct.  But it had the effect of --

1          THE COURT:  It's based on an average.

2          MR. STEVENS:  -- it had the effect of raising the

3     bottom depth substantially.

4          THE COURT:  I understand that.  This sounds like great

5     cross-examination for the expert; but, I need -- being a

6     fairly -- let me say, I've worked on patience for a long, long

7     time, and it's something I have to fight -- but being a

8     relatively impatient person, at one point I was a very

9     impatient person -- I just simply need to know, what you're

10    telling me now is you're going to come out with a table that's

11    going to be using the same data but different depths, I'm

12    guessing?

13         MR. STEVENS:  Right.  We're going to use real bottom

14    depths --

15         THE COURT:  When is that coming?  So I'll know --

16         MR. STEVENS:  We spoke to Dr. Bea yesterday.  Dr. Bea

17    is using Dr. Rune Storesund to assist with that project.

18         THE COURT:  So when do you think it's coming in?

19         MR. STEVENS:  We are told we'll have a draft of it in

20    the next few days, by the end of June, June 30th, which is day

21    after tomorrow.

22         THE COURT:  Draft of it meaning -- when do you think it

23    will be given to the other side?

24         MR. STEVENS:  I would say within 10 days of Friday.

25    That would be July --

1          THE COURT:  Well, Mr. Treeby's -- he certainly was

2     correct that there was more to come.

3          MR. STEVENS:  Right.  But all it is, is a 3D graphic

4     representation.  Which, Your Honor, frankly --

5          THE COURT:  I don't know what it is.

6          MR. STEVENS:  -- the bulk of -- this diagram that they

7     produced --

8          THE COURT:  Why is it rebuttal?  Let's get to that

9     question.  Why is it rebuttal?

10         MR. STEVENS:  Well, because it rebuts what they say in

11    their depositions about Dr. Bea's graphics.

12              Let me show you Pages 68 --

13         THE COURT:  Wait, wait.  Dr. Bea didn't have any

14    graphics, did he?

15         MR. STEVENS:  Well, sure, he had the three Swiss Cheese

16    preliminary drawings.

17         THE COURT:  That was in his rebuttal report.

18         MR. STEVENS:  Yes, it was.  It was not in the original.

19              Your Honor, at Pages 68 and 69 of

20    Dr. Silva-Tulla's report in this case -- and I circled those

21    that deal with things regarding the trenching and the

22    Swiss Cheese, and then these little arrows are about things

23    where they attack him on flow or steady flow.

24         THE COURT:  Right.  We'll stick to --

25         MR. STEVENS:  I understand.  But the circled ones,

1    those 22 points are the deficiencies that Dr. Marr and

2    Dr. Silva-Tulla attack --

3            THE COURT:  Well, as I recall in Dr. Bea's original

4    report, there was certainly no correlation based on a GIS

5    system; is that correct?

6            MR. STEVENS:  That is correct.

7            THE COURT:  Dr. Bea's estimates on the depths were

8    primarily based on post-Katrina -- primarily, and you correct

9    me if I'm wrong, please -- as I understand it, were certainly

10   in part, if not substantially, based on photographs of the area

11   where the holes were.  Because, as he said in his deposition,

12   the trail ran cold when trying to ascertain that from the

13   existing records without correlating the GIS records.

14           MR. STEVENS:  You're absolutely correct, Your Honor.

15   They used both, documents, daily reports and NFAATTs, they used

16   photographs.  Even Dr. Tulla testified in his supplemental

17   deposition that we had to take after we got the amended

18   numbers, that they also, to fill in the gap in the data, they

19   used GIS.

20           We did the same thing.  We used the same basic

21   evidence.  At the trial, when you consider the evidence as it

22   comes in -- because, ultimately, you're going to decide -- you

23   hit it on the head at the very beginning, is this the result of

24   underseepage or overtopping.  All of this goes to --

25           THE COURT:  Frankly, whether it would have occurred

1    with or without the holes.

2           MR. STEVENS:  Yes.

3                All of that, when you -- if you have these

4    charts, their charts, the two-dimensional ones that I showed

5    you that they did, and the three-dimensional one that we have,

6    as you receive evidence during the trial, it is basically a

7    template for you to look at and say, the important holes are

8    Boland Marine Number 8, Saucer Marine Number 12, whichever --

9           THE COURT:  The holes in proximity, I would guess, to

10   the breaches?

11          MR. STEVENS:  Sure.  You will see, if you'll just take

12   a quick look at this, Judge -- I almost said the R word, sorry

13   about that -- *Robinson* -- if you'll see here in the insets,

14   coincidentally, and the evidence will show this at the trial,

15   where the breach is the deepest or most severe, if you will,

16   where the floodwall is pushed back the furthest, or here where

17   the stretching of the metal --

18          THE COURT:  The South Breach.

19          MR. STEVENS:  -- the South Breach is deepest, correlate

20   with the locations on the water side where the trenching was

21   there, that's not on their map anymore -- those are five

22   feet -- six feet at the top, four feet at the top, and six feet

23   deep, the whole area -- and where the most excavations took

24   place.

25               Unfortunately, like Dr. Bea, and he's very

1    careful with his words, he admits the trail runs cold on some

2    of the holes.  We have a photograph that shows it, but we may

3    not have a document, a daily report or an NFAATT report, that

4    describes the precise dimensions of that hole.

5          THE COURT:  I think Dr. Bea, when Mr. Treeby showed him

6    in his deposition, as Mr. Treeby called it, conceptual

7    illustrations of certain of the holes, Dr. Bea wasn't able to

8    state that this was based on empirical data?

9          MR. STEVENS:  The real question, because I remember it

10   when he played it, can you tell me when that hole was dug based

11   on documents?  Dr. Bea says, when, document, don't have one.

12   Because, for that hole, maybe I don't.

13               Can you tell me when any particular hole was dug?

14   When, hole, particular, can't do it.

15               You've had enough experience with Dr. Bea to know

16   he's very precise in his answers; so, yes, those were correct

17   answers at the time.

18               You will see, when you receive the evidence in

19   this case, that nobody, not Dr. Silva-Tulla, not Dr. Marr, not

20   Mr. Treeby, not me, not Mr. Bruno, no one can describe for you

21   every hole, the dimension of it, exactly whether it was, or

22   what it was backfilled with.

23               What Dr. Tulla says in his supplemental

24   deposition is that the depths of the excavations was

25   essentially irrelevant to the cause of the failure.

1          We don't really need to know any of that.  Our

2     theory is it's overtopping, and the depth of the excavation is

3     irrelevant.

4          He also said, for example, at Page 122 -- excuse

5     me, at Page 129 of his deposition and 130, if the excavation at

6     Boland Number 8, the one immediately in line with the deepest

7     penetration of the North Breach, if that representative hole,

8     instead of being 5.27 feet, as it is on the amended version of

9     this report, was actually 12.27 feet, as it was represented

10    initially before they averaged the bottom depths, would it make

11    a difference?

12         Answer, it might make a difference in a different

13    way, but not related to Katrina.  If you could open the

14    excavation to a hundred feet -- or whatever the number was you

15    said, because we asked him what if it was 112 feet -- it

16    wouldn't make any difference with respect to Katrina storm

17    surge because the water and the pressures cannot penetrate the

18    clays.

19         On the land side, the pore pressures would not

20    change very much at all, regardless of the depth of the

21    excavation.

22         THE COURT:  So he's saying, holes or no holes, the

23    permeability is such that there couldn't be underseepage or

24    blowout or whatever.

25         MR. STEVENS:  Right.  He even answered this question:

1    Dr. Silva, if, hypothetically, the entire area of the EBIA, the

2    entire excavated area, was all excavated to a depth of 25 feet,

3    would depth matter in that situation?

4         ANSWER:  Well, with respect to changing pore

5    pressure on the land side during the Katrina surge, it would

6    not matter.

7         THE COURT:  So I assume his opinion is that overtopping

8    caused the failure.

9         MR. STEVENS:  Exactly.  Their difference, the key

10   difference that you're going to be asked to decide, and you

11   will decide what weight to give our demonstrative or theirs and

12   what weight to give all the evidence, is was it flow?  Did the

13   water molecule have to actually flow from the channel through

14   the substrata and come back up on the land side of the levee,

15   or was it pressure transferred, the hydrostatic head that

16   developed here because the underground --

17        THE COURT:  As you know, I heard some of that testimony

18   in the barge.

19        MR. STEVENS:  Right.

20             -- where the marsh layer was fully saturated and,

21   therefore, had the compressibility of virtually zero.

22        THE COURT:  You're going to need to spend some time,

23   though, in your argument, or somebody is, as to why giving this

24   information, whenever it comes in, is one, timely, and, two,

25   not unduly prejudicial at this late stage, because we did have

1    deadlines.

2         MR. STEVENS:  You pointed out in the e-mail or one of

3    your messages to us that the Court's orders were silent on

4    supplemental reports.

5         THE COURT:  I reluctantly put that in there because I

6    felt obligated to do so, but then we have to decide -- I'm

7    going to decide now -- just let me tell you, I'm not going to

8    have another *Daubert* hearing.  I'm going to decide -- when I

9    say now, I'll have to contemplate this, think -- I was thinking

10   about doing certain things, but I'm probably going to have to

11   muse on this a bit -- ruminate, I should say, but I'm not going

12   to wait and have another hearing on these tables.

13              I don't know when they're going to come in.

14   You're representing to me that they should be in some

15   preparation to go to the other side sometime in July.

16        MR. STEVENS:  Yes, sir.  We should have it, we're told,

17   by June 30th.

18        THE COURT:  But that's a draft, and then -- you mean in

19   final form, so they get them, and it's going to be in the form

20   of a supplemental report?

21        MR. STEVENS:  It's a demonstrative aid.  We were just

22   going to --

23        THE COURT:  I mean, it's not going to be a rebuttal

24   report, because it's too late.

25        MR. STEVENS:  Right.  We were just going to hand it

 1    over as a demonstrative aid.  If you want to call it a

 2    supplemental report, fine.

 3            THE COURT:  A demonstrative aid, I'm not sure what that

 4    means.  It looks like more than a demonstrative aid.  It's

 5    going to be evidence.

 6            MR. STEVENS:  All right.  Well, we'll --

 7            THE COURT:  I mean, it's simply not -- you can call it

 8    whatever it is.  It's going to be another report.  That's what

 9    it is, because it's completely -- it's not mentioned in

10    anything yet, that is, the depth, the depth based on GIS

11    correlation.  It's new.  Right?

12            MR. STEVENS:  Right.  It not attached to that diagram.

13    The depths were used in the modeling that he did.  It was used

14    in the SEEP/W model.  Those depths are there.  It's the same

15    depths that they have.  Everybody has the same -- we got it

16    from them.

17            THE COURT:  So there's no argument about depth?  We can

18    stipulate as to depth?  I doubt that.

19            MR. STEVENS:  No, no, no.  It's all subject to

20    interpretation.  They have people --

21            MR. BRUNO:  Judge, we can stipulate.  Yes, we can.

22            THE COURT:  To depth?

23            MR. BRUNO:  Yes, we can.  Because our --

24            THE COURT:  Then we don't need a chart.  Let's get a

25    stipulation.

1          MR. BRUNO:  If we can get them to use the depths that

2     they originally reported and changed, because that's --

3          THE COURT:  Well, that's not going to happen, so we're

4     not going to get a stipulation.  You're not going to get a

5     stipulation.

6               We've got to call this what it is.  We're going

7     to have yet another report.  The reason for this motion, one of

8     the reasons, is because Mr. Treeby anticipated that,

9     reasonably.  Because, again, the demonstrative in the rebuttal

10    report, in and of itself, was fairly useless, at least it seems

11    to me.  I could be wrong about that.

12         MR. STEVENS:  No, it was a heads-up.

13         THE COURT:  A heads-up.

14              Well, now I've got -- now that we know that it's

15    a reality, then I'm going to let Mr. Treeby take the last

16    10 minutes in saying why it's prejudicial, and you're going to

17    have to tell me why -- you might as well take your shot now as

18    to why it's not.  That's what we're talking about.

19         MR. STEVENS:  Your Honor, it's nothing new.  Dr. Bea

20    issued a declaration.

21         THE COURT:  Well, it's corporately supplemental, too --

22    as well.  Go ahead.

23         MR. STEVENS:  Yes, sir.  He issued a sworn declaration.

24    In that declaration, he attests to this Court that there is

25    nothing new in that model.  There is nothing new in that 3D --

1          THE COURT:  Well, it's new to his report.

2          MR. STEVENS:  Sir?

3          THE COURT:  It's new to his reports.

4          MR. STEVENS:  This is what he says.

5          THE COURT:  I don't care what he said.  There's nothing

6    new to his report.  Are you telling me in his report there are

7    depths of holes in any reports he's given?  There is a

8    correlation of GIS data?

9               Are you telling me -- he has spoken to the depth

10   of the holes based on the correlation of GIS data in any of

11   the -- with any precision in any of the two -- three reports?

12         MR. STEVENS:  There is no new information about depths

13   in that report.

14         THE COURT:  Let me ask you again, see if you can

15   understand this question, see if I can formulate it so it's

16   clear.  Has Dr. Bea opined as to the depth of any of the holes

17   based on GIS correlation in any of the three reports that --

18   I'm calling the April 11th thing a report -- in any of the

19   three documents that are before the Court.

20         MR. STEVENS:  What I think he does is he relies upon

21   Chad Morris' GIS data for that.  He and Chad Morris

22   collaborated, and that was an appendix to his report.  So

23   Chad --

24         THE COURT:  But these are different depths -- relying

25   on something else?

 1          MR. STEVENS:  It's more thorough.

 2               When Chad did it, we didn't have all -- he did it

 3     back in, I want to say, 2011.  He did it early.  We did not

 4     have all the photographs.  It was piecemeal produced to us.

 5          THE COURT:  Let me ask you a clear question.  So you're

 6     telling me he used -- there is something in some of the

 7     appendixes or something that I haven't seen that clearly sets

 8     forth what depths Dr. Bea used in opining whatever he opined on

 9     any subject?

10          MR. STEVENS:  There are depths in Chad's report, and

11     not every one that is going to be on this 3D GIS, no, sir.

12          THE COURT:  I'll let Mr. Treeby --

13          MR. STEVENS:  There are depths in his report.  He talks

14     about photographs at certain locations, and he talks about --

15          THE COURT:  I saw them.  The photographs were lumped in

16     with a GIS --

17          MR. STEVENS:  Sure.

18          THE COURT:  -- determination, which is using a more

19     scientific method than guessing at the size of a hole.

20          MR. STEVENS:  Yes, sir.  They use -- just like they

21     did, we used GIS data to fill in gaps where we didn't have a

22     daily report or we didn't have an NFAATT report that reported a

23     depth consistent with what's shown in a photograph or didn't

24     have any other information to go on because the document trail

25     for that hole went dry.

1      THE COURT:  Why wasn't this done originally, if you had

2  the information?  That's a question I'm duty bound to asking

3  you.

4      MR. STEVENS:  Why did we not do it originally?

5      THE COURT:  If you had that great GIS data, why didn't

6  you correlate it.

7      MR. STEVENS:  Well, it's not the same as the GIS data

8  we had in that other trial.

9      THE COURT:  Well, I understand, but, I mean, you had

10  this GIS data, correct?

11      MR. STEVENS:  Yes.

12      THE COURT:  The GIS data that you're talking about now,

13  correct; you had it?

14      MR. STEVENS:  The GIS database is stuff that we all

15  inserted into, but it's the NFAATT report --

16      MR. BRUNO:  With all respect, GIS, the word, the phrase

17  GIS is what's troubling me.  They are talking about --

18      THE COURT:  Let me ask it another way, did you have the

19  information necessary to do a correlation based on GIS data

20  three years ago?

21      MR. STEVENS:  No, no.

22      MR. BRUNO:  If you take out the word "GIS," the answer

23  is yes.

24          GIS is a computer program, Judge.  Did we have

25  pieces of paper which told us how deep the holes were three

1    years ago?  Yes, they were buried in a mountain of a million

2    documents.

3                 After we got their reports -- they had the

4    advantage of having all this stuff convenient and easy to

5    identify and locate.  We had to go through a million documents

6    to get there.  We didn't get there as fast as they did.

7                 They did the report.  We saw there was a

8    discrepancy.  One report said 16 feet.  The new one said

9    12 feet.  We said, oh, my god, there is something wrong here.

10   We need to produce a demonstrative which says, wait, it's not

11   seven, it's really 12.

12                I'll tell you right now, we believe that the

13   first version, that Mr. Treeby, we believe, caused his experts

14   to withdraw, is the accurate version.  It shows the right

15   depth.  It shows the grid trenching.  That got yanked.  So when

16   it got yanked, we have no way to show you in a demonstrative

17   fashion where the grid trenching is.

18                So the GIS stuff is a bunch of -- frankly, is a

19   misnomer.  That is nothing to -- a piece of paper that allows

20   Your Honor to say, okay, how deep is this hole?

21                There is two ways to do it.  You can go to the

22   graph, which is what they did; or, you can press a button on a

23   computer, and it will give you the information.

24                If you don't want us to use a computer, I'll

25   trash the computer.  That's not what's important here.  What's

1    important is for us to be able to show you, frankly, the

2    trashed version of the demonstrative that they originally used

3    and discarded because it was too prejudicial to their case.

4             Then, when we cross-examined their witnesses

5    about it, all of a sudden, Dr. Silva-Tulla, for the first time,

6    says, I don't care how deep the hole, you can dig to China, it

7    doesn't matter.

8             So all we are trying to do through this thing,

9    call it what you will -- I'll take the GIS part out, if that's

10   what's so disconcerting to Mr. Treeby -- is say, wait a minute,

11   this hole is not 10 feet, as Dr. Silva-Tulla says, it is

12   12 feet.  I will tell you that it will be consistent with the

13   first version that they threw away that you'll never see.

14            That's all we're asking for here.  That's why we

15   were not concerned about whether it was due tomorrow or the

16   next day because it is nothing more than taking many, many

17   pieces of paper and putting it on a demonstrative.

18            The true and best question was, well, Mr. Bruno,

19   Dr. Bea, in his report, doesn't refer to these thousands of

20   pieces of paper.  No, what he did was something different.  He

21   said, here is the layer of the marsh.  If you poke a hole and

22   you touch the marsh layer, that's how the pressure gets

23   transmitted.  He says, overtopping didn't cause the failure.  I

24   see this photograph, and I see this big hole.

25            THE COURT:  But doesn't the depth of the hole have

1    something to do with the amount of translation of force?

2         MR. BRUNO:  It's not a mathematical thing.  What he

3    says is, if you have any hole -- and that's where we're getting

4    sideways, because Mr. Treeby is suggesting there has to be some

5    kind of mathematical formula which says, the hole is this big

6    and this big and this deep, and you calculate pressures.

7              No.  If you have any hole, any hole at all which

8    breaks through that clay layer, then you allow pressure --

9         THE COURT:  That would depend on the depth, correct?

10        MR. BRUNO:  Which we can stipulate to because the depth

11   is the depth is the depth.  The only information that I have

12   about depth is from the documents that they produced.

13             I am suggesting to Your Honor that there is a

14   document that they trashed that has the correct depths.

15        THE COURT:  You said they produced.  You don't have it.

16        MR. BRUNO:  Well, by mistake, you see.  The rules --

17   no, no, no.  He's laughing, but he says, I pulled that by

18   mistake.  He says, I'm not -- we have this rule in this case in

19   the CMO that any early drafts of the reports can be yanked.

20             Well, he calls this demonstrative an early

21   version draft, and they yanked it.  In fact, they yanked it in

22   the middle of a deposition.

23             So all we are doing here is resurrecting that

24   yanked document utilizing the same identical -- there is no new

25   document.  I can't pull documents out of the sky, Judge.  The

1   only way that I could prove to you that there is a hole is

2   using their document.  The only way I can show you how deep the

3   hole is, is using their document.  The only way I can show you

4   what's in the hole is using their document.

5            THE COURT:  I got the point.

6            MR. BRUNO:  Forgive me for the histrionics.  I didn't

7   take my pills this morning.  I've got to react.

8            THE COURT:  Let's move on.  Go ahead, Mr. Stevens.

9            They are not through yet, Mr. Treeby.  I know you're

10  ready, but you're going to have time.  I'm going to give you

11  time.

12           MR. STEVENS:  Your Honor asked if Dr. Bea, in his

13  original report, correlated any of these holes to his theory of

14  failure due to underseepage.

15           THE COURT:  Well, I said, really, correlating it using

16  the scientific method of a GIS system.  Apparently, the other

17  one is -- Mr. Morris' is an improved version.  At least, that's

18  what I'm getting.  Go ahead.

19           MR. STEVENS:  Like Joe says, we're getting hung up on

20  what's GIS and what's just a -- it's a 3D depiction.  They

21  don't have depth depicted graphically.  They have depth shown

22  in a chart.  We have the same thing depicted in 3D.

23            So, ultimately, you're going to look at each area

24  adjacent to the two breaches and what holes are most relevant

25  and which ones are most likely to have penetrated or

1    perforated, if you will, the marsh layer.

2              But Dr. Bea says early on that when the waters of

3    the IHNC were able to flood the surface of the EBIA, these

4    hydraulic connections facilitated seepage and hydraulic

5    pressures that had important negative effects on the integrity

6    of the hurricane flood protection.

7         THE COURT:  I understand that general proposition, but

8    I don't know if it's based on -- to my understanding, it's not

9    based on using a specific or scientific method to determine the

10   depth of those hydraulic connections.

11        MR. STEVENS:  I would end with this, Judge.  The rule

12   says for supplemental reports, that they shall be filed no less

13   than 30 days prior to trial.  So, if you deem this a

14   supplemental report, we are well ahead of that.

15             Dr. Bea basically gave a precursor to this

16   demonstrative in his rebuttal report, and we will get it to

17   them just as soon as possible.  If you deem or they deem a

18   supplemental deposition is appropriate, we would do that, just

19   like we did, we came back on June 6th and deposed

20   Dr. Silva-Tulla.

21        THE COURT:  Let me tell you what I am going to do.  I

22   don't know what I'm going to do in this case.  I'm going to

23   have to think about this, but I am going to order you, just in

24   case, to get together and get a deposition date available, just

25   in case.

1          Mr. Treeby, you're shaking your head.  But let me

2    say this, if I order it and you lose, you better doggone well

3    have a date, shouldn't you?

4          MR. TREEBY:  We'll absolutely do it.

5          MR. STEVENS:  Thank you, Your Honor.

6          MR. TREEBY:  Hope to persuade you -- oh.

7          THE COURT:  We haven't gotten through steady flow, one

8    of my favorite things.  Unfortunate -- I won't get into that,

9    but unfortunately --

10          MR. BRUNO:  We're all there, Judge.  It's okay.

11          MR. JOANEN:  Take a five-minute break?

12          THE COURT:  I apologize.  Go ahead.

13          MR. JOANEN:  Your Honor, Scott Joanen on behalf of the

14    plaintiffs.

15          Let me just say, Your Honor, the comment that I

16    made at the deposition about that we would produce it the day

17    before as a demonstrative, that was not being coy with defense

18    counsel or not cognizant of the fact that the Court sets when

19    we'll turn over demonstratives.  That was just my recollection,

20    kind of on the fly, of what we had done with the United States

21    in a previous trial.  I understand that you will tell us when

22    to do that.

23          THE COURT:  That's right.

24          MR. JOANEN:  As it relates to steady flow --

25          THE COURT:  That's just necessarily going to be my

1   paradigm as long as I have this honored position.  Go ahead.

2       MR. JOANEN:  As it relates to steady flow, Your Honor,

3   my understanding of the way that you wanted us to present

4   evidence to you was where it was in Dr. Bea's report, how it

5   was attacked, whatever was in Dr. Bea's report was attacked by

6   the defense counsel and he replied with that.

7           I have a little cheat sheet, but, to set up for

8   that a little bit, let me just set forth that Dr. Bea talks

9   about two aspects of the steady flow analysis, which is the

10  compressibility factor and the hydraulic conductivity.

11          As you know from the *Daubert* motion, our

12  opposition, we talked about the joint soils testing protocol,

13  and we indicated that we didn't really need to do too much

14  about compressibility because Dr. Bea was going to rely upon

15  those piezometer tests that were found in the evidence produced

16  by the government that were done after the storm.

17          So that's talked about, not only in his report,

18  but also in Appendix C of his expert report.

19          Dr. Marr -- to draw a correlation as to where

20  they then pick up on that, Dr. Marr, in his Appendix T to his

21  report, looks at what Dr. Bea did in that analysis.  When

22  Dr. Bea assigns that marsh layer as being noncompressible, as

23  having a fully saturated amount and no air in -- air bubbles in

24  the soil skeleton.

25          So, for him to make the explanation as to how it

1    works, he has to do the model in such a fashion that it becomes

2    basically incompressible, which is the same terminology that

3    Dr. Marr comes to the conclusion as to what it is.

4              We have deposition testimony that Dr. Marr agrees

5    that that buried swamp-marsh layer is, in essence, fully

6    saturated.  Dr. Silva-Tulla does the same.  Dr. Stark does the

7    same.  So that's where he's talking about the steady flow, both

8    pressure in his expert report, but also gives an analysis of

9    how he's coming to that, both in his Appendix C and Appendix D

10   of his expert report.

11             In the expert reports of the defendants and in

12   their deposition testimony, they tell him he's so lost, he

13   can't even find where anything is.  They say that at 10 to the

14   minus nine, which is as close as you can really kind of come to

15   essentially incompressible, that doesn't exist in the whole

16   world.

17             Well, I can tell you as I sit here now that in

18   Dr. Silva-Tulla's expert report, he indicates that there is a

19   finding of incompressible soils at 10 to the minus nine.  He

20   makes that little thing.

21             He also says that it wouldn't be working anywhere

22   here in Louisiana.  I don't know if it's Mr. Dunbar or

23   Dr. Dunbar says, basically, the only place you would find

24   something like this is on an imploding neutron star.

