UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO: MRGO | * | |
| *Armstrong*, No. 10-866 | * | SECTION "K"(2) |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

## JOINT PRE-TRIAL ORDER

**NOW INTO COURT,** through undersigned counsel, comes the Plaintiffs Kenneth & Jeannine Armstrong, Fred Holmes, The Succession of Ethel Coats, Alvin Livers, Clifford Washington, in conjunction with the defendant The United States of America, and defendant Washington Group International, Inc. (hereinafter "WGI")[1], who in accordance with the provisions of Federal Rules of Civil Procedure, Rule 16, and pursuant to Minute Entry dated November 23, 2011 (Rec. Doc. 20592), submit their Pre-Trial Order.

1.      A pre-trial conference is scheduled for July 26, 2012 at 10:30 a.m.

**2.      ATTORNEYS**

> *a.      Attorneys for the Plaintiffs:*
>
> > 1.      Jonathan Andry, Andry Law Group;
> > 2.      Joseph M. Bruno, Bruno & Bruno. LLC;
> > 3.      Frank C. Dudenhefer, Jr, Dudenhefer Law Firm;
> > 4.      Phillip Gregory, Cochett, Pitre & McCarthy, LLP;

---

1 Subsequent to the activities alleged in Plaintiff's Complaint, WGI was acquired by URS Corporation, a Delaware Corporation.  WGI, now known as URS Energy & Construction, Inc., is a subsidiary of URS E&C Holdings, Inc., a Delaware Corporation.  URS E&C Holdings, Inc. is a subsidiary of URS Holdings Inc., a Delaware Corporation. URS Holdings Inc. is a subsidiary of URS Corporation.

1099992v1

5.     Scott Joanen, Joanen Law Firm;
6.     Gerald Meunier,Gainsberg, Benjamin, David, Meunier & Warshauer,LLC;
7.     Andrew P. Owen, The Trial Law Firm, PC;
8.     Joshua Palmintier, DeGravelle, Palmintier, Holthaus & Fruge, LLC;
9.     Michael Palmintier, DeGravelle, Palmintier, Holthaus & Fruge, LLC;
10.    James P. Roy, Domengeaux, Wright, Roy, & Edwards, LLC;
11.    Matt Schultz, Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, PA;
12.    Thomas Sims, Baron & Budd, PC;
13.    Elwood Stevens, Domengeaux, Wright, Roy, & Edwards, LLC.

b.     *Attorneys for Defendant Washington Group International, Inc.:*

1.     William D. Treeby, Stone Pigman Walther Wittmann LLC
2.     James C. Gulotta, Stone Pigman Walther Wittmann LLC
3.     Heather S. Lonian, Stone Pigman Walther Wittmann LLC
4.     Maggie A. Broussard, Stone Pigman Walther Wittmann LLC
5.     Adrian Wager-Zito, Jones Day
6.     Debra S. Clayman, Jones Day
7.     Christopher R. Farrell, Jones Day
8.     Julia L. Cronin, Jones Day
9.     Christopher N. Thatch, Jones Day
10.    Brian J. Kerwin, Jones Day

c.     *Attorneys for Defendant United States of America:*

1.     Robin D. Smith, United States Department of Justice, Torts Branch;
2.     Rupert Mitsch, United States Department of Justice, Torts Branch;
3.     Conor Kells, United States Department of Justice, Torts Branch;
4.     James McConnon, United States Department of Justice, Torts Branch;
5.     Jack A. Woodcock, United States Department of Justice, Torts Branch

## 3.     DESCRIPTION OF THE PARTIES

a.     *Plaintiffs*

1.     Kenneth Armstrong - Mr. Armstrong is a person of the full age of majority, and was a resident of Chalmette, Louisiana on August 29, 2005.

2.     Jeannine Armstrong - Ms. Armstrong is a person of the full age of majority and was a resident of Chalmette, Louisiana on August 29, 2005.

2

1099992v1

3.      Fred Holmes - Mr. Holmes is a person of the full age of majority and was a resident of Arabi, Louisiana on August 29, 2005.

4.      The Succession of Ethel Coats, herein represented by Lentoi Franklin (Naked Owner) and/or Nathan Morgan (Lifetime Usufructuary) - Ms. Coats is a deceased person and was a resident of New Orleans, Louisiana on August 29, 2005.

5.      Alvin Livers - Mr. Livers is a person of the full age of majority, and was a resident of New Orleans, Louisiana on August 29, 2005.

6.      Clifford Washington - Mr. Washington is a person of the full age of majority, and was a resident of New Orleans, Louisiana on August 29, 2005.

b.      *Defendants*

1.      Washington Group International, Inc. ("WGI").

2.      The United States of America.

## 4.      JURISDICTION

A.      Plaintiffs allege that the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1346(b) (Defendant United States); 28 U.S.C. § 2671, *et seq.*(Federal Tort Claims Act); 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, Pub.L. 109-2; 28 U.S.C § 1367.

B.      Defendant United States

The United States contends that the Court lacks subject matter jurisdiction for the following reasons:

1.      The United States is immune from suit for the alleged damages pursuant to the Flood Control Act of 1928, 33 U.S.C. § 702c.

2.      The United States is immune from suit for the alleged damages because Plaintiffs' claims are barred by the discretionary function exception to the Federal Tort

1099992v1

Claims Act, 28 U.S.C. § 2680(a).

3.      The United States is immune from suit for the alleged damages because the United States is not liable for acts or omissions of any contractor with the United States.   28 U.S.C. § 2671.

4.      The Court lacks jurisdiction to award damages to any Plaintiff in excess of the amount of the administrative claim presented by the Plaintiff.   28 U.S.C. § 2675(b).

5.      The Court lacks jurisdiction over Plaintiffs' claims because they failed to timely exhaust their administrative remedies under the FTCA before instituting their actions.  28 U.S.C. 2401(b), 2675(a).

## 5.   MOTIONS

a.      Motions Pending:

1.      WGI's Motion to Strike Claims of Ethel Mae Coats (Doc. Nos. 20640 & 20875).

2.      On June 29, 2012, the Court indicated that it intends to deny the following motions, with an Order and Reasons to follow at a later date:  WGI's Motion to Exclude Testimony of Scott Taylor (Doc. No. 20830); WGI's Motion to Exclude Testimony of Dr. Robert G. Bea (Doc. No. 20822); U.S. Motion to Exclude Testimony of Dr. Robert G. Bea (Doc. No. 20823).

b.      Contemplated:

1.      Plaintiffs

A.      Motion in Limine to exclude any testimony or evidence relating to Dr. Robert Dalrymple's new and yet unseen analyses of internal polder flood water heights based upon re-computed levee heights of the 40 Arpent Canal that Defendants have advised is forthcoming in a new/corrected report.

B.      Motion in Limine to exclude any testimony or evidence relating to Francisco Silva-Tulla's new and yet unseen analyses of matters still undisclosed that defendants have advised is forthcoming in a new/corrected report.

4

C.      Motion in Limine to exclude any testimony or evidence relating to Dr. W. Allen Marr's new and yet unseen analyses of matters still undisclosed that defendants have advised is forthcoming in a new/corrected report.

D.      Motion in Limine to exclude any testimony or evidence relating to Dr. David Sykora new and yet unseen analyses of matters still undisclosed that defendants have advised is forthcoming in new/corrected report.

E.      Motion in Limine to exclude cumulative testimony from various defense experts;

F.      Motion in Limine to preclude defendants from claiming benefit or credit against Plaintiffs' recovery by application of the Collateral Source Rule;

G.      Motion in Limine precluding defendants' damages expert testimony regarding scope of recovery determined by net value (value of the home less sale value of the lot);

H.      Motion in Limine to exclude any evidence or references relating to the Declaration Dr. William Lambe;

I.      Motion in Limine to preclude the defendant experts from offering an opinion regarding amount of damage attributable to waters from the IHNC;

J.      Motion in Limine to exclude evidence/testimony regarding damage caused by wind and rain as this evidence/testimony is irrelevant;

K.      Motion In Limine to prohibit the defense from inquiring about the claims dropped by Clifford Washington;

L.      Request for Judicial Notice regarding weather data relative to hurricane Katrina, including wind direction and wind speed in the IHNC.

M.      Plaintiffs reserve the right to maintain all evidentiary motions pursuant to Federal Rules of Evidence, Rules 403 and 702.

1099992v1

N.     Motion in Limine to exclude testimony by R. Miles Brodsky as not having been timely put on the parties' witness list.

O.     Motion in Limine to exclude testimony by T. William Lambe as not having been timely put on the parties' witness list.

2.    *Defendants WGI and The United States*

A.     Motion in Limine to exclude any testimony or evidence relating to Dr. Robert Bea's lost or stolen three-dimensional seepage analyses of the levee breaches in the EBIA, including any opinion referring to: Cobos-Roa, D. and Bea, R.G. (2008), "Three-Dimensional Seepage Effects at Three New Orleans Levee Breaches During Hurricane Katrina," <u>Electronic Journal of Geotechnical Engineering</u>, Stillwater, OK.

B.     Motion in Limine to exclude any testimony or evidence relating to Dr. Robert Bea's newly-disclosed "dilatational wave theory," which is not mentioned in any of his expert reports, including: Expert Report of February 1, 2012, Rebuttal Report of April 3, 2012 and Rebuttal Report of April 11, 2012.

C.     Motion in Limine to exclude the testimony of Mr. Melvin McElwee.

D.     Motion to limit the claims of Plaintiffs Jeannine and. Kenneth Armstrong, Fred Holmes, and Alvin Livers to diminution in value of property from pre-Katrina value because they did not, in fact, repair or renovate their residences.

E.     Motion by the United States to offset the plaintiffs' damages by the amounts previously received from the United States.

F.     Motion in Limine to exclude all evidence of "mental anguish and inconvenience" on the grounds that such damages are not recoverable in the circumstances here presented.

G.     Motion to limit expert testimony of Chad Morris to matters within his expert report.

c.    Special issues appropriate for determination in advance of trial on the merits:

6

1099992v1

1.      Plaintiffs

    A.    Allotment of time and other trial management issues (ex. requirement *vel non* for disclosing exhibits to be used with each witness and timing thereof);

    B.    Assignment of benches to the parties in the traditional manner (i.e, Plaintiffs assigned to the bench nearest the jury box);

    C.    The parties have agreed to exchange demonstrative aids utilized for the direct examination of a prospective witness 48 hours before the day the demonstrative aids are to be used.

        Plaintiffs have suggested that the parties exchange demonstrative aids to be utilized for the cross-examination of a prospective witness 48 hours before the day the demonstrative aids are to be used.   Defendants have declined to enter into such an agreement.

2.      Defendants

    A.    In light of the voluminous exhibit lists submitted in this case, Defendants propose that at the end of the trial, only those exhibits that have been used with a live witness during trial or that have been designated to be part of the record in conjunction with a witness' deposition testimony, be admitted into evidence.   All other exhibits contained on the parties' exhibit lists, but not used during trial, will be returned to the parties.

d.      Matters the Court previously indicated it would decide at the time of Pre-Trial:

      None.

## 6.    PARTIES SUMMARY OF MATERIAL FACTS

### a.    *Plaintiffs' Summary of Material Facts:*

The Court is well versed in the circumstances giving rise to the hurricane breaches litigation that arose from the collapse of the Lake Pontchartrain and Vicinity Hurricane Protection Levees and floodwalls in the aftermath of Hurricane Katrina which occurred on

1099992v1

August 29, 2005.  The *Armstrong* case   - whose plaintiffs represent citizens from distinct areas of the Lower Ninth Ward (Orleans Parish), Arabi (St. Bernard Parish), and Chalmette (St. Bernard Parish) - presents the final chapter to this Court's undertaking to adjudicate issues subsumed by the *In re Katrina Canal Breaches Consolidated Litigation* umbrella.

That the citizens of each distinct area of the St. Bernard polder suffered substantial harm is undisputed.   The issues to be addressed at trial "pertain to the remediation work undertaken at the East Bank of the Industrial Canal ("EBIA") and whether that work was a substantial cause of the North and South Breaches of the floodwalls that ran adjacent to the EBIA and resulted in the cataclysmic inundation of the Lower Ninth Ward." (Rec. Doc. 20200).

The predominant hydro-geologic feature influencing the EBIA is the Inner Harbor Navigational Canal ("IHNC"), a waterway 5.5 miles long that provides access from the Mississippi River to the Gulf Intercoastal Waterway and Lake Pontchartrain.   The Port of New Orleans constructed the IHNC between 1918 and 1923, with a lock being placed in service in 1923.

As years passed, the IHNC lock was deemed to be dimensionally inadequate; and in March of 1997, the Corps issued a New Lock and Connecting Channels Evaluation Report that proposed a new, larger lock be placed in the IHNC between the Claiborne Avenue and Florida Avenue bridges.   Because the new lock would be situated in the existing channel, a temporary bypass channel between Claiborne and Florida Avenues on the east side of the canal would be required to allow for continued navigation during new lock construction.

The area where the bypass channel would be located is known as the East Bank Industrial

Area ("EBIA"), a parcel nearly 32 acres in size and subdivided into six distinct sites.  This area had been owned by the Port of New Orleans and leased to various industrial entities, however, by 1997 the industrial entities were defunct and the Corps was undertaking efforts to purchase the site.  Each of the six distinct sites was named for a defunct entity that had occupied the area and included Boland Marine, McDonough Marine, Indian Towing, Mayer Yacht - Distributor's Oil, Saucer Marine, and International Tank Terminal.

In June 1999, Morrison Knudsen (now the Washington Group International, Inc. ("WGI")) was engaged by the Corps through an architect-engineering (A-E) type contract (the TERC, Task Order 26) to perform demolition and site preparation for the IHNC Lock Replacement Project in the EBIA.  Such work included demolition and removal of above ground structures and their foundations, utility lines, underground concrete slabs, abandoned barges, underground storage tanks, and hundreds of pilings.  A separate, concurrent aspect of Task Order 26 was a substantial environmental remediation project that resulted in the excavation of tens of thousands of tons of soil, often to depths exceeding fifteen (15) feet, and the backfill of this same work.  By the summer of 2005, WGI had completed a substantial portion of the physical work in the EBIA.

On August 29, 2005, Hurricane Katrina struck southeastern Louisiana.  The storm surge from the Gulf of Mexico and Lake Borgne, hydraulically connected to the IHNC by the Gulf Intercoastal Waterway / MRGO channel, raised the water levels in the IHNC and induced two distinct breaches of the flood wall adjacent to the Lower Ninth Ward when superimposed on the severely compromised EBIA site, destroying neighborhoods and killing hundreds of residents as

1099992v1

far east as Paris Road in St. Bernard Parish.   The larger of the two breaches along the east bank of the IHNC - the South Breach -was approximately 900 feet in length adjacent to the area known as the Saucer Marine site.   The smaller North Breach was approximately 250 feet long at the area adjacent to the Boland Marine site.

