UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE Duval MAG. Wilkinson |
| PERTAINS TO:   MRGO *Armstrong*, No. 10-866 | |

**ARMSTRONG PLAINTIFFS' TRIAL BRIEF**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................... 1

II.    STATEMENT OF FACTS ..................................................................................... 2

    North Breach ............................................................................................................ 8

    South Breach ............................................................................................................ 9

    Near Breach Adjacent To McDonough Marine ...................................................... 10

III.   ARGUMENT ......................................................................................................... 11

  A.  Defendants' Conduct At The EBIA Was Negligent ........................................... 11

     i.  Defendants Were Required to Act Reasonably and Avoid Harm to the IHNC Floodwall .............................................................................. 12

     ii.  Defendants Breached Their Duty Owed To Plaintiffs ................................. 14

     iii.  Defendants' Failures Were A Substantial Factor In Causing Plaintiffs' Damages ....... 14

     iv.  The Risk Of Harm Was Within The Scope Of Protection Afforded By The Duty Breached .................................................................................. 18

     v.  Plaintiffs Suffered Damages As A Result of Defendants' Negligence ........... 19

  B.  Flood Control Immunity Is Not Available To Defendant United States. ......................... 20

  C.  The Discretionary Function Exception Is Not Available To Defendant United States. .... 20

     i.  The Army Corps Ignored Its Policy Of Performing Engineering Analyses On Excavation Projects That Could Impact Adjacent Flood Control Structures ............... 22

     ii.  Army Corps Regulations, Guidelines, and Engineering Standards Qualify as Specific Legal Mandates Under Prong One ............................................................. 23

     iii.  The Corps Violated Several of its Own Mandatory Engineering Requirements in the Planning and Execution of the EBIA Excavation and Backfilling Work at the Breach Sites ................................................................................................ 24

       1.  ER 1110-2-1150; Engineering and Design-Engineering and Design for Civil Works Projects (Aug. 1999) ........................................................................ 24

       2.  EM 1110-2-1913; Engineering and Design - Design and Construction of Levees (April 2000) ...................................................................................... 29

3.    EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989) ............................................................................................................ 30

4.    EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994) ............................................................................................................ 30

5.    EM 1110-2-5027; Engineering and Design - Confined Disposal of Dredged Material (Sept. 1987) ...................................................................................... 31

6.    EM 1110-2-1901; Seepage Analysis and Control for Dams (Sept. 1986)............... 31

iv.  33 C.F.R. § 208.10 Mandates a Geotechnical Analysis.................................................. 31

v.   Standard Engineering Practices Mandated a Geotechnical Analysis And a Proper Method of Compacting Backfilled Excavations ............................................ 32

D.   The Corps' Failure To Perform The Required Engineering Analyses Is Not The Type Of Decision The DFE Protects.................................................................. 35

E.   Because WGI Breached Task Order 26 And The TERC, Plaintiffs, As Third Party Beneficiaries, Have Standing To Sue For Damages ........................................ 36

i.   The Stipulation to Benefit Plaintiffs Is Manifestly Clear ............................................. 37

ii.  Task Order 26 And The TERC Provided Certainty As To The Benefit Provided To Plaintiffs.................................................................................................... 39

iii. The Benefit To Plaintiffs Is Not A "Mere Incident" Of Task Order 26 And The TERC ...................................................................................................... 40

F.   Plaintiffs' Claims Against WGI Are Not Precluded by La. R.S. 9:2771.......................... 41

i.   WGI Made The Plans And Specifications For Their EBIA Excavations Activity........ 42

ii.  The Conditions WGI Created Were Hazardous And It Had No Justifiable Reason To Believe That Its Adherence To Its Own Plans And Specifications Would Not Create A Hazardous Condition. ............................................................................... 44

G.   WGI Is Not Absolved From Liability Because The Corps Did Not Supervise And Approve All Aspects Of WGI's Work............................................................ 46

IV.   CONCLUSION............................................................................................................. 47

## TABLE OF AUTHORITIES

### Cases

*A & M Pest Control Service, Inc. v. Fejta Const. Co., Inc.*,
   338 So.2d 946 (La. App. 1976) ................................................................................ 44

*Alabama Elec. Cooperative, Inc. v. United States*,
   769 F.2d 1523 (11th Cir. 1985) ............................................................................... 23

*Albe v. City of New Orleans*,
   ___ So. 3d ___, 2012 WL 2629229 (La. App. 4th Cir. July 5, 2012) ...................... 36

*Am. Waste & Pollution v. Madison Parish*,
   488 So.2d 940 (La. 1986) ........................................................................................ 41

*Andrepont v. Acadia Drilling Co., Inc.*,
   231 So.2d 347 (La. 1969) ........................................................................... 37, 38, 40

*Andrulonis v. United States*,
   952 F.2d 652 (2d Cir. 1991) .................................................................................... 23

*Ashford v. United States*,
   511 F.3d 501 (5th Cir. 2007) ................................................................................... 22

*Bagner v. United States*,
   428 F.Supp.2d 101 (N.D. N.Y. 2006) ..................................................................... 23

*Barabay Prop. Holding Corp. v. Boh Bros. Const. Co., L.L.C.*,
   991 So.2d 74 (La. App. 1st Cir. 2008) ............................................................... 41, 44

*Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*,
   1998 WL 113935 (E.D. La. March 10, 1998) ..................................................... 12, 23

*Berkovitz v. United States*,
   486 U.S. 531 (1988) ................................................................................................. 35

*Bernard v. State*,
   640 So.2d 694 (La. App. 3d Cir. 1994), *writ denied,* 643 So.2d. 165 (La. 1994) .................. 44

*Berry v. Berry*,
   371 So.2d 1346 (La. App. 1st Cir.), writ denied, 373 So.2d 511 (1979) ................................ 39

*Bonin v. Ferrellgas, Inc.*,
   877 So.2d 89 (La. 2004) ..................................................................................... 14, 15

*Broussard v. Northcott Exploration Co., Inc.*,
   481 So.2d 125 (La. 1986) ........................................................................................ 39

*Cope v. Scott*,
   45 F.3d 445 (D.C. Cir. 1995) ................................................................................... 35

*Dartez v. Dixon*,
   502 So.2d 1063 (La. 1987) ...................................................................................... 39

*Dugas v. Thompson*,
   71 So. 3d 1059 (La. App. 4th Cir. 2011) ................................................................. 36

*Freeman v. United States,*
 556 F.3d 326 (5th Cir. 2009) ...................................................................... 21, 22

*Griffin v. United States,*
 500 F.2d 1059 (3d Cir. 1074)............................................................................ 23

*Hargroder v. Columbia Gulf Transmission Co. ,*
 290 So.2d 874 (La. 1974) .................................................................................. 39

*Hazelwood Farm, Inc. v. Liberty Oil and Gas Corp.,*
 790 So.2d 93 (La. App. 3d Cir. 2001) ............................................................... 39

*In re Katrina Canal Breaches Litig.,*
 2008 WL 5234369 ................................................................................. 12, 24, 45

*In re Katrina Canal Breaches Litig.,*
 2009 WL 1033783 (E.D. La. 2009) .............................................................. 14, 15

*In re Katrina Canal Breaches Litig.,*
 2011 WL 1792542 (E.D. La.) ....................................................................... 16, 17

*In re Katrina Canal Breaches Litig.,*
 2011 WL 651946 (ED. La.) .................................................................... 20, 21, 23

*In re Katrina Canal Breaches Litig.,*
 471 F.Supp.2d 684 (E.D. La. 2007).................................................................. 23

*In re Katrina Canal Breaches Litig.,*
 620 F.3d 455 (5th Cir. 2010) ................................................................ 2, 3, 42, 46

*In re Katrina Canal Breaches Litig.,*
 647 F. Supp. 2d 644 (E.D. La. 2009)..................................................... 11, 22, 24, 35

*In re Katrina Canal Breaches Litig.,*
 673 F.3d 381 (5th Cir. 2012) ............................................................................ 20

*Joseph v. Hospital Serv. Dist. No. 2 of Parish of St. Mary,*
 939 So.2d 1206 (La. 2006) .................................................................. 36, 37, 39, 40

*LeBreton v. Brown,*
 277 So.2d 645 (La. 1973) .................................................................................. 43

*LeJeune v. Allstate Ins. Co.,*
 365 So.2d 471, 477 (La. 1978) .......................................................................... 15

*Liquid Drill, Inc. v. U.S. Turnkey Exploration, Inc.,*
 48 F.3d 927 (5th Cir. 1995) ......................................................................... 38, 39

*Marlys Bear Medicine v. United States,*
 241 F.3d 1208 (9th Cir. 2001) .......................................................................... 35

*Merchants Nat. Bank & Trust Co. of Indianapolis v. Smith, Hinchman & Grylls Associates,*
 876 F.2d 1202 (5th Cir. 1989) .......................................................................... 12

*Morgan v. Lafourche Rec. Dist. No. 5,*
 822 So.2d 716 (La. App. 1st Cir. 2002)............................................................. 41

*Navarette v. United States*,
   500 F.3d 914 (9th Cir. 2007) ................................................................. 23

*Navarrete v. General Ins. Co. of Am.*,
   2008 WL 659477 (E.D. La.) (Engelhardt, J.) ....................................... 39

*Paul v. La. State Employees' Group Benefit Program*,
   762 So.2d 136 (La. App. 1st Cir. 2000) ............................................... 36

*Pitre v. La. Tech Univ.* ,
   673 So.2d 585 (La. 1996) ............................................................. 11, 12

*Pitre v. Opelousas Gen. Hosp.*,
   530 So. 2d 1151 (La. 1991) ................................................................. 18

*Pittman Constr. Co. v. City of New Orleans*,
   178 So.2d 312 (La. App. 4th Cir. 1965) .............................................. 12

*PPG Indus. Inc. v. Bean Dredging*,
   447 So.2d 1058 (La. 1984) .................................................................. 18

*Raburn & Assocs. v. Burgundy Oaks L.L.C.*,
   875 So.2d 119 (La. App. 2d Cir. 2004) ............................................... 12

*Rando v. Anco Insulations, Inc.*,
   16 So.3d 1065 (La. 2009) .................................................................... 18

*Roberts v. Benoit*,
   605 So. 2d 1032 (La. 1991) ................................................................. 18

*Rowan Cos., v. Greater LaFourche Port Comm'n*,
   2006 WL 2228950 (E.D. La. 2006) ................................. 42, 43, 44, 46

*Soldano v. United States*,
   453 F.2d 1140 (9th Cir. 2006) ............................................................ 23

*United States v. Gaubert*,
   499 U.S. 315 (1991) .............................................................. 21, 22, 23

*Wagoner v. Exxon Mobil Corp.*,
   813 F. Supp. 2d 771 (E.D. La. 2011) .................................................. 15

## Statutes

28 U.S.C.   § 2680(a) ................................................................................. 21

33 C.F.R. § 208.10 ............................................................................... 31, 32

La. C.C. art.1978 ......................................................................................... 36

La. Civ. Code. Art. 2762 ...................................................................... 13, 47

La. R.S. 9:2771 ..................................................................................... 41, 43

## Other Authorities

J. Denson Smith, *Third Party Beneficiaries in Louisiana: The Stipulation Pour Autrui*, 11 Tul. L.
   Rev. 18 (1936) ..................................................................................... 40

Prosser on Torts, Section 41 (4th ed. 1971)..................................................................................... 15

## I.      INTRODUCTION

When Defendants Washington Group International and the Army Corps of Engineers remediated the East Bank Industrial Area in 2000, they had a duty to not harm the floodwall protecting the residents of the Lower 9th Ward and St. Bernard Parish.  By failing to conduct a full and competent geotechnical site assessment, failing to fully evaluate the impact of their activities on the floodwall, and failing to employ prudent engineering practices, WGI and the Corps breached their duty to maintain and protect the integrity of the levee and floodwall system along the east bank of the Inner Harbor Navigation Canal.   These breaches of duty were substantial factors in causing Plaintiffs to sustain devastating and clearly foreseeable damages.

WGI's negligent work created and/or exacerbated subsurface pathways for Hurricane Katrina's surge water pressures, which were transmitted through the improperly backfilled and compacted excavations directly into the underlying swamp/marsh layer.  This pressure transfer from the flood side to the protected side of the floodwall resulted in significant uplift pressures beneath the floodwall and played a substantial role in the ultimate failures at the North and South Breaches adjacent the Lower 9th Ward.  These pressure transfers, uplift pressures, and floodwall failures could have been prevented had WGI and the Corps complied with industry custom and practice, as well as the myriad of policies and regulations mandating WGI and/or the Corps perform a geotechnical analysis on the potential impact of this excavation activity on the adjacent EBIA floodwall.  Moreover, before Defendants completed their work, they knew (or reasonably should have known) that the IHNC and the soils beneath the EBIA were hydraulically connected; thus, an increased tidal or storm event in the IHNC would result in enhanced underseepage and the transmission of hydraulic pressures laterally across the EBIA site and beneath the floodwall.

