UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE Duval MAG. Wilkinson |
| PERTAINS TO:   MRGO *Armstrong*, No. 10-866 | |

**ARMSTRONG PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

# **TABLE OF CONTENTS**

**PROPOSED FINDINGS OF FACT** ......................................................... 1

DEFENDANTS' OBLIGATIONS AND RESPONSIBILITIES AT THE EBIA ......................... 1

DEFENDANTS' KNOWLEDGE THAT THE IHNC AND THE EBIA ARE HYDRAULICALLY
CONNECTED ................................................................................ 8

DEFENDANTS' ROLES IN THE EXCAVATION PERMIT PROCESS WITH THE ORLEANS LEVEE
DISTRICT .................................................................................. 10

NORTH BREACH ........................................................................... 11

SOUTH BREACH ........................................................................... 12

NEAR BREACH AT MCDONOUGH MARINE .................................................. 13

HURRICANE KATRINA WINDS .............................................................. 15

**PROPOSED CONCLUSIONS OF LAW** ..................................................... 16

DEFENDANTS' CONDUCT AT THE EBIA WAS NEGLIGENT ................................... 16

    Defendants' Duty to Plaintiffs ........................................................ 17

    Defendants Breached Their Duties Owed To Plaintiffs ................................. 20

    Defendants Breach Was a Substantial Factor In Causing The Two Breaches And
    Plaintiffs' Damages ................................................................... 20

    The Risk Of Harm Was Within The Scope Of Protection Afforded By The Duty
    Breached .............................................................................. 23

    Defendants' Breach of Duty Caused Plaintiffs To Suffer Damages ..................... 25

        Kenneth and Jeaninne Armstrong ................................................. 25

        Estate of Ethel Coats ............................................................ 25

        Fred Holmes ...................................................................... 26

        Alvin Livers ..................................................................... 27

        Clifford Washington .............................................................. 27

FLOOD CONTROL IMMUNITY IS NOT AVAILABLE TO DEFENDANT UNITED STATES ............ 28

THE DISCRETIONARY FUNCTION EXCEPTION IS NOT AVAILABLE TO DEFENDANT UNITED
STATES ................................................................................... 28

    The United States Fails The DFE's First Prong Because The Corps Failed To Follow Its
    Own Policy Mandating A Geotechnical Analysis On The EBIA Excavations ............. 29

    The United States Fails The DFE's First Prong Because The Corps Failed To Follow Its
    Own Regulations, Guidelines, And Engineering Standards That Mandated A
    Geotechnical Analysis On The EBIA Excavations ..................................... 30

        ER 1110-2-1150; Engineering and Design-Engineering and Design for Civil
        Works Projects (Aug. 1999) ..................................................... 30

i

EM 1110-2-1913; Engineering and Design - Design and Construction of Levees (April 2000) ................................................................................................ 35

EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989) ........................................................................................................... 36

EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994) ........................................................................................................... 36

EM 1110-2-5027; Engineering and Design - Confined Disposal of Dredged Material (Sept. 1987) ..................................................................................... 37

EM 1110-2-1901; Seepage Analysis and Control for Dams (Sept. 1986)............ 38

33 C.F.R. § 208.10 Mandates a Geotechnical Analysis........................................ 39

Standard Engineering Practices Mandated A Geotechnical Analysis And A Proper Method Of Compacting Backfilled Excavations .................................................... 39

The United States Fails The DFE's Second Prong ......................................... 42

BECAUSE WGI BREACHED TASK ORDER 26 AND THE TERC, PLAINTIFFS, AS THIRD PARTY BENEFICIARIES, HAVE STANDING TO SUE FOR DAMAGES ......................................................... 44

The Stipulation to Benefit Plaintiffs Is Manifestly Clear ............................................... 44

Task Order 26 And The TERC Provided Certainty As To The Benefit Provided To Plaintiffs .................................................................................................................. 45

The Benefit To Plaintiffs Is Not A "Mere Incident" Of Task Order 26 And The TERC ...................................................................................................................... 45

PLAINTIFFS' CLAIMS AGAINST WGI ARE NOT PRECLUDED BY La. R.S. 9:2771 ...................... 46

WGI Made The Plans And Specifications For Their EBIA Excavations Activity........ 47

The Conditions WGI Created Were Hazardous And It Had No Justifiable Reason To Believe That Its Adherence To Its Own Plans And Specifications Would Not Create A Hazardous Condition ................................................................................................. 49

WGI IS NOT ABSOLVED FROM LIABILITY BECAUSE THE CORPS DID NOT SUPERVISE AND APPROVE ALL ASPECTS OF WGI'S WORK ................................................................................. 51

ii

Plaintiffs set forth below their Proposed Findings of Fact and Conclusions of Law based on the record existing before trial.  Wherever appropriate, a proposed finding is supported by a citation to exhibits, depositions, expert reports, and/or judicially noticeable evidence.  Plaintiffs will supplement these Proposed Findings of Fact and Conclusions of Law based on additional evidence adduced at trial.

## PROPOSED FINDINGS OF FACT

### Defendants' Obligations And Responsibilities At The EBIA

1.      In 1994, the Corps and WGI entered into an indefinite delivery/indefinite quantity contract for the remediation of some hazardous, toxic, and radioactive waste sites in the southwestern United States.[1]

2.      That "umbrella contract," known as the Total Environmental Restoration Contract ("TERC"), set forth general requirements for all of WGI's anticipated work in the region, with the understanding that the Corps would approve a specific Statement of Work for each Task Order issued to WGI.[2]

3.      The intent of the TERC was for WGI to develop the performance specifications needed to remediate a particular location, and to consistently monitor the project as the work proceeded to keep the Corps informed of all developments.[3]

4.      Pursuant to the TERC, WGI was obligated to (1) demolish existing structures in that area by removing surface and subsurface obstructions, (2) characterize contaminants on the

---

[1] *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 457-58 (5th Cir. 2010).
[2] *Id.* at 458.
[3] JX 0048, TERC, PX 4676, (Anne Patten Veigel Depo.) at 84:21-85:2.

site, and (3) remediate the site in accordance with any applicable environmental standards.[4] These specific tasks were contracted for and identified as Task Order 26 of the TERC.[5]

5.      Within the terms of the TERC, WGI was also expected to provide complete Architect-Engineering (A-E) services to support the implementation of the remedial action.[6]

6.      WGI was required to write a Work Plan describing WGI's detailed approach for the performance of Task Order.[7]  This Work Plan is based on the Corps' Statement of Work.

7.      Upon issuance of the Statement of Work, WGI would be required to provide input to support the planning, scheduling and formulation of the Corps' Statement of Work.[8]

8.      The Corps provided back up data to WGI from the Corps' prior investigations.[9]

9.      With this data, WGI would develop plans within regulations and execute those plans.

10.      An essential role of WGI was to provide recommendations to the Corps' Contracting Officer about any alternative methods of executing a remedial action that would result in improvements.[10]

11.      In June 1999, the Corps issued a Statement of Work for Demolition and Site Preparation that stated WGI "shall furnish all engineering services, materials, supplies, labor, as required, in connection with the technical review of site documents...associated with the demolition and remediation" of the EBIA.[11]

---

[4] *In re Katrina Canal Breaches Litig.*, 620 F.3d at 458.
[5] *Id.*
[6] JX 0048, TERC at p. C-5 §§2.4, *et seq.* (WGI000132); PX 4676, (Anne Patten Veigel Depo.) at 87:5-11.
[7] PX 3836, Corps Statement of Work, (June 1, 1999).
[8] PX 4676, (Anne Patten Veigel Depo.) at 85:11-16.
[9] *Id.* at 86:13-20.
[10] *Id.* at 86:3-9.
[11] PX 3836, Corps Statement of Work, (June 1, 1999) (emphasis added); *see also* USA Summary Judgment Memorandum at p. 40, (Aug. 8, 2010) (Doc. No. 19988-4).

12.     While the Corps brought its own engineering expertise to bear in approving WGI's work plans, "*WGI's engineering expertise and its subcontractors' expertise cannot be discounted*.  The EBIA remediation and demolition was premised on the requirement that WGI would 'furnish all services, materials, supplies, labor, and travel, as required,' including specifically '*all engineering services*.'"[12]

13.     WGI was also obligated to "prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to be filled by sampling or other investigations."[13]

14.     This Recommendation Report was designed to instruct the Corps about what needed to be done to prepare the EBIA for future activity associated with the lock replacement project.[14]

15.     The Project Work Plan would set the performance standards regarding the project processes, including the depths of excavation.[15]

16.     The Project Work Plan specified that WGI would be required to provide engineering details, including geotechnical and geology/hydrology.[16]

17.     The Corps had an expectation that WGI would advise about the particularities and nuances of the site as well as any geotechnical issues that they encountered.[17]

18.     This expectation included advising about the potential effect or damage that any subterraneous excavations could have on the floodwall, and that licensed engineers who WGI hired would address those issues.[18]

---

[12] *See* USA Summary Judgment Memorandum at p. 40, (Aug. 8, 2010) (Doc. No. 19988-4) (emphasis added).
[13] PX 3836, Corps Statement of Work, (June 1, 1999).
[14] JX 1234, Recommendation Report.
[15] *Id.* at § 5.1.2.1.3.
[16] *Id.* at § 5.1.2.1.5.
[17] JX 1710 (Guillory 30(b)(6) Depo. Vol. I) at 150:21-151:17.
[18] *Id.* at 164:19-167:6.

19.     In developing the plans and specifications for this project, WGI was obligated to evaluate its excavation and backfill procedures to determine their impact on the stability of the flood project.[19]  Such considerations would include the necessary subsurface investigations to obtain geotechnical properties necessary for underseepage analysis, including seepage forces, hydraulic gradients, and uplift pressure.[20]

20.     Lee Guillory, the Project Delivery Team manager and Corps 30(b)(6) witness, explained that the Corps expected geotechnical support from WGI because they had a staff at their Denver home office that could be called upon for any geotechnical support.[21]

21.     This service particularly important to Mr. Guillory because he was not an expert on seepage issues,[22] and because "flood protection is extremely important" to the Corps as they must assure that their projects "do not jeopardize the flood protection."[23]

22.     In 1999, the Corps began its Inner Harbor Navigation Canal Lock Replacement Project in New Orleans, which included the cleanup of the East Bank Industrial Area.[24]

23.     Each of the six distinct sites was named for a defunct entity that had occupied the area.  These sites are as follows: Boland Marine (Boland), McDonough Marine, Indian Towing, Mayer Yacht - Distributor's Oil, Saucer Marine (Saucer), and International Tank Terminal.

24.     The Corps developed a 1999 Design Documentation Report (DDR), which was a record of final design effort after the feasibility phase and is required for all engineering design products.[25]

---

[19] JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40.
[20] *Id.*
[21] JX 1710 (Guillory 30(b)(6) Depo. Vol. I) at 150:21-151:17.
[22] *Id.* at 219:22-221:13.
[23] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 72:3-73:11.
[24] *In re Katrina Canal Breaches Litig.*, 620 F.3d at 458.
[25] JX 0009-16 (1999 DDR Vols. 1-8); *see also* JX 0044 at p. 3, § 8.2.

