UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO: MRGO | * | |
| *Armstrong*, No. 10-866 | * | SECTION "K"(2) |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO
PRECLUDE EVIDENCE EMPLOYING UNPRODUCED GIS MODEL
OR, IN THE ALTERNATIVE, TO COMPEL PRODUCTION OF THE MODEL**

PLAINTIFFS hereby request entry of any order prohibiting introduction of graphics (demonstrative aids or substantive evidence) generated from Defendants' GIS model, which has never been produced to Plaintiffs despite having been relied upon and utilized extensively by Defendants' expert witnesses. Alternatively, Plaintiffs seek an order compelling production of the model so that Plaintiffs can test and validate any demonstrative aids or substantive evidence based upon it.

1. On April 24, 2012, Plaintiffs deposed the USA's causation expert, Dr. Allen Marr. Dr. Marr was questioned about the table of EBIA excavations appended to his report (Table B-1). He confirmed that in creating Table B-1, he relied upon a spreadsheet generated by Mr. Matt Mayo, working for WGI expert Dr. Francisco Silva-Tulla.[1] All of the excavation

---

[1] Ex. A, Marr Dep. (4/24/12) Vol. 2 at 185:16-186:1.

1

depths in Dr. Marr's report were derived from Table B-1.[2]

2.   On June 6, 2012, per the parties agreement, Dr. Silva-Tulla sat for a supplemental deposition concerning the manner in which Defendants ascertained and reported the elevation, depth, dimensions, and locations of excavations at the EBIA.   Dr. Silva confirmed that his team created the excavation spreadsheet upon which Dr. Marr relied.[3]   The spreadsheet itself was reportedly out of a <u>GIS model</u> created and utilized by the Defendants' experts.[4]   That is, the spreadsheet included a subset of information contained in the defense experts' GIS model.[5]

As the defense expert team updated information in its GIS model, it would export sets of information for use, generating documents like the excavation spreadsheet that Dr. Marr relied upon, and as borne out by Dr. Silva's testimony that his report would correspond directly to what is contained in the GIS database.[6]

To populate this GIS model, Dr. Silva's team consulted primary source documents,

---

[2] Ex. A (Marr.) at 193:1-14.

[3] Ex. B, Silva Supp. Dep. (6/6/12) at 19:20-21:02.

[4] Ex. B (Silva) at 61:25-62:9. ("A. This spreadsheet comes – it's exported from the GIS. Q. And the GIS contains data that your team collected on the excavations, is that right? A. Correct.").

[5] Ex. B (Silva) at 73:12-15. ("Q. But everything we see in Exhibit 2 [the excavation spreadsheet] is a subset of information contained in the GIS database? A. It is.")

[6] Ex. B (Silva) at 63:15-64:25;  *Id.* at 69:24-70:9 ("It's the GIS database. The files [such as the spreadsheet file] were produced as a convenience. <u>They were exported from the GIS database to disseminate information</u>....So as different corrections were made to the GIS database, some of the corrections were transmitted by e-mail, um, so we can export what we have in the GIS database now, and that would be, that would correspond to the information in my report.").

such as daily reports, and "enter[ed] this information into our GIS model and analysis."[7]

Accordingly, the GIS model is "mostly a collection of the underlying documents"[8] that

details the EBIA and WGI's excavation work within it in order to "summarize all of the

information available to us."[9]  In an earlier deposition, Dr. Silva described the creation of the

GIS model this way:

> We went through all of these daily reports and all of the quality assurance
> reports, we went through the photographs, and we incorporated all of this
> information into the GIS model that we had, that we started putting together
> I guess over a year now, a year ago.  Once we had that information, we
> selected our study sections, and we would go to our GIS model, extract from
> the model actual excavations that had been performed and backfilled, and
> incorporate those geometric features into our geometry for the analysis.  So
> that's the way we do it.[10]

    3.  Defense experts indisputably relied upon the model in formulating their opinions:

Q.    What was the purpose in creating what we see as Exhibit 2 [the
      excavation spreadsheet] either as it exists or in its final iteration?

A.    Well, mostly to share the data with the others.

Q.    Others meaning other defense experts?

A.    Including other defense experts, yes. It was also used to go through some of
      these numbers and to share within our group, to check some of these

---

[7] Ex. B (Silva) at 24:1-20. *See also id.* at 134:102 (surveys are included in the "GIS model") & 139:1-5 (Lidar data are in "the GIS"); 153:14-24 (grid trenching excluded from the "GIS model").

[8] Ex. B (Silva) at 70:25-71:7.

[9] Ex. B (Silva) at 71:17-19.

[10] Ex. C, Silva Dep. (4/12/12) Vol. 1 at 97:17-98:4. *See also id.* at 182:11-16 ("As I mentioned earlier, we have a GIS model that depicts quite accurately, or as accurately as we possibly could do it, all of these excavations. So we have that information within the GIS model, but I couldn't tell you the [soil volume] numbers from memory.")

numbers.[11]

In Dr. Silva's words, "[T]he whole purpose of the GIS model is to help us do analysis."[12] Defense expert Dr. David Sykora confirmed this point:

> I was working closely with Mr. Matt Mayo, M A Y O, and Miss Kathy Thrun. They were two consultants that were working closely with Dr. Francisco Silva-Tulla and they were developing GIS database systems that would allow for an evaluation of the spatial distribution of information from the project. So when I was first retained, it came to my knowledge that <u>Kathy and Matt were providing these services already and had already developed these databases that were available for my use</u>." (emphasis added)[13]

Dr. Sykora described in broad terms the process by which the GIS model was populated with data, as well as his reliance upon it:

> Okay. They take various information that's available, some of it is aerial photographs, some of it is AutoCAD drawings, some of it is information gleaned from the various reports including the NFATT, N F A T T, reports, the RECAP, R E C A P, reports, and all of that spatial information is input into the GIS system; and once that information is provided and input in the system, then the analysts can look at all the information spatially in whatever combination of layers that they or the engineer find useful.[14]

4. Although Defendants' experts have relied extensively on their GIS model, it has never been produced to Plaintiffs, as Dr. Silva confirmed at deposition:

> Q.    In your -- did you produce that in connection with your reliance materials? All this GIS model that you say that predicts that [excavation volumes] accurately?

