UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO: MRGO | * | |
|     *Armstrong*, No. 10-866 | * | SECTION "K"(2) |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE TESTIMONYAND/OR EVIDENCE PERTAINING TO  THE SUPPLEMENTAL REPORT OF W. ALLEN MARR**

**I.     STATEMENT OF FACTS**

    **A.  BRIEF PROCEDURAL POSTURE**

This Honorable Court issued a scheduling order in this matter on November 23, 2011. The Scheduling Order stated that the deadline for the defendants to produce all expert reports was March 8, 2012. Trial is set for September 10, 2012.

The United States (USACE) produced the expert report of W. Allen Marr, titled "What Caused the I-Wall Failures at the EBIA North and South Breaches?" to the Plaintiffs on March 12, 2012.  Defendant, USA, also produced the expert report of Robert A. Dalrymple on March 21, 2012. On April 25, 2012, Defendant USA produced a "corrected" version of the Marr report.

On July 24, 2012 – months after the judicially-imposed deadline for submitting expert reports – defendant produced ta supplemental report titled "Effects of Waves on Scour on the land-side of I-Walls at the EBIA" by W. Allen Marr.

1

### B. FACTS

In Dr. Marr's Supplemental Report, Dr. Marr changes his opinion regarding the significance of overtopping waves as a cause of scouring as the cause of the I-wall failure. *See Deposition of W.Allen Marr, Vol. 1, p. 36 line 20- p. 39 line 11*. In Dr. Marr's deposition, he testified that he did not consider waves significant at all, explaining that "waves are a small contributory factor but not something we---I normally consider significant for this type of problem". *Deposition of W. Allen Marr, p. 37 line 2-12*. Dr. Marr further testified that the water reached the top of the I-wall at 7:00am, at which time surge overtopping began, eventually causing the South Breach at 9:00am. *Id.*

After the depositions of Dr. Dalrymple and Dr. Marr, it became apparent there exists gross disparities between the opinions of Drs. Dalrymple and Marr as to the timing of the South Breach. Dr. Marr opined that the South Breach occurred due to surge overtopping, which began at 7:00am, causing the breach at 9:00am. *Deposition of W.Allen Marr, p. 37 line 13- p. 39 line 11*. Dr. Dalrymple opined that the South Breach occurred at 7:00am, two hours before Dr. Marr's breach time. *Expert Report of Robert B. Dalrymple, p. 6*. While it comes as no surprise that Dr. Marr succumbed to pressure to change his report, the issue is whether or not the Federal Rules allow a change at this point in the proceedings.

Dr. Marr, in his so called supplemental report, now claims that Dr. Dalrymple's opinion that waves were "3 ft with periods of about 2 seconds in the hours before the breaches occurred" is new information which has altered his opinions and created the necessity of a supplemental report. Dr. Dalrymple's opinion (to which Dr. Marr cites) was actually included in Dalrymple's original expert report dated March 21, 2012 –more than one month before Dr. Marr corrected his initial report and over four months before Dr. Marr's supplemental report was submitted. Most

importantly, Dr. Dalrymple's opinion was based on the IPET report, dated March 26, 2007. This is the same IPET report that Dr. Marr used in forming the initial opinions contained in his own March 12, 2012 expert report and his April 25, 2012 "corrected" report.

## II. LAW & ARGUMENT

### A. THE INFORMATION FORMING THE BASIS OF MARR'S SUPPLEMENTAL REPORT IS NOT "NEW", BUT WAS KNOWN AND AVAILABLE WELL BEFORE THE DEADLINE FOR PRODUCTION OF HIS INITIAL REPORT.

The Federal Rules require each party seeking to use the testimony of an expert to disclose its expert's opinion "at the times and in sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). A supplemental report is not permitted, unless it is "disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due," *id.* 26(e)(2), and, in any event, only where the additional or corrective information has not otherwise been made known to other parties during the discovery process or in writing," *id*. 26(e)(1)(A).

