UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO: MRGO | * | |
| *Armstrong*, No. 10-866 | * | SECTION "K"(2) |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION IN LIMINE TO EXCLUDE EVIDENCE OF OR
REFERENCE TO, PAYMENTS FROM COLLATERAL SOURCES**

**MAY IT PLEASE THE COURT:**

Plaintiffs submit this memorandum in support of their motion *in limine* for an order excluding evidence of or reference to, payments by collateral sources.

**I.      BACKGROUND**

During hurricanes Katrina and Rita, homeowners and renters of the Lower Ninth Ward and the areas adjacent to the Inner-Harbor Navigational Canal ("IHNC") suffered catastrophic flooding that destroyed or severely damaged their homes. Thousands of people were displaced, including the Plaintiffs, and required financial assistance to survive and rebuild their lives. Plaintiffs were given financial assistance through various sources including federal grants, gratuitous gifts from charitable organizations, private donors, friends and family members, and

1

insurance proceeds under applicable insurance policies. The financial assistance received by the Plaintiffs to rebuild their lives was independent of any procuration by or contribution from the tortfeasors in this case.

The damages sustained by Plaintiffs were caused by flooding which was the direct result of negligence of the U.S. Army Corps of Engineers' ("USACE") and its subcontractor, Washington Group International, Inc. ("WGI"), in their performance of engineering and excavation work conducted as part of a lock expansion project along the IHNC and the East Bank Industrial Area ("EBIA"). As a matter of law, receipt of financial assistance by Plaintiffs does not exonerate either USACE or WGI from liability for damages suffered by the Plaintiffs due to and arising from their negligent acts and/or omissions. USACE and WGI may not benefit from Plaintiffs' receipt of this financial assistance, nor can the injured Plaintiffs' tort recovery be reduced by that amount. Thus, the amounts received by Plaintiffs from independent sources are neither admissible nor relevant to this litigation. Plaintiffs seek an Order from this Court excluding evidence of or reference to, payments by collateral sources.

I. **LAW AND ANALYSIS**

The collateral source rule is a rule of evidence and damages that provides that a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution.[1] Louisiana courts recognize that the main reason for the collateral source rule is that "the defendant should not gain an advantage from outside benefits provided to the plaintiff

---

[1] *Bozeman v. State*, 03–1016 (La. 07/02/04), 879 So.2d 692.

independently of any act of the defendant."[2] Under this rule, payments received from an independent source "are not deducted from the award the aggrieved party would otherwise receive from the wrongdoer."[3]

Louisiana courts have held that receipt of such benefits does not result in a windfall to the injured party. In *Griffin v. La. Sheriff's Auto Risk Ass'n*,[4] the court focused "on the nature of the write-offs [windfall] *vis-à-vis* the tortfeasor, rather than *vis-à-vis* the tort victim" and held that plaintiffs are entitled to recover the full amount from the wrongdoer.[5] The court explained why it reached this conclusion as follows:

> This rationale can best be understood by analyzing the write-offs in two situations: one in which a tortfeasor injures an uninsured victim and the other in which the same tortfeasor, in the same matter and to the same extent, injures an insured victim.  Unless the write-offs are considered collateral sources, the tortfeasor would be relieved of his liability to the insured victim to the extent of the amount of the write-offs.  The argument that there is no underlying obligation for plaintiff to pay the amount of the write-offs and, therefore, the plaintiff should not be allowed to benefit from a non-existent debt, falls because the effect of this reasoning results in a diminution of the tortfeasor's liability *vis-à-vis* an insured victim when compared with the same tortfeasor's liability *vis-à-vis* an *uninsured* victim.  Assuming the injury is the same, a tortfeasor's liability to both, and insured and an uninsured victim, should be the same: the full extent of the medical bills incurred.  Why then, should a tortfeasor's liability be any less when his victim has procured insurance which provides the benefit of write-offs?  To allow such a reduction in a tortfeasor's liability would indeed be a "windfall" – inuring to the benefit of the torfeasor!  This is precisely what the collateral source rule is designed to prevent.[6]

---

[2] *La. Dept. of Trasp. & Dev. V. Kansas City So. R.R.*, 2002-2349 (La. 5/2/2003), 846 So. 2d 734, 739 (emphasis added).

[3] *Id.* at 739 (emphasis added).

[4] 99-2944 (La. App. 1 Cir. 6/22/01), 802 So.2d 691.

[5] *Id.* at 715.

[6] *Id.*

3

The purpose of the collateral source rule is to deter tortious behavior by preventing tortfeasors from benefitting from victims' receipt of monies from independent sources:

> [T]he question is not whether a windfall is to be conferred, but rather who shall receive the benefit of a windfall that already exists…This may permit a double recovery, but it does not impose a double burden. **The tortfeasor bears only a single burden for his wrong.**[7]

There are three sides to every collateral source issue: (1) the injured party, (2) the injurer, and (3) the source independent of the injurer who has paid the injured party.[8] In this case the "injured parties" are the homeowners and renters of the Lower Ninth Ward and the areas adjacent to the IHNC, including the Plaintiffs, that suffered catastrophic flooding due to negligence that occurred during the performance of engineering and excavation work conducted as part of a lock expansion project along the IHNC and the EBIA by USACE and its subcontractor, WGI.

