1  surveying, and I just wanted to ask you what
2  the difference is.
3     A.   The way it's used here, traditional
4  surveying would be traditional land-based
5  measurements as opposed to using satellites to
6  make those measurements.  That's the
7  distinction I guess I am using there.
8     Q.   Have you used any global positioning
9  system surveying in the EBIA case?
10    A.   Yes.
11    Q.   What have you surveyed?
12    A.   Thousands of points in the -- mainly
13 I guess in the Chalmette area.  Much of it was
14 associated or it was initially done for the
15 Murphy Oil case.  The Plaintiff lot
16 elevations, some of that work, it was a
17 combination; some was done with GPS and some
18 traditionally.  Levee heights.
19    Q.   Did you use GPS surveying to
20 determine the levee heights in the Lower Ninth
21 Ward, East Bank Industrial Area?
22    A.   I did not physically make those
23 measurements, no.
24    Q.   Okay.  And what about -- You said
25 levee heights.

```
 1      A.   Floodwall.
 2      Q.   The same answer for floodwall?
 3      A.   Yes.
 4      Q.   What about along the 40 Arpent
 5 Canal; did you use or did you provide any GPS
 6 surveying along the 40 Arpent Canal?
 7      A.   Yes.
 8      Q.   And what did you do there?
 9      A.   Measured the height of the levee
10 after Katrina.
11      Q.   I am not very well versed in this,
12 but I understand along the 40 Arpent Canal
13 there were some areas that had levees and some
14 areas that had actual floodwall cap.  Did you
15 use GPS surveying to measure both of those
16 parts?
17      A.   Along the 40 Arpent?  I don't recall
18 specific floodwall height measurements.  We
19 did some of that along the -- on the MRGO.
20 There were some floodwall heights that I
21 recall measuring there.  I don't recall any
22 along the 40.
23      Q.   Okay.  Do you intend to do or do you
24 have any current plans to do any GPS surveying
25 in the East Bank Industrial Area?
```

```
 1        A.    I haven't been asked to do anything
 2   specifically, but certainly could if
 3   requested, like we have done even very
 4   recently with some of the Plaintiff
 5   locations.
 6        Q.    We talked a little bit about the
 7   definition of photogrammetric data.  What have
 8   you done with photogrammetric data in
 9   connection with the East Bank Industrial Area,
10   the Lower Ninth Ward area?
11        A.    Well, in the report you can see
12   photographs as a backdrop used to show the
13   locations of construction, planned
14   construction activities, and used to show what
15   was visible in the photographs in terms of
16   holes; showed the breach location on an image
17   that has a photograph, and the background of
18    -- the genesis of that photography is
19   photogrammetric work.
20        Q.    Have you acquired any aerial photos
21   that you intend to use in connection with
22   photogrammetric work at trial since August of
23   2011?
24        A.    No.
25        Q.    Have you been asked to gather any
```

1  involving the IHNC levee breaches?
2     A.   I guess the LIDAR would be an
3  example of that.
4     Q.   Okay.
5     A.   Aerial photography is also an
6  example.  "Spatial data" is a relatively broad
7  term.
8     Q.   Do you intend, in connection with
9  your proposed testimony at trial, to create a
10 GIS model?
11    A.   We certainly can if asked, yes.  A
12 GIS is really simply a compilation of data.
13 If we have ten different aerial photographs
14 that are taken of the same location, those can
15 be ten different layers in a GIS.  If there's
16 LIDAR, that would be a layer in a GIS.  It's
17 simply a way to put that data together to
18 display it or to answer a specific question.
19 There's nothing, you know, magical about the
20 term "GIS".  It's simply a way to put the data
21 together.
22    Q.   So you currently have all the
23 spatial data that you have collected in
24 connection with the EBIA case in a program
25 that could -- that compiles all of the data

```
 1   together in something that make sense?
 2        A.   The data can be put together into a
 3   GIS, yes.
 4        Q.   As I mentioned before, we received a
 5   hard drive, an external hard drive in August
 6   of 2011 which contained LIDAR data and aerial
 7   photographs.  Have you collected or received
 8   any new or different aerial photos or LIDAR
 9   data since August of 2011 relating to the East
10   Bank Industrial Area?
11        A.   I have received -- They weren't
12   aerial photographs.  I received some
13   photographs recently that were post-Katrina
14   related to clean-up.  Cajun I think provided
15   them.
16        Q.   And your understanding was that
17   those materials were produced in connection
18   with this litigation?
19        A.   Yes.
20        Q.   And have you reviewed those
21   photographs?
22        A.   I looked through them.  I haven't
23   reviewed them in great detail.
24        Q.   Have you been asked to do anything
25   in connection with your review of those
```

```
 1        Q.    Figure 3-2?
 2        A.    Right.  Whoever made the figure.
 3        Q.    You don't know if figure 3-2 is
 4   drawn to scale, do you?
 5        A.    The background for the figure is an
 6   aerial photograph.
 7        Q.    Oh, I see.
 8        A.    And all of the individual boxes on
 9   the figure represent planned work areas, and
10   all of those planned work areas coincide with
11   physical features and things on the ground.
12   So yes, I think it's safe to say that that was
13   drawn to a scale.  I can't sit here and tell
14   you today the exact scale.
15        Q.    Okay.  The caption that you've
16   written here for figure 3-2 says that the
17    "Floodwall breach location was added to
18   existing work plan drawing which was provided
19   by WGI showing their structure removal and
20   excavation areas at the site."  And do you
21   know for a fact that there were excavations in
22   all of these work areas?
23        A.    Yes, as we said before, these are
24   work areas.  I don't know the details of what
25   was done at each location.
```

