Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES        CIVIL ACTION

CONSOLIDATED LITIGATION              NO. 05-4182 K2

JUDGE DUVAL

PERTAINS TO:  MRGO AND ROBINSON

(No. 06-2268)



(V O L U M E   I)

Deposition of REED L. MOSHER, PH.D.,
given at the Law Offices of the Joseph M.
Bruno, 855 Baronne Street, New Orleans,
Louisiana 70113, on February 19th, 2009.




REPORTED BY:

JOSEPH A. FAIRBANKS, JR., CCR, RPR

CERTIFIED COURT REPORTER #75005

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

```
 1   REPRESENTING THE PLAINTIFFS:

 2            LAW OFFICE OF JOSEPH M. BRUNO

 3            (BY:  JOSEPH M. BRUNO, ESQUIRE)

 4            (BY:  ROB WARREN, ESQUIRE)

 5            855 Baronne Street

 6            New Orleans, Louisiana 70113

 7            505-525-1335

 8    - AND -

 9            ELWOOD C. STEVENS, JR., APLC

10            (BY:  ELWOOD C. STEVENS, JR., ESQUIRE)

11            1205 Victor II Boulevard

12            Morgan City, Louisiana 70380

13            985-384-8611

14    - AND -

15            DOMENGEAUX, WRIGHT, ROY & EDWARDS

16            (BY:  ASHLEY E. PHILEN, ESQUIRE)

17            556 Jefferson Street, Suite 500

18            Lafayette, Louisiana 70501

19            337-233-3033

20

21

22

23

24

25
```

REED   MOSHER, Ph.D. (VOL I)                              February 19, 2009

Page 3

```
 1    - AND -

 2             SHER, GARNER, CAHILL, RICHTER, KLEIN &

 3             HILBERT, L.L.C.

 4             (BY:  MATTHEW CLARK, ESQUIRE)

 5             909 Poydras Street, 28th Floor

 6             New Orleans, Louisiana 70112

 7             504-299-2100

 8

 9    REPRESENTING THE UNITED STATES OF AMERICA:

10             UNITED STATES DEPARTMENT OF JUSTICE,

11             TORTS BRANCH, CIVIL DIVISION

12             (BY:  PAUL LEVINE, ESQUIRE)

13             (BY:  RUPERT MITSCH, ESQUIRE)

14             P.O. Box 888

15             Benjamin Franklin Station

16             Washington, D.C. 20044

17             202-616-4289

18

19    ALSO PRESENT:

20             DAVID DYER, ESQ.

21             ROBERT FISHER, ESQ.

22             TIANA CHRISTOPHER, ESQ.

23             RICHARD PAVLICK, ESQ.

24

25
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 4

1    PARTICIPATING VIA I-DEP:

2            ELWOOD STEVENS, ESQ.

3            NICK DIETZEN, ESQ.

4            ERIC GOLDBERG, ESQ.

5            ELISA GILBERT, ESQ.

6            BRENDAN O'BRIEN, ESQ.

7            BEN RODGERS, ESQ.

8            CHRISTOPHER ALFIERI, ESQ.

9            JAMES P. ROY, ESQ.

10           MARK RAFFMAN, ESQ.

11           SARAH SOJA, ESQ.

12           MARTIN COHEN, ESQ.

13

14   VIDEOGRAPHER:

15           LORRI FABRE (HART VIDEO)

16           KEN HART (HART VIDEO)

17

18

19

20

21

22

23

24

25

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 5

1         E X A M I N A T I O N   I N D E X

2

3    EXAMINATION BY:                        PAGE

4

5    MR. BRUNO   ...............................7

6           E X H I B I T   I N D E X

7

8    EXHIBIT NO.                             PAGE

9    Exhibit 1   ...............................8

10   Exhibit 2   .............................104

11   Exhibit 3   .............................236

12   Exhibit 4   .............................268

13   Exhibit 5   .............................278

14

15

16

17

18

19

20

21

22

23

24

25

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 6

1              S T I P U L A T I O N

2              IT IS STIPULATED AND AGREED by and

3    among counsel for the parties hereto that the

4    deposition of the aforementioned witness may be

5    taken for all purposes permitted within the

6    Federal Rules of Civil Procedure, in accordance

7    with law, pursuant to notice;

8              That all formalities, save reading

9    and signing of the original transcript by the

10   deponent, are hereby specifically waived;

11             That all objections, save those as to

12   the form of the question and the responsiveness

13   of the answer, are reserved until such time as

14   this deposition, or any part thereof, is used

15   or sought to be used in evidence.

16

17

18                    *   *   *

19

20

21

22             JOSEPH A. FAIRBANKS, JR., CCR, RPR,

23   Certified Court Reporter in and for the State

24   of Louisiana, officiated in administering the

25   oath to the witness.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                            Page 7

     1            REED L. MOSHER, PH.D.,

     2    ERDC, ITL-MS, 3909 Halls Ferry Road, Vicksburg,

     3    Mississippi 39180-6199, a witness named in the

     4    above stipulation, having been first duly

     5    sworn, was examined and testified on his oath

     6    as follows:

     7    EXAMINATION BY MR. BRUNO:

     8       Q.   All right, let's start with the Notice

     9    of Deposition.

    10            MR. LEVINE:

    11                Federal Rules.

    12            MR. BRUNO:

    13                That is the usual stipulation.

    14            MR. LEVINE:

    15                We can disagree about that, but

    16            if it is it is.

    17            MR. BRUNO:

    18                It is.  It's been codified.  If

    19            you could share with me how they're

    20            different, I'd like to know.  Because

    21            I won't say that anymore.  I'll be

    22            instructed.

    23            MR. LEVINE:

    24                I don't even know what the usual

    25            stips are, so I say no, Federal Rules.

REED  MOSHER, Ph.D. (VOL I)                     February 19, 2009

Page 8

```
 1   EXAMINATION BY MR. BRUNO:

 2       Q.   Doctor, this is the Notice of

 3   Deposition I've marked as Exhibit 1.  Have you

 4   seen that before?

 5           (Exhibit 1 was marked for

 6   identification and is attached hereto.)

 7       A.   Yes.

 8   EXAMINATION BY MR. BRUNO:

 9       Q.   All right.  Have you brought with you

10   today some documents in response to the

11   request?

12       A.   Yes.

13       Q.   Okay.

14       MR. LEVINE:

15           I'll just make a note for the

16       record you saw our recent filing where

17       we said we're not obligated to do

18       this, we're doing this for convenience

19       so that you guys get your documents.

20       MR. BRUNO:

21           Once again, Paul, what difference

22       does that make?

23       MR. LEVINE:

24           Just putting it in the record.

25       MR. BRUNO:
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 9

1              Are you giving them?

2         MR. LEVINE:

3              I'm just putting it on the

4         record.

5         MR. BRUNO:

6              Are you giving me documents or

7         not.  Are you holding something back

8         or are you not?  All I want to know is

9         what you're giving me.

10         MR. LEVINE:

11              Could you burn us a copy of that

12         CD?

13         MR. BRUNO:

14              Yes.  I'll be absolutely pleased

15         to burn you a copy, and we'll do it

16         right this second.

17    EXAMINATION BY MR. BRUNO:

18    Q.   Do you have, doctor, some way of

19    indicating what's on the disk, or can you

20    remember it?

21    A.   Yeah.

22    Q.   Let's just walk through it, then.

23    A.   It's basically the photographs, some

24    spreadsheets with information about

25    permeability and some E-mails, a couple of

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 10

```
 1    E-mails passed about flooding and inundation of
 2    St. Bernard Parish area.  Most of all the other
 3    information that I've used in this is public
 4    access.
 5         Q.   Public?
 6         A.   It's either the IPET report, things
 7    from the IPET study, things that are on the
 8    IPET website.
 9         Q.   All right.  I don't -- I get that.
10    But I need to know which of those things that
11    are accessible publicly you used in order to
12    create the report.  You see?  That's my
13    problem.  There's a billion documents on the
14    Internet.
15         A.   Uh-huh.
16         Q.   I'd like easy if I can learn the
17    subset of those documents that you used --
18         A.   Right.
19         Q.   -- if you did, in the formulation of
20    your report.
21              Are you able to do that from memory
22    or -- we can do it -- we may just do that as we
23    discuss each of the sections of your report.
24    That may be the better way.
25         A.   We could do it that way, yeah.
```

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 11

1       Q.     That would probably be a better way.

2       A.     Yeah.

3       Q.     Then let's move to your -- I guess

4    this is -- is this a CV?  I guess you'd call

5    this a CV.  Curriculum vitae?  And you have

6    appended it to your report.  It's 189.  And I

7    have a copy for you.  And it's in color.

8       A.     Great.

9       Q.     Because I spent the extra bucks.

10            What is your current position, doctor?

11      A.    I'm the director of the information

12   technology lab at the Engineer Research and

13   Development Center of the Corps of Engineers.

14      Q.    For how long have you been in that

15   position?

16      A.    I've been there for just a little bit

17   over a year.  January 20th, of last year I

18   became the director.

19      Q.    What does the director of the U.S.

20   Army Engineer Research and Development Center

21   do?

22      A.    Okay.  Information and technology.

23   I'm responsible for lead ing that laboratory 's

24   research and development program.  We also

25   operate the -- one of DOD 's four

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 12

1    high-performance computing centers located

2    there.  And we, um -- we also do support to the

3    Army in the Corps of Engineers and DOD for

4    numerical modeling.

5        Q.   You are an employee of the United

6    States Army Corps of Engineers as opposed to

7    the United States Army.

8        A.   Well, we are part of the Army.

9        Q.   Right.

10       A.   So I'm one of -- I'm a member of the

11   Army.

12       Q.   Okay.  And then under that, you are

13   also, though, a member of the United States

14   Army Corps of Engineers?

15       A.   Right.

16       Q.   On the civilian side.

17       A.   Civilian side.

18       Q.   And you report to whom?

19       A.   To Dr. Houston who's the director of

20   the ERDC, the Engineer Research and Development

21   Center.

22       Q.   Dr. Houston?

23       A.   Dr. Houston.  Dr. Holland.  Excuse me,

24   Dr. Holland who's a deputy, also.

25       Q.   How many folks do you supervise?

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 13

1      A.   Um -- about 160 civilians and another

2   120 contractors.

3      Q.   Do you actually get in the lab and do

4   laboratory work yourself?

5      A.   Um -- well, for this last year I have

6   done less of that, but I still get involved in

7   technical issues in leading how we ought to do

8   things, what our technical competency is that

9   we should follow.

10      Q.   You're not on a day-to-day basis in a

11   laboratory doing --

12      A.   Not anymore.  No.

13      Q.   You are more of an administrative

14   capacity?

15      A.   I'm more of a -- well, it's more of a

16   senior leader.

17      Q.   Uh-huh.  And what kinds of things does

18   the information technology laboratory do?  Or

19   perhaps a better way to ask the question was

20   what kinds of issues do you all deal with in

21   the information technology laboratory?

22      A.   Um -- development of numerical models

23   for navigation and water control and water

24   resources programs.  We do also numerical

25   modeling for blast and weapons effects.  Also

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 14

1    involved in numerical modeling for finding IUDs

2    locating and distinguishing what IUDs are.  And

3    we also do the operations part of its, too,

4    running a high performance computer system.

5         Q.   What is an IUD?

6         A.   It's an improvised explosive device.

7         Q.   Can you spell that for me?

8         A.   Improvised.

9         Q.   Improvised.  Okay.  Sorry.  Your

10   northeastern accent is a little difficult for

11   me to get since I have --

12              MR. LEVINE:

13                   When you say IUD you meant IED.

14   A.   IED.

15              (Off the record.)

16   A.    I mean, those are some of the things

17   that we do.  We also -- you know, there's a

18   number of other things.  We write programs

19   for -- or develop programs for project

20   management, accounting systems, wide range of

21   different computer --

22        Q.   And all right.

23        A.   And we do research related to -- we a

24   project going on for our I-walls and T-walls.

25        Q.   And what project is that?

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

```
 1      A.    It's a research project to develop

 2    criteria for I-walls.  One of our folks is

 3    leading that research along with folks in the

 4    geotechnical instructions lab where I used to

 5    work.

 6      Q.    And you're revisiting the E-99 sheet

 7    pile evaluations?

 8      A.    It's E-99 and 17th Street, London

 9    Avenue.

10      Q.    Uh-huh.

11      A.    But I'm more looking at it across

12    other places where you find these in the U.S.

13      Q.    Are you personally involved in that

14    work?

15      A.    I'm -- yes.  But not on a regular

16    basis, but on a -- consulting with a leader.

17      Q.    Do they need your approval or

18    permission in order to proceed?

19      A.    No.

20      Q.    Okay.  So how do you get involved when

21    you get involved, for example, in a project

22    like this I-wall and/or T-wall evaluation?

23      A.    Usually in reviewing where they're

24    headed, what are the results from it, where

25    they may want to spend more time studying that,
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1    and decisions on how they ought to proceed.

2        Q.    Okay.  Now, before you were named the

3    director, you were apparently the technical

4    director for survivability and protective

5    structures?

6        A.    Uh-huh.

7        Q.    And I take it at the same time you

8    were also the lead technical director --

9        A.    For military engineering.

10       Q.    -- for military engineering in the

11   geotechnical and structures laboratory.

12       A.    That's correct.

13       Q.    Okay.  How long were you in that

14   position?

15       A.    From about 2000 until, um -- 2008.

16       Q.    About eight years.

17       A.    Yeah.  And during that time period,

18   though, I also was involved in the IPET study.

19       Q.    Okay.  We'll reserve our discussion

20   about the IPET study for later.

21           How many folks did you supervise while

22   you were in those I take it two positions?

23       A.    It's, um -- yeah.  It's -- one is the

24   business area lead, which is the military

25   engineering, and the survivability and

JOHNS PENDLETON COURT REPORTERS                800  562-1285

REED   MOSHER, Ph.D. (VOL I)                     February 19, 2009

Page 17

1    protective structures is a subset under that.

2    I had -- I crossed ERDC responsibility for

3    those.  I directly supervised only a small

4    group in our office, but was the leader of

5    about a hundred and ten people.

6         Q.   Okay.

7         A.   And had about a twenty-five to thirty

8    million dollar program that I was responsible

9    for.

10        Q.   How much money did you all have

11   available to do the IPET work?

12        A.   Um -- about, the total program for

13   IPET --

14        Q.   Yeah.

15        A.   -- from beginning to end?  Um --

16   somewhere around, I don't know the exact cost,

17   but somewhere around 22 to $24 million.

18        Q.   22 to $24 million.  Who was it that

19   decided on that sum; how did that budget get to

20   that number?  If you know?

21        A.   Well, it started out as an initial

22   estimate, and then looking at the time that was

23   put in as it went on we refined that and put

24   more money into it to make sure we could finish

25   it.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 18

1      Q.    Who's the we?

2      A.    That one really -- I was involved to

3  some extent but Ed Link who was the director

4  and then, um -- at the time Don Basham who was

5  the head of engineering for the Corps of

6  Engineers.

7      Q.    But we can find him on the Internet.

8  He's the director of --

9      A.    He was the director.  He's retired

10  since then.

11      Q.    But he was the director of?

12      A.    Engineering for the Corps of

13  Engineers.

14      Q.    Okay.

15      A.    In Washington.

16      Q.    And he retired approximately?

17      A.    A year and half ago.

18      Q.    Fine.  That should give us enough to

19  get it.

20      A.    And his name is in, probably -- it's

21  in the IPET report, in Volume 1, in the front.

22      Q.    All right.  Then it says, Dr. Mosher

23  has -- am I saying that correctly; Mosher?

24      A.    Yeah.  Mosher.

25      Q.    -- has thirty years of experience

REED  MOSHER, Ph.D. (VOL I)                        February 19, 2009

Page 19

1    conducting research at all levels in the field

2    of geotechnical and structural engineering.

3        A.   Uh-huh.

4        Q.   Okay.  How many times in the past

5    thirty-five years have you done a forensic

6    evaluation of a levee failure?

7        A.   Of a levee failure?

8        Q.   Yes.

9        A.   Well, since we haven't had lots of

10   levee failures, but I've been in -- I haven't

11   done many forensic analysis of levee failures,

12   but I have done a significant amount of

13   research on levees and I-walls as part of my

14   job.

15       Q.   Okay.  I understand that.

16       A.   So --

17       Q.   I'm asking a very specific question.

18   And so let's sort of understand each other.  It

19   is important for me to get -- for you and I to

20   talk on the same level.

21       A.   Uh-huh.

22       Q.   And I understand the need to maybe

23   expand, and I will let you answer any way you

24   want to.  I only ask one favor, and that is you

25   answer my question first.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 20

1       A.   Okay.

2       Q.   So the question on the table is -- and

3   let's just break it down -- how many levee

4   failures did you have anything to do with?

5       A.   Well, anything --

6       Q.   Regardless of your --

7       A.   Okay.

8       Q.   Just any role at all, let's do it that

9   way.

10       A.   Okay.  Um -- there's been three or

11   four that I've been involved in that were on

12   the Mississippi River levees that had failures.

13       Q.   Okay.  And approximately when were

14   these, if you could just give me a rough, rough

15   date?  You know, like, even if you a give me

16   five-year band, that's fine.

17       A.   Yeah.  There were some that we looked

18   at along the '73 flood, and then again in the

19   '93 flood.

20       Q.   Okay.  The '73 flood in the midwest?

21       A.   It was on along the Mississippi River.

22       Q.   Okay.  Was that St. Louis or --

23       A.   It was floods all up and down the

24   river.  They were mainly, um -- seepage

25   problems.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1       Q.    Okay.  All right.  And the second

 2   one --

 3       A.    Were in the midwest.

 4       Q.    -- was the '93 flood?

 5       A.    '93 flood.

 6       Q.    And that's the one in the midwest.

 7       A.    In the midwest.

 8       Q.    Yeah.  All right, that's two.  Were

 9   there some others?

10       A.    Those had several, um -- areas that we

11   looked at.  They weren't all in one place.

12       Q.    All right.  Now, so let's -- but those

13   are the two general --

14       A.    Uh-huh.

15       Q.    -- levee failure evaluations.  Okay.

16   So let's talk about the '73 flood.  What was

17   your role in connection with the evaluation of

18   the '73 flood failures?

19       A.    It was we were investigating seepage,

20   uplifts in what would be the, um -- head sand

21   boils and those types of problems that led to

22   the failure.  And did slope stability studies

23   to look at how, much both to calibrate the

24   codes that we were using and to look at the --

25   you know, how much material had to be washed

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1   away before the slope was lost.

 2       Q.   Okay.  Was there a forensic evaluation

 3   with regard to a determination of the cause of

 4   any of the failures at any of the locations

 5   which --

 6       A.   It wasn't a formal forensic report

 7   that was sent out, we were more looking at what

 8   we believed was the cause of it.

 9       Q.   All right.  In other words, it was

10   not -- there was no intent to evaluate

11   forensically for cause, there was an assumed

12   cause and you evaluated the assumed cause.

13       A.   Well, it was clear from the physical

14   evidence what was leading to the failure.

15       Q.   All right.

16       A.   And so from the forensic standpoint it

17   would be how much material needed to be eroded

18   away before you lost stability of the slope.

19       Q.   Okay.  So because there were sand

20   boils the assumption was that there was a

21   seepage issue, and --

22       A.   Yeah.  That's what leads to sand

23   boils.

24       Q.   I understand.  But you didn't evaluate

25   the cause of the sand boil, or the cause of the

JOHNS PENDLETON COURT REPORTERS              800  562-1285

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 23

```
 1  seepage, the issue was how much -- at what
 2  point would the levee become unstable with
 3  those in place.
 4       A.   Yeah.
 5       Q.   So it really wasn't a forensic
 6  evaluation.
 7       A.   Why not?
 8       Q.   Well, did you do anything to determine
 9  why the seepage occurred in the first instance,
10  why wasn't it caught earlier, why wasn't it
11  part of the design, what could they have done
12  to determine whether there was a problem before
13  it became a problem?  All of those things.
14           MR. LEVINE:
15               Objection.  Compound.
16           MR. BRUNO:
17               That's intended to be.
18           MR. LEVINE:
19               I know.
20  EXAMINATION BY MR. BRUNO:
21       Q.   Isn't that what -- let's ask it.  What
22  is a forensic evaluation?  Maybe I'm wrong.
23  What does one do when one does a forensic
24  evaluation?
25       A.   When we go out, and particularly in
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 24

1   cases go out to look at what physical evidence

2   there is out there.

3        Q.   Right.

4        A.   Okay.  Compare that to what is in

5   place, what was in place before the event

6   occurred, compare those to what was the

7   intended design, assess, you know, what would

8   be the potential, you know, possibilities of

9   modes of failure that could occur, tie that,

10  also look at that relative to the physical

11  evidence that you see, do some -- if it's

12  appropriate, if you have the tools do it, do

13  some analysis, particularly using something

14  that's, you know, state-of-the-practice type of

15  analysis, something other people would accept

16  as a tool for doing that analysis, and try to

17  understand what were the modes of failure.

18       Q.   Right.  And what is the purpose, if

19  you know, of doing a forensic evaluation?

20       A.   Principally, the ones the I've been

21  involved in is to try to understand what the

22  mechanism was of failure.

23       Q.   Uh-huh.

24       A.   And to develop techniques to prevent

25  that in the future.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 25

```
 1      Q.   Okay.  Would the logic be that in
 2  order for you to prevent things from occurring
 3  in the future one has to have a full
 4  understanding of what happened in the past?
 5  Right?
 6      A.   Uh-huh.  Yes.
 7      Q.   And so again, going back to '73, to do
 8  a forensic evaluation one would have had, I
 9  would suspect, to do some kind of evaluation to
10  determine how the underseepage began --
11      A.   Uh-huh.
12      Q.   -- right?
13      A.   Yes.
14      Q.   Did you guys do that?
15      A.   Yeah.  We did a seepage analysis
16  looking at what would drive that and what were
17  the thicknesses that would cause you to have a
18  sand boil.  A lot of times sand boils are also
19  caused by farmers digging in their field too
20  close, somebody --
21      Q.   Holes?
22      A.   No, just digging.
23      Q.   Even just -- not even too deep.
24      A.   Yeah.
25      Q.   Just disturbing the soil.
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 26

1      A.   Disturbing the soil.  Somebody driving

2   poles and things like that into the ground,

3   changing the elevation.  A lot of the levees,

4   and particular one of the ones we looked at

5   wasn't a federal levee, we didn't have control

6   over it.  And so we looked at those things.

7   But at what level would you start to have those

8   problems?

9      Q.   All right.  And if you disturb the

10  soil on the water side, you could also cause a

11  sand boil, couldn't you?

12     A.   Well, what you could do is shorten the

13  path of the seepage.  That's one of the things

14  generally you looked at is are there, um --

15  areas where they've shortened the path?

16     Q.   Okay.  So --

17     A.   And other forensic analysis that I've

18  been involved in also deal with things on the

19  weapons side.

20     Q.   Right.

21     A.   Um -- I was involved in the Klobar

22  Tower assessment of a blast against that, and

23  that ended up being -- and it was the bombing

24  that took place in Saudi Arabia, and the report

25  ended up being part of a report to the

REED MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1    President on what happened there.

 2        Q.    So what was the cause of seepage in

 3    the '73 flood?

 4        A.    What was the cause of seepage?

 5        Q.    Yeah.

 6        A.    Well, there was, um -- particularly on

 7    the Mississippi River levees you have a sand

 8    that runs underneath the topsoil, the top

 9    layer, and there was high water in the river

10    over a long period of time, and it built up

11    through that.  And particularly sands are very

12    porous, so you get uplift pressures that go

13    across to the foot of the -- to the levee, and

14    if those are too low you will get sand boils

15    popping up.

16        Q.    Right.  So what did you all conclude

17    needed to be done in order to prevent that from

18    happening again?

19        A.    Um -- the best thing would be is to

20    have a seepage berm at the toe of the levees

21    and have it designed to ensure that you

22    wouldn't get -- and you'd have actually a

23    factor of safety against sand boils.

24        Q.    Did y'all do that?

25        A.    That was a recommendation that was

REED  MOSHER, Ph.D. (VOL I)                        February 19, 2009

Page 28

 1   provided.

 2        Q.   Did it happen?

 3        A.   Um -- on not all of them, because some

 4   of them aren't federal levees and they didn't

 5   have the funds to do them.

 6        Q.   Okay.  On the federal levees was it

 7   done?

 8        A.   On several of the cases they've added

 9   berms to them.

10        Q.   But not all.

11        A.   Not all.

12        Q.   Why not?

13        A.   Funding.

14        Q.   Funding.  Okay.  And to whom did you

15   report these findings?

16        A.   Mostly I was working with a team of

17   folks from St. Louis District and the Vicksburg

18   District.

19        Q.   Okay.  Were the findings reported to

20   Congress?

21        A.   Um -- I don't believe they were.  I

22   mean, other than the recommendations were to do

23   that, but not the findings of the forensic

24   analysis.

25        Q.   And the funding would come from where,

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 29

1    would it be the Corps?

2         A.    From the district.  From the Corps.

3         Q.    From the Corps.

4         A.    Yeah.

5         Q.    So the Corps has the decide whether or

6    not it's got the money to do --

7         A.    Oh, you mean for the repairs?

8         Q.    Yeah.

9         A.    They would recommend it but Congress

10   would provide it.

11        Q.    All right.  So you certainly would

12   agree that in order for Congress to decide

13   whether or not to make these kinds of

14   expenditures they need to have all the

15   information necessary to understand the

16   problem, the potential harm, and then to make

17   an appropriate judgment, right?

18                MR. LEVINE:

19                    Object to the form.

20        A.    Uh-huh.

21        MR. BRUNO:

22                    What's wrong with the form?

23         MR. LEVINE:

24                    Vague.

25        MR. BRUNO:

REED   MOSHER, Ph.D. (VOL I)                          February 19, 2009

    1                    It's vague.  Okay.  I don't think

    2            so.  All right.

    3     EXAMINATION BY MR. BRUNO:

    4        Q.    So the '93 flood.  Did you all do a

    5     forensic evaluation in connection with that

    6     flood?

    7        A.    Yes.  Very similar type.

    8        Q.    Underseepage?

    9        A.    Underseepage.

   10        Q.    Did you do any evaluations of the

   11     materials of construction of the levees?

   12        A.    Um -- what do you mean by

   13     investigation?

   14        Q.    Well, in other words, if it was

   15     forensic, I think you pointed out to me that

   16     you would look at all possible mechanisms of

   17     failure.

   18        A.    Uh-huh.

   19        Q.    Which I imagine might include the

   20     materials of construction of the levee, methods

   21     of construction, design of the levee, location

   22     of the levee, there's the soil stratification

   23     below, et cetera, et cetera, et cetera, and on

   24     and on and on.

   25        A.    Uh-huh.  I just want to get -- I just

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1   want to make sure what you meant by the, um --

 2   did an assessment of what the materials were

 3   there from what we had for local borings in

 4   that area, look at the stratification.

 5   Otherwise you can't do the seepage analysis.

 6   You should have some -- if you don't have that

 7   material you don't have any bearing to these

 8   analysis.

 9       Q.   Sure.  All right.  Well, you went back

10   to seepage and I was asking you about materials

11   of construction.  Did you evaluate --

12       A.   Yeah.

13       Q.   -- the materials of construction that

14   went into the levee?

15       A.   Uh-huh.

16       Q.   And what --

17       A.   From a soil stability and sediment

18   standpoint.

19       Q.   Okay.

20       A.   Primary, though, most levees along the

21   Mississippi River had a other places, once

22   they're built, okay, um -- most of the problems

23   from their failure of the levees come from

24   construction.  And once they're placed they

25   actually get stronger with time.  And so that

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 32

```
 1   generally, you know, isn't a problem.  But we
 2   do check it.
 3       Q.   Yeah, I know.  See, I'm listening to
 4   your answers and I'm getting a little bit
 5   confused because it seems to me that if you
 6   decided before you start that it's generally
 7   not a problem that sort of eliminates one of
 8   the potential possibilities.
 9       A.   Yeah.  But you still check it.
10       Q.   You got to look at it.
11       A.   Yeah.  But I mean, experience tells
12   you that those are generally not the problem.
13       Q.   Right.  Well, can a -- from a for --
14       A.   But even --
15       Q.   Sorry.
16       A.   Just to go on a little bit more --
17       Q.   Yeah.
18       A.   -- why you end up having to know
19   though things, if I loose material at the toe
20   and the whole thing slides, okay, you've had to
21   use the materials in what the levee is made of
22   to do that assessment, so you have to go back
23   to do them.
24       Q.   Sure.  But you have to first determine
25   what caused the slide.
```

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1      A.    Uh-huh.

 2      Q.    And, I mean, isn't there the potential

 3  of bias introduced in the evaluation if you go

 4  in thinking, well, that's not even a

 5  possibility?

 6      A.    No.

 7      Q.    And I'm saying, anything being any of

 8  the -- if you eliminate one of the potential

 9  mechanisms of failure before you start, it kind

10  of seems--

11      A.    But one thing you're asked to do as an

12  expert is to bring your knowledge of the

13  problem so you can look at that.  Okay?

14      Q.    Uh-huh.

15      A.    So you do the things necessary,

16  looking at what was there before, what was the

17  physical evidence?  You know, sand boils, it

18  turns out, in the cases of levees along the

19  Mississippi River are -- the floods are over a

20  longer period of time, okay, so you have some

21  information about what took place prior to the

22  actual failure.

23      Q.    Right.  But you see, don't you know

24  that going in?  Anytime you're evaluating a

25  levee failure along the Mississippi, you know

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 34

1   before you start that these are floods that are

2   of long duration because it's the Mississippi

3   River.

4           MR. LEVINE:

5               Hold on a second.  You got to

6           answer yes or no.

7       A.   Okay, yeah.  Yeah, I think you're

8   going to have that information, yeah.

9   EXAMINATION BY MR. BRUNO:

10      Q.   And so I guess it sounds like there's

11  sort of a resignation or an acceptance of the

12  fact that we have what we have and we are going

13  to -- because we have the levees that we have

14  and we're not going to rebuild those levees our

15  analysis is limited to sort of I guess patching

16  what we already have as opposed to rethinking

17  future flood prevention completely.

18              Does that make any sense?

19      A.   Well, I would say that, you know, we

20  have to live with the levees that we have.

21      Q.   Right.

22      A.   Okay?  There's a tremendous amount of

23  expense that's gone into those.  Okay?  And in

24  general terms they have performed quite well

25  with time.  Okay?  And so you can't rebuild

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 35

1    them totally.  Okay?  And basically, materials

2    in a lot of them are quite good.  It's a matter

3    of controlling the seepage part of it, to a

4    large extent on it's levees, the ensure that

5    they perform okay.

6        Q.   Uh-huh.

7        A.   And there are circumstances that we

8    don't control, the area outside the levee

9    footprint, and/or have the regulatory

10   responsibility to really control that.  And

11   that's a fairly serious problem.  An example of

12   this is the vegetation along the levees in

13   California.  People don't want to cut the trees

14   off of them.  But they perform much better if

15   the trees are cut off them.  And yet the

16   federal government doesn't necessarily control

17   that.

18       Q.   Right.  Okay.  So the -- I'm sorry.

19   The '93 flood, the issue again was

20   underseepage?

21       A.   Uh-huh.

22       Q.   Okay.

23       A.   Yes.

24       Q.   And the solution again was building

25   berms at the toe?

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 36

1        A.    Berms at the toe and regular

2   inspection prior to the levees to make sure

3   that there weren't holes and things like that

4   dug.

5        Q.    Would you tell me, what is

6   geotechnical engineering?

7        A.    It's the -- in the past it used to be

8   called soil mechanics and foundation

9   engineering, but it's somewhat broader because

10  it's dealing with the behavior of soils, the

11  design of foundations, things like that,

12  dealing with earth.

13       Q.    Okay.

14       A.    And it goes all the way from geology

15  to the mechanics of soil.

16       Q.    And structural engineering, is that

17  a -- is one a subpart of the other?

18       A.    No, structural engineering deals more

19  with structural components, steel, concrete,

20  buildings, more vertical construction, but also

21  deals -- well, concrete dams, locks, those

22  types of things.

23       Q.    Okay.  All right.  Now, in your CV

24  when you describe your thirty years of

25  experience, are you in the same position for

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 37

1    that thirty years or --

2        A.   No, that's why I said a variety of

3    positions, starting from a young engineer when

4    I first came to work there until currently.

5        Q.   All right.  Geotechnical engineering

6    includes monitoring of earth works, as well;

7    right?

8        A.   Uh-huh.  Yes, it does include

9    monitoring.

10       Q.   Okay.  So your role in this case had

11   to do with the soils and the structure of the

12   levee itself.

13       A.   Primary, yes.

14       Q.   You don't have any expertise in

15   hydrology, do you?

16       A.   No.

17       Q.   All right.

18       A.   Other than courses I took as an

19   undergraduate.

20       Q.   Sure.  I understand.  But you're not

21   presenting yourself as an expert in hydrology.

22       A.   No.

23       Q.   I'm just trying to see how this all

24   works now in terms of the way that the

25   experts -- the defense experts have been

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 38

1  organized.

2          When did you first know that you would

3  be working in this litigation?

4      A.   Um -- that's probably about a year

5  ago, I think, something like that.  I can't

6  remember exactly, but.

7      Q.   Roughly the early part of '08,

8  somewhere in there?

9      A.   Yeah.  It was probably a little bit

10  before then.  Probably maybe October of '07.  I

11  can't remember exactly.

12      Q.   Okay.  Late '07 was early '08?

13      A.   I think so.

14      Q.   Okay.  All right.  And who was it that

15  advised you that you would be working on this

16  team?

17      A.   Um -- I think our counsel did.

18      Q.   Okay.  Robin Smith?

19      A.   No, actually our lawyer at ERDC.

20      Q.   Okay.  Now, how does that work?  I

21  mean, you're an employee of the United States

22  Corps of Engineers, you're doing this work at

23  your lab up there, and are you ordered to do

24  this?  Or is this something that you

25  voluntarily do?  I mean, how does that -- how

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 39

 1  does this become part of your daily routine?

 2       A.   Well, um -- I mean, it's not like

 3  you're going to do this.  But it's somewhat

 4  like that, you know, too.  They asked if I

 5  would do that.  And, um -- and they are, you

 6  know, basically looking at the possibilities of

 7  who could do it and who would sign up to do it,

 8  and I was asked if I would do it and said that

 9  I would.

10       Q.   Okay.  What were you asked to do?

11       A.   Um -- basically -- it has changed a

12  little bit, but particularly looking at the

13  MRGO litigation, you know, what happened during

14  Katrina.  And, um -- and as the litigation

15  changed a little bit over time, to look at some

16  other possible surge heights and things like

17  that, of how the levees along the MRGO

18  performed, and then also looking at the I-walls

19  along the Lower Ninth Ward.

20       Q.   All right.  Let's break it down, then,

21  into location.  Maybe that will make our job a

22  tad easier.

23            Were you asked to look at all at the

24  Lake Pontchartrain and Vicinity Hurricane

25  Protection System as it relates to New Orleans

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 40

1   East?

2        A.    No.  Not to include that in my --

3        Q.    All right.  So you have no opinions

4   that regard the levees and/or I-walls and/or

5   T-walls or whatever is there that was intended

6   to protect New Orleans East, correct?

7        A.    I haven't provided any of that in my

8   expert report.

9        Q.    All right.  Fair enough.  Right.  I'm

10  just sort of seeing where we are.

11       A.    Yes.

12       Q.    Okay.  And you haven't addressed the

13  I-walls at the 17th Street Canal.

14       A.    Not in my expert report.

15       Q.    All right.  And you haven't addressed

16  the I-walls at the London Avenue Canal --

17       A.    Yeah.

18       Q.    -- right?

19       A.    Not in the expert report.  I mean, I

20  do have -- I have done work in those --

21       Q.    No, I understand.  But in this expert

22  report, opinions that you'll be offering at

23  this trial, that's not what you've been asked

24  to do.

25       A.    Right.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 41

1        Q.   And you've not evaluated the walls on

2    the west side of the IHNC --

3        A.   In this report.

4        Q.   -- in this report.

5        A.   No, I haven't.

6        Q.   Okay.  So what you have evaluated are

7    the I-walls at the Lower Ninth Ward --

8        A.   Uh-huh.

9        Q.   -- right?

10       A.   Between -- sout of -- I guess it was

11   south of Florida Street bridge.

12       Q.   All right.  And you've been asked to

13   evaluate some federal levees along the MRGO, is

14   that accurate?

15       A.   That's accurate.  Particularly Reach

16   2.

17       Q.   Okay.  Well, that's why I was --

18   that's frankly where I was going.  For example,

19   were you asked to look at Reach 1?

20       A.   Um -- I did do some looking at it, but

21   where there was little damage along Reach 1 it

22   didn't really become part of my expert report.

23       Q.   All right.  But again, the question

24   is, did you look at Reach 1, yes or no?

25       A.   You know, yeah, that's part of the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 42

1    talking about performance of the levees.

2         Q.    Sure.  Absolutely.  The fact that one

3    performed and one didn't would be relevant, I

4    would think.

5         A.    Uh-huh.

6         Q.    Don't you agree?

7         A.    Uh-huh.

8         Q.    And one would like to know why one --

9         A.    That's correct.  I mean, you would --

10   it was part of what we had originally had done

11   in the IPET studies.

12        Q.    All right.  But in this exercise here,

13   for this case, what we call the MRGO

14   litigation, did you evaluate Reach 1?

15        A.    Um -- I don't believe there's any

16   specific details of Reach 1 in this report.

17        Q.    All right.  Now, as we travel down the

18   MRGO we come to the intersection of the

19   Intracoastal Waterway and what we call Reach 2,

20   correct?

21        A.    Correct.

22        Q.    And you have evaluated the levees

23   along the Reach 2 --

24        A.    Uh-huh.

25        Q.    -- to the point at which they make the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 43

```
 1    sharp right-hand turn toward the river,

 2    correct?

 3         A.   Correct.

 4         Q.   All right.  Did you evaluate the

 5    levees between the MRGO and the Mississippi

 6    River?

 7         A.   No.

 8         Q.   All right.  Now, with regard to the

 9    I-walls at the Lower Nine, to be specific, what

10    were you asked to do?

11         A.   Um -- to give my opinion of why the,

12    um -- what was the failure mechanism for those

13    walls?

14         Q.   Okay.  Now, you've already told us,

15    and we already know from your CV, that you were

16    the co-lead for the levee and floodwall

17    performance team of the Interagency Performance

18    Evaluation Task Force.  Is that correct?

19         A.   Correct.

20         Q.   Okay.  So the fact of the matter is,

21    you had already done precisely what you were

22    asked to do --

23         A.   Uh-huh.

24         Q.   -- by the lawyers in this case.

25    Right?
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 44

1      A.   Pretty much, yes.

2      Q.   Okay.  So what I'm curious to know is

3   whether you undertook a new and different

4   evaluation, or did you just simply draw on your

5   IPET experience and take the conclusions that

6   you had reached in connection with the IPET

7   work and then put them into this report?

8           MR. LEVINE:

9               Objection.  Vague as to location.

10          Are you talking about in the Lower

11          Ninth?

12      MR. BRUNO:

13              No.  It wasn't vague as to

14          location.  It was very specific as to

15          location.  And it was extremely

16          specific to the Lower Ninth Ward.  I

17          can read it back if you'd like.

18      MR. LEVINE:

19              It was three questions ago.

20      MR. BRUNO:

21              No, it wasn't three questions

22          ago.  It was the premise upon which I

23          built the following questions.  That's

24          why I established the location first,

25          so that we wouldn't have to do this.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1            Arched I will be doing this all day

 2            long, so that we don't have to --

 3     EXAMINATION BY MR. BRUNO:

 4        Q.   You see, what they like do is they'll

 5     object after I set up the whole thing and then

 6     they'll say where are you, and then I'll have

 7     to start all over again, and then we'll be here

 8     until the cows come home as my grandfather used

 9     to say.  So what I do generally is set up a

10     subject matter, a location and the time, and

11     then I ask questions about that subject matter,

12     location and time.  And if I change it then I

13     will tell you.  So we are talking about, once

14     again, the Lower Ninth Ward.  Nothing else.

15        A.   Okay.

16        Q.   All right.  And do you remember the

17     question or should I read again?

18        A.   Yep.  I remember the question.  I used

19     the information that I had from when we did the

20     IPET investigation, re-looked at what was done

21     there and what other people had done in what

22     has taken place since then, to provide my

23     opinions for the expert report.  So things have

24     taken place since then.

25        Q.   Right.

JOHNS PENDLETON COURT REPORTERS            800  562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 46

1        A.    And I tried to use that information to

2    see if there is any changes to them -- what I

3    had seen before.

4        Q.    Okay.

5        A.    The other part that's interesting as

6    well, as the IPET report, what we had stated

7    there had been reviewed by the ASCE and by the

8    National Research Council, and by a number of

9    prominent engineers in the field have reviewed

10   what we had stated there.

11       Q.    Well, hasn't the ASCE come under sharp

12   criticism for the alleged connections with the

13   Army?

14       A.    They've come under some criticism, but

15   not the technical part of what they've done.

16   And the National Research Council hasn't.

17       Q.    Okay.  And has the National Research

18   Council been in full agreement with everything

19   that the IPET concluded?

20       A.    Um -- they have not been in -- as the

21   process went on --

22       Q.    Right.

23       A.    -- there were questions asked, but

24   actually all of those have been publicly

25   answered, and they're in agreement as of the

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 47

1    last public meeting.

2        Q.    Was an evaluation by the national

3    academies -- the National Academy of Sciences?

4        A.    Uh-huh.

5        Q.    That's this?  The National Academy of

6    Engineering and National Research Council?

7        A.    Correct.

8        Q.    That's what you're referring to?

9        A.    Uh-huh.  Yes.

10       Q.    They had some criticism of the --

11       A.    Yeah.  And that's particularly why we

12   did the process the way we did, is so that we

13   could get that criticism and move forward and

14   correct those and make sure that it was

15   acceptable to the engineering community what we

16   were going to produce.

17       Q.    All right.

18       A.    Which is, you know, far -- which is

19   actually a kind of greater task to do than most

20   forensic analyses are, because we're having to

21   meet the community of engineering and having an

22   acceptable product to them.  And we have public

23   meetings, we have been scrutinized by them and

24   have to answer to their questions.

25       Q.    Okay.  All right.  So again, back to

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 48

1   the question, the IPET team had reached a

2   conclusion as to the performance of the I-walls

3   at the lower Ninth Ward.

4        A.   Uh-huh.  Yes.  There was a -- right.

5        Q.   So I guess what I'm trying to

6   understand is, was it a tabula rasa evaluation,

7   as a result of --

8        A.   I don't know what you mean by that.

9        Q.   Oh.  A blank slate evaluation of the

10  cause of the Lower Nine failures, or was it

11  simply an attempt to take the conclusions of

12  the IPET and measure them against what the

13  plaintiffs said and perhaps what other -- what

14  the Team Louisiana said or other investigative

15  groups, and compare their conclusions with your

16  conclusions?

17       A.   Um -- so the process probably would

18  involve is there any new information available

19  that would actually lead you to different

20  conclusions than what was in the IPET.  Study

21  those conclusions and then do an assessment

22  based on that.

23       Q.   So it's clear, then, that what you did

24  for the lawyers was not a forensic evaluation.

25            MR. LEVINE:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 49

 1              Objection.

 2    EXAMINATION BY MR. BRUNO:

 3       Q.   Right?  I mean, you already had an

 4    opinion, and you were simply asking the

 5    question generally, is there some new stuff?

 6       A.   It's still a forensics analysis, just

 7    like your expert had opinions from when they

 8    did their study and they've continued on using

 9    those.  So I don't see any difference at all in

10    that.

11       Q.   You don't see any difference between

12    evaluating everything from -- with an eye

13    toward considering all possibilities as opposed

14    to accepting a conclusion and testing whether

15    or not that conclusion is still good?  I mean,

16    you would agree with me that's not the same;

17    those two things are not the same.

18       A.   But it would be -- you can say that if

19    you like.  Okay?  Would not say that, because

20    all of those possibilities were explored in the

21    original part.

22       Q.   Fair enough.  But Doc, that's a

23    different question.

24              MR. LEVINE:

25                 Hold on.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 50

1    EXAMINATION BY MR. BRUNO:

2        Q.    In fairness to me.

3        A.    No, it isn't.

4            MR. LEVINE:

5                Let him answer the question.

6    EXAMINATION BY MR. BRUNO:

7        Q.    It is a different question.  Here's

8    where we're having a problem.  I will ask you

9    about IPET and the work that you did at IPET.

10   I'm not asking you about IPET now.  Okay?  In

11   fairness to me, I am asking you about the work

12   that you were asked to do by the lawyers.

13   Okay?  Which was after IPET was finished,

14   completed and done.  And I'm just trying to

15   establish whether or not you would agree with

16   me that the work that you were asked to do by

17   the lawyers -- and I'll come back and ask you

18   the same question about IPET, and the answer is

19   going to be different.  But with regard to the

20   work that you did for the lawyers, it was not a

21   forensic evaluation, it was, rather, an

22   inquiry; do we have new information out there

23   that would cause us to change our opinions that

24   we had come to in the IPET evaluation?

25       A.    I disagree with you.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

1      Q.    Okay.  Well, you didn't start from
2   scratch, did you?

3      A.    Did anyone?

4      Q.    I'm not asking about anyone.  I'm
5   asking about you.  You keep -- you seem to want
6   to talk about my experts.  And you'll have lots
7   of time to answer his questions at trial.  I'm
8   not interest at the moment about what you have
9   to say about my expert.  I'm asking you about
10   what you did in response to the request by the
11   lawyer up there in the northeast when he said
12   to you you're working on the MRGO case.  That's
13   what I'm tying to understand.  Okay?  There's
14   nothing nefarious, or -- I'm not suggesting
15   that that may be inappropriate or appropriate.

16      A.    Uh-huh.

17      Q.    I'm just trying to establish what we
18   know to be the facts, and that is you guys
19   reached a conclusion in IPET and that
20   conclusion did not change in your report.

21      A.    No.

22      Q.    Right?

23      A.    Our opinion didn't vary much from
24   that.  But I would say that we still did a
25   forensic analysis.  I cannot separate when I

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1   starting thinking about the actual data,

 2   whether it started when I was doing IPET or all

 3   the way through.  It is the data.  It is the

 4   information.  This is what you have to do the

 5   analysis.

 6        Q.   Doctor, you could have chosen to throw

 7   away all of your IPET data.  You could have

 8   said to the lawyers, you know what?  What I'd

 9   like to do is start all over again.  I'm going

10   to just discount everything we did in IPET, and

11   I'm going to start fresh.  You could have said

12   that, couldn't you?

13        A.   Then, um -- what data would you have

14   available?  You'd have to make stuff up.

15        Q.   No.  You have the facts which underpin

16   your thoughts.

17        A.   The data is part of those facts.

18        Q.   No.  There's.  No -- if we have to go

19   that route we will.  What is data in your mind?

20        A.   Data is the information that you have,

21   both field, laboratory --

22        Q.   Right.

23        A.   -- observations --

24        Q.   Right.

25        A.   -- what took place.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 53

1        Q.    Some of the data, or what we in our

2   business call the facts, is what's out there in

3   the field.

4        A.    Right.

5        Q.    Some of the data are what comes out of

6   a computer after you do a computer model.

7   Right?

8        A.    Uh-huh.

9        Q.    Right?  Is that true?

10       A.    That is a form of data.

11       Q.    So one set of data is not going to

12   change, but the set of data that comes out of a

13   computer may change if you rethink the

14   formulas, the strategies, the models that you

15   choose to use.

16       A.    Physics is physics.  Okay?

17       Q.    Really?

18       A.    You can't change the physics.

19       Q.    You can't.  How do you explain the

20   fact that the IPET, when it reached its

21   conclusions about the waves, said, in clear

22   terms -- we can pull it out and show it to

23   you -- that the IPET conclusion was the waves

24   that were generated in Hurricane Katrina were

25   ocean-generated waves with periods of 15 to 16

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 54

1   seconds, and yet now we have Dr. Resio who says

2   something entirely different?  He says, no,

3   we've got a whole different answer now.  We

4   don't say it's 15 to 16 second, now we're

5   saying something different.

6           MR. LEVINE:

7                Objection.

8           MR. BRUNO:

9                Isn't that true?

10      A.   I do not know that.

11  EXAMINATION BY MR. BRUNO:

12      Q.   You don't know that?

13      A.   I don't know the difference.  I'm not

14  a, um --

15      Q.   Well, you don't know that the wave --

16      A.   I understand the waves are somewhat

17  different --

18      Q.   Somewhat.

19      A.   Somewhat.

20      Q.   Well, let's start with this:

21          MR. LEVINE:

22                Hold on a second.  Let him finish

23          answering the question before you ask

24          your next one.

25          MR. BRUNO:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

```
 1                   I'm getting confused by --
 2             MR. LEVINE:
 3                   He's trying to answer, though.
 4             MR. BRUNO:
 5                   No, he wasn't.
 6             MR. LEVINE:
 7                   Yes, he was.
 8             MR. BRUNO:
 9                   Let's pull the executive summary,
10          please.
11          (Off the record.)
12    EXAMINATION BY MR. BRUNO:
13       Q.   At Page 40 of Volume 1 --
14       A.   Of IPET.
15       Q.   -- of the IPET executive Summary, to
16    be fair to you.
17             MR. LEVINE:
18                   Which version?
19             MR. BRUNO:
20                   The June 2008 version.
21       A.   Okay.
22    EXAMINATION BY MR. BRUNO:
23       Q.   Okay?  The sentence at the top of the
24    page that begins with the word "the" says, the
25    most significant finding was that the waves
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 56

1    along the GIWW, St. Bernard, MRGO and

2    Plaquemines levees were ocean-generated waves

3    with wave period in the 15 to 16 second range,

4    much more capable of overtopping structures

5    than the design assumed wind waves with periods

6    of 5 to 6 seconds.

7          Now, that's not the conclusion of the

8    defense expert team today, isn't that true?

9          MR. LEVINE:

10              Can we see that?

11   EXAMINATION BY MR. BRUNO:

12      Q.   Do you need to see that or do you

13   trust that I've read it accurately?

14      A.   I trust that you read it accurately.

15      Q.   Thank you.  All right.  As you said,

16   there are certain facts, and it is an absolute

17   fact that the IPET concluded that they were 15

18   to 16 second period waves, and Dr. Resio has

19   reached a different conclusion today.

20      A.   Okay.

21      Q.   Isn't that true?

22      A.   I don't know if it's true about the

23   period wave.  I was more interested in the

24   height of the wave and the height of the surge.

25      Q.   What was the height of the wave that

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1   the IPET team found?

 2       A.   I believe they're -- I can't remember

 3   exactly, but I believe they're 3 to 5-foot

 4   range.  I can't remember exactly.

 5       Q.   What was the wave that Dr. Resio

 6   found?

 7       A.   I can't remember offhand.

 8       Q.   All right.  Fair enough.  So obviously

 9   height of the waves didn't really have much to

10   do with your opinions.  Right?

11       A.   Right.  If you read in the expert

12   report it talks about more the surge getting

13   there than -- I said that the waves would

14   accentuate the erosion but the surge would

15   drive it.

16       Q.   Well, we'll get there.  I think you

17   said surge and waves.

18       A.   But --

19       Q.   And every time you say surge you say

20   surge and waves in your report.  Small detail.

21           All I'm trying to get at, Doctor, is

22   this:

23       A.   Well, but --

24           MR. LEVINE:

25               Let him finish.

JOHNS  PENDLETON  COURT  REPORTERS          800   562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 58

    1      A.    -- I want to actually explore that.

    2   EXAMINATION BY MR. BRUNO:

    3      Q.    All right.

    4      A.    In Dr. Resio 's things, did he say the

    5   physics of how he did the analysis changed, or

    6   did --

    7      Q.    Yes.

    8      A.    He said the physics changed or the

    9   data?

   10      Q.    No, the input.

   11      A.    The inputs, which is data.

   12      Q.    Well, so you told me that the data

   13   inputs shouldn't change, and now we're finding

   14   out that they did change.

   15      A.    Well --

   16      Q.    And that's why I asked the question

   17   that I asked you.

   18      A.    What I said was -- didn't I say that

   19   we go back and look at what the information was

   20   that the other -- has come out since that time,

   21   to see if there's changes in what took place?

   22   That's data.  I mean, you can't change the

   23   physics.  The analysis code --

   24      Q.    Doctor --

   25           MR. LEVINE:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1            Hold on.  Let him finish

2        answering the question.  Go ahead.

3        MR. BRUNO:

4            We're talking on different planes

5        here, but go ahead.

6    A.   No.  I was saying, and you a made an

7  objection to it, about the physics, the physics

8  stays the same.  So it has to be the input that

9  changes.

10  EXAMINATION BY MR. BRUNO:

11    Q.   Right.

12    A.   How you model it.  So you need to

13  examine, and that's what I did, examine was

14  whether changes to the information that was

15  available compared to what we did in the IPET.

16    Q.   And that's why I asked you about a

17  forensic evaluation of it.  Because one way to

18  do it would be to say to one's self, well, this

19  guy over her says something different, and I'm

20  going to evaluate when this guy has to say.

21    A.   Uh-huh.

22    Q.   Another way to do it is to start

23  fresh, start all over again, using the facts

24  that you have, that is, what facts do I have,

25  what facts do I don't?  And what models do I

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1  have available to me?  I mean, in fact, you

2  talk about the physics being the same or

3  different, Dr. Resio used a different model,

4  didn't he?

5            MR. LEVINE:

6                 Objection.

7       A.   I do not know.

8  EXAMINATION BY MR. BRUNO:

9       Q.   Well, he did.  He used different

10  modeling than the IPET team used.  The IPET

11  team used an SO8 and he used I think it was

12  SL15.  So again, I'm trying to just simply

13  understand about the approach.

14            You agree with me that a forensic

15  evaluation is an exercise to look at all

16  possible mechanisms of failure?

17       A.   Uh-huh.

18       Q.   And what you do is you go out in the

19  field and you collect has much factual

20  information as you can, what's out there,

21  what's not, what evidence do I have, what

22  evidence do I not have?  And I'm simply asking

23  you if you would agree, you, when you were

24  contacted by the lawyers, already had a

25  conclusion about the cause of failure at the

JOHNS PENDLETON COURT REPORTERS          800  562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 61

1    Lower Ninth Ward?  Isn't that true?

2        A.   I would have to say that I had a

3    conclusion because of my forensic analysis that

4    was done for IPET.

5        Q.   Fair enough.  That's good.

6        A.   But that was a forensic analysis.

7        Q.   That's fine.  But we're not asking you

8    that.  And I told you in fairness to you that

9    I'd get there, but I'm not there yet because I

10   can't get the answer to my question now.  You

11   didn't do a forensic evaluation in response to

12   the lawyers' request.

13       A.   I disagree with that.  I believe that

14   this whole process is part of that forensic

15   analysis.

16       Q.   Okay.

17       A.   It was a continuation of that.

18       Q.   All right.

19       A.   What I did.

20       Q.   It was a continuation of the process.

21            All right.  So technically, then,

22   according to your response, the work that you

23   did for IPET becomes a part of the work that

24   you did for the lawyers, there's no way to

25   divide the two, right?

REED   MOSHER, Ph.D. (VOL I)                      February 19, 2009

Page 62

1      A.   Um -- I don't disagree.  I mean, that

2   was a piece of what we did.

3      Q.   Sure.  So the IPET effort becomes a

4   component of the opinions that you're going to

5   offer to Judge Duval.  Right?  That work can't

6   be divorced from your opinions.

7      A.   No.  That can't be.

8      Q.   It can't be.

9      A.   No.  I don't disagree.

10     Q.   And that would be true of Resio and

11  all the others, right?  Ebersole?

12     A.   I can't speak for them.

13     Q.   But they're intertwined.

14     A.   That's correct.

15     Q.   Fair enough?

16     A.   Okay.

17     Q.   All right.  So with regard to the

18  Lower Nine, did you ever go out there?

19     A.   Many times.

20     Q.   Okay.  And did you gather the physical

21  evidence that was necessary for your forensic

22  evaluation?

23        MR. LEVINE:

24           Let me just make a general

25        objection on the record relating to

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 63

1          the whole stuff along the Lower Nine.
2          We contend that that whole portion of
3          the case isn't even involved in the
4          matter.
5          MR. BRUNO:
6              Why did he write it in his
7          report?
8           MR. LEVINE:
9              Because plaintiffs keep
10          contending that it is part of the
11          matter.
12          MR. BRUNO:
13              It is part of the matter.
14  EXAMINATION BY MR. BRUNO:
15      Q.   Doc, if one is going to talk about
16  potential causes of anything, don't we have to
17  talk about all the potential causes?  I mean,
18  even if you're going to discount them and say,
19  you know, plaintiffs, you're out of your mind,
20  you're wrong?
21           MR. LEVINE:
22              We contend that you don't have
23              jurisdiction to talk about these
24              causes.  That's different than like,
25              studying the causation issue.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 64

1          MR. BRUNO:

2                No, you're not understanding my

3          question.

4    EXAMINATION BY MR. BRUNO:

5          Q.   The question on the table is, as an

6    intellectual exercise, if something is going to

7    be asked the question what caused water to

8    enter into the Lower Ninth Ward, if that's the

9    question, isn't it intellectually sound to

10   evaluate all of the potential causes that have

11   been suggested by whoever is in the room

12   proposing a cause?

13         A.   Well, okay.  I would say you have --

14   there's a certain amount of reason in that.

15   Okay?  Just any suggestion is not an

16   appropriate -- I mean, people could have

17   wildest dream suggestions.  But with a

18   reasonable amount of, um -- of some validity of

19   what they're talking about --

20         Q.   Sure.

21         A.   -- some credibility, yes.

22         Q.   Sure.  There are folks who claim a

23   barge knocked down the wall.  Did you know

24   that?

25         A.   I understand that that is the case.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 65

1        Q.    You understand that.

2        A.    Uh-huh.

3        Q.    Do you think that that's a relevant

4    inquiry?  Should we look at that or should we

5    just say, no, it's impossible and walk away?

6    Never mind.

7              (Brief recess.)

8    EXAMINATION BY MR. BRUNO:

9        Q.    All right.  The fact of the matter is

10   that you guys didn't consider the barge as a

11   potential mechanism of failure of the Lower

12   Nine in your report, did you?

13       A.    It wasn't considered in this part of

14   the report, spoken to exact in that area in the

15   expert report, but, um -- it has been looked at

16   as a potential means of --

17       Q.    In the IPET?  Was that in the IPET

18   report?

19       A.    There's some discussion about it in

20   the IPET report.

21       Q.    Is there a conclusion?

22       A.    I can't remember right off.

23       Q.    Okay.  All right.

24       A.    But I'm not sure what's stated in

25   there, but I generally believe that we did an

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 66

```
 1    investigation and everyone felt that the barge

 2    wasn't the cause of the failure of the walls.

 3         Q.    All right.  Did you do any analyses in

 4    connection with the report that you did for the

 5    lawyers -- and again, we're still talking about

 6    the Lower Ninth Ward in case counsel gets

 7    confused, we're still there.  Did you do any

 8    analyses in connection with this report that

 9    you did not do as part of IPET?

10         A.    Um -- we did some analysis of

11    permeability values that we had received

12    information since the IPET report.

13         Q.    Okay.  That's only evaluation that you

14    did?

15         A.    That was the primary difference,

16    uh-huh.

17         Q.    Okay.

18         A.    But it -- there was a number of

19    assessments of information that had come out

20    since then, such as, you know, leakage through

21    walls, things like that that we did do some

22    investigation of whether that could occur or

23    not.

24         Q.    I didn't see that in your report.  You

25    did some evaluation of leakage of the Lower
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 67

1   Nine walls?

2       A.   Yeah.

3       Q.   Okay.  And that was through the --

4   through the piles?

5       A.   Through the piles.  Looking at it

6   taking place.

7       Q.   Anything else that you all did?

8       A.   Um -- there was a -- we're talking

9   about the Lower Ninth Ward?

10      Q.   Yes, sir.  We haven't' left there yet.

11      A.   Okay.  Um -- in some assessment of how

12  you treat pore pressures in undrained shear

13  strengths.

14      Q.   And that was relevant to the

15  underseepage evaluation, correct?

16      A.   Uh-huh.

17      Q.   And as was the permeability values,

18  right?

19      A.   Correct.

20      Q.   And but that's different from the

21  leakage issue.

22      A.   Different from the leakage issue.

23      Q.   All right.  So why don't we just -- so

24  we can categorize them, we have the

25  underseepage evaluation, and with regard to

REED  MOSHER, Ph.D. (VOL I)                        February 19, 2009

Page 68

```
 1    underseepage we looked at permeability values

 2    and we also looked at some pore pressures of

 3    undrained --

 4         A.   Effects of pore pressures and

 5    undrained shear strength.

 6         Q.   Did we do anything else after IPET as

 7    part of this report?

 8         A.   Other than, um -- looking at, you

 9    know, what has taken place since then, other

10    data, what -- other papers that have come out

11    and some discussions with the folks that were

12    involved in building the new T-wall that was

13    there and what they found for ground

14    conditions.

15         Q.   Did you evaluate the soils as part of

16    this report?

17         A.   It's a matter of looking at had they

18    changed.

19         Q.   Well, did they change?

20         A.   There was not a significant change, it

21    was pretty much the borings that we had and

22    compared to what they've used for the design of

23    the T-walls.

24         Q.   Okay.  So we just looked to determine

25    whether there were other borings available, is
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 69

1    that right?

2         A.    Other borings and also what they found

3    when they dug into the levees to build the

4    T-walls.

5         Q.    Okay.  Did you evaluate the borings

6    that were done in connection with the

7    demolition and environmental cleanup by WGII?

8         A.    Actually, those -- we actually look at

9    those actually before we finished the IPET

10   report because there were some discrepancies in

11   the -- some of the statements that the folks

12   that were doing the ILIT report from California

13   about permeabilities and what the strength of

14   those soils were and what they were made up of.

15        Q.    Uh-huh.

16        A.    And there was a meeting in, um -- an

17   ASCE geotechnical conference in Denver and it

18   was an open public meeting where we discussed

19   those things, and actually that group at the

20   time publicly said that they had misinterpreted

21   what the soil conditions were on the flood side

22   of the IHNC and that the permeability that they

23   used in their analysis was incorrect.

24        Q.    Who is the they?

25        A.    Um -- Ray Seed and Rogers --

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 70

1    Dr. Rogers who was the chief geologist and the

2    chief geotechnical guy in that report.

3        Q.    They said they used the wrong what,

4    exactly?

5        A.    Permeability values.

6        Q.    All right.  And they said this in

7    Denver?

8        A.    In Denver.

9        Q.    Okay.  And how did that relate to the

10   WGI soil borings?  That was the question.

11       A.    The WGI?  When they actually did that

12   assessment, there were borings done before they

13   took out the tanks in that area --

14       Q.    Right.  Exactly.

15       A.    -- and, um -- Dr. Rogers had said that

16   the material was all shells and granular

17   material along there.  And we had showed -- had

18   borings that showed that that was not true.

19       Q.    All right.  Well, again, the question

20   was, did you look at the borings that were done

21   in connection with the site remediation and

22   demolition?

23       A.    Yeah.  And those were the set of

24   borings --

25            MR. LEVINE:

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1              Let him finish.

 2    EXAMINATION BY MR. BRUNO:

 3        Q.    All I'm asking is did you look at

 4    them?

 5        A.    Yeah.

 6        Q.    And did you look at them as part of

 7    the work that you did for the lawyers or did

 8    you look at them as part of the work that you

 9    did for IPET?

10        A.    Um -- it was part of IPET and also

11    looking at them in terms of what we did -- I

12    have a change of opinion based on what has been

13    done by -- the assessment I agreed to do for

14    the lawyers.

15        Q.    You don't talk about them in your

16    report, do you?

17        A.    No.  Because they didn't affect the

18    soil conditions.

19        Q.    All right.  You didn't talk about them

20    in the IPET report.

21        A.    Um -- they're in the IPET report.

22        Q.    The WGI borings?

23        A.    Uh-huh.

24        Q.    Okay.  All right.

25              MR. LEVINE:

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 72

1              Is that a yes?

2      A.    That's a yes.

3   EXAMINATION BY MR. BRUNO:

4      Q.    Okay.  So in connection with the Lower

5   Nine, we really -- so we didn't really look at

6   any new borings, we simply talked to the folks

7   that built the new T-wall just to confirm that

8   they had found in fact what you believed to be

9   there by virtue of the soil borings, right?

10     A.    Right.

11     Q.    No change.  So there was no laboratory

12  tests done, right?

13     A.    On those samples there, there were no

14  laboratory tests -- additional laboratory tests

15  done.

16     Q.    No, I mean in general.  Since IPET --

17     A.    Yes.

18     Q.    -- you performed no laboratory

19  testing, period, in connection with the Lower

20  Nine, on anything.

21     A.    In connection with the Lower Ninth.

22     Q.    Yeah.

23     A.    Um -- not directly connected to the

24  Lower Ninth.

25     Q.    All right.  You did no computer

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 73

1   simulations, did you?

2       A.   No additional computer simulations,

3   no.

4       Q.   Okay.  So who did the -- whatever it

5   was that you did with the permeability values,

6   who did the actual work?

7       A.   The testing?

8       Q.   No, I think you said something about

9   the fact that we looked at some different

10  permeability values.

11      A.   Right.

12      Q.   Who did that?

13      A.   Um -- actually -- I actually examined

14  them.  Okay?  They were collected and tested

15  by, um -- Eustis Engineering.  And I provided

16  those on that disk there.

17      Q.   Okay.

18      A.   And I also did the -- had somebody go

19  to the library to get information, but I

20  actually did the assessment of what the

21  permeability values were and where they came

22  from.

23      Q.   All right.  I'm a little confused.

24  The Eustis information, what is that?

25      A.   Um -- it was a series of consolidation

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 74

1    tests and permeability tests that were done.

2        Q.    When was that done?

3        A.    Um -- I forgot the date.  I'm not sure

4    exactly.  But within the last year or so.

5        Q.    Okay.  And do you discuss that in your

6    report?  I didn't see any mention of Eustis

7    Engineering in here.

8        A.    Um -- it really revolves around the

9    permeability values.

10       Q.    I understand that.  But I mean one

11   would think that the data would be described.

12   Right?  And so if this is data that you got

13   from Eustis, wouldn't it be reasonable for me

14   to conclude that that would be discussed so we

15   would know where the data came from?

16       A.    There is a plot in there of

17   permeability values that some of that data was

18   included in.

19       Q.    Okay.

20       A.    But the broad data is actually on

21   the -- in the file that I provided in --

22       Q.    I get that the raw data is described.

23   But there's no indication as to where the raw

24   data came from, is there?

25       A.    There may not be.  I don't know for

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1    exact sure.

 2        Q.    All right.  So you've got some data

 3    from Eustis Engineering.

 4        A.    Uh-huh.

 5        Q.    And that data was obtained by Eustis

 6    about a year ago.  So it was after the IPET

 7    report.

 8        A.    Right.

 9        Q.    Okay.  And the actual numbers are

10    reported in your report, but the source of the

11    numbers is not indicated in your report.

12        A.    Probably not.

13        Q.    Okay.  And then you, yourself,

14    evaluated the numbers?

15        A.    Uh-huh.

16        Q.    Okay.

17             MR. LEVINE:

18                  You got to say yes.

19        A.    Yes.  Sorry.

20    EXAMINATION BY MR. BRUNO:

21        Q.    Now, other than evaluating the values,

22    did you do anything else with those?

23        A.    Well, we didn't do -- I didn't do an

24    additional set of studies because they were

25    covered -- these values were covered in our

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

```
 1   parameter study of the seepage that we did --

 2   seepage analysis that we did.

 3       Q.   As part of IPET.

 4       A.   A part of IPET.  We reconfirmed the

 5   values that we had used were sufficiently low

 6   enough to cover -- I mean high enough to

 7   cover --

 8       Q.   I'm with you.  Again, the purpose of

 9   these questions is simply to learn what you did

10   since IPET.

11       A.   Yeah.

12       Q.   I'm not even getting into the why and

13   the wherefore.  I'm just trying to see if I can

14   see the distinction between IPET and what you

15   are now doing for the lawyers.  Okay?

16       A.   As part of my expert report.

17       Q.   Precisely.  Okay.  Did you do anything

18   with regard to the pore pressure and undrained

19   shear strengths?  Did you do that?

20       A.   Uh-huh.

21           MR. LEVINE:

22               That's a yes?

23       A.   That is a yes.

24   EXAMINATION BY MR. BRUNO:

25       Q.   That's a yes.
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 77

```
 1      A.   I had to do a, um -- to ensure that,
 2   you know, that the interpretation of how you
 3   use those pressures is correct.
 4      Q.   Sure.  All right.  And then leakage.
 5   What did you do, if anything, with regard to
 6   the leakage?
 7      A.   Actually, it involved examining the
 8   wall and how it was constructed, and where the
 9   water stops were located and their potential
10   for causing or allowing water to leak into the
11   Ninth Ward.
12      Q.   Okay.  So I take it that you
13   physically went somewhere and looked at some
14   walls.  They weren't there, so where did you
15   go?
16      A.   Actually, pictures and then the actual
17   design details for the walls.
18      Q.   Okay.  All right.  So you looked at
19   design details.
20      A.   And pictures.
21      Q.   And you hadn't done that for IPET?
22      A.   No.  I hadn't done that for IPET.
23      Q.   All right.  And so we look at the
24   pictures --
25      A.   Of the actual walls as they were.
```

JOHNS PENDLETON COURT REPORTERS              800  562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 78

```
 1     Q.   Walls.  Okay.  I don't recall seeing

 2   the pictures.  Are the pictures in here?

 3     A.   Um -- some of them are in there.  I

 4   don't know if all of them are in there.

 5     Q.   Okay.

 6     A.   There's probably some more detailed

 7   ones.

 8     Q.   All right.  I don't remember that

 9   either, I must confess.  So looked at pictures,

10   looked at the design, looked at the design

11   memos, the GDMs?

12     A.   Uh-huh.

13          MR. LEVINE:

14             Say yes.

15     A.   Yes.  That's correct.

16   EXAMINATION BY MR. BRUNO:

17     Q.   So I've got all that you did with

18   regard to Lower Nine since IPET, right?

19     A.   I think we have covered it, you know,

20   but --

21     Q.   Okay.

22     A.   -- subject to specific questions --

23     Q.   Right.  Sure.  And the -- let's see.

24   That would be Roman numeral II of your report;

25   right?
```

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 79

```
 1      A.    That's correct.

 2      Q.    Okay.  And did you write Section II?

 3      A.    Yes.

 4      Q.    You wrote the whole thing?

 5      A.    Uh-huh.

 6      Q.    And this was new writings, or was it

 7   pulled from IPET?

 8      A.    Some of it was pulled from IPET, but I

 9   was the principal writer of IPET so I thought

10   that I could take that.

11      Q.    Okay.  Good.  Okay.  Now, there are

12   two other sections of your report:  One of them

13   is entitled The Assessments of Levee Erosion

14   and Scour Along the Gulf Outlet?

15      A.    Uh-huh.

16      Q.    All right.  First of all, the location

17   is just Reach 2?

18      A.    Right.  In our discussion, uh-huh.

19      Q.    All right.  And is this work that was

20   done for IPET or did you do some new work?

21      A.    Um -- it was taking -- or reexamining

22   what was done for IPET relative to the other

23   conditions that may occur, and actually was

24   a -- a lot of it is a new arrangement of what

25   we had in the IPET, looking at more information
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 80

 1   that was available.

 2        Q.    What's the more information?

 3        A.    It had to do with an examination of

 4   the photos, a closer examination of the erosion

 5   testing that was done, um -- and a presentation

 6   of the material.

 7        Q.    All right.  Okay.  Well, so can you be

 8   more precise?  I mean, what did you have that

 9   you didn't have in IPET?

10        A.    Um -- well, actually, the principal

11   part is that we had some of these things during

12   IPET but it was at actually toward the end of

13   the IPET so we didn't have as much time to

14   examine the borings and the other pieces of

15   information along with the pictures at the

16   time.

17        Q.    Okay.  All right.  So you had some

18   more -- well, you certainly had pictures,

19   because they're old pictures.

20        A.    Yeah.  They're old picture, but we

21   didn't have the time to examine them and tie

22   those with the borings and the test data that

23   was produced for that.

24        Q.    Okay.  So all the data was there for

25   IPET?

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 81

```
 1      A.   Most of the data was there.

 2      Q.   And so what you did was compare the

 3  boring data with the failure locations and the

 4  photos?

 5      A.   And the photos and the erosion tests

 6  that were done.

 7      Q.   And, what erosion tests?

 8      A.   There was a series of erosion tests

 9  done by ERDC on the different locations along

10  the, um -- Reach 2 and a few other locations.

11      Q.   All right.  Are those reported in this

12  report?

13      A.   Uh-huh.

14          MR. LEVINE:

15              Is that yes?

16      A.   Yes.

17  EXAMINATION BY MR. BRUNO:

18      Q.   Where is that reported?

19      A.   Let's see.  There's actually -- let me

20  look at where the plots are.  Um -- the data is

21  actually shown in the Figure 52.

22          MR. LEVINE:

23              What page are you on?

24          THE WITNESS:

25              On Page 54.
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 82

1    EXAMINATION BY MR. BRUNO:

2        Q.   Well, this would be under Subsection

3    D, soil quality?

4        A.   Soil quality and erosion.  We had --

5    the report about the testing was in the IPET,

6    but the assessments of it and the tying it to

7    the borings and that part of it we didn't have

8    the kind of time that we needed to do a full

9    assessment.  During this time I had greater

10   time to look at that.

11       Q.   Okay.  All right.  Well, perhaps I

12   misunderstood.  I thought you said to me that

13   you had some erosion testing --

14       A.   Yeah, that's --

15       Q.   -- that you did not have in IPET.

16       A.   Oh.  Excuse me.  Okay.

17       Q.   I mean, again, remember that's what

18   I'm asking you.  I want to know what you had in

19   IPET versus what -- I'm sorry.  I want to know

20   what --

21       A.   The data --

22            MR. LEVINE:

23                Whoa.  You guys are talking over

24            each other.

25            MR. BRUNO:

REED   MOSHER, Ph.D. (VOL I)                          February 19, 2009

Page 83

1              I'm asking the questions, so

2              you're directing the objection to the

3              wrong guy.  Okay?

4    EXAMINATION BY MR. BRUNO:

5         Q.   Dock, what I'm trying to get my arms

6    around is what is new since IPET?  That's all

7    I'm focused on.  And you told me you had some

8    erosion studies that was new.  Now that's not

9    right.  That erosion stuff was already in

10   existence.

11        A.   Okay.  What I was saying, that the

12   assessments of that erosion --

13        Q.   I got that.

14             MR. LEVINE:

15                  Let him finish the answer.

16        A.   But that part of it is new, the

17   assessments of that data.  That -- and you

18   asked me specifically what new have you done

19   since IPET.

20   EXAMINATION BY MR. BRUNO:

21        Q.   Yeah.

22        A.   And I said, in this expert report, the

23   assessment of that data.  I think that's quite

24   clear.

25        Q.   And then you told me that you had some

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 84

1   new erosion.  That's where we got sideways.

2          So the fact of the matter is you have

3   no new data in your report regarding Roman

4   Number I.

5       A.   Of actual physical data.

6       Q.   Yes.  Physical data.  No new data.

7          Now, you've had more time to --

8         MR. LEVINE:

9            Did you answer the question?

10      A.   Um -- I actually find it hard to

11  separate.  Okay, the basic data was available

12  at the end of the IPET study.  Arrangement and

13  assessment of that data which is what I was

14  expected to do when I agreed to do this was

15  what comes out of it in the expert report.

16  EXAMINATION BY MR. BRUNO:

17      Q.   That's what happens when you use

18  multiple definitions for the same word data.

19  And why I didn't like it.  But you want to use

20  it so we're stuck with it. The point is that

21  the facts -- okay?  The facts.  There or no new

22  facts between IPET and this report regarding

23  Roman Numeral I.  Correct?

24      A.   There's no, um -- I would say the

25  basic physical evidence, the physical data that

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 85

1    was collected, is the same.

2        Q.    Is the same.   There's a new

3    evaluation.

4        A.    Correct.

5        Q.    How about that?  Because you didn't

6    have time to do this evaluation as part of

7    IPET --

8        A.    Right.

9        Q.    -- right?

10            And the evaluation that you've done is

11   you've compared the photos to the core samples

12   to the erosion testing that IPET did, correct?

13       A.    Correct.

14       Q.    Okay.  And those are, um -- shown at

15   various places like, for example, at Page 50

16   you have the photo and you have the soil and

17   you have a boring.

18       A.    Uh-huh.

19       Q.    Okay?  All right.  But you don't have

20   that same correlation to the erosion.  Right?

21   That seems to be a separate section.

22       A.    Um -- the borings are tied to those

23   locations, too.

24       Q.    Okay.  All right.  Fine.  So if I can

25   summarize, with regard to Roman Numeral I the

REED  MOSHER, Ph.D. (VOL I)                        February 19, 2009

Page 86

```
 1    difference between IPET and this report is that

 2    you have taken facts -- I'm not going to call

 3    it data -- that you already had, you take some

 4    results, some erosion studies that you already

 5    had, and you analyzed them differently.

 6    Correct?

 7        A.   Uh-huh.

 8        Q.   All right.  Now --

 9           MR. LEVINE:

10              Say yes.

11        A.   Yes.  That's correct.  Did an

12    assessment of them.

13    EXAMINATION BY MR. BRUNO:

14        Q.   And then you come to a conclusion,

15    correct?

16        A.   Correct.

17        Q.   Now.  Is your conclusion different in

18    any way from the conclusion that IPET reached?

19        A.   The conclusion, um -- is basically the

20    same.  Okay?  And has been, as I said again, is

21    um -- basically the same and has been reviewed

22    by the outside groups.  And the conclusion

23    hasn't been rejected by them, objected to.

24        Q.   At Page 9 of the introduction here,

25    and this is under Roman Numeral I, IPET did not
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 87

1    evaluate front side wave attack, did it?

2         A.   Um -- what do you mean by evaluate?

3         Q.   I mean the IPET did not consider as a

4    potential mechanism of failure front side wave

5    attack of Reach 2.

6         A.   In the, um -- assessment of it, I

7    can't remember exactly what it was, but there

8    little discussion about the possibility of

9    front side wave attack.

10        Q.   And is there a sentence in the IPET

11   report that addresses that subject?

12        A.   I think there is a sentence that talks

13   about the, um -- but I can't remember exactly

14   where it is.

15        Q.   Okay.  All right.  What scientific

16   analysis was used to determine whether or not

17   front side wave attack was a potential

18   mechanism of failure, in IPET?

19        A.   In IPET?  Um -- actually, there is --

20   there hasn't been an acceptable scientific

21   process that is state-of-the-practice used for

22   looking at front side attack.  So we've focused

23   on what was the physical evidence from out in

24   the field of any evidence of front side attack.

25   Where we saw lots of evidence of near failure

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                          Page 88

 1    from overtopping, we saw very little evidence,

 2    only in two locations, of front side attack.

 3         Q.    So your testimony is that you looked

 4    at --

 5         A.    Studied.   Investigated.

 6         Q.    Studied?

 7         A.    Studied, investigated --

 8         Q.    Well, studied --

 9         A.    -- the photographs.

10         Q.    Well, your investigation consisted of

11    looking with your eyeballs, right?

12         A.    Uh-huh.

13         Q.    I mean, if there's no scientific basis

14    to determine whether or not there's front side

15    wave attack, all you have left is what you

16    observed.

17         A.    Yeah.

18         Q.    Right?

19         A.    We looked at -- we did the assessment

20    by looking at the physical evidence that's

21    actually there.

22         Q.    Right.   Which is a photograph.

23         A.    Right.   Photographs.

24         Q.    Right.

25         A.    And walking them, too.

REED   MOSHER, Ph.D. (VOL I)                     February 19, 2009

Page 89

1      Q.    You walked them, as well.

2      A.    Yeah.

3      Q.    But you really -- did you make some

4    notes while you were walking?

5      A.    Um -- I don't remember.

6      Q.    All right.

7      A.    Mainly dealing with the photographs, I

8    guess.

9      Q.    Yeah.  So you walked it, but let's be

10   realistic about it.  The true evaluations had

11   to come from looking at the pictures so you

12   would know what you were looking at.

13     A.    Yeah.  But I mean the pictures kind

14   of -- the walking confirms what you see in the

15   pictures.

16     Q.    Well, sure.  They're the same.  But I

17   mean, if you had -- and I understand that if

18   you had decided to walk the length of the Reach

19   2 you could have notated where you were by

20   lat/long, you could have looked at the evidence

21   and you could have made some notes.  Right?

22     A.    Uh-huh.

23     Q.    You guys didn't do that.

24     A.    No.

25     Q.    So what you did instead was you took

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1   pictures.

 2        A.   Yes.

 3        Q.   Did you take the pictures yourself?

 4        A.   No.  They were provided.

 5        Q.   Who took the pictures?

 6        A.   They were flown as part of the LIDAR

 7   study and they were provided to me from the New

 8   Orleans District.

 9        Q.   All right.  Okay.  Fair enough.  But

10   the bottom line is you looked at photographs.

11        A.   Uh-huh.

12        Q.   You looked at pictures and you said to

13   yourself, that looks like front side attack, or

14   you said to yourself, that doesn't look like

15   front side attack.  Right?  That's what you

16   did.

17        A.   Or actually looked at places,

18   particularly at locations where there was,

19   um -- um -- partial breaching so that you could

20   see where, what was taking place, what were the

21   mechanisms that were taking place.

22        Q.   Sure.  You still looked at a picture

23   and still made a determination --

24        A.   Right.

25        Q.   -- based upon what you observed in the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 91

 1   photo, right?

 2        A.    Uh-huh.

 3        Q.    Okay.  Now, did you do something

 4   different when you wrote Section I?

 5        A.    Um -- the only thing that was

 6   primarily different is, um -- tying those with

 7   the erosion data, the borings that we had.

 8        Q.    Okay.  All right.  Now, Number 2

 9   conclusion, to a reasonable degree of

10   scientific certainty, a primary factor that led

11   to the erosion and breaching of the levees from

12   overtopping along Reach 2 of the MRGO was the

13   construction of the levees using hydraulic

14   placement of soil.

15            Now, I'm having sort of a hard time

16   understanding this because I don't know if you

17   are saying that this is a defect or not in the

18   levee.

19            Are you?

20        A.    What I'm saying there is the type of

21   construction had a bearing on the erosion that

22   took place.  At the time when these were

23   designed that was an acceptable construction

24   procedure.  But since that time, more recently,

25   we wouldn't build a levee using hydraulic fill.

REED   MOSHER, Ph.D. (VOL I)                              February 19, 2009

 1    We would use, or if we did, we would cap it

 2    with a compacted, um -- clay material on top of

 3    it.

 4        Q.    All right.  So you're not suggesting

 5    here that there is any defect in design or in

 6    construction.

 7        A.    Not based on the known facts at the

 8    time that they designed it.

 9        Q.    All right.

10        A.    But, you know, times change, we learn

11    more, and we understand that, you know, that

12    those types of hydraulic fills are more

13    erodible than if we had a compacted material.

14        Q.    Okay.

15        A.    And actually, Corps guidance has

16    changed based on -- since the time of that, you

17    know, if we look at the more recent guidance,

18    in 2000 they suggest not using hydraulic fills.

19        Q.    Well, I get that, doctor.  And what

20    I'm trying to figure out is why didn't you say

21    that in IPET?  I mean, is this something new?

22        A.    No, that was part of IPET.  I mean,

23    what we had time to understand in IPET is that,

24    because we were looking at all the levees and

25    the erosion, not just that reach, that we had

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1   some levees that eroded and some that didn't,

2   okay, what were the main characteristics?  You

3   know, what we found was that the main

4   characteristic, the ones at the end of IPET was

5   that we had, um -- hauled-in levees that didn't

6   erode and we had hydraulically filled levees

7   that did erode.  And that was the primary

8   conclusion that we drew, because we didn't have

9   time to examine.

10          What we actually found here when we

11  examined them, we actually have some locations

12  that didn't erode even though they had

13  significant flow across them, primarily because

14  of the difference in the materials.  It's a

15  little more than just hydraulic fill, it also

16  requires that if you have a fat clay, medium

17  fat clays and above performed much better.

18      Q.   Uh-huh.  Is that as the cap or the

19  interior of the levee?

20      A.   Um -- I mean, it starts out as the

21  cap, but even in the interior.  If you can get

22  a good fat clay, that would be a better

23  material to build a levee on.

24      Q.   So I think what you're telling me is

25  that since 1962 when the levees were designed

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1   initially --

 2        A.    Uh-huh.

 3        Q.    -- the Corps has learned that putting

 4   a thick clay cap on that levee would have

 5   allowed it to survive overtopping?

 6        A.    Perform better under overtopping.

 7   That's correct.

 8        Q.    And so if the Corps had understood

 9   that there was the potential for increased wave

10   action because of the existence of MRGO, at

11   least there was -- and I'm not saying that's

12   true, but the Corps did have available to it a

13   method to protect the levees which would have

14   made them perform better.

15             MR. LEVINE:

16                  Objection.

17   EXAMINATION BY MR. BRUNO:

18        Q.    Isn't that true?

19        A.    Um -- I think actually the -- I

20   believe this is true, from my reading -- is

21   that they actually had a, um -- proposal to cap

22   the levees as the last bit of construction for

23   that, and I think that started in the 2000 time

24   frame and their plans were to do that.  And

25   that's based on what we've learned since the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 95

1   construction of the levees.

2       Q.   Right.  Okay.  All right.  And

3   finally, did you do anything since IPET about

4   the -- I'm going to call it generally

5   subsidence.  You say they are below their

6   authorized elevations.  I'm assuming the cause

7   is subsidence.

8       A.   Uh-huh.  Other than did a grading look

9   at what elevations were, what the designs were

10  and that part of it.

11      Q.   So no new testing, no new models, no

12  new -- really, no new -- not even a new

13  evaluation, you just kind of looked at the same

14  stuff you looked at before, perhaps in more

15  detail.

16      A.   Uh-huh.

17      Q.   Fair enough?

18      A.   Yes.

19          MR. LEVINE:

20              Yes.

21      A.   That's correct.

22  EXAMINATION BY MR. BRUNO:

23      Q.   And then finally, Roman Numeral III is

24  the Assessment of the Erosion and Potential for

25  MRGO Hypothetical Alternative Conditions.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 96

1       A.    Uh-huh.

2       Q.    All right.  Is this something you did

3    in IPET?

4       A.    No.

5       Q.    So this is new work.

6       A.    Uh-huh.

7       Q.    Okay.  Now, what exactly did you do in

8    this regard?

9       A.    Okay.  The primary part of what I did

10   there was to assess what -- given the surge

11   that was developed under these hypothetical

12   conditions, um -- to assess whether that surge

13   would cause similar problems as to what we

14   had -- what had occurred during Katrina, and

15   would our expectations of the performance of

16   the levees as built at that time, the Katrina

17   style levees, would they still erode?  And that

18   was the assessment that I did.

19       Q.    How is that different from what

20   Ebersole did?

21       A.    Um -- probably is somewhat similar,

22   other than my primary part was looking at the

23   soil conditions and tying those to this

24   behavior.

25       Q.    Okay.  All right.  So I'm still kind

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 97

1    of lost.

2         A.   I mean --

3            MR. LEVINE:

4                Hold on.  He's going to continue.

5    EXAMINATION BY MR. BRUNO:

6         Q.   Go ahead.

7         A.   The surge heights and things like that

8    would be exactly the same.  Because I would

9    take those from Bruce on what those were.

10        Q.   All right.  The surge heights are the

11   same.

12        A.   Uh-huh.

13        Q.   Well, Bruce didn't produce the surge

14   heights.

15        A.   Okay.  From --

16        Q.   Resio?

17        A.   Well, the surge heights actually came

18   from, um -- I actually got them from Bruce, but

19   they probably came from, um --

20        Q.   Westerink.

21        A.   Westerink.

22        Q.   Well, he made them higher.  Did you

23   know that?  He raised up the surge heights?

24   Did you know that?

25            MR. LEVINE:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1              Objection.

2      EXAMINATION BY MR. BRUNO:

3          Q.    Westerink's surge heights.  He made

4      them higher.

5          A.    When?

6          Q.    Before he gave them to you.  Did you

7      know that?

8          A.    I used what they -- what was provided.

9      I'm not a hydrologist.

10         Q.    Fair enough.  Well, how about this:

11     The surge heights that he gave you, were they

12     the same surge heights that you guys when you

13     were at IPET had?

14             MR. LEVINE:

15                 Objection.  What's this you guys

16             with IPET?  You keep referring to,

17             like, you guys.

18         MR. BRUNO:

19                 The work that he did while he was

20             working on IPET.  How about that?

21         MR. LEVINE:

22                 Perfect.

23         MR. BRUNO:

24                 Which is the same thing as you

25             guys, but okay.  Just easier and

JOHNS  PENDLETON  COURT  REPORTERS            800  562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1              shorter and makes me get home earlier.

2              MR. STEVENS:

3                   But legally imprecise.

4         A.   The surge heights that were given were

5    in a range.  Okay?  And so mainly what you're

6    looking at is how much are they exceeded over

7    the heights of the actual levees.  And so the

8    actual values, there was a series of them, I

9    think you've seen in the report, of plots with

10   ranges of what those surge heights would be.

11   EXAMINATION BY MR. BRUNO:

12        Q.   Here's the question, though:  The

13   question was, were the surge heights, or ranges

14   if that's what you prefer to use, that you used

15   when you were working with IPET the same

16   heights or ranges that you used when you did

17   your report, in particular Roman Numeral III?

18        A.   Okay.  So don't we have to -- that

19   question is a little vague because we never

20   looked at -- we only looked at Katrina during

21   the IPET, and during this we looked at other

22   scenarios.

23        Q.   I'm comparing whatever surge heights

24   you had for IPET to whatever similar surge

25   heights you had in connection with Roman

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 100

1    Numeral III, which I assume would be Katrina.

2        A.    Under the same scenarios.

3        Q.    Sure.

4        A.    Okay.  Um -- they may have been some

5    slight differences in what those -- what they

6    were, but they still were sufficient enough to

7    overtop the levees by a significant amount.

8        Q.    Sure.  Would you agree with me that if

9    you raised the surge and lowered the levees

10   then that would certainly bolster your opinion?

11           MR. LEVINE:

12               Objection.

13       A.    No.

14   EXAMINATION BY MR. BRUNO:

15       Q.    No?

16       A.    I don't know what you're getting at.

17       Q.    If you raised the surge --

18       A.    If you had a higher surge.

19       Q.    -- and you had a lower levee --

20       A.    Had a lower levee.

21       Q.    -- what does that do to your opinion?

22       A.    Um -- it changes it to some extent,

23   but it hasn't -- it really depends because,

24   um -- you have to look at each location and

25   soil condition at each location.  Because we

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1   had some locations that had five or six feet of

 2   water over the top of it and they didn't erode,

 3   where we had other locations where we had two

 4   or three feet over the top of it and they

 5   eroded.

 6        Q.   Right.

 7        A.   So you can't make a generalization as

 8   you've given.

 9        Q.   Well, isn't it true that the more

10   overtopping the more probability there is for

11   erosion?  Or is that not true?

12        A.   It's not, um -- I believe that's true

13   to a limit but not -- that's not the only part

14   of the equation.  You have to look at what --

15   the other soil conditions.

16        Q.   Okay.  All right.

17        A.   Because we have plenty examples of

18   very large amounts of water going over the

19   levees and not having breaches occur.

20        Q.   Okay.  So it's not the mere fact that

21   a lot of water is going over the levee, it's

22   the way that levee is constructed.

23        A.   It's -- you have to have both

24   combinations of a sufficient amount of water to

25   generate a, um -- a flow down the back of the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 102

 1    levees to a certain level, and to have the

 2    right materials that will -- ones that are more

 3    erodible versus ones that aren't.

 4         Q.   I understand.  Okay.  Now, in your

 5    report you don't isolate surge, you say surge

 6    and wave.  It's a combination of the two, isn't

 7    it?

 8         A.   Uh-huh.

 9         Q.   You really can't separate out the two.

10         A.   You can separate out the two.

11         Q.   Did you?

12         A.   Um -- I didn't, in the main part, but

13    when I did look at the different scenarios I

14    just looked at the surge.

15         Q.   Let me look at that.  I think you

16    looked at waves and surge in the main part, you

17    even had a little chart for the waves.

18         A.   Uh-huh.

19         Q.   Now, going back to your CV just for a

20    tad, you last published in '97?

21         A.   Uh-huh.  Other than the IPET report.

22         Q.   Right.  And none of the publications

23    regard forensic evaluations of levee failures,

24    do they?

25         A.   No.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                              Page 103

    1      Q.    Are any of your publications relevant
    2   to any of the opinions that you offer in your
    3   report?
    4      A.    There are some in there on, um -- on
    5   I-walls.
    6      Q.    Right.  But nothing about levees.
    7      A.    Um -- well, some of those I-walls set
    8   on levees, so they deal with levees and levee.
    9      Q.    None of your publications deal which
   10   levees like the levees that were on Reach 2.
   11      A.    No.
   12      Q.    You have a bachelor's degree in civil
   13   engineering?
   14      A.    Uh-huh.
   15      Q.    When did you get that?
   16      A.    I graduated in '77.
   17      Q.    '77.  And your Master's degree is in
   18   civil engineering, as well?
   19      A.    Uh-huh.
   20      Q.    Any subspecialty there?
   21      A.    Geotechnical engineering.
   22      Q.    Geotechnical.  All right.  And then
   23   you have a Ph.D. from -- where is that from?
   24      A.    From Virginia Tech.
   25      Q.    What was your the subject of your

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 104

 1  thesis?

 2      A.    Sheet pile cellular cofferdams.

 3      Q.    So your real specialization is in

 4  sheet piles.

 5      A.    No.  It's in soil.  Soil behavior.

 6      Q.    Uh-huh.  Well, as it relates to levees

 7  and/or hurricane protection structures, would

 8  you say that you had more of an expertise in

 9  sheet pile structures as opposed to earth berm

10  structures?

11      A.    Um -- I probably have more, um -- I've

12  probably written more about soil structure

13  actual type problems than I have about

14  earth-related problems, but that's basically

15  because of the research things that I worked on

16  at the time.

17      Q.    Okay.  I just have to ask, since you

18  had 22 to $24 million to spend, how come you

19  guys didn't have the time to evaluate -- let me

20  just --

21          (Off the record.)

22  EXAMINATION BY MR. BRUNO:

23      Q.    Have you ever seen this document?

24  (Tendering.)

25          (Exhibit 2 was marked for

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 105

1    identification and is attached hereto.)

2         A.    No.

3         Q.    Okay.  Do you agree that it's a Corps

4    document, EC 1110-2-60?

5         A.    Yes.  From what I can tell, looking at

6    the cover.

7              MR. LEVINE:

8                   Is there a copy I can look at?

9         A.    Has it been approved?

10   EXAMINATION BY MR. BRUNO:

11        Q.    Yeah.  It's on your website.

12        A.    Does it have --

13        Q.    It expires 30 September 2010.

14        A.    Okay.

15        Q.    Right?

16        A.    Yeah.  Why I say that, ECs are

17   temporary documents.

18        Q.    All right.  Yeah.  And they have

19   expirations on them.

20        A.    Right.

21        Q.    And this one in fact has an expiration

22   of 30 September 2010.

23        A.    Yep.

24        Q.    Now --

25              MR. LEVINE:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 106

1              Is there another copy of that?

2              I'd just like to be able to see it.

3          MR. BRUNO:

4              You can have the original.

5          (Tendering.)

6    EXAMINATION BY MR. BRUNO:

7      Q.    There is an Appendix D which talks

8    about -- well, it's entitled Toward a

9    Probability and Uncertainty-Based Approach for

10   Characterizing the Flood Hazard Associated with

11   the Storm Surge, Wave, and Overtopping of

12   Levees.

13             First of all, when it comes to

14   overtopping, you can't divorce waves from

15   surge, can you?

16     A.    They will be a part of that.

17     Q.    Certainly.  The higher the wave the

18   more probable it is that there will be

19   overtopping.

20     A.    Generally true.  Yes.

21     Q.    D-2.  It says, Historically, most

22   attention has been paid to estimation of water

23   level changes associated with high winds often

24   referred to as wind setup or storm surge which

25   arises from forces in addition to the wind

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 107

 1   because water level is the first-order

 2   parameter of importance in flooding.

 3          You agree with that, right?

 4   A.    Uh-huh.  Yes.

 5   Q.    It says, However, in some cases

 6   insufficient attention was given to waves

 7   generated by the same winds, to the

 8   dependencies and interaction of waves and surge

 9   and to the role of waves and wave overtopping

10   in levee system design an performance.

11          Do you agree with that?

12   A.    As a general statement, yes.

13   Q.    Okay.  It says, generation of

14   significant wave heights of 2 to 4 feet or more

15   is possible even in restrictive fetch

16   situations subjected to high winds where

17   fetches are only a few miles in length, much

18   higher wave heights are possible for hurricane

19   force winds.

20          Do you agree with that?

21   A.    Yes.

22   Q.    And then in D-3, it says, As waves are

23   generated across an open-water fetch propagate

24   in the shallow water they begin to break and

25   their energy is dissipated.  In very shallow

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 108

 1   water, shallow in terms of water to --

 2   depth-to-wave length ratio, wave height tends

 3   to be limited by breaking and it becomes

 4   proportional to the local water depth.

 5          Do you agree with that?

 6      A.   I'm not a --

 7      Q.   It's not your field.

 8      A.   Not my field.

 9      Q.   All right.  So we won't go there.

10   That's fine.

11      A.   But I do understand the importance of

12   breaking waves in the -- and kind of the

13   process that's involved in doing the physics

14   for that.

15      Q.   All right.  In D-4, it says, The IPET

16   investigation of Hurricane Katrina and response

17   of the hurricane protection system in southeast

18   Louisiana to that extreme event showed that

19   levee system and floodwall failure was

20   dominated by overtopping, either overtopping of

21   levees and subsequent erosion of the levee from

22   the protected side toward the flooded side, or

23   overtopping of walls, scour on the protected

24   side of the wall and subsequent failure of the

25   wall.  To a lesser degree, failure was caused

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 109

1    by scour at transitions between the levees and

2    hard structures.  Levee response and wave and

3    water level conditions throughout the system

4    were far from uniform.

5            You agree with that.

6       A.   Correct.

7       Q.   All right.  And this is all consistent

8    with IPET.

9       A.   Uh-huh.

10           MR. LEVINE:

11               Is that a yes?

12      A.   Yes.

13   EXAMINATION BY MR. BRUNO:

14      Q.   Yes.  And this is what allowed the

15   IPET team to conclude that the levees performed

16   as designed.  Correct?

17           MR. LEVINE:

18               Objection.  When you say this is,

19           are you talking about --

20           MR. BRUNO:

21               This conclusion, that is the

22           overtopping of the levees and

23           subsequent erosion of the levees from

24           the protected side toward the flooded

25           side or overtopping of the walls,

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                            Page 110

1                scour on the protected side of the

2                wall and subsequent failure of the

3                wall, et cetera, et cetera, et cetera,

4                is the basis upon which you reach the

5                conclusion in IPET that the levees

6                performed as designed.

7                     With the exception of the four

8                foundation failures.  We'll leave that

9                out for the moment.

10       A.   Okay.  They performed as designed with

11    a hurricane that severely overtopped them and

12    it was much greater than what their design

13    elevation was.

14    EXAMINATION BY MR. BRUNO:

15       Q.   All right.  So the logic is that the

16    Corps designed the levees to be a certain

17    height.  Right?

18       A.   Correct.

19       Q.   And the water and waves overtopped

20    those levees, and the Corps knew and understood

21    that they would fall down if water overtopped

22    them.  Right?  Isn't that true?

23       A.   No.  That's not true.

24       Q.   It's not true.  So was it the Corps'

25    expectation that if the water was higher than

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 111

1    the levee height the levee would not fail?

2        A.   Um -- I believe that they didn't know

3    whether they would fail or not.  I think they

4    believed that they wouldn't fail.  And in the

5    case of Katrina they overtopped them

6    significantly.  I don't think they expected

7    that significant of overtopping to lead to

8    their failure.

9        Q.   Well, isn't it true that the designers

10   of the levee designed the levees so that there

11   would be no overtopping?

12       A.   Um -- their design was to a given

13   hurricane.  And they provided a, um --

14   elevation for that hurricane plus wave run-up.

15       Q.   I'm sorry.  In their design they

16   designed to a certain height; right?  We got

17   that.

18       A.   Anticipated --

19       Q.   A certain height.  And --

20            MR. LEVINE:

21                Let him finish.

22       A.   Well, I'm not sure where you're going.

23   Okay.  Keep going.  Keep going.  Sorry.

24   EXAMINATION BY MR. BRUNO:

25       Q.   Well, at Page 23 of the Design Memo

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 112

 1   Number 1, the hydrology and hydraulic analysis,

 2   this is Part 1 of Chalmette, it says at

 3   Page 23, Subparagraph 2, protective structures

 4   exposed to wave run-up will be constructed to

 5   an elevation that is sufficient to prevent all

 6   overflow from the significant wave and waves

 7   smaller than the significant wave accompanying

 8   the standard project hurricane.  That's what it

 9   says.

10        A.    Okay.

11        Q.    Doesn't that mean that the levees were

12   designed so that -- I'm sorry.  The levels were

13   designed on the belief that no water would go

14   over the top of the levee?

15            MR. LEVINE:

16               Let me see that.

17        A.    I believe what it's saying there, from

18   what I read reading, that given a specific

19   hurricane, given a specific significant wave

20   height, they were designing it so that it

21   wouldn't overtop.

22   EXAMINATION BY MR. BRUNO:

23        Q.    Sure.

24        A.    Okay.  That doesn't mean that other

25   hurricanes could come along with different wave

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 113

 1  characteristics and overtop the levees.

 2  They're talking about specific design

 3  parameters that they were designing for.

 4      Q.    Sure.  And they told the Congress they

 5  were designing for those specific parameters,

 6  right?

 7      A.    Um -- I can't say.

 8      Q.    They told --

 9      A.    Well, I just say I can't specifically

10  say that they told Congress that.

11      Q.    Well, they told the Congress --

12      A.    I wasn't there and I wasn't around at

13  the time.

14      Q.    The documents would reflect that the

15  Corps of Engineers designed a levee to protect

16  against a standard project hurricane.  Correct?

17      A.    I believe that is correct.

18      Q.    And a standard project hurricane was

19  supposed to be the most severe hurricane

20  anticipated to come into the area.  Right?

21          MR. LEVINE:

22              Objection.

23      A.    No.  No.  I think it had --

24  EXAMINATION BY MR. BRUNO:

25      Q.    A standard project hurricane is

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 114

 1    defined to be a hypothetical hurricane intended

 2    to represent the most severe combination of

 3    hurricane parameters that is reasonably

 4    characteristic of the regions involved,

 5    excluding extremely rare combinations.  Isn't

 6    that true?

 7        A.    Okay.  That's different than what you

 8    said.

 9        Q.    I said the most severe combination of

10    hurricane parameters that were reasonably

11    characteristic of the area.

12        A.    You said it there, but that's not in

13    the previous question.  You said most severe

14    hurricane.

15        Q.    All right.  Well, explain to me the

16    difference between what you understood my

17    question to mean and this.

18        A.    Well, there it talks about other

19    extreme hurricanes that can occur.

20            MR. LEVINE:

21                Can we see that for a second?

22            MR. BRUNO:

23                Sure.  This is from the 1967 Lake

24            Pontchartrain Louisiana Vicinity

25            Design Memo Number 1, Hydrology and

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

```
 1            Hydrologic Analysis, Part 4, Chalmette

 2            Extension.  (Tendering.)

 3   EXAMINATION BY MR. BRUNO:

 4       Q.   All right.

 5       A.   And truly, I'm not a hydrologist.

 6   Okay?  But --

 7       Q.   Right.  All I'm trying to get at is

 8   this:  The statement is made in the IPET, the

 9   levees performed as designed.  We agree on

10   that, don't we?

11       A.   Um --

12       Q.   Let's get the exhibit so I can read

13   it.

14       A.   Yeah.  I believe that they -- that

15   they in general performed as designed.  Um --

16   they were severely overtopped and that's what

17   led to the failures and the breaches.

18       Q.   All right.  Well, it certainly wasn't

19   the intent of the authors of the IPET to misled

20   those who would read the report, right?

21       A.   Unh-unh.

22       Q.   All right.

23       A.   No.  They didn't intend to misled and

24   I don't believe we did.

25       Q.   Okay.  That's fine.  That's why I'm
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 116

1    exploring this right now, because I want to see

2    if what is in here is accurate and whether

3    the -- at Volume 1, Page 2 and 3, it says,

4    Ironically, the structures that ultimately

5    breached performed as designed, providing

6    protection until overtopping occurred and then

7    becoming vulnerable to catastrophic breaching.

8          That's what it says.

9    A.    Yeah.  That's what it says and

10   that's -- I agree to that.

11   Q.    You're an engineer.  You're a civil

12   engineer and you've got a Ph.D.

13   A.    Uh-huh.

14   Q.    They say in here that overtopping

15   makes the levees vulnerable, don't they?

16   A.    They were vulnerable to overtopping.

17   Q.    Sure.  And those guys who wrote

18   this --

19   A.    Don't separate -- the IPET team

20   provided it.

21   Q.    All right.  Fine.  The gentlemen who

22   designed the levees understood that; isn't that

23   true?

24   A.    I don't know.  I don't know what they

25   understood at the time when they were designing

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 117

 1    it.  They designed -- what I take from the

 2    documents is they designed them to a specific

 3    hurricane, specific types of waves and not to

 4    exceed, to make sure that those waves and surge

 5    didn't exceed the height that they designed

 6    them to.

 7        Q.   Right.  The idea was that the waves

 8    and surge shouldn't overtop.  That's what

 9    they -- we may not know what's in their heads,

10    but we know what they wrote.

11        A.   That was the plan in the design.

12        Q.   All right.  The plan was, the design

13    assumed that the waves and water would not go

14    over the top of the levee.  Right?

15        A.   For the design --

16        Q.   For this design height.

17        A.   -- height, and the surge and wave

18    conditions.

19        Q.   Exactly.  Now, they also knew, we can

20    gather from these documents and from what you

21    wrote in IPET, that they understood that if the

22    water did, in that rare occasion, with waves go

23    over the top the levees would become

24    vulnerable?

25        A.   I don't see anything in the

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 118

1    documentation that says they looked at

2    overtopping and did anything to assess or even

3    talk about overtopping.

4        Q.   Well, at Page 23, again, it says,

5    protective structures exposed to wave run-up

6    will be constructed to an elevation that is

7    sufficient to prevent all overflow from the

8    significant wave and waves smaller than the

9    significant wave accompanying the SPH.

10           So the intent was the prevent all

11   overflow, right?

12            MR. LEVINE:

13               Let me see that before you --

14       MR. BRUNO:

15               That's the second time you've

16           seen it. (Tendering.)

17            MR. LEVINE:

18               I'm entitled to see it before he

19           answers the question.

20       MR. BRUNO:

21               He asked ask for it, though,

22           Paul.

23       MR. LEVINE:

24               Well, I want him to look at it.

25       MR. BRUNO:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 119

```
 1              You want him to look at it?

 2         MR. LEVINE:

 3              You're asking him about a

 4         document.

 5         MR. BRUNO:

 6              Yes, I am.  And if he wants to

 7         see it, he can, but he didn't ask me

 8         to.  You're asking to see it, which is

 9         different from him.

10    A.   I appreciate him getting it for me.

11 EXAMINATION BY MR. BRUNO:

12    Q.   That's fine.  Take a look.  Read the

13 whole paragraph.  Because he goes on to say --

14    A.   You'd asked a question.  Do you want

15 me to answer that question?

16    Q.   Yes.  I want you to look at the

17 sentence first.  Now that we have it in front

18 of you, I want to make sure that I read it

19 properly, that it's there.

20    A.   But it does mention the significant

21 wave height.

22    Q.   Yes.

23    A.   And then protect all the significant

24 wave heights.

25    Q.   Sure.
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 120

1       A.    The significant wave height is not the

2   highest wave that you're going to get.  So they

3   understood that there would be waves that were

4   higher than the significant and those would

5   overtop.

6       Q.    Yeah, and it's in there.  The point

7   that they are making, though, is that they want

8   to keep the flow to a point where it's not

9   going to damage the back of the levee.  That is

10  what they're saying.

11          The next sentence says there could be

12  a little overtopping, but the little

13  overtopping that we'd experience with those odd

14  waves that you just described is not going to

15  do any damage.  It says it right there.

16      A.    Okay.

17      Q.    Doesn't it say it?

18          To be specific, it says, However,

19  waves larger than the significant wave will be

20  allowed to overtop -- which is just what you

21  just said.

22      A.    Uh-huh.

23      Q.    -- however, such overtopping will not

24  endanger the security of the structures or

25  cause material interior flooding.  So

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 121

 1   obviously, the guy who wrote this understood

 2   that if there was a lot of overtopping it would

 3   endanger the backside of the levee or it would

 4   cause some flooding.  Right?

 5       A.   That's --

 6       Q.   Is that a reasonable conclusion?

 7       A.   That's reasonable to think that they

 8   at least were somewhat aware of the fact that

 9   if it was overtopping it would cause flooding.

10       Q.   Of course.  Right.  So the point I'm

11   trying make is that it's crystal clear from

12   this paragraph that, yes, they were designing

13   to a standard project hurricane, and we know

14   the standard project hurricane is what they

15   used to generate the significant wave height

16   and the wave run-up, right?

17       A.   Uh-huh.

18       Q.   Okay.

19       A.   Correct.

20       Q.   And it was their intent that water,

21   that is the combination of surge and waves,

22   would not overtop, because they knew that if it

23   did it would, as they say here, endanger the

24   security of the structure.  Those are their

25   words.  Right?

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 122

1      A.    Yes.

2      Q.    All right.  So we can conclude that

3  the designers understood what the IPET folks

4  understood when they wrote the sentence

5  overtopping occurred and then made the levees

6  vulnerable to catastrophic breaching.   Correct?

7      A.    Okay.  Yes.

8      Q.    All right.  Now, all I'm saying is

9  that it was crucial to the function of the

10  levee that the surge and waves not go over the

11  top.  Right?

12      A.    Um -- it was important for that

13  designing for that level that they didn't,

14  correct.

15      Q.    All right.  Now, would you agree with

16  me that if -- and this is a big if, I know you

17  don't agree with the premise -- but if the MRGO

18  causes increase in surge and wave such that

19  there is overtopping, then the -- and if you

20  combine that with the knowledge that the

21  overtopping is going to, quote, endanger the

22  security of the structures, then the MRGO would

23  be the cause of the failure of the levee.  If

24  that's true now.  I'm not asking you to agree

25  with me that MRGO causes increased surge and

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 123

1    wave.

2              MR. LEVINE:

3                   Objection.  Incomplete

4              hypothetical.

5       A.   I'm not sure if I fully understand,

6    but you would have to look at the -- to assess

7    that, okay, you'd have to look at the, um --

8    standard hurricane versus MRGO being there and

9    MRGO not being there, and what that would have

10   caused --

11   EXAMINATION BY MR. BRUNO:

12      Q.   Different question.  Didn't ask you

13   all that.  And I'll ask you that later on this

14   afternoon, I promise you.  This is my question:

15   Since I get the ask them, this is my question:

16   If in fact it is established that the MRGO

17   caused an increase in surge and wave so that

18   that put the water over the top of the levee

19   sufficient to endanger the security of the

20   structure, as they wrote here, would you agree

21   with me -- that's if, and I'm not asking you to

22   agree with the premise -- that the MRGO is one

23   of the causes of the failure of the levee?

24             MR. LEVINE:

25                   Same objection plus vague.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                          Page 124

 1      A.    I would say any substantial wave and

 2   surge that goes over the levees would

 3   potentially lead to failure of the levees.

 4   EXAMINATION BY MR. BRUNO:

 5      Q.    Right.

 6      A.    This is where the hypothetical cases

 7   that we've talked about, Katrina, those things,

 8   you have the potential for erosion of the

 9   levees.

10      Q.    All right.  And if MRGO is the cause

11   or is one of the causes of the increase in the

12   surge and waves, then MRGO is one of the causes

13   of the failure of the levee, isn't that true?

14           MR. LEVINE:

15              Same objections.

16      A.    Well, it's the amount -- it's water

17   going over.  You know, water going over the top

18   of it, um -- you know, it's design and the way

19   it was designed didn't substantiate significant

20   water going over the top of them.

21   EXAMINATION BY MR. BRUNO:

22      Q.    Right.  That's not an answer to my

23   question.

24           MR. LEVINE:

25              That is an answer to your

JOHNS PENDLETON COURT REPORTERS              800  562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 125

1          question.

2          MR. BRUNO:

3               No, it's not.

4           MR. LEVINE:

5               Yes, it is.

6          MR. BRUNO:

7               No, it's not.  The question is,

8          and I'll read it back again.

9          MR. LEVINE:

10              You've asked him three times.

11         MR. BRUNO:

12              I don't have an answer yet and

13         I'm going to stay here until I get

14         one.  I make that crystal clear.

15     EXAMINATION BY MR. BRUNO:

16      Q.   My question is as follows:  If the

17  MRGO is the cause or one of the causes of the

18  increase in surge and waves, then MRGO is one

19  of the causes of the failure of the levee,

20  isn't that true?  That's a yes or no answer.

21  You can answer yes or no, and you can explain

22  all day long.

23      A.   Okay.

24         MR. LEVINE:

25              Same objections.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 126

     1      A.    The MRGO --

     2            MR. STEVENS:

     3                 You got to answer yes or no.

     4            MR. LEVINE:

     5                 He doesn't have to answer yes or

     6      no.

     7            MR. BRUNO:

     8                 Yes, he does.  Yes, he does.

     9            MR. LEVINE:

    10                 He can't answer it yes or no.

    11      A.    Okay.  I don't see -- the way it's

    12   asked I find it difficult to answer that yes or

    13   no.

    14   EXAMINATION BY MR. BRUNO:

    15      Q.    Why?

    16      A.    Okay.  Because you're saying one of

    17   many causes -- if the MRGO it can be shown to

    18   be the sole reason that the water got --

    19      Q.    I didn't say that.  I didn't say that.

    20   Now let's not play games with each other.  I

    21   said, if it's the cause or one of the causes.

    22   Because I knew you were going to play that game

    23   with me.  And that's why I said multiple choice

    24   or sole.  One or the other.  Okay?

    25                 Now, if it's one or the other, I want

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1    to understand -- you've told me -- you've got a

 2    big old long expert report.  You've said,

 3    overtopping is the reason why these levees fell

 4    down.  You've also told me the levees performed

 5    as designed.  We've just established that the

 6    designers knew that if waves and water went

 7    over the top that it would, quote, endanger the

 8    security of the structure.  Now, the rest of

 9    the analysis is simple.

10              If MRGO is a cause or the cause or one

11    of the causes -- we can ask them separately, if

12    you'd like, one at a time.  If MRGO is a cause

13    or one of the causes or the cause of the

14    failure of the levee.  Isn't that true?

15              MR. LEVINE:

16                   Same objections.

17        A.   Okay.  And I'll take them in turn.  If

18    MRGO was the only reason that the water was

19    overtopping the levees, then I would say that

20    they would be the primary cause of the failure.

21              If it's the other ones, I can't --

22              MR. STEVENS:

23                   Primary cause of the failure?

24              THE WITNESS:

25                   Could be the primary cause of the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 128

1              failures of the levee.

2              MR. STEVENS:

3                   Thank you.

4       A.   The owners where it's a piece of or

5    part of, I don't -- I can't say that MRGO is

6    the reason it failed.

7    EXAMINATION BY MR. BRUNO:

8       Q.   If it's one of the causes?

9       A.   Yeah.

10      Q.   There are multiple causes.

11      A.   There could be multiple causes.

12      Q.   Sure.  South it could be one of the

13   multiple causes of failure.

14      A.    It could be a multiple piece of that.

15      Q.   Right.  Well, let's explore that.  If

16   there are multiple causes for higher water --

17   okay -- and the MRGO is one of the causes of

18   that higher water --

19      A.   But it will --

20   EXAMINATION BY MR. BRUNO:

21      Q.   -- then the question is, if that's

22   true that MRGO is one of the causes of levee

23   failure.  I'm not saying sole, I'm not saying

24   only, but just one of them.

25      A.   But there it would make a difference.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 129

 1    It could be a piece of it, but there it would

 2    make a difference of what contribution was the

 3    MRGO.

 4        Q.    Fair enough.

 5        A.    But if you have a storm such as

 6    Hurricane Katrina, it was so overwhelming I

 7    believe whether the MRGO was there or not it

 8    had very little to do with.

 9        Q.    Okay.

10          MR. LEVINE:

11             Let him finish his answer.

12          MR. BRUNO:

13             I'm fine.  I was saying okay.

14          You interrupted him, too.  I'm just

15          following - yes.  Yes.

16    EXAMINATION BY MR. BRUNO:

17        Q.    Okay.  And?  Are you finished.

18        A.    Okay.  Yeah.

19        Q.    All right.  So the issue, then, in

20    that scenario, is the significant of the cause.

21    Right?

22        A.    I would say yes, the significance of

23    what the contribution is.

24        Q.    Fair enough.  Okay.  And with regard

25    to the contribution, when it comes to

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 130

1    hurricanes, hurricanes are short duration

2    events, are they not?

3        A.    That's correct.

4        Q.    Okay.  So when we talk about cause, we

5    have to consider the when, or when in the

6    sequence of events the cause occurred.   In

7    other words, if it happens early as opposed to

8    happening late, that may make a big difference

9    as opposed to the significance of the cause,

10   isn't that true?

11       A.    It's too vague.  I can't really --

12       Q.    All right.  If the hurricane --

13       A.    I mean, that's being very general.

14       Q.    Well, I think if we walk through this

15   together I think you and I will come to

16   understand each other.  The hurricane is not a

17   long duration event, it's a short duration

18   event, less than a day.

19       A.    It has pieces of it that actually

20   start well before.

21       Q.    Sure.

22       A.    The building up of the water before it

23   gets there.

24       Q.    Yeah, no question.

25       A.    And then the event.  And basically in

JOHNS PENDLETON COURT REPORTERS                    800  562-1285

REED  MOSHER, Ph.D. (VOL I)                     February 19, 2009

Page 131

```
 1    the term of a day or so.

 2         Q.    The time that we're interested in,

 3    though, with regard to this overtopping, is the

 4    time period within which the water is higher

 5    than the top of the levee.  Right?

 6         A.    Correct.

 7         Q.    Okay.  And so if that time frame

 8    happens long before the hurricane gets there,

 9    then you have a higher potential of -- I'm

10    sorry.  If it happens a long time before the

11    hurricane gets there then you have less

12    significant contribution than you would if it

13    happens much later, because if the water gets

14    higher later it doesn't stay high longer

15    because the hurricane passes by and it's gone.

16    This is, just as a general statement does that

17    make sense?

18         A.    I'm not going to give a yes or no

19    because it's confusing.  If the hurricane -- if

20    the water surge goes up early --

21         Q.    Right.

22         A.    -- and it overtops the levees, okay?

23    And you have water running down the back of it,

24    it will stay up for a longer period of time

25    until the hurricane passes.
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 132

     1     Q.    Exactly.

     2     A.    So you'll have a longer period of

     3   water running down the backside.

     4     Q.    Precisely.  We're on the same page,

     5   you and I.  Now, if the water level goes up

     6   later, closer to the point when hurricane is

     7   about the pass us by, then we have less

     8   potential for damage to overtopping, correct?

     9     A.    Duration has -- the amount of time it

    10   takes for water to overtop the levees, duration

    11   does have a period of effect to it.

    12     Q.    Right.  And so logically, then, the

    13   timing of the peak surge is relevant to the

    14   degree to which you're going to have damage

    15   from overtopping, that is, relative to the

    16   passage of the hurricane, right?

    17     A.    In general terms, yes.

    18     Q.    Okay.  The earlier the peak surge

    19   comes or the earlier the damage -- the wave

    20   action damages the levee before the hurricane

    21   gets there, the more damage you have from

    22   general overtopping.  The later that

    23   overtopping occurs, then the less likely -- the

    24   less the likelihood for damage to the levee,

    25   right?

JOHNS  PENDLETON  COURT  REPORTERS          800   562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 133

1      A.   The shorter duration of time the water

2   is running over the back of it.

3      Q.   Okay.

4      A.   But it's not just duration, it has to

5   be also volume of water.

6      Q.   No, I understand.  That's why we talk

7   about peak surge.

8           And so when we talk about the

9   potential contribution of the MRGO, we have to

10  not only look at its contribution to the total

11  surge and waves, we have to talk about whether

12  or not it contributes to the wind or the timing

13  of that peak surge and wave, right?

14     A.   If it affects the amount of surge

15  that's going over the top of the levee, then

16  you have to do assessment of that.

17     Q.   Right.  Time is important.

18     A.   The duration.

19     Q.   Is very important.

20     A.   Duration and height.

21     Q.   Okay.

22          (Lunch break.)

23  EXAMINATION BY MR. BRUNO:

24     Q.   Okay.  Going back to Appendix D,

25  Dr. Mosher --

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 134

 1      A.    Appendix D of.?

 2      Q.    Oh.   The, um -- Exhibit 2, that's the

 3  levee certification manual.  And we were on

 4  Page D-2.  We were at Paragraph D-4.  All

 5  right.  The last sentence:  It says, It was not

 6  possible within the time frame of the IPET

 7  investigation to fully evaluate the relative

 8  roles of the following factors in the

 9  overtopping and levee erosion process:  1,

10  spatially varying waves and still water levels;

11  2, overtopping duration; 3, levee soil

12  variability; 4, vegetation cover; 5,

13  construction method; and last is protected side

14  inundation.

15          Do you agree with that statement?

16      A.    Yes.   In general.

17      Q.    Okay.   Can you describe for me what

18  spatially varying waves and still water levels

19  is.

20      A.    Okay.   Spatially varying waves is how

21  do they vary along the different reaches from

22  one end to the other, um -- and particularly if

23  we're looking at all the levees in the area.

24  So -- because the storm -- direction of where

25  the waves are coming from, things like that,

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1    they'll have a different variation along there.

2    And still water levels will vary somewhat along

3    that area.

4         Q.   Okay.  Have you, since IPET, as part

5    of your report or the work that you did in

6    connection with the report, studied spatially

7    varying waves and still water levels?

8         A.   We have looked more at the still water

9    levels, how that affects erosion.

10        Q.   Okay.  Did the IPET study waves as

11   they may impact erosion?

12        A.   Only in the terms of, you know, that

13   waves will have an impact on the erosion -- an

14   additive effect to the surge.

15        Q.   Surge plus waves means more water.

16        A.   Right.

17        Q.   Okay.  All right.  Next thing is levee

18   soil variability.

19        A.   Uh-huh.

20        Q.   I guess you've done --

21        A.   More of that.

22        Q.   More of that.  You've described that

23   already in connection with your report.

24        A.   Right.

25        Q.   Vegetation cover.  Have you guys

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 136

 1   looked into vegetation cover?

 2       A.   Um -- not actually studied in terms of

 3   the MRGO Reach 2.

 4              MR. LEVINE:

 5                 What do you mean by you guys; do

 6          you mean him or --

 7       A.   Do you mean -- yes.  In the expert

 8   witness report?

 9   EXAMINATION BY MR. BRUNO:

10       Q.   Yeah.  Right.

11       A.   Now, the Corps of Engineers has done

12   some more since the IPET study working with the

13   folks from the Netherlands in looking at what

14   they had for their data and use of grass cover

15   for levees.

16       Q.   Was that covered by one of the other

17   experts?

18       A.   Um -- I don't believe it is.  Other

19   than Bruce may have included some of that in

20   his discussion.

21       Q.   All right.

22              MR. STEVENS:

23                 Do you mean Dr. Ebersole?

24              THE WITNESS:

25                 Yes.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1    EXAMINATION BY MR. BRUNO:

 2        Q.    Construction methods?

 3        A.    Um -- I have done some more on

 4    construction method.  We had covered some of

 5    that during the IPET.  We've further looked at

 6    that.

 7        Q.    All right.  And then finally,

 8    protected side inundation?  I'm not quite sure

 9    what they mean by that.

10        A.    Um -- well, what they were talking

11    about is how fast did it rise up on the inside

12    and how does that affect that erosion part of

13    it.

14        Q.    I see.

15        A.    And we haven't done anymore -- I

16    haven't done anymore with that in the expert

17    witness report.

18        Q.    All right.  Then let's move to the

19    next paragraph, D-5.  It says, Current coastal

20    engineering design practice is to use an

21    overtopping discharge rate threshold to define

22    the onset of levee damage.

23            Would you please explain that to us --

24    well, first of all, is this within your area of

25    expertise?  Let's start with that.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 138

```
 1      A.   It isn't in terms of what -- looking
 2  at what that over rate -- how you calculate it.
 3  It isn't within my expertise to determine the
 4  process to go about determining it.  I
 5  understand a little bit about what they're
 6  talking about, it's how much water is flowing
 7  over the top of the levees.
 8      Q.   Okay.  I see.  So what field of
 9  expertise is the field that would address
10  overtopping discharge rates?
11      A.   Well, okay.  It's kind of an
12  intersection of that.  What I would be
13  interested in is what is that rate?  Okay?
14      Q.   I understand that.  You told me that.
15      A.   And then Dr. Resio would actually be
16  one determining -- calculating what those rates
17  would be.
18      Q.   Okay.  And that field is what?
19      A.   Hydrodynamics.  Or ocean engineering
20  or coastal and ocean engineering.
21      Q.   Now, it says, in the next sentence --
22  you said you were interested in the rates
23  themselves.  Right?
24      A.   Uh-huh.
25      Q.   This says, these overtopping rate
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1    thresholds are rather crude and uncertain.  Is

 2    that accurate?

 3         A.   Yeah.

 4         Q.   Is that true?

 5         A.   I believe it is.  It's a, um --

 6    because there's so much limited data at what

 7    causes the erosion and how it's affected by

 8    both grass and soil content, um -- there's wide

 9    variations across the spectrum of what soils

10    can be and what grass cover can be to when the

11    erosion occurs.

12         Q.   Okay.  It says, They somewhat account

13    for certain factors that can influence levee

14    resistance to erosion, such as the quality of

15    levee soils, clayey versus sandy sediments, for

16    example -- and you discuss that in your report.

17         A.   Uh-huh.

18            MR. LEVINE:

19              Is that yes?

20         A.   Yes.  Sorry.

21    EXAMINATION BY MR. BRUNO:

22         Q.   -- condition of the vegetation cover?

23         A.   Correct.

24         Q.   All right.  But you didn't address

25    that, did you?

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 140

1      A.    No.

2      Q.    Do you know if any of the other

3  experts did?

4      A.    Um -- I believe Dr. Bea covered some

5  about vegetation, particularly looking at grass

6  cover.

7      Q.    Okay.

8      A.    Um -- my problem with not being able

9  to do it is there's not very good data on that.

10  There's only a bit of laboratory information,

11  and it varies significantly.  It actually

12  varies exponentially with the root volume

13  amount, which is a measure of that, and it has

14  significant variations in it.

15      Q.    And finally, and presence of armoring.

16  So is this a true statement, then?

17      A.    Yeah.  Yes, these would be the

18  uncertainties that you deal with.

19      Q.    It says, However, the thresholds do

20  not incorporate nor are they so sensitive to

21  several other key site specific conditions that

22  influence levee erosion in response to

23  overtopping: Thickness of protective soil

24  cover, degree of root system development or

25  lack thereof, degree of cracks and gullies in

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 141

1     the levee soil, spatial variation in the soil

2     properties or presence of pertubations of

3     structural features on the levee that would

4     promote local scour if overtopped, duration of

5     overtopping or degree of inundation on the

6     backside that might serve as a buffer to

7     degradation of the levee.

8              So do you agree with that?

9        A.   Actually, I'd have to read it because

10    it's kind of long and I --

11       Q.   Sure.  Go ahead.  It is.

12       A.   Okay.  In terms of the -- they do not

13    incorporate nor are they so sensitive to.

14    Okay?  Um -- that adds, the things they

15    describe there actually add to the lack of

16    uncertainty in these thresholds.  Okay?

17       Q.   Okay.

18       A.   And so all of these, as I said a

19    little before, do account for the uncertainties

20    that you would have in being able to try to

21    determine the erosion, the protection that it's

22    given by grass, soil and that part of it.

23       Q.   And this overtopping discharge rate is

24    what, exactly?  It's a number?

25       A.   It's a, um -- a volume of water that's

JOHNS PENDLETON COURT REPORTERS              800  562-1285

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 142

 1   going over the top of the levees.

 2       Q.   Okay.  And it's the point at which we

 3   are going to experience some damage, or

 4   initiation of damage?

 5       A.   It is, as I said, a crude threshold --

 6       Q.   Sure.

 7       A.   -- where you may be able to anticipate

 8   that you will get damage after that.

 9       Q.   Okay.  All right.

10       A.   It doesn't mean -- one of the problems

11   with it is it varies so much with soil

12   conditions and grass conditions.

13       Q.   I see.  You cannot say that if the

14   overtopping discharge rate threshold is met

15   that there will necessarily be damage, I think

16   is what you're saying.  Right?

17       A.   That's correct.

18       Q.   Okay.

19       A.   Whereas, conditions where even if that

20   threshold is even exceeded you might not get

21   erosion, because of the materials.

22       Q.   And in fact, the evidence in this case

23   shows that even with high rates of overtopping

24   we have places where there is no damage.

25       A.   Correct.  I actually show that in some

REED  MOSHER, Ph.D. (VOL I)                February 19, 2009

Page 143

 1    of my plots.

 2        Q.    Right.  Okay.  Now, it says the

 3    thresholds that are in use today -- and I'm

 4    skipping a sentence, doctor.  You see it?  The

 5    thresholds --

 6        A.    Uh-huh.

 7        Q.    All right -- have been developed

 8    primarily based on situations where the still

 9    water level is above the levee crest and

10    overtopping is rather steady.  So they're

11    talking about the facts that these numbers were

12    created looking at, frankly, only surge and not

13    waves.  Isn't that true?

14        A.    That's what that says.

15        Q.    Okay.  It says, during wave

16    overtopping alone, or wave overtopping in

17    addition to still water overtopping, the

18    velocities associated with each wave crested

19    passage can be significantly higher than

20    velocities associated with steady flow alone.

21           Do you agree with that?

22        A.    Yes.  I would say that they can be.

23        Q.    Okay.  So it seems -- tell me if I'm

24    understanding this correctly:  It seems to say

25    that the waves on top of the surge are going to

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 144

 1    cause -- are going to have a larger role to

 2    play, if you will, in the erosion.  Or am I

 3    saying it wrong?

 4        A.   Well --

 5         MR. LEVINE:

 6              Hold on a second.

 7              Objection.  Vague as to erosion.

 8              And I don't mean to say that the word

 9              erosion is vague, but you're talking

10              about overtopping erosion.

11         MR. BRUNO:

12              Yes.  I'm talking about

13              overtopping erosion.

14        A.   Um -- waves can aggravate the

15    situation of erosion.  In fact, it's not just

16    velocity, it's the fact that they also impact

17    onto the --

18    EXAMINATION BY MR. BRUNO:

19        Q.   It's a pounding.

20        A.   A pounding of it that can make it

21    worse, erosion.

22        Q.   Okay.  So basically, if we have a

23    component of the water that's wave and a

24    component of the water that's surge, the wave

25    component is more damaging than the surge

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 145

1    component to overtopping erosion.  Did I get

2    that right?

3       A.   I can't say that for sure.  I don't

4    think there's enough information out there to

5    say that.  But there are possibilities that it

6    could have higher velocities.

7       Q.   Okay.  The next sentence seems to

8    speak to that.  Computations made by IPET

9    investigators show that velocities on the

10   backside of levees due to wave overtopping were

11   three or more times greater than velocities

12   associated with steady flow overtopping, which

13   translates into an erosion potential of about

14   thirty times greater albeit not a steady

15   forcing.

16         Am I reading that to mean that

17   overtopping from waves causes 30 times more

18   damage than just plain old surge overtopping?

19      A.   They're saying that if the velocities

20   could be as much as, what is it, three times?

21      Q.   Thirty.

22      A.   No, the velocity of the waves are

23   three times greater, which leads to the erosion

24   being thirty times greater.

25      Q.   I'm sorry.  Okay.  You are right.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 146

1      A.   And that's possible.  The difference

2    is is that the waves are not steady.  Okay?  So

3    the amount of erosion that could actually occur

4    from them may be about the same depending upon

5    the situation.  You have to accumulate that.

6      Q.   Sure.  Well, it sounds like, though,

7    that without question waves are not less

8    damaging than surge, they're equal or more

9    damaging than surge.  Is that a correct

10    conclusion?

11      A.   The instant of the wave with a greater

12    velocity than an instant with the surge could

13    be greater damage, or greater amount of erosion

14    occurring.  Waves are a significant -- can be a

15    significant piece of damage.

16      Q.   Okay.  All right.  I'm going to move

17    to D-3.  You want to follow along?  The next

18    page, D-3.  The next page.

19          MR. LEVINE:

20              What paragraph are you in?

21    EXAMINATION BY MR. BRUNO:

22      Q.   The first full sentence, Doctor, where

23    it says levee erosion and damage is a function

24    of duration --

25      A.   Uh-huh.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                       Page 147

    1      Q.    -- which is not considered in these

    2   thresholds.  Is that true?

    3      A.    True.

    4      Q.    Okay.  All right.  Then the last

    5   sentence:  Work is underway in the Louisiana

    6   Coastal Restoration and Protection study to

    7   further examine the issue of wave overtopping

    8   threshold for the onset of damage to earthen

    9   levees.  Additional work is needed on this

   10   topic to refine the thresholds for various

   11   types of levee conditions.  So this is -- is

   12   this true?

   13      A.    I believe there is some work being

   14   done in that area.

   15      Q.    All right.  So we don't, at present,

   16   have a wave overtopping threshold, right?

   17      A.    Uh-huh.

   18      Q.    Okay.  All right.  D-7.  That's really

   19   not your subject, where it talks about the

   20   average overtopping discharge rate due to wave

   21   action.  That's Dr. Resio 's area; right?

   22      A.    Uh-huh.

   23          MR. LEVINE:

   24             That's yes?

   25      A.    Yes.

JOHNS PENDLETON COURT REPORTERS                 800  562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1   EXAMINATION BY MR. BRUNO:

 2       Q.   Yes.  And let's see.  Page D-4 says,

 3   the WAVEWATCHIII and SWAN wave models are other

 4   suitable models for making offshore and

 5   nearshore wave computations respectively.  Both

 6   models were evaluated during the IPET

 7   examination.  Comparisons between resulted from

 8   the ADCIRC, WAM, STWAVE, WAVEWATCHIII and SWAN

 9   models and measurements made during Hurricane

10   Katrina, and inter-wave model comparisons are

11   present in the IPET report.

12            Is that something you did?

13       A.   No.

14       Q.   That's something somebody else?

15       A.   That's is something Dr. Resio --

16       Q.   All right.

17       A.   -- and his team did.

18       Q.   Is there a way to determine the rate

19   at which a levee will deteriorate after the

20   erosion is initiated by overtopping erosion?

21       A.   Is there a, um -- is there -- I guess

22   you're asking, is there a, um -- procedure that

23   is being -- that's used by the profession to do

24   that?

25       Q.   Yes.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 149

```
 1      A.   To my knowledge, there isn't an

 2  accepted proceed procedure that you would find

 3  on that.

 4      Q.   All right.  So you have not offered an

 5  opinion, and apparently nor could you, as to

 6  the speed with which once the levee started to

 7  erode that they eroded to their final

 8  threshold.

 9      A.   I believe that the calculations are so

10  uncertain in doing that that you cannot give it

11  a reasonable way to calculate that.

12      Q.   Okay.  All right.  Moving to your

13  report now, if you want to follow along, I'm at

14  I.

15          MR. LEVINE:

16              Page number?

17          MR. BRUNO:

18              Page 9.

19      A.   Okay.

20  EXAMINATION BY MR. BRUNO:

21      Q.   Okay.  You say that the MRGO levees

22  were overtopped by as much as five feet of

23  water from surge and wave.

24      A.   Uh-huh.

25      Q.   So you've combined the two.
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 150

     1      A.   Here I have, yeah.

     2      Q.   Okay.  Now, for an extended period of

     3   time.

     4           And it is true, is it not, that there

     5   are some levees that were able to withstand

     6   that amount of surge and waves?

     7      A.   Along the Reach 2 of the MRGO.

     8      Q.   Yes.

     9      A.   Yes, there were.

    10      Q.   Okay.  Now, where did you get the data

    11   from, that is the five?  Where did that come

    12   from?

    13      A.   Um -- it came from -- some of that

    14   actually came from both the IPET study and then

    15   later on the results from the work that I

    16   actually provided through Bruce, through

    17   Mr. Ebersole, but I believe the calculations

    18   were done by, um -- Joannes Westerink.

    19      Q.   Okay.  All right.  Remember you've

    20   told me that a lot of your information comes

    21   from IPET.

    22      A.   Uh-huh.

    23      Q.   So a lot of confusion has arisen in

    24   about whether the IPET numbers are the same as

    25   the Westerink numbers and are the same as the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 151

 1   Ebersole numbers and Resio and on down, and I'm

 2   having a hard time following that.

 3        A.   And I would say, understanding your --

 4   I probably won't be able to clear that up.  You

 5   ought to talk to them.

 6        Q.   All right.  Okay.  But the number that

 7   you used, the five, you got that from Bruce.

 8        A.   I got it from looking at their, um --

 9   history -- the, um --

10        Q.   Hydrographs?

11        A.   Hydrographs, yeah.

12        Q.   Bruce's hydrograph?

13        A.   There were -- I think they were

14   provided by -- I think I actually have some

15   pictures of them in here.

16        Q.   Yeah.  Let's look for them, because

17   I -- Bruce told us in his deposition that he

18   scaled them up, and that's why I'm trying to

19   figure out what you used.

20        A.   Uh-huh.  If I remember correctly,

21   there were significant differences between

22   them.

23        Q.   He scaled them up by 12 percent.  And

24   he lowered the levees by half a foot.

25              MR. LEVINE:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1              Objection.

2         MR. BRUNO:

3              No objection.  That's what he

4         said.

5          MR. LEVINE:

6              Misstates the testimony.

7         MR. BRUNO:

8              Would you like me to show you the

9         testimony?  I got it right here.

10         MR. LEVINE:

11              I know what he said.  I was

12         there.

13         MR. BRUNO:

14              I know you were there, too.

15         That's what he said.

16          MR. LEVINE:

17              I dispute your characterization

18         of that testimony.

19    EXAMINATION BY MR. BRUNO:

20       Q.   I'm looking at Page 20.  Is that

21   maybe -- I know it's not a hydrograph, but it's

22   a graph.

23       A.   Uh-huh.

24       Q.   Is that maybe one that you used?

25       A.   That's one of the ones, yes.

REED  MOSHER, Ph.D. (VOL I)                     February 19, 2009

Page 153

```
 1      Q.    Okay.  That's one of the ones.

 2      A.    Uh-huh.

 3      Q.    Well, it's the first one I came across

 4   so let me ask you a couple of questions.

 5      A.    Okay.

 6      Q.    Okay.  The red line says peak surge

 7   and wave.

 8      A.    Uh-huh.

 9      Q.    Um --

10      A.    Yes.

11      Q.    Do you know --

12      A.    I was saying yes that's what it says.

13      Q.    Okay, yes, it does say that.

14      A.    I got to be careful --

15      Q.    The next question is, where in

16   relationship to the levee is the peak surge and

17   wave?  In other words, is it in deep water, is

18   it on the toe, is it at the levee itself?

19      A.    Um -- I don't know the answer to

20   that --

21      Q.    Okay.

22      A.    -- because that, um -- when we were --

23   well, when we were, um -- producing these we

24   took integration points that were along the

25   levee.
```

REED   MOSHER, Ph.D. (VOL I)                        February 19, 2009

Page 154

1      Q.    You looked at hydrographs.

2      A.    Well, we took hydrographs, but they

3  were at calculation points along the levee.

4      Q.    Along the levee.  Okay.  All right.

5  So we have one of those?  That's not this,

6  certainly Figure 11 is not that.

7      A.    No, I don't have one of those in here,

8  I don't believe.

9      Q.    Okay.  But you do recognize that the

10  waves -- the peak wave is not the same height

11  in deep water as it is as it gets closer to the

12  levee, right?  As it gets closer to the levee,

13  you get shallower water, it gets knocked down.

14         You have to say yes.

15     A.    Yes.  I thought you were just making a

16  statement.

17     Q.    I'm leaving out the isn't that true

18  part.  I'm asking you, do you agree when I'm

19  making these statements as you call them.

20         All right.  So I guess what I'm trying

21  t figure out is, when you say the MRGO levees

22  were overtopped by as much as five feet, that's

23  not your conclusion, that's Ebersole 's

24  conclusion?

25     A.    From the calculation standpoint, yes.

REED  MOSHER, Ph.D. (VOL I)                      February 19, 2009

Page 155

 1    That's from their --

 2         Q.    From his.

 3         A.    From his and Westerink's.

 4         Q.    You agree with me, do you not, that

 5    you have to know what the levee crest height is

 6    and you have to know what the surge and wave

 7    height is in order to make that statement?

 8         A.    Uh-uh.

 9         Q.    And since you don't know you have to

10    rely on somebody else to give that information

11    to you.

12         A.    I have to rely on somebody else to

13    provide the surge information.

14         Q.    Okay.  Surge and wave, plus levee

15    crest.

16         A.    Levee crest, um -- I was involved in

17    what we did for the LIDAR data, so.

18         Q.    All right.  Well, good.  That was my

19    next question.  But insofar as surge and wave,

20    that data comes straight from Ebersole.  Or did

21    you talk to Resio, as well?

22         A.    For the surge -- well, I talked to

23    both of them.  But Bruce actually provided

24    that.

25         Q.    So it comes from Bruce.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 156

1      A.    Yes.

2      Q.    Just so I can get the --

3      A.    Uh-huh.

4      Q.    -- the chain of information.

5            Now, the next component, in order to

6   make this comparison in this statement, you

7   have to know levee crest height and you said

8   something about LIDAR.

9      A.    Uh-huh.

10     Q.    Bruce Ebersole testified that there

11  were two LIDAR data sets, is that accurate?

12     A.    Uh-huh.

13     Q.    One from 2000 and one from 2005?

14     A.    Uh-huh.

15     Q.    And that there were some discrepancies

16  in the data sets?

17     A.    Uh-huh.

18     Q.    And that he made some -- well, at

19  least there was a team of people, and to be

20  accurate I don't recall who was on the phone.

21  Were you a part of that team who decided to cut

22  the levee heights from the 2000 LIDAR by half a

23  foot?

24           MR. LEVINE:

25                 Objection.  Mischaracterizes

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 157

 1          testimony.

 2      A.   I was involved in the process of

 3  deciding what the levee heights were from the

 4  data, in the process of that.  And this

 5  primarily came from the IPET work that was done

 6  to reconcile the levee heights along with using

 7  survey data to do that.  There was an intensive

 8  survey done during IPET to get the right datums

 9  and heights.

10  EXAMINATION BY MR. BRUNO:

11      Q.   Okay.  That statement was a little

12  complicated.  I -- let's see if we can direct

13  my questions, though, specifically to the

14  report.  Bruce Ebersole testified that there

15  was a discussion about the different data sets.

16  And this is post-IPET.  Okay?

17      A.   Okay.

18      Q.   And that he did something different

19  than IPET did.

20      A.   Okay.

21      Q.   Do you recall that to be true?

22      A.   I wasn't involved in that.

23      Q.   Oh, you weren't involved in that.

24  Okay.  That's what I'm trying to get a handle

25  on.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1            You were involved in the IPET --

2       A.   Right.

3       Q.   -- attempt to resolve this --

4       A.   The datum heights.

5       Q.   -- the datum heights.  Okay.  All

6  right.  Well, you're using the word datum

7  heights and that's going to confuse me

8  further --

9       A.   The location of datum and the heights

10  of the levees.

11      Q.   We've got a bunch of things going on

12  here.  We discovered the fact during the IPET

13  that the datums were possibly incorrect, and

14  then we also learned that there was a

15  difference between the data sets of the LIDAR

16  from 2000 from the LIDAR from 2005, is that

17  right?

18      A.   Yeah.  There were some differences.

19      Q.   Okay.

20      A.   It has to do with, um -- you know,

21  where you choose to start to rectify your data.

22  If those are different locations or aren't at

23  the same elevations, then you'll propagate a

24  difference all the way through your assessments

25  of the data.

REED   MOSHER, Ph.D. (VOL I)                        February 19, 2009

     1      Q.   Right.   So the first question is, what

     2   was the datum used in the 2000 LIDAR, if you

     3   know?  Was it --

     4      A.   I don't know.

     5      Q.   -- NAVD --

     6      A.   Mainly because with the IPET we

     7   corrected everything back to NVAD88 and 2000,

     8   so we worked on -- because of the time frame,

     9   we had to work on what was the elevation of the

    10   levees.  Okay?  Or what was the top of

    11   elevation.

    12      Q.   What was the levee crest.

    13      A.   Well, we worked actually a little

    14   differently.  We took the levee crest and then

    15   we measured everything down from the levee

    16   crest so that when we actually got the

    17   elevation, all of the rest of the data and all

    18   of the rest of the work that we had done could

    19   be tied to that new elevation and we wouldn't

    20   have to rework all the elevations.  So we just

    21   measured distances down from the top of the

    22   levee or the top of the wall.

    23      Q.   I see.

    24      A.   Then we could update those with

    25   elevations once the datum was corrected.

REED   MOSHER, Ph.D. (VOL I)                      February 19, 2009

                                                          Page 160

 1      Q.   All right.

 2           (Brief interruption.)

 3   EXAMINATION BY MR. BRUNO:

 4      Q.   Let's see if way can walk through this

 5   slowly.  I understand from your testimony that

 6   the 2000 LIDAR data was corrected to the NAVD88

 7   data.  Right?

 8      A.   All the elevations that we worked with

 9   were corrected to that.

10      Q.   All of them.

11      A.   Yeah.

12      Q.   So that --

13           MR. LEVINE:

14                NAVD88, is there a number with

15           that or anything?

16           THE WITNESS:

17                Yeah, I think it's 2000.  I'd

18           have to look it up, but these are the

19           reference we used in IPET.

20   EXAMINATION BY MR. BRUNO:

21      Q.   Right.  Can we simply conclude,

22   though, that whatever the number of the NAVD88,

23   it was the same number for the 2000 LIDAR, the

24   2005 LIDAR and any other information that you

25   had in order to establish the levee crest

REED  MOSHER, Ph.D. (VOL I)                      February 19, 2009

Page 161

1   height?

2       A.   To my knowledge, yes.

3       Q.   Okay.  Now, next question:  When you

4   compared the 2000 to the 2005, what if anything

5   did you do between those two data sets to

6   ultimately conclude what the levee heights were

7   on the day before Katrina?

8       A.   Actually, um -- when the two surveys

9   were rectified to the same elevations, we used

10  those elevations through the process.  And so

11  there was not -- basically, once those were

12  established, we used those elevations

13  throughout the, um -- study.

14          MR. LEVINE:

15              When you say we, who do you mean?

16          THE WITNESS:

17              Okay.

18      A.   Both in the IPET study and what I did

19  used these elevations.

20  EXAMINATION BY MR. BRUNO:

21      Q.   All right.  Well, in 2000 the levees

22  are intact, and in 2005 many of the levees are

23  gone.

24      A.   Um -- well --

25      Q.   So I'm trying --

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 162

     1     A.    Actually -- you're saying many of the

     2   levees.

     3     Q.    Portions of the levees are gone.

     4     A.    Portions of the levees.  But other

     5   things are still there.

     6     Q.    Sure.  So was the 2000 LIDAR an

     7   accurate depiction of the levee crests

     8   pre-Katrina?

     9          MR. LEVINE:

    10              Objection.

    11     A.    Um -- there may be some differences

    12   due to settlement and subsidence, but those

    13   should be relatively small --

    14   EXAMINATION BY MR. BRUNO:

    15     Q.    Okay.

    16     A.    -- differences.

    17     Q.    All right.  So can I gather from your

    18   testimony that the IPET team used the 2000

    19   LIDAR data once corrected to the appropriate

    20   NAVD88 --

    21     A.    Uh-huh.

    22     Q.    -- used that for the levee crest

    23   height pre-Katrina?

    24     A.    Um -- yes, in terms of -- I believe we

    25   did.  In terms of where there were levees

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 163

 1   missing, you know, from breaching and things

 2   like that, in those locations yes.

 3       Q.   And where you had actual LIDAR data

 4   where the levees were still there, you used

 5   that.

 6       A.   Right.  But what I remember is that

 7   there was very little difference between those.

 8       Q.   Okay.  That's fine.  I mean, so that

 9   would allow you to use the 2000 LIDAR data

10   where there was no levee in 2005, and you could

11   use the 2005 LIDAR data where there was a

12   levee.

13       A.   But I think what we ended up is coming

14   up with a rectified set of elevations for the

15   whole area based on those two surveys.

16       Q.   I'm with you.  But I'm trying to

17   figure out how you joined the two surveys

18   together.  If they were close to each other

19   then I can see where you just overlap them.

20       A.   Yeah.  That -- personally, in doing

21   that you would have to talk to somebody that

22   actually did that work.

23       Q.   Who did that for IPET?

24       A.   For IPET, one of the principals was,

25   um -- Rob Wallace was one of the principal ones

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1   that did a lot of the LIDAR corrections.

 2       Q.   Okay.  All right.  Was the IPET team

 3   satisfied with whatever the answer was with

 4   regard to the levee crest heights?

 5       A.   Yeah, within reason.  I mean, they're

 6   not perfect, but.

 7       Q.   Okay.  All right.  So as far as you're

 8   concerned, there was no need to change the IPET

 9   data or to question the IPET data as it relates

10   to the levee crest height for a pre-Katrina

11   levee along Reach 2.

12            MR. LEVINE:

13                 Objection.  Compound.

14            MR. BRUNO:

15                 That's not compound.  That's one

16            question.

17       A.   The data along Reach 2, as far as the

18   elevations were, they were within the range of

19   what I would think would be reasonable values

20   for those measurements based on that data.

21   Now, you have to keep in mind that LIDAR data,

22   you know, has a certain amount of inaccuracies

23   in itself.  So I think these were only good to

24   about six inches, I think, something like that.

25   EXAMINATION BY MR. BRUNO:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1      Q.   Well, I think what we've heard is that

 2  it doesn't do very well with sheet pile because

 3  it can't pick up the width --

 4      A.   Right.

 5      Q.   -- below six inches.  But insofar as

 6  the height above whatever the measurement, it's

 7  not bad.  Is that true?

 8      A.   Um -- I think it would even be hard to

 9  pick up the sheet pile because it's so narrow.

10      Q.   That's what I mean, it can't pick

11  up --

12      A.   So it's hard to pick up its elevation,

13  the top of it.

14      Q.   Right.  My point is it cannot pick

15  up --

16      A.   Yeah.

17      Q.   -- things that are more narrow than

18  six inches, but for everything else it works

19  well.

20      A.   Yeah.

21      Q.   What's what I thought I had asked.

22      A.   Yeah, it's reasonable.  It has

23  inaccuracy.  But then if you walk out on the

24  levees, the fact that you have grass, you have

25  trees, you have all of those things, they have

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 166

 1    an effect on that reflected image back.  And so

 2    you have to make corrections for it, but

 3    they're not going to be perfect.

 4         Q.   Right.  Okay.  All right.  It says,

 5    these levees were built using a hydraulic

 6    filling construction method which contributed

 7    to their vulnerability to erosion.  It says,

 8    over the years since the construction of the

 9    levees along the MRGO, subsidence of the New

10    Orleans area and the consolidation of the soils

11    below the levees resulting in their settlement

12    have led to a reduction in the protection

13    elevation level below that of the original

14    design protection level for the MRGO which

15    increased the amounts of overtopping erosion

16    and subsequent flooding.

17              MR. LEVINE:

18                   You're reading from Page 9, the

19              first paragraph there?

20              MR. BRUNO:

21                   I'm reading from Page 9, the last

22              sentence of the first paragraph, yes.

23         A.   Yes, I wrote that.

24    EXAMINATION BY MR. BRUNO:

25         Q.   Okay.  Now, did you evaluate the role,

REED   MOSHER, Ph.D. (VOL I)                        February 19, 2009

Page 167

 1    if any, of the MRGO in contributing to the

 2    sinking of the levees?

 3         A.    Um -- I -- no, I didn't.  I didn't do

 4    an analysis of that because in those types of

 5    soils the dominant consolidation of the

 6    material tends to be dominant as long as the,

 7    um -- slope stability factors of safety moving

 8    out into the -- for the levees to move out into

 9    the MRGO were in the range of 1.3, settlement

10    from that area is very -- is not likely to

11    occur.

12         Q.    All right.  Well, did you review the

13    design of the levee itself, of Reach 2?

14         A.    I did look at the levee designs of

15    those.

16         Q.    And did you read where the engineers

17    themselves recognized that the -- because; of

18    the interdistributary layers below the levee

19    and location of the channel, that the channel

20    might contribute to a sinking of the levees

21    because it provides a vehicle, if you will, or

22    a pipe, for the water or moisture to be

23    squeezed into --

24              MR. LEVINE:

25                   Objection.  Misstates the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

    1            evidence.  Do you have a document here

    2            so he can see it?

    3    EXAMINATION BY MR. BRUNO:

    4        Q.    Well, obviously you didn't read it.

    5            Or did you?

    6        A.    I have read some about that, I just

    7    want to know whether it is -- which part is it?

    8    I thought it was -- and this is where we need

    9    to look at -- I thought it was dealing with the

   10    MRGO design and not on the levees design.

   11        Q.    It was -- maybe I'm wrong.  It was in

   12    the design documents for the MRGO?

   13        A.    That's what I thought.

   14        Q.    Okay.  That may be true.  I don't have

   15    a perfect memory, I can assure you.

   16        A.    I don't either.

   17        Q.    But the real point of the exercise is

   18    did you do an evaluation of that at all?

   19        A.    In terms of understanding what they

   20    were talking about --

   21        Q.    They being the Corps of Engineers?

   22        A.    -- the Corps of Engineers at the

   23    time -- they mentioned about the unconsolidated

   24    material and the concern, and that concern is

   25    more about sloughing of the materials, because

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 169

1    unconsolidated soils have a very low strength,

2    and they're concerned about the actual failure

3    of that material out into the --

4         Q.    The channel.

5         A.    -- the channel.

6         Q.    Which means the levee can go down.

7         A.    And those clays there aren't subject

8    the piping or migration, they're subject to

9    consolidation and slope stability problems.

10        Q.    Okay.  This document which I will show

11   you certainly -- and this comes from our --

12   have you read the plaintiffs' expert reports?

13        A.    I have read some of them.

14        Q.    Okay.  This document is -- what is

15   this?  It's Page 6-2 of our Duncan FitzGerald

16   report.  It is a table which comes from the,

17   um -- Corps.  It's the geological

18   investigation, Mississippi River Gulf Outlet

19   channel physical characteristics of

20   depositional types from 1958.  Have you seen

21   that before?

22        A.    I'm not sure if I've actually seen

23   this one, but ones similar to that.

24        Q.    Okay.  Fair enough.  And what I'm

25   asking you about, if I may direct you, it says

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1    here, um -- disposed in clay wedges between --

2    and this is the interdistributary trough that's

3    there on that line.  It says, deposed in clay

4    wedges between major distributaries, clay

5    sequence interrupted by silty or sandy

6    materials association with myriad small

7    distributaries but otherwise soils homogeneous,

8    the material will probably displace laterally

9    under a fairly light load.  Meaning that if you

10   put a load on top of it it's going to squish it

11   out.  And if you have a channel there it's got

12   a place to go.  I mean, ask that -- do you

13   understand at least what I'm talking about?

14   I'm not asking you to agree with me.

15       A.   Right.  I'm not agreeing with you.  I

16   understand what you're talking about.  Any of

17   the levees built on this type of material will

18   tend to have a lateral squeeze.  When you put

19   that much weight on it, you you're pushing the

20   soil down and out.  Okay?

21       Q.   Okay.

22       A.   And depending on, if you're very close

23   to an area, you may have some lateral squeeze

24   in that one.

25           My determination would be if you have

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 171

1    a lot more going out into the channel you

2    should see a tilt to your levees.  We didn't

3    see a tilt to the levees.  Because more is

4    going to be moving out on that side of the

5    levee than on the land side.  It just makes

6    sense.

7            And we see this.  When levees are

8    built and you get some local failures at the

9    toe, he whole thing tilts -- failures at the

10   toe from lateral spread.  It's just not

11   unusual.  They built -- you know, this is a

12   similar thing that they saw when they built the

13   turnpikes in New Jersey.  They put a lot of

14   soil above them to consolidate them and let

15   them spread and then go back and raise the

16   height.

17      Q.   Right.  Okay.  So your testimony is

18   that -- and I'm a little confused.  Did you

19   evaluate this, yes or no?

20      A.   Evaluate it in terms of --

21      Q.   As a forensic exercise.  Okay?  Here

22   we are, we're out there, we're asking ourselves

23   the question what caused the levee failure?

24   You've indicated that the height of the levees

25   was a cause, right?

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 172

 1      A.    Uh-huh.

 2      Q.    You say that in black and white.  So a

 3  forensic engineer would ask himself, or

 4  herself, the question what caused that levee to

 5  sink?  Right?

 6      A.    Uh-huh.

 7      Q.    And a good forensic engineer would

 8  evaluate the various potential mechanisms by

 9  which that could occur, right?

10      A.    Uh-huh.

11      Q.    Okay.  And we have one mechanism right

12  there which is, got this material which is

13  going to displace under a light load.  So that

14  becomes a potential mechanism of failure, isn't

15  that true?

16      A.    It is a potential --

17      Q.    Just a potential.

18      A.    -- a potential mode that you --

19      Q.    A potential mode.  That's all I'm

20  after.  So the question is, did the IPET team

21  evaluate from a forensic perspective the

22  potential of that interdistributary lateral

23  displacement to be a potential explanation for

24  the sinking of the levee?  Did they do that

25  exercise, yes or no?

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 173

1      A.   There were slope stability analyses

2   done, but they were not significant to actually

3   report because they weren't -- we did checks on

4   them to see if there was a potential.  They

5   were so high we moved on to looking at other

6   things, particularly because the physical

7   evidence didn't show that there was failures of

8   large lateral movements in that direction.

9   There was a lot of vertical movement and that's

10   from the settlement.

11      Q.   We're talking about vertical movement.

12   Doc, we're talking about vertical movement.

13   You're talking about slope stability, which you

14   and I both know is something else.  Okay?  The

15   slope stability is the degree to which the

16   slope will be maintained given the conditions

17   that you find it in.  It's a 1:5 slope, right?

18   And you saw no indication that that slope had

19   deteriorated from any other reason other than

20   erosion.

21      A.   No.  You're incorrect.  Because what

22   causes -- okay, what causes lateral movement?

23   It's stresses.  The stresses from the slope

24   cause the lateral movement.  Those stresses

25   also are involved in the slope stability.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 174

 1       Q.    We're talking about something that's

 2   underneath the ground, are we not?

 3       A.    Yes.

 4       Q.    How far underground?

 5       A.    Here?  Um -- these may be down twenty,

 6   thirty feet.

 7       Q.    Twenty or thirty feet below.  Okay?

 8   So it's possible, is it not, that something

 9   twenty feet or thirty feet below wouldn't be

10   visible on the surface.  Right?

11       A.    If it's settling, it definitely would

12   by visible because the rest of it settles.

13       Q.    My point is --

14       A.    If it's --

15       Q.    -- it's not necessarily so --

16       A.    If it's significant enough to cause

17   movement of the soil at the Mississippi channel

18   some 200 feet plus away, it would be

19   significant to show up at the levee.

20       Q.    Well, did you all evaluate the

21   distance of the MRGO shoreline to these

22   locations where the levee was low, and did you

23   compare that to the location of the

24   interdistributary layer in order to be able to

25   make an intelligent determination about the

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 175

1    potential impacts?  Not just guessing?

2            MR. LEVINE:

3                Objection.  You all is IPET?

4            MR. BRUNO:

5                No.

6    EXAMINATION BY MR. BRUNO:

7        Q.    You.

8        A.    In this report.  Okay.  Those were

9    looked at, they weren't significant, so they

10   weren't looked at as a reason for the failure.

11       Q.    When you say you looked at and not

12   looked at, I get confused.  Okay?  You can't

13   look at it and not look at it at the same time.

14   All right?

15            Let's use forensic evaluation

16   methodology for this exercise.  Okay?  Look at,

17   in a forensic evaluation, requires more than

18   just I'm going to decide not to look at it,

19   don't you agree?

20       A.    It does, yes.

21       Q.    Okay.

22       A.    So you go back and look at what was

23   the design and what was the actual locations

24   where what has taken place, you also look at

25   the settlement across it, across the area --

JOHNS PENDLETON COURT REPORTERS              800  562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 176

```
 1      Q.    Right.

 2      A.    -- and you talk to also the folks that

 3   were involved in maintaining those levees

 4   during a period of time.

 5      Q.    Well, do you know, for example,

 6   whether or not the levee crest heights in any

 7   way conformed to this interdistributary trough?

 8   Did you look at that?

 9      A.    Because of the significance of all the

10   settlements along there, it's hard to

11   distinguish whether those troughs had an effect

12   or didn't have an effect.

13      Q.    You're not answering my question, Doc.

14   You're giving me the reasons why.  I want a yes

15   or no is the question.

16          Okay.  Did you or did you not do

17   something is going to be answered with a yes or

18   no question.  Now you can give me an

19   explanation as to why you did it.  I got no

20   problem with that.  What you're giving me now

21   is an explanation.  Because of.  Well, I got to

22   know what the answer is before I get the

23   because of.

24          MR. LEVINE:

25              Let him answer the question.
```

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                      Page 177

 1   EXAMINATION BY MR. BRUNO:

 2        Q.    Now I want an answer to the question.

 3            Did you or did you not evaluate the

 4   levee crest heights as they related to this

 5   interdistributary trough?  Yes or no?

 6        A.    We looked at the geology along there

 7   and the locations and we found no significant

 8   tie to the location of how far away they were

 9   from the trough.

10        Q.    They're not far away from the trough,

11   they're on top of the trough.

12        A.    I'm talking about their distance from

13   the, um -- okay.  Their distance from the,

14   um --

15        Q.    The water.

16        A.    -- the water.

17        Q.    Water 's edge.  That's different.  I

18   didn't ask about the difference from the

19   water 's edge.  I asked you about whether or

20   not this trough in any way relates to the levee

21   crest height.  Did you look at that?  Yes or

22   no?  I find nothing in your report --

23        A.    No.

24        Q.    You certainly didn't put anything in

25   your report about it.

JOHNS PENDLETON COURT REPORTERS              800  562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 178

 1      A.   No.  We looked at individual borings

 2   along --

 3      Q.   Different subject.  We'll talk about

 4   borings all day long.  I want to talk about the

 5   trough, the interdistributary trough.

 6      A.   Hold it.  The location of the trough

 7   is determined by the borings, isn't it?

 8      Q.   Yeah.

 9      A.   So those borings are the most

10   significant detail of the levees.

11      Q.   Did you map the trough?

12      A.   I didn't map the trough.

13      Q.   Did somebody map the trough?

14      A.   Yes.  It had been on done by the

15   Corps.

16      Q.   Who mapped the trough?

17      A.   Corps of Engineers.

18      Q.   Okay.  When?

19      A.   Some of it dates back to the fifties,

20   some of it more recent than that.

21      Q.   Okay.  So we got a map.  Right?

22      A.   Uh-huh.

23      Q.   We know where that trough is.  Right?

24   Do we need borings to determine where the

25   trough is today?  I mean, I've if I said, Doc,

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 179

 1   I want to know where the trough is, would you

 2   tell me, no, Joe, I got to go out and do a

 3   bunch of borings?  Would you tell me that?

 4        A.   I could tell you generally where it's

 5   located.

 6        Q.   Exactly.  Okay.  So now that we know

 7   we know where it is, and we know that the data

 8   has been around since 1958, the question on the

 9   table is, did you relate the levee crest

10   heights to that trough layer?

11        A.   Levee crest heights?  No, I didn't.

12        Q.   Did IPET?

13        A.   No.

14        Q.   They didn't.  All right.  So that

15   there's no way for you to either dispute or

16   even to agree with FitzGerald when he says the

17   interdistributary trough mimmicks the levee

18   crest heights; in other words, where it's low,

19   the levee crests are low?

20        A.   Could be.  I don't dispute that.

21        Q.   All right.  But my point is, not

22   having looked at it, you're not in a position

23   to dispute it.

24        A.   Yeah.  But keep in mind, though, the

25   other materials that are along there also have

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 180

 1    significant amounts of sediment and subsidence

 2    that takes place.

 3       Q.   Other materials.

 4       A.   Where the trough isn't located.  There

 5    are other materials, the clays and the, um --

 6    the marsh material and things like that.

 7       Q.   Where is it located?

 8       A.   What?

 9       Q.   Where is the trough located?

10       A.   Um -- I'd have to get out a map and

11    look.

12       Q.   Isn't it located along the length of

13    the Reach 2, between Bayou Bienvenue and Bayou

14    Dupre?

15       A.   There's part of it along there, yeah.

16    But it does vary somewhere along there.  And

17    the thickness of it varies.

18       Q.   Sure.  And where it's thick, that's

19    where the crest is lower, did you know that?

20       A.   Could be.

21       Q.   Could be.  All right.  And you

22    wouldn't necessarily have to have a levee

23    that's cockeyed in order for the levee to be

24    lower there.

25       A.   Well, but if it's affected by the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1    channel, which you asked that question, it

2    would be.  It would have an effect on it.

3         Q.  So your testimony will be to the judge

4    that if the channel plays a role, then the

5    levee has to sink toward the channel, it has to

6    be off center.  It has to be.  Absolutely

7    mandatory.

8         A.  It would -- it would have evidence

9    of -- that it would be leaning that way.

10        Q.  It has to.  It's mandatory, though.

11   There's no other way -- no other way it could

12   happen been other than it's going to have to --

13   the toe of the levee closer to the channel has

14   got go sink lower than the toe on the protected

15   side in order for MRGO to play a role.  That's

16   your absolute bottom line, got to be the way

17   testimony, right?

18        A.  No.  Because what I'm saying is if --

19   you have migration in the movement of the

20   material because of the MRGO, it will be more

21   pronounced, you'll have more movement close to

22   the channel, and that part of the levee would

23   settle more.

24        Q.  Can you point to a scientific journal,

25   an article, a textbook, anything that supports

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 182

1   that view?

2        A.   That would support that view?

3        Q.   Yeah.

4        A.   Of movements and settlement?

5        Q.   No, no, no.  Very specific.  You just

6   said to me that if the channel plays a role,

7   then you absolutely are going to see evidence

8   of the fact that you have a higher -- a

9   lower -- I'm sorry -- the toe on the levee is

10  going to be lower nearer to the channel than it

11  is on the protected side.  That's what you've

12  told me.  So there's got to be a book or a

13  scientific journal where it says that.  Right?

14       A.   Well, you're talking about a specific

15  situation.

16       Q.   I sure am.

17       A.   Right.  And a book will not tell you

18  the specific pieces.  It will tell you what

19  should be trending based on the conditions that

20  are there.

21       Q.   Uh-huh.

22       A.   And that's what I'm talking about is

23  the conditions that are there.

24       Q.   Well, let's see now.  You've got a

25  levee of how wide?

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 183

1        A.    Um -- a hundred and fifty feet or

2    something like that.

3        Q.    150.  And how tall is it?

4        A.    Seventeen and a half feet.

5        Q.    Seventeen and a half feet.  So would

6    you agree with me that most of the weight is at

7    the crest?

8        A.    Uh-huh.

9        Q.    Okay.  And would you agree with me

10   that where the weight is the heaviest is where

11   it's going to sink the fastest?

12       A.    But if you have material moving --

13       Q.    Answer my question and you can do the

14   but all day long.  Yes or no?

15       A.    If the ground surface is level, yes.

16       Q.    Okay.  All right.  Now, so it's

17   possible for the levee to sink straight down.

18       A.    Uh-huh.

19       Q.    If the material below is being

20   squeezed out into the channel.  It's possible.

21       A.    You will get lateral movement even if

22   the ground surface is -- there will be lateral

23   movement in both directions.

24       Q.    So the answer is yes or no?  Is it

25   possible for the levee to sink straight down,

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 184

1   given the fact that most of the bulk is in the

2   center of the levee, with the channel being

3   close to the levee?  Is it possible that it

4   sinks straight down?

5       A.   With movement going to the levee.  I

6   would say no.

7       Q.   Okay.  It's not. It's going to

8   absolutely sink --

9       A.   It's going to be tilted.

10      Q.   The levee crest is going to be tilted

11  toward the channel.

12      A.   The levee -- base of the section will

13  be tilted to the channel.

14      Q.   All right.  The base of the levee is

15  tilted toward the channel.

16      A.   You are not pointing to the base.

17      Q.   Where is the base?

18      A.   The horizontal.  That's the base of

19  the levee.

20      Q.   Well, I know, but this is lower than

21  that.  The toe -- this is the toe of the levee,

22  is it not?

23      A.   Toe towards the --

24      Q.   Water side.

25      A.   Yeah.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 185

    1       Q.    So the water side toe is lower than

    2   the land side toe.

    3       A.    Correct.

    4       Q.    So I'm pointing to the water side toe.

    5       A.    Uh-huh.

    6       Q.    And so the levee is going to be on a

    7   tilt.

    8       A.    Uh-huh.

    9       Q.    And it has to.  There's no other

   10   explanation.

   11       A.    If you have the movements that we're

   12   talking about, it should tilt to the outside.

   13       Q.    How much?

   14       A.    I don't know exactly.

   15       Q.    Did you measure it?

   16       A.    No.

   17       Q.    Well, how do you know, then, if you

   18   didn't measure it, whether you had tilt or no

   19   tilt?

   20       A.    I said it should be seen and I don't

   21   see tilting of the levee.

   22       Q.    Well, how much can you see?

   23       A.    Well, the levees moved from 17-1/2 to

   24   about 13 to 14.  It would seem like if that

   25   much settlement occurred overall that you would

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 186

1    so some tilt in those areas and you would see

2    some possible cracking occurring.

3        Q.    Well, the whole reach didn't sink five

4    feet, did it?

5        A.    The whole --

6        Q.    Whole reach, Reach 2, the whole thing

7    didn't sink.

8        A.    No, not the whole thing.

9        Q.    Certain portions of it sank.

10       A.    Some of it sank more but some of it

11   was also built up at different stages, too.

12       Q.    It was all built up at the same

13   height, wasn't it?

14       A.    I thought there was several different

15   enlargements of the whole Reach 2.

16       Q.    There was several lifts, but the lift

17   was for the whole reach.

18       A.    I thought that it -- the lower reach

19   was built up more recently, the one below

20   Bienvenue.

21       Q.    Between the IW -- Intracoastal

22   Waterway and Bienvenue, you said that was built

23   up?

24       A.    No.  Dupre.  The one lower, down to

25   the corner.  Because it's at a higher

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 187

 1   elevation.

 2        Q.   The levee between Dupre and Violet --

 3        A.   Violet.

 4        Q.   -- that list occurred later?

 5        A.   I thought it did.  Yes.

 6        Q.   Okay.  All right.  Well, I'm talking

 7   about between Dupre and Bienvenue, the space in

 8   between.  That lift occurred at the same time.

 9   And so -- and you have great variability in

10   levee heights in that -- along that span, don't

11   you?

12        A.   There is significant differences along

13   there.

14        Q.   All right.  And where the significant

15   differences are, you don't see a beg crack in

16   the levee, do you?

17        A.   No, I don't.

18        Q.   It's more of -- it's more of a smooth

19   line.  In other words, if you walked along the

20   crested of the levee from Bayou Dupre to Bayou

21   Bienvenue, you would not encounter a crack.

22        A.   Um -- I don't know that for sure, but.

23        Q.   Well, somebody should have picked that

24   up, don't you think?

25        A.   Yes.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 188

```
 1      Q.   I mean, come on.  But in fact, as you
 2   walked along that levee from Bayou Dupre to
 3   Bayou Bienvenue you would be moving you and
 4   down and you probably wouldn't even notice it,
 5   would you?
 6      A.   Right.  But the ground elevation --
 7      Q.   It's hard to see.
 8      A.   But the natural ground elevation
 9   varies along there, too.
10      Q.   Sure, it does.  But my point is, you
11   could be going up and down as much as five or
12   six feet and not even know if you were moving
13   up five or six feet.
14      A.   But okay.
15      Q.   Isn't that true?
16      A.   Possibly, yes.
17      Q.   I mean, I can tell you that --
18      A.   Yeah.
19      Q.   -- my mother's home is on a street
20   called Topaz, and it is no more than five
21   blocks away from General Haig, and the
22   difference between those two points for the
23   flooding was twelve feet.
24      A.   Uh-huh.
25      Q.   And when you drive from Robert E. Lee
```

REED   MOSHER, Ph.D. (VOL I)                          February 19, 2009

                                                              Page 189

 1    Boulevard to Topaz Street, you don't feel

 2    yourself going up ten feet.  Right?

 3         A.   Uh-huh.

 4         Q.   That's normal.  Because it's hard for

 5    us humans to see that much change in elevation

 6    even though it's there.

 7         A.   Uh-huh.

 8         Q.   And so my point is, as you're walking

 9    along the crest of the levee you are not

10    walking along a straight line at the same

11    height above whatever the datum is, you could

12    be going up and down and up and down and up and

13    down and you wouldn't even know it.

14         A.   If there are long enough distances

15    between them, yeah, you would not notice.

16         Q.   Okay.

17         A.   But also, the soil -- the top of the

18    soil, natural ground surface varies also along

19    there.  And had varying thicknesses of the

20    marsh.  So you'll get different settlements

21    because of the different thicknesses of the

22    marsh, also.

23         Q.   Did you evaluate that?

24         A.   I didn't have the information

25    available to do that, the surveys of the actual

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1   ground elevation.  But you do see differences

 2   in the thickness in the borings of some of the

 3   marsh material along there.

 4       Q.   Well, is that something the levee

 5   builder should have done?  My goodness, if they

 6   knew about all that differential settling,

 7   shouldn't they have put that into their design?

 8       A.   I believe they accounted for some of

 9   that in their design by continually building up

10   the different elevations of the levee.  I mean,

11   it's something that they -- you mentioned about

12   this lateral movement.  And, you know, there

13   was some studies done in the Atchafalaya Basin

14   where they had built levees along that period,

15   and they knew over the time period that they

16   had to keep building those up because there was

17   so much settlement.

18       Q.   Right.

19       A.   And those places had lateral movement

20   like you're talking about, and that lateral

21   mere movement actually caused cracks in the

22   levee surface.  And we don't see any of those

23   cracks due to that on the MRGO, so that also

24   leads to evidence of very unlikely that you had

25   that lateral movement to the channel.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 191

    1        Q.    Well, you also didn't see any cracks

    2   in the width, despite the fact that you've got

    3   difference in heights of five feet.  You've got

    4   levees right next to each other.  This one is

    5   seventeen feet, this one is thirteen feet.

    6        A.    What is the -- they weren't straight

    7   vertical dropoffs were three?

    8        Q.    Of course not.

    9        A.    They were over a long distance.

   10        Q.    Exactly my point.

   11        A.    Okay.  These are less of a distance,

   12   and the slopes are at the same height.  But

   13   when you get that much movement moving away

   14   from the center line, you get cracks forming

   15   along the center line of the levee, towards --

   16   that run parallel to it.

   17        Q.    Fact of the matter is, Doctor, you --

   18   neither you nor IPET did a thorough evaluation

   19   of the potential impact of the MRGO regarding

   20   its potential contribution to settlement, did

   21   you?

   22             MR. LEVINE:

   23                  Objection.  Vague.

   24   EXAMINATION BY MR. BRUNO:

   25        Q.    There wasn't any thorough

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 192

1    reevaluation.

2         A.   A thorough evaluation.

3         Q.   No.

4         A.   We did an assessment of it and felt

5    that it wasn't --

6         Q.   And discounted it.

7         A.   -- wasn't an important factor based on

8    the fact that the levees at the of the

9    hurricane at a certain elevation.

10        Q.   Well, did you put that in your report?

11        A.   Nope.

12        Q.   Why no?

13        A.   Because they were looking at what was

14   the conditions of what happened with the

15   levees.

16        Q.   Well, that's one of the things that we

17   allege happened.  You did read our reports

18   didn't you?

19        A.   Uh-huh.

20        Q.   You read Bea 's report; right?

21        A.   Yes.

22        Q.   You read FitzGerald's report.

23        A.   Uh-huh.  I looked at his report.

24        Q.   Well, you read Bea 's.  You know Bea

25   makes that allegation; right?  And you felt

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 193

1   like it wasn't -- didn't even deserve a

2   sentence.

3      A.   He doesn't do any analysis of it.

4      Q.   Neither do you.  You didn't even talk

5   about it.

6      A.   Right.  Because I didn't think it was

7   important.

8      Q.   Well --

9      A.   I didn't feel it was.

10      Q.   You didn't even put the sentence I

11   don't think this is important.

12           MR. LEVINE:

13               Let him finish.  Let him finish.

14      A.   No, I looked at what was the important

15   cause, what was -- what was the cause as

16   opposed to things that weren't.  And then

17   things that we actually had some evidence of,

18   as opposed to -- there was no physical evidence

19   showing that that was the case.

20   EXAMINATION BY MR. BRUNO:

21      Q.   Well, one would think that the

22   reasonable thing to do would be to indicate in

23   your report that I evaluated it, I didn't see

24   any evidence, therefore I made the conclusion

25   that I'm making.  But you don't choose to do

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 194

1    that at all, which makes a third-party person

2    like the Judge possibly believe that you didn't

3    evaluate it in the first place.

4         A.    Well --

5         Q.    Isn't that true?

6         A.    No, that's not true.

7         Q.    Okay.  All right.  Well, we can agree

8    that there is not a single sentence in this

9    report nor is there a single sentence in the

10   IPET report which discusses the potential of

11   the MRGO to have any causal relationship to

12   settlement.  Isn't that true?

13        A.    To the settlement and subsidence of

14   the levees.

15        Q.    Yes.

16        A.    I don't know.  I haven't mentioned

17   that.

18        Q.    Well, you say I don't know.

19        A.    No, I said I haven't --

20        Q.    It came up as I don't know.  I'm

21   sorry.  What is your actual answer to the

22   question?

23        A.    I said I haven't put anything in the

24   report --

25        Q.    That's fair enough.  I'm just trying

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                      Page 195

 1   to get it on the piece of paper here.

 2          You do say that there's rapid

 3   subsidence in your report.

 4          MR. LEVINE:

 5              Where did you see that?

 6   EXAMINATION BY MR. BRUNO:

 7      Q.   Next paragraph.  The elevations of the

 8   pre-Katrina hurricane protection levees and

 9   flood walls are significantly below the

10   originally designed heights in part from errors

11   in initial construction elevations, in part

12   from rapid subsidence.  So there's this rapid

13   subsidence, right?

14      A.   Yeah.  I think it --

15      Q.   What is that?  What is rapid

16   subsidence as compared to regular old

17   subsidence.

18      A.   Choice of adjectives used there.  But

19   basically that the subsidence happened very

20   fast, probably faster than anticipated by the

21   designers, and based their calculations it

22   happened faster than they anticipated.

23      Q.   Okay.  Those gentlemen were well

24   educated engineers, were they not?

25          MR. LEVINE:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 196

 1              Objection.

 2    EXAMINATION BY MR. BRUNO:

 3       Q.    They worked for the Corps.  I hope

 4    they were.

 5       A.    I don't know exactly.

 6       Q.    You don't know.

 7       A.    Yeah.  How can I offer an opinion?

 8       Q.    How about this?  Did the Corps of

 9    Engineers have -- was the state of the art

10    advanced enough in 1962 for the geologists who

11    were working for the Corps back then to

12    evaluate the soils in order to make an

13    assessment of the likely rate of subsidence in

14    that area?  Did that -- was science --

15       A.    I believe the state of the art at that

16    time wasn't available to determine the

17    subsidence.  Not until more recently have we

18    actually been able to gather significant

19    information about the rates of subsidence.

20       Q.    So obviously you've not done a

21    detailed analysis of the documents that were

22    extant back in that time frame to learn whether

23    or not the engineers did those evaluations or

24    didn't do those evaluations.

25              MR. LEVINE:

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 197

1                 Objection.  Vague.

2      EXAMINATION BY MR. BRUNO:

3          Q.   You didn't do that.

4          A.   I read through the documents.  Okay.

5      They do talk about subsidence.  But whether the

6      accuracy of that subsidence has been something

7      that's been more -- that's been worked on more

8      recently that it gives a better picture.  And

9      what I understand from when we did the IPET

10     study, that the subsidence is actually greater

11     than what they thought at that period of time.

12         Q.   What did they think the subsidence

13     would be?

14         A.   I'd have to go look and see.  I can't

15     remember all of that data.

16         Q.   Okay.  No problem.  All right.  You

17     say Figure 4 -- all right.  You say pre and --

18     Figure 4 shows the pre- and post-elevations of

19     the levee along the MRGO.  The figure is taken

20     from the IPET, so we know where it comes from.

21         A.   Uh-huh.

22         Q.   It shows pre- and post-Katrina

23     conditions that would be similar to the base

24     conditions used in this litigation.

25              When you say base conditions, you're

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 198

 1   referring to the conditions that were plugged

 2   into the modeling that was done by Westerink

 3   and Resio, right?  Is that what you mean by

 4   base condition?

 5       A.   Right.  I'm looking at the pre-Katrina

 6   elevations.

 7       Q.   Yeah.  I know.  I'm trying to figure

 8   out what base conditions refers to.

 9       A.   Yeah.

10       Q.   Right?

11       A.   Uh-huh.

12       Q.   All right.  So this was plugged into

13   or should have being plugged into those models.

14       A.    In other words, it would be similar to

15   what they put into their --

16       Q.   Similar.  Well, how much can you fudge

17   it and not have unaccurate data?  How

18   dissimilar can it be without ruining the

19   outcome?

20       A.    I would say in general terms that, you

21   know, these are close to the elevations that

22   they have, probably within -- they may vary a

23   little bit if they've made some corrections on

24   other data, but in general terms they're

25   probably were within six inches or so of the

REED   MOSHER, Ph.D. (VOL I)                         February 19, 2009

Page 199

1    data that they have.

2         Q.   Well, as I said, Ebersole testified

3    that he reduced the levee crest height by one

4    half a foot in the locations where there was no

5    levee between the 2000 LIDAR and the 2005

6    LIDAR, and in the case where there was a levee

7    he split the difference.  That's what he did.

8         A.   Okay.

9         Q.   So he -- where there was no levee he

10   reduced the levee heights by a half a foot, six

11   inches.

12           MR. LEVINE:

13              No levee when?

14           MR. BRUNO:

15              After the hurricane.

16           MR. LEVINE:

17              I get that.  I don't know if he

18           gets that.

19   EXAMINATION BY MR. BRUNO:

20        Q.   Do you understand?

21        A.   Go again.

22        Q.   All right.  What Ebersole testified is

23   that where the levee was still in intact he

24   compared the 2000 LIDAR to the 2005 LIDAR.

25   Even though it was intact, even though it was

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                          Page 200

 1    there, he split the difference between those

 2    two numbers.  Okay?

 3        A.    Okay.

 4        Q.    It doesn't make a lot of sense because

 5    it's still there, so you should use, it seems

 6    to me, the height of the levee that your LIDAR

 7    tells you it is in 2005.

 8             Would that make sense?

 9        A.    I don't know what the other

10    information that he had or why he did it.

11        Q.    Well, he says what he did was he took

12    the 2000 LIDAR and the 2005 LIDAR.  Where the

13    levee was still intact, instead of using the

14    levee height that he got in 2005, when it's

15    still there, he says I split the difference

16    between the two numbers.  Does that make sense?

17        A.    Um -- I'd have to know why he did it.

18    I would stick with the elevations that I have

19    here.

20        Q.    Okay.  And in those locations where

21    there was no levee -- Okay?  So he didn't have

22    a levee to compare to -- he took the 2005 data

23    and reduced it by half a foot.

24        A.    That's six inches.

25        Q.    Right.  Six inches.  And you would

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 201

 1   agree with me that six inches is a large enough

 2   distance to have a significant impact if one

 3   were doing erosion evaluations.

 4       A.   I don't agree to that, necessary,

 5   especially if you compare -- it depends on how

 6   much overtopping you have.  If you have two

 7   feet of overtopping or three feet of

 8   overtopping, six inches isn't very much.

 9       Q.   Well, again --

10       A.   If you have a foot of overtopping,

11   then six inches is -- could have a significant

12   amount.

13       Q.   Well, but, remember, you told me that

14   duration is very important.

15       A.   Uh-huh.

16       Q.   So if you have a limited duration then

17   the height of the water overtopping the levee

18   will have a larger role, won't it?  The shorter

19   the duration.

20       A.   The shorter the duration -- it affects

21   the duration and it affects the amount of water

22   going over the top of it.

23       Q.   All right.  Now, you say to a

24   reasonable degree of scientific certainty.

25   That means you are -- you're saying that

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1    there's science to back up your position,

 2    right?

 3        A.    Uh-huh.

 4        Q.    Okay.  It says, breaching and erosion

 5    which occurred along the levees adjacent to

 6    Reach 2 were primarily caused by overtopping.

 7            Now you're okay making that statement

 8    about leaves that don't exist, right?  Anymore.

 9        A.    Uh-huh.  That have been eroded.

10        Q.    They're gone.  Not that they're

11    eroded, they're just not there anymore.

12        A.    Uh-huh.  Yes.

13        Q.    And in your own report you indicate

14    that it's very difficult to evaluate levees

15    that are not there because there's just not a

16    whole lot of evidence that allows you to point

17    in one direction or the other.  Right?

18        A.    It's fully scoured, but you look at

19    the other locations and you can draw from that.

20        Q.    I understand that.  With regard to

21    that levee that's gone, you can draw no

22    conclusions --

23        A.    That's not necessarily true.  I mean,

24    you can look at the scour, the debris and

25    things like that to try to ascertain --

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 203

1          (Brief interruption.)

2     EXAMINATION BY MR. BRUNO:

3          Q.   Okay.  We were on Conclusion 1, and

4     you said, about this scientific certainty, and

5     we've established that with regard to the

6     levees that weren't there, what you had

7     available was not the levee but some residue of

8     the levee.

9          A.   Uh-huh.  Yes.

10         Q.   And we had water that was going

11    through the hole to come in and we had water

12    that was coming out of the hole when it

13    drained.

14         A.   Yes.

15         Q.   So it could have moved, displaced some

16    materials in either direction.

17         A.   You have some of that, yes.  In

18    locations.

19         Q.   And so -- and your testimony is that

20    you were able to derive some scientific

21    conclusions from looking at that space where

22    the levee was.  Right?

23         A.   In some locations, you could -- yes,

24    you could do that.

25         Q.   In some locations you could --

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 204

     1      A.   Yes.

     2      Q.   -- but in some other locations you

     3   could draw no scientific conclusions, right?

     4      A.   Right.  All the evidence is --

     5      Q.   Is gone.

     6      A.   -- is pretty much gone, yep.

     7      Q.   So in the places where there's no

     8   levee and there's some evidence, what evidence

     9   is there?

    10      A.   Where there --

    11      Q.   There's no levee and there's some

    12   evidence.

    13      A.   Uh-huh.

    14      Q.   What does that evidence look like?

    15      A.   There are several possibilities of

    16   what it would look like.  It depends somewhat

    17   on what the top of the levee, what's left

    18   there, the size of the holes and the debris

    19   that comes out on either side of it.

    20      Q.   Okay.  So it's the debris pattern?

    21      A.   Uh-huh.

    22      Q.   Okay.

    23         MR. LEVINE:

    24            Please say yes.

    25   EXAMINATION BY MR. BRUNO:

REED  MOSHER, Ph.D. (VOL I)                        February 19, 2009

 1      Q.    So there must be some scientific

 2   journal or textbooks that we can all reference

 3   which will tell us how to read a hole.  Right?

 4      A.    There is information about which

 5   materials will drop out first and where they'll

 6   end up, and there is -- in various papers

 7   talking about, the um -- the types of scour

 8   that you get.

 9      Q.    Right.  Well, there's no levee there

10   anymore, so what you've got left is just a

11   debris field, right?  Okay.  So what I'm

12   wanting to understand is how does the debris

13   field tell me that that levee didn't originally

14   start to fail from front side wave attack?

15      A.    The other part that you do is you also

16   draw, by looking at the other locations where

17   you have -- locations where you have partial

18   erosion from backside and you have full erosion

19   all in one picture, you can draw the

20   similarities from that location to another.

21      Q.    All right.  Well, let's -- right now;

22   we're talking about no levee.  There's no levee

23   there at all but there's some evidence.  So are

24   you telling me that we go to another location

25   where the levee is there --

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 206

 1        A.    That parts of the levee are still

 2   there --

 3        Q.    Some parts.

 4        A.    -- and parts of it are totally washed

 5   away.

 6        Q.    What parts are there and what parts

 7   are not there?

 8        A.    You can see where you've had total

 9   erosion through the levee, and even within the

10   same location or close to the same location, in

11   the same picture, where it's partially eroded.

12   You can see how they progress at different

13   stages looks like and then how it ends up.

14        Q.    Well, once the top of the levee is

15   gone, isn't the erosion process going to look

16   pretty much the from that point down to where

17   there's no levee?

18        A.    There are going to be, um -- they

19   should be somewhat similar if you just take the

20   crest off --

21        Q.    Sure.  I mean --

22        A.    -- once the crest is gone.

23        Q.    Wave side front attack is simply the

24   wave beats up on the front of the levee, it

25   removes the protective grass layer, it removes

JOHNS PENDLETON COURT REPORTERS               800  562-1285

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 207

 1    the -- perhaps the clay layer and gets in the

 2    sand.  Once it gets into the sand, it's all

 3    over, right?

 4        A.   Um -- first of all, not all the levees

 5    are all sand.  Okay?

 6        Q.   Well, whatever --

 7        A.   The material --

 8        Q.   Whatever that bad material is that you

 9    criticize in your report, whatever one we call

10    that -- characterize that for me.  Um -- you

11    called it hydraulic fill I think is what you

12    called it.

13        A.   Hydraulic fill.

14        Q.   Once it reaches -- once the water is

15    in contact with the hydraulic fill, I think

16    that's what you told me, that levee is going to

17    start deteriorating pretty rapidly --

18        A.   That's correct.

19        Q.   -- right?

20        A.   Uh-huh.

21        Q.   Okay.  So what we're talking about

22    is --

23        A.   But if you --

24        Q.   -- what initiates.  Okay, what is the

25    thing that initiates the deterioration, front

JOHNS PENDLETON COURT REPORTERS            800  562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 208

1    side versus backside?  Right?

2         A.    Uh-huh.

3         Q.    Now, I just want to understand that

4    once erosion has been initiated so that the

5    water is now in contact with this hydraulic

6    material and the cap is now gone, the top of

7    the levee is gone, from that point to the point

8    where the levee disappears it's going to erode

9    the same way whether it's front side, backside

10   or sideways erosion.

11        A.    The pattern should be somewhat

12   different.  You should see some differences.

13   The other part, though, is if you had frontal

14   erosion of it it seems like you would see

15   locations along the levee where, um -- you

16   would have frontal erosions down on something

17   other than the crest, where you had long

18   periods of water and waves hitting it, and

19   other than just two locations.  I don't see any

20   other locations where you saw that pattern.

21        Q.    So you've got two, and that's not

22   enough.

23        A.    No.  Because they're -- no.

24        Q.    Okay.  Well, I mean --

25             MR. LEVINE:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1           Let him finish.

 2     A.   Comparatively to all the other

 3  physical evidence of the backside erosion,

 4  um -- it is very small.

 5  EXAMINATION BY MR. BRUNO:

 6     Q.   I'm with you.  I'm going to let you

 7  make your case all die long.  Let me just see

 8  if I can get us to agree on this point.  Once

 9  the top of the levee is gone, the same

10  mechanism that's overflowing now, it's

11  overflowing -- whether --

12     A.   Uh-huh.

13     Q.   -- it starts from the front or it

14  starts from the back, once the top is gone what

15  you've got left is overflowing erosion.  Right?

16     A.   Yes.

17     Q.   Yes.  And so therefore, regardless of

18  what starts the attack, once the top is gone,

19  when we have overflowing erosion it's going to

20  erode the same way, whether it erodes --

21  whether the initiating attack was from front or

22  from the back, from that point down to the

23  point where there's no levee at all, it's going

24  to look the same.

25           MR. LEVINE:

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 210

```
 1              Objection.  Vague.  What do you
 2        mean by overflow?
 3        MR. BRUNO:
 4              You got to be kidding me.
 5   EXAMINATION BY MR. BRUNO:
 6        Q.   Do you know what I mean by overflow?
 7   Dr. Ebersole, Dr. Resio all say that once it
 8   starts cutting over the top it's the same.
 9   There's no dispute here.
10         MR. LEVINE:
11              Are you talking about surge, are
12         you talking about waves, what are you
13         talking about?
14   EXAMINATION BY MR. BRUNO:
15        Q.   Do you know what I'm talking about?
16        A.   I'm going to try to clarify that.
17   Okay?
18        Q.   All right.
19        A.   Are you talking about -- once water is
20   flowing over the top of the levee or once it's
21   flowing, once the crest is gone and water is --
22        Q.   Once the crest is gone -- I mean, by
23   our logic the height of the levee is intended
24   to keep water out.  If you take the top of the
25   levee off, then you have an opportunity for
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 211

1  water to go over the levee.  Right?  To the

2  extent that the top is no longer there.  It

3  happens earlier, right?

4          So -- all I'm saying is once you have

5  a removal of the top, then from that point

6  forward the levee is going to be reduced by a

7  continuous overflow to the point where there's

8  no more levee.

9      A.   If it goes to the point where there's

10  no more levee, then you can't tell.  Okay?  In

11  between, though, you may find that on the

12  backside of the levees that you have a much

13  deeper gully farther down into the levee, and

14  then because of inundation you'll have water up

15  in that, and that won't be, you won't see as

16  much erosion at that point.

17      Q.   I'm with you.  I'm trying to just get

18  finished with the no levee scenario.  Because

19  what I'm hearing you tell me is that the

20  conclusions that you've drawn have not been

21  drawn from the no levee scenario, they've been

22  drawn from the number of locations where there

23  is a levee and there has been wave side attack

24  from the front, and you've compared that to

25  other locations where there is a levee and

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 212

1    there has been overtopping erosion from the

2    back.  That's what you've truly done.

3         A.   That's a piece of it.  But there are

4    locations where the levee is totally gone and

5    the debris field is primarily on the protective

6    side.

7         Q.   Yeah.  But I'm confused by that,

8    because regardless of what initiates it at the

9    end of the day it's all -- the destruction of

10   the levee after the cap is gone has got to be

11   from overtopping erosion.  Isn't that true?

12   Overtopping flow.

13        A.   I agree, yes.

14        Q.   So it would the debris field is going

15   to be the same.  It has to be.

16        A.   Okay.

17        Q.   Does that make sense?

18        A.   There, um --

19        Q.   Just that one small point.

20        A.   Well, I think that you might find a

21   distinction where if you had frontal erosion

22   you might have some debris field out on the

23   front side.

24        Q.   There's no more front, it's gone.

25        A.   No, but the process of eroding it,

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 213

 1   with those waves hitting and coming up, there

 2   would be a debris field in the front.

 3        Q.   Yeah.  But the front -- you mean in

 4   front of the levee under the water?

 5        A.   No, it would carry that material back

 6   down.

 7        Q.   But there's no more levee.

 8        A.   But it still blows off.

 9        Q.   Here's our levee.  Okay?  We have our

10   nice levee, and we have -- this is the water

11   said and this is protected side with nice trees

12   and grass and stuff.  The waves attack and the

13   waves cause the top of the levee to go.  Once

14   the top of the levee is gone, now you've got

15   overflow which is destroying the remainder of

16   levee.  There is no doubt about the fact that

17   once the levee starts flowing over the top --

18   I'm sorry -- once the water starts flowing over

19   the top, all of the damage done to the levee

20   after the cap is gone is from overflow erosion.

21   It has to be.

22        A.   Okay.

23        Q.   All right?  You agree with me?

24        A.   I agree with you on that part.

25        Q.   All right.  Now, you're telling me

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 214

```
 1    that if this levee which is no longer there is

 2    attacked by the waves there is going to be a

 3    debris field somehow under the water --

 4         A.   In this process of the water rising up

 5    and you having an attack on the levees, and the

 6    material can't go over the top of the levee --

 7    right?

 8         Q.   No.

 9         A.   Where is it going to go?  It has to go

10    back down into the water side of it.

11         Q.   Sure.  But then there's no levee.  The

12    water carries it through and to the flood side.

13    That's where I'm getting confused.

14         A.   No.  Won't it end up down at the

15    bottom of it and in the debris field?

16         Q.   Why would it go all the way down?

17    You've got, you told me what, fifteen feet of

18    water.  You got a lot of water there.

19         A.   I believe there's velocities carrying

20    this all the way down as it runs up and rushes

21    down.

22         Q.   It depends on where the surge is and

23    depends on where the waves are.

24         A.   Uh-huh.  Yes.

25         Q.   Well, if the waves are two feet and
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                          Page 215

 1   the surge is, I don't know, ten, fifteen feet,

 2   it doesn't have a whole lot of place to go, and

 3   if it ends up on the surface of this levee and

 4   the levee is no longer there, then the

 5   inrushing water is going to wash away anything

 6   that was in the front.

 7        A.   Under that scenario I would say yes,

 8   it would wash it away.

 9        Q.   I guess what you're trying to say is

10   if the wave attack occurs very, very early so

11   that there is an opportunity to put debris

12   under the water, so that it's not moved out,

13   but then still again the flows would have to be

14   sufficient not to affect that at all, which

15   means you'd have to have really virtually no

16   flow at the lower level for that debris to stay

17   there.

18        A.   If it is granular material it's apt to

19   stay there.

20        Q.   Okay.

21        A.   Just like we see right at the end of

22   the water flowing out, we see granular material

23   there.

24        Q.   Or the other side.

25        A.   On the other side.  It didn't go all

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 216

 1   way into St. Bernard Parish.

 2        Q.    It went a good distance.

 3        A.    But still, a lot of it is right

 4   directly there.

 5        Q.    Yeah.  And again, that's because we

 6   know that you've got a good ten feet of levee

 7   that's being washed away from, we all agree,

 8   overflowing water.  So you would expect a big

 9   debris field regardless of the cause of

10   initiation.  Because the wave attack is going

11   to happen, you know, three feet below the

12   crest.  I mean, that's where the evidence is,

13   isn't it?

14        A.    What is the question?

15        Q.    There is evidence of wave attack on

16   those levees up and down the entire reach.

17   There's a band of grass that's gone.

18        A.    That's correct.  There's a band of

19   grass that shows there is some wave attack.

20        Q.    So there's definitely wave attack, the

21   only question is whether or not the wave attack

22   was sufficient to cause the levee crest to be

23   knocked off or not.  Right?  That's the real

24   issue.

25        A.    Okay.  In terms of -- yes, that is the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 217

 1   issue.

 2       Q.    Right.

 3       A.    And the physical evidence, um -- of

 4   actual physical evidence shows very little on

 5   the frontal attack part of it.

 6       Q.    The physical evidence is not there

 7   where there's no levee, though.  And you can

 8   draw no conclusions.  I mean, I'm just trying

 9   to get -- see where you are in terms of where

10   you reach your conclusions.  And they are what

11   they are.  In fact, the conclusions that you

12   reach are based upon your evaluation of

13   locations where the levee did not completely

14   fail, isn't that true?

15             MR. LEVINE:

16                  Objection.  Misstates the

17             testimony.

18       A.    I'm not sure.

19   EXAMINATION BY MR. BRUNO:

20       Q.    I'll say it one more time.  The

21   conclusions that you reach are based upon your

22   evaluation of locations where the levee did no

23   completely fail, isn't that true?

24       A.    Let's start with that.

25             MR. LEVINE:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 218

1              Same objection.

2      A.    Okay.  Um -- my conclusions are based

3  on all the information.  But that is one of the

4  primary physical evidence that it's there has a

5  high weighting factor.

6  EXAMINATION BY MR. BRUNO:

7      Q.    Sure.  And the truth of it is that you

8  see a larger number of locations where the

9  levee is still there where there is

10  overtopping -- in your view, evidence of

11  overtopping erosion versus the few or two

12  locations where you see front side erosion.

13  Right?

14     A.    That's correct.

15     Q.    All right.  So logically you conclude,

16  because there are so many more locations where

17  there's overtopping erosion, then the

18  primary -- then it's logical for you to assume

19  that everywhere along the reach where there's

20  no levee it had to always and only be

21  overtopping erosion.  Right?

22     A.    I would say it's -- it would be the

23  primary cause.  Not only, but the primary

24  cause.

25     Q.    So wave attack is possibly a cause of

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 219

1   some of those levee failures.

2        A.   There is a -- there is a possibility

3   that it's not the primary cause of the

4   overtopping.

5        Q.   All right.  Now, you're not making --

6   when you say the available data does not

7   support a conclusion as to weather front side

8   erosion of the waves was a cause, that's not

9   accurate because front side attack could be a

10  cause.  You're simply saying that it's not the,

11  um -- I think the words you used were primary.

12       A.   Uh-huh.

13       Q.   Right?  You didn't mean to say --

14  you're saying, really, here, the available data

15  does not support a conclusion as to whether

16  front side erosion from waves was a primary

17  cause of the breaching of Reach 2.  Because you

18  have not, based upon what you've just told me,

19  eliminated front side attack as a cause at all,

20  completely.

21       A.   Okay.  Um -- and what I mean by the

22  available data, from what I've seen and what

23  I've looked at and assessed, that I don't see a

24  case for front side erosion being a cause of

25  the breaching.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 220

1      Q.   Any cause.  You're telling me --
2  you're saying it's a scientific certainty.
3  You're going to look at that judge and say,
4  Your Honor, there's no way that wave attack
5  occurred during Katrina.  It just didn't
6  happen.  It never happened and there's a
7  scientific basis for it.  That's what you're
8  doing to tell him.
9           MR. LEVINE:
10              Objection.  You're saying
11          scientific basis.  He says to a
12          reasonable degree of scientific
13          certainty.
14          MR. BRUNO:
15              Okay.  So?
16          MR. LEVINE:
17              That's the standard.
18          MR. BRUNO:
19              No, it's not.  You all gave him
20          the wrong standard, but that's okay.
21  EXAMINATION BY MR. BRUNO:
22      Q.   What I'm trying to get you to either
23  agree with me or disagree with me.  Okay?  And
24  it's very important.  You just told me a few
25  moments ago that you cannot totally discount

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 221

1  front side wave attack, you can't do it.

2      A.   I cannot totally do that because there

3  is a couple of places where it occurred.

4      Q.   Right.  Now, that's fine. So but you

5  cannot say that front side wave attack was not

6  a, not -- you're saying not a cause, meaning it

7  didn't happen anywhere along Reach 2.  That's

8  what that sentence says, it's not a cause.

9  Right?  Isn't that what you're telling me?

10     A.   I'm saying front side -- that's what

11  I'm saying, is that it was not the cause of the

12  erosion -- or the primary cause of the erosion.

13     Q.   You didn't say the.  You said a.  So

14  you have eliminated front side wave attack as a

15  potential cause of levee failure, and you're

16  saying to this judge that there's scientific

17  certainty in that sentence.  Right?  And that's

18  really not true because you've just told me

19  that it's possible that front side wave attack

20  could have occurred.

21          MR. LEVINE:

22              Objection.  Mischaracterizes

23          testimony.

24  EXAMINATION BY MR. BRUNO:

25     Q.   Did I mischaracterize your testimony?

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 222

 1    Didn't you just tell me that front side wave

 2    attack could occur along Reach 2 on the day of

 3    Hurricane Katrina?

 4         A.   There was two location where there was

 5    some front side erosion.

 6         Q.   And it's also possible --

 7         A.   But it didn't cause a breach.

 8         Q.   How do you know that?

 9         A.   Because I looked at -- those two

10    occasions didn't cause a breach.

11         Q.   Well, I know that.

12         A.   It didn't lead to a breach.

13         Q.   But you have places where there's no

14    levee.  How do you know that front side attack

15    wasn't the initiating cause where there was no

16    levee?

17         A.   Because I don't see any available

18    data, available information from physical data

19    showing that front side erosion led to

20    breaching -- full breaching of the levees.

21         Q.   But you also have no data to establish

22    that it's backside attack that caused those

23    levees to breach either.

24         A.   I have significant amount of data

25    showing that --

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 223

1        Q.    No, you don't.  You got no levee.

2              MR. LEVINE:

3                  Let him finish.

4        A.    There's a significant amount of data

5    available showing that backside erosion did

6    lead to full breaching.

7    EXAMINATION BY MR. BRUNO:

8        Q.    You just told me a few moments ago

9    that where there's no levee all you've got is a

10   bunch of debris on the ground, and a lot of it

11   is on the protected side.  You told me that,

12   didn't you?

13       A.    Uh-huh.

14       Q.    You also told me that regardless of

15   the cause of the initiation of the erosion,

16   once water starts flowing over the top it's

17   going to be the same method of deterioration,

18   it's going to be overflowing erosion that's

19   going to cause that levee to be knocked down

20   once the cap is gone.  Right?

21       A.    Is the question whether I said that or

22   not?

23       Q.    Yes.

24       A.    Primarily, if you've knocked it all

25   down and you have water flowing through it,

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 224

 1    yep.

 2        Q.    It's going to look the same whether

 3    the wave attack initiated it or not.   Right?

 4    You said yes to that to me not more than ten

 5    minutes ago.  You said yes.  And now you're

 6    saying no.  So I'm confused.

 7        A.    I don't know that I'm saying no.

 8        Q.    Well, if -- where you have no levee,

 9    the picture that you look at is going to be the

10    same picture.  Whether wave attack started or

11    whether overtopping erosion started, the

12    picture of the levee is going to be the same,

13    isn't that true?

14            MR. LEVINE:

15                Objection.  Vague as to location.

16        A.    I think you have to look at it

17    specifically where is the locations and what

18    you have.  Um -- if the lever is totally eroded

19    away, then it's hard to determine whether front

20    side erosion had a play in it.  But when you

21    look at the data that's actually available

22    along the levee, then, um -- overtopping is the

23    primary cause of the erosion.

24        Q.    And that data consists of your photos.

25        A.    Photos.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 225

```
 1      Q.    And that's it.

 2      A.    And the erosion information and the

 3  overtopping.

 4      Q.    Well, again, the erosion information

 5  is the same.  Once you have overflow, the levee

 6  is going to deteriorate in the same way.

 7      A.    No, it isn't.

 8      Q.    Once the top is gone it's going to be

 9  somehow different?

10      A.    You said once water is over the top.

11      Q.    No, once the crest is gone.  Okay?

12  The remainder of the levee is going to

13  deteriorate in the same way regardless of what

14  caused that cap to be knocked off.

15      A.    No.  It's going to depend on what the

16  materials are there.

17      Q.    Talking about in a levee that is

18  eroded, it's gone.

19           MR. LEVINE:

20              You just --

21  EXAMINATION BY MR. BRUNO:

22      Q.    I'm not talking about levees that

23  didn't erode.

24      A.    Your questions are kind of confusing

25  because they're talking about many different
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1   things.

 2       Q.   No we're not.  We're talking about

 3   levees that aren't there.

 4       A.   But you're applying absolutes to this,

 5   and I'm saying that --

 6       Q.   Let me remained you about the

 7   absolutes that you gave us.  You told me, I

 8   thought, and I read it, that the levees that

 9   are gone, you said, your conclusion, that was

10   because of the hydraulic fill.  That was a

11   component.  Right?

12       A.   Uh-huh.

13       Q.   Okay.  So I have to conclude that

14   levels that are gone had hydraulic fill.

15   Right?

16       A.   Along Reach 2, all of them were built

17   with hydraulic fill.

18       Q.   All of them.  Every last one of them.

19   Okay.

20       A.   But not all hydraulic fill levees

21   eroded.

22       Q.   No, but --

23       A.   That's --

24            MR. LEVINE:

25               Let him finish.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 227

1   EXAMINATION BY MR. BRUNO:

2       Q.    The eroded ones are the ones we're

3   talking about, the ones that are gone.

4             MR. LEVINE:

5                 Let him finish.

6       A.    You had asked the question whether

7   once the water overtopped the levees that they

8   would be gone, and I said that they wouldn't

9   depending on the material.

10  EXAMINATION BY MR. BRUNO:

11      Q.    No, I didn't say that.  I said, in the

12  case of a levee that had eroded to its base,

13  that's what we're starting with, and I said in

14  the case where the top of the levee has been

15  removed in some fashion, either A, by front

16  side wave attack, or B, by rear side wave

17  attack, once that's gone you now have flowing

18  water going over a reduced height of a levee.

19  Right?

20            MR. LEVINE:

21                Objection.

22  EXAMINATION BY MR. BRUNO:

23      Q.    You with me?

24      A.    I'm with you.

25      Q.    Now, the fact of the matter is that

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 228

 1   levee is going to erode in the same fashion --

 2   from the point at which there's no cap to the

 3   point where there's no levee in the same

 4   fashion, it's all due to overflowing erosion.

 5          MR. LEVINE:

 6              Objection.  Vague.

 7   EXAMINATION BY MR. BRUNO:

 8      Q.   Isn't that true?

 9      A.   If the cap is gone and you have

10   overflowing, at that point it will erode

11   similarly, but not all --

12      Q.   Not all what?

13      A.   I'm just saying that just because the

14   cap is gone you don't necessarily have full

15   erosion all the way down.

16      Q.   I didn't say that.

17      A.   Well --

18      Q.   I said in the case where -- listen to

19   me one more time.

20      A.   No.

21      Q.   You keep changing it to suit yourself.

22   I have a real simple question.

23          MR. LEVINE:

24              He's trying to answer your

25          question?

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 229

1          MR. BRUNO:

2               No, he's not trying to answer the

3          question --

4          MR. LEVINE:

5               Yes, he is.

6          MR. BRUNO:

7               --he's trying to change the

8          question, because I didn't talk about

9          half an erosion, or a quarter of

10         erosion, I said in the instance where

11         there's no levee.  I've said that

12         fifty times already.  I'm not talking

13         about three quarters of a levee or a

14         quarter of a levee or seven eighths of

15         a levee.

16    EXAMINATION BY MR. BRUNO:

17      Q.   In the instance where there's no

18    levee, one; two, in the instance where the cap

19    is removing either from front side wave attack

20    or from rear side wave attack, no more cap,

21    water is now over flowing that levee at a

22    pretty good clip -- okay?  The mechanism of

23    failure of that levee from the point where

24    there's no cap to the point where there's no

25    levee is the same whether the cap comes off

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 230

1    from front side wave attack or the cap comes

2    off from rear side wave attack, isn't that

3    true?

4            MR. LEVINE:

5                Objection.  Incomplete

6            hypothetical, vague as to no levee.

7        A.   If, um -- the cap is gone, okay?  I'm

8    just repeating.

9    EXAMINATION BY MR. BRUNO:

10       Q.   Okay.

11       A.   If the cap is gone, and the overflow

12   erosion is eroding and the levee is gone, it

13   will be difficult to tell whether it was

14   frontal or all overtop.

15       Q.   So all I'm saying to you is, now, it

16   is possible then, in that scenario where

17   there's no levee, that that particular levee

18   location where there's no levee, it's possible

19   that front side wave attack could have been the

20   initiating form or I should say type of

21   erosion.

22           MR. LEVINE:

23               Same objections.

24       A.   It is possible, but there's no

25   physical evidence leading to that type of

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 231

1    conclusion.

2    EXAMINATION BY MR. BRUNO:

3        Q.   Where there's no levee it's impossible

4    to determine whether the initiating cause was

5    front side or rear side wave attack, right?

6            MR. LEVINE:

7                 Objection.  Vague.

8        A.   It's difficult to tell whether it is,

9    but if there isn't any other physical evidence

10   around, how can you tell whether it -- which

11   way it is?

12   EXAMINATION BY MR. BRUNO:

13       Q.   You're the one making a call A or B.

14   I'm saying it could be either A or B.  You're

15   saying it's all B.  And I'm saying to you,

16   logically, trying to be logical about this,

17   that it could be A or it could be B.  Our guys

18   say it's a little bit of both.  You say it's

19   all one way.  And I'm trying to understand how

20   on God's Earth you get to choose B when you're

21   just telling me there's no way to distinguish

22   between A or B when there's no levee.

23           MR. LEVINE:

24                Objection.  Vague.

25   EXAMINATION BY MR. BRUNO:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 232

1      Q.   That's what I'm having a hard time

2   understanding.

3      A.   Well, my conclusion is -- my opinion

4   is that --

5      Q.   It's just your conclusion.  Just your

6   opinion.

7           MR. LEVINE:

8                Let him finish.

9      A.   My conclusion based on the evidence

10   that's there, the total evidence, that --

11   EXAMINATION BY MR. BRUNO:

12      Q.   What evidence?  There's no levee.

13      A.   But you're taking one spot as opposed

14   to looking at the total evidence.

15      Q.   How many spots are there where there's

16   no levee?

17      A.   There's sections where there's no

18   levee, but there's sections where there's levee

19   and erosion.

20      Q.   Answer the question.  How many

21   sections are there where there's no levee?  How

22   many?  There's a bunch, right?

23           MR. LEVINE:

24                Let him answer the question

25                instead of you telling him the answer

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                      Page 233

1          that you want to hear.

2     EXAMINATION BY MR. BRUNO:

3        Q.   What's the answer?   How many

4     locations?

5        A.   I don't know.

6        Q.   You don't know.

7        A.    I'd have to count them.   And what are

8     the sections?   You know, there's long stretches

9     where there are places where the levees have

10    eroded.   And there are stretches where they are

11    partially eroded, and there are stretches where

12    there's full erosion and right beside it a part

13    where there's only partial erosion.

14       Q.   Okay.  All right.  That's fine.  And

15    just so we're clear, and we'll leave this

16    alone, you are able to divine, in those

17    locations where there's no levee, even though

18    you've just agreed that the mechanism of

19    failure once the cap is gone is the same, that

20    in every instance where there's no levee that

21    the only cause of erosion was overtopping

22    erosion.   That's your testimony.

23            MR. LEVINE:

24               Objection.

25    EXAMINATION BY MR. BRUNO:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 234

1      Q.    Right?  That's all I want to confirm.

2  That's your testimony.

3      A.    My testimony is that with a reasonable

4  degree of scientific certainty, that based on

5  all the evidence that that's my conclusion.

6      Q.    Ruth.  You just toss out front side

7  wave attack because you looked at a bunch of

8  pictures.

9            MR. LEVINE:

10                Objection.

11  EXAMINATION BY MR. BRUNO:

12      Q.    That's basically it.

13      A.    It's my assessments of them.

14      Q.    Okay.  All right.

15            Let me show you this document which

16  is -- this got a Bates number on it xSF 0029

17  and 10.

18            MR. STEVENS:

19                It's produced as part of his

20            documents today on the disk.

21  EXAMINATION BY MR. BRUNO:

22      Q.    So you produced this, so maybe you can

23  tell me what it is.

24            MR. LEVINE:

25                Where did these Bates numbers

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 235

```
 1          come from?  Did you guys put them on

 2          there?

 3          MR. STEVENS:

 4               No.  No.

 5          MR. BRUNO:

 6               They're your Bates numbers.

 7           MR. LEVINE:

 8               I don't even know those Bates

 9          numbers.

10          MR. STEVENS:

11               They're also attached to

12          Mr. Steven Fitzgerald 's deposition as

13          Exhibit 6.2 and 4 or something like

14          that.

15           MR. LEVINE:

16               Have you seen these before?

17          THE WITNESS:

18               Yeah.

19      EXAMINATION BY MR. BRUNO:

20          Q.   Do you know what they are?

21          A.   Um -- I don't know the details of

22      them.  I have seen them before.  They were --

23      they accompanied some information that, um --

24      Dr. Fitzgerald -- is it Dr. -- Mr. Fitzgerald

25      provided going along with some total numbers
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 236

 1   dealing with contributions of erosion.

 2        Q.   Contributions of erosion.

 3        A.   Yeah.  He was looking at what was the

 4   contributions of erosion -- excuse me,

 5   contributions of internal flooding from water.

 6        Q.   From water.  So he was trying to

 7   calculate -- he was trying to gets some sill

 8   heights so that he could determine the opening

 9   in a levee which would then allow him to

10   calculate the volume of water that passed

11   through those holes, right?

12        A.   I believe that's what the -- yeah.

13        Q.   All right.  Now, is this accurate?

14        A.   I don't know.

15        Q.   All right.  Did you use it?

16        MR. BRUNO:

17             I'm going to mark this as

18        Exhibit 3.

19        (Exhibit 3 was marked for

20   identification and is attached hereto.)

21   EXAMINATION BY MR. BRUNO:

22        Q.   Well, he seems to indicate that there

23   are eleven breaches between -- well, let's see,

24   between Bienvenue and a little south of Dupre.

25   Do you think that's accurate?

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 237

1       A.   I would have to look at what the

2   elevations are and what they compare to.

3       Q.   Um -- what would constitute a missing

4   levee?  Do you know what the elevation would

5   be?

6       A.   I'd have to look at and see, but --

7       Q.   Here.  (Tendering.)

8       MR. BRUNO:

9            For the record, this comes out of

10            that disk that you gave us as a

11            reliance document, so we're clear.

12            And that's just to identify it for the

13            record.  It comes from your disk.

14       A.   Uh-huh.  Yeah.  And I would have to

15   look at those and ask Steve to answer this.

16   But this was provided with it.  But I was using

17   the numbers that came from his study here.  Or

18   I looked at those numbers that came from those

19   studies.  I was interested in finding out what

20   contribution, um -- at the time looking at what

21   contribution of internal flooding was due to

22   Reach 2 and.

23   EXAMINATION BY MR. BRUNO:

24       Q.   Versus Industrial Canal?

25       A.   Industrial Canal.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 238

```
 1      Q.   All right.  So you didn't use this
 2   document.
 3      A.   I don't use it as --
 4      Q.   For any of your opinions.
 5      A.   Not this piece of it, no.
 6      Q.   Okay.
 7           MR. LEVINE:
 8               When you say this piece of it,
 9      you mean --
10           THE WITNESS:
11               Those particular --
12           MR. LEVINE:
13               Okay.
14   EXAMINATION BY MR. BRUNO:
15      Q.   If these represent sill heights of
16   levees that are no longer there -- let's assume
17   they do --
18           MR. LEVINE:
19               What heights?
20           MR. BRUNO:
21               Sill heights.  That's the bottom
22      of the hole.
23   EXAMINATION BY MR. BRUNO:
24      Q.   Right?  You understand what I'm
25   talking about?
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                    Page 239

 1      A.    Yes.

 2      Q.    No way to determine whether these

 3  levees failed because of front side or backside

 4  erosion.

 5      A.    Based on those --

 6      Q.    Based upon the sill heights.

 7      A.    Just on the sill heights.  Based on

 8  those --

 9      Q.    Just on sill heights.

10      A.    I don't think I could, no.

11      Q.    No.  So your evaluation is based

12  upon -- I'm still trying to get handle on

13  this -- is based upon the fact that you simply

14  see more instances where there's a levee still

15  there, with something that looks like

16  overtopping erosion as opposed to something

17  that looks like, in your mind, front side wave

18  attack.  Is that it?

19      A.    Based on the -- and again, based on

20  that physical evidence there, yes.

21      Q.    All right.  Now you say physical

22  evidence, so there must be a book, there must

23  be a textbook or some scientific journal that

24  says this is a picture of overtopping erosion.

25  Right?  Where would I go to find that?

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 240

1      A.   A book on overtopping.

2      Q.   Or a text or -- I mean, it's

3   scientific so there's got to be somewhere that

4   I could go to that is the definitive place for

5   me to say, okay, this is the benchmark for a

6   picture of overtopping erosion and we're going

7   to compare this picture to other pictures of

8   overtopping erosion and we are, therefore,

9   going to be able to conclude that because the

10   pictures look alike that it's overtopping

11   erosion.  So tell me where you go to get that.

12      A.   There are, um -- papers and things

13   along that area that have showed overtopping

14   erosion and things like that.  Um -- there are

15   some references, um -- the Japanese have done

16   several studies on that and talk about it.  And

17   there is some -- even in here some documents on

18   the types of erosions and where they come from.

19      Q.   They have pictures.  The picture

20   becomes the standard, right?  Because the

21   picture is your standard.

22           MR. LEVINE:

23               Objection.

24      A.   It's actually in -- there's a diagram

25   in here about he types of erosions.

JOHNS PENDLETON COURT REPORTERS            800  562-1285

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 241

 1   EXAMINATION BY MR. BRUNO:

 2      Q.   Yeah.  I saw those.  They indicate how

 3   erosion progresses, I see that, Stage A, B, C

 4   and D.

 5      A.   Uh-huh.

 6      Q.   But I'm talking about pictures.  Do

 7   you have any pictures of front side erosion as

 8   a standard?

 9      A.   As a standard?

10   Q.   Yeah.

11        MR. LEVINE:

12             Objection.  Vague.

13      A.   There's not a standard because, um --

14   but there are pictures of front side erosion in

15   some of the work that has been done in Europe

16   and things like that.  And the Netherlands have

17   some pictures of front side erosion.

18      Q.   Do you have a graph just like you have

19   here in Figure 6 to demonstrate the erosion

20   progression stages in front side erosion?

21      A.   No, I don't.

22      Q.   Does it exist?

23      A.   There are some graphs showing the

24   progression in some of the more recent work

25   that's been done.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1      Q.   All right.  You didn't reproduce them

 2   in your report, did you?

 3      A.   No, I didn't.

 4      Q.   All right.  Going back to Figure 4,

 5   which is your chart of peak surge and wave --

 6   peak surge -- you would agree with me, would

 7   you not, that between location 40000 as a rough

 8   guesstimate and 60000, there's a huge component

 9   of waves?

10            MR. LEVINE:

11                Objection.  Vague.

12      A.   There is more waves along that section

13   high waves --

14   EXAMINATION BY MR. BRUNO:

15      Q.   Well, maybe I'm reading it wrong.  The

16   red line is peak surge and waves, right?

17      A.   Right.

18      Q.   And the blue line is peak surge.

19      A.   Correct.

20      Q.   So if I take the difference between

21   the blue line and the red line, that's all

22   waves --

23      A.   Correct.

24      Q.   -- right?  So waves are a substantial

25   contribution to the red line.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 243

```
 1     A.   Correct.

 2     Q.   It looks like in many places more than

 3   half.

 4     A.   Correct.

 5     Q.   So waves are a huge component to this

 6   red line.

 7          MR. LEVINE:

 8              Objection.

 9   EXAMINATION BY MR. BRUNO:

10     Q.   Well, I mean, take a look.  Let's look

11   at --

12     A.   Okay.  When you talk about huge

13   component, um --

14     Q.   Well, here's the levee height.  The

15   levee height is in green, right?

16     A.   Uh-huh.

17     Q.   Okay.  All right.  So --

18          MR. LEVINE:

19              Wait, wait.  The levee height --

20   EXAMINATION BY MR. BRUNO:

21     Q.   The levee height seems to be -- Am I

22   wrong?  Pre Katrina elevation is green.  That's

23   the levee height, right?

24     A.   That's correct.

25     Q.   Okay.
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 244

 1        MR. BRUNO:

 2             So we're on the same page here

 3        Paul.  At least me and the witness

 4        are.

 5   EXAMINATION BY MR. BRUNO:

 6      Q.   And the blue line is the peak surge,

 7   right?  Okay.  And the red line is the waves.

 8   Now, you don't have anything in here for time;

 9   in other words, you don't have an indication of

10   when these things occurred and you don't have

11   any indication of the duration.

12      A.   No.

13      Q.   All right.  So we don't know that.

14   But one of the things we can conclude is that,

15   for example, from 0 to -- I don't know, is this

16   tenths -- what are the increments?

17      A.   Feet.

18      Q.   Yeah, I know, but between the blocks.

19   Is it -- is it fives?  It doesn't make any

20   sense.  20,000 goes to 40,000 and then there's

21   four blocks in between.

22             I'm having a hard time determining

23   what those blocks look like, but let's say they

24   are, I don't know, 3,000 -- four thousand.  It

25   looks like four thousand.  There's four

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 245

1   thousand feet to a block.

2        A.   Uh-huh.

3        Q.   All right.  So between 0 and about

4   8000 feet waves are the only component that

5   gets over the levee.  Is that right?

6        A.   Yes.

7        Q.   I just want to make sure I'm reading

8   it right.  And then when I go to, say --

9             MR. LEVINE:

10                When you see waves, you mean peak

11            surge and waves.

12            MR. BRUNO:

13                No.  No.  No.  No, I'm not.  No.

14            Listen to me one more time.  Peak

15            surge and wave is red.

16            MR. LEVINE:

17                Okay.

18            MR. BRUNO:

19                Peak surge is blue.

20            MR. LEVINE:

21                Okay.

22            MR. BRUNO:

23                So when you subtract the blue

24            from the red, what do you get?  Just

25            waves.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 246

 1          MR. LEVINE:

 2               Don't you also need peak surge to

 3          get those waves over the levee?

 4          MR. BRUNO:

 5               I didn't make the chart.  You

 6          guys made this chart.

 7     A.    A little bit of interpretation.

 8   EXAMINATION BY MR. BRUNO:

 9     Q.    All right.

10     A.    You've got to have the surge at a

11   certain level in order for waves to get over

12   it.  So the surge played for the waves to get

13   over the levee.

14     Q.    Sure.  No question about it.

15     A.    I think that's the point.

16     Q.    The point I'm making is that right

17   from 0 to 4000 the surge doesn't, by itself,

18   get over the levee.  But only the waves get

19   over the levee.  Right?

20     A.    Uh-huh.

21     Q.    Yeah.  Of course, the surge delivers

22   the wave, I'll grant you that.  But the fact of

23   the matter is it's only waves that are getting

24   over.  Right?

25     A.    Right.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 247

 1      Q.    Okay.  And then, for example, at

 2   40000, same thing.  I've got only -- at that

 3   little peak there only waves are getting over.

 4   Right?  Just at the point.

 5      A.    Right at that one point, yep.

 6      Q.    I mean, that point is not just a

 7   centimeter, that's some span of distance, we

 8   don't know what it is.  Because we'd have to

 9   stretch this thing out to figure it out.

10      A.    Yes.

11      Q.    But between -- and let's see.

12   40000 -- okay.  Do you know where Bayou

13   Bienvenue and Dupre is on this map?

14      A.    Um -- I'd have to do a little bit of

15   measuring to be sure.

16      Q.    Oh, I see.  Okay.  Let me see if this

17   works.

18            Our Exhibit 3 has the same -- appears

19   to be the same numbers, 35000, et cetera.  So

20   if this is correct, it says Bayou Bienvenue is

21   about at --

22      A.    I would sooner think that -- I'm not

23   sure if those numbers -- his numbers are the

24   same as mine.

25      Q.    44000.  His numbers for what?

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 248

```
 1      A.   Those distances.

 2      Q.   Yeah, but you don't make this.  Did

 3   you?

 4      A.   I collected -- I mean, this was

 5   something that was done for -- during IPET for

 6   me.

 7           MR. LEVINE:

 8              I think he's saying his numbers

 9           are different than those numbers, so

10           he can't tell you --

11   EXAMINATION BY MR. BRUNO:

12      Q.   Wait.  I'm looking at Figure 4.

13   You're not looking at Figure 4.

14           MR. LEVINE:

15              Yeah.  He is.

16   EXAMINATION BY MR. BRUNO:

17      Q.   How come yours has got the black on it

18   and mine doesn't have the black on it?

19           MR. LEVINE:

20              Because you're not looking at

21           Figure 4.

22   EXAMINATION BY MR. BRUNO:

23      Q.   Figure 4.  Page 14.

24           MR. LEVINE:

25              You didn't pay enough money for
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 249

1           the color printing.

2       A.    You provided me this morning.

3    EXAMINATION BY MR. BRUNO:

4       Q.    I know.  I did.  Okay.  Fine.  Mine --

5    it disappeared magically.  And this is the one

6    you gave me.  In any case, Figure 4 comes from

7    IPET --

8       A.    Basically, yes.

9       Q.    So the led line is the IPET surge and

10   wave calculation, the blue line is surge

11   calculation, and these are your LIDAR numbers.

12      A.    Yes.

13      Q.    And the black -- what is black on

14   yours?

15      A.    The black is the post-Katrina

16   elevations.

17      Q.    Okay.  All right.  Now, so why can't

18   we believe that at 4400 feet that's not Bayou

19   Bienvenue?  You think Number 3 is wrong?

20      A.    I don't know.  I mean, I haven't

21   looked at what he used for his scale for that.

22      Q.    Well, he's using stations and feet.

23      A.    Right.

24      Q.    You're using the same thing, aren't

25   you?  That was the intent.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 250

 1      A.    Yeah.  But where he started and where

 2    he --

 3      Q.    Well, okay.  If this is right, then,

 4    let's see, 44000 would be about Bayou

 5    Bienvenue, and Bayou Dupre would be at about

 6    78000.  So that would be about -- so if that's

 7    correct, the biggest jump in the waves seems to

 8    be right between Bayou Bienvenue and Bayou

 9    Dupre.  Right?  The biggest concentration of

10    the waves.

11      A.    I think a more accurate look at the

12    scale would be to look at Figure 3 in my

13    report.

14      Q.    Okay.  All right.  So it looks to me

15    like --

16          MR. STEVENS:

17              It doesn't match at all.  They're

18          totally different numbering.

19    EXAMINATION BY MR. BRUNO:

20      Q.    It doesn't even work.  Your Figure 4

21    goes to 80000, which is -- makes the round of

22    the bend there.  Let's see.  Bayou Bienvenue is

23    44000?

24          MR. LEVINE:

25              You have two different sets of

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 251

1            numbers from two different people.

2            MR. BRUNO:

3                 Well, both of whom work for the

4            Corps.

5            MR. LEVINE:

6                 Actually, one doesn't.  There's a

7            third set of numbers up there.

8            MR. BRUNO:

9                 No, those are station numbers.

10           Well,except that this is produced by

11           you and not us.

12           MR. LEVINE:

13                I appreciate that, but you know,

14           to you monolithic U.S. is not just one

15           person.

16   EXAMINATION BY MR. BRUNO:

17       Q.   Well, in any case, we don't know,

18   we'll find this out from somebody else, but if

19   44000 on your Figure 4 is Bayou Bienvenue and

20   if looks to be about, I don't know, 78000 seems

21   to be Bayou Dupre, which pretty much would be

22   about 44000 to 76000 here, that the largest

23   difference between peak surge and wave and peak

24   surge is within that area.

25       A.   I actually think the, um -- the LIDAR

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                      Page 252

 1    map that we see on 3 is closer to -- is the

 2    stations that we have on here.  And it does run

 3    around to -- back to 80000.  Because in the

 4    IPET report it has LIDAR data all the way

 5    around the edge of it.

 6         Q.   Uh-huh.

 7         A.   And so Bayou Dupre would be probably

 8    closer to about 42000 and the other one would

 9    be closer to -- it's probably around 15000.

10         Q.   Actually, 9.

11         A.   9.  Yep.  9.

12         Q.   Okay.  All right.  I guess we can

13    agree, though, there's a lot of wave component

14    to this chart, Figure 4.

15              MR. LEVINE:

16                   Objection.  Vague.

17         A.   Okay.  There's a significant amount of

18    wave action that takes place.

19    EXAMINATION BY MR. BRUNO:

20         Q.   Now, did you study the contribution of

21    the MRGO to waves?

22         A.   No.  In terms of hydrodynamic

23    analysis, no.

24         Q.   Right.  Okay.  Figure 8 is a picture

25    of front side wave attack?

JOHNS PENDLETON COURT REPORTERS              800  562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 253

```
 1      A.    Correct.

 2      Q.    Okay.  And it appears to me that with

 3   the front side wave attack there is a trough,

 4   if you will, at the I'm going to call it the

 5   lowest part of the hole, the lowest part of the

 6   eroded area.

 7      A.    There's a band, are you saying?

 8      Q.    No, no, no.  There's a trough.  The

 9   point -- the lowest point of the hole is not,

10   um -- the same height as the bottom of the

11   hole.  Looks like there's a hole below that.

12            MR. LEVINE:

13                 Objection.  Vague.

14            MR. MITSCH:

15                 Can you pick it out?

16   EXAMINATION BY MR. BRUNO:

17      Q.    Am I wrong?  I'm looking at all of

18   these holes and I'm seeing that there is a

19   circle which represents where a piece of levee

20   has been removed.  You see that?

21      A.    Uh-huh.

22      Q.    Okay.

23      A.    Yes.

24      Q.    And then it looks to me like beneath

25   that circle, all the way around the circle the
```

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 254

1    depth at the bottom of the hole is lower than

2    the depth -- I mean the surface of the hole.

3         A.   I wouldn't say that.  I think that's

4    just an illusion from the shadows.  You're

5    saying around the outside of the hole it's

6    deeper than the center part?

7         Q.   No, the center part is deeper than the

8    outside.

9         A.   That's a possibility, yes.

10        Q.   Okay.  And if you look at Figure 7, I

11   don't know that -- and if you -- and if you'd

12   look at the -- if you cover up the right-hand

13   side of the crest, like that, you see a hole

14   and you see the beginning of the hole right

15   where that band is.  Right?

16        A.   But -- um -- I'm not sure --

17        Q.   Is that not true?  You see a hole just

18   like you see there, the only difference between

19   the two is that it continues toward the back.

20   In other words, if you take your Figure 7 and

21   you cover up -- or you draw a line right down

22   the middle the crest of the levee --

23        A.   Actually, I don't see it quite that --

24   the back of the hole of the one in 7 has a more

25   vertical shape to it.

JOHNS PENDLETON COURT REPORTERS            800  562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 255

1      Q.    The back of 7?

2      A.    The side that's on the flood side has

3   a more vertical --

4      Q.    Well, it may be more in this picture,

5   but in this Figure 8 there is a vertical on the

6   flood side, too.

7      A.    Most of them lead to almost flat out

8   to the front side.

9      Q.    Well, that's where I thought we just

10   agreed that the bottom of the hole is lower

11   than that.  That's why I asked the question.

12   You told me before when we got to this point in

13   our interrogation --

14      A.    And I said around the sides of it.

15      Q.    You're looking around the sides.

16   Yeah.  If you go all the way around the hole

17   you can feel a side of that entire hole all the

18   way around it.

19      A.    I don't see that.  I don't see that,

20   as well, in Figure 8 is what we're talking

21   about.

22      Q.    All right.  That's fine.  You don't

23   see it.  But you do agree with me that in

24   Figure 7, what you see there in the lowest

25   eroded section, the beginning of that hole is

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 256

1    right at the wave attack line.

2              MR. LEVINE:

3                   Joe, what do you mean by lowest?

4              MR. BRUNO:

5                   Lowest on the picture.  This one

6              right here.

7              MR. LEVINE:

8                   Lowest to the bottom, lowest

9              to --

10             MR. BRUNO:

11                  The bottom.  Right here.  I'm

12             pointing to it.

13   EXAMINATION BY MR. BRUNO:

14        Q.   It goes right there where the wave

15   line is, doesn't it?

16        A.   This area here?

17        Q.   Figure 8 -- Figure 7, the hole starts

18   right where -- the brown at Figure 7 is

19   evidence of wave attack, isn't it?

20        A.   No, I wouldn't say it is.  I'd say

21   that you had an opening --

22        Q.   No, the brown stripe.  From the bottom

23   of the picture all the way to the top.  We've

24   already established that with Ebersole and

25   others, that is evidence of wave attack.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 257

 1   Right?

 2        A.   Yes, this brown stripe.

 3        Q.   Okay.  Now, the hole is physically

 4   located -- I'm sorry.  A portion of this eroded

 5   area is physically located inside that stripe.

 6   Isn't that true?

 7        A.   Part of the physical hole is located

 8   in that stripe.

 9        Q.   Yeah.  All right.  Okay.

10        A.   And it has worn down -- my opinion is

11   it's worn down from overtopping to that level.

12        Q.   All right.

13        A.   Like these other holes along here.

14        Q.   And Number 9 also initiates in the --

15   in that brown wave attack zone, right?

16        A.   That's right.

17        Q.   And there's debris on the backside.

18        A.   Right.

19        Q.   Just like you said you would expect,

20   right?

21        A.   But it is --

22        Q.   Not on the front side.

23        A.   But it is different.

24        Q.   I understand that.  But you told me

25   that the debris field is going to be a little

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 258

1   different.  But the fact is the debris field

2   looks very much the same.

3        A.   I think it actually looks quite

4   different.

5   EXAMINATION BY MR. BRUNO:

6        Q.   Well, you've got --

7             MR. LEVINE:

8                  Let him finish.

9   EXAMINATION BY MR. BRUNO:

10       Q.   -- sand materials on the protected

11  side, don't you?

12       A.   Uh-huh.  But it has shot out where

13  these tend to be flowing in front of the hole.

14  And essentially you have a wave hitting and

15  forcing the material out on the frontal attack.

16       Q.   Okay.

17            (Brief recess.)

18  EXAMINATION BY MR. BRUNO:

19       Q.   Okay.  On Exhibit 3 again, are these

20  numbers feet?  75000?

21       A.   Yes.  That's station feet.

22       Q.   Feet.  So that, for example, the

23  distance between 75 and 80 is 5000 feet?

24       A.   Let me see.

25       Q.   Is that what we're seeing here?

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 259

```
 1      A.   Um -- based on what I see here that
 2   would be my interpretation.
 3      Q.   All right.  So that means that if
 4   those things are representative of these
 5   so-called breaches, as he's indicated here,
 6   that this first breach is about five hundred
 7   feet, the second one is about two thousand
 8   feet, the third one is thirty-five hundred feet
 9   long?  So they're substantial size holes, or
10   cuts, if you will.
11      A.   But that's his interpretation of
12   what's there, and I can't -- other than he
13   provided that with the information.  I'll have
14   to ask him about those.
15      Q.   Wait.  This is what he used to do this
16   flood model.
17      A.   Right.
18      Q.   So there's some question about their
19   accuracy?
20      A.   No.  I'm just saying that I did not
21   check those personally, myself.
22      Q.   Okay.  All right.  You didn't check
23   them, so that means they may not be accurate?
24      A.   No.  I'm just saying --
25      Q.   Can somebody in this room rely on
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 260

1   this?

2        A.   Well, I can't --

3        Q.   You won't.

4        A.   How am I going to do that without

5   going to check them.

6        Q.   Well, because he's one of the guys

7   working for your team, that's why.

8             MR. LEVINE:

9                  Hold on.  Let him finish the

10            answer.

11       A.   I have to rely on what he provided.

12   EXAMINATION BY MR. BRUNO:

13       Q.   Right.

14       A.   But I have not independently checked

15   those.

16       Q.   All right.  I didn't ask if you

17   independently checked them.  I asked if they

18   were reliable.

19       A.   No.  But you're saying, well, it's

20   35000 feet or whatever or 3500 --

21       Q.   And you're telling me that a document

22   produced by one of your co-experts who's

23   working for your team, that I can't draw any

24   conclusions from this piece of paper without

25   you checking them yourself?  Is that what

REED  MOSHER, Ph.D. (VOL I)                     February 19, 2009

                                                        Page 261

 1   you're telling me?

 2            MR. LEVINE:

 3                  Objection.

 4       A.   I would say if you wanted me to draw

 5   conclusions of them, I'm not sure that I would

 6   use this information right there to do that.

 7       Q.   Listen, I'm happy with that.

 8            MR. LEVINE:

 9                  Let him finish it.

10   EXAMINATION BY MR. BRUNO:

11       Q.   You're telling me that you would not

12   use this data for any opinions that you would

13   offer in this case.

14             MR. LEVINE:

15                  That's not what he's saying.  And

16            if you would let him answer the

17            question fully --

18            MR. BRUNO:

19                  I did.

20            MR. LEVINE:

21                  No.  You didn't.  You talked over

22            him.  You've been talking over him all

23            day.

24            MR. BRUNO:

25                  No, I haven't.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 262

1        MR. LEVINE:

2            Joe, you've been talking over him

3        all day.

4        MR. BRUNO:

5            Paul, please.

6        MR. LEVINE:

7            Let him answer his question

8        fully.

9        MR. BRUNO:

10           I'm not going to put up with that

11       kind of foolishness.  Okay?  Don't you

12       dare represent what's been happening

13       all day, because I could do he same

14       thing as you and I could represent all

15       kinds of things that are inaccurate

16       and untrue.

17       MR. LEVINE:

18           Well, the record is going to

19       reflect --

20       MR. BRUNO:

21           The record reflects that this

22       witness will not rely on this

23       document --

24       MR. LEVINE:

25           That's not what he said.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                          Page 263

     1          MR. BRUNO:

     2                -- which is produced by your

     3          expert.  That's what I got so far.

     4          MR. LEVINE:

     5                That's not what he said.

     6   EXAMINATION BY MR. BRUNO:

     7     Q.   Then tell me what I can do with this

     8   piece of paper.  What can I do and what can I

     9   not do with this piece of paper marked

    10   Exhibit 3?

    11     A.   The first time that I've seen those,

    12   actually looked at these particular documents,

    13   this piece, is right now.  And you're asking me

    14   to draw conclusions from these without looking

    15   to what context they're used in.  And so you're

    16   asking me to draw conclusions to something I

    17   don't know the context of how these were used

    18   in detail.

    19     Q.   This was produced by you, on your

    20   disk --

    21     A.   It was --

    22     Q.   -- and it's the first time you're

    23   seeing it?

    24          MR. LEVINE:

    25                Let him answer it.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

1          MR. BRUNO:

2              I'm not finished my question.

3          MR. LEVINE:

4              Well, he doesn't know --

5          MR. BRUNO:

6              I'm not finished my question

7          first and then we can yell about who's

8          answering or not answering.

9     EXAMINATION BY MR. BRUNO:

10        Q.   My question is simple.  You produced

11   Exhibit 3, did you not?

12        A.   Yes.

13        Q.   Okay.  And you're going to tell me

14   that this is the first time you saw it was

15   today?

16        A.   The first time that -- I did not use

17   that particular piece.  That is part of the

18   information that was sent to me.

19        Q.   Did you or did you not --

20         MR. LEVINE:

21              Again, he's not done.

22        MR. BRUNO:

23              Because every time I start a

24          question you start talking.  I start

25          talking when he stops talking, and

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 265

1        when I start talking he starts

2        talking.

3        MR. LEVINE:

4            Well, he's the witness.  Let him

5        answer.

6        MR. BRUNO:

7            No, I have to have some

8        indication of when you're finished.

9        And usually there's a pause that

10       indicates that you're done.  But every

11       time I start asking a question the

12       witness starts talking.  So I don't

13       know how I'm supposed to know when

14       he's finished.

15        MR. LEVINE:

16            Some people like to breathe in

17       the middle of their words.

18       MR. BRUNO:

19            No, I'm sorry, Paul; that's not

20       what's going on here, and I don't

21       appreciate it.

22   EXAMINATION BY MR. BRUNO:

23       Q.   Now I'm really confused.  Did you or

24   did you not tell me this is the first time you

25   saw Exhibit 3?

REED  MOSHER, Ph.D. (VOL I)                        February 19, 2009

1      A.   I did probably say this is first time

2    I saw exhibit 3.  I think I said that.

3      Q.   Not true, though, is it?

4      A.   It's actually true in the terms of

5    actually looking at it.  It was a file that was

6    attached to the other information that I did

7    look at.  And I was told that I needed to

8    produce all E-mail that's associated with the

9    other expert witnesses that were provided to

10   me.  And I provided that on that disk.

11     Q.   Okay.

12     A.   Is that not correct --

13     Q.   I don't know --

14     A.   -- that I was supposed to do that?

15     Q.   Well, yeah.  So now you're telling me

16   that you got an E-mail and this was attached

17   and you didn't look at it then either.

18     A.   It didn't bear on what I was asking

19   for.

20     Q.   Well, why did he send it to you?

21     A.   Because I guess he wanted to be

22   complete in what he was sending.  I don't know.

23     Q.   Okay.  Did he not use this as the

24   basis for his flood model?

25     A.   I don't know.  I would have to assume

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1   that he did because he sent it.  But I think

 2   you've already actually examined with him on

 3   that.

 4       Q.   By the way, there are no E-mails on

 5   your disk.  So anyway, enough of that.  Okay.

 6   Fine.  So we don't know what this is and he

 7   can't use it.

 8            But can we assume that the breaches

 9   are of some substantial length in various

10   locations along the MRGO?

11            MR. LEVINE:

12                 Objection.  Vague.

13       A.   There are breaches along the MRGO.

14   EXAMINATION BY MR. BRUNO:

15       Q.   All right.  And some of them are of

16   pretty substantial length along the MRGO.

17            MR. LEVINE:

18                 Objection.  Vague.

19       A.   Some of the individual breaches are.

20   EXAMINATION BY MR. BRUNO:

21       Q.   On the order of thousands of feet.

22            MR. LEVINE:

23                 Objection.  Vague.

24       A.   I believe some of them probably are of

25   considerable length, maybe a thousand feet.

REED  MOSHER, Ph.D. (VOL I)                     February 19, 2009

Page 268

1    EXAMINATION BY MR. BRUNO:

2       Q.   Okay.  And so does it logically follow

3    that a large volume of water went through those

4    failures?

5       A.   Yes.

6       Q.   Let me show you another document which

7    appears on your disk.  I'm going to mark this

8    as Exhibit Number 4.  See if I can understand

9    what this is.

10           (Exhibit 4 was marked for

11   identification and is attached hereto.)

12           MR. LEVINE:

13               Do you have another copy?

14           MR. BRUNO:

15               You can have my copy.

16           (Tendering.)

17   EXAMINATION BY MR. BRUNO:

18      Q.   Do you know what it is?

19      A.   Yes.

20      Q.   What is it?

21      A.   It is information on how much water --

22   volume of water that went into St. Bernard

23   Parish based on the Katrina model, the -- the

24   Katrina event, and it has contributions from

25   breaches and contributions from no breaches.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 269

```
 1      Q.    So overtopping and breaching, right?

 2      A.    (Nods affirmatively.)

 3      Q.    So it gives you a volume of water that

 4  passed through a respective breach.

 5      A.    Correct.

 6      Q.    Did you do this?

 7      A.    No.  That was provided to me.

 8      Q.    Did you use it?

 9      A.    I did it in the terms of trying to get

10  a, um -- I was interested in finding out what

11  contribution was the MRGO relative to the IHNC.

12      Q.    Okay.

13      A.    So it is part of my deliberation.

14      Q.    Okay.  Let me see if I can understand

15  what this thing is saying.  It says with

16  breaches -- it says 442 of something.  What is

17  the 442 a measure of?

18      A.    I believe it's in acre feet.

19      Q.    In acre feet.  Which means one foot of

20  water over one acre.  So 442 is what, exactly?

21      A.    442 would be the amount of water at

22  that location, um -- that resulted from

23  breaching.

24      Q.    Yeah.  I know, but it's 442 whats?

25      A.    Acre feet.
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 270

```
 1       Q.    So is it 442 feet per acre?  That
 2    can't be right.
 3       A.    No, acre feet.
 4       Q.    It's a volume of water.  So it's a
 5    cubic?
 6       A.    Cubic, yeah.
 7       Q.    442 cubic feet.  So it's not --
 8       A.    No, it says, total volume in acre
 9    feet.  It says so right on the bottom.  So you
10    have an acre which is square and then you have
11    one foot deep.  So that's a volume.
12       Q.    I'm with you.  But what does the 442
13    refer to?  442 --
14       A.    You take 442 acres, and it would be
15    442 feet of acres above that.
16       Q.    There would be 442 acres that have one
17    foot of water; is that it?
18       A.    Yeah.
19       Q.    How many acres are there in the
20    central wetlands unit?
21       A.    I don't know because they can be
22    stacked upon each other.  It's doesn't -- it's
23    not total volume laid over an area.  It's
24    stacked above.
25       Q.    But water is going to find its own
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 271

1   level, isn't it?

2       A.   It's a volume measurement.  I mean,

3   you can take and convert it into, um -- volume

4   in terms of cubic feet by taking the square

5   feet of an acre and multiplying it by this

6   number, and it will give you a volume.

7           MR. STEVENS:

8               How many square feet in an acre?

9       A.   It's roughly 44000 square feet, I

10  think.  That may be off.  That's too big.

11  EXAMINATION BY MR. BRUNO:

12      Q.   Yeah.  An acre is only about 250 by --

13      A.   Yeah.  That's too big, but it's --

14      Q.   All right.  Now we can convert, and

15  you didn't use this.  This just tells you in

16  volume of water in acre feet that came in north

17  of Bayou Dupre and south of Bayou Dupre?

18  Through the breaches.  All right.

19          What does lateral weirs with breaches

20  mean?

21          MR. LEVINE:

22              If you know.

23      A.   I don't know.  I don't know exactly.

24  EXAMINATION BY MR. BRUNO:

25      Q.   I'm sorry.  Did you give me an answer?

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 272

1      A.   I said I don't know --

2      Q.   That's fine.

3      A.   -- what a lateral weir is.

4      Q.   Now, in your executive summary you

5  have opinions that I don't find in the body of

6  your report.  First of all, is that true?  Am I

7  missing something?  For example, the first one,

8  you say the Mississippi River Gulf Outlet did

9  not cause the breaches of the LPV levees and

10 floodwalls adjacent to St. Bernard Parish.

11         Is there a discussion of that in the

12 body of your report?

13     A.   A discussion?

14     Q.   Is there --

15     A.   No.

16     Q.   The question is -- I'll read it to you

17 one more tie.  Is there a discussion of that

18 opinion in your report?  I don't see how the

19 hurricane did it is responsive to that

20 question.

21     A.   Again, he executive summary, from what

22 I looked at and from the, um -- I don't see

23 that the, um -- Mississippi gulf outlet in

24 itself caused the flooding of St. Bernard

25 Parish, New Orleans East and the Lower Ninth

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 273

1    Ward.

2        Q.   You don't see it?

3        A.   I don't.

4        Q.   Did you study it?

5        A.   Yes I studied it.

6        Q.   You studied it?

7        A.   I studied it in terms of --

8        Q.   In terms of what?  It's not discussed

9    in your report so I don't know what you

10   studied.

11            MR. LEVINE:

12                Objection.

13       A.   It is obvious from what I have seen,

14   and my opinion is that with Hurricane Katrina

15   the MRGO didn't cause the problems that we saw

16   with Hurricane Katrina and the flooding in that

17   area.

18       Q.   It's obvious.

19       A.   Yeah.

20       Q.   Okay.  Well, all right.  And you did

21   no evaluation of the MRGO 's impact on waves,

22   right?

23       A.   I did see the results of that.

24       Q.   You saw the results.  You saw somebody

25   else's work product.

REED  MOSHER, Ph.D. (VOL I)                        February 19, 2009

                                                        Page 274

     1      A.   Yes.

     2      Q.   Did you check that their work product

     3  the same way you want to check this Exhibit 3?

     4           MR. LEVINE:

     5               Objection.

     6  EXAMINATION BY MR. BRUNO:

     7      Q.   Did you?

     8      A.   I talked with the folks that had done

     9  it and provided some information because I was

    10  interested in seeing what those, um --

    11      Q.   Okay.

    12           MR. LEVINE:

    13               Wait.  Hold on.  He was waiting

    14           for the loudspeaker to go off.

    15      A.   -- and, um -- as they provided that

    16  information.

    17  EXAMINATION BY MR. BRUNO:

    18      Q.   All right.  So basically because of

    19  something some other expert said you can

    20  conclude without question that MRGO had no

    21  impact.  Let me ask you this here.

    22      A.   That's different.

    23      Q.   Well, I mean -- are you an expert on

    24  hydrology?

    25           MR. LEVINE:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 275

1              Hold on.  Hold on.  He said

2              something, he was trying to answer

3              that.  It was either a question by you

4              or a statement.

5       A.   Your question was, it had to impact.

6    EXAMINATION BY MR. BRUNO:

7       Q.   No.

8       A.   My statement is it didn't cause the

9    breaching.

10      Q.   And what scientific evaluations did

11   you undertake in order to reach that

12   conclusion?  I'd like -- I'm going to write

13   them down.

14      A.    It's actually in the very beginning

15   and throughout the thing, that the subsidence,

16   the high, um -- surge and wave that came from

17   Katrina caused that.

18      Q.   High surge caused what?

19      A.   The high surge and wave action --

20      Q.   The high surge and wave --

21      A.   -- from Hurricane Katrina caused the,

22   um --

23      Q.   Okay.

24      A.   -- flooding.  And it's actually

25   something -- it's also for St. Bernard Parish,

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 276

 1    New Orleans East and the Lower Ninth Ward.

 2        Q.   Well, first of all, what role if any

 3    did MRGO play in the surge?  And what did you

 4    do to evaluate that?

 5        A.   The role was that it was such a great

 6    earthquake -- excuse me, sorry -- such a great

 7    hurricane that, um -- that it -- whether the

 8    MRGO was there, from the surge, um -- analysis

 9    that's been done, whether it occurred or it

10    didn't occur, it still would have had

11    sufficient surge to overcome the levees as they

12    are now.  Or as they were at the time.

13        Q.   How does that discount the MRGO 's

14    role?  You have n't evaluated whether or not

15    the MRGO had some role in the surge.  So I'm

16    missing something here.

17        A.   Caused.

18        Q.   Yeah, caused.  You haven't done an

19    evaluation, yourself, in order to answer the

20    question what role if any did the MRGO have in

21    creating the surge?  And you're not a

22    hydrologist, you don't pretend to be a

23    hydrologist, and yet you're making this

24    conclusion that the MRGO had no impact on

25    surge.  I'm sort of confused as to how you're

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 277

 1   doing that.

 2        A.   The two scenarios of, um -- no MRGO

 3   and with the hurricane -- in Hurricane Katrina,

 4   using the same elevations, the surges are

 5   basically the same.

 6        Q.   They are.

 7        A.   And --

 8        Q.   Let's take a look at Table 15 of the

 9   IPET report.  In this table there's a

10   discussion about --

11             MR. LEVINE:

12                  Table 15, Volume -- all sorts of

13             stuff that you got to add to that.

14             MR. BRUNO:

15                  It's Volume III, Page 212, Table

16             15.  It talks about the wave run-up.

17             MR. LEVINE:

18                  Which edition?

19             MR. BRUNO:

20                  22 August '07.

21        A.   What is the Volume III?

22   EXAMINATION BY MR. BRUNO:

23        Q.   Volume III is the Hurricane Protection

24   System.  Okay?

25        A.   As it was.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 278

1      Q.   As it was.  Okay.  And you'll see here

2   there is a chart.  And the chart -- let's just

3   mark that as Exhibit 5.

4          (Exhibit 5 was marked for

5   identification and is attached hereto.)

6   EXAMINATION BY MR. BRUNO:

7      Q.   All right.  This is what they used to

8   design the levee.  I'm sure you evaluated this

9   very carefully, since you evaluated the

10   performance of levees.  Right?

11      A.   Evaluated --

12      Q.   The variables considered by the

13   designers of the levee.  You evaluated that,

14   didn't you?

15      A.   I did look at those values, yes.

16      Q.   All right.  Well, here we see that

17   there is an average fetch depth indicated on

18   this chart our Table 15.  You see that?

19      A.   Uh-huh.

20      Q.   And there's a fetch depth of 16.3 in

21   the area Chalmette east of Paris Road to Bayou

22   Lawler.  You see that?

23      A.   Yep.

24      Q.   And that produces a significant wave

25   height of seven feet.  You see that?

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1      A.   Uh-huh.

2      Q.   Okay.  Then below that we see a fetch

3  depth of 9.7 feet.

4      A.   Uh-huh.

5      Q.   And we see a significant wave height

6  of 4.6 feet.

7      A.   Uh-huh.

8      Q.   So there's about a two and a half foot

9  difference in significant wave height that's

10  related to the fetch depth.  Isn't that true?

11      A.   That's what it says.

12          MR. LEVINE:

13              Objection.

14  EXAMINATION BY MR. BRUNO:

15      Q.   That's what it says here, right?

16      A.   Based on this.

17      Q.   Based on this.

18      A.   And again, I'm not a, um --

19  hydrologist.

20      Q.   I know.  You're not hydrologist, but

21  you're making a conclusion about hydrology and

22  that's why we're going through this.

23      A.   Um --

24      Q.   So from this -- this is a Corps

25  document.  I didn't write this, you all wrote

REED MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 280

 1    this.  You get two and half feet of surge

 2    height when you increase the fetch depth by six

 3    feet.

 4              MR. LEVINE:

 5                   Objection.

 6         A.   I disagree, because you're saying

 7    surge height.

 8    EXAMINATION BY MR. BRUNO:

 9         Q.   I'm sorry.  Significant wave height

10    goes up 2.4 feet when the fetch depth goes up

11    6.6 feet.  Right?

12              MR. LEVINE:

13                   Objection.

14         A.   Based --

15    EXAMINATION BY MR. BRUNO:

16         Q.   Based on this.

17         A.   Just based on what it says here.

18         Q.   Based on this here.  This could be,

19    you know, terrible engineering.  I don't know.

20    But it's Corps of Engineers engineering, right?

21              MR. LEVINE:

22                   Objection.

23         A.   It's actually what's been extracted

24    from the design documents.

25    EXAMINATION BY MR. BRUNO:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 281

 1      Q.   Of course.  The design document -- and

 2  you also know a little bit about waves and

 3  fetch, the deeper the fetch the higher the

 4  higher the wave.  Right?

 5      A.   That seems to be the case, yes.

 6      Q.   Right.  And so you have a MRGO which

 7  is 35 feet deep, so that adds 35 feet to the

 8  fetch depth over that little fetch, right?

 9      A.   Uh-huh.

10      Q.   Well, if six feet gives you two feet,

11  you think maybe an extra thirty-five feet might

12  contribute just a little something to the

13  waves?

14          MR. LEVINE:

15              Objection.  Outside the scope of

16          the report.

17          MR. BRUNO:

18              No, it's not.  It's Opinion 1.

19      A.   Opinion 1, though, is able to be dawn

20  without the waves.  It says the surge was

21  sufficient enough to cause that.  Without --

22  the waves are an addition to it.

23      Q.   Doctor, with respect, you didn't say

24  that.  You didn't say the wave was sufficient

25  to cause the damage.  You could have said that

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 282

1    but you didn't.  What you said here was, and

2    I'm quoting you, the MRGO did not cause the

3    breaching.  Meaning you have once again

4    eliminated from consideration -- you've got a

5    black board here, and there may be ten possible

6    causes, and Dr. Mosher has taken his eraser and

7    erased it, without any explanation, without any

8    scientific evaluation whatsoever.

9            Now, I suggest to you, doctor, that if

10   you wanted to say the surge was sufficient to

11   cause damage whether or not the MRGO was a

12   cause, maybe logically you could say that.

13           But you didn't say that.  What you

14   said was the Mississippi River Gulf Outlet did

15   not cause.  Now, so a reader, wouldn't you

16   agree, who would read this would assume that

17   you did an evaluation of the MRGO, you did an

18   evaluation of whether or not the MRGO was a

19   causative element, and you concluded that it

20   did not cause, meaning it played no role.

21           But you didn't do that.  And that's

22   why I'm asking these questions.  I understand

23   what you're trying to say, but you didn't say

24   it.  So are you willing to withdraw this

25   sentence and put in its place that the surge

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 283

 1   was so high in the MRGO -- I'm sorry -- the
 2   surge was so high in Katrina that the flooding
 3   would have occurred whether or not the MRGO
 4   contributed?  Is that a better way to say it?
 5       A.   Doesn't that say the same thing?
 6       Q.   No, it doesn't, not by a long shot.
 7   Not by a long shot.
 8           MR. MITSCH:
 9               Then agree to disagree.
10       A.   I disagree.  We disagree.
11   EXAMINATION BY MR. BRUNO:
12       Q.   Well, what role did the MRGO play in
13   surge?  Because you now say that the surge was
14   being enough to overtop the levees and cause
15   the damage.  So that means you've also
16   discounted the role that the MRGO may have had
17   in creating the surge.  Right?
18       A.   It had only a minor effect on surge.
19       Q.   What scientific work did you undertake
20   in order to make that conclusion?
21       A.   None.  My part was that, dealing with
22   the surges provided, that the breaching would
23   have occurred due to the surge.
24       Q.   You said the surge that provided.  But
25   you didn't provide the surge.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 284

```
 1       A.    No.

 2       Q.    That's not your opinion.

 3       A.    That's not in my opinion.  Using --

 4  but my opinion is, provided the surge that I

 5  received from --

 6       Q.    Other experts.

 7       A.    -- other experts, the breaching would

 8  have occurred.  So my discussion is about the

 9  breaching.

10       Q.    But you didn't say that either.  You

11  could have said, based upon the surge

12  information that I received from Dr. A, Dr. B

13  and Dr. C, I draw this conclusion.  But you

14  didn't write that.  What you wrote instead was,

15  conclusively, the Mississippi River Gulf Outlet

16  did not cause the breaching.  And you have no

17  scientific basis upon which to make that

18  statement.  Isn't that true?

19       A.    No.  I do.  I have a scientific basis

20  because I'm looking at the breaching.  Given

21  the water conditions that they had, the

22  breaching would have occurred whether the MRGO

23  was there or not.

24       Q.    All right.  Is it your testimony that

25  the level of the surge without waves was
```

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                              Page 285

 1    sufficient to knock the levels down?

 2         A.    To breach the levees?

 3         Q.    Yeah.

 4         A.    Overtop them and breach them?

 5         Q.    Without waves.

 6         A.    There is sufficient water that was

 7    going over them to cause them to breach.  Waves

 8    would have enhanced that.

 9         Q.    How do you know?

10         A.    Um --

11         Q.    Show me the scientific analysis where

12    you have evaluated the quantities of water

13    going over the tops of the levees and how it is

14    that you conclude that surge along would have

15    destroyed the levees.

16         A.    We actually have some of those back

17    here looking at surge heights.

18         Q.    We do.  Where is there?  All I can see

19    is -- Figure 4?

20         A.    Water heights above the crown.

21         Q.    Where is that?

22         A.    Page 54.

23         Q.    54.  And where is this?

24         A.    These are various locations along and

25    looking at the amount of erosion that took

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 286

1    place.

2        Q.    Water height above crown.  Well, first

3    of all, how do we know if water height above

4    crown is just surge, as opposed to surge and

5    wave?

6        A.    We used the water level above the

7    crown for these.

8        Q.    What?

9        A.    We used the water level above crown.

10       Q.    But what water level, surge and wave

11   or just surge?

12       A.     In here there are some that have,

13   um -- both surge -- well, this was primarily

14   surge.

15       Q.    How do you know?

16       A.    Well, because that's the way we

17   developed them.

18       Q.    Here's your chart.  You got a chart

19   here, Figure 4?  So you're telling me that --

20   let's see, water height above crown is the

21   bottom -- is the X axis, so we got some

22   locations where the water level above the crown

23   without waves was seven feet?

24       A.    Uh-huh.  Some of the very low places.

25       Q.    Where is that?

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 287

 1      A.   I would have to -- A45 -- I'll have to

 2   go back and look at this.

 3      Q.   If you look a Page 45, I think you'll

 4   find that you used surge and waves.  It says,

 5   surge plus wave overtopping was approximately

 6   five feet along this reach and the scour depth

 7   was approximately seven feet.  I'm reading

 8   Page 45, the bottom line, last words, surge

 9   plus wave overtopping.  Okay?

10      A.   It does.  Okay.

11      Q.   All right.  So you didn't do an

12   evaluation of just the surge.  You didn't an

13   evaluation of surge and waves.

14      A.   And waves.  Okay.

15      Q.   All right?  Okay.  Now, that's number

16   one.  Number two, the chart you have here talks

17   about crown erosion in feet.  There is one

18   location where there's erosion of ten feet.

19           MR. LEVINE:

20               What's that page again?

21           MR. BRUNO:

22               Page 54.

23      A.   Uh-huh.

24   EXAMINATION BY MR. BRUNO:

25      Q.   Right?

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 288

```
 1      A.   Yes.
 2      Q.   And that's another location where it's
 3 eight feet.
 4      A.   What's eight feet?
 5      Q.   I don't know.  It says -- I guess
 6 you've got only -- where you had water seven
 7 foot above the crown you had eight feet of
 8 erosion in one location where there was medium
 9 clay, and you had, what, ten feet of erosion
10 where it was soft?
11      A.   Uh-huh.
12      Q.   Is that what this is saying to me?
13      A.   It says, um -- okay.  Well, please
14 show me which one you're talking about.
15      Q.   Well, this is ten feet.  There's only
16 one ten foot mark, and that corresponds, I
17 think, to five feet of water.
18      A.   Five feet of water.  Yep.
19      Q.   And that's just one location.
20      A.   Yes.
21      Q.   Okay.  So if you reduce the water
22 height above the crown by three feet, that gets
23 you down to five feet, it eliminates a lot of
24 serious breaching, doesn't it?
25      A.   Where do you see that?
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 289

    1      Q.   Well, because the water height above

    2   the crown is supposed to be an indication of

    3   where I've got this -- these loss of crown

    4   elevations, right?

    5      A.   It actually is more showing that you

    6   have water above the crown in that if you have

    7   better materials that you have less erosion.

    8      Q.   Well, that's fine.  So this doesn't

    9   really help us understand the amount of erosion

   10   due to the amount of water above the crest.

   11      A.   Above the crest.

   12      Q.   Does it show us that?

   13      A.   It shows in some locations that you

   14   have -- that if you have soft materials you're

   15   going to get significant erosion above the

   16   crown.

   17      Q.   I know, but you showed me this table

   18   because you said this is a table we need to

   19   look at in order for us to see that the water

   20   levels without waves were sufficient to knock

   21   the levees down.  And you've pointed me to this

   22   chart.

   23      A.   Uh-huh.

   24      Q.   Well, this chart doesn't really show

   25   that.  Right?

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 290

```
 1      A.   It shows that even in the case of

 2   medium CL, which we'll see in other locations,

 3   that even if you have two feet or you have four

 4   feet you still have a significant amount of

 5   crown erosion.

 6      Q.   At that location, right?

 7      A.   At those locations.

 8      Q.   All right.  But that doesn't tell

 9   us -- you can't generalize from this, can you?

10      A.   It seems like the median CLs in those

11   locations is -- actually four of those across

12   there, that they're almost independent of crown

13   elevation.

14      Q.   You've got dome medium CLs at seven

15   feet above the water --

16      A.   Yeah.

17      Q.   -- and you don't have any crown loss.

18   I mean, am I reading that wrong?

19      A.   Where is this?

20      Q.   You've got one at -- you've got six

21   feet of water above the crown with medium -- is

22   that CH?  What is CH?

23      A.   CH is a fat clay.

24      Q.   That's fat clay.

25      A.   Those are better materials.
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 291

 1      Q.    Better materials.  You've got --

 2      A.    This group of the ones here with --

 3  this group here, as you can see --

 4      Q.    The medium clays?

 5      A.    The medium clays.

 6  EXAMINATION BY MR. LEVINE:

 7            You talking about all the stuff --

 8      A.    The medium CLs --

 9  EXAMINATION BY MR. BRUNO:

10      Q.    The medium CLs.

11      A.    -- in this area, they're virtually

12  independent of water over the crown, because

13  they have about the same amount of erosion.

14      Q.    Well, it seems like you lose five feet

15  of crown with two feet of water, you still lose

16  five feet of crown -- that's for feet of water.

17      A.    Right.  You lose a little bit more --

18  you go all the way to eight feet and you still

19  lose the same amount of crown.  Right.  So

20  that's independent of the elevation above

21  the -- the amount of water above it.  These

22  materials are of sufficient erode or not that

23  if you have surge and waves, whether they're

24  two feet above or they're seven feet above they

25  still lose about the same amount of crown

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 292

 1   height.

 2        Q.   How can that be?

 3        A.   Why?  Because, I mean --

 4        Q.   You told me that the higher --

 5        MR. LEVINE:

 6             You asked him how can it be?

 7        A.   We talked about earlier, there's, you

 8   know, the idea of a threshold where once you

 9   get to a certain amount it will continue and

10   you'll started having -- you'll have erosion

11   and it will continue eroding.

12   EXAMINATION BY MR. BRUNO:

13        Q.   Right.

14        A.   And adding more water won't make a

15   significant amount of difference to that amount

16   of erosion if you have a duration of time long

17   enough.  So it's independent of the height of

18   the water.

19        Q.   And there's no indication of time here

20   either.

21        A.   No.  I mean, it's -- no, there isn't.

22        Q.   All right.  Well, so, we have the same

23   amount of erosion between two and eight feet of

24   water, right?

25        A.   Okay.

JOHNS PENDLETON COURT REPORTERS              800  562-1285

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 293

 1      Q.   So what that tells me is that the

 2   height of the water really doesn't have a whole

 3   lot to do with how fast the levee erodes once

 4   you reach a magic number which apparently seems

 5   to be about five or a six feet.  No, I'm sorry,

 6   which is two feet -- two to eight feet,

 7   anywhere between there.  Because at eight feet

 8   of water above the crown you still erode it to

 9   six, and at two feet above water --

10      A.   You erode it to five.

11      Q.   You erode it to five.  So it's close.

12      A.   Uh-huh.

13      Q.   So wouldn't that logically mean that

14   at that other location where there was eight

15   feet of water you'd have had the same damage

16   with two feet of water?

17      A.   Based on the materials, I'd say it

18   would lead you to that.

19      Q.   That's right.

20      A.   Yeah.

21      Q.   All right.  So what that tells me is

22   that the amount of -- the height of the water

23   going over the levee really is not an indicator

24   of whether you're going to have failure or not,

25   it's just whether you've got that two feet.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 294

 1      A.   Okay.  It is an indicator that -- you

 2   need to be able to have both the soil

 3   conditions that are there --

 4      Q.   Right.

 5      A.   -- and the water flowing over it.  And

 6   the water beyond a certain amount doesn't

 7   increase the erosion.

 8      Q.   Exactly.  And so what that means is

 9   that two feet of water seems to be the magic

10   height.  If it's below two feet, you don't have

11   a problem.

12           MR. LEVINE:

13               Objection.

14   EXAMINATION BY MR. BRUNO:

15      Q.   Right?

16      A.   I don't think in this data there's

17   sufficient amount of points to say that.

18      Q.   Well, if you don't have a sufficient

19   amount of points, then are really can't really

20   say anything about the height of the water

21   going over the levee.  You're concluding that

22   the water was high enough to destroy the levee.

23      A.   You're saying the cutoff is two feet.

24   I'm saying I can't say that the two feet,

25   because I have very little data below that.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1      Q.   Well, okay.  Fine.  But we've

2   established here that whether it's two feet or

3   eight feet, the damage is the same.  It least

4   where you have medium clays.

5      A.   It's the same.

6      Q.   Okay.  And so once you get above two

7   feet, it's not terribly relevant to the

8   question that we're asking, which is how much

9   water do you need to destroy the levee?

10   According to this chart all you need is two

11   feet.

12      A.   Okay.

13      Q.   Okay?  Is that right?

14      A.   Um -- according to this chart, that

15   the amount of scour for these materials at a

16   certain point is somewhat independent of --

17      Q.   Agreed.  But it's two feet.

18       MR. LEVINE:

19          Independent of what?

20       THE WITNESS:

21          Independent of the amount of

22       water.

23   EXAMINATION BY MR. BRUNO:

24      Q.   Beyond two feet.

25      A.   Well, I'm not going to say two feet is

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1   the absolute cutoff.

 2       Q.   All right.  But there's a number above

 3   which it's irrelevant, isn't that true?

 4       A.   It would be -- there would be a point,

 5   and probably -- yes.

 6       Q.   Okay.  All right.  And so we cannot

 7   conclude that because the water was so high

 8   that all the levees would have eroded because

 9   this data doesn't really support that view.

10   It's more an issue of whether we've met that

11   magic threshold, whatever it is, two feet or

12   above, pick a number, if water is that high

13   then you can draw the conclusion with this

14   material that you're going to have this

15   erosion, according to you.  Right?

16       A.   Based on this and what we're seeing

17   with the materials, that yes, you would have

18   erosion occurring and it could be significant

19   erosion.

20       Q.   Okay.  All right.  And so if the MRGO

21   was responsible for a portion of the water,

22   that could materially impact which levees fail

23   and which levees don't.

24           MR. LEVINE:

25               Objection.  Vague, incomplete

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1          hypothetical.

2     EXAMINATION BY MR. BRUNO:

3          Q.   Isn't that true?

4          A.   If the MRGO had a contribution to

5     whatever height of the water and the surge --

6          Q.   Yes.

7          A.   -- it could have -- at the limits of

8     where the top of the levees are, if it caused

9     them to go over it could have an impact on it.

10         Q.   That's right.  Okay.  All right.

11    Okay.  Now, if you to Page 106 of your report

12    I'm wondering if this sentence still makes

13    sense in light of what we just talked about:

14    You say here, extreme water levels were the

15    most important factor that influenced

16    overtopping/overflow as relates to the height

17    above the crest.

18          I don't know if I'm understanding that

19    correctly.  Are you simply saying here that the

20    water was really high?

21         A.   Well, the water was sufficient enough

22    to go over the top of the levees to cause the

23    erosion.  We saw that in Katrina, and we see

24    this in some other of these cases that we have

25    something similar to that.  If you have the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 298

 1   same levee system and you have water going over

 2   the levees and they're close to the same height

 3   in the two different scenarios, you're likely

 4   to get the same scenario.

 5            Doesn't that make sense?

 6      Q.    Yeah.  But it doesn't answer the

 7   question that you are answering on the first

 8   page, which is the role of MRGO, which you've

 9   left out of the analysis, which is why I keep

10   asking these questions, because you haven't

11   addressed whether the MRGO had a role in

12   creating that surge or, as you put it, in

13   creating the surge and waves, since you tie

14   them together.

15            And while we're on it, since we're on

16   this page, since you've -- I know you've

17   carefully checked the work of your compadres on

18   the defense team.

19            MR. LEVINE:

20                Objection.  Argumentative.

21   EXAMINATION BY MR. BRUNO:

22      Q.    Look at Figure Number 90.  You see it?

23      A.    Uh-huh.

24      Q.    That's supposed to be a chart which

25   illustrates the waves, right, the maximum wave

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 299

1    height along MRGO?  You see that?

2             Now, and there's various scenarios

3    here, right?  The black one is the base case

4    H1.  And then the red one, square with the

5    dashes, is no MRGO but the, um -- the swamp is

6    the way it -- I'm sorry, the wetlands are the

7    way they were in 2005.  There's no MRGO.  All

8    right?

9             MR. LEVINE:

10                You talking about H2?

11            MR. BRUNO:

12                H2.

13            MR. LEVINE:

14                Okay.

15   EXAMINATION BY MR. BRUNO:

16       Q.   You with me?

17       A.   Uh-huh.

18       Q.   Okay.  Now, so there's no MRGO.  What

19   would you believe would be the case about

20   waves, would you expect the waves to be higher

21   or lower with no MRGO?

22            MR. LEVINE:

23                Objection.  Outside the scope of

24            the report.

25   EXAMINATION BY MR. BRUNO:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 300

1     Q.   Just guess.

2     A.   I'm not going to guess.

3     Q.   Well, do you know?

4     A.   I don't know.

5     Q.   Well --

6     A.   The waves effects would be --

7     Q.   There's no MRGO now, so it's

8  shallower.  So one would expect because it's

9  shallower you have a lower wave.  Isn't that

10  logical?

11          MR. LEVINE:

12              Objection.

13     A.   It depends also on what are the other

14  conditions.

15  EXAMINATION BY MR. BRUNO:

16     Q.   Well, all the other conditions are the

17  same.  By the definition of your experts.  H1,

18  H2, H3, H4, all are Katrina winds, every last

19  one of them identical, as they say.

20     A.   Uh-huh.

21     Q.   The only difference between them is

22  the MRGO is out in some, the MRGO is at its

23  design width and depth in some.  That's the

24  only difference.  So everything else is the

25  same, according to your experts.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 301

1           MR. LEVINE:

2                Objection.  Misstates the

3           evidence.

4           MR. BRUNO:

5                Why don't you tell me how it

6           misstated the evidence.

7           MR. LEVINE:

8                You misstated the evidence

9           because in some of those conditions

10          there's different vegetation patterns.

11          You said --

12          MR. BRUNO:

13               No, it's not.  '58 conditions

14          versus you '05 conditions.

15          MR. LEVINE:

16               That's right.  You left there out

17          of your question.

18          MR. BRUNO:

19               I said the winds are the same.

20          The winds are the same.  And they are.

21          The winds are the same.

22          MR. LEVINE:

23               But you left out vegetation when

24          you asked your question to him.

25     EXAMINATION BY MR. BRUNO:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 302

 1      Q.   H2 has the same vegetation in Katrina

 2  as it does in the base case.   Identical.

 3  Vegetation is the same in H2.   But there's no

 4  MRGO, which means that the water depths is

 5  shallower.   So you would expect the waves to be

 6  smaller, isn't that true?

 7           MR. LEVINE:

 8                Objection.   Outside the scope of

 9           the report.

10  EXAMINATION BY MR. BRUNO:

11      Q.   Well, you had to do some evaluation of

12  this, you put it in your report.   Just tell me.

13  We just established a few moments ago, even

14  from this document here that's still in front

15  of you, if you increase the fetch depth you

16  increase the wave height.   If you decrease the

17  fetch depth, you decrease the wave height.   In

18  this scenario, in H2, we've removed the MRGO,

19  so we have decreased the fetch depth.

20           So wouldn't we expect the waves to be

21  smaller?

22      A.   Well, it also has to do with the

23  distances.   Um -- I would have to rely on the

24  experts that provided this --

25      Q.   Well, in fact --

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 303

 1      A.    -- because I'm really addressing, you

 2   know, given these wave conditions, what would

 3   be the response of the levees and the

 4   breaching.

 5      Q.    Well, let's look at this.  In your

 6   chart at Figure 90, you put it in your report,

 7   for some crazy reason when you remove the MRGO

 8   the waves get bigger.

 9           How on earth did that happen?  If you

10   look at the red dotted line with the squares,

11   at approximately location, say, 9-3/4, all the

12   way until location 16, the waves with no MRGO

13   are higher than they are in Katrina, which was

14   the mother of all storms.

15           How do you explain that?

16        MR. LEVINE:

17             Objection.  Asked and answered

18        multiple times now.

19   EXAMINATION BY MR. BRUNO:

20      Q.    Do you have an explanation?

21      A.    Okay.  In my assessment of this, the

22   amount of waves -- if you look at any of these

23   conditions, okay, the amounts of waves we're

24   talking about, very small differences along

25   here.  We're still talking about four feet of

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

```
 1   waves and above.  That is sufficient enough,

 2   they're not that much different --

 3       Q.   You're talking about a foot of waves?

 4       A.   A foot of waves.

 5       Q.   A foot of waves is a lot of waves.

 6       A.   Yeah.  But a foot of waves in four

 7   feet of waves or five feet of waves is not very

 8   much.

 9       Q.   Well, this doesn't even take into

10   consideration wave energy, we've period, nor

11   does it take into consideration the timing or

12   the duration.

13       A.   Uh-huh.

14       Q.   So if the waves are higher earlier, it

15   makes a big difference, doesn't it?

16       A.   Potentially.  It would --

17       Q.   Because overtopping earlier --

18            MR. LEVINE:

19                Let him finish.

20       A.   -- potentially be overtopping earlier.

21   EXAMINATION BY MR. BRUNO:

22       Q.   Earlier.  Exactly.  So if you

23   eliminate higher waves, that means your

24   overtopping is later.  If you can reduce your

25   wave action, right, everything stays the same.
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 305

1    If you reduce the wave action by a foot, then

2    your whole time line moves back, doesn't it?

3    Because your waves don't reach the height of

4    the levee at the same time.

5              MR. LEVINE:

6                   Objection.  Outside the scope of

7              the report.

8              MR. BRUNO:

9                   Sorry.  It's in the report.

10             Waves are here.  Right here.

11             MR. LEVINE:

12                  This is his --

13             MR. BRUNO:

14                  It's right here.

15             MR. LEVINE:

16                  He didn't analyze --

17             MR. BRUNO:

18                  Then why is it here?

19        A.   It basically says -- it is showing --

20    what I'm talking about it is there wasn't

21    sufficient -- the waves were there but they

22    weren't necessary to destroy the levees.

23    EXAMINATION BY MR. BRUNO:

24        Q.   What I'm reading here is, it says,

25    while the waves were not necessary to destroy

REED  MOSHER, Ph.D. (VOL I)                         February 19, 2009

1    the levees, okay -- which we just established

2    is not accurate, because you have no evidence

3    of that -- the waves from either actual

4    conditions or the hypothetical alternatives

5    would have contributed to the overtopping rates

6    and levee erosion.

7              So what you're concluding here is the

8    waves contribute to overtopping rates.

9         A.   Yeah.

10        Q.   Right?  And let's me just make sure --

11        A.   Yes.  That's correct.

12        Q.   -- I understand.  You have no

13   evaluation of surge only.  I mean, we just

14   looked at it and we discovered that it's not

15   surge only, it's surge and waves.  So maybe

16   there's another place in the report where it's

17   just surge?  Is there someplace else that we

18   need to look?

19        A.   No.  This is it.

20        Q.   This is a mistake.

21        A.   What's a mistake?

22        Q.   While the waves were not necessary to

23   destroy the levees.  That's not true.  You

24   don't have any evaluation of surge only.

25        A.   Actually, what we've just talked about

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 307

1   and showed in the things is that it's

2   independent of the height of the water.

3        Q.   No, it's dependent upon the height of

4   water.

5        A.   No.  No.  Actually, I just said --

6   didn't we just go over that chart showing --

7        Q.   The chart we looked at was surge and

8   waves, though.

9        A.   Right.  But it's independent of the

10  height of that water.

11       Q.   Above a certain number which we can't

12  get to.  But that number, whatever it is, is a

13  combination of surge and waves.

14       A.   Right.  But if it could be -- it could

15  be all surge or it could be surge and waves

16  together.

17       Q.   And the problem is we don't know what

18  the surge height is.  And we haven't evaluated

19  just surge height to determine whether the

20  surge height by itself was enough to destroy

21  the levees.

22       A.   I think it actually showing that -- I

23  disagree.  I said it shows that it's

24  independent of the water going over the crest.

25       Q.   That's a number that's larger than

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 308

 1    some number that you and I can't agree on.  I

 2    say it's 2, you say it's some other number.  So

 3    it's not --

 4         A.   It's between 0 and 2, and it's --

 5         Q.   It's between 0 and 2.  Okay.  And my

 6    point is is that, for example, if it's between

 7    0 and 2, and half is waves and half is surge,

 8    then you know what?  We got a one-foot wave

 9    again which we now have to conclude is

10    significant.  Right?

11         A.   But none of these waves are one foot

12    are they?

13         Q.   Actually, there's a difference of one

14    foot between L2 and, um -- Katrina.  Now you

15    take away the MRGO --

16         A.   Look at total.  The total waves are

17    four feet to six feet to seven feet.

18         Q.   We don't know where that is.

19         A.   So one foot away from seven feet is

20    still six feet of wave.

21         Q.   Well, we also know that these waves

22    cannot possibly be that high at the toe because

23    we know that the toe is, according to your

24    experts, nine feet.

25         A.   Uh-huh.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 309

1        Q.   And we know that the waves cannot be

2   taller than half the depth of the water there.

3   So something is wrong with this analysis.

4             MR. LEVINE:

5                  Is there a question there?

6   EXAMINATION BY MR. BRUNO:

7        Q.   Isn't that true?

8        A.   No.  I don't see -- I don't see from

9   what you said.

10       Q.   Well, do you understand that wave

11  height as indicated in this chart is not wave

12  height at the toe of the levee?  This wave

13  height is some other location at some other

14  place?

15       A.   Uh-huh.

16       Q.   Okay.  So we're talking about wave

17  height at the toe, which is what's relevant to

18  our inquiry because that's where the levee is.

19  Correct?

20       A.   It could be at the crest.

21       Q.   Or at the crest.  Well, between the

22  toe and the -- the wave height gets lower as it

23  impacts the land.  Isn't that true?

24            MR. LEVINE:

25                  Objection.  Outside the scope.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 310

 1   EXAMINATION BY MR. BRUNO:

 2       Q.   We're back to the levee certification

 3   document.  Where is that?

 4            MR. LEVINE:

 5               (Tendering.)

 6       A.   I would have to look it up.

 7            MR. STEVENS:

 8               Thank you, Paul.  Let the record

 9            reflect that he was very cooperative

10            in locating that document.

11            MR. LEVINE:

12               I'm a cooperative fellow.  You

13            can put that in the record.

14   EXAMINATION BY MR. BRUNO:

15       Q.   To aid in a quick -- I'm reading from

16   D-1, Paragraph D-3.  To aid in a quick first

17   assessment of the importance of waves to levee

18   system overtopping, the depth-limited

19   significant wave height at the toe of a levee

20   fronted by extensive shallow water areas with

21   very small slopes such as natural marsh areas

22   is roughly 40 percent of the local still water

23   depth at the toe.

24               What they're saying there is -- you

25   can read it yourself -- is that if you have a

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1    water level at the toe of 10 feet, the highest

 2    the wave can be is four feet.

 3              MR. LEVINE:

 4                   So you're reading from Paragraph

 5              D-3 on Page D-1.

 6    EXAMINATION BY MR. BRUNO:

 7        Q.    Because the depth limits the waves.

 8        A.    That's what it says.

 9        Q.    Well, do you agree or disagree?

10        A.    I don't have an opinion.

11        Q.    All right.  So if you don't have an

12    opinion, you can't possibly have an opinion

13    about the Figure 90, because Figure 90 doesn't

14    take into consideration the fact that the depth

15    limits the wave height.

16              MR. LEVINE:

17                   Objection, vague.  Opinion as to

18              what?

19    EXAMINATION BY MR. BRUNO:

20        Q.    Opinion as to the degree to which the

21    waves will contribute to overtopping.  Isn't

22    that true?

23        A.    I don't understand the question from

24    that point, so I can't answer whether it's true

25    or not.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 312

```
 1       Q.   Well, if you don't understand how

 2   depth of water --

 3       A.   I don't understand --

 4       Q.   -- of water limits the waves --

 5          MR. LEVINE:

 6               Let him ask his question.

 7   EXAMINATION BY MR. BRUNO:

 8       Q.   Do you understand that the depth of

 9   the water limits the waves?  Do you understand

10   that?

11       A.   Yes.

12       Q.   Okay.  And as you get close to the

13   levee, the water depth gets shallower because

14   you're at the toe.  The toe is nine feet.

15       A.   Uh-huh.

16       Q.   And if the water is 15 feet, that

17   means the water is -- you got six feet of

18   water.  Right?

19       A.   Right.

20       Q.   Okay.  So the wave can't be any higher

21   than, say, three feet.

22       A.   Um -- now, in this scenario, if you

23   had surge to the top or even over the top of

24   the levee, you could have waves that were

25   significantly greater than that.
```

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 313

```
 1      Q.    No.

 2      A.    Why not?

 3      Q.    Read your own Corps of Engineers

 4  manual.  The wave is reduced by the depth.

 5  Okay?  Now, if the water is --

 6      A.    We're talking about overtopping.

 7      Q.    I'm talking about before you get

 8  overtopping.  The water is not above the levee

 9  crest.  Okay?  Its waves are breaking, because

10  we're talking about the waves being the engine

11  that gets the water over the top.  And

12  therefore, we're not talking about the scenario

13  where the surge is high enough, where the surge

14  itself is over the levee, we're talking about

15  the waves.

16           MR. LEVINE:

17                Joe, to be fair, we're getting a

18           little bit outside of his expertise.

19           We're talking about hydrodynamics and

20           things.

21           MR. BRUNO:

22                I didn't write the conclusion

23           that the MRGO didn't have any

24           contribution.  He did.  If you want to

25           withdraw this opinion, that's fine.
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 314

 1          MR. LEVINE:

 2               But he's not here to interpret

 3          other people's work.

 4          MR. BRUNO:

 5               Well, he's not going to -- wait.

 6          Will you put that in the record?

 7     EXAMINATION BY MR. BRUNO:

 8        Q.   You are not interpreting the other

 9     experts' work, right?  Is that what you just

10     said?

11          MR. LEVINE:

12               He's not going to look at other

13          people's work and rely on it in the

14          basis of his work.

15     EXAMINATION BY MR. BRUNO:

16        Q.   You are not relying on the work of any

17     other experts in this case as the basis for

18     your work?  Is what he said true?

19          MR. LEVINE:

20               He is allowed to do that.

21          MR. BRUNO:

22               Well, that's what I'm doing.

23          MR. LEVINE:

24               But you're asking him specific

25          questions about these waves and how

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                            Page 315

 1              you create these waves --

 2         MR. BRUNO:

 3              So he's allow to rely on only

 4         certain parts of other people's work,

 5         not all of their work.  Like waves.

 6              I'm sorry.  I don't get your

 7         logic.  It's totally escapes me.

 8    EXAMINATION BY MR. BRUNO:

 9         Q.   I mean, the bottom line here is,

10    you've reached some conclusions about waves.

11    And so because you've reached some conclusions

12    about waves I need to ask you about waves.

13              You say at Page 106 that the surge was

14    enough to overtop -- to] go over the top of the

15    levees.  And yet we don't even know what the

16    surge level was that would be sufficient to

17    make the levees fall apart.  Isn't that true?

18         A.   We know that it's -- why do; you say

19    that?  I don't believe that's true.  I think

20    I've answered it.  It's between 0 and 2 feet

21    that you would start to -- that you could have

22    sufficient water over the top from surge, okay?

23         Q.   Only with the materials of

24    construction of that medium clay.  Right?

25         A.   Medium clay.  Yeah.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                              Page 316

1       Q.   All right.  Now --

2       A.   And --

3       Q.   But you'll remember --

4            MR. LEVINE:

5                 Wait.  Wait.  He hasn't finished.

6   EXAMINATION BY MR. BRUNO:

7       Q.   But we agreed that that was surge and

8   waves.

9       A.   I understand that.  But that's -- and

10  so if it was surge and wave, even at two feet

11  then you would have -- you're actually going to

12  get a greater volume of water going over if

13  it's just surge.

14      Q.   Why?

15      A.   Because if it's two feet that's waves

16  that are a portion at the time, you're not

17  going to have water going over the top.  If

18  it's two feet and surge, you're going to have a

19  steady flow of water going over.

20      Q.   Well, but it could be two feet of

21  waves.  I mean, remember it's surge and waves.

22  So if the surge is fourteen feet and the waves

23  are three feet, then it's going over the top.

24            Although, you know, I'm going to do

25  the bath but, you know, you understand my

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 317

1    point?  If the surge is a number, when you add

2    the waves on top of that number, if that total

3    number is above the crest of the levee at two

4    feet you're doing damage.  And so my point to

5    you, and I want to know if you agree with me,

6    is that the waves alone would be contributing

7    to the damage to the levee.

8         A.   Waves alone.

9         Q.   Yeah.

10        A.   Could contribute to the --

11        Q.   Right.

12        A.   But in the case of both the, um --

13   Hurricane Katrina event, we had both surge and

14   waves --

15        Q.   Together.

16        A.   -- going over them.

17        Q.   Yeah, I know.  So tell me how much --

18   or tell me how much of just plain old surge we

19   had going over the levees. What's the number?

20        A.   The number?  It varies along the

21   distance.

22        Q.   Yeah.  In some places there wasn't

23   sufficient surge to go ever the levee tops and

24   in some places there was.

25        A.   Uh-huh.  In the places -- but there

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 318

1    was erosion in those places where we had

2    surge -- just surge going over, along with the

3    waves.

4         Q.    Yeah.  But it's dependent upon the

5    materials of construction at those locations,

6    it's also depending upon the height of the

7    levee, a variety of things.

8         A.    I don't disagree.  It's a number of

9    things.

10        Q.    And so you can't separate out surge by

11   itself without having done the evaluation,

12   which you didn't do, is all I'm saying.

13        A.    I disagree.  You know, I don't think

14   there's sufficient information to sort out the

15   contribution of the erosion that's due to surge

16   and due to waves.  But we have shown that the

17   amount of water going over the crown for these

18   types of materials is independent of that.

19        Q.    Agreed.  Okay.  All right.  So but

20   we've concluded, though, that there's not

21   sufficient information to sort out the

22   contribution to erosion that's due from surge

23   versus the contribution to erosion that's due

24   from waves.  We can't do that, right?

25             MR. LEVINE:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 319

1              You talking about on the

2         protected side?

3         MR. BRUNO:

4              No, I'm talking about erosion,

5         period.

6     A.   I'm talking about the protective side.

7    That is true.  Um -- but there is a

8    contribution to it, but it is independent of

9    the height of water.  And there's the

10   velocities going on --

11   EXAMINATION BY MR. BRUNO:

12    Q.   I know.  I'm just trying to confirm

13   whether or not this thing is taken down on the

14   record.  Okay?  I'm not asking all those other

15   questions.  Did you or did you not just tell me

16   that there is insufficient information

17   available to allow you to sort out the

18   contribution of waves to erosion versus the

19   contribution of surge to erosion?  You just

20   said that, didn't you?

21    A.   I don't think I said it quite like

22   that.

23    Q.   Well, say I again because it's not

24   clear on the record.

25    A.   Okay.  What I believe is that we're

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                             Page 320

 1    showing water going over the crown.  Whether it

 2    is surge or waves, that contribution of water

 3    going over the crown is what drives that.  If

 4    you're going to have it in terms of surge, it

 5    would cause it.  If it's in terms of surge and

 6    waves, it would cause it.

 7             (Brief recess.)

 8    EXAMINATION BY MR. BRUNO:

 9       Q.   Okay.  Conclusion 2:  It's Page 6,

10    Number 6.  You jumped from the GO to the IHNC,

11    so we're back to -- trying to stay with the

12    MRGO for the moment.  Okay?  Number 6 seems to

13    be, you say Hurricane Katrina generated

14    sufficient surge and waves to overtop the LPV

15    levees and floodwalls for a prolonged period

16    and would have done so even if the MRGO had not

17    been in existence or had been at its design

18    dimensions.

19             So what is the prolonged period, how

20    long was it?

21       A.   I'd have to look it up again.  I can't

22    remember exactly, but it was several hours.

23       Q.   Several hours.  Okay.  Well, once

24    again, do we know how much time we need to

25    destroy a levee?  Let's start with that.  If we

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                          Page 321

 1    have our two feet of water, okay?  Because

 2    above that doesn't make a whole lot of

 3    difference, how much time do we need at two

 4    feet in order to destroy a levee?

 5         A.   The portion of that of how I drew that

 6    conclusion is looking at the surge hydrographs

 7    that -- that the other experts provided.  And

 8    those surge hydrographs were similar to what

 9    was Katrina, and then based on these periods

10    you would get a similar performance for those

11    hydrographs.

12         Q.   Well, I know, but here's any question:

13    How long does it take for two feet of water to

14    knock the levee down?

15         A.   Oh, I know that it's -- I don't have

16    to determine exactly how long it takes, I just

17    know that -- all I have to know to draw that

18    conclusion is if we have sufficient hydrographs

19    of what we see in Katrina, then we would have

20    sufficient time to cause a similar performance.

21         Q.   Okay.  The hydrograph in Katrina looks

22    like the hydrograph in what?

23         A.   In the different scenarios that we've

24    looked at, heights, time of peak, overtopping,

25    if they're similar in time period and height,

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 322

 1    then they would lead to the same performance.

 2         Q.   All right.  Well, I guess we've got

 3    some hydrographs we can look at in your report.

 4    Where are those?  Are those in here?

 5         A.   104.

 6         Q.   Well, these hydrographs, I guess

 7    you're suggesting, all produced exactly the

 8    same -- sorry.  For each of the four or five

 9    base cases --

10              MR. LEVINE:

11                   Just different cases not base

12         cases.

13              MR. BRUNO:

14                   I know.

15    EXAMINATION BY MR. BRUNO:

16         Q.   For each of the five cases the

17    hydrograph looks identical?

18         A.   It seems to be very close to the same.

19         Q.   Okay.  All right.  Well, how on earth

20    can that be when you look at Figure 90 and

21    they're not the same?

22         A.   Um --

23         Q.   Figure 90.  They're different.  Well,

24    they're not hydrographs, but this is

25    information that would come from a hydrograph.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 323

1    This is the wave height.

2         A.    It's the wave height.

3         Q.    And the hydrograph is just surge

4    without waves.

5         A.    Surge.  Uh-huh.

6         Q.    So the first problem we have is that

7    we have surge only, we're not considering wave

8    heights, we have significant difference in wave

9    height so we have significant differences in

10   how much?

11        A.    I don't consider them significant

12   differences in wave heights.

13        Q.    Why not?

14        A.    Because they're in the order of a foot

15   or so out of seven feet.  Or six and a half to

16   seven feet.  It's -- I don't consider those

17   significant differences.

18        Q.    Well, you've got as much as two feet

19   in some of these, two-foot differences in some

20   of these scenarios.  And remember, we said to

21   feet is the magic number.

22             MR. LEVINE:

23                 Objection.  You said two feet is

24        the magic number.

25   EXAMINATION BY MR. BRUNO:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

1      Q.    Well, I said two feet, you said

2   somewhere above two feet.

3      A.    No, I said between 0 and 2 feet.

4      Q.    Okay.  Well, between 0 and 2 feet.  So

5   two feet is the magic number because if it's

6   within 2 feet then it's worse, not better,

7   right?

8              MR. LEVINE:

9                  What?

10     A.    You have to repeat that again.

11             MR. LEVINE:

12                 Objection.  Vague.

13  EXAMINATION BY MR. BRUNO:

14     Q.    Well, if two feet -- if it's between 0

15  and 2 feet, that means that if the water is

16  above two feet it doesn't really contribute any

17  more to the erosion process.  So where it's

18  significant is between 0 and 2 feet.  So if

19  it's less than 2 feet, then you have a

20  situation where you would likely not have

21  erosion.

22     A.    No.  You're saying -- you're excluding

23  this to be just waves.  It's actually the

24  combination of waves and surge.

25     Q.    I'm saying waves and surge.  I'm

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 325

 1   saying, if it's less than two feet --

 2        A.   Waves and surge.

 3        Q.   -- waves and surge, you might not have

 4   any erosion.

 5        A.   If it's less than two feet.

 6        Q.   Yeah.  Isn't that true?

 7             MR. LEVINE:

 8                  Objection.

 9   EXAMINATION BY MR. BRUNO:

10        Q.   Can I get an answer first?

11             MR. LEVINE:

12                  Objection.  I got an objection.

13             Vague as to --

14             MR. BRUNO:

15                  Well, just note it because -- you

16             know, how but we make it continuing?

17             Every question in the whole record is

18             vague.  Let's get through this.

19             MR. LEVINE:

20                  No, no, no, no.  Objection.

21             You're question is vague.

22             MR. BRUNO:

23                  Fine.

24             MR. LEVINE:

25                  You first of all suggested that

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                      Page 326

 1            two feet is the magic number, not --

 2            MR. BRUNO:

 3                 Two feet is the magic number.

 4            MR. LEVINE:

 5                 Second of all, you have to

 6            discuss other parameters --

 7            MR. BRUNO:

 8                 No.  I don't have to discuss

 9            anything.  Okay?

10    EXAMINATION BY MR. BRUNO:

11       Q.   We've decided that you didn't break

12    out surge from waves or waves from surge.  You

13    put them together.  So we agree on that, right?

14       A.   Yes.

15            MR. LEVINE:

16                 Objection.

17    EXAMINATION BY MR. BRUNO:

18       Q.   Okay.  Now, the next thing we agree on

19    is that at two feet or above the erosion is

20    going to be the same.

21       A.   For those materials.

22       Q.   For that type of materials.  Okay.

23    Now, so below two feet is where we have the

24    possibility that you won't have a destruction

25    of the levee.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 327

   1      A.    There is a possibility.

   2      Q.    There's a possibility that it goes

   3   both ways.

   4      A.    Right.

   5      Q.    So the hydrographs that we're looking

   6   at only discuss surge, they don't discuss

   7   waves.  And the waves fluctuate as much as two

   8   feet on this chart -- I'm sorry -- Figure 90.

   9      A.    Uh-huh.

  10      Q.    There's a big difference in waves.  I

  11   mean, two feet could make a difference is my

  12   point.

  13      A.    Two feet, um -- two feet could make a

  14   difference based on the data, if it was right

  15   at the top of the levee, then -- so.

  16      Q.    Right.  And that's all I'm saying is

  17   that -- so because two feet could make a

  18   difference, and because you've got at least

  19   about two feet of difference, then it's really

  20   difficult to say whether or not there was a

  21   sufficient surge and waves --

  22      A.    But that location showing two feet

  23   difference is at the very southeast part of the

  24   system.

  25      Q.    Well, I'm also looking at between 13

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 328

```
 1   and 15, I'm looking at 17, I'm looking at, you

 2   know, more than one -- I'm looking at, you

 3   know, number I guess that's about 6.  You know.

 4   The point is we know that there are differences

 5   here in waves depending upon where you are and

 6   depending upon which case you're in.  That's

 7   all I'm saying, there are differences.

 8       A.   There are some differences.

 9       Q.   Okay.

10       A.   But there are -- looking at the surges

11   that we're looking at at these locations,

12   they're in the range of peaking at 16 feet,

13   when all of these are four feet, so that would

14   give us, at least peak wise, twenty feet of,

15   um -- if you look at the peaks and the waves.

16   So we're talking about significant amounts of

17   water even with just four feet of waves on top

18   of the surge.

19       Q.   I know.  But if -- let's remember what

20   these scenarios are supposed to show.  This

21   wave -- this variation in waves is supposed to

22   show the differences with the MRGO and no MRGO.

23   And we see that there are some variations in

24   wave heights depending upon MRGO being there or

25   not being there.
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 329

 1      A.    Yeah.

 2      Q.    Without getting into detail, just

 3   generally, there's a potential difference of up

 4   to two feet.  Let's say there's a foot

 5   potential.  Let's use that as a magic number.

 6   A foot of difference.

 7      A.    Okay.

 8      Q.    All right.  So a foot of difference

 9   will have an impact on the timing of

10   overtopping, right?

11      A.    Could have an impact.

12      Q.    So it can change the duration, it

13   could push it back.  In other words, if you

14   removed that one foot then you could

15   theoretically move back in time the start of

16   the erosion process, and you could decrease the

17   duration.  Right?

18      A.    There's a possibility.  Yes.

19      Q.    Because it is a peak.  It goes up and

20   then it goes down again.

21      A.    Uh-huh.

22      Q.    And what you would hope to be able to

23   do is shorten it to the point where there's not

24   enough time to erode the levee.

25      A.    You would hope.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 330

1        Q.    You would hope.

2        A.    You're saying that -- that's what

3   you're -- I'm saying I believe that there is

4   not a significant amount of difference in wave

5   heights, based on the surges and the wave

6   heights, between the different scenarios to

7   allow a significant difference in the what we

8   saw during Katrina.

9        Q.    Well, you've got a peak here of 16,

10  according to this.  Let's -- I'm at Bayou

11  Bienvenue.  I guess that's 16.  Is it 16 or 17?

12  I can't even tell.

13       A.    It's closer to 17.

14       Q.    Let's see.  I'd say it's 17.  Okay.

15  So if you add a foot to that, that's 18 feet.

16       A.    Well, we're adding four feet to that.

17  The minimum wave height is four feet in the

18  chart.

19       Q.    Okay.  I'm sorry.  So it's 21 feet

20  to --

21       A.    20 feet.

22       Q.    20 feet.

23       A.    No, it's actually 21 or 22.

24       Q.    21 or 22-feet, if these numbers are

25  accurate.  So that's going to potentially --

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                      Page 331

 1   and that's at the peak, now, not --

 2        A.    Uh-huh.

 3        Q.    And that only happens -- how long it

 4   is at that height?

 5             MR. LEVINE:

 6                  How long is what at that height,

 7             the surge or the wave?

 8             MR. BRUNO:

 9                  Both.  We just added them

10             together, didn't we?

11             MR. LEVINE:

12                  Yeah.  I just want to make sure

13             your question is clear.

14   EXAMINATION BY MR. BRUNO:

15        Q.    So we're at that height for not a

16   terribly long period of time.

17        A.    No, but each one of these is also --

18        Q.    Each one of these is a three-hour

19   block.

20        A.    So it's about -- it's above, um --

21   let's see.  It's above 15 feet for about three

22   hours.  So I mean --

23        Q.    Well, that's why I asked the question.

24             Don't you have to determine how long

25   it takes to destroy the levee in order to make

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 332

1  sense of all this?

2     A.   Yeah.   There has to be a period of

3  time when the levees are overtopping.

4     Q.   Right.  So in order for us to figure

5  that out, we have to know how long it takes to

6  destroy the levee.

7     A.   No.  I don't believe you do.  I think

8  you can draw on what took place during Katrina

9  and what -- and durations there of how high the

10  water levels were, and you can draw the analogy

11  of what happened during Katrina.  If you have

12  the same levees, you're going to have the same

13  thing as the hydrographs.

14     Q.   The one thing, though, that we do

15  agree on is that for every foot in height that

16  you go down, you lengthen the duration.  If you

17  go up in height, you shorten the duration.

18  Because it's a cone.

19     A.   Uh-huh.

20     Q.   Right?  So even if you add the three

21  feet at -- if you go to 22 feet, that's the

22  shortest duration is at that height.

23     A.   The shortest duration --

24     Q.   The shortest duration is at the

25  height.  And as you go down, the duration goes

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 333

1    longer --

2         A.    Longer.   Uh-huh.

3         Q.    -- right?  So if you decrease the

4    height, you're decreasing the duration.

5         A.    Decrease the height of --

6         Q.    In other words, if you have less

7    water -- if for some reason -- the MRGO is in

8    fact contributing to the height, okay?  Just

9    assume that it is.

10        A.    Contributing to the height of the

11   surge?

12        Q.    Both.  Surge and waves.

13        A.    Well, based on the information I have,

14   it doesn't.

15        Q.    Well, based on the work of other

16   experts it doesn't.  Not based upon anything

17   you did.  I'm simply saying, though, that --

18        A.    Based on the information that I used

19   to form my conclusion, which were provided by a

20   set of experts that you can question about what

21   they did, this is what they provided me to draw

22   my conclusions from.

23        Q.    And what I'm telling you is -- what

24   I'm asking you is simply this:  Because it's a

25   cone, when you -- when the cone is lower, then

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 334

 1    the duration of a particular water level is

 2    shorter.

 3         A.   Okay.

 4         Q.   That's all I'm saying.

 5         A.   If you move the whole hydrograph.

 6         Q.   If you the move the whole hydrograph

 7    down, it's shorter.

 8         A.   Shorter.

 9         Q.   So that the length of time that the

10    water is at 18 feet, for example -- let's just

11    pick that, okay?  If we chop off a foot, the

12    length of time it stays at 18 feet is shorter.

13         A.   If we take off a foot --

14         Q.   Right.

15         A.   -- of the surge?

16         Q.   Yes.

17         A.   Okay.

18         Q.   And duration is very important to how

19    well the levee performs.

20         A.   Duration does play a role in

21    importance of that.

22         Q.   All right.  So it's not simply looking

23    at this hydrograph, it's determining whether or

24    not this hydrograph, the whole thing goes up or

25    down depending upon the role of the MRGO.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 335

 1   Right?

 2        A.   I don't see that here.

 3        Q.   I understand.

 4        A.   I don't see that in this information.

 5   And so, you know -- and that's not my expertise

 6   about whether it goes up and down because of

 7   the MRGO.  What I have is a series of

 8   hydrographs that were provided to me to draw my

 9   conclusions of how the levees would behave.

10        Q.   Exactly.

11        A.   So if these -- if there's difference

12   in these, then you need to talk to the experts

13   that did that.

14        Q.   Well, except that the conclusions that

15   you have drawn are not conclusions that were

16   drawn based only on the surge number, they're

17   based upon both numbers, surge and waves.  It

18   wasn't just this hydrograph that you relied on,

19   it's really a hydrograph that we don't have in

20   front of us.  It is something that includes

21   surge and waves.  Because they both contributed

22   to the erosion.

23        A.   They do both contribute to the --

24        Q.   They both contribute.  So in order for

25   us to do this analysis correctly we have to

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 336

1    have a chart which charts surge and wave, given

2    the amount of time, and which shows the amount

3    of time that the surge and waves were at a

4    particular height.  That's what we have to do.

5        A.   Um -- I don't think you have to do the

6    surge and waves at the particular time, because

7    you're going to -- waves are going to be based

8    on a period, and they're going to fluctuate.

9    If you have the water at a certain level you're

10   going to have a series of waves that are going

11   to the operate at that level.

12       Q.   That's right.

13       A.   So it's more about the surge, I

14   believe, at that time and how long it's up

15   above the, um -- up to a certain level above

16   the levee heights that's going to contribute to

17   that.

18       Q.   We don't want to redo all the

19   testimony that we've got today, but we've

20   already established that the waves are more

21   destructive a force when it comes to erosion

22   than is the flowing water.  We've already got

23   that.

24            MR. LEVINE:

25                 Objection.  Misstates the

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 337

 1          testimony.

 2          MR. BRUNO:

 3                Fine.

 4   EXAMINATION BY MR. BRUNO:

 5      Q.    Did I misstate your testimony?   You

 6   did say that.

 7      A.    I did say that, but I did --

 8      Q.    Thank you.

 9      A.    I want to clarify that.

10      Q.    All right.

11      A.    You just have waves breaking over the

12   back of the levee, but one's the water is over

13   the top of the levee with the waves it just

14   adds into the amount of water flowing over it.

15   They're not going to have a significant impact

16   on the, um -- erosion from its impact, because

17   it's going to be protected from that impact

18   because you got a flow of water going over the

19   top of it.

20      Q.    Yeah.   Except there's a big problem

21   with that, because Bruce Ebersole says that the

22   levees started to fail before the water started

23   flowing over the top, doesn't he?

24          MR. LEVINE:

25                Objection.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 338

1   EXAMINATION BY MR. BRUNO:

2        Q.   Doesn't he?

3             MR. LEVINE:

4                  Objection.

5             MR. BRUNO:

6                  Oh, really?  You want me to read

7             that testimony to you, too?

8              MR. LEVINE:

9                  I know what it said, too.

10       A.   I haven't read that testimony.

11   EXAMINATION BY MR. BRUNO:

12       Q.   Have you read his report?

13       A.   I've read his report.

14       Q.   Didn't his report say that the levee

15   starts to be damaged when the surge reaches one

16   foot below the crest of the levee?  That's what

17   he said.

18       A.   Okay.

19       Q.   He didn't say that?

20       A.   I'll accept that.

21       Q.   I'll read it to you.  Well, we will --

22   let's get this page in the report.

23       A.   But basically --

24       Q.   Wait.  You said timing is important,

25   duration is important.  That's still important,

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 339

1   right?

2           MR. LEVINE:

3               Can you clarify what Bruce said?

4           MR. BRUNO:

5               I'm going to read it to you.  I'm

6           going to do better than that.  "Once

7           the storm surge reached levels that

8           were 1 to 1.5 feet below the levee

9           crest, significant head cutting and

10          degradation occurred due to wave

11          overtopping lowering levee crest."

12              There it is, Page 6.

13      A.   And that's not different from what I

14  said.

15  EXAMINATION BY MR. BRUNO:

16      Q.   Hold the phone.  I don't have a

17  question on the table yet.  First thing I had

18  to do was establish whether or not he said

19  that.  Now that we've established that let's go

20  back to the question.

21              Now, so, if we want to recreate

22  Katrina conditions, Bruce Ebersole says the

23  Katrina condition was not water flowing over

24  the top, Bruce Ebersole says, when the water

25  level got to 1.5 to 1 feet below the crest the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 340

1   waves were going over the top and that's what

2   caused the head to go over and that's when the

3   water flowed over the headless levee.

4            MR. LEVINE:

5                 Objection.

6            MR. MITSCH:

7                 No.

8       A.   I think that's a misinterpretation of

9   what he said.

10  EXAMINATION BY MR. BRUNO:

11      Q.   Well, then, you tell me what your

12  interpretation is of what he said.

13      A.   Is that you started to have some

14  degradation on the back of the levee when the

15  water was 1 foot to 1-1/2 feet because waves

16  were breaking over the top of it and causing --

17      Q.   Right.  And then what happened?

18      A.   And then the water kept coming up and

19  the flow started over the back of the levees.

20  Because you have -- you have surge that are

21  above that.

22      Q.   He says the damage started before the

23  surge got to the top.  Isn't that true?

24            MR. LEVINE:

25                 It says what it says in there.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

 1          MR. BRUNO:

 2               Well, he says that.

 3    EXAMINATION BY MR. BRUNO:

 4        Q.   And isn't it also true that that

 5    initial damage -- it's that trigger he calls

 6    it.  Once you get the trigger, then the erosion

 7    process moves very quickly.  Once you have the

 8    trigger -- you pull the trigger, if you will.

 9    Isn't that true?

10        A.   Well, we actually have seen that,

11    um -- that you have -- it can be significance

12    amounts of water or small heights of water over

13    it can --

14        Q.   No, we said that once you get over

15    that two foot mark than it ceases to be

16    relevant.  And that's --

17        A.   It's somewhere between 0 and 2 feet.

18        Q.   Fine.  Somewhere between 0 and 2,

19    whatever, it ceases to be relevant because the

20    damage is done.

21        A.   No, the damage will continue.

22        Q.   The damage will continue.  Fine.  The

23    fact of the matter is is that the damage starts

24    before the surge hits the top, according to

25    him.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 342

1      A.    And I don't think that's different

2   than what I've stated in my report and what I

3   said just a few minutes ago.

4      Q.    Well --

5      A.    That waves -- before the surge gets

6   over the top, waves breaking on the backside of

7   the levee will do damage to the levees.

8      Q.    And I keep asking you to answer the

9   simple question that if you reduce the height

10   of the waves, then you're going to delay the

11   point in time when you have this trigger.

12      A.    Okay.  That question -- if you reduce

13   the, um --

14          MR. LEVINE:

15             With the same surge level.

16      A.    With the same surge level, you will

17   reduce that.  You will reduce the damage.

18   EXAMINATION BY MR. BRUNO:

19      Q.    All right.  You'll reduce the damage,

20   which means you'll put back the point in time

21   when the erosion process begins.

22      A.    But the Hurricane Katrina event is so

23   overwhelming that we go way beyond that.

24      Q.    We've just established that the

25   overwhelming issue is not really relevant,

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 343

1   because there's a point at which the

2   overwhelming produces the same amount of

3   damage.  You and I walked through your own

4   report and established that.  Right?  So it's

5   not the fact that it's overwhelming, it's all

6   about timing.  It's about when the first damage

7   occurs.

8        A.   Um --

9        Q.   When you reached this magic number,

10  whatever it is, that's the relevant component,

11  because once you get above that it doesn't

12  count anymore.  And so if there's a change in a

13  parameter which pushes the timing back, that

14  may have a very large influence on whether a

15  levee survives or doesn't survive.  Isn't that

16  true?

17             MR. LEVINE:

18                  Objection.  Vague.

19       A.   It is -- it's, um -- there isn't

20  enough in the question -- there isn't enough

21  information there to really answer that

22  question.

23  EXAMINATION BY MR. BRUNO:

24       Q.   Okay.  Well, let's walk through it.

25  Bruce Ebersole says -- he said the hydrograph

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 344

1    is the end all and the be all.  And Bruce

2    Ebersole doesn't use the surge hydrograph to

3    begin the trigger, he uses waves.  He says, 1

4    to 1.5 feet below the crest is when you start

5    to have damage.

6              MR. LEVINE:

7                   What's below the crest?

8         MR. BRUNO:

9                   I'm not going to say it again if

10              you don't want to pay attention next

11              time.  I'm not going to do it for the

12              eight time.

13              MR. LEVINE:

14                   You got to ask the question.

15         MR. BRUNO:

16                   I'm asking the same question that

17              I've asked fifty times.  And I'll do

18              it again until I get in answer.

19              MR. LEVINE:

20                   So I presume you're talking about

21              surge.

22         MR. BRUNO:

23                   How did you guess that, Paul?

24              Because I maybe asked the same

25              question earlier.  I sure did.  It's

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 345

1          the same exact question over and over

2          again.  You got the stop.  You really

3          have to.  Okay?  I keep doing the same

4          thing, I never change it.

5     EXAMINATION BY MR. BRUNO:

6        Q.   The fact of the matter is that Bruce

7     Ebersole says that when the surge is 1 to 1.5

8     feet below the crest is when the damage begins.

9     So it's waves that are an important component.

10    At that point in the process it's waves.  Isn't

11    that true?

12             MR. LEVINE:

13             Before you answer this

14          question --

15             I'm just trying to say you're

16          making a record.  And when you don't

17          define what Bruce Ebersole

18          specifically says in response to that

19          question, that question is vague.  I'm

20          just trying to ask you to clarify the

21          question so the record is clear.

22    MR. BRUNO:

23             Paul, the record is clear because

24          if you just read the record you'll see

25          that it's the same question over and

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 346

     1              over again.  Same question.  None of

     2              the parameters have changed.  So I'm

     3              content with the record.  Okay?

     4           MR. LEVINE:

     5                 Well, I wasn't.  So objection,

     6              vague.

     7           MR. BRUNO:

     8                 It doesn't matter if you're not

     9              happy with the record.

    10    EXAMINATION BY MR. BRUNO:

    11        Q.   We're saying the Katrina event is what

    12    we're using to -- what we're using as our

    13    yardstick.  The Katrina event.

    14        A.   Uh-huh.

    15        Q.   The Katrina event is not an event

    16    that's based solely upon overtopping from

    17    surge.  Isn't that true?

    18        A.   That's correct.  It has two

    19    components.

    20        Q.   It has two components to it.  This

    21    hydrograph is only one component.

    22        A.   Uh-huh.

    23        Q.   So this hydrograph doesn't allow us to

    24    answer all the questions.  Right?

    25        A.   Um -- all the questions -- all what

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 347

 1   questions?

 2        Q.    About the degree to which Katrina was

 3   large enough to cause the same damage with or

 4   without MRGO.

 5        A.    I believe it is.  I think based on the

 6   hydrograph that you have, the setup of where --

 7   where you start with the surge and you have the

 8   waves on top of that, there's a sufficient

 9   amount of surge, and the waves, whether they're

10   four feet or six feet, um -- don't have -- that

11   difference between them isn't significant

12   enough to say that the breaches wouldn't have

13   occurred.

14        Q.    Well --

15        A.    And that's what --

16        Q.    Let's see if that's true.  Because if

17   it's a four-foot wave, then at the levee toe

18   it's going to be half that size, according to

19   the documents that we've logged at, 40 percent

20   to 60 percent.  So it's going to be two feet.

21        A.    That's outside of --

22        Q.    So --

23        A.    Outside of my --

24        Q.    It's outside of your scope.

25              MR. LEVINE:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 348

 1                 Let him answer now.

 2      A.   I was provided these as being the wave

 3   heights that I would see at the levees.

 4   EXAMINATION BY MR. BRUNO:

 5      Q.   All right.  Fine.  Let's use those,

 6   then.  4 to 6 feet.  I think you'll find that

 7   that's not true, but that's okay.  4 to 6 feet.

 8   So your testimony is that the waves were as

 9   high as 7 feet right at the levee toe.  That's

10   what your testimony is.

11      A.   At the levees.

12      Q.   At the levees, levee's toe,

13   difference?

14      A.   Well --

15      Q.   At the levees.  We're talking about

16   the space between the levee toe and the crest,

17   are we not?

18      A.   You're talking about that.  What I'm

19   saying is, these are what I was provided from

20   the experts --

21      Q.   We're talking about water going over

22   the top of levee.  Are you going to tell me now

23   that water goes over the top of a levee before

24   it even gets there?  We're talking about the

25   levee.  So if we're talking about waves and the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 349

1    potential for the waves to go over the top of

2    the levee, we have to look at the wave heights

3    when they are at the levee.  Isn't that true?

4        A.    That's correct.

5        Q.    Okay.  All right.  So your testimony

6    is that Figure 90 says to you that the waves

7    got as high as seven feet at the levee toe.

8    That's what you're telling me.

9             MR. LEVINE:

10                 Objection, vague.

11   EXAMINATION BY MR. BRUNO:

12       Q.    Is that what you're telling me?

13       A.    Yes.

14       Q.    Okay.  Fair enough.  So at the levee

15   toe they were between four feet and seven feet,

16   at the levee toe.  Which means that if we had a

17   surge of 17 feet, that the water level got as

18   high as 24 feet.  Right?

19       A.    Yes.

20       Q.    That's how high it got?

21       A.    Uh-huh.

22       Q.    And it was at that height for some

23   period of time, based upon --

24       A.    It would fluctuate up and down between

25   that height and something below that.  Because

JOHNS PENDLETON COURT REPORTERS            800  562-1285

REED  MOSHER, Ph.D. (VOL I)                        February 19, 2009

                                                              Page 350

1    the waves fluctuate.

2        Q.   Right.  So -- that's fine.  Peak wave

3    is 24 feet.  I mean, the peak wave plus the

4    peak surge is 24 feet.  Right?

5        A.   Yes.

6        Q.   That's a big number.  And if we reduce

7    the waves by some number, it means that there

8    is a delay at the point in time when the damage

9    begins.  Right?  That has to logically follow.

10           MR. LEVINE:

11               Objection.

12       A.   I would say that if you lower the wave

13   heights, if they're lower then the onset of the

14   start of the damage would be, um -- different.

15   It would start later.

16   EXAMINATION BY MR. BRUNO:

17       Q.   It starts later.  Right.  Now, if it

18   starts later, the curve doesn't change, the

19   hydrograph curve, it doesn't change, it's just

20   a delay --

21       A.   Uh-huh.

22       Q.   -- right?  And so the period of time

23   that we have available to us for the water to

24   go over the top is shorter.

25       A.   Total amount of water is shorter.

REED  MOSHER, Ph.D. (VOL I)                     February 19, 2009

 1      Q.   Is shorter, okay.  All right.  So we

 2   need to know, in order to draw some

 3   conclusions, since we now have the same curve,

 4   but we don't have the same Katrina experience

 5   because we now have a shorter duration of

 6   time -- correct?

 7      A.   You're drawing that conclusion based

 8   on the changes in wave height.

 9      Q.   Exactly.  That's all I'm doing.  I'm

10   chang ing the wave height.  And I just want to

11   see if we agree, if we change the wave height

12   the curve stays the same, it just delays the

13   trigger by some length of time, which means

14   that we have less time available to us to erode

15   our levee.  Right?

16      A.   There's, um -- there will be some

17   changes in that.

18      Q.   Of course.

19      A.   But, you know, please keep in mind

20   that when my statement says this would have

21   happened, the surge -- we still would have had

22   significant amount of water going over the top

23   of the levees with the surge heights that we're

24   talking about.

25      Q.   Right.  But we know that the surge

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 352

```
 1   alone didn't destroy the levees.  In fact, we
 2   have lots of levees that survived not only the
 3   waves but they also survived the surge.  Right?
 4        A.   Yeah.  But they also have different
 5   materials that they're made of, too.
 6        Q.   Well, they do, but --
 7        A.   That's pretty significant.
 8        Q.   Well, I don't know, we haven't tested.
 9   We don't know, since you haven't done any
10   evaluation, about what time it would take, and
11   nor do we know whether the levee would have
12   survived if there had been a delay the time
13   which the wave attack began.  Because we've
14   already established the shorter the duration
15   the more likely it is the levee is going to
16   survive.  We've also establish the shorter the
17   wave there's a delay in the trigger.  So those
18   two components are at least a relevant
19   consideration in connection with answering the
20   question is there a difference between Katrina
21   and some hypothetical situation where there's
22   no MRGO.
23        A.   And what I'm saying is that those
24   aren't significant differences in those to make
25   a difference --
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 353

1      Q.    That's fine.

2      A.    -- in the trigger.

3      Q.    Now, what did you do to determine

4   whether or not those were significant?

5      A.    Okay.  By comparisons of what the

6   surge heights were, the small differences that

7   we see in the waves here, okay -- and the fact

8   that, you know, that based on the heights of

9   what the levees were, um -- pre-Katrina, the

10   ones we're dealing with, we had significant

11   amounts of water flowing over the top of the

12   less.

13      Q.    We did.

14      A.    Whether there were waves or not waves,

15   it was still significant amounts.  Now, we

16   would have had that kind of erosion for those

17   types of soils with that water flowing over.

18      Q.    It wouldn't have been the same,

19   though, we've just established that.

20      A.    Why wouldn't it?

21      Q.    We would have had a shorter

22   duration -- let's see if we --

23         MR. LEVINE:

24            He's saying something.

25   EXAMINATION BY MR. BRUNO:

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 354

1      Q.   We don't have to go over this again

2   and again and again.  We just agreed that we're

3   going to have less time available for our

4   erosion process.

5      A.   I'm saying it's not a significant

6   amount of less time.

7      Q.   Well, what is a significant amount?

8   Five minutes?  Ten minutes?  An hour?

9      A.   I mean, we had locations along the

10  levees that had different wave heights.  They

11  still suffered significant amount of erosion.

12  So wave heights just in that part weren't,

13  um -- a big enough difference to make -- and we

14  had other locations where we had more wave

15  heights over it and we had less erosion.

16     Q.   Exactly.  We also had locations that

17  were low and didn't sustain a lot of damage.

18  So we had all kinds of conditions.

19     A.   Right.  And so you can't just say that

20  it is the waves or the surge.  It also has to

21  deal with the materials.  But in these

22  locations where we had these types of materials

23  we had significant erosion whether we had two

24  feet or something less than two feet going over

25  the top and/or eight feet going over the top.

REED  MOSHER, Ph.D. (VOL I)                     February 19, 2009

Page 355

1      Q.   But you had levees which survived

2   under all those scenarios.

3      A.   Right.

4      Q.   Okay.  Wait.  If you had a levee of

5   the same material that survived, then that is

6   not an independent determinant of whether the

7   levee lives or dies, if you will.  There's

8   something else going on there.

9           MR. LEVINE:

10              You were going to say something

11           before he asked his question.  Can you

12           say that and then answer his question?

13           MR. BRUNO:

14              You're a mind reader.  How did

15           you do that?

16           MR. LEVINE:

17              He was trying to say something.

18           MR. BRUNO:

19              I don't think so.  But now that

20           you've said to him that he needs to

21           say something I'm sure we're going to

22           get something now.

23           MR. LEVINE:

24              He was going to try to say

25           something.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 356

1          MR. BRUNO:

2              Paul, you know, I don't think so.

3          But go ahead.

4          MR. LEVINE:

5              You've been talking over him all

6          day.

7          MR. BRUNO:

8              Yeah, I know, and you've been

9          talking over him, and you've been

10         giving him answers all day long, too.

11         Because every time you object and you

12         say you need to say something, well,

13         all of a sudden he magically needs to

14         say something.  Where does that come

15         from?  So you want to keep coaching

16         the witness or do you think he can

17         handle it by himself?

18         MR. LEVINE:

19             I'm not coaching the witness.

20         MR. BRUNO:

21             You're not coaching the witness?

22         I think you've been coaching witness

23         all day long.

24         MR. LEVINE:

25             I'm not coaching the witness.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 357

```
 1          MR. BRUNO:

 2              Oh, you don't like it when --

 3          when somebody accuses you of something

 4          you don't like it, do you, Paul?

 5          MR. LEVINE:

 6              I'm trying to let him answer the

 7          question.

 8          MR. BRUNO:

 9              Yeah, and so am I.  I'm trying to

10          get an answer to my question.

11          MR. LEVINE:

12              I'm trying to get an answer to

13          the question for you.

14          MR. BRUNO:

15              I have been trying to get an

16          answer to this simple question all day

17          long.

18   EXAMINATION BY MR. BRUNO:

19      Q.   Let's try to get an answer and we can

20   wrap it up.  We've come to some agreements and

21   now we're at the point where we're trying to

22   decide what is significant.  Okay?  So what --

23   in order for us to determine significance we

24   have to have some concept, do we not, of how

25   long it takes to destroy a levee given a
```

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 358

```
 1   certain level of water with a certain flow

 2   going over the levee top?  Right?

 3        A.   And my comparison for that would be

 4   what took place during Katrina.  The events

 5   during that, the durations that we saw there,

 6   wave heights, they varied significantly along

 7   the levee, and we had significant erosion in

 8   locations.

 9        Q.   Right.

10        A.   And in some places we didn't, and I

11   think the fact that the material was different

12   at those locations was more of a significant

13   factor of why we didn't have erosion at that

14   location relative to the other locations.  And

15   I think the data supports that.

16        Q.   We have locations where there was no

17   failure even with the hydraulic fill.  Didn't

18   you?

19        A.   Right.

20        Q.   Okay.  So that's not the sole

21   determinant.

22        A.   No.  But in those locations, I think I

23   pointed out that those are places where we had

24   medium fat clays which are significantly less

25   erodible than the other locations.
```

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 359

1      Q.   All right.  So the bottom line is that

2   you can't tell me why it is that they're

3   insignificant, you just think that they're

4   insignificant.

5           MR. LEVINE:

6              Objection.  Vague.

7      A.   Okay.  And I can -- my opinion is

8   they're not significantly different than what

9   we saw in Katrina and so the behavior that we

10  would see would be similar to what we saw in

11  Katrina and we'd have had breaches in those

12  locations.

13  EXAMINATION BY MR. BRUNO:

14     Q.   What is the difference -- what point

15  does it become significant, then?  An hour?

16  Half an hour?  Two hours?  How much of a delay

17  in the onset of erosion would be significant?

18     A.   I would say, to me, if the surge

19  didn't overtop the levees by a certain -- by a

20  foot or so, and then we had the waves, then

21  that would be a case where we didn't have,

22  um -- that erosion would have been a minimal

23  amount.

24     Q.   There's no component of duration

25  there, and we've already established duration

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 360

1   is critical.  In fact, that's why you pointed

2   me to the hydrographs.

3        A.   But you just say, as a matter of fact,

4   that when you moved this up and down you move

5   the duration up and down based on the storms.

6        Q.   You shorten the duration.

7        A.   Right.  But you move them up -- you

8   were just saying that changed it.  So if you

9   moved it down, and we only had a surge -- say

10  we only had a surge to the top of the levee.

11  We would have had a shorter duration, we'd have

12  had some waves breaking over it, and we

13  would -- I would draw the conclusion we'd have

14  had significantly less, um --

15       Q.   No, I think what you're missing here

16  is that the duration doesn't change, because

17  the wind is the same and the hurricane is

18  moving at the same speed.  So our duration

19  stays the same.  Okay?  The point is, though,

20  that depending upon your height of the water,

21  if during Katrina, for example, it's at 18 feet

22  for an hour, under our hypothetical situation

23  if we've reduced the surge it might be at

24  18 feet for five minutes.  Because the wind

25  speed is the same and the track of the

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 361

1    hurricane is the same and the forward speed of

2    the hurricane is the same.  Because as it

3    leaves, the water is no longer being pushed up

4    against the levee.  So it's going to recede.

5    Right?

6              MR. LEVINE:

7                   Objection.  Vague.

8        A.   I would say, okay, based on what

9    you're saying, um -- if we had a significant

10   change in what the hydrographs were, and a

11   significant change, then it wouldn't occur.

12   But looking at data that I have available from

13   the, um -- other experts, I don't see that

14   difference in the hydrograph that you're

15   talking about.  So my opinion is we would have

16   had similar behavior, similar breaching, um --

17   for all of the scenarios that we're talking

18   about.

19       Q.   Well, again, I guess where the

20   disconnect is here, you don't have a hydrograph

21   which includes waves.  It doesn't exist.  And

22   so there's nothing for us to look at to

23   compare.  I mean, if there was, we wouldn't be

24   having this discussion.  But do you agree with

25   me that if you had a hydrograph that had waves

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 362

1   and surge in it -- let's just say if, it's got

2   them both, because we all agree that there are

3   two components to it -- and if the hydrograph

4   is different from one to the other, that is,

5   it's not going to be as high but the durations

6   are all the same --

7       A.   Yeah.  But the duration of the time,

8   okay --

9       Q.   Is the same.

10      A.   -- is the same.  The duration --

11      Q.   Got to be.

12      A.   The duration is going to be -- these

13  are waves going up and down.  It will just

14  really amplify what we currently have.

15      Q.   No, it won't, because the hurricane is

16  passing by.  Okay?  The hurricane is moving at

17  a certain speed.  That doesn't change.  If

18  there's less waves, for example, less water,

19  the time that we have the experience of that

20  waves and water is going to be diminished,

21  because if the height of the water goes down,

22  then the bottom, the lower levels go down -- in

23  other words, the entire peak moves down.

24      A.   You're getting beyond, okay, based on

25  the scenarios we're talking about, where my

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 363

1   expertise to answer those questions can be

2   provided.

3        Q.   Would you agree with me, though, in

4   order for you to properly and fairly answer

5   this question you really do need to look at a

6   hydrograph which has surge and waves, and you

7   need to see if there is any difference between

8   those two hydrographs, given the various, um --

9   you know, cases, to truly fairly and honestly

10  answer that question?

11       A.   I think based on what I have, in

12  looking at what happened in Katrina and what

13  happened in those cases, that I can draw the

14  conclusions I have.  Yes, I would like to see

15  that, it would be interesting, but I don't

16  think I need that, necessarily, to draw the

17  conclusions that I have.

18       Q.   Well, did you know, for example, that

19  Professor or Dr. Westerink attributes three and

20  a half feet of surge to the MRGO and the IHNC?

21  Three and a half feet?  Did you know that?

22       A.   In these scenarios?

23       Q.   (Nods affirmatively.)  Yep.  And we

24  can pull that deposition testimony if you'd

25  like, but did you know that?

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 364

 1      A.   That was not the information that I'm

 2   provided here.

 3      Q.   Well, this is not in the IHNC.

 4      A.   Oh, in the IHNC.  I'm sorry.  I didn't

 5   understand your question.

 6      Q.   Well, I mean, I know, but --

 7      A.   I'm sorry, because you jumped from the

 8   MRGO to the other one.

 9      Q.   No.  No.  No.  I'm saying I'm

10   apologizing to you, not the other way around.

11      A.   Yes.

12      Q.   But it illustrates my point.  Because

13   you're reaching conclusions about the entire

14   system --

15      A.   Hold it.

16      Q.   -- and you don't even have a

17   hydrograph for the IHNC in here.

18           Did you know -- well, because you're

19   looking at me like you never heard it before.

20   Did you know that Professor Westerink says that

21   three and a half feet of surge in the IHNC was

22   caused by the MRGO?  Did you know that?  Just

23   yes or no?

24      A.   I don't recall, no.

25      Q.   You don't recall that.  Okay.  Well,

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 365

 1   if that's true, than you can't make the

 2   statement that the MRGO had absolutely no

 3   effect on hydrostatic pressures inside of the

 4   IHNC, right?

 5       A.   Yes.

 6       Q.   Three and half feet of water is a lot

 7   of water, isn't it?

 8       A.   That's right.  But the north breach

 9   failed before it got to the top of the levee.

10       Q.   I never said it did.  I said, three

11   and a half feet was contributed by the MRGO.

12   So before it got to the peak, MRGO is

13   contributing a fair share of the water.

14       A.   But it didn't have to need to peak in

15   order for it to --

16       Q.   I didn't say peak.  You're not

17   listening to me.  I said MRGO is contributing a

18   proportionate share of the water that gets

19   there.  Whether it gets there earlier or later,

20   the MRGO is contributing a piece of the water.

21   And it's three and a half feet.  And out of

22   sixteen feet -- let's see, the normal, I think,

23   um -- what was the level of the water in the

24   IHNC?

25            MR. STEVENS:

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 366

1              At peak it's 14.2.

2         MR. BRUNO:

3              But what is it every day, zero?

4         MR. STEVENS:

5              No.  Yeah.  It is zero.  It might

6         be -7 or something.  I don't know.

7         MR. BRUNO:

8              I don't know what it is.

9         THE WITNESS:

10              I don't think it can be -7.

11         MR. STEVENS:

12              There's a difference between it

13         and the lake.

14         MR. LEVINE:

15              Relative to what datum and --

16    EXAMINATION BY MR. BRUNO:

17       Q.   The point is that with a peak surge of

18    14 feet the MRGO contributes three and a half

19    feet.  I don't know it's proportional or not,

20    but let's say at ten feet it's going to

21    contribute some same ratio of water at ten, and

22    if it's at five MRGO is also contributing a

23    component of that water, as well.  Right?  I

24    mean, it's logic.  Right?

25       A.   That sounds correct.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 367

1       Q.   Okay.  So the MRGO, if 14 is its peak,

2    that's about, would you agree, 25 percent of

3    the surge is coming from MRGO?  3-1/2 into 4?

4    Close enough?

5       A.   Did I say 14?  So it's, yes.  Okay.

6    25.

7       Q.   About 25 percent.  So 25 percent of

8    the water level when the north breach failed

9    came from MRGO.  Right?

10            MR. LEVINE:

11                 The water level inside the IHNC?

12            MR. BRUNO:

13                 Yeah.

14             MR. LEVINE:

15                 When the north breach failed.

16            MR. BRUNO:

17                 Yeah.

18    EXAMINATION BY MR. BRUNO:

19       Q.   Right?

20       A.   Uh-huh.

21       Q.   So the MRGO contributed to the

22    hydrostatic pressure against the wall.  Didn't

23    it?

24       A.   Yeah.

25       Q.   So the MRGO had a role to play in the

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 368

 1    failure of the north breach --

 2         A.    Uh-huh.

 3         Q.    -- right?

 4         A.    But the peak would have reached --

 5         Q.    Forget about peak.  I'm not talking

 6    about the peak.  No matter what the level is.

 7    okay?  If the MRGO is supplying water -- let

 8    say we have two spigots, we have a Katrina

 9    spigot and we have a MRGO spigot.  Westerink

10    says that 25 percent of the water comes from

11    the MRGO spigot and 75 percent of the water

12    comes from the Katrina spigot.  Okay?  So it

13    doesn't matter whether it's peak or otherwise,

14    when the wall fell down or when the wall

15    started to fall down or started to lean,

16    25 percent of the water that was pushing

17    against that wall came there because of the

18    MRGO.  Right?

19         A.    And would have reached that level even

20    if the MRGO hadn't been there, though.  That

21    same level would have failed.  Right?

22         Q.    How do we know that?  We didn't do the

23    analysis.  We just said -- he says 25 percent

24    of that water, which means that the water would

25    have been three and a half feet lower.  At the

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 369

1    peak, now.  Not earlier when it fell.  So that

2    when you say the wall fell over, the water

3    would have been three and half feet lower.

4         A.   At the time that it took place.

5         Q.   Yeah.  So it wouldn't have happened at

6    the same time.  Right?

7         A.   Okay.

8         Q.   Exactly the point I'm trying to make

9    with Reach 2.

10        A.   Well, that's different, though.

11        Q.   Well, okay.  Fine, it's different.

12   The point is, with IHNC, if the water is that

13   three and a half feet higher then it means that

14   the breach doesn't happen at the same time.

15   Right?

16        A.   And I want to make this clear:  First

17   year talking about surge, then you're talking

18   about waves --

19        Q.   No, now I'm just surge in IHNC.  Just

20   surge.

21        A.   Okay.

22        Q.   Pure surge.

23        A.   Okay.  But that's not the same as the

24   conclusion you were trying to make in answer to

25   about the MRGO about those breaches.

REED  MOSHER, Ph.D. (VOL I)                        February 19, 2009

                                                              Page 370

     1      Q.   Let the judge figure that out.   I

     2   don't care.   My point is where it is.   The

     3   judge will decide if I'm right or you're right.

     4           Now we're in the IHNC, and now we got

     5   your expert saying three and a half feet comes

     6   from MRGO.   And so now we ask the question

     7   isn't it true that the MRGO contributed to the

     8   failure of the north wall by providing

     9   25 percent of the hydrostatic pressure on that

    10   wall when it fell?

    11      A.   Okay.   Based on what you're saying,

    12   that at that particular time it would have

    13   contributed 25 percent at the time.   But that

    14   water that -- if the MRGO hadn't been there, we

    15   would have reached a level in the canal that

    16   would have caused the breach to occur if the

    17   MRGO hadn't been there.

    18      Q.   It would have been later.

    19      A.   So?   But it still would have failed.

    20      Q.   But if it had happened later, then the

    21   duration would have been different.   And we

    22   don't know --

    23      A.   The duration --

    24      Q.   We don't know how long --

    25      A.   To the north breach.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 371

1      Q.   -- how much pressure do you need, what

2    duration, for the wall to fall over is the

3    question?  Because we don't know that.  We know

4    that the breach was initiated, according to

5    your view, at about five o'clock.  Right?

6      A.   Yep.

7      Q.   I mean, the hurricane was leaving us

8    at 9:00, going out the other way.

9      A.   9:0, 9:30.

10     Q.   It was leaving.  So the water would

11   have gone away.  It's going the other way,

12   being pushed away from the IHNC.  So there

13   would have been less hydrostatic pressure.

14     A.   Hold it.  Hold it.  I really have to

15   object, because you're making these long

16   statements and putting facts about the behavior

17   in there when it's not true.  Hydrostatic

18   pressure is hydrostatic pressure.  Whenever the

19   water is at a certain level you have that

20   pressure.

21     Q.   Right.  I agree.

22     A.   You have that pressure.  It doesn't

23   build up, it doesn't come -- you know, if the

24   surge -- if the water got to that level you'd

25   have that pressure.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 372

1       Q.   And if the hurricane moves away the

2   water goes down, doesn't it?

3       A.   But it also --

4       Q.   Does it?  Yes or no?  Does it go down?

5       A.   If the hurricane moves away?

6       Q.   The water goes down.

7       A.   After the hurricane passes through an

8   area the water will go down.

9       Q.   It goes down.  And so the later you

10  push back the point in time where you're

11  creating all this pressure, the less amount of

12  time there is for the pressure to be exerted on

13  the wall.

14      A.   So are you saying -- asking me the

15  question does duration have an effect on the

16  hydrostatic pressure and the failure

17  mechanism --

18      Q.   No.

19      A.   -- of the north wall?

20      Q.   No.

21      A.   It certainly sounds like it.

22      Q.   No.  All I'm trying to establish is

23  this:  That according to your own expert, the

24  MRGO contributed 25 percent of the hydrostatic

25  pressure on that wall.  That's a fact.

REED   MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                          Page 373

    1       A.    I believe that --

    2             MR. LEVINE:

    3                  Object.

    4       A.    -- you have asked him that and he must

    5    have provided you an answer to that.

    6    EXAMINATION BY MR. BRUNO:

    7       Q.    All right.  And you obviously didn't

    8    know it, and so I'm asking you whether or not

    9    it is true that the -- if I'm right, and if I'm

   10    telling you the truth, Westerink said three and

   11    a half feet came from the MRGO, it means the

   12    water would have been three and a half feet

   13    lower at whatever time it was you think the

   14    wall started to fail.  Okay?  So the wall

   15    wouldn't have failed.  Because you're using the

   16    Katrina event.  The wall would have failed --

   17    might have failed later, might have, if the

   18    water had gotten to that height, but we haven't

   19    established that yet.  Right?  All we know in

   20    fact is, since you're using the Katrina event

   21    as your baseline, that we've changed a big

   22    component of the Katrina event.  Isn't that

   23    true?

   24       A.    We have changed the elevations of the

   25    water.

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 374

```
 1      Q.   Right.

 2      A.   At a given time.

 3      Q.   Precisely.  By a significant -- would

 4   you agree that three and a half feet is

 5   significant out of fourteen?

 6      A.   That's a significant amount.

 7      Q.   Well, would you say 25 percent is a

 8   significant amount?

 9      A.   I'd say it's close to 25 percent.

10      Q.   Okay.  Okay.  25 percent.  All right.

11   So what level of water do you need to fail the

12   north breach wall?

13      A.   Um -- somewhere between ten and half

14   and eleven and a half feet elevation.

15      Q.   And that's when it fails.  Okay.  So

16   that means, if we buy the logic that peak surge

17   was about what, 8:30 -- when is peak surge?

18      A.   I'd have to go look.  But it's in

19   there.

20      Q.   Well, I don't see a hydrograph of the

21   IHNC, but Southeastern end --

22      A.   I think you need to look at Page 182.

23      Q.   So.  Oh, nine o'clock.  I'm sorry.

24   You say nine o'clock.  That's your number.

25   Page 100.  So it's nine o'clock.  Right?
```

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 375

 1     A.   Uh-huh.

 2     Q.   Okay.  So three and a half feet

 3   from -- how much do we need to break the wall?

 4     A.   About eleven.  Between ten and a half

 5   and eleven feet.

 6     Q.   Eleven feet?  Okay.  So you're right

 7   at the -- you're right there.  I mean, you're

 8   right on the line.  If you take away three and

 9   a half feet, then the highest the water gets

10   according to you is eleven -- sorry, three from

11   four is eleven, and then six from two is, um --

12   .6, so it's what, 10.6 feet.

13          MR. LEVINE:

14             10.7.

15          MR. BRUNO:

16             10.7?

17          MR. LEVINE:

18             Yeah.

19   EXAMINATION BY MR. BRUNO:

20     Q.   Okay.  So at nine o'clock, the highest

21   the water gets, if you take away our three and

22   a half feet, is, sorry, 10.7 feet.  Does the

23   levee fail?

24     A.   Based on what we've seen it would be

25   at the point of failure.

JOHNS PENDLETON COURT REPORTERS              800  562-1285

REED  MOSHER, Ph.D. (VOL I)                     February 19, 2009

 1      Q.    Right there.  So it could have

 2    survived.  Or it could have failed.  We don't

 3    know.  It could go either way.  Fair enough?

 4      A.    It would be right on the verge of

 5    failure.

 6      Q.    Right on the verge of failure.  So you

 7    can't say with any scientific certainty that it

 8    would have failed, can you?

 9      A.    You would say that based at that --

10      Q.    Come on.  Scientific certainty.

11         MR. LEVINE:

12             Let him answer now.

13         MR. BRUNO:

14             Give me a break here.

15    EXAMINATION BY MR. BRUNO:

16      Q.    With scientific certainty you're going

17    to tell the judge it would have failed at 10.7

18    feet of water.  Just tell me that you're going

19    to say that.  Tell me.  I just want you to tell

20    me under oath you can tell the judge when you

21    get to the courtroom that you know to a, as you

22    say, a scientific certainty, scientific

23    certainty, that if there was no MRGO and if the

24    water in the IHNC was three and a half feet

25    lower, which would have made, then, the water

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

                                                        Page 377

 1   at the north breach at nine o'clock when the

 2   hurricane is exiting, leaving, going the other

 3   way, 10.7 feet, you're going to tell the judge

 4   the IHNC north breach would have occurred

 5   anyway.  Is that what you're going the tell

 6   him?

 7       A.   What I would say is that the

 8   probability of that occurring would be more

 9   than 50 percent that it would occur.  Yes, I

10   would.

11       Q.   Based on what?

12       A.   Based on the height of the water and

13   the soil conditions at that location.

14           MR. LEVINE:

15               How much more you got?

16       MR. BRUNO:

17               That's it.  That's it.  See you

18           tomorrow.

19

20

21

22

23

24

25

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 378

1                  WITNESS' CERTIFICATE

2

3             I, REED L. MOSHER, do hereby

4    certify that the foregoing testimony was given

5    by me, and that the transcription of said

6    testimony, with corrections and/or changes, if

7    any, is true and correct as given by me on the

8    aforementioned date.

9

10   _____       _____

11   DATE SIGNED            REED L. MOSHER

12

13   _____ Signed with corrections as noted.

14

15   _____ Signed with no corrections noted.

16

17

18

19

20

21

22

23

24

25   DATE TAKEN:  February 19th, 2009

REED  MOSHER, Ph.D. (VOL I)                    February 19, 2009

Page 379

1              REPORTER'S CERTIFICATE

2              I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,

3    Certified Court Reporter in and for the State

4    of Louisiana, do hereby certify that the

5    aforementioned witness, after having been first

6    duly sworn by me to testify to the truth, did

7    testify as hereinabove set forth;

8              That said deposition was taken by me

9    in computer shorthand and thereafter

10   transcribed under my supervision, and is a true

11   and correct transcription to the best of my

12   ability and understanding.

13             I further certify that I am not of

14   counsel, nor related to counsel or the parties

15   hereto, and am in no way interested in the

16   result of said cause.

17

18

19

20

21

22

23   _____

24        JOSEPH A. FAIRBANKS, JR., CCR, RPR

25        CERTIFIED COURT REPORTER #75005

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES     CIVIL ACTION

CONSOLIDATED LITIGATION           NO. 05-4182 K2

                                  JUDGE DUVAL

PERTAINS TO:  MRGO AND ROBINSON

                    (No. 06-2268)



(V O L U M E   II)

        Deposition of REED L. MOSHER, PH.D.,
given at the Law Offices of the Joseph M.
Bruno, 855 Baronne Street, New Orleans,
Louisiana 70113, on February 20th, 2009.



REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                      Page 381

 1   REPRESENTING THE PLAINTIFFS:

 2           LAW OFFICE OF JOSEPH M. BRUNO

 3           (BY:  JOSEPH M. BRUNO, ESQUIRE)

 4           (BY:  ROB WARREN, ESQUIRE)

 5           855 Baronne Street

 6           New Orleans, Louisiana 70113

 7           505-525-1335

 8    - AND -

 9           ELWOOD C. STEVENS, JR., APLC

10           (BY:  ELWOOD C. STEVENS, JR., ESQUIRE)

11           1205 Victor II Boulevard

12           Morgan City, Louisiana 70380

13           985-384-8611

14    - AND -

15           DOMENGEAUX, WRIGHT, ROY & EDWARDS

16           (BY:  ASHLEY E. PHILEN, ESQUIRE)

17           556 Jefferson Street, Suite 500

18           Lafayette, Louisiana 70501

19           337-233-3033

20

21

22

23

24

25

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 382

```
 1   - AND -

 2           DEGRAVELLES, PALMINTIER, HOLTHAUS &

 3           FRUGE, L.L.P.

 4           (BY:  MICHAEL C. PALMINTIER, ESQUIRE)

 5           618 Main Street

 6           Baton Rouge, Louisiana 70801-1910

 7           225-344-3735

 8   - AND -

 9           SHER, GARNER, CAHILL, RICHTER, KLEIN &

10           HILBERT, L.L.C.

11           (BY:  MATTHEW CLARK, ESQUIRE)

12           909 Poydras Street, 28th Floor

13           New Orleans, Louisiana 70112

14           504-299-2100

15

16   REPRESENTING THE UNITED STATES OF AMERICA:

17           UNITED STATES DEPARTMENT OF JUSTICE,

18           TORTS BRANCH, CIVIL DIVISION

19           (BY:  PAUL LEVINE, ESQUIRE)

20           (BY:  RUPERT MITSCH, ESQUIRE)

21           P.O. Box 888

22           Benjamin Franklin Station

23           Washington, D.C. 20044

24           202-616-4289

25
```

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 383

1   ALSO PRESENT:

2           DAVID DYER, ESQ.

3           ROBERT FISHER, ESQ.

4           TIANA CHRISTOPHER, ESQ.

5           RICHARD PAVLICK, ESQ.

6

7   PARTICIPATING VIA I-DEP:

8           ERIC GOLDBERG, ESQ.

9           ELISA GILBERT, ESQ.

10          BRENDAN O'BRIEN, ESQ.

11          BEN RODGERS, ESQ.

12          ROBIN SMITH, ESQ.

13          JONATHAN ANDRY, ESQ.

14          SARAH SOJA, ESQ.

15          MARTIN COHEN, ESQ.

16

17  VIDEOGRAPHER:

18          LORRI FABRE (HART VIDEO)

19

20

21

22

23

24

25

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 384

1          E X A M I N A T I O N   I N D E X

2

3    EXAMINATION BY:                        PAGE

4

5    MR. BRUNO   ..............................386

6          E X H I B I T   I N D E X

7

8    EXHIBIT NO.                            PAGE

9    EXHIBIT 6   ..............................482

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 385

 1              S T I P U L A T I O N

 2              IT IS STIPULATED AND AGREED by and

 3    among counsel for the parties hereto that the

 4    deposition of the aforementioned witness may be

 5    taken for all purposes permitted within the

 6    Federal Rules of Civil Procedure, in accordance

 7    with law, pursuant to notice;

 8              That all formalities, save reading

 9    and signing of the original transcript by the

10    deponent, are hereby specifically waived;

11              That all objections, save those as to

12    the form of the question and the responsiveness

13    of the answer, are reserved until such time as

14    this deposition, or any part thereof, is used

15    or sought to be used in evidence.

16

17

18                    *   *   *

19

20

21

22              JOSEPH A. FAIRBANKS, JR., CCR, RPR,

23    Certified Court Reporter in and for the State

24    of Louisiana, officiated in administering the

25    oath to the witness.

DR. REED MOSHER (VOL.II)                     February 20, 2009

1              REED L. MOSHER, PH.D.,

2    ERDC, ITL-MS, 3909 Halls Ferry Road, Vicksburg,

3    Mississippi 39180-6199, a witness named in the

4    above stipulation, having been previously

5    sworn, was examined and testified on his oath

6    as follows:

7    EXAMINATION BY MR. BRUNO:

8       Q.   All right.  Good morning, again.

9       A.   Good morning.

10      Q.   Hope you had a pleasant evening last

11   night.

12           Okay.  I think we were speaking about

13   the IHNC when we broke last night, and we

14   talked about the mechanics of failure of the

15   breach at the north site.  We were walking

16   through the surge and such.  But now what I'd

17   like to talk about is your opinion as to what

18   caused the breach at the what we call the north

19   breach on the east side of the IHNC.

20           What is your opinion as to what went

21   on there?

22      A.   Okay.  My opinion is that the wall

23   moved when the hydrostatic pressure came up on

24   the wall, developed hydrostatic pressures down

25   the wall, and that was sufficient enough, based

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 387

1    on the soils and the geometry of the wall, to

2    cause failure before water got to the top of

3    the wall.  And looking back at what -- that was

4    between 9.5 and 10.5, in the expert report.

5         Q.   Okay.  9.5 and 10.5 feet of water --

6         A.   Elevation.

7         Q.   -- elevation.  And were waves an issue

8    in the IHNC?

9         A.   Waves weren't an issue as far as

10   reaching that, but waves -- if you had waves,

11   that's why you could get some fluctuations.

12        Q.   All right.  Now, you'll remember we

13   had a conversation about the logic, if you

14   will, that went into the design of the levees

15   at Reach 2.  We talked about the Corps' use of

16   what they called the standard project hurricane

17   in order to establish a height to which to

18   build the levee.

19             Remember that discussion?

20        A.   Yes.

21        Q.   All right.  And can I assume that the

22   Corps, in building to that height, built the

23   levee to withstand wave attack and/or surge

24   elevations up to the top of the height,

25   whatever that height was?

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                    Page 388

 1            MR. LEVINE:

 2                 At Reach 2?

 3            MR. BRUNO:

 4                 At Reach 2.

 5       A.   Yes.  They built the levees to account

 6  for, based on the design hurricane, elevation

 7  and some run-up for waves.

 8  EXAMINATION BY MR. BRUNO:

 9       Q.   All right.  Now, how does the design

10  address wave attack, if it does at all?

11       A.   Particularly in terms of wave attacks

12  or the functions is a run-up distance, given

13  the freeboard at the top to allow for it, and

14  for that hurricane that they were designing

15  for, they wanted to make it tall enough so that

16  you didn't get, as we saw in the document

17  yesterday, sufficient water going over the back

18  of it from wave breaking.

19       Q.   All right.  So I understand your

20  testimony is that the wave defense component is

21  the freeboard?

22       A.   Is the run-up.  Uh-huh.

23       Q.   Which is freeboard, right?

24       A.   Freeboard.

25       Q.   How about did design slope; does it

DR. REED MOSHER (VOL.II)                          February 20, 2009

 1   have any role in addressing wave attack?

 2       A.   Um -- I'm not sure about that.  Okay,

 3   the reason that -- most of the slopes on the

 4   levees are controlled by the material that

 5   they're made of, so that you have stable

 6   slopes.

 7       Q.   It's a stability issue.

 8       A.   Generally in terms, yes.

 9       Q.   And the slope on Reach 2 was 1 on 5?

10       A.   I think it varied somewhat, but 1 on

11   5 --

12       Q.   I'm sorry.  I didn't ask the question

13   intelligently.  The design slope was 1 on 5.

14       A.   I believe so, yes.

15       Q.   Plus I'm gathering that upon

16   investigation the Corps found that the slope

17   was not in fact 1 on 5?

18       A.   They vary some due to the settlements

19   and movements of it, and the soil placements.

20   Particularly on the protective side they have

21   had some berms added at the bottom of it that

22   changed the slopes some.  That's not a constant

23   slope.

24       Q.   Okay.  So if you add a berm, how would

25   that change the slope, would it go -- it would

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 390

 1   go --

 2       A.   Not as steep.

 3       Q.   Not as steep.  So it would be 1 on 6

 4   or 1 on 7.

 5       A.   Yeah.

 6       Q.   As opposed --

 7       A.   It won't have a constant slope.  It

 8   will slope down and flatten out.

 9       Q.   Do you know whether the designers of

10   Reach 2 levees contemplated the installation of

11   something called a wave berm?

12       A.   I can't remember that.

13       Q.   That's fine.  It's not something you

14   studied.

15       A.   Yeah.

16       Q.   Fair enough.

17       A.   Yeah.  I don't know.

18       Q.   Right.  Meaning you didn't study that.

19       A.   I didn't study that.

20       Q.   All right.  Now, with that as our

21   background, let's now move to north breach.

22            So can we conclude that the same logic

23   applied to the design of the north breach, and

24   that is the intent of the Corps of Engineers

25   was to build an I-wall in such a fashion that

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 391

1    it could hold or keep back a surge to a certain

2    level that didn't overtop the wall?

3         A.   In general terms, yes.

4         Q.   All right.  Now, that would include,

5    logically, a design feature that would prevent

6    the wall from leaning when it encountered the

7    pressures put upon it by the high water, right?

8         A.   Right.  They didn't intend it to lean.

9         Q.   But it did.

10        A.   Correct.

11        Q.   So would you regard that as a design

12   failure or is that a construction failure?

13        A.   Um -- based on what I've assessed, it

14   is a problem that they didn't consider in the

15   design.

16        Q.   Okay.  Now, and the problem that they

17   didn't consider was what exactly?

18        A.   Um -- actually, there's two pieces of

19   it.

20        Q.   Okay.

21        A.   Um -- part of that is the elevation on

22   the protective side, or the protective side

23   elevation of the ground was approximately three

24   feet lower than what their design calculations

25   are based on, and the factor of safety -- they

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 392

1    allowed the factor of safety to go down to

2    roughly 1.2 to I think it's 1.25, and it was

3    below the 1.3 --

4         Q.    Standard.

5         A.    -- standard.

6         Q.    Yeah, 1.3 is a standard.

7         A.    It was the design factor of safety

8    they were shooting for.

9         Q.    All right.  While we're on that,

10   maybe, are you -- is it within your field of

11   expertise to teach us about factors of safety?

12        A.    I can talk about factors of safety.  I

13   understand what they're based on.

14        Q.    What is a factor of safety?

15        A.    Um -- factor of safety is the

16   relationship between the strength of the

17   material, or the design that you're dealing

18   with versus -- or the loads applied to it.

19        Q.    Okay.  So in our case here, we want --

20   if the strength of the material, that would be

21   the wall --

22        A.    Right.

23        Q.    Okay -- and the strength of the -- or

24   load would be the water against the wall at the

25   design height --

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 393

 1      A.    Uh-huh.

 2      Q.    -- which was whatever it was, I don't

 3   recall, those -- if they are equal that's a

 4   factor of safety of 1, right?

 5      A.    Correct.

 6      Q.    Okay.  And so the idea is to have the

 7   strength of the material be higher than the

 8   load put on it.

 9      A.    Uh-huh.  Essentially, the strength of

10   material provides the resistance.

11      Q.    The resistance should exceed the load.

12      A.    Right.

13      Q.    And the factor of safety is 1.3.

14      A.    That was the design level they were

15   trying to achieve.

16      Q.    Okay.  All right.  So I think what you

17   said, the designers had intended that there be

18   a three-foot levee on the protected side.

19      A.    No.  There would be -- that the ground

20   surface was three feet higher than -- they

21   designed it for a ground surface that was three

22   feet higher on the protective side.

23      Q.    Okay.  Maybe -- yeah.  I think I'm --

24      A.    It's not a berm, it's the surface.

25      Q.    Well, there is, in an I-wall, for lack

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 394

1      of a better word, a levee or a small, um --

2      what's the proper -- what's the right way to

3      describe that little mound of earth that's

4      piled against the protected side of the I-wall?

5          A.   It would be a levee.

6          Q.   It's a levee.

7          A.   It's an I-wall setting on a levee.

8          Q.   I-wall setting on a levee.

9               But am I understanding that this three

10     feet issue is not related to the levee, it's

11     related to what the levee is sitting on?

12         A.   Right.  That's correct.  What it is is

13     the levee comes down, and then you have the

14     ground surface that it intersects with.  This

15     ground surface was three feet lower.

16         Q.   All right.  Is that a settlement

17     issue?

18         A.   Um --

19         Q.   Or did you -- I should ask the

20     question differently.  Did y'all investigate

21     what the source or what the reason or the

22     mechanics of whatever it was that caused the

23     earth there to be three feet lower than what

24     was contemplated when they built the I-wall?

25         A.   Um -- no, we didn't investigate that,

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 395

1   because farther up the wall it was that

2   elevation and even slightly higher.  So what we

3   determined was, in this same area you didn't

4   get an equal amount of settlement across there,

5   this was just lower and, um -- you know, it was

6   lower and I suspect that they didn't capture

7   that in making enough sections along there to

8   determine that.  They took that elevation as

9   being the same along that whole reach.

10      Q.   All right.  Because obviously this is

11  not something the Corps would have built, this

12  is something that the Corps would have built

13  upon, right?

14      A.   Uh-huh.

15      Q.   Now, that particular location is very

16  near to a Surekote Road ramp that allows, or

17  allowed in the past, trucks to go over the top

18  of the levee and into the East Bank Industrial

19  Area, right?  Did you guys or you -- did you,

20  sir -- did you, either as part of your IPET

21  investigation or as part of the investigation

22  performed for the lawyers, attempt to determine

23  whether or not that road or the use of that

24  road in its industrial use or perhaps as part

25  of a remediation and demolition activities had

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                    Page 396

 1  anything to do with the sinking of that area?

 2           MR. LEVINE:

 3                Objection.  Compound.

 4      A.   What we did was we looked at what the

 5  slope was running from, um -- I guess it's

 6  south up to the Florida Avenue, and there seems

 7  to be a constant slope acting down in that

 8  direction.  It doesn't seem to be a cause of

 9  settlement due to local, and that would be very

10  local, where this is along a significant part

11  of that section of it.

12  EXAMINATION BY MR. BRUNO:

13      Q.   Okay.  So once -- it's that same sort

14  of deductive reasoning that you have applied

15  really throughout, and that is you found a

16  plausible explanation which allowed you to

17  exclude other potential mechanisms, right?

18           MR. LEVINE:

19                Objection.

20      A.   Used the available information to,

21  um -- provide the opinion that I have of what

22  took place.

23  EXAMINATION BY MR. BRUNO:

24      Q.   Well, again, isn't that consistent

25  with what I just said?  You found a plausible

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 397

 1    explanation for what occurred, and once you

 2    found that plausible explanation you said to

 3    yourself, there's no need to do any other

 4    investigation?

 5        A.    And the plausible explanation of why

 6    it failed at that point.

 7        Q.    Yes.

 8        A.    Yes.

 9        Q.    Okay.  All right.  Now, is this

10    something the Corps of Engineers should have

11    discovered when it built the wall?

12        A.    What I'm saying is during the design

13    it should have been something that was

14    accounted for during the design.

15        Q.    Well, but the -- I guess what I'm

16    seeing in my mind 's eye is I'm seeing a

17    drawing which has the I-wall, and it's of a

18    certain height.  And then we have an earth berm

19    of a certain height.  And I'm just I guess

20    wondering to myself, perhaps incorrectly, that

21    when you built it you would end up a levee

22    height that's three feet lower than it should

23    have been.

24        A.    Again, it's not the levee, it's the

25    ground surface.  And so they built the levee to

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                      Page 398

1    an elevation, which they would have set that

2    elevation -- they may not have -- they would

3    just fill the area up during construction, as

4    they constructed it to an elevation.  That's

5    what he's required to do.  He wasn't

6    responsible for building the protective side

7    soil up.

8        Q.   But wouldn't the levee have a crown

9    elevation in its design?

10       A.   Right.

11       Q.   Okay.  And that would not be -- and

12   that crown elevation would be a certain number

13   based upon a datum, not based upon an elevation

14   higher than the earth that was there --

15       A.   Right.

16       Q.   -- right?

17       A.   That's exactly what I was saying.

18       Q.   You follow me?  So the point I'm

19   making is that the levee would be built as the

20   designers intended the levee to have been

21   built.  So you'd have really more levee there,

22   not less.

23       A.   Yes.  You'd have more material there.

24       Q.   So you've got more material there.

25       A.   Right.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 399

 1      Q.    Well, and that's why -- you'll forgive

 2    me, I'm getting a little confused.   Because

 3    you've got more material, not less material,

 4    one would think that that would have provided a

 5    higher factor of safety as opposed to a lower

 6    factor of safety.

 7      A.    No.   The resistance -- where it turns

 8    out, if you have look at this, on that side of

 9    the terrace, the slope down is actually part of

10    the driving force.   So if you have more

11    distance out here going to a lower distance

12    you're going to have more driving force.   You

13    have less resisting force at the toe because

14    you don't have this higher elevation.   So you

15    have less resisting forces over here to resist.

16      Q.    Okay.   Well, the force is a force

17    which moves the wall on a center point right?

18    In other words, the bottom of the pile is the

19    center and the wall is forced into the protect

20    side.

21      A.    That's incorrect.

22      Q.    That's not -- how does it happen?

23      A.    It actually -- the whole wall

24    including the bottom moves.   Along with that

25    slope.   The whole thing moved.   And it's that

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 400

1    slope being resisted by what's at the toe.

2        Q.   I see.   Okay.   All right.   So -- I now

3    get it -- because the whole wall is moving the

4    toe would play a role.

5        A.   Yes.

6        Q.   But if it was moving the way I

7    thought --

8        A.   Then it would be just a local

9    response.

10       Q.   Okay. and then the extra dirt might

11   actually increase the factor of safety.

12       A.   Yes.

13       Q.   I follow.   Okay.   So the whole wall

14   moved landward.

15       A.   Uh-huh.

16       Q.   All right.   Now --

17           MR. LEVINE:

18               You have to say yes.

19       A.   Yes.

20   EXAMINATION BY MR. BRUNO:

21       Q.   And when it moved landward, what

22   happened next?

23       A.   When it moved landward, um -- once you

24   shear the soil, it's apt to drop some strength

25   after you shear it some distance, and so it

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 401

 1    will have a drop in its shear strength and it

 2    will continue moving.  At that time, it also

 3    ruptured a, um -- sheet pile that was hooked to

 4    the T-wall and it ruptured it down the, um --

 5    length of the web and then the whole thing

 6    failed.

 7        Q.   Okay.  Let me see now.  Help me

 8    through this:  If you are walking along the

 9    I-wall before Hurricane Katrina -- and you're

10    walking toward the north.

11        A.   Uh-huh.

12        Q.   Okay?  It's all I-wall until you

13    encounter the Surekote Road, right?

14        A.   There's a little section that comes

15    out and goes in a square like this, it's a

16    T-wall, and that's close the wear that entrance

17    wall is, and that's connected to the sheet pile

18    wall.

19        Q.   Okay.  So Surekote Road goes through a

20    T-wall and not through an I-wall, is that

21    right?

22        A.   Uh-huh.

23        Q.   And so the T-wall is on a

24    perpendicular or some kind of angle.  It may

25    not be exactly 90 degrees.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 402

1       A.    Uh-huh.

2       Q.    But it's on an angle and that's where

3   the corner is between the I-wall and the

4   T-wall; is that right?

5       A.    That's correct.

6       Q.    And the sheet pile was welded to the

7   T-wall?

8       A.    I believe it was welded.  I'd have

9   to -- it was connected at that point.

10      Q.    All right.

11      A.    I believe it was welded.

12      Q.    At what time did you conclude the

13  initial -- well, how should we describe this?

14  In reviewing what you've just told me, wall

15  moves, next thing that happens, weld breaks.

16  When does water start to come through the wall?

17      A.    When the wall moved and caused the

18  breaking of that, I believe at that time you

19  got close to an opening up of a channel where

20  water could flow in, and the process of the

21  continued failure took place.  And at the same

22  time there was still a rising head.

23      Q.    Have you seen that videotape that the

24  firemen took of the break at the 17th Street

25  Canal?

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 403

 1      A.   Yes, I have.

 2      Q.   All right.  And you see how that was

 3  opened up a little bit and then allowed water

 4  to flow -- in other words, it wasn't a big rush

 5  all at once.  It took a little while to

 6  develop.

 7      A.   Yeah.  I've looked at that tape.  That

 8  tape took place after the failure took place.

 9      Q.   Oh, you think?

10      A.   As a matter of fact, it says it

11  doesn't start until -- actually, if you watch

12  the tape very beginning, this one of the things

13  I've seen is that doesn't start until 10:30 in

14  the morning.

15      Q.   Which is an hour later.  Too late.

16      A.   Yeah, an hour too late.  Even though

17  your expert witness Dr. Bea has labeled it at

18  eight o'clock in the morning before, in some

19  public presentations, which is, you know,

20  totally incorrect --

21      Q.   Uh-huh.

22      A.   -- because they actually start -- at

23  the very beginning of that tape, that is this

24  is 10:30 in the morning, or between 10:30 and

25  quarter of 11:00.  So -- and that actually

DR. REED MOSHER (VOL.II)                      February 20, 2009

Page 404

 1   doesn't show at that time the wall has already

 2   failed and everything has moved.

 3       Q.   Okay.

 4       A.   And the head's dropped.

 5       Q.   Well.  With regard to the north

 6   breach -- so water -- I mean, does water start

 7   out at a certain flow rate and then get larger,

 8   or does it just crash and burn at one instant?

 9       A.   No, as this thing moves, that

10   failure --

11       Q.   Gets larger and larger.

12       A.   -- gets larger and larger, and the

13   wall, as you can see in some of the pictures,

14   the wall actually stayed together and actually

15   rotated and flipped over.

16       Q.   So it took some time.

17       A.   But not a significant amount of time.

18       Q.   How much time?

19       A.   I would say within fifteen to thirty

20   minutes you would have had a full breach

21   opening up there.

22       Q.   Fifteen to thirty minutes.

23       A.   And that's only an estimate.  I wasn't

24   there.  I don't know exactly.

25       Q.   Okay.  That was my next question.  Did

DR. REED MOSHER (VOL.II)                          February 20, 2009

Page 405

1    you do any scientific evaluation the assess how

2    long it would have taken from initial movement

3    of the wall to full breach?

4         A.   I didn't because I don't believe

5    there's a tool available to do that.

6         Q.   That's fine.  Now, with regard to the

7    timing of the breach, how did you all determine

8    the time that the breach occurred?

9         A.   That was actually extracted from the

10   IPET work that was done on stopped clock

11   surveys done down in that lower -- that area

12   adjacent to houses that were in the Florida

13   Avenue location.

14        Q.   All right.  Stopped clock.  Well, it

15   would also have to relate to a water level,

16   wouldn't it?  In other words, you've already

17   told me that the wall failed when the water

18   reached a certain level.

19        A.   Uh-huh.

20        Q.   Right?

21        A.   That's correct.

22        Q.   And so in order for this to all work,

23   we've got to see what the water level was at

24   that particular time to see if you had

25   sufficient water levels to cause the levee to

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 406

1   fail.

2        A.   That's correct.  The surge had to be

3   at a certain level to coincide with when the

4   wall, um -- failed and then the information we

5   had on the stopped clock.

6        Q.   So you must have had a hydrograph that

7   you looked at in order to evaluate how high the

8   water was at a variety of times in the IHNC.

9        A.   That's correct.

10       Q.   And that's part of the IPET work.

11       A.   Right.

12       Q.   It's not in your report.

13       A.   It is in the report.

14       Q.   Oh, it is.  Where is that?

15       A.   Page 61.

16       Q.   Okay.  All right.  So let's see now.

17   We're looking at -- these are one-hour

18   increments?  Am I right?  These are one-hour

19   increments; right?

20       A.   Uh-huh.

21       Q.   All right.  And you all opined this

22   happened at five o'clock?

23       A.   Somewhere around five o'clock, yeah.

24       Q.   And so at five o'clock the water level

25   was 10-point looks to me a little under half,

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 407

1    maybe?

2        A.    Uh-huh.

3    EXAMINATION BY MR. LEVINE:

4        Q.    Are you looking at the --

5        MR. BRUNO:

6              Red line.

7        MR. LEVINE:

8              At the lock, right?

9        MR. BRUNO:

10              Yeah.  Well, yeah, that's a good

11              point.  Let's look at each one of

12              them.

13    EXAMINATION BY MR. BRUNO:

14        Q.    So according to the IHNC lock staff

15    gauge, it's 10-1/2 feet.

16        A.    Uh-huh.

17        Q.    According to the Orleans levee gauge

18    it's under 8 feet.  Am I right?

19        A.    This one has a little bit of -- No,

20    no.  Yeah.  It's probably -- at five o'clock in

21    the morning?

22        Q.    Uh-huh.

23        A.    I think I have it about nine feet.

24    But --

25        Q.    The big thick red line?

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 408

```
 1        A.    No, no.  The red line I take is -- my
 2   red line --
 3        Q.    The Orleans levee gauge, IHNC at I-10.
 4   It's -- I don't want to call it red, it's like
 5   a fuchsia?
 6        A.    It has --
 7        Q.    It has big blue squares on it?
 8        A.    Oh, okay.  Yep.  Sorry.
 9        Q.    So it's under eight.
10        A.    Yeah.
11        Q.    Okay.  And the USGS gauge IHNC at I-10
12   has it at -- well, that's showing the water
13   going down, actually.  Right?
14        A.    That has a -- and I think there is an
15   explanation of why that happened at that
16   location, because the gauge got stuck.
17        Q.    Okay.  But at five o'clock it is at
18   9 feet.
19        A.    Approximately 9.
20        Q.    Right?  And what's the explanation?
21   Just say it again for me.  I know you probably
22   just said it.
23        A.    Why it drops at that location?  There
24   was -- the gauge got stuck.
25        Q.    Okay.  So does that mean that the data
```

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                      Page 409

1    after that point is not reliable?

2         A.    Correct.

3         Q.    So is the data before that time

4    reliable?

5         A.    It's probably close.  It just depends

6    on exactly, you know, at the peak where that

7    changes over and where the reading was made at

8    the time.

9         Q.    All right.  Let's see.  And we have

10   digital pictures but we don't have any pictures

11   at 5:00, right?

12        A.    At 5:00, no.

13        Q.    Okay.  And then finally, we have the

14   USGS gauge at the IWW at I-10 at Paris Road,

15   and that's showing 9 feet.

16        A.    Yes.  That's correct.

17        Q.    That's a ways away from the IHNC.

18        A.    Right.  The one that's probably the

19   closest to that location is the lock.

20        Q.    The lock staff gauge.

21        A.    Right.

22        Q.    So did you look at all three of these

23   things and kind of figure it out and/or did you

24   just accept the lock staff gauge?

25        A.    Well, we put a range of when this --

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 410

1    you know, it's a matter of assessing where the

2    stability took place and the water conditions

3    at that time, and they were -- and what we saw

4    for water in the neighborhood.  And so we're --

5    you know, 9-1/2 to 10 feet, 9-1/2 to 10-1/2

6    feet is about the place where that would occur.

7    And it was around five o'clock to 5:30 in the

8    morning.

9        Q.   Okay.  All right.

10       A.   And that matches up with information

11   that we have on the, um -- stopped-clock

12   hydrograph.

13       Q.   Well, the hydrograph -- Figure 55 is

14   not a stopped clock, that's a hydrograph from

15   Mr. Fitzgerald, right?

16       A.   No.  That's a stopped-clock.

17       Q.   It says hydrograph.

18       A.   Right.

19       Q.   You have to help me.  Isn't a

20   hydrograph an indication of water level?

21       A.   Yes.

22       Q.   So how does that relate the stopped

23   clocks?

24       A.   So, when the water is rising up in a

25   house, you got clocks.  Okay?  And will stop at

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 411

1    that time.  When you go back and survey those

2    clocks you can get an elevation at what point

3    the clock stopped and what water level caused

4    that stopped clock -- that clock to stop.

5         Q.   Were those electric clocks?

6         A.   Um -- no.

7         Q.   They were --

8         A.   Battery-operated.  Because the power

9    goes out and you don't have clocks.

10        Q.   So it's battery-powered clocks.  And

11   the thinking was that the battery-powered

12   clocks would stop when they get inundated.

13        A.   Yes.

14        Q.   So every one of these clocks is a

15   battery-powered clock.

16        A.   I believe that's correct.

17        Q.   Who collected the stopped-clock data?

18        A.   It was part of the IPET study.  There

19   was a team of folks that had done that.  And I

20   can get the names, but right offhand I don't

21   know all the folks that actually did that.

22        Q.   Okay.  All right.  If we're reading

23   this correctly, it seems to show that there is

24   an elevation of two feet at Site C1.  Where is

25   Site C1?

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                    Page 412

 1      A.   I'd have to go back to the map to get

 2   that.  And that's in the IPET report.

 3      Q.   All right.  Do we know where Cite C2

 4   is?

 5      A.   It's also in the same location, but

 6   it's in the Lower -- it's in the houses on the

 7   streets adjacent to the Florida Avenue area.

 8      Q.   Okay.

 9      A.   It's in the area adjacent to the

10   Florida Avenue.

11      Q.   Okay.  Jackson Barracks, of course we

12   they where that is.  That's on the line.

13      A.   Right.

14      Q.   On the Orleans/St. Bernard line.

15           And Chalmette?  Do you know where in

16   Chalmette those were?

17      A.   I would have to look where those were.

18      Q.   And OP-5?  Do you know what that is?

19      A.   I would have to go and look, but it's

20   also one of those houses down in the lower

21   Florida Avenue area.

22      Q.   Did you, as part of your work with

23   IPET, or as part of the work you did for the

24   lawyers, evaluate how much of a load would be

25   necessary to knock the wall down given the

DR. REED MOSHER (VOL.II)                          February 20, 2009

Page 413

 1   conditions of the soils, et cetera, and the

 2   levee berm at the north breach location?

 3        A.   Did we do an assessment of --

 4             MR. LEVINE:

 5                  Objection.  Vague.  Go ahead.

 6        A.   Okay.  Did a slope stability

 7   assessment of what the forces would be, what

 8   loads it would take to have that, yes, to fail.

 9   EXAMINATION BY MR. BRUNO:

10        Q.   Yes.

11        A.   Yes.

12        Q.   And is that reported in this report?

13        A.   Yes.

14        Q.   Where is that?

15        A.   There's a series of slope stability

16   analyses starting on 89, running through 85.

17   Figure 85.

18        Q.   All right.  Would you explain what

19   these charts show us?

20        A.   They're a series of slope stability

21   analysis which show the water loads, the soil,

22   um -- conditions and the failure patterns and

23   the factors of safety derived from those.

24        Q.   All right.  It seems that Figure 71 is

25   Case 1, water level at ten feet with a crack.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 414

1              The crack is between the, um -- I-wall

2       and the T-wall?

3          A.   No.  The crack is -- it's an opening

4       of the soil between the soil on the levee and

5       the I-wall.

6          Q.   All right.  So does this case assume

7       the crack is already there?

8          A.   Excuse me?

9          Q.   Does this case assume -- it says Case

10      1, so I'm referring to the case -- assume that

11      the crack is already there when you were doing

12      this analysis?

13         A.   Correct.  Yes.

14         Q.   Okay.  So there's been some movement

15      before in this case.

16         A.   Correct.

17         Q.   All right.  So what exactly are we

18      doing here?

19         A.   Okay.  We have water pressure acting

20      down on the -- we have water pressures acting

21      against the wall.  We have the levee surface

22      and the natural ground surface.

23         Q.   Okay.

24         A.   Okay?  And then we're doing a slope

25      stability analysis using Spencer 's Method

DR. REED MOSHER (VOL.II)                          February 20, 2009

Page 415

 1    which defines the failure surface that we see,

 2    and the red dots, and it's doing a, um --

 3    moment and force equilibrium analysis and

 4    comparing those shear strength that's developed

 5    along that versus the driving and resisting

 6    forces.

 7         Q.   And what is the result?

 8         A.   The result is that we have a factor of

 9    safety of 1.042.

10         Q.   Okay.  With a factor of safety of

11    1.042, it doesn't necessarily fail; right?

12         A.   It's on the verge of failure.

13         Q.   Well, it's in equilibrium.

14         A.   It's on the verge of failure.

15         Q.   Well, if the two are equal --

16         A.   It's right at the point where failure

17    would start.  So --

18         Q.   Well, let me see if I understand it.

19    If the resisting force and the loads are

20    identical, at that magic moment it's not

21    necessarily a failure.

22         A.   Not necessarily a failure, but not

23    necessarily not a failure.

24         Q.   Oh, I understand.  But, I mean,

25    it's -- logically, the loads have to exceed the

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 416

1    resistance in order for there to be a failure;

2    correct?

3        A.    Correct.

4        Q.    All right.  But in your world, when

5    the -- how close do you get to 1, or unity,

6    before you've concluded we have failure?

7        A.    For practical purposes, as an engineer

8    if you're at 1.0, whatever, you're at a point

9    where failure is.

10       Q.    Imminent.

11       A.    Imminent and likely to occur.  And

12   with the uncertainties that you have in the

13   shear strengths and the surfaces and all the

14   measurements, that, you know, you would not

15   build anything that has a factor of safety of

16   1.

17       Q.    I understand that.  That's a different

18   issue.  We're not talking about building, we're

19   talking about the point at which we have a

20   failure.

21            All right.  Now, in this scenario --

22       A.    But I would like to kind of finish.

23       Q.    Sure.  Yeah.

24       A.    I mean, you are at the verge of

25   failure.  And, you know, these are also the

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 417

 1   case where what we're doing is looking at an

 2   upper limit of the shear strength.  At this

 3   point you would have considerable movement you

 4   might have as much as two fate of movement of

 5   the wall at a case of a, um -- factor of safety

 6   of 1.

 7        Q.   Why would you have so much movement

 8   when the load and resistance are equal?

 9        A.   Because the shear strength requires

10   strain, which turns into displacement, to

11   develop.  And you may need 5 to 10 percent

12   strain to have that occur.  If that occurs,

13   you're going to get movement of the walls.

14        Q.   Right.

15        A.   And finite element studies show that

16   if you're approaching 1, you're going to have

17   very large movement.

18        Q.   Now, does this analysis allow you to

19   predict the manner in which the failure will

20   occur, that is, the whole wall moves as opposed

21   to cantilevering over?

22        A.   This method actually distinguishes the

23   type of failure that is occurring, and this is,

24   a, um -- mass movement, so it does give you an

25   indication of the type of failure.

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                    Page 418

1       Q.    So that's what we're talking about

2   when we see this side force inclination at

3   -4.92 degrees?

4       A.    No.

5       Q.    What does that refer to?

6       A.    That refers to the side forces in the

7   slices this is cut up to.  It's part of the

8   analysis.  It's a readout of what the side

9   forces are.

10      Q.    In order for you to run this

11  evaluation you have to plug in some variables;

12  right?

13      A.    That's correct.

14      Q.    And the little, I guess that's a

15  tannish brownish, box is a description of the

16  variables?

17      A.    It's a description of the soil

18  strengths and soil characteristics.

19      Q.    All right.  So where did you get the

20  information which allowed you to indicate the

21  depth of the levee fill versus marsh 1, marsh

22  2, the wall, the interdistributary and the

23  nearshore gulf relic beach?

24      A.    Those were developed from the IPET

25  study with borings and geology --

JOHNS PENDLETON COURT REPORTERS              800  562-1285

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 419

1      Q.    Okay.

2      A.    -- in that area.

3      Q.    Weren't there some layers of organic

4    material in there?

5      A.    The marsh material is organic

6    material.

7      Q.    Okay.  Well, it's a mixture of

8    materials, it's not all organic.

9      A.    Um -- that is correct.  But we don't

10   have any all-organic materials there.

11     Q.    Okay.  So you got your depth from the

12   borings, right?

13     A.    That's correct.

14     Q.    And then the unit weight.  How did you

15   all figure that out?

16     A.    That was also from the samples that

17   were retrieved and, um -- both -- and also with

18   the, um -- previous work that was done for the

19   design.

20     Q.    Okay.  And what unit weight is that?

21   109 is what unit of weight?

22     A.    It's pounds per cubic foot.

23     Q.    Pounds per cubic foot.  All right.

24   The next column is shear strength.  And if we

25   look at the levee fill we see a cohesion of

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 420

1    500.0 of something.  What is that measurement?

2        A.    That's in pounds per square foot.

3        Q.    Pounds per square foot.  And the

4    friction angle; where does that come from?

5        A.    That is a measure of the internal

6    friction of the soil.  And in this case it was

7    zero.

8        Q.    And the pore pressure; how do you

9    determine pore pressure?

10       A.    Actually, when you're doing an

11   undrained analysis you shouldn't be using pore

12   pressures.  The fact that you are using

13   undrained analysis assumes that you have a

14   material that's impervious enough so that the

15   pore pressures won't drain.  And so it's

16   basically a way to look at this as if you've

17   got something that's frictionous, friction,

18   that's what they're -- or you have something

19   that is adhering to the material.  So friction,

20   if you push on it hard enough you get actually

21   weight of resistance.

22       Q.    Uh-huh.

23       A.    When it's adhering, if you push on it

24   it's the same resistance whether you have a

25   little bit of pushing down on it or a lot.  And

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 421

```
 1   these materials have zero shear strength when
 2   you're doing undrained analysis, so the weight
 3   of the soil doesn't affect the strength.  And
 4   it's something that, you know -- I mean you
 5   learn that in undergraduate soil mechanics.
 6        Q.   All right.  Well, the fact of the
 7   matter is that the marsh layers are full of
 8   water, aren't they?
 9        A.   They have water in them.  So does all
10   the clay.
11        Q.   But the marsh layers have more water
12   than the clay does.
13        A.   They have higher water content.
14        Q.   And do I understand that we're doing
15   this test as if there's no water?
16        A.   No.  We're doing the test assuming the
17   water, but the water doesn't -- when you shear
18   the soil it doesn't dissipate.  It actually --
19   actually, what happens is the water actually,
20   um -- holds the load that's being applied to
21   it.  So it's actually carrying the load.  So
22   you don't get a volume change of the soil.
23        Q.   Okay.  All right.  And then we have
24   Marsh 2 -- Marsh 1 and 2 seem to also
25   incorporate shear strength interpolated.
```

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                    Page 422

 1            What does that mean?

 2       A.   That we have some variation issues

 3   throughout the thickness.  So you have a

 4   different value at the top than you do at the

 5   bottom.

 6       Q.   So what value did you use?

 7       A.   I would have to go back and look.

 8       Q.   Minimum Su.  What does that refer to?

 9       A.   Su?  Is the undrained shear strength.

10       Q.   And that's zero?

11       A.   I don't -- it depends on.

12       Q.   0.00?

13       A.   Where are we looking?

14       Q.   Marsh 1.

15            MR. LEVINE:

16                He's looking at Page 89, Figure

17            71?

18            MR. BRUNO:

19                Yeah.  Never left it.

20       A.   And it has a maximum, I believe.

21   EXAMINATION BY MR. BRUNO:

22       Q.   What does that mean?

23       A.   I'd have to go back and look exactly.

24   Um --

25       Q.   Okay.  And the maximum is 1000.  Do

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 423

1    you know where that came from?

2        A.   I think those are limits the program

3    puts.  I think we actually have different

4    values for those.

5        Q.   And the wall, it just says very

6    strong.

7        A.   Yeah.  Well --

8        Q.   I mean, it should be, it's made out of

9    metal.

10       A.   Meaning we don't expect it to shear.

11       Q.   But it bends.

12       A.   Correct.

13       Q.   The E-99 test taught you that.

14       A.   It does flex.

15       Q.   I mean the E-99 test in the

16   Atchafalaya Basin showed that -- actually it

17   shows that the wall is going to fall over,

18   doesn't it?

19       A.   I would say that it doesn't show that

20   it's falling over, it shows that if you put

21   sufficient enough water load behind it you're

22   going to get bending of the wall, movement of

23   the wall.  And it's -- particularly in that

24   case was a case -- you're going to get bending

25   or movement, lateral movement of the wall.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 424

```
 1      Q.    Which then allows an opening to form

 2    between the wall and the soils below for water

 3    to go into it.

 4      A.    Correct.

 5      Q.    I mean, that's -- isn't that -- that's

 6    the mechanism of failure that you all

 7    determined happened at 17th Street Canal;

 8    right?

 9      A.    That's correct.

10      Q.    And is this mechanism of failure the

11    same as the 17th Street Canal?

12      A.    It's very similar.

13      Q.    And it's a different because it didn't

14    bend and allow water to go into it, the whole

15    wall moved.

16      A.    Um -- no, they're both very similar.

17    They're soil mass movements.

18      Q.    So do you believe that the wall bent

19    before the whole wall moved?  It kind of had

20    to, didn't it?

21      A.     I would like to correct that a little

22    bit.  It's not that the wall bent.  We see very

23    little bending of the wall.  It's the fact that

24    soil in front of the wall displaced, moved, and

25    the whole wall leans.
```

DR. REED MOSHER (VOL.II)                         February 20, 2009

Page 425

1       Q.    The whole wall leans into the canal?

2       A.    No, the other direction.  Into the

3   protective side.

4       Q.    What forces the soil on the water side

5   to be displaced?

6       A.    It doesn't.  It actually -- the wall

7   displaces.

8       Q.    So it displaces on the back side.

9   Something has got to move in order for it to

10  move.

11      A.    Oh.  Okay.  The wall -- let's talk

12  about protective side.

13          MR. LEVINE:

14              What location are we talking

15          about now?

16          MR. BRUNO:

17              Oh, give me a break, Paul.

18          MR. LEVINE:

19              We're talking about two different

20          locations.

21          MR. BRUNO:

22              Paul, no we're not.

23          MR. LEVINE:

24              You're talking about two

25          different locations here, the 17th

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 426

1          Street Canal and the IHNC.  And I want

2          to be clear what we're talking about.

3          MR. BRUNO:

4              He's talking about generally the

5          failure mechanism.  Okay?  At either

6          location.  And at E-99.  We're talking

7          about a general concept here, we're

8          not talking about specifics.  When we

9          get specific I'll let you know.

10  EXAMINATION BY MR. BRUNO:

11      Q.   All right.  Now, were you finished?

12      A.   The wall in those cases moved.  The

13  soil on the protective side would have

14  compressed in front of the wall to allow it to

15  move, because of the hydrostatic pressure on

16  the wall.  And as you open that space, water

17  can get in there and cause greater movement.

18      Q.   Okay.  All right.  And maybe -- it's

19  been a long time since I've read the E-99 sheet

20  pile evaluation, perhaps years ago, but I

21  thought they talked about a flexing component

22  of the sheet pile.  In other words, did I

23  miss -- am I wrong?  Did they talk about a

24  bending or a flexing?

25      A.   Their analysis looked at the flexing

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 427

1    part of it as a bending and we found that that

2    was not a sufficient amount of movement to

3    cause the kind of displacements that we were

4    seeing.  It had to be -- and we actually had,

5    um -- load inclinometers in front of the wall

6    where you could actually see that the soil was

7    compressing, moving laterally.

8         Q.   So --

9         A.   The wall is sufficiently stiff not to

10   have that amount of movement.

11        Q.   I see.  So your testimony is that the

12   E-99 test showed the entire wall moving, not a

13   flexing mechanism.  Just --

14        A.   Flexing is a piece of it, but a very

15   piece.

16        Q.   Small part.  And the movement was

17   allowed because there was some pressure on the

18   soils behind due to the pressures of the loads

19   put on it.

20        A.   In front.

21        Q.   In front.  Sure.  And that's what

22   opens the gap, if you will, between the wall

23   and the soils on the water side, the flood

24   side.

25        A.   Right.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 428

1      Q.    Okay.  All right.  And you believe

2   that's what occurred at the north breach.

3      A.    Correct.

4      Q.    And that's what also occurred in 17th

5   Street Canal?

6      A.    Correct.

7      Q.    Okay.  Does it disturb you at all that

8   is was a mechanism of failure that was

9   identified by the E-99 sheet pile sent as early

10  as the late sixties?

11     A.    E-99 was not -- it was '87.

12     Q.    You're right.  It was late eighties.

13  It's been several years, as I said.  I admitted

14  that.  It was the late eighties, you're right.

15          But did that cause you any -- I mean,

16  concern?  I mean, the mechanism was identified

17  twenty years earlier.

18     A.    I'd like to speak to that.

19     Q.    Okay.  I would like to hear you speak

20  to it, too.  So would the rest of the people

21  who pay taxes in the City of New Orleans.

22     A.    The E-99 wall didn't have a mass

23  failure like 17th Street or this one.  It was

24  actually just a local movement of the wall.  We

25  didn't have the whole soil mass, like you see

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 429

 1   there, moving, it was just local movement.  And

 2   the, um -- if you look at how the test was

 3   designed, they didn't see the gap behind the

 4   wall because there was black plastic covering

 5   that area to keep it water tight.  So that was

 6   never discovered at that time.

 7       Q.   Well, let's remember, this is the test

 8   where there's a discussion, and there's a

 9   review of the minutes of the meeting, and

10   there's a suggestion that the word failed be

11   removed from the minutes and their word

12   performed be put in its place.  Right?  We're

13   talk about the same one.

14       A.   But it --

15       Q.   Just allow me.  We're talking about

16   that meeting --

17       A.   Yes.

18       Q.   -- right?  And the fact is that

19   somebody in your team thought that the wall

20   was -- had failed.  Somebody.

21       A.   Uh-huh.  Okay.

22       Q.   Right?

23          MR. LEVINE:

24             Objection.  Vague.

25   EXAMINATION BY MR. BRUNO:

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 430

1      Q.   And somebody else said, no, it didn't

2    fail, it performed.  That's a big gap in

3    evaluation, wouldn't you believe, when you go

4    from somebody thinking it failed to somebody

5    thinking that it performed?  Wouldn't you agree

6    with me?  That's a large difference of opinion.

7      A.   Um -- but I would say that if you were

8    conducting an experiment looking at this and

9    you would be looking at what was the

10   performance of -- I think in the report it said

11   if it was on the verge of failure they were

12   taking failure as the whole thing laying down,

13   and I don't think they shied away in the report

14   that insipent failure was -- or it was close to

15   occurring when the test stopped.  And what

16   caused the test the stop was that a gap opened

17   up the allowed the water to run out so they

18   couldn't continue the test to failure.

19     Q.   Isn't it true that the reason why they

20   substituted the word performed for the word

21   failed is because they really weren't looking

22   at the lateral displacement of the sheet pile,

23   they were trying to figure out whether they

24   could use a short sheet to carry the loads from

25   above?

DR. REED MOSHER (VOL.II)                      February 20, 2009

Page 431

1        A.    The primary focus was to look at

2   reducing the length of sheet pile.

3        Q.    Right.  And the concept was, can we

4   save money by using a short sheet, and their

5   concern was that short sheet had to carry the

6   same loads from above in order for the

7   substitution to be practical.  Right?

8        A.    With the same lateral loads from the

9   water pressure from above.

10       Q.    All right.  They were not looking at

11  the ability of the wall to withstand a

12  hydrostatic pressure, were they?

13       A.    Correct.  Hydrostatic -- well --

14       Q.    The loading from -- I'm going to call

15  it lateral loading.  How about that?

16       A.    They were looking for it to carry the

17  lateral loading, but not necessarily

18  hydrostatic pressure all the way down to the

19  tip of the sheet pile.

20       Q.    So again, the question is, would it

21  disturb you that -- well, let me ask it this

22  way:  E-99 demonstrated the same mechanism of

23  failure that we see at the north breach and

24  also at the 17th Street Canal, right?

25       A.    I would say no.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 432

```
 1      Q.   Oh, we don't.  It's different.

 2      A.   I would say the initiation of the

 3 failure is the same, but it didn't -- in those

 4 cases it didn't lead to that type of failure

 5 because it was a local response in the E-99

 6 test.

 7      Q.   But they shut the test down, so we

 8 didn't -- we wouldn't know how far it would go.

 9      A.   Well, the wall wouldn't hold any more

10 water.

11      Q.   So --

12      A.   Well --

13      Q.   Are we passing in the night here or

14 what?  If it wouldn't hold any more water, that

15 kind of sounds to me like it's not going to

16 hold any more water.

17           MR. LEVINE:

18                Hold on, hold on, hold on.

19           You're talking over each other, both

20           of you.

21           MR. BRUNO:

22                Enough already with this.  Okay?

23           We've been fine.

24           MR. LEVINE:

25                You're talking, he's talking --
```

DR. REED MOSHER (VOL.II)                          February 20, 2009

Page 433

```
 1          come on, Joe.  I'm just trying to get

 2          the record to be clear.

 3          MR. BRUNO:

 4              How bout -- yeah, but you're just

 5          causing lots of confusion and you're

 6          making the record unintelligible.  I

 7          think we've got a good rapport going,

 8          myself.

 9     A.   Can I finish?

10  EXAMINATION BY MR. BRUNO:

11     Q.   Of course.

12     A.   Okay.

13     Q.   Finish your thought.

14     A.   If you did a slope stability analysis

15  such as is right in front of you for the case

16  that you're looking at at E-99, you would have

17  found that you had a factor of safety of

18  1-1/2 -- close to 1-1/2.  It did not have that

19  kind of mass soil failure.  They actually

20  designed it so that it wouldn't have that kind

21  of failure.  They wanted to look at just the

22  local response of the wall.  So when you design

23  sheet pile wall you look at the local response

24  and the global response.  And so they were

25  concerned about the local response, the bending
```

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 434

1   of the wall to the hydrostatic walls, and the

2   fact that they had in the past analysis

3   procedures showed they needed to drive sheet

4   piling that was considerably longer than what

5   they believed would be necessary to keep it

6   stable for local stability reasons.

7        Q.   Bottom line is that if the sheet pile

8   had been longer at the north breach it wouldn't

9   have failed, right?

10       A.   I don't agree with that.

11       Q.   You don't.  Okay.  The sheet pile

12  there were twelve feet -- driven to twelve feet

13  below?  Yeah.  Twelve feet?

14       A.   I believe that's correct.  Something

15  like that.

16            (Brief recess.)

17  EXAMINATION BY MR. BRUNO:

18       Q.   All right.  We were talking about the

19  series of figures which appear in your report

20  at Pages 88, 89, 90 and 91.  And we had just

21  gone through Figure 71.

22            Now, what is the difference between

23  Figure 71 and 72?

24       A.   There's a slight change in the

25  elevation.

JOHNS PENDLETON COURT REPORTERS                 800  562-1285

DR. REED MOSHER (VOL.II)                        February 20, 2009

Page 435

1        Q.    Of what?

2        A.    Of the water.

3        Q.    And why did you do that?

4        A.    Trying to see the effects of increased

5    water on the factor of safety, how it changes

6    it.

7        Q.    It changed it by .2 or thereabouts.

8        A.    Right.

9        Q.    Not much.

10       A.    Not much.

11            MR. LEVINE:

12                 .02?

13       A.    .02.

14    EXAMINATION BY MR. BRUNO:

15       Q.    .02.

16            What is the difference between Figure

17    72 and Figure 73?

18       A.    It's without the crack behind the

19    wall.

20       Q.    And it also looks like there's a

21    change in elevation of the water bed.  Or I

22    should say on the flood side.

23       A.    I think that is just the fact that you

24    have a different surface and it's made the

25    graph bigger.  The pressures are the same.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 436

1    It's just, um -- those aren't the height of the

2    water, that's an arrow that represents the

3    water pressure acting down.

4         Q.   Well, in Figure 73 on the flood side,

5    there is an area of 1 which is levee fill,

6    which frankly I don't see on Figure 71 or on

7    Figure 72.

8         A.   Correct.

9         Q.   So why is there a difference there?

10        A.   In order to do that analysis what we

11   chose to do is not put those layers in because

12   they didn't participate in the behavior of the

13   failure.  So they were left out because the

14   crack eliminates them from being a driving

15   force.  So it's a technique you use in doing

16   the analysis.

17        Q.   So, in other words, to simulate a

18   crack you removed a portion of the water

19   bottom, is that what you did?

20        A.   A portion of the soil that made up the

21   levee on that side, on the flood side.

22        Q.   Which is underwater, isn't it?

23        A.   Yes.  Well, with the water -- yeah.

24        Q.   I mean, it's underwater.

25             Okay.  How much of the soil was

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 437

1    removed in your Figure 71 and Figure 72?

2        A.    I'd have to look, but it was the

3    amount that would go down to the bottom of the

4    wall.  The tip of the sheet pile.

5        Q.    So in your Figure 71 and in your

6    Figure 72, when you're doing this analysis it's

7    as if the sheet pile is not embedded in any

8    earth at all on the flood side.

9        A.    Correct.

10       Q.    And all of the soil is on the

11   protected side.

12       A.    Correct.

13       Q.    I see.  And this is a valid way to

14   undertake this evaluation?

15       A.    Yes.

16       Q.    Now, without a crack, the factor of

17   safety goes up pretty substantially, doesn't

18   it?

19       A.    That's correct.

20       Q.    So that logically means that it's the

21   crack that's -- the crack plays a pretty

22   central role in this mechanism of failure.

23       A.    That's correct.

24       Q.    So if there's no crack there's at

25   least a delay in the -- in this mechanism.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 438

```
 1      A.    If the crack didn't form --

 2      Q.    Right.

 3      A.    Okay -- yes, there would be more

 4  resistance to the water levels.

 5      Q.    And what is your evidence that the

 6  crack did develop?

 7      A.    Um -- there's actually photographs

 8  that are included in there.  You can see cracks

 9  adjacent to the wall that's still standing.

10      Q.    Okay.  And where are -- are those in

11  your report?

12      A.    Yes.  Uh-huh.

13      Q.    Where are those photos?

14      A.    They're on Page 66.

15      Q.    66.

16      A.    Page 66, Figure 59.

17      Q.    And so what we're seeing there is a

18  crack, you think?

19      A.    Yes.

20      Q.    Or a space?

21      A.    A space in the soil.  It's moved

22  enough so the soil has actually settled.

23      Q.    Well, again, now, it looks to me, and

24  I'm just -- you know, it looks to me like the

25  wall is leaning.  It doesn't look like the
```

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 439

1   entire wall has moved back laterally.  Am I

2   seeing something --

3        A.   There will be some leaning to it, but

4   it was enough to move the whole wall.  It's got

5   to start out by leaning.  Okay?

6        Q.   Right.

7        A.   And then the water gets down in behind

8   it and it can push the whole thing over.

9        Q.   It's not a lateral movement, there

10  is -- okay.  There's got to be some leaning

11  first and then water goes into the hole --

12       A.   And then lateral movement.  But --

13  Okay, if you look at soil motion in front, on

14  the protective side, that's not going to be --

15  it's going to be a lateral movement of that

16  soil.  Okay?  It will be more at the top

17  because the hydrostatic pressures -- you know,

18  it's starts there, and then as it goes deeper

19  there's more resistance so it will be less.

20       Q.   Did you make any effort to determine

21  the length of the crack?

22       A.   Um -- we have in 17th Street and other

23  places done that, by both bottom surveys and

24  then with -- also by putting a probe down

25  behind the wall o see how far it would go.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 440

1       Q.   Did you do that in the north breach?

2       A.   No, not at the north breach.

3       Q.   Okay.  It just seems like an exercise

4   that you may have wanted to do would have been

5   an exercise whereby you would have determined

6   the length of the crack and then you see how

7   that length relates to that lower elevation on

8   the other side, to see if the two are

9   connected.

10      A.   Um --

11      Q.   Because that's what you said was the

12  reason for this occurring in the first place.

13      A.   But I know the bottom of the wall is

14  well above that elevation on the other side.

15  The elevation on the other side is, would be

16  -6.

17      Q.   No, I meant the lower-than-designed

18  components.  Remember you said to me --

19      A.   Yeah.  Uh-huh.

20      Q.   -- that -- you opined this morning

21  that the reason for the failure was that the

22  height of the land upon which the I-wall was

23  built was lower than was anticipated by the

24  designers.  But it wasn't low for the entire

25  length of the reach, it was low for some

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                      Page 441

 1   distance.  Right?

 2       A.   It was -- correct.

 3       Q.   Right.  And so one would think

 4   logically that if that was a component of the

 5   mechanism of failure one would want to see the

 6   point at which it no longer played a role in

 7   the failure, and one would sort of want to

 8   determine where does that level start to go

 9   back to what the designers had anticipated and

10   to see what the connection is between the

11   lowness of that -- the floor, if you, and

12   compare that to the length of the crack.

13           Does that sound crazy or is that not a

14   reasonable exercise?

15       A.   I don't see the relevance of it.

16   Okay, we did do some examination of the

17   photographs.  You can see the ones above this

18   are close to the breach, at the south breach.

19       Q.   Yeah.

20       A.   And you'll see less wall movement and

21   less cracks forming along that section.

22       Q.   Right.

23       A.   And they're higher at that point.

24       Q.   Sorry.  What is higher?

25       A.   The surface is somewhat higher at that

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 442

 1    point.

 2         Q.   Well, it's not about being higher, I

 3    thought, it's about whether it's consistent

 4    with what the designers expected versus what

 5    was there.

 6         A.   Well, this is -- at the south breach

 7    is closer to what the expected -- what the

 8    designers used in their design, that protected

 9    side elevation.

10         Q.   But it's still low?

11         A.   No, it is what they --

12         Q.   Is it the same as what the designers

13    anticipated or is it lower than what the

14    designers anticipated at the south breach?

15         A.   It's at or higher than what they

16    anticipated.

17         Q.   Okay.  All right.  Well, I guess what

18    I'm driving at, wouldn't you anticipate that

19    the wall would fail at every location where

20    that level was as low as it was on the north

21    breach?

22         A.   Um -- if all things were consistent?

23         Q.   Yeah.

24         A.   Yes.

25         Q.   Okay.  Well, what would have been

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 443

1    different as one moved south?

2         A.   The elevation of the protective side

3    soil, natural ground elevation, rose.

4         Q.   Well, that's why I asked the question.

5         A.   Yeah.

6         Q.   Wouldn't you have done an exercise to

7    see -- you know, to try to see if there was

8    some corroboration because where the level went

9    up would be the point where you would expect to

10   see no cracking on the flood side, right?

11   Right?

12        A.   There is, um -- where possible, we did

13   do some examination of where that took place.

14   But there are actually other locations along

15   the wall midway where we also saw the crack

16   formation on the walls.  So it is not strictly

17   tied to that lowest point, there are actually

18   midpoint places where the wall had moved and

19   the cracks had formed.  So it's not just at

20   that location.

21        Q.   How did you explain those cracks?  Why

22   did they form?

23        A.   Um -- first mechanism is the wall

24   moving.

25        Q.   Right.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 444

1      A.   Okay?  That could occur even if it

2   didn't fail.  Okay?  A total failure of the

3   levee and the wall.  So that could happen even

4   if the wall didn't fail.  It would be

5   anticipated on the verge of failing.

6      Q.   Well, where there's a crack, you have

7   a factor of safety of 1.0 -- I forgot what it

8   was.

9      A.   1.042, I believe.

10      Q.   Yeah.  So at the center of the reach

11   we have that same low factor of safety that we

12   would have expected?

13      A.   No.

14      Q.   And that's because you got a little

15   higher surface behind it?

16      A.   That's correct.

17      Q.   Well, did you all do any investigation

18   to see how the two correlate with one another;

19   in other words, how does the level of the land

20   below the levee correlate to an increase of the

21   factor of safety?  Did you do that evaluation?

22      A.   We did in several locations along

23   there, in the IPET report.

24      Q.   Okay.  What did you find?

25      A.   Found that as you raise up that, um --

JOHNS PENDLETON COURT REPORTERS              800  562-1285

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 445

1  protective side surface the factor of safety

2  increases.

3      Q.   Okay.  So is it your belief that the

4  wall was about to fail at the center where the

5  cracks were identified?

6      A.   Um -- they had a low factor of safety.

7  Okay?  And they would have moved in some of

8  those locations, and but didn't fail because --

9      Q.   Right.

10     A.   But they did have significant movement

11 because they had low factors of safety.

12     Q.   Right.

13     A.   But they didn't have a factor of

14 safety low enough to fail.

15     Q.   Do you recall the factors of safety

16 that y'all --

17     A.   I don't right off.

18     Q.   It's in the IPET?

19     A.   But --

20     Q.   All right.  Now, on the south breach,

21 in your report you say that it's all

22 overtopping.  Right?

23     A.   We say the failure is due to

24 overtopping.

25     Q.   All overtopping.  Now, in fact,

JOHNS PENDLETON COURT REPORTERS            800  562-1285

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 446

```
 1   utilizing your numbers, again, you were good

 2   enough to find this for me last time, the

 3   14-point, um -- I got it.  Page 100.

 4        A.   Uh-huh.

 5        Q.   The peak storm surge elevation was

 6   14.2, about 1.7 feet above the top of the

 7   floodwalls and levees.  And you'll recall

 8   yesterday we talked about, oh, Dr -- is it

 9   Dr. Westerink?

10             MR. LEVINE:

11                  Yeah.

12             MR. BRUNO:

13                  He's a Ph.D.?

14   EXAMINATION BY MR. BRUNO:

15        Q.   Dr. Westerink, one of the defendant

16   experts, deposed and in fact in his report

17   indicates that the MRGO was responsible for

18   3.5 feet of water in the IHNC.

19             Do we agree, then, that the MRGO is

20   what caused the overtopping since 3.5 is higher

21   than 1.7?

22             MR. LEVINE:

23                  Objection.  Vague.

24        A.   Okay.

25             MR. LEVINE:
```

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                    Page 447

1            You can answer.

2       A.   Um -- his numbers are somewhat

3   different than your own experts'.

4   EXAMINATION BY MR. BRUNO:

5       Q.   His are higher, actually, than our own

6   experts.  But that's another issue.  Just

7   answer my question and you can explain it all

8   day long.  Just tell me, number one, what is

9   the answer to my question here?  He says MRGO

10  is responsible for 3.5 feet.  If that's true,

11  can you and I agree that 3.5 is larger than

12  1.7?

13      A.   I would have to know what his -- the

14  only point that I would say, you're using my

15  numbers here of 14.2.  If his -- if his

16  predictions are 14.2 in the IHNC for the MRGO

17  being there, and then, um -- then not the MRGO

18  being there it's 3-1/2 feet less than that, I

19  would say they wouldn't have got overtopping at

20  that point.

21      Q.   Well, how about this; is 3.5 bigger

22  than 1.7?

23      A.   I said that.  I said they wouldn't get

24  overtopping.

25      Q.   I understand that.  But just to be

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 448

```
 1   fair with me, if you subtract 1.7 from 3.5 --

 2        A.   I think I've answered that.

 3        Q.   I understand.  And I'm not asking that

 4   question yet.  Don't --

 5        A.   Sorry.

 6        Q.   Hold on. It's about -- that's 1.8 feet

 7   of difference.  Right?  So even if Westerink is

 8   off by 1.8 feet, you still don't have

 9   overtopping, right?  Either you are wrong on

10   your 14.2 -- and let's make it, instead of 14.2

11   let's make it 16 feet.  There's still no

12   overtopping.

13        A.   16 feet --

14        Q.   Of surge.

15        A.   Right.

16        Q.   In other words, at Page 100 -- let's

17   see if we can walk through this very slowly --

18   the peak storm surge elevation in the IHNC was

19   14.2.  Let's say you're wrong by 1.8 feet.

20   Let's make it 16 feet.

21             There's still no overtopping.

22        A.   The walls are at 12 to 12-1/2, so

23   13-1/2 would put it right at 12-1/2, so we

24   would have just got started getting some

25   overtopping.
```

DR. REED MOSHER (VOL.II)                        February 20, 2009

Page 449

1      Q.   A little water coming over.  That
2  wouldn't have made the walls fall down, right?
3      A.   There would have been --
4      Q.   Some splash.
5      A.   There would be considerable splash.
6  If you look at the hurricane that recently hit
7  New Orleans --
8      Q.   Yeah, I remember.  Watched it very
9  carefully.
10     A.   -- and the water was -- the surge was
11  considerably lower than the top of the wall and
12  we still got a lot of wave splash over.  So if
13  you were right at the top of the wall you would
14  be getting considerable water flowing over the
15  top of the wall.
16     Q.   Yeah.  We all watched it.  The walls
17  didn't fall down.  Right?
18     A.   That's correct.
19     Q.   Okay.  And there was no -- as I
20  remember from watching that very carefully
21  since I'm a little too close to the case, there
22  was splash but there was no really water
23  flowing over these walls on the west side, in
24  the pictures.
25     A.   In the pictures.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 450

1        Q.    Yeah.  Isn't that true?

2        A.    True.  But the surge was considerably

3    lower than twelve feet.

4        Q.    Regardless -- well, I don't know.

5    What I saw was the water level was about at the

6    top of the wall.  I didn't measure the surge,

7    but my eyes saw water as high as that levee

8    wall.  And I saw waves splashing over the top.

9    That's what I saw.

10       A.    The water level was considerably

11   below --

12       Q.    Well, then, you must have done some

13   evaluation to determine at what amount of waves

14   will cause sufficient scouring of the backside

15   to cause the walls the fall down right?  Have

16   you done that?

17       A.    No, I haven't.

18       Q.    Okay.  So we don't know, right?

19       A.    Right.

20       Q.    We don't know?

21       A.    No, we don't know.

22       Q.    Fair enough.  So if your numbers are

23   correct, let's -- this is it:  If your numbers

24   on Page 100 are correct and Dr. Westerink is

25   correct, then the MRGO contributed

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                   Page 451

 1   substantially to the failure of the south

 2   breach, right?

 3           MR. LEVINE:

 4               Objection.  Vague.

 5       A.   His answer -- if his answers are

 6   correct, but also in the same aspect, looking

 7   at what your experts have done they show that

 8   there would be considerable -- that the MRGO

 9   didn't have a significant contribution to this,

10   and I think your experts have said the wall

11   would have failed under both scenarios.

12   EXAMINATION BY MR. BRUNO:

13       Q.   That's not in entirely accurate.  What

14   do you believe my experts have indicated to be

15   the peak surge?

16       A.   Um -- around 14.4.

17       Q.   Okay.  And what do they say is the

18   contribution of the MRGO?

19       A.   Um -- I was actually looking at the

20   peak surge for that scenario.  If it's 14.4 and

21   this is a scenario without the MRGO, that would

22   be sufficient enough to cause the overtopping

23   and failure.

24       Q.   Okay.  But my experts did -- actually

25   did calculate discharge flows, didn't they?

DR. REED MOSHER (VOL.II)                         February 20, 2009

Page 452

1   We -- our modeling at least gave us the flows

2   over the top.  Yours did not do that.  Right?

3       A.   Right.

4       Q.   Okay.  All right.  So what is the

5   difference between the conclusion of the

6   plaintiff experts as to the contribution to

7   surge and Dr. Westerink, do you know that

8   number?

9       A.   I don't know the number.

10      Q.   My recollection is that Westerink says

11  3.5 and our experts say 3.  Have any reason to

12  dispute that?

13      A.   I don't know.

14      Q.   All right.  That's fair enough.

15  Now --

16      A.   But --

17      Q.   But what?

18      A.   Well, if their scenario is 14.4

19  without the MRGO, that would mean their

20  scenario with the MRGO would be three feet

21  higher than, 17-point --

22      Q.   If that's right, that's right.  I

23  mean, it is what it is.  Right?

24      A.   Okay.

25      Q.   Okay.  The point I'm making is this:

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 453

```
 1    That your experts, the plaintiffs' experts,

 2    both conclude that the MRGO contributed

 3    substantially to the surge.  Isn't that true?

 4            MR. LEVINE:

 5                Object.  Vague.

 6    EXAMINATION BY MR. BRUNO:

 7        Q.   It may not be all of it, but there's a

 8    contribution.

 9            MR. LEVINE:

10                Objection.  Vague.

11        A.   Based on the information that you said

12    in the question, that they did contribute to

13    partially.

14    EXAMINATION BY MR. BRUNO:

15        Q.   And you -- I'm sorry, neither you nor

16    any member bear of your team has done an

17    evaluation to determine how much overflow would

18    have caused enough scour to cause the I-walls

19    to fail.  Correct?

20        A.   But --

21        Q.   Just say yes or no and then you can

22    answer.

23            MR. LEVINE:

24                Let him explain his answer.

25            MR. BRUNO:
```

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 454

1              No.  I don't have an answer.  And

2         I want an answer, and I'm entitled to

3         an answer, and then the witness can

4         explain for an hour if he'd like.  I

5         want -- it's a yes or no question.

6         MR. LEVINE:

7              Those are his answer.  You may

8         not like his answers, but those are

9         his answer.  Let him answer the

10        question.

11        MR. BRUNO:

12             No. I am entitled to an answer.

13        And what I don't like is when I don't

14        get an answer, and it's not nice to

15        not be nice to me.

16        MR. LEVINE:

17             I know you don't like it when you

18        get an answer, that's why we have this

19        little dispute.

20        MR. BRUNO:

21             I want an answer to my question.

22        His answer is not what he chooses to

23        say, his answer --

24        MR. LEVINE:

25             Are you testifying our is he?

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 455

```
 1        MR. BRUNO:

 2             No.

 3        MR. LEVINE:

 4             Okay.  Then thank you.  His

 5        answers are the ones that are the

 6        answers, not what you want.

 7        MR. BRUNO:

 8             No.  I'm sorry, guys.  The rules

 9        of the are, is the light on?  He's got

10        to say yes or no.  Or he can say, I'm

11        blind, I don't know.

12        MR. LEVINE:

13             No, the rules of the game are you

14        ask a question and he gives an answer.

15        You show me the rule where it says you

16        ask a question and he has to give you

17        the yes no answer.

18        MR. BRUNO:

19             Well, with a judge in the room

20        we'll see how the works at trail.

21        Okay?

22         MR. LEVINE:

23             And we'll see how this works at

24        trail, too.

25        MR. BRUNO:
```

DR. REED MOSHER (VOL.II)                         February 20, 2009

Page 456

1          All right.  Fine.

2          MR. STEVENS:

3               You guys are never going to

4          agree.  We need to let the witness

5          talk.

6               So would you please answer his

7          question?

8     EXAMINATION BY MR. BRUNO:

9          Q.   You remember the question?  Let me ask

10    it again.

11             Neither you or any member of your team

12    has done an evaluation to determine how much

13    overflow would have caused enough scour to

14    cause the levees to fail, isn't that true?

15         A.   I disagree in terms of there was --

16    Bruce Ebersole did an assessment of how long it

17    took of overflowing the water to occur.  Thirty

18    minutes.  And that I believe is the assessment

19    that was done to look at the quantity of water

20    necessary to cause erosion.

21         Q.   Bruce looked at the I-walls?

22         A.   The I-walls.

23         Q.   Bruce looked at the levees.

24         A.   He also looked at the I-walls, the

25    time it took.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 457

1      Q.   All right.  Well, here is the report.

2    Why don't you show me where you think -- I

3    think I've got the section that deals with it.

4    But I can't find where he has that half an hour

5    in there.

6      A.   On Page 154.

7      Q.   Uh-huh.  I just read that.  What this

8    says is, he's calculating, based upon what

9    actually occurred, the time that it took for

10   the wall the fall down.

11     A.   Correct.

12     Q.   My question didn't ask that.  My

13   question is, did you do an evaluation to

14   determine how much water would be necessary to

15   overtop the levee the cause it to fall?  That

16   was my question.

17     A.   And in that, okay, the assessment is

18   if you have water overtopping the wall --

19     Q.   Yes.

20     A.   -- that's going to be sufficient

21   enough to cause the erosion, and you only need

22   thirty minutes of that, of any water flowing

23   once it gets to the top of the wall above, that

24   would cause that to erode.

25     Q.   So your testimony is it has nothing to

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 458

1   do with the volume of water that goes over the

2   top?

3       A.   It has to do with the volume, but if

4   you have overtopping a wall that's going to be

5   sufficient --

6       Q.   Sure.

7       A.   -- to cause that.

8       Q.   Yeah, but that doesn't make any sense.

9   What he says in this report is simply this:

10  And I'll quote it.  He says, the stopped-clock

11  data showed a very rapid rate of water level

12  rise in the Lower Ninth Ward beginning in the

13  7:15 to 7:45:00 a.m. time frame.  This rapid

14  rise was apparently created by the south

15  breach.  Where he gets that from the Good Lord

16  only knows.  The timing of the rapid rate of

17  water rise suggests that the south breach

18  formed rapidly, on the order of 15 to 30

19  minutes after overflow commenced.

20          Does that sound like a scientific

21  evaluation to you that would allow us to

22  conclude how long it takes given a certain

23  volume of water for a I-wall to fail?

24      A.   Yes.  I mean, if you look at what the

25  height of the water was at the time water

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                    Page 459

 1    started flowing over it, in the time period

 2    there was only a small increase in the water

 3    level at that time, and within 15 or 30 minutes

 4    it failed, they're saying that you only need

 5    several tenths of inches of water flowing over

 6    the top of it to occur.

 7         Q.   That's kind of a large logical leap,

 8    isn't it, doctor?

 9         A.   I don't think so.

10         Q.   Well, then, why didn't the whole wall

11    fail?

12         A.   Because it got concentrated -- once

13    the wall starts to fail, you'll actually --

14         Q.   Wait a minute.

15              MR. LEVINE:

16                  Let him finish.  Let him finish.

17                  He was in the middle of an answer.

18    EXAMINATION BY MR. BRUNO:

19         Q.   All right.  Go ahead.  Go ahead,

20    finish.

21         A.   Once the wall starts to fail, it

22    leans, you get a drop in that wall elevation

23    and the flow concentrates in that area and you

24    get some relief due to the opening of that.

25    And there's examples of that bending and

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 460

```
 1    flowing of the wall at the, um -- bulk storage

 2    along the Citrus levee, back Citrus levee along

 3    the, um -- Gulf Intracoastal Waterway.

 4        Q.    The picture at 156 shows a leaning

 5    wall and no failure and scour.  Does it not?

 6              MR. LEVINE:

 7                  156 of Ebersole?

 8              MR. BRUNO:

 9                  156 of Ebersole shows it.

10    EXAMINATION BY MR. BRUNO:

11        Q.    There is a leaning wall there.  The

12    wall didn't fall over.

13        A.    Correct.

14        Q.    All right.  Now the fact of the matter

15    is we have about six hundred feet of I-wall

16    from north to south breach.  Right?

17        A.    Correct.

18        Q.    We have the same, the water -- I'm

19    sorry -- the height of the wall is the same for

20    that whole distance.

21        A.    It's not exactly the same.  It varies.

22        Q.    It's close.

23        A.    It varies.

24        Q.    By how much?

25        A.    A half a foot.
```

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 461

1        Q.    A half a foot?  And the water level

2    was the same for the whole length of the wall,

3    right?

4        A.    Once the wall started to lean at the

5    south breach it would have dropped at that

6    area.

7        Q.    The question is the water level was

8    the same before the -- before the wall fell,

9    the water level was the same.

10        A.    It's not exactly the same.  But it's

11    very close.

12        Q.    All right.  Now, what evaluations did

13    you all do to correlate the I-wall height to

14    failure?

15        A.    Um -- we didn't do a correlation of

16    I-wall height to failure.

17        Q.    Okay.  So we don't even know the

18    height of the wall that failed, do we?

19        A.    We don't have very good data on that.

20        Q.    No, we don't.  Well, so if -- one

21    would expect, then, that the walls that were

22    lower would have failed because they would have

23    had more water going over the top.  Right?

24        A.    Potentially.

25        Q.    Potentially.  So what is your

DR. REED MOSHER (VOL.II)                          February 20, 2009

Page 462

1  scientific explanation as to why they failed at

2  the south breach and nowhere else?

3       A.   The flow conditions could have been

4  different there.  I'm not sure.  But at that

5  point they failed there.

6       Q.   They failed.  That much we agree.

7  They failed there.

8       A.   Uh-huh.

9       Q.   Okay.  So we've got --

10      A.   There could have been soil conditions

11 that were different and other things at that

12 location that allowed the walls to lean more.

13      Q.   Okay.  All right.  So the bottom line

14 is, still, which is my original question,

15 nobody has done an evaluation to determine how

16 much water needs to go over the wall to cause

17 the wall to fail.

18      A.   I disagree in terms of that we have a

19 reasonable explanation of what -- the short

20 time it takes for those walls to fail, and we

21 had under these scenarios significant time for

22 that to occur.

23      Q.   And what is the scientific basis for

24 that statement?

25      A.   The observations of what took place.

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                  Page 463

   1      Q.   The observations of what took place

   2   seem to be firm when you want it to work and

   3   kind of loosey-goosey when you don't went it to

   4   work.  And you've told me before that the IHNC

   5   water levels are not sacrosanct.  Haven't you

   6   told me that?  They're not the Bible, if you

   7   will, to the water levels in the whole IHNC.

   8   They are what they are.

   9           MR. LEVINE:

  10               Objection.

  11      A.   What's the question there?  I need

  12   more detail.

  13   EXAMINATION BY MR. BRUNO:

  14      Q.   Well, because it seems to me like you

  15   are -- you're starting with a conclusion and

  16   trying to find a way to make the facts fit the

  17   conclusion.  At Page 154 of Ebersole 's report,

  18   he says the water level at the lock reached

  19   12.3 feet at 7:00 a.m.

  20           The measurements are hourly, are they

  21   not?

  22      A.   I don't know for sure.

  23      Q.   Well, so we don't even know when the

  24   IHNC lock measurements are taken, but we're

  25   going to assume that 7:00 a.m. is the magic

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 464

1    number because that's what you've got.  You're

2    not going o assume that the water was lower or

3    higher before 7:00 a.m.; right?

4        A.   Was lower than?

5        Q.   Lower, sure.

6        A.   It could be lower.

7        Q.   And then it says, at this time water

8    flowed over the low spots along this section of

9    wall.  Well, where are the low spots along that

10   section of wall?

11       A.   It is very likely, okay, that the low

12   sections are where it failed.  But they're gone

13   now so we can't measure them.

14       Q.   Well, there are other low spots,

15   aren't there?  I mean, you have data that

16   says -- well, first of all, he says, assuming a

17   wall elevation.  Why didn't he have actual

18   information?  Why does he have to assume?

19       A.   Because the wall's gone.

20       Q.   He had walls there.  Did he measure

21   the walls that were still there?

22       A.   There are some surveys of the walls

23   that are there.

24       Q.   Well, what makes us believe that his

25   assumption is accurate?

DR. REED MOSHER (VOL.II)                     February 20, 2009

Page 465

```
 1      A.   I would say that the fact that they
 2   failed at that location would, um -- lead you
 3   to believe that that was true and you could
 4   draw that conclusion.
 5      Q.   So it was a backwards evaluation.  It
 6   failed, therefore the water got over the top.
 7      A.   That makes sense.
 8      Q.   Okay.  But we don't know how much
 9   water got over the top, and we really don't
10   know when the failure occurred.
11      A.   Well, we do know that it was -- at
12   seven o'clock it was 12.3.  We have a
13   hydrograph of that -- at that lock area, and so
14   we can look at the height that the water went
15   up at that point for between -- for fifteen
16   minutes, which it was very small amount.
17      Q.   But we don't have a hydrograph.  What
18   we have is the lock master's numbers which wave
19   put on a chart.
20      A.   Isn't that a hydrograph?  You used it
21   just a little while ago as a hydrograph.
22      Q.   I used what you used.  I asked you
23   questions about what you used.  I didn't use
24   it, I asked you questions about how you used it
25   and how it relates to your opinions.  Okay?
```

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 466

1      A.   We used --

2      Q.   I wasn't using it.  I was asking you

3  questions.

4      A.   Okay.

5      Q.   What I'm trying to get at is this:

6  The report doesn't say anything about these

7  data being actual, they are assumptions.  Those

8  are his words, not mine.  Isn't that true?

9      A.   The assumption that he makes is that

10  the wall's elevation is between 12 and 12-1/2.

11     Q.   Right.  He can't tell me where along

12  the wall, after Hurricane Katrina, where there

13  was still a wall, which of those locations were

14  12 and which were 12.5.  Right?  He can't tell

15  me that.

16          MR. LEVINE:

17              Objection.

18     A.   I believe that he could actually tell

19  you that because there's survey data in parts

20  of he IPET report that actually show what those

21  elevations are.

22  EXAMINATION BY MR. BRUNO:

23     Q.   Despite that, he uses the word

24  assumption.  He doesn't use the word the data

25  reveals, right?  His words.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 467

1        A.    His words.

2        Q.    Then he says, the stopped clock data

3   showed a very rapid rate of water level rise

4   beginning at 7:15 a.m. to 7:45 a.m.  Right?

5        A.    Correct.

6        Q.    All right.  This rapid rise was

7   apparently created by the south breach.

8              How did he reach that conclusion?

9        A.    How else would the water get into the

10  neighborhood?

11       Q.    From the north breach.

12       A.    The north breach has already been

13  opened for a period of time.  How would more

14  water --

15       Q.    Well, how do we know how much of the

16  north breach was open and when?

17       A.    Um --

18       Q.    We didn't do a scientific evaluation,

19  you've already told me that.

20             MR. LEVINE:

21                  Objection.

22  EXAMINATION BY MR. BRUNO:

23       Q.    All we did was we figured, well, it

24  happened, and I think what we said it was based

25  upon was some eyewitness report?  That's what

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 468

1    the report says?

2         A.   I believe it says stopped clock.

3         Q.   It's not eyewitness reports?

4         A.   It's primarily stopped clock data

5    showing when water was rising in the

6    neighborhood.

7         Q.   Okay.  Well, we don't know how much of

8    that water was water that came in from

9    overtopping of the levees, or I-walls either.

10   We didn't measure that, did we?

11        A.   Um -- at that time, until the water

12   got to about seven o'clock in the morning it

13   wouldn't have been overtopping, it would have

14   been coming through the breach.

15        Q.   All right.  So his conclusion is the

16   stopped clock data tied to the elevation means

17   that it must have been the south breach.

18   That's the logic.

19        A.   That's the logic.

20        Q.   Okay.  All right.  And nothing else.

21             MR. LEVINE:

22                  Objection.

23   EXAMINATION BY MR. BRUNO:

24        Q.   Correct?

25             MR. LEVINE:

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 469

1          Calls for speculation.

2      MR. BRUNO:

3          You have to speculate in order to

4      determine whether there's something

5      else or nothing else?  That doesn't

6      make any sense.

7      MR. LEVINE:

8          Joe, let him answer your

9      question.

10     MR. BRUNO:

11         I'm trying to --

12     MR. LEVINE:

13         Without your like involvement

14     into my objections.

15     MR. BRUNO:

16         Well, your objections don't make

17     any sense.  Remember, I have an

18     opportunity and a right to rephrase

19     the question to deal with your

20     objection.  But your objections don't

21     make any sense to me.  So if the judge

22     were --

23     MR. LEVINE:

24         Would you like me to explain my

25     objection?

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                    Page 470

1        MR. BRUNO:

2             Yeah.  Do.

3        MR. LEVINE:

4             Sure.  You're asking him to

5             comment on Ebersole 's report and fill

6             in data that you could have asked

7             Ebersole about.

8        MR. BRUNO:

9             Nope.  I'm asking him about his

10            conclusions because his conclusions

11            are based upon what Ebersole said.

12            That's been established by this

13            record.

14       MR. LEVINE:

15            We can dispute what the record

16            establishes.  If you don't want to --

17   EXAMINATION BY MR. BRUNO:

18       Q.   Doctor, again I'm confused.  Are you

19   drawing conclusions on your own or are you

20   drawing conclusions based upon what Ebersole

21   said.

22       A.   I'm drawing conclusions -- based on

23   his information, my conclusions.

24       Q.   So you obviously had to talk to him

25   about what his conclusions were.  Right?

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 471

1      A.   Or what his presentation of the report

2   were providing.

3      Q.   Yeah.  So did you have anything more

4   than what was in his report?

5      A.   No.

6      Q.   No.  Okay.  So there's nothing else.

7   Right?

8      A.   I agree.

9      Q.   Thank you.

10          Now, the water got much higher than

11   twelve feet later in the morning.  Right?

12      A.   Uh-huh.

13      Q.   Okay.  So there is a lot more water

14   going over those walls between seven and nine

15   o'clock in the morning.

16          MR. LEVINE:

17              Objection.

18   EXAMINATION BY MR. BRUNO:

19      Q.   The Lower Ninth Ward I-walls between

20   the Florida Avenue and I forgot the other

21   street, you've got a foot -- 1.7 feet going

22   over those walls.

23      A.   Potentially there's 1.7 feet more

24   water in the canal.  But at the location of the

25   walls with the breaches it may not be because

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 472

1    you're going to get a drop in the water at

2    those locations because of the opening -- the

3    large openings that are there.

4         Q.   So I imagine you did some evaluation

5    in order to determine that.  Right?

6         A.   That is not my --

7         Q.   Not your field.

8         A.   It is beyond the part I was --

9         Q.   So even though you didn't do the

10   evaluation --

11             MR. LEVINE:

12                  Let him finish.

13   EXAMINATION BY MR. BRUNO:

14        Q.   -- you're able to conclude that no

15   more water went over the tops of those I-walls

16   between 7:00 and 9:00?

17        A.   I didn't say that.

18        Q.   All right.  Did water go over those

19   walls between 7:00 and 9:00 where there was no

20   breaching?

21        A.   There's a possibility it could have.

22        Q.   All right.  In fact, there's evidence

23   that it did because you've got scouring

24   trenches.

25        A.   There's some scouring in the trenches,

DR. REED MOSHER (VOL.II)                      February 20, 2009

Page 473

1   right.

2        Q.    So water did go over those walls.

3        A.    It could have been at the same time

4   that the south breach was occurring, too.

5        Q.    It could have been later.

6        A.    Could have been later.

7        Q.    We don't know.

8        A.    We don't know.

9        Q.    We don't know.

10       A.    I agree.

11       Q.    Okay.  But it's easier to assume that

12  it was the same time because it's more

13  consistent with what your opinion is, right?

14            MR. LEVINE:

15                Objection.  Argumentative.

16       A.    I don't think it makes a difference.

17  EXAMINATION BY MR. BRUNO:

18       Q.    Well, it would make a difference if

19  larger quantities of water overtopped those

20  walls in other locations and the wall didn't

21  fail.  Wouldn't that be evidence of the fact

22  that it takes more than just a few droplets of

23  water to topple the wall, as Ebersole seems to

24  conclude?

25       A.    I don't believe Ebersole said a few

DR. REED MOSHER (VOL.II)                          February 20, 2009

Page 474

1    droplets of wall, so the characterization in

2    the question isn't relevant.

3         Q.   Well, he says a couple of inches is

4    all it takes?  Let see what he says.  He says,

5    12 to 12.5, and we have -- yeah, we have .3.

6    So .3 of a foot would be what?

7         A.   .3 of a foot would be about three

8    inches.

9         Q.   Three inches.

10        A.   Three or four inches.

11        Q.   So Ebersole says all it takes is three

12   inches to knock the wall down.?

13        A.   That you could erode the materials.

14        Q.   I'm sorry.  .3 is --

15             MR. STEVENS:

16                  It's 3.6 inches.

17   EXAMINATION BY MR. BRUNO:

18        Q.   2.6.  So to be precise, Ebersole says

19   you only need 3.6 inches of water to knock the

20   wall down.

21             MR. LEVINE:

22                  Objection.

23   EXAMINATION BY MR. BRUNO:

24        Q.   Is that what he says or not?

25        A.   He's saying that -- he doesn't say

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 475

1   that verbatim in here, but you can draw that

2   conclusion from the data that he has here.

3        Q.   Thank you.  Well, let's go over this

4   again.  Because at Page 73 it seems like you

5   said, maybe it got taken down wrong, you only

6   need several tenths of an inch?  Or is it a

7   foot?

8        A.   It should have been a foot.

9        Q.   You meant to say foot.

10       A.   (Nods affirmatively.)

11       Q.   So the point is, though, you only need

12   about, according to Ebersole, 3.6 inches of

13   water for the I-wall to fall down.

14       A.   For the erosion that will allow the

15   wall to fail.

16       Q.   Okay.  All right.

17            MR. STEVENS:

18                 And for the record, that's

19            Page 73 of the transcript, not the

20            report.  Of today's transcript.  Which

21            is subject to change in final form.

22            MR. LEVINE:

23                 That's okay.

24   EXAMINATION BY MR. BRUNO:

25       Q.   Now, the maximum water level recorded

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 476

1    at the lock was 14.3 feet, right?

2         A.    14.3, 14.4.

3         Q.    And in order for the water level to be

4    14.3 feet at the lock it had to be higher --

5    I'm sorry -- it had to be that high after the

6    south breach occurred and after the north

7    breach occurred --

8         A.    That's correct.

9         Q.    -- right?  And since the lock is past

10   the south breach one has to assume that waters

11   that high flowed past not only the north breach

12   but the south breach and the remaining I-wall,

13   as well.

14        A.    It had to flow past it, correct.

15        Q.    So we can safely assume that we had

16   water overflowing the entire reach between

17   seven o'clock and nine o'clock.  Can't we?

18        A.    I would say that there -- it's likely

19   that there was water overflowing.  But the

20   elevation may not have been at the 14 because

21   you're going to get sloping from out in the

22   middle of the channel down to where these large

23   breaches are.

24        Q.    All right.  Where is the location of

25   the lock master 's gauge, is it in the middle?

DR. REED MOSHER (VOL.II)                      February 20, 2009

Page 477

1        A.    It's on the edge of the -- out on the

2    lock -- it's more or less in the middle of the

3    channel.

4        Q.    How close to the side is it?

5        A.    Um -- it's in the pictures.

6        Q.    How much fall off can you expect --

7    and again, even though you're not an expert in

8    this field you seem to have lots of opinions

9    about water, so what is your view of the

10   difference in heights between the center of the

11   channel and the shoreline?  If it's 14.3 feet

12   in the middle, what's its height at the

13   shoreline?

14       A.    Okay.  The, um -- at the -- you have

15   to keep in mind that at the lock, the look

16   would not be -- at the location lock, even in

17   the center of the channel --

18              (Brief interruption.)

19       A.    This is a local behavior that we'd see

20   at the breaches area.  The buildup, because of

21   the water would tend seek its level, down at

22   the lock will tend to be fairly uniform across

23   its surface because water is not running out

24   there.

25       Q.    Okay.  All right.  So is the water

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 478

1    lower?  If the water is 14.3 feet at the lock,

2    what's the water level at the reach -- along

3    the center of the reach?

4        A.   It will be lower than what it is at

5    the lock.

6        Q.   How much lower?

7        A.   Um -- I would be speculating if I

8    said.

9        Q.   Okay.  Well, Doc, if it's lower for my

10   question then it's lower for your conclusion

11   that you jump on with Ebersole at Page 154,

12   because if the lock master 's recording 12.3 as

13   7:00 a.m., It's got to be lower at the south

14   breach.  Right?

15       A.   No.  Not until the breach occurs.  The

16   breach has to occur for that to happen.  You

17   have to get an opening so that the water could

18   run out.  If it's just starting to occur at

19   that point and then does occur, then it will

20   drop.  But at the time the breach area now has

21   an elevation that's going to be down at the

22   bottom of the breach area.  So you're going to

23   have significant opening of the wall.

24       Q.   Right.  I understand.  But it's not so

25   significant that it prevents a water height of

DR. REED MOSHER (VOL.II)                     February 20, 2009

 1   14 feet, some two feet higher, two hours later,

 2   right?

 3       A.   (Nods affirmatively.)

 4       Q.   Okay.  So what is the height of the

 5   water near the center of the reach when the

 6   look master 's reading 14.3?  How high is the

 7   water at the center of the I-wall?

 8       A.   I can't say exactly what it is, but it

 9   would be lower than that.

10       Q.   Is it a foot lower?

11       A.   Potentially, yes.

12       Q.   It could be a whole foot lower.

13       A.   (Nods affirmatively.)

14       Q.   So it's still a foot higher than the

15   wall.

16       A.   Possibly.

17       Q.   So you got a foot of water going over.

18   Or six inches.

19           (Off the record.)

20   EXAMINATION BY MR. BRUNO:

21       Q.   Doctor, if you had 14.3 feet of water

22   at the lock master, I'm asking you the question

23   how high is the water at the center of the

24   reach?  And you're telling me it could be --

25   you don't know but it's lower.  And I asked you

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 480

1    how much lower, and you said you don't know.

2    Well, is it going to be a whole foot lower?

3    And you said it could be.  So is it going to be

4    more than three inches higher than the 12

5    inches or 12.5 inches that we believe is the

6    height of the I-wall crest?

7        A.   It's way beyond my ability and

8    technical capability to determine that.

9        Q.   Is it fair for us to conclude that

10   there is a lot of water overflowing the reach

11   between the north and south breaches from seven

12   o'clock until peak surge?

13       A.   I would -- I can't provide an expert

14   opinion on that, but I believe there would be.

15       Q.   And is it fair for us to conclude that

16   it is more than three inches?  3.5 inches, to

17   be precise?  Or 6.  3.6.

18       A.   It's possible.

19       Q.   Did the IPET study underseepage at the

20   north breach?

21       A.   Yes.

22       Q.   What did they do?

23       A.   There was a series of seepage analysis

24   done with varying permeabilities to investigate

25   the sensitivity of permeability on, um -- the

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 481

 1   seepage analysis and uplift pressures.

 2            (Brief recess.)

 3   EXAMINATION BY MR. BRUNO:

 4       Q.   All right.  Doc, let me show you this

 5   report of the NAE/NRC committee on the New

 6   Orleans Regional Hurricane Protection Projects.

 7   This is a third report of the NAE/NRC Committee

 8   on the New Orleans Regional Hurricane

 9   Protection Projects.  It is the pre-publication

10   copy.  Okay?  And in here there are -- you had

11   already testified about the fact that this

12   group and others was critiquing the work of the

13   IPET, and there was apparently an exchange of

14   information between the groups.  Right?

15       A.   Correct.  Uh-huh.

16       Q.   Okay.

17       A.   What's the date on that?

18       Q.   Let's see.  Where would I go to find

19   that?

20       A.   Maybe on the front cover.

21            MR. LEVINE:

22                Do you mind if we attach a copy

23            of that as an exhibit?

24            MR. BRUNO:

25                Sure.

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                    Page 482

 1        MR. STEVENS:

 2             We'll get a clean copy.

 3        (EXHIBIT 6 was marked for

 4   identification and is attached hereto.)

 5   EXAMINATION BY MR. BRUNO:

 6        Q.   Copyright 2006?

 7        A.   Could be.

 8        Q.   I mean, it says that.  Copyright 2006,

 9   by the National Academy of Sciences, all rights

10   reserved.  I don't see a better date, Doctor.

11   I'm sorry.

12        A.   Okay.

13        Q.   I just wanted to see if some of

14   their -- some of this critique makes some

15   sense.  They're talking here about the causes

16   of the breaches, and there's a discussion here

17   about the IHNC, the 17th Street Canal and

18   London Avenue.  I'll show it to you just to see

19   where I'm at.  Okay?

20        A.   Okay.

21        Q.   You with me?  First of all, they say

22   gap formation, however, should not have been an

23   unexpected mechanism, nor did it exclusively

24   lead to all foundation failures.  For example,

25   the formation of a gap between I-wall and sole

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 483

1   was demonstrated in full scale field tests

2   performed nearly twenty years I go by the Corps

3   of Engineers, Jackson, 1988.  Moreover, the

4   consequences of gap formation are affected by

5   sheer strength of the underlying soils.

6   Although the phenomenon of gap formation has

7   been investigated in depth, including the use

8   of centrifuge tests, undrained shear strength

9   of marsh and clay deposits has been

10   investigated in an uneven manner with imported

11   data, especially direct, simple shear strength

12   data absent in the IPET June 1, 2006 final

13   draft.  In meetings and in discussions with

14   IPET members, they've indicated that IPET has

15   gathered these direct, simple shear strength

16   data.  This useful information should be

17   included in the IPET report and integrated into

18   the report's geotechnical analysis.

19          Did the IPET do that?

20     A.   Yes.

21     Q.   It says, low undrained shear strength

22   of low permeability foundation soils referred

23   to as marsh, and gray/lacustrine clays clearly

24   contribute to the failure of the I-walls at the

25   17th Street Canal.  The lack of reliable shear

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 484

 1    strength data, particularly laboratory test

 2    data gathered by IPET does not allow for a

 3    clear resolution of resisting forces.

 4    Moreover, it inhibits reaching a firm

 5    conclusion regarding relative contributions of

 6    gap formation and soil strength safety factor

 7    and raises concerns about the characterization

 8    of clay and marsh deposit strength at other

 9    locations.  In addition, the highly variable

10    strength data do not support the assertion that

11    the breach occurred at a location of local

12    weakness in the underlying marsh/clay layers

13    within the levee.  Although the failure

14    mechanism proposed by IPET is plausible,

15    back-analyses only match the observed surge

16    elevation at failure by introducing a

17    full-depth gap and assuming a very low shear

18    strength in the clay beyond the toe of the

19    levee.

20            Were you aware of this thought?

21        A.   Uh-huh.  That's correct.

22        Q.   And in fact, what they're saying here,

23    unless I'm reading it incorrectly, is that you

24    are working backwards -- or they suggest that

25    you're working backwards, you're trying to find

DR. REED MOSHER (VOL.II)                    February 20, 2009

1   facts which support your conclusion.

2          Isn't that what they're suggesting?

3      A.   There is, in what they said right at

4   that point, um -- that's true, but since then

5   we have actually met with them and presented

6   data and added additional shear strength data

7   from borings and laboratory tests to support

8   that.  And you'll find that in the May 2000.

9          In order for us to move forward with

10  the document, we had to answer these questions.

11         MR. LEVINE:

12             That's in May 2000?

13         THE WITNESS:

14             May 2007.  Sorry.  May 2007,

15         something like that.

16  EXAMINATION BY MR. BRUNO:

17     Q.   Well, we did agree, though, that I'm

18  not the only person that suggested that we have

19  a conclusion -- that it seems like the Corps

20  gets a conclusion and goes back to find facts

21  to support the conclusion, as opposed to the

22  other way around.

23     A.   I believe that the reason that they

24  stated that, and from talking with them, is

25  that they weren't sure of the shear strength

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 486

 1    data that we had.  We had to do additional

 2    borings and shear strength testing in order to

 3    demonstrate to them that that was the shear

 4    strength levels.

 5        Q.   Well, they say, in fairness to them, a

 6    little bit more than that.  They say, although

 7    the failure mechanisms proposed by IPET is

 8    plausible, back analyses only match the

 9    observed surge elevation at failure by

10    introducing a full-depth gap.

11            So in order for your conclusion to

12    work, you had to assume that the gap went all

13    the way to the bottom of the sheet pile; right?

14        A.   That's correct.  And now on the 17th

15    Street, we were able to actually show through

16    bottom surveys that a full gap occurred and

17    that you had a complete failure plane all the

18    way to the bottom of the wall.

19        Q.   Do we have a full-depth gap at the

20    north breach?

21        A.   In the analysis the we have, we do.

22    But in the cases of the actual wall that failed

23    on the forth breach, um -- the soil, um --

24    because of the reconstruction that they did at

25    the site, we were unable to get a survey --

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 487

1    bottom survey to show exact exactly where that

2    occurred.

3         Q.   All right.  They also say here, at

4    Page 10, IPET has relied almost exclusively on

5    cone penetration data to estimate undrained

6    shear strength profiles in low permeability

7    fill, marsh and clay units and frictional

8    strength of sand at the London Avenue Canal.

9    These data show quite uniform properties

10   beneath the crest of the levee.  There is,

11   however, little information supporting the

12   interpretation of undrained strength profiles

13   at the toe of the levee.  It is erroneous to

14   assume normally consolidated properties for the

15   marsh and clay units beyond the levee.  This

16   issue is also discussed by Seed, et al, which

17   is the ILIT team.  Right?

18        A.   (Nods affirmatively.)

19        Q.   What is your comment on that?

20        A.   Um -- we have done some additional,

21   um -- work to the borings in that area out at

22   the toe.  There's actually been a full scale,

23   um -- test done with water behind the wall and

24   additional borings to confirm the shear

25   strengths that were used.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 488

1          MR. LEVINE:

2               Joe, what pages are you reading

3          off of?

4          MR. BRUNO:

5               That was 10.  I said that.  That

6          one I said 10, because I remember

7          saying it.

8    EXAMINATION BY MR. BRUNO:

9       Q.   They also say, the IPET has used two

10   independent analysis methods for evaluating

11   mechanisms of failure at the breach sites;

12   limited equilibrium methods, LEM, and nonlinear

13   deformation-based finite element techniques.

14   Several features of these methods deserve close

15   attention.  Limit equilibrium methods, LEM, are

16   standard geotechnical analysis techniques

17   (Duncan and Wright 2005; Krahn, 2005) that

18   provide direct assessments of stability (e.g.,

19   for a specified loading condition or she

20   strength distribution within the soil) by

21   searching for the critical failure surface

22   within the soil mass.  It is not clear why the

23   IPET calculations had been restricted to

24   circular arc failure mechanisms which

25   apparently are not the critical mechanisms

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 489

1    associated with the levee breaches as they are

2    in consistent with the finite element analysis

3    and physical model test the IPET has conducted.

4         What's your comment on that?

5    A.   Okay.   The comment is that we went

6    back and showed that they only make a slight

7    difference.   The circular ones are a little

8    more conservative, and the -- if you had a

9    failure plane that is plainer in that

10   direction, in that area, it might make a

11   difference of 2 to 3, as a maximum, a 5 percent

12   difference in the stability.   And it's on

13   the -- ours on the circular side is on the

14   conservative side, which would mean we would

15   have a lower factor of safety by between 2 to

16   5 percent.

17   Q.   All right.   It says, finite element

18   analyses are well established within

19   geotechnical practice (Duncan 1994; Potts and

20   Zdravkovic, 2001) and offer unique capabilities

21   to model both coupled ground deformations and

22   seepage.   The selection of constitutive models

23   in the current analysis is limited by lack of

24   reliable strengths and thickness data usually

25   obtained from laboratory tests.   The IPET

DR. REED MOSHER (VOL.II)                        February 20, 2009

                                                        Page 490

 1    finite element analysis are able to simulate

 2    the large deformations of the I-wall that occur

 3    due to the storm surge but they generate a full

 4    failure mechanism at the assumed failure surge

 5    height, only when a gap is introduced at the

 6    soil/wall interface.

 7              Is that true?

 8         A.   A full failure mechanism only when a

 9    gap is --

10              (Brief interruption.)

11         A.   That is correct.  It turns out that

12    the other co-lead with me on that was actually

13    the Duncan that's referred to in there.  So

14    he's well versed in this area because they

15    actually use him as the reference.

16    EXAMINATION BY MR. BRUNO:

17         Q.   All right.  They say, finally,

18    although this represents a plausible failure

19    mechanism, it is but one of several possible

20    failure mechanisms.

21              Is that true?

22         A.   It is, if you want to say possible

23    ones, yes.

24         Q.   Okay.  And you all didn't evaluate the

25    other possible failure mechanisms.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 491

1      A.   Well, um -- based on the physical

2   evidence that -- we showed that some of those

3   possible failure mechanisms such as seepage and

4   other things weren't possible by our analysis.

5   They don't match the physical evidence.

6           MR. BRUNO:

7                This will be Exhibit Number 6,

8           and I was reading from Page 11.

9   EXAMINATION BY MR. BRUNO:

10     Q.   This is what the IPET team responded.

11  Lewis Link.  This is Page 21.  It says,

12  alternate breaching mechanisms have been

13  addressed in the draft IPET final report to

14  include the potential for instability at other

15  locations.  The risk analysis is addressing the

16  statistical and probabilistic procedures for --

17  I think he meant characterizing the

18  vulnerabilities of the soil conditions

19  throughout the system.  The most reliable IPET

20  field testing results came from the CPT tests

21  for the clays.  Results from the DSS and field

22  vane tests are being added to the IPET report.

23  The National Science Foundation sponsored

24  results are also being reviewed to assess

25  applicability to the IPET report.  To date, the

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 492

1    information received for the University of

2    California at Berkley team has been consistent

3    with the IPET geotechnical data.

4           Is that true?

5       A.   At that time it had been.

6       Q.   It's not anymore?

7       A.   There are some differences between the

8    two.

9       Q.   What are the differences?

10      A.   Um -- which areas do you want?  The

11   ones relevant particularly to 17th Street,

12   um -- they say that it was a thin layer, about

13   an inch or so thick, that is where the failure

14   took place.  They've been the only ones that

15   have been able to find that layer.  All the

16   other borings that have been done in the area

17   and the excavations that have been done in the

18   area, um -- have not been able to locate that.

19          The NRC in the most recent work has

20   not questioned what we've done on that, they've

21   accepted what we've done compared to what

22   they've done.  Um -- I think that's the primary

23   thing on 17th Street.

24          Um -- originally, on the IHNC there

25   were differences in their thoughts on the

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                      Page 493

 1    permeability of the area, but at our -- after

 2    this, in the conference that was held in

 3    Denver, they have now said that they had used

 4    the wrong permeability for their analysis and

 5    that the characterization of the soil on the

 6    flood side of the IHNC was incorrect.

 7         Q.   All right.  At Page 31, you say,

 8    answering the question of why one section of

 9    levee eroded compared to another section is

10    difficult to do as a significant amount of

11    forensic evidence was washed away during the

12    muck.

13              That's still your opinion today;

14    right?

15         A.   Yes.

16              THE WITNESS:

17                   Page 31 did you say?

18              MR. LEVINE:

19                   Yeah.

20    EXAMINATION BY MR. BRUNO:

21         Q.   Of your report.

22         A.   Got it.

23         Q.   Now, at Page 33, you say, storm surge

24    crest elevations are approximated based upon

25    actual high water marks and IPET simulations to

DR. REED MOSHER (VOL.II)                      February 20, 2009

Page 494

```
 1    provide the distribution across several

 2    reaches, and the overtopping waterfall heights

 3    are approximated based upon available

 4    pre-Katrina levee floodwall elevations

 5    presumably referred to local mean sea level

 6    datum.

 7            Do you find it troubling that the best

 8    you could say here is that those are presumably

 9    referenced?  Wouldn't you want to confirm that?

10       A.   Which --

11       Q.   Page 33, top of the page.  Storm --

12       A.   Surge.

13       Q.   You say they're presumably referred to

14    local mean sea level datum.  It makes a big

15    difference, doesn't it?  Using a different

16    datum.

17       A.   Um -- and I think it's referring to

18    that having to depend on LIDAR data is an

19    approximation, it's not totally confirmed.  We

20    didn't have survey data along the whole length

21    of the levees.  We have to use LIDAR data, and

22    LIDAR data is an approximation.

23       Q.   Well, that's not what you're saying

24    here.  What you're saying here is you really

25    don't know what is being referenced, you don't
```

DR. REED MOSHER (VOL.II)                    February 20, 2009

  1    know whether it's referenced to mean sea level

  2    datum or some other datum.

  3         A.   There is a conversion that we used in

  4    IPET between mean sea level and the NAV88, and

  5    that's described in the, um -- IPET report.

  6         Q.   You say also that the storm surge

  7    crest elevations are approximated based upon

  8    actual high water marks.

  9         A.   I'd like to finish that.

 10         Q.   Okay.

 11         A.   Mean sea level has to have some

 12    approximation because it does -- our sea level

 13    does fluctuate.  Okay?  So there is some

 14    process that they go through to come up with

 15    what that sea level is.  It's not something you

 16    can go out and measure exactly.

 17         Q.   Well, that's not what you're saying

 18    here.  You're not saying that you are having

 19    difficulty with mean sea level, you're saying

 20    you're not sure whether it's mean sea level or

 21    some other datum.  You're saying, presumably

 22    referenced to -- let's just leave that -- put

 23    an X there.  The point is that you're not sure

 24    what the references are for the levee and

 25    floodwall elevations.  Isn't that true?  That's

DR. REED MOSHER (VOL.II)                        February 20, 2009

Page 496

1    your sentence that you wrote.

2        A.   Well, it may be the way that it was

3    written.  References were to a common elevation

4    convention.

5        Q.   All right.  The water marks.  What

6    water marks are you referring to there?

7        A.   The high water marks that were

8    collected during IPET, and --

9        Q.   Who collected those?

10       A.   It was a team of folks that are both

11   from, um -- the IPET, ASCE and, um --

12   Louisiana.

13       Q.   You go the Page 35 where you have the

14   first I believe of your figures where you

15   compared the soil boring data, the elevations?

16       A.   Uh-huh.

17       Q.   Did you use the elevations that are

18   indicated in the soil boring data for any

19   purpose?

20       A.   Other than that that's the top of the

21   levee in measuring down from the levee.

22       Q.   Okay.  Well --

23       A.   So that's distance from the top of the

24   levee.  That's all.

25       Q.   All right.  Now, the first one is from

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 497

1   December of 1985, right?

2        A.   Correct.

3        Q.   And this location is indicated by an

4   arrow at the 70000 foot mark?

5        A.   Correct.

6        Q.   Okay.  And what is the pre-Katrina

7   elevation?

8        A.   Um -- pre-Katrina, it's roughly 17-1/2

9   or so.

10       Q.   17-1/2 feet?  Okay.  Can I assume that

11  the ground elevation shown on the boring for

12  the crest of the levee is also 17.2?

13       A.   That's what it says on here.

14       Q.   That's what it says.

15       A.   Yes.

16       Q.   Do we know if there was a lift at this

17  location between 1985 and 2000?

18       A.   I'd have to look exactly which one

19  this is.  I believe that is true, looking at

20  the location.

21       Q.   I'm sorry.  It's true that there was a

22  lift?

23       A.   If this is down at the corner where

24  the levee turns back into -- it's more recent.

25       Q.   So there was a lift since '85?

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 498

```
 1      A.   I'd have to go back and retrace.  I
 2  believe that's true.
 3      Q.   In any case, the ground elevation in
 4  '85 is similar --
 5      A.   Oh, you're saying since '85?
 6      Q.   Yeah.
 7      A.   Okay.
 8      Q.   Yeah.
 9      A.   I'd have to look and see.  I don't
10  recall right offhand.
11      Q.   I'm just asking -- you know, just
12  observing here that the ground elevation in '85
13  is 17.2, the elevation in 2000 is 17-point -- I
14  know it's rough to be -- but they're pretty
15  close --
16      A.   Yes.
17      Q.   -- over the fifteen years that are
18  between the --
19      A.   Uh-huh.
20      Q.   -- boring and the -- the, um -- 2000
21  LIDAR.  And if we look at 25, we see -- let's
22  see.  We see here, um -- a ground elevation in
23  19 -- or 2001 we have a ground elevation of 16.
24  Right?  And what is our?
25      A.   On the boring.
```

JOHNS PENDLETON COURT REPORTERS              800  562-1285

DR. REED MOSHER (VOL.II)                          February 20, 2009

                                                              Page 499

 1      Q.    I'm sorry.

 2      A.    On the boring.

 3      Q.    On the boring.  And our elevation in

 4   2000 LIDAR is what?  Can you tell?

 5      A.    Um -- it is the green line here, and

 6   it's -- right at that location it's close to

 7   16.

 8      Q.    Close to 16?  I thought the same

 9   thing.  And that would be pretty consistent

10   with the LIDAR taken in 2000, this is a year

11   later, right?

12      A.    Um -- personally, the elevations on

13   the borings I didn't use those because I wasn't

14   sure of the reliability of those numbers.

15      Q.    Well, I know, but we're sort of

16   evaluating the reliability right now, aren't

17   we?

18      A.    We're checking it relative to what we

19   have on the LIDAR data.

20      Q.    Sure.  Yeah.  Okay.  Is that a

21   reasonable exercise?

22      A.    It's reasonable, but it's not

23   necessary for what I used the data for.

24      Q.    Okay.  That's fine.  Now, let's look

25   at Number 30.  We have a 2001 ground elevation

DR. REED MOSHER (VOL.II)                          February 20, 2009

 1    of 18.1.

 2              MR. LEVINE:

 3                   Figure 30?

 4              MR. BRUNO:

 5                   Figure 30, yes.  And Figure 31.

 6    EXAMINATION BY MR. BRUNO:

 7        Q.   Um -- I don't know if I can read that

 8    one.  I guess that black line is halfway

 9    between 15 and 20?  Fair enough?

10        A.   Yep.  So it's probably about 17 feet

11    or so.

12        Q.   About a foot difference.  So this one,

13    this levee has gotten taller in a year.

14        A.   Um --

15        Q.   According to this information.

16        A.   Yeah.

17        Q.   I'm not saying it did.

18        A.   But that could be the reference point

19    that they used to measure that from.

20        Q.   All right.  And 32, we have 17.4, and

21    in Figure 33 probably a little lower than 17.4.

22        A.   About 16 something.

23        Q.   Yeah.  Okay.  And then 34, we have --

24    in '91, elevation is 14.36, and in 2000 it's --

25    or the black arrow is right on top.

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 501

1        A.    Uh-huh.

2        Q.    So it looks like it might be about

3    14.6 but we really can't see.

4        A.    Correct.

5        Q.    Okay.  Figure 36 and 37, we have a

6    ground elevation of 15.4 and our LIDAR is

7    pretty close.  Right?

8        A.    Correct.

9        Q.    Okay.  And Number 40, we have 17.9 in

10   '81, and in 2000 we have -- once again it's

11   pretty close.  Wouldn't you agree?

12       A.    Uh-huh.  Yep.

13       Q.    Okay.  Then on Figure 46 and 47, you

14   got 13-point, it's at Page 50 and 51, we have

15   13 feet -- 13.01, in '91, and then in 2000 we

16   have -- once again looks pretty close, about

17   13.

18       A.    Pretty close.

19       Q.    Okay.  Very close.

20             All right.  And then 48 and 49, we

21   have 17.2 feet, and in 2000 we have, um -- once

22   again, pretty close.

23       A.    Uh-huh.

24       Q.    Okay.  By the way, the photo that we

25   see there at Bayou Bienvenue --

DR. REED MOSHER (VOL.II)                          February 20, 2009

Page 502

1        A.    Correct.

2        Q.    -- was that picture taken after

3   Katrina?

4        A.    It was taken after Katrina.

5        Q.    Was it taken after Rita?

6        A.    It may have been after Rita.

7        Q.    Do you know if Rita did any further

8   damage to that structure?

9        A.    Rita may have done some further

10  damage.

11       Q.    Do you know what it did or didn't do?

12       A.    Um -- no, because I didn't assess

13  that.  But looking at the damage and what took

14  place, primarily this was done by Katrina.

15       Q.    How about, since we're on the subject,

16  Bayou Dupre, the Bayou Dupre control structure,

17  was that taken after Rita?

18       A.    Yes.

19       Q.    That was after Rita.

20       A.    I believe it was after Rita.

21       Q.    All right.  Have you seen photographs

22  of the Dupre control structure after Katrina?

23       A.    I've seen some pictures of it, yes.

24       Q.    And they're different, right?

25       A.    Not substantially different.

DR. REED MOSHER (VOL.II)                          February 20, 2009

Page 503

1      Q.    There's more concrete wall after

2   Katrina then there is after Rita.

3      A.    No, I don't believe there is.

4      Q.    Okay.  Have you read Dr. Bea 's report

5   where he illustrates that?

6      A.    Yes.  I have.

7      Q.    And he's wrong?

8      A.    Yes, he is.

9      Q.    So y'all both looked at the same set

10  of pictures, and you see one thing and he sees

11  something else.

12     A.    No.  Actually, he has the wrong set of

13  pictures.  He's actually looking at the wrong

14  side of it.  And if you take examination of

15  those pictures you'll find the control

16  structure -- the buildings are located in the

17  wrong place in his pictures if they're going to

18  mean -- so what he's done is some very sloppy

19  engineering there to make that assessment.  And

20  careful examination of the pictures will show

21  you that those -- he's looking at the wall the

22  wrong way and labeling them that way.

23     Q.    Okay.

24           (Lunch break.)

25  EXAMINATION BY MR. BRUNO:

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 504

1       Q.   All right, doctor, you recall before

2   lunch you were suggesting that you really

3   couldn't say whether or not all of the walls on

4   the IHNC were overtopped because there was some

5   possibility that even though the water levels

6   at the IHNC lock were high they might have been

7   lower due to the fact that the southern break

8   had occurred and water was flowing through

9   there.   Remember that?

10      A.   Correct.

11      Q.   Okay.  Well, if you look at Page 57 of

12  your report, the second full paragraph that you

13  wrote, you say, the peak storm surge elevation

14  in the IHNC was 14.2 feet at 9:00 a.m. and

15  about 1.7 feet above the tops of the floodwalls

16  and levees.  It says, all of the IHNC

17  floodwalls and levees were overtopped.  All of

18  them.

19           Is that consistent with what you told

20  me this morning?

21      A.   It's consistent in that we have

22  evidence to show that all the walls were

23  overtopped.

24      Q.   Every last one of them.

25      A.   True.

DR. REED MOSHER (VOL.II)                          February 20, 2009

Page 505

1      Q.    So the whole reach, from the north

2   breach and to the south breach, the whole

3   I-wall was overtopped.

4      A.    Correct.

5      Q.    Okay.  And it was overtopped by about

6   1.7 feet.

7      A.    As much as 1.7.

8      Q.    As much as.  Could have been higher.

9      A.    Could have been higher?

10     Q.    Yeah.

11     A.    With waves and things like that.

12     Q.    Sure.

13     A.    Possibly.  But it could have been

14   lower than that on certain occasions, too.

15     Q.    Sure.  Okay.  Now, at Page 57, you

16   say, eyewitness reports indicate -- in the

17   third paragraph, middle sentence.  What

18   eyewitness reports are you referencing?

19     A.    Those are some -- the eyewitness

20   reports that were done with the survey on the

21   IPET study.  There were some folks located in

22   that area that there was water come into that

23   neighborhood.

24     Q.    Okay.  Last paragraph, you say, the

25   stability analysis of the north side -- I'm

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 506

1    sorry.  The stability analysis of the north

2    breach on the east side result in a computed

3    factor of safety equal to 1.0 at the crack or

4    gap on this canal side of the wall and water in

5    the IHNC at elevation 11.2.  You say, this is

6    about one foot higher than the average IHNC

7    water level at the time floodwater was observed

8    in the Lower Ninth Ward.

9         A.   That's correct.

10        Q.   Could you explain that to me?  I'm not

11   sure I'm following what you're saying.

12        A.   So our calculations are when the

13   floodwall would actually reach a factor of

14   safety of 1 was at an elevation of, our

15   calculations showed, of 1.2, or 11.2 feet.

16        Q.   All right.

17        A.   If you look at that time on the

18   hydrograph, this is somewhat higher than what

19   the hydrograph has at that time.  But the

20   hydrograph doesn't have any wave.

21        Q.   I see what you're saying.  I asked you

22   this very question; I asked you if you compared

23   this or correlated this with the levels of

24   water in the IHNC, that is, the stability

25   analysis.

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                    Page 507

1       A.   Yes.

2       Q.   And in fact they didn't match.

3       A.   They are different.

4       Q.   They're different.  By about a foot?

5       A.   When you look at the hydrograph.  But

6   that could be as a result of the waves.

7       Q.   Once again we're looking backward, we

8   can make the proof fit our conclusion; right?

9       A.   No, there were waves --

10      Q.   I understand.  I asked you that, too.

11      A.   Right.

12      Q.   I asked you if makes any difference.

13  You told me no.

14          MR. LEVINE:

15              Hold on.  Hold on.  Hold on.  Let

16          him finish.

17          MR. BRUNO:

18              That's all right.

19  EXAMINATION BY MR. BRUNO:

20      Q.   Go ahead.

21      A.   I don't believe I said that waves

22  didn't make a difference.  I said waves would

23  make a difference.  They do have an effect on

24  it.  That's why we gave -- when you actually

25  look in the report, we give a range of when it

JOHNS PENDLETON COURT REPORTERS              800  562-1285

DR. REED MOSHER (VOL.II)                    February 20, 2009

                                                    Page 508

 1    would occur.  If the water goes up with the

 2    waves, the hydrostatic pressure goes up.  Okay?

 3    At the wall.  You're going to get an increase

 4    in hydrostatic prestore as the waves go up.

 5         Q.   How high a wave would you need to have

 6    the same impact of an 11.2-foot surge?

 7              MR. LEVINE:

 8                   Objection.  Vague.

 9         A.   Relative to what surge level?

10    EXAMINATION BY MR. BRUNO:

11         Q.   11.2.

12         A.   Okay.

13         Q.   In other words, you just said to me

14    that it's one foot lower.  So it's really -- I

15    guess it's at 10.2-foot surge.  So the question

16    I'm asking you is how much of a wave, a peak

17    wave, would you need to develop the same factor

18    of safety as you developed with your surge

19    elevation at 11.2?

20         A.   It's almost one foot of wave -- it

21    would be about one foot of equivalent in surge

22    height.

23         Q.   So a one-foot wave which is not one

24    foot constantly, it fluctuates.

25         A.   But the pressure goes up and

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 509

```
 1   fluctuates.

 2       Q.   All right.  Okay.  Now, what is your

 3   scientific basis for saying that an additional

 4   one foot of wave will equate to the same amount

 5   of surge with no waves?  I should say, what is

 6   the scientific basis for saying that a surge

 7   height of 11.2 feet equates with a surge height

 8   of 10.2 feet plus one foot of waves?

 9       A.   When dealing with hydrostatic

10   pressure, if you have a height of water to a

11   given height, whether it's wave or not, it will

12   increase the pressure.

13       Q.   It will increase the pressure, but you

14   said they're the same.  I don't doubt that

15   there is an increase in pressure, but you're

16   going much further than that, you're saying

17   they're the same.  You're saying that 11.2 feet

18   of surge is going to produce the same

19   hydrostatic pressure as 10.2 feet of surge plus

20   one foot of waves.  Isn't that what you said?

21       A.   Yes.  I said the pressure is the same.

22       Q.   What is the scientific basis for

23   marking that statement?

24       A.   It's the height of the column of water

25   at the location times the unit weight of water.
```

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 510

1      Q.   Well, but the height changes with
2   waves, it doesn't stay static.
3      A.   And so it will go up, down, up, down.
4   That still means that at that point you will
5   get the higher pressure.  Right?
6      Q.   Not constantly, no.
7      A.   It doesn't matter constantly.  It is
8   fluctuating, you're getting that higher
9   pressure, so you'll constantly go over to a
10  factor of safety less than 1.
11     Q.   Uh-huh. right.
12     A.   And then down.  And as the soil
13  strains it loses some of its strength --
14     Q.   Right?
15     A.   -- with strain.
16     Q.   And you're saying that even though
17  you're not an expert in hydrology or
18  hydrostatic pressures, right?
19     A.   Well, not on hydrology, but at least
20  on hydrostatic pressures.  That's --
21     Q.   That's fine.  It seems the me at least
22  you'd have a two-foot wave because with a
23  two-foot wave the median would be the foot and
24  would absolutely equate with 11.2.
25     A.   But you're going to have pressures

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 511

 1   going up and down.

 2        Q.   All right.  Whatever.

 3             Now you said you did the stability

 4   analysis where there was no I-wall at the south

 5   breach.  Page 60.

 6        A.   Page 60?

 7        Q.   Yeah.  First paragraph.  Stability

 8   analysis of the south breach on the west side

 9   where there was no I-wall showed that the

10   factor of safety there was also high?  That's

11   on the west side, right?  Okay.  Never mind.

12             That's on the other side of the canal.

13        A.   (Nods affirmatively.)

14        Q.   As an expert, is it your opinion that

15   the north breach resulted from defective design

16   by the Corps of Engineers?

17        A.   And I actually have had a deposition

18   to this.  I believe it is.

19        Q.   Did you do any underseepage analysis

20   at the south breach?

21        A.   Um -- I'd have to look and see.  I

22   believe we did.  But I'll have to take a look

23   at the seepage analysis.  I believe there were.

24        Q.   On Page 100, you say, it is clear that

25   one of the east side breaches occurred before

DR. REED MOSHER (VOL.II)                          February 20, 2009

Page 512

1    the wall was overtopped because eyewitness

2    reports indicate that the water level in the

3    Lower Ninth Ward near Florida Avenue was rising

4    when the water level in the IHNC was still

5    below the top of the floodwall.

6              If the eyewitness report is

7    inaccurate, does that mean the conclusion is

8    inaccurate?

9         A.   No, because we also have, um -- the

10   stopped-clock hydrograph that shows that, too.

11        Q.   But you didn't discuss that in this

12   paragraph, right?

13        A.   I didn't mention it in that paragraph.

14        Q.   I'm sorry?

15        A.   I didn't mention it in that paragraph,

16   to answer your question.

17        Q.   At Page 102, you say, the presence of

18   waves would just make the onset of breaching

19   occur sooner.

20             MR. LEVINE:

21                  Where are you reading that from?

22             MR. BRUNO:

23                  Page 102.  Middle paragraph, last

24             sentence.

25             MR. LEVINE:

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 513

 1          Thanks.

 2     A.   Correct.

 3  EXAMINATION BY MR. BRUNO:

 4     Q.   You still believe that?

 5     A.   Uh-huh.

 6     Q.   Now, if it is concluded that the

 7  levees, or some of the levees, not all of the

 8  levees, along Reach 2 failed due to front side

 9  wave attack, if that's a true statement, would

10  you still be able to say that the levees along

11  Reach 2 performed as designed?

12     A.   Um -- if they, if -- hypothetical,

13  right?

14     Q.   Hypothetical.

15     A.   If they were -- they didn't perform as

16  designed and there would have been

17  consideration of a design flaw.

18     Q.   Okay.  All right.  You were in charge

19  of the IPET Task Force on the performance of

20  the levees, right?

21     A.   Levees and floodwalls.

22     Q.   And your conclusion was that the

23  levees performed as designed.

24     A.   As designed.

25     Q.   And you got an award for that --

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 514

1      A.   Not --

2      Q.   -- by the Army.

3      A.   Not for that, but for doing the work.

4      Q.   For doing the work.  Who else got --

5      A.   And --

6      Q.   Sorry.  Go ahead and answer.

7      A.   You make a flat statement.  Also in

8   there was discussion about the failures that

9   occurred.  The failures had occurred before

10  they reached the design level of the floodwalls

11  in these situations.  So it wasn't just a good

12  news story.

13     Q.   Well, actually, if you read the

14  paragraphs that you wrote in IPET, you didn't

15  use the word defective design, did you?

16     A.    No, because we weren't assessing the

17  design, we were assessing what actually

18  happened.

19     Q.   All right.  Well, but the whole

20  purpose of IPET was to give the public an

21  understanding of what happened, and in

22  particular to give the public some

23  understanding of whether or net there were some

24  defects in design and construction; isn't that

25  true?

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 515

1      A.   No.  That wasn't our purpose.

2      Q.   That wasn't the purpose?

3      A.   That wasn't our purpose.

4      Q.   Okay.  But in that same paragraph

5   where you talk about performed as designed, you

6   say that the other -- there were four breaches

7   that resulted from I believe you would call it

8   a foundation failure.

9      A.   Correct.

10      Q.   Right?  Would you agree with me that

11   some third party reading that sentence would

12   not immediately conclude from the phrase

13   foundation failure that there was some defect

14   of design, right?

15      A.   That may not.  And that was not our

16   tasking, is to -- our tasking was to find out

17   how they were designed and how they failed.

18   Okay?  Relative to how they failed, and to talk

19   about how that failure occurred and how you

20   might overcome that.

21      Q.   All right.  Page 106.  You say, while

22   the waves were not necessary to destroy the

23   levees, the waves from either actual conditions

24   or the hypothetical alternatives would have

25   contributed to overtopping rates and levee

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 516

 1    erosion.

 2              You agree with that.

 3        A.    Right.

 4        Q.    They would have triggered the onset of

 5    overtopping and early damage for the more

 6    erodible sections of levee before the water

 7    level reached the crest, right?

 8        A.    Correct.

 9        Q.    Who else got an aware?

10        A.    Um -- all of the members of the IPET

11    team received some type of award.

12        Q.    For civilian service, right?

13        A.    Some of them were civilian service,

14    some of them were meritorious service.

15        Q.    Um -- do you know if the Army

16    considered the work of ILIT or Team

17    Louisiana --

18        A.    In giving an award?

19        Q.    -- in giving out the awards?

20        A.    Nope.

21        Q.    At Page 16, in Appendix B, you say

22    that Dr. Bea and the ILIT team's analysis of

23    seepage is the product of inaccurate data.

24              What inaccurate data are you referring

25    the?

DR. REED MOSHER (VOL.II)                    February 20, 2009

1      A.    The permeability of the soils.

2      Q.    And the flawed and idiosyncratic

3  methodology is what exactly?

4      A.    Is the, as stated in their ILIT

5  report, coming up with a permeability based on

6  observations and their past history, not

7  relying on any data.

8      Q.    They can't rely on observations, but

9  you can rely on observations and pictures.

10     A.    But not when it comes to dealing with

11  the data for seepage analysis.  I wouldn't

12  attempt to do it strictly on no data --

13     Q.    Right.

14     A.    -- when it comes to doing the

15  analysis.

16          (Brief recess.)

17          MR. BRUNO:

18               Okay.  That's all questions I

19          have.  Thank you very much, doctor.

20     A.    Okay.  Thank you.

21

22

23

24

25

DR. REED MOSHER (VOL.II)                          February 20, 2009

Page 518

1                    WITNESS' CERTIFICATE

2

3              I, REED L. MOSHER, Ph.D., do hereby

4    certify that the foregoing testimony was given

5    by me, and that the transcription of said

6    testimony, with corrections and/or changes, if

7    any, is true and correct as given by me on the

8    aforementioned date.

9

10   _____        _____

11   DATE SIGNED            REED L. MOSHER, Ph.D.

12

13   _____ Signed with corrections as noted.

14

15   _____ Signed with no corrections noted.

16

17

18

19

20

21

22

23

24

25   DATE TAKEN:  February 20th, 2009

DR. REED MOSHER (VOL.II)                    February 20, 2009

Page 519

1              REPORTER'S CERTIFICATE

2         I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,

3    Certified Court Reporter in and for the State

4    of Louisiana, do hereby certify that the

5    aforementioned witness, after having been first

6    duly sworn by me to testify to the truth, did

7    testify as hereinabove set forth;

8         That said deposition was taken by me

9    in computer shorthand and thereafter

10   transcribed under my supervision, and is a true

11   and correct transcription to the best of my

12   ability and understanding.

13        I further certify that I am not of

14   counsel, nor related to counsel or the parties

15   hereto, and am in no way interested in the

16   result of said cause.

17

18

19

20

21

22

23   _____

24        JOSEPH A. FAIRBANKS, JR., CCR, RPR

25        CERTIFIED COURT REPORTER #75005