1                  UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF LOUISIANA

3

4

5   NORMAN ROBINSON, ET AL          *   DOCKET 06-CV-2268-K
                                    *
6   VERSUS                          *   NEW ORLEANS, LOUISIANA
                                    *
7   UNITED STATES OF AMERICA, ET AL *   MAY 7, 2009
    * * * * * * * * * * * * * * * * *

8

9

10                 VOLUME 14 - AFTERNOON SESSION
                   TRIAL PROCEEDINGS BEFORE THE
11            HONORABLE STANWOOD R. DUVAL JR.
                   UNITED STATES DISTRICT JUDGE
12

13
    APPEARANCES:
14

15  FOR THE PLAINTIFFS:        O'DONNELL & ASSOCIATES, PC
                               BY:  PIERCE O'DONNELL, ESQ.
16                             550 SOUTH HOPE STREET, SUITE 1000
                               LOS ANGELES, CALIFORNIA 90071
17

18  FOR THE PLAINTIFFS:        LAW OFFICES OF JOSEPH M. BRUNO, A PLC
                               BY:  JOSEPH M. BRUNO, ESQ.
19                                  L. SCOTT JOANEN, ESQ.
                               855 BARONNE STREET
20                             NEW ORLEANS, LOUISIANA 70113

21
    FOR THE PLAINTIFFS:        THE ANDRY LAW FIRM, LLC
22                             BY:  JONATHAN B. ANDRY, ESQ.
                                    KEA SHERMAN, ESQ.
23                             610 BARONNE STREET
                               NEW ORLEANS, LOUISIANA 70113
24

25

                            FINAL DAILY COPY

MOSHER00001

2940

1    <u>APPEARANCES (CONTINUED)</u>:

2

3    FOR THE PLAINTIFFS:          BARON & BUDD, PC
                                  BY:  THOMAS SIMS, ESQ.
                                  3102 OAK LAWN AVENUE, SUITE 1100
4                                 DALLAS, TEXAS 75219

5
     FOR THE PLAINTIFFS:          DOMENGEAUX WRIGHT ROY & EDWARDS,LLC
6                                 BY:  JAMES P. ROY, ESQ.
                                  556 JEFFERSON STREET, SUITE 500
7                                 POST OFFICE BOX 3668
                                  LAFAYETTE, LOUISIANA 70502
8

9    FOR THE PLAINTIFFS:          THE DUDENHEFER LAW FIRM, LLC
                                  BY:  FRANK C. DUDENHEFER JR., ESQ.
10                                601 POYDRAS STREET, SUITE 2655
                                  NEW ORLEANS, LOUISIANA 70130
11

12   FOR THE PLAINTIFFS:          DUMAS & ASSOCIATES LAW FIRM, LLC
                                  BY:  WALTER C. DUMAS, ESQ.
13                                LAWYER'S COMPLEX
                                  1261 GOVERNMENT STREET
14                                POST OFFICE BOX 1366
                                  BATON ROUGE, LOUISIANA 70821
15

16   FOR THE PLAINTIFFS:          FAYARD & HONEYCUTT
                                  BY:  CALVIN C. FAYARD JR., ESQ.
17                                519 FLORIDA AVENUE S.W.
                                  DENHAM SPRINGS, LOUISIANA 70726
18

19   FOR THE PLAINTIFFS:          MICHAEL C. PALMINTIER, A PLC
                                  BY:  MICHAEL C. PALMINTIER, ESQ.
20                                     JOSHUA M. PALMINTIER, ESQ.
                                  618 MAIN STREET
21                                BATON ROUGE, LOUISIANA 70801

22
     FOR THE PLAINTIFFS:          LAW OFFICE OF ELWOOD C. STEVENS JR.,
23                                   A PLC
                                  BY:  ELWOOD C. STEVENS JR., ESQ.
24                                1205 VICTOR II BOULEVARD
                                  POST OFFICE BOX 2626
25                                MORGAN CITY, LOUISIANA 70381




                        FINAL DAILY COPY

MOSHER00002

1   APPEARANCES (CONTINUED):

2

3   FOR SUBROGATED INSURERS:    THE GILBERT FIRM
                                BY:   ELISA T. GILBERT, ESQ.
                                      BRENDAN R. O'BRIEN, ESQ.

4                               325 EAST 57TH STREET
                                NEW YORK, NEW YORK 10022

5

6   ALSO PRESENT FOR           J. ROBERT WARREN II, ESQ.
       PLAINTIFFS:             ASHLEY E. PHILEN, ESQ.

7                              MRGO LITIGATION GROUP
                               600 CARONDELET STREET, SUITE 604

8                              NEW ORLEANS, LOUISIANA 70130

9

    FOR THE DEFENDANT:         U.S. DEPARTMENT OF JUSTICE
10                             TORTS BRANCH, CIVIL DIVISION
                               BY:   DANIEL M. BAEZA JR., ESQ.
11                                   JEFFREY PAUL EHRLICH, ESQ.
                                     TAHEERAH KALIMAH EL-AMIN, ESQ.
12                                   MICHELE S. GREIF, ESQ.
                                     CONOR KELLS, ESQ.
13                                   PAUL MARC LEVINE, ESQ.
                                     JAMES F. MCCONNON JR., ESQ.
14                                   KARA K. MILLER, ESQ.
                                     RUPERT MITSCH, ESQ.
15                                   PETER G. MYER, ESQ.
                                     ROBIN D. SMITH, ESQ.
16                                   SARAH K. SOJA, ESQ.
                                     RICHARD R. STONE SR., ESQ.
17                                   JOHN WOODCOCK, ESQ.
                               BENJAMIN FRANKLIN STATION
18                             P.O. BOX 888
                               WASHINGTON, DC 20044
19

20  OFFICIAL COURT REPORTER:   TONI DOYLE TUSA, CCR, FCRR
                               500 POYDRAS STREET, ROOM HB-406
21                             NEW ORLEANS, LOUISIANA 70130
                               (504) 589-7778
22

23

24

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
25  PRODUCED BY COMPUTER.

FINAL DAILY COPY

MOSHER00003

1                    **I N D E X**

2                                              PAGE

3   DONALD RESIO
          CROSS-EXAMINATION                    2943
4

5   REED MOSHER
          DIRECT EXAMINATION                   2964
6

7   DEFENSE PROFFER 4                          2988

8
    DEFENSE PROFFER 5                          3012
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    FINAL DAILY COPY

MOSHER00004

| | | |
|---|---|---|
| 13:52 | 1 | OVERSEES RESEARCH CONDUCTED AT ONE OF THE ARMY'S SUPERCOMPUTING |
| 13:52 | 2 | FACILITIES.  HIS EXPERT REPORT IS JX-212 AND HIS CV IS JX-42. |
| 13:52 | 3 | THE UNITED STATES TENDERS DR. REED L. MOSHER AS AN EXPERT IN |
| 13:52 | 4 | GEOTECHNICAL ENGINEERING. |
| 13:52 | 5 | **MR. O'DONNELL:**  NO OBJECTION AT ALL, YOUR HONOR. |
| 13:52 | 6 | **THE COURT:**  THE COURT ACCEPTS DR. MOSHER AS TENDERED. |
| 13:52 | 7 | **MR. LEVINE:**  IF WE COULD TAKE A LOOK AT PAGES 9 AND |
| 13:52 | 8 | 10 OF DR. MOSHER'S EXPERT REPORT, WHICH WE HAVE IDENTIFIED AS |
| 13:52 | 9 | JX-212. |
| 13:52 | 10 | **DIRECT EXAMINATION** |
| 13:52 | 11 | BY MR. LEVINE: |
| 13:52 | 12 | **Q.**  DR. MOSHER, CAN YOU READ TO THE COURT YOUR FIRST OPINION |
| 13:53 | 13 | ON THAT PAGE. |
| 13:53 | 14 | **A.**  YES.  TO A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY, THE |
| 13:53 | 15 | BREACHING AND EROSION WHICH OCCURRED ALONG THE LEVEES ADJACENT |
| 13:53 | 16 | TO REACH 2 OF THE MRGO WERE PRIMARILY CAUSED BY OVERTOPPING. |
| 13:53 | 17 | THE AVAILABLE DATA DOES NOT SUPPORT A CONCLUSION AS TO WHETHER |
| 13:54 | 18 | FRONTAL EROSION FROM WAVES WAS THE CAUSE OF THE BREACHING ALONG |
| 13:54 | 19 | REACH 2. |
| 13:54 | 20 | **Q.**  CAN YOU PLEASE READ YOUR SECOND OPINION ON THAT PAGE. |
| 13:54 | 21 | **A.**  YES.  TO A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY, THE |
| 13:54 | 22 | PRIMARY FACTOR THAT LED TO THE EROSION AND BREACHING OF THE |
| 13:54 | 23 | LEVEES FROM OVERTOPPING ALONG REACH 2 OF THE LEVEES WAS THE |
| 13:54 | 24 | CONSTRUCTION OF THE LEVEES USING HYDRAULIC PLACEMENT OF THE |
| 13:54 | 25 | SOIL.  BREACHING AND EROSION OF THE LEVEES IN THE NEW ORLEANS |

FINAL DAILY COPY

| 13:54 | 1 | AREA FROM HURRICANE KATRINA ONLY OCCURRED ALONG SECTIONS WHERE |
|---|---|---|

13:54    1    AREA FROM HURRICANE KATRINA ONLY OCCURRED ALONG SECTIONS WHERE

13:54    2    THE SOIL FOR THE LEVEES WAS PLACED USING HYDRAULIC FILL OF THE

13:54    3    CHANNELS AND THE HYDRAULIC PLACING OF THE SOIL TO FORM THE

13:54    4    LEVEES.  WHERE THE LEVEES WERE CONSTRUCTED BY PLACING CLAY AT A

13:54    5    CONTROLLED WATER CONTENT AND COMPACTED, NO BREACHING OCCURRED.

13:54    6    Q.   COULD YOU PLEASE READ YOUR THIRD OPINION ON THAT PAGE.

13:54    7    A.   TO A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY, THE

13:54    8    EROSION AND BREACHING OF THE LEVEES AND THE SUBSEQUENT FLOODING

13:54    9    THAT OCCURRED ALONG REACH 2 WAS MORE SEVERE BECAUSE THE

13:55    10    PROTECTIVE ELEVATIONS OF THE LEVEES WERE BELOW THE AUTHORIZED

13:55    11    ELEVATIONS.  SECTIONS OF THE LEVEES BETWEEN BAYOU BIENVENUE AND

13:55    12    BAYOU DUPRE CONTROL STRUCTURES WERE 2 FEET BELOW THE AUTHORIZED

13:55    13    PROTECTIVE ELEVATIONS OF THE LEVEES.

13:55    14    Q.   LET'S TURN TO PAGE 106 AND 107 OF YOUR EXPERT REPORT.  CAN

13:55    15    YOU READ TO THE COURT YOUR OPINION THERE.

13:55    16    A.   BASED ON MY REVIEW OF THE AVAILABLE DATA AND THE ANALYSIS

13:55    17    THAT HAS BEEN PERFORMED, IT IS MY OPINION TO A REASONABLE

13:55    18    DEGREE OF SCIENTIFIC CERTAINTY THAT THE EROSION AND BREACHING

13:55    19    WHICH OCCURRED ALONG LEVEES ADJACENT TO REACH 2 OF THE MRGO

13:55    20    DURING HURRICANE KATRINA WOULD ALSO HAVE OCCURRED IF THE

13:55    21    HYPOTHETICAL ALTERNATIVE CONDITIONS HAD BEEN IN PLACE DURING

13:56    22    HURRICANE KATRINA.  WITH BREACHING OF THE LEVEES ADJACENT TO

13:56    23    REACH 2 OF THE MRGO BEING ESSENTIALLY THE SAME FOR ALL OF THE

13:56    24    HYPOTHETICAL ALTERNATIVE CONDITIONS AS THE ACTUAL CONDITIONS,

13:56    25    THEIR CONTRIBUTION TO FLOODING ALONG REACH 2 WOULD BE THE SAME

FINAL DAILY COPY

13:56  1   AS THE ACTUAL EVENT.

13:56  2          FITZGERALD'S ANALYSIS OF THE VOLUME OF WATER FROM

13:56  3   BREACHING SHOWS THAT 85 PERCENT OF THE VOLUME OF THE FLOODING

13:56  4   IS DUE TO BREACHES ALONG REACH 2; THEREFORE, EVEN UNDER THE

13:56  5   HYPOTHETICAL ALTERNATIVE CONDITIONS ALONG REACH 2 ALONE, THE

13:56  6   FLOODING IN ST. BERNARD PARISH WOULD HAVE BEEN SEVERE.

13:56  7   Q.   DR. MOSHER, HAVE YOU REACHED AN OPINION TO A REASONABLE

13:56  8   DEGREE OF SCIENTIFIC CERTAINTY AS TO WHETHER THE MRGO CAUSED

13:56  9   THE FAILURES OF THE LEVEES DURING HURRICANE KATRINA?

13:56  10  A.   YES, I HAVE.

13:56  11  Q.   WHAT IS THAT OPINION?

13:56  12  A.   THAT THE MRGO DIDN'T CAUSE THE BREACHING OF THE FAILURES.

13:57  13  Q.   BEFORE WE GET TOO FAR, LET'S DISCUSS SOME OF THE

13:57  14  BACKGROUND ON SOILS IN THIS CASE.  TO DO SO, I WANT TO LOOK AT

13:57  15  FIGURE 17 OF PAGE 29 OF YOUR EXPERT REPORT.  WHAT IS THIS

13:57  16  FIGURE?

13:57  17  A.   THIS IS A FIGURE FROM THE UNIFIED SOIL CLASSIFICATION

13:57  18  SYSTEM.

13:57  19  Q.   WHAT'S A COURSE-GRAINED SOIL AS WE CAN SEE RIGHT THERE IN

13:57  20  YOUR CHART?

13:57  21  A.   COURSE-GAINED SOILS ARE SANDS AND GRAVELS.  GRAVELS ARE

13:57  22  USUALLY THINGS THAT ARE GREATER THAN -- IT SAYS A NO. 4 SIEVE,

13:57  23  WHICH IS ABOUT AN EIGHTH OF AN INCH, A QUARTER OF AN INCH, AND

13:57  24  THEN SANDS ARE SIZES BELOW THAT.  IT'S ANGULAR IN SHAPE AND IS

13:57  25  GRANULAR IN NATURE, SO SANDS AND SILTS.

FINAL DAILY COPY

MOSHER00007

| | | |
|---|---|---|
| 13:57 | 1 | **Q.**   ARE THESE MATERIALS PERMEABLE? |
| 13:58 | 2 | **A.**   THEY'RE HIGHLY PERMEABLE. |
| 13:58 | 3 | **Q.**   HOW WELL DO COURSE-GRAINED SOILS RESIST EROSION? |
| 13:58 | 4 | **A.**   THEY WOULD GENERALLY BE CONSIDERED THE MOST ERODIBLE |
| 13:58 | 5 | MATERIAL THAT WE GET. |
| 13:58 | 6 | **Q.**   NOW, IN CONTRAST, LET'S TAKE A LOOK AT FINE-GRAINED SOILS. |
| 13:58 | 7 | WHAT'S A FINE-GRAINED SOIL? |
| 13:58 | 8 | **A.**   THERE'S REALLY TWO KINDS OF FINE-GRAINED SOILS:  THEY ARE |
| 13:58 | 9 | SILTS AND CLAYS.  IN GENERAL TERMS, THE SILT PARTICLES ARE MUCH |
| 13:58 | 10 | LIKE THE SAND BUT MUCH SMALLER.  THEY PASS THROUGH A 200 SIEVE. |
| 13:58 | 11 | THEY'RE ANGULAR OR ROUND SHAPED.  WHERE THE CLAYS ARE |
| 13:58 | 12 | MICROSCOPIC IN SHAPE AND THEY'RE USUALLY FLAT, THE FLAT |
| 13:58 | 13 | MATERIAL, MICROSCOPIC, CAN BE ROLLED UP INTO A TUBE OR |
| 13:58 | 14 | SOMETHING LIKE THAT OR JUST LAY FLAT. |
| 13:58 | 15 | **Q.**   ARE FINE-GRAINED MATERIALS PERMEABLE? |
| 13:58 | 16 | **A.**   THEY'RE LESS PERMEABLE THAN THE SANDS.  THEY RANGE FROM |
| 13:58 | 17 | WHERE THE SILTS ARE SOMEWHAT MORE PERMEABLE, WITH THE CLAYS |
| 13:58 | 18 | BEING THE LEAST PERMEABLE. |
| 13:58 | 19 | **Q.**   HOW WELL DO FINE-GRAINED MATERIALS RESIST EROSION? |
| 13:59 | 20 | **A.**   THEY RANGE.  THE SILTS WILL BE BETTER THAN THE SANDS. |
| 13:59 | 21 | GENERALLY, SILTS HAVE A LITTLE BIT OF CLAY WITH THEM.  THEN THE |
| 13:59 | 22 | CLAYS ALSO RANGE WITH THE -- WHAT WE CALL PLASTIC CLAYS, OR |
| 13:59 | 23 | ONES WITH HIGH PLASTICITY OR FAT CLAYS, WOULD BE THE LEAST |
| 13:59 | 24 | PERMEABLE. |
| 13:59 | 25 | **Q.**   WHEN YOU SAY "PLASTIC," WHAT DO YOU MEAN BY THAT TERM? |

FINAL DAILY COPY

MOSHER00008

| 13:59 | 1 | **A.**   GENERALLY, THE CLAY, IF YOU ROLL IT IN YOUR HANDS, IT WILL |
| 13:59 | 2 | FEEL STICKY, AND IT HAS A PLASTIC, SO IT HAS A HIGHER WATER |
| 13:59 | 3 | CONTENT TO IT.  IT'S VERY COMPRESSIBLE, SO IT'S A STICKY |
| 13:59 | 4 | MATERIAL. |
| 13:59 | 5 | **Q.**   TECHNICALLY SPEAKING, WHAT'S A SILT? |
| 13:59 | 6 | **A.**   SILTS, YOU WILL FEEL IT -- IT WILL LOOK A LOT LIKE A CLAY, |
| 13:59 | 7 | BUT WHEN YOU PUT IT IN YOUR HAND, YOU RUB IT, IT ACTUALLY HAS |
| 13:59 | 8 | GRAINS.  YOU CAN FEEL THE GRAINS IN IT.  IF YOU PAT IT, THE |
| 13:59 | 9 | WATER WILL COME UP TO THE SURFACE; WHERE A CLAY, IF YOU PAT IT, |
| 13:59 | 10 | THE WATER WILL STAY WITHIN ITS COMBINED GROUPING.  IT HAS A |
| 13:59 | 11 | CHEMICAL BOND TO THE CLAY. |
| 14:00 | 12 | **Q.**   ARE SILTS PERMEABLE? |
| 14:00 | 13 | **A.**   THEY'RE MORE PERMEABLE THAN THE CLAYS BUT LESS THAN THE |
| 14:00 | 14 | SANDS.  THEY CAN BE -- THERE'S DEGREES.  THEY CHANGE IN THE |
| 14:00 | 15 | PERMEABILITY BY FACTORS OF 100 IN THE RANGES WE'RE TALKING |
| 14:00 | 16 | ABOUT. |
| 14:00 | 17 | **Q.**   HOW WELL DO SILTS RESIST EROSION? |
| 14:00 | 18 | **A.**   THEY'RE ON KIND OF A MEDIUM TO LOW ERODIBILITY.  THEY CAN |
| 14:00 | 19 | BE QUITE ERODIBLE. |
| 14:00 | 20 | **Q.**   WHAT'S A CLAY? |
| 14:00 | 21 | **A.**   A CLAY IS GOING TO BE, AS I SAID, DUE TO FLAT KIND OF |
| 14:00 | 22 | PARTICLES.  THEY'RE GOING TO ALSO HAVE A DEGREE OF ERODIBILITY. |
| 14:00 | 23 | IF YOU GET THE REALLY SOFT, ALMOST -- CLAYS ALMOST LIKE PEANUT |
| 14:00 | 24 | BUTTER, THEY'RE SOFT CLAY, AND THEY'RE GOING TO BE QUITE |
| 14:01 | 25 | ERODIBLE.  THE LEAN CLAYS, WHICH HAVE SOME SILTS AND SANDS IN |

MOSHER00009

14:01    1    THEM, ARE GOING TO BE QUITE ERODIBLE, WHERE THE PLASTIC CLAYS,

14:01    2    THE ONES WITH HIGH -- WHAT WE CALL FAT CLAYS THAT ARE MEDIUM OR

14:01    3    STIFF WILL BE OUR BEST PERFORMING ONES.

14:01    4    **Q.**    HOW DOES PLASTICITY RELATE TO EROSION?

14:01    5    **A.**    GENERALLY, IF YOU HAVE A HIGHER PLASTIC CLAY, YOU'RE GOING

14:01    6    TO HAVE LESS EROSION.  IF YOU COMPACT THAT, HAVE SOME

14:01    7    COMPACTION IN IT SO IT'S A MEDIUM OR STIFF, IT WILL BE MUCH

14:01    8    BETTER.

14:01    9    **Q.**    I'M GUESSING THAT CLAYS ARE MORE RESISTANT TO EROSION THAN

14:01    10   OTHER MATERIALS?

14:01    11   **A.**    THAT'S CORRECT.

14:01    12   **Q.**    NOW, YOU MENTIONED A TERM *LEAN CLAY*.  WHAT'S THAT?

14:01    13   **A.**    LEAN CLAY, IT STILL HAS 50 PERCENT OF ITS COMBINATION OF

14:01    14   THE -- WHAT MAKES IT UP AS BEING A CLAY, BUT IT'LL HAVE SOME

14:01    15   SANDS OR SILTS IN IT, POTENTIALLY, AND YOU WON'T FEEL THE SAME

14:01    16   AMOUNT OF WATER IN IT.  IT'LL HAVE A LOWER WATER CONTENT.

14:01    17   **Q.**    HOW WELL DOES A LEAN CLAY RESIST EROSION?

14:02    18   **A.**    THERE ARE A MAGNITUDE OF WAYS.  IT'LL BE MORE ERODIBLE

14:02    19   THAN A FAT CLAY.  IT'S KIND OF A MEDIUM NATURE.

14:02    20   **Q.**    WHAT'S A FAT CLAY?

14:02    21   **A.**    A FAT CLAY WILL BE YOUR BETTER MATERIAL, ESPECIALLY ONCE

14:02    22   IT GETS ABOVE THE SOFT.  WHEN IT'S ACTUALLY IN THE MEDIUM OR

14:02    23   STIFFER AREA, IT'S GOING TO BE QUITE RESISTANT TO EROSION.

14:02    24   **Q.**    I TAKE IT A FAT CLAY HAS LESS SAND OR SILT IN IT THAN A

14:02    25   LEAN CLAY?

MOSHER00010

| | | |
|---|---|---|
| 14:02 | 1 | **A.**   IT'S GOING TO HAVE A LARGER COMPONENT OF -- IT'S GOING TO |
| 14:02 | 2 | BE MOSTLY CLAY PARTICLES WITH VERY LITTLE SILT OR SAND IN IT. |
| 14:02 | 3 | **Q.**   NOW, YOU MENTIONED COMPACTION.  AS IT PERTAINS TO CLAY, |
| 14:02 | 4 | CAN YOU EXPLAIN WHAT YOU MEAN BY COMPACTION. |
| 14:02 | 5 | **A.**   WELL, A SOFT CLAY WILL BE, AS I MENTIONED, LIKE A PEANUT |
| 14:02 | 6 | BUTTER.  A STIFF CLAY WILL BE ALMOST LIKE A HARD, FROZEN ICE |
| 14:02 | 7 | CREAM, IF YOU THINK OF IT IN THAT TERM.  THE MEDIUM CLAY WILL |
| 14:02 | 8 | BE SOMEWHERE IN BETWEEN THOSE TWO. |
| 14:02 | 9 | **Q.**   I TAKE IT A SOFT CLAY IS MOST ERODIBLE; A STIFF CLAY IS -- |
| 14:03 | 10 | **A.**   PROBABLY THE BEST THAT WE GET. |
| 14:03 | 11 | **Q.**   THEN A MEDIUM IS SOMEWHERE IN THE MIDDLE? |
| 14:03 | 12 | **A.**   THAT'S CORRECT.  YOU CONTROL THOSE BY THE MOISTURE CONTENT |
| 14:03 | 13 | OF THE SOIL. |
| 14:03 | 14 | **Q.**   NOW, ONE OF YOUR OPINIONS IS THAT THE BREACHING OCCURRED |
| 14:03 | 15 | AS A RESULT OF USING HYDRAULIC FILL IN THE LEVEES; CORRECT? |
| 14:03 | 16 | **A.**   THAT'S CORRECT. |
| 14:03 | 17 | **Q.**   LET'S FIRST TALK ABOUT HYDRAULIC FILL.  IN GENERAL, WHAT |
| 14:03 | 18 | IS IT? |
| 14:03 | 19 | **A.**   HYDRAULIC FILL HAS BEEN AROUND SINCE THE LATE 1800S FOR |
| 14:03 | 20 | OUR CONSTRUCTION PROCESS TO BUILD EMBANKMENTS.  WHAT THEY DO IS |
| 14:03 | 21 | YOU FIND A LAYER OF SOIL THAT YOU CAN HYDRAULICALLY DREDGE OUT, |
| 14:03 | 22 | THAT HAS THE RIGHT SOIL CONTENT THAT YOU WANT, AND YOU HAVE A |
| 14:03 | 23 | CONTAINMENT AREA WHERE YOU WANT THE LEVEE OR EMBANKMENT TO BE. |
| 14:03 | 24 | YOU BUILD DIKES OUTSIDE OF THAT CONTAINMENT AREA, PLACE PIPES |
| 14:03 | 25 | ON TOP OF THOSE DIKES, AND THEN WITH A HYDRAULIC DREDGE YOU |

FINAL DAILY COPY

MOSHER00011

| | | |
|---|---|---|
| 14:04 | 1 | PUMP THE FILL INTO THAT AREA.  THE PIPES ARE SITUATED SO THAT |
| 14:04 | 2 | THE MATERIAL IS FLOWING. |
| 14:04 | 3 | GENERALLY, YOU'LL GET THE COURSE-GRAINED MATERIALS TO |
| 14:04 | 4 | DROP OUT FIRST.  THE FINER-GRAINED MATERIALS GO TO THE CENTER |
| 14:04 | 5 | OF THE EMBANKMENT, WHICH IS WHAT YOU WANT BECAUSE YOU WANT TO |
| 14:04 | 6 | MAKE THE EMBANKMENT IMPERVIOUS TO WATER.  YOU GO THROUGH |
| 14:04 | 7 | THAT -- IT TAKES A WHILE, AFTER YOU PLACE IT, FOR THE WATER TO |
| 14:04 | 8 | DRAIN OUT.  THEN YOU PUT ANOTHER SET OF DIKES UP AND RAISE IT |
| 14:04 | 9 | UP UNTIL YOU GET TO THE DECIDED HEIGHT.  ONCE IT SAT THERE LONG |
| 14:04 | 10 | ENOUGH, YOU CAN GET EARTH-MOVING EQUIPMENT ON IT TO SHAPE IT. |
| 14:04 | 11 | Q.   WELL, LET'S TAKE A LOOK AT FIGURE 1 ON PAGE 11 OF YOUR |
| 14:04 | 12 | EXPERT REPORT.  WHAT DOES THIS FIGURE SHOW? |
| 14:04 | 13 | A.   IT IS THE LOCATION OF THE BREACHES ON REACH 2. |
| 14:05 | 14 | Q.   IF WE TAKE A LOOK AT FIGURE 4-1 ON PAGE 10 OF THE EXPERT |
| 14:05 | 15 | REPORT OF CHAD MORRIS, WHICH IS MARKED JX-191, IS THIS FIGURE |
| 14:05 | 16 | GENERALLY CONSISTENT WITH FIGURE 1 ON PAGE 11 OF YOUR EXPERT |
| 14:05 | 17 | REPORT THAT YOU JUST SAW? |
| 14:05 | 18 | A.   I THINK IT'S GENERALLY CONSISTENT WITH THAT. |
| 14:05 | 19 | Q.   IN BOTH FIGURES WE SEE BREACHING OCCURRING ALL ALONG |
| 14:05 | 20 | REACH 2, NORTH OF BAYOU DUPRE, SOUTH OF BAYOU DUPRE; CORRECT? |
| 14:05 | 21 | A.   THAT'S CORRECT. |
| 14:05 | 22 | Q.   NOW, LET'S TAKE A LOOK AT FIGURE 2 ON PAGE 12 OF YOUR |
| 14:05 | 23 | EXPERT REPORT, WHICH, AGAIN, IS JX-212.  WHAT DOES THIS FIGURE |
| 14:05 | 24 | SHOW? |
| 14:05 | 25 | A.   IT SHOWS THE CONSTRUCTION METHOD FOR THE LEVEES ALONG |

MOSHER00012

| | | |
|---|---|---|
| 14:05 | 1 | THOSE AREAS AND THE BOUNDARIES OF THE LEVEES. |
| 14:06 | 2 | **Q.**   WHERE WAS HYDRAULIC FILL USED TO CONSTRUCT THE LEVEES? |
| 14:06 | 3 | **A.**   ALONG REACH 2.  THEN IT WAS ALSO USED ALONG REACH 2 THERE. |
| 14:06 | 4 | IT WAS USED ALONG THAT SECTION COMING BACK, CORRECT. |
| 14:06 | 5 | **Q.**   HOW WERE THE LEVEES ON THE SOUTHERN PART OF THE |
| 14:06 | 6 | ST. BERNARD POLDER CONSTRUCTED? |
| 14:06 | 7 | **A.**   THOSE INVOLVED A HYDRAULIC FILL BUT WITH SAND IN SOME |
| 14:06 | 8 | LOCATIONS, AND THEN IT WAS CAPPED WITH A CLAY CAP ABOUT 3 FEET |
| 14:06 | 9 | DEEP AND COMPACTED. |
| 14:06 | 10 | **Q.**   WHERE DID THEY GET THE CLAY FOR THAT CAP? |
| 14:06 | 11 | **A.**   I THINK IT'S FROM THE BORROW AREAS NEAR THAT AREA. |
| 14:06 | 12 | **THE COURT:**  WHAT AREAS? |
| 14:06 | 13 | **THE WITNESS:**  SOME LOCAL BORROW AREAS.  THEY DUG IT |
| 14:06 | 14 | OUT. |
| 14:06 | 15 | **THE COURT:**  BORROW AREAS. |
| 14:06 | 16 | **THE WITNESS:**  EXCUSE ME.  IT'S MY NEW ENGLAND ACCENT. |
| 14:06 | 17 | **BY MR. LEVINE:** |
| 14:06 | 18 | **Q.**   WHY WAS HYDRAULIC FILL NOT USED TO CONDUCT THE LEVEES AT |
| 14:06 | 19 | THE SOUTHERN PART OF ST. BERNARD PARISH? |
| 14:07 | 20 | **A.**   IT HAD TO DO WITH ALSO THE AVAILABILITY OF THE MATERIAL |
| 14:07 | 21 | AND ALSO THE DISTANCE IT WOULD HAVE TO BE PIPED IF IT WAS |
| 14:07 | 22 | DREDGED. |
| 14:07 | 23 | **Q.**   IN GENERAL, HOW DID THE LEVEES ALONG THE SOUTHERN PART OF |
| 14:07 | 24 | REACH 2 PERFORM? |
| 14:07 | 25 | **A.**   IN GENERAL, THEY PERFORMED QUITE WELL, WITH ONLY SOME |

MOSHER00013

| | | |
|---|---|---|
| 14:07 | 1 | MINOR EROSION AT THE CREST. |
| 14:07 | 2 | **Q.**   IN CONTRAST, HOW DID THE LEVEES CONSTRUCTED WITH HYDRAULIC |
| 14:07 | 3 | FILL PERFORM? |
| 14:07 | 4 | **A.**   THAT'S WHERE, IN ALL OF THE 220 MILES OF FEDERAL LEVEES |
| 14:07 | 5 | THAT WE HAVE, ONLY HYDRAULIC LEVEES WERE THE ONES THAT ACTUALLY |
| 14:07 | 6 | FAILED, THAT WE HAD BREACHING IN.  IT'S THAT LOCATION AND |
| 14:07 | 7 | ANOTHER PLACE OUT ON THE NEW ORLEANS EAST BACK LEVEE.  IT'S THE |
| 14:07 | 8 | ONLY PLACE THAT WE SAW COMPLETE BREACHING ALONG THE LEVEE |
| 14:07 | 9 | SYSTEM. |
| 14:07 | 10 | **Q.**   WHEN USING HYDRAULIC FILL, HOW DO YOU ENSURE THAT YOU |
| 14:07 | 11 | OBTAIN MORE PLASTIC, FINE MATERIALS SUCH AS CLAY IN A LEVEE? |
| 14:08 | 12 | **A.**   IT'S TWO THINGS THAT DO IT:  ONE IS THE SELECTION OF THE |
| 14:08 | 13 | LAYER THAT YOU'RE DREDGING FROM, TO MAKE SURE YOU HAVE THAT |
| 14:08 | 14 | AMOUNT OF MATERIAL IN IT; AND THEN THE ACTUAL PUMPING OF THE |
| 14:08 | 15 | MATERIAL TO THE SITE. |
| 14:08 | 16 | **Q.**   WOULD YOU CALL THE MATERIAL IN A LEVEE CONSTRUCTED WITH |
| 14:08 | 17 | HYDRAULIC FILL HOMOGENEOUS OR HETEROGENEOUS? |
| 14:08 | 18 | **A.**   HETEROGENEOUS.  IT VARIES SIGNIFICANTLY THROUGH THE |
| 14:08 | 19 | CROSS-SECTION, AND THEN ALSO ALONG THE LENGTH OF IT, DEPENDING |
| 14:08 | 20 | ON WHAT IS ACTUALLY IN THAT LAYER THAT'S BEING DREDGED. |
| 14:08 | 21 | **Q.**   CAN THERE BE MEDIUM FAT CLAYS IN A LEVEE EVEN THOUGH |
| 14:08 | 22 | HYDRAULIC FILL IS USED TO CONSTRUCT THE LEVEE? |
| 14:08 | 23 | **A.**   IT CAN BE, YES. |
| 14:08 | 24 | **Q.**   HOW WOULD YOU DESCRIBE THE COMPACTION OF A LEVEE |
| 14:08 | 25 | CONSTRUCTED WITH HYDRAULIC FILL? |

FINAL DAILY COPY

MOSHER00014

| | | |
|---|---|---|
| 14:08 | 1 | **A.**   I WOULD GENERALLY CONSIDER IT UNCOMPACTED.  THE ONLY |
| 14:08 | 2 | COMPACTION YOU MIGHT GET IS VERY NEAR THE SURFACE WITH THE |
| 14:08 | 3 | BULLDOZERS DRIVING ACROSS IT, BUT IT'S AN UNCOMPACTED LEVEE. |
| 14:09 | 4 | **Q.**   HOW DOES AN UNCOMPACTED LEVEE IMPACT PERFORMANCE DURING A |
| 14:09 | 5 | HURRICANE? |
| 14:09 | 6 | **A.**   PARTICULARLY FOR OVERTOPPING, IT'S GOING TO BE MORE |
| 14:09 | 7 | ERODIBLE THAN A COMPACTED LEVEE. |
| 14:09 | 8 | **Q.**   WHY WAS HYDRAULIC FILL USED IN CREATING ANY LEVEE, LET |
| 14:09 | 9 | ALONE THE REACH 2 LEVEES? |
| 14:09 | 10 | **A.**   AT THE TIME OF CONSTRUCTION, IT WAS AN ECONOMICAL TOOL OR |
| 14:09 | 11 | AN ECONOMICAL PROCEDURE FOR CONSTRUCTING A LEVEE.  YOU HAVE A |
| 14:09 | 12 | LOT OF MATERIAL THAT YOU CAN DREDGE UP. |
| 14:09 | 13 | **THE COURT:**  I UNDERSTAND WE'RE GETTING INTO -- GO |
| 14:09 | 14 | AHEAD. |
| 14:09 | 15 | **MR. O'DONNELL:**  OBJECTION:  OUTSIDE THE SCOPE OF HIS |
| 14:09 | 16 | REPORT; NO FOUNDATION.  THIS HAPPENED IN THE 1960S, AND THERE'S |
| 14:09 | 17 | NO FOUNDATION.  IT'S ALSO OUTSIDE THE SCOPE OF HIS REPORT, |
| 14:09 | 18 | YOUR HONOR. |
| 14:09 | 19 | **MR. LEVINE:**  IF I MAY RESPOND, YOUR HONOR? |
| 14:09 | 20 | **THE COURT:**  YOU MAY. |
| 14:09 | 21 | **MR. O'DONNELL:**  MY OTHER OBJECTION IS THERE'S NO |
| 14:09 | 22 | FOUNDATION. |
| 14:10 | 23 | **MR. LEVINE:**  ON PAGE 25 OF DR. MOSHER'S EXPERT |
| 14:10 | 24 | REPORT, HE WRITES, UNDER A SECTION CALLED "HYDRAULIC PLACEMENT |
| 14:10 | 25 | OF FILL FOR THE LEVEE CONSTRUCTION": |

FINAL DAILY COPY

MOSHER00015

| | | |
|---|---|---|
| 14:10 | 1 | "THE USE OF HYDRAULIC PLACEMENT OF FILL FOR THE |
| 14:10 | 2 | CONSTRUCTION OF LEVEES DATES BACK TO THE LATE 1800S AND HAS |
| 14:10 | 3 | BEEN COMMONLY USED FOR LEVEE CONSTRUCTION UP UNTIL THE 1980S. |
| 14:10 | 4 | IT IS A COST-EFFECTIVE CONSTRUCTION METHOD WHEN THE MATERIAL |
| 14:10 | 5 | (SOIL) FOR THE LEVEE IS DREDGED FROM AN ADJACENT CHANNEL BY A |
| 14:10 | 6 | HYDRAULIC DREDGE." |
| 14:10 | 7 | HE TALKS ABOUT THE COSTS OF THE LEVEE |
| 14:10 | 8 | CONSTRUCTION VIA HYDRAULIC FILL IN HIS REPORT. |
| 14:10 | 9 | **MR. O'DONNELL:**  MY FUNDAMENTAL OBJECTION IS THERE'S |
| 14:10 | 10 | NO FOUNDATION THAT THIS WITNESS, WHO WAS NOT THERE AT THE TIME, |
| 14:10 | 11 | WAS PARTY TO OR KNEW ABOUT WHAT THE COST/BENEFIT, IF ANY, |
| 14:11 | 12 | DYNAMIC WAS FOR PICKING HYDRAULIC FILL VERSUS FAT CLAYS VERSUS |
| 14:11 | 13 | BRINGING STUFF IN FROM SOMEWHERE ELSE.  I DON'T THINK HE CAN |
| 14:11 | 14 | OPINE ON WHY THEY MADE THE DECISION.  HIS REPORT SAYS, |
| 14:11 | 15 | GENERALLY, IT WAS THOUGHT COST-EFFECTIVE, BUT HE CANNOT |
| 14:11 | 16 | TESTIFY, YOUR HONOR, ABOUT WHAT HAPPENED WITH THE LPV. |
| 14:11 | 17 | **THE COURT:**  I WILL NOTE YOUR OBJECTION AND ASSUME HIS |
| 14:11 | 18 | TESTIMONY IS A GENERAL ASSUMPTION BASED ON THE HISTORY OF THOSE |
| 14:11 | 19 | LEVEES.  I'M SURE IT WAS COST-EFFECTIVE, AT LEAST UP UNTIL |
| 14:11 | 20 | KATRINA.  COST-EFFECTIVE IS THE BANE OF OUR EXISTENCE HERE IN |
| 14:11 | 21 | NEW ORLEANS.  GO AHEAD. |
| 14:11 | 22 | **BY MR. LEVINE:** |
| 14:11 | 23 | **Q.**   IS HYDRAULIC FILL USED TODAY TO CONSTRUCT LEVEES? |
| 14:11 | 24 | **A.**   NO, IT ISN'T. |
| 14:11 | 25 | **Q.**   WHAT'S THE CORPS PRACTICE? |

FINAL DAILY COPY

MOSHER00016

| | | |
|---|---|---|
| 14:11 | 1 | **A.**   THE CURRENT CORPS PRACTICE SINCE ABOUT 2001 IS TO |
| 14:11 | 2 | CONSTRUCT THE LEVEES USING A COMPACTED FILL. |
| 14:12 | 3 | **Q.**   WHY WAS THE PRACTICE CHANGED? |
| 14:12 | 4 | **A.**   COMPACTED FILL ALLOWS YOU TO CONTROL THE MATERIAL BOTH |
| 14:12 | 5 | ACROSS THE CROSS-SECTION AND DOWN THE LEVEES, SO YOU HAVE |
| 14:12 | 6 | BETTER CONTROL OF IT AND IT WILL PROVIDE A BETTER LEVEE THAT |
| 14:12 | 7 | WILL BE LESS ERODIBLE. |
| 14:12 | 8 | **THE COURT:**  JUST TO LET THE LAWYERS KNOW THE COURT'S |
| 14:12 | 9 | UNDERSTANDING OF THE DIFFERENTIAL BETWEEN THE 702C ISSUE HERE |
| 14:12 | 10 | AND THE FTCA ISSUES, I UNDERSTAND -- JUST TO MARK IT -- THAT IT |
| 14:12 | 11 | GOES ULTIMATELY TO THE FRONT WAVE ATTACK ISSUE RATHER THAN |
| 14:12 | 12 | WHETHER THE LEVEES WERE GOOD OR NOT.  THAT IS MY |
| 14:12 | 13 | UNDERSTANDING -- |
| 14:12 | 14 | **MR. LEVINE:**  OF HIS -- |
| 14:12 | 15 | **THE COURT:**  -- OF HIS TESTIMONY.  ULTIMATELY, IT GOES |
| 14:12 | 16 | TO THE FRONT WAVE ATTACK AS OPPOSED TO THE BACK EROSION METHOD. |
| 14:13 | 17 | I DON'T THINK WE'RE GETTING TO WHETHER YOU BUILT CRUMMY LEVEES, |
| 14:13 | 18 | ARE WE? |
| 14:13 | 19 | **MR. LEVINE:**  HE'S GOING TO DISCUSS SOME OF, YOU KNOW, |
| 14:13 | 20 | WHAT WAS THE SOIL USED TO CONSTRUCT THE LEVEES. |
| 14:13 | 21 | **THE COURT:**  I'M ASSUMING THE PURPOSE IS NOT TO |
| 14:13 | 22 | ESTABLISH THAT THE LEVEES ARE BAD BECAUSE WE HAVE ALREADY HAD, |
| 14:13 | 23 | I THOUGHT, AN UNDERSTANDING THAT THAT WASN'T AN ISSUE HERE -- |
| 14:13 | 24 | WE'RE ASSUMING THE LEVEES WERE BUILT AS DESIGNED -- BUT THAT |
| 14:13 | 25 | THE ISSUE IS:  DOES THIS RELATE TO THE FRONT WAVE EROSION OR |

MOSHER00017

| | | |
|---|---|---|
| 14:13 | 1 | NOT?  OTHERWISE, THERE'S A TOPSY-TURVY HERE FROM THE COURT'S |
| 14:13 | 2 | UNDERSTANDING OF HOW THIS CASE WAS GOING TO BE TRIED. |
| 14:13 | 3 | **MR. LEVINE:**  YOUR HONOR, HE'S GOING TO DISCUSS |
| 14:13 | 4 | WHETHER IT'S A FRONT-SIDE ATTACK OR OVERTOPPING, BUT YOU -- |
| 14:13 | 5 | **THE COURT:**  THE NATURE OF THE SOIL GOES MORE TO -- MY |
| 14:13 | 6 | UNDERSTANDING WAS -- AND PLEASE CORRECT ME IF I'M WRONG -- THAT |
| 14:13 | 7 | THE NATURE OF THE TESTIMONY WAS TO SHOW THAT THAT'S WHY, |
| 14:13 | 8 | ULTIMATELY, LOOKING AT ALL THE TESTIMONY, IT'S MORE LIKELY THAT |
| 14:13 | 9 | IT WAS BACK-SIDE EROSION THAN NOT. |
| 14:14 | 10 | WHEN I SAY THE 702C ISSUE, THE COURT HAS ASSUMED |
| 14:14 | 11 | THAT WE'RE NOT TALKING ABOUT THE LEVEES BEING DEFECTIVE IN THIS |
| 14:14 | 12 | CASE AND THAT NOBODY'S TAKING THAT POSITION. |
| 14:14 | 13 | **MR. LEVINE:**  I DON'T THINK WE'RE TAKING THE POSITION |
| 14:14 | 14 | THAT THE LEVEES ARE DEFECTIVE.  I THINK WHAT WE'RE TRYING TO |
| 14:14 | 15 | SHOW IS THAT TO ASSESS WHETHER IT'S OVERTOPPING, FRONT-SIDE |
| 14:14 | 16 | EROSION, TO MAKE ANY OPINIONS ABOUT WHAT HAPPENED AT THE |
| 14:14 | 17 | LEVEES, YOU HAVE TO KNOW WHAT WAS IN THE LEVEES.  THAT'S AN |
| 14:14 | 18 | IMPORTANT PART OF HIS OPINION. |
| 14:14 | 19 | **THE COURT:**  THAT'S WHAT I WAS ATTEMPTING TO SAY. |
| 14:14 | 20 | THANK YOU. |
| 14:14 | 21 | **MR. LEVINE:**  YOUR HONOR, AT THIS TIME I'D LIKE TO |
| 14:14 | 22 | REFER THE COURT TO THE 30(B)(6) DEPOSITION DESIGNATIONS FROM |
| 14:14 | 23 | THE 702C DEPOSITION OF WALTER BAUMY, WHICH WAS TAKEN ON |
| 14:14 | 24 | NOVEMBER 14 AND 15, 2007.  A FULL COPY OF THAT DEPOSITION IS |
| 14:14 | 25 | AVAILABLE AS JX-461.  THESE DEPOSITION DESIGNATIONS EXAMINED |

FINAL DAILY COPY

MOSHER00018

| | | |
|---|---|---|
| 14:15 | 1 | THE CORPS' ENGINEERING MANUALS CONCERNING LEVEE CONSTRUCTION |
| 14:15 | 2 | AND DETAILS THE USE OF HYDRAULIC FILL IN LEVEE CONSTRUCTION. |
| 14:15 | 3 | **THE COURT:** I HAVE READ THOSE DEPOSITIONS, SYNOPSIZED |
| 14:15 | 4 | THEM, TAKE NOTE OF THEM, AND WILL LOOK AT THEM AGAIN. |
| 14:15 | 5 | **BY MR. LEVINE:** |
| 14:15 | 6 | **Q.** NOW, IPET'S THE INTERAGENCY PERFORMANCE EVALUATION TEAM; |
| 14:15 | 7 | CORRECT? |
| 14:15 | 8 | **A.** THAT'S CORRECT. |
| 14:15 | 9 | **Q.** WHAT WAS IPET'S MISSION? |
| 14:15 | 10 | **A.** TO DO A SCIENTIFIC AND ENGINEERING ASSESSMENT OF WHAT |
| 14:15 | 11 | HAPPENED DURING HURRICANE KATRINA. |
| 14:15 | 12 | **Q.** WHO MADE UP IPET? |
| 14:15 | 13 | **A.** IT WAS MADE UP OF PEOPLE FROM THE GOVERNMENT AND FROM THE |
| 14:15 | 14 | PRIVATE SECTOR. |
| 14:15 | 15 | **Q.** WERE YOU A MEMBER OF IPET? |
| 14:15 | 16 | **A.** YES, I WAS. |
| 14:15 | 17 | **Q.** WHAT WAS YOUR ROLE ON THE IPET TEAM? |
| 14:15 | 18 | **A.** I WAS THE CO-LEADER FOR THE PERFORMANCE OF THE LEVEES AND |
| 14:15 | 19 | FLOOD WALLS. |
| 14:15 | 20 | **Q.** WHICH VOLUME OF THE IPET REPORT DID YOU PARTICIPATE IN |
| 14:15 | 21 | WRITING? |
| 14:15 | 22 | **A.** VOLUME 5. |
| 14:15 | 23 | **Q.** WHAT DID VOLUME 5 OF THE IPET REPORT ANALYZE? |
| 14:15 | 24 | **A.** IT ANALYZED THE LEVEES AND FLOOD WALLS AND THE PERFORMANCE |
| 14:16 | 25 | OF THOSE. |

MOSHER00019

| | | |
|---|---|---|
| 14:16 | 1 | **Q.**   THAT WOULD INCLUDE THE REACH 2 LEVEES; CORRECT? |
| 14:16 | 2 | **A.**   THAT'S CORRECT. |
| 14:16 | 3 | **Q.**   WERE YOU THE PRINCIPAL AUTHOR OF VOLUME 5 OF THE IPET |
| 14:16 | 4 | REPORT? |
| 14:16 | 5 | **A.**   I WAS THE PRINCIPAL AUTHOR OF THE MAIN VOLUME. |
| 14:16 | 6 | **Q.**   AS PART OF YOUR WORK FOR THE IPET TEAM, DID YOU ACTUALLY |
| 14:16 | 7 | VISIT THE REACH 2 LEVEES? |
| 14:16 | 8 | **A.**   YES.  ON SEVERAL OCCASIONS. |
| 14:16 | 9 | **Q.**   DO YOU BELIEVE THE CONCLUSIONS OF IPET WERE BIASED IN ANY |
| 14:16 | 10 | WAY TO SHOW THAT THE ARMY CORPS OF ENGINEERS WAS NOT |
| 14:16 | 11 | RESPONSIBLE FOR THE BREACHING OF THE LEVEES? |
| 14:16 | 12 | **A.**   NO, I DON'T. |
| 14:16 | 13 | **MR. O'DONNELL:**  OBJECTION:  IRRELEVANT.  I MOVE TO |
| 14:16 | 14 | STRIKE.  WE'RE NOT PUTTING IPET ON TRIAL, YOUR HONOR -- OR |
| 14:16 | 15 | MAYBE WE ARE, BUT I OBJECT AS IRRELEVANT. |
| 14:16 | 16 | **THE COURT:**  I'M GOING TO ALLOW THE QUESTION. |
| 14:16 | 17 | BY MR. LEVINE: |
| 14:16 | 18 | **Q.**   WHY NOT? |
| 14:16 | 19 | **A.**   I BELIEVE IF YOU WILL LOOK AT THE RESULTS OF IT, IT'S |
| 14:16 | 20 | PRETTY CRITICAL OF SOME OF THE THINGS OF THE CONSTRUCTION AND |
| 14:16 | 21 | THE PERFORMANCE OF THE LEVEES. |
| 14:16 | 22 | **Q.**   DID YOUR IPET WORK PLAY ANY ROLE IN DEVELOPING THE |
| 14:17 | 23 | CONCLUSIONS THAT YOU DREW IN THIS CASE? |
| 14:17 | 24 | **A.**   IT HAS TO BE PART OF IT.  IT'S PART OF THE KNOWLEDGE THAT |
| 14:17 | 25 | I HAD AS I DID MY INVESTIGATION AND PREPARED MY REPORT. |

FINAL DAILY COPY

MOSHER00020

| | | |
|---|---|---|
| 14:17 | 1 | **Q.**   IS YOUR WORK IN THIS LITIGATION SIMPLY A RUBBER STAMP OF |
| 14:17 | 2 | THE IPET CONCLUSIONS? |
| 14:17 | 3 | **A.**   NO, IT'S NOT. |
| 14:17 | 4 | **Q.**   WHY NOT? |
| 14:17 | 5 | **A.**   I WENT BACK AND LOOKED AT NEW THINGS THAT HAVE COME OUT, |
| 14:17 | 6 | LOOKED AT WHAT THE PLAINTIFFS HAVE REPORTED, AND I DID SOME |
| 14:17 | 7 | FURTHER ASSESSMENT OF WHAT I HAD FOR PHYSICAL EVIDENCE AT THE |
| 14:17 | 8 | SITE BEFORE RENDERING MY OPINION. |
| 14:17 | 9 | **Q.**   NOW, YOU WERE THE UNITED STATES' 30(B)(6) WITNESS WITH |
| 14:17 | 10 | RESPECT TO THE PERFORMANCE OF THE FLOOD PROTECTION SYSTEM |
| 14:17 | 11 | DURING HURRICANE KATRINA; CORRECT? |
| 14:17 | 12 | **A.**   YES. |
| 14:17 | 13 | **Q.**   IN THAT DEPOSITION YOU CONCLUDED THAT THE REACH 2 LEVEES |
| 14:17 | 14 | PERFORMED AS DESIGNED? |
| 14:17 | 15 | **A.**   YES. |
| 14:17 | 16 | **Q.**   I'M THINKING THAT THE DESIGN WOULD HAVE TWO PRIMARY |
| 14:17 | 17 | CONSIDERATIONS.  ONE IS THE HYDROLOGY, WHICH CONCERNS THE WATER |
| 14:18 | 18 | LEVELS? |
| 14:18 | 19 | **A.**   THAT'S CORRECT. |
| 14:18 | 20 | **Q.**   THE SECOND ASPECT WOULD CONCERN GEOTECHNICAL ISSUES? |
| 14:18 | 21 | **A.**   THAT'S CORRECT. |
| 14:18 | 22 | **Q.**   THOSE ARE THINGS LIKE LEVEE STABILITY, SUBSIDENCE, SLOPE |
| 14:18 | 23 | STABILITY? |
| 14:18 | 24 | **A.**   YES.  IT'S THE WHOLE PROCESS.  IT'S THE STABILITY ANALYSIS |
| 14:18 | 25 | OF IT, THE SETTLEMENT, AND THE SEEPAGE, IF THERE'S A CONCERN OF |

FINAL DAILY COPY

MOSHER00021

| | | |
|---|---|---|
| 14:18 | 1 | SEEPAGE. |
| 14:18 | 2 | **Q.**   WITH RESPECT TO THE WATER LEVELS PORTION, THE HYDROLOGY |
| 14:18 | 3 | ASPECT, CAN YOU EXPLAIN TO THE COURT WHAT YOU MEANT BY THE |
| 14:18 | 4 | STATEMENT "PERFORMED AS DESIGNED." |
| 14:18 | 5 | **A.**   YES.  THE LEVEES WERE DESIGNED FOR A STILL WATER LEVEL OF |
| 14:18 | 6 | 13 FEET WITH A FREEBOARD OF 4.5 FEET, GIVING THEM 17.5 FEET OF |
| 14:18 | 7 | ELEVATION.  SO AS DESIGNED IS THEY WOULD HAVE, THE LEVEES, |
| 14:18 | 8 | SURVIVED UP TO A STILL WATER LEVEL OF 13 FEET AND IT WAS OVER. |
| 14:18 | 9 | THEN DURING HURRICANE KATRINA, IT WAS SUCH A STORM THAT IT |
| 14:19 | 10 | OVERWHELMED THE SYSTEM; BUT UP UNTIL THAT POINT, THEY WERE |
| 14:19 | 11 | PERFORMING WITHOUT BREACHING TO THAT LEVEL. |
| 14:19 | 12 | **Q.**   WELL, HOW DO YOU KNOW THE LEVEE WAS NOT DESIGNED TO |
| 14:19 | 13 | WITHSTAND OVERTOPPING? |
| 14:19 | 14 | **A.**   WELL, FIRST OF ALL, THERE'S A FREEBOARD LEVEL PROVIDED |
| 14:19 | 15 | ABOVE THAT FOR THE WAVES.  IT ACTUALLY SAYS IN THE DOCUMENT |
| 14:19 | 16 | THAT THEY WANTED TO MAKE SURE NO SIGNIFICANT WAVE HEIGHTS WOULD |
| 14:19 | 17 | BREAK OVER THE TOP OF THE LEVEE. |
| 14:19 | 18 | **Q.**   WHAT IS ARMORING IN THE CONTEXT OF LEVEES? |
| 14:19 | 19 | **A.**   GENERALLY, WE THINK OF ARMORING AS SOME KIND OF MATERIAL |
| 14:19 | 20 | THAT'S PLACED ON THE BACK OR THE FRONT OF THE LEVEES TO PROTECT |
| 14:19 | 21 | IT.  A MINIMAL AMOUNT OF ARMORING WOULD BE GRASS TO KEEP IT |
| 14:19 | 22 | FROM ERODING FROM JUST RAIN. |
| 14:19 | 23 | **Q.**   DID THE REACH 2 LEVEE DESIGN INCLUDE ARMORING? |
| 14:19 | 24 | **A.**   NO, OTHER THAN JUST GRASS. |
| 14:20 | 25 | **Q.**   LET'S FOCUS ON THE OTHER ASPECT OF THE DESIGN, WHICH IS |

FINAL DAILY COPY

MOSHER00022

| | | |
|---|---|---|
| 14:20 | 1 | THE GEOTECHNICAL ASPECTS.  WE'VE ALSO DISCUSSED THAT HYDRAULIC |
| 14:20 | 2 | FILL WAS USED IN THE CONSTRUCTION OF THE REACH 2 LEVEES. |
| 14:20 | 3 | **A.**   THAT'S CORRECT. |
| 14:20 | 4 | **Q.**   EVEN WITH THE USE OF HYDRAULIC FILL, WOULD THE DESIGN BE |
| 14:20 | 5 | ABLE TO WITHSTAND EROSION PRIOR TO OVERTOPPING? |
| 14:20 | 6 | **A.**   YES. |
| 14:20 | 7 | **Q.**   NOW, IN SOME INSTANCES THE IPET TEAM DID FIND THAT THE |
| 14:20 | 8 | LEVEES WERE BELOW THEIR DESIGN GRADE; CORRECT? |
| 14:20 | 9 | **A.**   THAT'S CORRECT. |
| 14:20 | 10 | **Q.**   WHAT CAUSED THE LEVEES TO BE BELOW THEIR DESIGN GRADE? |
| 14:20 | 11 | **A.**   IT WAS DUE TO SETTLEMENT OF THE MATERIAL.  THERE ARE SOFT |
| 14:20 | 12 | MATERIALS BELOW THE LEVEES, AND THOSE MATERIALS WILL SETTLE |
| 14:20 | 13 | SIGNIFICANTLY.  PART OF THAT IS A LATERAL DEFORMATION THAT |
| 14:20 | 14 | TAKES PLACE. |
| 14:20 | 15 | **Q.**   DID THE DESIGN OF THE LEVEE ANTICIPATE THAT THE LEVEE |
| 14:20 | 16 | ELEVATIONS WOULD ENCOUNTER SOME REDUCTION BECAUSE OF |
| 14:20 | 17 | SETTLEMENT, SUBSIDENCE, ANY OTHER TYPE OF ISSUES? |
| 14:20 | 18 | **A.**   THEY UNDERSTOOD DURING THE CONSTRUCTION OF HYDRAULIC FILL, |
| 14:21 | 19 | OR ANY PLACEMENT, THAT YOU'RE GOING TO GET SETTLEMENT OF THE |
| 14:21 | 20 | SOFT MATERIALS.  THAT'S WHY THEY BUILT IT IN STAGES AND HAD |
| 14:21 | 21 | LIFTS PLANNED OUT TO ACCOUNT FOR THAT. |
| 14:21 | 22 | **Q.**   WAS A LIFT SCHEDULED TO OCCUR AT THE TIME OF HURRICANE |
| 14:21 | 23 | KATRINA? |
| 14:21 | 24 | **A.**   THERE WAS A LIFT -- THERE WAS A DESIGN FOR A NEW LIFT, AND |
| 14:21 | 25 | I THINK IT'S 2001. |

FINAL DAILY COPY

MOSHER00023

14:21    1         **MR. O'DONNELL:**  YOUR HONOR, OBJECTION AS TO VAGUE.

14:21    2   I'D LIKE TO KNOW ON WHAT AREA.  I ASSUME WE'RE TALKING ABOUT

14:21    3   REACH 2.  CAN HE TELL ME WHAT AREA THESE LIFTS WERE PLANNED?

14:21    4   UNLESS IT WAS THE FULL 12 MILES.  IT'S VAGUE AS TO TIME AND

14:21    5   PLACE.

14:21    6         **THE COURT:**  COUNSEL, IF YOU WANT TO AMPLIFY THAT, I'M

14:21    7   GOING TO ALLOW THE GENERAL QUESTION AS TO LIFTS.  THE COURT AT

14:21    8   THIS TIME, OF COURSE, DOESN'T KNOW THE EXTENT OR PLACE OF ANY

14:21    9   PLANNED LIFTS.

14:21   10   **BY MR. LEVINE:**

14:22   11   Q.   WHY DID THIS LIFT NOT OCCUR ALONG REACH 2?

14:22   12         **THE COURT:**  WHEN YOU SAY "THIS LIFT," AGAIN, I'M IN

14:22   13   THE DARK.  IT IS A LITTLE VAGUE BECAUSE IT COULD HAVE BEEN A

14:22   14   LIFT OF 10 FEET.  I KNOW IT WASN'T, BUT IF YOU COULD MAYBE LAY

14:22   15   A LITTLE MORE FOUNDATION AS TO IF THE WITNESS KNOWS WHAT LIFT

14:22   16   WE'RE TALKING ABOUT.

14:22   17         **MR. LEVINE:**  I'M TALKING ABOUT A LIFT THAT WAS

14:22   18   SCHEDULED TO OCCUR AFTER --

14:22   19         **THE COURT:**  IF THE WITNESS KNOWS --

14:22   20         **THE WITNESS:**  I BELIEVE IT'S BETWEEN THE TWO CONTROL

14:22   21   STRUCTURES, BIENVENUE AND DUPRE.

14:22   22         **THE COURT:**  WELL, I UNDERSTAND THAT.

14:22   23   **BY MR. LEVINE:**

14:22   24   Q.   WHY DID THIS LIFT NOT OCCUR?

14:22   25   A.   I UNDERSTAND THAT THERE HADN'T BEEN FUNDING AUTHORIZED FOR

FINAL DAILY COPY

2984

```
14:22    1   IT.

14:22    2           MR. O'DONNELL:  OBJECTION, YOUR HONOR.  I MOVE TO

14:22    3   STRIKE.  THERE'S NO FOUNDATION THIS WITNESS REALLY KNOWS WHY IT

14:22    4   DIDN'T HAPPEN.  HE SAID "I BELIEVE" OR UNDERSTAND.  THERE'S NO

14:23    5   FOUNDATION HE KNOWS.

14:23    6           THE COURT:  I'M GOING TO ALLOW THE ANSWER AND SIMPLY

14:23    7   REALIZE IT MAY NOT BE HIS -- I'M NOT SURE WHAT PERSONAL

14:23    8   KNOWLEDGE HE HAS.  YOU MAY NEED TO ESTABLISH IT.  I'M GOING TO

14:23    9   ALLOW IT AS GIVEN.  IF YOU WANT TO ASK HIM IF THAT'S HIS

14:23   10   PERSONAL KNOWLEDGE AND WHAT DOES --

14:23   11           MR. LEVINE:  FOR THE COURT'S REFERENCE, I THINK WE'LL

14:23   12   HAVE A WITNESS LATER ON THAT WILL BE ADDRESSING THESE ISSUES IN

14:23   13   MORE FULL PERSPECTIVE.  I'M JUST TRYING TO GIVE THE COURT A

14:23   14   LITTLE BACKGROUND.

14:23   15           MR. O'DONNELL:  YOUR HONOR, I MOVED TO STRIKE.

14:23   16   THEREFORE, THEY SEEM TO BE AGREEING WITH ME THERE'S NO

14:23   17   FOUNDATION FOR THIS WITNESS.  THEY'LL BRING ON SOMEBODY ELSE,

14:23   18   YOUR HONOR.  I MOVE TO STRIKE.  I WANT TO PROTECT THE RECORD.

14:23   19           THE COURT:  I UNDERSTAND.  AT THIS TIME I'M NOT GOING

14:23   20   TO STRIKE WHAT HE SAID.  I CERTAINLY CAN EVALUATE IT.  UNLESS

14:23   21   HE'S GOING TO SPEAK WITH PERSONAL KNOWLEDGE, IT'S NOT VERY

14:23   22   HELPFUL TO THE COURT.

14:24   23           MR. LEVINE:  I UNDERSTAND, YOUR HONOR.

14:24   24           THE COURT:  IT'S REALLY NOT ADMISSIBLE IF IT'S NOT

14:24   25   PERSONAL KNOWLEDGE, UNLESS IT'S SOMETHING HE USED IN RENDERING
```

MOSHER00025

```
14:24    1   AN EXPERT OPINION IN THIS CASE.
14:24    2           MR. LEVINE:  I UNDERSTAND.  I'LL MOVE OFF THIS TOPIC.
14:24    3   BY MR. LEVINE:
14:24    4   Q.   HAVE YOU REVIEWED THE REACH 2 LEVEE DESIGN?
14:24    5   A.   YES.
14:24    6   Q.   DID THE REACH 2 LEVEE DESIGN INCLUDE ANY MECHANISMS TO
14:24    7   PROTECT THE LEVEE STABILITY?
14:24    8   A.   YES, THEY DID.
14:24    9   Q.   WHAT WAS INCLUDED?
14:24   10   A.   THEY HAD STABILITY BERMS DURING CONSTRUCTION TO HELP
14:24   11   PROTECT THOSE, AND THEY DID SOME STABILITY ANALYSIS AND MADE
14:24   12   SURE THAT THEY HAD FACTORS OF SAFETY ABOVE 1.3 FOR THOSE.
14:24   13   Q.   WE JUST INTRODUCED A NEW TERM, FACTOR OF SAFETY.  CAN YOU
14:24   14   GO TO THE BLACKBOARD AND DRAW A STANDARD LEVEE PROFILE AND
14:24   15   MAYBE EXPLAIN THE FACTOR-OF-SAFETY CONCEPT.
14:24   16           MR. O'DONNELL:  I HAVE TO OBJECT.  I THINK WE'RE
14:24   17   WANDERING INTO LEVEE DESIGN AND ALL OF THAT.  I DON'T KNOW WHY
14:24   18   WE'RE TALKING ABOUT FACTORS OF SAFETY.  WE REALLY WANT TO KNOW
14:25   19   WHAT HAPPENED DURING KATRINA.
14:25   20           THE COURT:  ONE, IS THIS IN HIS REPORT?
14:25   21           MR. LEVINE:  HE TALKS ABOUT THE DESIGN OF THE LEVEE
14:25   22   IN HIS REPORT.  YOU HAVE TO UNDERSTAND THE DESIGN OF THE LEVEE
14:25   23   TO UNDERSTAND WHAT OCCURRED DURING THE STORM.
14:25   24           MR. O'DONNELL:  WHAT HE'S ABOUT TO TALK ABOUT IS NOT
14:25   25   IN HIS REPORT, I BELIEVE, YOUR HONOR.
```

FINAL DAILY COPY

MOSHER00026

14:25    1          **THE COURT:**  AGAIN, I'M NOT SURE.  WE NEED TO BE

14:25    2   RESTRICTED -- I'M TRYING TO BE SOMEWHAT FLEXIBLE, BUT AT THE

14:25    3   SAME TIME WE HAVE TO STICK TO THE CONTOURS OF THE REPORT.  IF

14:25    4   YOU CAN ILLUMINATE ME AS TO WHETHER IT'S IN THE REPORT.  I HAVE

14:25    5   THE SYNOPSIS OF IT, BUT I CAN'T SAY IT'S A 100-PERCENT ACCURATE

14:25    6   SYNOPSIS.

14:25    7          **MR. LEVINE:**  YOUR HONOR, THIS IS ABOUT THE LEVEES, SO

14:25    8   YOU NEED TO --

14:25    9          **THE COURT:**  I KNOW IT'S ABOUT THE LEVEES.  THAT

14:26   10   WASN'T MY QUESTION.  MY QUESTION IS:  DID HE OPINE ON THIS IN

14:26   11   HIS REPORT?

14:26   12          **MR. LEVINE:**  ON THE FACTOR-OF-SAFETY CONCEPT?

14:26   13          **THE COURT:**  ON THE FACTOR-OF-SAFETY CONCEPT.  I THINK

14:26   14   THAT WAS THE QUESTION.

14:26   15          **MR. LEVINE:**  EXCUSE ME.  YOUR HONOR, THIS IS GETTING

14:26   16   INTO AREAS OF, LIKE, PROTECTED ELEVATION OF THE LEVEES.  IN

14:26   17   DR. BEA'S DIRECT EXAMINATION, HE SAID THAT 50 PERCENT OF THE

14:26   18   LEVEES HAD A REDUCED PROTECTED ELEVATION DUE TO A SQUEEZING

14:26   19   MECHANISM OCCURRING ALONG REACH 2.

14:26   20          **THE COURT:**  IS THE SQUEEZING MECHANISM DISCUSSED IN

14:26   21   HIS REPORT?

14:26   22          **MR. LEVINE:**  YOUR HONOR, IT'S NOT.

14:26   23          **THE COURT:**  THEN THE OBJECTION IS SUSTAINED.  IT'S

14:26   24   NOT IN HIS REPORT.  IT'S SUSTAINED.

14:26   25          **MR. LEVINE:**  MAY I PLEASE PROVIDE AN EXPLANATION?

**MOSHER00027**

| | | |
|---|---|---|
| 14:27 | 1 | **THE COURT:**  MY RULE IS -- THIS IS A PRETTY |
| 14:27 | 2 | FUNDAMENTAL TOPIC -- IF IT'S NOT IN THE REPORT, HE CAN'T OPINE |
| 14:27 | 3 | ON IT NOW BECAUSE SOMEONE ELSE OPINED ON IT IN THEIR REPORT. |
| 14:27 | 4 | HE COULD HAVE FILED MAYBE A SUPPLEMENTAL REPORT ABOUT SQUEEZING |
| 14:27 | 5 | AND HE DIDN'T. |
| 14:27 | 6 | **MR. LEVINE:**  THE SQUEEZING MECHANISM IN THE |
| 14:27 | 7 | 50 PERCENT OPINION RENDERED BY DR. BEA WERE FIRST DISCLOSED TO |
| 14:27 | 8 | THE UNITED STATES ON APRIL 3, 2009. |
| 14:27 | 9 | **THE COURT:**  NO, NO, NO, SIR.  I'VE LOOKED AT THE |
| 14:27 | 10 | REPORTS.  IT WAS NOT.  THE SQUEEZING EFFECT WAS IN THE JANUARY |
| 14:27 | 11 | REPORT AND ACTUALLY MENTIONED IN THE JULY REPORT TO A SMALL |
| 14:27 | 12 | DEGREE.  THE OBJECTION IS SUSTAINED. |
| 14:27 | 13 | **MR. LEVINE:**  IF I COULD FURTHER CLARIFY, THE |
| 14:27 | 14 | 50 PERCENT OPINION IS THE NUMBER THAT WE'RE -- |
| 14:27 | 15 | **THE COURT:**  THE OBJECTION IS SUSTAINED.  IT IS DONE. |
| 14:27 | 16 | IF YOU WANT TO PROFFER SOMETHING LATER ON, THAT'S FINE, BUT |
| 14:27 | 17 | IT'S NOT GOING TO BE PART OF THIS RECORD. |
| 14:27 | 18 | **MR. LEVINE:**  CAN WE MAKE A PROFFER NOW BECAUSE WE |
| 14:27 | 19 | WOULD LIKE TO DISCUSS THE SQUEEZING MECHANISM VIS-À-VIS THE 50 |
| 14:27 | 20 | PERCENT OPINION -- |
| 14:27 | 21 | **THE COURT:**  I UNDERSTAND WHAT YOU'D LIKE TO DO, BUT |
| 14:27 | 22 | IT'S NOT IN HIS REPORT.  SO WHATEVER DR. BEA SAID -- IT'S NOT A |
| 14:28 | 23 | GIANT SURPRISE.  I'VE LOOKED AT ALL THE REPORTS.  IT'S NOT. |
| 14:28 | 24 | NOW, WHETHER IT'S 50 -- AND THE APRIL REPORT WASN'T EVEN IN THE |
| 14:28 | 25 | RECORD.  I HAVE BEEN STRICT.  I KNOW IT IS NOW.  THAT WAS THE |

FINAL DAILY COPY

**MOSHER00028**

| 14:28 | 1 | GOVERNMENT'S CHOICE.  YOU CAN MAKE A PROFFER.  GO AHEAD. |
| 14:28 | 2 | **MR. LEVINE:**  WE'LL MAKE A PROFFER ON THIS ISSUE. |
| 14:28 | 3 | WHEN I'M CONCLUDED WITH THE PROFFER, I'LL LET THE COURT KNOW |
| 14:28 | 4 | AND LET EVERYONE KNOW SO THAT WE CAN MOVE ALONG. |
| 14:28 | 5 | * * * |
|  | 6 |  |
|  | 7 |  |
|  | 8 |  |
|  | 9 |  |
|  | 10 |  |
|  | 11 |  |
|  | 12 |  |
|  | 13 |  |
|  | 14 |  |
|  | 15 |  |
|  | 16 |  |
|  | 17 |  |
|  | 18 |  |
|  | 19 |  |
|  | 20 |  |
|  | 21 |  |
|  | 22 |  |
|  | 23 |  |
|  | 24 |  |
|  | 25 |  |

FINAL DAILY COPY

MOSHER00029

| | |
|---|---|
| 14:28 | 1 |
| 14:28 | 2 |
| 14:28 | 3 |
| 14:28 | 4 |
| 14:28 | 5 |
| 14:29 | 6 |
| 14:29 | 7 |
| 14:29 | 8 |
| 14:29 | 9 |
| 14:29 | 10 |
| 14:29 | 11 |
| 14:29 | 12 |
| 14:29 | 13 |
| 14:29 | 14 |
| 14:29 | 15 |
| 14:29 | 16 |
| 14:30 | 17 |
| 14:30 | 18 |
| 14:30 | 19 |
| 14:30 | 20 |
| 14:30 | 21 |
| 14:30 | 22 |
| 14:30 | 23 |
| 14:30 | 24 |
| 14:30 | 25 |

**DEFENSE PROFFER 4**

BY MR. LEVINE:

Q.   CAN YOU GO TO THE BOARD AND DRAW A LEVEE PROFILE SO WE CAN
DISCUSS THE FACTOR-OF-SAFETY CONCEPT.

A.   (COMPLIES)

Q.   NOW, WHAT FORCES ARE TYPICALLY ACTING ON THAT LEVEE?

A.   TYPICALLY, YOU HAVE GRAVITY ACTING DOWN ON THIS WEIGHT OF
MATERIAL, AND IT WILL WANT TO SETTLE AND MOVE.  SO YOU'LL HAVE
WHAT WE CALL A WEDGE, A STABILITY WEDGE OUT HERE AND THEN OUT
TO THIS AREA.  SO BETWEEN THESE WEDGES YOU HAVE -- DUE TO THE
HORIZONTAL MATERIAL PUSHING DOWN, YOU HAVE HORIZONTAL FORCES
HERE, AND YOU HAVE RESISTING FORCES OVER HERE FROM THE WEIGHTS.
THEN YOU WOULD ALSO HAVE RESISTING FORCES DUE TO THE SOIL.
THAT'S KIND OF A SIMPLIFIED ASSESSMENT OF IT.

Q.   SO THE DRIVING FORCE WANTS TO MAKE THE LEVEE MOVE OUT INTO
THE CHANNEL; RIGHT?

A.   THAT'S CORRECT.

Q.   THE RESISTING FORCE IS ACTING UPON THE LEVEE TO TRY TO
HOLD BACK THOSE DRIVING FORCES?

A.   THAT'S RIGHT.  THE RESISTING FORCES, THE MAIN COMPONENT OF
THAT IS THE RESISTANCE OF THE SOIL.

Q.   NOW, THIS SCHEMATIC IS SIMPLIFIED, BUT I THINK IT
ILLUSTRATES A POINT.  IF YOU HAVE A FACTOR OF SAFETY OF 1, THE
DRIVING FORCE AND THE RESISTING FORCE ARE EQUIVALENT?

A.   THAT'S CORRECT.  THERE WOULD BE UNITY.  THEY'RE

FINAL DAILY COPY

MOSHER00030

14:30   1   EQUIVALENT.

14:30   2   **Q.**   IF WE MAKE THE LEVEE WITH A FACTOR OF SAFETY OF 1.3, NOW

14:30   3   THE RESISTING FORCE IS GOING TO GET 30 PERCENT STRONGER --

14:30   4   **A.**   ROUGHLY 30 PERCENT STRONGER.

14:30   5   **Q.**   -- THAN THE DRIVING FORCES?

14:30   6   **A.**   THAT'S CORRECT.

14:30   7   **Q.**   SO HOW DOES THE LEVEE'S STABILITY BERM RELATE TO THE

14:30   8   FACTOR OF SAFETY?

14:30   9   **A.**   WELL, THE STABILITY BERM IS ADDED HERE TO ADD WEIGHT TO IT

14:30   10   TO GIVE MORE RESISTANCE.  IT'S ADDED OUT IN FRONT OF THE --IN

14:30   11   FRONT OF THE --

14:30   12   **Q.**   DID IPET EXAMINE THE FACTORS OF SAFETY USED IN THE DESIGN

14:31   13   OF THE LEVEE?

14:31   14   **A.**   YES.

14:31   15   **Q.**   WHAT DID IPET FIND?

14:31   16   **A.**   IT FOUND IN THE DESIGN THAT THOSE FACTORS OF SAFETY WERE

14:31   17   1.3 OR GREATER IN THE DESIGN WHEN THEY LOOKED AT A WHOLE ARRAY

14:31   18   OF POSSIBILITIES FROM ALSO THE OUTLET OF THESE OUT INTO THE

14:31   19   CHANNEL.

14:31   20   **Q.**   SO WHAT WOULD THIS MEAN IN TERMS OF THE LEVEE'S STABILITY?

14:31   21   **A.**   IT WOULD MEAN THAT YOU HAVE ADEQUATE STABILITY TO MAINTAIN

14:31   22   THOSE AND THAT IT'S NOT LIKELY THAT YOU WOULD HAVE A FAILURE

14:31   23   OUT INTO THE CHANNEL AND YOU WOULD LOSE THIS MATERIAL OUT INTO

14:31   24   THE CHANNEL.

14:31   25   **Q.**   SO, ONCE AGAIN, YOU DETERMINED THAT THE LEVEES ALONG

MOSHER00031

| 14:31 | 1 | REACH 2 OF THE MRGO PERFORMED AS DESIGNED WITH RESPECT TO THE |
| 14:31 | 2 | GEOTECHNICAL ASPECTS; CORRECT? |
| 14:31 | 3 | **A.**   THAT'S CORRECT. |
| 14:31 | 4 |         **MR. LEVINE:**  I THINK FOR NOW THIS CONCLUDES PART OF |
| 14:31 | 5 | OUR PROFFER.  WE MIGHT GET BACK INTO THIS AREA.  IF WE DO, I'LL |
| 14:32 | 6 | ALERT THE COURT. |
| 14:32 | 7 |         **THE COURT:**  THANK YOU. |
| 14:32 | 8 |              **(END OF PROFFER)** |
| 14:32 | 9 |                  * * * |
|  | 10 |  |
|  | 11 |  |
|  | 12 |  |
|  | 13 |  |
|  | 14 |  |
|  | 15 |  |
|  | 16 |  |
|  | 17 |  |
|  | 18 |  |
|  | 19 |  |
|  | 20 |  |
|  | 21 |  |
|  | 22 |  |
|  | 23 |  |
|  | 24 |  |
|  | 25 |  |

FINAL DAILY COPY

MOSHER00032

14:32  1          **THE COURT:**  LET ME ASK THE PLAINTIFFS, ON

14:32  2   CROSS-EXAMINATION IN THE PROFFER, DO YOU WISH TO WAIT UNTIL

14:32  3   IT -- IT MAKES THE RECORD A LITTLE SPOTTY.

14:32  4          **MR. O'DONNELL:**  I'VE GOT TO THINK ABOUT WHETHER I

14:32  5   WANT TO CROSS ON IT OR NOT, YOUR HONOR, BUT I'LL MAKE CLEAR

14:32  6   THAT I'M CROSSING THE PROFFER.

14:32  7          **THE COURT:**  DURING YOUR ENTIRE CROSS-EXAMINATION.

14:32  8          **MR. O'DONNELL:**  YES.  THANK YOU.

14:32  9          **THE COURT:**  IT WILL HELP THE RECORD BECAUSE WE DON'T

14:32 10   WANT IT TO BLEED.

14:32 11   **BY MR. LEVINE:**

14:32 12   **Q.**   NOW, I WANT TO TAKE A LOOK AT SOME OF THE WORK YOU

14:32 13   CONDUCTED, SINCE YOU WERE THE PRINCIPAL AUTHOR OF VOLUME 5 OF

14:32 14   THE IPET REPORT.  LET'S TAKE A LOOK AT PAGE V-1 OF VOLUME 5,

14:32 15   WHICH IS MARKED AS DX-1267.  IF YOU LOOK AT THE LAST PARAGRAPH

14:33 16   THERE, IT SAYS:

14:33 17          "THE ABILITY OF LEVEES TO WITHSTAND OVERTOPPING

14:33 18   WITHOUT SUFFERING EXTENSIVE EROSION VARIED SIGNIFICANTLY

14:33 19   THROUGHOUT THE NEW ORLEANS AREA.  THE AREAS WHERE THE LEVEES

14:33 20   WERE MADE OF CLAY PERFORMED WELL IN SPITE OF THE FACT THAT THE

14:33 21   LEVEES WERE OVERTOPPED.  IN OTHER AREAS THE LEVEES WERE

14:33 22   COMPLETELY WASHED AWAY AFTER BEING OVERTOPPED.  THE DIFFERENCE

14:33 23   IN PERFORMANCE APPEARS TO DEPEND ON THE TYPE OF MATERIAL THAT

14:33 24   WAS USED TO CONSTRUCT THE LEVEES.  GRASS-COVERED, SEMICOMPACTED

14:33 25   CLAY LEVEES WITHSTOOD OVERTOPPING THE BEST.  LEVEES CONSTRUCTED

FINAL DAILY COPY

MOSHER00033

14:33    1   OF SAND AND SILT BY HYDRAULIC FILLING SUFFERED FAR MORE EROSION

14:33    2   FROM OVERTOPPING."

14:33    3           DID I READ THAT CORRECTLY?

14:33    4   **A.**   THAT'S CORRECT.

14:33    5   **Q.**   IF WE TURN TO PAGE V-6 OF THIS SAME REPORT AND IF WE LOOK

14:33    6   AT THE TOP PARAGRAPH THERE, IT SAYS:

14:34    7           "THE PERFORMANCE OF LEVEES VARIED SIGNIFICANTLY.  IN

14:34    8   SOME AREAS THE LEVEES PERFORMED WELL IN SPITE OF THE FACT THAT

14:34    9   THEY WERE OVERTOPPED.  IN OTHER AREAS THE LEVEES WERE

14:34   10   COMPLETELY WASHED AWAY AFTER BEING OVERTOPPED.  THE KEYS TO THE

14:34   11   ABILITY OF SOME LEVEE REACHES TO WITHSTAND OVERTOPPING WITHOUT

14:34   12   EROSION WERE:  ONE, THE TYPE OF MATERIAL OF WHICH THE LEVEES

14:34   13   WERE CONSTRUCTED; AND, TWO, THE SEVERITY OF THE SURGE AND WAVE

14:34   14   ACTION TO WHICH THE LEVEES WERE SUBJECTED."

14:34   15           DID I READ THAT CORRECTLY?

14:34   16   **A.**   THAT'S CORRECT.

14:34   17   **Q.**   THOSE TWO SECTIONS THAT I JUST READ TO YOU, WHAT DOES THAT

14:34   18   MEAN?

14:34   19   **A.**   WELL, THAT THE LEVEES PARTICULARLY IN THE NEW ORLEANS

14:34   20   AREA -- THESE LEVEES THAT WE LOOKED AT IN THE NEW ORLEANS AREA,

14:34   21   THE ONES THAT WERE CONSTRUCTED OF HYDRAULIC FILL WERE THE ONES

14:34   22   THAT SUFFERED THE MOST DAMAGE OUT OF THE 220 MILES OF LEVEE

14:34   23   THAT WE SAW, AND THAT OVERTOPPING OF THESE LEVEES LED TO

14:34   24   BREACHING AND EROSION OF THE HYDRAULICALLY FILLED LEVEES.

14:34   25   **Q.**   IF WE TURN TO PAGE V-104 OF THIS SAME EXHIBIT AND TURN TO

FINAL DAILY COPY

MOSHER00034

| | | |
|---|---|---|
| 14:35 | 1 | THE SECOND PARAGRAPH UNDER THE PLACE THAT SAYS "LEVEES," IT |
| 14:35 | 2 | SAYS: |
| 14:35 | 3 | "TWO VARIABLES PLAYED A MAJOR ROLE IN DETERMINING THE |
| 14:35 | 4 | EXTENT AND AMOUNT OF LEVEE DAMAGE.  THE HYDRAULIC LOADING |
| 14:35 | 5 | (STORM SURGE AND WAVE ACTION) FROM THE HURRICANE WAS THE |
| 14:35 | 6 | DRIVING INFLUENCE, OF COURSE, BUT THE LEVEE DAMAGE WAS NOT A |
| 14:35 | 7 | CONTINUOUS FUNCTION OF OVERTOPPING SURGE AND WAVE HEIGHTS.  THE |
| 14:35 | 8 | LEVEE RESPONSE (FAILURE VERSUS FUNCTIONAL) WAS ALSO DETERMINED |
| 14:35 | 9 | BY PRE-KATRINA GEOTECHNICAL ISSUES (SOIL TYPE, SOIL LAYERING, |
| 14:35 | 10 | SOIL CONSISTENCY, AND LEVEE CONSTRUCTION METHODS)." |
| 14:35 | 11 | DID I READ THAT CORRECTLY? |
| 14:36 | 12 | **A.**   THAT'S CORRECT.  WE SAW SOME PLACES THAT HAD AS MUCH AS 4 |
| 14:36 | 13 | OR 5 FEET OF WATER GOING OVER THE TOP IN AREAS THAT ONLY HAD |
| 14:36 | 14 | MINOR EROSION OR NO EROSION AT ALL.  WE HAD OTHER PLACES WHERE |
| 14:36 | 15 | THERE WERE ONLY A COUPLE FEET OF WATER GOING OVER THE TOP OF |
| 14:36 | 16 | THEM AND THEY ERODED AWAY. |
| 14:36 | 17 | **Q.**   IF WE TURN TO PAGE V-123 OF THIS SAME EXHIBIT, THE LAST |
| 14:36 | 18 | PARAGRAPH ON THAT PAGE SAYS: |
| 14:36 | 19 | "NO LEVEE BREACHES OCCURRED WITHOUT OVERTOPPING.  THE |
| 14:36 | 20 | DEGREE OF EROSION AND BREACHING OF OVERTOPPED LEVEES WAS |
| 14:36 | 21 | DIRECTLY RELATED TO THE CHARACTER OF THE IN-PLACE LEVEE |
| 14:36 | 22 | MATERIALS AND THE SEVERITY OF THE SURGE AND WAVE ACTION. |
| 14:36 | 23 | HYDRAULICALLY FILLED LEVEES WITH HIGHER SILT AND SAND CONTENT |
| 14:36 | 24 | IN THE EMBANKMENT MATERIAL THAT WERE SUBJECTED TO HIGH |
| 14:36 | 25 | OVERTOPPING SURGE AND WAVE ACTION SUFFERED THE MOST DAMAGE. |

FINAL DAILY COPY

MOSHER00035

14:37  1  ROLLED CLAY LEVEES PERFORMED WELL, EVEN WHEN OVERTOPPED."

14:37  2  **A.**   CORRECT.  THAT WAS AN IMPORTANT PIECE, THAT THE

14:37  3  HYDRAULICALLY FILLED LEVEES WERE THE ONES THAT YOU HAD TO BE

14:37  4  CONCERNED ABOUT FOR EROSION DUE TO OVERTOPPING AND SUPPORTS THE

14:37  5  IDEA OF NOT CONSTRUCTING THEM IN THE FUTURE WITH HYDRAULIC

14:37  6  FILL.

14:37  7  **Q.**   I WANT TO TAKE A LOOK AT A FEW LOCATIONS AND COMPARE THE

14:37  8  SOIL BORINGS IN THE LIDAR PLOT PRE- AND POSTHURRICANE.  NOW,

14:37  9  FIRST, WHAT IS A SOIL BORING?

14:37 10  **A.**   A SOIL BORING IS WHEN THEY GO OUT INTO THE FIELD AND THEY

14:37 11  PUT A TUBE DOWN INTO THE GROUND AND EXTRACT SOIL FROM IT.  IT'S

14:37 12  INSTANT TO CONDITION.  THEY DO THAT CONTINUOUSLY DOWN, COULD BE

14:37 13  30 FEET OR 20 FEET OR 60 FEET, DEPENDING ON WHAT THEY'RE

14:37 14  LOOKING FOR.  FROM THAT, THEY CAN USE THAT TO RUN TESTS ON IT

14:38 15  AND CHARACTERIZE THE SOIL.

14:38 16  **Q.**   WHAT IS LIDAR?

14:38 17  **A.**   LIDAR IS A TECHNIQUE USING A LASER TO MEASURE ELEVATIONS

14:38 18  ON THE SURFACE OF THE EARTH.

14:38 19  **Q.**   LET'S PULL UP PAGE 32 OF YOUR EXPERT REPORT, WHICH IS

14:38 20  EXHIBIT JX-212.  WHAT DOES THIS FIGURE SHOW?

14:38 21  **A.**   IT SHOWS THE LOCATION OF THE SOIL BORINGS.

14:38 22  **Q.**   LET'S TURN TO PAGE 41 OF YOUR EXPERT REPORT.  I WANT TO

14:38 23  FOCUS FIRST ON FIGURE 31, WHICH IS THE PLOT AT THE BOTTOM OF

14:38 24  THE SCREEN.

14:38 25  **A.**   OKAY.

MOSHER00036

| | | |
|---|---|---|
| 14:38 | 1 | **Q.**  THIS IS FOR LOCATION 1 AS DEPICTED ON PAGE 32 OF YOUR |
| 14:38 | 2 | EXPERT REPORT; CORRECT? |
| 14:38 | 3 | **A.**  YES. |
| 14:39 | 4 | **Q.**  WHERE WOULD THIS LOCATION BE ALONG REACH 2? |
| 14:39 | 5 | **A.**  IT LOOKS LIKE IT IS JUST SOUTH OR SOUTHEAST OF BAYOU |
| 14:39 | 6 | BIENVENUE. |
| 14:39 | 7 | **Q.**  LET'S TRY TO ORIENT OURSELVES ON THIS FIGURE.  I THINK I |
| 14:39 | 8 | SEE A RED LINE HERE.  WHAT DOES THAT RED LINE REPRESENT? |
| 14:39 | 9 | **A.**  THE RED LINE REPRESENTS THE PEAK SURGE AND WAVE AT THAT |
| 14:39 | 10 | LOCATION. |
| 14:39 | 11 | **Q.**  WHAT DOES THE BLUE LINE REPRESENT? |
| 14:39 | 12 | **A.**  JUST THE PEAK SURGE. |
| 14:39 | 13 | **Q.**  WHAT DOES THE DASHED LINE SHOW? |
| 14:39 | 14 | **A.**  THAT'S THE DESIGN ELEVATION. |
| 14:39 | 15 | **MR. O'DONNELL:**  IS THIS A COLORED CHART?  MAYBE IT'S |
| 14:39 | 16 | JUST MY AGING EYES. |
| 14:40 | 17 | **MR. LEVINE:**  IT'S A COLORED CHART. |
| 14:40 | 18 | **THE COURT:**  IT'S DIFFICULT TO SEE. |
| 14:40 | 19 | **MR. O'DONNELL:**  MAY THE WITNESS TELL US WHICH ONE IS |
| 14:40 | 20 | THE PEAK SURGE WITHOUT WAVES, WHICH COLOR, WHICH LINE, MAYBE |
| 14:40 | 21 | POINT TO IT ON HIS LITTLE THING. |
| 14:40 | 22 | **THE COURT:**  OKAY.  IF YOU WOULDN'T MIND USING YOUR |
| 14:40 | 23 | MONITOR, THAT WOULD BE FINE. |
| 14:40 | 24 | **THE WITNESS:**  THE ONE ON THE TOP OF THIS LITTLE BLOCK |
| 14:40 | 25 | YOU SEE UP THERE IS THE PEAK SURGE AND WAVES.  THE ONE BELOW |

FINAL DAILY COPY

MOSHER00037

| | | |
|---|---|---|
| 14:40 | 1 | THAT IS, I BELIEVE, THE PEAK SURGE. |
| 14:40 | 2 | BY MR. LEVINE: |
| 14:40 | 3 | Q.   I BELIEVE IN THE UPPER RIGHT-HAND CORNER THERE IS A LITTLE |
| 14:40 | 4 | LEGEND THAT HELPS YOU DECIPHER THIS IN THE REPORT. |
| 14:40 | 5 | THE COURT:  IT'S HARD TO DISTINGUISH. |
| 14:40 | 6 | THE WITNESS:  THE TOP ONE, THEY'RE HARD TO SEE ON THE |
| 14:40 | 7 | MONITOR.  IT'S EASIER TO SEE IN THIS PICTURE HERE.  THE TOP ONE |
| 14:40 | 8 | IS THE PEAK WAVE AND SURGE.  THIS ONE RIGHT HERE, OR JUST AT |
| 14:41 | 9 | THE BOTTOM OF THAT BLOCK, IS THE PEAK SURGE. |
| 14:41 | 10 | BY MR. LEVINE: |
| 14:41 | 11 | Q.   THEN THE DASHED LINE REPRESENTS -- |
| 14:41 | 12 | A.   THE DESIGN ELEVATION. |
| 14:41 | 13 | Q.   WHERE DID YOU GET THESE SURGE AND WAVE NUMBERS FROM? |
| 14:41 | 14 | A.   THOSE ARE FROM THE IPET REPORT.  IT'S THE IPET RESULTS. |
| 14:41 | 15 | Q.   IT'S A LITTLE HARD TO SEE ON THIS, BUT YOU SEE THIS LINE |
| 14:41 | 16 | RUNNING ALONG HERE, THIS THIN GREEN LINE?  CAN YOU SEE THAT? |
| 14:41 | 17 | A.   YES. |
| 14:41 | 18 | MR. LEVINE:  CAN YOUR HONOR SEE THAT LINE? |
| 14:41 | 19 | THE COURT:  LET ME MAKE SURE. |
| 14:41 | 20 | MR. LEVINE:  LET ME TRY TO DRAW ALONG THIS LINE RIGHT |
| 14:41 | 21 | IN HERE. |
| 14:41 | 22 | THE COURT:  I SEE THE DASHED LINE.  ARE WE ABOVE THE |
| 14:42 | 23 | DASHED LINE? |
| 14:42 | 24 | MR. LEVINE:  IT KIND OF KEEPS INTERSECTING UP AND |
| 14:42 | 25 | DOWN WITH THE DASHED LINE. |

FINAL DAILY COPY

MOSHER00038

| | | |
|---|---|---|
| 14:42 | 1 | **THE COURT:** I SEE IT.  IT UNDULATES TO SOME DEGREE. |
| 14:42 | 2 | **THE WITNESS:**  THAT'S THE PRE-KATRINA ELEVATIONS IN |
| 14:42 | 3 | THE LIDAR DATA. |
| 14:42 | 4 | **BY MR. LEVINE:** |
| 14:42 | 5 | **Q.**   WHAT'S THIS JAGGED BLACK LINE RIGHT HERE? |
| 14:42 | 6 | **A.**   THAT'S THE POST-KATRINA ELEVATIONS. |
| 14:42 | 7 | **Q.**   AGAIN, WHERE DID YOU GET THESE NUMBERS FROM? |
| 14:42 | 8 | **A.**   THESE WERE FROM THE IPET STUDY. |
| 14:42 | 9 | **Q.**   JUST TO MAKE SURE WE UNDERSTAND WHAT'S GOING ON THIS PAGE, |
| 14:42 | 10 | WHAT'S THIS ARROW WITH "9BU-CHBD" WRITTEN ABOVE IT? |
| 14:42 | 11 | **A.**   THAT'S THE LOCATION OF THE BORING. |
| 14:42 | 12 | **Q.**   IS THIS LABELING SYSTEM USED THROUGHOUT THE LIDAR PLOTS IN |
| 14:42 | 13 | YOUR EXPERT REPORT? |
| 14:42 | 14 | **A.**   THAT'S CORRECT. |
| 14:42 | 15 | **Q.**   IN THIS LOCATION IT MIGHT BE HARD TO TELL BECAUSE IT'S |
| 14:42 | 16 | HIDDEN A LITTLE BIT BY THE ARROW, BUT IT APPEARS THE |
| 14:42 | 17 | PRE-KATRINA ELEVATION OF THIS STRUCTURE WAS ABOUT 17 FEET; IS |
| 14:43 | 18 | THAT CORRECT? |
| 14:43 | 19 | **A.**   CORRECT.  AT THAT LOCATION, YES. |
| 14:43 | 20 | **Q.**   THAT'S PRETTY CLOSE TO THE DESIGN ELEVATION? |
| 14:43 | 21 | **A.**   CORRECT. |
| 14:43 | 22 | **Q.**   HOW MUCH EROSION OCCURRED AT THIS LOCATION? |
| 14:43 | 23 | **A.**   IF YOU'LL LOOK AT THE -- IT'S DOWN TO A LITTLE BELOW 12. |
| 14:43 | 24 | SO IT'S ABOUT 12 FEET, SO ABOUT 5 FEET OF EROSION. |
| 14:43 | 25 | **Q.**   NOW, IF WE STAY ON THE SAME PAGE, PAGE 41, AND WE CAN |

2999

| | | |
|---|---|---|
| 14:43 | 1 | FOCUS ON THE TOP FIGURE IN THIS, ON THIS PAGE, WHICH IS FIGURE |
| 14:43 | 2 | 30, NOW, THIS IS THE SOIL BORING FOR LOCATION 1; CORRECT? |
| 14:43 | 3 | A.   THAT'S CORRECT. |
| 14:43 | 4 | Q.   LET'S JUST WALK THROUGH ONE OF THESE ONE TIME SINCE |
| 14:43 | 5 | THERE'S A LOT OF NUMBERS, SYMBOLS, AND LETTERS ALL OVER THIS |
| 14:43 | 6 | FIGURE.  AT THE TOP IT SAYS:  "BOR. 9BU-CHBD STA. 445 PLUS 00 |
| 14:44 | 7 | ON LEVEE C/L, 25 JANUARY 2001."  WHAT DOES THAT NOTATION MEAN? |
| 14:44 | 8 | A.   IT'S THE BORING NUMBER AT THE TOP.  THE NEXT ONE IS THE |
| 14:44 | 9 | LOCATION.  IT'S SAYING THAT IT'S ON THE CENTERLINE OF THE |
| 14:44 | 10 | LEVEE.  IT WAS TAKEN 25 JANUARY 2001. |
| 14:44 | 11 | Q.   NOW, ON THE LEFT SIDE OF THE FIGURE, I SEE SOME NUMBERS |
| 14:44 | 12 | RUNNING DOWN THE BORING, STARTING AT 20 AND WORKING ALL THE WAY |
| 14:44 | 13 | DOWN TO MINUS 20.  WHAT ARE THOSE NUMBERS? |
| 14:44 | 14 | A.   THOSE ARE ELEVATIONS.  YOU CAN USE THOSE TO MEASURE |
| 14:44 | 15 | DISTANCE FROM THE TOP DOWN THE BORING TO GET A LOCATION FROM |
| 14:44 | 16 | THE TOP HOW FAR DOWN THE SOIL WAS LOCATED. |
| 14:44 | 17 | Q.   ON THE BORING I THEN SEE WHERE IT SAYS:  "GROUND EL. |
| 14:45 | 18 | 18.1."  WHAT'S THAT? |
| 14:45 | 19 | A.   THAT IS THE GROUND ELEVATION THEY USED TO LOG THAT IN.  IT |
| 14:45 | 20 | WAS SURVEYED IN FROM A LOCATION THAT HAD AN ELEVATION SPOT. |
| 14:45 | 21 | ONE OF THE PROBLEMS WITH THIS ELEVATION IS THAT THEY HAVEN'T |
| 14:45 | 22 | BEEN CORRECTED FOR SUBSIDENCE AND ANY OF THE OTHER THINGS THAT |
| 14:45 | 23 | MAY HAVE TAKEN PLACE.  BUT IT DOES GIVE A REFERENCE TO A |
| 14:45 | 24 | HEIGHT, AND YOU CAN MEASURE DOWN FROM THAT HEIGHT TO LOCATE ANY |
| 14:45 | 25 | SAMPLE ON THIS. |

FINAL DAILY COPY

MOSHER00040

| | | |
|---|---|---|
| 14:45 | 1 | **Q.**   WHICH IS MORE ACCURATE FOR THE ELEVATION OF THE LEVEE, THE |
| 14:45 | 2 | LIDAR PROFILE OR THE GROUND NOTATION ON THE BORING? |
| 14:45 | 3 | **A.**   TO MY KNOWLEDGE THE LIDAR DATA WOULD BE MORE ACCURATE. |
| 14:45 | 4 | IT'S BEEN CORRECTED FOR SUBSIDENCE AND FOR THE CHANGE IN |
| 14:46 | 5 | SURVEYS THAT HAVE BEEN DONE. |
| 14:46 | 6 | **Q.**   DOWN THE CENTER OF THE BORING, I SEE SOME JAGGED LINES AND |
| 14:46 | 7 | A COUPLE WAVY LINES.  CAN YOU EXPLAIN TO THE COURT WHAT THESE |
| 14:46 | 8 | LINES MEAN. |
| 14:46 | 9 | **A.**   THEY'RE USED TO INDICATE WHAT TYPE OF SOIL IS THERE.  AT |
| 14:46 | 10 | THE VERY TOP OF THIS ONE IS A LEAN CLAY.  JUST BELOW IT, THE |
| 14:46 | 11 | THIN, DIAGONAL LINES ARE FOR A LEAN CLAY.  THE THICKER ONES ARE |
| 14:46 | 12 | FOR A FAT CLAY, AND SO ON.  IT GOES DOWN UNTIL YOU GET LOWER. |
| 14:46 | 13 | YOU CAN SEE WHERE THE MARSH MATERIAL OR PEAT MATERIAL IS |
| 14:46 | 14 | LOCATED. |
| 14:46 | 15 | THE COURT:  I NOTICE THESE BORINGS WERE DONE IN 2001. |
| 14:46 | 16 | DO YOU KNOW FOR WHAT OCCASION THESE BORINGS WERE BEING |
| 14:46 | 17 | PERFORMED? |
| 14:46 | 18 | THE WITNESS:  I BELIEVE THEY WERE AS PART OF THE |
| 14:46 | 19 | GEOTECHNICAL REPORT THAT WAS GOING TO BE PRESENTED AS PART OF |
| 14:46 | 20 | THE RECONSTRUCTION.  THE OTHER LIFTS, THEY WERE DOING |
| 14:47 | 21 | GEOTECHNICAL INVESTIGATIONS TO -- |
| 14:47 | 22 | THE COURT:  PRIOR TO ANY LIFT THAT WAS DONE IN THIS |
| 14:47 | 23 | AREA? |
| 14:47 | 24 | THE WITNESS:  THAT'S CORRECT. |
| 14:47 | 25 | THE COURT:  THIS WAS DONE BY THE CORPS? |

FINAL DAILY COPY

MOSHER00041

14:47    1            **THE WITNESS:**  BY THE CORPS OF ENGINEERS.

14:47    2            **THE COURT:**  IN PREPARATION FOR A LIFT IN THIS AREA;

14:47    3   IS THAT CORRECT?

14:47    4            **THE WITNESS:**  TO DO THE CHARACTERIZATION OF THE SOIL

14:47    5   IN THAT AREA.

14:47    6            **THE COURT:**  THANK YOU.

14:47    7   **BY MR. LEVINE:**

14:47    8   **Q.**   JUST TO THE LEFT OF THE LINE, THE JAGGED LINE, YOU SEE A

14:47    9   LOT OF LETTERS WITH CIRCLES AROUND THEM.  CAN YOU EXPLAIN WHAT

14:47   10   THOSE MEAN.

14:47   11   **A.**   YES.  THOSE ARE THE TESTS THAT WERE DONE AT THE SAMPLES AT

14:47   12   THOSE LOCATIONS.  THE Q TEST IS AN UNDRAINED-CONSOLIDATED

14:47   13   TRIAXIAL CONSOLIDATION TEST.  YOU'LL SEE FARTHER DOWN HERE ONE

14:47   14   WITH A C.  THOSE ARE CONSOLIDATIONS TESTS DONE FOR SETTLEMENT

14:47   15   ANALYSIS.

14:47   16   **Q.**   THEN TO THE RIGHT OF THE LINE, THE JAGGED LINE, YOU SEE

14:47   17   SOME REALLY SMALL LETTERS.  CAN YOU EXPLAIN WHAT THOSE LETTERS

14:47   18   MEAN.

14:48   19   **A.**   THOSE ARE GENERALLY WHAT WE CALL MODIFIERS.  THERE WILL BE

14:48   20   SOMETHING SAYING EITHER MEDIUM CLAY OR SOFT CLAY.  IT'S AN

14:48   21   OBSERVATION THAT'S MADE WHEN THE SAMPLES -- THEY TAKE LITTLE

14:48   22   JAR SAMPLES AND LOOK AT THOSE, AND THEN THEY CORRELATE THOSE

14:48   23   WITH THE TEST DATA AS IT COMES ALONG.

14:48   24   **Q.**   FINALLY, ALL THE WAY TO THE RIGHT OF THE BORING, I SEE

14:48   25   SOME MORE SETS OF LETTERS.  CAN YOU EXPLAIN TO THE COURT WHAT

FINAL DAILY COPY

MOSHER00042

| | | |
|---|---|---|
| 14:48 | 1 | THOSE MEAN. |
| 14:48 | 2 | **A.**   THOSE DEAL WITH THE COLOR OF THE SAMPLE.  THEY WILL BE |
| 14:48 | 3 | GRAY, BROWN, AND THEN THERE WILL BE DEGREES.  THE FIRST ONE IS |
| 14:48 | 4 | THE PRIMARY COLOR, AND THE OTHER ONE'S ARE SECONDARY COLORS. |
| 14:48 | 5 | ALSO, IN THIS OTHER ONE BACK HERE, IT WILL ALSO SPECIFY -- IN |
| 14:48 | 6 | THIS ONE HERE, IT WILL ALSO SPECIFY IF THERE'S ANY TRACES OF |
| 14:48 | 7 | MATERIALS, SAY, A SILT LENS OR A SAND LENS OR ANYTHING LIKE |
| 14:48 | 8 | THAT. |
| 14:48 | 9 | **Q.**   JUST SO THE RECORD'S CLEAR, YOU'RE TALKING ABOUT THE |
| 14:49 | 10 | LETTERS THAT ARE RIGHT NEXT TO THE BORING; CORRECT? |
| 14:49 | 11 | **A.**   THAT'S CORRECT. |
| 14:49 | 12 | **Q.**   NOW, IS THIS LABELING STRUCTURE USED FOR ALL THE BORINGS |
| 14:49 | 13 | THAT YOU CITE IN YOUR EXPERT REPORT? |
| 14:49 | 14 | **A.**   YES.  IT'S A STANDARD METHOD THE CORPS USES. |
| 14:49 | 15 | **Q.**   SO NOW THAT WE'VE EXPLAINED THIS BORING A LITTLE BIT, |
| 14:49 | 16 | LET'S REVIEW.  WE'RE TALKING ABOUT A 17-FOOT HIGH LEVEE |
| 14:49 | 17 | ACCORDING TO THE LIDAR PROFILE; CORRECT? |
| 14:49 | 18 | **A.**   THAT'S CORRECT. |
| 14:49 | 19 | **Q.**   THAT WAS PRIOR TO THE STORM? |
| 14:49 | 20 | **A.**   THAT'S CORRECT. |
| 14:49 | 21 | **Q.**   WHAT SOIL FORMED THE TOP OF THIS LEVEE SECTION? |
| 14:49 | 22 | **A.**   IT WAS A MEDIUM LEAN CLAY. |
| 14:49 | 23 | **Q.**   NOW, HOW DID THIS IMPACT -- |
| 14:49 | 24 | **A.**   A MEDIUM, STIFF, LEAN CLAY. |
| 14:49 | 25 | **Q.**   HOW DID THIS IMPACT LEVEE PERFORMANCE DURING THE |

MOSHER00043

| | | |
|---|---|---|
| 14:49 | 1 | HURRICANE? |
| 14:49 | 2 | **A.**   WELL, AS YOU CAN SEE LATER, IT WAS ONE OF THE SOILS THAT |
| 14:49 | 3 | WAS ERODIBLE WITH WATER GOING OVER THE TOP OF IT AND CAUSED |
| 14:49 | 4 | EROSION, SO IT'S AN ERODIBLE SOIL, CAUSED DEEP EROSION AT THIS |
| 14:49 | 5 | LOCATION. |
| 14:49 | 6 | **Q.**   WHY DOES THE SOIL AT THE TOP OF THE LEVEE MATTER SO MUCH? |
| 14:50 | 7 | **A.**   BECAUSE IT'S WHERE THE EROSION WOULD START, WHERE YOU LOSE |
| 14:50 | 8 | THE GRASS, AND THEN YOU START HAVING EROSION.  ONCE IT BREAKS |
| 14:50 | 9 | THROUGH THE SOIL, THEN THE REMAINING SOIL UNDERNEATH IT IS MUCH |
| 14:50 | 10 | EASIER TO ERODE DUE TO THE TURBULENCE IT CAUSES. |
| 14:50 | 11 | **Q.**   WHAT IS TURBULENCE? |
| 14:50 | 12 | **A.**   IT'S ESSENTIALLY A ROUGHNESS OF THE FLOW.  IT'S THE |
| 14:50 | 13 | AGGRESSIVE NATURE OF THE FLOW THAT LIFTS MATERIAL OFF. |
| 14:50 | 14 | **Q.**   ONCE YOU GET A LITTLE BIT OF TURBULENCE, THE EROSION |
| 14:50 | 15 | PROCESS JUST KEEPS SPEEDING UP AND SPEEDING UP? |
| 14:50 | 16 | **A.**   SPEEDING UP AND CONTINUES OVER. |
| 14:50 | 17 | **Q.**   REGARDLESS OF THE SOIL TYPE UNDERNEATH THAT TOP LAYER? |
| 14:50 | 18 | **A.**   RIGHT.  ONCE YOU BREAK THROUGH THE SURFACE, IT'S GOING TO |
| 14:50 | 19 | BE MUCH MORE ERODIBLE.  EVEN IF YOU HAVE A GOOD MATERIAL |
| 14:50 | 20 | UNDERNEATH IT, IT'S EASY FOR THAT TO BE ERODED AWAY. |
| 14:50 | 21 | **THE COURT:**  SO FOR FUTURE REFERENCE, THE KEY IS, IN |
| 14:50 | 22 | THE INTEGRITY OF A LEVEE, TO HAVE REALLY GOOD STUFF ON THE TOP? |
| 14:51 | 23 | **THE WITNESS:**  ON THE OUTSIDE, RIGHT. |
| 14:51 | 24 | **THE COURT:**  ON THE OUTSIDE. |
| | 25 | |

FINAL DAILY COPY

MOSHER00044

| | | |
|---|---|---|
| 14:51 | 1 | **BY MR. LEVINE:** |
| 14:51 | 2 | **Q.**   LET'S TURN TO PAGE 44 OF YOUR EXPERT REPORT AND TAKE A |
| 14:51 | 3 | LOOK AT ANOTHER LOCATION.  THIS PAGE, I THINK, DEPICTS THE |
| 14:51 | 4 | LIDAR PROFILE AND THE SOIL BORING FOR LOCATION 5 AS SHOWN ON |
| 14:51 | 5 | PAGE 32 OF YOUR REPORT; CORRECT? |
| 14:51 | 6 | **A.**   YES. |
| 14:51 | 7 | **Q.**   LOCATION 5, WHERE IS THAT BETWEEN? |
| 14:51 | 8 | **A.**   I BELIEVE IT'S ALSO LOCATED -- IT'S ABOUT MIDWAY OR |
| 14:51 | 9 | TWO-THIRDS OF THE WAY BETWEEN BAYOU BIENVENUE AND DUPRE.  SO |
| 14:52 | 10 | IT'S TWO-THIRDS OF THE WAY DOWN FROM BAYOU BIENVENUE. |
| 14:52 | 11 | **Q.**   LET'S JUST CALL UP PAGE 32 REALLY QUICKLY AND TAKE A LOOK |
| 14:52 | 12 | AT THAT FIGURE 19.  SO LOCATION 5 IS TWO-THIRDS OF THE WAY |
| 14:52 | 13 | BETWEEN BAYOU BIENVENUE TOWARDS BAYOU DUPRE; CORRECT? |
| 14:52 | 14 | **A.**   THAT'S CORRECT. |
| 14:52 | 15 | **Q.**   IF WE GO BACK TO THE PAGE WE WERE JUST LOOKING AT, |
| 14:52 | 16 | PAGE 44, AND TAKE A LOOK AT FIGURE 37 -- |
| 14:52 | 17 |           **MR. O'DONNELL:**  I DON'T HAVE A COLOR VERSION.  I |
| 14:52 | 18 | WONDER IF THE WITNESS COULD EXPLICATE AGAIN FOR US THE PEAK |
| 14:53 | 19 | SURGE AND WAVE LINE AND THE PEAK SURGE.  I'D BE GRATEFUL. |
| 14:53 | 20 |           **THE COURT:**  COUNSEL, DO YOU MIND TO GO AHEAD AND LET |
| 14:53 | 21 | THE WITNESS DO THAT? |
| 14:53 | 22 |           **THE WITNESS:**  IT MAY BE EASIER TO DO IT FROM HERE. |
| 14:53 | 23 | THE PEAK SURGE AND WAVE IS HERE. |
| 14:53 | 24 |           **MR. O'DONNELL:**  WHERE? |
| 14:53 | 25 |           **THE WITNESS:**  HERE.  THE SURGE IS LOCATED THERE.  THE |

MOSHER00045

14:53    1   DESIGN HEIGHT IS LOCATED HERE.  THE PRE-KATRINA HEIGHTS ARE

14:53    2   LOCATED RIGHT HERE.

14:53    3           **MR. O'DONNELL:**  THANK YOU VERY MUCH.

14:53    4           **THE COURT:**  THANK YOU.  JUST TO LET YOU KNOW, I HAVE

14:53    5   A CONFERENCE CALL I HAVE TO BE ON AT 3:00, SO WE'LL BREAK AT

14:53    6   3:00.  WE'VE GOT SIX OR SEVEN MINUTES.

14:53    7           **MR. LEVINE:**  I'M NOT WEARING A WATCH, SO THANKS FOR

14:53    8   TELLING ME.

14:54    9   **BY MR. LEVINE:**

14:54   10   **Q.**   SO THE BORING WAS TAKEN AT THE LOCATION WITH THE BLACK

14:54   11   ARROW; CORRECT?

14:54   12   **A.**   THAT'S CORRECT.

14:54   13   **Q.**   WHAT WAS THE PRE-KATRINA ELEVATION OF THIS STRUCTURE?

14:54   14   **A.**   THIS ONE IS RIGHT AROUND 15 FEET.

14:54   15   **Q.**   HOW MUCH EROSION OCCURRED AT THIS LOCATION?

14:54   16   **A.**   ON THIS GRAPH IT SHOWS, BETWEEN THE TWO, THERE MAY BE A

14:54   17   HALF A FOOT OR A FOOT, BUT IT'S VERY SMALL.  THAT COULD BE THE

14:54   18   DIFFERENCES BETWEEN -- THESE HAVEN'T BEEN ADJUSTED TO MATCH

14:54   19   EACH OTHER, THE TWO SURGES; THEY WERE DONE AT DIFFERENT TIMES.

14:54   20   **Q.**   SO HERE WE HAVE A LOW SPOT ALONG REACH 2, AND YET WE SHOW

14:54   21   VERY LITTLE, IF ANY, EROSION; RIGHT?

14:54   22   **A.**   THAT'S CORRECT.

14:54   23   **Q.**   LET'S TAKE A LOOK AT THE SOIL BORING FOR THIS LOCATION.

14:54   24   WE CAN PULL UP FIGURE 36 ON PAGE 44.  WHAT WAS THE SOIL AT THE

14:55   25   TOP OF THIS LEVEE?

FINAL DAILY COPY

| 14:55 | 1 | **A.**   THE SOIL AT THE TOP OF THIS LEVEE WAS A MEDIUM FAT CLAY. |
| 14:55 | 2 | **Q.**   HOW DID THE PRESENCE OF MEDIUM FAT CLAY IMPACT ERODIBILITY |
| 14:55 | 3 | AT BORING LOCATION 5? |
| 14:55 | 4 | **A.**   IT WAS A LOT LESS ERODIBLE; IT DIDN'T ERODE AT THAT |
| 14:55 | 5 | LOCATION. |
| 14:55 | 6 | **Q.**   NOW, FOR RIGHT NOW I WANT TO LOOK AT ONE MORE LOCATION, |
| 14:55 | 7 | AND THAT'S LOCATION 9 ON PAGE 32 OF YOUR EXPERT REPORT.  IF YOU |
| 14:55 | 8 | WOULD PULL UP PAGE 32 AGAIN, CAN YOU IDENTIFY WHERE LOCATION 9 |
| 14:55 | 9 | IS. |
| 14:55 | 10 | **A.**   YES.  IT'S SOUTHEAST OF DUPRE, CONTROL STRUCTURE DUPRE. |
| 14:55 | 11 | **Q.**   NOW, IF WE TURN TO PAGE 46 OF YOUR EXPERT REPORT, LET'S |
| 14:55 | 12 | FOCUS ON FIGURE 41.  LET'S JUST WALK THROUGH THIS AGAIN.  WHERE |
| 14:56 | 13 | IS THE RED LINE DEPICTING PEAK SURGE AND WAVES? |
| 14:56 | 14 | **A.**   RIGHT THERE, CORRECT. |
| 14:56 | 15 | **Q.**   SO A LITTLE BIT ABOVE THE 22.5 MARK; CORRECT? |
| 14:56 | 16 | **A.**   THAT'S CORRECT. |
| 14:56 | 17 | **Q.**   WHERE'S THE PEAK SURGE NUMBER? |
| 14:56 | 18 | **A.**   PEAK SURGE IS RIGHT IN THERE, RIGHT BELOW THE 20 LINE. |
| 14:56 | 19 | THE GREEN LINE IS JUST A LITTLE ABOVE THE 17.5 AREA, THIS AREA. |
| 14:56 | 20 | SO IN THE DESIGN ELEVATION, IT'S A DASHED LINE.  SO THE ACTUAL |
| 14:56 | 21 | PRE-KATRINA WAS ABOVE THE DESIGN LINE. |
| 14:56 | 22 | **Q.**   SO THAT'S ABOUT, YOU KNOW, SOMEWHERE AROUND 18 FEET? |
| 14:56 | 23 | **A.**   18 FEET. |
| 14:56 | 24 | **Q.**   HOW MUCH BREACHING OCCURRED AT THIS LOCATION? |
| 14:56 | 25 | **A.**   THIS BREACHED DOWN AS LOW AS 10 FEET, SO 8 FEET OF |

FINAL DAILY COPY

MOSHER00047

| | | |
|---|---|---|
| 14:56 | 1 | BREACHING. |
| 14:56 | 2 | Q.   SO JUST SO THE RECORD'S CLEAR, THE RED LINE FOR PEAK SURGE |
| 14:57 | 3 | AND WAVE AND THE BLUE LINE FOR PEAK SURGE, THAT COMES FROM |
| 14:57 | 4 | IPET; CORRECT? |
| 14:57 | 5 | A.   THAT'S CORRECT. |
| 14:57 | 6 | Q.   LET'S TAKE A LOOK AT THE SOIL BORING FOR THIS LOCATION. |
| 14:57 | 7 | THAT'S FIGURE 40 ON PAGE 46 OF YOUR EXPERT REPORT? |
| 14:57 | 8 | A.   THAT'S CORRECT. |
| 14:57 | 9 | Q.   WHAT TYPE OF SOIL MADE UP THE TOP OF THIS LEVEE SECTION? |
| 14:57 | 10 | A.   IT WAS A STIFF LEAN CLAY. |
| 14:57 | 11 | Q.   HOW DID THE PRESENCE OF LEAN CLAY AFFECT LEVEE PERFORMANCE |
| 14:57 | 12 | AT THIS LOCATION? |
| 14:57 | 13 | A.   THE LEAN CLAY ERODED AND CAUSED THE EROSION TO TAKE PLACE. |
| 14:57 | 14 | Q.   HERE, WE HAD ONE OF THE HIGH SPOTS ALONG THE REACH 2 |
| 14:57 | 15 | LEVEES AT 18 FEET, YET WE STILL SUFFERED SIGNIFICANT AMOUNTS OF |
| 14:57 | 16 | EROSION; CORRECT? |
| 14:57 | 17 | A.   THAT'S CORRECT. |
| 14:58 | 18 | Q.   NOW, ANOTHER ONE OF YOUR OPINIONS IS THAT THE LEVEES IN |
| 14:58 | 19 | SOME LOCATIONS WERE BELOW THE REQUIRED DESIGN GRADE; CORRECT? |
| 14:58 | 20 | A.   THAT'S CORRECT. |
| 14:58 | 21 | Q.   LET'S TAKE A LOOK AT FIGURE 4 ON PAGE 14 OF YOUR EXPERT |
| 14:58 | 22 | REPORT.  CAN WE ZOOM IN ON THIS.  WHAT DOES THIS FIGURE SHOW? |
| 14:58 | 23 | A.   THAT FIGURE SHOWS THE DESIGN ELEVATION VERY SIMILAR TO THE |
| 14:58 | 24 | OTHER ONES.  IT GIVES YOU THE PEAK SURGE AND WAVE, THE PEAK |
| 14:58 | 25 | SURGE, THE PRE-KATRINA ELEVATIONS, POST-KATRINA, AND THE DESIGN |

MOSHER00048

| | | |
|---|---|---|
| 14:58 | 1 | ELEVATIONS ALONG THE WHOLE REACH. |
| 14:58 | 2 | **MR. LEVINE:** IS THE COLOR OF THIS PICTURE A LITTLE |
| 14:58 | 3 | BIT EASIER TO SEE? |
| 14:58 | 4 | **MR. O'DONNELL:** YES. AS I UNDERSTAND IT, THE BLUE |
| 14:58 | 5 | LINE IS THE PEAK SURGE WITHOUT WAVES, YOUR HONOR? |
| 14:58 | 6 | **THE COURT:** THAT'S CORRECT. |
| 14:58 | 7 | **BY MR. LEVINE:** |
| 14:58 | 8 | **Q.** SO WHERE DID YOU GET THIS FIGURE FROM? |
| 14:58 | 9 | **A.** THIS IS OUT OF THE IPET REPORT. |
| 14:58 | 10 | **Q.** SO THE NUMBERS IN THERE FOR THE PEAK SURGE AND WAVES AND |
| 14:59 | 11 | THE PEAK SURGE ARE CALCULATED BY IPET; CORRECT? |
| 14:59 | 12 | **A.** THAT'S CORRECT. |
| 14:59 | 13 | **THE COURT:** AM I CORRECT -- AND I THINK I REMEMBER |
| 14:59 | 14 | LOOKING AT THIS REPORT -- MR. O'DONNELL, YOU HAD AN OBJECTION? |
| 14:59 | 15 | **MR. O'DONNELL:** NO. I'D JUST LIKE TO KNOW WHAT PAGE |
| 14:59 | 16 | FROM IPET, IF HE KNOWS, YOUR HONOR. HE CAN TELL ME OVERNIGHT. |
| 14:59 | 17 | I JUST NEED TO KNOW WHAT PAGE IT'S FROM. IT DOESN'T SAY. |
| 14:59 | 18 | **THE COURT:** ON THE IPET? |
| 14:59 | 19 | **MR. O'DONNELL:** IT DOESN'T SAY WHAT PAGE IT'S FROM. |
| 14:59 | 20 | **THE WITNESS:** IT IS A FIGURE IN MY EXPERT REPORT. |
| 14:59 | 21 | **THE COURT:** IT'S IN HIS EXPERT REPORT. |
| 14:59 | 22 | **MR. O'DONNELL:** I KNOW, BUT HE SOURCES IT TO IPET |
| 14:59 | 23 | 2007. I WANT TO KNOW WHAT PAGE OF IPET IT IS. |
| 14:59 | 24 | **THE COURT:** I DON'T KNOW IF YOU HAVE THAT |
| 14:59 | 25 | INFORMATION. |

FINAL DAILY COPY

14:59    1                    THE WITNESS:  I DON'T KNOW OFFHAND.

14:59    2                    MR. O'DONNELL:  I'LL ASK HIM ON CROSS, YOUR HONOR.

14:59    3                    THE COURT:  I READ THIS IN YOUR REPORT, SIR, AND IT

14:59    4    SHOWS THE PEAK SURGE AT ONE POINT ABOUT 23 FEET.  AM I RIGHT

14:59    5    ABOUT THAT?  PLUS WAVE.

15:00    6                    THE WITNESS:  PLUS WAVE.

15:00    7                    THE COURT:  HAVE YOU BEEN IN COURT MOST OF THE TIME?

15:00    8                    THE WITNESS:  OFF AND ON, YES.

15:00    9                    THE COURT:  DO YOU KNOW IF THAT COMPORTS WITH THE

15:00   10    TESTIMONY OF THE OTHER DEFENSE EXPERTS AS TO THE AMOUNT OF PEAK

15:00   11    SURGE?

15:00   12                    THE WITNESS:  THIS MAY BE DIFFERENT FROM THEIR OTHER

15:00   13    REPORTS.  I'M NOT REALLY RELYING ON THE --

15:00   14                    THE COURT:  THAT'S NOT THE GRAVAMEN OR THE LINCHPIN

15:00   15    TO YOUR OPINION?

15:00   16                    THE WITNESS:  CORRECT.

15:00   17                    THE COURT:  COUNSEL, I'VE GOT TO TAKE A CALL.  IS

15:00   18    THIS A GOOD TIME?

15:00   19                    MR. LEVINE:  THIS IS AN EXCELLENT TIME.

15:00   20                    THE COURT:  THANK YOU.  WE ARE IN RECESS UNTIL ABOUT

15:00   21    3:15.

15:00   22                    THE DEPUTY CLERK:  ALL RISE.

15:12   23                    (WHEREUPON THE COURT TOOK A BRIEF RECESS.)

15:12   24                    THE DEPUTY CLERK:  ALL RISE.

15:12   25                    COURT IS IN SESSION.  PLEASE BE SEATED.


                                FINAL DAILY COPY

MOSHER00050

```
15:19   1           THE COURT:  WE WILL WAIT UNTIL EVERYBODY GETS
15:19   2   SETTLED.  UNLESS ANYBODY NEEDS A BREAK, WE WILL TRY TO KEEP
15:19   3   GOING UNTIL -- WE MIGHT HAVE ONE 10-MINUTE ONE, BUT WE'LL TRY
15:19   4   TO KEEP GOING UNTIL 5:30 IF WE CAN, UNLESS SOMEBODY RAISES A
15:19   5   HAND.
15:19   6           MR. LEVINE:  MAY I PROCEED?
15:19   7           THE COURT:  YES, SIR, YOU MAY.
15:19   8   BY MR. LEVINE:
15:19   9   Q.   THANK YOU.  WE WERE LOOKING AT JX-212 AT 14 AND FOCUSING
15:19  10   ON FIGURE 4 FROM YOUR EXPERT REPORT.  IT'S PAGE 14 WE WANT TO
15:19  11   LOOK AT.  WHERE IS BAYOU BIENVENUE ON THIS CHART,
15:19  12   APPROXIMATELY, ON THE FEET LOCATION, LOOKING AT THE BOTTOM?
15:20  13   A.   APPROXIMATELY AT THIS LOCATION RIGHT IN HERE.
15:20  14   Q.   WHERE IS BAYOU DUPRE ON THIS CHART?
15:20  15   A.   IT'S RIGHT IN THIS, JUST BEYOND THE 40,000.
15:20  16   Q.   RIGHT NOW, I WANT TO TAKE A LOOK AT THREE FIGURES.  TWO OF
15:20  17   THEM ARE FROM YOUR EXPERT REPORT.  IT'S JX-212 AT 11 AND JX-212
15:20  18   AT 12.  THEN I ALSO WANT TO LOOK AT A FIGURE FROM CHAD MORRIS'
15:20  19   EXPERT REPORT, WHICH IS 7-1 FROM PAGE 18, AND THAT'S JX-191.
15:20  20   IT'S A LITTLE HARD TO SEE ALL THREE ON THE SCREEN AT ONE TIME,
15:20  21   SO WE'VE PRINTED OUT A FEW COPIES.
15:20  22           MR. LEVINE:  MAY I APPROACH, YOUR HONOR?
15:20  23           THE COURT:  YES, YOU MAY.
15:20  24   BY MR. LEVINE:
15:21  25   Q.   NOW, THIS IS FIGURE 1, JX-212 AT 11, AND THIS SHOWS THE
```

FINAL DAILY COPY

MOSHER00051

3011

| | | |
|---|---|---|
| 15:21 | 1 | LOCATION OF THE BREACHES ALONG REACH 2; CORRECT? |
| 15:21 | 2 | **A.**   THAT'S CORRECT. |
| 15:21 | 3 | **Q.**   THEN IF WE LOOK AT FIGURE 2 FROM PAGE 12 OF YOUR EXPERT |
| 15:21 | 4 | REPORT -- |
| 15:21 | 5 | **A.**   CORRECT. |
| 15:21 | 6 | **Q.**   -- THIS FIGURE SHOWS THE CONSTRUCTED LEVEE SOURCES; RIGHT? |
| 15:21 | 7 | **A.**   THAT'S CORRECT. |
| 15:21 | 8 | **Q.**   THEN IF WE LOOK AT PAGE 18 OF JX-191, THIS SHOWS THE |
| 15:21 | 9 | HEIGHTS OF THE LEVEE ALONG REACH 2; CORRECT? |
| 15:21 | 10 | **A.**   THAT'S CORRECT. |
| 15:21 | 11 | **Q.**   IT'S YOUR OPINION THAT BOTH SOILS AND LEVEE HEIGHTS |
| 15:21 | 12 | INFLUENCED ERODIBILITY DURING THE STORM; CORRECT? |
| 15:22 | 13 | **A.**   THAT'S CORRECT. |
| 15:22 | 14 | **Q.**   BASED ON THESE THREE FIGURES THAT YOU HAVE BEFORE YOU, |
| 15:22 | 15 | WHICH FACTOR HAD MORE OF AN INFLUENCE, THE SOIL OR LEVEE |
| 15:22 | 16 | HEIGHT? |
| 15:22 | 17 | **MR. O'DONNELL:**  OBJECTION, YOUR HONOR:  VAGUE AS TO |
| 15:22 | 18 | LOCATION. |
| 15:22 | 19 | **THE COURT:**  ARE YOU ASKING HIM IN GENERAL? |
| 15:22 | 20 | **THE WITNESS:**  ALONG REACH 2. |
| 15:22 | 21 | **THE COURT:**  HE'S ASKING HIM A GENERAL QUESTION ALONG |
| 15:22 | 22 | REACH 2.  I'LL ALLOW IT AS A GENERAL PROPOSITION. |
| 15:22 | 23 | **THE WITNESS:**  IN GENERAL, IT WOULD BE THE SOIL |
| 15:22 | 24 | CONDITIONS. |
| | 25 | |

FINAL DAILY COPY

MOSHER00052

3012

15:22    1   **BY MR. LEVINE:**

15:22    2   **Q.**   WHY THE SOIL CONDITIONS?

15:22    3   **A.**   WELL, THERE ARE LOCATIONS WHERE THE STRUCTURE WAS AT

15:22    4   DESIGN GRADE, YET WE HAD EROSION.  WE HAD SOME THAT THE

15:22    5   STRUCTURE WAS 1 OR 2 FEET BELOW, YET WE HAD CONSIDERABLE

15:22    6   EROSION.  ALL THOSE YELLOW SECTIONS AND THE WHITE SECTIONS,

15:22    7   THOSE HAD CONSIDERABLE EROSION; IT WAS THE MATERIAL TYPE THAT

15:22    8   WAS THE MAIN DIFFERENCE.

15:22    9           **MR. LEVINE:**  YOUR HONOR, AT THIS TIME, I THINK WE'RE

15:22   10   GETTING BACK INTO AN AREA REGARDING THE PROFFER.  I JUST WANT

15:23   11   TO NOTE FOR THE RECORD SOME OF THESE ISSUES WERE DISCUSSED IN

15:23   12   DR. MOSHER'S DEPOSITION.

15:23   13           **THE COURT:**  I UNDERSTAND.  AS I SAID EARLIER, I'M

15:23   14   TRYING TO BE CONSISTENT.  IT'S BEEN A LONG TRIAL.  GENERALLY,

15:23   15   IT HAS TO BE IN THE REPORT OR COVERED IN SOME ASPECT OF THE

15:23   16   REPORT.  SIMPLY BECAUSE IT'S DISCUSSED IN DEPOSITION IS NOT

15:23   17   SUFFICIENT, GENERALLY, UNLESS IT'S CONNECTED TO SOMETHING IN

15:23   18   THE REPORT, BUT I WILL NOTE THAT.  IF WE VISIT THIS ON

15:23   19   BRIEFING, MAYBE YOU CAN POINT TO A SPECIFIC SPOT AND I'LL LOOK

15:23   20   AT IT; I'LL THEN UNDO THE PROFFER AND LOOK AT IT AND ADMIT THE

15:23   21   EVIDENCE RETROACTIVELY.

15:23   22                           * * *

        23

        24

        25

                           FINAL DAILY COPY

MOSHER00053

3013

| | | |
|---|---|---|
| 15:23 | 1 | **DEFENSE PROFFER 5** |
| 15:23 | 2 | **BY MR. LEVINE:** |
| 15:23 | 3 | **Q.**   I WANT TO TALK A LITTLE BIT MORE ABOUT THE LEVEE DESIGN. |
| 15:24 | 4 | YOU EARLIER TESTIFIED THAT THE LEVEE DESIGN ANTICIPATED THAT |
| 15:24 | 5 | THE LEVEES WOULD BE BROUGHT UP THROUGH A SERIES OF LIFTS; |
| 15:24 | 6 | CORRECT? |
| 15:24 | 7 | **A.**   THAT'S CORRECT. |
| 15:24 | 8 | **Q.**   WHY ARE THE LEVEES CONSTRUCTED THROUGH A SERIES OF DESIGN |
| 15:24 | 9 | LIFTS? |
| 15:24 | 10 | **A.**   BECAUSE THEY KNOW THAT BOTH THE FILL MATERIAL FOR THE |
| 15:24 | 11 | EMBANKMENT AND THE UNDERLAYING MATERIAL IS GOING TO BE SETTLING |
| 15:24 | 12 | THROUGHOUT THE PERIOD OF CONSTRUCTION, WITH THE FILL FOR THE |
| 15:24 | 13 | EMBANKMENT FIRST AND THEN THE UNDERLYING MATERIAL SETTLING |
| 15:24 | 14 | LATER. |
| 15:24 | 15 | **Q.**   THE TIME THAT IT NEEDED TO SETTLE FOR THE LEVEES, WAS THAT |
| 15:24 | 16 | CONTEMPLATED IN THE ORIGINAL DESIGN OF THE LEVEES? |
| 15:24 | 17 | **A.**   THAT'S CORRECT. |
| 15:24 | 18 | **Q.**   LET'S TAKE A LOOK AT THE 1966 DESIGN OF THE LEVEES.  THIS |
| 15:24 | 19 | IS MARKED AS JX-254, AND TURN TO A PAGE BATES-STAMPED |
| 15:24 | 20 | DEX0154800. |
| 15:24 | 21 | **MR. O'DONNELL:**  CAN WE HAVE A TAB NUMBER? |
| 15:25 | 22 | **MR. LEVINE:**  JX-254. |
| 15:25 | 23 | **MR. O'DONNELL:**  WHICH VOLUME? |
| 15:25 | 24 | **THE LAW CLERK:**  VOLUME 1. |
| 15:25 | 25 | **MR. O'DONNELL:**  THANK YOU. |

FINAL DAILY COPY

MOSHER00054

15:25  1  **BY MR. LEVINE:**

15:25  2  **Q.**   CAN YOU EXPLAIN WHAT IS MEANT BY THE FIRST FULL PARAGRAPH

15:25  3  ON THIS PAGE, IF WE CAN FOCUS IN ON THAT, PLEASE.

15:25  4  **A.**   YES.  WHAT THEY WERE LOOKING AT HERE IS THE EXPECTED

15:25  5  SETTLEMENT OVER TWO YEARS.  THEY WERE TRYING TO PREDICT IT SO

15:25  6  THEY WOULD UNDERSTAND HOW MUCH SETTLEMENT THAT THEY WOULD GET

15:25  7  AND THEN HOW MUCH AVAILABLE MATERIAL WOULD BE AVAILABLE FOR

15:26  8  RESHAPING IN THE FORM OF A LEVEE.

15:26  9  **Q.**   HOW MUCH SETTLEMENT DID THEY EXPECT TO OCCUR IN THOSE TWO

15:26  10  YEARS?

15:26  11  **A.**   THEY SAID THE SURFACE -- THIS IS BELOW THE LEVEE, IT IS

15:26  12  EXPECTED TO SETTLE ABOUT 3.9 FEET.

15:26  13  **Q.**   IF WE CAN TURN IN THAT SAME DOCUMENT TO A PAGE

15:26  14  BATES-STAMPED DEX0154913, WE SEE A NUMBER OF TABLES RUNNING

15:26  15  DOWN THE RIGHT-HAND PART OF THE SCREEN.  CAN YOU EXPLAIN WHAT

15:26  16  THESE TABLES SHOW.

15:26  17  **A.**   THESE ARE THE DIFFERENT STRATUM OF SOIL THAT'S UNDERNEATH

15:26  18  THE LEVEE.  THEY'RE CALCULATING THE TOTAL SETTLEMENT THAT THEY

15:26  19  EXPECT.  THEY ACTUALLY DO IT BY PERCENTAGES FOR THE HEIGHTS,

15:26  20  THE TOTAL SETTLEMENT THAT THEY'RE GOING TO GET FOR THESE FOUR

15:27  21  STRATUM OF SOIL.

15:27  22  **Q.**   HOW MUCH TOTAL SETTLEMENT WERE THEY EXPECTING WOULD OCCUR

15:27  23  IN THESE STRATUMS OF SOIL?

15:27  24  **A.**   I BELIEVE IT WAS ABOUT 13 FEET IF YOU ADD THOSE UP.

15:27  25  **Q.**   HOW HIGH WOULD THE LEVEE GET TO BE, ABOUT?

FINAL DAILY COPY

MOSHER00055

| | | |
|---|---|---|
| 15:27 | 1 | **A.**  THE LEVEE TOP, I THINK, IS AT 14 FEET. |
| 15:27 | 2 | **Q.**  THAT'S AFTER THE SETTLEMENT? |
| 15:27 | 3 | **A.**  AFTER. |
| 15:27 | 4 | **Q.**  LET'S TAKE A LOOK AT THE 1979 SOILS PLAN FOR THE LEVEES, |
| 15:27 | 5 | WHICH IS MARKED AS DX-1751, AND TAKE A LOOK AT THE PAGE THAT'S |
| 15:27 | 6 | BATES STAMP NUMBERED XRB006253.  CAN WE FOCUS IN ON THE FOURTH |
| 15:28 | 7 | PARAGRAPH FOR US.  CAN YOU READ THAT FOURTH PARAGRAPH. |
| 15:28 | 8 | **A.**  YES.  "THE APPROACH TO DETERMINE THE TOTAL SETTLEMENT WAS |
| 15:28 | 9 | TO SET THE CROWN AT VARIOUS ELEVATIONS AND COMPUTE THE TOTAL |
| 15:28 | 10 | SETTLEMENT UNDER PRESENT SOIL CONDITIONS.  IT WAS DETERMINED |
| 15:28 | 11 | THAT A GROSS GRADE ELEVATION OF 20 NGVD WAS REQUIRED TO YIELD A |
| 15:28 | 12 | NET SETTLEMENT OF 17.5 NGVD.  THE GROSS GRADE ELEVATION |
| 15:28 | 13 | INCLUDED 2 FEET OF SETTLEMENT COMPUTED, PLUS A 25 PERCENT |
| 15:28 | 14 | INCREASE DUE TO LATERAL SPREAD." |
| 15:28 | 15 | **Q.**  WHAT DOES THIS PARAGRAPH TELL US WHAT THE CORPS KNEW ABOUT |
| 15:28 | 16 | LATERAL DEFORMATION? |
| 15:28 | 17 | **A.**  THEY UNDERSTOOD THAT THERE WOULD BE AN INCREASE IN |
| 15:28 | 18 | SETTLEMENT DUE TO LATERAL DEFORMATION. |
| 15:28 | 19 | **MR. LEVINE:**  DID YOUR HONOR HEAR THAT RESPONSE? |
| 15:28 | 20 | **THE COURT:**  YES. |
| 15:28 | 21 | **MR. LEVINE:**  WOULD YOU LIKE TO HEAR IT AGAIN? |
| 15:28 | 22 | **THE COURT:**  YES. |
| 15:28 | 23 | **BY MR. LEVINE:** |
| 15:29 | 24 | **Q.**  WHAT DOES THIS PARAGRAPH TELL US ABOUT WHAT THE CORPS KNEW |
| 15:29 | 25 | ABOUT LATERAL DEFORMATION? |

FINAL DAILY COPY

MOSHER00056

3016

| | | |
|---|---|---|
| 15:29 | 1 | **A.**   AT THAT TIME THEY UNDERSTOOD THAT YOU WOULD GET LATERAL |
| 15:29 | 2 | DEFORMATION AND IT WOULD INCREASE THE SETTLEMENT. |
| 15:29 | 3 | **Q.**   I WANT TO TAKE A LOOK AT THE 2001 SOILS PLAN, WHICH IS |
| 15:29 | 4 | MARKED AS JX-232.  LET'S TAKE A LOOK AT PAGE 5 OF THAT EXHIBIT. |
| 15:29 | 5 | CAN WE FOCUS IN ON PARAGRAPH 7 ON THAT PAGE.  CAN YOU READ THE |
| 15:29 | 6 | FIRST PARAGRAPH IN SECTION 7. |
| 15:29 | 7 | **A.**   "THE SETTLEMENT ESTIMATES BENEATH THE EARTHEN LEVEE BUILT |
| 15:30 | 8 | TO AN ELEVATION 20 NGVD WERE BASED ON CONSOLIDATION TEST DATA |
| 15:30 | 9 | FROM FOUR NEW, UNDISTURBED SOIL SAMPLES TAKEN FOR THE PROJECT. |
| 15:30 | 10 | THE COMPUTED SETTLEMENT WAS INCREASED BY 25 PERCENT TO INCLUDE |
| 15:30 | 11 | THE EFFECTS OF LATERAL DEFORMATION IN THE FOUNDATION.  AN |
| 15:30 | 12 | ADDITIONAL 10 PERCENT SHRINKAGE OF THE FILL WAS ADDED." |
| 15:30 | 13 | **Q.**   WHAT DOES THIS PARAGRAPH TELL US ABOUT WHAT THE CORPS KNEW |
| 15:30 | 14 | ABOUT LATERAL DISPLACEMENT? |
| 15:30 | 15 | **A.**   THEY UNDERSTOOD THAT THERE WOULD BE LATERAL DISPLACEMENT |
| 15:30 | 16 | TAKING PLACE ON THE LEVEES. |
| 15:30 | 17 | **Q.**   THIS REPORT WAS FOR THE ADDITIONAL LIFT THAT WAS SUPPOSED |
| 15:30 | 18 | TO TAKE PLACE THAT WAS NEVER FUNDED; CORRECT? |
| 15:30 | 19 | **A.**   CORRECT.  YOU CAN SEE BELOW IT TALKS ABOUT BETWEEN |
| 15:30 | 20 | BIENVENUE AND DUPRE. |
| 15:30 | 21 | **Q.**   I WANT TO TAKE A LOOK AT FIGURE 29 FROM PAGE 39 OF |
| 15:30 | 22 | DR. BEA'S APRIL 3 EXPERT REPORT, WHICH IS MARKED AS PX-2118. |
| 15:31 | 23 | **MR. O'DONNELL:**  EXCUSE ME, YOUR HONOR.  COULD I HAVE |
| 15:31 | 24 | THE PX AND PAGE NUMBER OF WHAT'S ON THE BOARD RIGHT NOW.  I |
| 15:31 | 25 | DIDN'T HEAR THAT EARLIER. |

FINAL DAILY COPY

| | | |
|---|---|---|
| 15:31 | 1 | **MR. LEVINE:**  SURE.  JX-232, AND WE ARE LOOKING AT |
| 15:31 | 2 | PAGE 5. |
| 15:31 | 3 | **MR. O'DONNELL:**  THANK YOU VERY MUCH. |
| 15:31 | 4 | BY MR. LEVINE: |
| 15:31 | 5 | **Q.**   I ACTUALLY WANT TO FOCUS ON THE TABLE IN THE UPPER |
| 15:31 | 6 | LEFT-HAND PORTION OF THE FIGURE.  THAT'S PX-2118 AT PAGE 39. |
| 15:31 | 7 | **MR. O'DONNELL:**  EXCUSE ME.  DID YOU SAY 2118 OR 211A? |
| 15:31 | 8 | **MR. LEVINE:**  2118. |
| 15:31 | 9 | **MR. O'DONNELL:**  THANK YOU. |
| 15:31 | 10 | BY MR. LEVINE: |
| 15:32 | 11 | **Q.**   IN HERE, WE SEE THAT THE LEVEE IS STILL SETTLING AFTER |
| 15:32 | 12 | 1980; CORRECT? |
| 15:32 | 13 | **A.**   THAT'S CORRECT. |
| 15:32 | 14 | **Q.**   WHY DOES THAT OCCUR? |
| 15:32 | 15 | **A.**   BECAUSE YOU STILL HAVE PRIMARY CONSOLIDATION TAKING PLACE, |
| 15:32 | 16 | PARTICULARLY IN -- THIS IS ONE THAT'S A WORD I HAVE TROUBLE |
| 15:32 | 17 | WITH.  IT'S THE INTERDISTRIBUTARY CLAY LAYERS.  THOSE CLAY |
| 15:32 | 18 | LAYERS WILL STILL CONTINUE TO SETTLE.  THEY ACTUALLY WILL |
| 15:32 | 19 | CONTINUE TO SETTLE FOR MANY YEARS.  IN '66, WHEN THEY DID THE |
| 15:32 | 20 | DESIGN, THEY CALCULATED THAT THOSE WOULD BE 877 MONTHS TO |
| 15:32 | 21 | CONTINUE TO SETTLE, WHICH IS ABOUT 70 YEARS. |
| 15:32 | 22 | **THE COURT:**  SO WITHIN THE PROFFER ARE YOU SAYING THAT |
| 15:32 | 23 | THE SETTLEMENT IS STRICTLY DUE AT THAT POINT -- THAT IS, AT THE |
| 15:33 | 24 | POINT FROM 1980 ON -- TO THE SETTLEMENT WITHIN THE |
| 15:33 | 25 | INTERDISTRIBUTARY LAYERS RATHER THAN ANY -- FOR LACK OF A |

FINAL DAILY COPY

MOSHER00058

| | | |
|---|---|---|
| 15:33 | 1 | BETTER WORD -- SQUEEZING OR LATERAL DISPLACEMENT EFFECT? |
| 15:33 | 2 | **THE WITNESS:**  AT THAT POINT THERE WAS STILL -- EVERY |
| 15:33 | 3 | TIME YOU PUT A LAYER OF SOIL ON, YOU'RE GOING TO GET SOME |
| 15:33 | 4 | LATERAL DEFORMATION. |
| 15:33 | 5 | **THE COURT:**  I GUESS I'M WONDERING WHY THE NUMBERS ARE |
| 15:33 | 6 | BASICALLY THE SAME. |
| 15:33 | 7 | **THE WITNESS:**  RIGHT.  BECAUSE PRIMARILY IT'S JUST NOW |
| 15:33 | 8 | BECAUSE THEY HAVE PRELOADED BEFORE TIME AND TAKEN A LOT OF THAT |
| 15:33 | 9 | OUT.  NOW IT'S JUST PRIMARILY DUE TO THAT CLAY LAYER BEING |
| 15:33 | 10 | PUSHED OUT.  IT'S SIMILAR TO TAKING A BRICK AND PUTTING IT ON A |
| 15:33 | 11 | SPONGE, AND THAT SPONGE ONLY HAS A REALLY SMALL TUBE FOR THE |
| 15:33 | 12 | WATER TO COME OUT.  IT TAKES A LONG TIME FOR THAT TO COME OUT. |
| 15:33 | 13 | THAT'S WHAT'S HAPPENING.  THAT SETTLEMENT, OVER THE YEARS, IS |
| 15:33 | 14 | SQUEEZING THAT WATER OUT OF THE SOIL.  THE LATERAL DISPLACEMENT |
| 15:33 | 15 | IS SO SMALL AT THAT POINT THAT IT DOESN'T HAVE A MAJOR EFFECT. |
| 15:34 | 16 | **BY MR. LEVINE:** |
| 15:34 | 17 | **Q.**   HOW DOES THE TYPE OF SOIL AFFECT THE CONSOLIDATION IN THE |
| 15:34 | 18 | WATER LEAVING THE LEVEE THAT YOU JUST DESCRIBED? |
| 15:34 | 19 | **A.**   EXCUSE ME.  COULD ASK YOU THAT AGAIN. |
| 15:34 | 20 | **Q.**   SURE.  HOW DOES THE TYPE OF SOIL AFFECT THE CONSOLIDATION |
| 15:34 | 21 | OF THE SOILS AND THE WATER LEAVING THE LEVEE THAT YOU JUST |
| 15:34 | 22 | DESCRIBED? |
| 15:34 | 23 | **A.**   THE HIGHER THE PLASTICITY, THE MORE CLAY-LIKE MATERIAL IN |
| 15:34 | 24 | THE SOIL, THE LONGER IT TAKES FOR THE SOIL TO SQUEEZE THE WATER |
| 15:34 | 25 | OUT AND GET THAT SETTLEMENT.  BECAUSE THEY HAVE A VERY LOW |

FINAL DAILY COPY

MOSHER00059

| | | |
|---|---|---|
| 15:34 | 1 | PERMEABILITY, THAT WATER HAS TO TRAVEL THOSE DISTANCES. |
| 15:34 | 2 | BECAUSE IT'S VERY DENSE, IT TAKES A LONG TIME FOR THAT TO BE |
| 15:34 | 3 | SQUEEZED OUT OF THE OIL. |
| 15:34 | 4 | **Q.**   HOW PLASTIC WAS THE INTERDISTRIBUTARY LAYER? |
| 15:34 | 5 | **A.**   IT'S CONSIDERED A HIGHLY PLASTIC CLAY.  WATER CONTENT IS |
| 15:34 | 6 | BETWEEN 60 AND 70 PERCENT. |
| 15:35 | 7 | **Q.**   DR. BEA TESTIFIED IN HIS DIRECT TESTIMONY ON APRIL 24, |
| 15:35 | 8 | 2009, THAT 50 PERCENT OF THE REACH 2 LEVEES WERE SUBJECTED TO |
| 15:35 | 9 | THE SQUEEZING PROCESS; CORRECT? |
| 15:35 | 10 | **A.**   THAT'S CORRECT. |
| 15:35 | 11 | **Q.**   DO YOU AGREE WITH DR. BEA'S ANALYSIS? |
| 15:35 | 12 | **A.**   NO, I DON'T. |
| 15:35 | 13 | **Q.**   GENERALLY SPEAKING, WHY NOT? |
| 15:35 | 14 | **MR. O'DONNELL:**  OBJECTION WITHIN THE PROFFER. |
| 15:35 | 15 | THERE'S NO FOUNDATION WHAT WORK/ANALYSIS THIS WITNESS HAS EVER |
| 15:35 | 16 | DONE ON THIS SUBJECT.  SO I THINK, EVEN WITHIN A PROFFER, WE |
| 15:35 | 17 | MIGHT BE ENTITLED TO A FOUNDATION. |
| 15:35 | 18 | **THE COURT:**  WELL, THIS IS A PROFFER.  IT'S UP TO |
| 15:35 | 19 | COUNSEL.  I'M NOT GOING TO GET WITHIN A PROFFER.  I HAVE ENOUGH |
| 15:35 | 20 | PROBLEMS.  IF IT'S NOT SUFFICIENTLY ESTABLISHED, IT'S UNLIKELY |
| 15:35 | 21 | IT WILL EVER COME OUT OF THE PROFFER. |
| 15:35 | 22 | **MR. LEVINE:**  YOUR HONOR, I'M WORKING ON LAYING THE |
| 15:35 | 23 | FOUNDATION AS WE SPEAK. |
| 15:35 | 24 | **THE COURT:**  GO AHEAD. |
| | 25 | |

FINAL DAILY COPY

MOSHER00060

| | | |
|---|---|---|
| 15:35 | 1 | **BY MR. LEVINE:** |
| 15:35 | 2 | **Q.**   DO YOU AGREE WITH DR. BEA'S ANALYSIS? |
| 15:35 | 3 | **A.**   I THINK I ANSWERED "NO." |
| 15:35 | 4 | **Q.**   GENERALLY SPEAKING, WHY NOT? |
| 15:35 | 5 | **A.**   BECAUSE WHEN THEY DID THE DESIGN, THEY DESIGNED THEM TO |
| 15:36 | 6 | HAVE A FACTOR OF SAFETY OF 1.3 FOR THE SLOPE STABILITY.  THE |
| 15:36 | 7 | SQUEEZING THAT HE TALKED ABOUT IS LIKE A TUBE DOESN'T OCCUR. |
| 15:36 | 8 | IT'S A LATERAL DEFORMATION DUE TO SLOPE STABILITY. |
| 15:36 | 9 | **Q.**   SO LATERAL DEFORMATION AND SQUEEZING, THAT GOES BY THE |
| 15:36 | 10 | SAME NAME? |
| 15:36 | 11 | **A.**   NO.  A GEOTECHNICAL ENGINEERING DESIGNER OR PEOPLE DOING |
| 15:36 | 12 | ANALYSIS OF SLOPES, THEY WOULD LOOK AT IT AS LATERAL |
| 15:36 | 13 | DISPLACEMENT.  SQUEEZING MEANS THAT YOU'RE PUSHING SOMETHING |
| 15:36 | 14 | OUT.  I MENTIONED SOMETHING LIKE A TUBE, WHERE IT SQUIRTS OUT |
| 15:36 | 15 | INTO THE CHANNEL. |
| 15:36 | 16 | **Q.**   LET'S EXPLAIN THE LATERAL DEFORMATION PROCESS.  HOW DOES |
| 15:36 | 17 | IT WORK? |
| 15:36 | 18 | **A.**   BECAUSE WHEN YOU PLACE A WEIGHT OF MATERIAL ON THE SOIL, |
| 15:36 | 19 | IT'S GOING TO PUSH THE MATERIAL DOWN AND OUT TO THE SIDE.  ALL |
| 15:36 | 20 | EMBANKMENTS THAT ARE BUILT ON SOFT CLAYS WILL HAVE THAT: |
| 15:37 | 21 | HIGHWAY EMBANKMENTS, RAILROAD EMBANKMENTS.  SO IT'S SOMETHING |
| 15:37 | 22 | THAT'S SEEN THAT YOU GET THAT LATERAL DEFORMATION. |
| 15:37 | 23 | ESSENTIALLY, IT MOVES SOME LATERALLY FROM THE CENTERLINE OF THE |
| 15:37 | 24 | MATERIAL.  YOU GET IT ON BOTH THE PROTECTIVE SIDE AND ON THE |
| 15:37 | 25 | FLOOD SIDE. |

FINAL DAILY COPY

| | | |
|---|---|---|
| 15:37 | 1 | **Q.**   BECAUSE THE MATERIAL'S MOVING OUT THE SIDES, THAT'S HOW |
| 15:37 | 2 | YOU START OBTAINING A REDUCTION IN THE LEVEE ELEVATION; |
| 15:37 | 3 | CORRECT? |
| 15:37 | 4 | **A.**   IT GIVES YOU -- BECAUSE IF YOU MOVE THINGS OUT TO THE |
| 15:37 | 5 | SIDE, THERE'S SO MUCH VOLUME, IT'S GOT TO MOVE DOWN. |
| 15:37 | 6 | **Q.**   NOW, DOES THIS LATERAL DEFORMATION PROCESS OCCUR ON JUST |
| 15:37 | 7 | THE FLOOD SIDE, OR DOES IT OCCUR ON THE PROTECTED SIDE AS WELL? |
| 15:37 | 8 | **A.**   IT HAPPENS ON BOTH OF THEM. |
| 15:37 | 9 | **Q.**   NOW, WHAT TYPE OF PHYSICAL EVIDENCE WOULD YOU EXPECT TO |
| 15:37 | 10 | SEE IF THE SQUEEZING PROCESS WAS HAPPENING BECAUSE THE MRGO WAS |
| 15:37 | 11 | CAUSING ADDITIONAL MATERIAL TO SQUEEZE OUT OF THE LEVEE? |
| 15:37 | 12 | **A.**   YOU WOULD EXPECT THAT THE FLOOD SIDE WOULD ACTUALLY HAVE A |
| 15:37 | 13 | LOWERING OF THE SURFACE AND THAT YOU WOULD SEE, POTENTIALLY, |
| 15:37 | 14 | CRACKING ALONG THE CROWN OF THE LEVEE. |
| 15:38 | 15 | **Q.**   NOW, CAN YOU GO TO THE BOARD AND SHOW THE COURT HOW THIS |
| 15:38 | 16 | CRACKING PROCESS WILL TAKE PLACE. |
| 15:38 | 17 | **A.**   OKAY.   THERE'S A LEVEE HERE RUNNING OUT TO THE CHANNEL. |
| 15:38 | 18 | WHAT WOULD HAPPEN IS YOU WOULD GET MOVEMENT OF A LEVEE ALONG |
| 15:38 | 19 | THIS DOTTED LINE.  YOU WOULD START SEEING CRACKS ALONG THIS |
| 15:38 | 20 | SIDE OF IT BECAUSE IT'S SETTLING DOWN AND MOVING OUT TOWARDS |
| 15:38 | 21 | THE CHANNEL. |
| 15:38 | 22 | **THE COURT:**  I UNDERSTAND. |
| 15:38 | 23 | BY MR. LEVINE: |
| 15:39 | 24 | **Q.**   SO WOULD YOU GET A TILTING PROCESS OCCURRING FIRST? |
| 15:39 | 25 | **A.**   YOU WOULD EXPECT TILTING BECAUSE IT'S LOSING ALTITUDE. |

FINAL DAILY COPY

| | | |
|---|---|---|
| 15:39 | 1 | IT'S ACTUALLY MOVING -- MATERIAL IS MOVING OUT AND SETTLING |
| 15:39 | 2 | DOWN.  SO YOU WOULD GET MOVEMENT OUT, AND THEN YOU WOULD SEE |
| 15:39 | 3 | CRACKS BECAUSE IT'S ALSO MOVING AWAY FROM THE SOIL ON THE |
| 15:39 | 4 | PROTECTIVE SIDE. |
| 15:39 | 5 | **Q.**   WOULD THE TILTING BE NOTICEABLE? |
| 15:39 | 6 | **A.**   IT'S NOTICEABLE.  I THINK YOU'LL FIND PLACES THAT, |
| 15:39 | 7 | DEPENDING ON HOW MUCH IT MOVES, YOU KNOW, YOU COULD GET AS MUCH |
| 15:39 | 8 | AS 2 TO 4 FEET OF MOVEMENT FROM ONE SIDE TO ANOTHER.  I THINK |
| 15:39 | 9 | THAT WOULD BE NOTICEABLE IF YOU WALKED THE LEVEES. |
| 15:39 | 10 | **Q.**   WOULD THE CRACKING BE NOTICEABLE? |
| 15:39 | 11 | **A.**   THE CRACKING WOULD BE VERY NOTICEABLE. |
| 15:39 | 12 | **Q.**   DID YOU OR ANYONE ELSE YOU SPOKE WITH REPORT ANY TILTING |
| 15:39 | 13 | OR CRACKING ON THE LEVEES? |
| 15:39 | 14 | **A.**   NO. |
| 15:39 | 15 | **Q.**   NOW, IN DR. BEA'S APRIL 3, 2009 REPORT -- WHICH, AGAIN, |
| 15:39 | 16 | FOR THE RECORD, IS PX-2118 -- DID HE CITE ANY ARTICLES IN |
| 15:39 | 17 | SUPPORT OF HIS OPINION THAT SQUEEZING WOULD OCCUR ON THE |
| 15:40 | 18 | LEVEES? |
| 15:40 | 19 | **A.**   YES.  HE CITED THE KAUFAN AND WEAVER REPORT ABOUT THE |
| 15:40 | 20 | ATCHAFALAYA BASIN. |
| 15:40 | 21 | **Q.**   WHAT DID THE KAUFAN ARTICLE TEST? |
| 15:40 | 22 | **A.**   THEY TESTED THREE EMBANKMENT SECTIONS TO TRY TO DISCOVER |
| 15:40 | 23 | WHICH WAS THE BEST CONSTRUCTION METHOD TO REDUCE THE LEVEL OF |
| 15:40 | 24 | THE SETTLEMENT AND LATERAL DEFORMATION. |
| 15:40 | 25 | **Q.**   IS THIS AN IMPORTANT ARTICLE IN THE FIELD OF GEOTECHNICAL |

FINAL DAILY COPY

MOSHER00063

15:40  1    ENGINEERING?

15:40  2    **A.**   YES.

15:40  3    **Q.**   WHY?

15:40  4    **A.**   IT PROVIDES THE BASIS FOR REDUCING THAT, AND IT TELLS YOU

15:40  5    WHAT ARE SOME OF THE THINGS THAT YOU CAN DO IN THE CONSTRUCTION

15:40  6    METHOD TO REDUCE THAT LATERAL DEFORMATION.

15:40  7    **Q.**   LET'S PULL UP THAT ARTICLE, AND IT'S DX-003.  TAKE A LOOK

15:40  8    AT PAGES 192 AND 193.  IF WE COULD ZOOM IN ON THE BOTTOM

15:40  9    PARAGRAPH IN 192 AND THE TOP PARAGRAPHS IN 193.  IN THAT

15:41  10   ARTICLE THEY WRITE:

15:41  11          "SIX MONTHS AFTER CONSTRUCTION, TEST SECTIONS 1 AND 2

15:41  12   HAD MOVED LATERALLY TO THE EXTENT THAT CRACKS DEVELOPED IN THE

15:41  13   SURFACE OF THE FILLS.  AT BOTH TEST SECTIONS, THE MAJOR LATERAL

15:41  14   MOVEMENTS WERE TOWARD THE FLOODWAY.  AT TEST SECTION 1, THE

15:41  15   CRACKS OCCURRED AT THE LAND-SIDE EDGE OF THE LEVEE

15:41  16   ENLARGEMENTS.  MOST OF THE CRACKS AT TEST SECTION 2 WERE IN THE

15:41  17   LEVEE CROWN, ALTHOUGH SOME WERE IN THE LAND-SIDE LEVEE SLOPE.

15:41  18   HOWEVER, THE OBSERVED CRACKS AT TEST SECTION 2 WERE NOT AS

15:41  19   LARGE AS THOSE AT TEST SECTION 1 AND WERE NOT ACCOMPANIED BY

15:41  20   ANY ABRUPT SETTLEMENT OF THE LEVEE CROWN, AS WAS THE CASE WITH

15:41  21   TEST SECTION 1.  NO CRACKS OR HEAVE ZONES WERE FOUND ON THE

15:41  22   FLOODWAY SIDE OF THE LEVEE."

15:41  23          DID I READ THAT CORRECTLY?

15:41  24   **A.**   YES.

15:41  25   **Q.**   IF WE READ THE NEXT PARAGRAPH, IT SAYS:

FINAL DAILY COPY

MOSHER00064

| | | |
|---|---|---|
| 15:41 | 1 | "MOVEMENT DATA FOR TEST SECTIONS 2 AND 3 SHOW THAT AT |
| 15:42 | 2 | BOTH SECTIONS THE LEVEE CROWN IS SLOWLY SETTLING DOWNWARD AND |
| 15:42 | 3 | THE FOUNDATION IS SPREADING LATERALLY AWAY FROM THE LEVEE |
| 15:42 | 4 | CENTERLINE.  IT IS SIGNIFICANT TO NOTE THAT WHILE THE NEW |
| 15:42 | 5 | INDUCED LEVEE LOAD IS THE SAME AT BOTH TEST SECTIONS 2 AND 3, |
| 15:42 | 6 | THE SETTLEMENT AND LATERAL MOVEMENT AT TEST SECTION 2 ARE |
| 15:42 | 7 | GREATER THAN AT TEST SECTION 3. |
| 15:42 | 8 | "WHILE THESE DIFFERENCES COULD BE DUE TO MINOR |
| 15:42 | 9 | VARIATIONS IN THE FOUNDATION, IT IS LIKELY THAT THE SMALLER |
| 15:42 | 10 | MOVEMENTS AT TEST SECTION 3 ARE THE RESULT OF REDUCED SHEAR |
| 15:42 | 11 | STRESSES IN THE FOUNDATION DUE TO THE STABILIZING EFFECT OF THE |
| 15:42 | 12 | LARGER BERMS DESIGNED FOR A HIGHER FACTOR OF SAFETY AT TEST |
| 15:42 | 13 | SECTION 3.  AS OF MAY 1966, CRACKS HAVE NOT DEVELOPED IN THE |
| 15:42 | 14 | SURFACE OF TEST SECTION 3." |
| 15:42 | 15 | DID I READ THAT CORRECTLY? |
| 15:42 | 16 | **A.**   YES. |
| 15:42 | 17 | **Q.**   JUST TO SUMMARIZE, IT APPEARS THERE WERE THREE TEST |
| 15:42 | 18 | SECTIONS THAT THEY ANALYZED IN THIS ARTICLE; CORRECT? |
| 15:42 | 19 | **A.**   THAT'S CORRECT. |
| 15:42 | 20 | **Q.**   TWO OF THE TEST SECTIONS TILTED? |
| 15:42 | 21 | **A.**   THAT'S CORRECT. |
| 15:42 | 22 | **Q.**   THAT TILTING LED TO CRACKING? |
| 15:42 | 23 | **A.**   THAT'S CORRECT. |
| 15:43 | 24 | **Q.**   ONE OF THE SECTIONS DID NOT CRACK? |
| 15:43 | 25 | **A.**   THAT'S CORRECT.  TEST SECTION 3. |

MOSHER00065

| | | |
|---|---|---|
| 15:43 | 1 | **Q.**   LET'S LOOK INSIDE THIS ARTICLE.  EXPLAIN WHY THE CRACKS |
| 15:43 | 2 | OCCURRED AT TEST SECTIONS 1 AND 2.  IF WE COULD GO TO FIGURE 1 |
| 15:43 | 3 | ON PAGE 181 OF THIS ARTICLE.  FIRST, WHAT DOES THIS FIGURE |
| 15:43 | 4 | SHOW? |
| 15:43 | 5 | **A.**   IT'S A DRAWING THAT'S SHOWING THE LAYOUT OF THE LEVEE, THE |
| 15:43 | 6 | CONSTRUCTION THAT WAS USED FOR THESE TEST SECTIONS. |
| 15:43 | 7 | **Q.**   IN THIS FIGURE, HOW FAR IS THE LEVEE CENTERLINE FROM THE |
| 15:43 | 8 | EDGE OF THE WATER? |
| 15:43 | 9 | **A.**   FROM THE EDGE OF THE WATER, ABOUT 320 FEET. |
| 15:43 | 10 | **Q.**   THAT'S SIMILAR TO THE DISTANCE WHERE DR. BEA FOUND THAT |
| 15:43 | 11 | HIS SQUEEZING PROCESS COULD OCCUR; CORRECT? |
| 15:43 | 12 | **A.**   THAT'S CORRECT. |
| 15:43 | 13 | **Q.**   CAN YOU EXPLAIN WHY TEST SECTION 3 HAD FAR LESS TILTING |
| 15:43 | 14 | AND, THEREFORE, NO CRACKING WAS OBSERVED. |
| 15:43 | 15 | **A.**   YES.  THE MAIN DIFFERENCE BETWEEN TEST SECTION 1, 2, AND 3 |
| 15:44 | 16 | WAS THAT TEST SECTION 1 HAD NO STABILITY BERM IN FRONT OF IT. |
| 15:44 | 17 | THEY CREATED -- ON TEST SECTION 3, THEY HAD A LARGER STABILITY |
| 15:44 | 18 | BERM, AND THEY MADE SURE THAT THE FACTOR OF SAFETY FOR LATERAL |
| 15:44 | 19 | DEFORMATION GLOBAL STABILITY TO BE 1.3, WHERE THE OTHER TWO |
| 15:44 | 20 | SECTIONS HAD A FACTOR OF SAFETY OF 1.1. |
| 15:44 | 21 | **Q.**   LET'S TURN TO FIGURE 4 ON PAGE 186 OF THE KAUFAN ARTICLE, |
| 15:44 | 22 | WHICH IS DX-003.  WHAT DOES THIS FIGURE SHOW? |
| 15:44 | 23 | **A.**   IT SHOWS THE STABILITY CALCULATIONS THAT WERE DONE FOR THE |
| 15:44 | 24 | THREE SECTIONS, WITH THE TOP ONE BEING TEST SECTION 1.  YOU CAN |
| 15:44 | 25 | SEE IN THIS LOCATION RIGHT HERE THAT THE FACTOR OF SAFETY IS |

FINAL DAILY COPY

MOSHER00066

15:44   1   1.11.  YOU CAN SEE THERE'S NO STABILITY BERM OUT IN THIS SPACE.

15:45   2            TEST SECTION 2 HAS A SMALL STABILITY BERM, BUT

15:45   3   ACTUALLY THE FACTORS OF SAFETY HERE IS 1.05 AT THAT LOCATION

15:45   4   AND 1.07 AT THAT LOCATION.

15:45   5            TEST SECTION 3, WHICH IS THE BOTTOM ONE, SHOWS THAT

15:45   6   THE FACTOR OF SAFETY IN THIS LOCATION IS CLOSE TO 3.  IT'S 1.26

15:45   7   IN A COUPLE LOCATIONS.

15:45   8   Q.   LET'S TURN TO PAGE 197 OF THE ARTICLE.  UNDER POINT 4

15:45   9   THERE, CAN WE ZOOM IN ON THAT, PLEASE.  LET ME READ THAT.  IT

15:45  10   SAYS:

15:45  11            "THE TEST SECTION DESIGNED TO HAVE A SAFETY FACTOR OF

15:45  12   ABOUT 1.3 FOR THE CONSTRUCTION CASE USING Q DESIGN STRENGTH,

15:45  13   AND WHICH HAD WIDE STABILITY BERMS, ALSO IS MOVING LATERALLY.

15:46  14   IT HAS MOVED LESS THAN THE SIMILAR SECTION WITH A FACTOR OF

15:46  15   SAFETY OF ABOUT 1.1, AND THUS FAR IT APPEARS TO BE RELATIVELY

15:46  16   STABLE.  HOWEVER, IT IS STILL MOVING SLOWLY, ALTHOUGH THE RATE

15:46  17   OF MOVEMENT IS DECREASING."

15:46  18            DID I READ THAT CORRECTLY?

15:46  19   A.   THAT'S CORRECT.

15:46  20   Q.   IN LAYMAN'S TERMS, WHAT DOES THAT MEAN?

15:46  21   A.   WHAT THEY ARE SHOWING IS THAT THE TEST SECTION 3, WITH A

15:46  22   HIGHER FACTOR OF SAFETY, HAS LESS MOVEMENT AND IS ALSO

15:46  23   DECREASING.  SO THAT WOULD PROVIDE -- IF YOU BUILD THEM WITH

15:46  24   THAT STABILITY BERM AND THAT KIND OF FACTOR OF SAFETY, YOU WILL

15:46  25   REDUCE THE LATERAL DEFORMATION THAT YOU WOULD SEE FROM THE

FINAL DAILY COPY

MOSHER00067

15:46  1  CONSTRUCTION.  CONSTRUCTION IS, GENERALLY, THE WORST CASE FOR

15:46  2  FACTOR OF SAFETY.  YOU USUALLY GAIN STRENGTH WITH TIME.

15:46  3  **Q.**   LET'S TAKE A LOOK OF THE FACTOR OF SAFETY USED BY DR. BEA

15:46  4  IN HIS APRIL 3, 2009 ANALYSIS.  I WANT TO LOOK AT PAGE 5 OF HIS

15:46  5  EXPERT REPORT, WHICH IS MARKED AS PX-2118.  IF WE CAN ZOOM IN

15:47  6  ON THE FIGURES IN THE BOTTOM, RIGHT-HAND CORNER, PLEASE.  WHAT

15:47  7  FACTORS OF SAFETY DID DR. BEA USE TO COMPUTE WHETHER THE

15:47  8  SQUEEZING PROCESS COULD OCCUR ALONG THE REACH 2 LEVEE?

15:47  9  **A.**   HE OBTAINED A FACTOR OF SAFETY OF 1.16 AND .09, SO CLOSE

15:47  10  TO UNITY, WHICH HE STATED AS AN INDICATOR THAT YOU WOULD HAVE

15:47  11  LATERAL SQUEEZING.

15:47  12  **Q.**   HOW DID THESE LOW FACTORS OF SAFETY INFLUENCE RESULTS?

15:47  13  **A.**   WELL, THEY GIVE YOU THE INDICATION THAT WE WOULD HAVE

15:47  14  LATERAL DEFORMATION OR, AS HE PUT IT, LATERAL SQUEEZING TAKING

15:47  15  PLACE OUT INTO THE CHANNEL.

15:47  16  **Q.**   HOW DID DR. BEA OBTAIN SUCH LOW FACTORS OF SAFETY?

15:47  17  **A.**   HE ACTUALLY REDUCED THE SHEAR STRENGTH OF THE SOIL RIGHT

15:47  18  HERE AND RIGHT HERE BY 30 PERCENT AND BY 40 PERCENT.

15:48  19  **Q.**   WELL, LET'S TAKE A LOOK AT PX-72, WHICH IS DR. BEA'S

15:48  20  JULY 11, 2008 DECLARATION 1.  LET'S TAKE A LOOK AT PAGE 175.

15:48  21  IF WE COULD FOCUS IN ON THE FIRST GRAPH THERE.  CAN YOU EXPLAIN

15:48  22  TO THE COURT HOW DR. BEA USED THIS FIGURE.

15:48  23  **A.**   HE LABELED THIS AS A REDUCTION IN EFFECTIVE UNDRAINED

15:48  24  SHEAR STRENGTH AS A FACTOR OF LONG-TERM APPLIED STRESSES.  SO

15:48  25  HE WENT IN HERE WITH AN OCR OF 1 AND CHOSE THIS NUMBER HERE AND

MOSHER00068

| | | |
|---|---|---|
| 15:48 | 1 | SAID THAT MEANS A 30 PERCENT REDUCTION AND THAT MEANS A |
| 15:48 | 2 | 40 PERCENT REDUCTION. |
| 15:48 | 3 | **Q.**   HOW IS THIS CHART TYPICALLY USED? |
| 15:49 | 4 | **A.**   ACTUALLY, FROM THE PAPER THIS IS FROM, THIS ONE HERE, THIS |
| 15:49 | 5 | IS ACTUALLY THE NORMALIZED, UNDRAINED SHEAR STRENGTH.  WHAT I |
| 15:49 | 6 | MEAN BY "NORMALIZED," IT'S A SHEAR STRENGTH AT A LOCATION |
| 15:49 | 7 | DIVIDED BY THE WEIGHT OF THE SOIL ABOVE IT.  THAT'S A COMMON |
| 15:49 | 8 | WAY TO REPRESENT SHEAR STRENGTH.  SO IT ALLOWS YOU TO LOOK |
| 15:49 | 9 | ANYWHERE IN A SOIL PROFILE AND CALCULATE THE SHEAR STRENGTH. |
| 15:49 | 10 | WHAT THIS CHART ACTUALLY IS, IS THE RATE OF |
| 15:49 | 11 | STRENGTH -- HOW FAST YOU LOAD SOMETHING -- IS ACTUALLY |
| 15:49 | 12 | INCREASING IN THIS DIRECTION SO THAT YOU GET WHATEVER THE |
| 15:49 | 13 | HEIGHT IS, PERCENTAGES AT THAT RATE.  THIS IS ACTUALLY THE |
| 15:49 | 14 | SHEAR STRENGTH; IT'S NOT A REDUCTION.  IT SHOWS THAT IF YOU |
| 15:49 | 15 | ACTUALLY INCREASE THE RATE OF SHEAR, THAT YOU ACTUALLY GET AN |
| 15:49 | 16 | INCREASE IN STRENGTH. |
| 15:49 | 17 | **Q.**   YOU INTRODUCED A NEW TERM HERE.  CAN YOU EXPLAIN TO THE |
| 15:49 | 18 | COURT WHAT YOU MEAN BY *SHEAR STRENGTH*. |
| 15:50 | 19 | **A.**   OKAY.  IF I COULD GO TO THE BOARD, I CAN GIVE YOU A SIMPLE |
| 15:50 | 20 | EXPLANATION.  IF YOU HAVE A SOIL, A BLOCK OF SOIL, AND YOU PUSH |
| 15:50 | 21 | ON IT THIS WAY, AND YOU HAVE A FLAT PLATE AND YOU HAVE A FLAT |
| 15:50 | 22 | PLATE HERE PUSHING ON IT THIS WAY, IT SHEARS ALONG THIS LINE. |
| 15:50 | 23 | THAT PEAK STRENGTH IS THE SHEAR STRENGTH OF THAT SOIL.  SO YOU |
| 15:50 | 24 | SHEAR IT OFF.  SO WHATEVER YOU MEASURE IS THE STRENGTH THAT IT |
| 15:50 | 25 | TAKES TO REQUIRE TO SHEAR THAT IS THE SHEAR STRENGTH.  THAT'S |

MOSHER00069

| | | |
|---|---|---|
| 15:50 | 1 | KIND OF A SIMPLE EXPLANATION. |
| 15:50 | 2 | Q.   CAN WE TURN TO PAGE 177 OF THIS DECLARATION.  WHAT WOULD |
| 15:51 | 3 | HAVE HAPPENED IF DR. BEA USED THE FIGURE ON PAGE 175 PROPERLY? |
| 15:51 | 4 | MR. O'DONNELL:  OBJECTION, YOUR HONOR:  COMMENT BY |
| 15:51 | 5 | COUNSEL, "PROPERLY."  IT'S ARGUMENTATIVE. |
| 15:51 | 6 | THE COURT:  I'M GOING TO ALLOW IT, UNDERSTANDING YOUR |
| 15:51 | 7 | OBJECTION, KEEPING IT IN CONTEXT.  CERTAINLY, COUNSEL'S USE OF |
| 15:51 | 8 | THE WORD *PROPERLY* IS MEANINGLESS TO ME SINCE HE'S NOT AN |
| 15:51 | 9 | EXPERT, SO IT'S WHAT THE WITNESS SAYS THAT COUNTS. |
| 15:51 | 10 | WHAT WOULD HAPPEN IF I EDIT OUT THE WORD |
| 15:51 | 11 | *PROPERLY*? |
| 15:51 | 12 | BY MR. LEVINE: |
| 15:51 | 13 | Q.   WHAT WOULD HAPPEN IF DR. BEA USED THIS FIGURE CONSISTENT |
| 15:51 | 14 | WITH THE TESTIMONY YOU JUST PROVIDED? |
| 15:51 | 15 | A.   THERE WOULDN'T BE A REDUCTION IN SHEAR STRENGTH, AND THE |
| 15:51 | 16 | FACTORS OF SAFETY WOULD BE 1.5, ABOUT, AND 1 POINT -- SOMETHING |
| 15:51 | 17 | AROUND 1.4, 1.38.  SO THAT WOULD HAVE GIVEN AN INDICATION THAT |
| 15:52 | 18 | YOU WOULDN'T HAVE LATERAL SQUEEZING, WHICH IS WHAT YOU SAW IN |
| 15:52 | 19 | THE DESIGN.  SO YOU WOULDN'T EXPECT TO HAVE LATERAL SQUEEZING |
| 15:52 | 20 | OR LATERAL DEFORMATION TAKING PLACE THAT YOU WOULD HAVE TO |
| 15:52 | 21 | WORRY ABOUT EXITING OUT INTO THE CHANNEL. |
| 15:52 | 22 | Q.   AGAIN, WHAT WERE THE FACTORS OF SAFETY USED IN |
| 15:52 | 23 | CONSTRUCTING THE LEVEES ALONG REACH 2? |
| 15:52 | 24 | A.   1.3 OR GREATER. |
| 15:52 | 25 | Q.   DID THE REACH 2 LEVEE DESIGN INCLUDE STABILITY BERMS? |

FINAL DAILY COPY

MOSHER00070

| | | |
|---|---|---|
| 15:52 | 1 | **A.**   YES, THEY DID. |
| 15:52 | 2 | **Q.**   DID THE WIDENING OF THE MRGO CHANNEL AFFECT THE FACTORS OF |
| 15:52 | 3 | SAFETY USED IN THE DESIGN? |
| 15:52 | 4 | **A.**   NO, THEY DIDN'T. |
| 15:52 | 5 | **THE COURT:**   LET ME ASK YOU A COUPLE QUESTIONS TO KEEP |
| 15:52 | 6 | ALL THIS WITHIN THE PROFFER AND IN PERSPECTIVE FOR THE COURT. |
| 15:52 | 7 | WHAT DO YOU RECALL AS BEING GENERALLY THE LOWEST POINT ALONG |
| 15:52 | 8 | REACH 2?  DO YOU RECALL? |
| 15:52 | 9 | **THE WITNESS:**   LOWEST AS FAR AS ELEVATION? |
| 15:52 | 10 | **THE COURT:**   UH-HUH. |
| 15:52 | 11 | **THE WITNESS:**   WITHOUT THE WALLS, THE LOWEST |
| 15:53 | 12 | PROBABLY -- THERE WERE SOME SHEET PILE WALLS.  IT WAS ABOUT 12. |
| 15:53 | 13 | **THE COURT:**   WHAT WOULD YOU ATTRIBUTE THAT BEING SO |
| 15:53 | 14 | LOW?  HOW DID THAT HAPPEN? |
| 15:53 | 15 | **THE WITNESS:**   I WOULD ATTRIBUTE IT TO THE SOIL |
| 15:53 | 16 | CONDITIONS THAT ARE UNDERNEATH THERE BECAUSE THEY VARIED |
| 15:53 | 17 | SIGNIFICANTLY ALONG THERE, SO THE MARSH MATERIAL AND THE CLAYS |
| 15:53 | 18 | UNDERNEATH THERE -- |
| 15:53 | 19 | **THE COURT:**   ANY PAPERS ON THAT OR EXPERIMENTS OR |
| 15:53 | 20 | CALCULATIONS? |
| 15:53 | 21 | **THE WITNESS:**   ABOUT THE DIFFERENT MATERIALS? |
| 15:53 | 22 | **THE COURT:**   JUST ABOUT THE PHENOMENON OF A 5-FOOT |
| 15:53 | 23 | SINKING OF A LEVEE. |
| 15:53 | 24 | **THE WITNESS:**   ACTUALLY, THEY CALCULATED THAT THEY |
| 15:53 | 25 | MIGHT ACTUALLY SETTLE 13 FEET IN THE DESIGN.  IN THE DESIGN, |

FINAL DAILY COPY

**MOSHER00071**

| | | |
|---|---|---|
| 15:53 | 1 | THEY CALCULATED 13 FEET OF SETTLEMENT AS A POTENTIAL. |
| 15:53 | 2 | **THE COURT:**  IN THE DESIGN.  YOU MEAN 13 FEET WITHOUT |
| 15:53 | 3 | LIFTS? |
| 15:53 | 4 | **THE WITNESS:**  WHEN YOU PUT THE LIFTS ONTO THE |
| 15:53 | 5 | MATERIAL, THE TOTAL SETTLEMENT WOULD BE 13 FEET OR MORE. |
| 15:53 | 6 | EXCUSE ME.  I HAVE TO SAY, THAT WAS IN THE DESIGN, SO THAT WAS |
| 15:53 | 7 | ONLY TO ELEVATION 14 THAT THEY CALCULATED 13. |
| 15:54 | 8 | **THE COURT:**  SOME THINGS I'M JUST CURIOUS AS TO HOW -- |
| 15:54 | 9 | AND IF YOU'VE DONE ANY STUDIES IN YOUR REPORT THAT WOULD |
| 15:54 | 10 | EXPLAIN THAT, OR EVEN OUTSIDE YOUR REPORT SINCE WE ARE IN THE |
| 15:54 | 11 | PROFFER. |
| 15:54 | 12 | **THE WITNESS:**  IN THE DESIGN, THEY ANTICIPATED THAT |
| 15:54 | 13 | THERE WOULD BE SETTLEMENT.  THEY CALCULATED FOR THE FIRST TWO |
| 15:54 | 14 | LIFTS, OR THE FIRST BRINGING UP OF THE SOIL, THERE WOULD BE |
| 15:54 | 15 | 13 FEET.  THEY KNEW THAT THIS IS A VERY DIFFICULT THING TO |
| 15:54 | 16 | CALCULATE, SO THEY WENT AHEAD AND SAID THEY WERE GOING TO |
| 15:54 | 17 | MONITOR IT AND ADJUST IT AS THEY WENT ALONG. |
| 15:54 | 18 | **THE COURT:**  YOU ATTRIBUTE VIRTUALLY ALL OF -- THE |
| 15:54 | 19 | FACT THAT WE HAD A 12-FOOT LEVEE -- AND I DON'T KNOW IF LIFTS |
| 15:54 | 20 | WERE PUT THERE OR NOT DURING THE COURSE OF THE HISTORY OF THE |
| 15:54 | 21 | LEVEE ALONG REACH 2.  YOU ATTRIBUTE VIRTUALLY ALL OF THAT TO |
| 15:55 | 22 | THE NATURE OF THE SOILS OR MATERIALS UNDERNEATH THE LEVEE? |
| 15:55 | 23 | **THE WITNESS:**  CORRECT. |
| 15:55 | 24 | **THE COURT:**  I'LL LEAVE THAT.  BY THE WAY, I AM NOT |
| 15:55 | 25 | GOING TO PENALIZE PLAINTIFF UNLESS PLAINTIFF GOES AMUCK IN THE |

FINAL DAILY COPY

MOSHER00072

| | |
|---|---|
| 15:55 | 1 |
| 15:55 | 2 |
| 15:55 | 3 |
| 15:55 | 4 |
| 15:55 | 5 |
| 15:55 | 6 |
| 15:55 | 7 |
| 15:55 | 8 |
| 15:55 | 9 |
| 15:55 | 10 |
| 15:55 | 11 |
| 15:55 | 12 |
| 15:55 | 13 |
| 15:55 | 14 |
| 15:56 | 15 |
| 15:56 | 16 |
| 15:56 | 17 |
| 15:56 | 18 |
| 15:56 | 19 |
| 15:56 | 20 |
| 15:56 | 21 |
| 15:56 | 22 |
| 15:56 | 23 |
| 15:56 | 24 |
| 15:56 | 25 |

CROSS-EXAMINATION OF THE PROFFER.  I'M NOT GOING TO COUNT THAT

TOWARDS YOUR TIME.

        **MR. O'DONNELL:**  THANK YOU, YOUR HONOR.

        **THE COURT:**  GO AHEAD.

**BY MR. LEVINE:**

**Q.**  THE REACH 2 LEVEE DESIGN INCLUDED STABILITY BERMS;

CORRECT?

**A.**  THAT'S CORRECT.

**Q.**  DID THE WIDENING OF THE MRGO CHANNEL AFFECT THE FACTORS OF

SAFETY USED IN THE DESIGN?

**A.**  NO.  THEY ACTUALLY EVALUATED THE CHANGING DISTANCES TO

MAKE SURE THAT THEY WOULDN'T FAIL -- THAT THEY MAINTAINED A

FACTOR OF SAFETY OF 1.3.  EXCUSE ME.

**Q.**  DID THE BANKS OF THE MRGO REACH THE TOES OF THE REACH 2

LEVEE STABILITY BERMS?

**A.**  I DON'T BELIEVE THEY HAVE.

**Q.**  IF DR. BEA USED THE FACTOR OF SAFETY SPECIFIED IN THE

REACH 2 LEVEE DESIGN, WHAT RESULTS WOULD HE HAVE LIKELY

OBTAINED?

**A.**  HE WOULD HAVE GOTTEN AN INDICATION THAT THE LEVEES

POTENTIALLY WOULD BE FAILING OR MOVING TOWARDS THE CHANNEL.

**Q.**  NOW, I WANT TO TAKE A LOOK AT ANOTHER ASPECT OF THE KAUFAN

ARTICLE, WHICH IS DX-003.  IF WE COULD TAKE A LOOK AT PAGE 191

AND LOOK AT FIGURE 8, PLEASE.  THIS IS FOR TEST SECTION 2,

WHICH WE DISCUSSED EARLIER; CORRECT?

FINAL DAILY COPY

**MOSHER00073**

| | | |
|---|---|---|
| 15:56 | 1 | **A.**   CORRECT.  I CAN'T SEE THE BOTTOM OF IT.  YES. |
| 15:57 | 2 | **Q.**   IN VERY, VERY GENERAL TERMS, WHAT DOES THIS FIGURE SHOW? |
| 15:57 | 3 | **A.**   AT THE TOP IT SHOWS SETTLEMENT PLATES THAT WERE PLACED AT |
| 15:57 | 4 | THE SURFACE OF THE LEVEE AND BOTH SIDES OF THE STRUCTURE, |
| 15:57 | 5 | PROTECTIVE SIDE AND FLOOD SIDE AWAY FROM THE LEVEE. |
| 15:57 | 6 | THIS ONE IS A MEASUREMENT OF SETTLEMENTS UNDERNEATH |
| 15:57 | 7 | THE LEVEE WITH DEPTH, WHERE THEY PLACED SETTLEMENT PLUGS, WHERE |
| 15:57 | 8 | THEY COULD GO DOWN AND MEASURE HOW MUCH WAS SETTLING. |
| 15:57 | 9 | THEN THIS IS THE MOVEMENT OF THE LEVEES.  THIS IS ON |
| 15:57 | 10 | THE LAND SIDE OR THE PROTECTIVE SIDE, AND THIS IS ON THE |
| 15:57 | 11 | FLOODWAY SIDE, THIS BEING THE CENTERLINE OF THE MATERIAL. |
| 15:57 | 12 | THEY'RE AT DISTANCES AWAY FROM THE LEVEE. |
| 15:57 | 13 | **Q.**   I WANT TO FOCUS ON THIS THIRD SET OF GRAPHS ON THERE. |
| 15:57 | 14 | LET'S JUST TRY TO EXPLAIN WHAT THEY MEAN.  LS STANDS FOR LAND |
| 15:57 | 15 | SIDE, WHICH IS THE PROTECTIVE SIDE; CORRECT? |
| 15:57 | 16 | **A.**   THAT'S CORRECT. |
| 15:57 | 17 | **Q.**   FWS STANDS FOR FLOOD WAVE SIDE, WHICH IS THE FLOOD SIDE; |
| 15:58 | 18 | CORRECT? |
| 15:58 | 19 | **A.**   CORRECT.  THE CHANNEL ON THE SIDE OF THE LEVEE. |
| 15:58 | 20 | **Q.**   THEN THIS BIG SPOT IN THE MIDDLE THERE, THAT'S THE |
| 15:58 | 21 | CENTERLINE OF THE LEVEE; CORRECT? |
| 15:58 | 22 | **A.**   THAT'S A GOOD WAY TO LAY IT OUT SO YOU UNDERSTAND WHAT |
| 15:58 | 23 | YOU'RE LOOKING AT. |
| 15:58 | 24 | **Q.**   ABOVE EACH FIGURE IN THE GRAPH THERE'S A DISTANCE? |
| 15:58 | 25 | **A.**   THAT'S THE DISTANCE AWAY FROM THE CENTERLINE OF THE LEVEE. |

FINAL DAILY COPY

MOSHER00074

| | | |
|---|---|---|
| 15:58 | 1 | **Q.**   EACH ONE OF THESE GRAPHS MEASURES THE AMOUNT OF LATERAL |
| 15:58 | 2 | DISPLACEMENT IN INCHES; CORRECT? |
| 15:58 | 3 | **A.**   THAT'S CORRECT. |
| 15:58 | 4 | **Q.**   SO IF WE LOOK AT THE ONE MARKED "55 FEET FWS," WHICH IS |
| 15:58 | 5 | THE FOURTH ONE IN -- |
| 15:58 | 6 | **A.**   THIS ONE HERE? |
| 15:58 | 7 | **Q.**   YES.  I SEE SOME WRITING UNDER EACH LINE.  CAN YOU EXPLAIN |
| 15:59 | 8 | WHAT THAT MEANS. |
| 15:59 | 9 | **A.**   YES.  EACH ONE OF THOSE REPRESENT A TIME WHEN THIS |
| 15:59 | 10 | MEASUREMENT WAS MADE, STARTING WITH MARCH '65, MAY '65, UP TO |
| 15:59 | 11 | THE LAST ONE, I THINK, IS DECEMBER '65. |
| 15:59 | 12 | **Q.**   THEN THOSE LINES CORRESPOND TO THE LINES IN THE OTHER SET |
| 15:59 | 13 | OF THESE SIX FIGURES; CORRECT? |
| 15:59 | 14 | **A.**   THAT'S CORRECT. |
| 15:59 | 15 | **Q.**   NOW THAT WE'VE ORIENTED OURSELVES TO WHAT THIS GRAPH |
| 15:59 | 16 | SHOWS, CAN YOU EXPLAIN TO THE COURT WHAT THE RESULT OF THIS |
| 15:59 | 17 | GRAPH IS. |
| 15:59 | 18 | **A.**   WELL, THIS IS THE MOVEMENT LATERALLY WITH DEPTH. |
| 15:59 | 19 | **Q.**   CAN WE LOOK AT ALL SIX IN CONTEXT. |
| 15:59 | 20 | **A.**   WHAT YOU CAN SEE IS THAT AT EACH OF THESE LOCATIONS -- |
| 16:00 | 21 | SAY, LOOK AT '55 LAND SIDE, '55 FLOOD SIDE -- THAT YOU HAVE THE |
| 16:00 | 22 | MOVEMENT THAT'S TAKING PLACE LATERALLY.  IT'S ABOUT 24 INCHES |
| 16:00 | 23 | FOR THIS ONE HERE.  ON THAT SIDE AND ON THIS SIDE, IT'S ABOUT |
| 16:00 | 24 | 16, I THINK.  THERE IS A LITTLE GREATER MOVEMENT ON THE FLOOD |
| 16:00 | 25 | SIDE. |

FINAL DAILY COPY

MOSHER00075

| | | |
|---|---|---|
| 16:00 | 1 | THE OTHER THING YOU NOTICE IS, AS YOU'RE MOVING |
| 16:00 | 2 | TOWARDS THIS 185 FEET, AWAY FROM THE CENTERLINE OF THE LEVEE, |
| 16:00 | 3 | THAT THE MOVEMENTS ARE GETTING SMALLER.  SO IT'S MOVING A |
| 16:00 | 4 | LITTLE BIT AT THOSE LOCATIONS, BUT THE SOIL IS ACTUALLY |
| 16:00 | 5 | COMPRESSING IN BETWEEN, SO IT'S PUSHING -- YOU'RE GETTING |
| 16:00 | 6 | RESISTANCE OUT HERE AT THIS SIDE, SO THE MOVEMENT IS LESS.  BUT |
| 16:00 | 7 | WE NOTICE THAT ON BOTH SIDES OF THE LEVEE, YOU'RE GETTING |
| 16:00 | 8 | MOVEMENT TAKING PLACE, THAT LATERAL SPREAD. |
| 16:00 | 9 | THE COURT:  IN THE KAUFAN STUDY, HOW DID THEY ADJUST |
| 16:01 | 10 | FOR THE SOILS UNDERNEATH THE MATERIAL IN THE EXPERIMENTAL AREA? |
| 16:01 | 11 | THE WITNESS:  ADJUSTING -- |
| 16:01 | 12 | THE COURT:  I MEAN, BECAUSE THE SOILS AND THE |
| 16:01 | 13 | MATERIALS UNDERNEATH THE REACH 2 LEVEE FOR MRGO YOU'VE ALREADY |
| 16:01 | 14 | TESTIFIED WERE PART OF THE REASON THAT IT SHRUNK, HOW DID THEY |
| 16:01 | 15 | FACTOR THAT IN HERE AND WHETHER SOIL IS COMPARABLE TO THE -- |
| 16:01 | 16 | THE MATERIALS THEMSELVES COMPARABLE TO WHAT'S UNDER THE |
| 16:01 | 17 | REACH 2? |
| 16:01 | 18 | THE WITNESS:  THEY DO MENTION THAT THE CLAY LAYER |
| 16:01 | 19 | THAT'S UNDERNEATH THIS DOESN'T GET SOME IMMEDIATE SETTLEMENT |
| 16:01 | 20 | INITIALLY FROM BUILDING ON IT.  BUT THE LONG-TERM SETTLEMENT, |
| 16:01 | 21 | IT HASN'T BEEN THERE LONG ENOUGH DURING THIS YEAR TO ATTAIN |
| 16:01 | 22 | MUCH SETTLEMENT. |
| 16:01 | 23 | THE COURT:  THANK YOU. |
| 16:01 | 24 | BY MR. LEVINE: |
| 16:01 | 25 | Q.   THESE FIGURES ARE FOR TEST SECTION 2; CORRECT? |

FINAL DAILY COPY

MOSHER00076

16:01   1    **A.**   CORRECT.

16:01   2    **Q.**   THIS WAS ONE OF THE SITES WHERE CRACKING WAS OBSERVED?

16:02   3    **A.**   THAT'S CORRECT.  BECAUSE YOU MOVE -- THIS MATERIAL HERE IS

16:02   4    MOVED AWAY FROM THE LEVEE AND THIS HERE, ALL OF THAT IS MOVING

16:02   5    AWAY.  THAT MEANS A VOLUME OF MATERIAL HAD TO MOVE; EITHER BE

16:02   6    COMPRESSED OR MOVE OUT TO THE LATERAL SIDE AS WELL AS DOWN.

16:02   7    **Q.**   LET'S TAKE A LOOK AT ANOTHER TEST SECTION.  FOR THAT I

16:02   8    WANT TO LOOK AT PAGE 192 OF THIS PAPER.  IF WE COULD TAKE A

16:02   9    LOOK AT FIGURE 9, PLEASE.  NOW, THIS IS FROM TEST SECTION 3;

16:02   10   CORRECT?

16:02   11   **A.**   THAT'S CORRECT.

16:02   12   **Q.**   AT THIS LOCATION WE DIDN'T OBSERVE ANY TILTING OR

16:03   13   CRACKING?

16:03   14   **A.**   THAT'S CORRECT.

16:03   15   **Q.**   NOW, CAN YOU EXPLAIN WHAT YOU SEE IN THE THIRD SET OF

16:03   16   GRAPHS ABOVE SLOPE INCLINOMETER DATA AGAIN.

16:03   17   **A.**   AGAIN, YOU SEE MOVEMENT TAKING PLACE LATERALLY ON BOTH

16:03   18   SIDES, BUT IT'S SIGNIFICANTLY LESS.  IT'S ONLY ABOUT 16 INCHES

16:03   19   OUT HERE.  IT'S LESS THAN 16 INCHES.  IT'S MUCH LESS.  THERE IS

16:03   20   SIGNIFICANTLY LESS MOVEMENT.  THIS ONE IS A LITTLE LESS THAN

16:03   21   16 INCHES HERE, ABOUT 8 INCHES HERE, AND ABOUT 8 INCHES OUT IN

16:03   22   HERE.

16:03   23   **Q.**   IS THAT LESS MOVEMENT?  IS THAT WHY YOU CAN'T NOTICE THE

16:04   24   TILTING AND THE CRACKING IN THE LEVEE?

16:04   25   **A.**   YES.  THAT WOULD BE LESS VOLUME CHANGE MOVING DOWN BECAUSE

FINAL DAILY COPY

MOSHER00077

16:04    1    OF THAT.

16:04    2    **Q.**    LET'S COMPARE THESE RESULTS TO THE 1979 SOILS DOCUMENT

16:04    3    THAT WE LOOKED AT EARLIER, AND THAT'S DX-1751.  LET'S TAKE A

16:04    4    LOOK AT PAGE XRB006-253.  NOW, IN LIGHT OF THE KAUFAN ARTICLE,

16:04    5    CAN YOU EXPLAIN WHAT IS MEANT WHEN IT IS SAID THAT LATERAL

16:04    6    DEFORMATION IS EXPECTED TO OCCUR.

16:04    7    **A.**    WELL, BASED ON WHAT THEY SAW IN THOSE ARTICLES, THEY

16:04    8    EXPECTED THERE WOULD BE SOME LATERAL DEFORMATION TAKING PLACE.

16:04    9    BECAUSE OF THE WAY THEY CALCULATE THIS -- AND EVEN IN THIS

16:05   10    TIME, IN 1979, IT WAS A HAND CALCULATION.  IT'S CONSIDERED A

16:05   11    ONE-DIMENSIONAL -- THEY CALCULATE JUST A VERTICAL SETTLEMENT.

16:05   12    THEY'RE GOING TO ACCOUNT FOR THAT LATERAL DEFORMATION BY

16:05   13    INCREASING THAT BY 25 PERCENT.

16:05   14    **BY MR. LEVINE:**

16:05   15    **Q.**    IN YOUR OPINION, WAS IT THE MRGO CAUSING THE LATERAL

16:05   16    DEFORMATION?

16:05   17             **THE COURT:**  CERTAINLY NOT IN THE ATCHAFALAYA STUDY.

16:05   18    ARE WE ON THE ATCHAFALAYA STUDY?

16:05   19             **MR. LEVINE:**  NO.  WE'RE TALKING ABOUT DX-1751.

16:05   20             **THE COURT:**  I'M SORRY.  I MAY HAVE MISSED SOMETHING.

16:05   21             **MR. LEVINE:**  THIS IS FROM DX-1751.

16:05   22             **THE COURT:**  I APOLOGIZE, COUNSEL.  THIS IS FROM

16:05   23    HIS --

16:05   24             **MR. LEVINE:**  FROM THE 1979 SOILS REPORT FOR THE

16:05   25    LAKE PONTCHARTRAIN AND VICINITY HURRICANE PROTECTION PROJECT.

                              FINAL DAILY COPY

MOSHER00078

3038

16:05    1              THE COURT:  IT'S MY UNDERSTANDING THAT THE

16:05    2   ATCHAFALAYA DID HAVE SOME EFFECT ON THE ATCHAFALAYA STUDY.

16:05    3              THE WITNESS:  YES.

16:05    4              THE COURT:  THE CHANNEL DID HAVE SOME EFFECT THERE

16:05    5   AND --

16:06    6              THE WITNESS:  THE CHANNEL DIDN'T AS MUCH -- THE FACT

16:06    7   THAT IT TILTED THERE, BUT THERE WAS NO SQUEEZING INTO THE

16:06    8   CHANNEL.  IT'S JUST LATERAL DEFORMATION.

16:06    9              THE COURT:  SO YOU'RE SAYING HAD THERE BEEN NO

16:06   10   CHANNEL, WOULD THERE HAVE BEEN AS MUCH LATERAL DEFORMATION IN

16:06   11   THE ATCHAFALAYA STUDY?

16:06   12              THE WITNESS:  IF THE SLOPES WERE THE SAME --

16:06   13              THE COURT:  YOU SEE, MY QUESTION IS:  HAD THERE BEEN

16:06   14   NO ATCHAFALAYA RIVER AND THE ATCHAFALAYA STUDY TOOK PLACE IN

16:06   15   THE PRECISE LOCATION IT DID, WOULD THERE HAVE BEEN AS MUCH

16:06   16   LATERAL DEFORMATION?  YOU CAN SAY, "YES," "NO," OR YOU DON'T

16:06   17   KNOW, AND THEN ANSWER THE QUESTION.

16:06   18              THE WITNESS:  I DON'T BELIEVE THERE WOULD HAVE BEEN.

16:06   19   THERE STILL WOULD HAVE BEEN LATERAL DEFORMATION.  I GUESS I

16:06   20   WANT TO EXPLAIN A LITTLE BIT.

16:06   21              THE COURT:  YOU CAN EXPLAIN IT, BUT ANSWER MY

16:06   22   QUESTION.  MY QUESTION IS:  HAD IT BEEN BUILT THERE WITHOUT THE

16:06   23   ATCHAFALAYA RIVER, WOULD THERE HAVE BEEN AS MUCH LATERAL

16:06   24   DISPLACEMENT?

16:06   25              THE WITNESS:  IF ALL THE SLOPES WERE THE SAME, YES,

FINAL DAILY COPY

MOSHER00079

| | | |
|---|---|---|
| 16:06 | 1 | THERE WOULD HAVE BEEN. |
| 16:06 | 2 | **THE COURT:**  IF ALL WHAT? |
| 16:06 | 3 | **THE WITNESS:**  IF THE SLOPES WOULD HAVE BEEN THAT WAY |
| 16:06 | 4 | AND THE CONSTRUCTION HAD BEEN THAT WAY.  THE WATER DIDN'T -- |
| 16:06 | 5 | THE FACT THAT THE CHANNEL WAS THERE AND THE WATER THERE WERE -- |
| 16:07 | 6 | **THE COURT:**  SO YOU'RE TELLING ME THAT HAD THEY DONE |
| 16:07 | 7 | IT ANYWHERE WITH THE SAME -- |
| 16:07 | 8 | **THE WITNESS:**  SLOPES.  THE GEOMETRY -- IF THE |
| 16:07 | 9 | GEOMETRY HAD BEEN THE SAME -- |
| 16:07 | 10 | **THE COURT:**  YOU'RE SAYING THAT THE RIVER HAD NO |
| 16:07 | 11 | EFFECT ON WHAT TOOK PLACE IN THAT EXPERIMENT? |
| 16:07 | 12 | **THE WITNESS:**  IF ALL THE SLOPES, ALL THE GEOMETRY -- |
| 16:07 | 13 | **THE COURT:**  DID THE RIVER HAVE ANY EFFECT OR NOT IN |
| 16:07 | 14 | THE EXPERIMENT? |
| 16:07 | 15 | **THE WITNESS:**  I WOULD SAY THE RIVER ITSELF DID NOT. |
| 16:07 | 16 | IT'S THE GEOMETRY THAT'S THERE. |
| 16:07 | 17 | **THE COURT:**  SO YOU'RE SAYING THAT IF THE GEOMETRY |
| 16:07 | 18 | WOULD HAVE BEEN -- IF YOU WOULD HAVE HAD NO BERM -- OF COURSE, |
| 16:07 | 19 | THERE WOULD BE NO REASON FOR A BERM.  I GUESS I'M A LITTLE |
| 16:07 | 20 | CONFUSED BY THAT.  I'LL BE FRANK.  SO I REMAIN CONFUSED. |
| 16:07 | 21 | **THE WITNESS:**  OKAY. |
| 16:07 | 22 | **THE COURT:**  WHY WOULD YOU HAVE A BERM IF THERE'S NO |
| 16:07 | 23 | CHANNEL? |
| 16:07 | 24 | **THE WITNESS:**  WELL, IF YOU WERE BUILDING THESE EVEN |
| 16:07 | 25 | OUT IN A -- SAY WE HAVE A LEVEL SURFACE AND YOU'RE BUILDING |

FINAL DAILY COPY

MOSHER00080

| | | |
|---|---|---|
| 16:08 | 1 | THESE.  YOU PLACE A STABILITY BERM TO REDUCE THAT LATERAL |
| 16:08 | 2 | DEFORMATION BECAUSE IT WILL MOVE.  IF IT MOVES ENOUGH, IT'LL |
| 16:08 | 3 | CAUSE CRACKING IN THE -- |
| 16:08 | 4 | **THE COURT:**  IF THE ATCHAFALAYA WOULD'VE BEEN -- |
| 16:08 | 5 | DIDN'T YOU TESTIFY -- CLEAR ME UP ON THIS.  WE'RE IN THE |
| 16:08 | 6 | PROFFER. |
| 16:08 | 7 | IF THE ATCHAFALAYA RIVER WOULD HAVE BEEN |
| 16:08 | 8 | IMMEDIATELY ADJACENT TO THE LEVEE, WOULD THE LATERAL |
| 16:08 | 9 | DISPLACEMENT HAVE BEEN MORE THAN IT WAS WITH THE BERM? |
| 16:08 | 10 | **THE WITNESS:**  YES. |
| 16:08 | 11 | **THE COURT:**  THE RIVER WOULD HAVE SOME FUNCTION? |
| 16:08 | 12 | **THE WITNESS:**  YES, BUT THERE'S -- |
| 16:08 | 13 | **THE COURT:**  THAT'S ALL I WANTED TO KNOW.  THANK YOU. |
| 16:08 | 14 | **MR. O'DONNELL:**  YOUR HONOR, I'M SORRY TO RISE, BUT I |
| 16:08 | 15 | BELIEVE THIS EXHIBIT, WHICH I'M TOLD IS DX-1751, HAS NEVER BEEN |
| 16:08 | 16 | ON THE GOVERNMENT'S EXHIBIT LIST.  SO WITHIN A PROFFER ON AN |
| 16:08 | 17 | OPINION NEVER RENDERED, I HAVE AN EXHIBIT NEVER SEEN. |
| 16:08 | 18 | **THE COURT:**  IT'S A PROFFER, SO I'M GOING TO CERTAINLY |
| 16:08 | 19 | ALLOW YOU TO INTRODUCE IT IN THE PROFFER. |
| 16:08 | 20 | **MR. LEVINE:**  THANK YOU, YOUR HONOR. |
| 16:08 | 21 | **THE COURT:**  TELL ME WHAT THAT IS AGAIN.  YOU TOLD ME. |
| 16:08 | 22 | I'M SORRY.  I'M TRYING TO UNDERSTAND THIS AS BEST I CAN.  I'M |
| 16:09 | 23 | JUST WORKING AT IT.  IF I SEEM FRUSTRATED, IT'S ONLY BECAUSE OF |
| 16:09 | 24 | MY LIMITED ABILITIES TO COMPREHEND CERTAIN THINGS.  GO AHEAD. |
| | 25 | |

FINAL DAILY COPY

MOSHER00081

16:09    1   **BY MR. LEVINE:**

16:09    2   **Q.**   IS THE LATERAL DEFORMATION PROCESS SEEN IN PLACES WHERE

16:09    3   THERE'S NO RIVER OR CHANNEL NEXT TO A STRUCTURE?

16:09    4          **THE COURT:**  I'LL TAKE JUDICIAL NOTICE -- THE COURT OF

16:09    5   APPEAL JUST ADMONISHED ME ABOUT THAT, NOT TO BE TOO QUICK ABOUT

16:09    6   THAT.  FOR THE PURPOSES OF THIS CASE, LET ME SAY THAT I

16:09    7   UNDERSTAND THAT IT WILL TAKE PLACE REGARDLESS OF A CHANNEL.  I

16:09    8   BELIEVE THAT.  I AM SO CONVINCED UNTIL OTHERWISE UNCONVINCED.

16:09    9   **BY MR. LEVINE:**

16:09   10   **Q.**   THANK YOU.  NOW, I WANT TO LOOK A LITTLE BIT MORE AT

16:09   11   DR. BEA'S TEST SITES IN HIS APRIL REPORT --

16:09   12          **THE COURT:**  TELL ME WHEN WE GET OFF THE PROFFER.

16:10   13          **MR. LEVINE:**  I WILL TELL YOU WHEN WE'RE OFF THE

16:10   14   PROFFER, YOUR HONOR.

16:10   15   **BY MR. LEVINE:**

16:10   16   **Q.**   PX-2118.  FOR THE 12 MILES OF THE REACH 2 LEVEES, HOW MANY

16:10   17   TEST SITES DID DR. BEA EXAMINE TO DETERMINE WHETHER THIS

16:10   18   SQUEEZING PROCESS WAS OCCURRING?

16:10   19   **A.**   IN HIS REPORT OF APRIL, IT WAS ONLY TWO.

16:10   20   **Q.**   I WANT TO TAKE A LOOK AT THE FIRST TEST SITE, WHICH IS

16:10   21   SHOWN ON FIGURE 12 OF PAGE 20 OF PX-2118.

16:10   22          **MR. O'DONNELL:**  YOUR HONOR, I HAVE TO OBJECT AGAIN

16:10   23   WITHIN THE PROFFER.  I DON'T THINK THE APRIL REPORT IS IN

16:10   24   EVIDENCE, IS IT?  I DON'T THINK THE APRIL REPORT IS IN

16:10   25   EVIDENCE.

FINAL DAILY COPY

MOSHER00082

| | | |
|---|---|---|
| 16:10 | 1 | **THE COURT:** WELL, IT SORT OF IS. I'M NOT SURE HOW |
| 16:10 | 2 | MUCH OF IT IS. |
| 16:10 | 3 | **MR. O'DONNELL:** OKAY. |
| 16:10 | 4 | **THE COURT:** SOME OF IT IS. I'M NOT SURE HOW MUCH. |
| 16:10 | 5 | SOME OF IT CAME IN AND, FRANKLY, I DON'T KNOW HOW MUCH. |
| 16:11 | 6 | **MR. O'DONNELL:** OKAY. THANK YOU, YOUR HONOR. |
| 16:11 | 7 | **BY MR. LEVINE:** |
| 16:11 | 8 | **Q.** NOW, WHAT WAS THE PROTECTIVE ELEVATION OF THIS SITE AT THE |
| 16:11 | 9 | TIME OF THE HURRICANE? |
| 16:11 | 10 | **THE COURT:** I THINK THAT WE HAD TALKED ABOUT TWO |
| 16:11 | 11 | SAMPLES; THE ONES IN THE MILK CARTON. I DON'T KNOW IF THIS WAS |
| 16:11 | 12 | IT OR SOMETHING ELSE. |
| 16:11 | 13 | **MR. LEVINE:** I BELIEVE THIS IS A DIFFERENT PAGE FROM |
| 16:11 | 14 | THE REPORT. |
| 16:11 | 15 | **BY MR. LEVINE:** |
| 16:11 | 16 | **Q.** WHAT WAS THE PROTECTIVE ELEVATION OF THIS SITE AT THE TIME |
| 16:11 | 17 | OF THE HURRICANE? |
| 16:11 | 18 | **A.** IT'S SLIGHTLY ABOVE 17.5. IT'S ABOUT 18. |
| 16:11 | 19 | **Q.** IF WE CAN TURN TO PAGE 21 OF THIS SAME REPORT AND LOOK AT |
| 16:11 | 20 | FIGURE 13. |
| 16:11 | 21 | **A.** AGAIN, THIS ONE IS THE SECOND TEST SITE, WHICH HAS AN |
| 16:11 | 22 | ELEVATION OF ABOUT 18 AT THE TIME OF HURRICANE KATRINA, FROM |
| 16:11 | 23 | HIS REPORT. |
| 16:12 | 24 | **Q.** I WANT TO TAKE A LOOK AT FIGURE 16 ON PAGE 24 OF THIS |
| 16:12 | 25 | REPORT. CAN YOU DETECT ANY DIFFERENCES IN THE TYPES OF SOIL |

FINAL DAILY COPY

| | | |
|---|---|---|
| 16:12 | 1 | USED FOR TEST SITE 1 AND TEST SITE 2? |
| 16:12 | 2 | **A.**   THE FIRST THING I NOTICE IS THIS IS DESCRIBED AS A SOFT |
| 16:12 | 3 | MARSH MATERIAL; THIS IS DESCRIBED AS A FIRM MARSH MATERIAL. |
| 16:12 | 4 | **Q.**   HOW WOULD THIS DIFFERENCE IN MARSH TYPES INFLUENCE THE |
| 16:12 | 5 | PROTECTED ELEVATION OF THE LEVEES? |
| 16:12 | 6 | **A.**   THE SOFTER MARSH MATERIAL WILL HAVE MORE SETTLEMENT AND |
| 16:12 | 7 | HAVE LESS STRENGTH.  THE FIRMER -- EXCUSE ME.  THE SOFTER |
| 16:12 | 8 | MATERIAL WILL HAVE MORE SETTLEMENT, LESS STRENGTH.  THE STIFFER |
| 16:12 | 9 | MATERIAL WILL BE STRONGER AND HAVE LESS SETTLEMENT. |
| 16:12 | 10 | **Q.**   WELL, LET'S TAKE A LOOK A LITTLE FURTHER AT THE |
| 16:12 | 11 | DIFFERENCES BETWEEN DR. BEA'S SITE SELECTION, AND I WANT TO |
| 16:12 | 12 | LOOK AT FIGURE 15 ON PAGE 23 OF THIS REPORT.  IF WE COULD ZOOM |
| 16:13 | 13 | IN AROUND WHERE IT SAYS SITE 1 AND SITE 2.  WHAT TYPES OF SOILS |
| 16:13 | 14 | MAKE UP -- |
| 16:13 | 15 | **THE COURT:**  WHAT ARE WE LOOKING AT NOW, SIR? |
| 16:13 | 16 | **MR. LEVINE:**  THIS IS FIGURE 15 ON PAGE 23 OF |
| 16:13 | 17 | DR. BEA'S APRIL 3 REPORT. |
| 16:13 | 18 | **THE COURT:**  AGAIN, I DON'T KNOW IF THAT'S IN EVIDENCE |
| 16:13 | 19 | OR NOT.  SOMEONE WILL HAVE TO ENLIGHTEN ME AS TO WHAT HAS BEEN |
| 16:13 | 20 | INTRODUCED AND ACCEPTED. |
| 16:13 | 21 | **THE WITNESS:**  IT'S A DOCUMENT OUT OF DM-3. |
| 16:13 | 22 | **THE COURT:**  I UNDERSTAND.  I DON'T KNOW IF THAT'S IN |
| 16:13 | 23 | EVIDENCE OR NOT.  WE WILL GET THAT STRAIGHT. |
| 16:13 | 24 | **BY MR. LEVINE:** |
| 16:13 | 25 | **Q.**   IF WE LOOK UNDER TEST SITE 1, WHAT TYPE OF MATERIAL DO WE |

FINAL DAILY COPY

MOSHER00084

| | | |
|---|---|---|
| 16:13 | 1 | SEE UNDERLAYS THE SITE? |
| 16:13 | 2 | **A.**   UNDER THIS SITE, YOU HAVE THE FILL THAT'S PLACED THERE, A |
| 16:13 | 3 | MARSH MATERIAL, AND THEN THE CLAY, WHICH IS THE |
| 16:13 | 4 | INTERDISTRIBUTARY CLAY LAYER. |
| 16:13 | 5 | **Q.**   LET'S LOOK AT TEST SITE 2.  WHAT TYPE OF MATERIALS DO YOU |
| 16:14 | 6 | SEE UNDERLAYING THAT SITE? |
| 16:14 | 7 | **A.**   YOU HAVE THE FILL, YOU HAVE A THICKER LAYER OF MARSH, |
| 16:14 | 8 | WHICH IS A LITTLE DIFFERENT THAN THIS MARSH OVER HERE.  IT'S |
| 16:14 | 9 | MORE PEAT-LIKE.  THEN UNDER IT IS WHAT THEY CALL A POINT BAR |
| 16:14 | 10 | MATERIAL, WHICH WILL HAVE MORE SANDS IN IT THAN CLAY.  IT WILL |
| 16:14 | 11 | BE A MIXTURE, BUT IT HAS SANDS IN IT. |
| 16:14 | 12 | **Q.**   IS THAT MORE OF A LEAN CLAY?  A FAT CLAY? |
| 16:14 | 13 | **A.**   IN THIS CASE THEY CHARACTERIZED IT AS A LEAN CLAY, THIS |
| 16:14 | 14 | BEING A FAT CLAY OVER HERE. |
| 16:14 | 15 | **Q.**   WHAT'S THE DIFFERENCE IN THE WATER CONTENT BETWEEN THE |
| 16:14 | 16 | INTERDISTRIBUTARY TROUGH AND THE POINT BAR MATERIAL? |
| 16:14 | 17 | **A.**   THIS IS GOING TO BE SOMEWHERE BETWEEN 60- AND 80-PERCENT |
| 16:14 | 18 | WATER CONTENT.  THIS IS GOING TO BE CLOSER TO BETWEEN 30 AND |
| 16:14 | 19 | 40 PERCENT. |
| 16:14 | 20 | **Q.**   WHAT HAPPENS, THEN, WHEN YOU ADD ADDITIONAL LIFTS ON SITE |
| 16:14 | 21 | 1 AS COMPARED TO SITE 22? |
| 16:14 | 22 | **A.**   YOU'RE GOING TO HAVE SIGNIFICANTLY MORE SETTLEMENT OVER |
| 16:14 | 23 | HERE ON THIS MATERIAL THAN YOU WILL ON THIS ONE. |
| 16:15 | 24 | **Q.**   WHEN YOU'RE SAYING "OVER HERE," YOU MEAN -- |
| 16:15 | 25 | **A.**   SITE 1, YOU'RE GOING TO HAVE MORE SETTLEMENT AND -- YOU'LL |

FINAL DAILY COPY

MOSHER00085

| | | |
|---|---|---|
| 16:15 | 1 | HAVE MORE LATERAL MOVEMENT.  ON SITE 2 YOU'LL HAVE LESS |
| 16:15 | 2 | SETTLEMENT AND LESS LATERAL MOVEMENT. |
| 16:15 | 3 | **Q.**   SO HOW DOES PICKING THESE TWO SITES WITH DIFFERENT FILL |
| 16:15 | 4 | MATERIALS -- EXCUSE ME, JUST DIFFERENT MATERIALS UNDERLYING THE |
| 16:15 | 5 | SOIL INFLUENCE DR. BEA'S RESULTS? |
| 16:15 | 6 | **A.**   WELL, IF YOU WERE TRYING TO DO A COMPARISON OF WHAT THE |
| 16:15 | 7 | CHANNEL EFFECT WOULD BE, YOU'D WANT TO PICK TWO SITES THAT |
| 16:15 | 8 | HAD -- I WOULD THINK YOU'D WANT TO PICK TWO SITES THAT HAD THE |
| 16:15 | 9 | SAME MATERIAL IN IT TO DO THAT COMPARISON. |
| 16:15 | 10 | **Q.**   DR. BEA HAD SOMEONE CONDUCT WHAT'S KNOWN AS A PLAXIS -- |
| 16:15 | 11 | P-L-A-X-I-S -- ANALYSIS; CORRECT? |
| 16:16 | 12 | **A.**   THAT'S CORRECT. |
| 16:16 | 13 | **Q.**   THAT ANALYSIS IS CONTAINED IN APPENDIX C OF DR. BEA'S |
| 16:16 | 14 | EXPERT REPORT; CORRECT? |
| 16:16 | 15 | **A.**   THAT'S CORRECT. |
| 16:16 | 16 | **THE COURT:**  THAT'S THE EXPERT REPORT OF? |
| 16:16 | 17 | **MR. LEVINE:**  APRIL 3, 2009, PX-2118. |
| 16:16 | 18 | **BY MR. LEVINE:** |
| 16:16 | 19 | **Q.**   ARE YOU FAMILIAR WITH PLAXIS? |
| 16:16 | 20 | **A.**   YES. |
| 16:16 | 21 | **Q.**   HAVE YOU EVER USED IT BEFORE? |
| 16:16 | 22 | **A.**   YES.  I USED IT DURING THE IPET STUDY IN INVESTIGATING |
| 16:16 | 23 | SOME OF THE FAILURES THAT TOOK PLACE. |
| 16:16 | 24 | **Q.**   IN LAYMAN'S TERMS, CAN YOU EXPLAIN WHAT PLAXIS IS. |
| 16:16 | 25 | **A.**   IT'S A COMPUTER PROGRAM.  IT'S ACTUALLY LABELED AS A |

FINAL DAILY COPY

| | | |
|---|---|---|
| 16:16 | 1 | NONLINEAR FINITE ELEMENT COMPUTER PROGRAM TO MODEL SOIL AND |
| 16:16 | 2 | SOIL STRUCTURE ACTIONS AND PROBLEMS.  IT'S A WAY TO CALCULATE |
| 16:16 | 3 | STRESSES AND DISPLACEMENTS WHEN THE MATERIALS BEHAVE |
| 16:16 | 4 | NONLINEARLY. |
| 16:16 | 5 | **Q.**   I WANT TO TAKE A LOOK A FIGURE 37 ON PAGE 56 OF |
| 16:17 | 6 | APPENDIX C, WHICH IS AGAIN CONTAINED IN DR. BEA'S APRIL 3, 2009 |
| 16:17 | 7 | REPORT.  VERY GENERAL TERMS, WHAT DOES THIS FIGURE SHOW?  VERY, |
| 16:17 | 8 | VERY GENERAL.  LET'S WALK THROUGH IT. |
| 16:18 | 9 | **A.**   IT SHOWS THE LATERAL DISPLACEMENT OF THE ANALYSIS FOR |
| 16:18 | 10 | SITE 1, WHERE YOU HAVE A CHANNEL LOCATED OUT HERE.  IT SHOWS |
| 16:18 | 11 | THE LATERAL DISPLACEMENT, OR HORIZONTAL DISPLACEMENT, AT THREE |
| 16:18 | 12 | LOCATIONS. |
| 16:18 | 13 | **Q.**   SITE 1 IS WHERE DR. BEA FOUND THAT THE SQUEEZING PROCESS |
| 16:18 | 14 | WOULD OCCUR; IS THAT CORRECT? |
| 16:18 | 15 | **A.**   THAT'S CORRECT. |
| 16:18 | 16 | **Q.**   I WANT TO FOCUS IN ON THE BOTTOM GRAPH OF THIS SET OF |
| 16:18 | 17 | FIGURES.  SO THE DOTTED LINE HERE, FURTHER TO THE LEFT, WHAT |
| 16:18 | 18 | DOES THAT REPRESENT? |
| 16:18 | 19 | **A.**   THAT REPRESENTS A LOCATION WHERE THE LATERAL DISPLACEMENT, |
| 16:18 | 20 | OR HORIZONTAL DISPLACEMENT, IS MEASURED, WHICH IS THIS ONE |
| 16:18 | 21 | HERE. |
| 16:18 | 22 | **Q.**   SO THAT'S 25 FEET ON THE FLOOD SIDE OF THE LEVEE |
| 16:18 | 23 | CENTERLINE; CORRECT? |
| 16:18 | 24 | **A.**   THAT'S CORRECT. |
| 16:18 | 25 | **Q.**   SO THAT WOULD CORRESPOND, ROUGHLY, WITH THE LEVEE CREST? |

FINAL DAILY COPY

MOSHER00087

| | | |
|---|---|---|
| 16:18 | 1 | **A.**   THAT'S CORRECT. |
| 16:18 | 2 | **Q.**   THE SECOND DASHED LINE, WHAT DOES THIS LINE REPRESENT? |
| 16:19 | 3 | **A.**   THAT REPRESENTS ANOTHER LOCATION.  THE CENTER GRAPH, THAT |
| 16:19 | 4 | SHOWS THE HORIZONTAL DISPLACEMENT AT THAT LOCATION. |
| 16:19 | 5 | **Q.**   THAT SECOND DASHED LINE CORRESPONDS WITH THE SECOND FIGURE |
| 16:19 | 6 | ON THE TOP; CORRECT? |
| 16:19 | 7 | **A.**   THAT IS CORRECT. |
| 16:19 | 8 | **Q.**   SO THAT WOULD BE ABOUT 300 FEET ON THE FLOOD SIDE OF THE |
| 16:19 | 9 | CENTERLINE; CORRECT? |
| 16:19 | 10 | **A.**   THAT'S CORRECT. |
| 16:19 | 11 | **Q.**   THE THIRD DASHED LINE THAT WE SEE, WHAT DOES THAT |
| 16:19 | 12 | REPRESENT? |
| 16:19 | 13 | **A.**   THAT REPRESENTS A MEASUREMENT OUT IN THE CHANNEL. |
| 16:19 | 14 | **THE COURT:**  I'M SORRY? |
| 16:19 | 15 | **THE WITNESS:**  IT REPRESENTS THE HORIZONTAL |
| 16:19 | 16 | DISPLACEMENT OF A LOCATION OUT IN THE CHANNEL. |
| 16:19 | 17 | **BY MR. LEVINE:** |
| 16:19 | 18 | **Q.**   SO THAT THIRD DASHED LINE IS GOING TO CORRESPOND WITH THE |
| 16:19 | 19 | THIRD SET OF GRAPHS ON THE TOP; CORRECT? |
| 16:20 | 20 | **A.**   THAT'S CORRECT. |
| 16:20 | 21 | **Q.**   THAT'S A POINT 575 FEET FROM THE CENTERLINE OF THE LEVEE? |
| 16:20 | 22 | **A.**   THAT'S CORRECT. |
| 16:20 | 23 | **Q.**   IF WE FOCUS IN ON THE TOP LEFT GRAPH, WE SEE A LOT OF |
| 16:20 | 24 | LINES, AND THEN I SEE SOME CIRCLES AND TRIANGLES AND SQUARES. |
| 16:20 | 25 | CAN YOU EXPLAIN WHAT THOSE MEAN. |

MOSHER00088

3048

| 16:20 | 1 | **A.**   THEY ARE THE DIFFERENT DATES WHERE THESE DISPLACEMENTS |
| 16:20 | 2 | WERE REPORTED IN THIS GRAPH.   SO IT'S A LEDGER SHOWING THE |
| 16:20 | 3 | DIFFERENT DATES WHERE THOSE WERE REPORTED. |
| 16:20 | 4 | **Q.**   THESE SYMBOLS ARE REPEATED THROUGHOUT THE REMAINDER OF |
| 16:20 | 5 | THIS GRAPH? |
| 16:20 | 6 | **A.**   YES, AS USED IN THIS GRAPH AND THIS GRAPH. |
| 16:20 | 7 | **Q.**   ON THE LEFT-HAND SIDE OF THIS GRAPH, I SEE WHERE IT SAYS: |
| 16:21 | 8 | 20, 10, 0, -10, ALL THE WAY DOWN TO -60.   WHAT DOES THAT SHOW? |
| 16:21 | 9 | **A.**   THAT SHOWS THE ELEVATION GOING DOWN ALL THE WAY THROUGH |
| 16:21 | 10 | THE CLAY LAYER, THE INTERDISTRIBUTARY CLAY LAYER DOWN INTO THE |
| 16:21 | 11 | PLASTICINE MATERIAL. |
| 16:21 | 12 | **Q.**   AT THE TOP OF THE PAGE, YOU SEE WHERE IT SAYS 0.5, 0.0, |
| 16:21 | 13 | 0.5, 1.0, A SERIES OF NUMBERS AT THE TOP OF EACH OF THE THREE |
| 16:21 | 14 | GRAPHS.   WHAT DO THOSE NUMBERS SHOW? |
| 16:21 | 15 | **A.**   THAT'S THE HORIZONTAL DISPLACEMENT IN LINEAR FEET. |
| 16:21 | 16 | **Q.**   SO FOR ANY PARTICULAR SET OF YEARS, YOU CAN JUST PICK YOUR |
| 16:21 | 17 | LINE, PICK YOUR DEPTH, AND YOU CAN FIGURE OUT HOW MUCH LATERAL |
| 16:21 | 18 | DISPLACEMENT IS OCCURRING? |
| 16:21 | 19 | **A.**   AT THAT DEPTH. |
| 16:21 | 20 | **Q.**   AND AT THAT PARTICULAR DISTANCE AWAY FROM THE CENTERLINE; |
| 16:21 | 21 | CORRECT? |
| 16:21 | 22 | **A.**   THAT'S CORRECT. |
| 16:21 | 23 | **Q.**   NOW, IF WE TURN TO THE NEXT PAGE AND TAKE A LOOK AT |
| 16:22 | 24 | FIGURE 38 ON PAGE 57, THIS FIGURE SHOWS HOW MUCH LATERAL |
| 16:22 | 25 | DISPLACEMENT WOULD BE OCCURRING IF THE CHANNEL DID NOT EXIST; |

FINAL DAILY COPY

MOSHER00089

| | | |
|---|---|---|
| 16:22 | 1 | CORRECT? |
| 16:22 | 2 | **A.**   THAT'S CORRECT, FOR SITE 1. |
| 16:22 | 3 | **Q.**   THE LAYOUT OF THIS FIGURE IS IDENTICAL TO THE FIRST |
| 16:22 | 4 | FIGURE, EXCEPT NOW THE CHANNEL DOESN'T EXIST? |
| 16:22 | 5 | **A.**   CORRECT.  IN THIS LOCATION THE CHANNEL IS NO LONGER THERE. |
| 16:22 | 6 | **Q.**   IT'S GOING TO BE HARD TO DO ON THE COMPUTER, SO COPIES OF |
| 16:22 | 7 | IT ARE IN PAPER.  I WANT TO LOOK AT PAGES 56 AND 57 OF |
| 16:22 | 8 | APPENDIX C FROM THIS EXPERT REPORT AT THE SAME TIME. |
| 16:23 | 9 | **MR. LEVINE:**  MAY I APPROACH? |
| 16:23 | 10 | **THE COURT:**  YES, YOU MAY. |
| 16:23 | 11 | **BY MR. LEVINE:** |
| 16:23 | 12 | **Q.**   THESE ARE PAGES 56, 57, AND ALSO INCLUDED ARE PAGES 116 |
| 16:23 | 13 | AND 117 OF APPENDIX C OF PX-2118, WHICH IS DR. BEA'S APRIL 3, |
| 16:23 | 14 | 2009 REPORT.  IF WE COMPARE THE FIRST GRAPH ON THE LEFT IN BOTH |
| 16:23 | 15 | FIGURE 36 -- EXCUSE ME, FIGURE 37 ON PAGE 56 AND FIGURE 38 ON |
| 16:23 | 16 | PAGE 57, DO YOU SEE ANY DIFFERENCES BETWEEN THE CHANNEL |
| 16:24 | 17 | SITUATION AND THE NO CHANNEL SITUATION IN THESE GRAPHS? |
| 16:24 | 18 | **A.**   ACTUALLY, IN THE FIRST TWO, I SEE -- I CANNOT TELL THAT |
| 16:24 | 19 | THERE'S ANY DIFFERENCE BETWEEN THOSE TWO WITH OR WITHOUT THE |
| 16:24 | 20 | CHANNEL. |
| 16:24 | 21 | **Q.**   THE FIRST TWO THAT WE SEE UP THERE, YOU DON'T SEE ANY |
| 16:24 | 22 | DIFFERENCES BETWEEN THESE TWO SETS OF GRAPHS; CORRECT? |
| 16:24 | 23 | **THE COURT:**  DO YOU MIND CLEARING THAT ANNOTATION |
| 16:24 | 24 | THERE, SIR? |
| 16:24 | 25 | **THE WITNESS:**  YES. |

FINAL DAILY COPY

MOSHER00090

| | | |
|---|---|---|
| 16:24 | 1 | **THE COURT:**  THANK YOU VERY MUCH.  I APPRECIATE THAT. |
| 16:24 | 2 | **BY MR. LEVINE:** |
| 16:24 | 3 | **Q.**   YOU DON'T SEE ANY DIFFERENCES BETWEEN THESE TWO; CORRECT? |
| 16:24 | 4 | **A.**   THEY LOOK EXACTLY THE SAME.  YOU COMPARE THE NUMBERS AT |
| 16:24 | 5 | DIFFERENT LOCATIONS THAT SHOW THE CHANNEL -- HAVING THE CHANNEL |
| 16:24 | 6 | AND NOT HAVING THE CHANNEL DOESN'T AFFECT THE LATERAL |
| 16:24 | 7 | DEFORMATION OR THE HORIZONTAL MOVEMENT UNDERNEATH THE LEVEE. |
| 16:24 | 8 | **THE COURT:**  THAT'S FROM '85 ON.  I'M SORRY.  IT'S |
| 16:24 | 9 | SAYS 67.  I WAS LOOKING AT IT BACKWARDS. |
| 16:25 | 10 | **THE WITNESS:**  IT'S FOR THE WHOLE PERIOD. |
| 16:25 | 11 | **THE COURT:**  IT'S NOT QUITE INTUITIVE BECAUSE THE |
| 16:25 | 12 | NUMBERS ARE NOT LINED UP.  I UNDERSTAND IT NOW.  IT IS FOR THE |
| 16:25 | 13 | WHOLE PERIOD. |
| 16:25 | 14 | **BY MR. LEVINE:** |
| 16:25 | 15 | **Q.**   IF WE MOVE TO THE SECOND SET OF GRAPHS IN THESE TWO |
| 16:25 | 16 | FIGURES, THE DIFFERENCES AT THE -- |
| 16:25 | 17 | **THE COURT:**  I'M GOING TO POINT OUT FOR THE RECORD, TO |
| 16:25 | 18 | MY KNOWLEDGE DR. BEA DID NOT TESTIFY ABOUT THIS EITHER, SO IT |
| 16:25 | 19 | MAY BE ENGAGING IN -- AT LEAST THESE GRAPHS THAT HE PREPARED. |
| 16:25 | 20 | I NOTE THAT THERE'S A REALLY GOOD REASON THIS IS IN A PROFFER, |
| 16:25 | 21 | AS I WILL STATE ON THE RECORD. |
| 16:25 | 22 | **BY MR. LEVINE:** |
| 16:25 | 23 | **Q.**   DO YOU SEE ANY DIFFERENCES BETWEEN THESE TWO FIGURES? |
| 16:25 | 24 | **A.**   I SEE VERY LITTLE.  THERE MIGHT BE A LITTLE BIT |
| 16:25 | 25 | DIFFERENCE, MAYBE JUST A LITTLE BIT.  I CAN'T SEE ANY |

FINAL DAILY COPY

16:26    1   DIFFERENCES.  IT'S NOT NOTICEABLE.

16:26    2   **Q.**   WHAT IF WE PULLED UP THE THIRD SET OF FIGURES IN PAGES 56

16:26    3   AND 57?  DO YOU SEE ANY DIFFERENCES THERE?

16:26    4   **A.**   YES, I DO SEE SOME DIFFERENCES THERE.

16:26    5   **Q.**   WHY ARE THESE TWO FIGURES DIFFERENT?

16:26    6   **A.**   WELL, THE DIFFERENCE IS THAT THIS IS OUT IN THE CHANNEL,

16:26    7   AND IF YOU CUT A CHANNEL DOWN THROUGH THE SOIL, YOU WILL GET

16:26    8   SOME MOVEMENT JUST BY THE EXCAVATION OF THE CHANNEL.

16:26    9             **THE COURT:**  YOU'RE SAYING DR. BEA'S OWN CHART SHOWS

16:26   10   THAT HIS THEORY OF LATERAL DISPLACEMENT IS BOGUS?

16:26   11             **THE WITNESS:**  YES.

16:26   12             **THE COURT:**  HIS OWN CHART?

16:26   13             **THE WITNESS:**  IS INCONSISTENT WITH HIS OPINION.

16:26   14             **THE COURT:**  ARE THESE ALL OF THE CHARTS, PART OF THE

16:26   15   CHARTS?  ARE THERE ANY CHARTS THAT ILLUSTRATE WHAT HE DID?

16:26   16             **THE WITNESS:**  THERE'S ANOTHER SET OF CHARTS FOR THE

16:26   17   NEXT SITE THAT SHOWS THE VERY SAME THING.

16:26   18             **THE COURT:**  SO ARE THERE ANY CHARTS THAT PROVE THAT

16:26   19   HE JUST PUT IN CHARTS THAT DISPROVE HIS THEORY ALL THROUGHOUT

16:27   20   HIS REPORT THAT I HAVEN'T LOOKED AT AND IS NOT IN EVIDENCE?

16:27   21             **THE WITNESS:**  I HAVEN'T SEEN ANY REPORTS THAT SHOW

16:27   22   THAT THAT INTERDISTRIBUTARY CLAY HAD ANY MOVEMENT HORIZONTALLY

16:27   23   THAT INFLUENCED THE BEHAVIOR OF THE LEVEE.

16:27   24             **MR. O'DONNELL:**  AT THE RISK OF SAYING THE OPPOSITE,

16:27   25   THE DEAR DR. BEA WAS NEVER EXAMINED, SO NEVER ASKED TO EXPLAIN

FINAL DAILY COPY

3052

| | | |
|---|---|---|
| 16:27 | 1 | THE FOLLY OF HIS WAYS -- |
| 16:27 | 2 | **THE COURT:**  I UNDERSTAND.  THERE IS A REALLY GOOD |
| 16:27 | 3 | REASON THIS IS IN A PROFFER.  GO AHEAD.  I HAVE NO CONTEXT OF |
| 16:27 | 4 | THIS AT ALL, OTHER THAN THIS WITNESS' INTERPRETING OF DR. BEA'S |
| 16:27 | 5 | CHARTS, WHICH HE DIDN'T TESTIFY, BUT GO AHEAD, FOR WHATEVER IT |
| 16:27 | 6 | MEANS. |
| 16:27 | 7 | **BY MR. LEVINE:** |
| 16:27 | 8 | **Q.**  YOU SAID YOU SEE SOME DIFFERENCES IN THE -- THE FIGURE ON |
| 16:27 | 9 | THE LEFT SHOWS WITH THE CHANNEL AND THE FIGURE ON THE RIGHT |
| 16:27 | 10 | SHOWS WITHOUT THE CHANNEL.  YOU SAID YOU SAW SOME DIFFERENCES; |
| 16:27 | 11 | RIGHT? |
| 16:27 | 12 | **A.**  YES. |
| 16:27 | 13 | **Q.**  DO THOSE DIFFERENCES AFFECT THE PROTECTIVE ELEVATION AT |
| 16:27 | 14 | THE TOP OF THE LEVEE? |
| 16:27 | 15 | **A.**  NO.  THOSE SEEM TO BE ALL LOCAL BECAUSE THEY DON'T |
| 16:28 | 16 | TRANSMIT BACK TO ANY MOVEMENT AT THESE OTHER LOCATIONS. |
| 16:28 | 17 | **Q.**  I WANT YOU TO CHECK ON THESE TWO FIGURES BECAUSE YOU SEE A |
| 16:28 | 18 | DIFFERENCE IN THE HORIZONTAL DISPLACEMENT IN THE CHANNEL.  SO |
| 16:28 | 19 | LET'S TAKE A LOOK AT FIGURES 31 AND 32, WHICH ARE LOCATED ON |
| 16:28 | 20 | PAGES 116 AND 117 OF APPENDIX C IN PX-2118.  FIGURE 31 ON |
| 16:28 | 21 | PAGE 116, THAT SHOWS DR. BEA'S PLAXIS ANALYSIS FOR SITE 2; |
| 16:28 | 22 | CORRECT? |
| 16:28 | 23 | **A.**  THAT'S CORRECT. |
| 16:28 | 24 | **Q.**  THAT'S THE SITE WHERE HE FOUND THAT LATERAL DISPLACEMENT |
| 16:29 | 25 | WAS NOT OCCURRING AS A RESULT OF THE CHANNEL; CORRECT? |

FINAL DAILY COPY

MOSHER00093

| 16:29 | 1 | **A.**   THAT'S CORRECT. |

16:29   1   **A.**   THAT'S CORRECT.

16:29   2   **Q.**   THEN IF WE CAN GO LOOK AT FIGURE 32 ON PAGE 117, THIS IS

16:29   3   FOR SITE 2 IF WE REMOVED THE CHANNEL FROM THE PROFILE; CORRECT?

16:29   4   **A.**   THAT'S CORRECT.

16:29   5   **Q.**   NOW, THERE'S SOME DIFFERENCES IN THE DISTANCES THAT YOU

16:29   6   ARE AWAY FROM THE CENTERLINE IN THESE TWO FIGURES; BUT,

16:29   7   OTHERWISE, THESE FIGURES ARE GENERALLY ORIENTED THE SAME AS IN

16:29   8   FIGURES 31 AND 32, WHICH WE JUST LOOKED AT?

16:29   9   **A.**   THAT IS CORRECT.

16:29   10   **Q.**   EXCUSE ME, FIGURES 37 AND 38, WHICH WE JUST LOOKED AT.

16:29   11   **A.**   THE SITE 1 FIGURES.

16:29   12   **Q.**   SO LET'S PULL UP THE BOTTOM LITTLE GRAPH ON 116 AND JUST

16:29   13   GET OURSELVES ORIENTED DISTANCE-WISE.  THE DASHED LINE IN THE

16:30   14   BOTTOM FIGURE ALL THE WAY TO THE LEFT, AGAIN, YOU SEE THAT'S A

16:30   15   LOCATION 25 FEET ON THE FLOOD SIDE OF THE LEVEE; CORRECT?

16:30   16   **A.**   THAT'S CORRECT.

16:30   17   **Q.**   THE SECOND DASHED LINE THAT WE SEE AT THE BOTTOM, THAT'S A

16:30   18   POINT 125 FEET FROM THE CREST TOWARDS THE FLOOD SIDE OF THE

16:30   19   LEVEE; CORRECT?

16:30   20   **A.**   THAT'S CORRECT.

16:30   21   **Q.**   THEN THE THIRD DASHED LINE THAT WE SEE, THAT APPEARS TO BE

16:30   22   A POINT THAT'S 765 FEET FROM THE CENTERLINE TO THE FLOOD SIDE

16:30   23   OF THE LEVEE; CORRECT?

16:30   24   **A.**   THAT'S CORRECT.

16:30   25   **Q.**   SO THE FIRST DASHED LINE CORRESPONDS WITH THE FIRST FIGURE

FINAL DAILY COPY

MOSHER00094

| | | |
|---|---|---|
| 16:30 | 1 | ON THE TOP OF THE PAGE; CORRECT? |
| 16:30 | 2 | **A.**   THAT'S CORRECT. |
| 16:30 | 3 | **Q.**   THE SECOND DASHED LINE CORRESPONDS TO THE SECOND FIGURE ON |
| 16:30 | 4 | THE TOP OF THE PAGE; CORRECT? |
| 16:30 | 5 | **A.**   THAT'S CORRECT. |
| 16:30 | 6 | **Q.**   THE THIRD DASHED LINE CORRESPONDS TO THE THIRD FIGURE ON |
| 16:31 | 7 | THE TOP OF THE PAGE; CORRECT? |
| 16:31 | 8 | **A.**   THAT'S CORRECT. |
| 16:31 | 9 | **Q.**   SO BOTH FIGURES 31 AND 32, THESE DISTANCES ARE USED; |
| 16:31 | 10 | CORRECT? |
| 16:31 | 11 | **A.**   THAT IS CORRECT. |
| 16:31 | 12 | **Q.**   LET'S TAKE A LOOK AT THE FIRST GRAPH IN EACH FIGURE NOW. |
| 16:31 | 13 | THESE ARE BOTH FOR POINTS 25 FEET FROM THE CENTERLINE OF THE |
| 16:31 | 14 | LEVEE; CORRECT? |
| 16:31 | 15 | **A.**   THAT'S CORRECT. |
| 16:31 | 16 | **Q.**   DO YOU SEE ANY DIFFERENCES BETWEEN THESE TWO FIGURES? |
| 16:31 | 17 | **A.**   NO, I DON'T. |
| 16:31 | 18 | **Q.**   LET'S TAKE A LOOK AT THE SECOND SET OF FIGURES |
| 16:31 | 19 | REPRESENTING THE POINT 125 FEET FROM THE CENTERLINE OF THE |
| 16:31 | 20 | LEVEE.  DO YOU SEE ANY DIFFERENCES IN THESE FIGURES? |
| 16:31 | 21 | **A.**   NO, I DON'T. |
| 16:31 | 22 | **Q.**   NOW, IF YOU CAN TAKE A LOOK AT THE THIRD SET OF GRAPHS IN |
| 16:31 | 23 | EACH FIGURE, DO YOU SEE ANY DIFFERENCE HERE? |
| 16:32 | 24 | **A.**   I SEE SOME DIFFERENCES BECAUSE OF THE CHANNEL -- WITH AND |
| 16:32 | 25 | WITHOUT THE CHANNEL, THE EFFECTS OF THE CHANNEL ESTIMATION. |

FINAL DAILY COPY

| | | |
|---|---|---|
| 16:32 | 1 | **Q.**  AGAIN, THIS DOESN'T HAVE ANY EFFECT ON THE LEVEE CREST |
| 16:32 | 2 | ELEVATION; CORRECT? |
| 16:32 | 3 | **A.**  THAT'S CORRECT.  IT DOESN'T SHOW UP IN THE OTHER TWO |
| 16:32 | 4 | GRAPHS ANY MOVEMENT HORIZONTALLY DUE TO THIS. |
| 16:32 | 5 | **Q.**  IN BOTH GRAPHS FOR SITE 1 AND IN BOTH GRAPHS FOR SITE 2, |
| 16:32 | 6 | WE NOTICE THE CHANNEL HAS AN INFLUENCE ALL THE WAY IN THE |
| 16:32 | 7 | CHANNEL; CORRECT? |
| 16:32 | 8 | **A.**  THAT'S CORRECT. |
| 16:32 | 9 | **MR. LEVINE:**  YOUR HONOR, I THINK THIS CONCLUDES THE |
| 16:32 | 10 | PROFFER. |
| 16:32 | 11 | **(END OF PROFFER)** |
| 16:32 | 12 | * * * |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

FINAL DAILY COPY

MOSHER00096

16:32   1       **THE COURT:**  I'M JUST GOING TO EXPLAIN THE COURT'S

16:32   2   RULING AND WHY WE WERE IN THE PROFFER.

16:32   3       **MR. O'DONNELL:**  YOUR HONOR, MAY I SUPPLEMENT MY

16:32   4   OBJECTION BEFORE YOU DO THAT, OR WOULD YOU LIKE ME TO SIT DOWN?

16:32   5       **THE COURT:**  WHY DON'T YOU LET ME GET THIS DONE.  IN

16:33   6   THE COURT'S SYNOPSIS OF DR. BEA'S JULY 14, 2008 REPORT, HE DOES

16:33   7   SAY ON PAGE -- EXCUSE ME.  ON PAGE 15, PARAGRAPH 15, HE

16:33   8   MENTIONS THE SQUEEZING EFFECT.  THIS IS MY WORDS.  ON PAGE 15,

16:33   9   PARAGRAPH 15 OF HIS REPORT, HE SAYS:

16:33  10       "LATERAL SQUEEZING OF THE UNDERLYING MARSH AND

16:33  11   CLAY LAYERS INTO THE ADJACENT MRGO CHANNEL RESULTED IN

16:33  12   SIGNIFICANT DECREASES IN THE CROWN ELEVATIONS OF THE EBSB'S."

16:33  13   THAT'S JUST ONE EXEMPLAR.

16:34  14       ON THE NEXT REPORT, WHICH IS ON JANUARY 29,

16:34  15   2009, HE SPEAKS OF ACCELERATED -- IN HIS EXECUTIVE SUMMARY, HE

16:34  16   SPEAKS OF THE ACCELERATED AND INCREASED SUBSIDENCE IN THE CLOSE

16:34  17   PROXIMITY OF THE DEEPWATER NAVIGATIONAL CHANNEL TO THE MRGO

16:34  18   HURRICANE FLOOD PROTECTION STRUCTURES, AND THE INCREASED

16:34  19   SETTLEMENT OCCURRED DUE TO SOIL CREEP AND SQUEEZING AND THE

16:34  20   LOSS OF THE LEVEE'S CREST ELEVATION.  THE PROXIMITY OF THE MRGO

16:34  21   CHANNEL TO THE HURRICANE STRUCTURES ALSO THREATENED THEIR

16:34  22   STABILITY.

16:34  23       I'M SIMPLY POINTING THAT OUT; NOT THAT IT WILL

16:34  24   BE PART OF MY OPINION OR THAT I'M ACCEPTING IT, BUT THAT THIS

16:34  25   ISSUE WAS DISCUSSED IN THE REPORTS.  I MIGHT ALSO POINT OUT

FINAL DAILY COPY

MOSHER00097

| | | |
|---|---|---|
| 16:35 | 1 | THAT THE GOVERNMENT FILED A MOTION TO STRIKE THE APRIL 2009 |
| 16:35 | 2 | REPORT OF DR. BEA, WHICH THE COURT HAD A PHONE CONFERENCE ON |
| 16:35 | 3 | AFTER THE GOVERNMENT SAID IT WOULD TAKE MONTHS TO GO OVER AND |
| 16:35 | 4 | THAT THEY WOULD BE PREJUDICED.  I MENTIONED THAT IT WOULD BE A |
| 16:35 | 5 | CONTINUANCE TO THE PLAINTIFFS.  MR. BRUNO SAID NO, AND HE |
| 16:35 | 6 | WITHDREW THE REPORT, THE APRIL REPORT. |
| 16:35 | 7 | NOW, AFTER THIS WAS DONE, IN THE COURSE OF THESE |
| 16:35 | 8 | PROCEEDINGS, TO SOME DEGREE THE REPORT IS NOW IN EVIDENCE.  NOT |
| 16:35 | 9 | THE ENTIRE REPORT.  YOU NEED TO GET THAT STRAIGHT EXACTLY WHAT |
| 16:35 | 10 | IT IS BECAUSE I HONESTLY DON'T KNOW.  BECAUSE THESE ISSUES WERE |
| 16:35 | 11 | NOT ADDRESSED IN THIS WITNESS' EXPERT REPORT, THE COURT |
| 16:36 | 12 | EXCLUDED IT. |
| 16:36 | 13 | MOREOVER, DR. BEA WAS HERE FOR A LONG TIME, AND |
| 16:36 | 14 | NOBODY QUESTIONED HIM ABOUT THESE GRAPHS.  SO JUST TO LET YOU |
| 16:36 | 15 | KNOW -- I'M NOT SURE THE SQUEEZING EFFECT, WHAT IT HAS -- WE'RE |
| 16:36 | 16 | GOING TO HAVE TO GET BRIEFING ON THAT AND WHAT'S ACTUALLY IN |
| 16:36 | 17 | EVIDENCE, THE DEGREE THAT'S IT'S IN, ETC. |
| 16:36 | 18 | CERTAINLY, I UNDERSTAND THE PROFFER.  I'M JUST |
| 16:36 | 19 | NOTING FOR THE RECORD WHY AT THIS TIME IT'S IN THE PROFFER.  I |
| 16:36 | 20 | WANT TO GIVE YOU, IN THE MANY PAGES OF BRIEFING YOU WILL BE |
| 16:36 | 21 | DOING, WHY IT SHOULDN'T BE IN THE PROFFER.  WE NEVER HAD |
| 16:36 | 22 | DR. BEA TESTIFY TO THESE CHARTS THAT WERE HERE, AND THAT'S KIND |
| 16:36 | 23 | OF A PROBLEM TOO. |
| 16:36 | 24 | **MR. O'DONNELL:**  MAY I SUPPLEMENT MY REASONS FOR |
| 16:36 | 25 | OBJECTING, YOUR HONOR? |

FINAL DAILY COPY

MOSHER00098

3058

16:36    1         **THE COURT:**  YES.

16:37    2         **MR. O'DONNELL:**  I FEEL SOMEWHAT LIKE ROSENCRANTZ AND

16:37    3    GUILDENSTERN WAITING FOR GODOT.  THIS IS THE TRIAL LAWYER'S

16:37    4    EXISTENTIAL NIGHTMARE.  I HAVE TO CROSS-EXAMINE A WITNESS TO

16:37    5    MAKE MY CROSS PROFFER BECAUSE I THINK EVERYTHING HE SAID IS

16:37    6    INCORRECT WITHOUT EVER HAVING HEARD THIS WITNESS SAY THESE

16:37    7    WORDS BEFORE THIS AFTERNOON, WITHOUT EVER GETTING A WRITTEN

16:37    8    REPORT, WHICH DR. BEA AND DR. FITZGERALD -- THERE WAS A LOT OF

16:37    9    TESTIMONY FROM DR. FITZGERALD ON THIS ISSUE AS WELL -- NEVER

16:37   10    HAVING A WRITTEN REPORT THAT IS A STATIONARY TARGET, NEVER

16:37   11    BEING ABLE TO TAKE HIS DEPOSITION, WHICH IS SORT OF WHAT THE

16:37   12    RULES OF CIVIL PROCEDURE ARE ALL ABOUT, AND OVERNIGHT I'M

16:37   13    SUPPOSED TO DEVOTE MY TIME TO TRY TO FIGURE OUT A CROSS

16:37   14    PROFFER.

16:37   15         I'M GOING TO MAKE A PRACTICAL POINT HERE.  THE

16:37   16    PREJUDICE TO US IS EXTREME.  WE NEVER, EVER HEARD THIS BEFORE.

16:37   17         **THE COURT:**  DON'T FORGET:  IT'S IN A PROFFER.  IT IS

16:37   18    NOT IN EVIDENCE.

16:37   19         **MR. O'DONNELL:**  OH, NO, BUT YOU LISTENED TO IT.

16:37   20         **THE COURT:**  I DID.

16:37   21         **MR. O'DONNELL:**  YOU ASKED QUESTIONS ABOUT IT.

16:38   22         **THE COURT:**  I DID.

16:38   23         **MR. O'DONNELL:**  TWO PEOPLE WHO ARE NEXT DOOR MIGHT

16:38   24    THINK THAT THIS WAS THE CAT'S MEOW.

16:38   25         **THE COURT:**  THE PEOPLE NEXT DOOR WON'T EVEN SEE THIS.


                              FINAL DAILY COPY

MOSHER00099

| 16:38 | 1 | IT WON'T BE IN THE RECORD UNLESS I OPEN IT UP OR UNLESS THEY |
| 16:38 | 2 | DECIDE TO OPEN IT UP. |
| 16:38 | 3 |        **MR. O'DONNELL:**  THEY HAD FIVE MONTHS TO RESPOND TO |
| 16:38 | 4 | THE JULY STATEMENT.  IF THEY THOUGHT JANUARY 29, 2009 WAS SOME |
| 16:38 | 5 | KIND OF NEW, FULL-BLOWN EPIPHANY, WHICH IT WAS JUST AN |
| 16:38 | 6 | AMPLIFICATION, THEY COULD HAVE ASKED FOR LEAVE TO FILE A |
| 16:38 | 7 | SUPPLEMENTAL REPORT LIKE THEY DID WITH DR. RESIO.  THEY DIDN'T |
| 16:38 | 8 | ASK PERMISSION; THEY JUST DID IT, AND YOU LET IN.  THEY MIGHT |
| 16:38 | 9 | HAVE BEEN ABLE TO DO THAT. |
| 16:38 | 10 |        I WANT TO TELL YOU RIGHT NOW:  I DON'T HAVE |
| 16:38 | 11 | ENOUGH INSURANCE TO TRY TO ATTEMPT TO DO A COMPETENT CROSS |
| 16:38 | 12 | PROFFER, SO I HAVE A PRACTICAL SOLUTION FOR MY RECORD.  I DON'T |
| 16:38 | 13 | WANT TO BRING DR. BEA AND DR. FITZGERALD HERE AT GREAT TIME AND |
| 16:38 | 14 | EXPENSE.  I HAVE A LIMITED AMOUNT OF TIME IN THIS CASE, AND I |
| 16:38 | 15 | DON'T WANT TO SPEND TIME TOMORROW, FRANKLY, WASTING IT ON A |
| 16:39 | 16 | CROSS PROFFER, SO I HAVE A PRACTICAL SUGGESTION TO PROTECT MY |
| 16:39 | 17 | RECORD. |
| 16:39 | 18 |        I'D LIKE TO BE ABLE TO SUBMIT A DECLARATION FROM |
| 16:39 | 19 | DR. BEA, A DECLARATION FROM DR. FITZGERALD, JUST TO MAKE MY |
| 16:39 | 20 | RECORD HOW WE WOULD RESPOND TO THIS PROFFER.  THAT'S ALL I |
| 16:39 | 21 | WANT.  I WANT PERMISSION TO DO IT.  I THINK I'M ENTITLED TO DO |
| 16:39 | 22 | IT. |
| 16:39 | 23 |        THE LAST THING, TO MAKE THE RECORD CLEAR, WHEN |
| 16:39 | 24 | WE DIRECTED DR. BEA -- BECAUSE I DID MOST OF THE DIRECT.  FIRST |
| 16:39 | 25 | OF ALL, YOU SUSTAINED THE OBJECTION TO THE REPORT.  WE DID NOT |

FINAL DAILY COPY

MOSHER00100

| | | |
|---|---|---|
| 16:39 | 1 | GO INTO THE SUBJECT ON THE DIRECT OR REDIRECT OF DR. BEA.  THE |
| 16:39 | 2 | GOVERNMENT OPENED THE DOOR ON CROSS-EXAMINATION AS TO SOME |
| 16:39 | 3 | ASPECTS OF HIS REPORT.  ON REDIRECT, WE WERE VERY CAREFUL NOT |
| 16:39 | 4 | TO EXPAND THE SCOPE OF HOW WE RESPONDED TO THE GOVERNMENT'S |
| 16:39 | 5 | OPENING OF THAT DOOR ON CROSS. |
| 16:39 | 6 | THE PROFFER IS WAY BEYOND ANYTHING THAT YOU |
| 16:39 | 7 | ALLOWED DR. BEA TO BE CROSSED AND REDIRECTED ON.  SO THE BOTTOM |
| 16:39 | 8 | LINE IS THAT I THINK WE'RE VERY PREJUDICED HERE, AND IT'S MORE |
| 16:39 | 9 | LIKELY THAT GODOT WILL WALK IN THAT DOOR THEN I COULD DO A |
| 16:40 | 10 | COMPETENT JOB CROSS-EXAMINING. |
| 16:40 | 11 | **THE COURT:**  I WILL ALLOW YOU TO DO A 103(B) FILING OF |
| 16:40 | 12 | THE PROFFER. |
| 16:40 | 13 | **MR. O'DONNELL:**  THANK YOU, YOUR HONOR. |
| 16:40 | 14 | **MR. LEVINE:**  MAY I RESPOND BRIEFLY? |
| 16:40 | 15 | **THE COURT:**  YES. |
| 16:40 | 16 | **MR. LEVINE:**  BOTH THE JULY 11 AND THE JANUARY 29 |
| 16:40 | 17 | REPORT, DR. BEA DID NOT QUANTIFY THE PERCENTAGE OF SQUEEZING |
| 16:40 | 18 | OCCURRING ALONG REACH 2 OF THE MRGO AT THE LEVEES.  THAT |
| 16:40 | 19 | OPINION WAS FIRST RENDERED IN THE APRIL 3 REPORT. |
| 16:40 | 20 | **THE COURT:**  WHICH WAS STRICKEN. |
| 16:40 | 21 | **MR. LEVINE:**  EXCEPT THAT DURING DR. BEA'S DIRECT -- |
| 16:40 | 22 | **THE COURT:**  WHO OPENED THE DOOR TO THAT REPORT, SIR? |
| 16:40 | 23 | **MR. LEVINE:**  DURING DR. BEA'S DIRECT -- AND THIS IS |
| 16:40 | 24 | PAGE 108 OF THE DAILY COPY FROM APRIL 24, 2009.  I BELIEVE THIS |
| 16:40 | 25 | IS THE MORNING SESSION.  IN THE DIRECT EXAMINATION OF DR. BEA, |

FINAL DAILY COPY

MOSHER00101

| 16:40 | 1 | HE SAID -- |
| 16:41 | 2 | **MR. O'DONNELL:**  I CAN'T READ IT.  OBJECTION. |
| 16:41 | 3 | **THE COURT:**  IF YOU CAN JUST BLOW IT UP A LITTLE BIT. |
| 16:41 | 4 | LET'S JUST TAKE OUR TIME.  WE'LL GET IT DONE. |
| 16:41 | 5 | **MR. LEVINE:**  PAGE 108: |
| 16:41 | 6 | "QUESTION:  "IN THAT DEPOSITION IN FEBRUARY 2009, |
| 16:41 | 7 | WERE YOU ALSO ASKED TO ESTIMATE HOW MUCH OF THE CENTRAL |
| 16:41 | 8 | SECTION OF REACH 2 BETWEEN BAYOU BIENVENUE AND BAYOU DUPRE |
| 16:41 | 9 | YOU CONSIDERED TO BE A VICTIM OR TO HAVE HAD THIS |
| 16:41 | 10 | PHENOMENON OCCUR TO ITS CROWNS AT THE TIME OF KATRINA? |
| 16:41 | 11 | "ANSWER:  YES. |
| 16:42 | 12 | "QUESTION:  AND WHAT DID YOU ESTIMATE? |
| 16:42 | 13 | "ANSWER:  30 PERCENT. |
| 16:42 | 14 | "QUESTION:  WHAT DID YOU LATER CONCLUDE IT WAS? |
| 16:42 | 15 | "ANSWER:  50 PERCENT." |
| 16:42 | 16 | **THE COURT:**  WAS THERE AN OBJECTION THAT IT WAS BEYOND |
| 16:42 | 17 | THE SCOPE OF HIS REPORT? |
| 16:42 | 18 | **MR. O'DONNELL:**  NO. |
| 16:42 | 19 | **MR. LEVINE:**  THAT'S WHAT THE RECORD REFLECTS. |
| 16:42 | 20 | **THE COURT:**  I TRIED TO KEEP IT AS BEST I CAN. |
| 16:42 | 21 | **MR. O'DONNELL:**  ONE MORE POINT.  WHEN DR. BEA'S |
| 16:42 | 22 | REPORT WAS SUBMITTED IN EARLY APRIL, THE GOVERNMENT SAID, "OH, |
| 16:42 | 23 | MY GOSH.  WE'RE GOING TO NEED MANY MONTHS" -- |
| 16:42 | 24 | **THE COURT:**  I MADE THAT POINT, AS YOU MIGHT HAVE |
| 16:42 | 25 | HEARD EARLIER. |

FINAL DAILY COPY

MOSHER00102

3062

16:42   1            **MR. O'DONNELL:**  THEY WERE ABLE TO DO IT IN THREE

16:42   2   WEEKS.

16:42   3            **THE COURT:**  NONETHELESS, IT'S NOT IN EVIDENCE NOW.

16:42   4            **MR. O'DONNELL:**  THANK YOU.

16:42   5            **THE COURT:**  I UNDERSTAND WHAT YOU'RE SAYING ABOUT THE

16:42   6   30 PERCENT AND 50 PERCENT.  IF IT'S NOT IN THE REPORTS, PERHAPS

16:42   7   AN OBJECTION SHOULD HAVE BEEN MADE.  YOUR PROFFER'S THERE.  TO

16:42   8   THE EXTENT THAT THIS CASE HINGES ON SQUEEZING, WE'LL SEE.

16:42   9            **MR. LEVINE:**  JUST FOR THE RECORD, THAT'S NOT A

16:42   10  COMPLETE ANALYSIS OF DR. BEA'S REPORT.

16:43   11           **THE COURT:**  OF COURSE IT'S NOT.  YOU MEAN THE WITNESS

16:43   12  DID NOT GIVE A COMPLETE ANALYSIS?

16:43   13           **MR. LEVINE:**  CORRECT.

16:43   14           **THE COURT:**  THE COURT UNDERSTANDS THAT.  FOR THE

16:43   15  RECORD, I UNDERSTAND.

16:43   16           **MR. LEVINE:**  TO SPEAK OF THE PREJUDICE THAT WE FEEL

16:43   17  THAT WE'VE SUFFERED IS THAT WE WERE PROCEEDING ALL ALONG ON A

16:43   18  THEORY BASED UPON DR. BEA IN HIS DEPOSITION.  THEN WHEN WE GET

16:43   19  TO TRIAL, THE NUMBER HAD RAISED FROM WHAT WAS 20 PERCENT IN HIS

16:43   20  DEPOSITION TO 50 PERCENT AT TRIAL.

16:43   21           **THE COURT:**  WE'LL HAVE TO SEE THAT IN BRIEFS, BUT I

16:43   22  UNDERSTAND THAT.  YOU'VE GOT THAT ON THE RECORD, WHICH IS WHAT

16:43   23  YOU SHOULD DO.  WE ARE OFF THE PROFFER, THANK GOODNESS.

16:43   24  **BY MR. LEVINE:**

16:43   25  **Q.**   WERE YOU IN THE COURTROOM ON FRIDAY, APRIL 24, WHEN

FINAL DAILY COPY

**MOSHER00103**

16:43    1   DR. BEA TESTIFIED ON DIRECT EXAMINATION?

16:43    2   **A.**   YES.

16:43    3   **Q.**   DID YOU HEAR DR. BEA CRITICIZE YOUR USE OF PICTURES IN

16:43    4   THIS CASE?

16:43    5   **A.**   YES.

16:43    6   **Q.**   DID YOU READ DR. BEA'S JANUARY 29, 2009 DECLARATION, WHICH

16:43    7   IS MARKED AS JX-207?

16:43    8   **A.**   YES, I DID.

16:44    9   **Q.**   DID DR. BEA CRITICIZE YOUR USE OF PICTURES IN THAT

16:44   10   DECLARATION TOO?

16:44   11   **A.**   YES, HE DID.

16:44   12   **Q.**   CAN WE TURN TO PAGE 66 OF THAT DECLARATION.

16:44   13         **THE COURT:**   COUNSEL, JUST TO ORIENT ME -- I'M SURE

16:44   14   YOU'RE GOING TO -- "USE OF PICTURES," DO YOU MEAN PHOTOGRAPHS?

16:44   15         **MR. LEVINE:**   YES.   PHOTOGRAPHS.

16:44   16         **THE COURT:**   THANK YOU.

16:44   17         **MR. LEVINE:**   YOUR HONOR, IF I MAY HAVE ONE MOMENT?

16:44   18         **THE COURT:**   YES.   ABSOLUTELY.

16:45   19         **MR. LEVINE:**   CAN WE SWITCH TO THE ELMO, PLEASE?

16:45   20         **THE COURT:**   WE ARE IN DR. BEA'S DECLARATION OF

16:45   21   JANUARY 29?

16:45   22         **MR. LEVINE:**   2009.   THAT IS JX-207.   THIS IS PAGE 66.

16:45   23   I'M GOING TO READ FROM PARAGRAPH 109:

16:45   24         "THE COMPARISON OF RESULTS FROM TWO SETS OF

16:45   25   FORENSIC ENGINEERING ANALYSES OF THE SAME BREACH (PLAINTIFFS

FINAL DAILY COPY

| | | |
|---|---|---|
| 16:45 | 1 | AND DEFENSE) ILLUSTRATES HOW IT IS EASY TO DRAW THE WRONG |
| 16:45 | 2 | CONCLUSIONS THROUGH ANALYSIS OF FLAWED OBSERVATIONAL DATA; TO |
| 16:45 | 3 | NOT PERFORM OTHER ANALYSES THAT CHALLENGE AND CORROBORATE THE |
| 16:45 | 4 | OBSERVATION-BASED ANALYSES; AND TO JUMP TO CONCLUSIONS |
| 16:45 | 5 | CONCERNING THE CAUSATIVE CONDITIONS AND FACTORS. |
| 16:46 | 6 | "THE WRONG DOTS (CLUES) ARE CONNECTED IN THE |
| 16:46 | 7 | WRONG WAYS AND THE WRONG CONCLUSIONS ARE DRAWN FROM THE |
| 16:46 | 8 | ANALYZES -- 'SEEING IS NOT BELIEVING - BELIEVING IS SEEING,' |
| 16:46 | 9 | (RESULTS FROM CONFIRMATION, ORGANIZATION, AND SOCIAL BIASES). |
| 16:46 | 10 | THIS SAME THEME ALSO IS EVIDENT IN THE DEFENSE EXPERT'S |
| 16:46 | 11 | ANALYSES OF THE BREACHES THAT DEVELOPED AT THE LOWER NINTH |
| 16:46 | 12 | WARD." |
| 16:46 | 13 | IN THIS SECTION DR. BEA'S TALKING ABOUT A COUPLE |
| 16:46 | 14 | OF FIGURES YOU REFERENCED CONCERNING THE BAYOU DUPRE CONTROL |
| 16:46 | 15 | STRUCTURE; CORRECT? |
| 16:46 | 16 | A.   THAT IS CORRECT. |
| 16:46 | 17 | Q.   I WANT TO TAKE A LOOK AT THE PICTURES CITED IN THE REPORT |
| 16:46 | 18 | BY DR. BEA.  I WANT TO TURN TO PAGE 61 OF THAT DECLARATION AND |
| 16:46 | 19 | LOOK AT FIGURE 3. |
| 16:47 | 20 | MR. LEVINE:  CAN WE TURN BACK TO THE COMPUTER. |
| 16:47 | 21 | BY MR. LEVINE: |
| 16:47 | 22 | Q.   THIS IS A PICTURE THAT YOU REFERENCED IN YOUR EXPERT |
| 16:47 | 23 | REPORT; CORRECT? |
| 16:47 | 24 | A.   THAT'S CORRECT. |
| 16:47 | 25 | Q.   THE YELLOW ARROW ON THE PICTURE, THAT'S FROM DR. BEA? |

FINAL DAILY COPY

MOSHER00105

| | | |
|---|---|---|
| 16:47 | 1 | THAT'S NOT IN YOUR REPORT? |
| 16:47 | 2 | **A.**   DR. BEA PUT IT IN THAT FIGURE IN HIS REPORT. |
| 16:47 | 3 | **Q.**   NOW, WHERE'S THE HOLE IN THE CONCRETE PILING IN RELATION |
| 16:47 | 4 | TO THAT STRUCTURE?  THE LEFT SIDE OR THE RIGHT SIDE? |
| 16:47 | 5 | **A.**   IT'S ON THE LEFT SIDE, WHICH WOULD BE THE NORTH SIDE OF |
| 16:47 | 6 | THE STRUCTURE. |
| 16:47 | 7 | **Q.**   NOW, THAT'S THE MRGO PRETTY CLEARLY IN THE BACKGROUND OF |
| 16:47 | 8 | THE PICTURE; CORRECT? |
| 16:47 | 9 | **A.**   THAT'S CORRECT. |
| 16:47 | 10 | **MR. LEVINE:**  LET'S MARK THAT AS "MRGO," PLEASE.  ZOOM |
| 16:48 | 11 | BACK IN ON THAT, PLEASE. |
| 16:48 | 12 | **BY MR. LEVINE:** |
| 16:48 | 13 | **Q.**   NOW, YOU SEE THOSE TWO PILLBOX-LIKE POSTS I'M POINTING TO? |
| 16:48 | 14 | **A.**   YES, I DO. |
| 16:48 | 15 | **Q.**   WHICH SIDE OF THE STRUCTURE IS THAT ON?  THE MRGO SIDE OR |
| 16:48 | 16 | THE -- |
| 16:48 | 17 | **THE COURT:**  WHEN YOU SAY THE "TWO PILLBOX-LIKE |
| 16:48 | 18 | STRUCTURES" -- |
| 16:48 | 19 | **THE WITNESS:**  THESE RIGHT HERE. |
| 16:48 | 20 | **THE COURT:**  WHY DON'T YOU POINT THEM OUT.  I DO A LOT |
| 16:48 | 21 | BETTER. |
| 16:48 | 22 | **THE WITNESS:**  RIGHT THERE WITH THE CIRCLES. |
| 16:48 | 23 | **BY MR. LEVINE:** |
| 16:48 | 24 | **Q.**   DO YOU SEE WHERE THE CIRCLES ARE? |
| 16:48 | 25 | **THE COURT:**  ONE'S ON THE LEFT, AND ONE'S ON THE RIGHT |

FINAL DAILY COPY

MOSHER00106

16:48    1    OF THE PHOTOGRAPH; IS THAT CORRECT?  AM I SEEING THAT?

16:48    2             **MR. LEVINE:**  ONE'S ON THE LEFT SIDE OF THE CONTROL

16:48    3    STRUCTURE, AND ONE APPEARS TO BE ON THE RIGHT SIDE.

16:48    4             **THE WITNESS:**  FACING THE MRGO.

16:48    5    **BY MR. LEVINE:**

16:48    6    **Q.**   BOTH THOSE POSTS ARE ON THE MRGO SIDE OF THE STRUCTURE;

16:48    7    CORRECT?

16:48    8    **A.**   THAT'S CORRECT.

16:48    9    **Q.**   HAVE YOU EVER VISITED THIS STRUCTURE BEFORE?

16:49   10    **A.**   SEVERAL TIMES.

16:49   11    **Q.**   DO THOSE POSTS MOVE?

16:49   12             **THE COURT:**  WHEN YOU SAY "ON THE MRGO SIDE OF THE

16:49   13    STRUCTURE," YOU MEAN IN THE FRONT OF THE WALL OF THE --

16:49   14             **THE WITNESS:**  THAT'S RIGHT, THEY'RE IN FRONT OF THE

16:49   15    WALL.

16:49   16             **THE COURT:**  OKAY.

16:49   17    **BY MR. LEVINE:**

16:49   18    **Q.**   SO YOU VISITED THOSE STRUCTURES.  DO THEY MOVE?

16:49   19    **A.**    NO, THEY DON'T.  THEY'RE WHERE THE GUY GOES TO OPEN AND

16:49   20    CLOSE THE GATES.  THEY'RE A CONTROL STRUCTURE THAT HAVE

16:49   21    HYDRAULIC CONNECTIONS TO THE GATES OPENING AND CLOSING.

16:49   22    **Q.**   WE'VE BEEN CALLING THEM PILLBOX-LIKE POSTS AND HAVE SORT

16:49   23    OF ADOPTED THAT TERMINOLOGY, BUT SOMEONE CAN ACTUALLY CLIMB IN

16:49   24    THERE AND OPEN AND CLOSE THE GATES?

16:49   25    **A.**   THAT'S CORRECT.

FINAL DAILY COPY

MOSHER00107

| 16:49 | 1 | **Q.**   IT'S LIKE A STRUCTURE WHERE BOATS CAN GO THROUGH? |
| 16:49 | 2 | **A.**   THAT'S CORRECT. |
| 16:49 | 3 | **Q.**   NOW, I WANT TO TURN TO PAGE 65 OF THIS SAME DECLARATION. |
| 16:50 | 4 | I WANT TO LOOK AT THE TOP FIGURE THERE, WHICH IS MARKED AS |
| 16:50 | 5 | FIGURE 6.  WHERE ARE THOSE POSTS?  DO YOU SEE THE POSTS AGAIN? |
| 16:50 | 6 | **A.**   I DO. |
| 16:50 | 7 | **Q.**   SO THEY'RE ON THE LEFT-HAND SIDE OF THE STRUCTURE THIS |
| 16:50 | 8 | TIME; CORRECT? |
| 16:50 | 9 | **A.**   THAT'S CORRECT. |
| 16:50 | 10 | **MR. LEVINE:**  CAN WE HIGHLIGHT THOSE. |
| 16:50 | 11 | **THE COURT:**  THE MRGO WOULD BE TO THE FRONT OR LEFT OF |
| 16:50 | 12 | THE PICTURE; IS THAT CORRECT? |
| 16:50 | 13 | **THE WITNESS:**  THAT'S CORRECT. |
| 16:50 | 14 | **BY MR. LEVINE:** |
| 16:50 | 15 | **Q.**   THE MRGO, THE JUDGE AND THE WITNESS HAVE IDENTIFIED, IS ON |
| 16:50 | 16 | THE LEFT SIDE OF THE PICTURE.  SO THERE WE SEE THE MRGO IN |
| 16:50 | 17 | PICTURES.  THE HOLE IS TO THE NORTH SIDE, AGAIN, OF THE |
| 16:50 | 18 | STRUCTURE; CORRECT? |
| 16:50 | 19 | **A.**   THAT'S CORRECT. |
| 16:51 | 20 | **Q.**   NOW, LET'S TAKE A LOOK AT SOME VIDEOTAPE.  WE'VE MARKED |
| 16:51 | 21 | AND IDENTIFIED THIS AS PX-1877.60.  THIS VIDEOTAPE IS A PORTION |
| 16:51 | 22 | OF THE VIDEOTAPE PLAINTIFFS PROVIDED TO THE COURT.  WE JUST |
| 16:51 | 23 | EXCERPTED A 50-SECOND CLIP FROM IT.  THE PORTION THEY PROVIDED |
| 16:51 | 24 | TO THE COURT IS PX-1877.6.  CAN WE PLAY THAT TAPE, PLEASE. |
| 16:51 | 25 | (WHEREUPON THE VIDEO WAS PLAYED.) |

FINAL DAILY COPY

**MOSHER00108**

| | | |
|---|---|---|
| 16:51 | 1 | **BY MR. LEVINE:** |
| 16:51 | 2 | **Q.**   WHERE IS THE MRGO IN THIS? |
| 16:51 | 3 | **A.**   TO THE LEFT. |
| 16:51 | 4 | **Q.**   CAN YOU SORT OF NARRATE WHAT YOU SEE HERE. |
| 16:51 | 5 | **A.**   YOU CAN SEE THAT THERE'S EROSION OF THE LEVEE AS YOU'RE |
| 16:51 | 6 | MOVING DOWN.  THERE'S SOME HEADCUTTING, EROSION SPOTS ALONG THE |
| 16:51 | 7 | LEVEE.  YOU'RE STARTING NOW TO COME UP TO WHERE THE CONTROL |
| 16:51 | 8 | STRUCTURE IS WITH SIGNIFICANT EROSION AND HEADCUTTING ALONG |
| 16:51 | 9 | THERE.  AS YOU APPROACH THE STRUCTURE, YOU CAN START SEEING |
| 16:52 | 10 | THERE WAS SOME MORE EROSION AS WE START GETTING CLOSER TO THAT |
| 16:52 | 11 | STRUCTURE.  THAT WAS DUE TO THE TRANSITION. |
| 16:52 | 12 | **MR. LEVINE:**  WHEN THE STRUCTURE COMES INTO VIEW, CAN |
| 16:52 | 13 | WE PRESS "PAUSE," PLEASE, SO WE CAN TAKE A LOOK AT THE |
| 16:52 | 14 | STRUCTURE.  RIGHT NOW. |
| 16:52 | 15 | **BY MR. LEVINE:** |
| 16:52 | 16 | **Q.**   ONCE AGAIN, YOU SEE THE PILLBOX POSTS; CORRECT? |
| 16:52 | 17 | **A.**   YES. |
| 16:52 | 18 | **Q.**   WHAT SIDE OF THE STRUCTURE ARE THEY ON? |
| 16:52 | 19 | **A.**   THEY'RE ON THE SIDE FACING THE MRGO, OR THE MRGO SIDE OF |
| 16:52 | 20 | THE WALL. |
| 16:52 | 21 | **THE COURT:**  I'M GOING TO ASSUME THOSE STRUCTURES ARE |
| 16:52 | 22 | NOT GOING TO MOVE UNLESS SOME FORCE PICKS THEM UP AND PUTS THEM |
| 16:52 | 23 | SOMEWHERE ELSE.  THEY'RE ON THE MRGO SIDE OF THE WALL.  I'M |
| 16:52 | 24 | WELL ORIENTED. |
| | 25 | |

FINAL DAILY COPY

| | | |
|---|---|---|
| 16:52 | 1 | **BY MR. LEVINE:** |
| 16:52 | 2 | **Q.**   LET'S TURN TO PAGE 63 OF JX-207.  LET'S TAKE A LOOK AT |
| 16:53 | 3 | FIGURE 5.  THAT WOULD BE THE BOTTOM PHOTO.  ACCORDING TO THE |
| 16:53 | 4 | CAPTION, THIS FIGURE WAS TAKEN JUST AFTER HURRICANE KATRINA; |
| 16:53 | 5 | CORRECT? |
| 16:53 | 6 | **A.**   THAT'S CORRECT. |
| 16:53 | 7 | **Q.**   THE YELLOW, ARROW WHERE IT SAYS "INTACT SHEET PILE OF THE |
| 16:53 | 8 | WALL," THAT COMES FROM DR. BEA; CORRECT? |
| 16:53 | 9 | **A.**   THAT'S CORRECT. |
| 16:53 | 10 | **Q.**   WHERE ARE THE POSTS THIS TIME?  ARE THEY IN THE FRONT OF |
| 16:53 | 11 | THE PICTURE OR THE BACK OF THE PICTURE? |
| 16:53 | 12 | **A.**   THEY'RE IN THE FRONT. |
| 16:53 | 13 | **Q.**   THAT MEANS THE MRGO IS -- |
| 16:53 | 14 | **THE COURT:**  HE CAN POINT IT OUT.  I THINK I KNOW |
| 16:53 | 15 | WHERE IT IS. |
| 16:53 | 16 | **THE WITNESS:**  THE MRGO WOULD BE BACK HERE, AND YOU'RE |
| 16:53 | 17 | FLYING INTO THE -- |
| 16:53 | 18 | **THE COURT:**  YOU'RE FLYING FROM THE MRGO TOWARDS THE |
| 16:53 | 19 | STRUCTURE. |
| 16:53 | 20 | **THE WITNESS:**  TOWARDS THE STRUCTURE. |
| 16:53 | 21 | **THE COURT:**  BASED ON THE JUXTAPOSITION OF THE |
| 16:53 | 22 | SO-CALLED PILLBOXES TO THE AIRCRAFT FROM WHICH THE POSITION THE |
| 16:53 | 23 | TAKEN. |
| 16:53 | 24 | **THE WITNESS:**  THAT'S CORRECT. |
| | 25 | |

FINAL DAILY COPY

MOSHER00110

| | | |
|---|---|---|
| 16:53 | 1 | **BY MR. LEVINE:** |
| 16:54 | 2 | **Q.**   LET'S SHOW ONE MORE PICTURE, AND LET'S SHOW THE TOP ONE ON |
| 16:54 | 3 | THIS PAGE.  THIS IS FIGURE 10.  NOW, THIS IS THE PICTURE THAT |
| 16:54 | 4 | WE SAW DURING DR. BEA'S DIRECT EXAMINATION; CORRECT? |
| 16:54 | 5 | **A.**   THAT'S CORRECT. |
| 16:54 | 6 | **Q.**   SO THIS TIME, WHERE DO YOU SEE THE PILLBOX POSTS? |
| 16:54 | 7 | **A.**   I SEE THEM ON THE FRONT -- FOREGROUND ON THE MRGO SIDE. |
| 16:54 | 8 | **THE COURT:**  WAIT A MINUTE.  CAN WE BLOW THAT UP. |
| 16:54 | 9 | THAT ONE. |
| 16:54 | 10 | **THE WITNESS:**  IT'S ALMOST IDENTICAL TO THE PICTURE |
| 16:54 | 11 | BEFORE. |
| 16:54 | 12 | **THE COURT:**  IT'S A LITTLE BETTER. |
| 16:54 | 13 | **BY MR. LEVINE:** |
| 16:54 | 14 | **Q.**   CAN YOU TELL WHERE THOSE POSTS ARE ON THE STRUCTURE THIS |
| 16:54 | 15 | TIME. |
| 16:54 | 16 | **A.**   YES. |
| 16:55 | 17 | **Q.**   WHERE ARE THEY? |
| 16:55 | 18 | **A.**   THEY ARE ON THE MRGO SIDE, AND THEY ARE IN FRONT AS YOU |
| 16:55 | 19 | ARE APPROACHING THE STRUCTURE. |
| 16:55 | 20 | **Q.**   SO WHERE'S THE MRGO AGAIN? |
| 16:55 | 21 | **A.**   THE MRGO IS BEHIND THE PLANE.  YOU'RE FLYING FROM THE MRGO |
| 16:55 | 22 | INTO THE -- APPROACHING THE STRUCTURE. |
| 16:55 | 23 | **Q.**   BUT THE BOTTOM OF THE SCREEN? |
| 16:55 | 24 | **A.**   BOTTOM OF THE SCREEN, THAT'S CORRECT. |
| 16:55 | 25 | **Q.**   THE CONCRETE WALL IDENTIFIED IN THE OTHER PICTURE, WHERE |

MOSHER00111

| | | |
|---|---|---|
| 16:55 | 1 | WOULD THAT -- THE ONE WITH THE HOLE IN IT, WHERE WOULD THAT BE? |
| 16:55 | 2 | **A.**   IT WOULD BE ON THE OTHER SIDE OF THE PLANE. |
| 16:55 | 3 | **Q.**   YOU CAN'T SEE THE HOLE IN THE CONCRETE WALL BECAUSE IT'S |
| 16:55 | 4 | BLOCKED BY THE PLANE? |
| 16:55 | 5 | **A.**   THAT'S CORRECT. |
| 16:55 | 6 | **MR. LEVINE:**  YOUR HONOR, CAN WE TAKE A VERY SHORT |
| 16:55 | 7 | BREAK? |
| 16:55 | 8 | **THE COURT:**  YES, YOU MAY.  FIVE MINUTES. |
| 16:56 | 9 | **MR. LEVINE:**  THANK YOU. |
| 16:56 | 10 | **THE DEPUTY CLERK:**  ALL RISE. |
| 16:56 | 11 | (WHEREUPON THE COURT TOOK A BRIEF RECESS.) |
| 17:04 | 12 | **THE DEPUTY CLERK:**  ALL RISE. |
| 17:04 | 13 | COURT IS IN SESSION.  PLEASE BE SEATED. |
| 17:04 | 14 | **THE COURT:**  PROCEED. |
| 17:04 | 15 | BY MR. LEVINE: |
| 17:05 | 16 | **Q.**   NOW, IT'S YOUR OPINION, DR. MOSHER, THAT THE LEVEES WHICH |
| 17:05 | 17 | BREACHED DURING HURRICANE KATRINA WERE PRIMARILY BREACHED BY |
| 17:05 | 18 | OVERTOPPING; CORRECT? |
| 17:05 | 19 | **A.**   THAT'S CORRECT. |
| 17:05 | 20 | **Q.**   YOU REVIEWED PICTURES PRIMARILY TO DETERMINE THAT THE |
| 17:05 | 21 | LEVEES WERE BREACHED BY OVERTOPPING? |
| 17:05 | 22 | **A.**   YES, I DID. |
| 17:05 | 23 | **Q.**   LET'S TALK ABOUT THESE PICTURES.  HOW DID THE PICTURES |
| 17:05 | 24 | SHOW YOU THAT THE BREACHING OCCURRED BY OVERTOPPING?  BY |
| 17:05 | 25 | "PICTURES," I MEAN PHOTOGRAPHS. |

FINAL DAILY COPY

MOSHER00112

| | |
|---|---|
| 17:05 | 1 |
| 17:05 | 2 |
| 17:05 | 3 |
| 17:05 | 4 |
| 17:05 | 5 |
| 17:05 | 6 |
| 17:05 | 7 |

17:05    1    **A.**   BY EXAMINING A SERIES OF PICTURES, PHOTOGRAPHS, YOU COULD

17:05    2    EXAMINE WHERE YOU HAD PARTIAL BREACHING, THE INTRODUCTION OF

17:05    3    BREACHING AT DIFFERENT LOCATIONS, AND YOU COULD ACTUALLY SEE

17:05    4    WITHIN SOME LOCATIONS WHERE YOU HAD THE FULL RANGE OF BREACHING

17:05    5    FROM OVERTOPPING, AND THEN LOOKING FOR EVIDENCE OF OTHER TYPES

17:05    6    OF BREACHINGS ALONG THAT.  SO YOU USE THE WHOLE SET OF

17:05    7    PHOTOGRAPHS TO DO THAT EXAMINATION.

17:06    8    **Q.**   WHEN A LEVEE WAS COMPLETELY ERODED, HOW DID A PHOTOGRAPH

17:06    9    HELP YOU DETERMINE THE METHOD OF BREACHING WHICH OCCURRED ON

17:06   10    THAT LEVEE?

17:06   11    **A.**   WELL, THE PHOTOGRAPH OF THAT PARTICULAR ONE, WHEN ONE IS

17:06   12    BREACHED ALL THE WAY THROUGH AND IS ERODED AWAY, YOU HAVE TO

17:06   13    LOOK AT THE FULL RANGE OF THE LEVEES ON ALL THE PHOTOGRAPHS TO

17:06   14    GET THE PONDERANCE OF WHAT TOOK PLACE.

17:06   15    **Q.**   HOW DOES WATER OVERTOPPING A LEVEE CAUSE EROSION?

17:06   16    **A.**   BY RUNNING DOWN THE BACK OF THE LEVEE.  IT HAS AN

17:06   17    INCREASED VELOCITY DOING THAT.  AND WHEN YOU HAVE ANY KIND OF

17:06   18    IRREGULARITY IN THE LEVEE, IT CAUSES TURBULENCE, AND THAT

17:06   19    TURBULENCE WILL CAUSE EROSION TO TAKE PLACE.  SO ANY

17:06   20    IRREGULARITY IN GEOMETRY OR EVEN SOFT PLACE IN THE LEVEE WILL

17:06   21    CAUSE THAT TO TAKE PLACE.

17:06   22    **Q.**   WHAT IS THIS PROCESS CALLED?

17:06   23    **A.**   WELL, THE PROCESS OF EROSION INVOLVES HEADCUTTING.  YOU

17:06   24    GET TURBULENCE AT THAT LOCATION, AND THAT TURBULENCE CREATES

17:07   25    EVEN MORE EROSION, UNTIL YOU GET A POINT OF HEADCUTTING THAT

FINAL DAILY COPY

MOSHER00113

| | | |
|---|---|---|
| 17:07 | 1 | CAN CUT BACK THROUGH THE LEVEE. |
| 17:07 | 2 | **Q.**   LET'S TAKE A LOOK AT FIGURE 6 ON PAGE 16 OF YOUR EXPERT |
| 17:07 | 3 | REPORT, WHICH IS JX-212.  JUST GENERALLY, WHAT DOES THIS FIGURE |
| 17:07 | 4 | SHOW? |
| 17:07 | 5 | **A.**   IT SHOWS THE STAGES OF EROSION FROM THE BACK SIDE TO THE |
| 17:07 | 6 | FLOOD SIDE. |
| 17:07 | 7 | **Q.**   IF WE CAN TURN BACK ONE PAGE REALLY QUICKLY AND LOOK AT |
| 17:07 | 8 | THE BOTTOM PARAGRAPH THERE ALL THE WAY AT THE BOTTOM.  NOW, |
| 17:07 | 9 | THAT FIGURE, WHERE DID THAT FIGURE COME FROM? |
| 17:07 | 10 | **A.**   IT CAME FROM THOSE REFERENCES.  ONE OF THEM IS HUNTER, AND |
| 17:07 | 11 | THE OTHER ONE IS A JAPANESE REFERENCE THAT TALKS ABOUT HOW, |
| 17:07 | 12 | WHEN YOU'RE DOING AN INVESTIGATION, THE VARIOUS STAGES OF |
| 17:07 | 13 | EROSION TAKE PLACE AND HOW TO CHARACTERIZE THOSE. |
| 17:08 | 14 | **Q.**   LET'S TURN BACK AND TAKE A LOOK AT FIGURE 6 ON PAGE 16 OF |
| 17:08 | 15 | YOUR EXPERT REPORT.  LET'S TALK ABOUT THE FOUR STAGES.  WHAT'S |
| 17:08 | 16 | STAGE A? |
| 17:08 | 17 | **A.**   STAGE A IS AFTER YOU'VE GOT AN INITIAL DISTURBANCE AND YOU |
| 17:08 | 18 | ARE GETTING TURBULENCE, YOU GET THE INITIAL HEADCUT.  SO IN |
| 17:08 | 19 | THIS CASE, IT'S SHOWING LOW ON THE LEVEE, WHERE YOU GET THIS |
| 17:08 | 20 | INITIAL FROM -- THIS VERTICAL HEADCUTTING. |
| 17:08 | 21 | **Q.**   I SEE IN THIS FIGURE AT THE TOP OF IT THE CREST IS |
| 17:08 | 22 | REPRESENTED BY THE AREA THAT SAYS "10 FEET."  YOU'VE GOT TWO |
| 17:08 | 23 | LINES ON EACH SIDE OF IT? |
| 17:08 | 24 | **A.**   THAT'S CORRECT.  IT'S ON THE BACK SIDE OF THE LEVEE. |
| 17:08 | 25 | **Q.**   CAN YOU DESCRIBE WHAT STAGE B IS. |

FINAL DAILY COPY

MOSHER00114

| 17:08 | 1 | **A.**  STAGE B IS WHERE THAT'S PROGRESSED UP TO WHERE IT'S |
| 17:08 | 2 | ACTUALLY CUT INTO THE CROWN. |
| 17:08 | 3 | **Q.**  NOW, WHAT'S STAGE C? |
| 17:09 | 4 | **A.**  IT'S WHERE IT'S CUT THROUGH AND YOU'VE ACTUALLY LOST THE |
| 17:09 | 5 | CROWN, SO YOU ACTUALLY HAVE BREACHING TAKING PLACE. |
| 17:09 | 6 | **Q.**  FINALLY, WHAT IS STAGE D? |
| 17:09 | 7 | **A.**  STAGE D IS THE LAST PLACE WHERE YOU CAN SEE SOME |
| 17:09 | 8 | CHARACTERIZATION OF BACK-TO-FRONT SIDE, BECAUSE YOU WOULD STILL |
| 17:09 | 9 | SEE THIS HEADCUTTING BACK HERE. |
| 17:09 | 10 | **Q.**  IT APPEARS TO ME THAT AS THE HEADCUTTING IS OCCURRING, |
| 17:09 | 11 | IT'S WORKING ITS WAY FROM THE BACK OF THE LEVEE, THE PROTECTIVE |
| 17:09 | 12 | SIDE -- |
| 17:09 | 13 | **A.**  THAT'S CORRECT.  YOU CAN SEE THE VERY STAGES AS IT EASES |
| 17:09 | 14 | ITS WAY THROUGH. |
| 17:09 | 15 | **Q.**  IT MOVES ALL THE WAY TO THE FLOOD SIDE; RIGHT? |
| 17:09 | 16 | **A.**  THAT'S CORRECT. |
| 17:09 | 17 | **Q.**  YOU'RE GOING TO SEE EROSION DAMAGE ON THE FLOOD SIDE OF |
| 17:09 | 18 | THE LEVEE AS A RESULT OF OVERTOPPING HEADCUTTING? |
| 17:09 | 19 | **A.**  THAT'S CORRECT. |
| 17:09 | 20 | **THE COURT:**  LET ME ASK YOU A QUESTION, SIR.  WITH |
| 17:09 | 21 | OVERTOPPING HEADCUTTING PRECIPITATED BY BACK-SIDE EROSION, AT |
| 17:09 | 22 | WHAT POINT -- IF THERE'S A WAY TO DO THIS.  IS THERE A POINT |
| 17:09 | 23 | WHERE YOU START SEEING THE HEADCUTTING ON THE FRONT SIDE OF THE |
| 17:10 | 24 | LEVEE, ABOUT WHAT POINT ALONG THE SLOPE OF THE LEVEE? |
| 17:10 | 25 | **THE WITNESS:**  WELL, YOU WOULD SEE SOME EVEN HERE. |

FINAL DAILY COPY

MOSHER00115

| | | |
|---|---|---|
| 17:10 | 1 | YOU KNOW, THIS IS WHERE IT'S JUST -- |
| 17:10 | 2 | **THE COURT:**  ARE WE ON THE BACK SIDE THERE? |
| 17:10 | 3 | **THE WITNESS:**  IT'S RIGHT IN THE CROWN.  RIGHT THERE. |
| 17:10 | 4 | **THE COURT:**  OKAY. |
| 17:10 | 5 | **THE WITNESS:**  THIS WOULD BE JUST A -- |
| 17:10 | 6 | **THE COURT:**  IT GETS STEEPER AS IT GOES DOWN? |
| 17:10 | 7 | **THE WITNESS:**  DOWN.  ON THE FRONT -- IT'S PRETTY |
| 17:10 | 8 | STEEP HERE, AND IT WOULD START GETTING STEEP UP HERE AGAIN. |
| 17:10 | 9 | BY MR. LEVINE: |
| 17:10 | 10 | Q.   I WANT TO TAKE A LOOK AT FIGURE 7 ON PAGE 17 OF YOUR |
| 17:10 | 11 | EXPERT REPORT.  THIS FIGURE SHOWS THE FOUR STAGES OF |
| 17:10 | 12 | PROGRESSIVE EROSION ALONG REACH 2 OF THE MISSISSIPPI RIVER GULF |
| 17:10 | 13 | OUTLET; CORRECT? |
| 17:10 | 14 | A.   THAT'S CORRECT. |
| 17:10 | 15 | Q.   SO WE KNOW THAT THE MRGO IS TO THE LEFT OF THIS PICTURE? |
| 17:11 | 16 | A.   THAT'S CORRECT. |
| 17:11 | 17 | Q.   COULD WE IDENTIFY THIS ON THE PICTURE. |
| 17:11 | 18 | WELL, LET'S JUST LEAVE IT AS IT IS AND TALK ABOUT |
| 17:11 | 19 | EACH ONE.  IN THE FRONT OF THIS PICTURE, WE SEE WHAT WE'VE |
| 17:11 | 20 | IDENTIFIED AS A MOWED STRIP OF GRASS.  CAN YOU EXPLAIN WHAT |
| 17:11 | 21 | THAT IS AND WHERE THAT COMES FROM. |
| 17:11 | 22 | A.   THAT IS SOME WAVE WEARING AND EROSION THAT COMES FROM THE |
| 17:11 | 23 | WAVES BREAKING THAT'S LOWER.  OVERTOPPING OCCURS. |
| 17:11 | 24 | Q.   APPROXIMATELY HOW HIGH ON THE LEVEE IS THIS MOWED STRIP OF |
| 17:11 | 25 | GRASS? |

FINAL DAILY COPY

MOSHER00116

| | | |
|---|---|---|
| 17:11 | 1 | **A.**   SOMEWHERE AROUND ELEVATION 13 OR SO. |
| 17:11 | 2 | **Q.**   DOES IT CONSTITUTE BREACHING? |
| 17:11 | 3 | **A.**   NO.  YOU CAN SEE IT'S WORN HERE, BUT YOU CAN SEE THAT IT |
| 17:11 | 4 | HASN'T BREACHED THROUGH. |
| 17:11 | 5 | **Q.**   NOW, LET'S DISCUSS THE STAGE A EROSION THAT WE SEE ON THIS |
| 17:11 | 6 | PHOTOGRAPH. |
| 17:12 | 7 | **A.**   YOU SEE IT IN A COUPLE LOCATIONS:  ONE UP HERE AND ONE |
| 17:12 | 8 | DOWN HERE.  YOU CAN SEE JUST SOME STARTING.  IT'S JUST STARTING |
| 17:12 | 9 | TO FORM HEADCUTTING IN THESE LOCATIONS. |
| 17:12 | 10 | **Q.**   LET'S TALK ABOUT STAGE B EROSION THAT WE SEE ON THIS |
| 17:12 | 11 | PHOTOGRAPH. |
| 17:12 | 12 | **A.**   YOU'LL SEE STAGE B RIGHT IN HERE. |
| 17:12 | 13 | **Q.**   IF WE MOVE DOWN, YOU SEE STAGE C? |
| 17:12 | 14 | **A.**   STAGE C, YOU SEE WHERE IT'S STARTING TO GET INTO THE |
| 17:12 | 15 | CROWN? |
| 17:12 | 16 | **Q.**   FINALLY, STAGE D, IT LOOKS LIKE IT'S ALREADY MOVED TO THE |
| 17:12 | 17 | FLOOD SIDE OF THE CROWN.  IS THAT -- |
| 17:12 | 18 | **A.**   THAT'S RIGHT.  YOU CAN SEE THAT IT'S ACTUALLY STARTED |
| 17:12 | 19 | EATING INTO WHERE THE MOWED STRIP IS LOCATED. |
| 17:12 | 20 | **Q.**   I WANT TO EXAMINE JUST A FEW MORE OF THE PICTURES, THE |
| 17:12 | 21 | PHOTOGRAPHS.  WE'VE LOOKED AT A WHOLE BUNCH OF THEM IN THE LAST |
| 17:12 | 22 | FEW DAYS.  LET'S TAKE A LOOK AT PAGE 141 OF YOUR EXPERT REPORT. |
| 17:12 | 23 | I WANT TO A LOOK AT FIGURE A31. |
| 17:13 | 24 | **THE COURT:**  COUNSEL, DO WE HAVE A COPY WITH YOUR |
| 17:13 | 25 | ARROWS? |

FINAL DAILY COPY

**MOSHER00117**

| | | |
|---|---|---|
| 17:13 | 1 | **MR. LEVINE:**  I'LL PROVIDE A COPY. |
| 17:13 | 2 | **BY MR. LEVINE:** |
| 17:13 | 3 | **Q.**  AGAIN, WHERE'S THE MRGO IN THIS PICTURE? |
| 17:13 | 4 | **A.**  THE MRGO IS LOCATED OVER HERE. |
| 17:13 | 5 | **Q.**  IS THAT ON THE LEFT OR THE RIGHT? |
| 17:13 | 6 | **A.**  ON THE LEFT. |
| 17:13 | 7 | **Q.**  YOU SEE THE MOWED STRIP OF GRASS IN THIS PICTURE? |
| 17:13 | 8 | **A.**  YES.  YOU CAN SEE THE MOWED STRIP OF GRASS RUNNING ALONG |
| 17:13 | 9 | THE FLOOD SIDE OF THE LEVEE. |
| 17:13 | 10 | **THE COURT:**  WHERE I'M LOOKING -- AND IT MAY BE JUST A |
| 17:13 | 11 | PERSPECTIVE.  AT THE BOTTOM OF THE PHOTOGRAPH, WHERE THE |
| 17:13 | 12 | OBVIOUS EROSION TAKES PLACE ON THE BACK SIDE, THE MOWED STRIP |
| 17:13 | 13 | LOOKS WIDER THAN IF WE GO DOWN TOWARDS THE TOP OF THE PICTURE. |
| 17:13 | 14 | IS THAT IN ACTUALITY? |
| 17:14 | 15 | **THE WITNESS:**  THAT IS IN ACTUALITY.  IT DOES VARY |
| 17:14 | 16 | SOMEWHAT ALONG THERE. |
| 17:14 | 17 | **BY MR. LEVINE:** |
| 17:14 | 18 | **Q.**  WHAT ELEVATION DO YOU SEE THAT MOWED STRIP OF GRASS? |
| 17:14 | 19 | **A.**  AGAIN, IT'S GOING TO BE AROUND 12 TO 13. |
| 17:14 | 20 | **THE COURT:**  HOW DO WE KNOW THAT?  JUST BY GOING BACK |
| 17:14 | 21 | ON THE -- |
| 17:14 | 22 | **THE WITNESS:**  RIGHT.  BY LOOKING AT THE PICTURES AND |
| 17:14 | 23 | THE LOCATION OF THE CROWN AND HOW FAR IT'S DOWN FROM THE LEVEE |
| 17:14 | 24 | BECAUSE WE KNOW SLOPES OF THAT. |
| 17:14 | 25 | **THE COURT:**  IS THAT AN ESTIMATE YOU'RE MAKING RATHER |

FINAL DAILY COPY

MOSHER00118

| | | |
|---|---|---|
| 17:14 | 1 | THAN AN ACTUAL MEASURED -- |
| 17:14 | 2 | **THE WITNESS:**  THAT'S AN ESTIMATE BASED ON THE |
| 17:14 | 3 | PHOTOGRAPHS. |
| 17:14 | 4 | **THE COURT:**  THANK YOU. |
| 17:14 | 5 | **BY MR. LEVINE:** |
| 17:14 | 6 | **Q.**  SO WHAT ELSE DO YOU SEE IN THIS PICTURE? |
| 17:14 | 7 | **A.**  YOU SEE SOME BACK-SIDE EROSION, THE BEGINNING OF IT, ALONG |
| 17:14 | 8 | HERE.  THEN YOU SEE SOME C-TYPE EROSION IN THIS LOCATION.  THEN |
| 17:14 | 9 | AT THE TOP -- THAT'S ON THE BOTTOM.  AT THE TOP YOU SEE SOME, |
| 17:14 | 10 | ACTUALLY, D-STAGE EROSION. |
| 17:15 | 11 | **Q.**  IF YOU CAN TURN TO THE NEXT PAGE, WHICH IS PAGE 142 OF |
| 17:15 | 12 | YOUR EXPERT REPORT, AND LOOK AT FIGURE A32.  WHAT DO YOU SEE IN |
| 17:15 | 13 | THIS PICTURE? |
| 17:15 | 14 | **A.**  YOU CAN ACTUALLY SEE ALMOST THE WHOLE SEQUENCE STARTING |
| 17:15 | 15 | WITH ALMOST A RUNNING UP THROUGH B LEVEL OR C STAGE, D STAGE. |
| 17:15 | 16 | THEN YOU CAN EVEN -- BECAUSE IT'S CUT INTO THIS MOWED AREA, SO |
| 17:15 | 17 | YOU'RE STARTING TO SEE THE C STAGE.  SO YOU CAN SEE THE |
| 17:15 | 18 | DIFFERENT -- THERE'S THREE DIFFERENT STAGES YOU CAN ALMOST SEE |
| 17:15 | 19 | IN THIS ONE PICTURE. |
| 17:15 | 20 | **Q.**  ON THE BACK OF THE PICTURE, YOU SEE A LOT OF THIS SOIL |
| 17:15 | 21 | DISPERSAL THAT'S RUNNING AWAY FROM THE CROWN OF THE LEVEE.  DO |
| 17:15 | 22 | YOU SEE THAT? |
| 17:15 | 23 | **A.**  YES. |
| 17:15 | 24 | **Q.**  CAN YOU EXPLAIN WHAT THAT MEANS. |
| 17:15 | 25 | **A.**  THAT THE WATER'S GOING OUT AND IT'S DISTRIBUTED THAT SOIL |

FINAL DAILY COPY

MOSHER00119

| | | |
|---|---|---|
| 17:16 | 1 | OUT INTO THAT AREA.  TO A LARGE EXTENT, IT'S GOING TO BE THE |
| 17:16 | 2 | COURSE-GRAINED MATERIAL THAT GETS LEFT BEHIND IN THAT AREA, |
| 17:16 | 3 | WHERE THE CLAYS AND THE SILTS ARE GOING TO BE TAKING THEM AND |
| 17:16 | 4 | FLOWING AND DISTRIBUTING THEM OUT INTO THAT AREA. |
| 17:16 | 5 | Q.   WHEN YOU SAY COURSE-GRAINED MATERIALS ARE IN THERE, YOU'RE |
| 17:16 | 6 | TALKING ABOUT THE SANDS AND THE GRAVELS ARE WHAT YOU SEE IN THE |
| 17:16 | 7 | DISPERSAL PATTERN? |
| 17:16 | 8 | A.   THAT'S CORRECT. |
| 17:16 | 9 | Q.   THE CLAYS AND SILTS, THE MORE FINE-GRAINED MATERIALS, |
| 17:16 | 10 | THOSE GET WASHED OUT IN THE OVERTOPPING? |
| 17:16 | 11 | A.   IN GENERAL, A LARGE PORTION ARE GOING TO BE WASHED OUT. |
| 17:16 | 12 | THE COURT:  CAN YOU TELL, FROM LOOKING AT THIS, HOW |
| 17:16 | 13 | MUCH YOU'VE LOST IN ELEVATION?  I KNOW IT'S AN ESTIMATE. |
| 17:16 | 14 | THE WITNESS:  RIGHT.  IN THIS AREA, I THINK IT'S |
| 17:16 | 15 | ROUGHLY AROUND 17.5 TO 18.  WE'RE DOWN TO SOMEWHERE AROUND 15 |
| 17:16 | 16 | OR SO.  WE LOST A COUPLE FEET OF ELEVATION. |
| 17:17 | 17 | BY MR. LEVINE: |
| 17:17 | 18 | Q.   I WANT TO TAKE A LOOK AT FIGURE 28 NOW ON PAGE 40 OF YOUR |
| 17:17 | 19 | EXPERT REPORT. |
| 17:17 | 20 | A.   FIGURE 28? |
| 17:17 | 21 | Q.   ON PAGE 40 OF YOUR REPORT.  AGAIN, I THINK WE SEE THE MRGO |
| 17:17 | 22 | IN THE TOP OF THE PICTURE? |
| 17:17 | 23 | A.   THAT'S CORRECT.  MRGO IS UP HERE AT THE TOP. |
| 17:17 | 24 | Q.   WHERE IS THIS FIGURE TAKEN? |
| 17:17 | 25 | A.   IT'S BETWEEN CONTROL STRUCTURE BAYOU BIENVENUE AND DUPRE. |

FINAL DAILY COPY

MOSHER00120

17:18  1   **Q.**   IN THE FOREGROUND OF THE PICTURE, WHICH IS THE PROTECTED

17:18  2   SIDE OF THE LEVEE, I SEE A LOT OF SOIL DISPERSAL.

17:18  3   **A.**   THAT'S CORRECT.

17:18  4   **Q.**   CAN YOU EXPLAIN WHAT THAT MEANS AGAIN.

17:18  5   **A.**   AGAIN, THE SOILS ARE WASHED OUT FROM THE LEVEE INTO THIS

17:18  6   AREA.   AGAIN, YOU'RE GOING TO SEE MORE OF THE COURSE-GRAINED

17:18  7   MATERIAL LEFT BEHIND, WHERE THE FINER GRAINS WILL BE FORCED OUT

17:18  8   FARTHER AND CARRIED ALONG WITH THE FLOW.

17:18  9   **Q.**   NOW LET'S TAKE A LOOK AT PAGE 45 OF YOUR REPORT.   I WANT

17:18  10  TO TAKE A LOOK AT --

17:18  11  **A.**   I WAS JUST GOING TO SAY YOU CAN SEE THE HEADCUTTING PRETTY

17:18  12  WELL IN THAT ONE, TOO.

17:18  13  **Q.**   LET'S TAKE A LOOK AT FIGURE 38, THE TOP FIGURE ON PAGE 45.

17:18  14  AGAIN, THE MRGO IS IN THE TOP OF THE PICTURE?

17:18  15  **A.**   THAT'S CORRECT.

17:18  16  **Q.**   WHERE IS THIS FIGURE TAKEN?

17:18  17  **A.**   THIS IS SOUTHEAST OF BAYOU DUPRE.

17:18  18  **Q.**   CAN YOU EXPLAIN WHAT YOU SEE IN THIS PICTURE.

17:18  19  **A.**   WELL, YOU SEE DOWN TO STAGE D EROSIONS IN THIS AREA.   YOU

17:19  20  CAN SEE KIND OF THE HEADCUTTING HERE, WHERE THERE'S STILL SOME

17:19  21  FRONT-SIDE ELEVATION LEFT OF THE LEVEE AND THE SOIL'S BEEN

17:19  22  PUSHED INTO THE PROTECTIVE SIDE.

17:19  23  **Q.**   I NOTICE HERE, IF YOU LOOK IN THE PICTURE ABOUT A THIRD OF

17:19  24  THE WAY, RIGHT NEXT TO THE GRASS, WHERE I'VE GOT THE LASER

17:19  25  POINTER, IT SEEMS THAT THE WATER HAS KIND OF WASHED AWAY THE

FINAL DAILY COPY

MOSHER00121

| | | |
|---|---|---|
| 17:19 | 1 | LEVEE UP TO THAT POINT.  YOU CAN SEE A HIGHER ELEVATION ON THE |
| 17:19 | 2 | GRASS SIDE THAN YOU DO ON THE HOLE SIDE. |
| 17:19 | 3 | **A.**   THAT'S CORRECT.  THAT'S THIS HEADCUTTING THAT TAKES PLACE |
| 17:19 | 4 | THROUGH HERE.  YOU CAN SEE KIND OF THE SEVERE EROSION THAT HAS |
| 17:19 | 5 | TAKEN PLACE ON THIS SIDE. |
| 17:19 | 6 | **Q.**   DID YOUR REVIEW OF THE PHOTOGRAPHS INDICATE THAT THERE |
| 17:19 | 7 | WERE SOME LOCATIONS WHERE FRONT-SIDE WAVE ATTACK OCCURRED? |
| 17:19 | 8 | **A.**   THERE ARE SEVERAL LOCATIONS WHERE WE'VE SEEN SOME |
| 17:19 | 9 | FRONT-SIDE ATTACK AND THERE WERE SOME FRONT-SIDE EROSION. |
| 17:19 | 10 | **THE COURT:**  HOW MUCH OF THIS LEVEE WAS -- AGAIN, IT'S |
| 17:20 | 11 | HARD TO TELL; IT'S SO ERODED.  BUT IS THERE A WAY TO ESTIMATE |
| 17:20 | 12 | ITS ELEVATION? |
| 17:20 | 13 | **THE WITNESS:**  THIS PARTICULAR LOCATION, I CAN'T SAY |
| 17:20 | 14 | EXACTLY WHAT IT IS.  WHAT YOU SEE FROM THE VARIOUS LOCATIONS, |
| 17:20 | 15 | WE HAVE SOME THAT ARE HIGH AND THAT WERE ABOVE DESIGN THAT |
| 17:20 | 16 | ERODED; SOME THAT WERE BELOW DIDN'T GET ERODED.  SO IT SEEMS TO |
| 17:20 | 17 | BE MORE MATERIAL RELATED THAN JUST ELEVATION. |
| 17:20 | 18 | **THE COURT:**  ONE OF THE THINGS ABOUT THAT -- I'M SURE |
| 17:20 | 19 | PEOPLE WILL TALK TO YOU ABOUT IT LATER -- IF THE MATERIAL WAS |
| 17:20 | 20 | HYDRAULICALLY LIFTED FROM THE MRGO ALONG THE WAY, I WOULD |
| 17:20 | 21 | ASSUME THE MATERIAL AROUND THE LA LOUTRE RIDGE WOULD HAVE BEEN, |
| 17:20 | 22 | SHALL WE SAY, BETTER MATERIAL THAN MATERIAL MAYBE IN OTHER |
| 17:21 | 23 | PLACES, OR WOULD IT? |
| 17:21 | 24 | **A.**   IT REALLY DEPENDS ON THE GEOLOGY OF THE DEPOSIT.  IT WILL |
| 17:21 | 25 | VARY DEPENDING ON WHAT THAT DEPOSIT IS MADE UP OF OR WHAT THEY |

FINAL DAILY COPY

MOSHER00122

17:21    1   WERE ACTUALLY DREDGING OUT OF IT.

17:21    2            **THE COURT:**  DID YOU DO ANY STUDIES ABOUT THE WIDTH OF

17:21    3   THE MRGO AND THE SIZE OF THE BREACHES?

17:21    4            **THE WITNESS:**  I HAVEN'T DONE ANY STUDIES TO THAT,

17:21    5   SIR.

17:21    6   **BY MR. LEVINE:**

17:21    7   **Q.**   WE WERE TALKING ABOUT A COUPLE OF LOCATIONS IN YOUR

17:21    8   PHOTOGRAPHS WHERE YOU SAID FRONT-SIDE WAVE ATTACK WAS

17:21    9   OBSERVABLE.  WERE THESE LOCATIONS PREVALENT?

17:21   10   **A.**   THEY WEREN'T PREVALENT.  IT WAS JUST A FEW LOCATIONS AND

17:21   11   ONLY ONE OR TWO THAT ACTUALLY WENT THROUGH THE CROWN.

17:21   12   **Q.**   HOW WOULD YOU CHARACTERIZE THE DAMAGE YOU OBSERVED AT THE

17:21   13   LOCATIONS WHERE FRONT-SIDE WAVE ATTACK OCCURRED?

17:21   14   **A.**   GENERALLY, THEY WERE HIGH UP ON THE LEVEE.  IT WAS IN THAT

17:22   15   AREA WHERE WE SEE THE MOWING, AND SO THERE WAS -- IT WAS QUITE

17:22   16   HIGH UP ON THE LEVEE.  IT WOULD SEEM THAT IF YOU WERE HAVING

17:22   17   FRONT-SIDE ATTACK, YOU WOULD HAVE SEEN IT AT ALL THE LOCATIONS,

17:22   18   EVEN LOWER ON THE LEVEE, WHERE YOU WOULD HAVE SEEN SOME

17:22   19   EROSION.

17:22   20   **Q.**   IN THE PLACES WHERE THE DAMAGE FROM FRONT-SIDE ATTACK WAS

17:22   21   OBSERVABLE ON THE PHOTOGRAPHS, WOULD YOU CHARACTERIZE THAT

17:22   22   DAMAGE AS MINOR OR MAJOR?

17:22   23   **A.**   IN THE TOTALITY OF ALL OF THE PHOTOGRAPHS THAT I EXAMINED,

17:22   24   IN THE LENGTH OF IT, IT WOULD BE MINOR.

17:22   25            **MR. LEVINE:**  YOUR HONOR, IF I ESTIMATE MY TIME

FINAL DAILY COPY

MOSHER00123

3083

| | | |
|---|---|---|
| 17:22 | 1 | CORRECTLY, I PROBABLY HAVE ABOUT ANOTHER HOUR TO AN HOUR AND A |
| 17:22 | 2 | HALF TO GO WITH THIS WITNESS.  THIS WOULD BE AN EXCELLENT |
| 17:22 | 3 | STOPPING POINT. |
| 17:22 | 4 | **THE COURT:**  ALL RIGHT.  WE WILL ADJOURN FOR THE DAY |
| 17:22 | 5 | AND BE BACK AT 9:00 TOMORROW FOR AN EXCITING FRIDAY.  WE'RE |
| 17:23 | 6 | ADJOURNED. |
| 17:23 | 7 | **MR. JOANEN:**  YOUR HONOR, BEFORE WE ADJOURN, CAN I |
| 17:23 | 8 | JUST ASK ONE THING? |
| 17:23 | 9 | **THE COURT:**  YES. |
| 17:23 | 10 | **MR. JOANEN:**  MY NAME IS SCOTT JOANEN WITH THE |
| 17:23 | 11 | PLAINTIFFS.  BASED UPON YOUR RULING TODAY OF THE MOTION TO |
| 17:23 | 12 | COMPEL THE ADCIRC MODELS FROM DR. WESTERINK, WE'D LIKE TO GET A |
| 17:23 | 13 | TIMETABLE OF WHEN WE COULD EXPECT THOSE, GET SOMETHING ON THE |
| 17:23 | 14 | RECORD. |
| 17:23 | 15 | **THE COURT:**  MAYBE YOU CAN TALK TO YOUR -- |
| 17:23 | 16 | **MR. JOANEN:**  I HAVE.  THEY SAID THEY WOULD EVALUATE |
| 17:23 | 17 | IT.  I ADVISED MR. SMITH THAT I WOULD -- |
| 17:23 | 18 | **THE COURT:**  WHEN IS HE TESTIFYING? |
| 17:23 | 19 | **MR. O'DONNELL:**  EARLY NEXT WEEK. |
| 17:23 | 20 | **MR. JOANEN:**  MONDAY OR TUESDAY. |
| 17:23 | 21 | **THE COURT:**  I WOULD SAY WITH ALL SPEED.  I'M GOING TO |
| 17:23 | 22 | TRUST YOU TO DO IT AS QUICKLY AS YOU HUMANLY CAN. |
| 17:24 | 23 | **MR. SMITH:**  WE'VE BEEN LOOKING INTO THIS SINCE WE GOT |
| 17:25 | 24 | YOUR HONOR'S ORDER THIS MORNING.  MY CURRENT UNDERSTANDING IS |
| 17:25 | 25 | CONSISTENT WITH WHAT WE FILED AS OUR OPPOSITION TO THE |

FINAL DAILY COPY

MOSHER00124

| 17:25 | 1 | PLAINTIFFS' MOTION, BUT LET ME EXPLAIN FURTHER AND EXPLAIN THE |
| 17:25 | 2 | DIFFICULTY THAT WE HAVE HERE. |
| 17:25 | 3 | THE DATA THAT DR. WESTERINK USED TO DO HIS |
| 17:25 | 4 | COMPARATIVE ANALYSIS -- IN OTHER WORDS, OUR SIX SCENARIOS, JUST |
| 17:25 | 5 | LIKE THE PLAINTIFFS HAVE THEIR SCENARIOS -- WAS NOT USED FOR |
| 17:25 | 6 | THE GRAPHICAL DEPICTIONS OF THE KATRINA REAL-RUN SCENARIO; IN |
| 17:25 | 7 | OTHER WORDS, OUR BASE CASE.  WHEN HE WAS COMPILING HIS REPORT, |
| 17:25 | 8 | HE USED A DIFFERENT SET OF DATA JUST TO CREATE THOSE GRAPHICAL |
| 17:25 | 9 | DEPICTIONS. |
| 17:25 | 10 | SO THE PICTURES, IF YOU WILL, THOSE SURGE |
| 17:26 | 11 | ELEVATION HYDROGRAPHS WERE FROM A RUN, PERHAPS, THAT WAS DONE |
| 17:26 | 12 | FOR FEMA.  AS WE SAID IN OUR PAPERS, DR. WESTERINK IS WORKING |
| 17:26 | 13 | WITH FEMA.  HE'S WORKING WITH THE STATE.  THEY'RE DOING |
| 17:26 | 14 | ANALYSIS FOR HURRICANE FLOOD PROTECTION THAT'S ONGOING.  HE'S |
| 17:26 | 15 | CONSTANTLY UPDATING HIS MODEL AS HE GETS MORE DATA.  SO WHEN HE |
| 17:26 | 16 | DID THE DOJ RUNS -- IN OTHER WORDS, FOR THIS LITIGATION, HE |
| 17:26 | 17 | USED HIS MOST UP-TO-DATE SET OF DATA FOR THE KATRINA REAL-RUN |
| 17:26 | 18 | ANALYSIS USING A GRID THAT WAS THE MOST ACCURATE ONE HE HAD AT |
| 17:26 | 19 | THE TIME. |
| 17:26 | 20 | WE GAVE THAT DATA TO THE PLAINTIFFS WHEN WE |
| 17:26 | 21 | TURNED OVER ALL THE DATA THAT WAS RELIED UPON BY DR. WESTERINK. |
| 17:26 | 22 | THAT WAS ON THE HARD DRIVE THAT WE GAVE TO THEM, ALONG WITH THE |
| 17:26 | 23 | OTHER RUNS:  THE NO-MRGO RUNS, THE MRGO AS-DESIGNED RUNS, THE |
| 17:27 | 24 | ONES WITH THE WETLANDS IN VARIOUS CONFIGURATIONS.  ALL THE DATA |
| 17:27 | 25 | THAT PROFESSOR WESTERINK RELIED ON WAS GIVEN TO THE PLAINTIFFS. |

FINAL DAILY COPY

| 17:27 | 1 | IT'S THE SAME SET OF DATA THAT HE GAVE TO MR. EBERSOLE AND THE |
| 17:27 | 2 | OTHER EXPERTS ON THE UNITED STATES SIDE. |
| 17:27 | 3 | THE ONLY THING THAT IS WRONG AND WHAT THE |
| 17:27 | 4 | PLAINTIFFS PICKED UP ON WHEN THEY LOOKED AT HIS REPORT IS THAT |
| 17:27 | 5 | YOU CAN SEE IN SOME OF THE PICTURES THAT THEY DON'T MATCH THE |
| 17:27 | 6 | DATA.  SO THEY ASKED HIM ABOUT THOSE PHOTOGRAPHS -- NOT |
| 17:27 | 7 | PHOTOGRAPHS, THOSE HYDROGRAPHS IN HIS DEPOSITION. I THINK |
| 17:27 | 8 | YOUR HONOR SAW THE DEPOSITION TESTIMONY SAYING THAT THOSE MAYBE |
| 17:27 | 9 | CAME FROM EARLIER RUNS. |
| 17:27 | 10 | WELL, THIS ISN'T SENDING A MAN TO THE MOON, |
| 17:27 | 11 | YOUR HONOR, BUT IF WE ONLY HAD THE COMPUTING POWER THAT THEY |
| 17:27 | 12 | HAD WHEN THEY SENT THE MAN TO THE MOON, YOU COULDN'T DO THIS |
| 17:27 | 13 | SORT OF ANALYSIS.  IT REQUIRES SUPERCOMPUTERS.  THERE ARE ONLY |
| 17:28 | 14 | A FEW OF THEM IN THIS COUNTRY.  WHEN HE DOES A RUN AND HE GETS |
| 17:28 | 15 | THE RESULTS OF THAT RUN, HE CAN PUT IT AND STORE IT ON THE |
| 17:28 | 16 | UNIVERSITY OF NOTRE DAME COMPUTERS FOR A LIMITED AMOUNT OF |
| 17:28 | 17 | TIME. |
| 17:28 | 18 | **THE COURT:**  IF IT'S NOT EXTANT, IT CANNOT BE |
| 17:28 | 19 | PROVIDED. |
| 17:28 | 20 | **MR. SMITH:**  WE BELIEVE IT IS EXTANT BECAUSE WHAT |
| 17:28 | 21 | HAPPENS IS THEY SAVE THOSE ON TAPED BACKUPS AT ERDC, AT THE |
| 17:28 | 22 | SUPERCOMPUTER, AND THEY HAVE THE STORAGE CAPACITY HE DOESN'T |
| 17:28 | 23 | HAVE AT NOTRE DAME.  SO WHEN HE MOVES ON TO ANOTHER GRID, HE |
| 17:28 | 24 | DUMPS THE OLD GRID AND USES HIS MOST UP-TO-DATE GRID.  SO IT'S |
| 17:28 | 25 | NOT A SIMPLE MATTER OF HIM PRODUCING THAT DATA THAT UNDERLAY |

FINAL DAILY COPY

MOSHER00126

17:28    1    THOSE PICTURES.

17:28    2              WE WOULD HAVE TO GO BACK TO ERDC AND FIND THOSE

17:28    3    EARLIER RUNS ON THEIR BACKUP TAPES, AND THEN OUTPUT THAT

17:28    4    THROUGH THE SUPERCOMPUTER.  WE HAVE TO NEGOTIATE FOR TIME ON

17:29    5    THOSE COMPUTERS, BUT IT WOULD TAKE A NUMBER OF DAYS -- OR MORE

17:29    6    THAN A FEW DAYS PERHAPS.  SO MY UNDERSTANDING IS IT'S UNLIKELY

17:29    7    WE COULD EVER GIVE THAT DATA TO THE PLAINTIFFS BY THE TIME

17:29    8    DR. WESTERINK'S SCHEDULED TO TESTIFY NEXT TUESDAY.

17:29    9              AS A PRACTICAL MATTER, YOUR HONOR, BECAUSE OF

17:29   10    THE SIZE OF THAT DATA, THERE'S NO WAY ANY PLAINTIFFS' EXPERT

17:29   11    COULD ACTUALLY GO INTO THAT DATA AND LOOK AT THAT DATA.  IT

17:29   12    ISN'T THE DATA THAT WAS RELIED UPON BY DR. WESTERINK OR ANY OF

17:29   13    THE UNITED STATES' EXPERTS.  THE DATA THAT THEY RELIED ON THE

17:29   14    PLAINTIFFS HAVE HAD NOW FOR A COUPLE MONTHS.  SO I KNOW

17:29   15    YOUR HONOR ORDERED US TO TURN OVER THE DATA THAT WAS BEHIND

17:29   16    THOSE PICTURES --

17:29   17         **THE COURT:**  AS APPARENTLY WAS AGREED TO DO IN THE

17:29   18    DEPOSITION, IT SEEMED TO ME, FROM READING IT.

17:29   19         **MR. SMITH:**  HE SAID HE WOULD GO TRY TO FIND WHAT RUNS

17:29   20    THEY CAME FROM.  I DON'T KNOW THAT HE EVER ACTUALLY DID THAT

17:30   21    BECAUSE HE HADN'T RELIED ON THEM; IN OTHER WORDS, THAT WASN'T

17:30   22    ACTUAL RELIANCE DATA.  I DON'T BELIEVE HE ACTUALLY LOOKED FOR

17:30   23    THAT DATA.

17:30   24         **THE COURT:**  WHAT EFFECT IT HAS ON THIS CASE, ALL OF

17:30   25    YOU KNOW A LOT BETTER THAN I DO.  IT MAY HAVE NONE.  IT MAY

FINAL DAILY COPY

MOSHER00127

| | | |
|---|---|---|
| 17:30 | 1 | HAVE SOME.  IF THE SIGNIFICANCE IT HAS MAKES A DIFFERENCE AS TO |
| 17:30 | 2 | HOW WE APPROACH ALL OF THIS -- AND I DON'T HAVE A CLUE.  IT MAY |
| 17:30 | 3 | HAVE NONE.  I DON'T KNOW.  MR. SMITH, ARE YOU FINISHED? |
| 17:30 | 4 |       **MR. SMITH:**  THAT'S ALL I HAVE TO SAY, YOUR HONOR.  I |
| 17:30 | 5 | JUST WANTED YOUR HONOR TO KNOW WHAT WE UNDERSTAND AT THE |
| 17:30 | 6 | PRESENT TIME. |
| 17:30 | 7 |       **THE COURT:**  LET ME HEAR FROM THE OTHER SIDE.  JUST |
| 17:30 | 8 | LET ME KNOW WHAT THE SIGNIFICANCE IS, AS WELL, BECAUSE WE HAVE |
| 17:30 | 9 | A LOT TO DO. |
| 17:30 | 10 |       **MR. BRUNO:**  WE THINK THIS IS EXTREMELY IMPORTANT |
| 17:30 | 11 | INFORMATION.  ONE OF THE FUNDAMENTAL PRECEPTS REGARDING AN |
| 17:30 | 12 | EXPERT'S TESTIMONY IS THAT AN EXPERT SHOULD BE ABLE TO |
| 17:30 | 13 | REPLICATE WHATEVER TEST OR LABORATORY STUDY HE DID SO THAT HE |
| 17:30 | 14 | CAN DEMONSTRATE TO YOUR HONOR THAT HE GETS THE SAME RESULTS |
| 17:31 | 15 | EVERY TIME.  THE THING THAT'S JUST MOST APPALLING TO US -- |
| 17:31 | 16 |       **THE COURT:**  TELL ME WHY IT'S PREJUDICIAL.  I DON'T |
| 17:31 | 17 | CARE ABOUT APPALLING. |
| 17:31 | 18 |       **MR. BRUNO:**  IT'S PREJUDICIAL BECAUSE WE DON'T KNOW |
| 17:31 | 19 | THE PROCESS BY WHICH THEY MANAGED TO SELECT THE RUN THAT THEY |
| 17:31 | 20 | SELECTED. |
| 17:31 | 21 |       **THE COURT:**  WHEN HE IS TALKING PHOTOGRAPHS -- NOT THE |
| 17:31 | 22 | PHOTOGRAPHS, THE HYDROGRAPHS. |
| 17:31 | 23 |       **MR. BRUNO:**  THERE ARE TWO WAYS TO DEPICT THE -- |
| 17:31 | 24 |       **THE COURT:**  I'VE ORDERED IT DONE.  WHAT THE |
| 17:31 | 25 | CONSEQUENCES ARE, I'LL HAVE TO DECIDE.  IF THEY CAN'T DO IT, |

FINAL DAILY COPY

MOSHER00128

| | | |
|---|---|---|
| 17:31 | 1 | THEY CAN'T DO IT.  WE'LL SEE WHAT THAT MEANS.  I'D LIKE TO |
| 17:31 | 2 | KNOW, THOUGH, THE CONTEXT INCISIVELY WHAT -- MR. SMITH SAID |
| 17:31 | 3 | SOMETHING WAS DIFFERENT, AND I DON'T UNDERSTAND IT. |
| 17:31 | 4 | **MR. BRUNO:**  SURE.  IF I MAY.  THE OUTPUT FROM THIS |
| 17:31 | 5 | MODEL CAN BE DEPICTED IN TWO DIFFERENT WAYS.  ONE IS THAT |
| 17:32 | 6 | HYDROGRAPH, WHICH IS THE LINE.  ESSENTIALLY, WHAT YOU'RE DOING |
| 17:32 | 7 | IS YOU'RE PICKING A LAT/LONG POINT WITHIN THE STUDY AREA, AND |
| 17:32 | 8 | YOU ARE HAVING THE COMPUTER TELL YOU WHAT THE WATER DID.  IT |
| 17:32 | 9 | WENT UP AND IT WENT DOWN.  FAIR ENOUGH? |
| 17:32 | 10 | **THE COURT:**  I'VE SEEN ENOUGH HYDROGRAPHS. |
| 17:32 | 11 | **MR. BRUNO:**  THE OTHER WAY TO GRAPHICALLY DEPICT THE |
| 17:32 | 12 | DATA IS TO SHOW THE STUDY AREA AND TO SHOW WITH A VARIETY OF |
| 17:32 | 13 | COLORS OR WITH CONTOUR LINES THE DIFFERENT LEVELS OF THE WAVES. |
| 17:32 | 14 | SO WHAT ONE DOES IF ONE WANTS TO FIGURE OUT, FOR EXAMPLE, HOW |
| 17:32 | 15 | HIGH THE WATER WAS NEAR THE MRGO, YOU LOCATE THE MRGO ON THE |
| 17:32 | 16 | MAP, YOU SEE THE COLOR, THE COLORATION NEXT TO THE CONTOUR |
| 17:32 | 17 | LINE, YOU COMPARE THE COLOR. |
| 17:32 | 18 | **THE COURT:**  I'VE SEEN THOSE. |
| 17:32 | 19 | **MR. BRUNO:**  SO WHAT CAUSED US SOME PAUSE IS THAT WE |
| 17:32 | 20 | SAW THESE -- I'M GOING TO CALL THEM PICTOGRAMS FOR LACK OF A |
| 17:33 | 21 | BETTER DESCRIPTOR.  THE PICTOGRAMS DIDN'T MATCH THE TESTIMONY |
| 17:33 | 22 | OF THE GOOD DOCTOR.  YOU'LL REMEMBER THAT ONE OF THE BIG ISSUES |
| 17:33 | 23 | IN THE CASE, WE BELIEVE, IS WHAT'S THE PEAK SURGE TIME. |
| 17:33 | 24 | **THE COURT:**  RIGHT. |
| 17:33 | 25 | **MR. BRUNO:**  IT'S OUR POSITION -- THEY HAVE THEIR |

FINAL DAILY COPY

MOSHER00129

| | | |
|---|---|---|
| 17:33 | 1 | POSITION -- THE IPET FOUND 8:30. WE HAVE GOOD, VALID, WE |
| 17:33 | 2 | THOUGHT, IPET ADCIRC DATA. FOR REASONS THAT WE CAN'T |
| 17:33 | 3 | UNDERSTAND, THEY WANTED TO DO SOME NEW ADCIRC DATA. WE NOW |
| 17:33 | 4 | LEARNED THROUGH DR. WESTERINK THAT HE DID A VARIETY OF ADCIRC |
| 17:33 | 5 | RUNS. HE CHOSE ONE. WE ASKED OURSELVES: WHY DID YOU CHOOSE |
| 17:33 | 6 | THIS ONE AND NOT THAT ONE OR THAT ONE OR THAT ONE? |
| 17:33 | 7 | SO IN ORDER FOR US TO UNDERSTAND, OR AT LEAST TO |
| 17:33 | 8 | SHOW YOU, PERHAPS, THAT THEY SELECTED PURPOSEFULLY THE RUN THEY |
| 17:33 | 9 | SELECTED BECAUSE IT IS MORE IN LINE WITH THE 7:30, WHICH |
| 17:33 | 10 | COMPORTS WITH THEIR THEORY, AS OPPOSED TO THE 8:30, WHICH |
| 17:33 | 11 | COMPORTS WITH OUR THEORY, WE HAVE TO SEE THE RUNS. I AGREE |
| 17:34 | 12 | WITH YOU, IF THEY DON'T EXIST, THEY DON'T EXIST. I HAVE NO |
| 17:34 | 13 | CONTROL OVER THAT, BUT AS AN ADVOCATE, I HAVE TO ASK FOR IT. |
| 17:34 | 14 | **THE COURT:** HOW DID YOU DETERMINE THAT THE TESTIMONY |
| 17:34 | 15 | DIDN'T MATCH, WE'LL CALL IT, THE PICTOGRAM? |
| 17:34 | 16 | **MR. BRUNO:** BECAUSE THE WITNESS WAS TESTIFYING THAT |
| 17:34 | 17 | THE WATER WAS AT A CERTAIN LEVEL, SO WE SIMPLY WALKED AND |
| 17:34 | 18 | LOOKED AT THE PICTOGRAM, FOUND THE CONTOUR LINE CLOSEST TO THE |
| 17:34 | 19 | MRGO -- I COULD EVEN SHOW IT -- WELL, I DON'T HAVE MY PAPERS |
| 17:34 | 20 | WITH ME, BUT I COULD SHOW YOU -- |
| 17:34 | 21 | **THE COURT:** THAT'S ALL RIGHT. |
| 17:34 | 22 | **MR. BRUNO:** I COULD SHOW YOU THAT ON ONE PICTOGRAM, |
| 17:34 | 23 | IT LOOKED LIKE IT WAS 15 FEET, AND IN THE OTHER PICTOGRAM IT |
| 17:34 | 24 | LOOKED LIKE IT WAS 16 FEET. DON'T RELY ON ME BECAUSE THE |
| 17:34 | 25 | WITNESS HIMSELF SAID, "YOU KNOW WHAT? YOU'RE RIGHT. THERE'S A |

FINAL DAILY COPY

MOSHER00130

17:34   1   PROBLEM."  YOU READ IT YOURSELF.  THEN HE SAID TO US, "I NEED

17:34   2   TO GO FIGURE OUT WHAT I DID."  OF COURSE, YOU'VE HEARD ROBIN'S

17:34   3   EXPLANATION, WHICH I ACCEPT.

17:34   4               IT'S A PROBLEM.  I'M TELLING YOU WHY WE NEED IT.

17:34   5   WE SUGGEST THAT IT IS RELEVANT TO YOUR HONOR WITH REGARD TO

17:35   6   THIS BUSINESS OF WHAT IS THE REAL PEAK TIME, WHAT IS THE RIGHT

17:35   7   ANSWER, AND WHAT IS THE METHODOLOGY EMPLOYED BY THIS EXPERT

17:35   8   WITNESS TO CHOOSE OUT OF THE OBVIOUSLY MANY, MANY RUNS OF

17:35   9   ADCIRC THAT HE HAD AVAILABLE TO HIM.  WHY DID HE PICK THE ONE

17:35  10   HE PICKED?

17:35  11        THE COURT:  WELL, I'M RELUCTANT TO STOP THIS TRIAL TO

17:35  12   GET THE INFORMATION.  I HAVE SIMPLY ASKED THE GOVERNMENT -- I

17:35  13   THINK IT IS SUFFICIENTLY SIGNIFICANT.  IT MAY NOT BE IN THE

17:35  14   GRAND SCHEME OF THINGS THAT IT'S SIGNIFICANTLY SIGNIFICANT THAT

17:35  15   I ORDERED IT PRODUCED.  IT WAS MY UNDERSTANDING THAT IT WAS

17:35  16   GOING TO BE PRODUCED, AND MAYBE -- THE COURT JUST RULED.  I

17:35  17   UNDERSTAND THAT.

17:35  18        MR. BRUNO:  JUDGE, WE MAY BE WRONG.  YOU ASKED ME FOR

17:35  19   AN EXPLANATION.

17:35  20        THE COURT:  SO I'D LIKE TO HAVE THE INFORMATION.  IF

17:35  21   IT CANNOT BE GIVEN BY THE APPROPRIATE TIME, THEN WE'LL HAVE TO

17:36  22   DETERMINE WHAT, IF ANY, EFFECT THAT HAS ON THE WAY THE COURT

17:36  23   EVALUATES THE EVIDENCE.

17:36  24        MR. BRUNO:  THANK YOU, YOUR HONOR.

17:36  25        THE COURT:  WE WILL SEE YOU TOMORROW AT 9:00.

                            FINAL DAILY COPY

MOSHER00131

| | | |
|---|---|---|
| 17:36 | 1 | **THE DEPUTY CLERK:**  ALL RISE. |
| 17:36 | 2 | (WHEREUPON THE COURT WAS IN RECESS FOR THE EVENING.) |
| 17:36 | 3 | * * * |
| 17:36 | 4 | <u>**CERTIFICATE**</u> |
| 17:36 | 5 | I, TONI DOYLE TUSA, CCR, FCRR, OFFICIAL COURT |
| 17:36 | 6 | REPORTER FOR THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT |
| 17:36 | 7 | OF LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE |
| 17:36 | 8 | AND CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND |
| 17:36 | 9 | UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN THE |
| 17:36 | 10 | ABOVE-ENTITLED AND NUMBERED MATTER. |

<pre>
                                          S/ TONI DOYLE TUSA
                                          _____
                                          TONI DOYLE TUSA, CCR, FCRR
                                          OFFICIAL COURT REPORTER
</pre>

FINAL DAILY COPY

MOSHER00132