UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO | § | |
| Armstrong, No. 10-866 | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' TRIAL BRIEF**

The burden in this trial is on the Plaintiffs.  In order to prevail, they must

establish, among other things, that negligence by the Army Corps of Engineers

caused the EBIA floodwall to fail.[1]  In their efforts to prove negligence, Plaintiffs will

try to show that the floodwalls failed not because of historic flood waters

overtopping and overwhelming the walls, but because subterranean hydraulic

pressures undermined their stability – and that a competent party in the Corps's

place both would have conducted a new geotechnical evaluation of the floodwall

prior to the excavations and would have concluded that the excavations would

result in changes to the soil that diminished the flood-control structures'

effectiveness.

---

[1] EBIA stands for "East Bank Industrial Area."

Put another way, Plaintiffs will have to prove facts that are not true.  Plaintiffs'
case depends on a single theory: that hydraulic pressure from storm surge waters
moved rapidly down through the earth, through WGI's back-filled holes, to a layer of
organic clay; from there, Plaintiffs will argue, the clays were so non-compressible
that the hydraulic pressures passed rapidly through the clays to points on the land
side of the floodwall with enough force to loosen the floodwalls from their
moorings.[2]  This theory depends on the soils beneath and around the floodwalls
having certain calculable and verifiable properties and behaving in a specific way
under specific conditions as a result of those properties.  Plaintiffs' expert – Dr.
Robert Bea – will give his opinion about the conditions under which their theory of
rapid pressure transmission through these soils could be true.

Plaintiffs' theory will fail because the conditions under which it could have been
true *were not present in this case*.  In order for pressures to travel swiftly through the
organic clays, the soil *must* have resisted compression; if the clay would compress, it
would have absorbed the pressures rather than transmitting them.  Yet while the
soil's compressibility is critical to Dr. Bea's analysis, the uncontested evidence will
show that the organic clay was *ten thousand times* more compressible than the soil
that Dr. Bea assumed existed and subsequently used in performing his seepage
analyses.  The facts will not support Plaintiffs' theory.

---

[2] WGI stands for "Washington Group International, Inc.," the contractor retained by the
Corps of Engineers to perform site clearing and remediation work in the EBIA.

The incorrect assumptions about compressibility are just the beginning. Dr. Bea follows the ILIT conclusion that underseepage caused the breaches even though the parties have now stipulated that the foundation soils were 1,000 times less permeable than ILIT believed.[3] Dr. Bea assumes that the organic clay was in a drained state for purposes of calculating its strength, even though the evidence will show that the clays were in an undrained condition – and even though Dr. Bea himself testified in the BARGE litigation that undrained strengths were the proper metric. Again, the factually inaccurate assumption is critical. Using undrained strengths – using the facts – it becomes clear that WGI's work could not possibly have caused these breaches. Plaintiffs' theories depend on facts they will not (and cannot) prove.

Plaintiffs will also fail to meet their burden of showing that had the Corps performed a geotechnical evaluation before the excavations, it would have concluded that the excavations would result in changes to the soil that diminished the flood-control structures' effectiveness. The Corps' design of the levee and floodwall included an antecedent assessment concluding that hurricane-induced underseepage would not endanger the levee or floodwall. That assessment concluded that the low permeability clays under and on the protected side of the levee and floodwall would slow seepage to a snail's pace, preventing seepage and

---

[3] ILIT stands for "Independent Levee Investigation Team," which produced a report on the levee failures during Hurricane Katrina. ILIT was established by the University of California at Berkeley. Dr. Bea was a co-leader of the ILIT study.

pressure from diminishing the floodwall's "surge-fighting capabilities" during the anticipated duration of a storm surge event.  None of WGI's remediation work changed or disturbed the low permeability clay soils under the levee and floodwall or the clay soils on the protected side of the levee and floodwall.  Thus, there was no reason for the Corps, or any geotechnical engineer, to conclude that a subsequent geotechnical evaluation would have reached a different conclusion.  To the contrary, as the Fugro field and lab work will show, the soils possessed the low permeability characteristics that the antecedent assessment had established.  A further geotechnical evaluation – even assuming that one was reasonably required, which it was not – would not have changed the analysis.[4]

The counter-factual assumptions and holes in Plaintiffs' theory are alone sufficient to defeat liability in this case.  But while the United States carries no burden of establishing what actually did cause the breaches, the United States will nonetheless set forth an explanation that is simpler, more consistent with the facts, and more accurate than the Plaintiffs' underseepage theory.  Analysis from multiple disciplines, testimony from multiple independent experts, and reports from both private and public bodies, all point in the same direction.  The historic rains and surges from the Hurricane Katrina caused overtopping at multiple points, ultimately overwhelming the floodwalls and causing the north and south breaches.  Further,

---

[4] Fugro stands for "Fugro Consultants, Inc.," the independent contractor jointly retained by Plaintiffs and Defendants to study the soils in the EBIA-IHNC area.  IHNC is short-hand for the Inner Harbor Navigation Canal, also referred to as the "Industrial Canal."

the resulting floodwaters – both because they directly resulted from Hurricane

Katrina's overwhelming surge of floodwaters and because of the IHNC Lock's

existing flood control purpose and the New Lock Replacement Project's overarching

integration with the LPV and Mississippi River and Tributaries projects – trigger the

Corps' immunity under Section 702(c) of the Flood Control Act.[5]

### STATEMENT OF MATERIAL FACTS

**I.   The Corps considered whether underseepage would affect the floodwall's surge-fighting capabilities and correctly concluded that it would not.**

Plaintiffs contend that "the Corps [was] negligent in failing to perform

geotechnical evaluations of the potential impact of the earthwork and excavations

performed in furtherance of the EBIA project."  Doc. 20920 at 10.  The evidence,

however, will show that the Corps did a seepage assessment that met the standard

of care, and neither WGI's operations nor any other event vitiated that assessment

or required an additional geotechnical evaluation.  When WGI began its work, the

Corps knew that the soils in the EBIA consisted predominantly of low-permeability

clays, including the soils forming the foundation for the EBIA levee and floodwall

and the soils on the protected side of the EBIA levee and floodwall.    In particular,

when designing the IHNC's east-bank floodwall in 1966, the Corps analyzed the site

and determined that clay predominated.  That knowledge was confirmed by soil

studies conducted shortly before WGI began Task Order 26 operations, and it was

---

[5] LPV is short for the "Lake Pontchartrain and Vicinity Hurricane Protection Plan," also referred to as the LPVHPP.

confirmed again in 2006 by IPET, and yet again last year by Fugro Consultants, Inc., on behalf of the parties.[6]  The Corps's understanding of the engineering properties of the EBIA soils and the soils beneath and on the protected side of the floodwall—obtained through years of experience—justified its determination that no further seepage analysis need be performed.  In short, none of WGI's remediation work disturbed or changed the low permeability soils that mattered for purposes of assessing the potential seepage.

The "EBIA floodwall," so called for ease of reference,  was designed and constructed pursuant to Congress's authorization of the Lake Pontchartrain and Vicinity Hurricane Protection Project. Those designs are set forth in LPVHPP General Design Memorandum Number 3, the Chalmette Area Plan ("GDM No. 3").  Congress gave the Corps's Chief of Engineers discretion to determine the extent of protection as long as it was consistent with the Chief's report to Congress.  Accordingly, the Corps designed the EBIA floodwall not to withstand any possible storm but to withstand a hypothetical 200-year storm (the "Standard Project Hurricane") that would generate a 13-foot surge in the IHNC.  To provide this level of protection, the EBIA floodwall's design height was 15 feet, two feet above the surge elevation, to minimize overtopping by the waves which the hypothetical storm would produce.

---

[6] IPET is short for "Interagency Performance Evaluation Task Force," a commission of government, academic, and private sector scientists and engineers created by the Corps of Engineers to independently investigate the performance of the Southeast Louisiana Hurricane Protection System during Hurricane Katrina.

As noted, the Corps analyzed the soils on which the levee would be founded and then set the sheet-pile depth at -8 feet (which converts to -10.5 feet in the current datum, NAVD88 (2004.65)) so that the bottom of the floodwall would be embedded in a layer of fat clay above a layer of soft organic clays.  GDM No. 3.  The depth was calculated to ensure the global stability of the levee and floodwall under hurricane conditions, not to prevent underseepage.  Because the levee and surrounding soils were clays, the Corps concluded that underseepage from storm surges would not diminish the protection provided by the levee and floodwall as designed.  This judgment derived from two salient facts:  hurricane storm surges are short-term events, and clay is a low permeability soil through which water cannot seep in sufficient quantities to cause piping or heaving between the onset and the subsidence of surge.  GDM No. 3.  The presence of these clay soils also led the Corps to conclude that erosion protection was unnecessary along the EBIA floodwall.  GDM No. 3.

In 1956, Congress authorized construction of the Mississippi River Gulf Outlet and a new lock linking the MRGO to the Mississippi River.  The existing IHNC lock, which opened in 1923, served dual purposes of navigation and flood control, passing ship traffic from the Industrial Canal to the Mississippi River for navigation purposes and closing its gates to control flooding during high water conditions on the Mississippi River and serving as an emergency dam during hurricane storm surge events.  LPV flood protection structures tied-in to the existing lock to its north, and Mississippi River flood control structures tied-in to its south.  Obsolescence of

the existing IHNC lock prompted the Corps to begin its evaluation of a new lock and lateral flood protection around the lock.

