# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re Katrina Canal Breaches | § | Civil Action |
| Consolidated Litigation | § | No. 05-4182 "K" (2) |
| | § | Judge Duval |
| | § | Mag. Wilkinson |
| | § | |
| | § | |
| Pertains to : MRGO | § | |
| *Armstrong*, C.A. No. 10-866 | § | |
| | § | |
| _____ | § | |

# United States' Proposed Findings of Fact
# and Conclusions of Law

## United States' Proposed Findings of Fact

**Geology of New Orleans**

### Surface Geology

1.    The city of New Orleans and the Inner Harbor Navigation Canal (IHNC) are located along the eastern edge of the Mississippi River's deltaic plain. Joseph Dunbar Expert Rpt. at 3.

2.    Broad natural levees associated with the present day Mississippi River, Bayou des Familles, Bayous Metairie-Gentilly-Sauvage, and Bayou La Loutre are the most prominent physiographic features. Dunbar Rpt. at 3.

3.    Natural levees from these different river courses are related to past distributary channels associated with different Mississippi River deltas.  Dunbar Rpt. at 3.

4.    Surface elevations in the New Orleans area are generally near sea level, ranging from approximately 25 ft above sea level along the crests of the Mississippi River levees, to a several feet below sea level behind the protected levee areas. Dunbar Rpt. at 3.

### Geologic History

5.    The geologic history of the New Orleans and IHNC area is governed by eustatic sea level rise, due to melting of continental glaciers at the end of the Pleistocene, and the formation of extensive deltas by major course shifts of the Mississippi River across the Louisiana Coastal Plain during the past 7,000 years. Dunbar Rpt. at 3.

6.    The geologic history of this region is based upon thousands of engineering borings drilled during the past 75 years, hundreds of radiocarbon age dates from organic fluvial-deltaic sediments, and numerous geologic studies conducted primarily by USACE geologists in support of flood control engineering projects in coastal Louisiana (Autin et al. 1991; Britsch and Dunbar 1990; Dunbar et al. 1994, 1995; Fisk 1952; Frazier 1967; Kolb 1962; Kolb, Smith, and Silva 1975; Kolb and Saucier 1982; Kolb and Van Lopik 1958a, 1958b; May et al. 1984; Schultz and Kolb 1954; Saucier 1963 1969, 1977, 1994). Dunbar Rpt. at 3.

7.    More than 10,000 borings have been drilled in the greater New Orleans area alone during the past 60 years in support of engineered structures and building foundations. Dunbar Rpt. at 3–4.

8.    Boring data from the New Orleans area defines a complex geology that is related to the different delta complexes, course shifts by the Mississippi River, and the

distributaries that form and were abandoned by these deltas during the Holocene (past 10,000 years). Dunbar Rpt. at 4.

9.    Five major Mississippi River deltaic systems or complexes have built seaward during the past 7,000 years. Dunbar Rpt. at 4.

10.   The relative ages of these deltas have been generally well established by radiocarbon dating of the organic sediments in these system. (Frazier 1967, Kolb and Van Lopik 1958a). Dunbar Rpt. at 4.

11.   These systems rapidly filled the shallow Gulf waters in the greater New Orleans area with fluvial-deltaic sediments. Dunbar Rpt. at 4.

12.   Overbank deposition from the many active distributary channels in this area has created well-developed natural levees that transition to inland swamps and low-lying marsh environments based on early historic maps of the greater New Orleans area (Works Progress Administration, WPA, 1937). Dunbar Rpt. at 4.

13.   The surface geology of the IHNC area corresponds to a cypress and oak swamp that is located between the bounding natural levee ridges of the Mississippi River and the Bayou Metairie-Gentilly-Sauvage distributary course (Dunbar et al. 1994, 1995, New Orleans and Spanish Fort Quadrangles, respectively, Saucier 1994). Dunbar Rpt. at 4.

14.   Active sedimentation by the present day Mississippi River course and distributary channels related to the former St. Bernard delta complex have created a unique landscape of natural levee and swamp deposits in the greater New Orleans and IHNC areas. Dunbar Rpt. at 5.

15.   The natural levees correspond to the high ground in the greater New Orleans area and were the focus of historic settlement by the early residents to the city. Dunbar Rpt. at 5.

16.   Draining of the cypress and oak swamps that bordered the flanks of these natural levees ridges began after World War (WW) I in the IHNC area and was especially rapid following WWII to meet the demands for increasing population growth. Dunbar Rpt. at 5.

**IHNC Subsurface Geology**

17.   The subsurface geology of the eastern IHNC area, which includes the 9th Ward Area, has been mapped in detail by several USACE studies (Kolb and Van Lopik 1958a, 1958b; Kolb 1962; Kolb, Smith, and Silva 1975; and Dunbar et al. 1994, 1995). Dunbar Rpt. at 5.

18.    These earlier studies provided valuable information on the surface and subsurface depositional environments, and their engineering properties. Dunbar Rpt. at 5.

19.    Engineering properties for these different depositional environments have been summarized by several USACE studies (Kolb and Van Lopik 1958a; Kolb 1962; Montgomery 1974; Saucier 1994). Dunbar Rpt. at 5.

20.    In addition, mapping of the subsurface stratigraphy was conducted during the IPET (2007) forensic studies into the causes of the IHNC levee failures. Dunbar Rpt. at 5.

21.    The IPET cross-sections were based in part on a comprehensive geologic mapping program of the eastern Mississippi River deltaic plain for the New Orleans District during the early 1990s (Dunbar et al, 1994 and 1995). Dunbar Rpt. at 6.

22.    The stratigraphy beneath the east side of the IHNC area consists of the following units in descending order:  a swamp unit (composed mainly of clay and organic clay with minor peats), interdistributary (primarily clay), intradelta (fine sand, silty sand, and sandy clay), bay-sound (primarily clay), and the Pleistocene surface (mainly fine-grained clay soils beneath the IHNC area). Dunbar Rpt. at 7.

**Swamp Deposits in the IHNC**

23.    The overwhelming evidence clearly demonstrates the greater New Orleans area as being dominated by inland swamp deposits and not marsh (Kolb and Van Lopik 1958a). Dunbar Rpt. at 10.

24.    The properties of swamp deposits clearly show that peat is a relatively minor constituent within this environment. Dunbar Rpt. at 10 - 11.

25.    Instead, the swamp environment is dominated by more than 90 percent organic clay and clay. Dunbar Rpt. at 11.

26.    In particular, the area is underlain by geologic swamp deposits that contain soils which classify as organic clay according to using ASTM D2216, 2974, and 4427. Timothy Stark Expert Rpt. at 13.

27.    The foundation stratigraphy at the east side of the IHNC where the two levee failures occurred has been characterized by Rogers (2012) as composed of fibrous sedge peats capable of transmitting groundwater flow through these sediments. Dunbar Rpt. at 27.

28.    The boring data from this area does not support this vision for these peat deposits. Instead, the stratigraphy consists of clay and organic clay which is representative of swamp deposits and contains only minor amounts of peat. Dunbar Rpt. at 27.

4

### Inner Harbor Navigation Canal

29.    Construction commenced on June 6, 1918 and proceeded from Lake Pontchartrain to the Mississippi River. Stark Rpt. at 11.

30.    Earthwork and canal excavation work initiated with dredging and construction of dikes parallel to the sides of the proposed canal (IPET, 2006).  The dredging created a trapezoidal channel with the dredged spoils cast to the sides to create the levees on both sides of the canal. Stark Rpt. at 11.

31.    The dredged material consisted primarily of low and high plasticity fine grained material dredged from the underlying organic clay and deeper clay deposits.  This material was subsequently graded along the canal which created a low hydraulic conductivity layer near the surface. Stark Rpt. at 11.

32.    Soil borings, cone penetration tests, field pump tests, and laboratory tests conducted by the USACE (1966 and 1969) clearly show that the dredged spoil consists of fine grained organic and interdistributary clays which had a low hydraulic conductivity. Stark Rpt. at 11.

33.    These soils are not representative of a fibrous peat because of the large amount of fine-grained material present. Stark Rpt. at 13.

34.    Details of the concrete I-wall along the east bank of the IHNC floodwall are set forth in USACE Design Memorandum No. 3 (1966), USACE As-Built Plans (1969), and IPET (2006). Stark Rpt. at 14.

35.    The as-built drawings of the I-wall along the east bank of the IHNC show the I-wall with a top and bottom of Elevation +15.0 feet and -8.0 feet, respectively. Correcting these elevations to the NAVD88,2004.65 datum yields a top and bottom Elevation +12.5 feet and -10.5 feet, respectively. Stark Rpt. at 14.

36.    The Jourdan Avenue Canal runs along the west side of Jourdan Avenue.  The canal was approximately parallel to the floodwall from about Station 16+00 to 57+00 and was eventually replaced with a box-culvert. Stark Rpt. at 14.

37.    The sheet pile extends from Elevations +9.0 feet to -10.5 feet (NAVD88,2004.65).  This makes the sheet pile along the east bank 19.5 feet long. The installed sheet pile used was PZ-27.  Stark Rpt. at 15.

38.    However, just north of the North Breach a longer sheet pile was installed in the 1980s as part of the Florida Avenue Complex project (USACE, 1980; and USACE, 1969)).  This sheet pile is also PZ-27 but it is 34 feet long instead of 19.5 feet long.  The approximate top and bottom elevations of the 19.5 foot long sheet pile along the East Bank Industrial Area (EBIA) are +9 and -10.5 feet (NAVD88,2004.65). Stark Rpt. at 15.

**Hurricane Katrina Impact on EBIA**

39.    Hurricane Katrina crossed the Florida peninsula on August 25, 2005 as a Category 1 hurricane. It then entered the Gulf of Mexico, where it gained intensity from the warm water of the Gulf. This resulted in Hurricane Katrina reaching Category 5 status on Sunday, August 28, shortly before making landfall just east of New Orleans early on Monday, August 29, 2005. Stark Rpt. at 16.

40.    The hurricane had weakened to a Category 4 level prior to landfall on August 29 and continued to weaken as it moved inland.  Because the eye of this hurricane passed to the east of New Orleans, the hurricane imposed severe winds and storm surge on the New Orleans region. Stark Rpt. at 16.

41.    Based on its size and intensity, Hurricane Katrina was a 400-year meteorological event. IPET Supplemental Report at 11 (June 2009).

42.    The LPV levees protecting the St. Bernard polder, including the I-walls on the east side of the IHNC, were designed to provide protection "equivalent to the surge and wave action predicted to result from [Standard Project Hurricane] parameters." *Katrina*, 647 F. Supp. 2d at 651-652; USACE DM No. 3, Lake Pontchartrain and Vicinity Chalmette Area Plan at 8 (1966).

43.    The Standard Project Hurricane was determined to be a 200-year meterological event. USACE DM No. 3, Lake Pontchartrain and Vicinity Chalmette Area Plan at 8 (1966).

44.    The North Breach was located near Florida Avenue and the Florida Avenue Bridge.   The North Breach is about 250 feet long and located between USACE floodwall stations 53+50 and 55+97. Stark Rpt. at 16 - 17.

45.    The water level in the Lower Ninth Ward was about +2 feet (NAVD88,2004.65) at or shortly after 5:00 am.  By 6:00 am a significant rise in the water level at the intersection of Jourdan and Florida Avenues was occurring. Stark Rpt. at 22.

46.    It is generally believed that the North Breach time of failure is around 6:00 a.m. These times are approximate.

47.    The South Breach was about 850 feet long and located between USACE floodwall stations 22+70 and 31+20. The sheet-pile interlocks remained intact. The shape of the dislocated sheet pile indicates that the failure initiated near the northern end of the breach, i.e., about Station 26+00 to 31+20, because the sheet pile is displaced further east in this area. Stark Rpt. at 23.

48.    Photos taken after the flood water receded did not reveal any evidence of sand boils or underseepage. Stark Rpt. at 23.

6

49.     Rogers (2012) describes evidence of seepage on page 113 of his report at the bottom of the page… "*In addition, there was ample physical evidence of underseepage at both the eastern IHNC breaches in the form of linear sand boils.*" Rogers has admitted in his deposition, however, that this sand was most likely not the result of underseepage. J. David Rogers Dep. at 238, Mar. 16, 2012 (Rogers I).

50.     Both the North and South Breaches occurred before the water in the IHNC reached its maximum level of +14.2 feet (NAVD88,2004.65) on August 29, 2005. Stark Rpt. at 24.

**EBIA Site Clearing**

51.     The USACE contracted  for the demolition and environmental clean-up of the EBIA of the IHNC to allow construction of a bypass channel for use with the new lock. The EBIA is located on the eastern side of the IHNC between the Florida Avenue and Claiborne Avenue bridges. Stark Rpt. at 26.

52.     The EBIA was approximately 32 acres in size. It was subdivided into six properties based on historic land use. Each property had its own structures and excavations that had to be removed. Thirty five (35) buildings in various states of disrepair were demolished prior to completion of the subsurface characterization. Stark Rpt. at 27.

53.     The subsurface characterization addressed contamination as well as the presence of buried structures and foundations that could interfere with construction of the bypass channel for the expanded IHNC. Stark Rpt. at 27.

54.     The removal process involved the extraction of twelve shallow sunken barges throughout the EBIA and one shallow railroad tank car near the shipping canal in the Boland Marine property. Stark Rpt. at 27.

55.     The removal process also included approximately 72,000 tons of shallow transite (non-friable) asbestos in the Boland Marine property. Stark Rpt. at 27.

56.     The USACE contracted with Washington Group International (WGI) to perform the site characterization, demolition, and environmental clean-up.  WGI began working at the project site in January 2001.  In its last No Further Action At This Time (NFATT) filing, the Louisiana Department of Environmental Quality (LDEQ) declared the clean-up of the EBIA of the IHNC finished on July 19, 2005 (WGI, 2005). Stark Rpt. at 27.

57.     From the north to the south, the properties included: Boland Marine, McDonough Marine, Indian Towing, Mayer Yacht, Saucer Marine, and International Tank Terminal.  The Boland Marine and Saucer Marine sites are primarily discussed

here because the North and South Breaches occurred on these properties. Stark Rpt. at 27.

58.     Boland Marine was used for ship repairs for nearly twenty years from the 1970s to the 1990s. The primary activities at this site were storage, office space, painting operations, and fabrication/welding.  Saucer Marine was initially leased in 1954 and used for ship building operations for about four decades (WGI, 2005). Stark Rpt. at 27.

