UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES     CIVIL ACTION

CONSOLIDATED LITIGATION           NO. 05-4182 K2

                                  JUDGE DUVAL

PERTAINS TO                       MAG. WILKINSON

(Robinson, No. 06-2268)

                - AND -

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES     CIVIL ACTION

CONSOLIDATED LITIGATION           NO. 05-4182 K2

                                  JUDGE DUVAL

FILED IN:                         MAG. WILKINSON

05-4181, 05-4182, 05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 06-0225, 06-0886, 06-1885,
06-2278, 06-2287, 06-4065, 06-4389, 06-4634,
06-4931, 06-5032, 06-5159, 06-5161, 06-5260,
06-5937, 07-1271

             (V O L U M E  I)

     Deposition of MELVIN M.L. MCELWEE,

SR., given at the Law Office of Joseph M.

Bruno, 855 Baronne St., New Orleans, Louisiana

70113, on April 23rd, 2008.

REPORTED BY:

     JOSEPH A. FAIRBANKS, JR., CCR, RPR

     CERTIFIED COURT REPORTER #75005

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0001

MELVIN M.L. McELVEE (VOL I)     4/23/2008

---

Page 2

```
 1   APPEARANCES:
 2   REPRESENTING THE PLAINTIFFS:
 3       BRUNO & BRUNO
 4       (BY: JOSEPH M. BRUNO, ESQUIRE)
 5       (BY: FLORIAN BUCHLER, ESQUIRE)
 6       (BY: SCOTT JOANEN, ESQUIRE)
 7       855 Baronne Street
 8       New Orleans, Louisiana 70113
 9       504-525-1335
10   - and -
11       LAMBERT AND NELSON
12       (BY: HUGH P. LAMBERT, ESQUIRE)
13       701 Magazine Street
14       New Orleans, Louisiana 70130
15       504-581-1750
16   - and -
17       SHER, GARNER, CAHILL, RICHTER, KLEIN &
18       HILBERT, L.L.C.
19       (BY: MATTHEW CLARK, ESQUIRE)
20       909 Poydras Street, 28th Floor
21       New Orleans, Louisiana 70112
22       504-299-2100
23
24
25
```

Page 3

```
 1   - and -
 2       WIEDEMANN & WIEDEMANN
 3       (BY: KARL WIEDEMANN, ESQUIRE)
 4       821 Baronne Street
 5       New Orleans, Louisiana 70113
 6       504-581-6180
 7
 8   REPRESENTING THE UNITED STATES OF AMERICA:
 9       UNITED STATES DEPARTMENT OF JUSTICE,
10       TORTS BRANCH, CIVIL DIVISION
11       (BY: SARAH SOJA, ESQUIRE)
12       (BY: PAUL LEVINE, ESQUIRE)
13       P.O. Box 888
14       Benjamin Franklin Station
15       Washington, D.C. 20044
16       202-616-4289
17
18   REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS:
19       CORPS OF ENGINEERS, OFFICE OF COUNSEL
20       (BY: DAVID DYER, ESQUIRE)
21       (BY: JENNIFER LABOURDETTE, ESQUIRE)
22       (BY: JUDY ALMERICO, ESQUIRE)
23       7400 Leake Avenue
24       New Orleans, Louisiana 70118-3651
25       504-862-2843
```

Page 4

```
 1   REPRESENTING WASHINGTON GROUP INTERNATIONAL:
 2       STONE PIGMAN WALTHER WITTMANN, L.L.C.
 3       (BY: WILLIAM D. TREEBY, ESQUIRE)
 4       (BY: HEATHER S. LONIAN, ESQUIRE)
 5       546 Carondelet Street
 6       New Orleans, Louisiana 70130
 7       504-581-3200
 8
 9   REPRESENTING ORLEANS LEVEE DISTRICT:
10       SUTTON LAW FIRM
11       (BY: CHARLES E. SUTTON, JR., ESQUIRE)
12       2101 N. Highway 190, Suite 105
13       Covington, Louisiana 70433
14       985-249-5991
15
16   ALSO PRESENT:
17       JOHN L. ROBERT, III, ESQ.
18       KEA SHERMAN, ESQ.
19       RYAN M. MALONE, ESQ.
20       MARK S. RAFFMAN, ESQ. (VIA I-DEP)
21       CHARLES LANIER, ESQ. (VIA I-DEP)
22       JENNIFER SHUMAKER, ESQ. (VIA I-DEP)
23       ADAM CHUD, ESQ. (VIA I-DEP)
24       J. WARREN GARDNER, JR., ESQ. (I-DEP)
25   VIDEOGRAPHER:   GILLEY DELORIMIER (DEPO-VUE)
```

Page 5

```
 1       E X H I B I T   I N D E X
 2
 3   EXHIBIT NO.                          PAGE
 4   Exhibit 1    ................................8
 5   Exhibit 2    ................................8
 6   Exhibit 3    ...............................10
 7   Exhibit 4    ...............................10
 8   Exhibit 5    ...............................26
 9   Exhibit 6    ...............................94
10   Exhibit 6    ..............................132
11   Exhibit 7    ..............................164
12   Exhibit 8    ..............................181
13   Exhibit 9    ..............................195
14   Exhibit 10   ..............................216
15   Exhibit 11   ..............................224
16   Exhibit 13   ..............................225
17   Exhibit 12   ..............................227
18   Exhibit 14   ..............................232
19   Exhibit 15   ..............................232
20   Exhibit 16   ..............................234
21   Exhibit 17   ..............................234
22   Exhibit 18   ..............................254
23   Exhibit 19   ..............................257
24   Exhibit 20   ..............................266
25   Exhibit 21   ..............................269
```

2 (Pages 2 to 5)

b0b09625-983e-472b-937c-43ef0ac82077

**PX-0686-0002**

Page 6

1   Exhibit 22   ...............................271
2   Exhibit 23   ...............................273
3   Exhibit 24   ...............................274
4   Exhibit 25   ...............................288
5   Exhibit 26   ...............................292
6   Exhibit 27   ...............................294
7   Exhibit 28   ...............................318
8   Exhibit 29   ...............................330
9   Exhibit 30   ...............................333
10  Exhibit 31   ...............................335
11  Exhibit 32   ...............................343
12  Exhibit 33   ...............................346
13  Exhibit 34   ...............................348
14  Exhibit 35   ...............................353
15      E X A M I N A T I O N   I N D E X
16
17  EXAMINATION BY:                     PAGE
18
19  MR. BRUNO   ...............................12
20  MR. TREEBY  ...............................215
21
22
23
24
25

Page 7

1          S T I P U L A T I O N
2       IT IS STIPULATED AND AGREED by and
3   among counsel for the parties hereto that the
4   deposition of the aforementioned witness may be
5   taken for all purposes permitted within the
6   Federal Rules of Civil Procedure, in accordance
7   with law, pursuant to notice;
8       That all formalities, save reading
9   and signing of the original transcript by the
10  deponent, are hereby specifically waived;
11      That all objections, save those as to
12  the form of the question and the responsiveness
13  of the answer, are reserved until such time as
14  this deposition, or any part thereof, is used
15  or sought to be used in evidence.
16
17
18              * * *
19
20
21
22      JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23  Certified Court Reporter in and for the State
24  of Louisiana, officiated in administering the
25  oath to the witness.

Page 8

1          MELVIN M.L. MCELWEE, SR.
2   14154 Rev. Joseph White Road, Independence,
3   Louisiana 70443, a witness named in the above
4   stipulation, having been first duly sworn, was
5   examined and testified on his oath as follows:
6           MR. BRUNO:
7               Let's go off the record for a
8       second.
9       (Off the record.)
10          MR. BRUNO:
11              All right.  The first thing I'd
12      like to do is mark as an exhibit the
13      Amended Notice of Deposition.  Both
14      amended?  Where's the original?  All
15      right.  We have two Amended Notice of
16      Deposition.  One --
17              What's the difference between the
18      two?
19      (Exhibit 1 was marked for
20  identification and is attached hereto.)
21      (Exhibit 2 was marked for
22  identification and is attached hereto.)
23          MR. JOANEN:
24              One is Robinson, one is MRGO.
25          MR. BRUNO:

Page 9

1               We have two notices.  One
2       reflects -- the first notice shows
3       that this deposition is being noticed
4       in MRGO and in Robinson --
5       MR. TREEBY:
6           Robinson is in the MRGO category
7       of cases.
8       MR. JOANEN:
9           Only Robinson.  That's what he
10      means.  That's the caption for only
11      Robinson.
12      MR. TREEBY:
13          It's in the MRGO category of
14      cases -- Robinson is.
15      MR. BRUNO:
16          I'll tell you how the CMO tells
17      you how to do it after the deposition.
18          It says MRGO/Robinson.  The
19      second notice says pertains to MRGO.
20      I want to make it clear on the record
21      that this deposition, so that it's
22      crystal clear to all involved, is
23      being noticed in both the Robinson
24      case scheduled to be tried in
25      September and the MRGO class action

EXHIBIT
1

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0003

Page 10

1  scheduled to be tried in June of '09.
2      The next things I'd like to mark
3  and attach are two CVs. The first one
4  has got the -- I'm trying to
5  distinguish between the two.
6  Technical background, it says Page 1
7  of 4. I'll mark it as 3, and the
8  other one with a smaller print font
9  I've marked as Exhibit 4. And that
10 says -- I'm sorry, Exhibit 3 says 1 of
11 4, Exhibit 4 says 1 of 3.
12     (Exhibit 3 was marked for
13 identification and is attached hereto.)
14     (Exhibit 4 was marked for
15 identification and is attached hereto.)
16 MR. MALONE:
17     Reserve the right of Lake Borgne
18 to ask questions regarding MRGO.
19 MR. BRUNO:
20     Sorry. Let me ask the question.
21 Those of you who, prior to my remarks
22 about the cases into which these cases
23 are noticed, if anybody wants to
24 change their appearance from appearing
25 only to participating, I'm going to

Page 11

1  ask you to do it now to protect the
2  record. And you've so indicated.
3      Anybody else? Okay. Just for
4  the record, everybody has the right to
5  ask questions is the bottom line,
6  including Barge.
7  MR. TREEBY:
8      Joe, are you going to ask
9  questions in Robinson?
10 MR. BRUNO:
11     Yes.
12 MR. TREEBY:
13     And later ask questions for MRGO,
14 or are you combining them together?
15 MR. BRUNO:
16     I'm just asking questions. I
17 wouldn't know how to do that, Bill.
18 I'm not as smart as you.
19     The usual stipulation is fine
20 with me.
21     Anybody?
22 MR. LEVINE:
23     Whatever is in the Federal Rules
24 of Civil Procedure.
25 MR. BRUNO:

Page 12

1      All right. Which is the usual
2  stipulation.
3  MR. LEVINE:
4      I don't know what the usual
5  stipulation means.
6  EXAMINATION BY MR. BRUNO:
7  Q. All right. Okay. All right, sir.
8      Would you please, for the record, give
9  us your full name as well as your home address.
10 A. My full name is Melvin Millard Louis
11 McElwee, Sr. My home address is 14154
12 Rev. Joseph White Road, Independence, Louisiana
13 70443.
14 Q. Mr. McElwee, are you currently
15 employed?
16 A. Yes.
17 Q. And for whom do you work?
18 A. McElwee Brothers. Self-employed.
19 Q. All right. And would you share with
20 us, please, what is the general work of McElwee
21 Brothers?
22 A. The general work of McElwee Brothers
23 is civil construction. McElwee Brothers is
24 licensed highway, roads and bridges, for the
25 state of Louisiana, License Number 31553.

Page 13

1  Q. Now, do I gather from the name McElwee
2  Brothers that you've got a brother? Who's in
3  this business with you?
4  A. No, sir. That name was designated for
5  my two sons who are brothers.
6  Q. All right. Can I conclude then that
7  you are the principal in the enterprise which
8  is called McElwee Brothers?
9  A. I am the 100 percent stockholder in
10 McElwee Brothers.
11 Q. All right. Can you give us just a
12 general sense of the kind of construction, or
13 construction work, that your firm has done over
14 the last several years?
15 A. Over the last several years we've,
16 um -- performed pile driving, box culvert canal
17 section work, pile driving for bridge work, and
18 in particular one project for the Corps of
19 Engineers along the Inner Harbor Navigational
20 Canal, also the pile driving for the bridge
21 work in Shreveport for Austin Bridge and Rode
22 out of Irving, Texas. The Red River bridge
23 crossing right outside of Barksdale Air Force
24 Base. We did some work also for the LSU
25 campus, as a subcontractor, recreational

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0004

MELVIN M.L. McELVEE (VOL I)                          4/23/2008

Page 14

1   fields, redoing their parking lot, things of
2   those natures.
3        Q.  I understand.  Okay.  All right.
4   Well, if you don't mind, I would like to learn
5   a little bit about your background, your
6   education and some of your employment over
7   time.
8        You've been kind enough to supply us
9   with two résumés; is that correct?
10       A.  Yes.
11       Q.  All right.  And as I indicated on the
12  record, I marked the four-page document as
13  Exhibit 3, so why don't we pick that one up
14  first.
15       A.  Yes.
16       Q.  And then we've got the other one which
17  we've marked as Exhibit 4 which is a
18  three-paged document.
19       A.  Yes.
20       Q.  My first question to you, sir, is what
21  is the difference if any between these two
22  résumés?
23       A.  The difference is my earlier years
24  experience after coming out of the active
25  component of the Air Force and working for the

Page 15

1   Corps of Engineers as a quality assurance
2   representative, it explains the professional
3   development courses that I've taken with the
4   Corps of Engineers and also some technical
5   development courses that I've taken in the U.S.
6   Air Force.  It explains that in Exhibit 3, but
7   in Exhibit 4 it doesn't.  It's more management
8   in Exhibit 4.
9        Q.  All right.  Do both of those exhibits
10  reflect your work experience, that is, the jobs
11  that you've held over time?
12       A.  Yes.
13       Q.  All right.  Let's look at Number 3,
14  then.
15       Did you grow up here in the New
16  Orleans Metropolitan area?
17       A.  I was born in New Orleans.
18       Q.  Okay.  It says here that you went to
19  Alfred Bonnabel High School in Metairie, and
20  you graduated May, '83.  Is that correct?
21       A.  That's correct.
22       Q.  Okay.  And then after that you were --
23  you went into the Army?
24       A.  Went into the United States Air Force.
25       Q.  Oh, the Air Force.  I'm sorry.

Page 16

1        A.  Yes.
2        Q.  And what did you do at the Air Force?
3        A.  I was a general purpose vehicle
4   mechanic.  If you look under technical
5   development, on Page 1, it shows my Air Force
6   experience of that Exhibit 3.  Stationed at
7   Chanute Air Force Base.
8        (Off the record.)
9   EXAMINATION BY MR. BRUNO:
10       Q.  Forgive me, Mr. McElwee, I'm just
11  trying to have a record that when people read
12  it it's very clear.  So you left high school,
13  you went into the Air Force.  And on Page 1 of
14  Exhibit 3, there's a description of the courses
15  that you took, correct?
16       A.  Yes.
17       Q.  All right.  Now, for how long were you
18  in the Air Force?
19       A.  Four years.
20       Q.  All right.  And what was the highest
21  rank that you obtained before leaving?
22       A.  E4.
23       Q.  E4.
24       A.  Yes.
25       Q.  All right.  After you left the Air

Page 17

1   Force, what did you do, sir?
2        A.  Came back to New Orleans and was
3   employed by the United States Army Corps of
4   Engineers.
5        Q.  All right.  For how long were you
6   employed by the United States Army Corps of
7   Engineers?
8        A.  Five years.
9        Q.  All right.  Now, what were -- here we
10  go.  No, that's the National Guard.  Let's see.
11  Okay.
12       Would that be reflected on Page 3 of 4
13  of Exhibit Number 3?
14       A.  Yes.
15       Q.  All right, sir.  And you've indicated
16  on this résumé that you were a quality
17  assurance representative from December, 1998,
18  to August, 1993.
19       A.  That's December, 1988 --
20       Q.  '88.
21       A.  -- to August, 1993, yes.
22       Q.  About five years, as you've already
23  indicated to us.  Okay.  Now, you worked at the
24  New Orleans District office?
25       A.  Yes.

