MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 142

1  Dwyer Road, I was informed that -- by the Corps
2  of Engineers representatives, that all parties
3  we've talked about so far, the Sewerage & Water
4  Board, the Orleans Levee District, the Port
5  Commission, um -- all had opportunities to look
6  at and review and talk about the plans and
7  specs for whatever it involved their points of
8  view.  To include Entergy, also.
9      Q.  Why was Entergy involved?
10     A.  There was a high voltage transmission
11  line running parallel to the levee structure
12  that had to be dealt with at some point.  When
13  you're driving sheet piling with cranes and
14  various booms, there's a great concern of
15  interfering with the power that supplied I
16  think Metairie at that time.
17     Q.  All right, sir.  Do you know a
18  gentleman by the name of Stephen G. Spencer?
19     A.  I may have come across him in the
20  construction process.  I can't remember him at
21  this time.
22     Q.  All right.  Did you have any working
23  relationships with anyone from the Orleans
24  Levee District during the time that you were
25  preparing the bid package or that you -- during

Page 143

1  the time that you actually did the work?
2      A.  During the time that we actually did
3  the work, yes.
4      Q.  Do you recall whether or not -- the
5  name of the folks that you may have dealt with?
6      A.  Mr. Dom Elgazabo.  How to spell his
7  name I don't know.  In fact, he started out
8  working for the Corps in the construction
9  division section, then he retired and went over
10  to the levee district.  So I was dealing with
11  him from the Corps side and from the levee
12  district side.
13     Q.  All right.  Now, did Mr -- and I don't
14  know if I can say this name, but did you
15  interact with him on the site or did you
16  interact with him in his office at the levee
17  district?
18     A.  Um -- on the site.
19     Q.  Okay.  So I gather then that the levee
20  district would have from time to time its own
21  representatives on the site?
22     A.  At particular meetings, yes.  Passing
23  throughout the construction process, yes.
24     Q.  All right.  Do you know why they were
25  there?

Page 144

1      A.  Um -- my hypothesis is, and back when
2  I was working for the Corps, once a structure
3  was built it was turned over to a local
4  authority, and the levee district has had a lot
5  of flood control structures turned over to them
6  for maintenance and whatever.
7      Q.  Right.
8      A.  And my appreciation of it is this
9  structure was eventually going to go back to
10  them.  The flood protection structure.
11     Q.  Okay.
12     A.  So that's why they had an interest in
13  knowing what was going on.  Not only that,
14  during hurricane season they provided
15  assistance to us in forms of having sandbagging
16  to immediately close off this flood control
17  area in case of an impending storm.  So we had
18  four impending storms during this construction
19  process.  And as part of our hurricane
20  protection plan they were integrated in at that
21  time, you know.  We'd go so far with the
22  construction, but then the rest of it may be
23  supported by sandbagging or backup plans of
24  having being balloons filled with sand, plastic
25  balloons, to provide protection in case of an

Page 145

1  impending storm.
2      Q.  All right.  Mr. McElwee, have you
3  heard of a firm called Design Engineering,
4  Inc.?
5      A.  Yes.
6      Q.  Do you know, sir, whether or not
7  Design Engineering, Inc. had anything
8  whatsoever to do with this Dwyer Road project?
9      A.  They had everything to do with this
10  project.
11     Q.  What did they do, sir?
12     A.  They were the design -- they were the
13  firm for the Corps of Engineers that designed
14  and monitored this construction process.  When
15  I worked for the Corps as a quality assurance
16  rep, the Corps used to do a lot of that work
17  with their own engineers.  They contracted
18  Design Engineering to perform what they used to
19  perform when I used to work for them.  And
20  Mr. Jim Lumsden was one of the design engineers
21  on the project, on the Dwyer Road job.
22     Q.  All right.  I'm going to show you a
23  document that has been numbered
24  OLD-MRGO-BOOM-003.
25         MR. TREEBY:

37  (Pages 142 to 145)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0037

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 146

1    It's incomplete.  You should have
2    another five numbers.
3         MR. BRUNO:
4         (Indicating.)
5         MR. TREEBY:
6         It's cut off, I think, because
7    all those have more numbers.
8         MR. BRUNO:
9         Yeah.  This is the way they were
10   given to me.  Every last one of them
11   is cut off at 3.
12        MR. TREEBY:
13        I got the right ones.
14        MR. BRUNO:
15        Well, I was hoping -- it's August
16   the 14th, 1998.  It is a letter from
17   the Board of Commissioners of the
18   Orleans Levee District.  It is
19   directed to John Holtgreve, Design
20   Engineering, Inc.  Let me show it to
21   the witness first and we can just take
22   a look at it.
23   EXAMINATION BY MR. BRUNO:
24   Q.  How about this:  You look at it.  I'm
25   going to give it to Bill before I ask you any

Page 147

1    questions.
2         MR. BRUNO:
3         I'm going to let him look at it,
4    I'm going to give it to you, see if
5    you can find it before I ask any
6    questions.  Same thing with the
7    government.
8         Guys, this came yesterday.  Okay?
9    This is not something that you've been
10   having.  So I don't know if you've got
11   a separate book.
12        MR. TREEBY:
13        He just gave us copies.  Just
14   now.
15        MR. BRUNO:
16        Oh, Scott.  Okay.  So this would
17   be toward the end.  Bill, if it's in
18   order it's the last couple of pages.
19        MR. LEVINE:
20        This one?  Is it August 14th,
21   1998?
22        (Lunch break.)
23   EXAMINATION BY MR. BRUNO:
24   Q.  Okay.  While we were off the record,
25   Mr. Treeby was kind enough to allow us to

Page 148

1    figure out the Bates numbers on these
2    documents.  Let me show you first a document
3    which is Bates numbered OLD-MRGO-BOOM-00329613.
4    And his is just to give you --
5         MR. TREEBY:
6         23.
7         MR. BRUNO:
8         No, no.  This is --
9         MR. TREEBY:
10        It's 23.  You said 13.  It's 23,
11   at the end.
12        MR. BRUNO:
13        I'm sorry.  Bill, I wrote down.
14   Give it to me again.  003 --
15        MR. TREEBY:
16        29623.
17   EXAMINATION BY MR. BRUNO:
18   Q.  00329623.  Okay.  Fine.  Now, this is
19   just to give you a frame of reference for the
20   next document.  Just read it.  (Tendering.)
21   A.  Yes, sir.
22   Q.  Okay.  And here we have a letter from
23   a Mr. Lumsden from Design Engineering.
24        Do you know who Mr. Lumsden is or was?
25   A.  Yes, I do.

Page 149

1    Q.  Who is he?
2    A.  He was one of the design engineers
3    that worked for Design Engineering, Inc.
4    relative to preparing this project for bid and
5    also administering it during construction.
6    Design Engineering Construction, Inc. was the
7    consultant that the Corps of Engineers hired to
8    do the engineering for this particular project.
9    Q.  All right.  Now, you see here,
10   obviously, a letter from Mr. Lumsden of Design
11   Engineering to Mr. Stephen Spencer who is
12   identified on this document as the Chief
13   Engineer for the Orleans Levee District, and he
14   says -- and it's regarding the Dwyer Road
15   drainage pumping station improvements discharge
16   tubes and canal, which is the project you
17   ultimately got.  Right?
18   A.  Yes, sir.
19   Q.  He says, Dear Mr. Spencer, we submit
20   herewith, one set of 95 percent drawings and
21   specifications on the referenced project for
22   your review and comments.
23        Do you have any idea why Design
24   Engineering would be at all interested in
25   having the Orleans Levee District comment on

38 (Pages 146 to 149)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0038

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 150

1  its designs and specifications?
2     A.  Yes.
3     Q.  Why would they do that?
4     A.  Well, any particular interest that is
5  involved in a particular project may be aware
6  of information, it's called information
7  sharing, to be disseminated amongst everyone so
8  that nothing falls through the gap, I would
9  say.  You know, even though they're a design
10 engineering firm, it's wise to have someone
11 check over your work, look at everything.
12    Q.  All right.  Then may I show you,
13 please, OLD-MRGO-BOOM-00329621 and 22, which is
14 a two-paged document.  I showed this to you
15 early earlier.  Okay?
16    A.  Yes, sir.
17    Q.  And you see here that that is the
18 response by the OLD to Mr. John Holtgreve of
19 Design Engineering, Inc., and he says, we have
20 reviewed your 95 percent submittal of
21 July 20th, for the referenced project, with the
22 following comments:  Now I would like to draw
23 your attention very specifically to Paragraph
24 Number 11.
25    A.  Yes, sir.

Page 151

1     Q.  All right.  Now, he says here that --
2  and he's referring to a contract section -- the
3  contract shall install monitoring devices in
4  the adjacent flood protection system to warn of
5  any structural damage that may occur due to
6  excavation work.
7        Now, my first question to you is, you
8  as a contractor, sir, you would agree with me
9  that monitoring devices could cover a whole
10 panoply of different kinds of equipment.
11    A.  That's correct.
12    Q.  Do you, as a contractor, preparing to
13 prepare a bid for this contract, have a better
14 understanding of what monitoring devices are
15 being referred to in this contract
16 specification?
17    A.  As per that letter, I don't know
18 exactly what they're talking about, but if we
19 go back to the actual contract plans that were
20 issued to the contractors, I can tell you some
21 of the items that they did talk about.  That is
22 like a general paragraph, but it was more
23 specific in the plans.
24    Q.  Okay.
25    A.  In the plans, um -- you know, some of

Page 152

1  the devices would be metal plates along the
2  wall installed to check survey elevations or
3  survey transversing -- you know, doing some
4  cross-sections.
5     Q.  Uh-huh.
6     A.  There was no electronic devices that
7  we installed, but we constantly monitored on a
8  weekly basis doing survey cross-sections to --
9  and survey measurements to show the government
10 movement in the railroad tracks, movement in
11 the floodwall.
12    Q.  How about piezometers?
13    A.  Piezometers would tell us about the
14 water levels relative to the excavation --
15    Q.  Right.
16    A.  -- but wouldn't necessarily tell you
17 about movement of the ground surface.  It would
18 only let you know what the water levels were
19 over a certain period of time and should there
20 be a need for concern.
21    Q.  Right.  But the reason I asked the
22 question is because I thought we learned this
23 morning that this seepage could cause
24 structural damage.
25    A.  It could.

Page 153

1     Q.  And because the seepage could cause
2  structural damage I'm wondering if the
3  monitoring devices might -- as described here,
4  generally may have included piezometers since
5  the purpose of these devices was to warn of any
6  structural damage that may occur to -- due to
7  the excavation work.
8        Or is that a different -- or am I way
9  off base?
10    A.  No, you're not way off base.  The data
11 that I as a contractor would give to the Corps
12 of Engineers in our daily reports concerning
13 piezometer measurements was utilized by
14 engineers to look for any changes.
15    Q.  Right.  Okay.
16    A.  So the engineer would use that.
17    Q.  Right.
18    A.  I, as a contractor, per se, would
19 not -- would only get alerted if the
20 measurements of the water levels were kind of
21 high for my pumping system.
22    Q.  All right.  But this section seems to
23 require the contract to require that these
24 things be installed, not necessarily by the
25 contractor but by someone over whom the

39 (Pages 150 to 153)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0039

Page 154

1  contractor has some control.
2       Is that what's -- am I wrong with
3  that?
4       MR. TREEBY:
5           Objection. Leading.
6    A.  I could better answer your question if
7  I had a set of specs in front of me and look at
8  Section 2200 and see what section are we
9  talking about, to answer that question.
10  Because there's various sections in the plans
11  and specs. And if it's dealing with
12  dewatering, then I can tell you it's dealing
13  with dewater. If it's dealing with something
14  else, embankment placement, I can tell you what
15  they're referring to. I need to see 2200.
16   Q.  All right. Can you tell me what the
17  purpose -- I mean, from reviewing the comments
18  by the chief engineer of the OLD, are you able
19  to discern from his comments what it is that
20  the OLD is interested in as regards the
21  construction contract?
22   A.  May I see that document?
23   Q.  Yes. And I ask that because I see in
24  1, floodgate; Number 2, I see, um -- something
25  about a fence; Number 3, flood walls; 4,

Page 155

1  existing floodwall; 5, T-wall, et cetera. I've
2  lost the second page. Sorry. There it is. 6
3  says flood protection; 7 says hydrostatic
4  pressure, sheet pile, et cetera. (Tendering.)
5       MR. LEVINE:
6           I'm going to object to the form.
7       Are you asking about the whole
8       document or just --
9       MR. BRUNO:
10          Yes. The whole document. I'm
11      asking him if this document gives him
12      any indication as to what the interest
13      is, if any, that the OLD has in the
14      specifications.
15   A.  After glancing at this correspondence,
16  it appears that their interest was basically
17  operational, as far as flood control. They do
18  have some engineering comments about
19  certain things, but the gist of it is hurricane
20  season.
21  EXAMINATION BY MR. BRUNO:
22   Q.  Right.
23   A.  And what's going to be in place during
24  that time frame.
25       Paragraph 8, 9 and 11 is the bulk of

Page 156

1  what they were concerned about.
2    Q.  Right. So let's see. Is it fair to
3  conclude that the OLD 's interest is in how the
4  project may or may not impact the flood control
5  structure that's there?
6       MR. TREEBY:
7           Object. Leading.
8    A.  Ask that question again.
9  EXAMINATION BY MR. BRUNO:
10   Q.  Is it not a fair conclusion to draw
11  from this piece of paper that the OLD 's
12  interest in the plans is to evaluate the impact
13  of the plans on its flood control structure?
14      MR. TREEBY:
15          Same.
16   A.  That is fair to say from that letter,
17  that is their interest. The impact of the work
18  on the flood control structure.
19  EXAMINATION BY MR. BRUNO:
20   Q.  I note that in Number 8 they say
21  decision to pull or leave in place the sheet
22  pile.
23       How might that, if it does, have any
24  impact on the flood control structure?
25   A.  During excavation, there was a

Page 157

1  question as to -- when we as a contractor was
2  directed to install sheet piling to do
3  excavation, there was a question or whether or
4  not that sheet piling was going to stay in
5  place or be removed. If it was going to be
6  removed, I think their concern at that time was
7  going to be what's going to take place to keep
8  the area that was excavated stable, what
9  materials are going to be used to backfill
10  after removing the sheet piling, so that voids
11  and everything were not in place.
12   Q.  All right. I see. Can I conclude
13  from your answer that the removal of the pile
14  would create voids?
15   A.  The excavation and the removal of the
16  piles would create voids.
17   Q.  Right. And what would be the
18  consequence of having voids? Would that relate
19  back to what you told us this morning about?
20   A.  The consequence would be some
21  traverse, traverse movement of the earth from
22  one part to the other. Whether it's your
23  foundation under your floodwall migrating to
24  the void, thus leaving you with an unstable
25  surface --

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0040

Page 158

1    Q.  Okay.
2    A.  -- or allowing a void for water to
3  travel in.
4    Q.  All right.  So is the business of the
5  removal of sheet piles relevant to the
6  potential damage to the floodwall?
7    A.  Yes, it's absolutely relevant.
8    Q.  All right.  Let me show you --
9    MR. BRUNO:
10       Bill, I'm going to ask your help
11     again, because again I don't have the
12     darned -- I got the cut off page.
13     It's about a quarter inch from the
14     bottom -- it cuts off, but it looks
15     like it says preconstruction
16     conference agenda.  And then right
17     below that, it says, contract number,
18     DACW 29-01-C-035, southeast Louisiana,
19     Dwyer Road drainage pumping station.
20    MR. LEVINE:
21       Can I look at it real quick?
22    MR. BRUNO:
23       (Indicating.)
24  EXAMINATION BY MR. BRUNO:
25    Q.  Yeah.  I'm showing you

Page 159

1  OLD-MRGO-BOOM-00329559, 60, 61, 62, 63 and 64,
2  I'm guessing.
3       Do you recall seeing a document like
4  that, Mr. McElwee?
5    A.  Yes, sir.
6    Q.  What is that?
7    A.  It's the preconstruction conference
8  agenda.  This took place prior to execution of
9  work on the project.  This was after bid.
10  After we placed the bid and received the
11  project, and prior to going out on the job, the
12  Corps holds what's called a pre construction
13  conference where all parties that have an
14  interest are invited to attend and items are
15  discussed, relative to the contract.
16    Q.  Do you recall at that preconstruction
17  conference having dialogue with the United
18  States Army Corps of Engineers about
19  underseepage issues generally?
20    A.  Yes.
21    Q.  All right.  Can you just share with
22  us, you know, how those -- how the subject came
23  up and what was discussed?
24    A.  Um -- because of the nature of the
25  contract, McElwee Brothers invited every last

