MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 278

1  with it?
2      A.  Nothing to do with it.
3      Q.  Okay.  But in any case, you ultimately
4  agreed to comply under protest with the
5  instructions to pull the piles.
6      A.  That is correct.
7      Q.  And you later complained, did you
8  not -- McElwee Brothers complained in the
9  spring of 2003 that the pulling of the sheet
10 piles, the sheet piles, and the subsequent
11 filling of the voids with bentonite slurry
12 caused greater difficulty dewatering the site;
13 is that correct?
14     A.  Pulling of --
15     Q.  Sheet piles.
16     A.  I'm -- I'm lost because -- we're
17 talking about one situation.  We pulled the
18 concrete piles.
19     Q.  Right.
20     A.  And we pulled --
21     Q.  Is that what was filled with bentonite
22 slurry?
23     A.  That's correct.
24     Q.  But didn't you, or McElwee Brothers
25 which I assume is you -- is that correct?

Page 279

1      A.  That's correct.
2      Q.  Okay -- complain that filling those
3  voids with bentonite slurry caused greater
4  difficulty with dewatering the site?
5      A.  I can't -- I can't tie those two
6  together.  I know that pulling the piles caused
7  difficulty -- pulling the piles -- McElwee
8  Brothers had a complaint about pulling the
9  existing piles and the impact that pulling
10 those existing piles and filing them with
11 bentonite, how it degraded the already poor
12 foundation such that when we drove the new
13 piling the anticipated results of driving with
14 a certain size hammer were impacted.  We
15 probably could have reduced the size of the
16 hammer with less soil friction on these piles.
17 I remember that being the bone of contention on
18 it.  But not dewatering problems because of the
19 bentonite.
20     Q.  Do you recall testifying about this in
21 the appeal at the government contract board,
22 the Armed Services Contract Board, testifying
23 about this issue of the bentonite slurry?
24     A.  I can verify that a deposition was
25 taken by the Corps of Engineers of me.  What it

Page 280

1  was used for, I believe it was concerning the
2  Armed Services Board of Contracting Appeals.
3      Q.  Yeah, this was March 4, 2005, is the
4  date of this transcript of testimony.
5      A.  Yes.
6      Q.  I'm trying to get the whole transcript
7  because I'm missing a page here.
8      A.  Yes.  I remember --
9          MR. BRUNO:
10             Where did that come from?  The
11         depo.
12         MR. TREEBY:
13             From the -- from this proceeding.
14         MR. BRUNO:
15             Well, was it produced by
16         somebody?  Was it produced by the
17         Corps?  We didn't get a copy.
18         MR. TREEBY:
19             You didn't ask for a copy.
20         MR. BRUNO:
21             Oh, man.  Come on.  Our discovery
22         requests are so broad -- come on,
23         Bill.
24         MR. TREEBY:
25             You can't go by that kind of a

Page 281

1      general statement.
2          MR. BRUNO:
3              How about this:  You know that
4          you have an obligation to continually
5          update your responses.  Come on.  If
6          you got them from the Corps, the Corps
7          has an obligation to update its
8          responses.  I know you didn't have
9          them.
10         MR. TREEBY:
11             I don't know what you asked the
12         Corps for, Joe.  I don't know that.
13         MR. BRUNO:
14             Well, all I'm asking --
15         MR. TREEBY:
16             I got it from the Corps.
17         MR. BRUNO:
18             You got it from the Corps.
19         MR. TREEBY:
20             Yes.
21         MR. LEVINE:
22             You want a copy?
23         MR. BRUNO:
24             Please.
25             Is there anything else that you

71 (Pages 278 to 281)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0071

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 282

1   all produced to WGI? I guess I need
2   to know that.
3       MR. TREEBY:
4           Yes. Yes. The answer is yes.
5       MR. LEVINE:
6           We have to seasonally update
7   these things.
8       MR. BRUNO:
9           I understand that. But would you
10  agree that this is seasonal since the
11  guy is being deposed? Come on.
12      MR. LEVINE:
13          There's stuff here that you guys
14  used today that wasn't produced to me
15  until today, so --
16      MR. BRUNO:
17          No. It was produced to you the
18  same day it was produced to me.
19  Absolutely.
20      MR. LEVINE:
21          I didn't actually get a copy
22  until today.
23          (Brief recess.)
24  EXAMINATION BY MR. TREEBY:
25      Q.  Okay. I'm going to try to make my

Page 283

1   question a little more intelligible,
2   Mr. McElwee. I was asking about the bentonite
3   causing the problem for dewatering. And I'm
4   sure that was a poor question on my part. But
5   I'm going to read to you an answer that you
6   gave on Page 285 of the transcript that was
7   taken on March 4th, 2005, Volume 2, actually,
8   and let me just read it to you, and then if you
9   need -- because you may be able to answer the
10  question. And if you need to look at this,
11  then we can.
12      MR. BRUNO:
13          Well, he needs to see the
14          question for sure.
15      A.  I want to -- remember what frame of
16  mind I was in at that time.
17      MR. BRUNO:
18          Page?
19  EXAMINATION BY MR. TREEBY:
20      Q.  Page 284 and 85. Here's the question
21  and here's the answer, and you can follow along
22  if you wish, beginning at Line 23 on Page 284:
23  And the notice of deficiency, Number 4, which
24  is on the third page, would you tell us what
25  you recall about that notice?

Page 284

1           And your answer is, when the joint
2   venture received this deficiency, I recall the
3   dewatering system pumps I think were being
4   exchanged out for maintenance, and we also at
5   that time had a problem -- I say we also, we as
6   in the joint venture and the Corps of Engineers
7   had a problem with the piezometers in this
8   area. As I mentioned earlier, the bentonite
9   from pulling the piles flowed in the ground,
10  and we noticed that after we pulled the piles
11  one of our piezometers wasn't functioning
12  properly, it kept reading at high water levels.
13  So from an inspector's point of view, the
14  deficiency was written stating we weren't
15  complying with the contract, without looking at
16  a technical and engineering review of the whole
17  situation, but the joint venture signed the
18  deficiency and said, hey, we'll fix the
19  problem, close quote.
20          Obviously, you're talking about the
21  notice that you got from the Corps, and that
22  you at least at the time in handwriting signed
23  off yes, we understand and we'll fix it.
24      A.  Yes, sir.
25      Q.  Okay. And as I -- my limited

Page 285

1   understanding, the problem was caused because a
2   piezometer was reading as though there were
3   high water flows --
4       A.  Yes.
5       Q.  -- is that correct?
6       A.  That's correct.
7       Q.  That's what I meant when I said --
8   when I asked you earlier that the pulling of
9   the sheet piles and the filling of the voids
10  with bentonite caused a difficulty with the
11  dewatering. The dewatering issue. Right?
12      A.  Caused a problem. I'd like to define
13  the problem it caused. Only reading that
14  piezometer, meaning that the bentonite flowed
15  and probably stopped that piezometer up,
16  because it traveled through from one area to
17  the other. It didn't mean it caused a problem
18  with dewatering the hole. With the measuring
19  device. It just clogged up a.
20      Q.  Pipe. But the purpose of the
21  piezometer was to address dewatering.
22      A.  To read water levels. Not --
23      Q.  Right, to read water levels.
24      A.  Yes.
25      Q.  And if it was -- and I understand it

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0072

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 286

1  may have been a bad reading.
2      A.  Bad reading.
3      Q.  Okay.  But the indication was that
4  there was a dewatering problem, and you're
5  saying that that probably was a false
6  indication.
7          MR. BRUNO:
8              Objection.  Objection.  That's
9          not at all what he means.
10         MR. TREEBY:
11             That's fine, Joe.  I've got your
12         objection.  I'm trying to understand
13         this.
14     A.  There was a problem reading the
15 measuring device because the measuring device
16 was stopped up, not with the dewatering.  The
17 pumps were steady working, the water levels
18 were lower on other piezometers, they read
19 lower levels, that one had a high level.
20     Q.  Uh-huh.
21     A.  But in that small area, if you got
22 four piezometers on each corner, one on each
23 corner and one is reading a high water level
24 and the other three are not, there is a problem
25 with that straw, not a problem with the

Page 287

1  dewatering.  Am I making sense?
2      Q.  I understand, but there would be --
3  because of the problem with the piezometer,
4  assuming that's what it was, it was reading as
5  though there was a dewatering problem.
6          MR. BRUNO:
7              Objection to form.
8  EXAMINATION BY MR. TREEBY:
9      Q.  Is that correct?
10     A.  That one piezometer was reading high,
11 it wasn't reading accurately, yes.
12     Q.  And in fact -- and I'm showing you a
13 document we've marked McElwee Exhibit 26, which
14 consists of two letters, they bear two
15 different Bates numbers, actually.  One Bates
16 number is -- I'm sorry.  Excuse me.
17         THE WITNESS:
18             Mr. Treeby, Exhibit 25, which one
19         is it?
20         MR. TREEBY:
21             I don't know.  Maybe we skipped
22         it.
23 EXAMINATION BY MR. TREEBY:
24     Q.  Okay.  We'll make the one I'm about to
25 do 25.  Just rewrite it.  Anyway, I show you --

Page 288

1  it appears to be two letters, one dated
2  March 18, 2003, one dated March 19, 2003, both
3  of them to you, from J. Michael Dixon, both of
4  them the subject is jacking and bore dewater.
5  And in both of these letters by Mr. Dixon, he
6  is indicating, is he not, that there is an
7  effective dewatering of this location?
8              (Exhibit 25 was marked for
9  identification and is attached hereto.)
10     A.  In the first page he's indicating that
11 the dewatering system is working properly.  In
12 fact, he says, in his first paragraph, last
13 sentence, this indicates that this sand stratum
14 is in a drawdown condition.
15     Q.  All right.  That's what I thought I
16 said.  You're agreeing.
17         MR. BRUNO:
18             No.  You do not say that.
19 EXAMINATION BY MR. TREEBY:
20     Q.  What I asked was, in both of these
21 letters, he is indicating, is he not, that
22 there is an effective dewatering of this
23 location?
24     A.  Sir, I'm just making it clear that
25 he's saying there is an effective drawdown,

