Page 366

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES        CIVIL ACTION

CONSOLIDATED LITIGATION              NO. 05-4182 K2

                                     JUDGE DUVAL

PERTAINS TO                          MAG. WILKINSON

(Robinson, No. 06-2268)

                    - AND -

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES        CIVIL ACTION

CONSOLIDATED LITIGATION              NO. 05-4182 K2

                                     JUDGE DUVAL

FILED IN:                            MAG. WILKINSON

05-4181, 05-4182, 05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 06-0225, 06-0886, 06-1885,
06-2278, 06-2287, 06-4065, 06-4389, 06-4634,
06-4931, 06-5032, 06-5159, 06-5161, 06-5260,
06-5937, 07-1271

                (V O L U M E   II)

        Deposition of MELVIN M.L. MCELWEE,

SR., given at the Law Office of Joseph M.

Bruno, 855 Baronne St., New Orleans, Louisiana

70113, on April 24th, 2008.

REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

EXHIBIT
2

f511046d-f246-478c-b182-17dab585135a

PX-0687-0001

MELVIN M.L. McELWEE (VOL II)                                    4/24/2008

```
                                    Page 367
1   APPEARANCES:
2   REPRESENTING THE PLAINTIFFS:
3       BRUNO & BRUNO
4       (BY:  JOSEPH M. BRUNO, ESQUIRE)
5       (BY:  SCOTT JOANEN, ESQUIRE)
6       855 Baronne Street
7       New Orleans, Louisiana 70113
8       504-525-1335
9   - and -
10      SHER, GARNER, CAHILL, RICHTER, KLEIN &
11      HILBERT, L.L.C.
12      (BY:  MATTHEW CLARK, ESQUIRE)
13      909 Poydras Street, 28th Floor
14      New Orleans, Louisiana 70112
15      504-299-2100
16
17  REPRESENTING THE UNITED STATES OF AMERICA:
18      UNITED STATES DEPARTMENT OF JUSTICE,
19      TORTS BRANCH, CIVIL DIVISION
20      (BY:  PAUL LEVINE, ESQUIRE)
21      P.O. Box 888
22      Benjamin Franklin Station
23      Washington, D.C. 20044
24      202-616-4289
25
```

```
                                    Page 369
1       E X A M I N A T I O N   I N D E X
2
3   EXAMINATION BY:                 PAGE
4
5   MR. TREEBY  ...............................371
6   MR. LEVINE  ...............................413
7   MR. BRUNO  ................................483
8   MR. TREEBY  ...............................488
9       E X H I B I T   I N D E X
10
11  EXHIBIT NO.                     PAGE
12  EXHIBIT 39  ...............................417
13  EXHIBIT 40  ...............................426
14  EXHIBIT 42  ...............................432
15  EXHIBIT 43  ...............................434
16  EXHIBIT 44  ...............................448
17  EXHIBIT 45  ...............................457
18
19
20
21
22
23
24
25
```

```
                                    Page 368
1   REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS.
2       CORPS OF ENGINEERS, OFFICE OF COUNSEL
3       (BY:  JENNIFER LABOURDETTE, ESQUIRE)
4       7400 Leake Avenue
5       New Orleans, Louisiana 70118-3651
6       504-862-2843
7
8   REPRESENTING WASHINGTON GROUP INTERNATIONAL:
9       STONE PIGMAN WALTHER WITTMANN, L.L.C.
10      (BY:  WILLIAM D. TREEBY, ESQUIRE)
11      546 Carondelet Street
12      New Orleans, Louisiana 70130
13      504-581-3200
14
15  REPRESENTING ORLEANS LEVEE DISTRICT:
16      SUTTON LAW FIRM
17      (BY:  CHARLES E. SUTTON, JR., ESQUIRE)
18      2101 N. Highway 190, Suite 105
19      Covington, Louisiana 70433
20      985-249-5991
21  ALSO PRESENT: KEA SHERMAN, ESQ., NICOLE
22  BOYER-DUPLASS, ESQ., CHARLES LANIER, ESQ. (VIA
23  I-DEP), KIRK AURANDT, ESQ. (I-DEP)
24  VIDEOGRAPHER:
25  GILLEY DELORIMIER (DEPO-VUE)
```

```
                                    Page 370
1          S T I P U L A T I O N
2          IT IS STIPULATED AND AGREED by and
3   among counsel for the parties hereto that the
4   deposition of the aforementioned witness may be
5   taken for all purposes permitted within the
6   Federal Rules of Civil Procedure, in accordance
7   with law, pursuant to notice;
8          That all formalities, save reading
9   and signing of the original transcript by the
10  deponent, are hereby specifically waived;
11         That all objections, save those as to
12  the form of the question and the responsiveness
13  of the answer, are reserved until such time as
14  this deposition, or any part thereof, is used
15  or sought to be used in evidence.
16
17
18              * * *
19
20
21
22         JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23  Certified Court Reporter in and for the State
24  of Louisiana, officiated in administering the
25  oath to the witness.
```

                                          2  (Pages 367 to 370)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0002

MELVIN M.L. McELWEE (VOL II)                                    4/24/2008

Page 371

1        MELVIN M.L. MCELWEE, SR.
2    14154 Rev. Joseph White Road, Independence,
3    Louisiana 70443, a witness named in the above
4    stipulation, having been first duly sworn, was
5    examined and testified on his oath as follows:
6    EXAMINATION BY MR. TREEBY:
7        Q. Good morning, Mr. McElwee. I have a
8    few more questions for you. In fact, to begin
9    the day I handed you an exhibit that we're
10   going to -- that I have already marked, I
11   believe, Exhibit 36. And it is simply a street
12   map of New Orleans, and I gave it to you ahead
13   of time so that you could attempt to look at --
14   I didn't instruct you this, so you may need to
15   do that now, look for Florida Avenue, just
16   below the Florida Avenue bridge.
17       A. Yes, sir.
18       Q. Do you see that?
19       A. Yes, sir. I see that.
20       Q. It's below the Gulf Intracoastal
21   Waterway?
22       A. Yes, sir, it is.
23       Q. Okay. And I'm going to ask you,
24   carefully, if you will, to put an X on the map
25   at the place where Florida Avenue intersects

Page 372

1    with the Inner Harbor Navigational Canal.
2        A. Is it okay in ink? Normally we write
3    on maps in pencil.
4        Q. No, in ink. I want this in ink. Be
5    careful. With a little small X.
6        A. Yes, sir.
7        Q. Okay. And then I want you to put an X
8    where Dwyer Road intersects with the Inner
9    Harbor Navigational Canal.
10       A. Dwyer Road doesn't intersect with it.
11   But I'll project a line to it.
12       Q. Yeah. Right. The site of the work
13   that you did.
14       A. Yes, sir.
15       Q. Have you done that?
16       A. Yes, sir.
17       Q. The scale of that map, and I have a
18   scale here, is -- as I read it, it's an inch
19   and 3/16ths per mile. Can you see that up
20   there? Check it and see if I'm right.
21       MR. BRUNO:
22         Bill, we can stipulate to this.
23       MR. TREEBY:
24         Okay, you stipulate -- will you
25       stipulate that it's two miles?

Page 373

1        MR. BRUNO:
2          Yeah, yeah, if you let me just
3        check it. I think he said a mile and
4        a half. This is ridiculous.
5        MR. TREEBY:
6          I think it will be quicker for
7        the witness to do it than for us to
8        stipulate, that's why --
9        MR. BRUNO:
10         I don't know. A stipulation is
11       always better.
12       MR. TREEBY:
13         Well, I don't know if it's
14       better.
15       MR. BRUNO:
16         Well, I'm going to tell you right
17       now --
18       MR. TREEBY:
19         But you know what? I want this
20       witness to say it. Okay?
21       MR. BRUNO:
22         All right, then fine. Then
23       you're going to stipulate that he's an
24       expert in charting and graphing and
25       all that?

Page 374

1        MR. TREEBY:
2          No.
3        MR. BRUNO:
4          Then it is what it is. All
5        right, it's three and three quarter
6        inches. Right? Do we agree? Can we
7        stipulate?
8        MR. TREEBY:
9          It's actually three and
10       thirteen-sixteenths, but that's okay.
11       MR. BRUNO:
12         No, it's not, because you asked
13       him to make the mark, and so you're
14       stuck with his marks, not your marks.
15       And since you haven't even bothered to
16       look at this you don't know if it's --
17       if you want to come look at it, you
18       can, but I'm putting the small end at
19       one X, and I got three and three
20       quarters based on his marks, which is
21       why, you know, it's kind of silly,
22       because if you move the mark a little
23       bit you're going to change it by a
24       large distance. Right, Bill?
25       MR. TREEBY:

3 (Pages 371 to 374)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0003

MELVIN M.L. McELWEE (VOL II)                                    4/24/2008

Page 375

1          No, I don't agree.  Would you
2   give the witness back the exhibit,
3   please?
4   MR. BRUNO:
5          So that's --
6   MR. TREEBY:
7          Mr. Bruno, would you give the
8   witness back the exhibit?
9   MR. BRUNO:
10         One second.  I get --
11  MR. TREEBY:
12         Would give the witness back the
13  exhibit?
14  MR. BRUNO:
15         One second.  I get 2.75 --
16  MR. TREEBY:
17         I would ask you, Mr. Bruno, to
18  give the witness back the exhibit.
19  MR. BRUNO:
20         I get almost 2-point -- I would
21  say 2.8 miles is what I would get.
22  MR. TREEBY:
23         Okay.  Well, that's fine with me.
24  2.8 miles.
25  EXAMINATION BY MR. TREEBY:

Page 376

1      Q.  Do you agree with that?  Do you agree
2   with Mr. Bruno?
3      A.  I agree with Mr. Bruno, and in
4   accordance with this map, that's what that
5   distance is, which is a different map than what
6   I looked at yesterday.
7      Q.  Right 2.8 miles.
8      A.  Yes, sir.
9      Q.  Okay.  That's all with that exhibit.
10  That's all I need.
11         Now, let me ask you this:  And if you
12  could hand me back my scale.
13     A.  Yes.
14     Q.  Thank you so much.
15         How, if you would, best you can
16  estimate -- and you probably have a pretty good
17  recollection of it.  The excavation that you
18  did at the Dwyer Road project?
19     A.  Yes, sir.
20     Q.  The closest end of that excavation to
21  the floodwall, how close was it to the
22  floodwall?
23     A.  It was through the floodwall.
24     Q.  Okay.  So it went all the way through
25  the floodwall.

Page 377

1      A.  Yes, sir.
2      Q.  And in fact, part of your job was to
3   demolish a portion of the floodwall.
4      A.  Yes, sir.
5      Q.  I read somewhere, but correct me if
6   I'm misremembering it, that it was about three
7   hundred lineal feet of the floodwall that was
8   demolished.
9      A.  No, sir.
10     Q.  That's not correct?
11     A.  That's inaccurate.
12     Q.  How much of the floodwall was
13  demolished?
14     A.  It was a forty feet section.  We had
15  to come through the wall with three 84-inch
16  diameter tubes, and those three tubes were
17  pretty close in proximity.  So it was nowhere
18  near three hundred feet of wall we took out.
19     Q.  Okay.  And how much of the floodwall
20  was demolished in order to put in the access
21  gate?  Wasn't there an access gate to the
22  project?
23     A.  There was an access road.  The road
24  was a diversionary road that went around the
25  floodwalls and come through the floodwall for

Page 378

1   traffic.
2      Q.  Right.  And that portion of it that
3   came through the floodwall required a
4   demolition of the floodwall, did it not?
5      A.  That's correct.
6      Q.  Okay.  And how much of the floodwall
7   was demolished for that?
8      A.  Without --
9      Q.  Approximately?
10     A.  Approximately maybe, I think -- I'm
11  saying twenty something feet.
12     Q.  Okay.  And how deep was the excavation
13  that you did?
14     A.  For the access road?
15     Q.  No.  No.  How deep was the excavation
16  that you did for the Dwyer Road project?
17     A.  Somewhere in the proximity of 26 to
18  maybe 30 feet.
19     Q.  Deep?
20     A.  Yes, sir.
21     Q.  Was that below the grade --
22     A.  Yes, sir.
23     Q.  -- of the batture?
24     A.  That's below the grade of the existing
25  batture.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

f511046d-f246-478c-b182-17dab585135a

PX-0687-0004

Page 379

1     Q.  Okay.  Now, Mr. Bruno raised this
2  already this morning to some extent:  You have,
3  if I remember correctly, but you can testify to
4  this from your CV, that you went to -- you've
5  gone to at least two different universities; is
6  that correct?
7     A.  That's correct, yes, sir.
8     Q.  One of them you, I believe, attained
9  the status, if you will, of a junior.  Is that
10  correct?
11     A.  At that time, when that résumé was
12  made, yes, it was a junior status.
13     Q.  And what university was that?
14     A.  That's the University of New Orleans.
15  That's on the first CV.  During my early on
16  curriculum.  On the second CV I attained the
17  status of a senior.
18     Q.  Okay.  And what was the course of
19  study you took at the University of New
20  Orleans?
21     A.  Civil engineering.
22     Q.  And how did you come to the conclusion
23  that you had the status of a junior at that
24  point from UNO?
25     A.  Looking at my transcript and my

Page 380

1  records of grades during that process.
2     Q.  Do you have that transcript, by the
3  way?
4     A.  I don't have it here, but I do have
5  it, yes.
6     Q.  How many hours did you take in civil
7  engineering?
8     A.  Um -- there's a hundred and
9  twenty-something hours.  I'm thirty hours shy
10  now.
11     Q.  How many shy were you when you
12  classified yourself as a junior?
13     A.  I'd have to look at my transcript.  I
14  can't answer that right now.
15     Q.  Okay.
16     A.  And I didn't classify myself.  I mean,
17  it was the university telling me on that
18  academic record what my status was.
19     Q.  Where is Excelsior College?  Albany,
20  New York, it says.
21         Are you attending there in person, or
22  did you attend there in person?
23     A.  No, not actually.  Excelsior College
24  does online courses and things like that, and
25  at the time I was in the National Guard, and in

Page 381

1  order to express my, um -- upgrade in rank I
2  was a dual enrollment in mathematics, taking a
3  lot of the courses that I already had from UNO
4  and just transferring them over to Excelsior
5  towards a mathematics degree, with a couple of
6  courses left to complete a degree in
7  mathematics.
8     Q.  Okay.  Now, on this Dwyer Road
9  project, you, or your firm, and -- well, did
10  your firm hire any geotechnical experts?
11     A.  Yes, sir.  Mr. J. Michael Dixon is the
12  expert.
13     Q.  That was Mr. Dixon?
14     A.  We talked about him thoroughly
15  yesterday.
16     Q.  He was a geotechnical soils type
17  expert?
18     A.  He was a geotechnical expert.
19     Q.  And would I be correct to say you do
20  not consider yourself a geotech expert?
21     A.  No, I'm not a geotech expert.
22     Q.  Okay.  I show you a document that we
23  have marked -- that I've marked McElwee Exhibit
24  38.  And I will represent to you, and subject
25  to being corrected by Mr. Bruno and Mr. Joanen

