CELMN-CD-NO-L
SUBJECT:  Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA

15.  Barriere Paving, Inc. of New Orleans, LA commenced work
on the asphalt portion of this contract on 26 December 1989.
The paving consisted of a twenty-two (22) foot wide by four
hundred (400) foot long roadway for the Haynes Boulevard
Access Ramp and ten (10) feet of roadway on the flood and
protected sides of Gate No. 1 along France Road.  All work in
connection with the paving operations for this contract was
done in compliance with the contract plans and specifications
and was completed on 3 January 1990.

16.  Westside Fence Co. of Gretna, LA relocated the existing
fence at Dravo Materials.  Westside Fence also installed the
gate which provides the entrance to the Haynes Blvd. access
ramp.  This work was done in accordance with the contract
plans and specifications and was completed on 28 January 1990.

17.  On 13 January 1990 work commenced on the fertilizing and
seeding of the project by Baton Rouge Turf Co.  The total area
fertilized and seeded was 2.485 acres and was completed on 15
January 1990.

18.  There were 11 modifications made to this contract which
included the following:

    a.  P00001 was dated 25 May 1989.  This modification was
issued to pay the contractor for the extra effort involved in
removing the concrete and asphalt roadways underneath the
parking lot slab between W/L Sta. 9+90 and W/L Sta. 9+49
underneath the Seabrook Floodwall.  This modification
increased the contract by #2,144.00 and 3 calendar days.

    b.  P00002 was dated 27 June 1989.  This modification was
issued to compensate the contractor for his additional costs
associated with demolishing a portion of the existing Lake
Pontchartrain Seawall which was buried and ran underneath this
contract's floodwall alignment.  The seawall was removed as
needed to allow the driving of the steel sheet piles which
form the foundation of the concrete floodwall.  This change
increased the contract cost by #12,600.57 and 8 calendar days.

    c.  P00003 was dated 20 July 1989.  This modification was
issued to increase the width of the skin and fascia plates for
swing gate no. 2.  This change increased the contract total by
#289.58 with no increase in the contract time.

7

NED-049-000008276

McElwee00138

PX-0109-0138

CELMN-CD-NO-L
SUBJECT:  Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA


     d.  P00004 was dated 20 July 1989. This change was
issued to decrease the length of concrete piles used for swing
gate monolith no. 2, revise the concrete pile layout for this
same monolith, and to add one (1) PSA-23 steel sheet pile to
the I-wall at W/L Sta. 8+67.42. This modification increased
the contract total by $473.47 and did not effect the contract
time.

     e.  P00005 was dated 17 August 1989.  This modification
was issued to extend the contract time of the contract by
seven (7) calendar days due to South Central Bell's untimely
relocation of the existing telephone lines in the vicinity of
this project.  There were no costs associated with this
change.

     f.  P00007 was dated 19 September 1989.  This change to
the contract was issued to lower the elevation of the existing
roadway immediately east of gate no. 3.  The lowering of the
roadway elevation was to allow the swing gate to swing freely
from an open to close position and back.  This modification
increased the contract total by $7,441.00 and 7 calendar days.

     g.  P00008 was dated 18 October 1989.  This modification
was issued to install additional pipe and connections to the
relocated waterline, item no. 18.  The addition of these pipe
and connections increased the total contract cost by
$3,265.41, but did not increase the contract time.

     h.  P00010 was dated 26 October 1989.  This change was
issued to allow the contractor to substitute a sandblasted
finished concrete floodwall in lieu of the bushhammered finish
that was called for in the plans and specifications.  This
modification decreased the total contract cost by $757.26 and
did not effect the contract time.

     i.  P00006 was dated 23 August 1989.  P00009 was dated 22
September 1989.  P00011 was dated 27 November 1989.
Modifications P00006, P00009, and P00011 were administrative
changes to the contract and concerned the funding of the
contract.


8

NED-049-000008277

McElwee00139

PX-0109-0139

CELMN-CD-NO-L
SUBJECT: Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA

19. The following companies were either suppliers or
subcontractors to the contractor:

| COMPANY | SERVICE |
| --- | --- |
| Jimco, Inc.<br>New Orleans, LA | Ready-Mix Concrete |
| Standard Materials Prestress<br>Slidell, LA | 12' Prestressed<br>Concrete Piles |
| Bethleham Steel Corporation<br>Pittsburgh, PA | Steel Sheet Piling |
| Dravo Materials<br>New Orleans, LA | Clam Shell |
| Murphy Trucking<br>Chalmette, LA | River Sand |
| Synko-Flex Products, Inc.<br>Houston, TX | Plastic Adhesive<br>Waterstop |
| Confabco<br>New Orleans, LA | Reinforcement Steel |
| Jurisich Machine & Construction<br>Slidell, LA | Swing Gates and<br>Miscellaneous Metals |
| New Orleans Cement Products<br>New Orleans, LA | Concrete Pipe |
| NAPPCO, Inc.<br>Northboro, MA | Ductile Iron Pipe<br>Fittings |
| EBBA Iron, Inc.<br>Eastland, TX | Joint Restraints<br>(Water Pipe) |
| Conmaco, Inc.<br>Belle Chasse, LA | Vibratory and Air<br>Pile Driving |
| J & P Petroleum Products, Inc.<br>Arkansas, Texas, and Europe | Expansion Joint<br>Fillers |

9

NED-049-000008278

McElwee00140

PX-0109-0140

CELMN-CD-NO-L
SUBJECT: Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA

| | |
|---|---|
| Vinylex Corporation<br>Knoxville, TN | 3-Bulb Waterstop |
| Buckhorn Rubber Corporation<br>Hannibal, MO | Rubber Gate Seals |
| Max Katz Bag Co., Inc.<br>Indianapolis, IN | Curing Blankets |
| Tammstech<br>Itasca, IL | Tamms Grout 621 |
| Specialty Coatings<br>Kenner, LA | Sandblasting and<br>Painting Sheet Piles |
| American Colloid Co.<br>Skokie, IL | Instac-Pak 425 |
| LCP Chemicals & Plastics, Inc. | PVC Well Casing<br>Pipe |
| Industrial Erection & Maintenance<br>Bush, LA | Brass Valves<br>(Check), Steel<br>Covers, Pipe Guard<br>Screens and I.D.<br>Tags for Relief<br>Wells |
| Janco Pipe & Manufacturing Co.<br>Houston, TX | 18" Steel Drain<br>Pipe (Coated) |
| Pipeline Seal & Insulators, Inc. | Casing Seals<br>(Boots) |
| Rexnord Chemical Products<br>Minnesota, MN | Sonneborn<br>Sonolastic NP-2<br>Sealant for<br>Railroad Tracks |
| Erico Products<br>Cleveland, OH | Cadwell (Cathodic<br>Protection) |
| M & H Valve Co.<br>Anniston, AL | 18" Gate Valves |

10

NED-049-000008279

McElwee00141

PX-0109-0141

CELMN-CD-NO-L
SUBJECT:  Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA

| | |
|---|---|
| Construction Materials, Inc.<br>Baton Rouge, LA | Safety-Guard<br>Plastic Fencing |
| Westside Fence Co.<br>Gretna, LA | Chain Link<br>Fencing |
| Louisiana Paving Co.<br>Pearl River, LA | Gravel |
| Ditmarsia<br>Mandeville, LA | Heavy Equipment |
| Southern Paving<br>New Orleans, LA | Asphalt Paving |
| Anthon Water Wells<br>Lacombe, LA | Relief Wells |
| Laiche, Inc.<br>Kenner, LA | Sandblasting &<br>Painting<br>(Floodwall) |
| Blackburn Steel | Placing<br>Reinforcement Steel |
| Pala-Interstate<br>Baton Rouge, LA | Water Line<br>Relocation |

20.  The contractor was efficient and professional in the
performance of the original contract work as well as the
additional work required by him through modifications.  He
maintained and excellent quality control organization and
program which enabled him to complete the project
significantly ahead of schedule.

21.  The contractor maintained a safety conscious attitude
during this project with no lost-time accidents.

22.  Recommendation:  In regard to the contract specification
on Safety Fencing, page SC-45, paragraph SC-41, it would be
helpful to all concerned if this phase of the contract were
more explicit and stated exactly what kind of fence is

11

NED-049-000008280

McElwee00142

PX-0109-0142

CELMN-CD-NO-L
SUBJECT:  Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA


required, where the fence should be placed, and what is
required of the contractor to maintain this fencing.

23.  Recommendation:  In regard to the radius of swing gate
no. 3; consideration should be given to any obstructions which
may prohibit swing gates from opening and closing.

24.  Recommendation:  In regard to the contract drawings for
the swing gates.  Drawings should be checked by everyone to
insure that the design is adequate and that the dimensions
shown are correct so that the gates when placed in accordance
with the plans and specifications will operate as installed
and not require major adjustments to the gate, monolith,
hinges, or seals.

25.  Recommendation:  Reference the backfill at the Railroad
Falsework, sheet no. S-18 of the contract drawings.  This
drawing shows and states that the backfilling of this area
shall be accomplished with railroad ballast.  The railroad
companies prefer the sand or other suitable backfill material
be used in backfilling areas where tracks have been removed
and excavation has occurred.  This should be incorporated into
future contracts where this type of work exists.

26.  Recommendation:  It is recommended and preferred by the
local interests that the sandblasting of floodwalls to give an
exposed aggregate finish be used in lieu of bushhammering.
Sandblasting is less expensive and provides a more uniform
finished surface.

27.  Recommendation:  It is recommended that the bottom gate
seals on future floodgates be slotted to allow for adjustments
to be made in the future.

28.  Recommendation:  It is recommended that when using an
adjustable bottom seal and seal plate, as was the case with
gate no. 2, the railroad gate, that an additional 1" X 4"
guide plate be installed to prevent bending in the 1" diameter
rod that adjusts the seal.

12

NED-049-000008281

McElwee00143

PX-0109-0143

CELMN-CD-NO-L
SUBJECT: Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain LA & Vicinity, High Level
Plan, N.O. Lakefront Levee, West of the I.H.N.C., Seabrook
Floodwall, New Orleans, LA

2B. Final Payment on Bid Items.

| ITEM NUMBER | DESCRIPTION | QUANT. & UNIT | UNIT PRICE | ESTIMATED AMOUNT | QUANTITY | EARNINGS TO DATE |
|---|---|---|---|---|---|---|
| 1 | Mobilization & Demobilization | LUMP SUM | L. S. | $40,000.00 | 100.0% | $40,000.00 |
| 2 | Clearing and Grubbing | LUMP SUM | L. S. | $20,000.00 | 100.0% | $20,000.00 |
| 3 | Fertilizing and Seeding | LUMP SUM | L. S. | $7,000.00 | 100.0% | $7,000.00 |
| 4 | Embankment, Semicompacted Fill | 7500 CY | $10.00 CY | $75,000.00 | 5047 | $50,470.00 |
| 5 | Embankment, Compacted Fill | LUMP SUM | L. S. | $90,000.00 | 100.0% | $90,000.00 |
| 6 | Structural Excavation and Backfill | LUMP SUM | L. S. | $15,000.00 | 100.0% | $15,000.00 |
| 7 P0004 | Piling, Concrete Precast, Prestressed, 12"X12" | | | | | |
| | a. In place | 1805 LF | $26.00 LF | $46,930.00 | 1816.5 | $47,229.00 |
| | b. Cutoffs | 0 LF | $13.00 LF | $0.00 | 93.0 | $1,209.00 |
| 8 | Piling, Steel Sheet, PZ-22 | | | | | |
| | a. Stockpiled on site | 700 SF | $8.64 SF | $6,045.43 | 638 | $5,509.98 |
| | b. In place | 700 SF | $13.36 SF | $9,354.57 | 638 | $8,526.02 |
| 9 P0004 | Piling, Steel Sheet, PSA-23 | | | | | |
| | a. Stockpiled on site | 279.26 SF | $13.4461SF | $3,754.96 | 279.26 | $3,754.96 |
| | b. In place | 279.26 SF | $8.5539SF | $2,388.76 | 279.26 | $2,388.76 |
| 10 | Piling, Steel Sheet, PZ-27 | | | | | |
| | a. Stockpiled on site | 18350 SF | $9.41 SF | $172,617.95 | 18414.56 | $173,220.25 |
| | b. In place | 18350 SF | $6.09 SF | $111,812.05 | 18414.56 | $112,205.43 |
| 11 | Structural Steel Gates Miscellaneous Metals, and Specialty Items | LUMP SUM | L. S. | $115,000.00 | 95.00% | $109,250.00 |
| 12 P0010 | Reinforced Concrete Floodwalls | LUMP SUM | L. S. | $187,037.74 | 100.0% | $187,037.74 |
| 13 | Relief Wells | | | | | |
| | a. Materials Stockpiled | 380 LF | $26.26 LF | $9,980.65 | 405 | $10,637.27 |
| | b. Wells Installed | 380 LF | $158.74 LF | $60,319.35 | 405 | $64,287.73 |
| 14 | Relief Well, Pumping Test | 9 EA | $1500.00 LF | $13,500.00 | 9 | $13,500.00 |
| 15 P0007 | Roadwork and Paving | LUMP SUM | L. S. | $101,171.00 | 100.0% | $101,171.00 |
| 16 | Railroad Falsework | LUMP SUM | L. S. | $80,000.00 | 100.0% | $80,000.00 |
| 17 | Chain Link Fence | LUMP SUM | L. S. | $6,500.00 | 100.0% | $6,500.00 |
| 18 P0008 | Relocation Of 16-Inch Waterline | LUMP SUM | L. S. | $55,265.41 | 100.0% | $55,265.41 |
| 19 | Relocation Of 12-Inch Waterline | LUMP SUM | L. S. | $37,000.00 | 100.0% | $37,000.00 |
| 20 | Relocation of 2-Inch Water Service | LUMP SUM | L. S. | $5,000.00 | 100.0% | $5,000.00 |
| 21 | Floodwall Utility Crossings | LUMP SUM | L. S. | $16,000.00 | 100.0% | $16,000.00 |
| 22 | 15-Inch Storm Drainage System | LUMP SUM | L. S. | $11,000.00 | 100.0% | $11,000.00 |
| 23 | 18-Inch Steel Drain Lines | LUMP SUM | L. S. | $38,000.00 | 100.0% | $38,000.00 |
| 24 | 12-Inch RCP Culvert | LUMP SUM | L. S. | $3,000.00 | 100.0% | $3,000.00 |
| 25 P0001 | Removal of Concrete and Asphalt Debris | LUMP SUM | L. S. | $2,144.00 | 100.0% | $2,144.00 |
| 26 P0004 | Concrete Pile Adjustment (CIN 01) | LUMP SUM | L. S. | $479.75 | 100.0% | $479.75 |
| 27 P0002 | Demolition of Seawall | LUMP SUM | L. S. | $12,600.57 | 100.0% | $12,600.57 |
| 28 P0003 | Increase Size of Gate No. 2 | LUMP SUM | L. S. | $289.58 | 100.0% | $289.58 |
| 29 P0007 | Installation of Tension Hook Bars | LUMP SUM | L. S. | $3,270.00 | 100.0% | $3,270.00 |
| | | | | $1,357,456.77 | | $1,332,946.45 |

Encl

CF:
Const Rep (Carr)
Ofc Engr (Berry) w/as-built
CELMN-CD-Q

HENRY CARR
Construction Representative
New Orleans Area Office

*Henry Carr*

13

NED-049-000008282

McElwee00144

PX-0109-0144

CELMN-CD-NO-L

26 Mar 90

MEMORANDUM THRU Area Engineer, New Orleans

FOR C/Const Div, ATTN: Proj Mgmt Sec

SUBJECT: Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High Level
Plan, N.O. Lakefront Levee, West of the I.H.N.C., Seabrook
Floodwall, New Orleans, LA

1.   The subject contract dated 8 Dec 88 was awarded to River Road
Construction, Inc., P.O. Box 1406, Mandeville, LA   70470.   The
notice to proceed was issued on 30 Jan 89, with construction to
commence no later than 13 Feb 89.  The original completion date
was 25 Feb 90, with the original estimated amount of the contract
being $1,332,000.00.

2.   Listed below are the bid items, quantities and unit prices
for the contract:

| Item No. | Description | Estimated Quantity | Unit | Unit Price | Estimated Amount |
|---|---|---|---|---|---|
| 1. | MOBILIZATION AND DEMOBILIZATION | Lump Sum | LS | 40,000.00 | 40,000.00 |
| 2. | CLEARING AND GRUBBING | Lump Sum | LS | 20,000.00 | 20,000.00 |
| 3. | FERTILIZING AND SEEDING | Lump Sum | LS | 7,000.00 | 7,000.00 |
| 4. | EMBANKMENT, SEMI-COMPACTED FILL | 7,500 | CY | 10.00 | 75,000.00 |
| 5. | EMBANKMENT, COMPACTED FILL | Lump Sum | LS | 90,000.00 | 90,000.00 |
| 6. | STRUCTURAL EXCAVATION AND BACKFILL | Lump Sum | LS | 15,000.00 | 15,000.00 |
| 7. | PILING, CONCRETE PRECAST, PRESTRESSED (12" x 12") | 1,830 | LF | 26.00 | 47,580.00 |
| 8. | PILING, STEEL SHEET, TYPE PZ-22 | 700 | SF | 22.00 | 15,400.00 |

c-2257

NED-049-000008269

EXHIBIT
10
PENGAD 800-631-6989

McElwee00145

PX-0109-0145

RECEIVED AT.

APR 1 6 1990

ADMN UNIT
CONST. DIV.

NED-049-000008270

McElwee00146

PX-0109-0146

CELMN-CD-NO-L
SUBJECT:  Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High Level
Plan, N.O. Lakefront Levee, West of the I.H.N.C., Seabrook
Floodwall, New Orleans, LA

| Item No. | Description | Estimated Quantity | Unit | Unit Price | Estimated Amount |
|---|---|---|---|---|---|
| 9. | PILING, STEEL SHEET, TYPE PSA-23 | 250 | SF | 22.00 | 5,550.00 |
| 10. | PILING, STEEL SHEET, TYPE PZ-27 | 18,350 | SF | 15.50 | 284,425.00 |
| 11. | STRUCTURAL STEEL GATES, MISCELLANEOUS METALS, AND SPECIALTY ITEMS | Lump Sum | LS | 115,000.00 | 115,000.00 |
| 12. | REINFORCED CONCRETE FLOODWALLS | Lump Sum | LS | 187,795.00 | 187,795.00 |
| 13. | RELIEF WELLS | 380 | LF | 185.00 | 70,300.00 |
| 14. | RELIEF WELLS, | 9 | EA | 1,500.00 | 13,500.00 |
| 15. | ROADWORK AND PAVING | Lump Sum | LS | 97,000.00 | 97,000.00 |
| 16. | RAILROAD FALSEWORK | Lump Sum | LS | 80,000.00 | 80,000.00 |
| 17. | CHAIN LINK FENCE | Lump Sum | LS | 6,500.00 | 6,500.00 |
| 18. | RELOCATION OF 16-INCH WATERLINE | Lump Sum | LS | 52,000.00 | 52,000.00 |
| 19. | RELOCATION OF 12-INCH WATERLINE | Lump Sum | LS | 37,000.00 | 37,000.00 |
| 20. | RELOCATION OF 2-INCH WATER SERVICE | Lump Sum | LS | 5,000.00 | 5,000.00 |
| 21. | FLOODWALL UTILITY CROSSINGS | Lump Sum | LS | 16,000.00 | 16,000.00 |
| 22. | 15-INCH STORM DRAINAGE SYSTEM | Lump Sum | LS | 11,000.00 | 11,000.00 |

2

NED-049-000008271

McElwee00147

PX-0109-0147

CELMN-CD-NO-L
SUBJECT:  Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High Level
Plan, N.O. Lakefront Levee, West of the I.H.N.C., Seabrook
Floodwall, New Orleans, LA

| Item No. | Description | Estimated Quantity | Unit | Unit Price | Estimated Amount |
|---|---|---|---|---|---|
| 23. | 18-INCH STEEL DRAIN LINES | Lump Sum | LS | 38,000.00 | 38,000.00 |
| 24. | 12-INCH RCP CULVERT | Lump Sum | LS | 3,000.00 | 3,000.00 |
| | | | TOTAL | | $1,332,000.00 |

3.  The preconstruction conference was held at the NOAO on 19 Jan
89 with the following in attendance:

| | | |
|---|---|---|
| Chester Ashley | Area Engr | NOAO     COE |
| Ward Purdum | Supv Civ Engr | NOAO     COE |
| Paul Tilly | Proj Engr | NOAO     COE |
| John Baudoin | Proj Insp | Mel, Inc. |
| Tom Murphy | Proj Engr | Const Div, COE |
| Charles Laborde | Struc Engr | Engr Div, COE |
| Sheila Enclade | Contr Spec | Contr Div, COE |
| Mike Curole | Safety Engr | Safety Ofc, COE |
| Gerard Whittle | Vice President | River Road Const. |
| Larry Fannaly | Proj Supt | River Road Const. |
| Hun Nguyen | EIT | New Orleans S&WB |
| Gerald Preau | Civil Engr | New Orleans S&WB |
| Brenton Morse | C/Plng | New Orleans Dock Board |
| Charles Anthon | Super | M.C. Anthon Waterwells |
| Pete O'Neil | Oper Mgr | Dravo Basic Materials |
| Sheila Oser | Engr | South Central Bell |
| Long Nguen | EOS Engr | NOPSI |
| Frank Vicidomina | Engr | Orleans Levee Board |
| James Randall | Captain | N.O. Harbor Police |
| T. R. Riley | Sig Proj Engr | Southern Railroad |
| H. B. Anderson | Div Engr | Southern Railroad |
| J. A. McGill | Bridge Sup | Southern Railroad |
| T. L. Shindelar | Sig & Elec Sup | Southern Railroad |
| A. D. Bryson | Trainmaster | Southern Railroad |
| F. D. Fowler | Term Sup | Southern Railroad |
| Robert Silk | Plan Engr | Norfolk-Southern RR |

3

NED-049-000008272

McElwee00148

PX-0109-0148

CELMN-CD-NO-L
SUBJECT: Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA

4. The Notice to Proceed was signed by the Contractor on 31
Jan 89 and construction began immediately. The contractor
mobilized a Case 580 backhoe with attached hoe-ram and began
demolition of concrete to make way for the excavation of the
inspection trench. Nothing of historical value was
discovered; however, two unknown underground obstructions were
encountered. Reference modifications P00001 and P00002 which
contain information on these obstructions.

5. On 14 Mar 89, the driving of 19,331 sq. ft. of steel sheet
piling commenced. All of the piling was domestic and forged
at Bethleham Steel. Three types of sheet piling were utilized
on this project, these included 18,414 sq. ft. of PZ-27 sheet
piles, 638 sq. ft. of PZ-22 sheet piles, and 279 sq. ft. of
PSA-23 sheet piles. The sheet piling in the area of the
obstructions and utilities were left standing until proper
modifications to the utilities and obstructions were
performed, then the sheet piles were driven to grade. All
sheet piles were driven to grade, therefore, there were no
deducts; the contractor demobed his equipment for this
operation on 8 Aug 89.

6. On 18 Apr 89, the first structural site cast concrete was
placed for this contract. The contractor used the Burke Crane
Set Forming System for the construction of the I-wall
monoliths. Quality Assurance was maintained daily thru
concrete test cylinders tested by the soils laboratory at the
New Orleans District. All operations for this item of work
was completed by 27 Oct 89.

7. On 14 Mar 89, modifications to the existing utilities and
the construction of a drainage system, for the floodside of
the floodwall in the area of the Seabrook Bridge, began. All
modifications to existing utilities were completed by 7 Dec
89.

8. On 18 May 89, The driving of the first 12" X 12" precast
concrete piles began. The piles were cast by Standard
Materials Prestressed in Slidell, Louisiana. On 6 Mar 89, a
revision to the pile schedule for Gate No. 2 decreased the
amount by 25' from 980 LF to 955 LF thus the total amount

4

NED-049-000008273

McElwee00149

PX-0109-0149

CELMN-CD-NO-L
SUBJECT:  Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA

required was 1909.5 LF.  The actual amount in place was 1816.5
LF with 93.0 LF being cut-off which all occurred at Gate No.
3.  Records of this data are located in the contract file.

9.  On 14 Aug 89, work began on the embankment fill item of
this contract with material being loaded by the contractor at
his approved alternate borrow pit, located off of Chef Menteur
Highway, into owner-operated trucks where the material was
then hauled to the project site on a per load basis.  The
material was spread and semi-compacted by a 1150 Case dozer.
All fully compacted fill was compacted by a Galion Pad Foot
Vibratory compactor.  All field compaction tests were
performed by Professional Service Industries, Inc., New
Orleans, and all moisture control testing was accomplished by
contractor Quality Control personnel with the records of these
tests in the contract file and the Government's Quality
Assurance Reports.  In the Haynes Blvd. access ramp,
approximately 12,100 cubic yards of fully compacted fill was
placed.  Approximately 5,050 cubic yards of semicompacted fill
was placed into the levee section for this project.  Quality
Assurance was accomplished by Mr. M. J. Broussard,
Construction Inspector, NOAO, for assuring the contractor
complied with borrow area limitations and with all fully
compacted and semicompacted fill requirements.

10.  Three swing gates were incorporated into this project.
Jurisich Industrial Machine and Contractors of Slidell, LA
fabricated the gates and specialty items, sandblasted and
painted the gates.  Five coats of vinyl primer (two white and
three gray) and two coats of vinyl copolymer (blue) were
applied to the gates as called for in the specifications.
Installation of the gates commenced on 13 November 1989 with
the final installation being completed on 7 December 1989.
Quality Control was maintained by the daily inspection and
reporting by the prime contractor, River Road Construction,
Inc.  Quality Assurance was accomplished during the
fabrication of the gates by Mr. John Baudoin, A/E inspector,
and Mr. Melvin McElwee, Construction Inspector - NOAO, who
visited the Jurisich plant on a regular basis.

11.  On 23 June 1989, Laiche Paint and Sandblasting Co., Inc.,
Kenner, LA commenced sandblasting the flood side and the
protected side of the floodwall.  The sandblasting was done to
create an exposed aggregate finish to the floodwall.  The

5

NED-049-000008274

McElwee00150

CELMN-CD-NO-L
SUBJECT:  Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA

application of one coat of cementitious paint and two coats of
acrylic emulsion paint were applied to the borders of the
floodwall (everywhere that was not sandblasted).  The
cementitious paint was Thoroseal – Louisiana Gray and the
acrylic emulsion paint was Glidden Porpoise (No. 20802).

12.  Merlin Anthon, Waterwell Contractors, successfully
drilled and tested nine (9) 'Relief Wells' in accordance with
the contract plans, specifications and approved submittals.
All drill and well logging reports were forwarded to the New
Orleans Area Office; from there these logs were placed in the
contract file while a copies of these logs were sent to
Engineering Division in accordance with the specifications.

13.  On 5 October 1989, the contractor began his incidental
paving operation by replacing 10 sq. yds. of pavement in the
area underneath the Seabrook Bridge.  This pavement was
removed to allow for the driving of the sheet piles in
connection with the reinforced 'I' wall that runs underneath
the Seabrook Bridge.  This area along with the area that runs
along the Lake Pontchartrain side of the Seabrook Bridge, W/L
Sta. 10+62 to W/L Sta. 12+23 was paved to make this strip
maintenance free.  The flood and protected sides of Gate No. 3
on Boat Launch Road were repaved due to the demolition of the
roadway to allow for the construction of the base slab and
monolith of the gate.  An additional 20' of roadway had to be
removed on the flood side of Gate No. 3 to allow the gate to
swing freely to its fully open and close positions.  This was
handled under modification no. P00007.

14.  On 26 November 1989, Pala-Interstate of Baton Rouge, LA
commenced the relocation work of the three (3) water lines,
one (1) manhole and one (1) fire hydrant.  Pala-Interstate
also installed a valve manhole at the intersection of Haynes
Boulevard and France Road.  The three (3) relocated water
lines were a 16" diameter along Haynes Boulevard Access Ramp,
a 12" diameter along France Road and a 2" diameter water
service for Dravo Materials.  The fire hydrant was installed
along France Road.  All work was done in accordance with the
Sewerage and Water Board inspection, testing, and chlorination
specifications.  This item of work was completed on 13
December 1989.

