It's not too late to do what's necessary to protect New Orleans from hurricane flood waters.

But we cannot succeed unless the people of New Orleans, and ultimately the people of America, are truly committed to saving this great city. That means reminding people of its cultural, commercial and other contributions - this, after all, is the home of 25% of domestic oil and gas production, chemical refining, and our 2nd largest commercial port - and the home of unique parts of our national culture of history, music, and art.

To succeed we must:
- reach out to the people that have been harmed and work more diligently to help right the wrongs,
- develop an effective and efficient organizational - institutional structure uniting federal, state, and local interests with flood protection as a priority,
- provision this structure with sufficient financial and operational resources, and
- develop an integrated and sustainable flood defense system that will provide desirable and acceptable levels of flood protection.

If we have the will to provide adequate long-term hurricane protection, then we have the ways. It will cost a lot of money and take a long time. But, as Katrina has taught, we can pay a little now or a lot more later.

Dr. Robert Bea
Professor of Civil and Environmental Engineering
Member Independent Levee Investigation Team
University of California Berkeley
bea@ce.berkeley.edu

Exhibit "D"
Attachment 2 of 4

## TEN SECRETS OF SUCCESSFUL STUDENTS

1. SET PRIORITIES - study is business.  business before pleasure.

2. STUDY - define schedule and place, concentrate, practice.

3. GET ORGANIZED - notebooks, notes, schedules, references, supplies, be neat and professional.

4. READ - be active, take notes, retain.

5. SCHEDULE - allot time for study, projects, research, recreation, rest.

6. TAKE GOOD NOTES - listen, write, organize, summarize, scan.

7. SPEAK UP & GET HELP - ask, find out why, question, understand, know.

8. DO MORE THAN YOU ARE ASKED - practice, work problems, consult other references, go the extra mile.

9. ENJOY - learning can be exciting and fun - find the fun - keep looking for the interest and joy, don't get discouraged.

10. BASICS - learn and practice the fundamentals, don't leave home without them

and Take Time To - -

- Work - it is the price of success

- Think - it is the source of power

- Play - it is the secret of life

- Read - it is the foundation of knowledge

- Help Friends - it is the source of happiness

- Dream - it can provide the path to the future

- Love - it is the sacrament of life

*Bob Bea*
*Department of Civil & Environmental Engineering*

*Exhibit "D"*
*Attachment 3of*

McElwee00311

*University of California at Berkeley*
*August 2006*
*bea@ce.berkeley.edu*

$Exhibit$ "O"

$Attachment$ 4 of 4
12/19/2007 13:19

## Melvin M. L. McElwee, Sr.

**From:** Bob Bea [bea@ce.berkeley.edu]
**Sent:** Friday, December 22, 2006 7:33 PM
**To:** Melvin McElwee, Sr.
**Subject:** the beat goes on


coming_home.pdf
(114 KB)


wagenaar
letter.pdf (3 MB)

Hi Melvin,

it sure was great to meet you and your family at the recent town hall forum in Lakeview. y'all were BEAUTIFUL — all of you have much to be proud of! thanks for taking time from your daughter's birthday party evening.

see attached for notes i used for the forum. please help build the african american community part of the 'family' — your voices are essential if we are to get this 'right.'

also, see attached for letter to N.O. Corps District Engineer: Col Wagenaar. the beat goes on.

thanks again

--
Professor Robert Bea, PhD, PE
Associate Director, Center for Catastrophic Risk Management Department of Civil & Environmental Engineering 212 McLaughlin Hall University of California Berkeley Berkeley, CA 94720-1710 Telephone/fax 510-642-0967 Telefax 510-643-8919
e-mail: bea@ce.berkeley.edu

Home office
Risk Assessment & Management
60 Shuey Drive
Moraga, California 94556
Telephone 925-631-1587
Cell 925-6099-3503

Exhibit "E".
page 1 of 1

1

**McElwee00313**

**PX-0109-0313**

# UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY · DAVIS · IRVINE · LOS ANGELES · MERCED · RIVERSIDE · SAN DIEGO · SAN FRANCISCO          SANTA BARBARA · SANTA CRUZ

TELEPHONE: (510) 643-8678
TELEFAX: (510) 643-8919
E-MAIL: bea@ce.berkeley.edu
HTTP://www.ce.berkeley.edu/

CENTER FOR CATASTROPHIC RISK MANAGEMENT
DEPARTMENT OF CIVIL & ENVIRONMENTAL ENGINEERING
212 McLAUGHLIN HALL
BERKELEY, CALIFORNIA 94720-1710



December 12, 2006

*Town Hall Forum*
*St Dominic Church, Lakeview*
*New Orleans, Louisiana*

## Coming Home. Some Thoughts: Family First, Levees Second

There are four important parts in this Family:
1. The Public – you
2. The Governments – of, by and for the people
3. Industry and Commerce – sources of power
4. The Environment – spaceship earth

**The Public - let your voices be heard**
- Take responsibility for your flood protection. You are responsible for the roof over your head. It provides essential protection. Also, you are responsible for your levees. They too provides essential protection.
- Work together. Do not pull apart. Together we succeed. Divided we fail. Be inclusive, not exclusive.
- Manage or be managed. There are plenty of people waiting to manage you. Do not let this happen.
- Invite informed, constructive, and respectful dissent and debate. Is it true; is it kind; is it constructive? Truth lurks in obscure places.
- Communicate, communicate, communicate. Understanding is crucial.

**Government - of, by, and for the people**
- Represent all of the people, not just those who elected you.
- Focus on provision of acceptable protection for those who need protection. Imposing risks on people is justified if and only if they have consented to those risks.
- Remember sustainability. Flood protection is a project that can never end.
- Work to preserve the essentials of Life, Liberty, and the Pursuit of happiness

**Industry - provides the fuel for civilization**
- Serve and flourish
- Work to protect human and hardware infrastructures necessary for production and profitability
- Use the power of industry wisely
- Be part of the solution, not the problem

**The Environment - spaceship Earth**
- This is the only one we have.
- Nurture and respect it.
- Nature first, engineered developments second.

**The Media and Communications – the ties that bind**
- Encourage and recognize quality and balance. Discourage distortions.
- Help facilitate communications in all mediums (radio, TV, newspapers, magazines, internet).
- Support as business so adequate and high quality resources can be made available to serve the public and industry

**Conclusions**
- Functional families are happy and productive. Dysfunctional families are not.
- Do not be intimidated. You can understand how to get and maintain adequate flood protection. Learn. Listen. Use your senses.
- Do accept compromise with your protection. Demand the best. Be prepared to pay for the best.
- There are no such things as Natural Disasters. There are natural hazards. There is human hubris. When we combine natural hazards with human hubris we have disasters. When we combine disasters with more human hubris, we have catastrophes.

Thank you for being here tonight,

Bob Bea

*Exhibit "E"*
*Attachment 19*
*pages total*

McElwee00314

UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ

TELEPHONE: (510) 643-8678
TELEFAX: (510) 643-8919
E-MAIL: bea@ce.berkeley.edu
HTTP://www.ce.berkeley.edu/

CENTER FOR CATASTROPHIC RISK MANAGEMENT
DEPARTMENT OF CIVIL & ENVIRONMENTAL ENGINEERING
212 McLAUGHLIN HALL
BERKELEY, CALIFORNIA 94720-1710

December 22, 2006

Col. Richard Wagenaar
District Engineer
U.S. Army Corps of Engineers
New Orleans, LA 70160

Subject: MRGO Levee Soil Samples

Dear Col. Wagenaar:

I listened with great interest to your interview with Garland Robinette on WWL's Think Tank program on 20 December 2006. Garland questioned you regarding an inspection I participated in on 11 January 2006 of the stretch of the MRGO levee between bayous Bienvenue and Durpe. During that inspection, I was accompanied by my University of California Berkeley colleague Dr. Ray Seed and by six Corps of Engineers representatives including Mr. Kevin Wagner and Mr. Rich Varuso. Dr. Seed documented the results of our trip in a letter to Lt. General Strock dated March 6, 2006 (Attachment A).

Before we made the inspection on January 11th, Dr. Seed and I were flown at low level over this stretch of the levee on January 9th. Mr. Lucas Ehrensing, president of Thigpen Construction Company (St. Rose, Louisiana) hosted and accompanied us during that trip. I took a large number of pictures of the reconstruction work that was underway. As a result of this flight, we developed concerns not only for the apparent poor quality of the soils that were being used to fill the breaches but as well for the lack of sufficient equipment and personnel on the work sites. These concerns led to my contacts with Kevin Wagner to arrange for our inspection of January 11th.

Of particular personal concern in your interview with Garland on December 20th are three statements you made regarding my part in inspection of the MRGO levee on January 11th (recording available on WWL radio website):

- "We asked him numerous times where did he get....."
- "He would never tell us......."
- "He, to this day, will not tell us....."

Your first statement is not true. I have never been contacted by any USACE employee or representative concerning where the samples were taken. I request you contact the sources of the information you have related as 'we', have them provide proof of such contacts, and provide this documentation to me.

Your second statement is not true. The letter to LT. General Strock provides general information on where the samples were taken. During this inspection, I took multiple photographs of each of the locations where I sampled soils being placed and compacted in the breach repair sites. I have attached copies of several of the photographs I took during this tour (Attachment B). The photographs show silty organic and sandy soils being placed and compacted in the repair sites. One of the photographs show the shoulder of one of the breaches; silty - sandy soils with little or no cohesion and containing white oyster shells are clearly evident. Persons present at

1

McElwee00315

PX-0109-0315

the time that these soils were placed have opined that the soils were taken from the spoil banks developed during the dredging of the MRGO.

During our January 11th inspection, Dr. Seed and I were accompanied by 6 USACE representatives including Kevin Wagner and Rich Varuso. Based on information they have provided to the USACE and to the media (e.g. National Public Radio, April 13, 2006), they have opined that they were present during our tour of January 11th. It should be clearly evident that they know where the soil samples were taken. I suggest you contact Mr. Wagner and Mr. Varuso and have them provide the information you stated is not available to the Corps of Engineers.

**Your third statement is not true.** We (the Independent Levee Investigation Team) documented and published the results of the soil sampling and testing in our final report dated May 22, 2006. You can obtain a copy of this report from http://www.ce.berkeley.edu/~new_orleans/ . I urge you to carefully read this report with particular attention to the chapter that addresses reasons for the failure of the flood protection system; Chapter 12, Organized for Failure. This report contains the information you contend was not and has not been made available; please refer to Chapter 9. The attached (Attachment C) map from this report shows where the soil samples were taken and includes results of erosion testing performed on these samples. The testing indicates the extreme susceptibility of these soils to the erosion by water.

The statements you have made to the public regarding my and our work clearly are not true; they are defaming. In a similar vein, the statements previously made by your USACE Task Force Guardian public relations representative, Mr. Jim Taylor, on February 20, 2006 are similarly defaming. My responses to the USACE Press Release (sent to Jim Taylor and the Lehrer News Hour on February 22) are attached (Attachment D). I reiterate my previous requests that such libel and slander cease. These actions do nothing to help foster cooperation and collaboration needed to help assure that adequate and acceptable flood protection is provided to the people of the greater New Orleans area. These and many other statements you made during the WWL Think Tank program on December 20th do not encourage other concerned and qualified engineers and public citizens to come forward with important valid information that the Corps of Engineers might deem as unwelcome or unfavorable. On 24 August 2006, Lt. General Strock provided "12 Actions for Change" that embodied three overarching themes: effectively implement a comprehensive systems approach; communication; and reliable public service professionalism. It is past time that these actions are implemented and practiced.

Please feel free to call me at my home office (925-631-1587, cell 925-699-3503) if you would like to discuss these developments further.

Sincerely yours,

R. G. Bea
Professor
Associate Director, Center for Catastrophic Risk Management

Cc: Mr. Garland Robinette, WWL Radio          Mr. Ralph Vartabedian, Los Angeles Times
Lt. General Carl Strock, Chief of Engineers, USACE     Ms. Sandy Rosenthal, Levees.org
Mr. Dan Hitchings, Director, Task Force Hope,     Dr. Raymond Seed, University of California Berkeley
USACE                                          Dr. Ivor Van Heerden, Louisiana State University
Mr. Lucas Ehrensing, Thigpen Construction Company     Mr. Joseph Bruno, Bruno & Bruno, LLP
Mr. Mark Schleifstein, Times Picayune
Mr. John Swartz, New York Times

2

McElwee00316

Attachment A

# UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY  •  DAVIS  •  IRVINE  •  LOS ANGELES  •  RIVERSIDE  •  SAN DIEGO  •  SAN FRANCISCO                    SANTA BARBARA  •  SANTA CRUZ

Prof. Raymond B. Seed
Department of Civil and Environmental Engineering
423 Davis Hall, University of California,
Berkeley, California 94720

March 6, 2006

Lt. General Carl A. Strock
Commander and Chief, USACE
U.S. Army Corps of Engineers Headquarters
441 G Street, NW
Washington, D.C.

## Re: Erodenbility of MRGO Replacement Levees

Dear General Strock,

The News Hour with Jim Lehrer ran a story on February 16th filed by Betty Ann Bowser which profiled the Corps of Engineers' ongoing work to rebuild damaged levees around New Orleans. This story included interviews and demonstrations with Professor Robert Bea of U.C. Berkeley, who is a member of the National Science Foundation-sponsored independent Levee Investigation Team (NSF/LIT), currently working on assessing the reasons for the various levee and systems failures that occurred during Hurricane Katrina. The NSF/LIT has been sharing data with the Corps' IPET group, and we remain committed to sharing the information both teams are uncovering in a spirit of professional cooperation.

Four days after the story ran, Jim Taylor of the Public Affairs Office of Task Force Guardian issued a two page press release alleging that misinformation had been presented in the Lehrer News Hour segment (copy attached).    This statement includes a number of assertions about supposed "misinformation" which we believe are erroneous, and feel should be brought to your attention. I checked today, two weeks later, and this statement is still actively posted as the lead article on the TFG website.

I was with Professor Bea during our visit to the Mississippi River Gulf Outlet (MRGO) levee reconstruction project on January 11th, while work was underway. [Ms. Bowser and the Lehrer News Hour crew apparently visited the site on a later date or dates.] Prof. Bea and I both collected samples that day. All samples were taken from the compacted embankments, NOT from any stockpiles or discard heaps (as alleged in the Task Force Guardian response). We examined the stockpiles, but did not take any samples of those materials. At no time did a "Corps' geotechnical engineer explain to Professor Bea that the Corps was not using the material that he was collecting", and Professor Bea never "said that he knew that, but proceeded to take the samples anyway." It concerns us that such mis-statements are being issued to the media.

During our visit we were accompanied by the Corps' project engineer and the Corps' lone QA/QC inspector assigned to monitor earthwork placement along the 11-mile long segment of levees being reconstructed. Three different contractors are engaged in this work, one at the north end, one in the middle, and one towards the south end of the project. We began by observing the lock structure at Bayou Bienvenue and the reconstructed levee section adjacent to it. This section appeared to consist of well-chosen cohesive, clayey soils which were properly compacted. When we next proceeded south about half a mile, however, we encountered a stretch of newly paced material along the levee where the contractor was placing clean, fine grained sand, which is highly erodeable. We pointed this out to the Corps QA/QC inspector, who then directed the contractor to remove the sandy fill and to waste it.

1

3

McElwee00317

PX-0109-0317

It greatly concerns us that Task Force Guardian was employing a single grading inspector to cover 11 miles of levee reconstruction by three different contractors (or contracts), using a wide variety of materials, many of which we all know to be unsuitable because of high organics content or low cohesion (as specified in Design And Construction of Levees - EM1110-2-1913). At this location the contractor was attempting to compact both sandy (unsuitable) and clayey (suitable) soils with three passes of a tracked dozer (as required in the contract). The moisture content of much of the (paludal) swamp clays is so high however (several hundred percent) that it has the consistency of toothpaste, and it was squeezing out from beneath the dozer tracks without any meaningful mixing or compaction.

As we crossed the second navigable channel and lock structure at Bayou Dupres, we entered the middle section of the contract. Here we observed and sampled recently placed sandy, cohesionless fill materials that had been obtained by dragline excavation from the swamp frontage inboard (behind) the new levee.   We did not observe any meaningful quantities of clay being incorporated into the embankment. Based on the geologic profiles developed for the excavation of the adjacent MRGO channel, and other references on the local geology (e.g.: Kolb and Van Lopek, 1958; Coastal Environments, 1984), we understand that there is a shortage of suitable levee fill borrow materials in this area. The surficial marsh deposits of soft clays and highly organic peat are clearly problematic, and in the central contract section the local soils beneath these appear to be dominated largely by clean, fine sands. Faced with the choice of wasting all of the excavated borrow material (potential fill), and thus, making no progress, or of using what was available, large volumes of sand fill were being placed.

We did not observe any meaningful program for "mixing" the sand fill with imported clayey fill, as the Task Force Guardian press release alleges. We certainly hope that such mixing is now being carried out, and with effective oversight. We note that it is very difficult to consistently mix clayey soil with sands, especially in a moist environment, and that the sands being excavated by dragline operations from the swamps behind the levee frontage are wet upon excavation and are fine enough that they dry slowly. To attempt such mixing with the volumes required for the construction of such a long levee would be a massive logistical challenge, and would require much more intense monitoring (QA/QC).

We did not make it fully to the far southern end where the third contractor was working, and so cannot directly comment on the operations there based on our ground visit of January 11th. That is the least accessible section, but on an airplane overflight (at low altitude) two days before, we observed efforts to fill two levee breaches near the southern end by placing highly fluid dark black soils that poured back out of the breaches as rapidly as they were dumped. We hope to return to these areas to verify our concerns there, but it appears to be another zone containing the soft and organic marsh deposits described in the above-cited references.

The Corps' project engineer, and the Corps' QA/QC inspector, were well aware that major sections of the levees, especially in the large middle section, were being reconstructed with unsuitable sandy soils, and were, in fact, eager for advice from us as to how they might, later, provide some measure of slope face protection to mitigate what they admitted was an unsafe condition with regard to the erodeability of these materials.

It is my understanding that Dr. Van Heerden from the Louisiana investigation team visited this same site recently, accompanied by Dr. Bas Jonkin (from Delft, Holland). Dr. Jonkin is another well known levee expert, and he also considered the soils he observed being placed to be unsuitable. I hope that they passed that information along to the Corps.

A number of members of our own team have now visited this site, and over a period of several months. As early as last October Dr. Les Harder and I informed the Corps that both the soils being placed, and the lack of close supervision at that time, along this critical section were of concern to us. Dr. Harder is the Deputy Director of the California Department of Water Resources, and is personally

2

4

McElwee00318

charged with the oversight of several thousands of miles of levees protecting approximately 1.3 million people here in California.

Dr. Bea is a member of both the National Academy of Engineering and of Management, two of the highest levels of recognition for lifetime achievement in those fields, and his long list of professional engineering awards and honors begins with the ASCE's Ralph W. Peck Medal. He is not someone who would confuse spoil heaps with sections of recently compacted levee embankment.

And neither am I.

A growing chorus of experts are trying to tell you that there may be some significant concerns with regard to the materials being placed along the MRGO frontage at the northeastern edge of St. Bernard Parish. These same levees eroded catastrophically during Katrina, and were the principal source of the massive flooding of St. Bernard Parish during that event.

The fill materials being placed can subsequently be sampled, and so this can be checked. We would encourage you to do so. Our own sampling and erosion testing from this section has shown large quantities of highly erodeable clean sands along major stretches of these evolving levee embankment sections. We continue to hope to see improvements in both material selection and placement along this critical section, or the announcement of a longer-term plan for more permanent work to follow.

Our goal has been, and will continue to be, to offer insights and advice that are of practical value to the nation and to the Corps in its ongoing mission to ensure public safety. The geotechnical problems associated with the lower Mississippi Delta region are very challenging, and will never be easy to resolve. We do not feel that dueling press releases does the Corps any long term benefit, especially if the information contained in such documents is easily proven erroneous. Instead, we need to pool our collective expertise to solve the enormous problems at hand, realizing that some portions of the emergency works aren't going to initially comply with long-term goals/safety factors, and may require further attention at a later date. In those cases, we feel that the public should be so informed so that they can make the necessary personal decisions with regard to their own safety, and with regard to their re-investment in the areas potentially at risk. We encourage you to use us as an asset, and work together in a spirit of cooperation for the common goals at hand.

Yours sincerely,

Raymond B. Seed, Ph.D.
Professor of Civil and Environmental Engineering, and
Head, NSF-Sponsored Independent Levee Investigation Team (NSF/ILIT)

cc:    Don Basham, Civilian Chief, USACE
       Dr. Ed Link, Director, USACE IPET Study
       Dan Hitchings, Director, Task Force Hope, USACE
       Jim Taylor, Public Affairs Office, Task Force Hope, USACE
       Dr. David E. Daniel, Chair, USACE/IPET External Review Panel
       Dr. G. Wayne Clough, Chair, USACE/IPET NRC Review Panel
       Dr. J. David Rogers, University of Missouri-Rolla, NSF/LIT
       Dr. R. G. Bea, University of California at Berkeley, NSF/LIT
       Dr. Les Harder, California Department of Water Resources, NSF/LIT
       Dr. Jean-Louis Briaud, Texas A&M University, NSF/LIT
       Dr. Richard Fragaszy, NSF

3

5

McElwee00319

PX-0109-0319

Attachment

**The News Hour with Jim Lehrer leaves out important information on levee work**
Jim Taylor
Corps of Engineers
Task Force Guardian, Public Affairs Office
February 20, 2006

"The News Hour with Jim Lehrer" ran a piece on its February 16 show about the Corps of Engineers' work to rebuild the New Orleans area levees. The report missed some important information that is necessary to a complete understanding of the work to restore hurricane protection for the people of New Orleans.

**Misinformation**
In her report, Ms. Betty Ann Bowser interviewed Dr. Bob Bea, an engineer at the University of California, Berkeley, and a member of the National Science Foundation. He showed her samples of soil that he said he took "In differing locations along the length of the MR-GO levee, we stopped, and I got out and colleted the soil samples." He implied that the Corps was using this material to rebuild the levees along the Mississippi River Gulf Outlet (MRGO). That is incorrect.

**Correct information**
What Dr. Bea doesn't say is that he took the samples from material not used to rebuild the levees.

Dr. Bea visited the Corps of Engineers construction site at Mississippi River Gulf Outlet with a geotechnical engineer from the Corps. On that visit, Dr. Bea took samples of material from areas that contained soil the Corps was avoiding. Each time that Dr. Bea took these samples the Corps' geotechnical engineer explained to him that the Corps was not using material that he was collecting. Dr. Bea said he knew that, but proceeded to take the samples. Yet, in The News Hour program, Dr. Bea implied that the Corps was using that type of unacceptable soil.

Kevin Wagner, an engineer with the Corps and the project manager for the levee work, spent several hours with Ms. Browser at the construction site and showed her the high-quality clay material the Corps is using to rebuild the levees.

Mr. Wagner also explained to her that the Corps is conducting extensive tests of the clay and soil it is using in the levees to ensure its quality.

In addition, independent teams of scientists are reviewing the Corps' work and analyzing the material we are using to rebuild New Orleans' hurricane protection system.

**Misinformation**
Ms. Bowser also interviewed an oceanographer who stated that he didn't think the Corps could complete its levee work along the MRGO before the hurricane season starts in June 2006.

**Correct information**
Actually, the Corps' engineers and construction contractors are well under way to meeting the June 2006 date. They have already rebuilt nearly half of the MRGO levees, and are confident that they will complete this work before the beginning of this year's hurricane season.

4

6

McElwee00320

PX-0109-0320

**Misinformation**
At another point in the story, Ms Bowser states that the Corps only allowed a team of independent investigators onto one of its construction sites after a representative from the Louisiana Attorney General's office intervened. That is inaccurate.

**Correct Information**
As part of standard construction safety procedures applicable to any worker on a construction site, the Corps asked the investigators to submit a safety and work plan before they arrived at the site. The submission of these plans is necessary to ensure that different construction schedules on work sites do not conflict, and that site workers are performing their efforts safely. Even though the team was informed, in writing of these requirements, they failed to submit the information, and then showed up unannounced.

Even on this short notice, the Corps of Engineers worked with the team to remind them of the necessity to submit their safety and work plan, and then allowed them on the site with the understanding that they would submit their plans later that day.

**The Army Corps of Engineers is committed to stronger and better hurricane protection**
The Corps of Engineers team of engineers, scientists, support staff, and contractors take this work personally. Most of the 200 Corps of Engineers people working directly to restore New Orleans' hurricane protection levees and floodwalls – and more than 300 Corps staff supporting them in this endeavor – live in New Orleans, and many of them lost their homes. It's their hurricane protection too.

**Information available on Corps of Engineers Website**
You can learn more about the Corps of Engineers work to restore the hurricane protection system for the people of New Orleans from the New Orleans District website at www.mvn.usace.army.mil

5

7

McElwee00321

PX-0109-0321

8

McElwee00322

PX-0109-0322

Attachment B



Aerial photo of soil borrow pit adjacent to breach repair site



Photo of soils being transported from borrow material stack to breach repair site. Multiple soil samples taken from repair site.



Photo of soils being deposited and compacted into breach site. Multiple soil samples taken of compacted materials.



Photo of soil borrow material stacked for drying. Note backhoe, bulldozer, and carrier tracks.



Photo of compacted soils in breach repair site. Multiple samples taken in light soil (sandy) and dark soil (organic silt) areas.

9

PX-0109-0323

Attachment C



Soil Sampling Plan



11

McElwee00324

PX-0109-0324



Photo of breach repair area. Sands and organic material compacted into breach repair. Multiple samples taken from multiple lifts of soils.



Photo of shoulder of breach. Note sandy – silty non-cohesive soils with white oyster shells in original levee. Multiple samples taken.



Photo of breach repair site. Note dark organic silt placed and compacted into breach repair. Multiple samples taken.

10

McElwee00325

PX-0109-0325

Attachment D

To: Jim Taylor, Corps of Engineers, Task Froce Guardian, Public Affairs Office
Subject: Response to Press Release Titled The News Hour with Mih Lehrer leaves out important information on levee work, by Jim
Taylor, Corps of Engineers, Task Force Guardian, Public Affairs Office, February 20, 2006
Date: February 22, 2006
From: Professor Robert Bea, University of California Berkeley

Hi Jim,

thank you for your email regarding the Lehrer Hour February 16th program. my responses to your
e-mail follows below.

Taylor, James H MVN wrote:

"The News Hour with Jim Lehrer" ran a piece on its February 16 show about the Corps of
Engineers' work to rebuild the New Orleans area levees. The report missed some important
information that is necessary to a complete understanding of the work to restore hurricane
protection for the people of New Orleans.

based on my experience with the Lehrer Hour producers, there was not any intent to miss important
information necessary to development of a complete understanding. in fact, i observed a struggle to
present balanced reporting and insights. The Lehrer Hour is a quality communications link with the
public. and, they have not built that reputation with irresponsible journalism.

