

## POSITIVE SEEPAGE CUTOFF

### a



## PRESSURE RELIEF WELLS

### b

PLATE 4

PX-0109-0462

VI. 1



BERM SHOULD BE MORE PERVIOUS THAN
TOP STRATUM AND SHOULD BE FREE
DRAINING.

## BERM TO REINFORCE
## TOP STRATUM

a



EXAMPLE OF WALL DRAINAGE

b

PLATE 5

McElwee00463

PX-0109-0463

VI. 1



## TYPICAL EXAMPLE OF
## BASE SLAB DRAINAGE

a.



## TYPICAL SUBDRAIN SYSTEM

b.

PLATE 6

McElwee00464

PX-0109-0464

V1. 1



DITCH NOT CLOSE TO SLOPE — INCORRECT



DITCH CLOSE TO SLOPE — CORRECT

## DITCH AT TOE OF SLOPE

a



## DEWATERING SYSTEM — SINGLE STAGE

b

PLATE 7

McElwee00465

PX-0109-0465

## Melvin M. L. McElwee, Sr.

**From:** Melvin M. L. McElwee, Sr. [mcelweebro@i-55.com]

**Sent:** Monday, January 09, 2006 7:43 AM

**To:** 'Robert Bea'

**Subject:** RE: Study of levee failures in New Orleans

Dr. Bea,

I will need a 24 hour notice. I am in Shreveport, LA performing pile driving along the Red River during this week. This is approximately 5 hours away from our home office. I will be more than happy to met with you all.

-----Original Message-----
**From:** Robert Bea [mailto:bea@ce.berkeley.edu]
**Sent:** Wednesday, January 04, 2006 11:33 AM
**To:** Melvin M. L. McElwee, Sr.
**Subject:** Re: Study of levee failures in New Orleans

Hi Melvin,

several members of our NSF sponsored team are going to be in New Orleans next week.

would it be possible to meet with you sometime during the week?

purpose - gather more background on the construction aspects of the flood defense system for the greater New Orleans area.

bob
--
Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503



EXHIBIT
2.9

McElwee00466

PX-0109-0466

## Melvin M. L. McElwee, Sr.

**From:** Robert Bea [bea@ce.berkeley.edu]
**Sent:** Saturday, January 14, 2006 5:06 PM
**To:** Melvin M. L. McElwee, Sr.
**Subject:** Re: Study of levee failures in New Orleans

Melvin,

i want to thank you and your family for all of your kindness and our meeting. attached are two documents that can help your son take the next steps. i will send the electronic versions of my books later.

bob

--

Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503



EXHIBIT

Exhibit "B"
page 1 of 1

McElwee00467

**PX-0109-0467**

RE: you are invited

**Melvin M. L. McElwee, Sr.**

From:     Robert Bea [bea@ce.berkeley.edu]
Sent:     Thursday, June 22, 2006 12:24 PM
To:       Melvin M. L. McElwee, Sr.
Subject:  RE: you are invited

Hi Melvin,

you can access our report at:

www.ce.berkeley.edu/~new_orleans

(no underline under 'orleans')

more developing on going forward.

thanks for your help.

bob

Thanks for the invitation. Sorry I was out of town during the week of May 21, 2006.

Is it possible to that I may receive a copy of the report, at our mailing address which is P. O. Box 1410, Independence, LA 70443.

I still haven't received any of your attachments on your last email correspondence.

Again, thanks for the invitation, and if there is anything else I can help with, let me now.

-----Original Message-----
From: Robert Bea [mailto:bea@ce.berkeley.edu]
Sent: Wednesday, May 17, 2006 10:42 AM
To: Melvin M. L. McElwee, Sr.
Subject: you are invited

Announcement
You are invited to attend

5

MCELWEE BROTHERS INC

**McElwee00468**



EXHIBIT
31

Exhibi
page
7 13:19

The National Science Foundation
Independent Levee Investigative Team
(Dr. Bob Bea)
(Dr. Ray Seed)
And many Other Volunteers
Will present their report on Katrina
Levee Failures

May 22nd, 2006

9:00 A.M. to 12:00 Noon

Sheraton New Orleans Hotel
500 Canal Street
New Orleans, Louisiana 70130

Grand Ballroom
5th Floor


Please feel free to invite anyone who is interested in attending.


i think we got it put together correctly. thanks for your help. but, it is not over - only started.


bob

--

Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503

--

Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California

$Exhibit$ "C"

page 2 of 2
12/19/2007 13:19

Re: "When the Levees Broke"                                                    Page 1 of 2

**Melvin M. L. McElwee, Sr.**

| | |
|---|---|
| **From:** | Robert Bea [bea@ce.berkeley.edu] |
| **Sent:** | Friday, August 25, 2006 12:01 PM |
| **To:** | Melvin M. L. McElwee, Sr. |

**Subject:** Re: "When the Levees Broke"

happy friday Melvin,

great to hear from you. give Sylvia and the rest of your family a hug for me.

i am happy that the HBO gig worked. i sure was impressed by the eloquence of the people of new orleans.

attached is an opinion editorial i am completing today for the NY Times. i am using every opportunity that i can to get the word to the public that new orleans needs help - for a long time - to be able to realize its potential.

now, responses to your email follow below.

Dr. Bea.

Thanks a million!!!!!!!!! You are a savior to those that pay attention to your study and wisdom. My family and I enjoyed, "meeting with you on Monday, and Tuesday night on HBO." My wife (Sylvia) says hello.

and hello with hugs to your family. it is people like you that make the place work!

To date I think you are the only man telling the truth about the current conditions of the levees as they relate to safety for the American Public.

i hope not. i think i am now getting some support from some of my engineering colleagues. but, there sure is silence from most of the Louisiana engineering and construction contingent. and none from the honest people inside the Corps.

My son is looking forward to taking you up on your invite to the University of California Berkley. He has transferred from Grambling State University to Louisiana Tech into the Civil Engineering program.

8/26/2006
PAGE  10/24

MCELWEE BROTHERS INC
McElwee00470

EXHIBIT
32

Exhibit "D"

great. he is welcome.   even though i know he does not need them, i have attached the 10 secrets of successful students that i hand out to our graduate students.  they might help.


> Take care of yourself and your family and may good continue to keep his presence around you in all of your works.

God is my pilot.

same for you.

bob


--

Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503

Exhibit "O"
page 2 of 2

McElwee00471

Katrina - One Year Later

One year ago, America suffered the worst natural and engineering disaster in its history when the failure of New Orleans' flood defenses allowed Hurricane Katrina's storm waters to wash away a great American city.

Now, in the thick of a new Hurricane season-as the city, state and nation rush to rebuild-I must say with great dismay that in all likelihood we would see significant flooding again if faced with another storm like Katrina.

This is a national disgrace.

I don't come to this conclusion lightly. Since last September, as a member of a national Independent Levee Investigation Team I have spent about 1000 hours studying the failures and repairs in the greater New Orleans area, and an additional 2000 hours working with citizens, colleagues, investigators, engineers, contractors, and federal, state, parish and city government officials. I have witnessed months of careful study, dozens of hearings, heroic efforts by a lot of hardworking and caring people, and watched more than $1 billion be invested in repairing and strengthening the city's flood protection system.

I must tell the people who are considering rebuilding their homes and lives in New Orleans at this time this simple fact: you face excessive risks of loosing everything again.

Why? Because today the city's flood protection system remains essentially what it was before Katrina. Extensive repairs have been made to damaged parts of the existing system to restore them to the pre-Katrina condition. However, the system remains a collection of incomplete, disjointed, defective and deficient pieces. Flood gates, when tested, do not function properly. Pumps, when tested, vibrate excessively and are undersized. Improved flood walls and levees interface ineffectively with older and weaker components. In low sections of the flood defenses, water can again enter the city.

In short, the system does not work the way it should. And it doesn't have to be this way.

In 1953, the Netherlands found themselves facing the same challenges that the New Orleans area faces today. At that time, they had a system that is very much like the present one that defends New Orleans. A storm had flooded the majority of their country and killed almost 2000 people. So the Netherlands embarked on a program to improve their flood protection system - work that continues to this day.

They made flood protection a national priority. They made appropriate investments to lower flooding risks. They learned to surrender some areas to water and to occupy and defend what should be developed when it should be developed. Yes, along the way they have made mistakes - but they've learned quickly from each one, and ultimately have forged a flood protection system that is today an engineering marvel.

Exhibit "O"
Attachment 1 of 4
12/19/2007 13:19

It's not too late to do what's necessary to protect New Orleans from hurricane flood waters.

But we cannot succeed unless the people of New Orleans, and ultimately the people of America, are truly committed to saving this great city. That means reminding people of its cultural, commercial and other contributions - this, after all, is the home of 25% of domestic oil and gas production, chemical refining, and our 2nd largest commercial port - and the home of unique parts of our national culture of history, music, and art.

To succeed we must:
- reach out to the people that have been harmed and work more diligently to help right the wrongs,
- develop an effective and efficient organizational - institutional structure uniting federal, state, and local interests with flood protection as a priority,
- provision this structure with sufficient financial and operational resources, and
- develop an integrated and sustainable flood defense system that will provide desirable and acceptable levels of flood protection.

If we have the will to provide adequate long-term hurricane protection, then we have the ways. It will cost a lot of money and take a long time. But, as Katrina has taught, we can pay a little now or a lot more later.


Dr. Robert Bea
Professor of Civil and Environmental Engineering
Member Independent Levee Investigation Team
University of California Berkeley
bea@ce.berkeley.edu

Exhibit " D "
Attachment 2 of 9

McElwee00473

## TEN SECRETS OF SUCCESSFUL STUDENTS

1. **SET PRIORITIES** - study is business.  business before pleasure.

2. **STUDY** - define schedule and place, concentrate, practice.

3. **GET ORGANIZED** - notebooks, notes, schedules, references, supplies, be neat and professional.

4. **READ** - be active, take notes, retain.

5. **SCHEDULE** - allot time for study, projects, research, recreation, rest.

6. **TAKE GOOD NOTES** - listen, write, organize, summarize, scan.

7. **SPEAK UP & GET HELP** - ask, find out why, question, understand, know.

8. **DO MORE THAN YOU ARE ASKED** - practice, work problems, consult other references, go the extra mile.

9. **ENJOY** - learning can be exciting and fun - find the fun - keep looking for the interest and joy, don't get discouraged.

10. **BASICS** - learn and practice the fundamentals, don't leave home without them

and Take Time To - -

- Work - it is the price of success

- Think - it is the source of power

- Play - it is the secret of life

- Read - it is the foundation of knowledge

- Help Friends - it is the source of happiness

- Dream - it can provide the path to the future

- Love - it is the sacrament of life

*Bob Bea*
*Department of Civil & Environmental Engineering*
Exhibit "D"
Attachment 3of 4

*University of California at Berkeley*
*August 2006*
*bea@ce.berkeley.edu*

McElwee00475

*Exhibit "O"*
*Attachment 4 of 4*

## Melvin M. L. McElwee, Sr.

| | |
|---|---|
| **From:** | Robert Bea [bea@ce.berkeley.edu] |
| **Sent:** | Sunday, October 15, 2006 5:54 PM |
| **To:** | jwtempleton@californiablackhistory.com |
| **Cc:** | Melvin M. L. McElwee, Sr. |
| **Subject:** | Re: How Technology Can Revive the Gulf Coast |

 

time_llne_Katrina.p what_do_we_do_n
df (119 KB)...    ow.pdf (90 KB)

happy sunday John,

thank you for your email below.

i have been delaying my response while attempting
to shuffle my schedule so i could help - and say
yes.

unfortunately, i have not been able to
re-schedule my obligations.  thus, i will not be
able to speak at the working lunch.

i do feel strongly about what i understand you
are doing - the two papers you attached helped a
lot.

i have attached some notes i wrote last October
and January about what happened and about going
forward - hopefully some more useful insights.

i am continuing to work with citizens in the
greater New Orleans area to try to learn how to
avoid some of the mistakes we have made in our
past.  One of my contacts has been Melvin McElwee
- McElwee Bros., Inc, Independence, LA (985)
878-0280.  Melvin and his family represent what i
wish could happen for all African-Americans - and
for that matter - for all Americans - to be good,
do good, get and give good.  if you can find the
time, i suggest you and Melvin make contact (i
have cc'd this email to Melvin - so the rest
should be history).

please feel free to call me at my home office -
number below - if you would like to talk.  i am
on sabbatical leave this semester - and i am
still embedded very heavily in what is going on
in and around New Orleans.

bob

>Dr. Bea,
>
>My company, eAccess Corp., has selected the 50 Most Important
>African-Americans in Technology for the past seven years and presents
>an annual symposium where these technology standouts discuss important
>issues.  I'd like to ask your availability on Saturday, Oct. 29 in San
>Francisco to speak to the group on the topic of the role that
>technology will play in the reconstruction and enhancement of the Gulf
>Coast in the wake of Hurricane Katrina. The symposium will last from 10
>a.m. to 4 p.m. at The Bayou at Mission Rock restaurant in San Francisco at 817

1



**EXHIBIT**
**33**

*Exhibit "F"*
page 1 of 2
12/19/2007 13:24

PX-0109-0476

>Terry A. Francois Blvd.   I thought you gave some of the clearest
>analysis of the issues involved not only in the report you chaired but
>also in the recent HBO documentary.   We would like you to speak during
>a working lunch at around noon.   We will also address the role of
>technology in closing the achievement gap and in fostering
>entrepreneurship.
>
>Please feel free to call me at 415-265-9455 to answer any questions you
>might have or reply to this e-mail address.  Let me also share with you
>two recent papers I've done on Gulf Coast related issues.
>
>Sincerely,
>
>John William Templeton
>
>Attachment converted: OES:suppressarticle_1_.doc (WDBN/«IC») (001CB5F6)
>Attachment converted: OES:ASALHtalk.doc (WDBN/«IC») (001CB5F7)


--
Professor Robert Bea (PhD, PE)
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503

2

Exhibit "F"
page 2 of 2

McElwee00477

PX-0109-0477

# UNIVERSITY OF CALIFORNIA, BERKELEY



BERKELEY · DAVIS · IRVINE · LOS ANGELES · RIVERSIDE · SAN DIEGO · SAN FRANCISCO    SANTA BARBARA · SANTA CRUZ

TELEPHONE: (510) 642-0967
TELEFAX: (510) 643-8919
E-MAIL: bea@ce.berkeley.edu

DEPARTMENT OF CIVIL & ENVIRONMENTAL ENGINEERING
215 MCLAUGHLIN HALL
BERKELEY, CALIFORNIA 94720-1712

## What do we do now? Bob Bea's answers to the questions about rebuilding the flood defense system for the greater New Orleans area

### Questions
- Do we build now or do we wait?
- How does one go about rebuilding?
- When do we begin?
- What standards should be used in rebuilding?
- How can we better use this Nation's economic resources?

### Background
Bob Bea began his career in 1954 working for the US Army Corps of Engineers in the South Florida Control District - Levee and Flood Control Division. Bob's dad was a career officer for the U.S. Army Corps of Engineers - he was raised 'Corps'. He then worked for Shell Oil Company and related companies from 1960 through 1976 and was located in New Orleans in 1965 when hurricane Betsy came over New Orleans. His family lost their home and all of their belongings due to flooding of the northeastern part of the city. After his Shell career, he helped start two engineering contracting firms - one part of which offered services in hurricane forecasting and design of flood protection systems for oil and gas refineries along the Gulf coast; this included storm surge and flooding work for FEMA. The second of the firms he help start was sold to Bechtel where he became a Vice President and senior international consultant; focusing on risk assessment and management and developing design and requalification criteria for a wide variety of types of engineered systems. In 1989, he joined the faculty at the University of California at Berkeley where he has been performing research on human and organizational factors in the quality and reliability of engineered systems; his primary expertise is focused in risk assessment and management associated with engineered systems.

### Rebuilding the New Orleans flood defense system represents major opportunities for the Nation to:
- Return a unique and important part of the history, culture, and productivity of the Nation to a condition that will promote its continued development, safety, and security.
- Learn how to better use the experience and technology that has been developed around the world during the past 50 years.
- Learn how to better allocate and use the resources of the United States including its financial, human, natural, material, and technology - science resources.

1

Exhibit " F"
Attachments 8
pages total
12/19/2007 13:24

McElwee00478

PX-0109-0478

- Learn how to better mitigate and manage potentially catastrophic events including those due to natural hazards (floods, hurricanes, earthquakes, fires, tornadoes) and civilization hazards (terrorism, health care, physical infrastructure systems).

This is an opportunity to make America proud of how it can rebuild in the wake of hurricanes Katrina and Rita. We do not want to throw $200+ billions into a bottomless pit of mud destroying a fragile piece of America and creating social 'cripples' in the process.

We have a primary model to learn from – the country of the Netherlands in the wake of the North Sea storm of the century that breached their coastal defense facilities and flooded the entire country (1953).
- Today the Dutch have a flood defense and management system that is a miracle of social and facilities engineering.
- Their unique history, culture, art, and important artifacts have been preserved and further developed to result in the country that we see today.
- Our challenge is to learn how to adapt this experience into the unique environment of the greater New Orleans and the areas surrounding the Mississippi River Delta.

