UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE:  KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NO. 05-4182 |
| | * | |
| PERTAINS TO:  MRGO | * | SECTION "K" (2) |
| | * | |
| | * | JUDGE DUVAL |
| | * | |
| | * | MAGISTRATE WILKINSON |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

## WASHINGTON GROUP INTERNATIONAL, INC.'S PRE-TRIAL BRIEF

William D. Treeby, 12901
James C. Gulotta, Jr., 6590
Heather S. Lonian, 29956
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Facsimile:   (504) 581-3361

Adrian Wager-Zito
Debra S. Clayman
Christopher R. Farrell
Christopher N. Thatch
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3891
Facsimile:  (202) 626-1700

*Attorneys for Washington Group
International, Inc.*

## Table of Contents

Page

TABLE OF AUTHORITIES ................................................................................. iii

WASHINGTON GROUP INTERNATIONAL, INC.'S PRE-TRIAL BRIEF .............................. 1

INTRODUCTION ................................................................................................ 1

LAW & ARGUMENT ........................................................................................... 4

    **A.**    WGI Did Not Have a Duty to Provide Geotechnical Engineering Services Relative to the Levees and Floodwalls. .................................................... 4

    **B.**    WGI Did Not Deviate from the Standard of Care of a Contractor Performing Demolition, Removal, Excavation, and Environmental Remediation Services ........................................................................... 7

    **C.**    WGI's Conduct Did Not Cause Plaintiffs' Alleged Damages. ............................. 10

    **D.**    Allocation of Fault, If Any ........................................................................ 15

    **E.**    WGI Is Immune from Liability Pursuant to La. R.S. 9:2771. ............................. 15

    **F.**    Plaintiffs Have Overstated Their Damages ................................................... 17

        **1.**    Plaintiffs Cannot Establish All Damages They Claim Related to Their Immovable Property. ......................................................... 17

            **a.**    Certain Plaintiffs May Only Recover the Diminution in Value of Their Immovable Property. ........................................... 17

            **b.**    Plaintiffs May Not Recover for Damages Resulting from Severable Causes. ...................................................... 18

        **2.**    Plaintiffs Cannot Establish All Claimed Damages Related to The Contents of their Homes. ..................................................... 20

            **a.**    Plaintiffs Cannot Recover for Property Belonging to Adults Who Are Not Parties to This Case. .......................... 20

            **b.**    Depreciation Must Be Applied to Any Award for Contents ........ 20

        **3.**    Plaintiffs Cannot Establish All Claimed Damages Related to Additional Living Expenses. .................................................... 21

            **a.**    Plaintiffs May Only Recover for Actual Additional Expenses Incurred. ...................................................... 21

            **b.**    Plaintiffs May Not Recover Additional Living Expenses after Establishment of a Permanent Residence ........................... 22

        **4.**    Plaintiffs Cannot Recover Damages for Inconvenience As a Matter of Law. .......................................................................... 23

## **Table of Contents**

<u>Page</u>

**G.**   Plaintiffs Are Not Entitled to Attorneys Fees Arising from Their Claims Against WGI. ......................................................................................................24

**H.**   WGI Is Immune from Liability Pursuant to the Government Contractor Defense. ..............................................................................................................24

CONCLUSION...............................................................................................................25

1101660v.1

## <u>Table of Authorities</u>

<u>Page</u>

## CASES

*Barabay Property Holding Corp. v. Boh Brothers Const. Co., L.L.C.*, 991 So. 2d 74 (La. App. 1 Cir. 2008) ...................................................................................9, 16

*Bellanger v. Webre*, 65 So. 3d 201 (La. App. 1 Cir. 2011) ..........................................10

*Borden, Inc. v. Howard Trucking Co.*, 454 So. 2d 1081 (La. 1983)..............................17

*Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988) ......................................................24

*Brewer v. J.B. Hunt Transport, Inc.*, 35 So. 3d 230 (La. 2010)......................................7

*Brown v. Williams*, 850 So. 2d 1116 (La. App. 2 Cir. 2003)..........................................20

*Crockett v. Cardona*, 713 So. 2d 802 (La. App. 4 Cir. 1998)..........................................12

*DOTD v. Wagner*, 38 So. 3d 240 (La. 2010) ................................................................24

*Gleason v. City of Shreveport*, 393 So. 2d 827 (La. App. 2 Cir. 1981) ........................11

*Graves v. Page*, 703 So. 2d 566 (La. 1997) ................................................................11

*Gray v. Security Storage & Van Co.*, 26 So. 2d 399 (La. Ct. App. Orleans 1946).......21

*Harrell v. Genco*, 671 So. 2d 530 (La. App. 1 Cir. 1996) ...........................................12

*Huddleston v.  Bossier Bank and Trust Co.*, 475 So. 2d 1082 (La. 1985)...................24

*Bradley v. Allstate Insurance Co.*, 620 F.3d 509 (5th Cir. 2010) .................................21

*In re Katrina Canal Breaches*, 2008 WL 5234369 (E.D. La. 2008), *rev'd on other grounds*, 620 F. 3d 455 (5th Cir. 2010) ...........................................................10

*In Re Katrina Canal Breaches Consolidated Litigation*, 647 F. Supp. 2d 644 (E.D. La. 2009) ................................................................................................................20

*Jimenez v. Omni Royal Orleans Hotel*, 66 So. 3d 528 (La. App. 4 Cir. 2011)................7

1101660v.1

## <u>Table of Authorities</u>

<u>Page</u>

*Khalimsky v. Liberty Mutual Fire Insurance Co.*, 2009 WL. 982641 (E.D. La. Apr. 13, 2009) ...............................................................................................................21

*Lacombe v. Greathouse*, 407 So. 2d 1346 (La. App. 3 Cir. 1981) ...................................5

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ...................................................10

*Lee v. Carwile*, 168 So. 2d 469 (La. App. 3 Cir. 1964) ................................................11

*Loupe v. Circle, Inc.*, 514 So. 2d 269 (La. App. 5 Cir. 1987)........................................11

*Maloney v. Oak Builders Inc.*, 224 So. 2d 161 (La. App. 4 Cir. 1969), *reversed in part on other grounds,* 256 La. 85, 235 So. 2d 386 (1970)............................................4

*McDonald v. Illinois Central Gulf R.R. Co.*, 546 So. 2d 1287 (La. App. 4 Cir. 1989) ................23

*McGill v. Republic Fire and Casualty Insurance Co.*, 2008 WL. 4792720 (E.D. La. 2008) ...........................................................................................................21

*Mitchell v. Eureka Chemical*, 2008 WL. 2597907 (E.D. La. 2008) .............................11

*Napolitano v. F.S.P., Inc.*, 797 So. 2d 111 (La. App. 4 Cir. 2001)...............................23

