UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO: MRGO | * | |
| *Armstrong*, No. 10-866 | * | SECTION "K"(2) |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE ANY EVIDENCE OR REFERENCES RELATING TO THE DECLARATION OF T. WILLIAM LAMBE, ScD., P.E. AND TO STRIKE DR. LAMBE FROM DEFENDANTS' WITNESS LIST

**NOW INTO COURT**, through undersigned counsel, come the *Armstrong* Plaintiffs, who in support of their Motion in Limine to Strike the Declaration of T. William Lambe, ScD., P.E. (Rec. Doc. 20869-25), and strike him from the defendants' Pre-Trial Order witness list, do state as follows:

**I.**

Defendant Washington Group International, Inc. (WGI) has listed as a trial exhibit the declaration of Dr. T. William Lambe, and have identified him as a trial witness despite not having timely listed him. Dr. Lambe's declaration is textbook hearsay. He should not be permitted to testify at trial because he is not a fact witness (nor was he ever disclosed as one), he did not present an expert report, and he was not deposed (because he was not listed as a witness). His testimony, by declaration or at trial, would violate Fed. R. Civ. P. 26 and this Court's case management orders.

**II.**

This motion in limine is necessitated by WGI's ongoing, and ever changing, attack of

1

Plaintiffs' causation expert, Dr. Robert Bea. This relentless attack on Dr. Bea was necessitated by defendant's myopic reliance on it's own soil testing regime instead of incorporating existing USACE piezometer field test data that reflected "in situ horizontal hydraulic conductivity properties" found to be "three orders of magnitude higher (x1000) than those values obtained from laboratory tests." (See Exhibit 1 - Bea Expert Report, 2012, Appendix C, pg 3). This field data was incorporated by Dr. Bea in his expert report to properly identify the response of the buried swamp/marsh layer when hydraulically connected to the Katrina storm surge.

Defendants' experts have mocked Dr. Bea's inclusion of these established field test findings, despite their unavoidable concessions that such conditions exist. Now, because it would be untenable to simultaneously acknowledge the existence of these field conditions and maintain their attack of Dr. Bea, WGI resorts to offering the declaration and proposed testimony of Dr. Lambe to opine that Dr. Bea has misapplied certain principles of soil mechanics previously dismissed by defendants' timely identified experts Dr. Silva-Tulla, Dr. Marr, and Dr. Brandon.

### III.

The *Armstrong* case falls within the *MRGO* category of the *In re Katrina Canal Breaches Consolidated Ligation* umbrella. For case management purposes, the Court issued Case Management Order No. 4 on March 1, 2007, which obligated the *MRGO* parties to update their witness list on the 20th day of each month "to facilitate regular and ongoing preparation for common liability issues trials." (*See* MRGO Case Management Order No. 4 ("CMO No. 4") (A)(2)(Rec. Doc. 3299)). Prior to December 15, 2008, WGI identified both Dr. Francisco Silva-Tulla and Dr. William Lambe in it's monthly witness listings to provide expert testimony "for civil and geotechnical engineering relating to the cause of failure of the levee/floodwalls along the eastside

of the Industrial Canal."

Upon the acceptance of the *Armstrong* matter as a common liability issues trial, the Court re-issued CMO No. 4 on April 28, 2010 to govern the present litigation. In that Order, the Court specified that "[n]o witness who is not identified in the [final witness] list will permitted to testify...without an order to do so on motion for good cause shown." (Rec. Doc 19743-2, p. 26, § (3)). The court provided further specificity to the parties' pre-trial obligations through its order of March 17, 2011. (Rec. Doc. 20200).

WGI filed its Preliminary Witness List on May 27, 2011, electing not to identify Dr. Lambe as one of its experts in the present matter. (Rec. Doc 20255). WGI's subsequent witness lists, including its Final Witness List dated April 6, 2012, excluded Dr. Lambe. The *Armstrong* discovery period expired on April 20, 2012, without WGI ever identifying Dr. Lambe as a witness or producing a report from him. For this purpose alone, Dr. Lambe should be excluded.

