# EXHIBIT 1

**KENNETH ARMSTRONG, SR.**  September 12, 2011

Page 17

1  most of the time.  She's a student at LSU.
2     Q.  And is she living with you during the
3  summer?
4     A.  Correct.
5     Q.  And where are you living now?
6     A.  Meraux, Louisiana.
7     Q.  Can you give me your address?
8     A.  2400 Aramis Drive.
9     Q.  That's in St. Bernard Parish?
10    A.  Correct.
11    Q.  How far from your prior house in
12 Chalmette on Hamlet Drive is that?
13    A.  Um -- probably about four miles.  Four
14 and a half miles.
15    Q.  Four miles in which direction?
16    A.  Going more southeast.
17    Q.  So are you closer to the Mississippi
18 River?
19    A.  Correct.
20    Q.  And how long have you been living on
21 Aramis Drive?
22    A.  Um -- about a year and a half.  Year
23 and three months, something like that.
24    Q.  This is a house; right?
25    A.  Yes, ma'am.

Page 18

1     Q.  Okay.  Do you own the house?
2     A.  I own a 15-year mortgage.
3     Q.  Do you remember when you purchased it?
4     A.  Um -- last year, June of last year.
5     Q.  Can you give me a brief description of
6  the house?  How big is it?
7     A.  About 2700 square foot living, 3100
8  total under roof.
9     Q.  How many levels?
10    A.  One.
11    Q.  And how many bedrooms?
12    A.  Five.
13    Q.  How many baths?
14    A.  Um -- two and a half.
15    Q.  And when was the house built?
16    A.  I'm not sure.
17    Q.  You bought it from somebody else?
18    A.  Bought it redone after the storm.
19    Q.  Do you know what happened to that
20 house during Katrina?
21    A.  Um -- I know it was flooded.  I'm not
22 exactly sure what was the extent of the damage.
23    Q.  Okay.  I'm going to update your
24 employment information now.
25         Are you still working for Southern

Page 19

1  Eagle Sales and Services?
2     A.  Yes.
3     Q.  And I believe at the time of your last
4  deposition your title was district sales
5  manager.  Is that still your title?
6     A.  Team leader, now.
7     Q.  So --
8     A.  Same title, changed name.
9     Q.  So is that a promotion or --
10    A.  No.  No.  It was just a different
11 owner of the company, and he changed the
12 titles, that's all.
13    Q.  Have your responsibilities changed and
14 all?
15    A.  No.
16    Q.  Are you still responsible for the same
17 area in Chalmette?
18    A.  Well, now.  I wasn't, now I'm back in
19 Chalmette, New Orleans.
20    Q.  How long were you not in Chalmette?
21    A.  Um -- April of last year -- let's see.
22 I was gone about a year and a half.  I was
23 working Plaquemines -- the west bank of this
24 area.
25    Q.  That's Plaquemines Parish?

Page 20

1     A.  Yeah.  Where the oil spill was.
2     Q.  Why were you moved to Plaquemines
3  Parish?
4     A.  Just when they came they changed the
5  district territory.  We don't change sales
6  people.  We changed the team leader.
7     Q.  And your change from working in
8  Chalmette to Plaquemines Parish, did that have
9  anything to do with Hurricane Katrina?
10    A.  No.  No, unh-unh.
11    Q.  And when did you go back to working in
12 Chalmette?
13    A.  August the 5th of this year.
14    Q.  Is your wife Jeannine currently
15 working?
16    A.  Yes.
17    Q.  And where is she working?
18    A.  Um -- on Houma, in Metairie.  It's the
19 same day surgery center.  I'm not exactly sure
20 of the name.
21    Q.  When did she start working there?
22    A.  I'm not sure.
23    Q.  Do you know what her position is?
24    A.  She's a nurse.
25    Q.  Is this a part-time job or full-time?

5 (Pages 17 to 20)

JOHNS, PENDLETON COURT REPORTERS                                504 219-1993

Page 49

1  there. But also, that's where you had to file
2  any, um -- paperwork or any things like that.
3  That's where FEMA's office was set up. All
4  your insurance companies were there. So you
5  had to make your way in there to, um -- to take
6  care of your business that you had to with your
7  house.
8      Q. You mentioned that your brother-in-law
9  accompanied you on a visit to your house on
10 Hamlet Drive. Was that while you were living
11 in this apartment in Prairieville?
12     A. It was either at his house or the
13 apartment in Prairieville. We made an attempt
14 to get back down there one time with him.
15     Q. And you did not succeed.
16     A. Oh, no. We got in there. But like I
17 say, it's nothing -- you know.
18     Q. Who else was with you when you went --
19     A. My wife, my kids and -- my son,
20 probably.
21     Q. And did you take any pictures?
22     A. Oh, we got pictures. Y'all got them.
23 Somebody's got them.
24     Q. Okay. That visit with your
25 brother-in-law, your wife, your kids, that's

