# EXHIBIT 3

### Page 69

1  pictures, but nothing -- nothing that they
2  could salvage.
3     Q. Any jewelry?
4     A. Jewelry? It was all corroded.
5     Q. When you had -- Let's go back for a
6  minute to the time when you evacuated. When
7  you evacuated, what did you and your wife take
8  with you to Houston?
9     A. I mean, we took what we thought
10 would be, you know, necessary, a couple of
11 days' worth of clothes. What we typically
12 would bring on an evacuation.
13    Q. So you said you took a couple of
14 days' worth of clothes. Did you take anything
15 else?
16    A. Not a whole lot. Not as much as we
17 should have.
18    Q. Did you take any family mementos
19 with you? Any pictures?
20    A. We -- I am trying to think. We took
21 a couple of things. Nothing -- Nothing
22 substantial.
23    Q. Okay. When you say "a couple of
24 things", do you think those couple of things
25 were pictures?

### Page 70

1     A. I believe there were a couple of
2  pictures.
3     Q. Did you take any valuables, any
4  jewelry with you?
5     A. We took some. Mostly what we had on
6  us.
7     Q. And what do you recall that you had
8  on you and took in terms of jewelry?
9     A. I know my -- my wedding band and my
10 wife's wedding band.
11    Q. Was there anything else besides a
12 couple of days' worth of clothes, your wedding
13 bands, and pictures that you took with you
14 when you evacuated?
15    A. I believe we have the -- we took the
16 closing documentation for the property.
17    Q. Any other important documents that
18 you took with you besides your closing
19 documents for Perrin Drive?
20    A. No, sir. Unfortunately, there was a
21 small safe that accidentally got left behind
22 and it was not waterproof.
23    Q. Now, you had mentioned earlier that
24 you believe the first time you went back to
25 visit New Orleans was November of 2005. Is

### Page 71

1  that correct?
2     A. Yes, sir.
3     Q. And, of course, Hurricane Rita hit
4  the end of September of '05? Is that correct?
5     A. It could be, yes, sir.
6     Q. So you obviously didn't visit your
7  home before Rita struck New Orleans.
8     A. That is correct.
9     Q. Did you receive any phone calls or
10 communications from anyone in New Orleans
11 regarding how Rita might have damaged your
12 house at Perrin Drive?
13    A. No, sir.
14    Q. Okay. So back to the time line.
15 When you left the Comfort Suites, you moved
16 into the house where you currently reside at
17 30231 Glenboro Drive in Spring, Texas. Is
18 that correct?
19    A. Yes, sir, that's correct.
20    Q. And so that was roughly the
21 beginning of January of 2006?
22    A. Yes, sir.
23    Q. Can you describe that house at
24 Glenboro Drive for me?
25    A. It's a single residence.

### Page 72

1     Q. Is it a ranch style home?
2     A. I don't know how -- how to describe
3  it. It is a two-story home. That's --
4     Q. Two-story home with a basement?
5     A. No, sir.
6     Q. No? How many bedrooms are in the
7  house?
8     A. Four, I believe.
9     Q. How many bathrooms?
10    A. Two and a half.
11    Q. Do you know how many square feet
12 total in the house?
13    A. Roughly 2,000.
14    Q. Roughly 2,000 you said?
15    A. Uh-huh (affirmatively).
16    Q. Now, when you moved into the
17 Glenboro house in January of '06, did you sign
18 a lease to rent?
19    A. Yes, sir.
20    Q. And how long was the lease that you
21 signed when you moved in in January?
22    A. We were allowed to stay for one
23 year.
24    Q. So you signed a one-year lease?
25    A. Correct.

Page 73

1  Q. And do you recall how much you paid
2  in rent per month when you first moved in?
3  A. Well, that -- that's -- was what it
4  is. We actually -- Catholic Charities
5  actually helped us in that effect.
6  Q. So Catholic Charities helped you to
7  pay for the rent at the Glenboro Drive when
8  you first moved in?
9  A. In essence. It was something that
10 the realtor -- It was a foreclosed property.
11 They were allowing us to stay there. I don't
12 know exactly how financials were taken care
13 of.
14 Q. Was this a Catholic charity in
15 Spring, Texas?
16 A. Actually, it's housed in Houston.
17 Q. And was the name of the charity
18 Catholic Charities?
19 A. Yes, sir.
20 Q. And do you recall how long Catholic
21 Charities paid for your rent at Glenboro
22 Drive?
23 A. I want to say it was a period of a
24 year.
25 Q. And do you recall, maybe not because

