# EXHIBIT 5

Page 17

1    MR. FARRELL:
2        Okay.  Sure.
3    EXAMINATION BY MR. FARRELL:
4    Q.  Are you involved in a lawsuit
5    involving Chinese drywall?
6    A.  No.
7    Q.  No?  Let me do this: I mark this as
8    Exhibit 1.  Take a quick look.  If you'll look
9    at the top of this page, this first page, it
10   says United States District Court for the
11   Eastern District of Louisiana, Kenneth Abel,
12   individually and on behalf of all others versus
13   Taishan Gypsum and some other people.  And it
14   says, plaintiffs omnibus class action
15   complaint.
16       Do you see that?
17   A.  For drywall.
18   Q.  For drywall.  Uh-huh.
19   A.  I can answer this?
20   Q.  Oh, sure.  Yes.  Go ahead.
21   A.  That's my son.
22   Q.  Oh, that's your son.  Okay.  And so
23   just -- I want to turn to Page 58 of the
24   complaint.  I just got one other thing I wanted
25   to clarify.

Page 18

1        Do you see on Page 58, Paragraph 304,
2    plaintiff Alvin J. Livers is a citizen of
3    Louisiana -- is that your son Alvin J.?
4    A.  Junior.
5    Q.  Okay.  I'm sorry.  What's the J stand
6    for?
7    A.  Junior.
8    Q.  Oh, okay.  And he owns the property at
9    930 Caffin Avenue?
10   A.  Correct.
11   Q.  That's his house?
12   A.  Correct.
13   Q.  You don't own that house?
14   A.  Not at all.
15   Q.  Okay.  Thank you.  That's the only
16   question I have there.
17       MR. ANDRY:
18           Do you still want to mark that as
19           an exhibit to this deposition?
20           (Off the record.)
21   EXAMINATION BY MR. FARRELL:
22   Q.  The court reporter, Mr. Livers, has
23   asked me to ask -- and I'll ask it when he's
24   got his hands free -- for your full legal name
25   and address.

Page 19

1    A.  My name is Alvin Livers.  My address
2    where I reside at now is 13492 Paces Point,
3    Gonzales, Louisiana.
4    Q.  All right, Mr. Livers.  Thank you for
5    clearing that up about that lawsuit.
6        So other than the hearing loss ten
7    years ago and this litigation, you're not
8    involved in any other lawsuits.
9    A.  No.
10   Q.  Okay.  Have you ever given a
11   deposition before?
12   A.  No.
13   Q.  Okay.  This is the first.
14       Have you ever been sued before?
15   A.  No.
16   Q.  Okay.  Ever filed for bankruptcy?
17   A.  No.
18   Q.  And ever involved in any kind of
19   criminal proceeding?
20   A.  No.
21   Q.  Okay.  All right.  We had gotten your
22   full legal name and address.  Do you mind if I
23   get some other general background information?
24   Can you give me your date of birth?  When were
25   you born?

Page 20

1    A.  9/20/41.
2    Q.  Happy early birthday.
3    A.  Thank you, sir.
4    Q.  For the record, can you give the name
5    of your spouse?
6    A.  Barbara Livers.
7    Q.  How long have you guys been married?
8    A.  November will be fifty years.
9    Q.  Congratulations.
10   A.  Thank you, again, sir.
11   Q.  Let me make sure I'm doing my math
12   right.  That is '61?
13   A.  Yeah.
14   Q.  And what's the date of your
15   anniversary?
16   A.  The day of our anniversary is
17   November 25th.
18   Q.  That's probably one of the worst
19   questions anyone can ask in a deposition with
20   their wife present, but you remembered the date
21   of your anniversary.  Good job.
22       Do you have any children?
23   A.  Yes.
24   Q.  Okay.  Can you tell me their names?
25   A.  Alvin Livers, Jr., Tanya Watts,

Page 21

1   Jolanda Adams.
2       Q.  Okay.  How old are your three
3   children?
4       A.  Alvin is, um -- let's see.  I get
5   confused.  Forty?  I'm confused.
6       Q.  Okay.  That's all right.  Let me ask
7   it this way:  Do any of them still live with
8   you?
9       A.  No.
10      Q.  Are any of them dependent on you?
11      A.  I imagine if they need me.
12      Q.  All right.  But as far as like on your
13  taxes and stuff like that.
14      A.  No.
15      Q.  Okay.  And they're all over 18.
16      A.  Yes.
17      Q.  Okay.  Are there any other people that
18  are dependent on you in the sense of you claim
19  them as dependents on your taxes?
20      A.  No.
21      Q.  Okay.  Just the two of you.
22          All right.  We've got your current
23  address.  I think you said that was 13492 Paces
24  Point --
25      A.  Correct.

