# EXHIBIT 7

Page 377

1      flood conditions.
2      EXAMINATION BY MS. WAGER-ZITO:
3      Q.  My question is asking, if the Court
4   determines that that's not the correct measure
5   of damages, is there anything in your report
6   that the Court can look to to determine the
7   valuation of the home pre-Katrina and the
8   valuation of the home subsequent to Katrina?
9          MR. PALMINTIER:
10             I object to form.
11         THE WITNESS:
12             The distinction between is not
13         something that I addressed in the
14         report.
15     EXAMINATION BY MS. WAGER-ZITO:
16     Q.  So the answer is "no"?
17     A.  I just stand by what I wrote for the
18  report.
19     Q.  And I understand that.  But I am
20  asking a different question.  I am just asking
21  you whether or not the Court can look to your
22  report, if the Court determines that the
23  proper measure of damages is the value of the
24  home prior to Katrina versus the value of the
25  home after Katrina.

Page 378

1          MR. PALMINTIER:
2             I object to form.
3          THE WITNESS:
4             This is the value of the home
5          restoration after Katrina and that's
6          all it is.
7      EXAMINATION BY MS. WAGER-ZITO:
8      Q.  The value of the home restoration?
9      A.  It's the cost of the home
10  restoration after.  That's all it is.
11     Q.  But there's nothing in there about
12  the value of the home before Katrina?
13     A.  No.
14     Q.  And there's nothing in there about
15  the value of the home unrestored after
16  Katrina?
17     A.  No.
18     Q.  We're going to mark Exhibit Taylor
19  24.  You can give one of those to your
20  lawyer.
21         Why don't you take a look at what
22  we have marked as Taylor Exhibit 24 and I'll
23  identify it for the record.  It's titled
24  "Flood 'N' Screen Closing Sheet".  It's Bates
25  numbered, among other Bates numbers,

Page 379

1   ACFIC-00435 through 458.  Will you take a
2   second to look through that, Mr. Taylor?  It
3   says on the front page "Insured name, Holmes,
4   Fred Holmes".
5      A.  Uh-huh (affirmatively).  Yes.
6      Q.  On the second page it says "Colonial
7   Claims Corporation, Service Invoice, Flood".
8   It's to Fidelity National.  Insured, Fred
9   Holmes.  Date of loss, 8/29/06.  So that would
10  be Katrina losses; correct, Mr. Taylor?
11     A.  Yes.
12     Q.  If you look on the third page of the
13  document, it discusses the coverage and the
14  policy number.  Have you seen this document
15  before?
16     A.  No.
17     Q.  So prior to the work that you did in
18  this case were you aware that Mr. Holmes'
19  flood insurer came up with a value for the
20  home in response to an insurance claim that
21  the Holmeses made for their residence?
22     A.  No.
23     Q.  Were you aware that the Colonial
24  Claims inspection and valuation for the
25  Holmeses' flood insurer, Fidelity, determined

Page 380

1   that the ACV was $109,280?
2      A.  No.
3      Q.  If you look at the page that's Bates
4   marked at the bottom 443, you can see the
5   estimated replacement cost on that page.  Do
6   you see that, 136,000?
7      A.  Yes.
8      Q.  Okay.  And the ACV number that's
9   reflected on there is $109,280?
10     A.  Yes.
11     Q.  Do you have any basis to dispute the
12  valuation?
13     A.  No.  I was not tasked to look at
14  valuations.  So, therefore, I don't have an
15  opinion.
16     Q.  If you look at page 23 of your
17  report, you have a line item total
18  $145,006.90.  This is the cost of the
19  materials and labor for the Holmes residence
20  prior to the application of sales tax and
21  overhead and profit?
22     A.  Pardon me?
23     Q.  I'm sorry?
24     A.  Could you repeat that?
25     Q.  Going back to your report, --