UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|                                      |   |                        |
|--------------------------------------|---|------------------------|
|                                      | * |                        |
|                                      | * |                        |
| IN RE:  KATRINA CANAL BREACHES       | * | CIVIL ACTION           |
| CONSOLIDATED LITIGATION              | * |                        |
|                                      | * | NO. 05-4182            |
|                                      | * |                        |
| PERTAINS TO:  MRGO                   | * | SECTION "K" (2)        |
|                                      | * |                        |
|                                      | * | JUDGE DUVAL            |
|                                      | * |                        |
|                                      | * | MAGISTRATE WILKINSON   |
| * * * * * * * * * * * * * * * * * * * * * * * * * * * * | * |        |


## DEFENDANT WASHINGTON GROUP INTERNATIONAL, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

William D. Treeby, 12901
James C. Gulotta, Jr., 6590
Heather S. Lonian, 29956
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Facsimile:   (504) 581-3361

Adrian Wager-Zito
Debra S. Clayman
Christopher R. Farrell
Christopher N. Thatch
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3891
Facsimile:  (202) 626-1700

*Attorneys for Washington Group*
*International, Inc.*

## TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ................................................................................ 1

I.   INTRODUCTION ........................................................................................... 1

II.  THE USACE WAS THE ENGINEER OF RECORD FOR THE LOCK
     REPLACEMENT PROJECT .......................................................................... 2
     A.   The IHNC and IHNC Lock ................................................................... 2
     B.   The USACE's Lock Replacement Project ............................................. 3
     C.   The USACE Designed the Proposed Bypass Channel in the EBIA ...... 4
     D.   The USACE Evaluated the Impact of Proposed Bypass Channel on
          Existing Flood Control Structures ........................................................ 6

III. THE USACE HIRES WGI TO CLEAR AND REMEDIATE THE EBIA ....... 8
     A.   The Total Environmental Restoration Contract ("TERC") ................... 8
     B.   Negotiation and Planning of Task Order 26 ......................................... 9

IV.  WGI WAS A GENERAL CONTRACTOR PERFORMING SITE CLEARING
     AND REMEDIATION ACTIVITIES, NOT A GEOTECHNICAL ENGINEER .......... 15
     A.   USACE's Extensive Involvement in Developing, Reviewing and
          Approving the Plans for Site Clearing and Remediation Work on Task
          Order 26 .............................................................................................. 16

V.   WGI BACKFILLED AND COMPACTED EXCAVATIONS IN THE EBIA
     WITH DUE CARE ........................................................................................ 25
     A.   Type of Backfill Material .................................................................... 25
     B.   Compaction Means and Methods ........................................................ 27

VI.  WGI PERFORMED SPECIFIC FEATURES OF WORK ON TASK ORDER 26
     WITH DUE CARE ........................................................................................ 29
     A.   The USACE Approved the Expansion of Borrow Pit After Referring the
          Design to Its Geotechnical Engineering Branch ................................. 30
     B.   Demolition and Piling Removal .......................................................... 32
     C.   Grid Trenching .................................................................................... 35
     D.   Sewer Lift Station at Saucer Marine ................................................... 36
     E.   Concrete Block #004 ("Wedding Cake") at Boland Marine ............... 39
     F.   Soil Remediation (Including Remediation of the Canal Bank and ACM
          Excavations) ........................................................................................ 41
     G.   Removal of Utility Lines Crossing the Floodwall ............................... 49
     H.   Close Out of EBIA Work Site .............................................................. 50

VII. HURRICANE KATRINA ............................................................................. 51

VIII. THE BREACHES ON THE EASTSIDE OF THE IHNC ................................ 55

IX.  THE EBIA FLOOD PROTECTION SYSTEM .............................................. 56

X.   JOINT SOILS INVESTIGATION ................................................................ 57

XI.  RESULTS OF THE JOINT SOILS INVESTIGATION: EBIA GEOMETRY,
     PERMEABILITY & COMPRESSIBILITY .................................................... 60

A. Geometry.................................................................................................. 60
B. Permeability/Hydraulic Conductivity ...................................................... 61
C. Compressibility ........................................................................................ 64

XII. DR. BEA'S SEEP/W (SEEPAGE) & SLOPE/W (STABILITY) ANALYSES.............. 65

XIII. WGI'S WORK DURING TASK ORDER 26 DID NOT CAUSE THE NORTH
AND SOUTH BREACHES........................................................................................ 68
A. Shear Failure Did Not Cause the EBIA Failures .................................... 68
B. Seepage Effects Were Negligible at the EBIA ....................................... 69

XIV. DR. BEA'S OPINIONS ARE FUNDAMENTALLY FLAWED AND
UNSUPPORTABLE: EBIA CROSS-SECTIONS ........................................................ 71
A. North Breach Case 1 Cross-Sections ...................................................... 72
B. North Breach Case 2 Cross Sections ...................................................... 73
C. South Breach Case 1 Cross-Sections ...................................................... 76
D. South Breach Case 2 Cross-Sections ...................................................... 77
E. So-Called "Near Breach" Case 1 Cross-Sections ................................... 79

XV. DR. BEA'S OPINIONS ARE FUNDAMENTALLY FLAWED AND
UNSUPPORTABLE: MANIPULATION OF THE COMPRESSIBILITY
VALUE ................................................................................................................ 80
A. Dr. Bea's Fictitious Compressibility Value ............................................ 81
B. Transient vs. Steady Flow Analysis ........................................................ 83
C. Complete Saturation Alone Does Not Create Incompressible Soils or
Steady Flow Conditions ........................................................................... 85
D. "Dilational Wave Velocity" .................................................................... 86

XVI. EBIA FAILURE MODES ..................................................................................... 89
A. North Breach .......................................................................................... 89
B. South Breach .......................................................................................... 90

XVII. MODELING THE FLOODING OF THE LOWER NINTH WARD AND ST.
BERNARD PARISH ............................................................................................... 91
A. Jeannine and Kenneth Armstrong ........................................................... 92
B. Ethel Mae Coats ..................................................................................... 98
C. Fred Holmes ........................................................................................... 104
D. Alvin Livers ........................................................................................... 109
E. Clifford Washington ............................................................................... 116

PROPOSED CONCLUSIONS OF LAW ......................................................................... 124

I. DUTY/RISK (PRE-TRIAL ORDER ISSUES 7, 8, 10, 14, 15 16) ................................ 124

II. BREACH OF DUTY (ISSUES 8) .......................................................................... 126

III. LA. R.S. 9:2771 (ISSUE 17) .............................................................................. 126

IV. CAUSATION (ISSUES 11, 12 13) ......................................................................... 127

V. DAMAGES (ISSUES 18, 19, 20, 21, 22, 23, 24, 30)................................................ 130

VI. ATTORNEYS' FEES (ISSUE 25) .......................................................................... 134

# TABLE OF AUTHORITIES

**Page**

CASES

*DOTD v. Wagner*,
38 So. 3d 240 ..................................................................................................134

*ACORN v. U.S. Army Corps of Eng'rs*,
No. Civ. A. 00-108, 2000 WL 43332 (E.D. La. Apr. 20, 2000) (Duval, J.).....................2, 3, 4

*Bellanger v. Webre*,
65 So. 3d 201 ..................................................................................................127

*Borden, Inc. v. Howard Trucking Co.*,
454 So. 2d 1081 (La. 1983) ..............................................................................124

*Bradley v. Allstate Ins. Co.*,
620 F.3d 509 (5th Cir. 2010) ............................................................................133

*Brown v. Williams*,
850 So. 2d 1116 (La. App. 2 Cir. 2003), *petition denied*, 860 So. 2d 555 (La. 2003) ..........130

*Crockett v. Cardona*,
713 So. 2d 802 (La. App. 4 Cir. 1998) ..............................................................128

*Gleason v. City of Shreveport*,
393 So. 2d 827 (La. App. 2 Cir. 1981), *writ denied*, 397 So. 2d 806 (La. 1981) .................129

*Harrell v. Genco*,
671 So. 2d 530 (La. App. 1 Cir. 1996) ..............................................................128

*In re Katrina*,
620 F.3d 455 (5th Cir. 2010) ..........................................................................8, 9

*In re Katrina Canal Breaches Consol. Litig.*,
647 F. Supp. 2d 644 (E.D. La. 2009)..................................................................130

*In re Katrina Canal Breaches Consol. Litig.*,
No. 05-4182, 2008 WL 5234369 (E.D. La. Dec. 15, 2008), *rev'd on other grounds*,
620 F.3d 455 (5th Cir. 2010) ............................................................................125

*Jarreau v. Hirschey*,
650 So. 2d 1189 (La. App. 5 Cir. 1995), *petition denied*, 650 So. 2d 348 (La. 1995) ..........130

iii

*Kemper v. Don Coleman, Jr. Builder, Inc.*,
   746 So. 2d 11 (La. App. 2 Cir. 1999), *appeal dismissed,* 779 So. 2d 1001 (La. App. 2
   Cir. 2001) ..........................................................................................................................131

*Lacombe v. Greathouse*,
   407 So.2d 1346 (La.App. 3 Cir. 1981) ...........................................................................125

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994)..........................................................................................................125

*Lee v. Carwile*,
   168 So. 2d 469 (La. App. 3 Cir. 1964) ............................................................................126

*Loupe v. Circle, Inc.*,
   514 So. 2d 269 (La. App. 5 Cir. 1987) ............................................................................129

*Maloney v. Oak Builders Inc.*,
   224 So.2d 161 (La. App. 4 Cir.1969), *rev'd in part on other grounds*, 256 La. 85, 235
   So.2d 386 (1970)...............................................................................................................126

*McDonald v. Ill. Cent. Gulf R.R. Co.*,
   546 So. 2d 1287 (La. App. 4 Cir. 1989), *reh'g denied*, 551 So. 2d 1340 (La. 1989)............131

*McGill v. Republic Fire & Cas. Ins. Co.*,
   No. 07-4025, 2008 WL 4792720 (E.D. La. Oct. 28, 2008) ..................................................132

*Mitchell v. Eureka Chem.*,
   No. 07-510, 2008 WL 2597907 (E.D. La. June 25, 2008)....................................................126

*Napolitano v. F.S.P., Inc.*,
   797 So. 2d 111 (La. App. 4 Cir. 2001) ............................................................................131

*Norfleet v. Lifeguard Transp. Serv.*,
   934 So. 2d 846, *reh'g denied* (La. App. 4 Cir. July 25, 2006) ...........................................130

*Pearce v. L. J. Earnest, Inc.*,
   411 So. 2d 1276 (La. App. 3 Cir. 1982) ..........................................................................127

*Perkins v. Entergy Corp.*,
   782 So. 2d 606 (La. 2001), *superseded by statute on other grounds* ...........................128, 129

*Pitre v. La. Tech Univ.*,
   673 So. 2d 585, *reh'g denied* (La. June 28, 1996).............................................................127

*Rando v. Anco Insulations, Inc.*,
   16 So. 3d 1065 ..................................................................................................................127

*Roberts v. Benoit*,
   605 So. 2d 1032 (La. 1991) ...................................................................124

*Roman Catholic Church of the Archdiocese of New Orleans v. La. Gas Serv. Co.*,
   618 So. 2d 874 (La. 1993) .....................................................................131

*Servicios-Expoarma, C.A. v Indus. Mar. Carriers, Inc.*,
   135 F.3d 984 (5th Cir. 1998) .................................................................124

*Tex-La Props. v. S. State Ins. Co.*,
   514 So. 2d 707 (La. App. 2 Cir. 1987) ..................................................127

*Toston v. Pardon*,
   874 So. 2d 791 (La. 2004) ............................................................127, 128

STATUTES

42 USC §§ 5170..................................................................................... passim

42 U.S.C. §§ 5301 et seq........................................................................ passim

La. Civ. Code Articles 888, 890 .................................................................132

La. R.S. 9:2271 ...........................................................................................126

La. R.S. 9:2771 ...................................................................................126, 127

Pub. L. No. 99-662, § 844(a)-(b), 100 Stat. 4082, 4177 ("WRDA")..............3

Pub. L. No. 104-303, § 326(b) 110 Stat. 3658, 3717...................................3

Pub. L. No. 84-455, 70 Stat. 65 ....................................................................3

OTHER AUTHORITIES

33 CFR § 208.10..........................................................................................23

Pursuant to the Court's scheduling order (Doc. 20592), Defendant Washington Group International, Inc. supplies the following Proposed Findings of Fact and Conclusions of Law based on the record existing before trial.

## PROPOSED FINDINGS OF FACT

### I.      INTRODUCTION

1.      The plaintiffs in this case are six individuals (Kenneth and Jeannine Armstrong, the successor to Ethel Mae Coats, Fred Holmes, Alvin Livers, and Clifford Washington) whose five properties were flooded during Hurricane Katrina on August 29, 2005.  The plaintiffs allege that their flood-related damages were caused, at least in part, by two breaches of the flood control structure along the eastside of the Inner Harbor Navigation Canal ("IHNC") in New Orleans.

2.      The plaintiffs allege, and WGI denies, that those breaches were caused, at least in part, by hydraulic under-seepage and uplift pressures generated in the organic clay layers under the levee through unspecified, improperly backfilled excavations that WGI performed in the East Bank Industrial Area ("EBIA") between 2001 and May 2005, pursuant to an environmental restoration contract with the United States Army Corps of Engineers (the "Corps" or "USACE").  Specifically, plaintiffs claim WGI backfilled these unspecified excavations with "high permeability and poorly-compacted materials."  (Doc. 20920 at 10).

3.      Plaintiffs also allege, and WGI denies, that WGI had a duty, and breached that duty, to perform geotechnical engineering evaluations of the potential impact that these excavations, conducted under the supervision of the USACE, would have had on the flood protection structure bordering the EBIA.

## II.   THE USACE WAS THE ENGINEER OF RECORD FOR THE LOCK REPLACEMENT PROJECT

### A.   The IHNC and IHNC Lock

4.      The IHNC connects the Mississippi River, the Gulf Intracoastal Waterway ("GIWW"), Lake Pontchartrain, and the Mississippi River-Gulf Outlet ("MRGO").  *ACORN v. U.S. Army Corps of Eng'rs*, No. Civ. A. 00-108, 2000 WL 43332, at *6 (E.D. La. Apr. 20, 2000) (Duval, J.); Uncontested Fact No. 21 (Joint Pretrial Order, Doc. 20920) (hereinafter "Uncontested Facts").

5.      In 1914, the Louisiana legislature authorized construction of the IHNC to increase the capacity of the Port of New Orleans.  The canal was at least 30 feet deep with a minimum bottom width of 150 feet, and a minimum channel width of 300 feet.  The bottom width was later increased to 300 feet, with a minimum canal width of 500 feet near the proposed piers and slips, and 600 feet adjacent to quays.  Uncontested Fact No. 48.

6.      IHNC construction commenced on June 6, 1918, and proceeded from Lake Pontchartrain to the Mississippi River.  Earthwork and canal excavation work initiated with dredging and construction of dikes parallel to the sides of the proposed canal.  The dredging created a trapezoidal channel with the dredged spoils cast to the sides to create the levees on both sides of the canal.  Uncontested Fact No. 49.

7.      The Port of New Orleans completed construction of the IHNC in 1923, with a navigation lock being placed in service as a unit of the IHNC.  Uncontested Fact No. 22.

8.      The IHNC lock, currently located north of the St. Claude Avenue Bridge, passes barge traffic between the Mississippi River at New Orleans and the GIWW.  *ACORN*, 2000 WL 43332, at *6; Uncontested Fact No. 23.  The IHNC lock is 75-feet wide, 640-feet long, and 31.5-feet deep (below mean low gulf).  Uncontested Fact No. 50.

2

9.      The lock has operated since the early 1920s, but "was projected to become dimensionally obsolete by 1970." *ACORN*, 2000 WL 43332, at *6; Uncontested Fact No. 24.

**B.     The USACE's Lock Replacement Project**

10.     In 1956, Congress authorized the USACE to construct an additional lock or a replacement for the existing IHNC lock, with suitable connection channels.  In doing so, Congress gave the Chief of Engineers discretion to determine both when construction of the lock would be "economically justified" and what the appropriate "type, dimensions, and cost estimates" of the project should be.  River and Harbor Act of 1956, Pub. L. No. 84-455, 70 Stat. 65; Uncontested Fact No. 51.

11.     In 1986, Congress modified the 1956 River and Harbor Act and directed the Secretary of the Army to determine the precise location and design of the lock project, provided that the Secretary consulted with "affected local communities" and made "a maximum effort to assure the full participation of members of minority groups" living in communities affected by the new lock.  Water Resources Development Act of 1986, Pub. L. No. 99-662, § 844(a)-(b), 100 Stat. 4082, 4177 ("WRDA"); Uncontested Fact No. 25.

12.     For all WRDA projects, Congress directed the Secretary of the Army to weigh "national economic development . . . the quality of the total environment, the well-being of the people of the United States, the prevention of loss of life, and the preservation of cultural and historical values." *Id.*, § 904; Uncontested Fact No. 26.

13.     In 1996, the WRDA was amended again to require the Secretary to submit "a comprehensive community impact plan, . . . that, to the maximum extent practicable, provides for mitigation or compensation, or both, for the direct and indirect social and cultural impacts" that the lock replacement project could have on surrounding communities.  WRDA of 1996, Pub. L. No. 104-303, § 326(b) 110 Stat. 3658, 3717; Uncontested Fact No. 27.

3

14. By March 1997, the Corps had developed a nine-volume Final Evaluation Report ("1997 Evaluation Report") that included an analysis of the various lock replacement alternatives considered, an Environmental Impact Statement, a Corps' Community Impact Plan, Engineering Investigations, and an Assessment of Potential Hazardous Toxic Radioactive Waste ("HTRW"). *ACORN*, 2000 WL 43332 at *7; 1997 Evaluation Report, Vol. 1 of 9, at NED-016-000003330.

15. Mr. Gerald Dicharry, Senior Project Manager for the Lock Replacement Project, supervised the Corps' preparation of the 1997 Evaluation Report. Uncontested Fact No. 29.

16. The USACE considered several sites for the new lock before finally deciding on the "North of Claiborne Avenue Plan," which provided for the construction of a new lock in the IHNC between Claiborne Avenue and Florida Avenue. *See* Uncontested Fact No. 52. The proposed lock would be 110 feet wide and 1,200 feet long with a bottom depth at elevation -36 feet (NGVD). Uncontested Fact No. 55.

17. In 1998, the Corps' lock replacement project received approval from the Secretary of the Army, followed by appropriations from Congress to begin construction. *ACORN*, 2000 WL 433332 at *8; Uncontested Fact No. 56.

**C.     The USACE Designed the Proposed Bypass Channel in the EBIA**

18. Because constructing a new lock on the IHNC would require shutting down a vital link to the GIWW for at least five years, the Corps planned to dredge a temporary two-way bypass channel in a 32-acre industrial area between Claiborne and Florida Avenues, west of the floodwall located between Surekote Road and Jourdan Avenue, and east of the IHNC (the "East Bank Industrial Area" or "EBIA"). *See* Uncontested Fact No. 32.

4

19. The Corps initially considered building the bypass channel on the west bank of the IHNC, but the east side was selected because the inventory of facilities on the EBIA (abandoned barges, buildings, storage tanks, wharves, bulkheads, fencing, transformer units, and other debris) were more expendable than the facilities on the west side.  Uncontested Fact No. 57.

20. Between 1945 and 2000, the Port of New Orleans owned and leased the EBIA to private companies for marine services use and petroleum distribution.  JX-1255 (Sampling and Analysis Plan ("SAP"), Jan. 2001 at 14-18).  After decades of commercial use, the EBIA was littered with assorted structures, contaminants, and debris that the Corps needed to remove before dredging the bypass channel.  Uncontested Fact No. 33.

21. For planning purposes, the Corps divided the EBIA into six facilities, each named for its most recent tenant.  From south to north, the sites were International Tank Terminal (ITT), Saucer Marine, Mayer Yacht, Indian Towing, McDonough Marine and Boland Marine.  Uncontested Fact No. 34.

22. The Corps "did an extensive amount of preliminary site investigations" at the EBIA.  Guillory Dep. II at 47-48.  In 1998, for example, the Corps hired Waldemar S. Nelson, Inc. and Dames & Moore, Inc. to preliminarily assess the demolition and site preparation necessary for construction of the new lock and bypass channel.  The contractors reported their findings in an 8-volume Design Documentation Report No. 1, submitted to the Corps in early 1999.  *See, e.g.,* JX-0010 (DDR No. 1 Site Preparation and Demolition, Vol. 2 (Feb. 1999)).

23. The bypass channel was to consist of a 110-feet wide "transit" channel, with a bottom depth at elevation -31 feet NGVD (or -32.47 feet NAVD88(2004.65)), and a 110-feet wide "laying" channel, with a bottom depth at elevation -22 feet NGVD (or -23.47 feet

NAVD88(2004.65)).  These two channels were to be separated by a sloped area approximately nine feet wide.  DX-0020 (2002 Design Documentation Report (DDR) No. 3, Plates 24 & 29); Silva-Tulla Rep., Fig. II-2 & p. 13; Sykora Rep., Fig. E.  The bypass channel ultimately would occupy a significant portion of the EBIA.  *Id.*

24.     The USACE's flood protection plan for the new lock (adjacent to the EBIA) included replacing the eastern floodwalls north of the existing lock and south of the proposed new lock in order to handle the higher river stages of the Mississippi River.  Lucia Rep. at 14-21.  The flood protection north of the proposed new lock to the Florida Avenue Bridge would remain unaltered.  *Id.*  (In other words, the Corps planned to build new floodwalls along the EBIA between ITT and Indian Towing, and to leave the existing walls in place along McDonough Marine and Boland Marine.  *Id.*)

## D.     The USACE Evaluated the Impact of Proposed Bypass Channel on Existing Flood Control Structures

25.     The flood protection system along the EBIA necessarily limited the size of the bypass channel.  Dicharry Dep. at 30:22-31:9.

26.     The USACE determined that dredging the proposed bypass channel (to a elevation of at least -23.47 NAVD88(2004.65)) would not impact the flood protection structures bordering the EBIA.  *See* Dicharry Dep. at 31:17-22; Lucia Rep. at 14-23.

27.     For the existing levee and floodwall, global stability and seepage potential already had been evaluated in 1966 as part of the USACE's design of the Lake Pontchartrain and Vicinity Hurricane Protection Project.  Lucia Rep. at 14-18; JX-1821 (1966 USACE Design Mem. No. 3, ¶ 30 and Plate 38 (1966)).  The global-stability analysis assumed a design condition of a flood at +13 feet.  *Id.*

28.     The USACE's 1966 design memorandum also included an analysis of the effect of seepage on the I-walls on the east side of the IHNC and concluded that "based on the soil conditions along this part of the project and the short duration of hurricane floods, hazardous seepage or hydrostatic uplift on the protected side is not anticipated." Lucia Rep. at 17-18 (quoting 1966 Design Memorandum No. 3, ¶ 31); *id.* at 68-70.

29.     There was no significant change in the characteristics of the soil at the EBIA between 1966 and the time WGI began its site-remediation efforts at the EBIA in 2000. Rogers Dep. II at 209-210.

30.     The USACE's 1966 evaluation of the stability of the floodwall applied to the entire length of the EBIA as it existed in 2005 immediately prior to Hurricane Katrina. Lucia Rep. at 23, 64-68. The evaluation implied the minimum control line for the floodwalls in the EBIA. *Id.* The minimum control line established that construction activity, including excavation and backfilling, conducted more than 15 feet from the floodwall on the flood side of the levee was unlikely to have any impact on the wall's stability during the design storm event. *Id.*

31.     WGI had no involvement in these stability and seepage analyses, nor did the USACE provide WGI with the 1966 Design Memorandum for consideration in performing its remediation work in the EBIA.

32.     Also, as part of their design of the Lock Replacement Project, the USACE evaluated the "stability of the existing east bank, bypass channel and laying channel during lock construction." DX-0020 (DDR No. 3, Lock Foundation Report, May 2002, at 3-4 & Plate 29); Sykora Report at 6. WGI had no involvement in this analysis, nor did the USACE provide WGI with the 2002 Design Documentation Report No. 3 (Lock Foundation Report)

[DX-0020] or the 2000 Design Documentation Report No. 2 (Lateral Flood Protection Design Report) [JX-0017] for consideration in performing its remediation work in the EBIA.

33.     The Corps' New Orleans District (the "Corps-NOD") designed the Lock Replacement Project, including the 1997 Evaluation Report and the later Design Documentation Reports Nos. 2-3.  Thus, in professional engineering parlance, the Corps' New Orleans District (the "Corps-NOD") was the Engineer of Record for the Lock Replacement Project.  Sykora Rep. at 11, 33, 71.  The Corps was responsible for design, construction management and the quality assurance program for the project, including drafting scopes of work, reviewing, revising and approving work plans and directing contractor activities.  *Id.*.

## III.    THE USACE HIRES WGI TO CLEAR AND REMEDIATE THE EBIA

### A.     The Total Environmental Restoration Contract ("TERC")

34.     In August 1994, WGI (formerly, Morrison Knudsen Corporation or "M-K") and the USACE's Tulsa District entered into an Indefinite Delivery-Indefinite Quantity Contract for the remediation of various Hazardous, Toxic, and Radioactive Waste ("HTRW") sites in the southwest region.  *In re Katrina*, 620 F.3d 455, 458 (5th Cir. 2010); Uncontested Fact No. 35.

35.     This "umbrella" contract, also known as a Total Environmental Restoration Contract ("TERC"), provided the general requirements for all of WGI's anticipated work on HTRW sites in the region with the understanding that the USACE would prepare specific Statements of Work ("SOW") for each individual Delivery Order (or "Task Order") it later issued.  Uncontested Fact No. 58.

36.     The TERC provides that each Task Order shall include the "specific requirements" for "architect-engineering type services in support of remedial action" to be

performed by WGI.  TERC, § 2.4.  And, each individual Task Order shall "specifically identif[y]" the requirements for both on-site and off-site personnel from WGI.  *Id.*, § 4.

37.     In selecting the appropriate contracting mechanism for the EBIA clean-up in 1999, the USACE had two options:  it could advertise and award an individual environmental remediation contract based out of the USACE-NOD, or it could "utilize either of two pre-awarded, pre-placed TERC contracts anchored at Tulsa District for a five-state region." Guillory Dep. I at 46:24-47:10.

38.     "[F]or the sake of time, expediency, [and] experience," the Corps-NOD chose to use the WGI TERC contract that was based in the Corps' Tulsa District to perform the EBIA clean-up.  Guillory Dep. I at 46:24-47:10; DX-01254 (June 29, 1999 Email from B. Turrell (Guillory Dep. Ex. 14)).

39.     The cost-reimbursable nature of the TERC was "highly desirable" because it provided "[f]lexibility for the Corps to accomplish the work within the time and money [allotted], and . . . to handle the unknowns, unknown contamination, unknown debris, unknown foundations," that might be discovered during the course of performing the contract. Guillory Dep. II at 39:11-24; JX-0034 (Project Execution Plan, Jun. 1, 1999 at 4); *see also* Bacuta Dep. at 23:19-24:13, 52:6-53:16, 55:4-55:17.

40.     But the cost-reimbursable nature of the TERC required the Corps to intently monitor the contractor's work, to work with the contractor in "a team type approach" and "to track all costs, labor, equipment, materials, and personnel" being used on the project.  Guillory Dep. II at 40:21-41:10; Montegut Dep. at 24:4-10.

**B.     Negotiation and Planning of Task Order 26**

41.     On July 12, 1999, the USACE formally tasked WGI with preparing to demolish the existing structures in the EBIA, removing surface and subsurface obstructions,

characterizing the contaminants on the site and ultimately remediating the site in accordance with the Louisiana Department of Environmental Quality's ("LDEQ") new Risk Evaluation and Corrective Action Program ("RECAP") standards.  JX-1364 (Technical Completion Rep., Aug. 2005 at 13-14); JX-0049 (Project Work Plan at 15; Delivery Order 0026, July 12, 1999 ("Task Order 26")).

42.    This task, considered part of the larger IHNC Lock Replacement Project, became known as "Task Order 26" of the TERC.

43.    WGI initially was to perform Task Order 26 in accordance with the project's first Statement of Work ("SOW"), dated June 1, 1999, which was drafted by the USACE-NOD's Construction Manager and Contracting Officer Representative ("COR"), Lee A. Guillory, P.E.  Uncontested Fact No. 59.

44.    A SOW "in essence lists the work elements, a little description of the site, [and] a little description of the work to be performed."  Roe Dep. at 16:1-12.

45.    The Corps typically would send a SOW to WGI with a Request for Proposal ("RFP") asking WGI to provide an estimated cost for the work identified in the SOW.  *See, e.g.*, JX-1265 (RFP for Mod. 10, Aug. 6, 2001); *see also* Roe Dep. at 87:3-16.  In response to the RFP, WGI would draft and submit a proposal.  Guillory Dep. II at 116:8-12.

46.    Mr. Guillory and his USACE staff then conducted an independent analysis of the proposal, known as a "Technical Analysis," to determine whether WGI's proposal was reasonable.  *See, e.g.,* JX-1267 (Technical Analysis of Proposal #113, Aug. 31, 2001); Guillory Dep. II 45:14-22.  The Corps negotiated or commented on WGI's proposal, verbally or in writing.  Then WGI submitted a revised proposal.  Roe Dep. at 102:22-103:2; *see e.g.*, JX-1275 (WGI Revised – Final Proposal #113, Sept. 24, 2001).  This process continued until

10

the Corps accepted WGI's proposal and issued the Task Order (or modification thereto). Guillory Dep. I at 146:3-148:13.

47.     Task Order 26 and its modifications (the "contract") included the Corps' SOWs, the WGI proposals that the Corps accepted and the applicable terms of the TERC.  *See, e.g.*, JX-0050 (Contract Mod. 1, Nov. 23, 1999 at 1-12); JX-0058 (Contract Mod. 10, Sept. 25, 2001 at 2).

### Roles And Responsibilities of USACE and WGI

48.     Lee Guillory, a professional engineer in the Construction Division of the Corps-NOD and a Functional Team Leader for the Lock Replacement Project, became the Contracting Officer Representative ("COR") for Task Order 26 in August 1999.  JX-1231 (Ltr. from A. Smith, Aug. 18, 1999); Guillory Dep. II at 25:15-26:18.

49.     Prior to Task Order 26, Mr. Guillory had "extensive experience of six years of being a project engineer on the ground in two different area offices, supervising, monitoring and administering construction contracts for earthen levees, hurricane protection levees . . . and major navigational structures."  Guillory Dep. II at 18:21-19:5.

