# EXHIBIT 1

### Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   CIVIL ACTION
CONSOLIDATED LITIGATION
                NO. 05-4182
                "K" (2)
PERTAINS TO:  MRGO         JUDGE DUVAL
FILED IN: 05-4181, 05-4182,  MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

VIDEOTAPED DEPOSITION OF
DIEGO COBOS-ROA,
1111 J Street, Apartment 37, Davis, California 95616, taken in the offices of Jones, Day, 555 California Street, 26th Floor, San Francisco, Louisiana 94104, on Tuesday, April 10, 2012.

### Page 2

1  APPEARANCES:
2  BARON & BUDD PC
     (BY: THOMAS SIMS, ESQ.
3     ANDY OWEN, ESQ.)
     3102 Oak Lawn Avenue
4    Suite 1100
     Dallas, Texas 75219
5    PLAINTIFFS COUNSEL
6
   DUDENHEFER LAW
7  (BY: FRANK C. DUDENHEFER, JR., ESQ.)
   601 Poydras Street
8  Suite 1000
   New Orleans, Louisiana 70130
9    PLAINTIFFS COUNSEL
        (Present via telephone)
10
11 STONE PIGMAN WALTHER WITTMANN
     (BY: WILLIAM D. TREEBY, ESQ.)
12   546 Carondelet Street
     New Orleans, Louisiana  70130-3588
13       AND
   JONES DAY
14 (BY:  CHRISTOPHER THATCH, ESQ.)
   51 Louisiana Avenue N.W.
15 Washington, D.C. 20001-2113
      ATTORNEYS FOR WASHINGTON GROUP
16      INTERNATIONAL, INC.
17
   UNITED STATES DEPARTMENT OF JUSTICE
18 (BY: ROBIN D. SMITH, ESQ.)
   Torts Branch, Civil Division
19 Post Office Box 888
   Ben Franklin Station
20 Washington, D.C. 20044
      ATTORNEY FOR UNITED STATES OF
21      AMERICA
22
   ALSO PRESENT:  ROBERT BEA
23
   VIDEO BY: DEPO-VUE, GILLY DELORIMIER, CLVS
24
   REPORTED BY:  ROGER D. JOHNS, RMR, CRR, CSR
25      Certified Court Reporter,

### Page 3

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;

That the formalities of reading and signing are specifically not waived;

That the formalities of certification and filing are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

         * * * *

ROGER D. JOHNS, RDR, CRR, Certified Court Reporter for the State of Louisiana, officiated in administering the oath to the witness.

### Page 4

I N D E X
                                                PAGE
Cobos-Roa Exhibit Number 1................. 61
Cobos-Roa Number 2......................... 62
Cobos-Roa Number 3......................... 64
Cobos-Roa Number 4......................... 69
Cobos-Roa Number 5......................... 72
Cobos-Roa Number 6......................... 74
Cobos-Roa Exhibit Number 7................. 99
8-A and 8-B............................. 101
Cobos-Roa 8............................. 110
Cobos-Roa 9............................. 161
Cobos-Roa 10............................ 172
Cobos-Roa 11............................ 191
Cobos-Roa Number 12..................... 207
Cobos-Roa Number 13..................... 209
Cobos-Roa 14............................ 210

EXAMINATION BY MR. TREEBY:................. 6
EXAMINATION BY MR. SMITH:................. 236
EXAMINATION BY MR. TREEBY:............... 305

Page 141

    2   Q. On page 18 of your 8-B report, you
    1   that, I guess.
    3   state that the north breach case 1 excavation
    4   was, quote, "developed during the EBIA site
    5   clearing activities located near the water
    6   side levee toe in the vicinity of the north
    7   breach." Isn't that what you say?
    8   A. Can you please tell me which
    9   paragraph?
   10   Q. It will take me a minute to find
   11   it. Yes. It's in the last paragraph. At the
   12   end of the -- I was quoting with the word
   13   "developed" at the end of the first line.
   14   A. Okay.
   15   Q. Okay? "Developed during the EBIA
   16   site clearing activities located near the
   17   water side levee toe in the vicinity of the
   18   north breach". Isn't that what you say?
   19   A. Yes.
   20   Q. But you testified that the
   21   excavation was located west of Surekote Road,
   22   60 feet from the sheet pile; right?
   23   A. Right.
   24   Q. That's not near the water side levee
   25   toe, is it?

