# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION    NO. 05-4182 K2
            JUDGE DUVAL
PERTAINS TO MRGO    MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
    05-6314, 05-6324, 05-6327, 05-6359,
    06-0225, 06-0886, 06-1885, 06-2152,
    06-2278, 06-2287, 06-2824, 06-4024,
    06-4065, 06-4066, 06-4389, 06-4634,
    06-4931, 06-5032, 06-5155, 06-5159,
    06-5156, 06-5162, 06-5260, 06-5771,
    06-5786, 06-5937, 07-0206, 07-0621,
    07-1073, 07-1271, 07-1285
            * * *
        (V O L U M E  I)
    Deposition of ROBERT G. BEA, PH.D.,
given at the offices of Stone Pigman Walther
Wittmann, LLC, 546 Carondelet Street, New
Orleans, Louisiana 70130, on March 27th, 2012.
REPORTED BY:
    JOSEPH A. FAIRBANKS, JR., CCR, RPR
    CERTIFIED COURT REPORTER #75005

Page 2

```
 1   APPEARANCES:
 2   REPRESENTING THE PLAINTIFFS:
 3       BRUNO & BRUNO
 4       (BY:  JOSEPH M. BRUNO, ESQUIRE)
 5       855 Baronne Street
 6       New Orleans, Louisiana 70113
 7       504-525-1335
 8   - AND -
 9       DOMENGEAUX, WRIGHT, ROY & EDWARDS
10       (BY:  ELWOOD C. STEVENS, JR., ESQUIRE)
11       556 Jefferson Street, Suite 500
12       Lafayette, Louisiana 70501
13       337-233-3033
14
15   REPRESENTING THE UNITED STATES OF AMERICA:
16       U.S. DEPARTMENT OF JUSTICE
17       (BY:  ROBIN DOYLE SMITH, ESQUIRE)
18       (BY:  RUPERT MITSCH, ESQUIRE)
19       (BY:  JACK WOODCOCK, ESQUIRE)
20       Torts Branch, Civil Division
21       P.O. Box 888
22       Benjamin Franklin Station
23       Washington, D.C. 20044
24       202-616-4289
25
```

Page 3

```
 1   REPRESENTING WASHINGTON GROUP INTERNATIONAL,
 2       INC.:
 3       JONES DAY
 4       (BY:  DEBRA S. CLAYMAN, ESQUIRE)
 5       (BY:  ADRIAN WAGER-ZITO, ESQUIRE)
 6       (BY:  CHRISTOPHER N. THATCH, ESQUIRE)
 7       51 Louisiana Avenue, N.W.
 8       Washington, D.C. 20001-2113
 9       202-879-4645
10   - and -
11       STONE PIGMAN WALTHER WITTMANN, L.L.C.
12       (BY:  WILLIAM D. TREEBY, ESQUIRE)
13       546 Carondelet Street
14       New Orleans, Louisiana 70130
15       504-581-3200
16
17   ALSO PRESENT:
18       FRANCISCO SILVA-TULLA
19       TIMOTHY STARK
20       TOM BRANDON
21
22   VIDEOGRAPHER:  GILLEY DELORIMIER (DEPO-VUE)
23
24
25
```

Page 4

```
 1           E X A M I N A T I O N   I N D E X
 2
 3   EXAMINATION BY:                         PAGE
 4   MR. TREEBY  ................................7
 5
 6              E X H I B I T   I N D E X
 7
 8   EXHIBIT NO.                             PAGE
 9   Bea Exhibit 1 ..............................10
10   Bea Exhibit 2 ..............................72
11   Bea Exhibit 3 ..............................78
12   Bea Exhibit 4 ..............................86
13   Bea Exhibit 5 ..............................98
14   Bea Exhibit 5A .............................99
15   Bea Exhibit 6 .............................127
16   Bea Exhibit 7 .............................132
17   Bea Exhibit 8 .............................136
18   Bea Exhibit 9 .............................154
19   Bea Exhibit 10 ............................157
20   Bea Exhibit 11 ............................170
21   Bea Exhibit 12 ............................173
22   Bea Exhibit 13 ............................177
23   Bea Exhibit 14 ............................180
24   Bea Exhibit 15 ............................203
25   Bea Exhibit 16 ............................219
```

