UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | § CIVIL ACTION NO. 05-4182 "K"(2) <br> § JUDGE DUVAL <br> § MAG. WILKINSON <br> § <br> § |
| PERTAINS TO: <br><br> MRGO <br> *Armstrong*, No. 10-866 | § <br> § <br> § <br> § <br> § <br> § |

**DEFENDANT WASHINGTON GROUP INTERNATIONAL, INC.'S
MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE
TO EXCLUDE TESTIMONY AND EVIDENCE PERTAINING
TO DR. ROBERT DALRYMPLE'S SUPPLEMENTAL REPORT**

Defendant Washington Group International, Inc. ("WGI") respectfully submits this Memorandum in Opposition to Plaintiffs' Motion in Limine to Exclude Testimony and Evidence Pertaining to Dr. Robert Dalrymple's Supplemental Report. Dr. Dalrymple's Supplemental Report properly corrects errors contained in his original Expert Report, and Plaintiffs themselves acknowledge that the information contained in the Supplemental Report has no effect on Dr. Dalrymple's conclusions as set forth in his original Expert Report. Because the Supplemental Report fulfills the requirements of Federal Rule of Civil Procedure 26(e), and because its submission will not prejudice Plaintiffs in any way, this Court should deny the Plaintiffs' Motion.

**I.    BACKGROUND**

Dr. Dalrymple, WGI's hydrology expert, submitted his Expert Report in this matter on March 21, 2012.[1] As he explained in that Report, his ultimate conclusions regarding

---

[1] Dr. Dalrymple's expert report was originally due on March 8, 2012. Order, November 23, 2011 [Doc. No. 20592]. However, in March 2012, Plaintiffs' hydrology expert, Prof.

the relative influences of the IHNC and MRGO breaches and the water levels and sources of flooding at each Plaintiff's property were based on the results of simulations run in the FLOW-3D model, which models transient, free-surface flows in three dimensions. (Expert Report at 14, 48.) Dr. Dalrymple's FLOW-3D model simulated the flooding in the Lower Ninth Ward and the portion of St. Bernard Parish west of Paris Road (the "LNW/SBP"). The topography of the LNW/SBP in the FLOW-3D model was based on LIDAR data, with additional analysis undertaken to identify significant features in the LNW/SBP—such as the elevation of the railroad bed that runs north/south in the eastern portion of the Lower Ninth Ward, and of the solid concrete run-up to the St. Claude Avenue Bridge—that would have an effect on the propagation of floodwaters within the LNW/SBP. (Expert Report at 49-51.) In addition, to ensure that the FLOW-3D model accurately reflected the elevation of the floodwall along the EBIA, the elevation of the EBIA floodwall in the model was based on the most recent pre-Katrina physical survey of that floodwall conducted by the Orleans Levee District.[2] (Expert Report at 8-9.)

In order to model the propagation of floodwaters from the IHNC and MRGO breaches through the LNW/SBP, the FLOW-3D model required inputs ("boundary conditions") representing the water levels at the boundaries of the study area—*i.e.*, the water levels in the IHNC, and the volumetric flow rate of water crossing Paris Road into the western portion of St.

---

(continued…)

Johannes Vrijling, submitted a revised version of his expert report changing the breach times and duration of the IHNC North Breach. The parties agreed that in light of this revised report, which altered Prof. Vrijling's opinions regarding the arrival of floodwaters in the Lower Ninth Ward, Dr. Dalrymple's report would be due March 21, 2012.

[2] By contrast, Plaintiffs' expert, Prof. Vrijling, assumed that the IHNC floodwalls had a uniform elevation of +14 feet (NAVD88 (2004.65)). Vrijling Dep. at 286:1—288:7 (attached as Exhibit 1). This is significantly higher than the OLD's surveyed elevations.

Bernard Parish. (Expert Report at 54-56.) To model the water levels in the IHNC during Hurricane Katrina, the FLOW-3D model used the water levels observed and recorded by the IHNC lock personnel during the storm. (Expert Report at 55-56.) The volumetric flow rate at Paris Road was calculated by a second model, known as ADCIRC, which simulated Hurricane Katrina's storm surge over a much larger area: from the Gulf of Mexico, over the continental shelf, through the MRGO breaches, over the central wetlands, and into the St. Bernard polder. (Expert Report at 16-47.) To ensure that ADCIRC accurately calculated the flow rate of water entering the LNW/SBP over Paris Road, the ADCIRC hydrographs for various MRGO breaching scenarios were compared to two data points immediately east of Paris Road: two sets of field observations recorded in connection with the IPET Report.[3] The breach scenario ultimately used to provide boundary conditions to FLOW-3D was the scenario that produced the best fit of the water levels over time at these locations from ADCIRC when compared to the actual data recorded at those locations.

