UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO: MRGO | * | |
|     *Armstrong*, No. 10-866 | * | SECTION "K"(2) |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

# OPPOSITION TO DEFENDANT WASHINGTON GROUP INTERNATIONAL, INC.'S MOTION TO EXCLUDE EVIDENCE REGARDING DR. ROBERT BEA'S 3D SEEPAGE ANALYSES AND "DILATATIONAL WAVE VELOCITY"

**NOW INTO COURT**, through undersigned counsel, come the *Armstrong* Plaintiffs, who in opposition to the Defendant Washington Group International, Inc.'s Motion to Exclude Evidence regarding Dr. Robert Bea's 3D Seepage Analyses and "Dilatational Wave Velocity" (Rec. Doc. 20967), do state as follows:

### I.

Washington Group International, Inc.'s ("WGI") motion seeks dual relief from the Court. First, it seeks an overly drastic remedy by precluding Dr. Bea's testimony owing to the loss of the model runs of his 3D analyses, despite WGI having sufficient data to re-run the analyses again. The second motion is simply a continuation of defendants' ongoing attack of Dr. Bea's *steady flow* analyses. As will be shown below, neither is merited.

1

*A.     Dr. Bea's 3D Seepage Analyses*

**II.**

In evaluating the cause of the EBIA floodwall failures, Dr. Bea studied "two fundamental types of 'two-dimensional' numerical analyses. These two fundamental types of analytical models were developed to investigate two inter-related and interactive modes of failure development: (1) hydraulic conductivity analyses to determine seepage pressures and forces that affected the Lower 9th Ward floodwall performance, and (2) coupled hydraulic conductivity limit equilibrium lateral stability analyses to help determine conditions under which failure and non-failure of the floodwall develop." (See Exhibit 1 - Bea Expert report, p. 74-75, ¶ 81).[1]

Dr. Bea's 2D analysis confirmed the evolution of pore water pressure near the toe of the levee sufficient to produce vertical uplift pressure and cause instability.

**III.**

To create a better picture, and thus gain a greater understanding of the development of the breaches, Dr. Bea, with the assistance of then graduate student (now Dr.) Diego Cobos-Roa, utilized three dimensional (3D) modeling. The 2D and 3D seepage modeling analyses are based upon the same theoretical principles, but the 3D formulation introduced a third variable for hydraulic conductivity in the "z" direction.[2] The 2D cross sections are *the* starting point for the 3D modeling,

---

[1] Defendants fully admit in their motion in limine that the all of the two dimensional (2D) modeling files and other data that make up Dr. Bea's work were produced to the Defendants with Dr. Bea's Rule 26 materials. (Rec. Doc. 20967-1, § II(A)(1), p.4-5).

[2] The software developed by GeoSlope International (SEEP 3D and SEEP/W) were used to perform the 3D and 2D analyses. WGI has previously listed individuals from GeoSlope International as consultants on its witness list, and its expert Dr. Silva-Tulla has claimed operational competence in these programs.

2

so the 3D modeling simply enabled Dr. Bea to more accurately characterize the influences of excavations near the levee breaches in his Expert Report.[3]

## IV.

Admittedly, Mr. Cobos-Roa lost or had stolen the actual computer and backup hard drive that contained the 3D model runs. However, as Dr. Bea explained in his March 27, 2012 deposition, the (lost) model files are immaterial to studying the results of the 3D analyses because the model operator could simply "repeat the analysis" with those input parameters and cross-sections. (See Exhibit 2 - Bea depo., 3/27/12, 142:9-144:12). From Dr. Bea's perspective, the primary constraint to repeating such analysis would be time, particularly for the model operator (such as Mr. Cobos-Roa). Dr. Bea estimated the time needed to re-run this model would be a "couple of months." (See Exhibit 2 - Bea depo., 3/27/12, 144:15-145:8).

## V.

Considering the availability of GeoSlope International personnel to WGI and Dr. Silva-Tulla's familiarity with the 3D analysis program, it is not surprising that counsel for WGI can boast that they have "people using the SEEP/W and 3D flow" models could re-run the analyses "in [a few] days, not months," "less than a week." (See Exhibit 2- Bea depo., 3/27/12, 145:11-15).

Here, there is no reason to believe that WGI has not already performed such analyses; and any claim of prejudice is disingenuous.

## VI.

In addition, WGI seeks to exclude any evidence Dr. Bea's article presenting his 3D analyses

---

[3] Dr. Bea provided additional justification for these conclusions, as they were in excellent agreement with a 2006 study done by R.L. Money. (See Exhibit 1 - Bea report, p. 100, §107). Defendants' had ample opportunity to cross Dr. Bea about that study, and did so extensively.

3

as published in the Electronic Journal of Geotechnical Engineering. It is beyond refute that Dr. Bea's report was submitted to rigorous critique by geotechnical engineering specialists, and was approved inclusion in this peer-reviewed publication. Thus, there is no reason to doubt the reliability of the results.

