UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re Katrina Canal Breaches § <br> Consolidated Litigation § <br> § <br> Pertains to: MRGO § <br> *Armstrong*, C.A. No. 10-866 § <br> § | Civil Action <br> No. 05-4182 "K" (2) <br> Judge Duval <br> Mag. Wilkinson |

**Plaintiffs' Memorandum in Opposition to the United States'
Motion *in Limine* to Limit or Exclude Testimony of Chad Morris (Doc. 20958)** [1]

Defendants move to limit or exclude Plaintiffs' Professional Surveying and Mapping expert, Mr. Chad Morris's, testimony by artificially creating a special meaning and inapposite significance for the word "spatial" (a GIS/mapping term in the context of this case).[2] Defendants first refer to "spatial" as a "spectacularly vague" term then immediately declare that according to the Old English Dictionary it means precisely "of or pertaining to space"—as opposed to the general spatial relationship between geographic features commonly used by surveyors, as intended by Mr. Morris in his reports and as explained in his deposition.[3]

Based upon this out of context dictionary definition of a surveying term, Defendants now suggest that since Mr. Morris made no actual measurements of any particular excavation or structure and readily admitted that he "could not demonstrate the <u>exact location or depth</u> of any particular earth work performed by WGI in the EBIA", his testimony must be deemed unreliable and/or irrelevant. As a matter of law, it is not

---

[1] Defendant, WGI, filed an unopposed motion to join with this motion by Defendant, USA.
[2] GIS: (Geographic Information System) maps made from compilations of different layers/types of data.
[3] USA's Memo., fn.11, p.5. *See also*: Morris, Depo. 60:25-61:21.

1

incumbent upon Plaintiffs to provide such exactitude and in the context of this motion *in limine* Defendants' actual criticisms of Mr. Morris' opinions are best left to cross-examination as they speak to the weight to be afforded his otherwise admissible testimony, not its exclusion.[4]

Defendants go so far as to suggest that <u>any</u> "spatial characteristics" testimony by Mr. Morris would therefore be beyond the scope of his prior reports and deposition testimony and must be excluded.[5] In the process, Defendants' ignore the essence of the opinions and conclusions expressed in Mr. Morris' two prior reports and the sworn testimony offered in his deposition, in favor of donning blinders and mulishly focusing on an inappropriate and self-crafted definition of the term "spatial".[6]

As demonstrated below, such is not the case and Defendants' *in limine* motion to limit or exclude is without merit.

## I.   FACTUAL BACKGROUND

Mr. Chad Morris' expert report entitled *"Survey and Spatial Data in the Vicinity of the IHNC"* dated July 18, 2011 and the report he co-authored with Dr. Robert Bea, entitled: *"IHNC Lock Expansion EBIA Site Clearing Excavations: Lower 9th Ward Breaches"* dated January 29,

---

[4] As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration. *Scordill v. Louisville Ladder Group, L.L.C.*, 2003 WL 22427981 (E.D.La., Vance, 2003) citing: *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.* 80 F.3d 1074, 1077 (5th Cir.1996) (quoting Viterbo v. Dow Chemical Co., 826 F.2d 420, 422 (5th Cir.1987).

[5] USA's Memo., p. 7.

[6] *"Mr. Morris's expert report, however, contained no opinions or conclusions concerning 'spatial characteristics' of the earth work performed by defendants at the EBIA. It contained no opinions or conclusions concerning 'spatial characteristics' of the EBIA and surrounding region."* [USA's Memo., p. 1.]

2

2009 were timely submitted. These reports address virtually identical issues and arrive at similar opinions regarding the general location of work activities and excavations, types of construction activities and poor or no compaction of backfill materials by WGI in the EBIA just prior to Katrina and their correlation to the vicinity of the North and South breaches.

