**KENNETH ARMSTRONG, SR.**                                **September 12, 2011**

---

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   CIVIL ACTION
CONSOLIDATED LITIGATION         NO. 05-4182 K2
                JUDGE DUVAL
PERTAINS TO MRGO        MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
     05-6314, 05-6324, 05-6327, 05-6359,
     06-0225, 06-0886, 06-1885, 06-2152,
     06-2278, 06-2287, 06-2824, 06-4024,
     06-4065, 06-4066, 06-4389, 06-4634,
     06-4931, 06-5032, 06-5155, 06-5159,
     06-5156, 06-5162, 06-5260, 06-5771,
     06-5786, 06-5937, 07-0206, 07-0621,
     07-1073, 07-1271, 07-1285

                * * *

     Deposition of KENNETH PAUL ARMSTRONG,
SR., given at the offices of Bruno & Bruno, 855
Baronne Street, New Orleans, Louisiana 70113,
on September 12th, 2011.
REPORTED BY:
     JOSEPH A. FAIRBANKS, JR., CCR, RPR
     CERTIFIED COURT REPORTER #75005

---

Page 2

 1  APPEARANCES:
 2
 3  REPRESENTING THE PLAINTIFFS:
 4      LAW OFFICE OF GERALD N. ANDRY, JR.
 5      (BY:  GERALD N. ANDRY, JR., ESQUIRE)
 6      710 Carondelet Street
 7      New Orleans, Louisiana 70130
 8      504-581-4334
 9  - AND -
10      DEGRAVELLES, PALMINTIER, HOLTHAUS &
11      FRUGE, L.L.P.
12      (BY:  JOSHUA M. PALMINTIER, ESQUIRE)
13      618 Main Street
14      Baton Rouge, Louisiana 70801-1910
15      225-344-3735
16  - AND -
17      THE ANDRY LAW GROUP, LLC
18      (BY:  JONATHAN B. ANDRY, ESQUIRE)
19      610 Baronne Street
20      New Orleans, Louisiana 70113-1004
21      504-525-5535
22
23
24
25

---

Page 3

 1  REPRESENTING THE UNITED STATES OF AMERICA:
 2      U.S. DEPARTMENT OF JUSTICE
 3      (BY:  JAMES F. O'CONNON, JR., ESQUIRE)
 4      Torts Branch, Civil Division
 5      P.O. Box 888
 6      Benjamin Franklin Station
 7      Washington, D.C. 20044
 8      202-616-4289
 9
10  REPRESENTING WASHINGTON GROUP INTERNATIONAL,
11      INC.:
12      JONES DAY
13      (BY:  DEBRA S. CLAYMAN, ESQUIRE)
14      51 Louisiana Avenue, N.W.
15      Washington, D.C. 20001-2113
16      202-879-4645
17  - and -
18      STONE PIGMAN WALTHER WITTMANN, L.L.C.
19      (BY:  WILLIAM D. TREEBY, ESQUIRE)
20      (BY:  JAY C. GULOTTA, ESQUIRE)
21      546 Carondelet Street
22      New Orleans, Louisiana 70130
23      504-581-3200
24
25  VIDEOGRAPHER:  KEN HART (HART VIDEO)

---

Page 4

 1          E X A M I N A T I O N   I N D E X
 2
 3  EXAMINATION BY:                       PAGE
 4  MS. CLAYMAN ..............................8
 5  MR. MCCONNON ...........................317
 6
 7            E X H I B I T   I N D E X
 8
 9  EXHIBIT NO.                           PAGE
10  Exhibit 1    ............................62
11  Exhibit 2    ............................99
12  Exhibit 3    ...........................139
13  Exhibit 4    ...........................162
14  Exhibit 5    ...........................171
15  Exhibit 6    ...........................188
16  Exhibit 7    ...........................241
17  Exhibit 8    ...........................248
18  Exhibit 9    ...........................254
19  Exhibit 10   ...........................258
20  Exhibit 11   ...........................260
21  Exhibit 12   ...........................263
22  Exhibit 13   ...........................276
23  Exhibit 14   ...........................279
24  Exhibit 15   ...........................284
25  Exhibit 16   ...........................296

---

Page 161

1   A. Mike.
2   Q. What was his last name?
3   A. Mike Tauzin. T-A-U-Z-I-N.
4   Q. And do you know when his house was
5   torn down?
6   A. No.
7   Q. And where is your house relative to
8   these two pieces of property?
9   A. I'm the grass to the right.
10  Q. And it looks like there's no longer --
11  in this picture, there's no longer a slab where
12  your property was?
13  A. No.
14  Q. Do you know who removed the slab?
15  A. No, I do not.
16  Q. That's all I have for these
17  photographs.
18      Let me give you another set of
19  photographs. I'll represent that these
20  photographs were produced by Allstate Insurance
21  Company, and we will mark this Exhibit 4.
22      Looking at the first page, which is
23  Bates numbered ALLSTATE 000037, there's four
24  photographs on the page. Do you recognize any
25  of these photographs?

