**JEANNINE ARMSTRONG, SR.**                                       **September 13, 2011**

---

Page 1

```
         UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
              JUDGE DUVAL
PERTAINS TO MRGO          MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
     05-6314, 05-6324, 05-6327, 05-6359,
     06-0225, 06-0886, 06-1885, 06-2152,
     06-2278, 06-2287, 06-2824, 06-4024,
     06-4065, 06-4066, 06-4389, 06-4634,
     06-4931, 06-5032, 06-5155, 06-5159,
     06-5156, 06-5162, 06-5260, 06-5771,
     06-5786, 06-5937, 07-0206, 07-0621,
     07-1073, 07-1271, 07-1285

                 * * *
       Deposition of JEANNINE ARMSTRONG,
given at the offices of Bruno & Bruno, 855
Baronne Street, New Orleans, Louisiana 70113,
on September 13th, 2011.
REPORTED BY:
     JOSEPH A. FAIRBANKS, JR., CCR, RPR
     CERTIFIED COURT REPORTER #75005
```

Page 2

```
 1  APPEARANCES:
 2
 3  REPRESENTING THE PLAINTIFFS:
 4     LAW OFFICE OF GERALD N. ANDRY, JR.
 5     (BY:  GERALD N. ANDRY, JR., ESQUIRE)
 6     710 Carondelet Street
 7     New Orleans, Louisiana 70130
 8     504-581-4334
 9  - AND -
10     DEGRAVELLES, PALMINTIER, HOLTHAUS &
11     FRUGE, L.L.P.
12     (BY:  JOSHUA M. PALMINTIER, ESQUIRE)
13     618 Main Street
14     Baton Rouge, Louisiana 70801-1910
15     225-344-3735
16
17  REPRESENTING THE UNITED STATES OF AMERICA:
18     U.S. DEPARTMENT OF JUSTICE
19     (BY:  JAMES F. MCCONNON, JR., ESQUIRE)
20     Torts Branch, Civil Division
21     P.O. Box 888
22     Benjamin Franklin Station
23     Washington, D.C. 20044
24     202-616-4289
25
```

Page 3

```
 1  REPRESENTING WASHINGTON GROUP INTERNATIONAL,
 2     INC.:
 3     JONES DAY
 4     (BY:  DEBRA S. CLAYMAN, ESQUIRE)
 5     51 Louisiana Avenue, N.W.
 6     Washington, D.C. 20001-2113
 7     202-879-4645
 8  - and -
 9     STONE PIGMAN WALTHER WITTMANN, L.L.C.
10     (BY:  WILLIAM D. TREEBY, ESQUIRE)
11     546 Carondelet Street
12     New Orleans, Louisiana 70130
13     504-581-3200
14
15  VIDEOGRAPHER:
16     KEN HART (HART VIDEO)
17
18  ALSO PRESENT:
19     KENNETH PAUL ARMSTRONG, SR.
20
```

Page 4

```
        E X A M I N A T I O N   I N D E X

EXAMINATION BY:                         PAGE
MS. CLAYMAN  ...............10
MR. MCCONNON .............164
MR. ANDRY    .............166

           E X H I B I T   I N D E X

EXHIBIT NO.                             PAGE
Exhibit 1     ...............84
Exhibit 2     ...............89
Exhibit 3     ..............111
Exhibit 4     ..............116
Exhibit 5     ..............132
Exhibit 6     ..............136
Exhibit 7     ..............140
Exhibit 8     ..............147
Exhibit 9     ..............150
Exhibit 10    ..............154
Exhibit 11    ..............163
```

Page 13

1   Q. So a total of three times?
2   A. Yes.
3   Q. And other than your deposition
4   transcript, what other types of materials did
5   you review in preparation for your deposition?
6   A. That's about it.
7   Q. Did you review any documents or any
8   exhibits?
9   A. Yes.
10  Q. Did you review the exhibits that were
11  used yesterday in your husband's deposition?
12  A. Yes.
13  Q. Have you reviewed your husband's
14  deposition transcript?
15  A. I've never read through his whole one,
16  no.
17  Q. Did you talk to anyone other than your
18  lawyers in preparation for this deposition?
19  A. No.
20  Q. Okay. I want to update the
21  information you gave during your last
22  deposition. Since you were last deposed in
23  July 2007, have you been involved in any
24  lawsuits other than this one?
25  A. Yes.

