**ALVIN L. LIVERS, SR.**                                       **September 14, 2011**

---

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
                JUDGE DUVAL
PERTAINS TO MRGO          MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
    05-6314, 05-6324, 05-6327, 05-6359,
    06-0225, 06-0886, 06-1885, 06-2152,
    06-2278, 06-2287, 06-2824, 06-4024,
    06-4065, 06-4066, 06-4389, 06-4634,
    06-4931, 06-5032, 06-5155, 06-5159,
    06-5156, 06-5162, 06-5260, 06-5771,
    06-5786, 06-5937, 07-0206, 07-0621,
    07-1073, 07-1271, 07-1285

             * * *

    Deposition of ALVIN L. LIVERS, SR.,
given at the offices of Bruno & Bruno, 855
Baronne Street, New Orleans, Louisiana 70113,
on September 14th, 2011.
REPORTED BY:
    JOSEPH A. FAIRBANKS, JR., CCR, RPR
    CERTIFIED COURT REPORTER #75005

---

Page 2

1  APPEARANCES:
2
3  REPRESENTING THE PLAINTIFFS:
4      LAW OFFICE OF GERALD N. ANDRY, JR.
5      (BY:  GERALD N. ANDRY, JR., ESQUIRE)
6      710 Carondelet Street
7      New Orleans, Louisiana 70130
8      504-581-4334
9  - AND -
10     DEGRAVELLES, PALMINTIER, HOLTHAUS &
11     FRUGE, L.L.P.
12     (BY:  JOSHUA M. PALMINTIER, ESQUIRE)
13     618 Main Street
14     Baton Rouge, Louisiana 70801-1910
15     225-344-3735
16 - AND -
17     ANDRY LAW GROUP, LLC
18     (BY:  MICHELLE PURCHNER, ESQUIRE)
19     610 Baronne Street
20     New Orleans, Louisiana 70113
21     504-586-8899
22
23
24
25

---

Page 3

1  REPRESENTING THE UNITED STATES OF AMERICA:
2      U.S. DEPARTMENT OF JUSTICE
3      (BY:  JAMES F. MCCONNON, JR., ESQUIRE)
4      Torts Branch, Civil Division
5      P.O. Box 888
6      Benjamin Franklin Station
7      Washington, D.C. 20044
8      202-616-4289
9
10 REPRESENTING WASHINGTON GROUP INTERNATIONAL,
11     INC.:
12     JONES DAY
13     (BY:  CHRIS FARRELL, ESQUIRE)
14     51 Louisiana Avenue, N.W.
15     Washington, D.C. 20001-2113
16     202-879-4645
17 - and -
18     STONE PIGMAN WALTHER WITTMANN, L.L.C.
19     (BY:  WILLIAM D. TREEBY, ESQUIRE)
20     546 Carondelet Street
21     New Orleans, Louisiana 70130
22     504-581-3200
23
24 VIDEOGRAPHER:  GEORGETTE RINKUS (HART VIDEO)
25 ALSO PRESENT:  BARBARA LIVERS

---

Page 4

        E X A M I N A T I O N   I N D E X

EXAMINATION BY:                         PAGE
MR. FARRELL ................................8
MR. MCCONNON ..............................247
MR. ANDRY   ...............................257

        E X H I B I T   I N D E X

EXHIBIT NO.                             PAGE
EXHIBIT 1    ..............................37
EXHIBIT 2    ..............................39
EXHIBIT 3    ..............................56
EXHIBIT 4    ..............................57
EXHIBIT 5    ..............................71
EXHIBIT 6    ..............................72
EXHIBIT 7    ..............................85
EXHIBIT 8    .............................146
EXHIBIT 9    .............................160
EXHIBIT 10   .............................174
EXHIBIT 11   .............................217
EXHIBIT 12   .............................222
EXHIBIT 13   .............................225
EXHIBIT 14   .............................226
EXHIBIT 15   .............................227

Page 53

 1  your personal property?
 2      A.  I imagine.
 3      Q.  Where would that be?
 4      A.  I have submitted.
 5      Q.  I'm sorry?
 6      A.  Are you asking me did I submit it?
 7      Q.  I'm just asking, first off, is there a
 8  list? Did you keep a list of your relocation
 9  costs?
10      A.  I don't quite understand.
11      Q.  Okay. We'd mentioned in the Taylor
12  report, which we'll get to in a little more
13  detail a little later on today, that there's a
14  list of all the contents of your house that
15  were damaged, that you're seeking money for.
16          Is there a similar list that's been
17  made of your relocation expenses?
18      A.  I still don't understand.
19      Q.  Okay. I'll see if I can get to that
20  in another way a little bit later on.
21          Okay. We'll move on to the next list
22  here. Loss of business opportunities and
23  business interruption. Are you still bringing
24  a claim for lost business opportunities?
25          MR. ANDRY:

Page 54

 1              We'll stipulate that he's not
 2          making a claim for that.
 3          MR. FARRELL:
 4              Okay. Great.
 5  EXAMINATION BY MR. FARRELL:
 6      Q.  Would you please turn the page,
 7  Mr. Livers?
 8          MR. ANDRY:
 9              He was retired before Katrina,
10          so.
11          MR. FARRELL:
12              That's what I figured. I just
13          wanted to confirm.
14  EXAMINATION BY MR. FARRELL:
15      Q.  Next is evacuation expenses, at the
16  top of Page 9. Do you see that?
17      A.  Uh-huh.
18      Q.  Are you still bringing a claim for
19  evacuation expenses?
20      A.  Yes.
21      Q.  Okay. What's the dollar amount of
22  those claims?
23      A.  I'd have to leave that up to the
24  Court.
25      Q.  Can you tell me what expenses are

