UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO | § | |
| Armstrong, No. 10-866 | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' OPPOSITION TO PLAINTIFFS' MOTION
TO EXCLUDE TESTIMONY RE MARR SUPPLEMENTAL REPORT**

Plaintiffs move for an order excluding testimony and evidence pertaining to

the supplemental report of Dr. W. Allen Marr.  Plaintiffs' motion must be denied

because Dr. Marr's supplemental report corrects inaccuracies based on information

that was not available when he issued his initial report.  As this Court recently ruled,

this is what "[s]upplementation under the Rules means."[1]  After Dr. Marr issued his

expert report, he learned of evidence that the IHNC waves were at least three times

larger than he had assumed when he penned his report.  This new information

prompted Dr. Marr to consider whether the larger, more powerful waves described

in Dr. Dalrymple's expert report would affect his opinion that waves were an

insignificant factor in the land-side levee erosion that triggered the south breach.

---

[1]R.D. 20890, at 4 (denying motion to strike Bea supplemental report).

Analysis revealed that the larger waves were powerful enough to initiate erosion before surge overtopping began, prompting Dr. Marr to issue a three-page report detailing his new analysis and his new opinion that overtopping waves initiated scour and trenching of the land-side levee embankment.  That supplemental report, issued before the deadline for pretrial disclosures, was timely under Fed. R. Civ. P. 26(e)(2).   Because Dr. Marr's timely supplemental report corrects his prior disclosure based on information that was not then available, the plaintiffs' motion must be denied.

## STATEMENT OF MATERIAL FACTS

1.  Dr. W. Allen Marr, the United States' expert professional civil engineer, issued his expert report on March 12, 2012.  In it he opined that "the South Breach occurred due to scouring of the land side embankment to a depth of several feet by overtopping of the wall."[2]  In support of this opinion he presented scour calculations from a study that "only addressed overtopping scour due to storm surge and did not include scour due to wave overtopping."[3]  He cautioned, however, that [t]hese calculations are very approximate"[4] and further advised that

> waves can overtop a floodwall even when the storm surge elevation is below
> the top elevation of the wall.  Since the floodwalls at the EBIA site experienced
> wave overtopping during Hurricane Katrina, it can be assumed that omission

---

[2]Marr Rpt. 109.

[3]*Id.* at 106.

[4]*Id.* 107.

of wave overtopping scour in our study would result in lower predicted scour depths than what actually developed at the floodwalls during the hurricane.[5]

"The point of this section," he explained, "is to demonstrate that the physics of scour support the development of scour depths of 6 to 8 ft or more for the EBIA floodwall conditions."[6]

2. On March 21, WGI's expert hydrologist, Dr. Robert A. Dalrymple, issued his expert report. In it he expressed his opinion that "there were 3-foot waves in the canal" hours before the floodwall failed.[7]

3. When Dr. Marr was deposed, on April 23-24, the plaintiffs' attorney attempted to correlate the scour depths computed by Dr. Marr with the south-breach time of failure.[8] After reiterating that his scour analysis excluded wave overtopping, Dr. Marr opined that overtopping would have commenced about two hours before the scour depths were deep enough to trigger the breach, implying a breach time from surge overtopping of around 9 a.m.[9] But again Dr. Marr cautioned that this estimate was "an approximate guess" and not the result of "any detailed calculation of when the failure occurred."[10] He explained: "I'm just looking at the mechanics of why it

---

[5]*Id.* at 106 (citations omitted).

[6]*Id.* at 107.

[7]Dalrymple Rpt. 9.

[8]*See* Marr Dep. I, at 37-45.

[9]*Id.* at 37-38.

[10]*Id.* at 39.

failed.  Not when it failed."[11]  When informed that other experts had placed the time of the south breach at "roughly 7:10 a.m.," Dr. Marr testified that he was "not aware of that."[12]  If surge overtopping did not begin at the south-breach site until "around 7:00 a.m.," Dr. Marr agreed that "there would not have been enough time for scour to develop" from overtopping alone to trigger the breach at 7:10 a.m.[13]  Crucially, however, Dr. Marr's opinion about the cause of the south breach was not disturbed by the lack of congruity between the time of floodwall failure implied by his surge-overtopping calculations and other experts' opinions about the time of the south breach:  "It's obviously a scour failure from all the photographic evidence that I have.  It's obviously overturning.  And the way for overturning to occur was the scour mechanism."[14]

4.  Dr. Marr's initial opinion "about the scouring effect of overtopping waves" was based on his "assum[ption] that waves within the EBIA area in the early morning of August 29, 2005 were on the order of 1 ft or less."[15]  His deposition testimony, like his report, reflected his "understanding that the significant waves had been small."[16]  After his deposition, Dr. Marr "learned that the waves were much larger than

---

[11]*Id.*

[12]*Id.* at 44-45.

