UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION § § § § § PERTAINS TO: § § MRGO § *Armstrong*, No. 10-866 § § | CIVIL ACTION NO. 05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |

**DEFENDANT WASHINGTON GROUP INTERNATIONAL, INC.'S
REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE PLAINTIFFS'
<u>NOTICE OF INTENT TO INTRODUCE SUMMARY EVIDENCE</u>**

Defendant Washington Group International, Inc. ("WGI") respectfully submits this reply brief in support of its motion to exclude Plaintiffs' Notice of Intent to Introduce "Summary Evidence."[1]  Plaintiffs would have this Court consider their "summary" evidence in a vacuum, separate and apart from the very purpose for which they will offer it at trial:  to support Dr. Robert Bea's constantly evolving opinion (which the Court already struck from his Rebuttal Report) that certain WGI excavations in unspecified locations and with unspecified elevations, depths, and backfill materials somehow "exacerbated the hydraulic conductivity pressure 'connections' with the underlying saturated, high water content swamp-marsh deposits."[2]  Plaintiffs' "summary" evidence is nothing more than improperly tendered expert materials submitted to circumvent this Court's Order striking Dr. Bea's so-called "Swiss Cheese Graphics" and related opinions.  Rule 1006 does not change that.  The "summary" evidence should therefore be excluded from trial.

---

[1]   Notice of Intent to Introduce Summ. Evid. (Rec. Doc. 20971).

[2]   Bea Rebuttal Report at 4.

I.     ARGUMENT

   A.   **The Summary Evidence is Dr. Bea's Expert Materials Submitted on the Eve of Trial to Ambush Defendants.**

Plaintiffs go to great lengths to disassociate their "summary" evidence from Dr. Bea's stricken Rebuttal Report, arguing that the summaries are not GIS models or "Swiss Cheese Graphics" at all.[3] That is beside the point. Regardless of how the summary evidence was created or is described, it is clear that Plaintiffs' submission is the very "correlation" that Dr. Bea intended to complete—but had not—as early as his first deposition in March 2012,[4] and then attempted to complete—but still had not—via the stricken portions of his Rebuttal Report.[5] Indeed, the excavation details listed in Plaintiffs' Exhibit A-1 table are the "aggregate extents of the excavation work—location, aerial extent, depth, and general type of backfill" that Dr. Bea's stricken Rebuttal Report purported to contain.[6] And the maps in Exhibits B-1 through B-16 and C-1 through C-16 show that excavation work in graphical form, just as Dr. Bea intended that his

---

[3]  Plaintiffs' Opp. Br. at 15-16 (Rec. Doc. 21007).

[4]  Deposition of Dr. Robert Bea, Mar. 27, 2012, at 213:7-19, excerpts attached hereto as Exhibit 1 ("Well, one of the things that we did not have the opportunity to provide at the time I had to provide my expert report, February the 1st, we wanted to develop a detailed mapping of the excavations on the East Bank Industrial Area. I have continued that work, and it will be a part of my rebuttal report that you will receive on April 3rd.").

[5]  Deposition of Dr. Robert Bea, Apr. 16, 2012, at 86:16-87:15, excerpts attached hereto as Exhibit 2 ("Q. What would it take, in a deposition, which is the only vehicle I have to ask you questions about it, for you to tell us that? Because we can't tell it from your plan. You've already said that. We can't tell it. Right? We can't tell the depth. You can't even tell the depth. A. No. I can't. That's correct. Q. So how can I get that information from you? A. Well, we would have to do a correlation for you to identify specific excavations, then connect that to their depth, then correlate that with the contact elevation for the varied swamp-marsh deposit, and you could produce a table that would portray that information. That's one of the powers of the GIS system and one of the reasons we went to this extent of work. But sitting here today, I can't do that for you. Q. Do you have such a table? A. No. I would be more than glad to produce it, if I had it. Q. Have you done such a correlation? A. No.").

