# EXHIBIT 2

## Page 1

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
                                 JUDGE DUVAL
PERTAINS TO MRGO                 MAG. WILKINSON
FILED IN: 05-4181, 05-4182, 05-5237, 05-6073,
         05-6314, 05-6324, 05-6327, 05-6359,
         06-0225, 06-0886, 06-1885, 06-2152,
         06-2278, 06-2287, 06-2824, 06-4024,
         06-4065, 06-4066, 06-4389, 06-4634,
         06-4931, 06-5032, 06-5155, 06-5159,
         06-5156, 06-5162, 06-5260, 06-5771,
         06-5786, 06-5937, 07-0206, 07-0621,
         07-1073, 07-1271, 07-1285
                    * * *

     Deposition of ROBERT G. BEA, PH.D.,
given at the offices of Stone Pigman Walther
Wittmann, LLC, 546 Carondelet Street, New
Orleans, Louisiana 70130, on April 16th, 2012.
REPORTED BY:
     JOSEPH A. FAIRBANKS, JR., CCR, RPR
     CERTIFIED COURT REPORTER #75005
```

## Page 2

```
 1   APPEARANCES:
 2   REPRESENTING THE PLAINTIFFS:
 3       BRUNO & BRUNO
 4       (BY: JOSEPH M. BRUNO, ESQUIRE)
 5       (BY: SCOTT JOANEN, ESQUIRE)
 6       855 Baronne Street
 7       New Orleans, Louisiana 70113
 8       504-525-1335
 9   - AND -
10       LEVIN, PANATONIO, THOMAS, MITCHELL,
11       RAFFERTY & PROCTOR, P.A.
12       (BY: MATTHEW D. SCHULTZ, ESQUIRE)
13       316 S. Baylen St., Suite 600,
14       Pensacola, Florida 32502
15       850-435-7140
16   - and -
17       SHER, GARNER, CAHILL, RICHTER, KLEIN &
18       HILBERT, L.L.C.
19       (BY: ASHLEY COKER, ESQUIRE)
20       909 Poydras Street, 28th Floor
21       New Orleans, Louisiana 70112
22       504-299-2100
23
24
25
```

## Page 3

```
 1   REPRESENTING WASHINGTON GROUP INTERNATIONAL,
 2       INC.:
 3       STONE PIGMAN WALTHER WITTMANN, L.L.C.
 4       (BY: WILLIAM D. TREEBY, ESQUIRE)
 5       546 Carondelet Street
 6       New Orleans, Louisiana 70130
 7       504-581-3200
 8   - and -
 9
10       JONES DAY
11       (BY: NORA WARREN, ESQUIRE)
12       (BY: CHRISTOPHER N. THATCH, ESQUIRE)
13       (BY: DEBRA S. CLAYMAN, ESQUIRE, VIA
14       TELEPHONE)
15       51 Louisiana Avenue, N.W.
16       Washington, D.C. 20001-2113
17       202-879-4645
18
19
20
21
22
23
24
25
```

## Page 4

```
 1   REPRESENTING THE UNITED STATES OF AMERICA:
 2       U.S. DEPARTMENT OF JUSTICE
 3       (BY: ROBIN DOYLE SMITH, ESQUIRE)
 4       (BY: RUPERT MITSCH, ESQUIRE)
 5       Torts Branch, Civil Division
 6       P.O. Box 888
 7       Benjamin Franklin Station
 8       Washington, D.C. 20044
 9       202-616-4289
10
11   ALSO PRESENT:
12       FRANCISCO SILVA-TULLA
13       TIMOTHY STARK
14
15   VIDEOGRAPHER: GILLEY DELORIMIER (DEPO-VUE)
16
17
18
19
20
21
22
23
24
25
```

Page 73

1          Object to the form.
2       A.  Well, I'm not certain they're
3   incomplete, because of my lack of knowledge
4   concerning the additional information that I
5   referred to here.  Given that additional
6   information has not produced anything
7   significant relative to this topic, the
8   graphics would remain unchanged.
