UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE Duval MAG. Wilkinson |
| PERTAINS TO:   MRGO                 *Armstrong*, No. 10-866 | |

**ARMSTRONG PLAINTIFFS' POST TRIAL BRIEF**

## TABLE OF CONTENTS

I.    SUMMARY OF ARGUMENTS .................................................................................. 1

   A.   FACTS ........................................................................................................................ 1

   B.   DUTY-BREACH ........................................................................................................ 2

   C.   IMMUNITIES ............................................................................................................. 3

   D.   CAUSATION .............................................................................................................. 4

   E.   DAMAGES .................................................................................................................. 7

II.   INTRODUCTION ............................................................................................................ 8

III.  STATEMENT OF FACTS ............................................................................................. 10

   A.   The Corps And WGI Contract To Commence The Project ..................................... 10

   B.   WGI Submits Its Recommendation Report .............................................................. 12

   C.   The Corps Presents WGI With A Second Statement Of Work ............................... 14

   D.   WGI Develops The Recap Submittal Report - Criteria Document ......................... 14

   E.   WGI Finalizes The Final Project Work Plan ........................................................... 15

IV.   LEGAL ARGUMENT ................................................................................................... 16

   A.   Defendants' Conduct At The EBIA Was Negligent ................................................ 16

      i.   Defendants' Duties ............................................................................................... 16

         1.   The Corps and WGI had a duty to act as reasonably prudent engineers and
              contractors would in similar circumstances ................................................. 17

         2.   WGI recommended performing a geotechnical analysis .............................. 18

         3.   The American Society of Civil Engineers' Code of Ethics required the Corps and
              WGI to put public safety first ...................................................................... 18

         4.   NEPA required the Corps to take a "hard look" at the EBIA Remediation's
              potential impact on the health and safety of the human environment ......... 19

         5.   The Louisiana Civil Code imposed additional duties on Defendants ........... 20

            a.   The Corps' duties as landowner ............................................................. 20

       b.  The Corps' duties as a public authority ............................................................... 21

   ii.  WGI Owed Duties To Plaintiffs To Perform According To Its
     Contract With The Corps ................................................................................. 22

   iii.  Industry Standards Require A Geotechnical Evaluation And Proper Backfilling And
     Compaction ................................................................................................. 24

  B.  Defendants Breached Their Duties Owed To Plaintiffs .................................................. 25

   i.  Defendants Failed To Perform Any Geotechnical Evaluations .................................... 26

   ii.  Defendants Failed To Properly Backfill And Compact Excavations ........................... 28

   iii.  Defendants Failed To Take Other Remedial Measures To Protect The Floodwall ....... 29

   iv.  A *Prima Facie* Case Of Negligence Exists Here ...................................................... 30

V.    WGI IMMUNITY ..................................................................................................... 31

  A.  Government Contractor Immunity Is Not Available To WGI .......................................... 31

  B.  State Law Contract Immunity Is Not Available To WGI ................................................. 32

VI.   GOVERNMENT IMMUNITY ................................................................................... 33

  A.  Flood Control Immunity Is Not Available To The United States .................................... 33

  B.  The New Fifth Circuit *Robinson* Opinion On The Discretionary Function Exception Does
     Not Impact The *Armstrong* Case ....................................................................... 33

   i.  The Corps Ignored Mandates Requiring Evaluation Of The EBIA Excavations .......... 34

    1.  Corps Policy Required a Geotechnical Analysis and Proper Backfill and
     Compaction of WGI's Excavations at the EBIA ............................................. 35

    2.  Engineering Regulations and Manuals Required a Geotechnical Analysis of WGI's
     Excavations at the EBIA .............................................................................. 38

    3.  Code of Federal Regulation 208.10 Required a Geotechnical Analysis of WGI's
     Excavations at the EBIA .............................................................................. 40

    4.  Standard Engineering Practices Required a Geotechnical Analysis and Proper
     Backfill and Compaction of WGI's Excavations at the EBIA ......................... 40

   ii.  The Corps' Failure To Determine Whether The EBIA Remediation Would Impact The
     Floodwall Is Not A Protected Policy Decision ............................................... 43

VII.  CAUSATION ......................................................................................................... 50

A.   Types Of Failure: Global And Lateral Stability Failure ................................................. 50

B.   Types of Failure: Overturning Failure ............................................................................. 52

C.   Types of Pressure ............................................................................................................... 53

   i.   Total Stress ...................................................................................................................... 53

   ii.   Pore Pressures Due To Flow ....................................................................................... 53

   iii.   Uplift Pressures ............................................................................................................ 54

D.   Types of Models/Analyses ................................................................................................ 57

   i.   Seepage/Pressure Analyses ........................................................................................ 57

   ii.   Stability Analyses ......................................................................................................... 60

E.   Overtopping Did Not Cause The Failure; Dr. Silva's CWALSHT Model Is Flawed ...... 61

F.   Uplift Pressures Caused The Failures .............................................................................. 65

   i.   Steady Flow Is The Appropriate Model ..................................................................... 65

   ii.   Piezometric Corroboration .......................................................................................... 67

   iii.   Near-Breach Corroboration ....................................................................................... 70

   iv.   Forensic "Signature" Corroboration .......................................................................... 71

   v.   Corroboration Conclusions .......................................................................................... 72

G.   Waves Were Insufficient To Cause Overtopping Failure ................................................ 72

   i.   Even If The I-Wall Was At A Lower Elevation, It Is Irrelevant .................................. 79

   ii.   Evaluation Of Surge Overtopping And Scour ........................................................... 81

   iii.   Dr. Silva's CWALSHT Model Is Entirely Unreliable ............................................... 85

VIII.   DAMAGES ............................................................................................................................ 87

A.   Supreme Court Precedent Allows Plaintiffs To Select Their Remedies .......................... 87

B.   The Plaintiffs' Testimony Establishes Their Personal Connection To Their Properties .. 90

   i.   Armstrongs' Testimony ................................................................................................. 90

   ii.   Holmes' Testimony ....................................................................................................... 92

iii.  Washington's Testimony ........................................................................... 94

iv.  Livers' Testimony .................................................................................... 94

v.  Coates' Testimony ................................................................................... 96

C.  The Plaintiffs' Experts Adequately Established Their Damages ...................................... 97

i.  Flood Damage Factors ................................................................................ 99

D.  Plaintiffs' Experts Adequately Eliminated Any Other Sources For Their Damages ...... 100

i.  Plaintiffs' Damages Were Not Caused By Wind or Rain ............................................. 100

ii.  Plaintiffs' Experts Have Established That Their Damages Would Have Remained Unchanged With The Exclusion Of Any Sources For Flooding Other Than The IHNC Waters ......................................................................................................... 101

E.  Plaintiffs' Experts Adequately Calculated Their Damages ........................................... 102

i.  Armstrong ........................................................................................... 102

  1.  Structure ........................................................................................ 102

  2.  Contents ......................................................................................... 102

ii.  Holmes .............................................................................................. 103

  1.  Structure ........................................................................................ 103

  2.  Contents ......................................................................................... 103

iii.  Washington ........................................................................................ 103

  1.  Structure ........................................................................................ 103

iv.  Livers .............................................................................................. 104

  1.  Structure ........................................................................................ 104

  2.  Contents ......................................................................................... 104

v.  Coats ............................................................................................... 105

  1.  Structure ........................................................................................ 105

  2.  Contents ......................................................................................... 105

F.   Plaintiffs Established Damages For Additional Living Expenses, Loss Of Use, And Inconvenience ............................................................................................................ 105

i.   Plaintiffs Suffered Additional Living Expenses/ Loss of Use Damages ..................... 105

ii.   Plaintiffs Suffered Hardship and Inconvenience Damages .......................................... 108

IX.   CONCLUSION............................................................................................................ 109

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alexander v. Qwik Change Car Center, Inc.*,
  352 So.2d 188 (La. 1977) ............................................................................................. 108

*Aretz v. United States*,
  604 F.2d 417 (5th Cir. 1979) ........................................................................................ 50

*Ayala v. United States*,
  980 F.2d 1342 (10th Cir. 1992) ......................................................................... 45, 46, 47

*Bailey v. McDonnell Douglas Corp.*,
  989 F.2d 794 (5th Cir. 1993) ........................................................................................ 31

*Banks v. New Orleans City*,
  620 F.Supp.2d 741 (E.D. La. 2009) ............................................................................. 90

*Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*,
  1998 WL 113935 (E.D. La. 1998) ................................................................................ 50

*BellSouth Telecomms., Inc. v. Citizens Utils. Co.*,
  962 F.Supp. 79 (E.D. La. 1996) ................................................................................... 89

*Berkovitz v. United States*,
  486 U.S. 531 (1988) ................................................................................................ 33, 43

*Boyle v. United Technologies Corp.*,
  487 U.S. 500 (1988) ...................................................................................................... 31

*Branch v. City of Lafayette*,
  663 So.2d 216 (La. App. 3d Cir. 1995) ........................................................................ 21

*Brandon v. State*,
  367 So.2d 137 (La. App. 1979) ..................................................................................... 20

*Cestonaro v. United States*,
  211 F.3d 749 (3d Cir. 2000) .......................................................................................... 44

*Clifton v. Louisiana Farm Bureau Cas. Ins. Co.*,
  510 So.2d 759 (La. App. 1 Cir. 1987) ........................................................................ 106

*Coleman v. Victor*,
  326 So.2d 344 (La. 1976) ........................................................................................ 88, 89

*Collins v. City of Shreveport*,
  799 So.2d 630 (La. App. 2d Cir. 2001) ...................................................................... 108

*Cope v. Scott*,
   45 F.3d 445 (D.C. Cir. 1995) ................................................................. 44

*Corbello v. Iowa Prod.*,
   850 So.2d 686 (La. 2003) ............................................................... 88, 89

*Coumou v. United States*,
   114 F.3d 64 (5th Cir. 1997). ................................................................. 50

*Dalehite v. United States*,
   346 U.S. 15 (1953)................................................................................. 49

*Denham v. United States*,
   834 F.2d 518 (5th Cir. 1987) ............................................................... 50

*Eagle Pipe and Supply, Inc. v. Amerada Hess Corp.*,
   79 So.3d 246 (La. 2011) ....................................................................... 88

*Emerson v. Empire Fire and Marine Ins. Co.*,
   393 So.2d 691 (La. 1981) ..................................................................... 89

*Faucheaux v. Terrebonne Consol. Gov't*,
   615 So.2d 289 (La. 1993) ............................................................... 16, 21

*Favalora v. Aetna Casualty & Surety Co.*,
   144 So.2d 544 (La. App. 1st Cir. 1962)............................................... 30

*Fire & Casualty Ins. Co. v. Garick*,
   312 So.2d 103 (La. App. 1st Cir. 1975)............................................... 17

*Fire Eagle, LLC v. Bischoff*,
   2009 WL 1309734 (E.D. La. 2009) ...................................................... 22

*Fortson v. Louisiana Power & Light Co.*,
   509 So.2d 743 (La. App. 3d Cir. 1987) ........................................... 88, 89

*Graci v. United States*,
   435 F. Supp. 189 (E.D. La. 1977)...................................................... 21, 22

*Grefer v. Alpha Technical*,
   901 So.2d 1117 (La. App. 4th Cir. 2005) ............................................ 89

*Hastings v. Baton Rouge General Hospital*,
   498 So.2d 713 (La. 1986) ..................................................................... 30

*Hayward v. Carraway*,
   180 So.2d 758 (La. App. 1st Cir. 1965).............................................. 89

*Hogan Exploration, Inc. v. Monroe Engineering Associates, Inc.*,
    430 So.2d 696 (La. App. 2d Cir. 1983) .................................................. 30

*Hornsby v. Bayou Jack Logging*,
    902 So.2d 361 (La. 2005) ......................................................................... 87

*In re FEMA Trailer Formaldehyde Products Liab. Litig.*,
    583 F.Supp.2d 758 (E.D. La. 2008) .................................................. 44, 50

*In re Katrina Canal Breaches Litig.*,
    2007 WL 4573052 (E.D. La. 2007) ......................................................... 17

*In re Katrina Canal Breaches Litig.*,
    2008 WL 5234369 (E.D. La. 2008) ............................................. 16, 30, 40

*In re Katrina Canal Breaches Litig.*,
    2008 WL 659467 (E.D. La. 2008) ............................................................ 16

*In re Katrina Canal Breaches Litig.*,
    2011 WL 3269641 (E.D. La. 2011) ............................................. 28, 32, 37

*In re Katrina Canal Breaches Litig.*,
    2011 WL 651946 (E.D. La. 2011) .................................... 19, 20, 25, 33

*In re Katrina Canal Breaches Litig.*,
    620 F.3d 455 (5th Cir. 2010) ....................................................... passim

*In re Katrina Canal Breaches Litig.*,
    647 F. Supp. 2d 644 (E.D. La. 2009) .............................. 16, 44, 97, 107

*In re Katrina Canal Breaches Litig.*,
    696 F.3d 436 (2012) ........................................................... 33, 34, 45

*Indian Towing co. v. United States*,
    350 U.S. 61 (1955) .................................................................................. 20

*Kennewick Irrig. Dist. v. United States*,
    880 F.2d 1018 (9th Cir. 1989) ................................................................ 17

*Lacombe v. Greathouse*,
    407 So.2d 1346 (La. App. 3d Cir. 1981) ............................................... 17

*LaRue v. Nat'l Park Serv. Of Dept. of Int.*,
    2011 WL 1828037 (S.D. Tex. 2011) ....................................................... 44

*Lombard v. Sewerage & Water Bd.*,
    284 So.2d 905 (La. 1973) ........................................................................ 21

*Marlys Bear Medicine v. United States*,
  241 F.3d 1208 (9th Cir. 2001) ............................................................................ 44, 45, 46, 47

*Mayer v. McNair Transport*,
  384 So.2d 525 (La. App. 2d Cir.1980) ............................................................................ 89

*Merchants Nat. Bank & Trust Co. of Indianapolis v. Smith, Hinchman & Grylls Assoc., Inc.*,
  876 F.2d 1202 (5th Cir. 1989) ............................................................................ 8, 17

*Milton J. Womack, Inc. v. House of Representatives*,
  509 So.2d 62 (La. App. 1st Cir. 1987) ............................................................................ 8, 17, 30

*Mossy Motors v. Sewerage and Water Bd.*,
  753 So.2d 269 (La. App. 4 Cir. 1999) ............................................................................ 89

*Myers v. United States*,
  652 F.3d 1021 (9th Cir. 2011) ............................................................................ 43

*Nolan v. Liuzza*,
  301 So.2d 892 (La. App. 4th Cir. 1974) ............................................................................ 108

*Payton v. United States*,
  636 F.2d 132 (5th Cir. 1981) ............................................................................ 49, 50

*Pete v. Trent*,
  583 So.2d 574 (La. App. 3d Cir. 1991) ............................................................................ 107

*Pike v. Stephens Imports, Inc.*,
  448 So.2d 738 (La. App. 4th Cir. 1984) ............................................................................ 108

*Pitre v. La. Tech Univ.* ,
  673 So.2d 585 (La. 1996) ............................................................................ 16

*Pitre v. Opelousas Gen. Hosp.*,
  530 So.2d 1151 (La. 1988) ............................................................................ 21

*Raburn & Assocs. v. Burgundy Oaks L.L.C.*,
  875 So.2d 119 (La. App. 2d Cir. 2004) ............................................................................ 17

*Rayonier v. United States*,
  352 U.S. 315 (1957) ............................................................................ 49

*Roman Catholic Church v. La. Gas Services Co.*,
  618 So.2d 874 (La. 1993) ............................................................................ 88, 89, 90

*S.R.P. ex rel. Abunabba v. United States*,
  676 F.3d 329 (3d Cir. 2012) ............................................................................ 44, 49

*Shansky v. United States*,
    164 F.3d 688 (1st Cir. 1999)........................................................................ 47

*Socorro v. City of New Orleans*,
    579 So.2d 931 (La. 1991) ........................................................................... 20

*Trevino v. General Dynamics Corp.*,
    865 F.2d 1474 (5th Cir. 1989) ................................................................... 44

*Truelock v. City of Del City*,
    967 P.2d 1183 (Okla. 1998)...................................................................... 109

*United States v. Gaubert*,
    499 U.S. 315 (1991)..............................................................33, 43, 44, 45

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*,
    467 U.S. 797 (1984)................................................................................... 44

*Wegener v. Lafayette Ins. Co.*,
    60 So. 3d 1220 (La. 2011) ....................................................................... 106

*Whisnant v. United States*,
    400 F.3d 1177 (2005)................................................................................. 44

*Young v. State Farm Fire & Cas. Ins. Co.*,
    426 So.2d 636 (La. App. 1 Cir. 1982) .................................................... 106

**Statutes**

La. Civ. Code Art. 2315.......................................................................... 90, 108

La. Civ. Code Art. 2316.................................................................................. 21

La. Civ. Code Art. 2317.................................................................................. 20

La. Civ. Code Art. 2762.................................................................................. 20

**Regulation**

CFR § 208.10.................................................................................................. 40

I.     **SUMMARY OF ARGUMENTS**

A.  <u>FACTS</u>

- In 1994, the Corps and WGI executed an umbrella contract, known as the TERC.

- In 1999, the Corps began its EBIA cleanup. WGI was obligated to demolish existing structures by removing surface and subsurface obstructions; characterize contamination of the site; and remediate the site in accordance with applicable environmental standards.

- In June 1999, the Corps issued a statement of work including the following terms: WGI "shall furnish all engineering services, materials, supplies, labor, as required, in connection with the technical review of site document . . . associated with the demolition and remediation" of the EBIA.

- On December 2, 1999, WGI submitted its Recommendation Report regarding the scope of work at EBIA.

- WGI understood there was a high water table running through the EBIA at this time.

- On May 15, 2000, the Corps presented WGI with a second Statement of Work to "furnish all services . . . as required to develop the work plans in accordance with the . . . Recommendation Report.

- In June 2000, in its Recap Submittal Report, WGI mistakenly informed the Corps' EBIA Team that "the floodwall to the east of the site is supported on sheet pile that reaches a depth of at least 25 feet and this would essentially interrupt the water flow in the easterly direction at lower excavations to 25 ft."

- In October 2000, WGI finalized the Project Work Plan.  WGI was responsible for the implementation of the overall project, and Materials Management Group was to provide environmental engineering and overall project support.

### B.  DUTY-BREACH

- Applicable engineering standards required Defendants to perform geotechnical evaluations including seepage and stability analyses, as well as proper backfill and compaction of excavations.

- Defendants were required to act reasonably and exercise the degree of professional care and skill customarily employed by others in the same general field.

- When Defendants remediated the EBIA from 2000-2005, each had a duty not to harm the floodwall system protecting the Lower 9th Ward and St. Bernard Parish.

- The Corps' policies required geotechnical analyses and certain measures in the planning and execution of the EBIA excavation and backfilling.

- WGI owed a duty to Plaintiffs to perform according to its contract with the Corps.

- Defendants failed to properly back fill and compact excavations, in order to mitigate seepage and uplift hazards when performing excavations.

- WGI failed to backfill certain excavations at all and backfilled others with permeable sands, falling below the standard of care for engineers.

- Defendants' conduct at the EBIA was negligent as they owed a common law duty to protect that floodwall by executing whatever engineering analysis or activity necessary in order to do so.

- Plaintiffs have established a prima facie case of negligence because the conduct of Defendants is so unprofessional, so clearly improper, and so manifestly below reasonable standards dictated by ordinary intelligence as to constitute a prima facie case of either lack of the degree of skill and care exercised by others in the same general vicinity or failure to reasonably exercise such skill and care.

2

C. **IMMUNITIES**

- WGI can only avoid liability on state law claims under the government contract defense only by showing the following: (1) that the government approved reasonably precise specifications; (2) that the product conformed to those specifications; and (3) the contractor warned the government about dangers associated with the use of the product known to the contractor but not to the government.

- The Fifth Circuit found that the government did not approve reasonably precise specifications.  This has not been challenged by Defendants.

- This Court has already evaluated the availability of this defense and determined that the issue of government contractor immunity is unavailable to WGI, and that this Court would not reexamine the issue.

- WGI did not present any evidence at trial and failed to meet its burden of proof of establishing the affirmative defenses of La. R.S. 9:2800.3 and 9:2771.

- Flood control immunity is not available to the United States because the negligent acts that caused Plaintiffs' damages were entirely extrinsic to the LPV and any flood control activity.

- The new Fifth Circuit *Robinson* Opinion on the Discretionary Function Exception does not impact the *Armstrong* Case because (1) there were several mandates governing the Corps' conduct at the EBIA which were ignored, and (2) even under the *Robinson II*'s interpretation of the DFE test, the Corps' negligent acts are "susceptible only to the application of scientific principles."

### D. <u>CAUSATION</u>

- Dr. Marr testified that the North Breach was a global instability failure – not an overtopping failure – whether modeled with or without the "gap" leading to a structural deformation of the wall that then allowed a jet of water through, causing overturning.

- IPET found a global instability failure at the North Breach, but did not conclude there was a structural deformation caused by water forces on the wall.

- There are three types of pressures relevant to this case: (1) total stress pressures, (2) pore pressures due to flow, and (3) uplift pressures. All three were present; only the third was causative.

- Underseepage, or flow-related pressure, was not causative. Underseepage occurred simultaneously with, but remains distinct from, the causative uplift pressures that do not depend upon the flow of water from canal side to land side.

- A near-instantaneous transmission of pore pressures occurs in the saturated high-water content soils of the EBIA.

- The flow of water through the soil skeleton may take time, but the pressure transmission is nearly instantaneous due to high water content.

- Dr. Bea performed a steady flow analysis appropriate to the conditions, which was the same steady flow analysis he performed in all his other investigations which he published under peer review.  This analysis was likewise compelled by the Corps itself in assessing levee design.

- Dr. Silva achieved the same results as Dr. Bea when he ran verification studies using Dr. Bea's steady flow inputs.

- A hydraulic connection existed only because of negligently backfilled excavations.

4

- Dr. Silva relied upon Dr. Marr's flawed scour analysis to corroborate that a scour trench of >4 foot caused the wall to fail.

- Dr. Silva was forced to disavow Dr. Marr's model, eventually claiming one would be "dreaming" to think that Dr. Marr's scour analysis could "predict the scour trench within 3 1/2 hours."

- Dr. Dalrymple did not perform any scour analysis himself.

- Dr. Silva's "simplified model" oversimplifies a complex occurrence and suffers from several flaws rendering it unreliable.

- Dr. Silva admits that this cascading water would create lateral support or "pressure" against the backside of the wall, which would influence an overturning analysis. The omitted water would produce a "tailwater" effect, or as Dr. Marr described, a cushioning effect, that would diminish the scour rate.

- Steady Flow is the appropriate model.

- Defendant's modeling confirms Dr. Bea's opinion that flow-related seepage did not cause the breach, and requires a contrived overtopping scenario that is contradicted at nearly every turn by the undisputed physical evidence in the field.

- The piezometer measurements accounted for a 30% change in the lateral resistance of the wall that enabled Dr. Bea, for the first time, to explain how the factor of safety at the 17th Street wall reached failure at the proper time and water elevation. These findings were corroborated by the study if the piezometers at the EBIA.

- The piezometers registered virtually instantaneous response to rising pressures in the swamp-marsh.

5

- Dr. Bea modeled his "near breach" scenario by using the same inputs as at the North and South Breaches except that there was no hydraulic connection between the excavations and the swamp-marsh.

- The near breach is self-reinforcing in that the difference between it and the breached sections explains why it did not fail and the steady-flow modeling of it "predicts" this fact, *i.e.*, confirms that one would not have expected it to fail under conditions as they existed due to that very difference.

- Each breach site bore a "signature" correlating to the excavations and was atypical of an overtopping failure.

- The North Breach signature on the canal side of the floodwall is coextensive with and illustrative of the sandy backfilled excavations discussed above and at trial (namely, the Area East of 8 excavated to the utility pole alignment).

- A scour hole appears on the canal side of the floodwall at the South Breach, 50-60 feet from the floodwall, *i.e.*, "synonymous" with grid trenching, drainage ditch and lateral sewer excavations discussed above. This is consistent with the lateral displacement of "blocks" of land-slide levee sections as depicted in Dr. Bea's report, which would not appear in an overtopping failure.

- A forensic evaluation is necessary in order to properly investigate the mechanisms of failure. Dr. Bea preformed a thorough forensic evaluation.

- There exist multiple discrepancies and inconsistencies among the Defense experts' opinions as to the cause of the failures.

- Dr. Marr initially did not take into account several important factors, such as time, accurate wave height, wind direction, and the effect of the wind, that are imperative to an accurate investigation into the causes of failure.

- Dr. Marr issued a "supplemental" report that also presented flawed investigatory information.

- Dr. Marr erroneously relied on Dr. Dalrymple for wave information.

- Waves at the time of the breaches were insufficient to be a primary factor in the mechanism of failure.

- There is no way to ascertain exactly what the wall heights were on the morning of August 25, 2005.  The minimal wall height elevation differences relied upon by Defense experts are irrelevant when weighted against the numerous other factors which were substantial and significant contributors to the failures of the North and South Breaches.

- There was insufficient surge overtopping to cause the failures.

- Dr. Silva's CWALSHT model is flawed and unreliable.

### E.  DAMAGES

- Plaintiffs are entitled to restoration damages under applicable law because of their personal connections to their homes and their homes' contents.

- Plaintiffs' experts adequately established the amount of restoration damages to which each Plaintiff is entitled.

- Plaintiffs' experts also established that, even excluding water from any other sources other than the IHNC, the Plaintiffs' damages remain unchanged given the duration of the flooding in the properties.

- Plaintiffs unequivocally showed that their damages were not caused by wind or rain.

- Plaintiffs as a matter of law are entitled to damages for additional living expenses and loss of use, and adequately have established the amounts due to each Plaintiff.

- Plaintiffs as a matter of law showed that they also are entitled to a significant award for inconvenience damages in the discretion of the Court.

## II.   INTRODUCTION

When Defendants Washington Group International and the Army Corps of Engineers remediated the East Bank Industrial Area from 2000 to 2005, each Defendant had a duty not to harm the floodwall protecting the residents of the Lower 9th Ward and St. Bernard Parish.[1]  Each Defendant failed to uphold that duty.