25             So when Dr. Bea hears all this, he basically

1   says, no, it happens all the time.  In fact, I can give you an

2   exact analysis of where it comes from.  Dr. Lamb and

3   Dr. Wittmann have a book that says steady flow is when you have

4   complete saturation with no air voids, which means that the

5   substrata is acting as if it's all water, which is basically

6   incompressible.

7          Because, as the pressure comes down, the soil

8   skeletons aren't deforming any; it's acting upon water content

9   that's a hundred percent around the soil skeletons.  So that

10  then takes the pressure, as you push it, it's going to send it

11  wherever it goes.

12         That's all he's saying; that's what he's talking

13  about, the pressure.  So every time you see him talking about

14  pressure and the effect of pressure going through the soils,

15  that's what he's talking about here.

16         When the experts from MIT said that's completely

17  impossible, he pulled out the book that was written by the MIT

18  professors from 1969, and said, look on this page, soil steady

19  flow comes from right here.  All we're saying is that the

20  properties of the soil are at total saturation and no air

21  voids.

22         The study that was done in California basically

23  is telling them, not only am I not just coming up with this,

24  but it's being -- these types of studies and analysis are being

25  done elsewhere.  We're not relying upon it to say what happens

1    in the deltas of California is the exact same as we have here.

2    We're simply saying, I'm not making this up, this is taking

3    place in other areas.

4          So that's why that is kind of put in there.

5    Dr. Bea is simply saying, I'm not a buffoon, I'm telling you

6    this has happened elsewhere in the world.

7          THE COURT:  Let me just -- this is a little diversion,

8    but the controversy among the experts on this, I'll call it,

9    phenomenon is, do they disagree with the proposition that these

10   particular -- these particular soils are incompressible?

11         MR. JOANEN:  They agree that it's fully saturated.  My

12   guesstimation is they're saying there's air voids, and they're

13   sufficient such that it's not acting completely as water, which

14   is basically incompressible.  It's acting as a sponge.

15         THE COURT:  So that's the fundamental dispute.

16         MR. JOANEN:  Correct.

17         THE COURT:  Then, of course, the cause and effect as to

18   what occurs as a result of air voids or no air voids becomes

19   important.

20         MR. BRUNO:  Yes, sir, Your Honor.  That's really what

21   it's going to come down to.

22         THE COURT:  Go ahead.

23         MR. BRUNO:  So then the question becomes, if Dr. Bea

24   understands that this buried swamp-marsh layer is acting, as he

25   says it is, with steady flow, how do I make it on a model an

1   accurate depiction of what he believes is happening in there?

2         So he tells Mr. Cobos-Roa that, I want you to run

3   the model with these soil properties, which is -- he goes to

4   the SEEP/W manual and says, how do I come up with something

5   that's basically incompressible, where you go to 10 to the --

6   maybe 10 to the minus eight or 10 to the minus nine.  He does

7   have indication in one of his reports where he says 10 to the

8   minus eight.

9         The models that were produced in the reliance

10  materials, which Dr. Marr reviewed and sees that we're using

11  10 to the minus nine, all he's doing is saying, we're trying to

12  model these as basically incompressible.

13        So, when Mr. Treeby asks Mr. Cobos-Roa, where are

14  you going with all this, Mr. Cobos-Roa says, to model this, the

15  initial conditions were achieved by running steady state

16  analysis.  After that, the model performed a transient

17  analysis.

18        The way Dr. Bea explains that between steady

19  state, as opposed to steady flow, and transient, is if you have

20  a sponge -- to use Dr. Silva-Tulla's analysis -- if you have a

21  sponge that is 100 percent filled with water with no air voids

22  in it, and you push your finger down on it, at some point,

23  water is going to pop out the sides.  If you just -- and that

24  would be steady state, because you're maintaining the pressure

25  on there.

1           If you walk up to that same sponge, push down on

2     it and pull your finger up, the amount of water that's shot out

3     the sides is dependent upon how long you had that finger down

4     on that.

5           The same thing happens with a water drop that you

6     put on there because water spreads pressure wherever it goes.

7           So we're not saying in any of this that the water

8     drop that we put on top of the sponge has worked its way

9     through and shot out the side.  What we're saying is, the water

10    that's shooting out the side is water that's there already.

11          The pressure that is being pushed onto that

12    sponge is making that sponge and the water contents of that

13    sponge push out through the transmission of pressure.  That's

14    really all we're saying.

15          So transient state is you push it and let it go;

16    steady state is you push it down.  The transmission of that

17    pressure is steady flow.  If you had air voids, the

18    transmission of that pressure would ultimate be through

19    non-steady flow.  It's quite that simple, as best I can say it

20    as a layman.

21          THE COURT:  You explained it very well.

22          MR. JOANEN:  So if you want to know why it was that

23    Dr. Bea is responding to certain things, it's because of the --

24    as Mr. Stevens showed you -- that list in Dr. Silva-Tulla's

25    report where he says, basically, we don't agree with any of

1   this, that 10 to the minus nine cannot exist.

2            We say that we don't need to use your joint soils

3   testing protocol because we are going to rely upon the PZ3 and

4   PZ6 piezometers, which he talks about in his expert report.  In

5   the rebuttal report, he's simply saying, hey guys, heads up,

6   this is steady flow, which goes back to the very introductory

7   part of the soil mechanics that you have, which Dr. Marr and

8   Dr. Silva-Tulla are writing the second version on now.

9            That's all he's doing is saying, I'm not changing

10  anything, I'm not telling you anything that I didn't tell you

11  before.  I'm just now saying it -- like you said, am I

12  repeating myself, or maybe I have to say it louder.  I don't

13  know what it is, but that's all he's doing.

14           So our models have not changed.  Our analysis

15  have not changed.

16           Like I said before, Dr. Marr, particularly in his

17  Appendix T, critiques exactly what Dr. Bea says, and so he just

18  comes back and responds with a rebuttal report.

19       THE COURT:  Thank you, sir.

20            Is that all?

21       MR. BRUNO:  Yes, Judge.

22       THE COURT:  Mr. Treeby, you have the last word.

23       MR. TREEBY:  Thank you, Your Honor.

24            As Your Honor indicated, that is a little

25  diversion, but I can't -- because what we're talking about

1    here, this motion -- the junk science stuff that I've just

2    heard Mr. Joanen try to explain, we'll deal with.  We've

3    examined Dr. Bea on that.  We think it's junk science.  We

4    think the Court will agree, ultimately, that it is junk

5    science.

6              But here, those pages that we're trying to strike

7    have all that stuff with the California Delta.  We suspect

8    those circumstances are completely different.

9              Yes, you would do a steady state flow analysis

10   with a sand levee.  We suspect if we get all the documentation,

11   if we're required to do that in this 10 weeks we have before

12   trial, we can show that those circumstances are so different

13   that whatever analysis done there has no application whatsoever

14   here because there is a place for steady state flow analysis in

15   proper use geotechnical engineering.  This is not that case

16   because of the soils we have.

17             Just to illustrate it, and I made this statement,

18   that steady flow analysis was never mentioned.  It wasn't.

19   Steady flow analysis.

20             Dr. Bea, now they are trying to fall back on

21   stuff where he talked about nearly steady state conditions.

22   That's something he said, Dr. Bea said -- I have a slide, but I

23   won't pull it up -- he said, it's very different.  He said

24   steady flow is something very different than steady state flow.

25   So he made a distinction.

1            But, again, his junk science, we'll deal with

2     that.  I'm dealing with the California Delta Study.  In order

3     to -- he should have put that in his initial report.  If it

4     validated his analysis, he should have put it in his initial

5     report.  He didn't.

6            To properly examine him on it, I know enough

7     about this stuff now, it's complex enough that I want to be

8     precise when I ask the questions, because I have to be precise

9     to make him give me -- to not go off on a tangent, as we can

10    see from just the few video clips we played.

11            Now, let me get back to the issue.

12            The Court asked the right question.  Why wasn't

13    this done before?  Their answer was, well, we didn't know what

14    you were going to do until we got your report.

15            Well, our report was March 12th.  Mr. Bruno got

16    very histrionic, in my view, when he started talking about, oh,

17    this was because they changed this or they changed that.  That

18    was all after his rebuttal report.

19            All of what -- to do a proper supplemental to

20    correct, we gave them -- there was given -- Dr. Marr testified.

21    He said, I took that information -- and he got it from a

22    draft -- I took that information from the GIS database.  When

23    it was pointed out that it was in error, he substituted a page.

24            Then, to accommodate the plaintiffs,

25    understanding fully, they said, well, can we -- we need

1    somebody to explain it.  Well, the proper person to explain it

2    was the person who oversaw the creation of the database, which

3    was Dr. Silva.  We gave them a supplemental deposition, which

4    you heard Mr. Stevens talk about.  They examined all of the

5    reasons for the depths that are there and all of the source

6    materials for the depths, because Dr. Silva was able to answer

7    those questions.  He could tell them how deep and why was it

8    that deep at that location on the grid trenching.

9           The grid trenching is mentioned throughout the

10   report.  It's talked about in depth.  Grid trenching -- this is

11   Dr. Sykora's -- happens to be his report.  Dr. Sykora's

12   opinion, on Page 20, it goes into the whole details of the grid

13   trenching, exactly what the documents underlying show about the

14   grid trenching, how deep it was, how wide it was.  All that

15   information is there.

16          The reason it was taken off, as Dr. Silva

17   explained in his supplemental deposition, was simply because

18   the grid trenching data did not seem to match up.  So he just

19   assumed, in all of his reports, grid trenching -- the whole

20   site was grid trenched, and it had no difference.  And he says

21   all of that in his report and deals with it, as does

22   Dr. Sykora.

23          But, still, we come back to this GIS database,

24   with all -- okay, let's assume they are right with their

25   estimate.  Two weeks -- 10 days, two weeks, we'll have -- we

1    then have to go dig into it, get all the underlying data, and

2    do all the checking and, after we do all that, then take

3    Dr. Bea's deposition.

4                    That should not be done in this last 10 weeks

5    before trial.  It's prejudicial to do that.  They had the

6    burden of proof in this case.  For their excuse to say, we

7    didn't know what you were going to do, you had all the

8    documents, no, no, they had the documents at the same time we

9    did.

10                   If they are trying to rely on the fact, well,

11   Washington Group did the work, yes, Washington Group did the

12   work, beginning -- up to 2005.  Then, when this case happened,

13   we have to get people involved to go back and look at the

14   documents, and they get them at the same time that the

15   plaintiffs had access to them.

16                   They have the burden of proof.  There was no GIS

17   database, and there should not be one that is still being done

18   now.

19                   I wanted to quickly -- Dr. Bea did not rebut

20   anything contained in Dr. Silva's GIS model which shows the

21   depths -- you know, he said something, 2D, 3D.  It shows the

22   exact location of the excavations.  You have all this with

23   Dr. Silva's report, so I probably don't need to give it to you

24   again, but I can if you want, if you want to look at it.

25                   It shows where the excavation is.  It shows how

1      deep the excavations are.  It gives all that information.

2                    The data was there.  Any question that was asked

3      of Dr. Silva about what's the basis for that excavation, he's

4      able to answer, not get the answers that I got from Dr. Bea

5      because he hadn't done the work yet.

6                    Dr. Bea did not rebut with anything other than,

7      just trust me, I think it's there.  Instead, Dr. Bea says, I

8      will prove that some of the excavation shown in my GIS Swiss

9      Cheese, which I haven't done yet, will show that the levee

10     failure underseepage as they are, they are deep enough, they

11     are close enough to the eyewall.

12                   Which ones?  Well, maybe I'll learn, maybe I

13     won't, but he can't -- this is science.  This isn't something,

14     oh, there is a bunch of holes there, and it had to happen.  You

15     have to do the proper analysis to see if underseepage could

16     cause it.

17                   This excuse, what I call an excuse, he says, this

18     isn't critical to the defense of the case.  Well, we believe we

19     know, with proper science -- by the way, we don't have to prove

20     what caused the failure.  We don't have that.  All we have to

21     do in this case is prove that what we did didn't cause the

22     failure.  That's what we have to do.  They have to prove what

23     caused the failure.

24                   Now, we're trying to help the Court understand

25     the thing.  So we have some causes of failure, modes of

1  failure.  That's not what we have to prove in this case.  We

2  have focused on what didn't cause it, which were any of the

3  excavations that Washington Group did in the East Bank

4  Industrial Area.

5              If Dr. Bea says differently, which he does, we

6  need to be able to defend against it and know the basis for him

7  saying that.  We don't have that in his expert reports to date.

8              This idea that this would be a supplemental

9  report that's covered by that Rule 26(e)(2), this is a rebuttal

10  report.  This is something beyond the rules, beyond the

11  scheduling order, something we should have had long ago.  This

12  is not a proper supplement.  It doesn't correct -- are they

13  saying what they've done is incorrect and needs to be

14  corrected?  No, they're not saying that.

15              They are saying -- they were embarrassed when

16  they looked and saw that those cross-sections don't apply to

17  any excavation that was done.  He still can't find an

18  excavation.  So we've got to now dig around and find some, and

19  at the last minute.

20              It's improper for us to face this at this late

21  date with the scheduling order we have.  It's not rebuttal.

22  They have the burden of proof.

23              Chad Morris.  What happened to Chad Morris?  He

24  did a GIS model.  We examined him on it.  We took his

25  deposition.  He was listed as an expert.  We took his

1    deposition.  He doesn't have depths of excavations.  He doesn't

2    have any of that.

3            Now, we have some unknown guy doing the GIS

4    model.  We still right now don't know who is doing it.  This

5    Court does not know who is doing this so-called GIS model.  It

6    requires an expert.  It requires a consulting expert.  Who is

7    it?

8            If we disagree with it, we should have the right,

9    as we did with Chad Morris and did take his deposition, to take

10   his deposition and see how he went about compiling this

11   information and what he based his assumptions on.  What's the

12   basis for it?  There is not time for that in this last

13   10 weeks, appropriately.

14           If the Court orders it, of course, we'll do what

15   we -- try to do what we have to do, but it's unfair to force us

16   to trial after we get all that data 10 days, two weeks from

17   now, and have to first dig into it, and then try to take a

18   deposition, find out who did it and find out what his

19   qualifications are.

20           Mr. Bruno -- I'll try to avoid being

21   histrionic -- Mr. Bruno said grid trenching was yanked.  No, it

22   wasn't.  There was a clear explanation in Dr. Silva's testimony

23   why it appeared on an early draft and why it's no longer there.

24           But, in his expert report on March 12th, and in

25   Dr. Sykora's expert report, grid trenching was described in

1    detail, the closest grid trenching to the floodwall, exactly

2    how deep it was, how it was backfilled, how the backfill was

3    compacted.  All of that is dealt with in Dr. Silva's report.

4    Nothing was changed.

5              If Your Honor please, this is simply an issue of

6    fairness.  At this late date, in this complex a case, with

7    these complexities of the science, we should not have to be

8    faced with this 10 weeks before trial, when we're trying to --

9    where we are already getting our witnesses scheduled to prepare

10   them, pulling together all the exhibits.

11             By the way, this 10 days, 2 weeks from now, we

12   have a pretrial responsibility, July 23rd date for contentions

13   of fact.  How can we do that when we, on July, whatever it was,

14   two week -- then we dig into it, then we find we do have a

15   contention of fact?

16             We're supposed to be -- we've already contacted

17   Mr. Bruno's office to be listing all of our exhibits, listing

18   our contentions of fact, trying to agree on what we can agree

19   on.  That's all blown out of the water by this late date new

20   information.

21             That's why we came here.  This was a protective

22   motion.  As Your Honor saw, what we feared is what is being

23   done.

24             Thank you, Your Honor.

25        THE COURT:  Thank you, sir.

1            I hate to delay this, but I think it needs to be

2     in writing, and I need to think about it a bit.

3            The reason I mentioned the deposition, you need

4     to get that scheduled in the event that I don't strike all of

5     the report.

6        MR. TREEBY:  How can we schedule it when we don't have

7     the information, so we don't know what we have to deal with?

8     We can set aside a date in August.

9        THE COURT:  That's what I'm saying.  Take your chances

10    then.  That's all I'm saying.

11           I think it's prudent to schedule it in the event

12    that I do let part of this rebuttal report in, of the first

13    53 pages.  So I think it's prudent to schedule it now.

14           If you don't, then don't come to me afterwards.

15    That's all I'm saying.  It's wise to do.  Pick a date you think

16    is best after talking to everybody.

17           I'm not going to tell you what the date is

18    because I haven't ruled yet, unless you want a vending machine

19    here.  I don't think you do.  You want something in writing so

20    you can at least have a record for the court of appeal or

21    whatever, a better record than me simply shooting from the hip

22    right now, because this is why we have oral argument.

23           But the bottom line is, best pick a deposition

24    date.  I'm not foreshadowing what I'm doing.  I honestly don't

25    know.  I'm going to go back and think about all of this.

1          That's why we have oral argument, and to put in

2     all of the elements that I have to put in, from fairness,

3     prejudice, truth, time, orders, and make a final decision.

4          Thank you very much.

5       (WHEREUPON, the proceedings were concluded at

6     12:35 p.m.)

7                          *     *     *

8

9

10                    REPORTER'S CERTIFICATE

11

12        I, Cathy Pepper, Certified Realtime Reporter, Registered

13     Merit Reporter, Certified Court Reporter of the State of

14     Louisiana, Official Court Reporter for the United States

15     District Court, Eastern District of Louisiana, do hereby

16     certify that the foregoing is a true and correct transcript to

17     the best of my ability and understanding from the record of the

18     proceedings in the above-entitled and numbered matter.

19

20

21                         *s/Cathy Pepper*

22                         Cathy Pepper, CRR, RMR, CCR
                           Certified Realtime Reporter
23                         Registered Merit Reporter
                           Official Court Reporter
24                         United States District Court
                           Cathy_Pepper@laed.uscourts.gov
25

**0**

**05-4182** [1] - 1:6

**1**

**1** [23] - 8:17, 8:24, 8:25, 12:3, 20:15, 27:21, 31:15, 31:24, 37:19, 38:3, 44:8, 44:15, 44:16, 58:21, 74:16, 75:18, 75:20, 76:1, 76:2
**10** [30] - 14:14, 14:15, 20:19, 41:19, 42:21, 47:22, 54:17, 55:25, 58:1, 59:3, 69:20, 76:22, 77:24, 86:16, 91:11, 97:13, 97:19, 100:5, 100:6, 100:7, 100:11, 102:1, 103:11, 105:25, 106:4, 109:13, 109:16, 110:8, 110:11
**10-866** [1] - 1:9
**100** [2] - 42:21, 100:21
**10:00** [1] - 1:7
**11** [2] - 28:7, 28:9
**112** [1] - 82:15
**11th** [5] - 14:1, 14:3, 14:21, 20:14, 87:18
**12** [5] - 71:16, 80:8, 90:9, 90:11, 91:12
**12.27** [1] - 82:9
**1205** [1] - 1:21
**122** [1] - 82:4
**129** [1] - 82:5
**12:35** [1] - 112:6
**12th** [8] - 6:2, 8:22, 14:3, 20:14, 58:23, 74:13, 104:15, 109:24
**13** [1] - 39:5
**130** [1] - 82:5
**14** [3] - 6:8, 26:21, 76:3
**14th** [2] - 14:11, 25:12
**15** [8] - 24:13, 43:3, 43:16, 43:18, 47:22, 63:23, 70:16, 70:17
**16** [3] - 13:25, 37:2, 90:8
**16th** [2] - 9:18, 54:12
**17** [3] - 28:9, 43:3, 43:18
**17-foot** [1] - 43:16
**1969** [1] - 98:18

**199** [1] - 48:7
**1st** [1] - 9:14

**2**

**2** [5] - 16:1, 44:15, 74:17, 75:20, 110:11
**20** [1] - 105:12
**2000** [1] - 36:9
**20001** [1] - 2:16
**20044** [1] - 2:7
**2005** [1] - 106:12
**2007** [3] - 17:6, 17:9, 36:11
**2008** [5] - 17:6, 19:6, 19:12, 19:16, 20:4
**2011** [2] - 19:12, 88:3
**2012** [4] - 1:7, 3:2, 5:22, 6:2
**21** [1] - 39:19
**213** [1] - 9:11
**22** [2] - 63:23, 79:1
**23** [1] - 48:7
**23rd** [1] - 110:12
**25** [5] - 42:20, 43:17, 57:14, 71:18, 83:2
**26** [8] - 8:13, 12:18, 15:7, 16:22, 18:24, 21:11, 22:25, 23:9
**26(a)(2)(B** [1] - 37:8
**26(a)(2)(B)** [1] - 37:14
**26(a)(2)(B)(i** [1] - 13:11
**26(a)(2)(D)(ii** [1] - 6:17
**26(e** [1] - 16:14
**26(e)(1** [1] - 16:1
**26(e)(2** [2] - 16:21, 108:9
**26(e)(2)** [1] - 16:6
**27** [2] - 11:16, 20:18
**27th** [1] - 9:10
**28** [5] - 1:7, 3:2, 11:16, 20:18
**28th** [1] - 42:1
**2D** [2] - 72:24, 106:21

**3**

**3** [6] - 5:22, 8:24, 14:15, 20:15, 22:2, 39:5
**30** [2] - 51:18, 94:13
**30th** [2] - 77:20, 84:17
**332** [1] - 12:15
**35** [1] - 57:3
**37** [1] - 13:23
**3D** [13] - 9:20, 20:2, 21:17, 26:24, 27:15,

72:25, 73:4, 78:3, 86:25, 88:11, 93:20, 93:22, 106:21
**3rd** [4] - 5:22, 9:17, 14:3, 58:21

**4**

**4** [5] - 14:10, 22:4, 26:23, 27:14, 28:22
**416** [1] - 1:24
**48** [1] - 51:19

**5**

**5** [4] - 71:17, 73:23, 74:4, 74:23
**5.27** [1] - 82:8
**50** [1] - 76:21
**500** [1] - 2:19
**504** [1] - 2:20
**51** [1] - 2:15
**52** [1] - 27:20
**53** [13] - 5:21, 8:17, 9:1, 9:3, 11:22, 12:3, 15:16, 45:15, 45:17, 54:3, 58:21, 70:18, 111:13
**530** [1] - 12:15
**546** [1] - 2:11
**551** [1] - 13:18
**589-7779** [1] - 2:20

**6**

**6** [1] - 74:23
**60** [1] - 42:17
**600-and-some** [2] - 46:25, 56:24
**64,000** [3] - 40:20, 40:21, 47:12
**65** [1] - 52:7
**68** [2] - 78:12, 78:19
**69** [1] - 78:19
**6th** [1] - 94:19

**7**

**7** [5] - 26:23, 27:15, 28:22, 74:2, 76:4
**70113** [1] - 1:18
**70130** [3] - 1:25, 2:12, 2:20
**70381** [1] - 1:21
**7118** [1] - 34:24
**72** [1] - 51:19
**7221** [1] - 34:24

**8**

**8** [8] - 28:7, 37:21, 71:17, 74:1, 74:23, 76:3, 80:8, 82:6
**80** [1] - 66:17
**855** [1] - 1:17
**888** [1] - 2:6

**9**

**9** [1] - 39:5
**95** [1] - 39:5

**A**

**A.M** [1] - 1:7
**abandon** [1] - 58:11
**ability** [1] - 112:17
**able** [18] - 14:17, 14:19, 14:21, 15:2, 30:9, 34:16, 34:19, 43:12, 44:16, 56:13, 70:8, 73:15, 81:7, 91:1, 94:3, 105:6, 107:4, 108:6
**above-entitled** [1] - 112:18
**absolutely** [14] - 11:12, 20:1, 29:15, 33:9, 33:11, 34:14, 34:19, 35:6, 36:21, 47:16, 53:11, 68:20, 79:14, 95:4
**accepted** [1] - 48:19
**access** [3] - 28:5, 36:5, 106:15
**accommodate** [1] - 104:24
**accomplish** [5] - 47:25, 48:25, 49:23, 51:22, 69:3
**accomplished** [1] - 41:18
**accomplishing** [1] - 47:20
**according** [3] - 47:17, 67:24, 70:20
**accuracy** [1] - 39:17
**accurate** [3] - 15:13, 90:14, 100:1
**accurately** [1] - 45:9
**achieved** [1] - 100:15
**acting** [5] - 90:5, 98:8, 99:13, 99:14, 99:24
**ACTION** [1] - 1:6
**actual** [6] - 36:5, 40:25, 41:1, 42:5,

54:18
**adding** [1] - 24:5
**additional** [9] - 5:23, 6:15, 8:8, 9:1, 16:16, 23:16, 25:3, 41:14, 63:11
**address** [5] - 6:6, 6:8, 11:6, 23:16, 25:8
**adequate** [1] - 37:13
**adjacent** [2] - 76:10, 93:24
**admissions** [1] - 19:5
**admit** [5] - 10:1, 20:13, 20:14, 37:2, 81:1
**admits** [5] - 10:1, 20:13, 20:14, 37:2, 81:1
**admitted** [8] - 9:6, 36:1, 38:5, 39:4, 42:1, 42:7, 47:18, 76:17
**admittedly** [1] - 49:9
**adopted** [1] - 45:13
**ADRIAN** [1] - 2:14
**advance** [1] - 67:2
**advantage** [3] - 63:8, 63:14, 90:4
**adverse** [1] - 10:6
**affect** [1] - 7:4
**afield** [1] - 66:23
**afterwards** [1] - 111:14
**ago** [5] - 9:24, 21:19, 89:20, 90:1, 108:11
**agree** [8] - 13:5, 18:14, 64:3, 99:11, 101:25, 103:4, 110:18
**agreed** [2] - 51:16, 51:19
**agrees** [1] - 97:4
**ahead** [12] - 40:17, 58:6, 59:25, 68:23, 69:7, 86:22, 93:8, 93:18, 94:14, 95:12, 96:1, 99:22
**aid** [5] - 71:3, 84:21, 85:1, 85:3, 85:4
**air** [9] - 96:23, 98:4, 98:20, 99:12, 99:18, 100:21, 101:17
**alerting** [1] - 56:7
**all-important** [1] - 15:3
**allegations** [1] - 36:3
**alleged** [3] - 4:5, 38:13, 73:11
**allegedly** [1] - 36:23
**allocated** [1] - 32:9
**allotted** [1] - 3:11
**allow** [1] - 92:8