Plaintiffs' contend these breaches were initiated by surge water pressures developed on the water side of the flood protection structures coupled with hydraulic under-seepage and uplift pressures generated in the marsh layers under the soil levee through nearby excavations improperly backfilled with high permeability and poorly compacted materials.

Plaintiffs further contend that WGI and the Corps were negligent in failing to perform geotechnical evaluations of the potential impact of the earthwork and excavations performed in furtherance of the EBIA project.   This negligence, abetted by improperly filled excavations, nullified the surge fighting capabilities of the EBIA flood wall.

Each Defendant's negligence was a substantial factor in causing the North and South Breaches, which resulted in the catastrophic inundation of Plaintiffs' properties and caused the damages claimed by each Plaintiff.

### b.      Defendant WGI's Summary of Material Facts:

WGI will show that its site clearing and remediation work in the East Bank Industrial Area ("EBIA") between 2001 and 2005 played no role whatsoever in the two levee breaches along the east bank of the Inner Harbor Navigation Canal ("IHNC").   Plaintiffs' entire case hinges on the wholly unsupportable and erroneous premise that seepage and hydraulic uplift

1099992v1

effects contributed to the North and South Breaches, and that certain excavations that WGI performed in the EBIA--under the direction of and with the approval of the United States Army Corps of Engineers ("USACE")--facilitated these effects.   But as all of Defendants' geotechnical engineering experts agree, seepage did not contribute the North and South Breaches.   WGI will prove that the sole proponent of the under-seepage theory, Dr. Robert G. Bea, conducted an entirely unscientific analysis using fictitious excavations, non-existent soil properties and erroneous assumptions about WGI's work.   See WGI's Motion to Exclude Dr. Bea's Testimony and Reply in Support Thereof (Doc. Nos. 20822, 20865).

As described summarily below, WGI will use the testimony of USACE employees, WGI employees, the extensive record of WGI's field activities, and renowned experts in geotechnical engineering, coastal engineering/hydrology and standard-of-care to prove each of its major defenses in this action.

<u>WGI Performed its Excavation Work in the EBIA in Conformance with USACE-Approved Specifications and in a Manner Consistent with the Applicable Standard of Care.</u>  WGI will show that it exercised reasonable care in performing the complained about excavation and backfilling activities in the EBIA pursuant to Task Order 26 of the Total Environmental Restoration Contract ("TERC") with the USACE.   The USACE hired WGI to clear and remediate the EBIA as part of the USACE's larger, Congressionally-authorized Lock Replacement Project.   During construction of the new lock, the USACE planned to dredge a two-way bypass channel through the EBIA.   WGI was tasked with clearing the EBIA to make way for the bypass channel.   The USACE determined that its plans for the Lock Replacement,

11

including the proposed bypass channel, would not affect the integrity of the existing levees and floodwalls along the EBIA.   The USACE was the Engineer of Record on the Lock Replacement Project.   WGI did not have any geotechnical engineering responsibilities relative to the levees and floodwalls on Task Order 26.   This responsibility rested solely with the USACE, who designed and built the levees and floodwalls in the first place.

WGI also will show that the plans and reasonably-precise specifications for the excavation work (including backfill and compaction) at issue in this case were developed with the involvement and approval of the New Orleans District of the USACE ("USACE-NOD"). The USACE monitored WGI's compliance with these plans and specifications on a daily basis, which will be demonstrated through testimony of on-site personnel on Task Order 26, as well as detailed daily Quality Assurance Reports (QARs), daily Contractor Quality Control Reports, photographs, and site-specific submissions to the Louisiana Department of Environmental Quality (LDEQ).   Although WGI primarily backfilled excavations across the EBIA using in-situ soils (native "spoils" from excavations or soil from the designated borrow pit), the USACE also approved the importation of river sand backfill for some excavations.   None of WGI's work fell below the applicable standard of care.

In support of these facts, WGI will offer witnesses, including but not limited to the following:

- *David Sykora, Ph.D., P.E.* of Exponent Failure Analysis Associates, has 28 years of professional engineering experience, nine of which were spent as a Research Civil Engineer with the USACE in Vicksburg.   Dr. Sykora has experience drafting and reviewing earthwork specifications and observing/inspecting construction from geotechnical and materials perspectives.   Dr. Sykora has thoroughly examined the TERC, Task Order 26, scopes of work, work plans, daily field records and deposition

12

testimony in this case and will opine, inter alia, that: (1) WGI was not tasked with any geotechnical engineering responsibilities relative to the levees and floodwalls in the EBIA; this was the sole responsibility of the USACE; (2) WGI and the USACE collaborated to develop reasonably precise specifications for site clearing and remediation operations in the EBIA, including for backfilling and compacting excavations; (3) WGI complied with the work plans and specifications so developed and did not fall below the standard of care in fulfilling its duties under Task Order 26 as it relates to earthwork and backfilling.   A complete summary of Dr. Sykora's Key Findings and Opinions are found in his Expert Report of March 9, 2012, on pages 71-77.

- *Mr. Gerald Dicharry, P.E.*, worked for the USACE-NOD from 1969 to 2003.   Mr. Dicharry was the Senior Project Manager for the Lock Replacement Project, and he supervised the development of the nine-volume 1997 Mississippi River Gulf Outlet, New Lock and Connecting Channels Evaluation Report.   Mr. Dicharry will testify via deposition that: (1) the USACE evaluated the proposed location for the Lock Replacement Project, including the location for the bypass channel; (2) the USACE determined that dredging a bypass channel (at least 22 feet deep) through the EBIA would not negatively impact the existing levees and floodwalls in the EBIA; and (3) WGI was retained to remediate potentially hazardous, toxic or radiological waste in the EBIA, and not provide input or analyses relating to the integrity of the levees and floodwalls in the area.

- *Mr. Lee Guillory, P.E.*, Contracting Officer's Representative and Construction Manager on Task Order 26 for the USACE-NOD.   Mr. Guillory has worked for the USACE since 1983.   He has experience supervising, monitoring, and administrating construction contracts for earthen levees, hurricane protection levees, concrete floodwalls, revetments and navigational structures.   Mr. Guillory drafted all of the Statements of Work that the USACE issued to WGI pursuant to Task Order 26.   Mr. Guillory will testify that throughout Task Order 26, the USACE never requested or expected any geotechnical engineering support from WGI relating to the levees or floodwalls.   Instead, Mr. Guillory specifically requested geotechnical engineering support from within the USACE-NOD on Task Order 26 as he deemed necessary.   Mr. Guillory also will testify as to the development and approval of the plans and specifications governing WGI's work in the EBIA, and WGI's conformance with those specifications.   Finally, he will testify about specific excavations at issue in this case, including but not limited to his understanding of their locations, geometry, and/or backfill.

- *Mr. James Montegut*, Contracting Officer's Representative, Project Engineer and Quality Assurance Representative on Task Order 26 for the USACE-NOD.   Mr. Montegut has a bachelor's degree in engineering and began working for the USACE in 1974 as a civil engineer.   Mr. Montegut will testify via deposition about his daily on-site involvement on Task Order 26, including his interactions with WGI personnel, observations of their

field work, and monitoring and approval of their work.  He also will testify about excavations at issue in this case, including but not limited to his understanding of their locations, geometry, and/or backfill.

- *Mr. Steven Roe*, Program Manager of the Tulsa TERC for WGI from 1997 to 2001.   Mr. Roe was responsible for negotiating Task Order 26 with the USACE-NOD in 1999.   Mr. Roe will testify about WGI's obligations under the TERC and his negotiations with the USACE relating to Task Order 26.   He will testify that WGI was not hired to perform any geotechnical engineering analyses relative to the levees and floodwalls, and accordingly, WGI did not staff Task Order 26 with any personnel capable of performing such analyses.   Finally, Mr. Roe will testify about the process for developing work plans and specifications on Task Order 26.

- *Mr. Phillip Staggs*, Construction Manager on Task Order 26 for WGI.  Mr. Staggs worked for WGI from 1988 through June 2007.   He was on-site in the EBIA nearly every day for the duration of Task Order 26.  Mr. Staggs will testify about WGI's and the USACE's roles on Task Order 26, the specific features of work WGI and its subcontractors performed, the plans and specifications governing that work, and WGI's daily Contractor Quality Control Reports and photographs.   Mr. Staggs also will testify about specific excavations at issue in this case, including but not limited to his understanding of their locations, geometry, and/or backfill.

- *Mr. Gerald Colletti*, Assistant Chief of Operations Division for the USACE-NOD.  Mr. Colletti will testify regarding the USACE-NOD's role in reviewing requests by contractors to conduct field work in the vicinity of a hurricane protection structure in New Orleans.

WGI's Work at the EBIA Did Not Cause the EBIA Floodwall Breaches.   WGI will show that the remediation work it performed for the USACE in connection with Task Order 26 did not cause the North or South Breach at the EBIA.   There is no evidence that the alleged seepage-induced mechanisms described in Dr. Bea's expert reports occurred as a result of WGI's work or contributed in any way to the North or South Breach.   In fact, the analyses that Dr. Bea conducted to generate his opinions in this case are based on made-up excavations that were never performed by WGI and soil properties that did not exist at the EBIA before or during Hurricane

14

Katrina.   Real-world, EBIA site-specific evidence from the parties' Joint Soils Investigation and other sources demonstrate that the North and South Breaches were not caused by seepage-induced mechanisms and/or by WGI's remediation work during Task Order 26.   Instead, WGI will show that the breaches likely occurred due to the overwhelming effect of the Hurricane Katrina storm surge on the levee/floodwall protection system, which caused: (1) floodwall deformations at the North and South Breaches; (2) loss of landside lateral support at the North and South Breaches when water from the waves and the storm surge overtopped the floodwall at the lowest elevations in the EBIA and created scour trenches that eroded the soil at the base of the floodwall; and (3) a tear in the floodwall sheetpile at the North Breach that developed immediately adjacent to a location, at the north end of the North Breach, where two different-length sheetpiles were joined in the existing floodwall.   The sheetpile tear initiated at the site of a faulty weld performed prior to any work by WGI in the EBIA.

In support of these facts, WGI will offer the testimony of *Francisco Silva-Tulla, Sc.D., P.E.*.   Dr. Silva-Tulla is a civil engineer with over 41 years of professional experience in engineering and environmental work, including geotechnical engineering related to earth structures such as embankments, dams, levees, dikes, slopes, landfills and excavations.   Dr. Silva-Tulla first visited the EBIA on September 25, 2005, as a member of the Levee Assessment Team organized by the American Society of Civil Engineers.   He has visited the EBIA numerous times since then.   Dr. Silva-Tulla conducted a thorough review of the evidence documenting WGI's remediation work during Task Order 26, the results of the parties' Joint Soils Investigation, and other historic information regarding the EBIA and IHNC.

15

Based on this evidence, and applying fundamental principles of soil mechanics, Dr. Silva-Tulla will testify that: (1) the excavations performed by WGI during Task Order 26 did not contribute to the North or South Breach at the EBIA, regardless of the type of soil used to backfill the excavations, and even if (hypothetically) the excavations were not backfilled at all; and (2) the seepage-induced mechanisms that Dr. Bea alleges were exacerbated by WGI's work, including localized "blowouts" at the toe of the levee on the landside of the levee/floodwall protection system, and uplift pressures acting to reduce the lateral stability of the levee/floodwall protection system, did not occur at the EBIA during Hurricane Katrina.

Dr. Silva-Tulla will also demonstrate the numerous flaws in Dr. Bea's analyses, including but not limited to: (1) that the EBIA cross-sections used by Dr. Bea to support his analyses are based on fictitious excavations and fabricated soil properties; (2) that Dr. Bea's flow analyses were performed using a value for a material soil property--compressibility--that is unrealistic and does not exist at the EBIA, despite the fact that the parties' Joint Soils Investigation produced an EBIA site-specific value for compressibility; (3) that Dr. Bea relies on the patently false premise that a fully saturated soil skeleton is incompressible; and (4) that Dr. Bea improperly modeled flow conditions at the EBIA as steady flow, notwithstanding the fact that it would have taken more than one year to achieve steady flow conditions from an increased canal water level such as that experienced during the storm surge created by Hurricane Katrina.

Dr. Silva-Tulla will further testify that:  (1) the North Breach was likely caused by a combination of decreased floodwall top elevation, floodwall deformations, loss of lateral landside support due to overtopping, and a faulty weld in the sheet pile that led to a rupture in the

16

floodwall; and (2) the South Breach was likely caused by a combination of decreased floodwall top elevation, floodwall deformations, and loss of lateral landside support due to overtopping. To establish the relevant floodwall heights along the EBIA pre-Katrina, Dr. Silva will rely on the 1999 Orleans Levee District Survey, dated 12 July 1999.   WGI will offer *Mr. Stephen King* of the Orleans Levee District to testify as to the contents of this 1999 Survey.

The Flooding of the Lower Ninth Ward and St. Bernard Parish during Hurricane Katrina is Not Solely Attributable to the Breaches at the IHNC.   WGI will show that the flooding in the Lower Ninth Ward and St. Bernard Parish was due to a combination of: (1) rainfall; (2) wave overtopping at the floodwall on the east bank of the IHNC; (3) flow overtopping at the floodwall on the east bank of the IHNC; (4) inflow of water from the two breaches in the floodwall on the east bank of the IHNC; and (5) inflow of water over the Florida Avenue/40 Arpent Levee from the MRGO and the Central Wetlands.

In support of these facts, WGI will offer the testimony of *Robert A. Dalrymple, Ph.D., P.E.*   Dr. Dalrymple is currently the Willard & Lillian Hackerman Professor of Civil Engineering at Johns Hopkins University and has more than 30 years of experience studying water waves, nearshore hydrodynamics, coastal processes, and natural hazards.   Dr. Dalrymple will testify regarding the storm surge generated by Hurricane Katrina and how and when the surge made its way into the Lower Ninth Ward and St. Bernard Parish.   He will further testify that the North IHNC Breach plays a significantly smaller role in the flooding of the Lower Ninth Ward / St. Bernard Polder than does the larger South IHNC Breach.   He will also testify that the flooding caused by the breaching along the MRGO Reach 2 levee created flows sufficient to

17

flood St. Bernard Parish and the Lower Ninth Ward to 11 feet (NAVD88 2004.65) had the IHNC breaches not occurred.

Plaintiffs have overstated their damages.   Even if the Court were to find that Plaintiffs had satisfied their burden of proof as to liability, WGI will demonstrate at trial that Plaintiffs' damages calculations are not credible, and will establish the true measure of Plaintiffs' damages. Although Plaintiffs contend that the totality of the damage to their movable and immovable property was caused by flooding from the IHNC, WGI will prove otherwise.