Unfortunately, despite this knowledge and in violation of their duties to exercise prudent engineering practices, Defendants failed to perform a geotechnical analysis of the subsurface deposits in the area adjacent to the floodwall.  Instead of backfilling and properly compacting every excavation, WGI did not backfill certain excavations at all and backfilled others with permeable sands.  WGI's business records show it that often failed to follow sound engineering practices and merely tamped down the soil with the bucket of a backhoe or did not compact it at all.  Instead of putting a clay wedge at excavations that were adjacent to significant deposits of shell fill, WGI again did nothing.

These negligent acts and omissions were a legal cause of the North and South Breaches, and thus were a legal cause of the Plaintiffs' damages.

## II.      STATEMENT OF FACTS

In 1994, the Corps and WGI entered into an indefinite delivery/indefinite quantity contract for the remediation of hazardous, toxic, and radioactive waste sites in the southwestern United States.[1]  That "umbrella contract," known as the Total Environmental Restoration Contract ("TERC"), set forth general requirements for all of WGI's anticipated work in the region, with the understanding that the Corps would approve a specific Statement of Work ("SOW") for each Task Order issued to WGI.[2]

In 1999, the Corps began its Inner Harbor Navigation Canal Lock Replacement Project in New Orleans, which included the cleanup of the EBIA.[3]  Pursuant to the TERC, WGI was obligated to (1) demolish existing structures in that area by removing surface and subsurface obstructions, (2) characterize contaminants on the site, and (3) remediate the site in accordance

---

[1] *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 457-58 (5th Cir. 2010).
[2] *Id.* at 458.
[3] *Id.*

with applicable environmental standards.[4]   These specific tasks were contracted for and identified as Task Order 26 of the TERC.[5]

WGI was required to write a Project Work Plan detailing its planned performance of Task Order.[6]  The Project Work Plan was based on the Corps' Statement of Work.  In developing the plans and specifications for this project, WGI was obligated to evaluate its excavation and backfill procedures to determine their impact on the stability of the flood protection structures.[7]  Such considerations of the adjacent structures would include the necessary subsurface investigations to obtain geotechnical properties necessary for underseepage analysis, including seepage forces, hydraulic gradients, and uplift pressure.[8]  Lee Guillory, the Project Delivery Team manager and Corps 30(b)(6) witness, explained that the Corps expected geotechnical support from WGI because staff at WGI's Denver home office could be called upon for needed geotechnical support.[9]  The Corps also expected WGI to report on the particularities and nuances of the site, including any geotechnical issues encountered.[10]  The Corps expected WGI to advise about the potential effect or damage that its subterranean excavations could have on the floodwall, and to have its licensed engineers address those issues.[11]  This service was particularly important to Mr. Guillory because he was not an expert on seepage issues,[12] and because "flood protection is extremely important" to the Corps as it must ensure that its projects "do not jeopardize the flood protection."[13]

---

[4] *In re Katrina Canal Breaches Litig.*, 620 F.3d at 458.
[5] *Id.*
[6] PX 3836, Corps Statement of Work, (June 1, 1999).
[7] JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40.
[8] *Id.*
[9] JX 1710 (Guillory 30(b)(6) Depo. Vol. I) at 150:21-151:17.
[10] *Id.*
[11] *Id.* at 164:19-167:6.
[12] *Id.* at 219:22-221:13.
[13] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 72:3-73:11.

In June 1999, the Corps issued a Statement of Work for Demolition and Site Preparation that stated WGI "**shall furnish all engineering services**, materials, supplies, labor, as required, in connection with the technical review of site documents...associated with the demolition and remediation" of the EBIA.[14]   WGI also was obligated to "prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to be filled by sampling or other investigations."[15] Among the documents provided to WGI for review was the Assessment of Potential Hazardous, Toxic and Radiological Waste, Volume 5 of 9, Appendix C, which discussed sampling and analysis of groundwater and, most importantly, identified the sheet pile curtain tip depth as -8 feet.[16]

WGI tasked Dennis O'Conner with this review responsibility.[17]   Notably, Mr. O'Conner is not an engineer.[18]   Mr. O'Conner, along with Jim Blazek of Materials Management Group (WGI's remediation sub-contractor), reviewed the materials and developed the Recommendation Report dated December 2, 1999.[19]   WGI defined the purpose of the report as "present[ing] recommendations regarding scope and duration of remediation/demolition activities" at the EBIA.[20]   WGI noted a number of "data gaps" that would affect the schedule, cost, and scope of work,[21] and committed to fill these data gaps by "sampling or other investigations."[22]

---

[14] PX 3836, Corps Statement of Work, (June 1, 1999) (emphasis added); *see also* USA Summary Judgment Memorandum at p. 40, (Aug. 8, 2010) (Doc. No. 19988-4) ("To be sure, the Corps brought its own engineering expertise to bear in reviewing and approving WGI's work plans. But reliance on *WGI's engineering expertise and its subcontractors' expertise cannot be discounted*. The EBIA remediation and demolition was premised on the requirement that WGI would "furnish all services, materials, supplies, labor, and travel, as required," including specifically "*all engineering services*.") (emphasis added).
[15] PX 3836, Corps Statement of Work, (June 1, 1999).
[16] JX 0032, 1997 New Lock and Connecting Channels report, Volume 5 of 9, Appendix C.
[17] JX 1711 (Stephen Roe Depo.) at 41:19-42:11.
[18] JX 1648 (Dennis O'Conner Depo.) at 16:19-21.
[19] JX 1711 (Stephen Roe Depo.) at 62:23-64:2.
[20] JX 1234, Recommendation Report at § 1.0.
[21] *Id.*
[22] *Id.* at § 2.0.

WGI's review of the Assessment of Potential Hazardous, Toxic and Radiological Waste, Volume 5 of 9, Appendix C, said the EBIA's "groundwater was impacted but…the size of the contaminant plume was not determined."[23]  This failure to determine the plume size was a monstrous "data gap" because the contamination plume areas and depths were not identified.[24] WGI stated that the impact of such data gaps would need to be addressed by "associated fieldwork."[25]  And, as defense expert Dr. Lucia recognized, this determination included an understanding of the groundwater pathways and where this water was likely to go.[26]

WGI understood that there was a high water table running through the EBIA, thus recognizing a subsurface hydraulic connection between the IHNC and the adjacent EBIA.[27] WGI acknowledged "there is a high probability that groundwater will be encountered" during excavation work.[28]  Any reasonably prudent engineer would thus know that the soil layers are hydraulically charged, resulting in a greater response to pressure gradients.[29]  Indeed, WGI and the Corps had information clearly indicating the pressure at ground water level in the EBIA soils adjacent to the IHNC were essentially unchanged at the face of the floodwall.[30]  This information was an early warning signal that the EBIA excavations at the north end of the Boland Marine site had established direct hydraulic connections with the sandy shell fill under the Surekote Road overpass.[31]  Email exchanges between Corps employees George Bacuta, Richard Lesser, and Lee Guillory further detail not only their awareness of the hydraulic connection between the IHNC

---

[23] JX 1234, Recommendation Report at § 3.1.1.1.
[24] *Id.*
[25] *Id.* at § 4.0.
[26] PX 4647 (Patrick Lucia Depo.) at 131:7-132:3.
[27] JX 1234, Recommendation Report at § 4.1.
[28] *Id.* at § 5.13.
[29] JX 1414, Bea Rebuttal Report (April 2012) at pp. 45, ¶ 60.
[30] *Id.* at pp. 45-47, ¶¶ 60-61.
[31] JX 1389, Bea Report (Feb. 2012) at pp. 54-60, ¶¶ 54-60; JX 1414, Bea Rebuttal Report (April 2012) at pp. 45-47, ¶¶ 60-61.

and EBIA, but also the knowledge that WGI's significant excavation activities directly impacted this connection:

> Note that the 1997 report groundwater flow information (actually the groundwater data was collected in 1993/1992?) indicate the influence of the structures (foundation of buildings, canal drainage, etc.) present at that time on the shallow gw [ground water] flow. **After remediation, the structures are gone, the soil subsurface had been modified on account of excavation/removal/new fill, the groundwater flow information (taken by WGI in May/June 2005) points to a flow away from the Canal.**[32]

After the documentation review, WGI recommended the preparation of specific work plans to provide "guidance and requirements for technical field execution."[33]  The plans and procedures were not definable features of site work, but WGI recommended that "considerable effort should be put forth to ensure that each plan be specifically tailored to meet the needs of the demolition and site preparation efforts."[34] As part of the Project Work Plan, WGI indicated that "systematic units of work" would be "integrated into the overall project" and that "**engineering details**" of the Project Work Plan would include "**geotechnical**" and "**geology/hydrology**" engineering details.[35]

After acknowledging that demolition would be a "substantial portion of the overall project work," WGI implemented a comprehensive approach to the site demolition activities that included "inspection and evaluation of demolition and site preparation results."[36]  WGI recognized that certain permits would be necessary, and that one of the "permits required [was] expected to be" from the Orleans Levee Board.[37]  For the remediation aspect of the project, WGI acknowledged responsibility of site investigation for the "identification of the horizontal and

---

[32] JX 1645, Aug. 5, 2004 email from Bacuta to Lesser (emphasis added).
[33] JX 1234, Recommendation Report at § 5.1.2.
[34] *Id.*
[35] *Id.* at § 5.1.2.1.5 (emphasis added).
[36] *Id.* at § 5.1.2.1.8.
[37] *Id.* at § 5.1.4.

vertical extent of the impact" and "identification and characterization of migration pathways and receiving media."[38]

The Corps then presented to WGI a Second Statement of Work on May 15, 2000. Again, WGI was to "**furnish all services...as required**" to develop the work plans "in accordance with the…Recommendation Report."[39]

Before completing the Project Work Plan, WGI began development of the Recap Submittal Report - Criteria Document in June, 2000. In that report, WGI mistakenly informed the Corps' EBIA Project Delivery Team that "the floodwall to the east of the site is supported on sheet pile that reaches a depth of at least 25 feet and this would essentially interrupt the water flow in the easterly direction at lower elevations to 25 ft."[40] The EBIA Project Delivery Team had convinced themselves that there were no problems with IHNC water reaching the face of the floodwall because the floodwall sheet piling was deep enough to cut off any seepage flows. This egregious mistake—combined with the other mistakes that accumulated during the life of this project—proved disastrous for the floodwall protecting the Lower 9th Ward when Hurricane Katrina tested this system.

The final Project Work Plan, dated October, 2000, indicated that WGI was, once again, being "tasked to **furnish all services**...for the project site development and remedial action" of the EBIA.[41] As such, WGI was responsible for the implementation of the overall project, MMG was to provide environmental engineering and overall project support, while WGI subcontractors

---

[38] JX 1234, Recommendation Report at § 5.8.
[39] PX 4365, Corps Statement of Work, (May 15, 2000) (emphasis added).
[40] PX 3652, RECAP Submittal Report, (June 2001) at WGI 003567, § 4.2.
[41] JX 1252, Project Work Plan (Oct. 2000) at § 1.1 (emphasis added).

7

would complete the demolition aspects.[42]  It is clear that "all services" included geotechnical

review and analyses, as evidenced by an email from the Corps' Lee Guillory:

> It is imperative that during **WGI's QC check of the RECAP documents**, that the logistics, practicality, **geotechnical stability** and environmental requirements of **each proposed RECAP excavation be evaluated**.  This reality check will 'red flag' any questionable areas for discussion with NOD prior to the report being submitted to NOD & LDEQ.[43]

Despite Defendants' certain knowledge of a hydraulic connection between the IHNC and

the EBIA—which it exacerbated—and despite its duty to perform the required geotechnical

analyses on the potential impact of its excavation work—which it failed to do—WGI completed

its demolition, site-clearing, remediation, and excavation activities in June 2005 and demobilized

from the EBIA.

### North Breach

The North Breach developed early (4:00-5:00 am CDT) before overtopping by the IHNC

surge waters and completed development of the 180-250 foot breach by 6:00 am CDT.[44]  Dr.