25.     After the documentation review, WGI recommended the preparation of specific work plans to provide "guidance and requirements for technical field execution."[26]

26.     The plans and procedures were not definable features of site work, but WGI recommended that "considerable effort should be put forth to ensure that each plan be specifically tailored to meet the needs of the demolition and site preparation efforts."[27]

27.     As part of the Project Work Plan, WGI indicated that "systematic units of work" would be "integrated into the overall project" and that "engineering details" of the Project Work Plan would include "geotechnical" and "geology/hydrology" engineering details.[28]

28.     In acknowledging that demolition would be a "substantial portion of the overall project work," WGI implemented a comprehensive approach to the site demolition activities that included "inspection and evaluation of demolition and site preparation results."[29]

29.     For the remediation aspect of the project, WGI acknowledged responsibility of site investigation for the "identification of the horizontal and vertical extent of the impact" and "identification and characterization of migration pathways and receiving media."[30]

30.     The Corps then presented to WGI a second Statement of Work on May 15, 2000. Again, WGI was to "furnish all services...as required" to develop the work plans "in accordance with the…Recommendation Report."[31]

31.     Prior to the completion of the Project Work Plan, WGI began development of the Recap Submittal Report - Criteria Document in June, 2000.[32]  In that report, WGI mistakenly informed the Corps' EBIA Project Delivery Team that "the floodwall to the east of the site is

---

[26] JX 1234, Recommendation Report at § 5.1.2.
[27] Id.
[28] JX 1234, Recommendation Report at § 5.1.2.1.5 (emphasis added).
[29] Id.  at § 5.1.2.1.8 (emphasis added).
[30] Id. at § 5.8.
[31] PX 4365, Corps Statement of Work, (May 15, 2000) (emphasis added).
[32] PX 3652, RECAP Submittal Report, (June 2001) at WGI 003567, § 4.2; JX 1234, Recommendation Report at § 5.7; JX 1711 (Stephen Roe Depo.) at 218:23-219:16; PX 4677, (Phillip Staggs Depo.) at 264:6-9.

supported on sheet pile that reaches a depth of at least 25 feet and this would essentially interrupt the water flow in the easterly direction at lower elevations to 25 ft."[33]

32.     In August 2000, the Corps produced a Statement of Work for Project Site Development and Remedial Action of EBIA.[34]   This Statement of Work required WGI to "furnish all services, materials, supplies labor, equipment, superintendence, procurement, security services, surveying services, subcontracting, all necessary permits, and licenses..." for the project site.[35]

33.     The final Project Work Plan, dated October, 2000, indicated that WGI was, once again, being "tasked to furnish all services...for the project site development and remedial action" of the EBIA.[36]

34.     As such, WGI was responsible for the implementation of the overall project, WGI's subcontractor, Materials Management Group, was to provide environmental engineering and overall project support, while other WGI subcontractors would complete the demolition aspects.[37] And, once again, WGI's agreed upon task to "furnish all services" included providing geotechnical review and analyses.[38]

35.     WGI developed and submitted its Project Work Plan in October of 2000 to direct the work activities.[39]   WGI defined the scope of the project to consist of the demolition and removal of surface and subsurface obstructions, characterization of contaminants present at the site and remediation of the site in accordance with LDEQ RECAP Standards.[40]

---

[33] PX 3652, RECAP Submittal Report, (June 2001) at WGI 003567, § 4.2; JX 1234, Recommendation Report at § 5.7; JX 1711 (Stephen Roe Depo.) at 218:23-219:16; PX 4677, (Phillip Staggs Depo.) at 264:6-9.
[34] DX-01302, Statement of Work (Aug. 2000).
[35] *Id.*
[36] JX 1252, Project Work Plan (Oct. 2000) at § 1.1.
[37] *Id.* at § 2.1.
[38] PX 0930, April 24, 2002 email from L. Guillory (MEB-112-00000013) (emphasis added).
[39] JX 1252, Project Work Plan (Oct. 2000).
[40] *Id.*.

36.     WGI acknowledged that only after the completion of the various phases of the demolition would the soils and subsurface issues be addressed.[41]

37.     As of October, 2000, the depth of soils considered to be removed was indicated as three feet at the Boland site and seven feet at the Saucer site.[42]

38.     From August to October 2000, the Corps' modification to Task Order 26 directed WGI to, inter alia, draft eight major work plans for various aspects of the remediation and demolition project: a Project Work Plan, Waste Management Plan, Storm Water Pollution Prevention Plan, Sampling and Analysis Plan, Contractor Quality Control Plan, Site Safety & Health Plan, Hurricane Preparedness Plan, and a Perimeter Monitoring Plan.

39.     For each location, the No Further Action At This Time ("NFAATT") report describes the areas that were remediated on [that site], their applicable boreho[l]es or bank locations that were excavated, the dates they were excavated, the dimensions . . . of each of the excavations, and the calculated excavated volume of each of the areas in cubic yards.

40.     WGI was required to provide engineering services during their work at the EBIA.

41.     The Corps expected WGI to provide engineering services during their work at the EBIA.

42.     Any excavation within 300 feet of the centerline of EBIA levee and floodwall required a geotechnical analysis about whether that excavation would impact the adjacent levee and floodwall.

43.     The levee and floodwall at the EBIA that protected Plaintiffs was vulnerable to destabilization from Defendants' adjacent excavation and backfill operations.

---

[41] JX 1252, Project Work Plan (Oct. 2000).
[42] *Id.*

44.     Neither the Corps nor WGI provided any engineering services for the excavations and backfill operations at Boland and Saucer Marine.

45.     Neither the Corps nor WGI determined whether any of their excavation and backfill activities could impact the adjacent EBIA floodwall.[43]

### Defendants' Knowledge That The IHNC And The EBIA Are Hydraulically Connected

46.     Among the documents provided to WGI for review was the Assessment of Potential Hazardous, Toxic and Radiological Waste, Volume 5 of 9, Appendix C, which discussed sampling and analysis of groundwater, and most importantly identified the sheet pile curtain tip depth as -8 feet.[44]

47.     WGI tasked Dennis O'Conner with this review responsibility.[45] Mr. O'Conner, however, is not an engineer.[46]

48.     Mr. O'Conner, along with Jim Blazek of Materials Management Group (WGI's remediation sub-contractor), reviewed the materials and developed the Recommendation Report, dated December 2, 1999.[47]

49.     WGI defined the purpose of the report as "present[ing] recommendations regarding scope and duration of remediation/ demolition activities" at the EBIA.[48]

50.     WGI conceded that there were a number of "data gaps" that would affect the schedule, cost, and scope of work,[49] and that these data gaps might need to be filled by "sampling or other investigations."[50]

---

[43] *In re Katrina Canal Breaches Litig.*, 2011 WL 651946, *10 (E.D. La. 2011).
[44] JX 0032, 1997 New Lock and Connecting Channels report, Volume 5 of 9, Appendix C.
[45] JX 1711 (Stephen Roe Depo.) at 41:19-42:11.
[46] JX 1648 (Dennis O'Conner Depo.) at 16:19-21.
[47] JX 1711 (Stephen Roe Depo.) at 62:23-64:2.
[48] JX 1234, Recommendation Report at § 1.0.
[49] *Id.*
[50] *Id.* at § 2.0

51.     WGI's review of the Assessment of Potential Hazardous, Toxic and Radiological Waste, Volume 5 of 9, Appendix C, led to the understanding that EBIA's "groundwater was impacted but…the size of the contaminant plume was not determined."[51]  This became a "data gap" as the contamination plume areas and depths were not identified.[52]

52.     WGI stated that the impact of some data gaps would need to be addressed by "associated fieldwork."[53]   And, as defense expert Dr. Lucia recognized, this determination included an understanding of the groundwater pathways and where the water was likely to go.[54]

53.     Apparent knowledge in WGI and the Corps' possession about the hydraulic connection between the IHNC and the adjacent EBIA was further buttressed by WGI's acknowledgment that there was a high water table running through the EBIA site,[55] and that during the course of excavations "there is a high probability that groundwater will be encountered."[56]

54.     Possession of such knowledge and information would give a reasonably prudent engineer notice that the soil layers are hydraulically charged and would result in a greater response to pressure gradients.[57]

55.     WGI and the Corps had information clearly indicating the ground water level in the EBIA soils adjacent to the IHNC had been allowed to penetrate essentially unchanged to the face of the floodwall.[58] This information provided early warning signals that the EBIA

---

[51] JX 1234, Recommendation Report at § 3.1.1.1.
[52] Id.
[53] Id.  at § 4.0.
[54] PX 4647 (Dr. Patrick Lucia Depo.) at 131:7-132:3.
[55] JX 1234, Recommendation Report at § 4.1.
[56] Id. at § 5.13.
[57] JX 1414, Bea Rebuttal Report (April 2012) at pp. 45, ¶ 60.
[58] Id. at pp. 45-47, ¶¶ 60-61.

excavations at the north end of the Boland Marine site had established direct hydraulic connections with the sandy shell fill under the Surekote Road overpass.[59]

56.     Email exchanges between Corps employees George Bacuta, Richard Lesser and Lee Guillory further detail not only the awareness of the hydraulic connection between the IHNC and EBIA, but also confirmed that WGI's significant excavation activities directly impacted this connection.[60]

## Defendants' Roles In The Excavation Permit Process With The Orleans Levee District

57.     WGI recognized that certain permits would be necessary, and that one of the "permits required [was] expected to be" from the Orleans Levee Board.[61]

58.     It was WGI's responsibility was to obtain all permits necessary to accomplish the work specified in the individual Delivery Order.

59.     When the work is done at a federal facility, the required clearances, such as excavation, digging, or drilling permits, are required to be obtained prior to the initiation of site operations by the Contractor.

60.     WGI assigned its employee, Dennis O'Connor, with the task of identifying the permits needed for the EBIA project.

61.     The Orleans Levee District ("OLD") was identified as the potential permit source because WGI would be working so close to the vicinity of the flood wall.

62.     The Corps contemplated that WGI would make application for any permit on behalf of the Corps that was deemed necessary by OLD.

---

[59] JX 1389, Bea Report (Feb. 2012) at pp. 54-60, ¶¶ 54-60; JX 1414, Bea Rebuttal Report (April 2012) at pp. 45-47, ¶¶ 60-61.
[60] JX 1653, Bacuta Depo. Exh. 16 (emphasis added).
[61] JX 1234, Recommendation Report at § 5.1.4.

63.     The State of Louisiana, Department of Transportation and Development issued a Letter of No Objection on December 29, 2000 in response to WGI's permit request conditioned upon WGI's agreement to notify the Levee District upon completion of the demolition activities, so that an inspection and approval of the levee condition may be made.

64.     Based upon the Corps of Engineers issued Letter of No Objection, the OLD forwarded a permit letter to WGI requiring strict adherence to the DOTD letter of December 29, 2000 as well as to establish an initial inspection.

65.     In order for this permit to be executory, WGI was required to sign the permit and return it to the OLD.

66.     The OLD permit was sent to WGI's legal counsel, whereupon WGI was advised not to sign the permit letter.

67.     The Corps did not press the issuance of a permit from the OLD matter any further after WGI reported to Lee Guillory that WGI had talked to the levee district and the levee district told them to just keep the levee district apprised of WGI's work and that a permit was not required.

**North Breach**

68.     The North Breach began to develop early on the morning of August 29, 2005 (4:00-5:00 am CDT) before overtopping by the IHNC surge waters and completed development of the 180-250 foot breach by 6:00 am CDT.[62]

69.     The seepage and hydraulic uplift pressures caused by WGI's negligent excavation and backfill activities resulted in differential movements of the concrete floodwall, which opened

---

[62] JX 1389, Bea Report (Feb. 2012) at p. 19, ¶ 32; p. 22, Table 1; p. 86, ¶ 95.

up the vertical joints between the floodwall panels thereby allowing the first floodwaters to enter the Lower 9th Ward.[63]

70.     As the sequence further developed, there was tearing and separation of the sheet piling at the north end of the North Breach and further lateral displacement of the supporting soil levee.[64]

71.     There is a definitive causal relationship between the entire community of poorly-backfilled excavations and deep shell fills at Boland Marine on the waterside of the levee and high uplift or heave gradients resulting in low uplift Factors-of-Safety.[65]

72.     When IHNC waters were able to make contact with the granular backfilled excavations adjacent to the top of the buried swamp/marsh deposits, a high likelihood of hydraulic failure materialized.[66]

73.     The vertical hydraulic gradients exceeded 0.8, uplift Factors-of-Safety were below unity, and the lateral stability probabilities of failure exceed 50% for a canal water elevation between +8 and +10 feet.[67]

**South Breach**

74.     The South Breach failure occurred at 7:00 am CDT after seepage and hydraulic uplift pressures destabilized the floodwall.[68]  The 800-900 foot long breach was fully developed by 9:00 am CDT.[69]

---

[63] JX 1389, Bea Report (Feb. 2012) at pp. 85-86, ¶¶ 94-95; pp. 125-131, ¶¶ 130-142; JX 1393, Bea App. D (Feb. 2012) at pp. 4-11, 21, 26-28, 35-40; JX 1414, Bea Rebuttal Report (April 2012) at pp. 16-38, pp. 107-09.
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] JX 1389, Bea Report (Feb. 2012) at pp. 85-86, ¶¶ 94-95; pp. 125-131, ¶¶ 130-142; JX 1393, Bea App. D (Feb. 2012) at pp. 38-40; JX 1414, Bea Rebuttal Report (April 2012) at pp. 16-38, pp. 107-09.
[68] JX 1389, Bea Report (Feb. 2012) at p. 22, Table 1.
[69] *Id.* at p. 19, ¶ 32; p. 22, Table 1; p. 23, ¶ 34.