---

[11] Ex. B (Silva) at 73:16-25.

[12] Ex. B (Silva) at 107:21-22.

[13] Ex. D, Sykora Dep. (3/22/12) at 125:12-23.

[14] Ex. D (Sykora) at 127:4-15.

A.    We produce [sic] a lot of information from it.[15]

Thus, Defendants have produced information <u>generated from the GIS model</u>, but never the <u>GIS model itself</u> (i.e., their set of underlying data).  For example, they have produced illustrations or screenshots (such as the plan views and site geometry illustrations appended to expert reports).  They have, where it suited their purposes, generated other subsets of their GIS data as they did in supplying Dr. Marr with an excavation spreadsheet for his reliance materials.  But Defendants have never produced the thing on which their experts relied—the model itself.  Without the GIS model itself, Plaintiffs' counsel are denied their right to see how the model was managed so as to generate the plan views, excavation maps, excavation tables and spreadsheets, site geometry illustrations, etc., furnished in discovery and in their reports.[16]

Denying Plaintiffs' counsel the opportunity to examine the underlying model which the experts created and upon which they relied deprives Plaintiffs the opportunity to reveal, for example, whether the defense experts cherry-picked data in creating their graphics, whether the data from which they worked was itself complete ("garbage in, garbage out"), whether it was used consistently from expert to expert, and so forth.  In short, it restricts Plaintiffs to cross-examining the defense experts on their published views of underlying data

---

[15] Ex. C (Silva) at 182:17-22.

[16] The Court may recall that in the *Robinson* case, the USA turned over the data comprising its GIS model, which revealed a wealth of helpful information once in the hands of Plaintiffs' expert Mr. Chad Morris, who presented it graphically at trial.

5

they collected and collated without revealing how they collected and collated it to begin with.

A recent defense motion before this Court is analogous. Plaintiffs' expert Dr. Bob Bea's rebuttal report relied upon a published study he co-authored (the Sherman Island study) to corroborate the underseepage methodology he employed in this case. Defendants insisted that they should obtain not only the published study, but "most importantly thousands of pages of digital computer analyses upon which the results of the engineering study are based." (Rec. Doc. 20764-1, at p. 10).

In addition to Dr. Bea's published study, they argued for and obtained the underlying data so they could test its validity, completeness, coherence, and so forth. Plaintiffs seek the same here. It is not enough for the defense experts to provide their "published" works from their underlying model (plan views, spreadsheets, etc.); Plaintiffs' counsel are entitled to the underlying model itself so they can test its validity, completeness, and coherence, and thus the reliability of the materials already generated as appended to their reports and to be generated for use at trial. Given that the defense experts indisputably relied upon these data comprising the GIS model, the model should have been produced in the normal course of discovery. Instead, Plaintiffs received "a lot of information from it," in the words of the defense expert primarily responsible for its creation. Plaintiffs are entitled to more than "a lot of" what the defense experts relied upon.[17]

------

[17] Plaintiffs were content to pre-admit the underlying project documents and present them at trial; but Defendants opposed the pre-admission of these documents. Then, as recently as July 24, Defendants apparently updated their GIS model with information produced by the USA in June, prompting the submission of several supplemental and revised reports by defense experts: Silva-Tulla, Dalrymple, Sykora, and Marr. Presented with this "moving target" so close to trial, Plaintiffs seek nothing more than a Court order requiring Defendants to produce reliance materials to which Plaintiffs were entitled all along, but which they were willing to forego until circumstances demanded otherwise.

The GIS model was admittedly created to "disseminate" information among defense experts and was relied upon by them; yet it was never produced.  Defendants should not be permitted to publish demonstrative aids or admit evidence generated from materials never produced during the course of this action.  Alternatively, the materials should be produced.

WHEREFORE, Plaintiffs seek an order prohibiting the use of demonstrative aids or admission of evidence generated from the Defendants' GIS model or, in the alternative, an order requiring production of that database so that Plaintiffs' counsel may have, in preparing for expert cross examination and trial presentation, the benefit of the information those experts actually relied upon.

Respectfully Submitted,

PLAINTIFFS' LIAISON COUNSEL

/s/ *Joseph M. Bruno*
JOSEPH M. BRUNO (La. Bar No. 3604)
BRUNO & BRUNO, L.L.P.
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

MR-GO PLAINTIFFS SUB-GROUP LITIGATION COMMITTEE

/s/ *James Parkerson Roy*
JAMES PARKERSON ROY (La. Bar No. 11511)
MR-GO PSLC Liaison Counsel
Domengeaux Wright Roy & Edwards LLC
P.O. Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

for

MR-GO PLAINTIFFS SUB GROUP LITIGATION COMMITTEE
Jonathan Andry (The Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing upon all counsel

of record by placing same in the United States mail, properly addressed and with first-class

postage, or by facsimile or other electronic transmission this 10th day of August, 2012.


/s/ Joseph M. Bruno
Joseph M. Bruno

8