Based on these fundamental requirements of expert discovery, courts across the country have routinely rejected untimely "supplemental" expert reports and testimony where, as here, the expert opinions were based on information available prior to the deadline for service of the initial report. *Simmons v. Johnson et al*, No. 06-325-A-M2, 2008 WL 474203 at 2, (M.D. La. Feb. 14, 2008). "Supplementation under the Rules means correcting inaccuracies, or filling in the inconsistencies of an incompetent report based upon information that was not available at the time of the initial disclosure". *Dag Enterprises, Inc. v. Exxon Mobile Corp.*, 226 F.R.D. 95, 109-110 (D.D.C.2005)*,* cited by this Honorable Court in *In Re Katrina Canal Breaches Consolidated Litigation Pertains To: Armstrong,* C.A. No. 10-888, No. 05-4182, "K", Order and Reasons, June 28, 2012.

The Marr Supplemental Report does not meet any of these criteria. Most fundamentally and contrary to Defendant, USA's, contention, this Supplemental Report is not based on "recent work by Robert B. Dalrymple of John Hopkins University." *Supplemental Report of W. Allen Marr, p.1*. Equally important, the Dalrymple Report that the Marr Supplemental Report relies on does not establish what the latter claims. Dr. Dalrymple, in fact, never "extensively studied the surge and waves during Hurricane Katrina" or established "that the significant wave height in the EBIA was about 3 ft with periods of about 2 seconds in the hours before the breaches occurred" as the Marr Supplemental report claims. *Id.* The Dalrymple Report simply states that "at 3:00am, the water level in the IHNC was about 8.5 feet, <u>implying</u> that there were 3-foot waves in the canal." *Expert Report of Robert B. Dalrymple, p. 9*. Adopting an inference or loosely making an implied consequence, of course, does not equate to "extensive study".

Furthermore, the inference of wave height made in the initial Dalrymple Report – based on Section IV-15-36 of the IPET report- Technical Appendix –is the *same* IPET report as well as the *same* volume on which Marr claims he based his own initial wave height estimate for his initial report. *Exhibit A: IPET IV-15-36 and Exhibit B: IPET IV-226*. For the Court's convenience, Plaintiffs have prepared a chart outlining the data utilized by Dalrymple and Marr, as well as, other information that was readily available to and actually used by these experts at the time of their research and has been available for years. (*Exhibit C, attached)*[1] Dr. Marr's Supplemental Report states that "when this work was being done, I assumed that waves within the EBIA area in the early morning of August 29, 2005 were on the order of 1 ft. or less. I had based this on Section IV-15-36 of the IPET report..". *Supplemental Report of W.Allen Marr, p.1.* Dalrymple also cites to the IPET report when offering the 3 foot wave inference on which Marr

---

[1] Exhibit C organizes data cited by Dalrymple and Marr, as well as, Dooley's weather data by time.

has based his new opinion. *Expert Report of Robert B. Dalrymple, p. 9.* The IPET report relied on by both experts is dated March 26, 2007, which is over *five years* before Marr's expert report dated March 21, 2012.

Thus, the information Dr. Marr now claims formed the basis of his Supplemental Report was known and available to him at the time that he authored his original expert report. An expert cannot claim information is new to them merely because they failed to avail themselves of it timely. The Marr Supplemental Report, therefore, stands in direct violation of the fundamental requirements of Federal Rule of Civil Procedure 26(e).

### B. THE DEFENDANTS' ARE IMPERMISSIBLY CHARACTERIZING NEW OPINIONS AS A "SUPPLEMENTAL REPORT".

#### 1. DR. DALRYMPLE'S EXPERT REPORT DOES NOT ESTABLISH WAVE HEIGHT AS DR. MARR CLAIMS AND IS BASED ON FLAWED ANALYSES.

Supposed supplemental reports cannot be used to "skirt the [expert] disclosure requirements" merely by characterizing new opinions as supplemental or to "fix" problems in the initial report. *Simmons v. Johnson et al,* 2008 WL 474203at 2(citing *Buxton v. Lil' Drug Store Products, Inc.,* No. 2:02CV178KS-MTP, 2007 WL 2254492 (S.D.Miss. Aug. 1, 2007)). To avoid such abuses, the Fifth Circuit has long held that "District Judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case". *Reliance Ins. Co. v. Louisiana Land & Exploration Co.,* 110 F.3d 253, 258 (5th Cir.1997).