The "injurers" in this matter are defendants USACE and WGI. USACE and WGI's negligence was a substantial factor in causing the catastrophic flooding experienced by homeowners and renters in the Lower Ninth Ward and areas adjacent to the IHNC, which not only severely damaged and/or destroyed the Plaintiffs' homes and personal belongings, but also forced Plaintiffs and their families to relocate.

Homeowners and renters in the Lower Ninth Ward and areas adjacent to the IHNC received financial assistance from "sources independent of the injurers" for the damages suffered

---

[7] *La. Dept. of Transp. & Dev. v. Kan. City S. Ry. Co.*, 2002-2349, p. 14 (La. 5/20/03), 846 So. 2d 734, 744 (quoting *Thyssen, Inc. v. S/S Euronity*, 21 F.3d 533, 538 (2d Cir. 1994))(emphasis added).

[8] *See* John G. Fleming, *The Collateral Source Rule and Contract Damages*, 71 Cal. L. Rev. 56 (Jan. 1983).

due to the extreme flooding caused by USACE and WGI's negligence. One such source of financial assistance was federal grants. The Federal Emergency Management Agency ("FEMA") provided money and services to affected individuals for necessary and serious needs caused by the disaster, such as medical, dental, funeral, personal property, food, transportation, moving and storage, and other expenses that FEMA approved. FEMA also provided to displaced homeowners and renters either funds for available rental properties, or temporary housing units when rental properties were not available, often referred to as Katrina Cottages and FEMA trailers. The Road Home Homeowner Assistance Program (the "Road Home Program" or "Program") is a Louisiana State program funded by federal Community Develop Block Grant(s) ("CBGD"). Upon the state's receipt of funds pursuant to a CBGD Grant, these Grants are no longer considered federal funds but state funds. The Road Home Program using these state monies was created to assist residents of Louisiana who had been displaced. The Program was administered by a state agency, the Office of Community Development ("OCD") of the State of Louisiana, an entity treated interchangeably throughout this memorandum with its predecessor, the Louisiana Recovery Authority ("LRA"). The amount of financial assistance received by each homeowner was based on several factors including how much the homeowner had previously received from insurance companies, the homeowner's income level, whether the homeowner desired to restore the home or relocate elsewhere, and what the pre-Katrina value of the home was. The financial assistance available to homeowners under the Road Home Program comes with a host of conditions that, if unfulfilled, results in the homeowner having to return the funds.[9]

---

[9] This Court acknowledged these conditions in *In re Katrina Canal Breaches Consolidated Litigation*: "The Court also notes that she [plaintiff] received $101,000.00 as a Road Home grant. It is the Court's opinion that this not an item to be deducted from her losses as she is obligated to

5

Homeowners that opted to receive financial assistance under the Road Home Program were required, in consideration of the grant, to agree to covenants that ran with their land and sign a "Declaration of Covenants Running with the Land."[10] Once the recipient met all the conditions of the covenants, the funds became a genuine grant without any continuing obligations. Grant receivers were also required to sign a "Limited Subrogation/Assignment Agreement." The LRA required that, when a grant under the Road Home Program was received, the rights of the LRA would be subrogated to the rights of the homeowner with regards to insurance payments and any payments from FEMA, Small Business Administration, and any other federal agency, arising out of physical damage to the Residence caused by Hurricane Katrina and/or Rita:

> In consideration of my/our receipt of funds under The Road Home program for Hurricane Katrina/Hurricane Rita victims (the "***Program***") being administered by the Office of Community Development, Division of Administration, State of Louisiana, subject to the provisions below I/we hereby assign to the State of Louisiana, Division of Administration, Office of Community Development (the "***State***"), to the extent of the grant proceeds awarded or to be awarded to me under the Program, all of my/our claims and future rights to reimbursement and all payments hereafter received or to be received by me/us (a) under any policy of casualty or property damage insurance or flood insurance on the resident, excluding contents ("***Residence***") described in my/our application or Homeowner's Assistance under the Program ("***Policies***"); (b) from FEMA, Small Business Administration, and any other federal agency, arising out of physical damage to the Residence caused by Hurricane Katrina and/or Rita.[11]

---

reimburse the Road Home from any insurance proceeds or other recovery she may receive." 647 F.Supp.2d 644, 736 (E.D. La. 2009).

[10] *See* Exhibit A, "The Road Home Declaration of Covenants Running with the Land" signed by Clifford Washington; *See* Exhibit B, "The Road Home Declaration of Covenants Running with the Land" signed by Ethel Coats.