1   (indicating), but this was the planned work.
2   I am assuming you would have to look at the
3   follow-up work to see what was done and how it
4   was done.
5        Q.   And that's not something you have
6   done in connection with this expert report?
7        A.   No.  What I have done is basically
8   what you see in the report.  You know, tried
9   to depict an overall -- that there was a bunch
10  of work done out here and then depict
11  photographs that show the type of work that
12  was done.  Or what that work consisted of.
13       Q.   Okay.  Let's look at the next
14  figure, 3-10.  And why did you choose these
15  photos?  I guess figure 3-10 is actually two
16  photos.  Why --
17       A.   Just to show that there were piles
18  that were removed on land and the piles were
19  relatively long.  That, you know, that --
20  Looking for things that would have caused
21  connections between water and subsurface
22  strata.
23       Q.   Is that something that Dr. Bea asked
24  you to look for?
25       A.   Yes.

1   where area 2 is at Boland Marine?
2       A.   If the numbers on the plate happen
3   to coincide this time, it appears to be in the
4   vicinity of the excavation that came in from
5   the waterway in my previous discussions, kind
6   of at the north end roughly across from where
7   the north breach happened.
8       Q.   And you don't know whether in fact
9   area 2 has any relationship to this plate 5,
10  which is Exhibit 4?
11      A.   No, I don't know whether or not they
12  were consistent with all of their numbering.
13      Q.   Okay.  Now, can you tell from the
14  photograph here in figure 3-14 what kind of
15  material is being pushed by this dozer?
16      A.   I can simply read what it said.
17  "Placing imported sand backfill material".
18      Q.   But you don't have an opinion based
19  on looking at the photo what kind of
20  material?  You're just reading what the
21  caption says; right?
22      A.   That's right.  And I can say that
23  this placement would be inconsistent with what
24  I have seen in terms of any sort of a
25  compaction technique.

```
 1   at in this case?
 2       A.   I believe the ones in the report
 3   show that it's extensive, but there are many
 4   more images that show additional work.  What
 5   -- Again, what I was trying to convey in the
 6   report is that -- give a context of the type
 7   of activities that happened out there.  My
 8   report, I don't claim that it shows every
 9   excavation that happened or in detail the
10   exact location of every excavation.  It's more
11   to give the flavor, if you will, of the work
12   that happened at that site.
13       Q.   Okay.  In terms of your testimony at
14   trial, you have provided us the photographs
15   that are in this report, but in your reliance
16   materials I did not see any other Washington
17   Group photographs that you considered.  So am
18   I to understand that at trial your testimony
19   is going to be limited to discussion of the
20   photographs that are in this report?  Or are
21   there other things that we have not received
22   yet?
23       A.   Do we have to provide everything
24   that was provided to us?
25            MR. STEVENS:
```

```
 1           I would look at that.
 2   EXAMINATION BY MS. CLAYMAN:
 3      Q.   And we can probably discuss this in
 4   part on the record, but when you say the
 5   documents WGI provided, I just want to get
 6   clarification that you're referring to two
 7   boxes of hard copy documents?  Is that right?
 8      A.   Basically everything that WGI
 9   provided I guess is what I am referring to.
10   If WGI provided it and -- and I looked at it
11   and a question comes up later that says "Chad,
12   can you look at this and can this help clarify
13   some point that becomes important in the
14   future"?  If asked to do that, I would do
15   that.
16      Q.   Okay.
17           MS. CLAYMAN:
18              And we can talk about this.  I
19        just want to make clear that under the
20        rules, Rule 26 (a), and this is for
21        the record, Rule 26 (a)(2) requires
22        that the expert provide with his
23        expert report "a list of all facts or
24        data considered by the witness in
25        forming opinions."
```