Amid considerable community and political opposition, the Corps considered numerous sites for the new lock and after evaluating social, environmental, and economic effects decided to build it in the IHNC, between Claiborne and Florida Avenues.  In 1998 Congress appropriated funds for construction.  Because the new lock would be farther from the river than the existing lock, the project required the construction of new, taller floodwalls from the river to the new lock site, to withstand the river's flood stages, which were higher than the LPV Standard Project Hurricane's 13-foot surge elevation that the walls north of the existing lock were designed to withstand.  As when the Corps designed the east-bank floodwall in 1966, the Corps assessed global stability and seepage conditions for the new, taller floodwalls. That geotechnical assessment relied on the same sound principles employed by the Corps over thirty years earlier, and the results were incorporated into the Corps's design documents.

To avoid shutting down the IHNC's link to the GIWW during the construction of the New Lock, a temporary, two-way bypass channel next to the lock was authorized. This channel would run through nearly two-thirds of the EBIA project. But after a long period of industrial use, the EBIA was littered with structures, contaminants, and debris that had to be removed and remediated before the bypass channel could be dredged.

In 1994, the Corps and WGI entered into a broad, indefinite-delivery contract, a

Total Environmental Restoration Contract, (TERC) for remediation of hazardous waste in the southwestern United States. The TERC established general requirements for all of WGI's anticipated work in the region. Under the TERC, a new project would begin by the Corps issuing a Task Order and then approving a specific Statement of Work, which provided a brief and general description of the work to be done.

In 1999, the Corps issued Task Order 26 and a Statement of Work for the remediation work at the EBIA to be funded by the New Lock project. From that SOW, WGI drafted a more detailed recommendations report to the Corps. After a reviewing and revising process between the Corps and WGI, the recommendations report was completed. Thereafter, WGI submitted a number of work plans, including the Project Work Plan which described the remediation process at the EBIA.  After beginning its work, WGI discovered subsurface structures that required removal. WGI submitted a proposal for the structures' excavation and removal which the Corps revised and then approved.  Operating from the initial Project Work Plan and subsequent revisions, WGI completed its work at the EBIA the spring before Hurricane Katrina.

The evidence will show that Corps's 1966 seepage assessment provided a sound basis for concluding that no significant underseepage could occur during short-term hydraulic loading, such as could result from a hurricane.  The EBIA floodwall in place during Task Order 26 and Hurricane Katrina was constructed according to General Design Memorandum No. 3 for the Lake Pontchartrain and

Vicinity Hurricane Protection Project.  In GDM No. 3, the Corps evaluated both the global stability of the floodwall under hurricane storm-surge conditions and the risks that underseepage might pose.  Based on the short duration of hurricane storm-surge events and the low permeability of the clays beneath and on the protected side of the floodwall, the Corps correctly concluded that seepage would not pose a problem.  The Corps's 1966 evaluations evinced good engineering judgment that rested on a substantial body of first-hand knowledge about the engineering properties of the soils where the flood-control structures were later built and where WGI performed the operations at issue in this case.

    Importantly, the 1966 engineering evaluations remained valid during Task Order 26 and the design of the New Lock and lateral flood protection.  All excavations during Task Order 26 were outside of the minimum control line that differentiated the area where changes could possibly destabilize the existing levee during hydraulic loading from the area where changes could not affect stability.  The Corps's assessment that underseepage would not pose a problem was correct in 1966 and remained correct in 2005 because the low permeability clays under the floodwall and on the protected side of the floodwall remained undisturbed by any of WGI's remediation work.  Using a generally accepted method for evaluating seepage, Dr. Patrick Lucia will demonstrate that the Corps's assessment of seepage risk was consistent with good geotechnical-engineering judgment and practice.  Further, he will show that none of WGI's plans or operations provided a basis for performing an additional seepage assessment:  no information available to WGI or the Corps then

or now suggests that underseepage could threaten the EBIA floodwall during a hurricane storm-surge event.

Dr. Lucia is a principal of Geosyntec Consultants and a licensed civil engineer specializing in the areas of geotechnical engineering and waste management.  He has more than 25 years of professional experience and practice directing and evaluating a broad range of projects requiring expertise in foundations and soils.  Dr. Lucia performed a comprehensive review of the Corps's design of the EBIA floodwall, the proposed New Lock project and associated design reports, and the work proposed and performed at the EBIA under Task Order 26, including all documented excavations and backfilling, to independently determine whether the Corps of Engineers correctly evaluated the potential effects of underseepage and met the standard of care in approving WGI's workplans and subsequent operations.

## II. IPET's study of the east-bank floodwall validated the Corps's earlier geotechnical assessments.

On August 29, 2005, Hurricane Katrina made landfall in Burras, Louisiana. Hurricane Katrina, a 400-year storm, generated the largest storm-surge elevations in the United States. Hurricane Katrina's storm surge overwhelmed the flood-protection structures rimming Greater New Orleans, which were designed for a much smaller storm, the Standard Project Hurricane a hypothetical 200-year storm. By mid morning, storm surge in the IHNC reached 14 feet, exceeding the height of the entire length of the east-bank floodwall. On top of this surge level, waves peaked

at about 3 feet in the IHNC near the EBIA.  Katrina's rising surge in the IHNC caused the east-bank floodwall's north and south breaches.

Immediately after Hurricane Katrina, IPET investigated the causes of the north and south breaches. IPET conducted new subsurface-soil tests of the EBIA. Because of the impermeable nature of the clay and peat layers in the EBIA's subsurface, IPET concluded that seepage did not play a role in the breaches. IPET further found no physical evidence of seepage along the east-bank floodwall.

IPET concluded that the north breach occurred before overtopping as a result of a gap forming behind the wall, allowing water to penetrate and increase the load on the wall. A shorter ground-surface on the protected side of the floodwall at the north breach also decreased the wall's ability to withstand Katrina's rising storm surge. IPET concluded that the south breach occurred later due to overtopping, which eroded the backside of the floodwall weakening it to the point of failure.

III.  **Comprehensive geotechnical analyses by the United States' experts confirm that underseepage did not cause the north and south breaches.**

The correctness of the Corps's belief that the EBIA consisted primarily of low permeability clays was confirmed by Fugro's field and laboratory work last year.  In-situ field work and laboratory testing were conducted to better define soil stratigraphy and relevant engineering properties.  The field investigation consisted of 40 exploratory borings, 50 cone-penetration tests, and 25 vane-shear borings in which vane-shear tests were performed at various depths.  Evidence about

hydraulic conductivity and other salient soil characteristics will be provided by Dr. Thomas Naymik, Ph.D., P.G., and Dr. Joseph B. Dunbar, Ph.D.

Dr. Naymik is a hydrogeologist with Geosyntec Consultants, Inc. He oversaw the pumping tests and evaluated the data to determine the permeability of the soils near the EBIA on behalf of the United States. He received a B.S. in 1972 from Ohio State University, an M.S. from Louisiana State University (1974), and a Ph.D. from Ohio State University (1977); all of his degrees are in geology. At LSU his studies and research focused on deltaic sedimentation on the Mississippi Delta and clay mineralogy, and at OSU his studies and research focused on hydrogeology. His experience ranges from conducting field tests, design and analysis of hydraulic conductivity to hydrogeological numerical analysis of specific sites to computer code development for use by others employed in the field of hydrogeology. Additionally, he teaches short courses for the National Ground Water Association (one of the courses is titled "Analysis and Design of Aquifer Test" and serves as an adjunct professor of hyrogeology at Ohio State University, both from 1984 to the present. Dr. Dunbar is a Research Geologist in the Geotechnical and Structures Laboratory, Engineer Research and Development Center, U.S. Army Corps of Engineers, Vicksburg, MS. He is an expert in the geologic history of the New Orleans area.

At trial it will become apparent that no competent evidence supports the plaintiffs' contention that hydraulic underseepage and uplift pressures caused the breaches. The sole proponent of this theory—Dr. Robert Bea—conducted a deeply flawed and unscientific analysis. Dr. Bea's theory of failure suffers from three

fundamental defects.  First, it is premised on fictitious excavations that never existed at the EBIA either before or during Hurricane Katrina.  Dr. Timothy D. Stark, Ph.D., P.E., will detail the scope of the work conducted by WGI, including the location of excavations and their approximate depth.  His testimony will demonstrate that Dr. Bea made numerous false assumptions about WGI's work, particularly the location and dimensions of excavations and the permeability of the soils used to fill them.  Dr. Stark is a professor of Geotechnical Engineering in the Department of Civil and Environmental Engineering at the University of Illinois.  He has published more than 270 technical papers in refereed journals, conferences, and magazines, including 96 refereed papers related to geotechnical and geoenvironmental engineering.  As the recipient of numerous awards for research, teaching and professional service, including a 2012 ASCE geotechnical award, Dr. Stark is well qualified to testify as to these facts.

The second defect in Dr. Bea's theory is that, as noted above, the soils at issue are, with only isolated exceptions, clays of low permeability.  This fact completely undercuts the plaintiffs' case.  The evidence will show that Dr. Bea's theory of underseepage-induced failure would only be plausible if the EBIA soils were as pervious as he initially thought.  This misconception explains why he formed the mistaken opinion that underseepage caused the breaches.  Dr. Bea himself cannot perform computer-assisted seepage analyses, so he directed a graduate student to perform them and instructed that student to use unrealistic values for the essential soil parameters. In doing so, not only did Dr. Bea ignore the results of the Parties'

soils-exploration program, but he also ignored the conclusions of Plaintiffs' own expert geologist based on those results.