**Task Order 26**

59.     The remediation of the EBIA was part of the larger IHNC lock-replacement project and became known as Task Order 26.  Delivery Order 0026, July 12, 1999 ("Task Order 26").

60.     The five-page Statement of Work (SOW) for Task Order 26, issued in June 1999, was "brief and provided only a general description of the work to be done." *In re Katrina*, 620 F.3d at 458; *See generally*, Statement of Work (June 1999), WGI038114--18.

61.     The SOW required the contractor to "prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to [be] filled by sampling or other investigations." SOW WGI03815.

62.     From that SOW, WGI submitted a more detailed recommendations report to the Corps. *In re Katrina*, 620 F.3d at 458.

63.     After responding to comments, WGI submitted a revised Recommendations Report. Draft – Revision B, Recommendation Report for Demolition and Site Preparation/Activities of the East Bank Industrial Area of the Inner Harbor Navigation Canal Lock Replacement Project – New Orleans, Louisiana, prepared for USACE, New Orleans District, DACA56-94-D-0021, Task Order #26, December 2, [NCS-010-000000423 to 533].

64.     The Recommendation Report was finalized in January 2000 and became the "basis of subsequent specifications for work and work orders and proposals." *In re Katrina,* 620 F.3d. at 458.

65.     Under the Total Environmental Restoration (TERC) contract, WGI was required to submit a Work Plan for each TERC delivery Order. TERC Contract, WGI000133.

66.     The Work Plan, written by WGI, "describes the Contractor's detailed approach for the performance of the delivery order" and is "based upon the Government's

statement of work, which is a general description of the work the Contractor is required to perform." TERC Contract, WGI000133.

67.     WGI drafted eight Work Plans for the EBIA project, including a Project Work Plan. Project Cite Development and Remedial Action of East Bank Industrial Area Inner Harbor Navigation Canal Lock Replacement Project New Orleans, LA, ("PWP") WGI027349.

68.     The Project Work Plan detailed the work WGI would perform at the beginning of the project. *See generally*, PWP WGI027349.

**Substantial Completion of Task-Order 26**

69.     A final site-visit and inspection of the EBIA was completed on May 26, 2005. Letter from J. Montegut, May 26, 2005; *see also* Guillory Dep. 204:19 - 205:9, Aug. 22, 2008 (Guillory II).

70.     On that day, all field operations officially concluded and the USACE declared Task Order 26 substantially complete. Letter from J. Montegut, May 26, 2005.

71.     After WGI left the EBIA site on May 26, 2005, the Corps continued to visit the EBIA in connection with the next phase of the Lock Replacement Project. *See, e.g.,* Email from J. Agan, Aug. 9, 2005.

72.     After the final site inspection, WGI worked on its "final deliverable" under the contract, the Technical Completion  Report, which is "a summary report to roll-up all definable features of work that occurred on the project, all clearance NFAATT letters from Louisiana DEQ to the Corps, [and] a tabular listing of all . . . subcontractors and vendors that worked on the project." Guillory II Dep. 30:18 - 24; Guillory II Dep. 207:16 - 208:3.

73.     The Technical Completion Report was "a final document to conclude Task Order 26." Guillory II Dep. 207:16 - 208:3.

**WGI Excavations**

74.   Dr.  Timothy Stark is a professor of Geotechnical Engineering in the Department of Civil and Environmental Engineering at the University of Illinois.  He has published more than 270 technical papers in refereed journals, conferences, and magazines, including 96 refereed papers related to geotechnical and geoenvironmental engineering.  As the recipient of numerous awards for research, teaching and professional service, including a 2012 ASCE geotechnical award, Dr. Stark is well qualified to testify. *See generally,* Stark Rpt.

75.   Plaintiffs' causation expert, Dr. Robert G. Bea, made numerous false assumptions about WGI's work, particularly the location and dimensions of excavations and the permeability of the soils used to fill them.

76.   Detailed information about the dimensions and locations of the WGI excavations were obtained from various sources including:

• Technical Completion Report and Record Drawings – IHNC-EBIA, New Orleans, Louisiana – WGI (2005), prepared for USACE, New Orleans District

 • Various No Further Action at This Time (NFATT) Reports - IHNC-EBIA, New Orleans, Louisiana – WGI (2005), prepared for USACE, New Orleans District.

Stark Rpt. at 33.

**Excavation Locations**

77.    The excavations in the Boland Marine (Figure 5-7(a)) and Saucer Marine (Figure 5-7(b)) properties are most relevant because these are the locations of the North and South Breaches, respectively. Stark Rpt. at 33.

78.   Boland Marine was used for ship repairs for nearly twenty years from the 1970's to the 1990's, and the primary activities at this site were storage, office space, painting operations and fabrication/welding. Stark Rpt. at 27.

79.   Saucer Marine was used primarily for ship building. Stark Rpt. at 63.

80.   The closest excavation (approximately 70 feet) to the North Breach was the shallow excavation to remove transite (non- friable) asbestos and other near surface hazardous waste. Stark Rpt. at 33.

81.   The typical depth of a transite excavation was about five feet with the transite occurring between a depth of one and four feet.  Given a ground-surface elevation of +2 feet (NAVD88,2004.65), the elevation of the bottom of the transite excavation was about elevation -3 feet (NAVD88,2004.65). Stark Rpt. at 33-34.

82. This was significantly above the bottom of the sheet pile (elevation -10.5 feet (NAVD88,2004.65)). Stark Rpt. at 34.

83. Since the transite excavations are underlain by about 7.5 feet of low-hydraulic-conductivity clay, no storm surge could be transmitted to the tip of the sheet pile. Stark Rpt. at 34.

84. The closest excavation (approximately 70 feet) to the South Breach was a small excavation SM-7 which had an overall depth of 8 feet. Stark Rpt. at 34.

85. Given a ground surface elevation of +1.3 feet (NAVD88,2004.65), the elevation of the bottom of excavation SM-7 is about elevation -6.7 feet (NAVD88,2004.65). Stark Rpt. at 34.

86. This is significantly above the bottom of the sheet pile which is elevation -10.5 feet (NAVD88,2004.65). Stark Rpt. at 34.

87. The transite excavations did not have an appreciable effect on the seepage analyses described below. Stark Rpt. at 34.

### Excavation Dimensions

88. The depth of the numbered excavations in Figure 5-7(a) and (b) are shown in Tables 5-1 and 5-2 for the Boland Marine and Saucer Marine sites, respectively. Stark Rpt. at 34.

89. The excavation depths in Table 5-1 were obtained from NFAATT Submittal Reports for Boland Marine dated June, 2005. Stark Rpt. at 34.

90. The excavation depths in Table 5-2 were obtained from NFAATT Submittal Report for Saucer Marine dated May, 2003. Stark Rpt. at 34.

91. In Table 5-1, the deepest excavation with an Area Identification Number, e.g., Area 1 or BM-1, on the Boland Marine property is eight (8) feet (BM-6 and 15) which corresponds to an elevation of about -6 feet (NAVD88,2004.65). Stark Rpt. at 34.

Table 5-1.   Depth of numbered excavations in Boland Marine in Figure
5-7(a) from NFAATT Submittal Reports for Boland Marine
dated June, 2005 and QARs

| Area Number in Figure 5-7(a) | EBIA Property | Ground Surface Excavation (feet) | Vertical Depth of Elevation (feet) (NAVD88.2004.65) | Bottom Elevation of Excavation (feet) |
|---|---|---|---|---|
| BM-1 | Boland Marine | 7.11 | 7.5 | -.39 |
| BM-2 | Boland Marine | 4.31 | 6 | -1.69 |
| BM-3 | Boland Marine | 3.45 | 5 | -1.55 |
| BM-4 | Boland Marine | 1.57 | 7 | -5.43 |
| BM-5 | Boland Marine | 1.20 | 7 | -5.80 |
| BM-6 | Boland Marine | 2.17 | 8 | -5.83 |
| BM-7 | Boland Marine | 2.27 | 4 | -1.73 |
| BM-8 | Boland Marine | 1.73 | 7 | -5.27 |
| BM-9 | Boland Marine | 2.20 | 4 | -1.80 |
| BM-10 | Boland Marine | 4.24 | 5.5 | -1.26 |
| BM-11 | Boland Marine | 4.00 | 6 | -2.00 |
| BM-12 | Boland Marine | 5.50 | 5 | -.50 |
| BM-13 | Boland Marine | 1.49 | 5 | -3.51 |
| BM-14 | Boland Marine | 1.76 | 5 | -3.24 |
| BM-15 | Boland Marine | 1.90 | 8 | -6.10 |
| BM-16 | Boland Marine | 2.26 | 4 | -1.74 |

Table 5-2.   Depth of numbered excavations in Saucer Marine in Figure
5-7(b) from NFAATT Submittal Report for Saucer Marine
dated May, 2003 and QARs

| Area Number Figure 5-7(b) | EBIA Property | Ground Surface Elevation (feet) | Vertical Depth of Excavation (feet) (NAVD88,2004.65) | Bottom Elevation of Excavation in (feet) |
|---|---|---|---|---|
| SM-1 | Saucer Marine | 3.39 | 8.5 | -5.11 |
| SM-2 | Saucer Marine | 3.07 | 7 | -3.93 |
| SM-3 | Saucer Marine | 2.91 | 6 | -3.09 |
| SM-4 | Saucer Marine | 3.80 | 7 | -3.20 |
| SM-5 | Saucer Marine | 4.69 | 13 | -8.31 |
| SM-6 | Saucer Marine | 5.55 | 8 | -2.45 |
| SM-7 | Saucer Marine | 1.31 | 8 | -6.69 |
| SM-8 | Saucer Marine | 3.21 | 4 | -0.79 |
| SM-9 | Saucer Marine | 3.94 | 6 | -2.06 |
| SM-10 | Saucer Marine | 4.10 | 5 | -0.90 |
| SM-11 | Saucer Marine | 2.69 | 7 | -4.31 |
| SM-12 | Saucer Marine | 3.12 | 5.5 | -2.38 |
| SM-13 | Saucer Marine | 3.62 | 4.5 | -0.88 |
| SM-14 | Saucer Marine | 3.21 | 6 | -2.79 |
| SM-15 | Saucer Marine | 3.65 | 12 | -8.35 |
| SM-16 | Saucer Marine | 6.71 | 0 | not excavated |

Stark Rpt. at 36 - 37.



Figure 5-7 (a)

Stark Rpt. at 38.



Stark Rpt. at 39.

92.    This is significant because -6 feet (NAVD88,2004.65) is well above the sheet pile tip, which is elevation -10.5 feet (NAVD88,2004.65). Stark Rpt. at 34.

93.    Excavation BM-15 yielded the lowest elevation of all of the Boland Marine excavations in Table 5-1 with an Area ID, which is -6.1 feet (NAVD88,2004.65). Stark Rpt. at 34.

94.    However, BM-15 is located approximately 300 feet from the floodwall and is too far removed from the floodwall to cause significant underseepage during the short duration of the storm surge. Stark Rpt. at 34.

95.    The closest excavation on the Boland Marine property to the North Breach is BM-7 but it is extremely shallow (minimum elevation of -1.73 feet (NAVD88,2004.65)). Stark Rpt. at 35.

96.    This is significantly above the bottom of the floodwall sheet pile (elevation -10.5 feet (NAVD88,2004.65)). It did not cause significant underseepage during the short duration of the storm surge. Stark Rpt. at 35.

97.    The deepest excavations on the Saucer Marine property are SM-5 and SM-15 which are 13 and 12 feet deep, respectively. Stark Rpt. at 35.

98.    SM-5 is near the north end of the South Breach and corresponds to a minimum elevation of -8.31 feet (NAVD88,2004.65). However, a minimum elevation of -8.31 feet (NAVD88,2004.65) is still well above the bottom of the floodwall sheet pile (-10.5 feet NAVD88,2004.65). Stark Rpt. at 35.

99.    More significantly, there is no record of this excavation being backfilled with high hydraulic conductivity material and the excavation is located approximately 190 feet from the floodwall (see Figure 5-7(b)). Stark Rpt. at 35.

100.   The closest excavation on the Saucer Marine property to the South Breach (~90 feet) is SM-7 but it is extremely small (13 feet by 11 feet from NFAATT Submittal Report for Saucer Marine dated May, 2003). Stark Rpt. at 35.

101.   It only has an excavation depth to elevation -6.69 feet (NAVD88,2004.65) which is also significantly above the bottom of the floodwall sheet pile (-10.5 feet NAVD88,2004.65). It did not play a role in the development of the South Breach. Stark Rpt. at 35.

102.   The next closest excavation on the Saucer Marine property to the South Breach (~120 feet) is SM-6 but it is also small (29 feet by 23 feet from NFAATT Submittal Report for Saucer Marine dated May, 2003) and has an excavation depth to only elevation -2.45 feet (NAVD88,2004.65). Stark Rpt. at 35.

103.   This is also significantly above the bottom of the floodwall sheet pile (-10.5 feet NAVD88,2004.65) and the excavation did not play a role in the development of the South Breach. Stark Rpt. at 35.

104.   In  summary, the Boland Marine and Saucer Marine excavations did not provide a direct hydraulic connection between the storm surge and underlying Lower Organic Clay which would allow seepage under the floodwall. Stark Rpt. at 35.

**Additional Remediation and Demolition**

**Wedding-Cake Structure**

105.   One of the largest operations on the Boland Marine property was the Wedding Cake Excavation.  This structure was located about 480 feet south of the North Breach and about 1000 feet north of the South Breach.  It resembled an inverted wedding cake with the size of the foundation decreasing with depth. Stark Rpt. at 41.

106.    The excavation extended to a minimum elevation of -23 feet NAVD88,2004.65  (WGI  photo #WGI006563) which is below the sheet pile tip at elevation -10.5 feet NAVD88,2004.65 and well below the water level in the IHNC. Stark Rpt. at 41.

107.   The concrete block was approximately 150-175 feet from the floodwall.  *Katrina,* 2008 WL 5234369, at *11.

108.   Because these concrete/steel structures were discovered after work on the EBIA project commenced, a modification to Task Order 26 was issued. Modification 10 to Task Order 26. *See* Statement of Work ("SOW") for Mod. 10.

109.   WGI submitted a proposal to excavate and dispose of the subsurface foundations located at the Boland Marine Site. *See generally*, Excavation and Disposal of Additional Subsurface Foundations, ACM and Concrete Wastes at EBIA, WGI 057606—057615.

110.   The wedding-cake structure was excavated using a braced-cofferdam system. Cofferdam Installation and Concrete Foundation Removal Final Work Plan, Dec. 6, 2001 at NCS-055-0000000105 - NCS-055-0000000106; Guillory II 122:12-123:7.