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0005

MELVIN M.L. McELVEE (VOL I)                                 4/23/2008

Page 18

1    Q.  Okay.  We've seen in the past some
2  organizational chart, and you'll forgive me for
3  not having one in front of me today, but for
4  which branch or division did you work within
5  the district office?
6    A.  Construction division, the New Orleans
7  area office.
8    Q.  Okay.  And the construction division
9  is a part of -- at that time, was a part of
10  which branch, was that an engineering or -- I
11  know I'm testing you now.
12    A.  You have engineering division, then
13  you have construction division, at that time.
14  Construction just dealt with the work in
15  progress as it was taking place and monitoring
16  the work in progress.
17    Q.  I see.  Might that have been the
18  projects section?
19    A.  Yes.
20    Q.  Okay.  Now, as I remember these many
21  depositions that we've been in -- all been
22  involved in over the several weeks, there was
23  usually a project manager assigned to a
24  particular construction project.
25    Do you recall whether that is accurate

Page 19

1  in what you remember of your employment from
2  '88 to '93?
3    MR. TREEBY:
4    Object to the form of the
5    question.
6    MR. BRUNO:
7    What's wrong with the form, Bill?
8    MR. TREEBY:
9    It's vague.  I don't know whether
10    you're talking about the contractor's
11    responsibility.  It just vague.
12    MR. BRUNO:
13    I didn't ask about the
14    contractor's responsibility.
15    MR. TREEBY:
16    I'm going to stand with my
17    objection.  Thank you.
18    MR. BRUNO:
19    That's fine.  You know what,
20    though?  I'm going to try to
21    respond --
22    MR. TREEBY:
23    It's unclear to me.  If it's not
24    unclear to you, then proceed.
25    MR. BRUNO:

Page 20

1    And if you can't tell me why it's
2  unclear, then I can't change the form
3  to assist you.
4    MR. TREEBY:
5    I told you what --
6    MR. BRUNO:
7    Let me finish.  You've had your
8    say.  I asked the question because the
9    purpose of an objection to form is to
10    alert the questioner that there may be
11    an opportunity to change the question,
12    which I'm happy to do.  But for me to
13    change the question I need to
14    understand what your problem is.  And
15    you've told me, I don't get it, so
16    we're going to move on.
17    MR. TREEBY:
18    Well, I'll try to explain it if
19    you want further --
20    MR. BRUNO:
21    Yes, I would like further
22    explanation.
23    MR. TREEBY:
24    You argued with my explanation.
25    That's why I --

Page 21

1    MR. BRUNO:
2    No, I didn't argue with it.  I
3  said I didn't understand it.  You said
4  it's just vague which is very
5  difficult for me to comprehend.
6    Now, one more time.  What's wrong
7  with the form?
8    MR. TREEBY:
9    When you asked me, I said it's
10  vague, I don't know whether you're
11  talking about the contractor's
12  responsibility.  It's just vague.
13  Now, what I meant by that was your
14  question was a very general one, and
15  you asked whether -- let me find the
16  question again --
17    MR. BRUNO:
18    Okay.
19    MR. TREEBY:
20    -- there was usually a project
21  manager assigned to a particular
22  construction project.
23    MR. BRUNO:
24    Yes.  That was the question.
25    MR. TREEBY:

6  (Pages 18 to 21)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0006

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 22

1      That could be asking about
2    whether the Corps of Engineers, who he
3    was working for, and you're apparently
4    asking for, had a project manager
5    assigned to a particular project, it
6    could be talking about whether the
7    contractor doing the project had a
8    project manager. I was not clear
9    which it was; therefore, I objected to
10   the form of the question.
11   MR. BRUNO:
12        And that helps me, because now
13   what I'm going to do, Mr. Treeby, is
14   I'm going to turn to the witness and
15   I'm going to ask him whether or not
16   there was a person at the Corps --
17   okay -- not working for the
18   contractor, who was the project
19   manager.
20   EXAMINATION BY MR. BRUNO:
21   Q. And do you recall whether that was the
22   way the Corps did its business in connection
23   with Corps construction projects?
24   A. When I was employed by the Corps of
25   Engineers, that is the way the Corps did

Page 23

1    business. There was a project manager that was
2    not just responsible but maybe for one project,
3    but maybe two or three.
4    EXAMINATION BY MR. BRUNO:
5    Q. I see.
6    A. As a project manager.
7    Q. Okay. Fine. I'm glad we cleared that
8    up.
9        So, um -- where was your job in the
10   structure of that branch?
11   A. If I can explain as far as layers,
12   there was a project manager over particular
13   projects, but then there was the area office
14   which had project engineers assigned to a
15   particular project. I myself was a quality
16   assurance rep, reported to the project
17   engineer, who in turn reported to project
18   managers.
19   Q. Okay. Great. That's very helpful.
20   Thank you.
21       Did you work as a quality assurance
22   representative for the entire five years?
23   A. Yes.
24   Q. Okay. Now, did you receive any
25   training by the Corps in order to help you do

Page 24

1    the work of a quality assurance representative?
2    A. Yes.
3    Q. All right. Is there a description of
4    that training on either Exhibit 3 or Exhibit 4?
5    A. There's a description on Exhibit 3,
6    Page 1 of 4, the middle of the page,
7    professional development.
8    Q. All right. I see that. And right
9    underneath, sure enough, I see United States
10   Army Corps of Engineers, Huntsville, Alabama,
11   and then there are a series of -- well, why
12   don't you tell me exactly what those words
13   describe.
14       Are those courses or -- you know, for
15   example, Dredging, semicolon, Contract
16   Administration, February, '93, twenty four
17   hours. What are you describing there?
18   A. I'm describing the dredging contract
19   administration course administered by
20   Huntsville, Alabama, for quality assurance
21   representatives, project engineers and project
22   managers.
23       Each -- the next one is Concrete
24   Quality Verification, October, '92. That was
25   specifically on concrete. Inspection of

Page 25

1    concrete, makeup of concrete, um -- testing of
2    concrete, from the Corps' aspect.
3        Construction Quality Management,
4    that's more managing relationships with
5    contractors when administering projects.
6        General Construction Verification is,
7    um -- training on the use of the government
8    documents, in which situations you use them,
9    how you use them, the reference materials.
10   Q. Okay.
11   A. Soils Quality Verification, strictly
12   dealing with soils. Soil is anything smaller
13   than rocks.
14   Q. Okay. Thank you. Now, were these
15   courses courses that you were required to take
16   as a condition of your employment?
17   A. Yes.
18   Q. Okay. And when it says 40 hours, does
19   that reflect 40 classroom hours or lecture
20   hours?
21   A. Lecture hours, yes.
22   Q. Lecture hours, okay. All right. Now,
23   let me -- you've been kind enough to produce in
24   response to a subpoena issued by the Washington
25   Group International some documents, and in this

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0007

MELVIN M.L. McELVEE (VOL I)                                4/23/2008

Page 26

1  stack of documents I came across a document
2  which I think is in this stack right here.
3  (Indicating.) And mine is entitled Instructor
4  Listing.
5      A.  Yes.
6      Q.  All right. Would you pleas, for the
7  record, identify this document. What is it?
8      A.  This document, and the following
9  pages, is an excerpt from the soils quality
10 verification course back in December, '90.
11     The earthwork quality verification
12 training course was taught in Huntsville,
13 Alabama, and the list there is the list of
14 instructors at the course -- the first page.
15     Q.  I understand. All right. So first of
16 all, can I assume that this document, which by
17 the way I'm marking for the record as Exhibit
18 Number 5, was given to you at the that you took
19 the course?
20     (Exhibit 5 was marked for
21 identification and is attached hereto.)
22     A.  Yes.
23 EXAMINATION BY MR. BRUNO:
24     Q.  All right. Was it part of the
25 training materials that you were given?

Page 27

1      A.  Yes.
2      Q.  All right. Now, do you know, as you
3  sit here today, which United States Corps of
4  Engineers employees employed at the New Orleans
5  District office during the period of time 1988
6  to 199 -- let me remember -- '93, were required
7  as a condition of their employment to take this
8  course?
9      A.  Yes.
10     Q.  All right. Who at the district office
11 would be required to take this course?
12     A.  If I may start from Page 2 --
13     Q.  Yes, sir.
14     A.  -- and Page 3, that's the list of
15 students that went during the time I went. On
16 Page 3 you see my name Melvin McElwee, first
17 column, second name.
18     Q.  I see that.
19     A.  And if you look and see New Orleans,
20 Allen Richard, on Page 1 --
21     Q.  Yes, sir.
22     A.  -- from the New Orleans District, he
23 was required to take it.
24     You see the fifth name down on the
25 first column Donald Constantine --

Page 28

1      Q.  Forgive me for interrupting you, but
2  while we're on Mr. Allen, let me ask you just a
3  few questions about him in particular that may
4  help us a little bit.
5      Do you know what Mr. Allen 's job was
6  at that time?
7      A.  That I do not know.
8      Q.  Okay. Now, do you see here under his
9  name it says, United States Army Engineering
10 District, New Orleans? That refers to the
11 district office?
12     A.  That's the New Orleans District
13 office.
14     Q.  All right. Now, below that it says
15 engineering division, engineering section.
16     Do you know what that means?
17     A.  Yes. The engineering division is the
18 other division I mentioned to you.
19     Q.  Okay. In other words, we had your
20 project division --
21     A.  Construction division.
22     Q.  -- construction division, then you had
23 your engineering division.
24     A.  Yes.
25     Q.  Okay. And then do I gather that

Page 29

1  there's a levee section within the engineering
2  division?
3      A.  Yes.
4      Q.  Okay. Thank you so much.
5      Let's move to -- let's see. You
6  mentioned our next gentleman was Donald
7  Constantine.
8      A.  Yes.
9      Q.  Now, here it says attention:
10 CELMN-OD-OM. Do you know what that means?
11     A.  Yes. That's a description of his
12 division inside the Corps. Anybody that worked
13 for the Corps at that time could tell where you
14 worked and what office you worked in. That's
15 the Corps of Engineers lower Mississippi -- I'm
16 trying to remember the acronyms for that CELMN.
17     Q.  Lower Mississippi New Orleans office,
18 I think.
19     A.  Yes.
20     Q.  That's what we've heard. And then
21 there's a dash and it says OD. What does that
22 mean?
23     A.  That's another division in the Corps.
24 Right now I can't tell you which one.
25     Q.  It would be operations division?

8 (Pages 26 to 29)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0008

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 30

1    A.  Operations division.  That's correct.
2    Q.  All right.  And again, I've been
3  looking at this a lot more than you have over
4  the past days, so -- and then it says OM?  Do
5  you know what that -- would that be a --
6       MR. TREEBY:
7         I object to leading the witness.
8       MR. BRUNO:
9         It's called discovery,
10        Mr. Treeby.  You can lead the witness
11        in discovery.
12      MR. TREEBY:
13        Object to the form of the
14        question.  Leading.
15      MR. BRUNO:
16        Fine.
17  EXAMINATION BY MR. BRUNO:
18   Q.  OM.  Would you know what OM stands
19  for?
20   A.  I don't know exactly, but I'm assuming
21  something maintenance.
22   Q.  Thank you.  Now, let's see.  Going on
23  down the line, moving to the second column, I
24  then come across a Leonard Hunter?
25   A.  Yes.

Page 31

1    Q.  Do you remember Mr. Hunter?
2    A.  I can't remember him right now, but if
3  I had a photo I'm going to say yes I know him.
4    Q.  Do you remember what his job was?
5    A.  No, sir.
6    Q.  All right.  And is there anything, you
7  know, under his name that would help us
8  understand?
9    A.  No, sir.
10   Q.  Carol Johnson.  Do you recall this
11  person?
12   A.  No, sir.
13   Q.  All right.  And there is nothing -- or
14  is there anything under this person's name
15  which would assist us in learning what -- I
16  don't know if that's a he or a she, but --
17   A.  Yes.  Second line.  It says ED-FT,
18  engineering division.  And I don't know if
19  that's foundation testing, FT.
20   Q.  All right.  Okay.  And then if we
21  would move to the next page, and I see you.
22  And let's just walk through you.  You see the
23  New Orleans District, you see then CD, which is
24  the construction division.
25   A.  Construction division.

Page 32

1    Q.  You've already told us that.
2        NO.  What is that?
3    A.  New Orleans area office.
4    Q.  All right.  And Q?
5    A.  Quality assurance.
6    Q.  There you go.  All right.
7        If you'd follow with me down, I see
8  then -- is that Lois Pierre?
9    A.  Yes.
10   Q.  Anything -- do you remember Lois
11  Pierre?
12   A.  Vaguely I do.  I don't remember his
13  job position.
14   Q.  Is there anything written here that
15  would assist us in understanding what he did?
16   A.  No, sir.
17   Q.  All right.  Then we have Brian G.
18  Weidenbacher.  Do you recall Mr. Weidenbacher?
19   A.  No, sir.
20   Q.  All right.  Anything under his name
21  that would help us know what he did?
22   A.  No, sir.
23   Q.  Okay.  All right.  To the best of your
24  recollection, Mr. McElwee, would this be a
25  complete list of all of the folks who took the

Page 33

1  course with you?
2    A.  Yes, sir.
3    Q.  All right.  Let's move to the next
4  page.  You with me?
5    A.  Yes, sir.
6    Q.  You see the upper right-hand corner?
7    A.  Yes, sir.
8    Q.  Do you know what the significance, if
9  any, there is to -- and I'm guessing it's Roman
10  numerals, I could be wrong -- either VI or
11  Roman Numeral VI.1.1?
12   A.  To my recollection, that was the
13  number for the course.  Because each course
14  that I mentioned to you had a number, and then
15  they could identify the chapter and then the
16  page.
17   Q.  All right.  Can I assume from that
18  answer that there is some book somewhere which
19  contains those pages?
20   A.  It's a binder.
21   Q.  It's a binder?
22   A.  Yes.
23   Q.  All right.  Okay.  Do you recall the
24  name of the binder?
25   A.  The name of the binder for this

9  (Pages 30 to 33)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0009

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 34

1  particular course was soils quality
2  verification.
3      Q.  Sorry.  I didn't ask the question
4  properly.  These pages that I have in front of
5  me which are described, again, either --
6      MR. BRUNO:
7          Does anybody know if that's a
8          Roman numeral or just a VI?
9      A.  It's a Roman numeral.
10 EXAMINATION BY MR. BRUNO:
11     Q.  Roman numeral.  Okay.  That's fine.
12 It says VI.1.1, and then it continues to
13 VI.1.12, and then I see after that there are a
14 series of plates.
15     A.  Yes.
16     Q.  I just assumed, perhaps incorrectly,
17 that these pages were all of the pages that
18 related to the course, soils quality
19 verification.
20     A.  Those are not all the pages.
21     Q.  Okay.  All right.  So you got a whole
22 binder full of paper --
23     A.  Yes.
24     Q.  -- for the course.
25     A.  Yes.

Page 35

1      Q.  All right.  This is just one section
2  of that whole binder.
3      A.  Yes.
4      Q.  Okay.  I understand now.
5          Do you still have the whole binder?
6      A.  Yes.
7      Q.  Okay.  May I ask, if you don't mind,
8  if we could make a copy of that whole binder?
9      A.  I will deliver it to IKON for you to
10 make a copy.
11     Q.  That's fair enough.  And then of
12 course everybody can obtain a copy from there.
13         Now, let me ask you this:  The context
14 of these pages are that they are attached to a
15 letter by yourself to Mr. Bob Bea.
16     A.  Yes.
17     Q.  Okay.  The letter is dated Friday,
18 October 14, 2005, and it says what it says.
19     A.  Yes.
20     Q.  I'm happy --
21     MR. BRUNO:
22         Anybody have any interest in
23         attaching this?
24 EXAMINATION BY MR. BRUNO:
25     Q.  Okay.  I don't have any need to attach

Page 36

1  it.
2          But would you just for the record tell
3  us what were the circumstances of your writing
4  Mr. Bob Bea and enclosing a copy of these
5  papers?
6      A.  To my recollection, this was
7  immediately following the failure of the levees
8  in New Orleans.  And I had spoken and talked
9  with Dr. Bea via E-mail and telephone, and in
10 our conversations we identified, with the
11 uniqueness that we had as far as he used to
12 work with the Corps and I used to work with the
13 Corps, and in the media there was a lot of
14 fluff I would call it, no one knew what
15 happened in the area, and I considered it to be
16 foolishness.  And I said, Dr. Bea, I mean, we
17 all are trained in this, here's the Corps
18 courses.  How can somebody not know?
19     Q.  Okay.  All right.  Why don't we go
20 ahead, just say that one more time loudly,
21 because I didn't know if I even understood it.
22 You said we something or other.
23     A.  Dr. Bea and I saw in our conversations
24 where we had some things in common.  He worked
25 for the Corps of Engineers, and I worked for

Page 37

1  the Corps of Engineers.  And during the time
2  frame after the storm, there was a bunch of
3  fluff, I would call it, in the media when
4  people were saying they didn't know why the
5  levees had failed.
6      Q.  Okay.
7      A.  And I had mentioned to Dr. Bea, I
8  mean, everybody that dealt with the Corps and
9  worked with the Corps was very familiar with
10 what happened.  And as an example, I sent him
11 our training, a copy of what we've been trained
12 on.
13     Q.  Okay.  And do I gather that your
14 selection of these pages which I have already
15 marked as Exhibit Number 5 represent, in your
16 mind, a portion of that training?
17     A.  Yes.
18     Q.  Is that correct?
19     A.  That's correct.
20     Q.  All right.  Now, let's, if you don't
21 mind, look at Page VI.1.1.  It's entitled
22 seepage and groundwater control.
23     A.  Yes.
24     Q.  All right.  Would you tell us, please,
25 generally, what is seepage?