Page 160

1  one of its subcontractors to come to that
2  preconstruction conference, which included its
3  selected design engineer, Mr. J. Michael Dixon.
4    Q.  Who's he with?  I'm sorry.
5    A.  He was with Dixon and Associates, and
6  he was also with another firm.  But when he
7  transferred from firm to firm I stayed with
8  him.  McElwee Brothers stayed with him.  Um --
9  during the preconstruction conference, the item
10  you see on the agenda were discussed and an
11  when we got down to excavation and dewatering
12  issues I deferred all questions to Mr. Dixon
13  and allowed him to answer them.  So when he
14  explained in detail what his, um -- design for
15  retaining sheet pile walls would be and how he
16  would go about doing the dewatering system --
17  in general, he didn't get into specifics.
18    Q.  All right.  Did you have any
19  understanding as to how far below the surface
20  the T-wall went?
21    A.  When I answer this question I'm going
22  to say I'm including the piling dealing with
23  the T-wall.
24    Q.  No.  Well, let me ask you -- I should
25  ask it this way, because I'm not quite as

Page 161

1  familiar with T-walls as I am I-walls:  In a
2  T-wall construction does the sheet pile go by
3  low the bottom of the T?
4    A.  Yes.
5    Q.  Okay.  And we've learned from your
6  course materials that the sheet pile itself can
7  act as a cutoff for seepage.
8    A.  That's correct.
9    Q.  So what I'm trying to understand is
10  whether or not you were advised by the Corps as
11  to how -- what the sheet pile depth was under
12  that T-wall?
13    A.  Yes.  It was indicated in the plans.
14    Q.  All right.  Do you recall -- I know,
15  you may not remember, but do you remember its
16  depth?
17    A.  I can tell you the length of the
18  sheets.  They were roughly about 12 and a half.
19  14 feet long.  So they were 12 and half, 14
20  feet long below the base of the T.  Yes.
21    Q.  All right.  So that you think the
22  negative elevation was about negative 12?
23    A.  I'd hate to answer that question for
24  you right now because I'd have to see a set of
25  drawings --

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0041

Page 162

1    Q.  Fair enough.
2    A.  -- and I'd have to see the datum we
3  were on.
4    Q.  All right.  Here's the simple last
5  question with regard to that T-wall business.
6  Was the sheet pile depth relevant to the issue
7  of underseepage as it relates to potential
8  damage to the flood control structure?
9    A.  Was sheet pile depth relevant?  Yes.
10   Q.  All right.  Okay.  Why is the sheet
11 pile tip depth relevant?
12   A.  Well, the purpose of the sheet pile is
13 to act as a cutoff wall.  And if -- depending
14 on how deep your soils investigation shows you
15 the strata that may transfer water is, you have
16 to design to that depth to cut that water off.
17 So it's very important.
18   Q.  Okay.  To kind of walk through this
19 and see if we can make it as easy as we can,
20 let's assume we have an engineering report that
21 gives us information about the soils strata
22 below the work site.  Okay?
23   A.  Yes.
24   Q.  Let's further assume that the soil
25 information reflects a 11-foot layer of clay,

Page 163

1  and below that a 10-foot layer of sand.
2    A.  Oh, yes.
3    Q.  Okay?  And let's further assume that
4  the sheet pile depth is 15.
5    A.  Yes.
6    Q.  Okay?  Now, what is the relevance of
7  that sheet pile tip depth to any excavation
8  that you may be contemplating doing on the
9  flood side of the flood protection structure,
10 if any?
11       MR. LEVINE:
12          Objection.  Improper
13       hypothetical.
14          You can answer.
15   A.  I'm going to try to answer.  What is
16 the relevancy?
17 EXAMINATION BY MR. BRUNO:
18   Q.  All right.  Let me draw it for you.
19 We'll do it that way.  I'm going to mark this
20 as McElwee Number 6.
21       MR. JOANEN:
22          It will be 7 if you want to count
23       that map.
24       MR. BRUNO:
25          7.  Okay.

Page 164

1          (Exhibit 7 was marked for
2  identification and is attached hereto.)
3  EXAMINATION BY MR. BRUNO:
4    Q.  Okay.  This is real rudimentary.  All
5  right.  You can see that what I've drawn there
6  I've attempted to draw a T-wall with a sheet
7  pile that goes below the T-wall.
8    A.  That's the sheet pile depth here?
9    Q.  No.
10   A.  No, this is the sheet pile.  This is
11 excavation.
12   Q.  Yeah.  This is the sheet pile.
13   A.  Okay.
14   Q.  This is the bottom of the T.
15   A.  Okay.
16   Q.  This is surface and the earth berm.
17   A.  Got you.
18   Q.  This is the clay layer, this is the
19 sand layer.
20   A.  Okay.
21   Q.  You can see the excavation.
22   A.  That's correct.
23   Q.  And I've purposefully drawn the
24 excavation to go below the clay layer and break
25 into the sand layer.

Page 165

1    A.  That's correct.
2    Q.  But I've shown the bottom of the
3  excavation to be equal to the bottom of the
4  sheet pile tip.
5    A.  That's correct.
6    Q.  Okay.  So what if anything -- how is
7  the sheet pile tip relevant to that kind of
8  excavation?
9    A.  It's very -- during the excavation
10 we're fine.  But when I get ready to remove
11 these sheets, like I talked about earlier,
12 that's when it comes into play.
13   Q.  Okay.
14   A.  The depth.  This area that -- the
15 clay.
16   Q.  Right.
17   A.  If this void in the clay is not filled
18 to be like the in situ, we call it in
19 engineering, the existing situation, that's
20 when the problem's going to occur.  Because the
21 water that's here flowing is going to have I
22 guess a snorkel, a way to come up.
23   Q.  Right.
24   A.  So if we don't treat this area that we
25 penetrated and excavated to block it off, we

42  (Pages 162 to 165)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0042

MELVIN M.L. McELVEE (VOL I)                                      4/23/2008

Page 166

1  got a major problem.
2      Q.  Got you.  Okay.  All right.
3          Now, if the sheet pile depth is deep
4  enough to cut off that potential underseepage,
5  then you don't have to worry.  Is that right?
6      A.  If we get ready to remove those
7  sheets --
8      Q.  I'm sorry.  I'm talking about the
9  sheet pile as a component of the floodwall now.
10     A.  Okay.
11     Q.  Let's say it goes down to 40 feet.
12     A.  If it does, you don't have a problem
13  because it's cutting the water off already.
14     Q.  So you have to know, in order to have
15  some intelligent basis to plan, how deep your
16  sheet pile tip is in your floodwall.  Right?
17         MR. TREEBY:
18            Object.  Leading.
19     A.  As a contractor, you need to know.
20  EXAMINATION BY MR. BRUNO:
21     Q.  All right.  Now, the next document is
22  the document right before, and you'll help me
23  remember the number.  OLD-MRGO-BOOM-003 -- it's
24  the document right before, the one with the
25  little note on it.  What's that number?

Page 167

1          MR. LEVINE:
2             329558.
3  EXAMINATION BY MR. BRUNO:
4      Q.  Thank you.  On this piece of paper
5  I'll just share with you that it says the job
6  is such that no work on the flood walls is to
7  be done during hurricane season.
8          Do you remember that to be true?
9      A.  Yes.
10     Q.  Do you know why that was?
11     A.  Yes.
12     Q.  Why?
13     A.  Because we were, during the
14  construction process, breaching the floodwall.
15  And if any impending storm was coming during
16  that time frame some, the amount of work effort
17  to seal off that opening required time.  But
18  during hurricane season you don't have a lot of
19  time.  If a storm is impending, over in
20  Jamaica, you know, you might have three, four,
21  maybe seven days.  Seven days is not enough
22  time to close that void --
23     Q.  Okay.
24     A.  -- to its existing state.
25     Q.  All right.  Now, let's talk about your

Page 168

1  relationship with the Corps, just in terms of
2  structure.  Okay?  While you're doing the work.
3  I see this document, and --
4          MR. BRUNO:
5             And it's this one.
6          MR. LEVINE:
7             How many pages is that?
8          MR. BRUNO:
9             It's just one page, the number
10         again is cut off.  I apologize.  It's
11         a few pages -- I'm going now from the
12         bottom to the top.  So if we just keep
13         going in that direction we'll catch up
14         with you.
15         MR. LEVINE:
16            That is 329547.
17         MR. BRUNO:
18            All right.  And it's entitled who
19         talks to whom.
20  EXAMINATION BY MR. BRUNO:
21     Q.  First of all, sir, have you seen that
22  document?
23     A.  Yes.
24     Q.  What is this document?
25     A.  This document is one that was utilized

Page 169

1  during a partnership session that took place
2  after the preconstruction conference to get a
3  full explanation of who talks to whom during
4  the construction process so there wouldn't be
5  any conflicts, ambiguities -- I mean, there
6  were so many agencies involved.  We already
7  discussed quite a few of them.
8      Q.  Yes.
9      A.  And one of the concerns that McElwee
10  Brothers had, and then also the Corps had, was
11  to make sure we understood the lines of
12  communication.  Because if you got four or
13  fifth engineers working on a job and two or
14  three of them coming up giving directions, it
15  creates havoc.
16     Q.  Okay.
17     A.  But if you have one point of contact,
18  those other engineers can work through that one
19  point of contact to convey whatever information
20  needs be conveyed throughout to all the rest of
21  the parties.
22     Q.  Now, was there a Corps engineer person
23  on site every day?
24     A.  Yes.
25     Q.  And what was that person's title?

43  (Pages 166 to 169)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0043

MELVIN M.L. McELVEE (VOL I)                                   4/23/2008

Page 170

1    A.  I'd like to clarify.  Every day of
2  construction, that work was being performed.
3    Q.  Yes, of course.
4    A.  Title?  Um -- was construction
5  representative was a QA person, quality
6  assurance rep.  I mentioned him earlier.
7    Q.  Right.  Quality assurance.  Was that
8  person, to your knowledge, an engineer?
9    A.  No.
10   Q.  And what was the role, as best you
11  understood, of the presence of the quality
12  control person by the Corps on the site?
13   A.  I'd like to clarify something.
14  Quality control was the contractor's personnel.
15  Quality assurance --
16   Q.  I'm sorry.  Quality assurance.
17   A.  -- is the government 's
18  representative.
19   Q.  QA.
20   A.  QA.  That's correct.
21   Q.  All right.
22   A.  His role was to be abreast of the
23  plans and specifications, and the contractor's,
24  McElwee Brothers', procedures and, um -- work
25  efforts taking place on a daily basis to assure

Page 171

1  that all mechanisms -- and I say mechanisms
2  because there's a contract quality control plan
3  that McElwee Brothers submitted to the Corps
4  for review and approval, and there were courses
5  that McElwee Brothers personnel had to attend
6  for contract quality control in relationship to
7  the QA person, documents that need to go back
8  and forth every day.  And he would monitor all
9  the processes and alert his project engineer of
10  any imperfections or things that need to be
11  concerned about.
12   Q.  All right.  On this chart I don't see
13  someone labeled quality assurance.  I see the
14  word inspector.  Is that the same person?
15   A.  That is the same person here, yes.
16   Q.  Okay.  All right.  And --
17      MR. LAMBERT:
18         What's the chart from?
19      MR. BRUNO:
20         The OLD documents.  We've already
21      marked it.  We haven't marked it, we
22      have described it.  I'm sorry.
23  EXAMINATION BY MR. BRUNO:
24   Q.  So this middle line, that's the Corps
25  of Engineers personnel?

Page 172

1    A.  Yes.  Contracting officer.
2    Q.  And then below him is administrative
3  contracting officer?
4    A.  Administrative contracting officer.
5    Q.  And then there's a team leader?
6    A.  Yes.
7    Q.  And a project engineer.
8    A.  Yes.
9    Q.  And then the inspector.
10   A.  That's correct.
11   Q.  Okay.  Now to the right of that, this
12  is the McElwee people, right?
13   A.  That's correct.
14   Q.  And to the left of that, who's DEI?
15   A.  That's Design Engineering, Inc.
16   Q.  Okay.  And then the other --
17   A.  Points of contact.  For the
18  railroad --
19   Q.  Sewerage & Water Board.
20   A.  -- Sewerage & Water Board, et
21  cetera --
22   Q.  Got you.
23   A.  -- the other entities.  It shows who
24  they need to speak to.
25   Q.  They interact with the project

Page 173

1  engineer and the inspector.
2    A.  That's correct.
3    Q.  Now, if I'm right, McElwee is supposed
4  to interact with the inspector.
5    A.  That's correct.
6    Q.  Not with the project engineer.
7  According to this chart.
8    A.  That's not correct.  Because the
9  project engineer will -- his line extends down
10  to the inspector.  So he has a right to talk to
11  anybody that the inspector talks to.
12   Q.  Do you have a right to call the
13  project engineer or are you supposed to call
14  the inspector?
15   A.  The inspector is on site, and if
16  there's a problem I contact the inspector.  If
17  the inspector is not available, then I contact
18  the project engineer.
19   Q.  All right.  Now --
20      (Brief interruption.)
21  EXAMINATION BY MR. BRUNO:
22   Q.  Okay.  While you were doing the work,
23  did you encounter -- I'm just going to hold
24  this up.  Okay?  This is Exhibit Number 5.
25  This is the Corps' manual on underseepage.

44  (Pages 170 to 173)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0044

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 174

1       Did you encounter issues that were
2   described by these course materials during the
3   work that you did on the Dwyer Road project?
4       A.  Yes.
5       Q.  Okay.  Now, did you have a dialogue
6   with the United States Army Corps of Engineers
7   on those issues?
8       A.  Yes.
9       Q.  All right.  Now, let's start from the
10  beginning.  You've produced to us this
11  geotechnical investigation by Eustis.
12      A.  Yes.
13      Q.  And we talked a little bit about that
14  before.  Maybe we didn't.  I'm sorry.  I think
15  you had suggested -- you'd requested some soils
16  information, you didn't get it.  And then you
17  made a reference to the fact that at some point
18  later you may have gotten some additional
19  information.
20      A.  Yes.
21      Q.  Okay.  Just to kind of put us back in
22  context.
23      All right.  What was the occasion
24  after you started the work that you felt it
25  necessary to ask the Corps for additional soils

Page 175

1   information?
2       A.  The occasion was during the design
3   process of the temporary retaining structure,
4   the sheet piling for the excavated hole, um --
5   in the plans and specifications the Corps
6   required a design for dewatering, a dewatering
7   system to be in place.
8       In that process, Mr. Dixon needed to
9   know some soil parameters we call them, what
10  types of soils are where.  The borings were
11  there, but the characteristics of the soils
12  which are in other lab tests wasn't.  And so
13  McElwee Brothers went back to the Corps of
14  Engineers to request that information.  And at
15  that time, this is after the bid process, I
16  personally was informed that the Corps did not
17  perform the soils testing relative to those
18  borings, it was done by Eustis Engineering who
19  were in concert with Design Engineering, Inc.
20  to do the soils evaluation for the project.
21      Q.  Right.
22      A.  And then I was given a copy of this
23  report by one of the Corps of Engineers
24  representatives.  He said, you can take this
25  with you since we don't have that information.