Page 289

1  it's working properly.
2      Q.  Okay.  That's all I was trying to say.
3  I thought you were disagreeing with me.
4      A.  No, sir.  I'm just telling you what
5  his letters say to me.
6          Mr. Treeby, I want to -- the second
7  page of this same exhibit, I wanted to mention
8  something that we just talked about, where he
9  talks about that trapped water in that second
10 paragraph, in the second letter he's
11 reemphasizing the trapped water situation when
12 we talked about the bentonite traveling and
13 trapping the water.
14     Q.  Uh-huh.
15     A.  And the piezometer that was reading
16 wrong.
17     Q.  Right.  Was there in fact,
18 Mr. McElwee, a schedule that the Corps
19 promulgated or that you had given the Corps and
20 they agreed to for the completion of your work
21 on this job?  Was there ever a schedule?
22     A.  There were schedules submitted to the
23 Corps, but the Corps would never agree with any
24 of schedules in the entire project.
25     Q.  They took the position that the

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0073

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 290

1  project was several months behind schedule when
2  they issued their default letter; isn't that
3  correct?
4      A.  They took that position from the
5  beginning of the project all the way to the
6  end.
7      Q.  Are you saying that McElwee Brothers
8  did not agree that you were behind schedule?
9      A.  McElwee Brothers never agreed, and
10 illustrated it in several pieces of
11 documentation that it was not behind schedule,
12 because whenever there were claims, there were
13 claims submitted to the Corps, McElwee Brothers
14 waited for responses, the Corps never
15 responded.  The Corps wouldn't answer certain
16 questions, the Corps would not approve certain
17 submittals, on time, and they never would admit
18 to their delinquency in the project.  They just
19 kept saying McElwee Brothers was behind
20 schedule.
21     Q.  Did McElwee Brothers encounter any
22 safety problems on the project?
23     A.  Yes, McElwee Brothers did have some
24 safety issue on the project.
25     Q.  Did the Corps complain to McElwee

Page 291

1  Brothers about the safety problems on the site?
2      A.  I would have to know particular
3  complaints.  The reason I'm answering that
4  question that way is we had a gentleman that
5  was involved in an accident on the project.
6  I'm referring to that.  Two gentlemen.
7      The Corps -- prior to one of the
8  gentleman having that accident, the day before
9  the Corps came out and expressed a concern that
10 the gentlemen was not wearing a safety harness.
11 And when the Corps of Engineers safety guy
12 mentioned that to me in particular, I
13 instructed the superintendent to write the
14 gentlemen up immediately.  And the
15 superintendent had some qualms about doing so,
16 but I told him that McElwee Brothers' policy is
17 whenever an official comes from the Corps of
18 Engineers and notifies me of a problem on the
19 job with safety, it is our duty and
20 responsibility to issue a warning to that
21 employee.  And just so happened the next day
22 that same employee did not wear a harness and
23 fell inside of an excavated hole 25 feet down
24 on his back on top of a couple of piles.
25     Q.  I show you a document we are marking

Page 292

1  McElwee Exhibit Number 26.
2      Were those safety issues that were
3  being addressed in this April 3rd, 2002
4  memorandum from Mr. Roth to McElwee Brothers,
5  or were those quality control issues?
6      (Exhibit 26 was marked for
7  identification and is attached hereto.)
8      A.  Actually, they were quality control
9  issues, quality control issues being presented
10 by the Corps as safety issues.  And the reason
11 I say that is because Mr. J. Michael Dixon was
12 requested to review this particular notice and
13 give his assessment.  And then he went down the
14 list, he said there's no safety problems
15 concerned.  My design and my system can support
16 everything that you're doing, and I don't know
17 why they have these problems.
18     In fact, Mr. Dixon said, Melvin, I
19 don't understand why the Corps is nit picking
20 you with such little stuff, they don't do this
21 on other people's jobs.
22 EXAMINATION BY MR. TREEBY:
23     Q.  And this is the Mr. Dixon who is
24 deceased at this point?
25     A.  Yes.  He has a response to this

Page 293

1  particular deficiency.
2      MR. BRUNO:
3          A writing?
4      A.  A written response, yes.
5      MR. BRUNO:
6          A written response.
7  EXAMINATION BY MR. TREEBY:
8      Q.  Do you have a written response?
9      A.  Sir, I'd have to verify.  I hate to
10 say yeah, I do, and then I look in the file and
11 it's something I threw away.  But I may can
12 place my hand on that response.
13     (Off the record.)
14     THE WITNESS:
15         Those annotations are joint
16     venture numbers, and GAIC is Great
17     American Insurance Company, documents
18     they had.
19     MR. BRUNO:
20         Okay.  So that's the other
21     litigation.
22 EXAMINATION BY MR. TREEBY:
23     Q.  I show you a document marked McElwee
24 Exhibit 27.  This letter of January 7, 2003 to
25 you from the Corps has in it, among other

74 (Pages 290 to 293)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0074

MELVIN M.L. McELVEE (VOL I)                                4/23/2008

Page 294

1  things, safety concerns, does it not?
2       (Exhibit 27 was marked for
3  identification and is attached hereto.)
4     A.  Um -- would you point out --
5  EXAMINATION BY MR. TREEBY:
6     Q.  Yeah.  Like at the bottom of the first
7  page.
8     A.  Okay, I can verify that this document
9  does state that.  This unsigned document does
10  state that, yes.
11     Q.  Do you recall this?  I thought you had
12  recalled earlier there were safety concerns
13  that were brought up by the Corps.
14     A.  I did on other documents that I could
15  verify, that I saw myself.
16     Q.  So you don't believe this document
17  accurately sets forth safety concerns?
18     A.  I'm saying this document here says
19  that.
20     Q.  I understand.  But are you saying
21  this -- are you denying that this was ever
22  given to you?  That's what I'm trying to find
23  out.  You said it's unsigned.
24     A.  Yeah.  It is.  And the only way I can
25  verify that it's something I received is --

Page 295

1  mostly everything I received was signed.  You
2  understand what I'm saying?
3     Q.  Uh-huh.  And if you would turn to the
4  second page of this exhibit which is unsigned,
5  there's -- and this is essentially the minutes
6  of a biweekly status and submittal meeting,
7  right?
8     A.  That's correct.
9     Q.  Okay.  And on the first full paragraph
10  on the second page talks about the problems
11  with the current dewatering situation on the
12  job site, is that right?
13     A.  That's what it says, yes --
14     Q.  Okay.
15     A.  -- in that particular --
16     Q.  Excuse me.
17     A.  This particular paragraph I think goes
18  along with Mr. Dixon 's Exhibit Number 25,
19  Page 2.
20     Q.  What's the date of Mr. Dixon 's
21  letter?
22     A.  Um -- March 19, 2003.
23     Q.  Right.
24     A.  Okay.  But, why -- the comment
25  relative to piezometers not reading right and

Page 296

1  stuff like that, I only remember one area,
2  which was Phase 4, that's why I say I don't
3  know these.
4     Q.  Okay.  Let me ask you this:  Who was
5  Ron Leslie?
6     A.  Ron Leslie?  There was Ross Leslie.
7     Q.  Ross Leslie.  Thank you.
8     A.  Ross Leslie was project manager for
9  Tri-State Design Construction Company.
10     Q.  Did you have difficulties with him?
11     A.  Very much so.
12     Q.  And who was Steve Faluti?
13     A.  Steve Falati was quality assurance
14  representative for the government.  He was the
15  on-site representative.
16     Q.  Did you have any problems with him?
17     A.  Did I have any problems?  I had
18  problems relative to communications process and
19  lines of authority, you know, that we looked at
20  earlier that were defined during the partnering
21  meeting and then the Corps decided that, hey,
22  they didn't no longer want to play along with
23  it, and so they started communicating with Ross
24  Leslie who was not an authorized person to
25  speak on behalf of the joint venture.  That's

Page 297

1  where some of the problems began to come in at.
2  Yes.  That's when I had problems with
3  Mr. Falati.
4     Q.  You indicated -- in fact, we have
5  already put this in evidence -- that draft of
6  the complaint to the contracting board.  Could
7  you find that?
8       MR. BRUNO:
9         Let me object to form.  You've
10       not put anything into evidence.
11       You've attached to this deposition
12       certain documents.  They're not in
13       evidence.
14       MR. TREEBY:
15         Whatever.
16       MR. BRUNO:
17         Whatever?
18       MR. TREEBY:
19         Joe, this witness has identified
20       it, that's all.
21       MR. BRUNO:
22         Thank you.
23       MR. TREEBY:
24         We don't have a judge here
25       putting things in evidence.

75 (Pages 294 to 297)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0075

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 298

1     MR. BRUNO:
2         Yeah, but then, don't say they're
3   in evidence.
4     MR. TREEBY:
5         Okay. Whatever.
6     MR. BRUNO:
7         Is that difficult?
8     A. The complaint of the --
9   EXAMINATION BY MR. TREEBY:
10    Q. Yeah, the draft complaint that you
11  said you had your handwritten note on. You
12  recall that? I just don't remember the exhibit
13  number. Perhaps you can find it for me.
14    A. I believe it's, um -- Exhibit 13.
15    Q. Thank you.
16    A. Yes, sir.
17    Q. And let me see if I can find it. If
18  you would look at Paragraph 34 of this draft of
19  the complaint this was filed in McElwee
20  Brothers' appeal of the default determination
21  by the contract officer. This was the appeal
22  of that determination before the Armed Services
23  Board of Contract Appeals. In Paragraph 34
24  there's a statement here that -- in the second
25  sentence -- I don't know, this sentence

Page 299

1   beginning however, hindsight reveals --
2         Do you see that sentence?
3     A. Yes, sir.
4     Q. -- that the soils information in the
5   Eustis report was unreliable for this
6   designation as the borings performed forming
7   the basis of the report were taken some
8   165 feet from the Corps' final designated site
9   for the work.
10        Was that information given to the
11  Sonny Shields firm, Elizabeth Gordon, by you?
12    A. Yes. By me and also by the project
13  superintendent that was hired. They had him
14  involved. Ellis Jackson worked on the project
15  site and Shields spoke with him and he verified
16  the soil boring was 165 feet away from the
17  T-wall section and, therefore, it wasn't
18  representative of the soils at the site for the
19  T-wall. That is why McElwee Brothers had Gore
20  Engineering come take a soil boring right
21  adjacent, probably would have been five feet
22  away from the T-wall --
23    Q. Okay.
24    A. -- to show the soil conditions.
25    Q. And this Ellis Jackson, he worked for