Page 382

1  or anyone else, and I hope I'm right in what
2  I'm saying, that I have extracted from the
3  Independent Levee Investigation Team report the
4  pages that refer to you.
5     A.  Yes, sir.
6     Q.  Have you read those pages before, that
7  refer to you?
8     A.  Um -- as I mentioned to you yesterday,
9  the first time I read it was when you requested
10  discovery documents, and you mentioned in your
11  request that McElwee was in the levee
12  investigation team report.  Up until you
13  notified me via that, I never knew it was
14  there.  I didn't know.
15     Q.  But after I -- I understand the
16  timing, but after I notified you am I correct
17  that you in fact have read those pages that
18  refer to you?
19     A.  Yes, I went specifically the Page
20  6-18, and I saw McElwee Construction, and I
21  was --
22     Q.  Okay.  And can you remember looking
23  for any pages that had your name on them?
24     A.  Prior to that request for discovery?
25     Q.  No, no.  I'm saying at any time.

f511046d-f246-478c-b182-17dab585135a

PX-0687-0005

MELVIN M.L. McELWEE  (VOL II)                    4/24/2008

Page 383

1  Including after that.
2      A.  Yes.  Yes.  Afterwards.  I went
3  straight to this page.  You referred it in your
4  request for discovery, and I went to that page
5  and saw McElwee.  I haven't really looked
6  through any of the rest of the report to see if
7  there was McElwee anywhere else, but I did find
8  that page, Page 6-18.
9      Q.  Okay.  I have tried to elicit from
10  you, both in documents and we have not yet been
11  able to get and review the IKON documents
12  because, as you know, I just learned about this
13  other CD that you're going to provide me, or
14  that is now available to me, yesterday
15  afternoon, and I have not yet been through
16  them.  Okay?  So with that exception, I have
17  tried to look at everything that you have given
18  to me, and I've listened carefully to your
19  testimony regarding your communications with
20  Bob Bea.
21      Do you know of any communications that
22  we have not discussed or I've not asked you
23  about between you and Bob Bea?
24      A.  Written communications, you have them
25  all.  I mentioned yesterday, and I'll say it

Page 384

1  again today, Dr. Bea and I talked on the
2  telephone quite a bit.  I have had a chance
3  since yesterday to look at the time frame.  I
4  can't nail specifics down, but it was the later
5  part of 2005 Dr. Bea and I began to speak,
6  around October, a little before then.  And I
7  say a little as maybe a week or two.  We held
8  some extensive telephone conversations during
9  that time frame.  I haven't looked at the
10  telephone records.  I did find out that the --
11  as time evolved, in the January, 2006 time
12  frame, I think it was close around January 16
13  or 17th, McElwee Brothers reserved a conference
14  room at the Rockwood Inn Suites in Hammond,
15  Louisiana, to meet with Dr. Bea initially.
16  That was the first meeting -- face-to-face
17  meeting.  Um -- and then I looked at the other
18  time frame, and my daughter's birthday,
19  December 12th, 2006, was the second meeting.
20  We've talked on the phone, um -- quite a bit
21  from the what, third quarter of 2005 up until
22  now, on telephone, and then with the
23  communications that I've given to you earlier
24  with the CD at IKON.  And still until recently
25  with the IKON document disk I said is available

Page 385

1  for you yesterday.
2      Q.  And I did ask about telephone
3  conversations.  I have not and I'm not going
4  the sit here and go through and say, what did
5  you remember on this day and that day.  I'm not
6  going to do that.
7      A.  Yes, sir.
8      Q.  That would be fruitless.  But I did
9  ask you whether in any of those telephone
10  conversations Dr. Bea told you he was recording
11  the conversation, and you said no.
12      A.  He never told me that he was recording
13  the conversation.
14      Q.  Okay.  If you look at the map that I
15  gave you, which is Exhibit 36, you have marked
16  Florida Avenue?
17      A.  Yes, sir.
18      Q.  And I'm sure you can see, down to the
19  south of that, the Claiborne Avenue bridge.
20      A.  Yes, sir.
21      Q.  Okay.  I can represent to you that the
22  southern -- there were two breaches in the
23  floodwall as a result of Hurricane Katrina, or
24  during Hurricane Katrina, between those two
25  points.

Page 386

1      A.  Yes, sir.
2      Q.  One is known as the northern breach,
3  one is known as the southern breach.
4      Are you familiar with that terminology
5  and those kind of -- generally, at least, those
6  locations of those breaches?
7      A.  As you defined breaches in that
8  particular section I'm familiar with that, but
9  when you said breach to me, breach and any
10  overtopping and anywhere in the levee system
11  throughout New Orleans is what I was thinking
12  of yesterday.
13      Q.  Right.  But I'm talking now in those
14  two areas.  You kind of generally know where
15  those two breaches were.
16      A.  Yes, sir.
17      Q.  Okay.  Am I correct you did not ever
18  tell Professor Bob Bea that you dewatered an
19  excavation immediately north of the southern
20  breach in the Inner Harbor Navigational Canal
21  in the East Bank Industrial Area that we've
22  just described?
23      A.  I can tell you I told Dr. Bea we
24  excavated at Dwyer Road.  The discussions of
25  anything else I can't answer to that.  But I

f511046d-f246-478c-b182-17dab585135a

PX-0687-0006

MELVIN M.L. McELWEE (VOL II)                    4/24/2008

Page 387

1    can tell you we excavated at Dwyer Road and he
2    was well informed of that.
3       Q.  And just to make sure, isn't it true
4    that you did not tell Dr. Bea that you had
5    witnessed massive underseepage flow through the
6    marsh deposits that were not adequately cut off
7    immediately north of the southern Inner Harbor
8    Navigational Canal breach?
9       A.  I can attest to you that where we
10   excavated at Dwyer Road, there was seepage.
11   That's all I discussed with him.
12      Q.  But I just need to make sure that you
13   did not tell him that you had witnessed massive
14   underseepage flow through the marsh deposits
15   that were not adequately cut off immediately
16   north of the southern Inner Harbor Navigational
17   Canal breach.
18      A.  I want to answer this with an
19   abundance of caution.  I told you Wednesday
20   several telephone conversations.  You asked me
21   about him taping me or whatever, and I can't
22   say what I've said at that time.  I don't want
23   to sit here and tell you I didn't say that and
24   I possibly said it in a telephone conversation.
25   I'm not saying I did or I didn't.  I'm just --

Page 388

1    I don't know.
2       Q.  By the way, I told you yesterday, I'd
3    just want to remind you, I don't have any such
4    tapes.  I don't know of any such tapes.  Okay.
5       A.  I hate to incriminate myself and then
6    tapes pop up and that's what's on the tapes.
7    And I'm not aware of that at this time.
8       Q.  You know that the Lower Ninth Ward is
9    below the Gulf Intracoastal Waterway do you
10   not?
11      A.  Yes.
12      Q.  Okay.  Did you not tell Professor Bea,
13   did you, that you encountered underseepage and
14   ponding of waters along the Inner Harbor
15   Navigational Canal frontage at the west edge of
16   the lower Ninth Ward, did you?
17      A.  I don't recall telling him that, no.
18      Q.  If you had told him that, that would
19   not be true, would it?
20      A.  I've answered your discovery requests.
21   I didn't do any work in that area, period.
22   McElwee Brothers didn't do any work in that
23   area.
24      Q.  Encountering underseepage might not
25   involve you doing work, so I need to be careful

Page 389

1    that I get an answer to my question.  You could
2    have encountered underseepage and ponding of
3    waters without doing any work, just driving
4    down the street.  In fact, you've told us
5    because of your training --
6       A.  Yes, sir.
7       Q.  -- when you're driving along River
8    Road you notice ponding and underseepage.
9       A.  Yes, sir.
10      Q.  So my question, listen carefully to
11   it, you did not tell Professor Bea, did you,
12   that you encountered underseepage and ponding
13   of waters along the Inner Harbor Navigational
14   Canal frontage at the west edge of the Lower
15   Ninth Ward, did you?
16      A.  I have to answer that with an
17   abundance of caution.  I've been in the Ninth
18   Ward area quite a few times, and I have been
19   around in those areas prior to the breaches,
20   and I don't know if I ever told him about
21   those.  I can't recollect that I said that, no.
22   I can't.
23          MR. BRUNO:
24             That's fine.  That's all he has
25          to say.  If he says he can't

Page 390

1          recollect --
2          MR. TREEBY:
3             Your commentary is unnecessary.
4          MR. BRUNO:
5             No.  I'm not going to let you
6          berate this witness?  Okay?
7          MR. TREEBY:
8             Let's get the magistrate on the
9          phone.
10         MR. BRUNO:
11            That's a good idea.  Damned good
12         idea.  Get him on the phone.
13            And I also want you to mark this
14         part of the deposition.  I'm want to
15         read back the last ten questions to
16         the judge.
17         MR. TREEBY:
18            I've got it.
19         MR. BRUNO:
20            Good.
21            (Whereupon the magistrate was
22         called.)
23         MR. TREEBY:
24            Your Honor, he also needs to
25         read -- or Joe, why don't you come

7  (Pages 387 to 390)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0007

MELVIN M.L. McELWEE (VOL II)                          4/24/2008

Page 391

1   look over my shoulder, because I have
2   the transcript here. I will read the
3   transcript from the point Joe wanted
4   it read, because we talked about it
5   before we got you on the line. And
6   I'm concerned -- I can tell you my
7   concern, but then I'll just read it.
8   My concern is that -- and Joe doesn't
9   think this is a critical point of the
10  deposition, to me it is. We're almost
11  finished with this witness. It's
12  Melvin McElwee who was referred to by
13  Professor Bea in the what Professor
14  Bea calls the Independent Levee
15  Investigation Team report as a source
16  for information that he uses in his
17  report. And so I'm almost finished
18  with the deposition, my part of the
19  deposition, and beginning -- here's
20  where Joe says we should begin, and
21  it's fine with me: My question --
22  these are my questions and his
23  answers -- I'm sorry, the witness's
24  answers.
25      "And just to make sure, isn't it

Page 392

1   true that you did not tell Dr. Bea
2   that you have witnessed massive
3   underseepage flow through the marsh
4   deposits that were not adequately cut
5   off immediately north of the southern
6   Inner Harbor Navigational Canal
7   breach."
8       Answer: "I can attest to you
9   that where we excavated at Dwyer Road
10  there was seepage, that's all I
11  discussed with him."
12      Question: "But I just need to be
13  sure that you did not tell him that
14  you had witnessed massive underseepage
15  flow through the marsh deposits that
16  were not adequately cut off
17  immediately north of the southern
18  Inner Harbor Navigational Canal
19  breach."
20      Answer: "I want to answer this
21  with an abundance of caution. I told
22  you Wednesday," and there the
23  transcript is not --
24  THE REPORTER:
25      "I told you we had several

Page 393

1   telephone conversations. You asked me
2   about him taping me or whatever, and I
3   can't say what I've said at that time.
4   I don't want to sit here and tell you
5   I didn't say that and I possibly said
6   it in a telephone conversation."
7   MR. TREEBY:
8       And then he continues, "I am not
9   saying I did or I didn't, I'm just --
10  I don't know."
11      Question: "By the way, I told
12  you yesterday, just to remind, I don't
13  have any such tapes. I don't know of
14  any such tapes. Okay?"
15      Answer: "I let --"
16  THE REPORTER:
17      "I hate to incriminate myself and
18  then tapes pop up and that's what's on
19  the tapes. And I'm not aware of that
20  at this time."
21  MR. TREEBY:
22      Question: "You know that the
23  lower Ninth Ward is below the gulf
24  intracoastal waterway, do you not?"
25      Answer: "Yes."

Page 394

1       Question: "Okay. Did you not
2   tell Professor Bea -- you did not tell
3   Professor Bea, did you, that you
4   encountered underseepage and ponding
5   of waters along the Inner Harbor
6   Navigational Canal frontage at the
7   west edge of the Lower Ninth Ward, did
8   you?"
9       Answer: "I don't recall telling
10  him that, no."
11      Question: "If you had told him
12  that, that would not be true, would
13  it?"
14      Answer: "I've answered your
15  discovery requests. I didn't do any
16  work in the area, period. McElwee
17  Brothers didn't do any work in that
18  area."
19  THE REPORTER:
20      Question: "Encountering
21  underseepage might not involve you
22  doing work, so I need to be careful
23  that I get an answer to my question."
24  MR. TREEBY:
25      Question (cont'd.): "You could

MELVIN M.L. McELWEE (VOL II)                                    4/24/2008

Page 395

1   have encountered underseepage and
2   ponding of waters without doing any
3   work, just driving down the street.
4   In fact, you've told us because of
5   your training --"
6       Answer: "Yes, sir."
7       Question: "When you're driving
8   along River Road you notice ponding
9   and underseepage."
10      Answer: "Yes, sir."
11      Question: "So my question,
12  listen carefully to it, you did not
13  tell Professor Bea, did you, that you
14  encountered underseepage and ponding
15  of waters along the Inner Harbor
16  Navigational Canal frontage at the
17  west edge of the Lower Ninth Ward, did
18  you?"
19      Answer: "I have to answer that
20  with an abundance of caution. I've
21  been in the Ninth Ward area quite a
22  few times, and I have been around in
23  those areas prior to the breaches, and
24  I don't know if I told him about
25  those. I can't recollect that I said

Page 396

1   that, no, I can't."
2   MR. TREEBY:
3       "That's fine." And then --
4       Isn't this Mr. Bruno?
5   THE REPORTER:
6       That's Mr. Bruno.
7   MR. TREEBY:
8       "That's fine. That's all he has
9   to say."
10      And I said -- I'm sorry. It got
11  a little --
12  MR. BRUNO:
13      And you said you wanted to call
14  the judge.
15  MR. TREEBY:
16      No. What does it say?
17  THE REPORTER:
18      "If he says I can't recollect --"
19  MR. TREEBY:
20      That's Mr. Bruno again. That's
21  not me.
22  THE REPORTER:
23      That's Mr. Bruno again.
24      And Mr. Treeby: "Your commentary
25  is not necessary."

Page 397

1       And Joe says, "I'm not going to
2   let you berate this witness."
3       And Mr. Treeby says: "Let get
4   the Magistrate."
5   MR. TREEBY:
6       Yeah. Basically, it was, in my
7   judgment, Your Honor, was drying to
8   instruct the witness that he didn't
9   need to tell me any more.
10  MR. BRUNO:
11      Come on.
12  THE COURT:
13      I'm not going to conclude that he
14  was trying to instruct the witness not
15  to say any more. Okay? First of all,
16  the witness has answered your
17  question. All right? So it's time
18  for your next question.
19  MR. TREEBY:
20      And I was headed to the next
21  question, but I don't want to --
22  THE COURT:
23      And second of all, Mr. Bruno, if
24  you want to make an objection, just
25  say objection, asked and answered,

Page 398

1   period.
2   MR. BRUNO:
3       Yes, Your Honor.
4   THE COURT:
5       And that way we won't have any
6   question about whether you are making
7   a suggestive or argumentative
8   objection. Okay?
9   MR. BRUNO:
10      Yes, of course.
11  JUDGE WILKINSON:
12      When you add the three or four
13  extra words that you just added, it
14  starts to look like you're making an
15  improper objection under Rule
16  30(c)(2). So my suggestion is don't
17  add those extra three or four words,
18  just say objection, asked and
19  answered. Okay?
20  MR. BRUNO:
21      Yes, of course.
22  JUDGE WILKINSON:
23      Now --
24  MR. TREEBY:
25      Thank you, Your Honor.