6

NED-049-000008275

McElwee00151

PX-0109-0151

CELMN-CD-NO-L
SUBJECT: Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA

15.  Barriere Paving, Inc. of New Orleans, LA commenced work
on the asphalt portion of this contract on 26 December 1989.
The paving consisted of a twenty-two (22) foot wide by four
hundred (400) foot long roadway for the Haynes Boulevard
Access Ramp and ten (10) feet of roadway on the flood and
protected sides of Gate No. 1 along France Road.  All work in
connection with the paving operations for this contract was
done in compliance with the contract plans and specifications
and was completed on 3 January 1990.

16.  Westside Fence Co. of Gretna, LA relocated the existing
fence at Dravo Materials.  Westside Fence also installed the
gate which provides the entrance to the Haynes Blvd. access
ramp.  This work was done in accordance with the contract
plans and specifications and was completed on 28 January 1990.

17.  On 13 January 1990 work commenced on the fertilizing and
seeding of the project by Baton Rouge Turf Co.  The total area
fertilized and seeded was 2.485 acres and was completed on 15
January 1990.

18.  There were 11 modifications made to this contract which
included the following:

     a.  P00001 was dated 25 May 1989.  This modification was
issued to pay the contractor for the extra effort involved in
removing the concrete and asphalt roadways underneath the
parking lot slab between W/L Sta. 9+90 and W/L Sta. 9+49
underneath the Seabrook Floodwall.  This modification
increased the contract by $2,144.00 and 3 calendar days.

     b.  P00002 was dated 27 June 1989.  This modification was
issued to compensate the contractor for his additional costs
associated with demolishing a portion of the existing Lake
Pontchartrain Seawall which was buried and ran underneath this
contract's floodwall alignment.  The seawall was removed as
needed to allow the driving of the steel sheet piles which
form the foundation of the concrete floodwall.  This change
increased the contract cost by $12,600.57 and 8 calendar days.

     c.  P00003 was dated 20 July 1989.  This modification was
issued to increase the width of the skin and fascia plates for
swing gate no. 2.  This change increased the contract total by
$289.58 with no increase in the contract time.

7

NED-049-000008276

McElwee00152

PX-0109-0152

CELMN-CD-NO-L
SUBJECT: Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA


    d.  P00004 was dated 20 July 1989.  This change was
issued to decrease the length of concrete piles used for swing
gate monolith no. 2, revise the concrete pile layout for this
same monolith, and to add one (1) PSA-23 steel sheet pile to
the I-wall at W/L Sta. 8+67.42.  This modification increased
the contract total by #473.47 and did not effect the contract
time.

    e.  P00005 was dated 17 August 1989.  This modification
was issued to extend the contract time of the contract by
seven (7) calendar days due to South Central Bell's untimely
relocation of the existing telephone lines in the vicinity of
this project.  There were no costs associated with this
change.

    f.  P00007 was dated 19 September 1989.  This change to
the contract was issued to lower the elevation of the existing
roadway immediately east of gate no. 3.  The lowering of the
roadway elevation was to allow the swing gate to swing freely
from an open to close position and back.  This modification
increased the contract total by #7,441.00 and 7 calendar days.

    g.  P00008 was dated 18 October 1989.  This modification
was issued to install additional pipe and connections to the
relocated waterline, item no. 18.  The addition of these pipe
and connections increased the total contract cost by
$3,265.41, but did not increase the contract time.

    h.  P00010 was dated 26 October 1989.  This change was
issued to allow the contractor to substitute a sandblasted
finished concrete floodwall in lieu of the bushhammered finish
that was called for in the plans and specifications.  This
modification decreased the total contract cost by #757.26 and
did not effect the contract time.

    i.  P00006 was dated 23 August 1989.  P00009 was dated 22
September 1989.  P00011 was dated 27 November 1989.
Modifications P00006, P00009, and P00011 were administrative
changes to the contract and concerned the funding of the
contract.


                                8


NED-049-000008277


McElwee00153


PX-0109-0153

CELMN-CD-NO-L
SUBJECT: Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA

19.   The following companies were either suppliers or
subcontractors to the contractor:

| COMPANY | SERVICE |
|---|---|
| Jimco, Inc.<br>New Orleans, LA | Ready-Mix Concrete |
| Standard Materials Prestress<br>Slidell, LA | 12' Prestressed<br>Concrete Piles |
| Bethleham Steel Corporation<br>Pittsburgh, PA | Steel Sheet Piling |
| Dravo Materials<br>New Orleans, LA | Clam Shell |
| Murphy Trucking<br>Chalmette, LA | River Sand |
| Synko-Flex Products, Inc.<br>Houston, TX | Plastic Adhesive<br>Waterstop |
| Confabco<br>New Orleans, LA | Reinforcement Steel |
| Jurisich Machine & Construction<br>Slidell, LA | Swing Gates and<br>Miscellaneous Metals |
| New Orleans Cement Products<br>New Orleans, LA | Concrete Pipe |
| NAPPCO, Inc.<br>Northboro, MA | Ductile Iron Pipe<br>Fittings |
| EBBA Iron, Inc.<br>Eastland, TX | Joint Restraints<br>(Water Pipe) |
| Conmaco, Inc.<br>Belle Chasse, LA | Vibratory and Air<br>Pile Driving |
| J & P Petroleum Products, Inc.<br>Arkansas, Texas, and Europe | Expansion Joint<br>Fillers |

9

NED-049-000008278

McElwee00154

PX-0109-0154

CELMN-CD-NO-L
SUBJECT:  Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA

| | |
|---|---|
| Vinylex Corporation<br>Knoxville, TN | 3-Bulb Waterstop |
| Buckhorn Rubber Corporation<br>Hannibal, MO | Rubber Gate Seals |
| Max Katz Bag Co., Inc.<br>Indianapolis, IN | Curing Blankets |
| Tammstech<br>Itasca, IL | Tamms Grout 621 |
| Specialty Coatings<br>Kenner, LA | Sandblasting and<br>Painting Sheet Piles |
| American Colloid Co.<br>Skokie, IL | Instac-Pak 425 |
| LCP Chemicals & Plastics, Inc. | PVC Well Casing<br>Pipe |
| Industrial Erection & Maintenance<br>Bush, LA | Brass Valves<br>(Check), Steel<br>Covers, Pipe Guard<br>Screens and I.D.<br>Tags for Relief<br>Wells |
| Janco Pipe & Manufacturing Co.<br>Houston, TX | 18" Steel Drain<br>Pipe (Coated) |
| Pipeline Seal & Insulators, Inc. | Casing Seals<br>(Boots) |
| Rexnord Chemical Products<br>Minnesota, MN | Sonneborn<br>Sonolastic NP-2<br>Sealant for<br>Railroad Tracks |
| Erico Products<br>Cleveland, OH | Cadwell (Cathodic<br>Protection) |
| M & H Valve Co.<br>Anniston, AL | 18" Gate Valves |

10

NED-049-000008279

McElwee00155

PX-0109-0155

CELMN-CD-NO-L
SUBJECT: Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA

| | |
|---|---|
| Construction Materials, Inc.<br>Baton Rouge, LA | Safety-Guard<br>Plastic Fencing |
| Westside Fence Co.<br>Gretna, LA | Chain Link<br>Fencing |
| Louisiana Paving Co.<br>Pearl River, LA | Gravel |
| Ditmarsia<br>Mandeville, LA | Heavy Equipment |
| Southern Paving<br>New Orleans, LA | Asphalt Paving |
| Anthon Water Wells<br>Lacombe, LA | Relief Wells |
| Laiche, Inc.<br>Kenner, LA | Sandblasting &<br>Painting<br>(Floodwall) |
| Blackburn Steel | Placing<br>Reinforcement Steel |
| Pala-Interstate<br>Baton Rouge, LA | Water Line<br>Relocation |

20. The contractor was efficient and professional in the
performance of the original contract work as well as the
additional work required by him through modifications.  He
maintained and excellent quality control organization and
program which enabled him to complete the project
significantly ahead of schedule.

21. The contractor maintained a safety conscious attitude
during this project with no lost-time accidents.

22. Recommendation:  In regard to the contract specification
on Safety Fencing, page SC-45, paragraph SC-41, it would be
helpful to all concerned if this phase of the contract were
more explicit and stated exactly what kind of fence is

11

NED-049-000008280

McElwee00156

PX-0109-0156

CELMN-CD-NO-L
SUBJECT:  Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High
Level Plan, N.O. Lakefront Levee West of the I.H.N.C.,
Seabrook Floodwall, Orleans Parish, LA

required, where the fence should be placed, and what is
required of the contractor to maintain this fencing.

23.  Recommendation:  In regard to the radius of swing gate
no. 3; consideration should be given to any obstructions which
may prohibit swing gates from opening and closing.

24.  Recommendation:  In regard to the contract drawings for
the swing gates.  Drawings should be checked by everyone to
insure that the design is adequate and that the dimensions
shown are correct so that the gates when placed in accordance
with the plans and specifications will operate as installed
and not require major adjustments to the gate, monolith,
hinges, or seals.

25.  Recommendation:  Reference the backfill at the Railroad
Falsework, sheet no. S-18 of the contract drawings.  This
drawing shows and states that the backfilling of this area
shall be accomplished with railroad ballast.  The railroad
companies prefer the sand or other suitable backfill material
be used in backfilling areas where tracks have been removed
and excavation has occurred.  This should be incorporated into
future contracts where this type of work exists.

26.  Recommendation:  It is recommended and preferred by the
local interests that the sandblasting of floodwalls to give an
exposed aggregate finish be used in lieu of bushhammering.
Sandblasting is less expensive and provides a more uniform
finished surface.

27.  Recommendation:  It is recommended that the bottom gate
seals on future floodgates be slotted to allow for adjustments
to be made in the future.

28.  Recommendation:  It is recommended that when using an
adjustable bottom seal and seal plate, as was the case with
gate no. 2, the railroad gate, that an additional 1" X 4"
guide plate be installed to prevent bending in the 1" diameter
rod that adjusts the seal.

12

NED-049-000008281

McElwee00157

PX-0109-0157

CELMN-CD-NO-L
.SUBJECT:   Narrative Completion Report for Contract No.
DACW29-89-C-0025, Lake Pontchartrain, LA & Vicinity, High Level
Plan, N.O. Lakefront Levee, West of the I.H.N.C., Seabrook
Floodwall, New Orleans, LA

28. Final Payment on Bid Items.

| ITEM NUMBER | DESCRIPTION | QUANT. & UNIT | UNIT PRICE | ESTIMATED AMOUNT | QUANTITY | EARNINGS TO DATE |
|---|---|---|---|---|---|---|
| 1 | Mobilization & Demobilization | LUMP SUM | L. S. | $40,000.00 | 100.0% | $40,000.00 |
| 2 | Clearing and Grubbing | LUMP SUM | L. S. | $20,000.00 | 100.0% | $20,000.00 |
| 3 | Fertilizing and Seeding | LUMP SUM | L. S. | $7,000.00 | 100.0% | $7,000.00 |
| 4 | Embankment, Semicompacted Fill | 7500 CY | $10.00 CY | $75,000.00 | 5047 | $50,470.00 |
| 5 | Embankment, Compacted Fill | LUMP SUM | L. S. | $90,000.00 | 100.0% | $90,000.00 |
| 6 | Structural Excavation and Backfill | LUMP SUM | L. S. | $15,000.00 | 100.0% | $15,000.00 |
| 7 P0004 | Piling, Concrete Precast, Prestressed, 12"x12" | | | | | |
| | a.  In place | 1805 LF | $26.00 LF | $46,930.00 | 1816.5 | $47,229.00 |
| | b.  Cutoffs | 0 LF | $13.00 LF | $0.00 | 93.0 | $1,209.00 |
| 8 | Piling, Steel Sheet, PZ-22 | | | | | |
| | a.  Stockpiled on site | 700 SF | $8.64 SF | $6,045.43 | 638 | $5,509.98 |
| | b.  In place | 700 SF | $13.36 SF | $9,354.57 | 638 | $8,526.02 |
| 9 P0004 | Piling, Steel Sheet, PSA-23 | | | | | |
| | a.  Stockpiled on site | 279.26 SF | $13.4461SF | $3,754.96 | 279.26 | $3,754.96 |
| | b.  In place | 279.26 SF | $8.5539SF | $2,388.76 | 279.26 | $2,388.76 |
| 10 | Piling, Steel Sheet, PZ-27 | | | | | |
| | a.  Stockpiled on site | 18350 SF | $9.41 SF | $172,612.95 | 18414.56 | $173,220.25 |
| | b.  In place | 18350 SF | $6.09 SF | $111,812.05 | 18414.56 | $112,205.43 |
| 11 | Structural Steel Gates Miscellaneous Metals, and Specialty Items | LUMP SUM | L. S. | $115,000.00 | 95.00% | $109,250.00 |
| 12 P0010 | Reinforced Concrete Floodwalls | LUMP SUM | L. S. | $187,037.74 | 100.0% | $187,037.74 |
| 13 | Relief Wells | | | | | |
| | a.  Materials Stockpiled | 380 LF | $26.26 LF | $9,980.65 | 405 | $10,637.27 |
| | b.  Wells Installed | 380 LF | $158.74 LF | $60,319.35 | 405 | $64,287.73 |
| 14 | Relief Well, Pumping Test | 9 EA | $1500.00 LF | $13,500.00 | 9 | $13,500.00 |
| 15 P0007 | Roadwork and Paving | LUMP SUM | L. S. | $101,171.00 | 100.0% | $101,171.00 |
| 16 | Railroad Falsework | LUMP SUM | L. S. | $80,000.00 | 100.0% | $80,000.00 |
| 17 | Chain Link Fence | LUMP SUM | L. S. | $6,500.00 | 100.0% | $6,500.00 |
| 18 P0008 | Relocation Of 16-Inch Waterline | LUMP SUM | L. S. | $55,265.41 | 100.0% | $55,265.41 |
| 19 | Relocation Of 12-Inch Waterline | LUMP SUM | L. S. | $37,000.00 | 100.0% | $37,000.00 |
| 20 | Relocation of 2-Inch Water Service | LUMP SUM | L. S. | $5,000.00 | 100.0% | $5,000.00 |
| 21 | Floodwall Utility Crossings | LUMP SUM | L. S. | $16,000.00 | 100.0% | $16,000.00 |
| 22 | 15-Inch Storm Drainage System | LUMP SUM | L. S. | $11,000.00 | 100.0% | $11,000.00 |
| 23 | 18-Inch Steel Drain Lines | LUMP SUM | L. S. | $38,000.00 | 100.0% | $38,000.00 |
| 24 | 12-Inch RCP Culvert | LUMP SUM | L. S. | $3,000.00 | 100.0% | $3,000.00 |
| 25 P0001 | Removal of Concrete and Asphalt Debris | LUMP SUM | L. S. | $2,144.00 | 100.0% | $2,144.00 |
| 26 P0004 | Concrete Pile Adjustment (CIN 01) | LUMP SUM | L. S. | $479.75 | 100.0% | $479.75 |
| 27 P0002 | Demolition of Seawall | LUMP SUM | L. S. | $12,600.57 | 100.0% | $12,600.57 |
| 28 P0003 | Increase Size of Gate No. 2 | LUMP SUM | L. S. | $289.58 | 100.0% | $289.58 |
| 29 P0007 | Installation of Tension Hook Bars | LUMP SUM | L. S. | $3,270.00 | 100.0% | $3,270.00 |

$1,357,456.77            $1,332,946.45

Encl

CF:
Const Rep (Carr)
Ofc Engr (Berry) w/as-built
CELMN-CD-Q

HENRY CARR
Construction Representative
New Orleans Area Office

Henry Carr

13

NED-049-000008282

McElwee00158

PX-0109-0158

BEFORE THE ARMED SERVICES BOARD OF CONTRACT APPEALS

FALLS CHURCH, VIRGINIA

Appeal of                    )
Great American Insurance Company  )
                          )
                          )    ASBCA NO. 54337
Under Contract No. DACW 29-01-C-0035  )

## COMPLAINT

      The complaint of Great American Insurance Company (hereinafter, "Great American") respectfully represents that the termination for default issued to McElwee Brothers, Inc. & Tri-State Design Co., Inc. (A Joint Venture) (hereinafter, "Joint Venture"), as a construction contractor on a government project, on June 24, 2003 should properly be converted to a termination for convenience for the reasons and under the facts more specifically set forth as follows:

### PROCEDURAL BACKGROUND IN THE BOARD

1.

      This is an appeal of a Contracting Officer's final decision, issued on June 24, 2003, to terminate for default a contractor's right to proceed with any further work for the construction of the Southeast Louisiana Project, Dwyer Road Drainage Pumping Station.

EXHIBIT

11

2.

A Notice of Docketing in this matter was issued on September 22, 2003.

3.

Pursuant to Rule 30 and by Order dated October 23, 2003, the Board suspended these proceedings until February 2, 2004.

4.

On motion of Great American that it be substituted for the contractor, and after reviewing the memoranda submitted by the parties, the Board issued an Order dated June 30, 2004, allowing Great American to be substituted in this matter for the defaulted contractor.

## BACKGROUND

5.

McElwee Brothers, Inc. (hereinafter, "MBI") is a contractor in the business of performing construction work.

6.

Tri-State Design Construction Company (hereinafter, "TSD") is a contractor in the business of performing construction work.

7.

On October 15, 1999, the United States Department of the Army, New Orleans District Corps of Engineers (hereinafter, the "Corps") issued Construction Solicitation and Specifications for a project referred to as "Competitive 8(a), Southeast Louisiana Project, Dwyer Road Drainage Pumping Station Improvements, Discharge Tubes and Canal Orleans Parish, Louisiana ED-98-072," Solicitation No. DACW29-00-B-005 (hereinafter, "SELA Dwyer Road Project" or

2

"Project"). See TAB C-6.[1]  The Project required the successful bidder to provide performance and payment bonds pursuant to 40 U.S.C. § 3131, *et seq.* (the Miller Act).

8.

To prepare the design for the Project, Design Engineering, Inc. (hereinafter, "DEI"), the Corps' engineer for the Project, hired Eustis Engineering Company, Inc. (hereinafter, "Eustis") to perform certain geotechnical investigations of the Project site.   Eustis prepared a report for DEI dated December 18, 1997 (hereinafter, "1997 Eustis Report").   The report noted that it should not be distributed.  See TAB C-5.

9.

The Contract contained the following standard Federal Acquisition Regulations clauses of relevance to certain aspects of this appeal: 52.233-1 DISPUTES (DEC 1998); 52.236-2 DIFFERING SITE CONDITIONS (APR 1984); 52.243-4 CHANGES (AUG 1987); TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (SHORT FORM) (APR 1984); TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED PRICE) (SEPT 1996) - ALTERNATE I (SEP 1996);  and, 52.249-10 DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984).

10.

Section 00100 of the specifications for the Project incorporated FAR 52.219-6, "NOTICE OF TOTAL SMALL BUSINESS SET-ASIDE (July 1996)," which states, in part as follows:

---

[1]   All references to "TAB," shall refer to documents contained in the Rule 4 file submitted by the Corps or as supplemented by Appellant. TAB "A," "B," "C-1" through "C-190k" and "D" and "E" have been submitted by the Corps. TAB CA-1 through CA-127 have been submitted by Appellant pursuant to Board Rule 4(b).

3

PX-0109-0161

(a) Definition

"Small business concern," as used in this clause, means a concern.
. . that is independently owned and operated, not dominant in its
field of operation in which it is bidding on Government contracts,
and qualified as a small business under the size standards in this
solicitation.

(b) General (1) Offers are solicited only from small business
concerns. Offers received from concerns that are not small business
concerns shall be considered non-responsive and will be rejected.

See TAB C-6.

11.

Further, this was a "Competitive 8(a)" contract.  A goal of such contracts is to provide

support and guidance to and to assist in the development of a business just starting or in a growth

stage which is owned and operated by individuals who are socially and economically

disadvantaged.  Recognizing the sometimes unsophisticated nature of such contractors and noting

a potential $250 - 300,000 discrepancy in the bid documents, an e-mail (concerning the Project)

from John C. Bivon of the Corps dated August 14, 2000 provided, in part:

. . . . pls note that this is a Comp 8(a) job and the bidding
sched/payment provisions should be very clear. . . and consistent
with similar jobs. . . . This is not a design call but a cost estimating
recommendation to facilitate proper 8(a) contractor estimating, bid
submission and payment. It should be properly addressed as part of
the bid schedule.  If there [sic] were not 8(a) job, contractor
inquiries, no doubt, would be coming in.  We are talking about
$250-300,000. [sic] that be be [sic] missed. (And yes, I know "big"
companies will do the work . . . but they do not provide their
estimators to the 8(a) firms).

See TAB CA-6.

Such a concern apparently resulted in an amendment to the bid documents.

4

PX-0109-0162

12.

The same is not true concerning a letter dated September 5, 2000 from Boh Bros. Construction Company. Boh Bros. is not an 8(a) company. In the letter, Boh Bros. points out several concerns about the Project, as follows:

> We would like to bring your attention to a problem with the proposed bid referenced above. The time allowed for construction, 500 calendar days, is woefully inadequate for construction of this project. There are certain provisions and restrictions in the specification language which will not allow certain work during "hurricane season" (see 1100-21 Flood Protection Plan). The amount of work required, order of work restrictions, and the time required to review and approve dewatering plans, braced excavation plans and the like (usually in excess of 120 calendar days) would actually provide about 380 calendar days to procure material and construct the work. We suggest that careful review of these requirements be taken into consideration and the time of construction be increased to twelve hundred (1,200) calendar days. . . .
>
> Kindly give this matter careful attention and advise us if changed [sic] to the proposed contact time will be made prior to bidding.
>
> See TAB CA-8.

13.

MBI was a qualified 8(a) contractor which sought to submit a bid for the work on the Project. However, MBI lacked both the financial ability and the bonding capacity to do so. Thus, at some point in time, MBI and TSD began talking about joining together to submit a bid for the work on the SELA Dwyer Road Project.

14.

On August 14, 2000, MBI and TSD, as McElwee Brothers, Inc. & Tri-State Design Construction Co., Inc. (A Joint Venture) (earlier identified as "Joint Venture") entered into a Joint

5

McElwee00163

Venture Agreement to bid and, if successful, perform and complete the work on the SELA Dwyer Road Project.

15.

On August 31, 2000, while reviewing the specifications to prepare a bid on the Project, the Joint Venture, requested, among other items:

> . . . access to review field notes and retrieve copies of graphic boring logs, field and laboratory results on which Government information is based for the borings listed in the plans [citing FAR 52.236-4 - (1984 APR)].
>
> . . . quantity estimates involved in certain items of work . . . solicited on a lump sum basis. . . .

See TAB CA-8.

16.

The only response to its pre-bid request that the Joint Venture received concerned the major lump sum quantities for the Contract. See TAB CA-9. Its request to review the other information was ignored.

17.

A letter dated November 8, 2000, from Ms. Audrey Liebross, attorney for the U. S. Small Business Administration, notified the Joint Venture that it the Joint Venture Agreement was approved. See TAB CA-10.

18.

On November 9, 2000, Mr. Michael J. Adams, attorney for the Corps, provided the Joint Venture with notice that "the Contracting Officer has decided to proceed with a pre-award survey of the McElwee/Tri-State Joint Venture" for the Project. See TAB CA-11.

6

McElwee00164

19.

The Corps requested that a Financial Risk Assessment be performed for MBI in or about January, 2001. By letter dated January 17, 2000, a representative of the Defense Contract Audit Agency, Eastern Region, Gulf Coast Branch Office, Pascagoula, Mississippi, stated that purpose of the risk assessment was "to determine if there were indications of any significant financial conditions that would warrant the performance of a financial capability audit." See TAB CA-12.

20.

In connection with this preaward investigation, The Corps also requested an investigation (conducted by two Industrial specialists) and received a "Preaward Survey of Prospective Contractor Technical" report. This report, in part, noted the following after an interview with Mr. Melvin McElwee, President of MBI:

> (2) EVALUATION OF THE TECHNICAL CAPABILITIES OF THE PROSPECTIVE CONTRACTOR/SUBCONTRACTOR WITH THE PROPOSED CONTRACT/ITEM CLASSIFICATION:
>
> . . . The prospective contractor has proposed to act as the on-site General Supervisor, Quality Assurance Representative and to effectively function as the overall Project Manager. . . .
>
> . . . McElwee also presented a complete Quality Assurance Plan, a Construction Milestone chart (made with Microsoft Project) with each of the major events identified and flowed, and a timeline. They also furnished SOP's for usual daily Administrative situations including discrepancy review, tracking equipment and material usage, and other day-to-day operations. . . .
>
> The furnished package was reviewed. It was very complete, detailed, with through analysis of costs, usages and requirements, and was constructed in a very professional and competent manner.
>
> All needed events had been addressed, and alternate scenarios, if needed, were given.

7

McElwee00165

SUMMATION: . . . The prospective contractor presented a very complete and professionally competent project planning and management package outlining every facet of the planned project from start to finish.

The prospective contractor appears to be FULLY CAPABLE to perform the Technical aspect of the project, and either has the resources needed to complete what he has offered to perform, or he has shown where his firm can acquire the needed resources within the time these resources will be needed.

TECHNICAL: FULL AWARD

See TAB CA-13. [Emphasis in original.]

21.

The "Preaward Survey Manager's Comments/Recommendations," dated January 31, 2001

and executed by Daniel Guitierrez, Preaward Survey Manager, stated:

PREAWARD SURVEY MANAGER COMMENTS: AWARD IS RECOMMENDED. THIS OFFEROR DEMONSTRATED THE TECHNICAL CAPABILITY TO PERFORM IF AWARDED THIS SOLICITATION. THERE IS NO ADVERSE INFORMATION ON FILE, THEREFORE, CURRENT AND PAST PERFORMANCE IS RATED SATISFACTORY.

Id. [Emphasis in original.]

22.

By letter dated March 29, 2001, the Corps notified the Joint Venture that its bid for the

SELA Dwyer Road Project was accepted and it was awarded the contract. See TAB C-7. On or

about that same date, the Joint Venture entered into a contract with the Corps for construction of

the SELA Dwyer Road Project. At that time, the contract amount was $5,501,188.10 and the

required completion date of the contract was estimated at November 30, 2002. Id.

8

McElwee00166

23.

Great American issued payment and performance bonds No. 397 8851, dated March 30, 2001 for the SELA Dwyer Road Project on behalf of McElwee Brothers and Tri-State (hereinafter individually, "Performance Bond" and "Payment Bond," respectively and, collectively, "Bonds"). See TAB C-2.

24.

On April 3, 2001, the Corps issued a notice to proceed requiring that work commence within ten calendar days after the date of the Notice to Proceed. See TAB C-8.

25.

The Submittal Procedure Meeting was scheduled for May 3, 2001 and the Pre-construction Conference was scheduled for May 15, 2001. See TABS C-9 and C-10, respectively.

26.

The Joint Venture submitted an Accident Prevention Program and Quality Assurance Plan on April 16, 2001 and began locating and clearing the staging area for the Project on or about April 17, 2001. See TAB CA-15. Although this was the same quality assurance plan referred to in the Preaward Survey as "complete, detailed,... [and] constructed in a very professional and competent manner," the plan was rejected by the Corps on May 9, 2001. See TAB C-12.

27.

The Corps did not schedule the required safety preconstruction meeting until July 30, 2001, which delayed the construction of the Project further. As a result of this late scheduling (and the requirements of Specification section 01100, paragraph 25), all construction in phases IV and V could not commence until December 1, 2001.

9

McElwee00167

28.

The specifications should have contained, but did not, sufficient data to allow the design of the dewatering system.  Specifically, the project specification did not contain a particle distribution analysis which was necessary to perform the requisite calculations for the dewatering plan.  Without the approval of the dewatering system plan, the required deep excavation could not commence and any substantial work on the Project could not be performed.

29.

By Request for Information 009 dated October 31, 2001, McElwee again asked for information that should have been furnished to design the dewatering system.  See TAB CA-30.

30.

After a protracted period, the Corps produced particle distribution analysis at elevation -60. This information was not pertinent because these results were well below elevation -40 where the well point system was required.  The Corps did not provide this information when requested to design the dewatering system.

31.

To move the progress along on the Project, the Joint Venture hired a boring contractor and an independent testing laboratory to provide the required particle distribution analysis which should have been provided by the Corps.  The independent contractor provided two additional borings and performed the necessary particle distribution analysis.

32.

Upon its own investigation and discovery of this information missing from the specifications on or about December 12-13, 2001, the Joint Venture's dewatering design was

10

McElwee00168

subsequently approved and implemented. This caused a substantial delay in starting the excavation and installation of the TRS system.

33.

In October of 2001, the Corps approved the Joint Venture's schedule for the project "for that part of the work that can be accomplished with the available funds." The schedule was a summary bar chart. See TAB C-20.