**The News Hour with Jim Lehrer leaves out important information on levee work**

Jim Taylor

Corps of Engineers

Task Force Guardian, Public Affairs Office

February 20, 2006

i assume with your identification above, that you were fully authorized and supported by the USACE
to send this correspondence to the public.

"The News Hour with Jim Lehrer" ran a piece on its February 16 show about the Corps of
Engineers' work to rebuild the New Orleans area levees. The report missed some important
information that is necessary to a complete understanding of the work to restore hurricane
protection for the people of New Orleans .

**Misinformation**

In her report, Ms. Betty Ann Bowser interviewed Dr. Bob Bea, an engineer at the University of

12/21/2006 11:21 AM

12

McElwee00326

PX-0109-0326

MRGO Jim Taylor

California , Berkeley , and a member of the National Science Foundation. He showed her samples of soil that he said he took "In differing locations along the length of the MR-GO levee, we stopped, and I got out and colleted the soil samples." He implied that the Corps was using this material to rebuild the levees along the Mississippi River Gulf Outlet (MRGO). That is incorrect.

i am not a member of the National Science Foundation. the NSF is sponsoring (along with others) the work we have been doing during the past 6 months.

yes, i am an engineer with 53 years of experience. i have been a professor of civil and environmental engineering at Berkeley for the past 17 years. i started my career with the USACE as an engineer in training in 1954 working for the South Florida Flood Control District - levees, canals, pump stations. My father was a USACE 'lifer'. I have spent most of my life in the world's oceans as a civil engineer - designing, constructing, operating, and maintaining offshore and coastal structures and pipelines. For the past 20 years, my work has focused on analyses of failures of major engineered systems, including work for NASA on the Columbia; risk assessment and management.

perhaps one of my best points of reference is my family lived in New Orleans in the 1960's and lost our home and all of our belongings during hurricane Betsy. i was chief offshore civil engineer for shell oil company at the time. and, i followed with great interest what has been going on since 1965 - and had the priviledge to visit the site of my former home again when i came to New Orleans almost 40 years later to the day - and saw the replacement home owners dragging the wet mattresses out of their house. the history of flooding was repeated. the promises of adequate protection had not been delivered.

since you were not at the work site during the time my colleague Dr. Ray Seed and I were present, the information you have received must be coming from unnamed people that accompanied myself and my colleague on the field trip.

during the trip, i took pictures and i gathered soil samples from the repair sites - not the borrow sites - i know the difference. and my colleague, Ray Seed, has also documented the results and observations from this trip. we have compared our observations and conclusions, and continue to do so.

**Correct Information**

What Dr. Bea doesn't say is that he took the samples from material not used to rebuild the levees.

and that is not true. i took the samples from breach repair sites in which the soils had been deposited, leveled, and compacted. i also photographed these sites.

Dr. Bea visited the Corps of Engineers construction site at Mississippi River Gulf Outlet with a geotechnical engineer from the Corps.

2 of 7

12/21/2006 11:21 AM

13

PAGE 06/31                    MCELWEE BROTHERS INC         ABZ/AA/ABAB     13:24   12/19/2007
McElwee00327

MRGO Jim Taylor

i believe he was a contractor Geotechnical Engineer, not a geotechnical engineer from the Corps. there were two USACE contractor levee construction inspectors that accompanied us on the trip; one was a doctoral graduate engineering student from the University of New Orleans.

> On that visit, Dr. Bea took samples of material from areas that contained soil the Corps was avoiding.

that is not true. i have the photographs of the materials being placed, leveled, and compacted into breach areas (south of Bienvineu). i have photographs of the borrow pit areas and the materials that had been excavated and placed aside to dry prior to hauling and placing.

the samples we have now tested, were gathered from the breach repair sites as described above. in some cases, the samples were almost clean sand, in fact, some of the sand was white and was not stained with other materials. many of the soils consisted of sandy, silty, organic materials with some clay. there had been an attempt to eliminate the organic materials. however, i found several large blocks of almost pure peat that had been compacted into the soil lifts that were being placed in the levee (toe to crown).

> Each time that Dr. Bea took these samples the Corps' geotechnical engineer explained to him that the Corps was not using material that he was collecting.

and that is not factual or true. at no time in the sampling that i did was any USACE or USACE contract employee with me. they stayed at the top of the levee discussing the operations with my colleague Ray Seed. Ray Seed has provided testimony to that fact.

> Dr. Bea said he knew that, but proceeded to take the samples.

and, that is not true. i would not purposely take samples that were not being used. i would not purposely distort the truths of what was being done at the time we were on the sites.

the forgoing statements constitute both libel and slander and i urge you and your colleagues to carefully consider such actions.

> Yet, in The News Hour program, Dr. Bea implied that the Corps was using that type of unacceptable soil.

i did not imply - i made my statements based on my personal judgement and demonstrated my concerns in the laboratory 'experiment' shown on the Lehrer News Hour..

> Kevin Wagner, an engineer with the Corps and the project manager for the levee work, spent

12/21/2006 11:21 AM

14

McElwee00328

PX-0109-0328

MRGO Jim Taylor

several hours with Ms. Browser at the construction site and showed her the high-quality clay material the Corps is using to rebuild the levees.

yes, and Kevin and the rest of the UsACE and contracting personnel we met are 'great guys' - they are doing their level best with what they have to do what they have been told to do. yes, they have a personal - family stake in what is being done.

what they face is sad for me, because in my experience and opinion, they do not have the resources they need to accomplish what really needs to be done - short term and long term. one important element that they need are meaningful goals and objectives - not meaningless goals or slogans. what they need is some honest leadership and quality engineering - to put the high quality engineering back in the Corps of engineers.

Mr. Wagner also explained to her that the Corps is conducting extensive tests of the clay and soil it is using in the levees to ensure its quality.

we saw no tests being run during the time we were there. i would like to see the test data. from what we know, at the present time proper materials are being barged into this section of the MRGO levee, i would bet that a lot of tests are being run. and, that is good. we want to encourage all possible be done to defend the soils that have been and are being placed in these very important levees.

but, the soils in the core of the levee remain essentially the same as before Katrina. and the unbreached areas are the same soils that were used to construct the original levee along this stretch of the MRGO - with some sheet piling that have been driven into the levee previously in some 'concerning' areas.

In addition, independent teams of scientists are reviewing the Corps' work and analyzing the material we are using to rebuild New Orleans ' hurricane protection system.

i have talked with one of those representatives, and he denys the contention you have made that they are analyzing the material (soils) - they are analyzing the information the USACE is providing.

**Misinformation**

Ms. Bowser also interviewed an oceanographer who stated that he didn't think the Corps could complete its levee work along the MRGO before the hurricane season starts in June 2006.

12/21/2006 11:21 AM

15

McElwee00329

PX-0109-0329

MRGO Jim Taylor

well, that is what Paul Kemp thinks - and that is OK. and based on what we saw in January, that would be the projection of any knowledgeable engineer or person that has built something on this scale.

you can debate this issue with other qualified and experienced building contractors. i have discussed this matter with several of them in the New Orleans area.

### Correct information

Actually, the Corps' engineers and construction contractors are well under way to meeting the June 2006 date. They have already rebuilt nearly half of the MRGO levees, and are confident that they will complete this work before the beginning of this year's hurricane season.

and that is really great progress and news. i hope it is true and factual. and that the rebuilding is of reasonable quality so that we can depend on it performing adequately during not just next hurricane season - but for several years until we can get a more 'permanent' solution or solutions operational.

### Misinformation

At another point in the story, Ms Bowser states that the Corps only allowed a team of independent investigators onto one of its construction sites after a representative from the Louisiana Attorney General's office intervened. That is inaccurate.

I can not speak for my colleague Dr. Ray Seed, i received the correspondence from the USACE and reviwed the correspondence from Dr. Seed and others regarding this matter. If the necessary cooperation was provided in a timely way, there would not have been any reason to have to go to the Louisiana Attorney General for assistance.

### Correct information

As part of standard construction safety procedures applicable to any worker on a construction site, the Corps asked the investigators to submit a safety and work plan before they arrived at the site.

that is true. i think the letter from the USACE was dated January 23rd (and takes working days to be delivered), 2 days after the soil exploration equipment was being mobilized from Baton Rouge. you can check these details with Dr. Seed. and, i suggest that you do so.

12/21/2006 11:21 AM

16

McElwee00330

MRGO Jim Taylor

The submission of these plans is necessary to ensure that different construction schedules on work sites do not conflict, and that site workers are performing their efforts safely.

and that is really true.

Even though the team was informed, in writing of these requirements, they failed to submit the information, and then showed up unannounced.

please confirm this statement with the parties involved.

Even on this short notice, the Corps of Engineers worked with the team to remind them of the necessity to submit their safety and work plan, and then allowed them on the site with the understanding that they would submit their plans later that day.

and to my knowledge, that is also true.  thanks for your help.

The Army Corps of Engineers is committed to stronger and better hurricane protection

i really hope that is true.  but, committment is only part of what is required.  resources and responsible action are also required.

The Corps of Engineers team of engineers, scientists, support staff, and contractors take this work personally.

that has certainly been my experience.  good people struggling to do good things.  but, the challenges they face are immense.  and to make these challenges trival is dangerous.  to provide unreasonable assurances is dangerous entrapment of the public potentially affected.

Most of the 200 Corps of Engineers people working directly to restore New Orleans ' hurricane protection levees and floodwalls – and more than 300 Corps staff supporting them in this endeavor – live in New Orleans , and many of them lost their homes. It's their hurricane protection too.

that is also true.  i sure would encourage the USACE and these people to come forward with their feelings and insights about what needs to be done to provide an adequate level of flood protection for their part of the world.

12/21/2006 11:21 AM

McElwee00331

PX-0109-0331

MRGO Jim Taylor

**Information available on Corps of Engineers Website**

You can learn more about the Corps of Engineers work to restore the hurricane protection system for the people of New Orleans from the New Orleans District website at www.mvn.usace.army.mil

yes, and that information has been very useful. however, we know that much more important technical information is being withheld from many that are interested in understanding the engineering -- technical developments that are critical to properly understanding what happened and what should happen to prevent the repeat of the Katrina flooding in the future. the real goals should be understanding and prevention. and, as you said earlier - Safety First -- and that includes flood protection.

i hope this will help. please feel free to circulate this to the people you think should have this understanding. open and truthful communications are vital to development of confidence and trust.

Bob

Robert Bea (PhD, PE)
University of California Berkeley
212 McLaughlin Hall
Berkeley, CA 94720-1710
510-642-0967 (office telephone)
510-643-8919 (office telefax)
Home Office
60 Shuey Drive
Moraga, CA 94556
925-631-1587 (telephone)
925-699-3503 (cellphone)

Robert Bea (PhD, PE)
University of California Berkeley
212 McLaughlin Hall
Berkeley, CA 94720-1710
510-642-0967 (office telephone)
510-643-8919 (office telefax)
Home Office
60 Shuey Drive
Moraga, CA 94556
925-631-1587 (telephone)
925-699-3503 (cellphone)

12/21/2006 11:21 AM

McElwee00332

PX-0109-0332

**Melvin M. L. McElwee, Sr.**

From:        Robert Bea [bea@ce.berkeley.edu]
Sent:        Sunday, October 15, 2006 5:54 PM
To:          jwtempleton@californiablackhistory.com
Cc:          Melvin M. L. McElwee, Sr.
Subject:     Re: How Technology Can Revive the Gulf Coast

 

time_line_Katrina.p   what_do_we_do_n
df (119 KB),..        ow.pdf (90 KB)          happy sunday John,

thank you for your email below.

i have been delaying my response while attempting
to shuffle my schedule so i could help — and say
yes.

unfortunately, i have not been able to
re-schedule my obligations. thus, i will not be
able to speak at the working lunch.

i do feel strongly about what i understand you
are doing — the two papers you attached helped a
lot.

i have attached some notes i wrote last October
and January about what happened and about going
forward — hopefully some more useful insights.

i am continuing to work with citizens in the
greater New Orleans area to try to learn how to
avoid some of the mistakes we have made in our
past. One of my contacts has been Melvin McElwee
— McElwee Bros., Inc, Independence, LA (985)
878-0280. Melvin and his family represent what i
wish could happen for all African-Americans — and
for that matter — for all Americans — to be good,
do good, get and give good. if you can find the
time, i suggest you and Melvin make contact (i
have cc'd this email to Melvin — so the rest
should be history).

please feel free to call me at my home office —
number below — if you would like to talk. i am
on sabbatical leave this semester — and i am
still embedded very heavily in what is going on
in and around New Orleans.

bob

>Dr. Bea,
>
>My company, eAccess Corp., has selected the 50 Most Important
>African-Americans in Technology for the past seven years and presents
>an annual symposium where these technology standouts discuss important
>issues.  I'd like to ask your availability on Saturday, Oct. 29 in San
>Francisco to speak to the group on the topic of the role that
>technology will play in the reconstruction and enhancement of the Gulf
>Coast in the wake of Hurricanes Katrina. The symposium will last from 10
>a.m. to 4 p.m. at The Bayou at Mission Rock restaurant in San Francisco at 817

1

*Exhibit "F"*
*page 1 of 2*

McElwee00333

>Terry A. Francois Blvd.    I thought you gave some of the clearest
>analysis of the issues involved not only in the report you chaired but
>also in the recent HBO documentary.   We would like you to speak during
>a working lunch at around noon.  We will also address the role of
>technology in closing the achievement gap and in fostering
>entrepreneurship.
>
>Please feel free to call me at 415-265-9455 to answer any questions you
>might have or reply to this e-mail address.  Let me also share with you
>two recent papers I've done on Gulf Coast related issues.
>
>Sincerely,
>
>John William Templeton
>
>Attachment converted: OES:suppressarticle_1_.doc (WDBN/«IC») (001CB5F6)
>Attachment converted: OES:ASALHtalk.doc (WDBN/«IC») (001CB5F7)


--

Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503

2

Exhibit "F"
page 2 of 2

McElwee00334

PX-0109-0334

UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY · DAVIS · IRVINE · LOS ANGELES · RIVERSIDE · SAN DIEGO · SAN FRANCISCO          SANTA BARBARA · SANTA CRUZ

TELEPHONE: (510) 642-0967
TELEFAX: (510) 643-8919
E-MAIL: bea@ce.berkeley.edu

DEPARTMENT OF CIVIL & ENVIRONMENTAL ENGINEERING
215 MCLAUGHLIN HALL
BERKELEY, CALIFORNIA 94720-1712

## What do we do now? Bob Bea's answers to the questions about rebuilding the flood defense system for the greater New Orleans area

### Questions
- Do we build now or do we wait?
- How does one go about rebuilding?
- When do we begin?
- What standards should be used in rebuilding?
- How can we better use this Nation's economic resources?

### Background
Bob Bea began his career in 1954 working for the US Army Corps of Engineers in the South Florida Control District - Levee and Flood Control Division. Bob's dad was a career officer for the U.S. Army Corps of Engineers - he was raised 'Corps'. He then worked for Shell Oil Company and related companies from 1960 through 1976 and was located in New Orleans in 1965 when hurricane Betsy came over New Orleans. His family lost their home and all of their belongings due to flooding of the northeastern part of the city. After his Shell career, he helped start two engineering contracting firms - one part of which offered services in hurricane forecasting and design of flood protection systems for oil and gas refineries along the Gulf coast; this included storm surge and flooding work for FEMA. The second of the firms he help start was sold to Bechtel where he became a Vice President and senior international consultant; focusing on risk assessment and management and developing design and requalification criteria for a wide variety of types of engineered systems. In 1989, he joined the faculty at the University of California at Berkeley where he has been performing research on human and organizational factors in the quality and reliability of engineered systems; his primary expertise is focused in risk assessment and management associated with engineered systems.

### Rebuilding the New Orleans flood defense system represents major opportunities for the Nation to:
- Return a unique and important part of the history, culture, and productivity of the Nation to a condition that will promote its continued development, safety, and security.
- Learn how to better use the experience and technology that has been developed around the world during the past 50 years.
- Learn how to better allocate and use the resources of the United States including its financial, human, natural, material, and technology - science resources.

1

*Exhibit " F "*
*Attachments 8*
*pages total*

- Learn how to better mitigate and manage potentially catastrophic events including those due to natural hazards (floods, hurricanes, earthquakes, fires, tornadoes) and civilization hazards (terrorism, health care, physical infrastructure systems).

This is an opportunity to make America proud of how it can rebuild in the wake of hurricanes Katrina and Rita. We do not want to throw $200+ billions into a bottomless pit of mud destroying a fragile piece of America and creating social 'cripples' in the process.

We have a primary model to learn from – the country of the Netherlands in the wake of the North Sea storm of the century that breached their coastal defense facilities and flooded the entire country (1953).
- Today the Dutch have a flood defense and management system that is a miracle of social and facilities engineering.
- Their unique history, culture, art, and important artifacts have been preserved and further developed to result in the country that we see today.
- Our challenge is to learn how to adapt this experience into the unique environment of the greater New Orleans and the areas surrounding the Mississippi River Delta.

Rebuilding the flood defense system for the greater New Orleans area should address major two phases
- Reestablishment of the city's defenses against flooding – short term (about 1 year)
- Improvement of the city's defenses against flooding – long term (about 10 to 20+ years)

Short-term: intermediate measures to reestablish the Category 3 hurricane flooding protection that existed prior to hurricane Katrina to restoration of the base of the social infrastructure including that of the public, industry, and government.
- This phase currently is underway – e.g. U.S. Army Corps of Engineers and FEMA activities
- Fix the levees
- Clear the drainage systems (canals)
- Repair the pump systems
- Dry out and de-toxify the area so that remediation – rebuilding activities can be started as soon as possible

During this phase we want to learn as much as possible from this catastrophe. At UC Berkeley, we have mounted three rapid response initiatives to develop the important lessons learned.
- Human and social dynamics – led by UCB Professor Karlene Roberts
- Flood protection infrastructure system – levees and canals – led by UCB Professor Ray Seed
- Coastal (industrial facilities, ports, harbors, Delta land bases) and offshore (oil and gas drilling and production, platforms and pipelines) infrastructure systems – led by Bob Bea and John Radke.

These initiatives have been encouraged by the National Science Foundation's Katina Rapid Response Program and are directed at
- Gathering and archiving data that can be degraded, lost, and destroyed during the short-term phase
- Analyzing the data to mine from it the important lessons learned

2

PX-0109-0336

- Define and prioritize short term (1-2 year) efforts that can be mobilized to help the long-term rebuilding efforts
- Work in collaboration with the academic, industrial, governmental, and professional societies and public groups represented in the immediate area and surrounding areas.

**At the end of this phase is when historically and generally we have stopped.**
- Hurricane Betsy in 1965 flooded large portions of the city. I lived in the city at that time and was flooded out. We lost our home and all of our belongings; bank account = zero time!
- Following this hurricane, the levees were re-established and in some cases extended using concrete 'I' walls. No substantial changes were made to the system of canals and pumping stations. It is obvious that this incremental approach was not effective when the Category 3 hurricane design conditions were exceeded.
- History of this area has adequately demonstrated that the historic incremental approach does not provide an acceptable level of safety to the people of New Orleans. In fact, major floods have been historically occurring every 30 to 50 years (since 1927) in this area. This is a 'predictable surprise' like the terrorist attacks on the World Trade Center, the NASA Columbia, and the Enron meltdown.
- **History has shown that we pay now or PAY MUCH MORE LATER.**

**Long-term: measures to provide an acceptable level of safety to the societal infrastructure systems in New Orleans.**
- The fundamental strategy is to use the proven approaches of Defenses in Depth – so that there is adequate robustness (damage and defect tolerance) incorporated into the facilities – combined with adequate factors of safety to protect the city of New Orleans.
- Increasing the protection level against flooding does not mean that the entire existing flood protection system needs to be replaced. Some parts can be utilized.
- It does mean re-thinking how we approach this challenge using traditional engineering approaches combined with innovative engineering and sustainable and natural processes.
- The Holland coastal defense facilities can not be directly extrapolated to this area because the differences in the natural, social infrastructure systems environments. Taller levees, more efficient drainage systems, and more robust pumping systems are only part of the story.
- A concert of approaches should be used that will match the natural and social infrastructure system environments including such measures as
  - o Re-establishing the coastal barrier island that lie off the Mississippi Delta
  - o Improving hurricane surge development into Lake Pontachatrain and Lake Bourne while maintaining the ability of the lakes to drain during heavy rain periods and very high river flood periods – the lakes to the north of the city were the primary source of water that flooded New Orleans.
  - o Broadening the Mississippi river flood plain and associated wetlands to provide natural surge dissipation restoring and preserving the natural environment of the Delta.
  - o Re-engineering the lake front surge barrier -- levee system.
  - o Re-engineering the canal drainage system. Canal Street in central New Orleans used to be a canal; now it is a primary and world recognized thoroughfare for the city, providing access to the central downtown commercial, recreational, and industrial facilities. It provides direct access to the historic French Quarter and Garden district. The access of the river to the canal was stopped with very successful river flooding defenses by the

3

McElwee00337

PX-0109-0337

U.S. Army Corps of Engineers. The canal drainage system provided the channels for entry of hurricane driven surge water from Lake Pontachatrain that breached the 'extended' levee system's concrete 'I' walls. The residential canals could be covered - underlain with large box culverts to facilitate drainage and control of flood waters - providing improved transportation and urban facilities.

o   Re-engineering the flood water removal pump station system so that it is not vulnerable to severe periods of rain and the effects of hurricane surges; placing modern well defended pump stations at the lake front.

o   Re-engineering the flood defense system for the Industrial Canal; given that it is warranted to maintain the commercial shipping enterprise of the Industrial Canal, this would mean increasing levee and barrier heights, installing flood gates at the lake, river, and inter-coastal canal openings.

o   Re-engineering needs to be directed at developing and evaluating the permanent closure of the Industrial Canal (presently 2 to 3 ships per week), closure and filling of the MRGO (Mississippi River Gulf Outlet) that has induced highly saline water into the area destroying surrounding wetland vegetation and whose ship traffic and associated dredging has removed a significant amount of the wetlands, and the closure and filling of the Industrial Canal in the same manner as the drainage canals (providing covered storm water drainage and pump stations).

**The long-term restoration and rebuilding of New Orleans provides this country with a major opportunity to make America proud. We can**

- Do it 'right' this time
- Be more effective at using our scarce resources - natural and national
- Learn the lessons of history, taking full advantage of experience and modern technology
- Learn better how to deal with similar catastrophic risks such as those due to tsunami , pandemics, earthquakes and terrorism.

**What did we learn in New Orleans as a result of our study of the failures of the flood protection system during hurricanes Katrina and Rita?** We learned that these failures had two major components: 1) organizational and 2) technical. The technical component included failures of flood walls and levees before their design conditions were reached, breaching of levees and flood walls at interfaces that had not been properly engineered and maintained, and massive overtopping of some of the levees because they were not designed for hurricanes with wind, surge, and wave conditions as severe as those developed by hurricane Katrina (and these were not the maximum possible conditions). The system of canals and waterways and their associated antique pumping stations provided other sources for failures during Katrina. The organizational malfunctions frequently developed at interfaces between the multiple organizations that have responsibility for and interactions with the New Orleans flood defense system (e.g. low sections in the defense levees, flood gates not in place or closed). Organizational capabilities had been allowed or forced to degrade to the point where many required core capabilities could not be mobilized (qualified personnel not available). Resources had been reduced to the point where only minimal protection and maintenance could be provided. In the end, we got what we paid for; it was truly a 'predictable surprise'.

McElwee00338

PX-0109-0338

What could be done to help the organizational developments that are required to provide adequate safety for the rebuilding of the New Orleans flood defense system? Develop a Louisiana Flood Defense Authority - like the TVA that was so effective in developing the flood protection system for the Mississippi River. Re-organize, energize, and provision the US Army Corps of engineers so that they have the responsibility for the overall engineering and management, design, construction, operation, and maintenance of the flood defense system, working in concert with other Federal, State, parish, industrial, and public - private agencies. The processes of engineering design and maintenance need to be thoroughly re-engineered to provide up-to-date technology. A board of independent internationally recognized and respected experts needs to be developed to help the US Army Corps of Engineers make the best possible use of currently available technology from U.S. and international sources.

Today, experience and technology can provide effective WAYS to adequately protect the greater New Orleans area from future flooding. The major challenge is to properly mobilize the WILL of the American public and government to provide the long-term resources required for rebuilding. This is the UNITED states, and now is the time to prove it again.

Professor Bob Bea (PhD, PE)
Department of Civil & Environmental Engineering
University of California
October 2005

McElwee00339

PX-0109-0339

UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY · DAVIS · IRVINE · LOS ANGELES · MERCED · RIVERSIDE · SAN DIEGO · SAN FRANCISCO                    SANTA BARBARA · SANTA CRUZ



TELEPHONE: (510) 643-8678
TELEFAX: (510) 643-8919
E-MAIL: bca@ce.berkeley.edu
HTTP://www.ce.berkeley.edu/

CENTER FOR CATASTROPHIC RISK MANAGEMENT
DEPARTMENT OF CIVIL & ENVIRONMENTAL ENGINEERING
212 McLAUGHLIN HALL
BERKELEY, CALIFORNIA 94720-1710

## Time Line to Disaster –
## *Flooding of the Greater New Orleans Area by Hurricane Katrina*

### *Some Personal Reflections*

**January 2006**

#### The Clock Has Been Ticking

Since September 8, 1965 the clock has been ticking; on this date hurricane Betsy overwhelmed the flood defenses for portions of the greater New Orleans area. The author's young family lost their home in Pines Village and all of their belongings as a result of this event. No insurance; bank account equals zero time. Start over and the rest is history.

Early on Monday morning, August 29 time ran out and the clock stopped. Here is our best fix on what happened that morning.

| Time | Event |
|---|---|
| 5:00 am | Water flooding through IHNC railroad openings on east and west bank at Lake front and at I10. Waves and surge breaching MRGO levees. |
| 6:00 am | Eye of hurricane Katrina makes landfall in Plaquemines Parish. Flooding of East New Orleans from the surge in Lake Bourne - levees overtopped; water surges through breaches. |
| 6:30 am | IHNC levees - floodwalls overtopping. |
| 7:30 am | IHNC 9th Ward flood walls fail due to backside toe erosion. |
| 9:30 am | Lake front levees overtopping by surge in lake. Orleans canal flooding through low areas adjacent to flood walls. London avenue canal breach at Mirabeau develops with extensive flooding (no overtopping of the floodwalls). Water backing up in water drainage system with flooding. |
| 10:30 am | 17th Street canal levee - flood wall breaches with extensive flooding (no overtopping of the floodwalls). London avenue canal breaches at Robert E. Lee (no overtopping of the floodwalls). |
| 12:00 noon | Eye of Katrina reaches north shore of Lake. |

By lunch time, the catastrophic flooding of the greater New Orleans area was well underway.

#### Looking Back

Why did this happen? If everything worked as it should, our work indicates that there would not have been a catastrophe. There would have been some flooding (wet carpets) and wind damage (missing shingles). But, the disastrous flooding would have been avoided; something of the order of 75% of the flood water came from breaches that should not have developed if everything had worked as we wanted it to work.