Rebuilding the flood defense system for the greater New Orleans area should address major two phases
- Reestablishment of the city's defenses against flooding – short term (about 1 year)
- Improvement of the city's defenses against flooding – long term (about 10 to 20+ years)

Short-term: intermediate measures to reestablish the Category 3 hurricane flooding protection that existed prior to hurricane Katrina to restoration of the base of the social infrastructure including that of the public, industry, and government.
- This phase currently is underway – e.g. U.S. Army Corps of Engineers and FEMA activities
- Fix the levees
- Clear the drainage systems (canals)
- Repair the pump systems
- Dry out and de-toxify the area so that remediation – rebuilding activities can be started as soon as possible

During this phase we want to learn as much as possible from this catastrophe. At UC Berkeley, we have mounted three rapid response initiatives to develop the important lessons learned.
- Human and social dynamics – led by UCB Professor Karlene Roberts
- Flood protection infrastructure system – levees and canals – led by UCB Professor Ray Seed
- Coastal (industrial facilities, ports, harbors, Delta land bases) and offshore (oil and gas drilling and production, platforms and pipelines) infrastructure systems – led by Bob Bea and John Radke.

These initiatives have been encouraged by the National Science Foundation's Katina Rapid Response Program and are directed at
- Gathering and archiving data that can be degraded, lost, and destroyed during the short-term phase
- Analyzing the data to mine from it the important lessons learned

2

PX-0109-0479

- Define and prioritize short term (1-2 year) efforts that can be mobilized to help the long-term rebuilding efforts
- Work in collaboration with the academic, industrial, governmental, and professional societies and public groups represented in the immediate area and surrounding areas.

**At the end of this phase is when historically and generally we have stopped.**
- Hurricane Betsy in 1965 flooded large portions of the city. I lived in the city at that time and was flooded out. We lost our home and all of our belongings; bank account = zero time!
- Following this hurricane, the levees were re-established and in some cases extended using concrete 'I' walls. No substantial changes were made to the system of canals and pumping stations. It is obvious that this incremental approach was not effective when the Category 3 hurricane design conditions were exceeded.
- History of this area has adequately demonstrated that the historic incremental approach does not provide an acceptable level of safety to the people of New Orleans. In fact, major floods have been historically occurring every 30 to 50 years (since 1927) in this area. This is a 'predictable surprise' like the terrorist attacks on the World Trade Center, the NASA Columbia, and the Enron meltdown.
- **History has shown that we pay now or PAY MUCH MORE LATER.**

**Long-term: measures to provide an acceptable level of safety to the societal infrastructure systems in New Orleans.**
- The fundamental strategy is to use the proven approaches of Defenses in Depth – so that there is adequate robustness (damage and defect tolerance) incorporated into the facilities – combined with adequate factors of safety to protect the city of New Orleans.
- Increasing the protection level against flooding does not mean that the entire existing flood protection system needs to be replaced. Some parts can be utilized.
- It does mean re-thinking how we approach this challenge using traditional engineering approaches combined with innovative engineering and sustainable and natural processes.
- The Holland coastal defense facilities can not be directly extrapolated to this area because the differences in the natural, social infrastructure systems environments. Taller levees, more efficient drainage systems, and more robust pumping systems are only part of the story.
- A concert of approaches should be used that will match the natural and social infrastructure system environments including such measures as
  - Re-establishing the coastal barrier island that lie off the Mississippi Delta
  - Improving hurricane surge development into Lake Pontachatrain and Lake Bourne while maintaining the ability of the lakes to drain during heavy rain periods and very high river flood periods – the lakes to the north of the city were the primary source of water that flooded New Orleans.
  - Broadening the Mississippi river flood plain and associated wetlands to provide natural surge dissipation restoring and preserving the natural environment of the Delta.
  - Re-engineering the lake front surge barrier – levee system.
  - Re-engineering the canal drainage system. Canal Street in central New Orleans used to be a canal; now it is a primary and world recognized thoroughfare for the city, providing access to the central downtown commercial, recreational, and industrial facilities. It provides direct access to the historic French Quarter and Garden district. The access of the river to the canal was stopped with very successful river flooding defenses by the

3

McElwee00480

PX-0109-0480

U.S. Army Corps of Engineers. The canal drainage system provided the channels for entry of hurricane driven surge water from Lake Pontachatrain that breached the 'extended' levee system's concrete 'I' walls. The residential canals could be covered - underlain with large box culverts to facilitate drainage and control of flood waters - providing improved transportation and urban facilities.

o Re-engineering the flood water removal pump station system so that it is not vulnerable to severe periods of rain and the effects of hurricane surges; placing modern well defended pump stations at the lake front.

o Re-engineering the flood defense system for the Industrial Canal; given that it is warranted to maintain the commercial shipping enterprise of the Industrial Canal, this would mean increasing levee and barrier heights, installing flood gates at the lake, river, and inter-coastal canal openings.

o Re-engineering needs to be directed at developing and evaluating the permanent closure of the Industrial Canal (presently 2 to 3 ships per week), closure and filling of the MRGO (Mississippi River Gulf Outlet) that has induced highly saline water into the area destroying surrounding wetland vegetation and whose ship traffic and associated dredging has removed a significant amount of the wetlands, and the closure and filling of the Industrial Canal in the same manner as the drainage canals (providing covered storm water drainage and pump stations).

**The long-term restoration and rebuilding of New Orleans provides this country with a major opportunity to make America proud. We can**

- Do it 'right' this time
- Be more effective at using our scarce resources - natural and national
- Learn the lessons of history, taking full advantage of experience and modern technology
- Learn better how to deal with similar catastrophic risks such as those due to tsunami , pandemics, earthquakes and terrorism.

**What did we learn in New Orleans as a result of our study of the failures of the flood protection system during hurricanes Katrina and Rita?** We learned that these failures had two major components: 1) organizational and 2) technical. The technical component included failures of flood walls and levees before their design conditions were reached, breaching of levees and flood walls at interfaces that had not been properly engineered and maintained, and massive overtopping of some of the levees because they were not designed for hurricanes with wind, surge, and wave conditions as severe as those developed by hurricane Katrina (and these were not the maximum possible conditions). The system of canals and waterways and their associated antique pumping stations provided other sources for failures during Katrina. The organizational malfunctions frequently developed at interfaces between the multiple organizations that have responsibility for and interactions with the New Orleans flood defense system (e.g. low sections in the defense levees, flood gates not in place or closed). Organizational capabilities had been allowed or forced to degrade to the point where many required core capabilities could not be mobilized (qualified personnel not available). Resources had been reduced to the point where only minimal protection and maintenance could be provided. In the end, we got what we paid for; it was truly a 'predictable surprise'.

4

McElwee00481

PX-0109-0481

What could be done to help the organizational developments that are required to provide adequate safety for the rebuilding of the New Orleans flood defense system? Develop a Louisiana Flood Defense Authority - like the TVA that was so effective in developing the flood protection system for the Mississippi River. Re-organize, energize, and provision the US Army Corps of engineers so that they have the responsibility for the overall engineering and management, design, construction, operation, and maintenance of the flood defense system, working in concert with other Federal, State, parish, industrial, and public - private agencies. The processes of engineering design and maintenance need to be thoroughly re-engineered to provide up-to-date technology. A board of independent internationally recognized and respected experts needs to be developed to help the US Army Corps of Engineers make the best possible use of currently available technology from U.S. and international sources.

Today, experience and technology can provide effective WAYS to adequately protect the greater New Orleans area from future flooding. The major challenge is to properly mobilize the WILL of the American public and government to provide the long-term resources required for rebuilding. This is the UNITED states, and now is the time to prove it again.

Professor Bob Bea (PhD, PE)
Department of Civil & Environmental Engineering
University of California
October 2005

McElwee00482

PX-0109-0482

# UNIVERSITY OF CALIFORNIA, BERKELEY



BERKELEY   ·   DAVIS   ·   IRVINE   ·   LOS ANGELES   ·   MERCED   ·   RIVERSIDE   ·   SAN DIEGO   ·   SAN FRANCISCO                    SANTA BARBARA   ·   SANTA CRUZ

TELEPHONE: (510) 643-8678
TELEFAX: (510) 643-8919
E-MAIL: bea@ce.berkeley.edu
HTTP://www.ce.berkeley.edu/

CENTER FOR CATASTROPHIC RISK MANAGEMENT
DEPARTMENT OF CIVIL & ENVIRONMENTAL ENGINEERING
212 McLAUGHLIN HALL
BERKELEY, CALIFORNIA 94720-1710

## Time Line to Disaster -
### *Flooding of the Greater New Orleans Area by Hurricane Katrina*

## *Some Personal Reflections*

**January 2006**

### The Clock Has Been Ticking

Since September 8, 1965 the clock has been ticking; on this date hurricane Betsy overwhelmed the flood defenses for portions of the greater New Orleans area. The author's young family lost their home in Pines Village and all of their belongings as a result of this event. No insurance; bank account equals zero time. Start over and the rest is history.

Early on Monday morning, August 29 time ran out and the clock stopped. Here is our best fix on what happened that morning.

| Time | Event |
|------|-------|
| 5:00 am | Water flooding through IHNC railroad openings on east and west bank at Lake front and at I10. Waves and surge breaching MRGO levees. |
| 6:00 am | Eye of hurricane Katrina makes landfall in Plaquemines Parish. Flooding of East New Orleans from the surge in Lake Bourne - levees overtopped; water surges through breaches. |
| 6:30 am | IHNC levees - floodwalls overtopping. |
| 7:30 am | IHNC 9th Ward flood walls fail due to backside toe erosion. |
| 9:30 am | Lake front levees overtopping by surge in lake. Orleans canal flooding through low areas adjacent to flood walls. London avenue canal breach at Mirabeau develops with extensive flooding (no overtopping of the floodwalls). Water backing up in water drainage system with flooding. |
| 10:30 am | 17th Street canal levee - flood wall breaches with extensive flooding (no overtopping of the floodwalls). London avenue canal breaches at Robert E. Lee (no overtopping of the floodwalls). |
| 12:00 noon | Eye of Katrina reaches north shore of Lake. |

By lunch time, the catastrophic flooding of the greater New Orleans area was well underway.

### Looking Back

Why did this happen? If everything worked as it should, our work indicates that there would not have been a catastrophe. There would have been some flooding (wet carpets) and wind damage (missing shingles). But, the disastrous flooding would have been avoided; something of the order of 75% of the flood water came from breaches that should not have developed if everything had worked as we wanted it to work.

This was a predictable and preventable catastrophe. The surge hazards had been pointed out for years. The deficiencies in the fundamentals of the system had been pointed out for years. The early warnings of the potential weaknesses in the flood defense system had been knocking on the doors of our awareness for years. But, we did not listen nor did we take action. We forgot to listen or care enough.

The failure of the flood defense system of the greater New Orleans area had four primary ingredients (the failure 'gumbo'):

1) a severe (not extreme) hurricane that pushed wind, waves, and surge into the waterways surrounding and in (IHNC and drainage canals) New Orleans; mother nature was doing what mother nature has done forever.

1

**McElwee00483**

PX-0109-0483

2) a seriously flawed flood defense system that had defects embedded in it starting with development of the concept and criteria that defined the starting points for the system, then during the design of the system, then during its construction, then during its operation, and finally during its maintenance. Bad ingredients. Bad Recipe.

3) a seriously flawed organizational complex responsible for development of the flood defense system that included federal, state, parish, city, and industrial components; no one organization was charged with the integrity of the system from its inception until the time it failed; no one organization was responsible for the system with the charge of providing appropriate security. Bad cooks.

4) a seriously deficient allocation and appropriation of resources to accomplish what needed to be accomplished. We tried to do it 'on the cheap.' We did not have the right stuff in the right places in the right ways at the right times. We said 'throw me something mister', and we accepted what we got. Bad gumbo.

Some of the key elements we have found in the background of the failures include:
1. lethal arrogance
2. loss of core capabilities
3. unnecessary complexity
4. inappropriate technology
5. massive communication breakdowns
6. bureaucracy that replaced thoughtful action
7. lack of cooperation with nature
8. ignoring history
9. ignoring early warning signs
10. normalization of deviance
11. bickering in the sandbox
12. wrong priorities
13. following the 'wrong' directions
14. trying to 'make do'

During the many interviews of people that have been and are working on the flood defense system for the greater New Orleans area the most poignant statement I heard came from a thoughtful and very experienced employee of the U.S. Army Corps of Engineers: "Bob we have taken engineering out of the Corps of Engineers." It would seem to be the time to put engineering back in the Corps of Engineers.

One of the questions I have been continually asked is 'who is to blame'. This was not the result of the 'wrath of God.' In this case God had a lot of help from people. And, it developed over a very long period of time. Many share the responsibility and shame for what happened; and most of these people know it. So, there is no really satisfactory answer to this question. I think our primary motivation for looking back at what has happened should be to develop enough understanding so that when we look forward we can put measures in place to prevent the types of problems that developed in the past and prevented us from realizing adequate flood protection for this part of the world.

Those who lost so much have my complete compassion and sympathy. Until you have gone through something like this, you can only remotely sense or imagine the despair, loss, pain, frustration, and anger.

Those who gave and are giving so much to help those in need have my ultimate respect; I wish there were more of you. You are the true heroes of humanity. I hope you will know it.

Looking Forward

Here are some thoughts about going forward. No one should tell you what to do. This time, it is up to you. Take charge of your recovery and defense; you are responsible. If you do not know, find out. If you do not have what you need to recover, then get it through honest endeavor. Help is available, use it wisely and carefully.

Pull together, not apart. United you succeed, divided you fail. This is the time to make it better than it was.

Demand short and long-term flood defense measures that will use the best available technology to provide an adequate and acceptable level of protection and security. These measures should be based on provision of defenses in depth (robust damage and defect tolerant systems), highest possible quality (serviceability, safety, compatibility, durability), and in concert and cooperation with nature and the natural defenses that have been provided in this region (barrier beaches, wetlands). Use manmade elements to supplement the natural elements to build a flood defense system that really makes sense. Use the best available technology. There are some really good models (e.g. the Netherlands) that have many lessons to teach.

2

McElwee00484

PX-0109-0484

Do not forget the Mississippi River and subsidence. These must be integrated into the plans for a long-term flood defense system. These are real hazards.

Proceed with caution until you know that your demands have been satisfied. Beware of quick fixes. Beware of promises that are not backed up with commitment, resources, and performance.

There are two challenges: short-term defenses (so we are not unduly exposed until satisfactory defenses are in place), and long-term defenses. I think in terms of one or two years for the short-term defenses. I think in terms of 20 to 30 years for the long-term defenses.

Short term defense operations are underway at the present time. These are like battlefield triage; secure and protect the victim and do no harm. Watch out for the quick fix or getting in too much of a rush. Avoid 'ready, fire, aim'; current repair operations can have undesirable longer term effects. This phase should adequately provisioned with the right stuff - people, procedures, materials, objectives, and attitudes. Currently, there are many signs for concern about the adequacy of the short term defense operations. Hopefully these concerns will be recognized in time and adequate defenses provided.

Long term defense operations have also begun and there seems to be a reasonable consensus developing on how the physical aspects can be approached. These aspects include those defined recently by the Lake Pontchatrain Basin Foundation (the Multiple Lines of Defense Strategy to Sustain Louisiana's Coast by John Lopez) and by the New Orleans Coalition for Legal Aid & Disaster Relief (Hurricane Protection and the Coastal Zone). The U.S. Army Corps of Engineers also has started a study of how the long-term defense system can be developed; this work represents a continuation of the process that started in 1965. It seems like we can know the WAYS to provide a reasonable long-term flood defense system. Some really good and caring people are working on this part of the challenge. This time, we want to do it right and so that the generations that follow will be proud of what we did and how we did it.

What has not become apparent is how the organizational, political, legal, social, economic, and technological development aspects can be woven together so that what needs to be done can and will be done. The synthesis of these aspects represents the WILLS. If we have the WILLS, then the WAYS can become reality. And, here is the real current challenge.

It obvious that we should not try to continue with the organizational - technological - economic framework that we have used in the past. A major revolution will be required that starts at the Federal level and goes all of the way to the personal level. But, it can be done if we resolve that THIS WILL NOT HAPPEN AGAIN.

What is really needed now is qualified, experienced, knowledgeable, and properly motivated LEADERSHIP. Are we ready to support such leadership? Who will step forward?

*Bob Bea*
*Engineering & Project Management Group*
*Department of Civil & Environmental Engineering*
*Center for Catastrophic Risk Management*
*University of California Berkeley*

3

PX-0109-0485

Melvin M. L. McElwee, Sr.

| | |
|---|---|
| From: | Robert Bea [bea@ce.berkeley.edu] |
| Sent: | Wednesday, December 13, 2006 7:21 PM |
| To: | James Delery |
| Cc: | David Rosenberg; Melvin M. L. McElwee, Sr. |
| Subject: | coming home together |

Hi Jimmy and David,

as promised, here is the contact information for Melvin McElwee Sr:
President, McElwee Bros., Inc, P.O. Box 1410, Independence LA 70443,
Cell (985-351-2816, Office 985-878-0280.