*New Orleans Unity Social of Practical Christianity v. Standard Roofing Co.*, 224 So. 2d 60 (La. App. 4th Cir. 1969)..................................................................16

*Norfleet v. Lifeguard Transportation Service*, 934 So. 2d 846 (La. App. 4 Cir. 2006)................15

*Pearce v. L.J. Earnest, Inc.*, 411 So. 2d 1276 (La. App. 3 Cir. 1982)...........................16

*Perkins v. Entergy Corp.*, 782 So. 2d 606 (La. 2001)...................................................11

*Pitre v. La. Tech University*, 673 So. 2d 585 (La. 1996) ..............................................10

*Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649 (5th Cir. 1994)..............................17

*Rando v. Anco Insulations, Inc.*, 16 So. 3d 1065 (La. 2009) .......................................10

*Roberts v. Benoit*, 605 So. 2d 1032 (La. 1991)..............................................................4

1101660v.1

## <u>Table of Authorities</u>

Page

*Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Service Co.*, 618 So. 2d 874 (La. 1993)..................................................................................17,. 18

*Servicios-Expoarma, C.A. v Industrial Maritime Carriers, Inc.*, 135 F.3d 984 (5th Cir. 1998) .....................................................................................................................17, 19

*Tex-La Properties v. South State Insurance Co.*, 514 So. 2d 707 (La. App. 2 Cir. 1987).............16

*Toston v. Pardon*, 874 So. 2d 791 (La. 2004).....................................................................10, 11

*Waterbury v. Byron Jackson, Inc.*, 576 F.2d 1095 (5th Cir. 1978)...................................................4

### STATUTES

Louisiana Civil Code article 2323 ...............................................................................................18

La. R.S. 9:2271 ......................................................................................................................15, 16

### OTHER

La. Civ. L. Treatise Tort Law § 4:2 (2d ed. 2012)........................................................................4

1101660v.1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|                                   |       |                        |
|-----------------------------------|-------|------------------------|
|                                   | *     |                        |
| IN RE:  KATRINA CANAL BREACHES    | *     | CIVIL ACTION           |
| CONSOLIDATED LITIGATION           | *     |                        |
|                                   | *     | NO. 05-4182            |
|                                   | *     |                        |
| PERTAINS TO:  MRGO                | *     | SECTION "K" (2)        |
|                                   | *     |                        |
|                                   | *     | JUDGE DUVAL            |
|                                   | *     |                        |
|                                   | *     | MAGISTRATE WILKINSON   |
| * * * * * * * * * * * * * * * * * * * * * * * * * * * | * |                        |

Pursuant to the Court's scheduling order (Doc. 20592), Defendant Washington Group International, Inc. ("WGI") hereby submits its Pre-Trial Brief.  In lieu of a Statement of Facts section, WGI incorporates by reference its Proposed Findings of Fact, dated August 10, 2012, which have been filed simultaneously with this Brief.  Specific references to WGI's Proposed Findings of Fact ("PFF") are incorporated herein as appropriate.

## INTRODUCTION

Plaintiffs (Kenneth and Jeannine Armstrong, the successor to Ethel Mae Coats, Fred Holmes, Alvin Livers, and Clifford Washington) seek damages for the flooding of their properties during Hurricane Katrina on August 29, 2005.  The Plaintiffs allege that these flood-related damages were caused by two breaches of the flood control structure along the eastside of the Inner Harbor Navigation Canal ("IHNC") in New Orleans.   They accuse Defendant Washington Group International, Inc. ("WGI") of causing or contributing to these two breaches by negligently performing excavation and backfilling work in the East Bank Industrial Area (EBIA) between 2001 and May 2005, pursuant to an environmental restoration contract with the United States Army Corps of Engineers (USACE).   Specifically, Plaintiffs claim that WGI

- 1 -

backfilled unspecified excavations with "high permeability and poorly-compacted materials," which created hydraulic under-seepage and uplift pressures in the organic clay layers under the levee. (Pretrial Order, Doc. 20920, at 10).   They also contend that WGI was negligent in failing to perform geotechnical engineering evaluations of the potential impact their environmental restoration work could have had on the levee and floodwall.  *Id.*

   ***Duty/Breach.***   The Plaintiffs have not shown, and cannot show, that WGI had any responsibility on Task Order 26 for geotechnical engineering relative to the levees and floodwalls bordering the EBIA.  The USACE hired WGI to clear and remediate the EBIA as part of the USACE's larger, Congressionally-authorized Lock Replacement Project.  The USACE was the Engineer of Record on the Lock Replacement Project, and the USACE alone was responsible for assuring that the excavation and backfilling work that WGI performed in connection with the Replacement Project would not jeopardize the stability of the nearby flood control structures during a hurricane.  The United States has admitted as much, and its witnesses will testify to this fact at trial.  Moreover, Plaintiffs have not shown, and cannot show, that WGI breached its standard of care in providing site clearing and remediation services as a contractor to the USACE on this project.  Indeed, all of WGI's excavation and backfilling work was performed in conformance with USACE-approved plans, and was monitored and approved by the USACE on an on-going basis.

   ***Causation.***   The Plaintiffs also cannot prove that WGI's excavation and backfilling work  had any role whatsoever in the two levee breaches along the east bank of the IHNC.  Plaintiffs' entire case hinges on the wholly unsupportable and erroneous premise that seepage and hydraulic uplift effects contributed to the North and South Breaches.  Specifically, WGI's expert will opine at trial that (1) there is no evidence of a shear failure through foundation

soils, which would be present if underseepage occurred; (2) the low-permeability organic clays in the EBIA indicate that seepage was negligible during the 30-hour storm surge from Katrina; and (3) WGI's excavations (regardless of how or whether they were backfilled) had no effect on the North and South Breaches.  WGI also will show, among other things, that the sole proponent of this "under-seepage" theory, Dr. Robert G. Bea, based his seepage and stability analyses on cross-sections that represent geometries and soil properties that never existed pre-Katrina in the EBIA.  He also distorted a material soil property in his analyses in order to support his otherwise flawed underseepage theory.

*Damages*.  Even if Plaintiffs were able to demonstrate that WGI's work on Task Order 26 caused or contributed to one or both of the breaches at the IHNC, Plaintiffs overstate the true measure of their damages.  To begin with, Plaintiffs contend that the totality of the damage to their movable and immovable property was caused by flooding from the IHNC, but the evidence will demonstrate that each of the Plaintiffs' homes was damaged, to varying degrees, by wind, rain, and floodwaters from the breaches at the IHNC and the MRGO, and that Plaintiffs have already been compensated for damage caused by wind and/or rain.  WGI will also identify specific elements of damage to the Coats, Washington, and Livers properties that would not have occurred in the absence of MRGO floodwaters.  Finally, the evidence will show that all of the Plaintiffs' houses, including those that Plaintiffs later voluntarily demolished, could have been repaired.  Indeed, in the case of the Armstrong, Coats, Holmes, and Livers Plaintiffs, there is no evidence that their houses suffered any structural damage from flooding.