## IV.

WGI now proposes to present Dr. Lambe, a "consulting expert" "to comment for the benefit of the Court, and justice, with respect to the Opposition's citations to his text." (Rec. Doc. 20865-2, p. 32). The stated purpose of his commentary is purely to attack the credibility of Dr. Bea.

## V.

Federal Rule of Evidence, Rule 701 specifies that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

( c ) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

Here, WGI has already admitted that Dr. Lambe is not a testifying expert but only a consulting expert, and that his specialized knowledge would be in geotechnical engineering.

## VI.

Dr. Lambe's declaration reflects that his proffered testimony would be well beyond the sphere of acceptable lay witness testimony as it purports to provide explanations of scientific and technical information, an improper purpose under the Federal rules of evidence and this Court's prior orders.[1]

## VII.

Federal Rules of Civil Procedure, Rule 26 (a)(2)(A) requires that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." WGI never included Dr. Lambe in any of its *Armstrong* witness lists nor produce a timely expert report.

Consistent with F.R.C.P., Rule 26, the Court's Pre-Trial Notice was incorporated into the Court's case management protocol referenced above. The Pre-Trial Notice specified that:

> "13.   b.   ... in the case of expert witnesses, counsel shall certify that they have exchanged expert reports in accordance with prior court orders.  Expert witnesses whose reports have not been furnished opposing counsel shall not be permitted to testify nor shall experts be permitted to testify to opinions not included in the

---

[1] Subsection ( c) of Rule 701 was amended in 2000 to "explicitly bar" the use of as expert as a lay witness as WGI now attempts to do with Dr. Lambe. *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 181 (C.A.2 (N.Y.)).  As specified in the Advisory Committee Notes, Rule 701 was amended "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.

       reports timely furnished;

  c.  Except for good cause shown, the Court will not permit any witness to testify unless with respect to such witness there has been complete compliance with all provisions of the pre-trial order and prior court orders."

  Clearly, WGI has failed to comply with any of the procedural requirements for presenting any testimony by Dr. Lambe. Dr. Lambe's declaration and proposed opinions are also inappropriate for consideration by this Court for substantive reasons.

**VIII.**

  Defense experts Dr. Silva-Tulla, Dr. Marr and Dr. Brandon each devote a section of their reports and portions of their deposition testimony criticizing Dr. Bea's opinions and conclusions. WGI commenced its critique of Dr. Bea through Dr. Silva-Tulla's expert report, wherein he stated that "[f]orensic engineering analyses of floodwall performance presented by Dr. Bea (2012) contain several critical errors. Most significantly, Dr. Bea erred in characterizing the hydrogeological properties of the materials used in his analyses...." Dr. Silva-Tulla further stated that "erroneous flow analyses results totally misrepresent the subsurface flow regime during the Katrina storm surge, giving the impression that changes in total head occur immediately, because he models the soft clays as porous, incompressible materials." (See Exhibit 2 - Silva-Tulla report, p. 68). Thus, Dr. Silva-Tulla concluded that Dr. Bea's "misunderstanding of soil mechanics fundamentals" led to incorrect and invalid conclusions about the cause of failure at the North and South Breach sites. (See Exhibit 2 - Silva-Tulla report, p. 68, Table VII-3, §3).

  Dr. Marr was more reserved and professional in his attack of Dr. Bea than Dr. Silva-Tulla,

perhaps a result of their teacher/pupil relationship.[2]  Dr. Marr merely characterized Dr. Bea's "flawed flow analyses" as an "incorrect...assumption of a very low value of coefficient of soil compressibility... of 1*10(-9)/psf, a value that is more like the compressibility of concrete, and 10,000 to 100,000 times less than realistic values for these soils."  (Exhibit 3 - Marr Report, p. 93-94).