Page 50

1  when you took pictures?
2      A. Right.
3      Q. Do you remember when that was?
4  Ballpark.
5      A. Maybe three to four months after
6  Katrina was the first time they actually went
7  in to see.
8      Q. Had you and your wife gone down there
9  previously without your kids?
10     A. No, I think that was the first time --
11 my sone might have been in. You know, he might
12 have got in there. But none of my -- my
13 daughters, and I think that might have been my
14 wife's first time going.
15     Q. During that visit, were you able to
16 salvage anything from that house?
17     A. No. I had a bucket full of change.
18 Um -- I took out a couple of old guns that were
19 flooded. That was it.
20     Q. Do you remember what month you left
21 Prairieville and moved to Covington?
22     A. I thought you said earlier it was
23 June. I know it was before my daughter started
24 school out there. So it had to be sometime in
25 the summertime.

Page 51

1      Q. Your address -- do you know what your
2  address was in Covington in this apartment?
3      A. No.
4      Q. Does 28 Park Place sound familiar?
5      A. Park Place sounds familiar.
6      Q. Do you know if that was Mandeville or
7  Covington?
8      A. No, it was Covington.
9      Q. Covington. And Covington is the north
10 shore?
11     A. Correct.
12     Q. Why did you decide to go there?
13     A. My daughter's school, Hannan --
14 Archbishop Hannan was going to relocate there.
15 Or they were attempting to. So that's why we
16 moved into the area.
17     Q. So when you were living at Covington,
18 did you still have to bring your daughter back
19 to Baton Rouge to school?
20     A. No. Remember, it was the summertime.
21 She finished at St. Michael's.
22     Q. I see.
23     A. And Hannan was opening up, um -- maybe
24 20, 25 minutes away from where we were living.
25     Q. Uh-huh. And did you sign a lease at

Page 52

1  this Park Place --
2      A. I'm sure we did.
3      Q. Do you remember how much rent per
4  month?
5      A. Um -- no.
6      Q. Okay. How long did you live in the
7  Covington apartment?
8      A. I'm not sure.
9      Q. Okay. While you were living in
10 Covington, did you commute back every day to
11 Metairie --
12     A. Yes, I did.
13     Q. -- to your job?
14     A. Yes, I did.
15     Q. About how long was that commute?
16     A. Um -- about forty-five minutes in the
17 morning and about an hour in the evening.
18     Q. Did your wife work while you were
19 living in Covington?
20     A. No.
21     Q. She didn't work at all this whole
22 period that you were living --
23     A. I'm not exactly sure when she went
24 back to work. While we were on the north shore
25 she did go back to work.

Page 53

1   Q. During this period while you were
2   living in an apartment in Covington, was your
3   wife diagnosed with pneumonia?
4   A. Yes. She was.
5   Q. Can you describe her condition?
6   A. She was diagnosed with an airborne
7   fungal that was diagnosed in her back or her
8   spine. And, you know, that was it.
9   Q. Okay. Did she have any surgery or
10  medical treatment for that condition?
11  A. Yes, she did.
12  Q. Do you remember when that was?
13  A. No, I don't. I was living in
14  Covington when the surgery took place, though.
15  Q. And while you will living in this
16  apartment in Covington, did you make frequent
17  visits back to your house on Hamlet Drive?
18  A. Um -- somewhat. You know, we passed.
19  I worked, actually, in Chalmette during that
20  time frame, um -- a couple days a week, maybe
21  one day, sometime two, depending on -- as the
22  parish came back more and more, I worked more
23  out there.
24       Remember, there's nothing to visit
25  other than the shell of a house.

Page 54

1   Q. While you were living in Covington,
2   did you make the decision to demolish your
3   house?
4   A. Um -- it might have been that time.
5   It might have been in that time frame. I'm not
6   exactly sure when it was.
7   Q. Did you hire anyone to inspect your
8   house and give you an estimate for repairs
9   before you decided to demolish your house?
10  A. We did have a guy come out and give an
11  estimate of the damage or what it would take to
12  replace what was damaged.
13  Q. Do you know who that guy was?
14  A. Um -- I can't remember his name. He
15  was a local guy. I can't -- at the time, they
16  were doing a lot of that work.
17  Q. Do you remember what month that was?
18  A. No.
19  Q. Okay. Did either that guy or a
20  contractor ever -- or anybody else ever tell
21  you that the foundation of your home on Hamlet
22  Drive was structurally unsound?
23  A. Um -- no. I don't recall that.
24  Q. Did anyone ever tell you that the
25  house could not be repaired?