Page 74

1  Catholic Charities was paying the rent, but do
2  you recall what that amount of money was?
3  A. No, I was never aware of that.
4  Q. Do you have a copy of the lease that
5  you signed to rent at Glenboro Drive?
6  A. I may have.
7  Q. And do you have any documentation to
8  show the arrangement that you made with
9  Catholic Charities?
10 A. I believe that would have been the
11 only documentation, would have been the actual
12 lease.
13 Q. The lease?
14 A. Uh-huh (affirmatively).
15 Q. Now, when you moved into Glenboro
16 Drive in January of '06, you had stayed in,
17 prior to -- prior to moving into Glenboro
18 Drive you had stayed in two hotels. Why did
19 you decide to move into a single family home
20 in January of 2006 as opposed to going to
21 another hotel?
22 A. I mean, they -- ultimately FEMA said
23 that they were not offering any more housing
24 assistance for anyone staying in a hotel. And
25 we could not afford that. And the Catholic

Page 75

1  Charities said that they may have something
2  available and then we got the phone call that
3  "Yes, we do have something available."
4  Q. So going back, I know you mentioned
5  this before, but I just want to go back and
6  clarify, --
7  A. Uh-huh (affirmatively).
8  Q. -- you mentioned when you stayed
9  initially at the Motel 6 that you paid -- you
10 paid to stay at the hotel for a brief period
11 of time and then you received money from
12 FEMA.
13 A. Correct.
14 Q. Did FEMA pay for you to stay at the
15 hotel at the Motel 6 and the Comfort Suites
16 for the entire period that you stayed in those
17 hotels aside from the initial period that you
18 paid yourself?
19 A. Either -- Either FEMA or Red Cross.
20 Those were the two organizations.
21 Q. Do you recall roughly how many days
22 at the Motel 6 you paid for yourself --
23 A. No, sir.
24 Q. -- initially?
25 A. No, sir.

Page 76

1  Q. You were at the Motel 6 for a week.
2  Do you think it was one day, two days?
3  A. I am really not -- I can't recollect
4  at the moment.
5  Q. But you didn't pay for the bill for
6  the entire week in the Motel 6?
7  A. I don't recall.
8  Q. Now, the house on Glenboro Drive in
9  Spring you now own; correct?
10 A. Yes, sir.
11 Q. And when did you all buy that house?
12 A. I don't recall the exact -- I'm
13 wanting to say 2008, but I am not 100 percent.
14 Q. 2008. Do you recall when in 2008?
15 A. No, sir, I don't. I'm trying to
16 think. No. I can't recall.
17 Q. And do you remember how much you
18 paid for the house?
19 A. I don't recall the exact amount, no,
20 sir.
21 Q. And do you have a mortgage at the
22 Glenboro Drive house?
23 A. Yes, sir, I do.
24 Q. Who's the mortgage through?
25 A. Small Business Administration.

Page 77

1   Q.  So just to clarify, you believe that
2   you bought the house on Glenboro Drive in
3   Spring in 2008?  Is that correct?
4   A.  I am not -- I am really not 100
5   percent sure.
6   Q.  So during the time that you first
7   moved in, which was January of '06, between
8   that period and -- between that date and the
9   time in which you bought the house --
10  A.  Yes, sir.
11  Q.  -- you were continuing to pay -- you
12  were paying rent that entire time?
13  A.  No, sir.  I mean, we -- I don't
14  recall when we actually purchased the home.  I
15  believe it was just for the one year after.
16  So it may have actually been '07.  I am not
17  100 percent sure, though.
18  Q.  So you moved in initially in January
19  of '06.
20  A.  Yes, sir.
21  Q.  You signed a year lease to rent.
22  And you believe then you actually may have
23  moved in that following year?
24  A.  Yes, sir.  It could be.  I am not
25  100 percent sure, though.

Page 78

1   Q.  It's not a trick question.  I
2   promise.
3   A.  Yes, sir, I understand.
4   Q.  I am just trying to nail down
5   dates.
6   A.  I understand.  I understand.  I
7   really don't recall, though.
8   Q.  But if you signed a year lease to
9   rent and then bought shortly thereafter, that
10  would put us in January of '07.  Correct?
11  A.  Correct.  But I believe they gave us
12  a couple of extensions, but I am not -- I
13  really don't recall 100 percent.
14  Q.  When you say they gave you a couple
15  of extensions, you're referring to the
16  Catholic Charities group?
17  A.  Not necessarily Catholic Charities
18  group.  I believe it was the group, the actual
19  realtor who owned the property.
20  Q.  I see.
21  A.  I believe that's Fannie Mae.
22  Q.  So after the year, the initial year
23  that you spent living at Glenboro Drive during
24  which Catholic Charities was paying for the
25  rent at that residence, --