Page 22

1       Q.  -- in Gonzales?
2       A.  Correct.
3       Q.  How long have you lived there?
4       A.  I've lived there going on about five
5   years.
6       Q.  Five years.  So you moved in in about
7   2006?
8       A.  Yeah.
9       Q.  Okay.
10      A.  Absolutely.
11      Q.  Do you remember the date you moved in,
12  or the month?
13      A.  Um -- April 28th or 27th, um -- 20 --
14  it was 20, um -- 06.
15      Q.  Okay.  And where did you live before
16  you lived in Gonzales?
17      A.  I lived at 4924 St. Claude Avenue.
18      Q.  And that's, of course, the property
19  that we're going to talk about in detail today
20  in the litigation.  Right?
21      A.  Right.
22      Q.  Okay.  Did you live anywhere between
23  4924 St. Claude and 13492 Paces Point?
24      A.  I don't understand.
25      Q.  Um -- did you live anywhere -- after

Page 23

1   you left the house on St. Claude Avenue, did
2   you live anywhere else before you moved into
3   Gonzales or --
4       A.  Yeah.  I lived with -- after -- after
5   the --
6       Q.  Yeah.  Tell me about where you lived
7   after the storm.
8       A.  I lived in Baton Rouge.
9       Q.  Okay.  How long were you there?
10      A.  A couple of weeks.
11      Q.  Okay.  So around the very end of
12  August and beginning of September 2005?
13      A.  That was after the storm.
14      Q.  Right.  Right.  And I'll represent to
15  you that the storm hit on August 29th of 2005.
16  So a couple of weeks after that, you --
17      A.  Yeah.
18      Q.  Okay.  And after that, where did you
19  live?
20      A.  After it was available that they was
21  letting us come back, I lived with my
22  daughter --
23      Q.  Okay.
24      A.  -- Tanya.
25      Q.  And where does she live?

Page 24

1       A.  Um -- I want to be sure of the
2   address, now.
3       Q.  Okay.
4       A.  It's all right?
5       Q.  Um -- sure.  Let's see.  We might want
6   to make a copy for the record.
7       A.  Well, I'm just trying to remember the
8   address.
9       Q.  Um -- we don't need -- how about do
10  you remember the town she lived in?  Did she
11  live in New Orleans?
12      A.  Marrero.  It's New Orleans, in
13  Marrero.  I was just trying to get the exact
14  number, address, I mean --
15      Q.  Sure.  That's all right.
16      A.  That's all.
17      Q.  That's okay.  And how long did you
18  live -- oh, I'm sorry.  Let me close this off:
19  So after you lived with your daughter Tanya
20  here in New Orleans, where did you live after
21  that?
22      A.  I live at an apartment in Forest Isle.
23  That's the name of the apartment; Forest Isle.
24      Q.  And when did you move there?
25      A.  After I left my daughter house.

```
                                          Page 161
 1    A.  79?
 2    Q.  Uh-huh.
 3    A.  Uh-huh.
 4    Q.  What's this a picture of?
 5    A.  The back.
 6    Q.  Okay.  And is that the porch up there
 7  that you were telling me about this morning?
 8    A.  Yeah.
 9    Q.  Okay.  And is that you and your wife
10  in the picture?
11    A.  Yeah.
12    Q.  Okay.  The next page, Page 80?
13    A.  80?  Yeah.  I got it.
14    Q.  Uh-huh.  Is this the shed?
15    A.  Yeah.
16    Q.  Okay.  Can you turn to 82?  And what's
17  this?
18    A.  That's the back -- let me see.  No,
19  this the front.  This is the front where they
20  bent up to get in.
21    Q.  Okay.
22    A.  That's the front.
23    Q.  So that's the iron gate in the front?
24    A.  Yeah.
25    Q.  And then your front door behind that?

                                          Page 162
 1    A.  Right.
 2    Q.  Okay.  What's this one on 83, the next
 3  page?
 4    A.  83?
 5    Q.  Uh-huh.
 6    A.  That's the side door that they took
 7  completely down.  You got it?
 8    Q.  I see.  Uh-huh.
 9    A.  That's the side -- that's the side
10  door from the driveway where you go into the
11  den, from outside.
12    Q.  Into the den.  So on the floor plan,
13  is that this door here?
14    A.  That's the side door.  Yeah.
15    Q.  That's this one here?
16    A.  Yeah, they took it completely down.
17    Q.  How about 91, can you tell me what
18  this is?
19    A.  91?  I got 91?
20    Q.  Is that your front door?
21    A.  Yeah.
22    Q.  Okay.
23    A.  Correct.
24    Q.  Okay.  And is 92 another part of your
25  front door?

                                          Page 163
 1    A.  92.  Yep.
 2    Q.  Okay.
 3    A.  That's the locks there, they broke.
 4    Q.  Okay.  All right.  Mr. Livers, I'm
 5  finished with that document.  That's helpful.
 6        Mr. Livers, you told me this morning
 7  that you bought the current house that you live
 8  in in Gonzales, bought that in April 2006?
 9    A.  Yeah.
10    Q.  Okay.  Is it fair to say that by that
11  time you had made up your mind not to return to
12  New Orleans?
13    A.  Yes.
14    Q.  Okay.  Do you recall when it was that
15  you had made up -- you and your wife decided
16  that you weren't going to go back to the house
17  on St. Claude, you were going to go somewhere
18  else?
19    A.  Talk up a little louder.
20    Q.  Sure.  Yeah.  And I'm doing it, too.
21  I got to look at the sign.  You had just
22  said -- you had just told me that by April of
23  2006, when you and your wife bought your new
24  house, you had made up your mind we're not
25  going to go back to live on St. Claude, we're

                                          Page 164
 1  going to live in this new home.  When was it
 2  that you had made up your mind not to come back
 3  to New Orleans, that you wanted to live
 4  somewhere else?
 5    A.  When they was taking and having
 6  violence still down there, plus they was
 7  stealing stuff that was -- people was trying to
 8  repair their houses, they still was taking
 9  wires out.  Incidentally, that one was gone at
10  the house, too.  We just had enough.
11    Q.  Okay.  Can you give -- what's your
12  best -- your best recollection, your best
13  memory as to when -- when you made that
14  decision, was it in March 2006, was it in the
15  wintertime?
16    A.  It was -- it was -- it was, um --
17  let's see.  I think it was -- it was in the
18  winter.
19    Q.  Okay.
20    A.  I think January.  I'm not sure.
21    Q.  Okay.
22    A.  I --
23    Q.  Did you ever consider repairing the
24  home on St. Claude?
25    A.  At one time.
```