50.     As COR, the Corps designated Mr. Guillory to perform the following functions on Task Order 26: (1) verify that WGI performed the technical requirements of the project in accordance with the contract terms and specifications; (2) conduct inspections of the work site throughout the project to assess WGI's performance; (3) maintain liaison and direct communications with WGI; and (4) where work deficiencies or other problems were observed, record and report the incidents to the Contracting Officer, notify WGI of the deficiencies, and direct appropriate action to effect correction.  JX-1231 (Ltr. from A. Smith, Aug. 18, 1999); Guillory Dep. II at 27-32.

51.     James Montegut, a Project Engineer in the Construction Division of the New
Orleans District, was first assigned to Task Order 26 when site mobilization began in early
2001.  Montegut Dep. at 26.  As the Project Engineer and on-site COR for Task Order 26, Mr.
Montegut was responsible for overseeing WGI's performance and ensuring WGI worked in
an efficient and cost-effective manner.  Montegut Dep. at 30-31, 46.

52.     In addition to reviewing and approving WGI's proposed expenses on Task
Order 26, Mr. Montegut managed the USACE's on-site Quality Assurance Representatives
("QA Representatives" or "QA Inspectors"), met daily with WGI's on site personnel,
reviewed and approved plans for certain features of work, and monitored the physical
progress of work on a day-to-day basis.  Montegut Dep. at 28, 42-44, 62-66, 68.  If Mr.
Montegut or his QA Inspectors "noticed any inconsistencies or anything that we were not 100
percent pleased with, we brought that to the attention of the Washington Group on-site staff,
and asked them to correct that non-conforming work."  *Id.* at 73:21-74:15.

53.     If Mr. Montegut encountered a situation on-site that required additional
assistance from the USACE, or if he determined a work plan warranted further engineering
review or input before he could approve it, he consulted with Mr. Guillory.  Montegut Dep. at
32-33; 62-63.

54.     At all times, the USACE had at least one or more Quality Assurance Inspectors
on-site monitoring WGI's and its subcontractors' work.  The QA Inspectors monitored the
project and WGI's operations to ensure compliance with the USACE's safety regulations, the
contract, and the USACE-approved specifications and drawings.  Clouatre Dep. at 29; Staggs
Dep. at 126, 223-24.  They documented their monitoring activities (and inspection results) in a

daily Quality Assurance Report ("QAR") addressed to Mr. Guillory and initialed by Mr. Montegut.  Guillory Dep. II at 93; Montegut Dep. at 69-70.

55.     Steven Roe was WGI's Program Manager for the overall TERC from mid-1997 until May 2001.  Uncontested Fact No. 40.  Mr. Roe drafted and negotiated WGI's initial proposal on Task Order 26.  Roe Dep. at 103:6-9, 92:2-16; JX-1252 (Project Work Plan at 19).

56.     Dennis O'Conner was WGI's Project Manager from Task Order 26's inception in 1999 to June 7, 2004.  Uncontested Fact No. 41.  He had an undergraduate degree in geology and geography, but was not an engineer.  O'Conner Dep. at 16:15-24.  Mr. O'Conner was responsible for performance aspects of the project and initially was the point of contact for the USACE on-site supervision.  JX-1252 (PROJECT WORK PLAN at 19).  He also was accountable for "project cost, schedule, safety and overall quality and technical management." *Id.*

57.     Phillip Staggs was WGI's on-site Construction Manager from July 2000 to March 2005.  Uncontested Fact No. 42.  Mr. Staggs, an experienced construction worker (but not an engineer), supervised all WGI and subcontractor site activities related to demolition, remediation and site restoration.  He also reviewed daily subcontractor reports and coordinated field activities with the Corps.  JX-1252 (Project Work Plan at 19); Staggs Dep. at 13:19-26:5.

<u>Initial Statement of Work for Demolition and Remediation of EBIA</u>

58.     In its June 1999 SOW for Task Order 26, the Corps directed WGI to provide "all engineering services . . ., as required, in connection with the technical review of site documents, attendance at site meetings and travel necessary for the period of approximately

21 June 99 through 30 Sep 99 associated with the demolition and remediation" of the EBIA.

JX-0049 (SOW No. 1 attached to Task Order 26 at 3-4).

59.     Mr. Guillory, who drafted the June 1999 SOW, testified that "all engineering

services" simply was "a general description" that included engineering, administration, design,

contract bidding, subcontract bidding and award, and any construction that WGI planned to do

itself.  Guillory Dep. II at 46:2-16.  The USACE did not expect WGI to perform, "engineering

services" related to the nearby levees and floodwalls.  Guillory Dep. I at 121:1-5; Guillory

Dep. II at 47:2-11; Clouatre Dep. at 77:23-78:17; Roe Dep. at 123:14-124:8; Lucia Dep. at

81:9-14, 82:4-14, 123:19-23.

60.     The June 1999 SOW also directed WGI to draft a "Recommendation Report"

describing the scope and duration of remediation and demolition activities, "including any

data gaps that may need to [be] filled by sampling or other investigations."  JX-0049 (SOW

No. 1 at 4).  Mr. Guillory testified that "data gaps" referred to things that WGI would need to

uncover through grid trenching, geophysical surveying and soil sampling.  Guillory Dep. II at

47-49 (noting that USACE and WGI met regularly to identify the various data gaps that would

need to be identified and filled).  WGI was not expected to identify "data gaps" relating to the

levee and floodwall.

61.     In connection with drafting the Recommendation Report, the USACE-NOD

provided WGI with a list of "government-furnished information" to review.  JX-0049 (SOW

No. 1 at 4-5).  None of the information furnished to WGI contained as-built drawings or

designs of the nearby levee and floodwall.  None of the information furnished to WGI

indicated that the USACE had any geotechnical engineering concerns relative to the stability

of the levees and floodwalls.

14

**IV.    WGI WAS A GENERAL CONTRACTOR PERFORMING SITE CLEARING AND REMEDIATION ACTIVITIES, NOT A GEOTECHNICAL ENGINEER**

62.    There is no evidence in the contract governing Task Order 26 that either WGI or the Corps contemplated that WGI would provide geotechnical engineering services of any kind on Task Order 26 relating to the levees and floodwalls the EBIA.  The United States has admitted as much, *see* Lucia Dep. at 11:23-12:21; 69:13-20; 81:9-14; 82:4-14; 123:19-23; Guillory Dep. I at 46:17-47:11, 53:24-56:5, 57:17-58:8, 254:21-255:20, and so has the plaintiffs' own expert on standard of care.  *See* Rogers Dep. II at 83:11-25; 95:23-96:17; *see also* Roe Dep. at 123:21-124:8 ("Our customer, the Corps of Engineers, are the ones who design flood control, maintain flood control, contract to have them constructed, maintained… [t]hey hired us to knock down buildings and pull out piles and remediate soil…   They didn't hire us for engineering expertise on flood control.").

63.    As the Engineer of Record on the Lock Replacement Project, the USACE opted not to contract out or delegate any responsibility for geotechnical engineering related to the flood control structures bordering the EBIA to WGI.  Sykora Rep. at 33-36.  Instead, engineers from the USACE-NOD's Construction Division oversaw Task Order 26:  "And as far as the geotechnical branch would go, problems or concerns of a geotechnical nature that are identified by the construction individual would come back through engineering, and if they're geotechnical in nature they would go to the geotech branch to look at."  Grieshaber Dep. I at 28:6-19; Grieshaber Dep. II at 11:16-12:9; Sykora Rep. at 34-35, 57; Lucia Rep. at 60.

64.    Thus, to the extent any USACE Engineer Regulation (ER) or Engineer Manual (EM) governed the USACE's geotechnical engineering responsibilities relative to flood control on Task Order 26, those ERs and EMs did not apply to WGI as the contractor

15

performing environmental restoration work in the EBIA.  *See* Sykora Rep. at 52-53; *see also*

Bea Dep. Vol. II at 150 (admitting that specific EMs and ERs do not apply to contractors of

the USACE unless they are specified in the contract); Rogers Dep. I at 251:18–252:6 (same).

65.     In sum, WGI should be held to a standard of care consistent with its role as a

general contractor performing demolition and environmental restoration work on Task Order

26, and not to the standard of care of a contractor with geotechnical engineering duties relative

to flood control or to the standard of care of a geotechnical engineering firm generally. Sykora

Rep. at 36; *see* Lucia Dep. at 11:23-12:21.

**A.     USACE's Extensive Involvement in Developing, Reviewing and Approving the Plans for Site Clearing and Remediation Work on Task Order 26**

The 1999 Recommendation Report

66.     The Recommendation Report established a "chronological approach to the

demolition and preparation of the site," and the "work methodologies for the 32-acre project

site."  JX-1234 (Rec. Report at 13); *see* Undisputed Material Fact No. 37.  The Report

included a list of more than twenty proposed tasks or "Definable Features Of Work"

("DFOWs") ranging from the development of each work plan to site mobilization to building

demolition, piling removal and remediation of the EBIA.  JX-1234 (Rec. Report at 66 (Table

6-1)).

67.     WGI collaborated with the USACE in developing the Recommendation Report.

WGI submitted, and the Corps substantively reviewed and commented on WGI's outline and

its drafts of the Report.  Guillory Dep. II 48:20-49:6, 61:15-63:2; Bacuta Dep. at 74:12-76:17.

WGI and the USACE held meetings to discuss and resolve any areas of disagreement.

Guillory Dep. II at 63:20-24.

68.     The Corps formally accepted WGI's final Recommendation Report on January 19, 2000, and the Report "formed the basis of subsequent specifications for work and work orders and proposals."  Guillory Dep. II at 78:7-11.  None of the recommendations contained in the Report relate to geotechnical engineering with respect to the levee/floodwall bordering the EBIA site.

### Development of Eight Major Work Plans

69.     The May 15, 2000 SOW on Task Order 26 directed WGI to draft eight major work plans for various aspects of the remediation and demolition project:  a Project Work Plan ("PWP"), Waste Management Plan ("WMP"), Storm Water Pollution Prevention Plan ("SWPPP"), Sampling and Analysis Plan ("SAP"), Contractor Quality Control Plan ("CQCP"), Site Safety & Health Plan ("SSHP"), Hurricane Preparedness Plan ("HPP"), and a Perimeter Monitoring Plan ("PMP").  In developing each work plan, WGI received substantial input from both the Corps and the LDEQ during meetings, and through written comments to drafts.  JX-1236 (Work Plan Gen. Discussion Mtg., Aug. 3, 2000); JX-1237 (Work Plan LDEQ Mtg. Min., Aug. 21, 2000); JX-1242 (Work Plan Gen. Discussion Mtg., Oct. 17, 2000); DX-01275 (Cmt. Submittal, Draft PWP, Oct. 27, 2000); Guillory Dep. I at 116:23-25, 119:6-120:4; Bacuta Dep. at 110:18-112:10; JX-1245 (Transmittal and Cmts., Final PWP).

70.     Ultimately, the Corps approved and accepted each of the work plans.  JX-1239 (CQCP, Nov. 1, 2000, Approval at 2); JX-1248 (SWPPP Approval Page, Nov. 14, 2000); JX-1249 (HPP Approval Page, Nov. 14, 2000); JX-1250 (PMP Approval Page, Nov. 14, 2000); JX-1252 (PWP, Approval at 2).

71.     The work plans incorporated requirements of the TERC, the Corps' SOWs, applicable RECAP requirements, and previously approved guidelines from the

Recommendation Report. *See, e.g.*, JX-1252 (PWP at 9-10). Because there were still a significant number of unknowns about the site (*e.g.*, the extent of contamination and the number and type of buried or submerged obstructions), these eight work plans were designed to provide "guidance and reference for the execution of project activities," but not to provide detailed specifications for each and every definable feature of work. Guillory Dep. II at 47:12-48:11; Roe Dep. at 128:6-18; JX-1234 (Rec. Rep. at 38); Guillory Dep. I at 111:4-112:18, 144:17-145:11.

72.     The more detailed plans and specifications for each definable feature of work typically were drafted by WGI's subcontractors and were reviewed, discussed and approved by WGI and the Corps on an on-going basis. *See* Clouatre Dep. at 89:23-90:9.

        Project Work Plan ("PWP")

73.     The PWP was one of the eight project plans that was "developed jointly between [WGI] and the Corps to begin" remediation and demolition activities on the site. Guillory Dep. I at 78:12-79:2.

74.     Among other things, the PWP generally described the currently-known structures and foundations to be demolished, the types of equipment to be used, depth for piling removal, and remediation procedures. JX-1252 (PWP at 41-58). The PWP also called for the removal of Surekote Road at the end of the project, and upon the Corps' approval, the final grading and re-vegetating of the area. *Id.* at 58.

75.     The Corps held numerous meetings with WGI regarding the PWP, and reviewed drafts and commented on each aspect. JX-1237 (Work Plan LDEQ Mtg. Min.); JX-1224 (LDEQ Mtg. Min.); JX-1245 (Transmittal and Cmts., Final PWP). WGI resolved and

incorporated all of the comments raised by the Corps into the Final PWP, which Mr. Guillory approved on November 16, 2000.  Guillory Dep. II at 84:24-85:17.

76.     There is no mention of WGI providing geotechnical engineering services relative to the levees and floodwalls in the PWP.  The reference materials that WGI considered in formulating the Corps-approved PWP "did not include information that would even allow WGI to conduct an evaluation of wall stability, seepage or global stability for the EBIA flood protection system."  Sykora Rep. at 16.

### Corps instructions regarding the levees/floodwalls

77.     Per the Corps' instruction, the Project Work Plan set the work site's boundaries:  all soil remediation and associated excavations were confined to "the area 15-feet west of the floodwall."  JX-1252 (PWP at 55).

78.     The Corps issued this "guideline at the beginning of the project that the contractors, [WGI], should not place any moving equipment, heavy equipment, within 15 feet of the floodwall face, which coincided with the curb side of Surekote Road, and would use that as like a clearance zone that you do not do any work in there because it has the possibility of the equipment impacting the floodwall." Guillory Dep. I at 159:21-160:5; *see* Guillory Dep. II at 82:20-83:13.

79.     Mr. Guillory developed the 15-foot guideline based on a "consensus of opinion between myself and the rest of the small HTRW team" at the Corps-NOD.  Guillory Dep. II at 83:2-7.  The guideline is consistent with the implied minimum control line found in the USACE's 1966 evaluation of the global stability of the floodwalls bordering the EBIA.  Lucia Rep. at 23, 74.

<u>Extensive Quality Control / Quality Assurance Requirements</u>

80.     The "USACE managed its prime contractor [WGI] by identifying Definable Features of Work (DFOWs)" for Task Order 26.  JX-1364 (Technical Completion Rep. at 30); see JX-1234 (Rec. Rep. Dec. 1999 at 66)(Table 6-1).

81.     For each definable feature of work the Contractor Quality Control Plan (as well as the TERC) mandated that WGI and its subcontractors follow a three-phase quality control system to ensure that the work was performed in accordance with contract requirements and with Corps approval.  JX-1239 (CQCP at 22); JX-0048 (TERC at 21-23); JX-1235 (SOW, May 15, 2000 at 4-5); Guillory Dep. II at 90:14-91:5.  The three-phase quality control system consisted of the "Preparatory Phase," the "Initial Phase," and the "Follow-Up Phase."  JX-1239 (CQCP at 22-24).

82.     Every day, WGI completed a Daily Quality Control Report ("DQCR") documenting its compliance with the three phases of quality control system for each definable feature of work performed.  WGI submitted the DQCRs to the USACE for review. Montegut Dep. at 69:6-70:25.

83.     The Preparatory Phase commenced just prior to the start of each DFOW, and required WGI to:  (1) review each paragraph of the applicable specifications; (2) review any applicable plans (*e.g.*, SAP, SSHP, PWP, etc.); (3) verify that appropriate drawings and submittals for materials and equipment were submitted and that the Corps actually approved them; (4) examine the work area to ensure all preliminary work was complete; (5) discuss field methods and procedures for the work; and (6) ensure that the work plan for the specific task has been approved by the Corps.  *See* JX-1239 (CQCP at 22-23); Guillory Dep. II at 91:6-22; Roe Dep. at 126:15-130:2, 144:21-145:10, 146:20-148:14.

84.      WGI held a preparatory meeting for each significant definable feature (or subfeature) of work and provided an agenda to the Corps in advance.  Guillory Dep. II at 91:15-22, 104:18-106:11.  At least one Corps representative, as well as relevant subcontractors, attended each Preparatory Phase meeting.  *Id*. at 91:15-22; Clouatre Dep. at 65:6-16; 65:17-66:2; *see also* Guillory Dep. II at 100:20-103:7.  After every meeting, WGI drafted meeting minutes and submitted them to the Corps for review and correction.  Guillory Dep. II at 58:18-59:13; *see also id*. at 77:3-78:3.

85.      WGI's Contractor Quality Control System Manager ("QC Manager") conducted Initial Phase inspections with a Corps QA Inspector as work began on each DFOW.  JX-1239 (CQCP at 23); Guillory Dep. II at 91:23-92:9.  While observing WGI or subcontractor personnel at work, the WGI QC Manager and the Corps' QA Inspector:  (1) checked the preliminary work for compliance with the contract and the Preparatory Phase meeting minutes; (2) verified that the level of workmanship met acceptable standards; (3) resolved any conflicts; and (4) checked that any required inspections or tests had been or were being performed.  JX-1239 (CQCP at 23); Guillory Dep. II at 91:23-92:9; O'Conner Dep. at 166:4-15.

86.      The results of the initial inspections were recorded in a form attached to WGI's Daily Quality Control Report ("DQCR"), which was then submitted to the Corps for review. Guillory Dep. II at 92:17-93:4; Montegut Dep. at 69:6-19.

87.      WGI's QC Manager, with the Corps QA Inspector performed follow-up phase inspections on a daily basis throughout the duration of a particular feature of work.  The follow-up phase consisted of monitoring compliance with contract requirements; evaluating the workmanship of the contractor; ensuing that testing was performed on-site; ensuring that

21

"rework items" were corrected; and ensuring that subcontractors were not concealing any non-conforming work.  JX-1239 (CQCP at 23-24); Guillory Dep. II at 92:10-93:4.

88.     The QC Manager reported the results of WGI's follow-up phase inspections in the DQCR submitted to the Corps for review.  *See* Guillory Dep. II at 92:10-93:4.  The Corps' QA inspectors also reported their observations to Messrs. Guillory and Montegut in a daily QAR.  *Id.*

89.     In addition to the three-phase system, the CQCP provided for the Corps' own inspections at the end of each DFOW.  During this Pre-Final Inspection, the Corps often established a "punch list" of items that needed to be finished or corrected before Final Inspection and completion.  JX-1239 (CQCP at 30); Guillory Dep. II at 93:23-94:6, 113:11-114:8.

90.     During the Final Acceptance Inspection, the Corps made sure any such punch-list items were remedied and that the contractors' work complied with plans and specifications. JX-1239 (CQCP at 30); Guillory Dep. II at 94:7-16, 94:22-95:2, 95:4-96:13, 113:11-114:8.

91.     The CQCP also required WGI to submit a "photographic record" consisting of at least 36 exposures of "progress photographs of field activities, inspection locations, and final constructed features" on a monthly basis.  JX-1239 (CQCR at 27); *see* Guillory Dep. II at 130:19-25.

Subcontractor Work Plans

92.     WGI used local subcontractors to complete many tasks.  JX-1234 (Rec. Rep. at 50); Staggs Dep. at 38:1-39:8; Guillory Dep. I at 144:15-16.  WGI and the Corps "got together, discussed what had to be accomplished" and "worked hand in hand in developing the scopes

of work for the subcontracts."  Guillory Dep. II at 100:20-103:7; Guillory Dep. I at 144:24-145:11; *see, e.g.*, JX-1302 (Email from L. Guillory, June 18, 2001).

93.    Once the subcontract's scope of work was finalized, WGI sent a Request For Proposal ("RFP") to potential subcontractors.  Potential subcontractors then drafted and submitted plans in response to the RFP, which included proposed means and methods for accomplishing the work.  Guillory Dep. I at 144:24-145:11; Guillory Dep. II at 100:20-103:7; O'Conner Dep. at 152:8-153:5.

94.    Upon receiving proposals from potential subcontractors, WGI "evaluated them based on technical merit and cost, made a spreadsheet of all the different bidders, and made a recommendation to the Corps as to who they thought would be the most appropriate subcontractor to complete that portion of the work."  Guillory Dep. I at 145:13-19; *see also* Guillory Dep. II at 100:20-103:7.

95.    The Corps reviewed WGI's recommendation and, if an agreement was reached, the subcontractor was hired.  Guillory Dep. I at 145:20-146:2; *see also* O'Conner Dep. at 152:8-19; Guillory Dep. II at 100:20-103:7.  Thereafter, the Corps reviewed, revised and approved the subcontractor's work plans for major DFOWs before physical work began. Guillory Dep. II at 106:22-107:14, 122:15-123:7.

<u>Orleans Levee District Permit</u>

96.    The Orleans Levee Board (OLD) operates and maintains the levees and floodwalls constructed by the USACE.  33 CFR § 208.10.  The USACE conducts an annual compliance inspection of OLD's operations and maintenance.  Sykora Rep. at 36.

97.    As part of its responsibilities, the OLD administers a permit program for third parties performing construction activities within 300 feet of a hurricane protection structure. Sykora Rep. at 36-37.  The USACE, and contractors working for the USACE, typically do not

need a permit from the OLD.  Lucia Dep. at 189:6-10; Sykora Rep. at 36-39.  Rather, the USACE obtains a right-of-entry to perform work in that area from the appropriate entity.  *Id.* There are no written guidelines with the USACE as to when its contractors need to obtain a permit from the OLD.  Sykora Rep. at 38 (citing Colletti Dep.).

98.    The OLD does not perform independent engineering investigations of any kind in connection with an applicant's request to perform subsurface work on or near a flood control structure.  Spencer Decl., ¶ 4.  Instead, the applicants' work plans are directed to the USACE for technical review and approval.

99.    After corresponding by phone with the OLD, WGI notified the OLD in writing on November 7, 2000 of its plans to perform environmental restoration work on behalf of the USACE in the EBIA.  *See* Undisputed Material Fact No. 44; Sykora Rep. at 39; JX-1260 (Nov. 7, 2000 Ltr. from D. O'Conner to S. Spencer [Rogers Dep. Ex. 41]); JX-1243 (Oct. 19, 2000 Telecon Report from B. Smith to D. O'Conner).

100.    The November 7, 2000 letter referenced the following proposed site clearing and remediation activities that WGI and the USACE had planned at the time in the EBIA: Grid trenching over entire site to depth of five feet; development of a borrow pit; removal of utility lines; removal of a sewer lift station on Saucer Marine (identified on enclosed map); "removal of all above ground and subsurface structures including slabs, foundations and barges, etc. (Fig. 3-5);" excavation areas associated with remediation (preliminarily estimated at 3 ft deep); and removal of pilings to a depth of -36 feet.  JX-1260 (Nov. 7, 2000 Ltr. from O'Conner at MEB-041-0000000069-86).

101.    WGI's notification to OLD subsequently was forwarded to the Operations Division at the USACE, who directed it to the Engineering Division, specifically the

Geotechnical and Structures branches, for review.  *Id.* at MEB-041-000000062.  On April 6,

2001, the USACE issued a Letter of No Objection to OLD, which indicated that it had no

objection to the issuance of a permit to WGI.  *Id.* at MEB-041-000000057.

102.    The OLD did not formally issue WGI a permit.  But the OLD continued to

maintain and inspect the levee/floodwall along the EBIA throughout the duration of Task

Order 26.  The OLD did not identify any problems with levee/floodwall during this time.

Spencer Decl., 10/27/2008, ¶ 9.

103.    The USACE participated in annual inspections of the levees and floodwalls in

the Greater New Orleans Area.  Sykora Rep. at 36.

104.    The USACE was on-site with WGI through the entire duration of the Task

Order 26.  To the extent that any feature of work required engineering input or review from

other persons or groups within the USACE, the USACE's Contracting Officer

Representatives from the Construction Division, both of whom were civil engineers by

training, were responsible for notifying the appropriate persons or groups within the NOD of

the same.  Grieshaber Dep. I at 28:6-19; Grieshaber Dep. II at 11:16-12:9; Lucia Dep. at

124:23-127:17.

## V.    WGI BACKFILLED AND COMPACTED EXCAVATIONS IN THE EBIA WITH DUE CARE

### A.    Type of Backfill Material

#### Primary Source of Backfill was Clay from the Borrow Pit at McDonough Marine

105.    The Corps determined in the early planning stages of Task Order 26 that to the

extent possible, excavations at the EBIA should be backfilled with native clay from an on-site

"borrow pit" rather than with imported material.  See JX-1252 (PWP at 26); *see also* Staggs

Dep. at 151:4-17; Guillory Dep. I at 194:6-14.

106.     The Corps' concerns in this regard were two-fold:  (1) using off-site commercial material would increase the cost of remediation since the Corps would have to pay for the material and transport it to the site; and (2) adding new material to the site would increase the future cost of hydraulically dredging and disposing of soil during construction of the bypass channel.  Guillory Dep. II at 116:21-118:4; JX-1267 (Technical Analysis of Proposal #113 at 2); JX-1255 (SAP at 4-3).

107.     WGI and the USACE originally planned to put the borrow pit on the ITT site, "but during drilling a significant number of underground obstructions were discovered that made the area unsuitable as a Borrow Pit and so the location was changed."  JX-0108 (8/2001 RECAP Submittal Report –Borrow Pit).  The McDonough Marine site ultimately was chosen for the borrow pit because of its relative lack of obstructions and contamination.  *Id.*

108.     The borrow pit contained "predominately cohesive-clayey soils," 2/1/12 Bea Rep., ¶ 47, which were similar to the clayey soils existing across the entire EBIA.  JX-0116 (2002 Boland Marine RECAP Submittal (Drilling Report)); DX-00021 (Saucer Marine RECAP Submittal (Drilling Report)); DX-00106 (McDonough Marine RECAP Submittal – Borrow Pit at 275-77); Silva-Tulla Testimony.

109.     WGI and its subcontractors used "clayey" borrow pit soils or other similarly clayey *in-situ* (native) soils to backfill all of its excavations across the EBIA, with the exception of some excavations on Boland Marine, McDonough Marine and ITT.  Sykora (Corrected) Rep. at 82, Table 2.

The USACE approved the use of imported river sand for backfilling certain excavations

110.     Although the primary source of backfill at the EBIA was the borrow pit on the McDonough Marine site, if there was insufficient borrow pit material, WGI could import

backfill material with the Corps' approval as to source, quality and cost.  JX-1267 (Technical

Analysis of Proposal #113 at 2); Guillory Dep. II at 103:8-104:17.

111.    The USACE considered and approved the use of imported river sand for

backfilling certain excavations in the EBIA on the Boland and McDonough Marine sites,

including shallow excavations of Asbestos Containing Material (ACM) on Boland.  JX-0060

(Revised SOW for FY-2002, Mod. No. 12 to Task Order 26 at WGI00646); JX-1302

(6/18/2001 Email from L. Guillory re: excavation sow at 13); Guillory Dep. II at 103:12-

104:17.  *See, e.g.,* JX-0336-0373 (QARs 178-215).  All of the excavations backfilled with

river sand either were relatively shallow and/or at a significant distance away from the

floodwall bordering Surekote Road.  Sykora Corrected Rep. at 82 (Table 2) & Exs. K, M, O;

Lucia Rep. at 69, 74-75.

112.    River sand is a colloquial term for "silty sand material that is hydraulically

dredged out of the base of the Mississippi River; . . . commercial suppliers sell it as a

traditional backfill for sub-base and foundation material throughout New Orleans."  Guillory

Dep. II at 181.  River sand also is used for structural backfill on the backside of flood control

structures.  Grieshaber Dep. II at 86:16-21.  It is less permeable than beach sand, *id.* at 84:1-5,

and commonly used for backfilling because "it's much easier to compact, and it has known

properties."  Rogers Dep. II at 161:10-15.

113.    WGI's use of imported river sand for backfilling certain excavations in the

EBIA, as approved and monitored by the USACE, did not fall below the relevant standard of

care on Task Order 26.  Rogers Dep. II at 174:7-22; Sykora Rep. at 74-77.

**B.    Compaction Means and Methods**

114.    The backfill specifications for various excavations in the EBIA were developed

with input from and approval by the USACE.  *See, e.g.,* JX-1238 (9/14/2000 Email from J.

Spadaro to L. Guillory); JX-1302 (6/18/2001 Email from L. Guillory re: excavation sow at

13); JX-1272 (USACE Transmittal For, Revised Lift Station Removal Plan, Oct. 12, 2001 at

1).

115.    Most of the work plans required WGI and its subcontractors to backfill daily to

prevent ponding and minimize subsidence.  "Backfill shall be put in place and compacted in

such a manner that traffic may move across the backfilled areas without experiencing

subsidence."  JX-1302 (6/18/2001 Email from L. Guillory re excavation SOW, at 13); *see also*

JX-1266 (WGI Construction Agreement with McDonald Construction, Scope of Work, at 23-

31).  No compaction testing was required.  *Id.*

116.    Compaction testing (i.e., proctor) typically is used by the owner/construction

manager to "keep the contractor honest and make him do as good a job as he can do

compacting.  If you don't run any tests, what's the – how are you going to encourage him to

do high quality work unless you have some [measure] that you're grading him by."  Rogers

Dep. II at 176:16-177:15.  But here, the USACE was on site daily observing, inspecting and

approving WGI's work, and did not believe proctor testing was needed.  Indeed, the Corps'

Project Engineer and COR, Mr. Montegut, testified:

> [A]s far as the backfill . . . what my thought process was is that a Proctor is good,
> you know, it proves something, it shows that compaction was achieved.  But I
> didn't need a Proctor [on this project], I had other things in my favor here that
> didn't make it necessary to spend our taxpayers' money on a Proctor. . . .  [I]f we
> had a problem with any of these backfill operations . . . it would have been quite
> simple for me to direct them, as contracting officer's representative, to correct . . . .
> And it would have been very easy to notice if there was a problem . . . if it were
> not compacted properly, the area that was excavated would have subsided and
> there would have been a depression or a hole in the ground at that site.  It would
> have been very simple to notice that and to direct [WGI] to go back and fix it.  So
> that was my thought process at the time.

Montegut Dep. at 72:15-77:14.

117.    The USACE's decision not to require compaction testing is at least consistent with EM 110-2-1913, which provides that compaction is <u>not</u> required for "pit fills" beyond the toe of the levee.  Sykora Rep. at 58-59, 76; Rogers Dep. II at 181:14-18.  But in the EBIA, all of the backfilled excavations were compacted by either track walking with a dozer or bucket tamping with an excavator.  Rogers Dep. II at 182:6-22.