Page 142

    1   A. Yes.
    2   Q. How far did the levee toe extend
    3   from the floodwall?
    4   A. Probably 30 feet.
    5   Q. 30 feet?
    6   A. Let's look at the cross section.
    7   Q. Would it surprise you if it was --
    8   if Surekote Road actually -- the east side of
    9   Surekote Road was typically 15 feet from the
   10   floodwall? The levee toe ended there, did it
   11   not?
   12   A. Yes.
   13   Q. So 60 feet is not near the water
   14   side levee toe, is it?
   15   A. "Near" is a relative term I would
   16   say.
   17   Q. Right. Okay. And to you "near"
   18   could be 10, 20, 60 feet? Is that right?
   19   A. Yes.
   20   Q. Okay. Now, what do you mean when
   21   you say in that sentence that the north breach
   22   case 1 excavation was, quote, "developed
   23   during the EBIA site clearing activities"?
   24   A. That's the information I got or we
   25   got, as in Geoestudios, from Dr. Bea and

Page 143

    1   that's what went into the report.
    2   Q. Are you suggesting that Washington
    3   Group removed something at that location
    4   during the site clearing activities?
    5   A. I am not suggesting.
    6   Q. I'm sorry, what?
    7   A. I am not suggesting that. I am
    8   again -- I am again placing here information
    9   we had received from Dr. Bea.
   10   Q. So you didn't independently verify
   11   that information; is that correct?
   12   A. That's correct.
   13   Q. Dr. Bea's name is nowhere on this
   14   report, is it?
   15   A. Right. It is not.
   16   Q. Would you agree with me that that
   17   language suggests that something Washington
   18   Group did created that excavation that you
   19   depict in your conceptual cross section?
   20   A. It might. If it does, it's not our
   21   intention, I'm sorry. It's as I've pointed
   22   out many times now, we are dealing with the
   23   technical aspects of the engineering and the
   24   breaches. We are not -- We're just trying to
   25   model what happened. We're not pointing

Page 144

    1   fingers, I guess.
    2   Q. Well, is it important to your model
    3   to have that excavation that deep, that long,
    4   and that wide at that location?
    5   A. It is.
    6   Q. That's input to your model, is it
    7   not?
    8   A. It is.
    9   Q. So if it's inaccurate, that would
   10   affect your model, would it not?
   11   A. Yes.
   12   Q. Or if there was such an excavation,
   13   but Washington Group didn't do it, then this
   14   would be misleading, would it not, what you
   15   say in 8-B?
   16   A. It would.
   17   Q. And I take it from your answer that
   18   you don't have any idea what might have been
   19   removed by Washington Group when it supposedly
   20   dug this excavation that you depict in your
   21   conceptual cross section?
   22   A. I do not.
   23   Q. And you do not know when this
   24   excavation was performed by Washington Group,
   25   if you contend that it was?

36 (Pages 141 to 144)

Page 181

1  Q. Okay. I am going to another
2  subject. Diego, we have heard various
3  versions of the theft or thefts and
4  destruction or damage and then thefts to
5  computer files containing digital computer
6  flow and stability analyses in this case. We
7  need to determine precisely what happened with
8  regard to the loss of those files. First tell
9  us how these files and the backup for these
10 files were lost, stolen, damaged and/or
11 destroyed. Give us the time and circumstances
12 of those losses.
13    A. Very well. As you -- I'm sure you
14 already know, we had -- I had a laptop with
15 those files and also an external hard drive
16 with the same files. The laptop was stolen
17 from my temporary place when I used to live in
18 Albany, California, and that should have been,
19 if I remember correctly, the second semester
20 of 2009. And the external hard drive that had
21 all the backups, I carried it with me to
22 campus during course work and I must have left
23 it somewhere, the cafeteria, library,
24 laboratory. When I realized, I was already
25 home and didn't find it again.

Page 182

1  Q. Okay. So somebody said it was
2  dropped and damaged. Is that true or not?
3     A. I mean, dropped in the sense that it
4  might have dropped from my bag or -- or that
5  -- but I don't recall dropping it to the
6  ground and breaking it and, therefore, files
7  were unavailable. This external hard drive
8  was lost in the sense that I do not have it
9  any more.
10    Q. When did the first theft occur? You
11 said it was in the second semester of 2009?
12    A. Indeed.
13    Q. The second semester, just so we're
14 on the same page, is that -- in your parlance,
15 is the second semester of 2009 the fall
16 semester?
17    A. The fall semester.
18    Q. Where did the theft occur?
19    A. At my apartment in Albany,
20 California.
21    Q. How did you discover the theft had
22 occurred?
23    A. After I got home, the computer and
24 other things were missing.
25    Q. Other things? What other things?