Page 145

1  studies of these effects.  So it would be a
2  matter of going back to those buildings and
3  estimate time and money.  My guess is a couple
4  of months at the pay scale of, um -- Diego
5  Cobos-Roa, with a day per week, maybe two, or a
6  day and a half, for my part.  So you could --
7  we could develop a time and a cost estimate for
8  you.
9      Q.  Do you know what his pay scale is?
10     A.  No.  Not now.
11     Q.  Would it surprise you if I told you
12 that people using that SEEP/W and 3D flow could
13 have done it in days, not months?  A few days?
14 Less than a week?
15     A.  They're probably very good.
16     Q.  You have numerous references in your
17 report in this case to the 3D flow analysis
18 done by Diego Cobos-Roa in 2008; isn't that
19 right?
20     A.  Yes, sir.
21     Q.  In fact, you make reference to the
22 analysis throughout your report.
23     A.  Repeat your question.
24     Q.  Yeah, I'm trying to go too fast.
25         You make reference to that 3D analysis

Page 146

1  throughout your report; isn't that right?
2      A.  Which report?
3      Q.  The report in this case.
4      A.  Yes.  Not throughout.  Only for Case
5  2, south breach.  So it's consistent through
6  the report to that specific case.
7      Q.  And that 3D analysis is something that
8  was in a report you did along with Diego
9  Cobos-Roa.  Isn't that right?
10     A.  That's correct, sir.
11     Q.  And then another 3D -- actually, the
12 2D 3D report in 2009 was done for the Robinson
13 case.  Right?
14     A.  I think that is correct, yes, sir.
15     Q.  And those files were lost, as well,
16 right?
17     A.  They're the same files.
18     Q.  Okay.  But is that the report in which
19 you did the comparison we've just talked about?
20     A.  Yes, sir.
21     Q.  Okay.  Now, both those -- well, that
22 3D analysis in the first -- in the 2008 report
23 that was just used again in 2009, this was a
24 report that you and Cobos-Roa did together;
25 right?

Page 147

1      A.  Yes.
2      Q.  This isn't some third party's
3  published report; right?
4      A.  That's correct.
5      Q.  It's your prior report that you are
6  relying upon in this report.
7      A.  And that's correct.
8      Q.  Now, I've heard differing versions of
9  how these files were lost.  I'd like your
10 version under oath.
11     A.  Um -- the files that were lost twice.
12 When Diego Cobos-Roa performed the analyses
13 using SEEP/W, those files were contained and
14 archives on his laptop computer.  At the same
15 time, he had a backup external hard drive in
16 which we backed up all of those files.  The
17 primary computer was stolen, taken, good-bye.
18 The backup hard disk drive was dropped,
19 crashed.  And afterward, no retrieval, and it
20 was stolen.  We lost it twice in two different
21 ways.
22     Q.  When was -- when were these events?
23     A.  Um -- I can't determine a precise date
24 for you, but it was late 2008 to early 2009,
25 and I'm sure Diego Cobos-Roa, being the victim

Page 148

1  of the problems, could give us a lot better
2  date.
3      Q.  So there were two separate events on
4  two different days, months, years, is that
5  right?
6      A.  That's correct.
7      Q.  And is anybody a witness to these
8  losses other than Diego Cobos-Roa?
9      A.  I don't know.  Of course, for a theft,
10 you would think only the thief would be a
11 witness, but we don't know who that is, or the
12 group that it was.  And I don't know about the
13 dropping of the external hard drive.  So I
14 can't answer your question, personally.
15     Q.  Where were you told these events
16 occurred?
17     A.  At the university.
18     Q.  Both events?
19     A.  Both events.
20     Q.  Was a police report made on the first
21 event?
22     A.  I have no knowledge.
23     Q.  If there was a police report, it would
24 have been done in Oakland?
25     A.  Well, usually the students had to make