During Dr. Dalrymple's deposition, it became apparent that the elevation of a portion of the 40 Arpent Levee *east* of Paris Road in the ADCIRC simulation—based on a physical survey of that levee in 2011—was higher than the elevation of the levee as it existed in 2005. When informed of this inaccuracy in the ADCIRC model, Dr. Dalrymple testified that the incorrect elevation of a portion of the 40 Arpent Levee in the ADCIRC model east of Paris Road likely did not result in an error in the FLOW-3D-depicted flooding of the LNW/SBP, because the ADCIRC model had been calibrated by using measured water levels in Chalmette just east of Paris Road. (Dalrymple Dep. at 40:8—41:9; 207:25—208:22 (attached hereto as Exhibit 2).)

---

[3] The flooding of St. Bernard Parish simulated in the ADCIRC model was also compared against video taken during Katrina from the WVUE-TV tower just east of Paris Road to determine whether the timing of the arrival of the MRGO flood waters in the ADCIRC simulation agreed with the recorded data.

Plaintiffs counsel then asked Dr. Dalrymple whether, "[g]iven the quality that you intend to bring to this exercise, wouldn't it be better to rerun this whole thing with the correct levee heights?" and Dr. Dalrymple answered that to do so "would be a more complete way of doing it, to see if my supposition is correct." (Dalrymple Dep. at 209:14-20).

Accordingly, following his deposition, Dr. Dalrymple re-ran the ADCIRC simulation, incorporating the corrected and accurate elevations of the 40 Arpent Levee east of Paris Road. (Supplemental Report at 3.) During this process, an error in the algorithm used by ADCIRC to simulate the breaches along the MRGO was discovered. (Supplemental Report at 3-4.) This error was subsequently corrected and the ADCIRC simulation was re-run, this time with the corrected 40 Arpent elevations and the corrected breaching algorithm simulating the MRGO breaches. Consistent with Dr. Dalrymple's testimony at his deposition, these changes to the ADCIRC model had a negligible effect on the volume of water flowing over Paris Road in the simulation, and they therefore had no significant impact on the boundary condition at Paris Road in FLOW-3D. (Supplemental Report at 5.) Dr. Dalrymple produced his Supplemental Report on July 23, 2012, setting out the results of these new simulations and noting that his conclusions regarding the timing and depth of flooding at each Plaintiff's property did not change in any significant respect from the conclusions in his Expert Report. (Supplemental Report at 5-6.)

**II.   ARGUMENT**

    **A.   Dr. Dalrymple's Supplemental Report Properly Corrects Inaccuracies in His Original Expert Report.**

Federal Rule of Civil Procedure 26(e)(1) obligates parties to supplement or correct existing disclosures where "the party learns in some material respect the disclosure or response is incomplete *or incorrect*" (emphasis added). Rule 26(e)(2) makes this obligation

applicable to expert reports, and notes that any such supplemental or corrective expert disclosures must be made by the time of the parties' pretrial disclosures.  Fed. R. Civ. P. 26(e)(2).

As set forth above, and in the report itself, Dr. Dalrymple's Supplemental Report corrects two errors in his original Expert Report: (1) the elevation of the 40 Arpent Levee east of Paris Road in the ADCIRC model; and (2) the error in the algorithm used in the ADCIRC model to simulate the MRGO breaches.  These corrections neither introduce new opinions nor alter Dr. Dalrymple's existing opinions regarding the relative influences of the IHNC and MRGO breaches and the water levels and sources of flooding at each Plaintiff's property.  It is therefore a paradigmatic supplemental report in accordance with Rule 26(e).