For the same reasons that Dr. Bea should be able to discuss the results of his 3D analyses in his Expert Report, Dr. Bea should be able to discuss the results of his 3D analyses as presented in his paper published in the Electronic Journal of Geotechnical Engineering.

## VII.

The remedy that WGI seeks is out of proportion to the character of the issue at hand. Here, it cannot be said that plaintiffs or their experts willfully failed to disclose or evade their discovery obligations. Federal Rule of Civil procedure, Rule 37(b) provides that the court may make such orders in regard to failure to comply "as are just." However, courts have been cautioned against the imposition of exclusionary sanctions unless the court finds that the party acted in bad faith. With no such factors before the court, the Court's evaluation mandates against exclusion, with any perceived effect of non-production directed to the weight of the evidence, not its admissibility.

## VIII.

As the instant matter is a judge trial, this Court has already addressed a similar issue in favor of admitting the evidence. As in *St. Joseph Abbey v. Castille*, the present motion is primarily based on an attack concerning the underlying facts upon which Dr. Bea's opinion is based. In *Castille* this Court, substantiated by 5th Circuit precedent, determined that "reliability of data underlying an expert's opinion goes to the weight of this evidence, but should not serve as a basis for its exclusion." *St. Joseph Abbey, et.al v. Castille, et. al*, 2011 WL 2182046, *1 (E.D.

4

La.), citing *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 392-93 (5th Cir.2002).

Because WGI is already in receipt of the 2D analyses materials, and has ready access to the 3D modeling software, WGI will be able to undertake "vigorous cross-examination," provide a "presentation of contrary evidence," and enunciate a "careful instruction on the burden of proof" at trial. As this court has found, these "traditional and appropriate" techniques provide sufficient redress to defendants in attacking "admissible evidence." *Id.*, at *2.

**B.     *Dr. Bea's Explanation of the Dilatational Wave Velocity Propagation***

### IX.

WGI claims to have been taken by surprise by the "dilatational wave" terminology, claiming that "Dr. Bea recently suggested for the first time that he used 'dilatational wave velocity' to determine the compressibility of the organic layer." (Rec. Doc. 20967-1, § II(B), p. 11). Because dilatational wave velocity is nothing more than the calculation of the distance a pressure wave moves in a unit of time[4], WGI's claimed surprise lacks candor on various levels.

First, the principles of *steady flow* are dependent upon the soil conditions having fully saturated soils with no air voids. Dr. Bea has consistently maintained that his analyses of pressure transmission through the buried swamp/marsh layer was based upon the principles of *steady flow*.

Second, because the characteristics of the buried swamp/marsh layer correlate with *steady flow*, pressure induced upon the buried swamp/marsh layer is transmitted not by the consolidation of soil skeletons but upon the water encapsulating the soil skeletons.

---

[4] In the textbook *Soil Mechanics*, the dilatational velocity of pressure through saturated soil is identified as "typically about 5,000 feet per second." (Lambe and Whitman, 1969, p.455).

5

## X.

WGI's own exert Dr. Silva-Tulla has now admitted that these field conditions are as Dr. Bea had consistently cited:

1. "Organic clays like those at the EBIA are located below the water table, where the soil is, for practical purposes, completely saturated.

2. At that level, dilatational wave measurements are dominated by the compressibility of the water in the clay pores (pore fluid), not the compressibility of the soil skeleton itself.

3. Dilatational wave velocities measured in any soil located below the water table will reflect mostly the compressibility of water."

(See Rec. Doc. 20865-2, p. 25, Ex. 57, Silva Declaration, at p. 3, ¶ 8).

## XI.

WGI further claims that "Dr. Bea's 'dilatational wave velocity' theory was disclosed during his rebuttal deposition," i.e., "trial by ambush." (Rec. Doc. 20967-1, § II(B), p. 12). Here again, WGI is less than candid with the Court.

First, this is not Dr. Bea's "theory" as defendants are eager to assert. The transmission of pressure through the buried swamp/marsh layer, and the rate of such transmission through the water medium are fundamental principals examined in elementary soil mechanics textbooks, including the one authored by WGI's consulting expert Dr. Lambe.

Whether by defendants' feigned ignorance or actual ignorance of the fundamental principle of *steady flow*, defendants' inquiry of the rate of transmission of pressure through the buried swamp/marsh layer only arose in Dr. Bea's rebuttal report deposition. As a result, Dr. Bea's *steady flow* analyses was explained to a greater degree of simplicity, citing passages from introductory textbook written and subscribed to by defendants' experts.

But this was not the first time Dr. Bea identified these fundamental concepts.