There is no dispute or challenge regarding the expertise of Mr. Chad Morris in the analysis of survey data, spatial data including: aerial and terrestrial photographs, LIDAR data, nor construction drawings and documents as expressly relied upon and described on page 2 of his July 18, 2011 report. This court previously accepted Mr. Morris as an expert in the area of Surveying and Mapping and acknowledged that his testimony was "highly credible"[7] and included "the most stunning visual evidence provided" to the court.[8]

As he did in connection with his testimony in MRGO, Mr. Morris relies upon, similar, and in some instances the same, spatial data sets, *viz*: LIDAR, aerial and terrestrial photographs, survey and construction drawings and documents to arrive at similar observations, opinions and conclusions in the instant matter. When asked what kind of "spatial" data he had reviewed for this case involving the IHNC levee breaches, Mr. Morris cogently explained: "Spatial data is a relatively broad term" but "LIDAR" and "aerial photographs" would be examples of spatial data.[9] Additionally, Mr. Morris testified that he had also reviewed "construction documents" and WINK survey data produced by Washington Group[10] and he confirmed that he used LIDAR and aerial photographs to provide the breach mapping contained in his reports.[11]

---

[7] *In re Katrina Canal Breaches Consolidated Litigation*, 647 F.Supp.2d 644, 674 (Nov. 2009); *Affirmed*, 673 F.3d 381 (5th Cir. 2012).
[8] *Id.* at p. 683.
[9] Morris, Depo. 61:2-7.
[10] Morris, Depo. 75:19-76:4.
[11] Morris, Depo. 202:16.

Mr. Morris has consistently opined that there were extensive construction/excavation activities in the vicinity of the North and South Breaches, that the images and documents provided by the USACE and WGI demonstrate that this extensive work included multiple excavations and pile removals which extended to depths of over 25 ft., and that these excavations and pile removals were either not backfilled at all or were poorly backfilled "primarily with non-compacted material and sand".[12] In summary, Mr. Morris' overarching opinion dating back to at least January 2009 has been:

> *"The documentation provided in this report provides sufficient evidence that there were many poorly backfilled excavations developed during the USACE IHNC Navigation Lock Expansion Project EBIA site clearing operations"*. (*Id.* at p. 31).[13]

> *"...the gist of the case is that excavations happened, a bunch of construction work was done, and I believe everyone agrees, especially at the north breach, that the wall went down before it was overtopped and there's some indication that groundwater seepage may have contributed to that and we were looking for excavations and pile removals, anything that would be evidence that would lead to how the water could be connected with the marshy layers where there could be conductivity. That was what he [Dr. Bea] asked me to look for".*[14]

Lest there be any doubt, Mr. Morris' role as a professional surveying and mapping expert was much more than to simply "pull photos for Dr. Bea".[15] Contrary to Defendants' mischaracterization of the data underlying his opinions and their unrealistically restrictive view of the scope of his opinions, Chad Morris, testified:

> *"I dealt with hundreds of documents, and again my focus was to try to find, in the hundreds of documents I was provided, try to find documentation that showed the types of construction that happened out there and that some of this construction involved deep excavations that could have impacted the potential*

---

[12] Morris Report, July 2011, p.15-16, 27; Bea-Morris Report, January 2009, p.8, 13, 17, 26, 28 and 31.
[13] Defense counsel have been fully aware of these opinions for a very long time, and in fact requested that full copies of the both reports, be attached to Mr. Morris' March 9, 2012 deposition. (*See*: Depo. Exhibits 2 and 8).
[14] Morris, Depo. 196:7-19.
[15] USA's Memo., fn.22, p.7.

4

*for water to reach levels which could affect water flow and undermine floodwalls. So I guess the answer is "yes", but I can't point to a specific one that literally—You know what it's like when there are thousands of documents and you're looking through them to find the needle in the haystack."* [16]

During questioning by defense counsel in his deposition Mr. Morris answered precise questions with precise answers:

*"Again, the exact location of every excavation is not something I can clearly ascertain from the data that we have been provided".* [17]

*"I simply was not able to gather the information that would allow me to pinpoint exactly where each excavation was".* [18]

After explaining his expertise in surveying and mapping and describing his use of photogrammetry (science of performing mapping from photographs) Mr. Morris further explained that he had personally observed and monitored "backfilling and compaction" activities on construction sites throughout his career. He further attested that he considers himself "knowledgeable" about backfilling and compaction on construction sites and certainly knows the difference between *"pushing sand in a hole with a bulldozer"* and actually *"placing lifts with clay materials and compacting them".* [19]