Page 162

1       (Exhibit 4 was marked for
2   identification and is attached hereto.)
3   A. Yes, I do.
4   EXAMINATION BY MS. CLAYMAN:
5   Q. Have you ever seen these photographs
6   before?
7   A. Yes, I have.
8   Q. When did you see them?
9   A. I'm not sure. Um --
10  Q. Do you know who took those
11  photographs?
12  A. We did. Me and my wife. One of us
13  took them.
14  Q. And did you submit these to your flood
15  insurance carrier?
16  A. Um -- I don't think so. I mean, I'm
17  not sure, but I don't think we did. I don't
18  think the insurance carrier ever came out. The
19  flood insurance.
20  Q. Your flood insurance carrier was
21  Allstate?
22  A. Um -- yes.
23  Q. Do you know how Allstate would have
24  gotten these photographs in their file?
25  A. Maybe they came out and took the same

Page 163

1   pictures that we did.
2   Q. Okay. The date on these photographs,
3   I know it's hard to read, but looking in the
4   bottom right-hand corner, it looks like it says
5   November 8 th or 9th, 2005. Do you see that?
6   A. Uh-huh. Yes.
7   Q. Did you ever accompany anyone from
8   Allstate to view your property? I think you
9   just said no.
10  A. No. No, we did not.
11  Q. Okay. Let's start with the top right
12  photo. Can you tell me what this is a
13  photograph of?
14  A. Um -- top right is looking at is my
15  house to the left and my neighbor's house to
16  the right.
17  Q. Okay. And there's your neighbor's
18  birch tree?
19  A. Yes.
20  Q. It looks like it's still standing.
21  A. Yes.
22  Q. In the foreground, it looks like -- in
23  the bottom left corner, it looks like there's
24  some kind of debris. Do you know what that is?
25  A. No, I do not.

Page 164

1   Q. Can you see a mud line along your
2   house here?
3   A. Um -- I see some mud line, I see some
4   lines on the posts. I see it on my neighbor's
5   house.
6   Q. About how high did the mud --
7   A. The mud was about -- inside my house,
8   or in the front yard?
9   Q. In the front. In the exterior.
10  A. I guess it was about a foot, a foot
11  and a half deep.
12  Q. What about on the inside?
13  A. Same thing inside.
14  Q. Okay. It looks like -- were the two
15  windows -- these windows looked into the dining
16  room/fourth bedroom; right?
17  A. Right.
18  Q. And neither of them appear to be
19  broken, is that right?
20  A. I can't really tell from this picture.
21  Q. Okay. Let's look at the next
22  photograph on the top left. What view is this?
23  A. That's standing directly east looking
24  west, according to diagram of my house. That's
25  the front yard of my house.

Page 257

1  document, it says, Unscheduled Personal
2  Property?
3     A.  Okay.
4     Q.  And it says, replacement cost.  First
5  of all, do you understand that the unscheduled
6  personal property would be the contents of your
7  home?
8     A.  Yes.
9     Q.  Okay.  And the estimate total
10 replacement cost is listed here as $145,100.
11 Do you see that?
12    A.  Yes, I do.
13    Q.  Is that consistent with your
14 understanding of what an Allstate adjuster
15 estimated the damage to your contents of your
16 home was?
17    A.  Like I said, I didn't see the report.
18 If you're asking me what I think -- I don't
19 understand.
20    Q.  You don't remember seeing this summary
21 or this estimate at all.
22    A.  Seven years ago.  I'm not saying it
23 didn't come.  I just don't remember seeing it.
24    Q.  Okay.  Whatever the amount was, you
25 only received 14,300; right?