Page 14

1   Q. What lawsuits are those?
2   A. Um -- we were involved in a lawsuit
3   against Liberty Mutual.
4   Q. And that was filed in August 2007, is
5   that right?
6   A. I believe so.
7   Q. And what was the name of your
8   attorney?
9   A. Frank Ippolito.
10  Q. Ippolito. And what's the status of
11  that case right now?
12  A. That's settled.
13  Q. Do you recall the amount of the
14  settlement?
15  A. Um -- I'm not sure of the whole
16  settlement, but I believe we came out with
17  about $16,000.
18  Q. And do you know what the $16,000
19  represented?
20  A. That was the content.
21  Q. Contents from any particular area in
22  your home?
23  A. From the attic.
24  Q. Did you get any additional -- was any
25  of the $16,000 related to damage to the

Page 15

1   structure of your house?
2   A. No.
3   Q. Did you claim in your lawsuit against
4   Liberty Mutual that there was additional damage
5   to the structure of your house that you were
6   entitled to recover for?
7   A. Could you explain that?
8   Q. Sure. Other than your claim for
9   $16,000 in contents relating to damage to
10  property in the attic, did you make any other
11  claims in this lawsuit against Liberty Mutual?
12  A. Not to my understanding.
13  Q. Okay. Are there any other lawsuits
14  that you've been involved in since your last
15  deposition in July 2007?
16  A. No.
17  Q. Have you given any other depositions
18  since July 2007?
19  A. No.
20  Q. Have you testified in any court
21  proceeding?
22  A. No.
23  Q. Have you been sued for anything?
24  A. No.
25  Q. Have you filed for bankruptcy?

Page 16

1   A. No.
2   Q. Have you been involved in any criminal
3   proceeding?
4   A. No.
5   Q. Just a couple of background questions:
6   You were born in November of 1962; is that
7   right?
8   A. Yes.
9   Q. And where were you born?
10  A. I was born in New Orleans.
11  Q. Where in New Orleans?
12  A. It was called The Marine Hospital.
13  Q. And did you grow up in New Orleans, as
14  well?
15  A. I grew up in St. Bernard Parish.
16  Q. And where are you living right now?
17  A. In St. Bernard Parish.
18  Q. And just for the record, I know we
19  covered this yesterday with your husband, but
20  what's the address in St. Bernard Parish?
21  A. It's 2400 Aramis Drive, Meraux,
22  Louisiana.
23  Q. And when did you move to this
24  location?
25  A. In June 2010.

Page 113

1  Q. In this report Mr. Taylor represents
2  that he inspected your former property on
3  Hamlet Drive on June 15th, 2011.
4     Did you accompany Mr. Taylor when he
5  inspected your property on Hamlet Drive?
6  A. No.
7  Q. Do you know anyone who did?
8  A. I don't know.
9  Q. Did Mr. Taylor discuss with you his
10 inspection of the property?
11 A. Um -- I'm not sure. I don't remember.
12 Q. What did you discuss with Mr. Taylor
13 during your meeting at your house?
14 A. Um -- we discussed the, um -- the
15 layout, the floor plan of the house, and, um --
16 I guess personal property.
17 Q. And did you provide him, during this
18 meeting, any documents?
19 A. Um -- we gave him pictures.
20 Q. And when you say pictures, do you mean
21 photographs?
22 A. Yes.
23 Q. And these are photographs of what?
24 A. Of the house.
25 Q. Before Katrina or after Katrina?

Page 114

1  A. I believe it was after.
2  Q. Did you look at any other or give him
3  any other documents besides the photographs?
4  A. Not that I can remember.
5  Q. And did you discuss any documents that
6  you received from or submitted to the
7  insurance -- any insurance companies with
8  Mr. Taylor?
9  A. Um -- not that I remember.
10 Q. Did you discuss or review any
11 documents that you received from or submitted
12 to Road Home with Mr. Taylor?
13 A. I don't think so.
14 Q. Do you know -- or did you provide
15 Mr. Taylor with any copies of any of your
16 insurance claims relating to your house on
17 Hamlet Drive?
18 A. Not that I know of.
19 Q. Have you reviewed this loss report
20 that's marked as Exhibit 3?
21 A. Yeah. Yes.
22 Q. Do you disagree with anything in it?
23 A. Um -- not that I know offhand.
24 Q. If you turn to Page 19 --
25 A. I'm sorry.