Page 55

 1  included in your claim for evacuation expenses?
 2  What type of things are you --
 3      A.  Travel.
 4      Q.  Travel? Uh-huh. Anything else?
 5      A.  Travel expense. Gasoline.
 6      Q.  Uh-huh. Anything else besides travel
 7  and gasoline?
 8      A.  Not at the moment.
 9      Q.  I'm sorry. Not at the moment, you
10  said?
11      A.  Uh-huh.
12      Q.  Okay. Sorry. I think you're starting
13  to trial off again.
14      A.  Oh, okay.
15      Q.  It's hard. We're right here and it's
16  a small room.
17          Do you have any documents that might
18  tell us what the travel or gasoline costs that
19  you're seeking to recover are?
20      A.  No.
21      Q.  Okay. I'll introduce another exhibit.
22      A.  Oh. I didn't understand that.
23      Q.  This is Exhibit 3. (Tendering.)
24  Mr. Livers, I'm going to ask you to look at
25  this document. I'm not sure if you recognize

Page 56

 1  it. Do you recognize it?
 2          (EXHIBIT 3 was marked for
 3  identification and is attached hereto.)
 4      A.  I saw this. I didn't read all of it.
 5  But I recognize it.
 6          MR. ANDRY:
 7              Talk up a little bit.
 8      A.  I recognize it.
 9  EXAMINATION BY MR. FARRELL:
10      Q.  Yes. I'm just going to ask you to
11  turn to Page 3 of the document. You don't need
12  to read the whole thing, but this might help
13  get us an answer to these questions here.
14          Middle of the paragraph -- or middle
15  of the page there's a paragraph that starts:
16  Expenses due to evacuation and relocation for
17  plaintiff Alvin Livers -- it's on Page 3. Do
18  you see that?
19      A.  Yeah. I see it.
20      Q.  Okay -- can be found in the documents
21  produced by State Farm Insurance at document
22  Bates number LIVERS 192. Let me see if I can
23  pull that out. Actually, let me do this: I'll
24  mark this as Exhibit 4. (Tendering.)
25          Mr. Livers, I've got another exhibit

Page 57

```
 1   for you, Exhibit 4.  Do you recognize this
 2   document?
 3          (EXHIBIT 4 was marked for
 4   identification and is attached hereto.)
 5      A.  Yes.
 6   EXAMINATION BY MR. FARRELL:
 7      Q.  And what is it?
 8      A.  State Farm.
 9      Q.  And what is it from State Farm?
10      A.  It's an amount.
11      Q.  I'm sorry.  It's the amount of what?
12      A.  It's amount of the insurance claim I
13   got paid.
14      Q.  I'm going to ask you to turn to
15   Page -- there is little numbers at the very
16   bottom, they start with 82 on the front.
17   There's a page marked 88.  It's the
18   second-to-last page.  It says Additional Living
19   Expense Worksheet.  It's not that one, it's the
20   next one.
21      A.  This one?
22      Q.  It might be the next one after that.
23   Sorry.
24          MR. ANDRY:
25             I'll help you.  There you go.
```

Page 58

```
 1   EXAMINATION BY MR. FARRELL:
 2      Q.  That's it.  Yep.
 3          Do you see this document?  I had just
 4   asked you about evacuation expenses.  And I
 5   asked if there was a list.  And do you see this
 6   document says Additional Living Expense
 7   Worksheet, and then down -- a couple lines
 8   down, it says, period beginning August 29th,
 9   2005, and period ending December 2nd, 2005.
10      A.  Uh-huh.
11      Q.  Okay.  Is this a list -- let me go
12   through, before I ask.  And then you see it
13   says Housing, Motel or Hotel, $840?
14      A.  Oh.
15      Q.  Meals prepared away from home, $560?
16      A.  Yes.
17      Q.  And then transportation?  Is this a
18   list of the evacuation expenses that you seek
19   to recover?
20      A.  Yes.
21      Q.  Okay.  So the total dollar amount
22   there is $1,676.89?
23          MR. PALMINTIER:
24             Object to form.
25          MR. FARRELL:
```

Page 59

```
 1             What was that?
 2          MR. PALMINTIER:
 3             I just lodged an objection.
 4          MR. FARRELL:
 5             Got it.
 6   EXAMINATION BY MR. FARRELL:
 7      Q.  All right.  So that's that one.
 8          Next is -- I'm going to bring you back
 9   to Exhibit 2.
10      A.  Yes.
11      Q.  Back to the interrogatories,
12   Exhibit 2.  So we just left off at evacuation
13   expresses at the top of the page.  The next is
14   personal injury.  Are you bringing a claim for
15   personal injury?
16      A.  No.
17      Q.  No?  How about -- next is wrongful
18   death and survival damages.
19      A.  No.
20      Q.  No?  Okay.  Great.  Next are fear and
21   fright.  Are you bringing a claim for fear or
22   fright?
23      A.  Can you put it in a different --
24   different version than what you're saying?
25      Q.  Sure.  Sure.  I can ask insofar as --
```

Page 60

```
 1   as your lawyers' answers are spelled out here.
 2          MR. ANDRY:
 3             We scan stipulate to fear and
 4      fright.
 5          MR. FARRELL:
 6             Stipulate to no?  Okay.
 7   EXAMINATION BY MR. FARRELL:
 8      Q.  Emotional distress.  Are you bringing
 9   an emotional distress claim?
10      A.  Oh, I have plenty emotion.
11      Q.  And so you are bringing one?
12      A.  Yeah.
13      Q.  You are?  Okay.  Can you describe that
14   claim to me?  What are you seeking emotional
15   distress damages for?
16      A.  Whatever the Court allow.
17      Q.  I'm sorry.  Can you --
18      A.  Oh, I'm getting confused.
19      Q.  Sure.  I'll ask the question again.
20          You said that you are still bringing a
21   claim for emotional distress.  Let's look at it
22   this way:  We had said earlier you're bringing
23   a claim for property damage to your house
24   because of the hurricane and the damage that's
25   occurred.  What is your -- so that would be the
```