[13]*Id.* at 46.

[14]*Id.* at 47.

[15]Marr Supp. Rpt. 1

[16]*Id.*

considered in [his] report."[17]  Based on Dr. Dalrymple's recent work in this case, Dr.

Marr "conducted additional analyses to determine whether [waves of the magnitude

described by Dr. Dalrymple] initiated scour before surge overtopping began."[18]  His

supplemental report provides the details of those analyses, which show that waves

with a significant wave height of "about 3 ft with periods of about 2 seconds" would

have initiated scour and created a scour trench in the land-side levee embankment

before surge overtopping began.[19]

## ARGUMENT

**I.  Dr.  Marr's supplemental report is based on information that was not
available when he issued his first report.**

Rule 26(e) obligates parties to supplement or correct Rule 26(a) disclosures "in a

timely manner if the party learns that in some material respect the disclosure or

response is incomplete or incorrect, and if the additional or corrective information

has not otherwise been made known to the other parties during the discovery

process or in writing . . . ."[20]  "For an expert whose report must be disclosed under

---

[17]*Id.*

[18]*Id.*

[19]*Id.*

[20]Fed. R. Civ. P. 26(e)(1).

Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition."[21]

Dr. Marr's supplemental report fulfilled the United States' Rule 26(e) obligation to disclose that the rates of scour included in Dr. Marr's initial report were incorrect. Those rates were based on the erosive effects of surge overtopping and did not include the erosive effects of wave overtopping.  After issuing his report, Dr.  Marr learned from Dr. Dalrymple that waves with a significant height of three feet and a period of two seconds developed in the vicinity of the EBIA before the breaches occurred.[22]  This information, first disclosed in Dr. Dalrymple's expert report, was not available when Dr. Marr prepared his report.  The plaintiffs' motion is based on the mistaken notion that Dr. Dalrymple's opinion was not new information because "it was based on the IPET report, dated March 26, 2007."[23]  The plaintiffs argue that Dr.  Marr's "Supplemental Report is not based on recent work by [Dr.] Dalrymple" because Dr.  Dalrymple's March 21 report "does not establish" that there were three-foot waves in the canal.[24]

Plaintiffs' argument hinges on a misunderstanding of the phraseology used by Dr. Dalrymple to express his expert opinion.  Dr. Dalrymple wrote, "'at 3:00am, the water level in the IHNC was about 8.5 feet, *implying* that there were 3-foot waves in

---

[21]Fed. R. Civ. P. 26(e)(2).

[22]*Id.*

[23]Plt.  Mem.  3.

[24]*Id.* at 4.

the canal.'"[25]  From *implying* the plaintiffs infer that Dr. Dalrymple was merely

"[a]dopting an inference or loosely making an implied consequence" from the IPET

report, not expressing an expert opinion.[26]

Plaintiffs' argument does not withstand scrutiny.  Only an expert can deduce

wave characteristics—significant wave heights and periods—from surge elevations

and wind speeds.  If Dr. Dalrymple were not an expert coastal engineer who

understands the dynamics of water waves, he would not be qualified to opine that a

canal water level of 8.5 feet implies that there were 3-foot waves in the canal.  His

report makes clear that Dr. Dalrymple is applying his own engineering judgment,

not parroting the IPET report.  The comment about wave heights comes as he is

explaining why the levee-elevation survey data, "taken together with the observed

water levels in the IHNC during Katrina, are in harmony with available evidence

regarding the occurrence of overtopping in the IHNC."[27]  He cites not the IPET report

but a coastal-engineering manual as a basis for believing William Villavasso's

testimony that water was splashing over the floodwall hours before the wall failed.

Fifty-mile-an-hour winds "blowing down the GIWW and the northern branch of the

IHNC" would, in Dr. Dalrymple's expert opinion, create sufficiently large waves to

---

[25]*Id.* (quoting Dalrymple report and adding emphasis).

[26]*Id.*

[27]Dalrymple Rpt. 9.

overtop the floodwall, as Mr. Villavasso testified.[28]  Only after stating the bases for his opinion does Dr. Dalrymple buttress it by observing that IPET "[a]lso . . . indicat[ed] that waves were on the order of 2.5 to 3.5 feet in the southern portion of the IHNC."[29]

Oddly, the bulk of the plaintiffs' brief is devoted to attacking Dr. Dalrymple's opinion as "repeatedly inconsistent with IPET," "erroneous," and "not in accordance with the parties' stipulation that . . . the prevailing winds were out of the North-Northeast."[30]  As these attacks imply, Dr. Dalrymple's opinion about waves has an evidentiary force all its own.  The plaintiffs therefore attempt to show that his opinion is unreliable and should not be given any weight by the Court.  But in so doing, the plaintiffs refute their argument that Dr. Dalrymple's March 21 report does not provide new information and that therefore Dr. Marr must be relying on the IPET report.[31]

The simple answer to the plaintiffs' argument, which their attacks inadvertently demonstrate, is that Dr. Dalrymple's March 21 report provides new evidence.  Whether his opinion about the size of the waves that attacked the floodwall merits great or little weight is a separate inquiry, to be undertaken by the Court at a later

---

[28]*Id.*

[29]*Id.* (citation omitted).