[6]  Bea Rebuttal Report at 4.

"Swiss Cheese Graphics" would "show the depths of excavations relative to the local ground elevation associated with the excavation."[7]

That the Plaintiffs are (yet again) attempting to supplement Dr. Bea's opinions with untimely submissions, even in the face of this Court's admonition that it "[doesn't] want anything else," is bad enough.[8]  Equally troubling, however, is the fact that the Plaintiffs have shielded Dr. Bea's opinions about the new summary evidence until trial, thus robbing the Defendants of their rightful opportunity under Rule 26 to examine those opinions during discovery.  This is classic sandbagging, and it cannot stand.  Plaintiffs' arguments to the contrary are meritless.

For instance, Plaintiffs claim that Dr. Bea "relied on and testified to the [materials that underlie the evidence summaries] well before the drafting of his Rebuttal Report."[9]  That is simply not true.  Dr. Bea himself admitted that some of the documents that he and others purportedly used to create his "Swiss Cheese Graphics" were not included in the reliance materials for his original report,[10] and to the extent those documents may have been provided to support the same graphics in the now ***stricken*** portions of his Rebuttal Report, they are not reliance materials at all.  Likewise, the record could not be more clear that Dr. Bea has not—and in fact, by his own admission, ***could not***—testify to any details about the excavations that he says "exacerbated the hydraulic conductivity pressure connections" in the EBIA, nor has he ever been able to point Defendants to specific documents that support those excavation details.[11]

---

[7]   Bea Rebuttal Report at 4.

[8]   Mtn. to Strike Hearing Tr., June 28, 2012, at 72 (Rec. Doc. 20903)

[9]   Plaintiffs' Opp. Br. at 13 (Rec. Doc. 21007).

[10]  Deposition of Dr. Robert Bea, Mar. 27, 2012, at 213:3-19.

[11]  Deposition of Dr. Robert Bea, Apr. 16, 2012, at 74:24-77:16, 85:7-16, 87:1-15, 114:24-117:7.

Plaintiffs also suggest that "Defendants' contention that Plaintiffs never previously specified the relevant excavations in the EBIA rings hollow" because "Defendants' own documents supply all the answers."[12] Defendants' documents certainly include details about excavations, but the documents themselves could *never* tell the Defendants how, in Dr. Bea's expert opinion, the specific excavations contributed to underseepage and ultimately caused the North and South Breaches at the EBIA. Those are answers that only Dr. Bea can provide, and to date, he has not done so—despite Defendants' repeated attempts to flesh out those opinions in Dr. Bea's multiple depositions.

The result of all of this is an even more "extreme" prejudice than the Court predicted would have occurred if Dr. Bea's "Swiss Cheese Graphics" and related opinions had not been stricken two months ago.[13] It is wholly improper for Dr. Bea to use the summary evidence to bolster his conclusions when Defendants have been afforded no opportunity to examine how and why the evidence purportedly impacts those conclusions. This is particularly true considering that the Defendants have demonstrated that the excavations Dr. Bea originally posited as sources of underseepage in fact did not exist prior to Katrina.[14] Now, conveniently, and only days before trial, Dr. Bea claims to have identified relevant details about excavation depths, backfilling and compaction that are buried in Plaintiffs' "summaries," but Defendants do not know how in Dr. Bea's opinion those particular details "exacerbated" underseepage, and that information will not be available before Dr. Bea is examined at trial.

---

[12]   Plaintiffs' Opp. Br. at 14 (Rec. Doc. 21007).

[13]   Order and Reasons, June 29, 2012, at 4 (Rec. Doc. 20890).

[14]   *See* Memo. in Support of WGI's Mtn. to Exclude Testimony & Opinions of Dr. Robert Bea, at 14-32 (Rec. Doc. 20822-1).