9       Q.  So you can't tell us how many
10  revisions of the GIS models you might plan to
11  make.  Is that right?
12      A.  Well, I hope there are no more
13  revisions.  But I can't assure you that there
14  wouldn't be.  And that's the reason for this
15  statement.
16      Q.  Turn to what you euphemistically
17  called the Swiss cheese graphics on Pages 8
18  through 10.  8, 9 and 10 of your report.
19          Isn't it true that the only difference
20  between Figures 1, 2 and 3 is the underlying
21  aerial photograph?
22      A.  Yes.
23      Q.  Figure 1 is the 2002 aerial, Figure 2
24  is the pre-Katrina 2005 aerial, and Figure 3 is
25  the post-Katrina 2005 aerial.  Right?

Page 74

1       A.  Correct.
2       Q.  The graphic overlays showing
3   excavations are exactly the same in each
4   figure; right?
5       A.  I think that's true.
6       Q.  Okay.  Let's mark the next document
7   Bea Exhibit number 52. (Tendering.)  I'm
8   handing you an enlarged version of Figure 1
9   from Page 8 of your rebuttal report, because
10  the copy in your report is pretty hard to read.
11          (Bea Exhibit 52 was marked for
12  identification and is attached hereto.)
13      A.  It is.
14  EXAMINATION BY MR. TREEBY:
15      Q.  The top page is exactly as it appears
16  in the report, just bigger.  The subsequent
17  pages are enlargements of specific segments of
18  Figure 1 so that we can read them better.
19  Page 2 of this document, for example, if you
20  would look at it, is an enlarged copy of the
21  Boland Marine graphic as it appears in Figure
22  1.  Does that make sense?
23      A.  Yes, sir.
24      Q.  Okay.  Turn back to, if you would, the
25  page -- just keep that there and turn back to

Page 75

1   Page 4 in your report.  In Paragraph 7, you
2   state, the intent of these 3D graphic models is
3   to show depths of excavations relative to the
4   local ground elevation associated with the
5   excavation.
6           Did I read that right?
7       A.  Yes, sir.
8       Q.  Now, look at, if you would,
9   Exhibit 52, the enlarged version of Figure 1.
10          Could you please explain to me how to
11  determine the depths of each of the excavations
12  on Boland Marine from reading this graphic?
13      A.  No, I can't.
14      Q.  Okay.  And would your answer be the
15  same for each of these blowups?  We've even
16  made them as big as we can.  You can't really
17  tell from these graphics the depths of the
18  excavations what they're supposed to say.
19      A.  I think that's a fair observation.  I
20  had to access the digital versions from
21  Dr. Storesund in order to determine that level
22  of detail.  It was not possible to convert it
23  to 8-1/2 x 11 and maintain that detail.  You
24  need the digital record.
25      Q.  So even with these blown up to 11 x

Page 76

1   17, by each area, you can't tell me what depths
2   anything is supposed to show, is that correct?
3       A.  I can't tell you for certain.  That is
4   correct.  Some of the figures show up, but you
5   need to know precisely what those figures were
6   referring to.
7       Q.  And we can't tell that from your
8   report or its exhibits, right?
9       A.  I think that's fair, yes.
10      Q.  Well, what is the deepest excavation
11  on Boland according to your so-called Swiss
12  cheese model?
13      A.  Well, I'd have to recall from memory,
14  and that's a very dangerous thing to do.  But
15  my memory says we were on the order of 20 feet,
16  25 feet deep at the Boland Marine wedding cake
17  structure they had the cofferdam built around
18  it.
19      Q.  But that's from memory, that's not
20  from this map.
21      A.  That's correct.
22      Q.  And I guess the same would be true if
23  I asked you the same question about Saucer
24  Marine?
25      A.  Correct.

Page 77

 1    Q.  Can you tell me where on the Boland
 2  Marine blowup the wedding cake structure is
 3  located?  From looking at the map, in other
 4  words.