WGI and the Corps were required to act reasonably and exercise the degree of professional care and skill customarily employed by others in the same general field.  *See Merchants Nat. Bank & Trust Co. of Indianapolis v. Smith, Hinchman & Grylls Assoc., Inc.*, 876 F.2d 1202, 1205 (5th Cir. 1989) (citing *Milton J. Womack, Inc. v. House of Representatives*, 509 So.2d 62, 64-65 (La. App. 1st Cir. 1987), *writs denied*, 513 So.2d 1208 and 513 So.2d 1211 (La. 1988)).  Given the proximity of the EBIA to the IHNC floodwall, WGI and the Corps were required to conduct geotechnical evaluations prior to and while performing subsurface exploration and excavation activities in order to ascertain potential harm to the floodwall during the remediation.

Geotechnical evaluations are required to assess seepage impacts and uplift hazards of excavations adjacent to the floodwall.  Such evaluations would have permitted Defendants to make reasonable judgments about the remediation's impact on the floodwall.  WGI and the Corps did not perform appropriate geotechnical evaluations prior to, during or after their

---

[1] To the Corps, "[f]lood protection is extremely important" as it must ensure that its projects Ado not jeopardize the flood protection."  JX 1647 (Grieshaber 30(b)(6) Dep. Vol. I) at 72:3-73:11.

remediation work and ignored information acquired after commencement of their activities. Thus, they did not discharge their respective duties or meet the standard of care by exercising the degree of care and skill expected of professional contractors and engineers acting under similar circumstances.

In addition, WGI and the Corps failed to properly backfill and compact numerous and extensive excavations that were in direct proximity to the North and South Breaches. Prudent engineering practice mandated proper compaction of appropriate backfill materials in order to mitigate seepage and uplift hazards when performing excavations. Instead of backfilling and properly compacting each excavation, WGI did not backfill certain excavations at all or backfilled others with permeable sands, falling below the standard of care for engineers and contractors charged with such a responsibility. WGI's business records show it often failed to follow sound engineering practices and merely tamped down the soil with the bucket of a backhoe or did not compact the excavation at all. WGI also failed to put a clay wedge at excavations adjacent to significant deposits of shell fill.

WGI's negligent work created or exacerbated subsurface pathways for Hurricane Katrina's surge water pressures, which were transmitted through the improperly backfilled and compacted excavations directly into the underlying swamp-marsh layer. These pressure transfers from the flood side to the protected side of the floodwall resulted in significant uplift pressures beneath the floodwall and were a substantial factor in the ultimate failures at the North and South Breaches adjacent the Lower 9th Ward. The failures at the North and South Breaches were not a result of latent defects in the floodwall.[2] These pressure transfers, uplift pressures, and floodwall failures would have been prevented had WGI and the Corps complied with industry custom and

---

[2] Marr 1831:9-10.

practice.  Finally, there were numerous policies and regulations mandating WGI and the Corps perform a geotechnical analysis on the potential impact of this excavation activity on the adjacent floodwall.

By failing to conduct any geotechnical site assessment, failing to fully evaluate and monitor the impact of their demolition and remediation activities on the floodwall, and failing to employ prudent engineering practices before, during or after this project, WGI and the Corps breached their legal duty to maintain and protect the integrity of the EBIA floodwall.  In the final analysis, Defendants' excavations and negligently performed remediation activities were substantial contributing factors without which the breaches would not have occurred.

## III.   STATEMENT OF FACTS

### A.   The Corps And WGI Contract To Commence The Project

In 1994, the Corps and WGI executed an Indefinite Delivery/Indefinite Quality/Quantity ("IDIQ") contract for the remediation of hazardous, toxic, and radioactive waste sites in the Southwestern United States.[3]  This umbrella contract, known as the Total Environmental Restoration Contract ("TERC"),[4] set forth general requirements for all of WGI's anticipated work in the region.

In 1999, the Corps began its IHNC Lock Replacement Project, which included the cleanup of the EBIA.[5]  Pursuant to Task Order 26 of the TERC,[6] WGI was obligated to:

- demolish existing structures by removing surface and subsurface obstructions,
- characterize contaminants on the site, and

---

[3] *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 457-58 (5th Cir. 2010).

[4] Sykora 3068:17-20.

[5] *In re Katrina Canal Breaches Litig.*, 620 F.3d at 458; Rogers 569:3-4.

[6] *In re Katrina Canal Breaches Litig.*, 620 F.3d at 458.

- remediate the site in accordance with applicable environmental standards.[7]

In developing the plans and specifications for this project, WGI was obligated to evaluate its excavation and backfill procedures to determine their impact on the stability of the flood protection structures.[8]  Consideration of the adjacent structures would include the appropriate subsurface investigations to obtain geotechnical properties necessary for underseepage analysis, including seepage forces, hydraulic gradients, and uplift pressure.[9]

Lee Guillory was the Project Delivery Team manager, the Corps' project engineer in charge of contract administration of various levee and floodwall contracts at the time of the EBIA excavations, and the Corps' 30(b)(6) witness.[10]  Mr. Guillory explained that the Corps expected geotechnical support from WGI because staff at WGI's Denver home office could be called upon for needed geotechnical support.[11]  The Corps also expected WGI to report on the particularities and nuances of the site, including any geotechnical issues encountered.[12]  The Corps expected WGI to advise about the potential effect or damage that its subterranean excavations could have on the floodwall, and to have its licensed engineers address those issues.[13]  This service was particularly important to Mr. Guillory because he was not an expert on

---

[7] *Id.*

[8] JX 1580 (Rogers Report (Jan. 2012)) at 228-37; JX 1389 (Bea Report (Feb. 2012)) at 120-25; JX 1414 (Bea Rebuttal Report (April 2012)) at 39-40; Guillory 2568:6-2569:17; 2570:8-15.

[9] JX 1580 (Rogers Report (Jan. 2012)) at 228-37; JX 1389 (Bea Report (Feb. 2012)) at 120-25; JX 1414 (Bea Rebuttal Report (April 2012)) at 39-40.

[10] Guillory 2344:21-24 ("I was in charge of contract administration of various levee contracts, floodwall contracts….").

[11] Guillory 2566:10-16; JX 1710 (Guillory 30(b)(6) Dep. Vol. I) at 150:20-151:17.

[12] Guillory 2357:22-2538:19; 2359:25-2360:8; 2566:10-13.

[13] Guillory 2359:25-2360:8, 2367:2-13.

seepage issues,[14] and because "flood protection is extremely important" to the Corps as it must ensure that its projects "do not jeopardize the flood protection."[15]

In June 1999, the Corps issued the initial Statement of Work for Demolition and Site Preparation, including the following terms:  WGI "**shall furnish all engineering services**, materials, supplies, labor, as required, in connection with the technical review of site document…associated with the demolition and remediation" of the EBIA.[16]

WGI also was obligated to "prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to be filled by sampling or other investigations."[17]

### B.  WGI Submits Its Recommendation Report

On December 2, 1999, WGI submitted its Recommendation Report.[18]  WGI defined the purpose of the Recommendation Report as "present[ing] recommendations regarding scope and duration of remediation/demolition activities" at the EBIA.[19]  WGI noted a number of "data gaps" that might affect the schedule, cost, and scope of work, and committed to fill these data gaps by "sampling or other investigations."[20]  As part of the Project Work Plan, WGI indicated "systematic units of work" would be "integrated into the overall project" and "**engineering details**" of the Project Work Plan would include "**geotechnical**" and "**geology/hydrology**."[21]

---

[14] JX 1710 (Guillory 30(b)(6) Dep. Vol. I) at 219:22-221:13.

[15] JX 1647 (Grieshaber 30(b)(6) Dep. Vol. I) at 72:3-73:11.

[16] PX 3836 (Corps Statement of Work, (June 1, 1999)) (emphasis added).

[17] *Id.*; Rogers 570:10-14 ("'Contractor shall prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to be filled by sampling or other investigations.'").

[18] JX 1711 (Stephen Roe Dep.) at 62:23-64:2.

[19] JX 1234 (Recommendation Report) at 1.0.

[20] *Id.*

[21] *Id.* at 5.1.2.1.5 (emphasis added).

For the remediation aspect of the project, WGI acknowledged responsibility of site investigation for the "identification of the horizontal and vertical extent of the impact" and "identification and characterization of migration pathways and receiving media."[22]  WGI recognized that certain permits would be necessary, and that one of the "permits required [was] expected to be" from the Orleans Levee Board.[23]

WGI reviewed the Assessment of Potential Hazardous, Toxic and Radiological Waste, Volume 5 of 9, Appendix C, stating the EBIA's "groundwater was impacted but . . . the size of the contaminant plume was not determined."[24]  WGI understood there was a high water table running through the EBIA, thus recognizing a subsurface hydraulic connection between the IHNC and the adjacent EBIA.[25]  WGI acknowledged "there is a high probability that groundwater will be encountered" during excavation work.[26]

Armed with this information, any reasonably prudent engineer would have known the soil layers were hydraulically charged, resulting in a greater response to pressure gradients.[27]  Indeed, WGI and the Corps had information clearly indicating the pressure at groundwater level in the EBIA soils adjacent to the IHNC were essentially unchanged at the face of the floodwall.[28]  This information was an early warning signal that the EBIA excavations at the north end of the Boland Marine site had established direct hydraulic connections with the sandy shell fill under the Surekote Road overpass.[29]  Email exchanges between Corps employees George Bacuta,

---

[22] JX 1234 (Recommendation Report) at 5.8.

[23] *Id.* at 5.1.4.

[24] JX 1234 (Recommendation Report) at 3.1.1.1.

[25] *Id.* at 4.1.

[26] *Id.* at 5.13.

[27] JX 1414 (Bea Rebuttal Report (April 2012)) at 45, 60.

[28] *Id.* at 45-47, 60-61.

[29] JX 1389 (Bea Report (Feb. 2012)) at 54-60, 54-60; JX 1414 (Bea Rebuttal Report (April 2012)) at 45-47, 60-61.

Richard Lesser, and Lee Guillory further detail not only their awareness of the hydraulic

connection between the IHNC and EBIA, but also their knowledge that WGI's significant

excavation activities directly impacted this connection:

> Note that the 1997 report groundwater flow information (actually the groundwater data was collected in 1993/1992?) indicate the influence of the existing structures (foundation of buildings, canal drainage, etc.) on the shallow gw [ground water] flow. **After remediation, the structures were gone, the soil subsurface had been modified on account of excavation/removal/new fill, the groundwater flow information (taken by WGI in May/June 2005) pointed to a flow away from the Canal.**[30]

### C.  The Corps Presents WGI With A Second Statement Of Work

On May 15, 2000, the Corps presented to WGI a Second Statement of Work.  According

to the Second Statement of Work, WGI was to "**furnish all services…as required** to develop

the work plans in accordance with the…Recommendation Report."[31]

### D.  WGI Develops The Recap Submittal Report - Criteria Document

In the June 2000 Recap Submittal Report – Criteria Document, WGI mistakenly

informed the Corps' EBIA Project Delivery Team that "the floodwall to the east of the site is

supported on sheet pile that reaches a depth of at least 25 feet and this would essentially interrupt

the water flow in the easterly direction at lower elevations to 25 ft."[32]  The EBIA Project

Delivery Team had improperly convinced themselves there were no problems with IHNC water

reaching the face of the floodwall because the floodwall sheet piling was deep enough to cut off

any seepage flows.

---

[30] JX 1645 (Aug. 5, 2004 email from Bacuta to Lesser) (emphasis added).

[31] PX 4365 (Corps Statement of Work (May 15, 2000)) (emphasis added).

[32] PX 3652 (RECAP Submittal Report (June 2001)) at WGI 003567 4.2.

### E.  **WGI Finalizes The Final Project Work Plan**

In October 2000, WGI finalized the final Project Work Plan.  The October 2000 Project Work Plan indicated WGI was "tasked to **furnish all services**...for the project site development and remedial action" of the EBIA.[33]  WGI was responsible for the implementation of the overall project and Materials Management Group ("MMG") was to provide environmental engineering and overall project support.[34]  WGI subcontractors would complete the demolition aspects.[35]

It is clear that "all services" included geotechnical review and analyses, as evidenced by an email from the Corps' Lee Guillory:

> It is imperative that during **WGI's QC check of the RECAP documents**, that the logistics, practicality, **geotechnical stability** and environmental requirements of **each proposed RECAP excavation be evaluated**.  This reality check will red flag any questionable areas for discussion with NOD prior to the report being submitted to NOD & LDEQ.[36]

Despite Defendants' certain knowledge of a hydraulic connection between the IHNC and the EBIA—which it exacerbated—and despite its duty to perform the required geotechnical analyses on the potential impact of its excavation work—which it failed to do—WGI completed its demolition, site-clearing, remediation, and excavation activities in June 2005 and demobilized from the EBIA.

---

[33] JX 1252 (Project Work Plan (Oct. 2000)) at 1.1 (emphasis added).

[34] Sykora 3118:22-3119:1.

[35] JX 1252 (Project Work Plan (Oct. 2000)) at 2.1.

[36] PX 0930 (April 24, 2002 email from L. Guillory (MEB-112-00000013)) (emphasis added); *see also* USA Trial Brief at 39 (Doc. No. 20960) ("The Corps's role in the Task Order 26 EBIA remediation project was inspection, not engineering or design").  While the Corps was clearly still responsible for engineering along with WGI (discussed, *infra*), distilling Defendants' argument about engineering responsibility down to their core results in the absurd conclusion that *no one* at the EBIA was responsible for determining whether these massive excavations would harm the floodwall protecting Plaintiffs' property.

IV.     **LEGAL ARGUMENT**

A.  **Defendants' Conduct At The EBIA Was Negligent**

Articles 2315 and 2316 of the Louisiana Civil Code state that every person is responsible for damages caused by his fault or negligence.  *In re Katrina Canal Breaches Litig.*, 647 F. Supp. 2d 644, 733 (E.D. La. 2009) (citing *Pitre v. La. Tech Univ.,* 673 So.2d 585, 589 (La. 1996)).  In analyzing negligence under *Pitre*, the five relevant questions to determine negligence are:

1) What, if any, duties were owed by the respective parties?

2) Whether the requisite duties were breached?

3) Was the conduct of which the plaintiff complains a cause-in-fact of the resulting harm?

4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?

5) Were actual damages sustained?

673 So.2d at 589-90 (questions in different order for ease of reference).

i.  **Defendants' Duties**

As parties removing hundreds of thousands of tons of soils in a restricted area nestled against a levee and floodwall, Defendants owed a common law duty to protect that floodwall by executing whatever engineering analysis or activity necessary in order to do so.  *In re Katrina Canal Breaches Litig.*, 2008 WL 5234369, *19 (E.D. La. 2008) (finding defendants had a general "responsibility and duty" to "[i]nsure the integrity of the levee system" during EBIA remediation).  The pertinent inquiry on the scope of the engineering analysis and activity necessary to protect the floodwall is "whether the plaintiff has any law—statutory, jurisprudential, or arising from general principles of fault—to support his claim."  *In re Katrina Canal Breaches Litig.*, 2008 WL 659467, *2 (E.D. La. 2008) (citing *Faucheaux v. Terrebonne Consol. Gov't*, 615 So.2d 289, 292 (La. 1993)).  Here, Defendants' duties are established by a

common law duty to act reasonably and meet industry standards, federal law, the Louisiana Civil Code, and contractual obligations.

### 1. The Corps and WGI had a duty to act as reasonably prudent engineers and contractors would in similar circumstances

Negligence in this case stems from Defendants' duty to exercise the degree of care ordinarily expected of a reasonably prudent person under similar circumstances. *Fire & Casualty Ins. Co. v. Garick*, 312 So.2d 103, 105 (La. App. 1st Cir. 1975).[37]  WGI owed this duty as a contractor; "[t]he determinative issue on the question of the contractor's negligence is one of reasonableness, *i.e.*, conformity of his conduct to the standard of care that would be exercised by a reasonable man in the same of similar circumstances." *Lacombe v. Greathouse*, 407 So.2d 1346, 1350 (La. App. 3d Cir. 1981) (citations omitted).

As professionals, engineers at the Corps and WGI were required to exercise the degree of professional care and skill customarily employed by others in the same general field.  *See Merchants Nat'l Bank & Trust Co. of Indianapolis v. Smith, Hinchman & Grylls Assoc., Inc.*, 876 F.2d 1202, 1205 (citing *Womack, Inc.*, 509 So.2d at 64-65); *see also Raburn & Assocs. v. Burgundy Oaks L.L.C.*, 875 So.2d 119, 122 (La. App. 2d Cir. 2004) ("An engineer owes a duty to exercise the degree of professional care and skill customarily employed by other [professionals] in the same general area.").  Here, the degree of professional care and skill customarily employed by others in the same general field was established by several authoritative sources that required both the Corps and WGI to perform basic engineering analyses and proper backfilling practices.  These sources included the Corps and WGI's own

---

[37] This duty to prevent flooding is also imposed by federal law. "Congress has mandated that the Secretary of the Army, acting through the Corps of Engineers, has the responsibility to provide flood protection for the City of New Orleans. *See* 33 U.S.C. 701 *et seq.*" *In re Katrina Canal Breaches Litig.*, 2007 WL 4573052 at *3 (E.D. La. 2007). Similarly, the Corps has a duty to avoid causing flooding in building, operating, and maintaining federal projects such as the EBIA.  *See, e.g.*, *Kennewick Irrig. Dist. v. United States*, 880 F.2d 1018, 1026 (9th Cir. 1989).

policies, engineering regulations and manuals, a Code of Federal Regulation, WGI's own

recommendations, the American Society of Civil Engineers, NEPA, and Louisiana Code.[38]

### 2.   WGI recommended performing a geotechnical analysis

In addition to the Corps' regulations, WGI's Recommendation Report set forth a standard

for demolition work like that performed at the EBIA site, and stated that geotechnical

engineering should be an integral component of the work at the site.[39]

### 3.   The American Society of Civil Engineers' Code of Ethics required the Corps and WGI to put public safety first

The first Fundamental Canon of the American Society of Civil Engineers' Code of Ethics

states: "Engineers shall hold paramount the safety, health, welfare of the public and shall strive

to comply with the principals of sustainable development in the performance of the professional

duties."[40]  This canon embodies the spirit of engineering; namely, engineers have a duty to

undergo projects in such a way that does not put the public in danger.[41]

Here, WGI and the Corps had a duty to evaluate and monitor the potential impact their

EBIA excavation and backfilling activities could have on the adjacent IHNC floodwall in order

to protect the public.[42]  This duty to engage in an evaluation process began at the project's

inception and continued throughout project's duration.[43]  If conditions previously understood to

exist change because of some project modification, some new, unforeseen discovery, or other

---

[38] JX 1580 (Rogers Report (Jan. 2012)) at 236-37; *see also* JX 1389 (Bea Report (Feb. 2012)) at 124-25, 128.  A discussion on the various Engineering Regulations, Manuals, and Code of Federal Regulation that mandated engineering analyses is contained in the Government Immunity Section VI.B.2, *infra*.

[39] JX 1234 (Recommendation Report) at § 5.1.2, § 5.1.2.1.5, § 5.1.2.1.8; JX 1580 (Rogers Report (Jan. 2012)) at 236.

[40] JX 1414 (Bea Rebuttal Report (April 2012)) at 39-40.

[41] Lucia 2959:23-2960:1 ("Q: And do you believe that an engineer, especially a geotechnical engineer, should hold paramount the safety, health, and welfare of the public? A: I believe all engineers should.").

[42] *Id.*

[43] *Id.*; Rogers 562:16 ("the DDR is a cradle-to-grave document").

event (*e.g.*, different field conditions are found relative to the initial design conditions), a reasonably prudent engineer must re-evaluate his design and determine whether these changed conditions will have an impact on the surrounding environment.[44]

Once the Corps and WGI undertook their EBIA remediation activity pursuant to Task Order 26, each Defendant had a duty to evaluate the potential impacts that their contemplated excavation activity could have on the adjacent floodwall.[45]  This duty to evaluate included a geotechnical evaluation with an assessment of seepage and uplift.[46]  Similarly, as part of the substantial excavations that occurred at the EBIA, a reasonably prudent engineer would have properly backfilled and compacted all excavations to protect against and prevent underseepage and the transmission of hydraulic uplift pressures to the adjacent IHNC floodwall, in order to protect the public.[47]

### 4. NEPA required the Corps to take a "hard look" at the EBIA Remediation's potential impact on the health and safety of the human environment

Mindful that this Court granted the United States' motion for summary judgment on the NEPA issue,[48] Plaintiffs respectfully submit that for any federal action, NEPA requires an

---

[44] *Id.*

[45] JX 1670 (Baumy 30(b)(6) Dep.) at 237:24-239:13; JX 1663 (Colletti Dep.) at 32:21-35:9, 40:17-43:9, 103:12-105:1; JX 1668 (Pinner Dep.) at 30:19-31:10, 35:2-23, 36:24-39:2, 39:14-41:13, 41:20-43:11, 47:7-48:4, 50:1-14, 62:12-63:2, 66:16-24, 67:20-69:1; *see also* JX 1580 (Rogers Report (Jan. 2012)) at 228-237; JX 1389 (Bea Report (Feb. 2012)) at 120-125; JX 1414 (Bea Rebuttal Report (April 2012)) at 39; Rogers 571:8-11, 573:19-574:12 ("The Corps of Engineers is also out there watching the project. It's their project.").

[46] Rogers 576:6-10 ("Q: . . . [B]ased on . . . the Corps' own policies and procedures, the Corps' analysis of the EBIA site, and your own experience in the industry, should a geotechnical evaluation include an assessment of seepage and uplift? A: Yes."); *see also* Lucia 2962:6-15("[T]hey're going to . . . dig a hole 50-foot deep next to the wall . . . and everyone should know that . . . could potentially cause a wall failure . . . that would be something they would be required to . . . inquire about and decide whether additional analysis is necessary.") One of the failure modes that could take down the levee is seepage.  *Id.* at 2965:5-15.

[47] JX 1580 (Rogers Report (Jan. 2012)) at 228-37; JX 1389 (Bea Report (Feb. 2012)) at120-25; JX 1414 (Bea Rebuttal Report (April 2012)) at39; *see, e.g.*, Rogers 583:20-23 ("Q: . . . [D]o you know if WGI and the Corps satisfied the standard of care with regard to the compaction and backfilling materials? A: I don't feel that they did.").

[48] *See In re Katrina Canal Breaches Litig.*, 2011 WL 651946, *10-11 (E.D. La. 2011).

agency to do an environmental assessment to evaluate whether the effects of a project on the

human environment will be great.  Based on that assessment, the agency may be required to

pursue an environmental impact statement, a more in-depth assessment, or issue a finding of no

significant impact.  *See In re Katrina Canal Breaches Litig.*, 2011 WL 651946, *10-11 (E.D. La.

2011).[49]  Here, the Corps engaged in a federal action that was to have an impact on the

environment and thus was required to—and failed to—follow these NEPA mandates.

### 5.  The Louisiana Civil Code imposed additional duties on Defendants

Under Louisiana Civil Code Article 2762 the Defendants had a general duty to complete

the project in a good, workmanlike manner, free from defects either in materials or

workmanship.  The Civil Code also imposes specific duties on the Corps as a landowner and

public authority.

### a.  The Corps' duties as landowner

Louisiana Civil Code Article 2317 establishes that the Corps—as owner of the EBIA—

has a duty to avoid "every act whatever…that causes damages to another" and must compensate

those "by whose fault it happened…."  As recognized in *Indian Towing co. v. United States*, 350

U.S. 61, 69 (1955),the Corps also had a duty to repair and a duty to discover any "unreasonably

dangerous conditions and to either correct the condition or warn of its existence."  *Socorro v.

City of New Orleans*, 579 So.2d 931, 939 (La. 1991).  This is especially true where the Corps'

own construction activities have created the dangerous situation.  *See Brandon v. State*, 367

So.2d 137, 143 (La. App. 1979) ("It is a breach of that duty for the Department to undertake

construction, partially complete the project, and then leave the project unfinished with hazardous

conditions existing for an unreasonable period of time, particularly when it is within the capacity

---

[49] Plaintiffs are mindful that this Court granted the United States' motion for summary judgment on the NEPA issue and include this section for preservation on appeal, if necessary.

of the Department to complete the project and eliminate the hazard.").

Louisiana courts have historically held landowners and proprietors liable for flooding a neighbor's property. *See, e.g.*, *Lombard v. Sewerage & Water Bd.*, 284 So.2d 905, 914 (La. 1973) (finding liability for damage to homes resulting from construction of a drainage canal); *Branch v. City of Lafayette*, 663 So.2d 216, 220 (La. App. 3d Cir. 1995) (finding liability for water damage to home after heavy rainfall caused by defective drainage system). Furthermore, the Corps—as landowner/proprietor of the EBIA—was in the unique position to prevent flooding and as a matter of public policy should be held liable for defects in the remediation. "The persons at whose disposal society has placed the potent implements of technology owe a heavy moral obligation to use them carefully and to avoid foreseeable harm to present or future generations." *Pitre v. Opelousas Gen. Hosp.*, 530 So.2d 1151, 1157 (La. 1988). Applying these standards to this case, the Corps had a duty to ensure its remediation and excavation work did not enhance the risk of flooding during hurricanes. By extension, the Corps also had a duty to ensure WGI did not enhance the risk of flooding during hurricanes. *See Faucheaux v. Terrebonne Consol. Govt.,* 615 So.2d 289, 293 (La. 1993); *see also Graci v. United States*, 435 F. Supp. 189, 195-96 (E.D. La. 1977) (finding the Corps had a high burden).

### b.  The Corps' duties as a public authority

A public authority is charged with a duty to design, construct, operate, and maintain its facilities to avoid "present[ing] an unreasonable risk of injury" to the public. *Faucheaux*, 615 So.2d at 293. Under Louisiana Civil Code Article 2316, the Corps is responsible for the damage it occasions not only by its acts, but also by its negligence, imprudence, and want of skill. The Corps as grantee of the right of way, builder, and maintainer of the EBIA assumed a high standard of care with relations to damages caused by the works to neighboring lands and

individuals.  *See Graci*, 435 F. Supp. at 195-96.  More specifically, the Corps had a legal duty to prevent the construction work from causing flood damages.  *Id.*

### ii.   WGI Owed Duties To Plaintiffs To Perform According To Its Contract With The Corps

WGI also had duties to perform according to the TERC—its contract with the Corps—including the Statement of Work issued pursuant to Task Order 26.[50]  WGI owed these duties to Plaintiffs, as third-party beneficiaries of the contract.  Under the Statement of Work, the Corps not only expected WGI not to damage the floodwall, but also to acquire necessary permits, do the engineering for the EBIA site remediation, make necessary reports to the Corps regarding geotechnical evaluation, and comply with ER 1110-2-1150.[51]  WGI failed to perform any of these tasks satisfactorily.