**allowed** [3] - 7:19, 20:10, 75:17
**allowing** [4] - 18:7, 41:11, 45:12, 64:11
**allows** [2] - 71:11, 90:19
**almost** [3] - 38:18, 45:16, 45:18, 58:2, 58:5, 66:17, 80:12
**alone** [4] - 33:8, 33:10, 39:18, 59:8
**alpha** [1] - 52:10
**Alpha** [1] - 52:13
**alterations** [1] - 74:25
**alternative** [1] - 55:1
**amazing** [1] - 25:2
**amazingly** [1] - 57:15
**ambush** [2] - 23:2, 37:9
**amended** [2] - 79:17, 82:8
**Amendment** [1] - 59:23
**AMERICA** [1] - 2:3
**amount** [3] - 92:1, 96:23, 101:2
**amounts** [1] - 12:22
**amplification** [1] - 7:18
**amplifying** [1] - 7:14
**analyses** [29] - 5:23, 6:1, 6:15, 9:2, 14:7, 14:12, 14:13, 14:14, 15:17, 15:19, 16:23, 20:17, 37:16, 41:14, 42:3, 42:6, 45:1, 45:2, 45:14, 46:1, 47:5, 47:9, 47:14, 50:4, 50:9, 53:13, 53:23, 57:19, 58:17
**analysis** [34] - 10:20, 11:11, 23:23, 41:12, 47:3, 47:16, 47:24, 48:2, 49:7, 51:23, 52:17, 53:17, 57:24, 62:2, 62:4, 62:7, 62:9, 66:12, 96:9, 96:21, 97:8, 98:2, 98:24, 100:16, 100:17, 100:20, 102:14, 103:9, 103:13, 103:14, 103:18, 103:19, 104:4, 107:15
**analyze** [1] - 57:5
**ANSWER** [45] - 19:13, 19:15, 19:19, 19:22, 20:1, 20:5, 27:19, 27:24, 28:4, 28:12, 28:17, 30:14, 30:24,

31:1, 31:10, 31:13, 31:18, 31:21, 32:3, 32:7, 32:14, 32:20, 32:24, 42:15, 42:19, 42:23, 43:4, 43:8, 43:11, 43:20, 44:2, 44:6, 44:8, 44:12, 44:14, 48:11, 52:5, 52:8, 52:10, 52:12, 52:16, 52:20, 52:24, 54:23, 83:4
**answer** [12] - 6:14, 6:22, 16:2, 27:7, 27:25, 42:24, 43:22, 82:12, 89:22, 104:13, 105:6, 107:4
**answered** [1] - 82:25
**answers** [4] - 72:8, 81:16, 81:17, 107:4
**anticipate** [1] - 18:11
**anticipated** [1] - 86:8
**anticipation** [2] - 12:24, 29:13
**apologize** [1] - 95:12
**apologized** [1] - 65:24
**apparent** [1] - 42:4
**appeal** [1] - 111:20
**APPEARANCES** [2] - 1:14, 2:1
**appeared** [1] - 109:23
**appendix** [1] - 87:22
**Appendix** [7] - 73:23, 74:4, 96:18, 96:20, 97:9, 102:17
**appendixes** [1] - 88:7
**apples** [1] - 57:19
**applicability** [1] - 57:16
**application** [1] - 103:13
**applied** [1] - 12:9
**applies** [1] - 50:6
**apply** [1] - 108:16
**appreciation** [1] - 70:8
**approach** [9] - 54:2, 54:5, 54:25, 55:1, 55:5, 55:6, 55:12, 55:13, 56:21
**appropriate** [8] - 8:14, 10:24, 13:24, 14:4, 14:10, 15:24, 62:8, 94:18
**appropriately** [2] - 4:6, 109:13
**April** [18] - 5:22, 6:2, 8:22, 9:17, 9:18, 14:1, 14:3, 14:21, 20:14, 20:19, 37:2, 54:12, 55:16, 58:21, 58:23, 87:18

**aquifer** [1] - 52:13
**area** [10] - 28:10, 37:19, 40:7, 74:23, 75:7, 79:10, 80:23, 83:1, 83:2, 93:23
**Area** [4] - 9:15, 17:5, 36:24, 108:4
**areas** [3] - 38:3, 38:14, 99:3
**arguably** [1] - 12:22
**argue** [4] - 6:21, 46:6, 46:17, 53:25
**argued** [2] - 5:12, 70:3
**arguing** [2] - 68:5, 71:20
**argument** [12] - 5:1, 6:6, 7:5, 7:23, 11:15, 62:15, 63:21, 70:2, 83:23, 85:17, 111:22, 112:1
**arguments** [2] - 6:12, 15:23
**ARMSTRONG** [1] - 1:9
**array** [1] - 50:21
**arrays** [1] - 50:16
**arrows** [1] - 78:22
**ascertain** [2] - 29:2, 79:12
**aside** [2] - 3:12, 111:8
**aspects** [1] - 96:9
**assert** [1] - 49:2
**asserted** [1] - 40:6
**assigned** [1] - 76:12
**assigns** [1] - 96:22
**assist** [1] - 77:17
**associated** [2] - 27:1, 27:17
**assume** [5] - 32:4, 39:21, 70:2, 83:7, 105:24
**assumed** [1] - 105:19
**assumption** [2] - 32:7, 39:25
**assumptions** [3] - 15:12, 40:19, 109:11
**assurance** [1] - 65:6
**assure** [1] - 62:5
**attached** [4] - 27:6, 32:12, 36:6, 85:12
**attack** [7] - 60:22, 61:20, 65:5, 65:8, 78:23, 79:2
**attacked** [3] - 66:17, 96:5
**attacks** [1] - 45:17
**attempt** [5] - 15:11, 22:10, 38:3, 49:1, 49:19
**attests** [1] - 86:24
**August** [1] - 111:8

**automatically** [1] - 12:19
**available** [14] - 9:23, 17:1, 17:8, 17:15, 17:20, 19:2, 19:6, 19:16, 19:21, 20:3, 36:9, 36:11, 36:14, 94:24
**AVENUE** [1] - 2:15
**average** [2] - 76:19, 77:1
**averaged** [1] - 82:10
**averages** [1] - 76:20
**avocados** [1] - 57:20
**avoid** [1] - 109:20
**awry** [1] - 35:13

# B

**B-1** [3] - 16:10, 74:13, 75:2
**B406** [1] - 2:19
**Backfill** [1] - 37:21
**backfill** [11] - 17:12, 26:6, 32:6, 32:9, 37:25, 38:14, 38:24, 39:23, 40:4, 43:2, 110:2
**backfilled** [16] - 26:5, 26:6, 29:12, 32:18, 35:1, 35:2, 35:4, 35:19, 35:20, 35:21, 36:23, 42:13, 42:16, 81:22, 110:2
**background** [1] - 37:12
**backside** [1] - 4:5
**bad** [1] - 34:17
**ball** [1] - 15:3
**bananas** [1] - 57:20
**Bank** [4] - 9:15, 17:5, 36:24, 108:3
**bar** [1] - 12:24
**barge** [4] - 3:23, 63:7, 67:25, 83:18
**BARONNE** [1] - 1:17
**baseball** [1] - 62:5
**based** [34] - 8:22, 16:25, 17:20, 19:1, 21:18, 24:6, 26:3, 26:4, 29:5, 29:8, 34:7, 46:25, 51:19, 54:7, 66:9, 68:1, 71:19, 73:19, 75:24, 76:20, 77:1, 79:4, 79:8, 79:10, 81:8, 81:10, 85:10, 87:10, 87:17, 89:19, 94:8, 94:9, 109:11

**bases** [6] - 13:13, 15:6, 39:1, 39:16, 40:4, 49:13
**basic** [8] - 22:25, 46:7, 52:3, 52:6, 52:21, 54:23, 57:23, 79:20
**basis** [13] - 18:10, 23:10, 23:25, 24:3, 37:16, 40:6, 45:1, 49:12, 61:1, 71:12, 107:3, 108:6, 109:12
**bat** [1] - 62:5
**Bea** [97] - 6:6, 8:17, 8:25, 9:6, 9:19, 9:23, 10:19, 13:8, 14:17, 15:2, 17:16, 19:8, 20:7, 20:13, 21:20, 22:14, 23:25, 24:5, 25:4, 26:9, 26:19, 26:24, 28:22, 29:5, 29:7, 30:2, 33:24, 34:22, 35:21, 36:1, 36:24, 37:2, 38:5, 38:15, 39:3, 39:6, 39:12, 39:20, 39:22, 40:9, 40:12, 41:3, 41:25, 42:7, 46:24, 47:24, 48:3, 48:11, 48:12, 53:16, 53:22, 55:16, 58:1, 58:12, 58:23, 61:7, 61:19, 62:3, 66:6, 66:16, 68:14, 69:10, 70:21, 77:16, 78:13, 80:25, 81:5, 81:7, 81:11, 81:15, 86:19, 87:16, 88:8, 91:19, 93:12, 94:2, 94:15, 96:8, 96:14, 96:21, 96:22, 97:25, 99:5, 99:23, 100:18, 101:23, 102:17, 103:3, 103:20, 103:22, 106:19, 107:4, 107:6, 107:7, 108:5
**Bea's** [39] - 5:21, 6:2, 14:5, 15:8, 15:17, 15:20, 15:22, 15:24, 16:2, 16:9, 19:5, 24:21, 26:18, 27:11, 28:19, 30:7, 33:3, 36:21, 37:20, 41:3, 42:11, 44:20, 45:6, 45:12, 45:23, 47:20, 48:24, 53:24, 54:14, 55:10, 55:15, 58:21, 58:22, 78:11, 79:3, 79:7, 96:4, 96:5, 106:3
**bean** [1] - 48:17

**bear** [1] - 72:6
**bearing** [1] - 72:7
**becomes** [3] - 97:1, 99:18, 99:23
**BEFORE** [1] - 1:12
**began** [2] - 19:22, 42:4
**begged** [1] - 5:11
**begin** [2] - 59:8, 60:11
**beginning** [5] - 3:10, 21:14, 22:24, 79:23, 106:12
**begins** [1] - 22:25
**behalf** [1] - 95:13
**behind** [2] - 24:17, 62:6
**believes** [1] - 100:1
**Beller** [2] - 20:9, 21:4
**below** [1] - 53:5
**bench** [1] - 17:23
**benefit** [1] - 62:14
**BENJAMIN** [1] - 2:6
**best** [9] - 5:18, 46:4, 46:19, 46:24, 91:18, 101:19, 111:16, 111:23, 112:17
**better** [5] - 24:9, 68:3, 69:2, 95:2, 111:21
**between** [4] - 36:22, 65:20, 75:19, 100:18
**beyond** [4] - 10:15, 68:21, 108:10
**big** [6] - 26:7, 28:1, 35:1, 91:24, 92:5, 92:6
**bit** [5] - 22:5, 46:21, 84:11, 96:8, 111:2
**blah** [1] - 66:18
**blow** [4] - 28:1, 31:15, 38:2, 73:7
**blow-up** [1] - 31:15
**blow-ups** [3] - 28:1, 38:2, 73:7
**blown** [2] - 28:9, 37:15, 110:19
**blown-up** [1] - 37:15
**blowout** [1] - 82:24
**blue** [2] - 37:25, 38:21
**Boland** [13] - 27:23, 38:6, 38:19, 39:9, 73:25, 74:1, 74:20, 74:22, 75:7, 76:3, 76:8, 80:8, 82:6
**bolster** [3] - 6:13, 14:6, 16:24
**Bone** [3] - 8:11, 14:16, 62:25
**book** [2] - 98:3, 98:17
**books** [1] - 49:10
**borrow** [1] - 38:21

**bottom** [11] - 11:10, 15:16, 37:24, 52:9, 75:22, 76:19, 76:24, 77:3, 77:13, 82:10, 111:23
**BOULEVARD** [1] - 1:21
**bound** [1] - 89:2
**boundary** [1] - 40:18
**BOX** [1] - 2:6
**boxes** [1] - 19:20
**BRANCH** [1] - 2:5
**breach** [1] - 80:15
**Breach** [8] - 44:3, 67:20, 67:21, 75:8, 76:11, 80:18, 80:19, 82:7
**Breaches** [2] - 3:20, 67:17
**BREACHES** [1] - 1:4
**breaches** [4] - 47:4, 47:5, 80:10, 93:24
**break** [1] - 95:11
**breaks** [1] - 92:8
**breath** [1] - 70:1
**brief** [3] - 58:5, 58:7, 59:12
**briefly** [1] - 64:5
**brought** [2] - 11:16, 62:19
**BRUNO** [40] - 1:16, 1:16, 59:7, 59:17, 59:24, 60:2, 60:11, 60:14, 60:20, 61:8, 61:11, 61:13, 63:20, 64:5, 64:8, 64:11, 64:25, 65:9, 65:17, 67:2, 67:6, 67:9, 68:7, 68:20, 68:24, 69:8, 85:21, 85:23, 86:1, 89:16, 89:22, 92:2, 92:10, 92:16, 93:6, 95:10, 99:20, 99:23, 102:21
**Bruno** [8] - 59:6, 59:25, 63:18, 81:20, 91:18, 104:15, 109:20, 109:21
**Bruno's** [1] - 110:17
**bubbles** [1] - 96:23
**buffoon** [1] - 99:5
**building** [1] - 38:9
**bulk** [1] - 78:6
**bunch** [2] - 90:18, 107:14
**burden** [4] - 69:9, 106:6, 106:16, 108:22
**buried** [4] - 55:2, 90:1, 97:5, 99:24

**button** [1] - 90:22
**buttress** [4] - 6:13, 14:6, 16:24, 21:8
**BY** [8] - 1:16, 1:20, 1:24, 2:4, 2:10, 2:14, 2:22, 2:22

**C**

**cake** [2] - 38:7, 38:8
**calculate** [1] - 92:6
**calculations** [2] - 20:22, 20:23
**California** [7] - 45:19, 54:4, 56:17, 98:22, 99:1, 103:7, 104:2
**CALLED** [1] - 3:4
**CANAL** [1] - 1:4
**Canal** [1] - 3:19
**candidly** [2] - 5:23, 66:5
**cannot** [4] - 24:1, 68:9, 82:17, 102:1
**cardboard** [1] - 19:20
**Care** [3] - 8:11, 14:16, 62:25
**care** [10] - 3:14, 58:2, 58:4, 58:11, 58:22, 60:9, 60:13, 61:2, 87:5, 91:6
**career** [1] - 47:2
**careful** [1] - 81:1
**CARONDELET** [1] - 2:11
**cars** [1] - 65:12
**Case** [2] - 44:8, 44:16
**case** [58] - 8:8, 8:10, 12:14, 12:16, 12:17, 13:3, 13:15, 13:20, 13:24, 14:15, 14:16, 17:2, 18:7, 18:22, 19:4, 21:8, 23:6, 30:16, 33:19, 35:23, 37:10, 44:24, 55:14, 62:2, 62:8, 62:10, 62:18, 62:20, 62:25, 63:4, 63:7, 63:11, 65:14, 67:25, 69:8, 70:8, 72:11, 72:15, 72:16, 72:19, 78:20, 81:19, 91:3, 92:18, 94:22, 94:24, 94:25, 103:15, 106:6, 106:12, 107:18, 107:21, 108:1, 110:6
**cases** [22] - 6:8, 6:14, 6:23, 7:7, 7:17, 7:20, 7:25, 8:2, 8:9, 11:18,

12:8, 12:10, 12:13, 12:19, 13:16, 13:23, 18:2, 18:6, 18:14, 42:13, 61:25
**Cases** [1] - 44:15
**Cathy** [2] - 112:12, 112:22
**CATHY** [1] - 2:18
**Cathy_Pepper@laed .uscourts.gov** [1] - 112:24
**caught** [2] - 11:12, 49:10
**causation** [1] - 15:4
**caused** [10] - 3:22, 4:5, 15:6, 15:10, 53:21, 67:19, 83:8, 90:13, 107:20, 107:23
**causes** [1] - 107:25
**CCR** [2] - 2:18, 112:22
**certain** [12] - 22:10, 28:12, 34:8, 36:17, 39:7, 60:17, 63:22, 70:19, 81:7, 84:10, 88:14, 101:23
**certainly** [8] - 3:12, 19:22, 25:6, 59:16, 70:21, 78:1, 79:4, 79:9
**CERTIFICATE** [1] - 112:10
**CERTIFIED** [1] - 2:18
**Certified** [3] - 112:12, 112:13, 112:22
**certify** [1] - 112:16
**Chad** [7] - 87:21, 87:23, 88:2, 108:23, 109:9
**Chad's** [1] - 88:10
**Chait** [4] - 12:15, 13:4, 13:15, 13:19
**CHAIT** [1] - 2:15
**challenges** [1] - 18:9
**chance** [2] - 12:23, 13:18
**chances** [1] - 111:9
**change** [2] - 54:19, 82:20
**changed** [9] - 50:12, 74:18, 75:19, 86:2, 102:14, 102:15, 104:17, 110:4
**changing** [2] - 83:4, 102:9
**channel** [1] - 83:13
**characteristics** [1] - 54:25
**chart** [6] - 65:1, 74:20, 74:22, 76:5, 85:24,

93:22
**charts** [2] - 80:4
**cheat** [1] - 96:7
**check** [2] - 34:14, 39:17
**checked** [2] - 40:24, 45:6
**checking** [1] - 106:2
**Cheese** [16] - 9:8, 25:9, 27:6, 28:24, 29:3, 36:6, 37:20, 39:13, 41:7, 60:8, 61:2, 70:4, 70:7, 78:15, 78:22, 107:9
**chief** [1] - 8:8
**China** [1] - 91:6
**chose** [2] - 50:2, 55:13
**chronologically** [1] - 65:19
**circled** [2] - 78:20, 78:25
**Circuit** [1] - 9:25
**circumstances** [2] - 103:8, 103:12
**circumvent** [1] - 21:10
**citation** [2] - 20:11, 38:13, 74:1
**citations** [1] - 58:4
**cite** [4] - 6:22, 6:23, 7:20, 12:14
**cited** [3] - 7:20, 44:14, 57:15
**cites** [2] - 37:13, 38:16
**citing** [3] - 18:2, 18:6, 53:15
**City** [2] - 8:11, 62:10
**CITY** [1] - 1:21
**Civil** [1] - 23:5
**CIVIL** [2] - 1:6, 2:5
**claim** [1] - 36:22
**claims** [3] - 28:21, 34:22, 39:6
**classic** [1] - 37:8
**clay** [7] - 47:22, 51:4, 51:9, 53:3, 53:4, 54:21, 92:8
**CLAYMAN** [1] - 2:14
**clays** [1] - 82:18
**clean** [1] - 3:23
**clear** [4] - 6:14, 87:16, 88:5, 109:22
**clearly** [2] - 6:17, 88:7
**CLERK** [3] - 3:7, 59:11, 59:14
**clip** [5] - 5:5, 30:2, 37:1, 48:4, 51:23
**clips** [3] - 5:3, 39:21, 104:10
**close** [4] - 30:11, 56:2, 97:14, 107:11

**closely** [1] - 25:25
**closest** [1] - 110:1
**CMO** [1] - 92:19
**co** [3] - 62:15, 63:19, 65:16
**co-counsel** [3] - 62:15, 63:19, 65:16
**Cobos** [13] - 20:20, 46:1, 47:3, 47:17, 47:25, 48:4, 48:6, 48:9, 48:21, 48:24, 100:2, 100:13, 100:14
**Cobos-Roa** [10] - 20:20, 46:1, 47:3, 47:25, 48:4, 48:6, 48:24, 100:2, 100:13, 100:14
**Cobos-Roa's** [3] - 47:17, 48:9, 48:21
**coefficient** [6] - 52:18, 52:23, 54:18, 54:20, 55:1, 55:6
**cognizant** [1] - 95:18
**coincidentally** [1] - 80:14
**cold** [5] - 42:9, 44:18, 44:22, 79:12, 81:1
**collaborated** [1] - 87:22
**color** [2] - 31:25, 32:1
**colors** [1] - 38:1
**coming** [6] - 65:5, 72:1, 77:15, 77:18, 97:9, 98:23
**comment** [1] - 95:15
**comments** [1] - 3:10
**common** [1] - 12:9
**compacted** [1] - 110:3
**compare** [1] - 72:23
**compared** [2] - 76:5, 76:17
**comparing** [2] - 57:19, 57:20
**compiling** [1] - 109:10
**complete** [8] - 5:8, 5:9, 13:12, 23:9, 24:21, 43:12, 43:23, 98:4
**completed** [3] - 25:18, 26:10, 68:9
**completely** [9] - 38:20, 45:16, 45:18, 47:14, 85:9, 98:16, 99:13, 103:8
**complex** [5] - 3:24, 6:5, 63:1, 104:7, 110:6
**complexities** [2] - 4:1, 110:7

**complexity** [1] - 4:14
**complied** [1] - 23:14
**Component** [1] - 13:20
**component** [1] - 62:16
**Components** [3] - 8:10, 37:10, 62:18
**comprehensive** [1] - 49:25
**compressibility** [13] - 11:13, 47:15, 47:19, 50:8, 52:13, 52:15, 52:21, 53:13, 53:20, 54:24, 83:21, 96:10, 96:14
**compute** [2] - 54:19, 54:23
**computer** [16] - 40:10, 40:19, 40:21, 41:6, 41:12, 41:15, 46:2, 47:6, 47:7, 47:13, 48:2, 56:23, 89:24, 90:23, 90:24, 90:25
**COMPUTER** [1] - 2:22
**conceded** [1] - 27:5
**concept** [2] - 43:13, 46:7
**conceptual** [4] - 42:25, 43:6, 44:4, 81:6
**concern** [1] - 55:2
**concerned** [6] - 3:23, 58:14, 70:15, 71:10, 71:22, 91:15
**concerning** [1] - 44:17
**concerns** [3] - 65:22, 71:1, 71:4
**concluded** [2] - 20:8, 28:20, 33:4, 44:21, 48:22, 53:1, 55:11, 112:5
**concluding** [1] - 18:10
**conclusion** [1] - 97:3
**conclusions** [1] - 25:19
**condition** [1] - 48:16
**conditions** [5] - 40:19, 50:12, 50:13, 100:15, 103:21
**conducted** [2] - 62:3, 62:7
**conductivity** [6] - 28:25, 29:4, 30:12, 52:15, 54:5, 96:10
**conducts** [1] - 62:2
**confirmed** [1] - 66:13
**connect** [1] - 31:2
**connected** [1] - 73:2
**connection** [1] - 74:13
**connections** [5] -

28:25, 29:4, 30:13, 94:4, 94:10
**consequence** [1] - 60:16
**consequences** [2] - 36:4, 61:14
**consider** [1] - 79:21
**consideration** [2] - 61:21, 62:8
**considered** [8] - 13:14, 15:22, 15:25, 23:11, 32:12, 34:20, 49:14, 57:22
**consistent** [3] - 49:15, 88:23, 91:12
**consists** [5] - 15:17, 25:17, 45:15, 45:18, 54:4
**CONSOLIDATED** [1] - 1:4
**constitutes** [2] - 39:18, 49:12
**constraints** [1] - 5:18
**construction** [1] - 51:7
**consultation** [2] - 23:23, 41:18
**consulting** [2] - 21:20, 109:6
**consuming** [1] - 25:7
**contact** [1] - 31:3
**contacted** [1] - 110:16
**contained** [4] - 5:5, 6:4, 44:15, 106:20
**contains** [1] - 39:13
**contemplate** [1] - 84:9
**contend** [2] - 30:11, 43:10
**contends** [1] - 39:23
**content** [2] - 29:1, 98:8
**contention** [2] - 46:6, 110:15
**contentions** [3] - 27:4, 110:12, 110:18
**contents** [1] - 101:12
**context** [2] - 5:8, 20:24
**continued** [1] - 9:15
**CONTINUED** [1] - 2:1
**continues** [1] - 24:5
**continuing** [1] - 16:20
**contours/elevations** [1] - 38:1
**contractor** [1] - 49:22
**contradict** [2] - 6:18, 10:5
**contradicting** [1] - 10:10
**contrary** [2] - 45:21,

70:3
**contributed** [2] - 39:8, 49:2
**control** [3] - 50:20, 51:6, 64:14
**controlled** [2] - 50:5, 51:14
**controversy** [1] - 99:8
**convenient** [1] - 90:4
**convert** [1] - 28:6
**convince** [1] - 12:5
**cooking** [1] - 49:10
**copies** [1] - 70:12
**copy** [3] - 5:2, 74:7
**corner** [1] - 37:24
**Corp** [3] - 8:10, 13:20, 37:10
**corporately** [1] - 86:21
**Corps** [2] - 4:6, 35:8
**correct** [31] - 10:18, 16:8, 16:21, 19:15, 20:22, 28:11, 28:13, 30:24, 32:3, 32:20, 32:23, 32:24, 43:4, 44:2, 44:6, 52:16, 76:25, 78:2, 79:5, 79:6, 79:8, 79:14, 81:16, 89:10, 89:13, 92:9, 92:14, 99:16, 104:20, 108:12, 112:16
**corrected** [1] - 108:14
**correcting** [1] - 18:25
**corrections** [1] - 16:10
**corrective** [1] - 16:16
**correctly** [2] - 37:11, 42:24
**correlate** [3] - 31:3, 80:19, 89:6
**correlated** [3] - 70:22, 75:10, 93:13
**correlates** [1] - 63:25
**correlating** [4] - 64:2, 71:13, 79:13, 93:15
**correlation** [14] - 29:8, 30:2, 30:3, 31:1, 31:12, 71:16, 71:19, 79:4, 85:11, 87:8, 87:10, 87:17, 89:19, 96:19
**correlations** [3] - 36:22, 37:3, 71:13
**cost** [1] - 50:2
**costly** [1] - 25:7
**counsel** [12] - 5:7, 18:5, 19:10, 62:20, 62:3, 62:15, 63:19, 65:16, 69:17, 70:2, 95:18, 96:6
**counsel's** [1] - 18:9