In the case of the Armstrong, Coats, Holmes, and Livers Plaintiffs, there is no evidence that their houses suffered any structural damage from flooding; moreover, all of the Plaintiffs' houses, including those that Plaintiffs later voluntarily demolished, could have been repaired. Additionally, WGI will identify specific elements of damage to the Coats, Washington, and Livers properties that would not have occurred in the absence of MRGO floodwaters.

Furthermore, the evidence will show that nearly all of the Plaintiffs received substantial payments from their homeowners insurance for wind and/or rain damage to their immovable and movable property, and that Plaintiffs' damages estimates include damage for which Plaintiffs have already been compensated on the basis that it was caused by wind and/or rain.   Plaintiffs' damage estimates for movable property are also overstated because they include property belonging to adults who are not parties to this suit, and more importantly, do not take depreciation into account.

With regard to Plaintiffs' claims for additional living expenses, WGI will prove that the estimates of Plaintiffs' expert Scott Taylor wildly overestimate the extent to which Plaintiffs'

post-Katrina expenses exceeded their normal pre-Katrina expenses.  For nearly all of the Plaintiffs, there is no evidence that their post-Katrina expenses exceeded their pre-Katrina expenses at all.  Because Plaintiffs would have had normal household expenses even if their properties had never flooded, they are only entitled to recover those expenses which they can prove were in excess of their normal household expenses prior to Katrina.

In support of these facts, WGI will offer testimony from the following experts:

- *James Danner, P.E.*, of Denson Engineering, has 35 years of professional engineering experience in civil engineering, including 29 years of forensic investigations of structure failures, moisture intrusion, and wind damage.  He is also a member of the American Society of Civil Engineers.  Since Hurricane Katrina, he has inspected and evaluated more than 500 structures in the New Orleans area on behalf of homeowners, business owners, and insurance companies.  Mr. Danner has inspected all of the properties and conducted a thorough review of the evidence documenting Katrina-related damages to Plaintiffs' properties (including, but not limited to, Plaintiffs' deposition testimony, insurance files, and post-Katrina photographs).  Mr. Danner has also reviewed the reports of Mr. Taylor, Mr. Crawford, and those of all parties' hydrological experts.  Based on this evidence, and applying sound engineering principles, Mr. Danner will testify: 1) that all of the Plaintiffs' properties suffered identifiable damages from wind and/or rain, in addition to flood damage; 2) that Mr. Taylor erroneously characterized this wind and/or rain damage as flood damage; and 3) that, in the case of the Coats, Washington, and Livers properties, there are identifiable elements of damages that would not occurred in the absence of MRGO floodwaters.

- *Jean-Prieur Du Plessis, C.P.E.* of Madsen, Kneppers, & Associates, has 15 years of experience as a cost estimator, and has been certified by the American Society of Professional Estimators.  He has prepared more than 100 Katrina-related repair estimates.  Mr. Du Plessis has thoroughly reviewed the evidence documenting Katrina-related damages to Plaintiffs' properties (including, but not limited to, the reports of Mr. Taylor, Mr. Crawford, Mr. Danner, and the available post-Katrina repair estimates and photographs of the Plaintiffs' properties).  Based on this evidence, and applying sound estimating principles, Mr. Du Plessis will testify: 1) as to the true cost of repairing Plaintiffs' flood damage (as determined by the scope provided to him by Mr. Danner); 2) as to the true cost of repairing Plaintiffs' wind and/or rain damage (as determined by the scope provided to him by Mr. Danner); 3) as to the true cost of replacing Plaintiffs' flood damage (as determined by the scope provided to him by Mr. Danner); 4) as to the true cost of replacing Plaintiffs' wind and/or rain damage (as determined by the scope

1099992v1

provided to him by Mr. Danner); and 5) as to the flaws in the methods and damages calculations of Mr. Taylor.

- *Karl Schneider*, of Madsen, Kneppers, & Associates, is a licensed adjuster with 20 years of experience.  He has experience in the review and evaluation of contents repair costs, replacement costs, depreciation, and the adjustment of additional living expense claims. Mr. Schneider has thoroughly reviewed the evidence documenting Katrina-related damages to Plaintiffs' properties (including, but not limited to, the reports of Messrs. Taylor, Crawford, Danner, and Du Plessis, Plaintiffs' insurance and Road Home files, and Plaintiffs' depositions).  Based on this evidence, and the sound principles of his profession, Mr. Schneider will testify as to 1) the true repair and/or replacement cost of Plaintiffs' flood-damaged contents; 2) the extent to which Plaintiffs' movable property suffered identifiable damages from wind and/or rain; 3) the proper application of depreciation to Plaintiffs' movable property; 4) the true amount of Plaintiffs' additional living expenses, and 5) the flaws in Mr. Taylor's methods and opinions.

- *Michael Truax, Sr., MAI, ASA*, of Truax, Robles, & Baldwin Appraisers, LLC, is a Louisiana Certified General Real Estate Appraiser and holds the designation of MAI from the Appraisal Institute.  He has inspected more than 400 Katrina-damaged properties. Mr. Truax has thoroughly reviewed the evidence documenting Katrina-related damages to Plaintiffs' properties (including, but not limited to, the reports of Mr. Taylor, Mr. Danner, Plaintiffs' insurance and Road Home files, and their deposition testimony).  Mr. Truax has also reviewed relevant pre- and post-Katrina public records, including, but not limited to title and sales records of similar properties.  Based on this evidence and the sound principles of real estate appraisal, Mr. Truax will offer his opinions regarding 1) the pre-Katrina value of the Holmes, Livers, and Armstrong properties; 2) the post-Katrina value of the Holmes, Livers, and Armstrong properties.

### c. *Defendant United States's Summary of Material Facts:*

The plaintiffs contend that "the Corps [was] negligent in failing to perform geotechnical evaluations of the potential impact of the earthwork and excavations performed in furtherance of the EBIA project."  *See supra* p. 10.  The evidence, however, will show that the Corps of Engineers did a seepage assessment that met the standard of care before WGI undertook Task Order 26, and neither WGI's operations nor any other event vitiated that assessment or required an additional geotechnical evaluation.  When WGI began its work, the Corps knew that the soils

20

in the EBIA consisted predominantly of low permeability clays.   In 1966, when designing the IHNC's east floodwall, the Corps analyzed the site and determined that clay predominated.   That knowledge was confirmed by soil studies conducted shortly before WGI began Task Order 26 operations, and it was confirmed again in 2006 by IPET and yet again last year by Fugro Consultants, Inc., on behalf of the parties.   The Corps's understanding of the engineering properties of the EBIA soils and the soils beneath the floodwall—obtained through years of experience—justified its determination that no further seepage analysis need be performed.

The correctness of the Corps's belief that the EBIA consisted primarily of low permeability clays was confirmed by Fugro's field and laboratory work last year.   *In situ* field work and laboratory testing were conducted to better define soil stratigraphy and relevant engineering properties.   The field investigation consisted of 40 exploratory borings, 50 cone penetration tests, and 25 vane shear borings in which vane shear tests were performed at various depths.   Evidence about hydraulic conductivity and other salient soil characteristics will be provided by ***Dr. Thomas Naymik, Ph.D., P.G.,*** and ***Dr. Joseph B. Dunbar, Ph.D.***

Dr. Naymik is a hydrogeologist with Geosyntec Consultants, Inc. He oversaw the pumping tests and evaluated the data to determine the permeability of the soils near the EBIA on behalf of the United States.   He received a B.S. in 1972 from Ohio State University, an M.S. from Louisiana State University (1974), and a Ph.D. from Ohio State University (1977); all of his degrees are in geology.   At LSU his studies and research focused on deltaic sedimentation on the Mississippi Delta and clay mineralogy, and at OSU his studies and research focused on hydrogeology.   His experience ranges from conducting field tests, design and analysis of hydraulic conductivity to hydrogeological numerical analysis of specific sites to computer code development for use by others employed in the field of hydrogeology.   Additionally, he teaches

1099992v1

short courses for the National Ground Water Association (one of the courses is titled "Analysis and Design of Aquifer Test" and serves as an adjunct professor of hyrogeology at Ohio State University, both from 1984 to the present.   Dr. Dunbar is a Research Geologist in the Geotechnical and Structures Laboratory, Engineer Research and Development Center, U.S. Army Corps of Engineers, Vicksburg, MS.   He is an expert in the geologic history of the New Orleans area.

The evidence will show that the Corps of Engineers met the geotechnical engineering standard of care in approving WGI's plans and operations.   As **Dr. Patrick C. Lucia, Ph.D., P.E.**, will explain, the Corps *did* assess whether seepage would compromise the IHNC levee and floodwall, and that assessment provided a sound basis for concluding that no significant underseepage could occur during short-term hydraulic loading, such as could result from a hurricane and, in fact, did result from Hurricane Katrina and other storms prior to it.   Even though the only documented seepage assessment occurred more than three decades before WGI undertook Task Order 26, Dr. Lucia will demonstrate that the intervening years did not vitiate the Corps' 1966 assessment.

The EBIA floodwall in place during Task Order 26 and Hurricane Katrina was constructed according to General Design Memorandum No. 3 for the Lake Pontchartrain and Vicinity Hurricane Protection Project.   In GDM No. 3, the Corps evaluated both the global stability of the floodwall under hurricane storm-surge conditions and the risks that underseepage might pose.   Based on the short duration of hurricane storm-surge events and the low permeability of the clays beneath the floodwall, the Corps correctly concluded that seepage would not pose a problem.   The Corps's 1966 evaluations evinced good engineering judgment that rested on a substantial body of first-hand knowledge about the engineering properties of the

soils where the flood-control structures were later built and where WGI performed the operations at issue in this case.

Importantly, the 1966 engineering evaluations remained valid during Task Order 26.   All excavations were outside of the minimum control line that differentiated the area where changes could possibly destabilize the levee during hydraulic loading from the area where changes could not affect stability.   The Corps's assessment that underseepage would not pose a problem was correct in 1966 and remained correct in 2005.   Using a generally accepted method for evaluating seepage, Dr. Lucia will demonstrate that the Corps's assessment of seepage risk was consistent with good geotechnical-engineering judgment and practice.   He will show that none of WGI's workplans or operations provided a basis for performing an additional seepage assessment:   no information available to WGI or the Corps then or now suggests that underseepage could threaten the EBIA floodwall during a hurricane storm-surge event.

Dr. Lucia is a principal of Geosyntec Consultants and a licensed civil engineer specializing in the areas of geotechnical engineering and waste management.   He has more than 25 years of professional experience and practice directing and evaluating a broad range of projects requiring expertise in foundations and soils. Dr. Lucia performed a comprehensive review of the Corps's design of the EBIA floodwall, the proposed New Lock project and associated design reports, and the work proposed and performed at the EBIA under Task Order 26, including all documented excavations and backfilling, to determine whether the Corps of Engineers correctly evaluated the potential effects of underseepage and met the standard of care in approving WGI's workplans and subsequent operations.

The plaintiffs cannot establish their case for a second reason:   no competent evidence supports their contention that hydraulic underseepage and uplift pressures caused the breaches. The sole proponent of this theory—Dr. Robert Bea —conducted a deeply flawed and unscientific

analysis.   Dr. Bea's theory of failure suffers from three fundamental defects.   First, it is premised on fictitious excavations that never existed at the EBIA either before or during Hurricane Katrina.   ***Dr. Timothy D. Stark, Ph.D., P.E.,*** will detail the scope of the work conducted by WGI, including the location of excavations and their approximate depth.   His testimony will demonstrate that Dr. Bea made numerous false assumptions about WGI's work, particularly the location and dimensions of excavations and the permeability of the soils used to fill them.   Dr. Stark is a professor of Geotechnical Engineering in the Department of Civil and Environmental Engineering at the University of Illinois.   He has published more than 270 technical papers in refereed journals, conferences, and magazines, including 96 refereed papers related to geotechnical and geoenvironmental engineering.   As the recipient of numerous awards for research, teaching and professional service, including a 2012 ASCE geotechnical award, Dr. Stark is well qualified to testify as to these facts.

The second defect in Dr. Bea's theory is that, as noted above, the soils at issue are, with only isolated exceptions, clays of low permeability.   This fact completely undercuts the plaintiffs' case.   The evidence will show that Dr. Bea's theory of underseepage-induced failure would only be plausible if the EBIA soils were as pervious as he initially thought.   This misconception explains why he formed the mistaken opinion that underseepage caused the breaches.

Today Dr. Bea continues to fundamentally misapprehend the engineering properties that govern the physical processes which caused the breaches.   His failure to grasp the true nature of the organic clays—the critical soil layer immediately below the floodwall—is reflected in his failure to use standardized engineering terminology to describe the soils.   Rather than labeling them as clays and organic clays, as the ASTM's Uniform Soils Classification System requires, he has persisted in calling them swamp-marsh deposits, a geological term that describes their

depositional environment but that masks the engineering characteristics that are key to understanding why neither underseepage nor hydraulic uplift occurred.

The third reason that the plaintiffs' causation theory fails is that, as the evidence will show, Dr. Bea incorrectly analyzed the strength of the soils and the hydraulic pressures that developed.  Also, he incorrectly assumed that the organic clays were incompressible in his seepage analyses.  He mistakenly ascribed incompressibility to this soil layer because he mistakenly believes that saturated soils are incompressible in his seepage analyses.  This belief lacks scientific validity and is demonstrably untenable.  Saturated soils, except in rare circumstances, are compressible, and the evidence will show that the organic clays under the levee were compressible in his seepage analyses.  The soil's ability to expand explains why Dr. Bea's assumption that pressure flowed from one side of the levee to the other in a matter of minutes is mistaken.

Dr. Bea unscientifically attempts to analyze pressure transmission in isolation from the flow of water.  Because clays consist of fine particles, they keep fluids from moving through them at any but the slowest speeds.  Distance matters when analyzing seepage, and the distance from the flood side to the protected side of the levee was too great for any hydraulic effect of consequence to develop during the hours of hydraulic loading that preceded the breaches.  The notion that destabilizing hydraulic uplift occurred in the absence of fluid transmission is nonsense.  The evidence will show that Dr. Bea's opinions about pressure transmission and hydraulic uplift have no scientific validity.  A full discussion of Dr. Bea's factual and methodological mistakes is set forth in the United States' briefs in support of its motion to exclude the testimony of Robert Glenn Bea, record documents 20823-1 and 20874.

Both breaches can be explained by physical processes unrelated to WGI's work.  As the United States' geotechnical experts will demonstrate, hydraulic pressure on the floodwall caused

the north breach when the driving force of the rising surge exceeded the resisting force of the levee and floodwall.   Overflowing waves and surge caused the south breach, as they eroded the landside levee embankment until the wall gave way under the force of inrushing floodwaters.