Bea's hydraulic conductivity and lateral stability analyses determined that the seepage and

hydraulic uplift pressures caused by WGI's negligent excavation and backfill activities resulted

in differential movements of the concrete floodwall, which opened the vertical joints between the

floodwall panels thereby allowing the first floodwaters to enter the Lower 9th Ward.[45]  As the

sequence further developed, there was tearing and separation of the sheet piling at the north end

of the North Breach and further lateral displacement of the supporting soil levee.[46]  This

---

[42] JX 1252, Project Work Plan (Oct. 2000) at § 2.1.
[43] PX 0930, April 24, 2002 email from L. Guillory (MEB-112-00000013) (emphasis added).
[44] JX 1389, Bea Report (Feb. 2012) at p. 19, ¶ 32; p. 22, Table 1; p. 86, ¶ 95.
[45] JX 1389, Bea Report (Feb. 2012) at pp. 85-86, ¶¶ 94-95; pp. 125-131, ¶¶ 130-142; JX 1393, Bea App. D (Feb. 2012) at pp. 4-11, 21, 26-28, 35-40; JX 1414, Bea Rebuttal Report (April 2012) at pp. 16-38, pp. 107-09.
[46] *Id.*

sequence continued until there was a total loss of lateral stability and the breach fully developed.[47]

Dr. Bea's analyses of the North Breach established a definitive causal relationship between the entire community of excavations and deep shell fills at Boland Marine on the waterside of the levee and high uplift or heave gradients resulting in low uplift Factors-of-Safety.[48]  When IHNC waters made contact with the granular backfilled excavations adjacent to the top of the buried swamp/marsh deposits, a high likelihood of hydraulic failure was realized. Dr. Bea's studies concluded that the vertical hydraulic gradients exceeded 0.8, uplift Factors-of-Safety were below unity, and the lateral stability probabilities of failure exceed 50% for a canal water elevation between +8 and +10 feet.[49]

### South Breach

The South Breach developed at 7:00 am CDT after seepage and hydraulic uplift pressures destabilized the floodwall.[50]  The 800-900 foot breach completed development by 9:00 am CDT.[51]  Once the floodwall was compromised at 7:00 am, however, the flooding of Plaintiffs' property was inevitable.  Dr. Bea's hydraulic conductivity and lateral stability analyses determined that there were several interacting modes of failure for the South Breach.[52]  These modes included excessive hydraulic seepage effects on the protected side of the floodwall in

---

[47] JX 1389, Bea Report (Feb. 2012) at pp. 85-86, ¶¶ 94-95; pp. 125-131, ¶¶ 130-142; JX 1393, Bea App. D (Feb. 2012) at pp. 4-11, 21, 26-28, 35-40; JX 1414, Bea Rebuttal Report (April 2012) at pp. 16-38, pp. 107-09.
[48] *Id.*
[49] JX 1389, Bea Report (Feb. 2012) at pp. 85-86, ¶¶ 94-95; pp. 125-131, ¶¶ 130-142; JX 1393, Bea App. D (Feb. 2012) at pp. 38-40; JX 1414, Bea Rebuttal Report (April 2012) at pp. 16-38, pp. 107-09.
[50] JX 1389, Bea Report (Feb. 2012) at p. 22, Table 1.
[51] *Id.*  at p. 19, ¶ 32; p. 22, Table 1; p. 23, ¶ 34.
[52] JX 1389, Bea Report (Feb. 2012) at pp. 94-119, ¶¶ 101-124; pp. 125-131, ¶¶ 130-142; JX 1393, Bea App. D (Feb. 2012) at pp. 15-25, 31-38, 43-48; JX 1414, Bea Rebuttal Report (April 2012) at pp. 16-38, pp. 110-11.

conjunction with a tension crack forming on the water side of the floodwall between the sheetpiling and the levee.[53]

While overtopping occurred before the breach, it did not occur for long enough to cause the breach.[54]  This conclusion is supported by the undisputed fact that the floodwall adjacent to both sides of the South Breach (EL 12.6-12.7 feet) was subjected to substantially more wave and surge over topping that also started before 7:00 am, but lasted for the entire duration of the storm (14.2 feet for several hours), yet the wall did not fail at these locations.[55]  As occurred at the North Breach location, WGI's numerous excavations, many of them large, deep, and improperly backfilled—if backfilled at all—made direct contact with the buried swamp.[56]  These excavations served as a pathway for Katrina's underseepage-induced pore water pressures and hydrostatic uplift pressures to reach the floodwall.[57]  This unabated hydrological attack resulted in a lateral instability mode of failure causing this massive breach.[58]

### Near Breach Adjacent To McDonough Marine

Dr. Bea's investigation also included analyzing portions of the LPV flood protection system that did not fail during Hurricane Katrina.  Of particular importance was his analysis of the Near Breach location at McDonough Marine, located between Boland and Saucer.  This Near Breach location was subjected to the same environmental conditions as the North and South Breaches, suffered the same environmental forces resulting in a tension crack, and also suffered overtopping erosion effects for the full duration of the 14.2 foot storm surge.[59]  And while the

---

[53] JX 1389, Bea Report (Feb. 2012) at pp. 94-119, ¶¶ 101-124; pp. 125-131, ¶¶ 130-142; JX 1393, Bea App. D (Feb. 2012) at pp. 15-25, 31-38, 43-48; JX 1414, Bea Rebuttal Report (April 2012) at pp. 16-38, pp. 110-11.
[54] JX 1389, Bea Report (Feb. 2012) at pp. 104-119, ¶¶ 113-124.
[55] *Id.*
[56] *Id.*
[57] JX 1389, Bea Report (Feb. 2012) at pp. 94-119, ¶¶ 101-124; pp. 125-131, ¶¶ 130-142; JX 1393, Bea App. D (Feb. 2012) at pp. 15-25, 31-38, 43-48; JX 1414, Bea Rebuttal Report (April 2012) at pp. 16-38, pp. 110-11.
[58] *Id.*
[59] JX 1389, Bea Report (Feb. 2012) at p. 64, Fig. 39; pp. 90-94, ¶¶ 97-100; p. 119, ¶ 124.

Near Breach site section of floodwall was very near to failure, this section did not fail.[60]  Why not?

The primary difference between the floodwall's performance at the North and South Breaches versus the Near Breach site was that the North and South Breach excavations had direct hydraulic contact with the buried swamp-marsh deposits.[61]  At McDonough Marine, unlike nearly every excavation at Boland and Saucer Marine, the most significant excavation—the borrow pit—was lined with clay, which effectively sealed and insulated the swamp/marsh deposits from the hydraulic effects generated in the IHNC during Katrina.[62]

Unfortunately, neither WGI nor the Corps performed the required geotechnical analyses on the potential impact their excavation work at Boland and Saucer Marine could have on the adjacent IHNC floodwall.  This failure—coupled with their certain knowledge that IHNC and the EBIA shared a hydraulic connection—violated their duty to Plaintiffs to not harm the floodwall protecting Plaintiffs' properties.

## III.    ARGUMENT

### A.  <u>Defendants' Conduct At The EBIA Was Negligent</u>

Articles 2315 and 2316 of the Louisiana Civil Code state that every person is responsible for damages caused by his fault or negligence.  *In re Katrina Canal Breaches Litig.*, 647 F. Supp. 2d 644, 733 (E.D. La. 2009) (citing *Pitre v. La. Tech Univ.,* 673 So.2d 585, 589 (La. 1996).  In analyzing negligence, the five relevant questions are:

(1) What, if any, duties were owed by the respective parties?

(2) Whether the requisite duties were breached?

---

[60] JX 1389, Bea Report (Feb. 2012) at p. 64, Fig. 39; pp. 90-94, ¶¶ 97-100; p. 119, ¶ 124.
[61] *Id.* at p. 119, ¶ 124.
[62] *Id.* at p. 119, ¶ 124; pp. 127-128, ¶¶ 137-138.

(3) Was the conduct of which the plaintiff complains a cause-in-fact of the resulting harm?

(4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?

(5) Were actual damages sustained?

*Pitre*, 673 So.2d at 589-90 (questions in different order for ease of reference).

### i.   Defendants Were Required to Act Reasonably and Avoid Harm to the IHNC Floodwall

With respect to the first question, the Court previously declared that a "responsibility and duty" existed "to insure the integrity of the levee system [during the EBIA remediation]."  *In re Katrina Canal Breaches Litig.*, 2008 WL 5234369, *19 (E.D. La. 2008).  As parties removing hundreds of thousands of tons of soils in a restricted area nestled against a levee and floodwall, Defendants owed a common-law duty to protect that floodwall, including the execution of whatever engineering analysis or activity was necessary to honor their duty.  Defendants owed a duty to exercise the degree of professional care and skill customarily employed by others in the same general field.[63]  *See Merchants Nat. Bank & Trust Co. of Indianapolis v. Smith, Hinchman & Grylls Associates*, 876 F.2d 1202, 1205 (5th Cir. 1989) (citing *Pittman Constr. Co. v. City of New Orleans,* 178 So.2d 312, 321 (La. App. 4th Cir. 1965); *see also Raburn & Assocs. v. Burgundy Oaks L.L.C.*, 875 So.2d 119, 122 (La. App. 2d Cir. 2004).

---

[63] The scope of Defendants' duty to Plaintiffs was also defined in the myriad of policies, regulations, and manuals that governed the EBIA site clearing activities.  As discussed fully *infra*, in Section III(C) on the Discretionary Function Exception, these sources also compelled Defendants to undertake the proper engineering investigations of their substantial EBIA earthwork to make certain it did not compromise the floodwall protecting Plaintiffs' properties.  And, as this Court is aware, engineering publications can create a specific legal duty.  *See, e.g., Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*, 1998 WL 113935, *5 (E.D. La. March 10, 1998) (rejecting government's claims that engineering manuals created "no duties to the general public" as publications at issue "imposed mandatory safety responsibilities on the Corps' inspection personnel….")

12

Defendants also owed a duty to complete the project in a good, workmanlike manner, free from defects either in materials or workmanship.  La. Civ. Code. Art. 2762.  WGI disputes that it owed any duty, but seeks to introduce evidence proving that it acted responsibly by backfilling with clay and sometimes calling for engineering evaluations of thorny problems onsite.  Although akin to the old "that's not my dog" defense, this position is revealing because, although WGI fell far short of its duty, its own evidence suggests it recognized that the duty existed.

The first Fundamental Canon of the American Society of Civil Engineers' Code of Ethic's states that "Engineers shall hold paramount the safety, health, and welfare of the public and shall strive to comply with the principles of sustainable development in the performance of the professional duties."[64]  WGI and the Corps are two of the largest engineering entities in the country.  As such, they both had a duty to evaluate and monitor the potential impact their EBIA excavation and backfilling activities could have on the adjacent IHNC floodwall.[65]  This evaluation process begins at the project's inception and continues throughout project's duration.[66]  If conditions previously understood to exist change because of some project modification, some new, unforeseen discovery, or other event, (*e.g.*, different field conditions are found relative to the initial design conditions), a reasonably prudent engineer must re-evaluate his design and determine whether these changed conditions will have an impact on the surrounding environment.[67]

Once the Corps and WGI undertook their EBIA site-clearing activity pursuant to the TERC and Task Order 26, each Defendant had a duty to evaluate the potential impacts that their

---

[64] JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40.
[65] *Id.*
[66] *Id.*
[67] *Id.*

contemplated excavation activity could have on the adjacent floodwall.[68]   Similarly, as part of the substantial excavation that occurred at the EBIA, a reasonably prudent engineer would have properly backfilled and compacted all excavations to protect against and prevent underseepage and the transmission of hydraulic uplift pressures to the adjacent IHNC floodwall.[69]

### ii.   **Defendants Breached Their Duty Owed To Plaintiffs**

Under the second question, Defendants breached their duties to act as reasonably prudent engineers by failing to perform required geotechnical evaluations on their excavation activities that fell within 300 feet of the adjacent IHNC floodwall,[70] failing to properly backfill and compact those excavations, and failing to take other remedial measures on these excavations to ensure the hydrological connection between the IHNC and the floodwall was minimized.[71]

### iii.   **Defendants' Failures Were A Substantial Factor In Causing Plaintiffs' Damages**

In response to the third question, Defendants' failures detailed above constitute a substantial factor in causing the North and South Breaches.  Where there are multiple potential causes, Louisiana law applies the substantial factor test.  *See In re Katrina Canal Breaches Litig.*, 2009 WL 1033783, at **6-7 (E.D. La. 2009) (citing *Bonin v. Ferrellgas, Inc.*, 877 So.2d 89 (La. 2004)).   The *Bonin* case sets out the test for determining whether a negligent act or omission is a substantial causal factor (*i.e.*, a legal cause) even where other (concurrent) causes may exist.  The Court should ask:

---

[68] JX 1670 (Baumy 30(b)(6) Depo.) at 237:24-239:13; JX 1663 (Colletti Depo.) at 32:21-35:9; 40:17-43:9; 103:12-105:1; JX 1668 (Pinner Depo.) at 30:19-31:10; 35:2-23; 36:24-39:2; 39:14-41:13; 41:20-43:11; 47:7-48:4; 50:1-14; 62:12-63:2; 66:16-24; 67:20-69:1; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40.

[69] JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40.

[70] JX 1670 (Baumy 30(b)(6) Depo.) at 237:24-239:13; JX 1663 (Colletti Depo.) at 32:21-35:9; 40:17-43:9; 103:12-105:1; JX 1668 (Pinner Depo.) at 30:19-31:10; 35:2-23; 36:24-39:2; 39:14-41:13; 41:20-43:11; 47:7-48:4; 50:1-14; 62:12-63:2; 66:16-24; 67:20-69:1; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40.