75.     Once the floodwall was compromised at 7:00 am, however, the flooding of the entire Lower 9th Ward and each of the Plaintiffs' properties was inevitable.   While some overtopping occurred shortly before the south breach failure, it did not occur for a long enough duration to cause the breach.[70]   This conclusion is supported by the undisputed fact that the floodwall adjacent to both sides of the South Breach (EL 12.6-12.7 feet) was subjected to substantially more wave and surge over topping—which also started before 7:00 am—but did not fail despite having experienced the entire duration of the maximum storm surge (14.2 feet for several hours).[71]

76.     As occurred at the North Breach location, WGI's numerous excavations, many of them large, deep, and poorly backfilled—if backfilled at all—made direct contact with the buried swamp/marsh layer.[72]   These numerous excavations served as a pathway for Katrina's underseepage-induced pore water pressures and hydrostatic uplift pressures to reach the floodwall.[73]  This unabated hydrological attack resulted in a lateral instability mode of failure causing the massive South Breach.[74]

**Near Breach at McDonough Marine**

77.     Defendants' experts never performed an analysis as to why the floodwall adjacent to the North and South Breaches did not fail.

78.     Dr. Bea's investigation also included analyzing portions of the LPV flood protection system that did not fail during Hurricane Katrina.  Of particular importance was his

---

[70] JX 1389, Bea Report (Feb. 2012) at pp. 104-119, ¶¶ 113-124.
[71] *Id.*
[72] *Id.*
[73] JX 1389, Bea Report (Feb. 2012) at pp. 94-119, ¶¶ 101-124; pp. 125-131, ¶¶ 130-142; JX 1393, Bea App. D (Feb. 2012) at pp. 15-25, 31-38, 43-48; JX 1414, Bea Rebuttal Report (April 2012) at pp. 16-38, pp. 110-11.
[74] *Id.*

analysis of the Near Breach location at McDonough Marine located between Boland and Saucer Marine at the EBIA.[75]

79.     This Near Breach location was subjected to the same environmental conditions as the North and South Breaches, suffered the same environmental forces resulting in a tension crack, and also suffered overtopping erosion effects for the full duration of the 14.2 ft storm surge.[76]  The Near Breach site section of floodwall did not fail.[77]

80.     The primary difference between the floodwall's performance at the North and South Breaches versus the Near Breach site was that the North and South Breach excavations contacted the buried swamp-marsh deposits.[78]  At McDonough Marine, unlike nearly every excavation at Boland and many at Saucer Marine, the most significant excavation—the borrow pit—was lined with clay, which effectively sealed and insulated the swamp/marsh deposits from the hydraulic effects generated in the IHNC during Katrina.[79]

81.     It was these multiple poorly-backfilled and compacted excavations present on the EBIA in the vicinity of the North and South Breaches that were in direct contact with the buried swamp – marsh deposits.[80] And it was this direct contact that allowed for Katrina's storm surge to transmit significant hydraulic uplift pressures and underseepage unabated across the EBIA, which ultimately resulted in the floodwall's failure at the North and South Breaches.[81]

82.     All excavations and backfill activities at the EBIA were within 260 feet of the adjacent floodwall.[82]

---

[75] JX 1389, Bea Report (Feb. 2012) at p. 64, Fig. 39; pp. 90-94, ¶¶ 97-100; p. 119, ¶ 124.
[76] Id.
[77] Id.
[78] Id. at p. 119, ¶ 124.
[79] Id. at p. 119, ¶ 124; pp. 127-128, ¶¶ 137-138.
[80] Id. at p. 119, ¶ 124.
[81] Id.
[82] JX 1777, Lucia Report (March 2012) at p. 74.

83. The North and South Breaches correlate to locations where the floodwall was the lowest prior to Katrina and where massive quantities of materials were excavated and removed during WGI's activities.

84. Of all the photographic evidence presented, only one photograph showing any type of compaction was presented.[83]

85. There was no evidence presented which demonstrated the existence or application of any regular, routine, habit or extensive program relating to proper compaction of backfill materials at either the Saucer or Boland Marine excavation sites.

86. While there were approximately 45 identified work areas at the Boland Marine site—8 at which subsurface concrete structures were discovered and 30 foot pilings on 5 foot centers were known to be beneath all foundations—the exact locations, volumes and depths of each could not be determined.

**Hurricane Katrina Winds**

87. An area within the northwest quadrant of a hurricane's wind field will experience winds blowing in a north, north-easterly direction prior to the passage of the eye past that area.[84]

88. From 4:00am through at least 7:00am, the IHNC was within the northwest quadrant of Hurricane Katrina's wind field.[85]

89. Between 4:00 am and 7:45 am on August 29, 2005, the prevailing winds at the IHNC blew in a northeasterly fashion.[86]

90. Between 7:00 and 9: 45 a.m., the prevailing winds were in a northeasterly direction at the IHNC.[87]

---

[83] JX 1780, Stark Report (March 2012) at p. 66, Fig. 5-28 (a) (WGI006447).
[84] *In re Katrina Canal Breaches Litig.*, 2011 WL 1792542, **8-9 (E.D. La.) (Barge Order).
[85] *Id.*
[86] *Id.*

91.    At 4:30 a.m. on August 29, 2005, the wind was from the northeast at 46.66°.[88]

92.    By 7:00 a.m. on August 29, 2005, the wind was from the northeast at 29.49°.[89]

93.    By 7:30 a.m., on August 29, 2005, the wind was from the northeast at 20.11°.[90]

94.    Maximum one-minute sustained winds at the IHNC as Katrina passed were between 70-80 knots (81-92 mph).[91]

## PROPOSED CONCLUSIONS OF LAW

95.    This Court has jurisdiction of the parties, and under 28 U.S.C. § 1346 (b)(1) and 28 U.S.C. § 2671, et seq., (Federal Tort Claims Act ("FTCA")) has subject matter jurisdiction over this suit by Plaintiffs against the United States for damages sustained as a result of Defendants United States and WGI's negligent work performed at the EBIA.

96.    In a suit brought under the FTCA, the United States is amenable to damages in the same manner and to the same extent as a private individual in like circumstances.  28 U.S.C. § 2674.

97.    In determining Defendants' responsibility for damages, the substantive laws of Louisiana (the state in which the incident occurred) are controlling.  *United States v. Muniz*, 374 U.S. 150 (1963); *Standefer v. United States*, 511 F.2d 101 (5th Cir. 1975).

## Defendants' Conduct At The EBIA Was Negligent

98.    Articles 2315 and 2316 of the Louisiana Civil Code state that every person is responsible for damages caused by his fault or negligence.  *In re Katrina Canal Breaches Litig.*, 647 F.Supp.2d 644, 733 (2009) (citing *Pitre v. Louisiana Tech Univ.*, 673 So.2d 585, 589 (La. 1996)); *Graci v. United States*, 435 F.Supp. 189, 195 (E.D. La. 1977).

---

[87] *In re Katrina Canal Breaches Litig.*, 2011 WL 1792542, **8-9 (E.D. La.) (Barge Order).
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*

99.     In analyzing negligence, the relevant questions are: (1) what, if any, duties were owed by the respective parties? (2) whether the requisite duties were breached? (3) was the conduct of which the plaintiff complains a cause-in-fact of the resulting harm? (4) was the risk, and harm caused, within the scope of protection afforded by the duty breached? and (5) were actual damages sustained?  *Pitre*, 673 So.2d at 589.

**<u>Defendants' Duty to Plaintiffs</u>**

100.     Defendants had a "responsibility and duty" existed "to insure the integrity of the levee system [during the EBIA remediation]."  *In re Katrina Canal Breaches Litig.*, 2008 WL 5234369, *19 (E.D. La. 2008).

101.     As parties responsible for the engineering aspects of the EBIA remediation, Defendants also owed a duty to exercise the degree of professional care and skill customarily employed by others engineers in the same general area.  *See Merchants Nat. Bank & Trust Co. of Indianapolis v. Smith, Hinchman & Grylls Associates, Inc.*, 876 F.2d 1202, 1205 (5th Cir. 1989) (citing *Pittman Constr. Co. v. City of New Orleans,* 178 So. 2d 312, 321 (La. Ct. App. 4th Cir. 1965)); *see also Raburn and Associates v. Burgundy Oaks L.L.C.*, 875 So. 2d 119, 122 (La. App. 2d Cir. 2004).

102.     Defendants also had a duty to complete the project in a good, workmanlike manner, free from defects either in materials or workmanship.  La. Civ. Code. Art. 2762.

103.     Defendant United States, as the landowner/proprietor of the EBIA, the United States is liable for any negligent actions at the EBIA "which may deprive [its] neighbor[s] of the liberty of enjoying [their] own [properties], or which may be the cause of any damage to [them]." La. Civ. Code Art. 667.

104.    Louisiana courts have historically held landowners and proprietors liable for flooding a neighbor's property. *See, e.g., Lombard v. Sewerage & Water Bd.*, 284 So. 2d 905, 914 (La. 1973) (damage to homes resulting from construction of drainage canal); *Branch v. City of Lafayette*, 663 So. 2d 216, 220 (La. App. 1995) (water damages to home after heavy rainfall caused by defective drainage system). Liability for causing flooding—which the landowner/proprietor is uniquely capable of preventing—implements a salutary public policy: "The persons at whose disposal society has placed the potent implements of technology owe a heavy moral obligation to use them carefully and to avoid foreseeable harm to present or future generations." *Pitre v. Opelousas Gen. Hosp.*, 530 So. 2d 1151, 1157 (La. 1988).

105.    Louisiana law also imposes a duty on a landowner/proprietor to warn the public of the risk of damage to the nearby property posed by the known defects of, and hazards created by, its facility or property. Thus, in addition to the duty not to create a hazard in the first instance, "a landowner owes a plaintiff a duty to discover any unreasonably dangerous conditions and to either correct the condition or warn of its existence." *Socorro v. City of New Orleans*, 579 So. 2d 931, 939 (La. 1991); *see also Shelton v. Aetna Cas. & Sur. Co.*, 334 So. 2d 406, 410 (La. 1976) (citations omitted.); *Faucheaux, supra*, 615 So. 2d at 294 (duty of parish in maintaining an automatic canal gate and providing warnings of perilous conditions).

106.    Government agencies like the Corps therefore have a legal duty to repair defective conditions and warn of known defects. *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955). This is particularly true where the agency's own construction activities have created the dangerous situation. *See Brandon v. State, Through Dept. of Highways*, 367 So. 2d 137, 143 (La. App. 1979) ("It is a breach of that duty for the Department to undertake construction, partially complete the project, and then leave the project unfinished with hazardous conditions existing for

an unreasonable period of time, particularly when it is within the capacity of the Department to complete the project and eliminate the hazard.")

107.    The first Fundamental Canon of the American Society of Civil Engineers' Code of Ethic's states that "Engineers shall hold paramount the safety, health, and welfare of the public and shall strive to comply with the principles of sustainable development in the performance of the professional duties."[92]

108.    The Corps and WGI both had a duty to evaluate and monitor the potential impact their EBIA excavation and backfilling activities could have on the adjacent floodwall.[93]  This evaluation process begins at the project's inception and continues throughout project's duration.[94]  If conditions previously understood to exist change because of some project modification, some new, unforeseen discovery, or other event, (*e.g.*, different field conditions are found relative to the initial design conditions), a reasonably prudent engineer must re-evaluate their design and determine whether these changed conditions are going to have an impact on the surrounding environment.[95]

109.    Once the Corps and WGI undertook their EBIA site clearing activity pursuant to the TERC and Task Order 26, each had a duty to evaluate the potential impacts that their contemplated excavation activity could have on the adjacent floodwall.[96]

110.    As part of the substantial excavation that occurred at the EBIA, a reasonably prudent engineer would have properly backfilled and compacted all excavations in order to

---

[92] JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] JX 1670 (Baumy 30(b)(6) Depo.) at 237:24-239:13; JX 1663 (Colletti Depo.) at 32:21-35:9; 40:17-43:9; 103:12-105:1; JX 1668 (Pinner Depo.) at 30:19-31:10; 35:2-23; 36:24-39:2; 39:14-41:13; 41:20-43:11; 47:7-48:4; 50:1-14; 62:12-63:2; 66:16-24; 67:20-69:1; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40.

protect against and prevent underseepage and the transmission of hydraulic uplift pressures to the adjacent IHNC floodwall.[97]

### Defendants Breached Their Duties Owed To Plaintiffs

111.    Defendants breached their duties to not harm the floodwall by failing to perform required geotechnical evaluations on their excavation activities that fell within 300 feet of the adjacent IHNC floodwall,[98] failing to properly backfill and compact those excavations, and failing to take other remedial measures on these excavations to ensure the hydrological connection between the IHNC and the floodwall was minimized.[99]

### Defendants Breach Was a Substantial Factor In Causing The Two Breaches And Plaintiffs' Damages

112.    Where there are multiple potential causes, Louisiana law applies the substantial factor test.  *See In re Katrina Canal Breaches Litig.*, 2009 WL 1033783, **6-7 (E.D. La. 2009) (citing *Bonin v. Ferrellgas, Inc.*, 877 So.2d 89 (La. 2004)); *LeJeune v. Allstate Ins. Co.*, 365 So. 2d 471, 477 (La. 1978) (emphasis added) (quoting Prosser on Torts, Section 41 at p. 239 (4th ed. 1971)).