Dr. Marr is attempting to skirt the disclosure requirements and rectify the inconsistent opinions of experts on the same team, now attempts to offer a novel theory and disguises it by claiming wave height actually was a consideration in his initial analysis. In fact, Dr. Marr claims that "during my deposition, I was questioned about the scouring effect of overtopping waves, <u>and I repeated what I had said in my expert report</u> because nothing had come to my attention to alter

5

my understanding that the significant waves had been small." *Supplemental Report of W. Allen Marr, p.1*. To the contrary, in Dr. Marr's deposition, he stated that he did not consider waves significant at all, explaining that "waves are a small contributory factor but not something we---I normally consider significant for this type of problem". *Deposition of W. Allen Marr, p. 37 line 2-12*. Apparently, he has been subsequently convinced to consider wave height as a significant factor and to proffer this new opinion by submitting a "Supplemental Report".

In addition to its procedural impropriety, the Marr Supplemental Report is substantively flawed because it relies on Dalrymples's flawed data and analysis. Dalrymple's opinion regarding wave height, on which the Marr Supplemental Report exclusively relies, is not the product of "recent work," nor did Dr. Dalrymple ever extensively study the waves during Hurricane Katrina.

Dr. Dalrymple now attempts to validate the "inference" contained in his expert report by stating that "Mr. William Villavasso "saw water splashing over the INHC floodwalls and the Florida Avenue (40 Arpent) levee floodwall around 3:00am", citing to the Deposition of William Villavasso, December 18, 2007, p. 48. A review of the deposition transcript reveals that William Villavasso actually does not specify a time as to when he made these observations. In fact, William Villavasso repeatedly stated under oath that he was unsure of the timeline of his observations during the storm. (Deposition of William Villavasso, December 18, 2007, p. 45: Q: "Roughly what time do you think you first started noticing any weather effects?" A: "See, I am not sure on the time, because we started getting heavy rains, but it was about 3:00 something…."; p. 141: Q: "When did you first see that it has gotten light?" A: "I have no idea what time it was, because we had no watches or clocks or anything.").[2] Dr. Dalrymple, was asked about his wave estimate in his deposition on April 18, 2012. In an effort to explain his

---

[2] See also Deposition of William Villavasso, December 18, 2007, p. 63-64, 116, 130, and 147.

6

estimate of 3 feet, Dalrymple states "Mr. Villavaso saw splashing at some time around after 3:00, and that the water level inside the INHC is at 8 and half feet, then a 3 foot wave would go over the wall." *Deposition of Robert B. Dalrymple, April 18, 2012, p. 180, line 6-9.*

Noteworthy is the fact that Villavasso was present at the North breach, as Dr. Dalrymple made clear in his deposition. *Deposition of Robert B. Dalrymple, p. 199, line 1-20.* A safe assumption, due to the his reliance on Villavasso's testimony in the formation of his 3 foot wave inference, is that Dr. Dalrymple is inferring 3 foot waves in regards to the North Breach as opposed to the South Breach. However, Dr. Marr erroneously applies the 3 foot estimate to the South Breach, stating "Waves with a significant wave height of 3 ft would have begun to overtop the wall at the south breach site when the still-water elevation was about 10 to 10 ½ feet". *Supplemental Report of W. Allen Marr, p. 1.* The lowest point of the North wall is a foot lower than the lowest point of the South wall. As such, any inference drawn from Villavasso's testimony about wave overtopping could have no bearing on the South Breach. Conveniently, Dr. Marr has re-tailored his initial opinion regarding the South breach by applying Dr. Dalrymple's North breach wave height inference.

The only wind speed and direction explanation Dr. Dalrymple gives in an effort to validate his erroneous estimate is that it is "consistent with 50 miles per hour winds blowing down the GIWW and the northern branch of the IHNC", which is contrary to IPET and confirmed by Dooley. *Expert Report of Robert B. Dalrymple, p. 9 citing to USACE Coastal Engineering Manual, 2008.* Due to the perpendicular nature of these waterways in relation to each other, wind simply cannot blow "down" the GIWW and the IHNC simultaneously. The INHC connects the Mississippi River to Lake Pontchartrain, running South to East. The GIWW is situated in a position parallel to the Mississippi River, running East to West. The two