[11] *See* Exhibit C, "The Road Home Limited Subrogation/Assignment Agreement" executed by Alvin and Barbara Livers; *See* Exhibit D, "The Road Home Limited Subrogation/Assignment Agreement" executed by Fred Holmes, Jr. and Jeneen Boudoin-Holmes; *See* Exhibit E, "The Road Home Limited Subrogation/Assignment Agreement" executed by Clifford Washington, Sr.; *See* Exhibit F, "The Road Home Limited Subrogation/Assignment Agreement" executed by

Honorable Judge Barbier in the matter of *Metoyer v. Auto Club Family Insurance Company*[12] granted relief similar to that requested by this Motion and excluded evidence at trial of LRA proceeds to rebuild a home as a collateral source.[13]  In *Metoyer*, Plaintiff argued, and Judge Barbier agreed, that LRA funds constitute a collateral source, and therefore all evidence of LRA funds should be excluded from evidence so as not to taint the jury.[14]  Although this case is factually distinguishable as a breach of contract claim against an insurer, Judge Barbier looks to a tort case, *Bonnet ex re. Bonnet v. Slaughter*,[15] in rendering a decision.[16]  In *Bonnet* the court considered a tort claim wherein a woman claimed lost wages for the time she had to spend with her injured son.[17]  The defendant claimed that the woman collected welfare during this time, and therefore defendant should be entitled to a credit against the lost wages claim for the amount welfare paid.[18]  The court held that the welfare payments were collateral source, and therefore defendant is not entitled to such an offset.[19]

---

Kenneth and Jeannine Armstrong;  *See* Exhibit G, "The Road Home Limited Subrogation/Assignment Agreement" executed by Ethel Coats.

[12] 536 F.Supp. 2d 664 (E.D. La. 2008).

[13] *Id.* at 665.

[14] *Id.*

[15] 422 So.2d 499 (La. App. 4 Cir. 1982).

[16] *Metoyer*, 536 F.Supp at 670.

[17] *Bonnet*, 422 So. 2d at 503.

[18] *Id.*

[19] *Id.*

*Bonnet* supports Plaintiffs' contention that receipt of this financial assistance through federal funds does not exonerate USACE and WGI from liability for damages suffered by the Plaintiffs due to USACE and WGI's negligent acts and/or omissions. Judge Barbier in *Metoyer* opines that "it could not have been the intention of the Federal Government grant writers, or the Louisiana Legislature that insurance companies should benefit from the provisions of the LRA."[20] The same is true for those who commit a tort and injure the property of another. It could not have been the intention of the Federal Government grant writers or the Louisiana Legislature to allow a tortfeasor to benefit from the provisions of the LRA. USACE and WGI, as tortfeasors, cannot gain an advantage from the financial assistance provided by the LRA through federal funds to the Plaintiffs, as these funds were given independently from any act of the USACE and WGI.

Other "sources independent of the injurers", from which Plaintiffs received financial assistance, included gratuitous gifts by charitable organizations, such as the Red Cross, family members, private donors, friends and other entities who generously responded to Plaintiffs' needs. The insured homeowners also received funds from homeowners and flood insurance companies for losses covered under the applicable policies. The financial assistance received by the Plaintiffs through gratuitous gifts and insurance proceeds was independent of any act of the USACE and WGI, thus constitute collateral sources, as the Louisiana Supreme Court long has recognized:

> [T]he collateral source rule is most commonly applied to insurance proceeds. Under this general rule, a tortfeasor's liability to an injured plaintiff should be the same, regardless of whether or not that plaintiff had the foresight to obtain

---

[20] *Metoyer*, 536 F.Supp at 00671.

insurance.  **However, our courts have applied the doctrine to a range of situations where the collateral source is provided to the plaintiff by a government agency or even a gratuitous source.**[21]

The financial assistance received by Plaintiffs through insurance policies, government agencies and other gratuitous sources constitute collateral sources and are neither admissible nor relevant to this litigation.

## II.     CONCLUSION

To allow USACE and/or WGI to benefit from the financial assistance given to Plaintiffs in their time of need, would not only be a prohibited windfall in the tortfeasors' favor but is, as a matter of law, inadmissible.  Defendants should not be permitted to introduce evidence of such payments in an effort to absolve themselves of liability or reduce the "single burden" they owe as tortfeasors to repair the full measure of Plaintiffs' damages.  Plaintiffs respectfully request that this Court enter an Order excluding the evidence of, and reference to, payments to Plaintiffs by collateral sources.

Respectfully Submitted,

PLAINTIFFS' LIAISON COUNSEL

/s/ *Joseph M. Bruno*
JOSEPH M. BRUNO (La. Bar No. 3604)
BRUNO & BRUNO, L.L.P.
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

---

[21]*Louisiana Department of Transportation and Development v. Kansas City Southern Railway Co., Inc.* 2002-2349 (La. 5/2/2003), 846 So. 2d 734,740.

9

MR-GO PLAINTIFFS SUB-GROUP LITIGATION COMMITTEE

/s/ *James Parkerson Roy*
JAMES PARKERSON ROY (La. Bar No. 11511)
MR-GO PSLC Liaison Counsel
Domengeaux Wright Roy & Edwards LLC
P.O. Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

for

MR-GO PLAINTIFFS SUB GROUP LITIGATION COMMITTEE
Jonathan Andry (The Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

## **CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 10th day of August, 2012.

*/s/ Joseph M. Bruno*
JOSEPH M. BRUNO