1    EXAMINATION BY MS. CLAYMAN:

2         Q.   And I am just saying, in addition to
3    the photographs and the WGI documents that are
4    listed in this expert report dated July 18,
5    2011, I am not aware of the Bates numbers or
6    the types of documents that were included in
7    those two boxes or -- and if you're relying on
8    the entire Washington Group production, that's
9    hundreds of -- thousands, hundreds of
10   thousands of documents that we provided.  So
11   we'll have to take that up on another day.
12   But the idea is we need to know in advance
13   what you're relying on in order to form your
14   expert opinion.
15        A.   Well, everything that is in this
16   report is what I have been asked today to
17   date.
18        Q.   Okay.
19        A.   If other issues come up that I am
20   asked to look into, I will, and I would look
21    -- I would use what's available, again, just
22   finding the best available information to look
23   into things that were -- that might be brought
24   up in the future.
25        Q.   Fair enough.  And I have stated it

1   material and sand."  I just want clarification
2   of what WGI images that you have seen to form
3   that conclusion.
4        A.   Well, ones that are in this report
5   and the ones in the box.
6        Q.   Okay.
7        A.   Boxes of images.
8        Q.   Okay.
9        A.   The only image that I saw of
10  placement of compacted material was the
11  placement of the clay in the borrow pit where
12  they very clearly were placing clay and
13  placing it in lifts.  All the other images
14  that I saw were similar to ones that are in
15  this report, which is, you know, essentially a
16  bulldozer pushing sand over the edge, and the
17  caption said it's sand.  So I am not looking
18  at the images and saying, hey, that sand is
19  based upon my expert background in material
20  classification.  I am looking at the caption
21  on the image.
22       Q.   I see.  Your reference to a
23  photograph -- I believe it's a photograph --
24  that you're talking about where it appeared
25  that Washington Group was putting clay in the

 1   extensive even excavations I saw were more
 2   out, where you can see the shoreline came in
 3   substantially towards the breach.
 4       Q.   Okay.  Do you recall seeing any
 5   within 50 feet of where it says "Break"?
 6       A.   Again, the exact location of every
 7   excavation is not something I can clearly
 8   ascertain from the data that we have been
 9   provided.  And the aerial photographs, we've
10   got four different dates over many years.  A
11   hole could be dug and closed and filled in
12   certainly without being able to see it in one
13   of these three or four dates on the aerial
14   photographs.  I don't think they're the proper
15   tool for that.
16       Q.   Okay.
17       A.   The only ones that kind of remained,
18   or you could see from the aerial photographs
19   where they drastically changed the bank line
20   are which, you know, happened immediately
21   across from the north breach.
22       Q.   Okay. And I just have the same
23   question for you, the same report on page 22,
24   figure 23 relating to the south breach, --
25       A.   I guess it's the same answer.

```
 1        Q.   -- which is dated September 2, 2005
 2   and I wanted to know if you recall seeing any
 3   photographs in Washington's files documenting
 4   an excavation greater than 5 feet within 25
 5   feet of the breach.
 6        A.   I can't pin down where exactly
 7   excavations are.
 8        Q.   Okay.
 9        A.   All I have done is what I have, I
10   think said more than a few times so far, is
11   document the types of activities that
12   happened, show where they had planned
13   construction activities.  I can't say how deep
14   they dug in any location.  I mean I know that
15   they did some trenching in some areas.
16   Exactly how deep and whether or not it got to
17   within 25 feet, whether or not there were
18   underground piles and all of those types of
19   things, I simply was not able to gather that
20   information that would allow me to pinpoint
21   exactly where each excavation was.
22        Q.   Okay.  I just want to ask you a
23   couple of more questions about your
24   interactions with Dr. Bea.  Earlier in the
25   deposition you mentioned that Dr. Bea had
```