Today Dr. Bea continues to fundamentally misapprehend the engineering properties that govern the physical processes which caused the breaches. His failure to grasp the true nature of the organic clays-the critical soil layer immediately below the floodwall-is reflected in his failure to use standardized engineering terminology to describe the soils. Rather than labeling them as clays and organic clays, as the ASTM's Uniform Soils Classification System requires, he has persisted in calling them swamp-marsh deposits, a geological term that describes their depositional environment but that masks the engineering characteristics that are key to understanding why neither underseepage nor hydraulic uplift occurred.

The third reason that the plaintiffs' causation theory fails is that, as the evidence will show, Dr. Bea incorrectly analyzed the strength of the soils and the hydraulic pressures that developed. Although Dr. Bea recognizes that the soils under the EBIA floodwall were "undrained" during Hurricane Katrina, he modeled those soils as if they were "drained." This switch vastly altered the soils' strengths. Also, he incorrectly assumed that the organic clays were incompressible in his seepage analyses. He mistakenly ascribed incompressibility to this soil layer because he mistakenly believes that saturated soils are incompressible in his seepage analyses. This belief lacks scientific validity and is demonstrably untenable. Saturated soils, except in rare circumstances, are compressible, and the evidence will show that the organic clays under the levee were compressible in his seepage analyses. The soil's

ability to expand explains why Dr. Bea's assumption that pressure flowed from one side of the levee to the other in a matter of minutes is mistaken.

Dr. Bea unscientifically attempts to analyze pressure transmission in isolation from the flow of water.  Because clays consist of fine particles, they keep fluids from moving through them at any but the slowest speeds.  Distance matters when analyzing seepage, and the distance from the flood side to the protected side of the levee was too great for any hydraulic effect of consequence to develop during the hours of hydraulic loading that preceded the breaches.  The notion that destabilizing hydraulic uplift occurred in the absence of fluid transmission is nonsense.  The evidence will show that Dr. Bea's opinions about pressure transmission and hydraulic uplift have no scientific validity.  A full discussion of Dr. Bea's factual and methodological mistakes is set forth in the United States' briefs in support of its motion to exclude the testimony of Robert Glenn Bea, record documents 20823-1 and 20874.

Both breaches can be explained by physical processes unrelated to WGI's work.  As the United States' geotechnical experts will demonstrate, hydraulic pressure on the floodwall caused the north breach when the driving force of the rising surge exceeded the resisting force of the levee and floodwall.  Overflowing waves and surge caused the south breach, as they eroded the landside levee embankment until the wall gave way under the force of inrushing floodwaters.

Dr. Thomas L. Brandon, Ph.D., P.E., will explain that rising surge opened a gap between the levee and the floodwall, increasing the hydrostatic pressure on the

wall.  Because of this gap and the low land-side levee toe at the north-breach site , a

shear failure likely occurred when the surge reached an elevation of about 10 feet.

The pressure of surge on the fully exposed wall caused the soils holding the wall in

place to give way as the upper soils sheared from the lower.

Dr. Brandon, the Director of the W. C. English Geotechnical Engineering Research

Laboratory and an Associate Professor of Civil and Environmental Engineering at

the Virginia Polytechnic Institute and State University (Virginia Tech), is

well-qualified to testify as to these facts.  For nearly three decades, he has taught

seepage and slope-stability analysis.  During this time he has consulted on more

than a score of dam and levee projects in the Americas and Asia.  Because of this

expertise he was selected to perform slope-stability analyses for the IPET

investigation, and the Army Corps of Engineers regularly calls on him to perform

levee and floodwall assessments.  Currently he is advising in the Corps's revision of

procedures for analyzing and designing I-walls.  Dr. Brandon will be a keynote

speaker at the 2013 GeoCongress, a quadrennial gathering of geotechnical

specialists, sponsored by the American Society of Civil Engineers.  Dr. Brandon has

been invited to present his views on shear strength for slope stability.

Dr. W. Allen Marr, Ph.D., P.E., an elected member of the prestigious National

Academy of Engineering, discovered that the IHNC breaches occurred at the two

points where the floodwall was lowest.  Neither IPET nor ILIT, nor any other

investigator had discovered this critical fact.  At these low points, wave and surge

overtopping began earliest and continued longest before the breaches occurred.

The overtopping waves and surge scoured erosion trenches behind the floodwall. As the surge rose, overtopping waves and then overflowing surge scoured away the soil holding the wall in place until eventually the driving force of the surge exceeded the resisting force of the levee and floodwall and the floodwall failed by overturning. At the south breach, these physical processes alone explain why the wall gave way and was carried away by the inrushing floodwaters.

Dr. Marr will explain that three unique conditions combined to cause the north breach.  First, as noted, the floodwall had subsided most and was lowest at that place.   Second, the land-side levee toe was lower here than at any other place. Because the toe was low, there was less soil to oppose the driving power of the surge on the opposite side of the floodwall.  Third, sheetpiles of substantially different lengths were interlocked at this place and this place alone.  The north breach occurred where older, shallower sheetpiles adjoined newer, deeper sheets. As the surge rose up almost to the top of the floodwall, the hydrostatic pressure stressed the adjoining sheets differentially because the older, shallower sheet had less soil to hold it in place, its bottom being about 12 feet shallower than the newer sheet.  These stresses deformed the older sheet, and as the deformation moved up into the concrete cap, the concrete cracked and then crumbled away as water forced its way through.  Simultaneously the wall rotated landward because overtopping waves were eroding the levee, a process that rapidly accelerated as floodwaters poured through the gap created by the broken concrete.  At some point, one overstressed sheet tore from the top downward 12 feet.  These movements and the

continuous hydraulic pressure caused the connection of two adjacent sheets to decouple.  As more and more water poured through the gap and eroded the levee, the sheets were displaced entirely and tumbled landward as the turbulent water surged over the decoupled sheet and those attached to it.

Dr. Marr is well qualified to testify as to these facts.  His familiarity with Louisiana soils dates to the late 1980s, when he advised Eustis Engineering as the firm was automating its consolidation-testing apparatus to measure the stiffness of clay soils.  Since Hurricane Katrina, Dr. Marr has been engaged by private-sector and governmental entities who are repairing, improving, and replacing flood-protection structures along the Gulf coast.  The Louisiana Office of Coastal Protection and Restoration selected Dr. Marr to lead the development of a new system for real-time monitoring of the levees surrounding New Orleans.  In 1982 Dr. Marr founded Geocomp Corporation, a geostructural services company that today employs more than 120 engineers, technicians, software specialists, and support staff to help clients manage risk and lower life-cycle costs by providing geostructural services, field instrumentation, and real-time monitoring software.  A related entity, Geotesting Express, provides testing of soils, rocks, and geosynthetic materials. Because Dr. Marr is a recognized authority in the field of geotechnical engineering, he too has been invited to be a keynote speaker at the 2013 GeoCongress, in San Diego next March.

## ARGUMENT

**I.  The evidence will show that the United States did not cause the alleged damages and that the United States' conduct was not negligent.**

"Whether liability exists under the facts of this particular case is determined by conducting a duty-risk analysis. Under this analysis, plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty." *Oubre v. Eslaih,* 869 So. 2d 71, 77 (La. 2004); *accord Pitre v. Louisiana Tech Univ*., 673 So. 2d 585, 589-90 n.7 (La. 1996).  "[A]ll four inquiries must be affirmatively answered for plaintiff to recover." *Oubre*, 869 So. 2d at 77.

Before any analysis of duty and breach, this Court must first determine whether the alleged conduct was a cause-in-fact of the resulting harm.  *See, e.g., Faucheaux v. Terrebone Consol. Gov't*, 615 So. 2d 289, 292 (La. 1993) (first addressing cause-in-fact before addressing duty and breach); *cf. Becnel v. St. John the Baptist Parish Police Jury*, 364 So. 2d 1074, 1076 (La. Ct. App. 1978) (noting that the duty-risk analysis begins with a cause-in-fact inquiry and holding that the duty question need not be reached because plaintiff had failed to establish a causal relationship between the alleged malfeasance and his injury).

Proceeding first to a cause-in-fact analysis, the United States is not liable to Plaintiffs because the remediation work at the EBIA had no influence whatever in causing the north and south breaches.  Proving causation is Plaintiffs' burden, and

Plaintiffs must therefore prove that the alleged negligent remediation work at the EBIA caused their alleged damages. *See Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 249 (5th Cir. 2008); *Burmaster v. Plaquemines Parish Gov't,* 982 So.2d 795, 808 (La. 2008); *Matthieu v. Imperial Toy Corp.*, 646 So. 2d 318, 322 (La. 1994); cf. 28 U.S.C. § 1346(b) ("law of the place where the act or omission occurred" determines FTCA liability); *Cleveland v. United States*, 457 F.3d 397, 403 (5th Cir. 2006) (law of state where claim arose determines liability). To prove "causation in fact" Plaintiffs must demonstrate that the alleged negligent remediation work was a substantial factor in bringing about their alleged damages and that "but for" that faulty work, their alleged damage would have been less or would not have occurred at all. *See Westchester Fire Ins. Co. v. Haspel-Kansas Inv. P'ship*, 342 F.3d 416, 420-21 (5th Cir. 2003); *Bonin v. Ferrellgas, Inc.*, 877 So. 2d 89, 94 (La. 2004); *Roberts v. Benoit,* 605 So. 2d 1032, 1042 (La. 1992); *Fowler v. Roberts*, 556 So. 2d 1, 5 & n.6 (La. 1990).