111.   The cofferdam was designed by professional engineers licensed in Louisiana. Guillory II 141:12-21.

112.   The Wedding Cake excavation was backfilled in late February, 2002 with low-hydraulic-conductivity clay.  This was confirmed in 2011 by Boring EBIA-B-45

16

which shows the full 26 foot depth, i.e., about elevation of -25.84 feet (NAVD88,2004.65), of the excavation was backfilled with low-hydraulic-conductivity clay. Stark Rpt. at 43.

113.   The excavation did not play a role in the development of either the North or the South Breach. Stark Rpt. at 43.

### Transite Excavations and Sand Backfill

114.   The most prevalent activity on the Boland Marine property were the shallow excavations used to remove the transite (non-friable) asbestos and other near surface hazardous waste.  These excavations were often in close proximity to the floodwall, especially along the Florida Avenue floodwall, and some of the excavations were backfilled with imported sand. Stark Rpt. at 45.

115.   More importantly, the imported sand was underlain by low hydraulic conductivity clay so it did not provide a hydraulic connection to the Lower Organic Clay during the storm surge. Stark Rpt. at 45.

116.   The typical depth of the transite excavation was about five feet.  The transite typically occurred between a depth of one and four feet.  Given a ground surface elevation of +1 to +2 feet (NAVD88,2004.65) near the floodwall in the North Breach area (Wink Survey Maps and Cross-Sections: Cross-Section #29; WGI264410), the lowest elevation of the bottom of the transite excavation is about elevation -3 to -4 feet (NAVD88,2004.65) which is significantly above the bottom of the sheet pile which is elevation -10.5 feet (NAVD88,2004.65). Stark Rpt. at 45.

117.   In addition, an elevation of -3 to -4 feet (NAVD88,2004.65) is above the top of the Upper Organic Clay layer (elevation ~-5 to -6 feet NAVD88,2004.65) and well above the top of the Lower Organic Clay layer (elevation ~-12 to -14 feet NAVD88,2004.65).  Therefore, the sand backfill was underlain by low hydraulic conductivity lean to silty grey clay and did not provide a hydraulic connection to the organic clay below the tip of the sheet pile at elevation -10.5 feet (NAVD88,2004.65). Stark Rpt. at 45.

118.   The excavations and sand backfill did not contribute to underseepage through the Lower Organic Clay and thus did not undermine the floodwall. Stark Rpt. at 46.

### Tank-Car Excavation

119.   This excavation had a minimum elevation of -8.1 feet NAVD88,2004.65 which is above the sheet pile tip at elevation -10.5 feet NAVD88,2004.65.)  The tank car is neither the largest nor the deepest excavation in the Boland Marine property but has been emphasized by Bea (2008).  It is located over 300 feet from the North

Breach floodwall and played no role in the development of the breach. Stark Rpt. at 61.

120. In addition to demolishing and removing obstructions on land in the EBIA, the remediation effort required removal of sunken or partially sunken barges from the eastern edge of the canal. *See, e.g.,* PWP.

121. One such submerged structure, a railroad fuel-tanker car, was located in the canal adjacent to the EBIA near Boland Marine. Guillory II 142:9-16, 148:1-13.

122. Stewart Construction, a subcontractor for WGI, drafted a work plan for excavating and removing the fuel-tanker car and sunken barge. The work Stewart would perform "encompasse[d] the provision of engineering, designing, and construction of a cofferdam to adequately assess and remove the tanker's contents." Proposal Submittal for Removal and Disposal of the Barge, Fuel Taker and Sunken Debris at the EBIA-IHNC, NCS004-000000543 at NCS004-000000556.

123. The cofferdam was designed by a licensed Louisiana engineer. Guillory II 142:12 - 24.

### Sewer-Lift Station

124. The sewer-lift station, buried in the Boland Marine site, was generally described as a "large diameter pipe with pumps in it, valves and ladders to get down into it, all encased in . . . metal pipe[,]"which had deteriorated due to prolonged exposure to brackish water in the IHNC." *Katrina*, 2008 WL 5234369, at *7; Montegut Dep. 75:3 - 10, Aug. 8, 2008.

125. The sewer-lift station was approximately 80-100 feet from the floodwall. Guillory II 132:12 - 23.

126. The Sewer Lift Excavation was one of the deepest on the Saucer Marine property and has been routinely cited by Dr. Bea as one of the sources of the hydraulic connection between the storm surge and the underlying organic clay layers (Bea, 2008 and 2009). Stark Rpt. at 63.

127. This excavation was located about 170 feet north of the South Breach, i.e., outside of the South Breach area.  In addition, the shortest distance from this excavation to the floodwall is about 82 feet. The removal operation involved excavating around the lift station so it could be removed by a crane. Stark Rpt. at 63.

128. The lift station excavation extended to a minimum elevation of about -18.9 feet (NAVD88,2004.65) based on a surface elevation of +2 to +3 feet

(NAVD88,2004.65) near the floodwall in the South Breach area (Wink Survey Maps and Cross-Sections: Cross-Section #11; WGI264410). Stark Rpt. at 63.

129.  The minimum elevation of about -18.9 feet (NAVD88,2004.65) is below the sheet pile tip at elevation -10.5 feet (NAVD88,2004.65) and well below the water level in the IHNC.  Stark Rpt. at 63.

130.  In addition, the pilings that supported the lift station extended thirty feet below the bottom of the excavation.  These pilings were removed after the lift station was removed. Stark Rpt. at 63.

131.  WGI's sub-contractor, Hamp Construction LLC, determined that a "cofferdam-shoring system [was] the appropriate type system to install in order of the lift station to be removed in a safe and efficient manner." Lift Station Removal Plan at 2, NCS-022000000336.

132.  The cofferdam-shoring system was designed by a professional engineer licensed in Louisiana. Guillory II 141:12-21, 142:19 - 143:18.

133.  Neither the excavation nor the pilings contributed to the South Breach because the excavation was backfilled with low-hydraulic-conductivity clay.  It was located about 170 feet north of the South Breach and about 110 feet away from the floodwall. Stark Rpt. at 64.

### Backfill and Borrow Pit

134.  The Sewer-Lift-station plan, written by Hamp Construction Co., called for the excavation to be "back filled with previously excavated material. If needed, the additional fill materials necessary to complete backfill operations [would] be provided by WGI." Lift Station Removal Plan at 3, NCS-022000000337.

135.  Similarly, Hamp  Construction Co.'s plan for excavating the wedding-cake structure called for backfill "with previously excavated soil in 2' lifts" and "complete backfilling to top of sheet piles with material to be provided by WGI." Cofferdam Installation and Concrete Foundation Removal Plan at 5, NCS-055-000000110.

136.  During the planning process for Task Order 26, the Corps determined that, when feasible, excavations should be backfilled with soils from a borrow pit on-site, rather than with imported material. Guillory Dep. 194:6-14 Jun. 30, 2008 (Guillory I); *see also* Staggs Dep. 151:4 - 17, Apr. 26, 2008.

137.  As the scope of the remediation work increased, so did the need for additional backfill material.  By late 2001, WGI and the Corps sought permission from the LDEQ to expand the borrow pit.  *See* Guillory II 149:2 - 150:2

138. The Corps' Engineering Division was requested to assess whether proposed borrow-pit extension complied with the district's geotechnical and engineering principles and practices. Guillory II: 153:3-20; Apr. 15, 2002, memo to Engineering Division at NCS-007-000000253.

139. The Engineering Division concluded that the borrow-pit expansion did present a stability problem, conducted additional analyses, and developed limitations for the expansion of the pit. 2 May 02 Memorandum for Construction Division at NCS-007-000000252.

140. When the borrow pit was no longer needed, the dikes between the borrow pit and the IHNC were breached, allowing water to fill the borrow pit. *See* Guillory II 154:2 - 24; *see also* Final Comments on WGI Submittal of McDonough Marine Borrow Pit Extension Draft Report at WGI207372 (approved Feb. 4, 2002).

141. Although the borrow pit was only 85 to 95 feet away from the floodwall, the wall adjacent to the  borrow pit did not breach during Hurricane Katrina. *See* Guillory II:161:8 - 17.

### Shallow Excavations

142. There is evidence of shallow burial of drums containing hazardous waste at Saucer Marine (WGI, 2005).  Using a typical depth of excavation of 4 to 5 feet and a ground surface elevation of +2 to +3 feet (NAVD88,2004.65) in the South Breach area (Wink Survey Maps and Cross-Sections: Cross-Section #11; WGI264410), the lowest elevation of the bottom of these excavation is about elevation -2 to -3 feet (NAVD88,2004.65). Stark Rpt. at 74.

143. This was significantly above the bottom of the sheet pile.  In addition, an elevation of -2 to -3 feet (NAVD88,2004.65) is above the top of the Upper Organic Clay layer (elevation ~-7 to -8 feet NAVD88,2004.65) and well above the top of the Lower Organic Clay layer (elevation ~-12 to -13 feet NAVD88,2004.65). Stark Rpt. at 74.

144. In addition to demolition, WGI remediated contaminated soil at the EBIA in accordance with the LDEQ's RECAP standards. *See* PWP; SOW, Aug. 28, 2000.

145. WGI drilled for potential contamination in the EBIA down to a maximum depth of twenty-two feet below ground surface. That depth was selected because "of the proposed future lane and transit bypass channels that the Corps was going to dredge through the EBIA for construction of the new lock." Guillory II at 88:18-89:17; 118:11-24.  SAP.

146. The shallow excavations used to remove buried drums and other wastes did not provide a hydraulic connection to the Lower Organic Clay. Stark Rpt. at 74.

## Surekote Road

147.  As part of its remediation effort and in accordance with RECAP procedures, in late 2004, WGI excavated a contamination "hot spot" directly beneath Surekote Road at the McDonough Marine site. Guillory II 158: 3 - 17.

148.  Surekote Road was approximately 24 or 25 feet wide and located roughly 15 to 20 feet west of the floodwall bordering the eastside of the EBIA. *See* Memo for Constr. Div., Geotech. Stability Analysis; *see also* Guillory II at 161:18 - 162:1.

149.  Because of the proximity of the excavation to the floodwall, the Corps' Engineering Division was requested to assess whether the excavation, which was 3-feet deep and 25-feet wide, complied with the district's geotechnical and engineering principles and practices. Guillory II 158:3-24; Apr. 15, 2002, memo to Engineering Division at NCS-007-000000253.

150.  The Engineering Division concluded that the excavation did not present a stability problem, but did require backfill in 12 inch lifts of 90% Proctor compacted backfill within +5% and -3% of the optimum moisture content. May 2, 2002, memo to Construction Division at NCS-007-000000252.

151.  WGI's work on the Surekote Road excavations was consistent with the specifications recommended by the Engineering Division's recommendations. Guillory II at 178:9-19.

152.  It did not cause any significant underseepage.

## Utility Excavations

153.  As described above, there were shipbuilding and other industrial operations in the EBIA.  As a result, utility pipelines, such as water, gas and sewer, had to be disconnected to install the sheet pile for construction of the I-wall after Hurricane Betsy. Stark Rpt. at 76.

154.  After placement of the sheet pile, the utilities had to penetrate or cross-over the sheet pile or I-wall.  These utility penetrations were usually accomplished by capping the utility at the floodwall prior to sheet pile installation, cutting a small hole in the installed sheet pile at the elevation of the utility, and re-connecting the utility after extending it through the sheet pile. Stark Rpt. at 76.

155.  USACE plans, e.g., GDM#3 (USACE, 1966),  Plans for Levee and Floodwall Capping (USACE, 1969), and Wink (2001), show the utilities that needed to pass through the sheet pile and concrete floodwall along the EBIA and in the South and North Breach areas. Stark Rpt. at 76.

156.   These project plans show a total of nine penetrations through the sheet pile along the EBIA I-wall north of Claiborne Avenue and South of Florida Avenue. Stark Rpt. at 76.

157.   There were no penetrations in the area of the North Breach. Stark Rpt. at 76.

158.   Seven of the utility penetrations are in areas which did not fail. Stark Rpt. at 76.

159.   There were only two penetrations near the South Breach.  These two utilities did not impact the performance at the I-wall during Hurricane Katrina since the deepest penetrations  were well above the bottom of the sheet pile and the top of the Lower Organic Clay. Stark Rpt. at 76 - 77.

### Extracted Pilings

160.   One other potential seepage path that might have been created by the WGI activities was the extraction of pilings used to support the structures in the EBIA. These extractions were often backfilled and the ones that were not would typically have closed up with the surrounding soil within a matter of months. Stark Rpt. at 108.

161.   Plaintiffs' expert, J. David Rogers, has also testified that these holes would have closed up within a matter of months. Rogers Dep. at 190 - 191, Mar. 17, 2012 (Rogers II).

162.   No storm surge water was transmitted to the Lower Organic Clay through piling holes. Stark Rpt. at 108.

### Fugro's 2011 Soils Exploration Program

163.   In June 2011, the parties initiated a joint geotechnical program to study the soils near the EBIA-IHNC area.  Fugro Consultants, Inc. ("Fugro") was chosen as the independent contractor to perform the field work, collect the data, and maintain the database for the program. Thomas Naymik Expert Rpt. at 3.

164.   The goal of the 2011 field testing program was to obtain estimates of in-situ and laboratory hydraulic conductivity in soils in the study area. Naymik Rpt. at 3.

165.    Thomas Naymik, Ph. D., P.G., a hydrogeologist with Geosyntec Consultants, Inc. (2006-present), oversaw the the pumping tests and evaluated the permeability data on behalf of the United States.  He received a B.S. in 1972 from Ohio State University, a M.S. from Louisiana State University (1974), and a Ph.D. from Ohio State University (1977); all of his degrees are in geology.  At LSU his studies and research focused on deltaic sedimentation on the Mississippi Delta and clay mineralogy, and at OSU his studies and research focused on hydrogeology.  His experience ranges from conducting field tests, design and analysis of hydraulic conductivity to hydrogeological numerical analysis of specific sites to computer code development for use by others employed in the

field of hydrogeology.  From 1984 to 2006 he was employed as a hydrogeologist with Battelle Memorial Institute, a non-profit research institute having approximately 10,000 employees at two main locations.  While at Battelle he was involved in all aspects of hydrogeology.  Additionally, he teaches short courses for the National Ground Water Association (one of the courses is titled "Analysis and Design of Aquifer Test" and serves as an adjunct professor of hyrogeology at Ohio State University, both from 1984 to the present.