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0010

MELVIN M.L. McELVEE (VOL I)                          4/23/2008

Page 38

1    A.   Seepage is the flow of a fluid, water,
2  whatever it may be, through a median [sic] I
3  would call it, whether it's soil or whether
4  it's filter cloth, fabric, whatever.
5    Q.   Right.
6    A.   In this particular instance, the
7  course was catered to explaining the history of
8  seepage over time, since it's been documented.
9  In fact, the first paragraph talks about Italy
10  and killing three thousand people.  Um -- and
11  the course described methods of inspecting and
12  noticing seepage to determine whether or not
13  there were potential problems.
14    Q.   Okay.  All right.  If I look at the
15  first sentence -- I'm going to read it to
16  you -- it says, perhaps no single feature of an
17  earthwork project deserves as much attention
18  during construction as the drainage system.
19        Could you explain that to me?
20    A.   When looking at a project, and you
21  determining what you're going to do with fluid
22  flow, meaning rain, runoff or whatever, um --
23  attention needs to be placed on what are you
24  going to do with the collection of water?  If
25  it's in your backyard, how are you going to get

Page 39

1  rid of it?  Which ways are you going to get rid
2  of it?  Are you going to dump it on your
3  neighbor?  Are you going to put something in
4  between you and your neighbor, a swale?  Are
5  you going to let it drain into a pipe and flow
6  out towards the street?  Any project, civil
7  project, you must take that under
8  consideration, when you're --
9    Q.   Okay.  Now, you've used the words
10  civil project this morning already.  What do
11  you mean by civil project?
12    A.   Civil projects are projects dealing
13  with streets, foundations, usually buildings,
14  close to the earth.  You're going to deal with
15  some material formed by the earth.
16    Q.   Okay.  All right.  I also see the
17  phrase earthwork project.  What does that mean?
18  In your mind.
19    A.   In my mind, an earthwork project is a
20  project dealing with soil.  I'll say soil
21  anything smaller than a pebble.  Sand and
22  below.
23    Q.   All right.  So, if one were asked to
24  build something on top of the land, a house or,
25  I don't know, any structure, would that fall

Page 40

1  within the discussion of this paper?
2    A.   Yes.
3    Q.   All right.
4    A.   The foundation portion would.
5    Q.   The foundation part, the part of the
6  structure that goes below the earth?
7    A.   Yes.
8    Q.   All right.  Now, suppose one were
9  asked to do excavation, but you're not really
10  building anything, you're just removing stuff.
11  You see the distinction between the building
12  and the excavation?
13    A.   Yes.
14    Q.   I'm wondering if that would be, in
15  your mind, considered an earthwork project?
16    A.   Yes.
17    Q.   And why is that?
18    A.   Because you're dealing with parts of
19  the earth that are smaller than a pebble.
20    Q.   Okay.  All right.  Now, the next
21  sentence says, however, since the drainage
22  system generally controls a hidden force, the
23  force of water seepage through soil, it's
24  importance is sometimes not fully appreciated.
25        Okay, now, I just need you to help me

Page 41

1  understand, first of all, what's the hidden
2  force?
3    A.   Hidden forces, to my recollection,
4  would be fluid forces below the surface that
5  travel to, um -- vacuum pockets.  You know, it
6  could be any open area, any open spot.  Um --
7  it may start off as a trickle, and then
8  eventually eat it's way through and before you
9  know it it's a heavy flow.
10    Q.   Okay.  All right.  I'll have to
11  confess to you I'm just a lawyer and I don't
12  really know a lot about engineering and things,
13  but, so you're telling me that there's movement
14  of water under the earth.  I mean, I know about
15  aquifers and things because you drill wells in
16  order to get access to water that's below the
17  surface.
18    A.   Yes.
19    Q.   So are you describing the concept of
20  the water that's below the surface and how it
21  moves through the soils?
22    A.   Yes.
23    Q.   Okay.  I understand.
24    A.   Different from the aquifer.
25    Q.   It's different?

11  (Pages 38 to 41)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0011

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 42

1   A.  Yes.
2   Q.  How is it different?
3   A.  The aquifer is a stream where water
4   may flow just in a sand layer throughout the
5   earth and travel all the time.
6   Q.  Uh-huh.
7   A.  It's constantly doing that.
8   Q.  Right.
9   A.  But outside of the aquifer, you have
10  water tables, traditionally in different areas,
11  that can produce their own aquifers if found in
12  weaker pockets of soils.
13  Q.  All right.  So obviously the rain
14  falls, it gets absorbed by the soils below, and
15  it goes somewhere below the soil.
16  A.  Yes.
17      MR. TREEBY:
18          Object to the form of the
19      question.  Leading.
20      MR. BRUNO:
21          Well, okay, fine.
22  EXAMINATION BY MR. BRUNO:
23  Q.  When the rain falls from the sky and
24  it hits the earth, where does it go?
25  A.  The earth is composed of water, and

Page 43

1   water doesn't ever change, it just goes -- it's
2   the same amount all the time.  It evaporates
3   and then it rains, it gets soaked in the earth,
4   it goes to the rivers and evaporates again,
5   comes back down again.  Whatever we do in
6   between then, it's the same amount of water.
7   Q.  Okay.  So after the water from the sky
8   hits the earth, where can it go?
9   A.  It's going to go -- if it can
10  penetrate a soil, it's going to go -- it's
11  going to saturate the soil.
12  Q.  Okay.
13  A.  Once it saturates the soil and heat is
14  applied, then it will evaporate.  The sun.
15  Heat by the sun.
16  Q.  Okay.
17  A.  It doesn't have to be any man-made
18  heat.  It will begin to form what we consider
19  to be fog, um -- humidity --
20  Q.  Right.
21  A.  -- and it goes back into the clouds.
22  Q.  I understand.  All right.  So we've
23  discussed two options.  One, the water that
24  falls from the sky can turn into vapor, it can
25  go below the soil.

Page 44

1       Is there any other options for the
2   water?
3   A.  I guess I'm not understanding when you
4   say options.  Now, it can travel.
5   Q.  That's what I mean.
6   A.  Yes.
7   Q.  So there's a third option.  It could
8   move across the surface.
9       MR. TREEBY:
10          Object to the form of the
11      question.  Leading.
12  EXAMINATION BY MR. BRUNO:
13  Q.  Now, the next sentence says, and this
14  is really striking, these hidden forces can
15  tear down a mountainside, as occurred in 1963
16  at the Vaiont Reservoir, Italy, killing three
17  thousand persons; destroy earthen structures
18  such as the Baldwin Hills Reservoir in Los
19  Angeles, California, where five lives were lost
20  in 1963 and $15 million property damage
21  resulted; or produce runway failures as
22  occurred at the Cleveland, Ohio airport in 1967
23  where three thousand feet of concrete runway
24  pavement failed and broke up into basketball
25  sized pieces due to inadequate subsurface

Page 45

1   drainage.  And just to complete it, it says,
2   many more examples could be cited but the
3   examples mentioned should clearly show the
4   devastating power of uncontrolled seepage of
5   water.
6       Now, help me understand.  I'm still
7   confused.  What is this power of uncontrolled
8   seepage that's referenced in this paragraph?
9   If you know.
10  A.  The power is -- I'm going to talk
11  engineering now.
12  Q.  That's fine.
13  A.  If you don't understand, I'll try to
14  break it down.
15  Q.  That's fine.
16  A.  In engineering we have different
17  energies called kinetic, potential, and water
18  is in that category potential.  It's sitting
19  there waiting to do something, go somewhere.
20  You get enough of it, it's weight itself
21  creates an opportunity for some destruction if
22  something in front of it is not strong enough
23  to hold it.  That is the power that they're
24  talking about.
25  Q.  Okay.  All right.  Now, the next

12  (Pages 42 to 45)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0012

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 46

1   subparagraph says basic considerations, and
2   then they make a reference to a laboratory.
3       Did you guys go to a laboratory and
4   watch some demonstrations?
5       A.   Yes.
6       Q.   Okay.  Do you remember what -- you
7   know, what those demonstrations showed?
8       A.   Yes.  We, um -- went to the Vicksburg,
9   laboratory, that's one of the research centers
10  for the Corps of Engineers, and there was a
11  mock model of the Mississippi River, and just
12  on that small scale showing the force of water
13  traveling throughout the United States from the
14  north down to the south in New Orleans, and
15  just watching that small model and the amount
16  of currents developed in that model as the
17  water was traveling, we generally could take a
18  multiplication factor and say, this is what's
19  happening throughout the United States.
20      Q.   I see.  Okay.  Now, they also talk
21  about a quicksand tank.
22      A.   Yes.
23      Q.   Do you remember the quicksand tank?
24      A.   Yes.
25      Q.   What was that all about?

Page 47

1       A.   There was a model there that explained
2   liquefaction.  It showed sand sitting dry and a
3   building on top of it, and the Corps
4   demonstrated if this sand is charged, we call
5   it, water placed in it --
6       Q.   And I'm going to slow you down.  Okay.
7   If the sand is charged.  That means if you put
8   water in the sand?
9       A.   Yes.
10          MR. TREEBY:
11              Objection to the form of the
12          question.  Leading.
13          MR. BRUNO:
14              I don't think that's leading,
15          Bill.
16          MR. TREEBY:
17              Well, that's fine.  I just have
18          to make my objection.
19          MR. BRUNO:
20              I know you do.  You'll get fired.
21      A.   Charge means water being forced into
22  it.
23  EXAMINATION BY MR. BRUNO:
24      Q.   All right.  Okay.
25      A.   Whether it's by hydraulic pressures,

Page 48

1   height or whatever, what happens to the
2   particles of the sand, the sand becomes fluid.
3       Q.   I see.
4       A.   And then given vibrations at that time
5   that building would collapse.  That happened in
6   some part of the world at one time where some
7   buildings --
8       Q.   All right.  So you mean just the fact
9   that the water went below the surface, moved
10  into an area where there was some sand and
11  because the water charged the sand --
12      A.   Yes.
13      Q.   -- that it somehow had some impact on
14  the ability of the foundation to hold up the
15  structure?
16      A.   It has a major impact.
17      Q.   Okay.  All right.
18      A.   Because the sand becomes fluid.
19      Q.   I see.  I see.  All right.  And then
20  on this page there are things called rate of
21  flow, coefficient of permeability, hydraulic
22  gradient, and area.  So when are all these
23  things?  What do those things relate to?
24      A.   Those are engineering calculations for
25  soils, and you can pretty much predict a

Page 49

1   soil 's behavior based on those characteristics
2   listed.
3       Q.   Okay.  All right.  And then let's see.
4   Let's just keep going here.  If you look at the
5   next page, VI.1.3, we have -- in the last
6   paragraph, it says, suppose that rather than
7   increasing the thickness of the sand an
8   impervious clay blanket top stratum had been
9   placed over the sand, in this case more weight
10  is provided to the sand and to a large extent
11  the seepage is stopped.  However, if the
12  pressure beneath the clay exceeds submerged
13  weight of the clay, an uplift pressure will
14  occur.  This --
15          MR. TREEBY:
16              You didn't read it correctly.
17          MR. BRUNO:
18              An uplift pressure will occur.
19          What did I miss?
20          MR. TREEBY:
21              You're reading the word pressure
22          when it says failure.
23      A.   No.
24          MR. BRUNO:
25              No.

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0013

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 50

1    MR. TREEBY:
2        Sorry. I must be at the wrong
3    paragraph then.
4    MR. BRUNO:
5        No, you're at the wrong sentence.
6    The next sentence is, this is commonly
7    noted as an uplift or heave failure.
8    MR. MALONE:
9        I read the same thing. It's an
10   uplift failure.
11   MR. BRUNO:
12       Yeah. Well, I just read uplift
13   failure.
14   MR. TREEBY:
15       You said pressure.
16   MR. BRUNO:
17       I'm sorry. If I said pressure,
18   it says failure.
19   EXAMINATION BY MR. BRUNO:
20   Q. What usually occurs in nature is that
21   the top stratum may be interspersed with root
22   holes, shrinkage, cracks or other
23   discontinuities which permit some of the sand
24   to escape through channels in the top stratum.
25   When seepage tends to localize instead of

Page 51

1    causing the entire top stratum to heave or
2    become quick, active erosion of subsurface
3    material occurs and concentration of seepage
4    occurs in localized channels. This is what
5    causes sand boils.
6        Okay. My goodness. What on earth is
7    heave?
8    A. Heave is the upward movement of a
9    material.
10   Q. Okay.
11   A. And it doesn't necessarily have to
12   always be soil, it can be concrete. You walk
13   the streets of New Orleans and there's a force
14   pushing something up from the bottom --
15   Q. Okay.
16   A. -- that's heave.
17   Q. All right.
18   A. In this particular case it's heave of
19   a clay blanket.
20   Q. And that somehow or other this heave
21   is related to seepage?
22   A. Yes.
23   Q. All right. Can you help me understand
24   how the seepage causes the heave?
25   A. Water has what's called head

Page 52

1    pressures. If you take -- if I can describe a
2    fish tank and you fill it up with water in the
3    inside, but if you cut a hole on the bottom of
4    that tank, the force of that water is very
5    strong and it's correlated to the depth of the
6    water. Called head pressure.
7    Q. Right.
8    A. When you cut that hole, that water
9    wants to go out of that hole, and it will push
10   the glass completely out of the way before you
11   finish cutting it. But as it's coming out it
12   has to go somewhere. So if there's a clay
13   blanket next to the fish tank that you built,
14   and then you also have a sand bottom
15   underneath, that sand layer is going to become
16   charged. When it becomes charged, at some
17   point if that clay blanket is not heavy enough
18   due to its weight to hold the head pressure and
19   stop the water from trying to go down, then
20   you'll get what's called an upheave in the clay
21   blanket, and then the water will come out of
22   the tank, go through the sand and come out
23   the --
24   Q. Okay. All right. Yeah. It's simple,
25   I guess. The water is moving, and if the water

Page 53

1    has nowhere to go it's going to go where there
2    is the least amount of pressure.
3    A. That's correct.
4    Q. So if there's something keeping it
5    from going below, something from keeping it
6    from going left or right, the only place else
7    it could go is up.
8    A. That's correct.
9    Q. And when it goes up, that's called a
10   heave.
11   A. That's correct.
12   Q. I see. Okay. Thank you. Now we're
13   talking about a sand boil. What on earth is a
14   sand boil?
15   A. A sand boil is -- I explained earlier
16   the process of charging the sand and the sand
17   becoming liquid. After it becomes liquid it
18   begins to flow. Once the clay blanket is
19   upheaved and an opening is created, then the
20   water -- the sand comes out like it's boiling.
21   And not under any heat effect or anything, but
22   it just comes running out on top of the clay
23   blanket, and then it continues the flow until
24   the sand that was underneath the clay blanket
25   is eroded, it's gone. It comes out. The sand