Page 176

1       Q.  Okay.  All right.  Now let's -- I
2   should have done this before, and I apologize.
3   But the work that you contracted to do for the
4   Corps was to install some large pipes on the
5   batture, to make it easy, right?
6       A.  Yes.
7       Q.  And they were going to be enclosed in
8   some concrete, um -- culvert?
9       A.  Penetration of the T-wall, there was
10  some piping --
11      Q.  Right.
12      A.  -- and then the piping ended and went
13  into what's called a sluice gate structure
14  where the gates can be mechanically opened and
15  closed to prevent backwater from coming from
16  the canal into the pump station.
17      Q.  Okay.
18      A.  And from the sluice gate structure out
19  to the canal was box culvert canal sections.
20      Q.  Okay.  All right.  So let's see.
21      There are three parts to this, right?
22      A.  Yes.
23      Q.  There is the floodwall demolition and
24  reconstruction, there is the sluice gate
25  construction, and there is the box culvert

Page 177

1   construction, right?
2       A.  Yes.
3       Q.  Which came first, second and third?
4       A.  Actually, timing dictated it because
5   of the non hurricane season and hurricane
6   season.
7       Q.  Right.
8       A.  So when we started initially, it was
9   during August, that was non hurricane season,
10  but, however, because everything wasn't in
11  place to begin the T-wall work for demolition
12  and getting it back up in a proper time frame.
13  Submittals weren't reviewed by the Corps.
14  Coordination hadn't taken place.  We didn't
15  jump on the flood control structure then that
16  was there, we went and did the excavation for
17  the box culvert canal section.
18      Q.  Okay.  All right.  So that was first.
19      A.  Yes.
20      Q.  Now.  And was that the event which
21  suggested the need for the additional soils
22  information?
23      A.  That's correct.
24      Q.  Okay.  And again, the borings weren't
25  enough, you needed to know more about the

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0045

MELVIN M.L. McELVEE (VOL I)                4/23/2008

Page 178

1  soils.  And now, was that solely to assist you
2  in building the cofferdam or did it have
3  anything to do with the potential for
4  underseepage damaging the flood walls?
5      A.  It was to control seepage.
6      Q.  Okay.  Which covered both of those
7  issues, right?
8      A.  Yes.
9      Q.  Okay.
10         MR. BRUNO:
11             I don't see a need to attach the
12         Eustis report.  Does anybody want to
13         attach it?  Hearing no response, we
14         won't.
15  EXAMINATION BY MR. BRUNO:
16      Q.  Now, you now have the Eustis
17  Engineering information.  Did that solve your
18  problem with regard to this excavation for the
19  box culvert?
20      A.  No.
21      Q.  Why not?
22      A.  Because in that report we didn't have,
23  um -- grain size distribution test analysis in
24  it.  Mr. Dixon, at that point, as a design
25  engineer, said, Melvin, I'm going to use worst

Page 179

1  case scenario, what if the particle size
2  distribution was this size, and I'll design a
3  system based on that.  So he utilized --
4      Q.  Okay.
5      A.  -- that scenario.  Worst case.
6      Q.  Bottom line is, the Eustis Engineering
7  report did not give you sufficient information
8  in order to assist you with the concerns that
9  you had about underseepage, is that right?
10      A.  That's correct.
11      Q.  Okay.  And so he just assumed the
12  worst case scenario with regard to particle
13  size and designed from that.
14         MR. TREEBY:
15             Object.
16      A.  Yes.
17  EXAMINATION BY MR. BRUNO:
18      Q.  Now, exactly how did that affect the
19  design, if you can tell us?
20         MR. TREEBY:
21             No objection there.
22  EXAMINATION BY MR. BRUNO:
23      Q.  In other words, the worst case
24  scenario, how did that change the design?
25      A.  Design of the box culverts?

Page 180

1      Q.  Well, I guess I got confused.  I don't
2  know if it was the dewatering or the box
3  culvert.
4      A.  The dewatering.  How did it change it?
5      Q.  Yeah.
6      A.  It actually didn't change it.  It
7  just -- well, yeah, it did.  It let us know
8  that -- what size pumping system we need to put
9  in place, how many straws, at what intervals,
10  what size pump we needed to operate to keep up
11  with the water flow that was expected to come
12  in that void --
13      Q.  Okay.
14      A.  -- so we could size up the right
15  equipment to handle whatever waters were
16  penetrating the soils to keep from filling the
17  void up.
18      Q.  Now, looking at the Eustis report, at
19  Page 16, under the subheading flood
20  protection --
21         MR. TREEBY:
22             You now need to attach it.
23         MR. BRUNO:
24             Okay.  I think I will.  And let's
25         mark it as 8.

Page 181

1         (Exhibit 8 was marked for
2  identification and is attached hereto.)
3  EXAMINATION BY MR. BRUNO:
4      Q.  Okay.  Now, first of all, this may be
5  obvious, but is it crystal clear that flood
6  protection was at least considered by Eustis
7  Engineering in this report?
8      A.  Yes.
9      Q.  All right.  Now, it says here, on the
10  T-wall, it says we -- they're talking about --
11  well, read it for me first.
12      A.  Which paragraph?
13      Q.  Number 47?
14      A.  Paragraph No. 47.  T-wall stations 9
15  plus 15 to 10 plus 40.  The sheet pile cutoff
16  beneath the T-wall along the east side of the
17  Jourdan Road embankment will be penetrated by
18  three new discharge pipes.  In addition,
19  existing piles supporting the T-wall will be
20  removed to make room for the penetration of the
21  discharge pipes.  An analysis of the t-wall
22  with the full Jourdan Road embankment at
23  elevation 33.5 has been made assuming a storm
24  water level of 31.5.  Results of these analyses
25  are presented on Figure 12.  We have assumed

46 (Pages 178 to 181)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0046

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 182

1   batter piles will support the T-wall base at
2   elevation 18. Summing moments about the base
3   of the T-wall indicates the sheet piles must
4   penetrate to an elevation minus 6 and to the
5   top of the stratum 5. The top of this sand
6   occurs at elevation minus 17 in the borings
7   drilled for the pump station just to the east
8   of this project site. Therefore, we recommend
9   the sheet piles have a design tip at elevation
10  minus 20 to ensure penetration of Stratum 5.
11      Q.  So what's that all about? Why do you
12  want to make certain that the sheet pile tip
13  goes into Stratum 5?
14      A.  If I can go back to Exhibit 7 --
15      Q.  Yes, you certainly may.
16      A.  -- it was to -- with the new design of
17  the sheet piling that was here, to make sure
18  that it goes to the bottom of the sand layer --
19      Q.  All right.
20      A.  -- to create a cutoff wall.
21      Q.  That's right.
22      A.  The existing sheet pile was too short.
23  Don't go back to that design elevation right
24  here.
25      Q.  All right.  Go deeper.

Page 183

1       A.  Go deeper.
2       Q.  All right.  So do we have here, do you
3   believe, a paragraph that addresses very
4   specifically what is taught by the Corps in its
5   earth work quality verification training
6   course?
7       A.  Yes.
8       Q.  All right.  Now, I also not that in
9   order to conduct this analysis, the analysis
10  wasn't done with the water at its normal level,
11  it was done with the water at a flood stage or
12  a storm stage, at 31.5.
13      A.  Yes, sir.
14      Q.  Why would you do that? Why would you
15  look at the storm level instead of the everyday
16  level of the water?
17      A.  There are engineering programs where
18  you can plug in different models, we call it,
19  situations and scenarios, and the purpose for
20  designing for that is, I guess over the --
21  normally the Corps looks at a 100-year history
22  of the worst case scenario. What's done
23  happened here before. So if we know what's
24  done happened here before. You design to that.
25  You don't design to anything less than that.

Page 184

1   So that's why they used 31.5.
2       Q.  Got you.
3       A.  The normal level would be fruitless.
4   We might as well not even have any levees or
5   I-walls if we're going to just do the normal
6   level, because the normal level the swamps
7   would just -- the water would rise and go out
8   on it's own.
9       Q.  All right.  If you would, go to
10  Page 18, Paragraph 52, talking about the
11  I-wall.
12      A.  Page 18?
13      Q.  Yes, sir.  It says here, the sheet
14  pile should be welded to the discharge pipe
15  that passes through the wall to prevent seepage
16  between the pipe and sheet pile.  The sheet
17  pile design should be carried at least ten feet
18  beyond the limits of the excavation for the
19  southern most discharge pipe.
20      In your view, does this also address
21  the seepage issues that you all were trained
22  about when you took that course we've made so
23  much reference to today?
24      A.  Yes.
25      Q.  Let's look at Page 19, Paragraph No.

Page 185

1   56.  It says here, in addition to the ground
2   water study recommended, the existing condition
3   of surrounding structures of the project site
4   should be assessed.  Our preliminary pressure
5   relief assessments indicate structures within
6   1,000 feet may be influenced by a pressure
7   relief system.
8       First, what is this pressure relief
9   system that they're talking about?
10      A.  The pressure relief system is the
11  dewatering system that you put in place to keep
12  the water from filling the void and messing
13  with other structures.  You design something to
14  pick that water up and discharge it in a
15  different area to levelize the water flow.
16      Q.  Let me slow down with you now.  So
17  this is that situation where you dig a hole --
18      A.  Yes.
19      Q.  -- and you put sheet pile in place to
20  keep the water and the soils from dumping back
21  in the hole.  Right?
22      A.  (Nods affirmatively.)
23      Q.  And then you excavated what's inside
24  of this cofferdam is what they call it, right?
25      A.  Yes.

JOHNS PENDLETON COURT REPORTERS                800 562-1285

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0047

Page 186

1    Q.  Okay.  So when you have a structure
2  like that, are you supposed to do a ground
3  water study?
4    A.  You have to.  You should.
5    Q.  You should.
6    A.  You're obligated.
7    Q.  You're obligated.
8    A.  I mean, as an engineer, you know,
9  you're changing existing conditions.
10    Q.  All right.
11    A.  So what do you need to do to stabilize
12  the conditions you're working with.
13    Q.  What is a ground water study, and how
14  does one do such a thing?
15    A.  We go back to the soils borings and
16  engineering reports, you know, looking at
17  particle size distribution, looking at, um --
18  water table contents in these soils borings,
19  um -- sticking in piezometers.  You may take a
20  piezometer and go down to the sand layer and
21  measure the level of water that's coming up
22  that piezometer.  That will give you the head
23  pressure on that flow.
24    Q.  Right.  Right.
25    A.  Um -- doing those type of things help

Page 187

1  you come about with your anticipations on what
2  you need to do --
3    Q.  Okay.
4    A.  -- while you're excavating that hole.
5    Q.  All right.  Now, do you always need a
6  pressure relief system, or is that -- in other
7  words, every time you do an excavation like
8  we've just described, you're on the batture
9  side, you're -- let's say you're within
10  100 feet of the floodwall, you're going 25 feet
11  down.  Do you need a pressure relief system for
12  something like that?
13      MR. LEVINE:
14        Objection.  Hypothetical, vague.
15    A.  If you are in navigable waterways, if
16  you are dealing with Artesian spring systems
17  underneath the surface, you should consider
18  that.  You must consider a relief -- water
19  relief.
20  EXAMINATION BY MR. BRUNO:
21    Q.  Now, there's a suggestion here that
22  within a thousand feet -- that's a big piece of
23  ground, isn't it?  I mean, a thousand feet.
24    A.  Yes.
25    Q.  With any structures within a thousand

Page 188

1  feet of your site?
2    A.  Yes.
3    Q.  All right.  Well, tell me, what
4  exactly are you -- it says, we recommend a
5  series of settlement points be established
6  within a thousand feet.  What is that?  What
7  are you doing when you establish a series of
8  settlement points a thousand feet from the
9  excavation?
10    A.  You take the center point of your
11  excavation and you sort of create a radius of a
12  thousand feet.
13    Q.  Right.
14    A.  Whatever falls in that thousand feet
15  radius, you set you some marks or monuments out
16  there that you can come check every so often to
17  see if you're having any impact on the ground.
18    Q.  You know, as a lawyer, I've read about
19  and heard about and experienced cases where
20  contractors do pile driving.  It's well known
21  that when you drive piles into the ground there
22  is the potential that you might harm your
23  neighbor's property and, as a result, you know,
24  they always say take pictures of the property
25  and do assessments to see whether or not that

Page 189

1  pile driver is going to damage your neighbor 's
2  property.  I'm wondering whether or not, and
3  you tell me, please, if there is any similarity
4  between the care that you take to make certain
5  that you don't damage your neighbor's property
6  from pile driving to the care that one would
7  take to make certain that you don't do any
8  damage to your neighbor's property if that
9  piece of property happens to be close to a
10  flood control wall next to which is a batture,
11  next to which is a waterway.
12      MR. LEVINE:
13        Objection.  Vague.
14      MR. TREEBY:
15        Objection.  Vague, leading, no
16  foundation.
17  EXAMINATION BY MR. BRUNO:
18    Q.  Is there any relationship between
19  those two things?
20      MR. LEVINE:
21        Objection being compound and
22  ambiguous.
23      MR. TREEBY:
24        Same thing.
25      MR. BRUNO:

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0048

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 190

1      What's wrong with you?
2      MR. TREEBY:
3         Leading.
4      A.  Um -- there is a relationship, and it
5   goes back to ethics and, um -- codes of conduct
6   by professions.  Anytime you're dealing with
7   impacting anything in the area, you ought to
8   consider your impacts.
9   EXAMINATION BY MR. BRUNO:
10     Q.  Right.  Well, I guess what I was
11  asking you is that most people understand and
12  know about pile driving.  In fact, on Page 22
13  of this very document, at Paragraph 63, it
14  talks about that.
15     A.  Uh-huh.
16     Q.  Take a look with me.  It says,
17  vibrations during installation of structures
18  and sheet piles my affect nearby structures.
19  Okay?
20     A.  Uh-huh.
21     Q.  I'm just wondering if excavating in an
22  area on the batture next to a flood control
23  project may affect nearby structures in the
24  same way that pile driving --
25     A.  Yes.  Yes.

Page 191

1   MR. TREEBY:
2         Objection.  Same objections we
3   made before.
4   MR. BRUNO:
5         It's noted, man.  It's noted.
6   MR. TREEBY:
7         Well, I've got to make it.  I'm
8   sorry.
9   MR. BRUNO:
10        It's noted.
11  MR. TREEBY:
12        Do you want me give me a
13  continuing objection to every
14  question?
15  MR. BRUNO:
16        Yeah.
17  MR. TREEBY:
18        You'll stipulate that I can
19  assert it, I don't have to do it
20  literally?
21  MR. BRUNO:
22        Absolutely, baby.  You just knock
23  yourself out.
24  MR. TREEBY:
25        I asked about it earlier.  You

Page 192

1   wouldn't do it.
2   MR. BRUNO:
3         To form?
4   MR. TREEBY:
5         Yeah.
6   MR. BRUNO:
7         Because clearly I can't help your
8   form.  I've tried in vain, in vain, to
9   change any question to handle --
10  MR. TREEBY:
11        So we're reserving objections as
12  to form just to get this thing moving.
13  Is that okay?  I don't care.
14  MR. BRUNO:
15        No, I would like a chance to
16  change my form.
17  MR. TREEBY:
18        Okay.  I'll continue --
19  MR. BRUNO:
20        I'm still going to -- it may be a
21  vain, it may be just like, you know,
22  bearing my breasts and asking you just
23  to shoot me.
24  MR. LAMBERT:
25        Wait, joe.  No.  Let's not go

Page 193

1   there.
2      (Off the record.)
3   EXAMINATION BY MR. BRUNO:
4      Q.  All right.  That's all we have on
5   that.  We've marked it, let's move on.
6         What is the next water seepage issue,
7   if any, that arose during the work?  We talked
8   about the -- you know, the dewatering system.
9         What came up next?
10     A.  There was a couple of other issues.
11  During the demolition of the, um -- T-wall, we
12  excavated through some humus material, that's
13  material full of organics, old trees, limbs,
14  stumps -- in fact, we have some photos that I
15  think we give to you all and also to -- to IKON
16  for anybody that wanted copies on the
17  plaintiffs and defendants side, showing tree
18  limbs and trunks and water just dripping from
19  it.
20     Q.  Let me slow you down.  I think you've
21  produced that, so let's see if we can find it.
22  Didn't you do a little -- a paper?
23     A.  Yes, sir.
24     Q.  And in that paper, you --
25     A.  May I make a correction?  My son did a

49 (Pages 190 to 193)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0049

MELVIN M.L. McELVEE (VOL I)                              4/23/2008

Page 194

1   paper while he was at Grambling State
2   University.
3       Q.  Oh, this is your son.
4       A.  Yes.
5       Q.  Okay.  Well, I'm sorry.  I thought --
6   let's take a quick peek.  I guess we'll look at
7   it for the sole reason of seeing if these
8   photographs that he has attached are the ones
9   that you were referencing.  It's Page 8.
10      A.  Yes.  Yes.  Those are job site photos
11  by McElwee Brothers on this project, Dwyer Road
12  project that we're talking about.  And you can
13  look at -- they're in color, the original
14  photos, but if you look at the soils, you can
15  see it's old coffee ground material, we call
16  it.  And you can find branches, tree trunks --
17  it was not foundation material to be used back
18  in the finished structure.  So it's stuff we
19  had to haul off.
20      Q.  All right.  So I only show it to you
21  to show that we have photos and these are the
22  photos, so I'm going to mark this entire
23  document as McElwee number --
24          MR. LEVINE:
25              9.