Page 300

1   McElwee Brothers?
2     A. Ellis Jackson worked for McElwee
3   Brothers, yes.
4     Q. Okay. In other words, you and I guess
5   Mr. Jackson, whoever commissioned Gore,
6   believed that the soil conditions within the
7   work site would be more properly determined by
8   soil borings taken within the work site.
9     A. They must be somewhere in close
10  proximity, at least a hundred feet.
11    Q. Okay.
12    A. You know, the Corps uses -- the Corps,
13  in the past, unless it's changed, has stated
14  that borings normally represent I think
15  200 feet. In the radius of that boring.
16    Q. Okay. So you believed, did you not,
17  and still believe, from what you're saying,
18  that soil conditions are individualized enough
19  from location to location that the Eustis soil
20  borings 165 feet away from your excavation at
21  the Dwyer Road job site were not representative
22  of the soil conditions at the excavation site.
23    A. That is true.
24    Q. Now, you've identified, it's already
25  in evidence, I was going to give it to you, but

Page 301

1   it's already?
2         MR. BRUNO:
3             Object to form.
4   EXAMINATION BY MR. TREEBY:
5     Q. In evidence, in my interpretation,
6   means that you've identified it earlier today.
7   But I don't remember. It was your son 's
8   report that you say you reviewed and you stood
9   behind.
10    A. Yes, sir.
11    Q. With some pride, I'm sure.
12    A. Yes, sir. That's Exhibit Number 9.
13    Q. Okay. In Exhibit Number 9, at the top
14  of Page 10 of 13, the paper states, when
15  designing a new T-wall structure the Corps did
16  not take into account the soil conditions which
17  impacted the production rate of MBIs, that's
18  McElwee Brothers, Incorporated 's dewatering
19  system. Is that correct?
20        I mean, was that a correct statement
21  in here? I think you've earlier said that you
22  stood behind what was in this, but I want to
23  make sure.
24    A. Yes. I -- yeah, this is -- I'm
25  standing behind that.

76  (Pages 298 to 301)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0076

MELVIN M.L. McELVEE (VOL I)                          4/23/2008

Page 302

1     Q.  And ten the next sentence says, the
2  Corps was informed of excessive water in the
3  excavation near the T-wall location.  Is that
4  correct?
5     A.  That's correct.  I think I mentioned
6  we have photos that show the organic materials
7  and water trickling in.  Those photos are not
8  in here, but you should have those in your
9  possession at IKON.  They were submitted in
10  those documents.  But McElwee Brothers has
11  photos showing water trickling in at the
12  T-wall -- demolished T-wall.  Just running in.
13  And that was above the excavation line inside
14  the cofferdam or TRS, temporary restraining
15  structure system.
16     Q.  And then the report goes on to say,
17  however, the Corps did nothing to study, alter
18  or reexamine the system designed to accommodate
19  the designated soil conditions.
20        Do you stand behind that statement?
21     A.  I stand -- I stand behind that
22  statement at a certain point prior to them
23  redesigning after the piles were cracked.  Now,
24  after the piles were cracked and the joint
25  venture was -- McElwee Brothers and the joint

Page 303

1  venture was -- McElwee Brothers and the joint
2  Corps came back with redesigning work.  But as
3  of the June 2003, I stand behind that
4  the way it's written.  They would -- the Corps
5  would not take a position in the design work
6  relative to the T-wall and the problems found.
7     Q.  Okay.  Looking at the next paragraph
8  in this report, also Page 10 of 13, it's a
9  paragraph beginning by pulling the piles.  This
10  is the concrete piles, is that what this is
11  referring to?
12     A.  Yes, sir.
13     Q.  Okay.  Voids were created that
14  weakened the already insufficient soils
15  conditions.  To fill the voids, the Corps
16  ordered McElwee Brothers, Inc. to place a
17  water-based treatment clay bentonite, which has
18  no sufficient strength, in the existing
19  foundation openings.
20        Do you stand behind that statement?
21     A.  I stand behind that statement at the
22  rate that they wanted the bentonite applied.
23  If you don't mix bentonite appropriately at a
24  certain mixture, you're going to get that type
25  of consistency, something loose.  But you can

Page 304

1  mix bentonite where it will thicken up and
2  support a void.  But in that -- on the job, at
3  that time, what the Corps approved and allowed
4  to take place, it wasn't sufficient.
5     Q.  Okay.  You go on to talk about the
6  pilings that you drove and made arrangements to
7  drive in accordance with the plans and
8  specifications you were given.  I assume those
9  were plans and specifications given by whom?
10     A.  Corps of Engineers.
11     Q.  By the Corps of Engineers.  And you
12  indicate the design was -- I say you.  This
13  report, which I want to make sure you stand
14  behind, the design was purportedly based on
15  existing soil conditions.  In following the
16  design to its specifications, the piling were
17  going to reach its bearing capacity maximum
18  strengths in a layer of dense sand.  After
19  following the design to its specifications, the
20  pile did not reach their bearing capacity
21  because there was no layer of dense sand.  Is
22  that correct?
23     A.  That is correct according to Gore 's
24  soil boring.
25     Q.  So the flaw in the design was due to

Page 305

1  inaccurate soils information given to you I
2  believe you've indicated during the bidding
3  phase, and it was the Eustis soils information.
4  Is that correct?
5     MR. BRUNO:
6        No.  That's not accurate.  I'm
7     objecting to form because you're
8     misstating what he said and what I
9     asked him.
10     MR. TREEBY:
11        I don't even think you have a
12     clue what you just said, Mr. Bruno.
13     Your objection is noted.
14     MR. BRUNO:
15        I do have a clue.  You want me to
16     explain it to you?  He didn't get the
17     Eustis report during the prebid
18     process.  He got it after he got the
19     contract.  How about that?
20     MR. TREEBY:
21        Your objection is noted.
22     MR. BRUNO:
23        How about you remember what I
24     said?
25     MR. TREEBY:

77  (Pages 302 to 305)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0077

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 306

1    How about your objection being
2  noted and we go on.
3       MR. BRUNO:
4       How about you don't tell me that
5  I don't know what I just said, Bill.
6       MR. TREEBY:
7       You know everything, Joe.
8       MR. BRUNO:
9       I know what I said.  I know a
10  lot.  I may not know everything, but I
11  know what I said.
12       MR. TREEBY:
13       May we proceed?
14       MR. BRUNO:
15       Yes, we can.
16       MR. TREEBY:
17       Thank you.
18  EXAMINATION BY MR. TREEBY:
19       Q.  Did you get soils information in the
20  prebidding phase of this job?
21       A.  I got a little soil information.  As I
22  was mentioning earlier, other information the
23  Corps said was available in the plans and specs
24  was not available.
25       Q.  What company or what individual was

Page 307

1  the source of the soils information that you
2  had?
3       A.  The Corps of Engineers.
4       Q.  The prebidding.
5       A.  Prebidding.
6       Q.  Uh-huh.
7       A.  The Corps of Engineers had a boring
8  legend in the plans.
9       Q.  And who provided, if you know, the
10  boring legend to the Corps?
11       A.  From my recollection, that legend was
12  provided by Eustis.
13       Q.  That's what I thought.
14       A.  That legend is the same legend that's
15  in this investigative report.  I think it's
16  about one or two sheets.  But it wasn't the
17  complete file for knowing all the soils
18  information on the job.
19       MR. BRUNO:
20       That's exactly what he said this
21       morning.
22  EXAMINATION BY MR. TREEBY:
23       Q.  But it was from Eustis, right?
24       A.  Yes.
25       Q.  Thank you.

Page 308

1       Page 11, the next page of the report.
2  If you would turn to that.
3       A.  Yes, sir.
4       Q.  And look at the third -- beginning the
5  third sentence reads, although McElwee Brothers
6  followed the design to its specifications and
7  plans and the piles cracked, the Corps faulted
8  McElwee Brothers for the flaw.  You see that?
9       A.  Yes, sir.
10       Q.  And this -- and you go on to say, this
11  flaw in the design was due to inaccurate soils
12  information given to the contractor during the
13  building phase.  Is that correct?
14       A.  Yes, sir.
15       Q.  And if I understand your testimony --
16  and I'm trying to understand it, I'm not trying
17  to argue with you -- that was because you
18  believe, at least, the Eustis soils information
19  that you were provided was 165 feet away from
20  the excavation site and, therefore, not
21  representative of what was in the excavation
22  site.  Is that correct?
23       A.  That is correct as it relates to the
24  Gore Engineering soils boring and the Eustis
25  Engineering soils boring.

Page 309

1       Q.  Eustis?
2       A.  Eustis.  Eustis.  Eustis reports.  If
3  you take the two borings and put them together,
4  they're not identical.
5       Q.  Okay.  That's fine.
6       And it was Gore taking soil borings
7  right at the excavation site that concluded
8  there was no dense sand layer and therefore
9  that McElwee Brothers performance was not the
10  reason the piling cracked during installation,
11  is that correct?
12       A.  Gore 's report does not go into those
13  details.  It merely tells you the soil
14  conditions at that T-wall section.  However,
15  the conclusion was drawn through a meeting that
16  McElwee Brothers had with McElwee Brothers,
17  Tri-State, Gore Engineering, Mr. Dixon, Ice
18  Equipment -- there were several subcontractors
19  and service suppliers that McElwee Brothers
20  utilized on the project and held a conference
21  to discuss the problems at hand.  Gulf Coast
22  Pre-Stress.
23       Q.  Okay.  I don't mind any of this
24  information, but I was really looking at that
25  last sentence, if you will, on Page 11 of 13.