9 (Pages 395 to 398)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0009

MELVIN M.L. McELWEE (VOL II)                    4/24/2008

Page 399

1  THE COURT:
2      Based on what you've just read
3  me, Mr. Treeby, he's answered your
4  question.  Go to the next one.
5  MR. TREEBY:
6      I am going to my next one, but
7  all I needed was that instruction
8  because I think that will solve our
9  problem.  That's what we did
10 yesterday, just objection.  And unless
11 Mr. Bruno asks me for an explanation
12 of my objection, I just said objection
13 leading, or whatever the objection
14 was.
15 THE COURT:
16     And for these, that's all I want
17 you to do.  Okay?
18 MR. TREEBY:
19     Thank you.
20 THE COURT:
21     All right.
22 MR. BRUNO:
23     Judge, while I've got you,
24 there's another issue.
25 MR. TREEBY:

Page 400

1      Is this on the record?
2  MR. BRUNO:
3      Yes, this is on the record.
4  Judge, I want to just address this now
5  because we're about seven hours?
6  Close.  Let's just say we're close to
7  seven hours without getting into it,
8  Judge, and the United States has not
9  had a chance to ask any questions.  I
10 just want to let you know about --
11 because the CMO says there's a maximum
12 of seven hours, and I'm quite certain
13 that we can work this out among
14 ourselves, but I just wanted to alert
15 you that there will be times when we
16 may go or may need to go beyond seven
17 hours.  Is that --
18 THE COURT:
19     Well, if a stipulation can be
20 reached that you go beyond it, it's
21 all right with me.
22 MR. TREEBY:
23     Yeah.  The circumstances here --
24 JUDGE WILKINSON:
25     But if no stipulation can be

Page 401

1  reached, then I'm going to have a
2  different opinion.
3  MR. TREEBY:
4      If your Honor please, just in an
5  abundance of caution, it should be
6  noted that Mr. Bruno -- I was going to
7  notice this deposition, Mr. Bruno did
8  notice the deposition, and he's
9  entitled to, and he took three hours
10 and forty-six minutes, and I've been
11 going a lot less time than he did
12 on --
13 MR. BRUNO:
14     Bill, we're almost a seven hours.
15 Now do the math.  Okay?  Three and a
16 half and three and a half is what?
17 Seven.
18 MR. TREEBY:
19     I have 3:46.
20 MR. BRUNO:
21     Fine.  I had fifteen minutes more
22 than you, so don't act like I've had
23 all this extra time. I'm just trying
24 to make the point that the government
25 hasn't had a chance to ask a single

Page 402

1  question, and we're very likely to go
2  beyond seven hours.  Okay?
3  MR. TREEBY:
4      You just wanted the Court to be
5  aware of the circumstances.
6  MR. BRUNO:
7      And I'm making you aware of it
8  because I'm doing a deposition of
9  Mr. Treeby 's client on Saturday in
10 Coco Beach, I know you won't be
11 around, and they've told me seven
12 hours is all you get.  And, you know,
13 because this is a 30(b)(6), I don't
14 know -- I'm going to work my darndest
15 to finish before seven, I can assure
16 you, I want to go get a drink, but if
17 we can't I want to alert you that it
18 may be a problem.  That's all I'm
19 doing.
20 MR. TREEBY:
21     And we're not asking any
22 questions of that witness.
23 THE COURT:
24     All right.
25 MR. TREEBY:

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

f511046d-f246-478c-b182-17dab585135a

PX-0687-0010

MELVIN M.L. McELWEE (VOL II)                                    4/24/2008

Page 403

1        Thank you.
2    MR. BRUNO:
3        Thank you, judge.
4        (End of conference with the
5    court.)
6    MR. BRUNO:
7        So your question has been
8    answered, which is the point I made.
9    Let's go.
10   MR. TREEBY:
11       Make your objection.
12   MR. BRUNO:
13       I will make my objections, Bill.
14   MR. TREEBY:
15       Thank you.
16   MR. BRUNO:
17       Okay? And you will not ask the
18   question fifty thousand times, as the
19   Court has just indicated to you. All
20   right? You've got your answer.
21   EXAMINATION BY MR. TREEBY:
22   Q.  Now, again, Mr. McElwee, I'm
23   addressing the same subject but this is a
24   different question: You did not tell Professor
25   Bea, did you, that you had significant problems

Page 404

1    with dewatering of excavations along this same
2    frontage at the west edge of the Lower Ninth
3    Ward, did you?
4    A.  I do not recollect telling Dr. Bea
5    that question. I don't recall telling him
6    that.
7    Q.  But you didn't do any excavations at
8    the west edge of the Lower Ninth Ward, isn't
9    that correct?
10   A.  That is --
11   MR. BRUNO:
12       Asked and answered.
13   A.  Correct.
14   MR. BRUNO:
15       Four times.
16   MR. TREEBY:
17       Let's go off the record.
18       (Off the record.)
19   EXAMINATION BY MR. TREEBY:
20   Q.  You understood, did you not, from
21   talking to Professor Bea that he was familiar
22   with New Orleans geography, right?
23   A.  I understood that he was -- yes, he
24   told me he lived in New Orleans.
25   Q.  And in fact he told you, did he not,

Page 405

1    that he and his parents had lived in New
2    Orleans and had been affected by Hurricane
3    Betsy, is that right?
4    A.  I recall him telling me someone was
5    affected. Who? I can't remember all the
6    details.
7    Q.  Okay. Now, written in your written
8    response to our discovery request Number 6 in
9    the subpoena, you -- and you want to find that?
10   A.  Is this Exhibit 17 we're looking at?
11   Q.  You have to forgive me, I don't
12   remember the exhibit number, but it's your
13   written response to our discovery. Okay?
14   A.  I think I had two -- only one response
15   or two responses?
16   Q.  I think that's the written response.
17   A.  Yes, sir.
18   Q.  And it would be Request Number 6, your
19   response to Request Number 6.
20   A.  Yes, sir. I have it in front of me.
21   Q.  You indicated that, and I think I'm
22   quoting, quote, McElwee Brothers has conducted
23   dewatering procedures along the Industrial
24   Canal 's east bank north of the Florida and
25   Claiborne Avenues, close quote.

Page 406

1        You see that?
2    A.  Yes, sir.
3    Q.  It's not clear to me in that response,
4    but I think it is based on your testimony and I
5    just need to confirm it, you were referring
6    there to the Dwyer Road pumping station
7    project, isn't that correct?
8    A.  I was answering your question and
9    referring to -- I didn't do any excavation in
10   those areas, because your question
11   specifically -- can I go back to your -- I
12   think on your request your question was asking
13   me about work in that area between Florida and
14   Claiborne Avenues, and I answered that I didn't
15   perform work between Florida and Claiborne
16   Avenues, but the work was north of those areas,
17   which was the Dwyer Road project.
18   Q.  Okay. That's all I need to know. So
19   what you were referring to in your response was
20   the Dwyer Road pumping station project.
21   A.  Yes, sir.
22   Q.  Thank you.
23       And similarly, in your response to
24   Request Number 7 of the subpoena, if you would
25   look at it --

11  (Pages 403 to 406)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0011

MELVIN M.L. McELWEE (VOL II)                                    4/24/2008

Page 407

1    A.  Yes, sir.
2    Q.  -- you state -- and by the way, I'm
3  not contending you didn't answer my request
4  here.  I'm just trying to clarify what you
5  meant by your answer.  Okay?
6    A.  Yes, sir.
7    Q.  Quote, McElwee Brothers has conducted
8  excavations along the Industrial Canal 's east
9  bank north of Florida and Claiborne Avenues,
10  close quote.  And that, as well, was referring
11  to the Dwyer Road pumping station job, is that
12  right?
13    A.  Yes, sir.
14    Q.  You need to wait until I finish.
15    A.  I'm sorry.
16    Q.  That way the court reporter can get
17  both of us on the record.
18         And you have a similar response to our
19  Request Number 8 in the subpoena.  And I'm
20  quoting from your response:  McElwee Brothers
21  has reported underseepage, ponding or pooling
22  of waters along the Industrial Canal 's east
23  bank north of Florida and Claiborne Avenues,
24  close quote.
25         You see that?

Page 408

1    A.  Yes, sir.
2    Q.  And that, as well, was referring to
3  experience you gained at the Dwyer Road
4  project, is that correct?
5    A.  That's correct.
6    Q.  To the best of your recollection, did
7  you ever tell Professor Bea that residents of
8  the neighborhood near the northern Inner Harbor
9  Navigational Canal breach, which is between N.
10  Claiborne Avenue and Florida Avenue, had
11  reported problems with seepage at the inboard
12  toe?
13         MR. BRUNO:
14              Object to form.
15    A.  I can't recollect making that
16  statement.
17  EXAMINATION BY MR. TREEBY:
18    Q.  Okay.  In fact, your written response
19  to the subpoena, Request Number 10, states,
20  correct me if I'm wrong, quote, McElwee
21  Brothers have not received any complaints or
22  expressions of concern from residents of the
23  Lower Ninth Ward and/or St. Bernard Parish
24  neighborhoods concerning underseepage, ponding
25  or pooling of waters along the Industrial

Page 409

1  Canal, close quote.
2    A.  That's a fact.
3    Q.  And that's your testimony.
4    A.  Yes.
5    Q.  Have you ever been charged with a
6  crime?
7    A.  No, sir.
8    Q.  In fact, recently you were charged
9  with assault in Tangipahoa parish; is that
10  correct?
11    A.  There's allegations of assault.  I
12  haven't been --
13    Q.  Charged.
14    A.  Charged with assault.  Aggravated
15  assault, yes.
16    Q.  Is that pending?  Is that matter
17  pending somewhere?
18    A.  It's pending.  I have an arraignment
19  on May the 9th or something like that.
20    Q.  And someone alleged, did they not, if
21  you know, if you know, that you had -- in
22  connection with a meeting that was taking place
23  of the advisory committee of the Tangipahoa
24  Parish School Board, alleged that you had
25  pulled out a gun.

Page 410

1    A.  What is what the person stated.
2    Q.  And when you were I guess arraigned
3  for that charge --
4    A.  I haven't been arraigned yet.  I'm
5  thinking arraignment is when I go in front --
6    Q.  Were you arrested?
7    A.  I'm not familiar with criminology
8  terms.  Let me --
9    Q.  I'm not either.
10    A.  The reason I'm answering this is, the
11  police -- the detective came to the house and
12  requested to talk to me, and I went and turned
13  myself in.
14    Q.  Okay.
15    A.  And at that time they said, look,
16  we're going to walk you through and you'll go
17  home.  And that's what happened.  I signed
18  myself out on my own recognizance.  So have I
19  been arrested?  I guess the definition is --
20  did they come by handcuff me in front of
21  anybody?  No.
22    Q.  That was not -- you went and turned
23  yourself in.  I understand that.
24    A.  Yes, sir.
25    Q.  In fact, when you did, they indicated

f511046d-f246-478c-b182-17dab585135a

PX-0687-0012

MELVIN M.L. McELWEE (VOL II)                          4/24/2008

Page 411

1  to you that there was an outstanding warrant
2  for you in connection with a charge for the
3  issuance of bad checks, is that --
4     A.  Yes, sir.  They sure did.  In fact,
5  that has been cleared because they had the
6  wrong person.  I went to them and asked them to
7  show me a copy of the check and the charge, and
8  the sheriff department said -- they showed it
9  to me, and I laughed and I showed them my
10 military ID and the Social Security number on
11 the check, it didn't match, and they -- I asked
12 for a copy of the charge sheet.  They say, we
13 can't give you that but we'll give you a copy
14 of the check.
15    Q.  Glad to hear that.  Thank you for
16 answering my questions.
17    A.  Yes, sir.
18    Q.  The only thing I would do at this
19 point is reserve the right, and I hope it won't
20 be necessary, I don't think it will be, but I
21 have not seen the documents that you referred
22 to yesterday that we're going to access at
23 IKON.  If any of them are things that I didn't
24 know about before, I reserve the right to
25 re-notice the deposition.  And I'm sure it will

Page 412

1  reach opposition, but anyway -- hopefully we'll
2  never have to deal with that, but I wanted to
3  reserve my right on the record.
4     A.  Yes, sir, I do want to mention that --
5     MR. BRUNO:
6        Yeah, I'm going to get into to
7     this.
8     THE WITNESS:
9        You're going to get into that?
10    MR. BRUNO:
11       When they're done.
12 EXAMINATION BY MR. TREEBY:
13    Q.  Well, there is apparently -- what are
14 you referring to, you brought more --
15    A.  This is the three-inch binder that
16 Mr. Treeby asked for.
17    MR. BRUNO:
18       I asked for it.
19    MR. TREEBY:
20       I asked for it.
21    MR. BRUNO:
22       I asked for this.
23    MR. TREEBY:
24       I did, too.
25    MR. BRUNO:

Page 413

1        I asked for it first.
2     A.  You both asked for it.  And this is
3  the course that was taken by the Corps of
4  Engineers earth work quality verification, the
5  three-inch binder.
6        (Brief interruption.)
7     A.  Located in front of Mr. Bruno is the
8  three-inch binder referenced yesterday in my
9  deposition of the earth work quality
10 verification course sponsored by the Corps of
11 Engineers.  I will have that document -- that
12 binder delivered to IKON for copies to anyone
13 in this deposition room and on the Internet at
14 their expense.
15    MR. TREEBY:
16       And my reservation would apply to
17    that, too, although I doubt it would
18    require any questions.
19       I tender the witness.
20       (Brief recess.)
21 EXAMINATION BY MR. LEVINE:
22    Q.  Mr. McElwee, my name is Paul Levine.
23 I'm an attorney for the United States.  I
24 apologize if I say your name wrong.
25    A.  That's okay.

Page 414

1     Q.  I just want to cover a couple of
2  pieces of your testimony from yesterday.
3  Yesterday I think you were talking about some
4  underseepage issues you had at the Dwyer Road
5  project.  Is that correct?
6     A.  That's correct, sir.
7     Q.  One of those issues was dewatering the
8  project; is that correct?
9     A.  Yes, sir.  That's correct, sir.
10    Q.  And I think what you said is there was
11 a lack of data provided by the Corps.
12    A.  That is correct, sir.
13    Q.  You said you didn't receive the soil
14 borings in a timely manner.
15    A.  I did not say it's the soil borings in
16 a timely manner, there was some analysis
17 relative to the soils borings that I didn't
18 receive.
19    Q.  Okay.  And whatever you received from
20 the Corps, it lacked particle distributions?
21    A.  Particle size distributions of the
22 sand layers, yes, sir, we didn't get any data
23 on that.  Or any information on that.
24    Q.  And the data provided from the Corps
25 was too far from the excavation site.

f511046d-f246-478c-b182-17dab585135a

PX-0687-0013

MELVIN M.L. McELWEE (VOL II)                                    4/24/2008

Page 415

1    A.  One of the borings in the plans was
2  too far away from the T-wall.
3    Q.  And I think you said that boring was
4  about 160 feet away from the T-wall?
5    A.  It was somewhere approximately 165.
6  That's what the record reflects.
7    Q.  And I believe you said, and correct me
8  if I'm wrong, that you need to be within about
9  100 feet to make any conclusions about the soil
10  quality in the area.
11    A.  That -- my recollection, that's what
12  served me during that time, yes.
13    Q.  Okay.  Now, once you received the
14  proper information from -- what you call the
15  proper information from Gore Engineering, you
16  were able to set your dewatering system up.  Is
17  that correct?
18    A.  I'd like the go back and mention to
19  you that I did mention Mr. Dixon used the worst
20  case scenario in his design.  That is how he
21  completed the design for the dewatering system.
22  The Gore boring came later during the problems
23  with the cracked piles at the T-wall, when the
24  Corps came out and said, you cracked some
25  piles, and we was like -- and McElwee was like,

Page 416

1  how do you know piles are cracked?  What did
2  you make that determination from?
3    Q.  That was a Gore boring obtained in
4  June, 2003.
5    A.  That's correct.
6    Q.  And I believe you also obtained some
7  soil borings from the Corps in December, 2001.
8    A.  That is correct.  On the, um -- west
9  end of the project we obtained a boring, yes,
10  we did.
11    Q.  And what was the purpose of those
12  borings?
13    A.  I'd have to look at the record to
14  answer that question for you exactly.
15    Q.  Would you like a copy of the borings?
16    A.  Yes.  I think we have it in an exhibit
17  already.
18      MR. LEVINE:
19        I'm sorry.  I don't have that.  I
20      need a copy for me.
21      MR. BRUNO:
22        Here, take mine.  You want '03 or
23      '01?
24      MR. LEVINE:
25        '01.