34.

As scheduled, the work was to be performed in five phases: Phase No. I, Box Culvert; Phase No. II, Outfall -- End of Discharge Tunnel; Phase No III, Sluice Gate Area; Phase No. IV, Blind Bridge # 2-3 and T-Wall Closure Structure; and, Phase No. V, Blind Bridge # 1.

35.

The schedule allowed the Joint Venture time to procure materials and mobilize all forces, labor and equipment necessary to perform the scheduled item of work.

36.

Contract Specification Section 01100, Paragraph 25, "ORDER OF WORK," required that certain work be completed during "non-hurricane season" (December through May). Such work included:

> Degrading Jourdan Road.
>
> Installation of welded steel discharge tubes and sluice gate structure to limits shown on the drawings.

11

McElwee00169

Reconstruction of Jourdan Road.   Jourdan Road shall be reconstructed to the grades shown on the construction drawings and opened to traffic during the hurricane season (June through November).

See TAB D.

37.

Before Jourdan Road could be degraded to facilitate future work, a by-pass road had to be constructed to facilitate future work and to allow movement of traffic on Jourdan Road.

38.

The Corps initially furnished layout information, survey data, grades and alignment to the Joint Venture to construct the temporary by-pass road. See Contract Specification Section 0225 and Plans G11. However, such information was inaccurate.

39.

On December 18, 2001, during a job site visit, the Joint Venture, through Mr. McElwee and Mr. Todd J. Jacquet (hired by the Joint Venture in the position of Alternate Contractor Quality Control Manager), informed Corps representative, Mr. Gremillion, that the survey data for the by-pass road was incorrect and requested further direction from the Corps. See TAB CA-36. The Corps hired a surveyor to perform a horizontal layout of the by-pass road on or about January 14, 2002. See TAB E, Volume 2, Report No. 115.

40.

On January 28, 2002, some 41 days after initial notice, and with knowledge of the defective information originally provided to the Joint Venture, the Corps issued a letter to the Joint Venture requesting a proposal to change the embankment on the by-pass road. See TAB CA-38. The letter provided the Joint Venture with a sketch to perform the work and also included certain revisions

12

to the curb detail which eliminated a pre-cast curb originally included in the specifications. However, even the new plan – the sketch -- proved to be faulty in that it, among other things, it called for a 1:1 side slope (instead of the minimum Corps standard, 1:1.5 side slope) of the granular fill material along a railroad right-of-way.

41.

In accordance with the January 28, 2002, layout, the Joint Venture performed the work along a railroad right-of-way, as directed by the Corps' changes. However, the Corps' new design was ultimately defective: it was impossible for the designated slope to hold in place using the specified granular fill. To correct this, the Corps requested that the Joint Venture's asphalt contractor place a tar coating on the granular fill for slope stability.

42.

The new layout also required additional I-Wall removal, additional I-wall replacement, backfill, sheet piles, paving, landscaping demolition, restoration work and erosion control.

43.

To correct the Corps' design error, the Joint Venture was forced to provide additional paving and demolition of I-wall as a result of the design error. Additional layers of asphalt also needed to be placed as a result the rain undermining the granular material.

44.

During the removal of Jourdan Road, the Joint Venture uncovered successive layers of asphalt paving well beyond the thickness indicated on the plans. See at TAB CA-124. The Joint Venture incurred additional expenses and suffered excusable delays to remove and dispose of the large quantities of asphalt. Such expenses and delays could not have been reasonably anticipated

13

PX-0109-0171

by the Joint Venture with the information provided to it by the Corps or through a reasonable site inspection prior to bidding.

45.

The degrading of Jourdan Road and the construction of the by-pass road, through changed conditions and faulty design, resulted in extra costs for additional excavation, backfill, additional survey, removal and replacement of the I-wall, additional sheet piling (paid under line item), additional paving, landscaping and replacement of water stop. The actual costs expended for this work total $86,879.74 and include procurement of materials, supplies and equipment in accordance with Section 01100 and Section 02411 of the Construction Solicitation and Specifications. The backup for the extra costs, equipment costs and delays are attached hereto as TABS CA-116 and CA-117, respectively. The Joint Venture has received no payment of this amount to date. Additionally, and consistently, 42 calendar days should be credited to the completion time under the contract. A schedule outlining entitlement to such credit is attached as TAB CA-118.

46.

The Project included construction of a new pile-supported T-wall structure at approximately Station 99+20. The borings forming the basis of the Eustis Report were performed in excess of 150' from the Corps' designated site for the work.

47.

Before the Joint Venture could install the new T-wall structure, the plans and specifications required that certain work be performed on the pre-existing, pile supported flood protection wall. On March 6, 2002, under a Request for Clarification (hereinafter, "Request"), the Joint Venture notified the Corps of certain ambiguities in the plans and specifications. See TAB C-32.

14

Specifically, the Joint Venture requested clarification as to whether certain existing concrete piles referenced in the Construction Specification section 02070.4.1 and DWG-13 should be cut at the base of the footing and removed, per the specifications, or "pulled-out" per the instruction on the drawing. The Joint Venture notified the Corps that section 02070.4.1 provided:

> . . . foundation piling shall be cut at the base of the footing and removed.

See Specifications section 02070.4.1.

48.

The Joint Venture read section 02070.4.1 to mean what it said: that the piles were simply to be cut and the cut section removed. This was a fair interpretation of this specification, particularly as there was no corresponding provision addressing the grouting of the voids which would typically be required when "pulling" – as opposed to cutting and "removing" – the piles. The Joint Venture's interpretation that the specifications simply provided for cutting the piles is also supported by the specifications as a whole, as the specifications did not contain any guidelines concerning pile extraction or pulling and did not contain a requirement for submittals concerning the method and/or equipment necessary for such work.

49.

In the March 6th Request, the Joint Venture also pointed out the discrepancy between section 02070.4.1 of the Specification and the instructions in DWG-13, which conversely provides:

> All existing pile and sheet pile between saw cut lines to be **pulled out**.

DWG-13 [Emphasis added.]

15

McElwee00173

PX-0109-0173

50.

FAR 52.236-21, which is incorporated in the contract pursuant to section 0700 of the Specifications, specifically provides:

> In case of difference between drawings and specifications, the specifications shall govern.

FAR 52.236-21.

51.

Accordingly, the Joint Venture relied on the specifications and planned only to cut the piles, and remove the cut portions as indicated in the specifications.

52.

By letter dated April 5, 2002, Tim Roth, Administrative Contracting Officer, stated that the plans and specifications were consistent and directed that the "concrete piles must be removed by pulling." See TAB C-38. On this same date, the Corps issued a unilateral modification (Modification A00004) which required that "holes remaining after the piles under the existing floodwall are pulled be filled with bentonite slurry [in accordance with paragraph 02365-11.3.7 of the Specifications]." Interestingly, rather than adding this provision to the Specifications which, pursuant to FAR 52.236-21, clearly governs inconsistencies with the drawings, the Corps directed that the grouting requirement be added to the description in DWG-13, not in section 02070.41 of the Specifications.

53.

By letter dated April 16, 2002, the Joint Venture stated its disagreement with the Corps' interpretation, but agreed to follow Mr. Roth's directive to perform, what the contract documents support to be, the changed scope of work. See TAB C-45. However, the layout of the site made

16

McElwee00174

performing the changed work difficult and onerous. In trying to resolve these difficulties and in presenting alternative methods of construction for approval by the Corps, the Joint Venture particularly noted:

> If the operation is not progressing satisfactorily within 5 days, we suggest cutting the piles at the foundation (3 feet below the invert of the new discharge tubes) and redesigning the "T"-Wall Foundation to use the existing piles as extra support.

> Letter dated April 19, 2002. *Id.*

The Joint Venture ended the letter by notifying the Corps that, as a result of the changed work and the difficulties presented in determining how to perform the work with the Corps' approval, the Joint Venture was "at a halt with all work relative to construction of the T-wall."

54.

On April 25, 2002, the Joint Venture submitted an "Existing Concrete Pile Removal Plan." The Removal Plan particularly provided that:

> [a]s the pile is extracted, the Bentonite (grouting) will be injected through the jet pipe. The pile and the jet pipe will be extracted simultaneously while the Bentonite is pumped into the void left by the pile.

> Removal Plan dated April 25, 2002. See TAB C-50.

55.

The Joint Venture pulled the existing piles in accordance with the directive provided by the Corps. In so doing, the Joint Venture incurred and paid, some out of pocket, additional costs and expenses ($234,096.61) and is entitled to an extension of contract time (39 calendar days) for the changed work performed.

17

McElwee00175

PX-0109-0175

56.

The extraction of the piles, as directed, created voids in the foundation materials further weakening the already insufficient soils conditions. Without looking further into the conditions of the soils, the Corps ordered the Joint Venture to fill the voids with Bentonite. See TAB CA-42. The use of the Bentonite compounded the already unstable soils problem which would subsequently affect pile driving activities in this area.

57.

Section 0110 of the Construction Solicitation & Specifications for the Project, paragraph 24, requires the Contractor to submit a flood protection plan to be implemented in case of potential flooding due to tropical storms/hurricanes. A portion of this section provides, in part:

> In the event of a hurricane or storm induced threat of flooding and if directed by the Contracting Officer, the Contractor shall cease all work associated with removal of floodwalls and levee ramp degrading and shall implement his flood protection plan with in 24 hours.

58.

Such a plan was submitted by the Joint Venture and approved by the Corps of Engineers prior to the hurricane season in 2002. See TAB C-62. The plan was implemented during three tropical storms in September, October and November of 2002.

59.

Under this section, such work necessarily includes, but may not be limited to:

1.    Capping any sheeting with formwork in place. If capping is not possible, emergency sheet piling will be driven to close any gaps in the flood protection;

2.    Close off and make watertight the open ends of the steel pipe drainage penetration; and,

18

McElwee00176

3.    Resuming normal operations after the threat is gone (which inherently includes taking down the work required by 1 & 2).

Subsection C of this Paragraph 24 provides that compensation for all such work will be made by equitable adjustment under the contract Clause entitled "CHANGES."

60.

During the 2002 "hurricane season" (designated under the contract documents as June through November), one tropical storm and three hurricanes threatened the New Orleans area and affected work on the project: Tropical Storm Hanna (September 13 - 16, 2002), Hurricane Isadore (September 19 - 30, 2002) and Hurricane Lili (October 1 - 4, 2002). The costs required to mobilize, demobilize and perform all preparatory work to secure the site and to provide necessary flood protection for each of these events under the Corps' directives are recoverable under the contract: the time delay is also excusable.

61.

Tropical storm Hanna appeared in the Gulf of Mexico sometime before Friday, September 13, 2002. By September 13, 2002, Hanna appeared to be a threat to the New Orleans area and, by 1100 hrs on that day, the contractor was "directed to enact part of his [sic] hurricane protection plan, pull sheeting pile." See TAB E, Volume 6, Report No. 282. The Corps' QAR form includes a question to be addressed daily concerning whether or not a possible delaying event on the project has occurred. The question is "[h]as anything developed which might lead to a change order or finding of fact?" On September 13, 2002, the Corps' inspector, Steve Filati, responded "yes" to this question and noted the above-stated directive to enact the hurricane protection plan.

19

McElwee00177

62.

The QAR for September 13, 2002, further provides:

> . . . Contractor was directed to pull the flood protection sheet pile
> along the north face of TRS-4A and sandbag corners. He was also
> asked to survey elevation of north end by-pass road where it passes
> through the I-wall.

> *Id.*

63.

New Orleans Change Order Documentation forms (hereinafter, "COD") were completed

for the changed work performed in order to memorialize the exact time and equipment used for the

extra work being performed. Any other ancillary items (i.e. standing time) wold be developed

when cost was submitted. These COD's were executed by the contractor's superintendent, Ellis

Jackson, and the Corps' inspector, Steve Filati. COD's were completed for September 13th - 16th,

noting the continued work performed as a result of the storm threat. The work identified on COD's

signed by Mr. Filati included:

1.    Mobilization of 100 ton crane, vibratory hammer, hose and power pac;

2.    Extraction of sheet piles-phase 4 North wall; and

3.    Sand bags along I-wall and T-wall.

See TAB CA-56.

64.

The QAR dated September 17, 2002, noted that there was "no production lost due to

adverse weather because the event occurred overnight." TAB E, Volume 6, Report No. 285.

However, what the QAR failed to note is the time lost due to implementing and demobilizing the

**20**

McElwee00178

PX-0109-0178

flood protection. Accordingly, additional calendar days (attributable to the events) should be added to the contract time for this work performed by the contractor.

65.

Hurricane Isadore was the second hurricane of the season and strengthened to hurricane force on September 19th, quickly intensifying to a category 2 hurricane by the 20th. At 1000 hrs on September 19th, the contractor was directed to stop performing its contract work and start:

> . . . to backfill TRS-4A with sand due to the threat of a hurricane approaching in the Gulf. Observed contractor mobbed 100 ton crane and vibro hammer to TRS-4A to drive down 5 or 6 pair of flood protection sheet pile to allow for backfilling hole with sand at TRS-4A. Both the contractor and the QA Rep. are keeping T & M sheets on all activities involved with this extra work as directed by Mr. Tim Roth.

> See TAB E, Volume 6, Report No. 287.

66.

The September 19, 2002, QAR further noted that the contractor received and backfilled 54 loads of sand into TRS-4A using a dozer. By September 23, 2002, the QAR noted that a total of 106 loads of sand had been delivered and backfilled into TRS IVA for hurricane protection used for hurricane protection. See TAB E, Volume 6, Report No. 289.

67.

The QAR for September 19th was the first report to indicate that a development occurred which "might lead to a change order or finding of fact." The QAR's for September 19th - 24th each noted "Backfilling TRS-4A with sand due to Hurricane." See TAB E, Volume 6, Report Nos. 289-290. QAR's for September 25th - 30th note the development of "Hurricane Isadore in Gulf." See TAB E, Volume 6, Report Nos. 291 - 294.

21

McElwee00179

68.

Appropriate COD's for (including exact cost only) work performed on September 19 - 30, 2002, were completed for the changed work performed and were executed by the Contractor's superintendent, Ellis Jackson, and the Corps' inspector, Steve Filati. The work identified on the COD's signed by Mr. Filati included:

1.   Fill TRS -4A with sand;

2.   Relocate crane, hammer and power pac;

3.   Drive sheets at phase 4;

4.   Provide traffic control;

5.   Street cleaning and maintenance;

6.   Tie down all equipment, remove phase 4 dewatering pump;

7.   Drive I-wall flood protection sheets; and,

8.   Place and compact backfill material as required.

See TAB CA-57.

69.

The contract has never been credited with the time lost due to implementing the flood protection and job shutdown.

70.

On or about October 1, 2002, Hurricane Lili was present in the Gulf of Mexico. At 1445 hrs on that day Lead Engineer, Glenn Gremillion, notified the contractor to "mob the 100 ton crane and vibro hammer to the east end of the project in prep of pulling the 72 lf of flood protection sheet pile at I-wall." See TAB E, Volume 6, Report No. 295. From October 1 - 3, 2002, the contractor

22

McElwee00180

PX-0109-0180

performed work necessary to implement the hurricane/flood protection plan. TAB E, Volume 6, Report Nos. 295-297.

71.

The QAR for October 1, 2002, was the first to indicate that a development occurred which "might lead to a change order or finding of fact." The QAR's for October 1 - 3, each note the development as "Hurricane Lili in Gulf."

72.

Appropriate COD's for work performed (exact cost only) on October 1 - 3, 2002, were completed for the changed work performed and were executed by the Contractor's superintendent, Ellis Jackson, and the Corps' inspector, Steve Filati. The work identified on COD's signed by Mr. Filati included:

1.    Relocate equipment;

2.    Pull up flood protection sheets;

3.    Relocate and secure traffic barricades;

4.    Provide traffic control personnel;

5.    Drive I-wall sheets;

6.    Restore by-pass road; and,

7.    Dewatering at TRS

See TAB CA-59.

73.

The QAR's for October 2 - 4 each note "[l]ost work time from regular construction activities due to hurricanes and working on flood protection sheet pile will be handled through a

23

PX-0109-0181

mod." See TAB E, Volume 6, Report Nos. 295 - 297. However, the contract has never been credited with the time lost due to implementing the flood protection.

74.

Under Section 01100 of the Specifications, the contractor is required to store emergency sheet piles on the site. Section 02411 requires, in part, that the contractor:

> . . . stockpile enough sheet piling on the site during hurricane season (June through November) to close the temporary gaps in flood protection required to construct T-wall at three (3) 84" diameter pipes, construct new I-wall west of Jourdan Road, and removal of 70 foot section of I-wall at the bypass road. The work consists of installation, removal, and restocking of emergence sheet piling **each time** there is a threat of hurricane, as determined by the Contracting Officer.

> (Emphasis added.)

This Section further provides:

> Payment for driving, pulling and restocking emergency sheet piling, if necessary, will be made by equitable adjustment under the Contract Clause entitled 'CHANGES'.

75.

For each hurricane/tropical storm the contractor performed work requiring compensation under this section of the specification. Such work is documented on the COD's includes:

1.    Installing emergency sheet piles at TRS-4A;

2.    Pulling existing I-wall sheets to final grade;

3.    Trucking granular fill material from TRS-4 to stock pile area;

4.    Removing granular fill;

5.    Dewatering;

6.    Removing sheets; and,

24

McElwee00182

PX-0109-0182

7.    Mobilizing and demobilizing a 100 ton crane and vibratory hammer, hoses and power pac.

76.

A portion of the work on the project included the installation of an 84" discharge tube between Station 98+56 to 99.40 B/L "A." The Joint Venture presented to the Corps a Value Engineering Proposal (hereinafter, "VECP") to jack and bore the 84" welded steel discharge tube under Jourdan Road. The Corps accepted the proposal and directed the Joint Venture to proceed according to the VECP.

77.

On February 8, 2003, after mobilization and setup for the work approved by the Corps, a subcontractor, Tri-State Road Boring (no relationship to the Joint Venture), began performing the jack and bore operation. At approximately 1:00 p.m. on that day and after about 2 feet of jacking, a large diameter pipe obstruction was encountered. Work was thereafter suspended. See, TAB E, Volume 7, Report No. 382. Glenn Gremillion, Corps Lead Engineer, witnessed the obstruction and told the Joint Venture that he would meet with the Sewerage & Water Board and provide further instructions. The Corps' QAR form includes a question to be addressed daily concerning whether or not a possible delaying event on the project has occurred. The question is "[h]as anything developed which might lead to a change?" The Corps' inspector, Steve Filati, responded "yes" to this question. Thus, the Corps admitted that the discovery of the pipe was a differing site condition for which equitable adjustment and additional contract time is appropriate.

25

78.

By letter dated February 10, 2003, the Joint Venture again notified the Corps that it had encountered what it believed to be an epoxy coated 24" pipe. See TAB CA-67. The Joint Venture warned that the previously unidentified pipe prohibited proceeding with construction by either the originally designed open trench or by the VECP jack and bore method. The Joint Venture and Government began attempting to identify the obstruction. At this point, the Joint Venture's progress concerning this critical work was stopped at the direction of the Corps. The status of the line and procedure necessary to allow the work to continue was in question. The questions remained as to whether the line was active or abandoned, and whether it contained gas, water or sewer.

79.

It took several days for the Government to determine the owner of the line and what it was intended to carry. However, by February 14, 2003, the Corps notified the Joint Venture that the line was an abandoned 30" diameter sewer force main. See TAB CA-68. The New Orleans Sewerage & Water Board agreed to verify that the line was abandoned by agreeing to perform a hot tap on the line. By letter dated March 5, 2003, the Corps instructed the Joint Venture to remove the entire pipe to at least 1-foot beyond the footprint of the welded steel discharge tubes, requiring an unanticipated expenditure of additional costs and time due to no fault of the Joint Venture. See TAB CA-74.

80.

From February 9, 2003 to March 5, 2003, all required material and equipment was mobilized, operated and demobilized, sheet piling and backfill material was installed and removed as a result of the encountered the unforeseen condition. Change Order Documentation reports were

26

completed on a daily basis from the date that the Joint Venture first encountered the obstruction (February 8, 2003) to the date it resumed normal jack and bore operations (March 5, 2003).

81.

Subsequent to the Termination, the Corps' and Appellant's representatives have resolved this issue and the Corps has issued Modification No. P00034 pertaining to this issue. This modifications provides compensation for the work (in excess of $288,000.00) and the delays (26 days) associated with the Joint Venture's additional work resulting from the discovery of the 30' sewer line. This issue is only mentioned to notify the Board of the delays to the Project at the time the 30" sewer line was discovered and the Corps' failure to provide compensation to the Joint Venture until more than a year after the costs and expenses were incurred.

82.

The Corps' design for the T-wall structure required 17 concrete piles each 14" square and 75' long. As designed by the Corps, the piles were to be driven on a batter within a 43' footprint.

83.

The soils information upon which the Corps' based its design (1997 Eustis Report) indicated that if completed as designed, the piles were to achieve bearing capacity in a strata of dense sand. However, the 1997 Eustis Report failed to consider the prior pulling of piles and injection of Bentonite (which was a changed condition) after commencement of the work. The Corps furnished soils information was incorrect: the soils strata indicated by the Eustis Report supplied by the Corps differed substantially from that which was actually present. As a result, the pile foundation designed for the new T-wall, which was designed in accordance with the faulty soils information presented by the Corps, was inherently defective and would prove to be unacceptable even if, as

27

McElwee00185

here, the work were performed in accordance with the design in the contract. The flaw in the design was not the "fault" of the Joint Venture, but rather, was the result of differing site conditions (inaccurate soils information and soils changes directed by the Corps, i.e. the injection of Bentonite subsequent to soil borings relied on in the design of the Project) beyond the control and without the fault or negligence of the Joint Venture. As such the delays and expenses attributable to such work are both excusable and compensable.

84.

The Eustis Report made certain recommendations to the Corps which were not included in the specifications, as follows:

1.  Several test piles should be driven to develop more definitive information including exact pile length and proper pile drilling equipment;

2.  Additional pile testing should be performed; and,

3.  Eustis Engineering should be retained to monitor the geotechnical related work performed by the contractor.

See TAB C-5.

Rather, the specifications did not recognize these procedural and substantive recommendations. As such, the specifications were defective as written.

85.

The Joint Venture began driving the 14" square piles using a driving hammer approved by the Corps of Engineers and/or by Eustis.

28

McElwee00186

PX-0109-0186

86.

On April 17, 2003, the Corps' geotechnical engineer, Frank Volkovich, observed the initial pile driving and approved this work. See TAB E, Volume 8, Report No. 427. Prior to continuing, the Corps did not require or even support performing any test piles.

87.

The geotechnical engineer approved of the utilized means and methods and the work performed by the Joint Venture. The Joint Venture continued to install the remaining piles in the previously approved, manner.

88.

From a review of the DEI calculations, it appears that approximately 75% (13 of 17) of the piles would be subject to only 50% to 60% of the calculated maximum applied load. Only approximately 25% (4 of 17) of the piles would be subjected to tensile load. The requirement to drive all piles to provide the maximum required compression and tension capacities appears to have been excessive and unreasonably exposed the piles to potential damages in unstable soils conditions.

89.

All 17 piles were driven by the Joint Venture on May 17, 18, 19 and 29, 2003 using an ICE 60S single acting hammer. By letter dated May 22, 2003, after all 17 piles were driven, the Corps expressed concerns based on "low blow counts" on piles 1, 2, 3, 4 and 9. The Corps faulted the Joint Venture, even though the work was performed as specified and previously approved.

90.

Subsequent to the Joint Venture driving all 17 of the piles required by the specifications, the Corps requested that Eustis Engineering perform a site inspection to analyze the condition of the piles.

29

McElwee00187

91.

On June 3, 2003, at the instruction of the Corps, the Joint Venture hired GRL Engineers, Inc. (hereinafter, "GRL") to perform high-strain and low-strain dynamic testing and related data analyses at the Project. It appears that the low-strain dynamic testing was used as the sole source of rejecting certain piles. However, the GRL report clearly stated that such dynamic testing has its limitations, and that it is not intended to be used as the sole basis in establishing pile acceptance or rejection.

92.

The Joint Venture employed Gore Engineering to take additional borings and soil samples. The borings drilled by Gore, although in closer proximity to the T-wall area than the Eustis borings, were still not taken at the location where the subject concrete piles were driven. Although there were some differences in the Eustis and Gore testing results, the differences would be even greater between the Eustis borings and those taken in the direct area that the piles were driven. This would be the case as the area soils had been disturbed by the prior pulling of piles and subsequent injection of Bentonite.

93.

The Corps did not specify that a test pile program be performed as had been recommend in the Eustis report. The Corps' reasoning was that the insignificant number of piles did not warrant initial testing prior to driving all of the required piles. However, the exact opposite reasoning is true: because the project called for so few supporting pilings, the test pile program was even more important.

30

PX-0109-0188

94.

The Joint Venture maintains that the plans and specifications for the Project were defective because they did not require the test pile program. If the test program had been implemented as recommended in the 1997 Eustis Report, any necessity for a re-design of the piling system would have been apparent during the testing of the initial pile and the Joint Venture would have been paid any additional expenses.

95.

In the 1997 Eustis Report, Eustis recommended that it be retained to monitor the geotechnical related work performed by the contractor. Such work would have included driving the concrete piles in the T-wall area. The Eustis report clearly warned:

> [t]his permits the geotechnical engineer that prepared the report to be on hand and quickly evaluate unanticipated conditions, conduct additional tests if required, and when necessary, recommend alternative solutions to problems. This is recommended to avoid major construction cost overruns and contractual disputes on the project.

96.

Following the Gore Report and the GRL findings, the Corps ordered a re-design of the piling support system for the new T-wall at the joint venture's expense. The new piling specifications were developed by DEI using the Gore, not the Eustis borings.

97.

Based on an analysis using the USACoE's computer program Computer Pile Group Analysis (CPGA), it was determined that only 2 of the 17 piles could be used in the redesign. It was suggested that the non-conforming piles simply be pulled and new piles redriven in their place. See TAB CA-101. The Corps rejected this suggestion as such action may cause a "weakening of the foundation resulting from disturbing the soils in the area of the piling." See TAB CA-102.

31

McElwee00189

98.

The redesign substantially differed from the original design included in the plans. This suggests that the original specifications were defective. Such defect is an unforeseeable cause beyond the control and without the fault or negligence of the Joint Venture. As such, any attributable delay is excusable, the costs incurred by the Joint Venture for such work is compensable and a Termination for Default is unreasonable.

99.

As discussed above, the Joint Venture performed work and provided labor and material for the general construction required to complete the work on the SELA Dwyer Road Project. Throughout the construction, the Joint Venture encountered changes to the project and excusable and compensable delays. The Joint Venture incurred the costs and expenses associated with the additional work and material necessary to complete the construction as directed by the Corps. To date, the Corps has not compensated the Joint Venture nor credited the contract with the associated extended time. However, by Modification No. P00028 dated June 24, 2003, the Corps terminated for default the Joint Venture's right to proceed with any further work on the SELA Dwyer Road Project (hereinafter, "Termination for Default"). See TAB B. The Corps contracting officer's decision concerning the default termination was final on that date.

100.

The Termination for Default listed as "Acts or Omissions Constituting the Default" the following:

A)      Repeated failure to maintain adequate Quality Control and workmanship including, as a minimum, such items as insufficient implementation of the Contractor Quality Control Plan, improper storage of materials, deviations from approved submittals and incomplete flood protection installation.

32

McElwee00190

B)   Repeated failure to manage performance including Contractor's ill-defined lines of authority, inconsistencies between the roles and the individuals of the joint venture performing these roles, and ineffective use of resources, resulting in a delay to the overall completion of the contract.

C)   Failure to fully implement an acceptable form of interim flood protection which maintains traffic on Jourdan Road by 20 June 2003, as a condition of continued forbearance per the Contracting Officer's letter dated 30 May 2003.

101.

The Joint Venture's Quality Control Plan was approved by the Corps in September, 2001. All Quality Control personnel were required to attend and pass certain quality control courses before assuming these positions. Occasionally, the Corps would disapprove of a reorganization of the management only one day after the revised structure was submitted to the Corps. The Corps' challenge was not to the qualifications of the Joint Venture personnel actually doing the work, but questioning why -- after only one day -- it appeared that certain individuals were performing roles they were qualified to perform, but not in the changed capacity designated just the day before.

102.