This was a predictable and preventable catastrophe. The surge hazards had been pointed out for years. The deficiencies in the fundamentals of the system had been pointed out for years. The early warnings of the potential weaknesses in the flood defense system had been knocking on the doors of our awareness for years. But, we did not listen nor did we take action. We forgot to listen or care enough.

The failure of the flood defense system of the greater New Orleans area had four primary ingredients (the failure 'gumbo'):

1) a severe (not extreme) hurricane that pushed wind, waves, and surge into the waterways surrounding and in (IHNC and drainage canals) New Orleans; mother nature was doing what mother nature has done forever.

1

McElwee00340

PX-0109-0340

2) a seriously flawed flood defense system that had defects embedded in it starting with development of the concept and criteria that defined the starting points for the system, then during the design of the system, then during its construction, then during its operation, and finally during its maintenance. Bad ingredients. Bad Recipe.

3) a seriously flawed organizational complex responsible for development of the flood defense system that included federal, state, parish, city, and industrial components; no one organization was charged with the integrity of the system from its inception until the time it failed; no one organization was responsible for the system with the charge of providing appropriate security. Bad cooks.

4) a seriously deficient allocation and appropriation of resources to accomplish what needed to be accomplished. We tried to do it 'on the cheap.' We did not have the right stuff in the right places in the right ways at the right times. We said 'throw me something mister', and we accepted what we got. Bad gumbo.

Some of the key elements we have found in the background of the failures include:
1. lethal arrogance
2. loss of core capabilities
3. unnecessary complexity
4. inappropriate technology
5. massive communication breakdowns
6. bureaucracy that replaced thoughtful action
7. lack of cooperation with nature
8. ignoring history
9. ignoring early warning signs
10. normalization of deviance
11. bickering in the sandbox
12. wrong priorities
13. following the 'wrong' directions
14. trying to 'make do'

During the many interviews of people that have been and are working on the flood defense system for the greater New Orleans area the most poignant statement I heard came from a thoughtful and very experienced employee of the U.S. Army Corps of Engineers: "Bob we have taken engineering out of the Corps of Engineers." It would seem to be the time to put engineering back in the Corps of Engineers.

One of the questions I have been continually asked is 'who is to blame'. This was not the result of the 'wrath of God.' In this case God had a lot of help from people. And, it developed over a very long period of time. Many share the responsibility and shame for what happened; and most of these people know it. So, there is no really satisfactory answer to this question. I think our primary motivation for looking back at what has happened should be to develop enough understanding so that when we look forward we can put measures in place to prevent the types of problems that developed in the past and prevented us from realizing adequate flood protection for this part of the world.

Those who lost so much have my complete compassion and sympathy. Until you have gone through something like this, you can only remotely sense or imagine the despair, loss, pain, frustration, and anger.

Those who gave and are giving so much to help those in need have my ultimate respect; I wish there were more of you. You are the true heroes of humanity. I hope you will know it.

## Looking Forward

Here are some thoughts about going forward. No one should tell you what to do. This time, it is up to you. Take charge of your recovery and defense; you are responsible. If you do not know, find out. If you do not have what you need to recover, then get it through honest endeavor. Help is available, use it wisely and carefully.

Pull together, not apart. United you succeed, divided you fail. This is the time to make it better than it was.

Demand short and long-term flood defense measures that will use the best available technology to provide an adequate and acceptable level of protection and security. These measures should be based on provision of defenses in depth (robust damage and defect tolerant systems), highest possible quality (serviceability, safety, compatibility, durability), and in concert and cooperation with nature and the natural defenses that have been provided in this region (barrier beaches, wetlands). Use manmade elements to supplement the natural elements to build a flood defense system that really makes sense. Use the best available technology. There are some really good models (e.g. the Netherlands) that have many lessons to teach.

2

McElwee00341

Do not forget the Mississippi River and subsidence. These must be integrated into the plans for a long-term flood defense system. These are real hazards.

Proceed with caution until you know that your demands have been satisfied. Beware of quick fixes. Beware of promises that are not backed up with commitment, resources, and performance.

There are two challenges: short-term defenses (so we are not unduly exposed until satisfactory defenses are in place), and long-term defenses. I think in terms of one or two years for the short-term defenses. I think in terms of 20 to 30 years for the long-term defenses.

Short term defense operations are underway at the present time. These are like battlefield triage; secure and protect the victim and do no harm. Watch out for the quick fix or getting in too much of a rush. Avoid 'ready, fire, aim'; current repair operations can have undesirable longer term effects. This phase should adequately provisioned with the right stuff - people, procedures, materials, objectives, and attitudes. Currently, there are many signs for concern about the adequacy of the short term defense operations. Hopefully these concerns will be recognized in time and adequate defenses provided.

Long term defense operations have also begun and there seems to be a reasonable consensus developing on how the physical aspects can be approached. These aspects include those defined recently by the Lake Pontchatrain Basin Foundation (the Multiple Lines of Defense Strategy to Sustain Louisiana's Coast by John Lopez) and by the New Orleans Coalition for Legal Aid & Disaster Relief (Hurricane Protection and the Coastal Zone). The U.S. Army Corps of Engineers also has started a study of how the long-term defense system can be developed; this work represents a continuation of the process that started in 1965. It seems like we can know the WAYS to provide a reasonable long-term flood defense system. Some really good and caring people are working on this part of the challenge. This time, we want to do it right and so that the generations that follow will be proud of what we did and how we did it.

What has not become apparent is how the organizational, political, legal, social, economic, and technological development aspects can be woven together so that what needs to be done can and will be done. The synthesis of these aspects represents the WILLS. If we have the WILLS, then the WAYS can become reality. And, here is the real current challenge.

It obvious that we should not try to continue with the organizational - technological - economic framework that we have used in the past. A major revolution will be required that starts at the Federal level and goes all of the way to the personal level. But, it can be done if we resolve that THIS WILL NOT HAPPEN AGAIN.

What is really needed now is qualified, experienced, knowledgeable, and properly motivated LEADERSHIP. Are we ready to support such leadership? Who will step forward?

*Bob Bea*
*Engineering & Project Management Group*
*Department of Civil & Environmental Engineering*
*Center for Catastrophic Risk Management*
*University of California Berkeley*

3

**Melvin M. L. McElwee, Sr.**

| | |
|---|---|
| **From:** | Robert Bea [bea@ce.berkeley.edu] |
| **Sent:** | Wednesday, December 13, 2006 7:21 PM |
| **To:** | James Delery |
| **Cc:** | David Rosenberg; Melvin M. L. McElwee, Sr. |
| **Subject:** | coming home together |

Hi Jimmy and David,

as promised, here is the contact information for Melvin McElwee Sr:
President, McElwee Bros., Inc, P.O. Box 1410, Independence LA 70443,
Cell (985-351-2816, Office 985-878-0280.

Melvin was the 'hero' at the Lakeview Town Hall meeting that got up
and described his 'experience' in working with the Corps in New
Orleans. his entire family was at the meeting, and Melvin had to
miss part of a birthday party to attend. my sensing indicates that
Melvin and his family are a real 'role model' for what is needed to
make this 'system work'.

During one of my trips to New Orleans, Melvin and his family spent a
day with me discussing their background and experiences in helping
the Corps construct parts of the New Orleans flood defense
facilities. They had obviously spent a lot of time organizing the
background materials and it was very shocking. It was clear that the
Corps had misled his construction companies and others. Their
experience clearly indicated that the Corps had known about the soft
soils, organic layers, and seepage problems far in advance of
Katrina. Also, that they had used unprofessional and reasonable
methods to pressure the contractors into desperate financial binds
(e.g. bond forfiture).

Before the Town Hall meeting, I asked Melvin to help mobilize the
african american leaders and citizens like him and his family in the
New Orleans area to help with development of a unified public
citizens group to help assure that adequate and acceptable flood
protection is provided to the city — coming back home — and no more
damn flooding.

so with the cc of this email — you and Melvin can start pulling
together to get adequate representation and leadership from this part
of the community — together we succeed, divided we fail.

thanks again Jimmy, David, and Melvin for all you have done and are
doing for the people of the greater New Orleans area.

bob
--
Professor Robert Bea (PhD, PE)
Center for Catastrophic Risk Management
Department of Civil & Environmental Engineering
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
Risk Assessment & Management
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587

1

*Exhibit "G"*
*page 1 of 2*

McElwee00343

Cell (925) 699-3503

2

Exhibit "G"
page 2 of 2

MCELWEE BROTHERS INC
**McElwee00344**

9858788280

12/19/2007 13:24

PX-0109-0344

## Melvin M. L. McElwee, Sr.

| | |
|---|---|
| **From:** | Robert Bea [bea@ce.berkeley.edu] |
| **Sent:** | Friday, December 15, 2006 9:54 AM |
| **To:** | wweiser |
| **Cc:** | James Delery; David Rosenberg; Lucas Ehrensing; Melvin M. L. McElwee, Sr.; Dennis G. Lambert; George.L.Sills@erdc.usace.army.mil; rnschleifstein@timespicayune.com; karlene@haas.berkeley.edu; Rune Storesund; Kofi Sekyi Inkabi; Sandy Rosenthal; Ed Wenk; hbosworth@lanier-engineers.com |
| **Subject:** | Re: Fw: Meeting in Lake View |
| **Importance:** | High |

well Wayne, so far, you are working on a Masters of USACE NO District Operations!  great progress.

if you want a Doctorate, many more details are needed:

1) what to change
2) how to change
3) who to change
4) when to change
5) validate and verify the above four items through implementation tests

there are no simple fixes.  there are no quick fixes.

but, we have to get fixing started quickly or we can expect much more trouble as we try to go forward to achieve a flood protection system that has:
A) acceptable quality (serviceability, safety, compatibility, durability) and
B) reliability (likelihood of acceptable quality)
through out its life-cycle (concept development, design, construction, operation, maintenance, and continued improvement). we want the system to be driven by a vision: nature first, engineered works second. no compromise with life-cycle sustainability and resilience.

this is a project that will never be completed.  if we stop work, we will fail again.

i got an idea from your input: **why don't we hold a workshop on "Helping the Corps Help Us"?**

i met two former Civilian chiefs of Corps in New Orleans on Tuesday morning.  i gave them the same question i gave you.  total experience = about 100 years.  they know more than i can ever know.  we need to pool our knowledge to find out how to help the Corps.

this could be the theme for your Masters Thesis and Doctorate Dissertation.

again, thank you for your help.  i have started a new notebook to compile this type of input.

bob

> **Will this get me a Masters on Corps operations, or a Doctorate?  Sure would be impressive for a retired PE.**

*Exhibit "H"*
*8 pages total*

PAGE 24/31        MCELWEE BROTHERS INC        9865788288        12/19/2007 13:24

**McElwee00345**

**PX-0109-0345**

Re: Fw: Meeting in Lake View

----- Original Message -----

**From:** Robert Bea

**To:** wweiser

**Sent:** Thursday, December 14, 2006 9:39 PM

**Subject:** Re: Fw: Meeting in Lake View

bless you Wayne. i will follow your suggestions. keep sending them they are a real help.

bob

--

Professor Robert Bea (PhD, PE)
Center for Catastrophic Risk Management
Department of Civil & Environmental Engineering
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
Risk Assessment & Management
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587

Cell (925) 699-3503

Delivered-To: bea@ce.berkeley.edu
From: "wweiser" <wweiser@cox.net>
To: "Bob Bea" <bea@ce.berkeley.edu>
Subject: Fw: Meeting in Lake View
Date: Thu, 14 Dec 2006 20:14:40 -0600
X-Priority: 1
X-Spam-Status: No, hits=0.123 required=5.1 tests=HTML_MESSAGE,X_PRIORITY_HIGH
X-Spam-Level:
X-Spam-Level:
X-Scanned-By: MIMEDefang 2.53 on 169.229.204.214

12/15/2006

McElwee00346

Re: Fw: Meeting in Lake View

X-Scanned-By: MIMEDefang 2.53 on 169.229.204.214

After reviewing my response I realized that I did not address Project Managers. While I was working most PM's never did much field work or visit the project. They dealt mostly with funding, state managers and boards. Again, they should and must visit the project more than once and especially during construction, push to get the proper rights-of-way, and sufficient quality borrow materials [never liked that designation]for levee projects and support in-house environmentalists and support the proper engineering design for levees, marsh creation and restoration projects. Assign their best and brightest environmentalists, engineers and project manager to fully use all Breaux Bill Funds yearly for positive protection projects along the coast. Revise current law which limits what solutions can be used.

You're right in saying minimum levees are required as cited in the book "Rising Tide" and use the river to control much of the silting that now occurs yearly and sometimes at much closer intervals. In 1947 we had mostly potato ridge type levees along the Pontchartrain Lake. The hurricane of that year was considered a Cat 3 and did damage, but flooding situations were minimal time events because of this.

Politics weighed greater than sound engineering in most if not all projects after that. Not relocating the New Orleans Pump Stations, bringing the MRGO into the city, construction of the channel prior to construction of an adequate lock and just sloppy engineering due to budget restraints were the norm due to local interest and government decisions. Increase that on a state basis and you will note the vast problem. Great/good engineers become frustrated with knowledge of what should be constructed vs. what they must design. Then because of existing law they design what is not the best.

One further item that would make all things work for the better, would be to increase the FS to a minimum of 1.5 for design of levees outside vast populated areas and 1.7 for vastly populated areas.

----- Original Message -----
From: wweiser
To: wayne weiser
Sent: Thursday, December 14, 2006 7:39 PM
Subject: Fw: Meeting in Lake View


----- Original Message -----
From: wweiser
To: Robert Bea
Sent: Thursday, December 14, 2006 3:23 PM
Subject: Re: Meeting in Lake View

First and foremost require them to use what they have available to discipline wrong doing for endangerment and destruction. This is located in their own AR's. This is a now fix. [See attachment]

Secondly, have congress remove the security blanket from the Corps on liability and accountability. The Corps requires all engineering positions to be filled by EIT's or RE's. With that designation they should as individuals be required to have insurance against malpratice for engineering blunders, errors, or sloppy decisions for P&S. Construction supervision should be insured by the Corps as their inspectors are lower graded engineering

12/15/2006

McElwee00347

technicians and the Corps must be held responsible for that portion of the project.

With this in place and used the quality will increase as well as the design FS. Projects would not be started without proper rights-of-way for the footprint of the envisioned project. Use of shorelines to place the project away from existing homes and businesses and violate current laws must be changed.

Currently the Calcasieu River is in trouble for disposal since their original right-of-way eroded some 200 - 1,000 feet and now is unavailable for that purpose because of environmental considerations. All levees in Jefferson Parish along the shore of Lake Pontchairtrain would benefit greatly if the area could be recovered from the eroded shoreline and the use of I-walls and T-walls would disappear.

Restrictions as to construction methods on barrier islands by environmentalist is creating the condition of wash away progress since positive controls cannot be used. There are brillent engineers working their as well as environmentalists, but brains and hands are tied to do anything positive or long lasting.

----- Original Message -----

From: Robert Bea

To: wweiser

Sent: Thursday, December 14, 2006 8:41 AM

Subject: Re: Meeting in Lake View

Hi Wayne,

thanks for your email. i thought that must be you when i heard Garland say "Wayne, you are on the air".

responses follow below.

> Caught most of the show and even called in. Garland was in rush to get to
> next person and didn't have time to say hello to all.

thanks for your call and contact.

> This discussion is to important to be limited to an auditorium as this will
> not reach the people of this area. It must be recorded and shown on public
> television for all on a couple of nights.

12/15/2006

McElwee00348

Re: Fw: Meeting in Lake View

thanks to your suggestion, it was recorded. both for TV and radio. Jimmy Delery is arranging for re-broadcast on WWL.

> The MRGO may not be the only channel available to NASA for their shipment of the Space rockets/engines. What is the draft on the barge[s] transporating these engines? The GIWW should be sufficient if loaded on the proper barge.

yes, you are right. barge draft is 20 feet. there is a way that will not be damaging to the coast and protection.

> As for the MRGO, if it had been turned into a new lock at Violet, LA as was envisioned in the 1960's and the lock constructed first. The upper portion could be closed and marsh creation started. The New Orleans Dock folks brought it to where it is for their greed and need.

yes, you are right. and now we must un-do the past.

> To construct the channel without the lock to handle the shipping was stupid at best. They killed their own project.

yes. but sometimes that is the only way we learn - the pain of our past.

> Bring the coast back to pre 1947 conditions, as a minimum, and all will do well. The sediment that daily goes out the Mississippi River through flow and dredging would build all the marsh one would ever want.

yes, you are right again. now to make it happen.

> Positive protection of all types should be placed along the coast to stop surge and protect the population. We did so much better before levees were introduced to this area for "Hurricane Protection". Stop the storm

12/15/2006

at the Gulf and levees can go away.

well, almost. our work shows that we will still need levees. but, they can be minimal - not much higher and wider than we have now. the key is the need to provide "adequate" protection - this means a hurricane that has a site return period in the range of 5,000 years (important areas) to 10,000 years (very important areas).

OK, NOW I HAVE A QUESTION FOR YOU. HOW CAN WE HELP THE NEW ORLEANS DISTRICT CORPS OF ENGINEERS? if there a way to help them become a high quality group of engineers and project managers? or is it hopeless? please let me have your thoughts.

thanks,

bob

--

Professor Robert Bea (PhD, PE)
Center for Catastrophic Risk Management
Department of Civil & Environmental Engineering
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710.
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
Risk Assessment & Management
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503

From: "wayne weiser" <wweiser@cox.net>
To: "Shelia TP Grissett" <sgrissett@timespicayune.com>,
  "Sandy Rosenthal" <Sandy@levees.org>,
  "Sandy Rosenthal" <hoppinhill@gmail.com>,
  "Steve Bayou Buzz" <steve@law-cyber.com>
Cc: "Mark TP Schletfstein" <mschleifstein@timespicayune.com>,
  "John TP Pope" <jpope@timespicayune.com>,
  "John TP McQuaid" <john.mcquaid@newhouse.com>,

12/15/2006

McElwee00350

PX-0109-0350

"Bob TP Marshall" <rmarshall@timespicayune.com>,
    "Congressman Jindal" <bobby.jindal@mail.house.gov>,
  "Bendily, Erin" <Erin.Bendily@mail.house.gov>,
"Peppi Rep Bruneau" <larep094@legis.state.la.us>
Bcc: "Richard WDSU Angelico" <rangel@wdsu.com>,
"WWL BIG Talkers" <WWLBIGTalkers@listenerclub.com>,
    "Frank Roccaforte" <cjack20@msn.com>,
  "Bev Dours" <refinderbev@bsf.net>,
    "Dawn W Gallo" <dwgallo@cox.net>,
    "Don Eames" <doneames@cox.net>,
"Doug/Chantal Dillon" <dldillon@cox.net>,
    "Kathy O'Meallie" <Kathy@beigc.com>
Subject: AR 600-50 & AR 600-700 Chapter 751
Date: Fri, 17 Feb 2006 15:24:29 -0600
MIME-Version: 1.0
Content-Type: multipart/alternative;
        boundary="----=_NextPart_000_000D_01C633D6.3E935A20"
X-Priority: 1
X-MSMail-Priority: High
X-Mailer: Microsoft Outlook Express 6.00.2800.1437
X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2800.1441
Information that should be available to the public as it pertains to actions of the COE!

AR 600-50 covers conduct of Civilian Employees in the Department of Army and AR 600-700 Chapter 751 is a Table of Penalties for various offenses.

These two documents are a must read to cover actions of civilian personnel of the Corps of Engineers.

An example of what they cover is shown in the table as B. OFFENSES WARRANTING PUNITIVE DISCIPLINE - Subparagraph 14. Failure to observe written regulations, orders, rules, or procedures. b. Violation of administrative rules or regulations where safety to persons or property is endangered. Penalty - written reprimand to removal.

This is usually used as an internal fix for employee vs. employee and/or government property is involved.

However, it should and must cover the same where the general public was endangered, their property destroyed and lives lost.

Just review statements made about not following guidelines, regulations, orders, rules and procedures that were and probable still are being cited by numerous COE employees by telecon, e-mail interviews, etc.

I understand that the COE while instrumental in our losses cannot be touched, but this says its employees can be for not adhering to this regulation. This has teeth to bite those who feel so secure in not being liable for damages under the state law governing engineers. This applies to all personnel no matter their designation.

McElwee00351

PX-0109-0351

Re: Fw: Meeting in Lake View

--

Professor Robert Bea (PhD, PE)
Center for Catastrophic Risk Management
Department of Civil & Environmental Engineering
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
Risk Assessment & Management
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503

12/15/2006

MCELWEE BROTHERS, INC

9857807880          13:24   12/19/2007

McElwee00352

SECTION 00700

CONTRACT CLAUSES

1  52.252-2      CLAUSES INCORPORATED BY REFERENCE (FEB 1998)

This contract incorporates one or more clauses by reference, with the
same force and effect as if they were given in full text. Upon request,
the Contracting Officer will make their full text available. Also, the
full text of a clause may be accessed electronically at these addresses:

                    http://www.arnet.gov/far
                    http://farsite.hill.af.mil
                    http://www.dtic.mil/dfars
                          (End of clause)

2  52.201-7000
                CONTRACTING OFFICER'S REPRESENTATIVE (DEC 1991)
                (Reference 01.602-70)
3  52.202-1  IDEFINITIONS (OCT 1995)--ALTERNATE I (APR 1984)
                (Reference 2.201)
4  52.203-3  GRATUITIES (APR 1984)
                (Reference 3.202)
5  52.203-5  COVENANT AGAINST CONTINGENT FEES (APR 1984)
                (Reference 3.404)
6  52.203-6  RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT (JUL 1995)
                (Reference 3.503-2)
7  52.203-7  ANTI-KICKBACK PROCEDURES (JUL 1995)
                (Reference 3.502-3)
8  52.203-8  CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER
                ACTIVITY (JAN 1997)
                (Reference 3.104-9(a))
9  52.203-10  PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997)
                (Reference 3.104-9(b))
10  52.203-12  LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (JUN
                1997)
                (Reference 3.808(b))
11  52.203-7001
                PROHIBITION ON PERSONS CONVICTED OF FRAUD OR OTHER
                DEFENSE-CONTRACT-RELATED FELONIES (MAR 1999)
                (Reference 03.570-5)
12  52.204-4  PRINTING/COPYING DOUBLE-SIDED ON RECYCLED PAPER (JUN 1996)
                (Reference 4.304)
13  52.205-7000
                PROVISION OF INFORMATION TO COOPERATIVE AGREEMENT HOLDERS (DEC 1991)
                (Reference 05.470-2)
14  52.209-6  PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS
                DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT (JUL 1995)
                (Reference 9.409(b))
15  52.209-7002
                DISCLOSURE OF OWNERSHIP OR CONTROL BY A FOREIGN GOVERNMENT (SEP 1994)
                (Reference 09.104-70(b)
16  52.211-18  VARIATION IN ESTIMATED QUANTITY (APR 1984)
                (Reference 11.703(c))
17  52.211-7000
                ACQUISITION STREAMLINING (DEC 1991)
                (Reference 11.002-70)
18  52.214-27  PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA--MODIFICATIONS--
                SEALED BIDDING (OCT 1997)
                (Reference 14.201-7(b))
19  52.214-28  SUBCONTRACTOR COST OR PRICING DATA--MODIFICATIONS--SEALED BIDDING
                (OCT 1997)
                (Reference 14.201-7(c))
20  52.219-5  IVERY SMALL BUSINESS SET-ASIDE (MAR 1999)--ALTERNATE I (MAR 1999)
                (Reference 19.905(a))
21  52.219-8  UTILIZATION OF SMALL BUSINESS CONCERNS (OCT 1999)
                (Reference 19.708(a))
22  52.219-9  ISMALL BUSINESS SUBCONTRACTING PLAN (JAN 1999)--ALTERNATE I (JAN 1999)
                (Reference 19.708(b))

DACW29-00-B-0005                    1

McElwee00353

EXHIBIT
18
PENGAD 800-631-6989

PX-0109-0353

INDEX

## SECTION 02140 – DEWATERING

1. SCOPE..............................................................................................................1
2. QUALITY CONTROL.........................................................................................1
3. SUBMITTALS....................................................................................................1
4. GENERAL .........................................................................................................2
5. DEFINITIONS....................................................................................................3
6. DESIGN.............................................................................................................3
7. DEWATERING REQUIREMENTS ....................................................................4
8. INITIAL TESTING..............................................................................................5
9. OPERATION .....................................................................................................6
10. MAINTENANCE AND SERVICING ...................................................................6
11. REMOVAL.........................................................................................................6
12. MEASUREMENT AND PAYMENT....................................................................6

ED 98-072

McElwee00354

PX-0109-0354

# SECTION 02140 - DEWATERING

## PART 1 - GENERAL

1. SCOPE. The work provided for herein consists of furnishing all plant, equipment, labor, and materials; performing all operations required for designing, furnishing, installing, and operating a system to dewater the excavated area or area inside of temporary retaining structures; maintaining these areas free from water during construction operations; rewatering the area under controlled conditions at the termination of the dewatering and removing the system.

2. QUALITY CONTROL.

2.1 General. The Contractor shall establish and maintain quality control for all dewatering operations to assure compliance with contract requirements and maintain records of his quality control for all construction operations, including but not limited to the following:

    (1) Designing.

    (2) Fabrication and workmanship.

    (3) Installation, operation, and removal.

    (4) Monitoring phreatic surface and piezometric elevations.

    (5) Measuring effluent from dewatering system.

    (6) Monitoring of sanding.

2.2 Reporting. An original and two (2) copies of these records and tests, as well as the corrective action taken, shall be furnished the Government daily. Format of the report shall be as prescribed in Section 01451 - "CONTRACTOR QUALITY CONTROL". Reports of operation and inspection shall include the following data: piezometric elevation, stages, time of operation and each pump, time of operation of each wellpoint segment and/or each well, effluent discharge, sanding rates, problems encountered, proposed actions, and any other pertinent data.

3. SUBMITTALS. Submittals shall be in accordance with Section 01330 "SUBMITTAL PROCEDURES". The Contractor shall submit an original and 9 copies of its complete dewatering design package with details of the proposed dewatering facilities to the Contracting Officer for review and approval by the Contracting Officer. These details must be presented in the form of shop drawings, including the type of system, planned layout and sizes of wells, jet eductors and/or wellpoints, headers, including all lengths requiring burial, collectors, ditches, piezometers, sumps and

ED 98-072

McElwee00355

PX-0109-0355

pumps; number, type, location, elevation, proposed method of installation, and proposed methods of testing of piezometers; facilities for measuring the flow of water pumped from each well and/or wellpoint segment of the dewatering system; facilities and proposed schedule for monitoring of sanding; provisions for disposal of water from the dewatering system; and plan of operation including flooding and rewatering plans. This submittal shall include the design capacity of each well and/or wellpoint segment at the design stage, and shall be submitted no later than 60 days prior to installation of the system. The Contracting Officer's initial review of the Contractor's proposed dewatering facilities will not exceed thirty (30) calendar days and will be for the purpose of determining (1) the acceptability of the general design concept and layout of the system; (2) the gross capacity of the system at the design state; and (3) the acceptability of the flooding and rewatering plans. The design and installation procedure of the individual components of the system need not be submitted for review as the performance of the complete system remains a responsibility of the Contractor. If the Contracting Officer determines, based on the above-mentioned review, that the system appears adequate to accomplish the required results, the system will be approved for installation. If the Contracting Officer's review determines that the Contractor's proposed dewatering facilities are either inadequate or inappropriate to accomplish the required results, the Contractor will be so notified in writing, and the basis for rejection will be included. Subsequent approval of the plan for installation, either as submitted or revised as a result of the review, should not be interpreted as the Government accepting responsibility for the performance of the dewatering system and shall not relieve the Contractor of full responsibility for the proper design, installation, maintenance, operation and actual performance of both the individual system components and the entire system. After approval of installation, the Contractor shall install the entire dewatering system and shall make no alteration to the planned system without the prior written approval of the Contracting Officer. If, during the progress of the work, the installed dewatering system proves inadequate to meet the requirements specified, including piezometers, the Contractor shall, at its expense, furnish, install, and operate such additional dewatering facilities and/or make such changes, either in features of the system or the plan of operation, as may be necessary to perform the required dewatering without additional cost to the Government.