Melvin was the 'hero' at the Lakeview Town Hall meeting that got up
and described his 'experience' in working with the Corps in New
Orleans. his entire family was at the meeting, and Melvin had to
miss part of a birthday party to attend. my sensing indicates that
Melvin and his family are a real 'role model' for what is needed to
make this 'system work'.

During one of my trips to New Orleans, Melvin and his family spent a
day with me discussing their background and experiences in helping
the Corps construct parts of the New Orleans flood defense
facilities. They had obviously spent a lot of time organizing the
background materials and it was very shocking.  It was clear that the
Corps had misled his construction companies and others.  Their
experience clearly indicated that the Corps had known about the soft
soils, organic layers, and seepage problems far in advance of
Katrina.  Also, that they had used unprofessional and reasonable
methods to pressure the contractors into desperate financial binds
(e.g. bond forfiture).

Before the Town Hall meeting, I asked Melvin to help mobilize the
african american leaders and citizens like him and his family in the
New Orleans area to help with development of a unified public
citizens group to help assure that adequate and acceptable flood
protection is provided to the city - coming back home - and no more
damn flooding.

so with the cc of this email - you and Melvin can start pulling
together to get adequate representation and leadership from this part
of the community - together we succeed, divided we fail.

thanks again Jimmy, David, and Melvin for all you have done and are
doing for the people of the greater New Orleans area.

bob
--
Professor Robert Bea (PhD, PE)
Center for Catastrophic Risk Management
Department of Civil & Environmental Engineering
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
Risk Assessment & Management
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587

1

EXHIBIT
34

PENGAD 800-631-6989

Exhibit "G"
page 1 of 2

**McElwee00486**

PX-0109-0486

Cell (925) 699-3503

2

Exhibit "G"
page 2 of 2

McElwee00487

PX-0109-0487

**Melvin M. L. McElwee, Sr.**

| | |
|---|---|
| **From:** | Robert Bea [bea@ce.berkeley.edu] |
| **Sent:** | Friday, December 15, 2006 9:54 AM |
| **To:** | wweiser |
| **Cc:** | James Delery; David Rosenberg; Lucas Ehrensing; Melvin M. L. McElwee, Sr.; Dennis G. Lambert; George.L.Sills@erdc.usace.army.mil; mschleifstein@timespicayune.com; karlene@haas.berkeley.edu; Rune Storesund; Kofi Sekyi Inkabi; Sandy Rosenthal; Ed Wenk; hbosworth@lanier-engineers.com |
| **Subject:** | Re: Fw: Meeting in Lake View |

**Importance:** High

well Wayne, so far, you are working on a Masters of USACE NO District Operations!  great progress.

if you want a Doctorate, many more details are needed:

1) what to change
2) how to change
3) who to change
4) when to change
5) validate and verify the above four items through implementation tests

there are no simple fixes.  there are no quick fixes.

but, we have to get fixing started quickly or we can expect much more trouble as we try to go forward to achieve a flood protection system that has:
A) acceptable quality (serviceability, safety, compatibility, durability) and
B) reliability (likelihood of acceptable quality)
through out its life-cycle (concept development, design, construction, operation, maintenance, and continued improvement). we want the system to be driven by a vision: nature first, engineered works second. no compromise with life-cycle sustainabiliy and resilience.

this is a project that will never be completed. if we stop work, we will fail again.

i got an idea from your input: **why don't we hold a workshop on "Helping the Corps Help Us"?**

i met two former Civilian chiefs of Corps in New Orleans on Tuesday morning. i gave them the same question i gave you. total experience = about 100 years. they know more than i can ever know. we need to pool our knowledge to find out how to help the Corps.

this could be the theme for your Masters Thesis and Doctorate Dissertation.

again, thank you for your help. i have started a new notebook to compile this type of input.

bob

**Will this get me a Masters on Corps operations, or a Doctorate?  Sure would be impressive for a retired PE.**

EXHIBIT
35

McElwee 00488

Exhibit "H"
8 pages total

12/15/2006
PAGE 24/31

MCELWEE BROTHERS INC

12/19/2007 13:24

----- Original Message -----

**From:** Robert Bea

**To:** wweiser

**Sent:** Thursday, December 14, 2006 9:39 PM

**Subject:** Re: Fw: Meeting in Lake View

bless you Wayne. i will follow your suggestions. keep sending them they
are a real help.


bob

--

Professor Robert Bea (PhD, PE)
Center for Catastrophic Risk Management
Department of Civil & Environmental Engineering
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
Risk Assessment & Management
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587

Cell (925) 699-3503

Delivered-To: bea@ce.berkeley.edu
From: "wweiser" <wweiser@cox.net>
To: "Bob Bea" <bea@ce.berkeley.edu>
Subject: Fw: Meeting in Lake View
Date: Thu, 14 Dec 2006 20:14:40 -0600
X-Priority: 1
X-Spam-Status: No, hits=0.123 required=5.1 tests=HTML_MESSAGE,X_PRIORITY_HIGH
X-Spam-Level:
X-Spam-Level:
X-Scanned-By: MIMEDefang 2.53 on 169.229.204.214

12/15/2006

McElwee00489

X-Scanned-By: MIMEDefang 2.53 on 169.229.204.214

After reviewing my response I realized that I did not address Project Managers. While I was working most PM's never did much field work or visit the project. They dealt mostly with funding, state managers and boards. Again, they should and must visit the project more than once and especially during construction, push to get the proper rights-of-way, and sufficient quality borrow materials [never liked that designation]for levee projects and support in-house environmentalists and support the proper engineering design for levees, marsh creation and restoration projects. Assign their best and brightest environmentalists, engineers and project manager to fully use all Breaux Bill Funds yearly for positive protection projects along the coast. Revise current law which limits what solutions can be used.

You're right in saying minimum levees are required as cited in the book "Rising Tide" and use the river to control much of the silting that now occurs yearly and sometimes at much closer intervals. In 1947 we had mostly potato ridge type levees along the Pontchartrain Lake. The hurricane of that year was considered a Cat 3 and did damage, but flooding situations were minimal time events because of this.

Politics weighed greater than sound engineering in most if not all projects after that. Not relocating the New Orleans Pump Stations, bringing the MRGO into the city, construction of the channel prior to construction of an adequate lock and just sloppy engineering due to budget restraints were the norm due to local interest and government decisions. Increase that on a state basis and you will note the vast problem. Great/good engineers become frustrated with knowledge of what should be constructed vs. what they must design. Then because of existing law they design what is not the best.

One further item that would make all things work for the better, would be to increase the FS to a minimum of 1.5 for design of levees outside vast populated areas and 1.7 for vastly populated areas.

----- Original Message -----
From: wweiser
To: wayne weiser
Sent: Thursday, December 14, 2006 7:39 PM
Subject: Fw: Meeting in Lake View

----- Original Message -----
From: wweiser
To: Robert Bea
Sent: Thursday, December 14, 2006 3:23 PM
Subject: Re: Meeting in Lake View

First and foremost require them to use what they have available to discipline wrong doing for endangerment and destruction. This is located in their own AR's. This is a now fix. [See attachment]

Secondly, have congress remove the security blanket from the Corps on liability and accountability. The Corps requires all engineering positions to be filled by EIT's or RE's. With that designation and salary they should as individuals be required to have insurance against malpratice for engineering blunders, errors, or sloppy decisions for P&S. Construction supervision should be insured by the Corps as their inspectors are lower graded engineering

12/15/2006

technicians and the Corps must be held responsible for that portion of the project.

With this in place and used the quality will increase as well as the design FS. Projects would not be started without proper rights-of-way for the footprint of the envisioned project. Use of shorelines to place the project away from existing homes and businesses and violate current laws must be changed.

Currently the Calcasieu River is in trouble for disposal since their original right-of-way eroded some 200 - 1,000 feet and now is unavailable for that purpose because of environmental considerations. All levees in Jefferson Parish along the shore of Lake Pontchairtrain would benefit greatly if the area could be recovered from the eroded shoreline and the use of I-walls and T-walls would disappear.

Restrictions as to construction methods on barrier islands by environmentalist is creating the condition of wash away progress since positive controls cannot be used. There are brillent engineers working their as well as environmentalists, but brains and hands are tied to do anything positive or long lasting.

    ----- Original Message -----

    From: Robert Bea

    To: wweiser

    Sent: Thursday, December 14, 2006 8:41 AM

    Subject: Re: Meeting in Lake View

    Hi Wayne,

    thanks for your email. i thought that must be you when i heard Garland say "Wayne, you are on the air".

    responses follow below.

        Caught most of the show and even called in.  Garland was in rush to get to next person and didn't have time to say hello to all.

    thanks for your call and contact.

        This discussion is to important to be limited to an auditorium as this will not reach the people of this area. It must be recorded and shown on public television for all on a couple of nights.

PX-0109-0491

Re: Fw: Meeting in Lake View

thanks to your suggestion, it was recorded. both for TV and radio. Jimmy Delery is arranging for re-broadcast on WWL.

> The MRGO may not be the only channel available to NASA for their shipment of the Space rockets/engines. What is the draft on the barge[s] transporating these engines? The GIWW should be sufficient if loaded on the proper barge.

yes, you are right. barge draft is 20 feet. there is a way that will not be damaging to the coast and protection.

> As for the MRGO, if it had been turned into a new lock at Violet, LA as was envisioned in the 1960's and the lock constructed first. The upper portion could be closed and marsh creation started. The New Orleans Dock folks brought it to where it is for their greed and need.

yes, you are right. and now we must un-do the past.

> To construct the channel without the lock to handle the shipping was stupid at best. They killed their own project.

yes. but sometimes that is the only way we learn - the pain of our past.

> Bring the coast back to pre 1947 conditions, as a minimum, and all will do well. The sediment that daily goes out the Mississippi River through flow and dredging would build all the marsh one would ever want.

yes, you are right again. now to make it happen.

> Positive protection of all types should be placed along the coast to stop surge and protect the population. We did so much better before levees were introduced to this area for "Hurricane Protection". Stop the storm

MCELWEE BROTHERS INC
McElwee00492

9858780288    13:24    12/19/2007

at the Gulf and levees can go away.

well, almost. our work shows that we will still need levees. but, they can be minimal - not much higher and wider than we have now. the key is the need to provide "adequate" protection - this means a hurricane that has a site return period in the range of 5,000 years (important areas) to 10,000 years (very important areas).

OK, NOW I HAVE A QUESTION FOR YOU. HOW CAN WE HELP THE NEW ORLEANS DISTRICT CORPS OF ENGINEERS? if there a way to help them become a high quality group of engineers and project managers? or is it hopeless? please let me have your thoughts.

thanks,

bob

--

Professor Robert Bea (PhD, PE)
Center for Catastrophic Risk Management
Department of Civil & Environmental Engineering
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
Risk Assessment & Management
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503

From: "wayne weiser" <wweiser@cox.net>
To: "Shelia TP Grissett" <sgrissett@timespicayune.com>,
  "Sandy Rosenthal" <Sandy@levees.org>,
  "Sandy Rosenthal" <hoppinhill@gmail.com>,
    "Steve Bayou Buzz" <steve@law-cyber.com>
Cc: "Mark TP Schletfstein" <mschleifstein@timespicayune.com>,
  "John TP Pope" <jpope@timespicayune.com>,
    "John TP McQuaid" <john.mcquaid@newhouse.com>,

12/15/2006

McElwee00493

"Bob TP Marshall" <rmarshall@timespicayune.com>,
   "Congressman Jindal" <bobby.jindal@mail.house.gov>,
  "Bendily, Erin" <Erin.Bendily@mail.house.gov>,
"Peppi Rep Bruneau" <larep094@legis.state.la.us>
Bcc: "Richard WDSU Angelico" <rangel@wdsu.com>,
"WWL BIG Talkers" <WWLBIGTalkers@listenerclub.com>,
   "Frank Roccaforte" <cjack20@msn.com>,
 "Bev Dours" <refinderbev@bsf.net>,
  "Dawn W Gallo" <dwgallo@cox.net>,
   "Don Eames" <doneames@cox.net>,
"Doug/Chantal Dillon" <dldillon@cox.net>,
  "Kathy O'Meallie" <Kathy@beigc.com>
Subject: AR 600-50 & AR 600-700 Chapter 751
Date: Fri, 17 Feb 2006 15:24:29 -0600
MIME-Version: 1.0
Content-Type: multipart/alternative;
    boundary="----=_NextPart_000_000D_01C633D6.3E935A20"
X-Priority: 1
X-MSMail-Priority: High
X-Mailer: Microsoft Outlook Express 6.00.2800.1437
X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2800.1441
Information that should be available to the public as it pertains to actions of the COE!

AR 600-50 covers conduct of Civilian Employees in the Department of Army and AR 600-700 Chapter 751 is a Table of Penalties for various offenses.

These two documents are a must read to cover actions of civilian personnel of the Corps of Engineers.

An example of what they cover is shown in the table as B. OFFENSES WARRANTING PUNITIVE DISCIPLINE - Subparagraph 14. Failure to observe written regulations, orders, rules, or procedures. b. Violation of administrative rules or regulations where safety to persons or property is endangered. Penalty - written reprimand to removal.

This is usually used as an internal fix for employee vs. employee and/or government property is involved.

However, it should and must cover the same where the general public was endangered, their property destroyed and lives lost.

Just review statements made about not following guidelines, regulations, orders, rules and procedures that were and probable still are being cited by numerous COE employees by telecon, e-mail interviews, etc.

I understand that the COE while instrumental in our losses cannot be touched, but this says its employees can be for not adhering to this regulation. This has teeth to bite those who feel so secure in not being liable for damages under the state law governing engineers. This applies to all personnel no matter their designation.

McElwee00494

--

Professor Robert Bea (PhD, PE)
Center for Catastrophic Risk Management
Department of Civil & Environmental Engineering
212 McLaughlin Hall
University of California
Berkeley, CA 94720-1710
Telephone (510) 642-0967
Telefax (510) 643-8919

Home Office
Risk Assessment & Management
60 Shuey Drive
Moraga, CA 94556
Telephone (925) 631-1587
Telefax (925) 631-1587
Cell (925) 699-3503



PX-0109-0496

## Melvin M. L. McElwee, Sr.

| | |
|---|---|
| From: | Bob Bea [bea@ce.berkeley.edu] |
| Sent: | Friday, December 22, 2006 7:33 PM |
| To: | Melvin McElwee, Sr. |
| Subject: | the beat goes on |

 

coming_home.pdf    wagenaar
(114 KB)         letter.pdf (3 MB)

Hi Melvin,

it sure was great to meet you and your family at the recent town hall
forum in Lakeview.  y'all were BEAUTIFUL - all of you have much to be
proud of!  thanks for taking time from your daughter's birthday party
evening.

see attached for notes i used for the forum.  please help build the
african american community part of the 'family' - your voices are
essential if we are to get this 'right.'

also, see attached for letter to N.O. Corps District Engineer: Col
Wagenaar.  the beat goes on.

thanks again

--
Professor Robert Bea, PhD, PE
Associate Director, Center for Catastrophic Risk Management Department of Civil &
Environmental Engineering 212 McLaughlin Hall University of California Berkeley Berkeley,
CA 94720-1710 Telephone/fax 510-642-0967 Telefax 510-643-8919
e-mail: bea@ce.berkeley.edu

Home office
Risk Assessment & Management
60 Shuey Drive
Moraga, California 94556
Telephone 925-631-1587
Cell 925-6099-3503

EXHIBIT
37

*Exhibit "E".*
*page 1 of 1*

1

McElwee00497

PX-0109-0497

# UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY · DAVIS · IRVINE · LOS ANGELES · MERCED · RIVERSIDE · SAN DIEGO · SAN FRANCISCO        SANTA BARBARA · SANTA CRUZ

TELEPHONE: (510) 643-8678
TELEFAX: (510) 643-8919
E-MAIL: bea@ce.berkeley.edu
HTTP://www.ce.berkeley.edu/

CENTER FOR CATASTROPHIC RISK MANAGEMENT
DEPARTMENT OF CIVIL & ENVIRONMENTAL ENGINEERING
212 McLAUGHLIN HALL
BERKELEY, CALIFORNIA 94720-1710



December 12, 2006

*Town Hall Forum*
*St Dominic Church, Lakeview*
*New Orleans, Louisiana*

## Coming Home. Some Thoughts: Family First, Levees Second

### There are four important parts in this Family:
1. The Public - you
2. The Governments - of, by and for the people
3. Industry and Commerce - sources of power
4. The Environment - spaceship earth

### The Public - let your voices be heard
- Take responsibility for your flood protection. You are responsible for the roof over your head. It provides essential protection. Also, you are responsible for your levees. They too provides essential protection.
- Work together. Do not pull apart. Together we succeed. Divided we fail. Be inclusive, not exclusive.
- Manage or be managed. There are plenty of people waiting to manage you. Do not let this happen.
- Invite informed, constructive, and respectful dissent and debate. Is it true; is it kind; is it constructive? Truth lurks in obscure places.
- Communicate, communicate, communicate. Understanding is crucial.