Plaintiffs' other damages calculations are similarly flawed.  Their damage estimates for movable property are also overstated because they include property belonging to adults who are not parties to this suit, and more importantly, do not take depreciation into

- 3 -

account.  And with regard to Plaintiffs' claims for additional living expenses, WGI will prove that the estimates of Plaintiffs' expert Scott Taylor wildly overestimate the extent to which Plaintiffs' post-Katrina expenses exceeded their normal pre-Katrina expenses.  For nearly all of the Plaintiffs, there is no evidence that their post-Katrina expenses exceeded their pre-Katrina expenses at all.

## <u>LAW & ARGUMENT</u>

In order to prevail on their negligence claims against WGI, Plaintiffs must prove by a preponderance of the evidence: (1) that WGI owed a duty to Plaintiffs; (2) that WGI breached that duty; (3) that WGI's alleged conduct was a substantial factor – or a cause-in-fact – of the alleged harm; (4) that the risk and harm caused were within the scope of protection afforded by the duty breached; and (5) that Plaintiffs suffered actual damages.  *Roberts v. Benoit,* 605 So. 2d 1032, 1051 (La. 1991); William E. Crawford, 12 La. Civ. L. Treatise Tort Law § 4:2 (2d ed. 2012).  "For a plaintiff to recover on a negligence theory, all four inquiries must be affirmatively answered."  *Roberts*, 605 So. 2d at 1042.

A.     **WGI Did Not Have a Duty to Provide Geotechnical Engineering Services Relative to the Levees and Floodwalls.**

Plaintiffs cannot prevail on their negligence claims against WGI unless they prove by a preponderance of the evidence that WGI failed to conform to the standard of care of a contractor performing demolition, removal, excavation, and environmental remediation services. Plaintiffs bear the burden of establishing the applicable standard of care.  *See, e.g., Maloney v. Oak Builders Inc.,* 224 So. 2d 161 (La. App. 4 Cir. 1969), *reversed in part on other grounds,* 256 La. 85, 235 So. 2d 386 (1970) (plaintiffs could not recover against architect where they failed to present evidence establishing the applicable standard of care).  "Establishing negligence is ordinarily a mixed issue of law and fact.  The determination of the standard of care to which the

defendant must be held is a question of law, although its legal formulation is guided by proved facts. Deciding whether the defendant adhered to that standard is then a pure question of fact." *Waterbury v. Byron Jackson, Inc.,* 576 F. 2d 1095, 1097 (5th Cir. 1978).  "The determinative issue on the question of the contractor's negligence is one of reasonableness, *i.e.*, conformity of his conduct to the standard of care that would be exercised by a reasonable man in the same or similar circumstances."  *Lacombe v. Greathouse*, 407 So. 2d 1346, 1350 (La. App. 3 Cir. 1981). WGI entered into a contract with the USACE to perform demolition, removal, excavation, and environmental remediation services in the EBIA.  (PFFs 34-36, 41-47, 58-61).  Thus, WGI's duty was to meet the standard of care of a contractor performing the work it undertook to perform: demolition, removal, excavation, and environmental remediation work on a federal civil works project.

Plaintiffs cannot and will not prove by a preponderance of the evidence that WGI ever undertook a contractual duty to perform geotechnical engineering services at the EBIA. The contract governing Task Order 26 is devoid of any language suggesting that that either WGI or the USACE contemplated that WGI would provide geotechnical engineering services of any kind on Task Order 26 relating to the levees and floodwalls the EBIA.  (PFFs 59-60, 62). Indeed, the United States' 30(b)(6) witness (and the USACE's Contracting Officer Representative on Task Order 26) testified that he did not expect WGI to perform any engineering services related to the nearby levee and floodwall, which was "outside of []our work site."  (PFF 59).  Similarly, the United States' geotechnical engineering and standard-of-care expert testified that, "in my review of all the work out there, [WGI] basically w[as] a contractor, you know, doing work as a remedial contractor would typically do work."  "The mitigation of any impacts on the flood protection system," however, "was separate work done by the Corps."

(PFF 62).  Finally, WGI's 30(b)(6) witness testified:  "Our customer, the Corps of Engineers, are the ones who design flood control, maintain flood control, contract to have them constructed, maintained; [t]hey hired us to knock down the buildings and pull out piles and remediate soil. They didn't hire us for engineering expertise on flood control."  (PFF 62; *see also* PFFs 31-32, 76).  To be sure, there were no geotechnical engineers from WGI even staffed on Task Order 26. (PFFs 48-57, 62).

The evidence will show that, instead of contracting out or delegating any responsibility for geotechnical engineering related to the flood control structures bordering the EBIA to WGI, the USACE relied upon geotechnical engineers from within the New Orleans District to provide any and all geotechnical engineering services that the USACE's Construction Manager on Task Order 26 deemed necessary.  (*E.g.,* PFFs 63, 77-79, 122-128, 150, 160, 188-89).  As an initial matter, the USACE relied on its previous geotechnical evaluations of the levee and floodwall in the EBIA to determine the relevant minimum control line.  (PFF 30).  This minimum control line established that construction activity, including excavation and backfilling, conducted more than 15 feet from the floodwall on the flood side of the levee was unlikely to have any impact on the wall's stability during the design storm event.  (PFF 30).  Accordingly, the USACE, instructed WGI that all remediation and associated excavations should be confined to the "area 15-feet west of the floodwall."  (PFFs 77-79).

Next, the USACE's Project Engineer (James Montegut) and Construction Manager (Lee Guillory) substantively reviewed and approved all of WGI's work plans.  To the extent any geotechnical evaluations relative to the nearby levee and floodwall were, in Mr. Guillory's judgment, required on Task Order 26, he submitted a request for such an analysis to the USACE's Engineering Division.  (PFFs 122-28) (Mr. Guillory requested geotechnical advice

relating to the expansion of the borrow pit on McDonough Marine); PFFs 188-91 (Mr. Guillory requested geotechnical advice relating to excavations of contaminated soil under Surekote Road)).  WGI had no responsibility for these geotechnical engineering evaluations, other than to implement what the USACE directed. (PFF 128).  Mr. Guillory, a professional engineer with years of experience working with levees and floodwalls for the USACE, was given the discretion to make these decisions. (PFF 48-50, 63).  It is therefore clear from the evidence that the USACE was not relying upon WGI to provide it with any geotechnical engineering services pertaining to flood control structures.