### IX.

Dr. Silva-Tulla's deposition testimony was even more caustic than his report, as the true source of its influence was fully unveiled.  Basic terminology in soil mechanics mentioned by Dr. Bea was labeled by Dr. Silva-Tulla as "Bea speak," which he described as terms Dr. Bea uses "that nobody in my profession uses, and makes his writing almost unintelligible." (Exhibit 4 - Silva-Tulla depo., p. 231, l. 8-14).  When asked about the term ***non-steady flow***, Dr. Silva-Tulla stated "I don't know how Dr. Bea defines nonsteady flow...because his definition might be something I have never heard before." (Exhibit 4 - Silva-Tulla depo, p. 229, l. 21 - p. 230, l. 3).  Finally, Dr. Silva-Tulla's unprofessional and unsupported disparagements were shown to be the result of litigious over-preparation.  He even went so far as to say "Dr. Bea uses a series of terms that nobody in my profession uses ...such as hydraulic conductivities and hydraulic conductivity analysis. To me that is honestly nonsensical."  (Exhibit 4 - Silva-Tulla depo., p. 229, l. 1-15).

In reality, these terms are very basic and widely used in geotechnical engineering.  Dr. Silva-Tulla used the same terms "hydraulic conductivity" or "hydraulic conductivities" over ten (10) times in his March 12, 2012 Expert Report alone.

---

[2] *See* Dr. Silva-Tulla's 1975 Master's Thesis, wherein he thanked his thesis supervisors Professor William Lambe and Dr. Allan Marr for their interest and guidance in his professional development. (Exhibit 5, p. 3).

6

## X.

Somewhat more comical was defense expert Dr. Tom Brandon's outlandish claim that the soil conditions modeled by Dr. Bea would only be found at "the center of a neutron star." (See Exhibit 6, Brandon deposition, at 229:24-230:6). WGI adopted and memorialized this puffery in its Motion to Exclude Testimony and Opinions of Dr. Robert Glenn Bea, asserting that the soils compressibility that Dr. Bea utilized to model the conditions of the buried swamp/marsh layer at the EBIA does "not exist anywhere in nature for a soil." WGI continued its excoriation of Dr. Bea throughout its Motion to Exclude with numerous snide remarks, claiming ultimately that his analysis "was a figment of his imagination and in no way consistent with geotechnical science or actual site conditions at the EBIA." (Rec. Doc. 20822-1, p. 39).

WGI's comment that Dr. Bea's understanding of the site conditions were figments of his imagination is easily debunked by Dr. Silva-Tulla's own Expert Report, wherein he conceded that "a review of the EBIA hydraulic conductivity data leads to the following observations...hydraulic conductivity measurements at the EBIA ranged from a low of about $10^{-9}$ cm/sec to a high of about $10^{-4}$ cm/sec." (See Exhibit 2 - Silva-Tulla report, p. 43).

Similarly, Plaintiffs' pointed out fundamental principles contained in the *Soil Mechanics* textbook and SEEP/W User Manual in the Opposition to WGI's Motion to Exclude, thereby refuting the assertion that the bases of Dr. Bea's findings were figments of his imagination.

Now having to concede that Dr. Bea's analyses were not figments of his imagination, and with its' "star" witnesses compromised, WGI resorts to violating this Court's protocol and seeks to interject Dr. Lambe to substantiate the re-adjusted position in its Reply Memorandum. (Rec. Doc. 20865).

## XI.

In this context, it should be noted that Dr. Marr already analyzed fundamental factors substantiating a *steady flow* analysis as presented in Dr. Bea's Expert report.  Dr. Marr's disagreement rests upon the identification of the buried swamp/marsh layer as being relatively incompressible (Exhibit 3 - Marr Expert Report, Appendix T, p. 4), but conceded in his deposition that the soils in the buried swamp/ marsh layer were 100 % saturated. (Exhibit 7 - Marr depo., 4/23/12, 186:8 - 187:6).  Of course, fully saturated soils are virtually incompressible.