Page 55

1   A. Um -- I don't think anybody ever said
2   that, that the house couldn't be repaired. But
3   the cost to probably repair it would have been
4   greater, you know, just, um -- I don't want to
5   say more than the house was worth, but it would
6   have been an astronomical amount.
7   Q. Do you remember how much that was?
8   A. No. No, I don't. Plus, the cost of
9   everything went up after the storm. To
10  rebuild, everything -- you know, everything I
11  don't want to say doubled in price, I would be
12  guessing, but everything went up, you know, to
13  rebuild your home at the time.
14  Q. Had the prices not been astronomical,
15  would you have wanted to repair?
16  A. Not back there, no. No. I think that
17  was an option that we stayed away from.
18  Q. Why is that?
19  A. We wanted to move to where we were,
20  um-- to higher ground.
21  Q. The home that you did move to in
22  Meraux?
23  A. Correct.
24  Q. That is higher ground?
25  A. Yes, it is.

Page 56

1   Q. Because it's closer to the river?
2   A. I would venture -- that's what they
3   say.
4   Q. Okay. Did you live in your apartment
5   in Covington up until the time that you moved
6   to Meraux --
7   A. No.
8   Q. -- or did you live somewhere else?
9   A. No. No. We moved -- actually, we
10  moved to Mandeville, which is the next city
11  over, next parish, into the next parish.
12  Q. Closer to the lake?
13  A. Yes.
14  Q. Do you remember when you moved there?
15  A. No.
16  Q. Do you know about how long you lived
17  in that apartment?
18      It was an apartment; right?
19  A. It was a townhouse, yeah.
20  Q. Townhouse?
21  A. I don't know. A couple years, I
22  guess. I mean, we just moved back what, in
23  2010? June 2010? So we were gone five years,
24  so. Between the Covington and that, we
25  probably -- that's where we spent the rest of

**KENNETH ARMSTRONG, SR.**                                              September 12, 2011

Page 57

1  our time when me moved out of Prairieville was
2  either Covington -- and mostly in Mandeville.
3      Q.  And who lived with you in Mandeville
4  in this townhouse?
5      A.  Um -- me and my wife and my two
6  daughters.
7      Q.  When did your son stop living with
8  you?
9      A.  He was kind of in between.  After the
10 storm he lived in Metairie.  His girlfriend had
11 a place in Metairie.  Because he had went back
12 to work.
13     Q.  And why did you choose to move to
14 Mandeville?
15     A.  At the time?  Um -- I think we just
16 was looking for a little bit bigger place than
17 what we had, because we only had two bedrooms
18 and I had the two girls living with us at the
19 time.  And this was a three-bedroom.
20     Q.  But you wanted to stay on the north
21 shore?
22     A.  Close to my daughter's school.  The
23 agreement was once my daughter got out of
24 school we would move back.
25     Q.  Okay.  And I take it you commuted to

Page 58

1  your office in Metairie every day?
2      A.  Correct.
3      Q.  And how long was the commute?
4      A.  Um -- probably five minutes less than
5  the other drive.  Forty minutes.  Probably
6  forty-five.  It depends.  They were both right
7  on the -- one was off of the main highway, and
8  one was right on the main highway just a little
9  further away.
10     Q.  And was your wife working while you
11 lived in Mandeville?
12     A.  Yes.
13     Q.  Where was she working?
14     A.  The place you have already.  The same
15 day surgery center where she is now.
16     Q.  And that was a part-time job?
17     A.  Correct.
18     Q.  Do you know how long her commute was?
19     A.  Um -- probably five minutes less than
20 mine.
21     Q.  Where is the surgery center located?
22     A.  On Houma Boulevard, in Metairie,
23 Louisiana.
24     Q.  And then while you were living in your
25 apartment, or your townhouse in Mandeville,

Page 59

1  your house on Hamlet Drive had been demolished.
2  Is that right?
3      A.  Um -- I'm sure it was within that time
4  frame it was demolished.  Yes, it was.
5          What's the date?  I don't know.
6      Q.  Once it was -- did you visit the house
7  while it was being demolished?
8      A.  My son watched.  I didn't.  We
9  couldn't go watch that.
10     Q.  Did you have to sign some paperwork
11 before --
12     A.  I think we did.  I think we had to
13 sign something.
14     Q.  Do you know what office or -- what
15 office did you sign the paperwork in?
16     A.  I don't recall.
17     Q.  Do you remember what kind of papers?
18     A.  No, I don't.
19     Q.  Okay.  And then why did you decide to
20 move to Meraux?
21     A.  Um -- well, one of the factors,
22 looking around, is that I think there's 119
23 homes in the neighborhood I'm in.  I think
24 there's only three homes that are still
25 unoccupied.  And it's, like I say, higher flood