Page 79

1   A.  Yes, sir.
2   Q.  -- did you pay the rent after that
3   initial year, or was that rent paid for by
4   someone else?
5   A.  That was still part of the ongoing.
6   Q.  So the entire period of time that
7   you lived there before you bought the house --
8   A.  Uh-huh (affirmatively).
9   Q.  -- you did not pay rent there?
10  A.  That's correct.
11  Q.  Now, when you bought the house at
12  Glenboro Drive, you still owned the house on
13  Perrin Drive in New Orleans; is that correct?
14  A.  Yes, sir, that's correct.
15  Q.  And were you continuing, were you
16  still paying the mortgage there when you
17  bought the house at Glenboro Drive?
18  A.  Yes, sir, unfortunately.
19  Q.  Were you at some point paying
20  utilities at Perrin Drive?
21  A.  Not after the fact.  I don't believe
22  so.
23  Q.  So after the storm you don't believe
24  that you paid for utilities at Perrin Drive at
25  any point in time?

Page 80

1   A.  I don't think so.
2   Q.  Now, the house at Perrin Drive in
3   New Orleans was ultimately demolished.  Is
4   that correct?
5   A.  Yes, sir.
6   Q.  Do you recall when that happened?
7   A.  No, sir, I do not.
8   Q.  Do you recall who demolished the
9   house?
10  A.  That would have been through the
11  orders of the Road Home.  They actually
12  purchased the property.
13  Q.  So you believe it was demolished
14  then after you sold it to Road Home?
15  A.  Oh, absolutely.
16  Q.  Did you receive any documentation or
17  any communication detailing or describing the
18  demolition?
19  A.  No, sir.
20  Q.  None?  Nothing telling you when it
21  was going to happen or did happen?
22  A.  No, sir.
23  Q.  How did you find out it was
24  demolished?
25  A.  I found out after the fact.  We went

Page 273

1  bottom 99, it's the second page of the
2  document, there's a marking there for option
3  3. Do you see that?
4      A. Yes, sir.
5      Q. Is that your handwriting there?
6      A. I don't know if that was actually my
7  selection or if that was the case worker's. I
8  don't think that was mine. I think that may
9  have been the case worker or the volunteer,
10 whoever was working.
11     Q. Let's go back to the beginning of
12 the document. It says -- You see at the top
13 for applicant name that your name, Fred Nelson
14 Holmes, Jr., is listed?
15     A. Yes, sir.
16     Q. And the address of eligible property
17 is listed as 1205 Perrin Drive, Arabi,
18 Louisiana, which was your address at the time
19 of Katrina; correct?
20     A. Yes, sir, that's correct.
21     Q. If you look a little bit farther
22 down that page it says "Option 1, stay in
23 home".
24     A. Yes, sir.
25     Q. Am I correct that that first option

Page 274

1  that was provided under the Road Home Program
2  was to return to Louisiana and stay in the
3  home that you lived in before the storm?
4      A. That's what that -- that's what that
5  offer is, yes, sir.
6      Q. And here on this document listed
7  under option 1, it says $84,380.30. Do you
8  understand that to have been the amount of
9  money that was provided to you under option
10 1?
11     A. I don't recall if that was the --
12 the end all, but yes, sir, it sounds about
13 right.
14     Q. This is just to correct a
15 discrepancy here potentially. Let me hand you
16 another document.
17         (Document marked as F. Holmes
18     Exhibit 21 attached to transcript.)
19         Have you seen this document
20 before, Mr. Holmes?
21     A. If I did, I don't recall.
22     Q. Well, just quickly then, if you look
23 at the second page of this document, which is
24 -- There's a page 3 at the bottom. It's cut
25 off. But at the top of that page -- I'm

Page 275

1  sorry, not at the top, sort of at the bottom
2  of that page, you see also "Option 1, stay in
3  your home"? You see that?
4      A. Yes, sir.
5      Q. And just for the record, this
6  document is an eGrantsPlus document I think
7  that was produced to us by the Road Home
8  group. And you see the total Road Home
9  compensation under option 1 there on that page
10 says $104,930.30?
11     A. Yes, sir.
12     Q. Is that a more accurate reflection
13 of what you were provided by Road Home under
14 option 1?
15     A. Again, that -- that's still -- I
16 mean, I really don't recall what that number
17 was at the time.
18     Q. Okay. Let's move to option 2. If
19 you go back to the document that we looked at
20 before, --
21     A. Yes, sir.
22     Q. -- you see there's also an option
23 2. My understanding of option 2 was that Road
24 Home provided that if you returned to
25 Louisiana and bought a new home in Louisiana,