Page 165

1  Q. Did you ever talk to any contractors
2  about doing any repair work?
3  A. I had talked to a cousin.
4  Q. Did you get an estimate from your
5  cousin as the how much money it would cost to
6  repair the house?
7  A. Not really.
8  Q. He never draw up any plans for --
9  A. No.
10 Q. Okay. All right. All right,
11 Mr. Livers, I want to go back to, um -- an
12 earlier exhibit, Mr. Taylor 's report. I
13 didn't write down what I marked it as. It's
14 Number 5. Okay. Exhibit 5. Okay.
15     Mr. Livers, do you recognize this
16 document?
17 A. Uh-huh. Yes.
18 Q. And what is it again?
19     MR. ANDRY:
20         Speak up a little bit.
21 EXAMINATION BY MR. FARRELL:
22 Q. What's this document?
23 A. Do I recognize it you're asking?
24 Q. Uh-huh.
25 A. Yeah. I recognize it.

Page 166

1  Q. And is this the report that Mr. Taylor
2  put together to explain the damages?
3  A. Yes.
4  Q. Okay. When did you see this document?
5  A. Um -- I can't remember when I saw
6  that, but I know I saw that. I can't remember
7  what date it was exactly.
8  Q. What month was it?
9  A. Um -- I think it was when he was
10 finishing the report they had it in the file.
11 I can't tell you exactly what month it was.
12 Q. Was it the summertime?
13 A. Oh, yes.
14 Q. Okay. So like June, July?
15 A. Maybe.
16 Q. Do you know if the report you looked
17 at, was it this final report, or did you see a
18 draft?
19 A. I don't know if it was the final.
20 Q. Who else was with you when you looked
21 at the report?
22 A. I looked at it myself.
23 Q. Was it just you?
24 A. Yeah.
25 Q. Did you go to your lawyer's office to

Page 167

1  look at it?
2  A. Did I go to my lawyer's office? No,
3  it was at my house.
4  Q. How did you get it at your house?
5  A. I had, um -- a document was -- I think
6  you it was mailed to me.
7  Q. Okay. Did your wife look as it at all
8  with you?
9  A. I remember asking her. I don't know
10 whether she went through it. My wife hardly
11 don't take in too much.
12     MR. ANDRY:
13         I couldn't hear any of that.
14 A. I said I had asked her to look at it.
15 But I don't know if she really read it.
16 EXAMINATION BY MR. FARRELL:
17 Q. Okay. Did you ever talk to
18 Mr. Taylor?
19 A. On the phone.
20 Q. Okay. How many times did you talk to
21 Mr. Taylor on the phone?
22 A. I can't remember how many times it was
23 after I had talked to him on the phone, so I
24 can't remember how many times it was, really.
25 Q. Was it more than twice?