118.    WGI exercised due care in backfilling and compacting excavations on Task Order 26 in accordance with Corps-approved specifications.  Sykora Rep. at 73; Rogers Dep. II at 178:3-10.

## VI.    WGI PERFORMED SPECIFIC FEATURES OF WORK ON TASK ORDER 26 WITH DUE CARE[1]

119.    Between February 2001 and May 2005, WGI performed numerous definable features of work, including but not limited to, Excavating a Borrow Pit, Demolition and Piling Removal; Grid Trenching; Sewer Lift Station Removal at Saucer Marine; Concrete Block #004 ("Wedding Cake") Removal at Boland Marine; Soil Remediation (including Remediation of the Canal Bank and ACM Removal); and Utility Line Removals.

120.    All of these features of work were completed in accordance with the guidelines developed with, and approved by, the Corps in the eight major work plans, and with the scopes of work, work plans and/or specifications reviewed and approved by the Corps.  Guillory Dep. I at 111:4-112:18, 144:17-145:11; Roe Dep. at 144:21-145:10, 146:20-148:14.

---

[1] To the extent plaintiffs intend to put on specific evidence that WGI failed to meet its standard of care with respect to excavations not otherwise described below, WGI reserves the right to counter that evidence at trial and supplement its findings at the end of the trial.  WGI was not able to discern through discovery, despite numerous attempts to elicit this information from plaintiffs' experts, exactly which pre-Katrina features, if any, plaintiffs contend WGI excavated and/or backfilled in a negligent manner.

A.   **The USACE Approved the Expansion of Borrow Pit After Referring the Design to Its Geotechnical Engineering Branch**

121.   In August 2001, WGI submitted a plan for an on-site borrow pit on McDonough Marine to the Corps and the LDEQ for review and approval.  *See* JX-0108 (RECAP Submittal Rep. – Borrow Pit, Aug. 2001 at 8); *see also* JX-0107 (Cmt. Submittal, Borrow Pit RECAP Submittal Rep., July 3, 2001); JX-0109 (Transmittal, Borrow Pit RECAP Submittal Rep., Sep. 7, 2001).  By late 2001, remediation work had increased the need for backfill material, so WGI and the Corps asked the LDEQ for permission to expand the borrow pit on McDonough Marine from 0.84 acres to 1.55 acres.  JX-1280 (Borrow Pit Extension App., Rev. Jan. 8, 2002 at 2-3, 10-11); *see* Guillory Dep. II at 149:11-150:2.

122.   Mr. Guillory and the USACE Geologist, Dr. Bacuta, reviewed WGI's initial proposal for the extension and expressed concern about the impact a larger borrow pit might have on the "structural integrity of the adjacent levee/floodwall."  JX-1282 (Transmittal and Cmts., Borrow Pit Ext. App., Feb. 4, 2002 at 3-4); Guillory Dep. II at 152:17-153:2.

123.   WGI's Construction Manager had no knowledge that the proposed borrow pit design might possibly impact the levees/floodwalls until he was informed by the Corps. Staggs Dep. at 98:15-99:16.

124.   Prior to excavating any additional borrow, Mr. Guillory asked engineers in the USACE's Geotechnical Branch—not WGI—"to evaluate the structural stability" of the proposed 16-foot deep borrow pit with respect to the existing Jourdan Avenue levee and floodwall.  JX-1285 (Memo. for Eng'g Div., Geotech. Stability Analysis, Apr. 15, 2002 at 2); Guillory Dep. II at 153:3-20; *see also* O'Conner Dep. at 196:13-197:24; Staggs Dep. at 153:18-154:12.

Case 2:05-cv-04182-SRD-JCW   Document 20966   Filed 08/10/12   Page 37 of 141

125.    The Engineering Division responded to this request in May 2002, and provided options to Mr. Guillory for remedying the perceived stability problem posed by the borrow pit.  The Engineering Division's advice to Mr. Guillory did not reference concerns relating to under-seepage or contain instructions to line any of the walls of the borrow pit with clay to prevent under-seepage.  JX-1285 (Memo. for Eng'g Div., Geotech. Stability Analysis, Apr. 15, 2002).

126.    After receiving a formal written response from the USACE's Engineering Division and meeting with a geotechnical engineer at the NOD, Mr. Guillory "took the recommendations and stability control lines from our . . . geotechnical branch and translated those dimensions so that we could reference them off of the floodwall itself."  Guillory Dep. II at 160:18-161:2; Guillory Dep. I at 172:24-173:18.

127.    The Corps' directions were incorporated into a "design template" for WGI to use in excavating the extended borrow pit.  *See* JX-1286 (Fax from J. Montegut, June 10, 2002 at 2-3); see also Guillory Dep. I at 175:23-178:21; Staggs Dep. at 236:13-21, 239:25-240:19.

128.    The Corps did not expect WGI to perform any of its own geotechnical engineering review with respect to the borrow pit design, other than to "implement what [the Corps] recommended."  Guillory Dep. II at 157:17-158:2.

129.    The Corps monitored the borrow pit extension excavation to verify that WGI's work conformed to the design specifications provided by the Corps.  *See, e.g.*, JX-0547 (QAR #389 at 2); JX-0917 (QAR #759 at 2); JX-1106 (QAR #948); *see* Guillory Dep. II at 165:20-166:7, 167:4-13.

130.    At the conclusion of Task Order 26, the Corps specifically directed WGI to "slowly breach[]" the dikes between the IHNC and the borrow area "to allow the IHNC water to fill [the] borrow area and allow intertidal flow between the two water-bodies."  JX-1282 (Transmittal and Cmts., Borrow Pit Ext. App. at 5).  The Corps did not believe that the borrow pit filled with water would pose a threat to the nearby levees and floodwalls.  Guillory Dep. II at 154:10-155:10.

131.    On January 18, 2005, the Corps inspected the McDonough Marine site and watched WGI remove a dam on the west side of the borrow pit to allow canal water to flow into the excavation.  JX-1157 (QAR #999 at 2); Guillory Dep. II at 167:15-169:1.  The Corps ultimately accepted WGI's work on the borrow pit as complete.  *See* Guillory Dep. II at 169:2-6.

132.    As of 2005, the borrow pit was 14.8 feet deep (11.4 ft NAVD88(2004.65)), and the eastern edge of the pit was about 53 feet away from the floodwall at McDonough Marine.  Silva-Tulla Rep., App. B, Fig. 13.

**B.    Demolition and Piling Removal**

133.    The February 1999 Design Documentation Report details the locations of above-ground structures and facilities that WGI demolished and removed across all six sites in the EBIA.  JX-0009 (DDR No. 1, Vol. 1, Feb. 1999, Plates 4 & 5); *see* JX-1252 (PWP at 41-47).  Some of those structures had 30-foot deep (or more) wooden or steel pilings beneath them.  *See* Silva-Tulla Rep., App. B, Figures 6, 10, 14 (indicating structures with pilings beneath them).

134.    The PWP set forth guidelines for demolition and piling removal activities.  JX-1252 (PWP at 9-10).  WGI submitted a more specific proposed work plan to the Corps through its local demolition subcontractor, Hamp's Construction, L.L.C.  *See* JX-1261

(Hamp's Demo. Work Plan, Apr. 12, 2001 at 17-26).  The Hamp's demolition work plan described the basic means and methods for all major demolition tasks, including building demolition and removal of pilings, bulk heads, and sheet pilings.  *Id.*  Among other things, the plan indicated that "[i]mmediately following pile extraction operations, a CAT D5 LGP dozer will be used to grade each site drain, filling in holes left by pile removal and concrete demolition activities."  *Id.*, § 3.3.  Borrow material, if needed for this task, would be provided from WGI from an area on-site.  *Id.*

135.    Even if the piling holes had not been backfilled at all (and there is no evidence to that effect), both WGI's expert Dr. Silva-Tulla, and Plaintiffs' expert, Dr. David Rogers, agree that due to the nature of the soils in the EBIA, the holes or cavities left behind from pile extractions would close in a matter of days or months due to the lateral stresses in the soft subsurface clays in the EBIA.  Silva-Tulla Rep. at 17, 20; Rogers Dep. II at 190:6-191:1; *see* Greishaber Dep. I at 176:20-177:11.

136.    Before the USACE finally approved Hamp's work plan for demolition and piling removal, the USACE held two Preparatory Phase meetings with Hamps, WGI and the USACE to discuss the demolition feature of work.  JX-0219 (Prep. Phase Mtg. Min., Demo., Mar. 29, 2001); JX-0229 (Supervisory Coordination Mtg. Min., Demo., Apr. 11, 2001); Guillory Dep. II at 104:18-105:13; 109:2-110:16.  During the preparatory meetings, WGI and the Corps took "the actual scope of work from the subcontract and the project work plans and quality control plans" and discussed each phase of work, the Corps' expectations, and the various levels of quality control that would be implemented.  Guillory Dep. II at 105:22-106:11; *id.* at 106:22-107:2.  In August 2001, WGI and the Corps also held a separate Preparatory Phase Meeting for bulkhead/sheet piling removal near Mayer Yacht, which was

part of the demolition feature of work.  *See* JX-0313 (Prep. Phase Inspection Mtg., Demo.,

Aug. 8, 2001 at 1-5); Guillory Dep. II at 111:14-22.

137.    Once the subcontractors began working, WGI and the USACE conducted two

different Initial Phase inspections.  *See* JX-0237 (Initial Phase Inspection, Demo., Apr. 23,

2001); JX-0313 (Initial Phase Inspection, Piling Removal, Aug. 8, 2001 at 6-7); *see also*

Guillory Dep. II at 110:19-112:22.  All work was determined to be "in full compliance with

work plans."  *See* JX-0237 (Initial Phase Inspection, Demo., Apr. 23, 2001; JX-0313 (Initial

Phase Inspection, Piling Removal, Aug. 8, 2001 at 6-7); *see also* Guillory Dep. II at 110:19-

112:22.

138.    WGI and the Corps QA Inspectors performed follow-up phase inspections for

demolition and piling removal until the work was complete.  The QA Inspectors reported the

results of their inspections in a QAR, which documented, among other things, any

"deficiencies observed," any "corrective action" taken or any "verbal instructions given to

[the] contractor" by the Corps.  *See, e.g.,* JX-0252 (QAR #94, May 14, 2001); JX-0291 (QAR

#133, July 9, 2001).

139.    WGI and the Corps conducted Pre-Final and then Final Inspections for the

demolition/piling removal feature of work on a site-by-site basis.  *See* JX-1304 (Pre-Final

Inspection Reps., Demo., Aug-Sept. 2001; Guillory Dep. II at 113:20-114:8; JX-1303 (Final

Acceptance Reps., Demo., May-Nov. 2001); JX-1268 (Final Acceptance Rep., Demo.,

McDonough Marine, Sept. 18, 2001).  After the Final Inspections were complete, the Corps

signed "Acceptance Reports" for each site verifying that "all work is complete, acceptable,

and complies with contract requirements."  JX-1303 (Final Acceptance Reps., Demo.); JX-

1268 (Final Acceptance Rep., Demo., McDonough Marine).

C.    **Grid Trenching**

140.    The Project Work Plan contemplated that WGI would locate residual subsurface debris and piping across the EBIA using a powered trencher on a 25-foot grid.  JX-1252 (PWP at 52).  WGI subcontracted the grid trenching operations to McDonald Construction, Inc. in August 2001.  JX-1266 (McDonald Construction Agreement, 8/24/2001).  The Corps-approved Scope of Work specified that trenches will be performed on 25' grid system to a depth of five feet, and shall be backfilled daily with existing soils from the trenching operation, or from soil in the surrounding area.  *Id.* at 30.  "Backfill shall be put in place and compacted in such a manner that traffic may move across the backfilled areas without experiencing subsidence" *Id.*  "No compaction testing will be required." *Id.*  WGI held a preparatory phase meeting with the USACE and McDonald Construction on September 7, 2001 to review the scope of work for the task.  JX-0334 (QAR #176).

141.    WGI and the Corps monitored and inspected the subcontractor's grid trenching operations to ensure compliance with specifications in the scope of work.  In an Initial Phase Inspection held on September 21, 2001, and attended by the Corps, it was reported that the trenches were "being performed on a 25' grid system.  The trenches were 5' in depth from the surface elevations, and approximately 24" in width." JX-0344 (QAR #186 at -1728).  "After the trenches were measured, flagged, and obstructions logged then the trenches were backfilled." *Id.*  "All work was observed in compliance with the work plan." *Id.* at -1728, -1722.

142.    The Corps and WGI continued to document the results of follow-up inspections (in QARs and DCQRs) confirming grid trenching operations were performed in accordance with applicable plans until the work was complete.  *E.g.,* JX-0498 (QAR #340).  Photographs also were provided to the Corps in accordance with the CQCP.  *See, e.g.,* JX-

1364 (Photos in Aug. 2005 Tech. Completion Report); DX-01526 (WGI Photo of 9/11/03 (WGI064958). No grid trenching was ever conducted east of Surekote Road. JX-1364 (Completion Report at 16).

### D.   Sewer Lift Station at Saucer Marine

143.   Based on investigations conducted at the EBIA prior to Task Order 26, the Corps knew that subsurface structures, including an abandoned sewer lift station, would have to be excavated and removed. Guillory Dep. II at 34:20-35:21; JX-1260 (Nov. 7, 2000 Ltr. from O'Conner to OLD). The Corps' Geotechnical Engineering Branch had specifically been informed of, and did not object to, WGI's removal of Sewer Lift Station at Saucer Marine. JX-1260 (April 6, 2001 Ltr. of No Objection).

144.   The lift station was "basically . . . a large diameter pipe with pumps in it, valves and ladders to get down into it, all encased in . . . metal pipe. Over the years, being exposed to a brackish water in the Industrial Canal, that thing was deteriorated substantially." Montegut Dep. at 75:3-10. It was located at the corner of the Saucer Marine and Mayer Yacht sites, 87 feet from the floodwall and 193 feet from the northern edge of the South breach. Sykora Rep., Exhibit J.

145.   WGI's subcontractor, Hamp's, submitted its initial proposal for removing the lift station as part of its February 2001 demolition and piling removal plan. JX-1261 (Hamp's Demo. Work Plan). By September 2001, before work on the lift station began, the technical approach in the February plan had to be changed based on newly-acquired information. JX-1274 (Lift Station Removal Plan (Revised) at 3); *see also* JX-0341 (QAR #183 at 2). The revised plan required the use of a "braced excavation" or "cofferdam"—designed by a licensed professional engineer in Louisiana—to prevent movement of the surrounding soil during excavation. DX-01311 (Lift Station Revised Work Plan, Oct. 1, 2001 at 2-4); Guillory

Dep. I at 142:15-143:10.  *See* Grieshaber Dep. II at 17:25-18:7 (temporary braced excavations will not impact stability of floodwall).

146.    The Professional Engineer, Huval & Associates, who WGI (through its subcontractor) hired to design the cofferdam, sought relevant geotechnical information relating to the soils in the area directly from a geotechnical engineer at the Corps.  Sykora Rep. at 40-41; DX-01307 (Fax, J. Richardson (USACE-NOD) to Huval, Sept. 18, 2001 [SWC 00462-466]).

147.    The subcontractor submitted its first revised proposal to WGI in late September 2001 (DX-01311 (Lift Station Revised Work Plan at 2)) and a preparatory meeting was held with the Corps on October 3, 2001 to discuss the new plan.  JX-0352 (Prep. Phase Inspection Min., Lift Station, Oct. 3, 2001).  The Corps reviewed and approved the sewer lift station submittals under consideration during the meeting, but requested that the subcontractors reevaluate the measurements for the cofferdam sheet pilings and submit a revised plan for approval.  JX-1270 (Prep. Phase Inspection Min., Lift Station at 1, 4); DX-01311 (Lift Station Revised Work Plan at 1); Guillory Dep. II at 134:15-135:16.

148.    The Corps reviewed and commented on the plan at least two more times before finally approving it on October 19, 2001.  Guillory Dep. I at 167:18-22, 180:17-181:13; JX-1271 (Lift Station Removal Plan (Rev. 1), Oct. 10, 2001); JX-1272 (Lift Station Removal Plan (Revised-Add. 1), Oct. 12, 2001 at 1-4); JX-1274 (Lift Station Removal Plan (Revised); Guillory Dep. II at 134:20-135:16.  The approved Lift Station Removal Plan included, among other details, the dimensions of the proposed excavation area, precise design specifications for the cofferdam and requirements for backfilling and compacting the excavated hole.  JX-1274 (Lift Station Removal Plan (Revised) at 6-8).

37

149.     The backfilling and compaction specifications for the lift station were "method specifications," which prescribe the equipment, process and materials to be used.  Sykora Rep. at 22.  The approach is different than, but just as precise as performance specifications, which impose a requirement for the end result but leave the means and method to the discretion of the contractor.  *Id.*

150.     Given the design of the cofferdam for the lift station excavation, the Mr. Guillory was "not concerned it was going to damage the flood control structures" along Jourdan Avenue:

> Location, proximity . . . the rigidity . . . of the design, the depth of the design, the bracing and the waler system.  I felt confident that that was not going to adversely affect any of the adjacent soil or site.

Guillory Dep. I at 169:22-170:9; Grieshaber Dep. II at 17:25-18:7.

151.     WGI was not aware of any potential danger to the levee and floodwall from this excavation.  *See* O'Conner Dep. at 206:10-208:20.

152.     An Initial Phase Inspection for the lift station removal and cofferdam installation was held on October 30, 2001.  JX-0373 (Initial Phase Inspection, Lift Station, Oct. 30, 2001).  The results of the inspection, which were reviewed and approved by the Corps, indicated that "[a]ll work is in compliance with the Revised Lift Station Removal Plan submitted on 10/19/01."  *Id.*; Guillory Dep. II at 136:5-9.

153.     WGI and the Corps held routine follow-up inspections of the lift station excavation to ensure work proceeded in accordance with the Corps-approved plans.  During one follow-up inspection, the Corps' QA inspector:  "Visually assured all debris and pilings have been removed from inside cofferdam and excavator began backfilling with spoil in

38

approx. 2' lifts and compacting to bottom of walers. . . .  No deficiencies observed."  JX-0378 (QAR #220 at 2).

154.    The Corps ultimately accepted that the removal of the lift station and the backfilling of the excavation were complete.  Guillory Dep. II at 146:10-23.

### E.    Concrete Block #004 ("Wedding Cake") at Boland Marine

155.    After demolition work began, WGI identified eight previously unknown subsurface concrete and steel foundations at the Boland Marine site, including a large concrete block commonly referred to as Concrete Block #004, "the southern block," or the "wedding cake."  JX-1265 (Statement of Work ("SOW") for Mod. 10, Aug. 6, 2001 at 2); JX-1803 (Sketch 1 – Boland Marine Subsurface Foundations); Guillory Dep. II at 114:9-115:8, 121:21-122:3; *see also* Montegut Dep. at 60:16-23; Guillory Dep. II 115:9-19.

156.    The wedding cake structure was located 187 feet from the floodwall and 590 feet from the southern edge of the north breach.  Silva-Tulla Rep., App. B, Fig. 6.

157.    The Corps' SOW for removal of the wedding cake directed WGI to remove the subsurface slabs, as well as any "concrete, steel and pilings" associated with the slabs. JX-1265 (Mod. 10 at 2).  The SOW also specified that an excavation plan must be submitted to the Corps with a cofferdam design that was "approved by a Louisiana State Registered, P.E." *Id.; see* JX-1267 (Technical Analysis of Proposal #113 at 2).

158.    WGI submitted a proposal on August 31 for removal of the "wedding cake." The Corps conducted a Technical Analysis of WGI's proposal and made comments, which WGI negotiated and incorporated into a revised proposal that the Corps accepted on September 25, 2001.  *Id.; see* JX-1267 (Technical Analysis of Proposal #113 at 2).  During a Preparatory Phase meeting on November 14, 2001, WGI's subcontractors presented their

initial work plan to WGI and the Corps.  JX-0384 (Prep. Phase Mtg. Min., Concrete Blocks, Nov. 14, 2001); Guillory Dep. II at 119:3-25.

159.    The Corps approved WGI's submittal of a Cofferdam Installation Plan for removal of the wedding cake on December 13, 2001.  JX-1277 (Wedding Cake Final Work Plan); *see* Guillory Dep. II at 122:18-123:8; JX-1364 (Technical Completion Rep. at 63). Among other things, this work plan provided drawings/measurements for excavation and cofferdam installation, instructions for backfilling the excavations, specifics on equipment and crew to be used, and an activity hazard analysis.  JX-1277 (Wedding Cake Final Work Plan at 3-11, 13-31, 39-56).

160.    Mr. Guillory opted not to seek advice from the Corps' geotechnical experts before approving the work plan because he did not have any concerns about the impact of the wedding cake removal on the levees and floodwalls:

> The location and proximity of those concrete foundations with respect to the floodwall and the levee were quite a bit far away as opposed to McDonough Marine borrowing area.  Also, where those concrete block foundations were located were within the footprint of where the future bypass channels were to be dredged . . . in a stairstep fashion to -22 NGVD and -31 NGVD, and those concrete foundations and their cofferdams fit within those footprints.  So that – those braced structural excavations were designed by a professional engineer . . . hired by WGI and their subcontractors – professionally reviewed by all parties, and constructed, and intense quality control and quality assurance inspection followed on how those were installed and removed.

Guillory Dep. I at 210:17-212:2.

161.    WGI was not aware of any potential danger to the levees and floodwalls from this excavation.  *See* O'Conner Dep. at 206:10-208:20.

162.    During the wedding cake excavation, WGI and the Corps continually monitored and inspected the subcontractors' work to verify compliance with the work plan's

specifications.  For example, in a December 2001 follow-up inspection, Messrs. Clouatre and

Ariatti noted that "no deficiencies [were] observed" in connection with the installation of

sheet piling for the construction of the cofferdam.  JX-0423 (QAR #245 at 2); *see* Guillory

Dep. II at 123:9-124:19; *see also* JX-0425 (QAR #267 at 2).  In February 22 and 24

inspections, a Corps QA Inspector reported that he "[v]isually assured all debris and pilings

above el. -23 are removed from cofferdam," and that "cofferdam is backfilled in 2' lifts and

compacted with bucket."  JX-0455 (QAR #297); JX-0457 (QAR #299); *see* Guillory Dep. II

at 124:20-127:8.  The backfill material included spoils from the excavation itself, as well as

clayey, borrow pit material from the McDonough Marine site.  *E.g.,* JX-0457, JX-0458 (QAR

# 299, 300).

163.     On March 21, 2002, WGI and the Corps conducted a Pre-Final Inspection of

the excavation of the concrete/steel foundations at Boland Marine, and identified punch list

items that the subcontractors needed to complete before demobilization.  JX-1284 (Pre-Final

Inspection Rep., Concrete Blocks, Mar. 21, 2002 at 1); *see* Guillory Dep. II at 128:15-129:11.

One week later, upon completion of the punch list items, the Corps signed a Final Acceptance

Report for the removal of the concrete blocks, including the wedding cake, and confirmed that

"all work is complete, acceptable, and complies with contract requirements."  JX-1284 (Final

Acceptance Rep., Concrete Blocks, Mar. 27, 2002 at 2); *see* Guillory Dep. II at 129:12-130:6.

**F.     Soil Remediation (Including Remediation of the Canal Bank and ACM Excavations)**

164.     In addition to demolition, the Corps tasked WGI with remediating

contaminated soil at the EBIA in accordance with the LDEQ's RECAP standards.  JX-1252

(PWP at 50); JX-1244 (SOW, Aug. 28, 2000 at 6-9).

165.    As of January 2001, the Corps set 22 feet below ground surface as the "standard limit" for sampling for contamination because that was the proposed depth of the "future lane and transit bypass channels that the Corps was going to dredge through the EBIA for construction of the new lock."  Guillory Dep. II at 88:18-89:17; JX-1255 (SAP at 58-59). If contamination was discovered at 22 feet below ground surface, the Corps understood it "was a possibility" that WGI would have to excavate down that far to remove it.  *Id.*

166.    In its third modification to Task Order 26, the Corps directed WGI to draft a Sampling and Analysis Plan ("SAP"), consisting of a Field Sampling Plan ("FSP") and Quality Assurance Project Plan ("QAPP") "to provide a comprehensive plan that covers all aspects and definable features of field sampling and analysis . . . in accordance with the 19 Jan 00 USACE-approved Recommendation Report."  JX-1235 (SOW, May 15, 2000 at 4); *see* JX-1255 (SAP at 7).

167.    The SAP describes how WGI will implement "a grid[d]ed sampling and analysis system . . . to determine the various hot spots, contaminants of concern across each of the six sites, and from that will determine . . . which contaminant sources need to be removed and remediated from the site."  Guillory Dep. II at 86:6-21.  The Corps reviewed and commented on WGI's drafts before approving the SAP in February 2001.  JX-1255 (SAP at 2); JX-1258 (Cmt. Submittal, Refined SAP, Feb. 1, 2001); Guillory Dep. II at 86:6-87:7.

168.    Later in 2001, the Corps "tasked [WGI] to come up with [a] RECAP criteria document listing all the regulatory levels and limits that we'd have to remediate the various six sites to in order to acquire a final clean or [No Further Action At This Time] letter from the Louisiana DEQ."  Guillory Dep. II at 182:5-183:3; see JX-0105 (RECAP Submittal Rpt. – Criteria Doc., June 2001).  Mr. Guillory and his "entire six-person HTRW team" at the Corps

reviewed and commented on the criteria document in draft form before approving it.  Guillory

Dep. II at 183:4-16.

169.    There is a passing reference in the RECAP Criteria Document, under the

heading "Identification of Groundwater Classification, the Point of Compliance (POC), and

the Point of Exposure (POE)," to the existence of a floodwall on the east side of the EBIA that

is supported by sheet pile reaching -25 feet.  (JX-0105 at 27).  Mr. Guillory testified that the

actual depth of the sheet pile supporting the flood control structure was "immaterial" to

WGI's work on Task Order 26.  Guillory Dep. II at 185:15-22.  *See* Lucia Dep. at 141:9-

143:5; 144:23-145:3, 151:25-152:23 (opining that whether the sheet pile tip was at -8 or -25

feet is secondary to the main point of the paragraph dealing with the classification of

groundwater; it certainly has "nothing to do with the floodwall stability").

170.    In addition to the RECAP Criteria Document, WGI provided "supplemental

submittals" to the Corps and LDEQ for each of the six individual sites on the EBIA that it

sampled for contamination and planned to remediate.  These were known as RECAP

Submittal Reports.  *See* JX-0105 (RECAP Submittal Rpt. – Criteria Document at 18-19); *see*

*also* JX-0108, JX-0114, JX-0115, JX-0116, DX-0119, DX-0120, DX-0121, DX-0124 .

171.    In accordance with RECAP, after identifying the contaminated soils at a site,

WGI had to produce a RECAP Corrective Action Plan ("CAP") for each of the six EBIA

sites.  *See, e.g.,* JX-0111 (RECAP Corrective Action Plan ("CAP") – Saucer Marine, May

2002); JX-0117 (RECAP CAP –Boland Marine, Nov. 2002).   The purpose of the CAP was

to:

> [Identify] the specific sites . . . and contaminated hot spots of the
> six industrial sites to determine what the . . . lateral and vertical
> depths of excavation for each one of the hot spots will be and what
> the backfill will be…[T]hen this CAP report was submitted to

> [L]DEQ for their review and approval, and to the Corps also,
> saying this is what we intend to do to remediate that industrial
> portion of this site.  Once approval was granted by DEQ and the
> Corps, . . . then [WGI] could implement this CAP for that
> particular six-site.

Guillory Dep. II at 186:1-187:16, 190:1-22; *see* JX-0111 (RECAP CAP – Saucer Marine at 2);

JX-0117 (RECAP CAP – Boland Marine at 2).

172.    On April 16, 2002, WGI and the Corps held a Preparatory Phase meeting to

discuss in detail the "Remediation Procedures and Work Plan" before starting actual work at

the southern end of the EBIA.  JX-0498 (QAR #340 at 7-10).  At the end of the meeting the

"USACE advised they would like to inspect each excavation and confirm measurements prior

to backfilling."  *Id.*

173.    In June 2002, the Corps agreed that the EBIA's canal bank—an area fifteen

feet from the water—also needed to be tested for contamination and remediated in accordance

with RECAP.  See JX-0112 (RECAP Workplan Amendment – Bank Remediation, June 2002

at 10).  Because of the proximity to the canal, these areas required "special" "excavation and

remediation techniques."  Guillory Dep. II at 198:20-200:6.  The Corps separately "tasked

[WGI] to develop this RECAP work plan."  *Id.* at 198:20-199:18.

174.    The RECAP Work Plan Amendment required WGI to remediate the bank in

two phases:  "in-the-dry" and "in-the-wet."  *See* JX-0112 (RECAP Workplan Amend – Bank

Remediation at 12, 15-17); Guillory Dep. II at 199:19-200:18.  Although the RECAP Work

Plan Amendment generally required WGI to limit excavations to a depth of four feet below

ground surface, it allowed excavations to extend deeper inland (*i.e.*, to the east) "based on

levels of contamination, soils stability and distance from water."  JX-0112 (RECAP Workplan

Amend – Bank Remediation); Guillory Dep. II at 200:19-201:22; JX-0588 (QAR #430, Aug.

18, 2002 at 22-24).

175.    The Corps reviewed and revised WGI's plan for the canal bank amendment before approving it.  *See, e.g.*, JX-1288 (Email from L. Guillory, June 25, 2002; Guillory Dep. II at 203:9-204:16.  WGI and the Corps also met to "collaborate" and "finalize" the remediation plan and accompanying figures.  JX-1288 (Email from L. Guillory, June 25, 2002 at 1); Guillory Dep. II at 204:12-16.

176.    WGI submitted its final draft of the bank remediation amendment in July 2002, and the Corps formally approved it on August 12, 2002.  JX-0112 (RECAP Workplan Amend-Bank Remediation at 1).  WGI and the Corps attended a Preparatory Phase meeting to further discuss the details for the canal bank remediation on August 19, 2002.  JX-0588 (QAR #430 at 22-24).