Page 183

1     A. My backpack with a lot of my
2  university notes, power cords, mouse, other
3  external hard drives like the smaller ones,
4  the thumb drives. A lot of my essentially
5  electronic files, not only for this project,
6  but personal information and other things that
7  I participated in at home. That's basically
8  it.
9     Q. Okay. You have testified that you
10 did the barge work in 2009; right?
11    A. Yes.
12    Q. So that was lost on that computer?
13    A. I believe so. If it wasn't there,
14 it was on the external hard drive that I also
15 lost.
16    Q. How long after you lost, or the
17 computer was stolen did you lose the hard
18 drive?
19    A. I do not recall at this moment. But
20 it was within the same semester.
21    Q. So it was in 2009?
22    A. Yes, sir.
23    Q. What did the lap- -- what was the
24 model of the laptop?
25    A. It was a Dell. The model I do not

Page 184

1  recall.
2     Q. What was the size of the hard drive
3  on the Dell?
4     A. I don't know about memory size. I'm
5  sorry.
6     Q. What else was on the hard drive of
7  the laptop?
8     A. Papers, university stuff, homeworks,
9  personal documents, pictures, videos.
10    Q. Did you live with anybody at that
11 location?
12    A. My wife.
13    Q. Apparently she wasn't home when this
14 was stolen?
15    A. She was not.
16    Q. Did you report the computer stolen?
17    A. No.
18    Q. Why not?
19    A. We had another one. I was relieved
20 that I had an external hard drive with
21 backups. And it was an old computer so I
22 didn't really think much of it.
23    Q. Did you have any homeowner's
24 insurance or renter's insurance?
25    A. No.

Page 185

1    Q.  So I assume you didn't make any
2    insurance claims for the loss?
3    A.  Right.
4    Q.  Did you tell anybody else about the
5    loss at that time?
6    A.  I don't think so.  My parents
7    perhaps.
8    Q.  Okay.  What exactly was on that
9    computer's hard drive in the form of data or
10   computer runs or computer files that relate to
11   any part of your investigation, your
12   investigations about Hurricane Katrina?
13   A.  I would say the models we ran.  I
14   guess Excel files summarizing the results from
15   the models.  References.  I'm sure that I had
16   copies of the IPET and ILIT reports;
17   electronic copies, of course.  I can't recall
18   anything else.
19   Q.  Anything else?
20   A.  No, sir.
21   Q.  So are you saying that all of the
22   models you had run in all of your work on
23   Hurricane Katrina other than what you've
24   called Phase 1 and Phase 2 in this case were
25   on that laptop?

Page 186

1    A.  And the backup drive, yes, sir.
2    Q.  And they were on the backup drive.
3    A.  Yes.
4    Q.  Describe that external hard drive
5    that you say it was backed up on.
6    A.  Describe it physically you mean?
7    Q.  Yes.  Model, type, size, connection
8    type.
9    A.  USB.  Perhaps Western Digital.  I
10   believe that's the brand.  Maybe 500 gigabytes
11   of size.  Green.  That's -- That's all I can
12   remember about it right now.
13   Q.  Did you access that hard drive, that
14   external hard drive in any way after the
15   computer theft of your laptop?
16   A.  Yes.  I had not only these files,
17   but I also had many other files, including
18   papers and books and homework.  So yes, I used
19   the file drive regularly.
20   Q.  How did you access that external
21   hard drive after you lost your laptop?
22   A.  My wife has a laptop.  I had a small
23   desktop computer at home as well.
24   Q.  After the laptop was stolen, did you
25   try to make another copy of those files from

Page 187

1    the external hard drive for your protection?
2    A.  I did not.
3    Q.  When you accessed the hard drive on
4    other computers, your wife's laptop or a
5    desktop at your house, did you copy those
6    files to the hard drive of those computers?
7    A.  I did not.
8    Q.  Why not?
9    A.  I don't know.
10   Q.  You say you accessed that external
11   hard drive after the loss or the theft of the
12   laptop.  Were the flow and stability analyses
13   on that external hard drive when you accessed
14   it for those other purposes?
15   A.  I wasn't looking for them, so I -- I
16   guess the answer is I don't know.  I wasn't
17   looking for them.
18   Q.  Now, Dr. Bea told us that "The
19   backup hard drive disk was dropped, crashed
20   and afterward, no retrieval and it was
21   stolen.  We lost it twice in two different
22   ways."  Is that what you told him?
23   A.  Maybe it was a misunderstanding when
24   you say we lost the files and I -- I remember
25   I also told him I must have dropped the hard