Page 149

1  the police report first to the campus police.
2  And at that point, depending on what's
3  involved, it will go to the City of Berkeley,
4  not the Oakland Police Department. And from
5  there, it will go to the local police
6  department for Berkeley.
7  　Q.　Okay.
8  　　(Off the record.)
9  EXAMINATION BY MR. TREEBY:
10  　Q.　Now, without the input files and other
11  computer files for that 3D model, one cannot
12  check to determine all of the inputs to that
13  model to see if they match reality. Isn't that
14  true?
15  　A.　Well, we could repeat the analyses and
16  check it.
17  　Q.　Yes. And do you, yourself, have
18  access to the computer software to do those
19  flow analyses?
20  　A.　Well, I don't perform the analyses, as
21  I explained to you this morning, myself. But
22  certainly with the assistance of Diego
23  Cobos-Roa, Dr. Storesund, we could repeat those
24  analyses.
25  　Q.　Is it your testimony Dr. Storesund

Page 150

1  knows how to run that computer software to do
2  those flow analyses?
3  　A.　Yes.
4  　Q.　But you do not personally know how to
5  run that software.
6  　A.　That's correct.
7  　Q.　Refer to Pages 70 and 71 of your
8  report, if you would, please.
9  　A.　Yes, sir.
10  　Q.　Paragraph 77. Wait. I'm sorry. I
11  may have said wrong. Pages 71 and 72. And I'm
12  looking particularly at Paragraph 77 which
13  begins on Page 71 and continues over to
14  Page 72.
15  　　In that paragraph, you refer to
16  Mr. Rogers' 2012 report and to your prior work
17  in 2008 and 2009 with Mr. Cobos-Roa; is that
18  correct?
19  　A.　Yes, sir.
20  　Q.　Did you mean to say there, in
21  Paragraph 77, in your work in 2008 and 2009
22  with Mr. Cobos-Roa, that you previously and
23  consistently estimated the horizontal
24  permeability of the marsh layer in the East
25  Bank Industrial Area to be 10 to the -5

Page 151

1  centimeters per second?
2  　A.　No.
3  　Q.　You didn't mean to say that?
4  　A.　No.
5  　Q.　That's not what you meant to imply.
6  　A.　No.
7  　Q.　Okay.
8  　A.　In the earlier report, we studied a
9  range of horizontal permeability.
10  　Q.　Well, in fact, in ILIT, it wasn't a
11  range, really, it was 10 to the -2 centimeters
12  per second. Isn't that right?
13  　A.　I'm not referring to ILIT, but in the
14  previous work in 2008.
15  　Q.　Okay. In this paragraph, you start
16  off by talking about ILIT. You include IPET,
17  you include the work that you did with
18  Cobos-Roa in 2008 and 2009, and you say, based
19  on all of that work the hydraulic permeability
20  was determined to be 1 times 10 to the minus --
21  10 to the -5 centimeters per second, isn't that
22  right?
23  　A.　No. I determined that based on those
24  sources.
25  　Q.　But in ILIT, in fact, you didn't have

Page 152

1  a range, did you?
2  　A.　Well, there are two ILIT phases: One,
3  the generation of the report; and then Phase II
4  is after. And we discriminate between the two
5  phases. In the second phase that led to the
6  multiple publications in the Journal of
7  Geotechnical and Geoenvironmental Engineering,
8  we studied a range of horizontal
9  permeabilities. My memory says 10 to the -2 to
10  10 to the -5 or 6.
11  　Q.　I understand that. This ILIT report
12  that's referred to in Paragraph 77 is 2006;
13  right?
14  　A.　Correct.
15  　Q.　In that report, you had one
16  permeability; isn't that correct?
17  　A.　Correct.
18  　Q.　For the East Bank Industrial Area, and
19  it was 10 to the -2 centimeters per second.
20  　A.　Yes, sir.
21  　Q.　Thank you. In fact, you have held
22  different opinions regarding your, quote, best
23  estimate, close quote, of the permeability of
24  the marsh layer in the East Bank Industrial
25  Area, isn't that right?