This Court's Order and Reasons of June 28, 2012, is not to the contrary.  As the Court is well aware, the June 28 Order addressed whether the Dr. Bea's April 3, 2012 "Rebuttal Report" should be stricken as an improper rebuttal report.  This Court held that the report did constitute proper rebuttal evidence, except insofar as it addressed Dr. Bea's opinions on the "East Bank Industrial Area Site Clearing Excavations" (the "Swiss Cheese Graphics").  The Court noted that as far as the "Swiss Cheese Graphics" and the GIS models underlying those graphics were concerned, Dr. Bea's "Rebuttal Report" was "in essence a place holder" for yet another "supplemental report" which had yet to be written, and which would describe the results of GIS model runs that had not even been completed, let alone provided to the Defendants, at the time the "Rebuttal Report" was submitted to the Court.  Order and Reasons, June 28, 2012 at 3.  Because the GIS models underlying the "Swiss Cheese Graphics" were still a work-in-progress, this Court held that they were not timely rebuttal evidence.  Order and Reasons, June 28, 2012 at 4.  The Court further noted that any as-yet-unwritten report on the results of these new GIS models could not be considered "supplemental" because any such report would not serve to

correct inaccuracies in Dr. Bea's original report, but instead would provide entirely new analysis based on materials available for years prior to the submission of Dr. Bea's initial report. Order and Reasons, June 28, 2012, at 4-5. Accordingly, this Court properly held that the portion of Dr. Bea's April 3 "Rebuttal Report" addressing the "Swiss Cheese Graphics" should be stricken. Here, by contrast, Dr. Dalrymple's Supplemental Report is limited to correcting inaccuracies in his original report; it does not offer previously undisclosed theories or even alter his opinions in any way.

### B. Dr. Dalrymple's Supplemental Report Does Not Prejudice Plaintiffs.

Contrary to the claims in their Motion, Dr. Dalrymple's Supplemental Report does not prejudice the Plaintiffs in any way. As Dr. Dalrymple testified during his deposition, as his Supplemental Report confirms, and as Plaintiffs themselves are forced to admit (Memorandum of Law at 4), the corrections to the MRGO breach algorithm and the elevation of portions of the 40 Arpent Levee east of Paris road in the ADCIRC model have no effect whatsoever on *any* of Dr. Dalrymple's opinions as set forth in his March 21 Expert Report. This admission of fact explains why Plaintiffs neglect to describe in their Motion *how* Dr. Dalrymple's Supplemental Report would prejudice them. Indeed, after Dr. Dalrymple submitted his Supplemental Report, the Plaintiffs decided *not* to call their own hydrology expert, Prof. Vrijling, at trial. *See* Joint Stipulation Regarding Expert Witness Johannes Vrijling (attached as Exhibit 3). Similarly, the corrections set out in Dr. Dalrymple's Supplemental Report do not affect the work of Dr. Francisco Silva-Tulla, whose opinions regarding the cause of failure of the flood protection structures at the EBIA WGI will offer at trial. Dr. Silva's work did not rely on any portion of Dr. Dalrymple's original Supplemental Report.

Plaintiffs' bald assertion that permitting Dr. Dalrymple to submit his Supplemental Report would somehow require Dr. Bea to modify his report is a *non sequitur*. Dr.

Bea's opinions relate to "causes of failure of the levee/ flood wall at the EBIA, the conduct of the defendants associated with the levee/ flood wall failures, and the standard of care for performing earthwork at the EBIA." Pre-Trial Order at 63. Both Dr. Dalrymple's Supplemental Report and the errors that it corrects—the elevation of portions of the 40 Arpent Levee east of Paris Road and the algorithm used to breach the MRGO in ADCIRC—have no connection whatsoever to the EBIA levees/floodwalls, or to Dr. Bea's opinions.

### III. CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion in Limine to Exclude Testimony and Evidence Pertaining to Dr. Robert Dalrymple's Supplemental Report.

Dated: August 17, 2012

Respectfully submitted,

/s/ William D. Treeby
William D. Treeby, 12901
James C. Gulotta, Jr., 6594
Heather S. Lonian, 29956
   Of
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Telephone: (504) 581-3200
Facsimile: (504) 581-3361

and

Adrian Wager-Zito
Debra S. Clayman
Christopher R. Farrell
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

*Attorneys for Washington Group International, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Memorandum in Opposition to Plaintiffs' Motion in Limine to Exclude Testimony and Evidence Pertaining to Dr. Robert Dalrymple's Supplemental Report has been served upon the Court via hand-delivery pursuant to the Court's July 26, 2012 Minute Entry (Doc. 20927) this 17th day of August, 2012. Notice of this filing will be sent by e-mail to all counsel of record

*/s/ Heather S. Lonian*
Heather S. Lonian