6

## XII.

In his Expert Report, Dr. Bea's "fundamental conclusion" was that the North and South breaches resulted from storm surge pressing on the face of the floodwall on the canal side "coupled with hydraulic seepage and uplift pressures generated in the marsh layers under the soil levee through nearby excavations backfilled with high permeability materials." (See Exhibit 1 - Bea Expert Report, p. 18, ¶ 29). The defendants' excavations facilitated "significant increases in ...porewater pressure development paths. This led to much quicker and greater increases in seepage pressures and hydraulic gradients and led to decreases in the lateral resistance of the levee-floodwall sections." (See Exhibit 1 - Bea Expert Report, p. 18-19, ¶ 30).

Dr. Bea corroborated this conclusion in ¶ 54 of his Expert Report (and then in his Appendix C), where he cited the data gathered by USACE piezometers that exposed the effects of elevated water in the canal. Increased readings by the piezometers indicated that the "water in the IHNC was able to communicate rapidly and directly with the buried swamp-marsh deposits." (See Exhibit 1 - Bea Expert Report, p. 55-56, ¶ 55).

Further, Dr. Bea incorporated into his analyses laboratory tests analyzing hydraulic conductivity values showing marked differences from the "in situ field test values that were found to have hydraulic conductivities that were <u>three orders of magnitude higher</u> (x1,000) than those values obtained in laboratory tests which showed hydraulic conductivities of the order of $10^{(-8)}$ cm/s for same soils." (See Exhibit 1 - Bea Expert Report, p. 60, ¶ 59).

For an expert in geotechnical science, the above conclusions clearly illustrate that Dr. Bea's analyses would not be based upon the ***non-steady flow*** analyses that defendants would utilize.

7

### XIII.

At his first two days of deposition, defense counsel has ample opportunity to inquire about Dr. Bea's findings. In fact, on the first day of deposition, Dr. Bea clarified that his position involved *steady flow*, and even referenced that concept as it was contained in the Lambe and Whitman textbook. (See Exhibit 2- Bea depo., 3/27/12, 184:18-23). Then Dr. Bea explained that the soils in the buried swamp/marsh layer were modeled with no change in the saturation percentage and no change on the air void ratio, thus modeling them as relatively incompressible. (See Exhibit 2 - Bea depo., 3/27/12 188:15-190:5; 194:10-12).

On day 2 of his cross examination, Dr. Bea further explained that the transmission of pressure was an important aspect of his *steady flow* analyses. (See Exhibit 3 - Bea depo., 3/28/12, 166:2-167:4; 299:8-300:7). Dr. Bea explained that his analyses relied upon the piezometer studies that the USACE had produced, and that his calculations indicated that it took a matter of minutes for pressure to build. (See Exhibit 3 - Bea depo., 3/28/12, 168:25-171:10). Dr. Bea understood that the instantaneous responses seen in the piezometers made sense; therefore the relationship between compressibility and uplift pressure on the protected side was appropriate per steady flow. (See Exhibit 3 - Bea depo., 3/28/12, 221:7-222:9).

It should be clear to the Court that Dr. Bea's *steady flow* analyses incorporated the transmission of pressure though the buried swamp/marsh layer that ultimately undermined the structural integrity of the EBIA floodwall. As Dr. Silva-Tulla has conceded, the rate of transmission of this pressure is calculated as the dilatational wave velocity.

### XIV.

Again, the defendants' claim of surprise is rebuffed by the findings of its own expert Dr.

8

Brandon. In his expert report, Dr. Brandon correctly identified the underlying principles that explain the failure of the EBIA flood wall, stating that "[w]hen canal water increases, the pore pressure increases at the toe of the levee [on the protected side]. This increase in pore pressure happens very quickly in a saturated system owing to the very low compressibility of water. Conditions can occur where the upward pressure on a low permeability layer, labeled as a clay...is greater than the weight of the layer. This can cause the layer to heave upwards." (See Exhibit 4 - Brandon Report, p. 38).

What should be abundantly clear is that the rate of transmission that Dr. Brandon knows happens "very quickly" is identified as the dilatational wave velocity. Hence any claim of surprise is utterly false.

## XV.

For the foregoing reasons, the defendants' Motion to Exclude Evidence regarding Dr. Robert Bea's 3D Seepage Analyses and "Dilatational Wave Velocity" should be denied.

Respectfully submitted,

PLAINTIFFS' LIAISON COUNSEL

s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar No. 3604)
BRUNO & BRUNO, L.L.P.
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

MR-GO PLAINTIFFS SUB-GROUP LITIGATION COMMITTEE

s/ James Parkerson Roy
JAMES PARKERSON ROY (La. Bar No. 11511)
MR-GO PSLC Liaison Counsel
Domengeaux Wright Roy & Edwards LLC
P.O. Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

for

MRGO PLAINTIFFS SUBGROUP LITIGATION COMMITTEE

Jonathan Andry (The Andry Law Group, LLC, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 17th day of August, 2012.

/s/ Joseph M. Bruno
Joseph M. Bruno

10