When defense counsel inquired further about the basis for Mr. Morris' opinion that the excavations and holes were poorly backfilled he offered the following supporting statements:

---

[16] Morris, Depo. 141:15-142:4.
[17] Morris, Depo. 194:7-9.
[18] Morris, Depo. 195:19-20. (emphasis supplied)
[19] Morris, Depo. 27:24-28:20. (emphasis supplied)

5

> *"Where there are thousands of images and the images—except for the one that was shown of a bucket reaching down into the bottom of the cofferdam location—we see lots of placement of fill material, labeled "placement" of fill material, captions that WGI put on the images labeling them "placement" of material.*
> *I think if they had had an extensive process of compacting that material, they would have documented that in some of those images and certainly—the images did not indicate —I didn't see evidence of compaction".*[20]

Pressed again about the topic of poor or no backfilling in the extensive areas of excavation work and pile removal activities, Mr. Morris, added:

> *"I think one image, yes, your statement is very accurate for one image, but when there are thousands of images that are showing all of their construction activities, everything from tearing down a building to measuring a pile that they pulled out of a hole to all the other construction activities they do, and <u>glaringly missing is the extensive work that it takes to do what I witnessed in my career of compaction of backfill material, and that isn't in all of those images, I think</u> it's <u>fair to glean that there was not an extensive program of careful compaction".</u>* [21]

In the final analysis, despite Defendants' attempt to redefine the term "spatial" in the context of Professional Surveying and Mapping and the resultant mischaracterization of the nature and scope of the opinions Mr. Morris has expressed repeatedly for several years, his testimony remains relevant and reliable. Likewise, it is highly likely that Mr. Morris' testimony and opinions will aide and assists this court to understand and ultimately determine the core issue presented—Whether the site clearing and remediation work performed by WGI at the EBIA more probably than not exacerbated under seepage and contributed to causing the North and South breaches along the IHNC.

---

[20] Morris, Depo. 204:25-205:12.
[21] Morris, Depo. 205:14-25. (emphasis supplied)

6

## II. ARGUMENTS AND AUTHORITIES

a. First, Defendants argue that Mr. Morris's testimony should be excluded because it is either irrelevant, not based on "specialized knowledge" or is otherwise inadmissible because not contained in his report(s); thus, it should be precluded before trial by motion *in limine*.[22]

b. Second, Defendants suggest that even if "relevant" Mr. Morris testimony should be excluded because its "probative value is substantially outweighed by, among other things, considerations of undue delay, waste of time, or needless presentation of cumulative evidence".[23]

c. Finally, Defendants suggest that Mr. Morris's testimony should be excluded because "Mr. Morris was never present at the EBIA site for any of the work performed".[24]

(a) The standard applied when making the distinction between topics that warrant an expert as opposed to those that are common knowledge is: To warrant or permit use of expert testimony, the subject matter must be closely related to a particular profession, business or science and not within the common knowledge of the average layman, and the witness must have such skill, experience or knowledge in that particular field as to make it appear that his

---

[22] USA's Memo., p. 7.
[23] USA's Memo., p.3. (*Citing*: Fed. R. Evid. 403).
[24] USA's Memo., p. 7.

7

opinion would rest on a substantial foundation and would tend to aid the trier of fact in its search for truth.[25]

"One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion as an expert". *Thomas J. Kline, Inc. v. Lorillard, Inc.*, C.A.4 (Md.) 1989, 878 F.2d 791, rehearing denied, certiorari denied 110 S.Ct. 1120, 493 U.S. 1073, 107 L.Ed.2d 1027. "The only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth." *Mannino v. International Mfg. Co.*, C.A.6 (Ohio) 1981, 650 F.2d 846.