Page 258

1     A.  Right.
2     Q.  And you never disputed the amount that
3  Allstate paid you for the contents --
4     A.  Correct.
5     Q.  -- for your home.  Okay.
6         Do you recall discussing -- well, you
7  don't remember seeing this, so you don't
8  recall --
9     A.  Right.
10    Q.  -- discussing it with anyone.
11    A.  Right.
12    Q.  All right.  Do you know how Allstate
13 came up with the estimate for your personal
14 property, the contents of your house?
15    A.  No, I don't.
16    Q.  Do you know if you submitted them a
17 list of contents?
18    A.  Um -- I don't remember that.  I really
19 don't.
20    Q.  I'm just going to mark this next
21 exhibit 10.  We're marking as 10 a Property
22 Loss Worksheet for Allstate Insurance Company.
23        Do you recognize this document?
24        (Exhibit 10 was marked for
25 identification and is attached hereto.)

Page 259

1     A.  No, I don't.
2  EXAMINATION BY MS. CLAYMAN:
3     Q.  Okay.  Did you ever speak to an
4  adjuster from Allstate regarding the contents
5  of your home that was destroyed by flood?
6     A.  No, I did not.  I don't recall it.
7     Q.  So you don't know where any of these
8  numbers may have come from?
9     A.  No.
10    Q.  Do you know if your wife would have
11 handled this?
12    A.  That's possible.
13    Q.  Okay.  We'll save this to ask her.
14        Who was your homeowner's insurance
15 with?
16    A.  Liberty Mutual.
17    Q.  Okay.  And did you submit a claim to
18 Liberty Mutual?
19    A.  Yes, we did.
20    Q.  Okay.  I'm going to mark this as
21 Exhibit 11.  This appears to be an estimate of
22 repairs from Liberty mutual.  The insured
23 listed on the estimate is Armstrong, Kenneth.
24 And it looks like the date -- there's several
25 dates, but the date the property was inspected

Page 260

1  appears to be 10/29/2005.
2         Have you ever seen this document?
3         (Exhibit 11 was marked for
4  identification and is attached hereto.)
5     A.  Um -- like I say, it's seven years
6  ago.  It's possible, but I just don't remember
7  it.
8  EXAMINATION BY MS. CLAYMAN:
9     Q.  Did you ever accompany an adjuster or
10 inspector from Liberty Mutual to your property?
11    A.  Yes, I did.
12    Q.  I believe that you testified in your
13 prior deposition that there were actually two
14 inspections by someone from Liberty Mutual.
15 Did you accompany the adjuster on the first
16 inspection?
17    A.  The second.
18    Q.  Okay.  So the first inspection, which
19 was, according to this document, October 29th,
20 2005 -- is that right?
21    A.  Yes.
22    Q.  And you were not with the adjuster at
23 this time.
24    A.  No, I was not.
25    Q.  Did you ever speak to this adjuster

Page 261

1  that appears on the first page of this document
2  his name is Dennis Eastep?
3       A.  Um -- I'm not sure if he's the one I
4  talked to, that we disputed the actual, um --
5  the actual, um -- estimate they were giving us.
6       Q.  Okay.  Let's look at what the actual
7  estimate is.  If you can turn to Page 10, which
8  is the very last page, it's 0110.
9           First of all, what kind of damage did
10 you understand that your homeowner's policy
11 would cover?  What kind of damage to your home
12 would your homeowner's insurance?
13      A.  Um -- well, I thought they would,
14 um -- cover mostly, um -- damage from the roof
15 and things like that.  And when I went to my,
16 um -- insurance, we met with them in Baton
17 Rouge, we were told that we would get the whole
18 policy that we had, which wasn't the case, from
19 one of the guys who was there doing the
20 adjusting or giving the checks or whatever.
21      Q.  When did you have this meeting?  Was
22 that before or after --
23      A.  Yeah.  This was way before this.
24      Q.  Okay.  So it was before October --
25      A.  Right.