Page 115

1  Q. 19. At the bottom of the page, under
2  the heading Coverage, there is a, the
3  right-hand column, it says ACV, which stands
4  for actual cost value, Total.
5     Do you see that?
6  A. Yes.
7  Q. Under Dwelling, Mr. Taylor has put a
8  figure of $194,407.31 total damages to your
9  dwelling.
10    Is that the total amount you're
11 claiming in this case for damages to your
12 dwelling?
13 A. Um -- I'm not certain on the dollar
14 amount.
15 Q. Okay. But you don't know offhand of
16 any other amounts of damages that you're
17 claiming for the dwelling.
18 A. Like I said, I don't know.
19 Q. Okay. For contents, it looks like
20 Mr. Taylor has come up with a figure of
21 $181,498.40. Do you see that?
22 A. Yes.
23 Q. Is this the total amount you are
24 claiming for contents of your home on Hamlet
25 Drive in this case?

Page 116

1  A. Yes.
2  Q. And then the last row says Additional
3  Living Expenses, $38,827.30. Is that the total
4  amount of additional living expenses that
5  you're claiming in this case?
6  A. I would guess so, yes.
7  Q. Do you remember providing Mr. Taylor
8  copies of any canceled checks relating to
9  additional living expenses?
10 A. Um -- not that I remember.
11 Q. I want to talk a little bit about the
12 contents of your house.
13 A. Okay.
14 Q. Yesterday your husband testified that
15 you and your children supplied a handwritten
16 list of contents to Mr. Taylor. Is that right?
17 A. Yes.
18 Q. We received a copy of that handwritten
19 list from your attorneys yesterday. I'm going
20 to mark that as Exhibit 4.
21    Have you seen this spreadsheet
22 entitled Flood Contents Worksheet before?
23    (Exhibit 4 was marked for
24 identification and is attached hereto.)
25 A. It looks familiar.

Page 117

EXAMINATION BY MS. CLAYMAN:
Q. Do you know when it was created?
A. Um -- we did this in the summer. This summer.
Q. Was this after your meeting with Mr. Taylor?
A. Yes.
Q. And did Mr. Taylor provide you with the basic structure of this document?
A. Yes.
Q. And on the first page, it says, Insured, Kenny Armstrong, and then there is a list with 21 items. Do you know whose handwriting that is on the first page?
A. I believe that's Kenny 's.
Q. Do you know who came up with the description in the third column over that says Description?
A. Where is that? Oh. I'm not sure. You mean like -- what do you mean by that?
Q. Did your husband come up with the descriptions contained in this column, or is that something you did as a collaborative project between you and your husband?
A. We did it together.

Page 118

Q. So you came up with what to put in the description, and your husband wrote it down?
A. Yeah. We came up with it together.
Q. Okay. And who came up with the dollar amounts that are listed in the column marked Base RCV?
A. We came up with that together.
Q. And how did you come up with those dollar amounts?
A. Um -- recollection of what you paid for it back then, and also we, um -- looked like on the Internet, stuff like that.
Q. Would you characterize the amounts of money in this column as the cost to buy a new one to replace what was lost?
A. Um -- I'm really not sure how to answer that.
Q. We can take certain ones item by item.
A. Okay.
Q. You said you looked on the Internet; is that right?
A. Yes.
Q. Did you print out copies of any of the research you did --
A. No.

Page 119

Q. -- on the Internet?
Did you save any of your Internet searches?
A. No.
Q. Did you discuss with Mr. Taylor what Internet searches you did to come up with these prices?
A. No. It would be like I had a KitchenAid mixer. How much does that cost? Look it up on the Internet. Oh, that's about $300. Okay. That -- you know, just like that.
Q. Okay. It looks like there's a column on this document that says make or model, and then next to that it says age or year.
A. Uh-huh.
Q. Did Mr. Taylor ask you to fill out those two columns?
A. Not that I remember.
Q. Okay. Is this something you could have done if Mr. Taylor had asked you to do it?
A. I'm not an expert on this. I just know like we tried to get a good idea of what things cost or what we had paid for them.
Q. Okay.
A. I couldn't do that. I'm not the

Page 120

expert on that.
Q. Okay. Did you provide a list of contents in your home to your flood insurance company Allstate?
A. I believe we did.
Q. Okay. That list was created before you created this list for Mr. Taylor; is that right?
A. Yes.
Q. Do you know where I might find a copy of that list?
A. I have no clue.
Q. Okay. You don't have a copy of it?
A. No.
Q. Okay.
A. That was six years ago.
Q. Do you know how that list that you provided to your flood insurance company might have been different from this list?
A. I have no idea.
Q. Do you recall doing Internet research in connection with the list you prepared for the flood insurance company?
A. We didn't have a computer at that time.