Page 85

1   A. That's the front porch.
2   Q. Is this where the porch is?
3   A. This is -- I had a front porch --
4   Q. Uh-huh.
5   A. -- and this part right here was the
6   den.
7   Q. Okay.
8   A. And it also --
9   Q. Now I want to go a little more slowly
10  through this.
11  A. Okay.
12  Q. Because I want to make sure that the
13  map that Mr. Taylor has drawn looks like what
14  your house looks like. I'm going to bring in
15  another exhibit here.
16      Mr. Livers, do you recall taking some
17  pictures of your house after the storm?
18  A. Yeah.
19  Q. Okay. I'm going to mark Exhibit 7.
20  (Tendering.)
21      Do you recognize this?
22      (EXHIBIT 7 was marked for
23  identification and is attached hereto.)
24  A. Yes.
25  EXAMINATION BY MR. FARRELL:

Page 86

1   Q. These pictures?
2   A. Yes, I do.
3   Q. All right. What is that?
4   A. The front.
5   Q. Okay. Do you mind flipping through --
6   you don't need to look at all the pictures, but
7   look at enough -- are those all pictures that
8   you have taken of your house?
9   A. This is -- well, evidently, you know
10  that because there's the trash can with my name
11  on it.
12  Q. Yeah. There it is. That's number 17?
13  A. Uh-huh.
14  Q. Let me take you back to that first
15  page that's marked Livers 7. I know I'm having
16  you flip around through a lot of pages here.
17  A. That's all right. Quite all right.
18  Q. So this is the front of your house you
19  said.
20  A. Yes. It is.
21  Q. And it looks like -- so we're looking
22  at this from the street, correct? We're
23  standing in the street looking at the front of
24  your house?
25  A. Yes.

Page 87

1   Q. Okay. It looks like there's -- if I'm
2   looking at your house, there's -- from left to
3   right there's a window, brick wall, a window,
4   the porch with the burglar bars on the door,
5   and then your house behind it. Is that right?
6   A. I don't understand. You're saying
7   this -- this is a window on this side.
8   Q. Okay. I want to make sure, because I
9   haven't been to your house --
10  A. Oh, you want me to --
11  Q. Exactly.
12  A. You want me to identify it.
13  Q. Yeah, exactly, I want --
14      (Reporter interruption.)
15  EXAMINATION BY MR. FARRELL:
16  Q. So yes, Mr. Livers, that's what I'm
17  logging for. Because I haven't been to your
18  house, I want to make sure I'm understanding
19  what it is.
20  A. I can understand. This is a window
21  here. This a window here. This is the front
22  of my house.
23  Q. Okay. Now, let's look at that, and
24  then let's look at Mr. Taylor 's picture or map
25  of the front of your house. He's got the porch

Page 88

1   over here on the right. Do you see? Or on the
2   left, I'm sorry, I'm upside-down, and an empty
3   space here. But to me it looks like your porch
4   should be over here, with more of the house
5   coming out that way.
6   A. This is the porch.
7   Q. I understand that. But if we're
8   looking at your house from the street right
9   here, and he's got your porch marked to the
10  left side, it looks like there's some more of
11  your house past your porch but he doesn't have
12  that here. He's got --
13  A. Perhaps it's according to what angle
14  he took the picture on. You know?
15  Q. I'm sorry.
16  A. What angle did he take it on? I'm
17  bound between Deslonde and Tennessee.
18  Q. Uh-huh.
19  A. And if he took it -- if he took it
20  from the left side, maybe -- it would maybe
21  show like that.
22  Q. Okay. I understand what you're
23  saying, Mr. Livers, but this is a picture you
24  took, right, here in Exhibit 7?
25  A. 7?

Page 89

1    Q.  That's your picture.
2    A.  That's my picture.
3    Q.  And what Mr. Taylor has tried to do is
4  to draw a map of the first floor of your house.
5  I just want to make sure that it looks like
6  what your house really looks like, it shows the
7  rooms as where they are.
8    A.  It shows the den, it shows the
9  bedrooms --
10   Q.  Uh-huh.
11   A.  -- this is -- this is -- this is a
12 dining room.
13   Q.  Uh-huh.  Well, let's try it this way.
14 And I just -- again, I want to make sure that I
15 understand what the inside of your house looks
16 like before I go too far here.  So -- let's
17 leave -- I'm sorry.  Go ahead.
18   A.  Well, I have pictures of the inside.
19 Are you trying to --
20   Q.  We'll get to those pictures.  Yeah.
21   A.  So what you really trying to see is
22 this really my house?
23   Q.  I have no doubt that this is your
24 house, because you took the picture and you
25 told me that this is your house.

Page 90

1    A.  Uh-huh.
2    Q.  But what I'm not entirely sure of yet
3  and I went to understand a little better is,
4  Mr. Taylor, who says he has been to your house
5  and looked at it --
6    A.  Uh-huh.
7    Q.  -- I want to make sure that this map
8  that he has drawn of all the rooms of your
9  house shows accurately what the house looks
10 like so that we and the Court can understand
11 the way that it's laid out.
12       And maybe, let's try doing it this
13 way:  So this is the front of your house and
14 the porch.  Where is your front door?
15       Let me give you a pen.  Let me give
16 you this pen here. (Tendering.)  Can you put a
17 circle where your front door is in your house?
18   A.  Not really, because if I circle it I
19 would circle it right about here.
20   Q.  Okay.
21       MR. ANDRY:
22          Go ahead and do that.
23 EXAMINATION BY MR. FARRELL:
24   Q.  Go ahead and do that, yeah.
25   A.  So if that would help you.