[30]Plt. Mem. 8-9,

[31]*See id.* at 4-5.

time.  For this motion, what matters is that Dr. Dalrymple's opinion constitutes new evidence.

Even though Dr. Marr, like Dr. Dalrymple, was aware of the IPET wind and wave information, he could not draw the inferences that Dr. Dalrymple drew.  As he explained at his deposition, he is not an oceanographer.  He has "some knowledge of waves" but relies on others to "tell me about wave mechanics."[32]  His awareness of the IPET information did not eliminate his need to rely on Dr. Dalrymple's analysis and conclusions.  As Dr. Marr states in his supplemental report, his new analysis stems from Dr. Dalrymple's recent work, not the earlier IPET study.  Because Dr. Marr's supplemental report corrects inaccuracies in his initial report based on information that was not available at the time of the initial report, his supplemental report is proper under Fed. R. Civ. P. 26(e)(2).[33]

## II. Dr. Marr's supplemental report is timely, does not prejudice the plaintiffs, and does not introduce a new theory.

Rule 26(e)(2) provides that supplemental reports "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due," which in this case was August 10.[34]  Dr. Marr's supplemental report was disclosed on July 30, and it is therefore timely.  The plaintiffs do not claim to be prejudiced by Dr. Marr's

---

[32]Marr Dep. I, at 68-69.

[33]*Dag Enters. v. Exxon Mobil Corp.,* 226 F.R.D. 95, 109 (D.D.C. 2005); *see also* R.D. 20890, at 5 (considering the Bea Report dated April 11, 2012, to be "supplemental in nature").

[34]*See* R.D. 20927 (setting pretrial deadlines).  *Cf.* R.D. 20881 (noting that "scheduling orders . . . are silent as to supplement reports").

supplemental report, and the absence of such a claim is decisive inasmuch as the report was disclosed before the deadline for pretrial disclosures. The plaintiffs characterize the report as an "attempt[] to 'fix' [the defense's] original erroneous causation opinions as expressed in the initial expert report of Marr by disguising a new theory as a 'supplemental report.'"[35] But as the facts demonstrate, this mischaracterizes the report.

Dr. Marr does not use the report to unveil a new theory. He hews to his opinion that overtopping-induced erosion of the land-side levee embankment caused the south breach. Moreover, as he plainly stated in his initial report and his deposition, this opinion does not depend on a correlation of scour depths with estimated times of floodwall failure. Physical evidence of deep trenches behind unfailed sections of the wall provides a sufficient basis for concluding that deep trenches also were scoured out behind the wall where it failed.[36]

The supplemental report revises the rate of scour to include the effects of wave overtopping. The calculated rates of erosion for wave and surge overtopping are "very approximate."[37] Consequently, attempting to infer a time of floodwall failure from the calculations would involve speculation. As Dr. Marr stated in both reports, "there are several sources of variability that produce uncertainty in the computed

---

[35]Plt. Mem. 11.

[36]*See* Marr Rpt. 107, 117; Marr Dep. 47.

[37]Marr Rpt. 107; Marr Supplemental Rpt. 1.

scour depth and calculated factor of safety against overturning such that it is not possible to determine from this analysis when the South Breach occurred."[38]

## CONCLUSION

Dr. Marr issued his supplemental report to correct his initial report, which did not consider the erosive effects of overtopping waves.  The supplemental report was prompted by information that had not been not available when he issued his initial report.  Dr. Marr's supplemental report was issued before the deadline for pretrial disclosures and does not prejudice the plaintiffs.  The report fulfills the United States' obligation to correct inaccuracies in a prior Rule 26(a) disclosure. Accordingly, the plaintiffs' motion must be denied.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General
PHYLLIS J. PYLES
Director, Torts Branch
JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch

/s/ Robin Doyle Smith
ROBIN DOYLE SMITH
Senior Trial Counsel, Torts Branch
Civil Division
U.S. Department of Justice
Benjamin Franklin Station,
Washington, D.C.  20044
(202) 616-4400
robin.doyle.smith@usdoj.gov
Attorneys for the United States

---

[38]Marr Supplemental Rpt. 2.

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 17, 2012, I served a true copy of the foregoing upon the Court via hand-delivery pursuant to the Court's July 26 Minute Entry. Notice of this filing will be delivered electronically via CM/ECF to all counsel of record.

/s/ Robin Doyle Smith
ROBIN DOYLE SMITH