Moreover, Plaintiffs have provided no indication as to whether at this late stage in the game Dr. Bea has incorporated the new excavation details from his "summary" evidence into the SEEP/W computer analyses that are critical to his opinions about the EBIA breaches. This Court knows all too well the time and effort involved in reviewing the computer model runs that make up a SEEP/W flow analysis. Even if the Plaintiffs had turned over any such model runs pertaining to the summary evidence—which they have not—the information could not possibly be digested before trial. And if those SEEP/W flow analyses have ***not*** been conducted, as Defendants presume is the case, then the new "summary" evidence has absolutely no bearing on Dr. Bea's seepage models and should be ruled unreliable under Rule 702. *See* Fed. R. Civ. P. 702 (requiring the expert testimony be "the product of reliable principles and methods"); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (holding that expert testimony is not reliable if the expert's technique or theory cannot or has not been properly tested).

By striking pages 3 through 16 of Dr. Bea's Rebuttal Report, this Court excluded more than just the "Swiss Cheese Graphics," however Plaintiffs choose to define them. The Court concluded that the ***analyses and opinions*** expressed on those pages cannot be proffered by Dr. Bea in this case. Plaintiffs cannot simply resurrect those analyses and opinions as summary evidence without providing Defendants an opportunity to examine them. Plaintiffs' notice and its contents should therefore be excluded from trial.

### B. Plaintiffs' Suggestion that WGI Intends to Exclude Every Task Order 26 Project Document from Trial Is a Mere Diversion and Unfounded.

Plaintiffs attempt to divert attention away from Dr. Bea by declaring that the "Defendants want this Court to forbid Plaintiffs from introducing any evidence of the work

performed at the EBIA,"[15] and that WGI's motion will "convert the ruling on the Swiss cheese model into an order *in limine* precluding the admission of any evidence of work performed at the EBIA."[16] But the Defendants have never contended that the documents underlying Plaintiffs' "summaries" are not admissible in and of themselves; in fact, some of those documents will be offered in WGI's own case-in-chief. Rather, Defendants object to the so-called "summaries"—the "correlation" table in Exhibit A-1 and the graphics in Exhibits B-1 through B-16 and C-1 through C-16—that were compiled by Plaintiffs' expert(s).[17] Those materials are being offered for the first time to support Dr. Bea's opinions regarding underseepage. They were submitted well after the deadline for Rule 26 disclosures and in direct violation of this Court's Order striking Dr. Bea's Rebuttal Report.

That said, given the last-minute nature of Plaintiffs' submission, Defendants cannot be certain that all of the underlying documents are **not** objectionable. For example, Plaintiffs' original Notice of Intent to File Summary Evidence provided almost no identifying information about the underlying documents; only individual bates numbers were given.[18] Based on that limited information, WGI determined that many of the bates numbers were **not** reflected on the Master Exhibit List. That is still true. However, Plaintiffs now provide Exhibit A to their opposition brief which they claim shows that the bates numbers that are not on the exhibit list are

---

[15] Plaintiffs' Opp. Br. at 3 (Rec. Doc. 21007).

[16] *Id.* at 12.

[17] Plaintiffs claim that "Defendants do not object to the admissibility of summary exhibits A-1 and D." Plaintiffs' Opp. Br. at 4 (Rec. Doc. 21007). That is not true. Exhibit A-1 is an improper "summary" and must be excluded. *Supra* at 2. Exhibit D is list of Task Order 26 project photographs, without more. Similar to the underlying project documents that are cited in Plaintiffs' "summaries," the photograph list and the photos themselves are not objectionable on their face. However, Exhibit D does not summarize anything; it is simply a list of photos in chronological order, with little identifying information. And there is no reference to any of the photographs in the Plaintiffs' "summary" Exhibits A-1, B-1 through B-16, or C-1 through C-16.