 5    A.  I cannot.
 6    Q.  Can you tell me where the sewer lift
 7  station located on the blowup of the Saucer
 8  Marine map?
 9    A.  Well, it's located toward the northern
10  end of Saucer.  My memory says approximately
11  300 feet from the I-wall.
12    Q.  No -- yeah.  Thank you.  Maybe I
13  didn't ask -- can you show me where that is on
14  this blowup of the Saucer Marine section in
15  your GIS Swiss cheese model?
16    A.  No, sir, I can't.
17    Q.  Okay.  We couldn't either.
18      Can you show me, on any of these maps
19  that we've blown up as big as we can, at least
20  with our systems here, where the Case 1 and
21  Case 2 cross-section excavations are from your
22  February 1 report?
23      In other words, are they shown on this
24  map?  That's my question.
25    A.  Well, the cross-section at Boland

Page 78

 1  Marine with that deep excavation would be to
 2  the west of Surekote Road, which you can see
 3  there, and there's a white building in the
 4  aerial photograph that this portrayal has been,
 5  um -- put on, and my memory says the grid
 6  trenching that is shown at that location is
 7  close to the location of the Case 1 excavation.
 8    Q.  I'm going -- because I can't see that
 9  here, could you circle that in red for us and
10  draw an arrow out -- and I assume you're using
11  the blowup of the Boland Marine site.  Right?
12    A.  Yes, sir.  This one.
13    Q.  That's Page 2 of this exhibit.
14    A.  Yes, sir.  (Witness complies.)
15    Q.  Is it your testimony that the red
16  circle you have placed on this map -- and if
17  you would, take that same red pen, and put --
18  draw a line out to the side, to the white side,
19  and write down, Case 1 excavation, if that's
20  what it is.
21    A.  (Witness complies.)
22    Q.  And I believe you testified that the
23  grid trenching that's shown on this map is
24  close to this.  Is that correct?
25    A.  Correct.

Page 79

 1    Q.  Do you know what lines are supposed to
 2  be demonstrating grade trenching on that
 3  exhibit?
 4    A.  I don't recall, no.
 5    Q.  Okay.  Is the Case 2 cross-section for
 6  the North Breach also on that -- shown on that
 7  map anywhere?
 8    A.  Well, the Case 2 cross-section isn't
 9  shown on the map because it's a vertical cut
10  through the soil, and this is a plan view.  But
11  the cross-section is at the intersection of the
12  1969 I-wall and the 1980 T-wall.  So it's close
13  here to the north end.
14    Q.  Okay.  But what I'm trying to
15  understand is, and I think you've answered,
16  it's not shown on that document?
17    A.  That's correct.
18    Q.  Would the same be true at the south
19  breach for your Case 1 and Case 2?  Look at the
20  Saucer Marine and tell me if the Case 1 and
21  Case 2 cross-sections are shown on that map.
22    A.  Well, I don't even have to look,
23  because the map is a plan view -- aerial view,
24  and the cross-sections are a vertical section
25  that was studied.  And the cross-sections are

Page 80

 1  not shown on the plan view.
 2    Q.  Well, but the location of the
 3  cross-section isn't shown there either, is it?
 4    A.  No, it isn't.
 5    Q.  On either the north or South Breach.
 6    A.  That's correct.
 7    Q.  I understand this is a plan view.
 8    A.  Okay.
 9    Q.  But you could show the location of the
10  cross-section if you wished.
11    A.  Sure.
12    Q.  But it's not been done.
13    A.  Correct.
14    Q.  On the GIS model.
15    A.  Correct.  For orientation on the GIS
16  model, the location of the breach at the north
17  end, Boland, and similarly at the Saucer site,
18  are identified.
19    Q.  On Paragraph 7, Page 4 of your
20  rebuttal report -- back to your rebuttal
21  report, Exhibit 49 I believe it is.