WGI owed a duty to Plaintiffs to perform according to the Statement of Work. "In determining whether a third party can enforce a contract, the intention of the contracting parties is controlling."  *Fire Eagle, LLC v. Bischoff*, 2009 WL 1309734, at *3 (E.D. La. 2009).[52]  The parties' intention to create a contract for the benefit of a third party must be clear in order for the third party to have a cause of action.  *Id.*  Here, the Statement of Work fell under the umbrella TERC, which was for the remediation of hazardous, toxic, and radioactive waste sites in the southwestern United States.[53]  The clear beneficiaries of this Corps project were Plaintiffs as residents of the area immediately adjacent to the EBIA who relied upon the integrity of the floodwall for their safety and protection.  Accordingly, WGI owed a duty to these residents to

---

[50] Sykora 3108:7 - 11 ("Q: So the contractor, if it's WGI in this TERC, shall provide those services? A: If needed. Q" Where does it say in that sentence if needed? A: . . [I]t doesn't . . . .").

[51] PX 4693 at WGI000093; Rogers 568:16-17 ("'[T]he contractor shall furnish all engineering services, supplying project requirements.'").

[52] Plaintiffs' Pre-Trial Brief (Doc. No. 20945) at 36-41 contains detailed discussion on Plaintiffs as third party beneficiaries to Task Order 26 and the TERC and is incorporated here by reference.

[53] *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 457-58 (5th Cir. 2010).

uphold its contractual obligations under the Statement of Work and to prudently discharge legal duties required of all professional engineers.

WGI's contractual duties included getting necessary permits, doing the engineering, and making necessary reports to the Corps. The Statement of Work stated WGI was required to "furnish all services, materials, supplies, labor, equipment, superintendence, procurement, security services, surveying services, subcontracting, **all necessary permits, licenses**…for the project site."[54]  In addition, the Corps hired WGI to "furnish all engineering services…as required, in connection with the technical review of site documents . . . associated with the demolition and remediation of [EBIA]."[55]  More specifically, WGI was required to retain a licensed professional engineer to do an evaluation.[56]  Finally, WGI was also expected to "prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to [sic] filled by sampling or other investigation."[57]  The TERC also required WGI to inform the Corps of geotechnical issues it encountered.[58]

The contractual relationship between WGI and the Corps does not absolve either party of its duties to Plaintiffs, in spite of their contention otherwise.  WGI claims they were not obligated to perform any geotechnical evaluation and that the Corps knew about all of its actions and was

---

[54] PX 4693 at WGI000093; Sykora 3109:24-3110:1 (emphasis added).

[55] PX 3836 (Corps Statement of Work, (June 1, 1999)); Rogers 568:16-17 ("'[T]he contractor shall furnish all engineering services, supplying project requirements.'").

[56] JX 1710 (Guillory 30(b)(6) Dep. Vol. I) at 157:21.24-161:1.21; Sykora 3109:11-13 ("Q: . . . 'The contractor shall utilize as geotechnical engineer,' correct? A: That's what it says.").

[57] PX 3836 (Corps Statement of Work, (June 1, 1999)); Rogers 570:10-14 (". . . 'Contractor shall prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to be filled by sampling or other investigations.'"); Sykora 3110:18-23. Similarly, WGI had to comply with ER 1110-2-1150, which required reports regarding geotechnical evaluations throughout the duration of the project. *See* Rogers 558:5-17 (paragraph 19.5 of the Corps' contract with WGI imposed the 1150 regulation on contractors).

[58] Sykora 3112:22-3113:3 ("'Engineering details are to include . . . geotechnical. . . .'").

therefore the responsible party. However, WGI Project Manager Dennis O'Conner admits he knew about the holes[59] and therefore, had a general duty to uphold the standard of care of a reasonable engineer and evaluate the holes. On the other hand, the Corps claims WGI was responsible for all the engineering;[60] however, even if the Corps had contracted with WGI, it would, as a matter of law and fact, continue to be responsible because the EBIA site remediation was its project.[61]

### iii. Industry Standards Require A Geotechnical Evaluation And Proper Backfilling And Compaction

Independent of any policy, regulation, manual, or code, every responsible engineer undertaking the same work performed by the Corps and WGI should know there are standard engineering practices obligating an engineer or engineering firm to perform a geotechnical evaluation of the potential impact its excavation work could have on an adjacent flood control structure, and properly backfill and compact all excavations in order to protect against and prevent underseepage from undermining the structure's design capacity (which includes an accepted safety factor).[62] Proper compaction plans are developed through at least testing material at excavation sites.[63] In addition, a prudent engineer would have taken precautions not to excavate in particular locations, would have applied clay wedges to specific excavations, would have used clay as backfill, and would have ensured the proper compaction of that clay.[64]

---

[59] PX 4681 (O'Conner Dep.) at 55:20-56:12.

[60] USA Trial Brief at 39 (Doc. No. 20960) ("The Corps's role in the Task Order 26 EBIA remediation project was inspection, not engineering or design.").

[61] Rogers 571:8-11 ("the Corps…is also out there watching the project. It's their project.").

[62] JX 1580 (Rogers Report (Jan. 2012)) at 236; *see also* JX 1389 (Bea Report (Feb. 2012)) at 120-25; JX 1414 (Bea Rebuttal Report (April 2012)) at 38-53.

[63] Rogers 580:12-581: 24.

[64] JX 1580 (Rogers Report (Jan. 2012)) at 228-37; JX 1410 ((Rogers Dep. Vol. II)) at 151:23-153:12; JX 1389 (Bea Report (Feb. 2012)) at 120-25; JX 1414 (Bea Rebuttal Report (April 2012)) at 39-40. PX 0583 (Tulla Dep. Vol. I) at144:2-145:7, 179:6-10.

### B.  Defendants Breached Their Duties Owed To Plaintiffs

Defendants owed a duty to Plaintiffs to ensure the EBIA excavations did not compromise the floodwall protecting their lives and property.  Defendants should have fulfilled this duty by conducting geotechnical evaluations and performing proper backfilling and compaction as required by a common law duty to act reasonably and meet industry standards, federal law, the Louisiana Civil Code, and contractual obligation.  *See* Section III, *infra*.  The various engineering regulations and manuals are mandatory and were not followed."[65]  "The Corps' policy required geotechnical engineering analysis for underseepage, wall stability and global stability on the EBIA excavations' potential effect on the IHNC floodwalls before the excavation was undertaken."[66]  This requirement was also reinforced by the standard of care in engineering practices, which WGI had to fulfill when it contracted with the Corps for the EBIA site excavations.  Because the Corps' own policy and standard engineering practice require a geotechnical analysis and a proper and accepted method of compacting backfilled excavations, Defendants breached their duty of care by negligently failing to undertake any geotechnical investigation into whether their Boland and Saucer Marine excavations could harm the floodwall, in negligently failing to implement basic engineering principles to protect the floodwall, and in negligently carrying out their day-to-day work.  Most notably, "[n]o such engineering investigations were undertaken."[67]

Defendants breached their duties to act as reasonably prudent engineers by:

- failing to perform required geotechnical evaluations on their excavation activities that

---

[65] *In re Katrina Canal Breaches Litig.*, 2011 WL 651946, at * 9 (E.D. La. 2011).

[66] *Id.*

[67]*Id.*

fell within 300 feet of the adjacent IHNC floodwall,[68]

- failing to properly backfill and compact those excavations, and

- failing to take other remedial measures on these excavations to ensure the
  hydrological connection between the IHNC and the floodwall was minimized.[69]

### i. Defendants Failed To Perform Any Geotechnical Evaluations

Defendants performed no geotechnical engineering evaluations in connection with the

EBIA site excavations at Boland Marine and Saucer Marine.[70]  Defendants failed to conduct any

geotechnical evaluations despite excavating more than 123,000 tons of contaminated soil and

encountering groundwater flowing under the floodwall,[71] and despite their own testimony that

Corps "make[s] sure [they] do not compromise the stability of the walls" when performing

excavations.[72]  Several authoritative sources required the Corps and WGI to perform basic

engineering analyses and proper backfilling practices in order to comply with the standard of

care for engineers engaged in a project of the type at the EBIA site.  *See* Section III, *infra*.

For example, the testimony from a variety of Corps personnel established that the

excavations near the floodwall along the IHNC "have to be reviewed" by geotechnical engineers,

who would "have to look at the site specific data for that location and determine…how close

---

[68] JX 1670 (Baumy 30(b)(6) Dep.) at 237:24-239:13; JX 1663 (Colletti Dep.) at 32:21-35:9, 40:17-43:9, 103:12-105:1; JX 1668 (Pinner Dep.) at 30:19-31:10, 35:2-23, 36:24-39:2, 39:14-41:13, 41:20-43:11, 47:7-48:4, 50:1-14, 62:12-63:2, 66:16-24, 67:20-69:1; *see also* JX 1580 (Rogers Report (Jan. 2012)) at 228-37; JX 1389 (Bea Report (Feb. 2012)) at 120-25; JX 1414 (Bea Rebuttal Report (April 2012)) at 39-40.

[69] JX 1580 (Rogers Report (Jan. 2012)) at 228-37; JX 1389 (Bea Report (Feb. 2012)) at 120-25; JX 1414 (Bea Rebuttal Report (April 2012)) at 39-40.

[70] With the exception of a stability analysis on the cofferdam excavations of the sewer lift station and wedding cake structure at Boland, there was no other proper geotechnical analysis performed at the EBIA.  *See* Rogers 577:11-15; Lucia 3010:18-21.

[71] JX 1364-0040, Table 1 (Technical Completion Report); JX 1389 (Bea Report (Feb. 2012)) at 119, 124, 127-28, 137-38; Rogers 567:19("[T]hey're the ones digging the holes."); Lucia 3015:19-20 ("[H]e says it's flowing across the floodwall. I assume he means under the floodwall.").

[72] JX 1647 (Grieshaber 30(b)(6) Dep. Vol. I) at 54:10-13, 55:6-8.  Indeed, only Defendants' experts contend - in attempt to justify Defendants conduct after the fact - that Defendants were not in fact required to conduct any of those analyses.

[engineers] could get and how deep [engineers] could go with that excavation."[73]  It is a "fair assessment" to conclude the Corps "needs to do some kind of an assessment, they need to figure out whether or not there is an underseepage potential…."[74]  "In the course of the design, [the Corps] will look at all aspects of the geotechnical loading that a wall could see.  And one of the aspects [the Corps] would look at is the effect of seepage."[75]

Another exampled involves ER 1110-2-1150, which defines the engineering responsibilities, requirements, and procedures during the planning, design, construction, and operations phases of civil works projects.[76]  It also requires Design Documentation Reports (DDR) to guarantee communication between engineers throughout the duration of the project. *See* Section III, *infra*.  Lee Guillory, the Corps project engineer in charge at the time of the EBIA excavations,[77] failed to comply with ER 1110-2-1150 and did not present the excavation plan to the engineering plan.[78]  There was no correct or complete DDR for Task Order 26.[79]  The Corps also should have followed EM1110-1-8157, the stated purpose for which was to "prescribe Geotechnical Data Quality Management (GDQM) responsibilities and requirements, from initial investigation through closeout at sites contaminated with hazardous, toxic, and radioactive waste."[80]  These failures led to no geotechnical evaluation being done at Boland Marine and

---

[73] PX 4686 (Varuso Dep.) at 177:17-178:5.

[74] PX 4686 (Varuso Dep.) at 197:15-198:21.

[75] JX 1647 (Grieshaber 30(b)(6) Dep. Vol. I) at 36:7-37:1.

[76] Engineering and Design - Engineering and Design for Civil Works Projects, 23 §19.1.1; Rogers 558:9-12 ("[T]his is the building block of all Corps of engineering regulations. It sets forth the minimum standards that they—for engineering and design that they expect for all their civil works projects.").

[77] Guillory 2344:21-24.

[78] JX 1710 (Guillory 30(b)(6) Dep. Vol I) at 206:23-207:10.

[79] *See* Lucia 3025:14-16 ("Q: . . . [T]here was not, in anything you've reviewed, a specific DDR that applied to just Task Order 26? A: I can't recall that.").

[80] Engineering and Design - Geotechnical Data Quality Management for Hazardous Waste Remedial Activities.

Saucer Marine locations,[81] which violated Defendants' duty to adhere to the standard of care for the project.[82]

No analysis of seepage could be found beyond that contained in a 1966 Design Memorandum.[83] Analysis of seepage is a required portion of geotechnical evaluation and Defendants' duty to protect the floodwall and Plaintiffs.[84]

### ii.  Defendants Failed To Properly Backfill And Compact Excavations

In addition to breaching their duty to perform geotechnical evaluations, the Corps and WGI also failed to properly backfill and compact excavations at the EBIA site.  There is no evidence the Corps approved reasonably precise specifications for *composition* of the offsite backfill material.[85]  The failure of the Corps to approve reasonably precise specifications for composition of the backfill material occurred in spite of the Corps' own 30(b)(6) witness, John Grieshaber, detailing the Corps' awareness of the potential harm poor backfill material could cause.  He testified, "the only way you could endanger the flood system is by some form of inappropriate excavation or backfill."[86]  Regardless, Defendants used river sand as backfill material instead of properly compacted clay or silt that would have prevented seepage and uplift under the floodwall.[87]

There is also no evidence that the Corps or WGI performed the tests associated with

---

[81] *See* Lucia 3010, 18-21 ("They didn't do an analysis on smaller excavations at a greater distance from the floodwall . . . .").

[82] JX 1580 (Rogers Report (Jan. 2012)) at 236-37; *see also* JX 1389 (Bea Report (Feb. 2012)) at124-25, 128.

[83] JX 4 (1966 DM 3), which was outdated, incomplete, and incorrect.  *See* Section III.B.ii., *infra*; Lucia 3001:24-3002:1 ("Q: . . . [T]here was no analysis of seepage done beyond what's in this statement? A: I didn't find any.").

[84] Colletti 310:21-311:2; JX 1647 (Grieshaber 30(b)(6) Dep. Vol. I) at 123:5-124:7.

[85] *See In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 457, 463, 465 (5th Cir. 2010), *In re Katrina Canal Breaches Litig.*, 2011 WL 3269641, *4 (E.D. La. 2011) (Doc. No. 20346 (Aug. 1, 2011)).

[86] JX 1709 (Grieshaber 30(b)(b) Dep. Vol. II)  at15:6-9; *see also* JX 1647 (Grieshaber 30(b)(6) Dep. Vol. I) at 62:7-22, 67:9-11, 67:21-68:2, 68:20-69:7.

[87] *See* Sykora 3122:3-5.

proper backfill and compaction plans.[88]  By not performing any testing and only considering the

cost associated with backfill and compaction, the Corps and WGI failed to meet their standard of

care to backfill and compact the EBIA site excavations properly.[89]

### iii.   Defendants Failed To Take Other Remedial Measures To Protect The Floodwall

Defendants were also required to perform remedial measures.  The conditions WGI

created were hazardous, and it had no justifiable reason to believe its adherence to its own plans

and specifications would not create a hazardous condition for which it was responsible.  WGI

excavated massive amounts of hazardous waste, building foundations, utility lines, and other

obstructions adjacent to the floodwall without taking any steps to perform a required

geotechnical analysis on the potential impact this work could have on exacerbating the hydraulic

connection with the floodwall.  It is a basic engineering principle and practice that if you dig

holes near a floodwall as substantial as those at issue here (and improperly backfill and compact

those holes), you need to determine whether your work would harm the floodwall.[90]  *See* Section

III, *infra*.

WGI was specifically tasked to provide all engineering service either directly or through

one of its subcontractors.[91]  Because of this assignment, it had a duty to determine whether its

---

[88] Rogers 583:15-18 (Rogers never saw any compaction tests done by WGI); Sykora 3132:25-3133:2 ("Q: Then, there was no post-compaction testing at this location, correct, sir? A: That's correct.").

[89] JX 1580 (Rogers Report (Jan. 2012)) at 236-37; *see also* JX 1389 (Bea Report (Feb. 2012)) at 124-25, 128.

[90] JX 1580 (Rogers Report (Jan. 2012) ) at 236-37; JX 1647( (Grieshaber 30(b)(6) Dep. Vol. I)) at 36:7-37:1, 41:20-42:25, 45:19-46:12, 47:2-14, 53:4-12, 54:2-56:6, 69:23-77:25, 78:22- 80:25, 88:7-21, 123:5-124:7, 91:2- 93:13, 103:3-18, 123:5-124:7, 145:22-146:6, 147:1-148:14, 159:14-160:25, 173:8-174:19, 168:9-22; JX 1414 (Bea Rebuttal Report (April 2012)) at 38-53.

[91] PX 3836 (Corps Statement of Work (June 1, 1999)); *see also* USA Summary Judgment Memorandum, 40, (Aug. 8, 2010) (Doc. No. 19988-4); JX 1234 (Recommendation Report) at § 5.1.2.1.5; PX 4365 (Corps Statement of Work (May 15, 2000)); JX 1245 (Project Work Plan (Oct. 2000)) at § 1.1; PX 0930 (April 24, 2002 email from L. Guillory (MEB-112-00000013)).

work would harm the floodwall,[92] but WGI made no effort to determine whether its work would jeopardize the floodwall.  The Corps was also responsible for the project, even after entering into a contract with WGI.[93]

Had Defendants properly evaluated the impact their excavation, backfilling, and compaction actions could have on the adjacent floodwall, they would have verified the hydraulic connection between the IHNC and the subsurface deposits supporting the adjacent floodwall protecting Plaintiffs.  Had Defendants performed those analyses they could have taken appropriate measures to protect against the possibility of an increased surge in the IHNC transmitting seepage and uplift pressures through the swamp marsh layers and ultimately destabilizing the adjacent floodwall.

### iv.   A *Prima Facie* Case Of Negligence Exists Here

A *prima facie* case of negligence exists "'when the conduct of [the professional] may be so unprofessional, so clearly improper, and so manifestly below reasonable standards dictated by ordinary intelligence, as to constitute a prima facie case of either lack of the degree of skill and care exercised by others in the same general vicinity or failure to reasonably exercise such skill and care.'"  *Hogan Exploration, Inc. v. Monroe Engineering Associates, Inc.*, 430 So.2d 696, 700 (La. App. 2d Cir. 1983) (citing *Favalora v. Aetna Casualty & Surety Co.*, 144 So.2d 544 (La. App. 1st Cir. 1962)).  "'Lay persons can infer negligence'" by applying a common sense standard.  *Womack*, 509 So.2d at 65 (quoting *Hastings v. Baton Rouge General Hospital*, 498 So.2d 713, 719-20 (La. 1986)).

Here, even if Defendants had no statutory or other duty to perform geotechnical

---

[92] *In re Katrina Canal Breaches Litig.*, 2008 WL 5234369, at *19 (E.D. La. 2008) (detailing a "responsibility and duty" existed "to insure the integrity of the levee system [during the EBIA remediation].").

[93] Rogers, 571: 10-11 ("[T]he Corps of Engineers is also out there watching the project. It's their project.").

evaluations, proper backfilling and compaction, or other remedial measures—which they did—a *prima facie* case of negligence exists.  Evidence proves that Defendants were not at all interested in evaluating the potential for their massive excavations to undermine the IHNC floodwall.  All of the testimony was merely an attempt at explaining what they did not do but should have done.

V.    **WGI IMMUNITY**

A.  <u>Government Contractor Immunity Is Not Available To WGI</u>

The "federal common law" defense identified as the governmental contractor defense allows for the displacement of state law only where a "significant conflict" exists between an identifiable federal policy or interest and the operation of state law.  *Boyle v. United Technologies Corp.*, 487 U.S. 500, 507 (1988).  Because the government contractor defense is an affirmative defense, the burden is on the defendant to establish the conditions for application of the defense.  *Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 802 (5th Cir. 1993).

WGI can only avoid liability on state law claims under the government contractor defense only by showing the following: (1) that the government approved reasonably precise specifications; (2) that the product conformed to those specifications; and (3) the contractor must warn the government about dangers associated with the use of the product known to the manufacturer but not to the government.  *Boyle*, 487 U.S. at 512.

The Fifth Circuit has recognized that *Boyle*'s first step requires the government approve reasonably precise specifications.  Such approval "entails both the existence of reasonably precise specifications and the approval of those specifications by the government."  *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 461 (5th Cir. 2010).  The evidence reviewed by the Fifth Circuit, as introduced through the pre-trial summary judgment motion, was admitted at trial and

unrebutted by WGI.  Thus, the Fifth Circuit's finding "that the government did not approve reasonably precise specifications" has not been challenged.

Prior to trial, the Fifth Circuit concluded that "the Corps, driven by cost concerns, approved specifications that mandated on-site material as the primary source of the backfill material.  The Corps also specified that if there was insufficient on-site material, WGI should import off-site backfill material to complete the project.  Two factors render those specifications imprecise."  *Id*. at 461-62.  "First, the specifications that authorized the use of on-site backfill material were not reasonably precise in regard to how WGI should parse through all the on-site material to determine which was suitable."  *Id.* at 462.  Secondly, the "Corps provided no reasonably precise specifications regarding the composition of that off-site backfill material. The Corps was not even fully aware of the contents of the backfill material used to fill the holes it had created."  *Id.* at 465.

Because the evidence relied upon by the Fifth Circuit was likewise introduced at trial, the finding that "WGI fail[ed] the first step of the *Boyle* test and is not entitled to GCI for its choice of backfill material and compaction method"[94] must be followed.  This Court has already evaluated the availability of this defense at trial, and determined that "the issue of government contractor immunity is unavailable to WGI, and the Court will not reexamine that issue."  *In re Katrina Canal Breaches Litig.*, 2011 WL 3269641, *4 (E.D. La. 2011) (Doc. No. 20346 (Aug. 1, 2011))

### B.  State Law Contract Immunity Is Not Available To WGI

In its answer to the MRGO Consolidated Class Action Complaint, WGI alleged the following affirmative defenses: "WGII qualifies for and claims the limitation of liability afforded

---

[94] *Id*. at 465.

by La. R.S. 9:2800.3 (1997) and the defense provided in La. R.S. 9:2771." As there was no evidence presented by WGI to meet its burden of proof of establishing such affirmative defenses, these defenses fail as a matter of law.

## VI.   GOVERNMENT IMMUNITY

### A.   Flood Control Immunity Is Not Available To The United States

Defendants' negligent acts that caused Plaintiffs' damages were entirely extrinsic from the LPV and any flood control activity. To claim 702c's protection, the government must establish that a flood control activity caused the harm. *In re Katrina Canal Breaches Litig.*, 696 F.3d 436, 446-48 (5th Cir. Sept. 24, 2012). As this Court has already determined, Defendants remediated the EBIA in order to prepare for an expansion of the existing IHNC lock to account for the increased barge traffic traversing the shipping canal. *In re Katrina Canal Breaches Litig.*, 2011 WL 651946, *4-6 (E.D. La. 2011) (Rec. Doc. 20164). This activity had nothing to do with drainage of the city or flood protection. *Id.* As a result, 702c immunity is not available here.

### B.   The New Fifth Circuit *Robinson* Opinion On The Discretionary Function Exception Does Not Impact The *Armstrong* Case

A familiar two-part test determines whether the government's conduct qualifies as a discretionary function or duty. First, the conduct must involve "an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Second, the judgment or choice must be based on considerations of public policy. *Id.* at 322-23.

The Fifth Circuit's new *Robinson* opinion (*In re Katrina Canal Breaches Litig.*, 696 F.3d 436 (2012), (*Robinson II*)) leaves the first part of the DFE's two-part test unscathed. It is the second part of the test that emerges as a tattered scarecrow from the court's unexplained (and inexplicable) results-based reasoning. Under *Robinson II*, all decisions by government actors

will be immunized unless that decision is "susceptible *only* to the application of scientific principles…."  *Robinson II*, 696 F.3d at 451 (emphasis added).  In other words, it appears that "even if the decision may entail application of scientific principles," it will be immune if there is any conceivable policy analysis that can possibly be linked to that decision.  *Id.*  Since every government act can be claimed to have some element of choice, *Robinson II* has effectively repealed the FTCA.

The numerous arguments about why *Robinson II* is wrong on this issue are best saved for the *Robinson* appellate briefs going forward.[95]  The question asked by this Court is what impact, if any, does *Robinson II* have on this case?  The answer is that it has no impact.  Regardless of *Robinson II*'s flawed analysis, the government still cannot prove the DFE applies because (1) there were several mandates governing the Corps' conduct at the EBIA which were ignored, and (2) even under the *Robinson II*'s interpretation of the DFE test, the Corps' negligent acts are "susceptible only to the application of scientific principles."

### i.  The Corps Ignored Mandates Requiring Evaluation Of The EBIA Excavations

Protecting the EBIA floodwall was of "paramount importance" to the Corps."[96]  Because "*any type of subsurface activity* [had] the potential" to damage that floodwall,[97] the Corps required a geotechnical analysis of WGI's excavations as well as a sound engineering protocol for backfilling and compacting those excavations.  There were several sources for this mandate, including the Corps' own policy, its own engineering regulations and manuals, the Code of

---

[95] *Robinson* Plaintiffs filed their Petition for Rehearing *En Banc* on November 5, 2012 (Case No. 10-30249, Doc. No. 512043877).  Amicus briefs were filed by Entergy and Hartford Steam Boiler Insurance (Doc. No. 512051438) as well as the State of Louisiana and St. Bernard Parish (Doc. No. 512052200) on November 13, 2012.  While the Fifth Circuit ordered the United States to respond to the petition on or before December 20, 2012, the court recently denied the petition rendering any government response moot.  *See* Order, Dec. 7, 2012 (Doc. No. 5120077211).  The *Robinson* Plaintiffs will seek a writ of *certiorari* from the United States Supreme Court.

[96] Colletti 298:23-299:1.

[97] Colletti 299:10-17 (emphasis added).

Federal Regulations, and standard engineering practices.  As the evidence showed, the Corps completely ignored these mandates.