**countenance** [1] - 16:23
**couple** [1] - 12:11
**course** [4] - 3:17, 60:5, 99:17, 109:14
**COURT** [189] - 1:1, 2:18, 2:18, 3:4, 3:9, 5:10, 6:10, 7:2, 8:3, 8:20, 10:13, 11:7, 11:18, 12:2, 12:7, 17:22, 18:20, 20:22, 20:24, 21:15, 22:5, 22:20, 23:3, 23:8, 23:20, 24:9, 24:12, 24:19, 24:25, 25:20, 26:1, 26:13, 26:22, 27:9, 29:13, 29:17, 29:20, 29:22, 33:7, 33:13, 33:18, 33:22, 34:5, 34:10, 34:13, 34:15, 34:17, 35:3, 35:10, 35:13, 35:16, 36:8, 36:13, 36:16, 40:14, 45:20, 46:3, 46:11, 46:17, 46:19, 55:17, 55:24, 56:6, 56:10, 57:2, 57:10, 58:5, 58:16, 59:1, 59:5, 59:10, 59:16, 59:19, 59:21, 59:25, 60:10, 60:12, 60:19, 61:5, 61:10, 61:12, 63:17, 63:21, 64:7, 64:9, 64:24, 65:8, 65:15, 66:25, 67:4, 67:8, 68:5, 68:18, 68:21, 69:4, 69:15, 69:17, 69:21, 70:14, 71:1, 71:4, 71:6, 71:15, 72:1, 72:4, 72:7, 72:11, 72:13, 72:15, 72:18, 72:21, 73:4, 73:10, 73:15, 74:3, 74:6, 74:9, 75:9, 75:12, 75:15, 75:24, 76:23, 77:1, 77:4, 77:15, 77:18, 77:22, 78:1, 78:5, 78:8, 78:13, 78:17, 78:24, 79:3, 79:7, 79:25, 80:9, 80:18, 81:5, 82:22, 83:7, 83:17, 83:22, 84:5, 84:18, 84:23, 85:3, 85:7, 85:17, 85:22, 85:24, 86:3, 86:13, 86:21, 87:1, 87:3, 87:5, 87:14, 87:24, 88:5, 88:12, 88:15, 88:18, 89:1, 89:5, 89:9, 89:12, 89:18,

91:25, 92:9, 92:15, 93:5, 93:8, 93:15, 94:7, 94:21, 95:7, 95:12, 95:23, 95:25, 99:7, 99:15, 99:17, 99:22, 101:21, 102:19, 102:22, 110:25, 111:9
**Court** [53] - 3:17, 5:7, 5:17, 6:8, 7:16, 8:9, 8:11, 8:15, 12:6, 12:8, 12:13, 12:17, 13:21, 15:21, 16:13, 16:19, 17:2, 18:24, 19:5, 20:9, 20:12, 21:3, 23:5, 25:11, 33:14, 35:10, 37:23, 38:4, 49:14, 49:15, 49:21, 50:19, 54:8, 60:8, 61:22, 62:9, 62:20, 66:2, 86:24, 87:19, 95:18, 103:4, 104:12, 107:24, 109:5, 109:14, 112:13, 112:14, 112:15, 112:23, 112:24
**court** [11] - 5:11, 6:24, 10:1, 10:4, 10:7, 13:2, 21:4, 37:11, 62:25, 63:1, 111:20
**court's** [1] - 10:8
**Court's** [11] - 3:14, 6:7, 6:11, 14:10, 15:23, 21:22, 22:2, 25:14, 49:23, 58:19, 84:3
**courts** [2] - 17:18, 17:24
**covered** [1] - 108:9
**coy** [1] - 95:17
**create** [8] - 9:20, 21:5, 25:10, 33:23, 34:22, 36:10, 36:11, 36:13
**created** [2] - 21:19, 73:21
**creates** [1] - 68:4
**creating** [2] - 33:25, 36:17
**creation** [1] - 105:2
**critical** [3] - 38:4, 70:7, 107:18
**criticism** [3] - 7:10, 7:13, 12:24
**criticized** [1] - 7:8
**critique** [1] - 14:6
**critiques** [2] - 54:1, 102:17
**CRONIN** [1] - 2:15
**cross** [13] - 14:17,

40:12, 41:5, 42:3, 42:8, 43:5, 43:6, 44:4, 54:6, 60:22, 77:5, 91:4, 108:16
**cross-examination** [4] - 41:5, 54:6, 60:22, 77:5
**cross-examine** [1] - 14:17
**cross-examined** [1] - 91:4
**cross-section** [3] - 43:5, 43:6, 44:4
**cross-sections** [4] - 40:12, 42:3, 42:8, 108:16
**Crowley** [5] - 12:14, 12:17, 13:4, 13:15, 13:19
**CRR** [2] - 2:18, 112:22
**CUMMINGS** [2] - 1:23
**cure** [2] - 6:15, 15:11
**curing** [1] - 25:3
**curious** [1] - 64:10

# D

**D.C** [1] - 2:7
**Dag** [1] - 18:22
**daily** [7] - 26:4, 35:9, 75:5, 76:17, 79:15, 81:3, 88:22
**Dalrymple** [1] - 67:25
**dam** [1] - 47:2
**dangerous** [2] - 32:7, 39:24
**data** [42] - 13:13, 14:25, 17:14, 19:6, 23:11, 26:2, 26:4, 26:7, 34:7, 34:22, 35:3, 35:4, 36:10, 36:11, 36:13, 38:4, 38:25, 45:5, 56:18, 57:18, 57:23, 71:16, 73:20, 73:21, 75:14, 76:15, 77:11, 79:18, 81:8, 87:8, 87:10, 87:21, 88:21, 89:5, 89:7, 89:10, 89:12, 89:19, 105:18, 106:1, 107:2, 109:16
**database** [17] - 26:8, 32:9, 32:11, 32:15, 32:16, 33:1, 35:18, 36:5, 36:8, 36:13, 45:9, 89:14, 104:22, 105:2, 105:23, 106:17
**date** [17] - 14:2, 20:3,

23:17, 41:17, 55:16, 58:1, 94:24, 95:3, 108:7, 108:21, 110:6, 110:12, 110:19, 111:8, 111:15, 111:17, 111:24
**dated** [2] - 5:21, 20:13
**Daubert** [7] - 15:9, 60:22, 61:20, 68:15, 68:17, 84:8, 96:11
**DAY** [1] - 2:13
**days** [9] - 14:15, 20:25, 41:19, 77:20, 77:24, 94:13, 105:25, 109:16, 110:11
**DC** [1] - 2:16
**deadline** [1] - 17:21
**deadlines** [1] - 84:1
**deal** [3] - 35:1, 78:21, 103:2, 104:1, 111:7
**dealing** [2] - 4:6, 104:2
**deals** [1] - 105:21
**dealt** [2] - 3:17, 110:3
**DEBRA** [1] - 2:14
**decide** [7] - 66:5, 79:22, 83:10, 83:11, 84:6, 84:7, 84:8
**decided** [3] - 11:13, 66:15, 72:15
**decision** [1] - 112:3
**declaration** [3] - 86:20, 86:23, 86:24
**deem** [3] - 94:13, 94:17
**deep** [27] - 4:11, 26:6, 29:10, 30:11, 42:16, 42:21, 43:3, 43:16, 43:18, 64:17, 71:16, 71:17, 71:18, 76:22, 80:23, 89:25, 90:20, 91:6, 92:6, 93:2, 105:7, 105:8, 105:14, 107:1, 107:10, 110:2
**deepen** [1] - 20:11
**deepest** [3] - 80:15, 80:19, 82:6
**defalcations** [1] - 4:6
**defect** [1] - 18:12
**defects** [1] - 6:15
**defend** [2] - 70:9, 108:6
**defendant** [4] - 64:20, 66:2, 69:9, 71:11
**defendant's** [2] - 9:9, 14:6
**defendants** [21] - 6:7,

16:7, 16:9, 21:13, 21:16, 30:4, 36:2, 45:12, 57:18, 60:24, 61:3, 61:4, 61:12, 61:14, 62:17, 63:10, 67:12, 68:13, 73:19, 73:20, 97:11
**defendants'** [4] - 20:21, 60:25, 62:13, 69:12
**defended** [1] - 34:2
**defense** [7] - 5:20, 20:18, 25:5, 45:5, 95:17, 96:6, 107:18
**deficiencies** [1] - 79:1
**define** [1] - 55:7
**defining** [1] - 12:9
**deforming** [1] - 98:8
**defuse** [1] - 10:5
**degree** [1] - 3:25
**delay** [1] - 111:1
**Delta** [5] - 45:19, 54:4, 56:17, 103:7, 104:2
**deltas** [1] - 99:1
**demand** [1] - 32:25
**demonstrate** [5] - 13:7, 34:7, 50:15, 65:10, 65:11
**demonstrative** [33] - 15:19, 22:8, 22:9, 25:9, 25:12, 25:14, 29:3, 29:9, 32:14, 33:8, 34:4, 37:7, 39:13, 40:3, 61:18, 64:3, 65:4, 65:9, 70:20, 71:3, 83:11, 84:21, 85:1, 85:3, 85:4, 86:9, 90:10, 90:16, 91:2, 91:17, 92:20, 94:16, 95:17
**demonstratives** [5] - 26:15, 36:6, 41:11, 44:25, 95:19
**depart** [1] - 25:23
**DEPARTMENT** [1] - 2:3
**dependent** [3] - 18:15, 18:16, 101:3
**depicted** [3] - 74:23, 93:21, 93:22
**depiction** [4] - 72:24, 75:2, 93:20, 100:1
**depose** [6] - 14:19, 14:21, 57:5, 58:9, 74:12, 74:19
**deposed** [4] - 56:5, 74:10, 74:11, 94:19
**deposit** [1] - 31:4
**deposition** [72] - 6:3, 9:6, 9:10, 9:18,

11:17, 15:5, 18:6, 19:8, 20:7, 20:19, 21:1, 22:17, 24:2, 27:11, 28:19, 30:1, 30:7, 30:18, 33:3, 33:24, 34:2, 34:23, 34:24, 36:5, 37:2, 38:6, 38:16, 39:4, 42:1, 42:11, 44:20, 48:6, 48:9, 48:21, 51:25, 53:1, 54:8, 54:10, 54:14, 54:17, 55:10, 57:25, 70:11, 70:20, 74:5, 74:18, 75:1, 76:7, 76:16, 79:11, 79:17, 81:6, 81:24, 82:5, 92:22, 94:18, 94:24, 95:16, 97:4, 97:12, 105:3, 105:17, 106:3, 108:25, 109:1, 109:9, 109:10, 109:18, 111:3, 111:23
**depositions** [2] - 5:3, 21:12, 78:11
**deposits** [2] - 29:1, 55:2
**depth** [51] - 17:11, 22:11, 27:5, 30:23, 31:3, 33:18, 33:19, 34:7, 34:25, 36:3, 43:2, 44:5, 64:2, 64:4, 65:2, 70:23, 71:19, 73:1, 73:11, 73:25, 74:1, 75:21, 75:22, 76:3, 76:19, 77:3, 82:2, 82:20, 83:2, 83:3, 85:10, 85:17, 85:18, 85:22, 87:9, 87:16, 88:23, 90:15, 91:25, 92:9, 92:10, 92:11, 92:12, 93:21, 94:10, 105:10
**depths** [31] - 26:25, 27:4, 27:16, 27:22, 28:2, 28:10, 38:12, 38:24, 75:18, 76:12, 76:21, 77:11, 77:14, 79:7, 81:24, 82:10, 85:13, 85:14, 85:15, 86:1, 87:7, 87:12, 87:24, 88:8, 88:10, 88:13, 92:14, 105:5, 105:6, 106:21, 109:1
**DEPUTY** [3] - 3:7, 59:11, 59:14
**describe** [4] - 42:16, 46:8, 64:15, 81:20
**described** [3] - 49:1,

55:13, 109:25
**describes** [2] - 64:21, 81:4
**deserving** [1] - 61:14
**designed** [2] - 21:17, 51:8
**detail** [5] - 28:6, 28:7, 30:15, 57:5, 110:1
**detailed** [4] - 9:14, 17:3, 35:8, 65:15
**detailing** [1] - 17:11
**details** [3] - 39:15, 40:8, 105:12
**detected** [1] - 13:21
**determination** [2] - 8:12, 88:18
**determine** [17] - 5:8, 8:15, 13:25, 27:22, 28:6, 29:7, 40:3, 41:16, 46:4, 46:5, 50:3, 50:7, 54:24, 55:6, 73:16, 94:9
**determined** [8] - 12:10, 52:18, 53:12, 53:13, 53:16, 53:18, 54:20, 73:17
**develop** [1] - 9:14
**developed** [4] - 43:22, 49:25, 53:9, 83:16
**diagram** [6] - 73:14, 74:12, 76:7, 76:9, 78:6, 85:12
**Diego** [3] - 20:20, 47:25, 48:9
**Diegos** [1] - 48:21
**difference** [6] - 82:11, 82:12, 82:16, 83:9, 83:10, 105:20
**different** [11] - 8:2, 55:8, 62:19, 77:11, 82:12, 87:24, 91:20, 103:8, 103:12, 103:23, 103:24
**differently** [1] - 108:5
**dig** [5] - 91:6, 106:1, 108:18, 109:17, 110:14
**digest** [2] - 3:13, 64:12
**digital** [2] - 28:5, 28:8
**dilatational** [3] - 54:11, 55:5, 56:12
**dimension** [2] - 73:24, 81:21
**dimensional** [7] - 73:21, 75:4, 76:6, 76:14, 80:4, 80:5
**dimensions** [3] - 43:17, 43:21, 81:4
**direct** [2] - 18:4, 18:8

**directed** [1] - 22:2
**direction** [1] - 49:23
**directly** [3] - 52:22, 67:16, 69:12
**disadvantaged** [1] - 63:16
**disagree** [2] - 99:9, 109:8
**discarded** [1] - 91:3
**discern** [1] - 73:11
**disclose** [1] - 24:6
**disclosed** [5] - 14:18, 15:1, 15:20, 18:8, 57:14
**discloses** [1] - 5:22
**disclosure** [3] - 16:15, 19:3, 21:10
**disclosures** [2] - 10:12, 16:22
**disconcerting** [1] - 91:10
**discounted** [1] - 68:9
**discovered** [1] - 42:8
**discovery** [3] - 16:18, 23:5, 25:4
**discrepancy** [1] - 90:8
**discretion** [2] - 7:21, 18:17, 18:18
**discuss** [2] - 14:9, 62:12
**discussed** [3] - 61:3, 61:6, 69:11
**discussing** [1] - 46:14
**discussion** [4] - 53:25, 54:3, 55:19, 66:7
**displayed** [1] - 28:23
**dispute** [3] - 39:12, 65:20, 99:15
**distinction** [2] - 7:22, 103:25
**distorted** [2] - 47:14, 53:20
**distortion** [2] - 47:18, 53:21
**DISTRICT** [2] - 1:1, 1:1
**District** [6] - 12:16, 17:17, 23:5, 112:15, 112:24
**diversion** [2] - 99:7, 102:25
**divide** [1] - 60:1
**dividing** [2] - 59:6, 59:7
**DIVISION** [1] - 2:5
**dixit** [1] - 15:10
**do-over** [1] - 13:18
**document** [13] - 17:7, 43:20, 44:16, 44:17, 81:3, 81:11, 88:24,

92:14, 92:24, 92:25, 93:2, 93:3, 93:4
**documentation** [2] - 73:18, 103:10
**documented** [1] - 45:8
**documenting** [1] - 17:4
**documents** [16] - 17:9, 21:25, 64:14, 64:15, 64:23, 79:15, 81:11, 87:19, 90:2, 90:5, 92:12, 92:25, 105:13, 106:8, 106:14
**doggone** [1] - 95:2
**dollar** [1] - 49:21
**done** [35] - 8:17, 17:12, 18:4, 24:23, 24:25, 25:24, 26:6, 30:2, 31:12, 37:3, 40:25, 45:1, 45:3, 50:16, 54:7, 55:16, 56:23, 57:19, 64:15, 74:15, 89:1, 95:20, 96:16, 98:22, 98:25, 103:13, 104:13, 106:4, 106:17, 107:5, 107:9, 108:13, 108:17, 110:23
**dots** [3] - 37:24, 38:14, 39:22
**doubt** [2] - 54:1, 85:18
**down** [7] - 76:3, 98:7, 99:21, 100:22, 101:1, 101:3, 101:16
**Dr** [207] - 5:21, 6:2, 6:6, 8:17, 8:25, 9:4, 9:6, 9:19, 9:23, 10:19, 11:23, 11:24, 13:8, 14:5, 14:17, 15:2, 15:8, 15:17, 15:20, 15:22, 15:24, 16:2, 16:9, 17:16, 19:5, 19:8, 20:7, 20:13, 21:20, 22:14, 23:25, 24:5, 24:21, 25:4, 26:9, 26:18, 26:19, 26:24, 27:11, 28:5, 28:19, 28:22, 29:5, 29:7, 30:2, 30:7, 33:3, 33:24, 34:22, 35:21, 36:1, 36:21, 36:24, 37:2, 37:20, 38:5, 38:15, 39:3, 39:6, 39:12, 39:20, 39:22, 40:9, 40:12, 41:3, 41:25, 42:7, 42:11, 44:20, 45:6, 45:12, 45:17,

45:23, 46:24, 47:20, 47:24, 48:3, 48:11, 48:17, 48:24, 50:15, 51:5, 51:21, 51:25, 53:1, 53:16, 53:22, 53:24, 54:1, 54:14, 54:20, 55:10, 55:15, 55:16, 58:1, 58:11, 58:12, 58:21, 58:22, 58:23, 61:7, 62:3, 65:1, 66:6, 66:16, 67:25, 68:14, 69:10, 70:12, 70:21, 73:24, 74:5, 74:10, 74:11, 74:12, 74:19, 75:1, 75:3, 75:5, 75:17, 76:6, 76:16, 77:16, 77:17, 78:11, 78:13, 78:20, 79:1, 79:2, 79:3, 79:7, 79:16, 80:25, 81:5, 81:7, 81:11, 81:15, 81:19, 81:23, 83:1, 86:19, 87:16, 88:8, 91:5, 91:11, 91:19, 93:12, 94:2, 94:15, 94:20, 96:4, 96:5, 96:8, 96:14, 96:19, 96:20, 96:21, 96:22, 97:3, 97:4, 97:6, 97:18, 97:23, 97:25, 98:2, 98:3, 99:5, 99:23, 100:10, 100:18, 100:20, 101:23, 101:24, 102:7, 102:8, 102:16, 102:17, 103:3, 103:20, 103:22, 104:20, 105:3, 105:6, 105:11, 105:16, 105:22, 106:3, 106:19, 106:20, 106:23, 107:3, 107:4, 107:6, 107:7, 108:5, 109:22, 109:25, 110:3
**dr** [1] - 48:12
**draft** [6] - 77:19, 77:22, 84:18, 92:21, 104:22, 109:23
**drafts** [1] - 92:19
**draw** [1] - 96:19
**drawing** [1] - 76:6
**drawings** [1] - 78:16
**drawn** [3] - 40:12, 65:12
**dredging** [1] - 73:1
**drives** [2] - 8:4, 8:5
**drop** [2] - 101:5, 101:8

**dry** [1] - 88:25
**DUDENHEFER** [2] - 1:23, 1:24
**due** [6] - 61:3, 63:6, 66:4, 91:15, 93:14
**dug** [4] - 43:3, 64:16, 81:10, 81:13
**duly** [1] - 67:1
**Dunbar** [2] - 97:22, 97:23
**duration** [2] - 51:15, 51:17
**during** [11] - 5:1, 9:18, 16:18, 20:18, 20:19, 24:2, 39:4, 50:10, 74:25, 80:6, 83:5
**duty** [1] - 89:2
**DUVAL** [1] - 1:12

# E

**e-mail** [2] - 60:25, 84:2
**early** [5] - 88:3, 92:19, 92:20, 94:2, 109:23
**East** [4] - 9:15, 17:5, 36:24, 108:3
**Eastern** [1] - 112:15
**EASTERN** [1] - 1:1
**easy** [2] - 46:23, 90:4
**EBIA** [13] - 17:14, 27:4, 36:20, 37:20, 37:22, 45:10, 47:6, 49:23, 50:17, 54:21, 64:16, 83:1, 94:3
**effect** [4] - 76:25, 77:2, 98:14, 99:17
**effects** [1] - 94:5
**effort** [3] - 36:17, 62:22, 64:1
**eight** [3] - 74:21, 100:6, 100:8
**Eighth** [1] - 59:23
**either** [5] - 4:4, 11:19, 31:21, 44:25, 68:15
**elements** [1] - 112:2
**elevation** [5] - 27:1, 27:17, 29:10, 31:3, 75:22
**elsewhere** [2] - 98:25, 99:6
**ELWOOD** [2] - 1:20, 1:20
**Elwood** [3] - 60:7, 69:13, 69:24
**Elwood's** [2] - 64:6, 64:25
**embarrassed** [1] - 108:15
**embellishing** [1] -

10:15
**embrace** [1] - 23:7
**emphatic** [1] - 16:2
**empirical** [1] - 81:8
**end** [3] - 50:17, 77:20, 94:11
**engage** [3] - 24:7, 59:21
**engineer** [1] - 49:10
**engineering** [5] - 3:25, 6:1, 9:2, 20:17, 103:15
**English** [1] - 52:14
**enlarged** [1] - 27:21
**enlightened** [1] - 7:24
**enlightening** [1] - 33:15
**ensure** [1] - 45:9
**Enterprises** [1] - 18:22
**entire** [5] - 8:21, 37:22, 47:2, 83:1, 83:2
**entirety** [1] - 40:16
**entitled** [2] - 39:9, 112:18
**environmentally** [1] - 17:13
**equals** [2] - 37:24, 37:25
**eroded** [1] - 4:4
**error** [1] - 104:23
**errors** [1] - 16:9
**ESQ** [1] - 1:24
**ESQUIRE** [11] - 1:16, 1:17, 1:20, 2:4, 2:4, 2:5, 2:10, 2:10, 2:14, 2:14, 2:15
**essence** [1] - 97:5
**essential** [5] - 45:25, 47:16, 50:7, 51:22, 53:11
**essentially** [3] - 48:15, 81:25, 97:15
**estimate** [1] - 105:25
**estimates** [1] - 79:7
**etcetera** [1] - 46:15
**evaluate** [3] - 20:17, 39:16, 41:15
**eve** [6] - 25:16, 29:18, 29:22, 34:10, 37:7, 39:17
**event** [2] - 111:4, 111:11
**events** [1] - 50:12
**evidence** [27] - 6:19, 10:1, 10:2, 10:5, 10:6, 10:10, 32:5, 35:22, 42:2, 43:15, 43:19, 44:10, 44:14,

45:8, 63:12, 63:15, 66:9, 79:21, 80:6, 80:14, 81:18, 83:12, 85:5, 96:4, 96:15
**exacerbated** [3] - 28:24, 29:4, 30:12
**exact** [4] - 75:14, 98:2, 99:1, 106:22
**exactly** [10] - 23:3, 24:18, 35:12, 56:19, 76:13, 81:21, 83:9, 102:17, 105:13, 110:1
**examination** [4] - 41:5, 54:6, 60:22, 77:5
**examine** [7] - 6:6, 14:17, 26:19, 40:2, 56:13, 57:16, 104:6
**examined** [7] - 41:3, 51:10, 58:14, 91:4, 103:3, 105:4, 108:24
**example** [6] - 8:6, 57:13, 61:17, 76:2, 76:24, 82:4
**examples** [1] - 26:21
**excavated** [2] - 83:2
**excavation** [38] - 4:8, 15:13, 27:1, 27:5, 27:17, 29:9, 29:12, 32:10, 35:19, 38:1, 38:8, 38:9, 38:22, 40:2, 42:14, 42:17, 42:20, 43:1, 43:9, 43:16, 43:17, 43:21, 43:25, 44:5, 44:11, 44:16, 75:21, 75:22, 82:2, 82:5, 82:14, 82:21, 106:25, 107:3, 107:8, 108:17, 108:18
**Excavations** [1] - 37:21
**excavations** [37] - 4:7, 9:14, 15:12, 15:18, 17:12, 22:10, 26:5, 26:25, 27:4, 27:16, 27:22, 28:3, 28:23, 29:3, 30:11, 31:2, 32:8, 33:20, 34:8, 36:4, 36:23, 38:7, 38:11, 38:23, 39:7, 39:10, 42:2, 42:5, 73:2, 73:13, 74:20, 80:23, 81:24, 106:22, 107:1, 108:3, 109:1
**exceeds** [1] - 22:23
**exceptions** [1] - 12:12
**excerpt** [14] - 19:8,

20:7, 27:11, 28:19, 30:7, 33:3, 42:11, 44:20, 48:9, 48:21, 51:25, 53:1, 54:14, 55:10
**excerpts** [1] - 70:11
**exclude** [3] - 12:19, 18:10, 21:3
**excuse** [6] - 13:6, 49:9, 82:4, 106:6, 107:17
**exercises** [1] - 25:7
**exhibit** [6] - 31:25, 64:19, 64:20, 65:10, 69:22
**Exhibit** [1] - 27:20
**exhibits** [8] - 22:8, 22:9, 23:12, 28:16, 33:9, 70:20, 110:10, 110:17
**exist** [4] - 41:8, 58:19, 97:15, 102:1
**existed** [2] - 19:19, 45:10
**existing** [3] - 21:8, 54:21, 79:13
**expands** [1] - 9:4
**expense** [1] - 40:24
**experience** [1] - 81:15
**expert** [67] - 5:25, 6:12, 6:20, 7:8, 7:9, 9:9, 10:9, 10:11, 10:16, 12:20, 12:25, 13:2, 13:18, 14:19, 15:3, 15:11, 15:20, 16:22, 17:19, 17:21, 17:25, 18:1, 18:3, 18:8, 21:7, 21:20, 25:18, 33:23, 36:11, 36:18, 37:12, 41:4, 47:1, 50:15, 51:21, 56:25, 57:3, 58:11, 61:3, 61:6, 62:2, 62:16, 62:19, 62:22, 66:10, 66:11, 68:11, 68:12, 69:5, 70:11, 70:21, 73:10, 77:5, 96:18, 97:8, 97:10, 97:11, 97:18, 102:4, 108:7, 108:25, 109:6, 109:24, 109:25
**expert's** [2] - 12:22, 18:6
**experts** [23] - 7:1, 10:8, 10:20, 20:21, 23:24, 24:8, 25:5, 40:24, 41:2, 41:19, 50:1, 51:10, 53:14, 53:19, 57:25, 60:23,