*Dr. Thomas L. Brandon, Ph.D., P.E.,* will explain that rising surge opened a gap between the levee and the floodwall, increasing the hydrostatic pressure on the wall.   Because of this gap and the low land-side levee toe at the north-breach site, a shear failure likely occurred when the surge reached an elevation of about 10 feet.   The pressure of surge on the fully exposed wall caused the soils holding the wall in place to give way as the upper soils sheared from the lower.

Dr. Brandon, the Director of the W. C. English Geotechnical Engineering Research Laboratory and an Associate Professor of Civil and Environmental Engineering at the Virginia Polytechnic Institute and State University (Virginia Tech), is well-qualified to testify as to these facts.   For nearly three decades, he has taught seepage and slope-stability analysis.   During this time he has consulted on more than a score of dam and levee projects in the Americas and Asia. Because of this expertise he was selected to perform slope-stability analyses for the IPET investigation, and the Army Corps of Engineers regularly calls on him to perform levee and floodwall assessments.   Currently he is advising in the Corps's revision of procedures for analyzing and designing I-walls.   Dr. Brandon will be a keynote speaker at the 2013 GeoCongress, a quadrennial gathering of geotechnical specialists, sponsored by the American Society of Civil Engineers.   Dr. Brandon has been invited to present his views on shear strength for slope stability.

*Dr. W. Allen Marr, Ph.D., P.E.,* an elected member of the prestigious National Academy of Engineering, discovered that the IHNC breaches occurred at the two points where the floodwall was lowest.   Neither IPET nor ILIT, nor any other investigator had discovered this

1099992v1

critical fact.   At these low points, wave and surge overtopping began earliest and continued longest before the breaches occurred.   The overtopping waves and surge scoured erosion trenches behind the floodwall.   As the surge rose, overtopping waves and then overflowing surge scoured away the soil holding the wall in place until eventually the driving force of the surge exceeded the resisting force of the levee and floodwall and the floodwall failed by overturning.   At the south breach, these physical processes alone explain why the wall gave way and was carried away by the inrushing floodwaters.

Dr. Marr will explain that three unique conditions combined to cause the north breach. First, as noted, the floodwall had subsided most and was lowest at that place.   Second, the land-side levee toe was lower here than at any other place.   Because the toe was low, there was less soil to oppose the driving power of the surge on the opposite side of the floodwall.   Third, sheetpiles of substantially different lengths were interlocked at this place and this place alone. The north breach occurred where older, shallower sheetpiles adjoined newer, deeper sheets.   As the surge rose up almost to the top of the floodwall, the hydrostatic pressure stressed the adjoining sheets differentially because the older, shallower sheet had less soil to hold it in place, its bottom being about 12 feet shallower than the newer sheet.   These stresses deformed the older sheet, and as the deformation moved up into the concrete cap, the concrete cracked and then crumbled away as water forced its way through.   Simultaneously the wall rotated landward because overtopping waves were eroding the levee, a process that rapidly accelerated as floodwaters poured through the gap created by the broken concrete.   At some point, one overstressed sheet tore from the top downward 12 feet.   These movements and the continuous hydraulic pressure caused the connection of two adjacent sheets to decouple.   As more and more water poured through the gap and eroded the levee, the sheets were displaced entirely and tumbled landward as the turbulent water surged over the decoupled sheet and those attached to it.

27

Dr. Marr is well qualified to testify as to these facts.   His familiarity with Louisiana soils dates to the late 1980s, when he advised Eustis Engineering as the firm was automating its consolidation-testing apparatus to measure the stiffness of clay soils.   Since Hurricane Katrina, Dr. Marr has been engaged by private-sector and governmental entities who are repairing, improving, and replacing flood-protection structures along the Gulf coast.   The Louisiana Office of Coastal Protection and Restoration selected Dr. Marr to lead the development of a new system for real-time monitoring of the levees surrounding New Orleans.   In 1982 Dr. Marr founded Geocomp Corporation, a geostructural services company that today employs more than 120 engineers, technicians, software specialists, and support staff to help clients manage risk and lower life-cycle costs by providing geostructural services, field instrumentation, and real-time monitoring software.   A related entity, Geotesting Express, provides testing of soils, rocks, and geosynthetic materials.   Because Dr. Marr is a recognized authority in the field of geotechnical engineering, he too has been invited to be a keynote speaker at the 2013 GeoCongress, in San Diego next March.

The United States also incorporates the WGI's summary of material facts as they relate to damages.   In addition, it will argue that the Plaintiffs have received compensation from: (1) the Federal Emergency Management Agency (FEMA) under its Individual and Households Program and (2) the U.S. Department of Housing and Urban Development's (HUD) Community Development Block Grant money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974.

The United States will offer the testimony of Mark Misczak and Scott Davis.   Mr. Misczak is the Individual Assistance Branch Director, FEMA, who will discuss the benefits provided by FEMA to the Plaintiffs due to Hurricane Katrina and will discuss FEMA's individual assistance program.   Mr. Davis is the Director of the Disaster Recovery Division,

HUD, who will discuss the monies provided by HUD to the Plaintiffs due to Hurricane Katrina through the Louisiana Recovery Authority's "Road Home" Program.

## 7.  ALL UNCONTESTED MATERIAL FACTS

*PLEASE NOTE:*   The parties continue to work together to stipulate as many material facts as possible.   To the extent the parties agree to additional uncontested material facts that are not listed herein, the parties will notify the Court as soon as possible.

1.   The following table shows the dates, times, and elevations from each of the Lockmasters' readings at the IHNC Lock from August 28, 2005 at 3:00 a.m. to August 30, 2005 at 7:00 a.m. converted to NAVD88(2004.65).

| Date | Time | Elevation in Feet - NAVD88 (2004.65) |
|------|------|--------------------------------------|
| 8/28/2005 | 3:00 a.m. | 1.4 |
| 8/28/2005 | 6:00 a.m. | 2.1 |
| 8/28/2005 | 3:00 p.m. | 4.3 |
| 8/28/2005 | 4:00 p.m. | 4.3 |
| 8/28/2005 | 5:00 p.m. | 4.5 |
| 8/28/2005 | 6:00 p.m. | 4.5 |
| 8/28/2005 | 7:00 p.m. | 4.5 |
| 8/28/2005 | 8:00 p.m. | 4.8 |
| 8/28/2005 | 9:00 p.m. | 4.9 |
| 8/28/2005 | 10:00 p.m. | 5.0 |
| 8/28/2005 | 11:00 p.m. | 5.7 |
| 8/29/2005 | 12:00 a.m. | 6.3 |
| 8/29/2005 | 1:00 a.m. | 7.1 |
| 8/29/2005 | 2:00 a.m. | 7.3 |
| 8/29/2005 | 3:00 a.m. | 8.1 |
| 8/29/2005 | 4:00 a.m. | 9.3 |
| 8/29/2005 | 5:00 a.m. | 10.3 |
| 8/29/2005 | 6:00 a.m. | 11.3 |
| 8/29/2005 | 7:00 a.m. | 12.3 |
| 8/29/2005 | 8:00 a.m. | 13.8 |
| 8/29/2005 | 9:00 a.m. | 14.3 |
| 8/29/2005 | 10:00 a.m. | 12.3 |

1099992v1

| 8/29/2005 | 11:00 a.m. | 11.7 |
| 8/29/2005 | 12:00 p.m. | 11.4 |
| 8/29/2005 | 1:00 p.m. | 10.1 |
| 8/29/2005 | 2:00 p.m. | 9.3 |
| 8/29/2005 | 3:00 p.m. | 7.4 |
| 8/29/2005 | 11:00 p.m. | 4.8 |
| 8/30/2005 | 7:00 a.m. | 3.5 |

2.  Hurricane Katrina made landfall at 6:10am on August 29, 2005, near Buras, Louisiana.

3.  As Hurricane Katrina made landfall and moved inland, its winds rotated counter-clockwise as all tropical cyclones do in the northern hemisphere.

4.  An area within the northwest quadrant of a hurricane's wind field will experience winds blowing from a north, north-easterly direction prior to the passage of the eye past that area.

5.  Wind speeds at 1020-1022 Charbonnet St., New Orleans, increased over time in the early morning hours of August 29, 2005, peaking at 7:15am with sustained 1-minute winds of 81 mph.

6.  From 4:00am until at least 7:00am on August 29, 2005, prevailing winds in the area of 1020-1022 Charbonnet St., New Orleans, were out of the north-northeast.

7.  Prevailing winds in the area of 1020-1022 Charbonnet St., New Orleans, did not blow out of the WNW before 10:00am on August 29, 2005.

8.  Wind speeds at 4016 Hamlet St., Chalmette, increased over time in the early morning hours of August 29, 2005, peaking at 7:15am with sustained 1-minute winds of 83 mph.

9.  From 4:00am until at least 7:00am on August 29, 2005, prevailing winds in the area of 4016 Hamlet St., Chalmette, were out of the north-northeast.

10.  Prevailing winds in the area of 4016 Hamlet St., Chalmette, did not blow out of the WNW before 10:00am on August 29, 2005.

11.  Wind speeds at 1910-1910 1/2 Charbonnet St., New Orleans, increased over time in the early morning hours of August 29, 2005, peaking at 7:15am with sustained

1-minute winds of 81 mph.

12.     From 4:00am until at least 7:00am on August 29, 2005, prevailing winds in the area of 1910-1910 1/2 Charbonnet St., New Orleans, were out of the north-northeast.

13.     Prevailing winds in the area of 1910-1910 1/2 Charbonnet St., New Orleans, did not blow out of the WNW before 10:00am on August 29, 2005.

14.     Wind speeds at 4924 St. Claude Ave., New Orleans, increased over time in the early morning hours of August 29, 2005, peaking at 7:15am with sustained 1-minute winds of 80 mph.

15.     From 4:00am until at least 7:00am on August 29, 2005, prevailing winds in the area of 4924 St. Claude Ave., New Orleans, were out of the north-northeast.

16.     Prevailing winds in the area of 4924 St. Claude Ave., New Orleans, did not blow out of the WNW before 10:00am on August 29, 2005.

17.     Wind speeds at 1205 Perrin Dr., Arabi, increased over time in the early morning hours of August 29, 2005, peaking at 7:15am with sustained 1-minute winds of 82 mph.

18.     From 4:00am until at least 7:00am on August 29, 2005, prevailing winds in the area of 1205 Perrin Dr., Arabi, were out of the north-northeast.

19.     Prevailing winds in the area of 1205 Perrin Dr., Arabi, did not blow out of the WNW before 10:00am on August 29, 2005.

20.     Between 4:00am and 7:00am on August 29, 2005, 3-second peak wind gusts were higher than one-minute sustained winds in the Lower Ninth Ward.

21.     The Inner Harbor Navigational Canal ("IHNC") or Industrial Canal, connects the Mississippi River, the Gulf Intracoastal Waterway ("GIWW"), Lake Pontchartrain, and the Mississippi River-Gulf Outlet ("MRGO").

22.     The IHNC was constructed by the Port of New Orleans between 1918 and 1923, with a navigation lock being placed in service in1923 as a unit of the IHNC.

23.     The IHNC navigation lock, currently located north of the St. Claude Avenue Bridge, passes barge traffic between the Mississippi River at New Orleans and the GIWW.

1099992v1

24.     The IHNC navigation lock has operated since the early 1920s but was projected to become dimensionally obsolete by 1970.

25.     In 1986, Congress modified the 1956 River and Harbor Act and directed the Secretary of the Army to determine the precise location and design of the lock project, provided that the Secretary consulted with affected local communities and made a maximum effort to assure the full participation of members of minority groups living in communities affected by the new lock.

26.     For all Water Resources Development Act ("WRDA") projects, Congress directed the Secretary of the Army to weigh national economic development, the quality of the total environment, the well-being of the people of the United States, the prevention of loss of life, and the preservation of cultural and historical values.

27.     In 1996, the WRDA was amended again to require the Secretary to submit a comprehensive community impact plan, that, to the maximum extent practicable, provides for mitigation or compensation, or both, for the direct and indirect social and cultural impacts that the lock replacement project could have on surrounding communities.

28.     In March of 1997, the U.S. Corp of Engineers ("the Corps") issued a New Lock and Connecting Channels Evaluation Report in which it proposed a new lock to be placed in the IHNC between the Claiborne Avenue and Florida Avenue bridges.

29.     Mr. Gerald Dicharry, Senior Project Manager for the lock replacement project, supervised the Corps' preparation of the 1997 Evaluation Report

30.     In 1998, the Corps' lock replacement project received approval from the Secretary of the Army, followed by appropriations from Congress to begin construction.

31.     The area where the bypass channel would be located is known as the East Bank Industrial Area ("EBIA"), a parcel nearly 32 acres in size and subdivided into six (6) distinct sites.  This area had been owned by the Port of New Orleans and leased to various industrial entities; however, by 1997 the industrial entities were defunct and the Corps was undertaking efforts to purchase the site.

32.     Because constructing a new lock on the IHNC would require shutting down a vital link to the GIWW for at least five years, the North of Claiborne Avenue proposal also included a plan for building a temporary two-way bypass channel in a 32-acre industrial area between Claiborne and Florida Avenues, west of the floodwall

located between Surekote Road and Jourdan Avenue, and east of the IHNC.

33.     After decades of commercial use, the EBIA was littered with assorted structures, contaminants, and debris that the Corps needed to remove before dredging the bypass channel.

34.     For planning purposes, the Corps divided the EBIA into six facilities, each named for its most recent tenant. From south to north, the sites were International Tank Terminal ("ITT"), Saucer Marine, Mayer Yacht, Indian Towing, McDonough Marine and Boland Marine.

35.     In August 1994, WGI (formerly, Morrison Knudsen Corporation or "M-K") and the Corps' Tulsa District entered into an Indefinite Delivery-Indefinite Quantity Contract for the remediation of various Hazardous, Toxic, and Radioactive Waste ("HTRW") sites in the southwest region.

36.     On December 2, 1999, WGI produced the Recommendation Report for Demolition and Site Preparation Activities of the EBIA.

37.     The purpose of the Recommendation Report was to present recommendations regarding the scope and duration of the remediation/demolition activities of the EBIA.

38.     The Corps issued a Statement of Work for Development of Work Plans and Subcontracting Plan/Services for EBIA on May 15, 2000.

39.     On August 28, 2000, the Corps produced a Statement of Work for Project Site Development and Remedial Action of EBIA.

40.     Steven Roe was WGI's Program Manager for the overall TERC from mid-1997 until May 2001.

41.     Dennis O'Conner was WGI's Project Manager from Task Order 26's inception in 1999 to June 7, 2004.

42.     Phillip Staggs was WGI's on-site Construction Manager from July 2000 to March 2005.

43.     At the end of the remediation process for each site, WGI drafted No Further Action At This Time ("NFAATT") reports to submit to the LDEQ for approval.