[71] JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40.

whether each of the multiple causes played so important a role in producing the result that responsibility should be imposed upon each item of conduct, **even if it cannot be said definitively that the harm would not have occurred 'but for' each individual cause**.'   [Citation]   Also considered is "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm."   [Citation].

*Bonin*, 877 So.2d at 94 (emphasis added) (citations omitted).

In multiple-cause cases, it must be "quite clear that each cause has in fact played so important a part in producing the result that *r*esponsibility should be imposed upon it; and it is equally clear that **neither can be absolved from that responsibility upon the ground that the identical harm would have occurred without it, or there would be no liability at all**.'" *LeJeune v. Allstate Ins. Co.*, 365 So.2d 471, 477 (La. 1978) (emphasis added) (quoting Prosser on Torts, Section 41 at p. 239 (4th ed. 1971)).

Plaintiffs need not prove that either Defendant's acts or omissions were a "but for" cause of the damages so long as they satisfy the test for concurrent causation.  *In re Katrina Canal Breaches Litig.*, 2009 WL 1033783, *2 (E.D. La. 2009) (government's attempt to impose "but for" standard was not "a correct statement of the law with respect to multiple factor cases."); *see also Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 797-98 (E.D. La. 2011) (Fallon, J.) (citing cases holding "but for" causation is not the proper inquiry with concurrent cause events).

As to both of these breaches, Defendants' failure to evaluate and protect against the impact their excavation and backfill activities could have on the IHNC floodwall allowed Katrina's storm waters to transmit significant under seepage and hydraulic uplift pressures unabated across the swamp/marsh layer resulting in differential movements of the concrete floodwall and, ultimately, its collapse at Boland and Saucer Marine.[72]  Had Defendants properly evaluated the impact their excavation and backfilling actions could have on the adjacent

---

[72] JX 1389, Bea Report (Feb. 2012) at pp. 85-86, ¶¶ 94-95; pp. 125-131, ¶¶ 130-142; JX 1393, Bea App. D (Feb. 2012) at pp. 4-11, 15-20, 21, 26-28, 31-40, 43-48; JX 1414, Bea Rebuttal Report (April 2012) at pp. 16-38.

floodwall, they would have verified the hydraulic connection between the IHNC and the subsurface deposits supporting the adjacent floodwall protecting Plaintiffs. With this appreciation and understanding, Defendants should have taken appropriate measures to protect against the possibility of an increased surge in the IHNC transmitting seepage and uplift pressures through the swamp marsh layers and ultimately destabilizing the adjacent floodwall. A prudent engineer would have taken precautions not to excavate in particular locations, would have applied clay wedges to specific excavations, would have used clay as backfill, and would have ensured the proper compaction of that clay.[73]

Defendants' seriously flawed and unreliable causation analyses further buttresses Dr. Bea's conclusions. Defendants' own experts cannot even agree on what caused the North Breach or when the South Breach occurred. Their theories conflict with each other as well as certain of this Court's own findings in the *Barge* matter.

Concerning the North Breach, WGI's expert, Dr. Silva-Tulla, claims that approximately three hours of wave overtopping from two to three foot waves created a four to five-foot deep scour trench on the protected side of the floodwall, which caused a tear in the sheet pile wall.[74] However this Court already has concluded, based upon the IHNC Lockmaster's observations during the storm and from other expert testimony, that the waves were only one to two feet high with winds from the northeast and then from the north pushing waves **away** from the east floodwall until well after the breaches occurred.[75] The Corps' expert, on the other hand, opines that there was no scour at the time of the North Breach failure. Dr. Marr posits that to develop the sheet pile tear, "high lateral forces" totaling 500,000 pounds of horizontal force were exerted

---

[73] JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1410 (Rogers Depo. Vol. II) at 151:23-153:12; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40.
[74] PX 0583 (Silva-Tulla Depo. Vol. I) at 144:2-145:7; 179:6-10.
[75] *In re Katrina Canal Breaches Litig.*, 2011 WL 1792542 (E.D. La.) (Barge Order).

by water and soil pushing against the wall.[76]  But this conclusion is complete speculation because Dr. Marr's model computing horizontal force "became unstable at 200,000 pounds of force" so his conclusions about any pounds beyond this artificial ceiling are just an approximation, begging the question why the experiment was conducted to begin with if Dr. Marr could supply the necessary pressure by use of his own engineering "judgment."[77]

Concerning the South Breach, Dr. Silva-Tulla and Dr. Marr's theories conflict with respect to timing.  First, the water level in the IHNC did not reach the top of the wall until approximately 7:00 a.m., which does not allow for sufficient amount of overflow onto the protected side to create the five-foot trench that both experts believe is necessary to induce failure.  Dr. Silva-Tulla tries to resolve this discrepancy by relying on the findings of WGI's hydrologist, Dr. Dalrymple.  However, Dr. Dalrymple finding was based on an assumption that wave overtopping occurred for three hours beginning at 3:45 a.m.[78]  To reach such a result, Dr. Dalrymple also needs two to three-foot waves to have sufficient overflow to produce the necessary scour trench depth.  But as pointed out previously, this Court has already concluded that the waves in the IHNC were only one to two feet high with winds from the northeast and then from the north pushing waves away from the floodwall for most of the morning.[79]  In contrast, Dr. Marr said that wave overtopping must be discounted.  But Dr. Marr is then confronted with another unresolvable issue: if he were to account for the two hours of overflowing water needed to create the scour trench, the initial failure of the South Breach wall would have occurred at 9:00 a.m.[80]

---

[76] PX 4439 (Marr Depo. Vol. II) at 88-89, 107.
[77] *Id.* at 99:17-103:20.
[78] PX 0583 (Silva-Tulla Depo. Vol. I) at 136:25-137:4.
[79] *In re Katrina Canal Breaches Litig.*, 2011 WL 1792542, **8-10 (E.D. La.) (Barge Order).
[80] PX 4438 (Marr Depo. Vol. I) at 63-65.

Defendants' cross-sections reveal additional flaws in their causation analyses. They evaluated soil conditions approximately 100 to 150 feet <u>south</u> of the North Breach initiation zone, not at the breach initiation zone itself.[81]  In so doing, they ignored boring 81A, which is the most relevant boring for the North Breach.  Boring 81A is closest to the North Breach initiation point, and most representative of soil conditions at the point where the floodwall failed.[82]

### iv.   <u>The Risk Of Harm Was Within The Scope Of Protection Afforded By The Duty Breached</u>

Concerning the fourth question, the risk of harm was within the scope of protection afforded by the duty breached.  For over 25 years, Louisiana law has been well settled on how to determine whether a plaintiff's damages are within the scope or reach of a tortfeasor's duty.  For example, in *PPG Indus. Inc. v. Bean Dredging,* 447 So.2d 1058 (La. 1984) the Louisiana Supreme Court held:

> Policy considerations determine the reach of the rule, and there must be an ease of association between the rule of conduct, the risk of injury, and the loss sought to be recovered.  A judge, when determining whether the interest of the party seeking recovery of damages is one that falls within the intended protection of the rule of law whose violation gave rise to the damages, should consider the particular case in terms of the moral, social and economic values involved, as well as a view toward the ideal of justice.

447 So.2d 1058, 1061 (La. 1984) (citations omitted); *see also Rando v. Anco Insulations, Inc.*, 16 So.3d 1065, 1088 (La. 2009) (finding scope of the duty inquiry is "ultimately a question of policy" and asks "'whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner'" and depends on "factual determinations of foreseeability and ease of association.") (citations omitted).[83]

---

[81] *See* Opp. Mtn. to Strike Bea Testimony (May 21, 2002) (Doc. No. 20849-2) at pp. 14-18.
[82] *Id.*
[83] *See also Roberts v. Benoit*, 605 So. 2d 1032, 1044 (La. 1991), *Pitre v. Opelousas Gen. Hosp.*, 530 So. 2d 1151 (La. 1991).

In this case, Defendants had a duty to not harm the IHNC floodwall as they knew it existed to protect the people living behind it.  It was obviously foreseeable that if the significant excavation and remediation activities that occurred within the 300-foot safety zone of the adjacent floodwall could jeopardize the floodwall's stability.   Thus, the precise harm that Plaintiffs' suffered was absolutely certain to occur.  Indeed, Defendants specifically recognized this potential harm when they undertook to line certain excavations at McDonough Marine with clay in order to cut off the hydraulic connection they knew existed between the IHNC and the EBIA.[84]  The Corps' own 30(b)(6) witness, John Grieshaber, further detailed the Corps' full awareness of this potential harm when he testified that "the only way you could endanger the flood system is by some for of inappropriate excavation or backfill."[85]

Plaintiffs are readily included within the scope of the duty breached by Defendants.

### v.  Plaintiffs Suffered Damages As A Result of Defendants' Negligence

The final question goes to damages: Plaintiffs suffered significant personal and property damages resulting from the failure of the IHNC floodwall caused by Defendants' negligent acts.[86]

In the end, Defendants owed a duty to Plaintiffs to ensure the EBIA excavations did not compromise the floodwall protecting their lives and property.  Defendants breached that duty by negligently failing to undertake any geotechnical investigation into whether their Boland and Saucer Marine excavations could harm the floodwall, in negligently failing to implement basic engineering principles to protect the floodwall, and in negligently carrying out their day-to-day

---

[84] JX 1394 (Bea Depo. Vol. I) at 270:14-271:10; 271:11-273:10; *see also* JX 1350, McDonough Marine (WGI 015044); JX 1355, Boland Marine (WGI 014918).
[85] JX 1709 (John Grieshaber 30(b)(b) Depo. Vol. II) at 15:6-9; *see also* JX 1647 (John Grieshaber 30(b)(b) Depo. Vol. I) at 62:7-22; 67:9-11; 67:21-68:2; 68:20-69:7.
[86] *See* Scott Taylor Final Loss Reports (Oct. 2011), JX 1605 (Kenneth and Jeaninne Armstrong); JX 1609 (Estate of Ethel Coats); JX 1607 (Fred Holmes); JX 1611 (Alvin Livers); JX 1613 (Clifford Washington).

work.  These negligent acts caused the floodwall to fail, allowing floodwaters to inundate Plaintiffs' properties and causing the damages claimed by each Plaintiff.

### B.  Flood Control Immunity Is Not Available To Defendant United States

In February, 2011, this Court granted the Entergy Plaintiffs' Motion for Partial Summary Judgment and the Armstrong Plaintiffs' Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment on 702c "insofar as the United States may be found liable for damages caused by its negligence that is extrinsic to the LPV if proven at trial."  *In re Katrina Canal Breaches Litig.*, 2011 WL 651946, *6 (E.D. La.) (Rec. Doc. 20164).  The Armstrong Plaintiffs do not contend that the LPV, or any flood control activity or project, played any role in the North and South Breaches.  To the contrary, Defendants' negligent site clearing activity and substandard excavation and backfilling operations were only related to navigation and expanding the existing IHNC lock to account for the increased barge traffic traversing the shipping canal.  *Id.* at *5.  Accordingly, 702c immunity is not available to the Corps because the negligent acts that caused Plaintiffs' damages are entirely extrinsic from the LPV and any flood control activity.  *In re Katrina Canal Breaches Litig.*, 673 F.3d 381, 390 (5th Cir. 2012).

### C.  The Discretionary Function Exception Is Not Available To Defendant United States

In February 2011, this Court also denied the parties' respective summary judgment motions concerning the availability of the DFE to the United States.[87]  This Court stated that there were factual disputes with respect to both DFE prongs and that the evidence presented raised a genuine issue "as to whether the Government violated mandates contained in their own manuals or their engineering regulations, including whether the appropriate Design

---

[87] This Court did grant the United States' DFE summary judgment motion with respect to claims based on NEPA violations alleged by the Entergy plaintiffs.  *In re Katrina Canal Breaches Litig.*, 2011 WL 651946, *10 (E.D. La. 2011).

Documentation Report (DDR) was done."[88]   This Court also recognized that there was Corps witness testimony establishing the various engineering regulations and manuals "are mandatory and were not followed and that the Corps' policy required geotechnical engineering analysis for underseepage, wall stability and global stability on the EBIA excavations' potential effect on the IHNC floodwalls before the excavation was undertaken."[89]   Most notably, this Court also recognized that "[n]o such engineering investigations were undertaken."[90]

Since this ruling, nothing has changed.   The same testimony from the same Corps witnesses concerning the same policies, regulations, manuals and other directives mandating specific conduct persists and will be presented at trial.   So, too, does the undisputed fact that neither the Corps nor WGI performed the required engineering investigations on their extensive excavations at Boland and Saucer Marine when doing so could have prevented the floodwall from failing.   The following is a brief summary of the case law governing the DFE in the Fifth Circuit, as well as Plaintiffs' argument as to why the DFE is not available to the Corps in this case.