113.    Thus, with multiple cause cases, a plaintiff does not need to prove that defendant's action were a "but for" cause of his damages.  *In re Katrina Canal Breaches Litig.*, 2009 WL 1033783, *2 (E.D. La. 2009); *see also Wagoner v. Exxon Mobil Corp.*, 813 F.Supp.2d 771, 797-98 (E.D. La. 2011) (Fallon, J.).

---

[97] JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40.

[98] JX 1670 (Baumy 30(b)(6) Depo.) at 237:24-239:13; JX 1663 (Colletti Depo.) at 32:21-35:9; 40:17-43:9; 103:12-105:1; JX 1668 (Pinner Depo.) at 30:19-31:10; 35:2-23; 36:24-39:2; 39:14-41:13; 41:20-43:11; 47:7-48:4; 50:1-14; 62:12-63:2; 66:16-24; 67:20-69:1; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40.

[99] JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40.

114.    Defendants' failures detailed above were substantial factors in allowed Katrina's storm waters to transmit significant seepage and hydraulic uplift pressures unabated across the swamp/marsh layer resulting in differential movements of the concrete floodwall and, ultimately, causing the two failures at Boland and Saucer Marine.[100]

115.    Had Defendants undertaken to properly evaluate the impact their excavation and backfilling actions could have on the adjacent floodwall, they would have appreciated and understood the hydraulic connection between the IHNC and the adjacent floodwall protecting Plaintiffs.  With this appreciation and understanding, Defendants should have taken remedial measures to protect against the possibility of an increased surge in the IHNC transmitting seepage and uplift pressures through the swamp marsh layers and ultimately destabilizing floodwall.

116.    Such remedial measures that a reasonably prudent engineer would have taken could include not excavating in that particular location, applying clay wedges to specific excavations, using clay as backfill and properly compacting that clay to a proper proctor.[101]

117.    Defendants' seriously flawed and unreliable causation analyses further buttresses Dr. Bea's conclusions.

118.    Defendants' own experts cannot agree on what caused the North Breach or when the South Breach occurred.  Their theories conflict with each other as well as certain of this Court's own findings in the *Barge* matter.

119.    Concerning the North Breach, WGI's expert, Dr. Silva-Tulla, claims that approximately three hours of wave overtopping from two to three foot waves created a four to

---

[100] JX 1389, Bea Report (Feb. 2012) at pp. 85-86, ¶¶ 94-95; pp. 125-131, ¶¶ 130-142; JX 1393, Bea App. D (Feb. 2012) at pp. 4-11, 15-20, 21, 26-28, 31-40, 43-48; JX 1414, Bea Rebuttal Report (April 2012) at pp. 16-38.
[101] JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1410 (Rogers Depo. Vol. II) at 151:23-153:12; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40.

five foot deep scour trench on the protected side of the floodwall, which caused a tear in the sheet pile wall.[102]

120.    However this Court has already concluded, based upon the IHNC Lockmaster's observations during the storm and from other expert testimony, that the waves were only one to two feet high with winds from the northeast and then from the north pushing waves away from the floodwall for most of the morning.[103]

121.    The government's expert, on the other hand, opines that there was **no** scour at the time of failure.  Dr. Marr posits that to develop the sheet pile tear, "high lateral forces" totaling 500,000 pounds of horizontal force were exerted by water and soil pushing against the wall.[104] But this conclusion is complete speculation because his model computing horizontal force "became unstable at 200,000 pounds of force" so conclusions about any pounds beyond this artificial ceiling is just an approximation.[105]

122.    Concerning the South Breach, Dr. Silva-Tulla and Dr. Marr's theories conflict with respect to timing.

123.    First, the water level in the IHNC did not reach the top of the wall until approximately 7:00 a.m., which does not allow for sufficient amount of overflow onto the protected side to create the five-foot trench that they believe is necessary to induce failure.  Dr. Silva-Tulla tries to resolve this discrepancy by relying on WGI's hydrologist Dr. Dalrymple's finding, which was based on an assumption that wave overtopping occurred for three hours beginning at 3:45 a.m.[106]

---

[102] PX 0583 (Silva-Tulla Depo. Vol. I) at 144:2-145:7; 179:6-10.
[103] *In re Katrina Canal Breaches Litig.*, 2011 WL 1792542 (Barge Order).
[104] PX 4439 (Marr Depo. Vol. II) at 88-89, 107.
[105] *Id.* at 99:17-103:20.
[106] PX 0583 (Silva-Tulla Depo. Vol. I) at 136:25-137:4.

124.     For such a result, Dr. Dalrymple needs two to three foot waves to have sufficient overflow to produce the necessary scour trench depth.  But as pointed out previously, this Court has already concluded that the waves in the IHNC were only one to two feet high with winds from the northeast and then from the north pushing waves away from the floodwall for most of the morning.[107]

125.     In contrast, Dr. Marr confirmed that wave overtopping must be discounted.  But Dr. Marr is then confronted with another unresolvable issue: if he were to account for the two hours of overflowing water needed to create the scour trench, the South Breach would have occurred at 9:00 a.m.[108]

126.     Defendants' cross-sections reveal additional significant flaws with their causation analyses.  In particular, they evaluated soil conditions approximately 100 to 150 feet <u>south</u> of the North Breach initiation zone, not at the breach initiation zone itself.[109]

127.     In so doing, Defendants inexplicably ignore boring 81A, which is the most relevant boring for the North Breach because it is closest to the breach initiation point, and most representative of soil conditions at the breach site.[110]

128.     The LaFarge barge ING 4727 was not a cause of any breach along the east side of the IHNC during Hurricane Katrina.[111]

### **The Risk Of Harm Was Within The Scope Of Protection Afforded By The Duty Breached**

129.     In determining whether the risk of harm was within the scope of protection afforded by the duty breached, Louisiana courts consider the particular case in terms of the

---

[107] *In re Katrina Canal Breaches Litig.*, 2011 WL 1792542, **8-10 (Barge Order).
[108] PX 4438 (Marr Depo. Vol. I) at 63-65.
[109] *See* Opp. Mtn. to Strike Bea Testimony (May 21, 2002) (Doc. No. 20849-2)at pp. 14-18.
[110] *Id.*
[111] *In re Katrina Canal Breaches Litig.*, 2011 WL 1792542 (E.D. La.) (Barge Order).

moral, social and economic values involved, as well as a view toward the ideal of justice. *PPG Industries, Inc. v. Bean Dredging,* 447 So.2d 1058, 1061 (La. 1984). Put another way, courts should ask whether the defendant was under a duty to protect each of the plaintiff's interests affected against the type of damage that did in fact occur. *Pitre v. Opelousas Gen. Hosp.*, 530 So.2d 1151 (La. 1988); *see also Rando v Anco Insulations, Inc.*, 16 So.3d 1065 (La. 2009) ("this legal determination depends on factual determinations of foreseeability and ease of association."); *Roberts v. Benoit*, 605 So. 2d 1032, 1044 (La. 1991), *Pitre v. Opelousas Gen. Hosp.*, 530 So. 2d 1151 (La. 1991).

130. Defendants' had a duty not to harm the IHNC floodwall as they knew it existed to protect the people living behind it.

131. It was obviously foreseeable that significant excavation and remediation activities within the 300-foot safety zone of the adjacent floodwall would jeopardize the floodwall's stability. Thus, the precise harm Plaintiffs' suffered was absolutely foreseeable.

132. Defendants specifically recognized this potential when they undertook to line certain excavation at McDonough Marine with clay in order to cut off the hydraulic connection they knew existed between the IHNC and the EBIA.[112] The Corps' own 30(b)(6) witness, John Grieshaber, further detailed the Corps' full awareness of this potential harm when he testified that "the only way you could endanger the flood system is by some for of inappropriate excavation or backfill."[113]

133. Plaintiffs are readily included within the scope of the duty breached by Defendants.

---

[112] JX 1394 (Bea Depo. Vol. I) at 270:14-271:10; 271:11-273:10; JX 1389, Bea Report (Feb. 2012) at p. 46, Fig. 25 (WGI photos 222110904-05, (McDonough Marine)); WGI photo 234030905-01 (Boland Marine).
[113] JX 1709 (John Grieshaber 30(b)(b) Depo. Vol. II) at 15:6-9; see *also* JX 1647 (John Grieshaber 30(b)(b) Depo. Vol. I) at 62:7-22; 67:9-11; 67:21-68:2; 68:20-69:7.

**Defendants' Breach of Duty Caused Plaintiffs To Suffer Damages**

134.    Plaintiffs suffered significant personal and property damages resulting from the failure of the IHNC floodwall caused by Defendants' negligent acts.[114]

**Kenneth and Jeaninne Armstrong**

135.    At the time of hurricane Katrina, Mr. and Mrs. Armstrong owned a home with the physical address of 4016 Hamlet Place in Chalmette, Louisiana.

136.    As a result of the flooding of their property and their subsequent relocation, the Armstrongs were forced to incur additional living expenses in the amount of $38,881.46.[115]

137.    The Armstrongs lost all of the contents of their homes. The value of their contents was 181,498.40.[116]

138.    As a result of the flooding of his property, Mr. and Mrs. Armstrong's home sustained severe damage. This damaged the Armstrongs in the amount of $194,407.31.[117]

139.    Mr. and Mrs. Armstrong were also damaged due to the inconvenience caused to them by the flooding of their property and their forced relocation.  The amount of damage caused by this inconvenience will be determined at trial.

**Estate of Ethel Coats**

140.    At the time of hurricane Katrina, Mrs. Coats owned a home with the physical address of 1020-1022 Charbonnet Street in New Orleans, Louisiana.

141.    As a result of the flooding of her property and her subsequent relocation, Mrs. Coats was forced to incur additional living expenses in the amount of 43,599.88.[118]

---

[114] *See* Scott Taylor Final Loss Reports (Oct. 2011),  JX 1605 (Kenneth and Jeaninne Armstrong); JX 1609 (Estate of Ethel Coats); JX 1607 (Fred Holmes); JX 1611 (Alvin Livers); JX 1613 (Clifford Washington).
[115] JX 1605, Scott Taylor Final Loss Report for Kenneth and Jeaninne Armstrong (Oct. 20, 2011) at p. 2.
[116] *Id.*
[117] *Id.*
[118] JX 1609, Scott Taylor Final Loss Report for Estate of Ethel Coats (Oct. 20, 2011) at p. 2.

142.    Mrs. Coats lost all of the contents of her home. The value of her contents was $214,119.72.[119]

143.    As a result of the flooding of her property, Mrs. Coats' home sustained severe damage. This damaged Mrs. Coats in the amount of $217,999.29.[120]

144.    Mrs. Coats was also damaged due to the inconvenience caused to her by the flooding of her property and her forced relocation.   The amount of damage caused by this inconvenience will be determined at trial.

**Fred Holmes**

145.    At the time of hurricane Katrina, Mr. and Mrs. Holmes owned a home with the physical address of 1205 Perrin Drive in Arabi, Louisiana.

146.    As a result of the flooding of their property and their subsequent relocation, the Holmes were forced to incur additional living expenses in the amount of $36,152.25.[121]

147.    The Holmes lost all of the contents of their homes. The value of their contents was $171,893.88.[122]

148.    As a result of the flooding of their property, Mr. and Mrs. Holmes' home sustained severe damage. This damaged the Holmes in the amount of $180,761.23.[123]

149.    Mr. and Mrs. Holmes were also damaged due to the inconvenience caused to them by the flooding of their property and their forced relocation.   The amount of damage caused by this inconvenience will be determined at trial.