waterways intersect at almost a 90° angle. Therefore, wind cannot blow up/down both waterways simultaneously. Additionally, the IPET report that Dalrymple cited to states that from 1:00am until 6:00am, the winds are relatively well aligned with the axis of the MRGO/GIWW. *Exhibit B.* This indicates a wind direction of East-Northeast blowing towards North-Northeast. Dooley also states that at 3:00am the wind direction would be East-Northeast. *(See Hurricane Katrina: Weather Analysis for the Inner Harbor Navigation Canal Between Florida Avenue and Claiborne Avenue by Austin Dooley, July 27, 2009, p. 23, attached herein as Exhibit D).* Dalrymple states that the water level at 3:00am in the INHC was about 8.5 feet. *Expert Report of Robert B. Dalrymple, p. 9.* However, according to the Lockmaster's readings, which have been stipulated to by the parties', the water level was 8.1 feet.[3] Thus, Dr. Dalrymple's 3 foot wave estimate is based on erroneous wind direction as well as water height.

As demonstrated above, Dr. Dalrymple's data is repeatedly inconsistent with IPET, Dooley and the parties' stipulations. This begs the question, how can Dalrymple rely on the IPET report, when he is often in disagreement with it? Furthermore, it does not stand to reason that the Defendant would stipulate to data that was incorrect and it is logical to deduce that Dr. Dalrymple is erroneous in these instances. For example, IPET IV-226, to which Dr. Dalrymple cites, states that "wave heights of over 4 ft produced in the vicinity of the GIWW/MRGO-INHC intersection during peak wind conditions at 1030 UTC (5:30a.m. CDT) were of about 80 knots out of the east." *Exhibit B.* This is the same page to which Dr. Dalrymple cites when discussing his 3 foot wave assessment at 3:00am. *Expert Report of Robert B. Dalrymple, p. 9.* However, IPET IV-266 does not discuss 3:00am, but 5:30am instead, a 2.5 hour difference. IPET reports an 80 knot wind at 5:30am. 80 knots converts to 92.06 miles per hour. Dooley reports a wind

---

[3] See Exhibit C, as well as the Joint Pre-Trial Order, filed July 24, 2012, p. 29, All Uncontested Material Facts, No. 1.

speed of 77.41 miles per hour at 5:30am.[4] Dr. Dalrymple reports winds between 60-70 miles per hour at 5:30am. *Expert Report of Robert B. Dalrymple, p. 6.*[5] Additionally, Dr. Dalrymple reports that the wind direction at 5:30am was out of the East-Notheast, which is not in accordance with the parties' stipulation that between 4:00am and 7:00am the prevailing winds were out of the North-Northeast.[6]

Dr. Dalrymple considers overtopping to be a factor in the IHNC I-wall breaches but is inconsistent as to the time of commencement, further demonstrating the flawed nature of his analysis. Dr. Dalrymple states that "overtopping commences when the water level at a floodwall or levee rises over the height of the structure. This occurred along the IHNC, commencing after 6:00 am and before 7:00 am, as mentioned earlier." *Expert Report of Robert B. Dalrymple, p. 10.* However, Dalrymple states earlier in his report that "after 5:00am, the surge in the INHC began to overtop the lower portions of the INHC floodwall". *Expert Report of Robert B. Dalrymple, p. 6.* Furthermore, the lowest wall height, according to Dalrymple, is 11.3. *Expert Report of Robert B. Dalrymple, p. 8-9.* At 5:00am, the water height was 10.3 feet, one foot shorter than the lowest part of the floodwall.[7] Overtopping is simply not possible at 5:00am.

Dalrymple further opines that "by 7:00am, most of the INHC (east bank) floodwall was being strongly overtopped". *Expert Report of Robert B. Dalrymple, p.6.* However, the average elevation of the floodwall was 12.6 feet, according to Dalrymple. *Expert Report of Robert B. Dalrymple, p. 8-9.* At 7:00am, the water height was 12.3 feet, which is below the average height

---

[4] Exhbit C and D, Dooley reports 67.27 knots, which converts to 77.41 miles per hour.
[5] See also Exhibit C.
[6] See Exhbit C, as well as Expert Report of Robert B. Dalrymple, p. 6. Please note that Dalrymple states the winds were blowing West-Southwest, which indicates the winds were blowing out of the East-Notheast.
[7] See Exhibit C, as well as Joint Pre-Trial Order, All Uncontested Material Facts, no. 1.

of the wall.[8] "Most" of the floodwall could not have been overtopped if the water level had not yet reached the average height of the floodwall.