1   given you instructions as to what to look for
2   and to provide him when you were looking
3   through these photos.  Can you give me a
4   detailed -- can you detail more me on the
5   record again exactly what he told you to look
6   for in these photographs?
7        A.   Well, as I mentioned, the gist of
8   the case is that excavations happened, a bunch
9   of construction work was done, and that I
10  believe every one degrees, especially at the
11  north breach, that the wall went down before
12  it was overtopped and there's some indication
13  that groundwater seepage may have contributed
14  to that and we were looking for excavations
15  and anything -- and pile removals, anything
16  that would be evidence that would lead to how
17  the water could be connected with the marshy
18  layers where there could be conductivity.
19  That was what he asked me to look for.
20       Q.   When did he ask you to do that?
21       A.   During Robinson.  And the time frame
22  -- before this report was made that you just
23  gave me.  What's the date on this thing?
24       MR. STEVENS:
25            The report you co-authored with

Page 201

1         Morris.  Thank you for your time.  I
2         am going to pass to the government.
3    EXAMINATION BY MR. KELLS:
4         Q.   Yes, I probably have a few
5    questions.  My name is Conor Kells.  I
6    represent the United States.  This is my
7    co-Counsel, Rupert Mitsch, who I think you may
8    have met in Robinson when you were deposed
9    initially a while back.
10             We have gone through your report
11   fairly extensively.  I just want to confirm
12   for my own sake, you're not trained or
13   licensed as an engineer?  Is that correct?
14        A.   That's correct.
15        Q.   And you're not trained or licensed
16   as a geotechnical engineer?
17        A.   That is correct.
18        Q.   You don't have any particular
19   training or expertise in soil
20   characterizations?
21        A.   That's correct.
22        Q.   And you don't have any particular
23   training or expertise in how certain soils
24   behave under certain conditions?
25        A.   That's right.

```
 1         Q.    Do you have any background,
 2   training, or experience in hydrology?
 3         A.    No.
 4         Q.    Back in Robinson, your report seemed
 5   to rely very heavily on use of things such as
 6   LIDAR to sort of do some mapping of breaches
 7   and whatnot.  My recollection of your Robinson
 8   report was that LIDAR was used pretty heavily
 9   as a data source for compiling your drawings
10   and whatnot.
11         A.    We used -- LIDAR was one of the
12   sources of data, yes.
13         Q.    What portion of your report here in
14   Armstrong would you say used LIDAR, if any, of
15   it?
16         A.    The breach mapping would have relied
17   on LIDAR in addition to the aerial
18   photography.
19         Q.    Is the breach mapping the same as
20   the breach modeling you did for the Robinson
21   trial?
22         A.    Yes.
23         Q.    So it's sort of the same breach
24   modeling that came out of your Robinson
25   report?
```

1  extensive program of careful compaction.
2       Q.   Perhaps the problem is what I was
3  asking was slightly more specific, which is
4  that these statements are drawn from those
5  images and not from some particular training
6  or expertise that you have as a geotechnical
7  engineer?
8       A.   That's correct.  It's based on 25
9  years of being around construction activities
10 and witnessing compaction activities and
11 working in sites where we did very careful
12 measurement of the results of those compaction
13 activities.  But not geotechnical engineering.
14      Q.   But you weren't present on this
15 site?
16      A.   Not physically on the site.
17      Q.   Were you ever present for any of the
18 EBIA activities?
19      A.   No.
20      Q.   Did you ever review the QARs or the
21 quality assurance reports, the daily progress
22 reports or any other documents other than
23 those images?
24      A.   No.  I was primarily tasked with
25 looking at survey data and the images that

```
 1       Q.   I don't want to summarize anything
 2   for you.
 3            MR. STEVENS:
 4                 No, I appreciate the work.  I
 5       just object to the admissibility.
 6   EXAMINATION BY MR. KELLS:
 7       Q.   Would it be fair for me to say that
 8   this report, this Exhibit 2 that you have
 9   looked at, is the sum and substance of all the
10   opinions and conclusions that you have been
11   asked to provide as part of the Armstrong
12   case?
13       A.   To date, yes.
14       Q.   So you have not been asked to do
15   anything else to date as of the date of this
16   deposition?
17       A.   Other than that additional
18   Washington property, no.
19       Q.   You have not been asked to put any
20   additional exhibits in here to explain your
21   testimony in any way?
22       A.   No.
23            MR. KELLS:
24                 I don't think I have anything
25       further to ask.
```