Put differently, the remediation of the EBIA was a cause-in-fact if it was a "necessary antecedent" of Plaintiffs' damages.  If those damages "would have occurred irrespective of the negligence of the [defendant], then his negligence was not a substantial factor or cause-in-fact." *Dixie Drive It Yourself Sys. v. Amer. Bev. Co.*, 137 So. 2d 298, 302 (La. 1962); *see also In re Air Crash Disaster Near New Orleans*, 764 F.2d 1084, 1092 (5th Cir. 1985); *Rodgers v. Missouri Pac. Ry. Co.*, 405 So. 2d 571, 574 (La. Ct. App. 1981); *Yates v. Brown*, 344 So. 2d 37, 39 (La. Ct. App. 1977; *Muse v. East Texas Grocery Co.*, 11 So. 2d 250, 253 (La. Ct. App. 1942).  Use of a  counter-factual is recommended to determine cause-in-fact: if the tortfeasor's conduct was

"corrected," is it probable that the plaintiff would nonetheless sustained the same damages. *Boteler v. Rivera*, 700 So. 2d 913, 916 (La. Ct. App. 1997). "If so, then defendant's substandard conduct was not a cause-in-fact." Id. See also *Craig v. Burch*, 228 So. 2d 723, 729 (La. Ct. App. 1969).

## II.  The Corps's failure to perform additional geotechnical evaluations did not cause the plaintiffs' alleged damages.

The plaintiffs contend that "the Corps [was] negligent in failing to perform geotechnical evaluations of the potential" harm that WGI's work could inflict on "the surge fighting capabilities of the EBIA flood wall."[7]  Implicit in this contention is the misguided notion that seepage and slope-stability analyses would have disclosed the possibility that poorly backfilled excavations might exacerbate underseepage during a hurricane and thereby cause the floodwall to fail.  The evidence will show, however, that additional geotechnical evaluations would not have disclosed such a risk.  Because the breaches were not caused by WGI's work but were caused by the hurricane's overwhelming storm surge and by defects in the floodwall's design and repair, no competent geotechnical evaluation would have disclosed a need for low permeability backfill or more thorough compaction of the fill.  Even assuming that a geotechnical analysis would have erroneously shown that WGI's work could create a risk of detrimental underseepage, the Corps's failure to perform such an evaluation cannot rightly be said to have caused the breaches:  requiring the use of highly-

---

[7]Joint Pre-trial Brief 10 (R.D. 20920).

compacted low-permeability backfill would not have prevented the breaches,
because they were not caused by underseepage.

**A.  Dr. Bea's seepage and stability analyses were incompetently performed.**

The defendants' four highly respected geotechnical engineers each
independently performed geotechnical evaluations of WGI's work, and none of those
evaluations disclosed a causal connection between WGI's work and the breaches.
All of those evaluations examined underseepage—underseepage from any source,
not just WGI's excavations—and ruled it out as a cause of the breaches.  Unlike Dr.
Bea, whose principal professional expertise and interest lies in applying human and
organizational factors to assess and reduce the risks posed by engineered systems,
the defendants' experts are academicians and consultants who focus their work on
geotechnical engineering.  Three of the defendants' experts have been invited to
present keynote addresses to the American Society of Civil Engineer's 2013
GeoCongress, a quadrennial gathering whose focus next year will be "Stability and
Performance of Slopes and Embankments."

For nearly three decades, Dr. Thomas L. Brandon, Ph.D., P.E., the Director of the
W. C. English Geotechnical Engineering Research Laboratory and an Associate
Professor of Civil and Environmental Engineering at the Virginia Polytechnic
Institute and State University (Virginia Tech), has taught seepage and slope-stability
analysis to students and practicing engineers.  During this time he has consulted on
more than a score of dam and levee projects in the Americas and Asia.  Because of

this expertise he was selected to perform slope-stability analyses for the IPET investigation, and the Army Corps of Engineers regularly calls on him to perform levee and floodwall assessments.  Currently he is advising in the Corps's revision of procedures for analyzing and designing I-walls.  At the 2013 GeoCongress Dr. Brandon will present his views on shear strength for slope stability.

Dr. Brandon performed seepage analyses that show no exacerbation of underseepage by WGI's excavations.  He will explain the physical principles that prevented WGI's excavations from having any impact on the levee or floodwall, and he will detail the numerous errors in the seepage modeling by Diego Cobos-Roa, the graduate student on whom Dr. Bea recklessly relied.  Dr. Brandon will also demonstrate that the steady-state conditions analyzed by Dr. Bea did not exist and could not have come into existence during Hurricane Katrina.  The low-permeability clays that comprised the majority of the soils in the EBIA and beneath the levee prevented seepage from occurring rapidly.  Using the stipulated hydraulic conductivity of the organic clays, which lay immediately below the floodwall and which were identified by Dr. Bea (and ILIT) as the critical soil stratum for purposes of seepage analysis,  Dr. Brandon will show that it would take months or years of continuous underseepage before the steady-state conditions discussed by Dr. Bea could have developed.  As Mr. Cobos-Roa has testified, Dr. Bea forced the development of steady-state conditions in the Cobos-Roa seepage models by instructing him to find and use a compressibility value that would generate high vertical gradients at or near the land-side toe of the levee.  Dr. Brandon will explain

why the ILIT investigators erroneously concluded that underseepage caused the breaches and will identify numerous ILIT errors that have infected Dr. Bea's analyses from 2006 to the present.

**B.  Flows were transient, not steady.**

As a basis for his opinion that underseepage caused the breaches, Dr. Bea cites computer models of flow and stability.  But  Dr. W. Allen Marr, Ph.D., P.E., will testify that the models are insufficiently documented to determine if their results are valid.  Dr. Marr will further testify that the model results do not support Dr. Bea's opinion because the graduate students working for Dr. Bea created models that are dissimilar to the breach-site conditions during Hurricane Katrina.  Even if it were to be assumed that the modeling was competently performed, the results do not support Dr. Bea's opinions because the models analyze porous backfill in contact with the EBIA's organic-clay soils—an assumed condition for which there is no evidence.  The models analyze flow and stability consequences of excavations unlike any excavations dug by WGI.  The models analyze flow and stability consequences of soil units that are as stiff, or hard, as concrete, a characteristic not present in any of the soils involved in the breaches.

Dr. Bea's opinion rests on his assumption that steady-state conditions developed before the breaches occurred, an erroneous assumption that will be refuted by the defendants' experts.  The evidence will show that the soil conditions prevented steady-state conditions from developing and will further show that Dr. Bea's

assumption of steady-state conditions led Mr. Cobos-Roa to give the organic clay an

unnatural stiffness instead of the stiffness actually present in the soils during the

storm.  The evidence will show that if the soils are described with their true

stiffness, then Mr. Cobos-Roa's models themselves show that steady-state conditions

did not develop.  Dr. Bea has admitted that his opinions lack validity if steady-state

Based on his assessment of the actual site conditions, Dr. Marr will testify that

the flows remained transient during the storm.  The duration of the surge was too

brief for steady-state conditions to have developed.  The evidence will show that

flow velocities and volumes were far too low for either high pressures or erosion to

have occurred near the land-side levee toe.  Dr. Marr's PLAXIS models show that no

change in flow occurred on the land side of the floodwall before the breaches

occurred.  Dr. Marr's models show that it would take at least a month for the effects

of changed water level on the canal side to reach the land-side toe.

**C. Conventional seepage and stability analyses point to other causes.**

Bolstering their testimony that underseepage did not cause the breaches, Drs.

Brandon and Marr will explain the actual conditions that caused the breaches.  As

the evidence will show, the hydrostatic pressure of surge on the floodwall was

sufficient to cause the north breach without any assistance from underseepage.  Dr.

Marr will explain that the hydrostatic pressure of surge on the floodwall combined

with erosion of the land-side levee embankment caused the south breach without

any assistance from underseepage.  Overtopping waves and surge scoured a deep

trench behind the floodwall, reducing the lateral support so that the pressure of

surge on the wall pushed the wall and supporting levee soils into the Lower Ninth

Ward.  Because the surge and waves far exceeded the conditions that the levee and

floodwall were designed to withstand, breaching inevitably would have occurred at

some point before the surge subsided.  The breaches occurred at the two weakest

points in the LPV line of defense, before the forces became sufficiently great to cause

failures elsewhere along the line.  WGI's work is irrelevant to the conditions that

caused the breaches, as the evidence will clearly show.

### III.  The Corps's formulation of Task Order 26 and its review and approval of WGI's plans and operations met the engineering standard of care.

Generally, a party owing a duty to prevent harm to others must exercise

reasonable care in protecting those at risk. *Dobson v. Louisiana Power & Light Co.*,

567 So.2d 569, 574-75 (La. 1990). Here, the Corps exercised reasonable engineering

judgment as to the EBIA remediation work.  Dr. Patrick Lucia, a licensed geotechnical

engineer, undertook a comprehensive review of the work performed by WGI in the

EBIA during Task Order 26.  Dr. Lucia evaluated all excavations performed and the

types of soil used to backfill those excavations, specifically those that were

performed at the Saucer Marine site, where the South Breach occurred, and Boland

Marine, where the North Breach occurred.  Dr. Lucia concluded that there was no

breach of the applicable geotechnical standards of care for evaluating stability or

seepage and that none of the excavations or backfilling work performed during Task

Order 26 could have foreseeably impacted the stability of the floodwall or resulted

in increased risk of underseepage during a short-term hurricane storm surge event.

Dr. Lucia concluded that the Corps undertook both stability and seepage analyses for the floodwall adjacent to the EBIA in General Design Memorandum No. 3 – The Chalmette Area Plan, in 1966.  The EBIA floodwall in place at the time of Hurricane Katrina and at the time WGI performed work in the EBIA was the same floodwall designed and constructed based on GDM No. 3.  The geometry of the floodwall and the low permeability clay soils forming the foundation of the floodwall remained unchanged from the floodwall's original design and construction throughout WGI's remediation work and Hurricane Katrina.