166.  The soil-exploration investigation was completed by early November.  Extensive field work and laboratory testing were conducted to better define soil stratigraphy and relevant engineering properties.  The field investigation consisted of forty (40) undisturbed borings, fifty (50) cone penetration tests (CPTUs), and twenty-five (25) vane shear borings in which vane shear tests (VSTs) were performed at various depths. Stark Rpt. at 112.

167.  The parties developed standard operating procedures ("SOP") which governed the conduct of the geotechnical program. Naymik Rpt. at 5.

168.  Soil cores were collected as the borings were installed.  Fugro then sampled and tested the soil cores in its laboratories for, among other things,  horizontal and vertical hydraulic conductivity.  Soil samples were also sent to Geocomp Inc. Naymik Rpt. at 3.

169.  Following the completion of the borings, 10 standpipe piezometers (narrow diameter wells) were installed in the vicinity of 10 selected initial borings and field tested for in situ horizontal hydraulic conductivity by using the single well (slug) test method.[1]  Naymik Rpt. at 4.

170.  More than 25 slug tests were performed at the piezometer sites.

171.  Fugro documented the results of its field work in a report provided at the conclusion of its work.  Interim information was provided to the parties' experts as the work progressed.  Naymik Rpt. at 3.

172.  Samples obtained from the EBIA and from off-site locations selected by the plaintiffs' experts underwent laboratory permeability, strength, and consolidation testing.

173.  The majority of the testing was performed by Fugro, while selected samples were shipped to Geo-Testing Express, Inc., for quality assurance testing and specialized testing. *See* Stark Rpt. at 125.

---

[1] This testing method consisted of quickly raising or lowering the level of groundwater in a well and measuring the rate that the water requires to regain the initial level.  From that water level data and the dimensions of the piezometer the in situ horizontal hydraulic conductivity can be estimated for the portion of the deposits that are contributing water to the piezometer at the bottom (screened interval) of the piezometer

174.    The lab tests were primarily assigned by the defense experts because the plaintiffs decided not to participate.  The plaintiffs did, however, request constant-rate-of-strain (CRS) consolidation testing on selected samples from the vicinity of the defendants' pumping-test sites.

175.    With data from Fugro and from prior soils investigations, the parties' experts created subsurface profiles, or cross-sections, based on the experts' interpretations of the patterns discerned in the soils information.

176.     Information about soil strength, water content, soil classification, and sensory characteristics (samples were seen, smelled, and touched by the boring operators and the parties' experts and their subordinates) were considered by the experts in creating their subsurface profiles.

177.    The defendants' geotechnical engineers and hydrological geologists all participated in the field program.  The plaintiff's geologist, J. David Rogers, also participated.  Dr. Robert G. Bea, the plaintiffs' geotechnical engineer did not appear at the site or the Fugro laboratories.

178.    The EBIA is dominated by fine-grained soils. Rogers I Dep. at 82 - 83.

179.    The soils in the EBIA are primarily composed of organic clay. Rogers I Dep. at 73, 79.

180.    In order to be classified as a peat, the organic content of the soil has to be greater than 75% of the dry weight of the soil.  ASTM D4427 (3.11); Rogers I Dep. at 56.

181.    There are only fairly thin zones of peat in the soils in the EBIA. Rogers I Dep. at 57 - 58.

182.    The foundation area of the EBIA is generally in the upper 45' of the soil. Rogers I Dep. at 79.

183.    The organic content of the foundation area is a relatively small percentage of the volume of soil. Rogers I Dep. at 78.

184.    Fine-grained soils typically have low permeability. Rogers I Dep. at 83.

**The Soils in the IHNC and the School Site Have Very Low Permeability**

185.    The study area in the Lower Ninth Ward of New Orleans is bounded on the west by the Inner Harbor Navigation Canal (IHNC), on the north by Florida Avenue, on the south by North Claiborne Avenue and on the east by Andry Street next to a former school site (Lawless High School), about 6 city blocks toward the east from the IHNC/EBIA flood wall.  Data from other sources external to this area have been included in the analysis as appropriate, for example data from the

24

Sewerage and Water Board of New Orleans ("SWBNO") and NOAA. Naymik Rpt. at 5.

186.    All testing wells were installed in the "swamp/marsh deposits" as outlined in the SOP. Naymik Rpt. at 5.

187.    Test data were analyzed in accordance with standard industry practice using guidance found in Kruseman and de Ritter, *Analysis and Evaluation of Pumping Test Data* (2 ed. 1991): and ASTM-D4050 – 96 (ASTM, 2008), and utilizing the pumping and slug tests analysis software AQTESOLV (Duffield, 2007). Naymik Rpt. at 5.

188.    *Analysis and Evaluation of Pumping Test Data* by Kruseman and de Ridder is an authoritative textbook. Rogers I Dep. at 191.

189.    The external influences encountered during the testing program included rainfall, storm water pumping from the storm water removal system, and tidal fluctuations. When possible, the data was corrected for external influences. Naymik Rpt. at 5 - 6.

### Slug Tests

190.    The slug tests were performed in accordance with the SOP.  Up to five slug tests were performed at each testing location. Naymik Rpt. at 8.

191.    The estimation of in situ horizontal hydraulic conductivity was performed using the proprietary aquifer testing analysis software AQTESOLV.  The analytical methods  employed to estimate hydraulic conductivity were the unconfined Hvorslev (1951) and the unconfined Bouwer-Rice (1976) methods. Naymik Rpt. at 8.

192.    Slug test results from each testing site and the slug test results from the standpipe piezometers are summarized below.  According to the SOP, well development was conducted between each slug test trial in order to document the connectivity of the testing well to the surrounding formation.  A well was deemed "developed" when the variance of the hydraulic conductivity varied less than 30% between slug test trials. Naymik Rpt. at 8.

### School Site Slug-Test Results

193.    Slug testing at the School Site was performed between August 30, 2011 and September 11, 2011.  Of the 49 slug test trials conducted at the 13 test wells, all were falling head tests. Naymik Rpt. at 8.

194.    The range of in situ horizontal hydraulic conductivity values estimated from all trials from all testing wells at the School Site ranged between a minimum of 1 x

$10^{-6}$ cm/sec and a maximum of $7 \times 10^{-4}$ cm/sec. The geometric mean was $2 \times 10^{-5}$ cm/sec. Naymik Rpt. at 9.

### South EBIA Site Slug-Test Results

195.   Slug testing at the South EBIA Site was performed between August 9, 2011 and October 3, 2011.  Of the 56 slug test trials conducted at the 13 test wells, all were falling head tests. Naymik Rpt. at 9.

196.   The range of in situ horizontal hydraulic conductivity values estimated from all trials from all testing wells at the South EBIA Site ranged between a minimum of $2 \times 10^{-7}$ cm/sec and a maximum of $1 \times 10^{-5}$ cm/sec. The geometric mean was $2 \times 10^{-6}$ cm/sec. Naymik Rpt. at 9.

### South Breach Site Slug-Test Results

197.   Slug testing at the South Breach Site was performed between August 19, 2011, and October 20, 2011.  Of the 35 slug test trials conducted at the 13 test wells, 31 were rising head tests and four were falling head tests. Naymik Rpt. at 10.

198.   The range of in-situ horizontal hydraulic conductivity values estimated from all trials from all testing wells at the South Breach Site ranged between a minimum of $3 \times 10^{-7}$ cm/sec and a maximum of $1 \times 10^{-5}$ cm/sec.  The geometric mean was $2 \times 10^{-6}$ cm/sec. Naymik Rpt. at 10.

### North Breach Site Slug-Test Results

199.   Slug testing at the North Breach Site was performed between August 19, 2011, and October 20, 2011.  Of the 31 slug test trials conducted at the 13 test wells, 25 were rising head tests and six were falling head tests. Naymik Rpt. at 10.

200.   The range of in situ horizontal hydraulic conductivity values estimated from all trials from all testing wells at the North Breach Site ranged between a minimum of $3 \times 10^{-7}$ cm/sec and a maximum of $7 \times 10^{-6}$ cm/sec.  The geometric mean was $2 \times 10^{-6}$ cm/sec. Naymik Rpt. at 10.

### Standpipe Piezometers Slug-Test Results

201.   Standpipe piezometer slug testing was performed between August 9, 2011 and August 19, 2011.  Of the 28 slug test trials conducted at the 10 piezometers, 14 were rising head tests and 14 were falling head tests. Naymik Rpt. at 11.

202.   The range of in situ horizontal hydraulic conductivity values estimated from all trials from all standpipe piezometers ranged between a minimum of $3 \times 10^{-6}$ cm/sec and a maximum of $3 \times 10^{-4}$ cm/sec. The geometric mean was $2 \times 10^{-5}$ cm/sec. Naymik Rpt. at 11.

### Pumping Tests

203.    A total of four pumping tests were conducted at the School Site, two at the South
        EBIA, and one at both the South and North Breach.  The pumping tests at the
        School and South EBIA sites were conducted utilizing traditional constant-rate
        test methods (with the exception of a single step test conducted at the School Site)
        and the pumping tests conducted at the South and North EBIA Sites were
        conducted utilizing constant-head methods. Naymik Rpt. at 11.

204.    The pumping tests were conducted in the following order: 1) School Site,
        beginning on September 24, 2011; 2) South EBIA Site, beginning on October
        11th; and 3) North Breach Site and South Breach Site, both beginning on
        October 26th. Naymik at 4.

205.    Constant *rate* pumping tests were conducted at the School and South EBIA sites.
        Naymik Rpt. at 4.

206.    Constant *head* pumping tests were utilized at the North and South Breach sites.[2]
        Naymik Rpt. at 4.

207.    Constant head pumping tests were not originally mentioned in the SOP. They
        were employed because of the difficulty in pumping water at a constant rate
        from the pumping wells. This stemmed from the very clay-rich nature of the
        soils at the test sites. To ensure the completion of the tests during the remaining
        time for the field work, the defendants opted to employ the constant head
        pumping tests. Naymik Rpt. at 4.

208.    Both methods are valid ways to determine hydraulic conductivity. *See* Naymik
        Rpt. at 4 - 5.

209.    A total of four pumping tests were conducted at the School Site, two at the South
        EBIA, and one at both the South and North Breach.  The pumping tests at the
        School and South EBIA sites were conducted utilizing traditional constant rate
        test methods (with the exception of a single step test conducted at the School
        Site) and the pumping tests conducted at the South and North EBIA Sites were
        conducted utilizing constant head methods. Naymik Rpt. at 11.

### School Site

210.    Pumping test activities were conducted at the School Site beginning on
        September 17, 2011 and concluded on October 20, 2011.  They consisted of a

---

[2] In constant rate pumping test the pumping well discharges water at a specified constant
rate which is a necessary condition that must be met in order to achieve valid results.  In
a constant head pumping test the water is discharged from the pumping well in order to
maintain a constant water level (constant head) in the pumping well which is necessary
for a valid analysis.

variable-pumping-rate step test to determine a sustainable-pumping rate of the pumping well and three intended constant-rate pumping tests. Naymik Rpt. at 12.

211.   Water levels during periods of pumping periods and periods of no pumping fluctuated.  This may be attributed to tidal fluctuations, rainfall, and/or other outside influences.  Proper identification and quantification of these outside influences was required prior to any data analysis. Naymik Rpt. at 12.

212.   The School Site Pre-Test was a variable-pumping-rate step test.  This test is normally intended to determine a sustainable pumping rate for the upcoming constant-rates pumping tests. Naymik Rpt. at 13.

213.   The test began on September 17, 2011, and ran for a total of 487 minutes at flow rates ranging between approximately 150 and 400 milliliters per minute (mL/min).  The step test was intended to have four steps with equilibrated flow rates of 200 (Step 1), 300 (Step 2), 350 (Step 3), and 400 mL/min (Step 4), respectively.  The durations for each step were 118, 117, 61, and 186 minutes, respectively. Naymik Rpt. at 13.

214.   Kruseman and de Ridder states: "A step-drawdown test [variable rate step test] is a single-well test in which the well is pumped at a low constant discharge rate until the drawdown within the well stabilizes.  The pumping rate is then increased to a higher constant-discharge rate and the well is pumped until the drawdown stabilizes once more.  This process is repeated through at least three steps, which should all be of equal duration, say from 30 minutes to 2 hours each." Naymik Rpt. at 13; G.P. Kruseman & N.A. de Ridder, *Analysis and Evaluation of Pumping Test Data* 200 (2nd ed. 2000).

215.   The step test was not performed in accordance with industry standards. Naymik Rpt. at 13.

216.   The two major problems included: the time steps were not of equal duration and each step was not run until the drawdown in the pumping well stabilized. Conventional step test analysis could not be completed with the data set collected. Naymik Rpt. at 13.

217.   Removal of the tidal signature from the testing data is not possible because the tidal response at each well is unique. Naymik Rpt. at 13.

218.   Because the tidal response could not be removed and the basic requirements of a step test noted above were not met, a valid step test drawdown analysis could not be performed. Naymik Rpt. at 13.

219.   In the absence of drawdown data, recovery data from pumping well EBIA-PW-01 was analyzed. Naymik Rpt. at 13.

220.   Recovery tests are single-well tests used to estimate near-well hydraulic parameters following a constant-pumping period.  Raw (uncorrected for external influences) recovery data from pumping well EBIA-PW-01 was analyzed and indicated an in-situ horizontal hydraulic conductivity of 1 x 10$^{-4}$ cm/sec. Naymik Rpt. at 13.

221.   In his expert report, Dr. Rogers noted drawdown in certain observation wells. The water level response from each of these wells was isolated and plotted with tidal response at the IHNC. Rogers Expert Rpt. at 202 - 206.

222.   The pumping period closely corresponded to the high-water level and low-water level, respectively in the tidal cycle exhibited in the site wells and IHNC. Naymik Rpt. at 14.

223.   Dr. Rogers analyzed the tidal response rather than drawdown in his report. Naymik Rpt. at 14.

224.   Dr. Rogers utilized a constant-rate analytical method using an average-flow rate of 316 mL/min.  This is not valid since a variable-rate flow test was performed. Naymik Rpt. at 14.

225.   School Site Test #1 was an intended constant-rate test run which began on September 24, 2011, and ran for 2,809 minutes.  The flow rate ranged between 300 and 400 mL/min. with an equilibrated flow rate of 350 mL/min.  During the two-day test, a total of 260 gallons of water was removed from the pumping well. Naymik at 14.

226.   Recovery data from pumping well EBIA-PW-01 was analyzed.  The geometric mean of the recovery analyses indicated an in situ horizontal hydraulic conductivity of 1.36 x 10$^{-4}$ cm/sec. Naymik Rpt. at 15.