14 (Pages 50 to 53)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0014

MELVIN M.L. McELVEE (VOL I)                              4/23/2008

Page 54

1    comes out with it. With the water.
2        Q. All right. I got you. Now, let's go
3    to VI.1.5. It says here, in this first full
4    paragraph, Dams are rarely if ever constructed
5    on completely impervious material and
6    consequently there is seepage beneath the
7    structure as well as through it. The seepage
8    beneath the structure is commonly referred to
9    as underseepage. Since water seldom stands
10   behind a levee a sufficient length of time for
11   seepage to occur through the embankment,
12   underseepage is the primary problem associated
13   with levels.
14       Okay. Explain that to me, please.
15   Why is underseepage the primary problem
16   associated with levees?
17       A. Why? Because levees are man-made
18   structures constructed of impervious materials,
19   meaning clay-like, where water doesn't
20   penetrate it very easily. The construction of
21   the levee is controlled. It's compacted. It's
22   put in place. But anything below that, if you
23   don't go down deep enough, is existing
24   material, uncontrolled. So if you're not
25   taking and building a levee on another type of

Page 55

1    impervious material, you'll begin to have some
2    problems like in the fish the tank, you are
3    still got that little opening that that water
4    can travel through.
5        Q. I see. Did you know before you took
6    the course that underseepage was the primary
7    problem associated with levees?
8        A. Before I took the course, no.
9        Q. Okay. Well, I mean, you know, gosh,
10   it sounds -- this is something you can't see
11   with your eyes, right?
12       MR. TREEBY:
13            Objection to the form of the
14       question. Leading.
15   EXAMINATION BY MR. BRUNO:
16       Q. Is this something one can see with
17   your eyes, that is, the movement of the water
18   under the earth?
19       A. Not through the earth, no. You can't
20   see it. However, once it becomes a problem
21   you'll see residuals on the other side.
22       Q. Well, now, I could be crazy here, God
23   forbid, I don't want to be accused of leading
24   you, but it seems to me that if, A, you can't
25   see the underseepage under the ground until you

Page 56

1    already have a problem, and if underseepage is
2    a problem associated with levees, then I'm
3    wondering if it is important for somebody who
4    is interested in making sure the levee doesn't
5    fall down to evaluate the potential for
6    underseepage to damage a levee. Is that
7    something that you learned from this course?
8        MR. TREEBY:
9            Object to the form of the
10       question. I'll accept your objection.
11       A. That is something I learned from the
12   course.
13   EXAMINATION BY MR. BRUNO:
14       Q. Uh-huh.
15       A. That it was very important to
16   understand any impact of work associated with
17   levees.
18       Q. Why is that, Mr. McElwee?
19       A. Levees were constructed for safety
20   reasons, to protect something on another side
21   of it, whichever side it may be on --
22       Q. Right.
23       A. -- from water.
24       Q. Right.
25       A. And if you're doing any work relative

Page 57

1    to that levee that's impacting that levee, you
2    increase the risk of damage to property and to
3    lives. So at all times, the Corps would stress
4    to its quality assurance representatives,
5    inspectors, and project engineers, to monitor
6    things of those sorts when you're on a
7    construction project.
8        Q. Okay. All right. Now, things of
9    those sorts -- now, first of all, I mean, let
10   me just -- I'm just curious, because I'm a
11   contractor now. Okay? And I've been asked to
12   dig a hole, not on the levee, not even, you
13   know, within ten feet of the levee or fifteen
14   feet of the levee, I'm digging this hole
15   200 feet from the levee. Okay? Now, how am I
16   supposed to know, if I'm the contractor, that
17   my hole digging may or may not have some impact
18   on this levee?
19       A. As a contractor, how are you supposed
20   to know?
21       Q. Yeah. How do I know?
22       A. There's various ways that you would
23   know, because as a contractor, you're going to
24   have at least some data given to you by the
25   Corps of Engineers in the bid solicitation

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0015

MELVIN M.L. McELVEE (VOL I)                              4/23/2008

Page 58

1 documents. If you don't have that information,
2 the Corps is going to give you some information
3 to contact someone where you can find out
4 whatever you need to know prior to doing work
5 on a -- on a Corps of Engineers project in the
6 New Orleans area district.
7    Q.  Okay. Well, would you agree with me
8 that the ordinary guy on the street, okay, who
9 would maybe be, you know, engaged in -- he digs
10 holes in his backyard or, you know, on his
11 farm, that this business of underseepage as it
12 relates to the potential for harm to a levee,
13 that's not information that most folks have.
14    MR. TREEBY:
15       Objection. Leading.
16 EXAMINATION BY MR. BRUNO:
17    Q.  Would you agree with me on that?
18    MR. TREEBY:
19       Objection. Leading.
20    MR. BRUNO:
21       It's noted and it's not leading.
22    A.  I would agree with you that, no, most
23 people don't have that information, and most
24 people don't look for that information because
25 they don't have the knowledge to look for that

Page 59

1 information.
2 EXAMINATION BY MR. BRUNO:
3    Q.  All right. So -- well, if that's
4 true, I mean -- so I guess I'm still a little
5 confused, because I'm trying to understand,
6 then, if most people don't have the knowledge,
7 and you are asked by the Corps to do some work,
8 you know, around a levee, and again, I don't
9 know if it's 100 feet or 200 feet or 300 feet
10 or 500 feet -- let me ask you this question:
11 How close to a levee -- how close does the work
12 that's contemplated have any potential impact
13 on this seepage business, based upon the
14 training that you received at the Corps?
15    MR. LEVINE:
16       Objection. Vague.
17    A.  I didn't quite understand your
18 question.
19 EXAMINATION BY MR. BRUNO:
20    Q.  Okay. What I'm trying to get at is,
21 we've got a contractor that's been asked to do
22 some work. Okay? And so I guess the first
23 thing I'm sort of curious about is, at what
24 point does the underseepage issue become an
25 issue relative to the distance between the

Page 60

1 proposed work and the levee or flood control
2 project?
3    A.  If I can make clear, when I said most
4 people don't know, I'm speaking of personnel
5 that are not in the craft of engineering and
6 construction. But someone that's in the craft
7 of engineering and construction, seepage
8 becomes a problem before they begin to do
9 construction. That's one of the things they
10 have to consider. You must consider it.
11 It's -- in the planning process, if the Corps
12 issues a contractor a set of documents, the
13 Corps gives them information in the documents,
14 if it's not in the documents they're going to
15 tell you where to go to get that information
16 for your particular job, you can ask all the
17 questions you want --
18    Q.  Okay.
19    A.  -- get all the clarification you want
20 prior to you beginning your construction
21 process. If you are doing work next to a
22 levee -- I'm going to speak for the New Orleans
23 area because that's where I'm born and raised
24 and worked -- it's general knowledge for most
25 contractors that work in that area, the

Page 61

1 importance of understanding the soils and your
2 impacts.
3    Q.  Uh-huh.
4    A.  I don't know many contractors that
5 don't know the impact of working next to a
6 levee.
7    Q.  Okay. All right.
8    A.  And I definitely don't know any
9 engineer that doesn't know, because the
10 engineers are trained in that.
11    Q.  All right. So I guess someone who's
12 going to be asked to do this work, because
13 they've been asked to do the work in the first
14 instance, that is, they're a contractor or
15 engineer, when they get the knowledge that
16 there is a levee somewhere in the vicinity, you
17 would expect, based upon what you've just told
18 me, that they would at least make the
19 intellectual inquiry about whether or not that
20 may have some impact on their work.
21       Is that what you said?
22    MR. TREEBY:
23       Objection. Leading.
24    MR. BRUNO:
25       No, it's not.

16 (Pages 58 to 61)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0016

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 62

1  MR. TREEBY:
2      Is that what you're saying, and
3  you put about so two sentences of long
4  information. If that's not leading
5  there isn't a leading question.
6  MR. BRUNO:
7      And if that's leading there's no
8  such thing as a non leading question,
9  because all I'm doing is indicating
10 what he's already put on the record.
11 MR. TREEBY:
12     We disagree.
13 MR. BRUNO:
14     We will disagree on everything.
15 MR. TREEBY:
16     I doubt it.
17 MR. BRUNO:
18     I know we will. Okay?
19 Particularly now --
20 MR. TREEBY:
21     Typical hyperbole.
22 MR. BRUNO:
23     It's typical that, you know, you
24 would say things like leading and
25 technical objections when you don't

Page 63

1  loke what you're hearing, instead of
2  getting to the subject of the matter
3  which is what the witness has to say.
4  MR. TREEBY:
5      I would rather here this witness
6  testify instead of you, Mr. Bruno.
7  MR. BRUNO:
8      I think we've been hearing the
9  witness testify. You just don't like
10 what he has to say, which is
11 unfortunate for you.
12 MR. TREEBY:
13     I haven't objected to the
14 witness, I've objected to your leading
15 questions, and I will because I have
16 to protect the record. If you want
17 to -- if you want to hold off leading
18 objections until trial, if you want
19 to --
20 MR. BRUNO:
21     I'm not --
22 MR. TREEBY:
23     I'll be happy not the make the
24 objection.
25 MR. BRUNO:

Page 64

1      No. On the contrary, Bill, you
2  know as well as I do what you're
3  doing, and it's okay.
4  MR. TREEBY:
5      Okay.
6  MR. BRUNO:
7      Just do it. But for me to recap
8  what the witness said and ask him if I
9  have a correct understanding is not
10 leading because the evidence is
11 already on the record and I'm simply
12 wanting to make certain that I
13 understand what he's saying. That is
14 not leading.
15 EXAMINATION BY MR. BRUNO:
16    Q.  And to satisfy Mr. Treeby, why don't
17 you just tell us, then, what is, in your mind,
18 based upon the course that you took, the
19 process that would ordinarily be undertaken by
20 an engineer or by a contractor who is
21 contemplating doing some work around a levee.
22 And I'm just going to ask you to define what
23 around means. Give it up.
24    A.  What's to be anticipated by a
25 contractor or an engineer when constructing

Page 65

1  work around a levee would be the impact of the
2  work on the levee, not the impact of the levee
3  on the work. The levee is there. It's a
4  structure for a particular purpose. It's
5  almost like a building. If we're going to dig
6  a hole next to the building we have to consider
7  digging this big old hole next to the building,
8  what impacts -- what's going to happen to the
9  building, is it going to stay intact? Is it
10 going to stand? Is the levee going to stay
11 intact? Will the levee stand? There are --
12 varied and many degrees of assessments, we call
13 them, that a contractor or an engineer would
14 take into consideration when getting ready to
15 perform any works of this nature.
16     It's almost -- and I'm going to kind
17 of try to make a parallelism here. It's almost
18 like being a lawyer. I'm not a lawyer. But if
19 I'm going to take on that task I need to be
20 prepared and trained to. Such with the
21 contractor and engineer. If you're going to
22 take on the task of working around structures,
23 you need to have the knowledge of it. If you
24 don't, you don't need to be in that business.
25     It is -- an engineer and a contractor

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0017

MELVIN M.L. McELVEE (VOL I)                          4/23/2008

Page 66

1  has duties and responsibilities that are in all
2  courses, whether it's the Corps of Engineers'
3  or whether it's college courses, of
4  responsibilities to the public. And to say
5  don't worry about it, I'm not going to look
6  into, or it doesn't matter because that
7  structure is not a part of my job is a total
8  dereliction of your obligations to the public.
9      Public safety is number one. For any
10  contractor -- should be. If it's not, he
11  doesn't need to be in that business. Or any
12  engineer. And, um -- when you're taking on
13  that type of work, if you don't know what
14  you're doing you need to hire someone that
15  knows what they're doing.
16     Q.  All right.
17         (Brief recess.)
18  EXAMINATION BY MR. BRUNO:
19     Q.  All right. If we may, I would like to
20  just continue down the same page because I'm
21  curious about this. It says, Plate 3A shows
22  how underseepage can occur beneath a levee
23  system. At the normal river stage the water
24  table is below the relatively impervious top
25  stratum and no danger exists. And then it

Page 67

1  says, during flood stage, however, seepage
2  entering the substratum through the bed of the
3  river, riverside borrow pits or any other
4  opening in the top stratum creates an Artesian
5  head in the substratum under and landward of
6  the levee. The term Artisian simply means that
7  the water in the sand is under pressure. For
8  example, if a pipe or piezometer were placed
9  through the top stratum into the substratum
10  shown in Plate 3A, the water level in the pipe
11  would rise to the elevation of the dashed line,
12  piezometric head. The height of this column of
13  water above the substratum is the Artesian
14  head.
15      Now, do we have this Plate 3A in here?
16     A.  Yes, sir. That's it.
17     Q.  Okay. Here we go to Plate 3A. Now, I
18  guess the thing that first confuses me is what
19  is the difference between the potential for
20  damage when there is no flood stage versus when
21  there is flood stage? Help us understand that.
22     A.  Looking at Plate 3, Figure A, the top
23  page, if you see where they say normal river
24  stage, where this arrow is pointing at the
25  level of water --

Page 68

1     Q.  Why yes. I see that.
2     A.  -- okay, that sand stratum underneath
3  the impervious material, the clay, which is
4  hash marked diagonally --
5     Q.  Yes.
6     A.  -- it has a normal at charge of flow
7  through it. Water is going to go through it.
8  There's no problem there. In fact, if water
9  stayed at that level you wouldn't need a levee
10  because it's just doing its normal thing,
11  traveling through the earth.
12     Q.  Okay.
13     A.  The problem comes in when you have
14  extra water brought in by whatever source to
15  raise the level of water. And when you raise
16  that level of water, we go back to talking
17  about that head pressure, the weight of it
18  acting downward, that's when the problem comes
19  in. If you have a levee next to it which is
20  construct here, you don't have just this water
21  flowing in, you got the flood stage water which
22  is going down through this opening --
23     Q.  I see.
24     A.  -- creating more pressure. Now you
25  got pressure underneath that system --

Page 69

1     Q.  Okay.
2     A.  -- and it's going to go through its
3  weakest point. And it will create -- eat up
4  this layer and create a sand boil. There's a
5  figure of a sand boil on the bottom.
6     Q.  That B picture is a --
7     A.  Yes.
8     Q.  That little mound looking thing.
9     A.  That mound thing.
10     Q.  That's a sand boil.
11     A.  That's a sand boil.
12     Q.  I see. All right.
13     A.  Water is going to come out of that and
14  continue to flow. Now, that's a pretty looking
15  sand boil but they don't always look nice and
16  neat like that. In fact, if you see some
17  around here they'll never look nice and neat
18  like this, it will just be sand rolled out --
19     Q.  I see.
20     A.  -- in the area where it created the
21  boil.
22     Q.  So we're looking at A, and the water
23  is at its regular stage. So you're telling us
24  that -- I think, tell me if I'm wrong -- in the
25  normal stage of the river you're going to have

18 (Pages 66 to 69)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0018

MELVIN M.L. McELVEE (VOL I)                     4/23/2008

Page 70

1   water in that sand.
2      A.  Yes.
3      Q.  Okay.  All right.  But when you have a
4   flood stage, you obviously have more water.
5   Right?
6      A.  You have more water, and the
7   difference in measurement in feet between this
8   normal stage and that flood stage is the extra
9   added head pressure, we call it.
10     Q.  Okay.  Now, you see how the arrows are
11  going from left to right?
12     A.  Yes, sir.
13     Q.  Why is that?  Why aren't they going
14  the other way?
15     A.  Well, because the pressure of any
16  river is higher than the surfaces around it, so
17  the water wants the flow from the river, not
18  towards the river.
19     Q.  I see.
20     A.  Only in rain stages when it flows off
21  of hills you'll see it coming towards the river
22  on the top.
23     Q.  Got you.
24     A.  But anything at the surface of the
25  river and below wants to flow outward.

Page 71

1      Q.  Okay.
2      A.  Just like taking some water, pouring
3   it here, and if a bowl don't catch it it's
4   going to go out on the table.
5      Q.  All right.  Now, let me ask you this:
6   First of all, did you know what a borrow pit
7   was before you worked for the Corps?
8      A.  I had an idea only because my dad and
9   several of his friends was in construction,
10  truck hauling out of Bonne Carre Spillway.  I
11  knew there was a borrow source there.
12     Q.  Did the Corps teach you what a borrow
13  pit was?
14     A.  They taught me the in-depth study of
15  what a borrow pit was.
16     Q.  May I learn then what you learned from
17  Corps about what a borrow pit was?
18     A.  Yes.  I learned to classify the types
19  of materials in a borrow source.
20     Q.  What is it?
21     A.  A borrow source is anywhere you
22  collect material from one place to transport it
23  to another one.  I say collect material because
24  that material varies.  You can collect from a
25  rock quarry which is a borrow source.