Page 195

1           MR. BRUNO:
2               It's 9?
3           (Exhibit 9 was marked for
4   identification and is attached hereto.)
5       Q.  9.  Okay.  But again, you didn't write
6   this paper, your son wrote the paper.
7       A.  No, my son wrote the paper with my
8   assistance.  I helped him out as far as
9   whatever he needed.  He did his own wording and
10  review of the project documents and stuff like
11  that.
12      Q.  Okay.  Just --
13      A.  I did check it and I can stand behind
14  it.  I can tell you that.
15      Q.  Of course.  But let's see.  First
16  photo is at Page 8.  What is that a photo of?
17      A.  This explains it on that Page 8 of 13,
18  McElwee Brothers' photo of a temporary
19  retaining structure excavation.  It shows the
20  sheet pile wall, the whalers and the
21  cross-bracing to hold the hole open, and
22  there's a track hoe boom in the picture
23  excavating the soil.  You can also see a pump
24  to the left of the picture -- well, middle of
25  the picture almost, looks like, but on the left

Page 196

1   side --
2       Q.  Right.
3       A.  -- to assist with some of the
4   dewatering at those levels.
5       Q.  All right.  Now, what phase of the
6   project does that photograph depict?
7           MR. TREEBY:
8               What page are we on, please?
9       A.  Page 8 of 13.
10          MR. BRUNO:
11              8 of 13.  The first photo.  It's
12      the one with the page with only one
13      photo on it.
14          MR. TREEBY:
15              No, I was just confused because
16      the next one says 9 of 14.  Whatever.
17      A.  Okay, it says 8 of 13 on the page I'm
18  looking at.
19  EXAMINATION BY MR. BRUNO:
20      Q.  Anyway, what phase of the work does
21  that photograph depict.  Is that the sluice
22  gate, the demolition of the T-wall?
23      A.  This is the box culvert section.  In
24  fact, we're looking at the Inner Harbor
25  Navigational Canal.  You see the dolphin

Page 197

1   structure out there?
2       Q.  Yes.  So this is that excavation which
3   prompted the request for the additional soils
4   evaluation, right?
5       A.  That's correct.
6       Q.  All right.  Look at the next page
7   which has a couple of more photos.  Is that the
8   same, um --
9       A.  Same excavation?
10      Q.  -- same excavation?
11      A.  Yes, sir.
12      Q.  Okay.  Thank you.
13          MR. LEVINE:
14              Joe, just to be clear, these are
15      all on this job site?
16          MR. BRUNO:
17              Yes.
18      A.  Yes.
19          MR. BRUNO:
20              That's what we just established.
21          THE WITNESS:
22              Those are all photos of the Dwyer
23      Road --
24          MR. BRUNO:
25              Those are all photos of the job

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0050

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 198

1          site.  And we just went through where
2      it was.  That's fine.  Let's move on.
3  EXAMINATION BY MR. BRUNO:
4      Q.  Okay.  Now -- okay, I thought perhaps
5  we -- and I brought up the pictures because I
6  thought we had -- I thought I remember seeing a
7  picture of the organic material underneath the
8  T-wall demolition.
9      A.  You did.  You did.  It's in some --
10 something I submitted to you all.  And I
11 submitted to --
12         THE WITNESS:
13             That I submitted to IKON that's
14         on that disk, Mr. Treeby?
15         MR. TREEBY:
16             Okay.
17     A.  That's where those are.
18 EXAMINATION BY MR. BRUNO:
19     Q.  Okay.  Well, I can't put my hand on it
20 at the moment.  But anyway, let's just -- let's
21 just go to a continuation of your description
22 of the problems you were having with the soils.
23         Now, you got so far as you were
24 demolishing the old T-wall and encountered a
25 lot of organic materials below that foundation,

Page 199

1  and then I think you were about to tell us what
2  the issue then became.
3      A.  Um -- reevaluation of our dewatering
4  system such that we could maintain a stable
5  excavation right at the T-wall.  Um -- we also
6  ran into some problems during the extraction of
7  the concrete piles from underneath the T-wall.
8  McElwee Brothers and the Corps was not definite
9  on the existing length of the concrete piles
10 under the T-wall, but there was concern that
11 the piling probably penetrated a sand layer
12 that was probably charged, meaning from the
13 canal pressure on it, and we were going to
14 extract these piles, and we wanted to try to
15 define the lengths and after we pulled the pile
16 what procedures were going to be used to fill
17 the voids.
18     Q.  No, you're saying we here, and what I
19 really need to understand is, is this McElwee
20 Brothers who is undertaking this evaluation, or
21 is it a dialogue that you're having with the
22 Corps?
23     A.  It's McElwee Brothers taking on the
24 evaluation, but there was some -- at the same
25 time, the inspector is out there, and then

Page 200

1  there's meetings -- biweekly meetings, status
2  meetings that were being held.  We'd have to
3  come to the Corps and tell them what evaluation
4  McElwee Brothers found.
5      Q.  Get some questions answered.
6      A.  And there did come a point with the
7  dialogue where we sat with the engineer and
8  said, look, we got some concerns.
9      Q.  Let's start with this:  The contract,
10 did it call upon McElwee Brothers to remove the
11 pile?  Just flat out yes or no?
12     A.  The documents weren't clear.  That was
13 one of the questions we had on the project.
14     Q.  All right.  Did the specifications
15 reflect that there were piling there in the
16 ground?
17     A.  Yes.
18     Q.  Did the specifications indicate to you
19 what you were supposed to do when you
20 encountered those piling?
21     A.  No.
22     Q.  Okay.  All right.  Now, is this the
23 point where McElwee brings his engineering
24 experience and his own training and his
25 knowledge of soils to the table?

Page 201

1      A.  Yes.
2      Q.  All right.  Now, so you see these
3  piles.
4      A.  Yes.
5      Q.  What are you concluding when you see
6  these things down there based upon your
7  knowledge of the seepage issues and the like?
8      A.  Um -- my conclusion at that point,
9  during a status meeting, was to -- we took --
10 McElwee Brothers took measurements.  Its
11 quality control personnel and superintendent
12 took measurements and they brought them to the
13 table.  We sat with the Corps of Engineers and
14 said, we have some concerns.  The specs called
15 for demolition of the T-wall, but it doesn't
16 get into specifics on the demolition.  It
17 didn't tell us what to do with the piles, and
18 we offer a recommendation to Corps at that
19 time.  We offered a recommendation that we just
20 cut the piles off.  Leave them in place.
21 Because we were concerned that we didn't
22 know -- McElwee Brothers, we, didn't know how
23 long the existing piling were, and if they were
24 protruding into a sand layer that was charged
25 by the canal system, we were afraid if we

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0051

Page 202

1  pulled a pile and it was charged that we could
2  have seepage that could turn into something
3  potentially uncontrollable right at the
4  floodwall.
5      Q.  Okay.  Could that damage the flood
6  protection structure?
7      A.  That could have damaged the city of
8  New Orleans.
9      Q.  Okay.
10     A.  Because we already demolished the
11 wall, and then we're pulling a pile, and if
12 water starts to come out of that hole we can't
13 stop.
14     Q.  All right.  Now, let me ask you this:
15 Can you tell me whether or not the
16 specifications were reasonably specific in
17 order for you to ascertain as a contractor what
18 you were supposed to do when you encountered
19 these piling?
20     A.  No.  They didn't.
21     Q.  Now, and can you tell me whether or
22 not the Corps evidenced to you some
23 understanding as to the potential for
24 underseepage damage that may have occurred by
25 pulling these piles?

Page 203

1      A.  Repeat that, please.
2      Q.  All right.  Did you believe that in
3  your conversations with the Corps about whether
4  to pull or not pull piles that the Corps
5  understood the problem the way you understood
6  the problem?
7      A.  In a meeting, when I presented the
8  problem, their geotechnical expert Mr. Vocovich
9  fully understood what I was saying, because
10 nobody else in the meeting understood it.
11 Everybody was looking like, what is he talking
12 about?  Mr. Vocovich says, he has a valid
13 point.
14     Q.  Now, Vocovich is who?  He's not the
15 quality assurance person; right?
16     A.  No.
17     Q.  Who is Vocovich?
18     A.  At that time, he worked for the United
19 States Army Corps of Engineers New Orleans
20 District in its engineering division.
21     Q.  Uh-huh.  Right.
22     A.  Geotechnical section.
23     Q.  Got you.  Did the quality assurance
24 person evidence to you a working understanding
25 and/or knowledge of the issues that you were

Page 204

1  trying to bring to the Corps?
2      A.  No.  He had no knowledge of it.
3      Q.  Okay.  Now, all right.  So did the
4  Corps accept your recommendation to cut the
5  piles?
6      A.  They teetered on it and then rejected
7  it ultimately as a result of Mr. Holtgreve
8  mentioning in one of the status meetings that
9  he ever intended for the piling to be cut off.
10     Q.  All right.  Holtgreve is the guy from
11 the design --
12     A.  Design Engineering, Inc.
13     Q.  Okay.  So he says all right.  So the
14 design guy comes in and says, wait a minute,
15 now, I fully expected these things to be
16 pulled, and so the decision was made to pull
17 them.
18     A.  That's correct.
19     Q.  Okay.  Now, now we have a new problem
20 though, right?
21     A.  Yes.
22     Q.  Now we have voids.
23     A.  Yes.
24     Q.  Okay.  So who -- well, first of all,
25 was there a recognition by anyone in that

Page 205

1  meeting that there may be a problem associated
2  with pulling the piles period?
3          MR. TREEBY:
4              Asked and answered.
5              Go ahead.
6      A.  Yes, there was a person in the
7  meeting.
8  EXAMINATION BY MR. BRUNO:
9      Q.  And that was you.
10     A.  No.
11     Q.  You?  I mean Vocovich.
12     A.  Vocovich, yes.
13     Q.  He knew, but you knew, too.
14     A.  I knew, too.
15     Q.  So two of you.
16     A.  Yes.
17     Q.  All right.  Now, after the decision
18 had been made to pull the piles.  Okay?  Did
19 Vocovich indicate to you what should be done to
20 address the problem, or did you indicate to
21 Vocovich what needed to be done to address the
22 problem?
23         MR. TREEBY:
24             Object to the form of the
25         question.

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0052

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 206

1   A.  I informed everyone at that meeting
2  that the specs did not address the problem.
3  And Mr. Vocovich concurred, and the rest of
4  everybody else concurred.  And they amended --
5  they did a change order, because amendments
6  come before.  But a change order came out
7  directing McElwee Brothers to inject bentonite
8  into the voided holes.
9  EXAMINATION BY MR. BRUNO:
10   Q.  Okay.  Where did that come from; in
11  other words, who made the suggestion that
12  bentonite be put in the voids?
13   A.  The Corps mentioned it, I was familiar
14  with it because that's what we've always -- I
15  say, we.  Now in this situation, the Corps,
16  when I worked for them, always did with voids,
17  is fill them with bentonite.
18   Q.  Okay.  All right.  So that there's a
19  dialogue, one, there is an underseepage problem
20  created by the removal of piles, there is a
21  decision made, initiated by the Corps to inject
22  bentonite.
23   A.  Yes.
24   Q.  Okay.  All right.  Did you do that?
25   A.  Yes, we did.

Page 207

1   Q.  And did that exercise reveal any other
2  problems or issues?
3   A.  Yes, it did.
4   Q.  And what did that exercise reveal?
5   A.  It revealed that we -- during the
6  excavation of the T-wall, which was
7  approximately 40 feet wide, when we injected
8  bentonite in one hole, it traveled underneath
9  the ground surface and came out of another
10  hole, which was totally unanticipated and
11  showed that soils were not homogeneous beneath
12  the surface at that depth.
13   Q.  Okay.  First of all, what year is
14  this?
15   A.  Now, today?
16   Q.  No.  I know you're testing me, and I'm
17  going to fail.  I mean what --
18   A.  At that time, that was --
19   MR. TREEBY:
20       You saved me from making the same
21  objection.  Thank you, Mr. McElwee.
22  EXAMINATION BY MR. BRUNO:
23   Q.  In what year did that occur?
24   A.  That occurred in 2002, if my memory
25  serves me correctly.

Page 208

1   Q.  Good.
2   A.  Plus or minus a year.
3   Q.  Fair enough.  Okay.  Now, and over
4  what area, in other words, did you experience
5  this, you know, bentonite coming up out of
6  another hole?
7   A.  I say forty feet.  We was on one hole
8  and injected the bentonite, and we saw it come
9  up two or three holes down.
10   Q.  Okay.  All right.  Now, what if
11  anything did that say to you as a person who's
12  been schooled about underseepage problems?
13   A.  At that time, it said to me that there
14  was conditions underneath the surface that
15  allowed water to flow freely.  Why?  We didn't
16  know.  It prompted us to call in Gore
17  Engineering to do a soil boring right near that
18  area, to check the conditions of the soils and
19  compare it to the plans and specifications.
20   Q.  All right.  Now, who is the we there?
21  Is that McElwee Brothers or is that the Corps,
22  or is that the result of a collaboration
23  between McElwee and the Corps?
24   A.  Strictly McElwee Brothers only.
25   Q.  All right.  And what did the Gore

Page 209

1  testing reveal?
2   A.  The Gore boring at that location
3  indicated high water contents in the soil
4  stratums, much higher than the plans and
5  specs.
6   A.  -- and specs had illustrated.  And
7  that all sort of happened around the same time
8  frame after we filled the holes.  We drove some
9  piling, and there was an issue with cracked
10  pilings.
11   Q.  Right.
12   A.  And it kind of like all happened at
13  the same time, and it got us focusing on some
14  very pertinent issues.
15   Q.  Okay.  All right.  Well, I understand
16  about the cracked piles.  Did the Gore borings
17  take place before you encountered cracked piles
18  or afterwards?
19   A.  Afterwards.
20   Q.  All right.  So the bentonite injection
21  and cracked pile issue, were those coexistent?
22   A.  Yes.
23   Q.  Then let's talk a little bit about the
24  cracked pile issue.  Where were you driving
25  piles, underneath the T-wall?

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0053

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 210

1    A.  Yes.
2    Q.  Okay. I see. Tell us what the issue
3   was with the contracted piles.
4    A.  When we initially started driving --
5   McElwee Brothers, we. When McElwee Brothers
6   initially began driving the new piling for the
7   T-wall, new T-wall, I think -- I believe it was
8   a weekend, a Saturday, Mr. Vocovich came out to
9   observe the pile driving operation. And during
10  the first installation of the first pile, the
11  pile went down easy.
12       Now, I didn't know it at the time,
13  because I was in the office. Mr. Vocovich, I
14  saw him observing the pile driving operation.
15  And then he scratched his head and walked off.
16  And I asked him how things were going. And he
17  said, it's okay. But to me, I kind of felt
18  something was going to be behind it. It wasn't
19  his normal reaction.
20   Q.  Something was up.
21   A.  Something was up.
22       We continued the drive piling, and on
23  the Monday, the following Monday, there was
24  word given back by the quality assurance
25  representative, or the inspector, that there

Page 211

1   was a problem with the pile driving and that
2   the Corps had anticipated that piling were
3   cracked.
4        Well, McElwee Brothers said, hey, how
5   do you come to that conclusion that piling were
6   cracked? McElwee Brothers learned later that
7   Mr. Vocovich called a meeting, and the Corps
8   called a meeting, with Design Engineering,
9   Inc., Eustis and their design engineering
10  section to discuss the problem, and
11  Mr. Vocovich asked them, in the meeting, what's
12  the problem, guys? This pile went down too
13  easy.
14       Now, there is an anticipation of, if
15  you know the soil conditions, when you're
16  driving piling that the hammer is going to
17  react a certain way.
18   Q.  Exactly. Obviously the more
19  difficult --
20   A.  The stiffer the soil, the harder the
21  driving.
22   Q.  More hammer hits.
23   A.  More hammer hitting. And it was just
24  tapping them in very, very easy. When he asked
25  that question, I think Eustis engineers said,

Page 212

1   the hammer is too heavy, as a response, to try
2   to place blame on why the driving was easy.
3    Q.  Sure.
4    A.  And then Mr. Vocovich said, you all
5   reviewed the hammer, so if it's too easy, whose
6   fault is it? And then dialogue went around,
7   and then somebody blurted some piling are
8   cracked. And that's what came back to McElwee
9   Brothers from the Corps, that there's
10  anticipation that piles are cracked.
11       And when driving concrete piling, if
12  you get a crack or a fracture, normally what
13  happens, it will break and drive down right
14  inside itself very, very easy.
15   Q.  I understand.
16   A.  But McElwee Brothers said, well, how
17  did you draw the conclusion? Because we don't
18  see it. We did not see it where it looked like
19  it broke during the process.
20       So immediately, um -- the Corps said
21  they wanted to perform some testing. And
22  McElwee Brothers said, okay, we're going to
23  assist y'all with the testing. Because of my
24  experience, I knew the Corps dealt with GRL,
25  which is a design engineering firm in -- up in