78  (Pages 306 to 309)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0078

MELVIN M.L. McELVEE (VOL I)                          4/23/2008

---

Page 310

1    A.  Yes, sir.
2    Q.  Gore Engineering soils sampling
3  illustrated there was no dense sand layer,
4  rather it was a soft layer, to support the
5  T-wall designed by the corps.  And McElwee
6  Brothers performance could not be ruled as the
7  factor for the piling cracking during
8  installation.
9        Do you stand behind that statement?
10   A.  I stand behind that statement.
11   Q.  Okay.  My question, where I was
12 heading with that, was, we have the Gore
13 report.  Could you point out to us in the Gore
14 report where that's documented?
15   A.  And I was just clearing it up for you
16 that it did not happen in the Gore report, that
17 that conclusion was drawn from a conference.  I
18 just explained where the conclusion came from,
19 after McElwee Brothers consulted with its
20 service suppliers, it's equipment suppliers
21 relative to the issue at hand, the cracked
22 piling.
23   Q.  Okay.  So the -- it would be -- Gore
24 Engineering's soil sampling would not
25 illustrate that McElwee Brothers' performance

---

Page 311

1  called not be ruled as the factor for the
2  piling cracking.  Is that correct?
3        MR. BRUNO:
4           Objection.
5  EXAMINATION BY MR. TREEBY:
6    Q.  I'm trying to understand.
7    A.  The Gore report would not talk about
8  McElwee Brothers' performance period.  It would
9  only evaluate the soil conditions and show you
10 the borings and show you what's at the depth
11 and what supposed to be anticipated what's
12 actually there.
13   Q.  Would it illustrate that there was no
14 dense sand layer?
15   A.  At the depth?  Yes, it would.
16   Q.  Rather a soft layer.  It would show
17 that?
18   A.  It would show that.
19   Q.  Can you show us that on the Gore
20 report?
21   A.  Now, I need to know -- I need to see
22 plans so I can tell you the depth of the plans
23 versus the depths of where we are.  Where the
24 tip of the pile was supposed to be versus what
25 layer it's going to penetrate.  Here's that

---

Page 312

1  boring by Gore engineering.
2    Q.  Okay.
3    A.  Okay?  Where the tip of the pile is
4  supposed to be I can't recollect, but if you
5  give me a set of plans and I find that tip
6  elevation I can point it on here and I can show
7  you this off of there.
8    Q.  Is there a dense sand layer shown on
9  the Gore boring sampling?
10   A.  There's a medium dense sand layer,
11 there's a loose gray fine sand layer, um --
12 there's various dark gray organic clay, and
13 there's very soft gray clay.  Again, I got to
14 see the tip of the pile elevation to tell you
15 that.  I don't remember that.
16   Q.  At what level does the Gore boring
17 show a sand layer?
18        MR. BRUNO:
19           Which Gore boring are we looking
20        at, 3 June 2003 or 2001?
21   A.  I need to look at the 2003, the
22 latest.
23        MR. BRUNO:
24           '3?
25   A.  I'm looking at 2001.  I'm sorry.

---

Page 313

1        MR. BRUNO:
2           You gave him the wrong one.
3    A.  I grabbed this paper.
4        MR. BRUNO:
5           You know, that's why you got to
6        make sure you get the right --
7  EXAMINATION BY MR. TREEBY:
8    Q.  What exhibit are you looking at?
9    A.  I grabbed the paper in front of me.
10 It says Gore Engineering.
11        MR. BRUNO:
12           It's not an exhibit.
13   A.  It's not an exhibit.
14        MR. TREEBY:
15           Okay.  So it's what you gave him.
16        MR. BRUNO:
17           No, it's not what I gave him.
18        THE WITNESS:
19           This was sitting here when I came
20        here at the table.
21        MR. BRUNO:
22           That's a copy of the materials
23        that he supplied to Bea.  I told
24        you -- I gave you a copy this morning.
25        MR. TREEBY:

79 (Pages 310 to 313)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0079

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 314

1       I didn't provide it.  That's all
2    I'm saying.
3        MR. BRUNO:
4        Well, all right.  I don't want
5    this record to be any more confused
6    than it is.  So it's the '03.  Here's
7    '03.
8        THE WITNESS:
9        Okay.  I have the '03 boring just
10   handed to me by Mr. Bruno.
11   EXAMINATION BY MR. TREEBY:
12   Q.  I do, too.
13   A.  And, um -- on the '03 boring, if we
14   looking at depths below the surface, at
15   approximately between 71 and 76.5 feet below
16   the surface we have medium dense reddish tan
17   and light gray clay, fine sand, we have --
18   Q.  Silty find sand you mean?  No, I see
19   clayey fine sand.
20   A.  I said between --
21   Q.  Yeah, I see it.  I see it.
22   A.  Um -- I also see some, um -- if you
23   looking between there we've got lose reddish
24   tan clay and light gray sand.  I need to know
25   exactly where that tip was supposed to be in

Page 315

1    order to tell you, and look at this boring
2    versus the contract plan boring.
3    Q.  There is also dense gray fine sand at
4    between 42 and 48.5, is there not?
5    A.  That's there, but that's not the tip
6    of the pile I don't believe.  That pile was
7    70-something feet long.  And it didn't go
8    straight down, it went on an angle, so I'd have
9    to calculate the leg of that angle to tell you
10   where the tip level is.
11   Q.  But it is your testimony that if we
12   determined the tip of the design pile it will
13   not -- it would not have rested in dense sand.
14   A.  That is true in accordance with the
15   boring that was given in the contract plan.
16   Q.  Did you agree with the Corps decision
17   to terminate the contract?
18   A.  Absolutely not.
19   Q.  You still don't agree with it, right?
20   A.  Well, it doesn't matter whether I
21   agree or not, but no, I don't agree.  I never
22   did agree.
23   Q.  Well, you haven't changed your mind,
24   you still don't agree.
25   A.  No, I don't agree.

Page 316

1    Q.  Did you lose money as a result of
2    Corps decision to terminate this contract?
3    A.  Yes, I did.
4    Q.  How much money did you lose?
5    A.  I'm $1.9 million in debt to a bonding
6    company.  Not only that, anticipated profits.
7    Q.  Excuse me.  I don't mean to interrupt
8    you.  I thought you were finished.
9        MR. BRUNO:
10       Well, finish.
11   A.  $1.9 million due to a bonding company,
12   plus anticipated profits on this particular
13   project.  That was lost by McElwee Brothers.
14   EXAMINATION BY MR. TREEBY:
15   Q.  How much were the anticipated profits?
16   A.  I haven't even looked at the records
17   and books in a while.  I mean, I'd have to --
18   Q.  What's your best judgment of what your
19   anticipated profits were?
20   A.  The anticipate profits on that
21   particular project was one million dollars.
22   Q.  Okay.  Who do you blame for the loss
23   of that money?
24   A.  A combination of the -- my joint
25   venture partner, basically, and along with the

Page 317

1    Corps and its, um -- its way in how it
2    administered that project.
3    Q.  And you've already identified, I
4    believe, at least to my knowledge, based on
5    what I've been able to find out, the other
6    litigations that were related to this project.
7    A.  Yes.
8    Q.  And those litigations either cost you
9    money or significant expenditure of your
10   energy?
11   A.  That's true.  That's true.
12   Q.  And you also blame that on your joint
13   venture partners and/or the Corps.
14   A.  Yes.
15   Q.  When did you first meet Robert Bea?
16   A.  If I can look back at the Exhibit I'll
17   give you an approximate date.  Let me look at,
18   um --
19       MR. BRUNO:
20       That letter?
21   EXAMINATION BY MR. TREEBY:
22   Q.  Let me show you something else that
23   might help you.
24   A.  Yeah.  My response to that, your
25   Request for Production of documents?

80  (Pages 314 to 317)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0080

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 318

1    Q.  Yeah.  I'll help.
2       MR. BRUNO:
3          October, '05?  This one?
4       MR. TREEBY:
5          I've got an exhibit, Joe.  Let me
6       just get it going.
7    EXAMINATION BY MR. TREEBY:
8    Q.  I show you document that -- and I know
9  part of this has already been shown to you by
10  Mr. Bruno and you have identified it, and it's
11  not in evidence.
12      MR. BRUNO:
13         No, it's been attached.
14   EXAMINATION BY MR. BRUNO:
15   Q.  But it's certainly something that's
16  been attached to the deposition by Mr. Bruno,
17  part of this, but I'm going to put the whole
18  thing in.
19      MR. BRUNO:
20         Yeah, attach the whole thing.
21   EXAMINATION BY MR. TREEBY:
22   Q.  And I've marked it as Exhibit -- I'm
23  going to introduce to you the entire thing and
24  see if I'm right.  Exhibit 28.  (Tendering.)
25      (Exhibit 28 was marked for

Page 319

1  identification and is attached hereto.)
2       MR. BRUNO:
3          You mean you're going to attach
4       the Corps materials again?
5       MR. TREEBY:
6          Yes.  Exactly.
7    A.  Wait.  It's got the cover sheet that
8  was missing.
9       MR. BRUNO:
10         I asked, I believe at the time
11      that I showed that to you, whether
12      anyone wanted to attach it as an
13      exhibit and no one said anything in
14      response.
15      MR. TREEBY:
16         Joe, let's move on.  You're just
17      wasting time.
18      MR. BRUNO:
19         No.  You're wasting time.  First
20      of all, we've gone over that document
21      and the document you now seek to
22      attach to the record.
23      MR. TREEBY:
24         Okay, Joe.  Thank you.  Is that
25      an objection?

Page 320

1       MR. BRUNO:
2          Yes.
3       MR. TREEBY:
4          Or is it a complaint?
5       MR. BRUNO:
6          It's a complaint, Bill.  It's a
7       complaint and an objection.  Lodge my
8       complaint.
9    EXAMINATION BY MR. TREEBY:
10   Q.  Does this help you determine when you
11  first met Dr. Bea?
12   A.  Somewhere there about, yes.
13   Q.  I assume it was sometime before
14  October 14.  Is that fair?
15   A.  Yes.  I wanted to look at your request
16  for documents so I could check the date, but
17  you told me don't worry about it look at this
18  document, but it's around that time.
19   Q.  Do you think -- okay.  Hurricane
20  Katrina occurred -- hit land August 29 of 2005.
21  This is October 14th.  Do you have some
22  recollection of how long after Hurricane
23  Katrina you first met Robert Bea?
24   A.  May I?
25   Q.  Sure.  Look at anything you want to,

Page 321

1  sure.
2    A.  Okay.  Thank you.  And I can give you
3  a better response.  Okay, that looks like the
4  earliest date.  So -- somewhere around October,
5  2005.  And Katrina did happen in August, but
6  what year?
7       MR. BRUNO:
8          '05.
9    A.  '05.
10   EXAMINATION BY MR. TREEBY:
11   Q.  And looking at the first page of
12  Exhibit 28, you indicate in it, in the second
13  paragraph of your letter, why you are sending
14  this to Robert Bea; is that correct?
15   A.  That's correct.
16   Q.  And you sent this to Robert Bea at his
17  home address, is that correct?
18   A.  That is correct.
19   Q.  How did you get his home address?
20   A.  It may have been during a telephone
21  call or something that we talked.
22   Q.  So you believe you had a telephone --
23  I'm trying to get you to recall how you first
24  came in contact with Robert Bea.
25   A.  Actually, I'm going to tell you how I

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0081

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 322

1  first initiated some contact. I was reviewing
2  levees.org. I don't know if you're familiar
3  with that, levee.org.
4      Are you familiar with levee.org?
5      Q. It doesn't matter whether I am. I'm
6  just listening to you.
7      A. I was reviewing levees.org and I read
8  some correspondence where Dr. Bea was involved
9  with the, um -- levees investigation team in
10 dealing with the Katrina issue. And I think I
11 may have placed a call to him at that time,
12 just cold called.
13     Q. So you believe you initiated the
14 communication with him, not the other way
15 around?
16     A. From my recollection, I initiated the
17 contact with him.
18     Q. Can you give us your best estimate of
19 how long before this letter of October 14 that
20 was?
21     A. It wasn't -- it may have been a week,
22 two weeks.
23     Q. Okay. Your letter -- am I correct;
24 your letter does not reference any specific
25 location? Is that fair?