Page 417

1      MR. BRUNO:
2        (Tendering.)
3    A.  I'm sorry.  I can't find it in here.
4  EXAMINATION BY MR. LEVINE:
5    Q.  Let me mark this as Exhibit 39.
6      Do you mind passing me that copy
7  really quickly?
8      (EXHIBIT 39 was marked for
9  identification and is attached hereto.)
10    A.  Yes.
11  EXAMINATION BY MR. LEVINE:
12    Q.  Why do you obtain these borings?
13    A.  May I look over this and then give you
14  an answer, sir?
15    Q.  Sure.
16    A.  Okay.  From looking at the cover
17  letter, yes, this was Boring Number 1 when we
18  requested Gore to come out to do the boring was
19  to assist with the dewatering, to complete the
20  information not listed in the Corps of
21  Engineers' initial boring.
22    Q.  Okay.  And then you also obtained
23  Boring Number 2 for that purpose.  There
24  appears to be two borings on there.  Turn to
25  Page -- I think it's Figure 1.  It's four pages

Page 418

1  in.
2    A.  Yes, sir, there were two borings, B1
3  and B2, and I think there's a location on the
4  Figure 1.  Yes.  Yes.  That's correct.
5    Q.  And those borings were to --
6    A.  To assist.
7    Q.  -- help assist with the --
8    A.  Exactly.
9    Q.  -- dewatering project.
10    A.  Yes, sir.  Yes, sir.
11      (Brief interruption.)
12  EXAMINATION BY MR. LEVINE:
13    Q.  So after you obtained these borings,
14  you were able to set up the dewatering system.
15    A.  That is correct.
16    Q.  Once you set up that dewatering
17  system, it ran well, is that correct?
18    A.  For that section, that's correct.
19  Remember I told you there was four -- five
20  sections we dewatered?  None of them at the
21  same time?  This project was completed in
22  phases.  At that phase, that phase worked well.
23  That's correct.  That's Phase I.
24    Q.  Did any of the other phases -- did you
25  have problems with any dewatering any of the

14  (Pages 415 to 418)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0014

MELVIN M.L. McELWEE (VOL II)                          4/24/2008

Page 419

1  other phases?
2      A.  Yes.  Phase 4 was the area at the
3  T-wall where I mentioned to you we have photos
4  that show the organics and trees underneath the
5  T-wall, and the constant "tricklation" of water
6  inside Phase 4 -- it's Phase 4A I believe it is
7  we called it.
8      Q.  Okay.  The other three phases, though,
9  you were able to dewater relatively well.
10     A.  I'd have -- I don't have the contract
11  documents in front of me, and believe me it's a
12  couple of file cabinets, I'd have to go back
13  and look before I just --
14     Q.  Well, based on your memory today.
15     A.  I know we had trouble at Phase 4A.  We
16  had problems at Phase 3.  That's where the
17  sluice gate structure was, underneath the
18  railroad.  We, um -- soils started caving in.
19  We almost lost the railroad section underneath,
20  during our jacking and boring.
21          We also had some challenges out near
22  the dolphin structure.
23          There was a couple of times during
24  some storm intervals that we had some great
25  concerns with dewatering.  Some storm

Page 420

1  intervals.  There was I think four storms that
2  took place; Lili, Isidore, Hanna.  Around that
3  time frame we was struggling with dewatering
4  issues.  And what in particular, I'd have to
5  pull the documents out.  And I think most of
6  the personnel that were on site at that time,
7  like the superintendent and our quality control
8  could give you the answers to those issues.
9      Q.  Those were tropical storms.
10     A.  That's correct.
11     Q.  So there was heavy rainfall during
12  that time period?
13     A.  Tropical storm sitting in the gulf,
14  threatening New Orleans, coming over New
15  Orleans that never were upgraded in winds, but
16  they brought high tides and they brought, um --
17  tremendous amounts of rain.  In fact, there was
18  one storm, the National Guard was activated.  I
19  can remember this vaguely.  Not vaguely, I can
20  remember this clearly.  I was activated with
21  the National Guard at Jackson barracks, and I
22  got away from my job at Jackson barracks to go
23  look at the project because no one was out
24  there and I wanted to see how the T-wall was
25  reacting and the flood protection we had in

Page 421

1  place in that area.  So I was out there one
2  afternoon while it was raining, in the rain,
3  looking at the canal and looking at the T-wall
4  so in case something was going wrong I could
5  put some plans into action to notify the Corps
6  and take and do something.
7      Q.  Now, you said you had some problems
8  with the trees in Phase 4 -- trees and soils in
9  Phase 4?
10     A.  Yes, sir.
11     Q.  Is that relating to the concrete
12  piles?
13     A.  When you say in relation -- no, that's
14  in relation to dewatering and excavation.
15  Um -- the initial borings given by the Corps
16  mentions some wood material -- some wood
17  material would be found in the subsurface.
18  However, we found trees and tree trunks.  Old
19  swamps.  That's what we was digging through.
20  And underneath the T-wall I mean.  There was a
21  section we cut out, and we have some photos
22  showing this organic materials sitting right
23  where I think 12-1/2 feet of sheets were
24  underneath the existing T-wall, you could see
25  underneath that sheet some wood and tree

Page 422

1  trunks.  That's where water was trickling in,
2  in our excavated area, and we had some
3  challenges in trying to get that dewatered.
4  Had to go back to Mr. Dixon to get him to
5  revise our dewatering plan to accommodate the
6  situation at hand.
7      Q.  And once he revised that plan, were
8  you able to dewater the site effectively?
9      A.  We were able to get the site dewatered
10  and perform the work in that area, yes.  And
11  when you say effectively, you'd have to define
12  whatever effectively is to you.
13          It was a continuous operation.  It was
14  a little bit more than Phase I.  Phase I was
15  easy.  I mean, once the water table was
16  dropped, we put some crushed stone in to work
17  off as a platform for working bottom, and we
18  didn't have major issues.  The pump continued
19  the roll, we didn't see ponding water in places
20  once we got it down to the proper grade.
21          But in areas like Phase 4A, and the
22  different other areas I mentioned, some of
23  those places we kept water and muck and we had
24  to just deal with the situation and the issue a
25  little bit more than we would in Phase I.

f511046d-f246-478c-b182-17dab585135a

PX-0687-0015

MELVIN M.L. McELWEE (VOL II)                          4/24/2008

Page 423

1    Q.  But you were able to get the site
2  dewatered so that you were able to excavate it.
3    A.  We were able to get the site dewatered
4  to excavate.
5    Q.  I think you mentioned you had some
6  problems with the jack and bore operation,
7  dewatering that area?
8    A.  Yes.
9    Q.  What's the jack and bore operation?
10    A.  Jack and bore operation is where
11  you -- it's underground work, underground
12  utility piping work, whereas instead of
13  excavating a hole, an open hole to do your work
14  and then close it back up, what you do is leave
15  the top surface soil surface, everything in
16  place, and in effect you bore -- there's a b
17  ore head that goes on the end of this 84-inch
18  pipe that -- you could walk through this pipe.
19  You put a bore head on the front of it and it
20  cuts through the earth 's surface.  When it's
21  cutting the material out, the material is being
22  transferred through the pipe backwards to the
23  end of the pipe for disposal.  And there's,
24  it's a railroad track that this setup sets on,
25  and the jack behind the pipe pushes the pipe

Page 424

1  forward as the bore head cuts the earth 's
2  surface.  So in effect, you have the jack
3  behind pushing the pipe, and your boring head
4  in front.  That's why it's called jack and
5  boring.
6    I hope I've given a good enough
7  description for you to understand that.  You do
8  that in areas where you -- I mean, it's done
9  all over the world.  In some places they've
10  jacked and bored underneath lakes and rivers to
11  run piping for oil lines, gas lines -- in this
12  case we did it after Phase 4 to keep from -- we
13  didn't want to have to remove the railroad
14  track.  It was a valued engineering change
15  proposal we proposed to the Corps, we could do
16  it a lot cheaper than what they had designed it
17  to be done in the initial plans, and we
18  wouldn't have to deal with the overhead
19  transmission lines, we wouldn't have to bring
20  in a crane and shut that line down.
21    In fact, we found out after we started
22  working on the job that the line could not be
23  shut down as the Corps had indicated in the
24  plans.  Entergy said we got to keep this line
25  on, this is a main line for Jefferson Parish,

Page 425

1  and if you shut this line down you're shutting
2  down major sections of Jefferson Parish that
3  has utilities.  So rather than getting into
4  those issues, we said we'll do jacking and
5  boring.
6    The problem came up with the soils
7  when we got ready to go under the railroad
8  track.
9    Q.  How far deep do you have to go into
10  the ground to jack and bore?
11    A.  Deep depth from the surface?
12    Q.  Yes.
13    A.  Oh, we were, um -- 84 inches is -- I
14  can't do the math real quick.  Is almost seven
15  something feet, eight feet.  Minus 24, so 24
16  minus 8, quick math on that, that was the
17  depth.  You want me to do that real quick?
18    Q.  I mean that's 7 feet.
19    MR. TREEBY:
20      84 is seven feet.
21    A.  Seven feet.
22  EXAMINATION BY MR. LEVINE:
23    Q.  Okay.
24    A.  Seven feet for the top of the pipe.
25  And then there was the 84 inches down below it,

Page 426

1  too, also.
2    Q.  Let me show you a letter dated March
3  18th, 2003.  It's not signed, but it's from
4  Timothy Roth and it's from the Army Corps of
5  Engineers.  We'll mark that as Exhibit 40.
6    (EXHIBIT 40 was marked for
7  identification and is attached hereto.)
8  EXAMINATION BY MR. LEVINE:
9    Q.  Now, I don't want to read this whole
10  letter, but in the first paragraph it says, in
11  the middle of the paragraph, it says, at each
12  of the above, there have been discussions about
13  the requirement for dewatering of the area
14  through which you are jacking and boring
15  84-inch welded steel discharge tubes.  You have
16  promised that an adequate system will be
17  installed and operated to sufficiently dewater
18  this area.
19    When there was the initial cave in,
20  did you have any dewatering system up and
21  running?
22    A.  Um -- if my memory serves me
23  correctly, yes.  We were not supposed to
24  proceed with the jacking and boring until
25  Mr. Dixon given us that design.  In that design

16 (Pages 423 to 426)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0016

MELVIN M.L. McELWEE (VOL II)                              4/24/2008

Page 427

1  we put I think some piping along the, um --
2  path, outside "extrimeter" paths of the jacked
3  and bored area to drop the water table.
4      Now, to answer your question
5  accurately, I got to look at the job records to
6  tell you when we installed the dewatering
7  versus the, um -- this letter. I don't know
8  where we're going with it, but, you know --
9      Q. So as best you can recall, you believe
10  that the dewatering system was set up prior to
11  the jack and boring operation.
12      A. Yes, sir. The Corps made sure of
13  that.
14      Q. But you would need to look at your
15  records to confirm that.
16      A. That's correct. In fact, if it wasn't
17  done, I think the core wouldn't have let us
18  start doing jacking and boring period.
19      Q. I think you also mentioned something
20  about dewatering issues with the dolphin
21  structure?
22      A. Yes, sir.
23      Q. What were those issues?
24      A. Not with the dolphin structure.
25  There's a phase, the discharge structure it's

Page 428

1  called in the plans. We installed the sheets
2  in a U shape from the canal section. We had an
3  open area that, um -- it was adjacent to the
4  canal and it stayed pretty much wet during that
5  time frame. We got the water -- we got it
6  dewatered, and I think this was during the time
7  frame when those storms came in. We had some,
8  um -- we had some ground flow material inside
9  our excavated area that we had to wind up
10  re-excavating again. Some of the earth filled
11  up our CON/SPAN system. This box culvert
12  section about 36 feet wide, roughly 15 feet
13  high, was full of sand and water that just
14  flowed back into the, um -- box culvert canal
15  section.
16      Q. And that was after the tropical
17  storms?
18      A. That was after -- I don't know which
19  one or how many times it happened. I think I
20  remember it happening twice. But this was
21  after the tropical storms, yes.
22      Q. All right. I think another issue you
23  mentioned with underseepage was the concrete
24  piles under the T-wall. Is that correct?
25      A. Existing concrete piles under the

Page 429

1  T-wall, yes, sir.
2      Q. And now the Corps wanted those piles
3  to be pulled.
4      A. Initially. No.
5      Q. Eventually, though.
6      A. Eventually. Because like I said,
7  Design Engineering, Mr., um -- his name was
8  mentioned yesterday -- Holtgreve walked into a
9  meeting -- the Corps had told us that we could
10  cut the piles off and leave them in place.
11  Then we come back two weeks later to another
12  meeting, Mr. Holtgreve walked in and said, I
13  never intended --
14      (Brief interruption.)
15      A. That was the initial position of the
16  Corps.
17  EXAMINATION BY MR. LEVINE:
18      Q. And you wanted -- go ahead. I don't
19  want to cut you off. Go ahead.
20      A. And we come back two weeks later at
21  another biweekly status meeting Mr. Holtgreve
22  walked in the meeting and said, I never
23  intended for the piles to be cut off. And the
24  Corps changed their position, said, well, the
25  piles got to be pulled.