In fact, in response to the Corps' criticisms of the Joint Venture's management communications, the Joint Venture implemented team problem solving methods and submitted Requests for Information to the Corps in an effort to reclaim the partnering attitude set forth at the beginning of the project with the Corps. What the Corps failed, or refused, to recognize was that it was the actions and inactions of other players, not the Joint Venture, that increased the delays and caused financial damage to the Joint Venture on the project.

33

McElwee00191

103.

The Joint Venture supplemented its management with personnel who had significant project experience on government projects. Their experience allowed them to make significant contributions in many areas. This addition gave the joint venture a level of quality control and expertise seldom see on a project of this size.

104.

By letter dated June 12, 2003, the Joint Venture notified the Corps that it was "actively implementing" the interim flood plan. However, the Joint Venture was having difficulty implementing the plan, not for lack of effort (the Joint Venture brought in a geotechnical engineering firm and its local project engineer to investigate), but as a result of recently encountered changed site conditions and defective design issues which the Corps refused to recognize.

105.

By letter dated June 13, 2003, the Joint Venture revised and resubmitted its flood plan to the Corps, the objective of which was to "open traffic to Jourdan Road". The plan addressed the current state of construction and included certain revised calculations in response to a prior request from the Corps. Subsequently, the Corps did not acknowledge the revised plan. Rather, shortly thereafter, it terminated the Joint Venture.

106.

On information and belief, the flood plan presently in place on the Project is the plan submitted by the Joint Venture, or the same with minor deviations. IN fact, in an e-mail dated June 17, 2003, prior to termination of the Joint Venture, John Grieshaber, a Corps representative, stated:

34

McElwee00192

> It is our belief that the contractors [sic] [flood] plan is workable - -
> we have developed comments and suggestions to the contractors
> plan. . . .

The Joint Venture was not provided the opportunity to implement the revised plan prior to

termination despite numerous excusable delays discussed, *infra*.

107.

In the Termination for Default, the Corps alleges that various management and

organizational problems resulted in the delay to the overall completion of the contract. However,

the delays to the completion of the contract are more appropriately attributable to events discussed

herein that are "excusable" under Federal Acquisition Regulation 52.249-10, "Default," which was

incorporated by reference into the SELA Dwyer Road Contract Specification in Section 00700

"Contract Clauses".   Federal Acquisition Regulation 52.249-10 states, in pertinent part:

> (a) If the Contractor refuses or fails to prosecute the work or any
> separable part, with the diligence that will insure its completion
> within the time specified in this contract including any extension, or
> fails to complete the work within this time, the Government may, by
> written notice to the Contractor, terminate the right to proceed with
> the work (or the separable part of the work) . . . .
>
> **(b) The Contractor's right to proceed shall not be terminated nor
> the Contractor charged with damages** under this clause, if–
>
> **(1) The delay** in completing the work **arises from unforeseeable
> causes beyond the control and without the fault or negligence of
> the Contractor. Examples** of such causes include (i) **acts of God** .
> . . (ii) **acts of the Government** in either its sovereign or contractual
> capacity, (iii) **acts of another Contractor** in the performance of a
> contract with the Government, . . . (xi) delays of subcontractors or
> suppliers at any tier arising from unforeseeable causes beyond the
> control and without the fault or negligence of both the Contractor and
> the subcontractors or suppliers; and
>
> (2) The Contractor, within 10 days from the beginning of any delay
> (unless extended by the Contracting Officer), notifies the Contracting
> Officer in writing of the causes of delay. The Contracting Officer

35

PX-0109-0193

shall ascertain the facts and the extent of delay. If, in the judgment of the Contracting Officer, the findings of fact warrant such action, the time for completing the work shall be extended. The findings of the Contracting Officer shall be final and conclusive on the parties, but subject to appeal under the Disputes clause.

(c) **If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government.**

Federal Acquisition Regulation 52.249-10 [Emphasis added].

108.

By letter dated June 24, 2003 to the Corps, the Joint Venture provided notification to the Corps of work that the Joint Venture believed to be beyond the scope of the original contract (hereinafter, "Claims"). See TAB C-164. The letter attached a single page spreadsheet which listed the Claims for equitable adjustment totaling $3,230,189.00 and indicated that the SELA Dwyer Road Contract should be credited with 627 days toward the completion time. Such notice was not the first sent to the Corps concerning each of these matters. The letter requested a decision of the Contracting Officer within 60 days.

109.

As will be shown, the principal events that caused the delay in the completion of the SELA Dwyer Road Project were excusable under FAR 52.249-10 as the delay is attributable to: (i) the Joint Venture receiving incorrect layout information, survey data, grades and alignment information from the Corps concerning soils information and Jourdan Road; (ii) the discovery of unforeseen subsurface site conditions: namely, an abandoned subsurface 30" sewer line; (iii) the discovery of unforeseen subsurface soil conditions on occasions work performed on the project; (iv) demobilization and mobilization activities required as a result of three tropical

36

McElwee00194

storms/hurricanes affecting the area in and around the SELA Dwyer Road Project; and (v). Some

of the delay occurring from these events was caused by the late responses of the Corps to Requests

for Information (hereinafter, "RFI") from the Joint Venture and disputes over excusable delays,

change order pricing and Government funding. Virtually all of the aforementioned delays, the

details of which are presented hereinafter, were not only excusable, but compensable.

110.

On information and belief, at the time of the termination , the Corps did not have sufficient

funds in the contract to pay the Joint Venture for the work in place on the Contract. This situation

did not change prior to October 6, 2003.

111.

Subsequent to the termination, the Corps called upon Great American to remedy the Joint

Venture's default and to complete the SELA Dwyer Road Contract in accordance with the terms

of the Performance Bond and the SELA Dwyer Road Contract terms.

112.

On or about October 6, 2003, the Corps, Great American and C. R. Pittman Construction

Co., Inc. (hereinafter, "Pittman") entered into a contract so that Pittman would perform the work

necessary to complete the  Project (hereinafter, "October 6, 2003 Agreement").  See TAB CA-

110.

113.

One provision of the October 6, 2003 Agreement required Pittman to accept responsibility

for "patent defects" on the Project. In connection therewith, Pittman conducted an investigation

of the work performed by the Joint Venture on the Project and discovered no "patent" defects on

the work. Further, Pittman spoke with the Corps' contract administrator for the Project who

37

McElwee00195

represented that the Corps believed that the wok presently in place was in conformance with the contract documents. See TAB CA-109 A.

114.

If, in fact, the quality on the project was poor, what you would have seen was a long list of defective work that required re-work. However, this was not the case.

CONCLUSION

The June 24, 2003, Termination for Default could not have been based on the reasons cited therein as the Joint Venture Quality Control personnel each completed a Construction Management for Contractor Course and were well qualified to hold those position. In fact, one such Quality Control representative who was originally considered questionable by the Corps is today employed by the New Orleans District of the Corps in a Quality Control position. Moreover, the Joint Venture consistently maintained a team of professional engineers on an as needed basis for design and evaluation of certain aspects of the work. Both the Quality Control personnel and the professional engineers were qualified and available to oversee, guide and manage this difficult project riffled with excusable delays.

The Corps, throughout the SELA Dwyer Road Project, consistently failed to acknowledge the Joint Venture's position regarding delays and the associated costs, and further refused to adequately demonstrate that the Corps could fund the costs to complete the job. As such, under Federal Acquisition Regulation 52.249-10, default was improper. Rather, the Corps should have, if determined, properly terminated the Joint Venture for convenience.

Despite the fact that most all of the SELA Dwyer Road Project delays were excusable and compensable, the Corps erroneously concluded that it had no obligation to grant EOT or delay compensation. That erroneous conclusion lead the Corps to conclude that it was justified in

38

PX-0109-0196

terminating the Joint Venture, when it in fact was not. The Corps' decision to terminate the Joint Venture for default was an abuse of discretion and constituted a breach of the contract with the Joint Venture and a violation of the Corps' equitable duty to Appellant.

The termination for default should appropriately be converted to a termination for convenience and Great American should be entitled to all rights and remedies under Federal Acquisition Regulation 52.249-2 "Termination for Convenience of the Government."

**WHEREFORE,** Great American  Insurance Company prays that after due proceedings herein, there be judgment in its favor and against the United States Department of the Army, New Orleans District Corps of Engineers, converting the June 24, 2003, decision of the contracting officer, terminating McElwee Brothers, Inc. & Tri-State Design Construction Company, Inc. (A Joint Venture) for default, to a termination for convenience, entitling McElwee Brothers, Inc. & Tri-State Design Construction Company, Inc. (A Joint Venture), and thus Great American Insurance Company, to all rights and obligations of a contractor terminated for convenience.

Furthermore, Great American Insurance Company prays for all other general, legal and equitable relief to which they may be entitled.

Respectfully submitted,

*[signature]*

Lloyd N. Shields (La. Bar #12022)
Daniel Lund, III (La. Bar # 19014)
Elizabeth L. Gordon (La. Bar # 21619)
Sean P. Bracken (La. Bar #26608)
Shields Mott Lund L.L.P.
650 Poydras Street, Suite 2400
New Orleans, Louisiana 70130
Telephone:   (504) 581-4445
Telecopy:    (504) 581-4440

Attorneys for
Great American Insurance Company

39

McElwee00197

PX-0109-0197

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above pleading has been forwarded to Alan D. Schulz, Sr., Esq. Corps of Engineers New Orleans District 7400 Leake Avenue, New Orleans, Louisiana 70160-0267 and counsel of record by United States First Class, overnight mail, hand delivery and/or facsimile transmission properly addressed and postage pre-paid this 7th day of September, 2004.

W:\Client\33483-19\Pleadings - ASRCA\Termination for Default - 34337\Complaint 9-03.wpd-



40

McElwee00198

PX-0109-0198



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2003 OCT -6 AM 10: 18
LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF LOUISIANA

GREAT AMERICAN INSURANCE COMPANY *

VERSUS

MCELWEE BROTHERS, INC. & TRI-STATE *
DESIGN CONSTRUCTION CO., INC.,
MCELWEE BROTHERS, INC., *
MELVIN M.L. MCELWEE, SR.,
SYLVIA HURST, TRI-STATE DESIGN *
CONSTRUCTION CO., INC.,
RONALD U. DAVIS and BEVERLY DAVIS
*     *     *     *     *     *     *     *

CIVIL ACTION NO.

SECTION NO. 03 - 2793

MAG.       SECT. K MAG. 2

---

### REQUEST FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY
### AND PERMANENT INJUNCTION, SPECIFIC PERFORMANCE
### AND DECLARATORY JUDGMENT

---

The complaint of Great American Insurance Company (hereinafter, "Great American")

respectfully represents:



Fee 150.
✓ Process
X Dktd.
CtRmDep
Doc. No.

EXHIBIT
12

**McElwee00199**

## NATURE OF ACTION

1.

Great American seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 to resolve questions concerning (1) an agreement of indemnity executed on October 25, 1999, by McElwee Brothers, Inc. (hereinafter, "McElwee Brothers"), Melvin M. L. McElwee, Sr. (hereinafter, "Mr. McElwee"), Sylvia Hurst (hereinafter, "Ms. Hurst"), Tri-State Design Construction Co., Inc. (hereinafter, "Tri-State"), Ronald U. Davis (hereinafter, "Mr. Davis") and Beverly Davis (hereinafter, "Ms. Davis") in favor of Great American (hereinafter, "1999 GAI") and (2) a separate agreement of indemnity executed on July 25, 2002 by, among others, Tri-State, Mr. Davis and Mrs. Davis in favor of Great American (hereinafter, "2002 GAI"). The 1999 GAI and the 2002 GAI are sometimes referenced collectively hereinafter as "the GAI's.") Specifically, Great American seeks a declaration that the 1999 GAI and the 2002 GAI are valid and enforceable as to all provision of the agreements, such declaration to include, but be not limited to, a declaration that McElwee Brothers, individually and as joint venturer of McElwee Brothers Inc. & Tri-State Design Construction Co., Inc. (A Joint Venture) (hereinafter, "Joint Venture") Mr. McElwee, Ms. Hurst and Tri-State, individually and as joint venturer of the Joint Venture:

(A)    must refrain from either directly or indirectly interfering with Great American's exercise of its rights under the 1999 GAI and the 2002 GAI, including, but not limited to, refraining from taking any action as to the Termination for Default (as defined hereinafter) and/or the Claims (as defined hereinafter);

(B)    must indemnify, exonerate and keep Great American indemnified against all loss, cost, expenses and attorneys' fees, and all other liabilities arising out of the Great

2

McElwee00200

PX-0109-0200

American's execution of the Bonds (as defined hereinafter) to the United States of America, including requiring McElwee Brothers, Mr. McElwee, Ms. Hurst and Tri-State to provide to Great American sufficient collateral in support of the potential exposure and actual payments that Great American has made, and continues to make under the Bonds;

(C)     must each specifically perform their obligations under the GAI's, including, but not limited to, producing all construction and financial (costs and expenditure) records, all correspondence and other all records including those necessary to allow Great American to arrange for the completion of the work on the SELA Dwyer Road Project (as defined hereinafter), to prepare for the appeal of the Termination for Default and to compile and submit Claims for equitable adjustment on the Project;

(D)     have irrevocably nominated, constituted and appointed Great American as the attorney-in-fact for McElwee Brothers and the Indemnitors (as defined hereinafter) with the right, but not the obligation, to exercise all of the rights assigned, transferred and set over to Great American under the 1999 GAI and the 2002 GAI, and that Great American may, in the name McElwee Brothers and Indemnitors make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by Great American in order to give full effect not only to the intent and meaning of the assignments, but also to the full protection intended to be given to Great American under all provisions of the 1999 GAI and the 2002 GAI and that McElwee Brothers and the Indemnitors consented to ratify and confirm all acts and actions taken and done by the Great American as

3

PX-0109-0201

such attorney-in-fact;

(E)     are required to reimbursement Great American for amounts paid and to be paid to subcontractors and suppliers and to be subrogated to the subcontractors' and suppliers' rights against others as a result of the aforesaid payments;

(F)     Great American be awarded a judgment against defendants, and each of them, for such sum as may be or hereafter be ascertained or required to indemnify the plaintiff, including for costs and disbursements and all reasonable attorneys' fees; and,

(G)     must cooperate with Great American in pursuing the various claims in this matter.

## THE PARTIES

2.

Plaintiff, Great American, is Ohio corporation with its principal place of business in Cincinnati, Ohio.

3.

Defendant, Joint Venture, is a joint venture with its principal place of business in Independence, Louisiana.

4.

Defendant, McElwee Brothers, is a Louisiana corporation with its principal place of business in Independence, Louisiana.

5.

Defendant, Mr. McElwee, is a natural person of the full age of majority who resides in Amite, Louisiana.

4

McElwee00202

6.

Defendant, Ms. Hurst, is a natural person of the full age of majority who resides in Amite, Louisiana.

7.

Defendant, Tri-State, is a New Jersey corporation with its principal place of business in Pennsylvania.

## JURISDICTION AND VENUE

8.

Jurisdiction of this Court is based upon 28 U.S.C. §1332 in that the claims are between residents of different states and the amount in controversy exceeds Seventy-Five Thousand and no/100 Dollars ($75,000.00).

9.

Venue is proper under the general federal venue statute, 28 U.S.C. §1391(a) in that a substantial part, if not all, of the acts giving rise to the claims herein occurred in Orleans and/or Tangipahoa Parishes, Louisiana.

## FACTS AND ALLEGATIONS

10.

Great American is a surety company which issues payment and performance bonds and stands as surety for selected contractors.

11.

McElwee Brothers is a contractor in the business of performing construction work.

5

PX-0109-0203

12.

Tri-State is a contractor in the business of performing construction work.

13.

On October 15, 1999, the United States Department of the Army, New Orleans District Corps of Engineers (hereinafter, the "Corps") issued Construction Solicitation and Specifications for a Southeast Louisiana Project, Dwyer Road Drainage Pumping Station Improvements Discharge Tubes and Canal, Solicitation No. DACW29-00-B-005 (hereinafter, "SELA Dwyer Road Project" or "Project"). The Project required the successful bidder to provide performance and payment bonds pursuant to 40 U.S.C. § 3131, *et seq.* (the Miller Act).

14.

McElwee Brothers sought to submit a bid for the work on the Project. However, McElwee Brothers lacked both the financial ability and the bonding capacity to do so. Thus, at some point in time, McElwee Brothers and Tri-State began talking about joining together to submit a bid for the work on the SELA Dwyer Road Project.

15.

In order to obtain the Project, McElwee Brothers and Tri-State requested that Great American issue the requisite bonds.

16.

As Great American was not willing to assume the sole risk that any failure for default by McElwee Brothers and/or Tri-State might result in a loss to Great American, it required both

6

**McElwee00204**

PX-0109-0204

companies, Mr. McElwee, Ms. Hurst, Mr. Davis and Mrs. Davis to enter into a general agreement

7

McElwee00205

PX-0109-0205

therefor. Such payment shall be equal to the amount of the reserve set by the Surety. In the event of any payment by the surety [sic] the Contractor and Indemnitors further agree that in any accounting between the Surety and the Contractor, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety.

19.

Further, under the 1999 GAI, McElwee Brothers and Indemnitors agreed to and did assign, transfer and setover to Great American certain rights, interests, actions and claims upon the occurrence of certain events. McElwee Brothers and Indemnitors agreed that, upon the occurrence of certain events, the assignments would become effective retroactive to the date of the first bond issued by Great American. More specifically, concerning the assignments, the 1999 GAI executed by McElwee Brothers and Indemnitors provided:

**ASSIGNMENT**

THIRD: The Contractor, the Indemnitors hereby consenting, will assign, transfer and set over, and do hereby assign, transfer and set over to Surety, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other indebtedness and liabilities of Contractor to the Surety, whether heretofore or hereafter incurred, the assignment to become effective retroactive to the date of the first Bond, but only in the event of (1) any abandonment, forfeiture or breach or alleged breach of any contracts referred to in the Bonds or of any breach or alleged breach of any Bonds; or (2) of any breach or alleged breach of the provisions of any of the paragraphs of this Agreement; or (3) of a default or alleged default in discharging such other indebtedness or liabilities when due; or (4) of any assignment by the Contractor for the benefit of creditors, or of the appointment or of any application for the appointment of a receiver or

9

McElwee00206

of indemnity.

17.

On October 25, 1999, McElwee Brothers, as Contractor, and Tri-State, Mr. McElwee, Ms.

Hurst, Mr. Davis and Mrs. Davis, as Indemnitors (collectively herein, "Indemnitors"), entered into

the 1999 GAI, which provided, in part, as follows:

> WHEREAS, the Contractor, in the performance of contracts and the fulfillment of obligations generally, whether in its own name solely or as a co-adventurer with others, may desire, or be required to give or procure certain surety bonds . . . which are called Bonds . . . at the request of the Contractor and Indemnitors and upon the express understanding that this Agreement of Indemnity should be given, the Surety has executed or procured to be executed . . . said Bonds on behalf of the Contractors [sic]. . . .

The 1999 GAI is attached hereto as Exhibit "A" and incorporated herein by reference.

18.

As partial consideration for Great American to issue certain bonds on behalf of McElwee

Brothers, McElwee Brothers and the Indemnitors agreed to exonerate, indemnify, and keep Great

American indemnified from and against any and all liability for losses and/or expenses as follows:

### INDEMNITY

> SECOND: The Contractor and Indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment

8

trustee for Indemnitors whether insolvent or not; or (5) of any proceeding which deprives the Contractor of the use of any of the machinery, equipment, plant, tools or material referred to in section (b) of this paragraph; or (6) of the Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisonment if Contractor be an individual: (a) All the rights of Contractor in, and growing in any manner out of the Bonds; (b) All the rights, title and interest of Contractor in and to all machinery, equipment, vehicles, plant, tools, and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the Bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of said sites; (c) All the rights, title and interest of Contractor in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontractors; (d) All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractors, laborers or materialmen or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in the Bonds; and against any surety or sureties of any subcontractor, laborer, or materialmen; (e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which Contractor has an interest.

[Emphasis added.]

20.

At the very least, the parties to the 1999 GAI agreed that:

**TRUST FUND**

FOURTH: If any of the Bonds are executed in connection with a contract which by its terms or by law prohibits the assignment of the contract price, or any part thereof, the Contractor and Indemnitors covenant and agree that all payments received for or on account of said contract shall be held as a trust fund in which the Surety has an interest, for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the

10

prosecution of the provided in said contract or any authorized extension or modification thereof; and further, it is expressly understood and declared that all monies due and to become due under any contract or contracts covered by the Bonds are trust funds, whether in the possession of the Contractor or Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said Bonds, which said trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any said Bonds, and this Agreement and declaration shall also constitute notice of such trust.

21.

Under the 1999 GAI, McElwee and Indemnitors also recognized Great American's potential

obligations and/or exposures under potential payment and performance bonds issued to McElwee

Brothers and agreed that:

### TAKEOVER

SIXTH: In the event of any breach, delay or default asserted by the obligee in any said Bonds, or the Contractor has suspended or ceased work on any contract or contracts covered by any said Bonds, or failed to pay obligations incurred in connection therewith, . . .or in the event of an assignment of creditors of the Contractor, . . .the Surety shall have the right, at its option and in its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of the Agreement, to take possession of any part or all of the work under any contract or contracts covered by any said Bonds, and at the expense of the Contractor and Indemnitors to complete or arrange for the completion of the same, and the Contractor and Indemnitors shall promptly upon demand pay to the Surety all losses, and expenses so incurred.

\* \* \*

11

McElwee00209

## BOOKS AND RECORDS

NINTH: At any time, and until such time as the liability of the Surety under any and all said Bonds is terminated, the Surety shall have the right to reasonable access to the books, records and accounts of the Contractor and Indemnitors; and any bank depository, materialman, supply house, or other person, firm or corporation when requested by the Surety is hereby authorized to furnish to the Surety any information requested including, but not limited to, the status of the work under contracts being performed by Contractor, the condition of the performance of such contracts and payments of accounts.

22.

Also, the 1999 GAI specifically provides that:

## ATTORNEY IN FACT

EIGHTEENTH: The Contractor and Indemnitors hereby irrevocably nominate, constitute, appoint and designate the Surety as their attorney-in-fact with the right, but not the obligation, to exercise all of the rights of the Contractor and Indemnitors assigned, transferred and set over to the Surety in this Agreement, and in the name of the Contractor and Indemnitors to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be herein given to the Surety under all other provisions of this Agreement. The Contractor and Indemnitors hereby ratify and confirm all acts and actions taken and done by the Surety as such attorney-in-fact.

23.

On July 25, 2002, Tri-State, Mr. Davis and Mrs. Davis, among others, as Indemnitors

(collectively herein, "Tri-State Indemnitors"), entered into the 2002 GAI. Although the provisions

of the 1999 GAI are similar to the 2002 GAI, the language differs somewhat, in part, and provides:

WHEREAS, the Undersigned, in the performance of contracts and the fulfillment of obligations generally, whether in its own name solely or as a co-adventurer with others, may desire, or be required to give or procure certain surety bonds . . . which are called Bonds . . . at the

12

McElwee00210

PX-0109-0210

request of the Undersigned and upon the express understanding that this Agreement of Indemnity (hereinafter, "Agreement") should be given, the Surety has executed or procured to be executed . . . said Bonds on behalf of the Undersigned . . . .

* * *

### INDEMNITY/EXONERATION

THIRD: The Undersigned jointly, severally and/or collectively shall exonerate, indemnify, hold harmless and keep the Surety indemnified from and against any and all liability for losses, costs, and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs, consultant or expert fees, and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of Bonds on behalf of any of the Undersigned, (2) By reason of the failure of the Undersigned to perform or comply with any of the covenants and conditions of this Agreement or (3) In enforcing any of the terms, covenants or conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Undersigned, upon demand by the Surety, as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor. The amount of such payment to the Surety by the Undersigned shall be determined by the Surety and the Surety's demand for payment hereunder may at the Surety's option be in addition to and not in lieu of or substitution for any other collateral that may have been previously deposited with Surety by or on behalf of the Undersigned. The Surety shall have the right to use the payment, or any part thereof, in payment or settlement of any liability, loss or expense for which the Undersigned would be obligated to indemnify the Surety under the terms of this Agreement. The Surety shall have no obligation to invest or to provide a return on the payment or any other collateral deposited with the Surety. The Undersigned shall be entitled to the refund of any unused portion of the payment upon termination of the liability of the Surety on all Bonds and the performance by the Undersigned of all obligations to the Surety under the terms of this Agreement. The Surety's demand shall be sufficient if sent by registered or certified mail, by facsimile transmission, or by personal service to the Undersigned at the addresses stated herein, or at the addresses of the Undersigned last known to the Surety, regardless of whether such demand is actually received. The Undersigned acknowledge that the failure of the Undersigned to deposit with the Surety, immediately upon demand,

13

deprives the Undersigned of the use of any of the machinery, equipment, plant, tools or material referred to in Section (b) of this paragraph; or (6) of the Undersigned's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisonment if the Undersigned be an individual: (a) All the rights of the Undersigned, in, and growing in any manner out of the Bonds or any contracts referred to in the Bonds; (b) All the rights, title and interest of the Undersigned in and to all machinery, equipment, vehicles, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the Bonds, materials which may in process of construction, in storage elsewhere, or in transportation to any and all of said sites: (c) All the rights, title and interest of the Undersigned in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such contracts; (d) All actions, causes of actions, claims and/or the proceeds therefrom and any demands whatsoever which the Undersigned may have or acquire against any party, including but not limited to owners, obligees, subcontractors, laborers or materialmen, architects, engineers or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in the Bonds; and against any surety or sureties of any party including, but not limited to, prime contractors, subcontractors, laborers, or materialmen; (e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Undersigned has an interest; (f) any and all accounts receivable, marketable securities, rents, proceeds of sale, instruments, chattel paper, letters of credit, documents of title, bills of lading, federal tax refunds, state and local tax refunds, and general intangibles; (g) any and all policies of insurance. The Undersigned agree that the Surety may add such schedules to this Agreement as it deems advisable, describing more specifically items of security covered by this Assignment.   Notwithstanding the foregoing, Undersigned further agree to execute and deliver to the Surety, upon its request, such further or additional instruments as may be necessary or desirable in the Surety's sole and absolute discretion to permit or facilitate either the filing of this Agreement as a Financing Statement and/or Security Agreement, or the filing of separate Financing Statements and/or Security Agreements, based upon this Agreement, in such states, counties, and/or other places as the Surety may deem

15

PX-0109-0212

the sum demanded by the Surety as payment shall cause irreparable harm to the Surety for which the Surety has no adequate remedy at law. The Undersigned agree that the Surety shall be entitled to injunctive relief for specific performance of any or all of the obligations of the Undersigned under this Agreement including the obligation to pay to the Surety the sum demanded and hereby waive any claims or defenses to the contrary. In the event of any payment of any kind by the Surety, the Undersigned further agree that in any accounting between the Surety and Undersigned, the Surety shall be entitled to charge for any and all disbursements made by the Surety in good faith in and about the matters herein contemplated by this Agreement under the belief that Surety is or was liable for the sums and amounts so dispersed, or that it was necessary or expedient for the Surety to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers, invoices, and affidavit or other evidence of any such payments made by the Surety shall be *prima facie* evidence of the fact and amount of the Undersigned's liability to the Surety. Each of the Undersigned authorizes and empowers any attorney in any state of the United States, at the request of Surety, to waive the issuing and service of process and to appear for and confess judgment against any of the Undersigned and any sum or sums due under this Agreement, together with the costs of the suit, without stay of execution, waiving inquisition and condemnation of real estate; and to release all errors and waive all right of appeal and stay of execution on behalf of the Undersigned.

## ASSIGNMENT

SECOND: The Undersigned hereby consenting, will assign, transfer and set over, and did assign, transfer and set over to Surety, as collateral, to secure the obligations in any and all of this Agreement and any other indebtedness and liabilities of Indemnitors to the Surety, whether heretofore or hereafter incurred, the assignment to become effective retroactive to the date of the first Bond, but only in the event of (1) any abandonment, forfeiture or breach or alleged breach of any contracts referred to in the Bonds or of any breach or alleged breach of any Bonds; or (2) of any breach or alleged breach of the provisions of any of the paragraphs of this Agreement; or (3) of a default or alleged default in discharging such other indebtedness or liabilities when due; or (4) of any assignment by the Undersigned for the benefit of creditors, or of the appointment or of any application for the appointment of a receiver or trustee for the Undersigned whether insolvent or not; or (5) of any proceeding which

14

McElwee00213

necessary or advisable.