3.1 All modifications to the design presented above shall be designed and stamped by a Registered Professional Engineer and submitted for review and approval. The Registered Professional Engineer shall be present at the Contractor Quality Control preparatory and initial inspections. The Contractor shall, as a part of the Quality Control, furnish a signed statement by the design Professional Engineer stating that the installation is in conformance with the approved design.

4. GENERAL. All permanent work under this contract, except as otherwise specified, shall be carried on in areas free of water. The Contractor shall design, furnish, install, operate, and maintain such facilities necessary to accomplish the following:

(1) Collect and dispose of all surface water in the protected area regardless of source.

(2) Control and dispose of all surface water around the periphery of the excavation areas to prevent such water from entering the excavation.

(3) Lower and maintain the water table at least 3 feet below the excavation slopes and at least 3 feet below the bottom of the excavation, but not more than 6 feet within the confines of the temporary retaining structures or excavated area.

(4) Install and monitor six construction piezometers inside the temporary retaining structure or excavated area. A detail of a typical piezometer is included at the end of this section.

(5) Relieve excess hydrostatic pressures in all foundation layers below elevation 5.0 Cairo Datum (CD), within the confines of the temporary retaining structures or excavated area to prevent upheaval of, or any form of damage to, the foundation.

5. DEFINITIONS.

(1) Dewatering defines the lowering of the ground water below the slopes and bottom of the excavation to ensure dry, firm working conditions and the reduction to safe levels of any hydrostatic uplift pressures in any confined foundation strata and/or aquifers which is necessary to ensure the stability and integrity of the foundation.

(2) Dewatering system defines the machinery, equipment, and appurtenances necessary for and related to the accomplishment of dewatering, and the collection and disposal of all surface water within the protected area.

(3) Flooding of the excavation is defined as the controlled process of filling the excavation with water to a specified elevation and at a specified rate.

(4) Unwatering is defined as the process of removing all water within an excavation.

(5) Rewatering is defined as the controlled process of placing water in the completed structure and/or excavation to its natural occurring elevation at a specified rate when the construction is completed and the dewatering system is no longer required.

6. DESIGN. The dewatering system shall be designed and stamped by a Registered Professional Engineer. The dewatering system shall be designed using accepted professional methods of engineering design consistent with the best current practice.

McElwee00357

PX-0109-0357

7. DEWATERING REQUIREMENTS. The dewatering system shall be of a type and capacity to accomplish all requirements specified herein.

(1) The dewatering system shall be designed, installed, and operated to dewater the excavation for canal stages up to and including elevation 25.50 CD within the confines of the temporary retaining structure at the construction site. The dewatering system must also include standby pumping and power supply such that a continuously operable system is available during power outages, pump failures, etc.

(2) The dewatering system shall be of such capacity that it will lower and maintain the free-water and hydrostatic pressures in the foundation and piezometric levels to an elevation at least 3 feet below all earth slopes and excavation surfaces lying within the area, inclusive of the interior slopes of the temporary retaining structure embankments proper. The system shall have sufficient capacity to accomplish this desired result, allowing for normal variation in soil properties and foundation conditions.

(3) The water level shall be maintained continuously as specified above so that construction operations can be performed without interruption due to wet conditions.

(4) No upward or vertical or lateral flow of ground water into the excavated area will be permitted at any time. The dewatering system shall be designed, constructed/installed, and operated at all times, including unwatering, rewatering, and/or flooding so as to prevent movement and/or piping of the foundation, excavation slopes, and fill materials. The system shall be operated as necessary during dewatering, unwatering, flooding, and rewatering so as to maintain piezometric levels, within the dewatered area, at or beneath the elevation of the water level in the excavation.

(5) The system shall consist of wells, jet eductors, wellpoints, pumps, standby pumps, sumps, sump pumps, ditches, and necessary appurtenances capable, at all canal stages less than or equal to the design stage defined in (1), of intercepting seepage before it exits on any interior surface or excavation face and of providing control of surface water. The system shall be operated as required in (3) above to prevent flooding filter materials and fresh concrete, and shall be designed to control a rainfall intensity from a 10-year return frequency storm. Protection of all slopes will be required to prevent erosion under normal surface runoff and construction conditions. Slope protection may include proper drainage, mulching, vegetation, geosynthetics, etc.

(6) Unwatering of an excavation need not be accomplished by sumping alone, but may utilize sumping in addition to positive dewatering accomplished with a system meeting the requirements of (5) above. Unwatering shall at all times fulfill the requirements of (4) above.

(7) Rewatering and/or flooding of the area shall be accomplished by directing surface and ground water into the area. The dewatering system shall be kept operating at full capacity during such conditions, with dewatering effluent being directed into the

02140-4

ED 98-072

McElwee00358

PX-0109-0358

excavation. Protection of slopes and excavation surfaces shall be provided as necessary to prevent erosion during flooding operations. No upward or lateral flow of ground water into the excavation will be permitted.

(8) Burying of headers will be allowed only in areas and to depths absolutely necessary for protection against damage at construction equipment crossings.

(9) A piezometer system consisting of six piezometers within the confines of the temporary retaining structure shall be installed by the Contractor, as shown on the drawings, to monitor free water-surface elevations and to monitor piezometric elevations to evaluate the effectiveness of the dewatering system in fulfilling the requirements specified herein. The Contractor shall take a minimum of two readings per piezometer, per 24-hour period, a minimum of 8 hours apart, based on a 7-day week. These piezometer readings, along with corresponding canal stage readings, shall be recorded and reported to the Contracting Officer within 12 hours after they are obtained.

(10) The system shall include mechanical means, such as an in-line Venturi meter for measuring the effluent from each wellpoint segment and/or each well as well as the total effluent of the dewatering system. Devices and techniques used in measurement shall be standard in the industry.

(11) The dewatering system shall be designed, installed, and operated in a manner which will preclude removal of materials from the foundation by the pumping operation (hereafter referred to as "sanding"). After installation, each well or jet eductor, or wellpoint segment shall be individually pump tested at maximum design flow rate to verify acceptability with respect to sanding. The dewatering system shall be designed and constructed so as to permit periodic measuring of sanding characteristics of each well and/or wellpoint segment. Any well or wellpoint segment found sanding at a rate exceeding 1 pint per 25,000 gallons of effluent at any time during this contract shall be replaced at no additional cost to the Government.

(12) The rate of dewatering the excavation shall be 1 foot per hour and the rate for rewatering the excavation shall be 4 feet per hour. Additional provisions and requirements for emergency flooding are specified in paragraph 01100-23.

8. INITIAL TESTING. Upon installation of the system, the Contractor shall test and evaluate the completed system to demonstrate that the system is, in fact, capable of performing the intended dewatering operation as outlined herein. This testing shall include complete falling-head tests to be conducted on each piezometer. The Contractor shall give 24-hour advance notice of its intention to perform testing to the Contracting Officer. The documentation of results of the test must be provided to the Contracting Officer within 48 hours of completion.

McElwee00359

PX-0109-0359

PART 2 - PRODUCTS (NOT USED)

PART 3 - EXECUTION

9. OPERATION. The Contractor shall perform such dewatering and maintain the work areas in a dry condition as long as is necessary for the work under this contract. Once an area is dewatered, it shall be maintained in a dewatered condition until all work in that area is completed, unless flooding is directed by the Contracting Officer. In the event that flooding is deemed necessary by the Contracting Officer, the protected area shall be flooded in accordance with the sequence of flooding proposed by the Contractor and approved by the Contracting Officer. However, the Contractor shall not flood the protected areas without approval to do so by the Contracting Officer. If flooding is directed by the Contracting Officer, the Contractor will be compensated for damages in accordance with the General Provision entitled "DAMAGE TO WORK" and the Contract Clause entitled "CHANGES" as applicable. If flooding occurs because of the Contractor's fault, negligence, or convenience, all costs resulting from such flooding will be borne by the Contractor. Commencement of dewatering subsequent to flooding shall be subject to prior approval of the Contracting Officer.

10. MAINTENANCE AND SERVICING. The Contractor shall be responsible for the maintenance, servicing, and repairs of the entire dewatering system and appurtenances during the life of the contract, including replacement of any and all wells, jet eductors, wellpoints, and piezometers found performing unsatisfactorily.

11. REMOVAL. The dewatering facilities required to maintain a dry condition within the protected area shall be maintained until completion of the work within the protected area, and then shall be completely removed. However, no dewatering facilities of any kind shall be removed without prior approval of the Contracting Officer. All wells, jet eductors, wellpoints, pumps, and appurtenances employed in the dewatering system and all materials other than earth shall remain the property of the Contractor and shall be removed by him from the site of the work. All holes created by removal of dewatering facilities shall be plugged in accordance with LADOTD water well closure criteria as stated in Chapter III of "Water Well Rules, Regulations, and Standards, State of Louisiana, dated November 1985". Any approvals of the implementation and/or removal of plans by the Contracting Officer do not shift the responsibility for the removal of the system from the Contractor to the Government. Nor does it relieve the Contractor of his responsibility to provide a removal plan, which comports with industry standards and prudent construction practices.

12. MEASUREMENT AND PAYMENT. No measurement will be made for dewatering. Payment for dewatering will be made at the contract lump sum price for "Construction Dewatering." Price and payment shall constitute full compensation for furnishing all plant, labor, material, and equipment; designing, furnishing, installing, maintaining, operating, flooding, rewatering, and removing the dewatering facilities; maintaining the dewatered area; and all work incidental thereto including construction of dikes, sumps, installation of wellpoints, jet eductors, wells and piezometers, plugging

02140-6

ED 98-072

**McElwee00360**

holes, maintaining protection dikes and closure dams, protection of slopes and all other work which may be necessary to accomplish the specified dewatering results and which is not specified to be paid for separately. Fifty percent of the lump sum price will be paid when installation of the dewatering system has been completed, tested, evaluated, and the piezometric level of the ground water has been lowered to the limits and elevations as specified. Forty percent of the lump-sum price will be prorated on the basis of the estimated number of months that dewatering will be required and will be paid monthly. The remaining 10 percent of the lump-sum price will be paid when the dewatering system has been removed as required herein and cleanup in connection therewith has been completed.

ED 98-072

McElwee00361

PX-0109-0361



DAILY W.S. ELEVATIONS
IN THE I.H.N.C.
by Orleans Levee District

FEB 1-15 1998

NOTE: ELEVATIONS BASED ON 1991 DATUM, NGVD
B.M. B-3130   ELEV. 10.23 NGVD
UNDER WEST SIDE DANZIER BRIDGE NEXT TO 2ND
ROW OF BRIDGE PIERS, JUST EAST OF FRANCE ROAD.

McElwee00362

PX-0109-0362



Industrial Canal

FEB 15-26   1998

McElwee00363



JAN 1 - 12    1998

McElwee00364

PX-0109-0364



DEC. 1-11   1997

McElwee00365



DEC. 11 - 31    1997

PX-0109-0366



Nov. 1-11   1997

McElwee00367



Nov. 11 - 30    1997

McElwee00368

PX-0109-0368



Industrial Canal

Oct. 1-12   1997

McElwee00369

PX-0109-0369



Industrial Canal

OCT. 12 - 31   1997

McElwee00370

PX-0109-0370



Industrial Canal

Sept. 1 - 11   1997

McElwee00371

PX-0109-0371



Sept. 12 - 30   1997

McElwee00372

PX-0109-0372



Aug 1- 12   1997

McElwee00373

PX-0109-0373



Aug 13-31    1997

McElwee00374



July 1 - 12   1997

McElwee00375



July 12-31 1997

McElwee00376



JuNE 1- 11 1997

McElwee00377

PX-0109-0377



Industrial Canal

JuNE 12-30 1997



MAY 1-12 1997

McElwee00379



Industrial Canal

MAY 13-31   1997

McElwee00380

PX-0109-0380



Industrial Canal

APRIL 1-10 1997

McElwee00381

PX-0109-0381



APRIL 11 - 30   1997

McElwee00382

PX-0109-0382



MAR. 1 - 11  1997

McElwee00383

PX-0109-0383



MAR. 12-31  1997

McElwee00384

# JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT (hereinafter called the "Agreement"), entered into this 14th day of August 2000, by and between McELWEE BROTHERS, INC. (hereinafter "McELWEE") a Louisiana Corporation having its main offices at P. O. Box 1410, 14150 Rev. Joseph White Road, Independence, LA 70443, and TRI-STATE DESIGN CONSTRUCTION CO., INC. (hereinafter "TRI-STATE"), a New Jersey Corporation, having its main office at 7401 Old York Road, Elkins Park, PA 19027.

WHEREAS, the U. S. Army Corps of Engineers, New Orleans District has submitted a project to obtain bids for construction of Dwyer Road Drainage Pumping Station Improvements in New Orleans, LA under solicitation no. DACW29-00-B-0005, (hereinafter the "Contract") and McELWEE, an 8(a) firm, desires to submit a responsible bid. In order to compete and complete the work upon acceptance of its proposal, McELWEE hereby provides this Joint Venture Agreement forming a venture titled, "McElwee Brothers, Inc. & Tri-State Design Construction Company, Inc. (A Joint Venture)"; to provide the necessary resources and expertise to enable McELWEE to perform the above referenced project; and

WHEREAS, this Joint Venture proposal is subject to the approval of the Small Business Administration, and it is the intent of this Agreement to complete the requirements contained in 13 CFR Section 124.513, entitled, "*Under what circumstances can a joint venture be awarded an 8 (a) contracts*"; and

McELWEE & TRI-STATE                    Page 4 of 33



GAIC002493

**PX-0109-0385**

WHEREAS,

McELWEE currently lacks the following:

    A. Bonding Capacity to obtain this size contract, and

    B. 100% contract financial ability.

McELWEE has the capacity to perform:

    A. General Supervision and Project Management,

    B. Guardrail,

    C. Selective Demolition,

    D. Construction Dewatering,

    E. Temporary Retaining Structures,

    F. Clearing and Grubbing,

    G. Embankment Fill, Geotextile Fabric,

    H. Base Course,

    I. Concrete Curb and Gutter,

    J. 10 inch Curb,

    K. Removed and Reused Riprap,

    L. Chain Link Fencing and Gates,

    M. Fertilizing, Seeding and Slab Sodding,

    N. Concrete for T-Wall Structure,

    O. Concrete for I-Wall Structure,

    P. Concrete for Discharge Structure,

    Q. Concrete for Discharge Canal Foundation,

JV 002534

McElwee00386        GAIC002494

PX-0109-0386

R. Concrete for Sluice Gate Structure,

S. Concrete for Dolphin Structures,

T. Concrete Box Canal OPTION 2 – Pre-cast,

U. Aluminum Bulkhead Gates, and

V. Light Standard and Foundation.

McELWEE, by participating in this joint venture with TRI-STATE will substantially

Benefit by gaining:

A. An increased bonding capacity,

B. Experience in contract financial management,

C. Useful technical personnel resources, and

D. Managerial resources.

All of the items gained by McELWEE are necessary to increase future construction

opportunities, and will enable McELWEE to develop and strengthen its organization; and

JV 002535

McElwee00387      GAIC002495

PX-0109-0387

WHEREAS, McELWEE BROTHERS, INC. and TRI-STATE DESIGN CONSTRUCTION COMPANY, INC. desire to enter into this Joint Venture Agreement in order to fix and define between themselves their respective interest and liabilities in connection with the performance of such work required by the Contract in the event that it is awarded to them.

NOW, THEREFORE, in consideration of the mutual promises and agreements herein set forth, the parties hereby agree to constitute themselves as joint venturers for the purpose of submitting a joint bid to the Department of the Army, Corps of Engineers, P. O. Box 60267, New Orleans, Louisiana 70160-0267, and for the purpose of performing and completing the Contract in the event that it is awarded to them as joint bid. The parties hereby agree that such bid shall be submitted and if a Contract is awarded to them, shall be performed and completed by them as a Joint Ventures subject to the following terms and conditions:

## 1. FORMATION OF JOINT VENTURE

1.1 The parties hereto hereby associate themselves as joint venture for the purpose of performing and completing the work contemplated by the Contract. All such Work shall be performed under the name, "McElwee Brothers, Inc. & Tri-State Design Construction Company, Inc. (A Joint Venture)", and all money, equipment, materials, supplies and other property acquired by the Joint Venture shall be held jointly in such name. The principal place of business of the Joint Venture shall be at P. O. Box 1410, 14150 Rev Joseph White Road, Independence, LA 70443.

McELWEE & TRI-STATE                     Page 7 of 33                     8/14/00

1.2  When the contract is awarded to the Joint Venture, the Joint Venture will perform the work as General Contractor in accordance with the Contract plans and specifications. In connection therewith, the Joint Venture shall enter into contracts with subcontractors who are acceptable to the Advisory Committee (as hereinafter defined) for the portion of the work to be performed by the subcontractor. The Joint Venture shall also engage in such other activities or business, enter into such other contract or subcontracts, and take such other action as may be necessary or desirable in connection with the foregoing purposes or incidental thereto.

1.3  Except as hereinafter provided, neither party shall make any charges against the other party or against the Joint Venture for any expenses incurred during bidding process once the contract is awarded.  Expenses incurred in the preparation of this proposal shall be shared at 50% per party of the Joint Venture. The cost of obtaining a bid bond, if required, shall be treated as an expense of the Joint Venture.

1.4  Both parties must agree upon the terms of any bid submitted. Either party may withdraw from the Joint Venture at any time prior to the submission of the final bid for the Contract.

## 2. INTEREST OF JOINT VENTURERS IN THE JOINT VENTURE

2.1 The interests of the parties hereto in and to any profits and assets derived from the performance of the Contract, and in and to any property required by this Joint Venture in connection with the Work, and in and to all contributions required, all monies received and losses incurred in the performance of the Contract shall be those

McELWEE & TRI-STATE                    Page 8 of 33                          8/14/00

JV 002537

McElwee00389                                          GAIC002497

percentages (hereinafter called "Percentage Ownership Interest") set opposite their respective names as follows:

A. McElwee Brothers, Inc. - 51%

B. Tri-State Design Construction Co., Inc., - 49%

### 3. MANAGEMENT

3.1 McELWEE is the managing venturer of the joint venture, and McELWEE shall appoint one of it's employees as the project manager with the duties and responsibilities needed for performance of this contract. There shall be an Advisory Committee that will consist of two persons, one appointed by and representing MCELWEE, and the other appointed by and representing TRI-STATE. The initial representatives shall be:

A. Melvin M.L.McElwee, Sr., President- McElwee Brothers, Inc.

B. Ronald U. Davis, President - Tri-State Design Construction Co., Inc.

3.2 Each Joint Venturer may change its representative on the Advisory Committee at any time and from time to time by sending written notice thereof to the other Joint Venturer. Advisory Committee meetings will be held monthly, with special meetings to be called by either Joint Venturer. The meetings will be held at the principal office of the Joint Venture unless otherwise determined by the Advisory Committee

JV 002538

**McElwee00390**                                               GAIC002498

**PX-0109-0390**

3.3  Each member of the Advisory Committee shall have one vote, on behalf of the Joint Venturer, which he/she represents, based on the weighted percentage of ownership. Both members of the Advisory Committee must be present at a meeting in order to have a quorum, and all actions of the Advisory Committee shall require a majority vote and be endorsed by both members of the Advisory Committee. MCELWEE, shall have final decision authority over all matters before the Advisory Committee.

### 4. BONDS

4.1  Each of the parties agrees to execute all applications and indemnity agreements required by the sureties upon any bond or bonds required in connection with the said bid and Contract. All financial obligations assumed by the parties hereto, or either of them, in connection with the performance of the Contract, all liabilities assumed by or charged to them, or either of them, as contractors, guarantors, or indemnitors in connection with any surety bond or other bonds which may be given or executed in connection with the Contract, and all other obligations and liabilities of any kind or character which are assumed or undertaken by the parties hereto, or either of them, in connection with and for the benefit of the performance of the Contract shall be shared by the parties hereto proportionately and in accordance with their respective interest as set forth in paragraph 2 hereof

McELWEE & TRI-STATE                Page 10 of 33                8/14/00

**McElwee00391**                                      GAIC002499

**PX-0109-0391**

## 5. CAPITAL OF THE JOINT VENTURE

5.1 The initial capital of the Joint Venture shall be approximately Ten Thousand Dollars. MCELWEE shall pay fifty-one percent (51%) of that sum and TRI-STATE shall pay forty-nine percent (49%) of that sum in cash within ten (10) days after the execution of the Contract and the determination of the Advisory Committee of the exact amount of the Initial Capital. The Joint Venture shall establish and administer finances from a special bank account hereinafter titled, "Operating Account." The operation capital account shall be in the name of "McElwee Brothers, Inc. & Tri-State Design Construction Company, Inc. (A Joint Venture)" at Liberty Bank & Trust Company, P. O. 60131, New Orleans, LA 70160-0131. All receipts of the Joint Venture shall be deposited into its Operating Account, from which all expenses shall be paid. All checks drawn on the Operating Account will require two signatures, one from each Joint Venturer. Each Joint Venturer may designate the person or persons who may sign on its behalf. All withdrawals from the account of the Joint Venture shall be for the purpose of the Joint Venture only. The operational account will require the signature of both Joint Venturers or their designees for withdrawal purposes.

5.2 Any additional capital reasonably required to conduct the business of the Joint Venture shall be contributed in cash to the Joint Venture in proportion to the parties' interest in the Joint Venture as set forth in Paragraph 2 at such times as the Management Committee requires. Except as provided in subparagraph 5.5 below, the percentage participations of the parties shall not be adjusted because of any such additional capital contributions.

McELWEE & TRI-STATE                Page 11 of 33                    8/14/00

JV 002540

**McElwee00392**                                                    GAIC002500

PX-0109-0392

5.3  Any return of capital made while the Contract is being performed by the Joint Venture shall be made in accordance with each Joint Venturer's participation percentage.

5.4  Capital accounts for each Joint Venturer shall be maintained as part of the books of the Joint Venture and the amount of profits and losses of the Joint Venture shall be credited or charged, as the case may be, to the capital account of each Joint Venturer in accordance with the provision of this Agreement. Disbursements shall require two signatures.

5.5  If either Joint Venturer fails to make any required additional capital contribution hereunder, the other Joint Venturer may lend to the Joint Venture an amount equal to the unpaid required additional capital contribution.   Any loan made under this subparagraph by either Joint Venturer shall be repaid by the Joint Venture with interest at the rate of three percent (3%) per annum above prime rate of interest charged by Liberty Bank & Trust Company (but not exceeding the maximum amount allowed by law), either at such time as determined in accordance with paragraph 12 or when the capital contribution deficiency has been remedied, whichever occurs sooner.

5.6  The income, gains, losses, deductions or credits realized or incurred by the Joint Venture during each fiscal year shall be credited or charged, as the case may be, as of the close of said fiscal year, to the respective capital account of each Joint Venturer based on its pro rata share of the Joint Venture, as of the close of such fiscal year. Interest earned by the Joint Venture on funds held by it shall be included in the

JV 002541

**McElwee00393**                                        GAIC002501

**PX-0109-0393**

income of the Joint Venture and divided in accordance with each party's participation interest in the joint venture.

## 6. COSTS, PROFITS, LOSSES AND INDEMNIFICATION

6.1  Cost of construction shall consist of the costs of all subcontracts, labor, material, supplies, plant and equipment purchased or rented, bonds, insurance, taxes on labor and materials, imports, charges, legal fees, liabilities not secured by insurance and all other expenses and obligations incurred or suffered in and about the performance of the Project of any nature under generally accepted accounting practices ("GAAP") properly charged as a cost of the performance of the Project. Any interest on capital invested by the Joint Venture will be the responsibility of the individual party making such contributions and will not be considered as part of the cost of performing the Work. Costs shall not include any home office overhead type of expenses of either party except as provided in Paragraph 8 hereof.

6.2  The parties intend that the Joint Venture distribute not less than 51 percent of the net profits earned by the joint venture to the 8 (a) Participant (McELWEE). Such profits shall not be distributed until the Joint Venture is liquidated pursuant to Paragraph 12 hereof

6.3  Any losses arising out of or resulting from the submission of the bid (except for those pre-bid expenses referenced in Paragraph 13) and/or the performance of the Contract shall be paid by each Joint Venturer in accordance with its original percentage interest.

JV 002542

McElwee00394                                    GAIC002502

PX-0109-0394

6.4 If, for any reason, a party hereto sustains any liabilities or is required to pay any losses arising out of or directly connected with the negotiations and/or the performance of the Contract, or the execution of any surety bonds or indemnity agreements in connection therewith, which are in excess of its percentage participation, the other party shall reimburse such party in such an amount or amounts as the losses paid and liabilities assumed by such party exceed its percentage participation of the joint Venture, so that each member of the Joint Venture will then have paid its proportionate share of such losses to the full extent of it percentage participation. To that end, each of the parties hereto agrees to indemnify,' the other party against, and to hold the other party harmless from, any and all losses of the Joint Venture that are in excess of such other party's percentage participation.  Provided, however, that the provisions of this subparagraph shall be limited to losses that are directly connected with, or arise out of negotiations and/or the performance of the Contract and the execution of any bonds or indemnity agreements in connection therewith, and shall not relate to or include any incidental, indirect or consequential losses that may be sustained or suffered by a party hereto such as, lost opportunity for business or loss or diminished bonding capacity for other jobs.

## 7.  BANKING AND ACCOUNTING

7.1 The Joint Venture does hereby adopt a fiscal year ending December 31 of each year.

7.2 The books and accounts of the Joint Venture shall be maintained in accordance with GAAP. The books and accounts shall be kept at the principal office of

McElwee00395                  GAIC002503

PX-0109-0395

the Joint Venture. Income shall be recognized on a percentage of completion (cost-to-cost) basis.

7.3  MCELWEE as the sponsoring joint venturer shall provide at a minimum the following financial reports to TRI-STATE periodically:

7.3.1  Within forty-five (45) days after the end of the first three quarters of each fiscal year, an un-audited financial statement showing cumulative contract receipts and expenditures and a balance sheet of the Joint Venture prepared as of the end of such fiscal quarter, and an un-audited summary of cash receipts and disbursements.