### Government - of, by, and for the people
- Represent all of the people, not just those who elected you.
- Focus on provision of acceptable protection for those who need protection. Imposing risks on people is justified if and only if they have consented to those risks.
- Remember sustainability. Flood protection is a project that can never end.
- Work to preserve the essentials of Life, Liberty, and the Pursuit of happiness

### Industry - provides the fuel for civilization
- Serve and flourish
- Work to protect human and hardware infrastructures necessary for production and profitability
- Use the power of industry wisely
- Be part of the solution, not the problem

### The Environment - spaceship Earth
- This is the only one we have.
- Nurture and respect it.
- Nature first, engineered developments second.

### The Media and Communications - the ties that bind
- Encourage and recognize quality and balance. Discourage distortions.
- Help facilitate communications in all mediums (radio, TV, newspapers, magazines, internet).
- Support as business so adequate and high quality resources can be made available to serve the public and industry

### Conclusions
- Functional families are happy and productive. Dysfunctional families are not.
- Do not be intimidated. You can understand how to get and maintain adequate flood protection. Learn. Listen. Use your senses.
- Do accept compromise with your protection. Demand the best. Be prepared to pay for the best.
- There are no such things as Natural Disasters. There are natural hazards. There is human hubris. When we combine natural hazards with human hubris we have disasters. When we combine disasters with more human hubris, we have catastrophes.

Thank you for being here tonight,

Bob Bea

*Exhibit "E"*
*Attachment 19*
*pages total*

McElwee00498

UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY · DAVIS · IRVINE · LOS ANGELES · MERCED · RIVERSIDE · SAN DIEGO · SAN FRANCISCO          SANTA BARBARA · SANTA CRUZ

TELEPHONE: (510) 643-8678
TELEFAX: (510) 643-8919
E-MAIL: bea@ce.berkeley.edu
HTTP://www.ce.berkeley.edu/

CENTER FOR CATASTROPHIC RISK MANAGEMENT
DEPARTMENT OF CIVIL & ENVIRONMENTAL ENGINEERING
212 McLAUGHLIN HALL
BERKELEY, CALIFORNIA 94720-1710

December 22, 2006

Col. Richard Wagenaar
District Engineer
U.S. Army Corps of Engineers
New Orleans, LA 70160

Subject: MRGO Levee Soil Samples

Dear Col. Wagenaar:

I listened with great interest to your interview with Garland Robinette on WWL's Think Tank program on 20 December 2006. Garland questioned you regarding an inspection I participated in on 11 January 2006 of the stretch of the MRGO levee between bayous Bienvenue and Durpe. During that inspection, I was accompanied by my University of California Berkeley colleague Dr. Ray Seed and by six Corps of Engineers representatives including Mr. Kevin Wagner and Mr. Rich Varuso. Dr. Seed documented the results of our trip in a letter to Lt. General Strock dated March 6, 2006 (Attachment A).

Before we made the inspection on January 11th, Dr. Seed and I were flown at low level over this stretch of the levee on January 9th. Mr. Lucas Ehrensing, president of Thigpen Construction Company (St. Rose, Louisiana) hosted and accompanied us during that flight. I took a large number of pictures of the reconstruction work that was underway. As a result of this flight, we developed concerns not only for the apparent poor quality of the soils that were being used to fill the breaches but as well for the lack of sufficient equipment and personnel on the work sites. These concerns led to my contacts with Kevin Wagner to arrange for our inspection of January 11th.

Of particular personal concern in your interview with Garland on December 20th are three statements you made regarding my part in inspection of the MRGO levee on January 11th (recording available on WWL radio website):

- "We asked him numerous times where did he get….."
- "He would never tell us……."
- "He, to this day, will not tell us….."

**Your first statement is not true.** I have never been contacted by any USACE employee or representative concerning where the samples were taken. I request you contact the sources of the information you have related as 'we', have them provide proof of such contacts, and provide this documentation to me.

**Your second statement is not true.** The letter to LT. General Strock provides general information on where the samples were taken. During this inspection, I took multiple photographs of each of the locations where I sampled soils being placed and compacted in the breach repair sites. I have attached copies of several of the photographs I took during this tour (Attachment B). The photographs show silty organic and sandy soils being placed and compacted in the repair sites. One of the photographs show the shoulder of one of the breaches; silty - sandy soils with little or no cohesion and containing white oyster shells are clearly evident. Persons present at

1

McElwee00499

PX-0109-0499

the time that these soils were placed have opined that the soils were taken from the spoil banks developed during the dredging of the MRGO.

During our January 11th inspection, Dr. Seed and I were accompanied by 6 USACE representatives including Kevin Wagner and Rich Varuso. Based on information they have provided to the USACE and to the media (e.g. National Public Radio, April 13, 2006), they have opined that they were present during our tour of January 11th. It should be clearly evident that they know where the soil samples were taken. I suggest you contact Mr. Wagner and Mr. Varuso and have them provide the information you stated is not available to the Corps of Engineers.

**Your third statement is not true.** We (the Independent Levee Investigation Team) documented and published the results of the soil sampling and testing in our final report dated May 22, 2006. You can obtain a copy of this report from http://www.ce.berkeley.edu/~new_orleans/ . I urge you to carefully read this report with particular attention to the chapter that addresses reasons for the failure of the flood protection system; Chapter 12, Organized for Failure. This report contains the information you contend was not and has not been made available; please refer to Chapter 9. The attached (Attachment C) map from this report shows where the soil samples were taken and includes results of erosion testing performed on these samples. The testing indicates the extreme susceptibility of these soils to the erosion by water.

The statements you have made to the public regarding my and our work clearly are not true; they are defaming. In a similar vein, the statements previously made by your USACE Task Force Guardian public relations representative, Mr. Jim Taylor, on February 20, 2006 are similarly defaming. My responses to the USACE Press Release (sent to Jim Taylor and the Lehrer News Hour on February 22) are attached (Attachment D). I reiterate my previous requests that such libel and slander cease. These actions do nothing to help foster cooperation and collaboration needed to help assure that adequate and acceptable flood protection is provided to the people of the greater New Orleans area. These and many other statements you made during the WWL Think Tank program on December 20th do not encourage other concerned and qualified engineers and public citizens to come forward with important valid information that the Corps of Engineers might deem as unwelcome or unfavorable. On 24 August 2006, Lt. General Strock provided "12 Actions for Change" that embodied three overarching themes: effectively implement a comprehensive systems approach; communication; and reliable public service professionalism. It is past time that these actions are implemented and practiced.

Please feel free to call me at my home office (925-631-1587, cell 925-699-3503) if you would like to discuss these developments further.

Sincerely yours,

R. G. Bea
Professor
Associate Director, Center for Catastrophic Risk Management

Cc: Mr. Garland Robinette, WWL Radio
Lt. General Carl Strock, Chief of Engineers, USACE
Mr. Dan Hitchings, Director, Task Force Hope, USACE
Mr. Lucas Ehrensing, Thigpen Construction Company
Mr. Mark Schleifstein, Times Picayune
Mr. John Swartz, New York Times

Mr. Ralph Vartabedian, Los Angeles Times
Ms. Sandy Rosenthal, Levees.org
Dr. Raymond Seed, University of California Berkeley
Dr. Ivor Van Heerden, Louisiana State University
Mr. Joseph Bruno, Bruno & Bruno, LLP

2

McElwee00500

**PX-0109-0500**

Attachment A

## UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY · DAVIS · IRVINE · LOS ANGELES · RIVERSIDE · SAN DIEGO · SAN FRANCISCO      SANTA BARBARA · SANTA CRUZ

Prof. Raymond B. Seed
Department of Civil and Environmental Engineering
423 Davis Hall, University of California,
Berkeley, California 94720

March 6, 2006

Lt. General Carl A. Strock
Commander and Chief, USACE
U.S. Army Corps of Engineers Headquarters
441 G Street, NW
Washington, D.C.

### Re: Erodeability of MRGO Replacement Levees

Dear General Strock,

The News Hour with Jim Lehrer ran a story on February 16th filed by Betty Ann Bowser which profiled the Corps of Engineers' ongoing work to rebuild damaged levees around New Orleans. This story included interviews and demonstrations with Professor Robert Bea of U.C. Berkeley, who is a member of the National Science Foundation-sponsored independent Levee Investigation Team (NSF/LIT), currently working on assessing the reasons for the various levee and systems failures that occurred during Hurricane Katrina. The NSF/LIT has been sharing data with the Corps' IPET group, and we remain committed to sharing the information both teams are uncovering in a spirit of professional cooperation.

Four days after the story ran, Jim Taylor of the Public Affairs Office of Task Force Guardian issued a two page press release alleging that misinformation had been presented in the Lehrer News Hour segment (copy attached).   This statement includes a number of assertions about supposed "misinformation" which we believe are erroneous, and feel should be brought to your attention.  I checked today, two weeks later, and this statement is still actively posted as the lead article on the TFG website.

I was with Professor Bea during our visit to the Mississippi River Gulf Outlet (MRGO) levee reconstruction project on January 11th, while work was underway.  [Ms. Bowser and the Lehrer News Hour crew apparently visited the site on a later date or dates.] Prof. Bea and I both collected samples that day. All samples were taken from the compacted embankments, NOT from any stockpiles or discard heaps (as alleged in the Task Force Guardian response). We examined the stockpiles, but did not take any samples of those materials. At no time did a "Corps' geotechnical engineer explain to Professor Bea that the Corps was not using the material that he was collecting", and Professor Bea never "said that he knew that, but proceeded to take the samples anyway." It concerns us that such mis-statements are being issued to the media.

During our visit we were accompanied by the Corps' project engineer and the Corps' lone QA/QC inspector assigned to monitor earthwork placement along the 11-mile long segment of levees being reconstructed. Three different contractors are engaged in this work, one at the north end, one in the middle, and one towards the south end of the project. We began by observing the lock structure at Bayou Bienvenue and the reconstructed levee section adjacent to it. This section appeared to consist of well-chosen cohesive, clayey soils which were properly compacted. When we next proceeded south about half a mile, however, we encountered a stretch of newly paced material along the levee where the contractor was placing clean, fine grained sand, which is highly erodeable. We pointed this out to the Corps QA/QC inspector, who then directed the contractor to remove the sandy fill and to waste it.

1

3

PX-0109-0501

It greatly concerns us that Task Force Guardian was employing a single grading inspector to cover 11 miles of levee reconstruction by three different contractors (or contracts), using a wide variety of materials, many of which we all know to be unsuitable because of high organics content or low cohesion (as specified in Design And Construction of Levees - EM1110-2-1913). At this location the contractor was attempting to compact both sandy (unsuitable) and clayey (suitable) soils with three passes of a tracked dozer (as required in the contract). The moisture content of much of the (paludal) swamp clays is so high however (several hundred percent) that it has the consistency of toothpaste, and it was squeezing out from beneath the dozer tracks without any meaningful mixing or compaction.

As we crossed the second navigable channel and lock structure at Bayou Dupres, we entered the middle section of the contract. Here we observed and sampled recently placed sandy, cohesionless fill materials that had been obtained by dragline excavation from the swamp frontage inboard (behind) the new levee. We did not observe any meaningful quantities of clay being incorporated into the embankment. Based on the geologic profiles developed for the excavation of the adjacent MRGO channel, and other references on the local geology (e.g.: Kolb and Van Lopek, 1958; Coastal Environments, 1984), we understand that there is a shortage of suitable levee fill borrow materials in this area. The surficial marsh deposits of soft clays and highly organic peat are clearly problematic, and in the central contract section the local soils beneath these appear to be dominated largely by clean, fine sands. Faced with the choice of wasting all of the excavated borrow material (potential fill), and thus, making no progress, or of using what was available, large volumes of sand fill were being placed.

We did not observe any meaningful program for "mixing" the sand fill with imported clayey fill, as the Task Force Guardian press release alleges. We certainly hope that such mixing is now being carried out, and with effective oversight. We note that it is very difficult to consistently mix clayey soil with sands, especially in a moist environment, and that the sands being excavated by dragline operations from the swamps behind the levee frontage are wet upon excavation and are fine enough that they dry slowly. To attempt such mixing with the volumes required for the construction of such a long levee would be a massive logistical challenge, and would require much more intense monitoring (QA/QC).

We did not make it fully to the far southern end where the third contractor was working, and so cannot directly comment on the operations there based on our ground visit of January 11th. That is the least accessible section, but on an airplane overflight (at low altitude) two days before, we observed efforts to fill two levee breaches near the southern end by placing highly fluid dark black soils that poured back out of the breaches as rapidly as they were dumped. We hope to return to these areas to verify our concerns there, but it appears to be another zone containing the soft and organic marsh deposits described in the above-cited references.

The Corps' project engineer, and the Corps' QA/QC inspector, were well aware that major sections of the levees, especially in the large middle section, were being reconstructed with unsuitable sandy soils, and were, in fact, eager for advice from us as to how they might, later, provide some measure of slope face protection to mitigate what they admitted was an unsafe condition with regard to the erodeability of these materials.

It is my understanding that Dr. Van Heerden from the Louisiana investigation team visited this same site recently, accompanied by Dr. Bas Jonkin (from Delft, Holland). Dr. Jonkin is another well known levee expert, and he also considered the soils he observed being placed to be unsuitable. I hope that they passed that information along to the Corps.

A number of members of our own team have now visited this site, and over a period of several months. As early as last October Dr. Les Harder and I informed the Corps that both the soils being placed, and the lack of close supervision at that time, along this critical section were of concern to us. Dr. Harder is the Deputy Director of the California Department of Water Resources, and is personally

2

4

PX-0109-0502

charged with the oversight of several thousands of miles of levees protecting approximately 1.3 million people here in California.

Dr. Bea is a member of both the National Academy of Engineering and of Management, two of the highest levels of recognition for lifetime achievement in those fields, and his long list of professional engineering awards and honors begins with the ASCE's Ralph W. Peck Medal. He is not someone who would confuse spoil heaps with sections of recently compacted levee embankment.

And neither am I.

A growing chorus of experts are trying to tell you that there may be some significant concerns with regard to the materials being placed along the MRGO frontage at the northeastern edge of St. Bernard Parish. These same levees eroded catastrophically during Katrina, and were the principal source of the massive flooding of St. Bernard Parish during that event.

The fill materials being placed can subsequently be sampled, and so this can be checked. We would encourage you to do so. Our own sampling and erosion testing from this section has shown large quantities of highly erodeable clean sands along major stretches of these evolving levee embankment sections. We continue to hope to see improvements in both material selection and placement along this critical section, or the announcement of a longer-term plan for more permanent work to follow.

Our goal has been, and will continue to be, to offer insights and advice that are of practical value to the nation and to the Corps in its ongoing mission to ensure public safety. The geotechnical problems associated with the lower Mississippi Delta region are very challenging, and will never be easy to resolve. We do not feel that dueling press releases does the Corps any long term benefit, especially if the information contained in such documents is easily proven erroneous. Instead, we need to pool our collective expertise to solve the enormous problems at hand, realizing that some portions of the emergency works aren't going to initially comply with long-term goals/safety factors, and may require further attention at a later date. In those cases, we feel that the public should be so informed so that they can make the necessary personal decisions with regard to their own safety, and with regard to their re-investment in the areas potentially at risk. We encourage you to use us as an asset, and work together in a spirit of cooperation for the common goals at hand.

Yours sincerely,

Raymond B. Seed, Ph.D.
Professor of Civil and Environmental Engineering, and
Head, NSF-Sponsored Independent Levee Investigation Team (NSF/ILIT)

cc:    Don Basham, Civilian Chief, USACE
       Dr. Ed Link, Director, USACE IPET Study
       Dan Hitchings, Director, Task Force Hope, USACE
       Jim Taylor, Public Affairs Office, Task Force Hope, USACE
       Dr. David E. Daniel, Chair, USACE/IPET External Review Panel
       Dr. G. Wayne Clough, Chair, USACE/IPET NRC Review Panel
       Dr. J. David Rogers, University of Missouri-Rolla, NSF/LIT
       Dr. R. G. Bea, University of California at Berkeley, NSF/LIT
       Dr. Les Harder, California Department of Water Resources, NSF/LIT
       Dr. Jean-Louis Briaud, Texas A&M University, NSF/LIT
       Dr. Richard Fragaszy, NSF

3

5

Attachment

**The News Hour with Jim Lehrer leaves out important information on levee work**
Jim Taylor
Corps of Engineers
Task Force Guardian, Public Affairs Office
February 20, 2006

"The News Hour with Jim Lehrer" ran a piece on its February 16 show about the Corps of Engineers' work to rebuild the New Orleans area levees. The report missed some important information that is necessary to a complete understanding of the work to restore hurricane protection for the people of New Orleans.

**Misinformation**
In her report, Ms. Betty Ann Bowser interviewed Dr. Bob Bea, an engineer at the University of California, Berkeley, and a member of the National Science Foundation. He showed her samples of soil that he said he took "In differing locations along the length of the MR-GO levee, we stopped, and I got out and colleted the soil samples." He implied that the Corps was using this material to rebuild the levees along the Mississippi River Gulf Outlet (MRGO). That is incorrect.

**Correct Information**
What Dr. Bea doesn't say is that he took the samples from material not used to rebuild the levees.