WGI should be held to a standard of care consistent with its role as a general contractor performing demolition and environmental restoration work on Task Order 26, and not to the standard of care of a contractor with geotechnical engineering duties relative to flood control or to the standard of care of a geotechnical engineering firm generally.  (PFF 65).

Because Plaintiffs have failed (and will fail at trial) to prove by a preponderance of the evidence that WGI assumed any duty that encompassed their alleged damages, Plaintiffs cannot satisfy their evidentiary burden of establishing WGI's negligence.

**B.** **WGI Did Not Deviate from the Standard of Care of a Contractor Performing Demolition, Removal, Excavation, and Environmental Remediation Services.**

Plaintiffs cannot satisfy their burden of proving that WGI deviated from the degree of professional care and skill customarily employed by others of its profession in the same general area.  "Whether a duty is owed is a question of law; whether defendant has breached a duty is a question of fact." *Jimenez v. Omni Royal Orleans Hotel*, 66 So. 3d 528, 532 (La. App. 4 Cir. 2011), (quoting, *Brewer v. J.B. Hunt Transport, Inc.*, 35 So. 3d 230, 240 (La. 2010)).

The evidence adduced at trial will show that WGI worked closely with the USACE to develop work plans for every stage of WGI's demolition, removal, excavation, and environmental remediation work.  (*E.g.,* PFFs 45-47, 50, 52, 60, 67, 69, 75, 84, 92-95).  The USACE was on-site with WGI at all times throughout the entirety of WGI's work at the EBIA.  (PFFs 51-54, 104, 116).  Most significantly, the USACE approved WGI's work plan prior to its commencement, and monitored WGI's work (through the use of ***on-site*** personnel, ***daily*** Quality Assurance Reports (QARs), ***daily*** Contractor Quality Control Reports, and other methods to ensure that it complied with the USACE-approved work plans.  (*See, e.g.,* PFFs 51-54, 70, 75, 83, 95.)  Ultimately, the USACE accepted WGI's work as complete.  (*See, e.g.*, PFFs 131, 139, 154, 163, 193-96).

With regard to the use of backfill, the evidence will prove that it was the ***USACE*** that determined that to the extent possible, excavations at the EBIA should be backfilled with native clay from an on-site "borrow pit" rather than with imported material.  (PFFs 105-06).  As with every other aspect of WGI's work, they approved, monitored, and accepted WGI's work in this regard.  Similarly, when there was insufficient borrow pit material, the USACE had to approve the use of imported backfill with respect to the quality, source, and cost.  The USACE specifically approved the use of imported river sand on Task Order 26.  (PFFs 110-13).

As for the compaction means and methods, the evidence will show that the specifications were developed with and approved by the USACE.  (PFFs 114-15).  The USACE was on-site at all times conducting ***daily*** observations and inspections of WGI's work (including any backfilling work), and ultimately accepted it.  (PFF 116).  While Plaintiffs maintain that compaction testing should have been performed at the EBIA, the USACE made the decision not to require it, consistent with EM 110-2-1913.  (PFF 116-17).  WGI compacted backfilled

- 8 -

excavations by track walking with a dozer or bucket tamping with an excavator in accordance with USACE-approved work plans. (PFF 117).

Additionally, the evidence will demonstrate that all definable features of work were completed in accordance with the guidelines developed with, and approved by the USACE. (PFFs 119-20). Specifically, the USACE instructed WGI, based on advice from its own geotechnical engineers, how to design the borrow pit expansion so as not to impact the stability of the floodwall. (PFFs 121-28). WGI complied with this instruction, and ultimately carried out its work with the USACE's approval, monitoring, and acceptance. (PFFs 126-31). Similarly, the USACE approved WGI's work plans for demolition and piling removal, and supervised and accepted WGI's work. (PFFs 132-138). The same is true for WGI's grid-trenching work (PFFs 130-42); soil remediation work (PFFs 164-182); ACM excavations (PFFs 183-185); and the excavations of the Sewer Lift Station (PFFs 143-54) and the Wedding Cake (PFFs 155-63).

No aspect of WGI's work fell below the standard of care. While a contractor is not permitted "to rely blindly on plans and specifications in fulfilling its duty to exercise ordinary care toward third parties in the fulfillment of its contractual obligations," *see Barabay Property Holding Corp. v. Boh Bros. Const. Co., L.L.C.*, 991 So. 2d 74, 79 (La. App. 1 Cir. 2008), the USACE was neither an uninformed nor a passive employer of WGI's services. The USACE was on the site every day, and under the terms of WGI's contract, WGI was required to obtain USACE approval before, during, and after the completion of its work. While the evidence at trial will prove that WGI's conduct did not cause the breaches, the relevant inquiry for the purposes of determining whether WGI met the standard of care is not whether the USACE's instructions were correct, but whether WGI acted reasonably in following them. The conduct of WGI, which was acting at all times under the supervision of the entity charged with designing

- 9 -

and maintaining the floodwalls, was perfectly reasonable under the circumstances, and well within the applicable standard of care.[1]

### C.    WGI's Conduct Did Not Cause Plaintiffs' Alleged Damages.

Under the Louisiana duty-risk analysis for tort claims, courts make two causation inquiries. *See Pitre v. La. Tech Univ.*, 673 So. 2d 585, 589-90 (La. 1996).  First, plaintiffs bear the burden of establishing that WGI is the cause-in-fact or "but-for" cause of plaintiffs' alleged damages. *Toston v. Pardon*, 874 So. 2d 791, 799 (La. 2004).  Plaintiffs also bear the burden of demonstrating that WGI is the proximate or "legal" cause of their alleged damages. *Rando v. Anco Insulations, Inc.*, 16 So. 3d 1065, 1092-93 (La. 2009).  Plaintiffs cannot satisfy either burden here.

In order to prove that WGI was the cause-in-fact of their damages, Plaintiffs must prove by a preponderance of the evidence that WGI's conduct was a necessary antecedent to their damages. *Bellanger v. Webre*, 65 So. 3d 201, 207-08 (La. App. 1 Cir. 2011).  To the extent the Court finds that the conduct of WGI, the USACE, and/or other actors or forces were concurrent causes of the same damages, Plaintiffs bear the burden of proving that WGI's conduct was a

---

[1] Although plaintiffs have repeatedly invoked certain regulations purportedly adopted by the Kansas City Office of the USACE (the so-called "Kansas City Guidelines"), this Court already has correctly found that WGI had no duty to comply with them because these regulations were not in effect in New Orleans at the time WGI performed its work in the EBIA:  "As these requirements are not Corps requirements in New Orleans, there is no imposition on WGI to comply with them."  *In re Katrina Canal Breaches*, 2008 WL 5234369 at n.5 (E.D. La. 2008), *rev'd on other grounds*, 620 F. 3d 455 (5th Cir. 2010).  (Evidence concerning the Kansas City Guidelines is the subject of objections to Plaintiffs' exhibit list, which WGI submits contemporaneously with this Pre-Trial Brief.)  Plaintiffs cannot retroactively impose a legal duty upon WGI to comply with regulations that were not in effect at the time of its work.  *See Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.  For that reason, the 'principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.'" (affirming presumption against retroactivity)).