## XII.

In the final analysis, Dr. Brandon, disentangled from his investigation of heavenly bodies, could not credibly rebut the utilization of *steady flow* analyses as he had already correctly conceded that "[w]hen canal water increases, the pore pressure increases at the toe of the levee [on the protected side].  This increase in pore pressure happens very quickly in a saturated system owing to the very low compressibility of water.  Conditions can occur where the upward pressure on a low permeability layer, labeled as a clay...is greater than the weight of the layer.  This can cause the layer to heave upwards."   (Exhibit 8 - Brandon Report, p. 38).

## XIII.

WGI, now forced to confront Dr. Bea's actual findings, was first required to have Dr. Silva-Tulla acknowledge the field conditions Dr. Bea had consistently cited.  Dr. Silva-Tulla finally admitted the following in WGI's Reply Brief:

1. "Organic clays like those at the EBIA are located below the water table, where the soil is, for practical purposes, completely saturated.

2. At that level, dilatational wave measurements are dominated by the compressibility

of the water in the clay pores (pore fluid), not the compressibility of the soil skeleton itself.

3. Dilatational wave velocities measured in any soil located below the water table will reflect mostly the compressibility of water."

(Exhibit 9 - Rec. Doc. 20865-2, p. 25, Ex. 57, Silva Declaration, at p. 3, ¶ 8).

Juxtaposed against the wild assertions in his report and deposition, Dr. Silva-Tulla is now required to admit that the above soil conditions were not figments of Dr. Bea's imagination without conceding that Dr. Bea's analysis is correct. While now claiming to have a full understanding of the principles of *steady flow*, Dr. Silva-Tulla could only state that "there is no evidence that steady flow conditions existed at the EBIA organic layer during Katrina storm surge." (Exhibit 9 - Rec. Doc. 20865-2, p. 25, Ex. 57, Silva Declaration, at p. 4, ¶ 11).

This position requires Dr. Silva-Tulla to completely ignore the USACE piezometer test results and disregard Dr. Bea's thorough analysis of the applicability of those results in Appendix C of Dr. Bea's Expert Report.

## XIV.

With Dr. Silva-Tulla's revised position places WGI in the untenable position of now conceding the underlying subsurface conditions for Dr. Bea's *steady flow* analysis while simultaneously ignoring the USACE piezometer test data. Forced into this position, WGI now attempts a new and separate attack of Dr. Bea's credibility, the intercessions of Dr. Lambe.

However, Dr. Lambe does not dispute the concept of *steady flow* analysis. He does not dispute that the buried swamp/marsh layer is 100% saturated. Further, he does not even dispute the concessions of Dr. Silva-Tulla in the Declaration in support of WGI's Reply Brief. The substance

...
...
...

of Dr. Lambe's Declaration is his opinion that Dr. Bea misapplied *steady flow* concepts to the conditions conceded by Dr. Silva-Tulla.

## XV.

Even if Dr. Lambe had been properly identified by WGI in compliance with the Court's case management protocol, his testimony could be properly excluded. "Expert testimony can be properly excluded if it is introduced merely to cast doubt on the credibility of other witnesses, since evaluation of a witness's credibility is a determination usually within the jury's exclusive purview." *United States v. Dorsey*, 45 F.3d 809, 815 (4th Cir.1995).