Page 60

1  elevation, and, um -- normalcy.  You know, it
2  was getting back to normalcy of a house in the
3  neighborhood that we live in.
4      Q.  And how far is your commute to your
5  office in Metairie?
6      A.  Um -- twenty minutes, twenty-five.
7  But I don't go to the office.  Now I go
8  straight into the territory.  My first -- the
9  first place I could visit is a half a mile from
10 my house.  You know?
11     Q.  Well, when did that start; when did
12 you no longer have to visit your office in
13 Metairie every morning?
14     A.  Um -- probably -- maybe a year and a
15 half, maybe.  A lot of that -- we had new
16 ownership.  They didn't require you to come to
17 the office.  You know, so now new ownership
18 wants you back on the street more.
19     Q.  Is your company no longer part of
20 Anheuser-Busch?
21     A.  Oh, no, it is.  Just a new owner.  Our
22 owner retired, and the new owners bought the
23 company.
24     Q.  Okay.  How much did you pay for the
25 new house?

15 (Pages 57 to 60)

Page 305

```
 1     Q.  Okay.
 2        MS. CLAYMAN:
 3            Counsel, if you have a copy of
 4        the settlement we'd like to get a
 5        copy.
 6        MR. ANDRY:
 7            We can request it from Frank
 8        Ippolito.  We don't have one.
 9        MR. TREEBY:
10            Are you saying you'll request it
11        from Frank Ippolito?
12        MR. ANDRY:
13            I will.
14        MR. TREEBY:
15            Okay.
16     EXAMINATION BY MS. CLAYMAN:
17     Q.  You just mentioned Road Home.  So
18  following Hurricane Katrina, you applied for
19  financial assistance from the Road Home
20  Program, correct?
21     A.  Yes, we did.
22     Q.  Did you ultimately receive money from
23  Road Home?
24     A.  Yes, we did.
25     Q.  Do you know how much?
```

Page 306

```
 1     A.  Not off the top of my head I don't.
 2     Q.  Does 75,000 sound roughly about what
 3  you received?
 4     A.  I'm not sure if that's the figure or
 5  not.
 6     Q.  Okay.  Do you know how Road Home
 7  determined the award amount that you received?
 8     A.  Um -- based -- based on the value of
 9  your home or based on the appraised value of
10  your home.
11     Q.  I'm sorry.  You say based on the --
12     A.  Appraised value of your home.
13     Q.  And that was the pre-storm value?
14     A.  Yes.
15     Q.  Okay.  And was any amount subtracted
16  from that appraised value -- pre-storm value of
17  your home?
18     A.  I think there was.  I think some of
19  the insurance monies and that were deducted.
20     Q.  Okay.  And do you know if it was just
21  the structure -- payments you received from
22  insurance companies for structure, or would
23  that include structure and contents?
24     A.  No.  I think it it's only structure
25  might been deducted.  I think.  I'm not sure.
```

Page 307

```
 1     Q.  Okay.  Just very quickly going back to
 2  your settlement with Liberty Mutual, you don't
 3  remember or you do remember how much the
 4  settlement was for?
 5     A.  No, I don't remember what our
 6  settlement was for --
 7     Q.  Do you remember ballpark?
 8     A.  No.  No, I don't.
 9     Q.  Now, Road Home initially offered you
10  three different options with three different
11  recovery amounts.  Do you remember that?
12     A.  I think so.
13     Q.  All right.  I'm just going to mark as
14  the next exhibit number 17 a letter from Road
15  Home dated October 16th, 2007.  We're handing
16  you what's been marked Exhibit Number 17, which
17  is an October 16th --
18        (Reporter interruption.)
19     EXAMINATION BY MS. CLAYMAN:
20     Q.  Okay.  I'm handing you what's been
21  marked Exhibit Number 17, which is a letter
22  from Road Home dated October 16, 2007, Token to
23  Kenneth Paul Armstrong.  And if you would, take
24  a minute to look at that and see if this looks
25  familiar to you.
```