Page 276

1  but sold your -- the home that you owned at
2  the time of Katrina, that that was option 2.
3  Is that correct?
4      A. Yes, sir, that's correct.
5      Q. And it says here on this document,
6  the benefit selection form, that under option
7  2, you were provided $84,380.30, the option of
8  taking that.
9      A. That's correct. Which would have
10 left us still owing quite a good bit on the
11 other home. That's why we declined that
12 option.
13     Q. And so on the next page then, option
14 3 is the option that you selected; correct?
15     A. That is correct.
16     Q. And that was to sell your home on
17 Perrin Drive to Road Home and relocate to
18 another state?
19     A. That is correct.
20     Q. And am I correct that you received
21 $34,608.18 from Road Home to sell your home?
22     A. I didn't receive it. It went
23 directly toward -- to the mortgagee.
24     Q. But that was the amount that was
25 provided under option 3?

Page 277

1  A.  Yes, sir.
2  Q.  Now, just quickly here, Mr. Holmes,
3  did you, apart from your dealings with your
4  insurance providers, did you ever solicit bids
5  to rebuild your house at Perrin Drive?
6  A.  I mean, we never did -- when we saw
7  everything that was happening, no, sir, we
8  never did go that route.
9  Q.  So you yourself never met with any
10 contractors or obtained any estimates to
11 rebuild?
12 A.  No, sir.
13     MR. THATCH:
14        Let's take a few minutes.
15     MR. PALMINTIER:
16        Okay.
17     MR. THATCH:
18        I think we might be able to wrap
19     up here.
20     MR. PALMINTIER:
21        All right.
22     MR. THATCH:
23        Just need to go through my notes
24     and put some things together.
25     VIDEO OPERATOR:

Page 278

1        Off the record.
2     (Recess.)
3     VIDEO OPERATOR:
4        This is the beginning of tape 5.
5     We're back on the record.
6     MR. THATCH:
7        Okay.  We are finished.  I am
8     going to put together the list as we
9     discussed earlier today of things that
10    we can expect to receive from you all
11    --
12    MR. PALMINTIER:
13       Okay.
14    MR. THATCH:
15       -- based on today and I will do
16    that now.  But we'll go ahead and let
17    the DOJ question and then I'll come
18    back on the record.
19    MR. PALMINTIER:
20       Sounds good.
21 EXAMINATION BY MR. KELLS:
22 Q.  Mr. Holmes, I'm Conor Kells and I
23 represent the United States in the case, and I
24 really only have a couple of brief questions
25 to follow up on a couple of things that you

Page 279

1  said.
2      Do you recall signing and
3  submitting an administrative claim to the Army
4  Corps of Engineers for damages arising out of
5  damages caused by flood waters?
6  A.  Yes, sir, I believe so.
7  Q.  I can show it to you to see, refresh
8  your memory.  I only have one copy,
9  unfortunately, since it got sent down here
10 without time to --
11     (Counsel hands document to Witness.)
12 A.  Okay.
13 Q.  You recall submitting that form?
14 A.  Yes, sir.
15     MR. KELLS:
16        Do you have copies of it?  If you
17     have an extra copy of it, I just want
18     to ask one or two questions.
19     THE WITNESS:
20        I can pass it back if you like.
21 EXAMINATION BY MR. KELLS:
22 Q.  If you want to hold on to that for
23 your own reference.
24 A.  Okay.
25     (Whereupon a discussion was held

Page 280

1     off the record.)
2     MR. PALMINTIER:
3        Conor, do you intend on attaching
4     that as an exhibit?
5     MR. KELLS:
6        If we get an extra copy.  We
7     probably don't need to, but we can do
8     it.
9     MR. PALMINTIER:
10       Okay.
11    MR. THATCH:
12       Here you go.  (Counsel hands
13    document to Counsel.)
14       (Document marked as F. Holmes
15    Exhibit 22 attached to transcript.)
16 EXAMINATION BY MR. KELLS:
17 Q.  Okay.  Mr. Holmes, you submitted
18 this claim on behalf of both you and your
19 wife.  Is that correct?
20 A.  Yes, sir.
21 Q.  And the total amount of property
22 damage that you requested in box 12-A was
23 $250,000?  Is that correct?
24 A.  That's what I wrote down, yes, sir.
25 Q.  And the total amount of damages that