Page 168

1  A. I think it was one time I talked to
2  him on the phone when he was doing his job.
3  Q. Do you remember how long the
4  conversation was, about?
5  A. Not really.
6  Q. An hour?
7  A. No, not that long.
8  Q. Fifteen minutes?
9  A. I really couldn't tell you.
10 Q. Half hour?
11 A. I couldn't tell you.
12 Q. But not as long as an hour, you said.
13     MR. ANDRY:
14         I'm going to object. I think
15     he's told you that he can't -- he
16     doesn't know.
17 EXAMINATION BY MR. FARRELL:
18 Q. Was anyone else on the phone when you
19 talked to Mr. Taylor?
20 A. No.
21 Q. Just you?
22 A. Just me.
23 Q. Did you ever send any writings to
24 Mr. Taylor?
25 A. No.

ALVIN L. LIVERS, SR.                                              September 14, 2011

Page 237

```
 1      Q.  Okay.  And it's calculation sheet by
 2   the Road Home?
 3      A.  Yes.  Pre-storm value.  Whatever.
 4      Q.  Okay.  So let's start there.
 5   Pre-storm value.  It says that the Road Home
 6   has the pre-storm value for your property at
 7   4924 St. Claude at $95,000.  Is that what it
 8   says?
 9      A.  That's what it says.
10      Q.  All right.  And it looks like it says
11   the estimated cost of damage --
12      A.  Again, what I just said?
13      Q.  Right.  312 --
14      A.  -- 12840.
15      Q.  And that's what you put on the revised
16   Form 95?
17      A.  The Road Home.  The Road Home put this
18   on here.  They the one went out there and
19   evaluated the damage.
20      Q.  Right.  I understand.  But you had
21   mentioned earlier in the Form 95s that we were
22   looking at, these forms --
23      A.  Uh-huh.
24      Q.  -- there was that amended form that
25   had the 312 number on it.  It's Exhibit 16.
```

Page 238

```
 1      A.  That's not right.
 2      Q.  So that -- as you said, that's where
 3   you got the number from.
 4      A.  That's where I got the number from.
 5      Q.  Okay.  Great.  Then it says, estimated
 6   elevation cost.  Do you know what that meant?
 7      A.  That meant if you elevated your home.
 8      Q.  Okay.  So they would give you $35,000
 9   to elevate your home?
10      A.  Yes.
11      Q.  Okay.  Or that's how much it would
12   cost, I should say?
13      A.  That's what they say.
14      Q.  Okay.  And then it goes through Other
15   Compensation.
16      A.  Uh-huh.
17      Q.  First is FEMA IA, $10,500.
18      A.  Uh-huh.
19      Q.  Is that the money that you got from
20   FEMA --
21      A.  Correct.
22      Q.  -- $10,000?
23      A.  Correct.
24      Q.  And then private insurance.  Like you
25   said a moment ago, $13,947?  Correct?
```

Page 239

```
 1      A.  That's what it says.
 2      Q.  All right.  And then it looks like
 3   Road Home gives you three options.  Can you
 4   tell me what those are?  What that --
 5      A.  What the three options it is?
 6      Q.  Yeah.
 7      A.  I can remember what they is, I don't
 8   see them on this paper here.  I remember.
 9      Q.  Tell me what they are.  You don't need
10   to read them off the paper.
11      A.  Um -- Option 1, I think it was that
12   they would repair your house if you stayed in
13   New Orleans.
14      Q.  Okay.  So the first option is you can
15   stay in the house and they would give you money
16   to fix it.
17      A.  Fix the house.  Repair it.
18      Q.  And what's the second option?
19      A.  Option 2 was an option that you would,
20   um -- that you can -- the Road Home would buy
21   your home, and -- long as you buy another home
22   in the state of Louisiana.
23      Q.  Okay.  So the Option 2, sell your home
24   to Road Home and buy another house in
25   Louisiana.
```

Page 240

```
 1      A.  Right.
 2      Q.  That's exactly what you said.
 3          And what's the third option?
 4      A.  Third option, if you choose to sell
 5   the Road Home your home and move to another
 6   state, you would get I think $3500 -- $35,000.
 7      Q.  Okay.  What option did you and your
 8   wife choose when you applied to Road Home?
 9      A.  2.
10      Q.  2.  And that's the sell your home to
11   Road Home and stay in Louisiana.
12      A.  Definitely.
13      Q.  Okay.  Do you remember when you did
14   that, when you made that choice?
15      A.  When I made that choice?
16      Q.  Uh-huh.
17      A.  I can't remember the exact date when I
18   made that choice.
19      Q.  That's okay.  I've got a document that
20   might be able to help you.
21      A.  Okay.
22      Q.  Let me give you a document that I'm
23   marking as Exhibit 19.  Do you recognize this
24   document, Mr. Livers?  (Tendering.)
25          (EXHIBIT 19 was marked for
```

60 (Pages 237 to 240)

JOHNS, PENDLETON COURT REPORTERS                                  504 219-1993