177.    After remediation work began, WGI and a Corps QA Inspector immediately conducted an Initial Phase Inspection.  JX-0498 (QAR #340 at 26-27); see Guillory Dep. II at 192:22-193:8.  The inspection checklist form indicated the preliminary work was "complete and correct" and "in full compliance with work plans."  JX-0498 (QAR #340 at 26). WGI and the Corps conducted daily follow-up inspections.  On June 21, 2002, for example, Mr. Montegut monitored WGI's remediation activities at Saucer Marine and reported:  "Assured that excavation was initially dug to the dimensions required by the CAP.  Final dimensions expanded to 10' x 10'x 6' and 16' x 23'x 6' . . . as a result of field screening and visual observations of EM [("Environmental Manager")]. . . .  Excavation was backfilled with clean material from borrow pit at McDonough Marine. . . .  No deficiencies observed."  JX-0547 (QAR #389 at 1-2); *see also, e.g.*, JX-0917 (QAR #759 at 2); JX-1107 (QAR #949 at 2); JX-1157 (QAR #999 at 2); (JX-0629 (QAR #471 (remediation of bank) at 12-13); JX-0641 (QAR #483 (remediation of bank) at 2).

178.    WGI compacted the backfilled RECAP excavations during placement operations by track walking with a dozer.  JX-1364 (Technical Completion Report at 19); Rogers Report at 107.

179.    At the end of the remediation process for each site, WGI drafted No Further Action At This Time ("NFAATT") reports on behalf of the Corps to submit to the LDEQ for approval.  *See, e.g.*, JX-0118 (NFAATT Submittal Rep. – Saucer Marine, May 2003); JX-0122 (NFAATT Submittal Rep. – Boland Marine, June 2005).  The NFAATT report "documents the remediation of [each site] by WGI in accordance with LDEQ and USACE accepted plans and procedures for a non-industrial exposure scenario and for protection of groundwater under RECAP."  JX-0118 (NFAATT Submittal Rep. – Saucer Marine at 9).

180.    For Saucer Marine, the NFAATT describes "the sixteen areas that were remediated on [that site], their applicable boreholes or bank locations that were excavated, the dates they were excavated, the dimensions . . . of each of the excavations, and the calculated excavated volume of each of the areas in cubic yards."  Guillory Dep. II at 195:16-196:2.

181.    Per the Corps' directives at the preparatory meeting, the NFAATT also included an "Excavation Log," which documented the location, size and amount of backfill used for each excavation on the site.  See JX-0118 (NFAATT Submittal Rep. – Saucer Marine at 49-75); Guillory Dep. II at 196:6-197:6; see also JX-0122 (NFAATT Submittal Rep. – Boland Marine at 45-72).  WGI and the Corps signed each excavation log as field work was completed.  *See* JX-0118 (NFAATT Submittal Rep. – Saucer Marine at 49-75); JX-0122 (NFAATT Submittal Rep. – Boland Marine at 45-72); Guillory Dep. II at 196:6-197:12, 201:23-202:9.

182.    After the NFAATT for a particular site was reviewed and approved by the Corps and then LDEQ, the LDEQ sent the Corps a letter verifying that the site "needs no further action at this time, which is a clean bill of health for that particular site."  Guillory Dep. II at 194:8-20; JX-1364 (Technical Completion Rep. at 1-22).

<u>ACM Excavations at Boland Marine</u>

183.    During demolition activities on Boland Marine, WGI discovered shallow, subsurface deposits of transite or Asbestos Containing Material ("ACM") that needed to be removed.  Accordingly, on August 6, 2001, the Corps issued a separate Statement of Work that required WGI to subcontract with a licensed asbestos abatement subcontractor to have the transite on Boland Marine removed.  JX-0058 (SOW, No. 10 ).  WGI and the Corps subsequently negotiated Modification No. 10 to Task Order 26.  *See* JX-1275 (WGI Proposal #113, Sept. 24, 2001 (Revised)); JX-1267 (USACE Technical Analysis of WGI Proposal #113); JX-0058 (Task Order 26 Mod. # 10).  The Final Revised Proposal, as approved by the Corps, indicated that "imported fill may be necessary to backfill" the shallow (average depth two feet) ACM excavations on Boland when native material was unavailable.  *See* JX-1275 (WGI Final Proposal #113 at 6); *see also* JX-0060 (Task Order 26, Mod. No. 12 at WGI000646).

184.    The removal of transite occurred in two phases during Task Order 26.  The first phase was completed in the fall of 2001, in the areas of Boland Marine where access roads and on-site trailers would not be impacted.  The second phase occurred between November 2004 and April 2005 in conjunction with other RECAP excavations on the site.  Silva-Tulla Rep. at 14-15; Supplemental Report, Corrected App. B, Fig. 4 (showing maximum extent of proposed ACM excavations).

185. WGI used <u>both</u> imported river sand and clay from borrow pit to backfill ACM excavations on the Boland Marine site. *See, e.g.,* JX-0337-0397 (QARs 179-239). The backfill was compacted by track walking with a bulldozer. All such excavation activity was monitored and approved by the Corps on daily basis. *Id.* The importation of any river sand similarly was tracked by WGI and approved by the Corps on a daily basis. *Id.*

<u>The USACE Sought Advice from its Geotechnical Branch for Excavations Under Surekote Road at McDonough Marine</u>

186. As part of its remediation effort and in accordance with RECAP procedures, in late 2004, WGI excavated a contamination "hot spot" directly beneath Surekote Road at the McDonough Marine site. Surekote Road was approximately 24 or 25 feet wide and located roughly 15 to 20 feet west of the floodwall bordering the eastside of the EBIA. *See* JX-1285 (Memo. for Constr. Div., Geotech. Stability Analysis at 4); *see also* Guillory Dep. II at 161:18-162:1.

187. The initial plans for removing the contaminants beneath Surekote Road were described in the January 2002 McDonough Marine Corrective Action Plan ("CAP"). JX-0113 (RECAP CAP – McDonough Marine, Jan. 2002 at 14-15, 23, 37-38). The CAP was substantively reviewed and approved by the Corps. JX-0110 (Transmittal and Cmts., RECAP CAP – McDonough Marine, Feb. 26, 2002); Guillory Dep. II at 190:14-15.

188. Due to concerns relating to the impact of excavation Area 2 of the Surekote Road excavations on the levees and floodwalls, in April 2002, Mr. Guillory requested that the Corps' Engineering Division conduct a stability analysis for the excavation. JX-1285 (Memo. for Eng'g Div., Geotech. Stability Analysis at 2); Guillory Dep. II at 153:17-20, 156:7-13, 158:3-18.

189.    The Corps' Geotechnical Branch performed the analysis and found that the

Surekote Road excavation "did not present a stability problem" for the nearby levees and

floodwalls.  JX-1285 (Memo. for Constr. Div., Geotech. Stability Analysis at 1).  At Mr.

Guillory's request, the Geotechnical Branch also provided specific guidance to the Corps'

Construction Division for backfilling and compacting the excavation under Surekote Road.

JX-1107 (QAR #949 at 2); JX-1350 (Monthly Photo Log, Nov. 29, 2004); Guillory Dep. II at

178:20-181:25.

190.    In a follow-up inspection in the Fall of 2004 for remediation under Surekote

Road, the Corps' QA Inspector reported:  "Assured compacted backfill placed in eight-inch

lifts with each lift given four passes with the dozer.  Observed semi-compacted backfill placed

in remaining excavation with the PC270 excavator and compacted . . . .  No deficiencies

observed."  JX-1107 (QAR #949 at 2); JX-1350 (Monthly Photo Log, Nov. 29, 2004);

Guillory Dep. II at 178:20-181:25.

191.    The Corps acknowledged that WGI's work on the Surekote Road excavations

was consistent with the specifications recommended by the Corps' Geotechnical Engineering

Branch.  Guillory Dep. II at 178:9-19.  In November 2004, the Corps formally approved the

measurements and backfill of these excavations.  JX-0105 (NFAATT Submittal Rep. –

McDonough Marine, Dec. 2004 at 66-67).

### G.    Removal of Utility Lines Crossing the Floodwall

192.    WGI also was tasked with removing utility lines (both water and gas) that

crossed the floodwall.  Plans indicated that there was a 6-inch water line and 3-inch gas line

on Boland Marine, located more than 400 feet from the south edge of the North breach.  Silva-

Tulla Rep., App. B, Fig. 7.  There also was a 6-inch water line and 2 or 3 inch gas line at the

Saucer Marine site.  *Id.,* Fig. 8.  Similar utilities lines also are indicated at the Indian Towing,

ITT, Mayer Yacht and McDonough Marine sites.  *Id.*, Fig. 12.  A sewer line also was to be removed at Mayer Yacht.  JX-0846 (QAR #688).

193.    The work plan for removing these utility lines was discussed with the USACE during a Preparatory Phase meeting on September 4, 2003.  *Id.*  The plan required WGI to, among other things, excavate the lines and remove the concrete encasement around the pipes; and then break and cap the line approximately 3 feet from floodwall.  "Where the line is to be capped the trench should not exceed 2 feet in depth."  *Id.*  Material to backfill the resulting trench will be placed in one-foot lifts and compacted.  *Id.*  Native clayey soils from the EBIA (either borrow pit or spoils from excavations) were used as backfill material.  Lucia Rep. at 40 (citing discussion with L. Guillory).

194.    The USACE's QAR confirms that WGI properly removed the abandoned utilities at Saucer Marine and other sites, and backfilled and compacted "the shallow trench in 1' lifts" using a BH-310 rubber tired backhoe and D41p dozer.  JX-0848 (QAR 690).  The USACE "[a]ssured shallow trench [was] adequately compacted."  *Id.*; *See* JX-1338 (Photographs WGI016081-83 (Saucer Marine)); JX-1339 (WGI016098 (Indian Towing; Boland Marine)); *Id. at* WGI016103-04 (Boland Marine; Mayer Yacht).

**H.    Close Out of EBIA Work Site**

195.    In 2004, years after WGI concluded excavations at the sewer lift station and the wedding cake structure, Hurricane Ivan flooded the EBIA work site up to the "base of the concrete portion of the floodwall."  Guillory Dep. II at 173:4-175:1.  After the hurricane, the USACE inspected the protected side of the floodwall along the EBIA and did not detect any visible signs of damage to the levees and floodwalls.  Guillory Dep. II at 173:4-175:1.

196.    Mr. Montegut, Mr. Guillory, Mr. John Weatherly (Corps –Tulsa Div.), Mr. Bobby Smith (WGI Field Supervisor) and Mr. Rick Hedrick (Corps –Tulsa Div.) conducted a

final site visit and inspection of the EBIA on May 26, 2005.  JX-1298 (Letter from J. Montegut, May 26, 2005); *see also* Guillory Dep. II at 204:19-205:9.  On that day, all field operations officially concluded and Mr. Montegut declared Task Order 26 substantially complete.  JX-1298 (Letter from J. Montegut, May 26, 2005).  The significance of "substantial completion" of the contract "is that it stops the time, and [the USACE] declared the contract physically complete."  Guillory Dep. II at 30:3-17.

197.    After WGI left the EBIA site on May 26, 2005, the Corps continued to visit the EBIA in connection with the next phase of the Lock Replacement Project.  *See, e.g*., JX-1300 (Email from J. Agan, Aug. 9, 2005 at 1-2).

198.    With the final inspection finished, WGI worked on its "final deliverable" under the contract, the Technical Completion Report, which is "a summary report to roll-up all definable features of work that occurred on the project."  Guillory Dep. II at 30:18-24; Guillory Dep. II at 207:16-208:3.  WGI submitted a draft of the report for the Corps' review and comment in July 2005, and the USACE approved it on August 23, 2005.  JX-1364 (Technical Completion Rep.); Guillory Dep. II at 30:18-24, 208:12-209:1.

## VII.   HURRICANE KATRINA

199.    Hurricane Katrina hit Miami, Florida on August 25, 2005, as a Category 1 hurricane on the Saffir Simpson scale.  *See* Uncontested Fact No. 65.  After crossing the southern tip of Florida, it entered the Gulf of Mexico on August 26, where, under favorable conditions, it exploded into a Category 5 hurricane.  Uncontested Fact No. 66.

200.    Hurricane Katrina peaked in intensity the afternoon of August 28, 2005, with maximum sustained surface winds of 175 miles per hour; hurricane force winds extending 100 miles from its center; and tropical force winds extending 225 miles from its center.

Uncontested Fact No. 67.  On August 28, 2005, Hurricane Katrina's central pressure fell to 902 mb, at the time the fourth lowest on record in the Atlantic basin.  Uncontested Fact No. 68.

201.    When Hurricane Katrina made landfall to the east of New Orleans at Buras, Louisiana, at 6:10 a.m. on August 29, 2005, it was a massive Category 3 hurricane, with winds about 125 miles per hour.  Uncontested Fact No. 69.  Hurricane Katrina generated the largest storm surge elevations in the history of the United States.  Uncontested Fact No. 70.

202.    The massive storm surge produced by Katrina, even though it had weakened from a Category 5 intensity the previous day to Category 3 at landfall in Louisiana, can be generally explained by the huge size of the storm.  Uncontested Fact No. 71.

203.    Storm surge is a wind driven process: the wind puts energy into the sea surface through the waves and currents. The greater the wind, the greater the storm surge will be. Uncontested Fact No. 72.

204.    The following table shows the dates, times, and elevations from each of the Lockmasters' readings at the IHNC Lock from August 28, 2005 at 3:00 a.m. to August 30, 2005 at 7:00 a.m. converted to NAVD88(2004.65).  Uncontested Fact No. 1.

| DATE | TIME | ELEVATION IN FEET - NAVD88 (2004.65) |
|---|---|---|
| 8/28/2005 | 3:00 A.M. | 1.4 |
| 8/28/2005 | 6:00 A.M. | 2.1 |
| 8/28/2005 | 3:00 P.M. | 4.3 |
| 8/28/2005 | 4:00 P.M. | 4.3 |
| 8/28/2005 | 5:00 P.M. | 4.5 |
| 8/28/2005 | 6:00 P.M. | 4.5 |
| 8/28/2005 | 7:00 P.M. | 4.5 |
| 8/28/2005 | 8:00 P.M. | 4.8 |
| 8/28/2005 | 9:00 P.M. | 4.9 |
| 8/28/2005 | 10:00 P.M. | 5.0 |
| 8/28/2005 | 11:00 P.M. | 5.7 |
| 8/29/2005 | 12:00 A.M. | 6.3 |
| 8/29/2005 | 1:00 A.M. | 7.1 |

52

| | | |
|---|---|---|
| 8/29/2005 | 2:00 A.M. | 7.3 |
| 8/29/2005 | 3:00 A.M. | 8.1 |
| 8/29/2005 | 4:00 A.M. | 9.3 |
| 8/29/2005 | 5:00 A.M. | 10.3 |
| 8/29/2005 | 6:00 A.M. | 11.3 |
| 8/29/2005 | 7:00 A.M. | 12.3 |
| 8/29/2005 | 8:00 A.M. | 13.8 |
| 8/29/2005 | 9:00 A.M. | 14.3 |
| 8/29/2005 | 10:00 A.M. | 12.3 |
| 8/29/2005 | 11:00 A.M. | 11.7 |
| 8/29/2005 | 12:00 P.M. | 11.4 |
| 8/29/2005 | 1:00 P.M. | 10.1 |
| 8/29/2005 | 2:00 P.M. | 9.3 |
| 8/29/2005 | 3:00 P.M. | 7.4 |
| 8/29/2005 | 11:00 P.M. | 4.8 |
| 8/30/2005 | 7:00 A.M. | 3.5 |

205. As Hurricane Katrina made landfall on August 29, 2005, and moved inland, its winds rotated counter clockwise as all tropical cyclones do in the northern hemisphere. Uncontested Fact No. 3.

206. An area within the northwest quadrant of a hurricane's wind field will experience winds blowing from a north, north easterly direction prior to the passage of the eye past that area. Uncontested Fact No. 4

207. Wind speeds at 1020-1022 Charbonnet St., New Orleans, increased over time in the early morning hours of August 29, 2005, peaking at 7:15am with sustained 1 minute winds of 81 mph. Uncontested Fact No. 5.

208. From 4:00am until at least 7:00am on August 29, 2005, prevailing winds in the area of 1020-1022 Charbonnet St., New Orleans, were out of the north northeast. Uncontested Fact No. 6.

209. Prevailing winds in the area of 1020-1022 Charbonnet St., New Orleans, did not blow out of the WNW before 10:00am on August 29, 2005. Uncontested Fact No. 7.

210.     Wind speeds at 4016 Hamlet St., Chalmette, increased over time in the early morning hours of August 29, 2005, peaking at 7:15am with sustained 1 minute winds of 83 mph.  Uncontested Fact No. 8.

211.     From 4:00am until at least 7:00am on August 29, 2005, prevailing winds in the area of 4016 Hamlet St., Chalmette, were out of the north northeast.  Uncontested Fact No. 9.

212.     Prevailing winds in the area of 4016 Hamlet St., Chalmette, did not blow out of the WNW before 10:00am on August 29, 2005.  Uncontested Fact No. 10.

213.     Wind speeds at 1910-1910 1/2 Charbonnet St., New Orleans, increased over time in the early morning hours of August 29, 2005, peaking at 7:15am with sustained 1 minute winds of 81 mph.  Uncontested Fact No. 11.

214.     From 4:00am until at least 7:00am on August 29, 2005, prevailing winds in the area of 1910-1910 1/2 Charbonnet St., New Orleans, were out of the north northeast.  Uncontested Fact No. 12.

215.     Prevailing winds in the area of 1910-1910 1/2 Charbonnet St., New Orleans, did not blow out of the WNW before 10:00am on August 29, 2005.  Uncontested Fact No. 13.

216.     Wind speeds at 4924 St. Claude Ave., New Orleans, increased over time in the early morning hours of August 29, 2005, peaking at 7:15am with sustained 1 minute winds of 80 mph.  Uncontested Fact No. 14.

217.     From 4:00am until at least 7:00am on August 29, 2005, prevailing winds in the area of 4924 St. Claude Ave., New Orleans, were out of the north northeast.  Uncontested Fact No. 15.

218.     Prevailing winds in the area of 4924 St. Claude Ave., New Orleans, did not blow out of the WNW before 10:00am on August 29, 2005.  Uncontested Fact No. 16.

219.    Wind speeds at 1205 Perrin Dr., Arabi, increased over time in the early morning hours of August 29, 2005, peaking at 7:15am with sustained 1 minute winds of 82 mph.  Uncontested Fact No. 17.

220.    From 4:00am until at least 7:00am on August 29, 2005, prevailing winds in the area of 1205 Perrin Dr., Arabi, were out of the north northeast.  Uncontested Fact No. 18.

221.    Prevailing winds in the area of 1205 Perrin Dr., Arabi, did not blow out of the WNW before 10:00am on August 29, 2005.  Uncontested Fact No. 19.

222.    Between 4:00am and 7:00am on August 29, 2005, 3 second peak wind gusts were higher than one minute sustained winds in the Lower Ninth Ward.  Uncontested Fact No. 20.

## VIII.   THE BREACHES ON THE EASTSIDE OF THE IHNC

223.    Two breaches occurred in the levee/floodwall protection system at the EBIA during Hurricane Katrina: the "North Breach" and the "South Breach."  Uncontested Fact No. 73.

224.    The North Breach occurred along the Boland Marine parcel of the EBIA and resulted in a 180-foot gap in the floodwall.  Uncontested Fact No. 74.  The floodwall failed at approximately 6:00 a.m. on August 29, 2005.  Dalrymple Rep. at 6, 63.

225.    The South Breach occurred along the Saucer Marine parcel of the EBIA and resulted in a 793-foot gap in the floodwall.  Uncontested Fact No. 75.  The floodwall failed at approximately 7:00 a.m. on August 29, 2005.  Dalrymple Rep. at 5, 63.

226.    The floodwall along the ITT, Mayer Yacht, Indian Towing and McDonough Marine parcels of the EBIA did not breach, despite the fact that WGI performed excavation and backfill operations during Task Order 26 on these sites.  *See* Uncontested Fact Nos. 60-64

(WGI performed excavations to remove utility lines and contaminated soil, grid trenching operations, piling removals and building demolition/removal on all six sites in the EBIA).

227.    The Borrow Pit in the McDonough Marine parcel, the largest excavation (by volume) performed by WGI, was  never backfilled at all.

## IX.    THE EBIA FLOOD PROTECTION SYSTEM

228.    The levee and floodwall protection system at the EBIA extends south from the Florida Avenue Bridge to the N. Claiborne Avenue Bridge.  Earthen levees were first constructed on both sides of the IHNC, most likely in the 1920s and 1930s, to protect the Upper and Lower Ninth Ward neighborhoods from flooding.  Silva-Tulla Rep. at 10-11.

229.    The original floodwall at the EBIA was built in the 1960s.  The sheetpile of the original floodwall at the location of the North Breach extended to an elevation of -11.3 feet NAVD88(2004.65) and a depth of 17.3 feet below ground surface.  The sheetpile of the original floodwall at the location of the South Breach extended to an elevation of -10.9 feet NAVD88(2004.65) and a depth of 16.3 feet below ground surface.  JX-1687 (WINK, Inc. Surey & Map of Survey, EBIA (2005)); JX-1698 (USACE IHNC Lock to Florida Ave., Levee & Floodwall Capping (1969)); JX-1925 (OLD Surveyor's Field Notes for Survey of IHNC East Bank Levee & Floodwall between IHNC Locks & MRGO Levee (July 12, 1999)); Silva-Tulla Testimony.

230.    Between 1982 and 1984, 22 feet of the original floodwall was removed at Boland Marine, north of Station 55+97.4, beginning at the location of the north end of the North Breach.  The original floodwall in that location was replaced with a new sheet piling and concrete cap floodwall.  The new floodwall attached to the existing floodwall near the most northern point of Boland Marine.  Silva-Tulla Rep. at 10, 60-62, 64; Brad James Rep.;

56

Silva-Tulla Testimony.  The sheetpile of the new floodwall extended to an elevation of -25.99 feet NAVD88(2004.65) and a depth of 31.6 feet below ground surface.  JX-1687 (WINK, Inc. Surey & Map of Survey, EBIA (2005)); JX-1698 (USACE IHNC Lock to Florida Ave., Levee & Floodwall Capping (1969)); JX-1925 (OLD Surveyor's Field Notes for Survey of IHNC East Bank Levee & Floodwall between IHNC Locks & MRGO Levee (July 12, 1999)); Silva-Tulla Testimony.

231.    After Katrina it was discovered that there was a faulty weld approximately 17 inches from the connection between the sheetpile of the newer 1980s floodwall and the sheetpile of the original 1960s floodwall.  Silva-Tulla Rep. at 10; Silva-Tulla Testimony; DX-02064 (LNA001155).  WGI had no involvement in, or pre-Katrina knowledge about, the installation of these sheetpiles.

232.    The floodwall heights along the EBIA between Florida and Claiborne Avenues were not uniform when Hurricane Katrina made landfall in New Orleans.  The lowest top-of-floodwall elevation was +11.3 ft NAVD88(2004.65) and included the section of the floodwall that failed at the location of the North Breach, which failed first.  The second lowest top-of-floodwall elevation was +12.1 ft NAVD88(2004.65) and included the section of the floodwall that failed at the location of the South Breach, which failed second.  Silva-Tulla Rep. at 10-11; Stephen King Testimony; JX-1925 (1999 Orleans Levee District Survey, 7/12/99).

## X.    JOINT SOILS INVESTIGATION

233.    At the Court's direction, the parties conducted a Joint Soils Investigation at the EBIA during the summer and fall of 2011.  The Joint Soils Investigation was performed to ensure that the testing necessary to support the parties' geotechnical expert reports proceeded efficiently, to minimize any disputes regarding the methodologies employed for testing, and to

enable all parties to share jointly in the results (and the costs) of the final program.  March 17, 2011 Scheduling Order, Rec. Doc. 20200.

234.    The parties chose Fugro Consulting, Inc., to perform the parties' Joint Soils Investigation at the EBIA and the corresponding laboratory testing.  Each party identified the field and laboratory work that it believed was necessary to provide its experts with sufficient data to reach their opinions.  Field testing included soil borings, vibrating wire piezometers installed in selected borings, piezo-cone penetrometer tests (CPTs), vane shear tests (VSTs), standpipe piezometers installed in selected borings, and control and observation wells at four pumping test locations.  Uncontested Fact No. 76.

235.    Field work began on or about June 21, 2011, and was completed on November 3, 2011.  Fugro provided interim information to the parties' experts as the work progressed.  All told, the joint soils investigation involved over 30 personnel from Fugro, the Plaintiffs' expert team, and the Defendants' expert team, as well as oversight from the parties' legal counsel.  Uncontested Fact  No. 77.

236.    Plaintiffs intended to conduct pumping tests at three locations—the EBIA South Site, the School Site, and the Railroad Site—but discovered that the Railroad Site was much more disturbed (with trash and debris) than had been anticipated.  Uncontested Fact No. 79.

237.    Plaintiffs' EBIA South Site pumping wells were located immediately north of the Claiborne Avenue Bridge ramp and just south of the EBIA.  Uncontested Fact No. 80.

238.    Plaintiffs' School Site was located in a park in the Lower Ninth Ward adjacent to North Rocheblave Street and over a third of a mile east of the EBIA.  Rogers Rep. at 190-91.

239.    Plaintiffs' Railroad Site was located north of Florida Avenue and over a third of a mile east of the EBIA.  The Railroad Site contained too many buried obstacles to install control and observation wells for pumping test purposes, and it was abandoned by the Plaintiffs.  Uncontested Fact No. 81.

240.    Plaintiffs' pumping tests were conducted at sites that the Plaintiffs decided were most relevant to their analysis of the EBIA floodwall failures.  The pumping tests were conducted to determine site-specific properties for the soil layers that Dr. Robert Bea claims contributed to the floodwall failures at the EBIA (hereinafter the "organic clays" or "organic clay layer").  Uncontested Fact No. 82; Bea Dep. II at 163:3-11; Bea Dep. III at 11:5-14.

241.    Plaintiffs' expert Dr. J. David Rogers and Kevin Pope, along with Dr. Rune Storesund, oversaw the Plaintiffs' pumping tests.  Mr. Pope evaluated the results from the pumping tests using accepted scientific methods and provided those results to Dr. Rogers, who then provided the results to Dr. Bea for use in his analyses.  Dr. Rogers used Mr. Pope's evaluation of the Plaintiffs' pumping test results to develop the EBIA site characterization that Dr. Bea relied on to conduct his analyses.  Uncontested Fact No. 83; Bea Dep. I at 80:14-18; Bea Dep. III at 11:1-20.

242.    Defendants chose to conduct pumping tests at two locations: the EBIA North Breach Site and the EBIA South Breach Site.

243.    Defendants' EBIA North Breach Site was located between the "wedding cake" excavation and the North Breach at Boland Marine.  Uncontested Fact No. 84.

244.    Defendants' EBIA South Breach Site was located adjacent to the South Breach at Saucer Marine and within the footprint of the temporary levee that was constructed in that location immediately after Hurricane Katrina. Uncontested Fact No. 85.

245.    A total of twelve (12) observation wells (six deep and six shallow) were installed around the pumping well at each of the parties' pumping test sites.  Slug tests were performed at each of the wells during the development process.  Fugro performed pumping tests at each site as directed by the experts for the parties that selected the site.  Uncontested Material Fact No. 86.

246.    Fugro documented the results of its field work in a report provided at the conclusion of its work. Uncontested Fact No. 78.

## XI.    RESULTS OF THE JOINT SOILS INVESTIGATION: EBIA GEOMETRY, PERMEABILITY & COMPRESSIBILITY

### A.  Geometry

247.    The EBIA subsurface soils are characterized primarily by natural and fill clay materials that were deposited by the Mississippi River delta system.  Silva-Tulla Rep., Appendix D at 7; Silva-Tulla Testimony.

248.    Based on historic information and the results of the Joint Soils Investigation, the primary stratigraphic units at the Defendants' EBIA hydrogeologic test sites are defined as follows, from the surface down: (1) excavation backfill consisting of material used by WGI to backfill the excavations it performed during Task Order 26; (2) fat clay, lean clay and silt associated with levee construction; (3) upper and lower organic clay; (4) interdistributary clay, or fat clay with silt layers; and (5) sand.  Silva-Tulla Rep. at 34-36, Figs. IV-3 & IV-4; Silva-Tulla Rep., Appendix D at 7; Silva-Tulla Testimony.

249.    The upper and lower organic clay layers are located as shallow as 3 feet below ground surface and extend as deep as 24 feet below ground surface.  The layers are characterized by elevated water content values, and they contain localized and clay-encapsulated wood fragments and organic material.  The organic clay layers were tested and

classified in accordance with ASTM D-2487, the "Standard Classification of Soils for Engineering Purposes (Unified Soil Classification System)."  Silva-Tulla Rep. at 34-35 & Appendix D at 7; Silva-Tulla Testimony.

250.    Utilizing ASTM D-2487, Fugro classified the soil layer that Dr. Bea believes was implicated in the floodwall failures at the EBIA as an "organic clay layer."  JX-1951 (Geotechnical Data Report, IHNC-EBIA, Fugro Consultants, Inc.).

251.    The soils classification standard ASTM D-2487 was required by the Joint Soils Investigation and was agreed to by the Plaintiffs.  DX-02453 (Agreement with Fugro Consultants, Inc, 6/20/11, at 4: "'Full Soil Classification Tests', where assigned by the Experts . . . will be performed utilizing the appropriate test procedures, including ASTM D 2487 . . . .").

**B.  Permeability/Hydraulic Conductivity**

252.    Hydraulic conductivity describes the ease with which water moves through a material such as soil.  Geotechnical engineers routinely use the term "permeability" to refer to the hydraulic conductivity of a soil.  Silva-Tulla Testimony.

253.    The permeability of a soil is a material property of that soil.  Geotechnical engineers can determine the material property of a soil scientifically. Bea Dep. III at 8:6-13, 9:12-20.

254.    One purpose of the parties' pumping tests during the Joint Soils Investigation was to determine the permeability of the organic clay layers that Dr. Bea believes were implicated in the floodwall failures at the EBIA.  Bea Dep. III at 11:9-14.

255.    Pumping tests are designed to measure the hydraulic properties of an aquifer system.  An aquifer is an underground layer of permeable rock, sediment or soil from which

groundwater can be extracted.  Under typical pumping test conditions, aquifers can yield

enough water to fill a 4-inch diameter pipe to capacity and provide a water supply for entire

communities.  The pumping tests performed during the Joint Soils Investigation barely

produced enough water to fill a 0.17-inch (inside diameter) plastic hose, and even then not to

capacity.  The relatively low hydraulic conductivity of the soils around the control well

collection zones resulted in pumping and recovery times that were uncharacteristically long,

up to one month each time a well was developed.  Silva-Tulla Rep. at 41-42; Silva-Tulla

Testimony.