Page 188

1    drive somewhere in the sense that, again, it
2    might have fallen from my bag or my pocket,
3    but I -- I didn't intend to suggest that it
4    physically broke after an impact.
5    Q.  If you simply -- Well, did you --
6    Excuse me.  Let me say it this way.  After you
7    lost both the stolen laptop and lost the
8    external hard drive, did you still have
9    available to you the inputs that you had used
10   in connection with your prior modeling of the
11   breaches in the EBIA?
12   A.  Can you please define "inputs"?
13   Q.  Input, input parameters, input
14   values, cross sections, whatever it is that
15   you would input into that model to make it
16   work.  Did you have that stuff available to
17   you?
18   A.  I recall I sent a DVD to Dr. Bea
19   with the models and I guess the reports we had
20   produced.  So yes, the inputs were in
21   possession other than mine.
22   Q.  When did you send Dr. Bea that DVD?
23   A.  Obviously before we lost the
24   information, but I cannot give you an exact
25   date.

47 (Pages 185 to 188)

Page 189

1  Q. Did the DVD contain the model runs?
2  A. You'll have to ask Dr. Bea.
3  Q. I would have if I had known. But go
4  ahead. You don't know?
5  A. I can't recall at this point.
6  Q. If it didn't include the model runs,
7  what would it have included?
8  A. Reports, cross sections, I guess.
9  Summary of results.
10  Q. Hydraulic conductivity inputs?
11  Would it have that?
12  A. Well, if you mean a table with the
13  input values we used for different layers, I
14  guess that will be contained within our
15  reports, so yes.
16  Q. So if you simply used the inputs
17  that were available to you in the -- in
18  connection with your October -- 8-A and 8-B
19  reports, how long would it take you to run
20  another 3D flow analysis in this case to
21  replicate the one that you did in 2008 that
22  was apparently lost on the stolen laptop and
23  the lost hard drive?
24  A. A month perhaps.
25  Q. Have you been asked? Were you asked

Page 190

1  to do this in this case by anyone?
2  A. No.
3  Q. Did you offer to do that?
4  A. No.
5  Q. From memory can you tell me any
6  differences between the inputs for those
7  earlier model runs and the ones you have
8  provided to us to support your 8-A and 8-B
9  reports?
10  A. I think the main difference would be
11  the value of saturated hydraulic conductivity
12  for the buried swamp layer.
13  Q. Anything else?
14  A. No. That was only a hydraulic
15  conductivity analysis. We did not perform
16  stability analysis at the time. That program
17  does not have the capability to do so.
18  Q. Okay. Just so we're clear, I think
19  I understand your testimony, but I want to be
20  100 percent on this point, --
21  A. Yes.
22  Q. -- based on what you've told me, I
23  would believe that the only flow analyses or
24  stability analyses you have done using Seep/W
25  or Slope/W with regard to the floodwalls in

Page 191

1  the East Bank Industrial Area since the theft,
2  damage, loss that you have just testified
3  about are the models that support 8-A and
4  8-B. Would that be correct?
5  A. I think that's correct.
6  Q. From your education in geotechnical
7  engineering you know, do you not, that one of
8  the basic parameters for a transient flow
9  analysis is compressibility?
10  A. I do.
11  Q. And, Diego, I want to show you an
12  email response, I'm sure your attorneys have
13  asked you about this, that we received from
14  your attorney, Tom Sims, to several questions
15  that related to Dr. Bea's report. And I am
16  marking this as Cobos-Roa 11. It consists of
17  a covering email and then a document that was
18  attached to the email which precedes
19  immediately on the -- and I have taken the
20  liberty of numbering the pages so it's easy to
21  find page numbers in this document.
22     In the first place, have you
23  discussed this with anyone in the last month?
24  A. Yes.
25  Q. When?

Page 192

1  A. It would be two weeks ago.
2  Q. When is the last time you saw any of
3  these pages in Cobos-Roa Number 11?
4  A. When was the last time I saw this?
5  I believe I have not seen this document as you
6  have it here. I have seen and gone over the
7  answers that I provided to this document
8  several times. So --
9  Q. When is the last time?
10  A. To your answer, might have gone back
11  to my answers, perhaps two weeks ago. The
12  same time I was discussing with --
13  Q. Not in the last couple of days?
14  A. No.
15  Q. Now, it has been stipulated by
16  Plaintiff's Counsel on the record, Elwood
17  Stevens, that you provided some of the
18  information that is in this document to Mr.
19  Sims. Is that correct?
20  A. That is correct.
21  Q. Look at the eighth page of the
22  attached letter. Page number 8 at the bottom,
23  which I have added as I said before, and I
24  have also highlighted some information on this
25  page. So the highlights I have added. The