Mr. Morris' opinions are clearly based on "specialized knowledge", substantial experience and substantial foundational materials. Contrary to Defendants' assertions Mr. Morris' work is not based solely on use of photo captions provided by WGI.[26] As he repeatedly states in his deposition the GIS images and overlays in his reports are based upon LIDAR data, document review and photographic analysis used to show spatial relationships by layering drawings onto photos or inserting Defendants' data onto Defendants' photos.[27] Mr. Morris demonstrates the horizontal and vertical positions of various features by showing where they are

---

[25] *Faircloth v. Lamb-Grays Harbor Co., Inc.*, C.A.5 (Ala.) 1972, 467 F.2d 685. See also: Fineberg v. U. S., C.A.9 (Cal.) 1968, 393 F.2d 417. See, also, *U.S. v. 60.14 Acres of Land, More or Less, in Warren and McKean Counties, State of Pa.*, C.A.Pa.1966, 362 F.2d 660; *U.S. v. Alker*, C.A. 3 (Pa.)1958, 260 F.2d 135, certiorari denied 79 S.Ct. 579, 359 U.S. 906, 3 L.Ed.2d 571, rehearing denied 79 S.Ct. 732, 359 U.S. 950, 3 L.Ed.2d 683.
[26] USA's Memo., p. 7.
[27] GIS (Geographic Information System) maps consists of maps and photos superimposed upon one another to show breach zones and dimensions, proximity of work areas to breaches and sill heights for N and S breaches.

8

on the globe and how they relate to one another. An expertise not shared by many professionals much less within the common knowledge of lay persons.

Only by adopting Defendants' self-crafted definition of "spatial" and simultaneously rejecting Mr. Morris' sworn testimony and ignoring the multiple images and overlays in his reports which demonstrate spatial relationships between objects and areas, could one conclude that Mr. Morris' reports do not contain "spatial characteristics" of the EBIA and the work performed by WGI.

Nonetheless, expert testimony is not strictly limited to the contents of his/her report. Judge Berrigan's recent analysis of the law in *Kadant Johnson Inc. v. Joseph D'Amico et al*, 2012 WL 2064413 (E.D., La., June 7, 2012) is instructive here:

> "Under 26(a)(2)(B) of the Federal Rules of Civil Procedure, a written report must be prepared when a party subpoenas a witness for expert testimony. Under 26(a)(2)(B)(I), the report must contain "a complete statement of all opinions the witness will express." The fact that subjects were not fully addressed may reflect on the weight of the testimony, but not on the admissibility or preclusion of the evidence. *Wagoner v. Exxon Mobil Corporation,* 813 F.Supp.2d 771, 810 (E.D.La.2011). **The testimony of an expert witness is also not "strictly limited to the content of his report."** *Stacey v. Bangor Punta Corp.,* 107 F.R.D. 786, 789 (D.Me.1985). Six factors that are used to analyze whether an expert's testimony should be limited are: 1) if the expert testified to opinions or data on content not disclosed in his pretrial discovery testimony; 2) the content should have been disclosed; 3) the testimony surprises the opposing party; 4) it causes unfair prejudice; 5) it could not have been reasonably anticipated; or 6) the issue is only ameliorated if excluded. *Id.* None of these factors apply here". *Supra* at p. 1-2 (emphasis supplied).

Likewise, the district court's assessment in *Stacey v Bangor Punta Corp.*, relied upon by Judge Berrigan in *Kadant Johnson,* is also instructive here:

> "More importantly, even if such an issue were generated, its resolution would require the application, in the exercise of the Court's discretion, of a complex of criteria

on the globe and how they relate to one another. An expertise not shared by many professionals much less within the common knowledge of lay persons.

Only by adopting Defendants' self-crafted definition of "spatial" and simultaneously rejecting Mr. Morris' sworn testimony and ignoring the multiple images and overlays in his reports which demonstrate spatial relationships between objects and areas, could one conclude that Mr. Morris' reports do not contain "spatial characteristics" of the EBIA and the work performed by WGI.

Nonetheless, expert testimony is not strictly limited to the contents of his/her report. Judge Berrigan's recent analysis of the law in *Kadant Johnson Inc. v. Joseph D'Amico et al*, 2012 WL 2064413 (E.D., La., June 7, 2012) is instructive here:

> "Under 26(a)(2)(B) of the Federal Rules of Civil Procedure, a written report must be prepared when a party subpoenas a witness for expert testimony. Under 26(a)(2)(B)(I), the report must contain "a complete statement of all opinions the witness will express." The fact that subjects were not fully addressed may reflect on the weight of the testimony, but not on the admissibility or preclusion of the evidence. *Wagoner v. Exxon Mobil Corporation,* 813 F.Supp.2d 771, 810 (E.D.La.2011). **The testimony of an expert witness is also not "strictly limited to the content of his report."** *Stacey v. Bangor Punta Corp.,* 107 F.R.D. 786, 789 (D.Me.1985). Six factors that are used to analyze whether an expert's testimony should be limited are: 1) if the expert testified to opinions or data on content not disclosed in his pretrial discovery testimony; 2) the content should have been disclosed; 3) the testimony surprises the opposing party; 4) it causes unfair prejudice; 5) it could not have been reasonably anticipated; or 6) the issue is only ameliorated if excluded. *Id.* None of these factors apply here". *Supra* at p. 1-2 (emphasis supplied).