Page 262

1       Q.  -- 29th --
2       A.  We met with somebody from Liberty
3  Mutual and they gave us some, um -- just
4  telling us where to go and things we'd have to
5  file, things like that.
6       Q.  All right.  So let's look at Page 10
7  of this document.  It says, Recap By Category
8  with Depreciation, and it lists the actual --
9  or the replacement cost value, RCV, and the
10 ACV, actual cost value, for various items to
11 your home, like general demolition, fireplaces,
12 heat, vent, air conditioning, roofing, soffit,
13 fascia and gutter.
14          Do you know why -- or did Liberty
15 Mutual ever tell you why after this first
16 inspection that's all they would cover you for?
17      A.  Um -- I want to say they were trying
18 to say most of the damage was flood.
19      Q.  And flood would not be covered under
20 your homeowner's insurance policy?
21      A.  That's what he -- the guy told me on
22 the phone.
23      Q.  So the total estimate at the bottom,
24 the grand total after your premium is deducted,
25 was $2,727.89.  Is that consistent with your

Page 263

1  recollection of what they first offered you?
2       A.  To be honest with you, I know it was
3  low.  In our eyes, our estimate, we thought it
4  was low.  So that would be yes.
5       Q.  So you thought there was more damage
6  to your home caused by something other than
7  flood?
8       A.  I thought so.
9       Q.  Okay.  And what did you do?
10      A.  I asked for another estimate.
11      Q.  Okay.  Did you make the call?
12      A.  Um -- me and my wife.  One of us.
13      Q.  When you complained to Liberty Mutual
14 that the estimate was too low, did they ask you
15 to get estimates from contractors?
16      A.  Um -- I don't remember that, if that
17 was the case or not.  I don't remember the
18 phone conversation.
19      Q.  I'm going to mark as Exhibit Number --
20 Exhibit 12 a document that appears to be dated
21 March 29th, 2006, from Liberty Mutual -- or to
22 Liberty Mutual from Kenny Armstrong.
23          Have you ever seen this document
24 before?
25          (Exhibit 12 was marked for

Page 264

1  identification and is attached hereto.)
2       A.  Um -- I mean, it's possible.  It's
3  from --
4  EXAMINATION BY MS. CLAYMAN:
5       Q.  Is this your handwriting?
6       A.  Um -- no.
7       Q.  Do you know whose handwriting it is?
8       A.  Could be my wife 's.
9       Q.  Okay.  It says, Dear Liberty Mutual,
10 and the two yellow sheets attached are the
11 contents of my refrigerator/freezer and my
12 freezer.  These are for my Home Protector Plus
13 clause of our policy.  The next paragraph says,
14 the white sheets are estimates from two
15 contractors to repair our home.  If you have
16 any questions, please contact me.  And it lists
17 a phone number, and it lists your cellphone
18 number or your wife's cellphone number.  Thank
19 you, Kenny Armstrong.
20          And then let's turn the page.  I
21 believe it's the -- let's turn to the page at
22 the bottom Bates numbered 0151.
23          Is this a contractor estimate that you
24 received to repair your home on Hamlet Drive?
25      A.  Well, I don't know if it was the total

|   | Page 265 |
|---|---|
| 1 | home. It looks like one was for -- to fix the |
| 2 | roof and one was for the gutting the home. |
| 3 | Am I on the right page; 0151? |
| 4 | Q. Yes. Okay. First of all, do you |
| 5 | remember contacting a contractor to come out |
| 6 | and give you an estimate? |
| 7 | A. I remember running into him at a |
| 8 | store, and he said he was working in the area |
| 9 | doing some of this. |
| 10 | Q. Okay. |
| 11 | A. And he said, would I want him to go to |
| 12 | my house? I said, yeah, you can go out there |
| 13 | and give it a shot, see what it was. |
| 14 | Q. Okay. and this is December 8th, 2005. |
| 15 | A. Yes. |
| 16 | Q. So the general contractor is T MAC, |
| 17 | Inc. Is that right? |
| 18 | A. Correct. |
| 19 | Q. Did you know anything about this |
| 20 | contractor? |
| 21 | A. I know he lived in St. Bernard. I |
| 22 | know he did contracting work out there. |
| 23 | Q. Okay. Were you with the contractor |
| 24 | that came out to your house when he came to |
| 25 | inspect it? |

|   | Page 266 |
|---|---|
| 1 | A. No, I was not. |
| 2 | Q. Do you know if anyone was with him? |
| 3 | A. No, I do not. |
| 4 | Q. Do you know who came out from T MAC? |
| 5 | A. Um -- no, I don't. I don't know if it |
| 6 | was him or one of his workers, I'm not sure. |
| 7 | Q. Okay. The Re: line on this estimate |
| 8 | says, renovation of home located at 416 Hamlet |
| 9 | Drive. |
| 10 | That's your property; right? |
| 11 | A. That was the old address, correct. |
| 12 | Q. Okay. It says, As per your request, |
| 13 | we submit the following proposal for all labor, |
| 14 | equipment and material required to renovate the |
| 15 | home 1416 Hamlet Drive. Specifically, the |
| 16 | scope of work includes: And then in all |
| 17 | capital letters it says, quote, Renovations to |
| 18 | damaged areas caused only by wind and wind |
| 19 | blown rain. |
| 20 | You see that? |
| 21 | A. What page are you on? |
| 22 | Q. I'm on the Page 0151. |
| 23 | A. Okay. |
| 24 | Q. Do you see that? |
| 25 | A. Okay. I see it. |