Page 145

1    A.  Yes.
2    Q.  Do you know why this contractor was
3  given a scope of work that included
4  renovation -- only renovations to damaged areas
5  caused by wind and wind blown rain?
6        MR. PALMINTIER:
7             Object to form.
8    A.  I'm sorry.  Can you say that again?
9  EXAMINATION BY MS. CLAYMAN:
10   Q.  Sure.  Do you know why this contractor
11 was given the scope of work that includes
12 renovations to damaged areas caused only by
13 wind and wind blown rain?
14       MR. PALMINTIER:
15            Objection to form.
16   A.  I have no idea.
17 EXAMINATION BY MS. CLAYMAN:
18   Q.  And this is referring to damage to
19 your house on 4016 Hamlet Drive, is that right?
20   A.  Right.  But I'm not a contractor.  I
21 have no idea.
22   Q.  Okay.  You can put that document
23 aside.
24       Did you ever talk to any of the --
25 well, you made a claim to your homeowner's

Page 146

1  insurance company for damage to your house
2  following the storm.  Is that right?
3    A.  Yes.
4    Q.  And your homeowner's insurance company
5  is Liberty Mutual?
6    A.  Yes.
7    Q.  Did you ever speak to anybody from
8  Liberty Mutual about your claim?
9    A.  I'm sure we did.
10   Q.  I'm talking about you personally.  Did
11 you ever speak to anyone about the claim you
12 were making?
13   A.  To Liberty Mutual?  I'm sure we did.
14 We spoke to these people constantly.
15 Constantly.
16   Q.  Do you recall meeting any of the
17 adjusters from Liberty Mutual that came out to
18 inspect your property at Hamlet Drive?
19   A.  No, I never did.
20   Q.  That would have been your husband?
21   A.  Yes.
22   Q.  I'm going to show you another exhibit
23 which we're going to mark Exhibit 8.  This is a
24 Proof of Loss form submitted to Liberty Mutual.
25 It says on the top, Date of Loss, August 29th,

Page 147

1  2005.
2        Have you ever seen this document
3  before?
4        (Exhibit 8 was marked for
5  identification and is attached hereto.)
6    A.  Yes.
7  EXAMINATION BY MS. CLAYMAN:
8    Q.  Is this your handwriting on the first
9  page?
10   A.  Yes.
11   Q.  And how did you get a copy of this
12 proof of loss form?  Did someone send it to
13 you?
14   A.  I'm assuming so.  It's got a Liberty
15 Mutual heading.
16   Q.  Okay.  Looking down at the Proof of
17 Loss form toward the bottom of the page, it
18 says Description of Loss:  Due to the multiple
19 holes in our roof we lost all of our attic
20 content along with the ceilings.
21       Do you see that?
22   A.  Yes.
23   Q.  You wrote that?
24   A.  That's my handwriting.
25   Q.  How did holes in the roof cause you to

Page 148

1  lose all of your contents and ceiling?
2        MR. PALMINTIER:
3             Object to form.
4    A.  Well, if there was holes in the roof,
5  there was water coming in.
6  EXAMINATION BY MS. CLAYMAN:
7    Q.  And do you know where the water that
8  was coming in came from?
9        MR. PALMINTIER:
10            Object to form.
11   A.  I don't know where the water came
12 from, but I can tell you this:  When we left
13 our house that Sunday morning, I never had any
14 water.  And when I seen that video that was
15 taken two days after the hurricane, I had water
16 to the tip of my roof.
17 EXAMINATION BY MS. CLAYMAN:
18   Q.  Turning to the next page, there
19 appears to be a two-page handwritten list, and
20 it says Attention, it looks like PPON.
21       Do you know what that says across the
22 top?
23   A.  I'm not sure what that stands for.
24   Q.  Is this your handwritten notes?
25   A.  That's my handwriting, yes.