Page 91

1    Q.  Yeah, that would be great.  That's
2  what we're trying to understand.  So this is
3  your front door.
4       And so when you walk in through the
5  front door, it looks like, according to
6  Mr. Taylor 's picture, you walk into the
7  kitchen.  Is that right?
8    A.  What he did -- this is -- when you
9  walk through here, this is the dining room.
10 And this --
11   Q.  I'm sorry, go ahead.
12   A.  Go ahead.
13   Q.  No, no, no.  That's okay.
14       MR. TREEBY:
15          Go ahead.  Go ahead.
16   A.  This is the dining room.  And this
17 kitchen -- the kitchen was in -- this is the
18 dining room.
19 EXAMINATION BY MR. FARRELL:
20   Q.  Okay.
21   A.  Okay.
22   Q.  So the room that you walk in through
23 the front door is the dining room, not the
24 kitchen.
25   A.  No.  This is the dining room here, on

Page 92

1  this side.
2    Q.  Okay.
3    A.  This is right.  This is right.
4    Q.  So then here -- I'm just going to
5  write here front door --
6    A.  Front door.
7    Q.  -- so that I can understand later.
8  And this will be an exhibit so you guys can see
9  it, too.  Okay.  So let's leave off what he's
10 written here.  I know this says kitchen, dining
11 room, living room, bedroom, bathroom.
12       But tell me, you walk in through the
13 front door, and you walk into the kitchen?  Or
14 you walk into the dining room?
15   A.  No.  You were into the dining room.
16   Q.  Uh-huh.
17   A.  The layout -- the layout is -- I think
18 the layout is the same, but perhaps the
19 abbreviation of the kitchen --
20   Q.  Uh-huh.  Okay.  So this shouldn't say
21 kitchen, it should say dining room, right?
22   A.  This dining room, I'm trying to see if
23 it was left or right.
24   Q.  Okay.
25   A.  The dining room was -- when you go

**Page 173**

1  EXAMINATION BY MR. FARRELL:
2    Q. So Mr. Livers, I was just having you
3  look at this list in the back of Mr. Taylor's
4  report a moment ago.
5    A. Okay. I got it. What you want, the
6  back?
7    Q. Yeah. We'll just start on the first
8  one that says Page 1. Now, we learned this
9  morning -- we got another document from your
10 lawyers, and it's a handwritten list.
11      MR. FARRELL:
12        This is the only copy I have. Do
13      you guys have other copies? I'm going
14      to mark this, but I'd like to hold
15      onto it.
16      MR. TREEBY:
17        We need more copies. Josh said
18      he had more copies, they're just down
19      in his car.
20      MR. ANDRY:
21        He left.
22      MR. FARRELL:
23        Is there Xerox we can use?
24      MR. ANDRY:
25        Yeah.

**Page 174**

1      MR. FARRELL:
2        You want to go off the record?
3      (Off the record.)
4      MR. ANDRY:
5        Okay. Back on?
6      MR. FARRELL:
7        Back on.
8  EXAMINATION BY MR. FARRELL:
9    Q. All right, Mr. Livers. I'm going to
10 give you a document that's now been marked as
11 Exhibit 10. Do you recognize this document?
12      (EXHIBIT 10 was marked for
13 identification and is attached hereto.)
14    A. Yes, I do.
15 EXAMINATION BY MR. FARRELL:
16    Q. Okay. What is this?
17    A. Document 10.
18    Q. What is this that has been marked as
19 Document 10?
20    A. It's the loss -- the summary of the
21 loss that we had.
22    Q. So is this the form that you filled
23 out and gave to your lawyers?
24    A. This is the form.
25    Q. Is this your handwriting?

**Page 175**

1    A. Nope.
2    Q. Is it your wife's handwriting?
3    A. Yes.
4    Q. Okay. All right. I'm going to ask
5  some questions. Actually, Mr. Livers, I wanted
6  to ask the questions from Number 5, from
7  Mr. Taylor's list. I realize this is the
8  handwritten last you gave to him. I want to
9  get that into the record. You've now said what
10 it was.
11      Let's go back to Mr. Taylor's list
12 and I've got some questions for you about some
13 things on here.
14    A. Okay.
15    Q. All right. So in this list, just like
16 in the list you filled out, or your wife filled
17 out in handwriting --
18    A. Uh-huh.
19    Q. -- you've got a description of an
20 item, a number, the number of the item, and
21 then there's this column Base RCV which is the
22 dollar value.
23    A. Let's see where you at.
24    Q. Right there. And it's filled in, in
25 handwriting, in the other form, too. You see

**Page 176**

1  those?
2    A. Yeah.
3    Q. Okay. And I'm just going to ask you a
4  about couple of the items here. Down at the
5  bottom of Page 1, there's a Number 20. It
6  says, one custom made cabinets, $35,000.
7    A. It's the estimated cost.
8    Q. Yeah. How did you come up with that
9  estimate?
10   A. Well, it could have been lower, it
11 could have been higher.
12   Q. All right. But -- I understand it
13 could have been lower or it could have been
14 higher. How did you pick that number?
15   A. I picked that number -- I think this
16 is my doing. I picked that number out because
17 that's what I thought it had cost at the
18 particular moment when we was estimating the
19 cost. And that was really supposed to be 15.
20   Q. I'm sorry. What was that last part?
21   A. That's an estimated cost. From off
22 of -- I don't have -- I didn't -- I didn't
23 really --
24   Q. Okay. If you turn the page, the first
25 one up in that next column -- okay, so Page 2