[18] *See* Manual Attachment, Ex. A, B, C.

simply different versions of documents that *are* on the exhibit list, and those documents, despite the bates number inconsistencies, are the same.[19]  Similarly, WGI has determined that, based on the identifying information in Exhibit A to Plaintiffs' opposition brief, some of the underlying documents may not have been included in Dr. Bea's materials considered.  Had all of these documents and their "summaries" been properly disclosed pursuant to Rule 26, or even disclosed in time for the parties to confer regarding trial exhibits, Defendants could have addressed these problems.  Instead, the materials were disclosed on the eve of trial, and Defendants have been given no opportunity to verify that any of Plaintiffs' representations about their underlying documents are true.

Defendants are not opposed to proper summaries under Rule 1006, nor are they opposed to Dr. Bea presenting any opinions and/or relevant documents that he has properly disclosed.  The "summary evidence" recently submitted by the Plaintiffs, however, fits neither of those categories, and it should be excluded.

### C.   Rule 1006 Is Unavailing.

Finally, Plaintiffs spend the majority of their opposition brief trying to explain Rule 1006.  Despite their best efforts, Plaintiffs cannot transform Dr. Bea's untimely expert materials into proper summaries under the Federal Rules.  Plaintiffs' Rule 1006 arguments must fail for at least the following reasons.

*First*, it is undisputed that the Fifth Circuit requires documents underlying summary charts to be first admitted into evidence.  *U.S. v. Whitfield*, 590 F.3d 325, 335 (5th Cir. 2009) (plainly stating that "summary evidence must have an adequate foundation in evidence that is already admitted"); *U.S v. Meshack*, 225 F.3d 556 581 n.26 (5th Cir. 2005) (distinguishing

---

[19]   *See* Exhibit A to Plaintiffs' Opp. Br., Column F (Rec. Doc. 21007-1) ("Notes, Explanation and bates numbers cited on the Master Exhibit List").

7

Rule 1006 from Rule 611 and stating that "Rule 1006 applies to summary charts based on evidence previously admitted . . ."); *U.S. v. Hart*, 295 F.3d 451, 455 (5th Cir. 2002) (stating that to admit summary evidence under Rule 1006 "there must be supporting evidence that has been presented previously to the jury to establish any assumptions reflected in the summary"); *U.S. v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2001) (making clear that "summary evidence must have an adequate foundation in evidence that is already admitted"). Yet many of the documents that Plaintiffs purport to "summarize" have been objected to on conditional relevance grounds by the Defendants, or, as stated *infra*, may not be on the Master Exhibit List at all. Those documents cannot be properly "summarized" under Rule 1006.

*Second*, although Plaintiffs would like to ignore applicable law, it is clear that courts in the Fifth Circuit must closely scrutinize summary evidence to ensure that it accurately and fairly reflects the documents that underlie it. *S.E.C. v. Seghers*, 298 Fed. Appx. 319, 326 (5th Cir. 2008) ("We have often emphasized, and do so once again, that district courts must be very cautious when admitting summary evidence and charts. . . ."); *Hart*, 295 F.3d at 455 (noting that the Fifth Circuit has "repeatedly cautioned that trial judges 'must carefully handle [Rule 1006 summary charts'] preparation and use'" because summary charts often have an "'air of credibility' independent of the evidence purported to be summarized") (quoting *U.S. v. Means*, 695 F.2d 811, 817 (5th Cir. 1983)); *see* 31 Charles A. Wright & Victor J. Gold, Federal Practice and Procedure § 8043, at 525 (2000). This Court cannot take comfort that Plaintiffs' alleged "summaries" are sufficiently accurate for purposes of Rule 1006. On just the first page of Plaintiffs' Exhibit A-1 "correlation" table, Plaintiffs make claims about WGI's work that have no

8

basis in the underlying documents that are allegedly summarized,[20] and that directly conflict with the underlying documents themselves.[21] What is more, several of the entries in Exhibit A-1 include no information at all with respect to excavation depths, backfill or compaction, leaving Defendants to wonder what Dr. Bea will ultimately testify to regarding the alleged "summaries" that correspond to those blank items.[22] All of these problems should have been addressed during expert discovery, but that time has obviously passed; now, just days before trial, Defendants do not have the ability to vet the problems with Dr. Bea.