22    A.  Page, sir?
23    Q.  Page 4, Paragraph 7.  You state, a
24  number of these excavations -- referring to the
25  GIS model -- would have exacerbated the

Page 85

1 You want to retract that answer now?
2    A.  No.  I want to connect that answer to
3 the two cross-sections you asked me
4 specifically, I thought, to address.
5    Q.  The record will be clear what's going
6 on.
7        Okay.  Then I need for you to tell me
8 any of the excavations that are shown on this
9 drawing that exacerbated the so-called
10 hydraulic conductivity pressure connections
11 with the underlying saturated high water
12 content swamp-marsh deposits.
13    A.  You can draw a big circle around the
14 entire area.  Any excavation that was deep
15 enough and poorly backfilled puts us in contact
16 with this swamp-marsh deposit.
17    Q.  What is deep enough?
18    A.  Well, that depends on where you are.
19 If you're close to the outer edge of the EBIA
20 site, the swamp-marsh deposits are shallower
21 than they are immediately under the I-wall
22 site.  And so the depth of the excavation
23 varies depending on where you are in the area.
24    Q.  Are you able, sitting here, looking at
25 what you've given us in your GIS model, to tell

Page 86

1 me and mark which excavations you contend are
2 deep enough and close enough to the I-wall to
3 have exacerbated the hydraulic conductivity
4 pressure connections?
5    A.  No, I could not.  But we could -- I
6 just can't do it sitting here with any level of
7 detail.
8    Q.  That's fairly important to us in this
9 case.  But you can't do that?
10    A.  No--
11    Q.  What would it take --
12        MR. TREEBY:
13            Excuse me.  Let me finish my
14        question before you object.
15 EXAMINATION BY MR. TREEBY:
16    Q.  What would it take, in a deposition,
17 which is the only vehicle I have to ask you
18 questions about it, for you to tell us that?
19 Because we can't tell it from your plan.
20 You've already said that.
21        We can't tell it.  Right?  We can't
22 tell the depth.  You can't even tell the depth.
23    A.  No.  I can't.  That's correct.
24    Q.  So how can I get that information from
25 you?

Page 87

1    A.  Well, we would have to do a
2 correlation for you to identify specific
3 excavations, then connect that to their depth,
4 then correlate that with the contact elevation
5 for the varied swamp-marsh deposit, and you
6 could produce a table that would portray that
7 information.  That's one of the powers of the
8 GIS system and one of the reasons we went to
9 this extent of work.  But sitting here today, I
10 can't do that for you.
11    Q.  Do you have such a table?
12    A.  No.  I would be more than glad to
13 produce it, if I had it.
14    Q.  Have you done such a correlation?
15    A.  No.
16    Q.  So despite the fact you write a report
17 saying a number of these excavations has that
18 effect, you can't tell us which ones.
19    A.  Well, I could point --
20    Q.  Right now?
21    A.  I could point to general ones, um --
22 and we cited, for example, the wedding cake
23 structure previously discussed.  We've had
24 discussions concerning the piles that were
25 pulled and the voids left behind from those

Page 88

1 piles.  We could cite the Area 8 that we've
2 discussed, that although it did not put you in
3 contact with the buried swamp-marsh deposit, it
4 put the system in contact with other sandy,
5 shelly materials that were in contact.
6        So it is a multi-connection problem.
7 It's not a individual excavation problem.  And
8 hence my inability to provide the detail that
9 you're requesting.
10    Q.  Has anyone done such a correlation?
11    A.  I think only in a general sense.
12 Certainly --
13    Q.  Well -- excuse me.
14    A.  Certainly, Dr. Rogers and Storesund
15 went through that process for their
16 deductive-based Case 2 cross-sections, both
17 locations.  I, with Chad Morris, had to go
18 through the same process for the Case 1
19 locations.