### 1. Corps Policy Required a Geotechnical Analysis and Proper Backfill and Compaction of WGI's Excavations at the EBIA

The Corps required a geotechnical analysis on excavations performed within 300 feet of the IHNC floodwall.  Several witnesses testified to this mandatory duty,[98] including Gerald Colletti whose trial testimony made clear that any work performed within 300 feet of the levee "has to be evaluated,"[99] and that anyone who opined otherwise would not be telling the truth.[100] Lee Guillory—who was seemingly the only Corps witness unaware of the 300 foot requirement—also testified that before the Corps could stop worrying about seepage or stability "the construction of the floodwall, the levee, the material characteristics, the soil strength at different layers and levels…*has to be evaluated by geotechnical engineers* for specifics."[101]

Mr. Colletti described the geotechnical evaluation process as including an analysis of local stability, general stability, and seepage.[102]  He also testified the Corps either performs the evaluation at that time or, if one was made previously, the Corps would have gone back to that evaluation and reviewed it to make certain its conclusions were still valid.[103]  Moreover, because

---

[98] JX 1647 (John Grieshaber 30(b)(b) Dep. Vol. I) at 41:20-42:25; 53:4-12; 54:2-56:6; 69:23-77:25; 78:22-80:25; 88:7-21; 91:2-93:13; 103:3-18; 123:5-124:7; 145:22-146:6; 147:1-148:14; 159:14-160:25; 173:8-174:19; 168:9-22;
JX 1670 (Walter Baumy 30(b)(6) Dep.) at 236:6-13; 237:24-239:13;
JX 1663 (Gerald Colletti Dep.) at 32:21-35:9; 40:17-43:9; 103:12-20;
JX 1669 (Richard Varuso Dep.) at 177:17-178:5; 198:7-21;
JX 1710 (Lee Guillory 30(b)(6) Dep. Vol. I) at 206:23-207:10;
JX 1668 (Richard Pinner Dep.) at 30:19-31:10; 35:2-23; 36:24-39:2; 39:14-41:13; 41:20-43:11; 47:7-48:4; 50:1-14; 62:12-63:2; 66:15-24; 67:20-69:1.

[99] Colletti 301:5-12.

[100] Colletti at 301:13-20.

[101] Guillory 2575:7-2576:20 (emphasis added).

[102] Colletti 310:21-311:2.  Richard Pinner, the Corps' Chief of the Geotechnical Branch of the Engineering Division also testified that the geotechnical analysis includes the presence of heave, seepage and uplift pressures.  JX 1668 (Pinner Dep.) at 39:14-24; 66:15-24.

[103] Colletti 302:24-304:13; 309:20-310:4; 311:9-16.

the project was constantly changing due to the discovery of new, unforeseen contaminants and obstructions, the obligation to make certain that these new holes did not compromise the floodwall continued.[104]

It is undisputed there was no geotechnical analysis ever performed on any of WGI's excavations at Boland and Saucer Marine.  The government's contention that the 1966 DM 3 constituted a geotechnical analysis of the EBIA remediation is belied by three facts:  (1) the analysis did not consider or detail any of the planned excavation activity during Task Order 26, (2) the analysis was not updated to consider either the new MMG soil borings or any of the unplanned excavations activity undertaken after additional contaminants and obstructions were discovered, and (3) there is simply no evidence that any geotechnical engineer from the Corps— or anywhere else—went to the drawer, dusted off the 34 year-old analysis, reviewed it, and declared that WGI's massive remediation project would not impact the floodwall protecting Plaintiffs' lives and property.[105]

The Corps' duty to perform a geotechnical analysis also included a specific mandate to make certain the excavations were properly backfilled and compacted.[106]  Based on advice from the geotechnical division, anytime soil was used for backfill, that soil had to be compacted to the density of the existing soil.[107]  As Mr. Colletti testified, the reason for this prudent requirement was simple: WGI had to "fill up the hole and compact the hole so that water can't go through the

---

[104] Colletti 341:10-343:7.

[105] Rogers 739:5-741:17.

[106] JX 1238; Colletti 317:17-318:14.

[107] JX 1238; Colletti 342:7-343:7; Rogers 748:14-751:9.

hole and undermine the levee."[108]  Mr. Guillory was tasked with making certain WGI followed these backfill and compaction requirements.[109]

Unfortunately, Mr. Guillory failed in this task.  First, there is no evidence that Mr. Guillory—or anyone else at the Corps—communicated this compaction standard to WGI.[110] Second, logic dictates that in order to determine whether the backfill is compacted to the density of the existing soil, you have to actually know the density of the existing soil.  Mr. Guillory did not have the first clue what that soil density was at any location at the EBIA.[111]  Third, logic also dictates that once you attempt to compact the backfill to a certain density, you need to actually confirm whether you achieved it.  But neither the Corps nor WGI performed any scientific testing or measurement of backfill compaction.[112]  While Mr. Guillory posited that a simple visual inspection was sufficient,[113] he confessed that he had no idea how to make sand backfill match the same density as the native clays.[114]  Without a valid means to determine whether the backfilled excavations were compacted to the same density of the existing soil, the excavations were vulnerable to the very hydraulic uplift pressures that Mr. Colletti predicted could—and did—cause the two breaches at the EBIA.

---

[108] Colletti 342:4-11.

[109] JX 1238.

[110] Rogers 766:7-18.  Because this compaction standard was not communicated to WGI, compaction was a determination left up to WGI and WGI, alone.  *See In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 457, 463, 465 (5th Cir. 2010), *In re Katrina Canal Breaches Litig.*, 2011 WL 3269641, *4 (E.D. La. 2011) (Doc. No. 20346 (Aug. 1, 2011)).

[111] Guillory 2589:16-2590:12.

[112] Guillory 2613:23-2615:3; Rogers 754:6-756:15.

[113] Guillory 2388:7-23.

[114] Guillory 2644:4-7.

## 2. Engineering Regulations and Manuals Required a Geotechnical Analysis of WGI's Excavations at the EBIA

As detailed extensively in Plaintiffs' Trial Brief,[115] several engineering regulations and manuals mandated an analysis of the WGI's remediation activities.  For brevity's sake, the following is a brief citation to the relevant publications that clearly applied to Defendants' conduct at the EBIA, but were ultimately ignored:

- ER 1110-2-1150; Engineering and Design for Civil Works Projects (Aug. 1999)

ER 1150 requires a Design Documentation Report (DDR) for any civil works project[116] and it applies to all projects "whether engineering is performed by in-house personnel or by architect-engineers."[117]  The DDR is not finalized until after completion of construction work.[118] All contract modifications had to receive input from engineering and be addressed in the DDR.[119]  The final DDR was also required to include the "results of geotechnical investigations."[120]

- EM 1110-2-1913; Design and Construction of Levees (April 2000)

EM 1913 demonstrates that any foundation condition that may impact the seepage potential under a levee must be evaluated.  In particular, "[w]ithout control, underseepage in pervious foundations beneath levees may result in (a) excessive hydrostatic pressures beneath an impervious top stratum on the landside, (b) sand boils, and (c) piping beneath the levee itself."[121]

- EM 1110-2-2502; Retaining and Flood Walls (Sept. 1989)

---

[115] Plaintiffs' trial brief includes a more detailed analysis of these various publications and is fully incorporated here by reference. *See* Doc. No. 20945 at 24-34.

[116] JX 44-0006 at §8.2.

[117] JX 44-0027 at §19.5; Rogers 557:24-558:17; JX 1580 (Rogers Report) at 231-234.

[118] JX 44-0045 at §D-1.4; JX 1580 (Rogers Report) at 231-234.

[119] JX 44-0023 at §15.6; JX 1580 (Rogers Report) at 231-234.

[120] JX 44-0047 at §§D-7, D-7.11; JX 1580 (Rogers Report) at 231-234.

[121] JX 46-0036 at §5-1; Rogers at 575:3-11; *see also* JX 1580 (Rogers Report) at 234.

EM 2502 states that "[u]ncontrolled seepage may result in *water pressures and uplift forces* on the wall base in excess of design assumptions and consequent structural instability…."[122]  Because of this seepage potential, "[s]eepage control entails the design of measures to ensure that seepage pressures and velocities are maintained below tolerable values."[123]  Thus, "seepage aspects and the foundation stability of walls which have had basements excavated on either side of and adjacent to the wall since the original design and construction were completed should be investigated."[124]

- EM 1110-2-2504; Design of Sheet Pile Walls (March 1994)

EM 2504 states that "[c]oordination and cooperation among hydraulic, geotechnical, and structural engineers must be continuous from the inception of the project to final placement in operation."[125]  It also mandates that "for floodwalls, foundation underseepage conditions must also be assessed."[126]

- EM 1110-2-5027; Confined Disposal of Dredged Material (Sept. 1987)

EM 5027 requires extensive field investigations where "foundation deposits are weak and compressible," "highly variable," and where "[u]nderseepage and/or settlement problems are severe" and where "the consequences of the failure involve life, property, or damage to the environment."[127]

---

[122] JX 40-0169 at §7-3 (emphasis added); Rogers at 661:9-21; *see also* JX 1580 (Rogers Report) at 234-235.

[123] *Id.*

[124] *Id.*

[125] JX 42-0008 at §2-1; *see also* JX 1580 (Rogers Report) at 235.

[126] JX 42-0016 at §3-1a; *see also* JX 1580, (Rogers Report) at 235.

[127] JX 38-0093 at Table 6-1; *see also* JX 1580 (Rogers Report) at 235.

- EM 1110-2-1901; Seepage Analysis and Control for Dams (Sept. 1986)

EM 1901 states that "all dams on earth foundations are subject to underseepage. Seepage control in earth foundations *is necessary to prevent excessive uplift pressures* and piping through the foundation…."[128]

### 3. Code of Federal Regulation 208.10 Required a Geotechnical Analysis of WGI's Excavations at the EBIA

CFR § 208.10 necessitated a geotechnical evaluation of the excavations' potential impact on the IHNC floodwall.[129] Among other things, Section 5 required Defendants' work "be constructed in accordance with standard engineering practice" as well as a determination by the District Engineer that the work would "not adversely affect the functioning of the protective facilities."[130]

### 4. Standard Engineering Practices Required a Geotechnical Analysis and Proper Backfill and Compaction of WGI's Excavations at the EBIA

Any competent engineer would tell you that he has a duty to do no harm.[131] At the EBIA, this meant that—independent of the several mandates requiring evaluation of Defendants' remediation activities—sound engineering practices also necessitated a geotechnical evaluation of the excavation work. Indeed, the testimony of the Corps' own employees and witnesses recognized this basic engineering practice.

Corps 30(b)(6) witness John Grieshaber testified that performing an analysis on wall stability, seepage, and global stability was not only the Corps' policy but also a matter of "good

---

[128] JX 37-0163 at §9-1; *see also* JX 1389 (Bea Report (Feb. 2012)) at 123; JX 1668 (Pinner Dep.) at 25:10-26:10.

[129] PX 287; Rogers 566:15-567:16; JX 1580 (Rogers Report) at 235-236.

[130] PX 287; Rogers 566:15-567:16; JX 1580 (Rogers Report) at 235-236.

[131] This Court has expressly recognized this fundamental duty. *In re Katrina Canal Breaches Litig.*, 2008 WL 5234369, *19 (E.D. La. 2008) ("[t]he Corps had the responsibility and duty to insure the integrity of the levee system [during the EBIA remediation].")

engineering and sound engineering principles."[132]  Lee Guillory testified that it was "good

engineering practice…to be cognizant of what's around you, and make sure you don't harm

it."[133]  Richard Pinner, the Corps' Chief of the Geotechnical Branch of the Engineering Division,

testified that a standard geotechnical analysis would include a review for the presence of heave,

seepage and uplift pressures because these forces can destabilize a floodwall.[134]  Richard

Varuso—who was second in command at the Corps' geotechnical division under Mr. Pinner—

testified that before the Corps or WGI could backfill any hole, it was prudent engineering to

perform an assessment before sand was used because sand was not an appropriate backfill

material where seepage and uplift are present.[135]

       Plaintiffs' expert, Dr. Rogers, also detailed what requirements standard engineering

practice imposed on Defendants.  In particular, a project as complex and substantial as Task

Order 26 required the involvement and counsel of geotechnical engineers who would look at

these significant geotechnical issues—not construction managers without any geotechnical

training or experience.[136]  This involvement was necessary not only from the project's inception,

but also through the project's entire duration.[137]  The reason for this continued oversight of the

remediation project was that it was constantly changing and expanding.  With every newly

discovered contaminant and unforeseen obstruction that penetrated the swamp/marsh layer,

prudent engineering practice required a geotechnical determination of whether removal of those

---

[132] JX 1647 (Grieshaber 30(b)(6) Dep. Vol. I) at 123:5-124:7.

[133] Guillory 2572:2-17.

[134] JX 1668 (Pinner Dep.) at 39:14-24; 66:15-24.

[135] JX 1669 (Varuso Dep.) at 197:15-198:21; 221:8-223:1.

[136] Rogers 658:15-659:12.

[137] Rogers 751:10-752:16.

items would destabilize the floodwall.[138]  In fact, both the Corps and WGI recognized this critical necessity in the Recommendation Report, which required geotechnical assistance as a component part of the entire project.[139]  The reason for this standard geotechnical review is that, while the EBIA is composed primarily of clay, there are stringers and lenses of previous peat and sands permeating the site.[140]  With every excavation, Defendants increased the chances of "hitting a conduit" that could create a pathway for uplift pressures to destabilize the floodwall.[141]  Because of this risk, prudent engineering practice required oversight and review from geotechnical engineers.[142]

With respect to the backfill and compaction of these excavations, putting aside the Corps' requirement that backfill be compacted to the same density as the surrounding soil—standard engineering practice informed a prudent engineer to seek approval from the geotechnical department before using sand as backfill material.[143]  To the extent sand is used as backfill, it is also standard practice to utilize a clay wedge at these excavations in order to abate the seepage and uplift pressures associated with this pervious material.[144]  Standard engineering practice also directed construction personnel that, regardless of the type of backfill material used, there needed to be some type of acceptable field test to determine whether that compaction was sufficient to cut off the hydraulic connection between the IHNC and the floodwall.[145]  Of course, standard engineering practice—and common sense—also dictate that the backfill and compaction protocol

---

[138] Rogers 751:10-752:16.

[139] JX 1234-0039-40 at 5.1.2.1.5; Rogers 570:7-571:11.

[140] Rogers 763:14-764:11.

[141] Rogers 763:14-764:11.

[142] Rogers 763:14-764:11.

[143] Rogers 742:11-18; 743:3-14; JX 1669 (Varuso Dep.) at 197:15-198:21; 221:8-223:1.

[144] Rogers 743:3-14.

[145] Rogers 579:2-581:24; 583:10-23; 713:7-715:6.

actually be communicated to the contractor in charge of the backfilling and compacting the excavations at Boland and Saucer Marine.[146]

The Corps failed to do all of these mandatory tasks.[147]  Their inexplicable failure to implement basic engineering procedures resulted in a massive remediation project in which neither the Corps nor WGI understood or appreciated the significant risks associated with their excavation and backfill activities and the nearby floodwall protecting Plaintiffs' lives and property.

Because the Corps ignored these mandates prescribed by their own policy, their own publications and regulations, as well as standard engineering practices, this Court's DFE "inquiry comes to an end because there can be no element of discretion when an employee 'has no rightful option but to adhere to the directive.'"  *Myers v. United States*, 652 F.3d 1021, 1030 (9th Cir. 2011) (quoting *Berkovitz*, 486 U.S. at 536).

### ii.  The Corps' Failure To Determine Whether The EBIA Remediation Would Impact The Floodwall Is Not A Protected Policy Decision

The second part of the DFE test requires the government prove that its decision to forego the required engineering analyses was the kind of judgment "the discretionary function exception was designed to shield."  *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536).  The DFE is designed to shield "legislative and administrative decisions grounded in social, economic, and political policy."  *Gaubert*, 499 U.S. at 323.  "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."  *Id.* at 325.

---

[146] Rogers 766:7-18.

[147] *See, e.g.*, Rogers 752:21-753:24; 754:10-756:15; 766:7-18.

Because of the government's tendency to frame every action as being "susceptible to policy analysis,"[148] courts have made clear that the "'susceptibility analysis is not a toothless standard that the government can satisfy merely by associating a decision with a regulatory concern.'" *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 336 (3d Cir. 2012) (quotation omitted).  To successfully wield the DFE shield, the government must establish that the challenged conduct is "grounded in the policy of the regulatory regime," and "based on the purposes that the…regime seeks to accomplish." *Gaubert*, 499 U.S. at 325 & n.7.  In other words, there must be a "rational nexus" between the government's decision and "social, economic, and political concerns." *Cestonaro v. United States*, 211 F.3d 749, 759 (3d Cir. 2000); *see also LaRue v. Nat'l Park Serv. Of Dept. of Int.*, 2011 WL 1828037, *9 (S.D. Tex. 2011).  In short, some decisions are just not "the kind of decision 'of the nature and quality that Congress intended to shield from tort liability.'" *In re Katrina Canal Breaches Litig.*, 647 F.Supp.2d at 710-11 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813 (1984)).

Thus, in carefully analyzing the "nature of the action taken" and whether the actions are "susceptible to policy analysis," courts typically find "'matters of scientific and professional judgment—particularly judgments concerning safety—are rarely considered to be susceptible to social, economic, or political policy.'" *In re FEMA Trailer Formaldehyde Products Liab. Litig.*, 583 F.Supp.2d 758, 783 (E.D. La. 2008) (quoting *Whisnant v. United States*, 400 F.3d 1177, 1181 (2005)); *see also Cope v. Scott*, 45 F.3d 445, 452 (D.C. Cir. 1995); *Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1217 (9th Cir. 2001).

---

[148] *See, e.g.*, *Trevino v. General Dynamics Corp.* 865 F.2d 1474, 1484 (5th Cir. 1989) ("The decisions of this circuit have been extraordinarily careful to avoid any interpretation of the discretionary function exception that would embrace any governmental act merely because some decision-making power was exercised by the official whose act was questioned.").

While *Robinson II* appears to limit the category of non-immune decisions to only those that are "purely scientific,"[149] Plaintiffs here still prevail because the Corps' negligent acts are "susceptible only to the application of scientific principles."[150]  This conclusion is supported by the very same cases the *Robinson II* court cites.  *See Robinson II*, 696 F.3d at 451 n.7 (citing *Marlys Bear Medicine v. United States*, 241 F.3d 1208 (9th Cir. 2001) and *Ayala v. United States*, 980 F.2d 1342 (10th Cir. 1992)).

In *Bear Medicine*, decedent was injured when a tree fell on him while he was working for a private logging operation on the Blackfeet Indian Reservation, pursuant to a Bureau of Indian Affairs (BIA) contract.  After he died from his injuries, his descendants filed suit alleging that the BIA was negligent in authorizing the contract; in failing to adequately inspect and manage the logging site; and in failing to ensure that appropriate safety measures were taken.

The court held that the DFE barred the contract claim because the applicable statute expressly allowed the BIA to use discretion in authorizing the contract.  *Bear Medicine*, 241 F.3d at 1214.  Concerning the remaining claims, the government asserted these decisions were susceptible to policy analysis thus satisfying the second part of the DFE test.  *Id*. at 1216.

First, the government argued the BIA's delegation of safety measures to the contractor was a result of the BIA's policy of promoting independence in the Indian Tribes.  *Id*.  The court dismissed this contention stating, "[p]olicies regarding tribal autonomy are most properly considered in the decision to authorize the…contract…not in the decision to insist that appropriate safety precautions be taken.  Failure to supervise or train for safety does not promote independence."  *Id*.

---

[149] *Robinson II*, 696 F.3d at 451 n.9.  Because driving a car is certainly not a "purely scientific" action "susceptible only to the application of scientific principles," it would seemingly be a protected policy act under *Robinson II*, which of course runs afoul of Supreme Court precedent.  *See Gaubert*, 499 U.S. at 325 n.7.

[150] *Robinson II*, 696 F.3d at 451.

Next, the government argued the BIA's failure to ensure adequate safety measures were taken was due to limited resources. *Id.* While there was no evidence of this argument in the record, the government contended there did not need to be because this decision was "susceptible to a policy analysis." *Id.* The court dismissed this claim as well stating that while the BIA may have had discretion in its monitoring of the logging operation, its actions in carrying out its responsibilities were not protected policy judgments and therefore did not satisfy the second prong of the two-part test. *Id.*

The court noted that it has generally held that "once the [g]overnment has undertaken responsibility for the safety of a project, the *execution* of that responsibility is not subject to the discretionary function exception," as "[t]he decision to adopt safety precautions may be based in policy considerations, but the *implementation* of those precautions is not." *Id.* at 1215 (emphasis added); 1216 ("long-held doctrine" that "safety measures, once undertaken, cannot be shortchanged in the name of policy.")[151]  The court observed that it would be improper for the government to claim both the decision to take safety measures and the implementation of those measures were protected policy decisions, as this "would essentially allow the [g]overnment to administratively immunize itself from tort liability under applicable state law as a matter of 'policy.'" *Id.* at 1215 (citation and quotation omitted).

In *Ayala v. United States*, decedents' survivors claimed defendant's negligent advice concerning the wiring of a methane monitor at a Colorado mine ultimately allowed an electrical spark to ignite methane gas causing a massive explosion killing fifteen miners.  980 F.2d 1342 (10th Cir. 1992).  Plaintiffs claimed a government inspector's negligent advice was based solely on objective safety and electrical engineering principles and not any protected policy choice.  *Id.*

---

[151] As this Court well knows, this doctrine that the DFE does not apply to safe implementation of a government project dates back to *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955) (Coast Guard could be sued because failing to maintain a light house was not a protected policy choice).

at 1348-49.  The court found that while the electrician's initial decision to offer technical advice

about connecting the methane monitor may have been discretionary, the technical advice actually

given was not.  *Id.* at 1349-50.  Recognizing that decisions "based on objective standards can

also incorporate policy choice," the court found that because the advice at issue—where to

connect the methane monitor—was based on objective principles of electrical engineering and

safety the DFE did not apply.  *Id.*

Here, there were several mandates requiring the Corps to perform a proper geotechnical

analysis of WGI's excavations and to backfill and compact those excavations properly thus

foreclosing the government's discretionary considerations.  To the extent this Court believes

there were no mandates, and that these actions were discretionary, *Bear Medicine* and *Ayala* still

instruct that once the Corps actually undertook to execute and implement a geotechnical

evaluation and a backfill and compaction protocol—which were unquestionably purely

objective, technical engineering decisions involving the safety of the people relying on those

decisions—they had to do so in non-negligent manner.  *Bear Medicine*, 241 F.3d at 1214-16;

*Ayala*, 980 F.2d at 1349-50; *see also Shansky v. United States*, 164 F.3d 688, 694 (1st Cir. 1999)

("[O]bjective professional judgments, without more, are not readily amenable to policy

analysis.")

To the extent the Corps contends the 1966 DM 3[152] contained an acceptable geotechnical

analysis of the EBIA site remediation in 2000, this contention is incorrect.  The 1966 DM 3 did

not detail or address any of the proposed excavation of the massive contaminants and subsurface

obstructions at Boland and Saucer Marine.  The 1966 DM 3 was also never updated to account

for the numerous unknown contaminants and obstructions that were subsequently discovered due

---

[152] JX 4 (1966 DM 3).

to the prolific grid trenching that occurred throughout the entire EBIA.  Nor was the 1966 DM 3 ever updated to account for the soil borings that were taken specifically to characterize the geology of the EBIA on the very year the remediation project began.[153]  Had this been done, it would have revealed the soil profile contained in the 1966 DM 3 was not accurate.  The MMG borings performed in 2000 revealed that the permeable swamp/marsh layer existed at depths of 5 to 6 feet below ground surface, as opposed to the 11 to 13 feet shown in Plate 28 of the 1966 DM 3.[154]

While the government contends the 1966 DM 3 considered the excavation of the future bypass channel, it failed to consider any of the excavation activities that occurred east of the proposed channel,[155] including the grid trenching,[156] utility line removal,[157] and the storm water drainage ditch removal.[158]  The proposed bypass channel depicted in the 1966 DM 3 also did not cut through any portion of the EBIA at Boland Marine that would later become known as Areas 7, 8 and east of Area 8.[159]  So, there was simply not any geotechnical analysis of excavation activity at any time of these Areas at Boland, which were directly west of Boring 81A and the North Breach.  Most importantly, if the government contends the Corps relied on the 1966 DM 3 to satisfy their geotechnical requirement, they had to show proof that someone qualified at the Corps actually read it and relied on it.[160]  They have not done this.[161]

---

[153] JX 116 (Boland RECAP Vol. 2) at 466-646.

[154] Rogers 738:9-22; JX 4 (1966 DM 3) at 193, Plate 28; JX 1871 (Marr App. G); JX 116 (Boland RECAP Vol. 2) at 466-646.

[155] JX 1576 (Morris Report) at 0006, Fig. 3-1, 0016, Fig. 4-1; JX 506-0030 (QAR 348); JX 507-0016 (QAR 349); JX 406-0010 (QAR 248); JX 409-0009 (QAR 251).

[156] Id.; PX 4748-0010 (Boland Summary); PX 4749-0009 (Saucer Summary).

[157] PX 4750-0002 (Sewer Main Excavation Summary).

[158] PX 3404-0507, 0508 (Photos of drainage ditch); Bea 1212:6-1218:5.

[159] JX 1576-0006 (Morris Report) at Fig. 3-1; PX 4748-0012 (Boland Summary).

[160] Colletti 302:24-304:13; 309:20-310:4; 311:9-16.

With respect to the backfill and compaction of the excavations at Boland and Saucer Marine, Corps protocol required the backfilled excavation be compacted to the same density as the existing soil.[162]  But even assuming this mandate did not exist, the Corps' own testimony informs the Court that the holes had to be backfilled and compacted "so that water can't go through the hole and undermine the levee."[163]  But the means the Corps employed to ensure the fundamental engineering precept involved only a visual inspection of the surface of the backfilled excavation.[164]  Merely eyeballing the surface of a backfilled excavation does not with any reasonable engineering certainty inform them what happened below the surface.[165]  Without any means to analyze what was happening below the ground, the Corps had no way to verify whether the backfilled excavation was compacted sufficiently so that hydraulic connection—and the accompanying pressure—between the IHNC and the adjacent floodwall was cut off properly.[166]

These monumental engineering blunders are not the type of negligence that Congress intended to immunize.  As the Supreme Court explained, "[u]ppermost in the collective mind of Congress [when it passed the FTCA] were the ordinary common-law torts."  *Dalehite v. United States,* 346 U.S. 15, 28 (1953) (partially overruled on other grounds by *Rayonier v. United States*, 352 U.S. 315 (1957)); *see also Payton v. United States*, 636 F.2d 132, 136 (5th Cir. 1981).  Congress's focus was on "the government's failure to take basic steps to alleviate specific safety concerns."  *S.R.P.*, 676 F.3d at 338-39.