67:14, 67:15, 70:4, 75:9, 90:13, 98:16, 99:8
**explain** [6] - 9:5, 27:21, 61:1, 103:2, 105:1
**explained** [3] - 12:17, 101:21, 105:17
**explains** [1] - 100:18
**explanation** [3] - 33:16, 96:25, 109:22
**explore** [1] - 39:9
**express** [1] - 23:10
**extent** [2] - 31:7, 37:5
**extra** [1] - 55:25
**extremely** [2] - 62:1, 63:3
**eyewall** [1] - 30:12, 107:11
**eyewitness** [1] - 68:1

## F

**F.Supp.2d** [1] - 12:15
**fabricated** [1] - 45:25
**face** [3] - 34:15, 66:14, 108:20
**faced** [4] - 17:16, 21:13, 21:16, 110:8
**facilitated** [1] - 94:4
**fact** [21] - 6:22, 8:14, 11:9, 13:22, 16:20, 18:5, 18:15, 23:13, 44:9, 52:17, 54:16, 55:20, 56:24, 63:1, 92:21, 95:18, 98:1, 106:10, 110:13, 110:15, 110:18
**fact-specific** [1] - 8:14
**factor** [1] - 96:10
**factors** [1] - 29:8
**facts** [11] - 8:2, 8:22, 9:22, 13:13, 14:18, 14:25, 18:13, 24:7, 26:11, 40:25, 41:16
**factual** [2] - 22:21, 25:8
**fail** [1] - 39:11
**failed** [3] - 4:3, 4:8, 18:11
**failing** [1] - 12:23
**failure** [17] - 3:18, 15:7, 15:10, 40:11, 47:2, 49:2, 67:17, 81:25, 83:8, 91:23, 93:14, 107:10, 107:20, 107:22, 107:23, 107:25, 108:1

**failures** [2] - 39:8, 67:19
**fair** [6] - 4:19, 4:22, 7:4, 28:4, 28:17, 32:6
**fairly** [3] - 30:16, 77:6, 86:10
**fairness** [3] - 22:23, 110:6, 112:2
**fall** [1] - 103:20
**false** [2] - 53:19, 53:23
**familiar** [1] - 17:22
**famous** [1] - 38:8
**far** [2] - 3:23, 66:23
**fashion** [2] - 90:17, 97:1
**fashioned** [1] - 13:21
**fast** [2] - 5:12, 90:6
**fatally** [1] - 49:20
**fault** [1] - 10:2
**faulty** [1] - 16:25
**favorite** [1] - 95:8
**feared** [1] - 110:22
**feasible** [1] - 22:18
**featured** [1] - 46:13
**February** [1] - 9:13
**Federal** [3] - 21:22, 23:7, 49:15
**feet** [35] - 42:17, 42:20, 42:21, 43:3, 43:17, 43:18, 47:22, 64:17, 67:24, 68:1, 71:16, 71:17, 71:18, 74:2, 75:21, 76:3, 76:4, 76:21, 76:22, 80:22, 82:8, 82:9, 82:14, 82:15, 83:2, 90:8, 90:9, 91:11, 91:12
**fell** [2] - 67:21, 67:22
**fellow** [1] - 23:19
**felt** [2] - 3:15, 84:6
**few** [4] - 35:14, 77:20, 104:10
**Fibreboard** [1] - 9:25
**field** [3] - 15:11, 17:4, 50:6
**Fifth** [1] - 9:25
**fight** [1] - 77:7
**Figure** [6] - 27:21, 31:15, 37:19, 38:3, 73:23, 74:4
**figure** [3] - 11:13, 31:18, 43:4
**figures** [4] - 22:8, 28:13, 28:14, 47:10
**filed** [2] - 58:9, 94:12
**fill** [6] - 4:7, 31:19, 31:22, 31:25, 79:18, 88:21

**filled** [2] - 64:17, 100:21
**filling** [1] - 19:1
**final** [2] - 84:19, 112:3
**finality** [1] - 21:7
**finally** [1] - 62:24
**findings** [1] - 55:8
**fine** [5] - 11:24, 38:4, 58:22, 60:14, 85:22
**finger** [3] - 100:22, 101:2, 101:3
**finished** [3] - 33:25, 56:2, 57:12
**first** [32] - 3:12, 5:21, 6:11, 8:15, 8:22, 9:3, 15:16, 25:9, 25:15, 37:18, 37:19, 38:5, 45:15, 46:8, 46:14, 47:3, 54:3, 54:10, 55:12, 55:14, 56:14, 56:20, 57:7, 57:14, 63:23, 70:16, 70:18, 90:13, 91:5, 91:13, 109:17, 111:12
**fit** [2] - 5:2, 5:7
**five** [6] - 3:14, 20:25, 59:10, 74:21, 80:21, 95:11
**five-minute** [1] - 95:11
**fixing** [1] - 11:15
**flawed** [2] - 45:13, 49:20
**flood** [2] - 94:3, 94:6
**floodwall** [12] - 3:19, 4:3, 4:10, 40:12, 47:23, 48:1, 49:2, 50:17, 50:22, 76:10, 80:16, 110:1
**flow** [64] - 7:4, 10:19, 10:23, 10:24, 11:2, 11:9, 11:11, 11:22, 13:16, 45:11, 45:13, 45:22, 46:1, 46:7, 46:12, 46:13, 47:14, 49:6, 49:7, 49:8, 49:19, 50:4, 50:12, 50:13, 50:24, 51:1, 51:2, 51:12, 52:2, 53:2, 53:8, 53:9, 53:24, 54:3, 54:9, 55:19, 60:9, 61:2, 61:5, 78:23, 83:12, 83:13, 95:7, 95:24, 96:2, 96:9, 97:7, 98:3, 98:19, 99:25, 100:19, 101:17, 101:19, 102:6, 103:9, 103:14, 103:18, 103:19, 103:24

**fly** [1] - 95:20
**focus** [3] - 6:11, 22:2, 61:15
**focused** [2] - 55:4, 108:2
**focusing** [1] - 4:17
**followed** [1] - 21:6
**follows** [7] - 19:9, 27:12, 30:8, 42:12, 48:10, 52:1, 54:15
**foot** [2] - 68:4, 68:9
**FOR** [3] - 1:16, 2:3, 2:9
**force** [2] - 92:1, 109:15
**forced** [1] - 23:15
**foregoing** [1] - 112:16
**forensic** [4] - 5:25, 9:1, 20:16, 49:10
**foreshadowing** [1] - 111:24
**forever** [1] - 12:24
**forget** [6] - 11:25, 23:6, 72:11, 72:13, 72:15, 72:18
**forgive** [1] - 93:6
**form** [3] - 37:7, 84:19
**forming** [2] - 13:14, 23:12
**formula** [1] - 92:5
**formulate** [1] - 87:15
**forth** [3] - 24:1, 88:8, 96:8
**foundations** [1] - 23:17
**four** [11] - 9:24, 12:8, 12:10, 12:13, 12:19, 15:1, 21:19, 38:2, 41:22, 74:21, 80:22
**four-plus** [1] - 15:1
**FRANK** [1] - 1:24
**FRANKLIN** [1] - 2:6
**frankly** [10] - 4:3, 7:8, 7:22, 15:9, 18:16, 24:22, 78:4, 79:25, 90:18, 91:1
**Friday** [1] - 77:24
**front** [2] - 75:7
**Fugro** [1] - 53:14
**full** [1] - 21:10
**fully** [6] - 53:5, 83:20, 96:23, 97:5, 99:11, 104:25
**function** [1] - 10:4
**fundamental** [2] - 69:9, 99:15
**fundamentally** [1] - 18:23
**furnished** [1] - 6:1
**furthest** [1] - 80:16

**future** [1] - 62:4

## G

**Gamble** [1] - 6:23
**gap** [1] - 79:18
**gaps** [1] - 88:21
**Gary** [2] - 8:11, 62:10
**gathered** [1] - 26:2
**Gauthier** [1] - 68:25
**general** [3] - 15:6, 16:24, 94:7
**generally** [1] - 10:1
**GeoEstudios** [4] - 48:5, 48:11, 48:13, 48:15
**geotechnical** [2] - 3:25, 103:15
**GIS** [77] - 9:8, 9:20, 20:3, 21:17, 21:25, 22:5, 24:10, 25:13, 25:17, 26:8, 26:20, 30:10, 31:6, 31:14, 32:1, 32:9, 32:11, 32:15, 32:16, 32:25, 33:24, 33:25, 34:22, 35:3, 35:4, 36:5, 36:8, 36:20, 37:4, 37:21, 40:2, 44:25, 45:9, 60:8, 61:2, 63:22, 64:1, 70:17, 71:16, 71:19, 72:24, 75:10, 75:11, 76:14, 79:4, 79:13, 79:19, 85:10, 87:8, 87:10, 87:17, 87:21, 88:11, 88:16, 88:21, 89:5, 89:7, 89:10, 89:12, 89:14, 89:16, 89:17, 89:19, 89:22, 89:24, 90:18, 91:9, 93:16, 93:20, 104:22, 105:23, 106:16, 106:20, 107:8, 108:24, 109:3, 109:5
**given** [12] - 14:14, 15:23, 16:2, 17:5, 19:11, 21:9, 30:10, 37:18, 63:10, 77:23, 87:7, 104:20
**glad** [2] - 3:12, 31:10
**glib** [1] - 49:9
**goal** [3] - 14:12, 47:20, 47:25
**god** [1] - 90:9
**government** [4] - 63:11, 67:15, 68:8, 96:16
**government's** [2] -

68:11, 70:3
**Graduate** [1] - 49:3
**graph** [1] - 90:22
**Graphic** [1] - 37:21
**graphic** [13] - 9:20, 20:2, 21:17, 26:24, 27:15, 27:23, 31:23, 36:6, 44:25, 50:15, 73:22, 75:4, 78:3
**graphically** [1] - 93:21
**graphics** [5] - 27:6, 28:2, 28:24, 78:11, 78:14
**GRAVIER** [1] - 1:24
**grayed** [3] - 38:20, 39:13, 40:8
**grayed-out** [1] - 39:13
**great** [4] - 3:21, 40:23, 77:4, 89:5
**green** [1] - 65:14
**grid** [18] - 39:3, 39:4, 75:6, 76:8, 76:9, 90:15, 90:17, 105:8, 105:9, 105:10, 105:12, 105:14, 105:18, 105:19, 105:20, 109:21, 109:25, 110:1
**gridded** [1] - 75:6
**ground** [4] - 4:11, 26:25, 27:16, 47:22
**Group** [18] - 17:6, 17:13, 19:17, 29:2, 35:7, 39:7, 39:9, 39:15, 39:21, 43:10, 43:25, 44:11, 64:15, 67:15, 68:12, 106:11, 108:3
**GROUP** [2] - 2:9
**Group's** [7] - 17:4, 17:8, 19:6, 21:18, 36:22, 45:4, 45:8
**guess** [5] - 11:3, 21:2, 24:16, 70:14, 80:9
**guessing** [2] - 77:12, 88:19
**guesstimation** [1] - 99:12
**guise** [2] - 8:7, 15:18
**GULOTTA** [1] - 2:11
**guy** [1] - 109:3
**guys** [1] - 102:5

## H

**half** [3] - 28:7, 60:21
**hand** [5] - 20:22, 20:23, 66:23, 67:10, 84:25

**hands** [1] - 66:13
**hard** [3] - 5:6, 51:6, 74:7
**harm** [3] - 24:20, 58:3, 58:8
**hate** [3] - 11:4, 111:1
**head** [3] - 79:23, 83:15, 95:1
**heads** [3] - 86:12, 86:13, 102:5
**heads-up** [2] - 86:12, 86:13
**health** [1] - 3:14
**hear** [5] - 27:8, 30:1, 61:4, 61:23, 62:3
**HEARD** [1] - 1:12
**heard** [11] - 37:1, 39:24, 47:8, 56:14, 57:8, 60:20, 62:4, 70:6, 83:17, 103:2, 105:4
**hearing** [3] - 4:22, 84:8, 84:12
**HEARING** [1] - 1:11
**hears** [1] - 97:25
**HEATHER** [1] - 2:10
**heck** [1] - 72:19
**held** [2] - 16:13, 18:3
**hell** [1] - 68:14
**help** [2] - 46:21, 107:24
**helpful** [1] - 62:1
**hereby** [1] - 112:15
**hid** [1] - 45:24
**hide** [1] - 15:2
**high** [5] - 29:1, 53:22, 58:16, 67:24, 68:14
**highly** [1] - 23:22
**himself** [1] - 48:3
**hip** [1] - 111:21
**hired** [1] - 49:22
**histrionic** [2] - 104:16, 109:21
**histrionics** [2] - 67:1, 93:6
**hit** [1] - 79:23
**hitting** [1] - 65:12
**holders** [1] - 39:14
**holding** [1] - 3:22
**hole** [32] - 11:15, 43:2, 43:21, 64:16, 64:21, 65:2, 68:4, 68:10, 76:21, 76:23, 81:4, 81:10, 81:12, 81:13, 81:14, 81:21, 82:7, 88:19, 88:25, 90:20, 91:6, 91:11, 91:21, 91:24, 91:25, 92:3, 92:5, 92:7, 93:1, 93:3, 93:4

**holes** [17] - 73:1, 73:12, 79:11, 80:1, 80:7, 80:9, 81:2, 81:7, 82:22, 87:7, 87:10, 87:16, 89:25, 93:13, 93:24, 107:14
**honestly** [1] - 111:24
**Honor** [38] - 4:24, 4:25, 5:9, 5:13, 7:25, 11:21, 18:17, 22:24, 23:1, 23:18, 35:14, 36:18, 46:16, 55:22, 56:9, 58:25, 59:4, 59:15, 71:25, 72:6, 72:20, 78:4, 78:19, 79:14, 86:19, 90:20, 92:13, 93:12, 95:5, 95:13, 95:15, 96:2, 99:20, 102:23, 102:24, 110:5, 110:22, 110:24
**HONORABLE** [1] - 1:12
**honored** [1] - 96:1
**hope** [9] - 7:25, 8:23, 12:5, 13:6, 18:18, 29:21, 46:21, 55:18, 95:6
**hour** [3] - 55:24, 60:20, 60:21
**hours** [4] - 40:24, 41:15, 51:18, 51:19
**hundred** [3] - 43:18, 82:14, 98:9
**hundreds** [4] - 17:3, 40:24, 41:15
**hung** [1] - 93:19
**hurricane** [1] - 94:6
**hydraulic** [10] - 28:25, 29:4, 30:12, 50:6, 52:14, 54:5, 94:4, 94:10, 96:10
**hydraulically** [1] - 73:2
**hydrogeologic** [1] - 52:22
**hydrogeological** [1] - 52:3
**hydrostatic** [1] - 83:15
**hyperbole** [1] - 4:2
**hypothetically** [1] - 83:1

### I

**idea** [4] - 18:23, 53:7, 57:21, 108:8
**ideas** [1] - 54:9
**identical** [1] - 92:24

**identification** [2] - 38:7, 38:12
**identified** [5] - 6:19, 10:11, 30:4, 38:24, 39:1
**identify** [3] - 31:2, 43:11, 90:5
**identifying** [1] - 15:18
**IHNC** [3] - 47:4, 47:5, 94:3
**II** [1] - 1:21
**ii** [1] - 13:12
**illustrate** [3] - 37:13, 41:12, 103:17
**illustration** [1] - 49:17
**illustrations** [1] - 81:7
**images** [3] - 24:14, 24:16, 38:2
**immediate** [1] - 53:21
**immediately** [5] - 5:22, 38:19, 47:21, 76:10, 82:6
**impact** [1] - 10:6
**impatient** [2] - 77:8, 77:9
**impeach** [1] - 10:5
**implicated** [1] - 13:24
**implication** [1] - 65:22
**implicit** [1] - 21:11
**imploding** [1] - 97:24
**important** [9] - 15:3, 30:16, 38:18, 70:23, 80:7, 90:25, 91:1, 94:5, 99:19
**impossible** [4] - 11:12, 24:7, 29:5, 98:17
**improper** [4] - 8:13, 10:20, 13:21, 108:20
**improve** [2] - 18:1, 62:22
**improved** [1] - 93:17
**impugn** [1] - 67:8
**IN** [1] - 1:4
**inaccuracies** [1] - 18:25
**inaccurate** [1] - 15:12
**inappropriate** [3] - 45:24, 60:5, 63:13
**INC** [1] - 2:9
**include** [2] - 12:23, 34:21
**included** [2] - 12:20, 27:6
**including** [3] - 40:20, 41:2, 56:19
**inclusion** [1] - 12:21
**incompetent** [1] - 66:18
**incomplete** [7] -

16:16, 16:21, 19:1, 23:16, 23:17, 24:6, 29:6
**incompressible** [12] - 48:14, 48:25, 55:3, 97:2, 97:15, 97:19, 98:6, 99:10, 99:14, 100:5, 100:12
**incorporate** [1] - 54:10
**incorrect** [3] - 16:16, 16:22, 108:13
**increased** [1] - 47:21
**indeed** [1] - 36:1
**Indian** [2] - 38:20, 38:23
**indicate** [1] - 35:3
**indicated** [7] - 34:3, 38:14, 38:24, 38:25, 39:2, 96:13, 102:24
**indicates** [2] - 39:22, 97:18
**indication** [1] - 100:7
**indirect** [1] - 18:4
**individual** [1] - 38:3
**induce** [1] - 50:24
**induced** [4] - 40:11, 51:2, 51:12, 53:9
**indulgence** [2] - 5:16, 7:3
**Industrial** [5] - 3:19, 9:15, 17:5, 36:24, 108:4
**information** [46] - 12:23, 13:1, 14:20, 16:17, 17:1, 17:15, 17:20, 19:2, 19:11, 19:23, 21:4, 21:18, 23:11, 25:18, 26:5, 27:5, 29:6, 30:3, 30:25, 31:5, 33:5, 36:2, 36:12, 37:6, 37:13, 38:15, 41:7, 49:19, 56:22, 63:25, 75:10, 76:13, 83:24, 87:12, 88:24, 89:2, 89:19, 90:23, 92:11, 104:21, 104:22, 105:15, 107:1, 109:11, 110:20, 111:7
**initial** [8] - 15:3, 17:21, 18:1, 19:2, 45:6, 100:15, 104:3, 104:4
**injury** [1] - 24:5
**input** [2] - 47:9, 47:11
**inputs** [2] - 45:2, 49:4
**inputting** [2] - 47:14, 47:18
**inquiry** [1] - 8:14

**inserted** [2] - 5:4, 89:15
**insets** [1] - 80:13
**instance** [2] - 13:3, 64:4
**instances** [1] - 12:10
**instantaneously** [1] - 47:23
**instead** [5] - 29:7, 40:1, 53:18, 82:8, 107:7
**instruct** [1] - 50:4
**instructive** [2] - 62:1, 62:25
**instructs** [1] - 8:6
**insult** [1] - 24:5
**insurance** [1] - 23:6
**integrity** [1] - 94:5
**intend** [2] - 35:21, 37:6
**intended** [2] - 9:20, 62:22
**intends** [2] - 30:3, 36:25
**intent** [2] - 26:24, 27:15
**interacted** [1] - 48:11
**interested** [2] - 4:16, 64:9
**interesting** [5] - 56:24, 57:2, 62:10, 67:20, 67:22
**International** [3] - 8:12, 14:16, 19:17
**INTERNATIONAL** [1] - 2:9
**interpretation** [1] - 85:20
**interrupt** [1] - 7:2
**interruptions** [1] - 7:4
**interstices** [1] - 19:1
**introduced** [1] - 33:14
**introducing** [1] - 12:25
**introductory** [1] - 102:6
**invented** [1] - 49:9
**investigated** [1] - 47:1
**investigation** [3] - 49:22, 49:25, 50:6
**involved** [3] - 47:18, 56:19, 106:13
**ipse** [1] - 15:10
**irony** [1] - 64:13
**irrelevant** [3] - 12:22, 81:25, 82:3
**isolation** [1] - 25:22
**issue** [12] - 3:18, 10:19, 11:24, 22:23, 24:10, 57:2, 60:8,

61:22, 62:17, 72:25, 104:11, 110:5
**issued** [4] - 16:9, 63:2, 86:20, 86:23
**issues** [6] - 6:25, 20:18, 22:18, 60:4, 62:21, 63:1
**it'll** [1] - 65:6
**Item** [2] - 14:10, 22:4
**item** [3] - 6:11, 22:2, 25:9
**itself** [5] - 18:13, 63:22, 71:11, 71:21, 86:10
**ITT** [1] - 40:7

### J

**JAMES** [1] - 2:11
**Janet** [2] - 69:22, 73:6
**Jersey** [1] - 12:16
**Joanen** [5] - 29:18, 34:2, 60:8, 95:13, 103:2
**JOANEN** [8] - 1:17, 95:11, 95:13, 95:24, 96:2, 99:11, 99:16, 101:22
**Joe** [1] - 93:19
**JOHN** [1] - 2:4
**Johnson** [1] - 17:18
**joint** [3] - 64:20, 96:12, 102:2
**JONES** [1] - 2:13
**JOSEPH** [1] - 1:16
**JR** [5] - 1:12, 1:20, 1:20, 1:24, 2:11
**judge** [6] - 7:21, 18:16, 60:3, 60:15, 64:18, 85:21
**Judge** [17] - 3:8, 29:24, 61:9, 62:24, 63:6, 65:18, 66:22, 67:11, 69:8, 69:23, 73:22, 80:12, 89:24, 92:25, 94:11, 95:10, 102:21
**JUDGE** [1] - 1:12
**judges** [1] - 7:19
**judgment** [2] - 5:13, 76:18
**JULIA** [1] - 2:15
**July** [4] - 77:25, 84:15, 110:12, 110:13
**jump** [1] - 11:4
**June** [7] - 6:8, 14:11, 25:12, 77:20, 84:17, 94:19
**JUNE** [2] - 1:7, 3:2

**junk** [4] - 103:1, 103:3, 103:4, 104:1
**JUSTICE** [1] - 2:3
**justification** [1] - 45:13
**justify** [2] - 21:21, 49:20

## K

**K"(2** [1] - 1:6
**Katrina** [13] - 42:2, 43:1, 43:14, 43:15, 43:22, 44:10, 45:10, 47:2, 50:10, 79:8, 82:13, 82:16, 83:5
**KATRINA** [1] - 1:4
**Keener** [1] - 19:3
**keep** [1] - 27:14
**Kevin** [1] - 54:20
**key** [1] - 83:9
**kidding** [1] - 60:22
**kind** [10] - 5:15, 34:21, 47:19, 48:5, 55:21, 70:23, 92:5, 95:20, 97:14, 99:4
**kinds** [1] - 34:12
**knowledge** [1] - 52:3
**known** [2] - 16:17, 66:9
**knows** [2] - 8:9, 17:2

## L

**LA** [5] - 1:18, 1:21, 1:25, 2:12, 2:20
**labeled** [1] - 37:20
**laborious** [2] - 36:16, 64:1
**laboriously** [1] - 40:23
**lack** [2] - 39:21, 73:12
**lamb** [1] - 98:2
**land** [3] - 82:19, 83:5, 83:14
**language** [1] - 59:20
**large** [1] - 38:22
**last** [8] - 40:7, 54:9, 54:17, 86:15, 102:22, 106:4, 108:19, 109:12
**late** [10] - 6:1, 6:4, 20:20, 23:17, 41:17, 83:25, 84:24, 108:20, 110:6, 110:19
**latest** [1] - 47:13
**laughing** [1] - 92:17
**laughs** [1] - 48:5

**law** [4] - 16:12, 23:1, 60:3, 68:19
**LAW** [1] - 1:20
**lawyers** [3] - 19:25, 46:20, 58:8
**lay** [1] - 73:24
**layer** [23] - 29:11, 36:24, 47:22, 48:1, 50:7, 50:11, 51:4, 51:9, 51:13, 53:3, 53:4, 53:9, 53:10, 73:3, 83:20, 91:21, 91:22, 92:8, 94:1, 96:22, 97:5, 99:24
**layman** [1] - 101:20
**lead** [2] - 12:21, 21:11
**learn** [2] - 46:22, 107:12
**learned** [2] - 54:11, 57:3, 62:15
**learns** [1] - 16:15
**least** [7] - 4:21, 9:24, 61:6, 69:1, 86:10, 93:17, 111:20
**leave** [2] - 46:5, 58:22
**left** [4] - 41:19, 51:7, 69:20
**legend** [2] - 31:24, 37:23
**lend** [1] - 18:13
**less** [2] - 21:25, 94:12
**letting** [1] - 58:3
**levee** [5] - 39:8, 47:2, 83:14, 103:10, 107:9
**levees** [1] - 39:11
**level** [3] - 28:6, 30:15, 69:9
**light** [2] - 65:12, 65:13
**likely** [1] - 93:25
**limit** [3] - 14:5, 46:12, 68:16
**limited** [2] - 6:25, 10:10
**limits** [1] - 5:14
**Line** [2] - 39:5, 48:7
**line** [4] - 11:10, 15:16, 82:6, 111:23
**lines** [1] - 50:17
**list** [1] - 101:24
**listed** [1] - 108:25
**listen** [1] - 12:7
**listing** [2] - 110:17
**lists** [1] - 74:20
**LITIGATION** [1] - 1:5
**litigation** [1] - 63:14
**load** [1] - 50:6
**loaded** [1] - 50:10
**local** [2] - 26:25, 27:16
**locate** [1] - 90:5
**located** [1] - 42:17