44.     In November 2000, WGI made contact with the OLD to inquire about permits for

33

work at the EBIA, confirmed by letter dated November 7, 2000 from Dennis O'Connor to Stevan Spencer of the OLD.

45.     On April 6, 2001, the Corps of Engineers issued a Letter of No Objection to OLD informing them that it had no objection to the issuance of a permit to WGI.

46.     The plaintiffs in this case are six individuals, Kenneth and Jeannine Armstrong, the successor to Ethel Mae Coats, Fred Holmes, Alvin Livers, and Clifford Washington.

47.     The IHNC is located just west of the lower Ninth Ward of Orleans Parish. Before Hurricane Katrina, the Lower Ninth Ward was protected from the IHNC by an I-shaped floodwall along the IHNC's east bank.

48.     In 1914, the Louisiana legislature authorized construction of the IHNC to increase the capacity of the Port of New Orleans.   The canal was at least 30 feet deep with a minimum bottom width of 150 feet, and a minimum channel width of 300 feet. The bottom width was later increased to 300 feet, with a minimum canal width of 500 feet near the proposed piers and slips, and 600 feet adjacent to quays.

49.     IHNC construction commenced on June 6, 1918, and proceeded from Lake Pontchartrain to the Mississippi River.  Earthwork and canal excavation work initiated with dredging and construction of dikes parallel to the sides of the proposed canal.  The dredging created a trapezoidal channel with the dredged spoils cast to the sides to create the levees on both sides of the canal.

50.     The existing IHNC lock is 75-feet wide, 640-feet long, and 31.5-feet deep (below mean low gulf).

51.     In 1956, Congress authorized the USACE to construct an additional lock or a replacement for the existing IHNC lock, with suitable connection channels.  In doing so, Congress gave the Chief of Engineers discretion to determine both when construction of the lock would be economically justified and what the appropriate "type, dimensions, and cost estimates" of the project should be.

52.     The USACE considered several sites for the new lock before finally deciding to place the lock in the IHNC between Claiborne Avenue and Florida Avenue.

53.     The USACE developed eight alternatives for construction of the new lock at the IHNC.  The two selected for detailed analysis were the 200-Foot East plan and the North of Claiborne Avenue Plan.

34

54.     After evaluating the social, environmental, and economic effects, the 1997 Evaluation Report ultimately recommended the North of Claiborne Avenue Plan.

55.     The USACE coordinated the filing of the 1997 EIS with the Environmental Protection Agency, as well as other federal and state agencies and the Governor of Louisiana, each of which responded with comments.

55.     The North of Claiborne Avenue Plan provided for the construction of a new lock 110 feet wide and 1,200 feet long with a bottom depth at elevation -36 feet (NGVD).   It was to be located adjacent to the EBIA, by Galvez Street, approximately one mile north of the east bank of the Mississippi River.

56.     In 1998, the USACE Lock Replacement Project received approval from the Secretary of the Army, followed by appropriations from Congress to begin construction.

57.     The Corps initially had considered building the bypass channel on the west bank of the IHNC, but the east side was selected because the inventory of facilities on the EBIA (abandoned barges, buildings, storage tanks, wharves, bulkheads, fencing, transformer units, and other debris) were more expendable than the facilities on the west side.

58.     This "umbrella" contract, also known as a Total Environmental Restoration Contract ("TERC"), provided the general requirements for all of WGI's anticipated work on HTRW sites in the region with the understanding that the USACE would prepare a specific Statement of Work ("SOW") for each individual Delivery Order (or "Task Order") it later issued.

59.     WGI initially was to perform Task Order 26 in accordance with the project's first Statement of Work ("SOW"), dated June 1, 1999, which was drafted by the USACE-NOD's Construction Manager and Contracting Officer Representative ("COR"), Lee Guillory.

60.     WGI performed excavations to remove utility lines on the ITT, Saucer Marine, Mayer Yacht, Indian Towing, McDonough Marine and Boland Marine sites during Task Order 26.

61.     WGI performed grid trenching operations on the ITT, Saucer Marine, Mayer Yacht, Indian Towing, McDonough Marine and Boland Marine sites during Task Order 26.

62.     WGI removed numerous pilings (at least 30 feet long or more) on the ITT, Saucer

35

Marine, Mayer Yacht, Indian Towing, McDonough Marine and Boland Marine sites during Task Order 26.

63.    WGI demolished and removed rubble from numerous buildings and building foundations on the ITT, Saucer Marine, Mayer Yacht, Indian Towing, McDonough Marine and Boland Marine sites during Task Order 26.

64.    WGI performed numerous excavations to remove contaminated soil (pursuant to the Louisiana Risk Evaluation and Corrective Action Program ("RECAP")) on the ITT, Saucer Marine, Mayer Yacht, Indian Towing, McDonough Marine and Boland Marine sites during Task Order 26.

65.    Hurricane Katrina hit Miami, Florida, as a Category 1 hurricane on the Saffir Simpson scale.

66.    After crossing the southern tip of Florida, it entered the Gulf of Mexico on August 26, 2005, where, under favorable conditions, it exploded into a Category 5 hurricane.

67.    Hurricane Katrina peaked in intensity the afternoon of August 28, 2005, with maximum sustained surface winds of 175 miles per hour; hurricane-force winds extending 100 miles from its center; and tropical-force winds extending 225 miles from its center.

68.    On August 28, 2005, Hurricane Katrina's central pressure fell to 902 mb, at the time the fourth lowest on record in the Atlantic basin.

69.    When Hurricane Katrina made landfall to the east of New Orleans at Buras, Louisiana, at 6:10 a.m. on August 29, 2005, it was a massive Category 3 hurricane, with winds about 125 miles per hour.

70.    Hurricane Katrina generated the largest storm-surge elevations in the history of the United States.

71.    The massive storm surge produced by Katrina, even though it had weakened from a Category 5 intensity the previous day to Category 3 at landfall in Louisiana, can be generally explained by the huge size of the storm.

72.    Storm surge is a wind-driven process: the wind puts energy into the sea surface through the waves and currents. The greater the wind, the greater the storm surge will be.

73.    Two breaches occurred in the levee/floodwall protection system at the EBIA

36

during Hurricane Katrina: the "North Breach" and the "South Breach."

74.    The North Breach occurred along the Boland Marine parcel of the EBIA and resulted in a 180-foot gap in the floodwall.

75.    The South Breach occurred along the Saucer Marine parcel of the EBIA and resulted in a 793-foot gap in the floodwall.

76.    The parties chose Fugro Consulting, Inc., to perform the parties' Joint Soils Investigation at the EBIA and the corresponding laboratory testing. Each party identified the field and laboratory work that it believed was necessary to provide its experts with sufficient data to reach their opinions. Field testing included soil borings, vibrating wire piezometers installed in selected borings, piezo-cone penetrometer tests (CPTs), vane shear tests (VSTs), standpipe piezometers installed in selected borings, and control and observation wells at four pumping test locations.

77.    Field work began on or about June 21, 2011, and was completed on November 3, 2011. Fugro provided interim information to the parties' experts as the work progressed. All told, the joint soils investigation involved over 30 personnel from Fugro, the Plaintiffs' expert team, and the Defendants' expert team, as well as oversight from the parties' legal counsel.

78.    Fugro documented the results of its field work in a report provided at the conclusion of its work.

79.    Plaintiffs intended to conduct pumping tests at three locations: the EBIA South Site, the School Site, and the Railroad Site, but discovered that the Railroad site was much more disturbed (by trash and debris) than had been anticipated.

80.    Plaintiffs' EBIA South Site pumping wells were located immediately north of the Claiborne Avenue Bridge ramp and just south of the EBIA.

81.    Plaintiffs' Railroad Site was located north of Florida Avenue and over a third of a mile east of the EBIA. The Railroad Site contained too many buried obstacles to install control and observation wells for pumping test purposes, and it was abandoned by the Plaintiffs.

82.    Plaintiffs' pumping tests were conducted at sites that the Plaintiffs decided were most relevant to their analysis of the floodwall failures. The pumping tests were conducted to determine site-specific properties for the soil layers that Dr. Robert Bea claims contributed to the floodwall failures at the EBIA (hereinafter the

1099992v1

"organic clays" or "organic clay layer").

83.     Plaintiffs' expert Dr. J. David Rogers and Kevin Pope, along with Dr. Rune Storesund, oversaw the Plaintiffs' pumping tests.  Mr. Pope evaluated the results from the pumping tests using accepted scientific methods and provided those results to Dr. Rogers, who then provided the results to Dr. Bea for use in his analyses.  Dr. Rogers used Mr. Pope's evaluation of the Plaintiffs' pumping test results to develop the EBIA site characterization that Dr. Bea relied on to conduct his analyses.

84.     Defendants' EBIA North Breach Site was located between the "wedding cake" excavation and the North Breach at Boland Marine.

85.     Defendants' EBIA South Breach Site was located adjacent to the South Breach at Saucer Marine and within the footprint of the temporary levee that was constructed in that location immediately after Hurricane Katrina.

86.     A total of 12 observation wells (six deep and six shallow) were installed around the pumping well at each of the parties' pumping test sites.  Slug tests were performed at each of the wells during the development process.  Fugro performed pumping tests at each site as directed by the experts for the parties that selected the site.

87.     The best estimate permeability/hydraulic conductivity value for the EBIA organic clays, as determined from all of the parties' tests conducted during the Joint Soils Investigation, is $1 \times 10^{-5}$ cm/s.

88.     Dr. Bea's expert team used a computer program called SEEP/W to run his seepage analyses in this case, and his team used a computer program called SLOPE/W to run his stability analyses in this case.

89.     The earthen levees along MRGO Reach 2 protect the same area (polder) as the floodwalls on the east side of the IHNC.

90.     The earthen levees and floodwalls along the Florida Avenue Canal / 40 Arpent Canal protect the same area (polder) as the floodwalls on the east side of the IHNC.

**Jeannine and Kenneth Armstrong**

91.     On August 29, 2005, Jeannine and Kenneth Armstrong resided at 4016 Hamlet Pl., Chalmette, Louisiana 70433.

1099992v1

92.    Mr. and Mrs. Armstrong purchased the residence at 4016 Hamlet Pl. on March 25, 1985.

93.    Mr. Armstrong purchased his boat in or before 2000 for approximately $15,000.00.

94.    On or about August 28, 2005, the Armstrongs evacuated to Baton Rouge, Louisiana.

95.    From September 1 through September 30, 2005 the Armstrongs stayed at the Cook Conference Center & Hotel in Baton Rouge, Louisiana.

96.    During the months of October and November 2005, the Armstrongs resided with family in Prairieville, Louisiana.

97.    From December 1, 2005 until May 31, 2006, the Armstrongs rented an apartment in Gonzales, Louisiana.

98.    The Armstrongs paid $890/month in rent for their apartment in Gonzales, Louisiana.

99.    In June 2006, the Armstrongs purchased a residence in Covington, Louisiana with the intention of residing there no less than three years, or until their daughter graduated from high school in May 2009.

100.   The Armstrongs paid approximately $900/month for their residence in Covington, Louisiana.

101.   The Armstrongs demolished the residence at 4016 Hamlet Pl. on or before July 2007.

102.   The Armstrongs are asserting claims for damage to immovable property and personal property located at 4016 Hamlet Pl., for inconvenience and for additional living expenses.  All other claims asserted on their behalf have been withdrawn with prejudice.

**Ethel Mae Coats**

103.   On August 29, 2005, Ethel Mae Coats resided at 1020-22 Charbonnet St., New Orleans, Louisiana.

104.   Ms. Coats purchased the residence at 1020-22 Charbonnet with her late husband,

1099992v1

Jimmie Lee Coats, Sr. on May 18, 1994.

105.     Mr. and Mrs. Coats had no biological children together, nor did they adopt any.

106.     Mr. Coats passed away on or about February 15, 1999.

107.     As of August 28, 2005, Ms. Coats paid approximately $415/month in utility expenses.

108.     On August 29, 2005, the residence at 1020-22 Charbonnet St. was a single home.

109.     On or about August 27, 2005, Ms. Coats evacuated to Hammond, Louisiana.

110.     Ms. Coats resided in the New Orleans condominium until her death in 2009.

111.     With the exception of a monthly $40/month water bill, the utility expenses for the residence at 1020-22 Charbonnet St. did not continue after Hurricane Katrina.

112.     Ms. Coats made post-Katrina repairs and/or renovations to the residence at 1020-22 Charbonnet St., including, but not limited to, converting the residence from a single home to a double home.

113.     Ms. Coats did not demolish the residence at 1020-22 Charbonnet St. after Hurricane Katrina.

114.     Ms. Coats passed away on or about January 29, 2009.

115.     Ms. Coats (as represented by her succession and/or Ms. Franklin) is asserting claims for damage to immovable property and personal property located at 1020 Charbonnet St., for inconvenience and for additional living expenses.  All other claims asserted on her behalf have been withdrawn with prejudice.

**Fred Holmes**

116.     On August 29, 2005, Fred Holmes resided at 1205 Perrin Dr., Arabi, Louisiana 70032 with his wife, Jeneen.

117.     Mr. and Mrs. Holmes purchased the residence at 1205 Perrin Dr. on June 20, 2003.

118.     On August 29, 2005, Mr. and Mrs. Holmes owned a 1998 Toyota Corolla.

40

119.     On or about August 28, 2005, the Holmeses evacuated to Houston, Texas.

120.     From August 29, 2005 through January 8, 2006, the Holmeses stayed at hotels in the Houston area.

121.     On or about January 8, 2006, the Holmeses relocated to a residence in Spring, Texas.

122.     In or about January 2007, the Holmeses purchased the residence in Spring, Texas, and have resided there until the present day.

123.     The Holmeses' utility expenses for the residence at 1205 Perrin Dr. did not continue after Hurricane Katrina.

124.     The residence at 1205 Perrin Dr. was demolished.

125.     Mr. Holmes is asserting claims for damage to immovable property and personal property located at 1205 Perrin Dr., for inconvenience and for additional living expenses.  All other claims asserted on his behalf have been withdrawn with prejudice.

## Alvin C. Livers

126.     On August 29, 2005, Alvin Livers resided at 4924 St. Claude Ave., New Orleans, Louisiana with his wife, Barbara.

127.     Mr. and Mrs. Livers purchased the residence at 4924 St. Claude on January 8, 1971.

128.     As of August 28, 2005, the Livers paid approximately $150/month in utilities expenses.

129.     As of August 28, 2005, the Livers paid approximately $400/month for food and groceries.

130.     On or about August 28, 2005, Mr. and Mrs. Livers evacuated to Baton Rouge, Louisiana, where they stayed with family members.

131.     Mr. and Mrs. Livers remained in Baton Rouge, Louisiana for approximately two weeks.

132.     Mr. and Mrs. Livers left Baton Rouge to stay with their daughter in Marrero, Louisiana, where they remained approximately three months.