The DFE bars suit on any claim that is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."   28 U.S.C. § 2680(a).   The Supreme Court has developed a two-prong test for determining whether the federal government's conduct qualifies as a discretionary function or duty."   *Freeman v. United States*, 556 F.3d 326, 336-37 (5th Cir. 2009).   Under the first prong, the conduct must involve "an element of judgment or choice."   *Id.* at 337 (quoting *United States v. Gaubert,* 499 U.S. 315, 322 (1991)) (citation omitted).   "If a statute, regulation, or policy leaves it to a federal agency or

---

[88] *In re Katrina Canal Breaches Litig.*, 2011 WL 651946, *10 (E.D. La. 2011).
[89] *Id.*
[90] *Id.*

employee to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary." *Id.* (citation omitted). "On the other hand, [t]he requirement of judgment or choice is not satisfied and the discretionary function exception does not apply if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." *Id.* (internal quotation marks omitted); *see also In re Katrina Canal Breaches Litig.*, 647 F.Supp.2d at 717.

### i. The Army Corps Ignored Its Policy Of Performing Engineering Analyses On Excavation Projects That Could Impact Adjacent Flood Control Structures

There is no rule or requirement that the agency's policy be codified in a writing. To the contrary, "[s]ome [agencies] establish policy on a case-by-case basis…[o]thers promulgate regulations on some topics, but not on others. In addition, an agency may rely on *internal guidelines rather than on published regulations*." *Gaubert*, 499 U.S. at 324 (emphasis added). Fifth Circuit precedent also holds that an agency's policy does not have to emanate from a writing. Rather, policy can be based on the agency's past process and procedures as testified to by Government witnesses. *See Ashford v. United States*, 511 F.3d 501 (5th Cir. 2007).

In this case, several Corps witnesses testified concerning the Corps' policy. Each witness confirmed that Corps policy mandates geotechnical analyses on the potential impact that an excavation project like the EBIA remediation and excavation project could have on a nearby existing (or proposed) flood control structure.[91] In particular, the Corps required a geotechnical

---

[91] JX 1647 (John Grieshaber 30(b)(b) Depo. Vol. I) at 36:7-37:1; 41:20-42:25; 45:19-46:12; 47:2-14; 53:4-12; 54:2-56:6; 69:23-77:25; 78:22-80:25; 88:7-21; 123:5-124:7, 91:2-93:13, 103:3-18; 123:5-124:7; 145:22-146:6; 147:1-148:14; 159:14-160:25; 173:8-174:19; 168:9-22;
JX 1670 (Walter Baumy 30(b)(6) Depo.) at 236:6-13; 237:24-239:13;
JX 1663 (Gerald Colletti Depo.) at 30:10-19; 32:21-35:9; 40:17-43:9; 103:12-105:1;
JX 1669 (Richard Varuso Depo.) at 177:15-178:5; 198:7-21;
JX 1710 (Lee Guillory 30(b)(6) Depo. Vol. I) at 153:2-7; 157:24-158:12, 198:6-16; 206:23-207:10;

analysis on excavations performed within 300 feet of the IHNC floodwall.[92]  The evidence also shows that this policy was ignored when the Defendants failed to perform the requisite geotechnical analyses even after WGI discovered substantial contaminants and obstructions at the Boland Marine and Saucer Marine locations well within 300 feet of the adjacent IHNC floodwall.[93]  Because the Corps ignored its own policy requiring these geotechnical evaluations, the DFE is unavailable to the government.

ii.  **Army Corps Regulations, Guidelines, and Engineering Standards Qualify as Specific Legal Mandates Under Prong One**

Government policy mandates may be "expressed or implied by statute, regulation or agency guidelines," both internal and published.  *Gaubert*, 499 U.S. at 324; *see also Andrulonis v. United States,* 952 F.2d 652, 654 (2d Cir. 1991).  Legal mandates may be articulated in many forms, and the label placed on the Corps' engineering directives is not talismanic.  Whether denominated as regulations, standards, guidelines, manuals, technical reports, pamphlets, or policies, they are nonetheless binding on Corps employees where the language dictates a specific course of action making it a "mandatory regulatory command."[94]

---

JX 1668 (Richard Pinner Depo.) at 30:19-31:10; 35:2-23; 36:24-39:2; 39:14-41:13; 41:20-43:11; 47:7-48:4; 50:1-14; 62:12-63:2; 66:16-24; 67:20-69:1; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 228-231.

[92] *Id.*; *see also* JX 1670 (Baumy 30(b)(6) Depo.) at 237:24-239:13; JX 1663 (Colletti Depo.) at 32:21-35:9; 40:17-43:9; 103:12-105:1; JX 1668 (Pinner Depo.) at 30:19-31:10; 35:2-23; 36:24-39:2; 39:14-41:13; 41:20-43:11; 47:7-48:4; 50:1-14; 62:12-63:2; 66:16-24; 67:20-69:1; *see also In re Katrina Canal Breaches Litig.*, 2011 WL 651946, *10 (E.D. La. 2011) ("No such engineering investigations were undertaken.")

[93] *Id.*

[94] *See, e.g.*, *Griffin v. United States,* 500 F.2d 1059, 1068-69 (3d Cir. 1074) (regulation); *see also, Navarette v. United* States, 500 F.3d 914, 917 (9th Cir. 2007) (Corps Safety Plan); *Alabama Elec. Cooperative, Inc. v. United States*, 769 F.2d 1523 (11th Cir. 1985) (Corps technical report); *In re Katrina Canal Breaches Litig.*, 471 F.Supp.2d 684, 699 (E.D. La. 2007) (Corps engineering "regulations and policies" and "standard engineering dictates"); *Bagner v. United States,* 428 F.Supp.2d 101, 104 (N.D. N.Y. 2006) (Corps Standards Manual); *Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*, 1998 WL 113935, *5 (E.D. La. 1998) (Corps Engineer Regulations, Pamphlets, Guidelines and Standards); *cf. Soldano v. United States,* 453 F.2d 1140, 1150-51 (9th Cir. 2006) (National Park Service Standards incorporating "basic, scientific safety specifications"); *see also Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*, 1998 WL 113935, *5 (E.D. La. March 10, 1998) (finding Corps publications "imposed mandatory safety responsibilities on the Corps' inspection personnel….").

The Corps' own detailed engineering standards are therefore specific legal mandates—indeed, the quintessence of micromanagement of engineering practices—and not general, precatory guidelines. *See In re Katrina Canal Breaches Litig.*, 647 F. Supp. 2d at 718. In this case, the government has conceded that certain engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects—like the EBIA excavation and soil replacement—were *mandatory*.[95] And this Court has already determined that "[t]he Corps had the responsibility and duty to insure the integrity of the levee system [during the EBIA remediation]." *In re Katrina Canal Breaches Litig.*, 2008 WL 5234369, *19 (E.D. La. 2008).

### iii.  The Corps Violated Several of its Own Mandatory Engineering Requirements in the Planning and Execution of the EBIA Excavation and Backfilling Work at the Breach Sites

In addition to the Corps' own policy that geotechnical evaluations address seepage, wall stability, and global stability, several Corps Engineering Regulations and Manuals also required engineering analyses of how their excavation project along the EBIA could potentially impact the integrity of nearby IHNC floodwall.

#### 1.  ER 1110-2-1150; Engineering and Design-Engineering and Design for Civil Works Projects (Aug. 1999)

<u>Section 8: Engineering Documents</u>

Section 8 required a Design Documentation Report ("DDR") for the EBIA excavations.[96]

A DDR is a "record of final design effort after the feasibility phase" and "provides the technical

---

[95] *See* JX 0044, ER 1110-2-1150 at § 19.1.1; JX 1709 (Grieshaber 30(b)(6) Depo. Vol. II) at 64:2-11; 82:2-23; JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 36:7-37:1; 41:20-43:3; 45:19-46:12; 47:2-14; 54:2-56:6; 69:23-77:25; 78:22-80:25; 88:7-21; 123:5-124:7, 91:2-93:13, 103:3-18; 123:5-124:7; 145:22-146:6; 147:1-148:14; 159:14-160:25; 173:8-174:19; 168:9-22.

[96] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 3, §8.2; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

basis for the plans and specifications and serves as a summary of the final design."[97]   The DDR covers both the preconstruction engineering and design phase and the construction phase of the project.[98]   In effect, the DDR is the mandated engineering master plan for a Corps project containing a discussion of all the engineering, geotechnical, and other analyses for the Corps' field personnel implementing the master plan.

As Appendix D instructs, the DDR is "not finalized until project construction is completed.   During the construction phase, *design decisions made in connection with contract modifications shall be added to the DDR*."[99]   Amendments to the DDR must reflect changes in the original DDR and the new engineering, geotechnical and other analyses relating to these changes.[100]   Accordingly, the DDR must include "*results of geotechnical investigations*, which supplement previous studies…."[101]

The initial DDR was drafted in 1999, and it did not address the EBIA excavation project as it evolved.   The EBIA excavation project that accompanied the IHNC Lock Replacement was modified several times because, once WGI began excavating in 2001, Defendants found massive contaminants and other subsurface structures and obstructions at the Boland Marine and Saucer Marine locations.   Contrary to the Corps' policy, despite these significant changes in the project's scope, neither the 1999 DDR nor the amended 2001 DDR No. 2 contained any geotechnical investigation of the excavations' potential impact on the adjacent IHNC floodwall.

---

[97] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 3, §8.2; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[98] *Id.*
[99] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. D-1, §D-1.4 (emphasis added); *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[100] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. D-1, §D-1.4; D-3, §D-7.11; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[101] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. D-3, §D-7.11 (emphasis added); *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

Section 10: Technical Coordination

Section 10 ER 1110-2-1150 provides that "Districts *shall conduct* analyses and investigations in accordance with approved engineering criteria and guidance, coordinate engineering activities, and seek advice on problems encountered during project development from appropriate MSC, HQUSACE, and other engineering staffs."[102]  As discussed above, once the Corps and WGI encountered the subterranean foundations, pipelines, and other obstructions, as well as unanticipated volumes of subsurface contaminants at the Boland Marine and Saucer Marine locations, the DDR required modification and a geotechnical evaluation designed to address the potential for the removal of these structures and contaminants to negatively impact the adjacent IHNC floodwall.[103]  These mandated modifications and geotechnical analyses never occurred.

Section 15:  Engineering During Construction

Section 15 of ER 1110-2-1150 requires Corps engineers be involved in "modification of [Plans & Specifications]…and preparation of engineering considerations and instructions to field personnel.  The engineers must also provide support for contract claims and modifications…."[104]  This requirement was further discussed by Corps 30(b)(6) witness, Mr. Grieshaber, who detailed the Corps' mandatory policy of reevaluating any changes and modifications that could impact adjacent flood control structures at the EBIA.[105]  This engineering evaluation was required to include analyses of underseepage, global stability, and the actual temporary retaining structures

---

[102] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 4, §10 (emphasis added); *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[103] *Id.*
[104] *Id.*
[105] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 90:14-96:15; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

at both the Boland Marine and Saucer Marine locations.[106]  In fact, these analyses should have been completed before WGI was allowed to move forward with its work.[107]

In addition, Section 15.6 ("Engineering support for claims and modifications") expressly provides that "[e]ngineering *shall* provide design and cost estimating assistance for claims and modifications when requested and be knowledgeable of all claims and modifications…. Engineering input into this process is *essential to ensure the continuity of the design process through construction*…."[108]

This requirement was not followed. Corps 30(b)(6) witness, Lee Guillory, testified that he never afforded the geotechnical division an opportunity to provide design assistance on the EBIA excavations at Boland Marine and Saucer Marine.[109]  Thus, despite the unambiguous mandate that the Corps engineers "shall" be knowledgeable of all claims and modifications, no such engineering support or review was even possible because Mr. Guillory never informed them of the claims and modifications necessitated by the evolving scope of WGI's excavation work along the EBIA.