---

[119] JX 1609, Scott Taylor Final Loss Report for Estate of Ethel Coats (Oct. 20, 2011) at p. 2.
[120] *Id.*
[121] JX 1607, Scott Taylor Final Loss Report for Fred Holmes (Oct. 20, 2011) at p. 2.
[122] *Id.*
[123] *Id.*

**Alvin Livers**

150.    At the time of hurricane Katrina, Mr. and Mrs. Livers owned a home with the physical address of 4929 St. Claude Avenue in New Orleans, Louisiana.

151.    As a result of the flooding of their property and their subsequent relocation, the Livers were forced to incur additional living expenses in the amount of $33,164.96.[124]

152.    The Livers lost all of the contents of their homes. The value of their contents was $77,971.57.[125]

153.    As a result of the flooding of their property, Mr. and Mrs. Livers' home sustained severe damage. This damaged the Livers in the amount of $165,824.79.[126]

154.    Mr. and Mrs. Livers were also damaged due to the inconvenience caused to them by the flooding of their property and their forced relocation.  The amount of damage caused by this inconvenience will be determined at trial.

**Clifford Washington**

155.    At the time of hurricane Katrina, Mr. and Mrs. Washington owned a home with the physical address of 1910-1910 ½ Charbonnet Street in New Orleans, Louisiana.

156.    As a result of the flooding of their property, the Washingtons' home sustained severe damage. This damaged Mr. and Mrs. Washington in the amount of $110,009.59.[127]

157.    Mr. and Mrs. Washington were also damaged due to the inconvenience caused to them by the flooding of their property and their forced relocation.  The amount of damage caused by this inconvenience will be determined at trial.

---

[124] JX 1611, Scott Taylor Final Loss Report for Alvin Livers (Oct. 20, 2011) at p. 2.
[125] *Id.*
[126] *Id.*
[127] JX 1613, Scott Taylor Final Loss Report for Clifford Washington (Oct. 20, 2011) at p. 2.

**Flood Control Immunity Is Not Available To Defendant United States**

158.    In February, 2011, this Court granted the Entergy Plaintiffs' Motion for Partial Summary Judgment and the Armstrong Plaintiffs' Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment on 702c "insofar as the United States may be found liable for damages caused by its negligence that is extrinsic to the LPV if proven at trial." *In re Katrina Canal Breaches Litig.*, 2011 WL 651946, *6 (Rec. Doc. 20164).

159.    The Armstrong Plaintiffs do not contend that the LPV, or any flood control activity or project, played any role in the North and South Breaches.

160.    Defendants' negligent site clearing activity was only related to navigation and expanding the existing IHNC lock to account for the increased barge traffic traversing the shipping canal. *Id.* at *5.

161.    702c immunity is not available to the Corps because the negligent acts that caused Plaintiffs' damages are entirely extrinsic from the LPV and any flood control activity. *In re Katrina Canal Breaches Litig.*, 673 F.3d 381, 390 (5th Cir. 2012).

**The Discretionary Function Exception Is Not Available To Defendant United States**

162.    The DFE bars suit on any claim that is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

163.    The Supreme Court has developed a two-prong test for determining whether the federal government's conduct qualifies as a discretionary function or duty." *Freeman v. United States*, 556 F.3d 326, 336-37 (5th Cir.2009).

**The United States Fails The DFE's First Prong Because The Corps Failed To Follow Its Own Policy Mandating A Geotechnical Analysis On The EBIA Excavations**

164.     Under the first prong, the conduct must involve "an element of judgment or choice." *Id.* at 337 (quoting *United States v. Gaubert,* 499 U.S. 315, 322 (1991)) (citation omitted). "If a statute, regulation, or policy leaves it to a federal agency or employee to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary." *Id.* (citation omitted).

165.     "On the other hand, [t]he requirement of judgment or choice is not satisfied and the discretionary function exception does not apply if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." *Id.* (internal quotation marks omitted); *see also In re Katrina Canal Breaches Litig.*, 647 F.Supp.2d at 717.

166.     Government policy mandates may be "expressed or implied by statute, regulation or agency guidelines," both internal and published.  *Gaubert*, 499 U.S. at 324; *see also Andrulonis v. United States,* 952 F.2d 652, 654 (2d Cir. 1991).

167.     The Corps' policy mandated geotechnical analyses on the potential impact that an excavation project like the EBIA could have on a nearby existing (or proposed) flood control structure.[128]

168.     In particular, Corps policy required a geotechnical analysis on excavations performed within 300 feet of the IHNC floodwall.[129]

---

[128] JX 1647 (John Grieshaber 30(b)(b) Depo. Vol. I) at 36:7-37:1; 41:20-43:3; 45:19-46:12; 47:2-14; 53:4-12; 54:2-56:6; 69:23-77:25; 78:22-80:25; 88:7-21; 123:5-124:7, 91:2-93:13, 103:3-18; 123:5-124:7; 145:22-146:6; 147:1-148:14; 159:14-160:25; 173:8-174:19; 168:9-22
JX 1670 (Walter Baumy Depo. Vol. I) at 236:6-13; 237:24-239:13;
JX 1663 (Gerald Colletti Depo.) at 30:10-19; 32:21-35:9; 40:17-43:9; 103:12-105:1;
JX 1669 (Richard Varuso Depo.) at 177:15-178:5; 198:7-21;
JX 1710 (Lee Guillory Depo. Vol. I) at 153:2-7; 157:24-158:12, 198:6-16; 206:23-207:10;
JX 1668 (Richard Pinner Depo.) at 30:19-31:10; 35:2-23; 36:24-39:2; 39:14-41:13; 41:20-43:11; 47:7-48:4; 50:1-14; 62:12-63:2; 66:16-24; 67:20-69:1; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 228-231.

169.    The government has conceded that certain engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects—like the EBIA excavation and soil replacement—were mandatory.[130]

170.    This policy was ignored when the Corps failed to perform the requisite geotechnical analyses after WGI discovered substantial contaminants and structures at the Boland Marine and Saucer Marine locations within 300 feet of the adjacent IHNC floodwall.[131]

171.    Because the Corps ignored its own policy requiring these geotechnical evaluations, the DFE is unavailable to the government.

## The United States Fails The DFE's First Prong Because The Corps Failed To Follow Its Own Regulations, Guidelines, And Engineering Standards That Mandated A Geotechnical Analysis On The EBIA Excavations

172.    The Corps has several Engineering Regulations and Manuals that also required engineering analyses of how their excavation projects along the EBIA could potentially impact the integrity of nearby IHNC floodwall.

173.    The Corps' own engineering standards are specific legal mandates and not general, precatory guidelines.  *See In re Katrina Canal Breaches Litig.*, 647 F.Supp.2d at 718.

### ER 1110-2-1150; Engineering and Design-Engineering and Design for Civil Works Projects (Aug. 1999)

174.    ER 1110-2-1150; Engineering and Design-Engineering and Design for Civil Works Projects (Aug. 1999) is a mandatory regulation that the Corps violated.

---

[129] *Id.*; *see also* JX 1670 (Baumy 30(b)(6) Depo.) at 237:24-239:13; JX 1663 (Colletti Depo.) at 32:21-35:9; 40:17-43:9; 103:12-105:1; JX 1668 (Pinner Depo.) at 30:19-31:10; 35:2-23; 36:24-39:2; 39:14-41:13; 41:20-43:11; 47:7-48:4; 50:1-14; 62:12-63:2; 66:16-24; 67:20-69:1; *see also In re Katrina Canal Breaches Litig.*, 2011 WL 651946, *10 (E.D. La. 2011) ("No such engineering investigations were undertaken.")
[130] *See* JX 0044, ER 1110-2-1150 at § 19.1.1; JX 1709 (Grieshaber 30(b)(6) Depo. Vol. II) at 64:2-11; 82:2-23; JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 36:7-37:1; 41:20-43:3; 45:19-46:12; 47:2-14; 54:2-56:6; 69:23-77:25; 78:22-80:25; 88:7-21; 123:5-124:7, 91:2-93:13, 103:3-18; 123:5-124:7; 145:22-146:6; 147:1-148:14; 159:14-160:25; 173:8-174:19; 168:9-22.
[131] *Id.*

175.     Section 8 required a Design Documentation Report ("DDR") for the EBIA excavations.[132]   A DDR is a "record of final design effort after the feasibility phase" and "provides the technical basis for the plans and specifications and serves as a summary of the final design."[133]

176.     The DDR covers both the preconstruction engineering and design phase and the construction phase of the project.[134]   In effect, the DDR is the engineering master plan for a Corps project containing a discussion of all the engineering, geotechnical, and other analyses for the Corps' field personnel implementing the master plan.

177.     As Appendix D instructs, the DDR is "not finalized until project construction is completed.  During the construction phase, *design decisions made in connection with contract modifications shall be added to the DDR*."[135]   Amendments to the DDR must reflect changes in the original DDR and the new engineering, geotechnical and other analyses relating to these changes.[136]   Accordingly, the DDR must include "*results of geotechnical investigations*, which supplement previous studies…."[137]

178.     The initial DDR was drafted in 1999 and did not address the EBIA excavation project as it evolved.

179.     The EBIA excavation project that accompanied the IHNC Lock Replacement was modified several times because, once WGI began excavating in 2001, Defendants found massive

---

[132] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 3, §8.2; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[133] *Id.*

[134] *Id.*

[135] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. D-1, §D-1.4 (emphasis added); *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[136] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. D-1, §D-1.4; D-3, §D-7.11; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[137] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. D-3, §D-7.11 (emphasis added); *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

contaminants and other subsurface structures and obstructions at the Boland Marine and Saucer Marine locations.

180.    Contrary to the Corps' policy, despite these significant changes in the project's scope, neither the 1999 DDR nor the amended 2001 DDR No. 2 contained any geotechnical investigation of the excavations' potential impact on the adjacent IHNC floodwall.

181.    Section 10 ER 1110-2-1150 states that "Districts *shall conduct* analyses and investigations in accordance with approved engineering criteria and guidance, coordinate engineering activities, and seek advice on problems encountered during project development from appropriate MSC, HQUSACE, and other engineering staffs."[138]

182.    Once the Corps and WGI encountered the subterraneous foundations, pipelines, and other obstructions and contaminants at the Boland Marine and Saucer Marine locations, the DDR required modification and geotechnical needed to address the potential for the removal of these structures to negatively impact the adjacent IHNC floodwall.[139]  This mandated modification and geotechnical analysis never occurred.

183.    Section 15 of ER 1110-2-1150 requires Corps engineering be involved in "modification of [Plans & Specifications]…and preparation of engineering considerations and instructions to field personnel.  The engineers must also provide support for contract claims and modifications…."[140]  This requirement was further discussed by Corps 30(b)(6) witness, Mr. Greishaber, who detailed the Corps' mandatory policy of reevaluating any changes and modifications that could impact adjacent flood control structures at the EBIA.[141]

---

[138] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 4, §10 (emphasis added); *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[139] *Id.*

[140] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 19; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[141] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 90:14-96:15; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

184.    This engineering evaluation was required to include analyses of underseepage, global stability, and the actual temporary retaining structures at both the Boland Marine and Saucer Marine locations.[142]   In fact, these analyses had to be completed before WGI could go forward with its work.[143]

185.    In addition, Section 15.6 ("Engineering support for claims and modifications") states that "[e]ngineering *shall* provide design and cost estimating assistance for claims and modifications when requested and be knowledgeable of all claims and modifications…. Engineering input into this process is *essential to ensure the continuity of the design process through construction*…."[144]   This requirement was not followed. Lee Guillory, another Corps 30(b)(6) witness, testified that he never afforded the geotechnical division an opportunity to provide design assistance on the EBIA excavations at Boland Marine and Saucer Marine.[145] Thus, despite a mandate that Corps engineers "shall" be knowledgeable of all claims and modifications, no such engineering support or review was even possible because Mr. Guillory never informed them of the claims and modifications necessitated by the evolving scope of WGI's excavation work along the EBIA.