Dr. Marr cites to IPET IV-15-36, which states "By 1030 UTC (5:30am CDT), the significant wave height at the end of the GIWW has grown to 4.1ft. A snapshot of the waves at this time is shown in Figure 15-28. Here, more wave energy is able to turn into the southern reach of the INHC, such that the significant wave height near the Florida Avenue Bridge is 1 ft." *Exhibit A*. It is noteworthy that IPET IV 15-36 uses the same data for its estimate of the wave height at 5:30 a.m. that Dr. Marr uses to for his estimate at 3:00 a.m. CDT., when the winds and waves were much calmer. Furthermore, IPET IV-15-36 estimates wave height at the Florida Avenue Bridge, while. Dr. Dalrymple simply estimates waves "in the canal" in his wave estimate. *Id.* In justifying the change in his opinion, Marr refers to a wave height estimate that is at a different time and location than the estimate used in his initial study of the IHNC I-wall failures, allowing him to manipulate his new analysis with the application of larger waves.

Drs. Marr and Dalrymple both rely on IPET. IPET generated theories using computer models, specifically STWAVE and the Boussineq Model. As a result, both Marr and Dalrymple are relying on electronically generated simulations, the reliability of which are in and of themselves questionable.

Dr. Marr's erroneously relies on Dr. Dalrymple's flawed inference of wave height, which in turn relies upon computer generated simulations and erroneous conclusions, are a prohibited basis for submission of a supplemental report.

---

[8] Id.

10

> **2. THE DEFENSE IS MAKING AN IMPERMISSIBLE SECOND ATTEMPT TO DEVELOP THEIR CAUSATION THEORY AFTER THE PLAINTIFFS' EXPERT REBUTTED DR. MARR'S INITIAL OPINIONS.**

As stated previously, the Fifth Circuit has long held that "District Judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case". *Reliance Ins. Co. v. Louisiana Land & Exploration Co.,* 110 F.3d 253, 258 (5th Cir.1997).

The defense further recognized the need to bolster Dr. Marr's expert opinion after the Plaintiffs' expert conclusively rebutted Marr's initial theory. Dr. Robert Bea rebutted the opinions expressed in Marr's initial expert report, stating that Marr's erroneous analysis results in "substantial over-estimation of the soil-erosion scour 'trench' depths." *Rebuttal Report of Robert Glenn Bea, p. 72*. Dr. Robert Bea also uncovered the fact that "Dr. Marr conveniently gives himself at least a one hour head-start on the erosion and scour of the soil". *Id.*

Upon recognizing the deficiencies of Dr. Marr's original opinions as recognized by Dr. Bea, the defense now attempts to "fix" their original erroneous causation opinions as expressed in the initial expert report of Marr by disguising a new theory as a "supplemental report". This supplemental report provides an alternative or revised causation theory via a hypothetical increase in scouring based upon the opinion of Dr. Dalrymple as to the size of the waves. This, of course, is not supplemental information at all, but an impermissible, new opinion. For this additional reason, the Marr Supplemental Report also should be excluded.

### III. CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion to exclude the proffered testimony and any evidence pertaining to the Supplemental Report of Dr. W. Allen Marr.

Respectfully Submitted,

PLAINTIFFS' LIAISON COUNSEL

*/s/ Joseph M. Bruno*

JOSEPH M. BRUNO (La. Bar. No. 3604)
Bruno & Bruno, L.L.P.
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6776
Email: jbruno@brunobrunolaw.com

MR-GO PLAINTIFFS SUB-GROUP LITIGATION COMMITTEE

*/s/ James Parkerson Roy*
MR-GO PSLC Liaison Counsel
Domengeaux Wright Roy & Edwards LLC
P.O. Box 3668
Lafayette, LA 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796

for

MR-GO PLAINTIFFS SUB GROUP LITIGATION COMMITTEE
Jonathan Andry (The Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et. al. Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 10th day of August, 2012.

*/s/ Joseph M. Bruno*
Joseph M. Bruno