The design memorandum specifically evaluated the stability of the floodwall during the conditions for which it was designed—a 13-foot hurricane surge event. The results of that analysis demonstrate that the floodwall would retain its stability so long as excavations on the EBIA (canal) side of the floodwall were outside of a minimum-control line—or boundary—of 15-20 feet from the floodwall.  Consistent with this minimum-control line, the Corps established a boundary approximately 15 feet from the floodwall and prevented any work from taking place within that boundary zone.  The excavations and backfilling performed under Task Order 26 all occurred outside of the minimum control line and, therefore, would not have been expected to impact the stability of the floodwall during a hurricane surge event up to design conditions.  There was no breach of the geotechnical standard of care in permitting these excavations without further evaluation.  New floodwalls that were designed as part of the New Lock Replacement Project in 2002 to provide flood

protection up to Mississippi River Levels with the construction of the new IHNC lock employed the same stability analyses used by the Corps in 1966.

Dr. Lucia further concluded that the 1966 GDM for the EBIA floodwall considered the likelihood of seepage and erosion effects during a hurricane storm surge event. Based on the short-term duration of a hurricane storm surge loading event and the soils known to exist under the EBIA floodwalls—low permeability fat clays and low permeability soft organic clays with peat—seepage was not expected to pose a problem. The Corps's assessment of seepage was consistent with past experience and good geotechnical judgment, as the short-term load event combined with the known low permeability of clay soils were sufficient to reach a reasonable conclusion about the potential for seepage.

To confirm the reasonableness of the Corps's 1966 assessment, Dr. Lucia employed a generally accepted method to measure seepage potentials today—a Lane's Weighted Creep Ratio. This same method was used by the Corps to evaluate seepage potential through sandy foundations in the design of the new floodwalls that were to be build as part of the New Lock project. Plaintiffs' own expert agrees that it is a generally accepted and valid method of evaluating seepage potential. Performing a Lane's Weighted Creep Ratio for the east-bank floodwall and the known clay soils, Dr. Lucia confirmed that the Corps's conclusion that seepage was not anticipated to pose a problem was conservative and correct. This conclusion held true even when the calculations were performed using excavations and backfill in the Boland Marine and Saucer Marine sites. Simply put, the soils that mattered

for assessing seepage potential were the low permeability clays forming the foundation of the levee and floodwall and the low permeability clays on the protected side of the levee and floodwall.  Because those low permeability clays were unaffected and unchanged by any of WGI's remediation work on the canal side of the floodwall, the Corps's 1966 seepage assessment remained valid for all the work performed by WGI.

Finally, Dr. Lucia evaluated the types of soils used to backfill holes excavated by WGI.  Most excavations were backfilled with native soils or soils from the on-site borrow pit, and these soils were known to be clayey, non-permeable soils.  In a limited number of excavations, river sand was used as backfill.  But placement of river sand was in shallow excavations or excavations located substantial distances from the floodwall.  Combined with the knowledge that the soils underlaying the river-sand backfill were low permeability clays, it was not likely that these soils could serve as a conduit for seepage, nor did any documentation available at the time Task Order 26 was carried out suggest any permeable pathways beneath the EBIA floodwall.

In sum, the Corps performed, consistent with the geotechnical standards of care, both stability and seepage analyses for the east-bank floodwall.  Using the Corps's stability and seepage assessments to evaluate the work performed by WGI demonstrates that no excavation or backfilling was likely to impact the stability of the floodwall or increase the likelihood that the floodwall would fail due to

underseepage during a hurricane storm surge event.  Accordingly, there was no breach of the geotechnical standard of care.

## IV. The United States is immune from suit under the Flood Control Act

### A.  The Flood Control Act's plain language bars this suit.

The Flood Control Act provides that "no liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place."  33 U.S.C. § 702c.  "It is difficult to imagine broader language." *United States v. James*, 478 U.S. 597, 604 (1986).  On its face, this language covers the damage alleged here. The damages alleged here occurred as a result of hurricane-driven surge that reached elevations far exceeding any flood previously recorded in New Orleans history.  "Nor do the terms 'flood' and 'flood waters' create any uncertainty in the context of" this natural disaster: it is "clear from § 702c's plain language that the terms 'flood' and 'flood waters' apply . . . to waters that [a federal flood-control project] cannot control." *Id.*  at 605.  "[T]he sweeping language of § 702c" reveals that "Congress clearly sought to ensure beyond doubt that sovereign immunity would protect the Government from 'any' liability associated with flood control." *Id.* at 608.    The Supreme Court therefore concluded that "the unambiguous words of the statute" should be given "their ordinary meaning." *Id.*

In *Central Green Co.  v.  United States*, the Court reiterated that the application of 702c immunity turns not "on whether the damage relates in some, often tenuous, way to a flood control project," but on "whether it relates to 'floods or flood waters.'"

531 U.S. 425, 430 (2001) (footnote omitted).  The Court found it instructive that "[t]he text of the statute does not include the words 'flood control project.'  Rather it states that immunity attaches to 'any damage from or by floods or flood water . . . .' Accordingly the text of the statute directs us to determine the scope of the immunity conferred, not by the character of the federal project or the purposes it serves, but by the character of the waters that cause the relevant damage and the purposes behind their release." *Id.* at 434; accord *id.*  at 437.  Here, "the character of the waters that cause[d] the relevant damage" is plain.  Indisputably, "catastrophic flooding" caused Plaintiffs' alleged damages.  For this reason, and this reason alone, § 702c confers immunity, and this case must be dismissed for lack of subject-matter jurisdiction.

### B.  Under this Court's own rulings, § 702c applies because the IHNC was part of a flood-control project.

This Court has held that "immunity is provided for damage caused by flood waters emanating from a flood control project." *In re Katrina Canal Breaches Consol. Lit.*, 533 F. Supp. 615, 635 (2008); accord *id.*  at 637; *In re Katrina Canal Breaches Consol. Lit.*, 577 F.Supp.2d 802, 824 (2008); *see also In re Katrina Canal Breaches Consol.  Lit.*, 471 F.Supp.  684, 692 (E.D. La.  2007) (FCA bars actions for floodwater damage caused by negligence connected with flood-control project); *In re Katrina Canal Breaches Consol. Lit.*, 2007 WL 3270768, at *5-*6 (E.D. La. Nov.  2, 2007) (§ 702c applies if damage results from floodwaters that escape from a canal that is "part of a flood control project").  If the challenged conduct "concerns" a flood-

control project "directly," then § 702c applies. *In re Katrina Canal Breaches Consol. Lit.*, 647 F. Supp. 2d 644, 699 (2009).

A canal that is bounded by flood-control structures is part of a flood-control project.  Accordingly, this Court reasoned that the presence of floodwalls along the 17th Street and London Avenue canals was sufficient to demonstrate that those canals were part of the LPV. *See Katrina.*, 533 F. Supp. 2d at 637.  Because the waters that escaped from these canals during Hurricane Katrina were floodwaters, the incorporation of the outfall canals into the LPV "compel[led] the Court to apply [FCA] immunity." *Id.* at 638.

The "nub of the issue," then, under this Court's prior rulings, "is whether the [IHNC] is a flood control project," *Katrina*, 471 F.Supp.2d at 689  or has a "nexus to a flood-control project." 577 F.Supp.2d at 824.  And as the Court is well aware through prior proceedings in this litigation, the IHNC was bounded by the existing lock, which operates as a flood control structure when its gates are shut, as they were during Hurricane Katrina, as well as by LPV levees and floodwalls that tie into the lock.  The flooding of the Lower Ninth Ward and St. Bernard Parish resulted from two breaches in the floodwall adjacent to the IHNC which separated the Lower Ninth neighborhoods from the IHNC's East Bank Industrial Area.  Storm surge waters accumulated and rose against the existing lock, which itself served a flood control purpose and as an emergency dam during storm surge events, and continued to accumulate against the existing floodwalls until they were

overwhelmed by these floodwaters and breached. The breaching of the east-bank

floodwalls by floodwaters compels application of FCA immunity.

### C. The FCA applies because the New Lock project was directly related to two flood-control projects.

The existing IHNC lock, constructed in 1923 and in operation at the time

Hurricane Katrina struck, is itself a multi-purpose structure that serves to reduce

flooding during high water events on the Mississippi River and operates as an

emergency dam during hurricane storm surges.  That Lock, combined with the LPV

hurricane floodwalls and levees lining the IHNC to its North and the Mississippi

River floodwalls and levees to its south, directly served a flood control purpose

during Hurricane Katrina.  Owing to its obsolescence, the existing Lock was due to

be replaced with a new IHNC lock, which itself was designed to serve as a flood

control structure, and new floodwalls designed to meet the criteria for both

Mississippi River floodwaters to its south and LPV hurricane surge floodwaters to its

north were to be constructed.

The IHNC Lock Replacement Project, which necessitated the EBIA's remediation

which Plaintiffs challenge here, was directly related to flood control, both through

the design of the New Lock itself, as well as the LPV project floodwalls and the

Mississippi River and Tributaries project floodwalls necessitated by the Lock's

construction in a new location.  The LPV levees and floodwalls between the

replacement lock and the river were to be raised to the design standards and

elevations of the Mississippi River and Tributaries (MR&T) Project to prevent

riverine flooding.  This improvement was necessary because the new lock was slated to be built north of Claiborne Avenue, further from the river than the old lock.  In addition, it was anticipated that "[t]he lock project will involve reconstruction of a portion of the [LPV] protection and/or tying the hurricane protection back to the new lock in order to maintain the integrity of the hurricane protection system." 1997 Eval. Rpt. Vol. 1, at 10 (MVD-006-000000172).   To keep the IHNC accessible from the river during construction, the project entailed construction of a bypass channel through the East Bank Industrial Area.  See 1997 Eval. Rpt.  The lock itself would retain its limited flood control and navigation purposes while still in operation, and the existing floodwalls would remain in place until they had been replaced, with temporary structures erected as necessary during the construction phase.  *Id.*; *see also* DDR No. 2, Lateral Flood Protection.