227.   Additionally, corrected recovery data from the pumping well EBIA-PW-01 was analyzed.  The geometric mean of the recovery analyses indicated a hydraulic conductivity of 1.36 x 10$^{-4}$ cm/sec. Naymik at 15.

228.   School Site Test #2 was an intended constant rate test which began on October 4, 2011, and ran for 3,509 minutes.  The flow rate ranged between 212 and 256 mL/min with an equilibrated flow rate of 230 mL/min.  During the two and a half day test, a total of 211 gallons was removed from the pumping well. Naymik Rpt. at 15.

229.   The geometric mean of the recovery analyses indicated an in-situ horizontal hydraulic conductivity of 7 x 10$^{-5}$ cm/sec cm/sec. Naymik Rpt. at 16.

230.   School Site Test #3 was an intended constant rate test which began on October 16, 2011, and ran for 5,756 minutes.  The flow rate ranged between 95 and 109

mL/min with an equilibrated flow rate of 100 mL/min.  During the four day test, a total of 152 gallons was removed from the pumping well. Naymik Rpt. at 16.

231.   A rain event occurred during the test. Naymik Rpt. at 16.

232.   Raw recovery data from the pumping well EBIA-PW-01 indicated a hydraulic conductivity of 4 x $10^{-5}$ cm/sec. Naymik Rpt. at 16.

233.   Dr. Rogers did not analyze data from School Site Test #3 citing an increase of water levels occurring from a rain event which occurred approximately two and a half days into the test. Naymik Rpt. at 16.

234.   Rogers noted that drawdown data was present but did not analyze it. Naymik Rpt. at 16.

**South EBIA Site**

235.   Pumping-test activities were conducted at the South EBIA Site beginning on October 11, 2011, and consisted of two constant-rate pumping tests.  Water levels during the tests exhibited fluctuations attributable to tidal fluctuations, rainfall, and/or other outside influences. Naymik Rpt. at 17.

236.   South EBIA Site Test #1 was an intended constant rate test which began on October 11, 2011, and ran for 5,773 minutes. The flow rate ranged between 17 and 41 mL/min with an equilibrated flow rate of 20 mL/min.  During the four day test, a total of 30 gallons was removed from the pumping well (EBIA-PW-02). Naymik Rpt. at 17.

237.   A regional downward drift in groundwater levels was recorded during this test. The result of the correction indicated that no drawdown in water levels had occurred in these wells as the result of pumping from the pumping well. Naymik Rpt. at 17.

238.   Raw (uncorrected for external influences) drawdown data indicated a hydraulic conductivity of 2 x $10^{-5}$ cm/sec. Naymik Rpt. at 18.

239.   Additionally, drawdown data corrected for external influences indicated a hydraulic conductivity of 3 x $10^{-5}$ cm/sec. Naymik Rpt. at 18.

240.   Raw (uncorrected for external influences) recovery data from the pumping well indicated a hydraulic conductivity of 4 x $10^{-6}$ cm/sec. Naymik Rpt. at 18.

241.   The regional water level upward drift observed from data recorded in distant observation wells was then applied to the recovery data.  The objective was to correct the raw water-level data by removing the regional drift. Naymik Rpt. at 18.

242.     Corrected recovery data from the pumping well were analyzed and indicated a hydraulic conductivity of 4 x $10^{-6}$ cm/sec. Naymik Rpt. at 18.

243.     South EBIA Site Test #2 was an intended constant rate test which began on October 27, 2011, and ran for 7,201 minutes.  The flow rate ranged from 10 and 30 mL/min with an equilibrated maximum flow rate of approximately 20 mL/min.  During the five-day test, 38 gallons were removed from the pumping well (EBIA-PW-02). Naymik Rpt. at 18.

244.     A regional downward drift in groundwater levels occurred during the drawdown and recovery phases of the South EBIA Site Pumping Test #2.  Similar to the South EBIA Site Pumping Test #1, the regional drift observed during the drawdown and recovery phases was removed with water-level corrections. Naymik Rpt. at 19.

245.     Raw (uncorrected for external influences) drawdown data yielded a hydraulic conductivity of 2 x $10^{-5}$ cm/sec. Naymik Rpt. at 19.

246.     Additionally, drawdown data corrected for external influences indicated a hydraulic conductivity of 2 x $10^{-5}$ cm/sec. Naymik Rpt. at 19.

247.     Raw (uncorrected for external influences) recovery data from the pumping well indicated a hydraulic conductivity of 4 x $10^{-6}$ cm/sec. Naymik Rpt. at 19.

248.     In order to complete the overall analysis, corrected recovery data from the pumping well EBIA-PW-02 were analyzed and indicated a hydraulic conductivity of 4 x $10^{-6}$ cm/sec. Naymik Rpt. at 19.

### South Breach Site

249.     Pumping test activities were conducted at the South Breach Site beginning on October 26, 2011, and consisted of a single constant head pumping test.   Water levels during the pumping tests exhibited fluctuations attributable to tidal fluctuations, rainfall, and/or other outside influences.  Proper identification and quantification of these outside influences were required prior to any data analysis. Naymik Rpt. at 20.

250.     Earlier work conducted at the EBIA South Site indicated that it was unlikely that constant-rate tests would be successful. Therefore, the constant-head testing method was employed at the South Breach Site. Naymik Rpt. at 19 - 20.

251.     South Breach Site Test #1 was a constant head pumping test run for a total of 7,762 minutes.  The flow rate equilibrated ranging between approximately 28 and 40 mL/min which remained consistent throughout the test.  During the five-day test, 67 gallons were removed from the pumping well. Naymik Rpt. at 20.

252.   Regional drift was observed in the South Breach Site Pumping Test #1 hydrograph during the drawdown and recovery phases. Appropriate corrections were made. Naymik Rpt. at 20 - 21.

253.   Raw (uncorrected for external influences) drawdown data from observation wells were analyzed and indicated a hydraulic conductivity of $5 \times 10^{-5}$ cm/sec. Naymik Rpt. at 21.

254.   Additionally, drawdown data corrected for external influences were analyzed and indicated a hydraulic conductivity of $5 \times 10^{-5}$ cm/sec. Naymik Rpt. at 21.

255.   Raw (uncorrected for external influences) recovery data from the pumping well were analyzed and indicated a hydraulic conductivity of $4 \times 10^{-6}$ cm/sec. Naymik Rpt. at 21.

256.   Corrected recovery data from the pumping well EBIA-PW-03 was analyzed and indicated a hydraulic conductivity of $4 \times 10^{-6}$ cm/sec. Naymik Rpt. at 21.

### North Breach Site

257.   Pumping-test activities were conducted at the North Breach Site beginning on October 26, 2011, and consisted of a single constant head pumping test. Water levels during periods of pumping periods and periods of no pumping exhibited fluctuations which are be attributable to tidal fluctuations, rainfall, and/or other outside influences.  Proper identification and quantification of these outside influences were required prior to any data analysis. Naymik Rpt. at 21.

258.   North Breach Site Test #1 was a constant-head pumping test which was run for 7,681 minutes.  During the five-day test, 17 gallons were removed from the pumping well (EBIA-PW-04). Naymik Rpt. at 22.

259.   A regional upward drift was observed during the North Breach Site Pumping Test #1 requiring correction. Naymik Rpt. at 22.

260.   Raw (uncorrected for external influences) drawdown data were analyzed and indicated a hydraulic conductivity of $8 \times 10^{-6}$ cm/sec. Naymik Rpt. at 22.

261.   Also, drawdown data corrected for external influences were analyzed and indicated a hydraulic conductivity of $8 \times 10^{-6}$ cm/sec. Naymik Rpt. at 22.

262.   Raw recovery data from the pumping well was analyzed and indicated a hydraulic conductivity of $1 \times 10^{-6}$ cm/sec. Naymik Rpt. at 23.

263.   Corrected recovery data from the pumping well was analyzed and indicated a hydraulic conductivity of $1 \times 10^{-6}$ cm/sec. Naymik Rpt. at 23.

**Laboratory Permeability Results**

264.    Samples of the subsurface deposits were obtained from 40 soil borings
        conducted at the EBIA and tested for horizontal and vertical permeability in the
        laboratory.  The laboratory analysis yielded permeability values that corroborate
        with, but are lower than the analysis of the field-based testing of permeability.
        Naymik Rpt. at 23.

265.    The geometric mean of the 35 laboratory horizontal hydraulic conductivity
        analyses was $4 \times 10^{-7}$ cm/sec.  The subsurface materials subject of analyses
        include fill material, fat clay, lean clay, and organic clay. Naymik Rpt. at 23.

266.    The geometric mean of the 20 laboratory horizontal-hydraulic-conductivity
        analyses with a lithologic description of organic clay was $4 \times 10^{-7}$ cm/sec
        indicating the organic clay has a similar hydraulic conductivity to the other
        materials comprising the subsurface at the testing sites. Naymik Rpt. at 23.

**Summary of Hydrologic Conductivity Results**

267.    The hydraulic-conductivity estimates from all three methods of hydraulic
        conductivity determination (slug tests, pumping tests, and laboratory
        permeability testing) for all of the test locations in the EBIA/IHNC during the
        2011 field program are summarized below according to test method.  The
        geometric mean is recognized as the most appropriate "averaging" method for
        calculating a representative value of several values of hydraulic conductivity as
        referenced by Jones (1993).

| Testing Method | Geometric Mean of Analyses (cm/sec) |
|---|---|
| Slug Tests | $5 \times 10^{-6}$ |
| Pumping Tests | $2 \times 10^{-5}$ |
| Laboratory Permeability Testing of Organic Clay Layer | $4 \times 10^{-7}$ |

Naymik Rpt. at 23.

268.    The extensive-soils exploration program led to the conclusion that the hydraulic
        conductivity (permeability) values of subsurface deposits in the EBIA-IHNC and
        the School Site were low and typical of clay-rich material.  The geometric means
        of the three testing methods, which included laboratory testing, slug tests, and
        pumping tests, varied from $10^{-5}$ to $10^{-7}$ centimeters per second (cm/sec). Naymik
        Rpt. at 1.

269.    Even plaintiffs' expert, J. David Rogers, concluded that the permeability of the
        soils was approximately $1 \times 10^{-5}$ cm/sec.  Expert Rpt. of J. David Rogers at 1.

**Historical Soil Borings Verified Fugro's 2011 Work**

270.　The Materials Management Group (MMG) completed a series of borings before WGI began the remediation effort. *See* Boland Marine Site Assessment Drilling Report-VII, IHNC-EBIA, New Orleans, Louisiana," July, 2002 (MMG 2002).

271.　This report presented results of a site assessment to characterize the subsurface conditions in the Boland Marine property that included ninety-nine (99) borings at ninety-six locations.  Most of the borings were drilled in 2001 and thus reflect the subsurface conditions prior to the WGI excavations described above. Stark Rpt. at 134.

272.　The MMG borings were used to verify that the stratigraphy in the 2011 borings was not altered by the North Breach and/or the effects of Hurricane Katrina. Stark Rpt. at 134.

273.　This comparison shows that the upper 1 to 1.5 feet may have been impacted by the breach and hurricane, although these small differences may be explained by differences in location.  Below this initial fill layer the 2011 stratigraphy matches the 2001 MMG stratigraphy. Stark Rpt. at 134.

274.　One MMG (2002) boring that exhibited different subsurface conditions was Boring 81A, which is located at the northern end of the North Breach.  Boring 81A is anomalous in that it showed layers of "FILL, SHELL with SILTY SAND" and "FILL, SILTY SAND and SHELL" to a depth of 17.5 feet. Stark Rpt. at 139.

275.　The boring is between 16 and 21 ft from the I-Wall levee (Figure 33, from Appendix B of Bea, Cobos-Roa, and Storesund 2012).  This boring samples the foundation for Surekote Road, and is adjacent to the levee I-Wall.

276.　No other surrounding MMG boring shows 17.5 feet of non-clay material.  For example, MMG Borings 81E, 81G, and 81I along the same cross-section show layers of "FILL, SHELL with SILTY SAND" and "FILL, SILTY SAND and SHELL" only to a maximum depth of 4.5 feet. Stark Rpt. at 139.

277.　In fact, the closest boring along this line, Boring 81E, shows only two feet of shell or silty sand fill material overlying the clay. Stark Rpt. at 140.

278.　Additionally, MMG Boring 79A is the next boring along the floodwall south of Boring 81A and it shows only six (6) feet of the silty sand or shell fill.  In addition, nearby borings, e.g., NO-8 (USACE-GDM#3, 1966), do not show a large depth of silty sand or shell fill material. Stark at 140.

279.　Boring MM 81A on page 226 in Rogers (2012) is described as being an example of "…*pervious cohesionless sand backfills that are capable of producing seepage conditions*."

34

280.    This characterization is misleading and attempts to explain the north breach because of the assumed pervious fill against the I-Wall instead of clay.

281.    The road is not part of the levee embankment as described by Rogers (2012), Bea (2012), and Rogers Cobos-Roa, and Storesund (2012).

282.    The road fill would have been in place long before any work was conducted by WGI for the port decommissioning.  USACE (1980, Plate 47, lower right corner) notes the settlement that will occur through time and need for multiple lifts instead of building the road higher than the wall.

**North Breach Soil Stratigraphy**

283.    Based on the pre-existing soils data and the 2011 Fugro investigation soil stratigraphy and cross-sections for the North Breach area were developed. Stark Rpt. at 130.

284.    The North Breach is located between Stations 53+50 and 56+00 of the original GDM#03 (1969) levee stationing.   In general, the North Breach Analysis Section is located along the line of the 2011 borings of EBIA-B-17, 18, 19, and 20 or about Station 54+20 and thus in the area of the North Breach. Stark Rpt. at 130 - 131.

285.    The cross-sections shown in Figures 6-11 (a) and (b) illustrate an overview and a close-up of the soil stratigraphy near the North Breach.  They correspond roughly to the location of the row 2011 Fugro borings (B-17, 18, 19, 19R, and 20) and are in close proximity to the row of MMG Borings #79. Stark Rpt. at 131.



(a)



(b)

Figure 6-11.    (a) Overview and and (b) close-up of North Breach Analysis Section and soil
stratigraphy near Station 54+25 and MMG Boring #79

Stark Rpt. at 136.

286. The cross-sections show that, beneath the lean to silty clay, there is an organic clay deposit about 17-feet thick.  The organic clay deposit is composed of organic material from the cypress swamp that occupied the area, together with clay and silt deposited by sediment laden floodwater.  Because the upper 8 to 9 feet of this organic clay deposit has different material properties than the lower portion, it was divided into two layers: Upper Organic Clay and Lower Organic Clay. Stark Rpt. at 132.