Page 72

1      Q.  I see.
2      A.  And ship those boulders somewhere
3   else.  Still a borrow source.
4      Q.  Right.
5      A.  But you can collect sand from a borrow
6   source and ship it somewhere else for cement,
7   to manufacture cement.  Then you can collect
8   the clay material, which I've learned with the
9   Corps in the Bonne Carre Spillway at that time
10  was the sole source for impervious material,
11  and they restricted it to the Corps' use only,
12  and that's the material we were watching build
13  the levees with.
14     Q.  Okay.
15     A.  And the Corps would allow contractors
16  to go to designated areas in the Bonne Carre
17  Spillway or any other source.  You know, if the
18  contractor had a connection to some land
19  somewhere that he could get the same type of
20  material to be used in a levee, they allowed
21  him to go get that material and bring it in, so
22  to truck as far as sometime 25, 30 miles away.
23  Now I think it's further than that because
24  there's a demand for it.
25     Q.  All right.  So am I correct in

Page 73

1   assuming, then, that a borrow pit is something
2   that man creates?
3      A.  Definitely.  Well, creates as in for
4   his use.  But it's originally there by nature.
5      Q.  All right.  The stuff is there.
6      A.  Yes.
7      Q.  But it becomes a pit because man takes
8   it out of the ground, and when you removed
9   stuff from the ground you have a hole there.
10     A.  You have a hole there, that's correct.
11     Q.  All right.  So is a borrow pit a hole?
12     A.  Well, no, you done used it at that
13  point.  The borrow is what you've taken out of
14  it.
15     Q.  Oh, I see.  The borrow.  I'm with you.
16  The borrow is the word that you use to describe
17  the material that you actually remove and use.
18     A.  That's correct.
19     Q.  The borrow pit is what's left after
20  you take it out.
21     A.  That's correct.
22     Q.  So that's a hole.
23     A.  That's a hole.
24     Q.  Okay.  I'm with you.
25     A.  Well, can I clarify?

19  (Pages 70 to 73)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0019

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 74

1    Q.  Yes, of course.
2    A.  The pit is the area where you're doing
3  this.
4    Q.  Uh-huh.  Oh.  So the pit is a
5  location.
6    A.  That's correct.
7    Q.  All right.  Is there a word to
8  describe the hole that's created when one
9  removes the borrow from the borrow pit?
10   A.  There's several words.
11   Q.  What are those?
12   A.  Number one, a void.
13   Q.  A void?
14   A.  Because there's nothing left.
15   Q.  Got you.
16   A.  A hole.
17   Q.  Okay.
18   A.  A pond, because after it gets
19  recharged with water, then you can go fish in
20  it.
21   Q.  Got you.  Okay.
22   A.  Um -- and then there are other various
23  terminologies I just can't think of.
24   Q.  Okay.  I understand.
25       Now, why, if you know, do you see on

Page 75

1  this Plate 3A, why is borrow pit even shown?
2  Is it relevant at all to this whole business of
3  underseepage?
4    A.  Yes.
5    Q.  Why?
6    A.  Because the Corps is trying to
7  illustrate their particularity in where you're
8  digging your borrow pits, and the proximity and
9  the effects of it, like I mentioned earlier
10  assessments being made --
11   Q.  Right.
12   A.  -- on what could happen if you digging
13  too close to a levee, the undermining of that
14  levee, the undermining of that structure.
15  They're illustrating that point there.  What
16  you're doing is adding the extra charge of
17  water that potentially could happen because you
18  undermined that blanket right there.
19   Q.  Oh.  Okay.  I see.  So that obviously
20  before they dug the hole to take the borrow
21  from the borrow pit there was clay there.
22   A.  That's correct.
23   Q.  And the clay blocked the water from
24  coming --
25   A.  Is that correct.

Page 76

1    Q.  -- from going down below.
2    A.  That's correct.
3    Q.  Obviously so if you take the clay
4  away, you dig a hole, now the water's got a way
5  to get in --
6    A.  Travel.  A way to get in.
7    Q.  -- to the sand.
8       MR. TREEBY:
9          Objection.  Form of the question.
10  EXAMINATION BY MR. BRUNO:
11   Q.  I want to make sure I understand this.
12  And we'll note his coming objection to leading,
13  but is not.
14       When you remove the clay, you now have
15  an opening through which the water can pass to
16  the substratum below; is that correct?
17       MR. TREEBY:
18          Objection.  Leading.
19  EXAMINATION BY MR. BRUNO:
20   Q.  Is that what you said?
21   A.  That's correct.
22   Q.  That's what you said.
23       MR. TREEBY:
24          Objection.  Leading.
25   A.  That's correct.

Page 77

1  EXAMINATION BY MR. BRUNO:
2    Q.  All right.  Fine.  All right.  Now,
3  this whole course -- the intent of this course
4  was to teach you about the issues related to
5  underseepage, as you've told us.  Now, so what
6  I want to see if I can figure out is, what did
7  this course teach you, if anything, about how
8  to deal with the borrow pit to prevent seepage
9  problems, if it did at all?  I don't know,
10  maybe it didn't.  But did you guys -- were you
11  taught anything about that?
12   A.  We were taught quite a bit about it.
13  In fact, while I was working with the Corps,
14  um -- beginning at the New Orleans
15  international airport, coming around the
16  lakefront all the way to New Orleans, all of
17  those levees I was involved in.  Those levees
18  were adjacent to houses.  There were berms,
19  sort of, to stabilize the levees that would go
20  from the levee close to adjacent to some
21  backyards.  The berms were constructed to add
22  additional weight to keep any excess pressures
23  from water or the levee material itself from
24  counterbalancing and trying to, I guess have
25  rotational under-failures towards the homes.

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0020

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 78

```
 1        As a quality assurance rep we
 2   monitored those things during the construction
 3   and even beyond.  I mean, the Corps has an
 4   annual inspection that they take the engineers
 5   on to ride the levees.  The reason they ride
 6   those levees is to look for these type of
 7   things, see do they see any seepage or problems
 8   concerning underseepage.
 9        Q.  Yeah.
10        A.  So, yeah, we learn quite a bit.  I
11   mean, always -- in fact, I became so accustomed
12   do doing it I would find myself when I would
13   just travel like from here to Baton Rouge if it
14   was a surface road I was on and it was a
15   bright, sunny day and it hadn't rained in two
16   weeks and I saw water ponding next to a levee,
17   I would point it out to my wife, we've got some
18   underseepage there.  She thought I was crazy at
19   the time.  She say, what are you talking about?
20   And I said, we got some underseepage, and it's
21   probably minimum, but it's there.  But we
22   watched this whenever the river stage would
23   come up high, and then there was a potential
24   for more water to be dumped in the certain
25   area.  You know, so we learned quite a bit
```

Page 79

```
 1   relative to this.
 2        Q.  All right.
 3        A.  You know, that the Corps' -- at that
 4   time, to us, was our responsibility when
 5   watching levees.  I mean --
 6        Q.  Okay.  How close were those houses,
 7   the ones to which you just made reference that
 8   you had some concern about, to the flood
 9   control structure?
10        MR. LEVINE:
11            Objection.  Vague as to location.
12        Q.  I was going to answer that way.  It
13   depends on where you were.  You know, sometime
14   it could be fifteen feet away and then it could
15   be 65 and 70 feet away.  It depends on --
16   there's a lot of engineering calculations that
17   go into that --
18   EXAMINATION BY MR. BRUNO:
19        Q.  Right.
20        A.  -- to tell you how close or how far
21   you can be away from the structure, and what
22   you need to do in areas to supported that
23   structure.  So it varied.
24        Q.  Well, I'm -- in fairness to me, I
25   thought that you said that you guys on doing
```

Page 80

```
 1   your inspection took some particular interest
 2   in certain houses where you thought there may
 3   be a problem.  And what I was trying to learn
 4   is, was there some distance from the flood
 5   control structure where you had interest in
 6   ascertaining whether or not there was the
 7   potential for --
 8        MR. TREEBY:
 9            Object to the preamble of counsel
10        trying to justify himself.
11            Go ahead.  I thought you were
12        finished.  Excuse me.
13        MR. BRUNO:
14            Yeah.  Just let me finish.  Okay?
15        MR. TREEBY:
16            I'm sorry.  Apologize.
17        MR. BRUNO:
18            Now I forgot where I was.
19        A.  If the question is, is there a
20   particular requirement --
21        MR. TREEBY:
22            Objection.  Let's have a question
23        and an answer.
24   EXAMINATION BY MR. BRUNO:
25        Q.  Go ahead.  Ignore him -- the comments.
```

Page 81

```
 1        MR. TREEBY:
 2            Object to the responsiveness of
 3        the answer, then.
 4        MR. BRUNO:
 5            Fine.
 6        A.  There was no criteria for just looking
 7   at how close or far a structure was away from
 8   the levee to question the effects.  You know,
 9   everything depended on design, how wide the
10   levee base was versus how narrow it was,
11   whether there was sheet piling and a concrete
12   wall on top and no levee at all.  All of those
13   things vary.  So, no, there's no --
14   EXAMINATION BY MR. BRUNO:
15        Q.  Okay.  All right.
16        A.  -- particular measurement.
17        Q.  What is the relevance of a sheet pile
18   wall, if any, to this seepage issue?
19        A.  It's very relevant because it would
20   cut off flows of water at a particular depth.
21        Q.  Okay.
22        A.  In this case, if a sheet pile wall was
23   placed inside the levee, then this water here
24   would have to travel further down --
25        Q.  I see.
```

JOHNS PENDLETON COURT REPORTERS                       800 562-1285

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0021

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 82

1    A.  -- to go to the other side.
2    Q.  So is it important to know how deep
3  the sheet pile is if you're going to be doing
4  one of these engineering analyses?
5    A.  If you're going to do any type of
6  construction work its important to know how
7  deep the sheet pile wall needs to be.
8    Q.  All right.  Now, what are the
9  precautions that should be taken if one is
10  going to locate a borrow pit near a flood
11  control structure, if there are any precautions
12  that should be taken?  What do you do?
13    A.  There are several precautions that
14  must be taken, now -- or should be taken.  Like
15  I said, must be because some -- I have seen
16  contractors try to dig deep holes without any
17  protection.  But for the safety of your
18  personnel and to keep the hole from falling in
19  on you, you need to have some type of
20  calculation relative to how you're going to
21  retain the material that's outside of the area
22  you're digging, to keep it from falling in on
23  you, for one.
24    Q.  Okay.
25    A.  Um -- you need to be concerned with

Page 83

1  the adjacent area and flows.  You know, if
2  you're digging in an aquifer, if you're doing
3  digging next to a river channel, which way the
4  water is going, what is it going to do at a
5  particular time, to determine how deep your
6  sheet pile needs to be.
7    Q.  Uh-huh.
8    A.  Um -- even when installing the sheet
9  piling, you need to consider the structure.
10  And if it's on sand, and let's say you're going
11  the vibrate the sheet piling in, what is the
12  frequency of vibration on the sheets, is it
13  going to disturb the sand layers beneath it to
14  cause any additional impact?  Because while
15  you're vibrating, that sand is moving, the
16  earth is moving, and if something is heavy on
17  one side it may cause change in condition.
18    Q.  Okay.
19    A.  You need to be concerned with uplift
20  pressures of water underneath the sheets,
21  because the water is going to tend to go deeper
22  down, and the deeper it goes that's more head
23  pressure, and it will try to come back in your
24  excavated area.  So you need to think about
25  what you're going to do to retain the water

Page 84

1  that tries to come back in your excavated area.
2  A dewatering system, if you're going deep.
3    Q.  Uh-huh.  What's deep mean?
4    A.  Deep is 25 -- at least 20 feet or more
5  in depth.
6    Q.  Okay.
7    A.  Adjacent to any stream bed or water
8  table that's pretty high.  And normally here in
9  New Orleans the water table is very high, so if
10  you get anywhere below -- in sometimes in cases
11  less than fifteen feet you got to be careful.
12  If you're digging a grave, you got to be
13  careful.  If you go too deep soil will start
14  caving in.  So, yeah, those are all
15  precautions.
16    Q.  All right.  Now, if -- am I -- again,
17  looking at this Plate 3A, what they're showing
18  here in the plate is a cut through a clay
19  layer.  Now, so if you cut through a clay layer
20  into the sand, is there anything, or any
21  precautions that needs to be taken to deal with
22  that fact?
23    A.  Yes.  The same precautions that we're
24  talking about.  When you dig this hole --
25  they're not showing this in this illustration,

Page 85

1  but what are the pressures in the strata?  Any
2  contractor needs get -- A, if he doesn't know
3  how to do it, get some engineer to get him some
4  calculations on the underground pressures, such
5  that when you create this hole, and the water
6  level is at this stage --
7    Q.  Uh-huh.
8    A.  -- what's going to stop that water
9  from coming up on you while you're digging that
10  hole?
11    Q.  Okay.  All right.  Well, suppose
12  you're done.  All right?  You dug your hole and
13  you've removed from the hole whatever you've
14  been asked to remove from the hole, and you're
15  finished your work.
16      Is there any particular precaution
17  that needs to be -- first of all, is there any
18  need to file the hole?  Let's start with that.
19  Can you at least leave it open?
20    A.  Not next to a levee, no.
21    Q.  Why not?
22    A.  Because with that void, material
23  that's close around in the area, germane to the
24  area, is going to try to fill that void.  And
25  it may be the material that's supporting your

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0022

MELVIN M.L. McELVEE  (VOL I)                                    4/23/2008

Page 86

1  levee that's trying to fill that void.  And
2  when it's going over to file that void, then
3  you undermine the structure.
4      Q.  Okay.
5      A.  So then you got a major concern.
6      Q.  All right.  So is it then necessary to
7  fill the hole?
8      A.  In many cases, most cases, it is.  You
9  fill it with some material.  Whether it's the
10 same material you took out or whether it's --
11 in this case it would be two materials because
12 you'd fill it with -- if you go into the sand
13 layer you'll fill that with sand, but if you
14 penetrate that impermeable layer which is clay,
15 you need to fill it with some clay or
16 clay-based material --
17     Q.  I see.
18     A.  -- to keep the water from trying to
19 penetrate in the area or go up or down in that
20 area.  You have to put something there.
21     Q.  All right.  And is there any need for
22 compaction?
23     A.  If it's dry and you have sheet piling
24 and you can come back with some clay and you
25 can compact it, it's perfectly good to do that.