Page 213

1   north America, I can't think of what state
2   they're from -- they're all over, really, and
3   most state agencies and the government utilized
4   their expertise when it comes to subsurface
5   geotechnical analysis and pile driving.
6        So we contacted them and say, hey,
7   y'all need to fly somebody in to do some
8   testing on all of these piling to tell us the
9   status of the piles. And testing was performed
10  and there were a couple of piles that were
11  cracked, but the crack was not a fracture, what
12  they thought. The cracks can potentially
13  happen during the transportation process, you
14  know, hairline cracks, some that may not affect
15  the integrity of the pile as far as its
16  placement and its engineering function.
17   Q.  Sure.
18   A.  So we agreed that, hey, there were
19  some cracks, but -- McElwee, we, agreed that
20  there were some cracks, but we wanted to hear
21  from the Corps what do you anticipate doing
22  about it, you know?
23       And so the Corps came back and said,
24  well, McElwee, y'all design a new floodwall
25  system for the problem. And that's where we

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0054

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 214

1   were at odds. Because McElwee Brothers took
2   the position and told the Corps we're not a
3   design engineering firm and we're not going to
4   design your floodwall.
5        And I myself was, later on, after this
6   meeting and all of that, in a conversation with
7   the contracting officer. When I mentioned to
8   her at that time -- her name is Mrs. Diane
9   Picou. I said, Ms. Picou, back during Betsy
10  when I was born my aunt was flooded in New
11  Orleans, the Ninth Ward, and she refused to
12  live here now, she lives in Wisconsin. And I
13  said, McElwee Brothers is not going to have its
14  name on any design that could potentially flood
15  the city.
16       And so we decided not to do it, and
17  that's when the Corps said, hey, you're
18  terminated. Not immediately on that telephone
19  conversation, but a couple weeks later.
20       Q.  Shortly thereafter.
21       A.  Yes.
22       Q.  I take it then you had no other
23  underseepage issues with the Corps after that.
24  Right?
25       A.  No. They ended at the point. Thank

Page 215

1   God.
2        Q.  All right. Okay.
3        (Brief recess.)
4   EXAMINATION BY MR. TREEBY:
5        Q.  Mr. McElwee, my name is William
6   Treeby. I represent Washington Group
7   International. You and I have talked on the
8   telephone once or twice, and I have a few
9   questions for you.
10       A.  Yes.
11       Q.  You indicated you have two sons. What
12  are their names?
13       A.  Melvin Millard Louis McElwee, Jr., and
14  Millard Louis McElwee.
15       Q.  Okay. Is your son who is named
16  junior, what is his age?
17       A.  He's 21.
18       Q.  Did he work on the project at Dwyer
19  Road?
20       A.  No, sir, he didn't.
21       Q.  Okay. I believe your testimony is
22  that you worked as an inspector for the Corps
23  of Engineers in the late eighties and early
24  nineties. Is that right?
25       A.  That's correct, sir.

Page 216

1        Q.  I'm going to show you a document which
2   is going to be marked McElwee Exhibit Number
3   10. This is just -- would this be fair -- are
4   you familiar with this document? Let me ask it
5   that way.
6        (Exhibit 10 was marked for
7   identification and is attached hereto.)
8        A.  It's an internal memorandum in the
9   Corps. I'm familiar with the items on the
10  document but not the document itself, because I
11  didn't -- I never saw this as a contractor.
12  EXAMINATION BY MR. TREEBY:
13       Q.  As a contractor?
14       A.  No, this is an internal memorandum,
15  memorandum through the area engineer for
16  construction division for project management
17  section. This stays with the Corps. That's
18  how I know that.
19       Q.  Okay. But your answer was I never saw
20  this as a contractor. What do you mean?
21       A.  Well, I worked for the Corps of
22  Engineers, so I saw their memorandums. This
23  particular document is about the contract that
24  I was working on as a contractor. Okay? The
25  Dwyer Road job. I never saw internal

Page 217

1   memorandums in the Corps.
2        Q.  No, this is March 26, 1990. This is
3   when you were an inspector for the Corps. You
4   see that at the top? You see the date at the
5   top?
6        A.  Oh, okay. I'm sorry, sir. I'm
7   thinking this had to do with -- yes, sir.
8        Q.  And if you would turn over to Page 5
9   at the bottom which bears Bates number
10  NED-049-000008274, in fact there's a reference
11  to you at the bottom of Paragraph Number 10.
12       Do you see that?
13       A.  That's correct, sir.
14       Q.  Do you remember this job at all?
15       A.  Let me read it for a second if that's
16  okay.
17       Q.  I'm not going to have a lot of
18  questions about it. I really don't. I just
19  want to ask a general question.
20       A.  Yes. I remember the Seabrook
21  floodwall, yes. I remember -- who was on this?
22  River Road Construction? I remember it. I was
23  on it for just a little while, yes.
24       Q.  Would you in your function as an
25  inspector, would you typically -- would you

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0055

MELVIN M.L. McELVEE (VOL I)                          4/23/2008

Page 218

1  typically get a copy of a document like this on
2  a job that you had been the quality control
3  inspector?
4      A.  No.
5      Q.  Okay.  Have you ever been deposed
6  before today?
7      A.  Yes.
8      Q.  How many times?
9      A.  Three?  Three to four times.
10     Q.  Do you recall what they involved?
11 Could you take them one at a time and tell me
12 what they involved?
13     A.  Okay.  The first one was when I worked
14 for the Corps of Engineers, I was involved in
15 an accident.  Somebody rear-ended me, and my
16 attorney had me -- well, a deposition was held,
17 and my attorney was in the room at the time
18 relative to that.
19     Q.  Who was your attorney?
20     A.  Lestelle and Lestelle was the firm.
21 Terrence Lestelle was the attorney at that
22 time.
23     Q.  Okay.
24     A.  Um -- there was another deposition
25 dealing with a bonding company, um -- Great

Page 219

1  American Insurance, Shields, Mott & Lund.  The
2  Corps of Engineers deposed me at that time.
3      Q.  Okay.
4      A.  Um -- there was a deposition I held
5  relative to negotiations in another project for
6  the, um -- LSU recreational fields.  It was
7  concerning, um -- a lien that McElwee Brothers
8  had on the job, and the opposing counsel wanted
9  to deposition me.  So I was in that on.
10          And this one.  I might be missing
11 something, now, but that's my memory right now.
12 I can tell you that.
13     Q.  Okay.  This job that there you said
14 McElwee Brothers -- I want to make sure I get
15 the pronunciation right.  I've been pronouncing
16 it wrong in my own head, so you'll have to
17 forgive me if I have a lapse.
18          McElwee filed a lien against UNO?
19     A.  No.  No.  McElwee Brothers filed a lien
20 against a project in Baton Rouge in which LSU
21 had some recreational felids installed in an
22 old cow pasture.  McElwee was performing work
23 for Tricor Properties in Baton Rouge, and there
24 was some monies owed, and McElwee Brothers
25 filed a lien at the end of the job, and in the

Page 220

1  course of mediation, private mediation,
2  Tricor's bonding company's attorney wanted to
3  depose me.
4      Q.  Okay.
5      A.  And it happened.
6      Q.  Okay.  Was there a lawsuit filed by
7  McElwee Brothers in that matter?
8      A.  Yes, in Baton Rouge, in the 19th
9  Judicial District.
10     Q.  And when was -- has that been resolved
11 or is it still pending?
12     A.  That's been resolved.  Just recently
13 resolved.
14     Q.  And who was your lawyer?
15     A.  Cassandra Butler.
16     Q.  Is she in Baton Rouge?
17     A.  No.  She's in Independence, Louisiana.
18     Q.  Okay.  Have you ever been a party to
19 litigation in the past?
20     A.  Oh, quite a few.
21     Q.  Other than the one you've just talked
22 about?
23     A.  Quite a few times.
24     Q.  Okay.  How many times?
25     A.  Um -- can I start from the bottom and

Page 221

1  come forward?
2      Q.  Sure.  Any way.
3      A.  Um -- prior to McElwee Brothers coming
4  into existence, I used to run a company Oxy
5  Aqua Filter System, sole proprietor, and I
6  began to do construction in that name.  O-X-Y,
7  there was a star, a little star -- asterisk in
8  the middle, Aqua, A-Q-U-A, Filter Systems, Inc.
9  I'm sorry.  It wasn't incorporated.  It was a
10 sole proprietorship.  At that time, I bidded a
11 contract with the State of Louisiana.  The
12 state -- I was a licensed contractor at that
13 time, was young, and the state was -- some of
14 the personnel in the state was kind of
15 fascinated that I was a young man with a
16 license to be in construction work, and they
17 yanked that contract from me with no rights to
18 do so.  I had a bond for it and bid the job,
19 and they said you don't have a license to do
20 it.
21          So litigation was filed to, um -- get
22 a writ of mandamus against the state to make
23 them comply with their own administrative
24 rules.  I was acting in pro se on that.
25     Q.  And where was that?

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0056

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 222

1    A.  That was in the 19th Judicial District
2  Court.
3    Q.  And I assume that was resolved at some
4  point?
5    A.  The writ of mandamus was issued to
6  compel the state to do what they were supposed
7  to do, yes.
8    Q.  Okay.  And the next, coming forward?
9    A.  Um -- there was a -- in Vidalia,
10 Louisiana, there was a bond claim on a project
11 with the state for Oxy Aqua at that time.  That
12 litigation, I was involved in that one, that
13 was a bonding company suing me, and I had to be
14 present with the suppliers to deal with some,
15 um -- bonding issues in Vidalia.
16   Q.  Who was the bonding company?
17   A.  Transamerica.
18   Q.  And who was the defendant?
19   A.  The defendant was everybody, the
20 state, myself, um -- myself meaning Oxy Aqua
21 Filter Systems.  Um -- there was two other
22 vendors, River -- Terrell River Services was
23 one.  There was another company, I can't think
24 of their name.  It's been a while.
25   Q.  Okay.  Who was your attorney in that

Page 223

1  matter?
2    A.  In that matter I was pro se.
3    Q.  Okay.  Next one?
4    A.  There was -- on this particular --
5  well, I'm saying this particular.  McElwee
6  Brothers, dealing with the Corps of Engineers
7  on that project, there was some litigation
8  involved with that.  The bonding company was
9  the plaintiff, Great American Insurance,
10 against McElwee Brothers, Try-State -- not
11 Tri-State, but, um -- Ronald Davis, Beverly
12 Davis and myself, in the Eastern District of
13 Louisiana here in New Orleans.  There was,
14 um -- a lawsuit filed by the bonding company
15 relative to the Corps of Engineers project.  I
16 was involved in that litigation.  And in that
17 litigation there was several attorneys, there
18 was one for the joint venture, because
19 Try-State Design Construction Company and
20 McElwee Brothers did a joint venture under that
21 agreement for McElwee Brothers to perform that
22 contract.  So there was a joint venture
23 attorney, there was a McElwee Brothers
24 attorney, and I myself acted Pro Se on behalf
25 of myself in that same litigation.

Page 224

1    Q.  I think I've identified some of these.
2  Let me show you a document we've marked McElwee
3  Exhibit Number 11 and ask if that is a document
4  you're familiar with in connection with the
5  appeal; of a contract decision against McElwee
6  Brothers and Great American Insurance Company
7  in connection with the Dwyer Road project.
8        (Exhibit 11 was marked for
9  identification and is attached hereto.)
10   A.  Yes, sir.
11 EXAMINATION BY MR. TREEBY:
12   Q.  Are you familiar with this document?
13   A.  I'm familiar to the degree of knowing
14 that the bond company filed a complaint.  And I
15 did see a draft of this, but I never saw the
16 filed copy.
17   Q.  You say you saw a draft.  How did you
18 come to see a draft of it?
19   A.  Elizabeth Gordon who works for
20 Shields, Mott & Lund sent the document to me,
21 asked me to review it before she filed it.  We
22 had some discussion, but I wasn't -- she was
23 the controlling factor in that.  What she put
24 in it afterwards I don't know.  All I know is I
25 spoke with her, had some input, and then it was

Page 225

1  filed.
2    Q.  Was there a legal proceeding, a
3  hearing or anything in connection with that
4  proceeding before the Armed Services Board?
5    A.  Yes.  There was, um -- several issues
6  brought before the Armed Services Board of
7  Contract Appeals relative to that job
8  concerning the Corps' administration of that
9  contract and refusal to cooperate with the
10 contractor that were filed with the Armed
11 Services Board of Contract Appeals.
12   Q.  I'm going to show you a document that
13 we've marked McElwee Exhibit Number 13 and ask
14 you if this is the draft that you saw of the --
15   A.  13?
16       (Exhibit 13 was marked for
17 identification and is attached hereto.)
18 EXAMINATION BY MR. TREEBY:
19   Q.  Yes.
20   A.  Can I say it's similar?  I can't
21 verify and tell you after looking at this for a
22 few seconds that it is the same one other than
23 to compare it with the one that I had, you know
24 what I'm saying, at my office, but it looks
25 similar, yes.

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0057

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 226

1    Q.  I don't know if it would help you, but
2  I can tell you the source of this document was
3  not you but was Dr. Bea in his production to
4  us, and the indication was it came from you.
5  And I would ask you to turn -- there's several
6  handwritten notes in it that might help you
7  identify it, um -- I'm not sure, but I have
8  some reason to believe that these may be your
9  handwritten notes.  For example, Page -- I see
10  one on Page 14, I see some on Page 15, and I
11  see some on Page 16.
12    A.  Okay.  Those are my handwritten notes.
13  But you say Dr. Bea.  Dr. Bea wasn't involved
14  in this at this point.  I don't know about
15  that.  I'm not aware of that.
16    Q.  Well, he indicated -- his production
17  of this document indicated to us that he got it
18  from you.
19    A.  Okay.  Fine.  Now I can tell you that
20  this is that document.  Yes.  I can answer
21  that.  I didn't know where it came from.  I
22  didn't know if you got it from Shields, Mott &
23  Lund and it was a little bit different.  I can
24  tell you Dr. Bea gave you this, this is a
25  document that McElwee Brothers saw and is

Page 227

1  familiar with.
2    Q.  So you recall providing Dr. Bea with a
3  copy of this draft?
4    A.  Dr. Bea gave you this, I can verify
5  that that is my corrections in this document,
6  and that if he got it -- you got it from him, I
7  provided it to him.
8    Q.  Okay.  And I'm going to show you a
9  document that I think you referred to a minute
10  ago.  I've marked it McElwee Exhibit Number 12,
11  which I believe is a copy of the complaint
12  filed against McElwee Brothers and others
13  including you personally in the Eastern
14  District allotted to Judge Duval, actually.
15    (Exhibit 12 was marked for
16  identification and is attached hereto.)
17    A.  That is correct.  This is the initial
18  documentation submitted to the Court on behalf
19  of the bonding company through Shields, Mott &
20  Lund.
21  EXAMINATION BY MR. TREEBY:
22    Q.  Okay.  We've identified -- you've
23  identified some of those entities that were
24  named in this suit, but I want to ask you about
25  Sylvia Hurst.  Who is Sylvia Hurst?

Page 228

1    A.  Sylvia Hurst?  That's my wife.  My
2  boss.
3    Q.  Okay.  And Try-State Design
4  Construction Company, Inc., who is that?
5    A.  Try-State Design Construction Company
6  is a firm out of Pennsylvania owned by Ronald
7  U. Davis who brought the financing and the
8  bonding to the project at the Dwyer Road.
9    Q.  Was Tri-State Design Construction
10  Company, Inc. the other member of the joint
11  venture that did the Dwyer Road project?
12    A.  Yes.
13    Q.  Okay.  There's a request for -- this
14  pleading is a request for temporary restraining
15  order, preliminary and permanent injunction,
16  specific performance and declaratory judgment.
17    In fact, was a preliminary and
18  permanent injunction issued by Judge Duval in
19  this matter?
20    A.  A preliminary injunction was issued.
21  A permanent injunction, no.
22    Q.  Were there sanctions issued against
23  you personally in this matter for failing to
24  cooperate with Great American Insurance
25  Company?