Page 323

1      A. That's correct. No specific location,
2  just a concept, an idea of engineering
3  principles.
4      Q. And similarly, the attachment that you
5  sent that Mr. Bruno went over in some detail
6  with you earlier does not reference a specific
7  site.
8      A. It just talks about earth in general.
9  Anywhere you go there's the same problem.
10     Q. Okay. I take it from your testimony
11 you believe your first contact with Robert Bea
12 was by telephone. Is that right?
13     A. Yes, sir.
14     Q. If you would look back, and I don't
15 have the exhibit number, but the report,
16 Post-Katrina forensic hurricane levee failure
17 evaluation that your son wrote for his
18 professor or his instructor at Grambling,
19 Exhibit 9?
20     A. Yes.
21     Q. Let me ask you this, first: Do you
22 think your son had some earlier communications
23 with Robert Bea than you did?
24     A. No, sir. He wouldn't have.
25     Q. Okay.

Page 324

1      A. He didn't know who Dr. Bea was.
2      Q. On -- in the abstract of the document,
3  on Page 2 of 13, under the heading Results, and
4  I'll just read it, it says, intrigued with the
5  construction results of McElwee Brothers, Inc.
6  on its U.S. Army Corps of Engineers project --
7  and I won't put the number --
8      A. What page are we on? I'm trying to
9  follow you.
10     Q. 3 of 13.
11     A. Okay.
12     Q. You see Results?
13     A. Yes, sir.
14     Q. Intrigued with the construction
15 results of McElwee Brothers, Inc. on its U.S.
16 Army Corps of Engineers project, and it has a
17 number, Dr. Bea asked that McElwee Brothers
18 share its experience on that project.
19     A. Yes.
20     Q. Is that correct?
21     A. That's correct.
22     Q. Did he make that request of you?
23     A. Um -- after the visit -- remember I
24 told you there was a visit -- that Dr. Bea came
25 to visit with McElwee Brothers in Hammond in a

Page 325

1  conference room where we brought the documents
2  and showed them to him, yes, he made that
3  request at that time. He said, Melvin --
4      Q. Excuse me. So his visit was before
5  November 28th, 2005.
6      A. Yes, it was.
7      Q. Did Professor Bea ask you to be
8  involved in what he has subsequently called the
9  ILIT investigation and report?
10     A. Is that for the levee investigation
11 team, that big report that we're talking about?
12     Q. Yes.
13     A. No, he didn't. In fact, I didn't know
14 McElwee Brothers was in that report until you
15 mentioned it during a discovery request and you
16 said Dr. Bea mentions this company at this
17 page. That was my first time ever knowing that
18 McElwee Brothers was involved in that report.
19 There was no discussion about it.
20     Q. So you did not know, then, that
21 information you were providing him was being
22 solicited by him for that report.
23     A. I knew information was being
24 solicited. I knew he was investigating. I
25 don't take it to be he pulled a trick on me,

82 (Pages 322 to 325)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0082

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 326

1  no. I was sharing information with him so that
2  he could see existing conditions somewhere else
3  versus destruction that's already taken place
4  and trying to do forensics on the after parts
5  of it.
6      Q.  Did he tell you whether or not, and I
7  don't know --
8          MR. TREEBY:
9              I don't have any information,
10         Mr. Bruno.
11 EXAMINATION BY MR. TREEBY:
12     Q.  But did he tell you whether or not he
13 was recording any of the telephone
14 conversations with you?
15     A.  He never told me that.  He never
16 indicated that was recording conversations.
17     Q.  Okay.  Have you provided, in response
18 to the subpoena that we gave, I think you're
19 answered this but I just want to make sure, us
20 all the documents that he request from you and
21 that you gave him?
22     A.  Yes, sir.
23     Q.  There are none that have been thrown
24 away?
25     A.  I mentioned to you that there have

Page 327

1  been documents that have been thrown away by
2  McElwee Brothers, and I asked your organization
3  to get with Dr. Bea.  And this letter is one of
4  them.
5          MR. BRUNO:
6              We have already gone through
7          this.  Objection.  We have already
8          gone through this twice before.  Given
9          the fact that you're complaining about
10         time, this is getting to be
11         ridiculous.
12 EXAMINATION BY MR. TREEBY:
13     Q.  On how many different occasions,
14 Mr. McElwee, did you send materials to Dr. Bea?
15     A.  Oh, I can't really remember the
16 number, but I did E-mails, um -- I did some
17 personal box deliveries, that's the disk you
18 saw at IKON, and then there's another disk
19 since that time that's coming to you that is at
20 IKON.
21     Q.  So there's another disk I don't have
22 het?
23     A.  There's another disk you don't have
24 yet, and the reason you didn't get it back then
25 is because I didn't have the documents in my

Page 328

1  possession, Dr. Bea and them still had it, but
2  that disk is going to made available to you.
3      Q.  When?
4      A.  It should be within the next three --
5  two days I would say.
6      Q.  When did you get it back?  You gave it
7  to him, but when did you get it back?
8      A.  I haven't gotten it back.
9      Q.  All right.  He's apparently committed
10 to give it back to you.
11     A.  Yes.
12     Q.  When did you have that conversation
13 with Dr. Bea?
14     A.  There's a third-party conversation.
15     Q.  Who was the conversation with?
16     A.  Um -- a gentleman working for him
17 named -- I can't think of his name.  Let me
18 think.  Rosenberg.
19     Q.  Do you have a first name?
20     A.  Dave Rosenberg.
21     Q.  Where is Mr. Rosenberg, if you know;
22 where is he located?
23     A.  I only contact him on the telephone.
24 I really don't know.
25     Q.  Well, do you have to call a local

Page 329

1  call.  Is it a long-distance call?
2      A.  I call a New Orleans number.
3          MR. BRUNO:
4              He's local, I think.
5      A.  Actually, his number -- he's local,
6  but his number is not local.
7          MR. BRUNO:
8              His number is long distance.  The
9          point is, though, that you subpoenaed
10         the same stuff and got it from Bea
11         already.  So I don't know why you're
12         dragging us through the mud.
13         MR. TREEBY:
14             We'll see.
15         (Brief recess.)
16 EXAMINATION BY MR. TREEBY:
17     Q.  Mr. McElwee, I show you a document
18 we've marked Exhibit 29 which is an E-mail from
19 Dr. Bea to you dated Wednesday, January 4,
20 2006.  This was Exhibit A to your subpoena
21 response to me.  And in this E-mail Dr. Bea is
22 asking you for a meeting for, and I quote, the
23 purpose of gathering more background on the
24 construction aspects of the flood defense
25 system for the Greater New Orleans area.  And

83 (Pages 326 to 329)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0083

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 330

1  you responded, on Monday, January 9, also on
2  this document, asking for 24 hours notice for
3  that meeting.
4       You see that?
5       (Exhibit 29 was marked for
6  identification and is attached hereto.)
7  A. Yes, sir.
8  EXAMINATION BY MR. TREEBY:
9  Q. Did that meeting take place?
10 A. Sir, I'm going to answer like this: I
11 came -- I came to New Orleans during a time
12 frame when Dr. Bea was, um -- meeting with the
13 Lakeview residents. And I don't know if
14 that -- this turned into that meeting. I'm
15 just telling you about the meeting times I've
16 met with him. I told you about the first time
17 with the conference. The second time was at
18 Lakeview. And there was no other meeting
19 between those two meetings. But Dr. Bea did
20 contact me and say, I want you to show up at a
21 meeting with the Lakeview residents. And I was
22 there, and he introduced me to several of his
23 colleagues and people that he was involved with
24 dealing with this levee thing.
25 Q. Do you believe that was in around this

Page 331

1  time frame, January of 2006?
2  A. I believe it was, sir.
3  Q. Okay.
4  A. I'm believing it was.
5  Q. I note in the E-mail that I just read
6  that Dr. Bea is asking for more background.
7       What background had you previously
8  given him?
9  A. Well, I mentioned the meeting, the
10 conference.
11 Q. Uh-huh.
12 A. And I gave him an oral presentation of
13 the project and let him look at all the
14 documents. That's what I gave him.
15 Q. And that was the Dwyer Road project.
16 A. That was the Dwyer Road project, yes,
17 sir.
18 Q. Okay.
19 A. Mr. Treeby, may I state for the
20 record, which I did state off the record, that
21 the disk is available at IKON of the documents
22 that you asked me when they're going to be
23 available. They are available right now. You
24 can call IKON and pay the cost for the other
25 documents that are in Dr. Bea 's colleague's

Page 332

1  possession that I didn't have as of the last
2  subpoena request.
3  Q. Okay. Was your -- this meeting that
4  took place in this January time frame, was your
5  family also present?
6  A. My family was present at the Lakeview
7  meeting, yes.
8  Q. Would you -- who in your family was
9  present?
10 A. My entire family. My wife Sylvia --
11 you know her in some documents as Sylvia Hurst
12 which is her maiden name -- Melvin, Jr.,
13 Millard, and my daughter Malonda.
14 Q. You've indicated this was a Lakeview
15 meeting. Did you know the other people who
16 were present besides -- I know you said you met
17 Robert Bea there again. You had met him once
18 before?
19 A. Actually, I knew no one but Dr. Bea
20 and, um -- a couple of other people only
21 because of television. That was the LSU
22 professor, um -- I can't think of his name --
23 with the glasses, curly hair.
24 Q. Is that Van Heerden?
25 A. Yes. I knew him from television. I