Page 430

1      Q. You wanted to cut the piles.
2      A. We wanted to cut the piles and leave
3  them in place. We felt strongly, and that's
4  from Mr. Dixon -- when I say we, McElwee
5  Brothers, Mr. Dixon, the geotechnical engineer
6  said, Melvin, if leave those soil conditions
7  the way they are, they are the strongest at
8  that point, leave the piles in the ground,
9  those piles do not interfere with the new piles
10  to be installed.
11      Q. After you cut the piles, you attempted
12  to inject bentonite and there were some issues,
13  generally, with how you injected it, is that
14  correct?
15      A. I'd like to correct -- no, that's not
16  correct. After we cut the piles -- we never
17  cut the piles. We were instructed to pull the
18  piles.
19      Q. So after you pulled the piles, you
20  tried to inject bentonite and then there were
21  some issues with the bentonite. Just
22  generally.
23      A. That's correct.
24      Q. And then you believe that was -- you
25  later on attempted to put new piles into the --

f511046d-f246-478c-b182-17dab585135a

PX-0687-0017

MELVIN M.L. McELWEE (VOL II)                    4/24/2008

Page 431

1  into those -- into that area where you pulled
2  the piles --
3      A.  That's correct.
4      Q.  -- and there were what the Corps
5  called low blow counts.
6      A.  That's correct.
7      Q.  And I think you described this
8  yesterday to Mr. Bruno, but the piles were just
9  going into the ground far too easily?
10     A.  Far too easily.
11     Q.  And it was your testimony that it was
12  the bentonite and the voids that were causing
13  the low blow counts, is that correct?
14     A.  That's correct.
15     Q.  And now, there was also some cracks in
16  the piles, is that correct?
17     A.  That's correct.
18     Q.  And it was your testimony that those
19  were just minor hairline cracks that weren't
20  really major issues?
21     A.  That's correct.
22     Q.  I want to show you a letter dated
23  May 30th, 2003, addressed to McElwee Brothers
24  from Diane K. Pecoul, the contracting officer
25  at the Army Corps of Engineers.  We're going to

Page 432

1  mark this as Exhibit 42.
2          And again, I don't want to read this
3  whole letter, but I guess the import of this
4  letter, and I know you disagree with it, is
5  that the Corps' position is that soil design
6  factors were not to blame for the cracks in the
7  piles.  Is that correct?
8          (EXHIBIT 42 was marked for
9  identification and is attached hereto.)
10     A.  That is correct.  That is the
11  posturing and position they took at that time.
12  EXAMINATION BY MR. LEVINE:
13     Q.  And then after you received this
14  letter you went out and conducted some
15  additional testing, is that right?
16     A.  No, the additional testing took
17  place -- this letter is in response to McElwee
18  Brothers' notification to the Corps of its
19  testing results.  And I think I mentioned
20  yesterday a conference that was held with its
21  geotechnical engineer Gulf Coast Pre-Stress,
22  Ice Equipment -- there were several personnel
23  in a conference.  After we met and had some
24  discussions, we presented our findings to
25  Ms. Pecoul.  And instead of trying to find or

Page 433

1  resolve the problem, the Corps took this
2  position: Hey, the bottom line is we don't
3  care what you said, this is what the problem
4  is.  You don't know what you're talking about.
5      Q.  Exhibit 43.
6          I mean, I think the testing happened
7  after that, but that's okay, because it's not a
8  major point to me.
9          But let me give you a letter marked
10  Exhibit 43.  It's a letter dated June 20th,
11  2003, from Diane K. Pecoul, the contracting
12  officer at the Corps of Engineers, to McElwee
13  Brothers.  And again, this letter states that
14  we reviewed your testing results, and
15  essentially -- I'll read the concluding line.
16  The key line on the second page of this letter
17  says, due to our aforementioned conclusions, we
18  go not recognize your assertion of a differing
19  site condition -- meaning that the soils, the
20  Corps didn't accept your -- let me strike all
21  that.
22          I guess the Corps' position, once
23  again, was that the soils was not the problem
24  with the low blow counts and the cracks in the
25  piling.  Is that correct?

Page 434

1          (EXHIBIT 43 was marked for
2  identification and is attached hereto.)
3      A.  Yes.  That's Corps' position.  I mean,
4  they always tell you, hey, it's not that
5  problem, it's something else.  And that's one
6  of these letters.
7  EXAMINATION BY MR. LEVINE:
8      Q.  And you disagree with that.
9      A.  Oh, strongly.  I mean, I'm sure most
10  of us contractors have always disagreed with
11  the Corps relative to these letters.
12     Q.  All right.  Let me go back in time to
13  when you were an inspector for the Corps.  You
14  were a quality assurance inspector?
15     A.  Quality assurance representative.
16  Construction inspector is what it is, but
17  quality assurance representative, yes.  QAR.
18     Q.  And that was from -- I got it here, I
19  think -- December 1988 through August, 1993; is
20  that correct?
21     A.  That's correct, sir.
22     Q.  Did you do any inspection work on the
23  MRGO?
24     A.  Yes.  Mississippi River Gulf Outlet.
25  A lot of dredging along the MRGO entirely.

18  (Pages 431 to 434)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0018

MELVIN M.L. McELWEE (VOL II)                                    4/24/2008

Page 435

1    Q.  From where to where?
2    A.  From the Inner Harbor Navigational
3  Canal all the way out to -- I don't know how
4  far the mile measurement is because we're going
5  out into open water in open areas.  I'd have to
6  look at a map and say, look, it was this mile
7  marker, and look at some of those records.  We
8  only identified it by, um -- station numbers
9  when I was in -- Mike Hooks did some of the
10 dredging then, and that's a contractor that was
11 doing the dredging during that time.
12   Q.  Did you do that inspection works in
13 the area of the MRGO that runs identical to the
14 GIWW?
15   A.  When you say identical, the MRGO runs
16 almost perpendicular to it, so it doesn't run
17 along it.  The only portion of area I mentioned
18 yesterday where I was involved with some work
19 in dredging on the Inner Harbor Navigational
20 Canal was near the mouth of the Mississippi
21 River.
22   Q.  Okay.  So you did some inspection work
23 on the Inner Harbor Navigational Canal.
24   A.  Yes, sir.
25   Q.  And that was with dredging.

Page 436

1    A.  Yes, sir.
2    Q.  And you did some work on the GIWW --
3    A.  Yes, sir.
4    Q.  -- as an inspector.
5    A.  Yes, sir.
6    Q.  And that was with dredging.
7    A.  Yes, sir.
8    Q.  And you did some work along the MRGO
9  as an inspector.
10   A.  Yes, sir.
11   Q.  And that was with dredging.
12   A.  Yes, sir.  Well, I also did some work
13 along the Inner Harbor relative to some levee
14 work, which was some sheet pile, and that was
15 done by Boone & King, B & K out of Mandeville.
16 They drove some sheet piling and built some
17 levees in that area.  I was walking the swamps
18 with the bore hogs as an inspector for the
19 Corps during that time.
20   Q.  Where along Inner Harbor Navigational
21 Canal did you do that work?
22   A.  Not -- I'm saying Inner Harbor.  The
23 gulf outlet.
24   Q.  Okay.  The MRGO.
25   A.  MRGO.

Page 437

1    Q.  Okay.
2    A.  That was around what, Bayou Bienvenue
3  locks?  I think that's somewhere around there.
4  I'm just pulling out names now.
5    Q.  Okay.
6    A.  And then there was another.  There is
7  an old fort out there that's sitting out in the
8  middle.  It was in that area, because I
9  remember seeing the old fort.  I was intrigued
10 by that.
11   Q.  When you did your inspection work, did
12 you find any problems with underseepage while
13 you were doing that inspection work?
14   A.  I'm -- I got to laugh at that, because
15 if you go out there, I mean, you're surrounded
16 by water and swamps, so it's kind of hard to
17 tell you.  The whole problem is underseepage.
18 You know, the sheets, they only go down so far.
19 I mean, I don't know.  All I did was drive
20 sheet piling and pull up some muck along the
21 sheet pile.  I mean, it wasn't like the
22 lakefront where we were bringing some clay
23 embankment and compacting and use some
24 procedures to put the embankment in place.
25      All we had out there was just the

Page 438

1  dredged material that had been dredged years
2  ago, and the Corps would take it and put it up
3  against the sheet piles.  So seeing a problem?
4  I really wasn't looking for one as an
5  inspector, I was just doing a job.  I mean.
6    Q.  So, not to put all your words into one
7  quick sentence, but yes, you saw underseepage
8  out along the MRGO on that job, but that was
9  expected.
10   A.  That's expected.  You're in the
11 swamps.  Water is high, sheet pile only go down
12 so low.  I mean, so there's continuous seepage
13 below that sheet piling.
14   Q.  Did you find any problems with the
15 dredging work that you inspected along the
16 IHNC, the MRGO or GIWW?
17   A.  I'd like to ask you to define
18 problems.  It was hard for me to -- to me it
19 wasn't a problem.  I'm working for the Corps,
20 this is what's supposed to be done, they want
21 this muck put over there.  Hey, the guy is
22 doing a fabulous job.
23   Q.  Is that what you would report,
24 basically?
25   A.  I would say he mucked this area out,

f511046d-f246-478c-b182-17dab585135a

PX-0687-0019

MELVIN M.L. McELWEE (VOL II)                    4/24/2008

Page 439

1  he did it this many hours, he had this many
2  personnel working, and he discharged it at the
3  stations designated by the Corps of Engineers.
4      Q.  So you didn't find any irregularities
5  with the dredging.
6      A.  When it comes to performance of the
7  contract, I found no irregularities with his
8  performance.  That's not an answer to the
9  engineering and technical side.
10     Q.  I understand.  I want to go back
11 really quickly to Exhibit 42.
12     (Brief interruption.)?
13 EXAMINATION BY MR. LEVINE:
14     Q.  I want to go back now to Exhibit 42.
15 The top of the second page there.  There's a
16 paragraph that says you needed to complete the
17 construction and reopening of Jourdan Road
18 during the non hurricane season, December
19 through May.  You see that?
20     A.  Yes.
21     Q.  Is part of your contract, you were
22 supposed to cut holes in the hurricane
23 protection floodwall, is that correct?
24     A.  Cut holes?  Cut -- demolition and go
25 through.  Not cut holes.  I mean, we took it

Page 440

1  out completely.
2      Q.  Okay.
3      A.  And went through it.
4      Q.  So there was a big gap in the
5  hurricane protection floodwall, is that right?
6      A.  A 40-foot gap in the hurricane
7  protection.  40 foot plus the other 20 for the
8  access road.
9      Q.  And those gaps initially started in --
10 I guess after the hurricane season in 2001
11 finished, is that correct?
12     A.  Yes, I would like to answer your
13 question and completely.  Yes, it did, due to,
14 as I mentioned yesterday, the Corps of
15 Engineers' failed to approve submittals, got
16 them back to us, and that's imperative to
17 performing your work.  You don't just go cut
18 the wall out without a plan.  And the Corps had
19 not completed any plan.  And again, I'll tell
20 you the position of posturing, they ignored
21 that.  That was some of the claims that was --
22 later the bond company recouped $1.9 million
23 on, that McElwee Brothers didn't get a chance
24 to see, as a result of the Corps refusing to
25 partner incorporate.

Page 441

1      Q.  And I understand all that.  I'm just
2  trying to make sure I get the time frame
3  correct for the record.  You started that in
4  December of 2001, after the hurricane season
5  ended in 2001.
6      A.  The Corps left us with no alternative
7  but to start it at that time because they was
8  complaining about it not being started.  And we
9  began to initiate the work, and then we went to
10 the Corps and said, okay, now, we began the
11 work, where's the approval on the discharge
12 tubes?  And they said, oh, we haven't gotten it
13 back to you yet.
14     Q.  Again, though, you started that work
15 approximately December.  2001.
16     A.  We were forced to start it at that
17 time by the Corps.
18     Q.  That's fine.  And then you were
19 supposed to have that floodwall reconstituted
20 before hurricane season in 2002, is that
21 correct?
22     A.  That was the initial request of the
23 contract plans, yes.
24     Q.  And you weren't able to do that, is
25 that correct?

Page 442

1      A.  No, we weren't, due to actions of the
2  Corps of Engineers.
3      Q.  And so you had to set up some interim
4  flood protection, is that right?
5      A.  Yes, we did.
6      Q.  Just so the record is clear, what is
7  interim flood protection?
8      A.  Interim flood protection is, the gap
9  is open, what can we put in place to assure
10 that water does not go through the gap?  And it
11 was sheet pile.  We had sheet piling driven to
12 connect the I-wall with the T-wall on the
13 outside of the gap.  If I had a map I'd
14 illustrate it to you.  If you want me to draw
15 it out.
16     Q.  That's all right.  And then again
17 in --
18     A.  Also, with that interim flood
19 protection -- I'm sorry.  I didn't mean to
20 interrupt you but I want to complete that
21 answer.
22     Q.  Go ahead.
23     A.  With that interim flood protection, we
24 had the along the access road the came through,
25 the 20-foot opening on that I-wall, we drove

20 (Pages 439 to 442)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0020

MELVIN M.L. McELWEE (VOL II)                    4/24/2008

Page 443

1  sheets below the ground -- the permanent
2  sheets, these are sheets that were supposed to
3  be there anyway -- below the ground for easy
4  retrieval if a storm was impending we just
5  pulled them up to the height of the I-wall. So
6  that was the interim protection of the job.
7      Q.  And then after hurricane season
8  concluded in 2002, you had another opportunity
9  to place -- or reconstitute the flood walls
10  before hurricane season in 2003, is that
11  correct?
12     A.  To reconstitute the flood wall, I
13  guess --
14     Q.  Rebuild the floodwall that you
15  excavated.
16     A.  We had an opportunity, but however it
17  was impacted by the impending storms. Remember
18  I told you there was four storms? During
19  August -- July and August, one year, there was
20  three storms back to back. And we couldn't
21  really get that work done during that non
22  hurricane season period.
23     Q.  Well, if the hurricanes -- these
24  storms happened during hurricane season,
25  wouldn't by the end of hurricane season you

Page 444

1  have an opportunity to the complete that work?
2      A.  I have to see when those storms
3  happened. I have to tell you when the storms
4  happened and what we were able to do during
5  that time. Ideally, if they all happened
6  during hurricane season and there was no -- all
7  submittals were approved and everything was on
8  site and we weren't impacted by other items,
9  yes, we could get that wall in place.
10        There's something else we had impact
11  the job, and think during that time frame was
12  the back fill. The Corps never designated the
13  back fill to go over the box culvert canal
14  sections, what type of new material needed to
15  be brought in. The contract was modified to
16  deal with that. And I don't know if it was
17  around the same time frame we were trying to
18  get these box culvert canal sections back
19  filled, which was impacting the work at the
20  time. There was just so much happening. I'd
21  have to look at the progress chart, show you
22  the impacts that was presented to the corps.
23  And, um -- if the Corps would have worked with
24  us like they would normally do with most
25  contractors, we could have got the job done,

Page 445

1  yes.
2      Q.  You weren't able to rebuild the
3  permanent hurricane flood protection structures
4  before the beginning of hurricane season in
5  2003, is that correct?
6      A.  We were able to do that. We was on
7  the process and a track record to have that
8  completed.
9      Q.  But it wasn't completed at the
10  beginning of hurricane seen in 2003, is that
11  correct?
12     A.  It wasn't, due to some difficulties
13  between the Corps of Engineers and McElwee
14  Brothers. In fact, if I could point --
15     Q.  Go ahead.
16     A.  If I could point out, one of the
17  difficulties is this exhibit -- Exhibit 40. As
18  I mentioned yesterday, were some lines of
19  authority established during the partnering
20  meeting.
21     Q.  Which one is Exhibit 40?
22     A.  That's your letter dated March 18th,
23  2003.
24     Q.  Yes.
25     A.  If we read the first sentence,

Page 446

1  gentlemen, reference the initial inspection on
2  Monday, March 10th, 2003, for the Jack and bear
3  operation. The phone conversation between
4  myself -- who was Mr. Tim Roth -- and Ross
5  Leslie -- who was a project manager for
6  Tri-State Design Construction Company, also I'd
7  like to note was ever authorized to do any
8  communications relative to the project -- on
9  Tuesday, March 11, 2003, the biweekly status
10  meeting of Thursday, March 13th, 2003, and the
11  field meeting of Friday, March 14th, 2003,
12  between your designer, Mr. Michael Dixon and
13  our geotechnical engineer Mr. Frank Vojkovich,
14  and the phone conversation on Monday
15  March 17th, 2003, between Mr. Glenn Gremillion
16  and Mr. Leslie.
17        I want to make it clear that that was
18  parts of the problem. The Corps would go to
19  Philadelphia to speak with Mr. Leslie about
20  getting work accomplished in New Orleans, and
21  they were ignoring me. And that was part of
22  the problems in having a lot of this work
23  accomplished.
24     Q.  Were you having difficulties at that
25  time with your joint venture partner about who

21 (Pages 443 to 446)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0021

MELVIN M.L. McELWEE (VOL II)                    4/24/2008

Page 447

1   has lines of authority with the Corps of
2   Engineers?
3       A.  No, I didn't have problems.  The Corps
4   had problems.  Because the Corps sat in meeting
5   with me and looked at Mr. Davis and tried to
6   convince him to pass a document to me
7   authorizing Mr. Leslie to conduct business down
8   here on behalf of McElwee Brothers when he was
9   never an employee or a consultant to McElwee
10  Brothers  That was the problem, not McElwee
11  Brothers having problems with the joint venture
12  partner.  It was the Corps of Engineers trying
13  to force the financier, the one that had the
14  money for this joint venture, to coerce him to
15  do what they wanted to get accomplished.
16      Q.  Well, you eventually sued your joint
17  venture partner, is that right?
18      A.  That's correct.
19      Q.  Why did you sue them?
20      A.  I sued them because Mr. Ross Leslie
21  should have immediately told them I'm not
22  authorized to communicate with the Corps of
23  Engineers, and I think you all need to talk to
24  Mr. McElwee.  They were willing participants in
25  these subversion tactics.