## TRUST FUNDS

FOURTH: Undersigned covenant and agree that all funds received by them, or due or to become due under any contract covered by any Bond are trust funds whether in the possession of the Undersigned or another, for the benefit of all parties to whom the Undersigned incurs obligations in the performance of the contract covered by the Bond(s) and/or for the benefit of, payment to or reimbursement of the Surety for any liability, loss or expense the Surety may incur under the Bond(s) or in enforcing this Agreement. If the Surety discharges any such obligation, the Surety shall be entitled to assert the claims of any such party to the trust funds. The Undersigned shall, upon demand of the Surety and in implementation of the trust, open an account or separate accounts with a bank designated by Surety, which account(s) shall be designated as a trust account(s) for the deposit of such trust and the Undersigned shall deposit therein all monies received pursuant to said contract. Withdrawals from such account(s) shall be by check or other instrument signed by the Undersigned and countersigned by a representative by the Surety. Notwithstanding anything to the contrary herein above this dedication may be implemented in any other manner provided at law or in equity.

\* \* \*

## TAKEOVER

SIXTH: In the event of any breach, delay or default asserted by the obligee in connection with any Bond or any contract covered by the Bonds, or if the Undersigned has suspended or ceased work on any contract or contracts covered by any Bonds, or failed to pay obligations incurred in connection therewith, or in the event of the death, disappearance, Undersigned's conviction for a felony, imprisonment, incompetency, insolvency, or bankruptcy of the Undersigned, or the appointment of a receiver or trustee for the Undersigned or the property of the Undersigned, or in the event of an assignment for the benefit of creditors of the Undersigned, or if any action is taken by or against the Undersigned under or by virtue of the National/Federal Bankruptcy Act, or should reorganization or arrangement proceedings be filed by or against the Undersigned under said Act, or if any action is taken by or against the Undersigned under the insolvency laws of any state, possession, or territory of the United States the Surety shall have the right, but not the obligation, as its

16

McElwee00214

PX-0109-0214

option and in its sole discretion, and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by any Bonds, and at the expense of the Undersigned to complete or arrange for the completion of the same, and the Undersigned shall promptly upon demand pay to the Surety all losses, costs, and expenses so incurred.

\* \* \*

## BOOKS AND RECORDS

TENTH: At any time, and until such time as the liability of the Surety under any and all Bonds is terminated, the Surety shall have the right to examine and copy the books, records, and accounts of the Undersigned; and any bank depository, materialman, supply house, or other person, firm or corporation when requested by the Surety is hereby authorized and directed by the Undersigned to furnish the Surety with any information requested including, but not limited to, the status of the work under contracts being performed by the Undersigned, the condition of the performance of such contracts and payments of accounts.

\* \* \*

## ATTORNEY IN FACT

NINETEENTH: The Undersigned hereby irrevocably nominate, constitute, appoint and designate the Surety as their attorney-in-fact with the right, but not the obligation, to exercise all of the rights of the Undersigned, transferred and set over to the Surety in this Agreement, and in the name of the Undersigned to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be herein given to the Surety under all other provisions of this Agreement. The Undersigned hereby ratify and confirm all acts and actions taken and done by the Surety as such attorney-in-fact.

The 2002 GAI is attached hereto as Exhibit "B" and incorporated herein by reference.

17

McElwee00215

PX-0109-0215

24.

On August 14, 2000, McElwee Brothers and Tri-State, as  McElwee Brothers, Inc. & Tri-State Design Construction Co., Inc. (A Joint Venture) (earlier identified as "Joint Venture") entered into a Joint Venture Agreement to bid and, if successful, perform and complete the work on the SELA Dwyer Road Project (hereinafter, "JVA"). The JVA is attached hereto as Exhibit "C."

25.

The JVA required that McElwee Brothers and Tri-State execute all appropriate indemnity agreements required by the sureties upon any bond or bonds required to bid on the SELA Dwyer Road Project or required by the contract to perform the work on the Project.

26.

By letter dated March 29, 2001,the Corps notified Joint Venture that its bid for the SELA Dwyer Road Project was accepted and it was awarded the contract. On or about that same date, the Joint Venture entered into a contract with the Corps for construction of the SELA Dwyer Road Project (hereinafter, "SELA Dwyer Road Contract"). At that time, the contract amount was $5,501,188.10 and the required completion date of the contract was estimated at November 30, 2002.

27.

In reliance on the covenants and agreements of McElwee Brothers and the Indemnitors under the 1999 GAI, at the request of Mr. McElwee and Mr. Davis and pursuant to 40 U.S.C.A. 3131, *et seq.*, Great American issued payment and performance bonds No. 397 8851 dated March 30, 2001 for the SELA Dwyer Road Project on behalf of McElwee Brothers and Tri-State (hereinafter individually, "Performance Bond" and "Payment Bond," respectively and, collectively, "Bonds").

18

The Bonds incorporate the SELA Dwyer Road Contract by reference. A copy of the Bonds is attached hereto as Exhibit "D." and incorporated herein by reference.

28.

The Joint Venture began the work on the Project. Under the JVA, McElwee Brothers was the managing joint venturer responsible for the performance of the SELA Dwyer Road Project. See JVA, Exhibit "C" at paragraph 3.1.

29.

However, by Modification No. P00028 dated June 24, 2003, the Corps terminated for default the Joint Venture's right to proceed with any further work on the SELA Dwyer Road Project (hereinafter, "Termination for Default"). See letter dated June 24, 2003, attached hereto as Exhibit "E," and incorporated herein by reference. The Corps contracting officer's decision concerning the default termination was final on that date.

30.

By letter dated June 24, 2003 to the Corps, the Joint Venture provided notification to the Corps of work that the Joint Venture believed to be beyond the scope of the original contract. The letter attached a single page spreadsheet which listed seven "claims" for equitable adjustment totaling $3,230,189.00 and indicated that the SELA Dwyer Road Contract should be credited with 627 days toward the completion time (hereinafter, the "Claims"). This purported claim submission was not certified and the cover letter stated that detailed costs would be submitted upon completion of each item. However, the letter requested a decision of the Contracting Officer within 60 days. See letter dated June 24, 2003, attached hereto as Exhibit "F," and incorporated herein by reference.

19

McElwee00217

PX-0109-0217

31.

As of August 15, 2003, no further details or documents supporting the Claims or costs associated with the Claims had been submitted. See letter dated August 15, 2003 attached hereto as Exhibit "G," and incorporated herein by reference.

32.

By letter dated September 17, 2003, Mr. McElwee, purportedly as Managing Venturer, notified the Armed Services Board of Contract Appeals that "[w]e [purporting to represent the Joint Venture] are formally appealing the contracting officer's decision" under Modification Number P00028, the Termination for Default (hereinafter, "Notice of Appeal").

33.

Subsequent to the termination, the Corps called upon Great American to remedy the Joint Venture's default and to complete the SELA Dwyer Road Contract in accordance with the terms of the Performance Bond and the SELA Dwyer Road Contract terms.

34.

Great American has requested and received bids from qualified contractors to complete the work on the SELA Dwyer Road Project. Great American and the Corps have accepted a proposal from C. R. Pittman (hereinafter, "Pittman") to complete the work on the Project for $2,025,025.00. That contract price to complete the work on the Project is $718,714.16 more than the remaining contract balance available. Under the terms of the Bonds, Great American is required to pay that deficiency.

20

McElwee00218

PX-0109-0218

35.

To date, Great American, in accordance with its obligations under the Performance Bond and in its sole capacity as surety under the Performance Bonds, has negotiated with the Corps, and the Corps has executed, an agreement arranging for Pittman to complete the work on the SELA Dwyer Road Contract in accordance with Pittman's proposal and the SELA Dwyer Road Contract (that agreement is hereinafter referenced as "October Agreement").

36.

The 1999 GAI and the 2002 GAI are specifically referenced and incorporated in the October Agreement. Moreover, under the October Agreement, the Corps specifically agrees to and does recognize that both the 1999 GAI and the 2002 GAI assign all of the rights under the Bonds, thus under the SELA Dwyer Road Contract, to Great American. Considering the assignments to Great American, under the October Agreement, the Corps has waived the statutory prohibition against assignments as provided in the Assignment of Claims Act, 31 U.S.C. 3727 and the Assignment of Contracts Act, 41 U.S.C. 15, or any other provision of law or contract. Further, the Corps has agreed to recognize Great American as the "single point of contact" for and to assert any and all claims under the SELA Dwyer Road Contract, whether such claims arose before the execution of the October Agreement. Moreover, under the October Agreement, the Corps recognizes Great American's exclusive rights including, but not limited to, the right to assert all claims of equitable adjustment for any matters that arose under, concerning or in any way related to Joint Venture's work on the SELA Dwyer Road Project or to the SELA Dwyer Road Contract prior to the execution of the October Agreement. The Corp has agreed to all of the waivers noted in this paragraph.

21

McElwee00219

37.

Great American has paid, and will continue to pay, money under its Performance Bond in order to provide for the maintenance and protection of the SELA Dwyer Road Project (hereinafter, "Interim Costs"). To date, Great American has made payments totaling $378,399.72 pursuant to its obligations under the Performance Bond.

38.

Great American has also paid and processed, and continues to pay and process, the claims of numerous subcontractors, suppliers and materialmen of Joint Venture under and pursuant to the terms of the Payment Bond. To date, these payments total $972,555.26 and Great American's aggregate payment bond claims are likely to exceed $1,300,000.00. These payments are in addition to the earlier referenced Performance Bond obligations for the completion of the work on the Project.

39.

By letter dated July 29, 2003, Great American demanded that McElwee Brothers and Indemnitors indemnify and exonerate Great American for its present and expected losses and expenses. Further, Great American demanded that McElwee Brothers and the Indemnitors each provide Great American with collateral security, as required in the 1999 GAI and the 2002 GAI, in the aggregate sum of $2,000,000.00. Tri-State, Mr. Davis and Mrs. Davis have complied with this demand to Great American's satisfaction. Neither McElwee Brothers, Mr. McElwee nor Ms. Hurst have replied or responded to the request.

22

**McElwee00220**

## COUNT I

## DECLARATION OF THE RIGHTS ASSIGNED TO GREAT AMERICAN
## UNDER THE 1999 GAI AND 2002 GAI

40.

Great American repeats and realleges each and every allegation contained in paragraphs 1 through 39 as if fully set forth herein.

41.

The plain language of the 1999 GAI and the 2002 GAI, upon the alleged breach (in this instance, the Termination for Default) of the SELA Dwyer Road Contract, all rights under that contract were, by agreement in the 1999 GAI and the 2002 GAI, assigned, *in toto*, to Great American. The language of each GAI provides that the assignment would become effective retroactive to the date of the first Bond (which is March 30, 2001, prior to any work being performed on the Project). Such rights include the right to challenge the Termination for Default and the right to prepare and assert the Claims.

42.

Also under the plain language of the 1999 GAI and the 2002 GAI, upon the alleged breach (in this instance, the Termination for Default) of the SELA Dwyer Road Contract, all rights to any and all percentages retained and any and all sums that may be due or may become due on account of any and all contracts referred to in the Bonds (this includes, but is not limited to, the SELA Dwyer Road Contract) and all other contracts whether bonded or not were, by agreement in the 1999 GAI and the 2002 GAI, assigned, *in toto*, to Great American. The language of each GAI provides that the assignment would become effective retroactive to the date of the first Bond (which is March 30, 2001, prior to any work being performed on the Project). Such rights include

23

McElwee00221

PX-0109-0221

receiving any equitable adjustments associated with the Termination for Default and the right to prepare and assert the Claims.

43.

Subsequent to the Termination for Default, Tri-State, Mr. Davis and Mrs. Davis have recognized Great American's rights under the 1999 GAI and the 2002 GAI and have cooperated with Great American concerning the pursuit of its rights under the GAI's. However, the Joint Venture (primarily through the unilateral actions of Mr. McElwee and with the cooperation of Ms. Hurst) McElwee Brothers, Mr. McElwee and Ms. Hurst, have, each step of the way, interfered, directly or indirectly, with Great American's rights under the 1999 GAI and 2002 GAI. Such interference includes, but is not limited to:

a.  The failure of McElwee Brothers, Mr. McElwee and Ms. Hurst to provide Great American with any collateral security as provided in the 1999 GAI;

b.  The failure of McElwee Brothers, Mr. McElwee and Ms. Hurst to make any payment to Great American for its exposure under the Bonds and/or its present actual losses and expenses incurred to date.

c.  Mr. McElwee's unilateral filing, purportedly on behalf of the Joint Venture, but on information and belief, without the requisite authority of the joint venturer, Tri-State, of the Notice of Appeal.

d.  Mr. McElwee's representation to attorney William Melancon that the Joint Venture is entitled to assert the claims and, on information and belief, enter into, without the consent of Tri-State, a 50% contingency fee arrangement to hire Mr. Melancon to compile and assert against the Corps the claims assigned to Great American.

24

**McElwee00222**

**PX-0109-0222**

44.

An actual case or controversy exists between Great American and the Joint Venture, McElwee Brothers, Mr. McElwee and Ms. Hurst regarding the extent, validity and enforcement of the assignment provisions provided in the 1999 GAI concerning the right to challenge the Termination for Default and to assert the Claims and collect all sums or equitable adjustments that may be due or that may hereafter become due in accordance with and/or under the SELA Dwyer Road Contract.

45.

Pursuant to 28 U.S.C. § 2201, Great American is entitled to a declaration that the Great American has been assigned and has the exclusive right, but not the obligation, to assert or otherwise pursue all rights under the contracts growing in any manner out of the Bonds, including, but not limited to the SELA Dwyer Road Contract, and to collect any and all percentages retained or sums that may be due or that may hereafter become due on account of any and all contracts referred to in the Bonds -- including, but not limited to, the SELA Dwyer Road Contract -- and all other contracts, bonded or not, in which the Joint Venture, McElwee and/or Tri-State has an interest and that the Joint Venture, McElwee, Mr. McElwee, Ms. Hurst and Tri-State must refrain from either directly or indirectly interfering with Great American's exercise of its rights under the 1999 GAI and the 2002 GAI, including, but not limited to, refraining from taking any action as to the Termination for Default and/or the Claims except to assist Great American in pursuit of the Claims and the challenge to the Termination for Default.

25

McElwee00223

PX-0109-0223

## COUNT II

### DECLARATION OF THE GREAT AMERICAN'S RIGHTS OF INDEMNITY
### UNDER THE 1999 GAI AND THE 2002 GAI

46.

Great American repeats and realleges each and every allegation contained in paragraphs 1 through 45 as if fully set forth herein.

47.

Despite appropriate demand made by Great American, McElwee Brothers, Mr. McElwee and Ms. Hurst have failed to provide Great American with any collateral security as required by the 1999 GAI. Moreover, McElwee Brothers, Mr. McElwee and Ms. Hurst have failed and refused to make any payment to Great American for its exposure under the Bonds and/or its present actual losses and expenses associated with the Bonds that have been incurred to date.

48.

An actual case or controversy exists between Great American and the Joint Venture, McElwee Brothers, Mr. McElwee and Ms. Hurst regarding the extent to which the Joint Venture, McElwee Brothers, Mr. McElwee and Ms. Hurst are required to indemnify and hold harmless Great American for any and all claims, expenditures, and/or losses of whatsoever kind arising out of or related to the Bonds or the SELA Dwyer Road Contract.

49.

Pursuant to 28 U.S.C. § 2201, Great American is entitled to a declaration that the Joint Venture, McElwee Brothers, Mr. McElwee and Ms. Hurst are required to promptly and fully indemnify and hold Great American harmless and to provide Great American with payment and/or collateral security to secure Great American for any and all claims, expenditures, and/or losses of

26

McElwee00224

whatsoever kind arising out of or related to the Bonds or the SELA Dwyer Road Contract.

## COUNT III

## DECLARATION OF GREAT AMERICAN'S RIGHTS UNDER THE 1999 GAI AND THE 2002 GAI TO ARRANGE FOR THE COMPLETION OF THE PROJECT AND PURSUE OR SETTLE ALL CLAIMS UNDER THE CONTRACT

50.

Great American repeats and realleges each and every allegation contained in paragraphs 1 through 49 as if fully set forth herein.

51.

Under the assignment provision of the GAI, Great American owns all rights to the contract subject to the Bonds and Great American wishes to exercise those rights, including the right to challenge the Termination for Default and to seek conversion of same to a termination for convenience and Great American's right to properly compose and support the Claims, submit the Claims to the Corps and receive whatever equitable adjustments are associated with the Claims. Great American admits that, after Great American has paid all obligations under the bonds and it has been fully reimbursed for all payments, attorneys' fees, costs and other expenses, if any funds remain, those funds should be distributed to McElwee Brothers and the Indemnitors, as their respective interests may appear, all in accordance with the GAI's.

52.

On information and belief, the Joint Venture, is continuing to take steps in contravention to the assignments in the 1999 GAI and the 2002 GAI. On information and belief, the Joint Venture, through the unilateral actions of Mr. McElwee and with the assistance of Ms. Hurst, is entering (or has entered) into a 50% contingency fee contract with an attorney to challenge the

27

McElwee00225

PX-0109-0225

Termination for Default and compile, submit and pursue the Claims which have been assigned to Great American. Such actions are unsupported by the assignments clearly provided in the 1999 GAI and the 2002 GAI and are in contravention thereof.

53

An actual case or controversy exists between Great American and the Joint Venture, McElwee Brothers, Mr. McElwee and Ms. Hurst regarding the extent to which Great American has the right and is authorized, at its option and in its sole discretion, with or without exercising any other right or option conferred upon it by law or in the terms of 1999 GAI or the 2002 GAI, to take possession of any part or all of the work under any contract or contracts covered by any said Bonds, and at the expense of the McElwee Brothers and Indemnitors to complete or arrange for the completion of the same, and that McElwee Brothers and Indemnitors are required to promptly, upon demand, pay Great American all losses, and expenses so incurred.

54.

Pursuant to 28 U.S.C. § 2201, Great American is entitled to a declaration that Great American has the right and is authorized, at its option and in its sole discretion, with or without exercising any other right or option conferred upon it by law or in the terms of 1999 GAI or the 2002 GAI, to take possession of any part or all of the work under any contract or contracts covered by any said Bonds, and at the expense of the McElwee Brothers and Indemnitors to complete or arrange for the completion of the same, and that McElwee Brothers and Indemnitors are required to promptly, upon demand, pay Great American all losses, and expenses so incurred.

55.

Nonetheless, McElwee Brothers and Indemnitors are obligated to assist Great American in

28

McElwee00226

pursuing the various Claims and these individuals and entities are compelled to do so under the

GAI's (not to mention to assist in their own best interest).

## COUNT IV

### DECLARATION OF GREAT AMERICAN'S RIGHTS
### UNDER THE 1999 GAI AND THE 2002 GAI
### TO RECEIVE ALL PROJECT DOCUMENTS

56.

Great American incorporates by reference all allegations contained in paragraphs 1 through

55.

57.

As McElwee Brothers was managing joint venturer responsible for the performance of the

SELA Dwyer Road Project and was, on information and belief, in possession and control of the

documentation for the Project, by letter dated July 3, 2003, Great American requested that the Joint

Venture produce or prepare documents to assist in the investigation of the status of the work on the

Project.

58.

By letter dated July 24, 2003 to counsel for the Joint Venture, counsel for Great American

noted that Great American required the production of "all project books and records" to arrange

for the continued performance of the construction process.  On information and belief, those

documents were maintained by McElwee Brothers, or McElwee.

59.

In response to this request, Tri-State provided its express authority and direction for Great

American to have full and unfettered access to review and copy the records.  McElwee Brothers

29

McElwee00227

PX-0109-0227

and/or McElwee, who maintained those files, initially set unreasonable terms and limited access to those files, thus, in essence refusing to produce the files.

60.

McElwee eventually agreed to make "the joint venture project records available" under certain conditions. On July 29, 2003, McElwee brought one file cabinet of project documents to IKON Office Solutions in New Orleans for copying. Great American was never allowed to make an investigation of the scope of other documents that McElwee might have in his possession.

61.

By letter dated August 12, 2003, counsel for the Joint Venture represented that "all of the project documents in the possession of Mr. McElwee were produced for copying at IKON on July 29, 2003, with the exception of the documents already copied and delivered to Joel Beach [Great American's representative] and the documents remaining on the job."

62.

On information and belief, these were not all of the documents in McElwee Brothers and/or McElwee's possession and McElwee Brothers and/or McElwee continues to produce those documents piecemeal.

63.

McElwee Brothers and/or McElwee has refused, contrary to the duties mandated in the GAI's and despite the continued assistance to Great American of Tri-State and the Davis Indemnitors, to produce all documents in its/his possession that Great American is entitled to receive under the GAI's and that are necessary for Great American to investigate, evaluate and arrange for the completion of the SELA Dwyer Road Project.

30

McElwee00228

64.

An actual case or controversy exists between Great American and the Joint Venture, McElwee Brothers, Mr. McElwee and Ms. Hurst regarding the extent to which Great American is entitled to receive all project documents and/or other financial records of the Joint Venture, McElwee Brothers, Mr. McElwee and/or Ms. Hurst.

65.

Pursuant to 28 U.S.C. § 2201, Great American is entitled to a declaration that the 1999 GAI and the 2002 GAI require that the Joint Venture, McElwee Brothers, Mr. McElwee and Mrs. Hurst provide Great American with reasonable access to the books, records and accounts of McElwee Brothers and the Indemnitors and that any bank depository, materialman, supply house, or other person, firm or corporation when requested by Great American is hereby authorized to furnish to Great American any information requested including, but not limited to, the status of the work under contracts being performed under the SELA Dwyer Road Contract, the condition of the performance of such contract and payments of accounts project documents or other financial records or information and that McElwee Brothers and the Indemnitors be ordered to specifically perform with its obligation to provide Great American with all such documentation.

## COUNT V

### DECLARATION THAT GREAT AMERICAN IS THE ATTORNEY-IN-FACT AS PROVIDED IN THE 1999 GAI AND THE 2002 GAI

66.

Great American incorporates by reference all allegations contained in paragraphs 1 through 65.

31

McElwee00229

PX-0109-0229

67.

An actual case or controversy exists between Great American and McElwee Brothers, Tri-State, Mr. McElwee and Ms. Hurst regarding the extent that Great American has been irrevocably nominated, constituted and appointed  as the attorney-in-fact for McElwee Brothers and the Indemnitors with the right, but not the obligation, to exercise all of the rights assigned, transferred and set over to Great American under the 1999 GAI and the 2002 GAI, and that Great American may, in the name McElwee Brothers and Indemnitors make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by Great American in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be given to Great American under all provisions of the 1999 GAI and the 2002 GAI and that McElwee Brothers and the Indemnitors consented to ratify and confirm all acts and actions taken and done by the Great American as such attorney-in-fact.

68.

Pursuant to 28 U.S.C. § 2201, Great American is entitled to a declaration that Great American has been irrevocably nominated, constituted and appointed  as the attorney-in-fact for McElwee Brothers and the Indemnitors with the right, but not the obligation, to exercise all of the rights assigned, transferred and set over to Great American under the 1999 GAI and the 2002 GAI, and that Great American may, in the name McElwee Brothers and Indemnitors make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by Great American in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be given to Great American under all provisions of the 1999 GAI and the 2002 GAI and that McElwee Brothers and the Indemnitors

32

McElwee00230

PX-0109-0230

consented to ratify and confirm all acts and actions taken and done by the Great American as such attorney-in-fact .

## COUNT VI

## DECLARATION Of GREAT AMERICAN'S RIGHTS OF SUBROGATION

69.

Great American incorporates by reference all allegations contained in paragraphs 1 through 68.

70.

Great American in its capacity as the issuer of the payment bond referred to above has paid the uncontested claims of subcontractors and suppliers in the excess of $840,000.00 to satisfy claims against the Joint Venture.  Great American expects to pay additional claims to other subcontractors and suppliers.  Such payments are expected to exceed $1,300,000.00.

71.

Pursuant to 28 U.S.C. § 2201, Great American is entitled to a declaration that Great American is entitled to reimbursement of amounts paid and to be paid to subcontractors and suppliers and to be subrogated to the subcontractors' and suppliers' rights against others as a result of the aforesaid payments.

WHEREFORE, plaintiff, Great American  Insurance Company prays:

1.     That this Court issue a judgment declaring that the 1999 GAI and the 2002 GAI are valid and enforceable as to all provision of the agreements, such declaration to include, but be not limited to, a declaration that McElwee Brothers, individually and as joint venturer of the Joint Venture, Mr. McElwee, Ms. Hurst and Tri-State, individually and as joint

33

McElwee00231

PX-0109-0231

venturer of the Joint Venture:

(A)    must refrain from either directly or indirectly interfering with Great American's exercise of its rights under the 1999 GAI and the 2002 GAI, including, but not limited to, refraining from taking any action as to the Termination for Default and/or the Claims except to assist Great American in pursuit of those matters;

(B)    must indemnify, exonerate and keep Great American indemnified against all loss, cost, expenses and attorneys' fees, and all other liabilities arising out of the Great American's execution of the Bonds to the United States of America, including requiring McElwee Brothers, Mr. McElwee, Ms. Hurst and Tri-State to provide to Great American sufficient collateral in support of the potential exposure and actual payments that Great American has made, and continues to make under the Bonds;

(C)    must each specifically perform their obligations under the GAI, including, but not limited to, producing all construction and financial (costs and expenditure) records, all correspondence and other all records including those necessary to allow Great American to arrange for the completion of the work on the SELA Dwyer Road Project, to prepare for the appeal of the Termination for Default and to compile and submit Claims for equitable adjustment on the Project and to assist Great American in pursuit of the various claims;

(D)    have irrevocably nominated, constituted and appointed Great American as the attorney-in-fact for McElwee Brothers and the Indemnitors with the right, but not the obligation, to exercise all of the rights assigned, transferred and set over to Great American under the 1999 GAI and the 2002 GAI, and that Great American

34

McElwee00232

may, in the name McElwee Brothers and Indemnitors make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by Great American in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be given to Great American under all provisions of the 1999 GAI and the 2002 GAI and that McElwee Brothers and the Indemnitors consented to ratify and confirm all acts and actions taken and done by the Great American as such attorney-in-fact and to assist Great American in pursuit of the various claims;

(E)     are required to reimburse Great American for all amounts paid and to be paid to subcontractors and suppliers and to be subrogated to the subcontractors' and suppliers' rights against others as a result of the aforesaid payments;

(F)     Great American be awarded judgment against defendants, and each of them, for such sum as may be or hereafter be ascertained or required to indemnify the plaintiff, including for costs and disbursements and all reasonable attorneys' fees; and,

(G)     must cooperate with Great American in pursuing the various claims in this matter.

2.     A temporary restraining order issue, according to law, to defendants, McElwee Brothers, individually and as joint venturer of the Joint Venture, Mr. McElwee, Ms. Hurst and Tri-State, individually and as joint venturer of Joint Venture:

(A)     requiring that each refrain from either directly or indirectly interfering with Great American's exercise of its rights under the 1999 GAI and the 2002 GAI, including, but not limited to, refraining from taking any action as to the Termination for

35

McElwee00233

PX-0109-0233

Default and/or the Claims except to assist Great American in pursuit of those
matters;

(B) requiring that each indemnify, exonerate and keep Great American indemnified
against all loss, cost, expenses and attorneys' fees, and all other liabilities arising
out of the Great American's execution of the Bonds to the United States of America,
including requiring McElwee Brothers, Mr. McElwee, Ms. Hurst and Tri-State to
provide to Great American sufficient collateral in support of the potential exposure
and actual payments that Great American has made, and continues to make under
the Bonds;

(C) requiring that each specifically perform their obligations under the GAI, including,
but not limited to, producing all construction and financial (costs and expenditure)
records, all correspondence and other all records including those necessary to allow
Great American to arrange for the completion of the work on the SELA Dwyer
Road Project, to prepare for the appeal of the Termination for Default and to
compile and submit Claims for equitable adjustment on the Project and to assist
Great American in pursuit of the various claims;

(D) requiring that each refrain from either directly or indirectly interfering with the
irrevocable nomination and appointment of Great American as the attorney-in-fact
for McElwee Brothers and the Indemnitors with the right, but not the obligation, to
exercise all of the rights assigned, transferred and set over to Great American under
the 1999 GAI and the 2002 GAI, and that Great American may, in the name
McElwee Brothers and Indemnitors make, execute, and deliver any and all

36

McElwee00234

PX-0109-0234

additional or other assignments, documents or papers deemed necessary and proper by Great American in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be given to Great American under all provisions of the 1999 GAI and the 2002 GAI and that McElwee Brothers and the Indemnitors consented to ratify and confirm all acts and actions taken and done by the Great American as such attorney-in-fact;

(E)     requiring that each reimburse Great American for all amounts paid and to be paid to subcontractors and suppliers and to be subrogated to the subcontractors' and suppliers' rights against others as a result of the aforesaid payments;

(F)     that the Court award Great American judgment against defendants, and each of them, for such sum as may be or hereafter be ascertained or required to indemnify the plaintiff, including for costs and disbursements and all reasonable attorneys' fees; and,

(G)     requiring that each cooperate with Great American in pursuing the various claims in this matter.