7.3.2  Audited financial statements will be prepared in accordance with and as required by the limits in 13 CFR 124.602.

7.3.3  Within fifteen (15) days after they are filed, copies of all local, state and federal income tax returns of the Joint Venture.

7.4  Within ninety (90) days after the completion of the Contract, a final profit and loss statement covering the period from the date hereof through the date of liquidation, with such statement to include the profit or loss attributable to each Joint Venturer, and the distributions made to each Joint Venturer on or before the date of such statement.

7.5  The following reports shall be submitted to the Small Business Administration:

JV 002544

McElwee00396

GAIC002504

PX-0109-0396

7. 5.1 A Quarterly financial statements showing cumulative contract receipts and expenditures (including salaries of the Joint Venture Principals) which shall be submitted not later than forty-five (45) days after each operating quarter.

7.5.2 A Project-end Profit and Loss Statement shall be submitted no later that ninety (90) days after completion of the contract with a statement of final profit distribution.

7.6 Jules F. Richards, III; a certified public accountant located at 3209 Ridgelake Drive, Suite 100, Metairie, LA 70002; shall prepare the Joint Venture's year end financial statements and taxes. The expense of his accounting firm shall be considered a project cost.

7.7 The operation capital account ("Operating Account") of the Joint Venture shall be in the name of "McElwee Brothers, Inc. & Tri-State Design Construction Company, Inc. (A Joint Venture)" at Liberty Bank & Trust Company, P. O. 60131, New Orleans, LA 70160-0131. All receipts of the Joint Venture shall be deposited into its Operating Account, from which all expenses shall be paid. All checks drawn on the Operating Account will require two signatures, one from each Joint Venturer. Each Joint Venturer may designate the person or persons who may sign on its behalf All withdrawals from the account of the Joint Venture shall be for the purpose of the Joint Venture only.

7.8 Accounting and other administrative records including the Joint Venture's books, and any other records relating to the Joint Venture shall be kept and maintained at P. O. Box 1410, 14150 Rev Joseph White Road, Independence, LA 70443;

McELWEE & TRI-STATE          Page 16 of 33                    8/14/00

JV 002545

McElwee00397                                              GAIC002505

PX-0109-0397

the principal office of the Joint Venture, with a duplicate copy at the other Joint Venturer's office, and each Joint Venturer shall, during regular business hours, have access to and may inspect and copy any and all of such books and records. The project manager shall promptly send to each Joint Venturer copies of all reports, correspondence, documents and other information sent or received by the Joint Venture. The Small Business Administration shall have the authority to inspect the records of the Joint Venture at any time.

## 8. DIRECTION AND CONDUCT OF JOINT VENTURE

8.1  The parties' rights in the direction of the business and affairs of the Joint Venture shall be exercised through the Management Committee.

8.2  For the purpose of directing the business and affairs of the Joint Venture, the Joint Venturers shall establish a permanent Management Committee, as set forth in paragraph 3 above. The Management Committee shall conduct regular meetings, such meetings to be held at least once each month. All such meetings shall be conducted at the principal offices of the Joint Venture, or at such other place as acceptable to the Management Committee.

8.3  The Management Committee shall act either by resolution adopted at a meeting of the Management Committee or by unanimous written consent as evidenced by an instrument (which may be a cable or telex, confirmed in writing) signed (or several instruments in like form signed) by all of the representatives for the time being holding such office. Notwithstanding the foregoing or anything else to the contrary contained in

McELWEE & TRI-STATE                Page 17 of 33                        8/14/00

JV 002546

**McElwee00398**                                                    GAIC002506

**PX-0109-0398**

this Agreement, neither party shall borrow any funds from the Joint Venture, nor invest the funds of the Joint Venture without the written approval of the other party.

8.4  Neither party shall subscribe to any bonds, sign or endorse any note, accept, sign or endorse any draft or bill of exchange, or guarantee any debt, oral or written in its own name in respect of the Joint Venture or in the name of the Joint Venture without the prior written unanimous approval of the Management Committee.

8.5  Both Joint Venturers, shall be responsible for the successful completion of the entire contract. MCELWEE, the designated 8(a) firm will perform at least fifteen percent *(15%)* of the cost of the contract with its own employees (not including the costs of materials).

8.5.1  Overall contract performance shall be the primary responsibility of the Project Manager/Job Superintendent. MCELWEE shall select from among its employees a Project Manager with prior project management experience, subject to the approval of the Advisory Committee. The Project Manager shall also be the Job Superintendent. The Job Superintendent shall be responsible for the Contract performance, overseeing the job site office, reporting to and implementing the instructions of the Advisory Committee, preparing and filing all governmental reports, preparing a daily written log detailing all developments and aspects of the job, and submitting such log to the Management Committee at its request.

8.5.2  It is the intent of this Agreement that the Joint Venture will on a "best effort" basis utilize minority subcontractors, suppliers and skilled and unskilled workers in the performance of this Contract. The Project Manager's duties and

McELWEE & TRI-STATE                 Page 18 of 33                      8/14/00

**McElwee00399**                                                      GAIC002507

**PX-0109-0399**

authority shall include determining that a concerted "best effort" is put into effect and is implemented to utilize minority subcontractors, suppliers and skilled and unskilled workers.

8.6 Any services provided by the parties during the construction phase shall be considered a cost of the project and chargeable to the Joint Venture, hourly rates for such services to be approved by the Management committee. Such services can include, but are not limited to: estimating, scheduling, accounting, project management, safety, insurance, and labor relations/EEO, electrical and mechanical services. All approved travel expenses incurred by Project staff personnel and Management Committee members in connection with the requirements of the Work shall be chargeable to the Joint Venture.

## 9. ASSETS/EQUIPMENT

9.1 All assets and property, owned by the Joint Venture or in which it shall have an interest shall be held and recorded in the name of the Joint Venture. Equipment belonging to each Joint Venturer may be rented by the Joint Venture and returned to the respective owner when the venture is complete. The cost of the rentals shall be determined in accordance with the requirements of EFARS 52.213-5000, EQUIPMENT OWNERSHIP AND OPERATING EXPENSE SCHEDULE (reference page 00800-3 of the Contract specifications), and shall be considered an expense of the venture. Office facility, other than field office, will be provided by MCELWEE and located at P. O. Box 1410, 14150 Rev Joseph White Road, Independence, LA 70443.

McELWEE & TRI-STATE                    Page 19 of 33                    8/14/00

JV 002548

**McElwee00400**                                                        GAIC002508

**PX-0109-0400**

Listed on the following pages are possible rental equipment to be furnished by

## McELWEE and TRI-STATE.

Date: 07/14/00

McElwee Brothers, Inc.
A S S E T   L I S T I N G   R E P O R T
Post Financial Book
Period Ending: June 30, 2000

Page: 1

Select: All   Sub-total By: Asset ID

| Asset No | Description | Serial No. | Acquired | Method | Life | Cost | Accum. Depr. | As of | Disposed |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Workshop | PTR 450 12/31/98 | SLEM | 5.0 | 1,498.05 | | 427.56 | 06/30/00 | |
| 2 | Survey Calculator | 4825 12/31/98 | SLEM | 5.0 | 135.43 | 43.36 | 06/30/00 | |
| 3 | Gas Powered Edger | 4232 12/31/98 | BLDM | 5.0 | 76.30 | 24.16 | 06/30/00 | |
| 4 | Fax Machine | 488276 12/31/98 | SLEM | 7.0 | 349.76 | 124.35 | 06/30/00 | |
| 5 | Used Kubota 4100 | | 12/31/98 | SLEM | 5.0 | 9,034.76 | 1,904.27 | 06/30/00 | |
| 6 | Nail Present | 719 12/31/99 | SLEM | 5.0 | 60.25 | 25.41 | 06/30/00 | |
| 7 | Nai Present | 715 12/31/99 | SLEM | 5.0 | 68.40 | 15.33 | 06/30/00 | |
| 8 | Exposed Agg. Brown 15.00 | | 12/31/98 | SLEM | 5.0 | 95.00 | 26.92 | 06/30/00 | |
| 9 | Finishing Trowel | TL2526 12/31/98 | SLEM | 5.0 | 62.00 | 19.63 | 06/30/00 | |
| 10 | Goldflatt Kusalong | TL2060 12/31/98 | SLEM | 2.0 | 49.10 | 15.48 | 06/30/00 | |
| 11 | Highway Edger | TL4501 12/31/98 | SLEM | 2.0 | 13.00 | 4.75 | 06/30/00 | |
| 12 | Bolt Cutter 24" | TL2985 12/31/98 | SLEM | 5.0 | 56.00 | 17.73 | 06/30/00 | |
| 13 | Bolt Cutter 36" | TL2082 12/31/98 | SLEM | 5.0 | 55.00 | 13.73 | 06/30/00 | |
| 14 | Edger 4 X 3 | TL1591 12/31/98 | SLEM | 5.0 | 13.00 | 4.12 | 06/30/00 | |
| 15 | Float 20 X 3 1/8" | TL1032 12/31/98 | SLEM | 5.0 | 52.00 | 16.47 | 06/30/00 | |
| 16 | Knee Pads | TL0042 12/31/98 | SLEM | 5.0 | 44.00 | 13.92 | 06/30/00 | |
| 17 | Concrete Mix Trailer | L25003 12/31/99 | SLEM | 5.0 | 303.36 | 97.40 | 06/30/00 | |
| 18 | Ladder | 6N023-3 12/31/98 | SLEM | 5.0 | 345.72 | 109.47 | 06/30/00 | |
| 19 | Concrete Mixture | 83357-1 12/31/98 | SLEM | 5.0 | 938.59 | 296.87 | 06/30/00 | |
| 20 | Mixer Drive Kit | 62157-6 12/31/98 | SLEM | 5.0 | 202.72 | 64.95 | 06/30/00 | |
| 21 | Acteylas Welding Tank | | 12/31/98 | SLEM | 5.0 | 1,005.00 | 316.47 | 06/30/00 | |
| 22 | Oxygen Welding Tank | | 12/31/98 | SLEM | 5.0 | 1,050.80 | 316.47 | 06/30/00 | |
| 23 | Air Compressor 3 1/2 | SF212-4 12/31/99 | SLEM | 5.0 | 367.69 | 116.44 | 06/30/00 | |
| 24 | Koursal Time Clock | 557AB01252 12/31/98 | SLEM | 5.0 | 236.00 | 75.37 | 06/30/00 | |
| 25 | Screw Shooter Kit | BM05E-12/31/98 | SLEM | 5.0 | 265.82 | 84.17 | 06/30/00 | |
| 26 | Oaks Screwdriver | C8735-12/31/98 | SLEM | 5.0 | 150.81 | 47.75 | 06/30/00 | |
| 27 | OXY / Acet Weld Kit | D6473 12/31/99 | SLEM | 5.0 | 251.62 | 79.48 | 06/30/00 | |
| 28 | OXY / Acet Weld Kit | D6475 12/31/98 | SLEM | 5.0 | 250.08 | 79.28 | 06/30/00 | |
| 29 | Topcon Auto Level | D0624C 12/31/98 | SLEM | 5.0 | 445.60 | 140.92 | 06/30/00 | |
| 30 | Ingrum Theodolite | BEL400 12/31/98 | SLEM | 5.0 | 1,870.00 | 592.17 | 06/30/00 | |
| 31 | Ext. Leg. Tripod | AAPOD 12/31/98 | SLEM | 5.0 | 115.00 | 36.47 | 06/30/00 | |
| 32 | Knee Pad | B059813 12/31/98 | SLEM | 5.0 | 28.78 | 9.12 | 06/30/00 | |
| 33 | Beat Gun | 417164 12/31/98 | SLEM | 2.0 | 63.09 | 15.98 | 06/30/00 | |
| 34 | 42'OC Welder | 32563-2 12/31/99 | SLEM | 5.0 | 409.74 | 129.78 | 06/30/00 | |
| 35 | Self Igniting Torch | B2005-1 12/31/98 | SLEM | 5.0 | 28.27 | 8.98 | 04/30/00 | |
| 36 | JE Vibrator W/3 HSR | 93102 12/31/98 | SLEM | 5.0 | 846.10 | 267.90 | 06/30/00 | |
| 37 | Square Point Shovel | JRV35-6 12/31/98 | SLEM | 5.0 | 45.66 | 14.46 | 06/30/00 | |
| 38 | Wheelbarrow | JW435-6 12/31/98 | SLEM | 5.0 | 108.15 | 40.56 | 07/30/00 | |
| 39 | Bull Float Handle | 4A370-5 12/31/98 | SLEM | 5.0 | 85.26 | 78.14 | 06/30/00 | |
| 40 | Safety Blow Gun | 53785-4 12/31/98 | SLEM | 5.0 | 5.99 | 1.95 | 06/30/00 | |
| 41 | Send Scratch Brush | 2A534-4 12/31/98 | SLEM | 5.0 | 4.63 | 1.47 | 06/30/00 | |
| 42 | Cembity Cone 1/2 Gal. | H-4249 12/31/98 | SLEM | 5.0 | 51.84 | 16.41 | 06/30/00 | |
| 43 | Field Density Plate | B-382. 12/31/99 | SLEM | 5.0 | 38.89 | 12.32 | 06/30/00 | |
| 44 | Field Scale Metric | W-4940 12/31/98 | SLEM | 5.0 | 595.00 | 187.83 | 06/30/00 | |
| 45 | Tire Inflator Gage | 61572-6 12/31/98 | SLEM | 5.0 | 23.05 | 9.44 | 04/30/00 | |
| 46 | Asphalt Road Scrapper | | 12/31/98 | SLEM | 5.0 | 2,500.00 | 516.47 | 08/30/00 | |
| 47 | Hand Threader | 45308-9 12/31/98 | SLEM | 5.0 | 467.31 | 147.98 | 04/30/00 | |
| 48 | Utility Vis 1.2' | 1ACF8-00 12/31/98 | SLEM | 5.0 | 54.80 | 17.10 | 06/30/00 | |
| 49 | Air Hose | 43233-4 12/31/99 | SLEM | 5.0 | 13.93 | 3.90 | 06/30/00 | |
| 50 | Dry Wall Gun | 48532-5 12/31/98 | SLEM | 5.0 | 77.76 | 24.63 | 05/30/00 | |
| 51 | Pipe Cutter | 48564-7 12/31/98 | SLEM | 5.0 | 150.55 | 11.95 | 06/30/00 | |
| 52 | Cut of Saw 12'' | 48308 12/31/98 | SLEM | 5.0 | 954.27 | 300.22 | 04/30/00 | |
| 53 | Printer | 01/01/98 | SLDM | 5.0 | 459.39 | 144.82 | 06/30/00 | |
| 54 | Computer | 01/01/99 | SLDM | 5.0 | 1,367.00 | 410.10 | 06/30/00 | |
| 55 | Typewriter | 9107809 12/31/98 | SLDM | 5.0 | 155.00 | 50.03 | 06/30/00 | |
| 56 | Auto Rev Micro RC | Micro - 55 12/31/98 | SLDM | 5.0 | 78.04 | 24.78 | 06/30/00 | |
| 57 | Saw, Circular 7 1/4'' | D6544 12/31/98 | SLDM | 5.0 | 189.05 | 60.15 | 07/30/00 | |
| 58 | Jack 20 Ton | 10/01/99 | SLDM | 5.0 | 399.94 | 60.00 | 06/30/00 | |
| 59 | Hurricane (R) | 10/01/99 | SLDM | 5.0 | 343.52 | 51.53 | 06/30/00 | |
| 60 | Fire Extinguisher 10lb | 11/03/99 | SLDM | 5.0 | 129.00 | 17.23 | 04/30/00 | |
| 61 | Trailer 16ft | 09/23/99 | SLDM | 2.0 | 3,495.00 | 249.27 | 04/30/00 | |
| 62 | Microcraft Office 2000 | 11/04/99 | SLDM | 2.0 | 499.00 | 113.87 | 04/30/00 | |
| 63 | Peachtree Accounting | 12/04/99 | SLDM | 2.0 | 219.99 | 48.89 | 06/30/00 | |
| 64 | Drain Spad (2) | 10/20/99 | SLDM | 3.0 | 38.13 | 5.73 | 06/30/00 | |
| 65 | Nokia (Vehicle Power Conr | 10/26/99 | SLDM | 5.0 | 32.63 | 4.39 | 06/30/00 | |
| 66 | Mobil Nokia Phone | 12/01/99 | SLDM | 7.0 | 58.00 | 4.92 | 06/30/00 | |

| Grand Totals | Assets: 66 | | | | | 27,645.32 | 7,971.54 | | |

# TRI STATE DESIGN'S EQUIPMENT LIST

|  | | | |
|---|---|---|---|
|  | 1990 CAT 25 DLC | $ 60,000 | |
|  | 1985 Komatsu PC300 Backhoe | $ 50,000 | |
|  | JCB 1400 Backhoe | $ 21,750 | |
|  | Bobcat Loader | $ 5,000 | |
|  | Tag-a-Long Trailer | $ 6,000 | |
|  | 10 x 46 Office Trailer | $ 3,500 | (Dover, DE) |
|  | 12 x 56 Office Trailer | $ 5,500 | (Sumter, SC) |
|  | 80 x 40 Office Trailer | $ 3,500 | |
|  | 7 x 36 Office Trailer | $ 1,000 | |
| (2) | 40' Trailer | $ 2,000 | |
|  | Buchrus Erie 30B Super Crawler Crane | $ 38,000 | |
|  | Buchrus Erie 38B Crawler Crane | $ 23,000 | |
|  | Komatsu D65P | $ 30,000 | |
|  | 8 x 40 Storage Trailer | $ 1,000 | (Dover, DE) |
|  | 8 x 35 Storage Trailer | $ 1,000 | (Willow Grove, PA) |
| (2) | 28' Office Trailers | $ 3,000 | |
|  | 8 x 16 Office Trailer | $ 1,000 | |
|  | 9 x 36 Office Trailer | $ 2,500 | |
|  | 10 x 37 Office Trailer | $ 2,500 | |
|  | 10 x 45 Office Trailer | $ 3,000 | |
|  | Volvoackerman Excavator | $ 60,000 | |
|  | CAT Hydraulic Excavator | $ 35,000 | |
|  | Komatsu D65P-8L6P | $ 40,000 | |
|  | Koehring 466 E Excavator | $ 35,000 | |
|  | 60 Crane Mats | $ 55,000 | |
|  | CAT D-250 | $100,000 | |
|  | Schramm Air Compressor | $ 4,500 | |
|  | Ingersoll Rand Compressor | $ 3,500 | |

McELWEE & TRI-STATE    Page 21 of 33    8/14/00

JV 002550

**McElwee00402**

GAIC002510

**PX-0109-0402**

## 10. **DEFAULT**

10.1 If, (1) voluntary proceedings or involuntary proceedings are commenced by or against either Joint Venturer which are not dismissed within thirty (30) days under any provision of any Federal or State act relating to bankruptcy or insolvency; (2) the attachment of the interest in the Joint Venture of a Joint Venturer which is not dismissed within thirty (30) days of the filing thereof, (3) any judgment being obtained in any legal or equitable proceeding against a Joint Venturer and the sale of its interest in the Joint Venture is contemplated or threatened under legal process as a result of such judgment; (4) any Management proceedings against a Joint Venturer's interest in the Joint Venture; (5) a Joint Venturer failing to correct any material default in the performance of its obligations under this Agreement within forty-five (45) days after it receives written notice of such default, a copy of such notice shall be simultaneously sent to the Small Business Administration; or (6) a Joint Venturer notifying the other Joint Venturer for any reason that it is unable to continue Its performance under this Agreement or the Contract, such Joint Venturer shall be in default under this Agreement (the Joint Venturer subject to such events is hereinafter referred to as the "Defaulting Joint Venturer"). During the period that such default continues to exist, the Defaulting Joint Venturer shall forfeit its right to exercise any decision making authority granted to it under this Agreement (including its right to representation on the Advisory Committee) and delegates full power, authority, and responsibility to the non-defaulting Joint Venturer to cause the completion of the Work.. During the period that a Joint Venturer is in default hereunder, wherever it is provided in this Agreement that the

McELWEE & TRI-STATE                    Page 22 of 33                    8/14/00

McElwee00403                              GAIC002511

PX-0109-0403

act, consent or decision of the Defaulting Joint Venturer is required, such provision shall be deemed thereafter to be unnecessary. The defaulting Joint Venturer shall continue to remain liable for its share of losses of the Joint Venture and shall be entitled to continue to receive its share of the profit, if any, of the Joint Venturer in accordance with its proportionate interest, except that all additional expenses incurred by the Venture as a result of a Joint Venturer's default hereof shall reduce the Defaulting Joint Venturer's share of Net Operating Profit by the entire amount of such additional expenses. The Joint Venture shall have such rights, remedies and privileges against the Defaulting Joint Venturer as may be available at law or in equity, including without limitation, the right to recover from the Defaulting Joint Venturer any amounts in default. The non-defaulting Joint Venturer shall not be obligated to the Defaulting Joint Venturer for failure to cause the completion of the Work or for any action or omission in connection with completing the Work.

10.2  If a venturer defaults under any of the provisions fond in this paragraph, the other venturer shall assume full management responsibility for the venture and for completion of the contract, and excluding the defaulting venturer or its successors and assigns of the obligation to bear its proportionate share of any losses suffered by the venture and without depriving the defaulting venturer, and it successors and assigns of the right to receive its distributive share of and net profits, except that all additional expenses incurred by the venture as a result of the other venture's default hereunder shall reduce that venture's share of any net profits by the entire amount of such additional

JV 002552

McElwee00404                                        GAIC002512

PX-0109-0404

expense. The venturer, assuming full management responsibility, also assumes full responsibility for continued performance of the contract.

## 11. **DISPUTES**

11.1 If any controversy or claim arising out of this Agreement cannot be agreed upon by the Venturers, the controversy or claim shall be settled by arbitration, in accordance with the following:

11.1.1 The claim or controversy shall be resolved by an arbitrator of the American Arbitration Association.

11.1.2 The arbitrator shall decide, resolve and determine the claim or controversy. The written decision of the arbitrator shall be final and conclusive upon the Joint Venture and Joint Venturers. Judgment on such decision may be entered in the highest court of the forum having jurisdiction.

11.1.3 The arbitrator shall conduct the arbitration proceedings in accordance with the rules of the American Arbitration Association, as then in effect, insofar as such rules are not inconsistent with this Agreement.

11.1.4 While the Arbitration proceeding is pending, work on the contract continues.

McELWEE & TRI-STATE                    Page 24 of 33                    8/14/00

JV 002553

**McElwee00405**

GAIC002513

PX-0109-0405

## 12 OBLIGATION

12.1  By executing this Joint Venture agreement, both parties obligate themselves to ensure performance of this contract despite the withdrawal of any member. The Joint Venture shall provide for continuance of performance of the contract in case of organizational dissolution or bankruptcy of one of the parties to the joint venture.

## 13 TERMINATION OF AGREEMENT

13.1  In addition to termination pursuant to paragraph 10 above, the Joint Venture shall terminate if the Joint Venture does not enter into the Contract or upon the Completion, with the vote of all the Joint Venturers, of(1) the Work and liability under the Contract, (2) all other activities, agreements and subcontracts of the Joint Venture, and (3) the settlement of all accounts between the Joint Venturers relating to the Joint Venture. Each Joint Venturer hereby waives his right to dissolve or obtain dissolution in any way other then specified herein. Upon termination of the Joint Venture, the assets of the Joint Venture, if any, shall be liquidated and the net proceeds remaining, if any, together with any other funds then held by the Joint Venture shall be distributed as follows:

13. 1.1  To pay taxes and other priority creditors;

13.1.2  To pay secured creditors;

13.1.3  To pay creditors of the Joint Venture, other than the Joint Venturers, and for expenses incurred in winding up the affairs of the Joint Venture;

13.1.4  To repay any loans made to the Joint Venture by either of the Joint Venturers; and

13.1.5  To pay the Joint Venturers, in accordance with their respective proportionate share in the Joint Venture, any remaining proceeds.

## 14 LOSSES

14.1  If the Joint Venture results in a loss, which is greater than the Capital contributed by the Joint Venturers, each Joint Venturer shall contribute to the Joint Venture their proportionate share of the deficiency and the Joint Venture shall pay all remaining obligations.

## 15 TRANSFERABILITY

15.1  Neither Joint Venturer may withdraw from the Joint Venture, cause the Joint Venture to dissolve or convey, sell, assign, give, donate or otherwise dispose of any or all of its rights, obligations or duties in the Joint Venture or its interest therein. For purposes of this Agreement, a transfer of operating control of Joint Venturer shall be deemed to constitute an assignment of its rights, obligations and duties in the Joint Venture.

JV 002555

**McElwee00407**                                                    GAIC002515

**PX-0109-0407**

## 16 SERVICE AND SCOPE

16.1 Neither Joint Venturer shall be required to devote all of its time and efforts to the business of the Joint Venture, but only such time and efforts as are necessary for the purposes herein contemplated and pursuant to the Contract entered into pursuant to this Agreement. Each Joint Venturer may engage in any other business or activities including, without limitation, the ownership, development, construction and operation of any other real estate. Neither the Joint Venture nor either of the Joint Venturers shall have any rights, obligations or liabilities by virtue of this Agreement in such other business or activities.

16.2 It is specifically understood and agreed between the parties hereto that this Joint Venture Agreement extends only to the performance of the Contract, together with any changes or additions thereto or extra work there under, and in no event shall this Agreement extend to or cover any other or different work. The term "Contract" as used in this Agreement is intended to and shall include the changes, additions or extra work hereinabove mentioned.

JV 002556

**McElwee00408**                                      GAIC002516

PX-0109-0408

## 17. MISCELLANEOUS

17.1 All notices issued pursuant to the terms of this Agreement shall be

delivered in person or by certified mail, return receipt requested, to the following

        McElwee Brothers, Inc.
        P. O. Box 1410
        14150 Rev Joseph White Road
        Independence, LA 70443

        Tri-State Design Construction Co., Inc.
        7401 Old York Road
        Elkins Park, PA 19027

or to such other address or addresses and to the attention of such other person or persons

as either of the Joint Venturers hereto may notify the other in accordance with the

provisions of this Agreement. Any notices, mailed in the above mentioned manner, shall

be deemed to be delivered as of the date on which the same was deposited in the United

States Mail, postage prepaid. Any notice required or permitted by this Agreement may be

waived in writing by the party entitled to receive such notice.

17.2 This Agreement constitutes the entire agreement between the parties

hereto and supersedes all prior negotiations, understandings and agreements of any nature

with respect to the subject matter hereof. An amendment, waiver or discharge of any

provision of this Agreement shall not be effective against either Joint Venturer unless the

Joint Venturers have consented thereto in writing, furthermore all amendments,

extensions and modifications to, and deviations from, requirements of the agreement

shall be subject to prior approval by the AA/MSD&COD or his/her designee.