Dr. Bea visited the Corps of Engineers construction site at Mississippi River Gulf Outlet with a geotechnical engineer from the Corps. On that visit, Dr. Bea took samples of material from areas that contained soil the Corps was avoiding. Each time that Dr. Bea took these samples the Corps' geotechnical engineer explained to him that the Corps was not using material that he was collecting. Dr. Bea said he knew that, but proceeded to take the samples. Yet, in The News Hour program, Dr. Bea implied that the Corps was using that type of unacceptable soil.

Kevin Wagner, an engineer with the Corps and the project manager for the levee work, spent several hours with Ms. Browser at the construction site and showed her the high-quality clay material the Corps is using to rebuild the levees.

Mr. Wagner also explained to her that the Corps is conducting extensive tests of the clay and soil it is using in the levees to ensure its quality.

In addition, independent teams of scientists are reviewing the Corps' work and analyzing the material we are using to rebuild New Orleans' hurricane protection system.

**Misinformation**
Ms. Bowser also interviewed an oceanographer who stated that he didn't think the Corps could complete its levee work along the MRGO before the hurricane season starts in June 2006.

**Correct information**
Actually, the Corps' engineers and construction contractors are well under way to meeting the June 2006 date. They have already rebuilt nearly half of the MRGO levees, and are confident that they will complete this work before the beginning of this year's hurricane season.

4

McElwee00504

PX-0109-0504

**Misinformation**
At another point in the story, Ms Bowser states that the Corps only allowed a team of independent investigators onto one of its construction sites after a representative from the Louisiana Attorney General's office intervened. That is inaccurate.

**Correct information**
As part of standard construction safety procedures applicable to any worker on a construction site, the Corps asked the investigators to submit a safety and work plan before they arrived at the site. The submission of these plans is necessary to ensure that different construction schedules on work sites do not conflict, and that site workers are performing their efforts safely. Even though the team was informed, in writing of these requirements, they failed to submit the information, and then showed up unannounced.

Even on this short notice, the Corps of Engineers worked with the team to remind them of the necessity to submit their safety and work plan, and then allowed them on the site with the understanding that they would submit their plans later that day.

**The Army Corps of Engineers is committed to stronger and better hurricane protection**
The Corps of Engineers team of engineers, scientists, support staff, and contractors take this work personally. Most of the 200 Corps of Engineers people working directly to restore New Orleans' hurricane protection levees and floodwalls – and more than 300 Corps staff supporting them in this endeavor – live in New Orleans, and many of them lost their homes. It's their hurricane protection too.

**Information available on Corps of Engineers Website**
You can learn more about the Corps of Engineers work to restore the hurricane protection system for the people of New Orleans from the New Orleans District website at www.mvn.usace.army.mil

5

7

McElwee00505

8

McElwee00506

PX-0109-0506

Attachment B



Aerial photo of soil borrow pit adjacent to breach repair site



Photo of soil borrow material stacked for drying. Note backhoe, bulldozer, and carrier tracks.



Photo of soils being transported from borrow material stack to breach repair site. Multiple soil samples taken from repair site.



Photo of soils being deposited and compacted into breach site. Multiple soil samples taken of compacted materials.



Photo of compacted soils in breach repair site. Multiple samples taken in light soil (sandy) and dark soil (organic silt) areas.

9

PX-0109-0507

Attachment C



Soil Sampling Plan



11

McElwee00508

PX-0109-0508



Photo of breach repair area. Sands and organic material compacted into breach repair. Multiple samples taken from multiple lifts of soils.



Photo of shoulder of breach. Note sandy – silty non-cohesive soils with white oyster shells in original levee. Multiple samples taken.



Photo of breach repair site. Note dark organic silt placed and compacted into breach repair. Multiple samples taken.

PX-0109-0509

Attachment D

To: Jim Taylor, Corps of Engineers, Tusk Froce Guardian, Public Affairs Office
Subject: Response to Press Release Titled The News Hour with Mih Lehrer leaves out important information on levee work,  by Jim Taylor, Corps of Engineers, Task Force Guardian, Public Affairs Office, February 20, 2006
Date: February 22, 2006
From: Professor Robert Bea, University of California Berkeley

Hi Jim,

thank you for your email regarding the Lehrer Hour February 16th program. my responses to your e-mail follows below.

Taylor, James H MVN wrote:

"The News Hour with Jim Lehrer" ran a piece on its February 16 show about the Corps of Engineers' work to rebuild the New Orleans area levees. The report missed some important information that is necessary to a complete understanding of the work to restore hurricane protection for the people of New Orleans.

based on my experience with the Lehrer Hour producers, there was not any intent to miss important information necessary to development of a complete understanding. in fact, i observed a struggle to present balanced reporting and insights. The Lehrer Hour is a quality communications link with the public. and, they have not built that reputation with irresponsible journalism.

The News Hour with Jim Lehrer leaves out important information on levee work

Jim Taylor

Corps of Engineers

Task Force Guardian, Public Affairs Office

February 20, 2006

i assume with your identification above, that you were fully authorized and supported by the USACE to send this correspondence to the public.

"The News Hour with Jim Lehrer" ran a piece on its February 16 show about the Corps of Engineers' work to rebuild the New Orleans area levees. The report missed some important information that is necessary to a complete understanding of the work to restore hurricane protection for the people of New Orleans .

Misinformation

In her report, Ms. Betty Ann Bowser interviewed Dr. Bob Bea, an engineer at the University of

1 of 7

12/21/2006 11:21 AM

12

PAGE 03/35    MCELWEE BROTHERS INC    9858788288    12/19/2007 13:24
McElwee00510

PX-0109-0510

MRGO Jim Taylor

California , Berkeley , and a member of the National Science Foundation. He showed her samples of soil that he said he took "In differing locations along the length of the MR-GO levee, we stopped, and I got out and colleted the soil samples." He implied that the Corps was using this material to rebuild the levees along the Mississippi River Gulf Outlet (MRGO). That is incorrect.

i am not a member of the National Science Foundation. the NSF is sponsoring (along with others) the work we have been doing during the past 6 months.

yes, i am an engineer with 53 years of experience. i have been a professor of civil and environmental engineering at Berkeley for the past 17 years. i started my career with the USACE as an engineer in training in 1954 working for the South Florida Flood Control District - levees, canals, pump stations. My father was a USACE 'lifer'. I have spent most of my life in the world's oceans as a civil engineer – designing, constructing, operating, and maintaining offshore and coastal structures and pipelines. For the past 20 years, my work has focused on analyses of failures of major engineered systems, including work for NASA on the Columbia; risk assessment and management.

perhaps one of my best points of reference is my family lived in New Orleans in the 1960's and lost our home and all of our belongings during hurricane Betsy. i was chief offshore civil engineer for shell oil company at the time. and, i followed with great interest what has been going on since 1965 - and had the priviledge to visit the site of my former home again when i came to New Orleans almost 40 years later to the day - and saw the replacement home owners dragging the wet mattresses out of their house. the history of flooding was repeated. the promises of adequate protection had not been delivered.

since you were not at the work site during the time my colleague Dr. Ray Seed and I were present, the information you have received must be coming from unnamed people that accompanied myself and my colleague on the field trip.

during the trip, i took pictures and i gathered soil samples from the repair sites - not the borrow sites - i know the difference. and my colleague, Ray Seed, has also documented the results and observations from this trip. we have compared our observations and conclusions, and continue to do so.

Correct information

What Dr. Bea doesn't say is that he took the samples from material not used to rebuild the levees.

and that is not true. i took the samples from breach repair sites in which the soils had been deposited, leveled, and compacted. i also photographed these sites.

Dr. Bea visited the Corps of Engineers construction site at Mississippi River Gulf Outlet with a geotechnical engineer from the Corps.

12/21/2006 11:21 AM

13

McElwee00511

MRGO Jim Taylor

i believe he was a contractor Geotechnical Engineer, not a geotechnical engineer from the Corps. there were two USACE contractor levee construction inspectors that accompanied us on the trip; one was a doctoral graduate engineering student from the University of New Orleans.

> On that visit, Dr. Bea took samples of material from areas that contained soil the Corps was avoiding.

that is not true. i have the photographs of the materials being placed, leveled, and compacted into breach areas (south of Bienvineu). i have photographs of the borrow pit areas and the materials that had been excavated and placed aside to dry prior to hauling and placing.

the samples we have now tested, were gathered from the breach repair sites as described above. in some cases, the samples were almost clean sand, in fact, some of the sand was white and was not stained with other materials. many of the soils consisted of sandy, silty, organic materials with some clay. there had been an attempt to eliminate the organic materials. however, i found several large blocks of almost pure peat that had been compacted into the soil lifts that were being placed in the levee (toe to crown).

> Each time that Dr. Bea took these samples the Corps' geotechnical engineer explained to him that the Corps was not using material that he was collecting.

and that is not factual or true. at no time in the sampling that i did was any USACE or USACE contract employee with me. they stayed at the top of the levee discussing the operations with my colleague Ray Seed. Ray Seed has provided testimony to that fact.

> Dr. Bea said he knew that, but proceeded to take the samples.

and, that is not true. i would not purposely take samples that were not being used. i would not purposely distort the truths of what was being done at the time we were on the sites.

the forgoing statements constitute both libel and slander and i urge you and your colleagues to carefully consider such actions.

> Yet, in The News Hour program, Dr. Bea implied that the Corps was using that type of unacceptable soil.

i did not imply - i made my statements based on my personal judgement and demonstrated my concerns in the laboratory 'experiment' shown on the Lehrer News Hour..

Kevin Wagner, an engineer with the Corps and the project manager for the levee work, spent

12/21/2006 11:21 AM

14

PAGE  8/11/21        MCELWEE BROTHERS INC            McElwee00512       9858788280   13:24   12/19/2007

**PX-0109-0512**

MRGO Jim Taylor

several hours with Ms. Browser at the construction site and showed her the high-quality clay material the Corps is using to rebuild the levees.

yes, and Kevin and the rest of the UsACE and contracting personnel we met are 'great guys' - they are doing their level best with what they have to do what they have been told to do. yes, they have a personal - family stake in what is being done.

what they face is sad for me, because in my experience and opinion, they do not have the resources they need to accomplish what really needs to be done - short term and long term. one important element that they need are meaningful goals and objectives - not meaingless goals or slogans. what they need is some honest leadership and quality engineering - to put the high quality engineering back in the Corps of engineers.

Mr. Wagner also explained to her that the Corps is conducting extensive tests of the clay and soil it is using in the levees to ensure its quality.

we saw no tests being run during the time we were there. i would like to see the test data. from what we know, at the present time proper materials are being barged into this section of the MRGO levee, i would bet that a lot of tests are being run. and, that is good. we want to encourage all possible be done to defend the soils that have been and are being placed in these very important levees.

but, the soils in the core of the levee remain essentially the same as before Katrina. and the unbreached areas are the same soils that were used to construct the original levee along this stretch of the MRGO - with some sheet piling that have been driven into the levee previously in some 'concerning' areas.

In addition, independent teams of scientists are reviewing the Corps' work and analyzing the material we are using to rebuild New Orleans ' hurricane protection system.

i have talked with one of those representatives, and he denys the contention you have made that they are analyzing the material (soils) - they are analyzing the information the USACE is providing.

**Misinformation**

Ms. Bowser also interviewed an oceanographer who stated that he didn't think the Corps could complete its levee work along the MRGO before the hurricane season starts in June 2006.

PAGE  08/31          MCELWEE BROTHERS INC          9858788280          13:24  12/19/2007

McElwee00513

PX-0109-0513

MRGO Jim Taylor

well, that is what Paul Kemp thinks - and that is OK. and based on what we saw in January, that would be the projection of any knowledgeable engineer or person that has built something on this scale.

you can debate this issue with other qualified and experienced building contractors. i have discussed this matter with several of them in the New Orleans area.

**Correct information**

Actually, the Corps' engineers and construction contractors are well under way to meeting the June 2006 date. They have already rebuilt nearly half of the MRGO levees, and are confident that they will complete this work before the beginning of this year's hurricane season.

and that is really great progress and news. i hope it is true and factual. and that the rebuilding is of reasonable quality so that we can depend on it performing adequately during not just next hurricane season - but for several years until we can get a more 'permanent' solution or solutions operational.

**Misinformation**

At another point in the story, Ms Bowser states that the Corps only allowed a team of independent investigators onto one of its construction sites after a representative from the Louisiana Attorney General's office intervened. That is inaccurate.

I can not speak for my colleague Dr. Ray Seed, i received the correspondence from the USACE and reviwed the correspondence from Dr. Seed and others regarding this matter. If the necessary cooperation was provided in a timely way, there would not have been any reason to have to go to the Louisiana Attorney General for assistance.

**Correct information**

As part of standard construction safety procedures applicable to any worker on a construction site, the Corps asked the investigators to submit a safety and work plan before they arrived at the site.

that is true. i think the letter from the USACE was dated January 23rd (and takes working days to be delivered), 2 days after the soil exploration equipment was being mobilized from Baton Rouge. you can check these details with Dr. Seed. and, i suggest that you do so.

12/21/2006 11:21 AM

16

McElwee00514

PX-0109-0514

MRGO Jim Taylor

> The submission of these plans is necessary to ensure that different construction schedules on work sites do not conflict, and that site workers are performing their efforts safely.

and that is really true.

> Even though the team was informed, in writing of these requirements, they failed to submit the information, and then showed up unannounced.

please confirm this statement with the parties involved.

> Even on this short notice, the Corps of Engineers worked with the team to remind them of the necessity to submit their safety and work plan, and then allowed them on the site with the understanding that they would submit their plans later that day.

and to my knowledge, that is also true. thanks for your help.

> **The Army Corps of Engineers is committed to stronger and better hurricane protection**

i really hope that is true. but, committment is only part of what is required. resources and responsible action are also required.

> The Corps of Engineers team of engineers, scientists, support staff, and contractors take this work personally.

that has certainly been my experience. good people struggling to do good things. but, the challenges they face are immense. and to make these challenges trival is dangerous. to provide unreasonable assurances is dangerous entrapment of the public potentially affected.

> Most of the 200 Corps of Engineers people working directly to restore New Orleans ' hurricane protection levees and floodwalls – and more than 300 Corps staff supporting them in this endeavor – live in New Orleans , and many of them lost their homes. It's their hurricane protection too.

that is also true. i sure would encourage the USACE and these people to come forward with their feelings and insights about what needs to be done to provide an adequate level of flood protection for their part of the world.

6 of 7                                                                 12/21/2006 11:21 AM

PAGE 10/31                  MCELWEE BROTHERS INC                9858788288      13:24  12/19/2007

**McElwee00515**

PX-0109-0515

MRGO Jim Taylor

**Information available on Corps of Engineers Website**

You can learn more about the Corps of Engineers work to restore the hurricane protection system for the people of New Orleans from the New Orleans District website at www.mvn.usace.army.mil

yes, and that information has been very useful. however, we know that much more important technical information is being withheld from many that are interested in understanding the engineering - technical developments that are critical to properly understanding what happened and what should happen to prevent the repeat of the Katrina flooding in the future. the real goals should be understanding and prevention. and, as you said earlier - Safety First - and that includes flood protection.

i hope this will help. please feel free to circulate this to the people you think should have this understanding. open and truthful communications are vital to development of confidence and trust.

Bob

--
Robert Bea (PhD, PE)
University of California Berkeley
212 McLaughlin Hall
Berkeley, CA 94720-1710
510-642-0967 (office telephone)
510-643-8919 (office telefax)
Home Office
60 Shuey Drive
Moraga, CA 94556
925-631-1587 (telephone)
925-699-3503 (cellphone)

--
Robert Bea (PhD, PE)
University of California Berkeley
212 McLaughlin Hall
Berkeley, CA 94720-1710
510-642-0967 (office telephone)
510-643-8919 (office telefax)
Home Office
60 Shuey Drive
Moraga, CA 94556
925-631-1587 (telephone)
925-699-3503 (cellphone)

12/21/2006 11:21 AM

McElwee00516

PX-0109-0516



# Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005

## Volume I: Main Text and Executive Summary

by

R. B. Seed, R. G. Bea, R. I. Abdelmalak, A. G. Athanasopoulos, G. P. Boutwell, J. D. Bray,
J.-L. Briaud, C. Cheung, D. Cobos-Roa, J. Cohen-Waeber, B. D. Collins, L. Ehrensing, D. Farber,
M. Hanemann, L. F. Harder, K. S. Inkabi, A. M. Kammerer, D. Karadeniz, R.E. Kayen, R. E. S. Moss, J. Nicks,
S. Nimmala, J. M. Pestana, J. Porter, K. Rhee, M. F. Riemer, K. Roberts, J. D. Rogers, R. Storesund,
A. V. Govindasamy, X. Vera-Grunauer, J. E. Wartman, C. M. Watkins, E. Wenk Jr., and S. C. Yim

**Final Report**
**July 31, 2006**



EXHIBIT
38

   


McElwee00517



EXHIBIT
B

PX-0109-0517

Figure 6.37 shows a close-up view of hydraulic gradients at this same canal surge stage. As expected, the exit gradients calculated at the toe are slightly unstable with regard to initiation of seepage erosion and piping for the relatively lightweight soils present.