"substantial factor" in causing plaintiffs' damages.  *Toston*, 874 So. 2d at 799.  To establish that WGI's conduct was a substantial factor in causing their injuries, Plaintiffs must prove by a preponderance of the evidence that: 1) their damages would not have occurred absent WGI's conduct; 2) WGI's conduct played so important a role in producing Plaintiffs' damages that responsibility should be imposed on WGI even if they cannot demonstrate that the damages would have occurred but for WGI's conduct; or 3) WGI's conduct created a force or series of forces that were in continuous and active operation up to the time of the harm.  *Perkins v. Entergy Corp.*, 782 So. 2d 606, 612 (La. 2001), *superseded by statute on other grounds*, (citing *Graves v. Page,* 703 So. 2d 566, 570 (La. 1997)).

        Plaintiffs cannot prevail against WGI simply by proving that WGI's conduct is a "possible" cause of their damages; rather, they must prove that it was more likely than not that WGI's conduct was in fact a substantial cause of their damages.  *Id.* at 618; *see also Gleason v. City of Shreveport*, 393 So. 2d 827, 829 (La. App. 2 Cir. 1981) (plaintiff did not establish that city's failure to maintain drainage was a substantial factor in flooding); *Loupe v. Circle, Inc.*, 514 So. 2d 269, 271 (La. App. 5 Cir. 1987) (explosion was not a cause-in-fact of back injury incurred during clean-up of explosion site 30 days later).  Nor can Plaintiffs prevail solely by proving that WGI violated a statute or regulation; rather, Plaintiffs must prove by a preponderance of the evidence that WGI's conduct caused their damages.  *See, e.g*., *Mitchell v. Eureka Chem.* 2008 WL 2597907 (E.D. La. 2008) (finding that the plaintiff failed to prove his employer was negligent, because the plaintiff could not show that the OSHA violation was the legal cause of the accident); *Lee v. Carwile*, 168 So. 2d 469 (La. App. 3 Cir. 1964) (plaintiff failed to prove negligence on part of landlord in suit  arising from injury sustained during fire when landlord's failure to comply with fire safety regulations was not proven to be cause of injury).

In order to prove that WGI was the proximate or legal cause of their damages, Plaintiffs must prove by a preponderance of the evidence that there exists a substantial relationship between WGI's conduct and Plaintiffs' damages.  *Harrell v. Genco*, 671 So. 2d 530, 533 (La. App. 1 Cir. 1996) (city's failure to enforce closing ordinance did not bear a substantial relationship to the death of man shot outside of bar); *Crockett v. Cardona*, 713 So. 2d 802 (La. App. 4 Cir. 1998) (negligent driver who caused a car accident that delayed a groom's arrival to his own wedding was not liable for the bride's emotional distress, as risk was not foreseeable).

Plaintiffs cannot prove by a preponderance of the evidence that WGI's conduct was the cause-in-fact, a substantial factor, or the legal cause of their alleged damages because there is no evidence that WGI's work at the EBIA caused the North and South Breaches.

The evidence presented at trial will prove that the seepage-induced mechanisms that Dr. Bea alleges were exacerbated by WGI's work simply did not occur at the EBIA during Hurricane Katrina.  (PFF 287).  WGI will present expert testimony establishing that there is no evidence of the shear failure through foundation soils that would have taken place if Dr. Bea's underseepage theories had in fact occurred at the EBIA during Katrina.   (PFFs 288-91).  Moreover, the results of the parties' Joint Soils Investigation, which produced site-specific evidence of the soil properties at the EBIA, indicate that seepage through the low-permeability organic clays was negligible during Katrina's 30-hour storm surge.  (PFF 292).  As such, pore pressures increased by only small amounts during the storm, and only as a result of the loads imposed by the floodwater on the canal and landside soils, not the result of subsurface flow or seepage.  (PFF 292).

Furthermore, given the distance of WGI's excavations from the floodwall and the depth of the excavations, and considering the lack of seepage through the EBIA subsoils, there is

no evidence that WGI's work had any impact on the North and South Breaches.   Even if the excavations had been backfilled with sand, or not backfilled at all, the excavations would not have contributed to the breaches.  (PFF 293).

The evidence presented at trial will also prove that the Plaintiffs' primary causation expert, Dr. Robert Bea, conducted an entirely unscientific analysis using fictitious excavations, non-existent soil properties and erroneous assumptions about WGI's work.  Dr. Bea and his expert team developed a series of conceptual, geologic cross-sections to analyze seepage and global stability performance at the EBIA during Katrina.   The cross-sections purport to "present reasonable representations of the geotechnical and floodwall conditions that existed at the three analysis sites at the time of Hurricane Katrina," including the excavations that WGI performed at the EBIA.  (PFF 296).  In reality, the excavations that are represented in Dr. Bea's cross-sections were never performed by WGI.  (PFFs 297, 301, 309, 311-16).  Dr. Bea's cross-sections also misrepresent the hydraulic properties of the backfill materials that WGI allegedly used at the EBIA.  (PFF 302, 308, 318-19).  The fictional information in Dr. Bea's cross-sections is critical to his seepage and stability analyses and is necessary to prove why, in his opinion, the North and South Breaches occurred.   None of the excavations that WGI *did* perform were modeled in Dr. Bea's seepage and stability analyses. (PFF 299).

Moreover, the evidence will show that Dr. Bea's assistant, Diego Cobos-Roa, distorted a material soil property in Dr. Bea's seepage analyses to create the false impression that pore pressures increased instantly in response to the Katrina loading conditions—a finding necessary to support Dr. Bea's erroneous opinions.  (PFFs 326-27).  Despite obtaining a real-world compressibility value from his own pumping tests at the EBIA showing the organic clays to be compressible, Dr. Bea instructed Mr. Cobos-Roa to "find a way how we can model this …

- 13 -

1101660v.1

*incompressible* soil response of the soils." (PFFs 330-31). The value that Mr. Cobos-Roa came up with—and Dr. Bea accepted—is lower than any known soil material in the universe, and it certainly never existed at the EBIA during the Katrina storm surge. (PFF 333). More importantly, if Mr. Cobos-Roa had run Dr. Bea's seepage analyses using the EBIA site-specific compressibility value that was produced from the Plaintiffs' pumping tests, the pore pressure values that Dr. Bea describes at the EBIA would have been lower, the factor of safety generated by Dr. Bea's stability analyses would have been higher, and the seepage-induced mechanisms that Dr. Bea claims contributed to the North and South Breach could not have occurred. (PFF 336).