## XVI.

Likwise, no other expert should be allowed to testify as a conduit for the opinion testimony of Dr. Lambe. It is well settled that an expert ... may not simply parrot the work actually done by another expert...." *Fowler v. United States*, 2009 WL 2827958, *9 n. 59 (W.D.La. Sept. 1, 2009). "A scientist, however well-credentialed he may be, is not permitted to be the mouthpiece of another scientist. That would not be responsible science." *Abrams v. Ciba Specialty Chemicals Corp*., 2010 WL 779283 (S.D.Ala.), citing *Dura Automative Systems of Indiana, Inc. v. CTS Corp*., 285 F.3d 609, 612 (7th Cir.2002) This proposition enjoys broad acceptance among federal courts. *Id.*

As stated in *Malletier v. Dooney & Bourke, Inc*., although Rule 703 allows experts to rely on opinions of others, "the expert witness must in the end be giving his own opinion. He cannot simply be a conduit for the opinion of an unproduced expert ." *Malletier v. Dooney & Bourke, Inc*., 525 F.Supp.2d 558, 664 (S.D.N.Y.2007). The wholesale adoption of the opinion of another expert verbatim cannot be within the intent of Fed.R.Evid. 702 and the court "performing its gatekeeping function necessarily must ensure that [the expert] is not merely parroting the opinions of others."

*Bouygues Telecom, S.A. v. Tekelec*, 472 F.Supp.2d 722, 729 (E.D.N.C.2007). An expert "should not be permitted to serve as a conduit for the opinions of undisclosed experts" *Wolkowitz v. Lerner*, 2008 WL 1885770, *4 (C.D.Cal. Apr. 21, 2008). "What an expert may not do is act as a 'mouthpiece' for another undisclosed expert." *Reginald Martin Agency, Inc. v. Conseco Medical Ins. Co.*, 2007 WL 831613, *3 (S.D.Ind. Mar. 5, 2007).

Additionally, the proffered affidavit of Dr. Lambe is inadmissible as hearsay. Although F.R.E. 703 permits an expert to rely on hearsay in reaching his own opinion, a party cannot use an expert simply as a "mouth piece" or conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 666 (S.D.N.Y.2007). Though courts have afforded experts a wide latitude in picking and choosing the sources on which to base opinions, Rule 703 nonetheless requires courts to examine the reliability of those sources. *Soden v. Freightliner Corp.*, 714 F.2d 498, 502 (5th Cir.1983).

While an expert witness may base his opinion on hearsay evidence, "such does not magically render the hearsay admissible". *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, D.C.Del.1983, 576 F.Supp. 107, affirmed 740 F.2d 956, affirmed 740 F.2d 957, affirmed 740 F.2d 958, certiorari denied 105 S.Ct. 909, 469 U.S. 1159, 83 L.Ed.2d 923. Furthermore, evidence rules do not permit an expert witness to circumvent the rules of hearsay by testifying that other experts, not present in the courtroom, corroborate his views. *U.S. v. Grey Bear*, C.A.8 (N.D.) 1989, 883 F.2d 1382, certiorari denied 110 S.Ct. 846, 493 U.S. 1047, 107 L.Ed.2d 840, on subsequent appeal 991 F.2d 1406.

The Fourth Circuit found that an expert witness could not bolster his opinion testimony by

11

testifying that a non-testifying expert's conclusions were essentially the same as the expert's. *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1143 (4th Cir.1994). The Sixth Circuit and Seventh Circuits have also held that a district court erred by admitting expert testimony that was based "upon the opinion of others who were not even qualified as experts nor present at the trial." *Taylor v. B. Heller & Co.*, 9 Ohio Misc. 104, 364 F.2d 608, 613 (6th Cir.1966). See also *Walker v. Soo Line R. Co.*, 208 F.3d 581, 54 Fed. R. Evid. Serv. 439. In line with these opinions, the Fifth Circuit ruled that testimony of an expert via affidavit was inadmissible as it lacked foundation and was unreliable as the expert in question had never actually examined the patient that was the subject of the litigation and had based his opinion on the opinion of other examining physicians. Washington v. Armstrong World Industries Inc., 839 F.2d 1121, 56 USLW 2632, 10 Fed.R.Serv.3d 1189, 25 Fed. R. Evid. Serv. 298.