Page 308

```
 1        (Exhibit 17 was marked for
 2  identification and is attached hereto.)
 3     A.  Yes.  I remember something about the
 4  three options.
 5     EXAMINATION BY MS. CLAYMAN:
 6     Q.  All right.  So on Page -- first of
 7  all, what is this letter, as far as you know?
 8     A.  Just one of the final steps you took
 9  when you were trying to either stay in your
10  house, leave the state or, um -- let the Road
11  Home take over your property, or purchase your
12  property.
13     Q.  Okay.  And Page 5 of this letter, it
14  appears to tell you how much Road Home was
15  willing to give you for each one of those
16  options, is that right?
17     A.  Um -- that's what it looks like.
18     Q.  Okay.  So Option 1, stay in your home,
19  looks like the total available benefit was
20  $105,379.89; Option 2 was $75,370.89; and then
21  Option 3 is on the next page, which was sell
22  your home, and that was $16,170.89.
23     A.  Okay.
24     Q.  Which option did you choose?
25     A.  I chose to sell my home.
```

Page 309

1    Q.  To sell your home and relocate within
2    the state of Louisiana?
3    A.  Yes.
4    Q.  So that's Option 2?
5    A.  Yes.
6    Q.  Okay.  Does this refresh your
7    recollection as to how much Road Home provided
8    you?
9    A.  I'm not sure if that's the amount of
10   money we got.
11   Q.  Okay.  On Page -- let's look at Page 4
12   of this document.
13   A.  Okay.
14   Q.  And it says, estimated pre-storm
15   value, $148,000.  Do you see that?
16   A.  Uh-huh.
17   Q.  You had mentioned earlier that you
18   believe someone came out and gave you -- or
19   someone from Road Home had done an appraisal of
20   your home?
21   A.  Correct.
22   Q.  Is this the final amount that the
23   appraiser found for your house on Hamlet Drive,
24   $148,000?
25   A.  Um -- yes.  I think that was it.  We

Page 310

1    disputed that total, too.
2    Q.  You disputed the $148,000?
3    A.  Yes.
4    Q.  Was there a prior appraisal done
5    before October 16th, 2007?
6    A.  Um -- no, based on the home across the
7    street from me, which was smaller, sold for
8    $161,000 two months before the storm.  What
9    they did when they approved your house, they
10   didn't appraise it in the neighborhood you
11   lived, they went into different areas.  And one
12   of the houses that they used to value was in a
13   lesser area than what we basically -- we
14   thought we lived in.  So it brought down the
15   value of the house, we thought.
16   Q.  The house that sold for $161,000, do
17   you know who lived there?
18   A.  The person who sold it was Ronnie
19   Couvillion, Sr.
20   Q.  And you said that house was sold in
21   2005?
22   A.  Um -- yeah.  It was -- yeah.  It was
23   2005.
24   Q.  And was that house also on Hamlet
25   Drive?

Page 311

1    A.  Yes.  Correct.  Right across the
2    street.
3    Q.  Okay.  So this was not -- did you
4    understand that there was a prior Road Home
5    appraisal before this $148,000?
6    A.  Yeah.  We had requested a new
7    appraisal.  Based on the information across the
8    street we had asked for a new appraisal.
9    Q.  Okay.  Well, let me just hand you
10   another appraisal that was dated -- or another
11   Road Home letter that is dated January 31st,
12   2007.  Okay.  I'm handing you what's been
13   marked Exhibit Number 18.  It's a Road Home
14   letter to Kenneth Paul Armstrong dated
15   January 31st, 2007.
16       So this was roughly nine, ten months
17   before the letter -- well, Exhibit Number 17
18   that we just looked at, right?
19       (Exhibit 18 was marked for
20   identification and is attached hereto.)
21   A.  Yes.
22   EXAMINATION BY MS. CLAYMAN:
23   Q.  And turning to the Page 5 on this
24   document --
25   A.  Uh-huh.

Page 312

1    Q.  -- it looks like -- it says,
2    Attachment 1, factors used to calculate
3    benefits.  And it says estimated pre-storm
4    value is 140,000.
5    A.  Yes.
6    Q.  You see that?
7    A.  Yes.
8    Q.  So the original -- is this the
9    original estimate they came back to you with?
10   A.  No.  The other one was the original.
11   If I'm not mistaken, this was the original one.
12   (Indicating.)
13   Q.  Well, this one is dated January --
14   Exhibit 18 is dated January 31st.  Exhibit 17
15   is dated October.  So that's --
16   A.  Well, this one had to be after, then.
17       MR. ANDRY:
18           You figure that out.
19   A.  I'm trying to understand -- oh, this
20   was January 2007.  This was October, the first
21   one we had.  Well, this was the last one we
22   got.
23   Q.  The October one?
24   A.  Yeah.  This was January 2007.
25   Q.  Right.