256.    Notwithstanding the low water yields and prolonged pumping and recovery

times, the pumping tests at the EBIA produced results that agreed well with the corresponding

slug tests and laboratory tests.  Silva-Tulla Rep. at 43; Silva-Tulla Testimony.

257.    Dr. Rogers, along with Mr. Pope, used standard scientific methods to evaluate

results from the pumping tests at the sites selected by the Plaintiffs' expert team in connection

with the Joint Soils Investigation.  Bea Dep. III at 11:1-14; Rogers Dep. I at 278:8-281:10.

258.    Dr. Bea included in his expert report the information that Dr. Rogers and Kevin

Pope developed from the Plaintiffs' pumping tests.  Bea Dep., Vol. 3, at 9:21-24, 11:9-20.

259.    Dr. Rogers's and Mr. Pope's analyses of the Plaintiffs' pumping tests

determined that the best estimate permeability/hydraulic conductivity of the organic clays at

the EBIA is **$1 \times 10^{-5}$ cm/s.**  Bea Dep. III at 25:15-20.

260.    The best estimate permeability/hydraulic conductivity value for the EBIA

organic clays, as determined from all of the parties' tests conducted during the Joint Soils

Investigation, is **$1 \times 10^{-5}$ cm/s.** Uncontested Fact No. 87; Bea Rep., Appendix C, at 1.

261.    Prior to this case, Dr. Bea posited three different permeability values for the EBIA organic clay layer, none of which are consistent with the permeability results from the Plaintiffs' own pumping tests during the Joint Soils Investigation.    *See infra.*

262.    The ILIT report, for which Dr. Bea served as a co-sponsor/co-author, initially estimated the permeability of the EBIA organic clay to be **$1 \times 10^{-2}$ cm/s**.  DX-1546 (ILIT Report, at 6-21 (2006)); Bea Dep. I at 151:25-152:20.  That permeability value is 1,000 times higher than the **$1 \times 10^{-5}$ cm/s** permeability value Dr. Bea is estimating in this case.  Silva-Tulla Testimony.  The IPET Report criticized ILIT's permeability value and estimated that the range of permeability for the organic clay layer was between **$1 \times 10^{-5}$ cm/s** and **$1 \times 10^{-8}$ cm/s.**  DX-01540 (IPET Report, Volume V, Chapter 17, at 17-17 (draft was published in 2006, final was published in 2009)).

263.    In the *Robinson* litigation, Dr. Bea opined that the permeability of the EBIA organic clay layer was **$1 \times 10^{-3}$ cm/s**.  Bea Dep. I at 161:11-24; DX-01577 (Bea Declaration in *Robinson*, January 29, 2009, at 132, ¶182).  That permeability value is 100 times higher than the **$1 \times 10^{-5}$ cm/s** permeability value Dr. Bea is estimating in this case.  Silva-Tulla Testimony.

264.    In the BARGE litigation, Dr. Bea testified that his best estimate for the permeability of the organic clay layer was **$1 \times 10^{-4}$ cm/s.**  Dr. Bea's permeability estimate in BARGE was 10 times higher than the permeability value he is estimating in this case.  DX-01590 (BARGE Transcript, 7/8/2010, at 2733:2; 2737:9-11); Bea Dep. I at 128:25-129:5, 129:17-22.

265.    Although Dr. Bea's estimates for the permeability of the EBIA organic clay layer have changed dramatically over time, these changes have had no impact on his opinion that underseepage and uplift pressures contributed to the North and South Breaches because

he considers pressure transmission to be independent of permeability.  Bea Dep. I at 161:10-163:7.

## C. Compressibility

266.    Compressibility is a measure of a soil's relative volume change as a response to a change in effective stress.  When weight or pressure are applied to the soil in such a way that the effective stresses change, the soil grains are rearranged, and the volume of the soil changes.  Dr. Bea appears to be referencing an undrained compressibility where a rapid loading of saturated soil results in zero effective stress change and therefore zero volume change.  Silva-Tulla Testimony.

267.    The same standard scientific methods used by Dr. Rogers and Mr. Pope to evaluate the permeability of the organic clays from the Plaintiffs' pumping tests at the EBIA produced a material soil property called storage coefficient.  Bea Dep. I at 172:24-173:7; Bea Dep. III at 11:21-12:3; Rogers Dep. I at 286:5-12.  Compressibility as a basic hydrogeological parameter is directly related to storage coefficient.  Rogers Dep. I at 286:9-12.

268.    When a qualified geotechnical engineer knows the storage coefficient and corresponding thickness for a particular soil layer, that engineer can use well-recognized mathematical equations to convert storage coefficient to coefficient of volume change, which is commonly represented by the symbol $m_v$.  Bea Dep. III at 12:4-20).

269.    The coefficient of volume change, or $m_v$, reflects a soil's compressibility.  JX-1696 (Lambe & Whitman, *Soil Mechanics* (1960) at 156, Equation 12.12); Silva-Tulla Testimony.  Soil compressibility as reflected in the coefficient of volume change or $m_v$ value is one of the basic parameters required for the flow analyses that all of the parties conducted in this case, including Dr. Bea.  Rogers Dep. I at 285:13-286:4; Cobos-Roa Dep. at 191:6-10. By Dr. Rogers's own admission, the storage coefficient used to compute the coefficient of

64

volume change or $m_v$ value of the EBIA organic clay layer is necessary for a complete site characterization when conducting seepage analyses like the analyses Dr. Bea conducted in this case.  Rogers Dep. I at 294:19-295:3.

270.    Dr. Rogers and Mr. Pope determined that, based on the results of the Plaintiffs' pumping tests during the Joint Soils Investigation, the organic clay layer at the EBIA has an average storage coefficient value of **$5.8 \times 10^{-3}$.**  JX-1998 (Pumping Test Analysis Report, South EBIA South Site).

271.    The storage coefficient value of **$5.8 \times 10^{-3}$** from the Plaintiffs' pumping tests converts to a coefficient of volume change or $m_v$ value of **$2 \times 10^{-5}$ 1/psf** (or in SI units, $5 \times 10^{-4}$ 1/kPa), using the five foot aquifer thickness employed by the Plaintiffs in their calculations, and rounded to one significant digit. Silva-Tulla Testimony.

272.    The Plaintiffs' pumping test results from the Joint Soils Investigation reflecting a coefficient of volume change or $m_v$ value of **$2 \times 10^{-5}$ 1/psf** indicate that the organic clays at the EBIA are compressible.  Silva-Tulla Testimony.

273.    The compressibility values derived from the Defendants' pumping tests performed at the EBIA as part of the Joint Soils Investigation agree well with the compressibility values derived from the Plaintiffs' pumping tests.  Silva-Tulla Rep. at 45, Table IV-2 & IV-3 at 37-38; Silva-Tulla Testimony.

## XII.   DR. BEA'S SEEP/W (SEEPAGE) & SLOPE/W (STABILITY) ANALYSES

274.    Dr. Bea's expert team used a computer program called SEEP/W, published by GEO-SLOPE International, as part of a suite known as GeoStudio, to run Dr. Bea's seepage analyses in this case.  Bea Dep. III at 15:1-8, 16:16-21, 31:11-17.

275.    The SEEP/W program used by Diego Cobos-Roa, on behalf of Dr. Bea in this case, is a two-dimensional ("2D") finite element CAD software product for analyzing groundwater seepage and pore-water pressure dissipation problems within porous materials such as soil and rock.  Its comprehensive formulation allows analyses ranging from simple, saturated steady-state problems to more sophisticated, saturated/unsaturated transient problems. The user must input into the SEEP/W program all of the relevant geometry, soil properties and boundary conditions for each cross-section to be analyzed.  Silva-Tulla Testimony (based on GEO-SLOPE documentation).

276.    Dr. Bea's expert team used a computer program called SLOPE/W, also published by GEO-SLOPE International, to run Dr. Bea's stability analyses in this case.  (Bea Dep., Vol. 3, at 15:1-8, 16:16-21, 31:11-17).

277.    SLOPE/W is a 2D limit equilibrium slope stability CAD software product for computing the factor of safety of earth and rock slopes.  Silva-Tulla Testimony (based on GEO-SLOPE documentation).

278.    Dr. Bea does not have a license or the requisite training and experience to use the SEEP/W or the SLOPE/W software. Bea Dep. II at 177:24-178:4; Bea Dep. III at 13:3-14:25.

279.    Diego Cobos-Roa, a graduate student at the University of California at Berkeley, ran the seepage analyses in SEEP/W and the stability analyses in SLOPE/W that Dr. Bea used to develop his opinions in this case.  Bea Dep. II at 195:12-19; Cobos-Roa Dep. at 226:24-227:8.

280.    Mr. Cobos-Roa is a co-author of Appendix B ("Development of Lower 9th Ward Floodwall Analysis: Cross-Sections"), Appendix C ("Development of Lower 9th Ward

Floodwall Analysis: Soil Characteristics") and Appendix D ("Analysis of Lower 9th Ward

Floodwall Performance During Hurricane Katrina") of Dr. Bea's expert report in this case.

Bea Rep., App. B, C, D; Cobos-Roa Dep. at 99:9-100:13.

281.    Although he did not run the analyses in SEEP/W or SLOPE/W, Dr. Bea—

along with Dr. Rogers and Dr. Rune Storesund—took responsibility for the values, data, and

other inputs that Mr. Cobos-Roa used to run the analyses.  Bea Dep. II at 251:14-23.

282.    In addition to the 2D seepage and slope analyses that he ran, Mr. Cobos-Roa

allegedly conducted three-dimensional ("3D") SEEP/W seepage analyses of the EBIA

floodwall breaches in 2008 and 2009 that Dr. Bea states he relied on to develop his opinions

in this case.  Bea Rep. at 76, 99-101, 133-134.

283.    Mr. Cobos-Roa stored the 3D seepage analyses of the EBIA breaches on his

personal laptop computer hard drive.  The laptop was stolen from Mr. Cobos-Roa's residence

in Albany, California, in the fall of 2009.  In addition to the 3D seepage analyses for the EBIA

breaches, the laptop contained the computer modeling files for all of the analyses that Mr.

Cobos-Roa and Dr. Bea have conducted in connection with Hurricane Katrina, with the

exception of the modeling files from their seepage analyses in this case.  The laptop also

contained various other documents, photographs, videos, and assorted personal items.  Mr.

Cobos-Roa did not report the laptop stolen.  Cobos-Roa Dep. at 181:1-191:5.

284.    Mr. Cobos-Roa stored an additional backup copy of the 3D seepage analyses of

the EBIA breaches on a separate external hard drive.  Also in the fall of 2009, Mr. Cobos-Roa

lost the external hard drive somewhere on campus at the University of California at Berkeley.

In addition to the 3D seepage analyses for the EBIA breaches, the external hard drive

contained the computer modeling files for all of the analyses that Mr. Cobos-Roa and Dr. Bea

have conducted in connection with Hurricane Katrina, with the exception of the modeling files from their seepage analyses in this case. The external hard drive also contained papers, books, coursework, and several other files. Cobos-Roa Dep. at 181:1-191:5.

285.   Sometime before the laptop was stolen and external hard drive was lost, Mr. Cobos-Roa sent a DVD to Dr. Bea containing the input values and input parameters, cross-sections, and other information that was used to run the 3D seepage analyses of the EBIA breaches. Cobos-Roa Dep. at 188:5-189:15.

286.   It would have taken one month to replicate the 3D analyses using the inputs, cross-sections, and other information that Mr. Cobos-Roa sent to Dr. Bea before the laptop was stolen and the external hard drive was lost. Mr. Cobos-Roa was never asked to replicate the 3D analyses, and he did not offer to do so. Cobos-Roa Dep. at 189:16-190:4.

## XIII.   WGI'S WORK DURING TASK ORDER 26 DID NOT CAUSE THE NORTH AND SOUTH BREACHES

287.   There is no evidence that the work performed by WGI during Task Order 26 contributed in any way to the North and South Breaches. The seepage-induced mechanisms that Dr. Bea alleges were exacerbated by WGI's work, including localized "blowouts" or landslides at the toe of the levee on the landside of the levee/floodwall protection system, and uplift pressures acting to reduce the lateral stability of the levee/floodwall protection system, did not occur at the EBIA during Hurricane Katrina. Silva-Tulla Rep. at 45-48; Silva-Tulla Testimony.

### A.   Shear Failure Did Not Cause the EBIA Failures

288.   Shear strength is defined as the degree of shear stress that a soil can endure without failing or experiencing large deformations. Knowledge of a soil's shear strength is

necessary to determine if that soil structure will remain stable under certain conditions.  Silva-Tulla Testimony.

289.    Evidence of shear failure through the EBIA levee foundation soils would have been found if Dr. Bea's alleged seepage-induced mechanisms occurred.  Such evidence would have included misaligned soil profiles, sand boils, or heaving near the toe of such a landslide.  The Joint Soils Investigation at the EBIA did not provide any evidence that a shear failure through the levee foundation soils occurred during Katrina.  All of the soil layers appeared at their expected locations and orientations.  Silva-Tulla Rep. at 45-48; Silva-Tulla Testimony.

290.    Moreover, there is no evidence of large lateral soil displacements associated with a shear failure.  Uninterrupted linear features in the subsurface soils can be traced across both the North and South Breach.  Silva-Tulla Rep. at 45-48; Silva-Tulla Testimony.

291.    The level of safety (Safety Factor) against shear slide that was computed during WGI's geotechnical experts' analyses confirmed that a shear failure through the levee foundation soils did not occur during Hurricane Katrina. Silva-Tulla Rep. at 45-48; Silva-Tulla Testimony.

**B.  Seepage Effects Were Negligible at the EBIA**

292.    The hydraulic properties of the EBIA organic clay layer that were determined from the Joint Soils Investigation indicate that seepage or pore water pressure barely advanced into the land-side subsoils during the approximately 30-hour-long Hurricane Katrina storm surge.  Consequently, during the surge, pore pressures along potential shear failure surfaces in the land side increased by only small amounts, if at all, due to subsurface flow.  Any increase in pore pressures was the result of the loads imposed by the canal water on the canal-side and

landside soils, not the result of subsurface flow or seepage, as Dr. Bea claims.  Silva-Tulla Rep. at 45-48; Silva-Tulla Testimony.

293.    There was a minimum distance of eighty (80) feet between either EBIA breach and the closest WGI excavation deeper than five feet.  Silva-Tulla Rep. at 48.  The deepest excavations performed during Task Order 26 were even farther away from the breaches.  Taking into account the negligible seepage that occurred during the Hurricane Katrina storm surge, there is no evidence that WGI's excavations had any impact on the North and South Breaches.  Silva-Tulla Rep. at 45-48; Silva-Tulla Testimony.

294.    The type of material used by WGI to backfill the excavations during Task Order 26 had no effect on the North or South Breach failures.  WGI's geotechnical expert analyzed the EBIA failures using three types of backfill: (1) in situ backfill material (e.g., material from the borrow pit); (2) sand backfill; and (3) no backfill at all.   In each scenario, it was determined that WGI's excavations did not contribute to the EBIA failures.  Therefore, even if the excavations performed by WGI were left open after Task Order 26 and never backfilled, the excavations would not have contributed to the North or South Breach.  Silva-Tulla Rep. at 47-48; Silva-Tulla Testimony.  The best proof of this is the Borrow Pit area, the largest volume excavation perform by WGI during the entire project.  While the Borrow Pit was never backfilled, the floodwall opposite the unfilled excavation did not fail.

295.    The pressure of the canal water against the floodwall at either breach represents a more significant threat to the stability of the floodwall than water flowing through any of the excavations that WGI performed during Task Order 26.  Silva-Tulla Rep. at 47-48; Silva-Tulla Testimony.

**XIV.  DR. BEA'S OPINIONS ARE FUNDAMENTALLY FLAWED AND
UNSUPPORTABLE: EBIA CROSS-SECTIONS**

296.    Dr. Bea's expert team created a series of conceptual, geologic cross-sections to

analyze seepage and global stability performance of the levees and floodwalls at three

locations in the EBIA:  the North Breach (on the Boland Marine site), the South Breach (on

the Saucer Marine site) and the so-called Near Breach (at the borrow pit on the McDonough

Marine site).  Bea Rep., App. B at 1; *id.* Figs 1-3 (showing location s of the cross-sections).

The cross-sections are supposed to "present reasonable representations of the geotechnical and

floodwall conditions that existed at the three analysis sites at the time of Hurricane Katrina."

*Id.* at 3.  Dr. Bea claims these cross-sections "illustrate the processes by which the backfilled

excavations in the EBIA induced and enhanced the geotechnical processes that led to the

development of the North Breach and South Breach."  *Id.*

297.    Dr. Bea's cross-sections are based on fictional excavations that WGI did not

perform in the EBIA during Task Order 26.  The cross-sections further misrepresent the

hydraulic properties of the backfill materials WGI used in the EBIA pre-Katrina.

298.    Mr. Cobos-Roa input the information from Dr. Bea's cross-sections into the

SEEP/W seepage and SLOPE/W stability computer models that support Dr. Bea's opinions

regarding the North and South Breaches.  The cross-sections are a critical input in the

SEEP/W and SLOPE/W computer models and are necessary to demonstrate how and why the

North and South Breaches occurred.  Bea Dep. II at 202:13-203:2; Cobos-Roa Dep. at 144:2-

16.

299.    Dr. Bea did <u>not</u> model in SEEP/W and SLOPE/W, and thus cannot prove, that

any of the excavations that WGI <u>actually</u> performed pre-Katrina in the EBIA, or any

reasonable representation of such excavations, contributed to under-seepage of the flood protection structures bordering the EBIA.

### A. North Breach Case 1 Cross-Sections

300.    Dr. Bea's Case 1-1 and Case 1-2 cross-sections for the North Breach contain a "deep backfilled rectangular" excavation that is located approximately 60 feet from the sheet pile in the vicinity of the North Breach.  Bea Rep., App. B, at 8 & 13, and Figs. 10 & 11.  The alleged excavation is "25 feet wide (direction normal [i.e. perpendicular] to levee alignment) extending west from the toe of the embankment of Surekote Road," and 100 feet long, starting at the north end of the North Breach and extending south.  Bea Rep., App. B, at 8.  Dr. Bea claims that prior to Hurricane Katrina, WGI dug this hole to a depth of 15 to 17 feet below ground surface, and backfilled it with river sand.  Bea Dep. II at 111:2-11, 266:23-268:5; Bea Rep., App. B, Figs. 10 & 11.

301.    There is no pre-Katrina evidence that WGI performed a excavation 25-feet wide, 100-feet long and at least 15-feet deep as described by Dr. Bea in his North Breach Case 1-1 and Case 1-2 cross-sections.  Mr. Cobos-Roa did not verify whether the excavation existed, he has no evidence that WGI performed the excavation, and he does not contend that WGI ever performed the excavation.  Cobos-Roa Dep. at 142:20-144:1, 144:17-145:7, 152:12-15, 178:18-25.  Dr. Bea claimed that he did not "have a complete enough record to trace it."  Bea Dep. II at 113:5-21.  Plaintiffs' site characterization expert, Dr. Rogers similarly admitted that he does not "know what that particular [excavation] is" in Dr. Bea's Case 1 cross-sections.  Rogers Dep. II at 248:13-250:6.  Finally, Plaintiffs' surveying expert, Chad Morris, said he could not tell if there were any pre-Katrina excavations within 50 feet of

the North Breach from looking at post-Katrina aerial photographs:  "I don't think [aerial

photographs] are the proper tool for that."  Morris Dep. at 193:11-194:15.

302.    Dr. Bea also claims that WGI backfilled the excavation in his Case 1 cross-

sections with river sand.  In his Expert Report and during his deposition, Dr. Bea claimed that

the river sand had a permeability of .01 cm/s.  Bea Report, App. C at 2; JX-1412 (Bea Dep.

Ex. 42).  However, in his SEEP/W model for  the North Breach Case 1-1 cross-section, Dr.

Bea assumed that the river-sand backfill was a factor of ten more permeable (.1 cm/s) than he

previously represented was appropriate.  DX-02443 (Silva-Tulla Decl., Apr. 30, 2012).

**B.  North Breach Case 2 Cross Sections**

303.    Dr. Bea's Case 2-1 and Case 2-2 cross-sections for the North Breach contain a

"deep sand and shell fill" layer that "abuts the floodwall at the location of the structural

connection between the 1966 sheet pile wall and the 1980s (deeper) sheet pile wall."  Bea

Rep., App. B at 16, 31, and Figs. 12 & 13.  According to Dr. Bea, the alleged shell fill extends

"from the sheet pile approximately 70 feet toward the IHNC," and "likely tapers upward,

towards the toe of Surekote Road."  Bea Rep., App. B at 16, 31.  Dr. Bea claims that the

"[t]hickness of shell fill at this location is approximately 18 feet measured from the top of

Surekote Road, down to the tip of the sheet pile."  Bea Rep., App. B at 16.  But in his

SEEP/W analysis, Dr. Bea modeled the alleged "shell fill" as having a depth of more than 20

feet.  DX-02443 (Silva-Tulla Decl., Apr. 30, 2012).

304.    Dr. Bea's evidence of this deep, allegedly pervious "shell fill" feature comes

from the 2001 MMG Boring 81A, which shows "fill, shell with silty sand" and "fill, silty sand

and shell" down to a depth of only 16 feet.  JX-1841 (MMG Boring Log for Boreholes 81A,

79A and 77A, Oct. 4, 2001).

305.    MMG Borehole 81 was located (pre-Katrina) at the northeast corner of Boland Marine between Surekote Road and the floodwall, about 24 feet north of the northern edge of the north breach.  JX-1841 (MMG Boring Log for Boreholes 81A, 79A and 77A, 10/4/01); DX-02444 (Boland Marine Borehole Map).  The borehole was uniquely situated relative to the other boreholes along the floodwall because it was drilled into the eastern slope or shoulder of Surekote Road at the same place where the road "traversed up and over" the 1980s floodwall.  Rogers Rep. at 80-82 and Figs. 84 & 86 (indicating "shell fill" was used to build up the "side slopes" of Surekote Road in this area).  For this reason, the ground surface elevation at Borehole 81A was higher than any other location along the floodwall, at approximately +7.85 feet NAVD88(2004.65).  Silva-Tulla Testimony; JX-1706 (IPET Pre-Katrina 3 Ft Interior (Adjusted) Resolution LiDAR Coverage).

306.    Borehole 81A is not representative of soil conditions at the North breach. There were two pre-Katrina MMG Borings that were taken along the actual failure zone at the North breach, borings 79A and 77A.  DX-02444 (Boland Marine Borehole Map).  Both of these borings show "fill, silty sand," "fill, shell with silt," and "fill, shell" down to a maximum depth of only six feet.  JX-1841 (MMG Boring Log for Boreholes 81A, 79A and 77A, 10/4/01).  Despite this evidence, Dr. Bea's two-dimensional flow and stability models assume that the 20-feet deep "shell fill" feature extended infinitely in a north-south direction across the entire length of the North Breach.  DX-02443 (Silva-Tulla Decl., Apr. 30, 2012).

307.    Even if Borehole 81A was representative of soil conditions at the North Breach, there is no evidence that the "shell fill" extended below the sheet pile tip as Dr. Bea posits in his Case 2 cross-sections.  Instead, Borehole 81A indicates that the "shell fill" material went down to approximately 2.4 feet *above* the sheet pile tip of the original 1960s floodwall, and

approximately 19.85 feet *above* the sheet pile tip of the deeper 1980s floodwall (assuming that the sheet piles extended to depths Dr. Bea assumes in his Expert Report).  *See, e.g.,* Bea Rep. at 36, ¶ 39; JX-0006 (Design Mem. No. 4, Fl. Ave Complex, June 1980); JX-1706 (IPET Pre-Katrina 3 Ft Interior (Adjusted) Resolution LiDAR Coverage); Silva-Tulla Testimony.

308.    Dr. Bea modeled the permeability of the "shell fill" in his Case 2 cross-sections as having a value of either 0.01 or $1 \times 10^{-2}$ cm/sec (Case 2-1) or 0.1 or $1 \times 10^{-1}$ cm/s (Case 2-2). DX-02443 (Silva-Tulla Decl., Apr. 30, 2012).  Such high permeability values are consistent with "clean" shell fill, or shell that is not mixed with any sand.  *See, e.g.*, Rogers Dep. II at 245:10-16; Stark Rep. at 140.  But as borings 81A and 79A indicate, the shell fill that Dr. Bea modeled in his North Breach Case 2 cross-sections was *not* clean.  JX-1841 (Boring Logs 81A, 79A).  There were silts and sands mixed in with the shells, which reduces the hydraulic conductivity of the shell fill.  Bea Dep. II 264:14-265:7.  "[I]f you have [shells] with silt and silty sand in it, you're almost starting at a permeability of ten to the minus three or below." Brandon Dep. at 106:2-107:18; Stark Rep. at 140.  Thus, Dr. Bea unjustifiably used permeability values for the "shell fill" in his seepage model that were at least one or two factors of ten (10 to 100 times) more permeable than existed in borehole 81A.

309.    In any event, the "shell fill" found in boring 81A pre-existed WGI's work in the EBIA.  Thus, to the extent the existence of shell fill somehow contributed to the levee failures, it has no bearing on the case against WGI.  Bea Rep., App. B. at 18; Bea Dep. III at 118:11-120:4; Cobos-Roa Dep. at 109:5-12.  Indeed, WGI did not perform excavations anywhere near Borehole 81A during Task Order 26.  Rogers Dep. II at 221:16-224:5.  Nor did WGI backfill any excavations in the EBIA with "shell fill" material.

### C.  South Breach Case 1 Cross-Sections

310.    Dr. Bea's Case 1 cross-sections for the South Breach contain a backfilled excavation located at the "waterside toe" of the levee.  Bea Rep., App. B, at 42 and Figs. 33 & 35.  This alleged excavation is rectangular-shaped, 20 to 25 feet wide (direction perpendicular to levee alignment), and fifty feet long (starting at the north end of the south breach and extending southward).  Bea Rep., App. B, at 35.  The depth of the excavation prior to Hurricane Katrina, according to Dr. Bea, was approximately 18 feet below ground surface.  Bea Rep., App. B, at Figs. 33 & 35; Bea Dep. II at 126:22-127:13.

311.    There is no pre-Katrina evidence that WGI performed a backfilled excavation at the "waterside toe" of the levee with the dimensions described by Dr. Bea in his South Breach Case 1 cross-sections.  Bea Dep. II at 116:3-117:6, 178:18-25.  Mr. Cobos-Roa did not verify whether the excavation was ever performed.  Cobos-Roa Dep. at 170:5-22, 178:18-25.

312.    Dr. Bea identifies four figures in his expert report that he claims are somehow "associated" with the backfilled excavation in his South Breach Case 1 cross-sections: (1) Figure 32a; (2) Figure 32b; (3) Figure 32c; and (4) Figure 34.  Bea Rep., App. B at 35-42.  These figures provide no support for Dr. Bea's backfilled excavation.

313.    Figure 32a shows buildings and foundations that WGI removed on Saucer Marine during Task Order 26.  Bea Rep., App. B at 37.  None of these buildings or foundations were adjacent to the toe of the levee like the alleged backfilled excavation in Dr. Bea's South Breach Case 1 cross sections.  The closest structure to the South Breach—a 5 x 5 foot electrical service box surrounded by four bollards—was more than 50 feet from the floodwall.  JX-0009 (Demolition Design Memo. No. 1, Feb. 1999, at -04192).

314.    Figure 32b shows the proposed RECAP excavations at Saucer Marine as of 2002, before the excavations were performed.  Bea Rep., App. B at 38.  The 2003 NFAATT Report for Saucer Marine, which identifies the locations and depths of the actual, post-remediation RECAP excavations, shows that there were no RECAP excavations performed anywhere near the location for the alleged backfilled excavation in Dr. Bea's South Breach Case 1 cross-sections.  JX-0118 (Excerpt of Saucer Marine NFAATT).  Dr. Bea agrees.  Bea Dep. II at 127:14-128:2.

315.    Figure 32c is a December 18, 2001, map showing grid trenching on Saucer Marine that ran north and south.  Bea Rep., App. B at 39.  The grid trenching map is an attachment to WGI's December 18, 2001 Daily Quality Control Report.  JX-0406 (QAR 248 at -0204).  The USACE's Quality Assurance Report for December 18, 2001, reported that, on that day, the north-south grid trenches on Saucer Marine were 2 feet wide and 5 feet deep, not 18-feet deep and 25 feet wide as described in Dr. Bea's South Breach Case 1-1 and Case 1-2 cross-sections.  JX-0406 (QAR 248 at -0196).   There is no evidence that grid trenches were dug 18-feet deep and 25-feet wide anywhere on Saucer Marine.

316.    Figure 34 is a diagram of a proposed excavation in RECAP Area 5 at Saucer Marine.  Bea Rep., App. B at 41.  Area 5 was more than 190 feet away from the floodwall at the location where Dr. Bea claims the backfilled excavation in his South Breach Case 1-1 and Case 1-2 cross-sections was located.  JX-0406 (QAR 248 at -0204).

D.    **South Breach Case 2 Cross-Sections**

317.    Dr. Bea's Case 2 cross-sections at the South Breach contain a "narrow" backfilled trench adjacent to the floodwall with a maximum depth near the sheet pile of approximately 10 feet below ground surface.  Bea Rep. at 99 and App. B. Figs. 41 & 42.  Dr. Bea claims that this "pipeline abandonment excavation" was associated with WGI's removal

77

of two utility lines—a 6-inch water line and a 2-inch gas line—that once ran through the floodwall at the Saucer Marine site near Station 30+00.  Bea Rep. at 99 and Fig. 69, App. B. at 43-47.  Dr. Bea contends that WGI backfilled the trench with *in situ* clay spoils "with little or no effective compaction," and as a result, the permeability value for the backfill is "5 times larger than the surficial 'undisturbed' clays" at the EBIA.  Bea Rep., App. C at 2.

318.    There is no evidence that the utilities removed by WGI on Saucer Marine resulted in a trench with the dimensions shown in Dr. Bea's South Breach Case 2 cross-sections, or that the trench was backfilled with little or no compaction as Dr. Bea claims.  Dr. Rogers, who Dr. Bea relied on for these Case 2 cross-sections, cannot confirm that the 6-inch water line and the 2-inch gas line were ever removed, and he does not know how the alleged trenches were backfilled.  Rogers Dep. II at 212:21-216:1.