Likewise, the district court's assessment in *Stacey v Bangor Punta Corp.*, relied upon by Judge Berrigan in *Kadant Johnson,* is also instructive here:

> "More importantly, even if such an issue were generated, its resolution would require the application, in the exercise of the Court's discretion, of a complex of criteria

that are intimately tied to factual questions of prejudice, surprise, the best means of alleviating prejudice, and the effect upon the progress of the trial of the allowance or disallowance of such testimony. *Meyers v. Pennypack Woods Home Ownership Assn.,* 559 F.2d 894, at 904 (3d Cir.1977); *see Simonsen v. Barlo Plastics Co., Inc.,* 551 F.2d 469 (1st Cir.1977); *Johnson v. Webster,* 775 F.2d 1, 6–9 (1st Cir.1985). Such issues are not capable of resolution generically or in a factual void. If such an issue is generated at trial, the Court must resolve it by the exercise of its discretion in the context of the facts as they exist at that time.

Finally, Plaintiff seeks a pretrial order limiting the testimony of Defendants' experts to the content of the reports provided by them. Such limitation would also be premature. **The scope of an expert witness' testimony at trial is not necessarily strictly limited to the content of his report provided in discovery.** Plaintiff will be entitled to limit a defense expert's testimony at trial only if the Court is satisfied, on generation of such an issue at trial, that he is to (1) testify to data or opinions not disclosed in pretrial discovery about the content of his testimony; (2) which should have been disclosed; (3) the production of which surprises the plaintiff; and (4) causes unfair prejudice to the plaintiff; which (5) could not have been reasonably anticipated by Plaintiff; or (6) cannot be alleviated otherwise than by exclusion of the testimony. **The relief sought by the Plaintiff would reduce the trial participation of expert witnesses to the mechanical process of reading aloud their pretrial reports into evidence.** Such a result is clearly not consonant with the objectives of a fair trial process whose goal is the determination of the truth or with the purposes of avoidance of surprise and unfair prejudice by permitted discovery. *See Johnson, supra.* Accordingly, Plaintiff's motion is *DENIED." (Stacey, supra* at p.789*)*

(b) This Court has also addressed the type of late-filed Rule 403 (probative value v. prejudicial effect) attack primarily concerning the underlying facts upon which an expert's opinions are based. In *St. Joseph Abbey v. Castille, et al,* 2011 WL 2182046 (E.D., La.) (June 3, 2011) this court soundly concluded:

> "This late-filed "*Daubert*" motion for the most part, appears to be an unnecessary expenditure of time, effort and expense, in the context of a non-jury, judge-tried case such as this one. The motion is primarily based on attacks concerning the underlying facts upon which the opinion was based. That approach is not contemplated under a *Daubert* challenge. "[T]he reliability of data underlying an expert's opinion goes to the weight of this evidence, but should not serve as a basis for its exclusion. *See Tyler v. Union Oil Co. of Cal.,* 304 F.3d 379, 392–93 (5th Cir.2002)." *General Electric*

10

> *Capital Business Asset funding Corp. v. S.A.S.E. Military Ltd.,* 2004 WL 5495590, *4 (W.D.Tex. Oct. 21, 2004).
> 
> As further discussed in *General Electric Capital Business:* Courts should not [be] lured by arguments disguised as *Daubert* challenges that actually attack the weight of the expert testimony, not its admissibility. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hartley,* 310 F.3d at 1061 (quoting *Bonner v. ISP Tech., Inc.,* 259 F.3d 924, 929–30 (8th Cir.2001) (internal citations and quotations omitted). Therefore, challenges to the factual bases or underpinnings of an expert opinion usually go only to weight and credibility of the evidence, not admissibility. *Moss v. Ole South Real Estate, Inc.,* 993 F.2d 1300, 1307 (5th Cri.1991); *Matador Drilling Co. v. Post,* 662 F.2d 1190, 1199 (5th Cir.1981)".[28]