|   | Page 267 |
|---|---|
| 1 | Q. Were these the instructions you gave |
| 2 | to the contractor? |
| 3 | A. No. I did not. |
| 4 | Q. Do you know why he was only evaluating |
| 5 | damage to the house caused by wind and |
| 6 | wind-blown rain? |
| 7 | A. I'm not sure. I'm not sure what was |
| 8 | his reason for only doing that area. |
| 9 | Q. Did you speak to the contractor on the |
| 10 | phone after he created this estimate? |
| 11 | A. Um -- no, actually, um -- we met with |
| 12 | him -- I went and met with him on one of his |
| 13 | workers or his wife, and she had this for me, |
| 14 | because he wasn't able to be there. |
| 15 | Q. Did you ask him why he only evaluated |
| 16 | the areas of the structure of your home that |
| 17 | were damaged by wind or wind-blown rain? |
| 18 | A. No, I did not. |
| 19 | Q. Did you ask him for an estimate of the |
| 20 | cost to rebuild the rest of your house? |
| 21 | A. Well, I think what was going on with |
| 22 | that was he was going out estimating damage of |
| 23 | things that he could fix or that needed to get |
| 24 | done. We needed the house gutted if we were |
| 25 | going to keep it. And at the time we wasn't |

|   | Page 268 |
|---|---|
| 1 | sure what we were going to do or where we were |
| 2 | going to go with this home. |
| 3 | Q. Okay. |
| 4 | A. So -- |
| 5 | Q. Okay. So do you know who determined |
| 6 | which areas of the house were damaged by wind |
| 7 | and wind-blown rain? |
| 8 | A. For him? For the contractor? |
| 9 | Q. Yes. |
| 10 | A. No. I wasn't there. So I don't |
| 11 | know -- |
| 12 | Q. It wasn't you, though. |
| 13 | A. No. I wasn't there. |
| 14 | Q. All right. So it looks like under the |
| 15 | heading Roof, he concluded that he would need |
| 16 | to remove damaged sections of the roof, 32.5 |
| 17 | square of the 3-tab roof shingles and replace |
| 18 | with new. Haul off roof debris. And then it |
| 19 | says, Note: Contractor noticed signs of severe |
| 20 | uplift. |
| 21 | Do you know what that means? |
| 22 | A. Um -- I mean, I'm not a contractor or |
| 23 | a roofer, so I don't -- I don't really know |
| 24 | what that means. |
| 25 | Q. Okay. And then it says, chimney stack |

Page 269

1  is leaning and allowing water to enter the
2  home.
3      Did you notice that the chimney stack
4  was leaning on the top of your house?
5      A.  Um -- not to any degree of, um -- that
6  would make you notice it.
7      Q.  Do you know if this contractor went
8  inside your house?
9      A.  No, I don't know that.
10     Q.  Okay.  It says, also, vent cover is
11 missing and allowing water into home.
12     Was there a vent cover missing on the
13 top of your roof?
14     A.  After the storm, something might have
15 blew off, I'm not sure.
16     Q.  My recommendation is a total roof
17 replacement.  And then he has an estimate there
18 for $10,187.
19     Did you discuss this estimate with him
20 for the roof?
21     A.  No.  Like I say, I met there -- they
22 had a mobile home set up in the parking lot.  I
23 met there, and he had -- his wife had this for
24 me.  Or a lady that worked for him.
25     Q.  Okay.  And did you discuss this