Page 149

1  Q. And the top says, Attic Contents.
2     Is this a list of the contents of your
3  attic that you are claiming were damaged from
4  the storm?
5  A. This is some of the attic content,
6  yes.
7  Q. This is not a complete list of your
8  attic contents?
9  A. Um -- I wouldn't think so.
10 Q. Okay. Do you know why you chose to
11 put this list -- or how you put this list
12 together?
13 A. We just, um -- my husband and I just
14 tried to remember what we had in the attic.
15 Q. So you didn't create this list while
16 you were at your damaged home on Hamlet Drive?
17 A. There was nothing left in the attic.
18 Q. Okay. And how did you come up with
19 the dollar amounts that are listed on the
20 right-hand column?
21 A. We just tried to put a dollar amount
22 to the item.
23 Q. Okay. And the total amount at the
24 bottom is $16,045, is that right?
25 A. That's what it says, yes.

Page 150

1  Q. What happened after you submitted this
2  Proof of Loss related to your attic contents to
3  the insurance company?
4  A. If I'm not mistaken, they denied it.
5  Q. Do you know what their reasoning was?
6  A. Um -- I'm really not sure.
7  Q. What did you do in response to Liberty
8  Mutual's denial of your attic content claim?
9  A. Um -- I know we went through a few
10 steps. Um -- I don't know if you could file
11 like a -- I don't even know what you would call
12 it. We didn't agree with it --
13 Q. Okay.
14 A. -- so we wanted it reevaluated.
15 Q. Okay. Here's another document. We're
16 going to make this Exhibit Number 9. This is a
17 handwritten cover letter dated September 18th,
18 2006, to Whom it May Concern, from Kenneth and
19 Jeannine Armstrong.
20    Do you recognize this document?
21    (Exhibit 9 was marked for
22 identification and is attached hereto.)
23 A. Yes.
24 EXAMINATION BY MS. CLAYMAN:
25 Q. And who was this submitted to? It

Page 151

1  says, to Whom it May Concern. Do you know what
2  company it was submitted to?
3  A. I'm assuming it was to Liberty Mutual.
4  Q. Okay. And it says -- the letter says,
5  I am submitting a copy of expenses we have
6  incurred since Hurricane Katrina. I would like
7  to submit a claim for ALE. And then it lists a
8  number of different bills and receipts that are
9  attached. Do you see that?
10 A. Yes.
11 Q. Why did you decide in July of '06 to
12 submit a claim for additional living expenses
13 or ALE?
14 A. We felt that in our policy that there
15 was a clause that paid you for additional
16 living expenses.
17 Q. Was there a cap on the amount of
18 additional living expenses that you could
19 recover against Liberty Mutual?
20 A. I don't know that.
21 Q. Why did you decide to attach these
22 particular receipts and bills? And feel free
23 to look at them.
24 A. We felt that these were additional
25 expenses that we incurred after the hurricane.

Page 152

1  Q. Additional expenses over and above
2  what you normally would have incurred if you
3  had been living at Hamlet Drive; is that right?
4  A. Yes.
5  Q. Just looking at the second page, the
6  Bates number at the bottom is ARMS 0168, and
7  this is an Entergy bill from Hamlet Drive. Is
8  that right?
9  A. Yes.
10 Q. Do you know why you included that
11 bill?
12 A. Um -- I have no idea. I'm sure we
13 wanted to try and recoup some of this money.
14 We had no idea why we still had a bill.
15 Because if you look on here, it says balance
16 was, um -- negative $2.29. But we were still
17 incurring an Entergy bill. Plus I was still
18 paying an Entergy bill wherever we were
19 staying.
20 Q. Okay. Looking back at the front
21 cover, one of the things it lists that is being
22 enclosed with this cover letter are two
23 receipts for apartment in Baton Rouge for 10/05
24 and 11/05. I believe you testified earlier
25 during that time period you were living with

Page 149

1   Q.  And the top says, Attic Contents.
2       Is this a list of the contents of your
3   attic that you are claiming were damaged from
4   the storm?
5   A.  This is some of the attic content,
6   yes.
7   Q.  This is not a complete list of your
8   attic contents?
9   A.  Um -- I wouldn't think so.
10  Q.  Okay.  Do you know why you chose to
11  put this list -- or how you put this list
12  together?
13  A.  We just, um -- my husband and I just
14  tried to remember what we had in the attic.
15  Q.  So you didn't create this list while
16  you were at your damaged home on Hamlet Drive?
17  A.  There was nothing left in the attic.
18  Q.  Okay.  And how did you come up with
19  the dollar amounts that are listed on the
20  right-hand column?
21  A.  We just tried to put a dollar amount
22  to the item.
23  Q.  Okay.  And the total amount at the
24  bottom is $16,045, is that right?
25  A.  That's what it says, yes.