Page 217

1  A. The reason I'm saying -- no. Let me
2  see could I explain to you.
3  Q. Uh-huh.
4  A. I had one adjuster come out, and he
5  came out on his own and I was not around. And
6  I wasn't satisfied.
7  Q. And why weren't you satisfied?
8  A. I wasn't satisfied for what he had
9  said concerning like my patio doors and things
10 like that there. I wasn't concerned what he
11 had said concerning that. In other words, I
12 wasn't satisfied with him, and I had a right,
13 by them, to get another adjuster, and they did
14 send me another adjuster.
15 Q. Okay. Let me do it this way: I'm
16 going to show you some more documents.
17     Mr. Livers, this has been marked as
18 Exhibit 11. Do you recognize that document?
19     (EXHIBIT 11 was marked for
20 identification and is attached hereto.)
21 A. Yes, I do.
22 EXAMINATION BY MR. FARRELL:
23 Q. What's that document?
24 A. It came from -- I think this document
25 came from State Farm.

Page 218

1  Q. And it looks like it's a check made
2  out to Barbara Livers for $2500?
3  A. Uh-huh.
4  Q. It looks like it's dated
5  September 13th, 2005.
6  A. That's what it's dated.
7  Q. Okay. Now, you just mentioned that
8  the adjuster didn't come out to your property
9  until after they let you back to look at the
10 property, which was after Hurricane Rita at the
11 and of September. Correct?
12 A. Correct.
13 Q. Okay. So is it fair to say this first
14 payment was made by State Farm before the
15 adjusters came out?
16 A. It's fair to say that if it was
17 9/13/05, that's when they came and that's when
18 they let you back.
19 Q. So -- okay.
20 A. I may be confused what you're saying.
21 What I'm saying is, I don't know if they let
22 the adjusters to go down there, but I know we
23 couldn't go down there until they cleared. So,
24 now, if they had the thing down there -- but
25 I -- I remember the question you asked me.

Page 219

1  Q. Uh-huh.
2  A. Do I recognize this? And I do. And
3  that's what they did pay me.
4  Q. Okay. Let me turn you back to Exhibit
5  Number 4.
6  A. Uh-huh. What --
7  Q. It looks like this. It should be in
8  your pile. It's another State Farm document.
9  A. Because you told me to pile all these
10 up. Now I got to find it.
11 Q. I'm leading you astray. I'm sorry.
12 A. No. No. No. No. Exhibit 4.
13 Q. That's it. I think it's this.
14 A. Okay. All right.
15 Q. You said this was another document you
16 got from State Farm? Earlier today?
17 A. Okay. Let me look at it.
18 Q. Uh-huh.
19 A. Yeah. This is another document.
20 Q. And this looks like another payment
21 from State Farm for about $2700. You see that
22 at the bottom?
23 A. Yes. I see it.
24 Q. If you look up to the top of the
25 numbers there, it says, date inspected,

Page 220

1  November 30th, 2005?
2  A. Uh-huh.
3  Q. Okay.
4  A. And it came to -- all right.
5  Q. All right. So this looks like a
6  second payment from State Farm after that first
7  one. Right?
8  A. This payment --
9  Q. Uh-huh.
10 A. -- was a payment that was issued for
11 the guy that came out the first time.
12 Q. Okay. So this --
13 A. This is the payment that I was not
14 satisfied with.
15 Q. Can you explain to me why you weren't
16 satisfied with it?
17 A. I just -- I just told you how I was
18 not satisfied with what he was -- what he was
19 saying, because the fence was down.
20 Q. Uh-huh.
21 A. He told me he give me eight boards.
22 Q. Eight boards for the fence?
23 A. He give me so much for the fence. But
24 not the whole fence.
25 Q. Okay. Let me turn the page to the

Page 221

1   next page of the document.
2      A.  Uh-huh.
3      Q.  This might help, too.  Under Coverage
4   A, it says, dwelling repairs, roof replaced and
5   fencing replaced.
6      A.  Uh-huh.
7      Q.  $3000.  And so that's all that State
8   Farm was going to pay you for at that point,
9   right?
10     A.  This was a combined, between this
11  and -- this was combined, if I can remember.
12     Q.  Okay.  So you got this payment from
13  State Farm, you said that you weren't
14  satisfied.  What did State Farm do?
15     A.  Send me another adjuster.
16     Q.  And do you remember when that other
17  adjuster came?
18     A.  I can't remember.  But it was behind
19  him.
20     Q.  So he came after him?
21     A.  Oh, certainly.
22     Q.  Okay.  I've got another document that
23  can help with that.  All right.  Mr. Livers,
24  I'm handing you what's been marked now as
25  Exhibit 12.  (Tendering.)

Page 222

1         (EXHIBIT 12 was marked for
2   identification and is attached hereto.)
3      A.  Uh-huh.
4   EXAMINATION BY MR. FARRELL:
5      Q.  Do you recognize this document?
6      A.  Yes.
7      Q.  And what is this?
8      A.  What this document is?
9      Q.  Yeah.
10     A.  This is the document from State Farm
11  that the other guy turn in.  I remember his
12  name.  This is the second one come out and
13  redid it.  And redid the -- the insurance
14  claim.
15     Q.  So this is the report and the coverage
16  from the second adjuster --
17     A.  Right.
18     Q.  -- that State Farm sent out.
19     A.  Uh-huh.
20     Q.  Okay.  And this time, it says up on
21  that page, Coverage A, Building, State Farm
22  building estimate revised February 14, 2006.
23     A.  On what page?
24     Q.  It's a little out of order.  That
25  page.