Plaintiffs cannot escape the fact that these alleged "summaries" are not mere factual chronologies or syntheses, as permitted under Rule 1006, but they reflect the scientific interpretation and ultimately the opinions of Plaintiffs' experts.[23] The "summaries" must therefore be excluded.

---

[20] Given the urgency of trial preparation and briefing over these last two weeks, WGI has had little time to locate each and every bates number that Plaintiffs cite in support of their so-called "summary" entries on Exhibit A-1. However, even a cursory review proves that Plaintiffs' "summaries" are not faithful summaries at all. For example, in the Boland Marine portion of Exhibit A-1, at items 21 and 22 regarding "Onshore Piles," Plaintiffs have "summarized" that the backfill was "None." Manual Attachment, Ex. A-1, at 1. The documents cited in support of this "summary" include an excerpt from "Draft Revision B" to the 1999 Recommendation Report (WGI038698), the cover page from the October 2000 Project Work Plan for Task Order 26 (WGI07250), two daily spreadsheets entitled "Demolition Status of Underground Utilities and On Shore Piling" (WGI037580-582 and WGI007932), and a document that could not even be located based on the bates number provided in Exhibit A-1 (NEB-124-000000170). None of these documents address whether pilings were intended to be backfilled or not, or whether the on shore pilings were in fact backfilled or not; thus, they are not evidence of anything with respect to backfill.

[21] In the Boland Marine portion of Exhibit A-1, at item 10 regarding "Area 8," Plaintiffs cite to the same document (QAR 1048) to "summarize" that the compaction of backfill was both "None" *and* compaction "By trackwalk." Manual Attachment, Ex. A-1, at 1. Defendants cannot know how Dr. Bea will opine on such a discrepancy without examining him. That opportunity should have been provided during discovery.

[22] *See, e.g.*, Manual Attachment, Ex. A-1, at 1. Considering that Dr. Bea has opined that WGI's "poor" backfilling of excavations contributed to underseepage at the EBIA, to receive these blank "summaries" now, for the first time, without any explanation from Dr. Bea as to how the "summaries" inform his opinions, is patently unfair.

[23] Plaintiffs admit that Dr. Rune Storesund created Dr. Bea's alleged "summaries." Plaintiffs' Opp. Br. at 16 (Rec. Doc. 21007). Dr. Storesund is not on the Plaintiffs' witness list pursuant to the Joint Pre-Trial Order in this case. Joint Pre-Trial Order at 61-63 (Rec. Doc. 20920). And of course, Defendants could not have deposed Dr. Storesund during discovery about evidence "summaries" that did not exist.

## II.     CONCLUSION

For all of the foregoing reasons, and for the reasons stated in WGI's Motion to Exclude Plaintiffs' Notice of Intent to Introduce Summary Evidence, this Court should exclude Plaintiffs' purported "summaries" from trial.

Dated: August 31, 2012

Respectfully submitted,

 /s/ Heather S. Lonian
William D. Treeby, Bar No. 12901
James C. Gulotta, Jr., Bar No. 6590
Heather S. Lonian, Bar No. 29956
STONE PIGMAN WALTHER WITTMANN LLC
546 Carondelet Street
New Orleans, LA 70130
Phone:  504-581-3200
Fax:  504-581-3361

Adrian Wager-Zito
Debra S. Clayman
Christopher N. Thatch
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Phone:  1-202-879-3939
Fax: 1-202-626-1700

*Attorneys for Defendant*
*Washington Group International, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 31, 2012, I served a true copy of the foregoing upon all parties via Electronic Court Filing ("ECF").  Notice of this filing will be sent by e-mail to all counsel of record by operation of the Court's electronic-filing system.

 /s/ Heather S. Lonian
Heather S. Lonian