20    Q.  You used the words in your answer only
21 in a general sense.  I'm asking you not in a
22 general sense, you've given it us to in a
23 general sense.
24    A.  Yes, sir.
25    Q.  I'm asking for you, in a specific,

Page 113

1  the page. The last line of the section I'm
2  talking about says, pumped water from three
3  excavations. You see that?
4      A. Yes, sir.
5      Q. Go up five lines. The line begins
6  Completed backfill of excavation along east
7  fence line at Boland number 7, 7A and 6; is
8  that right?
9      A. Yes, sir.
10     Q. Again, Washington Group was
11 backfilling ACM Transite excavations with clay
12 from the borrow pit according to this document.
13 Is that right?
14         MR. JOANEN:
15             Object to the form.
16 EXAMINATION BY MR. TREEBY:
17     Q. Borrow material?
18     A. Well, it says, Completed backfill of
19 excavation along E fence line at Boland 7, 7A
20 and 6.
21     Q. This is all one report. The first
22 page says it was backfilled with borrow
23 material, doesn't it? Page 1 that we looked
24 at?
25     A. Yes.

Page 114

1      Q. Okay. Did you consider these daily
2  QAR's from the Corps or daily quality control
3  reports from Washington Group in preparing your
4  GIS model?
5      A. Well, Dr. Storesund, together with the
6  individuals I cited previously, they did. I
7  did not review all of the daily documents.
8      Q. Do you know why these daily reports
9  aren't identified in your reliance materials?
10     A. They may be in a previously cited
11 documentation. If they're not, it's an
12 omission.
13     Q. You know, and I've got to go back to
14 this: You said, well, Dr. Storesund, together
15 with the individuals I cited previously.
16        Have you, since you've testified
17 earlier this morning, determined who this GIS
18 expert is?
19         MR. JOANEN:
20             Object to the form.
21     A. No.
22 EXAMINATION BY MR. TREEBY:
23     Q. No? Okay.
24         Look at Saucer Marine on your GIS
25 model in Figure 1. This is the maps. But then

Page 115

1  there's a blowup of Saucer.
2          MR. JOANEN:
3              And we're going back to
4  Exhibit 52?
5          MR. TREEBY:
6              It's the maps. If that's the
7  number on it -- I assume it is. I
8  think the doctor knows what document
9  I'm talking about because he has it
10 front of him.
11         MR. JOANEN:
12             I just want the record to be
13 clear, Mr. Treeby.
14 EXAMINATION BY MR. TREEBY:
15     Q. You got it?
16     A. Is this the figure?
17     Q. Saucer, yes. I don't see any sand
18 fill on Saucer. Is that right?
19     A. Well, I don't either, but that doesn't
20 mean there wasn't any sand fill on Saucer. But
21 you can't tell from this graphic.
22     Q. Well, there is a legend on Page 1 of
23 that exhibit that says, predominantly sand
24 fill, and has a color. None of that color
25 appears on this GIS model on Saucer; isn't that

Page 116

1  right?
2      A. That's correct.
3      Q. Okay. I would assume that means that
4  whoever was doing the model couldn't find any
5  evidence of sand being a predominant backfill
6  on Saucer. Is that fair?
7      A. Well, that could be a dangerous
8  assumption. You'd have to go to specific
9  excavations, which is possible in the GIS
10 database, and then see what backfill was
11 allocated to that excavation.
12     Q. Is there a GIS -- the GIS database
13 you're referring to, is that in your matters
14 considered attached to your rebuttal report?
15     A. Well, we're producing the
16 demonstrative that's come from that GIS
17 database. I don't think we have produced the
18 GIS database for you.
19     Q. But you're saying you could go to that
20 and see if there were some sand --
21 predominantly backfilled sand on the Saucer
22 Marine if you looked in that. Is that right?
23     A. Correct.
24     Q. And you can't tell me right now
25 whether there were or not any such sites at

Page 117

```
 1   Saucer Marine.  Is that correct?
 2       A.  Not sitting here, I can't.  That's
 3   correct.