---

[161] Rogers 739:13-17.

[162] JX 1238; Colletti 342:7-343:7; *see also* Rogers 748:14-751:9.

[163] Colletti 342:4-11.

[164] Guillory 2388:7-23.

[165] Rogers 754:6-756:15.

[166] Rogers 754:6-756:15.

For decades, the Fifth Circuit and its District Courts have expressly recognized this directive.  They refused to immunize the negligent classification of a chemical as an explosive and a failure to warn a government contractor of same,[167] the negligent maintenance and operation of a swimming area,[168] the negligent provision of psychiatric services,[169] the negligent handling of exculpatory information,[170] the negligent survey of utility locations,[171] or the negligent disregard of potential health concerns associated with FEMA trailer.[172]  The holding running through all of these cases—as well as other circuit cases throughout the country—is the unambiguous message of *Indian Towing* that while the decision to undertake all of these tasks may have been discretionary, once the government actually performed the task, they had to do it correctly, in a manner that did not harm someone else.

The exact same analysis and rules apply here.  This Court should decline the government's invitation to extend the DFE's protections to the Corps' activities because the geotechnical analysis and backfill operations were performed negligently and are purely engineering misjudgments that in no way involved a weighing of policy considerations.

Because the government fails both parts of the DFE test, the defense is not available.

## VII.   CAUSATION

### A.   Types Of Failure: Global And Lateral Stability Failure

Many descriptors were used at trial to describe differing failure modes.  The modes themselves overlap and frequently include elements of one another.  For example, a failure may

---

[167] *Aretz v. United States*, 604 F.2d 417, 431 n. 18 (5th Cir. 1979).

[168] *Denham v. United States*, 834 F.2d 518, 520-21 (5th Cir. 1987).

[169] *Payton v. United States*, 636 F.2d 132, 149 (5th Cir. 1981).

[170] *Coumou v. United States*, 114 F.3d 64, 65 (5th Cir. 1997).

[171] *Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*, 1998 WL 113935, *7 (E.D. La. 1998).

[172] *In re FEMA Trailer Formaldehyde Products Liab. Litig.*, 583 F.Supp.2d 758, 783 (E.D. La. 2008).

include a blowout at the levee toe, compromising global stability and causing lateral displacement of the wall, i.e., lateral instability.

Global stability refers generally to the ratio of the resisting landside forces to the driving canal-side forces trying to push the floodwall landside—in Dr. Marr's words, "the overall stability of this whole system."[173]  Evaluating global stability is an element in a proper geotechnical evaluation.[174]  Translational instability, which may be pictured as the wall sliding landside while upright, is a subset of global instability;[175] but a global instability event may include features of either or both translational failure and rotational (overturning) failure.[176]

"Lateral stability" is a form of slope stability,[177] and failure of lateral stability leads to lateral displacement of the wall.  Although lateral stability failure is not the same as a shear slide (which no one alleges here), accurately assessing the shear strength of the relevant soils is important in conducting a lateral stability analysis.[178]

Uplift pressures threaten global stability,[179] including a threat of translational instability and lateral displacement.  Plaintiffs allege an uplift-pressure induced global and lateral stability failure.  Recall Dr. Bea's analogy of the air hockey table:  The air furnishes uplift pressure to the puck.  When the power is off, there is no uplift pressure and the puck is hard to slide due to inertia.  When turned on, the air creates uplift pressures essentially levitating the puck and allowing it to slide easily.[180]  At the IHNC, uplift pressures compromised the entire system by

---

[173] Marr 1890:10-15; Marr 1892:2-9.

[174] Rogers 574:13-17.

[175] Marr 1891:13-17.

[176] Marr 1923:6-10.

[177] Bea 1097:7-13.

[178] Bea 1123:16-20.

[179] Marr 1891:22-1892:1.

[180] Bea 1301:23-1302:4.

essentially levitating the wall, which allowed the lateral forces from the canal to laterally displace the floodwall.[181]

The USA's expert Dr. Marr conceded "there was a low factor of safety against global stability" at the North Breach location.[182]  At a factor of safety of 1.1 the landside soil can deform and move, leading to a global stability failure.[183]  In fact, Dr. Marr testified that the North Breach was a global instability failure (not an overtopping failure), whether modeled with or without the "gap," leading to a structural deformation of the wall that then allowed a jet of water through, causing overturning.[184]  IPET also found a global instability failure at the North Breach, but did not conclude, as did Dr. Marr, that there was a structural deformation caused by water forces on the wall.[185]

### B.   Types of Failure: Overturning Failure

An overturning failure is more self-explanatory, and in the context of this case overtopping would be the culprit in an overturning failure because overtopping erodes the soils on the backside of the levee, removing lateral support, allowing the wall to fall over (aka rotate aka overturn).  The government postulates a global stability failure at the North Breach as described above.[186]  The government urges an overtopping/overturning failure at the South Breach location.[187]  WGI argues that both breaches involved overtopping/overturning failures.[188]

---

[181] Bea 3946:17-3947:16.

[182] Marr 1831:18-20.

[183] Marr 1901:25-1902:1-4.

[184] Marr 1911:17-1912:1; 1947:7-15; 1953:1-4; 2120:8-19.

[185] Marr 1953:1-21.  USA expert Dr. Brandon also deemed the North Breach a global instability failure. 1959:9-13.

[186] Marr 1831:16-24; 1911:17-1912:1; 1947:7-15; 1953:1-4; 2120:8-19.

[187] Marr 1836:12-18.

[188] Silva 3699:234-3700:2; JX 01672 (Silva Report) at 53.

Drs. Silva and Marr thus disagree as to the cause of the North Breach with only Dr. Silva (WGI) opining that overtopping caused the failure.[189]

### C.  Types of Pressure

Pressure was discussed extensively at trial, but it is important to distinguish the type of pressure under discussion at a given moment.  There are three types of pressure relevant to this case: (1) total stress pressures, (2) pore pressures due to flow, and (3) uplift pressures.  All three were present.  Only the third was causative (though Defendants focused almost exclusively on the second throughout the trial).

### i.  Total Stress

The weight of IHNC waters exerts stress on the underlying soils.  This ever-present stress is called total stress pressure.[190]  It will vary as water levels rise and fall.  No one claims it played a causative role in the floodwall failure, but it must be noted as a technical matter, and Defendants do mistakenly suggest total stress accounts for the piezometer readings that Dr. Bea relied upon, which is discussed below.[191]

### ii.  Pore Pressures Due To Flow

The second type of pressure, pore pressures associated with water flow, featured heavily in the Defendants' presentations and cross-examinations despite the fact that no one claimed such pressures caused either failure.  In Dr. Silva's hallway demonstration, the tube with the expanding bags illustrated these pressures via transient flow analysis (the second tube demonstrated the instantaneous transmission of the third type of pressure via steady flow/steady

---

[189]  *Compare* Marr 2124:8-11 (overtopping did not cause North Breach) *with* Silva 3920:18-25 (four feet of overtopping scour necessary to fail the wall).

[190]  Bea 3839:17-3940:16.

[191]  Silva 3823:12-17.

state analysis, which is discussed below).[192]  The same ultimate pressures may be achieved on

the landside via pore pressure due to flow as with uplift pressures, but it takes far more time

depending on compressibility and permeability of the soil, as Defendants' experts pointed out.[193]

The Defendants' arguments and opinions in this regard were largely accurate, but were

red herrings.  Dr. Bea testified that "underseepage," meaning flow of water and associated

pressures, was local in character and did not "reach the finish line," to use his horse-race

analogy.[194]  Dr. Bea was emphatic that this subset of underseepage—that is, flow-related-

pressure—was not causative.[195]

### iii.  Uplift Pressures

Thus, Dr. Bea's opinions were not based on "underseepage" in the sense of moving a

molecule of water from canal side to land side.[196]  That phenomenon occurred simultaneously

with, but remains distinct from, the causative uplift pressures that do not depend upon the flow of

water from canal side to land side.[197]

Rather, Dr. Bea focused on the near-instantaneous transmission of pore pressures that

occurs in the saturated high water-content soils of the EBIA.[198]  Bringing to mind Dr. Bea's car

brake analogy, there need not be any significant "flow" of brake fluid for the brake pedal to

---

[192] Silva 3736:7-18.

[193] Silva 3737:11-16.

[194] Bea 847:20-25.

[195] Bea 862:14-22.

[196] Bea 848:12-17.

[197] Bea 848:25-849:14.

[198] This third type of pressure also is a "pore pressure" because the pressure is communicated through the pores in the soil, just as "flow" of water and its associated pressures communicate through the pores in the soil, but the terms "flow" and "uplift" pressures are used to avoid confusion of these types of pore pressure.

activate the brake pad against the shoe.  The pressure from the pedal transmits immediately to the brake shoe and "flow" (i.e., a leak) would actually undermine the system:[199]



Dr. Silva explicitly confirmed the validity of this phenomenon in a declaration before this Court, which he affirmed at trial:

> Q.    And you stated in a declaration to this court that using geophysical techniques to measure <u>saturated clays like those at the EBIA</u> generally yield dilatational wave velocity in the vicinity of the velocity of sound and water or approximately <u>5,000 feet per second</u>, correct?
>
> A.    That is correct.[200]

There is no dispute that the clays of the swamp-marsh layer were saturated,[201] and there is no dispute that they had a high water content—even those that appear solid when held in the hand.[202]  Dr. Marr's demonstrative sample of EBIA soils, for example, was at 157% saturation.[203]  It appeared "solid," but contained half-again as much water as it did solid soil particles.  Dr. Marr pointed out that "water <u>flows</u> through this very, very slowly,"[204] but

---

[199] Bea 1299:18-1301:2; D-Bea 32 (Bea PowerPoint Slide 32).

[200] Silva 3844:10-15 (emphasis added).

[201] Silva 3844:10-15 (clays at EBIA "saturated"); Bea 3973:8-11.

[202] PX 4724 (Marr Rep., Appx. G, Figs. G-6, G-8 & G-15) (showing >100% water content in organic clays at both breach sections).

[203] Marr 1925:10-14.

[204] Marr 1925:21-22 (emphasis added).

overlooked the primary importance of its high water content—that it efficiently transmits pressure as even Dr. Silva admitted in his declaration and on the stand.  Dr. Bea testified at trial: "The high-water-content soils are the soils that are able to transmit hydraulic pressures.  If the water contents are…of the order of 30 percent, it will be the soil structure that is transmitting pressure, and that's much less efficient at transmitting pressure.  So water content is critical to pressure transmission."[205]



This slide by Dr. Silva graphically demonstrates why the EBIA soils act in this way.[206] Although the EBIA swamp-marsh soils may act as a solid mass when held in the hand, the high water content of these saturated soils is more obvious when magnified.  The <u>flow</u> of water through this soil skeleton may take time, but the pressure transmission is nearly instantaneous due to the high water content.  Contrary to Defendants' repeated suggestion, this was not a new theory brought out for trial.  Mr. Treeby actually quoted on cross exam a deposition passage in

---

[205] Bea 1432:12-18; Bea 1434:20-21 ("High water content is synonymous with an effective pressure transmission.")
[206] DX DM 0015-00 Slide 25; DX 02715-0030 (Soil Mechanics Fundamentals - Saturated Soil).

which Dr. Bea drew the distinction between flow and pressure well before trial.[207]  Of course it was modeled and explained in his reports as well.

### D.  Types of Models/Analyses

#### i.   Seepage/Pressure Analyses

Model analyses for failures of this sort generally fall into two overarching categories—seepage and stability.[208]  Dr. Bea performed seepage analyses, which he termed "hydraulic conductivity analyses, and which are contained in Appendix D to his initial report.[209]

Seepage analyses encompass transient flow analysis and steady flow analysis.[210]  Both types of seepage analysis will indicate pressure and flow, but there are important differences between the two.[211]  Dr. Silva's "flow simulator" set up in the hallway during trial illustrated these differences between transient flow and steady flow.[212]  The transient flow tube included expanding bags with small orifices between them intended to simulate a non-confined soil stratum with low permeability.[213]  The steady flow simulator did not include expanding bags or the small orifices, thus demonstrating how one would "immediately establish steady flow" in a "rigid" system once steady state conditions were established.[214]  Dr. Silva confirmed any rise in pressure would communicate almost instantaneously in the steady flow simulator, but not in the transient flow simulator.[215]

---

[207] Bea 888:23-889:7.

[208] Brandon 3159:10-13.

[209] JX 1393 (Bea Rep. Appx. D.)

[210] Silva 3736:5-6 ("In the Lambe & Whitman we use steady flow and steady state to mean the same thing.")

[211] Rogers 729:11-24.

[212] Silva 3725:7-10.

[213] Silva 3725-28.

[214] Silva 3727:6-17.

[215] Silva 3735:23-3736:18.

The experts disagree over the time necessary to establish steady flow conditions at the EBIA and, consequently, how best to model it.[216]  Defense experts agree with Dr. Bea that steady flow conditions may be reached, but they claim it would take months to establish the steady-flow conditions necessary to communicate uplift pressures as Dr. Bea opines.[217]  Rather than theorizing what would happen and choosing a model based upon that theory, Dr. Bea looked at what happened based upon field observation and data and chose a model that captured the occurrence—a steady flow model.

Defendants not only relied on transient flow models in formulating their opinions, but went further by erroneously criticizing Dr. Bea's steady flow models using transient flow concepts and terminology, often failing to distinguish the two.[218]

For example, Dr. Silva used transient flow modeling to conclude that flow and Type 2 flow-related pressures extended only 16 feet from a given excavation.[219]  But he went further and used that transient-flow conclusion to criticize Dr. Bea's opinion on the communication of Type 3 uplift pressures without distinguishing the two for the Court.  No matter how insistent Dr. Bea was that this was a steady flow problem, Defendants attacked his opinions as if he were relying on transient flow analyses.[220]  Another example is Dr. Silva's characterization of Dr. Bea's compressibility figure of $10^{-9}$ as a parlor trick in which he "takes the clay out of the EBIA profile and substitutes the sandstone and computes the transmission of pore pressure based on

---

[216] Bea 3987:4-6.

[217] Silva 3737:11-16; Silva 3728:11-12 ("You will achieve steady-flow conditions if you wait long enough.").

[218] Marr 1929:22-1930:5; Marr 2182:7-12; Silva 3756:21-25.

[219] Silva 3770:8-16 (pressures extend 16 feet and dissipate in a "transient-flow process").

[220] Dr. Bea and Mr. Cobos-Roa ran both types of analyses in SEEP/W. (912:2-6.)  But as Dr. Bea explained in the context of ILIT, transient analyses were run using steady flow conditions, like a series of steady flow still frames knitted together to create a transient film. (Bea 1084:17-1085:12.) Dr. Bea's initial report made this clear from the start: "The transient hydraulic conductivity analyses initiate from a steady state condition."  JX 1393 (Bea Rep., Appx. D at 1.

flow through this rigid material" but then "to get the safety factor, he takes the sandstone out and puts the clay back in."[221]  Note the terminology—Dr. Silva speaks as if Dr. Bea were analyzing "flow" through sandstone.  But of course Dr. Bea was not and he did not "substitute" stone for soft clays and peats; nor is his compressibility factor concerned with "flow" to the landside causing failure in the first place.  These soft, high-water-content soils <u>behave</u> like sandstone in terms of compressibility for purposes of analyzing the communication of uplift pressures.[222]  Defense expert Tim Stark confirmed that "[f]requently in geotechnical engineering saturated materials are assumed to be incompressible."[223]  And that compressibility yields pressures that correlate to field measurements including piezometric measurements.  Also, despite Defendants' criticisms, SEEP/W was the proper program for determining these pressures; its user manual "specifically cautions the engineer not to focus on flows but to focus first on pressures and validate that those pressures are correct."[224]

So it is no answer for Defendants to complain that had Dr. Bea performed a transient flow analysis his inputs would have been wrong.  He was not performing a transient flow analysis.[225]  He was performing the steady flow analysis appropriate to the conditions, performed in all his other investigations,[226] published under peer review,[227] and compelled now by the

---

[221] Silva 3806:21-3807:8.

[222] Bea 1149:3-7 (liquid nature of the soils is why Dr. Bea modeled the swamp marsh as incompressible).

[223] Stark 3499:9-10; *See also* Stark 3496:9-11 ("Q. Is water relatively incompressible? A. In geotechnical engineering it's assumed to be incompressible.").

[224] Bea 4027:16-4028:3.

[225] Dr. Bea described the *event* and *conditions* as transient, *i.e.*, "time-dependent," but the analyses were based on steady flow conditions. (JX 01414 and DX 02688 (Bea Rebuttal Rep.) at 17-18 ¶ 20); *see also* JX 0193 (Bea Rep., Appx. D at 1) ("The transient hydraulic conductivity analyses initiate from a steady state condition.").

[226] Bea 846:3-6.

[227] Bea 846:8-10.

Corps of Engineers itself in assessing levee design.[228]  When Dr. Silva ran verification studies

using Dr. Bea's steady flow inputs, he achieved the same results.[229]

### ii.  Stability Analyses

The umbrella term "stability analyses" encompasses several shear strength-related

analyses such as slope stability analyses, lateral stability analyses, translational stability analyses,

and may also entail some element of seepage analysis.[230]  Dr. Bea termed his stability analyses

"limit equilibrium lateral stability analyses," and they too are reported in Appendix D to his

original report.[231]  These analyses evaluate the lateral stability of the floodwall under maximum

demands and capacity using the SLOPE/W program and the pressures generated by the SEEP/W

analyses.[232]  Slope stability analyses depend heavily on the characterization of the relevant soils,

and Dr. Bea reported in great detail the relevant soil characteristics he employed and his reasons

for using them.[233]  Contrary to Defendants' repeated suggestions, Dr. Bea ran his analyses for

both drained and undrained conditions.[234]  He performed these analyses for the North Breach,

South Breach, and Near Breach sites.  His analyses, like the seepage analyses, accounted for the

"gap" (aka tension crack) on the canal side of the wall.[235]

Dr. Bea explained that it was the marriage of the uplift pressures determined through

seepage analysis with these lateral stability analyses that provided the "Eureka!" moment at the

17th Street Canal.  Dr. Bea studied the piezometer measurements at the 17th Street Canal and

---

[228] Bea 1316:16-1317:10.

[229] Silva 3838:5-7.

[230] Brandon 3159:17-22.

[231] JX -01393 (Bea Rep. Appx. D.)

[232] JX 1393 (Bea Rep. Appx. D at 21.)

[233] JX 1392 (Bea Rep. Appx. C.)

[234] Bea 1108:11-15; Bea 1125:20-23.

[235] JX 1389 (Bea. Rep. at 75.)

discovered that pressures in the swamp-marsh layer followed the rising and lowering waters "like a dog on a leash," responding "virtually instantaneously."[236]  Addition of the uplift pressures to the equation resulted in a 30% change in the lateral resistance of the wall that enabled Dr. Bea, for the first time, to explain how the factor of safety at the 17th Street wall reached a failing factor of safety at the precise time and water elevation.[237] He carried this knowledge over to the EBIA and "the whole picture suddenly cleared."[238]

These stability analyses likewise showed, through modeling of the near breach location, that in the absence of hydraulic connections, Type 1 total stress pressures were not significant on the protected side and the probability of lateral stability failure was less than 30% for peak surge elevation.[239]  Thus, the important causative pressures were that required hydraulic connections with the surge water—a hydraulic connection that existed only because of poorly backfilled excavations.

**E.   Overtopping Did Not Cause The Failure; Dr. Silva's CWALSHT Model Is Flawed**

Dr. Silva opines that there must have been a greater-than-four-foot scour trench at both breach locations because his CWALSHT model shows that the factor of safety for overturning reaches unity (below which = failure) at four feet. Because the wall fell, the scour trenches must have exceeded four feet. [240]  However, Dr. Silva cut several corners to decrease the depth at which the factor of safety reaches 1.  His opinion is at odds with the empirical evidence such as the fact that walls with >4-foot scour trenches survived, and all of the scour trenches behind

---

[236] Bea 843:8-23.

[237] Bea 1308:8-18; D-Bea 42 (Bea PowerPoint Slide 42 - Factor of Safety Analysis at 17th St. Canal).

[238] Bea 844:13-15.

[239] JX 1389 (Bea Rep. at 91-93 ¶¶ 98-99.)

[240] JX 1672 (Silva Rep., Appx. E at 41-42.)

unfailed portions of the wall (which experienced hours more overtopping) would have vastly exceeded four feet had there been four-foot trenches at the breach points at the time of failure. Dr. Silva and defense expert Dr. Marr disagree on whether overtopping played a causative role at the North Breach site. [241]  In the end, Dr. Silva's model is so flawed as to be entirely unreliable, and the cut corners suggest he was stretching to reach a result that even his own colleague, on whom he relied, does not agree with.

Dr. Silva relied on Dr. Marr's flawed scour analysis to corroborate Dr. Silva's conclusion that a >4-foot scour trench caused the wall to fail.[242]  But after witnessing the dismantling of Dr. Marr's model (which would have predicted >9-foot scour trenches by storm's end), Dr. Silva was forced to disavow it, eventually claiming that one would be "dreaming" to think that Dr. Marr's scour analysis could "predict the scour trench within three and a half hours." [243]

Dr. Silva made no attempt to correlate the suggested scour trench as modeled by CWALSHT to conditions on the site, other than to verify that there was wave overtopping before the breach "that would have caused scour erosion."[244]  Dr. Silva also purported to rely upon information  provided  by Dr. Dalrymple based upon "three weeks of meetings," but Dr. Dalrymple's name does not appear anywhere in Dr. Silva's report or appendices, including in his reliance materials or his CWALSHT modeling analysis.[245]  This is true even though in response

---

[241] *Compare* Marr 2124:8-11 (overtopping did not cause North Breach) *with* Silva 3920:18-25 (four feet of overtopping scour necessary to fail the wall); JX 01672 (Silva Rep. at 53) (failure due to "loss of lateral support at the landside crest from overtopping and scour erosion").

[242] 3904:14-23.

[243] 3915:8-10.

[244] 3917:15-25.

[245] Silva 3916:12-16 (relied on Dalrymple); Silva 3919:20-24 (same); Silva 3921:8-20 (three weeks of work).

to a question by the Court, Dr. Silva said his work with Dr. Dalrymple occurred before Dr.

Silva's report was written.[246]  Dr. Dalrymple did not do any scour analysis himself.[247]

Most important, the model, which Dr. Silva himself described as a "simplified model" for

a very complex occurrence, suffers from several flaws that render it unreliable.[248]



First, Dr. Silva uses the same undrained shear strength (Su) for soils on both sides of the

levee,[249] and only one model for both breaches, despite testimony that "soils vary a lot"[250] in

terms of shear strength, and shear strength is intimately related to factor of safety (factor of

safety being the ratio of shear strength over shear stress).[251]  When confronted with this on cross-

---

[246] Silva3765:7-10.

[247] Dalrymple 2820:23-25.

[248] Silva 3903:13.

[249] Silva 3896:13-19 ("the same strength on both sides").

[250] Silva 3709:23-25.

[251] Silva 3709:1-20 (soil conditions in a single location can yield numerous different shear strength measurements); Silva 3707:4-18 (factor of safety).

examination, Dr. Silva responded that "the model is approximate."[252]  How approximate, *i.e.*, how far off the mark, we do not know.

There are more problems.  As depicted in the CWALSHT geometry above, the red lines indicate the soil that is eliminated at one-foot intervals in order to plot factor of safety;[253] but of course a real-world scour trench is only a few feet wide (4-6 feet according to Dr. Silva[254]); the entire backside of the levee and whatever lateral support it offers is not washed away by scouring, particularly by wave overtopping.  Again departing from reality, Dr. Silva's model replaces the scoured-away soil with nothing while in the real world the scour trench fills with water.[255]  Dr. Silva admits that water in the trench would create lateral support or "pressure" against the backside of the wall, which clearly would influence an overturning analysis.[256]

One need only view the geometry above to see that at four feet of scour, Dr. Silva depicts a levee with half of its backside entirely washed away when in reality there would be a relatively narrow scour trench filled with water offering lateral support to the floodwall, thus increasing the factor of safety against overturning.  Dr. Silva admitted that "[a]ny force you apply would increase the factors of safety some."[257]  This includes the force that would be provided by water in the trench:

> Q.     If you take that trench, however wide it is, and you fill it up with water that water is going to offer some opposing force or resistance to overturning?
>
> A.     Yes, it would do that.

---

[252] Silva 3915:21.

[253] Silva 3897:6-12.

[254] Silva 3900:6-7.

[255] Silva 3899:16-19.

[256] Silva 3899:20-23.

[257] Silva 3900:20.

The water that Dr. Silva omitted from his scour model also would have had a now-familiar "tailwater" effect.  Dr. Marr described the water in the scour trench as providing a cushioning effect: "[Y]ou really almost have a cushion now as the water is filling the scour trench. The water continuing to pump over is falling on water. It's not splashing or beating against the bottom of the scour."[258]  This would diminish the scour rate, thus rendering more implausible Dr. Silva's opinion that a 4-foot scour trench existed at the North Breach as early as 6:00am and at the South Breach as early as 7:00 a.m.  Sections of the wall that sustained several hours more scour did not register such depths at those times or at any time, much less the depths one would have predicted had they been in the four-foot range so early in the morning.

These shortcomings in the model are critical given that at 3 feet of scour, the factor of safety is well within the no-fail zone of 1.4.  Even a six-inch difference in scour depth at the four-foot range places the wall in a no-fail zone at 1.2.[259]  This "simplified" and "approximate" model, to use Dr. Silva's own words, is contradicted by field evidence, limited by its inputs, and yet so sensitive that even if it is off by less than one foot in its prediction, the outcome is the difference between a wall that fails by overturning and a wall that does not.  It also is disputed by Dr. Marr.