**location** [11] - 17:11, 22:10, 43:16, 43:18, 43:22, 44:12, 44:13, 44:17, 73:12, 105:8, 106:22
**locations** [2] - 80:20, 88:14
**lockmaster** [1] - 68:2
**logical** [1] - 44:1
**logs** [1] - 75:5
**LONIAN** [1] - 2:10
**look** [23] - 5:7, 7:18, 25:25, 26:13, 27:20, 31:14, 34:16, 34:19, 37:23, 40:2, 46:3, 48:6, 62:11, 63:2, 70:16, 73:15, 80:7, 80:12, 93:23, 98:18, 106:13, 106:24
**looked** [6] - 32:19, 40:14, 40:15, 48:15, 73:10, 108:16
**looking** [14] - 7:7, 7:17, 17:23, 22:12, 25:21, 30:9, 33:15, 46:25, 65:25, 66:1, 67:19, 68:18, 73:14
**looks** [3] - 76:7, 85:4, 96:21
**lose** [1] - 95:2
**lost** [2] - 47:7, 97:12
**louder** [1] - 102:12
**LOUISIANA** [3] - 1:1, 1:7, 2:15
**Louisiana** [2] - 97:22, 112:14, 112:15
**lumped** [1] - 88:15

## M

**machine** [1] - 111:18
**Magistrate** [2] - 17:17, 65:21
**mail** [2] - 60:25, 84:2
**main** [1] - 70:14
**maintain** [2] - 28:7, 61:1
**maintaining** [1] - 100:24
**major** [2] - 23:20, 68:5
**man** [1] - 41:15
**man-hours** [1] - 41:15
**manifested** [1] - 70:19
**manipulate** [1] - 49:4
**manner** [1] - 49:15
**manual** [1] - 100:4
**map** [3] - 8:1, 65:1, 80:21
**mapping** [1] - 9:14

**maps** [1] - 31:15
**March** [7] - 9:10, 11:16, 20:18, 42:1, 74:13, 104:15, 109:24
**Marine** [23] - 27:23, 31:14, 32:19, 32:22, 38:6, 38:19, 38:22, 39:8, 39:9, 39:20, 39:22, 66:18, 73:25, 74:1, 74:20, 74:22, 75:7, 75:8, 76:3, 76:8, 76:10, 80:8
**mark** [1] - 30:10
**Marr** [25] - 11:24, 45:17, 54:1, 74:10, 74:12, 74:17, 74:19, 75:1, 75:17, 75:18, 75:20, 76:1, 76:6, 79:1, 81:19, 96:19, 96:20, 97:3, 97:4, 100:10, 102:7, 102:16, 104:20
**Marr's** [2] - 9:4, 75:5
**marsh** [13] - 29:1, 29:11, 31:4, 48:1, 55:2, 73:3, 83:20, 91:21, 91:22, 94:1, 96:22, 97:5, 99:24
**mask** [1] - 45:24
**match** [1] - 105:18
**material** [14] - 6:6, 12:22, 12:25, 16:15, 20:2, 35:5, 38:24, 41:21, 46:1, 47:8, 47:11, 47:16, 47:19, 50:3
**materials** [14] - 17:7, 17:11, 24:22, 34:20, 38:13, 38:25, 54:7, 54:21, 55:2, 57:9, 57:22, 100:10, 105:6
**mathematical** [2] - 92:2, 92:5
**matter** [10] - 6:19, 10:11, 11:9, 22:21, 62:11, 62:12, 83:3, 83:6, 91:7, 112:18
**matters** [4] - 22:16, 32:12, 34:20, 58:24
**maximum** [1] - 51:18
**Mayer** [1] - 38:20
**McDonough** [2] - 38:19, 38:22
**McNeil** [1] - 6:23
**mean** [14] - 14:23, 30:17, 31:21, 33:9, 35:4, 57:4, 57:21, 61:8, 63:6, 63:9, 84:18, 84:23, 85:7,

89:9
**meaning** [1] - 77:22
**meaningful** [3] - 41:8, 41:10, 63:24
**meaningfully** [1] - 50:2
**means** [4] - 18:25, 32:4, 85:4, 98:4
**meant** [1] - 3:14
**measure** [3] - 50:23, 53:8, 56:9
**measured** [1] - 53:2
**measurements** [3] - 51:2, 51:8, 51:12
**MECHANICAL** [1] - 2:22
**mechanics** [1] - 102:7
**meeting** [1] - 65:22
**memo** [1] - 17:23
**memoranda** [1] - 25:13
**memorandum** [1] - 6:22
**mention** [1] - 49:6
**mentioned** [7] - 45:22, 52:7, 56:25, 85:9, 103:18, 105:9, 111:3
**mentions** [2] - 9:3, 57:3
**MERIT** [1] - 2:19
**Merit** [2] - 112:13, 112:23
**messages** [1] - 84:3
**met** [1] - 69:9
**metal** [1] - 80:17
**method** [3] - 88:19, 93:16, 94:9
**micro** [1] - 57:5
**middle** [6] - 12:1, 12:3, 50:20, 51:9, 74:18, 92:22
**Middle** [1] - 17:17
**might** [8] - 59:24, 62:4, 71:15, 71:17, 72:1, 76:23, 82:12, 86:17
**million** [3] - 49:21, 90:1, 90:5
**mine** [1] - 3:11
**minimum** [2] - 51:15, 75:22
**minus** [9] - 48:18, 54:18, 97:14, 97:19, 100:6, 100:8, 100:11, 102:1
**minute** [5] - 60:4, 71:21, 91:10, 95:11, 108:19
**minutes** [6] - 3:14, 55:25, 59:3, 59:10,

**misconstrued** [1] - 18:23
**misnomer** [1] - 90:19
**misquoted** [1] - 70:9
**missing** [3] - 38:4, 40:8, 76:11
**misstatements** [1] - 16:8
**mistake** [2] - 92:16, 92:18
**mistaken** [1] - 41:16
**mistakes** [1] - 3:15
**misuse** [1] - 15:14
**MIT** [2] - 98:16, 98:17
**mitigated** [1] - 24:20
**MITSCH** [1] - 2:5
**model** [39] - 9:8, 21:18, 21:25, 22:1, 25:13, 25:17, 26:18, 26:20, 28:24, 29:6, 30:10, 31:14, 32:1, 32:5, 33:24, 33:25, 34:3, 34:23, 36:20, 40:2, 40:19, 41:6, 41:7, 41:12, 48:13, 70:5, 70:7, 85:14, 86:25, 97:1, 99:25, 100:3, 100:12, 100:14, 100:16, 106:20, 108:24, 109:4, 109:5
**modeled** [1] - 42:8
**modeling** [1] - 85:13
**models** [7] - 9:20, 20:3, 26:24, 27:15, 40:10, 100:9, 102:14
**modes** [1] - 107:25
**modify** [1] - 21:9
**molecule** [1] - 83:13
**money** [1] - 49:24
**Montana** [1] - 19:3
**months** [1] - 14:15
**MORGAN** [1] - 1:21
**morning** [2] - 3:8, 93:7
**morphed** [1] - 54:10
**Morris** [4] - 87:21, 108:23, 109:9
**Morris'** [2] - 87:21, 93:17
**most** [8] - 9:22, 12:10, 13:23, 62:24, 80:15, 80:23, 93:24, 93:25
**motion** [19] - 5:12, 5:24, 35:11, 40:14, 40:15, 41:9, 58:10, 58:13, 59:5, 60:15, 61:19, 61:20, 68:5, 68:15, 70:3, 86:7, 96:11, 103:1, 110:22

69:20, 86:16

**MOTIONS** [1] - 1:11
**motions** [2] - 5:20, 15:9
**motivation** [9] - 60:5, 66:24, 67:12, 67:13, 67:14, 68:16, 68:17, 68:18, 69:6
**motivations** [2] - 68:21, 68:22
**mountain** [1] - 90:1
**move** [2] - 55:24, 93:8
**moving** [1] - 57:11
**MR** [196] - 4:24, 5:11, 6:11, 7:25, 8:4, 8:21, 11:4, 11:8, 11:21, 12:4, 12:8, 18:17, 18:22, 20:9, 20:23, 21:3, 21:16, 22:14, 22:21, 23:4, 23:9, 23:22, 24:11, 24:18, 24:20, 25:1, 25:23, 26:2, 26:17, 26:23, 28:21, 29:15, 29:18, 29:21, 29:24, 30:1, 33:5, 33:11, 33:17, 33:21, 33:23, 34:9, 34:12, 34:14, 34:16, 34:19, 35:6, 35:12, 35:14, 35:18, 36:10, 36:15, 36:18, 40:18, 44:22, 45:21, 46:10, 46:16, 46:18, 46:21, 48:23, 53:2, 55:12, 55:22, 56:2, 56:8, 56:11, 57:7, 57:11, 58:7, 58:18, 59:4, 59:7, 59:15, 59:17, 59:20, 59:24, 60:2, 60:11, 60:14, 60:20, 61:8, 61:11, 61:13, 63:20, 64:5, 64:8, 64:11, 64:25, 65:9, 65:17, 67:2, 67:6, 67:9, 68:7, 68:20, 68:24, 69:8, 69:16, 69:19, 69:23, 70:24, 71:3, 71:5, 71:14, 71:25, 72:3, 72:6, 72:9, 72:12, 72:14, 72:17, 72:20, 72:23, 73:9, 73:14, 73:18, 74:4, 74:7, 74:10, 75:11, 75:13, 75:16, 75:25, 76:25, 77:2, 77:13, 77:16, 77:19, 77:24, 78:3, 78:6, 78:10, 78:15, 78:18, 78:25, 79:6, 79:14, 80:2, 80:11, 80:19, 81:9, 82:25, 83:9,

83:19, 84:2, 84:16, 84:21, 84:25, 85:6, 85:12, 85:19, 85:21, 85:23, 86:1, 86:12, 86:19, 86:23, 87:2, 87:4, 87:12, 87:20, 88:1, 88:10, 88:13, 88:17, 88:20, 89:4, 89:7, 89:11, 89:14, 89:16, 89:21, 89:22, 92:2, 92:10, 92:16, 93:6, 93:12, 93:19, 94:11, 95:4, 95:5, 95:6, 95:10, 95:11, 95:13, 95:24, 96:2, 99:11, 99:16, 99:20, 99:23, 102:21, 102:23, 111:6
**MRGO** [1] - 63:10
**multi** [1] - 49:21
**multi-million** [1] - 49:21
**muse** [1] - 84:11
**must** [5] - 14:17, 21:3, 22:8, 58:16, 60:25
**mv** [6] - 47:20, 54:19, 54:24, 55:6, 55:7

**N**

**N.W** [1] - 2:15
**NADDS** [1] - 75:24
**name** [1] - 67:4
**near** [2] - 43:17, 52:9
**nearly** [1] - 103:21
**necessarily** [1] - 95:25
**necessary** [1] - 89:19
**need** [29] - 18:11, 23:15, 25:5, 28:7, 28:13, 34:22, 35:18, 39:15, 40:1, 44:25, 55:21, 56:18, 66:11, 66:15, 72:1, 72:7, 77:5, 77:9, 82:1, 83:22, 85:24, 90:10, 96:13, 102:2, 104:25, 106:23, 108:6, 111:2, 111:3
**needed** [4] - 35:18, 41:22, 45:5, 70:8
**needs** [3] - 16:5, 108:13, 111:1
**negative** [1] - 94:5
**neighboring** [1] - 39:10
**neutron** [1] - 97:24
**never** [7] - 14:14, 46:24, 47:1, 57:8, 68:21, 91:13, 103:18

**New** [2] - 12:16, 19:20
**new** [50] - 6:5, 13:9, 14:7, 15:5, 15:14, 15:17, 15:18, 16:23, 16:24, 23:23, 24:1, 24:6, 25:6, 41:7, 41:14, 41:16, 45:23, 49:12, 49:19, 55:14, 56:3, 56:11, 58:3, 58:4, 62:2, 62:4, 62:7, 62:9, 66:12, 66:21, 76:5, 76:6, 85:11, 86:19, 86:25, 87:1, 87:3, 87:6, 87:12, 90:8, 92:24, 117:9
**NEW** [5] - 1:7, 1:18, 1:25, 2:12, 2:20
**newest** [1] - 20:15
**newly** [1] - 45:12
**next** [8] - 30:1, 38:2, 38:5, 38:17, 48:4, 77:20, 91:16
**NFAATT** [5] - 75:4, 76:18, 81:3, 88:22, 89:25
**NFAATTs** [1] - 79:15
**night** [1] - 6:2
**nine** [7] - 48:18, 54:18, 97:14, 97:19, 100:6, 100:11, 102:1
**NO** [1] - 1:9
**nobody** [2] - 65:7, 81:19
**Noffsinger** [6] - 6:24, 8:6, 10:4, 14:5
**Noland** [1] - 17:17
**non** [2] - 10:24, 101:19
**non-steady** [2] - 10:24, 101:19
**noncompressible** [1] - 96:22
**none** [4] - 32:1, 38:10, 41:6, 55:16
**norm** [2] - 23:2, 23:6
**North** [4] - 3:19, 67:17, 67:20, 82:7
**notable** [1] - 57:13
**nothing** [12] - 9:3, 33:9, 33:11, 36:21, 58:3, 86:19, 86:25, 87:5, 90:19, 91:16, 110:4
**notice** [3] - 50:19, 75:5, 76:8
**notion** [1] - 21:13
**nuance** [2] - 4:13, 57:6
**Number** [9] - 74:1,

74:17, 74:23, 75:18, 76:3, 80:8, 82:6
**number** [5] - 11:25, 28:23, 48:15, 65:2, 82:14
**numbered** [1] - 112:18
**numbers** [2] - 74:22, 79:18

**O**

**obligated** [1] - 84:6
**obligation** [1] - 16:21
**obligatory** [1] - 37:11
**observation** [3] - 28:4, 51:3, 51:13
**observed** [2] - 37:11, 53:10
**obvious** [1] - 58:12
**obviously** [5] - 15:24, 16:20, 39:6, 41:12, 56:4
**occasions** [1] - 16:11
**occur** [2] - 4:9, 24:1
**occurred** [2] - 21:1, 79:25
**occurs** [1] - 99:18
**OF** [5] - 1:1, 1:11, 1:20, 2:3
**offer** [2] - 8:7, 13:9
**offered** [3] - 10:6, 12:11, 64:19
**office** [1] - 110:17
**OFFICE** [1] - 1:10
**OFFICIAL** [1] - 2:18
**Official** [2] - 112:14, 112:23
**old** [3] - 13:10, 49:20, 66:17
**once** [4] - 25:17, 45:22, 57:1, 68:25
**one** [73] - 4:4, 7:6, 7:11, 7:22, 9:11, 10:21, 10:22, 11:1, 11:18, 13:3, 15:13, 18:3, 20:21, 29:7, 29:8, 30:5, 31:6, 31:7, 33:19, 36:16, 37:3, 37:4, 37:19, 39:20, 40:1, 46:12, 47:15, 47:23, 48:1, 50:2, 50:16, 52:2, 54:17, 54:18, 54:24, 55:16, 56:3, 56:15, 57:13, 62:13, 63:17, 64:18, 65:2, 66:3, 66:4, 66:6, 67:14, 67:15, 67:18, 68:1, 69:17, 70:13, 74:21,

75:6, 75:9, 75:16, 75:19, 76:22, 77:8, 80:5, 81:11, 81:20, 82:6, 83:24, 84:2, 86:7, 88:11, 90:8, 93:17, 95:7, 100:7, 106:17
**One** [1] - 9:11
**ones** [6] - 35:21, 52:6, 78:25, 80:4, 93:25, 107:12
**ongoing** [2] - 20:16, 24:3
**open** [2] - 38:22, 82:13
**opens** [1] - 15:11
**opined** [3] - 4:10, 87:16, 88:8
**opining** [1] - 88:8
**opinion** [5] - 15:6, 25:15, 71:18, 83:7, 105:12
**opinions** [29] - 6:16, 13:9, 13:10, 13:12, 13:14, 14:5, 14:6, 14:18, 15:8, 15:13, 16:23, 16:24, 17:20, 20:11, 21:9, 22:1, 23:10, 23:16, 37:13, 39:16, 40:4, 40:6, 40:11, 49:13, 49:20, 55:15, 58:4
**opponent** [1] - 18:12
**opportunities** [3] - 16:5, 63:11, 63:12
**opportunity** [3] - 9:12, 18:1, 39:17
**opposed** [2] - 67:16, 100:19
**opposing** [3] - 7:1, 18:5, 18:9
**opposition** [2] - 45:22, 96:12
**option** [1] - 66:16
**oral** [4] - 6:11, 62:15, 111:22, 112:1
**oranges** [1] - 57:20
**ORDER** [1] - 3:4
**order** [19] - 6:7, 10:8, 11:5, 11:20, 14:2, 14:11, 21:7, 25:11, 25:15, 28:5, 36:1, 45:4, 49:1, 49:24, 94:23, 95:2, 104:2, 108:11, 108:21
**ordered** [1] - 16:19
**orders** [6] - 21:22, 49:15, 58:19, 84:3, 109:14, 112:3
**organic** [1] - 36:24,

47:22, 51:4, 51:9, 53:3, 53:4
**original** [25] - 6:13, 6:15, 9:5, 9:7, 9:13, 10:15, 12:20, 14:7, 15:6, 15:8, 15:20, 18:9, 40:9, 40:14, 40:15, 41:4, 45:23, 46:7, 49:14, 62:21, 69:11, 75:6, 78:18, 79:3, 93:13
**originally** [5] - 74:17, 86:2, 89:1, 89:4, 91:2
**Orleans** [1] - 19:20
**ORLEANS** [5] - 1:7, 1:18, 1:25, 2:12, 2:20
**ostensibly** [2] - 22:8, 29:14
**otherwise** [3] - 14:23, 16:17, 21:4
**oversaw** [1] - 105:2
**overtopped** [1] - 4:4
**overtopping** [10] - 4:12, 67:19, 67:23, 68:3, 68:8, 68:9, 79:24, 82:2, 83:7, 91:23
**own** [6] - 23:24, 24:7, 65:1, 68:23, 70:4, 73:21

---

**P**

**P&G** [1] - 6:24
**p.m** [1] - 112:6
**P.O** [1] - 2:6
**page** [9] - 5:22, 9:11, 11:22, 11:25, 27:13, 45:17, 52:9, 98:18, 104:23
**Page** [15] - 8:24, 13:18, 20:15, 26:23, 27:14, 28:22, 31:24, 34:24, 37:21, 48:7, 52:7, 57:14, 82:4, 82:5, 105:12
**pages** [21] - 5:21, 9:3, 15:16, 17:3, 24:12, 24:13, 26:3, 35:7, 40:21, 45:15, 47:12, 54:3, 56:16, 57:24, 57:25, 63:23, 69:14, 70:16, 103:6, 111:13
**Pages** [5] - 8:17, 8:25, 58:21, 78:12, 78:19
**pains** [1] - 3:21
**pairs** [1] - 50:21

**Pakootas** [2] - 8:11, 62:2
**paper** [8] - 5:2, 64:12, 64:18, 64:21, 89:25, 90:19, 91:17, 91:20
**paradigm** [1] - 96:1
**Paragraph** [5] - 8:24, 20:15, 26:23, 27:15, 28:22
**parameter** [2] - 48:12, 52:22
**parameters** [2] - 52:3, 55:7
**part** [10] - 9:16, 12:18, 37:11, 58:22, 59:2, 60:6, 79:10, 91:9, 102:7, 111:12
**parted** [1] - 66:14
**participate** [1] - 50:2
**particular** [10] - 10:23, 12:24, 15:2, 29:9, 29:11, 38:7, 81:13, 81:14, 99:10
**particularly** [4] - 4:16, 63:24, 102:16
**parties** [5] - 16:18, 16:20, 17:9, 65:21, 66:10
**parts** [1] - 62:16
**party** [8] - 8:7, 10:6, 10:9, 10:11, 16:13, 16:15, 49:22, 65:10
**party's** [2] - 6:20, 7:1
**past** [2] - 6:9, 60:20
**patience** [1] - 77:6
**penetrate** [1] - 82:17
**penetrated** [1] - 93:25
**penetration** [1] - 82:7
**people** [2] - 85:20, 106:13
**PEPPER** [1] - 2:18
**Pepper** [3] - 112:12, 112:21, 112:22
**percent** [2] - 98:9, 100:21
**perforated** [1] - 94:1
**perform** [2] - 29:8, 50:8
**performed** [8] - 9:2, 20:17, 39:7, 43:9, 43:25, 44:11, 53:14, 100:16
**permeability** [7] - 46:14, 47:10, 50:8, 52:13, 53:12, 53:16, 82:23
**permissible** [1] - 17:24
**permission** [1] - 59:9
**permits** [1] - 10:8

**person** [5] - 69:1, 77:8, 77:9, 105:1, 105:2
**personally** [1] - 19:19
**persuade** [2] - 18:18, 95:6
**PERTAINS** [1] - 1:8
**phase** [1] - 55:4
**phenomenon** [1] - 99:9
**photograph** [3] - 81:2, 88:23, 91:24
**photographs** [8] - 17:4, 43:14, 45:7, 79:10, 79:16, 88:4, 88:14, 88:15
**phrase** [1] - 89:16
**physics** [2] - 4:1, 23:19
**pick** [3] - 96:20, 111:15, 111:23
**piece** [4] - 64:20, 66:9, 90:19
**piecemeal** [1] - 88:4
**pieces** [5] - 64:12, 64:18, 89:25, 91:17, 91:20
**piezometer** [1] - 96:15
**piezometers** [1] - 102:4
**PIGMAN** [1] - 2:9
**pile** [1] - 42:18
**piling** [1] - 39:1
**pills** [1] - 93:7
**pinpoint** [1] - 22:10
**pit** [1] - 38:21
**place** [6] - 7:7, 39:14, 80:24, 97:23, 99:3, 103:14
**plaintiff** [5] - 10:3, 17:25, 23:5, 62:18, 64:19
**PLAINTIFFS** [1] - 1:16
**plaintiffs** [26] - 6:21, 9:24, 14:24, 15:1, 16:7, 17:5, 17:16, 18:11, 18:23, 21:19, 22:3, 23:13, 24:21, 25:12, 36:9, 37:6, 39:14, 46:6, 46:17, 49:24, 69:24, 71:19, 95:14, 104:24, 106:15
**plaintiffs'** [11] - 19:11, 19:25, 41:2, 45:21, 50:14, 50:16, 51:21, 53:14, 53:18, 62:23, 72:25
**plan** [2] - 30:21, 49:25
**planned** [1] - 44:24

**plans** [1] - 17:3
**play** [1] - 30:5
**played** [10] - 19:9, 27:11, 30:7, 37:2, 42:11, 48:10, 51:25, 54:14, 81:10, 104:10
**plotted** [1] - 26:3
**plus** [2] - 15:1, 76:12
**point** [21] - 19:7, 20:6, 27:10, 28:18, 30:6, 33:2, 42:10, 44:19, 48:8, 48:20, 51:24, 52:25, 54:13, 55:9, 56:7, 59:12, 61:13, 76:22, 77:8, 93:5, 100:22
**pointed** [2] - 18:12, 63:21, 84:2, 104:23
**points** [2] - 22:2, 79:1
**poke** [1] - 91:21
**political** [1] - 23:19
**polka** [3] - 37:24, 38:14, 39:22
**poor** [1] - 23:19
**poorly** [7] - 29:12, 35:1, 35:2, 35:4, 35:20, 35:21, 36:23
**pop** [1] - 100:23
**Pope** [1] - 54:20
**pore** [9] - 47:21, 51:2, 51:12, 53:2, 53:8, 53:23, 55:4, 82:19, 83:4
**porosity** [4] - 52:11, 52:12, 52:15
**portion** [2] - 12:2, 60:16, 70:3
**portray** [1] - 31:5
**posed** [1] - 6:7
**position** [3] - 21:8, 46:9, 96:1
**possible** [3] - 28:6, 32:8, 94:17
**possibly** [2] - 41:7, 54:7
**post** [1] - 79:8
**post-Katrina** [1] - 79:8
**PowerPoint** [3] - 5:1, 5:4, 11:5
**powers** [2] - 31:6, 37:4
**POYDRAS** [1] - 2:19
**practice** [1] - 21:9
**practicing** [1] - 23:1
**praises** [1] - 26:9
**pre** [4] - 42:2, 43:15, 43:22, 44:10
**pre-Katrina** [4] - 42:2, 43:15, 43:22, 44:10
**precise** [4] - 81:4,

81:16, 104:8
**precisely** [5] - 22:12, 28:14, 29:3, 58:19, 62:16
**precision** [2] - 72:7, 87:11
**precursor** [1] - 94:15
**predominant** [1] - 32:6
**predominantly** [3] - 31:25, 32:18, 37:25
**prefer** [1] - 65:16
**prejudice** [10] - 21:14, 22:19, 22:25, 25:3, 25:8, 25:10, 39:18, 45:4, 68:19, 112:3
**prejudiced** [3] - 23:15, 45:12, 63:5
**prejudicial** [12] - 12:5, 22:17, 24:17, 34:13, 34:15, 34:17, 41:17, 57:12, 83:25, 86:16, 91:3, 106:5
**preliminary** [2] - 21:5, 78:16
**preparation** [1] - 84:15
**prepare** [2] - 23:25, 110:9
**prepared** [1] - 61:1
**present** [2] - 36:25, 96:3
**presentation** [2] - 21:21, 59:24
**presented** [1] - 63:23
**press** [1] - 90:22
**pressure** [24] - 28:25, 29:4, 30:12, 47:21, 51:2, 51:12, 53:8, 53:21, 83:5, 83:15, 91:22, 92:8, 97:8, 98:7, 98:10, 98:13, 98:14, 100:24, 101:6, 101:11, 101:13, 101:17, 101:18
**pressures** [6] - 53:3, 53:23, 82:17, 82:19, 92:6, 94:5
**pretrial** [2] - 25:15, 110:12
**pretty** [3] - 4:13, 25:25, 27:1
**prevent** [2] - 14:12, 58:19
**previous** [2] - 3:21, 95:21
**previously** [4] - 14:18, 15:5, 16:25, 21:9
**primarily** [2] - 79:8