41

133.     Mr. and Mrs. Livers then relocated to an apartment in New Orleans, where they remained for approximately four months.

134.     Mr. and Mrs. Livers paid $744/month in rent for their New Orleans apartment.

135.     In or about January 2006, Mr. and Mrs. Livers decided to permanently relocate from New Orleans.

136.     In April 2006, Mr. and Mrs. Livers purchased a residence in Gonzales, Louisiana, and have resided there until the present day.

137.     Mr. and Mrs. Livers did not demolish the residence at 4924 St. Claude.

138.     Mr. Livers is asserting claims for damage to immovable property and personal property located at 1205 Perrin Dr., for inconvenience and for additional living expenses.  All other claims asserted on his behalf have been withdrawn with prejudice.

**Clifford Washington**

139.     Mr. and Mrs. Washington purchased a residence at 1910 Charbonnet St., New Orleans, Louisiana 70117 on February 23, 2001.

140.     The Washingtons were evacuated to Houston, Texas.

141.     On or about September 4, 2005, the Washingtons checked into the Normandy Hotel in Houston, Texas.

142.     The Washingtons paid approximately $700.00 during their stay at the Normandy Hotel.

143.     Upon leaving the hotel, the Washingtons stayed at a senior citizens living center in Houston, Texas for approximately five months.

144.     The rent at the senior citizens living center was approximately $700/month.

145.     Upon leaving the senior citizens living center, the Washingtons moved into a residence at 14126 Meyersville Dr. Houston, Texas, where they remained for approximately two years.

146.     The monthly rent for the Meyersville Dr. residence was $1,500/month.

147.     Upon leaving Houston, Texas, the Washingtons relocated to 615 N. Villere St., New Orleans, Louisiana, where they remained for approximately seven months.

148      The rent for the Villere St. apartment was $975/month.

149.     Upon leaving the Villere St. apartment, the Washingtons moved to 4211 S. Prieur St., where they remained for approximately one year.

150.     In late 2008, the Washingtons moved into the newly constructed residence at 1910 Charbonnet St.

151.     The Washingtons rebuilt a residence on the 1910 Charbonnet lot that is a larger, significant upgrade to the residence that existed on the lot on August 28, 2005.

152.     Mr. Washington has withdrawn all property damage claims arising from damage to his residence and movable property located at 5027 Derbigny St. with prejudice.

153.     Washington is asserting claims for damage to immovable property located at 1910 Charbonnet St. and inconvenience.   All other claims asserted on his behalf have been withdrawn with prejudice.

## 8.  ALL CONTESTED ISSUES OF FACT

1.       The south breach occurred at approximately 7:00 a.m.

2.       The north breach occurred at approximately 6:00 a.m.

3.       The LaFarge barge ING 4727 was not a cause of any breach along the east side of the IHNC during Hurricane Katrina.

4.       From 4:00am through at least 7:00am, the IHNC was within the northwest quadrant of Hurricane Katrina's wind field.

5.       Between 4:00 am and 7:45 am on August 29, 2005, the prevailing winds at the IHNC blew in a northeasterly fashion.

6.       Between 7:00 and 9: 45 a.m., the prevailing winds were in a northeasterly direction at the IHNC.

7.       At 4:30 a.m. on August 29, 2005, the wind was from the northeast at

1099992v1

46.66°.

8.        By 7:00 a.m. on August 29, 2005, the wind was from the northeast at 29.49°.

9.        By 7:30 a.m., on August 29, 2005, the wind was from the northeast at 20.11°.

10.       Maximum one-minute sustained winds at the IHNC as Katrina passed were between 70-80 knots (81-92 mph).

11.       The Corps developed a 1999 Design Documentation Report (DDR), which was a record of final design effort after the feasibility phase and is required for all engineering design products.

12.       On June 1, 1999, the Corps issued to WGI its initial Scope of Work ("SOW") which set forth the project requirements for work agreed to be undertaken to clear the EBIA in preparation of the lock expansion project.

13.       The standard procedure undertaken by the Corps involved sending a SOW to WGI with a Request for Proposal ("RFP") asking WGI to provide an estimated cost for the work identified in the SOW.  In response to the RFP, WGI would draft and submit a proposal.

14.       Upon issuance of the SOW, WGI would be required to provide input to support the planning, scheduling and formulation of the Corps's USACE's statement of work.

15.       WGI was provided back up data from the Corps that was available from prior investigations.

16.       With this data, WGI would develop plans within regulations and execute those plans.

17.       An essential role of WGI was to initiate recommendations to the Contracting Officer of the Corps about any alternative methods of executing a remedial action that would result in improvements.

18.       The intent of the TERC was for the Contractor to develop the performance specifications needed to remediate a particular location, and to consistently monitor the project as the work proceeded to keep the Corps informed of all developments.

1099992v1

19.     Within the terms of the TERC, WGI was expected to provide complete Architect-Engineering (A-E) services to support the implementation of the remedial action.

20.     The Contractor would be required to write and submit a Work Plan that would describe the Contractor's detailed approach for the performance of the Delivery Order, including the activities to be performed in the field.

21.     An additional WGI responsibility was to obtain all permits necessary to accomplish the work specified in the individual Delivery Order.

22.     When the work was done at a federal facility, the required clearances, such as excavation, digging, or drilling permits, were required to be obtained prior to the initiation of site operations by the Contractor.

23.     The June 1, 1999 Statement of Work for Task Order 26 set forth the project requirements that WGI would furnish all engineering services, materials, supplies, labor, as required, in connection with the technical review of site documents associated with the demolition and remediation of the EBIA.

24.     WGI was to prepare a comprehensive report recommending the scope and duration of the remediation and demolition that would be required, as well as any data gaps that may need to be filed by sampling or other investigations.

25.     The Recommendation Report was designed to instruct the Corps about what needed to be done to prepare the EBIA for future activity associated with the lock replacement project.

26.     The June 1, 1999 Statement of Work required WGI to furnish all services, materials, supplies, labor, equipment, superintendence and travel, as required, for the development, submission, review and approval of the required Work Plans for the EBIA.

27.     On August 28, 2000, the Corps produced a Statement of Work for Project Site Development and Remedial Action of EBIA.

28.     This Statement of Work required WGI to furnish all services, materials, supplies labor, equipment, superintendence, procurement, security services, surveying services, subcontracting, all necessary permits, licenses

45

for the project site.

29.       WGI developed and submitted its Project Work Plan in October of 2000 to direct the work activities.

30.       WGI defined the scope of the project to consist of the demolition and removal of surface and subsurface obstructions, characterization of contaminants present at the site and remediation of the site in accordance with LDEQ RECAP Standards.

31.       WGI acknowledged that only after the completion of the various phases of the demolition would the soils and subsurface issues be addressed.

32.       As of October, 2000, the depth of soils considered to be removed was indicated as three (3) feet at the Boland site and seven (7) feet at the Saucer site.

33.       Mr. Roe drafted and negotiated WGI's initial proposal on Task Order 26, and was responsible for provid[ing] overall program leadership and direction from WGI's Denver Office.

34.       From August to October 2000, the Corps' modification to Task Order 26 directed WGI to, inter alia, draft eight major work plans for various aspects of the remediation and demolition project: a Project Work Plan ("PWP"), Waste Management Plan ("WMP"), Storm Water Pollution Prevention Plan ("SWPPP"), Sampling and Analysis Plan ("SAP"), Contractor Quality Control Plan ("CQCP"), Site Safety & Health Plan ("SSHP"), Hurricane Preparedness Plan ("HPP"), and a Perimeter Monitoring Plan ("PMP").

35.       The Project Work Plan would set the performance standards regarding the project processes, including the depths of excavation.

36.       The Project Work Plan specified that WGI would be required to provide engineering details, including geotechnical and geology/hydrology.

37.       For each location, the NFAATT report describes the areas that were remediated on that site, their applicable boreholes or bank locations that were excavated, the dates they were excavated, the dimensions of each of the excavations, and the calculated excavated volume of each of the areas in cubic yards.

1099992v1

38.     The United States Army Corp of Engineers has enacted Engineering Regulations, based upon sound engineering principles and the standard of care for the particular engineering discipline, that dictate mandatory requirements for the conduct of its employees.

39.     Engineer Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects.

40.     Section 16 of ER 1110-2-1150 requires that engineering support shall be provided to those maintenance activities that require plans and specifications as support for operations activities.

41.     This engineering support was required to be provided to review operational deviations, identify and address project deficiencies, and evaluate replacement plans."

42.     Deviations of any portion of a project were required to be reviewed and approved by engineering.

43.     WGI assigned Dennis O'Connor with the task of identifying the permits needed for the EBIA project.

44.     The Orleans Levee District ("OLD") was identified as potential permitter because WGI would be working so close to the vicinity of the flood wall.

45.     The Corps contemplated that WGI would make application for any permit on behalf of the Corps that was deemed necessary by OLD.

46.     The State of Louisiana, Department of Transportation and Development issued a Letter of No Objection on December 29, 2000 in response to WGI's permit request conditioned upon WGI's agreement to notify the Levee District upon completion of the demolition activities, so that an inspection and approval of the levee condition may be made.

47.     Based upon the Corps of Engineers-issued Letter of No Objection, the OLD forwarded a permit letter to WGI requiring strict adherence to the DOTD letter of December 29, 2000 as well as to establish an initial inspection.

48.     In order for this permit to be executory, WGI was required to sign the permit and return it to the OLD.

1099992v1

49.     The OLD permit was sent to WGI's legal counsel, whereupon WGI was advised not to sign the permit letter.

50.     The Corps did not press the issuance of a permit from the OLD matter any further after WGI reported to Lee Guillory that it (WGI) had talked to the levee district and the levee district told them, you don't need to get a permit, just keep us apprized as to what's going on.

51.     The Corps mandates that in order to understand an excavation's potential impact on a flood wall, proper specifications must begin with an examination of the soil stratigraphy to evaluate if it impacts the stability and/or seepage analysis.

52.     For a 25 ft deep excavation within 300 ft. of the flood wall, it is mandatory that the Corps evaluate the wall stability, seepage, and global stability of the wall.

53.     WGI assumed that the Corps's site representative Jim Montegut was knowledgeable about the potential for excavations to affect the flood wall.

54.     Mr. Montegut had never studied the soil stratigraphy of the EBIA, did not know the depth of the sheet pile at the EBIA flood wall, and was not involved with the analysis of subsurface ground water flow.

55.     Whether the TERC or Task Order 26 (including any modifications thereto) required WGI to provide geotechnical engineering services relative to the levee and floodwall in the EBIA.

56.     Whether the TERC or Task Order 26 (including any modifications thereto) required WGI to staff Task Order 26 with personnel capable of making geotechnical engineering evaluations related to the levees and floodwalls.

57.     The role of USACE employees on Task Order 26, including but not limited to Contracting Officer Representatives, James Montegut and Lee Guillory, P.E.

58.     Whether the Corps' plans for the new IHNC lock (adjacent to the EBIA), included replacing the existing levees and floodwalls along the EBIA.

59.     Whether the Corps determined that dredging the proposed bypass channel through the EBIA would not impact existing flood protection structures

48

bordering the EBIA.

60.     Whether the Corps assessed the potential adverse effects of WGI's excavations and backfilling on the flood protection structures bordering the EBIA.

61.     Whether the Corps and its contractors, Waldemar S. Nelson and Dames & Moore, Inc., did an extensive amount of preliminary site investigation in the EBIA prior to WGI's involvement in Task Order 26, which resulted in the 1999 8-volume Design Documentation Report (DDR).

62.     Whether detailed documentation of field activities on Task Order 26 existed, including but not limited to WGI's submission of Daily Quality Control Reports (DQCRs) and monthly photographs, and the Corps' preparation of daily Quality Assurance Reports.

63.     Whether WGI collaborated with the USACE in developing the December 1999 Recommendation Report, and each of the eight major work plans, including the Project Work Plan, Contractor Quality Control Plan, and Sampling and Analysis Plan.

64.     Whether the USACE reviewed and approved the December 1999 Recommendation Report, as well as each of the eight major work plans, including the Project Work Plan, Contractor Quality Control Plan, and Sampling and Analysis Plan.

65.     Whether WGI collaborated with the USACE in formulating the scopes of work for all major subcontracts on Task Order 26.

66.     Whether the USACE reviewed, revised and approved the work plans for major features of work (e.g., remediation, demolition and piling removal, lift station removal, wedding cake removal, submerged fuel tanker car and borrow pit).

67.     Whether the USACE reviewed, revised and approved all submissions WGI made on the USACE's behalf to the Louisiana Department of Environmental Quality.

68.     Whether the USACE approved the means, methods and materials that WGI and its subcontractors used to backfill excavations in the EBIA.

1099992v1

69.        Whether the USACE required compaction testing (i.e., use of proctors) when backfilling excavations in the EBIA.

70.        Whether WGI backfilled and compacted excavations in the in EBIA in accordance with the relevant standard of care for a TERC contractor.

71.        The type of material used to backfill specific excavations in the EBIA, including the hydraulic properties of the backfill material.

72.        The presence of a faulty weld in the floodwall sheet piles at Boland Marine that contributed to the North Breach.

73.        The heights of the floodwall at the EBIA during Hurricane Katrina, including the lowest top-of-floodwall heights at the North and South Breaches.

74.        The depths of the floodwall sheet piles at the EBIA during Hurricane Katrina.

75.        How the 2011 Joint Soils Investigation was conducted by the parties, including but not limited to, which particular tests were performed and why, how those tests were performed, what results the tests produced, and how the results were analyzed.

76.        The geometry and composition of the soil layers at the EBIA.

77.        The engineering properties of the soil layers at the EBIA pre-Katrina, other than the permeability of the swamp-marsh/organic clay layer, which the parties agree was 1 x 10-5

78.        The locations, depths and relative elevations of the excavations that WGI performed on Task Order 26.

79.        Whether the Orleans Levee District inspected and maintained the flood protection structures bordering the EBIA throughout the duration of WGI's work on Task Order 26.

80.        Whether, between 2001 and July 2005, there were any visible signs of under-seepage along the flood protection structures bordering the EBIA after flooding events, such as Hurricane Ivan in 2004.

81.        Whether the site clearing and remediation work performed by WGI in

connection with Task Order 26 at the EBIA caused and/or contributed to the North and South Breaches.

82.    Whether the seepage-induced mechanisms described by Dr. Robert Bea in his expert reports occurred at the EBIA and/or were exacerbated by the site clearing and remediation work performed by WGI in connection with Task Order 26.

83.    The extent to which other factors (not under-seepage) caused and/or contributed to the North and South Breaches, including but not limited to: lower-than-planned floodwall top elevations; floodwall deformations; wave and storm surge overtopping; pre-existing faulty weld in the sheetpile at the North Breach; shear failure due to gap between levee and floodwall at the north breach.