Section 17:  Design Quality

Section 17 of ER 1110-2-1150 required engineering to have responsibility for the "[e]xecution of the design and technical quality" of the project.[110]  Because of this requirement, it was "essential that coordination and planning the work effort occur at the earliest stages of

---

[106] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 123:5-124:7; 159:20-160:25; 173:8-174:19; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[107] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) 147:1-148:14; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[108] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 20, §15.6 (emphasis added); *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[109] JX 1710 (Guillory 30(b)(6) Depo. Vol. I) at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[110] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

project development, through preparation and execution of the Management Plan."[111]   In

addition, Section 17 mandates that "[t]echnical quality *shall* be achieved mainly through a

process that includes…*adequate coordination among the project team and technical

disciplines*."[112]  Finally, [q]uality is further achieved by participation in *value engineering studies*

and thorough internal checking and review by *qualified engineers*."[113]

On the Corps' behalf, Mr. Guillory testified that there was no "adequate coordination"

with geotechnical for the excavation work at the EBIA.[114]  He further testified that there was no

"coordination and planning the work effort" with geotechnical once WGI discovered the

subsurface structures and obstructions at the Boland Marine and Saucer Marine sites.[115]

Confirming his understanding of Section 17's mandatory provisions, Mr. Grieshaber testified

that such coordination and planning was required.[116]  The Corps should not have allowed WGI to

proceed with the excavations at Boland and Saucer without evaluating the potential negative

impact these excavations could have on the nearby floodwall.[117]

Section 17 also required a "qualified engineer" to check and review the excavation plans

at these two locations.[118]  To the extent the Corps tasked George Bacuta with reviewing the

---

[111] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug.
1999) at p. 22, §17; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[112] *Id.* (emphasis added).
[113] *Id.* (emphasis added).
[114] JX 1710 (Guillory 30(b)(6) Depo. Vol. I) at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10; JX 1653 (Bacuta
Depo.) at 176:20-178:12; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[115] *Id.*
[116] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 88:7-21; 123:5-124:7; 147:1-148:14; 159:20-160:25; 173:8-
174:19; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[117] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 36:7-37:1; 41:20-42:25; 45:19-46:12; 47:2-14; 53:4-12; 54:2-56:6;
69:23-77:25; 78:22-80:25; 88:7-21; 123:5-124:7; 91:2-93:13; 103:3-18; 123:5-124:7; 145:22-146:6; 147:1-148:14;
159:14-160:25; 173:8-174:19; 168:9-22; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[118] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug.
1999) at p. 22, §17; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

excavation plans,[119] Mr. Bacuta was a geochemist and not a "qualified engineer,"[120]  Worse yet, Mr. Bacuta never actually reviewed any excavation plans.[121]

## 2. EM 1110-2-1913; Engineering and Design - Design and Construction of Levees (April 2000)

The Corps' Engineering Manuals also "contain mandatory requirements for engineering procedures and design standards," as well as "policy standards for uniform engineering practice related to civil works projects."[122]  Certain of these requirements are designed "to ensure project safety and function."[123]  According to the Corps, "flood protection is extremely important."[124] They must assure that their projects "do not jeopardize the flood protection."[125]  To adhere to this reasonable safety policy, Mr. Grieshaber testified that the Corps follows EM 1110-2-1913.[126]

EM 1110-2-1913 demonstrates that any foundation condition that may impact the seepage potential under a levee must be evaluated.   In particular, "[w]ithout control, underseepage in pervious foundations beneath levees may result in (a) excessive hydrostatic pressures beneath an impervious top stratum on the landside, (b) sand boils, and (c) piping beneath the levee itself."[127]

---

[119] JX 1710 (Guillory 30(b)(6) Depo. Vol. I) at 188:8-17; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[120] JX 1653 (Bacuta Depo.) at 145:18-146:6; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[121] JX 1653 (Bacuta Depo.) at 142:21-25; 177:4-13; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[122] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 4, §10.1; p. 23, §19.1.2; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234; JX 1389, Bea Report (Feb. 2012) at p. 121, ¶ a.

[123] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 23, §19.1.2; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[124] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 72:3-73:11; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[125] *Id.*

[126] *Id.*

[127] JX 0046, EM 1110-2-1913; Engineering and Design - Design and Construction of Levees (April 2000) at p. 5-1, §5-1; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234; JX 1389, Bea Report (Feb. 2012) at p. 121.

### 3. EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989)

The Corps' Lock Evaluation Report states that the "structural components shall be designed according to the applicable portions of…EM-1110-2-2502."[128]  This manual states that "[w]ater-retaining structures are subject to through-seepage, underseepage, and seepage around their sides or ends" and that "[u]ncontrolled seepage may result in water pressures and uplift forces on the wall base in excess of design assumptions and consequent structural instability…."[129]  Because of this seepage potential, "[s]eepage control entails the design of measures to ensure that seepage pressures and velocities are maintained below tolerable values."[130]  As a result, "the seepage aspects and the foundation stability of walls which have had basements excavated on either side of and adjacent to the wall since the original design and construction were completed should be investigated."[131]

### 4. EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994)

EM 1110-2-2504 concerns the design of sheet pile walls.  This manual states that "[c]oordination and cooperation among hydraulic, geotechnical, and structural engineers must be continuous from the inception of the project to final placement in operation."[132]  It also mandates that "for floodwalls, foundation underseepage conditions must also be assessed."[133]

---

[128] JX 0025, MRGO New Lock and Connecting Channels Evaluation Report: Main Report and Environmental Impact Statement March 1997, Vol. 3 at B-86, §B.2.8; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[129] JX 0040, EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989) at p. 7-3, §7-3; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234; JX 1389, Bea Report (Feb. 2012) at p. 122.
[130] *Id.*
[131] *Id.*
[132] JX 0042, EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994) at p. 2-1, §2-1; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234; JX 1389, Bea Report (Feb. 2012) at pp. 122-123.
[133] JX 0042, EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994) at p. 3-1, §3-1*a.* ("Geotechnical Investigation"); *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234; JX 1389, Bea Report (Feb. 2012) at pp. 122-123.

### 5.   EM 1110-2-5027; Engineering and Design - Confined Disposal of Dredged Material (Sept. 1987)

EM 1110-2-5027 concerns confined disposal of dredged material.  Specifically, this manual required more extensive field investigations where "foundation deposits are weak and compressible," "highly variable," and where "[u]nderseepage and/or settlement problems are severe" and where "the consequences of the failure involve life, property, or damage to the environment."[134]

### 6.   EM 1110-2-1901; Seepage Analysis and Control for Dams (Sept. 1986)

Corps employee and witness, Richard Pinner, testified that the Corps' dam engineering manuals have information concerning failure modes relevant to levees.[135]  EM 1110-2-1901 states that "all dams on earth foundations are subject to underseepage. Seepage control in earth foundations is necessary to prevent excessive uplift pressures and piping through the foundation…The purpose of the project, i.e., long-term storage, flood control, hydropower, etc., may impose limitations on the allowable quantity of seepage…."[136]

### iv.   33 C.F.R. § 208.10 Mandates a Geotechnical Analysis

This regulation concerns local flood protection works and includes maintenance and operation of structures and facilities.[137]  It required a geotechnical evaluation on the potential impact Defendants' excavation activities could have on the IHNC floodwall.  In particular, Section 5 states:

> No improvement shall be passed over, under, or through the walls, levees, improved channels or floodways, nor shall any excavation or construction be

---

[134] JX 0038, EM 1110-2-5027; Engineering and Design - Confined Disposal of Dredged Material (Sept. 1987) at p. 6-4, Table 6-1; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[135] JX 1668 (Pinner Depo.) at 25:10-26:10.

[136] JX 0036, EM 1110-2-1901; Seepage Analysis and Control for Dams (Sept. 1986) at p. 9-1, ¶ 9-1; *see also* JX 1389, Bea Report (Feb. 2012) at p. 123; JX 1668 (Pinner Depo.) at 25:10-26:10.

[137] 33 CFR § 208.10; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 235-236; JX 1389, Bea Report (Feb. 2012) at pp. 123-124.

permitted within the limits of the project right-of-way…without prior determination by the District Engineer of the Department of the Army or his authorized representative that such improvement, excavation, construction, or alteration **will not adversely affect the functioning of the protective facilities**.

Such improvements or alterations as may be found to be desirable and permissible under the above determination **shall be constructed in accordance with standard engineering practice**.

Advice regarding the effect of proposed improvements or alterations on the functioning of the project and information concerning methods of construction acceptable under standard engineering practice **shall be obtained from the District Engineer or, if otherwise obtained, shall be submitted for his approval**.  Drawings or prints showing such improvements or alterations as finally constructed shall be furnished the District Engineer after completion of the work.

33 C.F.R. § 208.10(a)(5) (emphasis added).

### v. Standard Engineering Practices Mandated a Geotechnical Analysis And a Proper Method of Compacting Backfilled Excavations

Independent of any policy, regulation, manual or code, every responsible engineer undertaking the same work performed by the Corps and WGI should know there are standard engineering practices obligating an engineer or engineering firm to (1) perform a geotechnical evaluation of the potential impact its excavation work could have on an adjacent flood control structure, and (2) properly backfill and compact all excavations in order to protect against and prevent underseepage from undermining the structure's design capacity (which includes an accepted safety factor).[138]

A senior Corps 30(b)(6) representative, Mr. Grieshaber, recognized this generally accepted principle and testified that it was "good engineering and [a] sound engineering principle[]" to coordinate engineering activities with geotechnical engineers and seek geotechnical input on significant safety issues that the Corps encountered during the EBIA

---

[138] JX 1580, Rogers Report (Jan. 2012) at p. 236; *see also* JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 38-53.

excavation.[139]  With respect to the Corps and WGI's excavation activity at the EBIA, standard engineering practice associated with site work being performed in the vicinity of a flood protection system required, as set forth in the WGI Recommendation Report for Demolition and Site Preparation Activities, that geotechnical engineering be an integral component of the work at the site.[140]  At a minimum, a prudent geotechnical engineer should have reviewed the additional subsurface information collected as part of the scope of work and ensured that the Corps' mandatory flood protection system evaluations were satisfied.[141]  This is especially true for those instances where the excavation work extended to the I‑wall itself and/or encountered preexisting pervious fills that have the obvious ability to quickly and rapidly convey water pressure directly to the floodwall.[142]

Concerning the backfilling activity associated with this massive excavation activity, WGI consulted with the Corps and determined that a clay seal should be applied at those locations adjacent to the floodwall that might pose a potential hydraulic load on the existing I‑wall structure.[143]  Inexplicably, this protective clay seal was not applied at the very pervious shell backfill and cohesionless sand backfills identified by WGI during their site characterization and sampling phase (most notably, MMG soil boring 81A, performed on October 4, 2001).[144]

Standard practice concerning geotechnical evaluations and protocols for mechanical compaction of "engineered fill" or "structural backfill" in areas adjacent to flood protection systems are essential to ensure that excavation activities will not degrade the capacity of the

---

[139] JX 1580, Rogers Report (Jan. 2012) at p. 236 (citing JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 123:5-124:7).
[140] JX 1580, Rogers Report (Jan. 2012) at p. 236.
[141] JX 1580, Rogers Report (Jan. 2012) at p. 236; *see also* JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 38-53.
[142] *Id.*
[143] JX 1580, Rogers Report (Jan. 2012) at p. 236; *see also* JX 1389, Bea Report (Feb. 2012) at pp. 127-128, ¶¶ 137-138.
[144] *Id.*

flood protection system, and thus expose the communities who depended on the protective system for their life and safety.  These standards were, in fact, pioneered and developed by the Corps over several decades of painstaking research and evaluations of levee problems, which drew considerable acclaim at the time.[145]  These standards became benchmark standards, employed in one form or another, by virtually every flood control agency in the USA.[146]

Because of this well−known hazard, several authoritative sources required the Corps and/or WGI to engage in basic engineering analyses and proper backfilling practices.  These sources included the Corps' own policy, engineering regulations and manuals, a Code of Federal Regulation, and standard engineering practices.[147]  The Corps and WGI failed to meet this standard of care.[148]

Without these critical and fundamental analyses, anyone engaged in excavation and backfilling activity similar to the activity engaged in by the Corps and WGI at the EBIA would have an insufficient understanding of whether they are jeopardizing the structural integrity of the adjacent flood control feature, although the potential dangers are themselves patently obvious.[149]

---

[145] JX 1580, Rogers Report (Jan. 2012) at pp. 236-237 (citing the April 1956 article by W.J. Turnbull and C. R. Foster of the Army Corps of Engineers titled "Stabilization of Materials by Compaction" (Journal of the Soil Mechanics & Foundations Division of ASCE, v. 82:934) received the Norman Medal of ASCE for 1959, the society's highest honor.  The January 1956 article by C.I. Mansur and R.I. Kaufman of the Army Corps of Engineers titled "Underseepage, Mississippi River Levees, St. Louis District (Journal of the Soil Mechanics & Foundations Division of ASCE, v. 82:864) received the Thomas Fitch Rowland Prize of ASCE in 1958.  *See also* JX 1389, Bea Report (Feb. 2012) at pp. 124-25, ¶ 128.

[146] JX 1580, Rogers Report (Jan. 2012) at pp. 236-237 (citing Mittler, E.L., L. Morgan, M. Shapiro, and K.Y. Grill. (2006). State Roles and Responsibilities in the national Flood Insurance Program, American Institutes for Research, Washington, DC., and Monday, J., K.Y. Grill, P. Esformes, M. Eng, T. Kinney, and M. Shapiro. (2006). An Evaluation of Compliance with the National Flood Insurance Program, Part A: Achieving Community Compliance, American Institutes for Research, Washington, DC).  *See also* JX 1389, Bea Report (Feb. 2012) at pp. 124-25, ¶ 128.

[147] JX 1580, Rogers Report (Jan. 2012) at pp. 236-237; *see also* JX 1389, Bea Report (Feb. 2012) at pp. 124-25, ¶ 128.