186.    Section 17 of ER 1110-2-1150 required engineering to have responsibility for the "[e]xecution of the design and technical quality" of the project.[146]   Because of this requirement, it was "essential that coordination and planning the work effort occur at the earliest stages of

---

[142] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 123:5-124:7; 159:20-160:25; 173:8-174:19; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[143] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) 147:1-148:14; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[144] ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 20, §15.6 (emphasis added); *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[145] JX 1710 (Guillory 30(b)(6) Depo. Vol. I) at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[146] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

project development, through preparation and execution of the Management Plan."[147]   In

addition, Section 17 mandates that "[t]echnical quality *shall* be achieved mainly through a

process that includes…*adequate coordination among the project team and technical

disciplines*."[148]  Finally, [q]uality is further achieved by participation in *value engineering studies*

and thorough internal checking and review by *qualified engineers*."[149]

187.    Mr. Guillory testified there was no "adequate coordination" with geotechnical for

the excavation work at the EBIA.[150]  He further testified that there was no "coordination and

planning the work effort" with geotechnical once WGI discovered the subsurface structures and

obstructions at the Boland Marine and Saucer Marine sites.[151]   Confirming what Section 17

states, Mr. Greishaber testified that such coordination and planning was required.[152]  The Corps

should not have allowed WGI to proceed with the excavations at Boland and Saucer without

evaluating the potential negative impact these excavations could have on the nearby floodwall.[153]

188.    Section 17 also required a "qualified engineer" to check and review the

excavation plans at these two locations.[154]  To the extent the Corps tasked George Bacuta with

reviewing the excavation plans,[155] Mr. Bacuta is a geochemist and not a "qualified engineer."[156]

Mr. Bacuta never actually reviewed any excavation plans.[157]

---

[147] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[148] *Id.* (emphasis added).
[149] *Id.*
[150] JX 1710 (Guillory 30(b)(6) Depo. Vol. I) at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10; JX 1653 (Bacuta Depo.) at 176:20-178:12; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[151] *Id.*
[152] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 88:7-21; 123:5-124:7; 147:1-148:14; 159:20-160:25; 173:8-174:19; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[153] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 36:7-37:1; 41:20-42:25; 45:19-46:12; 47:2-14; 53:4-12; 54:2-56:6; 69:23-77:25; 78:22-80:25; 88:7-21; 123:5-124:7; 91:2-93:13; 103:3-18; 123:5-124:7; 145:22-146:6; 147:1-148:14; 159:14-160:25; 173:8-174:19; 168:9-22; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[154] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 22, §17; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[155] JX 1710 (Guillory 30(b)(6) Depo. Vol. I) at 188:8-17; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

189.    Because the Corps failed to follow the specific mandates of ER 1110-2-1150, they have failed the DFE's first prong, and the DFE is not available.

### EM 1110-2-1913; Engineering and Design - Design and Construction of Levees (April 2000)

190.    The Corps' Engineering Manuals "contain mandatory requirements for engineering procedures and design standards" as well as "policy standards for uniform engineering practice related to civil works projects."[158]   Certain of these requirements are designed "to ensure project safety and function."[159]   According to the Corps, "flood protection is extremely important," and they must ensure that their projects "do not jeopardize the flood protection."[160]   To adhere to this reasonable safety policy, Mr. Greishaber testified that the Corps follows EM 1110-2-1913.[161]

191.    EM 1110-2-1913 demonstrates that any foundation condition that may impact the seepage potential under a levee must be evaluated.   In particular, "[w]ithout control, underseepage in pervious foundations beneath levees may result in (a) excessive hydrostatic pressures beneath an impervious top stratum on the landside, (b) sand boils, and (c) piping beneath the levee itself."[162]

192.    The Corps failed to follow EM 1110-2-1913 by failing to evaluate and determine whether the foundation conditions at Boland and Saucer Marine may impact the seepage potential under the adjacent EBIA levee and floodwall.

---

[156] JX 1653 (Bacuta Depo.) at 145:18-146:6; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[157] JX 1653 (Bacuta Depo.) at 142:21-25; 177:4-13; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[158] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 4, §10.1; p. 23, §19.1.2; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234; JX 1389, Bea Report (Feb. 2012) at p. 121, ¶ a.

[159] JX 0044, ER 1110-2-1150; Engineering and Design -Engineering and Design for Civil Works Projects (Aug. 1999) at p. 23, §19.1.2; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[160] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 72:3-73:11; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

[161] *Id.*

[162] JX 0046, EM 1110-2-1913; Engineering and Design - Design and Construction of Levees (April 2000) at p. 5-1, §5-1; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234; JX 1389, Bea Report (Feb. 2012) at p. 121.

193. Because the Corps failed to follow the specific mandates of ER 1110-2-1913, they have failed the DFE's first prong, and the DFE is not available.

### EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989)

194. The Corps' Lock Evaluation Report states that the "structural components shall be designed according to the applicable portions of…EM-1110-2-2502."[163]

195. This manual states that "[w]ater-retaining structures are subject to through-seepage, underseepage, and seepage around their sides or ends" and that "[u]ncontrolled seepage may result in water pressures and uplift forces on the wall base in excess of design assumptions and consequent structural instability…."[164]  Because of this seepage potential, "[s]eepage control entails the design of measures to ensure that seepage pressures and velocities are maintained below tolerable values."[165]  As a result, "the seepage aspects and the foundation stability of walls which have had basements excavated on either side of and adjacent to the wall since the original design and construction were completed should be investigated."[166]

196. The Corps failed to follow EM 1110-2-2502 by never evaluating the "seepage aspects and the foundation stability" of their excavations at Boland and Saucer Marine.

197. Because Defendants failed to follow the specific mandates of ER 1110-2-2502, they have failed the DFE's first prong, and the DFE is not available.

### EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994)

198. EM 1110-2-2504 concerns the design of sheet pile walls.  This manual states that "[c]oordination and cooperation among hydraulic, geotechnical, and structural engineers must be

---

[163] JX 0025, MRGO New Lock and Connecting Channels Evaluation Report: Main Report and Environmental Impact Statement March 1997),Vol. 3 at B-86, §B.2.8; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.
[164] JX 0040, EM 1110-2-2502; Engineering and Design - Retaining and Flood Walls (Sept. 1989) at p. 7-3, §7-3; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234; JX 1389, Bea Report (Feb. 2012) at p. 122.
[165] *Id.*
[166] *Id.*

continuous from the inception of the project to final placement in operation."[167]  It also mandates that "for floodwalls, foundation underseepage conditions must also be assessed."[168]

199.    Defendants never engaged in any "coordination" or "cooperation" among the hydraulic, geotechnical and structural engineers responsible for the EBIA site clearing activities.

200.    Defendants never assessed how their EBIA site clearing activities could impact the foundation underseepage conditions at the EBIA floodwall.

201.    Because Defendants failed to follow the specific mandates of ER 1110-2-2504, they have failed the DFE's first prong, and the DFE is not available.

## EM 1110-2-5027; Engineering and Design - Confined Disposal of Dredged Material (Sept. 1987)

202.    EM 1110-2-5027 concerns confined disposal of dredged material.  Specifically, this manual required more extensive field investigations where "foundation deposits are weak and compressible," "highly variable," and where "[u]nderseepage and/or settlement problems are severe" and where "the consequences of the failure involve life, property, or damage to the environment."[169]

203.    Defendants knew that EBIA had extensive foundation deposits that were "weak and compressible," "highly variable," and that these locations were susceptible to "underseepage and/or settlement problems."  They also know that these vulnerable locations were immediately adjacent to the EBIA floodwall that was protecting the lives and property of the citizens of the Lower 9th Ward and St. Bernard Parish.

---

[167] JX 0042, EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994) at p. 2-1, §2-1; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234; JX 1389, Bea Report (Feb. 2012) at pp. 122-123.
[168] JX 0042, EM 1110-2-2504; Engineering and Design - Design of Sheet Pile Walls (March 1994) at p. 3-1, §3-1*a*. ("Geotechnical Investigation"); *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234; JX 1389, Bea Report (Feb. 2012) at pp. 122-123.
[169] JX 0038, EM 1110-2-5027; Engineering and Design - Confined Disposal of Dredged Material (Sept. 1987) at p. 6-4, Table 6-1; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 231-234.

204. Despite this knowledge, Defendants never undertook any investigation into the potential impact their excavation work could have on the adjacent floodwall.

205. Because Defendants failed to follow the specific mandates of ER 1110-2-5027, they have failed the DFE's first prong, and the DFE is not available.

## EM 1110-2-1901; Seepage Analysis and Control for Dams (Sept. 1986)

206. Corps employee and witness, Richard Pinner, testified that the Corps' dam engineering manuals have information concerning failure modes relevant to levees.[170]

207. EM 1110-2-1901 states that "all dams on earth foundations are subject to underseepage. Seepage control in earth foundations is necessary to prevent excessive uplift pressures and piping through the foundation…The purpose of the project, i.e., long-term storage, flood control, hydropower, etc., may impose limitations on the allowable quantity of seepage…."[171]

208. Despite their knowledge that the IHNC and the EBIA were hydraulically connected, and this connection could be exacerbated during high-water storm events, Defendants never undertook to analyze and determine whether their excavation work at the EBIA would impact the adjacent floodwall by exposing it to excessive uplift pressures and piping through the pervious swamp/marsh foundation.

209. Because Defendants failed to follow the specific mandates of ER 1110-2-1901, they have failed the DFE's first prong, and the DFE is not available.

---

[170] JX 1668 (Pinner Depo.) at 25:10-26:10.
[171] JX 0036, EM 1110-2-1901; Seepage Analysis and Control for Dams (Sept. 1986) at p. 9-1, ¶ 9-1; *see also* JX 1389, Bea Report (Feb. 2012) at p. 123; JX 1668 (Richard Pinner Depo.) at 25:10-26:10.

### 33 C.F.R. § 208.10 Mandates a Geotechnical Analysis

210.    33 C.F.R. § 208.10 concerns local flood protection works and includes maintenance and operation of structures and facilities.[172]

> No improvement shall be passed over, under, or through the walls, levees, improved channels or floodways, nor shall any excavation or construction be permitted within the limits of the project right-of-way…without prior determination by the District Engineer of the Department of the Army or his authorized representative that such improvement, excavation, construction, or alteration **will not adversely affect the functioning of the protective facilities**.

> Such improvements or alterations as may be found to be desirable and permissible under the above determination **shall be constructed in accordance with standard engineering practice**.

> Advice regarding the effect of proposed improvements or alterations on the functioning of the project and information concerning methods of construction acceptable under standard engineering practice **shall be obtained from the District Engineer or, if otherwise obtained, shall be submitted for his approval**.   Drawings or prints showing such improvements or alterations as finally constructed shall be furnished the District Engineer after completion of the work.

33 C.F.R. § 208.10(a)(5) (emphasis added).

211.    This regulation required a geotechnical evaluation on the potential impact Defendants' excavation activities could have on the IHNC floodwall, but such an evaluation never occurred.

212.    Because Defendants failed to follow the specific mandates of 33 C.F.R. § 208.10, they have failed the DFE's first prong, and the DFE is not available.

### Standard Engineering Practices Mandated A Geotechnical Analysis And A Proper Method Of Compacting Backfilled Excavations

213.    Independent of any policy, regulation, manual or code, a responsible engineer undertaking the same work performed by the Corps and WGI knows there are standard

---

[172] 33 CFR § 208.10; *see also* JX 1580, Rogers Report (Jan. 2012) at pp. 235-236; JX 1389, Bea Report (Feb. 2012) at pp. 123-124.

engineering practices obligating an engineer or engineering firm to (1) perform a geotechnical evaluation of the potential impact its excavation work could have on an adjacent flood control structure, and (2) properly backfill and compact excavations in order to protect against and prevent underseepage from undermining the structure's design capacity (which includes an accepted safety factor).[173]

214.   A senior Corps 30(b)(6) representative, Mr. Greishaber, recognized this generally accepted principle as he testified that it was "good engineering and [a] sound engineering principle[]" to coordinate engineering activities with geotechnical engineers and seek geotechnical input on significant safety issues that the Corps encountered during the EBIA excavation.[174]

215.   With respect to the Corps and WGI's excavation activity at the EBIA, standard engineering practice associated with site work being performed in the vicinity of a flood protection system requires, and as stated in the WGI Recommendation Report for Demolition and Site Preparation Activities, that geotechnical engineering be an integral component of the work at the site.[175]

216.   At a minimum, a geotechnical engineer should have reviewed the additional subsurface information collected as part of the scope of work and ensured that the Corps' mandatory flood protection system evaluations were satisfied.[176]   This is especially true for instances where the excavation work extended to the I‑wall itself and/or encountered pervious

---

[173] JX 1580, Rogers Report (Jan. 2012) at p. 236; *see also* JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 38-53.

[174] JX 1580, Rogers Report (Jan. 2012) at p. 236 (citing JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 123:5-124:7).

[175] JX 1580, Rogers Report (Jan. 2012) at p. 236.