Indeed, Plaintiffs' primary allegation of negligence against the Corps—failing to assess the potential for underseepage at the EBIA floodwall due to WGI's remediation work—is directed at an assessment that the Corps makes when it designs floodwalls or other flood control structures.   In fact, the Corps performed a seepage assessment when it designed the EBIA floodwall.  But even assuming that it failed to perform such an assessment, or that it performed it incorrectly, that failure would have arisen directly out of negligence in designing the floodwall itself.  Put differently, the Plaintiffs' claim of negligence would arise directly out of the Corps' prosecution of a flood control project.

Under this Court's own rulings, this direct connection between the IHNC Lock Replacement Project, itself a flood control project, as well as two other flood-control projects renders the United States immune to Plaintiffs' claims. *See In re Katrina Canal Breaches Consol. Lit.*, 647 F. Supp. 2d 644, 699 (2009); 577 F. Supp. 2d at 824. Although flood control was not the project's sole purpose, that does not matter, because FCA immunity applies to multi-purpose projects. *See Kennedy v. Texas Utils.*, 179 F.3d 258, 262 (5th Cir. 1999); *see also Boudreaux v. United States*, 53 F.3d 81, 84-86 (5th Cir. 1995) (broadly applying FCA immunity to flood-control-project management).

## V. The Discretionary Function Exception bars Plaintiffs' claims against the Corps of Engineers

The FTCA specifically preserves the government's immunity for:

> Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). The discretionary function exception preserves the government's immunity under circumstances where, even though a government employee's actions or omissions might be actionable under state tort law, those actions or omissions were within the discretion afforded to the employee by federal statute, regulation, or policy. *See Spotts v. United States*, 613 F.3d 449, 566 (5th Cir. 2010).

The Supreme Court has developed a two-part test for determining whether the discretionary function exception applies.  "First, the conduct must be a 'matter of choice for the acting employee.'" *Freeman v. United States*, 556 F.3d 326, 336-37 (5th Cir. 2009) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Importantly, "it is the nature of the conduct, rather than the status of the actor, that governs whether the exception applies."  *Id.* at 337; *United States v. Gaubert*, 499 U.S. 315, 322 (1991).  "If a statute, regulation, or policy leaves it to a federal agency or employee to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary."  *Freeman*, 556 F.3d at 337.

Second, if the challenged conduct involves an element of judgment or choice, a court must determine whether that judgment or choice "is of the kind that the discretionary function exception was designed to shield."  *Id.*; *Gaubert*, 499 U.S. at 322-23.  The purpose of the discretionary function is to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *See Gaubert*, 499 U.S. at 323 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).  Because the exception protects governmental actions and decisions based on considerations of public policy, the Supreme Court has held that the "focus of [this] inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are

susceptible to policy analysis." *Freeman*, 556 F.3d at 337; *Gaubert*, 499 U.S. at 324-25.

As a threshold matter, it is crucial to identify the governmental conduct that Plaintiffs allege caused their damages. *See Garcia v. U.S. Air Force*, 533 F.3d 1170, 1176 (10th Cir. 2008); *Cestonaro v. United States*, 211 F.3d 749, 753-54 (3d Cir. 2000); *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997); *Autery v. United States*, 992 F.2d 1523, 1527 (11th Cir. 1993). With respect to the alleged impacts of the remediation work at issue in this case, however, the Corps' conduct was limited. Per Task Order 26, the Corps retained WGI, a contractor, to perform extensive remediation work in the EBIA as part of the New Lock project. Under the contract, WGI performed site investigations, prepared recommendations, and formulated the project work plans. Those work plans defined the features of work that WGI later carried out on the site. The decision to hire a contractor, the choice of contractor, and the degree of supervision exercised over that contractor are all inherently discretionary choices to which the discretionary function applies. *See Guile v. United States*, 422 F.3d 221, 230 (5th Cir. 2005) (noting that supervision of a contractor, a decision to hire a contractor, and the choice of contractor are all policy-based discretionary decisions) (citations omitted).

Indeed, the Corps' role in the remediation work—all of which was carried out by WGI, not the Corps—was limited to approval of WGI's proposed work plans and oversight to ensure that the work plans were being carried out correctly and in an efficient manner. To the extent Plaintiffs' claims implicate the Corps's responsibility

to oversee WGI's work, that oversight was nothing more than the degree of contractor supervision that is clearly barred by the discretionary function exception.

But to the extent the alleged negligent conduct is the Corps's decision to approve WGI's plans, the Corps's approval of those plans is also protected by the discretionary function exception. The work at issue in this case is the remediation work that the Corps hired WGI to plan and perform before construction of the New Lock and its new flood control structures could begin. Through Task Order 26, the Corps hired WGI to investigate, plan, and execute a remediation project, the goal of which was to leave behind an uncontaminated 32-acre parcel of land for future use. The Corps relied on WGI and its extensive experience and expertise in environmental remediation projects to identify the work that needed to be performed and the manner in which that work was to be performed. WGI created the plans and specifications and provided them to the Corps. The Corps reviewed those plans and provided input where it saw fit. Distilled down to its essence, Plaintiffs' claim against the Corps amounts to an allegation that the Corps failed to perform an adequate investigation or inspection of WGI's proposed work plans to safely accomplish the remediation task at hand. The Corps's role in the Task Order 26 EBIA remediation project was inspection, not engineering or design.

In *Varig Airlines*, the Supreme Court held that the conduct of the Federal Aviation Administration in performing spot-checks of aircraft manufacturer's plans and specifications to certify aircraft as safe for use in commercial aviation was conduct protected by the discretionary function exception. *Varig Airlines*, 467 U.S. at 815-16.

The FAA in *Varig* established a review process for the certification of aircraft design and manufacture at various stages of production.  The manufacturers developed plans and specifications to conform with the FAA's regulations, and the FAA would "spot-check" the manufacturer's work.  *Id.* at 816-17.  Plaintiffs challenged both the system of review and the application of that review process, alleging that the FAA's failure to perform more exhaustive checks caused the FAA to miss design errors that resulted in deaths.  Those claims were barred, as the FAA had exercised discretionary judgment and choice in its approval of those plans and specifications, balancing agency resources and safety in furtherance of its governmental objectives. *Id.* at 820-21.

Here, contrary to Plaintiffs' assertions, the evidence will show that no federal statute, regulation, or policy specified how extensively the Corps should review WGI's proposed remediation work plans.  The Corps had discretion to choose how thorough its review would be and what aspects of WGI's plans might warrant further and more extensive review.  It set up a process for that review and executed that review process as it deemed necessary.  This is the essence of judgment and choice protected by the discretionary function exception.

Like the FAA in *Varig Airlines*, the Corps's involvement in Task Order 26 was limited to spot-checking and approving the plans and specifications of others.  Plaintiffs' complaint, like Plaintiffs in *Varig Airlines*, is ultimately that the Corps should have performed more thorough spot-checks, particularly regarding geotechnical assessments.  But like in *Varig Airlines*, the Corps' decision to rely on

-40-

WGI's work plans without analyzing every detail of those plans was a discretionary function for which the government has not waived immunity in tort. *See National Union Fire Ins. v. United States*, 115 F.3d 1415, 1420-21 (9th Cir. 1997) (summarizing *Varig Airlines* conclusion that the FAA's decision not to analyze every detail of a private party's manufacturing plans was protected by the discretionary function exception). Indeed, the discretionary function is not vitiated where an agency has discretion to perform more thorough investigations and the failure to perform a more thorough investigation leads to catastrophic consequences. *See Gen. Pub. Utils. v. United States*, 745 F.2d 239, 245 (3d Cir. 1984). In short, no statute or regulation required the Corps to extensively evaluate every aspect of WGI's work plans, and the Corps's personnel reviewing those plans made decisions about which aspects of the work might warrant additional assessments based on safety, cost, and the ultimate governmental interest in preparing the EBIA parcel for later use as part of a multi-purpose project, including flood control. The discretionary function exception requires that Plaintiffs' claims against the Corps be dismissed.

Nor does Plaintiffs' claim that the Corps had a policy of conducting geotechnical assessments of excavations within 300 feet of a flood control structure apply or eliminate the Corps' discretion in how it reviewed WGI's work plans. That "policy," to the extent it can be called that, is nothing more than guidance for the Corps's permitting process once a project has entered the operations phase. Because the Corps itself had contracted the work under Task Order 26 and was approving the work plans, there was no need for it to issue a permit to itself. Notwithstanding that

no permit was required, an agency that is entrusted with approving entities for licensing or permitting is "engaged in activity that is at the heart of the regulatory function." *Gen. Pub. Utils.*, 745 F.2d at 247. Any failure to perform a more thorough review of WGI's plans through the permitting process is also protected by the discretionary function exception.