287. The main soil stratigraphic units in the North Breach Analysis Section are from top to bottom:

- Levee embankment - compacted clay
- Fill Material, e.g., lean clay, silty sand with some shells or shell with silt or silty sand
- Native Lean Clay to Silty Clay
- Upper Organic Clay – water content < 100% Lower Organic Clay – water content > 100%
- Interdistributary clay
- Nearshore Gulf, Beach Sand
- Pleistocene geologic units - clay and silt deposit.

Stark Rpt. at 131 - 132.

288. The main distinction between the Upper and Lower Organic Clays is the Upper Organic Clay has a higher elevation and zones or pockets containing woody material versus the Lower Organic Clay which is a layer of clay and some organics. Stark Rpt. at 132.

289. These layers are not classified as peat according to ASTM D4427 because only one sample exhibited an organic content greater than 75% (see Table 6-6). According to ASTM D4427, a sample is classified as a peat if ash content is less than 25% by dry weight or organic content is greater than 75%. Stark Rpt. at 132.

290. The one sample with organic content greater than 75% was located about one-half mile from the floodwall at the Plaintiff's pump test site referred to as the School Site. Stark Rpt. at 132.

291. As a result, the soils along the EBIA are referred to as organic clay herein instead of peat. Stark Rpt. at 132.

**South Breach Soil Stratigraphy**

292. Figure 6-21 presents the soil stratigraphy and cross-section for the South Breach area. Stark Rpt. at 151.

293.    The South Breach is located between Stations 22+70 and 31+20 (~850 feet) of the
          original USACE GDM #3 (1966) levee stationing.   In general, the South Breach
          Analysis Section is located along the line of the 2011 borings EBIA-B-7, B-8, B-
          9, B-24, and B-25 or about Station 29+20 and thus in the area of the South
          Breach. Stark Rpt at 151.



(a)



(b)

Figure 6-21.   (a) Overview and and (b) close-up of South Breach Analysis Section and soil
          stratigraphy near Station 29+37 and MMG Boring rows #27, 28, and 29

Stark Rpt. at 152.

294.    The stratigraphic characterization shown in Figure 6-21 (a) and (b) is based
        primarily on borings completed by MMG and Fugro ("Saucer Marine Site
        Assessment Drilling Report-IV, IHNC-EBIA, New Orleans, Louisiana," January,
        2002) borings. MMG (2002) presents results of a site assessment to characterize
        the subsurface conditions in the Saucer Marine property that includes fifty-five
        (55) borings. Most of the borings were drilled in 2001 and thus reflect the
        subsurface conditions prior to the WGI excavations described below. Stark Rpt. at
        152 - 153.

295.    The main soil stratigraphic units in the South Breach Analysis Section are from
        top to bottom:

        •       Levee embankment - compated clays
        •       Fill: Silty Sand with some shells or Shell with Silt or Silty Sand
        •       Native Lean Clay to Silty Clay
        •       Upper Organic Clay - water content < 100%
        •       Lower Organic Clay - water content > 100%
        •       Interdistributary clay
        •       Nearshore Gulf, Beach Sand
        •       Pleistocene geologic units - clay and silt deposit.

        Stark Rpt. at 153.

**Seepage and Stability Assessments of the East-Bank floodwall**

**Lake Pontchartrain and Vicinity Hurricane Protection Project**

296.    The "EBIA floodwall," was designed an constructed pursuant to Congress's
        authorization of the Lake Pontchartrain and Vicinity Hurricane Protection Project.
        Pub. L. No. 298 (1965); H.R. Doc. No. 231(1964); Lake Pontchartrain, LA. and
        Vicinity Chalmette Area Plan, General Design Memorandum No. 3 (1966) at 1.

297.    Congress gave the Corps's Chief of Engineers discretion to determine the extent
        of protection as long as it was consistent with the Chief's report to Congress. Pub.
        L. No. 298 (1965).

298.    Accordingly, the Corps designed the EBIA floodwall not to withstand any
        possible storm but to withstand a hypothetical 200-year storm (the "Standard
        Project Hurricane") that would generate a 13-foot surge in the IHNC. Lucia Rpt.
        at 14-15.

299.    To provide this level of protection, the EBIA floodwall's design height was 15
        feet, two feet above the surge elevation, to minimize overtopping by the waves
        which the hypothetical storm would produce.  Lake Pontchartrain, LA. and
        Vicinity Chalmette Area Plan Design Memorandum No. 3 at ¶ 14; Plate 38
        (1966).

300. The Corps analyzed the soils on which the levee would be founded and then set the sheet-pile depth at -8 feet (which converts to -10.5 feet in the current datum, NAVD88 (2004.65)) so that the bottom of the floodwall would be embedded in a layer of fat clay above a layer of soft organic clays. Lake Pontchartrain, LA. and Vicinity Chalmette Area Plan Design Memorandum No. 3 at Plate 28 (1966).

301. The depth was calculated to ensure the global stability of the levee and floodwall under hurricane conditions, not to prevent underseepage. *See* Lake Pontchartrain, LA. and Vicinity Chalmette Area Plan Design Memorandum No. 3 at ¶ 31 (1966)

302. Because the levee and surrounding soils were clays, the Corps concluded that underseepage from storm surges would not diminish the protection provided by the levee and floodwall as designed. This judgment derived from two salient facts: hurricane storm surges are short-term events, and clay is a low permeability soil through which water cannot seep in sufficient quantities to cause piping or heaving between the onset and the subsidence of surge. Lake Pontchartrain, LA. and Vicinity Chalmette Area Plan Design Memorandum No. 3 at ¶ 31 (1966); Lucia Rpt. at 17–18.

303. These two facts also led the Corps to conclude that erosion protection was unnecessary along the EBIA floodwall. Lake Pontchartrain, LA. and Vicinity Chalmette Area Plan Design Memorandum No. 3 at ¶ 36 (1966); Lucia Rpt. at 17–18.

304. The Army Corps of Engineers made an assessment of seepage in the EBIA in 1966. Rogers I Dep. at 208.

305. There was no significant change in the characteristics of the soil at the EBIA between 1966 and the time WGI began its site-remediation efforts at the EBIA. Rogers I Dep. at 209.

306. Because the essential subsurface conditions remained unchanged from 1966, the 1966 seepage assessment remained valid throughout the EBIA remediation project. *See generally* Lucia Rpt.

307. The Lane's Creep Ratio is a means of checking if "hydrostatic uplift is getting in the danger zone on the protected side of the levee." Rogers I Dep. at 210.

308. The Lane's Creep Ratio is an appropriate method to assess levees. Rogers I Dep. at 211.

**New-Lock Project**

309. In 1956, Congress authorized construction of the Mississippi River Gulf Outlet and a new lock linking the MRGO to the Mississippi River. Rivers and Harbors Act of 1956, Pub. L. No. 84-455, 70 Stat. 65.

310. The existing IHNC lock, which opened in 1923, served dual purposes of navigation and flood control, passing ship traffic from the Industrial Canal to the Mississippi River for navigation purposes and closing its gates to become a flood control structure during high water conditions on the Mississippi River or during hurricane storm surge events. 1997 New Lock Connecting Channel Report, Appx. D.

311. LPV flood protection structures tied-in to the existing lock to its north, and Mississippi River flood control structures tied-in to its south.

312. Amid considerable community and political opposition, the Corps considered numerous sites for the new lock and after evaluating social, environmental, and economic effects decided to build it in the IHNC, between Claiborne and Florida Avenues. 1 New Lock Eval.

313. In 1998, Congress appropriated funds for construction of the New Lock. *ACORN,* 2000 WL 433332 at *8.

314. Because the new lock would be farther from the river than the existing lock, the project required the construction a new, taller floodwalls from the river to the new lock site, to withstand the river's flood stages, which were higher than the LPV Standard Project Hurricane's 13-foot surge elevation that the walls north of the existing lock were designed to withstand. Lucia Rpt. at 18.

315. As when the Corps designed the east-bank floodwall in 1966, the Corps assessed global stability and seepage conditions for the new, taller floodwalls. Lucia Rpt. at 18-23.

316. The geotechnical assessments for stability and seepage in the new floodwall designs were based on the same, sound principles employed by the Corps in 1966 for the existing EBIA floodwall. Lucia Rpt. at 18-23.

317. The designs for the New Lock project required an assessment of global stability and seepage for the existing EBIA floodwall. That assessment was fulfilled by the 1966 GDM assessment for stability and seepage, which remained valid for the entire length of the EBIA floodwall as it existed at the time of Task Order 26 through Hurricane Katrina. Lucia Rpt. at 23.

318. The impacts of seepage were evaluated consistent with the known soil conditions under the levee and floodwall, the effects of the design storm, including the effects of time, and the USACE prior experience with seepage impacts under the known soil conditions. Lucia Rpt. at 23.

319. That assessment was essentially unchanged from the one done over thirty years earlier and reached the same basic conclusions. Lucia Rpt. at 18-23.

**The Corps's Assessments Met the Standard of Care**

320.    Dr. Lucia is a principal of Geosyntec Consultants and a licensed civil engineer specializing in the areas of geotechnical engineering and waste management. He has more than 25 years of professional experience and practice directing and evaluating a broad range of projects requiring expertise in foundations and soils. Dr. Lucia performed a comprehensive review of the Corps's design of the EBIA floodwall, the proposed New Lock project and associated design reports, and the work proposed and performed at the EBIA under Task Order 26, including all documented excavations and backfilling, to determine whether the Corps of Engineers correctly evaluated the potential effects of underseepage and met the standard of care in approving WGI's workplans and subsequent operations. Lucia Report at vii–viii, 87–88.

321.    The Corps's assessment that underseepage would not pose a problem was correct in 1966 and remained correct in 2005. Lucia Rpt. at viii.

322.    The Corps's 1966 evaluations evinced good engineering judgment that rested on a substantial body of first-hand knowledge about the engineering properties of the soils where the flood-control structures were later built and where WGI performed the operations at issue in this case. Lucia Rpt. at viii.

323.    A generally accepted method for evaluating seepage demonstrates that the Corps's assessment of seepage risk was consistent with good geotechnical-engineering judgment and practice. Lucia Rpt. at 69-70.

324.    None of WGI's work plans or operations provided a basis for performing an additional seepage assessment because none of the work or operations disturbed the low permeability clay soils forming the foundation of the EBIA levee or floodwall. Lucia Rpt. at 70, 73.

325.    No information available to WGI or the Corps then or now suggests that underseepage could threaten the EBIA floodwall during a hurricane storm surge event. Lucia Rpt. at 75.

**Bypass Channel**

326.    The Corps had determined that dredging this proposed bypass channel would not impact the existing levee/floodwall structures bordering the EBIA. Dicharry Dep. 31:17- 32:1, Oct. 2,2008; *see also* General Design Memorandum No. 3 at ¶ 30 and Plate 38 (1966).

**IPET's Study of the East-Bank Floodwall**

327.    Immediately after Hurricane Katrina, IPET investigated the causes of the north and south breaches. *See generally,* Interagency Performance Evaluation Task

Force (IPET) Vol. V, Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System.

328.  IPET conducted new subsurface-soil tests of the EBIA. Because of the impermeable nature of the clay and peat layers in the EBIA's subsurface, IPET concluded that seepage did not play a role in the breaches. IPET Rpt. V-127.

329.  IPET further found no physical evidence of seepage along the east-bank floodwall. IPET Rpt. V-127.

330.  IPET concluded that the north breach occurred before overtopping as a result of a gap forming behind the wall, allowing water to penetrate and increase the load on the wall. IPET Rpt. V-68–69.

331.   A shorter ground-surface on the protected side of the floodwall at the north breach also decreased the wall's ability to withstand Katrina's rising storm surge. IPET Rpt. V-74.

332.   IPET concluded that the south breach occurred later due to overtopping, which eroded the backside of the floodwall weakening it to the point of failure. IPET Rpt. V-74.

**Seepage and Erosion Characteristics**

333.  Dr. Thomas Brandon, the Director of the W. C. English Geotechnical Engineering Research Laboratory and an Associate Professor of Civil and Environmental Engineering at the Virginia Polytechnic Institute and State University (Virginia Tech), is well-qualified to testify as to these facts.  For nearly three decades, he has taught seepage and slope-stability analysis.  During this time he has consulted on more than a score of dam and levee projects in the Americas and Asia. Because of this expertise he was selected to perform slope-stability analyses for the IPET investigation, and the Army Corps of Engineers regularly calls on him to perform levee and floodwall assessments.  Currently he is advising in the Corps's revision of procedures for analyzing and designing I-walls.  Dr. Brandon will be a keynote speaker at the 2013 GeoCongress, a quadrennial gathering of geotechnical specialists, sponsored by the American Society of Civil Engineers. Dr. Brandon has been invited to present his views on shear strength for slope stability.

334.  The Corps conducted soil borings before Katrina to obtain information about the engineering properties of the EBIA subsurface soils. Thomas Brandon Expert Rpt. at 2 & Fig. 1.

335.  IPET conducted soil borings soon after Katrina to obtain more information about the engineering properties of the EBIA subsurface soils. Brandon Rpt. at 2 & Fig. 1.

336.   The parties jointly conducted soil borings, cone-penetration and vane-shear tests in 2011 soon after Katrina to obtain even more information about the engineering properties of the EBIA subsurface soils.  *See generally* Brandon Rpt.

337.   The parties obtained in situ soil strengths from the CPTs and VSTs. Brandon Rpt. at 5-6.

338.   The parties obtained in situ undrained soil strengths from the VSTs. Brandon Rpt. at 6.

339.   The parties obtained undrained soil strengths from a variety of laboratory tests. Brandon Rpt. at 5.

340.   Consolidation tests by Fugro provided data from which the parties' experts were able to determine whether the EBIA organic clays were drained or undrained when the breaches occurred. Brandon Rpt. at 20.

341.   Consolidation tests showed that the EBIA's organic clay layers were undrained and would have remained undrained for months or years if the surge loading had remained in place. Brandon Rpt. at 20 - 21.

342.   Engineering judgment supports the use of an undrained-strength analysis for fine-grained soils, including organic clays, when the duration of loading is short enough so that pore-water pressures will not dissipate during loading. Brandon Rpt. at 19.

343.   Factors of safety based on undrained shear strengths are independent of pore pressures calculated from seepage analysis. Brandon Rpt. at 20 - 21.