Page 87

1  But then there are cases when it may not be dry
2  but you'd have to inject what we call bentonite
3  with a trimey tool in the hole.
4      Q.  Okay.  Now, continuing, it says here
5  at the last sentence on Page VI.1.5, the amount
6  of underseepage and uplift pressure that may
7  develop landward of the levee or dam is known
8  to be related to the river and reservoir
9  stages, location of seepage entrance, extent of
10 thickness and imperviousness of the landside
11 top stratum, underground storage and geological
12 features.
13         MR. LEVINE:
14             Where are you reading from, Joe?
15         MR. BRUNO:
16             I thought I said VI.1.5, carrying
17         over to VI.1.6.  You with me?
18         MR. LEVINE:
19             I think so.
20 EXAMINATION BY MR. BRUNO:
21     Q.  All right.  Now, is it possible that
22 you could have an underseepage issue and not
23 know that you had an -- if you were not
24 knowledgeable about all these underseepage
25 issues, okay?  Is it possible you could have an

Page 88

1  underseepage issue but it wouldn't -- there
2  would be no problem caused until the level of
3  the channel or canal or reservoir, whatever it
4  is, got higher due to rain or hurricane or
5  flooding of some sort?
6          MR. LEVINE:
7              Objection.  Vague, compound,
8          ambiguous.
9      A.  You can know before it starts to rain
10 and flood that you got problems.
11 EXAMINATION BY MR. BRUNO:
12     Q.  You could know.  I'm just saying --
13     A.  You will know if there's -- depending
14 on the water table.  Like I say, when you're
15 digging -- in New Orleans, it's known not to
16 dig below six feet.  And most people are buried
17 above ground because the water table is so
18 high.  So soon as begin to dig, you'll begin to
19 see water and you'll have problems.  And there's
20 is no storm around.
21         Same thing with construction.  If
22 you're below the water table you're going to
23 begin to have problems.  You're going to see
24 water penetrating coming in.  And that's how
25 outside of raining, flooding or whatever.  If

Page 89

1  you're in the batture, we call it, batture is
2  when the lever comes up high and it flows
3  towards the levee, you know, that batture is
4  the area that stays dry on low river stage.
5      Q.  Right.
6      A.  If you're in the batture and you start
7  to dig in the river you're probably going to
8  start seeing, at some point, some water.  So
9  you'll see the problem.  It doesn't have to be
10 associated with a flood.
11     Q.  Right.  But my question was just the
12 reverse.  And that is, is the nature of what
13 you've been talking about all morning long,
14 this seepage business, is it something that
15 wouldn't create damage until the water in the
16 canal got much higher due to either excessive
17 rainfall or a flooding scenario?
18         MR. LEVINE:
19             Same objection.
20     A.  It will create damage before then.  I
21 mean, the Corps -- if I walk out of this room
22 today and walk up close to a levee and start
23 digging a hole right next to that levee and
24 it's not even flooding out here, and if it
25 wasn't flood season, believe me, a lot of Corps

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0023

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 90

1    employees would be out there to stop me.
2    Because it's going to have some impacts on that
3    levee without a flood stage.
4        EXAMINATION BY MR. BRUNO:
5        Q.  I know.  But what I'm asking is, is it
6    possible that you wouldn't see a sand boil
7    until you got to a flood stage?
8        A.  No, you may see -- you may --
9        Q.  I know you may.  I'm saying is it
10   possible that you wouldn't?
11       A.  It's possible you wouldn't if the
12   river stage is below your depth of digging.
13       Q.  Right.  Okay.  That's what I'm driving
14   at.
15       A.  Yeah.
16       Q.  Okay.  All right.  Then the next
17   series of subparagraphs are, starting on VI.1.6
18   and continuing, cutoffs, riverside or upstream
19   blankets, relief wells, berms, drainage
20   blankets, drainage trenches, sublevees, seepage
21   control related to structures such as retaining
22   walls, slabs, roadways, et cetera.
23           What do all those things relate to?
24           MR. TREEBY:
25               Objection.  Vague.

Page 91

1        EXAMINATION BY MR. BRUNO:
2        Q.  If you know, go ahead.  Do you think
3    my question is vague?
4        A.  It relates to controlling the flow of
5    water in an excavated area.
6        Q.  All right.
7        A.  All of those items relate to that.
8        Q.  All right.
9        A.  Some of the things I've taught on
10   already.
11       Q.  Right.  So all those are just methods
12   that the Corps is suggesting can be employed to
13   deal with seepage, right?
14       A.  Yes.
15       Q.  Okay.  All right.  Now, let's see.
16   Then we have ground water control during
17   construction, and that is what it is, right?
18       A.  It is what it is.
19       Q.  All right.  And then do I gather that
20   ditches and sumps, well points, deep wells,
21   electroosmosis cutoffs, those are just ways
22   that you can deal with ground water control
23   during construction?
24           MR. TREEBY:
25               Objection.  Leading.

Page 92

1        A.  Yes.
2        EXAMINATION BY MR. BRUNO:
3        Q.  All right.  Were you told by your
4    instructor when you took the course what you're
5    supposed to do with this information that you
6    had been taught during this 40 hours of soil
7    quality verification?
8        A.  Yes.
9        Q.  What were you told to do with this
10   information?
11       A.  Um -- I can remember vividly one of
12   the instructors said, now you all are
13   responsible for observing situations and
14   problems and finding -- contacting someone that
15   can find preventive measures to keep the public
16   safe.  If we see something, convey it to our
17   project engineers and/or any engineer in the
18   Corps of Engineers so that any potential
19   problems could be acted upon to reduce risk.
20       Q.  Okay.  Now, I've realized I've marked
21   this instructor document as 5, but it's got
22   highlighting on it.  I'm going to substitute a
23   clean copy.  But for now I'll give that to you.
24           All right.  Let's see.
25               Did you want to add something?

Page 93

1        A.  I wanted to mention, I have in my
2    hands the verification course, the cover
3    letter, and I wanted to know just, all that is
4    one exhibit?
5        Q.  No, no, no.  I just made the exhibit
6    the Instructor Listing, Earth Work Quality
7    Verification Training Course sponsored by -- by
8    the way, I neglected to ask you, this --
9            MR. TREEBY:
10               Joe, he has one.  Don't you want
11           to just use that one?  He has one
12           that's not marked up.
13           MR. BRUNO:
14               I might do that, Bill, but
15           frankly I don't like the way it's been
16           stapled.  The pages are not even.
17       EXAMINATION BY MR. BRUNO:
18       Q.  Take a look at the first three pages
19   where it says instructor listing.
20       A.  Yes, sir.
21       Q.  And then it says, you know, the
22   listing of the folks.  Would that have been in
23   the front of this binder?
24       A.  Yes.
25       Q.  Okay.  And then following this would

24  (Pages 90 to 93)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0024

Page 94

1  have been the various parts of the binder that
2  you've kindly offered to send to the copy
3  place?
4      A.  Yes.
5      Q.  Okay.  I understand now.  All right.
6  And you know, I guess what we'll do is we'll
7  mark that as Exhibit 6 and just attach it to
8  the deposition when we get it.
9          MR. BRUNO:
10             The whole binder.  We don't have
11         to attach it, but I'm going to mark it
12         as 6 and it will be available for
13         everybody to have copies of it, just
14         so we have a reference point.
15         (Exhibit 6 was marked for
16  identification and is attached hereto.)
17         MR. TREEBY:
18             With all due respect, Joe, I
19         think that whatever is marked as an
20         exhibit this witness ought to identify
21         under oath as the entire binder, not
22         in the procedure you're utilizing.  I
23         have know objection to getting it --
24  EXAMINATION BY MR. BRUNO:
25      Q.  Well, in the procedure I'm utilizing,

Page 95

1  are you willing to swear to us under oath that
2  you are going to submit to the photocopy place
3  a complete copy of what you have that you've
4  referred to as the course materials?
5      A.  So help me God.
6          MR. TREEBY:
7             My objection is noted.
8          MR. BRUNO:
9             It sure is, Bill.
10         MR. TREEBY:
11             Because it's not here for us to
12         cross-examine him on, obviously.  It's
13         just inappropriate.
14         MR. BRUNO:
15             How would you cross-examine him
16         on completeness even if it was here,
17         Bill?  I mean, that's ridiculous.
18         That's utterly ridiculous.
19         MR. TREEBY:
20             Your definition --
21         MR. BRUNO:
22             Guy says, here it is, it's
23         complete.  And you're going to say,
24         is it complete?  He's going to say,
25         yes, it's complete.  Whatever.

Page 96

1          MR. TREEBY:
2             Your definition of what I would
3         cross-examine him on is unacceptable
4         to me.
5          MR. BRUNO:
6             And you know what?  Your
7         cross-examination would be generally
8         unacceptable to me, I can assure you.
9         So anyway, let's not play games.
10         MR. TREEBY:
11             All of us aren't prescient like
12         you.
13         MR. BRUNO:
14             You're pressing it, Bill.
15         MR. TREEBY:
16             Prescient I said.
17         MR. BRUNO:
18             Oh, prescient.  I'm sorry.  I
19         didn't hear you.  I'm deaf, too.
20  EXAMINATION BY MR. BRUNO:
21      Q.  All right, let's where we are.  Now,
22  we're back to your CV.  Let's kind of walk
23  through.
24         MR. LEVINE:
25             Which one, 3 or 4?

Page 97

1          MR. BRUNO:
2             Well, they both refer to the same
3         thing, but I'm looking at Number 3.
4  EXAMINATION BY MR. BRUNO:
5      Q.  You left the Corps in '93.  All right.
6  Why did you leave?
7      A.  To, um -- I had began my own
8  construction firm at the time, and I couldn't
9  work for the Corps at the same time while
10  performing construction for other government
11  agencies.
12      Q.  Okay.  All right.  And once you left
13  the Corps, were you free to contract with the
14  Corps?
15      A.  After a certain period, yes.
16      Q.  Do you remember the period of time?
17      A.  I'm guessing.  I'm thinking it was
18  about two years or something to that effect.
19      Q.  All right.  That's fine.  Now, you
20  have on here a description of work with the
21  Louisiana Army National Guard.
22      A.  Yes, sir.
23      Q.  It says from 1994 to 2004, you were an
24  engineering officer.
25      A.  Yes, sir.

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0025

MELVIN M.L. McELVEE (VOL I)                                4/23/2008

Page 98

1    Q.  All right.  What does an engineering
2  officer do?
3    A.  Um -- the engineering officer in the
4  National Guard acts as a project manager, plans
5  construction, studies processes and procedures
6  relative to implementing particular projects
7  that may be handed down by higher headquarters,
8  planning men, material, equipment to perform
9  the construction, looking at construction
10 processes.
11   Q.  All right.  Now, did you do work
12 through McElwee Brothers during that same
13 period of time?
14   A.  Yes.
15   Q.  Okay.  All right.  Have you been
16 employed by anybody else that we haven't talked
17 about already?  We talked about the Air Force,
18 we talked about the United States Army Corps of
19 Engineers, we talked about the Louisiana Army
20 National Guard and we talked about McElwee
21 Brothers.
22   A.  I was briefly employed, I can't think
23 of the engineering firm, but there was a firm
24 that was doing some work for Entergy when they
25 were doing mapping -- digital mapping of all

Page 99

1  the utilities in Louisiana, Mississippi,
2  Arkansas.
3    Q.  Okay.
4    A.  I did that for a short period.  I
5  can't remember the exact dates.  But, um -- the
6  firm also does work for one of the Mobil Oil
7  companies, I can't think of the name of it
8  right now.
9    Q.  Now, Exhibit Number 4, what does this
10 describe?
11   A.  It describes the management side of
12 the experience.  Actually, in Exhibit 3 I did a
13 lot of performance work, field engineer on the
14 ground.  The Exhibit 4 is the management side.
15   Q.  Okay.
16   A.  There were times when there were
17 projects I didn't act as a field engineer on,
18 had superintendents working on, and while
19 working for McElwee Brothers I was strictly a
20 construction manager, you know, doing the
21 submittals, doing the, um -- scheduling,
22 coordinating with suppliers for equipment,
23 those type of things.  That's from the office.
24   Q.  Okay.  All right.  What was the
25 purpose of Exhibit 4?

Page 100

1    A.  To explain the management side of
2  experience.
3    Q.  Okay.  All right.  Looks to me like
4  you're very generally describing what your
5  skills are.  Is that right?
6    A.  That's correct.
7    Q.  Okay.  Now --
8    (Brief recess.)
9  EXAMINATION BY MR. BRUNO:
10   Q.  Okay.  Mr. McElwee, what I'd like to
11 talk about now is the work that McElwee
12 Brothers did for the United States Army Corps
13 of Engineers.
14   A.  Yes, sir.
15   Q.  In your résumé you reference a project
16 that I'm going to generally refer to as the
17 Dwyer Road drainage pumping station
18 improvements project.
19   A.  Yes, sir.
20   Q.  And I'm going to just say Dwyer Road
21 for short if that's okay with you and everybody
22 else in the room.
23   A.  That's fine.
24   Q.  My first question, sir, is did McElwee
25 Brothers do any other work for the Corps in its

Page 101

1  history; in other words, as you sit here today
2  looking back, have you done anything else for
3  the Corps other than the Dwyer Road project?
4    A.  Yes, sir.
5    Q.  Okay.  Let's start with the earliest
6  one, if you don't mind and give me the date,
7  tell me what you did.
8    A.  I can't remember the date.
9    Q.  That's fair.  Was it before Dwyer Road
10 or after?
11   A.  It was before Dwyer Road.
12   Q.  Okay.
13   A.  Out at the New Orleans District 's
14 parking lot, the parking lot extends over the
15 river batture, and there was some failure in
16 some of the piling underneath the parking lot,
17 and we did some repairs to the piling along the
18 river at that time.
19   Q.  That's on Leake Avenue?
20   A.  That's on Leake Avenue.
21   Q.  Okay.  Glad you fixed it, we park
22 there all the time the last couple of weeks.
23      What other work did you do for the
24 Corps, if any?
25   A.  There was some building work done at

26 (Pages 98 to 101)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0026

MELVIN M.L. McELVEE (VOL I)                          4/23/2008

Page 102

1    Leake Avenue in one of the maintenance
2    buildings, the new warehouse.
3        Q.  Okay.  And that's right up there on
4    the left?
5        A.  Right up there on the left -- as
6    you're facing the Corps from Leake Avenue, it's
7    too the left.
8        Q.  Okay.  All right.  Anything else?
9        A.  That was it.
10       Q.  Okay.  Good.  Now we're going to --
11   let's just talk about the Dwyer Road project.
12   Okay?
13       A.  Yes, sir.
14       Q.  All right.  Now, first, how did you
15   come to know about an opportunity to bid on the
16   Dwyer Road project?
17       A.  As a general contractor we get
18   notifications from various outfits that do
19   publications on government work coming out, and
20   that particular project was in an advertisement
21   that I used to subscribe to, a paper.
22       Q.  Uh-huh.
23       A.  And the various papers are the Dodge
24   Reports, the newspaper, Commerce Business Daily
25   Journal.  McElwee Brothers saw a job in there

Page 103

1    and we decided to go after it.
2        Q.  Okay.  All right.  Now, explain to me,
3    what is the process when one like yourself is
4    interested in making a bid; what is the first
5    thing that you do?
6        A.  For the bid process itself?
7        Q.  Yes, sir.
8        A.  The first thing you do is obtain the
9    plans and specifications on the job from the
10   owner, and you check with the owner to assure
11   that if there are any amendments or addendums
12   prior to the bid date that you need to be
13   notified of.  You get all those documents in
14   your possession.  As a prudent contractor --
15   and the reason I say prudent is because you do
16   have some contractors that just take those bid
17   documents and whip up some prices real quick to
18   bid on the job and move forward with it.  But
19   as McElwee Brothers, what I normally do is
20   either myself or some person that work for the
21   firm go out and do a reconnaissance on the job
22   as it is, prior to any construction.  And in
23   this particular job I performed some
24   reconnaissance.  I found out where the job was
25   located, what structures were around on the job

Page 104

1    as far as, you know, the levee structures, high
2    powered lines, gas lines, any potential
3    underground stuff.  I started doing
4    reconnaissance to see if I saw some visuals in
5    the field.  In fact, I take pre-bid photos.  I
6    normally keep a packet of photos to show the
7    job as it was before we ever bid the job.
8        Q.  Uh-huh.
9        A.  And the reason for that is because a
10   lot of times when you get into some work the
11   owners come back and say, well, you should have
12   known about this.  And then I say, well, if
13   it's in the photo I should have known, but if
14   it's not in the photo how would anybody have
15   known?  So we take, you know, take pre-bid
16   photos.
17       We also look at the documents, comb
18   the documents to see what we have.  And the
19   first thing that McElwee Brothers looks for
20   when it comes to subsurface work, meaning
21   driving piles or excavating or anything of that
22   sort, is to see if we got some soils borings.
23       Q.  Soil?
24       A.  Soil borings.
25       Q.  Borings.  I'm sorry.

Page 105

1        A.  Yes.  And because of my training with
2    the Corps of Engineers, that's the things I
3    immediately look for in any job, you know, if
4    I'm dealing with subsurface work.
5        (Brief interruption.)
6    EXAMINATION BY MR. BRUNO:
7        Q.  Nature and characteristics of the
8    what?
9        A.  Soil material.
10       Q.  There you go.  Okay.  All right.  Now,
11   let's just take a breather for a second.
12       Why are you interested in structures,
13   high power lines, gas lines, the things that
14   you can see with your eyes?  Okay?  What is the
15   relevance of those things to this bid?
16       A.  The relevance is to compare what is
17   visually out there versus the plans.  Because
18   there are times when the owner may not show a
19   utility in a plan.  That's going to impact your
20   work.  It's going to impact your labor, your
21   equipment and your materials because you've got
22   to deal it with.  It's going to impact your
23   cost.  You want to assure that the plans and
24   specifications are fair for everybody, such
25   that if I'm seeing it out here and another

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0027

MELVIN M.L. McELVEE (VOL I)                                4/23/2008

Page 106

1    contractor who's not taken a visual of it, and
2    don't see it in his plans, his price may be
3    different, but yet he hadn't considered things
4    that should have been out there visually.
5         You went to develop a relationship
6    with the owner that you're being fair in your
7    assessment and that maybe they should consider
8    some things they didn't consider, that you're
9    looking at these plans thoroughly.
10   Q.   Uh-huh.
11   A.   And sometimes some amendments come out
12   afterwards to answer the questions for all the
13   bidders that may have not done what you have
14   done as a prudent contractor, like McElwee
15   Brothers did.
16   Q.   Okay.
17   A.   To also give McElwee Brothers an
18   insight to its intended construction
19   procedures, labor, personnel, time frames, how
20   long it will take to do the calculations
21   relative to items of work on that particular
22   job.
23   Q.   Okay.  All right.  Now, what was the
24   relevance of the soil borings to this proposed
25   work?