Page 229

1    A.  Yes.
2    Q.  Now, I don't know if you had
3  completed -- had you completed, as best you
4  could recall, the list of litigation that you
5  had been involved in, or your company had been
6  involved in?
7    A.  I hadn't completed it, but I mean,
8  whatever you go over I'll verify whether it
9  was --
10    Q.  Well, why don't you complete it, and
11  then -- I may know about some of them and not
12  others, so why don't you complete the list.
13    A.  Well, I think between what I said and
14  then what you've just brought out, I think that
15  is basically all of it that I know of at this
16  point.
17    Q.  Okay.  Do you recall a proceeding
18  brought by one Timothy Miller against McElwee
19  and the Corps of Engineers?
20    A.  I am familiar with that.  That was
21  brought through an insurance company.  The
22  insurance company handled that one.  They sent
23  documents to me and I conversated [sic] with
24  them, but I never was involved in it other than
25  to tell them, here are the contract documents

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0058

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 230

1  and our records don't show Mr. Miller being on
2  the project. Purportedly he worked for some
3  firm, a service firm, and got hurt on the job.
4  And, but McElwee Brothers didn't have any
5  records to confirm that he was ever on that job
6  that day and got hurt. We confirmed that he
7  came to the job, but not that he got hurt that
8  day.
9      Q. Do you know what happened in that
10 lawsuit?
11     A. No, sir, I don't. I just know that
12 the, um -- insurance company that was handling
13 it at that time dealt with it.
14     Q. So you don't know the end result of
15 it?
16     A. No, sir, I never researched the
17 documents to find out what the end result was.
18     Q. Do you recall a suit that you and
19 McElwee Brothers, plaintiffs, brought against
20 Ronald Davis and Try-State Design?
21     A. I'm familiar with that one.
22     Q. Tell me what that suit was about.
23     A. That suit was the initial onset of --
24 after the termination for default took place
25 with the Corps of Engineers, McElwee Brothers

Page 231

1  sued Mr. Davis and his -- some of his practices
2  he began the utilize at the end of the project
3  that, um -- were not productive for the
4  project.
5      Q. And that suit was brought in 2003.
6         What has happened with that case?
7      A. It was stayed pending arbitration.
8      Q. Did the arbitration take place?
9      A. No, sir.
10     Q. The case still there?
11     A. It's still there.
12     Q. And who is your attorney in that case?
13     A. Roderick White and Lori White.
14     Q. Are you familiar with a matter named
15 Hancock Bank of Louisiana versus McElwee
16 Brothers?
17     A. Yes, I'm familiar with that.
18     Q. And what is that about?
19     A. That was about a, um -- a mortgaged
20 vehicle purchased from Hancock Bank.
21     Q. Is that still pending?
22     A. Not that I know of, no. They turned
23 it from a writ of seizure to a suit against a
24 mortgage note and received a judgment on it.
25     Q. I show you a document, it refers to

Page 232

1  the suit that I mentioned earlier, brought by
2  you and McElwee Brothers against Ronald Davis
3  and Tri-State Design. It's McElwee Exhibit 14.
4         Does that look familiar to you?
5         (Exhibit 14 was marked for
6  identification and is attached hereto.)
7      A. Yes, sir. This is the complaint that
8  was filed in the federal Court by Lori Folse
9  White.
10     Q. I show you a document McElwee
11 Exhibit 15. And I think you've already talked
12 about this. I asked you about the sanctions
13 brought against -- the sanctions order issued
14 by Judge Duval against you.
15         Is that a copy of the Order?
16         (Exhibit 15 was marked for
17 identification and is attached hereto.)
18     A. That's correct.
19 EXAMINATION BY MR. TREEBY:
20     Q. Have you ever paid those sanctions?
21     A. Yes. They were paid.
22     Q. Okay. While we're marking some
23 documents here, Mr. McElwee, when did you first
24 meet with Mr. Bruno to prepare for this
25 deposition?

Page 233

1      A. To prepare for it? Um -- actually, it
2  was a couple of weeks ago. I can't tell you
3  the exact date but I came in and we had a brief
4  conversation, and we was talking about the job
5  I was on with the Corps of Engineers.
6      Q. That's the Dwyer Road job?
7      A. Yes. I mentioned to Mr. Bruno, I
8  said, Mr. Bruno, I had a job with the Corps of
9  Engineers and these are some of the things that
10 took place. And I can't --
11     THE WITNESS:
12         Your name?
13     MR. JOANEN:
14         Scott Joanen.
15     A. Scott said, y'all need to cease this
16 conversation at this moment because we don't
17 want to get into no discussion about too much.
18 But we went to deposition you. And are you
19 willing to go through a deposition? And
20 then --
21 EXAMINATION BY MR. TREEBY:
22     Q. I'm going to show you a document that
23 we've marked McElwee Exhibit Number 16 which
24 you should be familiar with, I believe. This
25 is a copy of a subpoena that we issued to you,

59 (Pages 230 to 233)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0059

MELVIN M.L. McELVEE (VOL I)                                4/23/2008

Page 234

1   which shows a return on it. I assume you
2   acknowledge having received this.
3       (Exhibit 16 was marked for
4   identification and is attached hereto.)
5       A. Yes, sir. You and I had a
6   conversation I think about this, with IKON
7   and -- you know, I'm waiting on your response
8   to tell me if you thought was enough or not.
9       (Brief interruption.)
10  EXAMINATION BY MR. TREEBY:
11      Q. And I want to show you a document we
12  have marked McElwee Exhibit 17 and ask you if
13  you can identify that as a written response to
14  the subpoena that you've just identified as
15  Exhibit 16.
16      (Exhibit 17 was marked for
17  identification and is attached hereto.)
18      A. Yes. This is -- yes, this is a
19  written response to that Request for Production
20  of documents.
21  EXAMINATION BY MR. TREEBY:
22      Q. Okay.
23      MR. BRUNO:
24      Did you furnish this to us?
25      THE WITNESS:

Page 235

1       Yes, sir.
2       MR. BRUNO:
3       No, no. Mr. Treeby.
4       MR. TREEBY:
5       I don't know. I assume we did,
6   but I forget. It was produced. He
7   filed it in the record, so I would
8   assume that you've got it.
9       MR. BRUNO:
10      Well, no.
11      MR. TREEBY:
12      It's in the --
13      MR. BRUNO:
14      All right.
15      MR. TREEBY:
16      It's in the filings in the case.
17  It's in Pacer.
18      MR. BRUNO:
19      Well, it's also something you
20  were obligated to give to us once you
21  got it.
22      MR. TREEBY:
23      We can talk about that later. If
24  that's so, I certainly will apologize.
25  I doubt that's so.

Page 236

1   EXAMINATION BY MR. TREEBY:
2       Q. However, proceeding ahead, in order
3   the respond to the specific requests in the
4   subpoena, particularly for documents, what did
5   you do to respond to it?
6       A. Um -- when I got the subpoena, I
7   looked at the request of the subpoena, the
8   definitions, and then exactly what you was
9   asking me for, and I tried to go verbatim to
10  give you an answer to your requests. And I
11  think this particular request you had asked me
12  about information relative to, um -- projects
13  that really were outside the scope of the Dwyer
14  Road project, and I think my response was,
15  generally, I didn't perform a contract in the
16  area where the failures were, but I did perform
17  a contract somewhere else, which was the Dwyer
18  Road project. And to your questions about who
19  I may have talked to on the levee investigation
20  team, I informed you that I talked to, um --
21  Professor Robert Bea, and the documents that I
22  had on hand that I had supplied him and any
23  communications I forwarded it to you. And I
24  also mentioned that there may be other
25  documents that I didn't have in my possession

Page 237

1   that he may have that I submitted to him and he
2   would be the best source of all the documents
3   that I had supplied him.
4       Q. I'm going to have to come back to
5   this. I apologize to you. And I will
6   represent to everybody here, apparently the
7   document that I had you identify as the
8   subpoena is incomplete. It gives the
9   definitions but doesn't give the specific
10  documents requested, which we will get and deal
11  with later because I am curious about it.
12      I believe it did ask you for
13  communications with Dr. Bea. Did it not?
14      A. It asked for communications held with
15  any member of the levee -- in fact, my
16  answer -- response to, um -- it asked for any
17  documents -- for any correspondence you've held
18  with any member of the levee investigation
19  team. something to that effect. Not Dr. Bea,
20  per se. But he just happened to be the one
21  that McElwee Brothers had spoken to that was a
22  member of the levee investigation team. And so
23  we --
24      Q. We'll get it before us, because I
25  apologize, I got here without the full

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0060

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 238

1    document. I believe it did asked, actually --
2    it may have asked for levee investigation team
3    but it specifically asked for Dr. Bea.
4         And in any case, you understood in
5    responding to it that we were asking for,
6    including other things, communications with
7    Dr. Bea, is that correct?
8    A.  I fully understood that. That's why I
9    submitted you all the E-mails and
10   correspondence that me and Dr. Bea had, and I
11   also mentioned in my response please contact
12   Dr. Bea because there was some time frame that
13   passed between the time I met with him, some
14   documents I actually started getting rid of,
15   and I knew he had copy of them, I said go to
16   Dr. Bea and get them.
17   Q.  And in doing your search, did you
18   search your computer at work?
19   A.  Yes.
20   Q.  At home?
21   A.  I don't have a computer at the house.
22   Most of my -- I have a laptop, but nothing on
23   the laptop was relative to conversations with
24   me and Dr. Bea. But the computer at home -- I
25   mean the computer at work, yeah.

Page 239

1    Q.  Did you talk to anyone else at your
2    place of -- you know, at McElwee Brothers, to
3    determine if they had responsive documents?
4    A.  There was no one else that
5    communicated with Dr. Bea. It was strictly me.
6    Q.  Did you search phone records?
7    A.  Did I search phone records?
8    Q.  Telephone records.
9    A.  I didn't go back and see how many
10   times I talked to him on the phone, on the
11   phone bill. That's the only thing I would
12   have.
13   Q.  And you didn't look there?
14   A.  No. No. Because all I'm going to
15   have is a phone bill telling me I talked to him
16   this time. But what we talked about, I don't
17   keep a record of that.
18   Q.  Okay. Did you search paper files both
19   at home and at work?
20   A.  Yes. Of all documents that we
21   provided to Dr. Bea, paper files, storage
22   facilities, you know -- I went -- effort -- you
23   know, a tremendous effort going through our
24   storage containers trying to find everything
25   that I remember. Because when I submitted

Page 240

1    documents to him -- I'd like to explain a
2    little, if I can.
3    Q.  I haven't shut you off and don't. Go
4    ahead.
5    A.  When the request was made, when I
6    first met with Dr. Bea he brought him file
7    cabinets in conference room in Hammond, in a
8    trailer, and said, hey -- we laid it out for
9    him to take a look at everything. He left but
10   he didn't get copies. So this communication is
11   the only thing that we had as far as
12   communication and documents. And then some
13   documents that we submitted that I don't have
14   on record now, in my possession.
15        When this subpoena was issued, from
16   that time where he met in the conference room
17   and saw everything, some documents had been
18   destroyed, because over time, I mean, I figured
19   it wasn't important. I didn't need it for IRS,
20   we got rid of it.
21        So that's why McElwee Brothers said,
22   Mr. Treeby, check with Dr. Bea. So every
23   document that was in McElwee Brothers'
24   possession, that was in McElwee Brothers'
25   office file cabinet, container, 40-foot storage

Page 241

1    container, um -- anywhere, I went through every
2    document to see what I had in writing to get it
3    to you.
4    Q.  I may be jumping ahead a little bit,
5    but you gave me a response and we're going to
6    go back into the response in a minute. And
7    then subsequently after some further
8    communication that we had telephonically, you
9    gave other documents to IKON. Is that correct?
10   A.  Yes. And the way that came about was,
11   this request was for information that I had
12   shared with Dr. Bea and given to Dr. Bea. That
13   IKON disk, that didn't happen at that time
14   after I met with Dr. Bea. This happened while
15   we were talking. I haven't stopped
16   communications with Dr. Bea. So what happened
17   was, I took that information that had been
18   given to him up -- in between November 18th,
19   2007, and until I produced it to you on that
20   day on the phone, that was that disk. That was
21   new information that had been presented to
22   Dr. Bea.
23   Q.  So it's your testimony that the
24   documents on the IKON disk are all documents
25   that were transmitted to Dr. Bea after

61 (Pages 238 to 241)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0061

MELVIN M.L. McELVEE (VOL I)                          4/23/2008

Page 242

1  November 19, 2007?
2      A.  Yes, sir.  So help me God.
3      Q.  Now, if you would look at the document
4  I believe we've marked as 17 --
5      A.  Yes, sir.
6      Q.  -- which is your response, did anyone
7  help you draft this response?
8      A.  No, sir, I mean -- we went over the
9  litigations that I've been involved in acting
10 Pro Se, so I've did a quite a bit of research
11 in libraries to look at the books and figure
12 out how to do these type of simple things.
13     Q.  Okay.  If you would look at Page 3 of
14 5 of your response --
15     A.  Yes, sir.
16     Q.  -- Response Number 7, do you see that?
17     A.  Yes, sir.
18     Q.  It states, McElwee Brothers has not
19 conducted or attempted to conduct excavation
20 along the Industrial Canal 's east bank between
21 Florida and Claiborne Avenues.
22         Is that statement true?
23     A.  Yes, sir.
24     Q.  Okay.  In your response to Number 7,
25 again Tab Number 8, Page 3, you state, McElwee

Page 243

1  Brothers has not conducted or attempted to
2  conduct excavation along the Industrial
3  Canal 's east bank between -- that's a repeat.
4  Forget that one.
5      A.  No.  No.  You said not.  It says has
6  conducted.
7          MR. BRUNO:
8              You took out not.
9          THE WITNESS:
10             He pit in not.
11     A.  Take the not out.  McElwee Brothers
12 has conducted excavations along the Industrial
13 Canal 's east bank north of Florida and
14 Claiborne Avenues, outside of the parameters in
15 your original request.
16 EXAMINATION BY MR. TREEBY:
17     Q.  Okay.  I'm sorry.  I misread
18 something.  That's not what I misread, though.
19         You also state McElwee Brothers has
20 not conducted or attempted to conducted
21 dewatering procedures along the Industrial
22 Canal 's east bank between Florida and
23 Claiborne Avenues.  Is that correct?
24         MR. BRUNO:
25             That's Number 6, that's not

Page 244

1          Number 7.
2          MR. TREEBY:
3              Right.  Number 6.
4      A.  That is correct.
5  EXAMINATION BY MR. TREEBY:
6      Q.  And in your response on Page 4 to
7  Number 8 you state, McElwee Brothers has not
8  reported underseepage, ponding or pooling of
9  waters along the Industrial Canal's east bank
10 between Florida and Claiborne Avenues.
11         Is that true?
12     A.  That is true.  I have not performed
13 any work between Florida and Claiborne avenues.
14     Q.  Well --
15     A.  Only north of there.
16     Q.  Yeah.  This wasn't really asking about
17 work you had done.  I want to make sure we're
18 clear.
19         Is it true when you stated here
20 McElwee Brothers has not reported underseepage,
21 ponding or pooling of waters along the
22 Industrial Canal's east bank between Florida
23 and Claiborne avenues, you've not reported
24 that.
25     A.  I'm going to answer you.  We don't

Page 245

1  have the complete request for production.  In
2  that complete request for production, your
3  request was only for information between
4  Florida and Claiborne Avenues.
5      Q.  That's all I'm asking about.  I'm just
6  quoting your response.  I just want to make
7  sure it's true.
8      A.  It's true.
9      Q.  Okay.  That statement that I just read
10 from your response is true.
11     A.  So help me God.
12     Q.  That's all I want to know.
13         Did you ever perform any work in the
14 East Bank Industrial Area at any time either
15 for the U.S. Corps of Engineers or anyone else?
16         Do you know what the East Bank
17 Industrial Area is?
18     A.  Explain that to me, please.
19     Q.  Okay.  The East Bank Industrial Area I
20 will define as the area between the Florida
21 Avenue bridge and the Claiborne Avenue bridge
22 and between the floodwall and the Industrial
23 Canal.  You understand that?
24         MR. LAMBERT:
25             Why don't you point to it on

                                   62  (Pages 242 to 245)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0062

MELVIN M.L. McELVEE (VOL I)                           4/23/2008

Page 246

1    Number 6.
2        MR. TREEBY:
3            Hugh, let me conduct -- you do
4    whatever you want when you're asking
5    questions.
6        MR. LAMBERT:
7            I just want to make sure he's
8    clear what you're talking about.
9        MR. TREEBY:
10           I'm being as clear as I can.
11       MR. BRUNO:
12           Isn't that interesting. Because
13   when we had the same problem before,
14   you suggested I was being vague all
15   day long and all day and night.
16       MR. TREEBY:
17           That wasn't really an objection.
18   He was suggesting how I conduct the
19   examination. I'll conduct it the way
20   I want.
21       MR. LAMBERT:
22           Wait. Wait. Don't get ticked
23   off at me. Just stick with Joe.
24   Okay?
25   EXAMINATION BY MR. TREEBY:

Page 247

1    Q.   Okay. Let's get the geographic
2    parameters. We're talk about the Florida
3    Avenue bridge to the north -- no, that's not
4    the Florida Avenue bridge. I'm sorry. That's
5    in fact the old Chef bridge.
6    A.   Okay.
7        MR. LAMBERT:
8            Well, there you go.
9        MR. TREEBY:
10           Okay. I understand. This
11   doesn't help at all.
12       MR. BRUNO:
13           Are you testifying now, counsel?
14   A.   Wait. Wait. Wait. Sir, if my memory
15   serves me correctly, there is a bridge here.
16       MR. BRUNO:
17           There is.
18   EXAMINATION BY MR. TREEBY:
19   Q.   There is a bridge at Florida Avenue.
20   That's true.
21   A.   That's correct.
22   Q.   And I'm asking --
23   A.   You told me this wasn't Florida
24   Avenue.
25   Q.   That's not Florida Avenue.