Page 333

1  knew Garland --
2  Q. Robinette?
3  A. -- Robinette from television, but no
4  one personally. Everybody else was introduced
5  to me.
6  Q. Okay. I show you a document which
7  we've marked McElwee Exhibit 30, which is an
8  E-mail that I believe you produced to us as
9  Exhibit B to your response. It's a January 14,
10 2006 E-mail from Robert Bea to you, and in it
11 he states, Melvin, I want to thank you and your
12 family for all of your kindness and our
13 meeting. Attached are two documents that can
14 help your son take the next steps. I will send
15 the electronic version of my books later, Bob.
16      Did you ever -- I assume -- did you
17 receive this E-mail?
18      (Exhibit 30 was marked for
19 identification and is attached hereto.)
20 A. Yes, sir, I did.
21 EXAMINATION BY MR. TREEBY:
22 Q. What was attached to the E-mail?
23 A. Um -- I think it was a draft report of
24 the independent levee investigation team. The
25 draft report. Because -- and the reason I say

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0084

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 334

1  draft is the financial report, after I saw your
2  request for production of documents and you
3  mentioned that McElwee was in that report, it
4  was different than the initial report that he
5  sent to me. It was -- so it was a draft report
6  of the final report that you have in your
7  possession.
8     Q. Do you not -- do you no longer have
9  the attachment to this E-mail?
10    A. I have that attachment. It's pretty
11 thick. I don't have it on computer form. I
12 printed it out when he sent it to me. And it
13 was about that thick. (Indicating.)
14    Q. Was there some reason that you didn't
15 give that to us in response to your subpoena?
16    A. The reason was you had the final
17 report, so I didn't see a need to duplicate
18 something that you already had. You had the
19 final report.
20    Q. Well, I would particularly want
21 anything he gave you, and that was specifically
22 requested in the subpoena. Do you still have
23 it?
24    A. Sir, you have no problem --
25    Q. Do you still have it?

Page 335

1     A. I still have that printed out. You
2  can have it.
3     Q. Want a copy of what you've got.
4     A. Yes, sir.
5     Q. And I believe it's responsive to the
6  subpoena.
7     A. That's fine. I mean, I just thought I
8  was duplicating things by sending you a draft
9  versus the final copy.
10       MR. BRUNO:
11          You are duplicating things, but
12       that's okay. They get paid by the
13       hour.
14 EXAMINATION BY MR. TREEBY:
15    Q. The next E-mail we have is one dated
16 June 22nd, 2006, which was marked as Exhibit C.
17 It's Exhibit 31. I mark it here McElwee
18 Exhibit 31. And I notice that you are
19 thanking -- let me just ask a general question
20 about this, because I was confused by this.
21 This purports to be printed obviously on your
22 computer, Melvin M. That's what that means
23 when your name is it at the top, is that
24 correct?
25       (Exhibit 31 was marked for

Page 336

1  identification and is attached hereto.)
2     A. At the top? This is an E-mail printed
3  on my computer -- I think it is, yes.
4  EXAMINATION BY MR. TREEBY:
5     Q. Yeah. Well, you gave it to me, it was
6  Exhibit C to your response to the subpoena.
7     A. Right. Right. I did, because here's
8  the fax. I faxed you that document, yes, on
9  the bottom.
10    Q. But on the top, under your name it's
11 got from Robert Bea, the date, to you, re: You
12 are invited.
13    A. That's correct.
14    Q. And then it's really a sting of
15 E-mails that begins, as best I can tell, and
16 again this is the best I can tell, it
17 appears -- it begins with one at the bottom
18 from Robert Bea to you dated May 17, 2006. You
19 see that?
20    A. On the second page?
21    Q. Well, no, it starts at the bottom of
22 the first page.
23       MR. BRUNO:
24          No, it starts at the bottom of
25       the second page.

Page 337

1  EXAMINATION BY MR. TREEBY:
2     Q. With all due respect to Mr. Bruno 's
3  eyesight, if you will look up from the bottom
4  of the first page, it says, Page 1 of 3 at the
5  top, it says, original message from Robert Bea
6  sent Wednesday, May 17, 2006, 1042 a.m, to
7  Melvin M.L. McElvee, Sr. You see that?
8     A. I see that part of the page you're
9  referring to, yes.
10    Q. That would be caption of an E-mail
11 from him to you, would it not?
12    A. Yes, it would.
13    Q. Okay. And then it says, announcement:
14 You're invited to attend, and it continues, it
15 looks to me, like on the second page. Is that
16 correct?
17    A. Yes.
18    Q. Right.
19       MR. BRUNO:
20          Right. On the second page.
21    A. He was inviting me to the Sheraton New
22 Orleans --
23 EXAMINATION BY MR. TREEBY:
24    Q. For an event on May 22nd.
25    A. That's correct.

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0085

MELVIN M.L. McELVEE (VOL I)                                4/23/2008

Page 338

1    Q.  Okay.  And then after the invitation
2  there's some more text.  It says, I think we
3  got it put together correctly, thanks for your
4  help, but it is not over, only started.  Bob.
5        You see that?
6    A.  Yes, I see that.
7    Q.  Here's what's confusing me:  I see
8  interjected between -- on the first page,
9  between Bob, there, and the beginning of the
10 next E-mail, I see some language that I presume
11 is from you.  Is that correct?
12   A.  Point the language out and I'm going
13 to tell you what --
14   Q.  Thanks for the invitation.
15   A.  Yeah.  Thanks for the invitation.
16 That's from me.
17   Q.  But what I don't see on this is any
18 typical E-mail address line from somebody to
19 somebody.
20   A.  I can't answer the question on how
21 that happened.  I mean, I really can't.
22   Q.  It looks like to me this was an
23 edited -- this has been edited before it was
24 printed.  Does it looks like that to you?
25   A.  No.  You mean -- if you're inferring

Page 339

1  that I edited --
2    Q.  I'm not inferring anything.
3        MR. BRUNO:
4        Yes, you are.
5        MR. TREEBY:
6        I'm not inferring a thing.
7  EXAMINATION BY MR. TREEBY:
8    Q.  Do you know of any E-mail that goes
9  out and that's printed without a from and a to
10 and a date on it?
11       MR. BRUNO:
12       Yes.  All the time.
13   A.  Yes.  It happens.
14       MR. TREEBY:
15       Joe, I'm not taking your -- you
16   want to get under oath and I'll take
17   your testimony?
18       MR. BRUNO:
19       Don't.  I'm just so resentful of
20   your suggestion that a goofy E-mail
21   like this, which is an invitation to a
22   presentation has been edited?  Give me
23   a break.
24       MR. TREEBY:
25       I'm trying to find out.

Page 340

1  EXAMINATION BY MR. TREEBY:
2    Q.  Can you explain it?
3    A.  I can explain this email to you coming
4  from the bottom up on the second page.
5    Q.  Can you explain why you don't have an
6  address on your -- before your note to him?
7  That's my question.
8    A.  I cannot answer a computer glitch.
9  I'm not a computer expert.
10   Q.  Okay.  You can't answer.
11   A.  No.
12   Q.  That's all I'm asking.  You don't have
13 an answer to that.  Then there is something
14 that says, in that same section of the E-mail,
15 would you -- well, first, look at it, between
16 Bob on the first page and then original message
17 on the first page, is all that you're text?
18   A.  Thanks for the invitation?  Yes.
19 Sorry I was out of town during that week.  Yes.
20 Is it possible that I may receive a copy of the
21 report at our mailing address?  Yes.  And I
22 gave him the mailing address to send the copy
23 of the report.  Um -- the final report.
24       I still haven't received any of your
25 attachments on your last E-mail correspondence.

Page 341

1  Again, thanks for the invitation.  And if there
2  is anything else I can help with let me know.
3    Q.  So all that's yours?
4    A.  That is me.  That's me.
5    Q.  Okay.  That's what I wanted to know.
6        Was there any -- to your knowledge,
7  was there any E-mail between you and Bob Bea
8  between January 14, the earlier exhibit that
9  you gave me, Exhibit B, and this Exhibit C?
10   A.  I can't -- if I had it, you have it.
11 I'm not going to tell you there wasn't one.
12   Q.  That's a different question.  I'm
13 really -- from your memory, can you tell me was
14 there any E-mail exchange between you and
15 Dr. Bea between January 14, 2006, and May 17,
16 2006?  From your memory.
17   A.  I want to approach the answer to this
18 question with an abundance of caution, and the
19 reason is, obviously tons of E-mails, and
20 sometimes some may go through and I deleted
21 them and it's gone.  Okay?  And you may have a
22 copy of an E-mail that Bob sent me that I'm not
23 aware of but I didn't print a copy of that out
24 at this time or even read it.
25   Q.  I wouldn't trick you like that.  I

86 (Pages 338 to 341)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0086

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 342

1  don't have any E-mail.
2       MR. BRUNO:
3       Oh, please.
4  EXAMINATION BY MR. TREEBY:
5       Q.  I have no E-mail from anybody between
6  those dates.
7       A.  Well, to my knowledge --
8       Q.  My question to you is -- and I
9  understand people delete E-mails.  I do it
10  myself.  My question to you is, do you remember
11  whether there was any E-mail exchange --
12      A.  No, sir.
13      Q.  -- between you and Dr. Bea -- listen
14  carefully -- between you and Dr. Bea between
15  January 14, 2006, and May 17, 2006?
16      It's not in there, I can tell you
17  that.
18      A.  It's not in the response?  Okay, no,
19  sir.  If it's not here, I don't remember.
20      Q.  You don't remember it.
21      A.  No, sir.  And I want to apologize
22  because I have been tricked up like that by
23  Lloyd Shields.  I'll answer a question, and
24  trying to be honest, and then all of a sudden
25  boom, he's trapping me.  So I'm doing it with

Page 343

1  caution.
2       Q.  I have in fact -- I'm not commenting
3  on that, but all I'm telling you is I have
4  subpoenaed E-mail from Dr. Bea, I've subpoenaed
5  E-mail from ILIT.  If I had any between these
6  dates, I would tell you.  It just, I'm asking
7  from your memory if during that four-month or
8  five-month period you remember any.
9       A.  No, sir.
10      Q.  Okay.
11      A.  I don't remember.
12      Q.  I show you an E-mail from Dr. Bea to
13  you dated August 25, 2006 with a re: line of
14  when the levees broke.  (Tendering.)  I marked
15  it Exhibit 32 for this deposition.
16      (Exhibit 32 was marked for
17  identification and is attached hereto.)
18      A.  Yes, sir, I remember his response
19  because I E-mailed him to let him know that I
20  saw his appearance on When the Levees Broke,
21  with Spike Lee, and I was complementing him on
22  his, um --
23  EXAMINATION BY MR. TREEBY:
24      Q.  Okay.  I'm going to ask you --
25      A.  -- appearance.