Page 448

1       Q.  Now, your contract was eventually
2   terminated on June 24th, 2003, is that right?
3       A.  That's correct.
4       Q.  I guess one of the reasons the Corps
5   terminated that contract is they thought the
6   hurricane flood protection structures were
7   still left open for far too long.  Is that
8   right?
9       A.  That is the position that they took,
10  and that's what they said as a reason to try to
11  default it, yes, sir.
12      Q.  And I don't want to misrepresent
13  anything you say, but you disagree with that
14  position.
15      A.  100 percent.
16      Q.  Let me show you this letter that's
17  also marked June 24th, 2003.  I'm going to mark
18  this as Exhibit 44.  And this is a letter from
19  you as the managing venturer of McElwee
20  Brothers and the joint venture to the Army
21  Corps of Engineers, is that correct?
22          (EXHIBIT 44 was marked for
23  identification and is attached hereto.)
24      A.  That's correct.
25  EXAMINATION BY MR. LEVINE:

Page 449

1       Q.  Now, we're going to have to reference
2   the third page and the first page.
3       A.  Yes, sir.
4       Q.  But I guess at the top of the first
5   page -- the third page, excuse me, you have a
6   number of claims listed.
7       A.  Yes.
8       Q.  And those are for, I guess, contract
9   modifications?
10      A.  Those were for some of the contract
11  modifications, yes.
12      Q.  What is a contract modification?
13      A.  Contract modification is after the
14  contract has been awarded and performance has
15  began there are issues that arise that the
16  contract did not consider, and so the contract
17  has to be revised.  And when it's revised,
18  normally there's something involved as far as
19  time or money impacting the contract, so
20  adjustments have to be made accordingly.  Now,
21  the adjustments can be to the negative to a
22  contractor where he actually owes the
23  government something, or to a positive to the
24  contractor where the government owes him.
25      Q.  Sure.  So at the top, there's a number

Page 450

1   of modifications that were finalized at that
2   time.
3       A.  Yes, sir.
4       Q.  And then I think in the middle section
5   where it says order of negotiations, there's a
6   number of claims that you had presented prior
7   to June 24th, 2003, that were still outstanding
8   at the time that this document was provided to
9   the Corps.  Is that correct?
10      A.  That's correct.
11      Q.  And the first four claims underneath
12  order of negotiation were provided to the Corps
13  on June 5th, 2003, initially?
14      A.  That's what my notes say, yes.  Wait,
15  wait.  Let me say -- let me, let me -- my notes
16  say this:  Let me clear this up.  The 5th of
17  June, 2003, the first session for negotiations
18  took place.
19      Q.  Okay.
20      A.  That's what that meant.
21      Q.  Okay.  So you might have provided
22  notification to the Corps previously.
23      A.  Yes, sir.
24      Q.  Do you know that to be true or you
25  just --

                    22  (Pages 447 to 450)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0022

MELVIN M.L. McELWEE (VOL II)                          4/24/2008

Page 451

1     A.  I know that to be true because we
2  would not begin negotiations without
3  notification being done.
4     Q.  And in the bottom section you have a
5  number of claims that you submitted to the
6  Corps for the first time on June 24th, 2003, is
7  that right?
8     A.  No, that that wasn't the first time.
9  The Corps knew about these items before this
10 sheet took place.
11    Q.  But this sheet is the first time you
12 provided notification to the Corps that you
13 wanted to submit those claims, is that correct?
14    A.  That's inaccurate.  If you look at the
15 job records, if you look at the contract
16 quality control reports, we daily tell the
17 Corps of Engineers of problems that we run
18 into.  So those are notifications, also.
19    Q.  Sure, but you have to formally submit
20 the notification for a contract modification,
21 is that correct?
22    A.  Formally?
23    Q.  Sure.  You just can't call someone up
24 on the phone and say, I've got such and such
25 problem and I think we should modify the

Page 452

1  contract.
2     A.  Notification has to be given.  Whether
3  it's in verbal form, communication, whether
4  it's through the job records, I mean, I'm --
5  let me give you an example of that.  These
6  storms on here, that "mod" came about when Tim
7  Roth said, hey there's going to be a change,
8  and we got to notification that the change was
9  formally accepted.  However, prior to getting
10 that notification it was agreed that the storm
11 was impacting the job.  In fact, McElwee
12 Brothers expended labor, materials and effort
13 to protect the work area and we hadn't agreed
14 to the modification.  So the notification can
15 come way before we sit down with the first
16 negotiations.
17    Q.  And to be fair, this document says,
18 under claims, notification -- well, look at the
19 first one.  Removal of additional sheet pile
20 and asphalt in Jourdan Road.  And if you go
21 down to note, it says notification to the
22 United States Army Corps of Engineers, 24 June
23 2003, is that correct?
24    A.  That is telling you that they were
25 notified on that date.  That's not telling you

Page 453

1  that's the first time they were notified.
2     Q.  It said that was notification to
3  the -- that's what it says there, is that
4  correct?
5     A.  That's correct.
6     Q.  And it says that under the next one,
7  is that correct?
8     A.  That's correct.
9     Q.  And it says it under the next one.
10    A.  That's correct.
11    Q.  It says it under the next one.
12    A.  That's correct.
13    Q.  It says, request final decision on the
14 next one?
15    A.  That's correct.
16    Q.  And then the last one, seven,
17 defective specifications, notification to the
18 Corps on June 24, 2003, is that correct?
19    A.  That is correct.
20    Q.  That's what the document says.
21    A.  That's what it says, and the reason
22 that was put there is because if you're
23 familiar with the termination records relative
24 to government procedures, a contractor, once
25 he's terminated, has a certain amount of time

Page 454

1  to assure -- to confirm that the agency is
2  aware of any potential claims that might come
3  after the termination for default.
4     Q.  Did you provide this letter to the
5  Corps before or after you were notified of your
6  decision that you were terminated for default?
7     A.  This was the same day, I believe it
8  was, if I'm not mistaken.  23rd or 24th.  I've
9  got to check the date of the termination.  Give
10 me something with the termination on it and
11 I'll tell you.
12    Q.  When you sent this letter in, though,
13 were you aware your contract had already been
14 terminated?
15    A.  I got to check.  Let me see the date
16 of the termination for default, if you have it.
17    Q.  The termination for default, I'll tell
18 you what date of the later is, I know what it
19 is, it's June 24th, 2003.
20    A.  Right.
21    Q.  The same day.
22    A.  The same day.  That letter went in
23 that day.  The morning.  And then we got a
24 termination for default faxed to us.
25    Q.  So this letter went in first.

23  (Pages 451 to 454)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0023

MELVIN M.L. McELWEE (VOL II)                                    4/24/2008

Page 455

1    A.  Uh-huh.
2    Q.  And then you were terminated for
3    default, is that correct?
4    A.  Yes.  Uh-huh.
5    Q.  Did you think when you sent this
6    letter in you were going to be terminated for
7    default at any time?
8    A.  Oh, Tim Roth had mentioned that on
9    several occasions, that we plan on terminating
10   your contract.  I mean, he mentioned that back
11   in 2001, 2002 -- the early part of 2002.  He
12   kept harping on the path that we're going to
13   terminate your contract.  I mean, that was --
14   that was his intent.
15   Q.  When you sent this letter in, did you
16   think that an impending termination was going
17   to take place?
18   A.  I'm going to say to you again, in 2002
19   Tim Roth made it clear he was going to
20   terminate this contract.  And if I can make it
21   a little bit more clear for you, um -- he
22   indicated that he was going to terminate it
23   after McElwee Brothers didn't select his
24   brother-in-law to work on the project as a
25   subcontractor, Mr. John Kernion.

Page 456

1        John Kernion works for Cycle
2    Construction.  And after McElwee Brothers did
3    not select his brother-in-law, the project
4    began to go south.  That's when I realized it
5    was going to be terminated.
6        So now hopefully that answers your
7    question.
8    Q.  It doesn't, so let me try it one more
9    time and then -- I mean, when you sent this
10   letter in this date, on June 24th, 2003, were
11   you expecting to be terminated that day, the
12   next day, the next week?
13   A.  To answer you again, in 2002, in
14   January, Tim Roth made it clear he was going to
15   terminate this contract.  We're planning on
16   terminate your contract.
17   Q.  So --
18   A.  And every action from that day forward
19   was in the act of terminating the contract.
20   Q.  So every day from what date did you
21   say in --
22   A.  January, 2002.
23   Q.  So for every day from January, 2002
24   onwards, you felt that you were at risk of
25   being terminated?

Page 457

1    A.  I didn't feel, I knew it.  Because the
2    Corps displayed the actions.  Let me repeat
3    that again.  When they came into meetings and
4    they ignored modifications that were previously
5    submitted to them, to include these hurricane
6    "mods."  Rather than negotiate these and get
7    them out of the way and get the monies to the
8    contractor so he could proceed, the government
9    held off on all of that.  That wasn't
10   negotiated until the bonding company came in.
11       That was totally ludicrous and
12   unnecessary.  The intent of most of the
13   government modifications, from my recollection
14   when I worked with them, was that they would
15   negotiate mods quickly because the longer you
16   take the higher the cost of the mod goes.
17       (Brief recess.)
18   EXAMINATION BY MR. LEVINE:
19   Q.  I'm going to hand you a document that
20   I've marked as Exhibit 45.  And this is an
21   affidavit that you signed in the case Great
22   American Insurance Company versus McElwee
23   Brothers.  Is that correct?
24       (EXHIBIT 45 was marked for
25   identification and is attached hereto.)

Page 458

1    A.  Yes.
2    EXAMINATION BY MR. LEVINE:
3    Q.  And it was sworn and subscribed before
4    a notary, is that right?
5    A.  That's correct.
6    Q.  Paragraph 2, it states, the contract
7    price that you bid on and received after an
8    award was $521,356.53.  Is that correct?
9    A.  That's correct.
10   Q.  Let's turn to Page 3 at Paragraph 8.
11   It says what it says there, but you believe the
12   issuance for the termination for default, at
13   the time you sent this affidavit -- filed this
14   affidavit, was inappropriate, is that correct?
15   A.  That's correct.
16   Q.  You still believe that today?
17   A.  Yes.
18   Q.  And you also say that some of the
19   fault was for Pittman Construction Company, is
20   that correct?
21   A.  That's correct.  Yeah.  Pittman
22   Construction Company, that's correct.
23   Q.  What role did they have to play in the
24   eventual termination of your contract?
25   A.  Um -- McElwee Brothers felt that the

24 (Pages 455 to 458)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0024

MELVIN M.L. McELWEE (VOL II)                                    4/24/2008

Page 459

1  termination was unjustifiable because the Corps
2  terminated McElwee Brothers, the joint venture,
3  for its work, when actually even up until today
4  that work is complete but the pump station is
5  still not functioning. Pittman was the
6  contractor on the pump station, and they were
7  delayed I think two or three years prior to
8  McElwee Brothers beginning its work, and the
9  essence of importance of work was on the pump
10 station itself. Had McElwee, McElwee meaning
11 McElwee Brothers and the joint venture, delayed
12 the pump station 's usage during any hurricane,
13 you know, and just recently Hurricane Katrina,
14 then McElwee would have understood the reason
15 for termination. But the Corps placed emphasis
16 on terminating McElwee because it was behind
17 schedule. But here we have a pump station
18 that's I think even today almost five, six
19 years -- hasn't even been completed. But the
20 Corps didn't terminate Pittman.
21        Those delays impacted McElwee tying in
22 the tubes to the pump station. That was part
23 of McElwee Brothers' job. The tubes have never
24 been tied in. It's just been accepted that,
25 hey, that job late, so what's the big deal?

Page 460

1     Q.  The next line of that says, it
2  wasn't -- the termination for default was not
3  reasonably based on any act or omission of the
4  joint venturer of its partners.
5        Did you believe that to be true at the
6  time you signed this affidavit?
7     A.  At the time I signed the affidavit,
8  yes, I believed it to be true that, um -- the
9  termination was not as a result of acts or
10 omissions of the joint venture, no.
11    Q.  Do you still believe that to be true
12 today?
13    A.  There's a sequence of events that have
14 happened in Court since then, to include the
15 joint venture being found in breach of the
16 indemnity agreement for failure to pay its
17 financial obligations. The Fifth Circuit Court
18 of Appeals has made that determination. You
19 know, the question can be answered two ways. I
20 believe it not to be true at this time, because
21 if the Corps would have made its bills and
22 would have acknowledged the amendments that we
23 looked at in Exhibit 44 and would have
24 cooperated and worked along partner with the
25 joint venture to get this project completed and

Page 461

1  been reasonable in saying, you know what, we
2  gave Pittman two or three years to finish that
3  pump station, I mean, you know, and it impacted
4  your work, whatever impacted you, you need
5  time, too. I still think the position is, hey,
6  it wasn't the fault of the joint venture, but
7  there's been some reactions afterwards that,
8  hey, if you look in the court record, the joint
9  venture failed to pay its obligations. But if
10 you look at the whys, you know, I feel that it
11 was not the joint venture's fault.
12    Q.  So you disagree, then, with what the
13 court record is. I mean, you personally
14 disagree with that.
15    A.  No, I agree that the Court was right
16 in making a determination that financial
17 obligations were not met. And that was the
18 truism, and it gave the bonding company the
19 right at that time to exercise its right to
20 take over the contract. I never disagreed with
21 that.
22        But had the Corps of Engineers paid
23 its bills like it paid the bonding company, the
24 joint venture never would have been in a
25 financial obligation to be in front of a Court.