3.     A preliminary injunction issue, according to law, to defendants, McElwee Brothers, individually and as joint venturer of the Joint Venture, Mr. McElwee, Ms. Hurst and Tri-State, individually and as joint venturer of Joint Venture:

(A)     requiring that each refrain from either directly or indirectly interfering with Great American's exercise of its rights under the 1999 GAI and the 2002 GAI, including, but not limited to, refraining from taking any action as to the Termination for Default and/or the Claims except to assist Great American in pursuit of those

37

McElwee00235

PX-0109-0235

matters;

(B)     requiring that each indemnify, exonerate and keep Great American indemnified against all loss, cost, expenses and attorneys' fees, and all other liabilities arising out of the Great American's execution of the Bonds to the United States of America, including requiring McElwee Brothers, Mr. McElwee, Ms. Hurst and Tri-State to provide to Great American sufficient collateral in support of the potential exposure and actual payments that Great American has made, and continues to make under the Bonds;

(C)     requiring that each specifically perform their obligations under the GAI, including, but not limited to, producing all construction and financial (costs and expenditure) records, all correspondence and other all records including those necessary to allow Great American to arrange for the completion of the work on the SELA Dwyer Road Project, to prepare for the appeal of the Termination for Default and to compile and submit Claims for equitable adjustment on the Project and to assist Great American in pursuit of the various claims;

(D)     requiring that each refrain from either directly or indirectly interfering with the irrevocable nomination and appointment of Great American as the attorney-in-fact for McElwee Brothers and the Indemnitors with the right, but not the obligation, to exercise all of the rights assigned, transferred and set over to Great American under the 1999 GAI and the 2002 GAI, and that Great American may, in the name McElwee Brothers and Indemnitors make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper

38

McElwee00236

PX-0109-0236

by Great American in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be given to Great American under all provisions of the 1999 GAI and the 2002 GAI and that McElwee Brothers and the Indemnitors consented to ratify and confirm all acts and actions taken and done by the Great American as such attorney-in-fact;

(E) requiring that each reimburse Great American for all amounts paid and to be paid to subcontractors and suppliers and to be subrogated to the subcontractors' and suppliers' rights against others as a result of the aforesaid payments;

(F) that the Court award Great American judgment against defendants, and each of them, for such sum as may be or hereafter be ascertained or required to indemnify the plaintiff, including for costs and disbursements and all reasonable attorneys' fees; and,

(G) requiring that each cooperate with Great American in pursuing the various claims in this matter.

4. Thereafter, permanent mandatory or prohibitory injunctions issue in the form and substance of the preliminary injunction prayed for above, immediately and permanently requiring defendants, McElwee Brothers, individually and as joint venturer of the Joint Venture, Mr. McElwee, Ms. Hurst and Tri-State, individually and as joint venturer of Joint Venture to:

(A) refrain from either directly or indirectly interfering with Great American's exercise of its rights under the 1999 GAI and the 2002 GAI, including, but not limited to, refraining from taking any action as to the Termination for Default and/or the Claims except to assist Great American in pursuit of those matters;

39

McElwee00237

(B)     indemnify, exonerate and keep Great American indemnified against all loss, cost, expenses and attorneys' fees, and all other liabilities arising out of the Great American's execution of the Bonds to the United States of America, including requiring McElwee Brothers, Mr. McElwee, Ms. Hurst and Tri-State to provide to Great American sufficient collateral in support of the potential exposure and actual payments that Great American has made, and continues to make under the Bonds;

(C)     each specifically perform their obligations under the GAI, including, but not limited to, producing all construction and financial (costs and expenditure) records, all correspondence and other all records including those necessary to allow Great American to arrange for the completion of the work on the SELA Dwyer Road Project, to prepare for the appeal of the Termination for Default and to compile and submit Claims for equitable adjustment on the Project and to assist Great American in pursuit of the various claims;

(D)     refrain from either directly or indirectly interfering with the irrevocable nomination and appointment of Great American as the attorney-in-fact for McElwee Brothers and the Indemnitors with the right, but not the obligation, to exercise all of the rights assigned, transferred and set over to Great American under the 1999 GAI and the 2002 GAI, and that Great American may, in the name McElwee Brothers and Indemnitors make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by Great American in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be given to Great American under all provisions

40

McElwee00238

PX-0109-0238

of the 1999 GAI and the 2002 GAI and that McElwee Brothers and the Indemnitors consented to ratify and confirm all acts and actions taken and done by the Great American as such attorney-in-fact;

(E)     reimburse Great American for all amounts paid and to be paid to subcontractors and suppliers and to be subrogated to the subcontractors' and suppliers' rights against others as a result of the aforesaid payments;

(F)     that the Court award Great American judgment against defendants, and each of them, for such sum as may be or hereafter be ascertained or required to indemnify the plaintiff, including for costs and disbursements and all reasonable attorneys' fees; and,

(G)     cooperate with Great American in pursuing the various claims in this matter.

5.     An award to plaintiff for all costs of this action and the reasonable attorneys' fees incurred by the plaintiff necessary to prosecute this action to trial, at trial and on appeal;

6.     Pre-judgment and post-judgment interest; and,

41

PX-0109-0239

7. Further, plaintiff prays for all such other legal, equitable and general relief to which it may be entitled.

Respectfully submitted,

Lloyd N. Shields (La. Bar # 12022)
Daniel Lund, III (La. Bar # 19014)
Stuart G. Richeson (La. Bar # 23912)
Elizabeth L. Gordon (La. Bar # 21619)
Shields Mott Lund L.L.P.
650 Poydras Street, Suite 2400
New Orleans, Louisiana 70130
Telephone:     (504) 581-4445
Telecopy:      (504) 581-4440

Attorneys for
Great American Insurance Company

W:\Clients\33405-19\Pleadings\Complaint 10-6.wpd

42

McElwee00240

PX-0109-0240

BEFORE THE ARMED SERVICES BOARD OF CONTRACT APPEALS

FALLS CHURCH, VIRGINIA

| | |
|---|---|
| Appeal of )<br>)<br>McElwee Brothers, Inc. & )<br>Tri-State Design Construction Company, Inc., )<br>Joint Venture )<br>)<br>Under Contract No. DACW 29-01-C-0035 )<br>)<br>)<br>)<br>) | ASBCA NO. 54337 |

---

**COMPLAINT**

---

The complaint of Great American Insurance Company (hereinafter, "Great American"),
a corporation organized under the laws of the State of Ohio, with its principal place of business
in the State of Ohio, on its own behalf and/or as attorney-in-fact for McElwee Brothers, Inc. &
Tri-State Design Construction Company, Inc. (A Joint Venture) (hereinafter, "Joint Venture")
respectfully represents:

McElwee00241

EXHIBIT
13

## BACKGROUND

### 1.

Great American is a surety company which issues payment and performance bonds and stands as surety for selected contractors.

### 2.

McElwee Brothers, Inc. (hereinafter "McElwee Brothers") is a contractor in the business of performing construction work.

### 3.

Tri-State Design Construction Company, Inc. (hereinafter "Tri-State") is a contractor in the business of performing construction work.

### 4.

On October 15, 1999, the United States Department of the Army, New Orleans District Corps of Engineers (hereinafter, the "Corps") issued Construction Solicitation and Specifications for a Southeast Louisiana Project, Dwyer Road Drainage Pumping Station Improvements Discharge Tubes and Canal, Solicitation No. DACW29-00-B-005 (hereinafter, "SELA Dwyer Road Project" or "Project"). The Project required the successful bidder to provide performance and payment bonds pursuant to 40 U.S.C. § 3131, *et seq.* (the Miller Act).

### 5.

McElwee Brothers sought to submit a bid for the work on the Project. However, McElwee Brothers lacked both the financial ability and the bonding capacity to do so. Thus, at some point in time, McElwee Brothers and Tri-State began talking about joining together to submit a bid for

2

McElwee00242

PX-0109-0242

the work on the SELA Dwyer Road Project.

6.

In order to obtain the Project, McElwee Brothers and Tri-State requested that Great American issue the requisite bonds.

7.

As Great American was not willing to assume the sole risk that any failure for default by McElwee Brothers and/or Tri-State might result in a loss to Great American, it required both companies, Mr. McElwee, Ms. Hurst, Mr. Davis and Mrs. Davis to enter into a general agreement of indemnity.

8.

On October 25, 1999, McElwee Brothers, as Contractor, and Tri-State, Mr. McElwee, Ms. Hurst, Mr. Davis and Mrs. Davis, as Indemnitors (collectively herein, "Indemnitors"), entered into the 1999 GAI, which provided, in part, as follows:

> WHEREAS, the Contractor, in the performance of contracts and the fulfillment of obligations generally, whether in its own name solely or as a co-adventurer with others, may desire, or be required to give or procure certain surety bonds . . . which are called Bonds . . . at the request of the Contractor and Indemnitors and upon the express understanding that this Agreement of Indemnity should be given, the Surety has executed or procured to be executed . . . said Bonds on behalf of the Contractors [sic]. . . .

> The 1999 GAI is attached hereto as Exhibit "__" and incorporated herein by reference.

9.

On July 25, 2002, Tri-State, Mr. Davis and Mrs. Davis, among others, as Indemnitors (collectively herein, "Tri-State Indemnitors"), entered into the 2002 GAI. Although the provisions

3

McElwee00243

of the 1999 GAI are similar to the 2002 GAI, the language differs somewhat. The 2002 GAI is attached hereto as Exhibit "__" and incorporated herein by reference.

10.

On August 14, 2000, McElwee Brothers and Tri-State, as Joint Venture entered into a Joint Venture Agreement to bid and, if successful, perform and complete the work on the SELA Dwyer Road Project (hereinafter, "JVA"). Under the JVA, McElwee Brothers was the managing joint venturer responsible for the performance of the SELA Dwyer Road Project.

11.

The JVA required that McElwee Brothers and Tri-State execute all appropriate indemnity agreements required by the sureties upon any bond or bonds required to bid on the SELA Dwyer Road Project or required by the contract to perform the work on the Project.

**THE PROJECT**

12.

By letter dated March 29, 2001, the Corps notified Joint Venture that its bid for the SELA Dwyer Road Project was accepted and it was awarded the contract. On or about that same date, the Joint Venture entered into a contract with the Corps for construction of the SELA Dwyer Road Project (hereinafter, "SELA Dwyer Road Contract"). At that time, the contract amount was $5,501,188.10 and the required completion date of the contract was estimated at November 30, 2002.

13.

In reliance on the covenants and agreements of McElwee Brothers and the Indemnitors under the 1999 GAI, at the request of Mr. McElwee and Mr. Davis and pursuant to 40 U.S.C.A.

4

**McElwee00244**

3131, *et seq.*, Great American issued payment and performance bonds No. 397 8851 and dated March 30, 2001 for the SELA Dwyer Road Project on behalf of McElwee Brothers and Tri-State (hereinafter individually, "Performance Bond" and "Payment Bond," respectively and, collectively, "Bonds"). The Bonds incorporate the SELA Dwyer Road Contract by reference. A copy of the Bonds is attached hereto as Exhibit "____." and incorporated herein by reference.

14.

On April 3, 2001, the Corps issued a notice to proceed requiring that work commence with in ten calendar days after the date of the Notice to Proceed.

15.

The Submittal Procedure Meeting was scheduled for May 3, 2001 and the Preconstruction Conference was scheduled for May 15, 2001.

16.

The Joint Venture began the work on the Project in or about ____, 2001.

17.

In October of 2001, the Corps approved the Joint Venture's schedule for the project "for that part of the work that can be accomplished with the available funds." See letter dated October 3, 2001, attached hereto as Exhibit "__." As scheduled, the work was to be performed in six phases: Phase No. I, Box Culvert; Phase No. II, Outfall – End of Discharge Tunnel; Phase No III, Sluice Gate Area; Phase No. IV, Blind Bridge # 2-3 and T-Wall Closure Structure; Phase No. V, Blind Bridge # 1; and, Phase VI, Dolphins.

5

McElwee00245

PX-0109-0245

18.

The schedule was basically linear in that work was scheduled to be completed on a successive, rather than concurrent basis and delineated certain lead time for items which allowed the Joint Venture time to procure materials and mobilize all forces, labor and equipment necessary to perform the scheduled item of work.

## THE TERMINATION FOR DEFAULT

19.

The Joint Venture performed work and provided labor and material for the general construction required to complete the work on the SELA Dwyer Road Project. However, by Modification No. P00028 dated June 24, 2003, the Corps terminated for default the Joint Venture's right to proceed with any further work on the SELA Dwyer Road Project (hereinafter, "Termination for Default"). See letter dated June 24, 2003, attached hereto as Exhibit "__," and incorporated herein by reference. The Corps contracting officer's decision concerning the default termination was final on that date.

20.

The Termination for Default listed as "Acts or Omissions Constituting the Default" the following:

> A) Repeated failure to maintain adequate Quality Control and workmanship including, as a minimum, such items as insufficient implementation of the Contractor Quality Control Plan, improper storage of materials, deviations from approved submittals and incomplete flood protection installation.

> B) Repeated failure to manage performance including Contractor's ill-defined lines of authority, inconsistencies

6

**McElwee00246**

between the roles and the individuals of the joint venture performing these roles, and ineffective use of resources, resulting in a delay to the overall completion of the contract.

C)    Failure to fully implement an acceptable form of interim flood protection which maintains traffic on Jourdan Road by 20 June 2003, as a condition of continued forbearance per the Contracting Officer's letter dated 30 May 2003.

21.

In the Termination for Default, the Corps alleges that various management and organizational problems resulted in the delay to the overall completion of the contract. However, the delays to the completion of the contract are more appropriately attributable to events that are "excusable" under Federal Acquisition Regulation 52.249-10 – "Default," which was incorporated by reference into the SELA Dwyer Road Contract Specification in Section 00700 "Contract Clauses". Federal Acquisition Regulation 52.249-10 states, in pertinent part:

(a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) . . . .

(b) The Contractor's right to proceed **shall not** be terminated nor **the Contractor charged with damages** under this clause, if–

(1) **The delay** in completing the work **arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples** of such causes **include** (i) **acts of God** . . . (ii) **acts of the Government** in either its sovereign or contractual capacity, (iii) **acts of another Contractor** in the performance of a contract with the Government, . . . (xi) delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers; and

7

McElwee00247

PX-0109-0247

(2) The Contractor, within 10 days from the beginning of any delay (unless extended by the Contracting Officer), notifies the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of delay. If, in the judgment of the Contracting Officer, the findings of fact warrant such action, the time for completing the work shall be extended. The findings of the Contracting Officer shall be final and conclusive on the parties, but subject to appeal under the Disputes clause.

(c) If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government.

Federal Acquisition Regulation 52.249-10 [Emphasis added].

22.

As will be shown, the principal events that caused the delay in the completion of the SELA Dwyer Road Project were excusable under FAR 52.249 as the delay is attributable to: (i) the Joint Venture receiving incorrect layout information, survey data, grades and alignment information from the Corps concerning Jourdan Road; (ii) delays granted by the Corps for certain work being performed by another contractor on an interrelated, superceding project to relocate a 30" sewer force main; (iii) the discovery of unforeseen subsurface site conditions: namely, an abandoned subsurface 30" sewer line; (iv) the discovery of unforeseen subsurface soil conditions on occasions work performed on the project; (v) demobilization and mobilization activities required as a result of three tropical storms/hurricanes affecting the area in and around the SELA Dwyer Road Project; and (vi) delays in the Corps' responses to various submittals from the Joint Venture. Much of the delay occurring from these events was caused by the late responses of the Corps to Requests for Information (hereinafter "RFI") from the Corps to the Joint Venture and disputes over excusable

8

McElwee00248

PX-0109-0248

delays, change or    pricing and Government funding. Virtually all of the aforementioned delays, the details of whic    are presented hereinafter, were not only excusable, but compensable.

## THE CLAIMS

### 23.

By letter d    d June 24, 2003 to the Corps, the Joint Venture provided notification to the Corps of work th    the Joint Venture believed to be beyond the scope of the original contract (hereinafter, "Cla    ;"). The letter attached a single page spreadsheet which listed the Claims for equitable adjustme:   totaling $3,230,189.00 and indicated that the SELA Dwyer Road Contract should be credited    ith 627 days toward the completion time. Such notice was not the first sent to the Corps conc    ing each of these matters. The letter requested a decision of the Contracting Officer within 60    ys. See letter dated June 24, 2003, attached hereto as Exhibit "___," and incorporated here    y reference. The Claims will be discussed herein as follows:

Jou    n Road de-grading and by-pass road construction;

De:    ive specifications for pile design, including additional dev    ring design costs, removal of existing concrete piles and the inje    on of Bentonite slurry;

Unf    seen subsurface site conditions: namely, an abandoned sub    face 30" sewer line;

Oth    Contractor (not the Joint Venture) delays on the project for the relo    ion of the 30" sewer force main relocation; and

Hur    ane/tropical storm work; and,

Go    ment delays – submittal review

9

**McElwee00249**

**PX-0109-0249**

JOURDAN ROAD DE-GRADING AND BYPASS ROAD CONSTRUCTION

24.

Contract Specification Section 01100, Paragraph 25, "ORDER OF WORK," required

that certain work be completed during "non-hurricane season" (December through May). Such

work included:

> Degrading Jourdan Road.
>
> Installation of welded steel discharge tubes and sluice gate structure to limits shown on the drawings.
>
> Reconstruction of Jourdan Road. Jourdan Road shall be reconstructed to the grades shown on the construction drawings and opened to traffic during the hurricane season (June through November).

25.

Before Jourdan Road could be degraded to facilitate future work, a by-pass road had to be

constructed to facilitate future work and to allow movement of traffic on Jourdan Road.

26.

The Corps initially furnished layout information, survey data, grades and alignment, to the

Joint Venture to construct the temporary by-pass road. However, such information was

inaccurate.

27.

By letter dated December 14, 2001, the Corps' Administrative Contracting Officer, Tim

Roth, criticized the Joint Venture for not starting the work on the by-pass road in keeping with the

approved schedule. However, on December 18, 2001, during a job site visit, the Joint Venture,

through Mr. McElwee and Mr. Todd J. Jacquet (hired by the Joint Venture in the position of

10

McElwee00250

Alternate Contractor Quality Control Manager OR WAS HE THE JOINT VENTURE'S PROJECT ENGINEER), informed Corps representative, Mr. Gremillion, that the survey data for the by-pass road was incorrect and requested further direction from the Corps. The Corps hired a surveyor to perform a horizontal layout of the by-pass road on or about January 14, 2002.

28.

On January 14, 2002, some 37 days after initial notice and with knowledge of the defective information originally provided to the Joint Venture, the Corps issued a letter to the Joint Venture with a standard Form 30 requesting a proposal to change the embankment on the by-pass road. The letter provided the Joint Venture with a sketch to perform the work and also included certain revisions to the curb detail which eliminated a pre-cast curb originally included in the specifications. However, even the new plan -- the sketch -- proved to be faulty in that it, among other things, it called for a 1:1 side slope of the granular fill material along a railroad right-away.

29.

In accordance with the January 24, 2002, layout, the Joint Venture performed the work along a railroad right-away, as directed by the Corps' changes. However, the Corps' new design was ultimately defective: it was impossible for the designated slope to hold using the specified granular fill. Thus, as a result of the embankment's close proximity to the railroad right-of-way and the disbursement of the granular fill, the railroad company required the Joint Venture to moved the fill back to avoid the path of the trains. To correct the Corps' design error, the Joint Venture was forced to also replace and re-pave the by-pass road. In the course of such corrective work, the Joint Venture noticed possibly troublesome soils conditions that evidenced the probability of

11

McElwee00251

further settlement. The Joint Venture notified the Corps of these soils conditions and the possibility that additional future remedial work would be required.

30.

On October 8, 2002, after almost nine months, the Corps demanded the proposal requested on January 24, 2002. The Corps stated that it would withhold retainage on the next payment if the proposal requested in January was not received by October 24, 2002. The Corps demanded the proposal with the knowledge that the Contractor warned that futurebable work being required due to foundation and earthfill conditions. ASK BOB WHERE WE ARE GOING WITH THIS. IS THIS A LACK OF FUNDING ISSUE?

31.

The troublesome soils conditions noted in the by-pass road work later created additional problems when the Joint Venture began degrading Jourdan Road. During this work, the Joint Venture uncovered successive layers of asphalt paving well beyond the thickness indicated on the plans. The Joint Venture incurred additional expenses and suffered excusable delays to remove and dispose of the large quantities of asphalt. Such expenses and delays could not have been reasonably anticipated by the Joint Venture with the information provided to it by the Corps or through a reasonable site inspection prior to bidding.

32.

As will be discussed, *infra*, the unforseen subsurface soils conditions and the Corps failure to provide the Joint Venture with accurate and appropriate soils information would again cost the Joint Venture time and money in the pile driving operations performed in June, 2003.

12

McElwee00252

PX-0109-0252

33.

The degrading of Jourdan Road and the construction of the by-pass road, through changed conditions and faulty design, resulted in extra costs for roadway construction, removal and disposal of additional asphalt, removal of additional sheet pile, repetitive embankment and paving efforts, contractor surveys, delays in Government direction, excessive reaction and indifference by the Government, disruption and loss of time resulting in schedule changes affecting later work. All such delays are "excusable" and all such expenses, compensable.

## DEFECTIVE SPECIFICATIONS FOR PILE DESIGN, INCLUDING ADDITIONAL DEWATERING DESIGN COSTS, REMOVAL OF EXISTING CONCRETE PILES AND THE INJECTION OF BENTONITE SLURRY

34.

The Corps designed a new pile- supported T- wall structure at approximately Station 99+20. The Corps designated this location, at least in part, as a result of its interpretation of soils from a geotechnical report prepared by Eustis Engineering in December, 1997 (hereinafter, "Eustis Report"). However, hindsight reveals that the soils information in the Eustis Report was unreliable for this designation as the borings performed forming the basis of the report were taken some 165 feet from the Corps' final designated site for the work. The inaccuracy of the soils information should have been apparent to the Corps upon the re-designed of the dewatering system, which was mandated upon the discovery of excessive water in the excavation near the T wall location. However, the Corps did nothing to study, alter or re-examine the system designed to accommodate the designated soil conditions. DOES THIS MEAN IT SHOULD HAVE ALSO BEEN APPARENT TO THE JV? IF NOT, EXPAND ON HE RE-DESIGN ASPECT.

13

McElwee00253

PX-0109-0253

35.

However, before the Joint Venture could install the new T wall structure, the plans and specifications required that certain work be performed on the pre-existing, pile supported flood protection wall. Before beginning this work, the Joint Venture notified the Corps of certain inconsistencies in the plans and specifications. The Joint Venture notified the Corps that the specifications required that the piles be cut and the plans indicated that the piles be removed. The Corps maintained the position that the plans and specifications were consistent and required that the Joint Venture pull, rather than cut, the pre-existing piles. The Joint Venture pulled the existing piles in accordance with the direction of the Corps.

36.

The extraction of the piles, as directed, created voids in the foundation materials further weakening the already insufficient soils conditions. Without looking further into the conditions of the soils, the Corps ordered the Joint Venture to fill the voids with Bentonite: a water based treatment clay which has no strength (TRUE?). The use of the Bentonite compounded the already unstable soils problem. Yes

37.

The final design for the T wall structure required 17 piles each 14" square and 75' long. **DIDN'T WE (DIXON) PREPARE THE DESIGN BASED ON THE INFORMATION PROVIDED BY THE CORPS?** As designed, the piles were to be driven on a batter within a 43' footprint. The soil information that the Corps originally supplied to the Joint Venture (in part, initially) indicated that if completed as designed, the piles were to achieve bearing capacity in a layer of dense sand. However, after commencement of the work, the Joint Venture discovered that

14

McElwee00254

the supplied soils information was incorrect as there was no dense sand layer within which to
embed the piling the soils layer indicated by the Eustis Report supplied by the Corps differed
substantially from that which was actually present. As a result, the pile foundation designed for
the new T wall, which was properly designed in accordance with the represented soils information,
was inherently defective and would prove to be unacceptable even if the work were performed in
accordance with the design in the contract. The inherent flaw in the design was not the "fault" of
the Joint Venture, but rather, was the result of unforeseeable causes (inaccurate soils information)
beyond the control and without the fault or negligence of the Joint Venture. As such the delays
and expenses attributable to such work are both excusable and compensable.

38.

Pile ✓

The Corps instructed the Joint Venture to began driving the 14" square using the pile a
specified driving hammer. In fact, the Corps' pile driving consultant was present to observe the

Geotechnical Engineer
USACOE

initial pile driving. The consultant approved of the specified means and methods and the work
performed by the Joint Venture. The Joint Venture continued to install the remaining piles in the
approved, specified fashion. Although the Joint Venture performed the work accordingly, the
pilings eventually cracked. The Corps blamed contractor, even though the work was performed
as specified and previously approved.

39.

The Corps requested that Eustis Engineering perform a site inspection to analyze the
condition of the pile. Immediately, Eustis proclaimed the pile driving hammer was too big, even

approved by Eustis.

though it was the hammer specified. However, Eustis did question why the Corps had not
performed a test pile program as had been recommended in the Eustis Report. The Corps'

15

McElwee00255

PX-0109-0255

on budget.

reasoning was that the insignificant number of piles did not warrant further testing. However, the exact opposite reasoning is true: because the project called for so few supporting pilings, the test pile program was even more important. The Joint Venture maintains that if the recommended pile test program had been implemented as recommended by Eustis, the re-design of the piling system would have been apparent.

40.

To confirm the unforseen soils problems, the Joint Venture employed Gore Engineering to take borings and soil samples at the location of the work (hereinafter, "Gore Report"). The results of those borings indicated that the soils present at the site designated in the plans and specifications were different from the soils represented in the Eustis Report. The Gore Report revealed that the soils at the site were soft with no dense sand layer to embed the piles at the specified tip elevation. This subsequent investigation proves that the Corps' plans and specifications were flawed.

41.

Following the Gore Report and the determination that the contract specifications were defective, the Corps has ordered a re-design of the piling support system to the new T wall. By these actions the Government has admitted their original specifications were defective. Such defect is an unforeseeable cause beyond the control and without the fault or negligence of the Joint Venture. As such, any attributable delay is excusable, the costs incurred by the Joint Venture for such work is compensable and a Termination for Default is unreasonable.

### UNFORSEEN SUBSURFACE SITE CONDITIONS; NAMELY, AN ABANDONED SUBSURFACE 30" SEWER LINE

16

**McElwee00256**

42.

The Joint Venture instituted a Value Engineering proposal, which was accepted by the Government to jack and bore the 84" welded steel discharge pipe under Jourdan Road. On February 8, 2003, after mobilization and setup for the work approved by the Corps, a subcontractor, Tri-State Road Boring (no relationship to the Joint Venture), began performing the jack and bore operation. At approximately 1:00 p.m. on that day, a large diameter pipe obstruction was encountered approximately 3 feet from the starting point. Work was thereafter suspended.

43.

By letter dated February 10, 2003, the Joint Venture notified the Corps that it had encountered what it believed to be an epoxy coated 24" pipe. The Joint Venturer warned that the previously unidentified pipe prohibited proceeding with construction by "Open Trench and VECP Jack & Boring" between STA 98+90 to 101+00 B/L "A." The Joint Venture and Government began attempting to identify the obstruction. The status of the line and procedure necessary to allow the work to continue was in question. WAS THE LINE LIVE, ABANDONED, BRANCH? GAS WATER OR SEWER?

44.

It took several days for the Government to determine the origin of the line. However, by February 14, 2003, the Corps notified the Joint Venture that the line was an abandoned 30" diameter sewer force main. The New Orleans Sewerage & Water Board agreed to perform a hot tap on the line to verify that it was indeed abandoned. By letter dated March 5, 2003, the Corps instructed the Joint Venture to remove the entire pipe to at least 1-foot beyond the footprint of the

17

McElwee00257

PX-0109-0257

welded steel discharge tubes: requiring an unanticipated expenditure of additional costs and time due to no fault of the Joint Venture.

45.