McELWEE & TRI-STATE          Page 28 of 33          8/14/00

JV 002557

**McElwee00409**

GAIC002517

**PX-0109-0409**

17.3  This Agreement shall be construed, interpreted and enforced in accordance with the laws of the State of Louisiana.

17.4  The captions and headings used in this Agreement are for convenience only and shall not be considered in construing or interpreting this Agreement. If any part of this Agreement shall be held invalid or shall be voided, then such portion of the Agreement shall be severed and excised from the remainder hereof and, insofar as is reasonable and possible, the remainder of the Agreement shall be considered valid and enforceable.

17.5  This Agreement shall be binding upon and inure to the benefit of the Joint Venturers and their respective heirs, successors and assigns.

## 18. AUTHORIZED SIGNATURE

18.1  On behalf of the **McElwee Brothers, Inc. & Tri-State Design Construction Co., Inc. (A Joint Venture)**, the following person is designated as the individual authorized to execute the contract documents:

Melvin M.L. McElwee, Sr. – McElwee Brothers, Inc..

JV 002558

**McElwee00410**

GAIC002518

**PX-0109-0410**

## APPENDIX A

## TASK ASSIGNMENT/RESPONSIBILITY

| ITEM NO. | TASK DESCRIPTION | MCELWEE COMPANY 'A' | TRI-STATE COMPANY 'B' | SUBCONTRA CTOR COMPANY 'C' |
|---|---|---|---|---|
| 1 | BONDING | | X | |
| 2 | FINANCIAL | X | X | |
| 3 | GENERAL SUPERVISION AND OVERALL PROJECT MANAGEMENT | X | | |
| 4 | SITEWORK | X | | |
| 5 | CONCRETE | X | | |
| 6 | MASONRY | NOT APPLICABLE | | |
| 7 | METALS | | | X |
| 8 | WOODS & PLASTICS | X | | |
| 9 | THERMAL & MOISTURE PROTECTION | | | X |
| 10 | DOORS & WINDOWS | X | There are no windows | |
| 11 | FINISHES | X | | |
| 12 | SPECIALTIES | X | | |
| 13 | EQUIPMENT | | X | |
| 14 | FURNISHINGS | NOT APPLICABLE | | |
| 15 | SPECIAL CONSTRUCTION | | | X |
| 16 | MECHANICAL | | | X |
| 17 | ELECTRICAL | | | X |

JV 002559

GAIC002519

IN WITNESS WHEREOF, the parties have caused this Joint Venture Agreement to be executed by their duly authorized officers or agents on the date first written above.

WITNESS/ATTEST:                          MCELWEE BROTHERS, INC.

By: _Mel M.L.M.A./_____
                                              Melvin M.L. McElwee, Sr.


                                         TRI-STATE DESIGN
                                         CONSTRUCTION CO., INC.

By: _____
                                              Ronald U. Davis, President


McELWEE & TRI-STATE          Page 31 of 33                   8/14/00

                                                            JV 002560

                    McElwee00412                        GAIC002520

                                                        PX-0109-0412

STATE OF LOUISIANA

Parish of Tangipahoa

On this        day of        2000, before me personally come(s) Melvin M. L.
McElwee,Sr. to me known and known to me to be the person(s) who are described in and
who executed the foregoing instrument and acknowledged to me that they executed the
same.

(notary - affix seal)

McELWEE & TRI-STATE                Page 32 of 33                8/14/00

.TV 002561

**McElwee00413**

GAIC002521

**PX-0109-0413**

**STATE of PENNSYLVANIA**

**COUNTY of MONTGOMERY**

I CERTIFY that on August 16 , 2000,  Darby R. Capri

personally came before me, and this person acknowledged under oath, to my satisfaction,

that:

      a. this person is the "Acting" assistant secretary of TRI-STATE DESIGN

CONSTRUCTION CO., INC.

      b. this person is the attesting witness to the signing of this document by

the proper corporate officer who is Ronald U. Davis, the President of the corporation;

      c. this document was signed and delivered by the corporation as its

voluntary act duly authorized by proper resolution of its Board of Directors;

      d. this person knows the proper seal of the corporation which was affixed

to this document; and

      e. this person signed this proof to attest the truth of these facts.

_Lisa Sumpter_
LISA SUMPTER

Signed and sworn to before me on

August 16, 2000

_Denise Sams_
(notary - affix seal)

Notarial Seal
Denise Sams, Notary Public
Philadelphia, Philadelphia County
My Commission Expires Aug. 18, 2003
Member, Pennsylvania Association of Notaries

McELWEE & TRI-STATE

Page 33 of 33

8/14/00

JV002561A

McElwee00414

GAIC002522

**PX-0109-0414**



# DEPARTMENT OF THE ARMY

NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO
ATTENTION OF:

**JUN 2 4** 2003

Contracting Division
Projects East Branch

McElwee Brothers, Incorporated & Tri-State Design Construction Company,
        Incorporated, A Joint Venture
Post Office Box 1410
Independence, Louisiana 70443

Gentlemen:

Attached is Modification No. P00028 of Contract No. DACW29-01-C-0035 covering Southeast
Louisiana Urban Flood Control Project, Dwyer Road Drainage Pumping Station Improvements,
Discharge Tubes and Canal, Orleans Parish, Louisiana, which is your notification that this
contract is hereby terminated for default.

We are forwarding a copy of this modification to your bonding company and to the Small
Business Administration Office.

                        Sincerely,

                        Diane K. Pecoul
                        Contracting Officer

Enclosure

CERTIFIED MAIL NO. _____
RETURN RECEIPT REQUESTED

**McElwee00415**

PENGAD 800-631-6989

**EXHIBIT**
20

**PX-0109-0415**

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | | 5. PROJECT NO.(If applicable) |
|---|---|---|---|---|
| P00028 | 24-Jun-2003 | | | |

| 6. ISSUED BY | CODE | DACW29 | 7. ADMINISTERED BY (If other than item 6) | CODE | B2M1200 |
|---|---|---|---|---|---|
| ;ACE, CONTRACTING DIVISION<br>;TN: CEMVN-CT, RM 172<br>7400 LEAKE AVE.<br>NEW ORLEANS LA 70118 | | | CD-CONTRACT ADMIN BRANCH<br>P.O. BOX 60267<br>NEW ORLEANS LA 70160-0267 | | |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code) | | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| MCELWEE BROS., INC. & TRI-STATE DESIGN C<br>POST OFFICE BOX 1410<br>INDEPENDENCE LA 70443 | | |
| | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MOD. OF CONTRACT/ORDER NO.<br>DACW29-01-C-0035 |
| | | 10B. DATED (SEE ITEM 13) |
| CODE  1TC73 | FACILITY CODE | X | 05-Apr-2001 |

### 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods:
(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA (If required) |
|---|
|  |

### 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
|---|---|
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER (Specify type of modification and authority)<br>FAR 52.249-10, "Default (Fixed-Price Construction)" |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return _____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)
The above numbered contract for SELA, Dwyer Road Drainage Pumping Station Improvements, Discharge Tubes and Canal, Orleans Parish, LA, is modified as follows:

SEE CONTINUATION SHEET.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| | | DIANE K. PECOUL / CONTRACTING OFFICER | |
| | | TEL: 504-862-2875   EMAIL: Diane.K.Pecoul@mvn02.usace.army.mil | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
| | | BY  _Diane K. Pecoul_ | 24-Jun-2003 |
| (Signature of person authorized to sign) | | (Signature of Contracting Officer) | |

CEPTION TO SF 30
ROVED BY OIRM 11-84

30-105-04

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

McElwee00416

PX-0109-0416

SF 30 BLOCK 14 CONTINUATION PAGE

In accordance with Contract Clause 52.249-10, "Default (Fixed Price Construction)," your right to proceed under this contract is terminated. Termination of your rights under this contract is based on your breach and repudiation of the terms and conditions of the contract. This termination is effective 24 June 2003.

## ACTS OR OMISSIONS CONSTITUTING THE DEFAULT

A) Repeated failure to maintain adequate Quality Control and workmanship including, as a minimum, such items as insufficient implementation of the Contractor Quality Control Plan, improper storage of materials, deviations from approved submittals and incomplete flood protection installation.

B) Repeated failure to manage the contract performance including the Contractor's ill-defined lines of authority, inconsistencies between the roles and the individuals of the joint venture performing those roles, and ineffective use of resources, resulting in a delay to the overall completion of the contract.

C) Failure to fully implement an acceptable form of interim flood protection which maintains traffic on Jourdan Road by 20 June 2003, as a condition of continued forbearance per the Contracting Officer's letter dated 30 May 2003.

## CONTRACT COMPLETION

This is to advise you that the Government will cause the contract to be completed and McElwee Brothers., Inc. & Tri-State Design Construction Company, Inc. (A Joint Venture) and its sureties will be held liable for any increased costs caused thereby. You and your sureties shall, in addition to bearing the increased costs in completing the work, be liable for liquidated damages.

## RIGHTS OF THE GOVERNMENT

It is further understood and agreed that the Government reserves all rights and remedies provided by law or under the contract, in addition to charging increased costs.

## CONTRACTING OFFICER'S DECISION

This is the final decision of the Contracting Officer. This notice of termination constitutes a decision that the contractor's failure to perform is not excusable and that the contractor may appeal this determination under the Disputes clause. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline 6, 5109 Leesburg Pike, Falls Church, Virginia 22041-3208. If you decide to appeal, you must mail or otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the contracting officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, shall include a copy of this decision, and identify the contract by number. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedures for claims of $100,000 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act, 41 U.S.C. § 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

You are directed to notify all subcontractors and suppliers of this termination for default and of the necessity to preserve all property for which progress payments have been made, pending further instructions from the Government. Copies of all such notifications shall be sent to the Contracting Officer or to the Administrative Contracting Officer.

**McElwee00417**

CF:
U.S. Small Business Administration
Office of Government Contracting
4300 Amon Carter Blvd., Suite 116
Ft. Worth, TX 76155

U.S. Small Business Administration
Attn: E.C. Coffey
365 Canal Street, Suite 2820
New Orleans, LA 70130

Great American Insurance Company
1120 Route 73, Suite 450
Mt. Laurel, NJ 08054

Mr. Ronald Davis
Tri-State Design Construction Company, Inc.
7401 Old York Road
Elkins Park, PA 19027

CEMVN-SB (Dyer)
CEMVN-CD-NO-O (Roth)
CEMVN-NO (Hunter)
CEMVN-OC (Schulz)
CEMVN-PM-E (Wingate)
CEMVN-CD-CS (Basurto)



# DEPARTMENT OF THE ARMY

NEW ORLEANS DISTRICT, CORPS OF ENGINEERS

P.O. BOX 60267

NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO
ATTENTION OF:

March 6, 2002

SELA Orleans Resident Office

SUBJECT: Contract Number DACW29-01-C-0035, Southeast Louisiana, Dwyer Road Drainage Pumping Station Improvements, Discharge Tubes and Canal, Orleans Parish, Louisiana

McElwee Bros., Inc. & Tri-State Design Const. Co., Inc. (A Joint Venture)
P. O. Box 1410
Independence, Louisiana 70443

Gentlemen:

This letter constitutes the formal minutes of the biweekly status and submittal meeting held at the SELA Orleans Resident Office on February 28, 2002 for the above subject contract. The following individuals were in attendance:

| Tim Roth | COE | CD-NO-O | Resident Engineer |
| Glenn Gremillion | COE | CD-NO-O | Team Leader |
| David Pavur | COE | CD-NO-O | Project Engineer |
| Steve Falati | COE | CD-NO-O | Project Inspector |
| Renato Basurto | COE | CD-CS | Construction Manager |
| Rob Dauenhauer | COE | ED-T | Engineering Division |
| Frank Vojkovich | COE | ED-FS | Engineering Division |
| Melvin McElwee | | | McElwee Bros/Tri |
| Todd Jacquet | | | McElwee Bros/Tri |
| Jim Lumsden | | | Design Engineering |
| Jim Legendre | | | I.L.S.I. Engineering |

The meeting began with Mr. Roth asking the contractor to give everyone present a brief overview of the progress and upcoming work. Mr. McElwee proceeded to hand out a revised supplementary schedule for the work that must be accomplished prior to the beginning of hurricane season. Mr. McElwee informed that degrading of Jourdan Road is complete and that the I-wall and T-wall have both been saw cut and are now being demolished. Mr. McElwee also stated that the installation of the temporary retaining structure (TRS) in this area will begin immediately. Finally, Mr. McElwee informed that the welded steel discharge tubes (WSDT) have been ordered and are scheduled for delivery on April 1, 2002, and that work will continue in preparation of their installation. With the overview of operations complete, Mr. McElwee addressed specific items as follows:

1. Degrading of Existing Jourdan Road and the Operation of the Jourdan Road Bypass.

EXHIBIT

21

PENGAD 800-631-6989

Mr. McElwee informed that the bypass road has been put into operation, and that it is functioning well. Truck traffic is slowing and there have been no problems with traffic entering or exiting the bypass. Mr. McElwee stated that existing Jourdan Road is degraded to the extent necessary to accomplish installation of the WSDT's, and that all of the shell base material is stockpiled behind the trailers. All other material from the degrading operation has been hauled offsite and disposed of. Mr. McElwee stated that the broken concrete from the demolition of the I-wall and T-wall would be used to line the degraded areas of Jourdan Road to help with slope stability.

2. Temporary Retaining Structure. (TRS).

Mr. McElwee stated that the contractor has received the additional information required for approval of the TRS from J. M. Dixon Consultants, and that the information will be assembled and provided to the Government following this meeting. This information was briefly reviewed and appeared to contain the necessary revisions.

3. Dewatering System.

Mr. McElwee stated that the additional information required for approval of the Dewatering System had also be received from J. M. Dixon Consultants, and that the information will be assembled and provided to the Government following this meeting.

Mr. McElwee informed that two installation procedures have been used for the piezometers, and that neither has worked as planned. The installation was attempted with a casing as previously discussed, but upon removal of the casing, the piezometer was extracted. Mr. McElwee stated that the procedure was revised and that one piezometer had been installed. The new procedure will be to drive and auger the casing and then drive and grout the piezometers. The casing will then be removed in sections such that the piezometers will not be extracted. Mr. McElwee informed that jetting the piezometers into place would also be investigated. It was agreed that the contractor would communicate with Mr. Falati on the status of the installation, and that once the most efficient method of installation is determined, the information will be provided for the Government's information.

Mr. McElwee informed that the first and second phase well points have been installed in the area of the concrete discharge tubes and appear to be functioning adequately. An electric pump is being prepared for installation and should be operational by day's end. The header pipe is installed and discharge information is being monitored daily. Mr. McElwee agreed to provide information on the dewatering system operation to the Government for review.

4. Demolition of the T-wall and I-wall.

JV 005963

**McElwee00420**

GAIC000673

Mr. McElwee stated that the demolition of the I-wall required for the Jourdan Road bypass is complete. The I-wall at the WSDT penetration location has been saw cut and demolished. The T-wall in this area has been saw cut and the stem is now being demolished. The footing of the T-wall will be demolished after the stem is removed. Mr. McElwee stated that in order to complete demolition of the north end of the T-wall, the TRS must be installed. Mr. McElwee informed that the entire demolition operation is proceeding well.

Mr. McElwee stated that once demolition of the footing is complete, a vibratory hammer would be outfitted with a pulling clamp in order to extract the concrete piles. Mr. McElwee expressed concern about the void that will be created by the pipe pulling operation and stated that because the tips of the piles penetrate the sand strata, he is worried about the infiltration of water into the voids and the possible undermining of the Jourdan Road bypass. Mr. Vojkovich stated that this is a valid concern, and that the holes must be immediately grouted with the required sand, cement and bentonite slurry from the bottom of the void upward. Mr. McElwee acknowledged. Mr. Roth asked Mr. McElwee to formulate the plan and procedure for this operation and provide it to the Government for review. Mr. McElwee agreed. Mr. Roth questioned Mr. McElwee about whether water was entering the excavation for the T-wall footing demolition and Mr. McElwee stated that it was, but that it is being controlled with sump pumps.

5.  Two Week Outlook

Mr. McElwee stated that operations will continue in accordance with the supplementary schedule provided at this meeting for the work associated with the installation of the WSDT. In addition, work will continue on the installation of the piezometers and the driving of the probe piles. Mr. Gremillion noted that the submittal for the preboring of the probe piles was still being reviewed. Mr. Lumsden stated he had completed the review and sent the submittal back to Mr. Dauenhauer. Mr. Lumsden informed that the proposed preboring procedure was acceptable. Mr. McElwee was given verbal permission to proceed with this operation. A Preparatory Meeting was scheduled for Friday, March 1, 2002 at 1300 at the project site.

With no further comment on the status or schedule of the work, the required submittals were reviewed as follows:

1.  Temporary Retaining Structure (TRS) – Transmittal Numbers 25 and 36.

Mr. McElwee stated that excavation and placement of the bedding material is scheduled to begin on March 26, 2002, pending final approval of this submittal. Mr. Gremillion reviewed the minutes of the meeting of February 19, 2002 and noted that the worst case load conditions and revised railroad loading must be reviewed and approved. Mr. McElwee stated that this information has been received from his consultant and will be forwarded for the Government's review and approval.

JV 005964

**McElwee00421**

GAIC000674

**PX-0109-0421**

2. Steel Sheet Pile – Transmittal Numbers 38 and 41.

Mr. Lumsden stated that the material submittal has been reviewed and approved pending review of the layout shop drawings. Mr. Gremillion asked Mr. Lumsden and Mr. Dauenhauer if the sheet pile material could be ordered by the contractor. Both stated that they saw no reason why the material could not be ordered and Mr. McElwee was given verbal permission to order the steel sheet pile.

3. Re-steel Shop Drawings – Transmittal Number 39.

It was noted that the review of this submittal has taken longer than thirty days because of the turnover of personnel at the New Orleans Sewerage and Water Board (NOS&WB). Mr. Gremillion questioned Mr. McElwee as to the need for the submittal and Mr. McElwee stated that approval would be needed within two weeks so that the material could be ordered. Mr. Lumsden stated that he had forwarded his comments to Mr. Dauenhauer. Mr. Dauenhauer stated that he would check with the NOS&WB and return the submittal as soon as possible.

4. Wood Pile Driving Equipment (Wet Rotary Methods) – Transmittal Number 44.

Verbal approval of this item was given to Mr. McElwee at this meeting.

5. Welded Steel Discharge Tubes (WSDT) (Deflection Calculations) – Transmittal Number 46

Mr. Lumsden stated that he had reviewed this submittal and noted that the calculations were performed for ½ - inch thick material. Mr. McElwee acknowledged that this was an error and that ¾ - inch thick pipe would be supplied. Mr. Lumsden stated that the calculations were acceptable and that the deflection for the ¾ - inch thick material would obviously be less than the deflection for the ½ - inch thick material. As such, no re-submittal is necessary.

With no further questions on the required submittals, the following issues were addressed

1. Updated Progress Chart for the Welded Steel Discharge Tube Installation.

Mr. McElwee provided the updated schedule during this meeting.

2. Preparatory Inspection.

It was agreed by the contractor and the Government, that these meetings will be scheduled when both parties are available. Mr. McElwee expressed concern that the availability of Government personnel may delay these meetings and impact the schedule of work. Mr. Roth assured Mr. McElwee that the Government does not

JV 005965

GAIC000675

McElwee00422

PX-0109-0422

intend to delay the work, and informed Mr. McElwee that someone from both parties, who is associated with the project, must be present at the meeting. Mr. McElwee acknowledged.

3.  Definable Features of Work.

Mr. McElwee stated that the definable features were submitted with the original Quality Control Plan, but agreed to revise and update the list and provide it for the Government's information and as the scheduling tool for the Preparatory Inspections.

4.  Flood Protection Plan.

Mr. Roth explained to Mr. McElwee that the plan submitted on February 19, 2002 did not properly address how and in what time frame the temporary protection would be installed. As such, Mr. Roth informed Mr. McElwee that the plan is unacceptable. Mr. McElwee agreed to revise the plan and re-submit it by April 1, 2002.

With no further comments or questions, the meeting was adjourned.

If you any further questions, please contact Mr. Glenn Gremillion, 861-2439.

Sincerely,

Timothy J. Roth
Administrative Contracting Officer

CF:
Mr. Ross Leslie
Tri State Design Construction Company, Inc.
7401 Old York Road
Elkins Park, PA 19027

JV 005966

**McElwee00423**

GAIC000676

**PX-0109-0423**

CEMVN-CD-NO-O                                    01 February 2002

MEMORANDUM THRU: Resident Engineer, SELA Orleans Resident Office
        FOR: Contract File

SUBJECT:  Contract Number DACW29-01-C-0035, Southeast Louisiana, Dwyer Road
Drainage Pumping Station Improvements, Discharge Tubes and Canal, Orleans Parish,
Louisiana, Submittal Meeting minutes.

1.  A meeting was held on 4 December 2001 at the SELA New Orleans office for the purpose of
    clarifying the comments on the Temporary Retaining Structure (Item #9) and Excavation
    Plan (Item #10) Submittals. The following were in attendance:

| Name | Organization | Position |
|---|---|---|
| Tim Roth | COE, SELA Resident Office | Resident Engineer |
| Glenn Gremillion | COE, SELA Resident Office | Team Leader |
| David Pavur | COE, SELA Resident Office | Project Engineer |
| Steve Falati | COE, SELA Resident Office | Construction Representative |
| Rob Dauenhauer | COE, ED-TF | Design Representative |
| Melvin M. L. McElwee, Sr. | MBI & TSDCCI (AJV) | Project Representative |
| Todd Jacquet | MBI & TSDCCI (AJV) | Project Representative |
| Paul Barcelona | Sewerage & Water Board | Engineering Representative |
| Jim Lumsden | Design Engineering, Inc. | Design Representative |
| Tom Stremlau | Eustis Engineering | Design Representative |

2.  The original submittal was discussed - Transmittal #15 that was received from the contractor
    on 18 Aug 2001 and returned to the contractor on 20 Sep 2001. Transmittal #15 was coded E
    on both Item #9 & #10. Also, the supplemental comments sent to the Contractor on 25
    September 2001 were discussed. The contractor represented by Mr. Melvin M. L. McElwee,
    Sr. did acknowledge that received the comments from Mr. David E. Pavur in a fax but that
    the comments were sent separately from the original transmittal. It was explained that
    Engineering Division did not forward the Eustis comments to the SELA-O office originally
    with the return submittal but later in an E-mail on 25 September 2001. The Eustis comments
    were faxed to the contractor the same day received from Engineering Division. Mr. David
    Pavur verified the contractor received the fax. A fax is an official form of communication.

Laundr Ex. 21

PENGAD 800-631-6989

EXHIBIT
22

bit 21

GAIC000171

**McElwee00424**

3. The resubmittal was discussed - Transmittal #20 (Resubmittal of transmittal #15) was received on 10 Oct 2001 and returned to the contractor on 6 Nov 2001. It was coded C on (Items # 9 and 10). The contractor did address some of Eustis' comments but not all. Each organization forwarding comments explained and clarified those comments to the contractor, and detailed what information must be resubmitted for final approval. Specifically, the contractor is to investigate and analyze the following:

    a. The worst-case field conditions for the steel sheet pile (highest ground elevation vs. lowest cut elevation).
    b. The error in computing force T-1 for the stage I, railroad case.
    c. The typographical error in the calculation under Tab A which reduces the computed wall moment for an increase in water level.
    d. Eustis agreed to review the stage II S-case that had previously been submitted.

It was agreed that the designer would not disapprove the submittal at this time, but would hold the submittal pending resolution the above comments by the contractor's design engineer.

4. The dewatering plan was discussed. The contractor stated that he felt additional information was needed to complete his dewatering design. The Corps of Engineers representative explained that the original information provided in the contract is sufficient to design a functional dewatering system and that the contractor must obtain any additional information necessary to facilitate his specific design. The contractor acknowledged this and stated that he would perform additional soil borings when the piezometers are installed. Again, it was agreed that the designer would not disapprove the submittal at this time, but would hold the submittal pending any necessary revisions to the dewatering system by the contractor's design engineer.

5. It was agreed that a better numbering system for the comments was necessary from the reviewers and that the reviewers would better clarify what is being asked for in their comments. Also, the reviewers will state what specifically is needed from the contractor to get their final approval. The contractor agreed that he would reference the comment number that he is addressing.

6. The contractor was reminded that he must properly address all comments so as not to require resubmissions of the submittal. The concerns of the timeliness of the review were addressed but will not relieve the contractor of ultimately addressing the comments. It was agreed to keep an open communications with all parties (Eustis/ DEI/COE/S&WB and contractor so that comments can be quickly resolved.

2

GAIC000172

**McElwee00425**

**PX-0109-0425**

7. Point of contact for this matter is Mr. David Pavur, 861-2439.

TIMOTHY J. ROTH
Resident Engineer
SELA Orleans Resident Office

CF:
Team Leader (Gremillion)
Proj Engr (Pavur)
Proj Inspector (Falati)
NOS&WB (Barcelona)
D.E.I. (Lumsden)
I.S.L.I. (Legendre)

3

GAIC000173

**McElwee00426**

**PX-0109-0426**



## DEPARTMENT OF THE ARMY
NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

April 29, 2002

REPLY TO
ATTENTION OF:

SELA Orleans Resident Office

SUBJECT: Contract Number DACW29-01-C-0035, Southeast Louisiana, Dwyer Road
Drainage Pumping Station Improvements, Discharge Tubes and Canal, Orleans Parish, Louisiana

McElwee Bros., Inc. & Tri-State Design Const. Co., Inc. (A Joint Venture)
P. O. Box 1410
Independence, Louisiana 70443

Gentlemen,

This letter constitutes the formal minutes of the biweekly status and submittal meeting
held at the New Orleans Area Office Conference Room on April 11, 2002, for the above subject
contract. The following individuals were in attendance:

| | | | |
|---|---|---|---|
| Tim Roth | COE | CD-NO-O | Resident Engineer |
| Domingo Elguezabal | COE | CD-NO | Area Engineer |
| Diane Pecoul | COE | CT-E | Contracting Officer |
| Bruce Terrell | COE | CD-A | Assistant Chief of Const. |
| Ward Purdum | COE | CD-QA | Chief Quality Assurance |
| Glenn Gremillion | COE | CD-NO-O | Team Leader |
| William Rossingol | COE | CD-NO-O | Project Engineer |
| Renato Basurto | COE | CD-CS | Construction Manager |
| Rob Dauenhauer | COE | ED-T | Engineering Division |
| Steve Conravey | COE | CD-CS | |
| Brook Brown | COE | CD-NO-O | Office Engineer |
| Frank Vojkovich | COE | ED-FS | |
| Kelly Gele | COE | CT-E | |
| Lori Wingate | COE | PPMD | |
| Mike Dixon | | | Dixon Engineering |
| Melvin McElwee | | | McElwee Brothers/Tri State |
| Jim Lumsden | | | Design Engineering |
| Jim Legendre | | | I.L.S.I. Engineering |
| John Holtgreve | | | DEI |
| Sylvie Auiet | | | McElwee Brothers/Tri-State |
| Todd Jacquet | | | McElwee Brothers/Tri-State |

The meeting began when Mr. Roth phoned Mr. Ron Davis of Tri-State. Mr. Roth then
asked everyone present to introduce themselves. Mr. Gremillion then presented a brief overview of



EXHIBIT
23

GAIC001367

**McElwee00427**

**PX-0109-0427**

the minutes from the March 14, 2002, status meeting. Mr. Roth then asked the contractor to give everyone present a summary of the progress and upcoming work. Mr. McElwee proceeded to hand out an updated progress schedule. Mr. McElwee informed everyone that the project was approximately 37% complete, but this only included material cost for sluice gates and concrete discharge tubes, and as of Monday, he was currently on schedule. With the overview of operations complete, Mr. McElwee addressed specific items as follows:

1. Piling under T-wall:

   Mr. McElwee stated that on Monday Mr. Roth explained that these piles were to be removed in their entirety. Mr. McElwee explained that he would do this, but under protest. Mr. McElwee also stated that he planned on mobilizing a crane to pull the piles and that Mr. Dixon was currently planning on how to pull the piles. Mr. Roth then asked about the backfilling of the voids left from pulling of piles. Mr. Dixon stated that while pulling piles grout would be simultaneously injected. Mr. Elguezabal then asked Mr. McElwee about the project schedule, which showed the piling pulled by the 29th of April. Mr. Gremillion stated that the Corps still needed a plan for pulling of the piles. Mr. McElwee then stated he would have a plan by Monday.