A key question in these analyses is the rate at which rises in outboard side canal water levels manifest themselves in the form of increased pore pressures beneath the inboard side of the levee embankment. That, in turn, is largely a function of the lateral permeability modeled within the marsh strata, and assumptions regarding degree of initial saturation.

It was our investigation team's observation that lateral permeability was very high within at least some of the sub-strata of these variable marsh deposits, both at the two east bank IHNC breach sites at the edge of the Lower Ninth Ward, as well as at sites along the drainage canals at the north end of the main (downtown) New Orleans protected basin. Hydraulic response at nearby boreholes was very rapid, and evidence of the occurrence of high water pressures and underseepage was noted at several locations. Investigators from the IPET team were surprised by difficulties in dewatering a very shallow excavation to recover large block samples of peaty "marsh" deposits at the 17th Street canal breach site for subsequent centrifuge testing. In addition, persistent reports of underseepage and ponding of waters along this IHNC frontage at the west edge of the Lower Ninth Ward, and contractor's significant problems with dewatering of excavations along this same frontage, all bespoke of high lateral permeability within these strata.

The values of lateral permeability used in these analyses were based on experience with similar geologic units from other regions, our own field observations, and the accumulated reports indicating high lateral permeability. A best-estimated coefficient of lateral permeability of $k_h \approx 10^{-2}$ cm/sec was modeled for the most open of the marsh sub-strata, and parametric sensitivity analyses were performed for values of $k_h$ that were five times higher, and values that were an order of magnitude (factor of 10) lower.

Figures 6.38 and 6.39 show results of these sensitivity analyses. Transient flow analyses were performed in which canal water levels were raised progressively, beginning with assumed fully equilibrated ("steady state") conditions with a canal water elevation of about +5 feet (MSL) at ~11:00 p.m. on the night of August 28th (after many hours of relatively slow surge rise to that level), then rising progressively to elevation +9 feet (MSL) by about 3:30 a.m. on the morning of August 29th, and then rising a bit more rapidly to elevation +14.4 feet (MSL) by about 8:30 a.m. (It should be noted that the failure and breach occurred at about 7:45 a.m., but that these transient flow analyses were carried forward to at least 9:00 a.m. to more fully examine progressive flow and pore pressure development.)

Figure 6.38 shows calculated pore pressures vs. time at location 1, at the top of the lower marsh stratum, directly below arrow "D" near the inboard toe of Figures 6.35 through 6.37. The horizontal light blue line at the top of this figure represents the "steady state" conditions that would eventually develop for a canal water level rise to Elevation +14.4 feet (MSL) if infinite time were allowed for full equilibration and development of steady state flow. The lower diamonds represent calculated transient pore pressures at Location 1 for the best-estimated lateral permeability of the marsh deposits, and for the upper and lower bound permeabilities. As shown in this figure, the variation in permeability does not exert a major

6 - 12

This is an important issue with regard to repair and reconstruction. The USACE has expended considerable effort and resources to replace "I-walls" with "T-walls", and to install concrete splash pads behind additional I-wall sections, in order to prevent failures due to the mechanism of overtopping, erosion of a trench at the rear side of the I-walls, and failure due to the resulting unbracing of the wall sections. Although also useful, this will not also deal effectively with the underseepage issues that appear to have been the actual cause of failure at this site; and there appear to be unreasonably short sheetpile curtains (insufficient as to effectively cut off underseepage flows) at other locations throughout the New Orleans regional flood defense system. This is a potentially pervasive problem throughout the system, and it should be evaluated system-wide, and remedied as necessary.

The IPET Final Draft Report notes that possible modes of failure initially considered at this site included "sliding instability and piping and erosion from underseepage." The report then goes on to say

*Piping erosion from underseepage is unlikely because the I-walls were founded in a clay levee fill, a marsh layer made up of organics, clay and silt, and a clay layer. Because of the thickness, the low permeabilities of these materials, and the relatively short duration of the storm, this failure mode was considered not likely and was eliminated as a possible mode of failure.*

This greatly underestimates the permeability, and especially the laterally permeability of the marsh deposits. It also continues the very dangerous assumption that underseepage was not a serious problem for "short duration" storm surge loading that plagued the original design of many sections of the New Orleans regional flood defense system, and led to use of sheetpile curtains that were far too short to effectively (and safely) cut off underseepage flows. At least four major failures (and breaches) that caused large portions of the overall flooding damage and loss of life during hurricane Katrina appear to have been principally due to lack of appreciation of underseepage, and resulting inadequate (short) sheetpile cut-offs. These are the major breach at the west bank near the north end of the London Avenue drainage canal (see Section 8.3.9), the major breach at the east bank of the London Avenue drainage canal farther to the south (see Section 8.3.8), and the two breaches on the east bank of the IHNC at the west end of the Lower Ninth Ward discussed in this current section and in Section 6.3.2. Exoneration, a priori, of underseepage dangers should be discontinued immediately, and underseepage analyses should be required for the full regional flood protection system.

Demonstration that underseepage occurred at this site can be based on arguments of analogous conditions and levee performance at this site, and at the London Avenue drainage canal breach sites, as well as at the site immediately to the north (as described in the next section.) It can also be based on the observed difficulties encountered by McElwee Construction in dewatering an excavation near the breach site immediately to the north (due to massive underseepage flow through the marsh deposits that were not adequately cut off at that site either.)

In addition, as noted in the IPET Draft Final Report in discussion of the two massive breaches at the west end of the Lower Ninth Ward:

6 - 15

**McElwee00519**

development of a water-filled gap at the outboard side of the sheetpile curtain) at a canal water elevation of approximately +13 to +14 feet (MSL).

Here again, as with the larger breach section immediately to the south, this breach section is analytically unstable by a number of potential mechanisms, all of them associated with underseepage flow passing beneath the sheetpile curtain. These potential mechanisms are:

1. Seepage erosion and piping due to excessive exit gradients at the inboard toe.

2. Hydraulic uplift or "blowout" at the inboard toe.

3. Translational stability failure, as a result of reduction in strength of the foundation soils at the inboard side due to underseepage-induced pore pressure increases.

As with the larger breach to the south, it is our investigation's position that despite the fact that overtopping (and resultant erosion at the inboard toe of the floodwall) was also occurring, this failure was the result of one or more of the underseepage-induced mechanisms above. (Two or more of these may have acted in concert.)

This site has a well-documented history of underseepage problems; McElwee Construction had great difficulty dewatering an excavation at this site during earlier construction, and residents of the neighborhood had also previously reported problems with seepage at the inboard toe.

Based on the geometry of the post-failure configuration (see Figure 6.46), this narrow, deep failure appears to have most likely caused by either by seepage erosion and piping, or by a combination of hydraulic uplift ("blowout") followed by piping. The calculated high exit gradients, and the hydraulic uplift pressures at the inboard toe region, would strongly support this.

The IPET interim draft report also concluded that foundation instability was the cause of the failure and breach at this site. The failure mechanism favored in those analyses, however, was based on a semi-rotational failure dominated by undrained shear failure through the soft clays underlying the marsh stratum, as shown in Figure 6.58. IPET concluded that this failure occurred at a relatively early stage, at a canal water level of only Elevation +9 feet (MSL), and that this early failure accounted for observations of ponding of water along this general levee frontage well in advance of the failure of the larger breach section to the south.

Figure 6.59 shows the IPET interpretation of shear strength data for this section, and the red lines are the IPET shear strength profiles for stability analyses (IPET: June 1, 2006.) In this figure, the values of undrained shear strength based on the CPT tip resistance data are based on a CPT tip factor of $N_k = 15$. This appears to be an overly conservative value of $N_k$ within the lower clay stratum, as the CPT-based shear strengths within this stratum are significantly lower then the trend based on the unconsolidated-undrained triaxial tests on "undisturbed" samples obtained with a 5-inch diameter thin-walled fixed-piston sampler. In

6 - 18

McElwee00520

# GORE ENGINEERING, INC.

## SOIL AND FOUNDATION INVESTIGATIONS

LAWRENCE W. GILBERT, D. ENGR.
REG. C.E.

JAMES R. GORE
(1925 - 1991)

BORINGS
ANALYSES

TESTING
REPORTS

3613 HESSMER AVENUE
P. O. BOX 8867
METAIRIE, LOUISIANA 70011

(504) 888-6690
FAX: (504) 888-6827

17 December, 2001

McElwee Brothers, Inc. &
 Tri-Star Design Construction Company, Inc.
(A Joint Venture)
P.O. Box 1410
Independence, Louisiana 70443

Attention:  Melvin M.L. McElwee, Sr.

> Soil Borings and Laboratory Tests
> Proposed Dwyer Road Pump Station
>  Upgrade and Discharge Canal
> Vicinity Dwyer & Jordan Roads
> New Orleans, Louisiana
> Our Project No. 7899

Gentlemen:

This letter report contains the results of soil borings and laboratory tests made at the subject site. Instructions to proceed with the investigation were received on December 12, 2001 from Melvin M.L. McElwee, Sr., Authorized Representative of McElwee Brothers, Inc. & Tri-Star Design Construction Company, Inc. (A Joint Venture), General Contractors for the Project.

It was originally requested that our office install six (6) piezometers to monitor groundwater at the subject site. However, it is understood that this will be done by your office utilizing equipment furnished by Burns Dewatering. It is further understood that samples of the sands involved in the dewatering are needed to

**McElwee00521**

PX-0109-0521

determine the slot size of the well screens. Therefore, the study included the drilling of soil test borings to obtain soil samples for particle size distribution testing and general soil classification.

Two (2) undisturbed sample type soil test borings (B-1 and B-2) were drilled to depths of 50 ft. on December 12 and 13, 2001. The borings were made with a truck mounted drill rig at designated locations approximately as shown in plan on Figure 1. Melvin M.L. McElwee, Sr. of your office, identified the boring locations in the field.

Undisturbed sampling was performed continuously in all cohesive or semi-cohesive materials with a three inch diameter thin wall tube sampler. Representative samples were cut from the cores and placed in moisture proof containers for preservation until laboratory testing could be performed. Logs of the individual borings showing the detailed stratification and sample depths are given on Figures 2 and 3.

When cohesionless material was encountered, which could not be sampled by undisturbed methods, the Standard Penetration Test was performed. This test consists of driving a two inch diameter splitspoon sampler 1 ft. (after first seating it 6 inches) with a 140 lb. hammer falling 30 inches. The number of blows required to drive the sampler gives an indication of the density of the material.

-2-

McElwee00522

PX-0109-0522

In order to develop the physical properties of the soils, soil mechanics laboratory tests were performed on samples obtained from the borings.  This testing consisted primarily of Natural Moisture Content.  Grain Size tests were performed on some of the more granular materials and Atterberg Limits tests were performed on selected cohesive samples.  The results of all the laboratory tests, except Grain Size, are tabulated along side the boring logs at the appropriate sample and depth on Figures 2 and 3.  Results of the Grain Size tests are given on Figures 4 thru 14.

It is hoped that the results of the soil borings and laboratory tests are self-explanatory.  If there are any questions or if further information is needed, please advise.

Yours very truly,

GORE ENGINEERING, INC.

Lawrence W. Gilbert

(Reda Bakeer)

-3-

McElwee00523



## BORING LOCATIONS
SCALE: 1"= 100'

## BORING LOCATION
Scale: 1" = 100'

SOIL BORINGS & LABORATORY TESTS
PROPOSED DWYER RD. PUMP STATION
UPGRADE & DISCHARGE CANAL
VICINITY DWYER & JORDAN ROADS
NEW ORLEANS, LOUISIANA

McELWEE BROTHERS, INC.
AND
TRI-STAR DESIGN CONSTRUCTION CO., INC.
(A JOINT VENTURE)
GENERAL CONTRACTORS
INDEPENDENCE, LOUISIANA

J-7899

Fig. 1

GORE ENGINEERING, INC.
SOIL AND FOUNDATION INVESTIGATIONS

PX-0109-0524

# GORE ENGINEERING, INC.

Soil and Foundation Investigations
Metairie, Louisiana

Boring No. **B-1**  ·  **LOG OF BORING AND TEST RESULTS**  ·  Date Boring Drilled: **12 December 2001**

Project: **PROPOSED DWYER RD. PUMP STATION UPGRADE & DISCHARGE CANAL - VIC. DWYER & JORDAN ROADS - NEW ORLEANS, LA.**
**McELWEE BROTHERS, INC. & TRI-STAR DESIGN CONSTRUCTION CO., INC. - (A JOINT VENTURE) - GENERAL CONTRACTORS - INDEPENDENCE - LA.**

Recorded By: **D. TUSA**

| Sample No. | SAMPLE Depth in Feet From | SAMPLE Depth in Feet To | STRATUM Depth in Feet | VISUAL CLASSIFICATION | *Blows per Foot | Symbol Log | Scale (feet) | UNCONFINED COMPRESSION (Qu) (lbs./sq.ft.) | WATER CONTENT (percent) | UNIT WEIGHT (lbs./cu.ft.) DRY | UNIT WEIGHT (lbs./cu.ft.) WET | ATTERBERG LIMITS L.L. | ATTERBERG LIMITS P.L. | ATTERBERG LIMITS P.I. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | .5 | 1.0 | .0 1.0 | LOOSE TAN & BROWN FINE SAND [SP] | | | 0 | | | | | | | |
| 2 | 1.5 | 2.0 | 2.0 | LOOSE GRAY & TAN FINE SAND [SP] | | | | | | | | | | |
| 3 | 2.0 | 3.5 | | MEDIUM DENSE GRAY & TAN FINE SAND [SP] | 14 | | | | 24.0 | | | | | |
| 4 | 3.5 | 5.0 | 5.0 | | 13 | | 5 | | | | | | | |
| 5 | 5.0 | 6.5 | 6.5 | LOOSE GRAY FINE SAND [SP] | 7 | | | | 31.4 | | | | | |
| 6 | 7.5 | 8.0 | 9.0 | SOFT GRAY CLAY [CH] W/ SAND & SHELL | | | | | 20.9 | | | | | |
| 7 | 9.5 | 10.0 | | LOOSE GRAY SANDY SILT [ML] | 5 | | 10 | | 60.3 | | | | | (53) |
| 8 | 10.0 | 11.5 | 12.5 | | | | | | | | | | | |
| 9 | 14.5 | 15.0 | | VERY SOFT GRAY ORGANIC CLAY [OH] W/ HUMUS & WOOD ( MUCH WOOD AT 19.5' - 20.0') | | | 15 | | 150.4 | | | | | |
| 10 | 19.5 | 20.0 | 20.0 | | | | 20 | | | | | | | |
| 11 | 24.5 | 25.0 | 26.5 | VERY SOFT DARK GRAY ORGANIC CLAY [OH] W/ HUMUS & MUCH WOOD | | | 25 | | 135.6 | | | | | |
| 12 | 29.5 | 30.0 | | VERY SOFT GRAY CLAY [CH] W/ TRACE ORGANIC | | | 30 | | 66.0 | | | | | |
| 13 | 32.0 | 32.5 | 32.5 | | | | | | | | | | | |
| 14 | 32.5 | 34.0 | | MEDIUM DENSE GRAY FINE SAND [SP] W/ SHELL | 12 | | 35 | | | | | | | |
| 15 | 36.0 | 37.5 | | | 11 | | | | 26.9 | | | | | (7) |
| 16 | 38.5 | 40.0 | 41.0 | | 12 | | 40 | | | | | | | |
| 17 | 41.0 | 42.5 | 43.5 | DENSE GRAY FINE SAND [SP] | 30 = .6' | | | | 26.6 | | | | | (8) |
| 18 | 43.5 | 45.0 | 46.0 | LOOSE GRAY FINE SAND [SP] | 8 | | 45 | | 26.3 | | | | | (10) |
| 19 | 46.0 | 47.5 | | MEDIUM DENSE GRAY SILTY FINE SAND [SM] | 11 | | | | 29.8 | | | | | (14) |
| 20 | 48.5 | 50.0 | 50.0 | | 20 | | 50 | | | | | | | |
| | | | | | | | 55 | | | | | | | |
| | | | | | | | 60 | | | | | | | |

Note: Symbols in Brackets [  ] indicate Unified Soils Classification.

NOTE: VALUES IN PARENTHESES ( ) INDICATE PERCENT PASSING NO. 200 SIEVE.

CLAY    SILT    SAND    ORGANIC
Predominant Type Bold. Modifying Type Light.

*140 lb. hammer dropped 30 inches on 2 inch splitspoon sampler after first being seated.