      The evidence also will demonstrate that none of Dr. Bea's "justifications" for using a fictional compressibility value in his analyses are based in fact. He claims he modeled incompressible soils because the EBIA organic clays reached steady flow conditions. But transient flow conditions existed in the organic clays during the Katrina storm surge, not steady flow. (PFF 340). In fact, it would have taken more than one year to reach steady flow conditions if the surge had remained constant during that time. (PFF 341). He claims he modeled incompressible soils because the organic clays were fully saturated. But ***all*** of the experts in this case agree that the organic clays were fully saturated. Only Dr. Bea claims that complete saturation created incompressible soils and steady flow conditions during the storm surge, which is contrary to both the evidence and science. (PFF 350). He claims he used "dilatational wave velocity" to determine that the organic clays were incompressible. But that theory was never part of his analyses (either before or during this case) until long after his expert reports were filed, and it has no relevance whatsoever to the compressibility of the EBIA soils given the known conditions that existed during the storm. (PFFs 353-54). In short, the evidence

- 14 -

will show that Dr. Bea's opinions are divorced from reality and completely unsupportable. Plaintiffs cannot prove by a preponderance of the evidence, based on Dr. Bea's opinions, that WGI's conduct caused the Plaintiffs' damages.

Finally, the evidence presented at trial will show that the North and South Breaches likely failed due a combination of floodwall deformations, loss of lateral landside support due to overtopping, and in the case of the North Breach, a faulty weld in the sheet pile that led to a rupture in the floodwall.  (PFFs 361-69).

**D.      Allocation of Fault, If Any.**

In the event the Court determines certain portions of Plaintiffs' damages are indivisible, it may allocate fault between and amongst those defendants, if any, that Plaintiffs have proven by a preponderance of the evidence to be at fault for those damages.  *See, e.g.*, *Norfleet v. Lifeguard Transportation Service*, 934 So. 2d 846 (La. App. 4 Cir. 2006).   In the event that Plaintiffs satisfy their evidentiary burden as to WGI with regard to one breach, but not the other, Plaintiffs must prove by a preponderance of the evidence that the amount of damages that resulted from the breach for which WGI has been assigned fault.  If Plaintiffs satisfy their burden of proof as to both Defendants, the Court should allocate a lesser portion of fault to WGI, whose work was commissioned, approved, and supervised by the USACE, the entity that built the floodwalls and is tasked with their design, construction, maintenance and oversight.

**E.      WGI Is Immune from Liability Pursuant to La. R.S. 9:2771.**

WGI is immune from liability pursuant to La. R.S. 9:2271, which provides, in pertinent part:

> No contractor . . . shall be liable for . . . defects in any work
> constructed, or under construction, by him if he constructed, or is
> constructing, the work according to plans or specifications
> furnished to him which he did not make or cause to be made and if

> the . . . defect was due to any fault or insufficiency of the plans or
> specifications.

La. R.S. 9:2771 affords protection to contractors, like WGI, that perform demolition and

remediation work in advance of planned construction. *See, e.g., Pearce v. L.J. Earnest, Inc.*, 411

So. 2d 1276 (La. App. 3 Cir. 1982) (contractor who cleared trees in advance of road project was

immune from liability in suit alleging trespass and destruction of property).[2]  In order to invoke

La. R.S. 9:2771, WGI is not required to prove that it had no role in developing the plans or

specifications of its work at the EBIA, especially when the USACE collaborated with WGI in

drafting and substantively approving work plans (PFFs 67, 69, 75, 92-95) and when the USACE

was out in the field with WGI on a daily basis monitoring and approving its work.  (PFFs 51-54,

83-91).   *See  Tex-La Properties v. South State Ins. Co.*, 514 So. 2d 707 (La. App. 2 Cir. 1987)

(liability is not imposed on the subcontractor where owner-contractor and the subcontractor held

relatively equal positions, both were engaged in construction, and both "actively engaged" in the

design specifications).[3]  Regardless, the USACE was the "Engineer of Record" for the Lock

Replacement Project (PFFs 10-33) and the responsibility for any defects in the plans and

specifications with which WGI complied, subject to USACE approval, supervision and

acceptance, does not belong to WGI.

Moreover, WGI had no reason to believe its work created or would create a

hazardous condition.  WGI worked under the supervision of the USACE at all times, and the

USACE relied on its own geotechnical engineering personnel to determine whether or not WGI's

---

[2] *But see Barabay Property Holding*, 991 So. 2d at 74 (soil excavation does not constitute "work" for purposes 9:2771).

[3] *But see, e.g.*, *New Orleans Unity Soc. of Practical Christianity v. Standard Roofing Co.*, 224 So. 2d 60, 63 (La. App. 4th Cir. 1969) (rejecting contractor's contention that Section 9:2771 should absolve it from liability when contractor was "an active and interested party" in the development of the plans and specifications).

1101660v.1

work plans had the potential to impact the flood control structure.  (PFFs 62-63).  WGI had no reason to believe that acting in conformity with the USACE-approved plans and specifications would (or, in fact, did) create a hazard situation. (*See, e.g.,* PFFs 123, 151, 161).

      **F.**     **Plaintiffs Have Overstated Their Damages.**

Plaintiffs must prove the damages to which they claim they are entitled by a preponderance of the evidence.  *Prunty v. Arkansas Freightways, Inc.*, 16 F. 3d 649, 652 (5th Cir. 1994).  It is the plaintiff's burden to prove the extent of his loss he claims to have suffered because of the defendant's fault, and the award must be supported by evidence in the record. *Borden, Inc. v. Howard Trucking Co.*, 454 So. 2d 1081, 1092 (La. 1983).  Here, Plaintiffs bear the burden of proving by a preponderance of the evidence that all of the damages they seek from WGI are in fact attributable to the conduct of WGI.  *Servicios-Expoarma, C.A. v Indus. Mar. Carriers, Inc.*, 135 F. 3d 984, 995 (5th Cir. 1998).  But the evidence at trial will demonstrate that Plaintiffs cannot prove by a preponderance that they are entitled to the damages they seek from WGI.

      **1.**     **Plaintiffs Cannot Establish All Damages They Claim Related to Their Immovable Property.**

          **a.**     **Certain Plaintiffs May Only Recover the Diminution in Value of Their Immovable Property.**

A plaintiff in a tort action may recover either (1) the reasonable costs that have been or may be incurred to repair or replace the damaged property, or (2) the difference between the value of the property before and after the harm, which is often referred to as diminution in value.  *Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Service Co.*, 618 So. 2d 874, 879-80 (La. 1993).  However, if the cost to repair the property exceeds the value of the property prior to the damage, the plaintiff may only recover repair costs if (1) he actually has performed or will perform the repairs, or (2) there is a reason "personal to the

owner" for seeking the repairs.   *Id.*   Otherwise, the plaintiff is limited to recovering the diminution in value to the subject property.