**XVII.**

Based upon the dictates of the above referenced case management orders, WGI carries the burden of overcoming a tardy witness designation by establishing "good cause" for the admissibility of that witness's testimony. The "good cause" standard focuses on the diligence of the party seeking the modification to the scheduling order. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (C.A.9 (Cal.),1992); *Marcum v. Zimmer*, 163 F.R.D. 250, 254 (S.D.W.Va.1995). Likewise, the absence of prejudice to the nonmovant and mere inadvertence on the part of the movant are insufficient to demonstrate "good cause." *Geiserman v. MacDonald*, 893 F.2d 787, 791 (C.A.5 (Tex.),1990). Instead, the movant may demonstrate "good cause" only by showing that, despite his diligence, he could not have reasonably met the scheduling deadline. *Callais v. Susan Vizier, Inc.*, 2000 WL 278097 (E.D.La.,2000) (Africk, Magistrate J).

Here, WGI only indicated its diligence in presenting evidence through Dr. Lambe in the *Armstrong* matter was after its "star" witnesses were compromised.

## XVIII.

To date, Plaintiffs have expended substantial efforts to prepare its case in compliance with the Court's succinct management protocol against the ever changing defense theories. Since the close of discovery, Plaintiffs have received numerous defense expert reports containing additional analyses that are the subject of concurrently filed motions in limine. The proposed presentation of opinion evidence by Dr. Lambe constitutes the most egregious infraction of this Court's case management orders, the rules of procedure, and the rules of evidence to date.

## XIX.

This court would be well within its discretion in striking or precluding any evidence from Dr. Lambe considering WGI's multitude of procedural and substantive violations. The Fifth Circuit has consistently recognized Fed.R.Civ.P., Rule 16(b)'s authority to the courts "to control and expedite the discovery process through a scheduling order" and trial court's "broad discretion to preserve the integrity and purpose of the pretrial order." *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 380 (C.A.5 (Tex.),1996). As such, Fed.R.Civ.P. 37(b)(2)(B) authorizes the trial court to impose sanctions on a party that violates the scheduling order "by refusing to allow that party to introduce designated matters into evidence." *Id*.

The preclusion of witnesses based on even less egregious reasons has been approved by the Fifth Circuit. It has found that a district court did not abuse its discretion in refusing to allow a party to call a witness to testify on rebuttal because that party had never included the witness on its witness list, and could not provide a valid reason for this omission. *Singer v. City of Waco, Tex.*, 324 F.3d

813 (C.A.5 (Tex.),2003).

More recently, the Fifth Circuit found that the district court did not abuse its discretion in excluding the testimony of certain witnesses on the grounds that the party had failed to include the witnesses on its pre-trial witness lists and that the witnesses had not been deposed before trial. *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, (C.A.5 (La.),2004), abrogated on other grounds.

**XX.**

For all of the foregoing reasons, Plaintiffs pray that this Court grant this Motion In Limine, thereby precluding any evidence from the Declaration of T. William Lambe, ScD., P.E. (Rec. Doc. 20869-25), and striking him from the defendants' Pre-Trial Order witness list.

Furthermore, the opinions of Dr. Lambe should not be allowed into evidence through other conduits.

Respectfully submitted,

PLAINTIFFS' LIAISON COUNSEL

s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar No. 3604)
BRUNO & BRUNO, L.L.P.
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

MR-GO PLAINTIFFS SUB-GROUP LITIGATION COMMITTEE

s/ James Parkerson Roy
JAMES PARKERSON ROY (La. Bar No. 11511)
MR-GO PSLC Liaison Counsel
Domengeaux Wright Roy & Edwards LLC
P.O. Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

for

MRGO PLAINTIFFS SUBGROUP LITIGATION COMMITTEE

Jonathan Andry (The Andry Law Group, LLC, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 10th day of August, 2012.

/s/ Joseph M. Bruno
Joseph M. Bruno