319.    WGI's work plan for removing utility lines crossing the floodwall indicates that the lines were to be broken about 3 feet from the floodwall, and where the lines were to be capped, the trench should not exceed 2 feet in depth.  JX-0846 (QAR 688 at -0343-44).  Material to backfill the resulting trench will be placed in one-foot lifts and compacted.  (*Id.* at -0344).  Daily reports and photographs confirm that the utility trenches at Saucer Marine and other sites were shallow, and did not reach depths of 10 feet.  JX-0848 (QAR 690 at -0398); DX-01513 (WGI Photographs); DX-01524 (WGI Photographs).  WGI removed an abandoned utility line at Saucer Marine and backfilled and compacted "the shallow trench in 1' lifts" using a BH-310 rubber tired backhoe and D41 dozer.  JX-0848 (QAR 690 at -0398).

320.    Further, the backfilled trench in Dr. Bea's South Breach Case 2 cross-sections was modeled in a two-dimensional SEEP/W analyses as a 99 feet wide east-west excavation

that runs infinitely across the entire north-south length of the EBIA. DX-02443 (Silva-Tulla Decl., Apr. 30, 2012).  No such excavation was ever performed by WGI at the EBIA.

### E.  So-Called "Near Breach" Case 1 Cross-Sections

321.    Dr. Bea's "Near Breach" cross-sections run through the borrow pit on the McDonough Marine site at the EBIA.  Bea Rep. at 90.  He claims that the borrow pit was up to 14 feet deep, 75 feet from the floodwall, and not backfilled.  Bea Rep., App. B. at 32.  Dr. Bea claims his analysis of the Near Breach cross-sections proves that the floodwall adjacent to the borrow pit did not fail because:  (1) WGI and the USACE chose the location for the borrow pit due to the "predominately cohesive-clayey soils in this area," and (2) "special attention was given during the EBIA site clearing work to line the walls of this known to-be-flooded excavation with low hydraulic conductivity cohesive soils-clays" to prevent underseepage.  Bea Rep. at 45 & 128, ¶¶  47, 138.

322.    There is no evidence that WGI or the USACE chose the McDonough Marine site for the location of the borrow pit because of the alleged "predominantly cohesive-clayey soils in this area."  Bea Rep. at 45 & 128, Paras. 47, 138.  Rather, WGI and the USACE chose the McDonough Marine site due to its "apparent lack of chemical impact," and lack of obstructions.  JX-0108 (Aug. 2001 RECAP Submittal Report – Borrow Pit).  The parties originally planned to dig the borrow pit on the International Tank Terminal site, "but during drilling a significant number of underground obstructions were discovered that made the area unsuitable."  Id.

323.    There is no evidence that WGI or the USACE lined the borrow pit with clay, or that anyone was concerned about seepage under the floodwall at the location of the borrow pit during Task Order 26.  Dr. Bea "deduced" this fact from his review of assorted photographs—

including a photograph that he admits is not of the borrow pit.  Bea Dep. I at 269:19-270:6;
Bea Rep. at 46, Fig. 25.  Neither WGI's photographs nor the corresponding daily quality
control reports from the field support Dr. Bea's assumption about the borrow pit.  Bea Dep. I
at 271:11-276:7; Bea Dep. II at 14:22-16:14; JX-0555 (Bea Dep. Exs. 24 & 25).

324.    The clay material found in the subsurface soils at the location of the borrow pit
was not unique in the EBIA.  Such material existed throughout the entire EBIA.  JX-0116
(Boland Marine Drilling Report); JX-0108 (Borrow Pit Drilling Report); DX-0121 (Saucer
Marine Drilling Report).

325.    The floodwall adjacent to the borrow pit at McDonough Marine did not fail
because the organic clay layer at that location, like the organic clay layers throughout the
entire EBIA, conducted negligible amounts of subsurface flow during the approximately 30-
hour-long Hurricane Katrina storm surge.  Silva-Tulla Rep. at 45-48; Silva-Tulla Testimony.

## XV.    DR. BEA'S OPINIONS ARE FUNDAMENTALLY FLAWED AND UNSUPPORTABLE: MANIPULATION OF THE COMPRESSIBILITY VALUE

326.    The compressibility value that Dr. Bea and Mr. Cobos-Roa used in their
seepage analyses to support Dr. Bea's opinions in this case is not based in fact.  No known
soil in the world—let alone the EBIA—is as incompressible as Dr. Bea claims the organic
clays to be in his analyses.  Cobos-Roa Dep. at 220:21-221:3.

327.    Dr. Bea and Mr. Cobos-Roa modeled the EBIA organic clays as virtually
incompressible to create the false impression that pore pressures were transmitted almost
immediately through the EBIA organic clay layer during Hurricane Katrina.  Without this
immediate transmission of pore pressures, the seepage-induced mechanisms that Dr. Bea

claims caused the North and South Breach could not have occurred.  Cobos-Roa Dep. at 198:23-200:8.

### A.    Dr. Bea's Fictitious Compressibility Value

328.    Dr. Bea was aware that the Plaintiffs' pumping tests performed during the Joint Soils Investigation produced a storage coefficient value that could be converted to coefficient of volume change, or $m_v$, and used to determine the compressibility of the EBIA organic clay layer.  Bea Dep. III at 11:21-12:20.

329.    Dr. Bea never asked Dr. Rogers for the storage coefficient that was produced by the Plaintiffs' pumping tests: "It never came up.  It was there if they asked for it. Obviously it's there.  If they had asked for it, we would have talked about it.  But I wasn't asked."  Rogers Dep. I at 292:3-13.  As a result, the EBIA site-specific compressibility value was not mentioned as a hydrogeological parameter in the site characterization that Dr. Rogers created for Dr. Bea's analyses.  Rogers Dep. I at 287:12-288:10, 294:19-295:9.

330.    Dr. Bea made a deliberate decision not to use the coefficient of volume change or $m_v$ value converted from the EBIA storage coefficient value that was produced by the Plaintiffs' pumping tests in his SEEP/W seepage analyses.  Bea Dep. III at 28:25-29:15.

331.    Instead, Dr. Bea instructed Mr. Cobos-Roa to use a coefficient of volume change or $m_v$ value that would model the EBIA organic clay layer as an incompressible soil layer: "Dr. Bea asked GeoEstudios to—to find a way how we can model this . . . incompressible response of the soils.  So GeoEstudios essentially looked for a number that was representative of this condition and that's how—when we came back to Dr. Bea and said, 'Hey, if we use this value of 10 to the minus 9, it seem[s] like we get this response.'  He accepted it and that's why we went to those values."  Cobos-Roa Dep. at 198:23-200:8.

332.    It appears that Mr. Cobos-Roa and Dr. Bea selected a small, but not zero, compressibility to match the known time of the EBIA failures.  Silva-Tulla Testimony.

333.    In response to Dr. Bea's instruction, Mr. Cobos-Roa used a coefficient of volume change or $m_v$ value of **1 x 10$^{-9}$ 1/psf or 0.000000001 1/psf** in their SEEP/W seepage analyses, which converts in metric units to **2.1 x 10$^{-8}$ 1/kPa**, nearly equivalent to an $m_v$ value of zero. *Id.*  That value is 16,000 times lower than the $m_v$ value that was produced by the Plaintiffs' own EBIA pumping tests.  By Mr. Cobos-Roa's own admission, the $m_v$ value that he used in Dr. Bea's seepage analyses is lower than any known soil material in the universe.  Cobos-Roa Dep., at 220:21-221:3.

334.    The coefficient of volume change or $m_v$ value that Mr. Cobos-Roa used in Dr. Bea's seepage analyses never existed in any soil at the EBIA during the Hurricane Katrina storm surge.  Silva-Tulla Testimony.

335.    Dr. Bea instructed Mr. Cobos-Roa to use the **1 x 10$^{-9}$ 1/psf or 0.000000001 1/psf** coefficient of volume change or $m_v$ value in their SEEP/W seepage analyses so that the landside pore pressure values at the EBIA would increase instantly in response to the Hurricane Katrina loading conditions.  Such conditions are necessary to support Dr. Bea's theory of underseepage.  Bea Dep. III at 30:24-34:21; Silva-Tulla Testimony.

336.    If Dr. Bea and Mr. Cobos-Roa had run their SEEP/W seepage analyses using the EBIA site-specific coefficient of volume change or $m_v$ value produced from the Plaintiffs' pumping tests, the pore pressure values that Dr. Bea described in his expert reports would have been lower during the elapsed time attributed to the Hurricane Katrina storm surge.  Those lower pore pressures would have resulted in a higher factor of safety than the factor of safety generated by Dr. Bea's SLOPE/W stability analysis, which Dr. Bea uses to support his

theory that seepage-induced mechanisms contributed to the North and South Breaches.  Bea Dep. III at 30:24-34:21.

**B.  Transient vs. Steady Flow Analysis**

337.    Dr. Bea claims that he modeled the EBIA soils as virtually incompressible in his seepage analyses because the EBIA organic clay layer reached steady flow conditions during Hurricane Katrina.  Bea Rebuttal Rep. at 18-24.

338.    Transient flow conditions exist where the properties of a fluid in a system— such as velocity and pressure—change over time.  Transient flow conditions are also known as time dependent, unsteady, non-equilibrium or non steady-state.  Silva-Tulla Testimony.

339.    If flow is not transient, it is steady (steady flow or steady state flow).  Steady flow conditions exist when the properties of a fluid reach a point in the system where they do not change with time and are therefore constant.  Silva-Tulla Testimony.

340.    Transient flow conditions existed in the EBIA organic clay layer during the Hurricane Katrina storm surge, not steady flow conditions.  As the water rose over and covered the EBIA, the transient pore water pressures in the fully saturated canal-side soils increased almost immediately beneath the transient water load and migrated to the fully saturated land-side subsoils through a diffusion process.  The subsurface flow regime changed in response to the soil's hydraulic conductivity, compressibility and porosity properties.  The results of the parties' Joint Soils Investigation demonstrate that the flow conditions at the EBIA continued to change throughout the 30-hour Hurricane Katrina storm surge.  Silva-Tulla Testimony.

341.    It would have taken more than one year to reach steady flow conditions at the EBIA if the storm surge had remained constant during that time—significantly longer than the 30-hour Hurricane Katrina storm surge.  Silva-Tulla Testimony.

342.    The SEEP/W analyses that Mr. Cobos-Roa ran for Dr. Bea were transient flow analyses, not steady flow analyses.  Cobos-Roa Dep. at 227:22-228:1, 263:8-11; Bea Dep. III at 15:1-8, 19:1-11.  Mr. Cobos-Roa used the same SEEP/W software for Dr. Bea's analyses in this case that he used to run transient flow analyses for Dr. Bea in the BARGE and *Robinson* litigations.  Bea Dep. III at 15:9-20, 16:10-15.  The same SEEP/W software could have been used to run a steady flow analysis, but that was not done by Mr. Cobos-Roa for Dr. Bea. Cobos-Roa Dep. at 227:22-228:1.

343.    By using the unrealistic coefficient of volume change or $m_v$ value of **$1 \times 10^{-9}$ 1/psf or 0.000000001 1/psf** in his SEEP/W seepage analyses and modeling the EBIA soils as virtually incompressible, Dr. Bea in effect used a transient flow tool to manufacture steady flow conditions that never existed at the EBIA during Hurricane Katrina.  Silva-Tulla Testimony.

344.    The SEEP/W software is a tool that can solve a wide range of problems when used by a knowledgeable analyst, but as with all software tools, when misused can provide any result desired.  In this case, the SEEP/W tool was used to manufacture steady flow conditions for a transient flow condition.  Silva-Tulla Testimony.  Mr. Cobos-Roa has never had any conversations with the owners of the SEEP/W software or any of his professors at the University of California at Berkeley about using a transient flow tool in SEEP/W to manufacture steady flow conditions.  Cobos-Roa Dep. at 227:14-228:9.

345.    Dr. Bea instructed Mr. Cobos-Roa to use a transient flow tool in SEEP/W to artificially manufacture a model of steady flow conditions at the EBIA to create the appearance that pore pressures were transmitted almost immediately from the canal side to the land side of the floodwall during Hurricane Katrina, in order support Dr. Bea's pre-determined underseepage opinions in this case.  Cobos-Roa Dep. at 202:3-204:7, 278:8-24.

346.    There is no basis in fact for Dr. Bea's proposition that he should model the EBIA soils as virtually incompressible in his seepage analyses because, in fact, the EBIA organic clay layer could not have reached steady flow conditions during Hurricane Katrina.  Silva-Tulla Testimony.

## C.  Complete Saturation Alone Does Not Create Incompressible Soils or Steady Flow Conditions

347.    Dr. Bea claims that, because the EBIA organic clays were completely saturated during Hurricane Katrina, the organic clay layer was virtually incompressible, and therefore that steady flow conditions existed during the storm.  Bea Rebuttal Rep. at 18-24.

348.    Completely saturated soil is not by definition incompressible because the soil response depends upon the rate of loading.  For a load applied rapidly to the consolidation time, a saturated soil experiences undrained behavior while maintaining constant volume and behaves as an incompressible material.  But steady flow analyses do not apply to undrained problems where pore pressure changes occur in response to total stress changes.  A fully saturated soil can be compressible when the load rate is slow compared to the consolidation time.  Silva-Tulla Testimony.  In fact, saturated, organic clays like those at the EBIA are very compressible.  Bea Dep. II at 231:20-22; Silva-Tulla Testimony.

349.    In cases of completely saturated soils, steady flow conditions take some time to develop.  Saturation is just one component used by geotechnical engineers to determine

whether steady or transient flow conditions will occur.  Other components include the rate at which a load is applied to the soil and the extent to which the soil changes in volume (essentially equal to the change in porosity) when a load is applied.  Whether or not steady or transient flow conditions exist, is affected significantly by the soil's compressibility, as well as by permeability and passage of time.  Silva-Tulla Testimony.

350.    All of the parties' geotechnical experts in this case determined that the EBIA organic clays were completely saturated.  Dr. Bea is the only expert from that group who claims that, because the organic clays were saturated, they were virtually incompressible for the loading conditions imposed on the landside soils, and therefore that steady flow conditions existed during the storm surge. Bea Rebuttal Rep. at 18-24.

351.    There is no basis in fact for Dr. Bea's unscientific proposition that, because the EBIA organic clays were completely saturated during Hurricane Katrina, the organic clay layer was virtually incompressible, and steady flow conditions existed during the storm.  Silva-Tulla Testimony.

**D.  "Dilatational Wave Velocity"**

352.    Dr. Bea claims that he used the "dilatational wave velocity," not storage coefficient, to calculate the compressibility of the EBIA organic clay layer.  Bea Dep. III at 22:22-23:7, 24:5-18, 34:3-21.

353.    Dr. Bea first mentioned "dilatational wave velocity" in his April 16, 2012 rebuttal deposition.  Bea Dep. III at 22:22-23:7, 24:5-18, 34:3-21.  He did not refer to "dilatational wave velocity" during his initial March 27-28, 2012, deposition, despite discussing compressibility at length.  Bea Dep. I at 164:15-170:4; Bea Dep. II at 165:4-166:15,

168:25-171:10, 220:5-221:6.  He did not refer to "dilatational wave velocity" in any of his expert reports filed in this case.

354.     Dr. Bea did not refer to "dilatational wave velocity" in any of his reports or analyses regarding the North and South Breaches that preceded this case.

355.     As part of the parties' Joint Soils Investigation, experts for the Defendants discussed with the Plaintiffs' experts the possibility of performing geophysical soils tests during the joint soils investigation at the EBIA, which could have included measuring dilatational wave velocities.  At that time, the Plaintiffs' experts were not interested in geophysical exploration and decided not to perform any geophysical tests.  Experts for the Defendants also decided not to proceed with geophysical exploration.  Silva-Tulla Testimony.

356.     One reason the Defendants' experts decided not to proceed with geophysical exploration in part because dilatational wave velocity measurements are not appropriate for determining the compressibility of the organic clays at the EBIA.  JX-1696 (Lambe & Whitman, *Soil Mechanics* (1969), at 455).  The EBIA organic clays are located below the water table, where the soil is, for practical purposes, completely saturated.  Below the water table, dilatational wave velocity measurements reflect mostly the compressibility of the fluid (water) in the soil pores; in fact, geophysical tests of any soil located below the water table will reflect mostly the compressibility of water.  By contrast, the compressibility of the soil skeleton itself cannot be measured by dilatational wave velocity tests below the water table. The compressibility of the soil skeleton is the soil property that relates to the $m_v$ value required to perform a correct flow analysis for the EBIA under the relevant Hurricane Katrina conditions, not the compressibility of water.  Silva-Tulla Testimony; DX-02455 (Whitman,

*The Response of Soils to Dynamic Loadings*, Contract Rep. No. 3-26, U.S. Army Corps of Engineers (1970), at 183-84).

357.    When measured using geophysical techniques, saturated clays like those at the EBIA generally yield a dilatational wave velocity in the vicinity of the velocity of sound in water, or approximately 5,000 ft/sec.  That dilatational wave velocity roughly corresponds to an $m_v$ value of **2 x 10$^{-8}$ 1/psf.**  By contrast, the **1 x 10$^{-9}$ 1/psf** $m_v$ value that Mr. Diego Cobos-Roa input into SEEP/W to conduct Dr. Bea's seepage analyses corresponds to a dilatational wave velocity of about 20,530 ft/sec for a soil with total unit weight equal to 76.4 pcf, which is equivalent to the velocity of sound within solid rock.  The 0.00 1/psf (zero) $m_v$ value, also used by Mr. Cobos-Roa for some of the soils in Dr. Bea's seepage analyses, corresponds to a wave velocity equal to infinity, or faster than the speed of light.  Such materials did not exist in the EBIA organic clay layer during the Hurricane Katrina storm surge.  Silva-Tulla Testimony.

358.    Moreover, the 20,530 ft/sec dilatational wave velocity that corresponds to the **1 x 10$^{-9}$ 1/psf** $m_v$ value used by Mr. Cobos-Roa to conduct Dr. Bea's seepage analyses is attributable to a loading time of a fraction of a second, as opposed to the 30-hour loading time experienced during the Hurricane Katrina storm surge.  That type of immediate loading time is most often found in dynamic events such as nuclear explosions, conventional explosive blasts, or earthquakes.  No such dynamic event occurred during Hurricane Katrina.  Silva-Tulla Testimony.

359.    Except in perfectly undrained, one dimensional conditions, the "dilatational wave velocity" has no relevance to the compressibility of the EBIA soils or the failure of the North and South Breaches.  Silva-Tulla Testimony.

360.    There is no basis in fact for Dr. Bea's claim that he used the "dilatational wave velocity," not storage coefficient, to calculate the compressibility of the EBIA organic clay layer.  JX-1696 (Lambe & Whitmann, *Soil Mechanics* (1969), at 455).

## XVI.  EBIA FAILURE MODES

### A.  North Breach

361.    The North Breach likely failed due to: (1) the existence of the lowest top-of-floodwall elevation at the North Breach location; (2) floodwall deformations that formed due to the overwhelming effect of the storm surge; (3) loss of lateral support on the landside of the levee due to overtopping; and (4) a faulty weld in the sheet pile that led to a rupture in the floodwall.  Silva-Tulla Rep. at 53-54; Silva-Tulla Testimony.

362.    During Hurricane Katrina, the lowest elevation point of the EBIA floodwall was in the vicinity of the North Breach.  As a result of this lowest top-of-floodwall elevation, the effect of the storm surge on the floodwall loads and the overtopping that occurred at the North Breach became critical earlier in the storm.  Silva-Tulla Rep. at 53-54; Silva-Tulla Testimony.

363.    A combination of floodwall deformations and loss of landside lateral support led to the ultimate failure of the floodwall at the North Breach.  The water elevation at the EBIA rose as the storm surge increased, causing the floodwall to deform inland due to pressure from the canal water.  As wave overtopping began and intensified, a scour trench developed in the earthen levee on the landside of the floodwall.  Plunging water from the canal further eroded the levee and caused additional floodwall deformations due to the loss of lateral support on the landside of the levee.  Silva-Tulla Rep. at 53-54; Silva-Tulla Testimony.

364.    The increased floodwall deformations led to a crack in the floodwall concrete cap, and the stresses from that crack were transferred to the top of the sheetpiles where the faulty weld existed between the original sheetpile installed in the 1960s and the sheetpile installed in the 1980s.  The weld failed, which initiated the tearing and rapid "unzipping" of the sheetpiles near the point of the faulty weld.  The tear and subsequent "unzipping" resulted in the complete separation of the interlock connection between the two sheetpiles.  Silva-Tulla Rep. at 53-54; Silva-Tulla Testimony.

365.    Ultimately the sheetpile wall detached at the north end of the breach, causing an onrush of water through the floodwall.  This intensified the erosion of the earthen levee and led to the development of the North Breach to its full width.  Silva-Tulla Rep. at 53-54, Silva-Tulla Testimony.

**B.  South Breach**

366.    The South Breach likely failed due to: (1) the existence of the second lowest top-of-floodwall elevation after the North Breach location; (2) floodwall deformations that formed due to the overwhelming effect of the storm surge; and (3) loss of lateral support on the landside of the levee due to overtopping.  Silva-Tulla Rep. at 53-55; Silva-Tulla Testimony.

367.    During Hurricane Katrina, the EBIA floodwall was at its second lowest elevation point in the vicinity of the South Breach.  As a result of this second lowest top-of-floodwall elevation, the effect of the storm surge on the floodwall loads and the wave and direct overtopping that occurred at the South Breach became critical earlier in the storm. Silva-Tulla Rep. at 53-55; Silva-Tulla Testimony.

368.     A combination of floodwall deformations and loss of landside lateral support from overtopping scour on the land-side of the wall led to the ultimate failure of the floodwall at the South Breach.  The water elevation at the EBIA rose as the storm surge increased, causing the floodwall to deform inland due to pressure from the canal water.  As wave overtopping began and intensified, a scour trench developed in the earthen levee on the landside of the floodwall.  Plunging water from the canal further eroded the levee and caused additional floodwall deformations due to the loss of lateral support on the landside of the levee.  Silva-Tulla Rep. at 53-55; Silva-Tulla Testimony.

369.     The deformations from the pressure of the canal water and the loss of lateral support led to cracking in the floodwall concrete cap, and the stresses from that crack were transferred to the top of the sheetpiles in the vicinity of the South Breach.  As canal water continued to plunge over the floodwall, the water pressure pushed hundreds of feet of the sheetpile wall inland, thus flattening many of the piles and developing the South Breach to its full width.  Silva-Tulla Rep. at 53-55; Silva-Tulla Testimony.

## XVII.  MODELING THE FLOODING OF THE LOWER NINTH WARD AND ST. BERNARD PARISH

370.     It is possible, through numerical modeling, to reconstruct the flooding of the Lower Ninth Ward and the portion of St. Bernard Parish west of Paris Road during Hurricane Katrina, and to determine the level of flooding that would have occurred in the Lower Ninth Ward and the portion of St. Bernard Parish west of Paris Road in the absence of the North and/or South IHNC Breaches, and in the absence of the MRGO breaches.  Vrijling 2011 Rep. at 1-7; Vrijling 2012 Rep. at 1-6; Dalrymple Rep. at 73-84.

371.    In addition to the breaches on the IHNC, Hurricane Katrina's storm surge also caused massive breaches in the earthen levees along Reach 2 of the Mississippi River Gulf Outlet ("MRGO").  The earthen levees along the MRGO protect the same area (polder) as the floodwalls on the east side of the IHNC.  The influence of the IHNC breaches on the flooding of the polder is much smaller than that of the MRGO breaches.  Vrijling 2011 Rep. at 7; Vrijling 3/13/12 Dep. at 56-57; Vrijling July 2007 Rep. at 45.

372.    In fact, both plaintiffs' and defendants' experts agree that the flooding caused by the breaching along the MRGO Reach 2 levee created huge flows sufficient to flood St. Bernard Parish and the Lower Ninth Ward to 11 feet (NAVD88 2004.65) had the IHNC breaches not occurred.  Dalrymple Rep. at 3; accord Vrijling July 2007 Rep. at 45 ("[W]ithout the IHNC breaches almost the same volume of water enters the populated area of the St. Bernard bowl compared with the scenario [of] MRGO breaches plus overtopping plus rain.").

373.    Plaintiffs' flood modeling does not accurately depict the arrival times of the floodwaters in the Lower Ninth Ward.  Vrijling July 2007 Rep. at 42; see also Dalrymple Dep. at 78-79; Dalrymple Rep. at 89 (noting that plaintiffs' "predicted arrival of the flood waters in the Lower Ninth Ward are two hours behind the IPET hydrograph").

A.    Jeannine and Kenneth Armstrong

374.    The Armstrongs are asserting claims for damage to immovable property and personal property located at 4016 Hamlet Pl., for inconvenience and for additional living expenses.  All other claims asserted on their behalf have been withdrawn with prejudice. Uncontested Fact No. 102.

375.    On August 29, 2005, Jeannine and Kenneth Armstrong resided at 4016 Hamlet Pl., Chalmette, Louisiana 70433.  JX-1450 (J. Armstrong 9/13/11 Dep. Ex. 5, ); Uncontested Fact No. 91.

376.    Mr. and Mrs. Armstrong purchased the residence at 4016 Hamlet Pl. on March 25, 1985 for $73,600.00.  Uncontested Fact No. 92.

377.    Mr. and Mrs. Armstrong's son, Kenneth Jr., reached the age of majority prior to August 29, 2005.  J. Armstrong 9/13/11 Dep. at 18:18-22.

378.    On August 29, 2005, certain movable property located at the Armstrong residence belonged to Kenneth Jr.  J. Armstrong 9/13/11 Dep. at 126:6-10.

379.    As of August 28, 2005, Mr. and Mrs. Armstrong had a combined annual income of approximately $90,000.00.

380.    As of August 28, 2005, the Armstrongs paid approximately $800/month in mortgage payments J. Armstrong 9/13/11 Dep. at 61:20-24.

381.    As of August 28, 2005, the Armstrongs paid approximately $500/month in household utility expenses.  K. Armstrong 9/12/11 Dep. at 24:11-19.

382.    As of August 28, 2005, the Armstrongs paid approximately $800/month in household food and grocery expenses.  J. Armstrong 9/13/11 Dep. at 60:24-61:1.

383.    Mr. Armstrong purchased his boat in or before 2000 for approximately $15,000.00.  K. Armstrong 9/12/11 Dep. at 244:2-25; Uncontested Fact No. 93.

384.    On or about August 28, 2005, the Armstrongs evacuated to Baton Rouge, Louisiana.  K. Armstrong 9/12/11 Dep. at 31:20-32:3, 33:22-25; Uncontested Fact No. 94.

385.    From September 1 through September 30, 2005 the Armstrongs stayed at the Cook Conference Center & Hotel in Baton Rouge, Louisiana.  J. Armstrong 9/13/11 Dep. at 64:25-65:10; Uncontested Fact No. 95.

386.    The Armstrongs paid $2,745 in total for their stay at the Cook Conference Center & Hotel.  JX-1457 (K. Armstrong 9/12/11 Dep. Ex. 15).

387.    During the months of October and November 2005, the Armstrongs resided with family in Prairieville, Louisiana.  J. Armstrong 9/13/11 Dep. at 67:11-20; Uncontested Fact No. 96.

388.    The Armstrongs were not charged for housing during October and November 2005.

389.    From December 1, 2005 until May 31, 2006, the Armstrongs rented an apartment in Gonzales, Louisiana.  J. Armstrong 9/13/11 Dep. at 72:18-73:9; Uncontested Fact No. 97.

390.    The Armstrongs paid $890/month in rent for their apartment in Gonzales, Louisiana.  K. Armstrong 9/12/11 Dep. at 290:23-291:3, JX-1457 (9/12/11 Dep. Ex. 15).

391.    In June 2006, the Armstrongs purchased a residence in Covington, Louisiana with the intention of residing there no less than three years, or until their daughter graduated high school in May 2009.  J. Armstrong 9/13/11 Dep. at 76:2-9, 83:8-10; Uncontested Fact No. 99.

392.    The Armstrongs paid approximately $900/month for their residence in Covington, Louisiana. J. Armstrong 9/13/11 Dep. at 76:10-13; Uncontested Fact No. 100.

393.    The Armstrongs paid off their mortgage on the residence at 4016 Hamlet Pl. using the proceeds from their flood insurance policy. K. Armstrong 7/9/07 Dep. at 30:2-4.

394.    The Armstrongs' utilities expenses for the residence at 4016 Hamlet Pl. did not continue after Hurricane Katrina.

395.    The Armstrongs received no less than $35,202.00 from their homeowners insurer, Liberty Mutual, for damage to their immovable property that was caused by wind

and/or rain during Hurricane Katrina.  JX-1455 (K. Armstrong 9/12/11 Dep. Ex. 13); K.

Armstrong 7/9/107 Dep. at 21:12-22:25.

396.    The Armstrongs received no less than $16,500.00 from their homeowners

insurer, Liberty Mutual, for damage to movable property that was caused by Katrina-related

wind and/or rain.  J. Armstrong 9/13/11 Dep. at 14:1-15:2; JX-1455 (K. Armstrong 9/12/11

Dep. Ex. 13).

397.    The Armstrongs received no less than $9,875.80 from their homeowners

insurer, Liberty Mutual, for additional living expenses arising from Katrina-related wind/rain

damage to their residence.  JX-1549 (S. Taylor Dep. Ex. 14).

398.    Kenneth and Jeannine Armstrong received $2,000 for expedited housing

assistance under the Federal Emergency Management Agency's Individual and Households

Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02467 (MEB-449-

000000369 thru MEB-449-000000580 and MEB-449-000000026 thru MEB-449-000000034).

399.    Kenneth and Jeannine Armstrong received $7,893 for rental assistance under

the Federal Emergency Management Agency's Individual and Households Program, 42 USC

§§ 5170 – 5189b, due to Hurricane Katrina. DX-02467 (MEB-449-000000369 thru MEB-449-

000000580 and MEB-449-000000026 thru MEB-449-000000034).

400.    Kenneth and Jeannine Armstrong received a total of $9,893 under the Federal

Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 –

5189b, due to Hurricane Katrina. DX-02467 (MEB-449-000000369 thru MEB-449-

000000580 and MEB-449-000000026 thru MEB-449-000000034).

401.    The Armstrongs filed suit against their homeowners insurer in a lawsuit styled

Jeannine Armstrong and/or wife of Kenneth Paul Armstrong v.  Liberty Mutual Ins. Co., Case

No. 07-5683, United States District Court for the Eastern District of Louisiana (Removal of Jeannine Armstrong and/or wife of Kenneth Paul Armstrong v.  Liberty Mutual Ins. Co., Case No. 109,700, 34th Judicial District Court for the Parish of St. Bernard, State of Louisiana). JX-1431 (K. Armstrong 9/12/11 Dep. Ex. 16).

402.    The Armstrongs voluntarily demolished the residence at 4016 Hamlet Pl. on or before July 2007.  K. Armstrong 7/9/07 Dep. at 31:14-16.