Clearly, this late attack against Mr. Morris by Defendants is based upon nothing more than the factual underpinnings of the opinions they anticipate he will offer at trial. Perhaps the solution echoed by the state district judge, the Louisiana Third Circuit Court of Appeal and Judge Haik in the W.D.La. (federal habeas court) in *State v Schmidt* [29] (albeit a criminal case) puts the instant motion into context. In analyzing and resolving a pretrial motion to exclude expert testimony the consensus among all three tiers of review was as follows:

> "… we note that this is a *preliminary* finding and that *at this time* the evidence may be considered admissible but subject to later review at trial on the merits. The finding required for admissibility under La.Code Evid. art. 404(B) does not address the question of relevance versus prejudice required by La.Code Evid. art. 403. That is a question that can only be **answered** when the evidence is offered at trial".[30]

---

[28] *See also: Deville v. Comar Marine Corp.,* 2009 WL 1870896 (E.D.La. June 25, 2009) (Barbier) and *Thompson v. Rowan Companies, Inc.,* 2007 WL 724646 (E.D.La. March 6, 2007) (Barbier).
[29] *State v. Schmidt,* 699 So. 2d 448 (La. App. 3rd, 1997).
[30] *Schmidt, supra* at 452 (emphasis in original).

11

(c) Similarly deficient is the assertion by Defendants that Mr. Morris' testimony should be excluded because he was not present during any of the WGI excavation activities.[31] As a matter of law and common sense an expert need not have personally experienced the factual situation about which he is to testify. *Globe Indem. Co. v. Highland Tank & Mfg. Co.*, E.D.Pa.1972, 345 F.Supp. 1290, *affirmed* 478 F.2d 1398. Likewise, trial courts have broad discretion in the admission of expert evidence and its decision must be sustained on appeal unless 'clearly erroneous'.[32]

However, conspicuously absent from Defendants' brief is any citation to authority for this "must be present to opine" proposition.

## CONCLUSION

The United States' Motion to Limit or Exclude the Testimony of Mr. Chad Morris is unfounded as he is well qualified, his testimony is both relevant and reliable and as such admissible. To the extent a question should arise as to its relevance, reliability or potential for unfair prejudice to the Defendants under FRE 403, the court can address that question in the context of the trial. At this juncture, it is premature to ask this Court to weigh and balance those factors as the attack on the underlying factual basis for Mr. Morris' opinions, as a matter of well-established law, goes to the weight of that evidence and not its admissibility.

---

[31] USA's Memo., fn 27, p. 7.
[32] *Faircloth v Lamb-Grays Harbor Co., Inc.*, 467 F.2d 685 (5th Cir. 1972) (Citing: *Crawford v. Worth*, 447 F.2d 738, 740-1 (5th Circ. 1971) and *Southern Cement Company, Div. of Martin-Marietta Corporation v Sproul*, 378 F.2d 48, 49-50 (5th Cir. 1967)).

Wherefore, based on the foregoing, Defendants' motion to limit or exclude the testimony of Mr. Chad Morris should be denied.

Dated: August 17, 2012

Respectfully submitted,

PLAINTIFFS' LIAISON COUNSEL

*s/ Joseph M. Bruno*
JOSEPH M. BRUNO (La. Bar No. 3604)
BRUNO & BRUNO, L.L.P.
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com


MR-GO PLAINTIFFS SUB-GROUP
LITIGATION COMMITTEE

s/ James Parkerson Roy
JAMES PARKERSON ROY (La. Bar No. 11511)
MR-GO PSLC Liaison Counsel
Domengeaux Wright Roy & Edwards LLC
P.O. Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

for

MRGO PLAINTIFFS SUBGROUP LITIGATION COMMITTEE

Jonathan Andry (The Andry Law Group, LLC, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 17th day of August, 2012.

/s/ *Joseph M. Bruno*
Joseph M. Bruno