Page 270

1  estimate with his wife or the lady working with
2  him?
3      A.  No.  No, I did not.
4      Q.  Okay.  Under Gutting, it says, gut
5  ceilings in living room and kitchen.  Includes
6  insulation and sheetrock.  Water entered these
7  areas when shingles on side of home were blown
8  off and were uplifted from roof.
9      A.  Okay.
10     Q.  Do you know why this estimate only
11 includes an estimate for gutting the ceilings
12 in the living room and the kitchen?
13     A.  I really don't understand his
14 terminology.  It was for gutting the home of
15 everything in it.  That was what that was.
16     Q.  Okay.  Did you understand that there
17 are shingles missing over -- on the roof that
18 were right above both the kitchen and the den
19 in your house?
20     A.  Um -- I mean, I saw the pictures.
21 There were shingles missing in various places.
22     Q.  Okay.  And he has a price there of
23 $4650.  It looks like all of these other costs
24 relate solely to the replacement of items in
25 the living room and kitchen.  Do you know why

Page 271

1  that is?
2      A.  No, I don't.
3      Q.  Did you understand that Liberty Mutual
4  would only pay for damage from Katrina that was
5  caused by wind and wind-blown rain?
6      A.  That's what they told us.
7      Q.  Is that what this estimate is for; is
8  that why this estimate only includes wind and
9  wind-blown rain, because you did this in
10 connection with your Liberty Mutual claim?
11         MR. PALMINTIER:
12             Object to form.
13     A.  No.  What happened was, um -- I don't
14 recall that.  But what it was at the time,
15 you're making decisions based on you don't know
16 what you're going to do next.  And this guy
17 comes up who is a local guy, he's not an
18 out-of-towner, he's from there, and says, look,
19 I'm going out and checking houses in the area,
20 and I can give you an estimate on what it would
21 take to fix some of your house.  And that's why
22 he went out there.
23     Q.  Okay.  On the bottom of Page 0152, the
24 second page of the estimate, it says, the front
25 door kicked in by rescue team.

Page 272

1      Do you know what that means?
2      A.  I think what he saw was they had some
3  footprints in the door, when they tried to go
4  in.  They had to go check every house to see if
5  there was somebody in it.  That's the only
6  thing I can think of.
7      Q.  Did you understand when you went to
8  look at it that a rescue team of some kind had
9  kicked in the door?
10     A.  No, I didn't notice that.  I didn't
11 know what that was, to be honest with you.
12     Q.  On the last page, there's a total
13 contract price of $51,692.
14     A.  Uh-huh.
15     Q.  Did you discuss this total price with
16 the contractor or any of the contractor's
17 representatives?
18     A.  No, I did not.
19     Q.  And if you want to turn one page back,
20 to Bates number 0150 --
21     A.  Uh-huh.
22     Q.  -- it says R & M Construction of
23 Louisiana, Inc.  And this looks like another
24 contractor estimate dated December 18th, 2005,
25 so it's about ten days later.

68 (Pages 269 to 272)

Page 321

1  hour or something like that, and.
2     Q.  Was it for living expenses?
3     A.  Yeah.  It was just to help out with
4  the situation.
5     Q.  Can you think of any other monies you
6  received from any other federal government
7  program?
8     A.  Not off the top of my head.  Nothing
9  else.  I mean, I don't know what else was out
10 there.
11    Q.  Okay.  That's all the questions I
12 have.  Thank you.
13        MS. CLAYMAN:
14           Thank you, Mr. Armstrong, for
15        your time.
16        (6 hours and 25 minutes elapsed time
17 used.)

Page 322

1         WITNESS' CERTIFICATE
2
3         I, KENNETH PAUL ARMSTRONG, SR., do
4  hereby certify that the foregoing testimony was
5  given by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10 _____    _____
11 DATE SIGNED     KENNETH PAUL ARMSTRONG, SR.
12
13 _____ Signed with corrections as noted.
14
15 _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25 DATE TAKEN:  September 12th, 2011

Page 323

1         REPORTER'S CERTIFICATE
2         I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3  Certified Court Reporter in and for the State
4  of Louisiana, do hereby certify that the
5  aforementioned witness, after having been first
6  duly sworn by me to testify to the truth, did
7  testify as hereinabove set forth;
8         That said deposition was taken by me
9  in computer shorthand and thereafter
10 transcribed under my supervision, and is a true
11 and correct transcription to the best of my
12 ability and understanding.
13        I further certify that I am not of
14 counsel, nor related to counsel or the parties
15 hereto, and am in no way interested in the
16 result of said cause.
17
18
19
20
21
22
23 _____
24 JOSEPH A. FAIRBANKS, JR., CCR, RPR
25 CERTIFIED COURT REPORTER #75005