Page 150

1   Q.  What happened after you submitted this
2   Proof of Loss related to your attic contents to
3   the insurance company?
4   A.  If I'm not mistaken, they denied it.
5   Q.  Do you know what their reasoning was?
6   A.  Um -- I'm really not sure.
7   Q.  What did you do in response to Liberty
8   Mutual's denial of your attic content claim?
9   A.  Um -- I know we went through a few
10  steps.  Um -- I don't know if you could file
11  like a -- I don't even know what you would call
12  it.  We didn't agree with it --
13  Q.  Okay.
14  A.  -- so we wanted it reevaluated.
15  Q.  Okay.  Here's another document.  We're
16  going to make this Exhibit Number 9.  This is a
17  handwritten cover letter dated September 18th,
18  2006, to Whom it May Concern, from Kenneth and
19  Jeannine Armstrong.
20      Do you recognize this document?
21      (Exhibit 9 was marked for
22  identification and is attached hereto.)
23  A.  Yes.
24  EXAMINATION BY MS. CLAYMAN:
25  Q.  And who was this submitted to?  It

Page 151

1   says, to Whom it May Concern.  Do you know what
2   company it was submitted to?
3   A.  I'm assuming it was to Liberty Mutual.
4   Q.  Okay.  And it says -- the letter says,
5   I am submitting a copy of expenses we have
6   incurred since Hurricane Katrina.  I would like
7   to submit a claim for ALE.  And then it lists a
8   number of different bills and receipts that are
9   attached.  Do you see that?
10  A.  Yes.
11  Q.  Why did you decide in July of '06 to
12  submit a claim for additional living expenses
13  or ALE?
14  A.  We felt that in our policy that there
15  was a clause that paid you for additional
16  living expenses.
17  Q.  Was there a cap on the amount of
18  additional living expenses that you could
19  recover against Liberty Mutual?
20  A.  I don't know that.
21  Q.  Why did you decide to attach these
22  particular receipts and bills?  And feel free
23  to look at them.
24  A.  We felt that these were additional
25  expenses that we incurred after the hurricane.

Page 152

1   Q.  Additional expenses over and above
2   what you normally would have incurred if you
3   had been living at Hamlet Drive; is that right?
4   A.  Yes.
5   Q.  Just looking at the second page, the
6   Bates number at the bottom is ARMS 0168, and
7   this is an Entergy bill from Hamlet Drive.  Is
8   that right?
9   A.  Yes.
10  Q.  Do you know why you included that
11  bill?
12  A.  Um -- I have no idea.  I'm sure we
13  wanted to try and recoup some of this money.
14  We had no idea why we still had a bill.
15  Because if you look on here, it says balance
16  was, um -- negative $2.29.  But we were still
17  incurring an Entergy bill.  Plus I was still
18  paying an Entergy bill wherever we were
19  staying.
20  Q.  Okay.  Looking back at the front
21  cover, one of the things it lists that is being
22  enclosed with this cover letter are two
23  receipts for apartment in Baton Rouge for 10/05
24  and 11/05.  I believe you testified earlier
25  during that time period you were living with

```
                                    Page 169
 1           WITNESS' CERTIFICATE
 2
 3        I, JEANNINE ARMSTRONG, do hereby
 4   certify that the foregoing testimony was given
 5   by me, and that the transcription of said
 6   testimony, with corrections and/or changes, if
 7   any, is true and correct as given by me on the
 8   aforementioned date.
 9
10   _____    _____
11   DATE SIGNED      JEANNINE ARMSTRONG
12
13   _____ Signed with corrections as noted.
14
15   _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25   DATE TAKEN:  September 13th, 2011
```

```
                                    Page 170
 1           REPORTER'S CERTIFICATE
 2        I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
 3   Certified Court Reporter in and for the State
 4   of Louisiana, do hereby certify that the
 5   aforementioned witness, after having been first
 6   duly sworn by me to testify to the truth, did
 7   testify as hereinabove set forth;
 8        That said deposition was taken by me
 9   in computer shorthand and thereafter
10   transcribed under my supervision, and is a true
11   and correct transcription to the best of my
12   ability and understanding.
13        I further certify that I am not of
14   counsel, nor related to counsel or the parties
15   hereto, and am in no way interested in the
16   result of said cause.
17
18
19
20
21
22
23   _____
24   JOSEPH A. FAIRBANKS, JR., CCR, RPR
25   CERTIFIED COURT REPORTER #75005
```