Page 223

1      A.  Okay.  I see it.
2      Q.  Okay.  And so rather than being $3000,
3   now we've got $15,000.  You see that?
4      A.  I see that.
5      Q.  Okay.  And if you turn the page, it's
6   labeled at the bottom Livers 005.
7      A.  005?
8      Q.  Uh-huh.
9      A.  All right.
10     Q.  Would you say that this looks like a
11  inventory of the items that State Farm was
12  going to pay for?
13     A.  The first time.
14     Q.  The first time.
15     A.  Uh-huh.
16     Q.  Okay.  All right.  Mr. Livers, if you
17  flip through the additional pages past 5, 6, to
18  7, it looks like this is covering more than
19  just the roof and the fencing now.
20     A.  It was.
21     Q.  And so that's what the adjuster did
22  the second time, he said, we're going to cover
23  you for these additional parts.  Right?
24     A.  That's what he -- that's what he put
25  on there.

Page 224

1      Q.  Okay.  So like the master bedroom,
2   they gave you money for.
3      A.  Yes.
4      Q.  Okay.  And for the roof?
5      A.  Uh-huh.
6      Q.  And for the shed.
7      A.  Uh-huh.
8      Q.  Okay.  And also, the iron doors you
9   were talking to me about --
10     A.  Uh-huh.
11     Q.  -- earlier this morning, they paid for
12  those.
13     A.  Uh-huh.
14        MR. ANDRY:
15            Say yes or no, please.
16        THE WITNESS:
17            Oh.  Sorry.
18  EXAMINATION BY MR. FARRELL:
19     Q.  So just to be clear so the transcript
20  reads, the iron doors State Farm paid for.
21     A.  Yes.
22     Q.  And the windows?
23     A.  Yes.
24     Q.  I show you another document that's
25  marked Exhibit 13.  (Tendering.)  Do you

|  | Page 233 |
|---|---|
| 1 | A. Not for North Claiborne. |
| 2 | Q. Not for North Claiborne? |
| 3 | A. No. |
| 4 | Q. So it's not your property? |
| 5 | A. No. |
| 6 | Q. Okay. All right. Mr. Livers, now I |
| 7 | want to talk briefly about the Road Home. |
| 8 | MR. ANDRY: |
| 9 | You have this one, the 2/26/07? |
| 10 | MR. MCCONNON: |
| 11 | Can I see it? |
| 12 | MR. ANDRY: |
| 13 | Sure. (Tendering.) I thought |
| 14 | that's what you were handing me. It's |
| 15 | a duplicate of the other one except |
| 16 | it's not stamped, it's signed. |
| 17 | MR. MCCONNON: |
| 18 | I've never seen this one. Was |
| 19 | this actually filed? |
| 20 | MR. ANDRY: |
| 21 | I think so. |
| 22 | MR. MCCONNON: |
| 23 | I ran the Army's claims operation |
| 24 | for Hurricane Katrina, I had our staff |
| 25 | checked twice, this doesn't show up in |

|  | Page 234 |
|---|---|
| 1 | the database. |
| 2 | MR. ANDRY: |
| 3 | It may not. It came from this |
| 4 | office -- from Bruno and Bruno. We |
| 5 | asked earlier to review the SF-95s, |
| 6 | and. |
| 7 | MR. MCCONNON: |
| 8 | Yeah, well, we produced -- |
| 9 | MR. ANDRY: |
| 10 | The ones that were actually |
| 11 | failed. |
| 12 | MR. MCCONNON: |
| 13 | Yeah, we produced the ones to |
| 14 | Plaintiffs' counsel, and all of them |
| 15 | would have Bates stamp numbers at the |
| 16 | bottom with this information |
| 17 | confidential. This has none of that, |
| 18 | so I'm not sure where this came from. |
| 19 | MR. ANDRY: |
| 20 | That's fine. |
| 21 | MR. MCCONNON: |
| 22 | It doesn't matter. We've got the |
| 23 | claim in the file, but -- |
| 24 | MR. ANDRY: |
| 25 | It's the same number. It's just |

|  | Page 235 |
|---|---|
| 1 | a different date. |
| 2 | MR. MCCONNON: |
| 3 | Yeah. I know. I've not seen |
| 4 | that. So. |
| 5 | MR. ANDRY: |
| 6 | That's fine. |
| 7 | EXAMINATION BY MR. FARRELL: |
| 8 | Q. All right. Mr. Livers, like I said, I |
| 9 | want to ask you just a few questions about the |
| 10 | Road Home now. |
| 11 | Can you tell me what the Road Home |
| 12 | was? Or is? |
| 13 | A. What? Can you speak up little louder? |
| 14 | Q. Sure. What is Road Home? |
| 15 | A. It's supposed to be a company that |
| 16 | help you when you're in a disaster. |
| 17 | Q. Okay. After Hurricane Katrina, you |
| 18 | applied for assistance from Road Home; correct? |
| 19 | A. Correct. |
| 20 | Q. Okay. And did you get money from Road |
| 21 | Home? |
| 22 | A. Yes. |
| 23 | Q. And how much money did you get? |
| 24 | A. Um -- a ballpark figure? I'll get |
| 25 | close. I think it was 120,000 maybe 800. |

|  | Page 236 |
|---|---|
| 1 | Q. I want to show you some documents |
| 2 | about that, too. |
| 3 | A. Okay. |
| 4 | Q. Do you know how -- before I show you |
| 5 | that, do you know how Road Home came up with |
| 6 | the dollar amounts, the money they were going |
| 7 | to give people who asked them for assistance? |
| 8 | A. I have no idea. |
| 9 | Q. Okay, Mr. Livers, I'm going to show |
| 10 | you now a document that's been marked as |
| 11 | Exhibit 18. (Tendering.) There you go. |
| 12 | (EXHIBIT 18 was marked for |
| 13 | identification and is attached hereto.) |
| 14 | A. No. It's less than what I said. |
| 15 | EXAMINATION BY MR. FARRELL: |
| 16 | Q. No, that's all right. We're going to |
| 17 | walk through all this in a moment. |
| 18 | A. Uh-huh. |
| 19 | Q. So have you ever seen this document |
| 20 | before? |
| 21 | A. This? |
| 22 | Q. Yes. |
| 23 | A. Yes, I have. |
| 24 | Q. You have? And what is it? |
| 25 | A. It's a calculation sheet. |