 4           MR. TREEBY:
 5               We demand the production of the
 6           GIS database that you're referring
 7           to -- he's been referring to.
 8   EXAMINATION BY MR. TREEBY:
 9       Q.  Go back to Paragraph 8 of your
10   rebuttal report, second line.  You there?
11       A.  Not yet.
12       Q.  Okay.
13       A.  Page?
14       Q.  Paragraph 8.
15           MR. JOANEN:
16               Page 5.
17       A.  Yes, sir.
18   EXAMINATION BY MR. TREEBY:
19       Q.  The second line actually, which is on
20   Page --
21       A.  4.
22       Q.  -- 4.  It says -- actually, it's not
23   the second line, but I want to refer you to the
24   second line on Page 5.
25       A.  Yes, sir.
```

Page 118

```
 1       Q.  I'm quoting.  These pervious backfill
 2   materials were, in cases such as the North
 3   Breach site, placed in contact with preexisting
 4   pervious shell filled layers that quickly
 5   conveyed water pressures directly to the EBIA
 6   flood wall leading to hydrostatic loading of
 7   the wall as a result of the navigation
 8   improvement project, close quote.
 9           Is that correct?
10       A.  Yes, sir.
11       Q.  Explain to me using the GIS model that
12   we have in Figure 1 exactly where the
13   preexisting shell fill layers are on Boland
14   Marine that you're referring to in this
15   sentence.
16       A.  The best place to reference that
17   information is in my expert report.  And the
18   expert report contains the cross-sections
19   identified as Case 1 and Case 2, and they
20   define the geometry of the contacts.
21       Q.  So these are the only shell fill
22   layers you're referring to in that sentence?
23       A.  Yes.
24       Q.  The ones in your hypothetical
25   conceptual cross-sections that we talked about
```

Page 119

```
 1   at your last deposition.  Right?
 2       A.  Yes.
 3       Q.  Okay.  By preexisting, you mean that
 4   Washington Group did not do any fill with shell
 5   at this location; isn't that true?
 6       A.  Well, that is not true in a
 7   generality.  There were some backfill materials
 8   that the photograph clearly showed included
 9   some shell.  You could see the bivalve mollusks
10   white shells.  The shells being referred to
11   here are those associated with the Surekote
12   Road overpass.  And that overpass preexisted
13   the WGI site clearing activities.  So we're
14   trying to carefully discriminate between shell
15   sandy backfill that preexisted the WGI site
16   clearing activities.
17       Q.  I'm just asking about the word
18   preexisting in your report.  And I think you've
19   answered me, but maybe my question was too
20   complex before, or maybe it was unclear.
21           When you use that term preexisting at
22   this point in your report, isn't it true that
23   you're talking about fill that preexisted
24   Washington Group 's work at the site?
25       A.  Correct.
```

Page 120

```
 1       Q.  So it could not be fill -- this
 2   preexisting fill that you refer to could not be
 3   fill Washington Group placed; is that true?
 4       A.  Correct.
 5       Q.  And isn't it true -- now I'm switching
 6   to the south breach.  Okay?
 7           And isn't it true that you have no
 8   evidence even of preexisting pervious shell
 9   fill layers at the south breach site?
10       A.  Please repeat your question.
11       Q.  Isn't it true that you have no
12   evidence of preexisting pervious shell fill
13   layers at the south breach site?
14       A.  Yes, sir.
15       Q.  Now, Dr. Bea, isn't it true that if
16   there were preexisting pervious shell fill
17   layers at either of the breach sites, right at
18   the floodwalls, the flood waters wouldn't have
19   needed any excavations further outboard, toward
20   the canal, to cause your theoretical water
21   pressures to have the effects you have claimed?
22           MR. JOANEN:
23               I'll object to the form.
24               But you can answer.
25       A.  No.
```