### F.  Uplift Pressures Caused The Failures

#### i.  Steady Flow Is The Appropriate Model

There is a fundamental choice as to which type of computer modeling best assists in determining the cause of the north and South Breaches.  But it also should be remembered that computer modeling is only one tool assisting in this endeavor.  Dr. Marr's scour model is patently flawed; but that fact alone does not rule out overtopping.  The Court must consider that

---

[258] Marr 1867:22-25.

[259] JX 01672 (Silva Rep., Appx. E at 42.)

together with the evidence on weather patterns, wave heights and directions, the composition of the soils, the eyewitness and photographic evidence, the forensic evidence remaining after the storm, and so on.  So it is with the seepage models.  They are useful tools, but the case is not merely a battle of the models.  This is particularly important where both sides recognize they are "working different problems."[260]  Neither the defense nor Dr. Bea believes flow-related (Type 2) pressures caused this breach, yet that is the problem the defense experts worked and the criticism they leveled at Dr. Bea.

That said, the modeling is an important component to the analysis, and there are important reasons why Dr. Bea's steady flow models are the most appropriate.  As a starting point, the disagreement is not over <u>whether</u> steady flow conditions may exist at the EBIA, it is <u>whether they existed during the storm</u>.  Dr. Silva made clear that such conditions might exist, but he believed they would take many months to come about.[261]

In this respect, it is vital to fully appreciate the flow simulator Dr. Silva demonstrated in the hallway.  The simulator accurately (even ingeniously) depicts the difference between steady flow and transient flow.  Dr. Silva himself described the two tubes as "the steady-flow simulator and the transient-flow simulator."[262]  The transient flow tube had the air bags, representative of an elastic, expanding medium through which the water was flowing[263] while the steady flow tube was a "rigid system" in which the four valves "will jump to the same pressure almost immediately" because "you immediately establish steady flow."[264]  Dr. Silva elsewhere confirmed that "saturated clays like those at the EBIA generally yield dilatational wave velocity

---

[260] Bea 907:16-908:6; Marr 1935:13-16.

[261] Silva 3728:11-12 ("So, you know, soil will achieve steady flow conditions if you wait long enough.").

[262] Silva 3725:9-10.

[263] Silva 3727:18-24.

[264] Silva 3727:14-17.

in the vicinity of the velocity of sound and water or approximately 5,000 feet per second." [265]   So we know that steady flow conditions <u>may</u> exist and what effect those conditions have on the transmission of pressure in the saturated soils of the EBIA.  Again, the question distills into whether they existed during the storm event.

Unfortunately, the simulator does not suggest which model is appropriate for the site conditions at the EBIA, it merely reflects the competing models in this case.  It does, however, validate Dr. Bea's description of steady flow conditions if he is correct that they existed.  To demonstrate that Dr. Bea is correct, we look for further forensic and analytical corroboration.

The Defendants' modeling, which largely ignores Dr. Bea's proffered cause while confirming his opinion that flow-related seepage did not cause the breach, requires them to contrive an overtopping scenario that is contradicted at nearly every turn by the evidence in the field.  Dr. Bea's proffered failure mode, on the other hand, is confirmed by field data, analytical data, and common sense.

### ii.  **Piezometric Corroboration**

Piezometric confirmation of Type 3 instantaneous uplift pressures corroborates Dr. Bea's opinions and defies any other explanation by defense experts.  Piezometers measure pressure.[266] In this instance, they measure pressure in the swamp-marsh layer in which they are buried.[267] There were not piezometers at the EBIA during Katrina, but there were piezometers at the 17th Street Canal, and they were later installed at the EBIA.

The piezometers at the 17th Street Canal actually led Dr. Bea to discover the role that Type 3 uplift pressures played in the failure at that location.  Dr. Bea plotted the piezometer

---

[265] Silva 3844:10-15 (emphasis added).

[266] Bea 844:18-845:21.

[267] Bea 842:18-24 (17th Street); JX 1392.0006 (Bea Rep. Appx. C at 6) (EBIA).

readings against the rising and falling waters in the canal and discovered virtually instantaneous responses between water elevations and piezometric pressures in the swamp-marsh layer.[268]  Dr. Bea depicted this pressure response in his powerpoint presentation.[269]  To replicate the instantaneous transmission required use of an $M_v$ close to zero (hence Dr. Bea's use of $10^{-9}$ in his models), hence establishing and illustrating the need for steady flow analysis to replicate storm events.[270]  These 17th Street piezometer measurements accounted for a 30% change in the lateral resistance of the wall that enabled Dr. Bea, for the first time, to explain how the factor of safety at the 17th Street wall reached failure at the proper time and water elevation.[271]

These findings were further corroborated by study of the piezometers at the EBIA.[272] PZs 3 and 6 were buried in the swamp-marsh on the canal side of the floodwall, with PZ-6 near the North Breach location and PZ-3 near the South Breach location.[273]  PZ-2 was buried in the swamp-marsh on the land side.[274]  All were installed after Katrina.[275]  These piezometers also registered virtually instantaneous response to rising pressures in the swamp-marsh.[276]  PZ-3 shows little fluctuation before water rises over the EBIA, but once the water levels begin to exceed the elevations of the EBIA surface, riddled with excavations, the piezometer begins registering pressures and at +3 feet (NAVD88), the response is rapid, indicating both the

---

[268] Bea 843:8-23.

[269] D-Bea 41 (Bea PowerPoint Slide 41 (17th Street Canal Piezometer Readings)). Also at PX 4494.0087, Fig. 3.53.

[270] Bea 923:16-924:10 & 924:20-24; Bea 944:12-945:3 (same).

[271] Bea 1308:8-18; D-Bea 42 (Bea PowerPoint Slide 42 - Factor of Safety Analysis at 17th St. Canal).

[272] Bea 1307:11-17.  The dredging at 17th created the necessary hydraulic connection. (Bea 1309:3-16.)

[273] Bea 954:14-15 (canal-side); Bea 1310:23-1311:2 (relative locations); D-Bea 45 (Bea PowerPoint Slide 45 - Hydraulic Pressures in IHNC Swamp-Marsh) (graphic of locations).

[274] JX 1392.0009 (Bea Rep. Appx. C at 9).

[275] Bea 955:2-3.

[276] Bea 1311:12-1312:2 (PZ 6); Bea 1313:16-1314:3 (PZ 3); D-Bea 46-47 (Bea PowerPoint Slides 46-47 - PZ 6 and PZ 3 Hydraulic Pressures). Also found at JX 1389.0057 or JX 1392.0015 (PZ 6) and JX 1389.0006 or JX 1392.0008 (PZ 3).

presence of the hydraulic connections (excavations) and the need for modeling that reflects this instantaneous pressure transmission.[277]  On the other hand, PZ-2 on the land side registered virtually no increase in pressure during these events.[278]  This is explained by installation of a 25-foot sheet pile since Hurricane Katrina, which cuts through the swamp-marsh layer and cuts off the pressure transmission—yet again corroborating Dr. Bea's analysis of what occurred during Katrina.[279]

Defendants suggested that the Corps' piezometers were simply unreliable.  Contrary to Dr. Silva's erroneous assertion of potential water intrusion,[280] these piezometers had a double-cap system including a tightly threaded inner cap to prevent such intrusion.[281]  The piezometric readings also registered a reduction in pressure as water levels fell, further debunking the Defendants' theory that the tubes had filled with water during the storm.[282]  Mr. Treeby also tried to impeach Dr. Bea into conceding that total vertical stress (Type 1 pressure) could alone account for the piezometer responses, but Dr. Bea successfully rejected this attack, and his deposition testimony (once the complete deposition response was read as prompted by the witness) bore out his explanation.[283]  And despite Defendants' repeated suggestions that this "pressure" explanation was invented for trial, all of this is discussed in Dr. Bea's original report.[284]

---

[277] JX 1392.0007 (Bea Rep. Appx. C at 7).

[278] JX 1392.0009-10 (Bea Rep. Appx. C at 9-10); D-Bea 48 (Bea PowerPoint Slide 48).

[279] Bea 1314:18-1315:21.

[280] Silva 3823:18-22 ("the cap is not a tight-fitting cap").

[281] Bea 957:7-958:15; Bea 1311:3-8 (double-capped and threaded); D-Bea 45 (Bea PowerPoint Slide 45) (photo of cap).

[282] Bea 4041:7-12.

[283] Bea 959:24-961:6.

[284] JX 1392.0006-0018 (Bea Rep. Appx. C at 6-18).

### iii.  **Near-Breach Corroboration**

Dr. Bea's conclusions are further corroborated by his near-breach analysis.  Consistent with Dr. Marr's graphics showing that the borrow pit did not pierce the swamp-marsh,[285] Dr. Bea modeled his "near breach" scenario by using the same inputs as at the North and South Breaches except that there was no hydraulic connection between the excavations and the swamp-marsh.[286] Dr. Bea's modeling of McDonough predicted a near-breach, but predicted the wall would not fail.  This is precisely what happened in the real world during the storm, again validating not only Dr. Bea's model, but demonstrating that without the extensive hydraulic connections created elsewhere, failure would not have occurred.[287]  Defendants made no attempt to explain this result on its own terms; rather, Dr. Tim Stark simply accused Dr. Bea of running a different analysis at the near breach than he had at the other breach sections (implying that Dr. Bea had misled the Court when he said he had in fact run the same analyses with only the one difference of omitted excavations).[288]  But as it turned out, Dr. Stark was the one who repeatedly misinterpreted Dr. Bea's analyses.[289]  In short, the near-breach is self-reinforcing in that the difference between it and the breached sections explains why it did not fail and the steady-flow modeling of it "predicts" this fact, *i.e.*, confirms that one would not have expected it to fail under conditions as they existed due to that very difference.

---

[285] D-Bea 11 (Bea PowerPoint Slide 11 (Nature of Soils - Soil Layers Under East Bank of IHNC)); JX 01871 (Marr Rep., Appx. G, Fig. G-2).

[286] Bea 1319:9-20. *See also* Bea 1296:20-1297:12.

[287] Bea 1296:3-14.

[288] Stark 3429:23-25; 3437:13-15 (Mr. Treeby: "Would it be fair to say that this comparison of the near breach to the breach sites in Dr. Bea's analysis would be cooking the books?")  Not incidentally, none of Dr. Stark's accusations in this regard were contained in his report; all were first presented at trial.

[289] Bea 4047:14-4049:2; Bea 4149:16-4153:6.

### iv.   **Forensic "Signature" Corroboration**

Finally, Dr. Bea pointed out that the site simply doesn't <u>look</u> like an overtopping breach, as field tests of the two breach "signatures" confirmed.  Just as a good physician gains a sixth sense for diagnosing disease over decades of treating patients, and just as a veteran crime scene investigator knows far more than they teach at the police academy, a good forensic engineer gains an intuition that further sharpens his or her professional skills.  This is not earned in a university, and even a passing comparison of Dr. Bea's experience with that of the defense experts reveals his vastly more extensive forensic experience, including his formal training in forensics.[290]

Each breach site bore a signature correlating to the excavations and atypical of an overtopping failure.[291]  The North Breach signature on the <u>canal</u> side of the floodwall is coextensive with and illustrative of the sandy backfilled excavations discussed above and at trial (namely, the Area East of 8 excavated to the utility pole alignment).[292]  An eerily similar scour hole on the <u>canal</u> side of the floodwall appears at the South Breach as well, which is 50-60 feet from the floodwall, i.e., "synonymous" with the grid trenching, drainage ditch and lateral sewer excavations discussed above.[293]  This also is consistent with the lateral displacement of "blocks" of land-side levee sections as depicted in Dr. Bea's report, which would not appear in an overtopping failure.[294]

---

[290] Bea 805:17-807:21; Bea 838:2-15.

[291] D-Bea 37 (Bea PowerPoint Slide 37 (North Breach) & Slide 38 (South Breach)).

[292] Bea 1304:13-1305:10.

[293] Bea 1305:14-1306:05.

[294] JX 1389 (Bea Rep. at 107, Fig. 76).

### v.   Corroboration Conclusions

Dr. Bea mentioned during his testimony that non-forensic engineers often believe their computer models with "almost theological reverence."[295]  Models are only one manner of corroborating engineering judgment, and models themselves are subject to corroboration.  Unlike the defense experts, Dr. Bea did look to field measurements during the storm and to similar conditions in subsequent storms.  One must account for those piezometer readings during those storm events.  It is no coincidence that once Dr. Bea accounted for those pressures, he was able to pinpoint the failure of the 17th Street Canal floodwall.  It is no coincidence that the piezometer readings in subsequent storms at the EBIA generated virtually identical results.  The Defendants' sticks-and-stones approach does not explain these corroborating field data.  Nor do they account for the correlation of Dr. Bea's near-breach scenario to those results and to real-world events at the site.  Nor do they account for the forensic signatures at each breach zone.  All of these facts and features corroborate Dr. Bea's conclusions and validate his use of steady flow modeling, while the Defendants make no attempt to explain them beyond unsuccessfully attacking Dr. Bea.

### G.   Waves Were Insufficient To Cause Overtopping Failure

The Plaintiffs' recognize that they bear the burden of proof in regard to causation.  However, because the event being evaluated had no witnesses, in order to ascertain the likely cause of the failures, it is essential to evaluate all potential causes.  As a result, forensic engineering is not only important but crucial to any investigation into the cause of the floodwall failures.  Furthermore, it is often the case that a proponent picks a theory and then tries to demonstrate that the particular theory is more likely than not, performing an evaluation by

---

[295] Bea 838:2-7.

"working the issue backwards.[296]  In this unique case that type of evaluation is not appropriate because of the extreme potential of bias as the expert is more likely to embrace the theory his employer prefers as opposed to evaluating all possible causes in conformity with the evidence and science.  Neither Dr. Dalrymple nor Dr. Silva-Tulla makes the assertion that they performed forensic evaluations.  In fact, the only expert in this case who unequivocally claims to have done forensic evaluation in order to discover the actual cause of the floodwall failures is Dr. Robert Bea.[297]

Dr. Marr suggests that he performed a forensic type of evaluation.[298]  However, the admissions and inconsistencies in and between Dr. Marr's reports are manifestations of his poor forensic engineering abilities and efforts.  For example, initially Dr. Marr did not consider the timing of the South Breach to be a relevant factor in his evaluation.[299]  This is a most extraordinary proposition given that any explanation of the mechanism of failure has to be consistent with the known facts. After his initial evaluation, Dr. Marr determined that the time of the failure of the South Breach was at approximately9:00 am, give or take one half hour based on his conclusion as to the mechanism of failure.[300]  This conclusion could not have been the result of a forensic evaluation and indeed is indicative of a sloppy analysis as it completely disregards the investigatory data from the other experts involved that collectively suggest the South Breach occurred between 6:45-7:15 am.[301]  More damning, Dr. Marr testified that, it was not until at or shortly after his deposition on April 23-24, 2012, that he learned/understood facts that he missed

---

[296] Bea 4009:19-21.

[297] Bea 807: 2-808:12.

[298] Marr 1950:20-25.

[299] Marr 1976:20-21.

[300] Marr 1889:2-7. PX 4438, 38:8-17. Dr. Marr further concluded that the South Breach "did not involve a defect in the wall."  Marr 1831:9-10.

[301] Dalrymple: 2751:15-18; 2860:13-16; 2859: 2-6; JX 01730-0063, 0064, 0065; Bea 1283:14-17.

during his own investigation which he decided, post issuance of his initial report and after recognition of the issue of timing, to take into consideration.[302]

A proper forensic evaluation clearly required an inquiry into whether or not there were waves in the INHC of sufficient size prior to the I-wall failures whose direction and impact could have caused scour trenches of sufficient depth to cause the South Breach or initiate the North Breach. In an effort to reconcile his theory of the cause of the South Breach with the other opinions of experts employed by the defense relative to the issue of timing, Dr. Marr issued a new opinion based on the contrived premise that he was not aware of the wave height in the IHNC at the time of the breach when he issued his initial opinion.  The truth of the matter is that Dr. Marr intentionally did not consider wave height at all in his initial evaluation as "in failures like this, you know, waves are a small contributory factor but not something we I normally would consider significant for this type of problem."[303]

Dr. Marr states in his supplemental report issued on July 24, 2012, that he had initially estimated the waves to be at 1 foot in the IHNC, citing to IPET Section IV-15-36.[304]  Dr. Marr claims that after he issued his initial report and was deposed, he learned from Dr. Dalrymple's investigation that the waves in the IHNC at the time of the breach were 3 feet.[305]

It is clear from the record that what Dr. Dalrymple did relative to waves can hardly be called an investigation. Dr. Dalrymple issued his expert report on March 21, 2012.[306]  In Dr. Dalrymple's entire 156 page report, there appears one solitary paragraph that discusses the height

---

[302] Marr 1967:15-19; 1970:16-1971:11; 1971:24-1972:17.

[303] PX 4438 at 37:8-12.

[304] PX 4720.

[305] Marr 1976:13-16; PX 4720.

[306] JX 01713-0001.

of the waves in the IHNC at the time of the breaches.[307]  Dr. Dalrymple estimates the waves in

the IHNC were 3 feet at 3:00 am on August 29, 2005.[308]  Dr. Dalrymple cites to three sources for

this wave estimate: IPET IV-226, Mr. William Villavasso's deposition testimony, and the

Coastal Engineering Manual.[309]  Both Dr. Marr and Dr. Dalrymple cite to the same volume and

appendix of IPET as to wave height. Therefore, the information was not only ascertainable but

available to Dr. Marr at the time of his initial evaluation. In explanation of this discrepancy, Dr.

Marr simply says that he "missed it."[310]

        The contrived nature of  Dr. Marr's efforts to explain his new theory of the cause of the

South Breach to make it work in terms of the timing of the failure is demonstrated by his reliance

on  Dr. Dalrymple's estimate of wave height, which the record shows are false. Dr. Dalrymple

admitted that his wave height estimate at 3:00 am was incorrect.[311]  Dr. Dalrymple cites to Mr.

William Villavasso's testimony in his estimate of 3 foot waves at 3:00 am, however Mr. William

Villavasso repeatedly stated that he was unsure of the time of his observation, as Dr. Dalrymple

admits in his testimony.[312]

        Dr. Dalrymple cites to IPET-IV-226, which describes STWAVE models that were run

using data from 5:30 am and 9:30 am, not at 3:00 am.[313]  The STWAVE model using 5:30 am

data, as reported in IPET, assumed that the winds were aligned with the axis of the

MRGO/GIWW-INHC intersection. Peak wind conditions at 5:30 am were about 80 knots out of

---

[307] *Id.*

[308] *Id.*

[309] *Id.*

[310] Marr 2073:21-2074:14.

[311] Dalrymple 2796:21-2797:2.

[312] Dalrymple 2802:24-2803:3.

[313] Dalrymple 2796:11-14; JX 2033-1814; *see also* Attachment A, IPET IV-226.

the east, resulting in winds coming down the GIWW.[314]  However, this assumption relied on by

the STWAVE models as described by the IPET report and also relied on by Dr. Dalrymple is

inconsistent with the parties' stipulated facts as well as the technical appendix of IPET.[315]

    The parties stipulated that the prevailing winds from 4:00 am – 7:00 am were out of the

N/NE, which direction is not aligned with the GIWW.[316]  The model described in IPET IV-226-

227 estimated that the wave height at the Lower 9th Ward floodwall at 5:30 am were 2 to 3 feet.

However, the technical appendix, IPET- 15-36, on which Dr. Marr initially relied for wave

height, estimated the significant wave height at 5:30 am at the Florida Avenue bridge was 1

foot.[317]  IPET IV-226 states that a second STWAVE model was conducted at 9:30 am, at which

time the maximum winds were aligned with the IHNC, resulting in a longer fetch, projecting

larger waves.[318]  More importantly, neither of the STWAVE models suggests that the waves

were hitting the Lower 9th Ward east wall at all, much less perpendicularly.  In fact, at 5:30 am,

the waves would have been striking the west side of the IHNC and at 9:30 am the waves would

have been moving from north to south.[319]

    In order for Dr. Dalrymple, and subsequently Dr. Marr, to explain that waves overtopped

the wall as they claim, not only must the waves be over three feet in height, the waves must

strike the east wall at a 90° angle.  Dr. Dalrymple solves this obvious flaw in his theory by

suggesting that the waves passed under the Florida Avenue Bridge and radiated in such a fashion

that they took a sharp left turn and then hit the wall at a 90° angle.  Dr. Dalrymple had admitted

---

[314] JX 2033-1814.

[315] Pre-Trial Order p. 30-31 nos. 6, 9, 12, 15, 18; JX 2033-0027-0034; *see also* Attachment C: "Wind, Water and Wave Information Chart."

[316] Joint Pre-Trial Order, filed July 24, 2012, p. 29, All Uncontested Material Facts, nos. 6, 9, 12, 15, 18.

[317] JX 2033-2734; *see also* Attachment B: IPET IV: 15-36.

[318] JX 2033-1814.

[319] Pre-Trial Order nos. 4, 6, 7, 12

that the wind was blowing generally in line with the water channel, so the only way the waves could get to the North Breaches was through diffraction, but even with diffraction, they would not hit the wall east wall at a 90° angle. Because of the distance from the Florida Avenue Bridge, diffracted waves could not have reached the South Breach.[320]

By definition of significant wave height, 2/3 of the waves are smaller than the 1/3 used to represent the significant wave height. Waves double in height when the waves hit at a perpendicular angle.[321] However, Dr. Dalrymple could not say with certainty what would happened if the waves hit at a different angle less than a 90° angle.[322]

Using Dr. Dalrymple's slides and assumptions, only waves splashing against the wall at a perpendicular angle are getting over the wall after having made a hard left turn at the bridge, after having successfully fought against winds that are coming from the North/Northwest at 70-72 knots, and after splashing to a height that is double the height of the wall. The circumstances are reconstructed as follows:[323] at 3:00 am, the significant waves are not high enough to go over the top of the wall (1.13 (Hm0) + 8.1 (Lock Water Level) = 9.23 feet).[324] At 4:00 am, the significant wave height is 1.7 feet, which is still not enough to go over the top of the wall (1.7 + 9.3 = 11 feet).[325] At 5:00 am, water is just beginning to get over the top of the wall when waves are hitting the wall at a perpendicular angle (2.5 +10.3 = 12.8).[326] We can conclude that wave overtopping begins at 5:30 am. At 6:00 am, water is getting over the top of the wall (3.1 + 11.3

---

[320] DX-DM 0006-0027.

[321] Dalrymple 2791:25-2792:3.

[322] Dalrymple 2791:25-2792:22.

[323] Dalrymple 2848:20-2851:22; 2788:20-2789:7; and 2791:25-2792:22; Bea 3996:17-3997:2.

[324] DX DM-1006-0031.

[325] DX DM-1006-0032.

[326] DX DM-1006-0033.

= 14.4 feet).[327]  Dr. Marr's chart shows that it takes 2 hours 15 minutes to have a trench deep

enough to cause the wall to fail.[328]  This leads to the conclusion that the time of failure was

around 7:45 am.  Contradictory to his own analysis, Dr. Dalrymple opines that the failure

occurred at 6:45 am, resulting in the breach being fully open at 7:00 am.[329]  At 6:45 am, the

scour trench is only 2.3 feet deep.[330]

      IPET IV-226 relied on the results of the STWAVE model.  No evidence or testimony

suggests that either STWAVE model or Dr. Dalrymple took into consideration the effect of the

Florida Avenue Bridge or Surekote Road when analyzing waves.  The Florida Avenue Bridge

was down at the time of the breaches, a fact that Dr. Dalrymple concedes.[331]  Both of these

structures would have broken the waves upon impact.  The computer models on which Dr.

Dalrymple relied failed to take all relevant factors into consideration.

      Dr. Marr opines that overtopping played absolutely no role in the failure of the I-wall at

the North Breach.[332]  This is contradictory to Dr. Silva.[333]  Dr. Marr prefers, instead, to assign

causation to a mysterious force solely caused by the high water in the canal which he believes

applied 500,000 pounds of pressure across the lateral surface of the I-wall, despite the fact that

none of the computer models otherwise utilized by the experts in this case substantiates this

scenario or demonstrates that this was even possible.[334]  Because the record evidence establishes

---

[327] DX DM-1006-0034.

[328] DX 02647-0003.

[329] Dalrymple 2859.

[330] DX 02647-0003.

[331] Dalrymple 2818:5-11.

[332] Marr 1947:7-13.

[333] Silva 3760:4-25.

[334] Marr 2106:1-14.

that there were no waves in the channel of sufficient height and direction to cause scour, we are left with surge as the sole potential mechanism of scour.

### i.   Even If The I-Wall Was At A Lower Elevation, It Is Irrelevant

In order to disprove the Plaintiffs' theory of causation regarding the North and South Breaches, Defendants offer an alternate explanation of the failures, specifically overtopping.  It is easy to understand why the defense would focus on overtopping, as the theory is based upon the misguided belief that because the lowest points on the pre-Katrina floodwall are consistent with the breach locations.  That alone explains the breaches.  The problem with this entire theory is that every expert in this case agrees that both the North and South Breaches occurred before surge overtopped the flood protection structure at these two locations.  Defendants persist in this flawed logic because they believe the evidence regarding the heights of the wall is incontrovertible.  Regardless, low wall elevation is irrelevant, as Dr. Bea states, "because of the uncertainties, natural uncertainties, and variations in the hydrodynamic conditions.  These uncertainties far swamp (sic) a 6 inch potential elevation difference."[335]  In addition, the difference in proposed elevations is not sufficient to explain the Defendants' scour theory.[336]

The fact is that there is no way to ascertain with precision the wall heights at the time of the failures.  Indeed, the IPET investigation team, which was a $30 million enterprise, concluded that the floodwall was 12.5 feet in elevation.[337]  The only evidence in support of the estimated wall height to which the defendant can point to is the Orleans Levee Board surveys, last recorded in 1999,[338] which, as the Defendants are forced to admit, are in error, at least as they were

---

[335] Bea 1287:7-16.

[336] *Id.*

[337] IPET JX 2033-3582; Marr 1861:9-17.