**print** [1] - 38:4
**problem** [9] - 11:16, 21:5, 35:20, 46:18, 52:2, 53:17, 54:2, 56:3
**problems** [1] - 20:10
**PROCEEDINGS** [3] - 1:11, 2:22, 3:1
**proceedings** [17] - 19:7, 20:6, 27:10, 28:18, 30:6, 33:2, 42:10, 44:19, 48:8, 48:20, 51:24, 52:25, 54:13, 55:9, 59:12, 112:5, 112:18
**process** [3] - 16:18, 17:13, 42:5
**Procter** [1] - 6:23
**produce** [5] - 24:21, 31:4, 31:10, 90:10, 95:16
**PRODUCED** [1] - 2:22
**produced** [10] - 19:17, 20:3, 32:15, 41:22, 78:7, 88:4, 92:12, 92:15, 96:15, 100:9
**producing** [1] - 32:14
**production** [2] - 32:25, 57:24
**productions** [1] - 17:10
**Professor** [1] - 61:19
**professors** [1] - 98:18
**program** [4] - 46:2, 47:6, 53:22, 89:24
**progress** [3] - 26:18, 33:12, 34:23
**prohibited** [1] - 19:24, 58:24, 60:17
**project** [1] - 77:17
**prominent** [1] - 58:17
**promise** [1] - 15:18
**promised** [1] - 29:15
**prompted** [1] - 20:25
**proof** [4] - 49:18, 106:6, 106:16, 108:22
**proper** [5] - 8:13, 10:4, 13:17, 18:4, 22:23, 34:22, 45:9, 54:6, 61:23, 103:15, 104:19, 105:1, 107:15, 107:19, 108:12
**properly** [3] - 25:24, 26:19, 104:6
**properties** [11] - 47:9, 47:11, 47:15, 47:16, 50:3, 50:7, 50:23, 51:22, 53:12, 98:20,

100:3
**property** [1] - 46:1
**proposal** [1] - 50:1
**proposed** [1] - 14:5
**proposition** [2] - 94:7, 99:9
**protection** [1] - 94:6
**protective** [3] - 41:9, 56:8, 110:21
**protocol** [3] - 51:19, 96:12, 102:3
**prove** [7] - 47:21, 93:1, 107:8, 107:19, 107:21, 107:22, 108:1
**provide** [9] - 8:8, 9:12, 9:13, 37:12, 40:18, 45:1, 45:2, 53:22, 58:3
**provided** [20] - 5:1, 5:9, 8:10, 8:22, 13:10, 13:11, 16:25, 20:11, 21:18, 25:15, 29:6, 30:4, 33:6, 37:15, 40:3, 40:5, 45:5, 54:8, 61:25, 63:25
**provides** [1] - 9:1
**providing** [4] - 5:4, 14:2, 16:23, 17:3
**provision** [1] - 16:22
**provisional** [1] - 63:2
**proximity** [1] - 80:9
**prudent** [2] - 111:11, 111:13
**psf** [1] - 54:18
**pull** [3] - 92:25, 101:2, 103:23
**pulled** [2] - 92:17, 98:17
**pulling** [1] - 110:10
**pumped** [3] - 50:23, 51:1, 51:11
**pumping** [24] - 50:4, 50:5, 50:11, 50:16, 50:20, 50:24, 50:25, 51:1, 51:3, 51:6, 51:11, 51:13, 51:14, 51:16, 51:18, 51:20, 52:17, 53:2, 53:7, 53:10, 53:12, 53:17, 53:19
**purport** [1] - 25:21
**purportedly** [3] - 34:6, 34:7, 75:10
**purports** [1] - 65:11
**purpose** [12] - 4:22, 6:18, 18:20, 18:21, 22:9, 41:8, 41:10, 47:20, 64:9, 64:11,

70:25
**pursuant** [2] - 15:25, 16:21
**pursued** [1] - 18:5
**push** [6] - 98:10, 100:22, 101:1, 101:13, 101:15, 101:16
**pushed** [2] - 80:16, 101:11
**put** [19] - 24:1, 26:7, 33:8, 63:11, 63:12, 65:9, 66:25, 68:14, 69:10, 70:13, 75:19, 84:5, 99:4, 101:6, 101:8, 104:3, 104:4, 112:1, 112:2
**puts** [1] - 26:11
**putting** [1] - 91:17
**PZ3** [1] - 102:3
**PZ6** [1] - 102:4

**Q**

**qualifications** [1] - 109:19
**qualified** [1] - 33:23
**quality** [1] - 64:14
**quandary** [1] - 7:16
**quantitative** [2] - 6:1, 20:17
**quantum** [2] - 3:25, 23:19
**QUESTION** [43] - 19:10, 19:14, 19:16, 19:21, 19:24, 20:2, 27:13, 27:20, 27:25, 28:9, 28:15, 30:9, 30:16, 30:25, 31:9, 31:12, 31:14, 31:19, 31:24, 32:4, 32:11, 32:17, 32:21, 42:13, 42:16, 42:20, 42:24, 43:6, 43:9, 43:13, 43:24, 44:3, 44:7, 44:9, 44:13, 52:2, 52:6, 52:9, 52:11, 52:14, 52:17, 52:21, 54:16
**questioned** [1] - 76:16
**questioning** [1] - 59:2
**questions** [6] - 6:7, 27:7, 30:19, 65:15, 104:8, 105:7
**quick** [1] - 80:12
**quickly** [2] - 45:11, 106:19
**quite** [3] - 34:15, 63:22, 101:19

**quote** [9] - 6:25, 13:12, 13:17, 14:13, 16:14, 17:18, 17:25, 29:12, 39:24
**quoted** [1] - 12:18
**quotes** [2] - 19:3, 33:8
**quoting** [1] - 9:10

**R**

**racing** [1] - 5:13
**raise** [2] - 66:23, 67:10
**raised** [4] - 6:25, 20:18, 20:21, 62:21
**raising** [1] - 77:2
**ran** [2] - 42:9, 79:12
**rather** [1] - 9:4
**rationale** [2] - 45:23, 46:14
**RE** [1] - 1:4
**reaching** [1] - 25:19
**react** [1] - 93:7
**read** [8] - 7:14, 10:22, 27:17, 38:3, 51:6, 68:6, 68:12
**reading** [3] - 27:23, 54:8, 61:9
**ready** [4] - 7:23, 34:3, 65:4, 93:10
**real** [4] - 39:17, 58:11, 77:13, 81:9
**reality** [1] - 86:15
**really** [25] - 4:12, 4:22, 10:18, 10:24, 11:2, 11:10, 12:14, 25:17, 28:2, 38:18, 41:9, 46:13, 57:17, 62:20, 63:13, 64:6, 68:21, 71:22, 82:1, 90:11, 93:15, 96:13, 97:14, 99:20, 101:14
**Realtime** [2] - 112:12, 112:22
**reason** [6] - 46:12, 58:18, 74:25, 86:7, 105:16, 111:3
**reasonably** [1] - 86:9
**reasons** [8] - 7:22, 13:13, 23:10, 31:7, 37:4, 49:12, 86:8, 105:5
**rebut** [9] - 6:18, 7:10, 7:13, 10:2, 10:13, 11:23, 66:21, 106:19, 107:6
**rebuts** [2] - 7:11, 78:10
**rebuttal** [92] - 4:17, 5:21, 5:25, 6:2, 6:12,

6:14, 6:15, 6:18, 6:24, 8:7, 8:13, 8:16, 8:18, 8:19, 8:23, 8:24, 9:16, 9:19, 10:1, 10:5, 10:8, 10:9, 11:3, 11:8, 11:15, 11:23, 12:9, 12:11, 13:2, 13:9, 13:17, 13:21, 14:2, 14:5, 15:15, 15:17, 15:22, 15:24, 20:21, 22:22, 22:23, 26:23, 27:6, 28:22, 32:13, 33:9, 34:2, 34:21, 36:7, 36:21, 37:12, 37:20, 37:21, 41:25, 46:11, 54:4, 55:19, 55:20, 56:17, 56:20, 57:8, 57:14, 57:22, 59:1, 59:3, 60:16, 61:23, 62:12, 62:19, 65:3, 65:23, 66:3, 66:11, 66:15, 69:10, 70:18, 73:6, 78:8, 78:9, 78:17, 84:23, 86:9, 94:16, 102:5, 102:18, 104:18, 108:9, 108:21, 111:12
**rebutting** [2] - 10:10, 11:1
**receive** [4] - 9:16, 57:18, 80:6, 81:18
**received** [3] - 6:4, 9:9, 20:14
**recess** [1] - 59:13
**recollection** [1] - 95:19
**record** [9] - 28:8, 43:11, 43:23, 45:7, 64:22, 70:10, 111:20, 111:21, 112:17
**RECORDED** [1] - 2:22
**records** [3] - 17:4, 79:13
**rectangular** [1] - 42:17
**red** [9] - 37:24, 38:14, 39:22, 50:19, 65:12, 65:13, 74:16, 75:19
**redepose** [1] - 25:4
**refer** [1] - 91:19
**reference** [2] - 13:24, 57:16
**referenced** [1] - 9:22, 12:8, 12:13
**references** [2] - 47:1, 56:25
**referring** [3] - 28:14, 32:12, 33:1

**refers** [1] - 64:14
**regard** [3] - 38:16, 67:16, 70:4
**regarding** [2] - 27:4, 78:21
**regardless** [2] - 4:8, 82:20
**Registered** [1] - 112:12
**REGISTERED** [1] - 2:19
**registered** [1] - 112:23
**rejected** [1] - 17:18
**relate** [2] - 55:17, 55:18
**related** [5] - 14:20, 38:11, 41:18, 52:22, 82:13
**relates** [2] - 95:24, 96:2
**relation** [1] - 75:23
**relative** [3] - 26:25, 27:16, 29:10
**relatively** [1] - 77:8
**relevant** [3] - 12:25, 39:12, 93:24
**reliance** [2] - 34:20, 100:9
**relied** [4] - 22:1, 24:22, 25:5, 25:18
**relief** [2] - 61:14, 61:15
**relies** [1] - 87:20
**reluctantly** [1] - 84:5
**rely** [5] - 30:3, 36:2, 96:14, 102:3, 106:10
**relying** [2] - 87:24, 98:25
**remediating** [1] - 17:13
**remediation** [1] - 38:11
**remedy** [8] - 8:14, 13:22, 13:25, 14:4, 14:10, 22:18, 63:2, 63:3
**remember** [8] - 23:4, 24:13, 49:21, 65:18, 65:20, 65:24, 66:6, 81:9
**removals** [3] - 38:9, 38:10, 39:2
**rendering** [1] - 22:1
**repeating** [1] - 102:12
**repel** [1] - 13:2
**replied** [3] - 9:20, 39:24, 96:6
**report** [169] - 4:17, 5:21, 6:3, 6:12, 6:13, 6:18, 6:20, 7:8, 7:9,

7:14, 8:12, 8:18, 8:19, 8:21, 8:24, 9:4, 9:5, 9:7, 9:13, 9:16, 9:19, 10:16, 11:23, 12:21, 12:22, 13:2, 14:1, 14:7, 14:21, 15:3, 15:4, 15:5, 15:17, 15:20, 15:25, 16:2, 16:14, 17:25, 18:1, 18:4, 18:7, 18:10, 18:11, 19:1, 20:13, 20:15, 20:20, 21:21, 22:7, 22:22, 24:14, 26:24, 27:7, 27:14, 28:15, 28:22, 32:13, 33:9, 34:21, 36:7, 36:21, 37:20, 37:22, 40:9, 40:13, 40:16, 41:4, 41:25, 44:15, 45:6, 45:23, 46:7, 46:8, 46:14, 47:1, 49:14, 50:15, 51:5, 54:4, 55:15, 55:19, 56:17, 56:20, 56:25, 57:3, 57:6, 57:8, 57:14, 57:22, 58:21, 60:16, 61:6, 61:23, 62:12, 62:23, 63:24, 65:23, 66:3, 66:10, 66:11, 66:15, 66:19, 69:11, 70:18, 73:6, 73:24, 74:13, 74:14, 74:15, 76:17, 78:17, 78:20, 79:4, 81:3, 82:9, 84:20, 84:24, 85:2, 85:8, 86:7, 86:10, 87:1, 87:6, 87:13, 87:18, 87:22, 88:10, 88:13, 88:22, 89:15, 90:7, 90:8, 91:19, 93:13, 94:14, 94:16, 96:4, 96:5, 96:17, 96:18, 96:21, 97:8, 97:10, 97:18, 101:25, 102:4, 102:5, 102:18, 104:3, 104:5, 104:14, 104:15, 104:18, 105:10, 105:11, 105:21, 106:23, 108:9, 108:10, 109:24, 109:25, 110:3, 111:5, 111:12
**reported** [3] - 8:15, 86:2, 88:22
**REPORTER** [3] - 2:18, 2:18, 2:19
**Reporter** [7] - 112:12, 112:13, 112:14, 112:22, 112:23,

112:23
**reporter** [2] - 3:13, 5:11
**REPORTER'S** [1] - 112:10
**reports** [46] - 5:25, 9:9, 9:22, 10:8, 10:9, 14:2, 14:19, 16:5, 16:8, 16:9, 16:12, 17:19, 17:21, 20:10, 21:6, 21:7, 21:9, 25:6, 26:4, 35:9, 36:19, 45:7, 46:4, 46:5, 56:11, 61:3, 62:13, 62:16, 69:11, 69:12, 73:19, 75:4, 79:15, 84:4, 87:3, 87:7, 87:11, 87:17, 90:3, 92:19, 94:12, 97:11, 100:7, 105:19, 108:7
**repository** [1] - 17:9
**representation** [5] - 45:21, 71:8, 73:22, 75:4, 78:4
**representative** [3] - 48:16, 76:21, 82:7
**represented** [2] - 45:10, 82:9
**representing** [1] - 84:14
**requested** [1] - 61:16
**requesting** [1] - 61:17
**require** [3] - 25:3, 57:18, 57:24
**required** [5] - 13:1, 13:11, 15:7, 50:8, 103:11
**requirement** [1] - 21:10
**requirements** [1] - 23:14
**requires** [5] - 23:9, 23:23, 52:3, 109:6
**requiring** [1] - 8:15
**respect** [7] - 16:15, 19:17, 61:4, 63:6, 82:16, 83:4, 89:16
**respond** [2] - 25:6, 69:12
**responding** [2] - 6:25, 101:23
**responds** [1] - 102:18
**response** [6] - 18:9, 48:1, 48:14, 48:18, 49:1, 49:5
**responsibility** [1] - 110:12
**rest** [1] - 8:18
**result** [6] - 18:5,

43:24, 48:25, 68:13, 79:23, 99:18
**results** [1] - 9:1
**resurrecting** [1] - 92:23
**review** [4] - 19:23, 36:2, 41:15, 41:18
**reviewed** [3] - 4:15, 40:23, 100:10
**revise** [1] - 25:6
**revised** [1] - 16:10
**rise** [3] - 3:7, 59:11, 59:14
**rivals** [1] - 3:25
**RMR** [2] - 2:18, 112:22
**Roa** [10] - 20:20, 46:1, 47:3, 47:25, 48:4, 48:6, 48:24, 100:2, 100:13, 100:14
**Roa's** [3] - 47:17, 48:9, 48:21
**Robert** [10] - 19:8, 20:7, 27:11, 28:19, 30:7, 33:3, 42:11, 44:20, 54:14, 55:10
**ROBIN** [1] - 2:4
**Robinson** [6] - 16:13, 72:10, 72:11, 72:13, 72:21, 80:13
**Rogers** [6] - 50:15, 51:21, 54:20, 58:11, 66:6, 66:15
**rogers'** [1] - 53:1
**Rogers'** [2] - 51:5, 51:25
**ROOM** [1] - 2:19
**roughly** [2] - 51:16, 51:17
**rounds** [1] - 21:11
**routinely** [1] - 17:18
**Rule** [19] - 6:17, 8:13, 12:18, 13:11, 13:23, 13:25, 15:7, 16:1, 16:6, 16:14, 16:21, 16:22, 18:24, 21:11, 22:25, 23:9, 37:8, 37:14, 108:9
**rule** [7] - 12:21, 13:5, 13:6, 21:4, 22:25, 92:18, 94:11
**ruled** [1] - 111:18
**Rules** [3] - 21:23, 23:7, 49:16
**rules** [5] - 12:9, 18:25, 58:18, 92:16, 108:10
**ruling** [2] - 3:14, 3:21
**ruminate** [1] - 84:11
**run** [6] - 37:16, 41:13, 41:14, 42:3, 53:3, 100:2

**Rune** [1] - 77:17
**running** [1] - 100:15
**runs** [9] - 40:21, 41:6, 41:15, 41:16, 47:7, 47:13, 56:23, 81:1
**RUPERT** [1] - 2:5

# S

**s/Cathy** [1] - 112:21
**sample** [1] - 55:4
**sanction** [2] - 13:22, 13:25
**sand** [10] - 31:19, 31:22, 31:25, 32:5, 32:18, 37:25, 38:13, 39:23, 103:10
**sandbagged** [2] - 65:7, 67:13
**sandbagging** [1] - 37:8
**satisfied** [3] - 4:21, 41:4, 41:5
**saturated** [6] - 29:1, 53:6, 83:20, 96:23, 97:6, 99:11
**saturation** [2] - 98:4, 98:20
**Saucer** [15] - 31:14, 31:16, 31:19, 31:20, 31:22, 32:1, 32:6, 32:19, 32:22, 39:8, 39:20, 39:22, 75:8, 76:10, 80:8
**save** [1] - 49:24
**saved** [2] - 69:25, 70:1
**saw** [6] - 22:7, 43:14, 88:15, 90:7, 108:16, 110:22
**scale** [1] - 51:15
**schedule** [3] - 111:6, 111:11, 111:13
**scheduled** [2] - 110:9, 111:4
**scheduling** [5] - 10:8, 14:1, 58:19, 108:11, 108:21
**science** [11] - 3:24, 15:14, 16:25, 23:19, 103:1, 103:3, 103:5, 104:1, 107:13, 107:19, 110:7
**Scientific** [4] - 8:10, 13:20, 37:10, 62:18
**scientific** [5] - 41:10, 53:18, 88:19, 93:16, 94:9
**scientifically** [1] - 21:17

**scientist** [1] - 54:19
**scope** [1] - 10:15
**SCOTT** [1] - 1:17
**Scott** [2] - 60:8, 95:13
**script** [1] - 25:23
**search** [1] - 49:7
**second** [4] - 12:2, 15:23, 56:16, 102:8
**Section** [2] - 8:25
**section** [6] - 11:25, 43:5, 43:6, 44:4, 45:15, 45:18
**SECTION** [1] - 1:6
**sections** [5] - 22:22, 40:12, 42:3, 42:8, 108:16
**see** [49] - 3:9, 5:2, 5:7, 19:5, 25:1, 26:10, 26:12, 26:14, 26:15, 27:9, 29:16, 31:19, 32:9, 32:18, 38:4, 38:17, 38:18, 42:14, 42:18, 42:22, 51:7, 53:7, 54:8, 57:19, 62:5, 65:21, 65:24, 66:25, 70:13, 71:1, 71:7, 76:2, 80:11, 80:13, 81:18, 87:14, 87:15, 91:13, 91:24, 92:16, 98:13, 104:10, 107:15, 109:10
**seeks** [1] - 4:19
**seem** [3] - 7:7, 7:10, 105:18
**SEEP/W** [11] - 40:10, 40:21, 46:2, 47:6, 47:13, 48:2, 49:7, 53:17, 53:22, 85:14, 100:4
**seepage** [7] - 42:3, 45:1, 47:3, 50:8, 51:22, 53:23, 94:4
**seeping** [1] - 53:17
**sees** [1] - 100:10
**selection** [1] - 48:12
**seminal** [1] - 13:15
**send** [1] - 98:10
**separate** [2] - 22:16, 61:20
**serious** [1] - 72:25
**service** [1] - 17:21
**set** [3] - 96:7, 96:8, 111:8
**sets** [2] - 88:7, 95:18
**seven** [2] - 74:21, 90:11
**several** [2] - 17:24, 24:12
**severe** [3] - 61:15,

63:3, 80:15
**shaking** [1] - 95:1
**shall** [1] - 94:12
**shape** [1] - 17:11
**share** [3] - 62:15, 66:22, 70:12
**sheet** [2] - 42:18, 96:7
**shook** [1] - 66:13
**shooting** [2] - 101:10, 111:21
**shore** [1] - 20:10
**shot** [3] - 86:17, 101:2, 101:9
**show** [28] - 8:23, 22:22, 25:20, 25:21, 26:25, 27:16, 28:11, 28:13, 36:25, 37:16, 42:13, 42:25, 44:4, 50:23, 64:4, 65:1, 70:23, 75:19, 76:14, 78:12, 80:14, 90:16, 91:1, 93:2, 93:3, 103:12, 105:13, 107:9
**showed** [5] - 73:8, 74:17, 80:4, 81:5, 101:24
**showing** [3] - 65:13, 69:10, 74:3
**shown** [11] - 29:9, 38:9, 38:10, 38:11, 39:3, 39:5, 74:16, 88:23, 93:21, 107:8
**shows** [13] - 37:22, 38:5, 39:19, 43:5, 43:7, 50:15, 81:2, 90:14, 90:15, 106:20, 106:21, 106:25
**side** [13] - 21:7, 47:23, 48:1, 50:22, 69:5, 77:23, 80:20, 82:19, 83:5, 83:14, 84:15, 101:9, 101:10
**sides** [2] - 100:23, 101:3
**sideways** [1] - 92:4
**sign** [1] - 59:20
**silent** [1] - 84:3
**Silva** [28] - 11:23, 45:17, 54:1, 65:1, 67:23, 70:12, 73:24, 74:5, 74:10, 74:11, 75:3, 76:16, 78:20, 79:2, 81:19, 83:1, 91:5, 91:11, 94:20, 97:6, 97:18, 100:20, 101:24, 102:8, 105:3, 105:6, 105:16, 107:3

**Silva's** [5] - 9:4, 106:20, 106:23, 109:22, 110:3
**Silva-Tulla** [13] - 65:1, 67:23, 70:12, 74:10, 74:11, 76:16, 79:2, 81:19, 91:5, 91:11, 94:20, 97:6, 102:8
**Silva-Tulla's** [7] - 73:24, 74:5, 75:3, 78:20, 97:18, 100:20, 101:24
**similar** [5] - 17:16, 39:10, 44:4, 50:11, 55:7
**similarly** [1] - 16:9
**Simmons** [1] - 17:18
**simple** [2] - 23:13, 101:19
**simplifying** [2] - 10:18, 10:25
**simply** [15] - 4:7, 7:12, 14:23, 18:11, 21:22, 40:2, 49:19, 77:9, 85:7, 99:2, 99:5, 102:5, 105:17, 110:5, 111:21
**sit** [1] - 97:17
**site** [8] - 39:23, 41:1, 54:21, 64:16, 73:25, 75:7, 76:11, 105:20
**sites** [5] - 32:22, 38:18, 38:19, 39:10, 39:14
**sitting** [4] - 30:9, 30:15, 31:7, 32:24
**situation** [3] - 17:17, 51:15, 83:3
**six** [3] - 74:21, 80:22
**size** [4] - 17:11, 26:7, 36:3, 88:19
**skeleton** [2] - 54:25, 96:24
**skeletons** [2] - 98:8, 98:9
**skip** [1] - 22:3
**sky** [1] - 92:25
**slate** [1] - 3:23
**slide** [5] - 38:5, 38:17, 40:7, 50:14, 103:22
**Slide** [2] - 26:21, 39:19
**SLOPE/W** [3] - 40:10, 40:22, 47:13
**smaller** [1] - 51:15
**smiles** [1] - 66:14
**SMITH** [1] - 2:4
**so-called** [16] - 5:21, 9:19, 15:17, 22:22, 29:11, 36:6, 41:11,

44:25, 45:13, 49:19, 53:24, 54:3, 54:4, 54:9, 56:16, 109:5
**software** [3] - 48:2, 48:3, 49:4
**soil** [16] - 49:25, 50:6, 50:7, 50:10, 51:22, 53:5, 53:9, 53:11, 54:25, 96:24, 98:7, 98:9, 98:18, 98:20, 100:3, 102:7
**soils** [11] - 46:15, 47:15, 48:14, 49:22, 50:3, 96:12, 97:19, 98:14, 99:10, 102:2, 103:16
**solely** [1] - 6:18
**solve** [1] - 52:2
**sometime** [1] - 84:15
**sometimes** [2] - 5:6, 7:4
**somewhat** [2] - 6:5, 8:1
**soon** [1] - 94:17
**sorry** [6] - 3:15, 35:25, 48:13, 60:21, 69:21, 80:12
**sort** [1] - 15:10
**sought** [1] - 63:3
**sounds** [2] - 43:4, 77:4
**source** [8] - 12:14, 17:7, 17:10, 35:22, 38:13, 38:25, 105:5
**sources** [1] - 58:4
**South** [8] - 3:20, 44:3, 67:17, 67:21, 75:8, 76:11, 80:18, 80:19
**south** [2] - 38:19, 50:16
**specific** [14] - 8:14, 13:22, 14:1, 21:25, 24:22, 25:8, 31:2, 32:8, 38:23, 44:16, 54:21, 61:15, 69:14, 94:9
**specifically** [5] - 3:18, 60:7, 60:9, 60:24, 60:25
**speculation** [1] - 15:14
**sped** [1] - 59:24
**spend** [1] - 83:22
**splashes** [1] - 68:3
**spoken** [1] - 87:9
**sponge** [8] - 99:14, 100:20, 100:21, 101:1, 101:8, 101:12, 101:13
**spots** [1] - 4:3