84.    Whether the soil layer referred to as the "swamp-marsh layer" by Plaintiffs and the "organic clay layer" by the Defendants was incompressible or virtually incompressible during the Hurricane Katrina storm surge.

85.    Whether steady flow or steady state conditions existed in the soil layer referred to as the "swamp-marsh layer" by Plaintiffs and the "organic clay layer" by the Defendants during the Hurricane Katrina storm surge.

86.    Whether the "deep backfilled rectangular" excavation modeled in Dr. Robert Bea's North Breach Case 1-1 and Case 1-2 cross-sections and described in his expert reports was performed by WGI, existed at the EBIA prior to Hurricane Katrina, or contributed to the North and South Breaches.

87.    Whether the "deep sand and shell fill" layer modeled in Dr. Robert Bea's North Breach Case 2-1 and Case 2-2 cross-sections and described in his expert reports existed at the EBIA prior to Hurricane Katrina or contributed to the North and South Breaches.

88.    Whether the "backfilled excavation" at the "waterside toe" of the levee modeled in Dr. Robert Bea's South Breach Case 1-1 and Case 1-2 cross-sections and described in his expert reports was performed by WGI, existed at the EBIA prior to Hurricane Katrina, or contributed to the North and South Breaches.

89.    Whether the utility or "pipeline abandonment excavation" trench modeled in Dr. Robert Bea's South Breach Case 2 cross-sections and described in

1099992v1

his expert reports was performed by WGI, existed at the EBIA prior to Hurricane Katrina, or contributed to the North and South Breaches.

90.     The scope of and impetus for the Corps' 2002 geotechnical analyses of the stability of the levee and floodwall relative to the proposed expansion of the borrow pit and relative to the proposed excavations under Surekote Road (at McDonough Marine).

91.     Whether WGI and the USACE chose the location of the borrow pit at McDonough Marine "due to the predominantly cohesive-clayey soils in this area," as alleged by Dr. Robert Bea in his expert reports.

92.     Whether the walls of the borrow pit at McDonough Marine were "line[d] with low hydraulic conductivity cohesive soils-clays" because of "concerns for seepage under the floodwall," as alleged by Dr. Robert Bea in his expert reports.

93.     Whether the permeability/hydraulic conductivity values from the cross-sections described in Dr. Bea's expert reports are consistent with the permeability/hydraulic conductivity values that were used in Dr. Bea's SEEP/W seepage analyses.

94.     Whether the excavation locations, depths, and other features from the cross-sections described in Dr. Robert Bea's expert reports are consistent with the excavation locations, depths, and other features from the cross-sections that were used in Dr. Bea's SEEP/W seepage analyses and/or his SLOPE/W stability analyses.

95.     The time the North Breach initiated and the period of time it took for the breach to fully form.

96.     The time the South Breach initiated and the period of time it took for the breach to fully form.

97.     Whether the Lane's Creep Ratio is a means of checking if hydrostatic uplift is getting in the danger zone on the protected side of the levee.

98.     Whether waters from the North Breach contributed to the flooding of the property located at 4016 Hamlet Drive, and if so, to what extent.

99.     Whether waters from the South Breach contributed to the flooding of the property located at 4016 Hamlet Drive, and if so, to what extent.

100.     Whether waters from other sources contributed to the flooding of the property located at 4016 Hamlet Drive, and if so, to what extent.

101.     Whether waters from the North Breach contributed to the flooding of the property located at 1020-22 Charbonnet St., and if so, to what extent.

102.     Whether waters from the South Breach contributed to the flooding of the property located at 1020-22 Charbonnet St., and if so, to what extent.

103.     Whether waters from other sources contributed to the flooding of the property located at 1020-22 Charbonnet St., and if so, to what extent.

104.     Whether waters from the North Breach contributed to the flooding of the property located at 1205 Perrin Drive, and if so, to what extent.

105.     Whether waters from the South Breach contributed to the flooding of the property located at 1205 Perrin Drive, and if so, to what extent.

106.     Whether waters from other sources contributed to the flooding of the property located at 1205 Perrin Drive, and if so, to what extent.

107.     Whether waters from the North Breach contributed to the flooding of the property located at 4924 St. Claude Avenue, and if so, to what extent.

108.     Whether waters from the South Breach contributed to the flooding of the property located at 4924 St. Claude Avenue, and if so, to what extent.

109.     Whether waters from other sources contributed to the flooding of the property located at 4924 St. Claude Avenue, and if so, to what extent.

110.     Whether waters from the North Breach contributed to the flooding of the property located at 1910 Charbonnet Drive, and if so, to what extent.

111.     Whether waters from the South Breach contributed to the flooding of the property located at 1910 Charbonnet Drive, and if so, to what extent.

112.     Whether waters from other sources contributed to the flooding of the property located at 1910 Charbonnet Drive, and if so, to what extent.

113.     Whether and to what extent Jeannine and Kenneth Armstrong's post-Katrina normal household expenses exceeded their pre-Katrina

normal household expenses.

114.    Whether and to what extent Fred Holmes' post-Katrina normal household expenses exceeded his pre-Katrina normal household expenses.

115.    Whether and to what extent Ethel Mae Coats' post-Katrina normal household expenses exceeded her pre-Katrina normal household expenses.

116.    Whether and to what extent Alvin Livers' post-Katrina normal household expenses exceeded his pre-Katrina normal household expenses.

117.    Whether and to what extent Clifford Washington's post-Katrina normal household expenses exceeded his pre-Katrina normal household expenses.

118.    The respective pre-Katrina value of the Armstrong, Holmes, and Livers' residences.

119.    The respective post-Katrina values of the Armstrong, Holmes, and Livers' residences.

120.    Whether Plaintiffs' damage was caused by floods or floodwaters.

121.    Whether Plaintiffs' damage was caused by wind.

122.    Whether Plaintiffs' damage was caused by rain.

123.    The quantum of Plaintiffs' damage, if any, proximately caused by actionable conduct of an employee of the United States.

124.    Whether, and if so, in what amounts, Plaintiffs received payments from the Federal Emergency Management Agency, the Louisiana Recovery Authority's Road Home Program, and their respective insurers related to Hurricane Katrina, including payments for damages to the subject properties caused by wind and rain.

125.    Whether, and if so, to what extent, movable property located at 4016 Hamlet Pl. belonged to Kenneth Armstrong, Jr., who had reached the age of majority prior to August 29, 2005, and is not a party to this litigation.

126.    Whether, and if so, to what extent, movable property located at 1020 Charbonnet St. belonged to Nathan Morgan, who is not a party to this litigation.

127.    The status, if any, of Jimmie Coats Sr.'s succession and succession proceeding to probate a document that Plaintiffs purport to be his last will and testament.

128.    Whether WGI was acting on behalf of the USACE in its performance under Task Order 26.

## 9.  CONTESTED ISSUES OF LAW

1.    Whether the Defendant, United States of America, breached a delictual duty owed to Plaintiffs and whether the breach of that duty caused Plaintiffs' damages entitling them to compensation;

2.    Whether the Defendant, Washington Group, Inc., breached a delictual duty owed to Plaintiffs and whether the breach of that duty caused Plaintiffs' damages entitling them to compensation;

3.    Whether Plaintiffs are a third party beneficiary of the contract between United States of America and Washington Group, Inc., and if so, whether Washington Group, Inc. breached that contract and whether that breach caused Plaintiffs' damages entitling them to be compensated.

4.    Whether the United States Army Corps of Engineers ("the Corps") approved reasonably precise work plans or specifications for WGI's work at the EBIA (proffer pursuant to Court's Order dated August 29, 2011 (Rec. Doc. 20402)).

5.    Whether WGI's work conformed to these specifications (proffer pursuant to Court's Order dated August 29, 2011 (Rec. Doc. 20402)).

6.    Whether WGI had actual knowledge, not otherwise known to the Corps, that the Corps-approved plans would endanger the levees and floodwalls (proffer pursuant to Court's Order dated August 29, 2011 (Rec. Doc. 20402)).

7.    Whether WGI owed a duty to the Plaintiffs.

8.    Whether any duty owed by WGI to Plaintiffs encompassed the risk of Plaintiffs' alleged injuries, and if so whether WGI breached such duty.

10.   Whether the supervision and approval of the Corps of all aspects of the work performed by WGI in the EBIA relieves WGI of legal liability of Plaintiffs' alleged injuries (regardless of whether the government contractor defense is

55

applicable).

11.    Whether WGI's alleged actions or inactions were the causes-in-fact or legal causes of Plaintiffs' alleged damages.

12.    Whether the action or inaction of any other parties or non-parties were causes-in-fact or legal causes of Plaintiffs' alleged damages, and if so, how fault should be apportioned between and amongst any such parties or non-parties.

13.    Whether, and to what extent, WGI is entitled to reduction of liability for any damage caused to Plaintiffs' residences by the hydrological effects of MRGO floodwaters, breaches of the MRGO levees, or causes other than flooding (e.g., wind, rain, etc.)

14.    Whether WGI should be held to the standard of care of a contractor performing demolition, removal, excavation, and environmental remediation work on a federal civil works project.

15.    Whether WGI satisfied the standard of care of a contractor performing demolition, removal, excavation, and environmental remediation work on a federal civil works project.

16.    Whether WGI had any statutory or contractual duty to comply with the Kansas City District Guidelines.

17.    Whether Plaintiffs' claims against WGI are precluded by La. R.S. 9:2771.

18.    Whether, and to what extent, Plaintiffs' claims for damages to contents should be reduced by depreciation.

19.    Whether Mr. Washington can recover for inconvenience when his claims arise exclusively from damage to a house that was not his residence at the time of Katrina.

20.    Whether the claims of Mr. and Mrs. Armstrong, Mr. Holmes, and Mr. Livers for damage to immovable property are limited to diminution in value of property from their respective pre-Katrina value because they did not, in fact, repair or renovate their residences.

21.    Whether the Plaintiffs can recover for damage to movable property belonging to persons who are not parties to this litigation.

1099992v1

22.     Whether the surviving children of Jimmie Lee Coats, Sr. are proper parties to this litigation.

23.     Whether the Plaintiffs' claims for additional living expenses are limited to proven expenses actually incurred by the Plaintiffs, in excess of their normal pre- Katrina expenses.

24.     Whether Plaintiffs' claims for additional living expenses are limited to the date on which they established permanent residences.

25.     Whether Plaintiffs are entitled to attorneys' fees and costs as to their claims against WGI.

26.     Whether the Court has jurisdiction over the subject matter of this action as it pertains to Defendant United States

27.     Whether the United States owed a duty of care to the Plaintiffs in the circumstances here presented.

28.     Whether the United States exercised the degree of care ordinarily expected of a reasonably prudent person under similar circumstances.

29.     Whether the damages alleged were proximately caused by any negligent or wrongful act or omission of any employee of the United States while acting within the scope of office or employment.

30.     Whether Louisiana law permits Plaintiffs to recover damages for inconvenience under the facts alleged.

31.     Whether Plaintiffs recovery for damages against the United States, if any, is limited to the amount claimed for property damage on their administrative claims.

32.     Whether, to the extent Plaintiffs are entitled to recover damages, the United States is entitled to a credit or set-off for any past or future benefits paid to or on behalf of or received by the Plaintiffs, to the extent allowed under federal and state common and statutory law.

33.     Whether and to what extent the damages alleged were caused by an Act of God or *force majeure*.

## 10.   LIST AND DESCRIPTION OF EXHIBITS INTENDED TO BE INTRODUCED

### a.  *Plaintiffs' List of Exhibits:*

The parties continue working together in good faith to create a Joint Exhibit List. Because of the current size and scope of the parties' exhibit lists, the parties continue to carefully and methodically review, edit and comment on the various versions that are continuously being exchanged.  The Joint Exhibit List will be created and provided by Monday, August 6, 2012, at 5 o'clock p.m., to assist the Court in referring to a particular document that appears on both the plaintiffs' and defendants' exhibit list, and that one or both parties may refer to or seek to admit.

### b.  *Defendants' List of Exhibits:*

The parties continue working together in good faith to create a Joint Exhibit List. Because of the current size and scope of the parties' exhibit lists, the parties continue to carefully and methodically review, edit and comment on the various versions that are continuously being exchanged.  The Joint Exhibit List will be created and provided by Monday, August 6, 2012, at 5 o'clock p.m., to assist the Court in referring to a particular document that appears on both the plaintiffs' and defendants' exhibit list, and that one or both parties may refer to or seek to admit.

## 11. DEPOSITION TESTIMONY TO BE OFFERED AT TRIAL

### a.  *Plaintiffs' list of deposition testimony:*

The parties continue working together in good faith to create their version of a witness call list via deposition at trial, being ever mindful of the time constraints currently contemplated by the Court. Because of the current size and scope of the list, the parties continue to carefully and methodically review, edit and comment on the various versions that are continuously being exchanged.

1099992v1

1.      U.S.A., Corps of Engineers - 30(b)(6) - Lee Guillory;

2.      U.S.A., Corps of Engineers - 30(b)(6) - John Greishaber;

3.      Washington Group International - 30(b)(6) - Steven Roe;

4.      Washington Group International - 30(b)(6) - Anne Veigel;

5.      Washington Group International - 30(b)(6) - Phillip Staggs;

6.      Lake Borne Basin Levee District - 30(b)(6) Deposition Upon Written Questions;

7.      New Orleans Sewerage & Water Board (S&WB) - 30(b)(6) - Jack Heurkamp;

8.      St. Bernard Parish Department of Public Works - 30(b)(6) - Hillary J. Nunez, Jr. and Louis D. Pomes;

9.      Dennis O'Conner (WGI);

10.    George Bacuta (USACE);

11.    William Villavaso (Deceased) (S&WB);

12.    Arlene Smith (USACE);

13.    James Montegut (USACE);

14.    Richard Varuso (USACE);

15.    Richard Pinner (USACE);

16.    Walter Baumy (USACE);

17.    Alvin Clouatre (USACE);

18.    John Saia (USACE);

19.    Ethel Coats (Deceased).

**b.  *Defendants' list of deposition testimony:***

Defendants intend to offer into evidence at trial deposition testimony from the individuals

59

identified below, unless plaintiffs call them to testify live.   The parties are working together to create designations and counter-designations for the witnesses whose deposition testimony will be offered at trial and, once the designations and counter-designations are complete, will add them to the parties' exhibit lists.