[148] *Id.*

[149] JX 1580, Rogers Report (Jan. 2012) at pp. 236-237.

**D.  The Corps' Failure To Perform The Required Engineering Analyses Is Not The Type Of Decision The DFE Protects.**

To succeed under the DFE's Prong Two, the Government must prove that its decision to forego the required engineering analyses "involve[d] the permissible exercise of policy judgment." *Berkovitz v. United States*, 486 U.S. 531, 538 n.3 (1988).  As this Court previously held, however, decisions involving safety, engineering judgment, and accepted professional standards do not constitute a "matter of policy" or an "exercise of policy judgment."  *In re Katrina Canal Breaches Litig.*, 647 F.Supp.2d at 705, 712-14 (citing *Cope v. Scott*, 45 F.3d 445, 452 (D.C. Cir. 1995), and *Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1217 (9th Cir. 2001)).

In this case, the Corps failed to perform the required engineering analyses on the potential deleterious impact of the EBIA excavations on the adjacent IHNC floodwalls.  This conscious decision not to perform these analyses indisputably concerned safety, engineering judgments, and accepted professional standards.  In particular, the Corps testified through Mr. Grieshaber that performing an analysis on wall stability, seepage, and global stability was not only the Corps' policy but also a matter of "good engineering and sound engineering principles."[150]  Mr. Grieshaber further emphasized that because "flood protection is extremely important" to the Corps, it must ensure that it does "not jeopardize the flood protection."[151]  The issue of safety with respect to the EBIA excavations is best exemplified by Mr. Grieshaber's testimony that a potential consequence of failing to engage in these mandatory analyses is the failure of that flood control measure, which results in "flood[ing] a city."[152]  It is uncontested

---

[150] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 123:5-124:7.
[151] *Id.* at 72:3-73:11.
[152] JX 1580, Rogers Report (Jan. 2012) at pp. 236-237 (citing JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 80:13-25).

here that these engineering analyses were not performed.[153]   Because these fundamental engineering analyses involve safety, engineering judgment, and accepted professional standards, and because the failure to perform these analyses cannot possibly involve a policy judgment, the government cannot satisfy the DFE's Prong Two.

Because the Corps fails both DFE's prongs, the defense is not available.

### E.   Because WGI Breached Task Order 26 And The TERC, Plaintiffs, As Third Party Beneficiaries, Have Standing To Sue For Damages

The Louisiana Civil Code provides that a contracting party may stipulate a benefit for a third person called a third-party beneficiary.  La. Civ. Code Art. 1978.  Such a contract for the benefit of a third party is referred to as a stipulation *pour autrui* ("for other persons.")  *Joseph v. Hospital Serv. Dist. No. 2 of Parish of St. Mary*, 939 So.2d 1206, 1211 (La. 2006) (citing *Paul v. La. State Employees' Group Benefit Program*, 762 So.2d 136, 140 (La. App. 1st Cir. 2000)).

The issue must be decided on a case-by-case basis, as "'[e]ach contract must be evaluated on its own terms and conditions in order to determine if the contract stipulates a benefit for a third person.'"  *Albe v. City of New Orleans*, ___ So. 3d ___, 2012 WL 2629229, at *2-3 (La. App. 4th Cir. July 5, 2012) (quoting *Dugas v. Thompson*, 71 So. 3d 1059, 1066 (La. App. 4th Cir. 2011)).

While the Louisiana Civil Code does not provide an "analytic framework for determining whether a third party beneficiary contract exists" in a particular case, the Louisiana Supreme Court has defined three criteria for determining whether contracting parties have provided a benefit for a third party  *Joseph*, 939 So.2d at 1211.  The criteria are: (1) the stipulation for a third party is manifestly clear; (2) there is certainty as to the benefit provided the third party; and

---

[153] JX 1710 (Guillory 30(b)(6) Depo. Vol. I) at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10; *see also* JX 1653 (Bacuta Depo.) at 176:20-178:12; PX 4691, Oral Argument Transcript from USA MSJ (Oct. 13, 2010) at 23:25-24:11.

(3) the benefit is not a mere incident of the contract between the promisor and the promisee.  *Id.* at 1212.

### i.   The Stipulation to Benefit Plaintiffs Is Manifestly Clear

The first criterion for determining whether contracting parties have provided a benefit for a third party is whether the stipulation is manifestly clear.  *Id.* at 1212.  While there is no general requirement that a stipulation *pour autrui* be in writing, if the contract must be in writing, then the stipulation must also be in writing.  *Id.* at 1215-16.

The seminal case of *Andrepont v. Acadia Drilling Co., Inc.*, 231 So.2d 347 (La. 1969) provides clear guidance as to "manifestly clear" contractual language that establishes a third party benefit.   In *Andrepont*, plaintiff was a share crop lessee who entered into a verbal lease with the landowner on the landowner's 35-acre tract.  *Id.* at 354.  Under this lease, the landowner allowed plaintiff to farm soybeans in return for twenty percent of his crop.  *Id.*   Later, the landowner executed an oil and gas lease granting the lessee gas company the right to enter the land and explore and produce oil, gas, and other minerals.  *Id.*   The gas company's exploration subsequently destroyed plaintiff's soybean crop.  The printed form used as the oil and gas lease initially read, "The [gas company] Lessee shall be responsible for all damages to timber and growing crops of the [landowner] Lessor caused by [gas company] Lessee's operations."  *Id.* at 349.  Prior to the gas company's exploration, the words "to timber and growing crops of Lessor" were deleted so that the lease then read "The [gas company] Lessee shall be responsible *for all damages caused by [gas company] Lessee's operations*."  *Id.* (emphasis added).

In reviewing this language, the Louisiana Supreme Court found that the amended lease created a stipulation *pour autrui* in favor of plaintiff.  In so doing, the court noted that plaintiff "is seeking to enforce a benefit stipulated in his favor by the landowner lessor as a condition of a contract between the landowner lessor and the gas company lessee.  Defendants, as assignees of

the oil and gas lessee, are, therefore, parties to the contract in which the stipulation is a condition...." *Id.* at 350. Therefore, plaintiff, as beneficiary of the stipulation, had a direct right of action against the gas company lessee to recover his damages.

The Fifth Circuit confronted a similar issue in *Liquid Drill, Inc. v. U.S. Turnkey Exploration, Inc.*, 48 F.3d 927 (5th Cir. 1995). There, plaintiff sub-contractors sought payment from the oil well owner after the contractor filed for bankruptcy protection. *Id.* at 929. The court discussed *Andrepont*, stating that the contracting parties there "clearly intended to contract for the benefit of a third party. The parties expressly stipulated a direct benefit to third parties: one of the contracting parties *specifically assumed tort liability to all those who were damaged by its operations*." *Id.* at 932 (emphasis added). In rejecting plaintiffs' stipulation *pour autrui* theory, the court said that, unlike the *Andrepont* contract, there was no reference to compensating sub-contactors nor was there an expression of any intent to benefit the sub-contractors in the contract at bar. *Id.* at 932-33 & n.30.

In this case, WGI and the Corps initially agreed that, with the exception of nuclear incidents in Texas, WGI would not provide any indemnity to the government for work performed under the TERC.[154]   But just as the indemnification language was changed in *Andrepont*, the indemnification language was changed here. Among other issues, the *Andrepont* indemnification language was expressly incorporated into the TERC and Task Order 26 by Modification No. 5, which read: "Contractor shall...be responsible *for all damages to persons or property* that occur as a result of the Contractor's fault or negligence."[155]   This language is essentially *identical* to the indemnification language in *Andrepont*, as well as several other

---

[154] JX 0048, TERC at H-8, ¶ 15 "Indemnification" (WGI000180).
[155] JX 1244, Mod. No. 5 at ¶ 5.0 (WGI000091) (emphasis added).

Louisiana cases finding stipulations *pour autrui*.[156]  With this contractual modification, WGI "specifically assumed tort liability to all those who were damaged by its operation."  *Liquid Drill*, 48 F.3d at 932.

Accordingly, it is manifestly clear that WGI's stipulation to be responsible for all damage to all persons and property provides a benefit to Plaintiffs, as third party beneficiaries to Task Order 26 and the TERC.

### ii.   Task Order 26 And The TERC Provided Certainty As To The Benefit Provided To Plaintiffs

The second factor—that there is certainty as to the benefit provided to the third party—is a corollary to the first factor.  It is based on the principle that in order to create a legal obligation enforceable by the beneficiary there must be certainty as to the benefit to accrue to the beneficiary.  *Joseph*, 939 So.2d at 1212 (citing *Berry v. Berry*, 371 So.2d 1346, 1347 (La. App. 1st Cir.), writ denied, 373 So.2d 511 (1979)); *see also Navarrete v. General Ins. Co. of Am.*, 2008 WL 659477, *2 (E.D. La.) (Engelhardt, J.) ("Where a contract provides for payment to a party upon an occurrence, it can safely be said that there is certainty of a benefit when the condition set forth is satisfied.")

Here, it is undisputedly certain the benefit accrued to Plaintiffs as third parties.  In the event Plaintiffs (and any other person for that matter) suffered damages as a result of WGI's negligent work performed at the EBIA, especially due to the foreseeable failure of the floodwall,

---

[156] *See Hargroder v. Columbia Gulf Transmission Co.*, 290 So.2d 874, 876 (La. 1974) (stipulation *pour autrui* created by language in a servitude agreement stating defendant "agrees to pay such damages which may arise to growing crops, timber, or fences from the construction of the (pipeline)"); *Dartez v. Dixon*, 502 So.2d 1063 (La. 1987) (stipulation *pour autrui* where party "agreed to be responsible for all liabilities incurred…."); *Hazelwood Farm, Inc. v. Liberty Oil and Gas Corp.*, 790 So.2d 93, 100-101 (La. App. 3d Cir. 2001) (stipulation *pour autrui* where contract provided "Grantee shall be responsible for all damages caused by his operations."); *compare Broussard v. Northcott Exploration Co., Inc.*, 481 So.2d 125, 127 (La. 1986) (no third party benefit in the damage clause of a mineral lease which limited liability to lessor, only: "[t]he Lessee shall be responsible for all surface damages of the *Lessor* caused by the Lessee's operations.") (emphasis added).

WGI agreed to pay "for all damages to persons or property that occur…."[157]  Because the benefit

accrued is certain, Plaintiffs have established *Joseph*'s second factor.

### iii.   The Benefit To Plaintiffs Is Not A "Mere Incident" Of Task Order 26 And The TERC

The third requirement is that the benefit cannot be a mere incident of the contract.  The

trial court must "distinguish a situation where an advantage has actually been stipulated on

behalf of a third party from a situation where the advantage relied upon is merely an incident of

the contract between the parties."  *Joseph*, 939 So.2d at 1212–13 (quoting J. Denson Smith,

*Third Party Beneficiaries in Louisiana: The Stipulation Pour Autrui*, 11 Tul. L. Rev. 18, 28

(1936)).  In examining this factor, certain issues that point to an intended rather than an

incidental benefit, including (1) the existence of a legal relationship between the promisee and

the putative beneficiary involving an obligation owed by the promisee to the beneficiary which

performance of the promise will discharge, and (2) the existence of a factual relationship

between the promisee and the putative beneficiary where there is a possibility of future liability

on the part of the promisee to the beneficiary against which the performance by the promisee will

protect the beneficiary.  *Andrepont*, 231 So.2d at 350–51 (citing Smith, *Third Party Beneficiaries*

*in Louisiana*, 11 Tul. L. Rev. 18, 58).

By including paragraph 5 of Modification No. 5 into the TERC, WGI specifically created

a legal and factual relationship with Plaintiffs.  In the event WGI negligently performed its work

at the EBIA, WGI agreed to compensate any person who suffered damages as a result.  This

express, manifestly clear benefit is an intended benefit of Task Order 26 and the TERC and thus

Plaintiffs have satisfied *Joseph*'s third factor.

---

[157] JX 1244, Mod. No. 5 at ¶ 5.0 (WGI000091).

Accordingly, because Plaintiffs are third-party beneficiaries of the TERC and Task Order 26, WGI is responsible for their damages suffered as a result of WGI's negligent work at the EBIA.

**F.   Plaintiffs' Claims Against WGI Are Not Precluded by La. R.S. 9:2771**

The protection afforded by La. R.S. 9:2771 is not available to WGI: it either specifically made, or caused to be made, the plans and specifications at issue here; and it cannot prove the conditions it created were not hazardous or that it had a justifiable reason to believe that its adherence to its own plans and specifications would not create a hazardous condition.   In relevant part, La. R.S. 9:2771 provides:

> No contractor…shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to **plans or specifications furnished to him which he did not make or cause to be made** and if the destruction, deterioration, or defect **was due to any fault or insufficiency of the plans or specifications**….

La. R.S. 9:2771 (emphasis added).