[176] JX 1580, Rogers Report (Jan. 2012) at p. 236; *see also* JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 38-53.

fills that have the ability to quickly and rapidly convey water pressure directly to the floodwall.[177]

217.    Concerning the backfilling activity associated with this excavation activity, WGI consulted with the Corps and determined that a clay seal should be applied at those locations adjacent to the floodwall that might pose a potential hydraulic load on the existing I‑wall structure.[178]  This protective clay seal, however, was not applied against the very pervious shell backfill and cohesionless sand backfills identified by WGI during their site characterization and sampling phase (specifically, MMG soil boring 81A, performed on October 4, 2001).[179]

218.    Standard practice concerning geotechnical evaluations and protocols for mechanical compaction of "engineered fill" or "structural backfill" in areas adjacent to flood protection systems are essential to ensure that excavation activities will not degrade the capacity of the flood protection system, exposing the community depending on the protective system for their life safety.  These standards were, in fact, pioneered and developed by the Army Corps of Engineers over several decades of painstaking research and evaluations of levee problems, which drew considerable acclaim at the time.[180]  These standards even became benchmark standards, employed in one form or another, by virtually every flood control agency in the USA.[181]

---

[177] JX 1580, Rogers Report (Jan. 2012) at p. 236; *see also* JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 38-53.

[178] JX 1580, Rogers Report (Jan. 2012) at p. 236; *see also* JX 1389, Bea Report (Feb. 2012) at pp. 127-128, ¶¶ 137-138.

[179] JX 1580, Rogers Report (Jan. 2012) at p. 236; *see also* JX 1389, Bea Report (Feb. 2012) at pp. 127-128, ¶¶ 137-138.

[180] JX 1580, Rogers Report (Jan. 2012) at pp. 236-237 (citing April 1956 article by W.J. Turnbull and C. R. Foster of the Army Corps of Engineers titled "Stabilization of Materials by Compaction" (Journal of the Soil Mechanics & Foundations Division of ASCE, v. 82:934) received the Norman Medal of ASCE for 1959, the society's highest honor. The January 1956 article by C.I. Mansur and R.I. Kaufman of the Army Corps of Engineers titled "Underseepage, Mississippi River Levees, St. Louis District (Journal of the Soil Mechanics & Foundations Division of ASCE, v. 82:864) received the Thomas Fitch Rowland Prize of ASCE in 1958).  *See also* JX 1389, Bea Report (Feb. 2012) at pp. 124-25, ¶ 128.

[181] JX 1580, Rogers Report (Jan. 2012) at pp. 236-237 (citing Mittler, E.L., L. Morgan, M. Shapiro, and K.Y. Grill. (2006). State Roles and Responsibilities in the national Flood Insurance Program, American Institutes for Research, Washington, DC., and Monday, J., K.Y. Grill, P. Esformes, M. Eng, T. Kinney, and M. Shapiro. (2006). An

219.    Without these critical and fundamental analyses, anyone engaged in excavation and backfilling activity similar to the activity engaged in by the Corps and WGI at the EBIA would have an insufficient understanding of whether they are jeopardizing the structural integrity of the adjacent flood control feature, although the potential dangers are patently obvious.[182]

220.    Standard engineering practices mandated Defendants to (1) perform a geotechnical evaluation of the potential impact its excavation work could have on an adjacent flood control structure, and (2) properly backfill and compact excavations in order to protect against and prevent underseepage from undermining the structure's design capacity (which includes an accepted safety factor).  Defendants failed follow both of these practices.  Because of this failure, they have failed the DFE's first prong, and the DFE is not available.

### The United States Fails The DFE's Second Prong

221.    To succeed under the DFE's Prong Two, the Government must prove that its decision to forego the required engineering analyses "involve[d] the permissible exercise of policy judgment."  *Berkovitz v. United States*, 486 U.S. 531, 538 n.3 (1988).  Decisions involving safety, engineering judgment, and accepted professional standards do not constitute a "matter of policy" or an "exercise of policy judgment."  *In re Katrina Canal Breaches Litig.*, 647 F.Supp.2d at 705, 712-14 (citing *Cope v. Scott*, 45 F.3d 445, 452 (D.C. Cir. 1995), and *Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1217 (9th Cir. 2001).

222.    Defendants failed to perform the required engineering analyses on the potential deleterious impact of the EBIA excavations on the adjacent IHNC floodwalls. This conscious decision not to perform the analyses indisputably concerned safety, engineering judgments, and

---

Evaluation of Compliance with the National Flood Insurance Program, Part A: Achieving Community Compliance, American Institutes for Research, Washington, DC).  *See also* JX 1389, Bea Report (Feb. 2012) at pp. 124-25, ¶ 128.
[182] JX 1580, Rogers Report (Jan. 2012) at pp. 236-237.

accepted professional standards.   In particular, Mr. Greishaber testified that performing an analysis on wall stability, seepage, and global stability was not only the Corps' policy but also a matter of "good engineering and sound engineering principles."[183]   Mr. Greishaber further emphasized that because "flood protection is extremely important" to the Corps, it must assure that it does "not jeopardize the flood protection."[184]   The issue of safety with respect to the EBIA excavations is best exemplified by Mr. Greishaber's testimony that a potential consequence of failing to engage in these mandatory analyses is the failure of that flood control measure, which results in "flood[ing] a city."[185]   It is uncontested here that these engineering analyses were not performed.[186]   Because these fundamental engineering analyses involve safety, engineering judgment, and accepted professional standards, and because the failure to perform these analyses cannot possibly involve a policy judgment, the Government cannot satisfy the DFE's Prong Two.

223.   Under the two-prong DFE test, (1) the Corps had no choice but to comply with, but nevertheless violated several, mandatory requirements, including those detailed in their own policies, regulations, and manuals, as well as Louisiana tort law in its EBIA activities, thereby depriving it the DFE immunity; and (2) alternatively, the Corps' negligent acts and inaction with regard to their (and WGI's) failure to perform the required geotechnical evaluations on the potential impact their excavations could have on the adjacent floodwall were ordinary, non-policy decisions concerning technical, engineering, scientific, and professional judgments about

---

[183] JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 123:5-124:7.
[184] *Id.* at 72:3-73:11.
[185] JX 1580, Rogers Report (Jan. 2012) at pp. 236-237 (citing JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 80:13-25).
[186] JX 1710 (Guillory 30(b)(6) Depo. Vol. I) at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10; *see also* JX 1653 (Bacuta Depo.) at 176:20-178:12; PX 4691, Oral Argument Transcript from USA MSJ (Oct. 13, 2010) at 23:25-24:11.

safety and not the type of economic, political, or social decisions that Congress that Congress sought to protect.

### Because WGI Breached Task Order 26 And The TERC, Plaintiffs, As Third Party Beneficiaries, Have Standing To Sue For Damages

224.   Louisiana Civil Code provides that a contracting party may stipulate a benefit for a third person called a third-party beneficiary.  La. Civ. Code Art. 1978.  Such a contract for the benefit of a third party is referred to as a stipulation *pour autrui*.  *Joseph v. Hospital Serv. Dist. No. 2 of Parish of St. Mary*, 939 So.2d 1206, 1211 (La. 2006) (citing *Paul v. La. State Employees' Group Benefit Program*, 762 So.2d 136, 140. (La. App. 1st Cir. 2000)).

225.   To determine whether contracting parties provided a benefit for a third party, courts analyze three criteria:  (1) the stipulation for a third party is manifestly clear; (2) there is certainty as to the benefit provided the third party; and (3) the benefit is not a mere incident of the contract between the promisor and the promisee.  *Joseph*, 939 So.2d at 1212.

### The Stipulation to Benefit Plaintiffs Is Manifestly Clear

226.   The first criterion for determining whether contracting parties have provided a benefit for a third party is whether the stipulation is manifestly clear.  *Id.* at 1212.

227.   Modification No. 5 expressly incorporated into the TERC and Task Order 26 indemnification language that read:   "Contractor shall…be responsible *for all damages to persons or property* that occur as a result of the Contractor's fault or negligence."[187]

228.   This language is essentially *identical* to the indemnification language in *Andrepont*, as well as several other Louisiana cases that found stipulations *pour autrui*.[188]

---

[187] JX 1244, Mod. No. 5 at ¶ 5.0 (WGI000091) (emphasis added).
[188] *See Hargroder v. Columbia Gulf Transmission Co.,* 290 So. 2d 874, 876 (La. 1974) (stipulation *pour autrui* created by language in a servitude agreement stating defendant "agrees to pay such damages which may arise to growing crops, timber, or fences from the construction of the (pipeline)"); *Dartez v. Dixon*, 502 So. 2d 1063 (La. 1987) (stipulation *pour autrui* where party "agreed to be responsible for all liabilities incurred…."); *Hazelwood Farm, Inc. v. Liberty Oil and Gas Corp.*, 790 So. 2d 93, 100-101 (La. App. 3d Cir. 2001) (stipulation *pour autrui*

229.     This indemnification language is manifestly clear that WGI's stipulation to be responsible for all damage to all persons and property provides a benefit to Plaintiffs, as third parties to Task Order 26 and the TERC.

### Task Order 26 And The TERC Provided Certainty As To The Benefit Provided To Plaintiffs

230.     The second factor—that there is certainty as to the benefit provided to the third party—is a corollary to the first factor.  It is based on the principle that in order to create a legal obligation enforceable by the beneficiary there must be certainty as to the benefit to accrue to the beneficiary.  *Joseph*, 939 So.2d at 1212 (citing *Berry v. Berry*, 371 So. 2d 1346, 1347 (La. App. 1st Cir.), writ denied, 373 So. 2d 511 (1979)); *see also Navarrete v. General Ins. Co. of America*, 2008 WL 659477, *2 (E.D. La.) (Engelhardt, J.) ("Where a contract provides for payment to a party upon an occurrence, it can safely be said that there is certainty of a benefit when the condition set forth is satisfied.")

231.     The benefit accrued to Plaintiffs, here, as third parties is undisputedly certain.  In the event Plaintiffs (and any other person for that matter) suffered damages as a result of WGI's negligent work performed at the EBIA, especially due to the foreseeable failure of the floodwall, WGI agreed to pay "for all damages to persons or property that occur…."[189]   Because the benefit accrued is certain, Plaintiffs have established *Joseph*'s second factor.

### The Benefit To Plaintiffs Is Not A "Mere Incident" Of Task Order 26 And The TERC

232.     The third requirement is that the benefit cannot be a mere incident of the contract. The trial court must "distinguish a situation where an advantage has actually been stipulated on

---

where contract provided "Grantee shall be responsible for all damages caused by his operations."); *compare Broussard v. Northcott Exploration Co., Inc.*, 481 So. 2d 125, 127 (La. 1986) (no third party benefit in the damage clause of a mineral lease which limited liability to lessor, only: "[t]he Lessee shall be responsible for all surface damages of the *Lessor* caused by the Lessee's operations.") (emphasis added).
[189] JX 1244, Mod. No. 5 at ¶ 5.0 (WGI000091).

behalf of a third party from a situation where the advantage relied upon is merely an incident of the contract between the parties." *Joseph*, 939 So.2d at 1212–13 (quoting J. Denson Smith, *Third Party Beneficiaries in Louisiana: The Stipulation Pour Autrui*, 11 Tul. L. Rev. 18, 28 (1936)). In examining this factor, there are certain issues that point to an intended rather than an incidental benefit, including (1) the existence of a legal relationship between the promisee and the putative beneficiary involving an obligation owed by the promisee to the beneficiary which performance of the promise will discharge, and (2) the existence of a factual relationship between the promisee and the putative beneficiary where there is a possibility of future liability on the part of the promisee to the beneficiary against which the performance by the promisee will protect the beneficiary. *Andrepont*, 231 So. 2d at 350–51 (citing Smith, *Third Party Beneficiaries in Louisiana*, 11 Tul. L. Rev. 18, 58).

233. By including paragraph 5 of Modification No. 5 into the TERC, WGI specifically created a legal and factual relationship with Plaintiffs. In the event WGI negligently performed its work at the EBIA, WGI agreed to compensate any person who suffered damages as a result. This express, unambiguous benefit is an intended benefit of the TERC and Task Order 26. Plaintiffs have satisfied *Joseph*'s third factor.

234. Because Plaintiffs are third party beneficiaries of the TERC and Task Order 26, WGI is responsible for their damages suffered as a result of WGI's negligent work at the EBIA.