Plaintiffs have also suggested that the "required" geotechnical assessment was not performed in any DDR or other design document regarding the potential effect that WGI's work plans might have on the adjacent flood wall. But this is simply untrue. The Corps assessed stability and seepage when it designed the flood wall along the EBIA in 1966, and those assessments remained valid for the New Lock and lateral flood protection designs as well as the remediation work undertaken by WGI. As this Court itself has noted, it was the *existing* floodwall, not any proposed new floodwall, that failed during Hurricane Katrina. The relevant engineering designs and assessments as to stability and seepage for the floodwall that failed during Hurricane Katrina are contained in the 1966 LPV General Design Memorandum No. 3. A review of the stability and seepage assessments performed in the 1966 Design Memorandum unequivocally show that none of WGI's excavations would impact the floodwall's stability under the design condition—a hurricane flood—and because the clay foundation of the floodwall remained intact throughout Task Order 26, the seepage assessment for a short-term hurricane flood event remained valid.

Accordingly, Plaintiffs' claim that a new or more extensive DDR was required or that a new geotechnical assessment was required in the DDRs for the New Lock

project and its flood protection features amounts to a claim that the Corps was
required to expend time and resources performing all phases of a Civil Works
Project—reconnaissance, feasibility, preconstruction engineering and design,
construction, and operations and maintenance—just to evaluate a floodwall that had
already been designed and evaluated and whose geometry and foundation were to
remain unchanged before, during, and after WGI's remediation work in the EBIA.
No such requirement can be found in any statute, regulation, or policy.  Even if it
were an abuse of the Corps's discretion not to undertake a more extensive
assessment of the existing floodwall while designing the New Lock and lateral flood
protection, or if its original 1966 design and assessments turned out to be
inadequate, the Corps's obligation to balance resources and other considerations in
making its determination that a new assessment of the existing floodwall was
unnecessary renders that determination protected by the discretionary function
exception.  *See Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1021-22, 1027-28
(9th Cir. 1989); *see also National Union Fire Ins.*, 115 F.3d at 1421-22 (concluding
that Corps's decisions about whether and how to address miscalculations in a
breakwater were protected by the discretionary function exception despite the fact
that miscalculations and the delay in correcting them caused the breakwater to fail).

Finally, Plaintiffs have alleged that numerous engineering manuals required
seepage analyses be performed for the EBIA floodwall.  As previously noted, the
Corps did assess seepage potential for the EBIA floodwall, largely rendering
Plaintiffs' allegations moot.  But to the extent these engineering manuals speak to

seepage analyses, the evidence amply demonstrates that these manuals, and the

principles embodied in them, deal with steady state conditions where water is in

constant hydraulic contact with the structures themselves.  A hurricane storm surge

flood event, due to its short-term duration, does not result in the steady-state

seepage conditions that are addressed in these manuals.  There is no manual that

specifies how the Corps is to perform seepage analyses for transient, short-term

loading conditions like a hurricane flood.  In fact, however, the Corps uses the same

conservative, generally accepted methodology to evaluate seepage potential in all of

its projects where seepage must be evaluated.  Plaintiffs' citations to these

engineering manuals is nothing more than a red herring that has no bearing on the

Corps's discretion in how it evaluated and approved WGI's work plans.

In sum, the conduct relevant to Plaintiffs' allegations in this case is the Corps's

decision to approve WGI's work plans.  The discretionary function exception

immunizes the Corps's approval process and the decisions approving of WGI's work

plans.  Plaintiffs' claims against the Corps must, therefore, be dismissed.


**VI.  The United States is not liable for WGI's actions.**

Under the FTCA, the United States may be held liable only for the acts or

omissions of "officers or employees of any federal agency . . . ." See 28 U.S.C. § 2671.

It further defines what is considered a federal agency:

> As used in this chapter and sections 1346(b) and 2401(b) of this title,
> the term "Federal agency" includes the executive departments, the
> judicial and legislative branches, the military departments,

independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

28 U.S.C. § 2671 (emphasis supplied).

It is undisputed that the Corps used WGI as a contractor to perform the remediation work at the EBIA. The Corps authorized WGI to develop work plans for the remediation of the EBIA and approved those plans, but it could not control WGI's physical conduct in performing its contractual duties. To the extent that WGI was negligent in performing the work dictated by contracts, the Corps is not liable and this court lacks jurisdiction because a contractor not subject to the FTCA's sovereign-immunity waiver . *See Logue v. United States,* 412 U.S. 521, 528 (1973); *Broussard v. United States*, 989 F.2d 171, 174 (5th Cir. 1993) ("The United States has statutorily consented to suits pursuant to the terms of the Federal Tort Claims Act. This consent to be sued, though, does not extend to the acts of independent contractors.")

## VII.  Plaintiffs did not exhaust their administrative remedies by filing suit, because the Army Corps of Engineers has no authority to compromise claims  in litigation.

As the Court has already found, the MRGO plaintiffs first informed the United States of their EBIA claims on March 15, 2007, when they filed the MR-GO Master Consolidated Class Action Complaint.  2010 WL 487431, at *5 (E.D. La. Feb. 2, 2010). Plaintiffs in this case have not complied with 28 U.S.C. § 2675(a), which requires that"the claimant shall have first presented the claim to the appropriate Federal

agency and his claim shall have been denied" before an action is instituted on the claim.  This defect afflicts the re-filed MRGO complaint no less than the initial complaint.

Although the Court has expressed its belief that the initial MRGO master complaint functioned as an administrative claim, that view cannot be squared with the statutory scheme in §§ 2672, 2675, and 2677.  It is untenable in view of *McNeil v. United States*, which insisted on "'strict adherence to the procedural requirements specified by the legislature.'"  508 U.S. 106, 113 (1992) (quoting *Mohasco Corp. v. Silver,* 447 U.S. 807, 826 (1980)). The FTCA's procedures "require complete exhaustion of Executive remedies before invocation of the judicial system."  508 U.S. at 112. Adhering to this and to other FTCA procedures fosters "'evenhanded administration of the law'" and promotes the efficiencies that Congress desired to obtain.  *See id.* at 112-13.  *McNeil* recognized that "[e]very premature filing imposes some burden on the judicial system and on the Department of Justice which must assume the defense of such actions."  *Id.* at 112-13.   The proceedings in the present litigation bear testimony to the truth of the Supreme Court's teaching.  Both the Department of Justice and this Court have expended more than *de minimis* resources simply because the plaintiffs did not hew to the FTCA's procedural requirements.

The FTCA's procedures do not mandate a single form or particular method for presenting tort claims administratively.  *Williams v. United States,* 693 F.2d 555, 557 (5th Cir. 1982).  But filing suit in federal court cannot be deemed an acceptable method of complying with § 2675(a).  The FTCA's administrative scheme rules that method

out.  The scheme is premised on adherence to § 2675(a)'s command that administrative exhaustion occur *before* an action is instituted upon a claim.  Under the procedural rules, the process is as follows: (1) claim is presented to agency; (2) agency considers claim (3) agency acts on the claim or, if the agency does not finally deny the claim within six month, the claimant deems it denied and files suit; (4) absent compromise or settlement of the claim, litigation ensues at the claimant's option.

The service of a complaint commencing action in federal court cannot satisfy the first step in the process because the action itself would preclude the second and third steps.  The agency could not consider the claim or act on it because § 2677 vests the authority to "arbitrate, compromise, or settle" the claim in the Attorney General.  Even though "the appropriate Federal agency" might be notified of the claims in litigation, the agency would be without power to "make final disposition of" those claims, *id.* § 2675(a), thwarting the very purpose of the rule that claims be exhausted administratively before an action is commenced.  Indeed, the statute allows claimants to deem agency inaction "a final denial of the claim for purposes of [§ 2675(a)]" based on the assumption that the agency will have had an adequate opportunity  to exercise the authority conferred by § 2672.  Section 2672 authorizes "[t]he head of each Federal agency or his designee . . . [to] consider, ascertain, adjust, determine, compromise, and settle any claim . . . ."  Reading this provision together with § 2677 makes it clear that the authority to "make final disposition" of a claim passes from the agency to the Attorney General when an action on the claim

commences.  Consequently, allowing the filing of suit in federal court to satisfy the administrative presentment requirement deprives the agency of any opportunity to "make final disposition of" the claims, and destroys the entire basis for allowing claimants to deem their claims finally denied.  *Cf. Brady v. United States,* 211 F.3d 499, 502-03 (9th Cir.), *cert. denied,* 531 U.S. 1037 (2000) (rejecting argument that first judicial complaint could fulfill administrative-presentment requirement for second action); *Houston v. U.S. Postal Service,* 823 F.2d 896, 903-04 (5th Cir. 1987 (state-court action did not toll limitations period because plaintiff had not exhausted administrative remedies).

An appreciation of the FTCA's procedural scheme reveals that *Williams* stands only for the undisputed  proposition that "[n]o particular method of giving [administrative] notice is required" by § 2675(a).  2010 WL 487431 at *8.  The holding of the case does not encompass the facts of the present case.  There, § 2675(a)'s administrative-notice requirement was deemed to have been satisfied because the agency received notice of claims that had been asserted in state court. Commencing the state-court action did not divest the agency of its authority to "consider, ascertain, adjust, determine, compromise, and settle" the claims.  28 U.S.C. § 2672.  Here, the commencement of actions in this Court did divest the agency of that authority.

In its February 2, 2010, ruling the Court allowed the MRGO plaintiffs to file a new suit, on the view that "plaintiffs' claims can be deemed exhausted because more that six months has passed since the 2007 complaint was filed placing the Corps on

notice that the EBIA claim was being made by these three plaintiffs, just as in *Williams*." 2010 WL 487431 at *12. But as the administrative scheme reveals, "placing the Corps on notice" of claims that the agency lacked the authority "to make final disposition of" does not provide any basis for allowing the plaintiffs to deem the agency's inaction a denial. Three years have passed since the 2007 complaint was filed, but the passage of time is irrelevant under the circumstances present in this litigation. The agency lacked the authority that is presupposed by § 2675(a). If thirty years had passed without any final action by the agency, that would be no basis for viewing the agency's inactivity as a denial of the claims, given the agency's inability to take any action on them while they remain in litigation.