344.   The most important part of a seepage analysis is the value of permeability or hydraulic conductivity assigned to the soils. Brandon Rpt. at 23.

345.   California peats differ substantially from New Orleans organic clays. Brandon Rpt. at 23.

346.   The flexible-wall permeability test is the best laboratory method to determine permeability. Brandon Rpt. at 25.

347.   Soil specimens obtained by Fugro were trimmed horizontally and vertically so that the soils' anisotropy, if any, could be assessed. Brandon Rpt. at 25.

348.   All of the vertical specimens had permeabilities less than $1 \times 10^{-5}$ cm/sec, and about 90% of the horizontal speciments had permeabilities greater than this value. Brandon Rpt. at 25.

349. The flexible-wall permeability tests showed that the hydraulic conductivity of the organic clays was isotropic—about the same horizontally and vertically. Brandon Rpt. at 25 - 28.

350. Geotechnical-engineering literature does not support the anisotropy ratio of 10 that Dr. Bea espoused in his BARGE testimony and employs in his analyses in this case. *See* Brandon Rpt. at 27 - 28.

351. More than 90% of the consolidation tests performed on Fugro soil samples yielded vertical permeabilities of $1 \times 10^{-5}$ cm/sec or less. Brandon Rpt. at 29.

352. All of the Fugro slug tests performed in pumping wells at or near the EBIA yielded organic-clay permeability values less than $1 \times 10^{-5}$ cm/sec. Brandon Rpt. at 20.

353. Ten slug tests performed at standpipe piezometers yielded an average organic-clay permeability value of about $1 \times 10^{-5}$ cm/sec. Brandon Rpt. at 31.

354. CPT dissipation tests performed near the floodwall yielded organic-clay permeability values less than $1 \times 10^{-5}$ cm/sec. Brandon Rpt. at 33.

355. Dr. Bea's 2008 report, published in an online journal, cited an organic-clay permeability of $1 \times 10^{-3}$ cm/sec, a value 100 times greater than the evidence supports. *See* R.G. Bea & Diego Cobos-Roa, *Failure of the I-Wall Flood Protection Structures at the New Orleans Lower 9th Ward During Hurricane Katrina*, Elec. J. of Geotechnical Eng'g Vol. 13, Bund. H  (2008).

356. Dr. Bea relies on his 2008 report to validate his opinions in this case.

357. The in situ and laboratory tests for permeability merely confirmed what engineers familiar with levee design and underseepage analysis already knew: the organic clay's low permeability would keep underseepage from occuring during a hurricane. *See* Brandon Rpt. at 35 - 36.

358. A permeability of $1 \times 10^{-5}$ cm/sec for the EBIA's organic clays is conservative, i.e., it is a reasonable upper bound, the highest defensible value. Brandon Rpt. at 35.

359. The best estimate for organic-clay permeability is $2 \times 10^{-6}$ cm/sec. Brandon Rpt. at 35.

360. Erosion analyses based solely on hydraulic gradients and soil unit weights without regard to soil type are flawed because soil type also affects erosion and therefore must be taken into account in assessing the effects of gradients. Brandon Rpt. at 35.

361. Dr. Bea's erosion analyses are flawed because they rely solely on hydraulic gradients and soil unit weights to predict whether hydraulic gradients on the

protected side of the levee would have produced sand boils. Brandon Rpt. at 35 - 36.

362.   Sands and silty sands are more susceptible to erosion than clays and clay-dominated composites and therefore will form sand boils when clayey soils would not. Brandon Rpt. at 36.

363.   Flow rate determines whether underseepage, erosion, and heaving will occur. Brandon Rpt. at 36.

364.   The EBIA organic clay's low permeability restricts flow and prevents erosion or heaving. Brandon Rpt. at 36.

365.   The Corps's engineer manuals and other guidance documents recognize that pervious, erodible soils must be present in order for underseepage to be a concern in levee analysis. Brandon Rpt. at 38.

366.   Heaving can only occur is a low-permeability soil is underlain by a high-permeability soil. Brandon Rpt. at 39.

367.   Neither heaving nor any other subsurface erosion occurred on the protected side of the IHNC levee because the levee was underlain by the low-permeability organic clays. Brandon Rpt. at 39 - 42.

**Dr. Bea's theory of failure suffers from fatal defects**

368.   Dr. Bea's theory of causation is premised on fictitious excavations that never existed at the EBIA either before or during Hurricane Katrina. *See generally* Stark Rpt.

369.   The soils at issue are, with only isolated exceptions, clays of low permeability and Dr. Bea's theory of underseepage-induced failure would only be plausible if the EBIA soils were as pervious as he initially thought. *See generally,* Brandon Rpt.

370.   Dr. Bea directed a graduate student to perform computer analyses and instructed that student to use unrealistic values for the essential soil parameters. In doing so, not only did Dr. Bea ignore the results of the Parties' soils-exploration program, but he also ignored the conclusions of Plaintiffs' own expert geologist based on those results. *See generally*, Brandon Rpt.

371.   Dr. Bea's  failure to grasp the true nature of the organic clays—the critical soil layer immediately below the floodwall—is reflected in his failure to use standardized engineering terminology to describe the soils.  Rather than labeling them as clays and organic clays, as the ASTM's Uniform Soils Classification System requires, he has persisted in calling them swamp-marsh deposits, a geological term that describes their depositional environment but that masks the

46

engineering characteristics that are key to understanding why neither underseepage nor hydraulic uplift occurred. *See generally*, Brandon Rpt.

372.  Dr. Bea incorrectly analyzed the strength of the soils and the hydraulic pressures that developed. *See generally*, Brandon Rpt.

373.  Although Dr. Bea recognizes that the soils under the EBIA floodwall were "undrained" during Hurricane Katrina, he modeled those soils as if they were "drained." This switch vastly altered the soils' strengths. *See generally*, Brandon Rpt.

374.  Also, he incorrectly assumed that the organic clays were incompressible in his seepage analyses. This belief lacks scientific validity and is demonstrably untenable.  Saturated soils, except in rare circumstances, are compressible, and the organic clays under the levee were compressible in his seepage analyses. *See generally*, Brandon Rpt.

375.  Dr. Bea unscientifically attempts to analyze pressure transmission in isolation from the flow of water. *See generally*, Brandon Rpt.

376.  Dr. Bea's opinions about pressure transmission and hydraulic uplift have no scientific validity. *See generally*, Brandon Rpt.

**Causes of the North and South Breaches**

377.  Both breaches can be explained by physical processes unrelated to WGI's work.

   **North Breach**

378.  Dr. Thomas L. Brandon, will explain that rising surge opened a gap between the levee and the floodwall, increasing the hydrostatic pressure on the wall.  Because of this gap and the low land-side levee toe at the north-breach site , a shear failure likely occurred when the surge reached an elevation of about 10 feet.  The pressure of surge on the fully exposed wall caused the soils holding the wall in place to give way as the upper soils sheared from the lower.  *See generally,* Brandon Rpt.

379.  Dr. W. Allen Marr, Ph.D., P.E., an elected member of the prestigious National Academy of Engineering, Since Hurricane Katrina, Dr. Marr has been engaged by private-sector and governmental entities who are repairing, improving, and replacing flood-protection structures along the Gulf coast.  The Louisiana Office of Coastal Protection and Restoration selected Dr. Marr to lead the development of a new system for real-time monitoring of the levees surrounding New Orleans. In 1982 Dr. Marr founded Geocomp Corporation, a geostructural services company that today employs more than 120 engineers, technicians, software specialists, and support staff to help clients manage risk and lower life-cycle costs by providing geostructural services, field instrumentation, and real-time

monitoring software.  A related entity, Geotesting Express, provides testing of soils, rocks, and geosynthetic materials.  Because Dr. Marr is a recognized authority in the field of geotechnical engineering, he too has been invited to be a keynote speaker at the 2013 GeoCongress, in San Diego next March.

380.    Three unique conditions combined to cause the north breach. Marr Rpt. at 2–3.

381.    First, the east-bank floodwall had subsided most and was lowest at that place. Marr Rpt. at 2–3.

382.    Second, the land-side levee toe was lower here than at any other place.  Because the toe was low, there was less soil to oppose the driving power of the surge on the opposite side of the floodwall.  Marr Rpt. at 2–3.

383.    Third, sheetpiles of substantially different lengths were interlocked at this place and this place alone. Marr Rpt. at 2–3.

384.    As the surge rose up almost to the top of the floodwall, the hydrostatic pressure stressed the adjoining sheets differentially because the older, shallower sheet had less soil to hold it in place, its bottom being about 12 feet shallower than the newer sheet.  Marr Rpt. at 2–3.

385.    These stresses deformed the older sheet, and as the deformation moved up into the concrete cap, the concrete cracked and then crumbled away as water forced its way through.  Marr Rpt. at 2–3.

386.    Simultaneously the wall rotated landward because overtopping waves were eroding the levee, a process that rapidly accelerated as floodwaters poured through the gap created by the broken concrete.  Marr Rpt. at 2–3.

387.    At some point, one overstressed sheet tore from the top downward 12 feet.  These movements and the continuous hydraulic pressure caused the connection of two adjacent sheets to decouple.  Marr Rpt. at 2–3.

388.    As more and more water poured through the gap and eroded the levee, the sheets were displaced entirely and tumbled landward as the turbulent water surged over the decoupled sheet and those attached to it.Marr Rpt. at 2–3.

**South Breach**

389.    The South Breach occurred at a low area of the east-bank floodwall. Marr Rpt. at 3.

390.    At this low section, wave and surge overtopping began earliest and continued longest before the breaches occurred.  The overtopping waves and surge scoured erosion trenches behind the floodwall.  Marr Rpt. at 3.

391.    As the surge rose, overtopping waves and then overflowing surge scoured away the soil holding the wall in place until eventually the driving force of the surge exceeded the resisting force of the levee and floodwall and the floodwall failed by overturning.  Marr Rpt. at 3.

**Payments to Plaintiffs**

392.    Clifford and Patricia Washington received $61,038.12 in compensation under the Louisiana Road Home Program for their property at 1910-1910B Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. (MEB-468-000000295 thru MEB-468-000000565)

393.    Clifford and Patricia Washington received $30,000 in elevation allowance compensation under the Louisiana Road Home Program for their property at 1910-1910B Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. (MEB-468-000000295 thru MEB-468-000000565)

394.    Clifford and Patricia Washington received $58,961.88 in additional compensation (for low-to-moderate income applicants) under the Louisiana Road Home Program for their property at 1910-1910B Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. (MEB-468-000000295 thru MEB-468-000000565)

395.     Clifford and Patricia Washington received a total of $150,000 under the Louisiana Road Home Program for their property at 1910-1910B Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. (MEB-468-000000295 thru MEB-468-000000565)

396.    Clifford Washington received $10,742 for personal property under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000581 thru MEB-449-000000879, MEB-467-000000005 thru MEB-467-000000009, and MEB-449-000000001 thru MEB-449-000000010)

397.    Clifford Washington received $2,000 for expedited housing assistance under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000581 thru MEB-449-000000879, MEB-467-000000005 thru MEB-467-000000009, and MEB-449-000000001 thru MEB-449-000000010)

398.    Clifford Washington received $10,500 for replacement housing under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000581 thru MEB-449-000000879, MEB-467-000000005 thru MEB-467-000000009, and MEB-449-000000001 thru MEB-449-000000010)

399.   Clifford Washington received $600 which was paid to the National Flood Insurance Program under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000581 thru MEB-449-000000879, MEB-467-000000005 thru MEB-467-000000009, and MEB-449-000000001 thru MEB-449-000000010)

400.   Clifford Washington received $17,858 for rental assistance ($2,358, Temporary Housing assistance and $15,500 Continued Rental Assistance thru Corporate Lodging Consultants) under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000581 thru MEB-449-000000879, MEB-467-000000005 thru MEB-467-000000009, and MEB-449-000000001 thru MEB-449-000000010)

401.   Clifford Washington received a total of $41,700 under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000581 thru MEB-449-000000879, MEB-467-000000005 thru MEB-467-000000009, and MEB-449-000000001 thru MEB-449-000000010)

402.   Alvin and Barbara Livers received $73,791.52 in compensation under the Louisiana Road Home Program for their property at 4924 St. Claude, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. (MEB-468-000000001 thru MEB-468-000000294)

403.    Alvin and Barbara Livers  received $50,000 in additional compensation under the Louisiana Road Home Program for their property at 4924 St. Claude, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. (MEB-468-000000001 thru MEB-468-000000294)

404.   Alvin and Barbara Livers sold their property at 4924 St. Claude, New Orleans, Louisiana, on April 18, 2007, to the Louisiana Road Home Program and received a total of $123,791.52. (MEB-468-000000001 thru MEB-468-000000294)

405.   Alvin and Barbara Livers received $11,342 for personal property under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000018 thru MEB-449-000000025 and MEB-449-000000035 thru MEB-449-000000194)

406.   Alvin and Barbara Livers received $10,500 for replacement housing under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000018 thru MEB-449-000000025 and MEB-449-000000035 thru MEB-449-000000194)

407.   Alvin and Barbara Livers received $2,000 for expedited housing assistance under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000018 thru MEB-449-000000025 and MEB-449-000000035 thru MEB-449-000000194)

408. Alvin and Barbara Livers received $2,358 for rental assistance under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000018 thru MEB-449-000000025 and MEB-449-000000035 thru MEB-449-000000194)

409. Alvin and Barbara Livers received a total of $26,200 under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000018 thru MEB-449-000000025 and MEB-449-000000035 thru MEB-449-000000194)

410. Kenneth and Jeannine Armstrong sold their property at 4016 Hamlet Place, Chalmette, Louisiana, on January 11, 2008, to the Louisiana Road Home Program and received $75,370.89. (MEB-468-000000805 thru MEB-468-000001069)

411. Kenneth and Jeannine Armstrong received $2,000 for expedited housing assistance under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000369 thru MEB-449-000000580 and MEB-449-000000026 thru MEB-449-000000034)

412. Kenneth and Jeannine Armstrong received $7,893 for rental assistance under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000369 thru MEB-449-000000580 and MEB-449-000000026 thru MEB-449-000000034)

413. Kenneth and Jeannine Armstrong received a total of $9,893 under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000369 thru MEB-449-000000580 and MEB-449-000000026 thru MEB-449-000000034)

414. Ethel Mae Coats received $29,761.79 in compensation under the Louisiana Road Home Program for her property at 1020 Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. (MEB-468-000000567 thru MEB-468-000000804)

415. Ethel Mae Coats received $50,000 in additional compensation under the Louisiana Road Home Program for her property at 1020 Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. (MEB-468-000000567 thru MEB-468-000000804)