Page 107

1    A.   On this particular job, the Dwyer Road
2    job, the relevance was the job was located in
3    the batture of the Industrial Canal.  It was so
4    close to the Industrial Canal that every level
5    over a period of time that may be high or low
6    on the canal was going to impact the work.  And
7    it was going to impact, potentially, structures
8    close to the work.  So McElwee Brothers wanted
9    to review, exploit, see and consider --
10   Q.   Okay.
11   A.   -- all potential impacts --
12   Q.   Okay.
13   A.   -- on that work.
14   Q.   Now, this whole morning you've told us
15   about what you learned at the course sponsored
16   by the geotechnical laboratory, Exhibit 5.
17        What I'm trying to figure out is, once
18   you found out where this job was going to be,
19   that is, that it was close to the Industrial
20   Canal or the Inner Harbor Navigation Canal and
21   that it regarded a floodwall, did you draw upon
22   your training that you got from the Corps
23   relative to the seepage issue that we've been
24   talking about all morning long?
25   A.   Every aspect of that job related to

Page 108

1    everything I've talked about this morning.  I
2    utilized my training to plan for that job.
3    Q.   Okay.  Now, did the plans and
4    specifications that were provided to you by the
5    Corps and on which you were supposed to make
6    this bid, did those plans and specifications
7    identify the potential for harm to the flood
8    control structure that was at the heart of the
9    job?
10   A.   Partially.
11        MR. LEVINE:
12        Objection.  Vague.
13        MR. BRUNO:
14        All right.  I don't know what the
15        vagueness is about, but maybe--
16   EXAMINATION BY MR. BRUNO:
17   Q.   Did I not -- tell me, first of all,
18   whether or not a flood control structure was
19   going to be involved in this proposed work?
20   A.   Yes.
21   Q.   All right.  And where was -- was the
22   proposed work going to be done on the batture?
23   A.   No.  Well --
24   Q.   Part of it.
25   A.   Part of it.

Page 109

1    Q.   Okay.  All right.  Now, let me ask you
2    this:  You said, I believe in answer to my
3    question, partially.  Would you explain your
4    answer.  Why did you say partially?
5    A.   In that particular set of plans and
6    specs, the Corps had a soils boring ledger in
7    the plans, and the Corps also had in the specs
8    a notification to the contractors if you wanted
9    to see any of the additional tests ran on the
10   materials relative to the job and soils,
11   contact the Corps of Engineers.  McElwee
12   Brothers contacted the Corps of Engineers
13   because when I worked as a quality assurance
14   represent the Corps of Engineers had a
15   laboratory at the district, and I knew what
16   soils data and information they kept, and I
17   want to see that as a contractor for this
18   particular job.  And so I inquired prior to bid
19   to see that information to complete my bid.
20   Q.   All right.  First, why; why did you
21   want to see that information?
22   A.   McElwee Brothers wanted to see that
23   information because any excavation that was to
24   be done on that particular job adjacent to the
25   floodwall was important.  I needed to see the

28 (Pages 106 to 109)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0028

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 110

1   soil makeup, the composition, where was the
2   sand layers? Were there any, um -- Artesian
3   springs below? Um -- then also, when we
4   performed the excavation in the batture, how
5   stable were the soils, you know? In that
6   particular job, the Corps required that the
7   contractor get a licensed professional civil
8   engineer to design the temporary excavation,
9   sheet piling, to submit his calculations and
10  everything, also, to design a dewatering system
11  to keep the water out of the excavated area
12  while work was being performed. And in order
13  to design the dewatering system, we needed to
14  see the composition of the materials, where, at
15  what level and what depths, how deep these
16  straws I call them, or pieces of pipe, needed
17  to go to suck the water to keep it from
18  creating sand boils in the excavated hole.
19  Q.  Okay. Did the Corps give you the
20  information that you requested?
21  A.  No. Not on that job. Initially.
22  Q.  Now, wait. When you said in that job,
23  at this point let's be clear for the record.
24  We are at the pre bid stage.
25  A.  Yes.

Page 111

1   Q.  And you're trying to draft a bid.
2   A.  Yes.
3   Q.  All right. So your testimony is that
4   you asked for soil boring information as a part
5   of your effort to write a bid, and they didn't
6   give it to you.
7       MR. TREEBY:
8           Objection. Leading.
9   EXAMINATION BY MR. BRUNO:
10  Q.  Is that what you said?
11  A.  That's what I said.
12      MR. TREEBY:
13          Objection. Leading.
14      MR. BRUNO:
15          All right. Whatever.
16      MR. TREEBY:
17          The record says what he said,
18      Mr. Bruno.
19      MR. BRUNO:
20          Mr. Treeby, we have a difference
21      of opinion as to whether or not it's
22      appropriate for a questioner to
23      clarify the answer for the questioner.
24      MR. TREEBY:
25          If that was your purpose, then it

Page 112

1       clearly was leading.
2       MR. BRUNO:
3           Okay. Fine. Whatever. I know
4       you don't like these answers and I'm
5       not apologizing to you.
6       MR. TREEBY:
7           I like the answers I just don't
8       like your testimony.
9       MR. BRUNO:
10          I don't know -- I keep saying --
11  EXAMINATION BY MR. BRUNO:
12  Q.  Mr. McElwee, am I testifying here or
13  are you testifying here?
14  A.  I thought I was testifying, answer the
15  questions.
16      MR. TREEBY:
17          Objection.
18      MR. BRUNO:
19          I thought you were, too. Maybe I
20      don't understand what's going on here
21      but I just got to deal with it.
22      MR. TREEBY:
23          Now -- in preparing.
24  EXAMINATION BY MR. BRUNO:
25  Q.  Now, in preparing your bid, what

Page 113

1   consideration, if any, did you give to
2   precautions that you felt you needed to take in
3   order to address the potential for damage to
4   the flood wall?
5   A.  Would you please repeat that question?
6   Q.  Okay. All right. And let me just
7   walk through it. You went to the site, you've
8   told us, you saw that the site included a
9   floodwall. Right?
10  A.  Yes.
11  Q.  All right. And you saw, from the
12  plans, that the plans called for the removal of
13  part of this floodwall, right?
14      MR. TREEBY:
15          Objection. Leading.
16  A.  Yes. That plans illustrated that, and
17  I saw in the area during the pre-bid photos of
18  what needed to be demolished.
19  EXAMINATION BY MR. BRUNO:
20  Q.  Sure. I'm just trying to get some
21  background so I can ask you the questions.
22  A.  Uh-huh.
23  Q.  And did you, at the time that you were
24  preparing the bid, have any understanding as to
25  whether or not the proposed work may have an

29 (Pages 110 to 113)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0029

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 114

1  impact on the flood control structure that was
2  there?
3      A.  Yes.
4      Q.  And I think you've already said this,
5  but did that work have the potential of
6  creating underseepage problems?
7      A.  Yes.
8      Q.  And did you, in preparing your bid,
9  consider precautions that may have been
10  necessary, based upon that, these previous
11  statements, to deal with the potential
12  underseepage problems?
13      A.  Yes.
14      Q.  All right.  Now, what exactly did you
15  build into your bid to address those issues?
16      A.  There was engineering consultation
17  cost that was incorporated to deal with those
18  issues, to have a design engineer available,
19  within 24 hours -- eight hours, really, that's
20  the concept we used -- to be available to
21  answer any questions and come out to deal with
22  any issues on that particular job.
23      Q.  Okay.  Okay.  I neglected to ask you,
24  but what was the frame of time when you learned
25  about the potential for contracting with the

Page 115

1  government and, you know, you actually
2  evaluated the bid and then submitted the bid,
3  what was the approximate time frame?
4      A.  On this particular job it actually was
5  two years.  Because the Corps brought it out
6  initially as an I think an open competitive bid
7  project, then they took it off the market and
8  made it 8A.  That's a program with the U.S.
9  Small Business Administration that allows
10  minority contractors to get into the open
11  market of bidding.
12      What the Corps would do was select
13  certain projects to be bidded by contractors
14  certified by the Small Business Administration
15  to bid 8A projects.  So that made the process
16  longer.  We looked at it and it was about two
17  years later before we actually started bidding
18  on it.
19      Q.  Okay.  All right.  Let me just clarify
20  something.  In answer to the question about
21  what precautions were taken relative to
22  underseepage, I think you testified that you
23  had included in the bid package the cost of
24  engineering services.  Is that what you said?
25      A.  Yes.

Page 116

1      Q.  All right.  What I wanted to know is,
2  did it indicate the type of engineer that you
3  had contemplated, that is, civil versus
4  geotechnical versus soils versus structure,
5  versus -- you know, was it -- or was it just
6  general?
7      A.  The Corps had a specification for the
8  specific type of engineer in the bid packet,
9  which was a civil engineer familiar with this
10  area and construction within this area;
11  however, McElwee Brothers, because of other
12  sections of those plans, needed an engineer
13  that could be versatile in traffic management
14  and versatile on structures.  We chose an
15  engineer that was with a firm and had the
16  capabilities to cover all those areas.
17      Q.  Okay.  All right.  Now, did the bid
18  package include engineering services for soils
19  evaluations, or was that something that you
20  proposed as part of your proposal?
21      A.  Initially, McElwee Brothers for its
22  proposal saw this evaluation, did that on its
23  own.
24      Q.  All right.  The soils stuff came from
25  McElwee, not from the government, right?

Page 117

1      A.  That's correct.
2      Q.  All right.  At the end of the day, you
3  guys got the contract, obviously?
4      A.  Yes.
5      Q.  All right.  About when was the
6  contract signed?
7      A.  I believe the contract was signed
8  around 2001, if I'm not mistaken.
9      Q.  All right.  Okay.
10      A.  The early part.  First quarter, I
11  believe.
12      Q.  All right.  Now, Mr. McElwee, we've
13  been provided some documents by the Orleans
14  Levee District, and before the deposition I
15  gave you a chance to look at these documents.
16  Right?  I told you I was going to ask you some
17  questions about them, right?
18      A.  Yes.
19      Q.  Okay.
20      MR. BRUNO:
21          And I don't have copies of this,
22      but I'm happy to make copies of this
23      thing.
24  EXAMINATION BY MR. BRUNO:
25      Q.  We just got these what, two days ago?

30 (Pages 114 to 117)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0030

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 118

1    MR. TREEBY:
2        If you're going to ask him
3    questions about documents, could we
4    have a copy before you ask the
5    questions so we know what we're
6    dealing with?
7    MR. BRUNO:
8        We're happy to do that for you,
9    Bill --
10   MR. TREEBY:
11       Thank you.
12   MR. BRUNO:
13       -- but it's not my job.  Okay?
14   I'm happy to do it.  I want to make
15   that crystal clear for the record,
16   since I was told by your people the
17   same exact thing, it wasn't your job
18   when I was in Boise, Idaho to get
19   documents for my deposition.
20   MR. TREEBY:
21       You were taking the deposition.
22   MR. BRUNO:
23       Exactly.  And you're taking this
24   deposition, as well, aren't you?
25   MR. TREEBY:

Page 119

1        I don't have the documents you're
2    talking about, so it would be helpful
3    if you would --
4    MR. BRUNO:
5        And I will be helpful.  I just
6    want to make the point, that's all.
7    MR. TREEBY:
8        I will tell you every time I take
9    a deposition, every time we take a
10   deposition in this case, we have and
11   we will provide copies of the
12   documents we're using to all counsel.
13   MR. BRUNO:
14       I don't know if I'm using any of
15   these documents.
16   MR. LAMBERT:
17       There's a lot of lawyers here,
18   Bill.
19   MR. TREEBY:
20       We'll do whatever it takes.
21   We've got copies.
22   MR. BRUNO:
23       All right.
24   EXAMINATION BY MR. BRUNO:
25   Q.  First, can you describe for me the

Page 120

1    ground, talking about the turf on which this
2    project was to be done.
3    A.  Please clarify for me what you men.
4    Q.  In other words, what piece of
5    ground -- what piece -- if I -- you know, what
6    was, for example, the size of the work site?
7    Let's start with that.
8    A.  Okay.  The size of the work site was
9    approximately 600 feet by 60 feet.
10   Q.  Okay.  Now, the 60 feet, was that
11   along the length of the flood control
12   structure?
13   A.  No.  That was perpendicular to the
14   length.
15   Q.  So the 60 feet went into the --
16   A.  The 60 feet was parallel to the
17   flood --
18   Q.  So it was along the flood wall.
19   A.  Yes.  The 60 feet was, I'm sorry.
20   Q.  All right.  Now, how far landward did
21   the construction site go, that is, from the
22   floodwall toward the land?  Did it go very far
23   into the land side?
24   MR. TREEBY:
25       Objection.  Vague.  I don't

Page 121

1        understand the question.
2    MR. BRUNO:
3        You don't know the difference
4    between the land side and the water
5    side of a flood control project?
6    MR. TREEBY:
7        I'm sorry, joe.  I'm not as smart
8    as you.  I just don't understand your
9    yes.  You don't have to clarify it if
10   you don't want to.
11   MR. BRUNO:
12       I'm trying to.  I'm just sort of
13   mystified how in all the depositions
14   we've taken that there's some
15   confusion about the land side and
16   water side of a floodwall.  But that's
17   okay, Bill, I can deal with it.
18   A.  Speaking in terminology that I have
19   learned with the Corps of Engineers, I'm going
20   to say flood side and protected site.
21   EXAMINATION BY MR. BRUNO:
22   Q.  That's fair enough.  We'll use that.
23   Flood side -- and for Mr. Treeby, what is the
24   flood side?
25   A.  The flood side is the batture towards

31 (Pages 118 to 121)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0031

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 122

1  the canal or towards the river.  That's the
2  side where the water rises and you're trying to
3  retain it at.
4      Q.  Okay.  Let me guess.  What is the
5  flood side now?  I'm sorry.  The protected
6  side.
7      A.   The protected side is the other side
8  of where the area you're protecting, the -- you
9  say land side.
10     Q.  Okay.
11     A.  It's where the homes are or where the
12 city is, or where the whatever area you don't
13 want water to penetrate.
14     Q.  And what's the dividing line between
15 the flood side and the protected side?
16     A.  Flood control structure, whether it's
17 the levee or whether it's an I-wall or T-wall
18 or a sheet pile.
19     Q.  In this particular instance,
20 Mr. McElwee, what was the nature of the flood
21 control structure, was it a levee, a T-wall or
22 an I-wall?
23     A.  It was an I-wall and T-wall.
24     Q.  I-wall and T-wall.
25     A.  Yes.

Page 123

1      Q.  Did the T-wall have any earth berm
2  component?
3      A.  Yes.
4      Q.  Okay.  Did the I-wall have an earth
5  berm component?
6      A.  Yes.
7      Q.  Okay.  Can you give me some sense
8  given I think you've already testified it's
9  about 60 feet of length of this flood control
10 structure, how much of the 60 feet was T-wall
11 and how much of the 60 feet was I-wall?
12     A.  For clarification, I would like to
13 mention that the T-wall itself was about 60
14 feet.
15     Q.  Oh.  Sorry.
16     A.  We had to take out another section of
17 I-wall for traffic to come through.  And the
18 section we took out there I think was
19 40 feet --
20     Q.  All right, sir.
21     A.  -- of I-wall.
22     Q.  Tell me if I'm wrong, but did that
23 make the work site then 100 feet in width?
24     A.  Yes.
25     Q.  Okay.  All right.  Now, I've got a

Page 124

1  picture now, and I've got 100 foot width on my
2  flood control structure and I'm -- I think I'm
3  understanding that that work site goes into the
4  water 's edge on the flood side.  Right?
5      A.  That's correct.
6      Q.  Okay.  Now what I was trying to learn
7  is, how far on the protected side, or landward,
8  if it went at all, did the work site extend?
9      A.  About 80 feet.
10     Q.  80 feet.
11     A.  Yes.
12     Q.  Okay.  I got you.  All right.  Now,
13 did you guys erect any sort of barrier or
14 fencing to demarcate this construction sites?
15     A.  Yes.
16     Q.  What did you use to demarcate the
17 site?
18     A.  Um -- we had to install chain-link
19 fence.
20     Q.  Okay.
21     A.  I think it was between 6 or 8 feet,
22 throughout the whole construction site to --
23     Q.  Okay.  All right.  Now, it's easy for
24 me to understand that you would have the
25 chain-link fence on the protected side.