Page 248

1        MR. BRUNO:
2            That's Almonaster.
3    A.   That's Almonaster. Okay.
4    EXAMINATION BY MR. TREEBY:
5    Q.   I'm just trying the help. I'm not
6    trying the confuse you. The Florida Avenue
7    bridge, you understand -- you know where that
8    is? Without regard to the map, do you know
9    where it is? Have you been there?
10   A.   I've been there but I'm confused now
11   because what I thought was the Florida Avenue
12   bridge, and maybe it wasn't the Florida Avenue
13   bridge, and I'm thinking between here and the
14   Claiborne.
15   Q.   Uh-huh. Well, let's help ourselves
16   geographically. Do you know where the
17   Intracoastal Waterway is to the east of the
18   Industrial Canal? The Intracoastal Waterway.
19   Exactly. You're pointing to the Intracoastal
20   Waterway. And the Intracoastal Waterway
21   intersects with the Industrial Canal. You're
22   familiar with that.
23   A.   The Inner Harbor Navigational Canal,
24   yes.
25   Q.   And would you agree with me that the

Page 249

1    Florida Avenue bridge is south of where the
2    Intracoastal Waterway intersects with the Inner
3    Harbor Navigational Canal?
4        MR. BRUNO:
5            Objection. Leading.
6    A.   I'll have to agree.
7        MR. BRUNO:
8            You did the exact same.
9    A.   I mean, I'm going to have to agree
10   with you because I don't have anything else to
11   refer to. And I'm actually -- I'm going to
12   have to agree with you for the purposes of this
13   illustration, yes.
14   EXAMINATION BY MR. TREEBY:
15   Q.   I mean, if don't know then say you
16   don't know. I'm trying to find out what you
17   know.
18   A.   Okay.
19   Q.   Where is the Florida Avenue bridge in
20   relation to the Intracoastal Waterway?
21   A.   It is south of Interstate 10. I can
22   tell you that.
23       MR. BRUNO:
24           Bill, the original question
25   was -- let's go back because we'll be

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0063

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 250

1    here all week.  You and I can
2    stipulate where it is.
3         MR. TREEBY:
4             I want this witness --
5         MR. BRUNO:
6             Can we?
7         MR. TREEBY:
8             No, that's not -- Joe, look --
9         MR. BRUNO:
10            Listen to me.  If you want to go
11    off the record and step outside I'll
12    be more than happy to.
13        MR. TREEBY:
14            I know where it is.  I know where
15    it is.  You know where it is.  I want
16    to make sur this witness knows where
17    it is.
18        MR. BRUNO:
19            He said -- it doesn't matter
20    whether he knows where it is.  Your
21    question was did he do work at a
22    particular location.  Why don't you
23    just point.  Okay?  You started this.
24    Did you do any work on the, what did
25    you call it, the -- I forgot what he

Page 251

1    called it.
2         MR. TREEBY:
3             Are you making an objection?
4         MR. BRUNO:
5             I forgot.  The service area?  The
6    wharfage area?  It's so long ago.
7    A.  Can I make a statement?
8         MR. BRUNO:
9             You got sideways on your own
10    damned question.
11    A.  McElwee Brothers has not performed any
12    work south of Interstate 10.  Now, that
13    includes the area that's in your Request for
14    Production of documents.
15    EXAMINATION BY MR. TREEBY:
16    Q.  Now, let me -- the East Bank
17    Industrial Area is an area bounded on the north
18    by the Florida Avenue bridge --
19    A.  Okay.
20    Q.  -- and bounded on the west by the
21    Inner Harbor Navigational Canal.
22    A.  Okay.
23    Q.  And bounded on the east by the
24    floodwall between the Florida Avenue bridge and
25    the North Claiborne Bridge.

Page 252

1    A.  Okay.  I know the area you're talking
2    about.
3    Q.  Okay.  Have you ever done any work
4    here?
5    A.  No, sir.
6    Q.  Thank you.  In all your inspection
7    work, I'm not talking about work as a
8    contractor now, I'm talking about your work for
9    the Corps of Engineers, when were an inspector
10    for the Corps of Engineers, did you ever
11    inspect any excavations in work in this area
12    that I have just defined for you as the East
13    Bank Industrial Area?
14    A.  No.
15    Q.  Did you ever do any inspection work in
16    the Lower Ninth Ward?
17    A.  Dredging inspection.
18    Q.  Dredging inspection?
19    A.  Not in the Lower Ninth Ward.  It was
20    in the canal.
21    Q.  In what canal?
22    A.  In the Inner Harbor Navigational
23    Canal.
24    Q.  Was that in the Inner Harbor
25    Navigational Canal itself or in the -- what's

Page 253

1    been known as the MRGO connecting to the Inner
2    Harbor Navigation Canal, or both?
3    A.  MRGO -- both MRGO and --
4    Q.  So you -- and in the dredging work
5    that you inspected in the Inner Harbor
6    Navigational Canal, where in the Inner Harbor
7    Navigational Canal did you do that inspection
8    of dredging?
9    A.  Right near the Mississippi River where
10    it enters the Inner Harbor Navigational Canal,
11    and then from -- I'm pointing here.
12    Approximately here on out.
13        MR. TREEBY:
14            And Joe, you may want to look
15        where he's pointing when he says from
16        here on out.
17    EXAMINATION BY MR. TREEBY:
18    Q.  You're painting pointing to an area
19    somewhere in the Intracoastal Waterway on out
20    to the east, right?
21    A.  Yes.
22    Q.  Do you know Mr. Shields?
23    A.  Yes, I do.
24    Q.  And what is your relationship to
25    Mr. Shields?

64  (Pages 250 to 253)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0064

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 254

1     A.  Mr. Shields was the attorney for -- if
2  we're talking about the same Sonny Shields.
3     Q.  Yeah.  Lloyd Sonny Shields.
4     A.  Lloyd Sonny Shields.  He was the
5  attorney for Great American Insurance Company.
6     Q.  Okay.  If you know, what is SELA?
7  S-E-L-A.
8     A.  Southeastern Louisiana, um -- I can't
9  tell you all the rest of it.
10    Q.  Did you understand that the Dwyer
11  discharge tubes and canal project that you
12  worked on was a SELA Project?
13    A.  Yes.  And SELA was an area that one
14  contracting officer administrator supervised
15  for construction, you know.  And in New Orleans
16  it was SELA.  And in Jefferson Parish it was a
17  different title.
18    Q.  I show you a document which we will
19  mark McElwee Exhibit 18.
20        Are you familiar with that document?
21        (Exhibit 18 was marked for
22  identification and is attached hereto.)
23    A.  Yes.  This appears to be an
24  extrapolation of some of the plans for the bid
25  used on the Dwyer Road discharge tube.

Page 255

1     Q.  Actually, the complete contract that
2  McElwee Brothers or the joint venture that it
3  was engaged in for the Dwyer Road project is
4  considerably longer than this document, is it
5  not?
6     A.  Oh, much bigger.  Yeah.  It's almost
7  two inches thick.
8     Q.  But this is a part of it, is it not?
9     A.  This is portion of it, yes.
10    Q.  Is this the part of it that deals with
11  the dewatering section of the job?
12    A.  This is part of that.  That's not --
13  it's not complete.  Because in part of it there
14  was a change orders that's a part of this, and
15  it's not here.
16    Q.  So there was a change order to the
17  dewatering section, is that what you're saying?
18    A.  There was a change order relative
19  to -- I believe it related to some parts of it.
20  I believe it was in this section when we were
21  extrapolating -- extracting the piles and we
22  had to inject bentonite.  I don't know if it
23  was this section or another section.
24        I hate to answer and say this is
25  complete until I was able to look at what

Page 256

1  modifications impacted the contract.  Usually
2  every "mod" would tell you what section it
3  impacted.  But this is the original bid packet
4  document.
5     Q.  For dewatering?
6     A.  For dewatering, yes.
7     Q.  What was the division of
8  responsibility between McElwee Brothers and
9  Tri-State?
10    A.  As I mentioned earlier, Tri-State
11  provided the financing and the bonding, McElwee
12  Brothers did the execution of the work.  That
13  was the division of responsibility as per the
14  U.S. Small Business Administration 's 8A
15  program.  The U.S. Small Business
16  Administration would always assure that
17  contractors were not fronts for different
18  organizations.  So McElwee Brothers had to be
19  in control and perform specific parts of the
20  contract.
21        (Brief recess.)
22  EXAMINATION BY MR. TREEBY:
23    Q.  Mr. McElwee, I show you a document we
24  marked McElwee Exhibit Number 19 and ask you if
25  can identify that document.

Page 257

1        (Exhibit 19 was marked for
2  identification and is attached hereto.)
3     A.  Yes, sir, this appears to be a copy of
4  the joint venture agreement initially submitted
5  to the U.S. Small Business Administration for
6  the project.
7        As I was saying, this appears to be
8  the joint venture agreement initially submitted
9  to the U.S. Small Business Administration for
10  the Dwyer Road project between McElwee Brothers
11  and Tri-State at the time.
12        (Off the record.)
13  EXAMINATION BY MR. TREEBY:
14    Q.  Can you identify that document?
15    A.  Yes, sir.  Again, that's the joint
16  venture agreement.  Looks like the original
17  submission that was given to the U.S. Small
18  Business Administration for the Dwyer Road
19  project in which McElwee and Tri-State were
20  involved.
21    Q.  Okay.  And does this agreement spell
22  out the division of responsibility that you
23  described earlier in your testimony?
24    A.  Yes, sir.  In fact, I'll find it for
25  you.  If we look at Page 9 of 33 --

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0065

MELVIN M.L. McELVEE (VOL I)                                 4/23/2008

Page 258

1    Q. Uh-huh.
2    A. -- we talk about percentages of
3    ownership. 51 percent, 49 percent Tri-State
4    Design. If we go further down in management,
5    we talk about Paragraph 3, Management 3.1,
6    McElwee is the managing venturer of the joint
7    venture and McElwee shall appointment one of
8    its employees as the project manager with the
9    duties and responsibilities needed for
10   performance of this contract.
11       MR. LAMBERT:
12           Slow down a little bit.
13   EXAMINATION BY MR. TREEBY:
14   Q. Let me just ask you to do this: This
15   exhibit will be part of the record so I don't
16   really need for you to read it. So you're
17   saying -- so far you've said that what
18   describes the separation is the 51/49 percent
19   and the management provision on Page 9 of 33.
20   Is that right?
21   A. Yes, sir.
22   Q. Is there anything else that
23   differentiates the responsibility of the
24   parties? And just refer to the paragraph and
25   we can then look at it.

Page 259

1    A. Okay. If you would look at Page --
2    Appendix A, it comes after Page 29 of 33, it's
3    a chart that shows task assignment and
4    responsibility. If you will notice Item
5    Number 1, bonding by Tri-State, Company B.
6    Q. Uh-huh.
7    A. Item 2, financial.
8    Q. Right. I can see -- I see the
9    document. I thought you had earlier said that
10   Tri-State had the financial responsibility for
11   this job.
12   A. When you say financial responsibility,
13   yes, they were bringing finance to the joint
14   venture. Finances.
15   Q. And this would indicate that so was
16   McElwee; is that right?
17   A. McElwee brought a little, yes --
18   Q. Okay.
19   A. -- to initiate the --
20   Q. Are there any other provisions in the
21   contract that would spell out the differing
22   responsibilities between the McElwee Brothers
23   and Tri-State?
24   A. In the contract, there's nothing.
25   Q. Okay.

Page 260

1    A. In the joint venture agreement,
2    there's everything.
3    Q. I meant in the joint venture
4    agreement.
5        Have you pointed -- I'm sorry. Have
6    you pointed us to all the paragraphs in the
7    joint venture agreement that would
8    differentiate the responsibilities between the
9    two members of the joint venture?
10   A. I pointed some of it. On Page 5 of 33
11   there is some more of it.
12   Q. Okay.
13   A. Page 6 of 33 there's some more of it.
14   Q. Okay.
15   A. It talks about the purpose of the
16   joint venture agreement, whereas McElwee lacks
17   the following, bonding capacity to obtain this
18   side contract, 100 percent contract financial
19   ability.
20   Q. Okay.
21   A. And then it spells out McElwee has the
22   capacity to perform --
23   Q. I got you.
24   A. -- Items A through V.
25   Q. Page 6?

Page 261

1    A. Yes, sir. Page 6. And it talks about
2    the benefits of being in the joint venture.
3    Q. Was the Dyer Road pumping --
4    the Dwyer Road job that we've described, is it
5    fairly close to the intersection of Dwyer Road,
6    or where Dwyer Road would have intersected with
7    Jourdan?
8    A. That is correct.
9    Q. Okay. It was reasonably close to that
10   location?
11   A. That is the location.
12   Q. That is the location. Okay.
13       Was this the largest dollar value
14   project that you or McElwee Brothers ever
15   worked on?
16   A. Yes.
17   Q. Now, as part of your contract on the
18   Dwyer Road project, were you required to
19   design, furnish, install, operate and then
20   remove a dewatering system?
21   A. Yes. That was part of the contract
22   documents. It was in the contract.
23   Q. How did McElwee Brothers go about
24   designing the dewatering plan?
25   A. I will reiterate what I mentioned

66 (Pages 258 to 261)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0066

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 262

1  earlier. We contacted Mr. J. Michael Dixon who
2  then -- he's deceased now. I say who was,
3  because his license never was taken away, but
4  edges deceased -- was a registered professional
5  civil engineer in the state of Louisiana. That
6  was a requirement in the contract that we
7  acquire somebody that had those credentials to
8  perform the design. And McElwee Brothers
9  worked with Mr. Dixon to provide him with the
10  field data, the input, of equipment suppliers
11  and everything for design of a system. So.
12     Q.  And Mr. Dixon is deceased at this
13  point.
14     A.  Yes, sir.
15     Q.  And I believe your testimony earlier
16  has indicated that either the joint venture or
17  the Corps -- let me just ask, who hired Eustis
18  Engineering, was it the joint venture or was it
19  the Corps?
20     A.  Eustis was hired by Design
21  Engineering, Inc. That's my understanding of
22  it. Design Engineering, Inc. was the
23  consultants to the Corps.
24     Q.  Okay. And who hired Gore?
25     A.  McElwee Brothers.

Page 263

1     Q.  And would it be fair to say that the
2  plans or the -- the plans for dewatering the
3  site, for carrying out your responsibility to
4  design, furnish, install, operate and then
5  remove a dewatering system, utilized
6  information that Eustis Engineering provided
7  and utilized information later that Gore
8  provided?
9     A.  McElwee Brothers' dewatering system
10  utilized information provided by the Corps of
11  Engineers.
12     Q.  Through -- some of that was Eustis. I
13  was asking about Eustis.
14     A.  And Eustis, yes.
15     Q.  I was just specifically asking, did
16  the dewatering system that was designed,
17  furnished, installed, and that whole part of
18  the project, did it utilize the Eustis soils
19  analysis?
20     A.  Yes.
21     Q.  Did it also then later utilize the
22  Gore soils analysis?
23     A.  Yes.
24     Q.  How would you describe the progress of
25  the dewatering of the site?