Page 344

1       Q.  -- a similar question to the one I
2  asked about the prior one.  And again, I just
3  want to make sure.  This again is an E-mail
4  that appears to have other E-mails cut into it.
5  What I mean by that is, it says, Happy Friday,
6  Melvin.  That's the way it starts.  And it's
7  got some text, then it says Dr. Bea.  And it
8  says, now responses to your E-mail -- your
9  E-mail, meaning you, I believe -- follow below.
10  And then there's a section that says thanks a
11  million with a bunch of exclamation points.
12  And it goes on, Sylvia says hello.  I assume
13  that's from you.
14      A.  Okay.  Let me tell you what Dr. Bea is
15  doing.
16      Q.  Is that correct?
17      A.  That's correct.  Dr. Bea took what --
18  my E-mail, and when I said something, he
19  responded.  You know, he just -- that's the way
20  he is.
21      MR. BRUNO:
22      He cut and pastes.
23      A.  I say thanks a million.  That's what I
24  said.  And he came back and said, and hello
25  with hugs to your family.  It's people like you

Page 345

1  that make the place work.
2       In my E-mail I said, to date I think
3  you're the only man telling the truth about the
4  current conditions of the levees as they relate
5  to the safety for the American public.  Dr. Bea
6  answered me back by saying, I hope not.
7       So that's what was going on there.
8  Dr. Bea did that.  But I had sent him an E-mail
9  with this same excerpts in it, and I think he
10  just went through and he did the cutting and
11  pasting.
12      Q.  Do you know where your E-mail that he
13  cut and pasted from is?
14      A.  I don't keep copies of my E-mails.
15      MR. BRUNO:
16      Your sent E-mails.
17      THE WITNESS:
18      Yeah.
19      A.  I just sent it.
20      MR. BRUNO:
21      Not many people do.
22  EXAMINATION BY MR. TREEBY:
23      Q.  Okay.  You -- this document that I've
24  attached as Exhibit 32 has some more pages
25  after the two pages of E-mails.

87 (Pages 342 to 345)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0087

MELVIN M.L. McELVEE (VOL I)                    4/23/2008

Page 346

1    Were these attached to this E-mail
2  from Dr. Bea?
3    A.  Yes.  That is why I submitted it as
4  all Exhibit D.  I'm showing you that this is
5  the E-mail I got back from him, and these are
6  the documents that were attachments to that
7  E-mail.  That's how I'm remembering it now.
8    Q.  Did your son ever go to the University
9  of California Berkley?
10   A.  No, sir, he hasn't.  I wish he would.
11 I was telling him to take that.  Son, everybody
12 don't get that opportunity, why don't you do
13 it.
14   Q.  So Dr. Bea invited him there?
15   A.  Yes, sir.  He don't want to get too
16 far away from dad.
17   Q.  I show you a document we've marked
18 Exhibit 33 which for this deposition, which is
19 an E-mail dated October 15, actually.  It's got
20 I think two E-mails in it.  One of them is
21 October 14 and one of them is October 15.
22       (Exhibit 33 was marked for
23 identification and is attached hereto.)
24   A.  Yes, sir.  And the --
25 EXAMINATION BY MR. TREEBY:

Page 347

1    Q.  From Dr. Bea to J.W. Templeton on
2  which you were copied.
3    A.  Yes, sir.
4    Q.  Do you know who Mr. Templeton is?
5    A.  Other than the explanation in the
6  E-mail, no, sir.
7    Q.  Did he ever contact you?
8    A.  No, sir.
9    Q.  Do you know why Dr. Bea referred
10 Mr. Templeton to you?
11   A.  Other than drawing a conclusion from
12 the E-mail, I don't know.  My conclusion was
13 that I think he had some conversations with
14 this guy, the guy wanted to talk with Dr. Bea
15 relative to the levee failures, and Dr. Bea
16 said, I think this is a great source, go to
17 Mr. McElwee.
18   Q.  Okay.
19   A.  And I think it had something to do
20 with -- I'm sorry.
21   Q.  Go ahead.
22   A.  I think it had something to do with
23 small businesses doing work for the government
24 in this area relative to Katrina.  Something
25 like that.  That's what I'm thinking.

Page 348

1    Q.  Okay.  This was given to us as your
2  exhibit after your response to our subpoena.
3  Were the attachments to this, to the two pages
4  of E-mail, attachments to that, were they the
5  attachments to this E-mail?
6    A.  Yes, sir.  In fact, if we look at
7  Exhibit F, Attachment 8, that's what's written
8  down there, 8.  Um -- third page is titled what
9  do we do?  Bob Bea's answers to questions.  If
10 you look at the E-mail, what do we do, I mean
11 that's the attachment that I opened up.
12       Can you see that?
13   Q.  I'll take your word for it.
14   A.  Yeah.  See, what do we do is the title
15 of this one.
16   Q.  Okay.
17   A.  What do we do is title of that
18 attachment.
19   Q.  Okay.  I show you a document we've
20 marked Exhibit 34 which is Exhibit G to your
21 response to your subpoena.  It's an E-mail
22 dated December 13, 2006, from Robert Bea to
23 somebody named James Delery.
24       (Exhibit 34 was marked for
25 identification and is attached hereto.)

Page 349

1    A.  Yes, sir.
2  EXAMINATION BY MR. TREEBY:
3    Q.  Coping David Rosenberg and Melvin M.L.
4  McElwee, Sr.
5    A.  That's me.
6    Q.  I just -- this David Rosenberg now
7  comes -- Who is he, by the way?
8    A.  David Rosenberg is a colleague or
9  somebody that works for Dr. Bea, that Dr. Bea
10 introduced me to at the, um -- the, um -- the
11 meeting my family went to.
12   Q.  Uh-huh.  Do you know what his
13 profession is, if any?
14   A.  I'm told he's a professional engineer
15 from California.
16   Q.  Okay.  Who told you that?
17   A.  He told me that.
18   Q.  He's the one that has these documents
19 that you told me I can get from IKON?
20   A.  Yes, sir.
21   Q.  This E-mail is introducing Mr. Delery
22 to you and encouraging you and Mr. Delery to
23 have communications with each other.
24       Did you ever communicate with
25 Mr. Delery?

88  (Pages 346 to 349)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0088

MELVIN M.L. McELVEE (VOL I)                          4/23/2008

Page 350

1    A. No, sir.
2    Q. If you know, is the town hall meeting
3  referenced in this E-mail the one described in
4  the earlier E-mail, the one at Lakeview?
5    A. No. I think this is a separate town
6  hall meeting that Dr. Bea mentioned to me on
7  that night that was going to come up, and he
8  want me to, um -- be involved in, but I never
9  heard from him, or I don't know if it ever took
10 place or not. I'm not --
11   Q. You didn't go to it if it did?
12   A. I didn't go to it if it did happen.
13   Q. Okay. In -- what materials, if you
14 know, was Dr. Bea referring to when he said you
15 and your family had spent a lot of time
16 organizing background materials?
17   A. Um -- the conference -- remember the
18 conference I told you I brought a trailer in
19 and went to a conference room at I think it was
20 Holiday Inn or one of the places, rented a
21 conference room, laid it all out?
22   Q. Brought file cabinets?
23   A. Yes.
24   Q. So these are all documents relating to
25 Dwyer Road project?

Page 351

1    A. That's correct.
2    Q. There's a reference in here, if you
3  know, to -- let's see if I can find it again.
4  Oh. In the third paragraph of this letter,
5  speaking of you and your family's experience.
6  I believe that's what he's speaking about. He
7  says in this statement also that they had
8  used -- let's go back. It was clear that the
9  Corps -- starting at the middle of that
10 paragraph. It was clear that the Corps had
11 misled his construction company and others.
12 Their experience clearly indicated that the
13 Corps had known about the soft soils, organic
14 layers and seepage problems far in advance of
15 Katrina, also that they had used unprofessional
16 and reasonable methods to pressure the
17 contractors into desperate financial binds,
18 example: Bond forfeiture. Do you know what he
19 was referring to there?
20   A. Yes. He was referring to the
21 conditions on the Dwyer Road project that we
22 have talked about, me agreeing with the Corps,
23 disagreeing with the Corps, the problems that
24 occurred, the Corps saying we were behind
25 schedule from the beginning of the job to the

Page 352

1  end, but not admitting the problems on the
2  job --
3    Q. Okay.
4    A. -- and then all of a sudden the
5  bonding company had to come in, and they
6  refused to pay for modifications, I think there
7  were nine modifications we brought to the
8  Corps' attention they ignored, and we went to
9  the Armed Services Board of Contract Appeals to
10 get answers and the Corps danced around it. I
11 mean, they're very good at dancing and getting
12 behind the scene and letting somebody else --
13   Q. And I don't need to go back through
14 that, but what I was trying to find out is do
15 you know of anything else he was referring to
16 there besides what you've already described for
17 us?
18   A. No. That's the only thing that he was
19 presented with by McElwee Brothers.
20   Q. Okay. I show you an E-mail marked
21 which was Exhibit H to your subpoena response,
22 and I've marked it as Exhibit 35. And it's an
23 E-mail -- by the way, did you ever meet -- I
24 may have asked this, I apologize if I did: Did
25 you meet with Mr. Delery?