Page 462

1     Q.  You said the Corps didn't pay its
2  bills. What do you mean?
3     A.  Let's go back to Exhibit 44.
4     Q.  Which one is that?
5     A.  Exhibit 44 is the notification of
6  claims. Page 3. You have look at the order of
7  negotiation, if you look at CIN -- if we look
8  at Change Identification Number 7, 8, 9, 10,
9  Amendment 0004 and Amendment 0002, and TE --
10 Time Extension 005, those numbers that I just
11 read to you are numbers assigned to
12 modifications by the Corps of Engineers.
13 That's not McElwee Brothers or the joint
14 venture's numbers assigned to those. The Corps
15 assigned numbers to those modifications meant
16 they agreed there's a mod in the contract.
17    Q.  Well --
18    A.  However, they never negotiated it and
19 passed the money on during the course of the
20 contract.
21    Q.  Well, the first four under order of
22 negotiation, that first negotiation session,
23 those took place on June 5th, 2003, is that
24 correct?
25    A.  That is correct. Now, if the Corps

25 (Pages 459 to 462)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0025

MELVIN M.L. McELWEE (VOL II)                                    4/24/2008

Page 463

1  tells you, hey, we're going to set the date in
2  June, 2007, and that's when we're going to meet
3  with you to first negotiate with this, you as a
4  contractor don't have a choice in that matter.
5  But if they handle it urgently and say, hey, we
6  knew the storm took place, and we knew you
7  expended labor and materials, let's get this
8  over with and let's modify this contract and
9  get you your monies because we know you need
10 your monies, that's a whole different aspect.
11 Now, the bonding company came in and they paid
12 them the monies that was due at that time.
13     Q. Did the Corps not paying you have any
14 impact on you not completing the project?
15     A. 100 percent.
16     Q. How is that?
17     A. You cannot complete a project if your
18 bills are running behind. It's like trying to
19 feed your family. If you don't get a check,
20 you family can't eat. And with time it's going
21 to impact them.
22     Q. Were you unable to pay your
23 subcontractors?
24     A. There was subcontractors and materials
25 suppliers that were not paid. That is what,

Page 464

1  um -- that's the financial obligation of the
2  joint venture that was negligible at that time.
3  Well, I mean, it was wrong at that time that
4  the Fifth Circuit said, hey, you didn't meet
5  your financial obligations. That is what
6  happened at that time.
7      Q. The original length of this project
8  was 600 days; is that right?
9      A. That's correct. Somewhere thereabout.
10     Q. And you said the Corps gave Pittman
11 numerous extensions. Is that right?
12     A. That's correct.
13     Q. Do you know how long Pittman 's
14 project length was for?
15     A. Their project length was supposed
16 to -- the pump station was supposed to end
17 before we began -- well, end before we began or
18 right at the time we began our work. But when
19 we arrived on job site in August, 2001, Pittman
20 was on a scarce schedule because they was
21 waiting for approvals for time delays
22 associated with the overhead power lines on
23 their side of the job, and I think the job was
24 already two or three hundred days behind
25 schedule at that time, if my memory serves me

Page 465

1  correctly.
2      Q. After your contract was terminated for
3  default you tried to bring a claim against the
4  Army Corps of Engineers and the Board of
5  Contract Appeals, is that correct?
6      A. We didn't try. We brought claims.
7  All of the ones you notice under order of
8  negotiation with Corps members, all of that was
9  brought in front of the Armed Services Board of
10 Contract Appeals. In fact, the Armed Services
11 Board of Contract Appeals had directed the
12 contracting officer to answer the contractor
13 relative to those claims. The contracting
14 officer was refusing to answer those claims.
15     Q. And then you litigated against your
16 surety Great American Insurance Company for who
17 has the right to pursue those claims.
18     A. That's not correct. The bonding
19 company, surety, instituted a preliminary
20 injunction. I think we talked about that
21 yesterday. The copy of that is in the exhibits
22 here. They were trying to exercise their
23 rights to the claims. Judge Duval issued a
24 temporary restraining order and an injunction,
25 which was mandatory and prohibitory at the same

Page 466

1  time, prohibiting McElwee from communicating
2  and being involved with the Corps and the
3  ASBCA, and making it mandatory to cooperate
4  with the surety to collect all amounts due.
5          But at that time, the Armed Services
6  Board of Contract Appeals did not recognize
7  nights the surety. In fact, the surety sent
8  several letters saying, look, the Eastern
9  District of Louisiana say we in charge now.
10 And the ASBCA says, you're not McElwee Brothers
11 so we can't honor you. And they continued to
12 try to communicate with me. And that is where
13 the contempt came in later, because the ASBCA
14 would not recognize the bonding company.
15     Q. So you believe that you were
16 sanctioned because the Board of Contract
17 Appeals kept dealing with you instead of trying
18 to deal with the bonding company, is that
19 correct?
20     A. That was part of that sanction. In
21 fact, that hearing on that sanction, Judge
22 Stanwick Duval brought me in during that
23 hearing, and to my surprise he said he had a
24 surprise guest to be on the telephone. The
25 surprise guest was the Honorable Judge Friedman

26 (Pages 463 to 466)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0026

MELVIN M.L. McELWEE (VOL II)                          4/24/2008

Page 467

1  at the Armed Services Board of Contract
2  Appeals. And it was a motion of contempt
3  requested by Great American against me for
4  communicating with the ASBCA after the
5  injunction was in place. Judge Friedman Had
6  issued -- sent a letter. In the letter
7  somewhere, the language said, Mr. McElwee, this
8  is in reference to your conversation with us on
9  a particular day. And, um -- um -- that letter
10  was brought up during that contempt proceeding.
11  And I was placed under oath and Judge Duval
12  asked me did I communicate with the ASBCA. And
13  I said, Your Honor, I haven't.
14      He said, Mr. McElwee, do you
15  understand you're under oath?
16      I said, yes, sir, I do.
17      He said, you're telling me you haven't
18  talked to Judge Friedman?
19      I said, Your Honor, I have not.
20      He said, Well, I have a surprise
21  guest. He said, Judge Friedman -- he brought
22  the telephone out -- y'all got him on the line?
23  That's what he said. He said, Judge Friedman,
24  I have under oath Mr. McElwee on the stand.
25  And he said, um -- Judge Friedman, I'm a

Page 468

1  federal judge and I've ordered Mr. McElwee not
2  the communicate with the ASBCA. And he said,
3  I'm trying to, um -- verify that he contacted
4  your office. And Judge Friedman -- he said,
5  Mr. McElwee, go I need to swear in Judge
6  Friedman?
7      I said, no, Your Honor, he's an
8  officer of the court, you don't need to swear
9  him in.
10      And he asked Judge Friedman, he said,
11  Judge Friedman, has Mr. McElwee contacted your
12  office?
13      And Judge Friedman said, no, he
14  hasn't.
15      And he said, excuse me, Judge
16  Friedman, even though I have a letter here that
17  you signed saying Mr. McElwee contacted your
18  office, you're telling me he hasn't?
19      He said, Mr. McElwee did not contact
20  my office. It was Ms. Sylvia Hurst that
21  contacted my office.
22      That was the initial institution of
23  the proceedings for that contempt. Along with
24  that was Mr. Lloyd Shields said that I refused
25  to cooperate with him and had refused to give

Page 469

1  them stuff they asked for. And it just
2  happened to be there were some old seals that
3  were no good when we left from the project site
4  that he requested, and I gave them to him when
5  he requested them, and then he filed documents
6  included in that proceeding stating that I was
7  withholding information. And Judge Duval said,
8  Mr. McElwee, I find that you did not talk to
9  Judge Friedman, but narrowly I do think you
10  violated my order. And that was because of the
11  fact that it was the third time that they had
12  raised contempt proceedings, and the first two
13  times he had dismissed it. And this third time
14  he wanted to me to understand his powers. And
15  then he found me in contempt.
16      Q.  Did you disagree with that entry of
17  the contempt order?
18      A.  I totally disagree with it. Because I
19  cooperated with the seals. I gave him the
20  seals he wanted. He wrote me a letter saying,
21  look, you got some seals over there, deliver
22  them to me, and I did. The seals were in bad
23  shape. The manufacturer of the seals, CON/SPAN
24  said the seals were bad when you left the job.
25  And I told Shields that the stuff was no good,

Page 470

1  that he was going to have to order new stuff.
2  So why did Mr. Shields come after me with some
3  old seals? He's setting me up, I felt, you
4  know, to deliver something to him and say I was
5  withholding information. And that's why I'm
6  careful and cautious on how I talk and answer
7  now. Because I'm afraid of setups again.
8      Q.  So you disagreed with Judge Duval 's
9  ruling.
10      A.  100 percent.
11      Q.  Um -- I think we've discussed this
12  earlier. You brought suit against Tri-State as
13  of the result of this contract termination; is
14  that right?
15      A.  That's correct.
16      Q.  Now, Paragraph 9, it says, McElwee
17  Brothers wanted to complete the contract. Is
18  that right?
19      MR. LEVINE:
20          For the record, it's Paragraph 9
21          of Exhibit 45.
22      A.  That's correct. That is correct.
23  EXAMINATION BY MR. LEVINE:
24      Q.  And I guess if the contract was going
25  to be terminated you felt a termination for

27 (Pages 467 to 470)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0027

MELVIN M.L. McELWEE (VOL II)                    4/24/2008

Page 471

1  convenience of the government would have been
2  more appropriate, is that correct?
3      A.  That's correct.
4      Q.  What's a termination for convenience
5  of the government?
6      A.  That's when the government comes in a
7  and terminates a contract because of maybe no
8  fault of either the contractor or the
9  government but it's just that the contract
10  cannot proceed on.  We felt it was, um --
11  probably would have been a lot better option
12  because along the course of from 2002, January,
13  until it was terminated, the Corps kept
14  hollering, screaming during that time, or
15  alleging they was running of monies because
16  Congress hadn't appropriated them any funds.
17  And in fact, they shut down several contractors
18  during this course because there was no funding
19  for them to complete their work.
20      Now, they did issue options for
21  contractors to complete the work and hope to
22  get paid somewhere down the road.  That was
23  merely a hope.  And, um -- they said, the
24  allegation was that the only reason they hadn't
25  terminated our contract for convenience is

Page 472

1  because we never gave them a letter one way or
2  the other on how we felt the contract should
3  go.  But we felt that that was not a position
4  for us to determine.  If you don't have any
5  money to pay for a job, it's your decision to
6  make at that time whether you're going to
7  terminate it for convenience or shut it down.
8  And being prudent as the Corps is, they're
9  familiar with monies and appropriations, we
10  felt that they should have terminated for
11  convenience at that time or issued some --
12  halted the contract but issued some, um --
13  delay time.  But I think it was critical they
14  didn't went to do that because there was some
15  opening in the flood protection and that wasn't
16  going to come across well if you're shutting a
17  job down and there's openings in the flood
18  protection and the city get flooded.
19      Q.  If the contract is terminated for the
20  convenience of the government, the contractor
21  is still entitled to receive a certain amount
22  of profit and fees from that termination, is
23  that correct?
24      A.  I believe that to be true.
25      Q.  Turn to Paragraph 20 of the

Page 473

1  Exhibit 45.  And it says -- it says what it
2  says, but do you believe that the fair value of
3  the modification of the claims due the joint
4  venturer is $4,347,807.37, is that correct?
5      A.  That's correct.
6      Q.  And you believe that if the surety had
7  successfully advanced that position and the
8  termination for convenience position that the
9  net funds due the joint venturer were
10  $2 million -- I'm just going to have to read
11  this out -- $2,030,212.55, is that correct?
12      A.  That's correct.
13      Q.  And instead, you were hit with a
14  judgment for $1.9 million, you testified to
15  yesterday?
16      A.  Yes, sir.  I say 1.9, but I think in
17  this document it's probably -- it's close to
18  somewhere around 1.9.  I'd have to see that
19  judgment.
20      Q.  The judgment says what the judgment
21  says.
22      A.  Yes.
23      Q.  So you're out two million dollars plus
24  the total amount of the judgment.  That's your
25  net loss.

Page 474

1      A.  Yes.
2      Q.  I don't know if anybody has asked you
3  this, but you don't have a degree in civil
4  engineering, do you?
5      A.  No.
6      Q.  And -- I guess it follows that you're
7  not a licensed professional engineer.  Is that
8  correct?
9      A.  I think I've affirmed that earlier,
10  that I am not an expert.
11      Q.  I understand.  I understand that.
12  There's a lot of stuff going on in two days,
13  I'm just trying to be clear for the record.
14      For the Dwyer Road project, the
15  biggest project you were a contractor with was
16  $150,000?
17      A.  Before that one?
18      Q.  Yeah.
19      A.  Yes.
20      Q.  And then --
21      A.  I'm saying yes.  But again, I got to
22  look at the records.  I know it was nowhere
23  near --
24      Q.  And the Dwyer Road project was
25  $5.5 million.

28  (Pages 471 to 474)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0028

MELVIN M.L. McELWEE (VOL II)                                    4/24/2008

Page 475

1     A.   That's correct.
2     Q.   Have you had any projects after the
3   Dwyer Road project, Mr. McElwee, where you were
4   the general contractor?
5     A.   Yes.  I mentioned those yesterday.
6   Austin Bridge and Rode, doing some pile driving
7   in Shreveport, Louisiana.  That was 2 million
8   dollars.  Um --
9     Q.   It's called Austin --
10    A.   Austin Bridge and Road.
11    Q.   And who are you contracting with on
12  that one?
13    A.   Again, Austin Bridge and Road.
14    Q.   That's the name of the company?
15    A.   Yes.
16    Q.   What's the location?
17    A.   It was the Red River westbound lane of
18  the Red River bridge crossing the Red River,
19  driving the pilings for that project.
20    Q.   Any other projects?
21    A.   Um -- Baton Rouge, Denton James.
22    Q.   These companies Austin Bridge and Road
23  and Denton James, are they construction
24  companies?
25    A.   Yes.

Page 476

1     Q.   They're the general contractor on the
2   project.
3     A.   That's correct.
4     Q.   You're just a subcontractor.
5     A.   That's correct.
6     Q.   Have you received any contracts where
7   you've been the general contractor since your
8   termination from the government?
9     A.   Okay.  Let me clear this up.  With
10  $1.9 million owed to a bonding company you
11  can't go in as a general contractor until you
12  take care of your bonding company.  You have to
13  be bonded.  So no, I couldn't go in as a
14  general.  I've been crippled as a result of
15  what's happened with the Corps.
16    Q.   Any other contracts where you've been
17  a subcontractor?  Denton James, where was that
18  project?  In Baton Rouge?
19    A.   That's Baton Rouge.  And, um -- LSU
20  recreational field for Tricor Properties.
21    Q.   Where are they out of?
22    A.   Baton Rouge, Louisiana.
23    Q.   Any other contracts?
24    A.   I'd have to -- I don't remember
25  anything right at this point.  But I'd have to

Page 477

1   look at and give you a résumé of contracts
2   since that time.  Those are the ones that stand
3   out.
4     Q.   When you were inspector at the Corps,
5   that was from December -- let's get the dates
6   one more time.  Sorry.  December, 1988, through
7   August, 1993.
8     A.   Yes, sir.
9     Q.   Did you have any performance problems?
10    A.   What do you mean performance problems?
11        MR. JOANEN:
12            Objection, vague.
13        MR. LEVINE:
14            It is vague.  Let me rephrase it.
15        You're giving me that look, too.
16  EXAMINATION BY MR. LEVINE:
17    Q.   Who were your supervisors while you
18  were there, if you can recall?
19    A.   Mr. Ward Purdum, Lee Guillory, Danny
20  Thurmond, Chester Ashley.
21        Performance, you mean performance
22  appraisal problems?  No.
23    Q.   Did they ever judge your
24  performance --
25    A.   Yes, they did.