Change Order Documentation reports were completed on a daily basis from the time of first encountering the obstruction (February 8, 2003) to the time of resuming normal jack and bore operations (March 5, 2003). From February 9, 2003 to March 5, 2003 sheet piling, clay backfill materials and bracings were procured, installed and removed to protect the jack and bore operation as well as to create a protected opening so that the 30" pipe could be explored and removed. Accordingly, equipment was mobilized, operated and demobilized, sheet piling and backfill material was installed and removed as a result of the encountered unforseen condition.

46.

Unpriced jobsite activities are documented on various daily forms. However, ongoing fixed costs, costs of standby equipment and subcontractor's costs associated with the delay resulting from the changed conditions are not addressed on the daily change order documentation forms.

47.

Yet again, the delay in completing this work arises from unforeseeable causes or conditions beyond the control and without the fault or negligence of the Joint Venture. Thus, the Joint Venture is entitled to full recovery of all costs associated with the delay of jack and bore operations from February 8, 2003 through March 5, 2003, as well as additional time to recover the lost 26 days due to this changed condition. Such a delay is also excusable and does not provide the Corps with a foundation for the Termination for Default.

18

**McElwee00258**

**PX-0109-0258**

48.

Contract Specification Section 01100, Paragraph 25 "ORDER OF WORK" required that

certain work be completed during non-hurricane season (December through May). This paragraph

also provided that:

> [t]he section of welded steel discharge tubes between Stations
> 100+50 and 100+15 cannot be installed until the existing
> 30"diameter sewer force main is relocated under the drainage
> pumping station contract . . .

49.

Under Corps contract number DACW29-00-C-093, C. R. Pittman Construction Company,

Inc. (hereinafter, "Pittman") was performing the work on the drainage pumping station referenced

in  Contract Specification Section 01100, Paragraph 25 (hereinafter, "Drainage Pumping Station

Work").

50.

~~The Government furnished~~ the Joint Venture acquired a copy of Pittman's approved schedule dated

October 10, 2000.  This schedule indicated that all work on the 30" sewer force main would be

completed at the end of July, 2001.  Accordingly, the schedule submitted by the Joint Venture on

September 12, 2001 and approved by the Corps on October 12, 2001, showed the work on the

welded steel discharge tubes (Blind Bridge Structure No. 3) beginning on January 28, 2002 and

scheduled completion by April 18, 2002.

51.

The Corps took the full 30 allotted days to review and approve the schedule.  On the date

that the Corps approved the Joint Venture's schedule, under the Pittman schedule, the relocation

of the 30"diameter sewer force main should have been completed three months prior.  However,

19

**McElwee00259**

at the time the Corps approved the Joint Venture's October 2001 schedule, Pittman had performed no work on the 30" sewer force main. Rather, Pittman actually completed such work on March 19, 2002, 10 months after scheduled completion.

52.

By letter dated February 7, 2002, the Corps demanded that the Joint Venture complete the welded steel discharge tubes before June 1, 2002. Certainly, the Corps must have been aware that its request was impossible as, under the specifications, the delay in the relocation of the 30" sewer force main prevented the Joint Venture from performing any work on the welded steel discharge tubes. In fact, the Corps was not only aware of the impossibility of its demand on the Joint Venture resulting from the delay in the performance of the work by Pittman, but the Corps had in fact approved the delay by a series of modifications to the Pittman contract and failed to notify the Joint Venture.

53.

As provided in the Contract Specifications, before the Joint Venture could begin installation of the welded steel discharge tubes, including the section between station 100+50 and 100+15 a number of activities, Pittman had to be finished with the sewer force main work. Pittman did not finish such work until mid-to-late March -- approximately 260 days after the scheduled completion date. CHECK THIS DATE WITH PITTMAN DOCUMENTS. Such a delay, as approved by the Corps, meant that the Joint Venture could not complete its work on the welded steel discharge tubes prior to the conclusion of the "non-hurricane season" -- the last month being May. Thus, such work could not commence, under the terms of the specifications, until December, 2002, after the designated "hurricane season." The Corps was fully aware of this situation having approved

20

**McElwee00260**

**PX-0109-0260**

the Pittman modifications and drafted the requirement in the SELA Dwyer Road Contract.

54.

The Corps approved a Joint Venture's construction schedule in October, 2001 with the knowledge, or at least an educated belief, that the schedule could not be met. It failed to share the knowledge of events related to the Pittman contract (events having a direct impact on the Joint Venture's work) and made impossible demands upon the Joint Venture. Such actions and inactions of the Corps and the acts (approved by the Corps) of another contractor with the Corps (Pittman) directly caused the Joint Venture to incur not only substantial additional direct and indirect costs attributable to this work, but also cost the Joint Venture over a year of time. Throughout this time, the Corps continually pressured the Joint Venture to do something that the Corps knew was not possible, through no fault of the Joint Venture, under the circumstances. Such costs and time are attributable to the Corps and to the "acts of another Contractor in the performance of a contract with the Government." Thus, any delay resulting therefrom does not support the Termination for Default.

## HURRICANE/TROPICAL STORM WORK

55.

Contract Specification Section 0110, Paragraph 24 require the Contractor submit a flood protection plan to be implemented in case of potential flooding due to Tropical Storms.

56.

Such a plan was submitted by the Joint Venture and approved by the Corps of Engineers. The plan was implemented during three tropical storms in September, October and November of

21

McElwee00261

2002.

### 57.

Paragraph 24, also requires that a contractor perform certain work in the event of a potential flood resulting from a tropical Storm. Subsection C further states that payment for these activities will be paid – "by an equitable adjustment under the contract clause entitled 'CHANGES'.

### 58.

INSERT CHANGES CLAUSE.

### 59.

Dutifully, the Government instituted daily extra-work reports, titled, Change Order Documentation. These unpriced daily forms were filled out, noting only actual labor and equipment employed on the work that day. No notice of equipment, manpower or material idled by this extra work is noted. Nor does the Government form address these ongoing costs, delays or effects of this extra work/change order work.

### 60.

The Joint Venture's actual costs for this work included procurement of materials supplies and equipment in keeping with the approved plan to be ready for these storm sequences, ongoing fixed costs, idled equipment costs, disruption to scheduled activities and lost time.

### 61.

In keeping with the applicable provisions of the Contract, the Joint Venture is entitled to recovery of all costs, overhead profit and lost time due to the preparation and execution of the flooding prevention during the tropical storm events of 2002.

22

McElwee00262

PX-0109-0262

62.

The contract states that the Government has 30 days to review submittals. Yet the Government repeatedly withheld comments and/or approvals well over 30 days. Of some 125 submittals 48 were returned after the 30 day window, some by days, others by as much as 2 and 3 months, 14 others remain unanswered.

63.

The Government has taken the position that the excessive turn around time on submittals had no effect in that the Joint Venture did not begin work on these facets of the work until well after the approval dates. This logic assumes that the contractor is sitting in wait, prepared to instantly start work when the Government answer arrives. Such is not the case. In the real world the approval of a submittal is the first step toward implementing work. Materials, equipment and manpower must be scheduled and mobilized or procured. In the cases where subcontractors are to be used, their schedules may have changed. The thirty to sixty days that elapsed beyond the contractual 30 day window have caused them to seek other opportunities, thus, starting later than originally planned at the time of submittal.

64.

In October of 2001 the Government approved the Joint Venture schedule for the project. Therefore, the Government was intimately familiar with the increments of the Joint Venture work plan. Having analyzed the document, the Government knew the schedule was basically linear in that there were successive items of work, not concurrent. The schedule showed lead times to procure materials which led to mobilizing forces, labor and equipment to perform the actual work. Specification section 01100- Paragraph 25, Order of work also restricts certain work items to the

23

McElwee00263

PX-0109-0263

time period of December through May of any year. Those work items are:

> Degrading Jourdan Road;

> Installation of welded steel discharge tubes;

> Reconstruction of Jourdan Road; and,

> Removing and replacing blind railroad bridges.

### 65.

Also, this specification section states that the welded steel discharge tubes between stations 100 + 50 and 100 + 15 cannot be installed before the 30 inch diameter sewer force main is relocated. As such, delays in submittal reviews of elements involved in those facets of work could extend the periods of performance another six months, making timely submittal reviews all the more critical.

### 66.

The Government knew full well how important timely review of submittals was to the Joint Venture's schedule. Submittal registers delivered to the Government's representative described the critical dates of when approvals were needed and when materials were needed. Yet, the Government continually delayed completion of their reviews.

### 67.

Among items delayed to the point of causing extra costs and lost time are:

> Backfill and crushed stone materials;

> Pile driving equipment;

> Dewatering systems;

> Metal work fabrications;

24

**McElwee00264**

**PX-0109-0264**

Reinforcing steel drawings;

Welded steel discharge tubes; and,

Precast box culvert designs.

All these caused major delays to work progress.

68.

The vast percentage of delayed submittal reviews illustrates a pattern by the Government that resulted in damage to schedule and additional costs to the Joint Venture to attempt to recover the lost time.

69.

The Joint Venture is entitled to recovery of all time and costs associated with these delays.

## TERMINATION FOR DEFAULT

70.

On June 24, 2003, the Corps issued a Termination for default to the Joint Venture based in part on the Joint Venture's alleged failure to complete the job in a timely manner.

71.

The Corps, throughout the SELA Dwyer Road Project consistently failed to acknowledge the Joint Venture's position regarding item delays and the associated costs, and further refused to adequately demonstrate that the Corps could fund the costs to complete the job.

72.

Despite the fact that most all of the SELA Dwyer Road Project delays were excusable and compensable, the Corps erroneously concluded that it had no obligation to grant EOT or delay compensation. That erroneous conclusion lead the Corps to conclude that it was justified

25

**McElwee00265**

PX-0109-0265

in terminating the Joint Venture, when it in fact was not. The Corps' decision to terminate the Joint Venture for default was an abuse of discretion and constituted a breach of th contract with the Joint Venture and a violation of the Corps' equitable duty to Great American.

73.

ADDRESS THE ISSUES CONCERNING THE QUALITY CONTROL PROBLEMS.

74.

ADDRESS THE ISSUES ASSOCIATED WITH THE IMPLEMENTATION FLOOD PLAN. IT COULD NOT BE DONE CAUSE OF THE PITTMAN PROJECT??

75.

The Joint Venture is therefore entitled to have its termination for default converted to a termination fr convenience and is thus entitled to all rights and obligations of a contractor terminated for convenience.

WHEREFORE, Great American Insurance Company prays that after due proceedings herein, there be judgment in its favor and against the United States Department of the Army, New Orleans District Corps of Engineers, converting the June 24, 2003, decision of the contracting officer, terminating McElwee Brothers, Inc. & Tri-State Design Construction Company, Inc. (A Joint Venture) for default, to a termination for convenience, entitling McElwee Brothers, Inc. & Tri-State Design Construction Company, Inc. (A Joint Venture), and thus Great American Insurance Company, to all rights and obligations of a contractor terminated for convenience.

26

PX-0109-0266

Furthermore, Great American Insurance Company on its own behalf and/or as attorney-in-fact for McElwee Brothers, Inc. & Tri-State Design Construction Company, Inc. (A Joint Venture) pray for all other general, legal and equitable relief to which they may be entitled.

Respectfully submitted,

Lloyd N. Shields (La. Bar # 12022)
Daniel Lund, III (La. Bar # 19014)
Stuart G. Richeson (La. Bar # 23912)
Elizabeth L. Gordon (La. Bar # 21619)
Shields Mott Lund L.L.P.
650 Poydras Street, Suite 2400
New Orleans, Louisiana 70130
Telephone:    (504) 581-4445
Telecopy:     (504) 581-4440

Attorneys for
   Great American Insurance Company

W:\Clients\33405-19\Pleadings - ASBCA\Complaint 10-21.wpd

27

McElwee00267

PX-0109-0267

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

Melvin M. L. McElwee, Sr. and
McElwee Brothers, Inc.
**Plaintiffs**

CIVIL ACTION NO.
03 - 2092

*VERSUS*

Ronald U. Davis and Tri-State Design
**Defendants**

DIVISION
MAGISTRATE SECT. T MAG. 3

## COMPLAINT

The complaint of **Melvin M. L. McElwee, Sr.**, a domiciliary of the Parish of

Tangipahoa, Louisiana, and **McElwee Brothers, Inc.**, a Louisiana corporation with it's

principal place of business in Tangipahoa Parish, Louisiana, authorized to do business

in Louisiana represents as follows:

### I.   Jurisdiction and Venue

1.

Made defendants herein are Ronald U. Davis, a resident of the state of New

Jersey and Tri-State Design Construction Company, Inc., a Pennsylvania corporation.

2.

Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

This matter is between citizens of different states. The amount in controversy exceeds

$75,000.00, exclusive of interest and costs.

Fee $150.00
Process
X Dktd
CtRmDep
Doc. No.

EXHIBIT
14

McElwee00268

3.

Venue of this matter is proper in this court. The major acts giving rise to this suit occurred within Orleans and Tangipahoa Parish in the State of Louisiana.

## II.    Count 1 – RECISSION OF A JOINT VENTURE AGREEMENT INDUCED BY FRAUD

4.

Attached hereto and incorporated herein by reference as Exhibit "A" is a document known as the "Joint Venture Agreement" (hereinafter referred to as the JVA) between McElwee Brothers, Inc. and Tri-State Design Construction Company, Inc.

5.

The JVA was entered into on or about August 16, 2000 with the purpose of pursuing the U. S. Army Corps of Engineers (hereinafter referred to as the Corps of Engineers) advertised bid Solicitation Number DACW29-00-B-0005.

6.

The contract was awarded to the joint venture through contract number DACW29-01-C-0035, with a notice to proceed issued April 4, 2001. The fixed price of the contract was 5.5 million dollars ($ 5,200,000.00).   Currently, this project is substantially complete (78%).

7.

On June 24, 2003 the Corps of Engineers terminated the contract for default.

8.

Attached hereto and incorporated herein as Exhibit "B" is a letter from the Corps of Engineers received in the office of McElwee Brothers, Inc on June 26, 2003.

2

McElwee00269

14.

Defendant Davis was aware that plaintiff Melvin McElwee, Sr., although a qualified 8(a) contractor, lacked both the financial resources and bonding capacity to handle jobs of the size the defendant wished the joint venture to seek.

15.

Plaintiff Melvin McElwee, Sr. expressed his interest and the parties began to negotiate an agreement whereby plaintiffs' status as a qualified 8(a) minority contractor and the larger financial resources and bonding capacity of the defendants could be legally combined to seek business under the provisions of the SBA 8(a) Business Development Program.

16.

During negotiation of the JVA defendants, deliberately, fraudulently and with intent to gain plaintiffs consent to the JVA misrepresented to the plaintiff that they understood that the SBA required that an 8(a) firm control both strategic policy setting and the day-to-day management and administration of business operations and that plaintiffs would have that authority.

17.

After reviewing several drafts of the Joint Venture Agreement and based upon the substantial consequences of the failure of such a venture, plaintiffs insisted that they be given final authority over all matters regarding the joint venture.

4

McElwee00270

PX-0109-0270

18.

The JVA on Page 9 of 33, Section 3 is entitled, "MANAGEMENT".  Section 3.1 states, "McELWEE is the managing venturer of the joint venture, and McELWEE shall appoint one of its employees as the project manager with duties and responsibilities needed for performance of this contract...."

19.

Section 3.3 of the JVA establishes an Advisory Committee.  The agreement provides that this committee will be made up of the plaintiff Melvin McElwee, Sr, and the defendant Davis.  The Advisory Committee can take no action without a majority vote and the endorsement of both committee members.  Additionally, Section 3.3 states, "MCELWEE, shall have final decision authority over all matters before the Advisory Committee."

20.

Plaintiffs would not have signed the JVA but for defendants numerous statements misrepresenting plaintiffs' position in the joint venture in order to gain the advantage of using his 8(a) contractor status to solicit work set aside to assist small minority-controlled businesses.

21.

On one occasion during negotiations, plaintiffs asked defendant Davis why he would not rather enter into a teaming agreement rather than a joint venture.  Whereupon defendant Davis responded that in a joint venture you're (referring to plaintiffs) in the driver's seat, I'm just riding along as a passenger".

5

McElwee00271

PX-0109-0271

22.

Defendants misrepresented to plaintiffs by numerous other statements that the defendants were sincere in their assertions that plaintiffs would be, from the inception of the agreement, the controlling interest with final decision making authority for the joint venture.

23.

As an additional fraudulent inducement defendants, in bad faith, feigned granting plaintiffs, as evidenced in the JVA, Section 3.3, final decision-making authority over all matters before the Advisory Committee responsible for overseeing joint venture management.

24.

With the knowledge that plaintiffs would not have signed the JVA without final decision making authority and control over both strategic policy setting and day to day operations, as further provided by SBA guidelines, defendants intentionally and fraudulently induced plaintiffs to enter into the JVA suppressing the true fact that the agreement was, in fact, being made in bad faith.

25.

From the inception of the JVA and securing of the contract with the Corp of Engineers defendant Davis continually either participated in, ignored or excused actions of defendant Tri-State Corporation, its employees, representatives and agents that directly reveals evidence of the fraud perpetrated upon the plaintiffs.

6

PX-0109-0272

26.

Defendants' fraud is evidenced by their intentional and malicious failure to perform their obligations imposed by the JVA as follows:

27.

The defendants *intentionally disregarded* the JVA by conducting closed and/or open door meetings with the Corps of Engineers, forming verbal contracts, transferring documents (information, letters, agreements, e-mails, video tapes, pictures, electronic and/or paper media, etc.) amongst themselves and the Corps of Engineers without review and/or approval of the plaintiffs.

28.

The defendants intentionally refused to acknowledge and adhere to the chain of authority established in the JVA and mandated by the SBA which gives the plaintiffs the right to select the project manager, make other major project decisions and the right to control both strategic policy setting and day-to-day management and administration of the joint venture.

29.

Attached hereto and incorporated herein as Exhibit "C" is a letter dated June 11, 2002 wherein plaintiffs communicated again a list of concerns regarding the blatant disregard of the authority granted to them in the JVA.

30.

Defendants plan, to disregard plaintiffs' controlling interest from the inception of the agreement, became so apparent that even the Corps of Engineers having knowledge of the JVA and plaintiffs' controlling interest refused to accept instructions

7

McElwee00273

from plaintiffs' project manager and/or jobsite superintendent without first consulting with defendants and receiving their approval.

31.

In a final attempt to establish their proper position in the joint venture the plaintiffs agreed to a resolution entitled, "Agreed Procedures for Advisory Committee Reviews and Approvals" attached hereto and incorporated herein as Exhibit "D".   These procedures were an attempt to provide specific instructions for defendants to follow during the administration of the remainder of the contract with the Corps of Engineers.

32.

Even after agreeing to these procedures, defendant Davis continued to support the intentional disregard of plaintiffs' authority resulting in confusion, continuing escalation of cost and the ultimate termination, by the Corps of Engineers, of the contract for default.

33.

The defendants accepted documents (information, letters, and paper media, etc.) from the plaintiffs as a formality, but persuaded the Corp of Engineers to rely solely on defendants as the binding authorities for the joint venture.

34.

Plaintiffs' continued to make numerous complaints and assertions of the undermining of their purported contractual grant of authority.

8

PX-0109-0274

35.

Among defendants' final and most blatant actions evidencing their fraud was their attempt to demonstrate to the Corps of Engineers that they were not only de facto in charge of the joint venture, but, also legally.

36.

On March 20, 2003, in a meeting with the Corps of Engineers, defendant Davis, without the approval or knowledge of the plaintiffs presented a letter (attached hereto and incorporated herein as Exhibit "E"), on the letterhead of the joint venture and under the signature of the defendant Davis only, purporting to be a plan to finish the contract.

37.

Included with the letter was a chart entitled "McElwee Brothers, Inc. Tri-State Design Construction Co., Inc. A Joint Venture Lines of Authority" (attached hereto and incorporated herein as Exhibit "F").

38.

Nowhere on the chart regarding lines of authority are the plaintiffs acknowledged, by name, as having any authority over the daily operations, project management, or superintending of the joint venture or the project.

39.

The next day, defendant Davis presented the plaintiffs with a letter (attached hereto and incorporated herein as Exhibit "G") addressed to the Corps of Engineers purporting to have implemented "[a]s we discussed … the changes of lines of authority". Additionally, the letter states, "Mr. Melvin McElwee is now acting as a

9

PX-0109-0275

consultant to the Joint Venture and will not have a daily interface with the Corps of Engineers".

40.

Plaintiff never agreed to the purported changes or signed the letter.

41.

The numerous representations made prior to the signing of the JVA mentioned above were false when defendant made them, in that defendants knew that their agreement with the plaintiffs regarding plaintiffs' authority over the joint venture would be disregarded from the inception of the agreement.

42.

Defendants knew that the representations were false when defendants made them, as shown by the allegations of fact of paragraphs 21-23, 25-28, and 36-39 said paragraphs incorporated herein by reference.

43.

Defendants made the representations mentioned above with the intent and for the purpose of deceiving plaintiffs and to induce plaintiffs into executing the JVA.

44.

Plaintiffs executed the JVA described above in reliance on defendants' representations.

45.

Plaintiffs' reliance on the representations mentioned above was reasonable under the circumstances, in that the JVA itself evidences that full authority was to be given to the plaintiffs.

10

McElwee00276

PX-0109-0276

46.

On several occasions, to no avail plaintiffs advised defendants that their actions were a direct violation of the plainly written provisions of the JVA.

47.

Because of defendants' fraud, plaintiffs are entitled to recission of the JVA and to recover all damages, foreseeable or not, that are a direct consequence of defendants' fraud, including, but not limited to, the following:

a.    All actual damages incurred that are above and beyond the original cost of the construction contract between the joint venture and the Corps of Engineers, including, all costs, overruns and liquidated damages that may become due to the Corp. of Engineers based upon the termination of the contract for default.

b.    All actual damages incurred that are above and beyond the original cost of the construction contract between the joint venture and the Corps of Engineers, including, all costs, overruns and liquidated damages that may become due to Great American Insurance Bonding Company based upon the termination of the contract by the Corp. of Engineers for default.

c.    All damages to and loss of business reputation, future business opportunities and bonding capacity based upon the termination of the contract by the Corp. of Engineers for default.

d.    Punitive damages based upon the fraud;

e.    Any and all such other and further relief as the court deems just and proper.

11

McElwee00277

PX-0109-0277

**WHEREFORE**, plaintiffs pray for judgment in plaintiffs' favor and against defendants Ronald Davis and Tri State Design Construction Company, together with all costs and reasonable attorney fees, as well as all costs of these proceedings. Plaintiffs request that this matter be tried by jury.

RESPECTFULLY SUBMITTED:

Lori Folse White, Bar Roll No. 28268
The White Law Firm, LLC
6142 Prescott Drive
Baton Rouge, LA 70805
Telephone: (225) 359-6701

PLEASE SERVE:

President
Tri-State Design Construction Company, Inc.
7401 Old York Road
Elkins Park, PA    19027

Ronald U. Davis
559 Stanwick Road
Moorestown, NJ    08057

12

**McElwee00278**

PX-0109-0278

# UNITED STATES DISTRICT COURT

## *EASTERN DISTRICT OF LOUISIANA*

| | |
|---|---|
| *MELVIN M. L. MCELWEE, SR. AND* *MCELWEE BROTHERS, INC.* *PLAINTIFFS* | *CIVIL ACTION NO.* |
| *VERSUS* | *DIVISION* |
| *RONALD U. DAVIS AND TRI-STATE DESIGN* *DEFENDANTS* | *MAGISTRATE* |

## *VERIFICATION*

**STATE OF LOUISIANA**

**PARISH OF EAST BATON ROUGE**

Before me, the undersigned Notary Public, personally came and appeared;

**Melvin M. L. McElwee Sr.,** who being duly sworn and deposed, said that the foregoing

allegations of fact contained in the foregoing complaint is true and correct to the best of

his knowledge, information, and belief.

Signed this ___21___ day of ___July___, 2003 at Baton Rouge, Louisiana.

*Mel M. McEw.*

**Melvin M. L. McElwee, Sr.**
Petitioner

SWORN TO AND SUBSCRIBED
BEFORE ME THIS 21th day of
July 2003

*Kim Anloe White*
NOTARY

13

**McElwee00279**

# SEE RECORD FOR
# EXHIBITS
# OR
# ATTACHMENTS
# NOT SCANNED

McElwee00280

PX-0109-0280

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2004 APR 30  P 3: 48

LORETTA G. WHYTE
CLERK

MINUTE ENTRY
DUVAL, J.
April 28, 2004

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

GREAT AMERICAN INSURANCE CO.                    **CIVIL ACTION**

VERSUS                                          **NO. 03-2793**

McELWEE BROTHERS, INC., ET AL.                  **SECTION "K"(2)**

A Third Motion for Contempt and For Sanctions came for hearing this day in open court.
Having heard testimony and argument of counsel, the Court found on the record that Melvin M. L.
McElwee, Sr. indeed violated the injunction issued by this Court on October 17, 2003, by virtue of
his engaging in prohibited communication with the Armed Services Board of Contract Appeals
("ASBCA") and by his failure to have prepared a full and complete inventory of materials as required
under the Court order establishing a preliminary injunction in this matter. This written order is
meant to augment those reasons stated in open court.

It is well established that Courts possess the inherent power to levy sanctions in response
to abusive litigation practices. Roadway Express, Inc. v. Piper, 447 U.S. 752, 100 S. Ct. 2455,
(1980); Scaife v. Associated Air Center, Inc., 100 F.3d 406, 411 (5th Cir. 1996) (federal courts have
inherent posers including authority to sanction a party when necessary to achieve orderly and



DATE OF ENTRY

MAY 0 3 2004

___ Fee _____
___ Process _____
X  Dktd _____
___ CtRmDep _____
___ Doc. No. _____

EXHIBIT
IS

McElwee00281

PX-0109-0281

expeditious disposition of their dockets). These powers have been recognized as required to address

acts which degrade the judicial system. Nasco, Inc. v. Calcasieu Television and Radio, 124 F.R.D.

120, 139 (W.D.La. 1989). Indeed, "a court has the power to conduct an independent investigation

in order to determine whether it has been the victim of fraud." Chambers v. NASCO, Inc., 501 U.S.

32, 44, 111 S.Ct. 2123, 2132 (1991).

The Court further recognizes that because of their very potency, inherent powers must be

exercised with restraint and discretion, and "a primary aspect of that discretion is the ability to

fashion an appropriate sanction for conduct which abuses the judicial process." Id. citing Roadway

Express,, supra, 447 U.S. at 764, 100 S. Ct. at 2463. As this Court has previously stated relying on

Natural Gas Pipeline Company of America v. Energy Gathering, Inc., 86 F.3d 464,467 (5th Cir.

1996), "[s]uch powers may be exercised only if essential to preserve the authority of the court and

the sanction chosen must employ 'the least possible power adequate to the end proposed.'" (citations

omitted).

> As recently stated by the United States Court of Appeals for the Fifth Circuit:
>
> A contempt order is characterized as civil or criminal based on its primary purpose.
> *FDIC V. LeGrandi*, 43 F.3d 163, 168 (5th Cir. 1995). "[T]he ultimate test for
> determining the civil or criminal character of a contempt order is 'the apparent
> purpose of the trial court in issuing the contempt judgment,' a punitive purpose or
> one' designed to vindicate the authority or the court' establishing the criminal nature
> of the order, while a coercive or remedial purpose characterizes a civil contempt."
> *Thyssen, Inc. v. S/S Chuen On*, 693 F.2d 1171, 1173-74 (5th Cir. 1982) .

*Clark v. Mortenson*, 2004 WL 635585, *6 (5th Cir. March 31, 2004). The Court finds that the matter

before it is one of civil contempt, that is in the nature of a remedial purpose–that is to prevent the

2

McElwee00282

further defalcations on the part of Mr. McElwee and to compensate Great American in part for the expenses it has incurred because of Mr. McElwee's conduct.

In particular and of most importance, this Court had admonished Mr. McElwee on at least two prior occasions that because this Court had found that Mr. McElwee had assigned his rights to pursue claims arising out of the Dwyer Road contract to Great American Insurance Company ("Great American"), he would be required to cooperate fully in Great American's pursuit of the Joint Venture's claims against the Government. This Court stated to Mr. McElwee on October 30, 2003, unequivocally that he was not to communicate in writing to the Board.