1. Dewatering System:

   Mr. McElwee stated that the Dewatering system was approved one week ago and is currently functioning as intended. Mr. McElwee also stated that Entergy still needed to provide service for the diesel pumps. Mr. McElwee mentioned that the piezometers were reading ok, but during the last storm the readings were higher than normal.

2. 84" Discharge Tubes:

   Mr. McElwee discussed the 84" Tubes, and that there are 9 onsite and 27 total. Mr. McElwee also stated that the VCEP to Jack and Bore tubes was still being evaluated.

3. Two Week Outlook

   Mr. McElwee concluded by saying that a crane would be mobilized on the 15th of April and the he was waiting on answer for probe piles. Mr. Gremillion proceeded to say that an answer would be given today or tomorrow.

Then a question was asked about the Flood Protection Plan. Mr. McElwee explained that sheets would be driven to close any gaps. Mr. Roth explained that calculations would be needed to ensure that sheets would work. Mr. Elguezabal then asked about the pulling of concrete piles under T-wall and if the by-pass road would have to be closed and Mr. McElwee said yes. Mr. Dixon provided a sketch of how the position of the crane would look when pulling piles, and Mr. Dixon also stated that the crane would be on mats while traversing on the by-pass road. Mr. Elguezabal then asked Mr. McElwee how many days would take to pull piling and Mr. Dixon replied with 17 days.

Mr. McElwee then proceeded to site FAR Clause 52.236-21 and state that this clause gives the following statement. "In case of difference between drawings and specifications, the specifications

McElwee00428

GAIC001368

shall govern." Mr. McElwee then asked Mr. Jacquet to read specification 02070, which contains the demolition of T-wall. Mr. Jacquet proceeded to read the specification and Mr. McElwee stated that this specification only requires that the piling be cut at the base of the piling and this portion be removed, not the whole piling like the drawing says.

With no further comment on the status or schedule of the work, the required submittals were reviewed as follows:

1. Submittal 0059 (Item No. 9 & 10) Temporary Retaining Structure – Phase IV Modified, Excavation Plan – Phase IV Modified. (Supplemental to Trans. No. 50)

   This submittal is currently in process.

2. Submittal 0058 (Item No. 8) Dewatering, Intial Testing.

   This submittal is currently in process.

3. Submittal 0057 (Item No. 49) Concrete Pile Extraction Equipment.

   Waiting on plan from contractor.

4. Submittal 0056 (Item No. 25) Pile cutting Plan.

   This plan has been investigated and found to be unacceptable.   Pulling required in accordance with the contract.

5. Submittal 0055 (Item No. 11) Timber Piles PP-1 thru PP-6

   Separate correspondence is forthcoming.

6. Submittal 0054 (Item No. 49) H and pipe piling driving Equipment.

   This submittal is currently in process.

7. Submittal 0053 (Item No. 49) Formwork for Concrete.

   This submittal is currently in process.

8. Submittal 0052 (Item No. 49) Wood Pile Driving Equipment, Pile Collars.

   This submittal is currently in process.

9. Submittal 0050 (Item No. 9 & 10) Temporary Retaining Structure – Phase IV Modified; Excavation Plan – Phase IV Modified. (Resubmittal of 36, 25, 20 & 15).

McElwee00429

GAIC001369

PX-0109-0429

The additional information required from J. M. Dixon Consultants was received on March 6, 2002 and is being reviewed by the Government.

10. Submittal 0047 (Item No. 10) General Excavation.

The information required for this submittal was received on February 28, 2002 and is being reviewed by the Government.

With no further comments or questions, the meeting was adjourned.

If you have any questions, please contact Mr. William Rossignol or Mr. Glenn Gremillion at 861-2439.

Sincerely,

Timothy J. Roth
Administrative Contracting Officer

Encl

CF:
Mr. Ronald Davis
Tri State Design Construction Company, Inc.
7401 Old York Road
Elkins Park, Pennsylvania 19027

Mr. Jim Lumsden
Design Engineering, Inc.
3330 W. Esplanade Avenue South
Suite 205
Metairie, Louisiana 70002

Mr. Jim Legendre
ILSI Engineering
4300 S. I-10 Service Road, Suite 113
Metairie, Louisiana 70006

GAIC001370

**PX-0109-0430**

05/03/2002  05:05    985-8780064       MBI TSDC       PAGE  05

NO.478    P.2/5



## DEPARTMENT OF THE ARMY

NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

April 17, 2002

REPLY TO
ATTENTION OF:

SELA Orleans Resident Office

SUBJECT: Contract Number DACW29-01-C-0035, Southeast Louisiana, Dwyer Road Drainage
Pumping Station Improvements, Discharge Tubes and Canal, Orleans Parish, Louisiana

McElwee Bros., Inc. & Tri-State Design Const. Co., Inc. (A Joint Venture)
P. O. Box 1410
Independence, Louisiana 70443

Gentlemen:

I have determined that your overall performance on the subject contract has been
unsatisfactory to date. Therefore, as I verbally informed you at our April 11, 2002, biweekly
status meeting, I am recommending to the contracting officer that an Interim Unsatisfactory
Performance Evaluation be issued on this contract. The individual elements evaluated in
determining this Interim Unsatisfactory Performance Evaluation are listed and described
below.

      a) Quality Control – Marginal

      b) Timely Performance – Unsatisfactory

      c) Effectiveness of Management – Unsatisfactory

      d) Compliance with Labor Standards – Satisfactory

      e) Compliance with Safety Standards – Marginal

The ratings in the above elements are based on the following:

a) Quality Control – Marginal

Although very little of the permanent construction has been accomplished to date, the
overall quality of workmanship on that work which has been performed is marginal.
Some of the temporary work inspected to date has been found to be incorrect,
requiring removal and/or replacement. Other work has been inspected and found to be
unsatisfactory, however, because of the temporary nature of this work, we did not
require you to remove it, but rather allowed you to repair it.



EXHIBIT

24

1825

GAIC000807

**McElwee00431**

PX-0109-0431

05/03/2002  06:06    985-8780064           MBI TSDC                                PAGE   06
                                                          NO.478   P.3/5

Although an adequate CQC Plan has been prepared and accepted for the project, your
onsite quality control personnel have not sufficiently implemented it. Documentation
of the control procedures is marginal, and very little description of the actual control
activities has been placed into the CQC reports.

Storage of required materials has been marginal. Items have been left in the staging
area unprotected from the elements. In the case of the pre-cast concrete discharge box
culverts, you were required to protect this material from becoming saturated prior to an
anticipated freeze. This was necessary because of your failure to include the required
air-entraining admixture in your concrete mix design. During a visit to the casting
yard where the material is being stored, it was discovered that the covering for the
material was not being maintained.

Although submittals and/or plans for the work were approved prior to beginning an
activity, in some instances you deviated from the approval without informing this
office. These situations have required additional information to be provided, but you
have often failed to obtain approval of this additional information prior to proceeding
with the activity.

There have been several meetings between our respective offices in an attempt to
correct the above problems, however, you have not address all of the issues discussed
at these meetings and therefore some of the problems have not been rectified.

b) Timely Performance - Unsatisfactory

The overall timeliness of performance on the project has been unsatisfactory.
Although an adequate construction progress chart was originally submitted and
approved for the project, you have failed to adhere to this schedule. Delays have
not been efficiently resolved and required documentation has not been submitted in
a timely manner with respect to performance of the work.

At the follow-up Partnering Meeting of February 14, 2002, it was agreed that an
updated construction progress chart would be submitted to this office by February
28, 2002. At each subsequent biweekly status meeting, I have asked for the
updated progress chart. On each occasion you agreed to furnish the update by a
certain date. As of the date of this letter we have received no such update.

In the absence of an updated construction progress chart, you submitted a
supplementary progress chart for the work that is required to install the welded
steel discharge tubes through the flood protection and under Jourdan Road. On
January 18, 2002, you presented this supplement and detailed the operation
necessary to accomplish the work described in it. Although it was agreed that
work would proceed as outlined on this supplement, you have failed to follow the

JV 001826

GAIC000808

McElwee00432

PX-0109-0432

necessary steps outlined in your presentation. As a result, problems have arisen and delays to the supplementary schedule have occurred.

The Government estimates that based on your rate of progress on the job, you will not be able to complete the project by the current revised contract completion date of November 27, 2002.

c)  Effectiveness of Management - Unsatisfactory

Your overall effectiveness of management has been unsatisfactory. You have failed to cooperate with and respond to the Government and it's concerns about the state of the project, other than to insist that you are on schedule and will complete the project on time. However, you have yet to submit an updated progress chart and plan to show how this will be accomplished. As of the date of this letter, roughly twelve (12) months of contract time have elapsed and virtually no permanent work has been completed.

You have failed to exhibit the planning and management skills necessary to construct a project of this scope. In many instances your focus has been on the task at hand with little or no thought given to the subsequent tasks to be performed. In several instances this failure to plan ahead has caused problems that have undoubtedly delayed the overall completion of the project.

Your jobsite supervision has been marginal at best. You have repeatedly stated that you plan to bring an experienced individual to the site to superintend the work. At our February 14, 2002 follow-up Partnering Meeting, you introduced Mr. Murray Seals as your new superintendent. However, shortly after this meeting, Mr. Seals was terminated and you have yet to replace him with an experienced superintendent.

e)  Compliance with Safety Standards - Marginal

Although an adequate Accident Prevention Program has been prepared and accepted for the project, it's implementation has been hampered by a lack of experienced personnel. There has already been one reportable accident on the project, although it did not result in lost time.

JV 001827

GAIC000809

McElwee00433

PX-0109-0433



**project**
**MEMORANDUM**

To:        Melvin McElwee
From:      J. Michael Dixon
Date:      March 18, 2003
Subject:   Jacking & Bore Dewater

On Friday, March 14, 2003, I visited the referenced site to review the dewatering installation prior to the onset of the second jack and bore run of the 84" pipe. Four rows of wellpoints were installed in a general north-south direction with two of the rows paralleling the NOPBRR tracks. The piezometer information indicated that the water table was located at approximate elevation 11.0 NGVD. Both the Gore and Eustis bores in this area indicate that the elevation of the bottom of the shallow sand stratum is located at about elevation 12.5 NGVD. This indicates that this sand stratum is in a draw down condition. I do not believe that the deep sand stratum located approximate elevation -16.0 NGVD will affect the jack and bore operation.

I recommended that you add an additional wellpoint on the north end of each row to ensure that draw down occurs on the north side of the jack and bore. I believe that this area is now dewatered effectively and that jack and bore operations can begin whenever the boring contractor is ready.

Please let me know if you have any questions or if you need additional information.

Yours truly,

J. Michael Dixon, P.E., P.L.S.

Consulting Engineer
/jmd

EXHIBIT
ZS
PENGAD 800-631-6989
GAIC002656

**McElwee00434**

**PX-0109-0434**



**project**
**MEMORANDUM**

| To:      | Melvin McElwee        |
|----------|-----------------------|
| From:    | J. Michael Dixon      |
| Date:    | March 19, 2003        |
| Subject: | Jacking & Bore Dewater |

On Tuesday, March 18, 2003, I received a fax copy of the current wellpoint and piezometer layout. As was indicated in my previous memo, four rows of wellpoints have been installed in a general north-south direction with two of the rows paralleling the NOPBRR tracks. The current piezometer information (two new ones have been set) indicates that the water table is located between the approximate elevations of 9.6 and 13.5 NGVD. Both the Gore and Eustis bores in this area indicate that the elevation of the bottom of the shallow sand stratum is located between elevation 12.5 and 13.5 NGVD. This *still* indicates that this sand stratum is in a draw down condition.

As I indicated to you in our job site meeting, I believe that the water levels that are displayed in the deep piezometers are not a true indication of the local water table elevation. I believe that this represents trapped water inside the sanded area which cannot be drawn down by pumps located at the present ground surface. Consequently, I do not believe that the deep sand stratum located at approximate elevation -16.0 NGVD will affect the jack and bore operation.

I *still* firmly believe that this area is now dewatered effectively and that jack and bore operations can begin whenever the boring contractor is ready. In fact, I understand that boring operations are under weigh and that the dewatering is performing in an exemplary manner.

Please let me know if you have any questions or if you need additional information.

Yours truly,



J. Michael Dixon, P.E., P.L.S.

Consulting Engineer
/jmd

JV 002694

GAIC002655

**McElwee00435**

**PX-0109-0435**



# DEPARTMENT OF THE ARMY

NEW ORLEANS DISTRICT, CORPS OF ENGINEERS

P.O. BOX 60267

NEW ORLEANS, LOUISIANA 70160-0267

April 3, 2002

REPLY TO
ATTENTION OF:
SELA Orleans Resident Office

SUBJECT: Contract Number DACW29-01-C-0035, Southeast Louisiana, Dwyer Road Drainage Pumping Station Improvements, Discharge Tubes and Canal, Orleans Parish, Louisiana

McElwee Bros., Inc. & Tri-State Design Const. Co., Inc. (A Joint Venture)
P. O. Box 1410
Independence, Louisiana 70443

Gentlemen,

Reference my site visit on Wednesday, April 3, 2002, and the attached Notices of Contract Deficiency (#2 and #3) on the subject contract.

During this visit to review the temporary retaining structure for phase IV-A, it was determined that you have made several variations from the currently approved plans and submittals. Those variations are as follows:

1. There are several large gaps between the sheet pile and the wale brace. These gaps have been shimmed with a small diameter pipe.

2. The east side of the retaining structure has not been driven because the concrete piles have yet to be extracted. There is a wale brace being supported by the T-wall to support the other three sides of the retaining structure.

3. The retaining structure was being excavated by roughly 10 to 12-feet, despite the fact that you have only installed three sides. Also, the upper bracing had not been properly installed prior to excavating.

4. Machinery was being supported from timber mats that were resting on the wale and strut bracing. The wale brace was only tacked to the sheet pile every 8-feet, and the strut was only hanging from the wale brace by an angle iron clip.

These conditions are not in accordance with your approved plans and submittals and are unacceptable. As discussed at our meeting on April 5, 2002, in the SELA Orleans Resident Office, you must submit revised calculations to show that these variations are adequate.



EXHIBIT
26

**McElwee00436**

GAIC000736

**PX-0109-0436**

This failure to perform operations in accordance with the approved plans and submittals will have been noted by this office and may result in an unsatisfactory performance evaluation in the areas of Quality Control and Compliance with Safety Standards.

If you have any questions, please contact my office at (504) 861-2439.

Sincerely,

Timothy J. Roth
Administrative Contracting Officer

Encl

CF:
Mr. Ross Leslie
Tri State Design Construction Company, Inc.
7401 Old York Road
Elkins Park, PA 19027

Mr. Jim Lumsden
Design Engineering, Inc.
3330 W. Esplanade Avenue South
Suite 205
Metairie, Louisiana 70002

Mr. Jim Legendre
ILSI Engineering
4300 S. I-10 Service Road, Suite 113
Metairie, Louisiana 70006

JV 005940

**McElwee00437**

GAIC000737

**PX-0109-0437**



**DEPARTMENT OF THE ARMY**
NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO
ATTENTION OF:

January 7, 2003

SELA Orleans Resident Office

SUBJECT: Contract Number DACW29-01-C-0035, Southeast Louisiana, Dwyer Road Drainage
Pumping Station Improvements, Discharge Tubes and Canal, Orleans Parish, Louisiana

McElwee Bros., Inc. & Tri-State Design Const. Co., Inc. (A Joint Venture)
P. O. Box 1410
Independence, Louisiana 70443

Gentlemen:

This letter constitutes the formal minutes of the biweekly status and submittal meeting
held at 2:00 p.m. in the New Orleans Area Office Conference Room on December 19, 2002, for
the above subject contract. The following individuals were in attendance:

| | | | |
|---|---|---|---|
| Tim Roth | COE | CD-NO-O | Resident Engineer |
| Domingo Elguezabal | COE | CD-NO | Area Engineer |
| Glenn Gremillion | COE | CD-NO-O | Project Team Leader |
| William Rossignol | COE | CD-NO-O | Project Engineer |
| Steve Falati | COE | CD-NO-O | Project Inspector |
| Rob Dauenhauer | COE | ED-T | Engineering |
| Lori Wingate | COE | | Project Management |
| Diane Pecoul | COE | CT-E | Contracting Officer |
| Ronald Davis | | | McElwee Brothers/Tri-State |
| Ross Leslie | | | McElwee Brothers/Tri-State |
| Todd Jacquet | | | McElwee Brothers/Tri-State |
| Melvin McElwee | | | McElwee Brothers/Tri-State |
| Ellis Jackson | | | McElwee Brothers/Tri-State |
| Jim Lumsden | | | Design Engineering INC |
| Jim Legendre | | | ILSI |

The meeting began when I asked you to give an overview of the current safety situation for
the jobsite. Mr. McElwee began by stating that he turned in the job hazard analysis for Double
Aught as a supplement to the Accident Protection Plan. Mr. Jackson stated that the handrails in
temporary retaining structure (TRS) IA are complete and handrails should be constructed in
phase III shortly. Mr. Jackson also stated that he is continuing to go over various components of
jobsite safety at the weekly safety meetings. I asked if you planned on using the staircases to
enter and egress the TRS IA, III, and IV as was used in TRS I. Mr. McElwee responded that he

**McElwee00438**

EXHIBIT
27

PENGAD 800-631-6839

GAIC003675

**PX-0109-0438**

had planned on using the staircases again. I then asked about the employee that may have had a heart attack. Mr. McElwee responded that the man did indeed have a heart attack and that he was doing ok. Mr. Rossignol explained that Mr. McElwee had contacted Mr. Plaisance of the safety office prior to notifying any of the quality assurance personnel. Mr. Rossignol continued that he would like Mr. McElwee to use the proper chain of command i.e. Mr. Falati, Mr. Rossignol, Mr. Gremillion, or myself prior to contacting the safety office. Mr. McElwee explained that his intent was to get some information not to report the heart attack. I explained that even though it was just for information, the proper way to approach anything on the jobsite is through the chain of command. Mr. McElwee responded that Mr. Falati had been notified of the heart attack. Mr. Falati responded that one of your employees had told him that the worker had chest pains, but nothing further was brought to Mr. Falati's attention nor was it ever mentioned that the worker had indeed suffered a heart attack.

I then discussed the current dewatering situation on the jobsite. I brought to your attention that several of the piezometers are reading above the excavations in their respective TRS'. I explained that the dewatering system has to be functional before any further excavation can take place, and I asked about your plans to correct the current dewatering situation. Mr. McElwee stated that discussions are ongoing with Mr. Burns and Mr. Dixon to see if more wells will be needed. I then asked if all 12 piezometers are working. Mr. McElwee responded that he wasn't sure how many were working and that 4 piezometers are not needed yet. I then directed Mr. McElwee to get the 8 that are installed to function properly, so that the systems could be monitored. I then asked about the corner bracing that has not been installed in phase III. Mr. Jackson said that additional struts would be added. I explained that you should follow your excavation plan. There was some additional discussion on the piezometers. I summarized this discussion by explaining that the dewatering plan should be followed to eliminate any problems.

At this time, I asked you to present a summary of the progress and upcoming work.

1. 84" Discharge Tubes:

I explained that there was a meeting held on December 9, 2002, to discuss the Value Engineering Change Proposal (VECP), and at this meeting you said that you would provide a plan from Tri-State boring and the information on the field coating. Mr. McElwee responded that he was currently working to provide these items to the Government. Ms. Pecoul asked if the VECP had been accepted. I explained that there are still some outstanding items. Mr. Rossignol asked if a target date had been set to start the tubes. Mr. Leslie stated that he hoped to start on the 13th of January. Mr. Lumsden stated that the New Orleans Sewerage and Water Board had some concerns on the field coating. Mr. Leslie asked what items needed to be resolved so that work could start. I responded that the cost and joint coating were the two most important items left to resolve.

JV 001796

**McElwee00439**

GAIC003676

**PX-0109-0439**

2. Cofferdam and Dewatering System:

This was discussed earlier.

3. Dolphin System:

Mr. Jackson stated that all of the piling had been driven and some of the bracing had been installed. Mr. Jackson also stated that the piles will be filled with concrete on Tuesday. Mr. Rossignol stated that he needed the submittals on the formwork for the concrete caps. Mr. Leslie explained that the beacon on the drawings is outdated and that a different one would be needed. Mr. Rossignol stated that the beacon needs to be submitted so that if this is the case the new beacon can be approved. Mr. Falati stated that a preparatory is needed for the concrete work prior to work beginning.

With no further comment on the status or schedule of the work, the required submittals were reviewed as follows:

1. Submittal 0094 Welded Steel Discharge Tubes; Additional coating.

This submittal is currently in process.

2. Submittal 0095 Welded Steel Discharge Tubes; Field Coating of Joints.

This submittal is currently in process. Need additional information as discussed at meeting.

3. Submittal 0097 Reinforcing Steel; Manhole.

This submittal is currently in process.

4. Submittal 0098 Manhole Covers;

This submittal is approved.

5. Submittal 0100 Temporary Retaining Structure; Pits for Jacking and Receiving.

This submittal is currently in process.

6. Submittal 0101 Reinforcing Steel; Dolphin.

This submittal is currently in process.

JV 001797

**McElwee00440**

GAIC003677

**PX-0109-0440**

7. Submittal 0103 As-built of box culvert.

Need to have Government and contractor surveyors meet to discuss further.

I then asked Mr. McElwee about the surveys of the floodwalls and railroad. Mr. McElwee asked Mr. Jacquet to provide those to Mr. Falati. Mr. Rosignol asked Mr. Jackson if he had attended the class given by Entergy on high voltage lines. Mr. Jackson responded that he had attended the class. Mr. Rossignol also asked if you had gotten in touch with the distribution line point of contact. Mr. Jackson stated that these lines are not a concern at the present time. I then asked about the modifications for the job. Mr. McElwee pointed out that he turned in the network analysis earlier and that this could be used to project the impacts associated with the modifications. Mr. Leslie stated that he was not ready at this time to settle the impact cost of the modifications. I then pointed out that the Government withheld interest on the last pay estimate due to your not paying the supplier of the welded discharge tubes within seven days as prescribed by contract. Mr. McElwee asked if the retainage withheld on all materials could be refunded similar to the retainage refunded on the welded steel discharge tubes, and if the $18,000.00 retainage that was refunded on the welded steel discharge tubes was considered when calculating interest. I explained that I was not sure but would get an answer to him shortly. Mr. Falati asked the contractor to work on submitting daily logs more timely.

With no further comments or questions, the next meeting was scheduled for January 7, 2002, at 2:00 p.m. at the Area Office conference room and this meeting was adjourned.

Point of contact on this matter is Mr. William Rossignol or Mr. Glenn Gremillion, 861-2439.

Sincerely,

Timothy J. Roth
Administrative Contracting Officer

CF:
Mr. Ross Leslie
Tri State Design Construction Company, Inc.
7401 Old York Road
Elkins Park, PA 19027

Mr. Jim Lumsden
Design Engineering, Inc.
3330 W. Esplanade Avenue South
Suite 205

JV 001798

McElwee00441

GAIC003678

PX-0109-0441

Metairie, Louisiana 70002

Mr. Jim Legendre
ILSI Engineering
4300 S. I-10 Service Road, Suite 113
Metairie, Louisiana 70006

JV 001799

McElwee00442                                           GAIC003679

PX-0109-0442



# McElwee Bros., Inc.

P.O. Box 1410
Independence, LA 70443
(985) 878-0280 • Telefax (985) 878-0064

This message is CONFIDENTIAL and is legally privileged. It is intended only for the person (s) or organization (s) named below and any other use or disclosure is strictly forbidden. If this message is received by anyone else, please notify us at once by telephone and return the original by mail to the address in the caption. Thank you.

Friday, October 14, 2005

Robert Bea, P. E.
60 Shuey Drive
Moraga, CA 94556

Reference: State of Louisiana, City of New Orleans, Hurricane Katrina's Aftermath, *Study of Levee Failures, United States Army Corps of Engineers' (USACOE) Earthwork Quality Verification Training Course 17-21 December 1990.*

Mr. Bea,

Attached for your review is an excerpt from the USACOE Earthwork Quality Verification Training Course mentioned in the reference paragraph above. This course was given to construction inspectors, representatives, engineers in training, and professional engineers.

I am forwarding this information to you, in hopes of illustrating that the USACOE, New Orleans District should have been aware of, "seepage problems" during the course of designing, and constructing all levees and floodwalls authorized by the, "Lake Pontchartrain and Vicinity, Louisiana Hurricane Protection Project in the Flood Control Act of 1965."

During this course, I was an employed as a construction inspector within the USACOE, New Orleans District.