REMARKS:   Water Table Depth = 2.5 ft   (See Text)
Free Water Depth = 2.0 ft   (See Text)

McElwee00525

Fig. 2

# GORE ENGINEERING, INC.

Soil and Foundation Investigations
Metairie, Louisiana

Job No. 7899

Boring No. **B-2**

## LOG OF BORING AND TEST RESULTS

Date Boring Drilled: **13 December 2001**

Project: **PROPOSED DWYER RD. PUMP STATION UPGRADE & DISCHARGE CANAL - VIC. DWYER & JORDAN ROADS - NEW ORLEANS, LA.**
**McELWEE BROTHERS, INC. & TRI-STAR DESIGN CONSTRUCTION CO., INC. - (A JOINT VENTURE) - GENERAL CONTRACTORS - INDEPENDENCE - LA.**

Recorded By: **D. TUSA**

| Sample No. | SAMPLE Depth in Feet From | To | STRATUM Depth in Feet | VISUAL CLASSIFICATION | *Blows per Foot | Symbol Log | Scale (feet) | UNCONFINED COMPRESSION (Qu) (lbs./sq.ft.) | WATER CONTENT (percent) | UNIT WEIGHT (lbs./cu.ft.) DRY | WET | ATTERBERG LIMITS L.L. | P.L. | P.I. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | .0 | .5 | .0 .5 | SOFT GRAY CLAY [CH] W/ SAND & SHELL (FILL) | | | 0 | | | | | | | |
| | | | 2.0 | SHELL W/ SOME CLAY (FILL) | | | | | | | | | | |
| 2 | 3.5 | 4.0 | | | | | | | 43.0 | | | | | |
| 3 | 5.5 | 6.0 | | MEDIUM STIFF GRAY & TAN CLAY [CH] W/ TRACE ORGANIC | | | 5 | | 53.8 | | | | | |
| 4 | 7.5 | 8.0 | 9.0 | | | | | | 49.1 | | | | | |
| 5 | 9.5 | 10.0 | | LOOSE GRAY CLAYEY FINE SAND [SC] W/ WOOD | | | 10 | | 45.1 | | | | | |
| 6 | 11.5 | 12.0 | 12.0 | | | | | | 33.3 | | | (12) | | |
| | | | 16.0 | WOOD W/ HUMUS | | | 15 | | | | | | | |
| 7 | 19.5 | 20.0 | 20.0 | VERY SOFT BROWN HUMUS [OH] W/ ORGANIC, CLAY, & MUCH WOOD | | | 20 | | 282.3 | | | | | |
| 8 | 24.5 | 25.0 | 25.0 | LOOSE GRAY FINE SAND [SP] | | | 25 | | 24.9 | | | (7) | | |
| 9 | 26.0 | 26.5 | | | | | | | 72.3 | | | 91 | 29 | 62 |
| 10 | 29.5 | 30.0 | 31.5 | VERY SOFT GRAY CLAY [CH] W/ SAND POCKETS | | | 30 | | 74.4 | | | | | |
| 11 | 31.5 | 32.0 | | | 9 | | | | 25.4 | | | | | |
| 12 | 32.0 | 33.5 | | LOOSE GRAY FINE SAND [SP] W/ SHELL FRAGMENTS | | | | | 21.7 | | | (7) | | |
| 13 | 34.5 | 35.0 | 36.5 | ( MUCH SHELL AT 34.5' - 35.0' ) | | | 35 | | 25.7 | | | | | |
| 14 | 36.5 | 38.0 | | MEDIUM DENSE GRAY FINE SAND [SP] W/ SHELL | 20 | | | | 41.4 | | | (9) | | |
| 15 | 39.0 | 40.5 | 41.0 | | 27 | | 40 | | 22.1 | | | | | |
| 16 | 42.0 | 43.5 | | | 4 | | 45 | | 34.1 | | | (26) | | |
| 17 | 45.0 | 46.5 | | LOOSE GRAY SILTY FINE SAND [SM] W/ SHELL | 9 | | | | 32.5 | | | | | |
| 18 | 48.5 | 50.0 | 50.0 | | 4 | | 50 | | 27.4 | | | (16) | | |
| | | | | | | | 55 | | | | | | | |
| | | | | | | | 60 | | | | | | | |

Note: Symbols in Brackets [ ] indicate Unified Soils Classification.

NOTE: VALUES IN PARENTHESES ( ) INDICATE PERCENT PASSING NO. 200 SIEVE.

CLAY  SILT  SAND  ORGANIC

Predominant Type Bold. Modifying Type Light.

*140 lb. hammer dropped 30 inches on 2 inch splitspoon sampler after first bedding of 6"

REMARKS:

Free Water Depth = 10.0 ft    (See Text)

McElwee00526

Fig. 3



## GRAIN SIZE DETERMINATIONS

SOIL BORINGS & LABORATORY TESTS
PROPOSED DWYER RD. PUMP STATION
UPGRADE & DISCHARGE CANAL
VICINITY DWYER & JORDAN ROADS
NEW ORLEANS, LOUISIANA

J-7899

Fig. 4

GORE ENGINEERING, INC.
SOIL AND FOUNDATION INVESTIGATIONS

McElwee00527

PX-0109-0527



## GRAIN SIZE DETERMINATIONS

SOIL BORINGS & LABORATORY TESTS
PROPOSED DWYER RD. PUMP STATION
UPGRADE & DISCHARGE CANAL
VICINITY DWYER & JORDAN ROADS
NEW ORLEANS, LOUISIANA

J-7899

Fig. 5

McElwee00528

GORE ENGINEERING, INC.
SOIL AND FOUNDATION INVESTIGATIONS

PX-0109-0528



**GRAIN SIZE DETERMINATIONS**

SOIL BORINGS & LABORATORY TESTS
PROPOSED DWYER RD. PUMP STATION
UPGRADE & DISCHARGE CANAL
VICINITY DWYER & JORDAN ROADS
NEW ORLEANS, LOUISIANA

J-7839

Fig. 6

GORE ENGINEERING CO.
SOIL AND FOUNDATION INVESTIGATIONS



**GRAIN SIZE DETERMINATIONS**

SOIL BORINGS & LABORATORY TESTS
PROPOSED DWYER RD. PUMP STATION
UPGRADE & DISCHARGE CANAL
VICINITY DWYER & JORDAN ROADS
NEW ORLEANS, LOUISIANA

J-7899

Fig. 7

GORE ENGINEERING INC.
SOIL AND FOUNDATION INVESTIGATIONS

PX-0109-0530



## GRAIN SIZE DETERMINATIONS

SOIL BORINGS & LABORATORY TESTS
PROPOSED DWYER RD. PUMP STATION
UPGRADE & DISCHARGE CANAL
VICINITY DWYER & JORDAN ROADS
NEW ORLEANS, LOUISIANA

J-7899

Fig. 8

GORE ENGINEERING, INC.
SOIL AND FOUNDATION INVESTIGATIONS

PX-0109-0531



## GRAIN SIZE DETERMINATIONS

SOIL BORINGS & LABORATORY TESTS
PROPOSED DWYER RD. PUMP STATION
UPGRADE & DISCHARGE CANAL
VICINITY DWYER & JORDAN ROADS
NEW ORLEANS, LOUISIANA

J-7899

Fig. 9

GORE ENGINEERING, INC.
SOIL AND FOUNDATION INVESTIGATIONS

PX-0109-0532



## GRAIN SIZE DETERMINATIONS

SOIL BORINGS & LABORATORY TESTS
PROPOSED DWYER RD. PUMP STATION
UPGRADE & DISCHARGE CANAL
VICINITY DWYER & JORDAN ROADS
NEW ORLEANS, LOUISIANA

J-7899

Fig. 10

PX-0109-0533



## GRAIN SIZE DETERMINATIONS

SOIL BORINGS & LABORATORY TESTS
PROPOSED DWYER RD. PUMP STATION
UPGRADE & DISCHARGE CANAL
VICINITY DWYER & JORDAN ROADS
NEW ORLEANS, LOUISIANA

J-7899

Fig. 11

GORE ENGINEERING, INC.
SOIL AND FOUNDATION INVESTIGATIONS

PX-0109-0534



**GRAIN SIZE DETERMINATIONS**

SOIL BORINGS & LABORATORY TESTS
PROPOSED DWYER RD. PUMP STATION
UPGRADE & DISCHARGE CANAL
VICINITY DWYER & JORDAN ROADS
NEW ORLEANS, LOUISIANA

J-7899

Fig. 12

PX-0109-0535



**GRAIN SIZE DETERMINATIONS**

SOIL BORINGS & LABORATORY TESTS
PROPOSED DWYER RD. PUMP STATION
UPGRADE & DISCHARGE CANAL
VICINITY DWYER & JORDAN ROADS
NEW ORLEANS, LOUISIANA

J-7899

Fig. 13

PX-0109-0536



## GRAIN SIZE DETERMINATIONS

SOIL BORINGS & LABORATORY TESTS
PROPOSED DWYER RD. PUMP STATION
UPGRADE & DISCHARGE CANAL
VICINITY DWYER & JORDAN ROADS
NEW ORLEANS, LOUISIANA

J-7899

Fig. 14

GORE ENGINEERING, INC.
SOIL & FOUNDATION INVESTIGATIONS

PX-0109-0537



**DEPARTMENT OF THE ARMY**
NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO
ATTENTION OF:

March 18, 2003

SELA Orleans Resident Office

SUBJECT: Contract Number DACW29-01-C-0035, Southeast Louisiana, Dwyer Road Drainage
Pumping Station Improvements, Discharge Tubes and Canal, Orleans Parish, Louisiana

McElwee Brothers, Inc. & Tri-State Design Construction Company, Inc.
P.O. Box 1410
Independence, Louisiana 70443

Gentlemen:

Reference the Initial Inspection on Monday, March 10, 2003 for the Jack and Bore
operation; the phone conversation between myself and Mr. Ross Leslie on Tuesday, March 11,
2003; the biweekly status meeting of Thursday, March 13, 2003; the field meeting of Friday,
March 14, 2003 between your designer, Mr. Michael Dixon, and our geotechnical engineer, Mr.
Frank Vojkovich and the phone conversation on Monday, March 17, 2003 between Mr. Glenn
Gremillion and Mr. Leslie. At each of the above, there have been discussions about the
requirements for dewatering of the area through which you are jacking and boring the 84-inch
welded steel discharge tubes. You have promised that an adequate system will be installed and
operated to sufficiently dewater this area. During the aforementioned field meeting, you were
asked to provide an "As-Built" of the system, as well as, a recommendation from Mr. Dixon of
it's adequacy. This recommendation, it was agreed, would be based upon the piezometers
readings taken in the area.

As of the date of this letter, I have not received any of the information listed above. As
previously stated, you will not be allowed to continue with the jack and bore operation until this
information is submitted and reviewed.

I again remind you that in your Value Engineering Change Proposal, Jason Consultants
noted the need to dewater the area in order to maintain a stable tunnel face during the jack and
bore operation. This was not done during installation of the first tube and the resulting formation
of sinkholes severely compromised the safety of the operation.

This failure to provide and maintain a the dewatering system as required by the contract
has been noted by this office and will be considered when evaluating your performance in the
areas of Quality Control, Effectiveness of Management and Compliance with Safety Standards.

**McElwee00538**

EXHIBIT

40

PENGAD 800-631-6989

If you have any questions, contact this office at 861-2439.

Sincerely,

Timothy J. Roth
Administrative Contracting Officer

**McElwee00539**

CF:
Team Leader (Gremillion)
QAR (Falati)
CEMVN-CD-CS (Basurto)

Mr. Ronald Davis
Tri State Design Construction Company, Inc.
7401 Old York Road
Elkins Park, PA 19027

Mr. Jim Lumsden
Design Engineering Inc.
3330 West Esplanade Avenue South
Suite 205
Metairie, Louisiana 70002

Mr. Jim Legendre
ILSI Engineering
4300 S. I-10 Service Road, Suite 113
Metairie, Louisiana 70006

McElwee00540



# DEPARTMENT OF THE ARMY

NEW ORLEANS DISTRICT. CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO
ATTENTION OF:

May 30, 2003

Contracting Division

SUBJECT: Contract Number DACW29-01-C-0035 8(a), Southeast Louisiana Drainage Project, Dwyer Road Drainage Pumping Station Improvements, Discharge Tubes and Canal, Orleans Parish, Louisiana

McElwee Brothers, Inc &
Tri-State Design Construction Company, Inc
(A Joint Venture)
P.O. Box 1410
Independence, LA 70443

Gentlemen:

This is in acknowledgement of Mr. McElwee's letter of May 27, 2003 and Mr. Davis' letter of May 28, 2003. Our testing consultant has concluded that the two (2) piles tested thus far of the five (5) questionable piles have indeed been damaged. I must take exception here to the reference in Mr. McElwee's letter that the test method being employed by our consultant is "destructive"; it is not. We stand ready, as of May 29, 2003, to similarly test the remaining three piles, as soon as you can mobilize the equipment to support this effort. We also have determined that four (4) additional piles have been driven out of tolerance with regard to the batter specified in the contract. Neither the damaged piles nor those driven out of tolerance are acceptable to the Government.

We are considering several possibilities that could have caused or contributed to the pile damage, including improper casting, handling, and storage of the piles, how they were positioned in the leads, and the driving procedure. All of these result from defective workmanship and lie within your responsibility. As such, the responsibility for developing a corrective action, including a probable re-design of the T-wall foundation and base slab, and for making up the delay caused by this setback lies with you. Likewise, the cost of the additional quality assurance testing we are performing to determine the condition of the suspect piles will be deducted from payment of your contract earnings, pursuant to the Inspection and Acceptance clause of your contract. Although Mr. McElwee's letter suggests that soil design factors are to blame, the facts do not support this contention. We must however emphasize the need for expedience in whatever additional testing you believe necessary on your part, and in determining an acceptable solution to rectify the defective work. To that end, we are open to working closely with you to arrive at an acceptable re-design concept as quickly as possible once the full extent of the defective work and associated impacts are known.

EXHIBIT
42

PENGAD 800-631-6989

**McElwee00541**

-2-

Your contract requires completion of the reconstruction and reopening of Jourdan Road during non-hurricane season (December through May). You have failed to accomplish this. As we enter this hurricane season on June 1, 2003, we still require flood protection and we still need to maintain two-way traffic flow along Jordan Road. Therefore, I am establishing a deadline of June 20, 2003 for you to implement an acceptable interim form of flood protection consistent with keeping Jourdan Road open. On May 28, 2003, Mr. Timothy Roth verbally requested your updated flood protection plan be provided by May 30, 2003.

Our letter of May 9, 2003, extended your forbearance period for completion of the required permanent flood protection to Saturday, May 31, 2003. Even though your performance continues to be less than satisfactory, I am willing extend the forbearance period to December 24, 2003, predicated on the following: 1) you continuously evaluate your performance, on-site management organization, and all resources available to you and consider any corrective measures that might improve your performance; 2) you diligently pursue and submit an acceptable re-design of the T-wall addressing all piles determined to be damaged, and those driven out of tolerance; 3) you implement an acceptable form of interim flood protection which maintains traffic on Jourdan Road by June 20, 2003. We expect you to complete all contract work by December 24, 2003 in accordance with your latest overall job progress schedule. However, I am reserving my rights to terminate your contract for default should you demonstrate an inability to perform the work and maintain progress, or otherwise jeopardize completion of the work as outlined above. Liquidated damages are not being waived and your timely performance evaluation element may be rated as unsatisfactory.

Sincerely,

Diane K. Pecoul
Contracting Officer

McElwee00542

-3-

CF:
Great American Insurance Company
1120 Route 73, Suite 450
Mt. Laurel, NJ 08054

U.S. Small Business Administration
Attn: Gayle Brogan
365 Canal Street, Suite 2820
New Orleans, Louisiana 70130

Ronald U. Davis, President
Tri-State Design Construction Company, Inc.
7401 Old York Road
Elkin Park; PA 19027

McElwee00543

PX-0109-0543



**DEPARTMENT OF THE ARMY**
NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA 70160-0267

REPLY TO
ATTENTION OF:

June 20, 2003

Contracting Division

SUBJECT: Contract Number DACW29-01-C-0035 8(a), Southeast Louisiana Drainage Project, Dwyer Road Drainage Pumping Station Improvements, Discharge Tubes and Canal, Orleans Parish, Louisiana

McElwee Brothers, Inc &
Tri-State Design Construction Company, Inc
(A Joint Venture)
P.O. Box 1410
Independence, LA 70443

Gentlemen:

Reference is made to the following:

1. Your letter dated Thursday, June 12, 2003, concerning your claim of a Differing Site Condition; Difference in soil conditions as compared to boring 2 illustrated on plan G-27.

2. Transmittal #161 dated 11 June 2003, concerning item number 23, Prestressed Concrete Pile, and item number 49, Concrete Pile Driving Equipment.

3. Transmittal #162 dated 13 June 2003, also concerning item number 23, Prestressed Concrete Pile, and item number 49, Concrete Pile Driving Equipment.

4. Mr. Roth's letter dated May 22, 2003, concerning preparation of the piles for Quality Assurance Testing.

We have reviewed the soil-boring log performed by Gore Engineering, Inc. received via Transmittal #161, on Thursday June 22, 2003. Although Gore's boring log fails to indicate the ground elevation from which the boring was taken, there does not appear to be a significant difference between Gore's boring and the boring log shown on contract drawing G-27. Furthermore, the boring log performed by Gore Engineering, Inc. does not show or indicate that voids were encountered. Therefore, we do not concur with your conclusion that the blow counts encountered may be a direct relation to voids caused by removal of existing piles and subsequent filling with bentonite.