Under the principle established in *Roman Catholic Church*, Plaintiffs Mr. and Mrs. Armstrong, Mr. Holmes, and Mr. Livers may recover only the difference between the value of their properties immediately prior to and following Hurricane Katrina.  618 So. 2d 874, 879-880 (La. 1993).  The Armstrongs, along with Holmes, and Livers have all sold their respective properties to the Louisiana Road Home Program.  (PFFs 404, 477, 514).  Because these Plaintiffs no longer own the property for which they are now claiming damages,  they cannot show that they will make the repairs that form the basis of those claims.  As such, Plaintiffs' claims for repairs to the properties at 4016 Hamlet Place, 1205 Perrin Drive, and 4924 St. Claude Avenue overstate their damages.  Any amount recovered by Armstrong, Holmes, and Livers related to their immovable property should be limited to the diminution in value of the property.

> **b.** **Plaintiffs May Not Recover for Damages Resulting from Severable Causes.**

Just as Louisiana Civil Code article 2323 requires that courts determine the percentage of fault of all persons causing or contributing to damage must be determined, it follows that courts must also determine the percentage of fault attributable to multiple causes of damage.   This Court acknowledged this principle in its March 17, 2011 Order, stating that "Any judgment rendered for any plaintiff will be limited to damages caused by the EBIA remediation project."  (Doc. 20200).  Accordingly, any damage Plaintiffs suffered as a result of causes other than the EBIA remediation project must be segregated and cannot be recovered.

Plaintiffs have made claims in this litigation for all damages sustained by their immovable property attributable to the events of August 29, 2005, irrespective of the cause of such damage.   Plaintiffs' repair estimates in this litigation make no attempt to segregate the

multiple sources of damage to their immovable properties, despite having done just that in other contexts.  For example, each of the Plaintiffs made claims with their homeowners insurer for damages to their immovable property attributable to wind and rain.  (PFFs 395, 442, 473, 520, 550).  Yet, Plaintiffs' claims for damages in this litigation include damages attributable to wind and rain.  As the governing law and this Court's Order make clear, WGI is not liable for any damage to Plaintiffs' homes that may have resulted from wind and/or rain, as such damages are not related to the EBIA remediation project.

Nor can Plaintiffs attribute to WGI the entirety of the damages to their homes caused by floodwaters.   Here, each of the Plaintiffs' immovable properties were affected by floodwaters resulting from the breaches along the MRGO, and by the North Breach and South Breach to different extents.  (PFFs 406-412, 447-452, 484-487, 526-531, 566-570).  WGI is not liable for damages associated with the floodwaters from the MRGO, and those damages must be segregated from damages associated with the floodwaters from the IHNC.  And to the extent that WGI is found not liable for either the North Breach or South Breach, damages related to those breaches must be segregated as well.

In other words, Plaintiffs have failed to segregate their recoverable losses from the total losses sustained.  "[W]here the damages that are legally recoverable are less than the total amount sustained, the injured party cannot simply show the total amount, but must prove that portion to which it is legally entitled."  *Servicios-Expoarma, C.A. v. Indus. Mar. Carriers, Inc.*, 135 F. 3d 984, 995 (5th Cir. 1998).  To the extent that the Court finds that Plaintiffs' properties sustained damages due to either wind and/or rain, the floodwaters of the MRGO, or breaches of the IHNC floodwall for which WGI is not liable, those damages must be segregated from the total amount claimed by Plaintiffs.

1101660v.1

2.      **Plaintiffs Cannot Establish All Claimed Damages Related to The Contents of their Homes.**

    a.      **Plaintiffs Cannot Recover for Property Belonging to Adults Who Are Not Parties to This Case.**

Plaintiffs may only recover for damages to contents that form part of their separate or community property.  Plaintiffs may not recover damages for property that did not belong to them.  To the extent that these Plaintiffs have included in their damage estimates contents belonging to others, those Plaintiffs may not receive any award related to those contents.

For example, at the time of Hurricane Katrina, Kenneth Armstrong, Jr. – the son of Plaintiffs Kenneth and Jeannine Armstrong – had reached the age of majority.  (PFF 377).  Certain movable property located at the Armstrong residence belonged to Kenneth, Jr.  (PFF 378).  Mr. and Mrs. Armstrong may not recover damages for any contents belonging to Kenneth, Jr.

Similarly, when Hurricane Katrina made landfall, Nathan Morgan, Lintoi Franklin, and the children of Ms. Franklin resided with Ethel Coats at 1020 Charbonnet Street.  (PFF 428).  Certain movable property in the residence belonged to Mr. Morgan, Ms. Franklin, and Ms. Franklin's children.  (PFF 429).  The Succession of Ms. Coats may not recover damages for any contents that may have belonged to the other individuals residing at 1020 Charbonnet (including Mr. Morgan's interest in any property he and Ms. Coats owned jointly.)

    b.      **Depreciation Must Be Applied to Any Award for Contents.**

A proper determination of damages owed to a plaintiff for loss of contents takes depreciation into account.  *See In Re Katrina Canal Breaches Consol. Litig.*, 647 F. Supp. 2d 644, 736 n. 57 (E.D. La. 2009) (Duval, J.); *accord Brown v. Williams*, 850 So. 2d 1116, 1125 (La. App. 2 Cir. 2003) (the value of the household item lost is the fair market value of the item—

- 20 -

replacement cost less depreciation).   The reason for this approach is obvious: "ordinary household effects which depreciate immediately upon becoming used and, because of ordinary wear and tear, are worth much less after several years than when originally purchased."  *Gray v. Security Storage & Van Co.*, 26 So. 2d 399, 402 (La. Ct. App. Orleans 1946).

The damages calculations included in the reports of Plaintiffs' damages expert, Mr. Scott Taylor, do not apply depreciation to Plaintiffs' contents, and as a result, his damages calculations are overstated.  (PFF 583).  In the event that Plaintiffs prevail in their case, the Court cannot rely on those calculations, and instead must account for depreciation for any recovery related to movable property in this case.