403.    The Armstrongs opted not to rebuild on the lot at 4016 Hamlet Pl. because they wanted to move to "higher ground".  K. Armstrong 9/12/11 Dep. at 54:24-55:20.

404.    Kenneth and Jeannine Armstrong sold their property at 4016 Hamlet Pl. to the Road Home Program on January 11, 2008 and received $75,370.89 in compensation under the US Department of Housing and Urban Development's Community Development Block Grant money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq., for their property that was damaged due to Hurricane Katrina. DX-01771 (MEB-468-000000805 thru MEB-468-000001069).

405.    The pre-Katrina floor slab elevation of the property located at 4016 Hamlet Drive was -2.0 feet (NAVD88 (2004.65)).  Supplemental Danner Report (Armstrong) at 2.

406.    During Hurricane Katrina, floodwaters from the IHNC and MRGO breaches reached the property located at 4016 Hamlet Drive simultaneously.  Dalrymple Rep. at 91-92.

407.    Waters from the IHNC breaches and the MRGO breaches contributed equally to the flooding of the property located at 4016 Hamlet Drive.  Dalrymple Rep. at 91-92; Supplemental Danner Report (Armstrong) at 2-3.

408. Waters from the IHNC breaches and the MRGO breaches contributed 13.0 feet (NAVD88 (2004.65)) of water above the floor slab elevation of the property located at 4016 Hamlet Drive. Dalrymple Report at 91-92; Supplemental Danner Report (Armstrong) at 2-3.

409. Waters from the North Breach alone would have contributed 5.8 feet (NAVD88 (2004.65)) of water above the floor slab elevation of the property located at 4016 Hamlet Drive. Dalrymple Rep. at 91-92; Supplemental Danner Report (Armstrong) at 2-3.

410. Waters from the South Breach alone would have contributed 8.5 feet (NAVD88 (2004.65)) of water above the floor slab elevation of the property located at 4016 Hamlet Drive. Dalrymple Rep. at 91-92; Supplemental Danner Report (Armstrong) at 2-3.

411. Waters from the IHNC breaches alone would have contributed 9.0 feet (NAVD88 (2004.65)) of water above the floor slab elevation of the property located at 4016 Hamlet Drive. Dalrymple Rep. at 91-92; Supplemental Danner Report (Armstrong) at 2-3.

412. Waters from the MRGO alone would have contributed 11.9 feet (NAVD88 (2004.65)) of water above the floor slab elevation of the property located at 4016 Hamlet Drive. Dalrymple Rep. at 91-92; Supplemental Danner Report (Armstrong) at 2-3.

413. The damage to the Armstrong residence at 4016 Hamlet Dr. related to the passage of Hurricane Katrina was caused by a combination of flooding, wind and rain. Danner Report (Armstrong) at 7.

414. There was no structural damage to the Armstrong residence at 4016 Hamlet Dr. caused by flooding, nor is there any evidence that the structural elements of the residence were at risk of being condemned by local building authorities or any other entity. As such, the residence may have been repaired by removing and replacing interior walls, ceilings, floor coverings, woodwork, and electrical, plumbing and HVAC elements. The exposed wood

framing may have been cleaned and decontaminated prior to rehabilitating the residence. No evidence was reviewed that indicated the floodwater rose to above the roof peak. Danner Report (Armstrong) at 7.

415. Damage to the roof, including gutters, downspouts, vents and flues and damage to the wood fence were caused by wind, not by flooding. Danner Report (Armstrong) at 7.

416. The pre-Katrina value of the Armstrong property at 4016 Hamlet Pl. was $146,000.00. Truax Report: Pre-Katrina Valuation (Armstrong) at 4. The post-Katrina value of the Armstrong property at 4016 Hamlet Pl. as of January 11, 2008, was $41,000.00. Truax Report: Post-Katrina Valuation (Holmes) at 4.

417. The total repair cost for the damage to the Armstrong property caused by flood is $90,442.51. DuPlessis Repair Cost Report (Armstrong) at 46-47.

418. The total value of the flood damaged contents in the Armstrong property is $53,644.36. Schneider Report (Armstrong) at 12.

419. The total additional living expenses (ALE) to which the Armstrongs are entitled is $11,090.80. Because the Armstrongs have already recovered $9,875.79 in ALE from their insurer in connection with their wind/rain damage, they are entitled to $1,215.01 in additional ALE. Schneider Report (Armstrong) at 12-13.

**B.    Ethel Mae Coats**

420. Ms. Coats (as represented by her succession and/or Ms. Franklin) is asserting claims for damage to immovable property and personal property located at 1020 Charbonnet St., for inconvenience and for additional living expenses. All other claims asserted on her behalf have been withdrawn with prejudice. Uncontested Fact No. 115.

421. On August 29, 2005, Ethel Mae Coats resided at 1020-22 Charbonnet St., New Orleans, Louisiana. E. M. Coats 7/17/07 Dep. at 13:15-17; Uncontested Fact No. 103.

422.    Ms. Coats purchased the residence at 1020-22 Charbonnet with her late husband, Jimmie Lee Coats, Sr. on May 18, 1994 for $16,000.00.  E. M. Coats 7/17/07 Dep. at 89:4-11; Uncontested Fact No. 104.

423.    Mr. and Mrs. Coats had no biological children together, nor did they adopt any. E. M. Coats 7/17/07 Dep. at 139:1-3; Uncontested Fact No. 105.

424.    Mr. Coats passed away on or about February 15, 1999. E.M. Coats 7/17/07 Dep. at 9:8-10; Uncontested Fact No. 106.

425.    As of August 28, 2005, Ms. Coats paid approximately $415/month in utility expenses.  N. Morgan 9/24/11 Dep. at 205:8-206:3; Uncontested Fact No. 107.

426.    On August 29, 2005, the residence at 1020-22 Charbonnet St. was a single home.  N. Morgan 9/24/11 Dep. at 51:14-22, 53:10-17; Uncontested Fact No. 108.

427.    As of August 28, 2005, Ms. Coats was a homemaker, and received $600/month from Mr. Coats' pension.  E. M. Coats 7/17/07 Dep. at 114:15-115:8.

428.    As of August 29, 2005, Nathan Morgan, Lintoi Franklin, and the children of Ms. Franklin resided with Ms. Coats at 1020 Charbonnet.  E.M. Coats 7/17/07 Dep. at 9:19-10:14.

429.    On August 29, 2005, certain movable property in the residence belonged to Mr. Morgan, Ms. Coats' adult children, and her grandchildren.  E. M. Coats 7/17/07 Dep. at 151:25-152:22; N. Morgan 9/24/11 Dep. at 165:23-166:7.

430.    On or about August 27, 2005, Ms. Coats evacuated to Hammond, Louisiana.  E. M. Coats 7/17/07 Dep. at 29:9-10; N. Morgan 9/24/11 Dep. at 32:22-25; Uncontested Fact No. 109.

431.    While in Hammond, Ms. Coats stayed with her sister, who did not charge her rent.  N. Morgan 9/24/11 Dep. at 41:10-23.

432.    In or about February 2006, a FEMA trailer was placed on the property at 1020-22 Charbonnet St.  N. Morgan 9/24/11 Dep. at 39:20-40:7.

433.    In or about May 2006, Ms. Coats relocated to a condominium in New Orleans with Mr. Morgan, who did not charge her rent.  N. Morgan 9/24/11 Dep. at 37:23-38:3, 194:7-19.

434.    Ms. Coats resided in the New Orleans condominium until her death in 2009.  N. Morgan 9/24/11 Dep. at 54:4-24, 61:10-12; Uncontested Fact No. 110.

435.    With the exception of a monthly $40/month water bill, the utility expenses for the residence at 1020-22 Charbonnet St. did not continue after Hurricane Katrina.  N. Morgan 9/24/11 Dep. at 209:6-23; Uncontested Fact No. 111.

436.    Ethel Mae Coats received $2,000 for expedited housing assistance under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02465 (MEB-449-000000255 thru MEB-449-000000368 and MEB-467-000000001 thru MEB-467-000000004).

437.    Ethel Mae Coats received $3,951 for rental assistance under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02465 (MEB-449-000000255 thru MEB-449-000000368 and MEB-467-000000001 thru MEB-467-000000004).

438.    Ethel Mae Coats received a total of $5,951 under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to

Hurricane Katrina. DX-02465 (MEB-449-000000255 thru MEB-449-000000368 and MEB-467-000000001 thru MEB-467-000000004).

439.    Ethel Mae Coats received $29,761.79 in compensation under the US Department of Housing and Urban Development's Community Development Block Grant money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq., for her property at 1020 Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. DX-01772 (MEB-468-000000567 thru MEB-468-000000804).

440.    Ethel Mae Coats received $50,000 in additional compensation under the US Department of Housing and Urban Development's Community Development Block Grant money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq., for her property at 1020 Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. DX-01772 (MEB-468-000000567 thru MEB-468-000000804).

441.    Ethel Mae Coats received a total of $79,761.79 under the US Department of Housing and Urban Development's Community Development Block Grant  money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq., for her property at 1020 Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. DX-01772 (MEB-468-000000567 thru MEB-468-000000804).

442.    Ms. Coats received no less than $1,733.00 from her homeowners insurer for damage to her immovable property that was caused by Katrina-related wind and/or rain.  E. M. Coats Dep. 59:5-15, July 17, 2007.  Ms. Coats did not demolish the residence at 1020-22

Charbonnet St. after Hurricane Katrina, and in fact made post-Katrina repairs and/or renovations to the residence at 1020-22 Charbonnet St., including, but not limited to, converting the residence from a single to a double.  N. Morgan 9/24/11 Dep. at 51:14-22, 53:10-17; 61:18-62:6; accord Uncontested Fact Nos. 112-13.

443.    Ms. Coats passed away on or about January 29, 2009.  Uncontested Fact No. 114.

444.    The residence at 1020-22 Charbonnet St. has not been condemned by Orleans Parish or any other civil authority.

445.    Ms. Coats' daughter and grandchildren currently reside at 1020-22 Charbonnet St.  N. Morgan 9/24/11 Dep. at 60:9-11.

446.    The pre-Katrina floor elevation of the property located at 1020-22 Charbonnet St. was 4.3 feet (NAVD88 (2004.65)).  Supplemental Danner Report (Coats) at 2.

447.    During Hurricane Katrina, floodwaters from the IHNC south breach reached the property located at 1020-22 Charbonnet St. shortly before 8:00 a.m.  After peaking shortly after 9:00 a.m., the floodwaters began to recede until 10:00 a.m., the influence of the MRGO waters caused the water level to rise again until eventually the water level reached 11 feet (NAVD88(2004.65)) above ground level at the property.  Dalrymple Rep. at 93-94; Supplemental Danner Report (Coats) at 2-3.

448.    Waters from the IHNC breaches and the MRGO breaches contributed 6.9 feet (NAVD88 (2004.65)) of water above the floor surface elevation of the property located at 1020-22 Charbonnet St.  Dalrymple Rep. at 93-94; Supplemental Danner Report (Coats) at 2-3.

449.    Waters from the North Breach alone would have contributed 0.2 feet (NAVD88 (2004.65)) of water above the floor elevation of the property located at 1020-22 Charbonnet St.  This level would have dropped relatively quickly to a level below the main floor.  This would have resulted in only the floor covering removal to affect repairs. Dalrymple Rep. at 93-94; Supplemental Danner Report (Coats) at 2-3.

450.    Waters from the South Breach alone would have contributed 3.3 feet (NAVD88 (2004.65)) of water above the floor elevation of the property located at 1020-22 Charbonnet St.  This level would have dropped relatively quickly to about 0.9 feet above the main floor.  This would likely have resulted in only 48 inches of wall covering removal, along with associated electrical wiring, base cabinetry and woodwork for repairs.  Dalrymple Rep. at 93-94; Supplemental Danner Report (Coats) at 2-3.

451.    Waters from the IHNC breaches alone would have contributed 4.0 feet (NAVD88 (2004.65)) of water above the floor elevation of the property located at 1020-22 Charbonnet St.  This level would have dropped relatively quickly to about 0.9 feet.  This would likely have resulted in only 48 inches of wall covering removal along with associated electrical wiring, base cabinetry and woodwork for repairs.  Dalrymple Rep. at 93-94; Supplemental Danner Report (Coats) at 2-3.

452.    Waters from the MRGO alone would have contributed 6.2 feet (NAVD88 (2004.65)) of water above the floor elevation of the property located at 1020-22 Charbonnet St.  This level would have dropped to about 4.7 feet after a relatively short period of time. This would likely have resulted in damage requiring removal of wall coverings at least 84 to 96 inches above the floor, along with associated electrical wiring, cabinetry and woodwork for repairs.  Dalrymple Rep. at 93-94; Supplemental Danner Report (Coats) at 2-3.

103

453.   Flood damage to the Coats residence was limited to first floor interior walls, ceilings, floor coverings, woodwork, and electrical, plumbing and HVAC elements.   Danner Report (Coats) at 6.

454.   Damage to the roof, fireplace, chimney and chimney flashing at the Coats residence was caused by wind and/or rain, not by flooding.   Danner Report (Coats) at 6.

455.   All of the plaster and lath wall and ceiling coverings could have been salvaged. Danner Report (Coats) at 6.

456.   The total repair cost for the damage to the Coats residence due to flood is $59,713.54.   Supplemental DuPlessis Repair Cost Report (Coats) at 4-5.

457.   The total value of the flood damaged contents in the Coats property is $63,920.60.   Schneider Report (Coats) at 12.

458.   Although Ms. Coats was displaced by Hurricane Katrina, she did not incur during that displacement "additional living expenses," properly defined.   Schneider Report (Coats) at 12.

**C.     Fred Holmes**

459.   Mr. Holmes is asserting claims for damage to immovable property and personal property located at 1205 Perrin Dr., and for inconvenience and for additional living expenses.   All other claims asserted on his behalf have been withdrawn with prejudice. Uncontested Fact No. 125.

460.   On August 29, 2005, Fred Holmes resided at 1205 Perrin Dr., Arabi, Louisiana 70032 with his wife, Jeneen.   F. Holmes 9/24/11 Dep. at 27:23-28:7; Uncontested Fact No. 116.

461.   Mrs. Holmes is not a party to these proceedings.

104

462.    Mr. and Mrs. Holmes purchased the residence at 1205 Perrin Dr. on June 20, 2003 for $107,000.00.  F. Holmes 9/24/11 Dep. at 28:8-13; Uncontested Fact No. 117.

463.    As of August 28, 2005, Mr. and Mrs. Holmes had a combined annual income of approximately $56,000.00.  JX-1469 (F. Holmes 9/24/11 Dep. Ex. 3).

464.    On August 29, 2005, Mr. and Mrs. Holmes owned a 1998 Toyota Corolla.  F. Holmes 9/24/11 Dep. at 217:20-218:3; Uncontested Fact No. 118.

465.    As of August 28, 2005, Mr. and Mrs. Holmes paid approximately $800/month in mortgage payments.  F. Holmes 9/24/11 Dep. at 31:25-32:2.

466.    On or about August 28, 2005, the Holmeses evacuated to Houston, Texas.  F. Holmes 9/24/11 Dep.  at 56:22-23, 58:3-9; Uncontested Fact No. 119.

467.    From August 29, 2005 through January 8, 2006, the Holmeses stayed at hotels in the Houston area.  F. Holmes 9/24/11 Dep. at 63:3-9, 64:19-25; Uncontested Fact No. 120.

468.    On or about January 8, 2006, the Holmeses relocated to a residence in Spring, Texas.  F. Holmes 9/24/11 Dep. at 71:14-22; Uncontested Fact No. 121.

469.    For the first year of their residence in Spring, Texas, the Holmeses' rent was paid in its entirety by Catholic Charities.  F. Holmes 9/24/11 Dep. at 73:1-24.

470.    In or about January 2007, the Holmeses purchased the residence in Spring, Texas, and have resided there until the present day.  F. Holmes 9/24/11 Dep. at 77:1-78:13; Uncontested Fact No. 122.

471.    The Holmeses' utility expenses for the residence at 1205 Perrin Dr. did not continue after Hurricane Katrina.  F. Holmes 9/24/11 Dep. at 79:23-25; Uncontested Fact No. 123.

472.     The Holmeses received $5,641.98 from their insurer for Katrina-related damage to their Toyota Corolla.  F. Holmes 9/24/11 Dep. at 245:21-246:4.

473.     The Holmeses received no less than $20,750.00 from their homeowners insurer for damage to their immovable and movable property that was caused by Katrina-related wind and/or rain.  F. Holmes 9/24/11 Dep. at 270:16-271:18, JX-1479, JX-1483 (9/24/11 Dep. Exs. 15 and 19).

474.     The Holmeses received no less than $2000.00 from their homeowners insurer for prohibited use/additional living expenses arising from Katrina-related wind and/or rain damage to their immovable property.  JX-1479 (F. Holmes 9/24/11 Dep. Ex. 15).

475.     The Holmeses paid off their mortgage on the residence at 1205 Perrin Dr. using the proceeds of their flood insurance policy and Road Home funds.  J. Holmes 9/25/11 Dep. at 108:10-109:6.

476.     The Holmeses filed suit against their homeowners insurer, Auto Club, in a lawsuit styled Jeneen Holmes and/or wife of Fred N. Holmes, Jr. v. Club Ins. Agency Inc., Case No. 110-615, 34th Judicial District Court for the Parish of St. Bernard, State of Louisiana.  JX-1480 (F. Holmes 9/24/11 Dep. Ex. 16).

477.     On or about March 13, 2009, Fred and Jeneen Boudoin-Holmes sold their immovable property located at 1205 Perrin Drive, and received $34,608.18 under the US Department of Housing and Urban Development's Community Development Block Grant money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq.  DX-01773 (MEB-468-000001070 thru MEB-468-000001257).

478.     Fred and Jeneen Boudoin-Holmes received $2,000 for expedited housing assistance under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02466 (MEB-449-000000195 thru MEB-449-000000254 and MEB-449-000000011 thru MEB-449-000000017).

479.     Fred and Jeneen Boudoin-Holmes received $2,358 for rental assistance under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02466 (MEB-449-000000195 thru MEB-449-000000254 and MEB-449-000000011 thru MEB-449-000000017).

480.     Fred and Jeneen Boudoin-Holmes received a total of $4,358 under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02466 (MEB-449-000000195 thru MEB-449-000000254 and MEB-449-000000011 thru MEB-449-000000017).

481.     The residence at 1205 Perrin Dr. was demolished.  F. Holmes 9/24/11 Dep. at 80:2-5; Uncontested Fact No. 41.

482.     The residence at 1205 Perrin Dr. was not condemned by St. Bernard Parish or any other civil authority.

483.     The pre-Katrina floor elevation of the property located at 1205 Perrin Dr. was -2.10 feet (NAVD88 (2004.65)).  Danner Report (Holmes) at 4; see also R.W. Krebs Flood Elevation Report (Holmes).

484.     During Hurricane Katrina, floodwaters from the IHNC south breach reached the property located at 1205 Perrin Dr. shortly after 8:00 a.m.  Beginning at roughly 9:30 a.m., the influence of the MRGO waters caused the water level to rise again until eventually the

water level reached 11 feet (NAVD88 (2004.65)) above ground level at the property.
Dalrymple Rep. at 95; Supplemental Danner Report (Holmes) at 2-3.

485.    Waters from the IHNC breaches and the MRGO breaches contributed 13.0 feet
(NAVD88 (2004.65)) of water above the floor slab elevation of the property located at 1205
Perrin Dr.  Dalrymple Rep. at 95; Supplemental Danner Report (Holmes) at 2-3.

486.    Waters from the IHNC breaches alone would have contributed 10 feet of water
above the floor elevation of the property located at 1205 Perrin Dr.  Dalrymple Rep. at 95;
Supplemental Danner Report (Holmes) at 2-3.

487.    Waters from the MRGO alone would have contributed 13.1 feet (NAVD88
(2004.65)) of water above the floor elevation of the property located at 1205 Perrin Dr.
Dalrymple Rep. at 95; Supplemental Danner Report (Holmes) at 2-3.

488.    There is no evidence to indicate that the residence at 1205 Perrin Dr. received
the degree of damage, as catalogued in Scott Taylor's report, that required it to be demolished
and rebuilt, including the foundation slab.  The main residence did not receive any flood
related structural damage to its foundation or structural framing.  There is no evidence of
movement relative to its foundation or racking of the framing.  Danner Report (Holmes) at 5-6.

489.    There is no evidence of structural damage to the residence at 1205 Perrin Dr.
caused by flooding including but not limited to damage to the roof framing and the coverings;
bowed walls; buckled roof lines; or loose sections of brick work noted by Mr. Taylor. There is
no evidence to indicate that the structural elements of the residence were at risk of being
condemned by local building authorities or any other entity.  Danner Report (Holmes) at 6.

490.    Removing and replacing interior walls, ceilings, floor coverings, woodwork,
and electrical, plumbing and HVAC elements would have repaired the residence at 1205

Perrin Dr.. The exposed wood framing could have been cleaned and decontaminated prior to rehabilitating the residence.  Danner Report (Holmes) at 6.

491.    Damages to the roof, fascia, soffit and gutters, were caused by wind.  Danner Report (Holmes) at 6.

492.    The pre-Katrina value of the Holmes property at 1205 Perrin Dr. was $115,000.00.  Truax Report: Pre-Katrina Valuation (Holmes) at 4.  The post-Katrina value of the Holmes property at 1205 Perrin Dr. as of March 13, 2009, was $41,000.00.  Truax Report: Post-Katrina Valuation (Holmes) at 4.

493.    The total repair cost for damage to the residence at 1205 Perrin Dr. caused by flood is $106,537.28.  DuPlessis Repair Cost Report (Holmes) at 35-36.

494.    The total value of the flood damaged contents in the Holmes property is $40,153.26.  Schneider Report (Holmes) at 13.

495.    The total additional living expenses (ALE) to which Mr. Holmes is entitled is $6,550.00.  Schneider Report (Holmes) at 13.

**D.    Alvin Livers**

496.    Mr. Livers is asserting claims for damage to immovable property and personal property located at 1205 Perrin Dr., for inconvenience and for additional living expenses.  All other claims asserted on his behalf have been withdrawn with prejudice.  Uncontested Fact No. 138.

497.    On August 29, 2005, Alvin Livers resided at 4924 St. Claude Ave., New Orleans, Louisiana with his wife, Barbara.  JX-1369 (A. Livers 9/14/11 Dep.  Ex. 2); Uncontested Fact No. 126.

498.    Mrs. Livers is not a party to these proceedings.

499.    Mr. and Mrs. Livers purchased the residence at 4924 St. Claude on January 8, 1971 for $17,000.00.  JX-1490 (A. Livers 9/14/11 Dep.  Ex. 1); Uncontested Fact No. 127.

500.    As of August 28, 2005, Mr. and Mrs. Livers had both been retired for several years.  A. Livers 9/14/11 Dep. at 26:24-27:7; B. Livers 9/15/11 Dep. at 16:24-17:14.

501.    As of August 28, 2005, Mr. Livers received a pension of approximately $900/month and Social Security benefits of approximately $1300/month.  A. Livers 9/14/11 Dep. at 28:24-29:10, 214:5-14.

502.    As of August 28, 2005, the Livers paid approximately $150/month in utilities expenses.  A. Livers 9/14/11 Dep. at 33:4-22; Uncontested Fact No. 128.

503.    As of August 28, 2005, the Livers paid approximately $400/month for food and groceries.  B. Livers 9/15/11 Dep. at 20:23-21:7; Uncontested Fact No. 129.

504.    As of August 28, 2005, there was no mortgage on the residence at 4924 St. Claude Ave.  A. Livers 9/14/11 Dep. at 36:21-25.

505.    On or about August 28, 2005, Mr. and Mrs. Livers evacuated to Baton Rouge, Louisiana, where they stayed with family members.  A. Livers 9/14/11 Dep. at 143:9-13, 144:15-20; Uncontested Fact No. 130.

506.    Mr. and Mrs. Livers remained in Baton Rouge, Louisiana for approximately two weeks.  A. Livers 9/14/11 Dep. at 145:1-3, 23:6-10; Uncontested Fact No. 131.

507.    Mr. and Mrs. Livers were not charged rent during their stay in Baton Rouge.

508.    Mr. and Mrs. Livers left Baton Rouge to stay with their daughter in Marrero, Louisiana, where they remained approximately three months.  Mr. and Mrs. Livers were not charged rent during their stay in Marrero.  *See* A. Livers 9/14/11 Dep. at 23:20-24:14, 25:1-5; *see also* Uncontested Fact No. 132.

509.    Mr. and Mrs. Livers then relocated to an apartment in New Orleans, where they remained for approximately four months.  A. Livers 9/14/11 Dep. at 24:17-25:13, JX-1509 (9/14/11 Dep. Ex. 21); Uncontested Fact No. 133.

510.    Mr. and Mrs. Livers paid $744/month in rent for their New Orleans apartment. JX-1509 (A. Livers 9/14/11 Dep. Ex. 21); Uncontested Fact No. 134.

511.    In or about January 2006, Mr. and Mrs. Livers decided to permanently relocate from New Orleans.  A. Livers 9/14/11 Dep. at 163:14-164:20; Uncontested Fact No. 135.

512.    Alvin and Barbara Livers received $73,791.52 in compensation under the US Department of Housing and Urban Development's Community Development Block Grant money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq., for their property at 4924 St. Claude, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. DX-01774 (MEB-468-000000001 thru MEB-468-000000294).

513.    Alvin and Barbara Livers received $50,000 in additional compensation under the US Department of Housing and Urban Development's Community Development Block Grant money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq., for their property at 4924 St. Claude, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. DX-01774 (MEB-468-000000001 thru MEB-468-000000294).

514.    On or about on April 18, 2007, Alvin and Barbara Livers sold their immovable property located at 4924 St. Claude, New Orleans, and received a total of $123,791.52 under the US Department of Housing and Urban Development's Community Development Block Grant money as awarded by the Louisiana Recovery Authority's "Road Home" program under

the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq. DX-01774 (MEB-468-000000001 thru MEB-468-000000294).

515.    Alvin and Barbara Livers received $11,342 for personal property under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02463 (MEB-449-000000018 thru MEB-449-000000025 and MEB-449-000000035 thru MEB-449-000000194).

516.    Alvin and Barbara Livers received $10,500 for replacement housing under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02463 (MEB-449-000000018 thru MEB-449-000000025 and MEB-449-000000035 thru MEB-449-000000194).

517.    Alvin and Barbara Livers received $2,000 for expedited housing assistance under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02463 (MEB-449-000000018 thru MEB-449-000000025 and MEB-449-000000035 thru MEB-449-000000194).

518.    Alvin and Barbara Livers received $2,358 for rental assistance under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02463 (MEB-449-000000018 thru MEB-449-000000025 and MEB-449-000000035 thru MEB-449-000000194).

519.    Alvin and Barbara Livers received a total of $26,200 under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02463 (MEB-449-000000018 thru MEB-449-000000025 and MEB-449-000000035 thru MEB-449-000000194).

520.    Mr. and Mrs. Livers received no less than $15,000.00 from their homeowners insurer, State Farm, for damage to their immovable property that was caused by Katrina-related wind and/or rain.  JX-1500 (A. Livers 9/14/11 Dep. Ex. 12).

521.    Mr. and Mrs. Livers received no less than $1,676.89 from their homeowners insurer, State Farm, for prohibited use/additional living expenses arising from Katrina-related wind and/or rain damage to their immovable property.  A. Livers 9/14/11 Dep. at 58:3-22, JX-1492 (9/14/11 Dep. Ex. 4).

522.    In April 2006, Mr. and Mrs. Livers purchased a residence in Gonzales, Louisiana, and have resided there until the present day.  A. Livers 9/14/11 Dep. at 163:4-9, JX-1369 (A. Livers 9/14/11 Dep. Ex. 2); Uncontested Fact No. 42.

523.    Mr. and Mrs. Livers did not demolish the residence at 4924 St. Claude; Uncontested Fact No. 42.

524.    The residence at 4924 St. Claude was not condemned by Orleans Parish or any other civil authority.

525.    The pre-Katrina floor elevation of the property located at 4924 St. Claude Ave. was 1.5 feet (NAVD88 (2004.65)).  Supplemental Danner Report (Livers) at 2.

526.    During Hurricane Katrina, floodwaters from the IHNC south breach reached the property located at 4924 St. Claude Ave. shortly before 8:00 a.m.  After peaking shortly after 9:00 a.m., the floodwaters began to recede until 10:00 a.m., the influence of the MRGO waters caused the water level to rise again until eventually the water level reached 11 feet (NAVD88(2004.65)) above ground level at the property.  Dalrymple Rep. at 96; Supplemental Danner Report (Livers) at 2-3.

527.     Waters from the IHNC breaches and the MRGO breaches contributed 13.0 feet (NAVD88 (2004.65)) of water above the floor slab elevation of the property located at 4924 St. Claude Ave.  Dalrymple Rep. at 96; Supplemental Danner Report (Livers) at 2-3.

528.     Waters from the North Breach alone would have contributed 2,9 feet (NAVD88 (2004.65)) of water above the floor elevation of the property located at 4924 St. Claude Ave.  This would likely have resulted in 48 inches or less of wall covering removal along with associated electrical wiring, base cabinetry and woodwork for repairs.  Dalrymple Rep. at 96; Supplemental Danner Report (Livers) at 2-3.

529.     Waters from the South Breach alone would have contributed 6.3 feet (NAVD88 (2004.65)) of water above the floor elevation of the property located at 4924 St. Claude Ave.  This level would have dropped relatively quickly to about 3.7 feet above the main floor.  This would likely have resulted in 84 to 96 inches of wall covering removal along with associated electrical wiring, base cabinetry and woodwork for repairs.  Dalrymple Rep. at 96; Supplemental Danner Report (Livers) at 2-3.

530.     Waters from the IHNC breaches alone would have contributed 7.0 feet (NAVD88 (2004.65)) of water above the floor elevation of the property located at 4924 St. Claude Ave.  This level would have dropped relatively quickly to about 3.7 feet.  This would likely have resulted in 84 to 96 inches of wall covering removal along with associated electrical wiring, base cabinetry and woodwork for repairs.  Dalrymple Rep. at 96; Supplemental Danner Report (Livers) at 2-3.

531.     Waters from the MRGO alone would have contributed 9.0 feet (NAVD88 (2004.65)) of water above the floor elevation of the property located at 4924 St. Claude Ave. This level would have dropped to about 8 feet after a relatively short period of time.  This

would likely have resulted in damage requiring removal of all first floor wall coverings at least 84 to 96 inches above the floor, along with associated electrical wiring, cabinetry and woodwork for repairs.  Dalrymple Rep. at 96; Supplemental Danner Report (Livers) at 2-3.