Page 237

1  Q. Okay. And it's calculation sheet by
2  the Road Home?
3  A. Yes. Pre-storm value. Whatever.
4  Q. Okay. So let's start there.
5  Pre-storm value. It says that the Road Home
6  has the pre-storm value for your property at
7  4924 St. Claude at $95,000. Is that what it
8  says?
9  A. That's what it says.
10 Q. All right. And it looks like it says
11 the estimated cost of damage --
12 A. Again, what I just said?
13 Q. Right. 312 --
14 A. -- 12840.
15 Q. And that's what you put on the revised
16 Form 95?
17 A. The Road Home. The Road Home put this
18 on here. They the one went out there and
19 evaluated the damage.
20 Q. Right. I understand. But you had
21 mentioned earlier in the Form 95s that we were
22 looking at, these forms --
23 A. Uh-huh.
24 Q. -- there was that amended form that
25 had the 312 number on it. It's Exhibit 16.

Page 238

1  A. That's not right.
2  Q. So that -- as you said, that's where
3  you got the number from.
4  A. That's where I got the number from.
5  Q. Okay. Great. Then it says, estimated
6  elevation cost. Do you know what that meant?
7  A. That meant if you elevated your home.
8  Q. Okay. So they would give you $35,000
9  to elevate your home?
10 A. Yes.
11 Q. Okay. Or that's how much it would
12 cost, I should say?
13 A. That's what they say.
14 Q. Okay. And then it goes through Other
15 Compensation.
16 A. Uh-huh.
17 Q. First is FEMA IA, $10,500.
18 A. Uh-huh.
19 Q. Is that the money that you got from
20 FEMA --
21 A. Correct.
22 Q. -- $10,000?
23 A. Correct.
24 Q. And then private insurance. Like you
25 said a moment ago, $13,947? Correct?

Page 239

1  A. That's what it says.
2  Q. All right. And then it looks like
3  Road Home gives you three options. Can you
4  tell me what those are? What that --
5  A. What the three options it is?
6  Q. Yeah.
7  A. I can remember what they is, I don't
8  see them on this paper here. I remember.
9  Q. Tell me what they are. You don't need
10 to read them off the paper.
11 A. Um -- Option 1, I think it was that
12 they would repair your house if you stayed in
13 New Orleans.
14 Q. Okay. So the first option is you can
15 stay in the house and they would give you money
16 to fix it.
17 A. Fix the house. Repair it.
18 Q. And what's the second option?
19 A. Option 2 was an option that you would,
20 um -- that you can -- the Road Home would buy
21 your home, and -- long as you buy another home
22 in the state of Louisiana.
23 Q. Okay. So the Option 2, sell your home
24 to Road Home and buy another house in
25 Louisiana.

Page 240

1  A. Right.
2  Q. That's exactly what you said.
3     And what's the third option?
4  A. Third option, if you choose to sell
5  the Road Home your home and move to another
6  state, you would get I think $3500 -- $35,000.
7  Q. Okay. What option did you and your
8  wife choose when you applied to Road Home?
9  A. 2.
10 Q. 2. And that's the sell your home to
11 Road Home and stay in Louisiana.
12 A. Definitely.
13 Q. Okay. Do you remember when you did
14 that, when you made that choice?
15 A. When I made that choice?
16 Q. Uh-huh.
17 A. I can't remember the exact date when I
18 made that choice.
19 Q. That's okay. I've got a document that
20 might be able to help you.
21 A. Okay.
22 Q. Let me give you a document that I'm
23 marking as Exhibit 19. Do you recognize this
24 document, Mr. Livers? (Tendering.)
25    (EXHIBIT 19 was marked for

60 (Pages 237 to 240)

ALVIN L. LIVERS, SR.                                                September 14, 2011

Page 241

1  identification and is attached hereto.)
2      A.  I remember this document, but
3  thoroughly reading it, with so much -- it has
4  so much literature in my form, but I do
5  remember it being stated just what I stated, if
6  you stay in the -- if you stay in your own home
7  for a certain length of time -- yeah, I can
8  remember this.
9  EXAMINATION BY MR. FARRELL:
10     Q.  Okay.  And so like you said, now, it
11 says in this Box Option 2, relocate as a
12 homeowner.  There's a check box in that.
13     A.  Uh-huh.
14     Q.  All right.
15     A.  This check was saying elevation is not
16 required.  That's what they got a checkmark in
17 that box.  Elevation is not required for this
18 property.
19     Q.  I see that.  But a little further down
20 there's some initials and then check box and
21 Option 2, relocate as a homeowner.
22     A.  Okay.
23     Q.  Okay?  And then turn to the next page.
24 You can see that there are signatures on that
25 document.