[338] JX 1925.

recorded.[339]  Dr. Marr used a wall height of 12.1 feet in his model, which he claimed was derived from the wall height as shown on the 1999 survey, with post survey settlement taken into account in order to obtain the lower wall height estimate.[340]  Nevertheless, as Dr. Bea stated, wall height estimates cannot be taken as gospel when modeling the flood protection structure.[341]  In any case, assuming *arguendo*, that Dr. Marr's estimated wall height was accurate, the surge height of 12.3 feet at 7:00 am on August 29, 2005, as stipulated by the parties, would simply not create sufficient overtopping to "even scour away the grass on the backside of the floodwall."[342]

It has been alleged by the defense that the lowest part of the I-wall was at the site of the North Breach.[343]  However, the wall at the North Breach is comprised of sheet piles that had been welded to a sheet pile wall that was installed in 1980 at a much greater depth.[344]  As such, it is the least likely place for there to have been subsidence or at the very least increased subsidence. In fact we are forced to believe that, if the data is accurate, after the 1980 wall was installed and welded to the 1966 wall, the 1980 wall did not subside very much from 1980 to 1999, less than 6 inches, but the 1966 wall dropped from 12.4 inches in 1991 to 11.35 inches in 1999, which is almost a foot.[345]  This is most intriguing as there is no evidence that the weld connecting the 1980 wall to the 1966 wall broke before Hurricane Katrina.

The issue of wall height is further complicated by the stipulated fact that the surge rose at a rate of one foot between 5:00 am and 7:00 am and at a rate of one and a half feet per hour

---

[339] JX 1414-0064 (Bea Rebuttal Report); King 2662-2664.

[340] Marr 2243:15-20.

[341] Bea 3986:15-3970:14.

[342] Bea 1289:7-12; Pre-Trial Order p. 29.

[343] Dalrymple 2732:24-2733:4; Marr 3827:11-13.

[344] Bea 3988:9-3990:7.

[345] JX 1869-0006.

between 7:00am and 8:00am and on August 29, 2005.[346]  Before 7:00 am, the surge rose at a rate

0.2 feet every 12 minutes.[347]  After 7:00 am, the surge rose at a rate of 0.25 feet every 12

minutes.[348]  The height of the wall that did not fail at either end of the South Breach was

approximately 12.3 feet.[349]  At these rates, the difference in wall height between the part of the

wall that failed and the part of the wall did not fail is obliterated in 15-20 minutes.  Even if one

assumes it takes 30 minutes for the surge to reach the height of the parts of the wall that did not

fail, there is no mechanism of failure that does its damage within 30 minutes because the wall

failed before surge overtopping.  The bottom line is that there was no overtopping before failure.

This is precisely why the defense had to manufacture the wave theory in an attempt to create

plausibility for their argument.  There is no evidence other than pure conjecture that waves

overtopped the flood protection structure at the North Breach or South Breach or that wave

overtopping caused enough scour to initiate failure.

### ii.  Evaluation Of Surge Overtopping And Scour

The mechanism of failure in surge overtopping is that the storm surge comes over the

wall, creating a scour trench which destabilizes the wall, causing it to fall over, resulting in a

breach.[350]  Dr. Marr, employed by the USCE, is the only defense expert who claims to have

---

[346] Pre-Trial Order p. 29-30, no. 1.

[347] PX 1413; DX 01870-002.

[348] *Id.*

[349] PX 4723-0011 (Appendix E of Dr. Marr's Expert Report, profile of EBIA levee) shows southern end of South Breach to be at station 24.  JX 1869-0011; JX 1925-0002 (1999 Levee survey) shows levee height at station 24  + 17 to be 12.94. To convert to NAVD 88 2004 you must subtract 0.6 as per PX-4723-006 (Appendix E of Dr. Marr's Expert Report, summary of datum conversion applied to surveys based on M152). PX 4723-0011 (Appendix E of Dr. Marr's Expert Report, profile of EBIA levee) shows northern end of South Breach at station 32. JX 1925-003 (1999 Levee survey) shows the levee height at station 32 + 16.4 to be 12.93. To convert to NAVD 88 2004 you must subtract 0.6 as per PX 4723-0006 (Appendix E of Dr. Marr's Expert Report, summary of datum conversion applied to surveys based on M152).

[350] Marr 1836:12-18.

performed any analysis regarding the rate of scour.[351]  He claims to have evaluated all known

potential causes of failure, thereafter eliminating the causes which lacked a scientific or factual

basis in order to reach a conclusion regarding the cause.[352]  Interestingly, Dr. Marr ignored the

basic tenet of evaluation by failing to gather the known facts, the most important of which is that

the South Breach occurred at 7:00 am on the morning of August 29, 2005.[353]  This fact was

reported by IPET.[354]  Additionally, Dr. Bea states that the South Breach occurred at 7:00 am.[355]

Noteworthy is that this fact was also reported by Dr. Dalrymple, an expert retained by WGI and

on which Dr. Marr allegedly relied for other information, but apparently only selectively.[356]

Dr. Marr's analysis shows that it would have taken two hours to create a scour trench of

sufficient depth to cause the failure at the South Breach.[357]  In his deposition, he hedged by

suggesting that the breach could have occurred anywhere between 8:30 am-9:30 am.[358]  This

estimate is particularly interesting because the scour trench model, which he produced to the

Court in July, shows that the tail water would have reached a height sufficient to stop scour at

about 9:00-9:15 am.[359]  This time estimate directly contradicts Dr. Dalrymple who, using

sophisticated flood modeling, estimates that the South Breach began at 6:45 am and was fully

open by 7:00 am.[360]

---

[351] Marr 1974:5-13.

[352] PX 4721-0016; Marr 1950:20-25.

[353] Marr 1967:18-22; Marr 1968:3-11; Marr 1974:17-18.

[354] JX 02033-1768, 1771-72; PX 3951 (Team Louisiana).

[355] Bea 1283:14-17.

[356] JX 01713-0065; Dalrymple 2859:2-6; Marr 1980:16-19; Marr 2074:6-8; 22-25.

[357] Marr 2166:11-25.

[358] PX 4438-0010.

[359] DX 02647, note the curve flattens is the point where there is no scour.

[360] JX 01713-0065.

Time was not the only factor that Dr. Marr failed to account for. Dr. Marr also erroneously included a wave estimate in his second analysis that assisted him in reaching the contrived conclusion that the scour trench at the South Breach was sufficient to cause the breach, as discussed further below.  Dr. Marr adopts a 3-foot wave estimate with periods of about 2 seconds in his second attempt at a defense friendly analysis.[361]  But Dr. Marr fails to take into account whatsoever wind direction or the effects of the wind on the waves.[362]  Additionally, Dr. Marr erroneously assumes that there existed highly erodible clay,[363] despite the testimony of Dr. Dunbar and certain Corps documents that report otherwise.[364]  Dr. Bea testified that, if Dr. Marr's model is performed with all other factors remaining the same but using the actual type of soils Dr. Bea found at the site, the depth of the resulting scour trench is reduced substantially.[365] Furthermore, Dr. Marr used the wrong distance from the top of the wall to the levee crown in his model.[366]  Equally mistaken, Dr. Marr also assumes no grass coverage in his model.[367]  As stated by Dr. Bea, Dr. Marr did not address the grass at the location nor did he address the effects the grass and its root structure have in preventing erosion.[368]

But, assuming Dr. Marr's analysis is accurate, his theory does not identify the cause of the floodwall failures.  Dr. Marr concluded, without taking into account any of these extraordinarily relevant factors, that a scour trench of 5.7 feet deep would be necessary in order

---

[361] PX 4720, DX 02647; Marr 1995:20-1996:13.

[362] Marr 2084:14-2085:9.

[363] Marr 1998:2-18.

[364] Dunbar 1801:24-1802:8.

[365] Bea 1290:13-18.

[366] Marr 2011:17-2012:22; JX 01869-0010.

[367] Marr 2065:7-19.

[368] Bea 1288:4-9.

for the breach to occur.[369]  At the rate of scour Dr. Marr utilized, the South Breach scour trench would not have reached that depth until 9:00 am, 2 hours after the other experts in this case estimate that that the breach occurred.

By far the most disconcerting conclusion reached by Dr. Marr was that the wall fell flat after breaching.[370]  His explanation for the movement of  the wall 200 feet east was that the waters rushing over the flattened wall had sufficient force against the narrow thickness of the bottom of the sheet pile to force it eastward for that distance.[371] As Dr. Bea states, not one expert outside of himself provided a proper explanation for the position of the wall post breach.[372]  In fact, had the wall fell over to 10 to 20 degrees and it is lying on the ground, the water flowing through the hole could not develop enough driving force to push that wall to the west.[373]

As in the case of the South Breach, there exists a lack of harmony among the defense experts regarding the failure at the North Breach.  All of the experts agree that there was no surge overtopping prior to the failure.[374]  Dr. Dalrymple and Dr. Silva-Tula both believe there was wave overtopping which destabilized the wall.[375]  Conversely, Dr. Marr does not believe that there was enough overtopping, even if you assume that there was wave overtopping, to destabilize the wall.[376]  None of these experts believes that surge overtopping had any impact on the failure at the North Breach.[377]  But, once again, there is no evidence to support the conclusion

---

[369] Marr 2160:1-8, 2162:6-7.

[370] Marr 2138:4-6.

[371] Marr 2093:19-25; Marr 2094:4-9.

[372] Bea 4004:1-16.

[373] Bea 4005:8-13.

[374] Marr 2124:8-11; Bea 851:22-25; Bea 1271:13-23.

[375] Silva-Tulla 3760:4-7, 18-25; Marr 1955:8-11; Dalrymple Expert Report JX 01713-0011.

[376] Marr 1889:12-22, 1889:24-1890:7, 1947:7-13, 1954:21-24, 2022:1-16.

[377] Marr 2124:8-11; Bea 851:22-25, 1271:13-23.

that there was any wave overtopping, much less sufficient wave overtopping, to create the alleged trench. That being the case, one simply must look to the foundation and below to find the cause of the North Breach.

Dr. Marr goes through great analysis to conclude that a force, presumably caused by the height of the surge, created 500,000 pounds of tension across the face of the sheet pile which is encased in concrete.[378] Dr. Marr suggests that this force was sufficient to stretch the sheet pile in place, causing it to separate at a joint, which then caused instability resulting ultimately in failure.[379] The problem with this entire theory is that Dr. Marr was not able to replicate, using any of the computer models at his disposal, the alleged 500,000 pounds of tension.[380]

Dr. Silva believes that there was a scour trench at the North Breach.[381] Silva, for reasons known only to him, needs a scour trench in order to initiate failure. If the landside levee was too low, and was the cause of failure, why does Dr. Silva insist that a scour trench initiated the failure? He does not bother to opine whether the wall fails without the scour trench or if the low landside levee elevation was a cause of the breach.

### iii.   Dr. Silva's CWALSHT Model Is Entirely Unreliable

Dr. Silva opines that there must have been a greater-than-four-foot scour trench at both breach locations because his CWALSHT model shows that the factor of safety for overturning reaches unity (below which = failure) at four feet. Because the wall fell, the scour trenches must have exceeded four feet.[382] However, Dr. Silva cut several corners to decrease the depth at which the factor of safety reaches 1. His opinion is at odds with the empirical evidence such as

---

[378] Marr 1908-09:1-10, 2102:1-6, 2103:6-22, 2105:20-25.

[379] *Id.*

[380] Marr 2106:4-19, 2108-09:20-3.

[381] Silva-Tulla 3760:1-25, 3761:12-21, 3763:6-9, 3764:1-6.

[382] JX 1680 (Silva Rep., Appx. E) at 41-42.

the fact that walls with >4-foot scour trenches survived, and all of the scour trenches behind unfailed portions of the wall (which experienced hours more overtopping) would have vastly exceeded four feet had there been four-foot trenches at the breach points at the time of failure. Dr. Silva and defense expert Dr. Marr disagree on whether overtopping played a causative role at the North Breach site.[383]   In the end, Dr. Silva's model is so flawed as to be entirely unreliable, and the cut corners suggest he was stretching to reach a result that even his own colleague, on whom he relied, does not agree with.

Dr. Silva relied on Dr. Marr's flawed scour analysis to corroborate Dr. Silva's conclusion that a >4-foot scour trench caused the wall to fail.[384]   But after witnessing the dismantling of Dr. Marr's model (which would have predicted >9-foot scour trenches by storm's end), Dr. Silva forced to disavow it, eventually claiming that one would be "dreaming" to think that Dr. Marr's scour analysis could "predict the scour trench within three and a half hours."[385]

Dr. Silva made no attempt to correlate the suggested scour trench as modeled by CWALSHT to conditions on the site, other than to verify that there was wave overtopping before the breach "that would have caused scour erosion."[386]   Dr. Silva also purported to rely upon information  provided  by Dr. Dalrymple based upon "three weeks of meetings," but Dr. Dalrymple's name does not appear anywhere in Dr. Silva's report or appendices, including in his reliance materials or his CWALSHT modeling analysis.[387]   This is true even though in response

---

[383] *Compare* Marr 2124:8-11 (overtopping did not cause North Breach) *with* Silva 3920:18-25 (four feet of overtopping scour necessary to fail the wall); JX-1672 (Silva Rep. at 53) (failure due to "loss of lateral support at the landside crest from overtopping and scour erosion").

[384] 3904:14-23.

[385] 3915:8-10.

[386] 3917:15-25.

[387] Silva 3916:12-16 (relied on Dalrymple); 3919:20-24 (same); 3921:8-20 (three weeks of work).

to a question by the Court, Dr. Silva said his work with Dr. Dalrymple occurred before Dr.

Silva's report was written.[388]  Dr. Dalrymple did not do any scour analysis himself.[389]

Most important, the model, which Dr. Silva himself described as a "simplified model" for

a very complex occurrence, suffers from several flaws that render it unreliable.[390]

## VIII.   DAMAGES

It comes as no surprise that the scope of damages in this case is as expansive as the

destruction levied upon New Orleans and the surrounding area as a result of Hurricane Katrina.

Plaintiffs and other families like them saw almost the total destruction of the area they had once

called home.[391]  With basic civil necessities inoperable for months or longer, some of the

families were unable to return and were compelled to start life anew elsewhere against their

wishes.[392]  Plaintiffs' personal residences were damaged and everything within them was

destroyed.  Plaintiffs were forced to scatter throughout the Gulf Coast, and incurred a bevy of

additional living expenses arising from the loss of use of their personal property.

### A.   <u>**Supreme Court Precedent Allows Plaintiffs To Select Their Remedies**</u>

When property is damaged through the legal fault of another, the primary objective is to

restore the property as nearly as possible to the state it was in immediately preceding the

damage." *Hornsby v. Bayou Jack Logging*, 902 So.2d 361, 365 (La. 2005) (quoting *Coleman v.*

---

[388] Silva 3765:7-10.

[389] Dalrymple 2820:23-25.

[390] Silva 3903:13.

[391] Livers 25:2-19; Holmes 230:6-11; Washington 493:1-2; Armstrong 1635:8-2; Deposition of Ethel Coates, 35:15-33:24.

[392] Livers 41-43; Holmes 266-268; Armstrong 1650, 1674:7-1675:25.

*Victor*, 326 So.2d 344, 346 (La. 1976)).  Recovery for such damages is a personal right belonging to the property owner at the time the damage occurs.[393]

When property has been destroyed, a plaintiff is presented with the choice to recover as damages the cost of restoration or replacement, or a plaintiff may elect the difference in property value before and after the damage.  *See Roman Catholic Church v. La. Gas Services Co.*, 618 So.2d 874, 879 (La. 1993); *Corbello v. Iowa Prod.*, 850 So.2d 686, 694 (La. 2003).  This approach has been applied to both immovable and movable property.  *See Fortson v. Louisiana Power & Light Co.*, 509 So.2d 743 (La. App. 3d Cir. 1987).  Of these methods, replacement cost is the proper measure of damages where (1) diminution in property value cannot be reasonably determined or (2) there is a reason personal to the homeowner for replacing/restoring the property.  *Id*. at 694.  This holds true even if the cost of restoring the property to its original condition is disproportionate to the value of the property or economically wasteful.  *Roman Catholic Church*, 618 So.2d at 879-80.[394]  As long as Plaintiffs present a personal reason for their selection, their damages election is unassailable.  *See id.* at 878 ("Reasons 'personal to the owner' frequently are pointed to as justification for allowing high damage awards, often in excess of diminution in market value….").

Most often, the "personal reasons" are simply the owners' desires to enjoy and live in their homes.  Indeed, there can be no more personal reason than the restoration of a family home. In examining whether personal reasons exist, courts have looked beyond purely personal reasons

---

[393] *Eagle Pipe and Supply, Inc. v. Amerada Hess Corp.*, 79 So.3d 246, 287 (La. 2011) (Weimer, J., dissenting.)

[394] An interesting feature of the language found in *Roman Catholic Church* that "a homeowner may still recover the cost of restoration where there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs." is the disjunctive "or" used.  *Roman Catholic Church*, 618 So.2d at 879-80.  From this language it is clear that an owner does not have to demonstrate that he will make repairs to the home.  He only needs a reason personal for electing to receive restoration costs.  Reading "reason personal to the owner for restoring the original condition" as requiring evidence that the owner will make the repairs would render the rest of the sentence superfluous.

of a plaintiff, opting to consider all of the pertinent circumstances as justification for the selection of replacement/restoration costs of the property. *See, e.g.*, *Mossy Motors v. Sewerage and Water Bd.*, 753 So.2d 269, 279 (La. App. 4 Cir. 1999) (considering plaintiffs' personal and commercial reasons for replacement costs - business was personal to the Mossy family and was not a purely commercial enterprise, business lost their grandfather status with General Motors, and Plaintiff was not a disinterested investor, but rather proprietor of a family owned business,). Moreover, the courts have avoided the mechanical application of formulae and remained firm in insisting that every award for property damage must be crafted according to the facts surrounding each case. *See BellSouth Telecomms., Inc. v. Citizens Utils. Co.*, 962 F.Supp. 79, 81 (E.D. La. 1996); *see Roman Catholic Church,* 618 So.2d at 876; *Coleman v. Victor*, 326 So.2d 344 (La. 1976).[395]

As Louisiana jurisprudence makes clear, a property owner who incurs damage to his property as the result of the fault of another is entitled to an election of remedies.  *Corbello*, 850 So.2d at 694.  The plaintiffs here have elected to receive damages based on the cost of restoring/replacing their property.  In addition to their properties being their primary residence, which is a sufficiently personal reason to justify election of restoration/replacement costs, all of the Plaintiffs had additional, compelling ties to their properties.  These reasons protect Plaintiffs

---

[395] Awards in excess of market value have been sustained for reasons "personal to [the] owner," such as a home inhabited by a couple for thirty years, *Mayer v. McNair Transport*, 384 So.2d 525 (La. App. 2d Cir.1980), special appearance of entertainment equipment, *Fortson v. Louisiana Power & Light Co.*, 509 So.2d 743 (La. App. 3d Cir.1987), research records with no market value but intrinsic value to the owner, *Emerson v. Empire Fire and Marine Ins. Co.*, 393 So.2d 691 (La. 1981) or unique historical, architectural, and esthetic value of personal property. *Hayward v. Carraway*, 180 So.2d 758 (La. App. 1st Cir. 1965).  Courts, moreover, have recognized a plaintiff's right to the restoration/replacement value of the damaged property for "personal reasons" where the plaintiff is prevented from restoring the property.  *See also Grefer v. Alpha Technical*, 901 So.2d 1117 (La. App. 4th Cir. 2005) (considering plaintiffs' "personal and economic reasons" for restoration costs - plaintiff and his siblings wanted to restore the contaminated family property, was unable to sell or lease the contaminated property without exposing themselves to liability, , and was concerned about the effects the radioactive contamination might have on the neighbors and the general public); *Roman Catholic Church*, 618 So.2d 874, 879-80 (personal interest in providing low-income housing).

damages selection.[396]  Therefore, replacement or restoration cost is the only proper measure of damages to fairly compensate the Plaintiffs.[397]

### B.   The Plaintiffs' Testimony Establishes Their Personal Connection To Their Properties

Each of the Plaintiffs evacuated from the storm and each returned to find that their residences and contents were totally destroyed by the flooding caused by the Defendants' negligence.  Further, they found that the surrounding community was damaged so badly that return to the area, at least for the foreseeable future, was unavailable.  This was true even for those Plaintiffs who were able to return to their properties at a later time.

"Justice, reason, and the principle of full reparation of La. C.C. art. 2315 require that, where an individual's property is damaged unlawfully by a tortfeasor for no good reason, the owner be compensated at least as fully as when his property is damaged by the state for a public purpose."  *Roman Catholic Church*, 618 So.2d at 876.  As such, each Plaintiff is entitled to an award of damages for the damage to their respective properties.  The value of these damages was provided to this Court through the Plaintiffs' testimony and the testimony and reports of Plaintiffs' experts, John Crawford, PE and adjuster Scott Taylor.

### i.   Armstrongs' Testimony

Kenny and Jeanine Armstrong grew up in St. Bernard Parish.[398]  Kenny and Jeanine were high school sweethearts who married shortly thereafter.[399]  The Armstrong's purchased their

---

[396] *Roman Catholic Church*, 618 So.2d at 879-80; *see also Banks v. New Orleans City*, 620 F.Supp.2d 741 (E.D. La. 2009).

[397] Plaintiffs' Motion *in Limine* to Exclude Evidence of Diminution of Value as a Measure of Damages applies only to the Armstrong, Holmes and Livers properties (*see* Doc. 20955 and Doc. 21021).

[398] K. Armstrong 1619:14 - 1620:11, J. Armstrong 514:3-14.

[399] K. Armstrong 1621:14-1633:3.

home at 4016 Hamlet Place in Chalmette in 1985[400] and raised three children in the house on Hamlet Place about four doors down from the home in which Jeanine grew up.[401]  Kenny and Jeanine were part of a close-knit community of family and friends. Kenny's mom lived two blocks over from him; his mother-in-law lived five houses away; his brother four miles away from him.  In fact, all of his friends and family members lived within about a five-mile area in Chalmette.[402]  The Armstrongs had every intention of retiring at the home on Hamlet Place to live out their golden years.[403]

In August of 2005, the Armstrong's had less than two years of mortgage payments left when the storm hit.[404]  Kenny was unable to return to his home until after Hurricane Katrina due to water remaining in the Hamlet home.  When the water finally receded, over a foot and a half of mud remained in the house.[405]

The flood devastated the Armstrongs.  When they evacuated, the family left 99 percent of their worldly possessions.  Jeanine left her engagement ring.  All mementos, keepsakes, pictures of their children, and other things of sentimental value, many of which can never be replaced were lost to the flood.  Nothing was salvageable.[406]  The home in which they lived and the community surrounding it were completely destroyed.  Jeanine lost her job at Chalmette Medical due to the closure of the hospital subsequent to Katrina.  Unable to return to their home or neighborhood, the couple purchased a fully furnished apartment in Baton Rouge and lived there for approximately one year, then moved to Covington.  Kenny was able to keep his job with

---

[400] K. Armstrong 1622:24-25, 1623:1-2.

[401] J. Armstrong 514:3-18.

[402] K. Armstrong 1622:22-1624:10.

[403] J. Armstrong 518:19-520:24.

[404] K. Armstrong 1623:17-19.

[405] K. Armstrong 1626:12-21, 1635:2-5.

[406] K. Armstrong 1635:8-23, J. Armstrong 526:12-528:8.

Budweiser but was forced to commute an hour and a half to get to his territory everyday—a territory that was right out the first street of his neighborhood before the storm—causing him to incur higher gas bills and prolonging his days due to the new commute.[407]

The Armstrongs since have been able to move back to a permanent residence in St. Bernard Parish where they now live, but they were not financially able to move back to their property on Hamlet in the aftermath of Katrina.[408]

### ii.  **Holmes' Testimony**

Fred Holmes was born and raised in St. Bernard Parish.  All of his friends and most of his family resided in St. Bernard.  He attended Chalmette High School and went to church in St. Bernard Parish, as well.  While at Chalmette High School he met the love of his life, Jeneen, whom he would later marry.[409]  The two lived in a few apartments and rental homes but knew they wanted a home they could call their own, and in 2003 the Holmes purchased their first home at 1205 Perrin Drive in Arabi.[410]  The Holmes were very proud to be first-time homeowners and excited as well because the house on Perrin was their dream.  Shortly after purchasing the home they stocked it with all new furniture befitting of their new beginning as homeowners.  In the year or so after purchasing the house the Holmes also made some improvements to the home.[411]

In short, this was a very exciting time for the couple; they were in the community they knew and loved with friends and family all around and in a home of their own where they planned to spend the next thirty years.[412]

---

[407] K. Armstrong 1638:4-14.

[408] K. Armstrong 1674:7-1675:25, J. Armstrong 526:12-528:8.

[409] Holmes 217:19-218:6.

[410] *Id.* at 217:11-218:25.

[411] *Id.* at 221:6-12.

[412] *Id.* at 223:1-23.

On the Wednesday before the storm, Fred and his wife made plans to evacuate.  The Holmes had pets, and the most difficult task at that time was finding lodging that accepted pets.  Unfortunately, the closest place available that would accept pets was in North Houston.  It was this twist of fate that landed the couple in their future home, a place they never thought they would end up.[413]

It was not until October 2005 that Fred was finally able to return to St. Bernard to inspect his house.  Although he was under no illusions of what had happened to his home and community, nothing could prepare him for what he saw.  It appeared as though a bomb went off inside the house.  The ceiling was on the ground overlaying everything.  The Holmes had lost all the furniture, the wedding dress, everything was lost.[414]  When Mr. Holmes returned to Houston to report back to his wife on what he had seen he could not put it into words; all he could do was cry.[415]

Over the course of the four months following Katrina, the Holmes were forced to live in a hotel.  Shortly thereafter Catholic Charities allowed the couple to live in a home in Greenbriar, Texas.  With the help of family and friends, Fannie Mae and Catholic Charities, they were later able to purchase that home.  Without the special lease-to-own program offered, the Holmes' would not have been able to make the purchase in January of 2007.[416]

It was the intention of the couple to return to St. Bernard Parish.  They were on several waiting lists for a FEMA trailer both through their property and their employment.  Unfortunately, during the time period between the flood and January of 2007, the Holmes

---

[413] *Id.* at 225:12-20.

[414] *Id.* at 229:3-230:25.

[415] *Id.* at 233:1-4.