**spreads** [1] - 101:6
**spring** [1] - 56:4
**ST** [1] - 1:24
**stage** [1] - 83:25
**stand** [2] - 56:12, 70:9
**standard** [7] - 58:2, 58:4, 58:11, 58:22, 60:9, 60:12, 61:2
**standing** [2] - 33:7, 33:10
**STANWOOD** [1] - 1:12
**star** [1] - 97:24
**Stark** [1] - 97:6
**start** [2] - 48:25, 67:4
**started** [4] - 9:7, 9:8, 23:1, 104:16
**State** [1] - 112:13
**state** [12] - 27:15, 50:12, 81:8, 100:15, 100:19, 100:24, 101:15, 101:16, 103:9, 103:14, 103:21, 103:24
**statement** [3] - 13:12, 23:9, 103:17
**states** [3] - 6:17, 26:24, 28:23
**States** [5] - 16:10, 19:3, 95:20, 112:14, 112:24
**STATES** [3] - 1:1, 1:12, 2:3
**States'** [1] - 17:9
**STATION** [1] - 2:6
**steady** [49] - 10:19, 10:23, 10:24, 11:2, 11:9, 11:11, 11:22, 45:11, 45:13, 45:22, 46:7, 46:11, 46:13, 49:6, 49:8, 49:19, 50:12, 53:24, 54:3, 54:9, 55:19, 60:9, 61:2, 61:5, 78:23, 95:7, 95:24, 96:2, 96:9, 97:7, 98:3, 98:18, 99:25, 100:15, 100:18, 100:19, 100:24, 101:16, 101:17, 101:19, 102:6, 103:9, 103:14, 103:18, 103:19, 103:21, 103:24
**STENOGRAPHY** [1] - 2:22
**step** [2] - 64:7, 64:25
**Stevens** [5] - 60:7, 69:24, 93:8, 101:24, 105:4
**STEVENS** [80] - 1:20,

1:20, 29:24, 59:15, 59:20, 69:16, 69:19, 69:23, 70:24, 71:3, 71:5, 71:14, 71:25, 72:3, 72:6, 72:9, 72:12, 72:14, 72:17, 72:20, 72:23, 73:9, 73:14, 73:18, 74:4, 74:7, 74:10, 75:11, 75:13, 75:16, 75:25, 76:25, 77:2, 77:13, 77:16, 77:19, 77:24, 78:3, 78:6, 78:10, 78:15, 78:18, 78:25, 79:6, 79:14, 80:2, 80:11, 80:19, 81:9, 82:25, 83:9, 83:19, 84:2, 84:16, 84:21, 84:25, 85:6, 85:12, 85:19, 86:12, 86:19, 86:23, 87:2, 87:4, 87:12, 87:20, 88:1, 88:10, 88:13, 88:17, 88:20, 89:4, 89:7, 89:11, 89:14, 89:21, 93:12, 93:19, 94:11, 95:5
**stick** [1] - 78:24
**still** [15] - 5:24, 7:12, 13:10, 21:24, 23:16, 23:17, 33:5, 37:16, 57:25, 66:20, 105:23, 106:17, 108:17, 109:4
**stipulate** [4] - 29:24, 85:18, 85:21, 92:10
**stipulation** [3] - 85:25, 86:4, 86:5
**stolen** [1] - 47:7
**STONE** [1] - 2:9
**stood** [2] - 69:23, 69:25
**stop** [2] - 66:22, 67:10
**storage** [5] - 52:18, 52:22, 54:20, 55:1, 55:6
**Storesund** [2] - 28:5, 77:17
**stories** [1] - 47:8
**storm** [5] - 50:10, 51:17, 82:16, 96:16
**straightforward** [1] - 27:2
**strange** [1] - 58:10
**STREET** [3] - 1:17, 2:11, 2:19
**strengthen** [1] - 20:11
**stretching** [1] - 80:17
**stricken** [1] - 14:20, 58:23

**strike** [12] - 5:20, 5:24, 9:23, 40:15, 40:16, 58:10, 58:14, 60:15, 61:18, 63:5, 103:6, 111:4
**striking** [1] - 13:16
**structure** [1] - 38:8
**Student** [1] - 49:3
**studies** [2] - 57:3, 98:24
**study** [5] - 54:7, 56:25, 57:13, 98:22
**Study** [4] - 45:19, 54:5, 56:17, 104:2
**studying** [1] - 47:4
**stuff** [8] - 46:22, 89:14, 90:4, 90:18, 103:1, 103:7, 103:21, 104:7
**subject** [12] - 6:19, 10:11, 18:5, 61:19, 62:11, 62:12, 62:13, 65:5, 65:8, 71:13, 85:19, 88:9
**subjects** [1] - 60:18
**submit** [2] - 10:9, 16:13
**submittals** [1] - 45:7
**subsequent** [1] - 58:23
**substance** [1] - 16:2
**substantially** [2] - 77:3, 79:10
**substituted** [1] - 104:23
**substitution** [1] - 45:25
**substrata** [2] - 83:14, 98:5
**subsurface** [1] - 36:23
**sudden** [1] - 91:5
**sufficient** [2] - 22:18, 99:13
**suggest** [2] - 63:13, 67:11
**suggested** [1] - 65:25
**suggesting** [4] - 61:19, 67:9, 92:4, 92:13
**suggests** [1] - 63:15
**summarize** [1] - 23:12
**summary** [3] - 5:12, 9:1, 36:20
**supplement** [2] - 21:8, 108:12
**supplemental** [26] - 11:19, 15:22, 15:25, 16:5, 16:8, 16:12, 16:14, 17:19, 18:7, 18:8, 20:10, 21:21,

63:25, 79:16, 81:23, 84:4, 84:20, 85:2, 86:21, 94:12, 94:14, 94:18, 104:19, 105:3, 105:17, 108:8
**supplementary** [1] - 21:6
**supplementation** [4] - 17:25, 18:3, 18:6, 18:24
**Supplementation** [1] - 18:25
**support** [6] - 8:8, 13:9, 15:7, 23:13, 42:2, 42:8
**supported** [1] - 40:11
**supposed** [5] - 28:3, 28:10, 40:18, 45:18, 110:16
**supposedly** [1] - 40:10
**Supreme** [1] - 3:14
**surely** [1] - 21:10
**surface** [2] - 47:22, 94:3
**surge** [5] - 50:10, 51:17, 82:17, 83:5
**survey** [1] - 26:4
**suspect** [3] - 23:1, 103:7, 103:10
**swamp** [6] - 29:1, 29:11, 31:4, 55:2, 97:5, 99:24
**swamp-marsh** [6] - 29:1, 29:11, 31:4, 55:2, 97:5, 99:24
**swapped** [1] - 74:16
**Swiss** [16] - 9:8, 25:9, 27:6, 28:24, 29:3, 36:6, 37:20, 39:13, 41:7, 60:8, 61:2, 70:4, 70:7, 78:15, 78:22, 107:8
**sworn** [2] - 47:17, 86:23
**Sykora** [1] - 105:22
**Sykora's** [3] - 105:11, 109:25
**system** [9] - 21:5, 31:6, 37:4, 55:3, 75:10, 75:11, 79:5, 93:16

**T**

**table** [7] - 31:4, 31:9, 74:13, 74:24, 75:1, 76:13, 77:10
**Table** [2] - 16:10,

74:13
**tables** [2] - 53:5, 84:12
**tabulate** [1] - 40:21
**talks** [6] - 62:11, 62:25, 88:13, 88:14, 96:8, 102:4
**tangent** [1] - 104:9
**target** [2] - 51:18, 57:11
**task** [3] - 4:18, 59:6, 59:7
**taught** [1] - 68:24
**team** [1] - 75:13
**technical** [2] - 23:22, 37:12
**template** [1] - 80:7
**ten** [2] - 48:18, 54:17
**term** [6] - 16:6, 25:11, 25:14, 45:22, 49:8, 49:11
**terminology** [1] - 97:2
**terms** [2] - 56:14, 61:6
**test** [10] - 50:3, 50:5, 50:16, 50:25, 51:14, 51:16, 52:17, 62:11, 66:20, 66:21
**testified** [5] - 40:1, 51:21, 54:16, 79:16, 104:20
**testifying** [2] - 58:24, 60:17
**testimony** [16] - 5:5, 8:7, 8:16, 13:2, 13:17, 17:19, 18:8, 46:25, 47:17, 51:23, 68:2, 70:21, 83:17, 97:4, 97:12, 109:22
**testing** [2] - 96:12, 102:3
**tests** [10] - 50:4, 50:11, 51:18, 51:20, 53:2, 53:7, 53:12, 53:17, 53:19, 96:15
**THE** [191] - 1:12, 1:16, 2:3, 3:7, 3:9, 5:10, 6:10, 7:2, 8:3, 8:20, 10:13, 11:7, 11:18, 12:2, 12:7, 17:22, 18:20, 20:22, 20:24, 21:15, 22:5, 22:20, 23:3, 23:8, 23:20, 24:9, 24:12, 24:19, 24:25, 25:20, 26:1, 26:13, 26:22, 27:9, 29:13, 29:17, 29:20, 29:22, 33:7, 33:13, 33:18, 33:22, 34:5, 34:10, 34:13, 34:15, 34:17, 35:3, 35:10, 35:13, 35:16, 36:8,

36:13, 36:16, 40:14, 45:20, 46:3, 46:11, 46:17, 46:19, 55:17, 55:24, 56:6, 56:10, 57:2, 57:10, 58:5, 58:16, 59:1, 59:5, 59:10, 59:11, 59:14, 59:16, 59:19, 59:21, 59:25, 60:10, 60:12, 60:19, 61:5, 61:10, 61:12, 63:17, 63:21, 64:7, 64:9, 64:24, 65:8, 65:15, 66:25, 67:4, 67:8, 68:5, 68:18, 68:21, 69:4, 69:15, 69:17, 69:21, 70:14, 71:1, 71:4, 71:6, 71:15, 72:1, 72:4, 72:7, 72:11, 72:13, 72:15, 72:18, 72:21, 73:4, 73:10, 73:15, 74:3, 74:6, 74:9, 75:9, 75:12, 75:15, 75:24, 76:23, 77:1, 77:4, 77:15, 77:18, 77:22, 78:1, 78:5, 78:8, 78:13, 78:17, 78:24, 79:3, 79:7, 79:25, 80:9, 80:18, 81:5, 82:22, 83:7, 83:17, 83:22, 84:5, 84:18, 84:23, 85:3, 85:7, 85:17, 85:22, 85:24, 86:3, 86:13, 86:21, 87:1, 87:3, 87:5, 87:14, 87:24, 88:5, 88:12, 88:15, 88:18, 89:1, 89:5, 89:9, 89:12, 89:18, 91:25, 92:9, 92:15, 93:5, 93:8, 93:15, 94:7, 94:21, 95:7, 95:12, 95:23, 95:25, 99:7, 99:15, 99:17, 99:22, 101:21, 102:19, 102:22, 110:25, 111:9

**theirs** [3] - 53:15, 72:24, 83:11

**themselves** [3] - 24:15, 33:14, 70:9

**theories** [7] - 6:5, 7:9, 14:8, 16:24, 24:1, 24:6, 24:21

**theory** [8] - 23:23, 54:11, 55:14, 56:3, 56:12, 68:13, 82:2, 93:13

**therefore** [1] - 83:21

**thereof** [2] - 4:7, 73:11

**they've** [5] - 61:16, 65:2, 66:17, 68:14, 108:13

**thinking** [1] - 84:9

**third** [2] - 20:13, 49:22

**third-party** [1] - 49:22

**thorough** [1] - 88:1

**thoroughly** [1] - 10:22

**thousands** [11] - 17:3, 26:3, 35:7, 35:15, 45:7, 47:12, 57:24, 64:12, 64:23, 91:19

**threatened** [1] - 24:3

**three** [25] - 22:7, 22:16, 22:21, 24:13, 24:16, 26:13, 26:15, 38:17, 38:19, 41:19, 52:3, 52:6, 52:14, 53:11, 67:24, 74:21, 76:14, 78:15, 80:5, 87:11, 87:17, 87:19, 89:20, 89:25

**three-dimensional** [2] - 76:14, 80:5

**threw** [1] - 91:13

**throughout** [2] - 47:21, 105:9

**throw** [1] - 68:15

**THURSDAY** [2] - 1:7, 3:2

**timed** [1] - 5:15

**timely** [1] - 14:2, 83:24

**TO** [2] - 1:8, 3:4

**today** [3] - 3:18, 31:8, 61:17

**toes** [2] - 64:7, 64:25

**together** [3] - 68:12, 94:24, 110:10

**tomorrow** [2] - 77:21, 91:15

**took** [8] - 3:21, 63:13, 73:20, 80:23, 104:21, 104:22, 108:24, 108:25

**tool** [1] - 26:9

**top** [8] - 51:8, 51:9, 67:21, 67:22, 68:4, 80:22, 101:8

**TORTS** [1] - 2:5

**total** [2] - 76:18, 98:20

**totally** [3] - 10:20, 45:25, 53:19

**touch** [2] - 64:5, 91:22

**toward** [1] - 50:24

**Towing** [2] - 38:20, 38:23

**trace** [3] - 42:9, 43:23, 44:16

**trail** [7] - 42:9, 44:17,

44:22, 44:23, 79:12, 81:1, 88:24

**Tramonte** [1] - 9:25

**transcript** [4] - 5:5, 5:8, 5:9, 112:16

**TRANSCRIPT** [2] - 1:11, 2:22

**transfer** [1] - 53:21

**transferred** [1] - 83:15

**transient** [7] - 11:10, 49:7, 50:12, 52:2, 100:16, 100:19, 101:15

**translation** [1] - 92:1

**transmission** [3] - 101:13, 101:16, 101:18

**transmitted** [1] - 91:23

**trash** [1] - 90:25

**trashed** [2] - 91:2, 92:14

**treatises** [1] - 57:4

**treats** [1] - 55:1

**TREEBY** [77] - 2:10, 4:24, 5:11, 6:11, 7:25, 8:4, 8:21, 11:4, 11:8, 11:21, 12:4, 12:8, 18:17, 18:22, 20:9, 20:23, 21:3, 21:16, 22:14, 22:21, 23:4, 23:9, 23:22, 24:11, 24:18, 24:20, 25:1, 25:23, 26:2, 26:17, 26:23, 28:21, 29:15, 29:18, 29:21, 30:1, 32:25, 33:5, 33:11, 33:17, 33:21, 33:23, 34:9, 34:12, 34:14, 34:16, 34:19, 35:6, 35:12, 35:14, 35:18, 36:10, 36:15, 36:18, 40:18, 44:22, 45:21, 46:10, 46:16, 46:18, 46:21, 48:23, 53:2, 55:12, 55:22, 56:2, 56:8, 56:11, 57:7, 57:11, 58:7, 58:18, 59:4, 95:4, 95:6, 102:23, 111:6

**Treeby** [25] - 4:23, 7:2, 29:13, 63:18, 63:21, 64:13, 66:8, 69:25, 70:9, 70:15, 71:20, 73:8, 81:5, 81:6, 81:20, 86:8, 86:15, 88:12, 90:13, 91:10, 92:4, 93:9, 95:1, 100:13, 102:22

**Treeby's** [2] - 70:2, 78:1

**trenched** [1] - 105:20

**trenches** [3] - 39:3, 39:4, 73:1

**trenching** [17] - 75:6, 76:8, 76:9, 78:21, 80:20, 90:15, 90:17, 105:8, 105:9, 105:10, 105:13, 105:14, 105:18, 105:19, 109:21, 109:25, 110:1

**trial** [32] - 4:18, 10:1, 14:15, 14:17, 22:17, 23:2, 24:24, 24:25, 25:16, 29:18, 29:22, 34:3, 34:11, 36:3, 36:25, 37:7, 37:8, 39:17, 41:20, 54:1, 58:1, 58:24, 79:21, 80:6, 80:14, 89:8, 94:13, 95:21, 103:12, 106:5, 109:16, 110:8

**tried** [6] - 25:13, 27:3, 29:2, 42:7, 63:6, 63:7

**tries** [1] - 9:5

**trouble** [1] - 7:23

**troubling** [2] - 20:16, 89:17

**true** [13] - 8:3, 8:16, 16:6, 16:7, 23:8, 39:19, 44:10, 61:12, 64:24, 68:16, 68:17, 91:18, 112:16

**truly** [1] - 12:11

**trust** [2] - 15:10, 107:7

**truth** [2] - 4:19, 112:3

**try** [9] - 6:21, 11:23, 46:19, 59:8, 63:4, 103:2, 109:15, 109:17, 109:20

**trying** [19] - 7:13, 7:18, 9:23, 23:5, 42:5, 46:22, 49:18, 66:2, 66:5, 69:2, 79:12, 91:8, 100:11, 103:6, 103:20, 106:10, 107:24, 110:8, 110:18

**Tuesday** [1] - 6:9

**Tulla** [15] - 65:1, 67:23, 70:12, 74:10, 74:11, 76:16, 79:2, 79:16, 81:19, 81:23, 91:5, 91:11, 94:20, 97:6, 102:8

**Tulla's** [7] - 73:24, 74:5, 75:3, 78:20, 97:18, 100:20,

101:24

**turn** [4] - 27:13, 27:14, 69:13, 95:19

**two** [38] - 4:3, 9:22, 10:21, 14:19, 29:8, 29:11, 38:13, 50:7, 50:17, 53:11, 54:23, 55:7, 55:22, 58:17, 67:14, 67:15, 67:24, 68:1, 68:4, 68:9, 73:21, 73:24, 74:21, 75:4, 75:19, 76:6, 80:4, 83:24, 87:11, 90:21, 93:24, 96:9, 105:25, 109:16, 110:14

**two-dimension** [1] - 73:24

**two-dimensional** [5] - 73:21, 75:4, 76:6, 80:4

**two-foot** [2] - 68:4, 68:9

**type** [2] - 35:5, 50:3

**types** [1] - 98:24

**typically** [2] - 8:4, 12:18

## U

**ultimate** [1] - 101:18

**ultimately** [4] - 76:20, 79:22, 93:23, 103:4

**unavailable** [1] - 10:2

**under** [8] - 8:7, 8:13, 15:18, 16:14, 18:24, 18:25, 47:22, 61:21

**underground** [1] - 83:16

**underlying** [5] - 28:25, 57:18, 57:23, 105:13, 106:1

**underseepage** [17] - 4:5, 4:8, 4:9, 4:13, 15:6, 15:10, 36:25, 37:17, 40:11, 46:15, 49:2, 49:13, 79:24, 82:23, 93:14, 107:10, 107:15

**underseepage-induced** [1] - 40:11

**understandable** [1] - 69:5

**understood** [1] - 66:3

**undue** [3] - 22:19, 25:10, 39:18

**unduly** [1] - 83:25

**unequivocal** [1] - 16:1

**unfair** [3] - 4:21,

18:19, 109:15
**unfortunate** [1] - 95:8
**unfortunately** [3] - 35:13, 80:25, 95:9
**uniform** [1] - 76:24
**UNITED** [3] - 1:1, 1:12, 2:3
**United** [6] - 16:10, 17:9, 19:3, 95:20, 112:14, 112:24
**unknown** [2] - 21:19, 109:3
**unless** [4] - 14:20, 63:24, 67:4, 111:18
**unlimited** [1] - 21:11
**unprepared** [1] - 67:12
**unreasonably** [1] - 53:22
**unstated** [1] - 15:5
**unsupplied** [1] - 24:6
**untimely** [3] - 5:25, 8:21, 17:19
**up** [31] - 11:14, 11:16, 15:5, 15:11, 20:10, 28:9, 28:13, 31:15, 37:15, 45:24, 47:14, 59:6, 59:24, 65:9, 69:23, 69:25, 83:14, 86:12, 86:13, 93:19, 96:7, 96:20, 98:23, 99:2, 100:4, 101:1, 101:2, 102:5, 103:23, 105:18, 106:12
**ups** [3] - 28:1, 38:2, 73:7
**useless** [1] - 86:10
**uses** [5] - 10:19, 25:11, 54:25, 55:5, 55:6
**utility** [1] - 38:10
**utilized** [2] - 16:8, 46:8
**utilizing** [1] - 92:24

## V

**vain** [1] - 49:7
**validate** [1] - 57:17
**validated** [1] - 104:4
**validates** [3] - 56:20, 56:21, 57:7
**validation** [1] - 45:19
**validations** [4] - 14:7, 14:13, 14:14, 54:5
**validity** [1] - 42:25
**Valspar** [1] - 6:24
**value** [4] - 45:25, 48:18, 53:18, 53:20

**values** [2] - 48:19, 48:23
**varied** [1] - 31:4
**variety** [1] - 38:1
**various** [1] - 38:10
**varying** [3] - 29:10, 47:8, 47:10
**vast** [1] - 12:21
**vastly** [1] - 22:6
**vehicle** [1] - 30:19
**velocity** [2] - 54:11, 55:5
**vending** [1] - 111:18
**version** [17] - 27:21, 37:15, 74:16, 75:18, 75:20, 76:1, 76:2, 82:8, 90:13, 90:14, 91:2, 91:13, 92:21, 93:17, 102:8
**versions** [1] - 28:5
**versus** [1] - 75:20
**vexed** [1] - 7:6
**VICTOR** [1] - 1:21
**video** [5] - 5:3, 5:5, 37:1, 48:4, 104:10
**videotaped** [14] - 19:8, 20:7, 27:11, 28:19, 30:7, 33:3, 42:11, 44:20, 48:9, 48:21, 51:25, 53:1, 54:14, 55:10
**view** [2] - 45:24, 104:16
**violate** [1] - 5:18
**violated** [1] - 59:23
**violates** [1] - 37:8
**violation** [1] - 21:22
**virtually** [3] - 24:7, 57:12, 83:21
**VOICES** [1] - 3:8
**voids** [8] - 37:25, 98:4, 98:21, 99:12, 99:18, 100:21, 101:17
**volume** [2] - 53:8, 54:19
**Volume** [1] - 39:5
**volumes** [1] - 34:12
**voluminous** [1] - 17:10

## W

**WAGER** [1] - 2:14
**WAGER-ZITO** [1] - 2:14
**wait** [6] - 71:21, 78:13, 84:12, 90:10, 91:10
**walk** [1] - 101:1
**walked** [1] - 74:19

**wall** [3] - 67:20, 67:22, 68:4
**WALTHER** [1] - 2:9
**wants** [1] - 56:4
**warned** [1] - 67:1
**Washington** [25] - 17:4, 17:6, 17:8, 17:13, 19:6, 19:17, 21:18, 29:2, 35:7, 36:22, 39:7, 39:9, 39:15, 39:21, 43:10, 43:25, 44:11, 45:4, 45:8, 64:15, 67:15, 68:12, 106:11, 108:3
**WASHINGTON** [3] - 2:7, 2:9, 2:16
**watch** [1] - 4:19
**water** [28] - 29:1, 50:23, 51:1, 51:11, 53:5, 53:6, 53:9, 53:10, 55:4, 67:21, 67:22, 68:15, 80:20, 82:17, 83:13, 98:5, 98:8, 99:13, 100:21, 100:23, 101:2, 101:5, 101:6, 101:7, 101:9, 101:10, 101:12, 110:19
**waters** [1] - 94:2
**wave** [7] - 54:11, 55:5, 56:12, 67:23, 68:3, 68:8, 68:9
**waves** [1] - 67:24
**ways** [2] - 54:23, 90:21
**wedding** [2] - 38:7, 38:8
**week** [1] - 110:14
**weeks** [11] - 14:14, 41:19, 58:1, 103:11, 105:25, 106:4, 109:13, 109:16, 110:8, 110:11
**weight** [2] - 83:11, 83:12
**wells** [4] - 50:21, 51:3, 51:13
**Wendell** [1] - 68:25
**WGI** [5] - 4:6, 6:1, 19:11, 43:22, 70:2
**WGI's** [1] - 44:17
**whatsoever** [1] - 103:13
**whereas** [1] - 13:20
**wherein** [1] - 62:25
**WHEREUPON** [16] - 19:7, 20:6, 27:10, 28:18, 30:6, 33:2, 42:10, 44:19, 48:8, 48:20, 51:24, 52:25,

54:13, 55:9, 59:12, 112:5
**whichever** [1] - 80:8
**whole** [8] - 18:20, 37:19, 69:25, 70:1, 80:23, 97:15, 105:12, 105:19
**wide** [4] - 42:21, 43:17, 76:21, 105:14
**Wilkerson** [1] - 65:21
**WILLIAM** [1] - 2:10
**wise** [2] - 68:22, 111:15
**withdraw** [3] - 58:13, 60:6, 90:14
**witness** [4] - 10:9, 23:10, 60:17, 65:14
**witnesses** [2] - 91:4, 110:9
**Wittmann** [1] - 98:3
**WITTMANN** [1] - 2:9
**wonderful** [1] - 26:9
**wondering** [1] - 7:11
**WOODSTOCK** [1] - 2:4
**word** [6] - 10:14, 61:4, 80:12, 89:16, 89:22, 102:22
**words** [3] - 39:1, 48:24, 81:1
**works** [1] - 97:1
**world** [2] - 97:16, 99:6
**worse** [1] - 21:24
**write** [1] - 25:5
**writes** [1] - 66:19
**writing** [4] - 16:18, 102:8, 111:2, 111:19
**written** [2] - 58:7, 98:17
**wrote** [1] - 61:9

## Y

**Yacht** [1] - 38:20
**yanked** [7] - 90:15, 90:16, 92:19, 92:21, 92:24, 109:21
**years** [7] - 9:24, 15:1, 21:19, 41:22, 66:17, 89:20, 90:1
**yellow** [1] - 65:14
**yesterday** [2] - 72:18, 77:16
**yourself** [1] - 67:18

## Z

**zero** [1] - 83:21

**zipper** [1] - 68:14
**ZITO** [1] - 2:14