1.      Walter Baumy (USACE);

2.      George Bacuta (former USACE);

3.      Diego Cobos-Roa;

4.      Alvin Clouatre (USACE);

5.      Gerald Dicharry (former USACE);

6.      John Grieshaber (USACE 30(b)(6));

7.      Lee Guillory (USACE (30(b)(6));

8.      James Montegut (USACE);

9.      Dennis O'Conner (WGI);

10.     Richard B. Pinner (USACE);

11.     F. Arlene Smith (USACE);

12.     Richard Varuso (USACE);

13.     Anne Veigel (WGI) (30(b)(6));

14.     William Villavasso (Sewerage & Water Board);

15.     Ethel Coats (Deceased);

16.     Nathan Morgan (Succession of Ethel Coats' claims);

17.     Stephen Roe (WGI) (30(b)(6)).

**12.     LIST OF CHARTS, GRAPHS, MODEL, SCHEMATIC DIAGRAMS, ETC.**

The parties continue working together in good faith to create their version of a demonstrative exhibit list based upon the witness call list, being ever mindful of the time constraints currently contemplated by the Court.   Because of the current size and scope of the list, the parties continue to carefully and methodically review, edit and comment on the various versions that are continuously being exchanged.

Additionally, the parties have agreed to exchange demonstrative aids utilized for the direct examination of a prospective witness 48 hours before the day the demonstrative aids are to be used.

Plaintiffs have suggested that the parties exchange demonstrative aids to be utilized for the cross-examination of a prospective witness 48 hours before the day the demonstrative aids are to be used.   Defendants have declined to enter into such an agreement.

**13.     PARTIES LIST OF WITNESSES**

   ***a.   Plaintiffs' List of Witnesses:***

   *Fact Witnesses That Plaintiffs Expect To Call At Trial:*

   1.     <u>Kenneth Armstrong</u>- Plaintiff from Chalmette, LA.   Mr. Armstrong will discuss about his circumstances leading up to, during, and after hurricane Katrina, and the resultant damages suffered.

   2.     <u>Jeannine Armstrong</u>- Plaintiff from Chalmette, LA.   Ms. Armstrong will discuss about his circumstances leading up to, during, and after hurricane Katrina, and the resultant damages suffered.

   3.     <u>Fred Holmes</u>- Plaintiff from Arabi, LA. Mr. Holmes will discuss about his circumstances leading up to, during, and after hurricane Katrina, and the resultant damages suffered.

1099992v1

4.  <u>The Succession of Ethel Coats, by Lentoi Franklin Alexis</u>- Plaintiff from Arabi, LA.  The succession representative will discuss Ms. Coats's circumstances leading up to, during, and after hurricane Katrina, and the resultant damages suffered.

5.  <u>Alvin Livers </u>- Plaintiff from New Orleans, LA. Mr. Livers will discuss about his circumstances leading up to, during, and after hurricane Katrina, and the resultant damages suffered.

6.  <u>Clifford Washington </u>-  Plaintiff from New Orleans, LA. Mr. Washington will discuss about his circumstances leading up to, during, and after hurricane Katrina, and the resultant damages suffered.

7.  <u>Daniel A. Rees </u>- the Road Home Program.  Mr. Rees will explain the Road Home process, Plaintiffs' involvement in the program, and the characterization of the funds received by the Plaintiffs.

8.  <u>Melvin McElwee</u> - Mr. McElwee will provide testimony regarding soil conditions within the IHNC region, and the response of the buried swamp/marsh layer within that region when it is penetrated.

9.  <u>Gerald Colletti</u> (U.S.A. Corps of Engineers) - Mr. Colletti will provide testimony regarding the Corps's standards relative to earthwork and excavations within a prescribed area relative to flood protection structures, as well as the requirements for the proper evaluation of excavation fieldwork.

10.  <u>Richard B. Pinner</u> (U.S.A. Corps of Engineers) - Mr. Pinner will provide testimony regarding the Corps's standards relative to earthwork and excavations within a prescribed area relative to flood protection structures, as well as the requirements for the proper evaluation of excavation fieldwork.

11.  <u>Stevan Spencer</u> (Orleans Levee District) - Mr. Spencer will provide testimony regarding the OLD's obligations to maintain and operate the flood control structures in Orleans Parish, and the monitoring and permitting of construction within a designation distance from the flood control structures.

12.  <u>Michael O' Dowd</u> (U.S.A. Corps of Engineers) - Mr. O'Dowd was the IHNC lockmaster at the time of hurricane Katrina and will provide testimony regarding his observations and experience during the storm.

*Expert Witnesses That Plaintiffs Expect To Call At Trial:*

62

1099992v1

13.    <u>John Crawford</u> - Mr. Crawford will provide expert testimony regarding Plaintiffs' damages from an engineering perspective.

14.    <u>Scott Taylor</u> - Mr. Taylor will provide expert testimony regarding Plaintiffs' damages by itemizing the losses suffered by Plaintiffs.

15.    <u>Chad Morris</u>- Mr. Morris will provide expert testimony evaluating spatial characteristics of the EBIA and surrounding region, spatial characteristics of the earth work performed by the defendants at the EBIA, and spatial characteristics of the locations of the Plaintiffs' residences.

16.    <u>Professor Johannes Vrijling</u> - Professor Vrijling will provide expert testimony evaluating hydrological parameters of hurricane Katrina, as well as the source and level of water at each Plaintiff's property.

17.    <u>Dr. David Rogers</u>- Dr. Rogers will provide expert testimony evaluating site characterization of the EBIA, engineering properties of the soils found in the EBIA, and the standard of care for performing earthwork at the EBIA.

18.    <u>Dr. Robert G. Bea</u> - Dr. Bea will provide expert testimony evaluating causes of failure of the levee/ flood wall at the EBIA, the conduct of the defendants associated with the levee/ flood wall failures, and the standard of care for performing earthwork at the EBIA.

*Fact Witnesses That Plaintiffs May Call At Trial:*

19.    <u>Richard Varuso</u> (U.S.A. Corps of Engineers) - Mr. Varuso will provide testimony regarding the geotechnical issues of flood protection structures.

20.    <u>Lee A. Guillory</u> (U.S.A. Corps of Engineers) - Mr. Guillory will provide testimony regarding work performed at the EBIA subject of the present litigation.

21.    <u>James Montegut</u> (U.S.A. Corps of Engineers) - Mr. Montegut will provide testimony regarding work performed at the EBIA subject of the present litigation.(Corps).

22.    <u>Robert Turner</u> (Lake Borgne Basin Levee District) - Mr. Turner will provide testimony regarding the Lake Borgne Basin Levee District's response to hurricane Katrina and the observations, records and experiences of it employees.

23.    <u>Walter Baumy</u> (U.S.A. Corps of Engineers) - Mr. Baumy will provide testimony regarding work performed at the EBIA subject of the present litigation.

24.      <u>James Blazek </u>(Materials Management Group) - Mr. Blazek will provide testimony regarding work performed at the EBIA subject of the present litigation.

25.      <u>Alvin Clouatre</u> (U.S.A. Corps of Engineers) - Mr. Clouatre will provide testimony regarding work performed at the EBIA subject of the present litigation.

26.      <u>John Saia</u> (U.S.A. Corps of Engineers) - Mr. Saia will provide testimony regarding the Corps's programming of the work performed at the EBIA.

27.      <u>John Greishaber</u> (U.S.A. Corps of Engineers) Mr. Greishaber will provide testimony regarding work performed at the EBIA subject of the present litigation.

### b.  *Defendants's List of Witnesses:*

*Fact Witnesses That Defendants Expect to Call at Trial:*

1.      <u>Gerald Colletti</u> - The USACE's role in reviewing requests by contractors to conduct field work in the vicinity of a hurricane protection structure in New Orleans.

2.      <u>Scott Davis</u>:   the "Road Home" program and money provided by HUD to the Plaintiffs due to Hurricane Katrina through the "Road Home" Program.

3.      <u>Lee A. Guillory, P.E. (USACE)</u>: The Inner Harbor Navigation Canal Lock Replacement Project and WGI's work for the U.S. Army Corps of Engineers in the East Bank Industrial Area of New Orleans between 1999 and May 2005, pursuant to Task Order 26.

4.      <u>Stephen King (Orleans Levee District)</u>: The operation, maintenance and surveying of the IHNC and 40 Arpent levees and floodwalls pre-Katrina.

5.      <u>Mark Misczak</u>:   benefits provided by FEMA to the Plaintiffs due to Hurricane Katrina and will discuss FEMA's individual assistance program.

6.      <u>Stephen C. Roe (WGI)</u>:   The TERC and the negotiation of Task Order 26.

7.      <u>Phillip L. Staggs (WGI)</u>: WGI's work for the U.S. Army Corps of Engineers in the East Bank Industrial Area of New Orleans between July 2000 and April 2005, pursuant to Task Order 26.

*Expert Witnesses That Defendants Expect to Call at Trial:*

1099992v1

1.      <u>Thomas Brandon, P.E.</u>: Geotechnical.

2.      <u>Robert A. Dalrymple, Ph.D., P.E.</u>: Civil and coastal engineering (including storm surge, waves, water flow, overtopping and tides) in connection with the breaches along the eastside of the IHNC and subsequent flooding.

3.      <u>James R. Danner, Jr., P.E.</u>: Civil engineering relating to plaintiffs' damage claims.

4.      <u>Jean-Prieur Du Plessis</u>: Plaintiffs' claims for real property damage.

5.      <u>Joseph Dunbar</u>: Geologic history of the New Orleans area and its influence on the engineering properties of the foundation soils beneath the levees.

6.      <u>Patrick Lucia, Ph.D.</u>: Standard of care.

7.      <u>Allen Marr, Ph.D.</u>: Geotechnical.

8.      <u>Thomas Naymik, Ph.D.</u>: Hydraulic conductivity of subsurface deposits near the IHNC.

9.      <u>Richard B. Pinner (USACE)</u>: Geotechnical engineering analyses relevant to the Lock Replacement Project and standard geotechnical engineering analyses in the New Orleans District.

10.     <u>Karl Schneider</u>: Plaintiffs' claims for movable property damage and additional living expenses.

11.     <u>Francisco Silva-Tulla, Sc.D.</u>: Civil and geotechnical engineering relating to the cause of failure of the levee/floodwalls along the east side of the IHNC.

12.     <u>Timothy Stark, Ph.D.</u>: Geotechnical analysis of floodwall failure.

13.     <u>David Sykora, Ph.D.</u>: The standard of care governing WGI's work performed pursuant to Task Order 26, and the applicability of the government contractor defense.

14.     <u>Michael Truax</u>: Real estate appraisal.

*Witnesses That Defendants May Call at Trial if the Need Arises:*

1.      <u>R. Miles Brodsky</u>:   Mr. Brodsky co-authored the RESIN Sherman Island Pilot Project entitled "A Method to Determine Probability of Failure Caused by Seepage Under Levees" that Dr. Bea claims to have used to validate his analyses in this case.   Mr.

Brodsky may be called to testify about the details of the RESIN Sherman Island Pilot Project and the input and output files that were used to perform the analyses for the project.

2. <u>T. William Lambe, P.E., Sc.D.</u>: Dr. Lambe co-authored the textbook, Soil Mechanics (published in 1969) with the late Robert V. Whitman. Dr. Bea referred to Soil Mechanics in his rebuttal deposition of April 16, 2012. Dr. Lambe may be called to testify in response to Dr. Bea's trial testimony relating to this textbook.

3. <u>Michael O'Dowd (USACE)</u>: Personal experience and observations from the IHNC lock during Hurricane Katrina.

4. <u>Stevan G. Spencer (Orleans Levee District)</u>: The operation and maintenance of the IHNC levees and floodwalls pre-Katrina, and permits from the Orleans Levee District.

5. <u>Dennis Trocchiano (Orleans Levee District)</u>: The operation and maintenance of the IHNC levees and floodwalls pre-Katrina.

***The parties' witness lists have been filed in accordance with prior court orders.***

14. This is a **NON-JURY** trial.

15. The issue of liability will ***NOT*** be tried separately from that of quantum.

16. **OTHER MATTERS** that might expedite disposition:

a. Plaintiffs

1. On February 11, 2011, the Court ruled that the United States' Motion to Dismiss based on the immunity granted under § 702c of the Flood Control Act of 1928 was denied and the Entergy Plaintiffs' Motion for Partial Summary Judgment and the Armstrong Plaintiffs' Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment were granted insofar as the United States may be found liable for damages caused by its negligence that is extrinsic to the LPV if proven at trial. (Rec. Doc. 20164).

The Court should note that Plaintiffs make no contention that there are any expert reports that suggest the LPV played any role in the Plaintiffs' claims.

2. The defendant United States of America asserts that they are entitled to a credit for Road Home funds received by Plaintiffs. This Court has previously

66

maintained that such funds should not be deducted from their losses as they are obligated to reimburse the Road Home from any insurance proceeds or other recovery they may receive.   (647 F.Supp.2d at 736)

b.   Defendants

None at this time.

17.   The trial shall commence on September 10, 2012 at 9:00 o'clock a.m.   The parties have conferred as to a realistic, good faith estimate of the number of trial days required, understanding that the Court's Scheduling Order of March 17, 2011 provides that the length of trial will be three (3) weeks.   The parties have determined the time each will need for the direct and cross examination of witnesses expected to be called for live testimony.   The results of that analysis indicate to the parties that Plaintiffs will require approximately seventy (70) hours for direct, cross and rebuttal examination and that Defendants, collectively, will require seventy (70) hours for direct and cross examination.   These estimates do not include the time required to read or view deposition testimony that will be submitted to the Court through deposition designations.

18.   This pre-trial order has been formulated after conference at which counsel for the respective parties have appeared in person.   Reasonable opportunity has been afforded to all counsel for corrections, or additions, prior to signing.   Hereafter this order will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice.

19.   Possibility of settlement of this case was considered.

1099992v1

By Plaintiffs

/s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
   *Plaintiffs Liaison Counsel*
Bruno & Bruno, L.L.P.
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

/s/ William D. Treeby
William D. Treeby, Bar No. 12901
James C. Gulotta, Jr., Bar No. 6590
Heather S. Lonian, Bar No. 29956
STONE PIGMAN WALTHER
WITTMANN LLC
546 Carondelet Street
New Orleans, LA 70130
Phone:   504-581-3200
Fax:   504-581-3361

Adrian Wager-Zito
Debra S. Clayman
Christopher N. Thatch
Christopher R. Farrell
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Phone:   1-202-879-3939
Attorneys for Defendant
Washington Group International, Inc.

By Defendants

/s/ Robin D. Smith
STUART F. DELERY
Assistant Attorney General
PHYLLIS J. PYLES
Director, Torts Branch, Civil Division
JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch, Civil
Division
ROBIN SMITH
Senior Trial Counsel, Torts Branch, Civil
Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C. 20044
(202) 616-4289/(202) 616-5200 (Fax)

Attorneys for the United States

New Orleans, Louisiana, this _____ day of July, 2012.

_____
JUDGE STANWOOD R. DUVAL
Eastern District of Louisiana

1099992v1