Immunity statutes must be strictly construed against the party claiming the immunity. *Am. Waste & Pollution v. Madison Parish,* 488 So.2d 940 (La. 1986); *Barabay Prop. Holding Corp. v. Boh Bros. Const. Co., L.L.C.*, 991 So.2d 74, 79 (La. App. 1st Cir. 2008).   While the immunity afforded by La. R.S. 9:2771 extends to third-party tort claims, the contractor invoking that defense has the burden of proving (1) the contractor did not make, or cause to be made, the plans and specifications at issue, and (2) the conditions created were not hazardous or the contractor had a justifiable reason to believe that its adherence to the plans and specifications would not create a hazardous condition..   *Barabay*, 991 So.2d at 79; *Morgan v. Lafourche Rec. Dist. No. 5*, 822 So.2d 716, 721-22 (La. App. 1st Cir. 2002).

### i. WGI Made The Plans And Specifications For Their EBIA Excavations Activity

To succeed, WGI first must prove that it did "not make or cause to be made" any of the plans or specifications concerning its remediation activities at the EBIA. WGI cannot do this. The Fifth Circuit foreclosed this defense (as well as the Government Contractor Immunity) when it concluded three separate times that **specifications** with respect to backfill and compaction were left to WGI's determination, alone:

> Because the **specifications for the work at issue were not reasonably precise**, WGI has no GCI, so we reverse the summary judgment and remand.

*In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 457 (5th Cir. 2010) (emphasis added).

> Given that the Corps provided imprecise, **and at times non-existent, specifications regarding the composition of the on-site and off-site backfill material**, WGI is not entitled to claim GCI for **its exercise of discretion** in choosing the composition of that material.

*Id.* at 463 (emphasis added).

> The Corps **did not "make"** WGI use the exact backfill material that was utilized, **nor did it "require"** WGI select the compaction method that was employed. In the absence of reasonably precise Corps specifications, **those decisions were made by WGI**. Thus, WGI fails the first step of the Boyle test and is not entitled to GCI **for its choice of backfill material and compaction method**.

*Id.* at 465 (emphasis added).

This Court affirmed these specific findings that WGI was responsible for backfill and compaction specifications when it denied WGI's motion on the continued availability of the GCI. *See* Doc. No. 20346 (Aug. 1, 2011).

This Court previously dealt with a similar situation in another case in which a contractor was found to have been solely responsible for certain specifications during a large construction project. Among other issues, *Rowan Cos., v. Greater LaFourche Port Comm'n*, 2006 WL 2228950 (E.D. La. 2006) detailed a contractor's attempt to claim immunity under La. R.S.

9:2771 for its alleged negligent discharge of limestone during a large construction project at a location that was incapable of handling the sizeable load.  *Id*. at *1-2.  In denying the contractor's summary judgment motion, this Court determined the contractor actually supplied "*its own specifications*" in deciding how much limestone to pile at that location and how high the pile should be.  *Id.* at *6 (emphasis in original).  The Court further noted that even though there was evidence that the hiring party supplied its own specifications for where to place the limestone, the collaborative effort whereby the contractor brought its own specifications to the table still deprived it of immunity under La. R.S. 9:2771.  *Id.* at *5-6; *see also LeBreton v. Brown*, 277 So.2d 645, 646 -647 (La. 1973) (finding immunity appropriate where "plaintiff alone" supplied plans and specifications).

It is the law of the case that WGI brought to the EBIA remediation activities "its own specifications" concerning backfill and compaction.  For this reason alone, contractor immunity does not apply.  Yet there is also evidence that the Corps relied on WGI to bring its own plans and specifications for other matters.  For example, WGI was required to write a Work Plan, which would describe WGI's detailed approach for the performance of Task Order 26.[158]  In developing the plans and specifications for this project, WGI was obligated to evaluate its excavation and backfill procedures to determine their impact on the stability of the flood project.[159]  WGI was also obligated to "prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to be filled by sampling or other investigations."[160]  The Corps also relied on WGI to

---

[158] PX 3836, Corps Statement of Work (June 1, 1999).
[159] JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40; PX 3836, Corps Statement of Work, (June 1, 1999); JX 1234, Recommendation Report at § 5.1.2.1.5; PX 4365, Corps Statement of Work, (May 15, 2000).
[160] PX 3836, Corps Statement of Work (June 1, 1999).

supply engineering services.[161]  This expectation included advising about the potential effect or damage that any subterraneous excavations could have on the floodwall, and addressing those issues by licensed engineers hired by WGI.[162]  This fact cannot be underscored enough, as the government, itself, declared that "the Corps brought its own engineering expertise to bear in reviewing and approving **WGI's work plans**."[163], [164]  Finally, common sense dictates that if the Corps did not set out WGI's specifications, then WGI must have done so itself.

### ii. <u>The Conditions WGI Created Were Hazardous And It Had No Justifiable Reason To Believe That Its Adherence To Its Own Plans And Specifications Would Not Create A Hazardous Condition</u>

Even though it is clear that WGI made the plans and specifications at issue here, assuming *arguendo* it relied solely on the Corps, it "cannot rely blindly on plans and specifications" in fulfilling its duty to exercise ordinary care toward third parties in the fulfillment of its contractual obligations.  *Morgan*, 822 So.2d at 721; *Barabay*, 991 So.2d at 79. In addition to proving it did not make the plans and specification, a contractor must also prove that the condition created was not hazardous or that it had no justifiable reason to believe that its adherence to the plans and specifications created a hazardous condition.  *Rowan Cos.*, 2006 WL 2228950, at *6 (citing *Bernard v. State,* 640 So.2d 694, 700 (La. App. 3d Cir. 1994), *writ denied,* 643 So.2d 165 (La. 1994)).

WGI cannot prove that the conditions it created were not hazardous.  WGI already was aware of a hydraulic connection between the IHNC and adjacent floodwall when it undertook the

---

[161] JX 1710 (Guillory 30(b)(6) Depo. Vol. I) at 150:21-151:17.

[162] *Id.* at 164:19-167:6.

[163] *See* USA Summary Judgment Memorandum at p. 40, (Aug. 8, 2010) (Doc. No. 19988-4) (emphasis added).

[164] To the extent WGI may claim no responsibility for plans and specifications that came from one of its subcontractors, that claim is meritless as Louisiana Courts find that a subcontractor's plans and specifications are "caused to be made" by the contractor.  *See, e.g., A & M Pest Control Service, Inc. v. Fejta Const. Co., Inc.*, 338 So.2d 946, 951 (La. App. 1976) (immunity inapplicable for contractor who subcontracted the work to subcontractor who provided the plans and specifications for the system, thus subcontractor's plans and specifications for the installation of sprinkler system "are plans or specifications which [contractor] 'caused to be made'….").

massive remediation at the EBIA.[165]   Despite this knowledge, WGI proceeded to excavate massive amounts of hazardous waste, building foundations, utility lines, and other obstructions adjacent to the floodwall without taking any steps to perform a required geotechnical analysis on the potential impact this work could have on exacerbating the hydraulic connection with the floodwall.  It is a basic engineering principle and practice that if you dig holes near a floodwall as substantial as the ones at issue here (and improperly backfill and compact those holes), you need to determine whether your work would harm the floodwall.[166]   Neither the Corps nor WGI followed this basic engineering precept.   As Dr. Bea concluded, such a failure created the hazardous conditions that played a substantial factor in causing the North and South Breaches.

WGI also cannot prove that it had any justifiable reason to believe its adherence to the plans and specifications would not create a hazardous condition.   WGI is one of the largest engineering firms in the country.  It was specifically tasked to provide all the engineering service either directly or through one of its subcontractors.[167]   Because of this, it had a duty to determine whether work would harm the floodwall.[168]   But it made no effort to determine whether its work would jeopardize flood control.   WGI has acknowledged this fact time and again stating that it was the Corps who had the responsibility to make this determination, not WGI.   Simply pointing the finger at the Corps as being the party responsible for engineering evaluations (and with the

---

[165] JX 1234, Recommendation Report at § 3.1.1.1, § 4.1, § 5.13; PX 4647 (Patrick Lucia Depo.) at 131:7-132:3; JX 1414, Bea Rebuttal Report (April 2012) at pp. 45-46, ¶ 60, Fig. 21; JX 1645, Aug. 5, 2004 email from Bacuta to Lesser (emphasis added).

[166] JX 1580, Rogers Report (Jan. 2012) at pp. 236-37; JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 36:7-37:1; 41:20-42:25; 45:19-46:12; 47:2-14; 53:4-12; 54:2-56:6; 69:23-77:25; 78:22-80:25; 88:7-21; 123:5-124:7, 91:2-93:13, 103:3-18; 123:5-124:7; 145:22-146:6; 147:1-148:14; 159:14-160:25; 173:8-174:19; 168:9-22; JX 1414, Bea Rebuttal Report (April 2012) at pp. 38-53.

[167] PX 3836, Corps Statement of Work (June 1, 1999); *see also* USA Summary Judgment Memorandum at p. 40, (Aug. 8, 2010) (Doc. No. 19988-4); JX 1234, Recommendation Report at § 5.1.2.1.5; PX 4365, Corps Statement of Work, (May 15, 2000); JX 1245, Project Work Plan (Oct. 2000) at § 1.1; PX 0930, April 24, 2002 email from L. Guillory (MEB-112-00000013).

[168] *In re Katrina Canal Breaches Litig.*, 2008 WL 5234369, *19 (E.D. La. 2008) (detailing a "responsibility and duty" existed "to insure the integrity of the levee system [during the EBIA remediation].").

Corps pointing that finger right back at WGI) is certainly not a justifiable reason to believe its work would not create a hazardous condition.

Accordingly, La. RS 9:2771 does not protect WGI because it made and caused to be made the plans and specifications for work at the EBIA, because it cannot prove the conditions it created were not hazardous, and because it cannot prove that it had a justifiable reason to believe that its adherence to the plans and specifications would not create a hazardous condition.

### G. WGI Is Not Absolved From Liability Because The Corps Did Not Supervise And Approve All Aspects Of WGI's Work

Boiled down, WGI believes it cannot be held liable for Plaintiffs' damages because "it simply did what it was told to do."[169]  For the reasons discussed above, this "just following orders" argument fails.  First, WGI alone was responsible for determining the backfill and compaction used at the EBIA.  *In re Katrina Canal Breaches Litig.*, 620 F.3d at 455, 457, 463, 465.  In addition to that responsibility, the evidence will also demonstrate that the Corps relied on WGI to furnish the mandated engineering services during all EBIA remediation operations:

> To be sure, the Corps brought its own engineering expertise to bear in reviewing and approving WGI's work plans.  But reliance on **WGI's engineering expertise and its subcontractors' expertise cannot be discounted**.  The EBIA remediation and demolition was premised **on the requirement** that WGI would "furnish all services, materials, supplies, labor, and travel, as required," including specifically "**all engineering services**."[170]

Indeed, when WGI presented the government an opportunity to stipulate that the Corps reviewed and approved the December 1999 Recommendation Report, as well as each of the eight major work plans, including the Project Work Plan, Contractor Quality Control Plan, and Sampling and Analysis Plan, the government correctly demurred.

---

[169] *Rowan Companies Inc., v. Greater LaFourche Port Commission*, 2006 WL 2228950, *6 (E.D. La.).

[170] *See* USA Summary Judgment Memorandum at p. 40, (Aug. 8, 2010) (Doc. No. 19988-4) (emphasis added) (citing PX 3836, Corps Statement of Work (June 1, 1999)).

Second, even if the Corps did "supervise and approve all aspects of WGI's work" (which it clearly did not), WGI still had a duty not to harm the floodwall, performing and completing its work in a good, workmanlike manner, free from defects either in material or workmanship.  La. Civ. Code Art. 2762.  The evidence will show that WGI did not perform its duty.  WGI ignored basic engineering principles, dug substantial holes, and removed massive quantities of obstructions and contaminants without making any analysis or determination about whether this work could harm the nearby floodwall protecting Plaintiffs.

As a result, WGI is not absolved from liability because WGI supervised and approved its own work and specifications and it did so in a negligent manner.

## IV.    CONCLUSION

At trial, Plaintiffs will establish that the negligent failure of WGI and the Corps to perform the required geotechnical analyses on their remediation and excavation activities at Boland and Saucer Marine, coupled with their failure to properly backfill and compact those excavations, were a substantial factor in causing the North and South Breaches along the IHNC. Due to this negligent failure, Plaintiffs suffered considerable damages for which these Defendants must be held liable.

Dated:  August 10, 2012

**Respectfully Submitted,**
**PLAINTIFFS LIAISON COUNSEL**

_____/s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
Bruno & Bruno, LLP
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

**MR-GO PLAINTIFFS SUB GROUP LITIGATION
COMMITTEE**

Jonathan Andry (The Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was served upon all counsel of

record by ECF on August 10, 2012.

<u>/s/ Joseph M. Bruno</u>