## Plaintiffs' Claims Against WGI Are Not Precluded by La. R.S. 9:2771

235. The protection afforded by La. R.S. 9:2771 is not available to WGI because it either specifically made, or caused to be made, the plans and specifications at issue here, and it cannot prove the conditions it created were not hazardous or that it had a justifiable reason to

believe that its adherence to its own plans and specifications would not create a hazardous condition. In relevant party, La. R.S. 9:2771 provides:

> No contractor…shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to **plans or specifications furnished to him which he did not make or cause to be made** and if the destruction, deterioration, or defect **was due to any fault or insufficiency of the plans or specifications**….

La. R.S. 9:2771 (emphasis added).

236.    Immunity statutes must be strictly construed against the party claiming the immunity. *American Waste & Pollution v. Madison Parish,* 488 So. 2d 940 (La. 1986); *Barabay Prop. Holding Corp. v. Boh Bros. Const. Co., L.L.C.*, 991 So. 2d 74, 79 (La. App. 1st Cir. 2008). While the immunity afforded by La. R.S. 9:2771 extends to third-party tort claims, the contractor invoking that defense has the burden of proving (1) the contractor did not make, or cause to be made, the plans and specifications at issue, and (2) the conditions created were not hazardous or that the contractor had a justifiable reason to believe that its adherence to the plans and specifications would not create a hazardous condition.. *Barabay*, 991 So. 2d at 79; *Morgan v. Lafourche Rec. Dist. No. 5*, 822 So.2d 716, 721-22 (La. App. 1st Cir. 2002)

### **WGI Made The Plans And Specifications For Their EBIA Excavations Activity**

237.    To succeed, WGI first must prove that it did "not make or cause to be made" any of the plans or specifications concerning its remediation activities at the EBIA. WGI cannot do this. The Fifth Circuit foreclosed this defense (as well as the Government Contractor Immunity) when it concluded three separate times that **specifications** with respect to backfill and compaction were left to WGI's determination, alone:

> Because the **specifications for the work at issue were not reasonably precise**, WGI has no GCI, so we reverse the summary judgment and remand.

*In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 457 (5th Cir. 2010) (emphasis added).

> Given that the Corps provided imprecise, **and at times non-existent, specifications regarding the composition of the on-site and off-site backfill material**, WGI is not entitled to claim GCI for **its exercise of discretion** in choosing the composition of that material.

*Id.* at 463 (emphasis added).

> The Corps **did not "make"** WGI use the exact backfill material that was utilized, **nor did it "require"** WGI select the compaction method that was employed.  In the absence of reasonably precise Corps specifications, **those decisions were made by WGI**. Thus, WGI fails the first step of the Boyle test and is not entitled to GCI **for its choice of backfill material and compaction method**.

*Id.* at 465 (emphasis added).

238.    This Court affirmed these specific findings that WGI was responsible for backfill and compaction specifications when it denied WGI's motion on the continued availability of the GCI.  *See* Doc. No. 20346 (Aug. 1, 2011).

239.    It is the law of the case that WGI brought to the EBIA remediation activities "its own specifications" concerning backfill and compaction.  For this reason, alone, contractor immunity does not apply.  Yet there is also evidence that the Corps relied on WGI to bring its own plans and specifications for other matters.  For example, WGI was required to write a Work Plan, which would describe WGI's detailed approach for the performance of Task Order 26.[190] In developing the plans and specifications for this project, WGI was obligated to evaluate its excavation and backfill procedures to determine their impact on the stability of the flood project.[191]  WGI was also obligated to "prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to be filled by sampling or other investigations."[192]  The Corps also relied on WGI to

---

[190] PX 3836, Corps Statement of Work (June 1, 1999).
[191] JX 1580, Rogers Report (Jan. 2012) at pp. 228-237; JX 1389, Bea Report (Feb. 2012) at pp. 120-125; JX 1414, Bea Rebuttal Report (April 2012) at pp. 39-40; PX 3836, Corps Statement of Work, (June 1, 1999); JX 1234, Recommendation Report at § 5.1.2.1.5; PX 4365, Corps Statement of Work, (May 15, 2000).
[192] PX 3836, Corps Statement of Work (June 1, 1999).

supply engineering services.[193]  This expectation included advising about the potential effect or damage that any subterraneous excavations could have on the floodwall, and addressing those issues by licensed engineers hired by WGI hired.[194]  This fact cannot be underscored enough, as the government, itself, declared that "the Corps brought its own engineering expertise to bear in reviewing and approving **WGI's work plans**."[195], [196]

240.    In fact, common sense dictates if the Corps did not set out WGI's specifications, then WGI must have done so itself.

**The Conditions WGI Created Were Hazardous And It Had No Justifiable Reason To Believe That Its Adherence To Its Own Plans And Specifications Would Not Create A Hazardous Condition**

241.    Even assuming WGI relied solely on the Corps for the plans and specifications at issue here, WGI "cannot rely blindly on plans and specifications" in fulfilling its duty to exercise ordinary care toward third parties in the fulfillment of its contractual obligations.  *Morgan*, 822 So.2d 716, 721, *Barabay*, 991 So.2d at 79.  In addition to proving it did not make the plans and specification, a contractor must also prove that the condition created was not hazardous or that it had no justifiable reason to believe that its adherence to the plans and specifications created a hazardous condition.  *Rowan Cos.*, 2006 WL 2228950, at *6 (citing *Bernard v. State,* 640 So. 2d 694, 700 (La. App. 3d Cir. 1994), *writ denied,* 643 So.2d 165 (La. 1994)).

242.    WGI cannot prove that the conditions it created were not hazardous.  WGI already was aware of a hydraulic connection between the IHNC and adjacent floodwall when it

---

[193] JX 1710 (Guillory 30(b)(6) Depo. Vol. I) at 150:21-151:17.

[194] *Id.* at 164:19-167:6.

[195] *See* Doc. No. 19988-4, USA Summary Judgment Memorandum at p. 40, (Aug. 8, 2010) (emphasis added).

[196] To the extent WGI may claim no responsibility for plans and specifications that came from one of its subcontractors, that claim is meritless as Louisiana Courts find that a subcontractor's plans and specifications are "caused to be made" by the contractor.  *See, e.g., A & M Pest Control Service, Inc. v. Fejta Const. Co., Inc.*, 338 So. 2d 946, 951 (La. App. 1976) (immunity inapplicable for contractor who subcontracted the work to subcontractor who provided the plans and specifications for the system, thus subcontractor's plans and specifications for the installation of sprinkler system "are plans or specifications which [contractor] 'caused to be made'….")

undertook the massive remediation at the EBIA.[197]  Despite this knowledge, WGI proceeded to excavate massive amounts of hazardous waste, building foundations, utility lines, and other obstructions adjacent the floodwall without taking any steps to perform a required geotechnical analysis on the potential impact this work could have on exacerbating the hydraulic connection with the adjacent floodwall.  It is a basic engineering principle and practice that if you dig holes near a floodwall as substantial as the ones at issue here (and improperly backfill and compact those holes), you need to determine whether your work would harm the floodwall.[198]  Neither the Corps nor WGI followed this basic engineering precept.  As Dr. Bea concluded, such a failure created the hazardous conditions that played a substantial factor in causing the North and South Breaches.

243.    WGI failed to prove that it had any justifiable reason to believe that its adherence to the plans and specifications would not create a hazardous condition.  WGI is one of the largest engineering firms in the country.  It was specifically tasked to provide all the engineering service either directly or through one of its subcontractors.[199]  Because of this, it had a duty to determine whether their work would harm the floodwall.[200]  But it made no effort to determine whether their work would jeopardize flood control.  WGI has acknowledged this fact time and again stating that it was the Corps who had the responsibility to make this determination, not WGI. Simply pointing the finger at the Corps as being the party responsible for engineering evaluations

[197] JX 1234, Recommendation Report at § 3.1.1.1, § 4.1, § 5.13; PX 4647 (Dr. Patrick Lucia Depo.) at 131:7-132:3; JX 1414, Bea Rebuttal Report (April 2012) at pp. 45-46, ¶ 60, Fig. 21; JX 1645, Aug. 5, 2004 email from Bacuta to Lesser (emphasis added).
[198] JX 1580, Rogers Report (Jan. 2012) at pp. 236-37; JX 1647 (Grieshaber 30(b)(6) Depo. Vol. I) at 36:7-37:1; 41:20-42:25; 45:19-46:12; 47:2-14; 53:4-12; 54:2-56:6; 69:23-77:25; 78:22-80:25; 88:7-21; 123:5-124:7, 91:2-93:13, 103:3-18; 123:5-124:7; 145:22-146:6; 147:1-148:14; 159:14-160:25; 173:8-174:19; 168:9-22; JX 1414, Bea Rebuttal Report (April 2012) at pp. 38-53.
[199] PX 3836, Corps Statement of Work (June 1, 1999); *see also* USA Summary Judgment Memorandum at p. 40, (Aug. 8, 2010) (Doc. No. 19988-4); JX 1234, Recommendation Report at § 5.1.2.1.5; PX 4365, Corps Statement of Work, (May 15, 2000); JX 1245, Project Work Plan (Oct. 2000) at § 1.0; PX 0930, April 24, 2002 email from L. Guillory (MEB-112-00000013).
[200] *In re Katrina Canal Breaches Litig.*, 2008 WL 5234369, *19 (E.D. La. 2008) (detailing a "responsibility and duty" existed "to insure the integrity of the levee system [during the EBIA remediation].").

(and with the Corps pointing that finger right back at WGI) is certainly not a justifiable reason to believe its work would not create a hazardous condition.

244.    Accordingly, La. RS 9:2771 does not protect WGI because it made and caused to be made the plans and specifications for work at the EBIA, and because it cannot prove the conditions it created were not hazardous or that it had a justifiable reason to believe that its adherence to the plans and specifications would not create a hazardous condition.

## WGI Is Not Absolved From Liability Because The Corps Did Not Supervise And Approve All Aspects Of WGI's Work

245.    WGI believes it cannot be held liable for Plaintiffs' damages because "it simply did what it was told to do."[201]  For the reasons discussed above, this argument fails.  First, WGI alone was responsible for determining the backfill and compaction used at the EBIA.  *In re Katrina Canal Breaches Litig.*, 620 F.3d at 455, 457, 463, 465.  In addition to the backfill and compaction, the government's position is also that the Corps relied on WGI to furnish the mandated engineering services during EBIA remediation:

> To be sure, the Corps brought its own engineering expertise to bear in reviewing and approving WGI's work plans.  But reliance on **WGI's engineering expertise and its subcontractors' expertise cannot be discounted**.  The EBIA remediation and demolition was premised **on the requirement** that WGI would "furnish all services, materials, supplies, labor, and travel, as required," including specifically "**all engineering services**."[202]

246.    Even if the Corps did "supervise and approve all aspect of WGI's work," WGI still had a duty not to harm the floodwall, performing and completing its work in a good, workmanlike manner, free from defects either in material or workmanship.  La. Civ. Code Art. 2762.  WGI did not perform its duty.  WGI ignored basic engineering principles, dug substantial holes, and removed massive quantities of obstructions and contaminants without making any

---

[201] *Rowan Companies Inc., v. Greater LaFourche Port Commission*, 2006 WL 2228950, *6 (E.D. La.).
[202] *See* USA Summary Judgment Memorandum at p. 40, (Aug. 8, 2010) (Doc. No. 19988-4) (emphasis added) (citing PX 3836, Corps Statement of Work (June 1, 1999)).

analysis or determination about whether this work could harm the nearby floodwall protecting Plaintiffs.

247.    Thus, WGI is not absolved from liability because WGI supervised and approved its own work and specifications and it did so in a negligent manner.

248.    Plaintiffs have demonstrated by a preponderance of the evidence that the negligent failure of WGI and the Corps to perform the required geotechnical analyses on their remediation and excavation activities at Boland and Saucer Marine, coupled with their failure to properly backfill and compact those excavations, were a substantial factor in causing the North and South Breaches along the IHNC.   Due to this negligent failure, Plaintiffs suffered considerable damages for which these Defendants are liable.

Dated:  August 10, 2012

**Respectfully Submitted,**
**PLAINTIFFS LIAISON COUNSEL**

_____/s/ Joseph M. Bruno_
JOSEPH M. BRUNO (La. Bar # 3604)
Bruno & Bruno, LLP
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

**MR-GO PLAINTIFFS SUB GROUP LITIGATION**
**COMMITTEE**

Jonathan Andry (The Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was served upon all counsel of record by ECF on August 10, 2012.

<u>/s/</u> Joseph M. Bruno