The plaintiffs failed to exhaust their administrative remedies before filing suit, even though the FTCA requires it. The prematurity of their actions not only precluded agency action but also prevented the passage of time from serving as a basis for deeming their claims to have been denied. Because the plaintiffs failed to heed the clear statutory command requiring administrative exhaustion before filing suit, their EBIA claims must be dismissed.

## VIII.  Diminution of property value is the correct measure of the plaintiffs' damages.

Louisiana law permits a plaintiff whose immovable property is damaged by a tort "to recover damages including the cost of restoration that has been or may be reasonably incurred," *Roman Catholic Church v. Louisiana Gas Serv. Co.*, 618 So. 2d 874, 879-80 (La. 1993). But these "restoration damages" are allowed only if "there is

a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs." *Id.* Allegations of personal reasons to restore a property are judged on the objective evidence of the plaintiff's use of the property, not his "self-serving testimony of their inchoate intent . . ." *Hornsby v. Bayou Jack Logging*, 902 So. 2d 361, 368 (La. 2005).

The proper measure of damages in Louisiana is the diminution of the property's market value when (1) immovable property is damaged; (2) a plaintiff does not elect to restore his property; and (3) no unique factor affecting the property's value is proven. *State Dep't of Transp. and Dev. v. Lobel*, 571 So. 2d 742 (La. Ct. App. 1990). Since "ordinary household effects . . . depreciate immediately upon becoming used and, because of ordinary wear and tear, are worth much less after several years than when originally purchased, and may be readily replaced, . . . the just method of determining the value of used articles, which are not subject to disposal on the open market and which become disintegrated by wear and the lapse of time, is to deduct from their original price a reasonable sum for depreciation." *Gray v. Sec. Storage & Van Co.*, 26 So. 2d 399 (La. Ct. App. 1946) (quoting *Gugert v. New Orleans Indep. Laundries*, 181 So. 653, 656 (La. Ct. App. 1938)).

Damages for inconvenience under Louisiana law are awarded only upon a showing that the plaintiff was in a zone of danger or present to witness property damage. *McDonald v. Illinois Central Gulf R.R. Co.*, 546 So. 2d 1287, 1292 (La. Ct. App. 1989). Cleaning and repairs after the immediate danger to persons and property has passed do not merit inconvenience damages. *Napolitano v. F.S.P., Inc.*, 797 So. 2d

111, 115 (La. Ct. App. 2001).  Apart from Plaintiff Clifford Washington, none of

Plaintiffs were in a zone of danger or present to witness their property damage and,

as such, their claims for "inconvenience" are not compensable under Louisiana law.

The FTCA is a limited waiver of sovereign immunity which must be construed

strictly and narrowly, in favor of the sovereign.  *O'Rourke v. Smithsonian Institution*

*Press*, 399 F.3d 113, 121 (2nd Cir. 2005) (citing *Lane v. Pena*, 518 U.S. 187, 195

(1996)).  The United States' limited sovereign-immunity waiver does not extend to

paying twice for the same injury.  As the Supreme Court recognized in *Brooks v.*

*United States*, 337 U.S. 49 (1949), it saw "no indication that Congress meant the

United States to pay twice for the same injury."  Id. at 53.

Louisiana law recognizes the collateral source rule that "a tortfeasor may not

benefit, and an injured plaintiff's tort recovery may not be reduced, because of

monies received by the plaintiff from sources independent of the tortfeasor's

procuration or contribution." *Bozeman v. State*, 879 So. 2d 692, 698 (La. 2004).

Plaintiffs were awarded grants under the Robert T. Stafford Disaster Relief and

Emergency Assistance Act (Stafford Act).[8]  See 42 USC. §§ 5121 et seq., for damages

they sustained during Hurricane Katrina.  Those grants were made through the

Federal Emergency Management Agency's Individual and Households Program, 42

---

[8] The Stafford Act authorizes the Federal Emergency Management Agency (FEMA) to
promulgate rules and regulations necessary to carry out the provisions of the Stafford Act.
*See* 42 U.S.C. § 5164.

USC § 5172.[9]   For damages they sustained during Hurricane Katrina, Plaintiffs also received grants from the United States Department of Housing and Urban Development's Community Development Block Grant money,[10]  as awarded by the Louisiana Recovery Authority's (LRA) "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq.

Those grants were not independent of the United States' procuration or contribution and must be deducted from any damages awarded to Plaintiffs. *Kennedy v. United States*, 750 F. Supp. 206, 213 (W.D. La. 1990).  In fact, the LRA payments have been recognized as "provided free of cost to eligible homeowners and is funded by a grant through the United States Department of Housing and Urban Development." *Metoyer v. Auto Club Family Ins.* Co., 536 F. Supp. 2d 664, 670 (E.D. La. 2008).  Moreover, "[a] person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates benefits available to the person for the same purpose from another source."  42 U.S.C. § 5155(c).

Plaintiffs cannot meet their burden of proving damages under Louisiana law because they did not properly quantify: (1) the loss of fair-market value of their immovable property; (2) actual reconstructions costs where appropriate; (3)

---

[9] Congress appropriates funds to carry out activities under the Stafford Act to an account known as the Disaster Relief Fund (DRF).  In support of its budget request each year, FEMA and the Department submit a budget justification for the "Disaster Relief Fund."

[10]*See* Pub. L. No. 109-148, 119 Stat. 2779 (Dec. 30, 2005; Pub. L. No. 109-234, 120 Stat. 418 (June 15, 2006); Pub. L. No. 110-116, 121 Stat. 1343 (Nov. 13, 2007).

depreciated value of their movable property; or (4) actual expenses.  Moreover, apart from Plaintiff Clifford Washington, they are not entitled to "inconvenience" damages because they were not present or in the zone of danger at the time the damage occurred.

If this Court awards damages, the award is limited to the sum certain found in the property-damage section of Plaintiffs' administrative claims (Standard Form 95).  Property claims are severable from personal injury claims.  See *Kokaras v. United States*, 980 F.2d 20, 23 (1st Cir. 1992) (holding that property damage is severable from personal injury and that failure to put a sum certain on administrative claim for personal injury does not prevent plaintiffs from seeking property damage where sum certain requirement was satisfied for such damage); *Allen v. United States*, 517 F.2d 1328, 1330 (6th Cir. 1975) (holding that, where plaintiffs filed an administrative claim for property but not personal injury or loss of consortium, but filed a complaint alleging only personal injury and loss of consortium, case was properly dismissed); *Schwartzman v. Carmen*, 995 F. Supp. 574, 576 (E.D. Pa. 1998) (holding that where sum certain was listed as to property but not personal injury, plaintiff could pursue property damages but not personal injury claims in district court).  Moreover, the Plaintiffs are not entitled to "inconvenience" damages because, apart from Plaintiff Clifford Washington, they were not present or in the zone of danger at the time the damage occurred.

Furthermore, to the extent other actors, even non-parties, are responsible for any portion of the damages incurred by plaintiffs, damages must be apportioned

accordingly among the various causes.  In 1996, Louisiana amended its Civil Code to expressly guarantee that "[a] joint tortfeasor shall not be held liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person." La. Civ. Code Ann. art. 2324(B) (2008).  The legislature also clarified that "the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty." La. Civ. Code art. 2323(A) (2008). (emphasis added).

   *Dumas v. State*, 828 So. 2d 530 (La. 2002), a recent case from the Supreme Court of Louisiana, is instructive on this point.  In that case, a wrongful death suit brought against the state, the decedent sustained a fatal head injury when the bicycle he was riding struck a large pothole on a state road.  *Id*. at 531.  As an affirmative defense, the state alleged that the death resulted from the negligent medical care provided to the decedent at the hospital following his accident.  *Id.* at 531-32.  The plaintiffs, in turn, argued that even if the hospital was also partly responsible for the death, the state should be held solidarily liable for 100 percent of their damages. *Id*. at 532. The court, however, roundly rejected this argument:

> Pursuant to Article 2323, the fault of both the State and the allegedly negligent health care providers should be determined notwithstanding the fact that the health care providers are non parties. Under Article 2324(B), if a jury determines that both the State and the health care providers negligently injured Mr. Dumas and plaintiffs, then the liability between them will be a joint and divisible obligation, they will not be solidarily liable, and each joint tortfeasor will be liable only for his portion of fault.

*Id.* at 537.  From this statement, it is evident that binding case law, in addition to well- established statutory provisions, forecloses the possibility of a negligent joint tortfeasor being held liable for the entire amount of a plaintiffs' damages.

## CONCLUSION

A final judgment in favor of the United States should be entered.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch

/s/ Conor Kells
CONOR KELLS
Trial Attorney, Torts Branch
ROBIN DOYLE SMITH
Senior Trial Counsel, Torts Branch
Civil Division
U.S. Department of Justice
Benjamin Franklin Station,
P.O. Box 888
Washington, D.C.  20044
(202) 616-4400/616-5200 (fax)
Conor.Kells@usdoj.gov
Attorneys for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 10, 2012, I served a true copy of the foregoing upon the Court via hand-delivery pursuant to the Court's July 26, 2012 Minute Entry.  Notice of this filing will be delivered electronically via CM/ECF to all counsel of record.

/s/ Conor Kells
Conor Kells