416. Ethel Mae Coats received a total of $79,761.79 under the Louisiana Road Home Program for her property at 1020 Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. (MEB-468-000000567 thru MEB-468-000000804)

417. Ethel Mae Coats received $2,000 for expedited housing assistance under the Federal Emergency Management Agency's Individual and Households Program

51

due to Hurricane Katrina. (MEB-449-000000255 thru MEB-449-000000368 and MEB-467-000000001 thru MEB-467-000000004)

418. Ethel Mae Coats received $3,951 for rental assistance under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000255 thru MEB-449-000000368 and MEB-467-000000001 thru MEB-467-000000004)

419. Ethel Mae Coats received a total of $5,951 under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000255 thru MEB-449-000000368 and MEB-467-000000001 thru MEB-467-000000004)

420. Fred and Jeneen Boudoin-Holmes sold their property at 1205 Perrin Drive, Arabi, Louisiana, on March 13, 2009, to the Louisiana Road Home Program and received $34,608.18. (MEB-468-000001070 thru MEB-468-000001257)

421. Fred and Jeneen Boudoin-Holmes received $2,000 for expedited housing assistance under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000195 thru MEB-449-000000254 and MEB-449-000000011 thru MEB-449-000000017)

422. Fred and Jeneen Boudoin-Holmes received $2,358 for rental assistance under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000195 thru MEB-449-000000254 and MEB-449-000000011 thru MEB-449-000000017)

423. Fred and Jeneen Boudoin-Holmes received a total of $4,358 under the Federal Emergency Management Agency's Individual and Households Program due to Hurricane Katrina. (MEB-449-000000195 thru MEB-449-000000254 and MEB-449-000000011 thru MEB-449-000000017)

## United States' Proposed Conclusions of Law

1. Proving causation is Plaintiffs' burden, and Plaintiffs cannot prove that the alleged negligent remediation work at the EBIA caused their alleged damages. *See Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 249 (5th Cir. 2008); *Burmaster v. Plaquemines Parish Gov't*, 982 So.2d 795, 808 (La. 2008); *Matthieu v. Imperial Toy Corp.*, 646 So. 2d 318, 322 (La. 1994); cf. 28 U.S.C. § 1346(b) ("law of the place where the act or omission occurred" determines FTCA liability); *Cleveland v. United States*, 457 F.3d 397, 403 (5th Cir. 2006) (law of state where claim arose determines liability).

2. The remediation of the EBIA was not a cause-in-fact of Plaintiffs damages because it was not a "necessary antecedent" of Plaintiffs' damages. *See Dixie Drive It Yourself Sys. v. Amer. Bev. Co.*, 137 So. 2d 298, 302 (La. 1962); *see also In re Air Crash Disaster Near New Orleans*, 764 F.2d 1084, 1092 (5th Cir. 1985); *Rodgers v. Missouri Pac. Ry. Co.*, 405 So. 2d 571, 574 (La. Ct. App. 1981); *Yates v. Brown*, 344 So. 2d 37, 39 (La. Ct. App. 1977; *Muse v. East Texas Grocery Co.*, 11 So. 2d 250, 253 (La. Ct. App. 1942).

3. Plaintiffs alleged damages would have occurred irrespective of any of the negligence Plaintiffs allege against United States and therefore that alleged negligence could not have been substantial factor or cause-in-fact of Plaintiffs' alleged damages. *See Dixie Drive It Yourself Sys. v. Amer. Bev. Co.*, 137 So. 2d 298, 302 (La. 1962); *see also In re Air Crash Disaster Near New Orleans*, 764 F.2d 1084, 1092 (5th Cir. 1985); *Rodgers v. Missouri Pac. Ry. Co.*, 405 So. 2d 571, 574 (La. Ct. App. 1981); *Yates v. Brown*, 344 So. 2d 37, 39 (La. Ct. App. 1977; *Muse v. East Texas Grocery Co.*, 11 So. 2d 250, 253 (La. Ct. App. 1942).

4. If the United States' alleged negligent conduct was "corrected," is it probable that Plaintiffs would nonetheless sustained the same damages. *See Boteler v. Rivera*, 700 So. 2d 913, 916 (La. Ct. App. 1997).

5. Thus, the United States' alleged negligence was not a cause-in-fact of Plaintiffs' alleged damages. *See Id. See also, Craig v. Burch*, 228 So. 2d 723, 729 (La. Ct. App. 1969).

6. The Corps exercised reasonable engineering judgment as to the EBIA remedation work. *See Dobson v. Louisiana Power & Light Co.*, 567 So.2d 569, 574-75 (La. 1990).

7. Plaintiffs' alleged damages were caused by an Act of God.

8. Therefore, the Court finds no liability by the United States for the damages alleged by the Plaintiffs.

9. The Flood Control Act's plain language covers the damages alleged here. *See* 33 U.S.C. § 702c.

10.     "Catastrophic flooding" caused Plaintiffs' alleged damages.  For this reason, and this reason alone, § 702c confers immunity, and this case must be dismissed for lack of subject-matter jurisdiction. *See id.*

11.     The IHNC is a flood-control project. *See In re Katrina Canal Breaches Consol. Lit.*, 471 F.Supp.2d at 689

12.     Alternatively, the IHNC has a "nexus to a flood-control project." *See In re Katrina Canal Breaches Consol. Lit.*, 647 F. Supp. 2d 644, 699 (2009); 577 F. Supp. 2d at 824.

13.     Because the waters that escaped from the IHNC during Hurricane Katrina were floodwaters, the incorporation of IHNC into the LPV compels this Court to apply [FCA] immunity. *See Katrina*, 533 F. Supp. 2d at 637.

14.     Under this Court's own rulings, this direct connection between the IHNC Lock Replacement Project, itself a flood control project, as well as two other flood-control projects—the IHNC lock itself and the LPV floodwalls—renders the United States immune to Plaintiffs' claims. *See In re Katrina Canal Breaches Consol. Lit.*, 647 F. Supp. 2d 644, 699 (2009); 577 F. Supp. 2d at 824.

15.     Although flood control was not the Lock Replacement Project's sole purpose, that does not matter, because FCA immunity applies to multi-purpose projects. *See Kennedy v. Texas Utils.*, 179 F.3d 258, 262 (5th Cir. 1999); *see also Boudreaux v. United States*, 53 F.3d 81, 84-86 (5th Cir. 1995) (broadly applying FCA immunity to flood-control-project management).

16.     The decision to hire a contractor, the choice of contractor, and the degree of supervision exercised over that contractor are all inherently discretionary choices to which the discretionary function exception applies.  *See Guile v. United States*, 422 F.3d 221, 230 (5th Cir. 2005) (noting that supervision of a contractor, a decision to hire a contractor, and the choice of contractor are all policy-based discretionary decisions) (citations omitted).

17.     The Corps' decision to rely on WGI's work plans without analyzing every detail of those plans was a discretionary function for which the government has not waived immunity in tort.  *See National Union Fire Ins. v. United States*, 115 F.3d 1415, 1420-21 (9th Cir. 1997)

18.     The discretionary function exception is not vitiated where an agency has discretion to perform more thorough investigations and the failure to perform a more thorough investigation leads to catastrophic consequences.  *See Gen. Pub. Utils. v. United States*, 745 F.2d 239, 245 (3d Cir. 1984).

19.     No statute or regulation required the Corps to extensively evaluate every aspect of WGI's work plans, and the Corps's personnel reviewing those plans made

decisions about which aspects of the work might warrant additional assessments based on safety, cost, and the ultimate governmental interest in preparing the EBIA parcel for later use as part of a multi-purpose project, including flood control. *See Varig Airlines*, 467 U.S. at 815-16; *National Union Fire Ins. v. United States*, 115 F.3d 1415, 1420-21 (9th Cir. 1997).

20.  Plaintiffs' claim that the Corps had a policy of conducting geotechnical assessments of excavations within 300 feet of a flood control structure does not apply to or eliminate the Corps' discretion in how it reviewed WGI's work plans. *See Varig Airlines*, 467 U.S. at 815-16; *National Union Fire Ins. v. United States*, 115 F.3d 1415, 1420-21 (9th Cir. 1997); *Gen. Pub. Utils.*, 745 F.2d at 247.

21.  Even if it were an abuse of the Corps's discretion not to undertake a more extensive assessment of the existing floodwall while designing the New Lock and lateral flood protection, or if its original 1966 design and assessments turned out to be inadequate, the Corps's obligation to balance resources and other considerations in making its determination that a new assessment of the existing floodwall was unnecessary renders that determination protected by the discretionary function exception. *See Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1021-22, 1027-28 (9th Cir. 1989); *see also National Union Fire Ins.*, 115 F.3d at 1421-22

22.  To the extent that WGI was negligent in performing the work dictated by contracts, the Corps is not liable and this court lacks jurisdiction because a contractor not subject to the FTCA's sovereign-immunity waiver . *See Logue v. United States,* 412 U.S. 521, 528 (1973); *Broussard v. United States*, 989 F.2d 171, 174 (5th Cir. 1993.

23.  Plaintiffs in this case have not complied with 28 U.S.C. § 2675(a), which requires that"the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been denied" before an action is instituted on the claim.

24.  This defect afflicts the re-filed MRGO complaint no less than the initial complaint. *See id.*

25.  The initial MRGO master complaint cannot function as an administrative claim, under the statutory scheme in 28 USC §§ 2672, 2675, and 2677.

26.  Viewing the complaint as an administrative claims is untenable in view of *McNeil v. United States*, which insisted on "'strict adherence to the procedural requirements specified by the legislature.'" 508 U.S. 106, 113 (1992) (quoting *Mohasco Corp. v. Silver,* 447 U.S. 807, 826 (1980)).

27.  Allowing the filing of suit in federal court to satisfy the administrative presentment requirement deprives the agency of any opportunity to "make final disposition of" the claims, and destroys the entire basis for allowing claimants to deem their claims finally denied. *Cf. Brady v. United States,* 211 F.3d 499, 502-

03 (9th Cir.), *cert. denied,* 531 U.S. 1037 (2000) (rejecting argument that first judicial complaint could fulfill administrative-presentment requirement for second action); *Houston v. U.S. Postal Service,* 823 F.2d 896, 903-04 (5th Cir. 1987 (state-court action did not toll limitations period because plaintiff had not exhausted administrative remedies).

28.  An appreciation of the FTCA's procedural scheme reveals that *Williams* stands only for the undisputed  proposition that "[n]o particular method of giving [administrative] notice is required" by § 2675(a). 2010 WL 487431 at *8.

29.  Because the plaintiffs failed to heed the clear statutory command requiring administrative exhaustion before filing suit, their EBIA claims must be dismissed.  *See* 28 USC 2675(a).

30.  The proper measure of damages in Louisiana is the diminution of the property's market value when (1) immovable property is damaged; (2) a plaintiff does not elect to restore his property; and (3) no unique factor affecting the property's value is proven.  *State Dep't of Transp. and Dev. v. Lobel*, 571 So. 2d 742 (La. Ct. App. 1990).

31.  Plaintiffs cannot meet their burden of proving damages under Louisiana law because they did not properly quantify: (1) the loss of fair-market value of their immovable property; (2) actual reconstructions costs where appropriate; (3) depreciated value of their movable property; or (4) actual expenses.

32.  Since "ordinary household effects . . . depreciate immediately upon becoming used and, because of ordinary wear and tear, are worth much less after several years than when originally purchased, and may be readily replaced, . . . the just method of determining the value of used articles, which are not subject to disposal on the open market and which become disintegrated by wear and the lapse of time, is to deduct from their original price a reasonable sum for depreciation." *Gray v. Sec. Storage & Van Co.*, 26 So. 2d 399 (La. Ct. App. 1946) (quoting *Gugert v. New Orleans Indep. Laundries*, 181 So. 653, 656 (La. Ct. App. 1938)).

33.  Apart from Plaintiff Clifford Washington, none of Plaintiffs were in a zone of danger or present to witness their property damage and, as such, their claims for "inconvenience" are not compensable under Louisiana law. *McDonald v. Illinois Central Gulf R.R. Co.*, 546 So. 2d 1287, 1292 (La. Ct. App. 1989); *Napolitano v. F.S.P., Inc.*, 797 So. 2d 111, 115 (La. Ct. App. 2001).

34.  Louisiana law recognizes the collateral source rule that "a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution." *Bozeman v. State*, 879 So. 2d 692, 698 (La. 2004).

35.  Plaintiffs were awarded grants under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act).  *See* 42 USC. §§ 5121 et seq., for

damages they sustained during Hurricane Katrina.  Those grants were made through the Federal Emergency Management Agency's Individual and Households Program, 42 USC § 5172.

36.      For damages they sustained during Hurricane Katrina, Plaintiffs also received grants from the United States Department of Housing and Urban Development's Community Development Block Grant money,  as awarded by the Louisiana Recovery Authority's (LRA) "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq.

37.      Those grants were not independent of the United States' procuration or contribution and must be deducted from any damages awarded to Plaintiffs. *Kennedy v. United States*, 750 F. Supp. 206, 213 (W.D. La. 1990).

38.      Moreover, "[a] person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates benefits available to the person for the same purpose from another source."  42 U.S.C. § 5155(c).

39.      If this Court awards damages, the award is limited to the sum-certain found in the property-damage section of Plaintiffs' administrative claims (Standard Form 95).

40.      Property claims are severable from personal injury claims.  See *Kokaras v. United States*, 980 F.2d 20, 23 (1st Cir. 1992).

41.      Should this court determine that the United States is a joint tortfesor, the United States cannot be held liable for the entire amount of a plaintiffs' damages. *See Dumas v. State*, 828 So. 2d 530 (La. 2002).

Dated: August 10, 2012

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch

ROBIN D. SMITH
Senior Trial Attorney

 *s/ John A. Woodcock*
JOHN A. WOODCOCK
Trial Attorney, Torts Branch,
Civil Division,
U.S. Department of Justice
Benjamin Franklin Station,
P.O. Box 888
Washington, D.C.  20044
(202) 616-4400/ (202) 616-5200 (Fax)

Attorneys for the United States

## CERTIFICATE OF SERVICE

I, John A. Woodcock, hereby certify that on August 10, 2012, a true

copy of the foregoing was hand delivered to the Court and served upon all parties by

ECF. Notice of this filing will be sent by e-mail to all counsel of record by operation of

the Court's electronic-filing system. Parties may access this filing through the Court's

system.

*s/ John A. Woodcock*
JOHN A. WOODCOCK