Page 125

1          You've got 100-foot length, and you've
2  got 80 feet until you get to the flood control
3  structure, right?
4      A.  Correct.
5      Q.  All right.  Now, did you have any
6  demarcation on the flood side of the site?
7      A.  Yes.
8      Q.  All right.  What did you have on the
9  flood side of the site?
10     A.  Same fencing.
11     Q.  All right.  So we had our chain-link
12 fence that went all the way from the flood
13 control structure to the water 's edge, right?
14     A.  Yes.
15     Q.  Okay.  And that would be north and
16 south, right?
17     A.  Yes.
18     Q.  Okay.  And by the way, am I wrong, I
19 don't want to be accused of leading, but the
20 Industrial Canal generally goes from north to
21 south, right?
22     A.  That's correct.
23     Q.  All right.  And the work that you guys
24 were contemplating to do was on the east bank
25 of the Industrial Canal, right?

32 (Pages 122 to 125)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0032

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 126

1    A.  That's correct.
2    Q.  All right.  And it was -- can you give
3  me some landmarks, bridges or the like, that
4  would assist us in learning where the work site
5  was?
6    A.  The work site was located north of the
7  Danzinger bridge, which is Chef Menteur
8  Highway, Highway 90, I believe it is, it was
9  north approximately maybe a quarter of a mile.
10   Q.  From?
11   A.  The Danzinger bridge.
12   Q.  The Danzinger bridge.
13   A.  Along the canal.
14   Q.  Along the canal.  Now, Mr. McElwee,
15  since hurricane Katrina, have you become aware
16  of the fact that there was at least two
17  failures of the flood control structure in the
18  area of the Lower Ninth Ward?
19   A.  Yes, I have.
20   Q.  All right.  And the reason I'm asking
21  the questions, sir, is I'd like to know how far
22  from the north break, okay, your construction
23  site was.  But before I ask that, do you know
24  generally where the north break that occurred
25  during Katrina was located?

Page 127

1    A.  My knowledge of the north break.
2    Q.  Just where it was, not how -- just
3  where.
4    A.  Location.
5    Q.  Location.  Nothing else.
6    A.  By the Florida bridge, I believe it
7  is, south of the Florida bridge -- southeast --
8    Q.  That's right.
9    A.  -- from the Florida bridge.
10   Q.  Okay.  Now, having established that,
11  so we're south of Florida and you're north of
12  Danzinger.
13   A.  Yes.
14   Q.  All right.  Are you able, sir, as you
15  sit here today, to give us a general
16  understanding of the distance between the north
17  break and the construction site?
18        MR. TREEBY:
19          Objection.  Vague.  You didn't
20        say what construction site, and
21        there's -- you started talking about
22        areas near --
23        MR. BRUNO:
24          Okay.  Bill, I thought we were
25        talking about the construction site

Page 128

1  that he was working on.
2        MR. TREEBY:
3          That's --
4        MR. BRUNO:
5          We've spent a lot of time on that
6        already, but if that's unclear to you
7        let me just clarify it.
8        MR. TREEBY:
9          Thank you.
10  EXAMINATION BY MR. BRUNO:
11   Q.  Sir, when I asked you the question
12  about the distance between these two locations,
13  first location is the north break which you've
14  identified for us, and the second location is
15  your, the McElwee Brothers', construction site
16  about which we've been talking.  And of course
17  we've not talked about any other construction
18  site.  But anyway, what is the distance, if you
19  can, between those two sites?
20   A.  The distance from the north break, and
21  that I described earlier, and McElwee Brothers'
22  project, the Dwyer Road project, is
23  approximately a half a mile.  I'm thinking.
24   Q.  I know you didn't measure it, but
25  there's some distance between the two?

Page 129

1    A.  Yes.
2    Q.  All right.  Do you know whether or not
3  there's a pump station in or around the
4  location of the north break that's operated by
5  the Sewerage & Water Board?
6    A.  Yes.
7    Q.  Okay.  You guys weren't working on
8  that pump station, were you?
9    A.  That pump station was an unmanned pump
10  station.  We weren't working on it.  Pittman
11  was working on that pump station.
12   Q.  All right.  Yours was north of that.
13   A.  No, that pump station was actually
14  what we were tying into.  Pittman was building
15  a new pump station, and it was an unmanned
16  station with a 50-foot tube that went alongside
17  of our job.  They was inside of our
18  construction area.  That's the only pump
19  station I'm aware of.
20   Q.  Okay.  Let me grab us a map, if you
21  don't mid, and see if I can help us out here.
22        (Off the record.)
23  EXAMINATION BY MR. BRUNO:
24   Q.  All right.  First of all, for the
25  record, we have all seen this map a hundred

33 (Pages 126 to 129)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0033

1  times. This is the Times-Picayune flood map.
2  Let me just ask you generally if it's, sir, in
3  your opinion, this generally accurately depicts
4  the Industrial Canal relative to the bridges
5  that cross the Industrial Canal?
6      A. Yes, it does.
7      Q. Can you show me the location of the
8  north break.
9      A. It's generally in this location.
10     Q. All right. And where -- what is the
11 bridge there?
12     A. Danzinger.
13     Q. No, no, no. Maybe I'm confusing you.
14 I thought you told me the location of the break
15 in the levee in the Lower Ninth Ward was --
16     A. Around the Florida Avenue bridge.
17     Q. Florida. So where's Florida?
18     A. From my looking at this map, this
19 should be Florida here.
20     Q. It's under I-10?
21     A. It's south of I-10.
22     Q. All right. Is it close to I-10?
23     A. It's close to I-10, yes.
24     Q. All right. Now, where is the
25 Danzinger bridge?

1      A. Right here. Chef Menteur Highway.
2      Q. Okay.
3      A. Highway 90. They don't have it on
4  here, but Chef Menteur Highway.
5      Q. So it's Chef Menteur Highway is the
6  Danzinger bridge.
7      A. Yes.
8      Q. Okay. All right. Now you see here
9  where this star is on the map?
10     A. Yes.
11     Q. With the arrow?
12     MR. TREEBY:
13         I object.
14     MR. BRUNO:
15         You can object all day long and
16     all night. Make your objection.
17     MR. TREEBY:
18         Thank you, Joe. Thank you.
19     MR. BRUNO:
20         Go ahead.
21     MR. TREEBY:
22         I object to the use of this map
23     unless you're going to attach it and
24     mark where this witness has indicated
25     where he believes the north breach is.

1      Mark it so we have a record of what
2  this witness said. That's what I'm
3  going to ask.
4      MR. BRUNO:
5          That's fine. That's fine. And
6      but I think is record pretty clear, we
7      have a videotape, Bill, and he's got a
8      picture of where he pointed. If that
9      isn't clear, I don't know what is, but
10     I'm happy to help you any way I can.
11 EXAMINATION BY MR. BRUNO:
12     Q. Now, Mr. McElwee --
13     MR. TREEBY:
14         So this is Exhibit 6? Is that
15     what it is?
16     MR. BRUNO:
17         No, I'm not marking it. If you
18     want to mark it -- it's on the
19     videotape. I would mark a smaller
20     version so that it could be attached,
21     which I'm happy to do, an 8 x 10.
22     (Exhibit 6 was marked for
23 identification and is attached hereto.)
24 EXAMINATION BY MR. BRUNO:
25     Q. But anyway, you see these two stars

1  with the arrows?
2      A. Yes, sir.
3      Q. All right. Do you know whether or not
4  those depict the locations of the breaks of the
5  Industrial Canal wall on the --
6      MR. TREEBY:
7          Objection. Leading.
8  EXAMINATION BY MR. BRUNO:
9      Q. On the Lower Nine?
10     MR. TREEBY:
11         Objection. Leading. That's not
12     where the witness indicated they were,
13     and now you've suggested to him where
14     they are. That's specifically
15     objectionable leading questioning.
16     MR. BRUNO:
17         No. Oh, Bill, no it's not. I
18     said, do you know whether or not the
19     star and the arrow reflects where the
20     breaks are? Yes or no? I know you
21     want to play a game and do your little
22     silliness, but it's just not fair and
23     I'm not going to tolerate it.
24 EXAMINATION BY MR. BRUNO:
25     Q. Go ahead.

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0034

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 134

1    A.  This is a break.  There was some
2  overtopping in this area.
3    Q.  Okay.
4    A.  This is a break, and I'm familiar with
5  this break that's, um -- south of Claiborne.
6  That's what I call it, but this connects into
7  Claiborne.
8    Q.  All right.  Well, all I'm trying to
9  get a sense is that, where the lower Ninth Ward
10  was --
11    A.  Yes, I'm familiar with that.
12    Q.  You're familiar -- are you familiar
13  with the Lower Ninth Ward?
14    A.  I'm familiar with the lower Ninth
15  Ward.
16    Q.  How far from your work site was the
17  Lower Ninth Ward?
18    A.  Okay.  Now that's a greater distance.
19  That I can't tell you what it is, but it's more
20  than a half a mile.
21    Q.  Okay.  All right.  All I'm trying to
22  do is get a distance here, I'm not trying to
23  play games or trap you or trick you, as
24  apparently Mr. Treeby --
25    A.  If I had to give an approximate, I

Page 135

1  would say maybe somewhere between two and five
2  miles --
3    Q.  Okay.  All right.  Can we agree it's
4  not close -- the two are not close to each
5  other?
6    A.  Yes.  We can agree.
7    Q.  All right.  Thanks.  All right.  Thank
8  you.  And we'll -- we're going to ask Stephanie
9  to print out a color copy of an 8 x 10 version
10  of that.
11        All right.  Now, we're talking about
12  the work site.  Did you know who owned the land
13  underneath the work site?
14        We got three components, we've got --
15  you've already told us, the protected side, the
16  flood or the flood control structure, and then
17  we have the flood side.
18    A.  If my memory serves me correctly, the,
19  um -- Port Commission either owned it or had
20  control of it during our construction process.
21  That's where most of the entities that service
22  New Orleans received their products.  So the
23  Port Commission, and they were involved in it.
24    Q.  Okay.  Do you know who owned the flood
25  control structure, that is, the T-wall, I-wall

Page 136

1  and the -- any berms that may have been
2  associated with it?
3    A.  I don't know directly, but I know the
4  New Orleans Levee Board was involved.
5    Q.  Okay.
6    A.  I don't know who owned it.  You know,
7  I can't tell you the titles of who owned that
8  structure.
9    Q.  Do you know whether the Sewerage &
10  Water Board owned any of the land underneath
11  this construction site?  If you know or don't?
12    A.  I don't know, but I know they're
13  responsible for maintaining the pumps after the
14  structure was going to be built.  So I know
15  they were involved in that project because of
16  that particular reason.
17    Q.  All right.  Do you know if the New
18  Orleans Sewerage & Water Board owned any
19  buildings or equipment or piping or the like
20  that went over this construction site?
21    A.  Yes.
22    Q.  All right.  What was your
23  understanding of what the Sewerage & Water
24  Board owned?
25    A.  They owned, and like I said before, an

Page 137

1  unmanned pump station that operated on the end
2  of Dwyer Road where it intersected with, um --
3  the flood construction area, 50-inch line that
4  traversed underneath the flood control
5  structure on out to the canal.
6    Q.  Okay.  The pump itself, was it on the
7  construction site or off of the construction
8  site?
9    A.  It was off the construction site.
10    Q.  Off.  Okay.  So that the -- based upon
11  your testimony, I want to have a clear
12  understanding, the only thing before the work
13  began that the Sewerage & Water Board owned was
14  that pipe --
15    A.  The pipe.
16    Q.  -- that went --
17    A.  Through the construction site.
18    Q.  Okay.  All right.  Did you know
19  whether or not there had been any agreement
20  between the Board of Commissioners of the
21  Orleans Levee District and the City of New
22  Orleans for the use and benefit of the Sewerage
23  & Water Board that regarded this project?
24    A.  I knew there was some relationship,
25  but what agreements were there, that I did not

35 (Pages 134 to 137)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0035

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 138

1  know.
2      Q.  Okay.  Do you know whether or not the
3  bid proposal or the bid package required you as
4  the contractor to provide as a component part
5  of the bid evidence of any insurance?
6      A.  Yes.
7      Q.  Do you know whether or not the bid
8  package required you to show evidence of
9  insurance which included coverage for
10  explosion, collapse and underground property
11  damage hazards?
12     A.  Yes.
13     Q.  Okay.  Do you know if the requirement
14  for that insurance came from an agreement
15  between the Board of Commissioners of the
16  Orleans Levee District and the City of New
17  Orleans for the use and benefit of the Sewerage
18  & Water Board of New Orleans; do you know
19  whether or not the genesis of that insurance
20  requirement came from any such agreement?  If
21  you know, you know.  If you don't --
22     A.  I don't know that it did, but I had an
23  inkling that it did.
24     Q.  All right.  Did the bid package
25  indicate whether or not the contractor was

Page 139

1  responsible for obtaining all permits?
2      A.  Yes.
3      Q.  Did the bid package identify for the
4  contractor all of the permits which may have
5  been required by any governmental entity or
6  body?
7      A.  Repeat that question again.
8      Q.  Did the bid package give the
9  contractor information about what permits may
10  be needed from anybody?
11     A.  Some permits, yes.  And the rest the
12  contractor was responsible for getting on his
13  own.
14     Q.  Okay.  Can you remember what permits
15  the bid package itself indicated the contractor
16  was required to obtain?
17     A.  There was I think a storm water
18  pollution control permit from DEQ, Louisiana
19  DEQ, Development of Environmental Quality.
20     Q.  Okay.
21     A.  Um -- hot work permits from, um -- the
22  port, Port of New Orleans Commission, whatever
23  it was, for any, um -- torches or anything lit
24  on that particular project or any fire expected
25  to be burned and what particular processes were

Page 140

1  going to be used.  That permit, um -- access to
2  the site and those type of things, those
3  permits were handled by the Corps of Engineers.
4      Q.  Did the bid package indicate to you,
5  the contractor, whether or not the Corps of
6  Engineers was going to evaluate, from an
7  engineering perspective, any of the excavation
8  that may have been made necessary by the plans
9  and specifications?
10     A.  Repeat that.
11     Q.  All right.  Did the bid package, in
12  describing the work --
13     A.  Uh-huh.
14     Q.  -- indicate to you, the contractor,
15  that the Corps was going to, as part of its
16  proposal, going to undertake an evaluation of
17  any excavation that may be required as a result
18  of the contract?
19         MR. LEVINE:
20             Objection.  Vague.
21     A.  To try to answer your question, yes,
22  there was -- the contract quality control and
23  QA procedures, provisions in the contracts,
24  whenever a contractor bids a Corps of Engineers
25  project and there's CQC provisions in it, most

Page 141

1  contractors know that the government is going
2  to be involved in evaluating procedures on that
3  particular project.  Whether it's excavation or
4  whether it's installation or whether it's off
5  site inspection, the Corps was going to be
6  involved in looking at it.
7  EXAMINATION BY MR. BRUNO:
8      Q.  Do you know whether or not the bid
9  package indicated to you that you were required
10  to get a permit from the Orleans Levee District
11  in order to perform the work outlined by the
12  plans and specifications?
13     A.  On my particular project, the Dwyer
14  Road project, I don't recall the requirement to
15  obtain a permit from the Orleans Levee
16  District.  Now, many of those permits were
17  already worked out by the Corps.
18     Q.  Okay.  All right.  Do you know whether
19  or not in fact the Orleans Levee District had a
20  chance to review the drawings and
21  specifications which later became the plans and
22  specifications which formed the basis of the
23  opportunity to bid?
24     A.  During that construction period and
25  time, for the project that we're talking about,

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0036