Page 264

1     A.  May I ask, would you be, I guess, more
2  specific? Because there was different phases
3  of the construction site, different situations
4  and problems that occurred at different times.
5  If you want me to talk in general about the
6  whole job, I will, but each -- McElwee Brothers
7  divided the entire project I think into five
8  phases, Phase I, Phase 2, Phase III, Phase IA,
9  and Phase IB, in the construction process.
10  When it divided it up, each dewatering scenario
11  was different for each one. Phase I, which was
12  the box culvert canal section that we saw in
13  the photos, it was a complete TRS system,
14  meaning complete sheet piling driven to enclose
15  a certain area. It was completely cut off.
16        When we got ready to deal with
17  Phase 4, the tubes went through that phase, so
18  we couldn't always keep it completely cut off.
19  So we had to do different things to
20  accommodate. So the dewatering system was
21  changed at certain times. That's why I'm
22  mentioning that. I'm trying to give you a
23  picture.
24     Q.  Well --
25     A.  And at the navigational -- once we had

Page 265

1  Phase I in and we got ready to deal with the
2  navigational canal end, the discharge end, it
3  could not be completely boxed off so we had it
4  U-shaped, sort of, towards the floodwall, and
5  we had to install dewatering tubes on the open
6  end to drop the water table such that a lot of
7  water wouldn't be in the work area.
8     Q.  Well, would it be fair to say that the
9  dewatering of the site went slowly at first but
10  that in fact the dewatering was able to -- you
11  were able to dewater the site sufficiently?
12     A.  Went slowly at first? I'm confused.
13  It went during a normal process to us.
14     Q.  Was it delayed at all? Let me ask it
15  that way. Did the dewatering process slow you
16  down from your original timetable for the job?
17     A.  No. It was just part of the process.
18  It didn't slow us down. It was part of the
19  process. We knew we had to do it. It was in
20  the plans and specs, and we were just
21  implementing. But no, it wasn't a curve ball,
22  something we didn't anticipate, other than
23  whenever we ran into the, what, pulling of the
24  piles and we had problems in that situation.
25     Q.  One of the complaints that the Corps

67 (Pages 262 to 265)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0067

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 266

1   levied, and one of the reasons it issued a
2   default letter and canceled the contract for
3   default, was that there were delays that should
4   not have occurred on this job. Isn't that
5   correct?
6       A.  I don't know that to be one of the
7   three reasons that's mentioned in that default
8   letter. I'd have to see that termination for
9   default letter. I don't remember that being
10  one of them. I remember three reasons, but --
11      Q.  I show you this document that we have
12  marked McElwee Exhibit 20 which is a letter
13  dated June 24, 2003, that attaches a form which
14  is described as Amendment of
15  Solicitation/Modification of Contract. I
16  believe that, taken together, is the default
17  letter. Can I you identify that?
18          (Exhibit 20 was marked for
19  identification and is attached hereto.)
20      A.  Yes. This is the termination for
21  default -- it's in four, and on Page -- it says
22  2 of 2 on the top, but it's actually the third
23  page in that stack. It talks about the acts or
24  omissions constituting a default, and there are
25  three items. And, um -- okay. I see on Item B

Page 267

1   where at the end of that sentence it says
2   resulting in a delay or to the overall
3   completion of the project.
4   EXAMINATION BY MR. TREEBY:
5       Q.  The contract.
6       A.  Yes. And I -- to answer your
7   question, that's mentioned there.
8           Can I read the whole --
9       Q.  Well, you don't need to read it aloud.
10  I'm just asking, does this confirm what I
11  believed to be true, that one of the reasons
12  for the default letter was work that you did
13  resulted in the delay to the overall completion
14  of the project?
15      A.  That's not a true statement.
16      Q.  Well, is that what the letter says?
17      A.  The later says repeated failure to
18  manage the contract performance including the
19  contractors, ill-defined lines of authority.
20          It has nothing to do with the
21  performance of the work. It's that was the
22  reason, they said there was a delay. And if
23  you keep reading it gets down to resulting in
24  delays.
25      Q.  Right. For the record, we'll just --

Page 268

1   what it says, and this is Item B on Page 2 of
2   2, acts or omissions constituting the default:
3   Repeated failure to manage the contract
4   performance, including the contractor's
5   ill-defined lines of authority, inconsistencies
6   between the roles and the individuals of the
7   joint venture performing those roles, and
8   ineffective use of resources resulting in a
9   delay to the overall completion of the
10  contract.
11          That is one of the reasons, one of the
12  acts of omissions that the Corps stated as a
13  default --
14          MR. JOANEN:
15              Objection. Leading.
16      A.  Yes.
17  EXAMINATION BY MR. TREEBY:
18      Q.  Is that correct?
19      A.  That is what the Corps mentioned.
20  That's what they said.
21      Q.  And in fact, your lawsuit against your
22  joint venturer alluded to some of these
23  problems of inconsistencies between the roles
24  and individuals of the joint venture performing
25  the roles, right?

Page 269

1       A.  That is accurate. That's correct.
2       Q.  Okay. So you even complained to your
3   joint venturer that his -- some of his -- some
4   of the things you alleged he had not done
5   appropriately were the cause of this default
6   letter.
7       A.  That's correct.
8       Q.  Okay. I show you a document we have
9   marked McElwee Exhibit Number 21 and ask if you
10  can identify that document.
11          (Exhibit 21 was marked for
12  identification and is attached hereto.)
13      A.  Yes, sir, this appears to be minutes
14  of a biweekly status submittal meeting held on
15  March the 6th, 2002. As I mentioned earlier,
16  we used to hold biweekly meetings with the
17  Corps to update them on the project.
18      Q.  And would you typically then get a
19  copy of these minutes?
20      A.  Yes, normally after -- prior to the
21  next meeting. Or even sometimes at the next
22  meeting, yes. I got copies but had no input.
23      Q.  If you would look at the last page of
24  that exhibit which bears Bates Number JV
25  005966, the last item, Number 4, this indicated

68 (Pages 266 to 269)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0068

MELVIN M.L. McELVEE (VOL I)                              4/23/2008

Page 270

1   that -- by way, who is Mr. Roth?
2       A.  Tim Roth was the administrative
3   contracting officer on the project.  He worked
4   for the contracting office.
5       Q.  Of the Corps?
6       A.  Yes.
7       Q.  And it indicated that he had explained
8   to you that the plan that you had submitted on
9   February 19, 2002, did not properly address how
10  and in what time frame the temporary protection
11  would be installed and informed you that the
12  plan was unacceptable and that you agreed to
13  revise the plan and resubmit it by April 1st.
14      Was that some indication that the
15  Corps felt that this project was being unduly
16  delayed at that point?
17      MR. JOANEN:
18          Objection.  Calls for
19      speculation.
20      A.  No.  No.
21  EXAMINATION BY MR. TREEBY:
22      Q.  Okay.
23      A.  That was just merely a comment on,
24  um -- review of a planned temporary -- that was
25  review of the initial flood protection plan.

Page 271

1   His comments on it.  It didn't mean that it
2   delayed the job, it was just that, hey, you
3   need to correct these things and then we'll
4   look at it again.
5       Q.  I'm going to show you a document that
6   we've marked McElwee Exhibit 22 which is a
7   document that has a date at the top of it of
8   February 1, 2002 bearing Bates Number
9   GA/COOO171 through 173.  This appears to be a
10  memorandum from Timothy Roth described here as
11  the resident engineer.  You described him as
12  something in the contracting office?
13          (Exhibit 22 was marked for
14  identification and is attached hereto.)
15      A.  Yes, sir.  If you look at the, um --
16  Exhibit 21, and look at Page JV -- the last
17  page, JV 005966, his title was the
18  administrative contracting officer.  That's
19  what he signed as on that page.
20  EXAMINATION BY MR. TREEBY:
21      Q.  Was he also the resident engineer?
22      A.  Yes, he was.
23      Q.  Okay.  If you would look at the second
24  page of this exhibit, in Number 4 where it says
25  the dewatering plan was discussed indicated

Page 272

1   that you stated you felt additional information
2   was needed to complete the dewatering design?
3       A.  Yes, sir.
4       Q.  And the Corps responded that you had
5   sufficient information to design the dewatering
6   plan, is that right?
7       A.  That's their response.
8       Q.  Do you recall this was a bone of
9   contention in the progress of the job?
10      A.  It was a bone of contention at that
11  point.  In fact, the following sentence behind
12  that, the contractor acknowledged this and
13  stated that he would perform additional soil
14  borings when the piezometers were installed.
15  So --
16      Q.  Excuse me.  I didn't mean to interrupt
17  you.  Go ahead.
18      A.  So I agreed that they had provided
19  information, but whether it was enough
20  information I never made any concurrence to
21  that.
22      Q.  Were those additional soil borings the
23  borings that Gore did?
24      A.  Yes.
25      Q.  I show you a document we've marked

Page 273

1   McElwee Exhibit 23 which is a April 29, 2002,
2   four-paged document, again signed by Timothy
3   Roth.  And again on this occasion he appears at
4   the end as administrative contracting officer
5   and in the beginning as resident engineer.  And
6   it indicates that this letter constitutes the
7   formal minutes of a biweekly status and
8   submittal meeting that was on April the 11th,
9   2002.  And this would indicate that by this
10  time, at least, the Corps indicated that
11  nothing encountered in the project excused the
12  delays that they believed were talking place.
13      Isn't that right?
14          (Exhibit 23 was marked for
15  identification and is attached hereto.)
16      A.  May I have some time to digest?
17  EXAMINATION BY MR. TREEBY:
18      Q.  Yes.
19      A.  Okay, please ask your question again.
20      Q.  Yes.  Would not these minutes indicate
21  that by this time the Corps believed that
22  nothing encountered in the project excused the
23  delays they believed were taking place?
24      MR. JOANEN:
25          Objection.  Calls for

69 (Pages 270 to 273)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0069

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 274

1   speculation.
2      A.  This letter illustrates a bone of
3   contention about delays and illustrates
4   McElwee 's explanation of where the project
5   was, line item by line item, and the Corps'
6   refusal to acknowledge those delays.
7   EXAMINATION BY MR. TREEBY:
8      Q.  Okay.  I show you a document we have
9   marked McElwee Exhibit 24 which is a letter of
10  April 17, 2002.  This one is addressed to
11  McElwee Brothers, Inc. and Tri-State Design, a
12  Joint Venture, and it indicated, did it not,
13  that the Corps believed that your overall
14  performance on the contract has been
15  unsatisfactory to date?
16        Is that correct?
17        (Exhibit 24 was marked for
18  identification and is attached hereto.)
19     A.  It indicates what Mr. Tim Roth
20  believed to be necessary to begin a paper trail
21  of what he was intending to do, if you're
22  really asking me, yes.
23  EXAMINATION BY MR. TREEBY:
24     Q.  Well, let's just deal with what --
25  without trying to get into people's heads about

Page 275

1   what they really intended, it indicates that
2   the quality control for the job is marginal, is
3   that correct?
4      A.  That's what he says there.
5      Q.  It indicates that timely performance
6   was unsatisfactory, is that correct?
7      A.  That's what he said there.
8      Q.  It indicates that effectiveness of
9   management was unsatisfactory.
10     A.  That's what said there.
11     Q.  And that compliance with safety
12  standard was marginal, is that correct?
13     A.  That's what he said there.
14     Q.  And he goes on to explain why he takes
15  that position, and that was just a summary at
16  the beginning but then on the subsequent pages,
17  with a suitable letter A, B, C, D, E, indicates
18  why they believe that's correct.  Is that
19  right?
20     A.  That's what he said there.
21     Q.  Okay.  I'm sure this didn't make you
22  happy at the time and still doesn't make you
23  happy.  Is that correct?
24     A.  Well, actually, the bonding company
25  wound up picking up, you know, all the appeals

Page 276

1   in the ASPCA, so therefore it showed that when
2   the Corps paid $1.9 million to the bonding
3   company relative to delays that some of that
4   was just what little it bit of hog wash.
5      Q.  Well, and the bonding company
6   similarly got judgment against you, did it not?
7      A.  For the excess amount that was n't
8   paid on the project, that's correct.
9      Q.  How much was that?
10     A.  That was 1.9 million.
11     Q.  $1.9 million judgment against you?
12     A.  That's correct.
13     Q.  Your company?  And that was because
14  the Corps had determined that -- and it played
15  out in various appeals to the Armed Services
16  Contract Board, as well, that you had not done
17  the job satisfactorily, is that correct?
18     A.  I'm not -- I can't confer with you on
19  that.  Not at all.
20     Q.  Well, that's what was determined in
21  the process, is it not?
22     A.  I cannot agree with you on that.  I
23  don't know that.
24     Q.  I thought you just admitted that a
25  $1.9 judgment was rendered against you for

Page 277

1   unsatisfactory performance.
2      A.  What I admitted to you is that the
3   Corps negotiated with the bonding company and
4   wound up paying the bonding company
5   $1.9 million for additional work performed on
6   the project and delays involved with it;
7   however, after the bonding company received
8   remaining funds on the contract, plus the
9   $1.9 million, it was still out $1.9 million in
10  cost, and that is where the judgment against me
11  came, not -- the two $1.9 million are separate
12  issues.
13     Q.  Those documents -- and we can go
14  through them, but I think there was a
15  disagreement, and you talked about it in your
16  testimony in answer to Mr. Bruno 's questions.
17        There was a disagreement between you
18  and the Corps about whether the pile should be
19  cut off or pulled; is that correct?
20     A.  That's correct.
21     Q.  And some of the concern for not
22  cutting them off had to do with damaging
23  existing pipes, isn't that correct?
24     A.  That's incorrect.
25     Q.  That's incorrect?  Had nothing to do

70  (Pages 274 to 277)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0070

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 278

1  with it?
2      A.  Nothing to do with it.
3      Q.  Okay.  But in any case, you ultimately
4  agreed to comply under protest with the
5  instructions to pull the piles.
6      A.  That is correct.
7      Q.  And you later complained, did you
8  not -- McElwee Brothers complained in the
9  spring of 2003 that the pulling of the sheet
10  piles, the sheet piles, and the subsequent
11  filling of the voids with bentonite slurry
12  caused greater difficulty dewatering the site;
13  is that correct?
14      A.  Pulling of --
15      Q.  Sheet piles.
16      A.  I'm -- I'm lost because -- we're
17  talking about one situation.  We pulled the
18  concrete piles.
19      Q.  Right.
20      A.  And we pulled --
21      Q.  Is that what was filled with bentonite
22  slurry?
23      A.  That's correct.
24      Q.  But didn't you, or McElwee Brothers
25  which I assume is you -- is that correct?

Page 279

1      A.  That's correct.
2      Q.  Okay -- complain that filling those
3  voids with bentonite slurry caused greater
4  difficulty with dewatering the site?
5      A.  I can't -- I can't tie those two
6  together.  I know that pulling the piles caused
7  difficulty -- pulling the piles -- McElwee
8  Brothers had a complaint about pulling the
9  existing piles and the impact that pulling
10  those existing piles and filing them with
11  bentonite, how it degraded the already poor
12  foundation such that when we drove the new
13  piling the anticipated results of driving with
14  a certain size hammer were impacted.  We
15  probably could have reduced the size of the
16  hammer with less soil friction on these piles.
17  I remember that being the bone of contention on
18  it.  But not dewatering problems because of the
19  bentonite.
20      Q.  Do you recall testifying about this in
21  the appeal at the government contract board,
22  the Armed Services Contract Board, testifying
23  about this issue of the bentonite slurry?
24      A.  I can verify that a deposition was
25  taken by the Corps of Engineers of me.  What it

Page 280

1  was used for, I believe it was concerning the
2  Armed Services Board of Contracting Appeals.
3      Q.  Yeah, this was March 4, 2005, is the
4  date of this transcript of testimony.
5      A.  Yes.
6      Q.  I'm trying to get the whole transcript
7  because I'm missing a page here.
8      A.  Yes.  I remember --
9      MR. BRUNO:
10          Where did that come from?  The
11      depo.
12      MR. TREEBY:
13          From the -- from this proceeding.
14      MR. BRUNO:
15          Well, was it produced by
16      somebody?  Was it produced by the
17      Corps?  We didn't get a copy.
18      MR. TREEBY:
19          You didn't ask for a copy.
20      MR. BRUNO:
21          Oh, man.  Come on.  Our discovery
22      requests are so broad -- come on,
23      Bill.
24      MR. TREEBY:
25          You can't go by that kind of a

Page 281

1      general statement.
2      MR. BRUNO:
3          How about this:  You know that
4      you have an obligation to continually
5      update your responses.  Come on.  If
6      you got them from the Corps, the Corps
7      has an obligation to update its
8      responses.  I know you didn't have
9      them.
10      MR. TREEBY:
11          I don't know what you asked the
12      Corps for, Joe.  I don't know that.
13      MR. BRUNO:
14          Well, all I'm asking --
15      MR. TREEBY:
16          I got it from the Corps.
17      MR. BRUNO:
18          You got it from the Corps.
19      MR. TREEBY:
20          Yes.
21      MR. LEVINE:
22          You want a copy?
23      MR. BRUNO:
24          Please.
25          Is there anything else that you

71 (Pages 278 to 281)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0071