Page 353

1       (Exhibit 35 was marked for
2  identification and is attached hereto.)
3    A. No, sir. I don't know Mr. Delery.
4  EXAMINATION BY MR. TREEBY:
5    Q. You don't know who he is or what he
6  does?
7    A. I don't know who he is or what he
8  does.
9    Q. Okay. This next Exhibit 35 from
10 Robert Bea to somebody W. Weiser, and then it
11 has a lot of folks copied, including you, I
12 believe -- yes, including you -- Re: meeting in
13 Lakeview. This is December of '06. And then
14 on the next page there's a -- continues and
15 there's another E-mail December 14.
16   A. If you're asking me about the details
17 of this E-mail, I can just tell you it's
18 something he courtesy copied me. I printed it
19 from my file. I can't tell you anything
20 about --
21   Q. Do you know who Weiser -- W. Weiser
22 is?
23   A. I have no clue.
24   Q. Have you looked through -- you gave it
25 to me, and if you need to look through it to

89  (Pages 350 to 353)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0089

MELVIN M.L. McELVEE (VOL I)                                4/23/2008

Page 354

1  answer this question, that's fine.  If you
2  don't, that's fine, too.
3       Were any of the comments contained in
4  here, because this is one of those edited
5  E-mails, were any of these comments yours?
6    A.  No, sir.
7    Q.  Okay.  I show you another E-mail.
8  This was your Exhibit E to your subpoena
9  response.  I've marked it Exhibit 37 for this
10 deposition.  This is dated December 22nd, 2006,
11 and this one is just from Bob Bea to you
12 entitled, subject, the beat goes on.  And this
13 appears to reference another meeting at
14 Lakeview that you went to.
15   A.  I'm -- I'm going to tell you, so help
16 me God, I only went to one meeting at Lakeview.
17   Q.  So you can't account for the date on
18 this E-mail, then, I take it.
19   A.  Um -- actually, if you can give me the
20 exact date of the Lakeview meeting, I can tell
21 you that's when I went to the Lakeview meeting.
22 I only went the one meeting, and it was
23 recorded and televised.  I'm in that meeting, I
24 make a comment in that meeting, but the exact
25 date of when it took place I can't answer you

Page 355

1  here.  I only went to one meeting.
2    Q.  So when you refer -- early in the year
3  2006, you remember -- I can take you back to
4  it, but maybe you can do it from memory --
5  there was an E-mail from him to you, January
6  4th, that he was coming to town, would like to
7  meet with you, and there was then a subsequent
8  E-mail of January 14, ten days later saying it
9  was great to meet with you and your family.
10   A.  Okay.
11   Q.  Okay?  And you had earlier testified
12 that you believe, yes, that meeting was the
13 meeting in Lakeview, and Garland Robinette was
14 there and whoever else you've testified about.
15   A.  Yes, sir, I said I believe that to be
16 that meeting.  However --
17   Q.  This is almost a year later.
18   A.  Okay.  Let me mention this to you:
19 Maybe I quoted -- it wasn't that meeting, but I
20 did tell you I met with him at a Holiday Inn
21 showing him all the documents.  Now, during
22 that time frame my family wasn't there -- well,
23 let me put is this way:  My wife was there and
24 her aunt was there.  But my children were not
25 there.  So maybe that's when he's referring to

Page 356

1  in that E-mail, at that time frame.
2    Q.  Well, now I'm getting really confused,
3  because there was also the November 28th report
4  by your son in which he alludes to -- he
5  alludes to a request made for materials that
6  had been provided to Dr. Bea.  That's back in
7  November of '05.  And I thought --
8    A.  Who made the request?
9    Q.  In the report that your son did --
10   A.  Yes, sir.
11   Q.  -- we read the part results.  And
12 there was an indication that Dr. Bea had
13 requested and that he, being you, because I
14 asked you who it was and it was you, had
15 provided materials to Dr. Bea.
16       You recall that?
17   A.  I'm going to answer you again.
18   Q.  Well, you either recall that or you
19 don't.
20   A.  The materials I provided --
21   Q.  Uh-huh.  Were at this meeting at the
22 Holiday Inn.
23   A.  -- were at the Holiday Inn -- yes.
24 And he didn't walk away with any materials, he
25 just looked at everything on the table.  I

Page 357

1  never provided him any documents.
2    Q.  I understand what you've saying.  And
3  you later said you haven't provided him any
4  documents until very recently.
5    A.  That's right.
6    Q.  Okay.  So I'm having trouble with
7  this -- you met with him at Holiday Inn.  Do
8  you remember what year it was?  Was it before
9  the report or not?
10   A.  It was before my son's -- let me look
11 at my calendar and answer the question when
12 that date of that meeting happened.  Can I do
13 something like that?
14   Q.  Sure.  I would like to got I right.
15       MR. BRUNO:
16         I don't know why it's remotely
17       relevant to anything we're doing, took
18       while we're at it.
19       MR. TREEBY:
20         I don't think Dr. Bea is remotely
21       relevant to anything, but you think he
22       is, so that's why this is important.
23       MR. BRUNO:
24         Really.  So it's important to
25       know that Dr. Bea met with him at a

90  (Pages 354 to 357)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0090

MELVIN M.L. McELVEE (VOL I)                                    4/23/2008

Page 358

1    certain time and at a certain place?
2    MR. TREEBY:
3        Uh-huh.  Yes, it is.
4    MR. BRUNO:
5        And that relevant to his
6    opinions?
7    MR. TREEBY:
8        Yes, it is.
9    MR. BRUNO:
10       Well, you need to read the
11   reports.
12   MR. TREEBY:
13       Very much so.
14   EXAMINATION BY MR. TREEBY:
15   Q.  Okay.  Now, this would indicate that
16   there was -- in fact, you will see attached
17   coming home and something from Wagenaar letter,
18   is attached to your 22nd -- this December 22nd
19   E-mail you gave to me as exhibit E to your
20   response to my subpoena.
21       You see that?
22   A.  Yes.
23   Q.  Okay.  If you'll look at the first
24   attachment, it speaks of a town hall forum
25   December 12, 2006, St. Dominic Church.

Page 359

1    A.  Yes, sir.
2    Q.  Are you testifying this is the only
3    meeting in Lakeview -- in Lakeview.  I'm not
4    saying at that church, but in Lakeview -- that
5    you attended?
6    A.  Yes, sir.
7    Q.  Okay.  So if there was a meeting in
8    January of '06, eleven months earlier, that was
9    where?
10   A.  That was the meeting I keep saying at
11   the Holiday Inn conference room in Hammond.
12   Q.  Okay.
13   A.  That's --
14   Q.  And then so if there was a meeting
15   prior to November 28th, 2005 when the report
16   was written, at which you showed Dr. Bea
17   materials, where was that?
18   A.  That was the meeting I'm telling you
19   about, whatever day it was.
20   Q.  Those dates don't work.
21   MR. BRUNO:
22       How about his daughter 's
23   birthday, why don't you ask him that?
24   MR. TREEBY:
25       Let's proceed.

Page 360

1    MR. BRUNO:
2        Because it says, thanks for
3    talking time from your daughter's
4    birthday party.
5        When is your daughter's birthday?
6    THE WITNESS:
7        December 12th.
8    MR. BRUNO:
9        So you have a reference.
10   THE WITNESS:
11       December 12th.  That's the date
12   that I met at the town hall meeting in
13   Lakeview.
14   EXAMINATION BY MR. TREEBY:
15   Q.  How many occasions have you met in
16   person with Dr. Bea?
17   A.  Met in person with him?
18   Q.  Yes.
19   A.  Twice.
20   Q.  And I know you're having trouble with
21   dates, and I'm not trying to nail you with
22   dates but can you tell me anything about the
23   two meetings that would help us identify them,
24   what happened, who was there?
25   A.  Okay, in Hammond, the conference room,

Page 361

1    myself, my wife --
2    Q.  Who booked the conference room?
3    A.  McElwee Brothers did.
4    Q.  Okay.
5    A.  Um --
6    Q.  You should be able to find out when
7    that was, then.
8    A.  Yes, sir.
9    Q.  Would you do that?
10   A.  Yes, sir.
11   Q.  Okay.  And what was the other
12   occasion?  Was it at the Lakeview?
13   A.  The Lakeview.
14   Q.  At St. Dominic's church?
15   A.  At St. Dominic 's church on
16   December 12th.
17   Q.  To your knowledge, did you meet or
18   speak with any of the team members, other than
19   Dr. Bea, responsible for what Dr. Bea has
20   called the Independent Levee Investigation Team
21   investigation and report?
22   A.  When you say team members, I'm just
23   going to mention to you Dave Rosenberg and
24   Dr. Bea.  Now, I don't know if Dave Rosenberg
25   was part of that team or whatever, but that's

91  (Pages 358 to 361)

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0091

Page 362

1   the only two people I've talked to.
2      Q.  Okay.  Have you met with Mr. Rosenberg
3   other than when he was with Dr. Bea?
4      A.  Yes.
5      Q.  On how many occasions?
6      A.  Oh, I can't --
7      Q.  Many?
8      A.  I'm sorry.  It was quite a few
9   occasions, yeah.  We met on quite a few
10  occasions.  I'd have to get my calendar to tell
11  you what the dates were.
12     Q.  When did you first meet -- when -- if
13  you recall, approximately when did you first
14  meet with Mr. Rosenberg?
15     A.  Meet with him after I met him?  I met
16  him at the town hall meeting.
17     Q.  So that would be December 12, 2006,
18  you believe.
19     A.  Yes, sir.
20     Q.  And that was the first time you had
21  met him.
22     A.  That's the first time I met him.
23     Q.  So he wasn't with Dr. Bea at Hammond?
24     A.  No, sir.  Dr. Bea was alone that time.
25     Q.  Okay.

Page 363

1      MR. TREEBY:
2          I think this is a good place to
3      break.  I'm not going to be too much
4      longer, but I'm really not -- I'm
5      almost finished, but this will take a
6      little while to develop this.
7          (Recessed for the day.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 364

1              WITNESS' CERTIFICATE
2
3          I, MELVIN M.L. MCELWEE, SR., do
4   hereby certify that the foregoing testimony was
5   given by me, and that the transcription of said
6   testimony, with corrections and/or changes, if
7   any, is true and correct as given by me on the
8   aforementioned date.
9
10  _____    _____
11  DATE SIGNED         MELVIN M.L. MCELWEE, SR.
12
13  _____    Signed with corrections as noted.
14
15  _____    Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN:  April 23rd, 2008

Page 365

1          REPORTER'S CERTIFICATE
2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3   Certified Court Reporter in and for the State
4   of Louisiana, do hereby certify that the
5   aforementioned witness, after having been first
6   duly sworn by me to testify to the truth, did
7   testify as hereinabove set forth;
8          That said deposition was taken by me
9   in computer shorthand and thereafter
10  transcribed under my supervision, and is a true
11  and correct transcription to the best of my
12  ability and understanding.
13         I further certify that I am not of
14  counsel, nor related to counsel or the parties
15  hereto, and am in no way interested in the
16  result of said cause.
17
18
19
20
21
22
23
24  _____
     JOSEPH A. FAIRBANKS, JR., CCR, RPR
25  CERTIFIED COURT REPORTER #75005

b0b09625-983e-472b-937c-43ef0ac82077

PX-0686-0092