Page 478

1     Q.   -- poorly?
2     A.   No.  Exemplary performance.
3     Q.   Were you ever tardy on a work site?
4     A.   Tardy at a work site?
5     Q.   Were you ever tardy to the jobs on a
6   regular basis?
7     A.   I mean, I was tardy at times.  On a
8   regular basis, no, because we had flex time and
9   you could flex in at between like 7:00 and I
10  think 8:00, something like that.  Ward Purdum
11  was my supervisor, so he understood -- or he
12  allowed -- not understood, he allowed me to
13  flex in and out for lunch to go to UNO for
14  classes.  So I mean when you say tardy, now, I
15  don't want you to come at me and say I didn't
16  tell you about something.
17    Q.   That's fine.  That's fine.
18    A.   I'm just telling you about, hey, my
19  time -- and everybody 's schedule was never the
20  same.  But the standard work time would
21  probably be from 7:00 to 3:30.  And if you came
22  after then, you know, like you came at 7:30, it
23  would be till 4:30.  So we all had times we
24  could flex in or flex out.  In fact, there were
25  times I went straight to the job site, you

f511046d-f246-478c-b182-17dab585135a

PX-0687-0029

Page 479

1  know, rather than report in to the office. So
2  if a job site was located closer to my home,
3  you know, I would -- was allowed to go straight
4  from home to Kenner.
5      Q.  Did any of your supervisors at the
6  Corps ever review your time for tardiness?
7      A.  Any of my supervisors?  There was --
8  he wasn't my -- well, I don't know if he was my
9  supervisor.  There's a gentlemen, his name
10 is -- and I think you're dancing around an
11 incident and I'm going to go straight on with
12 you and tell you about it.  Um -- he's dead
13 now.  He killed himself, suicide.  Um -- you
14 wouldn't happen to know his name, huh?
15     Q.  Can you just describe the incident?
16     A.  Um -- the incident?  This project
17 engineer, um -- began to target and harass me
18 with my military time, if that's what you're
19 speaking of.  The Corps had a policy that if
20 you were in the military that you could use
21 your military leave while you were on active
22 duty for the guard or the reserves.  And there
23 was a time frame when I went away for two
24 weeks, and I took my military levee at the
25 Corps, which meant I got paid military pay

Page 480

1  while I was gone and I got paid by the National
2  Guard.
3      Well, he had a personal problem with
4  that.  There never was a problem with any other
5  veterans in that area office.  Um -- and many
6  of those other veterans I served in the same
7  units with them.  Um -- Cal Smallwood, several
8  others.  Danny Thurmond who I mentioned was my
9  supervisor.  Um -- Buck Burgess -- Mr. Burgess
10 is his name, I think we called him Buck for
11 short -- we were all in the same engineering
12 unit in the National Guard.  And we would all
13 do the same things.  But so this supervisor
14 began to harass me about that time.  He said,
15 you took military leave.
16     I say, okay.  Yeah, I did take
17 military leave.  What's the point?
18     He say, well, according to some
19 regulation you wasn't supposed to do this or
20 that.
21     I said, I not aware of what you're
22 talking about.  I say, provide me with your
23 documentation what you're talking about.  I'm
24 doing the same thing everybody else does.
25     And I never could understand the

Page 481

1  problem.  And they brought me in for a
2  conference relative to it.
3      Q.  Did someone ever accuse you of forging
4  a letter?
5      A.  Forging a letter?
6      Q.  I'm just asking, did someone ever
7  accuse you of forging a letter relating to your
8  military time?
9      A.  This gentleman may have said it was
10 forgery.  The same guy who is dead now and
11 killed himself for whatever his mental problems
12 were, I don't know, he may have said that.  I'm
13 not aware of that.  He might have said that to
14 somebody after I left the Corps.
15     Q.  Did you ever precipitate the end of
16 you -- you eventually leaving the Corps as an
17 inspector?
18     A.  Did it precipitate it?  No.  As I
19 mentioned yesterday, what happened was I
20 started my own construction company, and I
21 couldn't work for the government and perform
22 work for the government at the same time.  You
23 know what I'm saying?
24     Q.  I follow that.
25     A.  It was a conflict.  And what happened

Page 482

1  was, I was beginning to get into the market and
2  bid government contracts, and I received a
3  contract -- right after I left, I was in line
4  the receive a contract by the U.S. Army, and I
5  said, well, I got to quit, I got to leave, I
6  can't work for the Army and then have a
7  contract with the Army, there's too much
8  conflicting interests.  That's what
9  precipitated my levee.
10     Q.  Okay.  So just to be clear, and I just
11 want to make sure I understand, you never
12 left -- you didn't -- you left the Corps on
13 relatively good terms when you left.
14     A.  When I left the Corps I left on
15 relatively good terms.  In fact, now, this is
16 how it happened in detail:  It happened, when I
17 left I was out sick on sick leave.  And I never
18 returned.  In fact, I think I told them that I
19 was being stressed and harassed and I wanted
20 some time off.
21     Q.  And no relation to any incident where
22 you would have forged a letter.
23     A.  I never forged a letter.
24     Q.  All right.
25     A.  I mean I never forged a letter.  I

f511046d-f246-478c-b182-17dab585135a

PX-0687-0030

MELVIN M.L. McELWEE (VOL II)                    4/24/2008

Page 483

1    don't have a letter to forge.  I mean,
2    military, you just write down what your leave
3    was.
4         MR. LEVINE:
5             I tender him.
6    EXAMINATION BY MR. BRUNO:
7         Q.  I just have a few questions,
8    Mr. McElwee.  You were kind enough to bring us
9    the book?
10        A.  Yes, sir.
11        Q.  And this is the book that you were
12   given when you took the course entitled Earth
13   Work Quality Verification Course?
14        A.  Yes, sir.
15        Q.  In this volume is this yellow thing
16   which is entitled Engineering and Design
17   Construction Control for Earth and Rock-Filled
18   Dams.  Were you given this engineering manual
19   at the same time?
20        A.  Yes, sir.  That manual --
21        Q.  Did you learn in the course whether or
22   not earth and rock-filled dams had anything to
23   do with levees?
24        A.  Yes.  Because you have some earth work
25   that's tied into these dams.  You know, it's

Page 484

1    not just strictly all rocks, per se.
2         Q.  All right.
3         A.  So there's some earth work around most
4    dams -- many dams.
5         Q.  All right.  We have agreed that what
6    we'd like to you do, if you don't mind, is just
7    take this book over to IKON for us and then
8    take your original back, and we'll obtain our
9    copies, you know, in the same fashion.
10        A.  Yes, sir.
11        Q.  Now, you were asked yesterday about
12   this business with the Corps and they
13   terminated your contract.
14        A.  Yes, sir.
15        Q.  Have you said anything in this
16   deposition that you would regard to be, um -- a
17   reaction to the fact that the Corps terminated
18   the contract; in other words, is your testimony
19   colored by the fact that you've been unfairly
20   treated by the Corps, and lashing out at them?
21        MR. LEVINE:
22            Objection.  Compound.
23        A.  No.  You know, facts are what they
24   are.  And I've just merely spoken facts.  And
25   to say I'm lashing out, I mean, the Corps is a

Page 485

1    big organization.  How could I lash out at
2    them?  I don't know.  I'm a retired officer
3    from the same U.S. Army.  So, you know, I've
4    always thought, hey, I don't want to get in a
5    predicament to be lashing out, but I'm going to
6    tell the truth.
7         Q.  All right.  Now just a few more.
8    There's hours and hours about your contract and
9    the piles and all that business.
10            First of all, was this an easy or a
11   difficult job to do?
12        MR. LEVINE:
13            Objection.  Vague.
14        A.  I am quoting Mr. Dom Algazabo who was
15   the, I guess, resident contracting officer at
16   that time who also, I said, went to the Orleans
17   levee board.
18   EXAMINATION BY MR. BRUNO:
19        Q.  Uh-huh.
20        A.  This was the most difficult project
21   the Corps of Engineers had in the New Orleans
22   district at that time.
23        Q.  And what role, if any, did the nature
24   of the soils have to do with the making that
25   job difficult?

Page 486

1         MR. LEVINE:
2             Objection.  Vague.
3         A.  The nature of the soils made it very
4    difficult for a situation where you didn't
5    anticipate to dig up log trees and roots.  You
6    saw some indications on the boring where
7    there's some wood.  But they didn't tell you
8    you're digging in a swampland, an area that
9    has -- that is practically virgin material, we
10   just covered over it.
11        Q.  Uh-huh.
12        A.  You know, as far as the batture is
13   concerned.  You know, it was very difficult.
14        Q.  All right.  Now, the other thing that
15   strikes me as I'm reading these letters from
16   the Corps about improper this and improper
17   that, I'm wondering -- I'm thinking to myself,
18   where's the quality assurance guy?  Is he on
19   the site every day when you're doing the work?
20        A.  He was on the site every day we were
21   doing the work, but he was -- because of the
22   tense relationship, he was overpowered,
23   overshadowed by his own supervisors.
24        Q.  Well, what I'm saying, though, is
25   there is an allegation here that the piling

31  (Pages 483 to 486)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0031

MELVIN M.L. McELWEE (VOL II)                                    4/24/2008

Page 487

1  might have been improperly handled.
2      A.  Yes, sir.
3      Q.  It's in Exhibit 42.  Is the quality
4  assurance -- the quality assurance guy was
5  there on site watching the way the pile was
6  handled, am I --
7      A.  That's correct.
8      Q.  Is that true?
9          MR. LEVINE:
10             Objection.  Leading.
11     A.  That's true.
12 EXAMINATION BY MR. BRUNO:
13     Q.  Well, was the quality assurance guy
14 there to witness how the piles were stored?
15     A.  He was there throughout the time the
16 piles were brought to the job site, stored,
17 moved around on the job site.
18     Q.  All right.  Well, he says -- did he
19 witness how the piles were positioned in the
20 leads?
21     A.  He witnessed it, yes.
22     Q.  Did he witness the pile driving
23 procedure?
24     A.  Yes, he did.
25     Q.  Did he say anything while he's

Page 488

1  standing there watching you do your work that
2  would have suggested to you that you were doing
3  something wrong?
4      A.  He didn't say anything, and neither
5  did Mr. Vojkovich who was witnessing the pile
6  driving initially when it took place, who was
7  the geotechnical engineer for the Corps of
8  Engineers.  Neither one of them mentioned
9  anything about handling procedures, movement of
10 the piles, or piles being cracked prior to
11 driving.
12         MR. BRUNO:
13             All right.  That's all the
14         questions I have.
15         MR. TREEBY:
16             Anybody else?
17 EXAMINATION BY MR. TREEBY:
18     Q.  I just want to follow-up, Mr. McElwee,
19 with we have been produced a big pile of paper
20 today that I'm told is the additional material
21 that would be described by our subpoena that we
22 had not received before today, and I just
23 want -- I think it might be helpful, if you're
24 able to do so, to -- and I believe I've been
25 given both a black and white copy of

Page 489

1  photographs and a color copy of the same
2  paragraphs.  Is the right?
3          MR. BRUNO:
4              Yes.
5  EXAMINATION BY MR. TREEBY:
6      Q.  And a huge pile of paper here.  Um --
7  and I guess I would like -- and I don't know
8  how best to identify it.
9          MR. TREEBY:
10             Will counsel trust me to
11         represent that --
12         MR. BRUNO:
13             Yes.
14         MR. TREEBY:
15             -- if I take this and Bates this
16         stack that this will be -- and then I
17         can make it available the same way
18         he's made I available by CD?
19         MR. BRUNO:
20             Sure.
21         MR. TREEBY:
22             Is that okay?
23         MR. BRUNO:
24             Yeah.  I mean, I told you --
25 EXAMINATION BY MR. TREEBY:

Page 490

1      Q.  Can you look at this and do you think
2  determine if this in fact is the additional
3  material that you described yesterday that I
4  had not been given?
5      A.  Sir, I can visually see from here, and
6  then I can tell you it is the stack.  I can
7  tell you I about the stacks.  The bottom stack
8  is the stack of documents that were submitted
9  to Dr. Bea 's constituent, and I don't think
10 they were ever really used but those were
11 documents I gave him and I told them to make
12 copies of them at IKON.  This is that stock of
13 documents that were never used as far as, you
14 know, by his constituent.
15     Q.  You don't know they weren't used,
16 though, do you, for sure?
17     A.  I'm -- I'm telling you what I was
18 told.
19     Q.  You were told that.  Okay.  By Mr --
20     A.  Rosenberg.
21     Q.  Rosenberg.  David Rosenberg.  Okay.
22     A.  Yes.  He asked me in particular how do
23 you want me to handle these stacks?
24         And I said, look, the first disk you
25 gave was documents done already, don't

                          32 (Pages 487 to 490)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0032

MELVIN M.L. McELWEE (VOL II)                    4/24/2008

Page 491

1  duplicate that again. We don't want to keep
2  giving the same documents over and over again.
3      I said, that stack you never made
4  copies of in the first disk, make a copy of
5  that.
6      That's the second stack.
7  Q.  Okay.
8  A.  He said, I didn't use those, I didn't
9  touch them.
10     I said, I don't care, he wants the
11 documents, make a copy for him.
12     And this is it.
13 Q.  Okay.
14 A.  This photos he had was strictly of all
15 the photos I'm told have been used in the case
16 study.
17     These are those photos --
18 Q.  Okay.
19 A.  -- of the excavation site.
20 Q.  Okay.  Okay.  And with the reservation
21 that I previously made, and in addition, we're
22 going to get a copy of what's in this binder
23 that consists of the entire training course?
24     MR. BRUNO:
25         Yes.

Page 492

1  A.  Yes, sir.
2      MR. TREEBY:
3          I then am finished, at least for
4  now and hopefully forever.
5      MR. BRUNO:
6          Okay.  Subject to the same
7  reservation.

Page 493

1          WITNESS' CERTIFICATE
2
3          I, MELVIN M.L. MCELWEE, SR., do
4  hereby certify that the foregoing testimony was
5  given by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10 _____    _____
11 DATE SIGNED        MELVIN M.L. MCELWEE, SR.
12
13 _____  Signed with corrections as noted.
14
15 _____  Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25 DATE TAKEN:  April 24th, 2008

Page 494

1          REPORTER'S CERTIFICATE
2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3  Certified Court Reporter in and for the State
4  of Louisiana, do hereby certify that the
5  aforementioned witness, after having been first
6  duly sworn by me to testify to the truth, did
7  testify as hereinabove set forth;
8          That said deposition was taken by me
9  in computer shorthand and thereafter
10 transcribed under my supervision, and is a true
11 and correct transcription to the best of my
12 ability and understanding.
13         I further certify that I am not of
14 counsel, nor related to counsel or the parties
15 hereto, and am in no way interested in the
16 result of said cause.
17
18
19
20
21
22
23 _____
24 JOSEPH A. FAIRBANKS, JR., CCR, RPR
25 CERTIFIED COURT REPORTER #75005

33 (Pages 491 to 494)

f511046d-f246-478c-b182-17dab585135a

PX-0687-0033