Nonetheless, when asked to assist Great American in its attempt to be substituted as the proper party in the appeal pending before the Board, Mr. McElwee chose to file a "Response" which he drafted independently and without Great American's knowledge. In doing so, the Court finds that Mr. McElwee clearly and blatantly violated the October 17, 2003 order. Furthermore, in that filing, he indicated that he had sent copies to both Great American and the Army Corps of Engineers, which he admitted in Court that he had not done. This action further demonstrates his desire to not be detected and his awareness that he was violating this Court's order.

In addition, on October 17, 2003, the Court also ordered Mr. McElwee to " produce a reasonable inventory of all items removed from the job site within 15 days of the entry of this order." At hearing it was made clear that this had to do with "essential equipment," and he opined that he personally made sure that he walked through the project and determined what was to stay on the job site because it was necessary to complete the job. Mr. McElwee produced a two-page list of

3

equipment removed from the job site and two police report supporting that certain equipment had been stolen from the job site

On March 19, 2004, Great American received a letter from Bridgetek stating that materials necessary for the completion of a particular portion of the job which had been previously delivered and which had been placed in a weather proof trailer on the job site were no longer there. A list of necessary materials was provided. Great American through its attorney then requested Mr. McElwee to provide these materials if they were in his possession. Indeed, a substantial amount thereof was subsequently delivered to Great American. The integrity of much of the materials was compromised. None of these materials (Doc. 19) were on the two-page inventory. Again, the Court finds unequivocally that Mr. McElwee has blatantly violated the Court's order by his actions and by doing so has caused unnecessary cost and time delays to Great American.

As to the other defalcations alleged, the Court finds these arise more out of a failure to communicate than blatant disregard of the Court's order and does not base its decision thereon. Nonetheless, these other defalcations indicate Mr. McElwee's continued disregard as to the spirit of the Court's order. Mr. McElwee is placed on notice that should he persist in material contemptuous conduct, a hearing shall be had pursuant to Rule 42 of the Federal Rules of Criminal Procedure. Accordingly,

**IT IS ORDERED** that Melvin M.L. McElwee, Sr. pay to Shields, Mott and Lund to the benefit of Great American Insurance Company the amount of $10,000.00 as sanction, a fine and in reparation for damages to that Great American Insurance Company incurred. Although the amount is due immediately, the parties are instructed to meet with Magistrate Judge Jay Wilkinson to

4

PX-0109-0284

determine a payment schedule in the event the magistrate judge determines that Mr. McElwee is unable to pay the entire amount immediately.

     **IT IS FURTHER ORDERED** that a status conference shall be held before Magistrate Judge Jay Wilkinson on **May 26, 2004 at 2:30 p.m.** to discuss outstanding discovery matters in an attempt to prevent any further problems in discovery and communications between the parties.

5

**McElwee00285**

**PX-0109-0285**

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT

Eastern _____ DISTRICT OF _____ Louisiana

In re: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION
V.

**SUBPOENA IN A CIVIL CASE**

Pertains to: All MRGO

Case Number:[1]  05-4182 "K" (2)

McElwee Brothers, Inc.
TO: 14154 Rev. Joseph White Rd, Independence, Louisiana 70443
c/o Sylvia A. Hurst (Registered Agent) and/or
Melvin M.L. McElwee, Jr. (Registered Agent)
14150 Rev. Joseph White Rd., Independence, Louisiana 70443

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to
testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
| --- | --- |
| | |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

See attached Schedule A.

| PLACE   Stone Pigman Walther Wittmann L.L.C. | DATE AND TIME |
| --- | --- |
| 546 Carondelet Street, New Orleans, Louisiana 70130 | 12/19/2007 10:00 am |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the
matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
| --- | --- |
| *William R. Treeby* | Nov. 19, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
William D. Treeby, Esq. (12901) Stone Pigman Walther Wittmann L.L.C. 546 Carondelet Street, New Orleans,
Louisiana 70130 (504) 581-3200  Counsel for Washington Group International, Inc.

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

**McElwee00286**


EXHIBIT
16
PENGAD 800-631-6989

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | November 19, 2007 | 14154 Rev. Joseph White Rd. Independence, LA |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| McElwee Brothers, Inc | through Melvin McElwee Jr. |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Jani I. Mitchell | Process Server |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ___November 19, 2007___
DATE

SIGNATURE OF SERVER

201 St Charles Ave., Ste 114-320
ADDRESS OF SERVER

New Orleans, LA   70170

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

McElwee00287

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION |
| | NO. 05-4182 "K" (2) |
| PERTAINS TO: MRGO | JUDGE DUVAL |
| | MAG. WILKINSON |

## NOTICE OF SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS

Pursuant to the Court's Case Management and Scheduling Order No. 4, entered March 1, 2007 (Docket No. 3299), and as subsequently amended ("CMO No. 4"), PLEASE TAKE NOTICE that pursuant to Rule 45 of the Federal Rules of Civil Procedure, Defendant Washington Group International, Inc. ("WGII") has caused a subpoena *duces tecum* ("subpoena") to be issued by the United States District Court for the Eastern District of Louisiana upon McElwee Brothers, Inc. ("McElwee Bros."). McElwee Bros. is located at 14154 Rev. Joseph White Road, Independence, Louisiana 70443. The subpoena has been directed to the Registered Agents for McElwee Bros., Sylvia A. Hurst and/or Melvin M.L. McElwee, Jr., 14150 Rev. Joseph White Road, Independence, Louisiana 70443.

The subpoena requires the production of documents as described and designated in the attached Schedule A, at 10:00 a.m., December 19, 2007, at the offices of Stone Pigman Walther Wittmann L.L.C., 546 Carondelet Street, New Orleans, Louisiana 70130.

900421v.1

**McElwee00288**

**PX-0109-0288**

The notice, service, and enforcement of this subpoena is without prejudice to the pending motion of WGII to dismiss, or any other similar motion to be filed by WGII, and shall not be deemed a waiver by WGII of any right.

Dated: November 19, 2007

Respectfully submitted,

*/s/William D. Treeby*

William D. Treeby, 12901
Carmelite M. Bertaut, 3054
Heather S. Lonian, 29956
    Of
Stone Pigman Walther Wittmann L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Telephone: (504) 581-3200
Facsimile: (504) 581-3361

Attorneys for Washington Group
International, Inc.

Of counsel
Adrian Wager-Zito
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-4645
Facsimile: (202) 626-1700

900421v.1

**McElwee00289**

PX-0109-0289

## SCHEDULE A

This subpoena is to be answered in accordance with the provisions of Federal Rule of Civil Procedure 45(d)(1) and in accordance with the following definitions and instructions:

**A.    Definitions**

The terms set forth below are defined as follows unless otherwise stated:

1.       "Document(s)," "data," "report(s)," "information," and "material(s)" shall be used in the broadest sense contemplated by Federal Rule of Civil Procedure 34, and shall include any writing of any kind, including, without limitation, any written, printed, taped, electronically or digitally encoded, graphic or other information, including, without limitation, originals, identical copies, translations and drafts thereof and all copies bearing notations and marks not found on the original.    "Document(s)," "data," "report(s)," "information," and "material(s)" includes, without limitation, affidavits; agreements; analyses; appointment books; articles from publications; workpapers of any kind; books; calendars; charts; checks (canceled or uncancelled); check stubs; communications; computer disks, print outs, tapes; confirmations; contracts; correspondence; credit card receipts; desk calendars; deskpads; diaries; diskettes; drafts; electronic mail; estimates; evaluations; facsimiles; files; filings; forms; graphs; invoices; journals; ledgers; letters; lists; maps; meeting minutes; memoranda; notations; notes; opinions; orders; pamphlets; papers; pictures; press releases; publications; receipts; recordings of conferences, conversations, or meetings; reports; statements; statistical records; studies; summaries; tabulations; telegrams; telephone records; telex messages; transcripts; understandings; videotapes; vouchers; and sheets or things similar to any of the foregoing however denominated.

1

**McElwee00290**

**PX-0109-0290**

"Document(s)," "data," "report(s)," "information," and "material(s)" further means any document now or at any time in the possession, custody or control of the entity to whom these Requests are directed (together with any predecessors, successors, affiliates, subsidiaries or divisions thereof, and their officers, directors, employees, agents and attorneys). Without limiting the term "control" as used in the preceding sentence, a person is deemed to be in control of a document if the person has the right to secure the document or a copy thereof from another person having actual possession thereof.

2.      "Concerning," "regarding," "relating to," and "demonstrating" means referring to, describing, discussing, evidencing, or constituting.

3.      "McElwee Bros." means McElwee Brothers, Inc. (and any subsidiary or predecessor thereof whether or not in existence on the date of these Requests); any of McElwee Brothers, Inc.'s directors, officers, employees, affiliates, representatives, advisors, agents, attorneys or associates; or any other person acting on behalf of McElwee Brothers, Inc. in any capacity.

4.      "You," or "Your" means McElwee Brothers, Inc., its predecessors, parents, subsidiaries, affiliates, and any of its present or former directors, officers, agents, employees, designees, assignees, representatives or other persons acting on its behalf.

5.      "Person" or "individual" means any natural person or any business, legal, or government entity or association.

6.      "Meeting" means the contemporaneous presence of any natural persons, whether or not such presence occurred by chance or was prearranged and whether or not the meeting was formal or informal or occurred in connection with some other activity, and whether or not the meeting took place via telephonic, telegraphic video or in-person, or otherwise.

2

90042 lv.1

**McElwee00291**

PX-0109-0291

7.     "Including" means including without limitation.

8.     "Identify," when used in reference to a person, means to state his, her, or its full name, present or last known address, and telephone number.

9.     Unless otherwise set forth specifically in a request, the relevant time period applicable to this subpoena is January 1, 1995 through and including the date of your document production.

10.    "Hurricane Katrina" means the hurricane that made landfall along the Mississippi Gulf Coast to the east of the New Orleans, Louisiana area on or about the morning of August 29, 2005.

11.    "WGII" means Washington Group International, Inc.

12.    "Canal" shall include the waterway itself, as well as any and all adjacent flood control structures and/or spoil banks, including levees and floodwalls.

13.    "MRGO" means the Mississippi River Gulf Outlet Navigation Canal, as well as any and all adjacent flood control structures and/or spoil banks, including levees and floodwalls.

14.    "GIWW" means the Gulf Intracoastal Waterway, as well as any and all adjacent flood control structures and/or spoil banks, including levees and floodwalls.

15.    "Industrial Canal" means the Inner Harbor Navigation Canal, also referred to locally as the Industrial Canal, that connects Lake Pontchartrain, the Mississippi River, and the segment of the GIWW between New Orleans East and St. Bernard Parish.

16.    "Breach(es)" means the failure, during and/or immediately after Hurricane Katrina, other than from overtopping, of a levee, berm, spoil bank, levee wall, and/or flood wall resulting in the release of floodwater.

3

900421v.1

**McElwee00292**

**PX-0109-0292**

17.    "Adjacent to" means next to, along, near, or on/or near the boundary of property or a specific area.

18.    "East Bank Industrial Area" ("EBIA") means the 32-acre parcel of land in New Orleans bordered by Florida and Claiborne Avenues to the north and south along the eastern edge of the Industrial Canal and bounded on the east by the levee and/or floodwall.

B.    **Instructions**

1.    The documents sought in these Requests include all documents in your possession, custody or control. Unless otherwise indicates, these Requests seek all documents generated or received by you during the Relevant Period.

2.    You shall produce all documents in the manner in which they are maintained in the usual course of your business and/or you shall organize and label the documents to correspond with the categories in these Requests. A Request for a document shall be deemed to include a request for any and all file folders in which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself.

3.    Each document withheld from production based upon privilege or any similar claim shall be identified by: (a) the type of document; (b) the general subject matter of the document; (c) the date of the document; and (d) such other information as is sufficient to identify the document, including, without limitation, the author of the document, the relationship of the author and any recipient to each other. The nature of each claim of privilege shall be set forth in sufficient detail to enable a determination to be made concerning the reasons for the privilege claim.

4.    Documents attached to each other should not be separated.

4

900421v.1

**McElwee00293**

5.      Documents not otherwise responsive to these Requests shall be produced if such documents mention, discuss, refer to, or explain the documents that are called for by these Requests.

6.      If any document within the scope of these Requests has been destroyed, that document shall be identified, including, without limitation, identification of its author(s), intended or unintended recipient(s), addressee(s), intended or unintended recipients of blind copies, date and subject matter. The circumstances of such destruction shall be set forth, and any documents relating to such destruction shall be produced.

7.      In producing documents and other materials, you are requested to furnish all documents or things in your possession, custody or control, regardless of whether such documents or materials are possessed directly by you or your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, accountants or investigators, or by your attorney or their agents, employees, representatives or investigations.

8.      If you object to any part of any request, you shall state fully the nature of the objection. Notwithstanding any objections, you shall nonetheless comply fully with the other parts of the request not objected to.

9.      Each Request shall be construed independently and not with reference to any other document Request for the purpose of limitation.

10.     "All" and "each" shall be construed as "all and each."

11.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery Request all responses that might otherwise be construed to be outside the scope.

5

900421v.1

McElwee00294

PX-0109-0294

12.    The use of the singular form of any word includes the plural and vice versa. The past tense shall include the present tense and vice versa.

13.    The documents shall be produced in full, without abbreviation or expurgation.

## SPECIFICATIONS OF DOCUMENTS TO BE PRODUCED

1)    communications you have had with any member of the Independent Levee Investigation Team ("ILIT"), including any statements provided by you to ILIT

2)    documents you provided to any member of the Independent Levee Investigation Team ("ILIT")

3)    documents you received from any member of the Independent Levee Investigation Team ("ILIT")

4)    documents and other materials requested and/or shared with the Independent Levee Investigation Team ("ILIT")

5)    documents and other materials requested and/or shared with the Interagency Performance Evaluation Task Force ("IPET")

6)    documents reflecting any dewatering procedures conducted or attempted by you or anyone acting on your behalf, along the Industrial Canal, particularly the East Bank Industrial Area between Florida and Claiborne Avenues along the east side of the Industrial Canal

7)    documents reflecting the location of any excavations you, or anyone acting on your behalf, made along the Industrial Canal, particularly the East Bank Industrial Area between Florida and Claiborne Avenues along the east side of the Industrial Canal

8)    documents reporting underseepage, ponding, or pooling of waters along the Industrial Canal, particularly the East Bank Industrial Area between Florida and Claiborne Avenues along the east side of the Industrial Canal

9)    documents recording or reflecting efforts by you or anyone acting on your behalf to remedy or otherwise limit underseepage, ponding, or pooling of waters along the Industrial Canal, particularly the East Bank Industrial Area between Florida and Claiborne Avenues along the east side of the Industrial Canal

10)    reports or other documents evidencing complaints or expressions of concern from residents of the Lower Ninth Ward and/or St. Bernard Parish neighborhoods concerning underseepage, ponding, or pooling of waters along the Industrial Canal, particularly the East Bank Industrial Area between Florida and Claiborne Avenues along the east side of the Industrial Canal

6

900421v.1

**McElwee00295**

11)   documents referring to or evidencing sink holes along the Industrial Canal, particularly the East Bank Industrial Area between Florida and Claiborne Avenues along the east side of the Industrial Canal

12)   documents reflecting the identities of any person or entity who has made or threatened to make a claim against you for any damage alleged to have been caused during Hurricane Katrina

13)  documents reflecting the identities of any residents of the Lower Ninth Ward and/or St. Bernard Parish with whom you, or anyone acting on your behalf, have settled or otherwise resolved litigation or anticipated litigation against you in connection with Hurricane Katrina, as well as the amounts of any such settlement or resolution

900421v.1

**McElwee00296**

**PX-0109-0296**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Notice of Subpoena Requiring the Production of Documents and Schedule A has been served upon liaison counsel and all other counsel of record through the Court's CM/ECF electronic filing system or by placing same in the United States mail, postage prepaid and properly addressed, this 19th day of November, 2007.

/s/William D. Treeby
William D. Treeby

900421v.1

**McElwee00297**

PX-0109-0297

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

*In re: KATRINA CANAL*                              CIVIL ACTION NO. 05-4182
*BREACHES CONSOLIDATED LITIGATION*

*VERSUS*                                            SECTION "K"

*Pertains to: All MRGO*                             Judge Standwood R. Duval, Jr.
                                                    District Judge

                                                    Judge Joseph C. Wilkinson, Jr.
                                                    Magistrate 2

### RESPONSES TO SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS

### DATED NOVEMBER 18, 2007

NOW INTO COURT, in Proper Persona, comes a respondent, Melvin M.L.
McElwee, Sr. pursuant to Federal Rule of Civil Procedure 45, who in response to
Defendant Washington Group International, Inc. (hereinafter, "WGII") request of
subpoena *duces tecum* (subpoena) being issued by the United States District Court for
the Eastern District of Louisiana upon McElwee Brothers, Inc. (hereinafter, "McElwee
Bros."). McElwee Bros. located at 14154 Rev. Joseph White Road, Independence,
Louisiana 70443. The subpoena was received by Melvin M. L. McElwee, Jr. 14150
Rev. Joseph White Road, Independence, Louisiana 70443.

1 of 5

EXHIBIT
17

PX-0109-0298

Respondent provides the following:

## RESPONSE TO SPECIFICATIONS OF DOCUMENTS TO BE PRODUCED

### NO. 1

Attached has exhibits A, B, C, D, and E. These documents are not all inclusive. McElwee Brothers, Inc. was not required and did not keep on file a complete list of communications held between it and any member of the Independent Levee Investigation Team.

### NO. 2

McElwee Bros. has some photos that it is willing to email WGII upon it furnishing an electronic mailing address for receipt. McElwee Brothers, Inc. did not keep on file a complete list of documents provided to Professor Robert Bea (PhD, P.E.), of the University of California Berkeley, a purported member of the Independent Levee Investigation Team. Dr. Robert Bea is the best source for this information.

### NO. 3

Please reference exhibits A, B, C, D, and E respectively, and exhibits F, G, and H. McElwee Bros., was also referred to a link to obtain a copy of the draft report, "Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005", completed by the Independent Investigation Team. McElwee Bros. is willing to email WGII upon it furnishing an electronic mailing address for receipt.

McElwee00299

PX-0109-0299

**NO. 4**

Please reference item number 2 above.

**NO. 5**

McElwee Bros. has not requested any documents with the Interagency Performance Evaluation Task Force. McElwee Bros. has no knowledge of sharing any documents with the Interagency Performance Evaluation Task Force.

**NO. 6**

McElwee Bros. has not conducted or attempted to conduct dewatering procedures along the Industrial Canal's east bank between Florida and Claiborne avenues. McElwee Bros. has conducted dewatering procedures along the Industrial Canal's east bank north of Florida and Claiborne avenues. McElwee Bros., **objects** to the production of documents associated with its dewatering procedure as a result of such request subjecting McElwee Bros.', director, officers, and employees to undue burden (labor, time, reproduction costs).

**NO. 7**

McElwee Bros. has not conducted or attempted to conduct excavation along the Industrial Canal's east bank between Florida and Claiborne avenues. McElwee Bros. has conducted excavations along the Industrial Canal's east bank north of Florida and Claiborne avenues. McElwee Bros., **objects** to the production of documents associated with its excavations as a result of such request subjecting McElwee Bros.', director, officers, and employees to undue burden (labor, time, reproduction costs).

3 of 5

McElwee00300

PX-0109-0300

**NO. 8**

McElwee Bros. has not reported under seepage, ponding, or pooling of waters along the Industrial Canal's east bank between Florida and Claiborne avenues. McElwee Bros. has reported under seepage, ponding, or pooling of waters along the Industrial Canal's east bank north of Florida and Claiborne avenues. McElwee Bros., **objects** to the production of documents associated with its excavations as a result of such request subjecting McElwee Bros.', director, officers, and employees to undue burden (labor, time, reproduction costs).

**NO. 9**

McElwee Bros., have not made any efforts to remedy or otherwise limit under seepage, ponding, or pooling of waters along the Industrial Canal.

**NO. 10**

McElwee Bros., have not received any complaints or expressions of concern from residents of the Lower Ninth Ward and/or St. Bernard Parish neighborhoods concerning under seepage, ponding, or pooling of waters along the Industrial Canal.

**NO. 11**

McElwee Bros., has no documentation evidencing sink holes along the Industrial Canal.

**NO. 12**

McElwee Bros., has no documentation reflecting the identities of any person or entity that has made or threatened to make a claim against it for any damage alleged to have been caused during Hurricane Katrina.

4of 5

PX-0109-0301

NO. 13

McElwee Bros., has no documentation reflecting the identities of any residents of the Lower Ninth Ward and/or St. Bernard Parish with whom it have settled or otherwise resolved litigation or anticipated litigation against it in connection with Hurricane Katrina.

I PRAY THAT THIS COURT, will find that the defendant has completed the requirement of Federal Rule of Civil Procedure 45, and deem this information to be sufficient.

Melvin M. L. McElwee, Sr.
In Proper Persona
Director of McElwee Brothers, Inc.
P. O. Box 1410
14154 Rev. Joseph White Road
Independence, LA  70443
Telephone    (985) 878-0280
Facsimile    (985) 878-0064

CERTIFICATE OF SERVICE

I certify that a copy of the above "RESPONSES TO SUBPOENA REQUIRING THE PRODUCTION OF DOCUMENTS DATED NOVEMBER 18, 2007" has been facsimiled to all counsel of record on this 18th day of December 2007.

Melvin M. L. McElwee, Sr.
In Proper Persona

McElwee00302

PX-0109-0302

**Melvin M. L. McElwee, Sr.**

**From:**    Melvin M. L. McElwee, Sr. [mcelweebro@i-55.com]

**Sent:**    Monday, January 09, 2006 7:43 AM

**To:**    'Robert Bea'

**Subject:** RE: Study of levee failures in New Orleans

Dr. Bea,

I will need a 24 hour notice. I am in Shreveport, LA performing pile driving along the Red River during this week. This is approximately 5 hours away from our home office. I will be more than happy to met with you all.

-----Original Message-----
**From:** Robert Bea [mailto:bea@ce.berkeley.edu]
**Sent:** Wednesday, January 04, 2006 11:33 AM
**To:** Melvin M. L. McElwee, Sr.
**Subject:** Re: Study of levee failures in New Orleans

Hi Melvin,

several members of our NSF sponsored team are going to be in New Orleans next week.

would it be possible to meet with you sometime during the week?

purpose - gather more background on the construction aspects of the flood defense system for the greater New Orleans area.

bob
--
Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503

Exhibit "A"
Page 1 of 1

1/9/2006

McElwee00303

Re: Study of levee failures in New Orleans                                   Page 1 of 1

## Melvin M. L. McElwee, Sr.

**From:**    Robert Bea [bea@ce.berkeley.edu]
**Sent:**    Saturday, January 14, 2006 5:06 PM
**To:**      Melvin M. L. McElwee, Sr.
**Subject:** Re: Study of levee failures in New Orleans

Melvin,

I want to thank you and your family for all of your kindness and our meeting.  attached are two documents that can help your son take the next steps.  I will send the electronic versions of my books later.

bob

--

Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503

Exhibit "B"
Page 1 of 1

1/15/2006

**McElwee00304**

PX-0109-0304

## Melvin M. L. McElwee, Sr.

**From:** Robert Bea [bea@ce.berkeley.edu]
**Sent:** Thursday, June 22, 2006 12:24 PM
**To:** Melvin M. L. McElwee, Sr.
**Subject:** RE: you are invited

Hi Melvin,

you can access our report at:

www.ce.berkeley.edu/~new_orleans

(no underline under 'orleans')

more developing on going forward.

thanks for your help.

bob

> Thanks for the invitation.  Sorry I was out of town during the week of May 21, 2006.

> Is it possible to that I may receive a copy of the report, at our mailing address which is P. O. Box 1410, Independence, LA 70443.

> I still haven't received any of your attachments on your last email correspondence.

> Again, thanks for the invitation, and if there is anything else I can help with, let me now.

> -----Original Message-----
> **From:** Robert Bea [mailto:bea@ce.berkeley.edu]
> **Sent:** Wednesday, May 17, 2006 10:42 AM
> **To:** Melvin M. L. McElwee, Sr.
> **Subject:** you are invited

> Announcement

> You are invited to attend

Exhibit "C"
page 1 of 2

**McElwee00305**

The National Science Foundation
Independent Levee Investigative Team
(Dr. Bob Bea)
(Dr. Ray Seed)
And many Other Volunteers
Will present their report on Katrina
Levee Failures

May 22nd, 2006

9:00 A.M. to 12:00 Noon

Sheraton New Orleans Hotel
500 Canal Street
New Orleans, Louisiana 70130

Grand Ballroom
5th Floor


Please feel free to invite anyone who is interested in attending.


i think we got it put together correctly. thanks for your help. but, it is not over - only
started.


bob

--

Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503


--

Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California

6/23/2006

McElwee00306

Exhibit "C"
page 2 of 2

**Melvin M. L. McElwee, Sr.**

| | |
|---|---|
| **From:** | Robert Bea [bea@ce.berkeley.edu] |
| **Sent:** | Friday, August 25, 2006 12:01 PM |
| **To:** | Melvin M. L. McElwee, Sr. |

**Subject:** Re: "When the Levees Broke"

happy friday Melvin,

great to hear from you.  give Sylvia and the rest of your family a hug for me.

i am happy that the HBO gig worked.  i sure was impressed by the eloquence of the people of new orleans.

attached is an opinion editorial i am completing today for the NY Times.  i am using every opportunity that i can to get the word to the public that new orleans needs help - for a long time - to be able to realize its potential.

now, responses to your email follow below.

> Dr. Bea,

> Thanks a million!!!!!!!!!  You are a savior to those that pay attention to your study and wisdom. My family and I enjoyed, "meeting with you on Monday, and Tuesday night on HBO." My wife (Sylvia) says hello.

and hello with hugs to your family.  it is people like you that make the place work!

> To date I think you are the only man telling the truth about the current conditions of the levees as they relate to safety for the American Public.

i hope not.  i think i am now getting some support from some of my engineering colleagues.  but, there sure is silence from most of the Louisiana engineering and construction contingent.  and none from the honest people inside the Corps.

> My son is looking forward to taking you up on your invite to the University of California Berkley. He has transferred from Grambling State University to Louisiana Tech into the Civil Engineering program.

Exhibit "D"
page 1 of 2

great. he is welcome.  even though i know he does not need them, i have attached the 10 secrets of successful students that i hand out to our graduate students.  they might help.


Take care of yourself and your family and may good continue to keep his presence around you in all of your works.

God is my pilot.

same for you.

bob


---

Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503

Exhibit "D"
_____page 2 of 2

**McElwee00308**

Katrina - One Year Later

One year ago, America suffered the worst natural and engineering disaster in its history when the failure of New Orleans' flood defenses allowed Hurricane Katrina's storm waters to wash away a great American city.

Now, in the thick of a new Hurricane season-as the city, state and nation rush to rebuild-I must say with great dismay that in all likelihood we would see significant flooding again if faced with another storm like Katrina.

This is a national disgrace.

I don't come to this conclusion lightly. Since last September, as a member of a national Independent Levee Investigation Team I have spent about 1000 hours studying the failures and repairs in the greater New Orleans area, and an additional 2000 hours working with citizens, colleagues, investigators, engineers, contractors, and federal, state, parish and city government officials. I have witnessed months of careful study, dozens of hearings, heroic efforts by a lot of hardworking and caring people, and watched more than $1 billion be invested in repairing and strengthening the city's flood protection system.

I must tell the people who are considering rebuilding their homes and lives in New Orleans at this time this simple fact: you face excessive risks of loosing everything again.

Why? Because today the city's flood protection system remains essentially what it was before Katrina. Extensive repairs have been made to damaged parts of the existing system to restore them to the pre-Katrina condition. However, the system remains a collection of incomplete, disjointed, defective and deficient pieces. Flood gates, when tested, do not function properly. Pumps, when tested, vibrate excessively and are undersized. Improved flood walls and levees interface ineffectively with older and weaker components. In low sections of the flood defenses, water can again enter the city.

In short, the system does not work the way it should. And it doesn't have to be this way.

In 1953, the Netherlands found themselves facing the same challenges that the New Orleans area faces today. At that time, they had a system that is very much like the present one that defends New Orleans. A storm had flooded the majority of their country and killed almost 2000 people. So the Netherlands embarked on a program to improve their flood protection system - work that continues to this day.

They made flood protection a national priority. They made appropriate investments to lower flooding risks. They learned to surrender some areas to water and to occupy and defend what should be developed when it should be developed. Yes, along the way they have made mistakes - but they've learned quickly from each one, and ultimately have forged a flood protection system that is today an engineering marvel.

Exhibit "O"
Attachment 1 of 4

McElwee00309