We remain,

Cordial

Melvin M. L. McElwee, Sr.
President

MMLMS/mmlms

XC: File

Attachment

McElwee Brothers, Inc.            Page 1 of 1            10/14/2005

EXHIBIT
28

McElwee00443

PX-0109-0443

INSTRUCTOR LISTING
Earthwork Quality Verification Training Course

Sponsored By

Geotechnical Laboratory
U.S. Army Engineer Waterways Experiment Station
3909 Halls Ferry Road, Vicksburg, MS  39180-6199


Dr. Paul F. Hadala          (Welcome and Introduction)
CEWES-GV-A
(601) 634-3475

William Milton Myers        (Course Coordinator)
CEWES-GS-S
(601) 634-2640

R. J. "Bob" Larson          (Origin of Soils)
CEWES-GG-YG
(601) 634-3201

Earl V. Edris               (Compaction; Slope Stability)
CEWES-GS-S
(601) 634-3378

Hugh M. "Buck" Taylor       (Fundamental Definitions, Field Tests)
CEWES-GS-S
(601) 634-3454

Jessie C. Oldham            (Soil Classification, Soils Laboratory)
CEWES-GS-GD
(601) 634-2122

P. J. Griffing              (Soils Laboratory)
CEWES-GS-GD
(601) 634-2607

Larry D. Johnson            (Foundations for Structures)
CEWES-GS-S
(601) 634-3840

S. Paul Miller              (Seepage, Filters, Slope Protection)
CEWES-GG-YH
(601) 634-3247

R. J. "Bob" Crisp           (Placement and Compaction of Earth Fills;
Consulting Civil Engr        Preparation of Rock Foundations)
422 Atwood Drive, NW
Marietta, GA  30064
(404) 428-4607


**McElwee00444**

Earthwork I-QV
17-21 Dec 90
Vicksburg, MS

Allen, Richard
US Army Engr Dist., New Orleans
Engr. Divn., Levee Section
P. O. Box 60267
New Orleans, LA  70160-0267

Allen, Thomas C.
USAED, Galveston Dist.
Attn: CESWG-RM-TE
P. O. Box 1229
Galveston, TX  77553-1229

Bailey, Hiram T.
US Army Engr Dist., Vicksburg
Monroe Navigation Field Office
3505 South Grand
Monroe, LA  71202

Billingham, Anthony
ROICC, North Island/Coronado
P. O. Box 75
San Diego, CA  92135-5237

Bragg, John M.
USAED, Galveston Dist.
1100 Freeway South, Suite 112
League City, TX

Constantine, Donald A.
ATTN:  CELMN-OD-OM
USAED, New Orleans District
P. O. Box 60267
New Orleans, LA  70160-0267

Cummings, Michael R.
ATTN:  CENCR-ED-C
USAED, Rock Island Dist.
P. O. Box 2004
Rock Island, IL  61204-2004

Damron, Michael E.
USAED, Memphis Dist., Wynne Area
P. O. Box 729
Wynne, AR  72396

Daughtry, Frank L.
USAED, Rock Island Dist.
CENCR-CD-Q, L&D 20
Canton, MO  63435

Dickson, Larry D.
USAED, Vicksburg Dist.
ATTN:  CELMK-SAO-N
P. O. Box 2131
Natchitoches, LA  71457

Finneran, Robert A.
USAED, Kansas City Dist.
ED, Local Protection Sec.
601 East 12th Street
Kansas City, MO 64106-2896

Gallup, Mickey A.
USAED, Vidalia Area
P. O. Box 910
Vidalia, LA  71373-0910

Hale, James R.
USAED, RRW Lock & Dam #3
Rt. 1 Box 157
Lena, LA  71447

Hoang, Huu M.
USAED, S. Pac Divn.
CESPD-ED-G Lab
P. O. Box 37
Sausalito, CA  94966

Hunter, Leonard
USAED, New Orleans Dist.
P. O. Box 60267
New Orleans, LA 70160-0267

Johnson, Carol A.
USAED, New Orleans, ED-FT
P. O. Box 60267
New Orleans, LA 70160-0267

Lear, Ronald
USAED, Sacramento Dist.
Fresno Resident Office
Fresno, CA

Macias, Ramon, III
USAED, Albequerque Dist.
El Paso Resident Office
P. O. Box 6096
Ft. Bliss, TX  77906-0096

McElwee00445

Earthwork I-QV
17-21 Dec 90
Vicksburg, MS

Madsen, Steven D.
W.Naval Fac Engr Command
ROICC Trident II Upgrade
Anderson Hill Road
Silverdale, WA  98383

McElwee, Melvin M., Sr.
USAED, New Orleans Dist., CD-NO-Q
P. O. Box 60267
New Orleans, LA  70160-0267

Nesaith, Sandy D.
USAED, Winfield Res Ofc, ORH-CD
Rt. 1 Box 529
Red House, WV  25161-9773

Newton, John C.
USACE, Waterways Exp. Sta.
Attn: ME-E, E&C Serv Div.
3909 Halls Ferry Road
Vicksburg, MS  39180-6199

Nicodemus, Mary B.
USAED, Ohio River Divn.
ATTN: CEORD-PE-GL, Divn Lab.,
5851 Mariemont Avenue
Cincinnati, OH  45227-4217

O'Connell, John
USAED, Detroit Area Office
P. O. Box 1027
Detroit, MI  48231

Paschke, Mark H.
USAED, St. Paul District
General Delivery
Chaska, MN  55318

Pierre, Lois M.
USAED, New Orleans District
P. O. Box 60267
New Orleans, LA  70160-0267

Purifoy, Claudinett
USACE, Redstone Arsenal
P. O. Box 8162
Redstone Arsenal, AL  35808-0162

Schulz, James W.
USACE, Grand Haven Area Office
P. O. Box 629
Grand Haven, MI  49417

Stalnaker, Larry H.
USAED, Gallipolis Res Ofc
Construction Divn.
P. O. Box 9
Applegrove, WV  25502-0009

Syed, Ishaq
USAED, Galveston Dist.
Attn: CESWG-ED-FS
P. O. Box 1229
Galveston, TX  77553-1229

Terrell, Billy D.
USAED, Kansas City Dist.
Whiteman AirForce Base,MO

Thomas, Richard R.
USACE, Charleston Dist.
Attn: Constr-Opers.
P. O. Box 919
Charleston, SC  29401

Tobine, Robert W.
Dept. of Navy, ROICC
North Island/Corando
P. O. Box 75
San Diego, CA 92135-5237

Weidenbacher, Brian G.
USACE, New Orleans Dist.
P. O. Box 60267
New Orleans,LA 70160-0267

Wielputz, Michael P.
USACE, SAD Laboratory
611 S. Cobb Drive
Marietta, GA 30060-3112

Wilson, Jerome
Cal Harbor Area Office
NCC
111 N. Canal
Chicago, IL

**McElwee00446**

**PX-0109-0446**

## Part 1.  Seepage and Groundwater Control

### Seepage

Introduction

Perhaps no single feature of an earthwork project deserves as much attention during construction as the drainage system.  However, since the drainage system generally controls a hidden force--the force of water seepage through soil--its importance is sometimes not fully appreciated. These hidden forces can tear down a mountainside, as occurred in 1963 at the Vaiont Reservoir, Italy, killing 3000 persons; destroy earthen structures such as the Baldwin Hills Reservoir in Los Angeles, California, where five lives were lost in 1963 and $15,000,000 property damage resulted; or produce runway failures as occurred at the Cleveland, Ohio, Airport in 1967, where 3000 ft of concrete runway pavement failed and broke up into basketball-size pieces due to inadequate subsurface drainage.  Many more examples could be cited, but the examples mentioned should clearly show the devastating power of uncontrolled seepage of water.

Structures are designed on the assumption that the drainage system will function properly.  If a drainage system is improperly constructed, time will not remedy the problem as it may do in other areas of earthwork construction.  The strength of a soil should improve with time, pore pressure will dissipate, rates of settlement decrease, etc.  But time will only aggravate a mistake or an omission in a drainage system.  If the system is not constructed correctly, trouble may not appear for years, and then it is very difficult or even too late to correct it as in the examples cited in the previous paragraph.  The importance of good inspection cannot be overstressed.  It is up to the inspector alone to see that the drainage system is installed in accordance with the project plans.

Basic considerations

In order to demonstrate what seepage forces consist of, let us look back on the quicksand tank we saw in the laboratory.  If we saturate the

PX-0109-0447

VI.1.2

sand and allow water to flow through it, we have a condition of seepage. In the case of the sand tank, the seepage was upward, seepage forces causing the sand to become loosened. (If the seepage forces were downward, the sand would densify.) When these seepage forces become as great or greater than the weight of the sand, a quick condition, or quicksand, results.

The basic rule governing flow or seepage through soil is Darcy's Law. Most all engineering analyses of seepage are made using this rule. In equation form, the rule is:

$$q = k \, i \, A$$

This equation will be discussed in some detail to give a better understanding of what is meant by such terms as permeability and hydraulic gradient which will be used throughout this section.

Please refer to plate 1. The terms in Darcy's Law are:

a. q – rate of flow. In the equation the rate of flow, q , of water through the sample is determined. The term q is in units such as cubic feet per second, cubic centimeters per second, cubic feet per year, etc.

b. k – coefficient of permeability. The coefficient of permeability, or permeability, is a measure of the soils resistance to flow through it. The higher the permeability, the easier water will flow through the material. Gravels have high permeabilities, while clays have low. In fact, the permeability of a gravel can be 10 billion times greater than the permeability of a clay. Permeability, k , is expressed in velocity units such as centimeters per second, feet per year, etc.

c. i – hydraulic gradient. The hydraulic gradient is a measure of the seepage force or the force causing flow through the sample. In plate 1, the elevation of the column of water on the left ($h_1$) is greater than that of the column on the right ($h_2$). The heights ($h_1$ and $h_2$) of these columns are referred to as heads. The difference in the elevations of the two columns $\Delta h$ is called the driving head or head differential. (The symbol $\Delta$ just means "change in," so

McElwee00448

PX-0109-0448

$\Delta h$ means "change in h.") The length of the sample in plate 1 is $L$. Therefore, there was a change in head equal to $\Delta h$ through the sample length $L$. The ratio $\Delta h/L$ is the hydraulic gradient, $i$, and is simply the change in head through a unit length of sample. Since both $\Delta h$ and $L$ are in the same units, $i$ is dimensionless.

     d.  <u>A - area.</u>  The value $A$ is simply the cross sectional area of the sample (plate 1).

Now, thinking back to the sand tank; in order for the sand to become quick, it has been found that the hydraulic gradient must be equal to or greater than about 0.80 to 0.85. The hydraulic gradient at which the material becomes quick is the critical hydraulic gradient. Remember that hydraulic gradient is equal to the driving head $\Delta h$ divided by the length of sample $L$. In the case of the sand tank, $L$ would be equal to the height of sand within it. To prevent the quick condition from occurring, the hydraulic gradient must be reduced. For example, if the driving head, $\Delta h$, was 2 ft and the height of sand in the box, $L$, was 2 ft, the resulting hydraulic gradient would be 2/2 or 1.0. Since this is greater than 0.80 or 0.85, a quick condition would exist. If the height of the sand in the box was doubled to 4 ft and the driving head remained the same at 2 ft, the resulting hydraulic gradient now equals 2/4 or 0.5, which is below the critical gradient and is a safe condition although water is exiting from the surface.

Suppose that rather than increasing the thickness of sand, an impervious clay blanket (topstratum) had been placed over the sand. In this case, more weight is provided to the sand, and to a large extent the seepage is stopped. However, if the pressure beneath the clay exceeds the submerged weight of the clay, an uplift failure will occur. This is commonly noted as an uplift or <u>heave</u> failure. What usually occurs in nature is that the topstratum may be interspersed with root holes, shrinkage cracks, or other discontinuities which permit some of the sand to escape through channels in the topstratum. When seepage tends to localize instead of causing the entire topstratum to heave or become quick, active erosion of subsurface material occurs and

McElwee00449

PX-0109-0449

VI.1.4

concentration of seepage occurs in localized channels.  This is what causes sand boils.

In many cases the presence of the water alone causes the problem, and this water must be controlled or removed even if the seepage forces are small or nonexistent.  For example, if water becomes entrapped behind a retaining wall, additional loads result and the wall would have to perform as a dam as well as its intended purpose.  The strength of the soil may be reduced by the presence of excess water.  Some soils swell when they become wet, while in others the growth of ice lenses becomes a problem.  Erosion from surface runoff can be a significant problem if left unchecked.  It is obvious that problems caused by water are many and varied.

Seepage control
related to embankments

The construction of embankments of one type or the other constitutes a large part of CE work.  The CE has been responsible for constructing numerous earth dams and extensive levee systems, both built for the specific purpose of controlling water.  Because of the nature of these works, seepage problems are ever present.

Plate 2a shows an embankment, probably a dam, built on an impervious subgrade material.  In this case water is seeping through the structure. The horizontal lines in the figures on plate 2 are "flow lines."  A flow line is simply the path a particle of water entering the upstream face of the embankment will take through the embankment.  Since there is flow, there is also a corresponding pressure or driving head causing the flow. Now, note on plate 2a there is flow from the critical toe section.  This flow and pressure can endanger the embankment from piping and/or reducing the strength of the soil in the section.  In plate 2b a drainage blanket has been placed in the embankment.  First, the water present at the toe has been removed, and second, the seepage force of the water is removed in a controlled manner so that piping is prevented.  Plates 2a and 2b are very simple model cases.  The soil would actually be much more pervious in a horizontal direction than in a vertical direction due to the embankment being built in compacted layers.  Consequently, the

McElwee00450

PX-0109-0450

drainage blanket should extend up into the embankment. The material
used to construct the drainage blanket will be discussed later.

Dams are rarely if ever constructed on completely impervious
material, and consequently there is seepage beneath the structure as
well as through it. The seepage beneath the structure is commonly
referred to as underseepage. Since water seldom stands behind a levee,
a sufficient length of time for seepage to occur through the embankment,
underseepage is the primary problem associated with levees.

Plate 3a shows how underseepage can occur beneath a levee system.
At the normal river stage the water table is below the relatively im-
pervious topstratum and no danger exists. During flood stage, however,
seepage entering the substratum through the bed of the river, riverside
borrow pits, or any other opening in the topstratum creates an artesian
head in the substratum under and landward of the levee. The term
artesian simply means that the water in the sand is under pressure. For
example, if a pipe or piezometer were placed through the topstratum
into the substratum shown in plate 3a, the water level in the pipe would
rise to the elevation of the dashed line (piezometric head). The height
of this column of water above the substratum is the artesian head.

It is the artesian head that would create uplift failure. If the
weight of the topstratum is not as great as this uplift pressure, heave
will result in the same manner as the clay would have heaved in the sand
tank. Sand boils such as those shown in plate 3b can also result.
These sand boils can lead to cavities beneath the structure that can
cause serious damage or failure.

The driving head $\Delta h$ causing seepage in the example shown on
plate 3a is the height of the column of water above the land surface.
The hydraulic gradient is computed simply by dividing the driving head
by the substratum thickness. We now have the same conditions that were
present in the sand tank, i.e., an upward flow of water through a given
thickness of soil.

The amount of underseepage and uplift pressure that may develop

McElwee00451

PX-0109-0451

VI. 1. 6

landward of the levee or dam is known to be related to the river and
reservoir stages, location of seepage entrance, extent of thickness and
perviousness of the landside topstratum, underground storage, and geolo-
gical features. It would be extremely difficult to isolate all of these
factors to make an analysis of an underseepage problem, although consi-
derable experience has been accumulated. In most instances it usually
is preferable to install a system of piezometers to determine the ef-
fects of these various factors which affect underseepage and then extra-
polate the results to a design stage. Piezometers have been installed
along numerous reaches of the Mississippi River and in other areas for
use in estimating the amount of seepage and pressures that will occur
at flood stages. Piezometers are also installed during the construction
of dams to determine how the seepage forces are acting. Many times
changes are made in the design of the dam or construction methods are
modified based on these piezometer readings. Therefore it is very
important that the piezometers be  installed properly and then read
accurately in the field. Piezometers have also been used to determine
when various seepage conditions occur.

| Seepage Condition | i |
|---|---|
| Light to none | 0 to 0.5 |
| Medium | 0.2 to 0.6 |
| Heavy | 0.4 to 0.7 |
| Sand boils | 0.5 to 0.8 |

Now that we know what the hydraulic gradient through and the uplift
pressure beneath the topstratum are, what can be done to control the
situation? Two things can be done: (a) reduce the driving head or up-
lift pressure and/or (b) increase the thickness of the soil. Some
control methods would be cutoffs, impervious riverside or upstream
blankets, relief wells, landside or downstream berms, drainage blankets,
drainage trenches, and sublevees. The choice of a control measure depends
on a number of factors, including the character of the foundation, economics,
permanency, availability of rights of way, maintenance, and disposal.

Cutoffs. The most effective means of underseepage control is the
use of cutoffs (see plate 4a). While widely used in connection with

dams, these seldom are feasible for use on levees. Impervious cutoffs should be 100 percent penetrating. Model tests and other data indicate that cutoffs with less than 98 percent penetration have relatively little effect on reducing underseepage or landside pressures. Therefore it is important that construction adhere to the plans, particularly where elevations are concerned. The cutoff, of course, eliminates the driving head or uplift pressures.

Riverside or upstream blankets. An impervious riverside or upstream blanket can be used to reduce the amount of seepage and pressures landside or downstream. Blankets are particularly effective where little or no topstratum exists upstream, or where the natural topstratum has been removed in borrow operations. The primary purpose is to increase the distance to the source of seepage entry, thereby providing more resistance to the flow. Blankets are placed by hauling in and compacting relatively impervious soils. It is up to the inspector to see that these blankets are constructed properly so the impervious material will be continuous with no weak or thin areas where seepage can enter the substratum. Weak areas can occur where stumps, limbs, etc. are allowed in the blanket.

Relief wells. Relief wells are used primarily to reduce artesian pressures which might otherwise cause sand boils and piping (see plate 4b). Wells also intercept and provide controlled outlets for seepage. The chief advantage of wells is that they can intercept flow in stratified soils. Their disadvantages are that they require periodic inspection and maintenance, and they must be protected from back-flooding. The construction and details of relief wells will be handled later.

Berms. Berms control seepage by increasing the weight of the topstratum so that the weight of the berm plus topstratum is sufficient to resist uplift pressures (see plate 5a). They are also used to increase the thickness of the soil, thereby reducing the hydraulic gradient and, in turn, seepage, as was done with the sand tank. A berm properly designed to prevent heave should extend landward or downstream far enough so that excess heads at the toe area are no longer critical. Berms along

McElwee00453

VI.1.8

the Lower Mississippi River are usually 3 to 10 ft thick at the levee toe and extend 100 to 400 ft landward. Berms are advantageous where the landside topstratum is relatively thin or nonexistent. Berms have some slope landward for drainage. Berms control but do not necessarily eliminate seepage. Therefore seepage from the berm is generally not a cause for alarm.

Drainage blankets. Drainage blankets as shown in fig. 2b are satisfactory for controlling underseepage from pervious, fairly homogeneous foundations extending to the surface. Blankets with perforated collector pipes are particularly effective for structures as will be seen later.

Drainage trenches. Drainage trenches to reduce underseepage are effective only when they can penetrate a major portion of the aquifer, and therefore they are not used extensively.

Sublevees. A landside sublevee can be used to control seepage by storing water over an area to provide a counterweight against excess heads beneath the topstratum. This is similar to raising the water level of the righthand column in plate 1, thereby reducing the driving head. Sublevees are used where the topstratum is relatively thin, and in low areas where seepage normally develops. A sublevee was used to control the sand boils shown in plate 3b. Water levels must be accurately controlled. Seepage boils cannot always be ascertained, and if a sublevee fails a critical condition could develop.

Seepage control related to structures
such as retaining walls, slabs, roadways, etc.

As we have said previously a retaining wall is not designed to act as a dam, and consequently water behind the wall must be removed. Although a retaining wall is discussed in the next paragraph, the comments also apply to other subsurface structures such as basement walls.

Plate 5b shows a retaining wall backfilled with a relatively pervious material. The wall was designed to retain this material, and the additional weight of water behind it could cause failure. To prevent this dangerous buildup of water behind the wall, a sand drain was provided. Water or seepage from the pervious backfill material is intercepted by the

filter sand and flows safely away through the collector pipe. Note that a filter sand and gravel was used. The purpose and design of these filters will be discussed later. In many cases, rather than using a collector pipe, weepholes are provided to allow the water to flow out at the base of the retaining wall.

We have discussed uplift as related to heaving of a topstratum of rather impervious soil. The same thing can happen to a foundation slab placed beneath the water table. If the water is intercepted and carried away, hydrostatic or uplift pressure will not develop. Plate 6a shows how this situation can be handled. Here water or seepage from the foundation material is intercepted by the filter sand and gravel and allowed to flow harmlessly away through the collector. Again note that both a sand and gravel are used.

Free water must be removed from base, subbase, and sometimes subgrade materials beneath paved surfaces such as roadways, airfields, parking areas, etc. This is commonly accomplished by what are known as subdrains. These are generally nothing more than trenches filled with a carefully selected pervious gravel or sand surrounding a collector pipe. When the collector pipe is not used, this arrangement is called a French Drain. Plate 6b shows a subdrain used adjacent to a paved surface. In addition to being used to drain paved areas, subdrains have also been used to lower the water table in boggy areas to allow equipment to operate or to lower the water table in agricultural fields.

Groundwater control
during construction

Most relatively deep excavations into soils below the water table require that the water table be lowered below the slopes and bottom of the excavation to prevent raveling and sloughing of the slopes and to ensure dry firm working conditions for construction operations. In some cases the excavation may be underlain by impervious strata under artesian pressure which, if not relieved, can rupture the bottom of the excavation with development of sand boils. Lowering the water table in an excavation may also increase the stability of the excavation slopes, permitting

McElwee00455

PX-0109-0455

VI.1.10

steeper slopes than otherwise possible, and also can consolidate the
soil to such extent that it will be more dense and firmer than prior
to dewatering. Unstable saturated soils can cause equipment to bog down
and valuable time to be wasted. Some dewatering methods are discussed
in the following paragraphs. Sometimes two or more of the methods are
used in conjunction with each other to control the groundwater.

    <u>Ditches and sumps.</u> For small excavations in some types of well-graded
or cemented soils, it is sometimes possible to let seepage from the slopes
flow into collector ditches and sumps from which it can be pumped out of
the excavation. For pumping, sump pumps with strainers are used. Ditches
should be located as close as possible to the toe of the slope (see
plate 7a). The ditch should not be indiscriminately placed, however,
since the removal of material from the toe area can affect the stability
of the slope. Ditches and sumps have several disadvantages. It may be
impossible to prevent loss of material when pumping; it may tend to cause
softening and reveling on the lower part of the slopes and, if the soil
is nonuniform or contains lenses of fine sand or silt, springs may develop
which can cause underground erosion. The inspector should be on the look-
out for such trouble signs and report them immediately if they occur.

    <u>Wellpoints.</u> Wellpoints are small well screens about 2 to 3 in. in
diameter and 2-1/2 to 3-1/2 ft long. Usually they are made of brass
screens with openings small enough to prevent entrance of fines. Well-
points are usually spaced on 3- to 12-ft centers at the periphery of
the excavation (see plate 7b). The wellpoints are attached to a common
header which, in turn, is connected to a wellpoint pump (a combined vacuum
and centrifugal pump). It is usually necessary to place wellpoints in
sanded holes to permit drainage of stratified soils. The use of well-
points is the most common method of dewatering or lowering the water
table in the United States. Under many conditions it is the most
economical and efficient method. The chief advantages are that a large
number of wellpoints can be operated from a single pump, and they are
easy to install using simple equipment. On the average, about 50 well-
points can be installed in a single day, and consequently they are very

McElwee00456

PX-0109-0456

V 1 .1.11

useful for emergency work. Wellpoints commonly are limited to suction lifts in the order of 15 to 18 ft, and when groundwater lowering must exceed this value, the wellpoints are placed in stages called a multi-stage system (see plate 8a).

It is important to see that all joints, connections, etc., are airtight since these leaks can reduce the effectiveness of the entire wellpoint system. Sometimes air leaking into a system can be detected by audible throbbing or bumping in some of the joints. Also, in warm weather wellpoint systems that are functioning properly with little or no air leaks feel cool and will sweat in a humid atmosphere. Likewise, in cold weather properly functioning wellpoints will feel warmer than the atmosphere temperature. The wellpoint system must be protected from damage by construction equipment. Traffic should be allowed to cross the system only when the pipes have been bridged.

A recent innovation consists of using eductors rather than suction wellpoints (see plate 8b). Eductor dewatering systems consist of a pumping unit connected to two parallel header pipes; one header feeds water at high pressure into a series of small vertical down pipes leading to the eductor wellpoints. The water flowing through a nozzle in the eductor creates a vacuum in the eductor, causing groundwater to flow into the wellpoint. This is the same principle used in the old pump-type insect sprayers. The groundwater joins the pressure water and returns through a second riser pipe to the other main header. The second header pipe collects the water and returns it to a discharge station. The eductor system has several advantages over conventional wellpoints. First, it can dewater to depths as great as 100 ft in a single stage. Second, the air in the pipe does not affect the operation of the eductors; this is often a serious problem with conventional wellpoints. Eductors also require very little adjustment, and they operate independently of each other. The principal disadvantage of the eductor system is that it requires a lot of power to operate the system, thus it is very costly. Another disadvantage is that with the presence of the high-pressure water system, considerable trouble could arise if the pressure header pipe should break.

McElwee00457

VI. 1. 12

Fine-grained silts with $k = 0.1$ to $10 \times 10^{-4}$ cm/sec, cannot be drained by gravity methods because the water is held in the soil by capillary forces. To dewater these silts, ordinary wellpoints in sanded holes with the top 5 ft or so of the hole sealed with clay are used. Vacuum in the sand column increases the pressure driving out the water. A small amount of water may be very effective in providing drainage. It is most important that the inspector on the job see that the holes are properly sealed.

Deep wells. Large-diameter deep wells are also suitable for lowering the groundwater table where the soils grade more pervious with depth. Deep wells operate on the same principles as do wellpoints; however, individual deep wells handle much larger quantities of water than a single wellpoint and can be installed outside of the zone of construction operations so that drainage can be effected to the full depth required ahead of excavation. Deep wells installed around the top of an excavation can intercept seepage before it affects the stability of the slopes. Deep wells may be spaced from 20 to 200 ft apart, depending on the amount the water table must be lowered, the perviousness of the soil and other factors. The wells usually have a diameter of 6 to 12 in. and consist of a screen 20 to 50 ft long or even longer. The screen may be a commercial type water-well screen, or perforated metal or wooden screen surrounded with a properly graded sand-gravel filter.

Electro-osmosis. Electro-osmosis is an electrical method for increasing the hydraulic gradient and causing consolidation of fine-grained soils. It is applicable for soils having extremely low permeabilities ($1 \times 10^{-4}$ to $0.01 \times 10^{-4}$ cm/sec). This method is seldom applicable because of the high cost of its operation. If two electrodes (one being a wellpoint) are driven in a saturated soil and direct current is passed from one to the other the water will migrate to the wellpoint.

Cutoffs. Sheet pile cutoffs sometimes are used with special compounds in the interlocks to prevent leakage. These compounds must be properly installed for the cutoff to be effective. Trenches filled with drilling mud may be used as cutoffs. Freezing of the

McElwee00458

PX-0109-0458

V1. 1



$\dfrac{\Delta h}{L} = $ hydraulic gradient

q = kiA WHERE:

q = RATE OF FLOW
k = COEFFICIENT OF PERMEABILITY
i = Δh/L = HYDRAULIC GRADIENT
A = CROSS SECTIONAL AREA OF SOIL SAMPLE

SEEPAGE MODEL

PLATE 1

McElwee00459

PX-0109-0459

VI. 1



## FLOW NET FOR
## UNIFORM EMBANKMENT SECTION

### a



## FLOW NET FOR
## UNIFORM EMBANKMENT SECTION
## WITH DRAINAGE BLANKET

### b

PLATE 2

McElwee00460

PX-0109-0460

VI. 1



CROSS SECTION OF LEVEE AND ALLUVIAL VALLEY
a.



SAND BOILS AT FRIARS POINT, MISS.
b.

PLATE 3

McElwee00461

PX-0109-0461