McElwee00544

EXHIBIT
_43_
PENGAD 800-631-6989

**PX-0109-0544**

-2-

We have also reviewed the letter written by International Construction Equipment, Inc. (ICE) received via Transmittal #162, on Friday, June 13, 2003. ICE indicates that neither of the two models of diesel hammers evaluated in the GRL Weap program produced stresses in the pile during driving that exceed the accepted norms for concrete piles. However, ICE fails to mention that the actual hammer used to drive the piles has variable energy settings and that the energy levels were not recorded during driving of the piles. It is possible that the high energy levels used during driving may have caused the damage to the piles.

Due to our aforementioned conclusions, we do not recognize your assertion of a differing site condition.

Finally, the Government only required the pile-driving hammer during our Quality Assurance testing of the piles on May 25, 2003. Your consultant GRL, performed testing at your request on May 30, 2003, using the crane and pile driving hammer. As such it was not necessary for us to repeat the same testing. On June 16, 2003, Mr. McElwee contacted Ms. Diane Callahan by telephone and asked if the hammer could be released. Ms. Callahan informed Mr. McElwee that the Government has had no need for the hammer since completion of our Quality Assurance Testing.

Sincerely,

Diane K. Pecoul
Contracting Officer

**McElwee00545**

PX-0109-0545

-3-

CF:
Great American Insurance Company
1120 Route 73, Suite 450
Mt. Laurel, NJ 08054

U.S. Small Business Administration
Attn: Gayle Brogan
365 Canal Street, Suite 2820
New Orleans, LA 70130

Ronald U. Davis, President
Tri-State Design Construction Company, Inc.
7401 Old York Road
Elkin Park, PA 19027

**McElwee00546**

**PX-0109-0546**





# McElwee Bros., Inc.

## &

TRI STATE DESIGN CONSTRUCTION COMPANY, INC.



## (A Joint Venture)

via facsimile (504) 862-2889 and via U. S. Postal Certified Mail Return Receipt Number 7001 2510 0000 2595 5893

Tuesday, June 24, 2003

Ms. Diane Pecoul, Contracting Officer
U. S. Army Corps of Engineers
P. O. Box 60267
New Orleans, Louisiana 70150-0267

Re:   Contract Number DACW29-01-C-0035, 8(a) Southeast Louisiana, Dwyer Road
Drainage Pumping Station Improvements, Discharge Tubes and Canal, Orleans Parish,
Louisiana; *FAR 52.243-7 Changes (b) Notification of Changes*.

Dear Ms. Pecoul,

    We are hereby providing notification of work that we believe is above and beyond
the original contract scope. Reference attachment number 0001. The items listed under
"ORDER OF NEGOTIATION" and "CLAIMS" are unfinished.   The date, nature, and
circumstances of the conduct is annotated in our daily CQC reports.

    We will forward detail cost upon completion of each item. Please provide your final
decision within 60 days on all items.

EXHIBIT
44
PENGAD 800-631-6989

McElwee Brothers, Inc. & Tri-State Design Construction Company, Inc. (AJV)

Page 1 of 2

6/24/2003

McElwee00547

PX-0109-0547

In conclusion, the Joint Venture is committed to completion of the Flood wall. However we must have clear and concise directives, as it relates to any design changes made by the USACOE. If you require any additional information, please do not hesitate to contact our office.

Sincerely,

Melvin M. L. McElwee Sr., Managing Venturer

Attachment

XC:   Great American Insurance Company
1120 Route 73, Suite 450
Mt. Laurel, NJ  08054

Jo Ann Lawerence, BOS
U. S. Small Business Administration
1661 Canal Street
New Orleans, LA  70112

Gary J. Rouse, Esq.
Koch and Rouse, LLC
Attorneys and Counsellors at Law
World Trade Center, 26th Floor
2 Canal Street
New Orleans, LA  70130

Randall Fish, Esq.
P. O. Box 220
LaCombe, LA  70445

Chief Counsel
U. S. Army Corps of Engineers
P. O. Box 60627
New Orleans, LA  70150-0267   via facsimile (504) 862-2827

McElwee Brothers, Inc. & Tri-State Design Construction Company, Inc. (AJV)

Page 2 of 2

6/24/2003

**McElwee00548**

PX-0109-0548

CHANGE ORDER LOG

McELWEE     THERS
TRI-STATE DESIGN CO    TION COMPANY
(A JOINT V    E)

DACW29-01

| ID No. | DESCRIPTION | ESTIMATED COST | TARGET DATE | TIME CALENDAR DAY(S) | NOTES |
|---|---|---|---|---|---|
| Amend 0000l | Time Extension 001  Adverse Weather - Rain | $0.00 | | 3.00 | FINALIZED |
| Amend 0000S | Add Compensins Price to Pile Numbers 290 and 293 | $509.00 | | 0.00 | FINALIZED |
| Amend 00006 | Time Extension 002  Adverse Weather - High Wind | $0.00 | | 1.00 | FINALIZED |
| Amend 00007 | Time Extension 003  Adverse Weather - High Wind | $0.00 | | 2.00 | FINALIZED |
| Amend 00008 | Time Extension 004  Adverse Weather - High Tide | $0.00 | | 1.00 | FINALIZED |
| P00019 | VECP (Jacking and Boring) | -$2,010.00 | | 0.00 | FINALIZED |
| CIN 005 | Correct Discrepancy between Plans and Specfications on the number of Piuepanders | $21,275.32 | | 0.00 | FINALIZED |
| P00026 | GRANULAR FILL - 2094 CY | $120,006.00 | | 20.00 | FINALIZED |
| P00026 | GRANULAR FILL - 2000 CY | $71,000.00 | | 9.00 | FINALIZED |
| P00026 | GRANULAR FILL - 6000 CY | $143,340.00 | | 0.00 | FINALIZED |
| | | | | | |
| | **ORDER OF NEGOTIOATION** | | | | |
| CIN 007 | MOB / DEMOB (HURICANE PROTECTION PLAN | $259,598.65 | 25-Apr-03 | 24.00 | 5 June 03 First Session Negotiation took place |
| | Missing Cost of Driving the sheets w/existing concrete piles in place. | | | | |
| CIN 008 | TROPICAL STORM HARINA | $23,015.65 | 9-May-03 | +.79 | 5 June 03 First Session Negotiation took place |
| CIN 009 | TROPICAL STORM ISIDORE | $76,243.00 | 23-May-03 | 12.00 | 5 June 03 First Session Negotiation took place |
| CIN 010 | TROPICAL STORM LILI | $24,045.00 | 6-Jun-03 | 4.00 | 5 June 03 First Session Negotiation took place |
| Amend 00004 | Install Bentonic Slurry in hole after Existing Concrne Pile Extraction | $64,164.23 | 20-Jun-03 | 14.00 | TO USACOE 24 Mar 03 U. S. Cerfied Mail 7001 2510 0003 5969 |
| Amend 00002 | By Pass Road Layout Revision | $85,832.00 | 4-Jul-03 | 36.00 | SUBMITTED TO THE CORPS W/O IMPACTS |
| - | Missing Cost of Placing Additional Water Stop and General Conditions | | | | |
| - | Unidentified Abandoned 30" SFM | $270,864.52 | 15-Aug-03 | 21.00 | TO USACOE 29 May 03 U. S. Cerfied Mail 7001 2510 0003 5991 |
| TE 005 | Time Extension 005  Adverse Weather - 1 High Tide, 3 - Rain | $0.00 | | 4.00 | N° 30 to contractor |
| SUBTOTAL | | $1,157,618.17 | | 159.00 | |
| | | | | | |
| | **CLAIMS** | | | | |
| 1 | REMOVAL OF ADDITIONAL SHSETPILE & ASPHALT IN JOURDAN ROAD | $10,500.00 | 18-Jul-03 | 4.00 | NOTIFICATION TO USACOE 24 June 2003 |
| II | DEWATERING DESING COST | $4,557.00 | 1-Aug-03 | 1.00 | NOTIFICATION TO USACOE 24 June 2003 |
| IV | IMPACT; Delay Associated with 30" SFM relocated by others | $1,500,000.00 | 29-Aug-03 | 395.00 | NOTIFICATION TO USACOE 24 June 2003 |
| V | IMPACT DELAY SUBMITTAL REVIEWS | $100,000.00 | 5-Sep-03 | 60 | NOTIFICATION TO USACOE 24 June 2003 |
| VI | REMOVAL OF CONCRETE PILES | $115,132.00 | 19-Sep-03 | 14.00 | REQUEST FINAL DECISION |
| VII | DEFECTIVE SPECIFICATIONS; Improper Concrete Pile Design | $1,500,000.00 | 26-Sep-03 | 151.00 | NOTIFICATION TO USACOE 24 June 2003 |
| | | | | | |
| SUBTOTAL | | $3,230,189.00 | | 627 | |
| | | | | | |
| TOTAL | | $4,387,807.37 | | 786.00 | |

Notification of Claims

Attachment Number 0001

TO: Diane Picou, Contracting Officer

McElwee00549

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF LOUISIANA

GREAT AMERICAN INSURANCE COMPANY     CIVIL ACTION NO. 03-2793

VERSUS

McELWEE BROTHERS, INC. and     SECTION "K"
TRI-STATE DESIGN CONSTRUCTION
COMPANY, INC., McELWEE BROTHERS,     JUDGE JOSEPH C. WILKINSON
INC., MELVIN M. L. McELWEE, SR.,     MAGISTRATE (2)
SYLVIA HURST

### AFFIDAVIT OF MELVIN M. L. McELWEE, SR., IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

STATE OF LOUISIANA

PARISH OF ST. TAMMANY

BEFORE ME, the undersigned Notary Public, duly commissioned and qualified, personally came and appeared MELVIN M. L. McELWEE, SR., who, after being duly sworn, did depose and state of his personal knowledge:

1. He is the President and CEO of McElwee Bros., Inc., a principal the managing partner in the Joint Venture formed pursuant to a Joint Venture Agreement dated August 16, 2000, with Tri-State Design Construction Company, Inc., a Pennsylvania corporation.

2. The Joint Venture was formed for the purpose of bidding on and performing the U.S. Army Corps of Engineers 8(a) Disadvantaged Business Contract designated as Contract DACW29-01-C-0032, known as "The Dwyer Road Discharge Tubes and Box Culvert Canal Section," located in New Orleans, Louisiana (the "contract"), which contract was awarded to the Joint Venture on March 20, 2001. The contract price was $5,521,356.53.

EXHIBIT
4-5

McElwee00550

PX-0109-0550

3.     Under the Joint Venture Agreement, he was the authorized representative of the Joint Venture with direct responsibilities including, but not limited to, project administration, management, and the retention of legal counsel. He was responsible for estimating costs, negotiating and reviewing proposals on subcontracts, reviewing accounts payables and receivables, advising the other Joint Venture Partner of cash flow, coordinating subcontract materials and supplies for the performance of the contract, overseeing daily operations on the project job site, and ensuring compliance with safety and engineering standards on the project.

4.     He is knowledgeable of all line items in connection with all construction phases of the project through completion.

5.     Pursuant to the requirements of the Corps for a payment and performance bond, on October 25, 1999, Great American entered into a General Agreement of Indemnity ("GAI) with McElwee Bros., Tri-State Design, Melvin and Sylvia McElwee, and Ronald and Beverly Davis. Great American was made aware at the time it entered into the GAI that none of the McElwee parties had assets sufficient to bond any failure or default that may occur in connection with the Dwyer Road Project.

6.     The Joint Venture undertook the project and performed and completed several phases of the project under his direction, inspite of numerous project delays and cost overruns caused by the Corps and other entities for whom the Joint Venture was not responsible.

7.     The Corps ordered the Joint Venture to perform additional work beyond its contractual obligations for which the Joint Venture submitted many change orders or requests for modification.

2

**McElwee00551**

8.     The issuance of the termination for default by the Corps against the Joint Venture on June 23, 2003, was inappropriate, was due to the acts or omissions of the Corps or other parties for whom the Joint Venture was not responsible, including Pittman Construction Company, and not reasonably based on any act or omission of the Joint Venture or its partners. The issuance of the termination for default allowed the Corps not to pay the Joint Venture for the amounts it owed and to demand that Great American as surety complete the project at no cost to the Corps.

9.     The Joint Venture, McElwee Bros., Inc., (and all other McElwee parties) and Tri-State Design remained able and willing at all times following the issuance of the termination for default to complete the project.

10.    The Joint Venture, McElwee Bros., Inc., (and all other McElwee parties) and Tri-State Design cooperated with Great American in investigating and pursuing the claims submitted to and pending with the Armed Services Board of Contract Appeal, including making all records, files, and all other documents available for inspection and copying by Great American, as well as in providing information and advice upon request. However, Great American failed to adequately utilize the expertise of Melvin McElwee in pursuing the claims with the ASBCA, which likely would have led to greater recovery on the claims.

11.    Great American had the option and opportunity to advocate that the Corps convert the termination for default to a termination for convenience when it acquired the claims pursuant to the GAI, but Great American elected not to do so. Nevertheless, Great American argued before the ASBCA that the Joint Venture did not merit a default for termination, however, Great American's argument was greatly weakened by its failure to advocate to the Corps to rescind the

3

**McElwee00552**

**PX-0109-0552**

termination for default, ultimately resulting in a devaluation of the substantial claims for modification submitted by the Joint Venture.

12.     By refusing to allow the Joint Venture or its principals to complete the project, Great American incurred substantially higher costs in having Pittman Construction Company, other consultants and service suppliers complete the project.

13.     The $154,471.07 deduction by the Corps from the remaining contract funds to redesign and complete the interim hurricane protection plan (Plaintiff's Exhibit I) (the same plan previously submitted by the Joint Venture), would have been owed by the Corps to the Joint Venture had the termination for default been converted to a termination for convenience. Furthermore, the delays for which such damages were allocated were caused by the Corps' efforts in redesigning the hurricane protection plan.

14.     The liquidated damages in the aggregate amount of $499,205.64 (Plaintiff's Exhibit I) deducted by the Corps from the remaining contract funds paid to Great American would have been owed to the Joint Venture had the termination for default been converted to a termination for convenience.

15.     Following the issuance by the Corps of the termination for default against the Joint Venture, Great American promised to pursue all claims for modification submitted by the Joint Venture to the Corps and ultimately to the Armed Services Board of Contract Appeals.

16.     The total value of the claims for modification at the time of the issuance of the termination for default against the Joint Venture was $4,347,807.37 (Plaintiff's Exhibit F), which

4

**McElwee00553**

PX-0109-0553

Great American and the Corps compromised for $1,900,000 (Plaintiff's Memorandum in Support, 8), far below fair or reasonable value.

17.     A termination for convenience would have preserved the right of the Joint Venture to recover a reasonable profit completed to date of termination as well as expenses and attorneys fees under the Equal Access to Justice Act. The decision of Great American to not pursue conversion of the termination for default to a termination for convenience vitiated any and all profit to which the Joint Venture would have been entitled. Therefore, the decision of Great American not to seek conversion of the termination for default to a termination for convenience cost the Joint Venture $ 358,993 in profit plus lost expenses.

18.     Providing that Great American recovered only $1,900,000 in settlement with the ASBCA on the claims for modification, and providing that the termination of default was converted to a termination for convenience, Great American's tabulation of its losses, less attorneys' fees, should be calculated as follows:

    $ 4,023,740.87 - Amount paid by Great American under the GAI (Plaintiff's Memo, 9)
    - 1,306,310.84 - Funds remaining under original contract (Plaintiff's Exhibit I)
    -1,900,000.00 - Modification claims settlement funds (Plaintiff's Memo, 8)
    $   817,430.03 - Subtotal due Great American
      - 154,471.07 - Interim hurricane protection work  (Plaintiff's Exhibit I)
      - 499,205.64 - Liquidated damages (Plaintiff's Exhibit I)
      - 123,904.77 - Amount paid to Great American by Tri-State
    $    38,848.55 - Total amount of Great American's losses less attorneys fees.

19.     At the time that the Corps issued the termination for default, the total value of the amount remaining in the original contract between the Corps and the Joint Venture for the completion of the project, plus the value of the settlements on the claims paid by the Corps to Great American

5

**McElwee00554**

**PX-0109-0554**

would have been adequate not only to complete the project at no loss to Great American, but actually resulted in a profit for the Joint Venture.

20.     Had Great American settled the claims for modification with the ASBCA for their reasonable value of $4,347,807.37, and providing that Great American successfully advocated conversion of the termination for default to a termination for convenience, Great American would have sustained no loss, calculated as follows:

> $4,347,807.37 - Fair value of modification claims due the Joint Venture
>   1,706,146.05 - Contract funds remaining (Plaintiff's Exhibit I, 2)
> $6,053,953.42 - Funds due Joint Venture after conversion of the "T for D" to "T for C"
>  - 4,023,740.87 - Amount paid by Great American under the GAI (Plaintiff's Memo, 9)
> $2,030,212.55 - Net funds due Joint Venture

21.     The $2,030,212.55 net funds due the Joint Venture following the conversion of the "T for D" to a "T for C" does not include attorneys fees which would have been available under the Equal Access to Justice Act or other applicable statute.

_(signature)_

MELVIN M. L. McELWEE, SR.

SWORN TO AND SUBSCRIBED before me,
Notary Public, this _13th_ day of February, 2007.

_(signature)_

RANDALL A. FISH, Notary Public
La. Bar Roll No. 1873

6

**McElwee00555**

PX-0109-0555