> **3.    Plaintiffs Cannot Establish All Claimed Damages Related to Additional Living Expenses.**
>
> > **a.    Plaintiffs May Only Recover for Actual Additional Expenses Incurred.**

Additional living expenses, by definition, are additional expenses incurred by the claimant "beyond the norm for his standard of living."  McGill v. Republic Fire and Cas. Ins. Co., 2008 WL 4792720, at *3 (E.D. La. 2008).  In order to recover additional living expenses in this litigation, Plaintiffs must provide evidence of their pre-Katrina living expenses and their post-Katrina living expenses in order to demonstrate that their living expenses increased.  *Id.; see also Bradley v. Allstate Ins. Co.*, 620 F. 3d 509, 527-28 (5th Cir. 2010).  Evidence of additional living expenses may include receipts, credit card statements, or affidavits from any person they paid after Hurricane Katrina.  *Khalimsky v. Liberty Mutual Fire Ins. Co.*, 2009 WL 982641, at *4 (E.D. La. Apr. 13, 2009).

Here, Plaintiffs cannot prove their claims for additional living expenses by a preponderance of the evidence.  Plaintiffs' expert, Scott Taylor, did not based his estimates of Plaintiffs' additional living expenses on actual, incurred expenses above their normal living

expenses.  (PFF 585).  Instead, Mr. Taylor simply calculated a percentage based on the repairs costs associated with each Plaintiffs' immovable property.  (PFF 584).  His estimates, therefore, are improper and overestimate Plaintiffs' incurred, additional living expenses.  For example, Ms. Coats lived with her sister for three to five months following Hurricane Katrina and was not charged rent during that time.  (PFF 431).  As a result, she did not incur additional living expenses related to room and board, which is not considered in Mr. Taylor's method.  Plaintiffs are limited to recovery of living expenses actually incurred above their normal pre-Katrina costs of living.

  **b.** **Plaintiffs May Not Recover Additional Living Expenses after Establishment of a Permanent Residence**

  The theory of additional living expenses is that a claimant may recover expenses incurred as a result of being forced to temporarily relocate from his or her home.  Once the relocation is permanent, the costs the claimant incurs are no longer "additional."  Here, the record is clear that Plaintiffs Armstrong, Holmes, and Livers cannot recover additional living expenses for the period of time following their decision to permanently relocate and not return to the damaged residences.   Specifically, the Armstrongs cannot recover expenses incurred beginning in June 2006, when they purchased a new residence in Covington, Louisiana with the intention of residing there no less than three years.  (PFF 391).  Holmes relocated to a residence in Spring, Texas in January of 2006, and purchased that same residence in January of 2007. (PFF 468, 470).  Livers made the decision not to return to his damaged property in January of 2006, and ultimately purchased a new residence in Gonzales, Louisiana in April 2006.  (PFF 511, 522).

  Despite the fact that the Armstrongs, Holmes, and Livers had each affirmatively decided to establish a new residence months after Hurricane Katrina, each of their estimated

damages includes a full year of additional living expenses.  Should Plaintiffs demonstrate at trial that they incurred some quantum of additional expenses following Hurricane Katrina, their recovery must be limited to the period between their evacuation from their prior residences and the date that they permanently relocated from the residence to which those additional living expenses are tied.

      **4.**    **Plaintiffs Cannot Recover Damages for Inconvenience As a Matter of Law.**

In order to recover for inconvenience as a result of damages to property, a plaintiff must demonstrate that he or she was present or situated nearby at the time of the damage to the property for which they are making a claim.  *Napolitano v. F.S.P., Inc.*, 797 So. 2d 111, 114-15 (La. App. 4 Cir. 2001); *McDonald v. Illinois Central Gulf R.R. Co.*, 546 So. 2d 1287, 1292 (La. App. 4 Cir. 1989).  None of the Plaintiffs were present at the properties for which they are making claims, and accordingly cannot recover inconvenience damages.

The Armstrongs evacuated to Baton Rouge, Louisiana on or about August 28, 2005.  (PFF 384).  Ms. Coats evacuated to Hammond, Louisiana on or about August 27, 2005.  (PFF 430).  The Holmeses evacuated to Houston, Texas on or about August 28, 2005.  (PFF 466).  The Livers evacuated to Baton Rouge, Louisiana on or about August 28, 2005.  (PFF 505).  Mr. Washington was residing at 5027 Derbigny Street – a property for which he makes no claims in this litigation – at the time of Hurricane Katrina, not 1910 Charbonnet.  (PFF 539).  Accordingly, under Louisiana law, Plaintiffs are not entitled to damages for inconvenience.  They do not meet the requirement that they be present at the time of the damage to their property.

1101660v.1

**G.**    **Plaintiffs Are Not Entitled to Attorneys Fees Arising from Their Claims Against WGI.**

Under Louisiana law, "[a]ttorneys' fees are not allowed except where authorized by contract or statute."  *DOTD v. Wagner*, 38 So. 3d 240, 241 (La. 2010) (citing *Huddleston v. Bossier Bank and Trust Co.,* 475 So. 2d 1082, 1085 (La. 1985)).  Plaintiffs cannot recover attorneys' fees from WGI because they have made no allegations against WGI pursuant any statute which allows for the recovery of attorneys' fees.

**H.**    **WGI Is Immune from Liability Pursuant to the Government Contractor Defense.**

WGI is immune from liability because its work at the EBIA satisfies all three elements of the test set forth in *Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988).  WGI hereby adopts the arguments and authorities set forth in its Motion for Summary Judgment (Rec. Doc. 15861), Reply Brief in Support of Motion for Summary Judgment (Rec. Doc. 16303), Motion for Summary Judgment and Entry of Rule 54(b) Judgment with Respect to Certain Individual Actions (Rec. Doc. 16871) as if set forth herein in their entirety.  Additionally, because WGI submits that the facts in support of the application of the government contractor defense are inextricably linked to the facts establishing that WGI's conduct was not negligent, WGI hereby adopts its Proposed Findings of Fact as though set forth herein in their entirety.

Plaintiffs have heretofore repeatedly and consistently failed to identify with specificity those items of WGI's work that they contend caused their damages.  In the event that Plaintiffs actually identify any specific work items over the course of the three-week trial, WGI will submit a post-trial memorandum in support of its proffer addressing why those work items enjoy government contractor immunity.

## CONCLUSION

For the foregoing reasons and as a result of the evidence to be presented at trial, the Court should enter a judgment in WGI's favor dismissing Plaintiffs' claims with prejudice.

Dated:  August 10, 2012                          Respectfully submitted,

*/s/ William D. Treeby*
William D. Treeby, 12901
James C. Gulotta, Jr., 6590
Heather S. Lonian, 29956
                 Of
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Facsimile:  (504) 581-3361

and

Adrian Wager-Zito
Debra S. Clayman
Christopher R. Farrell
Christopher N. Thatch
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3891
Facsimile:  (202) 626-1700

Attorneys for Washington Group
International, Inc., a division of URS
Corporation

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Pre-Trial Brief of Washington Group International has been served upon all counsel of record by electronic notice via the Court's CM/ECF system this 10th day of August 2012.

*/s/ William D. Treeby*

- 25 -

1101660v.1