532.    The Livers property at 4924 St. Claude Ave, including storage building, may be repaired and does not require replacement.  The residence did not receive any flood-related structural damage to its foundation or structural framing. There was no evidence of movement relative to its foundation or racking of the framing.  Danner Report (Livers) at 7.

533.    Flood damage to the Livers' main residence was limited to first floor interior wall, ceiling and floor covering, woodwork, and electrical, plumbing and HVAC elements. Danner Report (Livers) at 7.

534.    Damage to the second floor of the Livers property at 4924 St. Claude Ave as not caused or aggravated by flooding.  Second floor interior damages, (including the broken window and associated water damaged carpet and wall coverings), were caused by wind and wind-blown rain.  Danner Report (Livers) at 7-8.

535.    Damage to the roof covering or appurtenances or to fencing were caused by wind.  Danner Report (Livers) at 8.

536.    The pre-Katrina value of the Livers property at 4924 St. Claude Ave. was $140,000.00.  Truax Report: Pre-Katrina Valuation (Livers) at 4.  The post-Katrina value of the Livers property at 4924 St. Claude Ave. as of April 18, 2007, was $53,000.00.  Truax Report: Post-Katrina Valuation (Livers) at 4.

537.    The total repair cost for damage to the Livers property at 4924 St. Claude Ave caused by flood is $108,320.88.  DuPlessis Repair Cost Report (Livers) at 48-49.

538.    The total value of the flood damaged contents in the Livers property is

$29,287.44.  Schneider Report (Livers) at 13.

The total additional living expenses (ALE) to which Mr. Livers is entitled is $5,396.89.  Because

Mr. Livers has already recovered $9,875.79 in ALE from his insurer in connection with

wind/rain damage, he is entitled to $1,215.01 in additional ALE.  Schneider Report (Livers) at 13.

### E.    Clifford Washington

539.    Mr. Washington is asserting claims for damage to immovable property located

at 1910 Charbonnet St., and for inconvenience.  All other claims asserted on his behalf have

been withdrawn with prejudice.  Uncontested Fact No. 153.

540.    On August 29, 2005, Mr. Washington resided at 5027 Derbigny St., New

Orleans, Louisiana 70117 with his wife, Patricia, and certain of their children.  C. Washington

9/27/11 Dep. at 42:17-43:5.

541.    Mrs. Washington is not a party to these proceedings.

542.    Mr. and Mrs. Washington purchased a residence at 1910 Charbonnet St., New

Orleans, Louisiana 70117 on February 23, 2001 for $10,000.00.  C. Washington 9/27/11 Dep.

at 239:3-11, JX-1538 (9/27/11 Dep. Ex. 19); see also Uncontested Fact No. 139.

543.    As of August 28, 2005, Mr. Washington had an annual income of

approximately $25,000.00, and received approximately $850/month in Social Security.  C.

Washington 9/27/11 Dep. at 86:7-17; 87:13-24.

544.    As of August 28, 2005, Mrs. Washington had an annual income of

approximately $10,400.00.  P. Washington 9/28/11 Dep. at 14:19-15:6.

545.    The Washingtons made a claim under their homeowners policy for Hurricane

Ivan-related wind and/or rain damage to the 1910 Charbonnet St. residence.  JX-1542 (C.

Washington 9/27/11 Dep. Ex. 23).

546.    The Washingtons made a claim under their homeowners policy for Hurricane Cindy-related wind and/or rain damage to the 1910 Charbonnet St. residence. JX-1540 (C. Washington 9/27/11 Dep. Ex. 21).

547.    The Washingtons were evacuated to Houston, Texas.  JX-1369 (C. Washington 9/27/11 Dep. Ex. 10); Uncontested Fact No. 140.

548.    In late 2008, the Washingtons moved into the newly constructed residence at 1910 Charbonnet St.  C. Washington 9/27/11 Dep. at 83:17-20; Uncontested Fact No. 150.

549.    The mortgage on the 1910 Charbonnet residence was paid off using the proceeds from Mr. Washington's flood insurance.  C. Washington 9/27/11 Dep. at 300:13-301:2.

550.    The Washingtons received no less than $36,614.72 from their homeowners insurer for damage to their immovable property at 1910 Charbonnet that was caused by Katrina-related wind and/or rain.  JX-1545 (C. Washington 9/27/11 Dep. Ex. 27).

551.    The Washingtons received no less than $5,710.00 from their homeowners insurer for prohibited use/additional living expenses arising from Katrina-related wind and/or rain damage to the 1910 Charbonnet residence. JX-1545 (C. Washington 9/27/11 Dep. Ex. 27).

552.    The Washingtons filed a lawsuit against their homeowners insurer styled Clifford Washington v. Louisiana Citizens Prop. Ins. Co., Case No. 2007-8207, Civil District Court for the Parish of Orleans, State of Louisiana.  JX-1523 (C. Washington 9/27/11 Dep. Ex. 3).

553.    The residence at 1910 Charbonnet St. was demolished in 2007.  C. Washington 9/27/11 Dep. at 111:13-20.

554.    Clifford and Patricia Washington received $61,038.12 in compensation under the US Department of Housing and Urban Development's Community Development Block Grant money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq., for their property at 1910 Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. DX-01775 (MEB-468-000000295 thru MEB-468-000000565).

555.    Clifford and Patricia Washington received $30,000 in elevation allowance under the US Department of Housing and Urban Development's Community Development Block Grant money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq., for their property at 1910 Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. DX-01775 (MEB-468-000000295 thru MEB-468-000000565).

556.    Clifford and Patricia Washington received $58,961.88 in additional compensation (for low-to-moderate income applicants) under the US Department of Housing and Urban Development's Community Development Block Grant money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq., for their property at 1910 Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. DX-01775 (MEB-468-000000295 thru MEB-468-000000565).

557.    Clifford and Patricia Washington received a total of $150,000 under the US Department of Housing and Urban Development's Community Development Block Grant money as awarded by the Louisiana Recovery Authority's "Road Home" program under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq., for their

property at 1910 Charbonnet Street, New Orleans, Louisiana, that was damaged due to Hurricane Katrina. DX-01775 (MEB-468-000000295 thru MEB-468-000000565).

558.    Clifford Washington received $10,742 for personal property under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02464 (MEB-449-000000581 thru MEB-449-000000879, MEB-467-000000005 thru MEB-467-000000009, and MEB-449-000000001 thru MEB-449-000000010).

559.    Clifford Washington received $10,500 for replacement housing under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02464 (MEB-449-000000581 thru MEB-449-000000879, MEB-467-000000005 thru MEB-467-000000009, and MEB-449-000000001 thru MEB-449-000000010).

560.    Clifford Washington received $600 which was paid to the National Flood Insurance Program per the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02464 (MEB-449-000000581 thru MEB-449-000000879, MEB-467-000000005 thru MEB-467-000000009, and MEB-449-000000001 thru MEB-449-000000010).

561.    Clifford Washington received a total of $41,700 under the Federal Emergency Management Agency's Individual and Households Program, 42 USC §§ 5170 – 5189b, due to Hurricane Katrina. DX-02464 (MEB-449-000000581 thru MEB-449-000000879, MEB-467-000000005 thru MEB-467-000000009, and MEB-449-000000001 thru MEB-449-000000010).

562.    The Washingtons rebuilt a residence on the 1910 Charbonnet lot that is a larger, significant upgrade to the residence that existed on the lot on August 28, 2005.  C. Washington 9/27/11 Dep. at 261:7-21.  Uncontested Fact No. 151.

563.    Mr. Washington has withdrawn all property damage claims arising from damage to his residence and movable property located at 5027 Derbigny St. with prejudice. Uncontested Fact No. 152.

564.    The pre-Katrina floor elevation of the property located at 1910 Charbonnet St. was 1.3 feet (NAVD88 (2004.65)).

565.    During Hurricane Katrina, floodwaters from the IHNC south breach reached the property located at 1910 Charbonnet St. shortly after 7:00 a.m.  After peaking shortly after 9:00 a.m., the floodwaters began to recede until 10:00 a.m., the influence of the MRGO waters caused the water level to rise again until eventually the water level reached 11 feet (NAVD88(2004.65)) above ground level at the property.

566.    Waters from the IHNC breaches and the MRGO breaches contributed 13.0 feet (NAVD88 (2004.65)) of water above the floor slab elevation of the property located at 1910 Charbonnet St.

567.    Waters from the North Breach alone would have contributed 3.4 feet (NAVD88 (2004.65)) of water above the floor elevation of the property located at 1910 Charbonnet St.  This would likely have resulted in 48 inches or less of wall covering removal along with associated electrical wiring, base cabinetry and woodwork for repairs. Supplemental Danner Report (Washington) at 2-3.

568.    Waters from the South Breach alone would have contributed 6.7 feet (NAVD88 (2004.65)) of water above the floor elevation of the property located at 1910

Charbonnet St.  This level would have dropped relatively quickly to about 4.0 feet above the main floor.  This would likely have resulted in 84 to 96 inches of wall covering removal along with associated electrical wiring, base cabinetry and woodwork for repairs.  Supplemental Danner Report (Washington) at 2-3.

569.    Waters from the IHNC breaches alone would have contributed 7.3 feet (NAVD88 (2004.65)) of water above the floor elevation of the property located at 1910 Charbonnet St.  This level would have dropped relatively quickly to about 4.0 feet.  This would likely have resulted in 96 inches of wall covering removal along with associated electrical wiring, base cabinetry and woodwork for repairs.  Supplemental Danner Report (Washington) at 2-3.

570.    Waters from the MRGO alone would have contributed 9.2 feet (NAVD88 (2004.65)) of water above the floor elevation of the property located at 1910 Charbonnet St.  This level would have dropped to about 8.2 feet after a relatively short period of time.  This would likely have resulted in damage requiring removal of wall coverings at least 84 to 96 inches above the floor, along with associated electrical wiring, cabinetry and woodwork for repairs.  Supplemental Danner Report (Washington) at 2-3.

571.    Even in the absence of the IHNC and the MRGO breaches, overtopping and rainwater would have ponded at the property to a level of 0.7 feet above floor elevation. Dalrymple Rep. at 97-98.

572.    The Washington Charbonnet residence could have been salvaged and rehabilitated. Although the residence was found to have moved laterally on its foundation; it could have been moved back and easily repositioned on its foundation by a local house raising and shoring contractor.  Danner Report (Washington) at 6.

573.   After repositioning it on its foundation and repairing the roof and exterior wall coverings, the Washington Charbonnet residence could have been repaired by removing and replacing interior walls, ceilings, floor coverings, woodwork, and electrical, plumbing and HVAC elements. The exposed wood framing could have been cleaned and decontaminated prior to rehabilitating the residence.  Danner Report (Washington) at 6.

574.   Damages to the roof including shingle loss and deck damage, fascia, soffit and siding loss were caused by wind.  Danner Report (Washington) at 6.

575.   The deterioration and potential wood destroying insect infestation at the Washington Charbonnet residence were the result of long term moisture intrusion into the building envelope from rain resulting from the wind related roof shingle, fascia, soffit and siding damage and loss.  Danner Report (Washington) at 7.

576.   Damage to the ceiling gypsum board coverings and batt insulation of the residence was caused by wind to the roof prior to the arrival of the floodwaters.  Danner Report (Washington) at 7.

577.   The total repair cost for damages to the Washington Charbonnet residence caused by flood is $84,705.04.  DuPlessis Repair Cost Report (Washington) at 39.

**Plaintiffs' Damages Expert**

578.   Mr. Taylor's damage estimates related to the Amstrongs' immovable properties are based on the cost to reconstruct the home.  *See* Taylor Revised Damages Report (Armstrong) at 1-2.

579.   Mr. Taylor's damage estimates related to the Holmes' immovable properties are based on the cost to reconstruct the home.  *See* Taylor Revised Damages Report (Holmes) at 1-2.

580.    Mr. Taylor's damage estimates related to the Livers' immovable property are based on the cost to reconstruct the home.  *See* Taylor Revised Damages Report (Livers) at 1-2.

581.    Mr. Taylor did not provide pre-Katrina or post-Katrina appraisal values of the Plaintiffs' immovable properties.  S. Taylor Dep. at 20:18-21:21.

582.    Mr. Taylor did not segregate Plaintiffs' damages caused by wind and rain.  S. Taylor Dep. at 19:23-5; 114:11-16.

583.    Mr. Taylor did not apply depreciation to the value of Plaintiffs' movables when estimating Plaintiffs' damages.  S. Taylor Dep. at 107:1-6; 108:14-109:17.

584.    Mr. Taylor estimated Plaintiffs' additional living expenses by employing a percentage of Plaintiffs' damages to immovable property.  S. Taylor Dep. at 143:21-144:4; 193:7-15.

585.    Mr. Taylors' estimates of Plaintiffs' additional living expenses are not based on Plaintiffs' incurred expenses. S. Taylor Dep. at 142:5-142:14; 193:7-15.

586.    Mr. Taylor estimated the Armstrongs' additional living expenses for the period of one year.  Taylor Revised Damages Report (Armstrong) at 18.

587.    Mr. Taylor estimated the Holmeses' additional living expenses for the period of one year.  Taylor Revised Damages Report (Holmes) at 22.

588.    Mr. Taylor estimated the Liverses' additional living expenses for the period of one year.  Taylor Revised Damages Report (Livers) at 19.

## PROPOSED CONCLUSIONS OF LAW

1.      In order to prevail on a claim for negligence, Plaintiffs must prove by a preponderance of the evidence: (1) that the defendant owed a duty to the plaintiffs; (2) that it breached that duty; (3) that the alleged conduct was a substantial factor – or a cause-in-fact – of the alleged harm; (4) that the risk and harm caused were within the scope of protection afforded by the duty breached; and (5) that the Plaintiffs suffered actual damages.  *Roberts v. Benoit*, 605 So. 2d 1032, 1051 (La. 1991), *on reh'g,* (La. May 28, 1992).

2.      Plaintiffs bear the burden of proving both the existence and quantum of their damages, and any damages awarded must be supported by evidence in the record.  *Borden, Inc. v. Howard Trucking Co.*, 454 So. 2d 1081, 1092 (La. 1983).

3.      Plaintiffs bear the burden of proving by a preponderance of the evidence that all of the damages they seek from WGI are attributable to the conduct of WGI.  *Servicios-Expoarma, C.A. v Indus. Mar. Carriers, Inc.*, 135 F.3d 984, 995 (5th Cir. 1998).

4.      In the event that the Court attributes fault to WGI for one breach but not the other, Plaintiffs must prove by a preponderance of the evidence the amount of damages that resulted from the breach for which WGI bears fault.

5.      Plaintiffs have failed to prove by a preponderance of the evidence that they suffered damage that resulted from the conduct of WGI.

## I.      DUTY/RISK (PRE-TRIAL ORDER ISSUES 7, 8, 10, 14, 15 16)

6.      The determinative issue on the question of the contractor's negligence is one of reasonableness, i.e., conformity of his conduct to the standard of care that would be exercised

by a reasonable man in the same or similar circumstances. *Lacombe v. Greathouse*, 407 So.2d 1346, 1350 (La.App. 3 Cir. 1981).

7.    WGI's duty was to meet the standard of care of a contractor performing demolition, removal, excavation, and environmental remediation work on a federal civil works project.

8.    Plaintiffs have failed to prove by a preponderance of the evidence that WGI's duty encompassed any damages resulting from the failures of the EBIA floodwall.

9.    Plaintiffs have failed to prove by a preponderance of the evidence that WGI had a contractual duty to provide geotechnical engineering services related to the floodwalls or the levees.

10.    Plaintiffs have failed to prove by a preponderance of the evidence that WGI had a legal duty to provide geotechnical engineering services or analyses related to the floodwalls or levees.  Specifically:

11.    Plaintiffs have failed to prove by a preponderance of the evidence that WGI had a legal or contractual duty to comply with the so-called "Kansas City Guidelines".

12.    WGI had no legal duty to comply with the so-called "Kansas City Guidelines" because they were not in effect in New Orleans at the time WGI performed its work.  *In re Katrina Canal Breaches Consol. Litig.*, No. 05-4182, 2008 WL 5234369 at,*9 n.5 (E.D. La. Dec. 15, 2008), *rev'd on other grounds*, 620 F.3d 455 (5th Cir. 2010); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).

13.    Plaintiffs have failed to prove by a preponderance of the evidence that the Corps was relying on WGI to provide geotechnical engineering services related to the floodwalls or levees.

## II.      BREACH OF DUTY (ISSUES 8)

14.      Plaintiffs bear the burden of proving that WGI deviated from the degree of professional care and skill customarily employed by others of its profession in the same general area.  *See, e.g., Maloney v. Oak Builders Inc*., 224 So.2d 161 (La. App. 4 Cir.1969), *rev'd in part on other grounds*, 256 La. 85, 235 So.2d 386 (1970) (plaintiffs could not recover against architect where they failed to present evidence establishing the applicable standard of care).

15.      Plaintiffs have failed to prove by a preponderance of the evidence that WGI deviated from the standard of care of a contractor performing demolition, removal, excavation, and environmental remediation work on a federal civil works project.

16.      Plaintiffs cannot prove negligence solely by proving that WGI violated a statute or regulation; rather they must prove by a preponderance of the evidence that WGI's conduct caused their damages.  *See, e.g., Mitchell v. Eureka Chem*., No. 07-510, 2008 WL 2597907, at*3 (E.D. La. June 25, 2008) (finding that the plaintiff failed to prove his employer was negligent, because the plaintiff could not show that the OSHA violation was the legal cause of the accident); *Lee v. Carwile*, 168 So. 2d 469 (La. App. 3 Cir. 1964).

## III.      LA. R.S. 9:2771 (ISSUE 17)

17.      WGI is immune from liability pursuant to La. R.S. 9:2271, which provides, in pertinent part:  "No contractor . . . shall be liable for . . . defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the . . . defect was due to any fault or insufficiency of the plans or specifications."

126

18.    In order to invoke La. R.S. 9:2771, WGI is not required to prove that it had no role in developing the plans or specifications of its work at the EBIA.  *Tex-La Props. v. S. State Ins. Co*., 514 So. 2d 707, 709 (La. App. 2 Cir. 1987).

19.    La. R.S. 9:2771 affords protection to contractors, like WGI, that perform demolition and remediation work in advance of planned construction.  *See, e.g., Pearce v. L. J. Earnest, Inc*., 411 So. 2d 1276 (La. App. 3 Cir. 1982).

20.    WGI's work in the EBIA did not create a hazardous condition.

21.    WGI, acting at all times at the commission and under the supervision of the entity charged with designing and maintaining the floodwalls (the USACE), had no justifiable reason to believe that its adherence to the plans and specifications created a hazardous condition.

## IV.    CAUSATION (ISSUES 11, 12 13)

22.    Under the Louisiana duty-risk analysis for tort claims, courts make two causation inquiries.  *See Pitre v. La. Tech Univ.*, 673 So. 2d 585, 589-90, *reh'g denied* (La. June 28, 1996).   First, Plaintiffs bear the burden of establishing WGI was the cause-in-fact or was the "but-for" cause of Plaintiffs' damages.  *Toston v. Pardon*, 874 So. 2d 791, 799 (La. 2004).  Even if cause-in-fact exists, WGI must also be the proximate or "legal" cause of Plaintiffs' damages.  *Rando v. Anco Insulations*, *Inc.*, 16 So. 3d 1065, 1092-93 (La. 2009).

23.    In order to prove that WGI was the cause-in-fact of their damages, Plaintiffs must prove by a preponderance of the evidence that WGI's conduct was a necessary antecedent to their damages.  *Bellanger v. Webre*, 65 So. 3d 201, 207-08 (La. App. 1 Cir. 2011), *cert. denied,* 65 So. 3d 1149 (La. 2011).

24.     Plaintiffs have failed to prove by a preponderance of the evidence that WGI's conduct was the cause-in-fact, or the "but-for" cause of their damages.

25.     In order to prove that WGI was the proximate or "legal" cause of their damages, Plaintiffs must prove by a preponderance of the evidence that there exists a substantial relationship between WGI's conduct and Plaintiffs' damages.  *Harrell v. Genco*, 671 So. 2d 530, 533 (La. App. 1 Cir. 1996); *Crockett v. Cardona*, 713 So. 2d 802 (La. App. 4 Cir. 1998).

26.     Plaintiffs have failed to prove by a preponderance of the evidence that WGI was the proximate or "legal" cause of their damages.

27.     To the extent the Court finds that the conduct of WGI and the USACE were concurrent causes of the same damages, Plaintiffs bear the burden of proving that WGI's conduct was a "substantial factor" in causing Plaintiffs' damages.  *Toston*, 874 So. at 799.

28.     In order to establish that WGI's conduct was a substantial factor for their damages, Plaintiffs must prove by a preponderance of the evidence that their damages would not have occurred absent WGI's conduct.  *Perkins v. Entergy Corp.*, 782 So. 2d 606, 612 (La. 2001), *superseded by statute on other grounds*, (citing *Graves v. Page*, 703 So. 2d 566, 570 (La. 1997).

29.     Plaintiffs have failed to prove by a preponderance of the evidence that their damages would not have occurred absent WGI's conduct.

30.     Alternatively, in order to establish that WGI's conduct was a substantial factor in causing their damages, Plaintiffs must prove by a preponderance of the evidence that WGI's conduct played so important a role in producing Plaintiffs' damages that responsibility should be imposed on WGI even if they cannot demonstrate that the damages would have occurred but for WGI's conduct.  *Perkins*, 782 So. 2d at 612.

31.     Plaintiffs have failed to prove by a preponderance of the evidence that WGI's conduct played so important a role in producing Plaintiffs' damages that responsibility should be imposed on WGI.

32.     Alternatively, in order to establish that WGI's conduct was a substantial factor in causing their damages, Plaintiffs must prove by a preponderance of the evidence that WGI's conduct created a force or series of forces that were in continuous and active operation up to the time of the harm.  *Perkins*, 782 So. 2d at 612 (citing *LeJeune v. Allstate Ins. Co*., 365 So. 2d 471, 475 (La.1978)).

33.     Plaintiffs have failed to prove by a preponderance of the evidence that WGI's conduct created a force or series of forces that were in continuous and active operation up to the time of the harm.

34.     Plaintiffs cannot prevail against WGI only by proving that WGI's conduct is a "possible" cause of their damage; rather they must prove that it was more likely than not that WGI's conduct was in fact a substantial cause of their damages.  *Perkins*, 782 So. 2d at 618; *see also Gleason v. City of Shreveport*, 393 So. 2d 827, 829 (La. App. 2 Cir. 1981), *writ denied*, 397 So. 2d 806 (La. 1981); *Loupe v. Circle, Inc.*, 514 So. 2d 269, 271 (La. App. 5 Cir. 1987).

35.     Plaintiffs have failed to prove by a preponderance of the evidence that WGI's conduct was a substantial factor in causing their damages.

36.     Plaintiffs have failed to prove by a preponderance of the evidence that WGI's conduct was negligent.

37.     In the event that the Court determines that certain portions of Plaintiffs' damages are divisible, the Court may divide the damages amongst and between the respective

causes.  *See, e.g., Jarreau v. Hirschey*, 650 So. 2d 1189, 1194 (La. App. 5 Cir. 1995), *petition denied*, 650 So. 2d 348 (La. 1995).

38.     WGI cannot be held liable for flood damage caused by the MRGO or by overtopping.

39.     WGI cannot be held liable for damages that were not caused by flooding.

40.     For the majority of Plaintiffs, wind/rain damage is divisible from flood damage, and fault should not be attributed to WGI for these damages.

41.     For the majority of Plaintiffs, flood damage caused by the MRGO is divisible from flood damage caused by the IHNC breaches, and fault should not be attributed to WGI for these damages.  *See, e.g., In re Katrina Canal Breaches Consol. Litig.*, 647 F. Supp. 2d 644, 698 (E.D. La. 2009) (divisible damage divided between and amongst MRGO and IHNC).

42.     In the event the Court determines certain portions of Plaintiffs' damages are indivisible, it may allocate fault between and amongst those defendants, if any, that Plaintiffs have proven by a preponderance of the evidence to be at fault for those damages.  *See, e.g., Norfleet v. Lifeguard Transp. Serv.*, 934 So. 2d 846, *reh'g denied* (La. App. 4 Cir. July 25, 2006).

43.     In the event that Plaintiffs satisfy their burden of proof as to both Defendants, the Court should allocate a lesser portion of fault to WGI because its work was commissioned, approved, and supervised by the USACE and because the USACE, not WGI, built the floodwalls and is tasked with their design, construction, maintenance and oversight.

**V.     DAMAGES (ISSUES 18, 19, 20, 21, 22, 23, 24, 30)**

44.     Under Louisiana law, a plaintiff's damages related to movable property are limited to the replacement cost of the property less depreciation. *See Brown v. Williams*, 850

So. 2d 1116, 1125 (La. App. 2 Cir. 2003) (holding that the plaintiff in a tort claim was limited to recovering the depreciated value of her movables), *petition denied*, 860 So. 2d 555 (La. 2003).

45.     Because Scott Taylor's valuations of Plaintiffs' movables do not account for depreciation, his estimates overvalue Plaintiffs' losses as they relate to movables.

46.     In order to recover for damages related to inconvenience under Louisiana law, a plaintiff must demonstrate that they were present at the time of the damage to the property for which they are making a claim. *Napolitano v. F.S.P., Inc.*, 797 So. 2d 111, 114-15 (La. App. 4 Cir. 2001); *McDonald v. Ill. Cent. Gulf R.R. Co.*, 546 So. 2d 1287, 1292 (La. App. 4 Cir. 1989), *reh'g denied*, 551 So. 2d 1340 (La. 1989).

47.     Although mental anguish claims may be separated from claims of inconvenience, the law still considers whether the plaintiff is "present or situated nearby" at the time of the damage in awarding damages for inconvenience. *Kemper v. Don Coleman, Jr. Builder, Inc.*, 746 So. 2d 11, 21 (La. App. 2 Cir. 1999), *appeal dismissed,* 779 So. 2d 1001 (La. App. 2 Cir. 2001).

48.     Because Plaintiffs were not present at the properties for which they are claiming damages of inconvenience, they are not entitled to such relief.

49.     Under Louisiana law, the appropriate measure of damages for immovable property that the claimant has no intent of repairing is the diminution in value of the property. *See Roman Catholic Church of the Archdiocese of New Orleans v. La. Gas Serv. Co.*, 618 So. 2d 874, 879-80 (La. 1993).

50.     Plaintiffs Holmes, Armstrong, and Livers have failed to prove by a preponderance of the evidence that they have any intent of repairing their respective

properties because they established permanent residences elsewhere and subsequently sold the subject properties to the Road Home Program.

51.     To the extent that any Plaintiffs claim damage for movable property owned by adults who are not parties to this litigation, they are not entitled to recovery for such claimed damages.

52.     Because Mr. Taylor's damages calculations include movable property belonging to adults who are not parties to this litigation, Mr. Taylor's damages calculations are inflated as a matter of law.

53.     If at any time, the testament of Jimmie Lee Coats, Sr. is challenged and found to be invalid, Mr. Coats' children should be joined as proper plaintiffs for the claims made in regard to 1020 Charbonnet Street, New Orleans, Louisiana.  If Mr. Coats did not execute a valid will, his estate passed intestate, and his children are entitled to ownership of his share of the community property, which includes the property at 1020 Charbonnet Street.  *See* La. Civ. Code arts. 888, 890.

54.     Additional living expenses related to the damage of immovable property are additional expenses incurred by the claimant "beyond the norm for his standard of living." *McGill v. Republic Fire & Cas. Ins. Co.*, No. 07-4025, 2008 WL 4792720, at*3 (E.D. La. Oct. 28, 2008).

55.     In order to recover additional living expenses, Plaintiffs must present evidence establishing by a preponderance of the evidence:  1) their pre-Katrina normal living expenses; and, 2) the amount by which their post-Katrina expenses increased past that baseline. *McGill*, 2008 WL 4792720, at *3.

56.     A plaintiff may only recover for expenses for which the plaintiffs can provide evidence. *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 527-28 (5th Cir. 2010).

57.     Because they have not provided sufficient evidence of their pre-Katrina and post-Katrina living expenses, Plaintiffs have not met their burden of proof regarding additional living expenses and cannot recover them.

58.     Because Mr. Taylor's damages estimates for additional living expenses for every Plaintiff greatly exceeds the difference between Plaintiffs' pre-and post-Katrina household expenses, they overvalue Plaintiffs' damages as a matter of law.

59.     To the extent that the Court finds that the plaintiffs are entitled to additional living expenses, those expenses must be limited to such expenses incurred up to the date by which they established permanent residence elsewhere.  The plaintiffs are not entitled to any damages for additional living expenses beyond the time that they permanently relocated from their residences in New Orleans.

60.     Because Mr. Taylor's damages estimates include one year of additional living expenses even though Plaintiffs had established a permanent residence, his calculations overstate their damages as a matter of law.  Specifically:

> a.  The Armstrongs established a permanent residence in Covington, Louisiana by June of 2006 and are not entitled to any damages for additional living expenses beyond that time.

> b.  Mr. Holmes permanently relocated to Spring, Texas in January of 2006 and is not entitled to any damages for additional living expenses beyond that time.

> c.  Mr. Livers determined to permanently relocate from New Orleans in or about January of 2006 and is not entitled to any damages for additional living expenses beyond that time.

## VI.   ATTORNEYS' FEES (ISSUE 25)

61.   Under Louisiana law, "[a]ttorneys' fees are not allowed except where authorized by contract or statute*." DOTD v. Wagner*, 38 So. 3d 240, 241 (La. 2010) (citing *Huddleston v. Bossier Bank & Trust Co.*, 475 So. 2d 1082, 1085 (La.1985)).

62.   Plaintiffs cannot recover attorneys' fees from WGI because they have made no allegations against WGI pursuant any statute which allows for the recovery of attorneys' fees.

/s/ William D. Treeby
William D. Treeby, 12901
James C. Gulotta, Jr., 6590
Heather S. Lonian, 29956
      Of
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Facsimile:   (504) 581-3361

and

Adrian Wager-Zito
Debra S. Clayman
Christopher R. Farrell
Christopher N. Thatch
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3891
Facsimile:  (202) 626-1700

Attorneys for Washington Group
International, Inc., a division of URS
Corporation

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Proposed Findings of Fact and

Conclusions of Law of Washington Group International has been served upon all counsel of

record by electronic notice via the Court's CM/ECF system this 10th day of August 2012.

*/s/ Heather S. Lonian*
_____