Page 242

1      A.  That's my signature.
2      Q.  Okay.  And looks like you made that
3  choice on April 18 th, 2007?  You signed the
4  document?
5      A.  Yeah.
6      Q.  Is that right?
7      A.  That's when I signed the document.
8      Q.  Okay.  Let me just break this out,
9  too: It says, Option 2, relocate as a
10 homeowner.  There's a compensation grant.  You
11 see that?  It's really small.  You might want
12 to put your glasses back on.  In fact --
13     A.  Yes.
14     Q.  And it's on this other Exhibit 18,
15 also.  And it says compensation grant, $70,552?
16     A.  Wait, wait, wait, wait, wait.  Where
17 you at?
18     Q.  The writing is really small.  Let's
19 try here on Exhibit 18 instead.
20     A.  Okay.
21     Q.  Under Option 2, Relocate, there's a
22 compensation grant amount, $70,552.07?
23     A.  So what are you asking me?
24     Q.  First off, is that what it says for
25 the compensation grant amount?

Page 243

1      A.  What is a compensation grant?
2      Q.  Um -- let me -- I'm just going to
3  leave that.  So you --
4      MR. ANDRY:
5          We'll stipulate the document says
6      what it says.
7      MR. FARRELL:
8          Yeah.  That's fine.  We can do
9      that.
10 EXAMINATION BY MR. FARRELL:
11     Q.  The document also includes a loan.  It
12 says under that, affordable loan calculation,
13 $50,000?
14     A.  Correct.
15     Q.  What's your understanding of that
16 loan?
17     A.  My understanding of that loan?
18     Q.  Uh-huh.
19     A.  The understanding of that loan was
20 when -- to purchase another home in the state
21 of Louisiana.
22     Q.  Uh-huh.
23     A.  I had to stay in that home for three
24 years or five years, and stipulate to -- I mean
25 give them literature on my Act of Sale,

Page 244

1  homeowner's insurance, flood insurance.
2  That's -- that's -- that's -- and after these
3  provisions are met, then they would exsolve
4  [sic] me.
5      Q.  Okay.  You mentioned the documents of
6  the sale of your house.  Let me just show
7  you -- okay.  Mr. Livers, this one is Exhibit
8  Number 20.  (Tendering.)
9          (EXHIBIT 20 was marked for
10 identification and is attached hereto.)
11     A.  Uh-huh.
12 EXAMINATION BY MR. FARRELL:
13     Q.  I would ask you to look it over and
14 tell me if you recognize it.
15     MR. ANDRY:
16          The writing is really small.  Can
17      you just tell him maybe what it
18      purports to be?
19     MR. FARRELL:
20          Sure.  Certainly.
21 EXAMINATION BY MR. FARRELL:
22     Q.  This is document the says Act of Cash
23 Sale, Barbara Deplush Livers and Alvin
24 Livers --
25     A.  Uh-huh.

61 (Pages 241 to 244)

JOHNS, PENDLETON COURT REPORTERS                                     504 219-1993

Page 261

1  long I got. But I'll tell you what, I really
2  miss -- really miss my friends. And most of
3  all, you know, you couldn't put him down as no
4  human being, but my dog. And it really -- it
5  really hurt me. It really hurted me to know
6  that I couldn't take him. I couldn't take him.
7  And I tried. I tried. But much as he loved
8  me, he would have bit me if I tried to get him
9  in that van. He wouldn't get in that van. I
10 miss him. I miss him for so -- every time I
11 plant something where I'm at now, I think about
12 him, because he would let me plant whatever I
13 want, and the next day he be done dug it up and
14 run behind the shed and peep out because he
15 know I'm coming behind him for what he done.
16      That's all.
17    Q. Mr. Livers, do you have a mortgage on
18 your house now? I know you said earlier that
19 you paid off the mortgage on your house on
20 St. Claude.
21    A. No. I had to take -- I had to take --
22 whatever they gave me, I took some of my
23 savings, because I had to pay it -- I had to
24 pay it off. I'm at an age I can't pay -- I
25 can't go for no thirty years mortgage. I ain't

Page 262

1  got that kind of time left. So I took whatever
2  they gave me I took and put the rest with and
3  paid my house off -- paid the house off that
4  I'm living in now. Because I couldn't afford
5  no 30-year mortgage and 20 years -- not even 20
6  years. So I just paid -- I just took that,
7  what I had left in my savings, and I just took
8  that, and when I did, I paid it off.
9      I even had -- the lady at the bank was
10 telling me about some -- how you get money if
11 you -- you know, for escrow and all the kind of
12 stuff to not pay it. And I told her, I can
13 probably do that. Oh, I'm sorry. I done got
14 too emotional.
15    Q. You're still hooked up, and they may
16 have a couple of follow-ups.
17      (Off the record.)

Page 263

1           WITNESS' CERTIFICATE
2
3      I, ALVIN L. LIVERS, SR., do hereby
4  certify that the foregoing testimony was given
5  by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10 _____    _____
11 DATE SIGNED       ALVIN L. LIVERS, SR.
12
13 _____ Signed with corrections as noted.
14
15 _____ Signed with no corrections noted.

25 DATE TAKEN: September 14th, 2011

Page 264

1           REPORTER'S CERTIFICATE
2      I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3  Certified Court Reporter in and for the State
4  of Louisiana, do hereby certify that the
5  aforementioned witness, after having been first
6  duly sworn by me to testify to the truth, did
7  testify as hereinabove set forth;
8      That said deposition was taken by me
9  in computer shorthand and thereafter
10 transcribed under my supervision, and is a true
11 and correct transcription to the best of my
12 ability and understanding.
13     I further certify that I am not of
14 counsel, nor related to counsel or the parties
15 hereto, and am in no way interested in the
16 result of said cause.

23 _____
24 JOSEPH A. FAIRBANKS, JR., CCR, RPR
25 CERTIFIED COURT REPORTER #75005