[416] *Id.* at 234:22-235:13.

suffered through a string of unfortunate events that forced their hand to start anew in Texas; both Fred and his wife were furloughed from their respective employment and were removed from the employment waiting lists.  The FEMA trailer they were to get for their individual property never panned out either.[417]  In addition, the Holmes learned that their mortgage company did not provide the right amount of flood insurance due to error regarding flood elevation.[418]  The flood elevation error caused a severe short fall regarding their policy limits both for structure and contents.[419]  Around this same time Mrs. Holmes developed health issues.  With Mrs. Holmes' new health issues and no ability to obtain gainful employment in their lifelong hometown, the Holmes were prevented from returning to Arabi.[420]

### iii.  **Washington's Testimony**

Clifford Washington, Sr. was a lifelong resident of the Lower 9th Ward.  At the time of Katrina he owned the home located at 1910 Carbonnet Street.[421]  The Washington home on Charbonnet was catastrophically damaged due to the flood waters that rose over the rooftop and it was moved off its kettles.  Mr. Washington had to tear the home down and rebuild. Unfortunately, the money he received from his insurance and the Road Home program was not enough to rebuild.[422]

### iv.  **Livers' Testimony**

Plaintiff Alvin Livers and his wife Barbara had been married for approximately 45 years when Katrina hit.  Alvin had lived his entire life in the Lower 9th Ward, and, in 1971, he and his

---

[417] *Id.* at 236:1-17.

[418] *Id.* at 237:17-238:3.

[419] *Id.* at 237:13-238:11.

[420] *Id.* at 267:22-268:11.

[421] Washington 492:3-5.

[422] Washington 492-17-25, the statement by Mr. Washington "moved off its kettles," was corroborated by John Crawford who stated in his report that "the home appeared to be laterally shifted on its piers" Crawford 1482:2-8.

wife purchased their home at 4924 St. Claude Avenue.[423]  It was the first house they had ever owned in a community they knew and loved.  They were living the American dream.[424]

The Livers raised their three children in their home and were heavily involved in the community.  Alvin's entire family lived in and around the area; the church the Livers attended was in walking distance as were the children's schools.[425]  During the time that they lived at the St. Claude home the Livers made numerous improvements to their home, including but not limited to central air and heat, custom cabinets and a second floor addition often called a camelback.[426]  Mr. Livers worked hard to make payments on his mortgage and after thirty years was able to pay off the note in full.[427]

When Katrina made landfall, the Livers had evacuated to Baton Rouge and were staying with relatives.  While there, they helped pay for groceries and other bills and incurred expenses for themselves as well because they had brought little with them but what they were wearing.  They had expected to return after the storm had passed.[428]

When they learned of the fate of their home and community the Livers were devastated.  Mr. Livers was not able to return to his home until weeks after the storm.  He cried when he first saw his home and the damage done.  Everything was destroyed.  Mr. Livers stated during live testimony when asked if he was prepared for what he saw:

A. no

Q. why

---

[423] Livers 19:10-13, 40:16-18, 24:5-7.

[424] *Id.* at 28:9-13.

[425] *Id.* at 28:9-23, 39:1-16.

[426] *Id.* at 24:15-25.

[427] *Id.* at 38:9-21.

[428] *Id.* at 35:1-16.

A.      I tell you why.  Because it took me 30 years to pay for that house. I work hard.  I had odd jobs that I work in the shipyard.  It wasn't steady, but I hung in there. And when I really seen my house, my whole – the whole dream I had looked like it just went up in smokes.[429]

In the months following the storm the Livers moved from place to place.  During this time he was paying rent and other living expenses.  This was a heavy burden for a man who was retired.[430]

The Livers had every intention of moving back to their St. Claude home.  Mr. Livers started by cleaning out the entire home.  He then went back and obtained a permit and began restoration of the home.  He gutted the house and had the studs cleaned or replaced.  He also replaced the wiring.  Unfortunately, the wiring and other materials were repeatedly stolen from his house.  This was due to the lack of basic civil services, including any meaningful police presence in the area.[431]

Although they wanted to return to the area, the Livers did not have a choice.  The area lacked the basic necessities they needed for survival: grocery stores, gas stations, medical facilities, and police.[432]  Furthermore, the Livers felt the effects of an increased criminal presence.[433]  The neighborhood and surrounding community were not the same after the flood.[434]

###      v.   Coates' Testimony

Ms. Coates and her husband purchased their home located at 1020 Charbonnet Street, New Orleans, Louisiana in 1994.[435]  The home was located about six blocks from the Industrial

---

[429] Livers 25:2-19, 38:12-17.

[430] Livers 35:2-36:12.

[431] *Id.* at 42:4-43:24.

[432] *Id.*

[433] *Id.* at 41:20-42:9.

[434] *Id.* at 62:20-25.

[435] Joanen (summary of deposition testimony of Ethel Coates) 1712:1-20.

Canal. Ms. Coates and many of her family members evacuated to Hammond, Louisiana, prior to Hurricane Katrina's landfall, bringing with them only two or three days' worth of clothing.[436] Prior to Hurricane Katrina, Mrs. Coats had completed several improvements to her home, including connecting the two sides of the double, turning it into a single home, doubling the size of the living room and kitchen, as well as renovating the bathrooms, bedrooms and exterior.[437]. She also added a structure onto the back of the home.[438] Ms. Coats was able to return to her home for the first time after the storm in May of 2006. She found everything in her home had been ruined, and she was unable to save anything, including her most treasured, irreplaceable family mementos.[439]

After Katrina, Ethel was in a state of complete disarray. She moved four times in the four months after the storm, finally landing at her sister's house for the second time.[440] During that time she had to hire someone to clean out her house.[441] In the years that followed, she had the home completely gutted and repaired.[442] After this experience Ms. Coats began to suffer substantial physical and psychological effects.[443]

### C. The Plaintiffs' Experts Adequately Established Their Damages

Plaintiffs retained the services of John Crawford, PE and Scott Taylor, an adjuster licensed within the State of Louisiana, to assess flood damage incurred to the their properties;[444]

---

[436] *Id.*

[437] *Id.*

[438] JX 1460 (Coats Deposition) at 98:14-23.

[439] Joanen (summary of deposition testimony of Ethel Coates) 1712:1-20.

[440] JX 1460 (Coats Deposition) at 34-37.

[441] *Id*. at 43:15-24.

[442] *Id.* at 72:22-73:1.

[443] Joanen (summary of deposition testimony of Ethel Coats) 1712:1-20.

[444] *In re Katrina Canal Breaches Litigation,* 647 F. Supp. 2d 644 (E.D. La. 2009).

both having extensive experience in assessing flood damaged homes (particularly Katrina-related flood damage) and both having testified in this Court during the *Robinson* trial.[445]  These experts were able to quantify the damage to Plaintiffs' properties caused by flood waters and testified before this Court regarding their findings.

As a professional engineer, Mr. Crawford was asked to assess flood damages from an engineer's perspective.  This required review of numerous materials, as well as reliance on his own working knowledge and experience in the St. Bernard Polder.[446]  The work included inspection of each of the properties where he canvassed the area for any forensic evidence that would help him discern how high water got into these residences.[447]  After finding the highest standing water mark, he then compared these high water marks (also known as stagnating or standing water lines) with hydrographs from Dr. Vriiling's hydrology report.[448]

Mr. Crawford's general opinions regarding all properties were the following:

- Floodwater heights rose well above the foundations in each of the Plaintiffs' properties;

- Floodwater stagnated within each residence for a long period of time, up to (10) days.  The water stagnation coupled with the prolonged loss of electricity in a closed environment exacerbated flood related damages; and

- Floodwater caused extensive damages to the interior and exterior finishes of Plaintiffs' homes.[449]

This general opinion was corroborated by the Plaintiffs' expert adjuster, Scott Taylor, who was tasked with the actual quantification of damages to the Plaintiffs' structures and contents, and to compute additional living expenses.  Mr. Taylor testified that in formulating his

---

[445] *Id.*

[446] D-Crawford 2-5.

[447] Crawford 1463:22-1464:2.

[448] Crawford 1474:17-22.

[449] D-Crawford 4.

opinions, his general methodology was two-fold:  There is the scoping segment, which is the

compilation of all the damages, and there is the estimating segment, which is calculating the

damages of the compilation[450]  In reference to the scoping segment, Mr. Taylor stated the

following:

> It is a five-point scope sequence that I use on each of them anywhere. Along the line that I can use the same scope, I always do. And it involves . . . a process that starts with getting a general perspective of the layout of the place. It means having eyes-on if at all possible. So the idea is that you're there with your eyes on, look at it, get a perspective of what it is, and again, to sketch it out or diagram it, and get a general perspective of how high things were, how high ceilings are, how wide rooms are, that kind of thing.
>
> Get a layout. Get a visual perspective as much as you can.  At that point then you go back in and -- with your sketch and your diagrams, then you begin to measure things, dimension them, find out what the precise numbers are, count things if it's a matter of counting. You determine the amount of things at that point by dimensioning everything properly.
>
> After that, I document the damages and determine what is wrong with it, what is happening here, what do I see, what do I observe, and document everything I can. The next point is that I will then determine the protocol for which it's to be restored. So should it be repaired? Should it be replaced? Should it be refinished? Should it be cleaned? Should something else happen in order to put it back whole?  And the last thing I do is, then I take that information, and then I use that to determine what photographs are necessary to corroborate that, that scope.[451]

### i.  **Flood Damage Factors**

Both John Crawford and Scott Taylor testified regarding the factors that were of great

importance when assessing flood damage in homes: height of the water and duration of the

flooding.[452]  Mr. Crawford testified that water height was important in determining what

materials were initially affected and/or saturated.[453]  Mr. Crawford testified that there were two

---

[450] Taylor 1507:22-1508:1.

[451] Taylor 1508:4-1509:6.  The Court will recall defense damages expert J.P. Duplessis did not perform a true scoping segment in his quantification of the damages.  The scope was provided for him.

[452] D-Crawford-7, Taylor 1516:1-15:1517:15.

[453] Crawford 1467:6-11.

components to duration; the length of time standing water was in the homes and the amount of time between the saturation of the materials and mitigation of the damages.[454]  Scott Taylor concurred in his testimony, stating "the fact that the water had stayed so long made the damage even worse….  That the homes had been shut up for so long after the water was gone created further damage….  Because until mitigation takes place inside a home, the damages continue to increase."[455]

The evidence presented to this Court was clear regarding these flood factors:

1.     Plaintiffs' homes were subject to high waters above floor;[456]

2.     Plaintiffs' homes had prolonged contact with these flood waters (*i.e.*, standing water in the homes);[457] and

3.     It was months before Plaintiffs were able to begin mitigation processes, if ever.[458]

**D.  <u>Plaintiffs' Experts Adequately Eliminated Any Other Sources For Their Damages</u>**

**i.  <u>Plaintiffs' Damages Were Not Caused By Wind or Rain</u>**

The source of damage caused to Plaintiffs' property has been heavily debated throughout this litigation the subject matter of which is an obvious catastrophic flooding event.  Throughout the trial, the defense made reference time and time again to insurance adjusters' opinions, contractors' opinions, as well as money paid to Plaintiffs' in out-of-court settlement agreements. Many of these documents and/or opinions were for what was alleged to be wind and rain damage.  Much of this evidence is in direct contradiction to this Court's order on the *motions in*

---

[454] Crawford 1467:15-20.

[455] Taylor 1517:20-1518:3.

[456] PX 4671-0004-0008 (Vriling Hydrographs).

[457] D-Crawford-8, D-Crawford-9.

[458] *See* Plaintiffs' testimony, *supra*.

*limine* regarding insurance documents and other legal proceedings.[459]  To the extent that some of these documents found their way into evidence that are in direct contradiction to this Court's order, little or no value should be given as to the issue of wind and rain as opposed to flood damage.  At trial, Plaintiffs' experts testified as to the full extent of what they considered to be flood damage to Plaintiffs' property, and that is all that Plaintiffs wish to recover.

Furthermore, the record is clear that Hurricane Katrina, as a rain event, did not produce the amount of rain requisite to cause the catastrophic flooding at issue.  Specifically, the St. Bernard Parish Public Works Department, through its designated representatives Hillary Nunez, Jr., Terri Doskey, and Louis Pomes, testified to this fact. As Nunez stated, even if the pumping stations had lost power at 4:00 a.m. without the influx of water caused by the multiple failures in the levee system, there would not have been substantial flooding due to rain alone.[460]  Hurricane Katrina simply did not produce the amounts of rainfall to be considered a "big rain event."[461] Doskey testified that there was not even enough rain to cover the sidewalks at his observation site.[462]  Therefore, the St. Bernard Polder would not have flooded simply due to the rainfall produced by Hurricane Katrina had the flood protection structures remained intact.

### ii.  Plaintiffs' Experts Have Established That Their Damages Would Have Remained Unchanged With The Exclusion Of Any Sources For Flooding Other Than The IHNC Waters

Another contested issue involves the source of the flood waters that inundated and destroyed Plaintiffs' homes.  Damages experts in this matter were to use hypothetical modeling scenarios concerning different sources of water as modeled by Dr. Johannes Vrijling.  Plaintiffs' engineering expert John Crawford used the hydrographs from Dr. Vriling's report to extrapolate

---

[459] Duval Order and Reasons dated 09/04/2012 (Doc. No. 21021).

[460] PX 4680 (Deposition Designations of the St. Bernard Parish Public Works) 25:02-16.

[461] *Id*. at 8:21-22; 9:13-14; 25:21-27:08; 43:11-23; 38:20-25.

[462] *Id*. at 93:5-22.

maximum water heights above floor in each of the Plaintiffs' residences.[463]  Mr. Crawford then conferred with Scott Taylor regarding the different modeling scenarios and water heights in an effort to create an accurate cost estimate for an IHNC-only scenario.[464]  Mr. Taylor testified that the IHNC-only scenario would have little or no change on his opinion of the damages[465] as more specifically set out in the section dealing with specialized damages below.

### E.  Plaintiffs' Experts Adequately Calculated Their Damages

#### i.  Armstrong

#### 1.  Structure

Mr. Taylor testified that on inspection of the home he realized that there was water that had reached well into the attic; that the water was in the house for a prolonged duration; and that the homeowners were not able to mitigate for months.  This led Mr. Taylor to conclude that the complete demolition and reconstruction of the house was necessary.[466]  Scott Taylor calculated damages to the Armstrong home of $194,407.31.[467]  (Mr. Taylor believed that the damages associated with the IHNC-only scenario were unchanged due to the water height and duration factors.)[468]

#### 2.  Contents

Mr. Taylor opined that the Armstrongs' contents were a total loss.  Mr. Taylor calculated content damages of $181,498.40.[469]

---

[463] Crawford 1473:14-21.

[464] *Id.* at 1487:1-13.

[465] Taylor 1439:4-8.

[466] Taylor 1520:20-1521:2.

[467] D-Taylor 1.

[468] Taylor 1536:1-10.

[469] D-Taylor 1.

### ii.  **Holmes**

#### 1.  **Structure**

Mr. Taylor's inspection of the Holmes' property was much like the Armstrongs'.  The amount of water in the house and the duration it remained there made it very obvious that it needed to be replaced.  Therefore, Mr. Taylor recommended a teardown and reconstruction.[470] Mr Taylor calculated damages to the Holmes' home of $180,761.23[471]  (Mr. Taylor believed that the damages associated with the IHNC-only scenario were unchanged due to the water height IHNC-only and duration factors.)[472]

#### 2.  **Contents**

Mr. Taylor was given photographs and a contents list from Mr. Holmes.  Mr. Taylor opined that the Holmes' contents were a total loss.  Mr. Taylor calculated content damages of $171,893.00.[473]

### iii.  **Washington**

#### 1.  **Structure**

Mr. Taylor reviewed photographs of the Washington property and spoke to both Mr. Washington and Mr. Crawford.  It was his opinion that the Washington property had shifted on its piers thereby rendering it an unsafe and unstable structure.  Mr. Taylor's recommendation was demolition and rebuilding.[474]  Mr. Taylor calculated damages to the Washington home of $110,009.59.[475]

---

[470] Taylor 1626:6-15.

[471] D-Taylor 1.

[472] Taylor 1536:1-10.

[473] D-Taylor 1.

[474] Taylor 1529:4-16.

[475] D-Taylor 1.

Mr. Taylor believed that the damages associated with the IHNC-only scenario would be no different due to the fact that it moved on its piers.  Mr. Taylor stated that the initial onslaught of water, the source of which was the IHNC, is what caused the movement off the piers.[476]  Mr. Crawford shared this opinion and opined that, in an IHNC-only scenario, the structure was still damaged to the point of needing complete demolition.[477]

### iv.  Livers

#### 1.  Structure

Mr. Taylor testified that, based on the evidence, the flood waters would not have reached into the second floor of the Livers home.  Because he could not confirm that the attic and second floor had mold or other issues, it was his opinion that a restoration of the home was more prudent.[478]  Mr. Taylor calculated damages to the Livers' home of $163,870.30.[479]  (Mr. Taylor believed that the damages associated with the IHNC-only scenario were unchanged due to the water height and duration factors.)[480]

#### 2.  Contents

Mr. Taylor was given a contents list from the Livers.  Based on that contents list and photographs, Mr. Taylor calculated the Livers' contents damages to be $77,500.00.[481]

---

[476] Taylor 1536:7-25.

[477] D-Crawford 24.

[478] Taylor 1530:4-15.

[479] D-Taylor 1.

[480] Taylor 1539:4-8.

[481] Taylor 1532:20-22.

### v. <u>Coats</u>

#### 1. **Structure**

Mr. Taylor testified that, based on the evidence, the Coats property needed to be reconstructed.  It was his opinion that the home was still in serious distress.  There were warped floor boards and extensive mold damage due to the duration of the water in the house.  The mold had infused in the attic compromising the sheathing.  The chimneys were compromised as well causing the need for a rebuild from the ground up.[482]  Mr. Taylor calculated damages to the Coats' home of:  $211,813.36.[483]  (Mr. Taylor believed that the damages associated with the IHNC-only scenario were unchanged due to duration both of the standing water in the house an the length of time prior to ability to mitigate.)[484]

#### 2. **Contents**

Mr. Taylor was given a contents list through counsel.  Based on that contents list Mr. Taylor found that the Coats contents damages were $214,119.72.[485]

### F. <u>Plaintiffs Established Damages For Additional Living Expenses, Loss Of Use, And Inconvenience</u>

One of the most conspicuous and lasting effects of the flooding caused by Defendants' negligence was the forced dislocation of many of the area's residents.  Plainitffs in this case suffered from such forced dislocation and have a right to recover their damages.

### i. <u>Plaintiffs Suffered Additional Living Expenses/ Loss of Use Damages</u>

In addition to those damages discussed above, a necessary result of Plaintiffs' displacement from their homes was an increase in their living expenses over and above those

---

[482] Taylor 1537:13-1539:2.

[483] D-Taylor 1.

[484] Taylor 1539:4-8.

[485] D-Taylor 1.

usually and customarily incurred prior to the event, *i.e.*, the increased expenses they were forced to incur due to the loss of use of their primary residence.  Awards for such damages, commonly referred to as "Additional Living Expenses" ("ALE"), are regularly awarded where plaintiffs were displaced from their homes.  *See Wegener v. Lafayette Ins. Co.*, 60 So. 3d 1220, 1225 (La. 2011), *reh'g denied* (May 6, 2011) (additional living expenses (loss of use) in the amount of $45,800 to family who were displaced from their home in New Orleans as a result of Hurricane Katrina); *Clifton v. Louisiana Farm Bureau Cas. Ins. Co.*, 510 So.2d 759 (La. App. 1 Cir. 1987); *Young v. State Farm Fire & Cas. Ins. Co.*, 426 So.2d 636 (La. App. 1 Cir. 1982).  These damages are designed to account for expenses such as, for example, the increased cost of doing laundry outside of the home,[486]  clothes and additional gasoline.[487]

At trial, Plaintiffs' expert Scott Taylor provided comprehensive estimates of the additional living expenses damages incurred by each Plaintiff. Mr. Taylor testified that the losses were as follows:

- $38,881.46 for the Armstrongs;[488]

- $36,152.25 for the Holmes;[489]

- $33,164.96 for the Livers;[490]

- $43,599.96 for the Coats.[491]

---

[486] *Id.* at 1524:15-16.

[487] Schneider 3619:16-18, in response to questioning by the Court.

[488] *Id.* at 1523:16-17.

[489] *Id.* at 1528:13-17.

[490] *Id.* at 1532:3-4.

[491] *Id.* at 1535:1.

Mr. Taylor relied on powerful software known as "Xactimate," which is "gold standard among insurance companies."[492]  When asked why he did not rely solely on receipts for his calculations, Mr. Taylor drew the Court's attention to a simple fact of the Plaintiffs' situations:

> Well, because in a catastrophic situation such as this, people have lost all their means of even compiling things, and they come back and they're missing half of the things that they would have used to help them in that instance. They're in a transitory situation in which they're constantly having -- things that they spend and don't even realize that those are additional living expenses, they don't keep receipts.
>
> And for them to be able to come up with all the receipts for two years of living or however long it took for them to get back into their home is a monumental task, and they're very rarely able to come up with all the receipts that it would take to substantiate each and every item. One example might be laundry.  People do laundry at home normally.
>
> But they spend money on laundry when they're out of home. Then don't think of that as an additional living expense in general. So they don't save laundromat receipts, and they don't save dry cleaning receipts and that kind of thing. It just becomes an impossibility.  And when you're going this far after the fact of them digging up all those receipts becomes almost impossible.[493]

Even though the Plaintiffs were unable to present extensive records of their ALE damages, Mr. Taylor was able to ascertain them by using Xactimate and an industry-standard twenty-percent factor.[494]  Mr. Taylor's approach was accepted by this Court in another case in which he testified:  *In re Katrina Canal Breaches Litig.*, 647 F.Supp.2d 644, 735 (E.D. La. 2009) (noting that "such an approach has been judicially sanctioned.  *Pete v. Trent*, 583 So.2d 574 (La. App. 3d Cir. 1991)").  WGI offered its own ALE estimates through Karl Schneider, but his estimates were diminutive in comparison and contrary to the bulk of the evidence.  Ignoring the simple reality of the catastrophic situation which Mr. Taylor described, Schneider admitted that he could think of only one instance where he charted an additional living expense without a

---

[492] *Id.* at 1511:9-15.

[493] *Id.* at 1524:3-14.

[494] *Id.* at 1523:15-25.

receipt to show it was incurred.[495]  Providing receipts is not the legal standard of proof for ALE

damages.  Therefore, his calculations grossly undervalue the actual amounts which Plaintiffs are

entitled to receive for ALE damages.

### ii.  Plaintiffs Suffered Hardship and Inconvenience Damages

Included in the broad array of damages contemplated under the Louisiana Civil Code

Article 2315 are damages for mental anguish, aggravation, distress and *inconvenience*.  *See* La.

Civ. Code art. 2315; *Meador v. Toyota of Jefferson, Inc.*, 332 So.2d 433 (La. 1976); *Pike v.

Stephens Imports, Inc.*, 448 So.2d 738 (La. App. 4th Cir. 1984).  In awarding damages for

inconvenience and loss of use, the trial court has broad discretion. *Alexander v. Qwik Change

Car Center, Inc.*, 352 So.2d 188 (La. 1977); *Nolan v. Liuzza*, 301 So.2d 892 (La. App. 4th Cir.

1974).

In addition to the damages to their dwellings and contents, Plaintiffs suffered

unimaginable hardship and inconvenience in the time period following the storm.  From the

moment they evacuated to the time they learned of the destruction of their respective homes and

possessions, as well as the long months that followed, Plaintiffs were essentially nomadic,

moving between hotels and family homes for months,[496] until they were able to find more

permanent solutions.

Although Louisiana case law has not so far dealt with the kind of catastrophic

consequences as the case at bar, it nonetheless provides helpful guidance as to the value which

should be placed on this type of loss.  Therefore, while cases like *Collins v. City of Shreveport*,

799 So.2d 630 (La. App. 2d Cir. 2001), where the trial court awarded plaintiffs $7,500 in

damages for inconvenience due to flooding caused by city drainage system which ruined the

---

[495] Schneider 3636:19-21.

[496] Livers 35:3-5, 20-25; Holmes 226:16-22; Armstrong 523:11-13; 529:14-15.

carpet and damaged some furniture, are no measure for the size of the damages necessary here to make Plaintiffs whole, the legal concepts are basically the same.  Other cases from around the country provide better guidance on the size and types of damages required here.  For example, in *Truelock v. City of Del City*, 967 P.2d 1183, 1191 (Okla. 1998), the plaintiffs' home was damaged on several occasions by a few inches of floodwater.  Although the home was not completely destroyed, as is the case for many of the plaintiffs here, it was rendered uninhabitable for a period of time.  *Id*.  The jury award $42,800.00 for inconvenience, annoyance, and discomfort in action against the government for flooding to the home.  *Id*.

Each of the Plaintiffs was forced to evacuate from the storm and each returned to find that their residences and contents were totally destroyed by the flooding caused by the Defendants' negligence.  Further, they found that the surrounding community was damaged so badly that return to the area, at least for the foreseeable future, was impossible.  Plaintiffs, of course, also were forced to spend months away, in hotels and other places, before they could take up a normal residence elsewhere.  Defendants' failures, as categorized above, caused the catastrophic flooding of the St. Bernard Parish and the ultimate damage to the Plaintiffs' property.  In addition, these acts and omissions caused Plaintiffs and the other citizens of this area untold hardship and inconvenience as they tried to put the shards of their existence back together into some sort of a mosaic resembling their former lives.  In recognition of their hardship and in an effort to make them whole, Plaintiffs are entitled to a significant award of no less than what the court awarded in *Truelock*.

## IX.    CONCLUSION

Plaintiffs have proven that the negligent failure of WGI and the Corps to perform the required geotechnical analyses on their remediation and excavation activities at Boland and

Saucer Marine, coupled with their negligent failure to properly backfill and compact those

excavations, were a substantial factor in causing the North and South Breaches along the IHNC.

Due to these negligent failures, Plaintiffs suffered considerable damages for which these

Defendants must be held liable.

Dated:  December 12, 2012

**Respectfully Submitted,**
**PLAINTIFFS LIAISON COUNSEL**

_____/s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
Bruno & Bruno, LLP
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

**MR-GO PLAINTIFFS SUB GROUP LITIGATION**
**COMMITTEE**

Jonathan Andry (The Andry Law Group, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served upon all counsel of

record by ECF on December 12, 2012.

/s/ Joseph M. Bruno